# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ENERGY FUTURE HOLDINGS CORP., *et al.*, | ) | Case No. 14-10979 (CSS) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | Docket Ref. Nos. 3593, 3603, 3605 |

## OMNIBUS OBJECTION OF THE AD HOC COMMITTEE OF
## TCEH FIRST LIEN CREDITORS TO STANDING MOTIONS

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................1

BACKGROUND ........................................................................................9

    A.    The 2007 Acquisition ...........................................................9

    B.    The TCEH Debtors Thrived in the Months after the 2007 Acquisition.........................................................................11

    C.    Issuance of the TCEH Unsecured Notes .............................13

    D.    The TCEH Debtors Hedged a Significant Portion of Their Natural Gas Exposure Through 2013 .................................15

    E.    Unforeseeable Events in Mid-2008 Derailed the TCEH Debtors' Financial Prospects ...............................................16

    F.    2011 Amend and Extend Transactions ...............................17

    G.    2013 Amend and Extend Transaction..................................18

    H.    Restructuring Negotiations and the Filing of These Chapter 11 Cases ................................................................19

OBJECTION..............................................................................................19

    I.    THE 2007 ACQUISITION (COUNT I).......................................21

        A.    Constructive Fraudulent Conveyance Claims Relating to the 2007 Acquisition Are Time-Barred......................................22

            i.    The IRS Is Not a Viable "Triggering Creditor".......................23

            ii.    The TCEH Junior Creditors Cannot Invoke the IRS's Sovereign Immunity from a State Statute of Limitations................................................................24

        B.    The 2007 Acquisition Did Not Render the TCEH Debtors Insolvent ...........................................................................32

        C.    The TCEH Debtors Received Reasonably Equivalent Value.............43

        D.    Section 546(e) of the Bankruptcy Code Protects the Liens Securing the Senior Secured Facilities and Obligations Incurred in Connection Therewith from Avoidance...........................45

            i.    Citibank is a Financial Participant..........................................46

            ii.    The Liens and Security Interests Incurred under the Senior Secured Facilities Were Transfers Made in Connection with a Securities Contract ....................................46

i

**Page**

II.    THE 2011 AMEND AND EXTEND TRANSACTIONS (COUNTS II-III)..48

    A.    The TCEH Debtors Received Reasonably Equivalent Value in Connection with the 2011 Amend and Extend Transactions...............49

        i.    The TCEH Debtors Received Reasonably Equivalent Value in Connection with the Maturity Extension and the Maintenance Covenant Amendment...................................................................................49

        ii.    The TCEH Debtors Received Reasonably Equivalent Value in Connection with the Bank Debt Repayment and the Incurrence of the First Lien Notes.......................................................................................54

    B.    The Safe Harbors Require Dismissal of the Claims Arising out of the Bank Debt Repayment and the Issuance of the First Lien Notes.....................................................................................56

III.    THE TCEH JUNIOR CREDITORS' OTHER CLAIMS ARE NOT COLORABLE ...........................................................................57

    A.    The Complaint Fails to State a Claim for Equitable Subordination (Count VIII) ...................................................57

    B.    The Complaint Fails to State Valid Preference Claims (Counts XI-XII)..............................................................................59

    C.    The TCEH First Lien Creditors' "Collateral" Includes Securities and Cash in Any Deposit Account to the Extent that Such Cash Constitutes "Proceeds" of Collateral (Count XV).............61

    D.    The TCEH First Lien Creditors' Collateral Includes Certain Tax Attributes (Count XVII) .............................................63

    E.    The TCEH Junior Creditors' Other Claims Are Either Not Subject to the TCEH Debtors' Stipulations in the Cash Collateral Order or Are Premature Confirmation Objections..............66

IV.    THE EFH COMMITTEE STANDING MOTION........................................67

    A.    The EFH Committee Is Not a Creditor of the Luminant Debtors .......68

    B.    The Savings Clauses Do Not Limit the Luminant Debtors' Guarantee Obligations .......................................................68

    C.    The Luminant Debtors Received Reasonably Equivalent Value in Connection with the Debt Service Payments .................................71

    D.    At Most, the Luminant Debtors Have Contribution Claims Against the TCEH Debtors, Not Fraudulent Conveyance Claims Against the TCEH First Lien Creditors...................................71

**Page**

V.    LIMITATIONS ON DERIVATIVE STANDING, IF GRANTED ................72

RESERVATION OF RIGHTS ........................................................................................75

CONCLUSION............................................................................................................76

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aiello* v. *Burns Int'l Sec. Servs. Corp.*,
  973 N.Y.S.2d 88 (N.Y. App. Div. 2013) ................................................................69

*Alberts* v. *HCA Inc. (In re Greater Se. Cmty. Hosp. Corp. I)*,
  365 B.R. 293 (Bankr. D.C. 2006) ..........................................................................30

*In re Aluminum Mills Corp.*,
  132 B.R. 869 (Bankr. N.D. Ill. 1991) ....................................................................59

*Angell* v. *BE Care, Inc. (In re Caremerica, Inc.)*,
  409 B.R. 737 (Bankr. E.D.N.C. 2009) ...................................................................32

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*,
  381 F. Supp. 2d 192 (S.D.N.Y. 2004) ...................................................................13

*Ardmor Vending Co.* v. *Kim (In re Kim)*,
  130 F.3d 863 (9th Cir. 1997) ................................................................................65

*Asarco LLC* v. *Ams. Mining Corp.*,
  396 B.R. 278 (S.D. Tex. 2008) ........................................................................49, 55

*Ashcroft* v. *Iqbal*,
  556 U.S. 662 (2009) ..............................................................................................20

*Badger Freightways, Inc.* v. *Cont'l Ill. Nat'l Bank & Trust Co. of Chi. (In re Badger Freightways, Inc.)*,
  106 B.R. 971 (Bankr. N.D. Ill. 1989) ....................................................................59

*BancorpSouth Bank* v. *Hazelwood Logistics Ctr., LLC*,
  706 F.3d 888 (8th Cir. 2013) ................................................................................63

*Bangor Punta Operations, Inc.* v. *Bangor & A.R. Co.*,
  417 U.S. 703 (1974) ..............................................................................................36

*Bank of N.Y.* v. *Epic Resorts—Palm Springs Marquis Villas, LLC (In re Epic Capital Corp.)*,
  307 B.R. 767 (D. Del. 2004) .................................................................................57

*Bank of New York Mellon Trust Co., N.A.* v. *Miller (In re Franklin Bank Corp.)*,
  --- B.R. ----, 2014 WL 3611596 (D. Del. July 21, 2014) .....................................58

*Bell Atlantic Corp.* v. *Twombly*,
  550 U.S. 544 (2007) ..............................................................................................20

**Page(s)**

*Benak* v. *Alliance Capital Mgmt. L.P.*,
  435 F.3d 396 (3d Cir. 2006) ......................................................9

*In re Bergh*,
  141 B.R. 409 (Bankr. D. Minn. 1992) ........................................65

*In re Best Prods. Co.*,
  168 B.R. 35 (Bankr. S.D.N.Y. 1994) ....................................33, 36

*Boyer* v. *Crown Stock Distrib., Inc.*,
  587 F.3d 787 (7th Cir. 2009) .....................................................33

*Brandt* v. *B.A. Capital Co. L.P. (In re Plassein Int'l Corp.)*,
  590 F.3d 252 (3d Cir. 2009) ......................................................45

*Brandt* v. *Trivest II, Inc. (In re Plassein Int'l Corp.)*, Bankr. No. 03-11489
  (KG), Adv. No. 05-51472 (KG), 2008 WL 1990315 (Bankr. D. Del.
  May 5, 2008)...........................................................................33

*Bresson* v. *Comm'r*,
  213 F.3d 1173 (9th Cir. 2000) ...................................................26

*Burtch* v. *Conn. Cmty. Bank, N.A. (In re J. Silver Clothing, Inc.)*,
  453 B.R. 518 (Bankr. D. Del. 2011) ...........................................62

*Burtch* v. *Seaport Capital, LLC (In re Direct Response Media, Inc.)*,
  466 B.R. 626 (Bankr. D. Del. 2012)......................................44, 71

*In re Capmark Fin. Grp. Inc.*,
  438 B.R. 471 (Bankr. D. Del. 2010)......................................43, 56

*In re Centaur, LLC*,
  No. 10-10799 (KJC), 2010 WL 4624910 (Bankr. D. Del. Nov. 5, 2010) .........3, 20, 74

*In re Champion Enters., Inc.*,
   Bankr. No. 09-14014 (KG), Adv. No. 10-50514 (KG), 2010 WL
  3522132 (Bankr. D. Del. Sept. 1, 2010 ..................................44, 59

*In re Chateaugay Corp.*,
  154 B.R. 29 (Bankr. S.D.N.Y. 1993) ..........................................65

*Claybrook* v. *Pricewaterhousecoopers U.S. LLC (In re Am.*
  *Remanufacturers, Inc.)*,
   Bankr. No. 05-20022 (PJW), Adv. No. 07-50967 (KG), 2007 WL
  2376723 (Bankr. D. Del. Aug. 16, 2007). ...................................32

*Cooper* v. *Ashley Commc'ns, Inc. (In re Morris Commc'ns NC, Inc.)*,
  914 F.2d 458 (4th Cir. 1990) .....................................................49

**Page(s)**

*Credit Managers Ass'n* v. *The Fed. Co.*,
  629 F. Supp. 175 (C.D. Cal. 1985) ........................................................39

*In re Creekside Senior Apts., LP*,
  477 B.R. 40 (B.A.P. 6th Cir. 2012) .......................................................65

*Crescent Res. Litig. Trust* v. *Duke Energy Corp.*,
  500 B.R. 464 (W.D. Tex. 2013) .....................................................47, 57

*Cuevas* v. *Hudson Un. Bank (In re M. Silverman Laces, Inc.)*,
  No. 01 Civ. 6209 (DC), 2002 WL 31412465 (S.D.N.Y. Oct. 24, 2002) ....................49

*Daley* v. *Chang (In re Joy Recovery Tech. Corp.)*,
  286 B.R. 54 (Bankr. N.D. Ill. 2002) ....................................................34

*Davidoff* v. *Farina*,
  No. 04 Civ. 7617 (NRB), 2005 WL 2030501 (S.D.N.Y. Aug. 22, 2005) .................37

*Dole* v. *Local 427, IUE*,
  894 F.2d 607 (3d Cir. 1990) ............................................................26

*EBC I, Inc.* v. *Am. Online, Inc. (In re EBC I, Inc.)*,
  380 B.R. 348 (Bankr. D. Del. 2008) .....................................................50

*Eberhard* v. *Marcu*,
  530 F.3d 122 (2d Cir. 2008) ............................................................23

*Ebner* v. *Kaiser (In re Kaiser)*,
  --- B.R. ---, 2014 WL 7409593 (Bankr. N.D. Ill. Dec. 31, 2014)..........................30

*In re Exide Techs.*,
  303 B.R. 48 (Bankr. D. Del. 2003) ......................................................74

*Fid. Bond & Mortg. Co.* v. *Brand (In re Fid. Bond. & Mortg. Co.)*,
  340 B.R. 266 (Bankr. E.D. Pa. 2006) ...................................................34

*Fid. & Deposit Co. of Md.* v. *First Nat. Bank*,
  54 S.W.2d 964 (Tenn. 1932) ...........................................................27

*First Nat'l Mercantile Bank and Trust Co.* v. *Mammoth Spring Distrib.*
  *Co. (In re Mammoth Spring Distrib. Co.)*,
  139 B.R. 205 (Bankr. W.D. Ark. 1992)..................................................64

*Fowler* v. *UPMC Shadyside*,
  578 F.3d 203 (3d Cir. 2009) ............................................................21

*Freeland* v. *Enodis Corp.*,
  540 F.3d 721 (7th Cir. 2008) ...........................................................71

**Page(s)**

*Gellert* v. *Coltec Indus., Inc. (In re Crucible Materials Corp.)*,
    Bankr. No. 09-11582 (MFW), Adv. No. 11-53884 (MFW), 2012 WL
    5360945 (Bankr. D. Del. Oct. 31, 2012) ...................................................................60

*Geron* v. *Palladin Overseas Fund, Ltd. (In re AppliedTheory Corp.)*,
    323 B.R. 838 (Bankr. S.D.N.Y. 2005)..........................................................................43

*Geron* v. *Palladin Overseas Fund, Ltd. (In re AppliedTheory Corp.)*,
    330 B.R. 362 (S.D.N.Y. 2005) ......................................................................................50

*In re Gulf Fleet Holdings, Inc.*,
    491 B.R. 747 (Bankr. W.D. La. 2013)..........................................................................44

*Harman* v. *First Am. Bank of Md. (In re Jeffrey Bigelow Design Grp., Inc.)*,
    956 F.2d 479 (4th Cir. 1992) ........................................................................................60

*In re Hawaiian Telcom Commc'ns, Inc.*,
    430 B.R. 564 (Bankr. D. Haw. 2009) ...........................................................................65

*Hunter* v. *Fort Worth Capital Corp.*,
    620 S.W.2d 547 (Tex. 1981) .........................................................................................70

*Infinity Investors Ltd.* v. *Kingsborough (In re Yes! Entm't Corp.)*,
    316 B.R. 141 (D. Del. 2004)..........................................................................................20

*Interbulk, Ltd.* v. *Louis Dreyfus Corp. (In re Interbulk, Ltd.)*,
    240 B.R. 195 (Bankr. S.D.N.Y. 1999)..........................................................................47

*Jackson* v. *Mishkin (In re Adler Coleman Clearing Corp.)*,
    263 B.R. 406 (S.D.N.Y. 2001) ......................................................................................45

*Johnston Indus.* v. *CB & T Bank of Russell Cty. (In re Johnston Indus., Inc.)*,
    357 B.R. 907 (Bankr. M.D. Ga. 2006) .........................................................................61

*Jones* v. *Williams (In re McDonald)*,
    265 B.R. 632 (Bankr. M.D. Fla. 2001)..........................................................................50

*Kinder* v. *Coleman & Yates Coal Co.*,
    974 F. Supp. 868 (W.D. Va. 1997).................................................................................28

*Kipperman* v. *Onex Corp.*,
    411 B.R. 805 (N.D. Ga. 2009).......................................................................................40

*Lehman Brothers Holdings Inc.* v. *JPMorgan Chase Bank, N.A.*,
    469 B.R. 415 (Bankr. S.D.N.Y. 2012)..........................................................................48

*LTV Corp.* v. *Valley Fid. Bank & Trust Co. (In re Chateaugay Corp.)*,
    961 F.2d 378 (2d Cir. 1992) ..........................................................................................51

**Page(s)**

*Marshall* v. *Intermountain Elec. Co.*,
614 F.2d 260 (10th Cir. 1980) ......................................................................23, 27, 28

*McCloskey & Co.*, v. *Wright*,
363 F. Supp. 223 (E.D. Va. 1973) .................................................................................27

*Mellon Bank, N.A.* v. *Metro Commc'ns, Inc.*,
945 F.2d 635 (3d Cir. 1999) .....................................................................................33, 51

*Mellon Bank, N.A.* v. *Official Comm. of Unsecured Creditors of R.M.L. (In re R.M.L.)*,
92 F.3d 139 (3d Cir. 1996) ...........................................................................*passim*

*In re Merck & Co., Inc. Sec. Litig.*,
432 F.3d 261 (3d Cir. 2005) .......................................................................................13

*Metlyn Realty Corp.* v. *Esmark, Inc.*,
763 F.2d 826 (7th Cir. 1985) ..................................................................................34, 37

*MFS/Sun Life Trust-High Yield Series*,
910 F. Supp. 943 (1995) .............................................................................*passim*

*Midland Food Servs., LLC* v. *Castle Hill Holdings V, LLC*,
792 A.2d 920 (Del. Ch. 1999) ...................................................................................36

*In re MIG, Inc.*,
No. 09-12118 (KG), 2009 WL 8662897 (Bankr. D. Del. Dec. 18, 2009) .................21

*Moody* v. *Sec. Pac. Bus. Credit*,
127 B.R. 958 (W.D. Pa. 1991) .............................................................................34, 42

*Moody* v. *Sec. Pac. Bus. Credit*,
971 F.2d 1056 (3d Cir. 1992) ...................................................................................34

*MSKP Oak Grove, LLC* v. *Venuto*,
875 F. Supp. 2d 426 (D.N.J. 2012) ...........................................................................70

*Mumford* v. *Robinson*,
231 A.2d 477 (Del. 1967) ...........................................................................................69

*NBD Park Ridge Bank* v. *SRJ Enters., Inc. (In re SRJ Enters., Inc.)*,
150 B.R. 933 (Bankr. N.D. Ill. 1993) ........................................................................66

*Official Comm. of Equity Sec. Holders of Adelphia Commc'ns Corp.* v. *Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*,
371 B.R. 660 (S.D.N.Y. 2007) ...................................................................................74

**Page(s)**

*Official Comm. of Unsecured Creditors of Cybergenics Corp.* v. *Chinery,*
226 F.3d 237 (3d Cir. 2000) .................................................................23

*Official Comm. of Unsecured Creditors of Cybergenics Corp.* v. *Chinery,*
330 F.3d 548 (3d Cir. 2003) .................................................................19

*Official Comm. of Unsecured Creditors of Fedders N.A., Inc.* v. *Goldman
Sachs Credit Partners L.P. (In re Fedders N.A., Inc.),*
405 B.R. 527 (Bankr. D. Del. 2009) ......................................................57

*Official Comm. of Unsecured Creditors* v. *Clark (In re Nat'l Forge Co.),*
304 B.R. 214 (Bankr. W.D. Pa. 2004) ...................................................55

*Official Comm. of Unsecured Creditors* v. *UMB Bank, N.A. (In re
Residential Cap., LLC),*
497 B.R. 403 (S.D.N.Y. 2013) ..............................................................67

*In re Ohio Corrugating Co.,*
91 B.R. 430 (Bankr. N.D. Ohio 1988) ...................................................39

*In re Optim Energy, LLC,*
No. 14-10262 (BLS), 2014 WL 1924908 (Bankr. D. Del. May 13,
2014) ...............................................................................................20, 40

*Oran* v. *Stafford,*
226 F.3d 275 (3d Cir. 2000) ...................................................................9

*Peltz* v. *Hatten,*
279 B.R. 710 (D. Del. 2002) .................................................................34

*In re Protocol Servs., Inc.,*
Nos. 05-06782-JM11, 05-06786-JM11, 2005 WL 6485180 (Bankr.
S.D. Cal. Dec. 23, 2005) .......................................................................64

*In re Quebecor Worldwide (USA), Inc.,*
719 F.3d 94 (2d Cir. 2013) ...................................................................57

*In re Refco, Inc., Secs. Litigation,*
No. 09-Civ-2885-GEL, 2009 WL 7242548 (S.D.N.Y. Nov. 13, 2009) .....................36

*Rehberger* v. *MRW Group, Inc.,*
No. 05-CV-0210 (JS)(MLO), 2008 WL 919665 (E.D.N.Y. Mar. 31, 2008)..............40

*Rushton* v. *Bevan (In re D.E.I. Sys., Inc.),*
996 F. Supp. 2d 1142 (D. Utah 2014).....................................................46

*Sch. Dist. of the Borough of Aliquippa* v. *Md. Casualty Co.,*
402 Pa. Super. 569 (Pa. Sup. Ct. 1991) .................................................27

**Page(s)**

*Schlossberg* v. *Barney*,
    380 F.3d 174 (4th Cir. 2004) ..........................................................................28, 29, 30

*In re Sharp Int'l Corp.*,
    403 F.3d 43 (2d Cir. 2005) ........................................................................................56

*SIPC* v. *Bernard L. Madoff Inv. Secs. LLC*,
    505 B.R. 135 (S.D.N.Y. 2013) ..................................................................................48

*Smart World Techs. LLC* v. *Juno Online Servs. (In re Smart World Techs. LLC)*,
    423 F.3d 166 (2d Cir. 2005) ......................................................................................73

*Statutory Comm. of Unsecured Creditors* v. *Motorola, Inc. (In re Iridium Operating LLC)*,
    373 B.R. 283 (Bankr. S.D.N.Y. 2008)...................................................................*passim*

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)......................................................................................................9

*Trenwick Am. Litig. Trust* v. *Ernst & Young, L.L.P.*,
    No. 1571-N, 2006 WL 4782378 (Del. Ch. Aug. 10, 2006) ........................................40

*In re Truong*,
    285 F. App'x 837 (3d Cir. 2008) ................................................................................29

*U.S. Bank Nat'l Ass'n* v. *Lewis & Clark Apts., LP (In re Lewis & Clark Apts., LP)*,
    479 B.R. 47 (B.A.P. 8th Cir. 2012) ...........................................................................64

*U.S. Express Lines, Ltd.* v. *Higgins*,
    281 F.3d 383 (3d Cir. 2002) ........................................................................................9

*U.S.* v. *Beebe*,
    127 U.S. 338 (1888)..............................................................................................26, 28

*U.S.* v. *California*,
    507 U.S. 746 (1993)....................................................................................................31

*U.S.* v. *Knight*,
    39 U.S. 301 (1840)......................................................................................................25

*Union Bank* v. *Wolas*,
    502 U.S. 151 (1991)....................................................................................................61

*VFB LLC* v. *Campbell Soup Co.*,
    482 F.3d 624 (3d Cir. 2007) ..................................................................................34, 49

**Page(s)**

*Wagner* v. *Ultima Homes, Inc. (In re Vaughan Co.),*
498 B.R. 297 (Bankr. D.N.M. 2013) .................................................*passim*

*Walker* v. *Sonafi Pasteur d/b/a Avents,(In re Aphton Corp.),*
423 B.R. 76 (Bankr. D. Del. 2010).........................................20, 44

*In re WCC Holding Corp.,*
171 B.R. 972 (Bankr. N.D. Tex. 1994).........................................40

*Weisfelner* v. *Fund 1 (In re Lyondell Chem. Co.),*
503 B.R. 348 (Bankr. S.D.N.Y. 2014).........................................36

*Whitaker* v. *Mortg. Miracles, Inc. (In re Summit Place, LLC),*
298 B.R. 62 (Bankr. W.D.N.C. 2002) .........................................50

*In re Wilkinson,*
196 F. App'x 337 (6th Cir. 2006).........................................55

*Williams* v. *Infra Commerc Anstalt,*
131 F. Supp. 2d 451 (S.D.N.Y. 2001) .........................................28

*In re Xonics Photochemical, Inc.,*
841 F.2d 198 (7th Cir. 1988) .........................................70

**STATUTES**

11 U.S.C. § 101(22A).........................................46

11 U.S.C. § 101(32)(A).........................................33

11 U.S.C. § 101(49)(A).........................................46, 56

11 U.S.C. § 101(54).........................................46

11 U.S.C. § 502(b)(2).........................................52

11 U.S.C. § 506(a).........................................64

11 U.S.C. § 544.........................................*passim*

11 U.S.C. § 546(e).........................................*passim*

11 U.S.C. § 547(c)(2).........................................60

11 U.S.C. § 548.........................................22, 43

11 U.S.C. § 552(a).........................................64

11 U.S.C. § 741(7).........................................46

**Page(s)**

26 U.S.C. § 6502 .................................................................................................25

Del. Code Ann. Tit. 6 § 1302(a) ..........................................................................33

Del. Code Ann. Tit. 6 § 1303(a) ..........................................................................43

Del. Code Ann. Tit. 6 § 1304(a)(2) ......................................................................33

Del. Code Ann. Tit. 6 § 1305 ...............................................................................33

Del. Code Ann. Tit. 6 § 1308(d) ..........................................................................22

Del. Code Ann. Tit. 6 § 1309 ...............................................................................22

N.Y. U.C.C. § 8-102(15) .....................................................................................62

N.Y. U.C.C. § 8-102(17) .....................................................................................62

N.Y. U.C.C. § 8-501(a) ........................................................................................62

N.Y. U.C.C. § 9-102(42) .....................................................................................63

N.Y. U.C.C. § 9-315(2) ........................................................................................62

Tex. Bus. & Com. Code Ann. § 24.010 ...............................................................22

**RULES**

26 C.F.R. § 1.166-6(c) .........................................................................................66

26 C.F.R. § 301.7701 ...........................................................................................24

Fed. R. Evid. 201(b) .............................................................................................13

N.Y. C.P.L.R. § 213 .............................................................................................22

**MISCELLANEOUS**

Beth Jinks & Richard Bravo, *Buyout Firms Clash Over Energy Future
    Holdings, the Biggest-Ever LBO*, Businessweek, Oct. 24, 2013,
    http://www.businessweek.com/articles/2013-10-24/buyout-firms-
    clash-over-energy-future-holdings-the-biggest-ever-lbo .............................14

Calpine Corp., Annual Report (Form 10-K) (Feb. 29, 2008) .............................12

Cengage Learning Holdings II, L.P., Annual Report (Sept. 13, 2012),
    http://www.cengage.com/investor/pdf/Annual_Report_For_The_Fiscal
    _Year_Ended_June_30_2012.pdf. ...............................................................52

**Page(s)**

Citigroup Inc., Annual Report (Form 10-K) (Mar. 3, 2014) ...........................................46

CPUC, 2008 Market Price Referent,
http://www.cpuc.ca.gov/PUC/energy/Renewables/mpr ..............................................12

Dynegy, First Quarter 2008 Results,
http://library.corporate-ir.net/library/14/147/147906/items/328577/
CBBD9FB4-8296-4C12-9FEF-8BD386ACB311_Q108.pdf.....................................12

EIA, Annual Energy Outlook 2008 (2008).........................................................................12

EIA, Supplemental Tables to the Annual Energy Outlook 2008, Table 104
Lower 48 Gas Production and Wellhead Prices by Supply Region,
http://www.eia.gov/oiaf/archive/aeo08/supplement/supref.html................................12

Energy Future Competitive Holdings Co. LLC, Annual Report (Form 10-K)
(Mar. 5, 2009) ............................................................................................................40

Energy Future Holdings Corp., Annual Report (Form 10-K) (Feb. 21, 2012).................17

Energy Future Holdings Corp., Annual Report (Form 10-K) (Mar. 3, 2009) ..................11

Energy Future Holdings Corp., Annual Report (Form 10-K) (Mar. 31, 2008) ...........12, 15

Energy Future Holdings Corp., Current Report (Form 8-K) (Apr. 13, 2011) ..................57

Energy Future Holdings Corp., Current Report (Form 8-K) (Dec. 12, 2007)..................36

Energy Future Holdings Corp., Current Report (Form 8-K) (Oct. 31, 2007)...................36

Energy Future Holdings Corp., Quarterly Report (Form 10-Q) (Nov. 14, 2007) .......15, 38

First Data Corp., Current Report (Form 8-K) (Mar. 26, 2012) ........................................52

First Data Corp., Current Report (Form 8-K) (Apr. 13, 2011)..........................................52

H.R. Doc. No. 137, 93rd Cong., 1st Sess. (1973).............................................................29

Jessica D. Gabel, *The Terrible Tousas:  Opinions Test the Patience of
Corporate Lending Practices*, 27 Emory Bankr. Dev. J. 415 (2011). ........................43

NRG Energy, Inc., Annual Report (Form 10-K) (Feb. 28, 2008) ....................................39

Moody's Investors Service, *Rating Action:  Moody's affirms Energy
Future Holdings Corp's Caa2 CFR; outlook changed to stable from
negative* (Apr. 14, 2011),
https://www.moodys.com/research/Moodys-affirms-Energy-Future-
Holdings-Corps-Caa2-CFR-outlook-changed--PR_217454.......................................53

**Page(s)**

TXU Corp., Proxy Statement (Schedule 14A) (July 25, 2007)............................10, 35, 41

The ad hoc committee of certain unaffiliated holders of first lien senior secured claims against the TCEH Debtors[1] (the "Ad Hoc Committee of TCEH First Lien Creditors"), by and through its undersigned counsel, hereby files this objection (the "Objection") to the following motions (collectively, the "Standing Motions"):

(i)     *Motion of the Official Committee of Unsecured Creditors* (the "TCEH Committee") *for Entry of an Order Granting Exclusive Standing and Authority to Commence, Prosecute, and Settle Certain Claims for Declaratory Judgment, Avoidance and Recovery of Liens, Security Interests, Obligations, Fees, and Interest Payments, and Disallowance of Claims* [Docket No. 3593] (the "TCEH Committee Standing Motion");

(ii)    *Motion of the EFH Official Committee* (the "EFH Committee") *for Entry of an Order Granting Derivative Standing and Authority to Prosecute and Settle Claims on Behalf of the Luminant Debtors' Estates* [Docket No. 3605] (the "EFH Committee Standing Motion"); and

(iii)   *Motion of the Ad Hoc Group of TCEH Unsecured Noteholders* (the "Ad Hoc Noteholder Group", and together with the TCEH Committee, the "TCEH Junior Creditors") *for Entry of an Order Granting Standing and Authority to Commence, Prosecute, and Settle Certain Claims for Declaratory Judgment, Avoidance and Recovery of Liens, Security Interests, Obligations, Fees, and Interest Payments, and Disallowance of Claims* [Docket No. 3603] (the "Ad Hoc Noteholder Group Standing Motion").

In support of this Objection, the Ad Hoc Committee of TCEH First Lien Creditors respectfully represents as follows:[2]

## PRELIMINARY STATEMENT

The Standing Motions and the proposed Complaints attached thereto are nothing more than naked attempts by out-of-the-money constituencies or, in the case of the EFH Committee, a constituency of another debtor, to exert leverage through baseless

---

[1]     As used herein, the term "TCEH Debtors" means, collectively, Texas Competitive Electric Holdings Company LLC ("TCEH"), Energy Future Competitive Holdings Company LLC ("EFCH"), and TCEH's direct and indirect subsidiaries that are debtors and debtors-in-possession in the above-captioned cases.

[2]     Capitalized terms used and not defined herein shall have the meanings ascribed to such terms in the TCEH Committee Standing Motion and the EFH Committee Standing Motion, as applicable.

litigation.  The TCEH Junior Creditors are, by any objective measure, vastly out-of-the-money, with the TCEH First Lien Creditors[3] likely being undersecured by **billions of dollars.**  The TCEH Junior Creditors' claims trade publicly for pennies on the dollar, reflecting, again objectively, their lack of entitlement to any meaningful recovery in these cases.  Their motivation here is to delay and run the expense meter in these cases, all in the hope that they can shake free a few more pennies on the dollar.  Similarly, the EFH Committee, which itself is not a creditor, or representative of creditors, of the TCEH Debtors, rears its head not because it has any legitimate challenge to the TCEH First Lien Creditors' liens and claims, but, rather, out of concern that if the TCEH Debtors reorganize through a taxable transaction, its constituents' recovery at EFH would be dramatically reduced or eliminated.  Thus, each creditor group seeking standing does so, not because it has identified legitimate challenges to the TCEH First Lien Creditors' liens and claims, but to pursue an obvious agenda to insert roadblocks in the TCEH Debtors' reorganization.

Unlike other circumstances where parties are free to commence litigation notwithstanding its merits, here, before the parties seeking standing can pursue their agenda, this Court must first determine that the claims they assert are "colorable" and that, even if "colorable," their pursuit is justified based on a cost/benefit analysis examined from the perspective of the TCEH Debtors' estates.  That same analysis was performed by the Debtors and their advisors prior to commencing these cases, and the Debtors concluded that the very same claims described in the Standing Motions lacked

---

[3]    As used herein, the term "TCEH First Lien Creditors" means, collectively, the administrative agent and collateral agent under the Credit Agreement, the indenture trustee for the First Lien Notes, and holders of first lien senior secured claims against the TCEH Debtors.

merit, which is why they stipulated in the Cash Collateral Order to the validity of the

TCEH First Lien Creditors' liens and claims.  The parties seeking standing belittle those

stipulations as typical debtor stipulations coerced under pressure from their secured

creditors as concessions for the consensual use of cash collateral.  One must remember,

however, that these Debtors did not precipitously file these cases and simply succumb to

pressure typical of the days leading up to a bankruptcy filing.  Rather, as the parties and

this Court are well aware, the Debtors began discussions with their key creditors many

months in advance of their actual filing.  The stipulations contained in the Cash Collateral

Order were the culmination of these many months of planning, which included the

Debtors' thorough investigation of the TCEH First Lien Creditors' liens and claims.

The parties seeking standing desire to second-guess the Debtors'

conclusions and are now asking the Court to do the same.  As detailed in the pages that

follow, such second-guessing leads inexorably to the same answer.

A.      **The TCEH Junior Creditors' Claims**[4]

*First*, many of the claims asserted by the TCEH Junior Creditors,

including the most significant claims, are not colorable in that they fail to state a claim

upon which relief can be granted.[5]  The reasons are:

- The TCEH Junior Creditors' most significant claim, which seeks to attack the liens and claims granted in connection with the 2007 Acquisition,[6] is time-barred under applicable state statutes of

---

[4]     Attached hereto as **<u>Exhibit A</u>** is a chart setting forth the Counts asserted by the TCEH Junior Creditors together with the Ad Hoc Committee of TCEH First Lien Creditors' principal responses thereto.

[5]     The "colorable claim" standard mirrors the standard for dismissing a complaint for failure to state a claim.  *See, e.g.*, *In re Centaur, LLC*, No. 10-10799 (KJC), 2010 WL 4624910, at *4 (Bankr. D. Del. Nov. 5, 2010) ("In deciding whether there is a colorable claim, the court should undertake the same analysis as when a defendant moves to dismiss a complaint for failure to state a claim.").

[6]     Curiously, the TCEH Ad Hoc Noteholder Group seeks to join in this challenge.  Substantially all of the TCEH Debtors' junior indebtedness was incurred shortly after the 2007 Acquisition to refinance or replace unsecured indebtedness that was incurred at the time of the 2007 Acquisition.  Accordingly,

limitations.  The TCEH Junior Creditors seek to circumvent these limitations periods by relying exclusively on the IRS's ability to seek to avoid the liens and claims; however, the IRS is not a valid "triggering creditor" for purposes of section 544(b) of the Bankruptcy Code as to many of the TCEH Debtors and, more significantly, the TCEH Junior Creditors cannot invoke the IRS's immunity, under the *nullum tempus* doctrine, from otherwise applicable state statutes of limitation.

- The liens granted in connection with the 2007 Acquisition and certain of the transfers in connection with the 2011 Amend and Extend Transaction are immune from avoidance as constructive fraudulent conveyances pursuant to the Bankruptcy Code's "safe harbor" provisions.  Many of the claims incurred in connection with those transactions are also immune from avoidance because the proceeds of such debt incurrences were used to satisfy valid antecedent debts.

- The claim for "equitable subordination" does not include allegations sufficient to demonstrate the type of egregious conduct necessary to state such a claim.

- The preference claim, which seeks to avoid certain interest payments made in the 90 days preceding the chapter 11 filings, disregards the obvious "ordinary course" affirmative defense applicable under section 547(b)(2) of the Bankruptcy Code.

*Second*, even if the Court were to determine that some or all of the claims are colorable, applying a Rule 12(b)(6) standard, the Court would nonetheless need to conclude that the pursuit of such claims is justified by a cost/benefit analysis.  That the Court certainly cannot do.  Not only would the impediments described above persist, but as detailed below, there are many other compelling reasons why pursuit of the TCEH Junior Creditors' claims would not benefit the TCEH Debtors' estates.  Most significant is that there exists overwhelming contemporaneous market evidence that the TCEH Debtors were solvent to the tune of ***many billions of dollars*** at the time of the 2007

---

any alleged infirmities with the TCEH First Lien Creditors' claims or liens similarly infect the TCEH Ad Hoc Noteholder Group's claims.  The Ad Hoc Committee of TCEH First Lien Creditors reserves all rights with respect to such claims and challenges.

Acquisition.  The evidence, which at this stage can be garnered from publicly filed documents, demonstrates conclusively that market participants, many of whom purchased or traded in the TCEH Debtors' unsecured bonds, and others of whom engaged in significant hedge transactions with the TCEH Debtors, all validated the TCEH Debtors' solvency both at or around the time of the 2007 Acquisition and for many months thereafter.  Also damning to the TCEH Junior Creditors' claim of insolvency in 2007 is the fact that the TCEH Debtors continued to operate in the ordinary course of business for ***nearly seven years*** following the 2007 Acquisition.  We are aware of no case in which a court avoided a transfer as constructively fraudulent when the debtor continued to operate in the ordinary course of business for nearly seven years following the subject transfer (expending billions of dollars in the process).

The TCEH Junior Creditors offer nothing to rebut this overwhelming market evidence.  Instead, they rely exclusively on the distorted lens of hindsight to second-guess a solvency opinion the Debtors received at the time of the 2007 Acquisition.  Curiously, while myopically peering through that lens, the TCEH Junior Creditors ignore that the TCEH Committee's own financial advisor, Lazard Frères & Co. LLC ("Lazard"), delivered a fairness opinion at the time of the 2007 Acquisition and concluded that the TCEH Debtors had positive equity value.  But, even putting that inconvenience for them aside, as discussed in greater detail below, courts in this Circuit and elsewhere have concluded that absent taint, and none is alleged here, the sight line provided by contemporaneous market evidence is far more reliable than 20/20 hindsight in determining solvency.

*Third*, the TCEH Junior Creditors fail to account for the reasonably equivalent value the Debtors received in various of the transactions at issue.  In many, it is clear that the TCEH Debtors received such value either through the receipt of the dollars borrowed or the repayment of valid antecedent debts.

*Finally*, the TCEH Junior Creditors conclude their Standing Motions with a smattering of additional claims and requests for declaratory relief, which are wholly without merit.  Others plainly address issues that are not even the subject of the TCEH Debtors' stipulations in the Cash Collateral Order, or amount to nothing more than thinly-veiled confirmation objections that are not ripe for adjudication or subject to the Challenge Period, and therefore there is no basis to grant standing to prosecute such claims at this time.

**B.    The EFH Committee's Claim**

The EFH Committee also argues that the 2007 Acquisition left the TCEH Debtors insolvent, but for a different reason.  As a threshold matter, the EFH Committee's request for standing should be denied because it is neither a creditor of the TCEH Debtors nor does it represent a creditor of any of the TCEH Debtors.

Moreover, the EFH Committee's claim, even if considered, is far from colorable.  It asserts that in 2007, the Luminant Debtors were liable for a ▮▮▮▮▮▮ contingent tax liability that was omitted from their balance sheet, the inclusion of which would have rendered them insolvent.  The EFH Committee concedes that this contingent claim would arise only upon a taxable sale of the TCEH Debtors' assets.  The Court need not venture any further, as the notion that in 2007, the Sponsors, after investing more than *$8 billion of new equity* in EFH, would then immediately sell the TCEH Debtors' assets

in a taxable transaction (as opposed to utilizing any number of tax-free alternatives) and thereby trigger a massive tax claim at EFH ███████████████████████████, strains credulity.  Indeed, to date, the Debtors' virtually exclusive reorganization strategy has been based on a tax-free reorganization for all of the Debtors.  Yet, even if one suspends logic and reason and assumes that the Sponsors were so inclined, the resulting tax claim would still never be an obligation of the Luminant Debtors███████████ ███████████.  This gaping hole renders the remainder of the EFH Committee Standing Motion meritless.

**C.    <u>Appropriate Limitations</u>**

Notwithstanding the foregoing, if the Court is inclined to grant standing for one or more of the causes of action, it should impose two critical limitations.

*First,* only the TCEH Committee should be granted standing to pursue causes of action that belong to the TCEH Debtors.  The EFH Committee's Standing Motion is infirm for the reasons identified above.  Also, the interests of the constituents the EFH Committee represents are in many ways misaligned with those of TCEH's creditors, making the EFH Committee an inappropriate advocate for the TCEH Debtors' creditors.

With respect to the Ad Hoc Noteholder Group, whose proposed complaint is virtually identical to the TCEH Committee's Complaint, its interests are already adequately represented by the TCEH Committee, whose members include the indenture trustee for the TCEH Unsecured Notes.  There is simply no reason also to grant standing to an unofficial committee of six institutions that hold a minority of TCEH's unsecured

indebtedness and whose motives are varied.[7]  In addition, members of the Ad Hoc

Noteholder Group derived substantial benefits from the transactions at issue—including

through the issuance of their debt, their receipt of additional interest and the increase in

the prices of their bonds at or about the time of the transactions at issue—and they are in

no position to challenge the very transactions from which they benefited.

            *Second*, the TCEH Debtors must retain authority to settle estate causes of

action.  Unlike any of the potential litigants in these matters, the TCEH Debtors have a

fiduciary duty to maximize the value of their estates for the benefit of all stakeholders.

The Standing Motions implicate critical issues that go to the heart of the Debtors'

restructuring and plan efforts.  Given the central importance of these claims and their

singular impact on the trajectory of these cases, it would be inconsistent with the broad

rights granted to the TCEH Debtors, particularly during their exclusivity period, to

deprive them of their statutory prerogative to build consensus and pursue confirmation of

a chapter 11 plan of reorganization that could include, among its elements, a resolution of

estate causes of action (including those implicated by the Complaint).

---

[7]    Three of the Ad Hoc Noteholder Group's six members have disclosed significant holdings across the
Debtors' capital structure and simultaneously participate on EFIH ad hoc creditor groups.  *See* Verified
Statement of White & Case LLP, Fox Rothschild LP and the Ad Hoc Group of TCEH Unsecured
Noteholders Pursuant to Bankruptcy Rule 2019 [Docket No. 676]; Verified Statement of Kramer Levin
Naftalis & Frankel LLP and Pachulski Stang Ziehl & Jones LLP Pursuant to Federal Rule of
Bankruptcy Procedure 2019 [Docket No. 1155]; Verified Statement of Ropes & Gray LLP, Cole,
Schotz, Meisel, Forman & Leonard P.A. and Drinker Biddle & Reath LLP Pursuant to Federal Rule of
Bankruptcy Procedure 2019 [Docket No. 850].

# BACKGROUND[8]

### A.    The 2007 Acquisition

1.    On October 10, 2007 (the "<u>Closing Date</u>"), Kohlberg Kravis

Roberts & Co. L.P., TPG Capital, L.P. and GS Capital Partners (together, the

"<u>Sponsors</u>") acquired all of the outstanding shares of TXU Corp. (the predecessor of

Energy Future Holdings Corp. ("<u>EFH</u>")) in what was the largest private acquisition of a

public company in history (the "<u>2007 Acquisition</u>").  In connection with the 2007

Acquisition, the Sponsors and their co-investors contributed approximately ***$8.3 billion***

***of new equity***—this was (and still is today) one of the largest new money equity

contributions ever made by one or more private equity firms to acquire a public company.

2.    Several financial institutions provided fairness and solvency

opinions regarding the 2007 Acquisition.  The TCEH Committee cites one such opinion

in its proposed complaint (the "<u>Complaint</u>"),[9] a solvency analysis prepared by Duff &

Phelps, LLC ("<u>D&P</u>") in October 2007 (the "<u>D&P 2007 Solvency Opinion</u>"), in which

---

[8]    The facts referenced herein are based on the TCEH Debtors' public filings and the *Declaration of Paul Keglevic, Executive Vice President, Chief Financial Officer, and Co-Chief Restructuring Officer of Energy Future Holdings Corp., et al., in Support of First Day Motions* [Docket No. 98] (the "<u>First Day Declaration</u>").  Because the "colorable claim" test for granting a party derivative standing to assert estate causes of action is akin to a determination on a motion to dismiss, the relevant record under consideration consists of the complaint and any "document integral or explicitly relied upon in the complaint."  *U.S. Express Lines, Ltd.* v. *Higgins*, 281 F.3d 383, 388 (3d Cir. 2002)); *see also Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007) (stating that when faced with a motion to dismiss, "courts must consider . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice").  This Court may also take judicial notice of properly authenticated documents filed with the SEC.  *Oran* v. *Stafford*, 226 F.3d 275, 289 (3d Cir. 2000).  Additionally, in the Third Circuit, courts may take judicial notice of public records to acknowledge that the facts contained in the record existed in the public realm at that time.  *Benak* v. *Alliance Capital Mgmt. L.P.*, 435 F.3d 396, 401 (3d Cir. 2006).  Certain of the documents referenced herein are not attached hereto due to their voluminous nature, but copies of such documents have been made available to the movants, the Debtors, the Office of the United States Trustee and the Court.

[9]    The proposed complaint filed by the Ad Hoc Noteholder Group is virtually identical in all respects to the TCEH Committee's Complaint.  Accordingly, while all references to the "Complaint" herein are to the TCEH Committee's Complaint, such arguments apply equally to the Ad Hoc Noteholder Group's proposed complaint.

D&P concluded that the TCEH Debtors had ***approximately*** ████████████

████ *pro forma* for consummation of the 2007 Acquisition.  Complaint ¶ 36.

        3.      Tellingly, the TCEH Committee neglects to reference other

valuation and fairness opinions provided in connection with the 2007 Acquisition,

including one by Lazard, the ***TCEH Committee's own financial advisor***.  In an opinion

dated July 12, 2007 (the "<u>Lazard Opinion</u>"), in which Lazard concluded that the 2007

Acquisition was fair to TXU Corp.'s equity holders, Lazard valued the TCEH Debtors'

assets at between $28.1 billion and $32.1 billion.  TXU Corp., Proxy Statement (Schedule

14A) (July 25, 2007) ("<u>Proxy Statement</u>") at 46.  Even at the low-point of the TCEH

Committee's own financial advisor's contemporaneous valuation of the TCEH Debtors'

assets, the TCEH Debtors were solvent following the 2007 Acquisition; using the mid-

point of Lazard's analysis, the TCEH Debtors had approximately ***$2.6 billion*** of positive

equity value *pro forma* for consummation of the 2007 Acquisition.[10]

        4.      The 2007 Acquisition was financed, in part, through the incurrence

of approximately $27 billion of new debt at TCEH and $4.5 billion of new debt at EFH.

Specifically, TCEH borrowed approximately $19 billion under certain senior secured

credit facilities that were incurred pursuant to that certain credit agreement, dated as of

October 10, 2007 (as amended, modified, or supplemented from time to time, the "<u>Credit</u>

---

[10]   The Lazard Opinion valued TXU Corp.'s assets across six business segments:  (i) Power; (ii) Development; (iii) Delivery; (iv) Retail; (v) Wholesale; and (vi) Corporate.  For purposes of this Objection, and without the benefit of any discovery regarding the precise assets that comprised each of these business segments, the estimates set forth herein assume that items (i), (ii), (iv) and (v) above are included among the TCEH Debtors' assets.  With respect to the Corporate segment, the estimates herein reflect a *pro rata* allocation between the Delivery segment, on the one hand, and the other business segments, on the other.  The Ad Hoc Committee of TCEH First Lien Creditors reserves the right to amend, modify or supplement these allocations as additional information becomes available.

Agreement"),[11] among TCEH, as borrower, EFCH, as parent guarantor, certain of

TCEH's subsidiaries, as subsidiary guarantors, Citibank, N.A. ("Citibank"), as

administrative agent and collateral agent, and the lenders from time to time party thereto

(the "Senior Secured Facilities").[12]  The Senior Secured Facilities were guaranteed jointly

and severally on a senior secured basis by EFCH and substantially all of EFCH's

subsidiaries, and are secured by substantially all of the current and future assets of EFCH

and such subsidiaries.  Additionally, on the Closing Date, TCEH and TCEH Finance, Inc.

entered into a $6.75 billion senior unsecured bridge facility (the "Bridge Facility").

### B.    The TCEH Debtors Thrived in the Months after the 2007 Acquisition

5.    The Complaint portrays the TCEH Debtors as having commenced

an inexorable downward spiral toward financial ruin immediately following the 2007

Acquisition.  This could not be further from reality.  In the first full year following the

2007 Acquisition, the TCEH Debtors' revenue *increased by more than $1.2 billion*, from

$8.56 billion to $9.79 billion.  First Day Declaration ¶ 114; Energy Future Holdings

Corp., Annual Report (Form 10-K) (Mar. 3, 2009) at 69.  This was driven, in large part,

by the rising price of natural gas through the first half of 2008.  As described in the First

Day Declaration and throughout EFH's public filings, the wholesale price of electricity in

the ERCOT market—and therefore a significant portion of the TCEH Debtors' revenue

and profitability—is highly correlated to the price of natural gas.  First Day Declaration

---

[11]    Copies of the Credit Agreement and its amendments are attached as Exhibits 1-5 to the Declaration of Christopher A. Ward, dated February 19, 2015, which is annexed to the TCEH Committee Standing Motion as Exhibit A.

[12]    On the Closing Date, such borrowings consisted of:  (i) $16.45 billion under a term loan facility; (ii) $2.15 billion under a delayed draw term loan facility (with an additional $1.95 billion undrawn as of the Closing Date); and (iii) $382 million under a commodity collateral posting facility.  The Senior Secured Facilities also included a $2.7 billion revolving credit facility, which, upon information and belief, was undrawn as of the Closing Date, and a $1.25 billion deposit letter of credit facility, which was fully cash-collateralized, but not utilized, as of the Closing Date.

¶¶ 91, 114; Energy Future Holdings Corp., Annual Report (Form 10-K) (Mar. 31, 2008) ("2007 10-K") at 19.  The 2007 Acquisition, and the Sponsors' substantial equity investments, were thus predicated, in part, on a belief that the price of natural gas would climb (or, at a minimum, not significantly decline) following the Closing Date.  First Day Declaration ¶ 114.

6.     In the fall of 2007, the Sponsors were hardly alone in this assessment.  The Energy Information Administration (the "EIA"), an independent statistical and analytical agency within the United States Department of Energy, projected that natural gas prices would range from approximately $6.87-7.75 per MMBtu (adjusted for inflation) from 2008 through 2020.[13]  The California Public Utility Commission (the "CPUC") was even more bullish, projecting that natural gas prices would range from $7.30-10.51 per MMBtu during the same period.[14]  Many of the Debtors' competitors publicly shared similar convictions based on their own market experience.[15]

7.     For the several months following the 2007 Acquisition, the Sponsors' investment thesis proved prescient, as natural gas surged from $6.42 per MMBtu in October 2007 to as high as $13.11 per MMBtu in July 2008, leading to increases in ERCOT wholesale electricity prices from $52.42 per MWh in 2007 to $63.44

---

[13]    EIA, Annual Energy Outlook 2008, at 116 (2008); EIA, Supplemental Tables to the Annual Energy Outlook 2008, Table 104 Lower 48 Gas Production and Wellhead Prices by Supply Region, *available at* http://www.eia.gov/oiaf/archive/aeo08/supplement/supref.html.  Unless otherwise specified, all natural gas prices set forth herein are for the Henry Hub.

[14]    CPUC, 2008 Market Price Referent, *available at* http://www.cpuc.ca.gov/PUC/energy/Renewables/mpr.

[15]    For example, Calpine Corporation noted in its 2007 annual report that "[n]atural gas contracts for delivery beyond 2007 continue to trade in the $8-$10/MMBtu range."  *See* Calpine Corp., Annual Report (Form 10-K) (Feb. 29, 2008) at 8.  And Dynegy Inc. projected that forward natural gas prices would be over $9 MMBtu for much of 2008, with similarly strong projections for 2009.  *See* Dynegy Inc., First Quarter 2008 Results, at 22, *available at* http://library.corporate-ir.net/library/14/147/147906/items/328577/CBBD9FB4-8296-4C12-9FEF-8BD386ACB311_Q108.pdf.

per MWh in 2008.  First Day Declaration ¶ 114.  Indeed, not only did the "spot-market" prices for natural gas increase substantially over this period, but the forward curve (representing market participants' collective views on the likely future trajectory of natural gas prices) also rose, demonstrating that the market did not believe the 2008 price increases to be aberrational.  Below is a table that sets forth the forward natural gas curve as of both the Closing Date (October 10, 2007) and June 30, 2008, together with the spot-market prices for natural gas over the same period.[16]



Source:  Bloomberg Finance L.P.

### C.    Issuance of the TCEH Unsecured Notes

8.    In the weeks following the 2007 Acquisition, the TCEH Debtors—

at a time when the TCEH Junior Creditors allege the TCEH Debtors were already

---

[16]    Attached hereto as **Exhibit B** is the Bloomberg Finance L.P. (2015) Futures Contract Table for the Henry Hub forward natural gas curves as of October 10, 2007.  Attached hereto as **Exhibit C** is the Bloomberg Finance L.P. (2015) Futures Contract Table for the Henry Hub forward natural gas curves as of June 30, 2008.  Attached hereto as **Exhibit D** is the Bloomberg Finance L.P. (2015) Daily Historical Line Chart for the Henry Hub natural gas spot-market prices.  The Court can take judicial notice of published prices of financial instruments on a motion to dismiss.  *See, e.g.*, Fed. R. Evid. 201(b); *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 264 n.3 (3d Cir. 2005) (taking judicial notice of stock prices); *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 245-46 n.61 (S.D.N.Y. 2004) (taking judicial notice of bond prices).

insolvent—issued approximately **$6.75 billion of new unsecured notes** to refinance the

Bridge Facility.[17]  The holders of the TCEH Unsecured Notes represent substantially all

of the TCEH Debtors' current unsecured creditors.[18]

      9.     One of the largest initial purchasers of the TCEH Unsecured Notes

was none other than Warren Buffet, whose firm, Berkshire Hathaway, purchased

approximately $2 billion of the TCEH Unsecured Notes in 2007.[19]  Berkshire

Hathaway's confidence in the TCEH Debtors' creditworthiness was validated by the

market:  for the first eleven months after the 2007 Acquisition, the TCEH Unsecured

Notes—the most junior securities in the TCEH Debtors' capital structure—traded at

prices between 95% and 104% of par.  As late as September 5, 2008 (*i.e.*, days before

Lehman Brothers' chapter 11 filing), the TCEH Unsecured Notes traded above par.

Below is a table that reflects the trading prices for the Initial Unsecured Notes from their

issue date (October 31, 2007, approximately three weeks after the 2007 Acquisition)

through October 31, 2008.[20]

---

[17]    Specifically, on October 31, 2007, TCEH and TCEH Finance, Inc. issued $3 billion aggregate principal amount of 10.25% unsecured notes due November 1, 2015 (the "Initial Unsecured Notes"). On December 6, 2007, pursuant to a supplement to the indenture governing the Initial Unsecured Notes, TCEH and TCEH Finance, Inc. issued $2.0 billion aggregate principal amount of 10.25% series B unsecured notes due November 1, 2015 (the "Series B Unsecured Notes"), and $1.75 billion aggregate principal amount of 10.50%/11.25% senior toggle notes due November 1, 2016 (the "Toggle Unsecured Notes," and, together with the Initial Unsecured Notes and the Series B Unsecured Notes, the "TCEH Unsecured Notes").

[18]    In addition, in 2010 and 2011 the TCEH Debtors issued approximately $1.5 billion of second lien notes pursuant to certain exchange offers with holders of the TCEH Unsecured Notes.  Accordingly, with the exception of certain limited pollution control revenue bonds that pre-date the 2007 Acquisition (of which approximately $800 million remain outstanding), all of the TCEH Debtors' junior funded indebtedness was incurred directly or indirectly in connection with the 2007 Acquisition.

[19]    *See* Beth Jinks & Richard Bravo, *Buyout Firms Clash Over Energy Future Holdings, the Biggest-Ever LBO*, Businessweek, Oct. 24, 2013, http://www.businessweek.com/articles/2013-10-24/buyout-firms-clash-over-energy-future-holdings-the-biggest-ever-lbo.

[20]    Attached hereto as **Exhibit E** is the Bloomberg Finance L.P. (2015) Daily Historical Line Chart for the Initial Unsecured Notes from October 31, 2007 through October 31, 2008.



Source:  Bloomberg Finance L.P.        —10.25% Fixed Senior Notes due 2015

### D.    The TCEH Debtors Hedged a Significant Portion of Their Natural Gas Exposure Through 2013

10.    Since 2005, EFH has utilized financial instruments to mitigate its exposure to volatility in wholesale electricity prices.  *See, e.g.*, First Day Declaration ¶ 103; 2007 10-K at 39.  At or around the time of the 2007 Acquisition, the TCEH Debtors significantly expanded this hedging program by entering into a series of transactions that effectively hedged approximately 75% of their equivalent natural gas exposure over the period from 2008 to 2013 at average annual prices ranging from $7.25 per MMBtu to $8.24 per MMBtu.  Energy Future Holdings Corp., Quarterly Report (Form 10-Q) (Nov. 14, 2007) at 63.

11.    These long-term natural gas hedges allowed the TCEH Debtors to "lock in" a significant portion of their natural gas exposure for ***six years*** following the 2007 Acquisition, thereby ensuring the stability and sufficiency of their cash flows and

capitalization during this period.  Of course, these hedges could not permanently insulate the TCEH Debtors from fundamental changes in market conditions.

E.      **Unforeseeable Events in Mid-2008 Derailed the TCEH Debtors' Financial Prospects**

12.      The Complaint largely ignores the two unforeseen events that together had a cataclysmic effect on the TCEH Debtors' financial condition:  (1) the "great recession" of 2008 that sparked a global financial crisis; and (2) the increased development and exploitation of hydraulic "fracking," which unexpectedly flooded the market with new supplies of natural gas, causing power prices in the ERCOT market to crater.  It was these two events—neither of which could have been foreseen at the time of the 2007 Acquisition—that derailed the TCEH Debtors' financial outlook and ultimately rendered them insolvent.

13.      The magnitude and scope of the 2008 global economic recession has been recounted in numerous publications (and in numerous filings in other cases before this Court) and does not require extensive discussion here.  Importantly, however, the recession caused more than a simple recalibration of the TCEH Debtors' credit profile.  The recession also had a direct impact on the TCEH Debtors' bottom line, as lower economic output resulted in reduced overall demand for electricity in the ERCOT market.  First Day Declaration ¶ 141.

14.      Beginning in mid-2008, in the midst of this worldwide financial crisis, natural gas prices also experienced a marked and unexpected decline caused by the increased exploitation and development of "unconventional" natural gas through hydraulic "fracking."  This technology fundamentally altered market conditions for the TCEH Debtors (and for all companies across the energy sector), leading to a precipitous

and prolonged decline in natural gas prices.  Until the development of fracking, much of

the natural gas in the United States could not be extracted economically.  *Id.* at ¶ 127.  No

one anticipated the widespread proliferation of the fracking process given, among other

things, technological barriers that existed at the time of the 2007 Acquisition.  *Id.* at

¶ 129.  However, with new technological advancements, fracking became an

economically viable option, leading to a dramatic increase in domestic natural gas

production.  *Id.* at ¶¶ 129-131.

15.     Thus, while natural gas prices were approximately $6.42 per

MMBtu at the time of the 2007 Acquisition and reached as high as $13.11 per MMBtu in

July 2008, this new, unexpected increase in production caused natural gas prices to fall to

as low as $2.04 per MMBtu in April 2012.  *Id.* at ¶ 132.

**F.     2011 Amend and Extend Transactions**

16.     In October 2009, the Debtors initiated a liability management

program to reduce interest payments, extend debt maturities and otherwise realign their

balance sheet to reflect these dramatically altered market conditions.  *See* Energy Future

Holdings Corp., Annual Report (Form 10-K) (Feb. 21, 2012) at 55-56.

17.     A foundational element of this liability management program was

extending or refinancing the approximately $24 billion of TCEH first lien debt that would

otherwise mature in October 2013 and October 2014.  Accordingly, in April 2011, the

TCEH Debtors entered into a series of arm's-length transactions (the "2011 Amend and

Extend Transactions") to address this significant financial hurdle and provide the TCEH

Debtors with critical breathing room, which included three principal elements:

- (1) amending the Credit Agreement to, among other things, substantially increase the secured leverage maintenance covenant (the "Maintenance Covenant Amendment");[21]

- (2) extending the maturities on approximately $18 billion of the loans under the Senior Secured Facilities for three years from October 2014 (or October 2013, in the case of the revolving credit facility) to October 2017 (or October 2016, in the case of the revolving credit facility) (together, the "Maturity Extension") in exchange for a 3.50% cash consent fee and a 1.0% increase in the contract rate of interest (from LIBOR + 3.50% *per annum* to LIBOR + 4.50% *per annum*) with respect to all extended term loans and deposit letter of credit facility loans; and

- (3) issuing $1.75 billion principal amount of 11.5% first lien notes due 2020 (the "First Lien Notes")[22] and using the proceeds thereof to repay $1.604 billion of borrowings under the Senior Secured Facilities (such repayment, the "Bank Debt Repayment") and to pay certain related transaction and financing fees.

18.     The 2011 Amend and Extend Transaction was in many respects an unprecedented capital markets transaction, as the TCEH Debtors, in the face of grave economic threats that substantially undermined their financial performance, effectively refinanced nearly ***$20 billion*** of their first lien debt obligations and obtained critical covenant headroom in exchange for certain market-rate fees.

## G.     2013 Amend and Extend Transaction

19.     On January 4, 2013, lenders holding the remaining unextended portion of the revolving credit facility commitments—approximately $646 million in the aggregate—agreed to extend the maturity date of such commitments from October 2013 to October 2016 (the "2013 Amend and Extend Transaction").  In exchange, TCEH paid, *inter alia*, an extension fee to the participating lenders in the form of the deemed

---

[21]    In exchange for agreeing to the Maintenance Covenant Amendment, consenting lenders received a 50 basis point amendment fee.

[22]    A copy of the indenture governing the First Lien Notes is attached as Exhibit 10 to the Declaration of Christopher A. Ward, dated February 19, 2015, which is annexed to the TCEH Committee Standing Motion as Exhibit A.

incurrence of $0.5264 in incremental term loans for each $1.00 of extended 2013 revolving credit commitments.  The aggregate principal amount of incremental term loans deemed to have been incurred pursuant to the 2013 Amend and Extend Transaction totaled $340 million.  As a result of the 2013 Amend and Extend Transaction, the TCEH Debtors extended the maturity dates on all of their remaining revolving credit facility commitments to October 2016.[23]

### H.    Restructuring Negotiations and the Filing of These Chapter 11 Cases

20.    Approximately one month after completing the 2013 Amend and Extend Transaction, the Debtors commenced full-blown restructuring negotiations with certain of their largest stakeholders, including the Ad Hoc Committee of TCEH First Lien Creditors.  Between February and November 2013, the Debtors issued three separate public disclosures describing or attaching no fewer than eight formal restructuring proposals that the parties shared during this period.  Ultimately, these arduous prepetition negotiations culminated in an agreement among certain of the Debtors' largest creditors on the terms of a restructuring plan, which was embodied in the restructuring support agreement executed shortly before the Petition Date.  The Debtors subsequently exercised their right to terminate the restructuring support agreement in July 2014.

### OBJECTION

21.    The Third Circuit Court of Appeals has held that bankruptcy courts may confer derivative standing upon a party to bring causes of action on behalf of a debtor's estate.  *Official Comm. of Unsecured Creditors of Cybergenics Corp.* v. *Chinery*, 330 F.3d 548, 580 (3d Cir. 2003).  But there is no absolute entitlement to derivative

---

[23]    The Ad Hoc Committee of TCEH First Lien Creditors does not address herein the 2013 Amend and Extend Transaction.

standing—it requires:  (1) a colorable claim; (2) that the debtor unjustifiably refuses to

pursue; and (3) the bankruptcy court's authorization to initiate the action.  *See, e.g.*,

*Infinity Investors Ltd.* v. *Kingsborough (In re Yes! Entm't Corp.)*, 316 B.R. 141, 145 (D.

Del. 2004); *In re Centaur, LLC*, No. 10-10799 (KJC), 2010 WL 4624910, at \*4 (Bankr.

D. Del. Nov. 5, 2010).  The party seeking standing must satisfy all of the prerequisites for

such relief.  *Yes! Entm't Corp.*, 316 B.R. at 145.

        22.     The "colorable claim" standard mirrors the standard for dismissing

a complaint for failure to state a claim.  *Centaur*, 2010 WL 4624910, at \*4.[24]  To survive

a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, "a

complaint must contain sufficient factual matter, accepted as true, to 'state a claim to

relief that is plausible on its face.'"  *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting

*Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).[25]  Additionally, a complaint

should be dismissed if it does not contain "enough factual matter (taken as true)" to

demonstrate "plausible entitlement to relief."  *Twombly*, 550 U.S. at 556-59.  A complaint

that "pleads facts that are 'merely consistent with' a defendant's liability . . . 'stops short

of the line between possibility and plausibility of 'entitlement to relief'" and, thus, fails to

---

[24]    The TCEH Committee cites two unpublished bench decisions (including a 2008 unpublished decision issued by Judge Shannon) for the proposition that the colorability standard is less rigorous than the motion to dismiss standard.  TCEH Committee Standing Motion ¶ 108.  However, the published decisions from this Court (including a recent published decision by Judge Shannon) clearly hold to the contrary.  *See, e.g.*, *In re Optim Energy, LLC*, No. 14-10262 (BLS), 2014 WL 1924908, at \*6 (Bankr. D. Del. May 13, 2014) (Shannon, J.) ("In deciding whether there is a colorable claim, the court should undertake the same analysis as when a defendant moves to dismiss a complaint for failure to state a claim." (quoting *Centaur*, 2010 WL 4624910, at \*4)).

[25]    *See also Walker* v. *Sonafi Pasteur d/b/a Avents,(In re Aphton Corp.*), 423 B.R. 76, 85-86 (Bankr. D. Del. 2010).

state a claim for which relief can be granted. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).[26]

23.    In considering whether to grant derivative standing, a court must also assess "the likely benefit to the estate" of pursuing the subject litigation. *In re MIG, Inc.*, No. 09-12118 (KG), 2009 WL 8662897, at *2 (Bankr. D. Del. Dec. 18, 2009). The court should "assure itself that there is a sufficient likelihood of success to justify the anticipated delay and expense to the bankruptcy estate that the initiation and continuation of litigation will likely produce." *Id.* (quoting *Unsecured Creditors Comm. of Debtor STN Enters.* v. *Noyes (In re STN Enters.)*, 779 F.2d 901, 906 (2d Cir. 1985)).

24.    For the reasons described below, the Standing Motions fail to articulate colorable claims. And consideration of the costs of prosecuting such claims, including the substantial delay, uncertainty and expense such litigation would impose on the TCEH Debtors' estates and their overall restructuring efforts, coupled with their lack of merit, weighs strongly against pursuit of the claims and further demonstrates that the Debtors were justified in refusing to pursue them. Accordingly, this Court should deny the Standing Motions.

## I.    THE 2007 ACQUISITION (COUNT I)

25.    Count I of the Complaint represents the TCEH Junior Creditors' boldest—and most baseless—cause of action: in it they seek to avoid over $20 billion of liens, security interests and obligations on the theory that the 2007 Acquisition (a transaction that closed ***more than seven years ago*** and that was funded ***with more than $8 billion of new equity***) was a constructive fraudulent conveyance. But pursuit of Count

---

[26]    *See also Fowler* v. *UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (stating that "'bare-bones' allegations" or "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" will not survive a motion to dismiss (citing *Iqbal*, 556 U.S. at 678)).

I is futile because the claim is time-barred under any applicable statute of limitations. Moreover, the allegations in the Complaint, together with publicly available market-based evidence, clearly demonstrate that the TCEH Debtors were not rendered insolvent as a result of the 2007 Acquisition and that they received reasonably equivalent value in connection therewith. Finally, the TCEH First Lien Creditors have a number of meritorious affirmative defenses, including pursuant to section 546(e) of the Bankruptcy Code, which would require dismissal of any such claim.[27]

### A.    Constructive Fraudulent Conveyance Claims Relating to the 2007 Acquisition Are Time-Barred

26.    The 2007 Acquisition, and the initial incurrence of obligations under the Credit Agreement, occurred more than six years prior to the Petition Date. As a result, a constructive fraudulent conveyance claim related to such transactions is time-barred under section 548 of the Bankruptcy Code and the fraudulent conveyance statutes of Texas, Delaware and New York, the only likely applicable state laws. *See* 11 U.S.C. § 548; Tex. Bus. & Com. Code Ann. § 24.010; Del. Code Ann. Tit. 6 § 1309; N.Y. C.P.L.R. § 213.

27.    Desperate to avoid this outcome, the TCEH Junior Creditors take the extraordinary position that, pursuant to section 544(b) of the Bankruptcy Code, they can instead invoke a ten-year limitations period allegedly available to the Internal Revenue Service (the "IRS") for the collection of assessed taxes under the Internal Revenue Code (the "IRC"). TCEH Committee Standing Motion ¶ 136. This argument fails for at least two reasons. *First*, the IRS is not a viable "triggering creditor" for the

---

[27]    The Ad Hoc Committee of TCEH First Lien Creditors reserves all rights to assert such affirmative defenses at the appropriate time, including that the TCEH first lien creditors, as good faith transferees, are entitled to retain their liens and claims to the extent of the value given to the TCEH Debtors. *See, e.g.*, Del. Code Ann. Tit. 6 § 1308(d).

███████ of the TCEH Debtors, which are disregarded for tax purposes, and therefore the TCEH Junior Creditors cannot step into the shoes of the IRS to pursue a constructive fraudulent conveyance claim on behalf of such debtors. *Second*, even if the IRS were such a creditor, the TCEH Junior Creditors cannot invoke the legal principle—*nullum tempus occurrit regi*—that uniquely immunizes the IRS from a state limitations period, as this limited sovereign immunity is only applicable "to an action brought by the federal government to vindicate public rights or public interests . . . ." *Marshall* v. *Intermountain Elec. Co.*, 614 F.2d 260, 262 (10th Cir. 1980).

  i.      *The IRS Is Not a Viable "Triggering Creditor"*

28.     Section 544(b)(1) of the Bankruptcy Code allows the trustee (or a creditor, acting derivatively on its behalf) to succeed only to the rights of an actual unsecured creditor with an allowable claim as of the commencement of a case (a so-called "triggering creditor"). *See* 11 U.S.C. § 544(b)(1). Thus, at most, the TCEH Junior Creditors can only seek to appropriate the IRS's limitations period for themselves with respect to the TCEH Debtors against whom the IRS held an allowable claim as of the Petition Date.[28]

29.     The TCEH Junior Creditors allege that the IRS's claims relate to ███████ and, importantly, concede that such claims can only be asserted "against those Debtors who were corporate members of the EFH consolidated tax group ███████." Complaint ¶ 110. This concession, which is consistent with applicable law, disables the

---

[28]    *See, e.g., Eberhard* v. *Marcu*, 530 F.3d 122, 129 (2d Cir. 2008) ("It is well settled that in order to set aside a fraudulent conveyance, one must be a creditor of the transferor . . . ."); *Official Comm. of Unsecured Creditors of Cybergenics Corp.* v. *Chinery*, 226 F.3d 237 (3d Cir. 2000) ("[F]raudulent transfer claims have long belonged to a *transferor's creditors*, whose efforts to collect their debts have essentially been thwarted as a consequence of the transferor's actions, and that tradition continues today.") (emphasis added).

TCEH Junior Creditors from prosecuting Count I on behalf of the ████████ of the TCEH Debtors.

30.    TCEH is a limited liability company that is "disregarded" as separate from EFH for federal income tax purposes.  *Omnibus Tax Memorandum* 6-7 [Docket No. 2296].  ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████[29]  As such, ████ ████ "are essentially ignored for federal income tax purposes" and are not liable to the IRS for the federal income taxes incurred by the members of a consolidated tax group. *Id.*; *see also* 26 C.F.R. §§ 301.7701-2(a), 301.7701-3(a).  Accordingly, as to those disregarded entities, the IRS cannot serve as a "triggering creditor" under section 544(b) of the Bankruptcy Code and the TCEH Junior Creditors cannot therefore be granted standing to pursue derivative claims on its behalf.

>    ii.    *The TCEH Junior Creditors Cannot Invoke the IRS's Sovereign Immunity from a State Statute of Limitations*

31.    Even assuming *arguendo* that the IRS was a creditor of each of the TCEH Debtors as of the Petition Date, Count I would nevertheless be time-barred.  The viability of Count I hinges on the TCEH Junior Creditors' ability to invoke a legal principle—*nullum tempus occurrit regi* ("time does not run against the king")—that uniquely immunizes the IRS from a state fraudulent conveyance statute's limitations period.  For the reasons discussed below, the TCEH Junior Creditors cannot cloak themselves with the *nullum tempus* defense.

---

[29]    Attached hereto as **Exhibit F** is the corporate structure chart included in the First Day Declaration.

32.     It is true that the IRS, when acting in its sovereign capacity, is typically not bound by a state fraudulent conveyance statute's limitations period.  *See, e.g.*, *Wagner* v. *Ultima Homes, Inc. (In re Vaughan Co.)*, 498 B.R. 297, 303 (Bankr. D.N.M. 2013) ("Vaughan") ("[T]o the extent the IRS seeks to collect taxes using the UFTA, the action would not be governed by any state statute of limitations.").  "The doctrine that 'the United States is not bound by state statute of limitation . . . in enforcing its rights' is known as *nullum tempus occurrit regi*."  *Id.* at 304 (quoting *U.S.* v. *Summerlin*, 310 U.S. 414, 416 (1940)).  This public policy exemption to the applicability of a state limitations period is based on the view "that the public interest should not be prejudiced by the negligence of public officers, to whose care they are confided."  *U.S.* v. *Knight*, 39 U.S. 301, 315 (1840).

33.     IRC section 6502,[30] upon which the TCEH Junior Creditors rely for what they describe as a ten-year limitations period,[31] serves to limit the doctrine of *nullum tempus* by requiring the IRS to bring a proceeding to collect an unpaid tax within ten years of its assessment.  It is the doctrine of *nullum tempus*, however, upon which the IRS must rely to avoid application of an otherwise applicable "look back" period under state law.  That doctrine is nowhere mentioned in the TCEH Junior Creditors' Standing Motions and the TCEH Junior Creditors' sole reliance on IRC section 6502 is misplaced.[32]

---

[30]    IRC section 6502 provides, in relevant part, that "[w]here the assessment of any tax imposed by this title has been made within the period of limitation applicable thereto, such tax may be collected by levy or by a proceeding in court, but only if the levy is made or the proceeding begun . . . within 10 years after the assessment of the tax . . . ."  26 U.S.C. § 6502(a)(1).

[31]    *See* TCEH Committee Standing Motion ¶ 136.

[32]    IRC section 6502 is forward-looking, as it authorizes the IRS to pursue tax collection remedies for up to ten years *after* an assessment is made.  IRC section 6502 does not address the IRS's "look back period" under state fraudulent conveyance laws.  *Nullum tempus*, on the other hand, in certain

34.    As described below, however, there exist well-developed, court-established limitations on a private litigant's ability to step into the shoes of the IRS to benefit from its unique sovereign immunity.

35.    *First*, *nullum tempus* only protects the federal government,[33] and only when the federal government is acting in its sovereign capacity. *See, e.g.*, *U.S.* v. *Beebe*, 127 U.S. 338, 344 (1888) ("[T]he United States are not bound by any statute of limitations . . . in a suit brought by them *as a sovereign Government* to enforce a public right, or to assert a public interest . . . .") (emphasis added); *Dole* v. *Local 427, IUE*, 894 F.2d 607, 611 (3d Cir. 1990) ("The critical issue . . . is whether the *[g]overnment was acting in its [g]overnmental capacity and asserting its claim in that right* or whether the [g]overnment was acting in . . . nothing more than a dispute between two [private] parties . . . .") (emphasis added) (internal quotation marks omitted).

36.    Courts have consistently refused to apply *nullum tempus* where the federal government is a mere nominal litigant or a conduit for litigation that is principally between private parties. *See, e.g.*, *Beebe*, 127 U.S. at 347 ("The mere use of [the federal

---

circumstances will immunize the IRS from a state statute of limitations that would otherwise run while the IRS may pursue collection remedies pursuant to federal law. This does not mean, however, that the IRS will always have a ten-year look back period to challenge a fraudulent conveyance. Consider the following hypothetical: (1) transferor fraudulently conveys assets in 2005; (2) transferor fails to pay taxes in 2012 and the IRS issues an assessment against the transferor in 2013 in respect of the disputed 2012 taxes; and (3) transferor files for chapter 11 protection in 2014. In this scenario, while the allegedly fraudulent transfer occurred less than ten years prior to petition date, the IRS would likely not be permitted to challenge the 2005 transaction as a fraudulent conveyance on account of the 2013 assessment. This is because the IRS did not become a creditor of the transferor until 2012 or 2013, which was after the limitations period expired on the 2005 fraudulent transfer (assuming a four-year limitations period, as is applicable under most state fraudulent conveyance statutes). In such circumstances, *nullum tempus* would not revive an otherwise extinguished claim. *See, e.g.*, *Bresson* v. *Comm'r*, 213 F.3d 1173, 1176 (9th Cir. 2000) ("[I]f the United States comes into possession of a valid claim, that claim cannot be 'cut off' later by a statute of limitations. On the other hand, if a claim *already has become infirm* (for example, when a limitations period expires) by the time the United States acquires the purported right, the rule of *Summerlin* will not operate to revive the claim.").

[33]    In certain states, *nullum tempus* also shields a state government, acting in its sovereign capacity and in furtherance of a public interest or public purpose, from the expiration of a statute of limitations.

government's] name in a suit for the benefit of a private suitor cannot extend its immunity . . . to said private suitor . . . ."); *Marshall*, 614 F.2d at 262 n.3 (*nullum tempus* is not available where "the federal government functions as a mere conduit for the enforcement of private rights which could have been enforced by the private parties themselves").

37.    This is true even in the highly analogous circumstance in which a private litigant seeks, by right of subrogation or assignment, to step into the shoes of a sovereign government and assert claims on the government's behalf.  *See, e.g.*, *McCloskey & Co.*, v. *Wright*, 363 F. Supp. 223, 228 (E.D. Va. 1973) ("The law appears to be well-settled, however, that an assignee of a government claim may not rely upon the government's immunity to the statute of limitations where it is intended to enforce the claim for private benefit."); *Sch. Dist. of the Borough of Aliquippa* v. *Md. Casualty Co.*, 402 Pa. Super. 569, 581-83 (Pa. Sup. Ct. 1991) (holding that surety, as subrogee of school district, could not invoke *nullum tempus* against school district's auditor to defeat statute of limitations defense); *Fid. & Deposit Co. of Md.* v. *First Nat. Bank*, 54 S.W.2d 964, 965 (Tenn. 1932) ("While the subrogees stood in the shoes of the creditor whose debt they paid, as equitable assignees, they were only assignees of the debt and of all the securities for its payment.  It cannot be said they became assignees of the state's sovereign right of exemption from the operation of the statute of limitations.").

38.    None of the TCEH Junior Creditors is a "sovereign" and none is pursuing Count I in a "sovereign capacity."  Indeed, even if the TCEH Junior Creditors were direct assignees or subrogees of the IRS's claims, *nullum tempus* would be inapplicable.  Accordingly, the TCEH Junior Creditors cannot avail themselves of *nullum*

*tempus* to prosecute the Complaint, which is merely "a conduit through which one private person [seeks to] conduct litigation against another private person." *Beebe*, 127 U.S. at 347.

39.    *Second*, not only is *nullum tempus* only available to the federal government acting in its sovereign capacity, but it can only be invoked "to enforce public rights and protect public interests." *Vaughan*, 498 B.R. at 305.[34]   Count I is a quintessential private action, brought by one private creditor constituency against another, for the sole purpose of reordering creditor priorities.  As such, there can be no argument that its prosecution is in furtherance of any "public right" or "public interest." *See, e.g.*, *Williams* v. *Infra Commerc Anstalt*, 131 F. Supp. 2d 451, 457-58 (S.D.N.Y. 2001) (holding that Delaware Insurance Commissioner could not invoke *nullum tempus* where it sought to prosecute fraudulent conveyance claims for the benefit of a private company's policyholders, shareholders and creditors); *Vaughan*, 498 B.R. at 305 (holding that chapter 11 trustee could not invoke *nullum tempus* to bring fraudulent conveyance claim "for the benefit of [the debtor's] creditors generally").

40.    *Third*, section 544 of the Bankruptcy Code does not permit a private litigant to invoke the IRS's unique rights and privileges as a sovereign tax collector.  *See Schlossberg* v. *Barney*, 380 F.3d 174 (4th Cir. 2004).  In *Schlossberg*, the debtor claimed an exemption in certain real property he owned with his non-debtor spouse as tenants in the entirety.  *Id.* at 176.  The trustee objected to the claimed

---

[34]    *See also Marshall*, 614 F.2d at 262 n.3 ("An action which, although brought in the name of the United States, involves no public rights or interests may be subject to a state statute of limitations."); *Kinder* v. *Coleman & Yates Coal Co.*, 974 F. Supp. 868, 872-75 (W.D. Va. 1997) (holding that federal government, as administrator of the Black Lung Disability Trust, could not invoke *nullum tempus* because the relevant enforcement action did "not serve a broad public policy" but rather had "a specific individual beneficiary" and provided only "the equivalent of money damages").

exemption and argued that it could instead avail itself, pursuant to section 544(a)'s

strong-arm provision, of the right—uniquely available to the IRS—to assert a tax lien

against such property to claim its value for the benefit of the debtor's creditors. *Id.* at

176-77. The Fourth Circuit rejected the trustee's argument, concluding that "[n]othing in

the text or legislative history of [section 544] suggests that Congress intended a

bankruptcy trustee to be capable of *invoking the [IRS's] 'sovereign prerogative'* to attach

property that ordinary secured creditors could not reach." *Id.* at 181 (emphasis added).

      41.    In the instant case, as in *Schlossberg*, the TCEH Junior Creditors

seek to utilize section 544 to invoke powers uniquely available to the IRS when it acts

pursuant to its "sovereign prerogative" to collect taxes. In both cases, allowing the

exercise of such rights and privileges would empower an estate representative to act in

ways that no private litigant could under applicable state law. The court's admonition in

*Schlossberg* that it did not believe "Congress intended a bankruptcy trustee to wield the

extraordinary collection powers of the federal government" applies with equal force here.

      42.    *Finally*, "section 544(b) is meant to incorporate state law, not

subordinate it." *Vaughan*, 498 B.R. at 305; *see also In re Truong*, 285 F. App'x 837, 839

(3d Cir. 2008) ("Section 544(b)(1) is a vehicle in which a trustee may recover

fraudulently transferred assets of the debtor's property under a state's fraudulent

conveyance laws."). The section's legislative history confirms this point.[35] Given the

IRS's ubiquitous role as a creditor in the vast majority of chapter 11 cases, permitting an

estate representative to invoke *nullum tempus* would "eviscerate the UFTA's four-year

look back period in most bankruptcy cases." *Vaughan*, 498 B.R. at 305. In light of

---

[35]   *See, e.g.*, H.R. Doc. No. 137, 93rd Cong., 1st Sess., at 30 (1973) (noting that section 70(e) of the Bankruptcy Act, the section of the Bankruptcy Act from which section 544 was derived, gives the trustee "the rights under *state law* of any actual creditor or creditors . . .") (emphasis added).

Congress's intent that section 544 codify—not subvert—the rights of creditors under state law, the Court should not adopt an interpretation that upsets otherwise settled law and expectations. *See id.*

43.    Admittedly, a handful of courts from outside this jurisdiction have reached a contrary result, concluding that a trustee can invoke the IRS's sovereign immunity to challenge transactions that would otherwise be time-barred under a state fraudulent conveyance statute. *See, e.g.*, *Ebner* v. *Kaiser (In re Kaiser)*, --- B.R. ---, 2014 WL 7409593 (Bankr. N.D. Ill. Dec. 31, 2014); *Alberts* v. *HCA Inc. (In re Greater Se. Cmty. Hosp. Corp. I)*, 365 B.R. 293 (Bankr. D.C. 2006). Their reasoning is flawed and should not be followed by this Court. Most notably, these courts fail to address the exceedingly narrow scope of the *nullum tempus* defense described above and do not articulate a legitimate basis to permit a trustee to invoke rights under section 544 that ***no private litigant could wield outside of bankruptcy***. Instead, without much analysis, these courts blindly conclude that, so long as the IRS could theoretically assert the underlying fraudulent conveyance claim (in reliance on *nullum tempus*), section 544 invariably permits a private litigant to do so the same. *See, e.g.*, *Greater Se. Cmty. Hosp.*, 365 B.R. at 304. But these courts fail to grapple with the limitations on the *nullum tempus* defense, and in so doing, "pervert the purpose of *nullum tempus*, which is to immunize the federal government from certain state laws." *Vaughan*, 498 B.R. at 304-05. This is especially true given the absence of any indication that Congress intended section 544 to allow a trustee "to wield the extraordinary collection powers of the federal government." *Schlossberg*, 380 F.3d at 181.

44.     These courts' reasoning is also inconsistent with rulings outside of bankruptcy that should inform this Court's consideration of section 544's scope.  For example, the Supreme Court has held that the federal government itself cannot invoke *nullum tempus* to defeat a state statute of limitations when the government is subrogated to the rights of a private creditor.  *See U.S.* v. *California*, 507 U.S. 746 (1993) (holding that federal government's tax refund claim, acquired by right of subrogation from a private contractor, was subject to a state statute of limitations).  If the federal government cannot invoke *nullum tempus* to litigate a private action, then a private litigant's ability to do so is even more specious.  Similarly, an assignee or subrogee of a government claim cannot benefit from the government's sovereign immunity from a state statute of limitations.  *See supra* ¶ 37.  If a private litigant that is a direct assignee of the government cannot avail itself of *nullum tempus* outside of bankruptcy, there is no basis to authorize a creditors' committee, as a representative for a debtor's unsecured creditors, to cloak itself in such protections.

45.     These examples demonstrate the fatal flaws of the TCEH Junior Creditors' position and the inability to harmonize their arguments with the extensive caselaw defining the parameters of the *nullum tempus* defense.  If Congress had intended that section 544 would so dramatically expand the rights of private creditors beyond those that they could exercise outside of bankruptcy, it would have expressly indicated so.  Instead, section 544's title (Trustee as lien creditor and as successor to certain creditors and purchasers), legislative history and purpose evidence the exact opposite, reflecting an intent to codify—not subordinate—existing state law.

46.    Accordingly, the TCEH Junior Creditors cannot utilize section 544(b) of the Bankruptcy Code to invoke the IRS's limited sovereign immunity from a state fraudulent conveyance statute's limitations period.  Standing to bring this time-barred claim should be denied.

**B.    The 2007 Acquisition Did Not Render the TCEH Debtors Insolvent**

47.    Count I also fails to present a colorable claim, or at least a claim worth pursuing, because the 2007 Acquisition—a transaction in which the Sponsors contributed ***more than $8 billion of new equity*** and following which the TCEH Debtors expended billions of dollars while operating in the ordinary course of business ***for nearly seven years***—did not render the TCEH Debtors insolvent or leave them with unreasonably small capital with which to operate their business.  Given the futility of the TCEH Junior Creditors' insolvency arguments, their pursuit of Count I would not confer any benefit upon the estate, as evidenced by the Debtors' justifiable refusal to assert such a claim in the first instance.[36]

48.    To prevail on Count I, the TCEH Junior Creditors must establish that as a result of the 2007 Acquisition, each of the TCEH Debtors:[37]  (i) was rendered insolvent on a balance sheet basis (the "Balance Sheet Test"); (ii) was left with unreasonably small capital with which to operate its business (the "Adequate

---

[36]    For the reasons set forth herein, the TCEH Junior Creditors' attempt to limit the TCEH First Lien Creditors' claims against the Guarantors also fails as such entities were not rendered insolvent by the 2007 Acquisition.

[37]    A fraudulent conveyance claim must be analyzed on an entity-by-entity basis. *See, e.g.*, *Claybrook* v. *Pricewaterhousecoopers U.S. LLC (In re Am. Remanufacturers, Inc.)*, Bankr. No. 05-20022 (PJW), Adv. No. 07-50967 (KG), 2007 WL 2376723, at *10-11 (Bankr. D. Del. Aug. 16, 2007).  The Complaint fails to do so, and instead includes only conclusory statements regarding the alleged insolvency of the TCEH Debtors *in toto*.  In the absence of *entity-specific* allegations (which rise above the level of mere conclusory statements that parrot the claim's statutory predicates), Count I fails to meet the necessary pleading standards and therefore is not "colorable."  *See, e.g.*, *Angell* v. *BE Care, Inc. (In re Caremerica, Inc.)*, 409 B.R. 737, 756 (Bankr. E.D.N.C. 2009).

Capitalization Test"); or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due (the "Equity Test"). *See, e.g.*, Del. Code Ann. Tit. 6 §§ 1304(a)(2), 1305; *Brandt* v. *Trivest II, Inc. (In re Plassein Int'l Corp.)*, Bankr. No. 03-11489 (KG), Adv. No. 05-51472 (KG), 2008 WL 1990315, at *8 (Bankr. D. Del. May 5, 2008). With respect to Count I, the Complaint's only relevant allegations relate to the Balance Sheet Test and, to a far lesser extent, the Adequate Capitalization Test.[38]

49.     The Balance Sheet Test requires that "[t]he debtor's assets and liabilities are tallied at fair valuation to determine whether the corporation's debts exceed its assets." *Mellon Bank, N.A.* v. *Metro Commc'ns, Inc.*, 945 F.2d 635, 648 (3d Cir. 1999); *see also* 11 U.S.C. § 101(32)(A); Del. Code Ann. Tit. 6 § 1302(a). The Adequate Capitalization Test, on the other hand, looks to whether an entity is unable to generate sufficient profits to sustain operations so that the transferor is "technically solvent but doomed to fail." *MFS/Sun Life*, 910 F. Supp. 913, 944 (S.D.N.Y. 1995) (citing *Moody* v. *Sec. Pac. Bus. Credit*, 971 F.2d 1056, 1070 & n.22 (3d Cir. 1992)). This requires consideration of whether a company was left with so few assets that its inability to pay debts in the future should have been "reasonably foreseeable." *Moody*, 971 F.2d at 1073; *see also Boyer* v. *Crown Stock Distrib., Inc.*, 587 F.3d 787, 792 (7th Cir. 2009) (holding that corporation was left with unreasonably small capital when the transfer in question left it "with insufficient assets to have a reasonable chance of surviving indefinitely").

---

[38]    To the extent the TCEH Junior Creditors rely on the Equity Test to support Count I, the Complaint falls far short of the relevant pleading standards, which would require allegations that the TCEH Debtors subjectively intended to incur debts beyond their ability to repay as they came due. *See In re Best Prods. Co.*, 168 B.R. 35, 52 n.28 (Bankr. S.D.N.Y. 1994), *aff'd*, 68 F.3d 26.

50.     "[T]he length of time a company continued to operate and pay

creditors after a disputed transfer" is a critical factor courts will consider in assessing the

adequacy of its capitalization. *Fid. Bond & Mortg. Co.* v. *Brand (In re Fid. Bond. &*

*Mortg. Co.)*, 340 B.R. 266, 299 (Bankr. E.D. Pa. 2006), *aff'd*, 371 B.R. 708 (E.D. Pa.

2007); *accord Daley* v. *Chang (In re Joy Recovery Tech. Corp.)*, 286 B.R. 54, 76 (Bankr.

N.D. Ill. 2002) ("[C]ourts will not find that a company had unreasonably low capital if

the company survives for an extended period after the subject transaction . . . .").[39]

51.     Courts in the Third Circuit and elsewhere have repeatedly

emphasized the importance of relying on objective, market-based evidence in considering

a company's solvency for fraudulent conveyance purposes. *See, e.g.*, *VFB LLC* v.

*Campbell Soup Co.*, 482 F.3d 624, 633 (3d Cir. 2007) (holding that the district court did

not err in relying on evidence from the public debt and equity markets because "[a]bsent

some reason to distrust it, the market price is a more reliable measure of stock's value

than the subjective estimates of one or two expert witnesses") (internal quotations

omitted).[40]

---

[39]  *See also Moody* v. *Sec. Pac. Bus. Credit*, 127 B.R. 958, 985 (W.D. Pa. 1991) (finding no unreasonably small capital where creditors were paid for twelve months after transaction), *aff'd*, 971 F.2d 1056 (3d Cir. 1992); *MFS/Sun Life Trust-High Yield Series*, 910 F. Supp. at 943 (stating that where "the company remained viable so long [*i.e.* for eight months] after the LBO strongly suggests that its ultimate failure cannot be attributed to inadequacy of capital as of the date of the buyout").

[40]  *See also Metlyn Realty Corp.* v. *Esmark, Inc.*, 763 F.2d 826, 835 (7th Cir. 1985) ("[T]he price of stock in a liquid market is presumptively the one to use in judicial proceedings."); *Peltz* v. *Hatten*, 279 B.R. 710, 737-38 (D. Del. 2002) ("[I]n determining whether a value is objectively reasonable the court gives significant deference to marketplace values.  When sophisticated parties make reasoned judgments about the value of assets that are supported by then prevailing marketplace values and by the reasonable perceptions about growth, risks and the market at the time, *it is not the place of fraudulent transfer law to reevaluate or question those transactions with the benefit of hindsight*.") (emphasis added), *aff'd*, 60 F. App'x 401 (3d Cir. 2003); *Statutory Comm. of Unsecured Creditors* v. *Motorola, Inc. (In re Iridium Operating LLC)*, 373 B.R. 283, 293 (Bankr. S.D.N.Y. 2008) ("[T]he public trading market constitutes an impartial gauge of investor confidence and remains the best and most unbiased measure of fair market value and, when available to the Court, is the preferred standard of valuation.").

52.     Substantial market-based evidence, together with multiple expert valuations of the TCEH Debtors' assets prepared at the time of the 2007 Acquisition and the fact that the TCEH Debtors continued to operate in the ordinary course of business *for nearly seven years following the 2007 Acquisition*, lead ineluctably to the conclusion that the TCEH Debtors had billions of dollars of positive equity value following consummation of the 2007 Acquisition.  The TCEH Junior Creditors' hindsight-dependent attempt to impeach this evidence, in which they blithely ignore the effects of unforeseeable, exogenous, subsequent events, is inconsistent with applicable legal standards and should be rejected by the Court.  *See, e.g.*, *Mellon Bank, N.A.* v. *Official Comm. of Unsecured Creditors of R.M.L. (In re R.M.L.)*, 92 F.3d 139, 155 (3d Cir. 1996) ("The use of hindsight to evaluate a debtor's financial condition has been criticized by courts and commentators alike.").

53.     The TCEH Junior Creditors acknowledge that D&P, a highly-respected financial advisory firm that specializes in providing solvency and fairness opinions, prepared a solvency analysis at the time of the 2007 Acquisition in which it concluded that the TCEH Debtors had ██████████████████████████████ after consummating the 2007 Acquisition.  *See* Complaint ¶ 36.  Tellingly, the TCEH Junior Creditors neglect to reference the fairness opinion that Lazard, *the TCEH Committee's own financial advisor*, prepared in connection with the same transaction.  As part of its fairness opinion, Lazard valued the TCEH Debtors' assets at between $28.1 billion and $32.1 billion.  Proxy Statement at 46.  Even at the low-point of the TCEH Committee's own financial advisor's contemporaneous valuation of the TCEH Debtors' assets, the TCEH Debtors were solvent following the 2007 Acquisition; specifically, at the mid-

point of Lazard's analysis, the TCEH Debtors had approximately **$2.6 billion** of positive

equity value *pro forma* for consummation of the 2007 Acquisition.

54.     Further undercutting the TCEH Junior Creditors' insolvency

allegation is the fact that following the 2007 Acquisition, the TCEH Debtors accessed the

capital markets and issued **$6.75 billion of new unsecured notes** (the most junior

securities in the TCEH Debtors' capital structure) to refinance the Bridge Facility.[41]  *See*

*Iridium*, 373 B.R. at 349 (debtor's ability to raise debt in the capital markets was an

indication of "both solvency and capital adequacy").  The largest initial purchaser of the

TCEH Unsecured Notes was none other than Warren Buffet, one of the most celebrated

value investors of all time.  Berkshire Hathaway's confidence in the TCEH Debtors'

creditworthiness was validated by the market:  for the first eleven months after the 2007

---

[41]    It should be noted that the holders of the TCEH Unsecured Notes are precluded from avoiding the transactions relating to the 2007 Acquisition pursuant to the "ratification doctrine," which bars creditors that participated in an allegedly fraudulent transaction from subsequently avoiding it as a fraudulent conveyance.  *See, e.g., Weisfelner* v. *Fund 1 (In re Lyondell Chem. Co.)*, 503 B.R. 348, 383-84 (Bankr. S.D.N.Y. 2014) ("Creditors who authorized or sanctioned the transaction, or, indeed, participated in it themselves, can hardly claim to have been defrauded by it, or otherwise to be victims of it.");  *Best Prods.*, 168 B.R. at 57 ("A fraudulent transfer is not void, but voidable; thus, it can be ratified by a creditor who is then estopped from seeking its avoidance.").  Here, the initial purchasers of the TCEH Unsecured Notes made such purchases knowing that the TCEH Debtors would use the proceeds thereof to repay the Bridge Facility, which was incurred as part of the 2007 Acquisition.  Energy Future Holdings Corp., Current Report (Form 8-K) (Oct. 31, 2007); Energy Future Holdings Corp., Current Report (Form 8-K) (Dec. 12, 2007).  Accordingly, such creditors ratified the 2007 Acquisition and, thus, are estopped from avoiding any transactions in connection therewith.  *See In re Refco, Inc., Secs. Litigation*, No. 09-Civ-2885-GEL, 2009 WL 7242548 (S.D.N.Y. Nov. 13, 2009) (holding that lender who "voluntarily participated" in allegedly fraudulent transaction could not serve as a triggering creditor under section 544(b) of the Bankruptcy Code); *Lyondell*, 503 B.R. at 384-85 (holding that lenders' knowledge that the proceeds of their loans would be paid to shareholders as part of a leveraged buyout transaction was sufficient to prohibit creditors' trust from bringing fraudulent conveyance claims arising from the leveraged buyout on the lenders' behalf).  Moreover, it would be inequitable to allow the TCEH Junior Creditors to bring a claim where the proposed beneficiaries of such claim (holders of the TCEH Unsecured Notes) have already received the benefit of their bargain—a junior position in the TCEH Debtors' capital structure and the accompanying high interest rates.  *See Bangor Punta Operations, Inc.* v. *Bangor & A.R. Co.*, 417 U.S. 703, 711 (1974) (holding that corporation could not assert claims against its former shareholders where the beneficiaries of the claim—the new shareholders—had already "received all they had bargained for"); *see also Midland Food Servs., LLC* v. *Castle Hill Holdings V, LLC*, 792 A.2d 920, 930 (Del. Ch. 1999) (dismissing fraudulent conveyance causes of action based on *Bangor Punta* and noting that *Bangor Punta* "is not limited to barring claims for 'breach of fiduciary duty or corporate mismanagement'").

Acquisition, the TCEH Unsecured Notes traded at prices between 95-104% of par.[42]  As

late as September 5, 2008 (*i.e.*, days before Lehman Brothers' chapter 11 filing), the

TCEH Unsecured Notes traded above par.  *Id.*  The debt issuance and subsequent trading

history provides a "powerful indicator" of then contemporaneous market views of the

TCEH Debtors' solvency.  *See, e.g.*, *Iridium*, 373 B.R. at 348 (courts "recognize that '[a]

powerful indication of contemporary, informed opinion as to value' comes from private

investors who '[w]ith their finances and time at stake, and with access to substantial

professional expertise, [ ] concluded at the time [ ] that the business was indeed one that

could be profitably pursued.'" (quoting *Brandt* v. *Samuel, Son & Co. (In re Longview

Aluminum, LLC)*, 2005 WL 3021173, at *7 (N.D. Ill. July 14, 2005))).

55.    The TCEH Junior Creditors' position—that sophisticated

investors, including Warren Buffet, invested billions of dollars in the most junior debt in

the TCEH Debtors' capital structure when the company was already insolvent—is

fantastical.  *See Davidoff* v. *Farina*, No. 04 Civ. 7617 (NRB), 2005 WL 2030501, at *11

& n. 19 (S.D.N.Y. Aug. 22, 2005) (finding it important that "sophisticated investors with

the most intimate knowledge of [the debtor's] business plan and capitalization had

confidence in the company's future and certainly did not think that the company was

undercapitalized" since it makes "no economic sense for defendants to invest literally

billions of dollars in a venture that they knew would fail"); *Metlyn Realty*, 763 F.2d at

835 ("The price at which people actually buy and sell, putting their money where their

mouths are, is apt to be more accurate than the conclusions of any one analyst.").

---

[42]    *See supra* note 20.

56.     Another piece of market-based evidence that is catastrophic to the TCEH Junior Creditors' insolvency claim is the TCEH Debtors' robust expansion of their natural gas hedging program at or around the time of the 2007 Acquisition.  Pursuant to these transactions, the TCEH Debtors "locked-in" natural gas prices between $7.25 per MMBtu to $8.24 per MMBtu for 75% of their equivalent natural gas exposure for the period between 2008-2013.  Energy Future Holdings Corp., Quarterly Report (Form 10-Q) (Nov. 14, 2007) at 63.  This natural gas hedging program was a multi-billion dollar insurance policy that stabilized the TCEH Debtors' cash flows and capitalization *for six years following the 2007 Acquisition*.  By locking in forward sales of natural gas, the TCEH Debtors insulated their cash flows from any significant price reductions, thus ensuring the adequacy of their capitalization during this period.

57.     The TCEH Debtors' ability to purchase this substantial "insurance policy" that guaranteed high natural gas prices for several years following the 2007 Acquisition further evidences the reasonableness of the natural gas price assumptions underlying the 2007 Acquisition, and therefore the TCEH Debtors' solvency at the time.  Simply put, the TCEH Debtors could not have hedged a significant portion of their equivalent natural gas exposure *for six years following the 2007 Acquisition* at average prices between $7.25 per MMBtu to $8.24 per MMBtu if, as the TCEH Junior Creditors allege, it was clear that natural gas prices would drop following the 2007 Acquisition, and remain depressed for years thereafter.  Nor would these other market participants have taken the TCEH Debtors' credit risk on their swap transactions had they been concerned with the TCEH Debtors' solvency.[43]

---

[43]    The TCEH Debtors' ability to hedge a substantial portion of their equivalent natural gas exposure through 2012 at these prices was not an anomaly.  NRG Energy Inc., one of the Debtors' primary

58.    But, perhaps the most obvious evidence of the TCEH Debtors'
solvency is the simple fact that they continued to operate in the ordinary course of
business for **nearly seven years** after the 2007 Acquisition.  The TCEH Junior Creditors
have not—and cannot—cite a single case where a company that operated in the ordinary
course of business for more than six years after a subject transaction (expending billions
of dollars in the process) was found to have been rendered insolvent or inadequately
capitalized.  Indeed, courts have refused to avoid transactions as constructively fraudulent
where the debtor continued to operate for only 1-2 years, or even only a matter of
months, after the applicable transaction.  *See, e.g.*, *MFS/Sun Life Trust-High Yield Series*,
910 F. Supp. at 943 (concluding that notwithstanding the company's liquidation within
two years of an LBO, the fact that it remained viable as a going concern for that period of
time supported its adequacy of capital as of the time of the LBO); *Credit Managers Ass'n*
v. *The Fed. Co.*, 629 F. Supp. 175 (C.D. Cal. 1985) (holding that there was no fraudulent
transfer where the debtor materially missed projections and sought bankruptcy protection
seventeen months after a failed leveraged buyout); *Iridium*, 373 B.R. at 345-46 (holding
that transfers were not fraudulent where debtor sought bankruptcy protection nine months
after transfers); *In re Ohio Corrugating Co.*, 91 B.R. 430, 440 (Bankr. N.D. Ohio 1988)
(fact that debtor could pay trade creditors for ten months after buyout "belie[s] the
contention that this was a company which was in the throes of insolvency").
Significantly, Judge Shannon recently held that a company was not undercapitalized

---

competitors in the ERCOT market, also hedged a significant portion of its equivalent natural gas
exposure for 2008-2012 at prices ranging from $6.70-$7.70 per MMBtu.  *See* NRG Energy, Inc.,
Annual Report (Form 10-K) (Feb. 28, 2008) at 10-13.

where it continued operating for seven years after the subject transactions, noting that the "age of the transaction" was "significant." *Optim Energy*, 2014 WL 1924908, at *7-8.[44]

59.    Unable to identify *any* market-based evidence to substantiate their insolvency claim, the TCEH Junior Creditors ignore the overwhelming market evidence to the contrary and instead attempt in hindsight to impeach the reasonableness of the assumptions underlying the D&P 2007 Solvency Opinion. *See* Complaint ¶¶ 34-42. Specifically, the TCEH Junior Creditors argue that D&P erred because it should have utilized (a) ███ weighted average cost of capital ("WACC") and (b) "realistic natural gas price projections." *Id.* at ¶ 42. However, the TCEH Junior Creditors' efforts to undermine the D&P 2007 Solvency Opinion almost 7 ½ years later miss the mark by a wide margin.

60.    First of all, when assessing the reasonableness of projections, a court "must focus on information available at the time of the transaction, *not on hindsight*. The court should principally focus not on whether the projections were correct but on whether they were reasonable and prudent at the time they were made." *In re WCC Holding Corp.*, 171 B.R. 972, 985 (Bankr. N.D. Tex. 1994) (internal citations omitted) (emphasis added).[45]

---

[44]    There are numerous other indicia of the TCEH Debtors' solvency after the 2007 Acquisition. For example, the TCEH Debtors' audited financial statements reflected more than $4 billion of positive equity value as of December 31, 2007. Energy Future Competitive Holdings Co. LLC, Annual Report (Form 10-K) (Mar. 5, 2009) at 99; *see also Trenwick Am. Litig. Trust* v. *Ernst & Young, L.L.P.*, No. 1571-N, 2006 WL 4782378, at *22 (Del. Ch. Aug. 10, 2006) (finding no rational inference of insolvency where company's net book value was positive). In addition, for five years following the 2007 Acquisition, the TCEH Debtors' audited annual financial statements did not include a going-concern qualification from their auditor. *See Rehberger* v. *MRW Group, Inc.*, No. 05-CV-0210 (JS)(MLO), 2008 WL 919665, at *4 (E.D.N.Y. Mar. 31, 2008) (concluding that company was solvent based on, among other things, absence of going-concern qualification in company's audited financial statements for several consecutive years).

[45]    *See also Kipperman* v. *Onex Corp.*, 411 B.R. 805, 836 (N.D. Ga. 2009) ("Courts should consider contemporaneous evidence 'untainted by hindsight or post-hoc litigation interests' when evaluating a

61.    In that second-guessing, the TCEH Junior Creditors argue that

D&P should have utilized the ████████ WACC that it later employed in its 2008

goodwill impairment report (a report issued in the midst of the global economic

recession).  Yet, even the TCEH Committee's own financial advisor, Lazard, applied a

████ 8.5%-10.0% WACC in its contemporaneous valuation of the TCEH Debtors'

assets.  *See* Proxy Statement at 46.  And another financial institution applied ████

WACCs that were ████████ with the WACC used by D&P.  *See* Proxy Statement at

29 (Credit Suisse applied a 7.5%-8.25% discount rate for the TCEH Debtors).

62.    With respect to D&P's natural gas price assumptions, the TCEH

Junior Creditors argue that "there was no reasonable basis to predict a near-term *increase*

in gas prices [following the 2007 Acquisition], as D&P did."  Complaint ¶ 41.  Again, the

TCEH Junior Creditors' argument is belied by the publicly-available facts—gas prices

surged after the 2007 Acquisition, rising from $6.42 per MMBtu in October 2007 to as

high as $13.11 per MMBtu in 2008.  D&P's assumptions were also consistent with

industry consensus—as reflected in Henry Hub forward price curves and the projections

published by, *inter alia*, the EIA and CPUC—that natural gas prices would remain

elevated well beyond 2007.  *See supra* ¶ 6.  And, as noted above, the TCEH Debtors

hedged a significant portion of their natural gas exposure for **six years** following the 2007

Acquisition at average prices between $7.25 per MMBtu to $8.24 per MMBtu, thereby

undercutting any notion that market participants believed it was obvious that natural gas

prices would decline.

---

company's financial condition." (quoting *Iridium*, 373 B.R. at 346)); *MFS/Sun Life Trust*, 910 F. Supp. at 943 (noting that when assessing the probative value of projections prepared at the time of a subject transaction "the question the Court must decide is not whether [the] projection was correct, for clearly it was not, but whether it was reasonable and prudent when made").

63.     Critically, the TCEH Junior Creditors' myopic recitation of the events surrounding the 2007 Acquisition completely ignores the exogenous and unforeseeable macroeconomic events—namely the 2008 global financial crisis and the unprecedented long-term decline in natural gas prices that began in mid-2008—that were the true cause of the TCEH Debtors' deteriorating financial condition.  These unforeseen circumstances do not render D&P's assumptions unreasonable or imprudent at the time they were made; while projections should include some margin for error, they are not required to "withstand any and all setbacks," including those as severe and reasonably unforeseeable as the events that subsequently transpired.  *Moody*, 127 B.R. at 996.

64.     The TCEH Junior Creditors cannot legitimately contend that it was reasonable to believe in October 2007 that a global economic collapse of nearly unprecedented proportion and a glut of natural gas (much of which became available through groundbreaking technological innovations) would cause a precipitous decline in natural gas prices.  Tellingly, the TCEH Junior Creditors themselves—who similarly loaned billions of dollars (but on a junior basis) to the TCEH Debtors at that time—were not so clairvoyant.

65.     For the reasons discussed herein, the allegations in the Complaint, together with a wealth of publicly available market-based evidence, uniformly support the conclusion that the 2007 Acquisition did not render the TCEH Debtors insolvent.  As a result, the TCEH Junior Creditors have not carried their burden to justify standing to pursue Count I of their Complaint.[46]

---

[46]  Even assuming *arguendo* that the 2007 Acquisition rendered the TCEH Debtors insolvent (and that the TCEH Debtors did not receive reasonably equivalent value therefor), Section 2(b) of the Guarantee and section 10.02 of the indenture governing the First Lien Notes (together, the "Savings Clauses") shield the TCEH first lien lenders' claims from avoidance.  Upstream savings clauses are specifically

### C.    The TCEH Debtors Received Reasonably Equivalent Value

66.    The TCEH Junior Creditors allege that the TCEH Debtors did not receive reasonably equivalent value in exchange for the liens and obligations incurred in connection with the Senior Secured Facilities because TCEH allegedly transferred certain of the loan proceeds to fund a portion of the 2007 Acquisition.  Complaint ¶ 115.  As a threshold matter, the TCEH Debtors necessarily received dollar-for-dollar reasonably equivalent value in connection with the incurrence of obligations and liens under the Senior Secured Facilities because they ***actually received the cash proceeds of the loans***. *See* Complaint ¶ 31; *Geron* v. *Palladin Overseas Fund, Ltd.* (*In re AppliedTheory Corp.*), 323 B.R. 838 (Bankr. S.D.N.Y. 2005) (holding that debtor's receipt of loan proceeds constituted reasonably equivalent value for grant of security interest).

67.    However, even if the Court were to collapse the loan transactions and the 2007 Acquisition,[47] the TCEH Junior Creditors acknowledge that the TCEH Debtors used ███████ of the proceeds from the Senior Secured Facilities to repay valid antecedent TCEH debt.  Complaint ¶ 115.  When a transfer reduces a valid antecedent debt, such transfer is made for reasonably equivalent value and cannot be avoided.  *See* 11 U.S.C. § 548(d)(2)(A); Del. Code Ann. Tit. 6 § 1303(a); *In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 518 (Bankr. D. Del. 2010) ("Where a bona fide antecedent

---

intended to minimize a lender's exposure to fraudulent conveyance claims by "limit[ing] the amount that can be clawed back from a guarantor as a fraudulent transfer by reducing the contractual obligation to a smaller amount, which allows the debtor to remain solvent."  Jessica D. Gabel, *The Terrible Tousas:  Opinions Test the Patience of Corporate Lending Practices*, 27 Emory Bankr. Dev. J. 415, 461 (2011).  The Savings Clauses thus eviscerate any fraudulent conveyance claim against the TCEH Debtors that are guarantors of the Senior Secured Facilities and First Lien Notes.  The TCEH Junior Creditors implicitly acknowledge as much.  *See* Complaint Count XIII (pursuant to which the TCEH Junior Creditors seek to invoke the Savings Clauses to limit the TCEH First Lien Creditors' claims against TCEH's subsidiary guarantors).

[47]    The Ad Hoc Committee of TCEH First Lien Creditors reserves all rights and defenses with respect to whether the TCEH Junior Creditors can collapse the transactions.

debt exists, a debtor's payment on account of that creditor's claim, even if it has the result of preferring that creditor over others, is not by itself a fraudulent transfer.").[48]

68.     The TCEH Junior Creditors also concede that the TCEH Debtors used ▓▓▓▓▓▓ of the proceeds from the Senior Secured Facilities to pay certain related financing fees.  Complaint ¶ 31.  Payments that reduce valid contractual obligations provide reasonably equivalent value and are not subject to avoidance.  *See In re Gulf Fleet Holdings, Inc.*, 491 B.R. 747, 766 (Bankr. W.D. La. 2013) (holding that satisfaction of contractual obligations constitutes reasonably equivalent value); *Sunbeam*, 284 B.R. at 371 ("Where the funds are ultimately used for legitimate corporate purposes, then the transfer is not fraudulent.").

69.     Accordingly, at a minimum, the TCEH Debtors received reasonably equivalent value for approximately ▓▓▓▓▓ of the initial borrowings under the Credit Agreement, and the TCEH Junior Creditors' constructive fraudulent claim in respect of such borrowings is meritless.[49]

---

[48]  *See also Burtch* v. *Seaport Capital, LLC (In re Direct Response Media, Inc.)*, 466 B.R. 626, 660 (Bankr. D. Del. 2012) ("A transfer made in satisfaction of an antecedent debt or for an obligation for which the debtor was liable presumptively constitutes reasonably equivalent value."); *In re Champion Enters., Inc.*, Bankr. No. 09-14014 (KG), Adv. No. 10-50514 (KG), 2010 WL 3522132, at *19 (Bankr. D. Del. Sept. 1, 2010) (stating that the grant of a security interest in respect of antecedent debt, like repayment of antecedent debt, is "necessarily" fair consideration under the New York fraudulent conveyance statute); *Aphton*, 423 B.R. at 89 ("[W]hen a transfer is made to pay an antecedent debt, the transfer may not be set aside as constructively fraudulent.").

[49]  In addition, any borrowings under the Senior Secured Facilities that occurred after the 2007 Acquisition (for example, borrowings under the delayed draw term loan facility, deposit letter of credit facility or revolving credit facility) cannot be challenged as a constructive fraudulent conveyance, as the TCEH Debtors unquestionably received and retained dollar-for-dollar value in connection with such borrowings.

**D.    Section 546(e) of the Bankruptcy Code Protects the Liens Securing the Senior Secured Facilities and Obligations Incurred in Connection Therewith from Avoidance**

70.    The TCEH First Lien Creditors also have a number of affirmative defenses that would require dismissal of Count I, including that the "safe harbor" provisions of section 546(e) of the Bankruptcy Code protect transfers made and obligations incurred in connection with the merger agreement for the 2007 Acquisition (the "Merger Agreement") from avoidance.[50]

71.    Section 546(e) of the Bankruptcy Code provides, in relevant part, that a transfer otherwise avoidable as constructively fraudulent under section 544 of the Bankruptcy Code is not subject to avoidance if, *inter alia*, the transfer is "*made by or to (or for the benefit of) a* commodity broker, forward contract merchant, stockbroker, financial institution, *financial participant*, or securities clearing agency, *in connection with a securities contract . . . .*"  11 U.S.C. § 546(e) (emphasis added).[51]

72.    Here, the Complaint's allegations establish that:  (i) Citibank, as the initial administrative agent and collateral agent under the Senior Secured Facilities and assignee of all liens and security interests granted thereunder, is a financial participant; and (ii) if the Court collapses the incurrence of obligations and grant of liens under the Senior Secured Facilities with the payments made pursuant to the Merger Agreement (which is a necessary element of the TCEH Junior Creditors' argument with

---

[50]    Courts routinely consider the applicability of the safe harbor provisions at the motion to dismiss stage. *See, e.g.*, *Brandt* v. *B.A. Capital Co. L.P., (In re Plassein Int'l Corp.)*, 590 F.3d 252, 255, 259 (3d Cir. 2009) (affirming grant of motion to dismiss under section 546(e)).

[51]    As described below, section 546(e) employs expansively defined terms that evidence Congress's deliberate decision to enact sweeping protections for financial actors.  *See Jackson* v. *Mishkin (In re Adler Coleman Clearing Corp.)*, 263 B.R. 406, 477 (S.D.N.Y. 2001) ("[Congress's] intent to reach broadly to encompass all aspects of securities industry practices is manifested in the language of the statute.").

respect to Count I), then the TCEH Debtors, by definition, granted such liens "in connection with" the Merger Agreement, which constitutes a "securities contract." Accordingly, section 546(e) plainly protects the transfer of such liens and security interests, and any obligations incurred in connection therewith, from avoidance.

i.      *Citibank is a Financial Participant*

73.      Citibank clearly is a "financial participant" as such term is defined in section 101 of the Bankruptcy Code.[52]   The Complaint establishes that the TCEH Debtors granted the liens and security interests under the Senior Secured Facilities to or for the benefit of Citibank, as the collateral agent for the Credit Agreement lenders. Complaint ¶¶ 25-30.  Accordingly, the first prong of section 546(e) is satisfied.

ii.     *The Liens and Security Interests Incurred under the Senior Secured Facilities Were Transfers Made in Connection with a Securities Contract*

74.      Section 546(e) protects all transfers[53] involving financial participants that are made "in connection with a securities contract."  A "securities contract" is "a contract for the purchase, sale, or loan of a security . . . ."[54]  11 U.S.C. § 741(7).  Pursuant to the Merger Agreement, the Sponsors acquired all of TXU Corp.'s existing publicly-traded equity interests for $69.25 per share in cash.  Complaint ¶ 23. Accordingly, the Merger Agreement is a contract "for the purchase [or] sale" of a "security."  *See also Rushton* v. *Bevan (In re D.E.I. Sys., Inc.)*, 996 F. Supp. 2d 1142,

---

[52]   *See generally* Citigroup Inc., Annual Report (Form 10-K) (Mar. 3, 2014).  An entity is a "financial participant" if, at any point in the fifteen months prior to the debtor's petition date, it was party to one or more swap agreements, repurchase agreements, master netting agreements, securities contracts, commodity contracts or forward contracts that had a total gross dollar value of at least $1 billion in "notional or actual principal amount outstanding," or if, during that period of time, it had "gross mark-to-market positions" with respect to such agreements of at least $100 million in the aggregate.  11 U.S.C. § 101(22A).

[53]   A "transfer" includes, *inter alia*, the creation of a lien.  *See* 11 U.S.C. § 101(54).

[54]   Stock of a publicly held corporation constitutes a "security."  *See* 11 U.S.C. § 101(49)(A).

1147-49 (D. Utah 2014) (holding that stock purchase agreement was a "securities contract" and, thus, prepetition payments to corporate debtor's shareholders in connection with such agreement were safe-harbored under section 546(e)).

75.     Because the Merger Agreement constitutes a "securities contract," any transfers made "in connection" therewith are safe-harbored under section 546(e). The "in connection with" requirement is read broadly to mean "related to." *Interbulk, Ltd.* v. *Louis Dreyfus Corp. (In re Interbulk, Ltd.)*, 240 B.R. 195, 202 (Bankr. S.D.N.Y. 1999). The TCEH Junior Creditors allege—indeed, it is the lynchpin of their collapsing claim—that certain of the borrowings under the Credit Agreement were directly used to fund a portion of the consideration that the Sponsors ultimately paid to acquire TXU Corp.'s outstanding equity interests pursuant to the Merger Agreement. Complaint ¶¶ 24-25. Put simply, the degree of interrelatedness the TCEH Junior Creditors must establish to collapse the funding of the Senior Secured Facilities with the payments made pursuant to the Merger Agreement is greater than that which is required to satisfy section 546(e)'s "in connection with" prong. Accordingly, accepting the Complaint's allegations as true, any liens and security interests transferred to the collateral agent to secure the Senior Secured Facilities were directly related to the Merger Agreement and are protected from avoidance by section 546(e) of the Bankruptcy Code. *See Crescent Res. Litig. Trust* v. *Duke Energy Corp.*, 500 B.R. 464, 476-77 (W.D. Tex. 2013) (holding that distribution of cash to the debtor's parent company was related to an agreement for the sale of the

debtor's equity interests to a third party and therefore was safe-harbored as a transfer made in connection with a securities contract).[55]

76.    Furthermore, because section 546(e) protects the liens and security interests incurred under the Senior Secured Facilities, Count I also fails to the extent that the TCEH Junior Creditors seek to avoid the "obligations" incurred in connection therewith.  *See Lehman Brothers Holdings Inc.* v. *JPMorgan Chase Bank, N.A.*, 469 B.R. 415, 444 (Bankr. S.D.N.Y. 2012) (dismissing claims for avoidance of guarantee obligations because the incurrence of such obligations was "connect[ed] so directly" to transfers that were shielded from avoidance under section 546(e)).  In *Lehman*, the court noted that, while section 546(e) does not expressly protect "obligations" from avoidance, claims relating to the incurrence of an obligation cannot be pursued where related liens and transfers are nonetheless safe-harbored.  *Id.* at 446.

## II.    THE 2011 AMEND AND EXTEND TRANSACTIONS (COUNTS II-III)

77.    In Counts II and III, the TCEH Junior Creditors seek to avoid, as constructive fraudulent conveyances, the TCEH Debtors' payment of certain market-rate amendment and consent fees, and the incurrence of the First Lien Notes, as part of the 2011 Amend and Extend Transactions.  Complaint ¶¶ 118-136.  However, these claims fall well-short of the "colorability" standard because the TCEH Debtors unquestionably received reasonably equivalent value in connection with each of the subject transactions. In addition, certain of these transfers are protected by the safe harbor provisions of section 546(e) of the Bankruptcy Code.  Accordingly, standing to prosecute Claims II and III should be denied.

---

[55]    *See also SIPC* v. *Bernard L. Madoff Inv. Secs. LLC*, 505 B.R. 135, 145 (S.D.N.Y. 2013) (noting that the "in connection with" requirement can be satisfied even if a transfer is "related to multiple underlying circumstances and agreements").

### A. The TCEH Debtors Received Reasonably Equivalent Value in Connection with the 2011 Amend and Extend Transactions

*i. The TCEH Debtors Received Reasonably Equivalent Value in Connection with the Maturity Extension and the Maintenance Covenant Amendment*

78. "A party receives reasonably equivalent value for what it gives up if it gets roughly the value it gave." *VFB LLC*, 482 F.3d at 631 (internal quotations omitted). "Reasonably equivalent value" can include both indirect and direct benefits, and it can exist even when a transfer is not a "dollar for dollar" exchange based on the "market value" of the properties transferred. *See Asarco LLC* v. *Ams. Mining Corp.*, 396 B.R. 278, 337, 364 (S.D. Tex. 2008) (holding that debtor received reasonably equivalent value when it transferred stock valued at between $811.4 million and $853 million in exchange for consideration valued at $727.8 million, and stating that "[t]he law does not demand that a plaintiff receive an amount equal to the fair market value of the asset it transfers; the consideration must only be *reasonably* equivalent").[56] The TCEH Debtors received significant direct and indirect benefits as a result of the Maturity Extension and Maintenance Covenant Amendment.

79. *First*, the TCEH Debtors obtained critical breathing room—both through the extension of the maturities on nearly $18 billion of their first lien claims and the significant loosening of the Credit Agreement maintenance covenant—that allowed the TCEH Debtors to focus on their operations and, it was hoped, weather the market downturn. Numerous courts have concluded that a debt issuer received reasonably equivalent value in circumstances similar to these. *See, e.g., Cuevas* v. *Hudson Un. Bank*

---

[56] *See also R.M.L.*, 92 F.3d at 145, 150; *Cooper* v. *Ashley Commc'ns, Inc. (In re Morris Commc'ns NC, Inc.)*, 914 F.2d 458, 466-67 (4th Cir. 1990) (adopting majority view that reasonably equivalent value is not synonymous with market value).

*(In re M. Silverman Laces, Inc.)*, No. 01 Civ. 6209 (DC), 2002 WL 31412465, at *6

(S.D.N.Y. Oct. 24, 2002) (holding that the borrower received value in the form of

'"breathing room'—an opportunity to avoid default, to facilitate its rehabilitation, and to

avoid bankruptcy").[57]

80.     This is true even if the "breathing room . . . ultimately prove[s] to

be short-lived."  *Geron* v. *Palladin Overseas Fund, Ltd. (In re AppliedTheory Corp.)*, 330

B.R. 362, 364 (S.D.N.Y. 2005) (holding that financing that allowed company to avoid a

default provided reasonably equivalent value).  This is because, as the Third Circuit noted

in *R.M.L.*, a strategic transaction does not have to succeed as originally envisioned to be

insulated from later attack as a fraudulent conveyance.  *R.M.L.*, 92 F.3d at 152

("[R]equiring that all investments yield a positive return in order to find that they

conferred value on the debtor would be unduly restrictive.").  Rather, the "mere

expectation" of conferring value may be sufficient "as long as the expectation was

legitimate and reasonable."  *Id.*

81.     *Second*, by extending the maturities on their revolving credit and

deposit letter of credit facilities—the TCEH Debtors' primary sources of working

capital—the TCEH Debtors ensured their continued access to nearly $4 billion of

liquidity that was essential to their operations.  *See EBC I, Inc.* v. *Am. Online, Inc. (In re*

*EBC I, Inc.)*, 380 B.R. 348, 356, 359-60 (Bankr. D. Del. 2008) (considering company's

---

[57]   *See also Whitaker* v. *Mortg. Miracles, Inc. (In re Summit Place, LLC)*, 298 B.R. 62, 73 (Bankr.
W.D.N.C. 2002) ("Summit Place received 'reasonably equivalent value' because part of the 'value' it
received was the avoidance of foreclosure and the chance to survive until it had an opportunity to
refinance its project."); *Jones* v. *Williams (In re McDonald)*, 265 B.R. 632, 637 (Bankr. M.D. Fla.
2001) (finding economic benefit where transaction "secur[ed] a future opportunity for Debtor to
enhance his net worth and possibly escape from insolvency").

access to credit as part of solvency analysis); *Metro Commc'ns*, 945 F.2d at 647 ("The ability to borrow money has considerable value in the commercial world.").

82.    *Third*, had the TCEH Debtors repaid $18 billion of obligations under the Senior Secured Facilities with the proceeds from the issuance of $18 billion of new debt maturing in 2017, this voluntary repayment of valid antecedent debt would unquestionably be immune from attack as a constructive fraudulent conveyance. *See supra* Part I.C.  However, the TCEH Debtors instead opted to effectively refinance these obligations through a negotiated maturity extension (and covenant amendment) with their existing lenders, thereby accomplishing similar objectives at a fraction of the cost.[58]  If the TCEH Junior Creditors could not pursue a constructive fraudulent conveyance claim on account of a new-money refinancing, their claim relating to the far more cost-effective Maturity Extension is even more untenable.[59]

83.    These significant direct and indirect benefits dramatically outweigh the transaction's market costs.  As an initial matter, the TCEH Junior Creditors' $2 billion "cost" calculation is overstated by at least $750 million, as it includes $330 million on account of the "Prepayment Benefit" and $420 million on account of

---

[58]    Indeed, the TCEH Debtors potentially saved **billions of dollars in additional fees and incremental interest expense** by proceeding in this fashion, as evidenced by the substantially higher rate of interest that new-money market participants required to fund only $1.75 billion of the First Lien Notes (11.5% *per annum*), as compared to the interest rate under the amended Senior Secured Facilities (LIBOR plus 4.50% *per annum*).

[59]    This is especially true in light of "Congress's intent to encourage consensual workouts and . . . minimiz[e] bankruptcy filings . . . ." *LTV Corp.* v. *Valley Fid. Bank & Trust Co. (In re Chateaugay Corp.)*, 961 F.2d 378, 383 (2d Cir. 1992).  Adopting the TCEH Junior Creditors' argument would likely discourage lenders from engaging in out-of-court extension transactions, even though such transactions may be the most cost-effective way for an issuer to refinance its indebtedness and entirely avoid bankruptcy.  This would presumably increase refinancing costs and, ultimately, force more companies to seek chapter 11 protection, precisely what Congress sought to avoid.  *See id.* ("In the absence of unambiguous statutory guidance, we will not attribute to Congress an intent to place a stumbling block in front of debtors seeking to avoid bankruptcy with the cooperation of their creditors . . . .").

incremental interest under the First Lien Notes, both of which (for the reasons discussed below) are irrelevant for constructive fraudulent conveyance purposes.  Moreover, even if one includes these amounts, the TCEH Junior Creditors calculate that the total cost of the 2011 Amend and Extend Transaction equated to a yield enhancement benefit of approximately 192 basis points.  Complaint ¶ 75.  This amount pales in comparison to the significant benefits described above and is consistent with the costs incurred by other large debt issuers at or around this time in extending significant debt maturities.[60]

84.     Ironically, the parties that benefited the most from the 2011 Amend and Extend Transactions were the ***TCEH Committee's own constituents***, as their recoveries were the most dependent on the prospect of an improvement in the company's financial condition.  This extra "runway" also allowed the TCEH Debtors' unsecured creditors to receive more than $1.4 billion in interest payments from April 2011 through the Petition Date, a significant portion of which they would not have received had the TCEH Debtors filed for chapter 11 protection earlier.  *See* 11 U.S.C. § 502(b)(2).

85.     It is therefore unsurprising that on April 1, 2011, the day that the TCEH Debtors publicly announced the terms of the 2011 Amend and Extend

---

[60]     Other companies executed similar amend-and-extend transactions at or around this time on comparable terms.  For example, First Data Corporation executed an amend-and-extend transaction on April 13, 2011 pursuant to which certain lenders extended the maturities on approximately $5 billion of first lien obligations by three years (subject to springing maturity) in exchange for, inter alia, a ***125-175*** basis point increase in the contract rate of interest (depending on certain leverage ratios), a 25 basis point increase in the undrawn revolver commitment fee and a partial par prepayment of existing obligations from the issuance of new first lien notes.  *See* First Data Corp., Current Report (Form 8-K) (Apr. 13, 2011).  First Data executed a second "amend-and-extend" transaction in March 2012 in which it extended additional debt maturities for 2.5 years in exchange for, *inter alia*, a ***225-275 basis point*** increase in the contract rate of interest (depending on certain leverage ratios).  *See* First Data Corp., Current Report (Form 8-K) (Mar. 26, 2012).  Similarly, Cengage Learning Acquisitions Inc. executed an amend-and-extend transaction in April 2012 in which certain lenders extended their debt maturities for approximately 3-4 years (varying by tranche) in exchange for, *inter alia*, a partial par prepayment and a ***225-300 basis point increase*** in the contract rate of interest (depending on certain leverage ratios).  *See* Cengage Learning Holdings II, L.P., Annual Report (Sept. 13, 2012) at 45-46, *available at* http://www.cengage.com/investor/pdf/Annual_Report_For_The_Fiscal_Year_Ended_June_30_2012.pdf.

Transactions, the price of the TCEH junior indebtedness ***jumped by approximately 13%***—resulting in a ***more than $500 million increase in their market value***.[61]  This is hardly the reaction one would expect for what the TCEH Junior Creditors argue was an exorbitant consent fee paid to secured lenders in exchange for an illusory extension.  *See Iridium*, 373 B.R. at 293 ("[T]he public trading market constitutes an impartial gauge of investor confidence and remains the best and most unbiased measure of fair market value and, when available to the Court, is the preferred standard of valuation.").

86.     Analyst reports from this period further buttress the conclusion that the TCEH Debtors received substantial benefits pursuant to the 2011 Amend and Extend Transactions.  For example, on April 14, 2011, two weeks after the TCEH Debtors announced the terms of the 2011 Amend and Extend Transaction, Moody's ***upgraded*** TCEH's outlook from "negative" to "stable" and concluded that the 2011 Amend and Extend Transaction was a "positive" development from a credit perspective.  The report specifically noted that the transaction provided "near-term financial covenant relief . . . eliminat[ing] a potential covenant violation in the 2nd half of 2011" and, together with the three-year maturity extension, "provides additional time for improving market conditions and economic recovery which could translate into improved cash flows."[62]

87.     The TCEH Junior Creditors fail to identify any market-based evidence to support their allegation that the TCEH Debtors did not receive reasonably equivalent value.  Instead, they again rely merely on hindsight, arguing that because the

---

[61]     Attached hereto as **Exhibit G** is the Bloomberg Finance L.P. (2015) Daily Historical Prices for the Initial Unsecured Notes from March 1, 2011 through April 29, 2011.

[62]     Moody's Investors Service, *Rating Action:  Moody's affirms Energy Future Holdings Corp's Caa2 CFR; outlook changed to stable from negative* (Apr. 14, 2011), *available at* https://www.moodys.com/research/Moodys-affirms-Energy-Future-Holdings-Corps-Caa2-CFR-outlook-changed--PR_217454.

TCEH Debtors did not ultimately get the full benefit of the three-year maturity extension, the extension itself must have been "illusory" from the start. However, such "Monday morning quarterbacking" is routinely criticized by courts. *See, e.g.*, *R.M.L.*, 92 F.3d at 152-55. Moreover, the contemporaneous views and actions of market participants belie the very notion of an illusory extension.

>        ii.    *The TCEH Debtors Received Reasonably Equivalent Value in*
>               *Connection with the Bank Debt Repayment and the Incurrence of*
>               *the First Lien Notes*

88.    As part of the 2011 Amend and Extend Transactions, TCEH issued $1.75 billion of First Lien Notes and used the proceeds thereof to, *inter alia*, repay $1.604 billion of first lien obligations under the Senior Secured Facilities and to pay certain related financing and amendment fees. Complaint ¶ 134. The TCEH Junior Creditors allege that this component of the 2011 Amend and Extend Transaction—a straight-forward, partial new-money refinancing of a portion of the Senior Secured Facilities—also constitutes a constructive fraudulent conveyance. Once again, they are wrong.

89.    As a preliminary matter, the TCEH Debtors received the proceeds from the issuance of the First Lien Notes, and therefore indisputably received dollar-for-dollar reasonably equivalent value.

90.    However, even if the Court were to collapse the transactions that resulted in the issuance of the First Lien Notes and the Bank Debt Repayment, the TCEH Junior Creditors' argument still fails.[63] As noted in Part I.C., *supra*, repayment of a valid antecedent debt constitutes *per se* "reasonably equivalent value." Accordingly, when the

---

[63]    *See supra* note 47.

TCEH Debtors used the proceeds of the First Lien Notes to repay an equivalent amount of first lien debt under the Senior Secured Facilities, they received *per se* dollar-for-dollar reasonably equivalent value.

91.    The TCEH Junior Creditors nevertheless press the novel argument that the TCEH Debtors did not receive reasonably equivalent value here because the relevant debt, when repaid, was trading below par.  TCEH Committee Standing Motion ¶ 126.  Not surprisingly, the lone authority they cite for this proposition—*Official Comm. of Unsecured Creditors* v. *Clark (In re Nat'l Forge Co.)*, 304 B.R. 214 (Bankr. W.D. Pa. 2004)—is completely inapposite, as it involved a debtor's redemption of its own ***stock***, not a repayment of antecedent indebtedness.  *See* 304 B.R. at 222.

92.    The TCEH Junior Creditors ignore the cases holding that repayment of a valid antecedent debt constitutes *per se* dollar-for-dollar reasonably equivalent value, even when such debt is trading or valued at a discount to par.  *See, e.g.*, *Asarco*, 396 B.R. at 340-41 (holding that the debtor received $50 million of value when it redeemed $50 million of debt, even though such debt was trading at 50-60 cents on the dollar); *In re Wilkinson*, 196 F. App'x 337, 343 (6th Cir. 2006) (holding that a $1 million payment on account of an antecedent debt provided dollar-for-dollar reasonably equivalent value even where the debtor's liabilities greatly exceeded the value of its assets at the time of transfer).

93.    While the effect of this repayment may have been to provide certain lenders with a recovery in excess of the then-market value of their claims, or to increase the cash-interest expense of the TCEH Debtors in respect of the new First Lien Notes, these "costs" are irrelevant for constructive fraudulent conveyance purposes.  *See,*

*e.g.*, *In re Sharp Int'l Corp.*, 403 F.3d 43, 54 (2d Cir. 2005) ("[P]referential repayment of pre-existing debts to some creditors does not constitute a fraudulent conveyance, whether or not it prejudices other creditors, because '[t]he basic object of fraudulent transfer law is to see that the debtor uses its limited assets to satisfy some of his creditors; it normally does not try to choose among them.'" (quoting *HBE Leasing Corp.* v. *Frank*, 48 F.3d 623, 634 (2d Cir. 1995))); *Capmark*, 438 B.R. at 518 ("A debtor may prefer one creditor over another without running afoul of the fraudulent conveyance laws.").

94.     Accordingly, no basis exists to provide the TCEH Junior Creditors standing to pursue Counts II and III.

**B.      The Safe Harbors Require Dismissal of the Claims Arising out of the Bank Debt Repayment and the Issuance of the First Lien Notes**

95.     Section 546(e) of the Bankruptcy Code also protects the Bank Debt Repayment and the issuance of the First Lien Notes from avoidance.  Specifically, the Complaint establishes that both the Bank Debt Repayment and the grant of liens and security interests in connection with the issuance of the First Lien Notes were transfers made "in connection with a securities contract."[64]

96.     As noted earlier, transfers (including the grant of liens) made "in connection with a securities contract" are safe-harbored from avoidance pursuant to section 546(e).  Upon information and belief, certain financial institutions served as underwriters for the private offering of the First Lien Notes pursuant to a note purchase agreement, which is a contract "for the purchase" of a "security."[65]  The Complaint

---

[64]    The Ad Hoc Committee of TCEH First Lien Creditors reserves the right to argue that other components of the 2011 Amend and Extend Transactions are also shielded from avoidance under the Bankruptcy Code's safe harbor provisions.

[65]    Section 101(49)(A) defines "security" to include a "note" and a "bond."  11 U.S.C. § 101(49)(A)(i), (iv).

establishes that the First Lien Notes were issued to finance the Bank Debt Repayment.

Complaint ¶¶ 66, 69, 134; *see also* Energy Future Holdings Corp., Current Report (Form

8-K) (Apr. 13, 2011) (stating that the Maturity Extension was conditioned upon the

closing of the offering of the First Lien Notes).  Accordingly, the Bank Debt Repayment

and the liens and security interests granted in connection with the issuance of the First

Lien Notes are safe-harbored as transfers made in connection with a securities contract.

*See In re Quebecor World (USA) Inc.*, 719 F.3d 94, 98-99 (2d Cir. 2013) (holding that

transfers made to effectuate the repayment of private placement notes were safe-harbored

under section 546(e) as transfers made in connection with a securities contract); *Crescent

Res. Litig. Trust*, 500 B.R. at 476-77 (holding that transfer of term loan proceeds as part

of an integrated transaction involving a contract for the purchase of equity securities was

safe-harbored as a transfer in connection with a securities contract).

### III.  THE TCEH JUNIOR CREDITORS' OTHER CLAIMS ARE NOT COLORABLE

#### A.  The Complaint Fails to State a Claim for Equitable Subordination (Count VIII)

97.  Equitable subordination is an "extraordinary remedy which is

applied sparingly."  *Bank of N.Y.* v. *Epic Resorts—Palm Springs Marquis Villas, LLC (In

re Epic Capital Corp.)*, 307 B.R. 767, 773 (D. Del. 2004) (citations omitted); *accord

Official Comm. of Unsecured Creditors of Fedders N.A., Inc.* v. *Goldman Sachs Credit

Partners L.P. (In re Fedders N.A., Inc.)*, 405 B.R. 527, 554 (Bankr. D. Del. 2009) (stating

that equitable subordination is a "drastic and unusual remedy") (internal quotations

omitted).  To support a claim for equitable subordination, the TCEH Junior Creditors

must allege that:  (1) the TCEH First Lien Creditors engaged in some type of inequitable

conduct; (2) the misconduct resulted in injury or harm to other creditors or conferred an

unfair advantage on the TCEH First Lien Creditors; and (3) equitable subordination of the TCEH First Lien Creditors' claims is not inconsistent with the provisions of the Bankruptcy Code.  *See, e.g.*, *Bank of New York Mellon Trust Co., N.A.* v. *Miller (In re Franklin Bank Corp.)*, --- B.R. ----, 2014 WL 3611596, at *4 (D. Del. July 21, 2014); *Epic Capital*, 307 B.R. at 772.  The TCEH Junior Creditors do not allege that the TCEH First Lien Creditors are insiders; accordingly, they bear a higher burden of proof by which they must show that the TCEH First Lien Creditors engaged in "egregious conduct such as fraud, spoliation, or overreaching." *Epic Capital*, 307 B.R. at 772.  Because the Complaint describes, at most, normal lender conduct in a workout scenario, it falls woefully short of pleading the egregious conduct necessary to support a colorable equitable subordination claim.

98.    The only purported "inequitable conduct" that the TCEH Junior Creditors can allege is that the TCEH First Lien Creditors obtained:  (a) liens in connection with arm's-length loans that the TCEH Debtors incurred in the marketplace; (b) market fees in exchange for their agreement to extend the maturities of and otherwise amend the Senior Secured Facilities so that the TCEH Debtors could avoid imminent defaults and prolong their runway; and (c) other benefits to which the TCEH First Lien Creditors were contractually entitled, including the receipt of contractually-mandated interest payments and the TCEH Debtors' voluntary prepayment of a portion of the Senior Secured Facilities.  Such conduct is far from "inequitable," let alone "egregious"—it amounts to nothing more than typical lenders' behavior to protect the value of their investment.

99.     The law is clear that "[n]ormal lender conduct does not amount to inequitable conduct for equitable subordination purposes." *Champion*, 2010 WL 3522132, at *8; *accord Badger Freightways, Inc.* v. *Cont'l Ill. Nat'l Bank & Trust Co. of Chi. (In re Badger Freightways, Inc.)*, 106 B.R. 971, 979 (Bankr. N.D. Ill. 1989) (dismissing equitable subordination claim in noting that lender's demand for payment of loans and assertion of setoff rights were legitimate exercises of its legal rights, which did not amount to inequitable conduct).  "[I]nequitable conduct requires behavior far more egregious" than a lender's act to improve its position by agreeing to amend a credit agreement in exchange for increased interest rates, amendment fees and additional collateral.  *Champion*, 2010 WL 3522132, at *8 (noting that the use of leverage and forceful negotiations does not provide a basis for a finding of inequitable conduct); *In re Aluminum Mills Corp.*, 132 B.R. 869, 896 (Bankr. N.D. Ill. 1991) ("[M]erely alleging that [the bank] knowingly made a loan for an LBO that it knew would result in insolvency and then acted strategically after the LBO to maximize its benefits is insufficient, by itself, to show that [the bank] engaged in 'egregious misconduct.'").

100.     Accordingly, the TCEH Junior Creditors fall woefully short of alleging sufficient facts to justify application of the "extraordinary remedy" of equitable subordination, and therefore standing to bring Count VIII should be denied.

**B.      The Complaint Fails to State Valid Preference Claims (Counts XI-XII)**

101.     The TCEH Junior Creditors' preference claims would also fail to survive a motion to dismiss because they have not sufficiently pled ██████████

████████████████████████████████████████████████████████

██████  (the "Account Transfer") or the payment of $216 million in interest to the TCEH

First Lien Creditors (the "Interest Payments") were preferential.[66]

102.    In Count XI, the TCEH Junior Creditors allege that the Account

Transfer "reduced the amount by which [the TCEH First Lien Creditors] were

undersecured, thereby allowing [the TCEH First Lien Creditors] to receive more than

they would in a hypothetical chapter 7 liquidation . . . ."  Complaint ¶ 200.  ██████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████  Accordingly, Count XI fails to state a preference claim.

103.    In Count XII, the TCEH Junior Creditors allege that the Interest

Payments were preferential because they "allowed [the TCEH First Lien Creditors] to

receive more than they would in a hypothetical chapter 7 liquidation . . . ."  Complaint

¶ 208.  However, the payment of interest on prepetition funded debt falls squarely within

section 547(c)(2)'s "ordinary course of business" defense and, thus, is not avoidable.

*See, e.g.*, *Harman* v. *First Am. Bank of Md. (In re Jeffrey Bigelow Design Grp., Inc.)*, 956

F.2d 479, 487-88 (4th Cir. 1992) (holding that payment of interest on line of credit within

preference period was not avoidable where loan was incurred in the ordinary course as

part of the debtor's workout efforts and debtor had made regular interest payments over

the life of the loan).[67]

---

[66]    Upon information and belief, the Interest Payments were regularly scheduled, ordinary course interest payments due under the Senior Secured Facilities.

[67]    *See also Gellert* v. *Coltec Indus., Inc. (In re Crucible Materials Corp.)*, Bankr. No. 09-11582 (MFW), Adv. No. 11-53884 (MFW), 2012 WL 5360945, at *5 (Bankr. D. Del. Oct. 31, 2012) (granting motion to dismiss preference action based on section 547(c)(2) defense arising from payment of interest on bonds because the debtor had made periodic interest payments before the preference period); *Johnston*

104.    The Complaint demonstrates that the TCEH Debtors incurred the Senior Secured Facilities on an arm's-length basis in the marketplace.  Complaint ¶¶ 25-26.  Additionally, the TCEH Junior Creditors do not allege (nor could they) that the TCEH Debtors' payment of interest on the Senior Secured Facilities was outside of the ordinary course of business or that the TCEH Debtors failed to make regular interest payments prior to the preference period.  Accordingly, the Interest Payments constitute ordinary course payments that are not avoidable pursuant to section 547(c)(2) of the Bankruptcy Code.

### C.    The TCEH First Lien Creditors' "Collateral" Includes Securities and Cash in Any Deposit Account to the Extent that Such Cash Constitutes "Proceeds" of Collateral (Count XV)

105.    The TCEH Junior Creditors' request for standing to seek a declaratory judgment that the TCEH First Lien Creditors do not have liens on certain deposit accounts misinterprets the nature and scope of the TCEH First Lien Creditors' liens on cash and should be denied.  While it is true that the TCEH First Lien Creditors' "Collateral" (as defined in the Security Agreement) excludes "assets specifically requiring perfection through control agreements (other than the Deposit L/C Loan Collateral Account)," (*i.e.*, deposit accounts), this fails to resolve the issue of whether the

---

*Indus.* v. *CB & T Bank of Russell Cty. (In re Johnston Indus., Inc.)*, 357 B.R. 907, 915-16 (Bankr. M.D. Ga. 2006) (holding that interest payment on prepetition debt fell within section 547(c)(2), and noting that a loan incurred in a typical transaction in the marketplace is an "ordinary commercial transaction"); *cf. Union Bank* v. *Wolas*, 502 U.S. 151, 533 (1991) (holding that payments on long- or short-term debt may qualify for the ordinary course preference exception).  In *Crucible*, the court noted that, in addressing the elements of an ordinary course preference defense, a court should consider "whether the payments to a creditor made in the 90 days preceding a filing for bankruptcy were in response to a zealous creditor's attempt to collect on a debt through preferential treatment ahead of other creditors, or an attempt by the debtor to maintain normal business practices in hope of staving off bankruptcy."  *Crucible*, 2012 WL 5360945, at *4 (quoting *Troisio* v. *E.B. Eddy Forest Prods. (In re Global Tissue L.L.C.)*, 106 F. App'x 99, 102 (3d Cir. 2004)).

TCEH First Lien Creditors have perfected security interests in any *cash and other*

*securities deposited* in such accounts.[68]

106.    Pursuant to the Security Agreement, the TCEH First Lien Creditors

have properly-perfected liens on all "Investment Property," which is defined as "all

Securities (whether certificated or uncertificated),[69] Security Entitlements,[70] Securities

Accounts,[71] Commodity Contracts and Commodity Accounts of any Grantor.  Security

Agreement §§ 1(d), 2(a)(ix).  The TCEH First Lien Creditors also have properly-

perfected liens on, *inter alia*, all of such Grantors' accounts (including accounts

receivable), inventory and general intangibles (including payment intangibles).  The

TCEH First Lien Creditors properly perfected their security interests in such Collateral by

filing UCC financing statements in Delaware and Texas, as applicable.  As a result, the

TCEH First Lien Creditors' security interests also automatically "attach[] to any

identifiable proceeds" of such Collateral.  N.Y. U.C.C. § 9-315(2) (McKinney 2001);

*Burtch* v. *Conn. Cmty. Bank, N.A. (In re J. Silver Clothing, Inc.)*, 453 B.R. 518, 532

(Bankr. D. Del. 2011) (holding that since lender had a perfected security interest in the

debtor's inventory, it "also had a valid perfected security interest in all proceeds from

inventory sales").

---

[68]    A copy of the Security Agreement is attached as Exhibit 7 to the Declaration of Christopher A. Ward, dated February 19, 2015, which is annexed to the TCEH Committee Standing Motion as Exhibit A.

[69]    "Security" as defined in the New York Uniform Commercial Code includes a broad range of interests that are represented by security certificates or that are one of a class or series of shares.  N.Y. U.C.C. § 8-102(15) (McKinney 2001).

[70]    "Security Entitlements" means "the rights and property interest of a person who holds securities or other financial assets through a securities intermediary."  N.Y. U.C.C. § 8-102(17), cmt. 17 (McKinney 2001).

[71]    "Securities Account" means "an account to which a financial asset is or may be credited in accordance with an agreement under which the person maintaining the account undertakes to treat the person for whom the account is maintained as entitled to exercise the rights that comprise the financial asset."  N.Y. U.C.C. § 8-501(a) (McKinney 1997).

107.    Given the expansive scope of the TCEH First Lien Creditors' liens, which encompass substantially all of the TCEH Debtors' personal and real property interests, all cash generated by the TCEH Debtors constitutes identifiable proceeds of the TCEH First Lien Creditors' other Collateral.[72]  Thus, the TCEH First Lien Creditors have a properly perfected security interest in such cash, wherever it resides (whether in a deposit account maintained with a TCEH First Lien Creditor or otherwise), and standing to pursue Count XV should be denied.

### D.    The TCEH First Lien Creditors' Collateral Includes Certain Tax Attributes (Count XVII)

108.    Contrary to the TCEH Junior Creditors' assertions in Count XVII, the TCEH First Lien Creditors have properly perfected liens and security interests on certain tax attributes generated postpetition, including any increase in the tax basis of the TCEH Debtors' assets that arises postpetition.

109.    Pursuant to the Security Agreement, the TCEH First Lien Creditors were granted a lien on, *inter alia*, all of the TCEH Debtors' general intangibles, which include "any personal property, including things in action, other than accounts, chattel paper, commercial tort claims, deposit accounts, documents, goods, instruments, investment property, letter-of-credit rights, letters of credit, money, and oil, gas, or other minerals before extraction."  *See* Security Agreement §2(a); N.Y. U.C.C. § 9-102(42) (McKinney 2001).  Certain tax attributes, such as tax refunds and net operating losses ("NOLs"), constitute general intangibles upon which a security interest may attach.  *See, e.g.*, *BancorpSouth Bank* v. *Hazelwood Logistics Ctr., LLC*, 706 F.3d 888, 898-99 (8th

---

[72]    The only possible exception relates to the $149 million of cash that the TCEH Debtors held in a segregated account as of the Petition Date deriving from their termination of an accounts receivable securitization facility (the "Segregated Cash").  The Ad Hoc Committee of TCEH First Lien Creditors reserves all rights with respect to the Segregated Cash.

Cir. 2013) (holding that security interest in general intangibles covered tax refund); *In re Protocol Servs., Inc.*, Nos. 05-06782-JM11, 05-06786-JM11, 2005 WL 6485180, at *2 (Bankr. S.D. Cal. Dec. 23, 2005) (stating that NOLs constitute general intangibles). Accordingly, the TCEH First Lien Creditors' Collateral includes, *inter alia*, any tax refunds, NOLs, and other tax attributes that constitute general intangibles (or the "Proceeds" thereof) to the extent that the TCEH First Lien Creditors acquired rights in such tax attributes before the Petition Date. *See* 11 U.S.C. § 552(a); *First Nat'l Mercantile Bank and Trust Co.* v. *Mammoth Spring Distrib. Co. (In re Mammoth Spring Distrib. Co.)*, 139 B.R. 205, 207 (Bankr. W.D. Ark. 1992) (holding that lien attached to debtor's right to receive a tax refund resulting from NOLs generated prepetition even though tax return was filed postpetition). The TCEH Debtors' tax basis in their assets also falls into this category, and therefore is subject to the TCEH First Lien Creditors' prepetition liens.

110.     Moreover, even if the tax basis in the TCEH Debtors' assets did not constitute a "general intangible," it is unquestionably an intrinsic and inseparable component of the TCEH First Lien Creditors' Collateral (such as the applicable power plants, coal mines and retail operations) and their remedies with respect thereto and therefore must be included in valuing the TCEH First Lien Creditors' prepetition secured claim pursuant to section 506(a) of the Bankruptcy Code. *See U.S. Bank Nat'l Ass'n* v. *Lewis & Clark Apts., LP (In re Lewis & Clark Apts., LP)*, 479 B.R. 47, 53-54 (B.A.P. 8th Cir. 2012) (holding that low-income housing tax credits were properly included in valuing the creditor's secured claim because they affected the amount that a willing buyer would pay for the real estate and, "like a low property tax rate or good schools—are a

benefit which accrues only to those who have an ownership interest in the [collateral]").[73]

Like low-income housing tax credits or the "goodwill" associated with an asset, any increase in the TCEH Debtors' tax basis (whether occurring pre- or post-petition) is inextricably linked to the Collateral and cannot be owned separate and apart from such assets. Thus, the value associated with such tax attributes must be included in the TCEH First Lien Creditors' Collateral and in valuing the TCEH First Lien Creditors' prepetition secured claim. Indeed, courts have consistently found that secured creditors that hold liens on substantially all of the debtor's assets are entitled to the enterprise (i.e., going concern) value of the debtor's business. *See, e.g., Ardmor Vending Co.* v. *Kim (In re Kim)*, 130 F.3d 863, 865-66 (9th Cir. 1997) (holding that where secured creditor's lien attached to the primary assets of debtors' dry cleaning business such as the lease and equipment, but not to general intangibles, total enterprise value was still the "the most relevant evidence" of value of secured creditor's lien); *In re Hawaiian Telcom Commc'ns, Inc.*, 430 B.R. 564, 602-03 (Bankr. D. Haw. 2009) (holding that secured creditors were entitled to debtors' enterprise value where their collateral consisted of the debtors' primary assets and was to be used by reorganized debtors to operate their business post-emergence); *In re Chateaugay Corp.*, 154 B.R. 29, 33-34 (Bankr. S.D.N.Y. 1993) (holding that secured creditor's liens attached to the going concern value of a

---

[73] *See also In re Creekside Senior Apts., LP*, 477 B.R. 40, 56, 59-60 (B.A.P. 6th Cir. 2012) (including value of low-income housing tax credits in calculating lender's secured claim because such tax credits "are better characterized as 'rights and privileges' belonging to the land under the definition of 'real property' . . . as they do not exist separate from an ownership right in the low-income housing") (internal quotations omitted); *In re Bergh*, 141 B.R. 409, 419-20 (Bankr. D. Minn. 1992) (valuing collateral at going concern value, which included both "goodwill" and tangible asset value).

debtor even where the grant of those liens included only hard assets and not general intangibles).[74]

111.    Finally, if not for the imposition of the automatic stay, the TCEH First Lien Creditors could foreclose on their Collateral, which would result in an increase in the tax basis of such assets that would inure to the benefit of the owners of such assets (*i.e.*, the TCEH First Lien Creditors).  26 C.F.R. § 1.166-6(c).  Accordingly, to the extent the TCEH First Lien Creditors do not receive the value associated with any such increase in the tax basis of the TCEH Debtors' assets, they will suffer diminution in the value of their interests in the Collateral due to the imposition of the automatic stay and will be entitled, pursuant to the Cash Collateral Order, to an adequate protection lien and superpriority administrative expense claim to the extent of such diminution.  *See* Cash Collateral Order ¶ 5.

**E.    The TCEH Junior Creditors' Other Claims Are Either Not Subject to the TCEH Debtors' Stipulations in the Cash Collateral Order or Are Premature Confirmation Objections**

112.    The TCEH Junior Creditors seek various declaratory judgments that either implicate issues that are not subject to the TCEH Debtors' stipulations in the Cash Collateral Order or amount to thinly-veiled confirmation objections that the Court need not—and should not—consider at this time.  Specifically, the TCEH Junior Creditors seek the following relief:

---

[74]    Furthermore, any tax attributes that arise upon the TCEH First Lien Creditors' exercise of their remedies against the TCEH Debtors' assets are an intrinsic part of the Collateral that existed as of the Petition Date and are independent of the TCEH Debtors' postpetition activities.  *See, e.g.*, *NBD Park Ridge Bank* v. *SRJ Enters., Inc. (In re SRJ Enters., Inc.)*, 150 B.R. 933, 941 (Bankr. N.D. Ill. 1993) (holding that value of automobile franchise's market share, "whether labeled as 'goodwill' [or] 'going concern value,'" constituted prepetition intangible property to which secured creditors' liens attached and, thus, enterprise value premium generated postpetition constituted proceeds of collateral).

- disallowance of the TCEH First Lien Creditors' claims under the First Lien Notes for unaccreted original issue discount as unmatured interest "*to the extent (i) it is determined by this Court that the holders of First Lien Notes were undersecured creditors as of the Petition Date*" (Count IX);

- recharacterization of adequate protection payments made to the TCEH First Lien Creditors under the Cash Collateral Order "*[t]o the extent the Court determines at any time that [the TCEH First Lien Creditors] are undersecured creditors*" (Count X);

- a declaratory judgment that the TCEH First Lien Creditors are not entitled to adequate protection because there has been no diminution in the value of the Collateral (Count XIX); and

- a declaratory judgment that, *if the TCEH First Lien Creditors are found to be entitled to postpetition interest*, such interest should be awarded at the contractual non-default rate (Count XXI).

113.    To force the Court to resolve these questions—such as whether the TCEH First Lien Creditors are oversecured and whether there has been diminution in the value of the Collateral since the Petition Date—at this time would be a profound waste of judicial resources.  *See, e.g.*, *Official Comm. of Unsecured Creditors* v. *UMB Bank, N.A. (In re Residential Cap., LLC)*, 497 B.R. 403, 422 (S.D.N.Y. 2013) (dismissing claims relating to diminution in value of collateral and creditors' entitlement to postpetition interest as not yet ripe for determination).  This is especially true because each of these issues will necessarily be addressed and resolved in connection with confirmation of a plan of reorganization, and therefore the TCEH Junior Creditors will have a full and fair opportunity to litigate these issues at the appropriate time.  Accordingly, the above-referenced claims are premature and standing to assert such claims should be denied.

## IV.    THE EFH COMMITTEE STANDING MOTION

114.    As explained below, the EFH Committee's Standing Motion should be denied because the EFH Committee:  (a) is not a creditor of the Luminant Debtors; and (b) fails to articulate a colorable claim because (i) it presumes, despite

overwhelming evidence to the contrary, that a taxable sale of the TCEH Debtors' assets was inevitable in 2007; (ii) it incorrectly presumes that the Luminant Debtors would be liable for any resulting tax claim; and (iii) even if the Luminant Debtors' guaranty claims were susceptible to being reduced, the payments made by the Luminant Debtors are not avoidable.

### A. The EFH Committee Is Not a Creditor of the Luminant Debtors

115.    The EFH Committee Standing Motion fails for the simple reason that while *EFH* is alleged to be a creditor of the TCEH Debtors, the *EFH Committee and those whom it represents* unquestionably are not.  The EFH Committee does not cite to a single case in which a court has granted standing to a creditor of a creditor.  This, by itself, justifies denial of the EFH Committee Standing Motion.

### B. The Savings Clauses Do Not Limit the Luminant Debtors' Guarantee Obligations

116.    The fundamental premise of the EFH Committee's argument is that there was an "inescapable" ▮▮▮▮▮▮▮ contingent liability assertable against the Luminant Debtors for future taxes that would arise upon a taxable sale of the TCEH Debtors' assets (the "Contingent Tax Claim"), and that the inclusion of this tax claim on the Luminant Debtors' balance sheets as of the 2007 Acquisition would have rendered the TCEH Debtors insolvent.  EFH Committee Standing Motion ¶¶ 3-5.  The EFH Committee thus argues that the Savings Clauses reduced the Luminant Debtors' guarantees of the Senior Secured Facilities to the extent of their alleged insolvency.  This argument fails for at least three reasons.

117.    *First*, even if the Contingent Tax Claim is a "liability" for purposes of state fraudulent conveyance law and section 548 of the Bankruptcy Code,[75] it would only reduce the Luminant Debtors' guarantees to the extent they were actually liable for such a claim.  As described in Part I.A.i., *supra*, upon information and belief,



118.    *Second*, the Luminant Debtors could not be liable to EFH or any of its affiliates for the Contingent Tax Claim.  Upon information and belief, the Luminant Debtors were not party to a tax sharing agreement with EFH as of the Closing Date of the 2007 Acquisition.[76]  Absent a tax sharing agreement, the Luminant Debtors could not be liable to EFH for the Contingent Tax Claim except through application of a state law contribution claim.  However, under Texas, Delaware and New York law, a contribution claim can only be asserted against parties that are jointly liable for an underlying debt.[77]

---

[75]    The Ad Hoc Committee of TCEH First Lien Creditors reserves the right to argue that the Contingent Tax Claim was not a "liability" as of the Closing Date for purposes of such statutes because its incurrence was dependent on a number of future and highly speculative actions that were not contemplated at the time of the 2007 Acquisition.

[76]    The Federal and State Income Tax Allocation Agreement (the "Tax Sharing Agreement"), among EFH, EFCH, TCEH and certain of TCEH's subsidiaries was executed on May 15, 2012 and purports to be effective only with respect to taxable years beginning after December 31, 2009.  The Ad Hoc Committee of TCEH First Lien Creditors reserves all rights with respect to the Tax Sharing Agreement.

[77]    *See Mumford* v. *Robinson*, 231 A.2d 477, 478 (Del. 1967) (holding that contribution claim under Delaware law is available "only when the proposed contributor shares with the defendant a 'common liability' to the plaintiff.  Absent such liability, no contribution may be enforced"); *Aiello* v. *Burns Int'l Sec. Servs. Corp.*, 973 N.Y.S.2d 88, 98 (N.Y. App. Div. 2013) ("Generally, a claim for common-law

███████████████████████████████████████████████████████

████████████████████████████████████████████████

█████████ .

119.   *Third,* ███████████████████████████████████

████████████████████████ , the amount of this contingent liability "must be

reduced to its present, or expected, value before a determination can be made whether the

firm's assets exceed its liabilities." *In re Xonics Photochemical, Inc.*, 841 F.2d 198, 200

(7th Cir. 1988).[78]  In discounting a contingent liability, a court should not rely on

"hindsight" or a "post-hoc" analysis, but rather must consider "the circumstances as they

appeared to the debtor and determine[] whether the debtor's belief that a future event

would occur was reasonable." *R.M.L.*, 92 F.3d at 156.  As of the Closing Date, it was

exceedingly unlikely that the Contingent Tax Claim would ever be triggered, as the

Sponsors would never voluntarily pursue a taxable sale that would ████████████

█████████ at EFH and thereby ███████████████ equity investment.  If the Sponsors

wanted to monetize the TCEH Debtors' assets, they would have presumably pursued any

number of tax-free alternatives, including the tax-free spin structure that has figured so

prominently in these Chapter 11 Cases.  As a result, the present value in 2007 of this

contingent liability must be reduced to zero or a *de minimis* amount.

---

contribution involves the apportionment of liability amongst joint tortfeasors, both of whom owed a duty to an injured plaintiff."); *Hunter* v. *Fort Worth Capital Corp.*, 620 S.W.2d 547, 553 (Tex. 1981) ("Neither contribution nor indemnity are recoverable from a party against whom the injured party has no cause of action.").

[78]   *See also MSKP Oak Grove, LLC* v. *Venuto*, 875 F. Supp. 2d 426, 438 (D.N.J. 2012) (holding that a contingent liability is discounted according to its apparent likelihood at the time of the contingent liability emerges); *R.M.L.*, 92 F.3d at 156 (holding that when determining solvency under the UFTA, for contingent assets or liabilities, "a court must take into consideration the likelihood of that event occurring from an objective standpoint").

**C.    The Luminant Debtors Received Reasonably Equivalent Value in Connection with the Debt Service Payments**

120.    The EFH Committee's fraudulent conveyance claims also fail because any "debt service payments" indirectly funded by the Luminant Debtors were on account of a valid antecedent debt and, thus, were necessarily for reasonably equivalent value.  The EFH Committee alleges that TCEH paid (or caused the Luminant Debtors to pay) at least $8 billion in interest and other debt service (collectively, the "Debt Service") on account of debt obligations during the four-year period prior to the Petition Date.  EFH Standing Motion ¶¶ 12, 29.  However, even if the Luminant Debtors' guaranty obligations were reduced by the full amount of the Contingent Tax Claim, their remaining guaranty obligations would still ███████████████████.  Accordingly, the Luminant Debtors received reasonably equivalent value on account of the transfers made in connection with Debt Service as payments on a valid antecedent debt (*i.e.*, the remaining amount of their guaranty obligations under, *inter alia*, the Senior Secured Facilities and First Lien Notes).[79]

**D.    At Most, the Luminant Debtors Have Contribution Claims Against the TCEH Debtors, Not Fraudulent Conveyance Claims Against the TCEH First Lien Creditors**

121.    Even if the EFH Committee is correct that the Savings Clauses reduced the Luminant Debtors' guarantee obligations and, thus, certain of the Luminant Debtors paid a disproportionate share of Debt Service, it does not follow that the Luminant Avoidance Actions are colorable.  This is because, at most, the Luminant

---

[79]    *See Freeland* v. *Enodis Corp.*, 540 F.3d 721, 735 (7th Cir. 2008) (noting that payment of accrued interest on a contractual obligation constitutes "dollar-for-dollar forgiveness of a contractual debt, which is reasonably equivalent value") (internal quotations omitted); *Direct Response Media*, 466 B.R. at 660 ("A transfer made in satisfaction of . . . an obligation for which the debtor was liable presumptively constitutes reasonably equivalent value."); *see also supra* Part I.C.

Debtors would be entitled to assert contribution claims against the other TCEH Debtors

to the extent of any overpayment.  Pursuant to the Guarantee, each Subsidiary Guarantor

agreed that if it paid more than its proportionate share of any payment due thereunder,

such Subsidiary Guarantor would be "entitled to seek and receive contribution from and

against any other Guarantor hereunder who has not paid its proportionate share of such

payment."[80]  Guarantee § 3.  Importantly, however, the Guarantee further provides that

the Subsidiary Guarantors may not assert a right of contribution until all outstanding

obligations under the Credit Agreement have been paid in full and all commitments

thereunder terminated.  Guarantee §§ 2(e), 5.

## V.    LIMITATIONS ON DERIVATIVE STANDING, IF GRANTED

122.    The Ad Hoc Committee of TCEH First Lien Creditors does not

believe that any of the movants have satisfied the requirements for obtaining derivative

standing, and the Standing Motions should therefore be denied.  Nevertheless, if the

Court is inclined to grant derivative standing for one or more of the causes of action

described herein, it should impose two critical limitations.

123.    *First,* only the TCEH Committee should be granted derivative

standing to pursue causes of action that belong to the TCEH Debtors.  With respect to the

Ad Hoc Noteholder Group, whose proposed complaint is virtually identical to the TCEH

Committee's Complaint, its interests are already adequately represented by the TCEH

Committee, whose members include the indenture trustee for the TCEH Unsecured

Notes.  There is simply no reason to grant derivative standing to an unofficial committee

of six institutions that hold a minority of TCEH's unsecured indebtedness when the

---

[80]    A copy of the Guarantee is attached as Exhibit 6 to the Declaration of Christopher A. Ward, dated
February 19, 2015, which is annexed to the TCEH Committee Standing Motion as Exhibit A.

official committee of unsecured creditors for all of the TCEH Debtors is prepared to prosecute an identical complaint.  In addition, the motives of the Ad Hoc Noteholder Group in seeking to prosecute these claims are unclear, as three of its six members have disclosed significant holdings across the Debtors' capital structure and simultaneously participate on EFIH ad hoc creditor groups.[81]

124.    For the reasons described above, the EFH Committee is also not an appropriate representative for the TCEH Debtors' creditors.  Putting aside that the EFH Committee is not (and does not represent) a creditor of the TCEH Debtors, the interests of the creditors that the EFH Committee does represent are in many ways misaligned with those of TCEH's creditors, making the EFH Committee an inappropriate advocate for the TCEH Debtors' creditors.

125.    The TCEH Committee is the only pure TCEH creditor representative with a fiduciary duty to maximize recoveries for all of the TCEH Debtors' unsecured creditors.  Granting standing to any party other than the TCEH Committee would only serve to impose needless duplication, expense and uncertainty and would not be in the best interests of the TCEH Debtors' estates.

126.    *Second*, the TCEH Debtors must retain the authority to settle estate causes of action.  Unlike any of the potential litigants in these matters, the TCEH Debtors have a fiduciary duty to maximize the value of their estates for the benefit of all stakeholders.  *Smart World Techs. LLC* v. *Juno Online Servs. (In re Smart World Techs. LLC)*, 423 F.3d 166, 175 (2d Cir. 2005) ("[T]he debtor's duty to wisely manage the estate's legal claims is implicit in the debtor's role as the estate's only fiduciary.");

---

[81]    *See supra* note 7.

73

*accord Official Comm. of Equity Sec. Holders of Adelphia Commc'ns Corp.* v. *Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 371 B.R. 660, 670 (S.D.N.Y. 2007) ("[N]owhere does *Smart World* suggest that . . . where derivative standing *does* exist, a debtor-in-possession is irreversibly stripped of its authority to settle that litigation absent the consent of the standing committee. . . . *Smart World* confirms repeatedly that it is the fundamental responsibility of the debtor-in-possession to manage the estate."), *aff'd sub nom. Official Comm. of Equity Sec. Holders of Adelphia Commc'ns Corp.* v. *Official Comm. of Unsecured Creditors of Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 544 F.3d 420 (2d Cir. 2008).

127.    The Standing Motions implicate critical case issues that go to the heart of the Debtors' restructuring and plan efforts.  Given the central importance of these claims and their singular impact on the trajectory of these cases, it would be inconsistent with the broad rights granted to the TCEH Debtors, particularly during their exclusivity period, to deprive them of their statutory prerogative to build consensus and pursue confirmation of a chapter 11 plan of reorganization that could include, among its elements, a resolution of estate causes of action (including those implicated by the Complaint).

128.    Courts generally allow a debtor to retain the power to settle estate causes of action even after a third party has been granted derivative standing to prosecute such claims.  *See, e.g.*, *Centaur*, 2010 WL 4624910, at *7 (allowing debtors to retain settlement rights over creditor's committee's derivative claims, and noting that, while grant of standing to committee includes authority to settle claims, "that authority is not exclusive"); *In re Exide Techs.*, 303 B.R. 48, 67 (Bankr. D. Del. 2003) (authorizing

74

debtors to settle creditor's committee's derivative claims as part of reorganization plan pursuant to section 1123(b)(3)(A) of the Bankruptcy Code).[82]

### **RESERVATION OF RIGHTS**

129.     Given, among other things, the expedited briefing schedule (which required interposing this Objection less than two weeks after the Standing Motions were filed), in the event the Court authorizes the prosecution of one or more causes of action, the Ad Hoc Committee of TCEH First Lien Creditors and its members reserve the right to amend, supplement or otherwise modify the arguments and defenses set forth in this Objection and to raise additional arguments and defenses in connection with any such adversary proceeding.  The filing of this Objection shall not constitute a waiver of the Ad Hoc Committee of TCEH First Lien Creditors' or its members' rights to assert any arguments or defenses that are not set forth herein.

---

[82]   The three orders the TCEH Junior Creditors cite in support of their request for exclusive settlement authority are inapposite, as in each the relevant debtors agreed to relinquish settlement authority without objection.  *See* TCEH Committee Standing Motion ¶ 229.  None stands for the proposition that a creditor representative should be granted exclusive settlement authority over a debtor's objection, especially during a debtor's exclusivity period and with respect to claims that go to the heart of a debtor's restructuring efforts.

## CONCLUSION

For the foregoing reasons, the Ad Hoc Committee of TCEH First Lien

Creditors requests that this Court deny the Standing Motions for the reasons set forth

herein and grant such other and further relief as this Court deems just and proper.


Dated: March 3, 2015                     /s/  *Ryan M. Bartley*
       Wilmington, Delaware       **YOUNG CONAWAY STARGATT & TAYLOR**
                                     **LLP**
                                     Pauline K. Morgan (Bar No. 3650)
Ryan M. Bartley (Bar No. 4985)
Andrew Magaziner (Bar No. 5426)
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

-and-

**PAUL, WEISS, RIFKIND, WHARTON &**
**GARRISON LLP**
Alan W. Kornberg (admitted *pro hac vice*)
Brian S. Hermann (admitted *pro hac vice*)
Jacob A. Adlerstein (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York  10019
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990

*Counsel to the Ad Hoc Committee of TCEH First Lien*
*Creditors*