**<u>EXHIBIT A</u>**

C 0631124 C

## SCHEDULE A-25

Following the Parties' execution of this Schedule A-25, KPMG LLP ("CONTRACTOR") " is authorized to perform the Work as identified below on behalf of EFH Corporate Services Company ("COMPANY") pursuant to the terms and conditions contained in the Master Services Agreement C0631124C ("the Agreement") dated November 1, 2009, as amended.

## SCOPE OF WORK AND DELIVERABLES

The Work will be performed in accordance with the specifications and instructions, if any, attached hereto and identified in the List of Attachments.  The Work will be scheduled at the direction of COMPANY'S Contract Coordinator as identified herein.

**SCOPE OF WORK:**

CONTRACTOR will assist COMPANY personnel in supporting key audit activities related to COMPANY's restructuring.  Services will be requested and directed by COMPANY's Internal Audit Group and may include:

    Management Reporting and Analysis
    Bankruptcy-Related Reporting and Analysis Assistance
    Claims Reconciliation Assistance

**DELIVERABLES:**

Deliverables will be in the format requested by COMPANY depending on the specific services that are requested (i.e., oral, e-mail, memorandum, letter, Excel spreadsheet, etc.).

Contract Coordinator:  Ricky Taylor                    Phone Number: (214) 812-8741

## WORK SITE

The Work Site will be the following location(s): COMPANY offices located in the Dallas, Texas area.

## TIMING

Commencement of services will be as requested beginning on or around January 5, 2015 and conclude by December 31, 2015.

## RIGHT TO TERMINATE

COMPANY or CONTRACTOR has the right to terminate this Schedule A-25, in whole or in part, at any time with ten (10) days advance written notice.

## EMPLOYMENT CLAIMS

For purposes of this Schedule A-25, CONTRACTOR shall indemnify, defend, and hold harmless COMPANY and its successors, officers, directors, employees, and agents (collectively, the "Indemnitees")

C 0631124 C

from and against any and all actions, claims, losses, damages, liabilities, judgments, and awards, including reasonable attorneys' fees (collectively, "Claims") that arise from or relate to any employment-related laws (including but not limited to discrimination, harassment, wage, benefit, and/or contractual claims under federal, state, or local statute or common law including but not limited to Title VII of the Civil Rights Act of 1964, as amended, the Americans with Disabilities Act, the Equal Pay Act of 1963, the Age Discrimination in Employment Act of 1967, the Civil Rights Act of 1866, the Older Workers Benefit Protection Act, the Family and Medical Leave Act, the Texas Labor Code, the Fair Labor Standards Act, and ERISA) based on an allegation that Company is an employer or joint employer of any CONTRACTOR staff.  In addition, CONTRACTOR agrees to maintain workers' compensation and other commercial insurance coverage and assumes all responsibility for and will indemnify the COMPANY Indemnitees from any Claims relating to the injury or death of any CONTRACTOR staff.   This indemnification provision excludes claims that are attributable to intentional or willful misconduct, or that are attributable to the negligence of COMPANY and/or to working conditions that are beyond CONTRACTOR's control.  CONTRACTOR further agrees that it is solely responsible for providing any reasonable accommodation required by any CONTRACTOR staff for a qualifying disability under the Americans with Disabilities Act or any state or local disabilities law; provided, however, that COMPANY will reimburse CONTRACTOR for any direct expenditures required for CONTRACTOR to fulfill such obligation, but only to the extent any such accommodation would require tangible modifications to the work environment provided by COMPANY and is deemed by COMPANY based on applicable law to be a reasonable accommodation that does not cause undue hardship for COMPANY.  CONTRACTOR is responsible for verifying identification and eligibility to work in the U.S. in accordance with the Immigration Reform Control Act of 1986 of any CONTRACTOR staff prior to such CONTRACTOR staff being assigned to COMPANY, and CONTRACTOR shall indemnify, defend, and hold harmless COMPANY Indemnitees from and against any Claims arising from any failure, in whole or in part, by CONTRACTOR to comply with all statutory requirements regarding verification of employment eligibility; provided, however, that CONTRACTOR shall be released from this requirement for all CONTRACTOR staff whose services to COMPANY began prior to the effective date of this agreement. To the extent necessary to permit COMPANY to enforce any term, clause, or condition of this agreement, CONTRACTOR agrees that with respect to any CLAIMS brought against COMPANY, CONTRACTOR will and does hereby waive as to Company any defense it may have by virtue of the workers' compensation laws of any state.

## COMPENSATION, INVOICES AND PAYMENT

As full compensation for the satisfactory performance by CONTRACTOR of the Work authorized pursuant to this Schedule A-25, COMPANY will compensate CONTRACTOR as follows.

**Professional and Support Staff Fees Schedule**

| Role | Name | Rate |
|------|------|------|
| Senior Associate | Aaron Milner | $175/hr |

The rates specified in the Schedule A will remain in effect, with respect to and until completion of the Work authorized pursuant to this Schedule A.  CONTRACTOR will provide one resource at COMPANY's offices, as defined in this Schedule A-25.  CONTRACTOR agrees to work and invoice for a maximum of forty (40) hours per work week, per resource, unless any additional work time is approved in writing by the Director of Internal Audit (Ricky Taylor).  A copy of the approved work time request must be attached to the invoice as proof of the authorization.

Total compensation for this effort are not authorized to exceed $240,000. CONTRACTOR will bill only for hours spent performing substantive Work for COMPANY, and CONTRACTOR shall provide timesheets on a weekly basis to the Director of Internal Audit (Ricky Taylor).  Any extension or increase in spend will

require amendment to this Schedule A-25. This estimate assumes there will be no travel to the participant's site(s). If travel is required, normal and reasonable travel expenses will be reimbursed in accordance with Article 5 and Attachment 5 of the Agreement (Reimbursable Expense Policy).

All invoices shall be sent to:

>Mr. Ricky Taylor
>Director of Internal Audit
>Energy Future Holdings Corp.
>1601 Bryan St, 3rd floor
>Dallas, TX  75201

## KEY PERSONNEL

CONTRACTOR agrees that the individuals listed below will be assigned to perform the Work authorized by this Schedule A-25. CONTRACTOR will employ all reasonable efforts to ensure that such individuals remain so assigned until such Work is accepted by COMPANY; provided, however, that in the event that any such individuals are reassigned by CONTRACTOR or otherwise become unavailable to perform such Work, CONTRACTOR will provide, by way of replacement, individuals with reasonably equivalent experience and expertise. In the event that a resource is replaced, no transition costs associated with the replacement of such replacement with another member of the CONTRACTOR's team will be charged to Company.

**Ricky Taylor**: Director, Internal Audit

**CONTRACTOR Professionals:** as requested by COMPANY

PRIVILEGES CLAIMED BY COMPANY, WITH RESPECT TO DELIVERABLES OR OTHER DOCUMENTS HEREAFTER DESIGNATED BY COMPANY

_____ ATTORNEY-CLIENT COMMUNICATION

_____ ATTORNEY WORK PRODUCT

_____ TAX ADVISOR

_____ OTHER:_____

## CONTRACTOR OBLIGATIONS

During the provision of Services under the Agreement and this Schedule A-25, CONTRACTOR shall:

(a) Assume sole and complete responsibility for hiring, firing, discipline, evaluation and direct supervision of Services and Key Personnel conduct.

(b) Conduct, or cause its suppliers to conduct, background investigations and drug screenings ("Investigations") for Key Personnel assigned to perform Services for COMPANY, in accordance with the terms and conditions set forth in Exhibit 1.

(c) Require Key Personnel to sign the Key Personnel Acknowledgment form attached to this Schedule A-25 as Exhibit 2 prior to performing any Services for COMPANY. Key Personnel must

C 0631124 C

execute a set of employment terms with his/her employer of record that specifically acknowledges his/her understanding that he/she is employee of such entity, that he/she is not employee of COMPANY or any of its Affiliates, that his/her employer of record provides workers' compensation insurance, employment benefits, and the like, and that he/she is to look only to his/her employer of record, and not to COMPANY or its Affiliates, for such insurances and benefits.

(d)  Assume sole and complete responsibility and liability for all work-related compensation, benefits, and legal requirements relating to the employment of Key Personnel, including but not limited to compensation, vacation pay, holiday pay, bonuses, overtime pay, pension rights, sick and disability pay, severance pay, pension or retirement benefits, health care benefits, workers' compensation benefits, unemployment benefits, social security and federal and state income tax withholding and payments, and any and all other work-related benefits or obligations which an employer is required to pay or perform relating to the employment of employees.  COMPANY shall not be liable to CONTRACTOR or to Key Personnel for CONTRACTOR'S failure to perform its obligations under this paragraph.

(e)  Assume sole control and responsibility for wage and hour administration and regulations, COBRA compliance when applicable, handling of all unemployment claims, protests, and appeal hearings, and compliance with requirements under Executive Order 11246.

(f)  Comply with all applicable reporting and recordkeeping rules and regulations, including but not limited to those of the U.S. Department of Labor Wage and Hour Division, Equal Employment Opportunity Commission, Office of Federal Contract Compliance Programs, Occupational Safety and Health Administration, Texas Commission on Human Rights and Texas Workforce Commission, and with all applicable employment laws, including but not limited to Title VII of the Civil Rights Act of 1964, as amended, the Americans with Disabilities Act, the Equal Pay Act of 1963, the Age Discrimination in Employment Act of 1967, as amended, the Employee Retirement Income Security Act of 1974, as amended, the Civil Rights Act of 1866, the Older Workers' Benefit Protection Act, the Family and Medical Leave Act, the Fair Labor Standards Act and the Texas Labor Code, as well as any and all other applicable executive orders, federal or state laws, precedents, statutes or regulations.

(g)  Require Key Personnel providing Services at a COMPANY Location to comply with applicable COMPANY security, safety, and fitness-for-duty regulations and policies and COMPANY's other standard business practices and policies.

(h)  Immediately notify COMPANY of any allegations of discrimination, harassment, retaliation or other work-related complaints made to, or made known to CONTRACTOR allegedly occurring in connection with any Key Personnel's assignment under this Schedule A-25.  CONTRACTOR shall cooperate with COMPANY in the investigation of any such allegations.

(i)  Maintain all -related records for a period of five (5) years following the termination or expiration of this Agreement.

Notwithstanding anything herein to the contrary, COMPANY will compensate CONTRACTOR for the Work (a) only after CONTRACTOR's engagement by COMPANY has been approved by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") pursuant to section 327(a) of the Bankruptcy Code and (b) in accordance with any order entered by the Bankruptcy Court governing the compensation or reimbursement of fees of parties employed pursuant to section 327(a) of the Bankruptcy Code.

## LIST OF ATTACHMENTS

COMPANY and CONTRACTOR agree that the following described attachments, if any, are incorporated herein in their entirety as fully as completely rewritten herein.

C 0631124 C

1. Exhibit 1 – Drug Testing Specifications
2. Exhibit 2 – Background Testing Specifications
3. Exhibit 3 - Key Personnel Acknowledgment

Work not specified above may be authorized only through a separate Schedule A, or through an amendment or supplement to this Schedule A-25.

**KPMG LLP**                                                    **EFH CORPORATE SERVICES COMPANY**

By: _____Francis K. Yogi_____            By: _____Tamar Willis_____
        Signature                                                          Signature

Name:   Francis Yogi                                   Name:   TAMAR Willis

Title:   Managing Director                          Title:   PROCUREMENT SPECIALIST

Date:   12/11/14                                         Date:   12/16/2014

5

C 0631124 C

## EXHIBIT 1
## DRUG TESTING SPECIFICATIONS

All members of PROFESSIONAL GROUP must pass an Investigation.   Provision of Services is conditional until the Investigation is satisfactorily completed. Members of PROFESSIONAL GROUP must agree and submit to the following:

a.   A drug screening; and

b.   A background investigation that includes:

> 1.   A nationwide, lifetime (or if not permissible, the past seven (7) years) check for felonies and violent crimes,
>
> 2.   A nationwide public records search for criminal misdemeanors and felony convictions and deferred adjudications within the past ten (10) years, and
>
> 3.   A third-party verification of previous employment and the highest education level completed by the Assigned Personnel.

All background investigations shall be conducted in accordance with applicable law.

Members of PROFESSIONAL GROUP will be ineligible for assignment to perform work for COMPANY under the Agreement if the background investigation confirms or if PROFESSIONAL otherwise is put on notice that the member of PROFESSIONAL GROUP has criminal convictions or deferred adjudications for a felony offense, a pattern of misdemeanor offenses, a misdemeanor relating to the job requirements, or a misdemeanor for a crime involving moral turpitude (e.g., theft, indecency with a minor, drug-related offenses).

Background and drug investigations will be paid for by PROFESSIONAL without reimbursement from COMPANY.

PROFESSIONAL may utilize drug and background screening providers chosen by PROFESSIONAL, subject to COMPANY approval.  Members of PROFESSIONAL GROUP visiting the collection facilities must identify themselves as employees of PROFESSIONAL or one of its approved subcontractors, not of COMPANY.

PROFESSIONAL or its approved subcontractors will keep background investigation and drug test records while members of PROFESSIONAL GROUP are working at COMPANY.  Such records will be kept confidential and PROFESSIONAL will only convey to COMPANY that the results were satisfactory or unsatisfactory.

If a member of PROFESSIONAL GROUP fails a background investigation or drug test, PROFESSIONAL will not assign such individual to work at COMPANY.

C 0631124 C

**EXHIBIT 2**
**BACKGROUND CHECK SPECIFICATIONS**

CONTRACTOR shall comply with the following guidelines and procedures that were developed by COMPANY for employment agencies responsible for the recruiting and employment of contract workers for COMPANY.

1.  All persons submitted as prospective Key Personnel must pass an Investigation.  Placement is conditional until the Investigation is satisfactorily completed. Resource must agree and submit to the following:

    c.  A drug screening; and
    d.  A background investigation that includes:
        4.  A nationwide, lifetime (or if not permissible, the past seven (7) years) check for felonies and violent crimes,
        5.  A nationwide public records search for criminal misdemeanors and felony convictions and deferred adjudications within the past ten (10) years, and
        6.  A third-party verification of previous employment and the highest education level completed by the Resource.

    All background investigations shall be conducted in accordance with applicable law.

2.  The maximum cut-off levels for drug tests are as follows:

    | | |
    |---|---|
    | Amphetamines | 500ng/mL |
    | Barbiturates | 150ng/mL |
    | Benzodiazepines | 150ng/mL |
    | Cocaine | 150ng/mL |
    | Cannabinoids (Marijuana) | 15ng/mL |
    | Opiates | 2000ng/mL |
    | Phencyclidine | 25ng/mL |

3.  Key Personnel will be ineligible for assignment to perform work for COMPANY under the Agreement if the background investigation confirms or if CONTRACTOR otherwise is put on notice that Key Personnel has criminal convictions or deferred adjudications for a felony offense, a pattern of misdemeanor offenses, a misdemeanor relating to the job requirements, or a misdemeanor for a crime involving moral turpitude (e.g., theft, indecency with a minor, drug-related offenses).

4.  Background and drug investigations will be paid for by CONTRACTOR or its approved Subcontractors without reimbursement from COMPANY.

5.  CONTRACTOR may utilize drug and background screening providers chosen by CONTRACTOR, subject to COMPANY's approval.  Key Personnel visiting the collection facilities must identify themselves as employees of CONTRACTOR or one of its approved Subcontractors, not of COMPANY.

6.  CONTRACTOR or its approved Subcontractors will keep background investigation and drug test records while Key Personnel is working at COMPANY.  Such records will be kept confidential and will only convey to COMPANY that the results were satisfactory or unsatisfactory.

7.  If Key Personnel fails a background investigation or drug test, CONTRACTOR will not assign such individual to work at COMPANY.

C 0631124 C

**EXHIBIT 3**
**KEY PERSONNEL ACKNOWLEDGMENT**


You have accepted a temporary assignment with [insert applicable business unit]  ("COMPANY") under an agreement between COMPANY and KPMG ("CONTRACTOR"). You understand, acknowledge, and agree that this assignment does not alter your employment relationship with your current employer of record, which is either CONTRACTOR or a subcontractor of CONTRACTOR, and that you will not in any way be deemed or classified as an employee of COMPANY or its affiliates. You will not be eligible to participate in any benefits offered by COMPANY to its employees, including without limitation medical insurance, 401(k) participation, and stock options.   COMPANY will not provide you with workers' compensation coverage or unemployment coverage.   All employment benefits provided to you will be provided exclusively by your employer of record.   COMPANY will not pay any employer portions of income, Social Security, Medicare, or any other federal or state withholding tax on your behalf. COMPANY is not your employer or joint employer for purposes of any federal, state, or local discrimination statute, wage and hour law, safety regulations, or any other federal, state, or local statute, ordinance, or common law related to employment.



**ACKNOWLEDGED AND AGREED TO BY**:


_____
[Signature]


_____
[Printed Name]


_____
[Date]


_____
[Company Name]

C 0631124 C

## SCHEDULE A-27

Following the Parties' execution of this Schedule A-27 ("SOW"), CONTRACTOR (also referred as "KPMG LLP" or "KPMG") is authorized to perform the services ("Services") as defined below on behalf of COMPANY (also referred as "EFH Corporate Services Company") pursuant to the terms and conditions contained in the Master Services Agreement C0631124C dated November 1, 2009 and subsequently amended (collectively referred to as the "Agreement").

This SOW shall be effective as of January 30, 2015 (the "Effective Date") and shall remain in full force and effect until it is either (a) superseded by a change order ("CO") or Schedule A-XX, or (b) until terminated in accordance with the Agreement or this SOW, or (c) June 30, 2016, whichever occurs first (the "Expiration Date"). Notwithstanding anything to the contrary in the Agreement, COMPANY, in its sole discretion may terminate this SOW for convenience upon the delivery of a written 15 day notice ("Notice") to CONTRACTOR. In the event COMPANY elects to terminate for convenience, the SOW shall end by operation of law at the close of business on the 15th day after receipt of notice by CONTRACTOR.

## SCOPE OF WORK AND DELIVERABLES

The Services will be performed in accordance with the specifications and instructions incorporated herein and if any, specifications and instructions identified in the attachments hereto.

## SCOPE OF WORK AND APPROACH

**Objectives**
CONTRACTOR will assist COMPANY personnel in performing the following activities:
- Review and understand COMPANY's existing energy trading risk management processes and controls ("Risk Management Program");
- Identify opportunities and recommendations for improvement, as well as potential changes to Risk Management processes and controls that should be considered as part of COMPANY's Energy Trading Risk Management ("ETRM") implementation project; and
- Understand the Allegro ETRM system capabilities the COMPANY is planning to implement and assist with determining how the Allegro system can be leveraged for energy risk management processes and controls.

**Scope**
The scope of this SOW is limited to COMPANY's Risk Management Program activities conducted in Dallas, TX.

**Approach**
CONTRACTOR will meet the objectives outlined above by using the following four-staged approach:
- Stage 1 – Trading and Risk Management Process / Controls Gap Assessment;
- Stage 2 – Design / Configuration / Build Review;
- Stage 3 – Test Planning / Execution Review; and
- Stage 4 – User Acceptance Testing ("UAT") / Deployment Review
Activities associated with each stage are detailed below.

C 0631124 C

**Stage 1 – Trading and Risk Management Process / Controls Gap Assessment**
- <u>Step 1 – Develop an understanding of COMPANY's Risk Management Program</u> – In Step 1, CONTRACTOR will review COMPANY's Risk Management Program documents and conduct interviews with COMPANY personnel to gain an understanding of COMPANY's Risk Management Program. Step 1 activities are listed below:

*Activity 1- Document Review*
CONTRACTOR will obtain and review documents related to COMPANY's Risk Management Program. Example documents may include:
- Risk management policies (e.g., market risk, credit risk);
- Risk management procedure documents;
- Organization charts;
- Trading compliance framework documents;
- SOX process documents related to COMPANY's Risk Management Program;
- Internal Audit reports, external auditor comments, and prior Risk Management Program review documents;
- Operational incident reports;
- Compliance incident reports;
- Management Information reports (e.g., daily and monthly risk reports, P&L reports); and
- Committee (e.g., Risk Management Committee, Ethics and Compliance Committee) documentation (e.g., charters, meeting packages).

*Activity 2 – Interviews*
CONTRACTOR will interview key COMPANY personnel to gain an understanding of how COMPANY's Risk Management Program has been implemented. It is anticipated no more than ten (10) interviews (1 hour each) will be required. Interview topics may include general descriptions of risk control requirements, identifying additional (undocumented) control activities, identifying existing risk management concerns held by COMPANY management, and clarifying the implementation of any ambiguously-documented risk controls. Interviewees may include the following:
- Senior management;
- Energy trading personnel;
- Middle Office personnel;
- Accounting and other Back Office personnel; and
- Other support functions (e.g., Legal, IT, Internal Audit, Compliance, Treasury) as needed.

COMPANY and CONTRACTOR will agree to the list of interviewees in advance of scheduling interviews.

- <u>Step 2 – Analyze and Assess Risk Management Program</u> – In Step 2, CONTRACTOR will review COMPANY's Risk Management Program activities and controls against Management objectives and CONTRACTOR's understanding of current industry practices, noting identified gaps. Step 2 activities are listed below:

*Activity 3 – Review and identify gaps in COMPANY's Risk Management Program against current industry practices.*
CONTRACTOR will compare our findings from Step 1, above, to our observations of industry practice ("Industry Comparison") at power generators, utilities, banks, global trading companies, and other entities with risk management activities. The goal of this activity is to highlight activities and controls

2

C 0631124 C

which are either missing, lagging capabilities noted elsewhere, are manual and can be automated, and/or made more efficient by utilizing the Allegro system.

*Activity 4 – Review existing controls to identify where COMPANY's controls infrastructure could fail*
Based on information obtained from Step 1, above, CONTRACTOR will select a sample of key controls for walk-throughs and conduct analyses to identify circumstances under which such controls and manual process could breakdown.

- <u>Step 3 – Categorize, Align, and Roadmap</u> – In Step 3, CONTRACTOR will document, categorize, and align each of its findings and recommendations and prepare a high-level implementation roadmap. Step 3 activities are listed below:

*Activity 5 – Align process / controls inventory with Allegro capabilities*
CONTRACTOR will work with COMPANY's ETRM implementation project team to align Risk Management Program processes and controls along with our findings and recommendations with the capabilities of the Allegro system.

*Activity 6 – Document and categorize findings*
Findings and recommendations from Steps 2 and 3, above, will be documented in a PowerPoint-based and / or Excel format for use by COMPANY during configuration and build. These findings could be categorized according to the following criteria:

- Criticality: Assessment of the overall criticality of the process / control based on COMPANY's business and strategy (e.g., must have or nice to have)
- Degree of Change: For existing processes / controls, what degree of change is anticipated from the current state as part of the Allegro implementation (e.g., High / Med / Low, Obsolete)
- Desired Maturity / Efficiency: Given the nature of the process or control as it relates to COMPANY's business activities, what level of maturity or efficiency is desired and appropriate (e.g., fully automated, partially automated, manual)
- Allegro Fit: Assessment of how the process / control can be enabled within Allegro and whether significant enhancements or extensions would be required
- High-level Complexity Estimate: An estimate of the relative complexity (e.g., High / Med / Low) where enhancements, extensions, or significant configuration and build effort is required

*Activity 7 – Develop high-level implementation roadmap*
CONTRACTOR will document its findings in a graphical roadmap which identifies high-level implementation timeframe, implementation priority (e.g., High / Med / Low), and finding theme (e.g., Governance, IT, Reporting).

## Stage 2 – Design / Configuration / Build Review
CONTRACTOR will perform a review of the ETRM implementation as it relates to findings and recommendations documented during Stage 1. CONTRACTOR will document its findings as they relate to observed changes or deviations to the original Stage 1 recommendations and the potential implications and action items to be addressed by the COMPANY.

The basis of this review will be the ETRM implementation project deliverables available at the time of the review, and the configured Allegro system, as is available at the time of the review. Project deliverables may include to-be process documentation, design specifications and an overview of the configured system. CONTRACTOR will work with COMPANY to agree to the timing of this review, and the documentation and system available to be reviewed.

3

C 0631124 C

**Stage 3 – Test Planning / Execution Review**
CONTRACTOR will perform a review of the ETRM implementation as it relates to findings and recommendations documented during Stage 1. CONTRACTOR will document its findings as they relate to observed changes or deviations to the original Stage 1 recommendations and the potential implications and action items to be address by the COMPANY.

The basis of this review will be the ETRM implementation project deliverables available at the time of the review, and the configured Allegro system, as is available at the time of the review. Project deliverables may include to-be process documentation, design specifications and an overview of the configured system. In addition, it will include any Testing documentation created by the ETRM implementation project. CONTRACTOR will work with COMPANY to agree to the timing of this review, and the documentation and system available to be reviewed.

**Stage 4 – User Acceptance Testing ("UAT") / Deployment Review**
CONTRACTOR will perform a review of the ETRM implementation as they relate to findings and recommendations documented during Stage 1. CONTRACTOR will also observe User Acceptance Testing activities conducted as part of the ETRM Implementation Project. CONTRACTOR will document findings as they relate to user and system readiness to support the COMPANY's Risk Management Program. This review will include documenting the implications of system issues which may impact the Risk Management Program of the COMPANY and work with the COMPANY to develop interim work-around processes.

The basis of this review will be the ETRM implementation project deliverables available at the time of the review, and the configured Allegro system being tested and evaluated by the COMPANY for potential deployment to production. Project deliverables include User Acceptance Testing documentation and a listing of known system issues along with resolution status and plans. CONTRACTOR will work with COMPANY to agree to the timing of this review, and the documentation and system available to be reviewed.

COMPANY may request changes that affect the scope or duration of the Services and CONTRACTOR may notify COMPANY that it has encountered issues or circumstances related to the Services that are beyond the scope documented above. If COMPANY requests such a change or if CONTRACTOR notifies COMPANY of issues or circumstances beyond the applicable scope of Services, the CONTRACTOR shall promptly notify COMPANY if CONTRACTOR believes that an adjustment in the scope of Services, fees to be paid to CONTRACTOR with respect to the applicable CO or applicable deadlines is required and the parties shall negotiate in good faith a reasonable and equitable adjustment in the applicable scope, fees, or deadlines. Unless COMPANY directs CONTRACTOR to stop work pending acceptance of such change, CONTRACTOR shall continue work pursuant to the existing CO and shall not be bound by any change requested by COMPANY until CONTRACTOR has accepted such change in writing.

It is understood and agreed that CONTRACTOR's Services may include advice and recommendations; but all decisions in connection with the implementation of such advice and recommendations shall be the responsibility of, and made by, COMPANY. CONTRACTOR will not perform management functions or make management decisions for COMPANY.

C 0631124 C

## DELIVERABLES

The primary deliverables for Stage 1 will include:
- A PowerPoint-based report which will detail procedures performed and results obtained. Report contents may include a summary of Risk Management Program activities and controls as well as a detailed discussion of gaps noted relative to industry practices;
- An Excel-based initial inventory of impacted Risk Management Program processes and controls; and
- A high-level implementation roadmap.

The primary deliverables for Stage 2 will include:
- A PowerPoint-based report which will summarizes the findings of this Stage;
- An Excel-based inventory of Risk Management Program processes and controls documenting any changes or deviations from the original recommendations developed in Stage 1; and
- A document of potential considerations and action items based upon the Stage 2 findings.

The primary deliverables for Stage 3 will include:
- A PowerPoint-based report which will summarizes the findings of this Stage;
- An Excel-based inventory of Risk Management Program processes and controls documenting any changes or deviations from the original recommendations developed in Stage 1; and
- A document of potential considerations and action items based upon the Stage 3 findings.

The primary deliverables for Stage 4 will include:
- A PowerPoint-based report which will summarizes the findings of this Stage focused on User Acceptance Test execution and system issues;
- A issue impact document which describes the implications of the issues and any interim work-around processes;
- A summary of suggested incremental training recommendations;
- A high-level roadmap that depicts the target dates for issues resolution and timing for when interim work-around processes can be addressed.

The draft deliverables will be provided to COMPANY management for review and comment prior to delivery. The deliverables presented as part of this engagement are for the internal use of COMPANY management, the Audit Committee and Board of Directors. If you elect to provide our deliverables to any third party, Article 31(b) of the Master Services Agreement between KPMG LLP and EFH Corporate Services Company dated November 1, 2009 shall apply.

## CLIENT PARTICIPATION AND RESPONSIBILITIES

During the development of this Agreement, we have been guided by certain assumptions about the project scope, and level of COMPANY's involvement and support.

COMPANY's management is responsible for establishing and maintaining an effective internal control process.

COMPANY will designate a project sponsor ("Project Sponsor" - a senior member of management who has the requisite skills and competencies to oversee the services being provided). The Project Sponsor is responsible for establishing the objectives & scope, and determining the nature, timing, and extent of procedures; for approving the service delivery plan; and for maintaining appropriate day-to-day oversight of the KPMG team.  In addition, the Project Sponsor will have responsibility for reviewing, approving, and taking full responsibility for engagement deliverables prepared during the engagement that document the results; for coordinating with management to determine whether control matters of concern noted constitute

C 0631124 C

deficiencies, significant deficiencies or material weaknesses; for reporting the results within COMPANY's reporting structure, including the Audit Committee; for evaluating the observations and recommendations that arise from the services; and for monitoring corrective action taken.

Notwithstanding the foregoing, CONTRACTOR shall not be obligated to fulfill any particular obligation to provide Services to the extent (and only to the extent) that CONTRACTOR is unable to fulfill such obligation, as a direct result of any of the following dependencies not being completed in all material respects:

- Appropriate access to the number and type of resources agreed upon by the parties and/or relevant documentation
- Material changes in the identified deficiencies and internal controls which require unanticipated incremental remediation
- Timely management review and approval of recommendations

## OTHER MATTERS

KPMG will provide Services in accordance with the terms and conditions of this SOW. The Services as outlined in this SOW constitute an Advisory Engagement conducted under the American Institute of Certified Public Accountants ("AICPA") Standards for Consulting Services. Such Services are not intended to be an audit, examination, attestation, special report or agreed-upon procedures engagement as those services are defined in AICPA literature applicable to such engagements conducted by independent auditors. Accordingly, these services will not result in the issuance of a written communication to third parties by KPMG directly reporting on financial data or internal control or expressing a conclusion or any other form of assurance.

Contractor uses third party service providers within and without the United States to provide at Contractor's direction, administrative and clerical services to Contractor. Accordingly, COMPANY consents to Contractor's disclosure to such third party service providers of data and information received from or at the request or direction of Client for the foregoing purposes; however, such COMPANY authorization does not relieve CONTRACTOR of its confidentiality obligations hereunder and CONTRACTOR shall remain responsible and liable for breaches of confidentiality committed by any such third party provider.

## WORK SITE

The work site will be the following location(s): CONTRACTOR &/or COMPANY offices located in or near Dallas, TX.

## COMPENSATION, INVOICES AND PAYMENT

The following rates will apply as full compensation for the satisfactory performance of authorized Services:
### PROFESSIONAL AND SUPPORT STAFF FEES SCHEDULE

| Role | Rate | Hours |
|------|------|-------|
| Partner | $325 | 104* |
| Director | $285 | 416 |
| Manager | $240 | 480 |
| Senior Associate | $185 | As needed |

*Includes investment of 64 hours of Partner/Managing Director oversight and subject matter professional's time at no cost to COMPANY.*

C 0631124 C

The table below summarizes the estimated fees for this engagement:

| | Estimated Timing | Estimated Hours | Estimated Fees |
|---|---|---|---|
| Stage 1 | 5 weeks | 328 | $79,880 |
| Stage 2 | 2 weeks | 156 | $38,300 |
| Stage 3 | 2 weeks | 156 | $38,300 |
| Stage 4 | 4 weeks | 320 | $78,880 |
| Inter-phase support | As needed | 40 | $11,400 |
| Total | | 1,000 | $246,760 |

The total fees associated with this engagement shall not exceed $271,000.

CONTRACTOR will bill only for hours spent performing substantive Services for COMPANY; substantive Services do not include any administrative expenses of whatsoever kind. Any extension or increase in spend will require a CO signed by an authorized agent of each party. If travel is required, normal and reasonable travel expenses will be reimbursed in accordance with Article 5 and Attachment 5 of the Agreement (Reimbursable Expense Policy).

The rates specified in this Schedule A-27 will remain in effect, with respect to and until completion of the Work authorized pursuant to this Schedule A-27.

All invoices shall be submitted to the United States Bankruptcy Court for the District of Delaware and electronically to the location as shown on the purchase order and:

With an electronic copy to:

Noah.Shapiro@EnergyFutureHoldings.com

The COMPANY mailing address is as follows:

> EFH Corporate Services Company
> 1601 Bryan St
> Dallas, TX 75201

Notwithstanding anything herein to the contrary, COMPANY will compensate CONTRACTOR for the Services (a) only after CONTRACTOR's engagement by COMPANY has been approved by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") pursuant to section 327(a) of the Bankruptcy Code and (b) in accordance with any order entered by the Bankruptcy Court governing the compensation or reimbursement of fees of parties employed pursuant to section 327(a) of the Bankruptcy Code.

## KEY PERSONNEL

Personnel furnished by CONTRACTOR to COMPANY for performing Services under this Schedule A-27 will have adequate qualifications to perform the Services described herein. In the event any of CONTRACTOR's personnel gives reasonable indications that they are not able to perform in accordance with this Schedule A-27, COMPANY shall notify CONTRACTOR of such fact, and such CONTRACTOR personnel shall be removed immediately or in accordance with the directions of COMPANY. CONTRACTOR agrees to use its best efforts to ensure the continuity of the assignment of

C 0631124 C

CONTRACTOR's employees assigned under this Schedule A-27 and CONTRACTOR will promptly provide substitute(s) for any of its employees who may be removed or reassigned.

The following personnel furnished by CONTRACTOR have been identified as critical to the success of the completion of this Schedule A-27.  Additional personnel, including project management team members, will be identified in specific CO, as needed:

   **Julie Luecht:** Principal
   **Steven Bradford:** Principal
   **Mark Gram:** Director

CONTRACTOR will not replace personnel identified as a Key Personnel unless COMPANY so agrees, which agreement shall not be unreasonably withheld, except in the event the applicable Key Personnel resigns, is disabled or his/her employment is terminated by CONTRACTOR.  If a Key Personnel is to be replaced whether at CONTRACTOR or COMPANY's request, CONTRACTOR will strive to achieve a smooth transition. CONTRACTOR will not charge COMPANY any additional fees or charges for the replacement such Key Personnel or for training hours required to bring the replacement Key Personnel up to date on the status of Services. The replacement Key Personnel provided by CONTRACTOR will become a Key Personnel as defined herein and shall have substantially similar skills and experience as the Key Personnel being replaced.

CONTRACTOR PERSONNEL AUTHORIZED TO ATTEND COMPANY MEETINGS AND RECEIVE CONFIDENTIAL INFORMATION RELATING TO THE SERVICES:

   **Julie Luecht:** Principal
   **Steven Bradford:** Principal
   **Mark Gram:** Director
   **Hunter Lassetter:** Manager

C 0631124 C

PRIVILEGES CLAIMED BY COMPANY, WITH RESPECT TO DELIVERABLES OR OTHER DOCUMENTS HEREAFTER DESIGNATED BY COMPANY

_____    ATTORNEY-CLIENT COMMUNICATION

_____    ATTORNEY WORK PRODUCT

_____    TAX ADVISOR

___X__  OTHER: _____COMPANY-owned intellectual property and or COMPANY-owned trade secrets, business know-how or the like.

## LIST OF ATTACHMENTS

COMPANY and CONTRACTOR agree that the following described attachments, if any, are incorporated herein in their entirety as fully as completely rewritten herein.

        None noted

Services not specified above may be authorized only through a separate Schedule A-XX, or through a CO signed by a duly authorized agent of each party.

**KPMG LLP**                                    **EFH CORPORATE SERVICES COMPANY**

By: _____                     By: _____
        Signature                                       Signature

Name:  Steven Bradford                           Name:  Joseph Ho

Title:    Principal                              Title:    Senior Vice President,
                                                           Enterprise Risk Management

Date:    January 30, 2015                        Date:    January 30, 2015

9

AMENDMENT NO. 13.1

DATED JANUARY 20, 2015

TO

MASTER SERVICES AGREEMENT


C0631124C

BY AND BETWEEN

KPMG LLP

AND

EFH CORPORATE SERVICES COMPANY

DATED NOVEMBER 1, 2009

Contract No. C0631124C

## AMENDMENT NO. 13.1

### EFFECTIVE DATE

The Effective Date of this Amendment is January 30, 2015.

### PURPOSE

This Amendment 13.1 amends Schedule A13 dated November 12, 2013 between EFH Corporate Services Company ("COMPANY") and KPMG LLP ("CONTRACTOR"). The Parties agree that, except as otherwise amended by this Amendment 13.1, the terms of Schedule A13 and provisions of the Master Services Agreement dated November 1, 2009 ("Agreement") shall apply to the services being provided hereunder. Any terms used in this Amendment 13-1 and not otherwise defined will have the same meaning as in the Agreement and/or Schedule A13.

### MODIFICATIONS

The Agreement is modified as follows:

I.    **TIMING**

The Schedule A13 will be in full force and effect from the Effective Date until January 19, 2016, unless otherwise terminated pursuant to the terms hereof; provided further however, the provisions contained in the Confidential and Proprietary Information, Records and Rights to Audit , Rights to Data, Warranty, Intellectual Property and Indemnification clauses will survive such termination.

II.    **COMPENSATION, INVOICES AND PAYMENT**

The first sentence of the second paragraph of "Compensation, Invoices and Payment" is hereby deleted and replaced with the following:

"Estimated fees for this work will be less than $140,000 and this project is not authorized to exceed $140,000."

III.    **RESERVATION OF RIGHTS**

Notwithstanding anything herein to the contrary, COMPANY will compensate CONTRACTOR for the Work (a) only after CONTRACTOR's engagement by COMPANY has been approved by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") pursuant to section 327(a) of the Bankruptcy Code and (b) in accordance with any order entered by the Bankruptcy Court governing the compensation or reimbursement of fees of parties employed pursuant to section 327(a) of the Bankruptcy Code.

The parties have signed this Amendment acknowledging their agreement to its provisions as of the Effective Date.

Contract No. C0631124C

**KPMG LLP**

By: _____
    Signature

Name: _BRIAN BURDEIT_

Title: _PRINCIPAL_

Date: _2/17/15_

**EFH CORPORATE SERVICES COMPANY**

By: _____
    Signature

Name: _MEAGAN HORN_

Title: _Assoc. Gen. Tax Counsel_

Date: _2/3/15_

C 0631124 C

## SCHEDULE A-13

Following the Parties' execution of this Schedule A, CONTRACTOR is authorized to perform the Work as identified below on behalf of COMPANY pursuant to the terms and conditions contained in the Master Services Agreement C0631124C ("the Agreement") dated November 1, 2009 and any amendments thereto. Any work performed in connection with this engagement before the date of execution of this letter is also governed by the terms and conditions contained in the letter.

### SCOPE OF WORK

The Work will be performed in accordance with the specifications and instructions, if any, attached hereto and identified in the List of Attachments. The Work will be scheduled at the direction of COMPANY'S Contract Coordinator as identified herein.

CONTRACTOR will provide sales and use tax consulting services with respect to such matters that may arise for which COMPANY seeks CONTRACTORS advice, both written and oral, and that are not the subject of a separate statement of work. However, CONTRACTOR will not render any advice with respect to a federal or state "listed transaction" or any transaction that is substantially similar to a federal or state "listed transaction."

If matters exceed the scope of this statement of work, CONTRACTOR will issue a separate statement of work to confirm the scope and related terms of any additional engagements. Furthermore, a separate statement of work will be issued for each discrete tax consulting project not specified in this statement of work (e.g., transfer pricing study, corporate acquisition or disposition, etc.) and for tax controversy representation.

When, in the course of providing general tax consulting services, it is determined that the services would exceed the scope of this letter, preliminary engagement planning activities undertaken prior to the issuance of a separate statement of work for the discrete tax consulting project are intended to be covered by this statement of work.

To be of greatest assistance to COMPANY, CONTRACTOR should be advised in advance of proposed transactions.

CONTRACTOR does not anticipate that the written tax advice provided under this statement of work will be a Covered Opinion as defined in §10.35 of Circular 230 (Covered Opinion). Therefore, all the written tax advice provided under this statement of work will contain the following legend:

> ANY TAX ADVICE IN THIS COMMUNICATION IS NOT INTENDED OR WRITTEN BY KPMG TO BE USED, AND CANNOT BE USED, BY A CLIENT OR ANY OTHER PERSON OR ENTITY FOR THE PURPOSE OF (i) AVOIDING PENALTIES THAT MAY BE IMPOSED ON ANY TAXPAYER OR (ii) PROMOTING, MARKETING OR RECOMMENDING TO ANOTHER PARTY ANY MATTERS ADDRESSED HEREIN.

However, if CONTRACTOR'S services will rise to the level of a Covered Opinion, CONTRACTOR will issue a separate statement of work for the issuance of a Covered Opinion.

C 0631124 C

## TAX ADVICE STANDARDS

If CONTRACTOR is considered to be a tax return preparer under Treasury Regulation §301.7701-15, CONTRACTOR will apply elevated standards in providing tax advice. These standards are dependent on certain characteristics of the entity to which CONTRACTOR'S services will be directed as follows:

1.  For U.S. public companies or "large private entities" (i.e., private entities with prior year gross revenues of $300 million or more reflected in audited financial statements prepared in accordance with U.S. generally accepted accounting principles): CONTRACTOR must be able to determine that (1) there is "substantial authority" for an undisclosed return position (i.e., the weight of authorities in support of a position is substantial in relation to the weight of authorities in opposition to the position) and (2) a disclosed return position has at least a "realistic possibility" of being sustained on its merits (i.e., approximately a one-in-three or greater likelihood of success if challenged by a tax authority). The laws of some states (e.g., New York) also may impose more stringent return preparation standards for state tax returns. For advice pertaining to a "Tax Shelter" (as defined in IRC §6662(d)(2)(C)(ii)) or a "reportable transaction" with a significant purpose of tax avoidance, tax practitioners must generally conclude their advice satisfies the "more likely than not" standard; if the taxpayer is advised regarding potential taxpayer penalties, tax practitioners may conclude at a "substantial authority" level.

2.  For "other private entities" (i.e., entities that do not fall within the definitions above as a U.S. public company or large private entity): CONTRACTOR must be able to determine that a return position is at least "more likely than not" to be upheld (i.e., has a greater than 50 percent likelihood of success if challenged by the taxing authorities).

3.  If a return position relates to a transaction that is a "principal purpose transaction," CONTRACTOR must arrive at a "should" confidence level (i.e., approximately a 70% or greater likelihood of success if challenged by the taxing authorities) with respect to the position.

4.  CONTRACTOR will not render any advice with respect to a federal or state "listed transaction" or any transaction that is substantially similar to a federal or state "listed transaction."

In determining whether a return position meets the appropriate standard, CONTRACTOR will not take into account the possibility that a tax return will not be audited, that an issue will not be raised on audit, or that an issue will be settled. CONTRACTOR will inform COMPANY as soon as possible if, during CONTRACTOR'S analysis, CONTRACTOR determines circumstances exist that prevent us from advising COMPANY under these standards.

## THIRD PARTY SERVICE PROVIDERS

CONTRACTOR uses third party service providers within and without the United States to provide at CONTRACTOR'S discretion administrative and clerical services to CONTRACTOR. Accordingly, COMPANY consents to CONTRACTOR'S disclosure to such third party service

C 0631124 C

CONTRACTOR will issue invoices on a bi-monthly basis. All invoices shall be sent to:

Ms. Meagan Horn
Tax Counsel
EFH Corporate Services Company
1601 Bryan St.
Dallas, TX 75201

## KEY PERSONNEL

CONTRACTOR agrees that the individuals listed below will be assigned to perform the Work authorized by this Schedule A. CONTRACTOR will employ all reasonable efforts to ensure that such individuals remain so assigned until such Work is accepted by COMPANY; provided, however, that in the event that and such individuals are reassigned by CONTRACTOR or otherwise become unavailable to perform such Work, CONTRACTOR will provide, by way of replacement, individuals with reasonably equivalent experience and expertise.

**Brian Burdett:**       Tax Principal, State and Local Tax

**Brandon Fulmer:**       Tax Manager, State and Local Tax

**Emily Gauthier:**       Tax Manager, State and Local Tax

**Esmeralda Castro:**       Tax Senior Associate, State and Local Tax

CONTRACTOR PERSONELL AUTHORIZED TO ATTEND MEETINGS WITH COMPANY PERSONELL PERTAINING TO THE WORK

**Brian Burdett:**       Tax Principal, State and Local Tax

**Brandon Fulmer:**       Tax Manager, State and Local Tax

**Emily Gauthier:**       Tax Manager, State and Local Tax

**Esmeralda Castro:**       Tax Senior Associate, State and Local Tax

PRIVILAGES CLAIMED BY COMPANY, WITH RESPECT TO DELIVERABLES OR OTHER DOCUMENTS HEREAFTER DESIGNATED BY COMPANY

_____ ATTORNEY-CLIENT COMMUNICATION

_____ ATTORNEY WORK PRODUCT

__✓__ TAX ADVISOR

OTHER: Prepared in anticipation of litigation

C 0631124 C

providers data and information received from or at the request or discretion of COMPANY for the foregoing purposes.

### DELIVERABLES

Deliverables will be in the format requested by COMPANY depending on the specific tax services that are requested (i.e., oral, e-mail, memorandum, letter, Excel spreadsheet, etc.).

Contract Coordinator: Meagan Horn                     Phone Number: 214.812.7821

### WORK SITE

The Work Site will be the following location(s): CONTRACTOR &/or COMPANY offices located in Dallas, TX.

### COMPENSATION, INVOICES AND PAYMENT

As full compensation for the satisfactory performance by CONTRACTOR of the Work authorized pursuant to this Schedule A, COMPANY will compensate CONTRACTOR as follows. CONTRACTORS fee for this engagement will be based on the actual time incurred to complete the work at 70% of CONTRACTORS standard hourly rates for the individuals involved in providing services.

Estimated fees for this work will range between $5,000 and $20,000 and this project is not authorized to exceed $20,000. Any extension or increase in spend will require an amendment to this Schedule A. This estimate assumes there will be no travel to the participant's site(s).

State and Local Tax Professional and Support Staff Standard Hourly Rates as of October 26, 2013:

| Title | Standard Hourly Rates | Project Hourly Rates |
|---|---|---|
| Partner/Principal | $975/hr | $682/hr |
| Manager | $625/hr | $437/hr |
| Senior Associate | $500/hr | $350/hr |
| Associate | $345/hr | $241/hr |
| Para-Professional | $200/hr | $140/hr |

C 0631124 C

## LIST OF ATTACHMENTS

COMPANY and CONTRACTOR agree that the following described attachments, if any, are incorporated herein in their entirety to this Schedule A.

Work not specified above may be authorized only through a separate Schedule A, or though an amendment or supplement to this Schedule A.

KPMG LLP

By: _____

Printed Name: Brian Burdett

Title: *Principal, Tax*

Date: _____November 12, 2013_____

EFH Corporate Services Company

By: _____

Printed Name: Meagan Horn

Title: *Tax Counsel*

Date: ____11/18/13____

**AMENDMENT NO. 14.3**

**DATED DECEMBER 22, 2014**

**TO**

**MASTER SERVICES AGREEMENT**

**C0631124C**

**BY AND BETWEEN**

**KPMG LLP**

**AND**

**EFH CORPORATE SERVICES COMPANY**

**DATED NOVEMBER 1, 2009**

Contract No. C0631124CC0631124C

# AMENDMENT NO. 14.3

**EFFECTIVE DATE**

The Effective Date of this Amendment is December 22, 2014.

**PURPOSE**

This Amendment 14-3 amends Schedule A14 dated March 4, 2014 and Schedule A14-2, dated August 1, 2014, both between EFH Corporate Services Company ("COMPANY") and KPMG LLP ("CONTRACTOR").  The Parties agree that, except as otherwise amended by this Amendment 14-3, the terms of Schedule A14 and provisions of the Master Services Agreement dated November 1, 2009 ("Agreement") shall apply to the services being provided hereunder.  Any terms used in this Amendment 14-3 and not otherwise defined will have the same meaning as in the Agreement and/or Schedules A14 and A14-2.

**MODIFICATIONS**

The Agreement is modified as follows:

    **TIMING**

    The engagement is hereby extended to June 30, 2015.

    **KEY PERSONNEL**

    CONTRACTOR agrees that the individuals listed below will be assigned to perform the Work authorized by this Schedule 14-3.

        **Amy Douthey, Associate**
        **Holly Waggoner, Associate**

    **COMPENSATION**

    The estimated fees for Work authorized by this Schedule 14-3 shall not exceed $260,000.

    Notwithstanding anything herein to the contrary, COMPANY will compensate CONTRACTOR for the Work (a) only after  CONTRACTOR's engagement by COMPANY has been approved by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court) pursuant to section 327(a) of the Bankruptcy Code and (b) in accordance with any order entered by the Bankruptcy Court governing the compensation or reimbursement of fees of parties employed pursuant to section 327(a) of the Bankruptcy Code.

Contract No. C0631124CC0631124C

**KPMG LLP**                                    **EFH CORPORATE SERVICES COMPANY**

By: _Francis K. Yogi_                           By: _Taman Willis_
Signature                                        Signature

Name:   Francis Yogi                             Name: _Taman Willis_

Title:   Managing Director                       Title: _Procurement Specialist_

Date:   1/9/15                                    Date: _01/15/2015_

EFH - Enterprise Architecture Strategy – Foundation Phase 2

## SCHEDULE A-27

This Schedule A-27 (also referred to as "SOW" herein) relates to and follows Schedule A-25 for EFH IT Enterprise Architecture Strategy.  Contractor is providing a resource (the "Resource") to assist with the EFH IT Enterprise Architecture team with the Work in progress as described in Schedule 25-A and the services herein described.

Following the parties' execution of this Schedule A-27, Contractor (also referred as "KPMG") is authorized to perform services as identified below on behalf of Company (also referred to as "EFH Corporate Services Company or "EFH") pursuant to the terms and conditions contained in the master agreement C0631124C (the "Agreement") dated November 1, 2009.

## SCOPE OF WORK AND DELIVERABLES

The services will be performed in accordance with the specifications and instructions, if any, attached hereto and the directions from the Company's Director of IT Enterprise Architecture (the "Director").

## BACKGROUND

Company's IT Governance and Strategy ("ITG&S") tower recognizes the need to clearly understand the key desired outcomes from its customer base, clearly define its organizational function, and transform its operating model and services to support and enable partner expectations.

As part of the ITG&S tower, its Enterprise Architecture & Innovation (EA&I) team is responsible for aligning corporate and business unit strategic objectives, priorities, and initiatives with the technical direction and delivery methodology across various IT service towers - infrastructure, applications, and security/compliance.  Pursuant to this Schedule A-27, the Work will cover three major areas:

- Enterprise Architecture
- Process Excellence
- Technology Innovation & Strategy

    The additional resource will participate as a member and assist with day-to-day activities of the EA&I team as instructed by the Director or his delegate.

Pursuant to this Schedule A-27, the Resource will collaborate with the EA&I team on the key foundational components of the EA&I process and establishing the baseline to support the longer term strategic vision and target Enterprise Architecture governance model for Company technology-based solutions.

**DESCRIPTION OF SERVICES TO BE PERFORMED**

The Resource will support the planning, analysis and design of the EA&I target state operating model, functional organization design, and roadmap / transition plan for the new model by  serving in a staff augmentation role for the EA&I team. All management and responsibility for deliverables will be directed by the ITG&S team.

EFH - Enterprise Architecture Strategy – Foundation Phase 2

The Resource is assigned to help Company with the following:

- Engage under the direction of the EA&I team
- Review existing deliverables from phase 1 and act under direction from the EA&I on deliverables
- Provide technical expertise as requested

Resource's assistance will be under the direction and supervision of the EA&I team which will be responsible for communicating the tasks and requirements of the project to the Resource assigned hereunder and for reviewing the Resources work product.  The Resource's deliverables consist of orally reporting observations, recommendations, and feedback; the Resource will provide written documentation where necessary or appropriate.  The Resource will not be considered the preparer/developer of Company's project and will not sign for any Deliverable(s).

In connection with this engagement, the Resource will not:

- Provide any management oversight of Contractor personnel in connection with the project;
- Participate in determining the scope and objectives of the project;
- Provide any partner review of the deliverable(s); or
- Function in a management role or make decisions that may have an effect on Company's business.

| Role | Resource | Rate/Hour | Hours/Wk. | Weeks | Est. Hours | Est. Fees |
|------|----------|-----------|-----------|-------|------------|-----------|
| SME Guidance | Susan Garcia, | $325 | 6 | 12 | 72 | $23,400 |
| Resource, IT Service Management | Heather Davidson | $275 | 40 | 12 | 480 | $132,000 |
| | | | | | 552 | |
| | | | | | Total Est. | $155,400 |

*SME Time as needed

The estimated labor fees for these Resources are $155,400; labor fees for are not authorized to exceed $155,400. The expected blended rate is $300/hr., and Contractor will bill only for hours spent directly assisting Company, limited by the  parameters set forth in the Master Agreement, specifically, Article 5 . Any extension or increase in spend requires a change order or other amendment to this Schedule A-27 signed by a duly authorized entity of each party.  The Resource will work on site for 3-4 days per week for the duration of the project.  Travel expenses will be estimated and capped at 10-15% of the fees. Normal and reasonable travel expenses will be reimbursed in accordance with Article 5 and Attachment 5 of the Agreement (Reimbursable Expense Policy).  Only actual expenses will be billed.

Services are expected to begin on January 6 and to end on March 31, 2015.

The rates specified in this Schedule A-27 will remain in effect with respect to and until completion of the services authorized pursuant to this Schedule A-27.

All invoices shall be sent to:

Accounts Payable

2

EFH Corporate Services Company
1601 Bryan St
Dallas, TX 75201
EFHITAP@EnergyFutureHoldings.com

**RESERVATION OF RIGHTS**

Notwithstanding anything herein to the contrary, Company will compensate Contractor for the Work (a) only after Contractor's engagement by Company has been approved by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") pursuant to section 327(a) of the Bankruptcy Code and (b) in accordance with any order entered by the Bankruptcy Court governing the compensation or reimbursement of fees of parties employed pursuant to section 327(a) of the Bankruptcy Code.

COMPANY PARTICIPATION AND RESPONSIBILITIES

During the development of this engagement, Contractor has been guided by certain assumptions about the project scope, and level of Company's involvement and support.

Contractor requires the support of Company's personnel in order to achieve timely completion of the project. Support includes, but is not limited to:

- Assisting with activities described in this document
- Providing timely collection and provision of all appropriate documents requested by the Resource (and other such documents that are relevant to project deliverables)
- Making key Company personnel available to participate in project activities as requested by the Resource
- Enabling the Resource to access Company data sources as needed to fulfill assignments
- Reviewing and providing feedback on work product
- Helping with the scheduling and coordination of interviews and meetings with Exelon and third party personnel as needed (e.g. telecommunication providers)

## OTHER MATTERS

Contractor will provide services in accordance with the terms and conditions of this SOW. Contractor's services as outlined in this SOW constitute an Advisory Engagement conducted under the American Institute of Certified Public Accountants ("AICPA") Standards for Consulting Services. Such services are not intended to be an audit, examination, attestation, special report or agreed-upon procedures engagement as those services are defined in AICPA literature applicable to such engagements conducted by independent auditors. Accordingly, these services will not result in the issuance of a written communication to third parties by Contractor directly reporting on financial data or internal control or expressing a conclusion or any other form of assurance.

3

**Sarbanes-Oxley Act of 2002**

The following paragraph supersedes Article 43(a) of the Agreement

In accepting this engagement, the Company acknowledges that completion of this engagement or acceptance of deliverables resulting from this engagement will not constitute the sole basis for its assessment or evaluation of internal control over financial reporting or the primary basis for its compliance with its principal officer certification requirements under Section 302 of the Sarbanes-Oxley Act of 2002 (the Act). This engagement shall not be construed to be the sole basis to support the Company's responsibilities under Section 404 of the Act requiring each annual report filed under Section 13(a) or 15(d) of the Securities Exchange Act of 1934 to contain an internal control report from management. It is the responsibility of Company management to establish and maintain an adequate internal control structure and procedures for financial reporting and to assess, as of the end of the most recent fiscal year of the Company, the effectiveness of the internal control structure and procedures of the Company for financial reporting.

<strong><em>Signature Page Follows</em></strong>

**IN WITNESS WHEREOF**, the parties hereto have caused this Schedule A-27 to be executed by their duly authorized representatives as of the date first written above.

Work not specified above may be authorized only through a separate Schedule A-X, or through an amendment or supplement to this Schedule A-27.

**KPMG LLP**

By: _____
    Signature

Name: <u>Susan Garcia</u>

Title:  Partner

Date:  January 8, 2015

**EFH CORPORATE SERVICES COMPANY**

By: _____
    Signature

Name: <u>Kolten K Sarver</u>

Title: VP of IT Governance and Strategy

Date: January 7, 2015

*"This proposal is made by KPMG LLP, a U.S. limited liability partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International, a Swiss cooperative, and is in all respects subject to our client and engagement acceptance procedures as well as the negotiation, agreement, and signing of a specific engagement letter or cont. KPMG International provides no client services. No member firm has any authority to obligate or bind KPMG International or any other member firm vis-à-vis third parties, nor does KPMG International have any such authority to obligate or bind any member firm."*

5

**SCHEDULE A-24**

Following the Parties' execution of this Schedule A, **KPMG LLP** ("CONTRACTOR'") is authorized to perform the Work as identified on behalf of **EFH CORPORATE SERVICES COMPANY** ("COMPANY") pursuant to the terms and conditions contacting in the Master Services Agreement C0531124C ("the Agreement") dated November 1, 2009 and subsequently amended.

**SCOPE OF WORK AND DELIVERABLES**

The Work will be performed in accordance with the specifications and instructions, if any, attached hereto. The Work will be scheduled at the direction of the COMPANY's Contract Coordinator as identified herein.

**SCOPE OF WORK:**

CONTRACTOR will assist the tax department with the following:

1. Provide a technical training to COMPANY on capitalization of transaction costs to facilitate a bankruptcy for U.S. federal income tax purposes.
2. Provide tax consulting services with respect to determining whether certain costs incurred by COMPANY and paid to its advisors during bankruptcy are deductible, amortizable, or capitalizable for U.S. federal income tax purposes.
3. If requested, CONTRACTOR's tax consulting services to assist COMPANY in gathering reports and records from its advisors (e.g., investment bankers) to serve as additional documentation and support for the U.S. federal income tax treatment of such costs.
4. If requested, CONTRACTOR's tax consulting service will include the issuance of an opinion letter as to the tax treatment of such costs.

CONTRACTOR will provide tax consulting services with respect to such matters that may arise for which COMPANY seeks CONTRACTOR's advice, both written and oral, and that are not the subject of a separate engagement letter. However, CONTRACTOR will not render any advice with respect to a federal or state "listed transaction" or any transaction that is substantially similar to a federal or state "listed transaction."

Written advice provided to COMPANY under this SOW will be based on facts, representations, assumptions, and other information COMPANY provides to CONTRACTOR, the completeness, accuracy and timeliness of which are critical factors in CONTRACTOR's ability to timely and accurately complete CONTRACTOR's services. Unless COMPANY requests and CONTRACTOR agrees under a separate

writing (a newly issued SOW or addendum to this SOW) after CONTRACTOR's advice has been issued in final form to COMPANY, CONTRACTOR will not update CONTRACTOR's advice to take into account COMPANY updating the facts COMPANY provides to CONTRACTOR through COMPANY's discovery of new or additional facts, or COMPANY updating any information that may have formed the basis of any assumptions CONTRACTOR made in developing CONTRACTOR's advice. In rendering advice, CONTRACTOR will consider tax authorities that are subject to change, retroactively and/or prospectively, and any such changes could affect the advice CONTRACTOR issue to COMPANY.

The advice or other information in this document was prepared for the sole benefit of CONTRACTOR's client and may not be relied upon by any other person or organization. CONTRACTOR accepts no responsibility or liability in respect of this document to any person or organization other than CONTRACTOR's client.

To be of greatest assistance to COMPANY, CONTRACTOR should be advised in advance of proposed transactions.

**TAX ADVICE STANDARDS:**

If CONTRACTOR is considered to be a tax return preparer under Treasury Regulation §301.7701-15, CONTRACTOR will apply elevated standards in providing tax advice.  These standards are dependent on certain characteristics of the entity to which CONTRACTOR's services will be directed as follows:

1.  For U.S. public companies or "large private entities" (i.e., private entities with prior year gross revenues of $300 million or more reflected in audited financial statements prepared in accordance with U.S. generally accepted accounting principles):  CONTRACTOR must be able to determine that (1) there is "substantial authority" for an undisclosed return position (i.e., the weight of authorities in support of a position is substantial in relation to the weight of authorities in opposition to the position) and (2) a disclosed return position has at least a "realistic possibility" of being sustained on its merits (i.e., approximately a one-in-three or greater likelihood of success if challenged by a tax authority). The laws of some states (e.g., New York) also may impose more stringent return preparation standards for state tax returns. For advice pertaining to a "Tax Shelter" (as defined in IRC §6662(d)(2)(C)(ii)) or a "reportable transaction" with a significant purpose of tax avoidance, tax practitioners must generally conclude their advice satisfies the "more likely than not" standard; if the taxpayer is advised regarding potential taxpayer penalties, tax practitioners may conclude at a "substantial authority" level.

2.  For "other private entities" (i.e., entities that do not fall within the definitions above as a U.S. public company or large private entity):  CONTRACTOR must be able to determine that a return position is at least "more likely than not" to be upheld (i.e., has a greater than 50 percent likelihood of success if challenged by the taxing authorities).

3.  If a return position relates to a transaction that is a "principal purpose transaction," CONTRACTOR must arrive at a "should" confidence level (i.e., approximately a 70% or greater likelihood of success if challenged by the taxing authorities) with respect to the position.

4.  CONTRACTOR will not render any advice with respect to a federal or state "listed transaction" or any transaction that is substantially similar to a federal or state "listed transaction."

In determining whether a return position meets the appropriate standard, CONTRACTOR will not take into account the possibility that a tax return will not be audited, that an issue will not be raised on audit, or that an issue will be settled. CONTRACTOR will inform COMPANY as soon as possible if, during CONTRACTOR analysis, CONTRACTOR determine circumstances exist that prevent CONTRACTOR from advising COMPANY under these standards.

**THIRD PARTY SERVICE PROVIDERS**

COMPANY acknowledges that CONTRACTOR uses third party service providers within and without the United States to provide at CONTRACTOR's direction administrative and clerical services for CONTRACTOR.  These third party service providers may in the performance of such services have limited access to COMPANY's information received by CONTRACTOR from or at the request or direction of COMPANY.  Accordingly, COMPANY hereby consents to CONTRACTOR's disclosure to such third party service providers of COMPANY's information for the purposes described herein.  CONTRACTOR represents to COMPANY that each such third party service provider has agreed to conditions of confidentiality with respect to COMPANY's information to the same extent as CONTRACTOR pursuant to the terms of the Agreement. CONTRACTOR has full responsibility to cause these third party service providers to comply with such conditions of confidentiality and CONTRACTOR shall be responsible for the consequences of any failure to comply by such third party service provider.

**DELIVERABLES:**

Deliverables will be in the format requested by COMPANY depending on the specific tax services that are requested (i.e., oral, e-mail, memorandum, letter, Excel spreadsheet, etc.).

Contract No. C0631124C

Contract Coordinator: Molly Oltmanns                Phone Number: (214) 812-1132

**WORK SITE**

The Work Site will be the following location(s): CONTRACTOR &/or COMPANY offices located in Dallas, TX.

**COMPENSATION, INVOICES, AND PAYMENT**

As full compensation for the satisfactory performance by CONTRACTOR of the Work authorized pursuant to this Schedule A, COMPANY will compensate CONTRACTOR as follows.

Estimated fees for this study will range between $700,000 and $1,000,000 and will be based on the actual time incurred to complete the work at 70% of CONTRACTOR standard hourly rates for the individuals involved in providing the services. The estimated fees for Work authorized by this Schedule A-24 shall not exceed $1,000,000.  Any extension or increase in spend will require amendment to the Schedule A. This estimate assumes there will be no travel to the participant's site(s). These fees are not dependent on tax or other savings achieved or otherwise based in any way on results obtained.

Any work performed in connection with this engagement before the execution date of this letter is also governed by the terms of this letter and the Standard Terms and Conditions.

**Professional and Support Staff Fee Schedule for services:**

| | |
|---|---|
| **Partner/Principal** | **$720/hr** |
| **Tax Managing Director** | **$680/hr** |
| **Senior Manager** | **$660/hr** |
| **Manager** | **$560/hr** |
| **Senior Associate** | **$420/hr** |
| **Associate** | **$260/hr** |

The rates specified in this Schedule A will remain in effect, with respect to and until completion of the Work authorized pursuant to this Schedule A. The rates are considered as "not to exceed" the maximum fees to be charged for services.

CONTRACTOR acknowledges that the Bankruptcy Court must approve its fees in order to be compensated. In that regard, CONTRACTOR intends to file applications with the Court for allowance of compensation and reimbursement of expenses in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, and any order of the Bankruptcy Court establishing procedures for monthly compensation and reimbursement of expenses for professionals.    COMPANY acknowledges that professional time required to prepare detailed applications in accordance with the Bankruptcy Code, applicable rules and guidelines differs from CONTRACTOR's normal billing procedures and, as a result, requires significant effort by CONTRACTOR to comply therewith. As a result, the Company agrees that, subject to Bankruptcy Court approval, CONTRACTOR shall be reimbursed for such professional time incurred.

All invoices shall be sent to:

> Ms. Molly Oltmanns
>
> Manager – Tax
>
> Energy Future Holdings Corp.
>
> 1601 Bryan St, 3rd floor
>
> Dallas, TX 75201

**KEY PERSONNEL**

CONTRACTOR agrees that the individuals listed below will be assigned to perform the Work authorized by this Schedule A.  CONTRACTOR will employ all reasonable efforts to ensure that such individuals remain so assigned until such Work is accepted by COMPANY; provided, however, that in the event that any such individuals are reassigned by CONTRACTOR or otherwise become unavailable to perform such Work, CONTRACTOR will provide, by way of replacement, individuals with reasonably equivalent experience and expertise.

> **Chuck Thompson:** Tax Principal, Mergers & Acquisitions
> **Harry Costin:** Tax Managing Director, Mergers & Acquisitions
> **Lisa Meekins:** Senior Manager, Mergers & Acquisitions
> **Brittny Laukhuff:** Manager, Mergers & Acquisitions

CONTRACTOR PERSONNEL AUTHORIZED TO ATTEND MEETINGS WITH COMPANY PERSONNEL PERTAINING TO THE WORK

> **Chuck Thompson:** Tax Principal, Mergers & Acquisitions
> **Harry Costin:** Tax Managing Director, Mergers & Acquisitions

**Lisa Meekins:** Senior Manager, Mergers & Acquisitions
**Brittny Laukhuff:** Manager, Mergers & Acquisitions

PRIVILEGES CLAIMED BY COMPANY, WITH RESPECT TO DELIVERABLES OR OTHER DOCUMENTS HEREAFTER DESIGNATED BY COMPANY

_X_  ATTORNEY-CLIENT COMMUNICATION

_X_  ATTORNEY WORK PRODUCT

_X_  TAX ADVISOR

____  OTHER: _____

Work not specified above may be authorized only through a separate Schedule A, or through an amendment or supplement to Schedule A.

| **KPMG LLP** | **EFH CORPORATE SERVICES COMPANY** |
|---|---|
| By: _____ | By: _____ |
| Signature | Signature |
| Name: Chuck Thompson | Name: Molly Oltmanns |
| Title:  Principal | Title: Manager |
| Date:  November 20, 2014 | Date:  December 05, 2014 |