```
                                                        Page 1
 1   UNITED STATES BANKRUPTCY COURT
 2   DISTRICT OF DELAWARE
 3
 4   In re:                          :
                                     :   Chapter 11
 5   ENERGY FUTURE HOLDINGS          :
     CORP.,  et al.,                 :   Case No. 14-10979(CSS)
 6                                   :
             Debtors.               :   (Jointly Administration
 7   _____    :   Requested)
     ENERGY FUTURE INTERMEDIATE     :
 8   HOLDING COMPANY LLC and EFIH   :
     FINANCE INC.,                  :
 9                                  :
             Plaintiff,            :
10                                  :
        v.                          :   Adv. Proc. No.
11                                  :   14-51002(CSS)
     UMB BANK, N.A., as INDENTURE   :
12   TRUSTEE,                       :
                                     :
13           Defendant.            :
     _____:
14
15                       United States Bankruptcy Court
16                       824 North Market Street
17                       Wilmington, Delaware
18                       March 10, 2015
19                       9:46 AM - 11:18 AM
20               AMENDED TRANSCRIPT
21   B E F O R E :
22   HON CHRISTOPHER S. SONTCHI
23   U.S. BANKRUPTCY JUDGE
24
25   ECRO OPERATOR:  LESLIE MURIN
```

1  HEARING re Motion of Pallas Realty Advisors, Inc. for Entry

2  of an Order Extending the Deadline to File Proof of Claim,

3  or Alternatively Allowing Late-Filed Proof of Claim [D.I.

4  2602; filed October 28, 2014]

5

6  HEARING re Motion of Energy Future Holdings Corp., et al.,

7  for Entry of an Order Authorizing Luminant Generation

8  Company LLC to Reject a Water Contract with Tarrant Regional

9  Water District, Effective Nunc Pro Tunc to the Petition Date

10  [D.I. 2662; filed October 28, 2014]

11

12  HEARING re Debtors' First Omnibus (Non-Substantive)

13  Objection to (Amended and Superseded, Exact Duplicate, and

14  Insufficient Documentation) Claims Pursuant to Section

15  502(b) of the Bankruptcy Code, Bankruptcy Rules 3001, 3003,

16  and 3007, and Local Bankruptcy Rule 3007-1 [D.I. 2808; filed

17  November 18, 2014]

18

19  HEARING re Debtors' Fourth Omnibus (Substantive) Objection

20  to Certain Substantive Duplicate and No Liability Claims

21  Pursuant to Section 502(b) of the Bankruptcy Code,

22  Bankruptcy Rules 3001, 3003, and 3007, and Local Bankruptcy

23  Rule 3007-1 [D.I. 29994; filed December 12, 2014]

24

25  HEARING re Debtors' Eighth Omnibus (Non-Substantive)

1    Objection to (Insufficient Documentation) Claims Pursuant to

2    Section 502(b) of the Bankruptcy Code, Bankruptcy Rules

3    3001, 3003, and 3007, and Local Bankruptcy Rule 3007-1 [D.I.

4    3381; filed January 27, 2015]

5

6    HEARING re Motion of Energy Future Holdings Corp, et al.,

7    for Entry of an Order Authorizing the KPMG Debtors and KMPG

8    Debtors in Possession to Establish Procedures to KPMG LLP as

9    Bankruptcy Accounting, Tax, and IT Advisors [D.I. 3442;

10   filed February 4, 2015]

11

12   HEARING re Motion to the Official Committee of Unsecured

13   Creditors for Entry of an Order Granting Exclusive Standing

14   and Authority to Commence, Prosecute, and Settle Certain

15   Claims for Declaratory Judgment, Avoidance and Recovery of

16   Liens, Security Interests, Obligations, Fees, and Interest

17   Payments, and Disallowance of Claims (Redacted) [D.I. 3593;

18   filed February 19, 2015]

19

20   HEARING re Motion of the Ad Hoc Group of TECH Unsecured

21   Noteholders for Entry of an Order Granting Standing and

22   Authority to Commence, Prosecute, and Settle Certain Claims

23   for Declaratory Judgment, Avoidance and Recovery of Liens,

24   Security Interests, Obligations, Fees, and Interest

25   Payments, and Disallowance of Claims (Sealed) [D.I. 3596;

Page 4

1    filed February 19, 2015]

2

3    HEARING re Motion of the EFH Official Committee for Entry of

4    an Order Granting Derivative Standing and Authority to

5    Prosecute and Settle Claims on Behalf of the Luminant

6    Debtors' Estates [D.I. 3605; filed February 29, 2015]

7

8    HEARING re Motion for Summary Judgment filed by Mary LaCour

9    [D.I. 3750; filed March 2, 2015]

10

11   HEARING re Motion to Compel the Production of Documents

12   [D.I. 3752; filed March 2, 2015]

13

14   HEARING re Motion of Allen Shrode for Relief from the

15   Automatic Stay Pursuant to 11 U.S. C. 362(d) [D.I. 2896;

16   filed November 26, 2014]

17

18   HEARING re Debtors' Third Omnibus (Non-Substantive)

19   Objection to (No Supporting Documentation) Customer Claims

20   Pursuant to Section 502(b) of the Bankruptcy Code,

21   Bankruptcy Rules 3001, 3003, and 3007, and Local Bankruptcy

22   Rules 3007-1 [D.I. 2992; filed December 12, 2014]

23

24   HEARING re Debtors' Sixth Omnibus (Non-Substantive)

25   Objection to (Insufficient Documentation) Claims Pursuant to

1    Section 502(b) of the Bankruptcy Code, Bankruptcy Rules

2    3001, 3003, and 3007, and Local Bankruptcy Rule 3007-1 [D.I.

3    3212; filed January 9, 2015]

4

5    HEARING re Debtors' Ninth Omnibus (Non-Substantive)

6    Objection to (Amended and Superseded, Exact Duplicate, No

7    Supporting Documentation, and Insufficient Documentation)

8    Claims Pursuant to Section 502(b) of the Bankruptcy Code,

9    Bankruptcy Rules 3001, 3003, and 3007, and Local Bankruptcy

10   Rule 3007-1 [D.I. 3471; filed February 6, 2015]

11

12   HEARING re Debtors' Eleventh Omnibus (Non-Substantive)

13   Objection to (Amended and Superseded) Claims Pursuant to

14   Section 502(b) of the Bankruptcy Code, Bankruptcy Rules

15   3001, 3003, and 3007, and Local Bankruptcy Rule 3007-1 [D.I.

16   3475; filed February 6, 2015]

17

18   HEARING re Application for Entry of an Order Authorizing the

19   Retention and Employment of McElroy, Deutsch, Mulvaney &

20   Carpenter, LLP as Delaware Counsel to Debtors and Debtors in

21   Possession Energy Future Competitive Holidays Company LLC

22   and Texas Competitive Electric Holdings Company LLC

23   Effective Nunc Pro Tunc to January 12, 2015 and Hearing

24   Thereon [D.I. 3517; filed February 11, 2015]

25

1   HEARING re Motion of Godfrey & Kahn, S.C. Counsel to the Fee

2   Committee, for an Extension of Time to File its Interim Fee

3   Application for the First Interim Fee Period (August 19,

4   2014 through December 31, 2014) and Statement of Position on

5   Extensions for the Second Interim Fee Period [D.I. 3539;

6   filed February 13, 2015]

7

8   HEARING re Debtors' Seventh Omnibus (Substantive) Objection

9   to Certain No Liability Claims Pursuant to Section 502(b) of

10  the Bankruptcy Code, Pursuant to Section 502(b) of the

11  Bankruptcy Code, Bankruptcy Rules 3001, 3003, and 3007, and

12  Local Bankruptcy Rule 3007-1 [D.I. 3218; filed January 9,

13  2015]

14

15  HEARING re Motion of Energy Future Holdings Corp., Energy

16  Future Intermediate Holding Company LLC, and EFIH Finance

17  Inc. for Entry of (A) Order (I) Authorizing Partial

18  Repayment of EFIH Second Lien Notes; (II) Approving EFIH DIP

19  Consent; and (III) Authorizing Consent Fee and (B) Revised

20  EFIH First Lien DIP Order [D.I. 3527; filed February 12,

21  2015]

22

23  HEARING re Adversary Complaint for Declaratory Judgment of

24  Energy Future Intermediate Holding Company LLC and EFIH

25  Finance Inc. [D.I. 3039/Adv. D.I. 1; filed December 16,

1    2014]

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:   Sonya Ledanski Hyde

```
1    A P P E A R A N C E S :

2    PAUL, WEISS, RIFKIND, WHARTON & GARRISON

3         Attorney for Ad Hoc Committee of TCEH First Lien

4         Creditors

5    BY:  Brian Hermann

6         Jacob Adlerstein

7

8    YOUNG CONAWAY

9         Attorney for Ad Hoc Committee of TCEH First Lien

10        Creditors

11   BY:  Pauline K. Morgan

12

13   KRAMER LEVIN NAFTALIS & FRANKEL LLP

14        Attorney for Computer Share, N.A., Indenture Trustee

15   BY:  Thomas Moers Mayer

16        Jennifer Sharret

17

18   PACHULSKI STENG ZIEHL & JONES LLP

19        Attorney for Computer Share, N.A., Indenture Trustee

20   BY:  Laura Davis Jones

21

22   MORRIS JAMES LLP

23        Attorney for Law Delaware, Indenture Trustee

24   BY:  Stephen Miller

25
```

1   PATTERSON BELKNAP WEBB & TYLER LLP

2        Attorney for Law Delaware, Indenture Trustee

3   BY:  Daniel A. Lowenthal

4

5   SHEARMAN & STERLING LLP

6        Attorney for Deutsche Bank, DIP Agent

7   BY:  Fredric Sosnick

8        Ned Schodek

9

10  POTTER ANDERSON & CORROON, LLP

11       Attorney for Deutsche Bank, DIP Agent

12  BY:  R. Stephen McNeill

13

14  CROSS & SIMON LLC

15       Attorney for Fidelity

16  BY:  Michael J. Joyce

17

18  MORRIS, NICHOLS, ARSHT & TUNNELL

19       Attorney for Sponsors

20  BY:  Derek C. Abbot

21

22  MORGAN, LEWIS & BOCKIUS

23       Attorney for PIMCO

24  BY:  Patrick Strawbridge

25

```
1   SULLIVAN & CROMWELL LLP
2        Attorney for EFH Committee
3   BY:  Brian D. Glueckstein
4
5   DRINKER BIDDLE & REATH LLP
6        Attorney for Citibank
7   BY:  Howard A. Cohen
8
9   VENABLE LLC
10       Attorney for PIMCO
11  BY:  Jamie L. Edmonson
12
13  MONTGOMERY McCRACKEN WALKER & RHOADS LLP
14       Attorney for EFH Committee
15  BY:  Mark A. Fink
16
17  MUNGER, TOLLES & OLSON LLP
18       Attorney for Conflict Counsel TCECH
19  BY:  Thomas B. Walper
20
21  ASHBY & GEDDES, P.A.
22       Attorney for WSFS, Trustee
23  BY:  Greg Taylor
24
25  KIRKLAND & ELLIS LLP
```

1          Attorney for Debtors

2    BY:  Bryan M. Stephany

3          Andrew Welz

4          Jonathan F. Gantor

5          Steven N. Serajeddini

6          David Klauder

7

8    USDOS/OUST

9          For U.S. Trustee

10   BY:  Richard L. Schepacarter

11

12   COLE SCHOTZ

13        Attorney for DTCO

14   BY:  Herman Pernick

15

16   RICHARD, LAYTON & FINGER

17   Attorney for EFH/Debtors

18   BY:  Daniel J. DeFranceschi

19        Jason M. Madron

20

21   POLSINELLI

22        Attorney for TCEH Committee

23   BY:  Chris Ward

24        Justin Edelson

25

1    Morrison & Foerster LLP

2         Attorney for TCEH Committee

3    BY:  Brett H. Miller

4

5    KLET HARRISON

6         Attorney for UMB Banking, Indenture Trustee

7    BY:  Ray (Indiscernible)

8

9    ROPES & GRAY LLP

10        Attorney for DTCO

11   BY:  Keith Wofford

12

13   FOX ROTHSCHILD LLP

14        Attorney for TCEH Unsec Ad Hoc Group

15   BY:  L. John Bird

16

17   ALSO PRESENT TELEPHONICALLY:

18   SAM GREEN

19   MATTHEW KIMBLE

20   JACOB A. ADLERSTEIN

21   SCOTT L. ALBERINO

22   ARLENE R. ALVES

23   NII-AMAR AMAMOO

24   PHIL ANKER

25   STEPHEN M. BALDINI

1    ROBERT J. BOLLER

2    PEG A. BRICKLEY

3    JOHN B. BRINGARDNER

4    MATTHEW BROD

5    PHILIP E. BROWN

6    STEPHEN BUMAZIAN

7    CHRIS CARTY

8    JAE SEON CHAOI

9    KEVIN COCO

10   MARK A. CODY

11   JEREMY COFFEY

12   KENT COLLIER

13   THOMAS CURTAIN

14   GREN DAY

15   ADAM A. DENHOFF

16   ANDREW DIETDERICH

17   IRA DIZENGOFF

18   STACECY DORE

19   DAVID M. DUNN

20   PHILIP G. EISENBERG

21   CATHERINE EISENHUT

22   MARITA ERBECK

23   BRADLEY FEINGERTS

24   JEFF FINGER

25   MARK FLANNAGAN

1    PARTICK FLEURY

2    BERE FLOM

3    JULIA FROST-DAVIES

4    CHARLES GARRISON

5    ERIC GELLER

6    MEGGIE GILSTRAP

7    SETH GOLDMAN

8    MATTHEW R. GRAY

9    DAVID GRINGER

10   DANIEL J. HARRIS

11   MARK F. HEBBELN

12   IAN HOLMES

13   SANDRA HORWITZ

14   NATASHA HWANGPO

15   ANNA KALENCHITS

16   HAROLD KAPLAN

17   CHRIS D. KENNY

18   CHARLES KOSTER

19   STUART KOVENSKY

20   MICHELE F. KYROUZ

21   MICHAEL LEE

22   RICHARD LEVIN

23   MICHAEL G. LINN

24   DANIEL A. LOWENTHAL

25   KENNETH MAIMAN

1   ROBERT K. MALONE

2   JEFF MARWIL

3   LUCKEY MCDOWELL

4   JAMES H. MILLAR

5   HAL F. MORRIS

6   NAOMI MOSS

7   JASON NEW

8   JOANNA S. NEWDECK

9   JERREY M. OLINSKY

10  RUSSELL W. PARKS, JR.

11  RICHARD PEDONE

12  TUVIA PERETZ

13  MEREDITH PFISTER

14  JASON T. PRAGER

15  ABID QURESHI

16  MATTHEW I. RAPPAPORT

17  ELIZABETH RASSKAZOVA

18  MATTHEW ROOSE

19  JEFF ROSENBAUM

20  RAVI SARAWGI

21  ERIK SCHNEIDER

22  ANDREA B. SCWARTZ

23  STEVEN SMITH

24  ANDREW M. THAU

25  MARK K. THOMAS

1    MEREDITH S. TINKHAM

2    AMER TIWANA

3    MICHELLE TSENG

4    MATTHEW UNDERWOOD

5    WARREN USATINE

6    KEVIN M. VAN DAM

7    GARY WALDREP

8    THOMAS WALPER

9    MICHAEL J. WALSH

10   BRADY C. WILLIAMSON

11   APARNA YENAMANDRA

12   LINDSAY ZAHRADKA

13   JOSEPH ZALEWSKI

14   DANIEL ZAZOVE

15   EMIL KLEINHAUS

16   MICHELLE DREYER

17   BENJAMIN D. FEDER

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2            CLERK: All rise.

3            THE COURT:  Please be seated.

4            MR. SASSOWER:  Good morning, your Honor.

5            THE COURT:  Good morning.

6            MR. SASSOWER:  Edward Sassower, Kirkland & Ellis

7    LLP on behalf of the Debtors.  Your Honor, I'd like the

8    podium in the (indiscernible).

9            THE COURT:  Your tax dollars at work.  Thank you

10   very much.  We truly appreciate it.  I can hear you, which

11   is wonderful.

12           MR. SASSOWER:  Yeah.  Your Honor, there are two

13   items up for today's hearing.  The first item is the

14   debtor's motion seeking authority to partially repay $750

15   million in EFI's second only notice in cash.  That's docket

16   entry 3527.  The debtor's filed a revised form of order

17   yesterday reflecting resolution between EFIH first and

18   second lien trustees, (indiscernible) creditor issues, and

19   the resolution between the EFIH Debtors and the EFIH second

20   lien trustee on the allocation of the partial repayment.

21   That revised form of order was docket entry 3842.  My

22   partner, Steve Hessler, will provide more color and present

23   the revised form of order in a few moments.

24           THE COURT:  Okay.

25           MR. SASSOWER:  Your Honor, the second item that

1    relates to one contested proof of claim for approximately

2    $128 billion.  That is proof of claim number 9658.  The

3    Debtors are seeking to expunge this claim from the claims

4    register as a part of the plan process.  And my colleague

5    Steve Serajeddin will present this claim at the conclusion

6    of today's hearing.

7              THE COURT:  Okay.

8              MR. SASSOWER:  Your Honor, before we move to

9    today's agenda, I'd like to provide you with an update on

10   the status of the cases.  As they laid out at the last

11   hearing on February 10th, one of the debtor's most important

12   work strains is negotiating a confirmable and hopefully

13   consensual plan of reorganization.  To that end, we informed

14   the Court at the last hearing that the debtor's chief

15   restructuring officers plan to issue a global plan, term

16   sheet, in an effort to further facilitate plan negotiations.

17             I'm pleased to report that on February 12th, two

18   days after the last hearing, the COOs circulated a 50 plus

19   page draft global term sheet to the various major creditor

20   decisions.  The draft global term sheet did not include

21   dollar figures or percentage estimated recoveries.  Instead,

22   there were blanks where the dollar figures or percentages

23   would normally appear in order to give all constituents time

24   to reflect on the term sheet structure and provide feedback

25   on the structure as well as recovery amounts.

1            Over the past few months, there have been a lot of

2    plan negotiations.  The Debtors have received multiple term

3    sheets from various stakeholders, both oral and written,

4    that would seek to resolve that particular creditor's

5    respective aspects of the capital structure.  The debtor

6    job, however, is to think about the case holistically, by

7    issuing a draft global term sheet that addresses all claims,

8    the COOs have merged the various creditor negotiations and

9    added their own ideas in an effort to focus those

10   negotiations on the key recovery issues for each

11   constituent.

12           Importantly, the draft term sheet that was

13   circulated on February 12th was posted to (indiscernible)

14   website, so that there wouldn't be any question as to

15   whether professionals could share the term sheet with their

16   clients.  The COOs wanted full and transparent feedback

17   directly from the principles.

18           In addition to distributing a global plan term

19   sheet, the COOs also simultaneously distributed a proposed

20   confirmation schedule that was teed off an unknown plan

21   filing date, but took into account, you know, every date

22   between the date of the filing of a plan and confirmation,

23   including anticipated related discovery.  In fact, any plans

24   that the Debtors would file in this case would be

25   accompanied by a motion to establish a confirmation related

1    schedule.  And it's our hope that that schedule will be as

2    consensual as possible, to the greatest extent possible.

3            After giving people nearly a month to absorb the

4    global plan term sheet to give comments to the structure, to

5    provide feedback on proposed recoveries, yesterday, the

6    Debtors and COOs circulated a revised version of the term

7    sheet with illustrative recovery values.  In other words,

8    they filled in the blanks.  The illustrative numbers in the

9    term sheet issued yesterday intended to represent reasonable

10   settlements of disputed claims in an effort to further drive

11   negotiations, and ultimately, consensus.

12           The circulation of the revised term sheet

13   yesterday also included a revised confirmation schedule,

14   that is consistent with the schedule that was circulated in

15   February, but with the specific dates filled in this time.

16   Importantly, unlike the numberless term sheet that was

17   circulated on February 12th, the illustrative number filled

18   version of the term sheet that was circulated yesterday was

19   just circulated to professionals and as covered by

20   (indiscernible) and confidentiality.

21           Now, I'd like to take a moment to explain the role

22   that the COOs and the boards and the disinterested director

23   for the various advisors played an issue in the term sheet.

24   The Debtors and their advisors, including the disinterested

25   directors and the conflict matters advisors paid vigorous

1    attention to corporate governance and arriving at this

2    point.  The term sheet was driven by the COOs, who approved

3    both the process, as well as the substantive content of the

4    term sheet.  The boards, including the disinterested

5    directors and the managers of EFH, EFIH and EFCH-ECH,

6    analyzed the illustrative term sheet and supported its

7    distribution in an effort to facilitate plan negotiations.

8           However, we've informed all parties that the

9    boards, including the disinterested directors, have not

10   approved the substance of the term sheet.  Specifically, the

11   disinterested directors and managers, in consultation with

12   the conflict matters advisors are still evaluating and

13   negotiating all intercom requests.  Indeed, while the

14   creditors continue to negotiate amongst themselves, the

15   disinterested directors and advisors are continuing to do

16   the same.

17          And should the disinterested directors arrive at a

18   settlement, then that settlement could serve as the basis

19   for the plan that we would file with the Court.  The

20   advisors for the disinterested directors are either in court

21   or on the phone, if your Honor would like to hear from them

22   directly, after I yield the podium.

23          Again, your Honor, our goal is to file a

24   confirmable plan, and hopefully, equally consensual plan as

25   soon as possible.  If the plan is not consensual at the time

1    of filing, then hopefully, it would be before your Honor

2    ruled on confirmation.  And hopefully, the draft of the

3    global term sheet that was issued yesterday is an important

4    step in that direction.

5           Your Honor, I'd also like to give you a brief

6    update on various litigation fronts.  As your Honor knows,

7    both official committees and the ad hoc group of the TCH

8    (indiscernible) note holders filed motions seeking standing

9    to prosecute certain claims covered by the debtor's

10   stipulations under the TCH cash (indiscernible) order.  In

11   order to satisfy the debtor line set forth in that order,

12   the Debtors and seven other parties filed objections and

13   responses over 5,000 pages in total.

14          The parties agreed to adjourn standing motion to

15   April 14th, omnibus hearing dates.  Your Honor, just prior

16   to this hearing, the parties filed and agreed to stipulation

17   that covers that adjournment.  And I have that stipulation

18   with us in court today, if you'd like it to be presented,

19   otherwise, we can handle it in the chambers after the

20   hearing.

21          THE COURT:  Well, we might as well.  Everyone's

22   here, so…

23          MR. SASSOWER:  Okay.

24          THE COURT:  At some point, we might as well

25   (indiscernible).

1           MR. SASSOWER:  Thank you.  May I approach?

2           THE COURT:  Yes, of course.

3           MR. SASSOWER:  Thank you.

4           THE COURT:  You want me to have a look at it?

5           MR. SASSOWER:  Sure.  Your Honor, it's my

6   understanding this is the same form (indiscernible) that he

7   had previously used.

8           THE COURT:  Does anyone wish to be heard on this

9   issue?  Okay, no.  Okay, I signed it.  Thank you.

10          MR. SASSOWER:  Thank you, your Honor.  Your Honor,

11  finally, there are a number of updates with respect to the

12  ongoing make whole litigations and the resolution of which

13  the debtor believe will help facilitate a plan confirmation.

14  With respect to the EFI (indiscernible) notes, the last

15  (indiscernible) of the EFIH first lien trustee filed an

16  appeal to the third circuit after the district court

17  (indiscernible) to EFIH first lien settlement consummated in

18  June 2014.

19          Also, as your Honor knows, the indentured trustee

20  put an EFIH first lien notes and EFIH itself filed cross

21  motions seeking summary judgment ruling on the existence of

22  alleged make wholes related to the EFIH first lien notes.

23  And, those motions are now fully briefed, and as the Court

24  requested, both sides have also filed a post-findings of

25  that in the law, and an oral argument on these motions

1    that's scheduled for this Friday.

2           With respect to the EFIH second lien notes, oral

3    arguments on the rightness of litigating existence

4    (indiscernible) alleged claims as scheduled for March 18th.

5    But, we're working with the professionals for the EFIH

6    second lien note to see if we can potentially adjourn that

7    hearing because if your Honor rules in favor of the

8    repayment motion today, that could render any rightness

9    arguments to move.

10          Finally, with respect to the EFIH unsecured notes,

11   the EFIH Debtors filed a preparatory action seeking among

12   other things, a determination that the EFIH unsecured note

13   holders are not entitled to a make whole.  The indentured

14   trustee from EFIH unsecured note holders filed a motion to

15   dismiss.  That's similar to the motion that was filed by the

16   indentured trustee for the EFIH second lien notes, and that

17   issue is also now fully briefed, and we're seeking

18   (indiscernible) possible hearing date for that motion.

19          THE COURT:  Has that been submitted under

20   (indiscernible) briefing, yet?  No?  Today?

21          MAN:  (Indiscernible), your Honor.

22          THE COURT:  This Thursday, you're going to submit

23   it?

24          MAN:  Yes, your Honor.

25          THE COURT:  Okay.

1          MR. SASSOWER:  So with that, unless your Honor has

2    any questions, I'll yield the podium before Mr. Hessler

3    presents the repayment motion, I think there are other

4    people in the courtroom who would like to make a few opening

5    statements.

6          THE COURT:  Could you just -- and the answer may

7    be it's still pending, but I lost track a little bit of the

8    timing.  What's going on in connection with the encore sale?

9          MR. SASSOWER:  The sale?  (Indiscernible).

10         THE COURT:  Thank you.

11         MR. HESSLER:  All right, good morning your Honor,

12   (indiscernible) Steve Hessler for Kirkland & Ellis.  The

13   most significant update that we're able to talk about,

14   hopefully, would be the first key deadline passed, which was

15   a week ago Monday.  It was the deadline for the receipt of

16   round one bids, which has occurred, and the movement of

17   bidders into the round two process, which also has occurred.

18         THE COURT:  Okay.

19         MR. HESSLER:  Although brief, that's about as much

20   as I can (indiscernible), I'm going to say this morning,

21   your Honor.

22         THE COURT:  So, can I ask, do we have the plural

23   of bidders, or is there a bidder, or is that too much

24   information?

25         MR. HESSLER:  We have received bids, your Honor.

1          THE COURT:  Received bids, okay.  Very good.

2          MR. HESSLER:  Thank you, your Honor.

3          THE COURT:  When's the next time I hear anything

4     on that?  I just don't have the schedule in front of me, so-

5     -

6          MR. HESSLER:  The -- well, the notional time

7     period for us filing a (indiscernible) agreement motion is

8     still probably about six weeks off.  So I think we would be

9     giving you another update at the next (indiscernible)

10    hearing, your Honor.

11         THE COURT:  Okay.  Thank you.

12         MR. SASSOWER:  And I guess it goes without saying,

13    your Honor, that because of the submission of those bids,

14    the process is continuing.

15         THE COURT:  Okay.

16         MR. HERMAN:  Good morning, your Honor.  Brian

17    Herman from Paul, Weiss, Rifkind, Wharton & Garrison on

18    behalf of the TCEH first lien creditor ad hoc committee.  I

19    just have brief remarks on the status of where things stand

20    on planned discussions.

21         THE COURT:  Okay.

22         MR. HERMAN:  Your Honor, you recall about 30 days

23    ago at the last hearing, my partner Mr. Kornberg said that

24    it should take about 30 to 60 days to determine whether a

25    tax re-transaction will work.  And you know, just to remind

1    everyone, our group, at least, has been at this for about

2    two years.  It's now about 30 days later, and I thought I

3    would let the court know where things stood from our

4    perspective.

5              I'm pleased to report, your Honor, that we, as a

6    group, including principles within our group, have been

7    working virtually nonstop to try to see if the task reveal

8    is achievable.  And that includes taking the lead role in

9    negotiating with creditors on the E side, multiple

10   constituencies on the E side, as well as junior creditors on

11   the T side, and as well as the company.  And we appreciate

12   the fact that the company is trying to make progress by

13   putting forward planned structures.  We think that that is a

14   helpful step for them to take.

15             But let me just be clear that an agreement with

16   any party, any party in this duel capital structure on a

17   task reveal remains quite elusive.  And the challenges that

18   are associated with the structure the Debtors are seeking

19   for imposed continues to overwhelm this process, and that's

20   for a few reasons.  One is that there are various

21   constituents on the east side that are fighting with one

22   another and with the debtor over multiple issues that your

23   Honor is well aware of.  And, there are issues on our side,

24   on the T side, with respect to our junior creditors, and

25   some of that has been pretty thinly pleaded related to the

1    standing motions.

2           But, what is crystal clear at this point is that

3    what has been offered to us thus far, to pursue the task

4    reveal and forego value, that we would otherwise receive in

5    a taxable transaction is just insufficient, and it's

6    insufficient by a fairly wide margin.  And as a result, we

7    continue to favor taxable transactions that are open minded

8    to an alternative, if one can compensate us sufficiently for

9    the value that we're being asked to forgo.

10          Your Honor, we, we've, as I said, now been at this

11   for over two years, at least our group and the company.  We

12   are committed to spending some additional time to take a

13   hard run, continue to take a hard run at a tax re-

14   transaction.  And if we fail, it will not be for lack of

15   effort, I can assure you of that.  But, because of the great

16   effort that's already gone into it, unless we can make

17   substantial progress in the next, call it, 30 days, we are

18   going to have to start taking steps to move in a different

19   direction.  And again, we are going to try not to do that,

20   but if we have to, we are going to start trying to move the

21   Debtors and others in a direction that is more favorable to

22   our constituency.  Thank you, your Honor.

23          THE COURT:  You're welcome.

24          MR. GLUECKSTEIN:  Good morning, your Honor.  Brian

25   Glueckstein of Sullivan & Cromwell of behalf of the EFH

1    Committee.  Just briefly and in further response, the EFH

2    Committee's prospective -- we do agree there has been

3    progress made over the past month or so, both within the

4    constituency and from working hard with the E side, creditor

5    capital structure, as well as across the group of Debtors

6    and the T creditors and (indiscernible) planning process.

7           We have expressed concerns to the Debtors about

8    the process, as Mr. Sassower made his comments, with respect

9    to the population of the debtor's term sheet, and the

10   numbers in there, and how that came to be.  But, the CRO's

11   proposing numbers that do not reflect this board, as we

12   understand (indiscernible) the independent directors on

13   conflict matters as to the substance, and don't have support

14   of any (indiscernible), certainly not the EFH Committee.

15          But, certainly, the Committee does believe that

16   progress is being made within the creditor negotiations.  We

17   hope that continues to be the case, and we believe

18   certainly, that our tax restructure is the appropriate way

19   to proceed, and will be the ultimate (indiscernible). Thank

20   you.

21          THE COURT:  Thank you.  Mr. Miller?

22          MR. MILLER:  Good morning, your Honor.  Brett

23   Miller of Morrison & Forester on behalf of the T Side

24   Creditors Committee.  Less than 16 hours ago, the co-COOs

25   term sheet that the (indiscernible) and a number of us got

1    it, and it was interesting riding down on the train, as

2    people were talking about their views of the term sheet.

3    And I think, as you often hear, the best settlement proposal

4    is the one that no one likes.  Well, here we are, with a

5    plan term sheet that no one seems to like, but it is

6    progress.  And as it is only less than 16 hours since it's

7    been submitted, there will be significant conversations

8    going forward.  And whether it's a taxable deal and a tax

9    free spin, an encore sale or whatever, there are many balls

10   up in the air, and the T Side Committee will continue

11   speaking with all the constituents and trying to get a deal

12   done.

13          THE COURT:  Thank you.  Anyone else?  All right.

14   So, is that the partial repayment issues.

15          MR. HESSLER:  Good morning again, your Honor.  For

16   the record, Steve Hessler of Kirkland & Ellis on behalf of

17   the Debtors.  At the outset, your Honor, we'd note, as Mr.

18   Sassower indicated, we gave you yesterday to file

19   (indiscernible) of the proposed order to approve the partial

20   repayment of EFI's second lien notes.  With that filing that

21   (indiscernible), it is our present understanding that we had

22   resolved all filed and otherwise potential (indiscernible)

23   to the motion. With regard to the orders as sells, there

24   have been no changes as we've filed yesterday.  I do have a

25   clean -- and (indiscernible) that could hand it off.

1       THE COURT:  Yes, please.

2       MR. HESSLER:  May I approach, your Honor?

3       THE COURT:  Yes.

4       MR. HESSLER:  Your Honor, the partial repayment

5   motion essentially sees three former -- three forms of

6   relief.  First, authority to make the partial repayment, the

7   second, approval of EFIH's entry into the requisite

8   consensus with the EFIH and DIP lenders to facilitate the

9   repayment and authority to pay them in consent before that.

10  And then, lastly, entry of a modified EFIH DIP order to also

11  facilitate the partial repayment.

12      Your Honor, given that we are -- we believe that

13  the motion is presently consensual, I'll provide a brief

14  overview of the relief requested in the resolution of the

15  objections, first, the repayment itself.  The partial

16  repayment motion requested the authority to use up to $750

17  million of cash on hand at EFIH to partially repay EFIH

18  second lien notes.  Earlier in this case, as your Honor will

19  remember, the Court approved the $5.4 billion EFIH first

20  lien DIP facility, and the use of those proceeds for the

21  repayment of the EFIH first lien notes.

22      Your Honor, EFIH, at that point in time, had

23  always intended to use a portion of the proceeds of that

24  EFIH DIP facility to repay second lien notes in full, along

25  with the proceeds of the proposed EFIH second lien DIP

1    facility, which of course, was subsequently withdrawn.  Your

2    Honor, by proceeding at this time to use the $750 million of

3    available DIP cash to partially repay second lien notes,

4    that will provide an estimated savings of $66 to $105

5    million of interest expense savings, depending on the length

6    of the case.

7            Secondly, your Honor, the consents and the consent

8    fee.  The documents covering the EFIH DIP facility required

9    the EFIH obtain the consent of the DIP agent and the

10   required lenders, in order to carry out the partial

11   repayment.  Before we filed the motion, EFIH did ex --

12   negotiate and execute a written consent with the EFIH first

13   lien DIP lenders to effectuate that partial repayment.

14   After we filed the motion, and then negotiated resolutions

15   to the objections, for the purpose of filing the amended

16   order, which we filed yesterday, we had to execute a second

17   consent with the DIP lenders.  Both of those consensus have

18   been -- we've had -- we had sufficient consensus that's

19   required with the lender, and we filed both the first and

20   second consent along with the packaging materials

21   (indiscernible) yesterday.

22           Both consents are necessary to effectuate the

23   repayment.  And in exchange for the debt lender's consent,

24   the consenting lenders shall receive a fee of 0.25 percent

25   of their respective DIP holdings, with -- which would result

1    in a maximum of $13.5 million consent fee.  Your Honor, as

2    to the repayment, there have been (indiscernible) DIP order

3    changes, lastly.

4            As to the repayment, there were two principle

5    objections.  One, involving inter-creditor issues, and the

6    other involving allocation issues, the allocation of the

7    repayment proceeds.  When the Debtors previously sought to

8    repay the EFIH second lien notes in full, the EFIH first

9    lien trustee initiated an adversary proceeding against the

10   EFIH second lien trustee and certain other parties.  That

11   complaint sought to require a second lien trustee to hold

12   back certain amounts of the repayment funds under the

13   applicable inter-creditor agreement, until the full

14   resolution of the EFIH first lien make whole litigation.

15           Before the objection deadline of this motion, your

16   Honor, EFIH handed EFIH's first lien trustee negotiated

17   language that allows the revised repayment order to be

18   entered, allows the partial repayment to go forward, but

19   still facilitates cutting off the accrual of interest.

20           In short, your Honor, the language provides that

21   subsequent distributions to the EFIH second lien note

22   holders, including under a (indiscernible) reorganization,

23   shall be treated as though they were the same as the partial

24   repayment.  The applicable language that facilitates that,

25   your Honor, that's found in paragraphs 10 through 15 of the

1    revised repayment order.  That language, your Honor, also

2    resolved the EFIH second lien trustees inter-creditor

3    objection and related cross motion.

4           And on that point, your Honor, my understanding is

5    that counsel for both the EFIH's first and second lien

6    trustees may want to make statements on the record

7    concerning the applicable resolution.  The second

8    (indiscernible) of -- principle (indiscernible) of

9    objection, your Honor, was to the proposed allocation of the

10   partial repayments (indiscernible).  The second lien trustee

11   requested that the cash first be allocated to the

12   reimbursement of trustee fees expenses, pursuant to a

13   waterfall provision in the second lien indenture.

14          Your Honor, the trustee also requested that cash

15   be allocated to accrue penalty interest, including interest

16   on overdue interest.  EFIH and the second lien trustee

17   resolved these issues by modifying paragraph three in the --

18   and (indiscernible) paragraph three, actually, it's existing

19   paragraph three, which, in the repayment order, to allocate

20   the repayment amount.  The first allocation does go to

21   reimbursement of the trustee, and then to accrued interest,

22   and then to the principle.  Paragraph four of the repayment

23   order, your Honor, includes a reservation of rights that

24   permits the Debtors to later challenge that allocation.

25          And lastly, your Honor, coming back to the

1    modifications to the EFIH's first lien DIP order, some

2    technical revisions to that order were necessary.  The

3    reason for that was, provisions of the order as originally

4    entered last -- late spring did allow for the pre-plan

5    repayment of EFIH's second lien notes, but only in

6    connection with what, at that time, had been a contemplative

7    EFIH proposed second lien DIP.  Therefore, we had to go

8    (indiscernible) and clean up where applicable references to

9    that -- the proposed second lien DIP, and make them

10   references to the partial repayment (indiscernible) before

11   the Court today.  Those really are the (indiscernible) to

12   the changes to the EFIH source lien DIP order, your Honor.

13   At this point, I am available to answer any questions of the

14   Court or see the podium to the counsel for the trustees.

15            THE COURT:  Let me hear from the other trustees

16   and then we can work through the order.

17            MR. HESSLER:  Yes, your Honor.

18            MR. MAYER:  Thank you, your Honor.  For the

19   record, Thomas Moers Mayer of Kramer, Levin, Naftalis &

20   Frankel, for computer share the EFIH second lien trustee.

21   The EFIH second lien trustee is not consenting to this early

22   payment -- and we didn't ask for it -- both given the

23   reservations of rights negotiated in the order, we do not

24   object to the entry of the order.  And I think it is useful

25   to illustrate some things about the order, in part to the

1    Court, and in part, because it's important to have these on

2    the record for a larger audience of market participants.

3            The EFIH second lien trustee believes that the

4    partial payment is in fact a redemption entitling the EFIH

5    second lien notes to an applicable premium or a make whole.

6    But, the Debtors disagree, and that issue is reserved for

7    another day.  There is already a pending adversary

8    proceeding relating to the allowance or disallowance that

9    bar a make whole, and this order does not affect that

10   adversary proceeding, with one exception, as Mr. Sassower

11   noted.  It eliminates the rightness issue.

12           The issue of a make whole is now right for

13   adjudication, partial repayment (indiscernible) early

14   redemption has to have.  Otherwise, the entry of this order

15   does not affect a make whole litigation, and all parties

16   have (indiscernible) their rights.  Because the make whole

17   is reserved to another day, the Debtors and the EFIH second

18   lien trustee have agreed to an order of payment.  The EFIH

19   second lien trustee will apply the pay down, importance with

20   the (indiscernible), and the order as follows, and all of

21   these numbers I'm about to read into the record, they're

22   estimates.  They are not precise, they are directional, they

23   all assume a pay down tomorrow.  All may change if the

24   payment is made at a later date, and they're subject to a

25   reservation of rights.  But, for the record, money should be

1    allocated as follows.

2            First, to the fees and expenses of the EFIH second

3    lien Trustee and its various professionals, approve to the

4    date of payment, estimated at fifteen, one-five, $15 million

5    dollars.  Second, to interest, estimated at $289.5 million

6    dollars.  This includes simple interest, interest on the

7    Debtor's missed post-petition interest payments, and 50

8    basis points of, quote, "additional interest," end quote,

9    that accrued because the bonds were not registered as per

10   the contractual terms of the indenture.  The Debtors refer

11   to this as penalty interest, but we will have a fight about

12   that at a later time.

13           Third, the remaining balance principal for a net

14   pay down estimated, and I stress these are estimates, at

15   $445.5 million dollars.  The EFIH second lien Trustee will

16   distribute to holders, through DTC, and in accordance with

17   DTC's operating arrangements, a notice setting forth the

18   precise amounts of the payments in the near future.  Those

19   amounts may be different from the amounts I just read into

20   the record.  Those amounts are directional in nature.

21           And finally, they are all subject to a reservation

22   of rights.  The Debtors reserve the right to dispute the

23   allocation of the $750 million to fees, to interest on

24   interest and to additional interest.  The amounts paid on

25   account of fees, interest on interest or additional interest

1    could be less, and the amount that the principal paid on

2    could be more.

3           The second lien Trustee has its own reciprocal

4    reservation of rights to oppose any re-characterization or

5    reallocation, and to assert additional amounts under the

6    indenture, including the (inaudible).  And that takes care

7    of the allocation piece of the settlement.  I want to

8    briefly reference, and Mr. Walker will be here to clean up

9    any mistakes I make, our resolution with the EFIH first

10   liens on the intra-Creditor litigation.

11          EFIH first lien Trustee sued the EFIH second lien

12   Trustee as previously mentioned, alleging that the intra-

13   Creditor provisions of the collateral trust agreement,

14   require the EFIH second lien Trustee to turn over monies to

15   the EFIH first lien Trustee.  The EFIH second lien Trustee

16   believes these claims to have no merit, and, was and is

17   prepared to litigate the issues expeditiously, but like the

18   (inaudible) litigation, this litigation has been reserved

19   for another day.

20          The EFIH first lien Trustee has agreed to allow

21   the funds to be indefeasibly distributed, so the EFIH second

22   lien note holders, without the threat of any claw back,

23   pursuant to the agreed upon order.  The orders defers, as I

24   have said, the intra-Creditor litigation.  It provides for

25   the EFIH first lien Trustee to file an amended complaint by

1    March 31.  If and to the extent the EFIH first lien Trustee

2    obtains a judgment that amounts paid under this order were

3    subject to turnover, then turnover will apply only to future

4    distributions to the EFIH second lien Trustee.

5             The mechanics of any future turnover, described in

6    some detail in the order, may be summarized as follows:

7    Distribution subject to turnover in the future could be

8    cash, they could be securities, they could be other

9    property.  The order provides that the EFIH second lien note

10   holders will have the right to pay any turnover in cash,

11   instead of in securities or other property, pursuant to

12   mechanics that are outlined in the order.

13            And that's the extent of what I have to say.  If

14   the Court has questions, I'm happy to answer.

15            THE COURT:  I don't, thank you.

16            MR. MAYER:  Thank you.

17            THE COURT:  Mr. Wofford?

18            MR. WOFFORD:  Your Honor, good morning.  For the

19   record, Keith Wofford from Ropes & Gray on behalf of

20   Delaware Trust Company, the Trustee for the EFIH first lien

21   notes, as well as the collateral Trustee under the

22   collateral Trustee case.  Your Honor, the Debtors actively

23   noted the key element of the settlement, mainly that the

24   first lien Trustee and the second lien Trustee, together

25   with the Debtors, have agreed to fight out the intra-

1    Creditor issues later if necessary.  Instead of litigating

2    the intra-Creditor issues now, with respect to this

3    distribution, we'll preserve these arguments for later, to

4    this distribution and apply the result to the extent that

5    the first lien Trustee prevails, to future distributions

6    made to the second lien Trustee or second lien holders in

7    the case.

8              We already note in our papers in the (inaudible)

9    litigation that our view is that the proposed pay down is,

10   in our view, an optional redemption, but that is an issue

11   for another day, perhaps Friday the 13th, coming up soon.

12   One last administrative matter, Your Honor.  The pay down

13   order also provides at Paragraph 15 that an order will be

14   entered in the intra-Creditor adversary that will

15   incorporate the key provisions of the pay down order

16   discussed by Mr. Mayer and Mr. Hessler.

17             THE COURT:  Okay.  Thank you.

18             MR. GLUECKSTEIN:  Your Honor, Brian Glueckstein,

19   consulting (inaudible) EFIH committee.  Just very briefly,

20   the EFIH committee supports entry of the order.  We -- our

21   committee pushed the Debtor forward and advocated the filing

22   of this motion.  We believe the entry of the order will save

23   the EFIH estate post-petition interest with a net estimated

24   value between $52- and $92 million dollars, which is a

25   significant savings to the estate.

1          THE COURT:  Okay, thank you.

2          MR. SOSNICK:  Good morning, Your Honor.  Fred

3     Sosnick from Sherwin & Sterling, counsel to Deutsche Bank,

4     the agent on the first named Debt.  I just wanted to amplify

5     something that Mr. Hessler said, just so the record is

6     clear.  Essentially, the second consent is an amendment to

7     the first consent, or it's actually a consent for a change

8     to the first consent.  And through the debt discussions that

9     were spearheaded by the Debtors, the required lenders, a

10    sufficient number of lenders approved the second consent, so

11    we got the required lender consent.  As tat was completed

12    yesterday, it wasn't sufficient time to all the lenders to

13    approve the first consent, but since it carried, it doesn't

14    really impact them directly.  But to address that time

15    issue, I just wanted to point to the Court that the agent

16    negotiated in Section 1 of the second consent, that the

17    consent fee would be paid to everyone who consented to the

18    first consent, even if they didn't get an opportunity, at

19    this point, to consent to the second consent.  So that it

20    would just be paid, (inaudible) presented the first time and

21    the amendment is, in effect, carried.

22          THE COURT:  Okay, thank you.  Anyone else?

23    (inaudible)

24          MR. HESSLER:  Would Your Honor --

25          THE COURT:  Well, let me -- let me just quickly

1    breeze through the pages (inaudible).  Okay, I have no

2    questions.

3           MR. HESSLER:  Thank you, Your Honor.  The Debtors

4    respectfully request entry of the order.

5           THE COURT:  Okay.  Okay, I've signed both orders.

6           MR. HESSLER:  Thank you, Your Honor.

7           THE COURT:  Yes, sir?

8           MAN:  Your Honor, may I (inaudible phrase)?

9           THE COURT:  Of course.  Don't all rush out at

10   once.

11          [LAUGHTER]

12          THE COURT:  Yes?  Proceed.

13          MR. SERAJEDDINI:  I won't take it personally.

14   [LAUGHTER].  Good morning, Your Honor.  Steven Serajeddini

15   at Kirkland & Ellis, on behalf of the Debtors.  Your Honor,

16   the last item on today's agenda is the Debtor's seventh

17   omnibus objection to claims, as it relates to claim number

18   9658 filed pro se by Richard Gary Waldrep.

19          The Debtor has filed the seventh omnibus claims

20   objection and the supporting declaration of Mr. Waldrep, or,

21   sorry, Mr. (inaudible) on January 9th, 2015.  The basis for

22   the objection was that the statute of limitations had

23   expired on the underlying claim, and as a result, the

24   Debtors had no liability.  On January 23rd, 2015, the

25   Claimant filed a response to the Debtor's objection with the

1    Court, and on March 3rd, 2015, the Debtors filed their

2    reply.

3              Your Honor, the Debtors appreciate the constraints

4    on the Court's time and schedule and resources, and have

5    sought to resolve or adjourn claims where possible, but

6    despite the Debtor's best efforts in filing this objection,

7    the parties have not been able to reach a consensual

8    resolution.  The proof of claim, however, as it is, total

9    claims in excess of $128 billion, and if left outstanding,

10   could have negative implications on the Debtor's claim

11   process, and so we thank Your Honor for hearing this matter

12   today.

13             Your Honor, Mr. Waldrep is in the Courtroom today,

14   and if acceptable to the Court, the Debtors propose to begin

15   with a brief argument in support of the objection before we

16   turn it over to Mr. Waldrep, and then we'll conclude with a

17   rebuttal, if needed.

18             THE COURT:  Okay.

19             MR. SERAJEDDINI:  Thank you, Your Honor.  The

20   Debtors object to the Proof of Claim because it is invalid

21   on its face.  This is because the claims are barred by the

22   doctrine of res judicata, or alternatively, the applicable

23   statutes of limitation.  The Proof of Claim asserts that on

24   January 26th, 1982, a transformer, operated by a predecessor

25   to Debtor EFCH, caused damage to Mr. Waldrep's television.

1    The Proof of Claim goes on to assert that the claim was

2    heard by a Justice of the Peace in Dallas County, Texas in

3    1984 and that the Justice of the Peace ruled in favor of the

4    Debtors, and found that EFCH was not liable.

5            Taking these assertions and all others in the

6    Proof of Claim and response on their face, the doctrine of

7    res judicata bars the claims, because there was a final

8    adjudication of the claim, in accordance with Texas state

9    law.  If the Claimant sought to overturn the original

10   ruling, he failed to resort to any of the appropriate

11   methods to appeal the ruling, and the time to do so has

12   lapsed.

13           In the alternative, to the extent the ruling did

14   not constitute a final adjudication of the matter, and there

15   is no reason to believe that it did not, the claims are

16   barred by the relevant statutes of limitation.  These

17   statutes are laid out in our response, and each one expired

18   well in advance of the petition date.

19           In sum, the Claimant has not alleged facts

20   sufficient to support a legal liability, and the claim is

21   invalid on its face.  For these reasons, and those set forth

22   in our papers, Your Honor, the Debtors commit that the

23   objection should be sustained, and unless Your Honor has any

24   further questions for me, I will turn the podium over to Mr.

25   Waldrep, and again, reserve a rebuttal if needed.

1            THE COURT:  I have no questions.

2            MR. SERAJEDDINI:  Thank you, Your Honor.

3            THE COURT:  Mr. Waldrep.

4            MR. WALDREP:  Good morning. Your Honor, I have a

5     prepared statement, if I may read that.

6            THE COURT:  Okay.

7            MR. WALDREP:  It's dated 10 March, 2015.  Good

8     morning, Your Honor.

9            THE COURT:  Good morning.

10           MR. WALDREP:  For the record, my full name is

11    Richard Gary Waldrep.  I am known as Gary Waldrep.  I would

12    like to begin by thanking this Court for the opportunity to

13    come to this hearing to present my challenged to dismiss and

14    expunge my Proof of Claim number 9658 in the matter of the

15    petition of Chapter 11 bankruptcy protection by the business

16    enterprise named Energy Future Holdings Corporation, EFH,

17    which has filed a motion to dismiss and expunge my Proof of

18    Claim.

19           I would like to thank the Court for considering

20    the standing on my Proof of Claim, although it was noted as

21    having been delivered past the bar cut off date of

22    submissions.  I had been rushed on Saturday morning, 25

23    October, 2014, to gather the documentation I have submitted,

24    and getting that all that to the Post Office, where I was

25    told that it had guaranteed delivery by 5pm Eastern Time on

1    Monday, the 27th of October, the bar cut off date.

2           I would like to thank the Court for correcting the

3    out of balance situation for the amount of the total claim,

4    in United States dollars, even though it appears that action

5    has resulted in doubling the original amount that I had

6    submitted for both secured and unsecured debts.  I am not

7    very knowledgeable of, nor experienced with these types of

8    legal forms, so everywhere I saw a blank line, referring to

9    an amount for a claim, I made sure to have an entry into

10   that space so that an omission did not nullify my claim.

11          I do appreciate the consideration of the Court

12   clerk and staff for their assistance to balance the amounts

13   of debt. The amount submitted for the unsecured debt as

14   noted within my letters submitted with a Proof of Claim that

15   it is to be considered that is exemplary and punitive

16   damages, and I determined that amount so that it would be

17   sufficiently large enough to get the attention of EFH, since

18   the company did not seem to want to pay any attention at all

19   for the secured debt amount for actual damages.

20          And I would like to apologize for an error of

21   omission for one entry of an email address for me.  The

22   email address that is shown on the Proof of Claim form under

23   my signature does not contain the correct address with an

24   omission of some numbers that go with it.  There is a

25   correct version, which is noted near the top of the Claim

1    form in the addressee box where my name and address was

2    printed on the Claim form.  That one has been used by legal

3    representatives of EFH with whom I have been communicating

4    over the past several weeks.  That omission of numbers

5    within my address under my signature occurred due to my

6    haste and rush to get everything related to the

7    documentation that was submitted.  That error was not

8    noticed until after it had been mailed on Saturday, 25

9    October.

10          Also, in reviewing the online image of the

11   documents that I submitted, there is one document that

12   appears not to have been scanned with the other documents

13   that were uploaded to the online image.  Ironically, the one

14   document that was omitted is at the core of this disputed

15   claim.  I have made an additional copy to provide to the

16   Court for review, Your Honor, so that document may be seen

17   and referenced henceforth from this point, in this

18   presentation on my challenge to the motion to dismiss and

19   expunge my claim.  I have an extra copy of that document if

20   needed for EFH to reference, although during email

21   exchanges, I have already provided that information to them.

22          THE COURT:  All right.

23          MR. WALDREP:  Do I (inaudible)?

24          THE COURT:  Yes, please approach.

25          MR. WALDREP: (inaudible)

1          THE COURT:  Thank you.

2          MR. WALDREP:  The document which I have noted

3    contains a second paragraph of a corporate policy station

4    under the title Service Regulations number 209, continuity

5    of electric service, beginning on page 16, and continuing

6    for at least two pages, 16 and 17, from a total of 18.  Page

7    16 has the numbering for Regulation number 209, which is

8    located near the bottom of the page and the first paragraph

9    is started on page 16 before continuing to page 17.  It is

10   page 17 that has been omitted in the online image.

11         That may sound confusing, so in simpler terms,

12   what I'm saying is that page 16 was scanned to the online

13   image, which is available for viewing digitally, whereas

14   page 17 was not scanned to the online image to be viewed

15   like page 16.  Page 17 may have gotten stuck to the back of

16   page 16 or split out of the sack of documents without being

17   noticed, but currently, page 17 is not part of the online

18   image from what I saw when I viewed my Proof of Claim

19   online.  And I knew that was an omission, since I kept a

20   copy of what I had sent in on Saturday 25 October, and the

21   fact that I had drawn a line under the last phrase of the

22   second paragraph for emphasis.

23         For anyone viewing that online image today during

24   this hearing or who does not have a copy of page 17, I will

25   recite the second paragraph of that regulation Number 209 in

1    this prepared statement.  That way, what is in question by

2    me of EFH's policy will be heard, so that when it is

3    referenced later, hopefully, the meaning of that second

4    paragraph will be better understood, especially since it is

5    the basic issue of contention between me and EFH's policy

6    statement which has caused a delayed payment of a rather

7    small debt due to me for damages to personal property.

8            The second paragraph of Regulation number 209 is

9    as follows:  "The Company is not liable to customers for

10   damage occasioned by interruptions, irregularities, or

11   failure to commence electric service caused by Government or

12   Municipal action or authority, litigation, war, public

13   enemies, strikes, acts of God, order of any Court or Judge

14   granted in a bona fide adverse legal proceeding or action,

15   or in any order of any commission or tribunal having

16   jurisdiction in a premises, or any other act or thing

17   reasonably beyond control of the Company."

18           The regulation continues beyond this point, but

19   that continuation of text is unrelated to this paragraph.

20   Your Honor, that second paragraph is an outright and direct

21   challenge to my rights guaranteed to me by the Constitution

22   of the United States, namely the right of just compensation

23   for personal property taken or damaged for public use.  Also

24   being challenged is the legality of adverse proceedings or

25   actions by this Court, as well as brushing aside the

1    supremacy of the Constitution of the United States and the

2    Constitution of the State of Texas, by stating any other act

3    or thing reasonably beyond control of the Company.

4         I definitely believe that both Constitutions are

5    reasonably beyond control of this Company.  In fact, I am

6    here to assert that both Constitutions are definitely beyond

7    control of this Company.

8         Also, the second paragraph reeks of an outright

9    declaration of rebellion and insurrection to reject the

10   authority of the Texas Public Utility Commission, PUC, which

11   is created under the Texas Public Utility Regulatory Act.

12   That is a State law which essentially gives this

13   Corporation, EFH, its purpose of existence and the State

14   Commission that is responsible for keeping this business

15   enterprise in line for compliance with all laws of the State

16   of Texas and the United States of America.

17        However, it appears that EFH wants to bite the

18   hand that feeds it in declaring that adverse actions and

19   proceedings ordered by the PUC will not force it, EFH, to

20   pay for damages to personal property for malfunctions of its

21   electric service, because the second paragraph is a Company

22   clause.

23        That status is what I was told by a Claims agent

24   when I contacted the electric company about damage to my

25   personal property.  That incident occurred after a damaged

1   and neglected ground level transformer malfunctioned,

2   causing an overload on the line, which blew a line fuse on

3   the pole outside my home and started a fire around where it

4   is located in an alley beside a driveway for the residents

5   in that part of the neighborhood.  That short in the

6   circuitry of the local electric service system created a

7   sudden electrical surge, which was the cause of damage to my

8   personal property.

9           I believe that it is under the Judicial Branch of

10  Government created by my Constitution of the United States

11  that the Courts and Commissions and Tribunals have been

12  created, and I emphasize, they are specifically noted as

13  having jurisdiction over the premises.  And we are here

14  today in one of those Courts that has been created under my

15  Constitution for this Corporation, EFH, to petition for a

16  favorable decision for Chapter 11 Bankruptcy protection.

17  Yet this paragraph is where the application of the Corporate

18  policy was described to me as being law by the company

19  Claims agent.  It is in that second paragraph that EFH

20  proclaims its unconditional disclaimer of exemption to any

21  and all liabilities or damages to my personal property.

22  Thus, that paragraph has been the point of contention about

23  which my claim has been centered over the extended life of

24  my pursuit for enforcement of my Constitutionally guaranteed

25  right of just compensation.

1          Considering the behavior of this Bankruptcy

2     petitioner regarding that law, I do not feel that the

3     rebalanced amount now applied to my Claim is anywhere large

4     enough to be considered as adequate as a punishment for

5     holding out that policy statement as law.  I would recommend

6     that the rebalanced total be redoubled, then tripled, then

7     quadrupled and then repeated like that for every minute for

8     a minimum of one hour.  That (inaudible) to me even that

9     final amount of potentially trillions of US dollars would

10    still be insufficient for punishing this business enterprise

11    that seems to have absolutely no respect for the

12    Constitution of the United States, nor the Constitution of

13    the State of Texas.

14          This Corporation has chosen to believe and is

15    still (inaudible) actually believing in a fantasy law that

16    professes to claim any and all liability for any damage to

17    all customers' property, and that it will not accept any

18    adverse proceeding and decision of any bona fide Court

19    having jurisdiction anywhere in the United States, as well

20    as probably in the universe, anywhere in the universe.

21          In reviewing the documentation provided to me by

22    mail for this Corporation's bankruptcy, I could not help but

23    notice that at least once in each Court document, referring

24    to this Chapter 11 Bankruptcy case for EFH, there is a

25    description of this Court being a bona fide Court having

he

1    jurisdiction for this case.  We are present here today

2    because a petition has been filed voluntarily by EFH through

3    its legal representatives on behalf of Corporate management

4    for this Court seeking action for this Court's proceedings

5    to assist in dealing with a negative financial situation.

6           To me, that begs the question for the management

7    of EFH, as well as for all its legal counselors and

8    advisors, as to just why are they here today for a Court

9    proceeding such as this hearing in a bona fide Court having

10   jurisdiction?  I do not exactly know what type of adverse

11   decision could be rendered in this type of Court, other than

12   to deny the financial protection normally afforded to

13   protecting Debtor businesses.  And if that denial of

14   protection would force to shut down and liquidation of this

15   particular business enterprise, then that result would

16   present quite a new set of problems, since it is an electric

17   service provider for a very large portion of Northern Texas,

18   including the Dallas and Fort Worth concentration of cities

19   and residences and businesses.

20          Is it possible that the mental image of that

21   situation, that is a forced shutdown actually occurring,

22   that has served as a confirmation of the concept that this

23   Company believes that it cannot be shut down because of the

24   negative impact upon the service area it controls?  In other

25   words, sort of like the concept of being too big to fail.

1    Or is it that the legal counselors and advisors have

2    convinced the Company's management that the Company's law

3    will suffice to convince a Judge in any bona fide Court

4    having jurisdiction, that it is their law to be obeyed and

5    upheld, somewhat like the mistaken illusion of its law that

6    the Constitution of the United States is longer the supreme

7    law of the land, especially since that document is beyond

8    control of the Company?

9            I think neither situation is plausible nor

10   acceptable, since I still firmly believe that the

11   Constitution of the United States is the supreme law of the

12   land, that is, this country, the United States of America.

13   And I believe that no operation of a business -- excuse me -

14   - I believe that no Corporation is too big to fail, since

15   there are ways to deal with continuing operation of a

16   business in that predicament normally conducted under new

17   management.  After all, it is simply a business and not some

18   Department of a State or Federal Government that has reached

19   the end of its useful life due to incompetence under

20   mismanagement.

21           In the former instance of failing, it is possible

22   to mobilize the Armed Forces of the United States, already

23   located in the State of Texas, as well as the neighboring

24   states, and with the President of the United States

25   declaring Martial Law within the electric service area of

1    EFH to insure continuity of that electric service in

2    Northern Texas.  Then, only the Management of the upper

3    levels will be removed from leadership positions due to

4    developing and promoting an attitude that the Company is too

5    big to fail, and/or extending that attitude to even

6    believing that the Company can write its own laws, that is

7    laws, which the citizens of the United States, all free

8    individuals, both men and women, must obey when they are

9    customers of this electric service company.

10          That would mean that the Bill of Rights and

11   amendments to this Constitution of the United States have no

12   application under this Company's law, and that is something

13   I will not allow to happen.  As a commended, decorated and

14   honorably discharged veteran of the United States Army,

15   which is the most successful freedom gaining and freedom

16   maintaining military force on the face of this earth, I

17   cannot in good conscience, allow a Corporation to get away

18   with writing its own self-serving laws, especially thinking

19   that citizens of the United States must obey them.  I find

20   it very unsettling as well as repulsive to think that I and

21   millions of other free individuals must live under such a

22   Corporate authority instead of the laws of the United

23   States.

24          We, the people of the United States have superior

25   laws for us citizens to live by, including the supreme law

1  of the land, under which this Corporation is given life to

2  be a business, a business to exclusively provide electric

3  service to the people and other businesses.  Upon being

4  constricted into the United States Army through the draft in

5  May, 1971, I raised my right hand to swear the oath to

6  support and defend the Constitution of the United States

7  against both foreign and domestic enemies.

8           I have personal friends who were personal

9  schoolmates and classmates in elementary and high school

10  where I grew up in New Holland and Hall County, Georgia, who

11  died while under the same oath while serving under arms in

12  Southeast Asia.  They were primarily in the fight for

13  freedom and independence for the young and struggling

14  company of the Republic of Vietnam, better known as South

15  Vietnam.  My friends, whose names are Ronnie Clark, Nick

16  James and Willard Croye, were good young men who responded

17  to the call of duty and served this country admirably.  I

18  feel that I have an obligation to them to come here today to

19  this Court hearing to explain to this Corporation's

20  management and legal representatives that what my friends

21  died for will not be desecrated nor defamed by this

22  presentation of the garbage laws that it believes are

23  superior to my Constitution.

24           I may no longer be on active military duty, but I

25  have never disavowed that oath I have sworn twice, first as

1   a draftee, and then later as an enlistee in the United

2   States Army.  I am here for other reasons, which are just as

3   important to me because of events that occurred during my

4   active duty in the US Army, and events and experiences since

5   discharge from active duty.  Those events and experiences

6   also motivate me to emphasize my firm belief that the

7   supremacy of my Constitution over this Corporation's law,

8   and I want this company and its legal representatives of all

9   different titles and names, to grasp the reality that it has

10  run headfirst into an immovable object, which is my

11  Constitution of the United States.

12          Among those other reasons, I have had wonderful

13  opportunities as a free man, as a citizen of the United

14  States, to travel and move around this country as well as

15  foreign countries, traveling under a passport from the

16  United States.  I have a right to that document, which

17  signifies my status as a free man in this world, because I

18  am a natural born citizen of the United States of America.

19          As I have traveled, I have encountered other

20  veterans of the United States Armed Forces, with many of

21  them being fellow Vietnam veterans.  Many of them are combat

22  veterans who know the value and meaning of what it is to be

23  free in this country.  I find those encounters to be

24  motivating factors for being here today to represent them.

25          For all of those incidents of me and my fellow

1    Vietnam veterans, I enjoy meeting those who have served in

2    more special actions as former prisoners of war, POWs.

3    Unfortunately, I have not had as much pleasure meeting

4    family members of other Vietnam veterans who were reported

5    as missing in action, MIAs, who have never returned to their

6    families and loved ones.  That predicament presents another

7    motivation for me to be here today to stand up for them,

8    because their loved ones who serve are still under oath to

9    support and defend my Constitution.

10            I want to draw special attention to that aspect,

11   since it has a very meaningful purpose to me.  That aspect

12   has caused me to love my status even more as a free man in

13   this country.  I did not have to serve in country in the war

14   zone in South Vietnam during my active duty time in the US

15   Army, however, I did serve in the territory in the consulate

16   of the Republic of Vietnam, the South Vietnamese consulate

17   located in Paris, France.  I was part of a six-man team

18   assigned to the American Embassy and deployed to the South

19   Vietnamese consulate for communication support for its link

20   to the Presidential Palace in Saigon, Republic of Vietnam.

21            I was serving during the period when the well-

22   known Paris peace talks were culminated with a peace

23   agreement, or a treaty, known as the Paris Peace Accords.

24   It is through that treaty document that almost 600 American

25   service people were released from captivity and deprivation

1    of their rights, their freedom and their rights as American

2    citizens, to return to freedom here in the United States and

3    to be with their loved ones.  It had been a wonderful

4    experience for me to meet and to shake the hands of those

5    once POWs, and to tell them I am extended a belated, but a

6    very personal experience of welcome home to them, since I

7    was working in Paris when the peace treaty was signed to

8    regain their freedom.

9           That statement usually catches the recipient by

10   surprise.  I have had some of them express thanks to me, but

11   I quickly explained that I had nothing to do with peace

12   negotiations, nor was I very close to them.  I was just

13   following orders like they had done, to go where needed, but

14   that we ended up in completely opposite circumstances in our

15   military service.  There are nearly 25 of those former POWs

16   whom I have had the pleasure of meeting to express my

17   sentiments for their enjoyment of again being free men in

18   this country.  There are other former POWs whom I have seen

19   or heard of, but whom I have not met, and for that

20   experience, I am proud to be here today as a representative

21   for them.

22          If those former POWs could endure captivity and

23   torture at the hands of their foreign enemy, then I cannot

24   and I will not cower away from showing up here today to

25   stand against a domestic enemy of my country.  If this

1   Corporation's management members and legal representatives

2   do not like my laws, and do not want to respect my

3   guaranteed rights that those service people endured to

4   support and defend, then those human elements of this

5   Corporation are more than welcome to turn in the Company's

6   business license its held and to rescind and tear up the

7   charter of the Corporation, as well as turn over the assets

8   and the keys to the Company's facilities to the Court and

9   then today, get out of my country.

10          Over the years since their return to freedom in

11  the United States, several of those former POWs have gotten

12  involved in politics, and many of them have been elected to

13  positions in Government at the State level as well as at the

14  Federal level.  To me, it is an action they used to continue

15  showing their love of their freedom, as well as their love

16  of our Constitution and our country.  I'm aware of two men

17  who are former POWs of the Vietnam war who are currently

18  serving in the United States Congress.  One man, whom I have

19  had the honor and pleasure of meeting is serving now in the

20  House of Representatives.  He is Congressman Sam Johnson.

21  The other man has served in the House of Representatives

22  before being elected to serve in the Senate.  Just a few

23  years ago, that man, Senator John McCain, ran unsuccessfully

24  to be President of the United States.  That is a huge change

25  in his life, to go from being in captivity to potentially

1    becoming president of a country of free people.

2             Each of these former POWs endured over six years

3    in captivity, and endured torture, while in (inaudible) to

4    support and defend my Constitution against a foreign enemy.

5    As I have now noted, I am here to stand up on their behalf

6    against a domestic enemy of our Constitution of the United

7    States.  And in addition to those special reasons, I have

8    been extremely fortunate to meet wounded Vietnam veterans

9    who told about how they were wounded and permanently injured

10   both physically and mentally.

11            One of them astounded me when he told me about how

12   he was wounded.  His name is Mike Woolen.  As he as since

13   died, to me, he is the late, great Mike Woolen, from the

14   Spartanburg, South Carolina area.  He told about his Army

15   unit coming under attack by enemy forces when a grenade

16   landed behind him and other soldiers in their camp.  He told

17   that he drove on the grenade to protect his men, and

18   luckily, he managed to grab a flak jacket to put over his

19   stomach before he landed on the grenade, while screaming to

20   his men to run, run, run, and how he laid there waiting for

21   the grenade to explode.  With serious wounds, Mike had

22   survived that explosion, thanks to that flak jacket's

23   protective features, and he was alive to tell me firsthand

24   about that experience.

25            To me, my Constitution is like that flak jacket,

1    for how it offers features of protection in my life as a

2    citizen of the United States.  When I met Mike, he was just

3    two years older than me, but at age 27, he looked like a man

4    a lot older.  The impact of that war experience had stressed

5    his body and caused it to age prematurely.  I went looking

6    for Mike some years later and found out that he had taken

7    his own life.  Mike deserved a chance to live a happy life

8    and freedom in this country, but that seemed to escape him

9    after he returned from the war.  So for him, and for the

10   thousands of other wounded Vietnam veterans who fought for

11   my Constitution, and who suffer from the scars and wounds

12   from that service, I am here today on their behalf.

13            Another special moment that is unique to me is an

14   incident in 2008 when I had an opportunity to meet a

15   Vietnamese man in Texas, who was born and was a child in

16   South Vietnam during that war period.  As a young man in his

17   20s, he had decided to escape Vietnam, leaving behind his

18   father and his mother and siblings.  He planned to escape by

19   boat from the oppressive rule of the victorious Communist

20   enemy of North Vietnam.  That change in the Government for

21   the South Vietnamese people occurred two years after the

22   Paris Peace Accord treaty was signed.  That man's name is

23   Hong Van.  He told me he had decided that he does not want

24   to live under that oppressive type of Government, and he

25   found out about ways of getting out of Vietnam so he could

1    be free from that situation.

2           He revealed how he was among a group of people on

3    a boat in the South China sea when pirates stopped the boat

4    and robbed them of basically every possession available,

5    then a few days later, the same pirates found them again,

6    but since there was nothing left for looting again, the

7    pirates chopped holes into the hull of the boat and shot up

8    the motor so there was no propulsion.  Luckily, the holes

9    were plugged enough to keep the boat afloat for a while, and

10   they drifted into radar range of an offshore oil drilling

11   rig.  The rig sent a helicopter to investigate and then

12   dispatched a supply boat to rescue the escaping Vietnamese

13   people from that sinking boat.

14          Hong went on to tell about being in one of the

15   main refugee camps for the Vietnamese people who survived

16   similar ordeals.  He said that his father had been a soldier

17   in the South Vietnamese Army.  He said that since his father

18   had been a soldier in the South Vietnamese Army, that he

19   received favorable consideration and recognition of his

20   father's service to be relocated to the United States.  Hong

21   said that consideration was how he came to be here in this

22   country, and living in Texas.  That situation is one that

23   causes me to feel very lucky to meet Hong, and to buy his

24   lunch one day in August, 2008 to help him mark the 20th

25   anniversary of that date of his arrival in the United

1   States.

2           Hearing his story about what he endured, as well

3   as the fact that knowing that he can never, ever return to

4   Vietnam to see his aging parents again, makes an impression

5   upon me as a citizen who was born here.  It causes me to

6   appreciate even more what being a free man really can mean.

7   I do not feel that Hong Van left an oppressive government in

8   Vietnam to come to the United States to be subjected a self-

9   serving law, that this Corporation, EFH, believes it has the

10  authority to write.  Since Hong lives in the electric

11  service area of EFH in Northern Texas, he could be bound to

12  ask him which law he wants to live under, either the

13  Constitution of the United States or this constitution's

14  law.

15          Also, Congressman Sam Johnson lives in the same

16  electric service area in Plano, Texas, which is North of

17  Dallas, and I have a strong suspicion that Congressman

18  Johnson might be interested in hearing EFH's management and

19  legal representatives give evidence for how they believe

20  there is an authority for writing laws, since that gives

21  competition to his job in the House of Representatives.

22          However, in spite of those inspirational and

23  motivating reasons I am sharing with the Court, Your Honor,

24  the main reason I have come here today to face this

25  Corporation as a domestic enemy of my Constitution, is to

1   prove that I am a free man as a citizen of the United

2   States, and that the Company's law is fraudulent and has no

3   applicability to me ever, as in never, ever.  At the time of

4   the incident of the malfunction of the damaged and neglected

5   electrical (inaudible) in 1982, I was married to a woman who

6   is not a citizen of the United States.

7           Over the following days after the damage to my

8   property, I was in contact with the customer service

9   department of the electric company which referred me to the

10  Claims department, where I began dealing with a blatant

11  denial of my right to just compensation by the Company's

12  Claims agent.  That Claims agent read that second paragraph

13  of the Service Regulation number 209 and said that it was

14  law.  As I noted in my letter, which accompanied my Proof of

15  Claim number 9658, describing these events and actions I

16  have pursued for my right of just compensation in 1982 and

17  later, I had asked the Claims agent just what made him think

18  that a Corporate policy was law.  His reply was that the

19  PUC-approved the policy, therefore it is law.  And as

20  mentioned in my letter, my response to the Claims agent was

21  that the Corporate policy had to be approved to show that

22  the Company was in compliance with Texas and United States

23  law, and that approval by the PUC in no way bestowed the

24  power of legislation upon the Corporate policy to consider

25  it as law.  He disagreed again, and I told him he was

1    ignorant of law.

2              Later on that day, of that conversation, my wife

3    asked me if I had been in contact with the electric company.

4    I told her about the conversation that day and what the

5    Claims agent had said about the Corporate policy being in

6    law.  My wife's reaction was to look at me with an

7    expression of, "Really?" Then she asked me a simple

8    question.  "You call yourself free in this country?"

9              Your Honor, what I thought would be an easy answer

10   to obtain to show her that, as a citizen of the United

11   States, there is no question about what is law and what is

12   not law.  However today, I have had to wait over 33 years to

13   date, to present the evidence that each and every officer of

14   any Court in this country, both at Federal and State level,

15   should be well aware of, since those Court officers,

16   commonly known as lawyers, would have studied to know the

17   law.  That is, the supreme law of the land, my Constitution

18   of the United States.  And as Court officers, they swear an

19   oath to uphold the Constitution of the United States, in

20   order to ply their trade as lawyers.

21             As I mentioned, I was married to a non-citizen of

22   the United States, so I understood that she had a reason to

23   ask that question, and historically, if anybody in this

24   whole wide universe would be recognized has having a

25   legitimate right to ask that question of a citizen of the

1    United States, then that person holding that legitimate

2    right would be someone who is still subject to the monarchy

3    that was rebelled against, fought against and defeated, and

4    which was forced to leave this land so that the United

5    States of America could be formed and come into existence.

6            Without that existence, the United States

7    Bankruptcy Court of Delaware would not be here for this

8    Corporation to petition for financial reorganization

9    protection, nor would any other Bankruptcy Court in any

10   other state in the United States.  To present the best

11   analogy to this Court for its consideration of the legality

12   of this Corporation's law having validity, I want to point

13   out that with my law, the Constitution of the United States,

14   this bona fide Bankruptcy Court has jurisdiction, and it has

15   a purpose, while you, Your Honor, have a job.

16           Under this Corporation's law, this bona fide Court

17   having jurisdiction is totally irrelevant as well as illegal

18   from rendering adverse decision, and as such, Your Honor,

19   you do not have a job.  So in closing my presentation for

20   this hearing and considering acceptance of my long overdue

21   and still unpaid outstanding claim of debt against this

22   Corporation as it seeks using my laws to protect itself, I

23   must remind this Corporation that once again, as I have done

24   in the email exchanged previously mentioned, I am a free man

25   and it is not.  This Corporation is owned, and I am not.

1    Any date that the physical evidence of those two conditions

2    exist can be delivered or considered before consideration of

3    being equal under my Constitution, and I will be interested

4    in seeing that evidence.

5            For my evidence, I have a copy of the Constitution

6    of the United States, from which I want to read Article 6,

7    ironically, also the second paragraph of that article

8    commonly known as the Supremacy Clause which states, "This

9    Constitution and the Constitution of the United States,

10   which shall be made in pursuance thereof, and all treaties

11   made or which shall be made under the authority of the

12   United States, shall be the supreme law of the land, and the

13   Judges in every State shall be bound thereby.  Anything in

14   the Constitution or laws of any State to the contrary

15   notwithstanding."  Your Honor, I have waited over 30 years

16   for the opportunity to come back to a Court, since I was

17   denied that chance when the Justice of the Peace did not

18   reconvene the trial for the lawsuit I had filed under Small

19   Claims Court at the very basic level of Texas State

20   Judiciary Branch of Government.  That JP had voluntarily

21   granted, with his own initiative, a continuance to the

22   Company's lawyer in the same legally ignorant Claims agent,

23   both of whom were present at the trial.  That continuance

24   was for them to locate and bring to Court the person who was

25   allegedly responsible for hitting and displacing the ground

1    level transformer that had been neglected, allowing it to

2    malfunction, and to cause the damage to my personal

3    property.

4              That State Judge did not reconvene the Court to

5    complete that trial.  Instead, he chose to call me one

6    morning a few days later to reprimand me for not settling,

7    as he said he had instructed me to do, therefore he was

8    ruling in favor of the Defendant.  I must call out that

9    adverse action against me as being unacceptable to me, which

10   is my right under my Constitution for equal protection under

11   the law, which in this case, would be the law of the

12   Company.  This same law, which this Corporation wanted to

13   cite as its vindication that its law is now valid through

14   the juris prudent interpretation of its Corporate policy

15   being accepted, and that decision by that State Justice of

16   the Peace Court, and which should now be applicable as a

17   binding law.

18             Again, I want to offer my appreciation to this

19   Court, which has stated that it has jurisdiction to hear my

20   rebuttal and challenge to this motion to dismiss my claim of

21   unpaid secure debt by application of my right of just

22   compensation, and to make a decision either favorable or

23   adverse to me in applying exemplary and punitive unsecured

24   debt to be added to the secure debt.

25             THE COURT:  Thank you.

1          MR. SERAJEDDINI:  Unless Your Honor has any

2   further questions, the Debtors are prepared to rest on our

3   papers, and request that the objection be sustained.

4          THE COURT:  Thank you.  I'm going to overrule the

5   response and grant the claim objection and expunge the claim

6   in full for a number of reasons.  First, I am going to

7   assume, for purposes of making this ruling, that Mr. Waldrep

8   has a valid claim against the Debtor in 1982, which he

9   pursued in a Court proceeding in 1983, 1984, and that, that

10  claim might include claims arising under the Constitution of

11  the United States.  Having said that, the claim is barred

12  for a number of reasons, from being pursued now in 2015,

13  well over 30 years later.

14          The first, and most important, is that the Statute

15  of Limitations for pursuing that claim have long passed.

16  Under State, Federal and Constitutional law, the Statute of

17  Limitations for this claim expired in the 1980s.  There has

18  been no allegation in the papers or the oral presentation

19  made before the Court that would give rise to any sort of

20  continuance of the Statute of Limitations for any reason,

21  such as not being knowledgeable of the claim or some sort of

22  continuing wrong theory.  The damage was a discrete

23  instance, there has not been any ongoing legal -- excuse me,

24  no ongoing physical harm to the property and no ongoing

25  violation of any law by the successor to the electrical

1    company that was, as I said, I'm assuming, liable for some

2    sort of claim back in the early 1980s.

3              In addition, based on the record that I have in

4    front of me, I believe that the doctrine of res judicata in

5    connection with the claim asserted bars any further action

6    in this Court.  The method and proper course to be pursued

7    would have been an appeal of the adverse ruling by the

8    Justice of the Peace Court in Texas in 1984.  That was not

9    done.

10             To collaterally attack that type of ruling now,

11   again, over 30 years later, there would need to be some

12   independent Constitutional basis or otherwise relating to

13   the prosecution of the claim, not the underlying claim

14   itself, that would give rise to some sort of claim, and that

15   claim, in and of itself, would still be subject to a Statute

16   of Limitation.

17             So, the Claim is barred by the doctrine of res

18   judicata.  Alternatively, on the merits as I understand the

19   Constitutional argument being offered by the Claimant, I do

20   not believe that it actually gives rise to any

21   Constitutional claim.  The authority of a Public Service

22   Commission, such as the Public Utility Commission that

23   approves the language that was cited to me, arises from

24   State law.  The Commission is given the power to implement

25   rules and regulations, which has the force and effect of

1    State law.

2              As I understand the theory here, it is that the

3    utility -- excuse me, the outage and the damage was

4    something that was, perhaps, reasonably beyond the control

5    of the Company, but that in and of itself should not serve

6    as a bar to pursing any type of claim against the Company.

7    The fact that the approved language by the Commission

8    provides a specific exemption from liability for an act or

9    thing reasonably beyond the control of the Company is in no

10   way a violation of the Constitution of the United States of

11   the State Constitution of Texas or law, and in fact, is a

12   direct result of a proper exercise of authority granted

13   under those important documents.

14             So, I find now underlying merit in the

15   Constitutional challenge to the language that has been

16   cited.  Having said all that, I of course respect the right

17   of any litigant to present its argument and case before the

18   Court.  I have considered the argument both in the papers

19   and orally presented today seriously, and in making my

20   ruling based on the facts as I find them, and the law as I

21   understand them.  I would note that I respect and honor the

22   service of any veteran of the United States Armed Forces,

23   and certainly that of the Claimant here today.  But,

24   although that is important, it is not the underlying fact or

25   circumstance that relates specifically to the claim being

1   asserted before the Court, and I want to make that clear for

2   the record.  I'm deciding this on the merits of what

3   occurred and what the law is, including the law barring

4   claims for violation of Statute of Limitations or based on

5   the doctrine of res judicata.  For all those reasons, I am

6   going to sustain the objection, overrule the Claim, and

7   dismiss and expunge the claim.  Do you have a form of order?

8           MR. SERAJEDDINI:  Yes.  If I may approach?

9           THE COURT:  Yes.  Thank you.  And I signed that

10  order.  Is there anything else for today?

11          MR: SERAJEDDINI:  That's all.  Thank you, Your

12  Honor.

13          THE COURT:  Thank you very much.  We stand

14  adjourned.

15

16

17                        *  *  *  *  *

18

19

20

21

22

23

24

25

Page 74

C E R T I F I C A T I O N

I, Sonya Ledanski Hyde, certified that the foregoing

transcript is a true and accurate record of the proceedings.

Sonya Ledanski Hyde

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501

Date:  March 10, 2015