1   UNITED STATES BANKRUPTCY COURT

2   DISTRICT OF DELAWARE

3

4

5   In re:                    :

                              :      Chapter 11

6   ENERGY FUTURE HOLDINGS    :

    CORP.,  et al.,           :     Case No. 14-10979(CSS)

7                             :

            Debtors.          :     (Jointly Administration

8   _____:     Requested)

9

10

11                                United States Bankruptcy Court

12                                824 North Market Street

13                                Wilmington, Delaware

14                                June 05, 2014

15                                9:46 AM - 5:34 PM

16

17

18   B E F O R E :

19   HON CHRISTOPHER S. SONTCHI

20   U.S. BANKRUPTCY JUDGE

21

22

23

24

25   ECR OPERATOR:  AL LUGANO

Page 2

1    HEARING re Motion of Energy Future Holdings Corp., et al.,

2    for Entry of an Order Directing Joint Administration of the

3    Debtors' Chapter 11 Cases [D.I. 17; filed April 29, 2014]

4

5    HEARING re Motion of Energy Future Holdings Corp., et al.,

6    for Entry of Interim and Final Orders Authorizing the

7    Debtors to Pay Certain Prepetition Taxes and Fees [D.I. 23;

8    filed April 29, 2014]

9

10   HEARING re Motion of Energy Future Holdings Corp., et al.,

11   for Entry of Interim and Final Orders (A) Authorizing the

12   Debtors to (I) Pay Certain Prepetition Compensation and

13   Reimbursable Employee Expenses, (II) Pay and Honor Employee

14   and Retiree Medical and Similar Benefits, and (III) Continue

15   Employee and Retiree Benefit Programs, and (B) Modifying the

16   Automatic Stay [D.I. 25; filed April 29, 2014]

17

18   HEARING re Motion of Energy Future Holdings Corp., et al.,

19   for Entry of Interim and Final Orders Determining Adequate

20   Assurance of Payment for Future Utility Services [D.I. 26;

21   filed April 29, 2014]

22

23   HEARING re Motion of Energy Future Holdings Corp., et al.,

24   for Entry of Interim and Final Order Authorizing the Debtors

25   to Pay Prepetition Critical Vendor Claims [D.I. 29; filed

1   April 29, 2014]

2

3   HEARING re Motion of Energy Future Holdings Corp., et al.,

4   for Entry of (A) an Order Authorizing the Debtors to (I)

5   maintain and Administer Customer Programs and Customer

6   Agreements, (II) Honor Prepetition Obligations Related

7   Thereto, (III) Pay Certain Expenses on Behalf of Certain

8   Organizations, (IV) Fix the Deadline to File Proofs of Claim

9   for Certain Customer Claims, and (V) Establish Procedures

10   for Notifying Customers of Commencement of the Debtors'

11   Chapter 11 Cases, Assumption of Customer Agreements, and the

12   Bar Date for Customer Claims and (B) an Order Authorizing

13   Certain of the Debtors to Assume the Customer Agreements

14   [D.I. 31; filed April 29, 2014]

15

16   HEARING re Motion of Energy Future Holdings Corp., et al.,

17   for Entry of an Order (A) Authorizing the Debtors to (I)

18   Continue Using Their Existing Cash Management System, (II)

19   Maintain Existing Bank Accounts and Business Forms, and

20   (III) Continue Using Certain Investment Accounts; (B)

21   Authorizing Continued Intercompany Transactions and Netting

22   of Intercompany Claims; and (C) Granting Postpetition

23   Intercompany Claims Administrative Expense Priority [D.I.

24   37; filed April 29, 2014]

25

Page 4

1   HEARING re Motion of Energy Future Holdings Corp., et al.,

2   for Entry of (A) an Order Authorizing Certain of the Debtors

3   to Pay Certain Prepetition Transition Charges and Delivery

4   Charges and (B) an Order Authorizing Certain of the Debtors

5   to assume Transmission and Distribution Service Agreements

6   [D.I. 38; filed April 29, 2014]

7

8   HEARING re Motion of Energy Future Holdings Corp., et al.,

9   for Entry of an Order Authorizing Certain of the Debtors to

10  Assume Standard Form Market Participant Agreements with

11  ERCOT [D.I. 40; filed April 29, 2014]

12

13  HEARING re Motion of Energy Future Holdings Corp., et al.,

14  for Entry of Interim and Final Order Authorizing the Debtors

15  to (A) Continue Performing Under Prepetition Hedging and

16  Trading Arrangements, (B) Pledge Collateral and Honor

17  Obligations Thereunder, and (C) Enter into and Perform Under

18  Trading Continuation Agreements and New Postpetition Hedging

19  and Trading Arrangements [D.I. 41; filed April 29, 2104]

20

21  HEARING re Motion of Texas Competitive Electric Holding

22  Company LLC and Certain of its Debtor Affiliates for Entry

23  of Interim and Final Orders (A) Authorizing Use of Cash

24  Collateral, (B) Granting Adequate Protection (C) Modifying

25  the Automatic Stay, and (D) Scheduling a Final Hearing [D.I.

1    71; filed April 29, 2014]

2

3    HEARING re Motion of Texas Competitive Electric Holdings

4    Company LLC and Certain of its Debtor Affiliates, for Entry

5    of Interim and Final Orders (A) Approving Postpetition

6    Financing, (B) Granting Liens and Providing Superpriority

7    Administrative Expense Claims, (C) Modifying the Automatic

8    Stay, and (D) Scheduling a Final Hearing [D.I. 73; filed

9    April 29, 2014]

10

11   HEARING re Motion of Energy Future Intermediate Holding

12   Company LLC and EFIH Finance, Inc. for Entry of (I) and

13   Interim order (A) Approving Certain Fees Related to

14   Postpetition Financing and Granting Such fees Administrative

15   Expense Priority and (B) Scheduling a Final hearing; and

16   (II) a Final Order (A) Approving Postpetition Financing, (B)

17   Granting Liens and Providing Superpriority Administrative

18   Expense Claims, (C) Authorizing the Use of Cash Collateral,

19   (D) Authorizing the EFIH First Lien Refinancing, (E)

20   Authorizing Issuance of Roll-Up Debt to the Extent

21   Authorized by the Settlement Motion, (F) Determining the

22   Value of Secured Claims, and (G) Modifying the Automatic

23   Stay [D.I. 74; filed April 29, 2014]

24

25   HEARING re Motion of Energy Future Holdings Corp., et al.,

1   for Entry of an Order Extending the Debtors' Time to File

2   Schedules of Assets and Liabilities, Schedules of Current

3   Income and Expenditures, Schedules of Executory Contracts

4   and Unexpired leases, and Statement of Financial Affairs

5   [D.I. 466; filed May 15, 2014]

6

7   HEARING re Motion of Energy Future Holdings Corp., et al.,

8   for Entry of Order Approving Certain EFIH Settlements and

9   the Oncor TSA Amendment [D.I. 472; filed May 15, 2014]

10

11  HEARING re Motion of Wilmington Savings Fund Society, FSB

12  for Leave to Conduct Discovery Pursuant to Rule 2004 of the

13  Federal Rules of Bankruptcy Procedure of Energy Future

14  Holdings Corporation, its Affiliates, and Certain Third

15  Parties (the "2004 Motion")[D.I. 6; filed April 29, 2014]

16

17  HEARING re Letter to the Honorable Christopher S. Sontchi

18  from Edward s. Weisfelner (Redacted)[D.I. 698; filed June 2,

19  2014]

20

21

22

23

24  Transcribed by:  Dawn South, Nicole Yawn, Jamie Gallagher,

25  Sheila Orem, and Lisa Beck

```
 1   A P P E A R A N C E S :
 2   RICHARDS, LAYTON & FINGER, P.A.
 3        Attorneys for the Debtors
 4
 5   BY:  DANIEL J. DEFRANCESCHI, ESQ.
 6        JASON M. MADRON, ESQ.
 7
 8   KIRKLAND & ELLIS
 9        Attorneys for the Debtors
10
11   BY:  ANDREW MCGAAN, ESQ.
12        BRIAN SCHARTZ, ESQ.
13        MARK MCKANE, ESQ.
14        BRYAN STEPHANY, ESQ.
15        JON GAUTER, ESQ.
16        BETH DALMUT, ESQ.
17
18   PAUL, WEISS, RIFKIND, WHARTON & GARRISON
19        Attorneys for Ad Hoc Committee of TCEH First Lien
20        Creditors
21
22   BY:  ALAN W. KORNBERG, ESQ.
23        KELLEY A. CORNISH, ESQ.
24        JACOB ADLESTEIN, ESQ.
25        ADAM DENHOFF, ESQ.
```

1    YOUNG CONAWAY STARGATT & TAYLOR, LLP

2         Attorneys for Ad Hoc Committee of TCEH First Lien

3         Creditors

4

5    BY:  PAULINE K. MORGAN, ESQ.

6         RYAN M. BARTLEY, ESQ.

7

8    BROWN RUDNICK

9         Attorneys for TCEH, Second Lien Trustee

10

11   BY:  JEFFREY L. JONAS, ESQ.

12        EDWARD S. WEISFELNER, ESQ.

13        JONATHAN D. MARSHALL, ESQ.

14        AARON B. LAUCHHEIMER, ESQ.

15

16   UNITED STATES DEPARTMENT OF JUSTICE

17        Attorneys for the U.S. Trustee

18

19   BY:  ANDREA B. SCHWARTZ, ESQ.

20        RICHARD L. SCHEPACARTER, ESQ.

21

22

23

24

25

1    AKIN GUMP STRAUSS HAUER & FELT LLP

2         Attorneys for Ad Hoc Committee of EFIH Unsecured

3         Noteholders

4

5    BY:  SCOTT ALBERINO, ESQ.

6         IRA DIZENGOFF, ESQ.

7

8    SHEARMAN & STERLING

9         Attorneys for Duetsche Bank AG New York Branch

10

11   BY:  FREDRIC SOSNICK, ESQ.

12        NED S. SCHODEK, ESQ.

13

14   POTTER ANDERSON & CORROON LLP

15        Attorney for Deutsche Bank AG New York Branch

16

17   BY:  LAURIE SELBER SILVERSTEIN, ESQ.

18

19   COUSINS CHIPMAN & BROWN, LLP

20        Attorney for Ad Hoc Committee of EFIH Unsecured

21        Noteholders

22

23   BY:  SCOTT D. COUSINS, ESQ.

24

25

1   ROPES & GRAY LLP

2        Attorneys for CSC Trust Company of Delaware

3

4   BY:  D. ROSS MARTIN, ESQ.

5        KEITH HOWARD WOFFORD, ESQ.

6

7   COLE SCHOTZ MEISEL FORMAN & LEONARD, PA

8        Attorney for CSC Trust Company of Delaware

9

10  BY:  NORMAN L. PERNICK, ESQ.

11

12  MORRIS, NICHOLS, ARSHT & TUNNELL, LLP

13        Attorney for Sponsors

14

15  BY:  DEREK ABBOTT, ESQ.

16

17  WACHTELL LIPTON ROSEN & KATZ

18        Attorneys for EFH Equity Owners

19

20  BY:  RICKY MASON, ESQ.

21        AUSTIN WITT, ESQ.

22        JON LYNCH, ESQ.

23        EMIL A. KLEINHAUS, ESQ.

24

25

1    DRINKER BIDDLE & REATH LLP

2         Attorney for CSC

3

4    BY:  JAMES MILLAR, ESQ.

5

6    BINGHAM MCCUTCHEN LLP

7         Attorneys for Pacific Investment Management Co. LLC

8

9    BY:  JEFFREY SABIN, ESQ.

10        JULIA FROST-DAVIES, ESQ.

11

12   WHITE & CASE LLP

13        Attorney for Ad Hoc Group of TCEH Unsecured Noteholders

14

15   BY:  J. CHRISTOPHER SHORE, ESQ.

16

17   FRIED FRANK HARRIS SHRIVER & JACOBSON

18        Attorneys for Fidelity Management & Research Company

19

20   BY:  MATTHEW M. ROSSE, ESQ.

21        PETER SIMMONS, ESQ.

22

23

24

25

```
1    CROSS & SIMON, LLC

2         Attorney for Fidelity Management & Research Company

3

4    BY:  MICHAEL JOSEPH JOYCE, ESQ.

5

6    BLANK ROME

7         Attorney for Wilmington Trust

8

9    BY:  MICHAEL D. DEBAECKE, ESQ.

10

11   SEWARD KISSEL

12        Attorneys for Wilmington Trust

13

14   BY:  JOHN ASHMEAD, ESQ.

15        ARLENE ALVES, ESQ.

16

17   POLSINELLI

18        Attorneys for the Committee

19

20   BY:  CHRIS WARD, ESQ.

21        JUSTIN K. EDELSON, ESQ.

22

23

24

25
```

1   MORRISON & FORRESTER

2        Attorneys for the Committee

3

4   BY:  LORENZO MARINUZZI, ESQ.

5        TODD GOREN, ESQ.

6        SAM MARTIN, ESQ.

7        JENNIFER MARINES, ESQ.

8

9   LANDIS RATH & COBB

10       Attorney for ALCOC

11

12  BY:  MATTHEW MCGUIRE, ESQ.

13

14  WOMBLE CARLYLE SANDRIDGE & RICE

15       Attorney for Holt Cat, Centerpoint

16

17  BY:  MARK DESGROSSEILLIERS, ESQ.

18

19  KLEHR HARRISON HARVY BRANZBURG LLP

20       Attorney for UMB Bank, Indenture Trust

21

22  BY:  RAYMOND H. LEMISCH, ESQ.

23

24

25

```
 1   SAUL EWING LLP

 2        Attorney for ERCOT

 3

 4   BY:  MARK MINUTI, ESQ.

 5

 6   MUNSCH HARDT KOPF & HARR

 7        Attorney for ERCOT

 8

 9   BY:  KEVIN LIPPMAN, ESQ.

10

11   CIARDI CIARDI & ASTIN

12        Attorney for EFH

13

14   BY:  JOSEPH H. MCMAHON, JR., ESQ.

15

16   MCCARTER & ENGLISH

17        Attorney for BOKF NA

18

19   BY:  KATHARINE L. MAYER, ESQ.

20

21   QUINN EMANUEL URQUHART & SULLIVAN

22        Attorney for Centerbridge

23

24   BY:  BENJAMIN FIRESTONE, ESQ.

25
```

1    SCHULTE ROTH & ZABEL

2        Attorney for Centerbridge

3

4    BY:  BRIAN PFEIFFER, ESQ.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              (DISCLAIMER:  Due to the speed in which acronyms

3    are spoken it is very difficult to distinguish between some

4    of them when spoken)

5              THE CLERK:  All rise.

6              THE COURT:  Good morning, please be seated.  Give

7    me just a moment.

8         (Pause)

9              THE COURT:  Okay.  Good morning.

10             MR. SASSOWER:  Good morning, Your Honor.  Edward

11   Sassower of Kirkland & Ellis LLP, proposed counsel to the

12   debtors.

13             Your Honor, before we turn to today's agenda I

14   wanted to give you a brief status report.

15             The debtors have been in Chapter 11 for just over

16   a month, and their primary focus so far has been to insure a

17   smooth landing into Chapter 11.  That effort has been

18   successful in large part because of the interim relief that

19   this Court entered in the first few days of these Chapter 11

20   cases.

21             Importantly, since the filing TXU Energy's

22   customers accounts have remained stable.  This is a

23   significant achievement.  As Your Honor will recall, and as

24   I described at the first-day hearing, the Texas electricity

25   market is hyper competitive and customers can change

1    providers with a few clicks of a mouse.

2         In addition, the debtors have done their best to

3    preserve Luminant's trading operations.  To that end several

4    counterparties have indicated that they are waiting for

5    entry of final orders approving the hedging and trading

6    motion and the TCH DIP in the proposed form before

7    continuing to engage with the debtors.

8         The debtors have also had countless productive

9    conversations with their employees, their vendors, and their

10   regulators.

11        The RSA and the direction that it provides these

12   cases has been helpful in that regard.  It dispels the

13   notion that these cases may be never ending.

14        Having said that, the debtors want to be clear

15   that they are not locked into the RSA.  The RSA contains an

16   unqualified fiduciary duty out, and if another party

17   proposes a better alternative or if the facts or

18   circumstances change, then the debtors have the right to opt

19   out of the RSA.  In fact the reason the debtors adjourned

20   the hearing on the EFIH second lien DIP from today to the

21   June 30th hearing is because they received a competing

22   proposal.  And if the debtors never opt out of the RSA and

23   the RSA does not limit any parties' rights to object to the

24   disclosure statement or the plan, every party will have

25   their day, or as Mr. (indiscernible - 9:48:55) likes to tell

1   me, days in court.

2         Regarding today's agenda the debtors have worked

3   with various stakeholders to significantly narrow the issues

4   for today by either resolving or adjourning issues.

5         Specifically the debtors have resolved all of the

6   objections from the U.S. Trustee and the official creditors'

7   committee subject to language that we're working through in

8   connection with the proposed orders.

9         That leaves the remaining TCH objections fro the

10  ad hoc group of TCH unsecureds represented by White & Case.

11  We believe that we've resolved their DIP and critical vendor

12  objections, but the joint administration, the SOFA, and the

13  cash collateral objections remain unresolved at this point

14  in time.

15        We're also still working on the EFIH financing

16  relief that's at the back end of today's agenda.

17        Your Honor, one last note.  The objections contain

18  many allegations.  The debtors intend to respond to each and

19  every one of them at the appropriate time, but we will leave

20  many of them unchallenged today because they're not relevant

21  to the motions that are before Your Honor today.

22        Unless Your Honor has any further questions or

23  comments at this time I will yield the podium to my partner,

24  Mr. Schartz, who will handle the joint administration

25  motion.

1            THE COURT:  All right.  So what's -- before you do

2     that, what's the plan of attack?

3            MR. SASSOWER:  We're going to start with joint

4     administration, then we're going to talk Your Honor through

5     the deals that we believe we've reached on hedging and

6     trading and critical vendors and the DIP.  Then we're going

7     to move into cash collateral, which we think is the only

8     evidentiary issue for today.  My understanding is that

9     Mr. Shore would like some live testimony in that regard

10    under two witnesses.  And then we're going to finish up with

11    the SOFAs and the discovery matters.  The reason we moved

12    SOFAs to the end, because it's -- it really is tied to the

13    discovery issues that are at the end of the agenda and the

14    status conference.

15            THE COURT:  Okay.

16            MR. SASSOWER:  And then my understanding is Your

17    Honor we'd like to handle the EFIH matters tomorrow absent a

18    settlement.

19            THE COURT:  No, tomorrow.

20            MR. SASSOWER:  Okay.  So we look forward to seeing

21    you tomorrow on --

22            THE COURT:  And I'm not trying to be difficult,

23    but you had many people to look at all this and I had me, so

24    I'm not prepared to deal with EFIH even on a settlement

25    basis without taking more time to review those documents.

1          MR. SASSOWER:  That's very fair, and look forward

2     to coming back tomorrow on EFIH, hopefully with a

3     settlement, otherwise that hearing could take a little bit

4     of time.

5          THE COURT:  Okay.

6          MR. SASSOWER:  Okay.  So first up is joint

7     administration.

8          THE COURT:  Joint administration, yeah.

9          MR. SCHARTZ:  Good morning, Your Honor, Brian

10    Schartz of Kirkland & Ellis, proposed counsel to the

11    debtors.  As Mr. Sassower said the first item I'd like to

12    address today is the debtors' request for entry of a final

13    order on their joint administration motion.  What the

14    debtors filed on April 29th is at docket number 17.

15          If you're looking at the amended agenda from

16    yesterday it's item number 8.

17          THE COURT:  Uh-huh.

18          MR. SCHARTZ:  That's the agenda that's at docket

19    number 822.

20          Your Honor, although the debtors have reached

21    consensus on a matter -- on a number of matters in advance

22    of today's hearing request for final relief on joint

23    administration is unfortunately not one of them.

24          As Your Honor will recall the Court approved the

25    joint administration motion on an interim basis on May 1st

1    over the objection of TCH unsecured ad hoc group's initial

2    objection.  That initial objection sought to deny joint

3    administration altogether.

4         The ad hoc group has since filed a supplemental

5    objection asking the Court to impose a modified form of a

6    check the box caption.

7         The debtors filed a reply to both objections,

8    because we hadn't filed anything, on June 3rd, and that

9    applies at docket number 739.

10        Your Honor, the debtors believe the Court should

11   approve the joint administration motion on a final basis as

12   we had originally proposed in our motion and deny the ad hoc

13   group's objections for four reasons.

14        First, Your Honor, that joint administration seeks

15   relief that is granted in nearly every case in this

16   jurisdiction.  These Chapter 11 cases are not the first mega

17   Chapter 11 case in Delaware to have single caption that

18   applies to all debtors, and despite the ad hoc group's views

19   to the contrary, it's important to recognize that the

20   debtors are not seeking anything today that's extraordinary.

21        At the first-day hearing Your Honor took judicial

22   notice of the administrative convenience of joint admin

23   stating:

24        "A large part of why this is an appropriate motion

25   has to do with the administrative convenience and

1    organization of the Court.  I do not need evidence on that,

2    I am more than capable of being sensitive to the

3    efficiencies that occur internally in the court system from

4    joint administration."

5           It will be difficult for anyone to dispute Your

6    Honor's foresight in making that observation.  As of today,

7    which is just under 40 days from the petition date, there

8    are more than 800 entries on the main docket, and looking at

9    that amount of paper I think there's little doubt that

10   multiplying each page by 71 would give any benefit to anyone

11   on this case.

12          The second point, Your Honor, is that the debtors

13   believe the current form of caption is working just fine.

14   Several observations support this point.

15          First, looking at the docket, parties' interests

16   have determined which estates are affected by the pleadings

17   without any confusion.  Indeed as highlight in our reply the

18   ad hoc group itself has filed several objections to debtors'

19   pleadings that relate primarily to the EFIH debtors, all of

20   which explains, and I firmly believe this, why the current

21   caption is working just as we intended.

22          The third point, Your Honor, the ad hoc group was

23   and remains the only part to object to joint admin.  This is

24   an important point.

25          At the May 1st hearing Your Honor recognized that

1    at the final hearing today the Court would have "the input

2    of whatever the official committee of unsecured creditors'

3    position will be regarding this motion."  Well here we are,

4    again just under 40 days into the case, the U.S. Trustee has

5    appointed the creditors' committee as the sole fiduciary of

6    the (indiscernible - 9:55:34) unsecured creditors, the

7    creditors' committee has retained advisors, those advisors

8    have reviewed the motion, reviewed the objection, and still

9    the ad hoc group remains the only party to object to joint

10   administration.

11          The last point, Your Honor, is that the debtors do

12   not believe ad hoc group's proposal regarding a modified

13   case caption would really provide any benefit to any party

14   in interest, including the Court.  In fact we read the

15   Court's ruling from the May 1st hearing to have essentially

16   considered and rejected the approach.

17          As you may recall in that ruling Your Honor noted

18   that "I can't imagine any attorney in this room will be

19   filing in the wrong case, so everything is going to be duly

20   captioned.  So we're not saving anything or drawing any

21   distinctions by separate our cases."

22          The debtors agree with that observation.  Although

23   the attorneys in these cases sometimes talk about the E side

24   and the T side, this restructuring ultimately is about the

25   fate of all filing entities, that is why the debtors on both

1    the E side and the T side signed one single restructuring

2    support agreement.  That is also why lawyers from both sides

3    routinely attend depositions on matters that primarily

4    involve the other side.

5            Thus, we would not be surprised that even under

6    the expanded caption regime that the ad hoc group proposes,

7    nearly every pleading filed in the case would simply check

8    the box applicable to all debtors.  That is in fact what the

9    debtors would do if the Court approved the ad hoc group's

10   proposal.  And of course if you were to approve the ad hoc

11   group's proposal the Court would still be asked to read

12   every pleading regardless of the caption and regardless of

13   what box was checked.

14           For these reasons, Your Honor, the debtors would

15   respectfully request that the Court enter the very customary

16   administrative relief in approving the joint administration

17   motion on a final basis.

18           Thank you.

19           THE COURT:  You're welcome.

20           All right, Mr. Shore, good morning.

21           MR. SHORE:  Good morning, Your Honor.

22           I'd like to start with some preliminary remarks

23   that address a lot of the stuff that's been filed in the

24   last couple of days by the debtors and then turn to the

25   joint administration motion.

1          We're here today on a whole host of final relief

2    request with respect to the first-day motions, almost all of

3    it has been done consensually, we've got three issues that

4    we're going to address with the Court today.

5          As I noted on the actual first-day's we view the

6    collections and motions that were filed by the debtors as a

7    means of stabilizing the business and an opportunity for all

8    parties in interest to come and have the Court hear what the

9    ground rules should be for the cases moving forward.

10          We trust the Court could see that in almost all

11    instances we've been able to agree on stabilizing the

12    business and coming up with a set of ground rules, and a lot

13    of that will be addressed today in settlements that are read

14    in and you can see in orders that were submitted to the

15    Court on certification of counsel we've resolved it.

16          Notwithstanding our debtors, the TCH debtors,

17    persistent to fiction that this group of $2.7 billion in

18    claims is only here to disrupt without regard to economics,

19    and even goes so far as to question whether the Court and

20    why the Court would want to listen to $2.7 billion in TCH

21    claims.  So let me take a moment to go through that again

22    who we are.

23          We are an ad hoc group of several funds and

24    financial institutions holding $2.7 billion in unsecured

25    claims against each of the TCEH debtors.  We filed our 2019

1    statement last week.  We note that in addition to the 2019

2    we're in contact with another 200- to $300 million of TCEH

3    unsecureds.

4             To be clear, given that, we are a party in

5    interest in these cases which is self-funded and intends to

6    appear and be heard to the fullest extent that the Court

7    will allow us to do so.  The existence of a creditors'

8    committee which represents both TCEH debtors and one EFH

9    debtor does not change that result, and in fact today's

10   proceeding should show that two pairs of eyes on these

11   debtors is going to be better than one.

12            We've worked cooperatively without any

13   inefficiencies and we hope you'll see that again in the

14   proposed orders that come out of the disputes.

15            In addition we represent 2.7 billion votes at the

16   TCEH debtors, and as such believe we will be integral to any

17   solution which seeks the consensual -- a consensual result

18   around TCEH unsecured claims and fundamentally what we've

19   been doing in this case and what you'll see in the 2004 is

20   trying to get our committee in a position to understand what

21   the issues are in this case so that they can provide an

22   informed input to the debtors, their management, and their

23   advisors with respect to what deals make sense.

24            What are our goals?  We have only one, to maximize

25   the recovery on unsecured claims at each of the TCH debtors.

1    It's a simple and pure motivation, and you will not see us

2    stray from that, even though the debtors want to say we're

3    doing something else than trying to maximize value of TCH

4    unsecured claims.

5            We're not naive, there's no utility in impeding

6    progress for the sake of shacking out a recovery.  You know

7    we don't do that.  We trust the Court having seem our

8    actions in the past will understand that we are a -- we have

9    a legitimate, defined, and comprehensive plan to drive value

10   in these cases to the payment of TCH unsecured claims which

11   the debtors say will receive as little as a pro rata share

12   of $150 million.

13           We're also -- let me also make clear that

14   everything we do in that regard redowns (sic) to the benefit

15   of all TCH unsecured creditors.  There are $8 billion of

16   unsecured claims in these cases that the debtors have said

17   are essentially going to get nothing unless and until you

18   step up and object and convince the Court that you're

19   entitled to something.

20           The TCH unsecureds are the orphan claims in this

21   case, with everybody else, including the arguments you're

22   going to hear tomorrow, arguing about how much of their

23   postpetition interest should be paid, what par plus accrued,

24   plus accrued, plus accrued really means in these cases.  The

25   TCH creditors deserve a voice.

1          So what is the dispute about the remaining first

2     days that we have and how does that play into out goals?

3          We looked at each of the motions that the debtors

4     filed with five goals in mind.

5          One, as I said to you on the first days,

6     maintaining a level playing field for the big confirmation

7     and valuation dispute that this balance sheet restructuring

8     portends.

9          Two, insuring parity of treatment of all unsecured

10    creditors when we get to the end of that process.

11          Three, establishing known processes at the

12    beginning of the case so that everybody knows what the rules

13    are going to be at confirmation.

14          Four, maintaining maximum flexibility for

15    settlement strategies that Mr. Lauria might be cooking up as

16    we proceed to confirmation.

17          And five, putting an end to past practices where

18    we believe that the debtors were running the TCH debtors in

19    a manner that was prejudicial to those estates.

20          Let me drill a little bit into that.

21          The confirmation.  You heard Mr. Weisfelner up

22    talking about valuation.  There are avenues of recovery for

23    us.  One out of unencumbered assets, and two out of showing

24    the Court that there is equity in the encumbered assets.

25    We're obviously going to be addressing the concept of

1    unencumbered assets in both the DIP and the cash collateral

2    contested matters, but we have a substantial disagreement,

3    and there's a substantial disagreement through the entire

4    TCEH creditor body as to the value of the collateral

5    securing the $25 billion in first lien debt and $1.8 billion

6    in second lien debt.  That valuation is, I hope you can

7    already see, going to try all of our collective skills in

8    coming up with a number.

9           There's 15,000 megawatts of power in Luminant and

10   TXU Energy is the largest retail provider of electricity in

11   the (indiscernible - 10:04:04) region.  The value of those

12   assets when we get to confirmation is going to be driven by

13   as many as a dozen independent variables, all of which,

14   depending on how you toggle them on or toggle them off, are

15   either going to put people in the money or out of the money.

16          For example, forward gas prices; capacity market

17   in ERCOT; the timing of equilibrium in that market between

18   supply and demand; what month the experts think that's going

19   to hit; cap-x assumptions; coal regulations; the demand

20   curves in ERCOT and how that's going to drive the TXU Energy

21   business.  Each one of those issues, those toggles, is going

22   to have an insanely detailed amount of sub-issues in it.

23          When this capital structure was set and management

24   put 30 plus billion dollars of debt on TCH fracking

25   existing, you saw that chart on the first day with the

1    natural gas reserves in the United States, that was known,

2    and fracking existed, it was just heavily regulated by the

3    EPA and the technology wasn't there to get it out of the

4    ground.  Management assumed in 2008 it's never going to

5    happen, fracking will never get here.  The whole business

6    plan was built on that.  We're now in 2014 and the business

7    plan on which the valuation is going to be done is assuming

8    that fracking is always going to be here.  Exactly the

9    opposite assumption from the same management team that put

10   the deal together.

11          I pulled out, and I've been doing this for a

12   couple of weeks, I keep getting these things coming across

13   my door, these are the articles that came across my virtual

14   doorstep this week with respect to fracking.  Texas juries

15   anti-fracking verdict to create problems for oils and gas

16   producers.  EPA rejects industry call to burden a draft

17   assessment of TMB's list.  That's trimethyl butane's

18   fracking chemicals.  NWT, the northwest territories

19   announced its wants to develop a tracking regulations.

20   Local fracking ban put to states top court, New York Court

21   of Appeals have an argument next week on whether

22   municipalities in New York can ban fracking.  (Indiscernible

23   - 10:06:19) adds ammunition to Colorado fracking war.  Rural

24   county protests fracking in Nevada.  Advisory panel in

25   Virginia takes on fracking rules.  Fracking moratorium falls

1    in California despite strong public support.  EPA issues

2    proposed rule about hydraulic fracturing chemicals in

3    mixtures.  EPA consider rule to require reporting of

4    chemicals in hydraulic fracturing, and EPA to regulate

5    potential water threats from fracking.  All of them were as

6    boring as they sound in their titles, but it is an issue.

7    That's going to be one subsidiary issues that plays into the

8    forward prices of natural gas, which is one of a dozen

9    factors that's going to affect valuation.

10            I'm not standing up today telling you that we're

11   in the money.  No one else should be standing up telling you

12   we're out of the money.  By the time we get to confirmation

13   those toggles, and there are going to be additional toggles,

14   and we're all going to be pulling our hair out trying to

15   figure out how we come to a concluded value for the

16   collateral if we don't resolve it.

17            This may be the rare case in which the Chapter 11

18   case gets better with age.  This industry and the power --

19   and the power restructurings that have gone on have shown

20   that there are material shifts that can occur within the

21   case during the pendency the case that drive value.  We did

22   (indiscernible - 10:07:47) in Texas, parent bonds were

23   trading at 40 cents, the subsidiary OPCO (ph) bonds were

24   trading at 60 cents, two years after they went into

25   bankruptcy we were arguing over what accrued interest meant

1    on both of those series of bonds.

2         So we were silent last week.  Well, let me come to

3    my second point, which is -- which is maintaining parity

4    while all this plays out.

5         We were silent last week on the issue of balance

6    sheet restructuring, we heard you loud and clear, it's not

7    an operations restructuring, but I think there's a

8    disconnect going on.  A balance sheet restructuring is a

9    laudable goal.  It is not a laudable goal to be

10   restructuring two or three line items in the liability side

11   of your balance sheet and leaving other liabilies

12   untouched our paid off.

13        So when we looked at the first-day motions we

14   wanted to make sure that prepetition unsecured creditors

15   remained prepetition unsecured creditors.  And accepting the

16   narrowest of circumstances where payments could be made

17   outside the context of a plan to keep the business running

18   out of necessity we looked at all the payments that were

19   going out on prepetition claims to see what really

20   constituted that and what didn't.

21        Every line item of liability needs to be

22   restructured.  There's no good class of prepetition

23   unsecured creditors who would trade at the time or who had

24   preexisting contracts or were business counterparties and

25   bad creditors who happened to provide funded debt several

1    years ago.

2              Three, we looked at all of these motions for

3    establishing known processes in the case.  We believe the

4    parties had an opportunity they said to comment on what was

5    going on and try to develop a better way to do it, not just

6    say, well, it's done in every other case so why don't we do

7    it here in the largest case pending in the United States and

8    the largest operational restructuring just the TCH debtors

9    to every take place in Delaware?

10             In many cases the debtors have agreed to modify

11   their procedures, and you're hear on critical vendors what

12   we did.  Cash management we also resolved some procedural

13   issues.  We've resolved some procedural issues with respect

14   to the DIP as well.  But it's not, I hope you trust, process

15   or process sake.  Process and rigor drive substance.

16             My last case before Your Honor I spent a month

17   fighting process, what it meant to bring a witness in, what

18   it meant to have competent evidence, what it meant to have a

19   rule apply.  That in the end drove the substantive result

20   that resulted in that case.

21             I'm not hear arguing for process for process sake.

22   In the end we believe that the ground rules set by the

23   Court, things about discovery, bringing witnesses, making

24   people available for deposition, having witnesses testify

25   from personal knowledge will drive the substantive result.

1          I'll pick this up with joint admin in a second,

2    but there's a real utility in the caption in making somebody

3    actually have to put their brain to the process and say,

4    which debtor am I really representing here?  Should I be in

5    filing a motion in the EFIH case that pertains solely to

6    EFIH requiring creditors to come forward and say, I just

7    want to make sure it's not the TCEH case?  There are

8    instances and you've done it by setting EFIH tomorrow.

9    Their instances, I'm not going to show up tomorrow, I don't

10   want to show up tomorrow and listen to them argue about the

11   size of postpetition interest and whether it's fair or not

12   fair.  But having somebody check the box, actually think

13   about what they're doing, it's process, it's hopefully not

14   burdensome process.  I would think the attorney who is

15   writing the pleading knows what debtor they're seeking

16   relief on behalf of.  But it's hopefully going to drive the

17   substantive result to the problem we see, which is people

18   aren't thinking about the issue.

19          Four, maintaining flexibility.  I'm going to avoid

20   the debate now about the RSA, it is what it is, but it's way

21   too early in these cases for anybody to be declaring a

22   victor with the volatility that's out there or to dissuade

23   any type of deal.

24          Developing a $30 billion debt in equity takeout in

25   a Chapter 11 case that is hostile to the debtors does not

1    need any impediments to it.  So every first-day motion was

2    scrubbed to see is there anything we're doing in the first

3    days that's going to make it harder when we get to

4    confirmation to address that issue?

5            But even outside the RSA we saw in any aspect of

6    the first days that baked the cake too much we protested.

7    Some of it we've resolved, some of it now, but unfortunately

8    a substantial portion of the thinking behind some of the

9    more substantive motions that have been driven -- have been

10   driven by the mistaken assumption by management and their

11   advisors that these cases are just two make whole fights and

12   a cram down.  They're not.

13           And that brings me to the last point on how we

14   looked at the first days, which is fighting for a TCH voice.

15           Your Honor got a pretty stunning admission on the

16   first day of the case that I've never seen where the CFO of

17   the TCH debtors got on the stand and said he believed that

18   the TCEH debtors have been insolvent for years, public

19   reporting company has been insolvent for years.  Think about

20   what that means.  Management at EFH is paid in cash and gets

21   stock in EFH.  They're owed duties -- that management,

22   Mr. Keglevic owes duties to the EFH sponsors all the way up

23   until the time that the petition was filed.  But more than

24   half of the value of EFH in their enterprise value existed

25   in insolvent subsidiaries.  In order words, for the period

1   leading up to the petition the shareholders of EFH were only

2   benefited by maximizing value at EFIH and down below it,

3   Oncor, and got no benefit.  If we ever get the 2004

4   discovery, we'll get to that this afternoon, we'll get to

5   the bottom of it.

6            We're just getting started on that process though,

7   and one of the things you'll see in the settlement of the

8   first days on cash management, they set up EFH Corporate

9   Services, which is the subsidiary of the parent.  No value

10  that flows into EFH Corporate Services comes back to TCH.

11           On the eve of what was going to be a prior filing

12  last year they entered into an agreement, the shared

13  services agreement, they amended it in April.  That shared

14  services agreement had a one-way limitation on liability.

15  EFH Corporation Services would control all of TCH's cash

16  with a limitation on liability of $250,000.  Didn't seem

17  particularly fair to us that that would continue

18  postpetition.  We sat down with the debtors, we negotiated,

19  and in the cash management order there is a waiver of the

20  EFH Corporate Services right to invoke the limitation of

21  liability.  If they mess up on TCEH cash postpetition and

22  they owe no duty to TCEH, other than what exists in the

23  contract, they're not going to be able to invoke that

24  limitation on liability.

25           But we believe that imbalance of the money is in

1    EFH, again, during the -- in the RSA EFH and EFH Equity are

2    going to recover because of the value coming out of the E

3    side with a wipeout of the value on the T side.  And the

4    management, we believe, has had a blind spot which hides

5    what is best for TCEH only without some process put on it.

6    It's what allowed them to seek to make that $69.1 million --

7    seek authorization to make the $69.1 million payment that

8    was the subject of the first days.  Well with a little light

9    on it they've now agreed not to do that, it's what allowed

10   us to resolve the tax motion where they took out another

11   $50 million that would have gone to affiliates -- insider

12   affiliates run by the same management with no value flowing

13   back to the TCH debtors.  And it has allowed management that

14   concept going forward to think of TCH as a collection of

15   assets to be transferred over to the lenders.

16          I heard again on the RSA this morning this concept

17   of, no, we're handing the assets over to the lenders, but we

18   have a fiduciary out.  Our problem is there's no fiduciary

19   in.  In the mind of purely TCEH creditors it is not an

20   appropriate exercise of one's fiduciary duty to say I'm

21   going to abandon the assets to the secured lenders, feel

22   free to come forward and object to it.

23          This is a $40 billion case, self-fund yourself,

24   come in and start complaining about why we should or should

25   not do that.  They did all that admittedly, and perhaps even

1    proudly, without a valuation.  The mark, it'll correct

2    itself, that's fine, if you don't like it you'll come in.

3           This is not the type of case in which it's going

4    to be easy to do a $30 billion debt in equity raise.  The

5    motion that what they're going to do is just turn this over,

6    we may be wrong, we may be right, if nobody objects I guess

7    it's going to happen, is not an appropriate response for the

8    TCEH debtors.  So we've tried to, where we can, force the

9    debtors -- the debtors, all of the debtors think about what

10   are they doing for the TCEH debtors?

11          So that brings me to the caption.  Whether joint

12   -- Your Honor has discretion with respect to the joint

13   administration motion.  Rule 1015(b) only puts one

14   restriction on it.  The Court shall give consideration to

15   protecting creditors of different estates against potential

16   conflicts of interest.  Not even actual conflicts of

17   interest, potential ones.  And we raise that objection and

18   make three points.

19          One, there are inefficiencies -- inefficiencies in

20   this case in having all of the cases, the E side and the T

21   side, jointed administered without some indication to people

22   that you should be appearing on an E matter or a T matter.

23          Two, far from there being potential conflicts we

24   believe there are actual ones, and you heard this morning

25   the debtors don't even portent today to address the issue at

1    all.  They're not going to engage as to whether any conflict

2    exists.

3            And three, that the Court can fashion a low cost

4    protection.  Whether it's happened in another case I don't

5    care.  In this case, with these debtors, with this capital

6    structure, and with this plan on process it makes sense to

7    at least require that the debtors deal with.

8            Let me deal with that issue first.  We're not

9    requesting that every creditor that filed a pleading in this

10   case do this.  We're requesting when the debtors file a

11   motion, below the caption which everybody else is going to

12   use, they're going to have a box -- four boxes -- this

13   pertains just to EFIH, this pertains just to TCEH, this

14   pertains to all debtors, this pertains to all debtors, and

15   you better watch out because there's a potential conflict in

16   here.

17           On inefficiencies.  Since the interim order it's

18   been clear that the E side debtors have their own particular

19   fights concerns, deals.  They're holding companies

20   admittedly with no operations, rank and file employees,

21   trade vendors, energy regulators, or anything of the sort.

22   But they do have wraths of estate funded fiduciaries, and on

23   the T side you have operating companies with everything one

24   would expect in a complex Chapter 11, and they have their

25   own wraths of estate funded fiduciaries -- well, two estate

1    funded fiduciary -- two estate funded entities.  The first

2    liens who under the cash collateral order are going to get

3    their fees paid and the committee.

4         We're just trying to avoid what we've seen in

5    these cases.  We had E side creditors attending the T side

6    depositions.  Three.  Three independent parties came to

7    those depositions.  Our only committee, which the debtors

8    want to say only owes duties to the T side, is going to

9    appear tomorrow on the EFIH DIP.

10        If the debtors just get out in front of that issue

11   and check the box, this applies to EFIH only, you can expect

12   that somebody is going to feel a little nervous about filing

13   a fee application as a T side advisor to revealing a whole

14   bunch of E side motions.  I suspect the United States

15   Trustee's Office will be looking at such entries, and the

16   debtors quite frankly shouldn't be paying to have T side

17   creditors appearing on E side matters and vice versa.  It's

18   not cheap to do it that way, and as the parties who bear all

19   of the administrative expense in these cases, if we're right

20   on our valuation thesis, we have the interest in making sure

21   we're not paying people to do the other side's work.

22        There are actual conflicts here and they became

23   the E side and the T side.  Look there a number, 71 debtors,

24   and they are going to be little conflicts between them, but

25   the conflicts between the T side and the E side are real.

1          There are prepetition conflicts with the moving of

2     assets from the T side to the E side in the LBO and the

3     Oncor spinoff.

4          There was prepetition lending from the T side to

5     the E side at what we believe were non-market rates.

6          There's tax sharing and billions of dollars

7     flowing back and forth between the T side and the E side.

8          There's the shared services agreement in which in

9     the prepetition period, and I think the debtor said three

10    years up to the petition date, $2 billion of value moved

11    from the T side to the E side.  We haven't had any discovery

12    on that, but they are real conflicts, and we had, as I've

13    noted, postpetition conflicts going on.  This whole thing

14    generated out of that $69.1 million payment they put in the

15    cash management motion.  That was, discovery turns out, the

16    stub shared services payment that was due under the

17    prepetition shared services agreement, clearly for

18    prepetition delivery of services, clearly under a

19    prepetition agreement, and if the debtors have their way in

20    the RSA and the plan they contemplated it's going to have to

21    be rejected because you're going to deconsolidate the

22    entities.

23          Notwithstanding any of that the debtors wanted to

24    move $69.1 million from the T side to the E side, which

25    ultimately would have been for distribution out to E side

1    creditors, without apparently giving any thought to it other

2    than it just didn't seem fair that we wouldn't pay our

3    affiliates prepetition claim.

4           How do we avoid the prejudice?  Look, I've got two

5    pairs -- I've got a lot of pairs of eyes and the committee

6    has a lot of pairs of eyes, but it seems to us that the

7    debtors' solution, well, you can just read the pleadings,

8    read them closely, read them really hard, well you can

9    (indiscernible - 10:23:50) it out isn't enough.  There needs

10   to be just some modicum of rigor on their part in which

11   they're going to tell people what they really think they're

12   doing in connection with a motion being filed.

13          And with respect to that what I don't understand

14   in the debtors' -- in the presentation that was made, what's

15   the harm in doing this?  It's not like that Kirkland's

16   (indiscernible - 10:24:24) pool is going to be typing up a

17   caption every time on a typewriter, it's going to become a

18   template for every motion they file.  It will be a -- they

19   can take mine, they can cut and paste the one that I put in

20   our objection, and all it requires is that the person who is

21   filing that motion, whether it be the management which is

22   approving the motion or the attorney that's drafting it,

23   what are we really trying to do here?  Are we really just

24   dealing with E side issues?  Are we really dealing with T

25   side issues?  Is, I hope that if they are ordered to do it

1    they wouldn't just blindly this affects all debtors, check

2    that box, or you know what, there's going to be some fair

3    debate over whether or not what we're doing here is in any

4    individual estates' best interest so you better pick.

5    What's the harm in any of that process that forcing them to

6    think about the issue is going to (indiscernible - 10:25:18)

7    our concerns?

8              $3 billion or 2.7 on the 2019 of TCH debtors are

9    concerned enough that they had me standing up here talking

10   to Your Honor for this amount of time to say they're going

11   to have to start thinking about these.

12             So we'd ask you to grant the motion, and unless

13   you have any questions I don't have anything further.

14             THE COURT:  All right, thank you.

15             Let me just address quickly what you touched on

16   earlier, which was a at least perceived slight or hostility

17   directed by the debtors and I think arguably the first lien

18   creditors towards the ad hoc committee and what it was

19   really trying to accomplish.

20             There was also a lot of talk about Orealious (ph)

21   and what are they really trying to do.

22             And I found in many of the pleadings a lot of

23   unhelpful comments disparaging the other sides' motivations,

24   disparaging the other sides' position.  There were a couple

25   pleadings where I thought it was particularly bad.  That's

1    not helpful to anybody.  You're not going to score points

2    with me briefing that way.  And while I look at what parties

3    say in the context of who they are and what, for example,

4    their fiduciaries would be and certainly a court I think

5    generally will look very carefully and listen carefully to

6    especially what an official committee might say, I view all

7    the creditors that are appearing to be legitimate creditors

8    and I have not seen other than some unfortunate language

9    throwing around by everybody, no one in particular, I don't

10   really consider that as part of what's going on.  I haven't

11   seen anybody doing anything that I would consider improper

12   or motivated by hostility or game playing.  Certainly

13   everyone is capable of doing that, we all are capable of,

14   you know, throwing grenades if we have to, and that may

15   happen or may not happen as this case develops and it'll be

16   what it'll be.  I haven't seen it so far, at least I don't

17   think so.

18            So I think Mr. Shore might be being more sensitive

19   to the issue than he needed to be, but of course he's not --

20   I'm not the one who people are writing about, so it's easy

21   for me to say that.

22            So I just throw that out there.  I'd ask people to

23   think about it and think about addressing the merits of the

24   actions, the merits of the legal and evidentiary positions

25   and not get into motivations or name calling, because it's

1    not helpful and it's not going to get you anywhere.

2            So I want to thank you for giving me the

3    opportunity, because I actually basically wanted to say that

4    at the beginning of the hearing at some point.

5            So having said all that I'll turn it back over to

6    the debtor, to the extent you wish to reply.

7            MR. MCKANE:  Your Honor, mark McKane, Kirkland &

8    Ellis for the debtors.

9            And just picking up on that theme, we are not

10   trying to respond to Mr. Shore or the filings, but we do

11   embrace and recognize what the Court is saying.

12           There have been a few misstatements in Mr. Shore's

13   presentation that we need to correct for the record so

14   there's just not an impression or a misimpression of the

15   Court, and we recognize that it was an opening statement for

16   what he views as the direction of the case, and we accept

17   that that's an important thing for you to consider at this

18   time, but we want to emphasize to you and to all the

19   creditors here that when we move forward and try to sit down

20   and engage in open and get down to try to resolve issues

21   whether it be with an official committee, an ad hoc group, a

22   single creditor, that we do so in good faith to try to

23   resolve issues.  And the fact that we were able to reach as

24   many resolutions as we did and file as many certificates of

25   counsel as we did we view as a success and not something to

1    be detrimented to anyone's affect.

2              And so we -- I think that's an incredibly

3    important thing to reach as much resolution as possible

4    today, and what we've been trying to do over the many days,

5    even before we filed replies and afterwards.

6              As it relates to the management team.  Mr. Shore,

7    and I don't think he meant this to be inaccurate, Mr. Shore

8    tired to suggest an error that somehow the management team

9    was aware of and embraced -- or knew of fracking as of the

10   time of the LBO.  As the facts are going show this is not

11   that -- that's not that management team.  The management

12   team that's in place for these companies now came in after

13   the LBO.

14             And but more importantly, the notion that somehow

15   the management team is doing something untoward or improper

16   doesn't give proper respect or acknowledgment that these are

17   very hard working salts of the earth people who are doing

18   the right thing for all the companies solvent or insolvent.

19   Whether it be TXU Energy employees, whether it be Luminant

20   employees, whether it be the senior management team, they're

21   all doing the best that they can to maximize value for these

22   enterprises for all of the creditors, and that is something

23   that we have to recognize.

24             As it relates to the notion of like some over

25   expense of whether there are people on the T side attending

1     E side depositions like happened last week or E side

2     personnel attended T side, we all want to have the most

3     efficient process possible, which is why we put things on

4     the record as to what the deposition is and what the topics

5     are going to be.  But to the extent that Mr. Shore is making

6     suggestions as to what the T side conduct was by attending

7     depositions that he took we would only have to recognize

8     that there were T side personnel, including members of his

9     firm at the E side depositions as well.  We'd like to move

10    forward more efficiently than that.

11            As it relates to EFH Corporate Services, it is

12    important, and we have sat down with Mr. Shore, and we've

13    sat down with members of his firm, and we've sat down with

14    members of the committee and their advisors to explain that

15    EFH Corporate Services is simply one -- is one of the means

16    by which TCH vendors get paid for providing services to

17    TCEH, and the $69 million in payment is the recognition of

18    payments for services provided directly to TCH companies to

19    maximize value for those companies.  We were able to resolve

20    that payment because of the ability of a preexisting letter

21    of credit that was provided prepetition so as to protect

22    unencumbered collateral -- unencumbered cash that could be

23    available to unsecured creditors.

24            So we do sit down and articulate the reasons for

25    why we might not need the first-day relief and reach

1    resolution, and much of that effort is there at times to

2    protect all creditors, including the unsecured creditors in

3    this case.

4           Finally, Your Honor, as it relates to valuation I

5    think it's a misstatement of the record to talk -- and we've

6    heard about this already a few times -- that there's been no

7    work done on valuation, that's there no concept of what

8    valuation is.  Make no doubt we agree there will be a

9    massive valuation trial at the end of this case, and I use

10   that term recognizing it's very important as to the size of

11   the value and the import of what it will have in these

12   cases, and we recognize that, and we are moving forward,

13   including providing 2004 discovery to help all of the

14   creditors, including the ad hoc group, prepare for that day,

15   but that day is not today.

16          And we're prepared to move forward today with the

17   motions that are to be addressed today, including I'd like

18   to have -- yield the podium to Mr. Schartz to allow him to

19   respond to the specific issues as it relates to joint

20   administration.

21          THE COURT:  Okay.  Thank you.

22          MR. SCHARTZ:  For the record Brian Schartz,

23   Kirkland & Ellis on behalf of the proposed debtors.

24          I think I'll be very quick here bringing back to

25   the main issue of joint administration.  The rule is one

1    that gives the judge discretion is one that talks about

2    potential conflicts.

3              But aside from all the things that Mr. Shore said

4    and to which Mr. McKane responded, I think the most

5    important point is that on the conflicts point TCH ad hoc

6    group hasn't done any discovery on potential conflicts,

7    there hasn't been any evidence in the record regarding

8    potential conflicts.  There was testimony of Mr. Keglevic at

9    the first-day declaration and that's it.  And I think all of

10   the rhetoric aside from both sides just focusing on this

11   very simple motion that's before the judge today I think

12   that we meet the legal standard that's in the local rule,

13   it's 1015, and I would ask that the Court approve the motion

14   on that basis.

15             Thank you.

16             THE COURT:  All right.

17             MS. MARINES:  Your Honor, Jennifer Marines from

18   Morrison & Foerster, proposed counsel for the official

19   committee.

20             We don't object anything in the joint

21   administration motion.  We recognize that the debtors have

22   filed this motion for administrative convenience only and

23   don't believe that there are any other implications of

24   granting this relief.

25             With respect to the check the box proposal we are

1    fiduciaries for all of the unsecured creditors of the TCEH

2    debtors and in exercising our role as fiduciaries we are

3    going to review and understand all of the relief whether the

4    pleading is checked, the E side debtors, whether it relates

5    to the T side debtors, or whether it relates to all of the

6    debtors.  We need to understand and analyze how it affects

7    our creditor body, so we will continue to do that.

8            As such we don't have any objection with respect

9    to the proposed form of order.

10           THE COURT:  Thank you.

11           Any last words?

12           All right.  I'm cognizant of the point that

13   Mr. Shore is making, I think it's -- contains an assumption

14   that I don't necessarily think is true, which is that every

15   item can be sort of boxed into either, you know, a T side

16   item or an E side item.  I think the committee makes the

17   point that I would make which is that the Court and the

18   parties are more than capable and really will be required to

19   evaluate cases, motions, things that happen in front of the

20   Court whether or not they're T side or E side or

21   indistinguishable, and I don't see a lot of or any really

22   constructive help coming from requiring or instituting this

23   modified check the box format, and I see a lot of mischief

24   when it comes to trying to actually organize the case and to

25   running the docket, handling the docket.  There's a human

1    being at the bankruptcy court that looks at everything

2    that's on the docket, we take it very seriously, and we

3    handle it as best we can, and I think adding this sort of

4    provision is simply going to create a lot of chaos

5    internally here at the court and significantly increase the

6    -- I won't say cost because the cost is what it is -- but

7    the human cost and capital that has to be put into keeping

8    the docket of this case organized and helpful and accurate.

9              So I see no reason to not handle what I've already

10   put in place, which is a general joint administrative order

11   with a general caption.

12             I expect there are matters that'll matter more to

13   the EFIH or the EFH or the TCEH creditors respectively, but

14   I don't think that modifying the caption in the way proposed

15   will be helpful for that, and I think that it will be

16   hurtful and not constructive for purposes of keeping the

17   docket organized both internally and externally for parties

18   that will be trying to figure out what's going to go on.

19             You know, it's 100 pro hoc vice motions as opposed

20   to somebody filing something in the TCH or EFH that makes

21   the docket confusing.  I mean there's only so much you can

22   do.

23             So I'm going to overrule this objection and I'll

24   grant the motion and sign the order as proposed by the

25   debtor.  And if you have a clean copy please approach.

1          Thank you.

2      (Pause)

3          THE COURT:  I have signed that order.

4          MR. HUSNICK:  Thank you, Your Honor.

5          I always forget how short I am until I stand up

6    there (indiscernible - 10:39:20).

7          THE COURT:  Mr. Shore gets it all out of whack.

8    Lawyers are not tall, Mr. Shore, we're little people.

9      (Laugher)

10         MR. SHORE:  What's that mean?

11     (Laughter)

12         THE COURT:  I think it means I'm wider than I'm

13   taller unfortunately.

14         MR. HUSNICK:  Good morning, Your Honor, Chad

15   Husnick, proposed counsel to the debtors from Kirkland &

16   Ellis.

17         Your Honor, the next item on the agenda is the

18   trading contracts motion, hedging and trading contracts.

19         Your Honor had entered the order on an interim

20   basis at the first-day hearing, and before I delve into the

21   trading contacts motion and where we're at with the Office

22   of the United States Trustee I'd just like to take care of

23   one housekeeping matter in terms of incorporating the record

24   from the first-day hearing.  Would Your Honor prefer that I

25   do that in context of each motion or all at once?

1            THE COURT:  No, let's do it by motion, because --

2            MR. HUSNICK:  Okay.

3            THE COURT:  -- it may raise an issue, I don't

4    know.

5            MR. HUSNICK:  Okay.  Your Honor, at the first-day

6    hearing we did, and I don't think we need any additional

7    evidence here today, we did offer the declaration of

8    Mr. Paul Keglevic, which was in the form of a first-day

9    declaration as well as the supplemental declaration from

10   Mr. Nutt, the chief risk officer for Energy Future Holdings

11   who is in charge of the hedging and trading activities.

12           Based on that evidence, Your Honor, I think the

13   debtors would be comfortable resting on their papers in

14   terms of final relief, and then I can discuss what the

15   Office of the United States Trustee and the debtor have

16   negotiated.

17           THE COURT:  All right.  Any objection to that in

18   the context of this motion?

19           All right, that's satisfactory.

20           MR. HUSNICK:  Thank you.

21           Your Honor, the debtors have engaged in

22   significant discussion with the Office of the United States

23   Trustee, and I will confess that this is one of the most

24   complicated motions I've ever dealt with in my career at

25   Kirkland, and I can't speak for Ms. Schwartz, but I think

1    she feels much the same way about the content of what the

2    debtors' hedging and trading activities are, and I think the

3    debtors are still working with the Office of the United

4    States Trustee to understand some of the parameters, and to

5    that end one of aspects of the relief that we are going to

6    put off to the final hearing on a particular portion of the

7    relief is going to be continued to the June 30th hearing,

8    and we're still negotiating an order that will memorialize

9    this agreement.

10              But effectively what the debtors have negotiated

11   with the Office of the United States Trustee is that the

12   debtors will get final authority to continue their hedging

13   business as it relates to the generation business that the

14   company does, and I talked at length as was set forth in the

15   declaration from Mr. Nutt about how important that is to the

16   operation of the business, and I believe the United States

17   Trustee does not have an issue with the hedging activities

18   per se.

19              The aspect of the trading motion that we're going

20   to put off is going to be the proprietary aspect of the

21   trading, and that is trading done largely for profit.

22              Your Honor, on that aspect we will continue to

23   discuss with the Office of the Untied States Trustee as to

24   the importance and to the proprietary of that type of

25   trading for the debtor in possession.

1            I do believe that what we have, we do have some

2     proprietary trades that are outstanding from prepetition

3     periods.  What we've negotiated with the U.S. Trustee as to

4     those existing trades is that to the extent the debtor needs

5     to take action to mitigate or close down those existing

6     transactions in an effort to preserve assets of the estate

7     we can do that limited proprietary trading activity to

8     actually shut those down, but beyond that the debtors will

9     enter into no additional new proprietary trades until we get

10    a final order from the Court on that aspect and we will --

11    we don't have to discuss at length that aspect of the relief

12    today, but I believe that's the deal we've negotiated with

13    the U.S. Trustee, subject to working out the specifics of

14    how the orders are going to look and submitting them I

15    believe probably under certification later today, tomorrow,

16    or whenever we can get it done.

17            THE COURT:  All right.  Ms. Schwartz?

18            MS. SCHWARTZ:  Thank you, Your Honor.  Andrea

19    Schwartz for the United States Trustee.  With me is

20    Mr. Richard Schepacarter, also for the United States

21    Trustee.

22            What Mr. Husnick advised the Court is in essence

23    the -- I think I'm even shorter than Mr. Husnick, although I

24    have heels on, but I don't think it matters.

25            It is consistent with our agreement with them.  I

1      think like the Court and unlike the debtors' counsel and

2      many of the parties here, we, like the Court, are wrapping

3      our heads around many, many motions and trying to understand

4      all of the goals that the debtors have for their

5      reorganization and the interest of the other parties.

6             In the context of that the trading motion, as Your

7      Honor has read it, certainly has its own nomenclature.  Much

8      like bankruptcy it has its nomenclature and we are working

9      with the debtors to try to understand not only what

10     everything means that they set forth in the trading order,

11     but also what is consistent with the debtors' duties under

12     1107 and 704 and also Section 345 and investments that are

13     set forth and to be complied with under the Code.

14            So just for the Court to understand, with respect

15     to the motion and in concept, and as Mr. Husnick said we're

16     going to try to work out the terms of one order or one final

17     order with respect to certain hedging activities and interim

18     order with respect to what the debtors are using the term

19     proprietary trading.  We're not necessarily signing on to

20     what their nomenclature is, but in concept with respect to

21     the hedging activities that relate to the business

22     operations of the debtor, that is the power generation and

23     the other -- on the retail business side the United States

24     Trustee does not object to the debtor continuing in those

25     hedging activities.

1          We are still in the process of understanding and

2     having a full grasp on what the proprietary trading is.

3     What we know so far, Your Honor -- and I just want to state

4     that certain information was, in fact, put forth for the

5     first-day affidavit and also at the hearing, but, as time

6     goes on, we're learning more things that we've been asking

7     for additional information with respect to.

8          What we know is that approximately $15 million in

9     what's called notional value of the trades relating to the

10    proprietary aspect of the business debtor is what's out

11    there, and those trades, as we understand it, so, at this

12    point, are totally for profit.  They're not related to the

13    operations of the debtor.

14          So what they're actually doing is engaging in

15    market trading for profit, and we're trying to get an

16    understanding as to whether or not what they're doing and

17    the risks involved in what they're doing are reasonable, as

18    required under the code, and it may be, Your Honor, at a

19    point in time the U.S. Trustee will have its position, and

20    the debtors will have their position, and the Court will

21    have to make a call on that, but we do find the motion to be

22    involving very sophisticated transactions.

23          The debtors have been very cooperative with our

24    office, Your Honor, I must say.  They've made their

25    businesspeople available to us.  We've had hours of

1    conversations regarding these transactions, but it does

2    represent over ten percent of the hedging and trading

3    activities that are engaged in by the company, and we're

4    still in the process of getting the information from the

5    debtors.

6            So we've agreed with them that, with respect to

7    the activities relating to the business operations, that we

8    won't have an objection.  They can obtain their final

9    relief.  They don't have any objections from any other

10   party, and, with respect to what they're calling the

11   proprietary trading, they can only engage in trading

12   activity that would minimize risks and prevent loss to the

13   company, not to enter into other transactions in order to

14   get profit on that.  So that's where we stand at this point,

15   Your Honor, but we wanted to bring that information to the

16   Court's attention.

17           The other thing I just want the Court to know is

18   that, as was stated in the introductory remarks, the U.S.

19   Trustee did, in fact, appoint a creditors' committee.

20   You've got a lot of people here from the committee, et

21   cetera, and also, yesterday we conducted the beginning of

22   the 341(a) meeting.  We'll continue that once the schedules

23   are, in fact, filed, but that's the progress we've been

24   making so far from the U.S. Trustee's side.

25           THE COURT:  Thank you.

1            MS. SCHWARTZ:  Thank you, Your Honor.

2            THE COURT:  Anything further?

3            MR. HUSNICK:  No.  With that, Your Honor, and

4    subject to seeing the final form of order, we'd respectfully

5    ask that the Court enter the order that will be agreed to

6    with the committee.

7            THE COURT:  All right.  I will look at the order

8    when it comes under certification, and, if it's consistent

9    with what I just heard, I'll sign it.

10            MR. HUSNICK:  Thank you, Your Honor.

11            The next item on the agenda, Your Honor, is the

12    debtors' critical vendor motion.

13            THE COURT:  Right.

14            MR. HUSNICK:  On this motion, Your Honor, the

15    debtors presented the oral testimony of Mr. Paul Keglevic

16    as well as the written declaration of Mr. Paul Keglevic in

17    the form of the first-day declaration.  Your Honor, we would

18    like to incorporate the record.  I believe there was some

19    cross of Mr. Keglevic, if I remember correctly, into the

20    record for the final hearing today.

21            THE COURT:  Any objection?

22            We're just talking about the evidence right here.

23            UNIDENTIFIED SPEAKER:  No, no objection.

24            THE COURT:  Okay.  Very good.

25            UNIDENTIFIED SPEAKER:  Assuming he's going to read

1       in the deal, as I understand it.

2               THE COURT:  As long as it's consistent, that's

3       fine.  Otherwise, we'll track back and deal with it, if

4       necessary.

5               MR. HUSNICK:  Yep.  So, Your Honor, as was

6       reported in the opening remarks by Mr. Sassower and

7       Mr. Shore, we've worked at length with the various parties

8       and interests, including the U.S. Trustee and the official

9       committee of unsecured creditors to resolve concerns

10      regarding the debtors' critical vendor motion.

11              Your Honor may remember that we filed the critical

12      vendor motion with an interim request of up to $30 million

13      and then agreed to come back to Your Honor for a final

14      approval for a bucket of up to $40 million.  The various

15      vendors that fit into the critical vendors buckets are

16      spread across various categories, including those vendors

17      that provide services to the company's nuclear power plant

18      as well as other outage vendors and other vendors that are,

19      for all the reasons we discussed, both in the oral testimony

20      and from the podium, are critical to the operation of the

21      debtors' business.

22              Now, I'm happy to report that we have reached an

23      agreement, subject to certain changes to the order that I

24      will read in the conceptual agreement into the record, and

25      then, we're working through the order.  I think we're almost

1    there, but this last part that came together this morning

2    we'll have to work with Mr. Shore and Mr. Lauria's team to

3    put some language to paper, but I'll try and articulate it

4    as best I can.

5            I apologize in advance.  As I walk through these,

6    some of this stuff came together this morning, and there may

7    be pieces that I miss, and, if I do, it's certainly not

8    intentional.

9            Your Honor, the debtors have agreed with the TCH

10   ad hoc group to generally provide to the TCH ad hoc group

11   the same level of notice in the critical vendor process that

12   the creditors' committee itself is receiving.  That will

13   include notice of summaries of payments that have been made

14   to critical vendors, notice of and consultation rights with

15   respect to proposed modifications to trade vendor agreements

16   for amounts that are in excess of $5 million.

17           In addition, the debtors will provide advanced

18   notice of any individual payments of more than $2 million to

19   the official committee of creditors as well as the TCH ad

20   hoc group.  Unique to the TCH ad hoc group and what we

21   negotiated this morning is several additional paragraphs.

22           First, Your Honor, we will add a paragraph that

23   comes from an order issues in the Mirant (ph) bankruptcy

24   case that puts creditors on notice that creditors receiving

25   a copy of the critical vendor order will understand the

1    implications that receiving or demanding a critical vendor

2    payment may have under the automatic stay memorialized in

3    362 of the bankruptcy code.  In addition, as to the three

4    members of the creditors' committee that are themselves

5    trade creditors, the debtors have agreed to alert the TCH ad

6    hoc group to requests from those three members of the

7    committee for critical vendor payments, in particular, as to

8    any payment requests that were made prior to today.

9            So retroactively, we will provide notice.  We will

10   explain to the TCH ad hoc group which of those three members

11   made requests, to the extent that that request was escalated

12   to the vendor review committee at the company, and just a

13   moment about the vendor review committee.

14           The company has established a committee consisting

15   of certain senior management that review each and every

16   official request for a critical vendor payment before that

17   payment can be made, and there is certain levels of approval

18   for the various members on the vendor review committee, and

19   legal and financial advisers do participate in that process

20   to ensure that the process remains controlled and that only

21   truly critical vendors are getting critical vendor payments.

22           So we will inform the ad hoc group of any requests

23   that have reached the vendor review committee prior to

24   today.  The reason I'm making that qualification is there

25   may have been conversations among lower level rank and file

1    employees at the company and representatives of the members

2    of the creditors' committee on the other hand that have

3    occurred that have not escalated to that level of review at

4    the company, although no payments have been made.

5            Going forward, Your Honor, we represent that no

6    one -- we will report to the ad hoc group if anyone at any

7    level at either the company or the three members of the

8    creditors' committee that are trade vendors makes a request

9    for a critical vendor payment.  Effectively, we are just

10   agreeing going forward that this will be -- the ad hoc group

11   will be put on notice, to the extent these discussions are

12   -- the requests are made and discussions are ongoing.  With

13   that, I think I've summarized the deal.

14            THE COURT:  Mr. Shore?

15            MR. SHORE:  Your Honor, with respect to critical

16   vendors, we had filed an objection, and we have raised two

17   concerns.  One, over a lack of sunshine and the other that

18   it looked like with all the first case (sic), we were

19   creating two classes of TCH unsecureds, those who were going

20   to get paid and those who weren't going to get paid.

21            Specifically, with respect to critical vendors, it

22   didn't seem to us to be a meaningful distinction to treat

23   people differently, that there would be one class of

24   creditors who would get paid by threatening to withhold

25   critical goods or services to the debtors unless they got

1    paid and those who either didn't or weren't in a position to

2    do so, and we wanted process around it.  We had proposed a

3    process which would have provided sunshine and a sunset.

4            We have been in dialogue with the debtors about

5    that and have come up with the alternate structure, and,

6    with that, we're hopeful that the TCH debtors won't have to

7    pay another dime to critical vendors.  I think we're all

8    hopeful for that, but, if they end up doing so, we'll at

9    least have some more protections with that.

10           THE COURT:  Okay.  Thank you.

11           All right.  Subject to seeing the order, I'll

12   approve it as modified.

13           MR. HUSNICK:  Thank you, Your Honor.

14           MS. BLACKER:  Your Honor, excuse me.

15           THE COURT:  Yes?

16           MS. BLACKER:  This is Monica Blacker.  I represent

17   Holt Cat, one of the trade vendors that sits on the

18   committee, and I would ask that the parties circulate that

19   order to me for a review as well.

20           THE COURT:  Certainly.  Will do.

21           MS. BLACKER:  Thank you.

22           THE COURT:  You're welcome.

23           MR. HUSNICK:  And we'll also share that order with

24   the official committee of unsecured creditors and the United

25   States Trustee.

1          THE COURT:  Okay.

2          MR. MARINUZZI:  Your Honor, good morning.

3    Briefly, Lorenzo Marinuzzi, Morrison & Foerster, proposed

4    counsel for the official committee.

5          THE COURT:  Okay.

6          MR. MARINUZZI:  We heard this resolution for the

7    first time this morning, as Your Honor did.  We heard there

8    was a deal.  We didn't quite understand what it was until it

9    was read into the record.

10          We haven't had an opportunity to circulate

11    anything to our committee to let them know that this was the

12    agreement between the ad hoc committee and the debtors.

13    Ms. Blacker represents a member of the committee.

14          THE COURT:  All right.

15          MR. MARINUZZI:  I think that we'd like to see the

16    order as well and have an opportunity to circulate it to the

17    committee to see if they have any comments on it.

18          THE COURT:  Sounds like I got to have it myself.

19    All right.  I was unaware that the committee wasn't in the

20    loop on the last piece.  So I'll withhold actual approval,

21    subject to seeing a COC.  We have all day for the committee

22    to get an opportunity to get up to speed and make sure

23    they're comfortable with it.  If they are, I'll sign the

24    order as it's been put on the record, subject to seeing it,

25    and, if the committee has any problems, we'll revisit the

1    issue.

2              MR. MARINUZZI:  Thank you, Your Honor.

3              THE COURT:  You're welcome.

4              MR. HUSNICK:  Thank you, Your Honor.

5              The next item on the agenda is -- I don't want to

6    say the main event, but, for me, it's the main event.  That

7    is the TCH debtors' motion for final approval of the cash

8    collateral and DIP financing packages.

9              THE COURT:  Before we turn to that, we've been on

10   for a little while.  Let's take a short recess, five or ten

11   minutes, and then, we'll turn to cash collateral.

12             MR. HUSNICK:  Thank you.

13        (Recess at 10:58 a.m.)

14             THE CLERK:  All rise.

15             THE COURT:  Please be seated.

16             Just give everybody a moment.

17        (Pause)

18             THE COURT:  Okay.  I think they got it.

19             MR. HUSNICK:  Thank you, Your Honor.  Chad

20   Husnick, Kirkland & Ellis, proposed counsel of the debtors.

21   Your Honor, the next item on the agenda is the debtors'

22   motion for final approval of the DIP financing and

23   consensual use of cash collateral.

24             Your Honor, as with a lot of the motions, we have

25   negotiated in good faith with the ad hoc unsecured group,

1    the creditors' committee, the DIP lenders, and the

2    prepetition first lien lenders in an effort to resolve the

3    outstanding objections.  Your Honor is also aware that

4    certain other parties have filed objections to the DIP

5    motion and to certain aspects of the cash collateral motion,

6    and we've worked with those parties as well, and, in most

7    instances, as I'll report, we've been able to negotiate

8    pieces of language that resolved those objections, and we'll

9    put those into the order, but I'd like to speak in

10   particular to the resolution on DIP financing and where

11   we're at on the DIP and cash collateral vis-à-vis the

12   primary objecting parties that could not be resolved with

13   just simple reservations of rights or other pieces of

14   language.

15           Your Honor, the negotiations between the debtors,

16   the prepetition first lien creditors -- that is the group of

17   creditors represented by Paul Weiss (ph) -- the DIP lenders,

18   and the creditors' committee were successful on both DIP and

19   cash collateral.  With respect to the DIP, Your Honor, the

20   debtors have also reached an agreement with the TCH ad hoc

21   group, and I'll summarize those changes in a moment.

22           Unfortunately, Your Honor, the negotiations were

23   unsuccessful or slightly less productive on resolution of

24   the ad hoc group's objections to the terms of the cash

25   collateral order, and I'll do my best to try and summarize

1    kind of what shakes out after we've implemented the

2    settlement with the creditors' committee, and then, I'm sure

3    Mr. Shore can respond to what I think is still open.

4    Your Honor, on the settlement front, I'm going to take it up

5    in a couple of different baskets, and again, I'll start with

6    just the DIP, which has been resolved between all of the

7    relevant parties.

8              The first issue was as to the liens and claims and

9    whether the liens, the superpriority claims, would attach to

10   the unencumbered assets, including the avoidance action.

11   Your Honor, the parties have agreed that the DIP liens and

12   the superpriority claims will be on all unencumbered assets

13   other than avoidance actions.  With respect to avoidance

14   actions, Your Honor, the superpriority -- I'm sorry.  With

15   respect to avoidance actions, it will only be superpriority

16   claims.  There will be no DIP lien.  I'm misspeaking here.

17   Give me one moment.

18             THE COURT:  Why don't you rewind and start over?

19             MR. HUSNICK:  Yeah, I just want to make sure I'm

20   getting it right.  This is one that came together at the

21   last minute.

22        (Pause)

23             MR. HUSNICK:  Okay.  Your Honor, the DIP liens and

24   the superpriority claims will be on all unencumbered assets

25   other than the avoidance actions.  The superpriority claims

1    will also attach to the avoidance actions, and it's the

2    proceeds of the avoidance actions.

3              In addition to that, Your Honor, the DIP lenders

4    have agreed to marshal a way from those unencumbered assets

5    in the event that a collection event or a termination event

6    has to happen.  With that, Your Honor, I believe that all of

7    the parties are resolved for the DIP on what happens with

8    liens and claims.

9              Your Honor, the next kind of set of objections was

10   related to the size of the DIP facility.  Your Honor may

11   remember the overall size of the DIP facility is $4.475

12   billion.

13             1.1 billion of that DIP facility is set aside for

14   what is called the delayed draw term loan, which can only be

15   drawn for the limited purpose of posting an L.C. to support

16   the railroad commission bonding requirement in event that

17   the railroad commission denies the debtors' pending

18   application for approval of the railroad commission carve-

19   out as the substitute bond.  Your Honor, the debtors have

20   warranted that they will use good faith efforts to continue

21   to have the railroad commission accept the railroad

22   commission carve-out as the replacement bond.

23             Your Honor, what we've agreed to do with respect

24   to the ad hoc group on the delayed draw term loan is that we

25   will continue to apprise the ad hoc group of developments in

1    the negotiations and the proceedings before the railroad

2    commission.  We will give them prompt notice of any decision

3    related to acceptance or denial of acceptance of the

4    debtors' application to post the railroad carve-out as the

5    replacement bond.

6            In addition, Your Honor, to the extent that the

7    railroad commission were to deny the debtors' pending

8    application for substitution bond, the debtors will give the

9    lesser of ten business days or such amount of time that

10   remains before the debtors will either lose access to the

11   post-petition L.C. or the delayed draw term loan or the date

12   on which the debtors' deadline to post the replacement bond

13   expires.  We will give notice, again, within the lesser of

14   the ten days or such shorter period that the debtors intend

15   to post the L.C. to the railroad commission as its form of

16   replacement bond.

17           Under those circumstances, the ad hoc committee of

18   TCH unsecured lenders will have an opportunity to file an

19   objection with Your Honor as to the posting of the L.C. as

20   an acceptable replacement bond and will be able to seek and

21   expedite a hearing at Your Honor's earliest convenience to

22   have that issue heard.

23           I believe I've summarized that accurately, but

24   I'll allow the ad hoc committee to respond.  That is as to

25   delayed draw term loan.

1          The third piece on the sizing bucket of issues has

2     to do -- go ahead.

3          THE COURT:  Can I just ask you really quick on

4     that?  Since that just came together, I'm guessing, but I

5     won't assume.  Has the railroad commission been given notice

6     of the proposed resolution?

7          MR. HUSNICK:  One second just to --

8          MR. MORRIS:  Your Honor, this is Hal Morris.

9     Your Honor, this is Hal Morris with the attorney general's

10    office in Texas.  May I speak to that, please?

11         THE COURT:  Yes, you may, sir.  Go ahead.

12         MR. MORRIS:  Thank you, Your Honor.  For the

13    record, Hal Morris, assistant attorney general, on behalf of

14    the Texas Railroad Commission.

15         Your Honor, we were advised by debtor late last

16    night of this change.  It is, in fact, acceptable to the

17    railroad commission.  I am pleased to advise Your Honor that

18    the railroad commission continues to try to expedite the

19    proceedings regarding the substitution of collateral.  The

20    matter has been assigned to an administrative law judge at

21    the railroad commission, who I anticipate will be able to

22    file a proposal for decision prior to the commissioner --

23    the railroad commission, Your Honor, has three commissioners

24    who will be meeting on June 17th, I believe, in an open

25    meeting to decide the matter, and it is our hope that this

1   matter can be timely brought before them for the

2   commission's approval or disapproval on June 17th.

3           So, Your Honor, if Your Honor is willing and able

4   to enter a final order today, that will, in fact, expedite

5   this process, because, as we indicated in a pleading that we

6   filed yesterday and as the debtor accurately stated in their

7   response to one of the objections, the railroad commission

8   will not be able to consider the matter unless there is a

9   final order approving the carve-out.  So, in answer to

10  Your Honor's question, this is an acceptable resolution to

11  us, and we look forward to continuing to work with the

12  debtor, the committee, the Court, and the other parties in

13  the matter as we move the case forward.

14          Thank you, Your Honor.

15          THE COURT:  Thank you very much.  That's very

16  helpful.  Thank you.

17          MR. HUSNICK:  Thank you, Your Honor.

18          THE COURT:  As to signing a final order, I can

19  only sign it when I'm given it, and hopefully, when I do

20  that, I'll be able to turn it quickly.

21          MR. HUSNICK:  Thank you.  The last piece,

22  Your Honor, on the settlement agreement with the ad hoc

23  group of TCH lenders related to sizing has to do with the

24  remaining portion of the DIP funds.  So again, we started

25  with $4.475 billion in total DIP funds.  If you take away

1    the $1.1 billion of delayed draw term loan, that leaves you

2    with $3.375 billion.

3           Of that, Your Honor, the debtors have agreed that

4    the last $300 million will be subject to further order of

5    the Court as to an actual draw on the revolver.  So, to

6    state that another way, Your Honor, we will get full

7    approval of the 4.475 billion now, and the debtors will sign

8    a credit agreement that lends that money to the debtors, but

9    the debtors will agree in the form of order that, as to the

10   last $300 million, before that amount is drawn on the

11   revolver, we must either obtain the consent of the TCH ad

12   hoc group or come back to Your Honor and get a further order

13   of the Court allowing us to draw the last $300 million.

14          That, Your Honor, I believe, would resolve the

15   objections of the creditors' committee and the TCH ad hoc

16   group as to the size of the DIP facility.

17          The last item that I'll address from the DIP

18   facility also just crosses into cash collateral, but it

19   relates to the challenge period and the budget that's

20   available to the creditors' committee to bring challenges

21   against the liens of the first lien lenders.  Your Honor,

22   the challenge period was originally proposed to be 60 days,

23   and the parties have agreed to extend that period to 135

24   days from entry of the interim order.

25          In addition, the parties have agreed to increase

1    the challenge budget from 175,000 to $500,000.  With those

2    modifications -- those are the primary substantive

3    modifications -- I believe that we have agreement amongst

4    the parties, and we just need to negotiate the form of

5    order, which made significant progress last night and even

6    this morning, but I believe it will probably take us to

7    after the lunch hour to get a final draft that we could walk

8    Your Honor through on the record and explain the various

9    other changes.

10            The last thing I'll mention, Your Honor, is the

11   changes I've summarized today that accomplish the settlement

12   agreement amongst the creditors' committee and the ad hoc

13   group will require an amendment to the first credit

14   agreement that was signed during the interim period.  The

15   parties are going to negotiate that amendment and embody the

16   settlement that we discussed today within the terms of that

17   amendment.

18            We've been informed that there may be a fee

19   associated with that amendment.  We are not asking

20   Your Honor today to approve that fee in connection with the

21   final order.

22            Instead, what we are proposing -- and you'll see

23   the language in the final order, and I believe we've

24   discussed this with each of the Office of the United States

25   Trustee, the creditors' committee, and the Paul Weiss Group,

1    and the DIP lenders -- that there will be a requirement to

2    the extent that we are obligated to pay a fee, that there

3    will be notice given to those parties and an opportunity for

4    those parties to object to the additional fee in connection

5    with the amendment that is necessary to accomplish the terms

6    of the final order.

7                 With that, Your Honor, I think I've covered off

8    the DIP issues, and I can, unless you have any questions,

9    stand down.  Again, as to the record, we did produce live

10   testimony at the first day hearing, a declaration from

11   Mr. Keglevic, a declaration from Mr. Goldstein.  We would

12   like to incorporate that record from the first day hearing

13   as part of the record today here at the final hearing, and,

14   with that, as to the DIP in particular, I believe the

15   debtors are prepared to rest on the evidence that they've

16   put into the record as it relates to the DIP.

17                 THE COURT:  Okay.

18                 Solely with regard to the evidence, assuming

19   everything's consistent with what the parties think they

20   agree, is that okay?

21                 MR. SHORE:  With one clarification, it is.  The

22   declarations that were submitted in connection with the DIP

23   were also submitted in connection with cash collateral.

24   Entering it into the record on the DIP portion of the

25   contested matter I'm not waiving my -- or I don't want to

1    waive my evidentiary objection on whether or not they are

2    appropriate evidence on the cash collateral motion.

3             THE COURT:  Okay.  Nor would I expect you to.

4             MR. MCKANE:  And to be clear, Your Honor, as it

5    relates to cash collateral, --

6             THE COURT:  For the record -- I'm sorry.

7             MR. MCKANE:  I'm sorry.  For the record, Mark

8    McKane, Kirkland & Ellis, (indiscernible - 11:31:22).  As it

9    relates to the evidentiary record for cash collateral, the

10   parties still haven't been able to resolve their issues.  We

11   will be making those witnesses available, and I believe

12   those declarations were in evidence in both previous -- for

13   both previous motions, but we'll address the evidentiary

14   issues in the cash collateral portion of the specifics

15   (sic).

16            THE COURT:  All right.

17            Let me hear from the other parties, and then, I

18   think I might have a question, but --

19            MR. GOREN:  Thank you, Your Honor.  Todd Goren,

20   Morrison & Forester, on behalf of the proposed counsel for

21   the official committee of unsecured creditors.

22            As we set forth in our objection, we have some

23   real issues with the direction the case is proceeding on

24   generally and the relief sought in both the DIP and cash

25   collateral motions, in particular.  The fight as to the

1    general direction on the case is for another day.  We're not

2    going to get into that now.

3           Hopefully, there will continue to be productive

4    discussions on that front and a resolution can be reached as

5    to the broader issues, but, with respect to the relief

6    sought here, we worked very hard over the last couple of

7    weeks with both the prepetition and the postpetition lenders

8    and were able to reach the resolution Mr. Husnick set forth

9    on the record with respect to the DIP.

10          Ultimately, you know, as with any negotiation,

11   there's a little bit of give and take, and, you know, you

12   didn't get everything you wanted, but, in general, the

13   committee believes that the resolution reached on the DIP

14   financing is acceptable, and we do support entry of the

15   motion -- entry of the order.  Thank you, Your Honor.

16          THE COURT:  All right.

17          Anyone else?

18          Mr. Shore?

19          MR. SHORE:  Chris Shore, on behalf of the ad hoc

20   group of TCH noteholders.  We had two concerns with the DIP

21   or two categories of concern.  One was with respect to what

22   was happening to the unencumbered assets and what providing

23   liens on those assets to the DIP lenders would mean in the

24   context of the benefit the estate was getting from the DIP.

25          If one believes the thesis that's being pursued by

1   the debtors that there is no equity in the first lien

2   lenders' collateral, that's gotten resolved with respect to

3   the DIP with the commitments that Mr. Husnick read into the

4   record.  Issues with respect to DIP sizing were related to

5   the concept that just because you can get the debt doesn't

6   mean you should borrow the debt and certainly doesn't mean

7   you should spend the debt.  That's how every Chapter 13 case

8   starts.

9           With respect to the railroad commission, we take

10  the debtors at heart that they are going to use their best

11  efforts to get them to accept the carve-out rather than cash

12  funding with DIP interest expense on the railroad commission

13  bond, and so, that's resolved.  Our concern with excess

14  liquidity and whether Your Honor had any questions on that

15  -- there have been a number of moves since the first day

16  motions, right?  The DIP motion was filed with the DIP

17  budget and the tiny numbers over a 24-month period.

18          There have been material adjustments that have

19  been made, including the taking out of the $300 million of

20  prepetition first lien principle payment, variants to budget

21  with respect to how successful they've been on their first-

22  day motions, the removal of the $69 million payment, the

23  lowering assumptions on the tax stuff, some of which we can

24  get into when we get into cash collateral, but we just

25  didn't want to create a situation in which the management,

1    which had set the budget and said we can live by this budget

2    and this is why the DIP is right-sized, to then take the

3    opportunity to use that excess liquidity to, for example, go

4    out and paint all the power plants.

5           We expect the debtors to operate as best they can,

6    pursuant to the budget, and putting at least this governor

7    in place on the last 300 kind of gives us the protection

8    that we're not getting into a situation where management has

9    wildly changed its business assumptions and has just used

10   the opportunity of excess liquidity to engage in that

11   activity without consulting the creditors first.

12           THE COURT:  Okay.

13           MR. SHORE:  With respect to the funding of the

14   adequate protection, they're getting authorization to borrow

15   over the next 24 months $2.9 billion to make adequate

16   protection payments that we are agreeing as part of the DIP

17   they can get authorization to borrow that amount, but,

18   whether or not it's appropriate to be making those payments

19   in the context of everything else that's gone in the case,

20   we're just going to reserve for the cash collateral.

21           THE COURT:  Well, that actually touches on my

22   question that I thought I had, and that deals with adequate

23   protection.  Is there anything in the DIP order that's

24   providing adequate protection to the existing first lien

25   lenders as adequate protection because of the priming, or

1    are all the adequate protection provisions in the cash

2    collateral order and apply to both being primed and the use

3    of cash collateral?

4              MR. SHORE:  All right.  Well, that's one issue I'm

5    trying to resolve with the 2.9 right now.  If they don't get

6    authorization to spend, you know, $100 million a month,

7    they're not going to be drawing under the DIP to spend $100

8    million a month.

9              THE COURT:  I understand that part.

10             MR. SHORE:  The other intersection we see -- and

11   then, others can respond -- is the cash collateral order as

12   adequate protection provides adequate protection liens for

13   diminution in value secured by collateral as defined in the

14   DIP.  It is our view now that, since the DIP lenders have

15   agreed to carve out unencumbered assets -- that is not take

16   liens on certain things -- the first lien lenders who

17   bargained for in the cash collateral order, you know, a

18   perry (sic) treatment essentially -- well, a same collateral

19   pool, that that would resolve issues with respect to any

20   cash collateral objection to the encumbering of unencumbered

21   assets.

22             In other words, --

23             THE COURT:  I see.

24             MR. SHORE:  -- as long as the first lien lenders

25   are agreeing that they're getting exactly the same

1    collateral for their adequate protection liens as the DIP

2    lien lenders, we can carve out the whole area of objection

3    with respect to the cash collateral order.

4              THE COURT:  And I understand that, and my question

5    is more my understanding of the adequate protection -- and

6    let's talk more specifically about the payments, the

7    adequate protection payments.

8              MR. SHORE:  Uh-huh.

9              THE COURT:  Were that they were adequate

10   protections for both the use of cash collateral and for

11   being primed.  And my question is where -- I'm glancing

12   through the order as I'm sitting up here trying to remember

13   whether the provision that provides adequate protection for

14   being primed is in this order, or is it in the cash

15   collateral order or both or neither?

16             MR. SHORE:  All of the adequate protection

17   provisions are contained in the cash collateral order.

18             THE COURT:  Okay.  But they would include -- at

19   least they argue you're including adequate protection for

20   both use of cash collateral and your cross-referencing being

21   primed?

22             MR. SHORE:  Correct.

23             THE COURT:  Okay.  We'll talk about that,

24   obviously, on a contested basis when we get there.

25             MR. SHORE:  Right.  And --

```
 1              THE COURT:  I'm assuming that your reservation of
 2    rights on whether they should be allowed to make the
 3    adequate protection payments would include both pieces of
 4    that, use of cash collateral and whether they're being
 5    primed.
 6              MR. SHORE:  Yes.
 7              THE COURT:  Okay.
 8              All right?
 9              MR. SHORE:  And, with that, we have no objection
10    to entry of the DIP order.
11              THE COURT:  Okay.  Thank you.
12              Anyone else?
13              All right.
14              MR. HUSNICK:  Your Honor?
15              THE COURT:  Oh, I'm sorry.  Do you have anything
16    else on that?
17              MR. HUSNICK:  No.
18              THE COURT:  Okay.
19              MR. HUSNICK:  I was just going to say that the
20    form of order -- and, for Mr. Morris' benefit, I will do the
21    best we can if we take a lunch break later after the
22    evidentiary basis, to get that order done so we can present
23    it to Your Honor and walk Your Honor through the changes.
24              THE COURT:  All right.  Well, subject to it
25    reflecting what's been put on the record, I'll approve it.
```

1    Of course, the devil's in the details.

2            MR. HUSNICK:  Yes, Your Honor.  Thank you,

3    Your Honor.

4            The next item on the agenda is the debtors' motion

5    for consensual use of cash collateral.  Your Honor, as I

6    said just a few minutes ago, we did negotiate a full

7    resolution of objections from the official committee of

8    unsecured creditors as well as any concerns of various other

9    parties that could be addressed in the form of additional

10   language.  Those settlements, like the DIP -- excuse me --

11   include a few modifications to the order that I'd like to

12   just highlight for the record.

13           First, the prepetition secured lenders have agreed

14   that they will not have liens on the unencumbered assets but

15   do have superpriority claims as to all unencumbered assets,

16   except the avoidance action.

17           THE COURT:  Are we talking -- I'm sorry.  We

18   jumped to the cash collateral now?

19           MR. HUSNICK:  Yes.

20           THE COURT:  Okay.

21           MR. HUSNICK:  I'm sorry.

22           THE COURT:  Thank you.

23           MR. HUSNICK:  You need me to repeat that?

24           THE COURT:  No.

25           MR. HUSNICK:  Okay.

1          THE COURT:  That's fine.

2          MR. HUSNICK:  Your Honor, --

3          THE COURT:  And so, that's the point Mr. Shore

4    raised just a few seconds ago.

5          MR. HUSNICK:  Correct.  So --

6          THE COURT:  I think resolves it in a manner

7    consistent with what you thought you wanted, Mr. Shore.

8          MR. HUSNICK:  No, to be specific, I think what

9    Mr. Shore was asking for not only would be the no liens, but

10   also no claims as to the avoidance action or as to the

11   unencumbered assets, no superpriority claims.

12         THE COURT:  That's an open issue?  Okay.

13         MR. HUSNICK:  Your Honor, with that change, we,

14   again, would resolve the issues with the official committee

15   of creditors on the DIP liens and claims.

16         THE COURT:  All right.  Let me make a note.

17         MR. HUSNICK:  Sure.  Sure.  So, just for the

18   record, I'll clarify one more time.  There will be no liens

19   on unencumbered assets.  However, the prepetition lenders

20   will have superpriority adequate protection claims as to all

21   unencumbered assets, except for the avoidance actions.

22         Your Honor, on the challenge --

23         THE COURT:  Hang on.  Hang on.  Hang on.  Hang on.

24         MR. HUSNICK:  Sorry.

25      (Pause)

1          MR. HUSNICK:  And just, Your Honor, to clarify, --

2          THE COURT:  Hang on.

3          MR. HUSNICK:  Sorry.

4          THE COURT:  When I look up, I'll be ready to hear

5    from you.

6          MR. HUSNICK:  Okay.

7          THE COURT:  All right.  So, for adequate

8    protection, there'll be no liens on any currently

9    unencumbered assets?  There will be proposed superpriority

10   claims for diminution?  Well, let me take out for

11   diminution.  We'll talk about that in a second.

12         There'll be superpriority claims on all assets,

13   except proceeds of avoidance actions?

14         MR. HUSNICK:  Correct.

15         MR. SHORE:  Your Honor, if we could maybe clarify,

16   because I think that's the -- you don't have a claim on an

17   asset.  They have claims that can be satisfied out of --

18         THE COURT:  That was loose language by me.  I

19   apologize.

20      (Pause)

21         THE COURT:  So claims to be satisfied out of all

22   assets, other than the proceeds of avoidance action?

23         MR. HUSNICK:  Correct.

24         THE COURT:  Okay.  All right.  Go ahead.

25         MR. HUSNICK:  I guess the takeaway is no liens, no

1    superpriority claims as to the avoidance action.

2            THE COURT:  And how is that different from what we

3    just talked about in connection with the DIP?

4            MR. HUSNICK:  The delta is in -- for the DIP

5    lenders, they will have the liens and the superpriority

6    claims on the unencumbered assets, other than the avoidance

7    action, and they'll have superpriority claims only as to the

8    avoidance action.  So the delta is whether there's a

9    superpriority claim as to the avoidance action -- or the

10   proceeds of the avoidance action.

11           THE COURT:  Unencumbered as to (indiscernible).

12           MR. HUSNICK:  Yes, and the liens.  There are liens

13   on the unencumbered assets are the DIP.

14           THE COURT:  Will the --

15       (Pause)

16           THE COURT:  Does the marshalling requirement in

17   connection with the liens on unencumbered assets, except for

18   proceeds of avoidance action, apply to satisfying the

19   superpriority claims under the adequate protection

20   provision?

21           MR. HUSNICK:  There is no marshalling requirement

22   in -- go ahead, do you want to answer the question?

23           MR. GORDON:  Yes, sorry.  Your Honor, Todd Gordon,

24   Morrison & Foerster on behalf of the official committee of

25   unsecured creditors.

1             There's no strict marshalling provision since

2     there's no lien on any of the unencumbered assets in the

3     cash collateral order, but what we did negotiate was some

4     language that makes clear that consistent with what Section

5     507(b) of the Code says, that they only can assert their

6     superpriority claim if the other adequate protection granted

7     to them, namely the liens and adequate protection payments,

8     is insufficient to satisfy any diminution in values.  It's

9     similar to marshalling, but a little bit different.

10             THE COURT:  All right.

11             MR. HUSNICK:  As to the challenge period, Your

12     Honor, I think I mentioned earlier the period will be 135

13     days from entry of the interim order and the challenged

14     budget will be increased to $500,000.  There are various

15     other tweaks to the language that have been agreed to

16     between the parties to accomplish some of the -- but suffice

17     to say, on some of the bigger ones, like 506(c) waivers and

18     552(b) waivers, and a full marshalling waiver, those issues

19     remain open.

20             In addition, as Mr. Shore said, I believe the

21     superpriority claims on the avoidance action issue remains

22     open, and the size of the adequate protection payments

23     remains open vis-à-vis the TCH ad hoc group.

24             The last issue I'll mention just at this point and

25     I'll reserve for argument is the objection from Aurelius

1    Capital.  Aurelius is a TCH first lien noteholder and they

2    filed an objection that relates to a dispute under the

3    inter-creditor agreement among the first lien creditors as

4    to the disposition of the adequate protection payments that

5    will -- or would be provided under the cash collateral

6    order.

7              The debtors and the ad hoc -- or certain members

8    of the first lien ad hoc group have agreed to include

9    language in the order responsive to the Aurelius objection.

10   Effectively, what that language does, Your Honor, is

11   establish an escrow for the disputed portion of the adequate

12   protection proceed -- or the adequate protection payments

13   that will be held for the benefit of either the first lien

14   credit agreement lenders, or the first lien noteholders,

15   depending upon who prevails in that inter-creditor dispute.

16             Your Honor, based on that, it is the TCH debtors'

17   position that the objection should be resolved and that the

18   inter-creditor dispute can be resolved later.  I believe

19   there's disagreement on that point and we can discuss that

20   further at the appropriate time.

21             Before we get into the argument on the remaining

22   open issues, Your Honor, unless you have any questions about

23   the terms of the deal I articulated, which are in the

24   process of being memorialized in the order, Your Honor, I

25   would flip to the evidentiary or begin the evidentiary

1    portion of the cash collateral hearing.

2          THE COURT:  Let me hear from the objectors, their

3    position on what's open that I -- if that's -- that'll help

4    me understand what to focus on because it's a little --

5          MR. HUSNICK:  Thank you, Your Honor.

6          THE COURT:  I'm a little vague on it.

7          MR. HUSNICK:  Okay.

8          THE COURT:  So --

9          MR. WEINTRAUB:  Good morning, Your Honor.  William

10   Weintraub of Goodwin Procter for Aurelius.  The proposed

11   escrow and delay of a determination of our issue doesn't

12   resolve our issue, Your Honor.  We believe that we have a

13   present right to payment, what is provided for under our

14   inter-creditor agreement, and that there's no basis to

15   unilaterally come up with a different formula than what is

16   in the inter-creditor agreement, escrow the difference and

17   delay us indefinitely.  We'd like to be heard today on that,

18   Your Honor.

19         THE COURT:  Okay.  And I understand the position

20   of the other side is you have no standing.  So, we'll take

21   that up.  Mr. Lauria?

22         MR. LAURIA:  Good morning, Your Honor.  My name is

23   Tom Lauria.  I'm with White & Case.  I represent the ad hoc

24   group of lenders.

25         I think I followed the presentation here and I'm

1    going to state back what I understand the situation to be as

2    far as the liens under the DIP and the cash collateral

3    protections.  And I think if I've got it right, I think

4    we're in agreement on the scope of the liens and the

5    superpriority claims.  And then we'll have just a couple of

6    other points that we're reserving on and we'll argue about.

7              With respect to the liens, it is my understanding

8    that the DIP lenders are taking a lien on the unencumbered

9    assets except for the avoidance actions and the proceeds

10   thereof, and that they are getting a superpriority claim on

11   the proceeds of avoidance actions, and that they are

12   agreeing that they will exhaust their other collateral

13   before they seek to get recovery from the unencumbered

14   assets or the proceeds of the avoidance actions.

15             With respect to cash collateral, it is my

16   understanding that the first lien lenders are not getting a

17   lien on the unencumbered assets, or the avoidance actions,

18   or the proceeds thereof.  But they are getting a

19   superpriority claim that can be enforced against the

20   unencumbered assets excluding avoidance actions or the

21   proceeds thereof.  And they are agreeing that they go to the

22   unencumbered assets or the proceeds -- that they go into the

23   unencumbered assets only if they can't otherwise get

24   compensated for any diminution in the value of their

25   collateral from their other sources of recovery.

1           So, with that --

2           THE COURT:  Okay, I understand.  With that, that

3    satisfies your issue?

4           MR. LAURIA:  Right, correct.

5           THE COURT:  Okay.

6           MR. LAURIA:  So, what we have left to argue about

7    is the -- whether or not the other elements of adequate

8    protection being provided to the prepetition lenders are

9    necessary and appropriate.

10          And in particular, the issue that we're really

11   focusing on is the need to make payments that are going to

12   exceed two and a half, or could exceed two and a half

13   billion dollars, over a hundred thousand -- a hundred

14   million dollars per month during the pendency of this case,

15   which is characterized as interest subject to some

16   determination at a point in time as to whether or not the

17   first lien lenders are over secured, in which I -- in which

18   case I presume the parties would have the right to re-

19   characterize the payments as principal payments.  But

20   whether or not that payment strain is necessary and

21   appropriate adequate protection on top of the other things

22   that are being provided here, and I think we're also going

23   to talk a little bit about the appropriateness of the 506(c)

24   waiver under the circumstances of this case and the

25   appropriateness of the lien challenge period in the context

1    of cash collateral.

2            Now, I understand that the lien challenge period

3    has been baked -- or is being baked into the DIP order as

4    well.  I'm not sure I understand why it's in both orders

5    because it's really -- it's really a protection for the

6    existing first lien claims.  But in any event, I think those

7    are the things that we want to argue about.

8            THE COURT:  Very good.  That's very helpful, thank

9    you.  All right, let's turn it back over to the debtor.

10           MR. HUSNICK:  Thank you, Your Honor.

11           At this point, I would like to turn to the

12   debtors' affirmative evidentiary case in support of the

13   final cash collateral order.

14           THE COURT:  Okay.

15           MR. HUSNICK:  Your Honor, as we've done on certain

16   of the other motions, we did have a lengthy evidentiary

17   hearing at the interim hearing wherein we submitted the

18   declaration of Mr. Paul Keglevic, the declaration of

19   Mr. Steven Goldstein, and again oral and -- or should I say

20   live testimony from both Mr. Keglevic and Mr. Goldstein in

21   support of, I think it was in context of both the cash

22   collateral and the DIP motion.

23           Your Honor, we'd ask that that evidence be

24   incorporated into this record for purposes of the final

25   hearing, again subject to appropriate cross, which I'm sure

1  there will be and we, I believe, will offer a short direct

2  of our witnesses, as well.  That's it.

3              THE COURT:  Okay.

4              MR. SHORE:  I just object to the entry of the

5  declarations until the cross is completed (indiscernible).

6              THE COURT:  Very good.  That's fine.  Thank you.

7              MR. HUSNICK:  With that, Your Honor, I'll cede the

8  podium to my colleague, Mr. McKane.

9              THE COURT:  All right.  Yes, sir?

10             MR. SHORE:  Can we discuss scheduling for a bit?

11 When do you -- I can probably get -- well, there are two

12 things going on, right?  I have a shorter Mr. Goldstein

13 cross and a longer Mr. Keglevic cross.  But in light of

14 where we've gotten on unencumbered assets, I can probably

15 carve out pieces of those crosses that are no longer

16 relevant.  So, I can do it however Your Honor wants

17 (indiscernible) --

18             THE COURT:  Well, I was planning on taking a --

19 taking the lunch break about -- I have a call that's

20 supposed to happen about 12:30.  So, I was planning on

21 breaking around then, probably for an hour and 15 minute

22 lunch and include, you know, the ability of people to do

23 some work and also get in and out of the building.

24             So, it -- maybe it makes sense to put the direct

25 on and leave cross for after lunch, however that means you

1    won't be able to talk to your client during the interim.

2              MR. MCKANE:  Your Honor, Mr. McKane of Kirkland &

3    Ellis on behalf of the debtors for the record.

4              Given where we are in terms of how we shape this,

5    I believe that Mr. Keglevic would be complete with his

6    direct examination before the 12:30 break.  And given that

7    he would be the primary witness, I think it makes more sense

8    to proceed with Mr. Keglevic than to put in Mr. Goldstein.

9              THE COURT:  All right.  Let's put Mr. Keglevic in

10   on direct.  Very good.  You may take the stand, sir.  And

11   you need not swear the witness, he's been previously.  Al,

12   we're good.

13             All right, you're still under oath, sir.

14             MR. KEGLEVIC:  Yes, sir.

15        (Witness previously sworn)

16                      DIRECT EXAMINATION

17   BY MR. MCKANE:

18   Q    With one minute to spare, good morning, Mr. Keglevic.

19   A    Good morning.

20   Q    Can you --

21   A    (Indiscernible).

22   Q    -- please remind the Court of your position with the

23   debtors?

24   A    I am the chief financial officer of TCEH and EFH.

25   Q    And do you also hold a title as it relates to the

1    restructuring?

2    A    Yes, I'm the co-chief restructuring officer.

3    Q    And can you briefly describe for the Court your

4    involvement in the negotiation of the DIP facility and the

5    cash collateral package?

6    A    Yes, the DIP facility was -- I was not personally

7    involved in the day to day negotiations, but people who

8    report to me conducted the negotiations with the banks and

9    the group of banks that we -- ended up being reflected in

10   the documents that are, I think, have been incorporated into

11   the record.

12           A key element of that negotiation, obviously, to

13   get the lowest possible price in connection with the DIP

14   facility was to assure that we had priming liens and to get

15   the priming liens, we had to have the negotiation of cash

16   collateral with the TCH first lien lenders.  And, in fact,

17   to -- the negotiation resulted in, we received the ability

18   to get priming liens, the use of their cash collateral, no

19   milestones for 18 months, and then the ability to, if we

20   went past 18 months to come to the Court and ask for further

21   use of the cash collateral.  And in return, we agreed to the

22   liens that, some of which have now been changed and also

23   that we would pay them adequate protection at the amounts

24   that were negotiated.

25   Q    We'll get to the adequate protection payments in a

1    moment, but the cash collateral package that was negotiated,

2    did you -- was that viewed as a success by the debtors -- by

3    the TCEH debtors?

4    A    Yes, absolutely.

5    Q    And can you explain to the Court how the DIP agreement

6    and the cash collateral order were or were not conditioned

7    to the RSA?

8    A    Yes, they weren't conditioned.  It was a standalone

9    separate negotiation.  As you're probably aware, there are

10   many milestones in the RSA, but as I indicated, the lack of

11   milestones in the DIP order, we thought, was paramount to

12   maintaining or maximizing the value of the enterprise during

13   the duration of this case.

14   Q    And what was the overall goal of the debtors in

15   negotiating this DIP and cash collateral package?

16   A    It was, once again, to maximize enterprise value by

17   having the full use of the cash collateral and to minimize

18   the cost of the DIP, and to have a DIP that was

19   appropriately sized to allow us to operate the business in a

20   most efficient manner.

21   Q    And did the debtor -- how did the debtors evaluate the

22   size of the adequate protection payments as a component to

23   securing what you believe is the lowest cost financing?

24   A    It was through negotiation and ultimately, you know, we

25   looked at -- we certainly started with trying to provide

1   lower adequate protection payments, but were, at the end of

2   the day, unsuccessful in getting the use of the cash

3   collateral and the priming DIP liens, which led to the lower

4   cost DIP, and therefore ultimately had to, in the

5   negotiations, agreed to paying them the adequate protection

6   that's reflected in the order.

7   Q    Let's pause there for a second as it relates to the

8   adequate protection payments.  And without getting any --

9   into any privileged communications, did the debtors, the

10  TCEH debtors, evaluate your options in terms of whether to

11  pay any adequate protection payments at all to the

12  prepetition first lien creditor group?

13  A    Yes, we reviewed scenarios where there would be no

14  adequate protection payments and, you know, that we then

15  couldn't get the priming liens.  I think we talked about it

16  at the last hearing, you know, such as a drop down structure

17  where effectively we could dip around the first lien lenders

18  without their cooperation, and ultimately that we did not

19  have the ability under the credit agreement to get enough

20  funds to operate the business in the manner that would

21  maximize enterprise value.

22          So, at that point, we knew we had to get the

23  cooperation of the first lien lenders and, like any other

24  negotiation, we would -- you know, we tried to get the

25  lowest possible amount of adequate protection payment we

1    could get, but at the end of the day were unsuccessful.

2              MR. SHORE:  Your Honor?

3              THE COURT:  Yes, sir.  Sorry.

4              MR. SHORE:  May I just interpose an objection I'd

5    like to carry.  Rather than voir dire the witness right now

6    and his involvement, I think he started out saying he did

7    not negotiate, he sent people to negotiate.  I'll follow up

8    with questions, but to the extent he -- his answers are

9    coming out now with respect to what the debtors did and did

10   not do in the negotiations, I'll just carry that to cross if

11   I could.

12             THE COURT:  All right.

13             MR. MCKANE:  Why don't -- let's just address some

14   of it now to make it absolutely clear.

15   BY MR. MCKANE:

16   Q    Sir, can you explain your role in terms of serving as a

17   director or member of management directing these

18   negotiations?

19   A    Yes, as a -- I was -- you know, the knowledge I

20   received was from the people who were having the direct

21   negotiations and I would routinely get updates.  I was

22   obviously very interested in achieving the objectives that I

23   stated previously that we get the, you know, lowest possible

24   -- an adequate DIP loan at the lowest possible rates and use

25   of the cash collateral, that we looked at that as a package

1    and that, you know, the people that were doing the

2    negotiation reported to me as the negotiations were going

3    on.

4    Q    And let's put a finer point on it.  The people who were

5    doing the -- who were the people leading these negotiations?

6    A    There were two different groups on the -- I think

7    primarily it was the -- my treasurer and financial advisors

8    on the DIP side with the DIP lenders and Ms. Dore supported

9    by Kirkland & Ellis on the cash collateral side.

10   Q    And as it relates to the financing, your treasurer is

11   someone who is a direct report to you, is that right?

12   A    Yes, she is.

13   Q    And as it relates to the cash collateral side,

14   Ms. Dore, as the general counsel, is someone who also

15   reports to you as a TCH director in some ways, is that

16   right?

17   A    Yes, as a TCH director and as a co-CRO we keep in

18   communication frequently.

19   Q    And the information you were receiving, were you -- was

20   there delay in that?  Was it real time?  How would you

21   characterize it?

22   A    It was fairly close to real time.  I mean it was,

23   generally speaking, after the conclusion of the sessions,

24   but there may have been some notes and things during breaks

25   and sessions.  I can't recall all of it, but it was pretty

1    close to the actual negotiation.

2    Q    And, sir, as it relates to these discussions, you know,

3    we've talked about the signs of the DIP, can you address for

4    the Court whether the DIP alone satisfies the cash needs of

5    the company over the 24 month period?

6    A    No, as reflected in the DIP budget, I think it's the

7    first major subsection of that document, there's

8    approximately a billion and a half dollars of what we call

9    unlevered cash flow that is just produced by the operations

10   of the company without burdening it for any interest

11   expense.

12   Q    And what would be the impact on the company if you were

13   unable to access the cash collateral generated by the

14   business?

15   A    Well, we would -- we wouldn't have had -- if, at the

16   end of the day we didn't get that billion and a half

17   dollars, obviously we would have had a shortfall in the

18   amount of the DIP sizing, but frankly, it's more complex

19   than that because if we didn't get the use of the cash

20   collateral, we probably wouldn't have got the priming liens

21   and we probably would have had an entirely different DIP

22   package.  And at the end of the day, as I said, we evaluated

23   that there was no alternative to this approach to get the

24   amount of the money that we needed to operate the business.

25   So, therefore, we were in this situation where they were

1    integrated and integral to the overall, you know, success

2    and our business judgment as we had to proceed in that path

3    for that reason.

4    Q    Well, let's unpack that a little bit.  The DIP budget

5    that the Court has, you know, and that has been filed with

6    this -- you know, on the record, has as you mentioned it, a

7    certain entry of over a billion dollars for unlevered pre-

8    cash, right?

9    A    That's correct, over the 25 month period.

10   Q    And is it -- can you explain to the Court how the

11   consensual use of cash collateral directly ties to the

12   ability of the companies to generate that amount of

13   unlevered pre-cash?

14   A    Sure.  It's the use of the cash collateral that

15   effectively pays the day to day operating expenses, the fuel

16   expenses, the cost of the people, the cost of the vendors,

17   you know, ultimately, the capital expenditures associated

18   with the maintenance of the plants, and the mines, you know,

19   it's -- the lifeblood of the company is the cash collateral

20   and effectively what we're borrowing for is for -- you know,

21   if you look at the big pieces, it's the Railroad Commission

22   of a billion one.  It's a billion one to support the hedging

23   and trading operation of the company.  It's $900 million

24   associated with the cost of this case, the estimate of

25   business disruption, and the fees.  When you add, you know,

1    those three things together, that's $3.1 billion.

2            And then there is a shortfall, the difference

3    between the unlevered cash flow and the amount we're paying

4    at adequate protection adds the other billion four.  That

5    comprised the approximate $4.5 billion we asked for in the

6    DIP.  Now, there's other puts and takes, obviously, but

7    that's generally speaking how we derived at the number.

8    Q    And did the debtors --

9            THE COURT:  All right, so I'm sorry.  So exclusive

10   the adequate protection payments, you've got approximately

11   3.1 billion, which is the Railroad Commission, the hedging

12   issues, and the cost of case.  And assuming you had use of

13   cash collateral without funding adequate protection

14   payments, cash collateral alone only would generate 1.5

15   billion.  So you have a $1.6 billion shortfall there, right?

16           THE WITNESS:  Yes.

17           THE COURT:  Okay.  And you'd have to get that

18   somewhere in your -- (indiscernible) is going to have to be

19   that you went -- for that you had to go to a bank and the

20   price of the bank was the priming lien, and the price of a

21   priming lien was adequate protection payments.

22           THE WITNESS:  That's correct.

23   BY MR. MCKANE:

24   Q    And, sir, did -- as part of that analysis, did you

25   evaluate what impact on the business could happen, and I

1    think you touched on this a little bit in the first day's

2    deposition -- first day hearing if you didn't have

3    consensual use of cash collateral on the first day?

4    A    If we didn't have use of cash collateral on the first

5    day, obviously we took a huge risk with respect to

6    disruption of the business.  We -- you know, as I said,

7    since it's so integrated to getting the liens, we would've

8    gotten a DIP that would have been -- well, who knew if we

9    could've gotten a DIP -- but the cost of any borrowing we

10   would have had to get -- gotten would have been severely

11   limited in terms of size and it would have been

12   significantly more expensive than the one we were able to

13   achieve, which, you know, I think the rate we have for this

14   DIP is very, very competitive and good for the company.

15   Q    And as to the size of the adequate protection payments,

16   what happens if at the end of the case is the determination

17   that the value of the collateral of the first lien lenders

18   is not equal to the entire face value of their debt?

19   A    And my understanding is that it -- those "excess

20   payments", if any, based on the termination of the

21   diminution of the value of the collateral can be re-

22   characterized as a reduction of the principal amount of the

23   claim of the first liens.

24   Q    Can you clarify for the Court what determination the

25   debtor took -- undertook to evaluate whether the value of

1    the collateral of the TCH first liens was within the zero to

2    face value of the debt range?

3    A    We, you know, we were constantly -- there are many

4    public sources as to what the value of TCH were and, you

5    know, all of them indicated that they were -- that the value

6    of the company was less than the face value of the first

7    lien claim, that I've seen published.  I can't remember a

8    situation where there's any public information that

9    indicated pre-filing or post that the value of the company

10   exceeds that amount.  And then, you know, we relied also on

11   our financial advisor and Mr. Ying's advice to the TCH board

12   that I, you know, sit on was that the first lien, you know,

13   was impaired, was an impaired class of creditors based on,

14   you know, public information and, you know, just his years

15   of experience.  Although, you know, in fairness, he did not

16   present a formal valuation report.

17   Q    Sir, you -- is your -- you've had an opportunity to

18   review the objections that have been filed as the -- one of

19   the co-restructuring -- two restructuring officers, is that

20   correct?

21   A    Yes, that's correct.

22   Q    So, you're aware of some of the arguments that are

23   being made that the whole effort here, this whole

24   bankruptcy, really for the benefit of the TCH first lien

25   creditor group.  Are you aware generally of that assertion?

1    A    I've read that assertion?

2    Q    Okay.  In response to that assertion, I want to address

3    two things, but first can you explain to the Court the

4    decision the debtors have undertaken in terms of moving

5    forward with a -- hopefully putting together a tax-free

6    approach to the resolution of these cases and how that would

7    impact -- potentially impact the TCH unsecured creditors?

8    A    Yes, at the end of the day we started just with the

9    business judgment that if you can avoid tax, it is always

10   better to avoid it than to pay it.  And in the situation

11   that when we began dialogue in March 2013 with the TCH first

12   lien group, moments after we started with the discussion,

13   the -- you know, they indicated that there was a willingness

14   to effectively split from EFH, take the assets, and incur a

15   deconsolidation tax that their hope was that would be

16   stranded and never paid, or certainly not to be their

17   responsibility.

18           One of our concerns as -- at TCEH was that, you

19   know, there would certainly be claims that the IRS could go

20   after all entities in terms of collection of that ultimate

21   tax and that ultimately EFH, while they were the ultimate

22   taxpayer, they did have abilities, such as checking the box

23   and making TCH move from a disregarded entity to a regarded

24   entity for tax, which means it would have been joint and

25   several for any tax due.

1          That tax, in my understanding would have been that

2     that tax would have come in ahead of and the claim, as I

3     think I've mentioned before, could have been in the 3

4     billion to 4 billion dollar range and that tax would have

5     obviously had a claim just like the unsecureds do.  And you

6     know, effectively, my understanding is it would have wiped

7     out, based on that size, any claims that the unsecured have

8     given the size of that, or at least substantially reduced

9     any recoveries the unsecureds might have had.

10          So, you know, we spent a substantial amount of

11     time trying to come up with a structure.  Originally it was

12     to keep the company together and not incur the tax.  And

13     then as time went on, we -- and we couldn't get that deal

14     done because we couldn't get agreement from the -- as we've

15     called it, the E side of the house in terms of their value

16     and the T side of the house to come up with common

17     valuation.  So, both would ultimately own EFH, that we

18     determined that there was a -- in our belief, a strong

19     possibility that we could, under the Internal Revenue

20     Service guidelines, do a tax-free spin of TCEH and

21     therefore, you know, we thought that was the best our

22     business judgment was to avoid that tax, that was the best

23     path forward for the entire company, and that's the one we

24     ended up pursuing and that's reflected in the RSA.

25     Q    And does the current DIP and collateral package

1    structure, including the amount of time that those orders

2    would allow enable the debtors to pursue that path forward?

3    A    Yes.  You know, we -- obviously, the -- you know, we're

4    hopefully we can get it done within the 18 month period

5    where we have no milestones.  The RSA calls for, if I

6    remember correctly, 11, 12 month period and that -- so we

7    have some cushion to that amount that's in the cash

8    collateral order, so we saw it as being very facilitating to

9    the overall execution of the RSA and to avoid the tax.

10   Q    And, sir, just -- I apologize for doubling back on the

11   valuation questions, but I do have a couple others just to

12   clarify some things.  With regards to the advice you

13   received from Evercore, and in particular, Mr. Ying, while

14   that may have been oral, can you give the Court some

15   understanding of the amount of work, and effort, and time

16   that the Evercore team has invested in that determination?

17   A    Certainly.  You know, we engaged Evercore in -- I don't

18   recall the month, sometime I think it was mid-2012, but it

19   was 2012 for sure.  And they've spent a lot of time getting

20   used to our forecasts, and our -- the nature of our

21   operations, the -- you know, our hedge positions, you know,

22   every aspect of how our EBITDA is produced and how our

23   operations -- you know, the risks and opportunities of those

24   operations.

25           And I should add, we also had, you know, routinely

1   -- we had Duff & Phelps come in and do valuations that were

2   based on valuing the stock of EFH and that we had to use for

3   accounting purposes, you know, for good will impairment

4   purposes that our auditors had to look at, that we used Duff

5   & Phelps also to come in.  So, it wasn't just, you know,

6   Evercore's point of view.  It was -- we had previous

7   information from Duff & Phelps and there was a lot of other

8   public information available that we could look at.

9           MR. SHORE:  Motion to strike as non-responsive,

10  Your Honor.  The question was, what work has Evercore done.

11          THE COURT:  Agreed.  Sustained.

12          MR. MCKANE:  All right, well in addition to --

13          THE COURT:  Why are we going down this road?

14          MR. MCKANE:  Your Honor, I can just explain to

15  Your Honor we anticipate that the challenge will be that the

16  adequate protection payments are oversized in part because

17  there is no valuation decision determined as to whether --

18  you know, the adequate protection should be up to the value

19  of the collateral.  We -- that was one of the lines of

20  questions that we faced in -- at the deposition.

21          And so, to the extent that there's been no final

22  determination on that issue, we certainly wanted the Court

23  to understand that there has been significant amount of work

24  done to determine that there is substantial impairment at

25  that level, and ultimately, the decision of the debtors was

1    that to the extent that there may be, at the end of these

2    cases, a determination of an overpayment, it would be re-

3    characterized as principal.

4            THE COURT:  All right, let's move on.

5            MR. MCKANE:  Your Honor, if I could just have a

6    minute just to confirm, as I understand the scope of issues

7    that are remaining, I may have just one or two more

8    questions.  Could I have a moment, please?

9            THE COURT:  Yes, of course.

10       (Pause)

11   BY MR. MCKANE:

12   Q   Mr. Keglevic, I understand you're not a lawyer but I

13   also understand that you have been involved as the co-chair

14   restructuring officer in these issues for a while.  Can you

15   explain to the Court how the 50(c) -- 506(c) waiver played

16   into the negotiations that ultimately resulted in the cash

17   collateral package?

18   A   My understanding, it's just another priority lien that,

19   you know, that we provided a carve-out for $15 million of

20   professional fees that wasn't something else we had asked

21   the first lien to give as part of the negotiation.

22           MR. SHORE:  Objection, motion to strike that which

23   was asked of the first lien lenders.  He said he wasn't

24   involved in that and everything he knows is hearsay on that

25   regard.  He can say his own mental impression on it, which

1    may be done here about what 506(c) means, but what was said

2    to the lenders and what the lenders said to them on 506(c)

3    would be hearsay.

4              MR. MCKANE:  Let me respond, Your Honor.  The

5    compromise that was struck by the TCH debtors as to what to

6    get -- obtain in exchange for granting the 506(c) waiver was

7    made at the board level.  As a board member, he can discuss

8    what was the bid -- what was the quid pro quo for that

9    exchange and that's what we're trying illicit.

10             THE COURT:  I'll allow it.

11   BY MR. MCKANE:

12   Q    So, again, sir, as a member of the board, can you --

13             THE COURT:  He's already answered it.

14             MR. MCKANE:  Then I have no further questions.

15             THE COURT:  All right.

16             MR. SHORE:  Can I ask one question before lunch so

17   we can clear something up?

18             THE COURT:  Yes.

19                      CROSS-EXAMINATION

20   BY MR. SHORE:

21   Q    Mr. Keglevic, I just want to give you an opportunity to

22   clarify an answer you gave.  I think you said something to

23   the effect that if there's going to be a tax, it's always

24   better to avoid paying it.  Did you -- what you really mean

25   was, if the debtors have an opportunity to avoid incurring a

1   tax it's better not to incur that tax?

2   A    Thank you for that clarification.  Yes.  That's

3   absolutely what I intended.  I appreciate it.

4            THE COURT:  Otherwise, I've got to call the U.S.

5   Attorney.  There's a lot of paperwork.  We don't need that.

6            MR. MCKANE:  Your Honor, the debtors can represent

7   that they believe they've -- they're good on all their

8   taxes.

9            THE COURT:  Right, I -- we like to hear that.

10  Okay.

11           Actually, I'll have you step down then and we'll

12  do cross after lunch.  You may not discuss the substance of

13  your testimony with anyone, not just lawyers, any person

14  appearing during the break.  You're welcome.

15           Can we put Mr. Goldstein on quickly or that will

16  be out of order.  We won't do that, never mind.  Okay,

17  anything else before we break?  All right, we'll break for

18  lunch.  Let's reconvene -- we can't do the math.  Let's

19  reconvene at 1:40 -- no later than 1:45.

20           UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

21       (Recess at 12:21 p.m.)

22           THE CLERK:  All rise.

23           THE COURT:  Please be seated.  That's ominous.

24           MR. SHORE:  They were created before we added a

25  lot of this.  There's really not a lot we need to use.

1                THE COURT:  That's fine.  Mr. Keglevic?

2                    CROSS-EXAMINATION (Resumed)

3      BY MR. SHORE:

4      Q    All right, next question.  Let's start this on the cash

5      collateral order.

6           Sir, you did not have any personal role in the

7      negotiation of the cash collateral order, right?

8      A    Correct.

9      Q    You did not have any direct interaction with any TCH

10     first lien lender or representative of any TCH first lien

11     lender regarding any of the specific provisions of the cash

12     collateral order, right?

13     A    Correct, not with respect to specific provisions.

14     Q    And a stipulation in paragraph F of the cash collateral

15     order concerning adequate protection, you were not

16     personally involved in those negotiations, right?

17     A    I was not personally involved, correct.

18     Q    Nor were you personally involved with the negotiations

19     of the adequate protection liens that are stipulated to in

20     the cash collateral order, right?

21     A    Correct.

22     Q    And you were you personally involved with the

23     negotiations over the payment of fees and expenses as set

24     forth in paragraph C of the cash collateral order?

25     A    Can I just look at paragraph C, Mr. Shore?

1    Q    Yeah.  The motion -- we have -- it's Exhibit 6 in the

2    binder.

3    A    Binder I of II or --

4    Q    Oh well, it's going to be -- they're sequentially

5    numbered, so.

6    A    Okay.  I'm sorry.  Yes, got it.

7    Q    And the cash collateral order is in the back.  It's the

8    payment of fees and expenses.  Sorry, I'm missing my cite

9    for that, so.  Adequate protection, 5-C on page 26.

10   A    Correct.

11   Q    All right.  In fact you weren't personally involved in

12   negotiations regarding any of the specific stipulations in

13   the cash collateral order, right?

14   A    That's correct.

15   Q    All right.  That was done by the lawyers, right?

16   A    Correct.

17   Q    Okay.  Kirkland & Ellis and your in-house counsel,

18   right?

19   A    That's correct.

20   Q    And you don't know any reason why one of them couldn't

21   have come to testify about the negotiations of the cash

22   collateral order, right?

23   A    I don't have any knowledge of that.

24   Q    But you do believe they would be able to have testified

25   to the Court about the actual back and forth between the

1    debtors on the one hand and the lenders on the other that

2    were memorialized in the cash collateral order which is in

3    Exhibit 6?

4    A    What -- they'll testify on what they testified on.  I

5    can't assume what they would have testified on.

6    Q    Well do you -- can you assume that they could have told

7    the Court what the first lien lenders actually demanded as

8    adequate protection?

9         MR. MCKANE:  I'm going to object, calls for

10   speculation, Your Honor.

11        THE COURT:  Overruled, I'll allow it.

12        THE WITNESS:  I assume they can.

13   BY MR. SHORE:

14   Q    And you assume they could also tell me whether the

15   lenders actually ever threatened to shut down the business

16   if they didn't get this adequate protection package that's

17   in the cash collateral order in Exhibit 6?

18   A    I don't recall that discussion that I've had with them

19   that the lenders made that threat.

20   Q    Okay.  But you were the debtors' 30(b)(6) witness

21   offered to provide testimony in a deposition to the ad hoc

22   group on the cash collateral order, right?

23   A    I was.

24   Q    Yeah.  By the way, did you ask any of the first lien

25   lenders either directly or indirectly to come to testify in

1    this case and testify to the Court about what they would and

2    would not lend on?  What terms they would allow cash

3    collateral usage on?

4    A    I did not have that discussion with the first lien

5    lenders.

6    Q    Okay.  Well, I'm going to show you, and I believe this

7    will be Exhibit 32.

8         MR. SHORE:  If I may approach, Your Honor.

9         THE COURT:  Yes.  This is something not in the

10   binders?

11        MR. SHORE:  It's not in the binder.

12        THE COURT:  Thank you.  Thirty-two?

13        (Pause)

14   BY MR. SHORE:

15   Q    Mr. Keglevic, have you ever seen Exhibit 32 before?

16   A    I don't recall seeing this before.

17   Q    Okay.  So you can see it's an email sent Friday,

18   September 27th, 2013.  Do you recall that that was about a

19   month -- oh, sorry -- a couple of weeks before you were

20   contemplating possibly filing a Chapter 11 case for TCH?

21   A    Yes.

22   Q    All right.  And there's a sentence in there, "To that

23   end attached is a draft order to advance discussions on the

24   consensual use of cash collateral."  Okay, do you see that?

25   A    Yes.

1    Q    Do you recall that whether you were monitoring as a

2    board member or not that in September of 2013 the cash

3    collateral was being draft -- the cash collateral order

4    being handed around?

5    A    I don't recall a draft of the cash collateral order

6    being handed around to the board.

7    Q    Okay.  Well, I would have had to ask then the lawyers,

8    either Ms. Dore or somebody from Kirkland in a deposition as

9    to whether or not this constituted the first draft of the

10   cash collateral order, right?

11   A    I don't have that knowledge.

12   Q    Okay.

13            MR. SHORE:  May I approach again, Your Honor?

14            THE COURT:  Be 33?

15        (Pause)

16   BY MR. SHORE:

17   Q    All right.  Mr. Keglevic, have you ever seen Exhibit 33

18   before?

19   A    Yes.

20   Q    And do you recall seeing the draft -- and I'm going to

21   draw your attention to one thing, because I think when this

22   got kicked out it picked up a new dating on the top of the

23   draft.  Do you see that?  So what I don't want you to answer

24   unless you know the following.

25            If you look at 32 you can see that the Bates

1  numbers ends 10175?

2  A    76.

3  Q    10175 is 32.

4  A    Oh, I see.

5  Q    Which is the cover email, and then 33 starts at 10176.

6  Do you see that?  Okay.  Sorry.  Sometimes we just jump far

7  too ahead.

8           All right.  In the bottom, if you look at 32

9  there's a document number down on the bottom right, we call

10  that a Bate stamp.

11  A    I'm with you.

12  Q    Okay.  Now you can see that the Bate stamp between 32

13  and 33 are sequential, which means in the production this

14  was the attachment to the email?

15           All right, so I don't know because I didn't have

16  the lawyers, but I'm assuming what ended up happening is

17  their system updated it when it was printed out, because you

18  don't recall that you were negotiating a cash collateral

19  order on May 14, 2014, right?

20  A    Correct.

21  Q    All right.  So let's go through this cash collateral

22  order, which went out to the lenders in September.

23           Now you can't tell me whether this was the first

24  one out of the box, the last one of the box, or anything

25  else, right?

1    A    I cannot.

2    Q    All we know is that this is the -- this was sent out to

3    advance the discussions on cash collateral.  See that?  You

4    saw that in 32, right?

5    A    Yes.

6    Q    All right.  Now if you go to the adequate protection

7    paragraph, which is what we're talking about today, in

8    paragraph 5, you can see in the first sentence, it's carried

9    over on page --

10           THE COURT:  What page number?

11   BY MR. SHORE:

12   Q    -- page 14.

13           THE COURT:  Thank you.

14           THE WITNESS:  And I think you're referring to

15   paragraph 4?

16   BY MR. SHORE:

17   Q    Paragraph 4.  Yes, sorry.

18   A    Yeah.

19   Q    4-A, you can see that in the first sentence the

20   adequate protection liens that -- which you're giving to the

21   lenders were as defined in the DIP order.  You see that?

22   A    Yes.

23   Q    And that's exactly the adequate protection liens you

24   ultimately gave the first lien lenders as part of your cash

25   collateral negotiations, right?

1    A    Yes, I believe it is.

2    Q    And then you -- and that was adequate protection for

3    the diminution in value of the collateral during the case,

4    right?

5    A    Yes.

6    Q    Okay.  And then you see that in paragraph B, can you

7    confirm that you're giving them the same superpriority

8    claims in this draft that you gave them now?  That was of

9    course before the modifications.

10   A    Before the modifications.

11   Q    Yeah.

12   A    Yes, they appear to be the same.

13   Q    Now, and you're offering to pay their fees and expenses

14   in 4-C?

15   A    Yes, that's what this says.

16   Q    Yeah.  And in 4-D you're offering the same adequate

17   protection payment as L plus 450.  You see that?

18   A    Yeah.

19   Q    And in 4-D you're offering the same adequate protection

20   payment as L plus 450.  You see that?

21   A    I do.

22   Q    In fact you were offering it on the TBD value of the

23   first lien secured claim, right?

24   A    Yes, that's --

25   Q    So the difference between what you're offering them now

1   and what you first offered them was just that instead of it

2   being L plus 450 on the value of the collateral you're

3   offering them L plus 450 on the principal amount of the

4   notes.

5           MR. MCKANE:  Objection to form.  This has never

6   been established that this is a first offer, all he can do

7   is compare this draft to the draft that (indiscernible -

8   2:01:39).

9           THE COURT:  It doesn't say collateral, it says

10  claim.

11          MR. SHORE:  Well it says value -- sorry.  Let me

12  rephrase my question.

13  BY MR. SHORE:

14  Q   In this draft -- well you can't tell me one way or the

15  other as to whether this is the first draft, right?

16  A   I can't.

17  Q   I would have to have actually had somebody who was

18  involved in the negotiation who could have told me whether

19  or not this was the first draft, the second draft, or

20  something else, right?

21  A   That's speculation.

22  Q   Okay.  The L plus 450 in Exhibit 33 is calculated off

23  of you see (indiscernible - 2:02:13) value of first lien

24  secured claims.  See that?

25  A   I do.

1    Q    And do you recall, and please tell me if you don't

2    know, whether you were discussing at that time that you

3    would have to do a valuation under section 506(c) to

4    determine what the secured claim was as opposed to the face

5    value of the notes?

6    A    I just remember at this point we were looking at

7    different values to pay that were below the face value of

8    their claim.

9    Q    Okay.

10   A    And I remember running numbers at different values.

11   Q    Okay.

12   A    But that's all I have.

13   Q    All right.  If you turn to page 9 of Exhibit 33, can

14   you confirm that you were offering to stipulate to the

15   validity --

16            THE COURT:  I apologize, I missed the page number.

17            MR. SHORE:  Page 9.

18            THE COURT:  Thank you.

19   BY MR. SHORE:

20   Q    That back in September of last year you were offering

21   them an acknowledgment of the extent, validity, and parity

22   of their liens?

23   A    That's what this says, yes.

24   Q    And that was the same stipulation you gave them now?

25   A    Yes.

1    Q    All right.  Now if you could turn to page 11 and you

2    look at paragraph G on the top of page 11, do you see that

3    the debtors in that case were stipulating that upon entry of

4    the final order there would be a waiver of the equities of

5    the case exception under 552(b)?

6    A    I do.

7    Q    And you see that there would be a waiver of the

8    provisions of Section 506(c) of the Code?  See that?

9    A    I do.

10   Q    And you've offered that to the first lien lenders some

11   eight months later, you ended up essentially where you were

12   in September of last year.

13   A    That's where we ended up in our negotiations.

14   Q    Okay.  And if you turn to page 14.  Sorry, I'm jumping

15   around a bit.  I'm sorry, paragraph 14, page 24.

16   A    I'm there.

17   Q    You can see there's an actual waiver of the 506(c)

18   claims in paragraph 12?

19   A    Yes.

20   Q    And in paragraph 14 you see that there's a no

21   marshaling provision?

22   A    I do see that.

23   Q    And can you confirm that that's the same no marshaling

24   relief you gave the first lien lenders in the cash

25   collateral order which you attached to the motion in these

1    cases?

2    A    I believe it is.

3    Q    Okay.  And as you sit here today you can't tell me

4    whether this is the opening bid of the company to the first

5    lien lenders or something else can you?

6    A    Mr. Shore, I can only assure you that my recollection

7    was that we had discussions with the first lien group in

8    advance of this date.  I don't -- I can't vouch as to this

9    is the first time it's been put in writing or --

10   Q    Uh-huh.

11   A    -- I don't have specific recollections as the dates

12   those negotiations began.

13   Q    Well, just to be clear, you had no discussion with any

14   first lien lender about any of the provisions in paragraph

15   -- or in the document 33.

16   A    That's right.

17   Q    All right.  So whether any discussions occurred prior

18   to this date you would just be -- have to be relying on an

19   out-of-court statement by people who worked for you that

20   something was going with respect to this, right?

21             MR. MCKANE:  Objection to form.

22             THE WITNESS:  Well in this case --

23             THE COURT:  Overruled, go ahead.

24             THE WITNESS:  -- I would have just relied on what

25   Ms. Dore says, she doesn't work for me.

1    BY MR. SHORE:

2    Q    Okay.  And again, any reason that -- Ms. Dore is here

3    today, right?

4    A    Yes, she is.

5    Q    Any reason to believe that she couldn't testify at this

6    hearing with respect to where and how Exhibit 33 fit in the

7    negotiation history of the cash collateral order?

8    A    I don't have any position on that.

9    Q    Okay.  Let's turn to the concept of the 506(c) waiver.

10   Sir, how much -- the TCH debtors under the DIP budget, how

11   much op-ex are the TCH debtors incurring every month?

12   A    I'd have to look at the budget to recall the number.

13   Q    Yeah.  Well that's the -- it's Exhibit 18.  Yeah, 18,

14   and then we go back to those small things, so I'm going to

15   take you forward, I know what the numbers are.

16        (Pause)

17    A    I haven't found it.  18 --

18            THE COURT:  It's the first page of -- yeah, there

19   you go.  The second one.

20            THE WITNESS:  And I'm sorry, this is very hard to

21   read, but I think it starts with EBIDA, which would have op-

22   exs already taken out of that number, so I don't think it's

23   on this --

24   BY MR. SHORE:

25   Q    Right, but can you tell from the margins how much op-ex

1    you're incurring a month or can you even tell the Court

2    within the nearest $100 million how much op-ex you're

3    incurring a month?

4            MR. MCKANE:  Your Honor, can I assist Mr. Shore

5    and Your Honor?

6            THE COURT:  You may certainly do that.

7        (Pause)

8            MR. SHORE:  I was using the original one.  It

9    doesn't matter.  What I'm trying to do is establish if the

10   CFO of the TCH debtors can tell us with the nearest 25-,

11   $50 million how much op-ex you're incurring a month.

12           THE COURT:  Let's use -- let's figure out real

13   quick here and let's use a document everyone can read.

14           THE SHORE:  Yeah.

15           UNIDENTIFIED SPEAKER:  In the original DIP budget

16   or the final --

17           MR. SHORE:  Original DIP budget.  Doesn't matter,

18   because our EBIDA numbers didn't change.

19           UNIDENTIFIED SPEAKER:  So if it doesn't matter

20   which document one might be more legible than the other

21   (indiscernible - 2:09:13).

22           THE COURT:  Sure, why not, what the heck.  And

23   let's label them.

24       (Pause)

25           THE COURT:  With your permission, Mr. Shore, can

1    we label the original 34 and the final 35?

2            MR. SHORE:  That's fine, Your Honor.  Thank you.

3            THE COURT:  The original is one page.  So let's

4    work off that.

5            So looking at No. 34, to the extent it helps,

6    Mr. Shore repeat your question just so that the record is

7    clear, please.

8            MR. SHORE:  Sure.

9    BY MR. SHORE:

10   Q    Can you tell the Court how much op-ex the TCEH debtors

11   are incurring under the DIP budget?

12   A    Like I said, it's not reflected in here, this is EBIDA,

13   this is after the subtraction of revenues, fuel, purchase

14   power, and operating expenses, so I'd have to do this based

15   on recollection, but I think op-ex is roughly a billion and

16   a half dollars a year, so maybe 100- to $150,000 a month.

17   Q    One hundred to 150 million.

18   A    Million, excuse me, yes, sir.

19   Q    Okay.  And how much on fuel procurement?

20   A    Fuel -- coal cost is about a billion dollars a year, so

21   that'd be 80 million a month, and purchase power cost

22   varies, but it's at least as big as those two numbers.

23   Q    Okay.  In all of those expenses you're incurring on a

24   postpetition basis you understand those are going to be

25   administrative claims against the TCH debtors' estates,

1    right?

2    A    I don't have that recollection that they're

3    administrative claims.

4    Q    Okay.  But you are incurring these expenses in order to

5    operate the Luminant and TXU Energy businesses, right?

6    A    Yes.

7    Q    Okay.  And the -- you understand that the concept of a

8    506(c) waiver is that at some time the lenders might try to

9    take possession of the Luminant assets and the TXU Energy

10   assets, right?

11   A    Correct.

12   Q    All right.  Now if you're incurring these

13   administrative expenses of over, what does it come out to,

14   over $300 million a month, right, you're giving these

15   lenders a 506(c) waiver which would, if they ended up taking

16   the assets, leave behind as much as $300 million a month in

17   expenses you incurred pursuant to the budget.  Do you know

18   that that's a possibility?

19   A    I've not had that -- discussed that possibility with my

20   attorneys.

21   Q    Okay.  And so you don't know that if, for example,

22   there are a couple of months of op-ex that have been

23   incurred, 300 million, $600 million and the lenders take the

24   assets that you're giving up the right to actually charge

25   those assets and recover that $600 million from the assets

1    because you spent that money protecting and preserving it?

2    Do you know that you're doing that?

3    A    I've not had that discussion.  I'd like to have that

4    discussion with my counsel.

5    Q    Okay.  And if that's the case, because I'm sure we can

6    argue about the legal ramifications of that, you understand

7    that if it's admin expense, because I think you were talking

8    before about the concept of the taxes and admin expense,

9    that that 3- to $600 million that was spent running the

10   business for the secured lenders until they took the assets

11   would come ahead of any recovery of general unsecured

12   creditors?

13   A    But my understand is so would the revenues, and since

14   the revenues exceed those expenses the estate would still be

15   better off after the occurrence of the expense than they

16   were before.

17   Q    Okay.

18   A    That we're showing an unlevered positive cash flow, not

19   a negative cash flow.

20   Q    So your assumption is when the lenders take the assets

21   they're going to leave the cash behind?

22   A    No, but they're -- at least there was enough cash to

23   cover the expenses, so there's not a shortfall in the estate

24   is the way I think about it from a finance perspective.

25   Q    So I take it what's happening with your op-ex is you're

1    actually doing -- spending -- getting the stuff on credit,

2    right, and then the bill comes due, right?

3    A    We collect revenues and pay the expense from the

4    revenues except for working capital, yes.

5    Q    Right.  So what ends up happening is if the lenders

6    take all the assets and all the cash you're still going to

7    be getting invoices, right, for the stuff that was done

8    before they took the assets?

9    A    Yeah, there could be some lag, yes.

10   Q    Right.  And if you've got your vendors out there on 30

11   to 60-day credit you could have 30 to 60 days of invoices

12   that come in after the assets go away.

13   A    There'd also be some revenue lag that I assume would

14   come in.

15   Q    And you're assuming that the lenders are going to leave

16   the cash behind?

17   A    Well it wouldn't be cash yet, it would be a bill that

18   we sent out that we hadn't collected just like the bills

19   that you're suggested we hadn't paid.

20   Q    Okay.  And with respect to anything that gets left

21   behind, right, that doesn't have an offset associated with

22   it, you're going to end up incurring an administrative

23   expense with that.  Do you know that?

24   A    To the extent there's any expense -- it's a

25   hypothetical, Mr. Shore, that I've not analyzed and I've had

1    to look at the leads and the lags and I just have not done

2    that exercise.

3    Q    Okay.  Well do you think the 506(c) waiver is

4    hypothetical?

5    A    The 506(c) waiver is not hypothetical.

6    Q    And you mentioned on your direct examination Mr. Ying

7    providing the company with oral advice on value.  Do you

8    recall that?

9    A    Yes.

10   Q    All right.  Isn't it true that whatever Mr. Ying might

11   have said the debtors don't have a current specific view on

12   the value of the first lien lender's collateral do they?

13   A    We don't have a specific view as we stand here today.

14   Q    Right.  You just believe they are impaired?

15   A    Yes, we got a -- when we filed our December 31st, 2013

16   financial statements we had to do a goodwill impairment and

17   we relied upon a valuation by Duff & Phelps to do that, that

18   was the last valuation specific that the debtors have seen.

19   Q    Okay.  So I took it from the direct questions you got

20   that Mr. Ying's oral advice played into your determination

21   to -- your determinations with respect to the cash

22   collateral order?

23   A    Yes, it was one of the consideration.

24   Q    Okay.  Did you ever ask him to put his oral advice in

25   writing?

1   A    I did not ask him to put it in writing.

2   Q    And would you consider the determination to proceed

3   along this path with the DIP loans and a consensual use of

4   cash collateral, among other things, has the company

5   borrowing $3 billion to pay its lenders to be some matter of

6   moment with the TCEH debtors?  It is an important decision?

7   A    We thought it was an important decision, we thought

8   based on Mr. Ying's representations, the public information

9   we had seen, and the Duff and Phelps report, et cetera, that

10  it was a reasonable conclusion.

11  Q    Can you tell the Court exactly what Mr. Ying said that

12  you relied upon in determining to enter into the DIP and

13  cash collateral arrangements you've done?

14  A    That the TCH first lien debt was impaired.

15  Q    And that was in verbatim, it was one sentence that came

16  out at the board meeting?

17  A    I don't recall the exact way he said it, but that was

18  my takeaway from what he said.

19  Q    Okay.  And as a board member of a giant public company

20  is it your practice to rely upon oral statements or

21  professionals that they don't back up with any kind of

22  writing, PowerPoint, analysis, or anything else?

23  A    I don't know what you mean by public company.  We have

24  public debt, we're not a public company.  But we rely on our

25  business judgment which includes oral, written, and our

1    experience, and all of the things told us his business

2    judgment was correct.

3    Q    Is there anything that prevented you from telling

4    Mr. Ying six months ago you wanted to have a valuation done

5    so that you could have an understanding as you had in

6    Exhibit 33 that you were going to calculate adequate

7    protection off the value of the secured lender's claim?

8    A    No, there was nothing that prevented us from doing it.

9    Q    I take it that part of your answer with respect to

10   negotiations is you were comfortable with what your team was

11   telling you?

12   A    Yes.

13   Q    All right.  And that's why you didn't participate

14   directly in any of the negotiations on the cash collateral

15   order?

16   A    That's correct.  At the end of the day I was interested

17   in making sure we got the use of the collateral and the

18   priming liens to get the lowest possible DIP cost, that was

19   my primary focus.

20   Q    All right.  If you'd pull out 34 since we have the big

21   copy.  Do you recall during the first-day hearings you and I

22   had some exchanges on the $400 adequate protection payment

23   that was going out to the lenders on the first day of the

24   case?

25   A    Yes.

1    Q    Right.  And do you recall testifying that that was the

2    deal that you were going to be paying $400 million out to

3    the first lien lenders?

4    A    I forget what I testified to, but I -- this schedule

5    says that we were going to pay it out in the first month.

6    Q    Right.  And as you -- you told me in your deposition,

7    as you were sitting in that same chair and I was asking you

8    questions about this, you actually thought that maybe this

9    number was wrong, that in fact the deal had changed, right?

10   A    Yes, I -- my -- you know, we had obviously done the

11   deal leading up shortly before those days, I thought the

12   deal was to not pay the adequate protection.  When I saw it

13   in the schedule I questioned whether or not I had it wrong.

14   Q    And you just decided to rely upon your team even though

15   you were the one there answering questions under oath about

16   what was happening?

17   A    My team made a mistake, they more often don't.

18   Q    All right.  Is there any reason you felt compelled in

19   that chair to answer a question that you didn't know the

20   answer to or worse yet that you thought was wrong?

21   A    I didn't say that I thought it was wrong, I question or

22   not whether my understanding was correct.  I believe my

23   understanding was correct and the testimony was to best of

24   my knowledge at that point in time.

25   Q    Well is there anything that you need to correct in

1    testimony you've given to the Court that you thought might

2    be right but you weren't sure?

3    A    Not that I'm aware of.

4    Q    Okay.  Is there any reason why going forward if you're

5    up in this stand you can't just commit to answer the

6    questions that you know and not answer the questions that

7    you don't know?

8    A    I answered it to the best of my knowledge then, I'll do

9    the same going forward.

10   Q    And will you tell us if you don't know the answer to a

11   question?

12           THE COURT:  Mr. Shore, move on.

13   BY MR. SHORE:

14   Q    Let's go over the check the box testimony that you gave

15   on your direct.

16           I take it that your view is that a scenario in

17   which the first lien lenders were put to the test as to

18   whether they would consent to the use of cash collateral was

19   not something you wanted to do because of the risk that the

20   business would have to shut down, right?

21   A    You want to rephrase that again?

22   Q    Sure.  Wasn't one of the things you were trying to do

23   in negotiating cash collateral avoid a shut down of the

24   business?

25   A    I was trying to avoid the shut down of the business,

1    correct.

2    Q    Right.  And in your view one of the primary benefits

3    for the debtors' estates was that taking on the DIP and cash

4    collateral was that it avoids a liquidation that would

5    trigger a tax liability, right?

6    A    That was one of the factors, yes.

7    Q    Uh-huh.  And that was the only -- the only benefit that

8    you were able to identify in your deposition as to why you

9    needed the cash collateral usage?

10   A    I know I did identify that in my deposition, yes.

11   Q    And one of the debtors' primary reasons for not

12   agreeing to a 363 sale with the first lien lenders was your

13   belief that a substantial tax could have been created

14   through such a sale, right?

15   A    That's right.

16   Q    And it's also your understanding that whatever tax

17   might be created as a result of a 363 sale EFH would be the

18   taxpayer of record on that, right?

19   A    EFH is the taxpayer of record as we sit here today.

20   Q    Right.  Right.  And when you say check the box, you, as

21   the CFO of EFH, are the person to whom the tax department

22   reports, right?

23   A    That's correct.

24   Q    Right.  And when you say we would check the box, it

25   would be Paul Keglevic checking the box at EFH which says

1    TCEH is now the taxpayer of record?

2    A    I believe it'd be my board of directors directing the

3    head of our tax department to check the box.

4    Q    And when you say you'd be there checking the box you'd

5    also be sitting there as the CFO of TCEH, right?

6    A    That's right.

7    Q    And you there as the CEO of TCEH, I think you testified

8    before, it's important to you if you can avoid incurring a

9    tax you should avoid incurring the tax, right?

10   A    That's right.

11   Q    And is it your testimony as the CFO of TCEH you'd sit

12   there and watch yourself as the CFO of EFH check the box on

13   TCEH and push a liability down for a tax?

14   A    TCEH would not want that to occur.

15   Q    Right.  The only person to protest TCEH letting that --

16   or to protest on behalf of TCEH is you as the CFO of TCEH.

17   A    The board of directors of TCEH can protest that.

18   Q    Okay.  But wouldn't you want to protest that as the CFO

19   of TCEH?

20   A    I would protest that as well.

21   Q    Okay.  So you would say to yourself, don't check the

22   box, Paul?

23   A    I would say to myself let's come up with a plan that

24   doesn't incur the tax so we weren't confronted with that

25   situation.

1    Q    Now I think as we go through your understanding of what

2    this liability means, you did know that when you were

3    negotiating the DIP cash collateral package that if that tax

4    got triggered that would prevent you from being able to

5    confirm -- potentially confirm a plan at TCEH because there

6    would be an administrative expense you couldn't pay.  You

7    knew that, right?

8    A    We knew the tax would be incurred.  I think it's up to

9    the Court to confirm if that plan would have been acceptable

10   to the Court or not.

11   Q    Right.  But during this you discussed whether it would

12   be possible to confirm a plan at TCEH if the tax hit at

13   TCEH, right?

14   A    Discuss with whom?  I'm not sure what you're asking me,

15   Mr. Shore.

16   Q    Okay.  While you are deliberating as a TCEH

17   (indiscernible - 2:23)51) over the reasons to enter into the

18   DIP and cash collateral package that's put out here, you,

19   within the company had discussions whether or not it would

20   be able to confirm a TCEH plan if TCEH got -- I think you

21   said it's a (indiscernible - 2:24:09) check the box on --

22   that if an administrative claim ended up there.

23   A    Well the full context as the TCEH CFO we look for

24   something that wouldn't disrupt the business, that would

25   give us use of collateral, that would get us the lowest

1     possible DIP cost.  And then I think you have asked me is

2     one of the additional considerations that, you know, as to

3     -- well, I'm not even sure how we've gotten here on

4     incurring the cost -- but my consideration around the DIP

5     and the cash collateral were largely those.  We were aware

6     that if the cash -- if the tax was incurred it would be a

7     negative impact to TCEH and the unsecured creditors.

8     Q    Right.  And you also discussed when you were having

9     these deliberations the ability of any TCEH debtor to grant

10    of release if it was not able to confirm a Chapter 11 plan

11    didn't you?

12    A    Yes.

13    Q    Okay.  And those discussions regarding the TCEH debtors

14    ability to confirm a Chapter 11 plan and to grant releases

15    bore on your business determination to not seek to turn the

16    assets over to the first lien lenders; isn't that correct?

17            MR. MCKANE:  Objection, Your Honor.  This whole

18    line of questions, I don't see the tether to cash collateral

19    or the issues at play that are remaining.  I think it's

20    irrelevant to the proceeding and the motion that's in front

21    of the Court.

22            THE COURT:  Mr. Shore?

23            MR. SHORE:  The issue is from our perspective, why

24    they were will to provide this package to the first lien

25    lenders.  We've had some statements in the papers why they

1    were willing to do it, but there has been no testimony as to

2    why they were willing to provide this grant of securities

3    and waivers and everything else.

4              I've only got one witness, this is who they gave

5    me with the 30(b)(6).  He was there to testify on behalf of

6    the company, he provided answers on behalf of the company as

7    to what they were thinking about when they were entering

8    into the cash collateral order agreement.

9              MR. MCKANE:  May I respond, Your Honor?

10             THE COURT:  Yes.

11             MR. MCKANE:  First, this is not the only witness.

12   Mr. Shore could have called any witness he wanted.  The only

13   witness he elected to examine in this case is Mr. Keglevic.

14   He had the ability to call Mr. Husnick, Ms. Dore, anyone

15   else he wants.

16             Second, as it relates to the issues that are --

17   questions that are being asked he asking about what could

18   possibly be confirmed in a plan.

19             We're here on the remainder of a cash collateral

20   motion where the issue is the approximately size or the

21   (indiscernible - 2:26:28) size of adequate protection

22   payments and a 506(c) waiver.

23             I don't see how this line of questions as to what

24   is the appropriate path for this restructuring generally

25   ties to the cash collateral issue here.

1          THE COURT:  All right.  Well, I'll give you some

2    more leeway on this, but I do agree, we're getting a little

3    far from -- far a field.

4          MR. SHORE:  Let's rephrase the question.

5    BY MR. SHORE:

6    Q    You had discussions at the time you were determining to

7    enter into said cash collateral package that regarding the

8    debtors' ability -- the TCEH debtors' ability to confirm a

9    Chapter 11 plan and to grant releases, right?

10   A    That was more an RSA discussion, not a cash collateral

11   discussion.  The cash collateral discussion was around was

12   it a fair trade and negotiation to get the use of cash

13   collateral, to get priming DIPs that would lower the cost of

14   the DIP in exchange for the entire package we gave them,

15   including adequate protection and the waivers you're talking

16   about.

17          On a standalone basis I believe that was a fair

18   trade without consideration of the other issues that you're

19   raising.

20   Q    Okay.  To be clear, the discussions though about the --

21   what would happen if you had turned the assets over to the

22   lenders, right -- because you agree with me, one of the

23   alternatives here is if you really believe the assets were

24   substantially impaired rather than borrowing on a DIP and

25   doing everything else you could have turned the assets over

1    to the lenders and not incurred a DIP at all, right?

2    A    I assume that's correct, yes.

3    Q    Right.  And so one of the things that you took into

4    consideration in not pursuing that path was that if you did

5    that you wouldn't be able to confirm a plan at TCEH and you

6    wouldn't be able to grant releases by TCEH of any

7    affiliates, insiders, or anything else?

8    A    My analysis of why we did not want to incur the tax and

9    allow the assets to be taken out of the corporate group was

10   that it would be -- reduce the value of the TCEH estate.

11   That was my finance focus at that point in time.

12   Q    What percentage of the first lien lenders have

13   consented to cash collateral on these terms?

14   A    I don't have that exact number, I think there were 41

15   percent that were signatories to the RSA, but that's the

16   only numbers I have.

17   Q    Okay.  And do you have any point of contact with the

18   other 59 percent of the secured lenders?

19   A    On general, yes, I talk to them, they ask questions

20   about the business, et cetera, so I know some of them, I

21   meet with them periodically, but I've not had discussions

22   with them about specifically the cash collateral order.

23   Q    So I take it they've given you no comfort as to what

24   their plans are with respect to the assets or any plan?

25   A    I've not had any discussions with them about

1    alternative plans.

2    Q    And so let's walk through -- continue with the 363

3    issue, which is let's assume that those 59 percent come

4    forward and seek to use what you gave them under the cash

5    collateral order, right, including the 506(c) waiver, the

6    552 waiver, no marshaling, anything else and they're taking

7    the assets, okay?

8              MR. MCKANE:  Object --

9              THE COURT:  He hasn't finished.

10   BY MR. SHORE:

11   Q    The tax liability you're talking about, check the box

12   tax liability, that's not in your DIP budget is it?

13   A    It is not.

14   Q    Okay.  So --

15             MR. MCKANE:  Objection, Your Honor.

16   (Indiscernible - 2:30:09) to the line of questions about a

17   363 sale path that has nothing to do with the cash

18   collateral order --

19             THE COURT:  Well it has to do with the 506(c)

20   waiver, that's what he's exploring.  He's exploring the fact

21   that you're giving a 506(c) waiver to 59 percent of the

22   lenders who are not parties to your RSA.  So are you -- I

23   mean his theory, I think, is that you're giving something to

24   people who may be proved to be very hostile to the debtor.

25   That's what he's exploring.

1          MR. MCKANE:  I understand if that's the line of

2    questions it's tied to the 506(c) waiver.  I am not certain

3    that even the witness understands --

4          THE COURT:  Well, I --

5          MR. MCKANE:  -- what inference he's trying to

6    draw.

7          THE COURT:  Okay.  Well, I did, and hopefully Mr.

8    Keglevic did, but --

9          MR. SHORE:  Yeah.

10          THE COURT:  -- go for it.

11    BY MR. SHORE:

12    Q    So, for example, with the RSA you could file your plan

13    and disclosure statement go on file sometime in June?

14    That's the plan, right?

15    A    Sure.

16    Q    And nothing -- you don't know whether a day after that

17    59 percent of your first lien lenders are going to file

18    something with the court that says this plan is dead on

19    arrival we will never support?

20    A    That would cause me to speculate what they would do.  I

21    would think in my discussions with the lenders generally

22    that they all are concerned about the tax and the ability of

23    EFH to check that box.

24    Q    The secured lenders are?  Let's just make sure I

25    understand your understanding of the check the box.

1    A    Yes.

2    Q    When the check the box occurs that is a tax claim which

3    is subordinate to the first lien lender's claims.

4    A    It does not come in front of them, but the incurrence

5    of the tax and bringing the IRS into the case I think

6    undoubtedly would result in a substantially longer case,

7    substantially longer potential disruption to the business,

8    and ultimately I think a longer case, our evaluation, my

9    evaluation has always been hurts the business, hurts the

10   enterprise, to which I would think the secured lenders would

11   have sensitivity.

12   Q    But if they just get relief to file their own plan that

13   includes a 363 sale you're going to get the tax, right, if

14   they were able to confirm that plan?

15             THE COURT:   I think we're well -- we're getting

16   far a field here.

17             MR. SHORE:   Okay.

18   BY MR. SHORE:

19   Q    So just so I'm clear though, your DIP budget and your

20   willingness to spend $100 million a month in adequate

21   protection to the first lien lenders and let all that cash

22   out the door, that would be a bad thing if the tax liability

23   hit in this case, right?

24   A    Well some of the 100 million gets offset by the cash

25   created by the cash collateral, so it's not the straight

1    100 million because we are getting use of the cash

2    collateral.  So net over the 25 months it was the 1.4

3    billion that we talked about --

4    Q    Uh-huh.

5    A    -- and under your construct I'd have to -- I have not

6    evaluated your construct and all the impacts on the

7    enterprise to determine whether it would be a bad thing.  I

8    just -- I would like more information and consultation

9    before I concluded about a hypothetical.

10   Q    So -- but so we're clear if you didn't spend the

11   100 million a month in adequate protection payments you

12   would have availability under the DIP to pay your

13   administrative expenses if you check the box on yourself?

14              MR. MCKANE:  I'm going to object, it calls for

15   speculation.

16              THE COURT:  Overruled.

17              THE WITNESS:  I don't know how to answer that

18   question.

19              MR. SHORE:  All right.  I have no further

20   questions.

21              THE COURT:  All right, thank you.

22              Redirect?

23              MR. MCKANE:  Just a few questions, Your Honor.

24                      REDIRECT EXAMINATION

25   BY MR. MCKANE:

1    Q    Mr. Keglevic, do you have a copy of Exhibit 32, the

2    email from Mr. Husnick to Mr. Kornberg?  It's the first

3    document not in the binders.

4    A    Yes.

5    Q    And just to orientate you again, you see where it says

6    that this was sent on September 27th of 2013?  You see that,

7    sir, right below Mr. Husnick's name?

8    A    Yes.

9    Q    Can you explain to the Court what the -- TCEH debtors'

10   thinking was about a potential bankruptcy filing before

11   November 1st of 2013?

12   A    Well it was uncertain whether or not we were going to

13   file.  We were in negotiations trying to get to a consensual

14   deal on a different structure than the one that is reflected

15   in the RSA.  It was the keep the company together structure,

16   and you know, we were exploring that possibility.

17   Q    And was an issue at that time in September and October

18   of -- a live issue at TCEH whether to file the company for

19   bankruptcy of not?

20   A    Yes.

21   Q    Had the TCEH debtors engaged with their first lien

22   lenders about the potential use of cash collateral in a

23   bankruptcy filing before September of 2013?

24   A    I'm not sure.  I don't recall that there -- I think

25   there were some discussions before that, but I don't recall,

1    you know, the exact chronology.

2    Q    Do you recall the first time that you had discussions

3    with Mr. Kornberg and individuals at Paul Weiss generally

4    about a potential restructuring?

5    A    Yes, it was before this.

6    Q    Approximately how long before this?  Just a ballpark.

7    A    It was -- we started discussions with them in March

8    2013 and I would say that this discussion was at least

9    taking place in the summer.

10   Q    And, sir, specifically as it relates to Mr. Husnick's

11   email.  If I could direct you to that full body paragraph.

12   And do you see the last sentence of that full body

13   paragraph, the one that starts, "As we have mentioned to

14   prepare for the possibility of a non-consensual case the

15   company is also pursuing financing that would not require

16   the consent of secured lenders."

17   A    Yes.

18   Q    Sir, does reading that paragraph refresh your

19   recollection at that point in time whether the debtors were

20   valuing a consensual case and a non-consensual case?

21   A    We were -- we were doing both and threatening a non-

22   consensual case and trying to -- and the drop down structure

23   potential to get the best possible deal we could get in a

24   consensual case from the TCH first lien lenders.

25   Q    And regarding the debtors' consideration of a potential

```
1    bankruptcy in late October of 2013, to your knowledge were

2    the debtors in a position to file that case, including the

3    potential use of cash collateral?

4    A    Yes, we were doing everything we could to be ready to

5    file on November 1st.

6    Q    So to the extent that there's some questions about why

7    this is being negotiated in September, some eight months

8    before you ended up filing for bankruptcy, does the fact

9    that you're evaluating bankruptcy in October impact the

10   timing of your discussions with the first lien lenders?

11   A    Yes, that's why we started in March 2013, because we

12   knew the November 1st interest payment was substantial and

13   one that, you know, the TCH first lien lenders would not

14   like us to make.

15   Q    And, sir, you answered a series of questions regarding

16   the 506(c) waiver and the operating expenses.  Do you recall

17   those questions?

18   A    Yes.

19   Q    And, sir, can I direct your attention to Exhibit, I

20   believe it's 35, it's the final DIP budget that was filed?

21   It's the large one.

22   A    Yes.

23   Q    And, sir, does -- does your budget project that the

24   company will have sufficient revenue to satisfy its

25   expenses?
```

1    A     Yes.

2    Q     And, sir, does your DIP budget project out over a span

3    of 24 months that you'll have enough cash flow and DIP

4    financing to remain solvent?

5    A     Yes.

6    Q     From a cash flow perspective.

7    A     From a cash flow perspective.

8    Q     Do you have enough liquidity in this budget to make all

9    the interest payments that you have scheduled during that

10   time period?

11   A     We do.  The adequate protection payments I assume

12   you're referring to?

13   Q     Yes, sir.

14   A     And the interest payments on the DIP.

15          MR. MCKANE:  No further questions, Your Honor.

16          THE COURT:  Assume that you don't have to make the

17   adequate assurance payments -- adequate protection payments

18   -- excuse me -- can the debtors survive solely on use of

19   cash collateral or do you still need financing?

20          THE WITNESS:  We need financing.

21          THE COURT:  To the tune of?

22          THE WITNESS:  The --

23          THE COURT:  About 1.4 billion or --

24          THE WITNESS:  I think it was -- I think the

25   numbers we calculated before were 1.6 billion, Your Honor,

1    this is showing me 1.5 billion of unlevered cash flow over

2    the 25 months, and then the big items I think I referred to

3    were the Railroad Commission, the collateral associated with

4    trading, those are both a billion one, 900 million

5    associated with expenses and business disruption.  When I

6    did that math I can see here that I had let off the interest

7    associated with the DIP of about 264 million, but there's

8    some puts and takes, but at the end of the day we were short

9    by -- in fact we did the analysis assuming that we didn't

10   get either adequate -- that we could use the cash

11   collateral, you know, the unlevered cash flow and not pay

12   adequate protection, we did not have any other financing

13   ability to raise that money.  That was the drop down DIP

14   structure and that was what we were using in our

15   negotiations to get the best cash collateral order we could

16   with the TCH first liens.  For that matter the best RSA we

17   could get with the TCH first liens.

18            THE COURT:  When did the negotiations that

19   culminated with the DIP loan, when did they begin?

20            THE WITNESS:  I don't recall exactly, but as I

21   said, my recollection was as early as in the summer of 2013

22   with an anticipation that we could file as early as

23   November 1st, 2013.

24            THE COURT:  Okay.  So that's the discussions with

25   the DIP lenders.

1              THE WITNESS:  With both, the DIP lenders and with

2      the TCH first liens around cash collateral.  They were

3      pretty much simultaneous.

4              THE COURT:  Simultaneous?  Okay.

5              MR. MCKANE:  Your Honor, there's one line of

6      questions that based on the question that you've raised and

7      my colleagues have asked me to cover it.  It's actually

8      important as to the issues that you've addressed.

9      BY MR. MCKANE:

10     Q    Mr. Keglevic, can you explain to the Court whether you

11     could satisfy your obligations to the Railroad Commission

12     either, you know, without the access to the cash -- access

13     to the -- let me rephrase.

14             You have obligations to the Railroad Commission,

15     correct?

16     A    Correct.

17     Q    You've proposed two solutions to the Railroad

18     Commission; is that right?

19     A    We have.  Posting a billion letter of credit or a

20     carve-out priority lien.  The carve-out priority lien would

21     have required the consent of the TCH first, and that's why

22     when you add the numbers together you have to include -- if

23     you're assuming that you don't have the use of the TCH first

24     lien cash collateral you have to assume you're going to

25     actually draw on the billion one of what we call the delay

1    draw of letters of credit to be in compliance with the

2    Railroad Commission's bonding requirements.

3              THE CLERK:  All rise.

4              THE COURT:  Please be seated.  That's ominous.

5              MR. SHORE:  They were created before we added a

6    lot of this.  There's really not a lot we need to use.

7              THE COURT:  That's fine.  Mr. Keglevic?

8                        CROSS-EXAMINATION

9    BY MR. SHORE:

10   Q    All right, next question.  Let's start this on the cash

11   collateral order.

12        Sir, you did not have any personal role in the

13   negotiation of the cash collateral order, right?

14             THE COURT:  All right.  So you have a binary issue

15   with how you deal with the Railroad Commission and without

16   the DIP loan -- no wait a minute.

17             THE WITNESS:  Without the use of cash collateral

18   -- with the ability to prime the TCH first lien lenders --

19             THE COURT:  Right.

20             THE WITNESS:  -- we could not give the Railroad

21   Commission the carve-out lien.

22             THE COURT:  Right.

23             THE WITNESS:  So if we didn't do that the

24   alternative would have been to raise a billion one --

25             THE COURT:  Right.

```
 1              THE WITNESS:  -- from letters of credit to post

 2    with them.

 3              THE COURT:  And you don't have that, absent this.

 4              THE WITNESS:  We don't have that absent this.

 5              MR. MCKANE:  No further questions, Your Honor.

 6              THE COURT:  Mr. Shore, I asked some questions, do

 7    you -- all right, thank you.  You may step down, sir.

 8              THE WITNESS:  Thank you.

 9              THE COURT:  See you again.

10         (Laughter)

11              THE WITNESS:  I look forward to it, Your Honor.

12              THE COURT:  Any further witnesses?

13              UNIDENTIFIED SPEAKER:  We have Mr. Goldstein.

14              THE COURT:  Oh, that's right.  I apologize, I'm

15    asking the wrong guy.

16              MR. MCKANE:  Your Honor, we have very few

17    questions for Mr. Goldstein.  We understand that Mr. Shore

18    has cross-examination regardless of whether we call him, I

19    just want to confirm that that's correct.  That's not

20    surprising, but understood.

21              THE COURT:  All right.  Mr. Goldstein.  Have you

22    testified prior?  Yes.  All right, you're fine.  You're

23    still under oath.

24              THE WITNESS:  Okay.

25         (Witness previously sworn)
```

1                    DIRECT EXAMINATION

2    BY MR. MCKANE:

3    Q    Good afternoon, Mr. Goldstein.  Can you remind the

4    Court your title, position, and employer?

5    A    Yeah.  I'm a senior managing director in the

6    restructuring group at Evercore.

7    Q    And, sir, can you describe what your role for, you

8    know, as part of the Evercore team as it relates to the

9    negotiations of the DIP and cash collateral?

10   A    Yeah.  I oversaw the team that Evercore that worked

11   closely with the company in solicitation of the DIP from the

12   banks.

13   Q    And, sir, did you give advice to the TCEH debtors

14   regarding whether a priming DIP was appropriate here?

15   A    Yes, we did.

16   Q    And what was your advice?

17   A    Our advice based on all the other testimony was

18   consistent with that, was that a priming DIP was the only

19   way to get the liquidity we needed to keep the company in

20   operations going during the bankruptcy.

21   Q    And, sir, did the TCH first lien creditors require

22   adequate protection payments to consent to that priming?

23   A    Yes they did.

24   Q    And, sir, the adequate protection payments that the TCH

25   first lien creditors require you're aware of the size of

1    those -- of those payments?

2    A    Yes, I am.

3    Q    And you're familiar generally with the TCEH budget?

4    A    Yes.

5    Q    And, sir, in your working with the TCEH debtors have

6    you ever -- you at Evercore or the TCEH debtors' finance

7    team ever apportioned the adequate protection payments

8    between those payments necessary for priming and those

9    necessary for payment of -- or use of cash collateral?

10   A    We have not.

11   Q    And, sir, it is your understanding that it is necessary

12   to use cash collateral to satisfy all the TCEH debtors'

13   liquidity needs?

14   A    Yes.

15            MR. MCKANE:  Sir, I have no further questions.

16                    CROSS-EXAMINATION

17   BY MR. SHORE:

18   Q    Good afternoon, Mr. Goldstein.  Chris Shore from White

19   & Case --

20   A    Good afternoon.

21   Q    -- on behalf of the TCEH ad hoc unsecured notes.

22            If you look at Exhibit 34, which is the big budget

23   which is out there, which is the original DIP budget.

24   A    Is this what you handed out?

25   Q    Yeah, the one-pager.

```
 1    A      The one-pager.

 2    Q      Yeah.  No, you got the right one.  That one.

 3    A      Got it.

 4    Q      Okay.  Your only role in preparing that DIP budget was

 5    at a reasonably high supervisory level, right?

 6    A      Yeah, I -- I mean from the Evercore perspective we did

 7    not prepare this budget, so I supervised the team that

 8    interacted with the company in preparing this budget.

 9    Q      But that was the company in A&M, right?

10    A      Yes.

11    Q      All right.  And you did not play any role in preparing

12    the next budget, which is the two-pager, which has been

13    marked as Exhibit 35?

14    A      Is it -- I'm not sure it's stamped.

15    Q      No, that's okay.  That's the --

16    A      Yes, that's correct.

17    Q      All right.  And you played no role in making the

18    $300 million reduction in postpetition spending relating to

19    the adequate protection payments?

20    A      Correct.

21    Q      Or removing the $69 million payment from the DIP

22    budget?

23    A      That's right.

24    Q      You played no role in determining the length of the DIP

25    budget?
```

1    A    that's correct.

2    Q    Nor are you aware of any effort by the debtors to

3    update the DIP budget that reflect actual performance?

4    A    Not that I know of.

5    Q    Okay.  You're not aware of how the TCH debtors

6    performed on business aspects relative -- or business

7    impacts relative to the budget?

8    A    No.

9    Q    And you don't know who -- even know who at the debtors

10   set the minimum amount of cash that they wanted to maintain

11   that's solved for in the budget?

12   A    I mean that I think was a conversation we had with the

13   finance team.  I don't know who specifically.

14   Q    Okay.  You were not in charge -- you've talked about

15   negotiations -- you were not in charge of negotiations of

16   the amount of the adequate protection payment, right?

17   A    That's right.

18   Q    the lawyers at K&E were leading that charge, right?

19   A    Right.

20   Q    You do have some familiarity though with the priming

21   DIP financing, right?

22   A    Yes.

23   Q    For example, you understand that a debtor must

24   demonstrate an equity cushion in assets to prime a

25   preexisting secured lender?

1  A    Yes.

2  Q    But to date the debtors have never obtained a formal

3  valuation of the collateral securing the TCH first lien

4  notes or bank DIP, right?

5  A    Yes.

6  Q    Evercore has provided oral valuation advice, right?

7  A    Yes.

8  Q    Outside the context of that one statement Mr. Ying made

9  at a board meeting are you aware of any oral advice being

10  provided by Evercore and the value of the first lien

11  collateral?

12  A    I can't recall specifically.

13  Q    Okay.  And other than your belief that he said that the

14  first liens were "substantially impaired" you can't recall

15  anything else about what he said at the board meeting about

16  valuation?

17  A    That's the conclusion I remember being talked about

18  here.

19  Q    And you don't even remember which board -- which board

20  meeting he said that at?

21  A    It was the TCH board meeting.

22  Q    You remember now it was the TCH board meeting or you're

23  presuming it was the TCH board meeting?

24  A    No, I think when we talked before I assumed it was the

25  TCH board meeting, which I think it -- I still believe

1    that's the case.

2    Q    Okay.  But did you go back to look at any meetings to

3    refer your recollection as to when that occurred?

4    A    No.

5    Q    Okay.  So you don't know any better now than you knew

6    at your deposition whether it was a TCH board meeting or an

7    EFH board meeting, or something else?

8    A    No, I think the concept of the first liens being

9    substantially impaired was talked about at all the board

10   meetings.

11   Q    Okay.  So now you recall it was at all the board

12   meetings it was discussed.

13   A    Well, I think I mentioned there was several board

14   meetings, I couldn't remember precisely, you know, which one

15   the exact statement was made at, but it was a consistent

16   theme throughout all of our advice.

17   Q    Well that's what I don't understand, did he just -- at

18   multiple board meetings just made an oral statement that

19   first liens are substantially unsecured?

20   A    As I said, it was a consistent theme whenever this

21   topic was discussed.

22   Q    So now you recall Mr. Ying saying this repeatedly to

23   the boards?

24   A    Again, it was a consistent point of view from Evercore.

25   Q    Well my question was, do you recall Mr. Ying saying

1    this at multiple board meetings?

2    A    I don't.

3    Q    Okay.  To be clear, other than the oral statements by

4    Mr. Ying, whenever he made them, to your knowledge Evercore.

5    has not delivered anything with respect to valuation of the

6    collateral securing the first lien notes to any of the TCH

7    debtors?

8    A    Yeah, we have never delivered a valuation report.

9    Q    And you personally have not done any work on valuing

10    the assets of any TCH debtor that's pledged to the first

11    lien lenders?

12    A    I have not.

13    Q    All right.  You don't recall specifically when the TCH

14    debtors first understood that they might have to seek a non-

15    consensual use of cash collateral do you?

16    A    I mean I think it was an option that considered in the

17    summer of 2013.

18    Q    Okay.  But you don't know about any preparations the

19    debtors might have made then for a contested cash collateral

20    fight?

21    A    I don't.

22    Q    All right.  And you had no role in negotiating the cash

23    collateral order in these cases did you?

24    A    No, I did nt.

25    Q    You had no role in negotiating the 506(c) waiver?

```
 1    A    Nope.

 2    Q    You didn't comment on any draft?

 3    A    I did not.

 4    Q    You had no role in negotiating the 552 waiver?

 5    A    Nope.

 6    Q    You had no role in negotiating the terms on timing of

 7    lien challenges?

 8    A    Nope.

 9    Q    No role in negotiating adequate protection payment or

10    liens?

11    A    I did not.

12    Q    Okay.  No role in the negotiation of payment of first

13    lien lender fees?

14    A    No.

15    Q    No role in negotiating provisions relating to the

16    modifications of the automatic stay?

17    A    I did not.

18    Q    No role in negotiating the carve-outs in the cash

19    collateral order?

20    A    I don't on any of that, few terms in the cash

21    collateral order.

22    Q    Okay.  Well, do you have a role in any terms of the

23    cash collateral order?

24    A    No.

25    Q    Okay.  So key or otherwise, you had no role in the cash
```

1    collateral order?

2    A    That's right.

3    Q    All right.  Can you turn to your declaration which is

4    in Exhibit 3?  I'm going to ask you to turn to paragraphs

5    30.  And paragraph 30, your second sentence says,

6    "importantly, the access to the capital provided by the DIP

7    facility and cash collateral will not only preserve the TCEH

8    debtors' liquidity, but as noted above, will only serve to

9    enhance the value of the TCEH debtors' estates."  Do you

10   stand by that statement?

11   A    Yes.

12   Q    Okay.  Then you make that same statement in paragraph

13   32, right?

14   A    Yes.

15   Q    Is Evercore or the debtors, as far as you ever know,

16   ever published an analysis which shows that the value of the

17   collateral securing the first lien lender's claims will

18   diminish over the forecast period?

19   A    No, we have not done that analysis?

20   Q    Are you aware whether anybody has come forward with any

21   analysis that shows if the debtors are operating pursuant to

22   the DIP budget, the collateral will decline in value?

23   A    I'm sorry, can you restate that?

24   Q    Sure.  Are you aware that whether anybody -- I asked

25   you whether Evercore and the debtors had done that, are you

Page 163

1    aware of any analysis that anybody has done, which shows

2    that the value of the first lien lender's collateral will

3    diminish over the forecast period?

4    A    I'm not aware of that analysis.

5          MR. SHORE:  Okay.  I have no further questions.

6          THE COURT:  Thank you.  Redirect?

7          UNIDENTIFIED:  No questions.

8          THE COURT:  Thank you.  You may step down.

9    Anything further from the debtors?

10         MR. SHORE:  I just have to move into evidence the

11   -- why don't we, so the record is clear, put in 31, 32, 33,

12   and 34.

13         THE COURT:  Any objection?

14         MR. MCKANE:  Your Honor, let me just make certain

15   I understand what 31 is.  I apologize.

16         MR. SHORE:  Isn't that the cover e-mail?

17         THE COURT:  That's 32.

18         MR. MCKANE:  Cover e-mail is 32.

19         MR. SHORE:  Oh, so it's 32, 33, 34 and 35.

20         THE COURT:  Very good.

21         MR. MCKANE:  I have no objection.

22         THE COURT:  All right.  Admitted without

23   objection.

24      (Debtor's Exhibit Nos. 32 through 35 received)

25         MR. SHORE:  And whether -- there are going to be

1    some materials that Mr. Lauria will reference in closing on

2    various orders that have been entered, I'd just ask you to

3    take judicial notice of the ones he does, but they're in the

4    record already.

5              THE COURT:  I've signed the order, I take judicial

6    notice of it.

7              MR. MCKANE:  And, Your Honor, there are a number

8    of declarations that were admitted into evidence already as

9    part of the interim hearing on cash collateral, and we ask

10   that that be part of the record as well.

11             THE COURT:  Very good.  Any further evidence?

12        (No response)

13             THE COURT:  No?  All right.  That'll close the

14   evidence.  Go ahead.

15             MR. HUSNICK:  Thank you, Your Honor.  For the

16   record, Chad Husnick, Kirkland & Ellis, proposed counsel for

17   the debtors.

18             Your Honor, we'll move into closing argument here.

19   Your Honor, again, just start with a quick summary, and I

20   know everybody in the courtroom knows, but for the record,

21   the debtors have extensive business operations.  Eighteen

22   percent of the generation capacity in the air comp markets

23   provided by the debtors' power plants.

24             1.7 million customers in Texas receive their

25   energy from the debtors' retail division.  5,700 individuals

1    are employed by the debtors, and they operate the debtors'

2    significant power plant operations, including two nuclear

3    power plants at Comanche Peak, 12 coal fire plants, and 26

4    natural gas fired plants.

5           Why do I reemphasize this?  I don't think anyone

6    here takes serious issue with the fact that the debtors need

7    to have access to the cash collateral, and they need to have

8    access to the DIP financing.

9           The use of the cash collateral, Your Honor, is

10   critical to the operations of this business, and to the

11   overall success of these cases.  And the debtors will use

12   that money, as we discussed in the evidence, to satisfy

13   their working capital needs, and very importantly to satisfy

14   their reclamation mining bonding obligation of $1.1 billion.

15          Your Honor, the failure to have access to the cash

16   collateral and the failure to have access to the DIP funds,

17   as discussed by Mr. Keglevic would cripple the TCH debtors'

18   business operations.

19          It's with that overall background that the

20   debtors, and as Mr. Keglevic testified, the debtors entered

21   into the negotiations with the prepetition lenders over the

22   use of cash collateral, with the idea in mind that they

23   needed to obtain the longest term of cash collateral they

24   could obtain in the bankruptcy to ensure that we did not

25   have to renegotiate cash collateral once we were in, and the

1    cheapest form of financing that they could obtain, the

2    debtors could obtain to operate in the Chapter 11 cases.

3            When you put those two things together, Your

4    Honor, I think you succinctly summarized it in a colloquy

5    with Mr. Keglevic.  The idea that the debtors did not have

6    sufficient cash to only have use of cash collateral led to

7    the idea that the debtors needed to get a DIP loan, which

8    led to the idea that the debtors needed to go to the DIP

9    market and find out what the DIP lenders were going to ask

10   for, which led to the idea that priming liens were

11   necessary, which concluded that we needed to go back to the

12   prepetition secured lenders and negotiate for a priming lien

13   DIP, and cash collateral usage.

14           As you go back, Your Honor, again, the debtors

15   worked very hard to negotiate for the best terms on cash

16   collateral that they could get.  And while whichever form of

17   order or whichever form of the cash collateral order was

18   introduced into evidence, there's no record as to whether

19   that was the first or the last, or whether that was

20   somewhere in between.  I suspect it was somewhere in

21   between.

22           Your Honor, what we need to know is what do we

23   have now.  And we have a consensual use of cash collateral

24   for 18 months that allows the debtor to obtain a 4.475

25   billion dollar loan, that allows the debtors to continue

1    their operations, meet their ordinary course obligations to

2    their employees, meet their ordinary course obligations to

3    their customers, continue to supply power to not just their

4    customers, but to the other power purchasers in the Texas

5    market.

6              Let's just focus for a moment about what's not in

7    this cash collateral order.  There are no milestones related

8    to a plan of reorganization, other than the obligation under

9    Chapter 11 to file a plan within 18 months.  There are no

10   milestones related to a Section 363 sale, or any sale of the

11   debtors' assets.

12             And very importantly, Your Honor, there's no tie

13   whatsoever to the restructuring support agreement.  The

14   debtors have untethered use of cash collateral for 18

15   months.  The implication that the cash collateral was agreed

16   to solely as a mechanism to obtain the RSAs is incorrect.

17             The RSA was, of course, a benefit of having

18   negotiated consensual cash collateral, but importantly, it

19   was not -- cash collateral was not terminated if the RSA

20   terminates.

21             At bottom, Your Honor, the cash collateral order

22   and the terms embedded in the cash collateral order, and

23   we've already talked about the DIP, and I'll refer

24   occasionally to it, those terms are extraordinarily

25   favorable to the TCH debtors.

1          The law here, Your Honor, I think is clear, the

2    business judgment rule governs, and it's the business

3    judgment rule, Your Honor, that says if the debtors have

4    exercised reasonable business judgment, have explored

5    alternatives, have determined in their business judgment

6    that the DIP loan and the cash collateral package that they

7    have is the best that they were able to obtain, that the

8    courts will not second guess that judgment.

9          This establishes a presumption, Your Honor, and I

10   know that you know the business judgment rule well, so I

11   won't spend too much time on it.  But as long as the debtor

12   has demonstrated, that is exercised the reasonable business

13   judgment, we believe that the cash collateral order should

14   be approved.

15         Your Honor, there's a lot of evidence that we put

16   on today in form of the declarations, as well as the formal

17   live testimony about the nature of the good faith arm's

18   length negotiations.  And while Mr. Keglevic didn't testify

19   that he had absolute personal knowledge of every single

20   meeting with the first lien lenders on these topics, he did

21   testify that he did have meetings with the first lien

22   lenders, in which these issues were discussed, albeit, not

23   directly related to the cash collateral.

24         But he also testified that he was aware of the

25   negotiations as to what was going on, he was presented with

1    the issues as they arose, and he evaluated those issues

2    towards the overall goal, his overall fiduciary duty of

3    maximizing value.

4           Your Honor, the evidence demonstrates both in the

5    Keglevic declaration and the Goldstein declaration, that the

6    TCH debtors carefully evaluated all of the financing

7    alternatives, and negotiated for the best possible terms.

8           Your Honor, we came to the Court on the interim

9    hearing when we presented what we were able to negotiate.

10   What we also negotiated, though, was to put off some of the

11   more difficult issues that I think we're still here dealing

12   with today to this hearing.

13          And following that first day hearing, the debtors

14   continued to engage in good faith negotiations with the

15   creditor's committee, with the ad hoc group of TCH unsecured

16   creditors, with the DIP lenders, and with the prepetition

17   secured lenders.

18          Those negotiations, as I said at the very outset

19   in opening argument that have been successful.  We've

20   negotiated consensual use of cash collateral with the

21   prepetition lenders that has the consent of the official

22   committee of unsecured creditors.

23          And we stand here today litigating over a very

24   narrow subset of what I'll consider the overall package that

25   we have delivered to the Court in the form of the DIP

1    financing, the Railroad Commission carve-out, and the 18

2    months of consensual use of cash collateral.

3            Simply blue penciling certain provisions out of

4    the order for the benefit of a particular creditor, I would

5    submit, is not an option here, it certainly wasn't something

6    that we didn't try.  We tried to eliminate certain

7    provisions, and unfortunately the lenders dug in on certain

8    provisions, and we were unable to get those provisions

9    removed.

10           Your Honor, I'll turn just quickly now to the

11   specific individual objections that have been raised.  I

12   think they fall into four major categories.  The first is

13   that the super priority claims are recoverable from the

14   unencumbered assets.  The second is that the adequate

15   protection is --

16           THE COURT:  I've taken care of that --

17           MR. HUSNICK:  What's that?

18           THE COURT:  -- result.

19           MR. HUSNICK:  I'm sorry, I missed that.  They

20   first said the adequate protection is too large.  The second

21   is that certain of the additional adequate protection

22   provisions, the most importantly 506(c) waiver is

23   inappropriate.  And last, we'll address the intercreditor

24   dispute relating to the payment of the adequate protection

25   payments.  This is the dispute between the first lien

1    noteholders, and particularly Aurelius, and certain of the

2    other first lien credit agreement lenders.

3           Your Honor, the adequate protection standard in

4    bankruptcy is very clear.  It's codified at 363(c)(2),

5    364(b), and it provides that a debtor can have use of cash

6    collateral, imposed priming liens, it must either obtain the

7    consent of the secured creditor or demonstrate that the

8    secured creditor is adequately protected.

9           It is the debtor, not the secured creditor, that

10   bears the burden of adequate -- of demonstrating adequate

11   protection.  That's under 363(p) and 364(d)(2).

12          Your Honor, there's severe consequences of not

13   providing adequate protection, including that there wouldn't

14   be no DIP facility here, as we need to consent or provide

15   adequate protections to get the DIP liens, no use of cash

16   collateral, and the ability of the secured lenders to

17   essentially request relief from the automatic stay and

18   foreclose on their collateral.

19          And we heard a lot today about what the

20   consequences of such a foreclosure would be.  Suffice to

21   say, I think the tax that would result from that, in excess

22   of 6 billion, whether against TCEH or EFH in the first

23   instance, I think there's no doubt in anyone's mind that the

24   IRS would pursue those claims against the TCH debtor.

25          The burden, Your Honor, and I need to address this

1    only because it was raised in the papers by certain of the

2    objecting parties, and I believe the ad hoc group as well,

3    is not on the secured creditors.  It's the debtor that bears

4    the burden.

5            And this -- any position to the contrary is

6    inconsistent with the law, including In Re Continental

7    Airlines, 146 B.R. 536, and other cases from various

8    districts around the country.

9            Your Honor, the debtors did fulfill their

10   fiduciary duties, and as we talk about the various actions

11   that they took during the period to negotiate the adequate

12   protection package that we summarized at the beginning of

13   the hearing, and that is memorialized in the papers, the

14   debtors believe that that adequate protection paper at the

15   end of the day is appropriate.

16           It ensures that the debtors have up to the 4.475

17   billion dollars of financing that they need to satisfy their

18   obligation, and ensures that the debtors have continued

19   access to cash collateral for the next 18 months.

20           The proposed adequate protection payments at the

21   non-default contract rate, Your Honor, are entirely

22   appropriate.  I have not seen or heard to date any reason

23   why those payments are inappropriate.  We discussed this

24   issue at length on the record at the first day hearing about

25   the size of the adequate protection payments, and whether it

1    was appropriate to make those payments.  And I believe Your

2    Honor concluded and we continued to believe that that's the

3    correct conclusion, is that the TCH prepetition secured

4    lenders are, in fact, entitled to adequate protection.  And

5    that it is fairly typical for that adequate protection to be

6    paid at the non-default contract rate as a proxy for

7    diminution in value.

8            This is not going to result in a windfall,

9    contrary to some of the assertions of the lenders and the

10   objecting parties.  Why?  Because the cash collateral order

11   contains an express provision at paragraph 5(d) that all the

12   payments made under the cash collateral order are subject to

13   recharacterization, reallocation, and disgorgement.  To the

14   extent that Your Honor determines that there was no

15   diminution in value.

16           Your Honor, I'll conclude just with a few -- to

17   the objections, the more substantive objections, the

18   adequate protection payments with a discussion quickly of

19   506(c).

20           Your Honor, I'm scoured for decisions in which

21   there's been no 506(c) waiver whatsoever.  I have not come

22   up with many, if at all, any cases, in which there was no

23   506(c) waiver in a consensual case in which there was a

24   significant professional fee carve-out, and an 18 month use

25   of consensual cash collateral.

1        Your Honor, the cases where 506(c) waivers have

2   been impaired, I believe are -- while they're rare, are

3   typically focused on situations in which there's an

4   administrative insolvent debtor, an administratively

5   insolvent debtor.

6        The testimony from Mr. Keglevic this afternoon was

7   that is not the case here.  I believe the budget bears that

8   out, and I believe the testimony bears that out.  And as a

9   result, in consideration for the overall deal that was cut

10  between the debtors and the creditor's committee now, and

11  the prepetition first lien secured lenders, we believe that

12  the 506(c) waiver is appropriate, and consistent with market

13  and over cases of similar size and similar complexity.

14        Unless Your Honor has any questions, I'll reserve

15  for rebuttal.

16        THE COURT:  Okay.  Are we going to talk about the

17  intercreditor dispute later?

18        MR. HUSNICK:  Oh, I'm happy to address that now.

19        THE COURT:  No, we don't have to actually, it

20  might make sense --

21        MR. HUSNICK:  Do you want to take it up

22  separately?

23        THE COURT:  Yeah.  Let's parse it out actually

24  because it's really a different issue than --

25        MR. HUSNICK:  Thank you.

1          THE COURT:  -- the issue that the ad hoc committee

2     has.  Yes, ma'am.

3          MS. CORNISH:  Good afternoon, Your Honor, Kelly

4     Cornish from Paul Weiss Rifkind Wharton & Garrison on behalf

5     of the ad hoc committee of TCEH first lien lenders.

6          Before I get into my argument, Your Honor, I just

7     want to make sure the record is clear as to the composition

8     and amount of debt held by our committee.  We have -- we

9     currently hold over 50 percent of the first lien

10    obligations, and together with two other first lien

11    creditors, we are able to, and in fact, direct the agent to

12    consent to the cash collateral that's before the Court.  So

13    we just wanted to be sure that the record was clear with

14    respect to that.

15         THE COURT:  Now, there's this distinction, right,

16    between the first lien notes and the first lien lenders; is

17    that right?  I want to get the terminology is right.

18         MS. CORNISH:  There are essentially three buckets

19    of first lien debt.  There is -- there are the first lien

20    credit lenders under the credit facilities.

21         THE COURT:  Right.

22         MS. CORNISH:  There are notes of about I think

23    $1.7 billion.  And then there are swap arrangements.

24         THE COURT:  Right, right.

25         MS. CORNISH:  And all three of those facilities

1    are part of what we have been referring to as the first lien

2    creditors.  And --

3              THE COURT:  And so is it the same agent for all

4    three tranches or not?

5              MS. CORNISH:  There's one agent for the -- there's

6    a trustee for the notes.

7              THE COURT:  Right.

8              MS. CORNISH:  There is an agent for the credit

9    facilities, which is Wilmington Trust.

10             THE COURT:  Right.

11             MS. CORNISH:  And the swap parties do not have a

12   trustee or --

13             THE COURT:  Do not.  All right.  So when you say

14   you directed to the agent, you directed for Wilmington

15   Trust?

16             MS. CORNISH:  We directed Wilmington Trust, that's

17   correct.

18             THE COURT:  Okay.  And what about the -- did you

19   direct the trustee and the notes?

20             MS. CORNISH:  No, it was not necessary under the

21   documents.

22             And just to be clear also, Your Honor, because

23   will become relevant when we briefly get to the Aurelius

24   issue, we have members on the committee, and I think the

25   Aurelius papers raise this issue.  We have members on the

1    committee that hold credit facility debt, and also of the

2    notes.  Okay.

3                THE COURT:  And some of them both.

4                MS. CORNISH:  And some of them both, correct.

5                THE COURT:  All right.

6                MS. CORNISH:  Your Honor, prior to the filing of

7    these cases, the ad hoc first lien committee and the debtors

8    negotiated, and you've heard testimony with respect to this,

9    we negotiated for almost a year with some interruption for

10   almost a year over the terms of a consensual cash collateral

11   order.

12                And we finally came to an agreement prior to the

13   filing of these cases, which reflected a great deal of give

14   and take on many, many different provisions.  Some give and

15   some take on both sides, which resulted in the order that

16   was presented at the beginning of these cases, the interim

17   order.

18                The cash collateral order unquestionably --

19                THE COURT:  He's going to say, he was standing up

20   to say, there's not much give and take, since it's the same

21   order that it was in last September.  Wasn't that what you

22   were going to say, Mr. Shore?

23                MR. SHORE:  I was going to say that the closing

24   should be limited to the evidence in the record, and not to

25   the statement of attorneys who may have participated in it,

1    and who had an opportunity to testify, Your Honor.

2              THE COURT:  Well, I think there was testimony that

3    there was negotiations certainly.

4              MR. SHORE:  Certainly negotiations.

5              THE COURT:  Thank you.

6              MS. CORNISH:  Thank you, Your Honor.

7              Your Honor, the cash collateral order

8    unquestionably provides substantial benefits to all the

9    stakeholders in these cases, and we've heard a lot of

10   reference to those, which include the 18 months of

11   untethered to the RSA or otherwise, cash collateral usage

12   that the company has, which is essential to its ongoing

13   operations.

14             The agreement to the priming by the new money,

15   4.47 billion dollar DIP, also essential to the company's

16   continued operations and liquidity.  And among other things,

17   the $50 million carve-out that we agreed to fund potentially

18   at the back end, if ever necessary, and we hope it's not,

19   but professional fees and expenses.

20             The first lien creditors made some major

21   concessions that we've also heard about through the

22   testimony in the course of the give and take that occurred.

23   And that included two things in particular that were

24   actually quite important to the first lien creditors, but we

25   did not manage to obtain in the give and take.  And they

1    included no case milestones, and also -- and this hasn't

2    been referred to much, but it was testified to earlier,

3    there are no budget controls, there are no tight budget

4    controls, and that was also an element that we pushed for

5    hard but we did not get.

6              Your Honor, in the context of that give and take,

7    we also negotiated for a full adequate protection package,

8    including payments, replacement liens, super priority

9    claims, and the payment of professional fees.  And as laid

10   out in the parties' briefs, and the cases we've all cited,

11   that is fairly standard both in this district and elsewhere,

12   and particularly in large big bankruptcy cases of this type,

13   where literally billions of dollars of the lenders' cash

14   collateral will be consumed throughout these cases.

15             Focusing for a moment on the adequate protection

16   payments which obviously remain a source of the ad hoc

17   group's objections, I'd like to just comment on a couple of

18   things with respect to the nature and the amount of those

19   payments.

20             First, Your Honor, with respect to the nature of

21   the payments, we need to make clear, and I think Your Honor

22   actually asked me some questions about this at the interim

23   hearing, these payments are not interest payments.  They are

24   adequate protection payments, which are used -- the contract

25   rate of interest as a proxy for the diminution claim, but

1    they are not interest payments.  They are not characterized

2    anywhere as interest payments, and they in fact, are not

3    interest payments.

4            Nonetheless, the unsecured creditors seem to be

5    taking the position by argument and questions that the first

6    lien creditors are perhaps over secured here.  And first

7    off, Your Honor, there is absolutely no evidence in these

8    cases that the debtors could demonstrate that there is any

9    equity cushion here.

10           THE COURT:  Well, it's kind of funny, what we have

11   is, we have parties who are under secured insisting on post-

12   petition interest, and parties who are over -- who think

13   you're over-secured saying you shouldn't get post-petition

14   interest.

15           MS. CORNISH:  That's correct, Your Honor, and

16   they're fundamentally inconsistent.  And I guess what I'm

17   saying with respect to those is I will repeat that we are

18   not receiving post-petition interest.  And to the extent

19   that it is determined that we are under secured, those

20   payments will go to satisfy the diminution claim, and then

21   they will be recharacterized as principle.  They are not

22   interest payments.

23           With respect to the point, and I think this is the

24   argument that the ad hoc group is making, and that Mr.

25   Weisfelner made in the interim hearing is that we're over

1    secured.  Well, Your Honor, if we're over secured, we are

2    entitled to the payment of post-petition interest.  And we

3    would, the first lien creditors, would urge that the

4    payments should be, in fact, at the default rate of

5    interest.

6              The arrival of plus 450 that is being -- that was

7    negotiated, and is being paid under the cash collateral

8    order is a blended rate, again a proxy, it's a blended rate

9    of interest.  And there are some interest rates, and you've

10   read this in the Aurelius papers that are higher, and some

11   that are lower.  It's a blended interest rate, and in any

12   event, most importantly, we would be requesting default

13   interest, which would just make the payments even higher.

14             So there is a fundamental inconsistency in the

15   arguments here.

16             In any event, Your Honor, from the outset of these

17   negotiations, the -- it was critical among other things to

18   the first lien creditors, and they never demanded or

19   requested anything other than to be paid a live or plus 450,

20   this blended rate of interest on the full amount of their

21   claim.  And that was, again, part of the give and take, part

22   of the terms that were negotiated.

23             THE COURT:  The draft that we bandied about a

24   little bit here, 33, seems to indicate that at least in this

25   version, whenever this was, that the live or plus 450 was

1    going to be paid on the collateral amount, not the face

2    amount, value of the secured claim.

3              MS. CORNISH:  That's right, Your Honor.  And as

4    the individual who did most of the --

5              THE COURT:  I think Mr. Keglevic said he

6    understood that at least at that point, it was -- they were

7    talking about something below face value.

8              MS. CORNISH:  Yes.  Your Honor, that actually

9    shows that there was vigorous negotiation of this term

10   because we did nothing but insist upon calculation of our

11   adequate protection payments based on the full amount of our

12   claims, and the debtors were trying to get us to agree to a

13   lesser amount, based on some value, value construct.

14             But the key bottom line concept here was, they

15   were trying to get us to agree to something lower, and we

16   consistently and without change throughout the negotiations

17   insisted on exactly what we got in our adequate protection

18   package, because it was so important to our group, and it

19   was on the full amount of the claim.

20             Your Honor, after the formation -- after the

21   filing of the cases and the formation of the official

22   creditor's committee, we almost instantly began discussions

23   and negotiations with the committee's counsel, as well as

24   the debtors, with respect to concerns that the committee

25   raised with respect to the interim order.

1          They raised a host of issues, covering single

2     space, a page and a half of e-mails.  We spent a great deal

3     of time negotiating those various points, and again, leading

4     into this hearing, the first lien creditors made additional

5     concessions to accommodate the committee's concerns.

6          Probably the most significant being the agreement

7     that there would be no liens on any unencumbered assets, and

8     secondly, that with respect to our super priority claims, we

9     would have those claims on all unencumbered assets, but we

10    gave up the proceeds of avoidance actions.  We considered

11    that a major concession.

12         In addition, we made other concessions, and when

13    Your Honor sees the mark up of the order, you'll see there's

14    a substantial amount of clarifying tightening language to be

15    sure people understood what was being given and taken and

16    the like.

17         Oh, the other major bucket of items we gave, Your

18    Honor, relates to the investigation of challenges.  The

19    interim cash collateral order provided for, that was

20    approved by Your Honor, provided for a $175,000 budget.  The

21    committee came back and asked for $500,000.  And again, in

22    the give and take of the negotiations over the last two

23    weeks, we ended up giving them exactly what they asked for,

24    $500,000.  Which to my knowledge, is one of the largest, if

25    not the largest investigation budget that I've seen.

1              Second, with respect to the period, the

2     investigation period, the interim cash collateral order

3     provided for 60 days, the committee asked for 120 days, and

4     we gave them the full 120 days.  So another, you know, bunch

5     -- also on the long end as we've looked at comparable cases

6     in this district and others on the far long end of

7     investigation periods.

8              THE COURT:  I thought it was more than that.  I

9     thought it was --

10             MS. CORNISH:  Oh, I apologize.

11             THE COURT:  -- 135 days --

12             MS. CORNISH:  Yes, Your Honor.  The refinement was

13    to make it consistent with the period for investigation by

14    creditors, other parties other than the committee is 135

15    days from the entry of the interim order.  Which if you

16    figure that out, it's about 120 days.  We gave them what

17    they asked for.  I apologize for that misstatement.

18             Your Honor, the creditor's committee obviously

19    represents the statutory fiduciary for the unsecured

20    creditors in these cases, and they are supporting the entry

21    of the final cash collateral order that's before Your Honor

22    today, including the elements that the ad hoc group persists

23    in opposing, that is the amount of the adequate protection

24    payments, and the 506(c) waiver.

25             The debtors, and the committee, and the first lien

1   committee have reached an agreement notwithstanding the ad

2   hoc group's concerns, have reached an agreement that they

3   believe strikes a -- the right balance here.  And that is,

4   the cash collateral order allows the debtors to access its

5   DIP facility, its new DIP facility and use the cash

6   collateral of the first lien creditors for an 18-month

7   period of time in order to continue to run its business, and

8   have the liquidity it needs to maximize value here.

9           While on the other hand, from the first lien

10  creditor's perspective, although we feel like we gave a lot

11  along the way, we believe that with the protections in the

12  -- afforded in the final cash collateral order, it provides

13  the protections that we feel comfortable conceding to the

14  use of cash collateral, the priming, the $50 million DIP or

15  carve-out and the like.

16          With respect to 506(c), Your Honor, I would say in

17  the first instance, that was an essential component of our

18  package.  It remains a consensual -- essential components.

19  It is again, I did the same sort of search that my

20  colleagues that Mr. Husnick did, and we believe that this is

21  standard and typical.  And the hypothetical scenarios that

22  Mr. Shore seemed to be positing through his questioning of

23  Mr. Keglevic, I would suggest are just not pertinent to this

24  kind of case.

25          This is a huge operating company that with the DIP

1    and the cash collateral order will continue to operate with

2    sufficient liquidity, will remain as a going concern, and

3    even in the unlikely event that there is any kind of -- that

4    the RSA isn't consummated, and there's some outcome in these

5    cases, Your Honor, there's certainly -- there's just no

6    evidence or it doesn't even make sense to imagine that this

7    is just a foreclosure of assets, you know, in a meltdown

8    type scenario.

9            So I would just say that the questions -- the

10   arguments that are suggested by those questions are just

11   completely inapposite here.  And furthermore, just

12   emphasizing that that element is very important to our

13   group.

14           So to be clear, Your Honor, and finally, the first

15   lien lenders consider the protections that are afforded to

16   it in the cash collateral order, very, very important to

17   them, each and every one of them, and including those that

18   are challenged by the ad hoc group.  And we are prepared and

19   have directed the agent to consent to the cash collateral

20   order on that basis.

21           And for those reasons, Your Honor, we would ask

22   that you overrule the remaining objections of the ad hoc

23   group.

24           I'd like to just briefly if I could while I'm here

25   at a high level, not arguing the merits, address the

1    Aurelius concern.

2              THE COURT:  No.

3              MS. CORNISH:  Okay.

4              THE COURT:  Let's deal with that later.

5              MS. CORNISH:  Thank you, Your Honor.

6              THE COURT:  Stay focused.

7              MR. GOREN:  Thank you, Your Honor, Todd Goren,

8    Morrison & Forester, proposed counsel to the official

9    committee of unsecured creditors.

10             We are generally, as many people have noted, filed

11   an objection to the use of cash collateral.  We raised many

12   of the same issues that the ad hoc group raised in that

13   objection.  We shared, and continue to share many of the

14   same concerns that they had and have.

15             Ultimately through a process of negotiation that

16   occurred both before and after the filing of that objection,

17   and right up to the eve of the hearing today, we were able

18   to reach agreement on a form of order that the committee

19   finds acceptable.

20             We believe we got a lot of significant concessions

21   from the first lien lenders in those negotiations.  You've

22   heard some of them certainly, the you know, removing liens

23   on the unencumbered assets, keeping the avoidance actions

24   completely pristine, and available for unsecured creditors

25   under any circumstances, the increases to the investigation

1    budget and investigation period, other clarifying language

2    about payment of fees with respect to that, in the event of

3    overage and clarification as to the scope.

4           As Ms. Cornish noted, there was also many

5    additional clarifications in there that we believe will be

6    helpful at the end of the day to unsecured creditors, and at

7    a minimum, and to the extent there is a diminution in value

8    fight in the future, at least put parties on equal footing.

9           We also negotiated some limitations which you

10   haven't heard about to the credit bidding language in the

11   proposed order.  There was a waiver of the right to seek for

12   cause limitations on credit bidding under 363(k) in the

13   order.

14          The committee was able to negotiate but to the

15   extent any portion of the claims is subject to a challenge

16   by the committee, or any party that those claims -- that you

17   would be able to see for cause challenge with respect to

18   those claims.

19          So it was an important package of rights that were

20   negotiated, that the committee believed were important to

21   lock in.  You know, we originally raised the same objections

22   the ad hoc committee continues to press today, the adequate

23   protection payments, the 506(c) waiver.

24          Ultimately at the end of the day, the committee

25   was comfortable giving on those issues, in exchange for what

1    we were able to achieve, which we believe were part of good

2    faith negotiations with the first lien lenders and the

3    debtors, and were important modifications to the order for

4    unsecured creditors.

5            So for that reason, we support entry of the order

6    as amended.

7            THE COURT:  Okay.  Thank you.

8            MR. ASHMEAD:  Good afternoon, Your Honor, John

9    Ashmead of Steward and Kissel for Wilmington Trust.

10   Wilmington Trust appears in these cases in --

11           THE COURT:  Give me just a sec, please.  I'm

12   sorry.

13           MR. ASHMEAD:  Sure.

14      (Pause)

15           THE COURT:  Okay.  Go ahead, I'm sorry.

16           MR. ASHMEAD:  That's okay, yes, Your Honor.  John

17   Ashmead of Steward and Kissel for Wilmington Trust.

18   Wilmington Trust appears in these cases in two capacities.

19   It is the admin agent on the first lien credit agreement.

20   It is the collateral agent separate and apart for that for

21   the first lien parties.

22           It's succeeded Citi in those rules, as Your Honor

23   may have remembered, during the first hearing on cash

24   collateral and the other first day hearings, so that Citi

25   could proceed to such roles with respect to the DIP

1    facility.

2            The capacity that you're hearing Wilmington Trust

3    referred to during today's hearing, is solely in its

4    capacity as collateral agent.  At the interim hearing, based

5    on the consent of required secured parties, which is a

6    defined term under the collateral agency and intercreditor

7    agreement and which does not include noteholders.  It

8    includes the obligations of the first lien credit facilities

9    and the swap obligations.

10           With the consent of those parties, Wilmington

11   Trust consented in its role as collateral agent to the

12   interim collateral, interim cash collateral agreement.

13           Post hearing, Aurelius, a purported noteholder on

14   the first liens raised an allocation issue.  To our

15   knowledge, and I think Aurelius has been quite clear about

16   this, they do not object to the agent's consent to the use

17   of cash collateral, nor do they object to the --

18           THE COURT:  Are you talking about Aurelius?

19           MR. ASHMEAD:  I'm just rolling, passing through

20   Aurelius.

21           THE COURT:  Yeah, because we're talking about

22   later.

23           MR. ASHMEAD:  Your Honor, I'm talking about our

24   consent.

25           THE COURT:  All right.

1           MR. ASHMEAD:  Just let you know we consent.  Their

2      objection, as I understand it, is not to the adequate

3      protection package in full.  Nevertheless, we've guilt in a

4      mechanic we hope satisfies them, that you'll hear about

5      later, but with that, and with that condition, it was a

6      condition to the collateral agent's consent, with that and

7      the direction by the required secured parties, with respect

8      to the proposed final order, the agent here -- stands here

9      today and does consent to the proposed final cash collateral

10     order, and hopes that Your Honor enters that order, so that

11     the debtors can get the cash that they need to operate their

12     businesses and continue these cases.  Thank you, Your Honor.

13           THE COURT:  All right.  Thank you.

14           MR. ORY:  Thank you, Your Honor.  Sam Ory on

15     behalf of the first lien noteholders that you've heard

16     about, the 11 and a half percent, 1.75 billion dollar we

17     represent BOKF and A doing business as Bank of Arizona,

18     which is successor trustee for that note issuance under the

19     indenture for that note issuance.

20           Standing here today, we don't have a specific

21     direction from a sufficient number of noteholders to take a

22     formal position.  However, we have also not been directed to

23     object.  We have been in contact with both Aurelius and with

24     the first lien agent, and with the ad hoc committee and as

25     presented, we also would support the entry of an order

1    today.

2            I am here to talk somewhat about the Aurelius

3    issues when those come up.

4            THE COURT:  Thank you.  All right.  Mr. Lauria.

5            MR. LAURIA:  Good afternoon, Your Honor, Tom

6    Lauria with White & Case, the ad hoc TCEH lender group.

7            I think I'm going to start by being clear, because

8    it seems to get confused in some of the dialog here that

9    we're not objecting to the DIP, that's already done, subject

10   to the finalizing the order.  Nor are we really objecting to

11   the usage of cash collateral.

12           What we are objecting to is the proposed terms

13   upon which the prepetition lenders purport to have consented

14   to the use of cash collateral, and in particular, I think

15   we're really focusing on two components of the adequate

16   protection package that's been proposed.  Number one, the

17   506(c) waiver, and number two, the amount of the adequate

18   protection payments.

19           We're also troubled by the length of the

20   investigation period, but I think that's really a far lesser

21   issue.

22           What I've heard each of the parties say in so many

23   words, is that the present adequate protection package is

24   standard typical customary, appropriate under the

25   circumstances, but I don't really think that that is the

1    legal standard, nor do I think that the issue of the

2    appropriateness of the adequate protection package is in

3    anyway qualified by the debtor's business judgment.

4         I think, and in fact, I think the debtors'

5    reliance on business judgment argument I thought was kind of

6    interesting, given that the testimony offered by Mr.

7    Keglevic was pretty clear that if anything, the debtors'

8    business judgment is incomplete at this point.

9         I heard the witness say that he had not considered

10   a number of potential scenarios that he acknowledged were

11   legitimate in making decisions regarding the waiver of the

12   506(c) provision in particular.

13        And that he acknowledged, I think, that there was

14   the prospect that if there were problems, if the assets were

15   separated, if the T debtors were separated from the E

16   debtors, it was the potential that the box could be checked,

17   and a significant tax liability would be realized that the T

18   debtor estates that would render the T debtor estates

19   insolvent, which administratively insolvent.  Which is

20   exactly the scenario where courts have found that 506(c)

21   waivers are inappropriate.

22        But what is the legal standard here?  The question

23   is, is the adequate protection package necessary and

24   reasonable under all the facts and circumstances in the

25   record.  Does the proposal properly balance the lender's

1   rights and entitlement to have their right to repayment

2   protected versus the interest of the residual estate in

3   getting a recovery if there's a recovery to be had.

4          In that regard, the testimony which I believe is

5   unrefuted, is that the value of the first lien lender's

6   collateral is not diminishing, and if anything, is

7   increasing over time, but in any event, is protected by the

8   other relief that's been obtained that permits the continued

9   operation of the business.

10          And in particular, it's important to note here

11  that given the fact that the debtors have signed an RSA that

12  obligates them to go forward with a plan that takes the

13  position that there is no residual estate value, that there

14  is no value in the business for the benefit of the second

15  lien lenders, for the benefit of the unsecured noteholders,

16  for the benefit of the municipal bonds, for the benefit of

17  any unsecured creditors that aren't picked up and paid under

18  the array of first day orders, there's nothing here for them

19  out of the business.

20          There may be some scraps, there may be

21  unencumbered cash at the end of the day, we don't know if

22  we're going to keep that safe and secure or not, we hope we

23  do.  There may be avoidance action proceeds, but today,

24  that's all speculative.

25          And so when you have a debtor who's taken that

1    position, I think the debtor is stuck to also take the

2    position that the benefit of all of the first day relief

3    which permits the payment of, we think, approximately $700

4    million in unsecured prepetition claims is all for the

5    benefit of the first lien lenders.  It's their collateral

6    value that's being protected, if we're to believe the

7    position the debtors have taken, that there's no recovery

8    here for the unsecured creditors.

9             All of that value, protecting, continuing the

10   business, everything that's provided by paying these -- this

11   $700 million in expenses inures to the benefit of the first

12   lien lenders.

13            So I think it would be relatively easy for the

14   Court to conclude that the protection, if not, increasing

15   value of the collateral combined with the now authorized

16   payment of $700 million of prepetition claims in and of

17   itself at this point in the case adequately protects the

18   rights and interest of the first lien lenders.

19            And indeed there is no evidence in the record

20   regarding what the first lien lenders require.  Nobody

21   testified on the first lien lender's behalf that they would

22   or would not agree to the use of cash collateral without any

23   particular component of this package.  And Mr. Keglevic

24   wasn't in any of the negotiations and is not competent to

25   testify as to where the line was drawn, or if the line was

1    ever drawn.

2           However, in that regard, I think an inference can

3    be drawn from the fact that the DIP financing has already

4    been approved on a priming basis, without a reservation of

5    rights, by the first lien lenders, with respect to their

6    adequate protection package.

7           Surely if all of the components of adequate

8    protection were that important, they would've reserved their

9    approval of the DIP.  They're not objecting to the DIP for

10   them getting adequate protection.  And if the Court did not

11   award all of that adequate protection, they would want to

12   have their right to come back in and say, well, in that

13   case, we object to the DIP.  Well, we're past that hump.

14          They've sat here silently, they did not reserve

15   their rights, and they permitted the DIP to be approved.

16          Now, I think the Court can draw an inference from

17   that regarding the necessity of this adequate protection

18   package from the perspective of the first lien lenders.

19          So I want to go back through it a little bit here,

20   but I think that what I'm really saying is that the adequate

21   protection payments in the 506(c) waiver are both

22   unnecessary and unreasonable at this time, and in fact, I

23   think based on the testimony are improvident because what

24   those payments and that waiver does, is exposes the estate

25   to a risk of administrative insolvency at a future time in

1    the case, if things happen that people recognize can happen.

2            The witness testified that the box could be

3    checked if there was a separation between E and T on terms

4    that didn't make everybody happy.  That would result in a

5    massive tax claim for the T debtors.

6            Now, we dispute, to be clear, we dispute that

7    that's going to be such an easy thing for Mr. Keglevic or

8    anybody else to do.  We think to check that box,

9    somebody better get relief from the automatic stay before

10   any box gets checked that would result in a tax claim of

11   that magnitude being a liability of the T debtors' estates.

12           And I presume that since the debtors are cautious

13   here, they're seeking 363 authority to be able to dispose of

14   de minimis assets.  I presume that somewhere there would be

15   some advice given that the stay needs to be relieved before

16   any box gets checked.  And we would oppose that relief for

17   obvious reasons.  And there would be a host of other issues

18   that would come up if that box checking exercise was ever

19   actually put on the table in these cases.

20           But the fact of the matter is that paying that

21   cash out, and just to be clear, I'm going to go through the

22   numbers here, I'll go through them right now.  The total

23   amount of the DIP is $4.475 billion.  The debtors have today

24   agreed on the record to a sublimit that the last 300 million

25   of revolver availability would only be available with our

1    consent or with further order of the Court.

2              The debtors have made clear that the $1.1 billion

3    LC component is only to be used if the Texas Railroad

4    Commission does not agree to use the carve-out to protect

5    its rights.

6              That takes it down to $3.075 billion.  The

7    business plan shows that over $2.5 billion during the two

8    year period is going to be used to make these adequate

9    protection payments for the first lien lenders.  That leaves

10   us with somewhere in the neighborhood of a half a billion

11   dollars that's actually being used to fund the business over

12   the next two years under the DIP.

13             Mr. Keglevic did a set of numbers on the stand,

14   but I don't think there's any refuting the numbers that I

15   just gave the Court.

16             So two and a half billion dollars is going to be

17   drained out of this estate over a two year period, during a

18   time when there's great uncertainty about what the end

19   result is.

20             Now, the debtors are going to, at some point in

21   time, say, well, one of the reasons we have to go forward

22   with the plan contemplated by the RSA is to avoid the

23   potential that Mr. Keglevic (indiscernible) EFIH had will

24   check the box over the objection of Mr. Keglevic wearing his

25   TCEH hat.  And we're going to hear that, that one of the

1    reasons we have to do this is because we have this big tax

2    liability.

3              Well, what they're doing in the meantime is

4    bleeding themselves dry of any ability to deal with it, to

5    pay for it.

6              Now, a comment was made well, geez if we're under-

7    secured, these payments just reduce our claim; if we're over

8    secured, we're entitled to our interest and the payments are

9    applied to our interest.  This is a distinction without a

10   difference.  It's just a timing issue.

11             Okay.  If they're under-secured plan of the plan

12   or any other (indiscernible) they're going to get their

13   collateral or the value of the collateral, and if they're

14   over-secured under any plan, they're going to get their

15   claim plus the interest that they're legally entitled to.

16             The adequate protection payments just go to the

17   issue of when that cash or value is delivered to them.  And

18   I'd submit, Your Honor, that it's almost irresponsible given

19   the magnitude of the liabilities these estates are exposed

20   to to bleed two and a half billion dollars of cash out of

21   the estates now to permit that to happen now, with no real

22   substantive benefit to the first lien lenders, they're going

23   to get what they're entitled to either way, and leaving the

24   estate exposed to the risk of not only insolvency but

25   administrative insolvency.

1            The other thing, of course, is if they're not

2    making these payments, the DIP balance is going to be a

3    lower number.  In other words, the liabilities, the leverage

4    on this estate, which everybody already acknowledges is way

5    over-levered would be less when it comes time to cut a plan.

6    That's got to be a good thing.  That's got to be a good

7    thing.

8            Remember the 506(c) right is the -- really kind of

9    falls right in here.  If the lenders resort to the

10   unencumbered assets for adequate protection, by definition,

11   the residual estate, the part that they couldn't get their

12   hands on before will have provided value to their position.

13           How can the estate not have a 506(c) claim back?

14   And if there's a 363 sale or other transaction that results

15   in the assets being taken away by the first lien lenders,

16   how can they leave the estates without the ability to

17   recover amounts that would be needed to pay trapped

18   administrative expenses that will have been incurred but not

19   yet paid at the time of that transfer, which could include,

20   if somehow the box gets checked, a massive tax liability.

21           The fact of the matter is, the debtors have

22   committed to a deal that, in effect, hands the business of

23   the two debtors over to the first lien lenders.

24           Now, I heard somebody say that you shouldn't think

25   of that as a foreclosure.  I don't know what else to think

1    of it as from the perspective of an unsecured creditor.  The

2    assets are gone, we're left with no source of recovery.

3              So given that all of the value of the collateral

4    goes to the secured lenders as the debtors propose, and the

5    debtors will -- I'm not suggesting that we're not going to

6    fight over valuation at some point in time, but the debtors'

7    position today is that there's nothing for the unsecureds.

8              So the -- I think the adequate protection package

9    is overly generous.  It's unreasonable and unnecessary.  In

10   effect, it's giving the first lien lenders dessert at a time

11   when the rest of the estate may not get anything at all, and

12   it leaves the estate exposed unnecessarily and with no real

13   benefit to the first lien lenders.  But exposed to massive

14   liabilities with no source of repayment.

15             So -- now, maybe the lenders, if asked, would take

16   the position that if this adequate protection package were

17   in any way modified, that they would seek to prevent the

18   debtors from using cash collateral, and seek the liquidation

19   of these estates, we haven't heard that.  There's been no

20   competent testimony on that fact.

21             So maybe we should hear from the first lien

22   lenders, and then if that is their testimony, if that is the

23   evidence on this point, then the Court can decide, should we

24   yield to their demand, or is non-consensual use of cash

25   collateral more appropriate, given where the line is drawn.

1    But the line hasn't been drawn anywhere by any competent

2    testimony to this point.

3            But I do think the first lien lender should be put

4    on the stand and say, without this, without these permits,

5    without the 506(c) waiver, we don't consent.  There's

6    nothing that is in this record that allows the Court to

7    conclude that that's the case at this point.  Even counsel

8    didn't go that far.  Counsel to the first lien lenders

9    identified a number of things that were very important, but

10   didn't say if there's any modification by the Court to this

11   adequate protection package, well, look they have consent

12   and force a fight over use of cash collateral.

13           So, Your Honor, I would submit that there is

14   evidence that the first lien lender's rights and their

15   collateral are adequately protected at this time by the

16   payment of $700 million in prepetition unsecured claims that

17   benefit their collateral.  Any by the value of their

18   collateral being preserved and protected, if not increasing,

19   through the continued operation of business.

20           And remember, the approval of an adequate

21   protection package today doesn't in any way prohibit the

22   lenders from coming back to Court at any point in time and

23   saying there's been a change of circumstances.  We're no

24   longer protected.  And maybe we should try to defer that

25   date until when the 700 million has been spent.  Maybe the

1      700 million that's going out to prepetition unsecured

2      creditors at the debtors' request and with the approval of

3      everybody else in this case ought to go out the door and

4      then we ought to decide if we ought to start making $100

5      million a month payments on top to protect the prepetition

6      lenders.

7              So we've resolved the issue regarding the adequate

8      protection collateral package and superpriority claim

9      protection.  We believe the 50(c) waiver is inappropriate

10     under the facts and under this record.  And we believe that

11     the adequate protection payments are inappropriate and

12     unnecessary.  They don't do anything to change the end

13     position of the lenders, but they put the estate at jeopardy

14     unnecessarily.

15             A final point I'd like to make and I mention this

16     as a lesser point is that the lien challenge period has been

17     extended to 135 days.  Your Honor, you're going to hear over

18     time in this case, and have heard already, about the

19     complicated financing history of the T debtors' business.

20     We, me and the unsecured creditors committee, have at this

21     point gotten to do any due diligence regarding issues, and

22     claims, and disputes that may arise regarding the liens and

23     claims of the first lien lenders.  People are going to try.

24             My sense, and I think you're going to hear later

25     when we talk about the discovery disputes that the debtors

1    somehow feel that they don't have to provide discovery to

2    us, that they haven't been providing discovery to us.

3    They've said we're shutting the flow of information down to

4    you because there's now an official committee that's been

5    appointed.

6              So, on the one hand, you're going to hear the

7    debtors tell you they don't have to give us discovery.  A

8    lot of my $2.7 billion creditors were standing in the case

9    but were not entitled to discovery to examine and find out

10   if liens that come ahead of us and that could wipe out our

11   recovery in this case are valid and enforceable or are

12   subject to attack.  Or, and at the same time, they're going

13   to say they support -- they have said they support 135 day

14   period to conduct diligence into those liens and claims.

15   Now, you can't have it both ways.  And I don't even know,

16   not having gotten into the diligence, if they totally opened

17   the kimono today if 135 days is enough.

18             The one thing that I think would be unfortunate is

19   if people are forced to resort to the preparation of

20   protective lawsuits to file to prevent the limitation period

21   from expiring at the early stage of this case, which is what

22   we're getting set up for with 135 day period.

23             So, you've got testimony about the value of the

24   collateral being protected.  You've got testimony and a

25   record before you about $700 million going out the door to

1    protect that collateral.  You've got testimony that the

2    debtors' analysis of the consequences of 506(c) waiver is at

3    best incomplete.  You can conclude from the record before

4    you that the adequate protection package and all of its

5    components is not required for the first lien lenders to

6    consent.

7            So we would ask that the Court modify the adequate

8    protection package or direct the parties back to the

9    negotiation table to revise it to terms that are more

10   prudent under the circumstances and that protect the estate

11   without in any way, on this record, harming the interests of

12   the first lien lenders.

13           Thank you.

14           THE COURT:  Thank you.  Reply?  Reply, no.  Yes,

15   sir.

16           MR. LOWENTHAL:  Your Honor, good afternoon.

17   Daniel Lowenthal from Patterson Belknap Webb & Tyler.  We

18   represent Law Debenture Trust Company of New York.  You'll

19   recall we're the indenture trustee on the more than $5

20   billion worth of unsecured notes at the TCH level.  And

21   we're also now co-chair of the unsecured creditors

22   committee.  And we'd filed an objection also to the cash

23   collateral motion.

24           And I am here today, Your Honor, in my capacity as

25   counsel for Law Debenture as indenture trustee with respect

1    to the injunction that we filed on their behalf.

2              And we're pleased that most of the points that we

3    raised on our objection have been taken care of and

4    satisfied.  We've worked closely over the last couple of

5    weeks with both counsel for the committee, with the White &

6    Case folks, and others and we're glad the unencumbered

7    assets, the challenge period, we're fine with that.  The

8    budget has been increased and that's all fine.

9              But there were two points that we did brief that

10   have not been resolved as of yet.  And Mr. Lauria just spoke

11   to two of those.  I know he spoke to three, but we have

12   concerns about two.

13             THE COURT:  I thought you -- I thought I was told

14   your objection was resolved?

15             MR. LOWENTHAL:  Our objection has not been

16   resolved, Your Honor, with respect to cash collateral

17   motion.  Our objection has been resolved with respect to the

18   DIP motion.  I haven't heard anybody say that and we haven't

19   consented this thing or that it's been resolved.

20             THE COURT:  All right, well then I was told

21   something different.  So you're going to have to start from

22   the beginning on your objection.

23             MR. LOWENTHAL:  Okay, Your Honor, we -- the --

24             THE COURT:  Not start from the beginning, but tell

25   me your outstanding objection.

1          MR. LOWENTHAL:  My outstanding objection is two-

2    fold, Your Honor, and Mr. Lauria just spoke to both of those

3    so I'll just be another minute or so.

4          One, it relates to the size of the adequate

5    protection package; and two, we also briefed the 506(c)

6    issue.  Mr. Goldstein's testimony that you heard today

7    referenced -- Mr. Shore asked him about paragraph 31 of his

8    affidavit, which gives us concern that this is just actually

9    too rich because it turns out the company rule be cash flow

10   positive and that we don't think these payments are

11   necessary for all of the reasons that Mr. Lauria just

12   outlined.  And that hails with his -- the concerns that he

13   has also expressed with respect to 506(c) and the

14   particulars of this case.

15          So we have not resolved those two points.  We have

16   resolved all the others, and we're glad, frankly, that we

17   have and I know folks worked hard on that and they deserve a

18   lot of credit, but as the trustee on this, not wearing my

19   committee member's hat, these two points remain a concern.

20   And as Mr. Lauria said, we join him in saying that those

21   really are unnecessary and unreasonable given where we are

22   in this case at this time and the amounts that are at stake.

23   That's all and that's where are.

24          THE COURT:  Okay.

25          MR. LOWENTHAL:  Thank you.

1           THE COURT:  Thank you.  Briefly.

2           MR. HUSNICK:  Very briefly, Your Honor.

3           I just want to say to refocus Your Honor on the

4    correct standard here.  It's not the law that the debtor

5    needs to produce evidence to show that there is an actual

6    diminution in value happening in order to obtain approval of

7    a consensual cash collateral order.  In fact, you negotiate

8    for a consensual cash collateral order in order to avoid a

9    contested a cash collateral fight.  That would undoubtedly

10   involve days of testimony about whether the value of the

11   company is decreasing during the case.

12           As to the reservation of rights, I can allow --

13   I'm sure Ms. Cornish will address this.  I just think from

14   the debtors' perspective, I don't believe that that's

15   entirely correct to say that they haven't reserved their

16   rights vis-à-vis the DIP.  And the reason is, is even if

17   they didn't object to the DIP, nothing stops them upon

18   denial of the cash collateral motion from immediately moving

19   for relief from the automatic stay under 363(e) and forcing

20   the debtor to have just that diminution of value fight that

21   we talked about trying to avoid.

22           Finally, Your Honor, I think there was a statement

23   made by Mr. Lauria regarding the over/undersecured and it's

24   just timing.  It's not really just timing, Your Honor.  The

25   DIP will need to be repaid at the end of the case and

1    ultimately will require that the DIP lender -- or that the

2    debtor go out and get additional financing to repay that,

3    which will then decrease the value of the equity that is

4    ultimately going to the TCH secured creditor should the plan

5    of reorganization that's contemplated under the RSA go

6    forward.

7              For that reason, Your Honor, it's just not a

8    timing issue, it actually is a substantive issue and it's a

9    substantive entitlement that Section 363(c)(2) and 364(d)

10   entitle the prepetition secured lenders to, in order for the

11   debtor to have consensual use of cash collateral and the

12   $4.475 billion priming DIP.

13             That's it.  Thank you.

14             THE COURT:  All right.  I'm going to take a short

15   recess and then I'll come out and rule, about 10-15 minutes.

16        (Recess)

17             THE CLERK:  All rise.

18             THE COURT:  Please be seated.  All right, we're

19   talking about the cash collateral motion and as people said,

20   and I certainly appreciate, the hard work that went in to

21   resolving the objections that were resolved and I understand

22   that some were unresolvable and that is what it is, and I

23   certainly don't have any problem with people protecting

24   their rights and making arguments.  If you can't settle, you

25   can't settle.

1          So, the open issues on cash collateral at this

2     point, I'm holding Aurelius issues aside, since that doesn't

3     really kick in until we know if we're going to have a cash

4     collateral order or not and it's a different issue is

5     whether the amount or whether really any adequate protection

6     payments should be made, whether the Court should allow a

7     506(c) waiver, and whether the investigation period and

8     budget or (indiscernible - 4:25:53) period are adequate.

9          I would say that at first blush, I think the

10    adequate protection payments seem overly generous or just

11    plain unnecessary, but the facts is they were put out and in

12    front of the Court and developed do lead to a different

13    conclusion.

14         If we were just talking about cash collateral

15    usage here -- excuse me, if just cash collateral was

16    necessary and the debtors' cash flows are as positive as

17    they appear, I wouldn't approve adequate protection

18    payments.  They wouldn't be necessary.  Or if as it appeared

19    when I first read the papers, if the debtor was just

20    borrowing money on a priming basis for the sole reason to

21    make adequate protection payments, I wouldn't approve the

22    adequate protection payments.  I wouldn't have approved the

23    loan either.

24         But the testimony is that the debtors cannot

25    survive solely on cash collateral usage, that the DIP loan

1    was only available on a priming basis, that prime secured

2    creditors are entitled to adequate protection, and that

3    secured creditors, whose cash collateral was being used, are

4    entitled to adequate protection.  Of course, the question is

5    what is that -- what does that adequate protection mean, at

6    least in that last piece?

7              Now, the price of consent to the priming and the

8    use of cash collateral here are the adequate protection

9    payments plus the other provisions that are included.  And I

10   think it's important to note that even on a non-consensual

11   basis, the prime creditor would be entitled to adequate

12   protection and possibly on the use of cash collateral.

13             So based on the reality of the situation, the fact

14   that the debtors can't survive solely on cash collateral,

15   they had to borrow the money.  Now the size of that loan is

16   large, why?  Well, a big part of that is that the adequate

17   protection piece is large because that was the price for

18   consensual use.  So, in my mind, I must approve the adequate

19   protection package that's been proposed that's not a blank

20   check.

21             Debtors get stuff in here and I don't -- I think

22   it's important to note that there are no milestones.  There

23   is no linkage to the RSA.  And we're talking about an

24   extended 18 month period of cash collateral.  Those are all

25   very positive pieces of the package that go to what is

1    appropriate or wasn't appropriate.

2            But I have to look at it from -- looking out for

3    the estate and, you know, what's actually necessary and

4    what's appropriate adequate protection payment.  Now, I

5    think, although I'm going to approve them, that the adequate

6    protection payments, even at the blended interest rate on

7    the entire amount of the claim is a generous package of

8    payments.  And based partly on that and based primarily, as

9    well, on the fact that it's not fully consensual, I think

10   that a 506(c) waiver is not necessary and I want to prove it

11   in this context.

12           Let me just make a little point about that.  Judge

13   Walsh once told me that he'd never approved a 506(c) waiver

14   on a non-consensual basis and he'd never had a 506(c)

15   hearing.  It just doesn't arise.  And a lot of times I think

16   we're worried a lot about nothing, but in this case I think

17   Mr. Shore brought out some very important points in the

18   context of what would occur in the event there was some sort

19   of collateral shut down or collateral transfer to the first

20   lien lenders, and what would that leave behind, and where

21   would the -- where would that leave the estate.  So, I am

22   not going to approve a 506(c) waiver.

23           In connection with the investigation period, in

24   this instance, I am going to rely on the official

25   committee's judgment in this issue.  I'm not saying the ad

1    hoc committee's input is not important.  And, in fact, I

2    just upheld their objection to the 506(c) waiver, but I

3    think investigation period's like this are particularly an

4    issue where the Court's going to rely on what the official

5    committee has to say.  So, I'm going to approve what has

6    been agreed to with the consent of the official committee of

7    unsecured creditors.  So, I will approve the adequate

8    protection payments, no 506(c) waiver, investigation period

9    and budget are sufficient as modified.

10              Now, just real quick, debtors' counsel seemed to

11   indicate at one point that, I don't know if he's talking

12   about me or others, but basically I can't pick and choose,

13   or blue line the provisions of the agreement that the

14   debtors have entered into in their business judgment.  I

15   sort of agree.  I sort of disagree.  That's part of my job.

16   That's why I get an order.  That's why we go through it.

17   But what the issue is I can't force any party, including the

18   first lien lenders, to consent.  What I can do is indicate

19   what I'll approve and what I won't approve, and in this cash

20   collateral order I'll approve the adequate protection

21   payments.  I won't approve a 506(c) waiver and if that's a

22   problem, we'll deal with it.  If not, I'll approve the order

23   subject to talking about Aurelius when we get a chance.

24              Is there any questions on that before we go any

25   further?

1              MR. HUSNICK:  Thank you, Your Honor.  No questions

2    on that.  I believe we'll have to circle with the ad hoc

3    committee of first lien lenders on the consent issue.

4              THE COURT:  Okay.

5              MR. HUSNICK:  I'm not sure if that could happen

6    right away.

7              THE COURT:  Well, let's deal with -- they may need

8    to discuss it.  They may need to talk to their people, but

9    in the meantime, let's deal with this Aurelius issue.

10             MR. HUSNICK:  Okay.  Your Honor, if I may, I'm

11   happy to give just a quick response on the debtor.  It won't

12   be long -- from the debtor on this point.

13             Your Honor, assuming that we do reach agreement

14   with the ad hoc committee, it is the debtor's position that

15   the language that was negotiated with the first lien lenders

16   to escrow the payments pending resolution of the inter-

17   creditor dispute is more than sufficient to resolve the

18   issue for purposes of --

19             THE COURT:  Do you have any language to that

20   effect I could look at.  Is it --

21             MR. HUSNICK:  Yes, Your Honor.

22             THE COURT:  -- is it baked?

23        (Pause)

24             MR. HUSNICK:  I'm just trying to find it, Your

25   Honor.  Thank you.

1           MR. WEINTRAUB:  Your Honor?

2           THE COURT:  Yes.

3           MR. WEINTRAUB:  While counsel is looking for the

4    language -- excuse me.  I've seen the language and we do

5    have an issue with the language.  Assuming that the Court is

6    going to enter the order with that language in it and deal

7    with us thereafter, there is a problem with the language, a

8    small one, which I'd like to raise.

9           It has the escrow agreement being reasonably

10   acceptable to the first lien lenders and the debtor, but not

11   to Aurelius.  And since we have an interest in the money

12   that's going into the escrow, we would like that opportunity

13   also to have a review of the escrow agreement --

14           THE COURT:  Okay.

15           MR. WEINTRAUB:  -- if the Court is going to enter

16   that order.

17           THE COURT:  Okay.

18           MR. HUSNICK:  Your Honor, may I approach?

19           THE COURT:  Yeah, I just -- yes, please.

20           Partly I want to make sure I understand the exact

21   lay of the land here.  Where -- okay.  That's the allocation

22   sort of fix or carve-out.  Where's the provision that

23   actually is problematic that specifies how -- where the

24   money goes?

25           MR. HUSNICK:  Your Honor, I believe that the

1    overall construct of how the order is set up, which says

2    that the adequate protection payments are paid to the first

3    lien indenture trustee and the first -- and the swap

4    counterparties and the, I believe, the collateral agents,

5    that is the issue that I think Aurelius takes issue with, or

6    that is (indiscernible - 4:34:45) mechanism.

7              MR. WEINTRAUB:  Your Honor, it's not just the

8    mechanism, it's the formula for how the allocation is made.

9              THE COURT:  Right, right.  That's what I'm trying

10   to --

11             MR. WEINTRAUB:  We would be fine with --

12             THE COURT:  Let me just see if I understand, okay?

13   I'm just trying to get my head around it before we get -- go

14   down this road.

15             So, the way it reads now and I'm looking at, I

16   guess it's paragraph -- it's at paragraph D on page 28.

17   "Each month each of the first lien admin agent, first lien

18   notes' trustee, each hedge counterparty, and swap

19   counterparty for the benefit themselves and the respective

20   creditors which they act as agent shall receive from the

21   TCEH debtors their ratable share" -- and then we have how

22   that's calculated -- "of the aggregate amount of the first

23   lien adequate protection payments."

24             That's the issue you have that this order does two

25   things, right?  It sends the money to the wrong party,

1    right, and then it -- and it splits it up in doing violence

2    to the --

3              MR. WEINTRAUB:  One drives the other if it's split

4    up the right way.  We don't really care if it bypasses the

5    collateral agent.  Our issue is that we think it's being

6    split up the wrong way.  It's being split up in a way that

7    doesn't take into account the fact that there are different

8    interest rates --

9              THE COURT:  Right, no.

10             MR. WEINTRAUB:  -- for the different tranches.

11             THE COURT:  Yeah, I understand that point.  So

12   your point is that the way this is said, it does violence to

13   the inter-creditor agreement?

14             MR. WEINTRAUB:  That's correct, Your Honor.

15             THE COURT:  And then their point is that you

16   standing right there talking to me right now is doing

17   violence to the inter-creditor agreement.  So my question

18   is --

19             MR. WEINTRAUB:  And I dispute that, Your Honor --

20             THE COURT:  Right.

21             MR. WEINTRAUB:  -- and I'll tell you why.

22             THE COURT:  My question then is, why am I getting

23   involved at all in this?  Why isn't this provision simply --

24        (Simultaneous speaking)

25             MR. WEINTRAUB:  Your Honor, can I speak?

1          THE COURT:  Yes.

2          MR. WEINTRAUB:  Because it's our objection and

3    counsel has ample opportunity to address the Court.  It's

4    our objection.

5          We're here now because the other side has

6    basically institutionalized this inter-creditor dispute by

7    baking it into the cash collateral order.  It's now become

8    part of an order in the case.  And that's why we're here.

9          And we have standing to be here and the inter-

10   creditor agreement does not silence us because Section 6.1

11   of the inter-creditor agreement, which is quoted in our

12   papers, only prohibits our ability to object to the use of

13   cash collateral.  We're not objecting to the use of cash

14   collateral.  We're objecting to the allocation of the

15   adequate protection payments.  This does not change the

16   amount of adequate protection.  It doesn't change the gross

17   dollar amount.  And if you look at Section 6.1, Your Honor,

18   it says nothing about allocation, only talks about objection

19   to the consent to the use.

20         If there was materially unequal treatment, we

21   would then have the ability to object to the use.  We have

22   not gone so far as to object to the use, even though we

23   think it's materially unequal treatment.  We're content to

24   say that the allocation needs to be as per the inter-

25   creditor agreement.  That's not an objection to cash

1    collateral, Your Honor.

2            THE COURT:  Okay, let me hear from (indiscernible

3    - 4:37:50).

4            MS. CORNISH:  If I could back up just for a

5    moment, Your Honor.  When the -- because I think the

6    background's important and then there's a very vital

7    procedural issue that I just need to get before the Court

8    before we even think about going to arguments like standing

9    and the merits.

10           In the context of negotiating the interim cash

11   collateral order, the committee of first lien creditors,

12   along with the debtors, negotiated a mechanism for the

13   payment of adequate protection that goes in two steps.

14           In the first instance, the LIBOR plus 450 blended

15   rate gets applied to the aggregate amount of first lien

16   obligations as of the petition date.  And that aggregate

17   payment then, step two, gets allocated among the different

18   tranches of first lien debt.  And this in the interim cash

19   collateral order, and it's also the way it's formulated in

20   the final order.  And it speaks to what the parties intended

21   and what was negotiated in the initial cash collateral

22   order.

23           The second step is that that aggregate amount of

24   adequate protection payments get allocated out among the

25   different tranches pro rata as per the amount outstanding as

1    of the petition date.  It's a petition date measure.  Okay?

2    And it's a monthly payment.

3            Aurelius filed an objection to the final cash

4    collateral order raising for the first time that they

5    believed a different allocation was appropriate.  They make

6    the argument that the inter-creditor agreement requires that

7    rather than allocating pro rata as of the petition date,

8    that what one must do under the inter-creditor agreement is

9    to, on a monthly basis, consider the accrual of post-

10   petition interest at each tranche and allocate what would be

11   then different amounts, growing amounts for higher interest

12   rates, to the different creditors on a monthly basis.

13           So, an issue has been joined here on this point.

14   The procedural point that I think is critical to make right

15   now is that it's two things.  One, in order to address this

16   issue for purposes of getting the debtors the cash

17   collateral order they need and everybody else in these

18   cases, and recognizing that this was clearly simply an

19   inter-creditor dispute, we negotiated with the debtors and

20   we attempted to bring Aurelius into the fold, and obviously

21   the unsecured creditors had input as well.  We negotiated

22   the escrow provision.  It's the new paragraph 6 in the final

23   cash collateral order, to basically reserve -- it does two

24   things.

25           It's long and it's kind of dense, but that's

1    because the agent and everybody in the debtors have to get

2    comfortable with mechanics, but the essence of it is two

3    things.

4              One, it -- the first sentence clearly reserves and

5    preserves every creditor -- first lien creditors' rights

6    with respect to the allocation issue going forward.  And

7    two, it sets up a holdback account whereby the difference

8    between the petition date calculation that was approved in

9    the interim order and the Aurelius, what we call the post-

10   petition allocation, the difference between those two gets

11   escrowed and held subject to further order of the Court.

12             Now here's the really essential procedural point.

13   We believe, first off, that the escrow provision and the

14   reservation of rights moots the issue, that the Court's not

15   required to decide that point today.  And perhaps more

16   importantly, now that there is an actual dispute and

17   controversy with respect to this allocation issue, this has

18   to be decided in the context of some action, probably a

19   declaratory judgment action or some type of action which

20   provides -- which, first of all, identifies the proper

21   parties to the dispute.

22             Your Honor, we are counsel, as you heard earlier,

23   and it's why I put a fine point it in the opening of my

24   closing.  We are counsel to a committee whose members are

25   holders of both notes and first lien credit debt.  Who are

1    the proper parties to even adjudicate this dispute?  I don't

2    know that it's that committee or (indiscernible - 4:42:28).

3              Furthermore, this thing should be teed up in a

4    lawsuit and adjudicated on notice to proper parties.  People

5    might want to intervene.  People -- creditors other than

6    Aurelius might want to participate on the noteholders side.

7    I don't know.  But it is simply not -- first off, no one's

8    rights are going to be prejudiced if the order, as presented

9    to Your Honor, is entered, as everyone's rights are

10   preserved and there's an escrow.  And furthermore, it just

11   can't be adjudicated before Your Honor today.

12             THE COURT:  I'm concerned about getting sucked into

13   something I'm charged in to adjudicate in the first place.

14   And this is not a debtor issue.  This is -- you know, (a)

15   we're going to have adequate protection.  We're going to

16   have consent.  We're going to have cash collateral.  You

17   know, what I care about is that the debtors are making

18   adequate protection payments and what they are.  And who

19   they go to, fine, but how they ultimately get divvied up

20   amongst the creditors, I'm wondering why I'm getting sucked

21   into that --

22             MS. CORNISH:  Well --

23             THE COURT:  -- because that's really not my

24   problem.

25             MS. CORNISH:  -- that's the point.  Is the escrow

1    provision in paragraph 6 that we have added and heavily

2    negotiated over, you know, the last couple of weeks, few

3    weeks, it puts the issue to the lawsuit I just described.

4           THE COURT:  Yeah.  But who's going to decide the

5    lawsuit?

6           MS. CORNISH:  Well, I presume Aurelius and somebody

7    is going to decide that they're going to bring a lawsuit.

8           THE COURT:  But --

9           MS. CORNISH:  I agree with you, Your Honor.

10          THE COURT:  Well, I'm asking does it say where

11   or --

12          MS. CORNISH:  No.  It simply preserves the rights

13   of all the parties to seek an adjudication of this -- and if

14   you look at, Your Honor, it's paragraph 6(a) -- paragraph

15   6 --

16      THE COURT:  Um-hmm.

17          MS. CORNISH:  -- in the very first sentence.

18   "Expressly reserves and preserves everyone's rights" and the

19   next part of this provision sets up the holdback accounts

20   and --

21          THE COURT:  Okay.

22          MS. CORNISH:  -- makes clear that the difference

23   between the two different calculations is going to be

24   escrowed and held.  And then finally, somewhere it does

25   say -- help me, Chad -- Mr. Husnick -- subject to further

1    Court order.  It's here somewhere.  Let me find it.  Sorry.

2    It's in here.  I just need to find it.  We're on page --

3    yeah, we're in a blackline.  But, Your Honor, it's in (a) --

4    6(a), okay, and it's a long paragraph but the sentence says:

5    "The holdback amount shall be held in the escrow account

6    pending further order of this Court or another Court of

7    competent jurisdiction approving an allocation of the

8    holdback amount among the pre-petition first lien creditors.

9              THE COURT:  Okay.

10             MS. CORNISH:  Everybody's preserved.  And, Your

11   Honor, I don't know how that dispute will be adjudicated but

12   I don't think it's today.  And it's not with these parties,

13   I don't think.

14             MR. WEINTRAUB:  Your Honor, first of all, counsel

15   has a unique definition of moot.  It's not moot.  It's a

16   live dispute.  This does not moot the dispute.  What would

17   moot the dispute is if the Court ruled -- what would moot

18   the dispute is if the other parties agreed to really is just

19   interpretation.  Neither of those things have happened.

20         THE COURT:  Well, I'm not going to sit here and give

21   you a ruling today on whose interpretation is correct.

22             MR. WEINTRAUB:  I understand that, Your Honor.

23             THE COURT:  I don't think that's my job.  And, you

24   know, you guys can go fight.  You can fight here maybe, you

25   can fight somewhere else maybe.  My issue is at the same

1    time, I don't want my Court order to somehow fix the rights

2    of the parties that might be subject to a real dispute.

3         MR. WEINTRAUB:  No, I understand that, Your Honor.  And

4    I think the reservation of rights and the escrow does that

5    but with two comments to that.  But the issue is that the ad

6    hoc committee who all of a sudden says, who me, I have

7    nothing to do with this, is the one who baked this into the

8    hour and it deviates from the intercreditor agreement.  So

9    this is -- both parties -- all of the members of that

10   committee are parties to the intercreditor agreement, Your

11   Honor.  They filed their reply to our opposition, withdrew

12   and then filed an amended one.  The reason they filed an

13   amended one was because those members of the ad hoc

14   committee who hold notes would not join in the opposition.

15   So they've got a rift in their own committee, Your Honor.

16   But my problem is that the debtor has been -- I wouldn't say

17   co-opted but has done what the ad hoc committee or what Paul

18   Weiss has wanted and come up with a formula that's

19   prejudicial to those people with a higher coupon rate and

20   baked into this Court's order.  I don't understand why the

21   default is not the intercreditor agreement as opposed to

22   some other calculation that people have invented for

23   purposes of this order.

24        THE COURT:  I'm not going to -- I in no way am able

25   to make a decision as to who's right about the intercreditor

1    agreement.  But I'm not going to enter an order that somehow

2    prejudices anybody's rights under that intercreditor

3    agreement.  And if it means I turn over all the money to the

4    collateral agent, and just leave it at that and let you

5    people fight it out, so be it.  But I'm not going to be able

6    to get you what you want.  You want me to sign an order

7    today that says you get what you think you're entitled to

8    under the intercreditor agreement.  I'm not going to do

9    that.  I can't do that.

10            MR. WEINTRAUB:  I understand that, Your Honor.

11            THE COURT:  But at the same time, I'm not going to

12   write a blank check to the opposition either.  So I don't

13   know what to tell you.

14          MR. WEINTRAUB:  Two points, Your Honor.  In terms of

15   the language, as I indicated earlier, we want the ability to

16   comment on the escrow agreement since we have an interest in

17   the money being put in there.

18            THE COURT:  Okay.  That's not a problem.

19            MR. WEINTRAUB:  Thank you.  The other thing, Your

20   Honor, is the Court just said that you don't want to

21   prejudice anyone's rights under the intercreditor agreement.

22   And the redline that I was handed today all of a sudden

23   there appeared an exculpation of the first lien agent, the

24   notes agent and maybe even of the collateral agent for any

25   liability relating to their consent for the allocation.  We

1    think the allocation is in violation of the intercreditor

2    agreement and we certainly don't think that this Court's

3    order should exculpate people before that dispute has even

4    been resolved.  So I would request that that be excised from

5    any order, Your Honor.

6           THE COURT:  Where is that?

7           MR. WEINTRAUB:  It's in a redline that was handed

8    to me.  I don't know if the Court has it.  This is called

9    the "PW comment 6/4/14".  It's found on page 56 of the

10   redline --

11          THE COURT:  Yeah.

12          MR. WEINTRAUB:  -- in paragraph 20.

13          THE COURT:  What paragraph again?

14          MR. WEINTRAUB:  Paragraph 20.  If I can approach,

15   Your Honor, you can look at my copy.

16          THE COURT:  Hang on.  Oh, I see -- I have --

17   somebody gave me something with handwriting in it.  That's

18   dangerous.  Gave this to the wrong guy.

19          MR. WEINTRAUB:  Is that the "PW comment 6/4/14"?

20          THE COURT:  All right.  Well, let me -- let me hear

21   the response to the second point.

22          MS. CORNISH:  That would be the --

23          THE COURT:  The exculpation provision.

24          MS. CORNISH:  Oh, on the exculpation?  Your Honor,

25   I believe that was a provision that was requested by the

1    agent.  And I'm sure he will want to -- and we agreed to it.

2    I'm sure he will want to address it.  As far as we're

3    concerned, if it would prevent the entry of the order, we

4    have no problem --

5            THE COURT:  I'm not letting anybody off the hook.

6            MS. CORNISH:  I understand.

7            THE COURT:  You people --

8            MS. CORNISH:  I understand.

9

10           THE COURT:  -- can go at each other.  I don't care.

11           MS. CORNISH:  I understand.

12           THE COURT:  It's not my problem.

13           MS. CORNISH:  Your Honor, the -- we agree.  Your

14   Honor, we agree.  That is the crux of my entire presentation

15   to you and it is the reason that we enter -- look, we are

16   getting, hopefully, adequate protection payments.

17         THE COURT:  Yeah.  I mean --

18           MS. CORNISH:  And they have to be paid.  And so,

19   paragraph 6, Your Honor, is an element -- a solution to that

20   to get the payments down to the various holders without

21   prejudicing anyone's rights.

22           With respect to the issue of the original

23   negotiation of this and the committee makeup, just to be

24   clear, we have noteholders and we have holders of the credit

25   facility debt.  They are all -- everyone in support of the

1    entry of this order, including the escrow provision.  We so

2    directed the agent, all of those holders.  The only thing

3    that was carved out in a footnote that was in our brief is

4    that there are three members -- excuse me -- four members of

5    the committee who did not sign on to the merits arguments,

6    on the merits of whether or not the allocation --

7              THE COURT:  Yeah.  I really --

8              MS. CORNISH:  They carved out of that -- but they

9    all support the entry of this order.  So there are

10   noteholders on our committee who support the entry of this

11   order with this escrow provision which they believe

12   preserves everyone's rights and also believe that this is

13   not something that the Court should take up today and --

14             THE COURT:  All right.

15             MS. CORNISH:  Okay?

16             THE COURT:  Okay.  We're losing control of the

17   podium here.  You sit down.  Where is counsel -- I'll get

18   you in a minute.  Let me hear from you.  Yes, sir?

19             MR. ORY:  Sam Ory, Your Honor.

20             THE COURT:  And I'm sorry.  I don't know everyone's

21   names.  I apologize.

22             MR. ORY:  Sam Ory on behalf of the first lien

23   indenture trustee.

24             I understand what Your Honor is saying and agree.

25   I have not yet seen -- I've asked for the blackline; I've

1    been told it's still in flux.  If the direction from the

2    Court is don't hurt anybody's rights on either side and

3    preserve the issue for a later hearing by this Court or

4    another perfect Court and nobody's going to exculpate it, I

5    think we can probably, as decent attorneys, hopefully work

6    that language out and get that done.  And I think from the

7    trustee's perspective for all of the noteholders, some of my

8    noteholders of which are on the committee and some are

9    Aurelius' and some have not contacted me yet, I'm

10   comfortable with that approach.

11           THE COURT:  Thank you.  Let me hear from Wilmington

12   Trust.

13           MR. ASHMEAD:  Your Honor, John Ashmead for

14   Wilmington Trust solely in its capacity as collateral agent.

15           Just to sort of level set this, Aurelius has raised

16   an issue.  I think they've made it clear that they don't

17   object to the entry of a cash collateral order insofar as it

18   relates to use of cash collateral or the adequate protection

19   package as a whole.  What they've identified is ultimately

20   an intramural dispute.

21           Wilmington Trust, once this dispute was raised and

22   after a week of talking to the different parties and looking

23   at these issues, insisted as part of its consent to this

24   order that we provide a mechanism that both preserved rights

25   and also provided a remedy because Wilmington Trust is not

1    an economic party as Your Honor, I'm sure, understands.  And

2    as so, we can't be the remedy.  That is what fed into as

3    well the exculpation language.

4            If this order with the escrow language, as agreed,

5    is entered, we could live without the exculpation language.

6    But just to be clear, if this language was not in here, we

7    would not be consenting to the cash collateral order.  And

8    to the extent that we've got money as collateral agent, we

9    would interplead it.  And that's what would happen.  So I

10   think it behooves the parties who would like to get this

11   money that they work out something that's sensible.  And we

12   recommend that they do that.

13           THE COURT:  All right.  Well, I'm not going to put

14   in the exculpation provision.  And Wilmington Trust gets

15   paid what it gets paid and that's part of the risk of doing

16   what you're doing.  And you're more than aware of that, I

17   know.

18           MR. WEINTRAUB:  And, Your Honor, I don't have to be

19   told four times.  I understand the Court does not want to

20   get in the middle of this.  But hopefully, we need someplace

21   to resolve this intercreditor --

22           THE COURT:  You have a choice of law and choice of

23   jurisdiction or a credit agreement, I'm sure.

24           MR. WEINTRAUB:  That's true, Your Honor.

25           THE COURT:  Go to New York State Court.

1          MR. WEINTRAUB:  I think to a certain extent this is

2     an issue that's going to flow through this case,

3     unfortunately, because we see this as a precursor to how

4     distributions might be made under a plan.  And we're going

5     to fight that as well if there's going to be a deviation

6     from the intercreditor agreement because that disadvantages

7     all of the noteholders, Your Honor.  So hopefully --

8          THE COURT:  And it may be -- it may be that at --

9     it may be at some point it would be appropriate for me to

10    get involved in this.  And it may be I get involved in what

11    is being set aside to be decided by a Court of competent

12    jurisdiction.  I'm not saying I won't do that.  I don't want

13    to be overly flip when I tell you to go to New York State

14    Court.  That's just the fact that it's 5 o'clock.  But I

15    can't deal with it in this context.  I have no way to deal

16    with it.

17         MR. WEINTRAUB:  I understand.  I would just

18    request, Your Honor, of the Court and all of the parties

19    that this is an issue that should not linger.  It's not a

20    very difficult issue and hopefully we can all agree on a

21    mechanism to have this determined sooner rather than later

22    on a consensual basis.  Otherwise, we're going to have to

23    take more direct action  unilaterally and we prefer not to.

24         THE COURT:  All right.  My ruling on the actual

25    merit issue in front of me is I will approve it with

1    paragraph 6 included provided that Aurelius is a consent

2    party to the escrow agreement, and of course, that's

3    reasonable consent, and provided that there's no exculpation

4    of any party in connection with this issue.

5           MR. WEINTRAUB:  Thank you, Your Honor.

6           THE COURT:  And if that's acceptable, I'll sign an

7    order.  If it's not, we have a problem.

8           UNIDENTIFIED SPEAKER:  Your Honor, that's the first

9    lien note.  The trustee is a consent party to the --

10          THE COURT:  Yeah.  Whoever -- yes, of course.  The

11   parties that have an economic interest or an administrative

12   interest should be a party to whatever escrow agreement is

13   reached.

14          MS. CORNISH:  And, Your Honor, that is acceptable

15   to the first lien creditors.  Thank you.

16          THE COURT:  And I will get involved in the escrow

17   agreement if it's a problem because it's necessary for the

18   order to be of any effect.

19          Okay.  Was this mine to keep?  I don't think so.

20          MR. HUSNICK:  Your Honor, may I approach?

21          THE COURT:  Yes.  Of course.  Thank you.  All

22   right.  So where we are is I've made my ruling on the

23   substance.  I've dealt with the Aurelius issue.  Are there

24   anything else -- I guess we need to go through the blackline

25   and you need to point out to me significant changes.

1          MR. HUSNICK:  Yeah.  What I can do, Your Honor,

2     because the language is still moving -- and I just asked

3     counsel to the ad hoc group whether they're in a position to

4     move forward now.  They are telling me that probably it'll

5     be this evening that they'll get signed off on moving

6     forward without the 506(c) whether or not they'll move

7     forward.  I don't know -- but because the order is still

8     moving, whether it makes sense for you -- do we want to do

9     it now or if you'd prefer to do it first thing in the

10    morning and we try and resolve the language with Aurelius

11    and the various agents this evening.  We're amenable to

12    either.

13          THE COURT:  I hate to keep people overnight who --

14    here who weren't otherwise planning on being kept overnight.

15    But given the hour and given the amount of work that still

16    needs to be done, let's spend the -- you can spend the

17    evening ironing out the exact order and we'll take it up

18    first thing tomorrow morning before we move to the balance

19    of the agenda --

20          MR. HUSNICK:  Okay.

21          THE COURT:  -- which will be at 9:30.

22          MR. HUSNICK:  Okay.

23          THE COURT:  Now that leaves us with the status

24    conference on discovery.  And that may take a while, right?

25          MR. HUSNICK:  We actually have schedules, too, Your

1    Honor, which --

2           THE COURT:  I can't --

3           MR. HUSNICK:  We also had schedules, the motion --

4           THE COURT:  Oh.

5           MR. HUSNICK:  -- to extend the schedules --

6           THE COURT:  You're right.

7           MR. HUSNICK:  -- which is probably very short.

8           THE COURT:  All right.  How does debtor want to

9    proceed?

10          MR. MCKANE:  Your Honor, we can address -- one

11   question the debtors have is what is the duration of time

12   that remains in your day with your court reporting service?

13          THE COURT:  Good till 6 but I'm not going past 6.

14          MR. MCKANE:  Okay.

15          THE COURT:  Especially since we have all day

16   tomorrow.  If I go -- just so -- it's not just that I'm

17   tired.  There are significant expenses associated with

18   staying past a certain hour that is difficult for the Court

19   to handle in its budget.

20          MR. MCKANE:  That's understood and that's what

21   prompted the request.  Your Honor, in terms of priorities,

22   we actually would like to walk through the DIP order and get

23   that entered first.  That's the highest priority objective

24   of the debtors at this time.  We're not trying to have

25   people unnecessarily hold over but we do have obligations.

```
 1            THE COURT:  Is it ready to go through?

 2            MR. HUSNICK:  Yes.

 3            THE COURT:  All right.  So let's do that.

 4            MR. HUSNICK:  May I approach?

 5            THE COURT:  Yes.

 6            MR. HUSNICK:  Your Honor, still up in the air on

 7    whether EFIH will be contested.

 8            THE COURT:  All right.  Let's just go through the

 9    blackline then.  I'll tell you what.  I'll let you know if I

10    need --

11            MR. HUSNICK:  Okay.  Thank you.

12            THE COURT:  -- you to tell me anything.

13        (Pause)

14            MR. SASSOWER:  Your Honor, we're having copies of

15    the order printed so other people can follow along.  That's

16    going to take about ten minutes.  So I don't know if you

17    want to take a short recess so we can hand those out.

18            THE COURT:  Oh, let's do that then.  Otherwise,

19    we're going to have chaos.  So get those printed out.  I'll

20    take this back and review it during the recess.

21            MR. HUSNICK:  Thank you, Your Honor.

22            MR. MCKANE:  Thank you.

23        (Recess at 5:01 p.m.)

24            THE CLERK:  All rise.

25            THE COURT:  Okay, guys.  Please have your seats.
```

1    Now I know I surprised you there.  Sorry.  All right.

2          MR. SASSOWER:  Your Honor, Edward Sassower from

3    Kirkland & Ellis for the record.

4          It appears to have been too ambitious of a plan to

5    try to settle the orders before 6 p.m.  So I think the game

6    plan for the rest of today and tomorrow is as follows:

7    We're going to start tomorrow with the DIP order and the

8    cash collateral order, hopefully, assuming that we make

9    progress on both of those this evening.  And then we will

10   pick up with the SOFAs and the discovery dispute.  And then

11   we'll address the East Side.

12       As far as tonight goes, there is -- an issue has arisen

13   with the committee and the Office of the United States

14   Trustee regarding the critical vendor settlement.  So I'm

15   going to yield the podium in a minute to Mr. Marinuzzi to

16   talk about that.  And then my partner, Stephen Hessler, is

17   hustling over here from our (indiscernible - 5:18:25)

18   offices to give Your Honor a quick update on the East Side

19   so you know where to focus your reading tonight.

20          THE COURT:  Which I appreciate.  Thank you.

21          MR. SASSOWER:  Yeah.  So with that --

22          MR. MARINUZZI:  Good evening, Your Honor.  Again

23   for the record, Lorenzo Marinuzzi, Morrison & Foerster,

24   proposed counsel for the official committee.

25          Your Honor, in the nature of housekeeping, we

1   received a copy of the proposed order, received

2   electronically.  If it hasn't been circulated to the entire

3   committee, it will be.  And we'll discuss the order as a

4   committee.  I anticipate that won't happen before Monday

5   because there are at least two committee members here in

6   court and other people that need to be involved in that

7   discussion are otherwise affected by this hearing.

8           Preliminarily, we've heard from at least one member

9   who expressed great concern over language that was inserted

10  into the order.  And let me preface this by saying that we

11  worked closely with the ad hoc committee, and White & Case

12  in particular, on a number of issues and there are a number

13  of issues where we're arm in arm and see things the same

14  way.  On this particular issue, I think we don't see things

15  the same way.  And it may be that the committee objects.  It

16  may be the committee doesn't take an official position on

17  this.  I know the U.S. trustee wants to be heard on it.

18          But I think the implication of the language that's

19  inserted there creates at least optically an impression that

20  someone who serves on a creditors' committee is not supposed

21  to have an ordinary business relationship with a debtor-in-

22  possession.  And I think, putting aside a chilling effect, I

23  think that it puts an inappropriate burden on a creditors'

24  committee member by virtue of the fact that they happen to

25  also be a vendor.

1          So the committee or members will weigh in

2     officially on the form of order.  I'll cede the podium to

3     the U.S. trustee.  Thank you.

4          THE COURT:  All right.  Thank you.

5          Mr. Schepacarter, good evening.

6          MR. SCHEPACARTER:  Good evening, Your Honor.

7     Richard Schepacarter for the United States trustee.

8          The provision that Mr. Marinuzzi talks about is

9     paragraph 6 of the proposed critical vendor order.  And I'll

10    just read it into the record so everyone knows what we're

11    discussing.  It basically says, "If any Employee of a member

12    of the Creditors' Committee requests any Employee of the

13    TCEH Debtors to pay Critical Vendor claims, the TCEH debtors

14    shall provide notice of such request to the Ad Hoc Group

15    provided, however, that the TCEH Debtors shall only be

16    required to provide notice of such request made prior to the

17    date hereof to the extent such request was elevated through

18    the Vendor Review Committee of the TCEH Debtors."

19         The committee indicated to us that they had a

20    concern over this.  And I really hadn't focused on any of

21    that when I heard it in court today.  It seemed pretty

22    benign.  But after listening to Mr. Marinuzzi give his

23    comments, I could see that there is some implications to

24    that language that perhaps I'm not sort of aware of at this

25    point.  And I kind of maybe want to maybe even hear from the

1    ad hoc group as to what the motivation is to include that

2    language and what the purpose is of receiving that

3    information.  Maybe at that point there could be some

4    further crafting or distilling of that language at some

5    point.  But I'm not comfortable after hearing counsel's

6    concerns that he raised to have that language included in

7    this order at this time especially when you have that

8    tension of committee members -- some are vendors, some

9    aren't.  The ones that aren't vendors don't have the

10   ability, to the extent that somebody's a critical trade

11   vendor, sort of to get paid on their claim.  As we all know,

12   and I'm sure that the committee understand and all the

13   players understand that if somebody were to be a critical

14   vendor and have their claim satisfied in some fashion that

15   they would no longer be eligible for the committee because

16   they would no longer be creditors.

17          So perhaps we need to look at this language.

18   Perhaps we need to refine it in some way or we need to

19   understand what the motivation is of the ad hoc group to

20   include that language in this order at this time.

21          THE COURT:  Okay.

22          MR. SCHEPACARTER:  Thank you, Your Honor.

23          THE COURT:  Mr. Shore?

24          MR. SHORE:  Chris Shore from White & Case on behalf

25   of the ad hoc group of TCEH unsecured notes.

1           We're happy to talk to anybody.  We'll continue to

2    talk to people.  If the U.S. trustee wants to engage on

3    this, we'll express our concerns.  We'll express our

4    concerns to the committee.  What we've proposed and what the

5    debtors agreed to was disclosure by the debtors.  We could

6    serve a discovery request on the debtors and the debtors

7    would presumably have to tell us what they've discussed with

8    other people any of their creditors.  We could do it through

9    a 2004; we avoided that.  They -- all we have in the order

10   is the debtors making a disclosure.  There's no onus, no

11   disclosure obligation on the part of any trade vendor or

12   anything else.  Just the debtors.  They've agreed and no one

13   has opposed the notion that making a demand for payment of

14   your pre-petition claim by withholding services under a pre-

15   petition contract for the sale of goods or the provision of

16   services is a stay violation.  That's what the debtors have

17   agreed to tell people.  All we're saying is with respect to

18   critical vendors, our concern has been that the debtors

19   would be using that in means outside protecting and

20   preserving the ongoing business.  And the debtors have

21   agreed to make disclosure around that to quell our concerns.

22   If the debtors --

23           THE COURT:  Why the --

24           MR. SHORE:  -- make the disclosures, it quells our

25   concerns.

1           THE COURT:  Why the focus on the committee members?

2           MR. SHORE:  We can -- if we want to have a

3    discussion on that, we can file a motion.  We can file

4    declarations and what-not.  This was a means of addressing

5    our concern.  It may be -- look, I would hope that the

6    response is from the debtors we've had no such

7    communications with any of the committee members about how

8    they would be paid outside the context of a plan.  I would

9    hope that would be the disclosure and it's all a tempest in

10   the teapot.

11          MR. SASSOWER:  Your Honor, the settlement that

12   we're talking about was agreed to maybe ninety seconds

13   before you walked in the courtroom this morning.  We had an

14   opportunity to quickly tell Mr. Marinuzzi what we had agreed

15   to.  He didn't have a moment to reflect on the settlement

16   much less talk to his client.  And we didn't have an

17   opportunity to tell the Office of the United States Trustee.

18   We were unaware that they would have serious concerns about

19   this provision and would not have agreed to it had we been

20   so aware.

21          I think we're happy to -- if everyone agrees to

22   this language, we're happy to have an order with this

23   language.  If Your Honor, were to strike this language from

24   an order, we're happy with that provision.  White & Case

25   wants to litigate the original Sunset provision in their

1    objection or if we can do that as well, I think we probably

2    all could use tonight to try to resolve this.  It may drift

3    into next week.  Unfortunately, there's not another hearing

4    until June 30th and so we'll have to figure out if we cannot

5    live with the interim relief which is up to thirty million

6    dollars.  And we need something in between this hearing and

7    the next hearing.  We'll have to figure out how to go about

8    doing that but we don't have to figure that out tonight.

9            THE COURT:  Okay.  All right.  Well, it sounds like

10   what needs to happen is a discussion over the evening to

11   figure out what's going on and whether people can get

12   comfortable with it or not.  I'll certainly be able to find

13   you time to deal with the discreet issue of critical trade

14   vendor at a later time.  If I have to have a hearing on

15   that, we'll have time.  I'm not sure when but sooner rather

16   than later would be my hope.

17           MR. SHORE:  Or on that one, we could even

18   potentially even do --

19           THE COURT:  All right.

20           MR. SHORE:  -- by telephone.

21           THE COURT:  Well, you can't do a contested  hearing

22   by telephone but if we were having a discussion or a

23   settlement issue, we could do that by phone.

24           Okay.  All right.  So we'll hold our --

25           MR. SASSOWER:  So the only other matter for tonight

1    is I'm just waiting for my partner to arrive.  He should be

2    here any moment.

3              THE COURT:  Not that far.

4              MR. SASSOWER:  I know.

5              THE COURT:  He's -- he's lost?  This is Wilmington.

6    There's no way to get lost.  There's nothing fun to do.

7              MR. SASSOWER:  So I don't know if we want to take

8    a -- there he is.  Right on queue.

9              THE COURT:  You have no idea what you were supposed

10   to say, do you?

11             MR. HESSLER:  Good afternoon.

12             THE COURT:  Good evening.  I understand and I know

13   you just walked in.  You were going to give an update as to

14   what the status is of the EFIH issues.

15             MR. HESSLER:  Sure.  For the record, Steve Hessler

16   of Kirkland & Ellis, proposed counsel for the debtors.

17             If Your Honor allows us a few minutes, happy to

18   walk through --

19             THE COURT:  Sure.

20             MR. HESSLER:  -- what is before and what's not

21   before the Court.  Just purely from a procedural posture --

22   standpoint -- and the other EFIH parties who we've been

23   talking with today, they're all here, too.  We all came

24   right over.  So everybody'll have an opportunity to say

25   their piece as needed.

1          Your Honor, tomorrow the debtors are proposing to

2     go forward with certain of the relief set forth in two

3     motions.  The first is the motion to approve the EFIH first

4     lien DIP.  And included within that is the ability to use

5     those DIP funds to repay all outstanding principal and

6     accrued interest of the EFIH first lien debt.

7          The second motion, Your Honor, is to approve the

8     EFIH first lien settlement.  And included within that, most

9     significantly, is the consensual resolution of the make-

10    whole claims of approximately forty-two percent of the first

11    lien DIP holders.

12         Your Honor, the DIP motion was filed on the

13    petition date at docket number 74.  On the agenda, it's item

14    number 20.  As originally requested as part of that DIP

15    motion, we had originally asked for a ruling disallowing in

16    full the make-whole claims of all non-settling first lien

17    DIP holders.  By agreement of the debtors and the other EFIH

18    first lien parties, that litigation, as I believe the Court

19    is aware, has been moved to a separate track.  So it's not

20    going forward tomorrow.  The Court yesterday entered at

21    docket number 803 a consensual scheduling order for the

22    make-whole litigation including all the discovery and

23    briefing deadlines.  And that's going to culminate in a

24    trial before this Court on September 10th, 11th and 12th.

25         The first lien settlement was originally filed as

1    part of a broader motion.  And that was filed on May 15th at

2    docket number 472.  That's item 22 on tomorrow's hearing

3    agenda.  Partly in response to the requests of many of the

4    parties that certain of the relief set forth in that broader

5    motion be moved to later hearing dates, both the EFIH second

6    lien make-whole settlement and the Encore tax sharing

7    agreement amendment like the first lien make-whole

8    litigation, those have been moved to separate tracks and

9    those will not be before the Court tomorrow.

10            Your Honor, the relatively discreet relief that is

11   going to be before the Court tomorrow is just the EFIH first

12   lien settlement and the specific relief being sought we

13   filed in a standalone order on June 2nd at docket number

14   730.

15            Lastly, Your Honor, at the May 22nd hearing, we had

16   stated at the time our intention to go forward to tomorrow

17   with the breakup fee related to the proposed EFIH second

18   lien DIP facility.  Since the May 2nd hearing, Your Honor,

19   the debtors subsequently determined to move this issue as

20   well to the June 30th hearing to be heard in conjunction

21   with the rest of the relief being sought in the EFIH second

22   lien DIP motion.

23            So to sum up on that front, Your Honor, with two

24   EFIH items going forward tomorrow:  the first lien DIP and

25   refinancing and the first lien make-whole settlement but not

1    the first lien make-whole litigation and not the second lien

2    DIP refinancing or make-whole claims.  All of those latter

3    items are reserved for later hearings.

4          So that's the procedural posture, Your Honor.  With

5    regard to progress to date resolving objections, beginning

6    with the first lien DIP motion, the EFIH second lien trustee

7    did file a limited objection regarding one specific

8    component of the EFIH first lien DIP.  But after discussions

9    with the second lien trustee, my understanding is the

10   trustee wants to make a statement regarding their

11   reservation of rights for the June 30th hearing but that the

12   trustee does not oppose the first lien DIP order being

13   entered.

14          Your Honor, the EFIH first lien trustee has

15   otherwise filed an objection to the DIP motion and I won't

16   characterize their objection whether it's resolved or

17   withdrawn.  I do believe I'm fine to go ahead and preview to

18   the Court and other folks can chime in as needed.  We're

19   nearly done on a fully consensual order.  I think there may

20   be a provision or two that parties want to make some

21   statements about before the Court and between now and

22   tomorrow, we may learn that we need your help deciding some

23   issues on that, but we do expect the DIP order itself to be

24   almost entirely, if not entirely, consensual by tomorrow,

25   Your Honor.  And we will file an updated version that shows

Page 248

1   all the changes in redline form since the last version was

2   filed with the Court.

3              Secondly, Your Honor, as to the first lien make-

4   whole settlement motion, the only objection that

5   specifically was -- or the only objection filed specifically

6   to the relief being sought in that motion was filed by the

7   EFIH first lien trustee.  And, Your Honor, as of now, that

8   objection remains unresolved.

9              THE COURT:  All right.  So the EFIH first lien

10  settlement exclusive of the second lien or the Encore tax is

11  going forward on a contested basis with the EFIH first lien

12  trustee having an objection.

13             MR. HESSLER:  That's correct from the debtors'

14  perspective, Your Honor.

15             THE COURT:  Okay.  And the first lien DIP is going

16  forward but you're almost consensual and hope to be fully

17  consensual by tomorrow.

18             MR. HESSLER:  That our perspective as well, Your

19  Honor.

20             THE COURT:  Okay.  And you don't at this point have

21  a blackline order that can be shared in connection with the

22  DIP?

23             MR. HESSLER:  We could.  If you want us to go ahead

24  and get that to chambers, we could.  I didn't know -- we

25  didn't --

1          THE COURT:  Is it still in flux?

2          MR. HESSLER:  A little bit but --

3          THE COURT:  I'll look at it tomorrow.

4          MR. HESSLER:  -- a number of terms have been

5    continued to go through with the parties but if you'd rather

6    see tomorrow morning the latest version --

7          THE COURT:  Yeah.

8          MR. HESSLER:  -- or we can get you one right now.

9          THE COURT:  No, no.  I'll look at it in the morning

10   then.

11         MR. HESSLER:  Okay.  And presumably, you prefer a

12   redline against the last version filed with the Court.

13         THE COURT:  Yes.

14         MR. HESSLER:  Okay.  We will do that.

15         THE COURT:  Okay.  Anybody have a burning desire to

16   be heard on the EFIH issues?  Good.  All right.  Is there

17   anything else for today?  All right.  Thank you very much.

18   I appreciate everyone's cooperation.  If you could -- you're

19   certainly welcome to keep your things here but if you can

20   neaten up the place a little bit, get rid of your trash, et

21   cetera, I would truly appreciate it.  And I'll see you

22   tomorrow at 9:30.

23         (A chorus of thank you)

24      (Whereupon these proceedings concluded at 5:34 PM)

25                    * * * * *

Page 250

```
1                        I N D E X

2                      W I T N E S S E S

3    WITNESS                  BY                      PAGE

4    PAUL KEGLEVIC            MR. MCKANE                94

5                            MR. SHORE              110, 112

6                            MR. MCKANE               146

7

8    STEPHEN GOLDSTEIN        MR. MCKANE               154

9                            MR. SHORE                155

10

11                       I N D E X

12                     E X H I B I T S

13   PARTY      NO   DESCRIPTION         ID.      EVID.

14   Debtor     32   9/7/13 Email        --        163

15              33   Unknown             --        163

16              34   Original DIP Budget --        163

17              35   Final DIP Budget    --        163

18

19

20

21

22

23

24

25
```

Page 251

1                        I N D E X

2                       R U L I N G S

3       DESCRIPTION                                        PAGE

4       Motion of Energy Future Holdings Corp., et al.,

5       for Entry of an Order Directing Joint Administration

6       of the Debtors' Chapter 11 Cases                    50

7

8       Motion of Energy Future Holdings Corp., et al., for

9       Entry of Interim and Final Order Authorizing the

10      Debtors to (A) Continue Performing Under Prepetition

11      Hedging and Trading Arrangements, (B) Pledge Collateral

12      and Honor Obligations Thereunder, and (C) Enter into

13      and Perform Under Trading Continuation Agreements and

14      New Postpetition Hedging and Trading Arrangements    59

15

16      Motion on DIP Financing                              82

17

18      Motion on Cash Collateral                           210

19

20      Motion of Texas Competitive Electric Holding Company  232

21      LLC and Certain of its Debtor Affiliates for Entry

22      of Interim and Final Orders (A) Authorizing Use of

23      Cash Collateral, (B) Granting Adequate Protection

24      (C) Modifying the Automatic Stay, and (D) Scheduling

25      a Final Hearing Approved Provided that Aurelius is

1   a Consent Party to the Escrow Agreement and Provided

2   that there's No Exculpation of Any Party in Connection

3   with this Issue

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 253

1              C E R T I F I C A T I O N

2

3    We, Dawn South, Nicole Yawn, Jamie M. Gallagher, Sheila

4    Orms, and Lisa Beck certify that the foregoing transcript

5    is a true and accurate record of the proceedings.

6    Dawn South    Digitally signed by Dawn South
                   DN: cn=Dawn South, o=Veritext,
                   ou, email=digital@veritext.com,
7    _____ c=US
                   Date: 2014.06.06 11:12:02 -04'00'

8    DAWN SOUTH

9    AAERT Certified Electronic Transcriber CET**D-408

10   Nicole Yawn    Digitally signed by Nicole Yawn
                    DN: cn=Nicole Yawn, o=Veritext, ou,
                    email=digital@veritext.com, c=US
11   _____ Date: 2014.06.06 11:13:59 -04'00'

12   NICOLE YAWN

13   Jamie          Digitally signed by Jamie Gallagher
     Gallagher      DN: cn=Jamie Gallagher, o=Veritext,
                    ou, email=digital@veritext.com,
14   _____ c=US
                    Date: 2014.06.06 11:14:59 -04'00'

15   JAMIE GALLAGHER

16   Lisa Beck      Digitally signed by Lisa Beck
                    DN: cn=Lisa Beck, o=Veritext, ou,
                    email=digital@veritext.com, c=US
17   _____ Date: 2014.06.06 11:15:39 -04'00'

18   LISA BECK

19   AAERT Certified Electronic Transcriber CET**D-486

20   Lisa Beck      Digitally signed by Lisa Beck
                    DN: cn=Lisa Beck, o=Veritext, ou,
                    email=digital@veritext.com,
21   _____ c=US
                    Date: 2014.06.06 11:17:49 -04'00'

22   SHELIA ORMS

23   Veritext - 330 Old Country Road

24   Suite 300 - Mineola, NY 11501

25   Date:  June 6, 2014