Page 1

1    UNITED STATES BANKRUPTCY COURT

2    DISTRICT OF DELAWARE

3

4

5    In re:                    :

                              :    Chapter 11

6    ENERGY FUTURE HOLDINGS    :

     CORP.,  et al.,          :    Case No. 14-10979(CSS)

7                              :

             Debtors.         :    (Jointly Administration

8    _____  :    Requested)

9

10

11                                United States Bankruptcy Court

12                                824 North Market Street

13                                Wilmington, Delaware

14                                June 06, 2014

15                                9:44 AM - 5:41 PM

16

17

18    B E F O R E :

19    HON CHRISTOPHER S. SONTCHI

20    U.S. BANKRUPTCY JUDGE

21

22

23

24

25    ECR OPERATOR:  AL LUGANO

1    HEARING re Joint Motion of CSC Trust Company of Delaware as

2    Indenture Trustee, and Certain EFIH 10% First Lien

3    Noteholders, for Confirmation that the Automatic Stay does

4    not Apply or, Alternatively, for Limited Relief from the

5    Automatic Stay, Solely Regarding Rescission of Acceleration

6    [D.I. 473; filed May 15, 2014]

7

8    HEARING re Motion of Energy Future Holdings Corp., LLC and

9    EFIH Finance Inc. for Entry of an Order (A) Approving

10   Postpetition Second Lien Financing, (B) Granting Liens and

11   Providing Superpriority Administrative Expense Claims, (C)

12   Authorizing the Use of Cash Collateral, (D) Authorizing the

13   EFIH Second Lien Repayment, (E) Authorizing Entry into and

14   Payment of Fees Under the Commitment Letter, and (F)

15   Modifying the Automatic Stay [D.I. 477; filed May 15, 2014]

16

17   HEARING re Motion of Energy Future Holdings Corp., et al.,

18   for Entry of an Order Authorizing the Debtors to (A) Pay

19   Certain Prepetition Amounts on Account of Non-Insider

20   Compensation Programs and (B) Continue the Non-Insider

21   Compensation Programs in the Ordinary Course of Business on

22   a Postpetition Basis [D.I. 468; filed May 15, 2014]

23

24   HEARING re Motion of Energy Future Holdings Corp., et al.,

25   for Entry of an Order Authorizing the RSA Debtors to Assume

1    the Restructuring Support Agreement and Modifying the

2    Automatic Stay [D.I. 505; filed May 15, 2014]

3

4    HEARING re Motion of Energy Future Holdings Corp., et al.,

5    for Entry of an Interim and Final Orders Authorizing the

6    Debtors to (A) Grant Administrative Expenses Priority to all

7    Undisputed Obligations for Good and Services Ordered

8    Prepetition and Delivered Postpetition and Satisfy Such

9    Obligations in the Ordinary Course of Business, and (B) Pay

10   Prepetition Claims of Shippers, Warehousemen, and

11   Materialmen [D.I. 27; filed April 29, 2014]

12

13   HEARING re Motion of Energy Future Holdings Corp., et al.,

14   for Entry of an Order Establishing Procedures to Sell,

15   Transfer, or Abandon Certain De Minimis Assets [D.I. 467;

16   filed May 15, 2014]

17

18   HEARING re Motion of Energy Future Holdings Corp., et al.,

19   for Entry of an Order Authorizing the Retention and

20   Compensation of Certain Professionals Utilized in the

21   Ordinary Course of Business [D.I. 506; filed May 17, 2014]

22

23   HEARING re Motion of Energy Future Holdings Corp., et al.,

24   for Entry of an Order Directing Joint Administration of the

25   Debtors' Chapter 11 Cases [D.I. 17; filed April 29, 2014]

Page 4

1   HEARING re Motion of Energy Future Holdings Corp., et al.,

2   for Entry of Interim and Final Orders Authorizing the

3   Debtors to Pay Certain Prepetition Taxes and Fees [D.I. 23;

4   filed April 29, 2014]

5

6   HEARING re Motion of Energy Future Holdings Corp., et al.,

7   for Entry of Interim and Final Orders (A) Authorizing the

8   Debtors to (I) Pay Certain Prepetition Compensation and

9   Reimbursable Employee Expenses, (II) Pay and Honor Employee

10  and Retiree Medical and Similar Benefits, and (III) Continue

11  Employee and Retiree Benefit Programs, and (B) Modifying the

12  Automatic Stay [D.I. 25; filed April 29, 2014]

13

14  HEARING re Motion of Energy Future Holdings Corp., et al.,

15  for Entry of Interim and Final Orders Determining Adequate

16  Assurance of Payment for Future Utility Services [D.I. 26;

17  filed April 29, 2014]

18

19  HEARING re HEARING re Motion of Energy Future Holdings

20  Corp., et al., for Entry of Interim and Final Orders

21  Authorizing the Debtors to Pay Prepetition Critical Vendor

22  Claims [D.I. 29; filed April 29, 2014]

23

24  HEARING re Motion of Energy Future Holdings Corp., et al.,

25  for Entry of (A) an Order Authorizing the Debtors to (I)

1    maintain and Administer Customer Programs and Customer

2    Agreements, (II) Honor Prepetition Obligations Related

3    Thereto, (III) Pay Certain Expenses on Behalf of Certain

4    Organizations, (IV) Fix the Deadline to File Proofs of Claim

5    for Certain Customer Claims, and (V) Establish Procedures

6    for Notifying Customers of Commencement of the Debtors'

7    Chapter 11 Cases, Assumption of Customer Agreements, and the

8    Bar Date for Customer Claims and (B) an Order Authorizing

9    Certain of the Debtors to Assume the Customer Agreements

10   [D.I. 31; filed April 29, 2014]

11

12   HEARING re Motion of Energy Future Holdings Corp., et al.,

13   for Entry of an Order (A) Authorizing the Debtors to (I)

14   Continue Using Their Existing Cash Management System, (II)

15   Maintain Existing Bank Accounts and Business Forms, and

16   (III) Continue Using Certain Investment Accounts; (B)

17   Authorizing Continued Intercompany Transactions and Netting

18   of Intercompany Claims; and (C) Granting Postpetition

19   Intercompany Claims Administrative Expense Priority [D.I.

20   37; filed April 29, 2014]

21

22   HEARING re Motion of Energy Future Holdings Corp., et al.,

23   for Entry of (A) an Order Authorizing Certain of the Debtors

24   to Pay Certain Prepetition Transition Charges and Delivery

25   Charges and (B) an Order Authorizing Certain of the Debtors

1   to assume Transmission and Distribution Service Agreements

2   [D.I. 38; filed April 29, 2014]

3

4   HEARING re Motion of Energy Future Holdings Corp., et al.,

5   for Entry of an Order Authorizing Certain of the Debtors to

6   Assume Standard Form Market Participant Agreements with

7   ERCOT [D.I. 40; filed April 29, 2014]

8

9   HEARING re Motion of Energy Future Holdings Corp., et al.,

10  for Entry of Interim and Final Order Authorizing the Debtors

11  to (A) Continue Performing Under Prepetition Hedging and

12  Trading Arrangements, (B) Pledge Collateral and Honor

13  Obligations Thereunder, and (C) Enter into and Perform Under

14  Trading Continuation Agreements and New Postpetition Hedging

15  and Trading Arrangements [D.I. 41; filed April 29, 2104]

16

17  HEARING re Motion of Texas Competitive Electric Holding

18  Company LLC and Certain of its Debtor Affiliates for Entry

19  of Interim and Final Orders (A) Authorizing Use of Cash

20  Collateral, (B) Granting Adequate Protection (C) Modifying

21  the Automatic Stay, and (D) Scheduling a Final Hearing [D.I.

22  71; filed April 29, 2014]

23

24  HEARING re Motion of Texas Competitive Electric Holdings

25  Company LLC and Certain of its Debtor Affiliates, for Entry

1    of Interim and Final Orders (A) Approving Postpetition

2    Financing, (B) Granting Liens and Providing Superpriority

3    Administrative Expense Claims, (C) Modifying the Automatic

4    Stay, and (D) Scheduling a Final Hearing [D.I. 73; filed

5    April 29, 2014]

6

7    HEARING re Motion of Energy Future Intermediate Holding

8    Company LLC and EFIH Finance, Inc. for Entry of (I) and

9    Interim order (A) Approving Certain Fees Related to

10   Postpetition Financing and Granting Such fees Administrative

11   Expense Priority and (B) Scheduling a Final hearing; and

12   (II) a Final Order (A) Approving Postpetition Financing, (B)

13   Granting Liens and Providing Superpriority Administrative

14   Expense Claims, (C) Authorizing the Use of Cash Collateral,

15   (D) Authorizing the EFIH First Lien Refinancing, (E)

16   Authorizing Issuance of Roll-Up Debt to the Extent

17   Authorized by the Settlement Motion, (F) Determining the

18   Value of Secured Claims, and (G) Modifying the Automatic

19   Stay [D.I. 74; filed April 29, 2014]

20

21   HEARING re Motion of Energy Future Holdings Corp., et al.,

22   for Entry of an Order Extending the Debtors' Time to File

23   Schedules of Assets and Liabilities, Schedules of Current

24   Income and Expenditures, Schedules of Executory Contracts

25   and Unexpired leases, and Statement of Financial Affairs

1      [D.I. 466; filed May 15, 2014]

2

3      HEARING re Motion of Energy Future Holdings Corp., et al.,

4      for Entry of Order Approving Certain EFIH Settlements and

5      the Oncor TSA Amendment [D.I. 472; filed May 15, 2014]

6

7      HEARING re Motion of Wilmington Savings Fund Society, FSB

8      for Leave to Conduct Discovery Pursuant to Rule 2004 of the

9      Federal Rules of Bankruptcy Procedure of Energy Future

10     Holdings Corporation, its Affiliates, and Certain Third

11     Parties (the "2004 Motion")[D.I. 6; filed April 29, 2014]

12

13     HEARING re Letter to the Honorable Christopher S. Sontchi

14     from Edward s. Weisfelner (Redacted)[D.I. 698; filed June 2,

15     2014]

16

17

18

19

20

21

22

23

24     Transcribed by:  Jamie Gallagher, Dawn South, Nicole Yawn,

25     Melissa Looney, Sheila Orms, and Sherri Breach

```
 1    A P P E A R A N C E S :

 2    RICHARDS, LAYTON & FINGER, P.A.

 3         Attorneys for the Debtors

 4

 5    BY:  DANIEL J. DEFRANCESCHI, ESQ.

 6         JASON M. MADRON, ESQ.

 7

 8    KIRKLAND & ELLIS

 9         Attorneys for the Debtors

10

11    BY:  ANDREW MCGAAN, ESQ.

12         BRIAN SCHARTZ, ESQ.

13         MARK MCKANE, ESQ.

14         BRYAN STEPHANY, ESQ.

15         JON GAUTER, ESQ.

16         BETH DALMUT, ESQ.

17

18    PAUL, WEISS, RIFKIND, WHARTON & GARRISON

19         Attorneys for Ad Hoc Committee of TCEH First Lien

20         Creditors

21

22    BY:  ALAN W. KORNBERG, ESQ.

23         KELLEY A. CORNISH, ESQ.

24         JACOB ADLESTEIN, ESQ.

25         ADAM DENHOFF, ESQ.
```

1    YOUNG CONAWAY STARGATT & TAYLOR, LLP

2        Attorneys for Ad Hoc Committee of TCEH First Lien

3        Creditors

4

5    BY:  PAULINE K. MORGAN, ESQ.

6        RYAN M. BARTLEY, ESQ.

7

8    BROWN RUDNICK

9        Attorneys for TCEH, Second Lien Trustee

10

11    BY:  JEFFREY L. JONAS, ESQ.

12        EDWARD S. WEISFELNER, ESQ.

13        JONATHAN D. MARSHALL, ESQ.

14        AARON B. LAUCHHEIMER, ESQ.

15

16    UNITED STATES DEPARTMENT OF JUSTICE

17        Attorneys for the U.S. Trustee

18

19    BY:  ANDREA B. SCHWARTZ, ESQ.

20        RICHARD L. SCHEPACARTER, ESQ.

21

22

23

24

25

1    AKIN GUMP STRAUSS HAUER & FELT LLP

2         Attorneys for Ad Hoc Committee of EFIH Unsecured

3         Noteholders

4

5    BY:  SCOTT ALBERINO, ESQ.

6         IRA DIZENGOFF, ESQ.

7

8    SHEARMAN & STERLING

9         Attorneys for Duetsche Bank AG New York Branch

10

11   BY:  FREDRIC SOSNICK, ESQ.

12        NED S. SCHODEK, ESQ.

13

14   POTTER ANDERSON & CORROON LLP

15        Attorney for Deutsche Bank AG New York Branch

16

17   BY:  LAURIE SELBER SILVERSTEIN, ESQ.

18

19   COUSINS CHIPMAN & BROWN, LLP

20        Attorney for Ad Hoc Committee of EFIH Unsecured

21        Noteholders

22

23   BY:  SCOTT D. COUSINS, ESQ.

24

25

1    ROPES & GRAY LLP

2          Attorneys for CSC Trust Company of Delaware

3

4    BY:  D. ROSS MARTIN, ESQ.

5          KEITH HOWARD WOFFORD, ESQ.

6

7    COLE SCHOTZ MEISEL FORMAN & LEONARD, PA

8          Attorney for CSC Trust Company of Delaware

9

10   BY:  NORMAN L. PERNICK, ESQ.

11

12   MORRIS, NICHOLS, ARSHT & TUNNELL, LLP

13          Attorney for Sponsors

14

15   BY:  DEREK ABBOTT, ESQ.

16

17   WACHTELL LIPTON ROSEN & KATZ

18          Attorneys for EFH Equity Owners

19

20   BY:  RICKY MASON, ESQ.

21          AUSTIN WITT, ESQ.

22          JON LYNCH, ESQ.

23          EMIL A. KLEINHAUS, ESQ.

24

25

1    DRINKER BIDDLE & REATH LLP

2        Attorney for CSC

3

4    BY:  JAMES MILLAR, ESQ.

5

6    BINGHAM MCCUTCHEN LLP

7        Attorneys for Pacific Investment Management Co. LLC

8

9    BY:  JEFFREY SABIN, ESQ.

10       JULIA FROST-DAVIES, ESQ.

11

12   WHITE & CASE LLP

13       Attorney for Ad Hoc Group of TCEH Unsecured Noteholders

14

15   BY:  J. CHRISTOPHER SHORE, ESQ.

16

17   FRIED FRANK HARRIS SHRIVER & JACOBSON

18       Attorneys for Fidelity Management & Research Company

19

20   BY:  MATTHEW M. ROSSE, ESQ.

21       PETER SIMMONS, ESQ.

22

23

24

25

1    CROSS & SIMON, LLC

2         Attorney for Fidelity Management & Research Company

3

4    BY:  MICHAEL JOSEPH JOYCE, ESQ.

5

6    BLANK ROME

7         Attorney for Wilmington Trust

8

9    BY:  MICHAEL D. DEBAECKE, ESQ.

10

11   SEWARD KISSEL

12        Attorneys for Wilmington Trust

13

14   BY:  JOHN ASHMEAD, ESQ.

15        ARLENE ALVES, ESQ.

16

17   POLSINELLI

18        Attorneys for the Committee

19

20   BY:  CHRIS WARD, ESQ.

21        JUSTIN K. EDELSON, ESQ.

22

23

24

25

1    MORRISON & FORRESTER

2        Attorneys for the Committee

3

4    BY:  LORENZO MARINUZZI, ESQ.

5        TODD GOREN, ESQ.

6        SAM MARTIN, ESQ.

7        JENNIFER MARINES, ESQ.

8

9    LANDIS RATH & COBB

10       Attorney for ALCOC

11

12   BY:  MATTHEW MCGUIRE, ESQ.

13

14   WOMBLE CARLYLE SANDRIDGE & RICE

15       Attorney for Holt Cat, Centerpoint

16

17   BY:  MARK DESGROSSEILLIERS, ESQ.

18

19   KLEHR HARRISON HARVY BRANZBURG LLP

20       Attorney for UMB Bank, Indenture Trust

21

22   BY:  RAYMOND H. LEMISCH, ESQ.

23

24

25

1    SAUL EWING LLP

2         Attorney for ERCOT

3

4    BY:  MARK MINUTI, ESQ.

5

6    MUNSCH HARDT KOPF & HARR

7         Attorney for ERCOT

8

9    BY:  KEVIN LIPPMAN, ESQ.

10

11   CIARDI CIARDI & ASTIN

12        Attorney for EFH

13

14   BY:  JOSEPH H. MCMAHON, JR., ESQ.

15

16   MCCARTER & ENGLISH

17        Attorney for BOKF NA

18

19   BY:  KATHARINE L. MAYER, ESQ.

20

21   QUINN EMANUEL URQUHART & SULLIVAN

22        Attorney for Centerbridge

23

24   BY:  BENJAMIN FIRESTONE, ESQ.

25

1    SCHULTE ROTH & ZABEL

2         Attorney for Centerbridge

3

4    BY:   BRIAN PFEIFFER, ESQ.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              THE CLERK:  All rise.

3              THE COURT:  Please be seated.  Good morning.  Good

4    morning.

5              MR. SASSOWER:  Good morning, Your Honor.  For the

6    record Edward Sassower of Kirkland & Ellis LLP, proposed

7    counsel to the debtors.

8              Your Honor, here's how the parties would like to

9    attack today.  We would like to, with your permission, start

10   with SOFAs and the discovery for the RSA, and then the 2004.

11   And then we'll be using that time to finalize the orders on

12   DIP, cash collateral, and hedging.  We think there maybe one

13   or two issues that we'll need to present to Your Honor for

14   your consideration in connection with those two orders,

15   three orders, and then we'll get into the inside stock.

16             THE COURT:  That's fine.

17             MR. SASSOWER:  Okay, so with that I'll yield the

18   podium to my partner, Mark McKane who will present the

19   SOFA's motion.

20             THE COURT:  All right.  Just give me a moment.

21        (Pause)

22             THE COURT:  Sorry, I have a lot to move around

23   over here.

24        (Pause)

25             THE COURT:  Okay, go ahead.  Okay.

1          MR. MCKANE:  Good morning, Your Honor.  For the

2     record, Mark McKane of Kirkland & Ellis, proposed counsel

3     for the debtors.

4          Your Honor, the next motion is the motion for an

5     extension of time to file schedules and statements.  The

6     TCEH unsecured ad hoc group filed an objection on docket, I

7     think, 645 and we filed a reply on June 3rd, that's docket

8     739.

9          Your Honor, as you well know, this is one of the

10    largest bankruptcies in history.  It is no exaggeration that

11    this is a massive undertaking due to the size of the

12    debtor's businesses, the number of creditors, the vast

13    amount of information that we need to process.  And,

14    therefore, I don't think it's surprising that the debtors

15    would ask for an extension of time for -- to be able to file

16    their statements and schedules for 60 days after the

17    petition date.  And on pages 11 and 12 of the reply, we

18    identify a number of other cases in this Court and in this

19    District where similarly complex and sometimes smaller cases

20    in terms of debt size received scheduling extensions of 60

21    to 90 days.

22          THE COURT:  But -- that's all well and good, but

23    isn't the problem self-created to a certain extent by the

24    fact that you want to accomplish a number of things to which

25    the schedules and SOFAs may be relevant on a timeframe that

1    is inconsistent with the extension of time you're asking

2    for?

3              MR. MCKANE:  Well, let me just get to two issues.

4    As you know, you cannot pull together some of this

5    information until the petition date given the need to close

6    the books to establish the creditor, to establish the

7    schedule, so you can be able to prepare those materials.

8    But let's go to the exact issue.

9              The underlying basis for the objections that the

10   TCEH ad hoc group filed and that is whether you need

11   statements and schedules to prepare and evaluate an

12   objection to the RSA assumption motion.  And exactly on that

13   issue, we believe the law is clear based on that -- to

14   evaluate the debtors' business judgment, you do not need to

15   go into issues that are confirmation related, and

16   specifically what the ad hoc group argued in their reply is

17   that they need the statement of schedules to challenge "the

18   debtor -- the RSA's treatment of the inter-debtor, and

19   insider, and third party claims."  And those issues are not

20   before the Court as part of an RSA assumption motion,

21   specifically as Judge Lane recognized in the Genco Trading

22   and Shipping case, specifically an objection to an RSA

23   assumption motion does not get to the underlying plan that's

24   used for the -- that have not yet been filed and everything

25   is preserved.  All the issues as it relates to valuation,

1    releases of -- potential releases to oppose the leases of

2    inter-debtor claims.  None of those issues are actually

3    before the Court in evaluating the business judgment of the

4    debtors to assume the motion, to assume the RSA.

5         And specifically, Your Honor, in that instance, in

6    that case, the same exact issues were engaged.  Issues as it

7    relates to what is the underlying valuation that would tie

8    to that plan.  What are the potential arguments for or

9    against confirmation as it relates to releases.  That was --

10   it attempted to be engaged in front of Judge Lane.  This was

11   just two months ago and the Court was very clear.  This is

12   not the time or the place for prolonged discovery or a

13   lengthy trial on those disputed issues.  The issues of

14   valuation and our objection to valuation is an issue that's

15   preserved for confirmation.  That's undeniably true.  We

16   make that point in our motion to assume the RSA.

17        And the other underlying issue here and I think if

18   we go back to Your Honor's analysis in improving the plan

19   support agreement in Visteon -- Visteon, excuse me.  And in

20   that instance, while Mr. Shore was representing one of the

21   parties to the plan support agreement, the issue -- and

22   Mr. (indiscernible - 9:50:38) was handling it for the

23   debtors -- the issue was engaged to are we going to have a

24   valuation fight to evaluate the plan support agreement or

25   are all those issues preserved?  And you recognized they're

1    preserved.  That's not the time or place to evaluate those

2    issues.

3             And that's what we're saying here as it relates to

4    the SOFAs and schedules and as it relates to the undeniably

5    massive discovery requests that we received as it relates to

6    the RSA assumption motion.  We tried to lay this out in the

7    motion itself to make clear to everyone when we evaluate the

8    RSA, we are not going forward on all these underlying plan

9    issues.

10            And to be clear, what we are doing -- excuse me,

11   Your Honor -- is -- and I think we laid this out, is we're

12   committing to try to achieve the transaction in the RSA.

13   We're committing to those timeframes.  We're committing the

14   parties' abilities to exercise their rights and to --

15   including the ability to terminate the RSA.  That's the

16   scope of relief that we're seeking as it relates to the RSA

17   assumption motion.  And while the ad hoc proclaims in their

18   objection that we are "obligated", that the RSA obligates

19   the TCEH debtors to support a plan of reorganization, that's

20   actually demonstrably not true.

21            And we want to make clear to everyone, as I

22   believe as Mr. Sassower tried to do at the start of the

23   hearing yesterday.  The RSA does not lock the debtors in.

24   We have a classic, broad, unqualified fiduciary owed.  It's

25   Section 8.06(c), and we want to highlight it for everyone,

1    that we are not locked in on this.  And if someone has a

2    higher, better plan, we'll consider it.  And the components

3    of that are already being engaged on each side of the house.

4            So, in addition to that, Your Honor, this RSA

5    approach doesn't limit the rights of any party with respect

6    to any of the steps necessary to confirm a plan and we're

7    not suggesting otherwise.  We recognize we have to have a

8    disclosure statement approved by this Court.  We recognize

9    that we have to satisfy all of the requirements for

10   confirmation.  And we recognize that there has to be a path

11   to allow that to happen.

12           And by filing the RSA assumption motion, we are

13   not trying to pre-litigate this issue.  And all we're asking

14   for is, Your Honor -- and we're also not trying to stonewall

15   discovery.  That was a third issue that the ad hoc groups

16   raised is that they raised some concern that we haven't been

17   providing discovery, or we haven't been providing the

18   ability to do due diligence and that's just not true.  What

19   we've tried to do is put this in a more formal and organized

20   path.

21           What we've tried to do is say, rather than

22   responding to nearly daily informal e-mails from Houlihan

23   Lokey or other financial advisors, since we are on a very

24   formal path in front of the Court, since we are in the midst

25   of adjusting 2004 discovery in a more formal basis, let's do

1    it through that channel in a more coordinated way.  And to

2    that end, this week we provided over 600 key documents on

3    due diligence, 34,000 pages of material that don't go to any

4    motion that we filed.  They go to the issues of what will be

5    -- issues to understand the company, to understand their

6    business, to understand the tax issues.  And so we are

7    providing that type of diligence, that kind of background

8    information that you would want to have.

9           And so it's not that they need the SOFAs and

10   schedules alone to even be able to evaluate the RSA or a

11   potential plan, but that's just not what the law is.  And we

12   recognize that there are certain circumstances in which you

13   could have a valuation trial before confirmation and we

14   recognize that in Nutraceutical that the debtor asked for

15   that, and consented to that, and agreed to that.

16          What we're saying is as it relates to the RSA

17   assumption motion, this is not the time or place.  We think

18   Judge Lane got it right and we think you got it right back

19   in Visteon.  All we're trying to do is -- we'll provide the

20   discovery.  We'll allow people to evaluate it, but we need

21   to have some organization and process so that (indiscernible

22   - 9:54:40) these depositions as they evaluate the debtors'

23   business judgments, or whether it was appropriate to enter

24   the RSA, we should not be having a large portion of that

25   deposition go to confirmation issues, go to valuation

1    issues.

2              THE COURT:  What were you saying --

3              MR. MCKANE:  I apologize, Your Honor.  But what we

4    have said we would do, to be very clear in terms of what we

5    are providing, is we had said the debtors have already

6    produced and are in the process of producing the RSA

7    assumption itself, including all of the drafts and the term

8    sheets, the communications and negotiations regarding the

9    proposed RSA, the payment of fees under the proposed RSA,

10   and the milestones and termination rights.  The boards'

11   discussion, and consideration, and decision making regarding

12   the RSA, putting the tax implications therein, and the

13   potential issues as it relates to a separation between

14   whether the TCEH debtors can take the -- TCEH creditors can

15   take the assets of the TCEH debtors and what tax

16   implications that may raise.  And we expect to have all

17   those materials, what was actually evaluated by the TCEH

18   debtors in entering into the RSA, those materials are --

19   many of them are already out the door and will be out the

20   door by next week.

21             So, when we talk about this requested extension

22   for the SOFAs and schedules, it bleeds right into what is

23   appropriate for discovery and hearing in front of Your Honor

24   in the RSA.  We acknowledge that those issues are enjoined

25   and that's why I'm rising in front of you to address it.

1    And what we have said to the creditors very clearly is, and

2    I know we got called out a little bit on like did we not

3    meet and confer, we were providing materials to them.  And

4    when we raised the issue, we said we're not saying no at

5    all.  We're not saying no.  We're saying we need to

6    prioritize.

7         And when we prioritize, we're prioritizing the

8    issues for the motions that are being raised.  We're not

9    saying no.  We've given 34,000 pages of basic due diligence

10   that's not tethered to any motion.  But we're prioritizing

11   those issues that are key to the RSA assumption motion and

12   that is the evaluation of the debtors' business judgment in

13   entering into it.

14        It is admittedly a very narrow set of relief that

15   we're asking for and in the ability to assume that motion,

16   all of the core underlying issues as it relates to valuation

17   and confirmation issues are not properly before the Court at

18   that time, we think it actually greatly expands the burdens

19   on everyone to have to go through that process now.  I think

20   the Court was very clear in Visteon that that was the right

21   way to go.  I think the Genco Trading decision

22   (indiscernible - 9:57:14) addresses the exact same issue.  I

23   think that that's the right way to manage the issue going

24   forward and that's what the debtors have asked.

25        We will get -- we have -- at into the specific

1     issue of the SOFAs and schedules.  Make no mistake, we know

2     how important it is and we have a small army on this.  We

3     have over 20 people at the company working on getting these

4     schedules and statements together.  We have over 10

5     additional advisors at Alvarez & Marsal working on it.

6     We've got a Kirkland team.  We are getting this done.  And

7     it will be done, but it doesn't tie directly to the RSA

8     assumption issues before the Court.  And we have -- for

9     those reasons we ask that the Court grant the extension.

10              THE COURT:  Okay.  Mr. Shore?

11              MR. SHORE:  Good morning, Your Honor.  Chris Shore

12    from White & Case on behalf of the ad hoc group of TCEH

13    unsecured noteholders.

14              I was reflecting on yesterday's hearing and this

15    case is taking on the air on a tragically comic plane ride.

16    Half of the time in the Court yesterday, half the noise on

17    the plane was coming from the front of the plane where

18    people were arguing about whether they get caviar or

19    lobster, or caviar and lobster.  And if everybody has

20    caviar, will there be enough caviar to go around and should

21    we apportion it by row number or seat number.

22              And there's $8 billion sitting in the back of the

23    plane who have to fight tooth and nail.  The debtors have

24    told them we're going to have chips for you at some point.

25    And you have to fight tooth and nail to make sure that the

1    first lien lenders didn't get first dibs on those chips.

2    The rules require, at least they tell us, what kind of chips

3    they have.  They're telling us we're going to get chips

4    within 30 days of the case, tell us what the chips are or

5    come get authorization from the Court.  They're telling you

6    now, we don't have time to tell you what kind of chips you

7    had.  Do you have any idea who hard it is to put out a

8    starch white tablecloth up in first class?  It's not an

9    acceptable result for us.

10           We had no objection to an extension on the E side,

11   which is largely containing, you know, the same disputes in

12   the front of the plane.  We do have an objection to the T

13   side extension.  They have made one factual allegation in

14   the record.  They are too busy stabilizing the business to

15   do the schedules.  Okay.  That's their allegation.  That's

16   what they're asking the Court to seek relief on and they're

17   going to have to live with that allegation.  The business is

18   -- there's so much work being done stabilizing the business,

19   we don't have time to comply with the rules.  Okay.

20           But just like any -- just like they can't pick and

21   choose are we just going to spend all our time in first

22   class, they can't come in and say we want some of the rights

23   and privileges of a debtor, exclusivity, the right to

24   propose a plan, work on a plan, and say we're not going to

25   do what the Code requires and the rules require, which is

1    published basic information which is going to be used.  We

2    don't need to get in an RSA dispute right now.  We've got

3    two very different views of the world.

4         On the one side, the debtors believe we can

5    propose to abandon the assets to secured lenders but if

6    anybody comes forward and shows us we shouldn't do that, we

7    reserve the right to actually analyze the issue, to look at

8    valuation, to look at the value of claims and the cost of

9    the releases, and everything else we're doing.  We reserve

10   the right at any time if you show us that you're right to

11   come in and say, okay, we won't do that.

12        We believe there should be a fiduciary in --

13   they've got to think about these issues.  Do we really want

14   to be doing this?  What are the value of the claims we're

15   releasing?  Why are we doing it this way?  What is the

16   benefit to TCEH of avoiding a tax at EFH?  All that stuff

17   should be done now.

18        I don't know what the right factual word is,

19   whether they had a fiduciary in that will give them a

20   fiduciary out, or whether they never did anything, but the

21   declarations that have been filed on their RSA assumption

22   motions by our independent director make allegations that

23   they reviewed claims, that they thought about valuation

24   issues, okay.  Then they're going to have to -- why can't

25   they give us that?  The same information that's going into

1    the schedules should have been what was informing the board,

2    which entered into the RSA.

3            So, their only excuse other than we're too busy is

4    it's done in every other case.  I had my guys pull out every

5    other case.  Every case they cited falls into two

6    categories, save one.  One, there was never an RSA

7    assumption motion.  This was not a situation in which the

8    debtors were seeking to proceed with a plan and disclosure

9    statement in an RSA context.  The only exception was Six

10   Flags where Paul Hastings came in with an RSA that they

11   never sought approval of.  So, there was never -- the issue

12   was never precipitated.  The rest of the cases are pre-packs

13   where they came in with the plan and disclosure statement

14   and that stuff was all disclosed there.

15           So, the excuse that it's done in every case

16   doesn't apply in a situation in which they want to say we're

17   too busy to do the schedules, and at the same time say we

18   have enough time to move forward with an RSA that's going to

19   set the course of these cases.  It's not a satisfying

20   result.

21           We're asking for the rule to be applied.  I'm not

22   going to ask the Court to overrule me, nor do I expect the

23   Court is going to enter a ruling which puts the debtors in

24   default under a rule.  They are not in the position, they

25   say, to file schedules today.  They need to file schedules

1    to be in accordance with the rule.  But an order which

2    grants them an extension over our objection is going to make

3    them have to live with the allegation they laid out, that

4    they're too busy stabilizing the business to do schedules.

5    And they're going to have to live in our mind with the

6    allegation and the effects of that allegation that would

7    result in a ruling from the Court if that's what the Court's

8    inclined to do.

9           It's just a different way of skinning the cat on

10    the committee's reservation.  The committee is saying you

11    can have it, but we're going to reserve the right to argue

12    scheduling later and I'm saying you can't have it and if

13    they get a ruling over my objection, they're going to have

14    to live with that ruling.  That's our view, Your Honor.

15           THE COURT:  All right, (indiscernible - 10:03:53).

16           MR. GOREN:  Thank you, Your Honor.  Todd Goren,

17    Morrison & Foerster on behalf -- proposed counsel for the

18    official committee of unsecured creditors.

19           As Mr. Shore noted we attacked this slightly

20    different than he did but really share the same concern.  We

21    filed a reservation of rights.  We understand it's a big

22    case.  There's a lot to do.  It's probably impossible to

23    have gotten the schedules done, or nearly impossible in 30

24    days and they might need 60 days to get it done.  But they

25    are seeking approval of an RSA motion in 60 days and we

1    believe it was important that we reserve the right to argue

2    in connection with approval of that motion, that it's

3    premature to approve that motion before parties have had an

4    opportunity to review this information.  So, that was our

5    position.

6              THE COURT:  Thank you.

7              MR. MCKANE:  Just briefly, Your Honor.

8              THE COURT:  Very brief.

9              MR. MCKANE:  Very brief.  Your Honor, this notion

10   that we're just too busy, that's not accurate.  It's --

11   there is just a massive amount of information that has to be

12   compiled.  We are not in a position to file them today, that

13   is true, but it is not because of an inability --

14             THE COURT:  Well, here's the thing.  I mean, I

15   hear where you're coming from on valuation and whether

16   that's relevant or not relevant for the RSA, but I'm not

17   sure that the schedules and statements are just limited to

18   making some sort of argument about valuation.

19             There may be relevance in the schedules and

20   statements, which are important, and required by the law and

21   some of them provide -- I mean, some of it frankly I wonder

22   why Congress and the rule makers have decided that it's

23   something that needs to be disclosed, but some of it's very

24   important.  And I'm -- I think that regardless of whether

25   valuation will be an issue at the RSA, which I guess we're

1    going to touch on next, holding that aside, I still think

2    the schedules and statements are important in that they be

3    provided some time before we actually have a hearing on the

4    RSA.

5            So, you're put in a tough situation because you

6    want the June 30 day -- and I understand the June 30 day,

7    and you have the June 30 day for the hearing, but you can't

8    have until June 30 to provide the schedules and statements

9    that are going to relevant, possibly, to the hearing on

10   June 30th.  So, you kind of have to choose.

11           What I'm inclined to do is give you until

12   June 20th, if you want to hold the June 30 hearing.  If you

13   don't think you can get it done by June 20 then we'll have

14   to move the June 30 hearing to an appropriate time.  I know

15   that the -- Mr. Shore would like it sooner.  I don't think

16   it's reasonable to push you any further on that.  If that

17   means that the objection isn't fully baked, so be it.  It

18   may mean that the depositions are less efficient, so be it,

19   and we'll deal with it at the hearing on June 30th, but

20   you're going to need -- you're going to need to provide that

21   information before the hearing and I think 10 days is an

22   appropriate timeframe.  If that means you have to put 60

23   people on it at the company and 30 professionals, nothing

24   about this case is cheap.

25           Mr. Sassower, you were --

```
 1              MR. MCKANE:  Understood, Your Honor.  Your Honor,
 2    I think we're now prepared to transition into the --
 3              THE COURT:  All right, well is June 20 okay?  I
 4    mean, I want to make -- is that what we're going to do?
 5              MR. SASSOWER:  If Your Honor can just give us a
 6    moment to confer and then we can move onto, I guess, the
 7    discovery in the meantime.
 8              MR. MCKANE:  So, we'll run on parallel paths.  I'm
 9    going to allow some of our counsel to confer with --
10              THE COURT:  We can't talk about -- I don't think
11    we can intelligently talk about the discovery issues that
12    were raised by the letters until we've got some closure on
13    when the hearing's going to be.
14              MR. SASSOWER:  Understood, Your Honor.  Let me --
15              THE COURT:  Let's take a recess.
16              MR. SASSOWER:  Thank you, Your Honor.
17         (Recess at 10:07 a.m.)
18              THE CLERK:  All rise.
19              THE COURT:  Please be seated.
20              MR. SASSOWER:  Thank you, Your Honor.  For the
21    record Edward Sassower, Kirkland & Ellis, proposed counsel
22    to the debtors.
23              Your Honor, the debtors do not have confidence
24    that we can file the schedules without any errors by
25    June 20th.  The consequence of that is that we're going to
```

1    have to talk to the RSA parties about moving the RSA

2    assumption motion to the July 18th hearing.

3            The lawyers for the RSA parties that are in the

4    courtroom today do not have authority to agree to that

5    extension, but the debtors will endeavor to convince them

6    that that's the appropriate course of action.

7            So I think for purposes of the next item, the

8    discovery of the RSA, I think we should assume that we'll be

9    moving the RSA assumption motion to July 18th, and we will

10   at a minimum file the schedules ten days before that

11   hearing, although I think we'll be able to file it

12   substantially in advance of ten days --

13           THE COURT:  All right.

14           MR. SASSOWER:  -- before that hearing.

15           Thank you, Your Honor.

16           THE COURT:  You're welcome.

17           MR. SASSOWER:  But I think they need a bridge

18   order because their schedule is dating itself now, so.

19           THE COURT:  No, they don't need a bridge order

20   under the local rules I don't think, because they'd ask for

21   it, but if you want a bridge order that's fine.

22           MR. MCKANE:  Well to that end, Your Honor, we do

23   have a form of order that extends the deadline to June 30th.

24           THE COURT:  I'll extend the deadline till today.

25   I tell you what, give me your order and I'll extend it

1    Monday and we'll talk further if we need further time,

2    because you're going to jam up -- like I said, until the RSA

3    parties consent we don't know exactly where we're going to

4    end up.

5              So any objection to extending it till Monday?

6              UNIDENTIFIED SPEAKER:  No, Your Honor.

7              THE COURT:  Extend it -- I'm just going to --

8        (Pause)

9              THE COURT:  All right, I've signed that order.

10             MR. MCKANE:  Thank you, Your Honor.

11             THE COURT:  Okay.  Who wrote the letter?  Is that

12   how we should proceed, or how do you -- how do you want to

13   proceed?

14             MR. MCKANE:  Well, Your Honor, if I could just

15   briefly frame the issues, because I think I articulated a

16   lot of those points in the service and schedules motion, but

17   I just wanted to summarize quickly and then I'll yield the

18   podium.  Again for the record Mark McKane of Kirkland &

19   Ellis.

20             We view the fundamental issue in dispute here,

21   Your Honor, is the proper scope of discovery and issues to

22   be presented to the Court in that RSA assumption hearing.

23   It's not just what discovery should be provided and not what

24   the -- but also and more critically what issues should be

25   presented to Your Honor?  And ultimately this goes down to

1    the fundamental relevance if what does an RSA assumption

2    provide and what doesn't it provide?

3            And frankly the TCH creditors want to use the RSA

4    assumption motion as a mini-trial to address valuation and

5    confirmation issues.  It's a dress rehearsal, but that's not

6    what is at issue for an RSA assumption motion, and that's

7    why I referred to Judge Lane's decision in Genco (ph)

8    Shipping and your decision in Visteon.

9            And what's important, Your Honor, is when I hear

10   Mr. Shore, because I really do think we have a disconnect as

11   to what has been and will be provided, because we've agreed

12   to and largely have already provided the materials that show

13   how the debtors, including the TCH debtors, exercise their

14   business judgment, and specifically on that issue we have

15   already provided all of the final board materials and

16   minutes from packages from October 31st through late April

17   that show how the TCH board evaluated the decision.  Not

18   just the TCH board, but when there were joint board meetings

19   that showed the discussions and the decisions around the RSA

20   assumption agreement.  We've showed the back and forth in

21   negotiations.

22           You know, I understand that this could easily be

23   viewed as well this is just a pre-panel, but what is

24   critical for Your Honor to appreciate is that this agreement

25   came together only in the final days before filing, and as

1    it came together and it -- we do believe it was the best

2    path forward.  We believe that the RSA motion did assist the

3    debtors in avoiding more business impact and disruption, and

4    we do at this time still believe it's the best path forward

5    for now, but we do have the fiduciary out that we highlight

6    so much because we are not (indiscernible - 10:20:09) on a

7    path one way towards confirmation.

8              And therefore, while we are continuing to provide

9    that discovery, that background diligence that is necessary

10   for the parties to evaluate what will be in a disclosure

11   statement, what will be in a plan.

12             When we're talking about the depositions that

13   they're asking for and we look at the topics that are being

14   highlighted, the valuation topics and the confirmation

15   topics should not be covered as it relates to an RSA

16   assumption motion.

17             I think to give the Court some sense of the scope

18   of discovery that we're discussing I think we look -- one of

19   the good examples is what we received in terms of the

20   deposition notice on Wednesday from the TCH second lien

21   creditors.  They came forward and served the deposition

22   notice for Mr. Todd Filsinger or Filsinger Energy Group.

23   Mr. Filsinger is an energy consultant to the debtors.  He

24   will be one of our testifying experts at confirmation at

25   trial about certain aspects of the Ercot market and the

1    power scene.  He is an energy professional, but he is not

2    part of the debtors' exercise of business judgment as it

3    relates to the RSA agreement.

4             This is undeniably, and you know, you look at 100

5    different topics, when you boil it down to 6 broad

6    categories, 2 of those categories are the debtors' exercise

7    of business judgment, what was presented to the board.

8             We have no doubt, we have no dispute with those

9    issues.  We will establish why the debtors made the

10   decision, the TCH debtors in particular, why they made the

11   decision they did to move -- to enter into the RSA right

12   before filing.  And when we look at what the RSA provides an

13   assumption really just commits the parties to trying to

14   achieve the transaction, it commits to the timetables, and

15   it provides clarity on the parties' ability to exercise

16   rights, including what occurs and terminates under the RSA.

17   That's it.

18            And so -- and as it relates to Mr. Shore's

19   concern, he will have an opportunity to depose Mr. Sawyer

20   (ph), the disinterested director at the TCH board and he

21   will have an opportunity to examine what his decision making

22   was and what was considered.

23            Obviously there are privilege issues, we'll always

24   have those issues, we'll work through those issues, but

25   we're not trying to prevent the parties from conducting an

1    examination of the debtors' exercise of business judgment.

2            What we're trying to do is have some structure and

3    shape to not only the discovery, but what's going to be

4    presented at the hearing, and we do think that that greatly

5    impacts our ability to go forward at this point in time.

6            And for that and all the reasons I discussed in

7    the earlier discussions that relates to the SOFAs and

8    schedules we ask that the Court give guidance on not just

9    the discovery issues, but what should properly be presented

10   to Your Honor as it relates to the RSA assumption motion.

11           THE COURT:  Okay.  Thank you.

12           Just really quickly.  I need parties who are

13   participating by phone to mute your phone.  Whoever just

14   coughed that's fine, but you need to mute your phone, and if

15   we continue to have interference I'll have to disconnect the

16   line.

17           Yes, sir?

18           MR. KORNBERG:  Good morning, Your Honor.  Alan

19   Kornberg from Paul, Weiss, Rifkind, Wharton & Garrison on

20   behalf of the ad hoc committee of first lien debt holders.

21           Your Honor, Tuesday we were served with a very

22   extensive document request by the White & Case firm with

23   respect to matters involving the RSA assumption motion, and

24   we filed a letter with Your Honor at docket number 789

25   asking to be heard, because the issues raised by that

1    discovery request are obviously very similar to the issues

2    that the debtor just addressed.

3         The discovery sought by the ad hoc unsecured

4    committee is extremely broad, it covers all documents that

5    were created beginning more than 15 months before the

6    Chapter 11 case, and the topics include valuation of the

7    debtor, how the secured creditors value their collateral,

8    how they analyze tax implications of the restructuring,

9    intercompany claims, liquidation analysis, how the first

10   lien debt holders evaluation the debtors' business plan, and

11   not only how they analyze the restructuring envisioned by

12   the restructuring support agreement but how they evaluate

13   alternative restructuring transactions.

14         We agree wholeheartedly with the debtors that the

15   issue before the Court on an RSA motion is as Your Honor

16   said in Visteon whether assumption "should be approved by

17   the Court as a reasonable exercise of the debtor's business

18   judgment."

19         Valuation and other confirmation topics are not

20   fair game for the hearing on an RSA motion or in prehearing

21   discovery, and if that's true for the debtors it's

22   exponentially true of their creditors.

23         How the first lien debt holders evaluate the

24   transactions envisioned by the RSA plan, how they

25   (indiscernible - 10:25:25) as the tax implications of that

1     restructuring, how they value the company, how they value

2     their collateral, how they think about alternative

3     restructurings simply are not relevant to the exercise of

4     the debtors' business judgment in determining whether to

5     assume the restructuring support agreement.

6                 How we think about it is not a matter that relates

7     to the debtors' business judgment.

8                 And, Your Honor, I think if you go further a field

9     in the RSA assumption motion that will be frankly a terrible

10    precedent.

11                While the unsecureds may not like their experience

12    in economy class, that's where they are, and the Code

13    encourages parties to negotiate and compromise and reach

14    agreement on the terms of a restructuring.  That is exactly

15    what the parties to the RSA agreement have done.  And if the

16    reward for doing that is to have not one, but two

17    confirmation trials and two sessions or series of

18    confirmation related discovery that will really defeat the

19    purpose and discourage parties from doing what the Code

20    encourages them to do, which is to reach agreement as soon

21    as possible on the outlines of a restructuring so that the

22    case has some order, some direction, and hopefully gets

23    concluded within a reasonable period of time.

24                So, Your Honor, for all these reasons we would ask

25    that you strike the discovery that was served on the first

1       lien debt holders, it's completely irrelevant to the

2       question before Court which is, is assumption of the RSA a

3       reasonable exercise of the business judgment of the debtors,

4       which is the standard, Your Honor, properly set in the

5       Visteon case and many cases have followed suit.

6               Thank you.

7               MR. JONAS:  Good morning, Your Honor.  Jeff Jonas

8       from Brown Rudnick for Wilmington Savings Fund Society,

9       indenture trustee for approximately a billion seven of

10      second liens.

11              Your Honor, first of all thank you for seeing us

12      today.  I know we did this by letter and we did feel -- I

13      think you told me the last time we were here to come see you

14      if we had a problem or an issue, and we took you at that and

15      we came and I appreciate it, and I think the parties

16      appreciate your having us and hearing us.

17              Your Honor, before I dive into the discovery

18      dispute, because I think -- I think some of the parties are

19      missing the boat here with this idea that we're trying to

20      bring on a valuation for purposes of the RSA and accelerate

21      it in the case, and I don't think that's true and I'll tell

22      you why, and I'll tell you why I think the Court might

23      actually be compelled to hear at least come valuation

24      testimony.  I'll get to that in a minute.

25              But I do think it's important to just put this

1    valuation issue in context, because I think it goes to the

2    heart of the discovery dispute.

3              Your Honor, leading up to the filing of these

4    cases the debtors paid energy consultants and restructuring

5    advisors more than $35 million, including Mr. Ying and

6    Evercore more than $20 million, Alvarez & Marsal $5 million

7    in the 90 days prepetition, Mr. Filsinger $11 million.

8              Despite all that talent and all that money spent

9    on those professionals when it came time for TCEH to do a

10   deal here, which they've now done, the TCH board, my

11   clients' fiduciaries, before not only -- I'm sorry -- before

12   selling out not only my clients and billions of dollars of

13   unsecured debt behind us and giving away the keys to the

14   first lien lenders, what did they rely on to make that

15   decision?

16             They had a Duff & Phelps goodwill valuation from

17   2012.  This is per Mr. Keglevic.  They had some

18   quote/unquote public information.  I'm not sure what that

19   is.  I think it's probably where the debt was trading, but I

20   don't know.  And they had Mr. Ying's statement unsupported

21   by any sort of formal report, a statement that the first

22   liens were impaired.  That's it.

23             One of the largest bankruptcy cases in history,

24   the debtors themselves in the RSA approval motion state,

25   "The parties were unable to agree on the respective value of

1     the various debtor entities."  And all the while my clients

2     for months prepetition, maybe as long as a year, were

3     telling the debtors that the second liens are in the money,

4     here's why, gave them information.  We did this all on our

5     dime, Your Honor, unlike any other professionals in the

6     case.  We were not -- we asked, the debtors refused to fund

7     any of the second liens' expenses, we had our own expert, we

8     did our own work, we provided that to the debtors, and said,

9     here, take a look at this, we're in the money.  Ignored.

10          And so, Your Honor, that's the record, that's

11    where we are, and perhaps that will explain why we're

12    screaming so loudly around and relating to the valuation

13    issue.

14          I think that's a shocking set of facts, Your

15    Honor, and I think that has to be considered in the context

16    of the present discovery dispute.

17          So with that, Your Honor, let me turn to the

18    discovery dispute, and I do want to, notwithstanding what

19    may be perceived as my own he said, she said, I want to move

20    away from that and I want to go to the merits of what's

21    before the Court.  And I don't want to talk about valuation

22    and when the tide in some abstract way about when we should

23    have a valuation in this case, because if I were doing that

24    I think you should tell me to sit down, because I would

25    agree with you, perhaps, that generally now isn't the time

1      for a valuation.  I don't want to concede it, but for

2      purposes of today I will.  Because I think we're entitled to

3      limited valuation discovery and limited testimony on the

4      merits.

5              Why?  Why do I say that?  First of all the

6      standard of review.  For purposes of the RSA, the starting

7      point, Your Honor, as you know in Delaware three standards

8      of review.  Business judgment, heightened scrutiny, and

9      entire fairness.  And I would posit, Your Honor, that you

10     won't know in this case until the hearing on the RSA which

11     standard of review is appropriate.

12             Why do I say that?  Well the debtors themselves

13     acknowledge that there's a serious question of

14     disinterestedness in this case.  And I don't have to tell

15     you, Judge, that if you were to find that the board was not

16     disinterested business judgment is no longer the standard

17     and the Court would have to use one of, either intermediate

18     or a highest level of scrutiny in looking at the RSA at the

19     hearing on whenever the hearing will be.  And if you were to

20     do that, Your Honor, I would also posit that valuation

21     becomes relevant because you're going to have to look at --

22     you're not -- you just can't accept what you're being told

23     and say, well, did they do it in good faith, I'm not going

24     to look at the merits, I accept business judgment, case

25     over, I'm going to approve the RSA.

1              So it's on that basis that we're arguing so

2     strenuously, Your Honor, for some limited valuation

3     discovery and testimony.

4              And I want to just come back to the

5     disinterestedness, because in this case I don't have to --

6     I'm not making this up, it's the debtors that went to the

7     trouble of appointing an allegedly disinterested director.

8     They realize they have a problem.  They've got sponsors that

9     are all over the boards.  They've got conflicting boards.

10    They've got one board member at least who's on every board.

11    And so they know they have a problem.  And so, yes, we will

12    be looking during discovery at that process.  They say,

13    don't worry, we have this one disinterested guy, Mr. Sawyer,

14    and we have separate special meetings with him, and he

15    approved the transaction.  Okay, maybe that works, maybe it

16    doesn't.  We need to dig into that and we will and we'll

17    find out.

18              But my point is, Your Honor, when we show up here

19    whether it's June 30th or perhaps July 18th we will not know

20    which standard of review is appropriate.

21              And again, as I said, on the valuation issue if it

22    is in fact going to be one of the more higher levels of

23    review I think it becomes relevant.

24              So now let me talk briefly about this valuation

25    piece.

1                    Your Honor, we believe with minimal discovery,

2       which is down or reduced to five substantive topic areas.  I

3       know the debtors like to talk about our 2004 motion and then

4       perhaps our initial discovery, but we have been working hard

5       to try and at least meet and confer, and approximately a

6       week ago we went back and we gave them an email and have had

7       five topic areas that go to the valuation issues.  And we

8       think with that limited discovery we will be able to present

9       at the RSA hearing competent expert testimony demonstrating

10      that the second liens are in the money and the first liens

11      are over secured.

12                   We're talking, Your Honor, about a couple hours of

13      testimony, and as I've mentioned I think it's critical to

14      the issue of valuation, and we're going to do that, Your

15      Honor, the expert testimony --

16                   UNIDENTIFIED SPEAKER:  Hello?

17                   MR. JONAS:  We're going to do that with readily

18      observable facts that go to implied value derived from the

19      debtors' public filings as amplified by unrestricted cash,

20      recently imposed capacity pricing implications, and last

21      leasing changes in the price of natural gas.  And let me

22      just -- I think this explains how we go about this, Your

23      Honor.

24                   The debtors for purposes of their own valuation

25      approach, we believe, are using from their 8-K August 13

1    projected natural gas prices.  August of 2013.  We would use

2    current analyst consensus estimates to update that

3    information.

4             So, Your Honor, again, with limited discovery and

5    a few hours of expert testimony we believe we'll be able to

6    demonstrate that the second liens are in the money.

7             Excuse me, Your Honor.

8             Your Honor, I just want to point out to amplify my

9    discussion relating to the standard of review.  I think

10   instructive is the Inn Keepers' decision from Judge Chapman,

11   442 B.R. 227, a Southern District of New York 2010 case

12   where Judge Chapman of course stated I think the obvious

13   proposition "that in considering approval of an RSA business

14   judgment will be the test to the extent of

15   disinterestedness."  Just to give you some support on that.

16            And then next, Your Honor, the last case I'll

17   cite, but I think it's right on point, is the Rural Metro

18   decision, Delaware Chancery Court from a few months ago, 88

19   A 3d. 54.  Judge -- Vice Chancellor Lastner (ph) in that

20   case was examining a boards breaches of fiduciary duty and

21   approving a merger and he said in relevant part:

22            "And here scrutiny applies to situations involving

23   potential conflicts of interest with the realities of the

24   decision making context can suddenly undermine the decisions

25   of even independent and disinterested directors.

1          And if that's the case the company then bears the

2     burden of proving reasonableness in seeking the transaction

3     offering the best value."

4          And because limited valuation work was done in

5     that case, Your Honor, I think it's very instructive that

6     the Court said as follows:

7          "Lacking any earlier valuation information, the

8     Rural directors did not have a reasonably adequate

9     understanding of the alternatives available to Rural,

10    including the value of not engaging in a transaction at all.

11         Because the board's financial advisors did not

12    provide the directors with valuation materials until the

13    final board meeting, just hours before the merger was

14    approved, the directors did not have an opportunity to

15    examine the materials critically and understand how the

16    value of the merger compared to Rural's value as a going

17    concern."

18         So, Your Honor, to summarize this point.  If you

19    determine to use a heightened standard instead of the

20    business judgment standard, which I would proffer, Your

21    Honor, you will ultimately will find that you must, then

22    it's more important that we have at least preliminary

23    valuation information available to the Court, because that

24    would be part of an integral part of the relevant analysis.

25         Your Honor, this --

1          THE COURT:  Are you -- by reading that are you

2     arguing that not restructuring the TCEH business is a viable

3     option?

4          MR. JONAS:  No, Your Honor, I'm comparing it in

5     this way.  They keep telling us, well we did the RSA, but

6     don't worry, maybe something else better will come along,

7     and don't worry, we (indiscernible - 10:39:58) of that.  But

8     as I think was said yesterday, all -- vis-à-vis, at least

9     everyone else behind the first in this case, my clients and

10    the rest of the unsecureds -- and when I say giving away the

11    keys I don't use it pejoratively, Your Honor, that's what

12    happened.  It is a -- vis-à-vis us it's a foreclosure.

13    There's nothing left in this case.  This case is over for us

14    if the RSA goes forward.

15         And so what I --

16         THE COURT:  Why is that?

17         MR. JONAS:  Why is that?

18         THE COURT:  Yeah.

19         MR. JONAS:  Well, it's their --

20         THE COURT:  They're not -- all I'm doing if I

21    approve the RSA is allowing them to assume the obligation to

22    pay certain professional fees and go forward until they

23    change their mind with a plan of attack they could have done

24    without an RSA.  So I'm confused how you're locked in, how

25    is this the death nail of the seconds or the ad hoc

1    committee of unsecured.

2            MR. JONAS:  Well, I'm not -- I don't think we're

3    suggesting -- and I hope it's not the death nail -- I'm not

4    sure that's what we're suggesting, but I'm asking --

5            THE COURT:  You said the case is over for you if I

6    approve --

7            MR. JONAS:  No, no, if --

8            THE COURT:  -- the RSA.  That's what you said.

9            MR. JONAS:  No, no, I think -- I think what I

10   said, Your Honor, with all due respect is if what's

11   contemplated by the RSA goes forward, the substance of the

12   RSA, what the debtors -- what --

13           THE COURT:  Okay.  So if the plan that's

14   contemplated --

15           MR. JONAS:  Yes.

16           THE COURT:  -- by the RSA is confirmed --

17           MR. JONAS:  Yes.

18           THE COURT:  -- you're out of the money.

19           MR. JONAS:  Correct.

20           THE COURT:  Okay.

21           MR. JONAS:  And my point is, Your Honor, I don't

22   -- I think that's an unfair -- in light of the facts here --

23   I think that's an unfair starting point.  Why do we have to

24   come into the case burdened by an RSA that provides --

25           THE COURT:  You don't, they will have the burden

1      of proof at plan confirmation.

2              MR. JONAS:  Well, but -- exact -- but, Your Honor,

3      I think they have a burden of proof now at the RSA hearing,

4      and I think the burden of proof, and I think we're going to

5      be able to show this to you, is not business judgment, and

6      if it's not business judgment then I think the Court has to

7      look at the transaction and the Court has to say, well, wait

8      a minute -- let me say this.  If I come in -- if I could

9      show you right now, Your Honor, that instead of being 5- or

10     $6 billion under water we're in the money and you were not

11     using business judgment and you were examining this

12     transaction I think you'd say, I hope you'd say, wait a

13     minute, I don't think that necessarily makes sense for this

14     board to give away the keys when I know there's value there.

15             And I think on June 30th or July 18th we're going

16     to be able to show you the value.  And assuming you're not

17     using business judgment standard then I think you will reach

18     that conclusion that wait a minute, this doesn't make sense,

19     I have to look at this independently and it doesn't make

20     sense.  Why would I let them sign a deal, whether it locks

21     up or not, why does that board get to sign up a deal where

22     they're giving away my value?  I don't think they can.  So

23     that's my point, Your Honor.

24             I know we'll get to the day when we'll ultimately

25     have confirmation and we'll have a full board valuation and

1    everything else, I know that, but I think -- I'm just asking

2    what I think we're entitled to now, which is get to an RSA

3    hearing and what am I entitled to.

4            If in fact you determine -- which I don't think

5    you'll be able to do until we get through discovery and get

6    to that hearing -- if you determine to use a heightened

7    standard then valuation will be an issue.  And I don't want

8    to get here on June 30th or July 18th and have you say,

9    well, gee, I guess we'll have to use -- I guess I have to

10   look at this transaction different, I can't just take

11   business judgment and say, okay, where's you -- you know,

12   put some evidence on, show me why this wasn't the right deal

13   for this board to do.

14           I need to be in a position to be able to do that.

15   And, Your Honor, I'm not asking, we understand the realities

16   of this case and the timing and everything else, we're not

17   asking to come in with a full board valuation.  I want to do

18   limited discovery, five substantive topics, I want to put on

19   my expert for a couple hours of testimony.  That's what I'm

20   asking for.  That's it.  And I think I'm entitled to that.

21   I think I'm entitled to that not in the context of when do

22   you do a valuation in a bankruptcy, in the context of my

23   debtors filed a motion asking for approval of an RSA.  That

24   context entitles me to get what I'm asking for.

25           And I also -- one last point, Your Honor, because

1     it goes to a point you made, which is aside from all those

2     arguments that I've made, that I think entitle me to do what

3     I'm asking for, (indiscernible - 10:44:32) from a common

4     sense approach if we're right on value, which some day we'll

5     find out, such that the T side deal contemplated by the RSA

6     can't get done or shouldn't get done, whenever that might be

7     determined, why permit the debtors now to irretrievably

8     spend tens of millions of dollars on fees as you mentioned

9     those -- those are gone, we can't get those back.  So while

10    the debtor talks about lots of stuff that can get undone

11    those tens of million dollars are spent and buried.

12             And more importantly than that -- I would argue

13    about that but I don't want to waste my time because in the

14    context of this case that will be small potatoes -- but why

15    let the debtors launch these cases down a path which won't

16    encourage compromise and consensual resolution and likely

17    will cause months of delay and unnecessary expense?

18             THE COURT:  Because they have exclusivity.  They

19    nave exclusivity, that's their -- that's their right under

20    the Bankruptcy Code to try to put together what they think

21    is an appropriate plan.

22             MR. JONAS:  And I --

23             THE COURT:  And they can spend money doing that.

24             MR. JONAS:  And I hear Your Honor, and again

25    coming back to my earlier point, I think we get to address

1    that and look at that at the RSA hearing and hopefully we'll

2    have a chance to do that.

3          But my point in the bigger context, Your Honor,

4    from at least my clients' perception of common sense for

5    purposes of the case, I understand they have exclusivity,

6    but we feel that once the RSA is in place --

7          THE COURT:  They're not doing anything in the RSA

8    that they couldn't do without my approval.

9          MR. JONAS:  Understood, Your Honor, but I'll just

10   give you one example.  I would posit, Your Honor, that the

11   first liens with the RSA in place will be much less likely

12   to enter into discussions with us about a resolution -- a

13   consensual resolution.

14          And my only point, Your Honor, is rather than

15   launch us down that path as much as the debtor can tell you

16   over and over again don't worry, not a big deal, we're not

17   locked in, maybe somebody else will show up with a better

18   plan, I would --

19          THE COURT:  I don't think it's fair to say that

20   that's what they're saying, maybe somebody else will show up

21   with a better plan.  I mean it may be, and maybe I'm wrong

22   and maybe this is why you should have discovery, that they

23   are continuing to monitor the situation in their own mind,

24   and it may be that they change their mind with regard to

25   what valuation is.

1          MR. JONAS:  Well, I hear you, Your Honor.  I mean

2    my clients are quite suspect about that, but I hear what

3    you're saying.

4          I'll just come back and I'll close with my -- what

5    I've already said, but just to summarize, Your Honor.

6          RSA approval what are we entitled to?  And I would

7    suggest to you, Your Honor, that because you will not know

8    the standard of review until the hearing we should be

9    entitled to reasonable, limited discovery and reasonable,

10   limited testimony.  That's all we're asking for, Your Honor.

11         Thank you.

12         THE COURT:  You're welcome.

13         MR. STARNER:  Good morning, Your Honor.  Greg

14   Starner of White & Case on behalf of the TCH ad hoc group.

15         I thought I would just begin by setting the table

16   a little bit on what we think the debtors are kind of asking

17   for and whether it makes sense for them to put up these

18   artificial limitations on what is appropriate discovery.

19         I heard that the RSA is just a starting point, and

20   I think it's our position that that suggests a slightly

21   illogical position.  That if ultimately no one does show up,

22   you know, the question is how was it that the debtors made

23   up their mind now to pursue and enter into the RSA?  And

24   that to the extent that they're committing themselves to

25   give the assets of the TCH estate to the first liens, to

1    what extent do they satisfy their fiduciary duties in making

2    that determination now and to pursue the RSA at this point?

3              And to the extent that -- that they can't show

4    they're exercising their fiduciary duties we would suggest

5    it's not appropriate to go forward with the RSA at this

6    point.

7              That's why there are fiduciary duties, that's why

8    there are fiduciaries, and the suggestion that the RSA is of

9    no moment we are concerned about that.

10             But I think, you know, as a threshold matter --

11             THE COURT:  Is there an open question as to

12   whether a board of director owes a fiduciary duty to

13   unsecured creditors they're out of the money?

14             MR. STARNER:  I think that's an open question,

15   Your Honor.  I mean -- but I think that presumes something

16   with that, that's an assumption that's based on what is the

17   value of it.

18             THE COURT:  What -- the valuation.

19             MR. STARNER:  Right.  And I think as we've --

20   certainly Mr. Jonas articulated well and I think we've heard

21   there's a question about that.  And to that point I would

22   just suggest if the debtors are relying upon any formal oral

23   statements regarding valuation it sounds to me is that the

24   debtors can easily respond to our valuation discovery

25   request by saying we have no responsive documents.  And if

1      that's the position they want to take that seems to be what

2      they can do.

3            But I guess let me just step back.  From my

4      perspective they put forward an assumption motion, Your

5      Honor, that make certain assertions and offer certain basis

6      for why the Court should approve that motion.  And I think

7      from our perspective we're just simply seeking to -- trying

8      to seek discovery regarding the basis they've put forward.

9            So if I may I would just touch on two quick

10     statements that, you know, their declarant, Mr. Sawyer, they

11     put forward in support of their motion.  He makes two

12     particular points that I think are critical here for the

13     topics that the debtors have suggested are off limits or

14     that they are artificially seeking to limit, and I'll get to

15     that in a moment.

16           But he specifically says that in evaluating the

17     proposed RSA that the RSA debtors (indiscernible - 10:50:14)

18     and management provided detailed presentations regarding the

19     risks and benefits associated with the RSA, including

20     settlements contained therein, and these presentations were

21     important to his evaluation of the RSA.

22           Similarly he discusses the potential tax

23     consequences and implications of the RSA, and he suggests

24     that he believes based on his analysis and assessment of the

25     tax issues that he believes the RSA yields significant value

1    to the TCH stakeholders.

2            So I think what we're suggesting, Your Honor, is

3    that it's appropriate for us to have an opportunity to test

4    those assertions and obtain discovery regarding those

5    issues.

6            So they can't have it both ways.  They can put

7    forward a declarant like Mr. Sawyer and suggest that he has

8    considered these issues but at the same time not let us have

9    an opportunity to test those assertions.

10           And so I thought I would just now briefly touch

11   on, I think what they suggest is well, don't worry about it,

12   we've already produced the board materials and so we don't

13   need to go any further than that.  I think that is a

14   questionable position, but just based on what they produced

15   to date everything (indiscernible - 10:51:16).  We have

16   agenda items that suggest they may have considered tax

17   consequences or tax issues associated with the RSA.  We have

18   (indiscernible - 10:51:24) that suggests they may have

19   considered the releases and resolutions of claims in the

20   RSA, but everything else is (indiscernible - 10:51:30).

21           So the question about whether or not

22   (indiscernible - 10:51:32) are appropriate is likely a

23   dispute for another day, but I would just suggest to the

24   Court we have not seen anything associated with the basis

25   for Mr. Sawyer's statements regarding what he considered in

1    connection with recommending the TCH debtors entering into

2    the RSA.

3              And let me just touch briefly on the discovery

4    with the first liens, Your Honor.

5              I think just as an initial matter we were slightly

6    surprised that they filed a letter with the Court.  We had

7    issued our discovery of them early this week, did not

8    receive any communication, did not -- they didn't reach out

9    to us.  Normally there is a requirement or certainly

10   expectation that they would meet and confer with us to

11   discuss the scope of our discovery requests.  We are

12   certainly happy to have that discussion.  I think from my

13   perspective this actually is slightly premature for this

14   Court to address the issue with respect to our discovery to

15   the first liens.  We're happy to have that conversation,

16   maybe -- we may need to come back to the Court to resolve

17   some disputes, but that seems to be the initial issue.

18             As a fundamental I will comment on this.  To the

19   extent the first liens are suggesting they don't have to

20   produce any discovery assertion with RSA that strikes me as

21   a slightly aggressive overly ambitious position and we're

22   happy to have that conversation with them and come back to

23   the Court and seek some relief if we need to.

24             THE COURT:  All right.  Thank you.

25             MR. FLORENCE:  Your Honor, Alex Florence, proposed

1    counsel for the committee of unsecured creditors.

2             We haven't weighed in in the writing of letters,

3    but we thought it would be appropriate for us to just let

4    the Court know our position.

5             We hear from the debtors that they are going to

6    produce more documents this week and we're hopeful that that

7    will be robust production.

8             But as to the one issue here that seems to have

9    enjoined, which is with respect to this valuation testimony

10   at an upcoming hearing, whether that's on the 30th or the

11   18th, the committee does not oppose the request to introduce

12   valuation testimony and to have limited discovery regarding

13   valuation.  The committee however does not plan on putting

14   on a valuation case at the hearing whether that's on the

15   30th or the 18th.

16             So with respect to that the committee does want to

17   reserve its rights with respect to if the Court were

18   inclined to proceed with a valuation hearing at the RSA

19   assumption motion hearing.

20             But primarily the committee would anticipate

21   putting on a valuation case at some point in the case and

22   would reserve its rights to do that.

23             Secondly, any testimony that is elicited at that

24   hearing should not be binding on the committee.

25             And thirdly, that any findings with respect to

1    valuation should be limited to the appropriateness of

2    entering into the RSA.

3              So with that that's the committee's position with

4    respect to the valuation discovery, Your Honor.

5              Thank you.

6              MR. MCKANE:  Your Honor, may I respond just very

7    briefly?

8              THE COURT:  Uh-huh.

9              MR. MCKANE:  And for the record Mark McKane of

10   Kirkland & Ellis.

11             We don't think there's any question or dispute

12   reasonably on what the law is on the standard of review as

13   you established and recognized in Visteon.  This is an arms

14   length agreement with creditors and it is a business

15   judgment, therefore it is appropriate.

16             We certainly don't think that any of the debtors

17   or Mr. Sawyer should be criticized for exercising good

18   governance, and when he was appointed to the board as an

19   additional restructuring professional to aid the TCH debtors

20   in evaluating their issues, everything Mr. Sawyer has done

21   to date, you know, it is consistent with what you'd expect

22   someone who's informed on those fiduciary duties to do, and

23   he will be available for examination.

24             As it relates to the notion that there would be

25   limited discovery.  The concept of putting forward an expert

1     witness on valuation for a few hours in an RSA assumption

2     motion, there's just a fundamental disconnect there.

3              I think you've properly recognized we're not

4     locked up here, we just want to make clear the debtors'

5     decision was based on what was the best available option at

6     the time, and we view it as a one-way option where we have

7     the ability to get out.  We spent almost two years

8     evaluating potential issues and opportunities here.  If

9     someone can come up with a better mousetrap we're all ears.

10             And then finally, Your Honor, as it relates to Inn

11    Keepers, the issue in Inn Keepers was radically different

12    than it was here, and there was a question as to whether

13    there was a valid and usable fiduciary out and whether there

14    was a deal with insiders.  That is not what we have here.

15    We have an undeniably, unqualified fiduciary out as you've

16    recognized.

17             And finally as it relates to the Rural decision,

18    the Rural Metro decision I'll just be brief in recognizing

19    that that decision really went to whether the board failed

20    to receive proper authorization to conduct the sale and the

21    failure to evaluate sale alternatives.

22             And therefore, Your Honor, what we ask is that the

23    Court limit the discovery and evidence for the RSA hearing

24    to materials considered by the boards in evaluating the RSA,

25    drafts of the RSA related materials, communications

1    regarding the RSA, and the payments that would be made under

2    the RSA.

3              To the extent that Mr. Starner or anyone at the ad

4    hocs have questions about our discovery we're happy to meet

5    with them and move forward on those issues.

6              THE COURT:  All right.

7              MR. MCKANE:  And for all those reasons we ask that

8    the Court issue a ruling today on this issue.

9              THE COURT:  Okay.  Thank you.

10             All right.  Well, I'm taking in the context of the

11   RSA, and I think that's important.  Obviously there are

12   ongoing 2004 discovery, et cetera, and there will be issues

13   that arise later in the case.  As to what discovery will be

14   appropriate at those time I don't know, and I'll deal with

15   that at the appropriate time.

16             I think it's important to start from my

17   perspective on what it is that I'm being asked to do in

18   connection with approving a restructuring support agreement,

19   especially one that's drafted as loosely or as neutrally as

20   possible in connection with committing the debtor to a

21   certain course of conduct.

22             I understand the utility of restructuring support

23   agreements and I understand why they make sense.  When you

24   look at it from a strictly legal perspective it really is

25   extremely limited relief that the Court is granting.  I'm

1      not confirming a plan, I'm not approving a disclosure

2      statement, I'm not making a valuation, I'm not saying that,

3      you know, the debtors if they continue down this road and

4      ultimately come to a point where I make a decision that

5      there's going to be some sort of presumption of

6      reasonableness or anything along those lines.

7              I'm approving the assumption of agreement that

8      really more than nailing down the debtor nails down the

9      creditors and allows the debtor to take a picture of where

10     -- where they are and where the creditors are and to if not

11     lock in, make it much more difficult for creditors who are

12     signatories to the RSA to back out at a later time for

13     whatever changed circumstances, while at the same time

14     preserving their option and -- the debtors' option on

15     whether it makes sense to continue down the road.

16             Now Mr. Jonas is probably right, they've made

17     their decision, they've made their call, 99 percent sure

18     they're going to stick with it unless something external

19     arises that changes the debtors' mind.  And Mr. Shore made

20     the point yesterday that it's not an easy task to say the

21     least to put together a $30 billion alternative.  It may be

22     even impossible.

23             But if we get to a point down the road -- and I

24     don't know if it's confirmation or not, it may be sooner, it

25     may be in a different context -- but I think everyone agrees

```
1    there's no way this Court will get to confirmation and maybe
2    no way I get to earlier issues without performing a
3    valuation and figuring out what the TCEH debtors are worth,
4    because you can't valuate the plan without knowing that --
5    the proposed plan.
6              I think a mini valuation hearing is actually not
7    constructive and would be not appropriate.  (A) I don't
8    think it could be done in the time frame contemplated, but
9    even if it could be done I think that it would be sort of
10   half baked frankly and of limited utility to the Court.
11             So I'm not going to consider valuation testimony
12   at the RSA agreement -- at the RSA hearing with a caveat,
13   and I'm not going to allow or require the valuation
14   discovery requested to get us between here and the RSA.
15             I think that the -- without that I still think
16   that the objecting parties have tools that they can -- that
17   they can raise as to, you know, whether it was appropriate
18   for the debtors to enter into the RSA and whether maybe even
19   a heightened standard could be reached.
20             I think that if I get to a point where it becomes
21   relevant to figure out whether, you know, to crawl inside
22   and do an entire fairness or perhaps a heightened scrutiny,
23   but to crawl inside the transaction I'll stop the bus, we'll
24   reset, and we'll have some discovery and we'll go to a
25   hearing on the merits of the actual decision.
```

1          But I don't think it makes sense in the context of

2     where we are, where we're going to go, and what's actually

3     being asked the Court to approve to allow that discovery

4     now.  I think you've gotten a lot of information and you've

5     articulated it to me over and over again, your theory of the

6     case and your theory as to the inappropriate decision that

7     the debtors -- the TCEH debtors made in signing on to this

8     RSA.

9          So I think the bus stops with the discovery that's

10    been stated it's going to be produced in the next days or

11    certainly by next week, and everybody use that information

12    to do the depositions and prepare their objections and we'll

13    go forward with a contested hearing either on June 30th or

14    July 18th, and we'll have to a certain extent see how it

15    develops.

16         But I would offer this, and I don't think it

17    surprises anyone, that I very much want to make it clear

18    that I'm not performing a confirmation hearing.  I'm not

19    buying into a valuation for ultimate decision in this court

20    as to whether the plan is confirmable or not.  I'm not

21    saying valuation has to wait until confirmation.  But what I

22    am saying is that it's not going to be a valuation hearing

23    at the RSA hearing unless developments occur to the point

24    where I feel that it's necessary for the Court to make that

25    decision at which point parties will be given an opportunity

1      to create a case and put that before me.

2                So I hope that -- oh, and I don't see any reason

3      at this time for there be any discovery with the first

4      lien lenders.  That is completely without prejudice with

5      regard to any discovery on any other issues, but in

6      connection with the RSA I don't see any point.  It's not a

7      TCEH first lien debt question, it's a debtor question.

8                I don't think I need an order do I?  Mr. Shore?

9                MR. SHORE:  Can I address two scheduling issues,

10     Your Honor --

11               THE COURT:  Yes.

12               MR. SHORE:  -- before we launch into the DIP and

13     cash collateral.

14               One is we'll talk to them about the redacted board

15     packages.  If we can't get to a resolution about what

16     they're going to produce is there a time we can have a call

17     with the Court early next week?  Because it doesn't make

18     much sense to have the deposition with a board package

19     that's redacted.

20               THE COURT:  Yeah, that's fine.  Let's do it by

21     phone if that arises.  I'm available all day Monday, Tuesday

22     morning, and all day Friday.

23               MR. SHORE:  Very good.

24               Second on the 2004 is not on the calendar although

25     we set this as a status date, and it had its intended

1    effect.  We met, we gathered the comments of the three main

2    parties on our side, put together the discovery protocol,

3    got it to the debtors last Wednesday.  With the discipline

4    of this coming up we got their mark up Wednesday at 11 p.m.

5    or something like that.  So now the ball is on our court.

6    We'll meet with them.  What I'd like to do if we can is use

7    the 30th date as the next holding date on that and hopefully

8    we will have a protocol to provide Your Honor on that date,

9    and if not maybe we could take some time to address any kind

10   of open issues on that.  But the discipline of having a date

11   out there is I think helping drive people towards a

12   resolution.

13             MR. MCKANE:  And as to that issue we did respond,

14   we actually are working with some of the RSA support

15   parties, I believe they may have comments as well.  I do

16   believe that continuing this process forward is good.  We

17   would just note that we think the protocol may -- one of our

18   suggestions, and I think this may be something we may need

19   your help with ultimately if we can't get there -- is we

20   think the protocol would have maybe broader in terms of and

21   to the extent it's for the 2004 process, it'd be useful to

22   have the same protocol carry into the confirmation process

23   down the road.

24             But in addition to that we also have been trying

25   to work through a protective order to govern the production

1    of highly confidential materials in the case.  That has gone

2    through multiple iterations of turns from comments from all

3    the creditors and the U.S. Trustee, and we strongly hope to

4    have -- be able to present a consensual stipulated

5    protective order for Your Honor's entry as well before the

6    next hearing.  But if we cannot we may also try to raise it

7    at that point in time and may ask that you aid us in

8    resolving any outstanding issues there.

9              And then finally as I mentioned earlier, I do want

10   the Court to understand that those issues, the protocol

11   (indiscernible - 11:06:32) that's not stopping us from doing

12   what we need to do to give them the background materials

13   that they need to conduct --

14             THE COURT:  All right.

15             MR. SHORE:  May I just be heard on one thing and

16   just make clear as far as providing this stuff.  It's not

17   helpful to be providing, you know, of the 35,000 page

18   production half of that were publicly available materials.

19   You're going to be producing stuff just to be producing it

20   in a fashion that makes sense in the context of our review

21   of it.

22             THE COURT:  Well, I'll allow you guys to figure

23   that out in the context of having the 2004 set for a status

24   conference on June 30th, which is still a hold date and

25   we're still going to have court that day that's fine.

1            MR. JONAS:  Your Honor, Jeff Jonas from Brown

2    Rudnick, briefly, and thank you for your careful

3    consideration of the discovery dispute, Your Honor.

4            I just want to say, and I'll reserve on it.  One

5    of our other complaints was just the timing of discovery.

6    The debtors were not able to promise us all the responsive

7    documentation, aside from the valuation materials, until

8    June 13th, our objection is due the 20th and we were

9    concerned, get the materials, do the depositions.  My guess

10   is the hearing won't go forward on June 30th and it'll be

11   pushed to July 18th in which case it should be a non-issue.

12           I just wanted -- I stood, Your Honor, just to --

13           THE COURT:  Well, yeah, my response on that is

14   move the objection deadline to give you the opportunity to

15   do what you need to do.  When you get the documents do the

16   depositions and file an objection and don't send it over on

17   the 29th at 4 p.m., but set a time that makes sense.  I

18   don't even know what day of the week the 30th is.  Is it

19   a --

20           UNIDENTIFIED SPEAKER:  Monday.

21           THE COURT:  It's a Monday.  All right.  Well, you

22   know, bake into it that, you know, you can get something to

23   the Court say by when you -- no later than say the 25th at

24   the latest.

25           MR. JONAS:  Thank you.

1            THE COURT:  And, you know, work around that.  And

2    obviously if we have a hearing at a later date --

3            MR. JONAS:  Thank you, Your Honor.

4            THE COURT:  -- the objection deadline should move

5    as well.

6            MR. GOREN:  Thank you, Your Honor.  Todd Goren,

7    Morrison & Foerster.  I just wanted to make one brief point

8    and I take Mr. McKane at his word that they'll keep the

9    documents rolling regardless, but you know, the protocol is

10   giving us at least some discovery that's relevant to our

11   investigation of the lenders as well.  We now have a clock

12   rolling on that date so it is very critical that the

13   documents continue to roll as quickly as possible.

14           THE COURT:  All right.  Well there's non-RSA

15   issue, but obviously an important issue.

16           Okay, that takes care of that.  Where are we?  We

17   have three orders to go through before we turn to new

18   matters?

19           MR. HUSNICK:  I believe --

20           THE COURT:  Four orders?

21           MR. HUSNICK:  -- two, Your Honor, are apparently

22   ready and that is the DIP order and the cash collateral

23   order.  We are still I believe out in the hall working

24   through issues on the hedging order.  And on critical vendor

25   I'm not sure we're going to be prepared to go forward on

1    that today, but we will report shortly.

2              Your Honor --

3              THE COURT:  I was -- there was a -- on the EFIH

4    first lien DIP there was a final order -- proposed order

5    filed, correct?

6              MR. HESSLER:  Yes, Your Honor.

7              THE COURT:  Okay.  And that's signed off on by all

8    parties?

9              MR. HESSLER:  So far as we know, yes, Your Honor.

10             THE COURT:  Okay.  Very good.  All right.

11             MR. HUSNICK:  Your Honor, if I may I'll begin with

12   cash collateral, and if I can approach, Your Honor, I'll get

13   you -- the Court a redline and then I'll explain there is

14   one open issue that we would need the Court's guidance on.

15        (Pause)

16             THE COURT:  Hang on, sorry, I'm getting confused.

17             MR. HUSNICK:  You may not have a redline of the

18   cash collateral.

19             THE COURT:  I do, I just -- no?  No.  What am I

20   looking at?  That's the DIP I'm looking at?  Why am I

21   looking at the DIP?

22             MR. HUSNICK:  If you want to begin with the DIP I

23   can do that.

24             THE COURT:  No, no, I'm just confused.  Give me a

25   minute.

1          (Pause)

2              THE COURT:  You know, if I had a check the box

3      caption it'd be a lot easier.

4          (Laughter)

5              THE COURT:  All right, I'm ready.

6              MR. HUSNICK:  May I approach?

7              THE COURT:  Yes.  Thank you.

8          (Pause)

9              THE COURT:  Okay.

10             MR. HOROWITZ:  Your Honor, I apologize, but

11     Gregory Horowitz of Cramer Levin on behalf of the EFIH

12     second lien trustee.  I just wanted to make one point clear.

13             Mr. Hessler made quick reference to the first lien

14     DIP order being signed off by all parties.  There is one

15     issue in the first lien DIP order relating to Fidelity --

16     what's been referred to as the Fidelity funding fee -- that

17     we need to be heard on.  We don't necessarily need to be

18     heard on it now, but I want to make sure that you wait until

19     you take up the (indiscernible - 11:11:49) issues.  Perhaps

20     this afternoon or --

21             THE COURT:  Okay.  Thank you.

22             MR. HOROWITZ:  Thank you.

23             THE COURT:  Thank you for the clarification.

24             MR. HUSNICK:  Your Honor, turning to the cash

25     collateral order, as I said, the parties negotiated last

1    night following Your Honor's ruling on the cash collateral

2    issues, -- excuse me -- including the 506(c) waiver.  There

3    is one open point, Your Honor, regarding interpretation of

4    Your Honor's ruling on the 506(c) waiver.

5             If you'd like to go directly to that, I can.  It's

6    the tab that's on your redline is this open issue, and then,

7    I can walk you through the rest of the redline.

8             THE COURT:  Okay.

9             MR. HUSNICK:  Your Honor, and I can just tee up

10   the issue, and then, I'll let the parties speak to it.  The

11   question is, Your Honor, in this paragraph on page 42, is an

12   event of default under the cash collateral order in the

13   event that the bankruptcy code -- there actually is an order

14   entered surcharging the collateral of the prepetition

15   secured lenders that would result in a termination of

16   consensual use of cash collateral.

17            The ad hoc group of TCEH creditors, on one hand,

18   believes that the provision should be stricken and

19   consistent with the order or the ruling, and, on the other

20   hand, the prepetition first lien lenders believe that the

21   provision remains appropriate, notwithstanding the Court's

22   ruling.  So, with that, Your Honor, I think we'd like the

23   Court's guidance on where you would come out here.

24            MS. CORNISH:  Good morning, Your Honor.  Kelley

25   Cornish, from Paul, Weiss, Rifkind, Wharton & Garrison, on

1        behalf of the ad hoc committee of TCEH first lien creditors.

2               Your Honor, we think this issue is very simple and

3        very clear.  It's one thing to preserve the debtors' right

4        to seek surcharge of the first lien creditors' collateral

5        under 506(c).  It's entirely another as to the consequence

6        of the exercise of those rights with respect to the first

7        lien creditors' consent, voluntary consent to the continued

8        use of their cash collateral in those circumstances.

9               I'd note, Your Honor, there are actually a number

10       of defaults currently in the order that -- events of default

11       that are triggered by parties' exercise of legal rights,

12       such as lifting the automatic stay to allow a creditor to

13       execute or enforce a lien on our collateral and several

14       others.  In addition, Your Honor, and very importantly, the

15       DIP credit agreement in section 11.154 actually has an event

16       of default that reads, "The bankruptcy Court shall enter an

17       order approving any claims for recovery of amounts under

18       section 506(c) of the bankruptcy code or otherwise arising

19       from the preservation of any collateral."

20               How can it possibly be that, if our collateral is

21       surcharged, the DIP lenders have an event of default, but

22       the first lien lenders' ability to terminate their voluntary

23       consent to the use of their cash collateral -- they're not

24       afforded an ability to terminate that consent.  We think

25       this is very clear and very simple.  The issues are very,

1    very different as to the debtors' ability to exercise a

2    right and the first lien lenders' continued consent to the

3    use of their cash collateral.

4            THE COURT:  Mr. Shore?

5            MR. SHORE:  Thank you, Your Honor.  Chris Shore,

6    from White & Case, on behalf of the ad hoc group of TCEH

7    unsecured notes.  Let's be clear about what the consequences

8    are, and let me draw a distinction.

9            The DIP could be defaulted if a 506(c) surcharge

10   is permitted against any DIP collateral.  That's one issue,

11   and the DIP lenders would have to make a decision with

12   respect to is it worth insuring the DIP in the event that a

13   million dollar, 5 million, $10 million charge were asserted

14   against these estates.  That's one.

15           The problem we're concerned is is, if a 506(c)

16   surcharge is entered and the cash collateral is terminated,

17   that's a totally different analysis the DIP lenders have to

18   make as to whether to call a default.  In other words, they

19   will then be lending to a company which does not have

20   authority to use cash.

21           We believe that the import of Your Honor's ruling

22   that the debtors may exercise the right without regard to

23   whether or not the lenders are consenting to that -- give

24   them an opportunity to consent to that.  It's consistent to

25   say that the debtors' exercise of that right should not be

1    hit with the consequence that the DIP lending goes into

2    material default at that point.  So our only concern is that

3    the -- and again, you're not ordering them to do anything.

4          The first lien lenders be told, consistent with

5    the ruling, if you want to lend to these debtors, you're

6    going to have to lend knowing that, if you get a 506(c)

7    right, you're not going to be able to terminate the use of

8    cash collateral.  Nothing would prevent them coming back to

9    the Court and seeking to modify or anything else, but it

10   just doesn't give them the option of saying to the debtors,

11   "You file a 506(c) motion, and the Court enters that order,

12   and you are going to be without a DIP."

13          THE COURT:  All right.  I do think it's different.

14   I do think that it's an appropriate event of default if the

15   Court enters an order approving a 506(c) surcharge.  That

16   said, there are things that happen when there are events of

17   default, including a five-day stay and an ability for the

18   debtor to come in and other parties and interests to

19   challenge that event, calling that event of default, and we

20   could have a non-consensual use of cash collateral within

21   that five-day period.

22          It may or may not trigger an event of default at

23   the DIP level, at the DIP loan level, but there's a whole

24   host, as counsel pointed out, of defaults here that the cash

25   collateral lenders or consenters can call that would have

1    the same effect.  So I do think it's different, and I think

2    it's an appropriate event of default.  So I'll allow it, but

3    again, the caveats on any event of default is that there is

4    a mechanism built in, I think five days, a mechanism built

5    in to stop the music long enough to figure out whether the

6    event of default should be allowed or what the alternatives

7    may arise as a result of that even of default being called.

8              MR. HUSNICK:  That's correct, Your Honor, five

9    business days.

10             THE COURT:  I'm glad you agree.

11             MR. HUSNICK:  Your Honor, thank you for that

12   ruling.  If you want, I'm happy to walk you through the

13   redline.

14             THE COURT:  Go through the changes.

15             MR. HUSNICK:  Okay.  Your Honor, on page 2 of the

16   redline, the debtors struck the 506(c) reference.

17             THE COURT:  Okay.

18             MR. HUSNICK:  The next change I have is on the

19   bottom of page 6, which is just updating the numbers for the

20   amount of the debt that had accrued as of the petition date.

21             THE COURT:  Okay.

22             MR. HUSNICK:  There are some changes on page 7,

23   which, if you remember, Your Honor, are relevant to the

24   switch of the administrative agent that occurred in the

25   middle of the first-day hearing.

1              THE COURT:  Right.

2              MR. HUSNICK:  So the top of page 8.  Your Honor,

3     this identifies the accrued and unpaid interest estimate as

4     of the petition date.

5              On page 9, Your Honor, at the bottom, there is a

6     reference -- and there's some other changes in here just

7     clarifying that the obligations under the first lien

8     documents do include prepetition indemnification

9     obligations, and it's moving it from that 1 paragraph up to

10    the top of that paragraph.

11             THE COURT:  Okay.

12             MR. HUSNICK:  In paragraph E, the important

13    language is at the bottom.  This was a reference to the

14    segregated account.  While it's stricken here, Your Honor,

15    it does show up in new paragraph 10, and I'll flag that for

16    you.  It was effectively moving it from the stipulations

17    into an effective paragraph for the order.

18             THE COURT:  Okay.

19             MR. HUSNICK:  Your Honor, page 10 -- we're just

20    memorializing that the consent rights and the effect of

21    consent by the collateral agent as to the use or under the

22    inter-creditor agreement and the effect of it.

23             Page 11, Your Honor, second lien collateral --

24    just clarifying that the debtor is not stipulating to the

25    secured nature of the second liens.

1           Your Honor, page 14, at the end of Roman IV, just

2     in clarifying again that nothing in this paragraph

3     prejudices the rights of the debtor under 506(c), consistent

4     with Your Honor's ruling.

5           In paragraph G, at the bottom of page 14, this was

6     part of the negotiated deal with the creditors' committee to

7     not limit the manner in which the prepetition collateral

8     would be valued for purposes of determining a diminution in

9     value.  Also clarifying at the end as to the fact that

10    priming liens does not immediately result in diminution in

11    value, that that's actually something that would be looked

12    at in terms of whether the DIP actually decreased the value

13    of the collateral.

14          Turning to page 16, again, deleting the references

15    in paragraph H to the 506(c) waiver, clarifying in slides --

16    or I keep saying slides -- sorry -- in paragraph I, that the

17    -- excuse me -- direction was given by the required parties

18    under the first lien inter-creditor agreement.

19          At the bottom of page 17, we're just including the

20    first lien creditor agent as one of the first lien

21    creditors.

22          Page 18, we're just now cleaning it up, because

23    we've now defined first lien creditor agent.

24          Page 20 added the creditors' committee to the

25    notice block.

1           Page 22 -- again, in determining diminution in

2    value, this is deleting a provision that had the effect of

3    narrowing the way in which the collateral would be valued

4    for purposes of diminution.

5           On page 23, this set of revisions is clarifying

6    that there are no adequate protection liens on the

7    unencumbered assets, including the avoidance actions and the

8    proceeds thereof.

9           Page 24, deleting the reference of 506(c).

10          Page 25, paragraph B, this is clarifying that the

11   507(b) super-priority claim would be payable from

12   unencumbered assets, except for the proceeds of avoidance

13   actions.  That carries over, Your Honor, onto page 26.

14          Page 27, just using the new defined terms for

15   creditors' committee in 2 places, and then, carrying over,

16   Your Honor, on page 28 is a provision that clarifies that

17   the TCEH debtors will only pay the amounts that are not

18   subject to an objection for fees and expenses of the first

19   lien ad hoc professionals and the first lien agents.

20          Your Honor, at the bottom of page 29 -- just

21   reading to make sure I know what this one's about.  This is

22   a reservation of rights as to --

23          THE COURT:  That's correct, yeah.

24          MR. HUSNICK:  -- the contract rate or default

25   interest rate.  All rights are going to be reserved on that

```
 1    point.

 2                Your Honor, then the last part of that big block

 3    has to do with the amount by which the debtors are

 4    calculating the adequate protection payment as to the swaps.

 5    What we've done here, Your Honor, is the debtors have

 6    received estimates of swap liabilities from the various

 7    parties that have terminated swaps that are secured by

 8    prepetition first liens.  We aggregated that amount, and we

 9    used the debtors' estimate versus the estimate of the swap

10    counterparties, and then, we reserved all rights of all

11    parties to continue to discuss the appropriate amount of the

12    allowed swap termination claims.

13                Your Honor, at the top of 30, it's just adding --

14    page 30, top of paragraph E, we're just adding the

15    creditors' committee, again, in the middle of that paragraph

16    as well.

17                Same on page 31.

18                The same on page 32 for access to records, and the

19    same at the page of top 33.

20                Page 33, 34, and 35, and 36, and the top of 37 are

21    the escrow provisions, Your Honor, that we previewed with

22    you yesterday related to the objection of Aurelius and the

23    other first lien noteholders.

24                THE COURT:  Are those --

25                MR. HUSNICK:  Sorry.
```

1          THE COURT:  Are those changes consistent with my

2     rulings of yesterday?

3          MR. HUSNICK:  Correct, Your Honor.  I can

4     highlight for you.  In the middle of page 34, we added the

5     first lien note's trustee in Aurelius Capital as having

6     consent rights over the form of the escrow agreement.

7          THE COURT:  Are there any objections to this

8     language remaining, given what I ruled yesterday?

9          I'm not going to try to understand it, if no one

10    objects to it.

11         MR. HUSNICK:  Yeah, and we have provided this to

12    Aurelius' counsel, and I believe they are signed off.

13         THE COURT:  All right.

14         MR. HUSNICK:  Your Honor, then in paragraph B was

15    the other, at the request of first lien notes trustee and

16    per Your Honor's order, we did add the first lien notes'

17    trustee here as a noticed party.  Same on page 36 in the

18    second line from the top.  We added the first lien notes'

19    trustee as a noticed party.

20         THE COURT:  Okay.

21         MR. HUSNICK:  With that, Your Honor, I think that

22    language has been signed off on.

23         Flip forward to page 41, Your Honor.  Your Honor,

24    this piece of language at the end of the credit bid

25    paragraph, which begins on page 9, is to preserve the rights

1     to the extent that a challenge action has been brought by

2     the official committee or any other party withstanding to

3     bring a challenge action.  The rights with respect to

4     section 363(k) and whether or not a credit bid is consistent

5     with that provision are all reserved as to the disputed

6     portion.

7               Your Honor, paragraph 10 was the paragraph where

8     we moved from up front as to the segregated cash.

9               Page 42 -- this is the issue that we just

10    discussed.  We will not be removing the bracketed language,

11    and I did have both versions here in court.

12              Page 43, paragraph K, adding, Your Honor, the

13    counsel to the creditors' committee to this paragraph.

14    Your Honor, in paragraph L, just changing five days to five

15    business days to give the debtors and the committee

16    additional notice related to this event of default.

17              Paragraph 12, again, adding the creditors'

18    committee as to the notice provision for the exercise of

19    rights and remedies in the event of an event of default.

20              Flipping forward to page 46, Your Honor, this is

21    just using the correct defined terms for various references

22    in the reservation of rights for the committee and third

23    party rights on the challenges, and then, on the bottom of

24    page 46 and carrying over onto 47, these are various

25    changes, including extending the challenge period to 135

1    days and also, I believe, increasing the budget to $500,000.

2    I think that might have been covered already.

3              THE COURT:  Yeah, I don't see that.

4              MR. HUSNICK:  It's actually covered, I think, in

5    the DIP order.

6              THE COURT:  Okay.  I was going to ask.

7              MR. HUSNICK:  Your Honor, then I move ahead to

8    page 48, where there's just changes related to the defined

9    terms.  On paragraph 16, page 49, just clarifying some

10   paragraph references and a reference to this final order.

11             The same on page 50 -- is clarifying the rights of

12   the creditors' committee and the types of challenge actions

13   that can be brought and the nature of the stipulations.

14             On page 51, here is our $500,000 number about

15   midway through the page.  The other changes on this page are

16   related to, again, the right of the creditors' committee and

17   limitations on the rights of the creditors' committee as to

18   compensation from the cash collateral and the carve-out.

19             Your Honor, there is, in the middle of that first

20   blocked paragraph, a reference to segregated cash.  I

21   believe it shows, in your redline, as being stricken, and

22   that's correct.  It's just conforming to the DIP order

23   language.

24             Page 52 -- this block of text is in here for

25   purposes of clarifying the ability of the creditors'

1    committee to access the unencumbered property, including --

2    or the segregated cash for purposes of bringing a challenge

3    action and also clarifying that the investigation as to 2007

4    leverage buyout and the transactions related to are reserved

5    and are not subject to the limitation, with the exception to

6    transactions to which the TCEH debtors became party to the

7    prepetition first lien documents.  So it's a limited

8    reservation.

9              Page 43, Your Honor, striking the section 506(c)

10   waiver.

11             THE COURT:  Fifty-three?

12             MR. HUSNICK:  Yes, yes, page 53, paragraph 16.

13             Page 55 -- this, Your Honor, is clarifying, based

14   on Your Honor's ruling regarding the exculpation that no

15   rights or remedies or no releases or exculpations are

16   granted as to the allocation of the first lien adequate

17   protection payments.

18             Your Honor, on page 56, this is just related to

19   the successor agency arrangements and agreements between

20   Citi Bank and Wilmington Trust, which is the new first lien

21   agent.

22             On page 57, I'm just including a reference to the

23   issuer, and this relates to changing the collateral agents

24   under the second lien notes and authorizing the appointment

25   of WISTIS (ph), I believe it's called.

1           THE COURT:  Very good.

2           MR. HUSNICK:  Your Honor, starting on page 59 and

3    carrying over to page 61 are certain reservations of rights

4    related to reservations filed by these parties.  The first

5    two relate to certain C.T. leases.  We call them C.T.

6    leases, but they're effectively leases of commercial

7    personal property that is now probably a fixture, and I'll

8    reserve rights on that, but nevertheless, it's just a

9    reservation of rights to make clear that the interests are

10   not being primed.

11          And finally, Your Honor, page 61, paragraph 29 --

12   this is the Alcoa reservation of rights as to any setoff or

13   recoupment rights.

14          With that, Your Honor, unless you have any

15   additional questions, I believe we have a signoff on the

16   order, and I'm prepared to present the original to you.

17          THE COURT:  I have no questions.

18          Does anyone wish to be heard?

19          All right.  You may approach with the order.

20      (Pause)

21          THE COURT:  Hey, Rachel?

22          MR. HUSNICK:  Your Honor, the next order that I

23   can discuss is the cash collateral order.  If I may

24   approach, I'll hand you a redline.

25          THE COURT:  We just did the cash collateral order.

1           MR. HUSNICK:  I'm sorry.  DIP.  Thank you.  Unless

2      you want to go through it again.

3           THE COURT:  No, no, once was enough.

4           MR. HUSNICK:  May I approach?

5           THE COURT:  Yes.

6        (Pause)

7           THE COURT:  Okay.  Yes, I did get that.

8           MR. HUSNICK:  (Indiscernible - 11:35:55.)

9           THE COURT:  Okay.

10           MR. HUSNICK:  Your Honor, there is one issue, I

11      believe, the committee wants to be heard on on this order,

12      and I'll flag it when we get there, if that's okay.

13           THE COURT:  Yes.

14           MR. HUSNICK:  The first change, Your Honor, is

15      just changing the reference to borrowings to indebtedness on

16      page 8.

17           On page 10, just clarifying the way the language

18      is used and clarifying per the settlement as to what the

19      liens and the super-priority claims have recourse to.

20           THE COURT:  Okay.

21           MR. HUSNICK:  Page 11 -- the addition of the word

22      only, just to make clear that the railroad commission

23      delayed draw term loan is not available, Your Honor, to fund

24      anything else.

25           Adding the, on page 15, the counsel to the

1    creditors' committee as a noticed party.

2         On page 17, Your Honor, this is one of the

3    provisions that will require some, I believe, discussion

4    from the creditors' committee.  The purpose of this

5    provision is to memorialize the sizing discussion that I had

6    with you yesterday, and that is to cap the amount of

7    outstanding borrowings under the revolving loan at $1.65

8    billion, unless the company and gets either the written

9    consent of the ad hoc group from the TCEH noteholders and/or

10   the consent of the Court to go beyond that amount.

11        With that, I'll just stop and allow the committee

12   to chime in.

13        THE COURT:  All right.

14        MR. GOREN:  Thank you, Your Honor.  Todd Goren,

15   Morrison & Forester, on behalf of the committee.

16        I don't know if this is an issue or not an issue,

17   but, in both this paragraph 3 and the other one would be 26,

18   there was language negotiated with the ad hoc group as to

19   certain limitations, notices, consent rights, et cetera.

20   The committee just felt that, as the fiduciary for unsecured

21   creditors, we should be included in that process.  So we'd

22   ask that that be included in the order.

23        I didn't think there was an issue with it, but it

24   wasn't included in here.  So we just wanted to clarify that

25   we believe we --

1             THE COURT:  Is there an issue with that?

2             UNIDENTIFIED SPEAKER:  The debtors have no

3     objection to that.

4             MR. SHORE:  Well, I can't think of anybody who's

5     going to be less likely than to want the debtors to spend

6     $300 million more of a DIP than us, but, if the committee

7     wants the right to object to it, that's fine.

8             THE COURT:  All right.  We'll add the committee.

9             MR. HUSNICK:  Thank you.  So, Your Honor, --

10            THE COURT:  To both places.

11            MR. HUSNICK:  Yes, thank you.  So we can

12    interlineate the committee's consent right on both places.

13    I believe I gave the original order -- handed the original

14    order up to Your Honor.

15            Both parties will have consent, right.

16            UNIDENTIFIED SPEAKER:  Absolutely.

17            MR. HUSNICK:  Okay.

18            Your Honor, at the bottom of page 17, carrying

19    over to the top, just clarifying the limitation on the

20    debtors' ability to borrow additional money under the

21    facility, and I'll -- obviously, subject to Court approval.

22            Page 20, Your Honor -- this is where the

23    settlement as to the liens and super-priority claims is

24    memorialized and the reservations as to commercial tort

25    proceeds and avoidance proceedings.

1          Same on page 21, Your Honor.  We're just

2     clarifying with use of defined terms as to the priming,

3     which creditors are being primed, and that is the first lien

4     creditors and the second lien creditors.

5          Paragraph 22 -- just fixing some paragraph

6     references.

7          THE COURT:  Page 22?

8          MR. HUSNICK:  Page 22.  Thank you.

9          Page 23, at the bottom, again, just adding and

10    clarifying some language about the unencumbered property and

11    what the effect of the order is on the unencumbered

12    property, including the avoidance actions, the proceeds of

13    the avoidance actions, and the commercial tort claims.

14         Page 25, paragraph B just clarifies that in no

15    event the DIP obligations be secured by a lien or mortgage

16    on the excluded collateral, the avoidance actions, the

17    avoidance proceeds, or the commercial tort claims.  So

18    again, just memorializing the deal.

19         At the bottom of page 25 and carrying onto the top

20    of page 26, Your Honor, this is the provision, I believe, I

21    discussed very briefly yesterday about the level of notice

22    and to whom notice needs to be given as to non-material and

23    material modifications to the DIP documents.  Also,

24    Your Honor, extending the period, the notice period from

25    five business days to seven business days, and then, at the

1    bottom, Your Honor, there's a separate provision here.

2          I mentioned that we need to do an amendment to

3    accomplish the negotiated settlement, and we need to amend

4    the DIP.  So that DIP is in the process of being documented

5    and will ultimately be executed, consistent with

6    Your Honor's rulings.

7          This provision just simply reserves rights of the

8    various parties as to the consent over that.  In addition,

9    it also reserves rights as to any fees that would be

10   requested in connection with such an amendment.  Your Honor,

11   just for the benefit of the Court and the record, I do

12   believe that there's agreement that there will not be a fee

13   paid in connection with this amendment.

14          THE COURT:  Where are we there?  I'm sorry.  You

15   totally lost me on the fee.

16          MR. HUSNICK:  Sorry.  Bottom of page 26.

17          THE COURT:  Yeah.

18          MR. HUSNICK:  It begins, "Pursuant to this final

19   order."

20          THE COURT:  Right.  Give me a sec.

21       (Pause)

22          THE COURT:  Okay.  I understand.

23          MR. HUSNICK:  Thank you.  Your Honor, on page 27,

24   this is just adding the creditors' committee as to various

25   provisions here on the budget and forecasting.

1          Paragraph 17, Your Honor, just adding in some

2     references to the bankruptcy code and in meeting an order of

3     the Court to the extent that the transaction or sale of

4     estate property is outside the ordinary course of business.

5          Your Honor, on page 32, extending the remedies

6     notice period from 5 calendar days to 5 business days and

7     adding, as noticed parties, the creditors' committee and the

8     TCEH first lien ad hoc committee as noticed parties.

9          Page 33 is more in the nature of cleanup and just

10    clarifying there's nothing in this order and then lettering

11    to make the language clearer.

12         Page 34 on DIP and other expenses, just making

13    clear that the fees and expenses of professionals to the DIP

14    agent are subject to the review by the TCEH debtors, the

15    U.S. Trustee, and the creditors' committee, consistent with

16    the procedures set forth in this paragraph.

17         On page 36, this paragraph just clarifies that

18    nothing in the sentence will impair the rights of the

19    debtors, the U.S. Trustee, and the creditors' committee with

20    respect to the fees and expenses, so long as they are

21    consistent with the procedures in this paragraph.

22         Page 37, paragraph 34, adding the creditors'

23    committee as consultation and noticed party.

24         On paragraph 25, this is just tweaking the

25    sections applicable to retention of the creditors' committee

1    in the carve-out.

2            Adding the creditors' committee on page 38 as a

3    noticed party, and, on page 39, clarifying the meaning of

4    this carve-out as to termination of the revolving

5    commitments to make clear that notwithstanding the existence

6    of an event of default, under the credit agreement and not

7    withstanding anything in the credit agreement or this final

8    order if there's an interlineations there, including with

9    respect to the existence of a default will the carve-out not

10   be able to fund from the revolver.

11           Your Honor, on page 40, this just clarifies the

12   function of the reserve accounts and says effectively if the

13   two reserve accounts are not funded in full and there's cash

14   left over in one of the reserve accounts, that it will spill

15   over into the other reserve account until that reserve

16   account is paid in full before monies are transferred to the

17   first lien creditors.

18           Your Honor, on page 43, this is the paragraph,

19   paragraph 26, that the creditors' committee referenced and

20   we will add the counsel to the creditors' committee in the

21   three places in the middle of this paragraph to add them as

22   noticed parties and I believe it's just noticed parties in

23   this paragraph, but the purpose of this paragraph,

24   Your Honor, is to require the debtors to give prompt updates

25   as to the Railroad Commission of Texas approval process and

1    the pending application for a replacement bond.

2         Page 45 -- this is making similar changes that we

3    discussed in connection with the cash collateral order about

4    the challenge rights of the creditors' committee and other

5    parties to prepetition liens, claims, and encumbrances.

6         Page 46 is the same, and it actually adds, in the

7    second portion of page 46, is preserving the rights of the

8    creditors' committees to seek compensation for objections to

9    the final cash collateral order and this final order.

10        Page 47 -- increasing the budget from 175 to

11   500,000, and again, broadening out the challenge rights of

12   the creditors' committee and other parties.

13        At the bottom, Your Honor, this is similar

14   language to what we discussed in the cash collateral order

15   as it relates to the ability of the lenders -- or I'm sorry

16   -- the creditors' committee to use the segregated cash or

17   the proceeds of the unencumbered property to litigate

18   challenge action and the reservation regarding the

19   application of the limitation on challenges to the 2007

20   leverage buyout as it relates to parties other than the

21   first lien lender.

22        Your Honor, turning to page 49, this is the

23   release of DIP lenders' provision.  The purpose of the

24   clarifications here is to just -- not necessarily narrow the

25   scope of the release, but to clarify the scope of the

1      release and make clear that the DIP lenders are being

2      released in their capacity as DIP lenders and for actions

3      related to the DIP, and that carries over onto the top of

4      page 50.

5              Bottom of page 50, Your Honor -- this is the

6      marshaling provision that we heard about yesterday that

7      requires the DIP lenders to marshal away from the

8      unencumbered assets and attempt to get compensated or repaid

9      in the first instance from the encumbered assets.

10             Your Honor, page 52 -- preservation of rights for

11     all parties.  We added the creditors' committee to take

12     action in the bankruptcy cases as they desire.  Preservation

13     in the bottom on paragraph 36 for the creditors' committee

14     as to not waiving any rights or remedies.

15             That takes us to page 56 and 57 and 58.  These

16     paragraphs are the same reservation of rights that we

17     included in the cash collateral order as the C.T. leases

18     that I mentioned, and then, on page 58 is the Alcoa

19     reservation of rights.  Again, the same as it was in the

20     cash collateral order.

21             Paragraph 45 is just clarifying that this is now a

22     final order and the consistency.

23             With that, Your Honor, I believe there are no

24     other changes to the order at this time.

25             THE COURT:  Okay.  I have a question on page 4,

1     footnote 3.

2               MR. HUSNICK:  Page 4?

3               THE COURT:  Yeah.

4               MR. HUSNICK:  Yes, sir?

5               THE COURT:  Just, given what's happening in

6     connection with the two-step final order on hedging, do we

7     need to add something here that says or any other similar

8     order?  I don't know what language, but --

9               MR. HUSNICK:  That's --

10              THE COURT:  -- we're locking ourselves into an

11    interim and a final order here, and I think we may have two

12    final orders.

13              MR. HUSNICK:  I think that's correct, Your Honor.

14    That's a very good catch.  We can interlineate a change to

15    that to make that clarification.

16              THE COURT:  Okay.

17              Anyone else on anything?

18              All right.  I have no issues.  I'll sign it as

19    modified.

20              You need to take this back?

21              MR. HUSNICK:  Your Honor, may I approach?

22              THE COURT:  Yes.

23         (Pause)

24              MR. HUSNICK:  Your Honor, at this point, I'm not

25    in a position to discuss the trading order.  If we could

1    take that up after the lunch break, that would be good, and

2    we'll go ahead and interlineate.

3              Your Honor, would you like to start now on the

4    EFIH stuff or take the lunch break now and take EFIH after

5    the lunch break?

6              THE COURT:  Well, can we -- we can -- can we deal

7    with the EFIH DIP pretty easily or not?

8              MR. HUSNICK:  I think we can -- Kramer Levin's

9    going to have something to say but I don't think they have

10   any opposition to the entry of the order.  It's going to

11   take a few minutes to go through the order and there's a

12   little bit of an introduction to that, so I think we can --

13   15, 20 minutes, maybe.

14             THE COURT:  Okay.  Let's take a recess then.

15   We'll just say recess until about noon and then we'll take

16   EFIH first lien debt and we'll break for lunch.

17             MR. HUSNICK:  Thank you, Your Honor.

18             UNIDENTIFIED SPEAKER:  Your Honor, do you mind if

19   the T side leaves.  It's not as much fun as it would be,

20   but --

21             THE COURT:  Not at all.  Not at all.  And if you

22   need a little more time to get everything moved around,

23   that's fine.  Thank you.

24        (Recess at 11:52 a.m.)

25             MR. HESSLER:  Good afternoon, Your Honor.

1              THE COURT:  Good afternoon.

2              MR. HESSLER:  Your Honor, forgive me.  I will do

3     my best to change gears as completely as we have to.  We may

4     be a little slow on the uptake on some of these issues.  We

5     will slide right into it, Your Honor.

6              THE COURT:  Very good.

7              MR. HESSLER:  For the record, Your Honor, Steve

8     Hessler of Kirkland Ellis, proposed counsel to the debtors.

9     As previewed at the conclusion of yesterday's hearing, the

10    two (indiscernible) EFIH motions before the Court today are

11    the motion to approve the EFIH first lien DIP and the motion

12    to approve the EFIH first lien settlement.

13             Your Honor, while these are two separate motions

14    that do involve two separate orders, there is an

15    interrelationship between the two to the extent that certain

16    of the proposed first lien DIP lenders are parties that are

17    settling their alleged first lien make-whole claims pursuant

18    to that settlement.

19             Your Honor, for that reason before getting started

20    with the presentation of the DIP motion, I did think it

21    would be helpful to spend no more than three or four minutes

22    for the benefit of the Court and all parties in interest, we

23    have a chart that clarifies the composition of the first

24    lien DIP and the first lien lenders.  We have copies in

25    front of the courtroom and in the back.  If you'd like me to

1     approach, Your Honor, I have a hard copy for you.

2              THE COURT:  All right.

3              MR. HESSLER:  Okay.  So, Your Honor, all this is

4     proposing to demonstrate for folks is the EFIH first lien

5     DIP facility, it's a $5.4 billion facility.  And moving from

6     top to bottom it's working through the six sort of groups of

7     lenders, I'll talk about those in a moment.  And then from

8     left to right, just the stages of the evolution of this DIP

9     and how we started with $5.4 billion and ended up with $5.4

10    billion, but the composition of the lenders evolved.

11             And so starting at the top, Deutsche Bank, the

12    lead arranging bank on the DIP at the time of the filing,

13    there was a $2.1 billion commitment that the debtors have

14    locked in from Deutsche Bank between the time of the filing

15    and the first day hearing a day and a half later given some

16    parties that had otherwise opted into the settlement, which

17    we'll hit as we go down the chart, that commitment had been

18    reduced from $2.1 billion to $1.85 billion.

19             In between the time of the first day hearing and

20    today, also as a result of additional parties opting into

21    the settlement, that reduction was further reduced, that

22    commitment, to $1.325 billion.  So the take away being the

23    new money coming in from the third party banks, Your Honor,

24    is $1.325 billion.

25             When we get to the other parties we're going to

1    talk about the consideration they're receiving.  As to the

2    DIP lenders, as you know, pursuant to the interim order

3    entered on the first day, their fees are under seal, so

4    hence why that's not referenced beyond the notation of under

5    seal on the right.

6            Secondly, Your Honor, moving down the column is to

7    PIMCO.  So PIMCO is participating in this DIP on two fronts.

8    PIMCO has approximately $837 million of first lien claims

9    that is rolling into the DIP pursuant to the settlement that

10   will be heard this afternoon.

11           Your Honor, in addition to that PIMCO has a $1.45

12   billion backstop commitment.  And what you see as to PIMCO

13   is their roll up commitment as well as their backstop

14   commitment remain constant throughout the evolution of the

15   hearing up until today and are -- PIMCO's roll up commitment

16   -- they're getting the proposed settlement treatment that

17   was provided to pre petition settling parties, which was the

18   greater of 105 percent of par plus 101 percent of accrued

19   interest or 104 percent of par plus original issue discount

20   and accrued interest.

21           And again, Your Honor, to be very clear, we're not

22   trying to argue any of this right now.  We're just trying to

23   explain how the DIP works and who is participating in what

24   is proposed to be the DIP and this is all dependent upon the

25   approval of the settlement this afternoon when that does get

1    argued.

2           But so PIMCO, rollup and backstop, Fidelity a

3    similar construct, but different amounts.  Fidelity was

4    rolling up $482 million in pre petition first lien debt

5    claims and in addition it had a $500 million backstop

6    commitment.  And you see consistent with the PIMCO

7    treatment, they otherwise have the same proposed settlement

8    treatment pre petition and the backstop commitment.  The

9    backstop treatment for pre petition parties, which is a 1.75

10   percent funding fee.

11          GSO, Your Honor, the fourth entity labeled here

12   stand alone $50 million backstop commitment that remained

13   constant up until today.  It's now a $50 million new money

14   commitment.  And GSO is receiving no fee.  It's simply

15   receiving the interest otherwise provided to DIP lenders.

16          WAMCO, Your Honor, is similar to PIMCO and

17   Fidelity insofar as it is a pre petition first lien

18   creditor.  The distinction between WAMCO and PIMCO and

19   Fidelity is WAMCO did not enter into the settlement until

20   the day after we filed, but the day before the first day

21   hearing.  So that's why you see their entry on the chart

22   comes at the time we were seeking interim approval.

23          There's a $57 million rollup, which carried

24   through until today and a $250 million backstop commitment

25   that became a $250 million new money contribution.  WAMCO

1    gets a 1 percent funding fee, which is slightly less than

2    the 1.75 funding fee for PIMCO and Fidelity, but that's the

3    consequence of being a post petition settling party as

4    opposed to a pre petition settling party.

5            And then lastly, Your Honor, just to highlight for

6    the Court are the exchange parties.  The exchange parties,

7    which you'll hear more about this afternoon, these are the

8    parties that did affirmatively opt into the proposed first

9    lien settlement via the exchange process that we ran.  These

10   are the parties that did come in post petition, that's why

11   they don't show up on the chart until today, because we did

12   not have their opt-in until after the first day hearing.

13   The total amount that they are rolling in is an increment of

14   $455 million in first lien claims.

15           The treatment that they receive pursuant to the

16   proposed settlement or the treatment they will be provided

17   if the settlement is approved is 105 percent of par, plus

18   101 percent accrued interest.

19           Your Honor, just we have the $5.4 billion

20   aggregate total on the bottom.  If you were to split out the

21   amount that's rollup money versus the amount that's new

22   money -- and you're going to hear live testimony this

23   afternoon from the debtors' financial advisor and CFO/CRO on

24   this.  It's approximately 100, excuse me, $1.8 billion of

25   first lien claims that are being rolled into the facility as

1    well as about $3.6 billion of new money that's in the

2    facility.

3              That's really it for the presentation.  I think it

4    will come up again over the course of the day in the

5    testimony and maybe in some of the presentations, but as I

6    said, I thought it would be helpful to just mention this at

7    the outside because as we now go through the DIP order there

8    are certain references to various parties that are

9    participating DIP lenders.

10              THE COURT:  Okay.

11              MR. HESSLER:  Pointing Your Honor to the proposed

12    DIP itself.  We did file, in the middle of the night, an

13    updated red line.  I have a copy of that redline as well as

14    the proposed execution version if you'd like me to hand up

15    either of those to Your Honor.

16              THE COURT:  Yeah, bring those up.  Is this one in

17    color?  Oh good.  Thank you.

18              Do you have a copy for Ms. Werkheiser (ph)?  Do

19    you have one?  Okay.  She's good.

20              MR. HESSLER:  So, Your Honor, for the record, we

21    did file this DIP motion on the petition date.  Within the

22    DIP motion we set forth at length the factual and legal

23    support for the relief requested.  Since the time we filed

24    the motion we've had very extensive interactions with

25    effectively all of the relevant stakeholders.  They raised a

1    series of issues and concerns.  After a lot of back and

2    forth on that front, we are at a point now where to our

3    knowledge there are no pending objections to the proposed

4    final order.

5              At the appropriate time, Mr. Horowitz from Kramer

6    Levin, I know wants to make a statement into the record.

7    But I do believe it's correct and I find out that there's no

8    opposition from Kramer Levin to the entry of the DIP order

9    today.

10             MR. HOROWITZ:  Well, I'd like to speak to it.

11             MR. HESSLER:  So I guess let me just ask, Your

12   Honor --

13             UNIDENTIFIED SPEAKER:  (Indiscernible).

14             MR. HESSLER:  Would you like to talk about the

15   order itself, first?

16             THE COURT:  Yeah, let's talk about the order

17   first, then I'll hear from Kramer Levin.  Don't need to --

18   we'll let him characterize his position.

19             THE COURT:  Sure.

20             MR. HESSLER:  Okay.  So, Your Honor, to assert

21   (indiscernible) to the debtors' knowledge, the red line that

22   we filed last night, which shows the changes in the order

23   from the previously filed version with the Court that this

24   order -- there's no pending objections to this form of order

25   or any of the provisions in the changed order.

1           Your Honor, I know we did file it late last night.

2      I'm happy to hit on the high points, answer any questions or

3      proceed in the way that's most helpful to the Court.

4           THE COURT:  Well, I think you better walk through

5      the changes.

6           MR. HESSLER:  Certainly, Your Honor.  Let me ask

7      at the outset is it okay the ones that were just simply

8      conforming, define terms or --

9           THE COURT:  Yeah, I don't --

10          MR. HESSLER:  -- kind of insignificant, nothing

11     like that?  Okay, Your Honor.  Page 2 in the middle of the

12     page the addition of PIMCO and Fidelity was just to add some

13     clarifications that they are now in fact, you know, they are

14     backstop parties and we are taking up their full backstop

15     amounts.

16          Flipping ahead to Page 5, Your Honor, within

17     paragraph that's Romanette vi, this is the additional

18     language to this is to make some clarification as to PIMCO

19     and Fidelity's fees.

20          Your Honor, the Fidelity funding fee and the

21     professional fees that are referenced in this paragraph,

22     this is solely related to Fidelity's participation as a DIP

23     lender.  It's not beyond that.

24          As to PIMCO, Your Honor, PIMCO's role in this case

25     really is only as a DIP lender, so it's all of the PIMCO

1    fees, as well as the PIMCO funding fee, but again, they're

2    really only participating as a DIP lender.  And they were

3    added here, Your Honor, because the RSA motion was otherwise

4    postponed where we could have otherwise had those

5    potentially in the RSA motion.

6              But given that this is the work that's being done

7    as well as the funding fee directly related to the

8    participation as DIP lenders, that's why we have moved it

9    into this order.

10             At the bottom of the page, Your Honor, this is one

11   of the clarifications that you'll see come up throughout.

12   There were various additions that the parties both opposing

13   the proposed make-whole settlement as well as supporting the

14   proposed make-whole settlement, there are various

15   clarifications that parties wanted to provide as much

16   clarity as possible as to both the mechanics and how the

17   repayment is occurring.  This is a simple clarification at

18   the bottom on that for the -- the context of the reservation

19   of rights.

20             The revision (indiscernible) actually, Your Honor,

21   carries over to the top of page 6 and that was a --

22   additionally a requested change on that part that there is a

23   reservation of rights as to whether or not additional

24   interest is due on certain months.

25             Turning to page 7, Your Honor, there is a

1    clarification added to existing footnote 6 at the bottom of

2    the page, which is to reiterate that entry of the settlement

3    order is a condition to the closing of the DIP.

4              Your Honor, in the middle of page 9, the top of

5    page 9, it's just clarifying the evidence that was offered.

6    The middle of page 9, this is additional clarification.

7    Again, reiterating the reservation of rights issues.

8              The clarification in footnote 7 at the bottom,

9    Your Honor, was to indicate that the only make-whole related

10   relief being treated by this order is as to the settling

11   parties only, not -- obviously not as to the objecting

12   parties who have all the make-whole rights fully reserved.

13             Clarification at the bottom of 10, I believe was

14   requested by the committee for the clarification as between,

15   you know, when they're sometimes referred to the appointed

16   committee and the creditors' committee.

17             Flipping ahead, Your Honor, to page 13, paragraph

18   5, Romanette v.  We added this paragraph because this was a

19   resolution amongst a number of the major settling parties

20   who wanted to make it clear that the full and final

21   resolution of their claims is affected by the terms of this

22   order and the settlement order if and when entered.

23             THE COURT:  Okay.

24             MR. HESSLER:  Your Honor, turning to the top of

25   page 14, the additional paragraph, Romanette vi, this was

1    added to resolve one of the stated issues in the first lien

2    trustee's objection to the DIP which is to have a statement

3    as to the total repayment amount of the first lien principal

4    and interest as well as an appropriate reservation as

5    needed.

6             The bottom of page 14, carrying onto the top of

7    page 15, this also is just a clarification of reservation of

8    rights language that the parties requested, Your Honor.

9             The finding in the middle of page 15 this just

10   makes the language conform and track the language that

11   already agrees in the credit agreement, Your Honor.

12            The middle of page 16 and tell me if I'm going too

13   slow or too fast.

14            THE COURT:  You can pick it up a little.

15            MR. HESSLER:  Pick it up.  Good.  Okay.  In the

16   middle of page 16, Your Honor, these are changes requested

17   by the first lien trustee to clarify the use of the funds.

18   We can hop to page 18.  Here, Your Honor, this is the

19   (indiscernible) that is proposed to be provided here, there

20   is an addition that it applies not just to the DIP agent,

21   but it applies also to the first lien trustee.  We're aware

22   of Your Honor's ruling yesterday in the context of the TCEH

23   DIP.  We read your ruling to be that it is in circumstances

24   where there is an objection to the 506(t) waiver that it's

25   problematic.  Here, given that it's unobjected to, we have

1    left it in the order, Your Honor.

2           Page 20.  Your Honor, (indiscernible) paragraph,

3    the clarification is adequate protection.  This was

4    requested by the first lien trustee in their objection.

5    This is a stipulation that they are over secured and

6    adequately protected.

7           THE COURT:  Okay.

8           MR. HESSLER:  Your Honor, go to page 25.

9           THE COURT:  Yes.

10          MR. HESSLER:  The additional language at the top

11   of the page this was requested by the creditors' committee

12   just to clarify their rights.

13          THE COURT:  Okay.

14          MR. HESSLER:  On page 30, paragraph 12, this was

15   language that was requested by counsel to the first lien

16   trustee to address what would be a potential, I guess

17   overnight risk is the term that is sometimes used by the

18   trustee that any lag between the time that the DIP facility

19   closes and the funds are used for repayment purposes, there

20   technically isn't an incremental risk to them during that

21   period of time.  So this was to make clear that the debtors

22   are going to consummate the repayment as soon as possible

23   after making the draw.  And in fact, our intention is to do

24   it on the same day.

25          THE COURT:  Okay.

1           MR. HESSLER:  Your Honor, the lengthy changes on

2    pages 30 to 32, which go into paragraph 13.  This is to

3    clarify the actual repayment mechanics of the specific flow

4    of funds upon the DIP draw for the purposes of repaying the

5    first liens.

6           Again, this was language that was negotiated

7    between the other parties, but was in response to a

8    requested change by the first lien trustee.

9           The top of page 32.  This is further clarification

10   that the repayment that's being affected by the use of the

11   DIP funds is repayment in full of the outstanding principal

12   and interest with all other reserved rights to the first

13   lien trustee or any first lien holders to argue that they're

14   entitled to other issues through the make-whole trial.

15          Paragraph 14, Your Honor, is further clarification

16   of the repayment mechanics.

17          On page 33 we have some clarification regarding

18   notice rights, 34 who gets to see the budget.  Flipping way

19   ahead, 39, this is a -- there was a discussion between the

20   first lien trustee and the DIP agent as to their rights of

21   the first lien trustee in the event of a default and the DIP

22   agent would be seeking to sell any collateral.

23          Pages 40 to 41, this is some clarifying language

24   requested by the committee regarding event of default.

25          Page 43 is a further resolution of the discussion

1    I referenced a moment ago between the DIP agent and the

2    first lien trustee about a potential sale of collateral.

3          Page 44 further clarification regarding the

4    professional fee payments that I referenced at the outset as

5    to PIMCO and Fidelity.

6          Page 45 is the response to a committee request

7    regarding objection rights.

8          Your Honor, page 49, this was 49 to 50, this was

9    language that was requested by the committee.  It provides

10   for consistency between the EFIH DIP and the TCH DIP on this

11   provision.

12          THE COURT:  Okay.

13          MR. HESSLER:  Your Honor, page 55 again this is

14   the 506(c) waiver.

15          THE COURT:  Yeah.

16          MR. HESSLER:  Page 56 a (indiscernible) provision.

17   This was requested by the committee, clarification of the

18   DIP loans, you know, to the extent to which they do not

19   apply to unencumbered assets.

20          THE COURT:  Okay.

21          MR. HESSLER:  Notice provision on page 57

22   regarding the committee.  Page 58 and 59, this is language

23   that we took nearly wholesale from the first lien trustee's

24   objection regarding their reservation of rights, Your Honor.

25          THE COURT:  Okay.

1           MR. HESSLER:  I think those are the only other

2     substantive --

3           THE COURT:  Okay.

4           MR. HESSLER:  -- edits to touch on, Your Honor.

5           THE COURT:  I'll hear from Kramer Levin.

6           MR. MARTIN:  Your Honor, for the record, Ross

7     Martin of Ropes & Gray for CSC Trust Company of Delaware,

8     the first lien notes trustee.  I'll be very brief.

9           If I could direct the Court just by way of example

10    to page 13 of the red line and paragraph little v., I'm just

11    amplifying something that Mr. Hessler was saying.  The way

12    they drafted this order, it contemplates that the second

13    motion, the (indiscernible) motion will have already

14    occurred and the Court will have ruled on that motion.  So

15    just to clarify, they've chosen to draft the order in that

16    fashion.

17          So I think the understanding is for efficiency

18    sake, Mr. Hessler is correct that we don't otherwise object

19    to the relief in this order and it made sense to go through

20    this now and then after the trial, they could be answered.

21          MR. HESSLER:  Sure, Your Honor, Steve Hessler,

22    Kirkland Ellis.  Your Honor, we propose that it may have

23    been more efficient to just take both orders at the same

24    time.  The first lien trustee wanted two separate records to

25    -- which we're fine with, by the way, to address Mr.

1    Martin's point though.  To the extent that the Court is

2    prepared to approve and enter the order if we want to hold

3    it aside until we get through the settlement order this

4    afternoon, that's fine as long as it can be ordered in

5    conjunction with assuming that the settlement order was

6    entered.

7              THE COURT:  Okay.

8              MR. MARTIN:  Yes, that's fine, Your Honor.  We

9    just wanted to make that point.

10             THE COURT:  Okay.

11             MR. MARTIN:  I'm (indiscernible).

12             MR. HOROWITZ:  Good afternoon, Your Honor.  Again,

13   Gregory Horowitz from Kramer Levin on behalf of the EFIH

14   second lien notes trustee.  Your Honor, Mr. Hessler is

15   correct when he represents that we no longer have any

16   objection to the entry of this first lien DIP order, but

17   he's correct subject to an explanation.

18             It's a very important explanation and in the

19   course of explaining, I think I will also shed some light on

20   the -- on our position with regard to the issues that are

21   going to be going forward after the lunch break.

22             Your Honor, the second lien notes trustee has

23   tried very hard to negotiate with the debtors on every issue

24   that's come up to avoid unnecessarily bringing issues before

25   the Court and to date we've been very successful in that.

1    But it would be misleading to the Court and to the public to

2    let this convey the impression that the second lien trustee

3    and holders have been satisfied with the process.

4         In fact, we've had very serious problems with the

5    process and the process that's going forward we began to

6    raise those problems in our emergency motion with regard to

7    the tender offer, we managed to reach a resolution, which

8    I'll address in a minute, that at least for the moment had

9    resolved those problems or allowed us to put them off.

10        We continued to try and negotiate all issues.  We

11   were happy to hear yesterday morning the debtors reaffirmed

12   their intention and willingness to engage in our DIP

13   proposal.  We have a fully committed DIP proposal that would

14   save hundreds of millions to the estate and could be

15   implemented completely consistently with the debtors with

16   proposed plan structure contemplated plan structure.  That

17   proposal includes the pay out of principal of the second

18   lien notes subject to the make-whole litigation.

19        If we did reach a resolution, a satisfactory

20   resolution on the DIP, that would obviate the need to have

21   DIP -- the objection to the second lien DIP go forward on

22   June 30th and now if the (indiscernible) issues get put off

23   to July 18th then maybe we'll actually get to some of these

24   issues on June 30th.

25        But to be clear, the indenture does allow for

1    prepayment, but provides that upon prepayment there is a

2    required make-whole and we have a very strong make-whole

3    claims and we believe that the debtors defenses are very

4    weak and we're fully prepared to litigate this.

5            We're prepared to do so even while providing the

6    DIP that takes us out.  So, a resolution on the DIP would

7    not necessarily resolve the make-whole issues.  We're also

8    prepared though and we've been trying very hard for a long

9    time to negotiate agreements on the make-whole issues.  We

10   tried persistently to do so pre petition and we continue to

11   do so now and we are hopeful that the debtors will continue

12   to engage with us on that.

13           We don't believe that the unilateral settlement

14   offer represented by the tender offer is legally permissible

15   way to do so for reasons that we've raised in our objection

16   to the second lien settlement.

17           And we share the discrimination issues that the

18   first lien holders -- the first lien trustee is going to be

19   raising this afternoon in that regard.

20           We brought our emergency motion to try and cutoff

21   the tender offer and as I said before we did manage to reach

22   an agreement with the debtors to resolve that motion, at

23   least for the moment by pushing all second lien issues to

24   the June 30th or at least we thought we had.

25           It was only when we saw the debtors papers that we

1    understood that in connection with the first lien DIP they

2    were going forward with the request for the Court to approve

3    Fidelity's participation to the tune of $500 million of the

4    first lien DIP which is an opportunity and as associated

5    with it, this 1.75 percent or $8.75 million -- it's been

6    referred to variously as commitment fee, now it's referred

7    to as funding fee.

8            And there can be no mistake, Your Honor, that

9    opportunity and associated fee are provided to Fidelity as

10   part of Fidelity's second lien make-whole settlement.  The

11   debtors themselves admit as much in their reply brief,

12   Docket No. 735 at page 9 they state that it is in connection

13   with the second lien settlement that Fidelity has obtained

14   this opportunity and the opportunity to participate in this

15   fee.

16           So, in other words, Your Honor, after agreeing in

17   connection with the emergency motion to pull out all second

18   lien settlement issues to be resolved per June 30th, the

19   debtors realized they couldn't really pull it out because

20   one portion of that second lien settlement required them to

21   deliver this option to Fidelity in connection with the first

22   lien DIP.  This is just one example that's emblematic of the

23   very carefully and completely intertwined nature of all of

24   the (indiscernible) that are embodied in the RSA and the

25   fact that they're all part of one unified plan support

1    structure.

2          The debtors try to say, well no these are a series

3    of separate deals that can be pulled out and considered on

4    their own, but when they tried to pull them apart, they

5    can't do it.

6          So they find themselves in the position today of

7    asking the Court to approve payment of a fee to Fidelity as

8    -- that's explicitly part of the second lien settlement,

9    that isn't a second lien settlement that isn't even going to

10   be put before the Court for approval for another three

11   weeks.  Logically and procedurally we think that's improper

12   and we raised that issue in our objection.

13         But where does that leave us?  We understand what

14   the debtors position is now.  They say well, we have to

15   deliver -- we have to allow Fidelity to participate in this

16   because if they don't participate and put up the $500

17   million in cash, someone else will and we'll have to pay

18   that 1.75 percent fee to somebody else.  You can see in the

19   chart that Mr. Hessler put up that the $500 million in cash

20   that Fidelity is putting in, the $500 million in new money

21   results in a decrease from the Deutsche Bank $2.1 billion

22   commitment and we don't know exactly how much Deutsche Bank

23   would have received in fees on that because that's under

24   seal, but we take debtors at their word, if Fidelity didn't

25   put up this $500 million, they'd end up having to pay a

1    similar fee to somebody else.

2            So they raised the question to us, why do you want

3    to try and prevent Fidelity from participating in this DIP

4    at the moment because if they don't, we're going to pay the

5    fee to somebody else.  That's the way we've ended up

6    structuring it.  It won't help the estate, it won't help

7    you.

8            And to be clear, depriving Fidelity of these --

9    this goody and all of the other goodies that's it's been

10    offered in its second lien make-whole settlement, it's not

11    at the end of the day what we're trying to accomplish.

12    We're not saying that Fidelity will be over -- is being over

13    paid or would be over paid on its make-whole claim, far from

14    it.  We're saying that we're not -- we're being improperly

15    deprived of an opportunity to get the same settlement.

16            And to quote when Harry met Sally, we're saying,

17    he'll have what she's having.  They're not offering it.  And

18    we think that as a matter of law, they're required to offer

19    it to us if they're offering it to Fidelity.

20            We will show on June 30th -- as I've said, I think

21    the debtors have admitted that this $8.75 million in

22    opportunity is part of the goodies offered to Fidelity on

23    the second lien make-whole claim, but we will show on June

24    30th with documents we've already seen that it was

25    absolutely deliberately and intentionally considered part of

1    those goodies that in fact the value of it was quantified

2    and Fidelity was told, this is how we are going to increase

3    the amount that you are being offered on your make-whole

4    claim.  It's going to be very clear.  And that's an

5    important part of our case.

6           So, while we realize that we don't accomplish

7    anything today by trying to prevent the debtors from paying

8    this goody to Fidelity up front, and that's why we're not

9    going to object to doing so, we need to make it perfectly

10   clear that on June 30th, we are going to prove that that is

11   part of the consideration being given to Fidelity and on its

12   make-whole settlement that that is part of the basis to the

13   objection to that make-whole settlement for our complaint

14   that we are not being treated fairly.

15          We are being unfairly discriminated against under

16   1123(b)(4) and we are reserving -- we need to make it clear

17   that we are fully reserving our rights to make that claim,

18   by not objecting to this payment, we are in no way

19   compromising our ability to make that argument on June 30th.

20          And Mr. Hessler has assured me that the debtors

21   will not argue that by withdrawing our objection in this

22   regard we have in any way compromised our position in that

23   regard.  So I apologize for the somewhat longwinded way of

24   explaining this, Your Honor, but I think it's important for

25   you to understand our position today and in this case and it

1    is with the understanding of that reservation of rights that

2    we are standing down on the objection to the first lien DIP.

3              THE COURT:  Okay.  I do understand.  I appreciate

4    the background.

5              MR. HOROWITZ:  Thank you, Your Honor.

6              Mr. Hessler, do you want to make any comment?

7              MR. HESSLER:  I don't think there's anything

8    further, Your Honor.

9              THE COURT:  Okay.

10             MR. HESSLER:  If no further questions from the

11   Court we'd ask that you enter the order this afternoon

12   consistent with assuming the settlement order gets approved.

13             THE COURT:  All right.  Well, I'm going to approve

14   the order as submitted.  I will, however, and I'm even

15   signing it.  But, I however will not finalize actually

16   docketing it, which will constitute formal approval until

17   the settlement is heard.

18             MR. HESSLER:  Okay.  Your Honor, at this point, I

19   do think the next step is to begin introductory arguments

20   and evidence and so forth on the settlement if you want to

21   break for lunch.

22             THE COURT:  Yeah, we're going to break for lunch.

23   We will reconvene as promptly as possible at 1:45.  See you

24   then.

25             MR. HESSLER:  Thank you, Your Honor.

```
1              (Recess at 12:33 p.m.)

2                    THE CLERK:  All rise.

3                    THE COURT:  Please be seated.  Excuse me.  Good

4        afternoon.

5                    MR. HESSLER:  Good afternoon, Your Honor.  Again

6        for the record, Steve Hessler of Kirkland and Ellis,

7        proposed counsel to the debtors.  Your Honor, I believe we

8        are now at the final motion of the afternoon, which is the

9        EFIH debtors' motion to approve the first lien -- the EFIH

10       first lien's settlement.

11                   THE COURT:  Yes.

12                   MR. HESSLER:  If it's -- with Your Honor's

13       permission, I'm prepared to begin with an opening argument.

14                   THE COURT:  Yeah.

15                   MR. HESSLER:  Your Honor, the opinions that we

16       have filed in support of the settlement and the evidence

17       that we are going to introduce today, we believe

18       demonstrates that the benefits of the proposed settlement

19       are very, very compelling, but they're also very, very

20       straightforward.  Your Honor, the settlement, stated simply,

21       it replaces higher interest rate debt with lower interest

22       rate debt.  And in doing so, it saves the estates $14.4

23       million per month, which is $172.8 million per year.  We

24       believe that's uncontested, Your Honor.

25                   Your Honor, the settlement secondarily allows
```

1    settling first lien lenders to roll their claims into the

2    first lien DIP and using participation in the first lien DIP

3    as consideration for the make-whole settlement allowed the

4    debtors an additional benefit, which was to -- as of this

5    morning, get a first lien DIP approved at better than market

6    rates.  So we were able to get two significant benefits to

7    the estate on both fronts.

8           This is what the record otherwise shows, Your

9    Honor.  42 percent of the first lien lenders support the

10   settlement.  They either agree to it on a prepetition basis

11   soon after the filing date, or by participating in the

12   exchange.  They want to participate in this settlement.  42

13   percent, we would argue, almost definitionally establishes

14   the reasonableness of the settlement.  That's almost half.

15   A little more -- a little bit less than half of the holders

16   think it's just a good enough deal and a bit more than half

17   of those holders want to hold out for more because they want

18   to pursue a greater recovery on their alleged make-whole

19   claim.

20          The fact that they want to do so, this highlights

21   what may be one of the most critical elements of the

22   settlement.  The creditors that want to hold out to pursue a

23   higher make-whole recovery are in no way prejudiced by this

24   settlement.  This settlement gives them every opportunity to

25   do so.  And in fact, as I described yesterday, on Wednesday

1    of this week, the Court entered a consensual make-whole

2    litigation schedule.  That path forward is already

3    established.  We know who doesn't want to be in this

4    settlement and we're not forcing anybody to be in this

5    settlement.  We know they want to vindicate their rights.

6    We've agreed to a schedule, a path forward to allow them to

7    pursue and vindicate their rights.

8              So what we're asking to do today in no way

9    prejudices the parties that do want out -- want to be in

10   this settlement.  So given that, Your Honor, on what grounds

11   does the first lien trustee, and the first lien lenders that

12   are part of the group, represented by counsel for the first

13   lien trustee, on what grounds do they oppose the settlement?

14             Your Honor, our reading of their pleadings is

15   primarily there are two objections.  It doesn't comply with

16   bankruptcy law.  It doesn't comply with securities law.

17   Let's start with bankruptcy law because we believe both of

18   these arguments were unpersuasive.

19             The first lien trustee relies on a number of plan

20   confirmation requirements which we respectfully submit are

21   inapplicable here.  They argue a bunch of different plan

22   confirmation requirements that supposedly we don't satisfy,

23   notwithstanding the fact that we're not seeking approval of

24   this transaction through a plan of reorganization.

25   Conversely, they ignore entirely -- it is not in their brief

1    -- they ignore entirely what is the governing legal

2    standard, which is Bankruptcy Rule 9019, which requires

3    before the approval of a settlement that the debtors

4    demonstrate it is a reasonable exercise of their business

5    judgment to consummate a settlement.

6              We're going to put on evidence today in support of

7    what I mentioned at the outset: the very significant

8    interest savings to the estate and the facilitation of the

9    first lien DIP.  We believe that evidence is going to be

10   unrebutted, Your Honor.

11             Securities laws.  These arguments, Your Honor, we

12   believe are distinctly red herring -- red herrings, and

13   here's why.  Despite the very many lengthy objections that

14   have been filed by the first lien trustee arguing all manner

15   of infirmities with regard to the proposed exchange, this is

16   also what the record is going to show.  Not one single first

17   lien lender since we launched the exchange has approached

18   the debtors, who had opted into the settlement and said, I

19   was misled.  I was hoodwinked.  I didn't understand what I

20   was getting myself into.  Please let me out of it.  No one

21   who has opted into the settlement has had a single complaint

22   with how that settlement was offered to them or how the

23   process was conducted.

24             On the flip side, Your Honor, there has not been a

25   single first lien lender who didn't opt into the settlement,

1    who's approached us and said I was misled.  I didn't

2    understand what I was passing up.  This went too fast.  You

3    didn't explain it to me well enough.  Please let me into it

4    even though the deadline has passed.

5          The lines of who wants to participate in this

6    settlement and who does not want to participate in this

7    settlement are very, very clear.  Very clear and candidly

8    have been very, very clear since for the large part

9    prepetition and to some extent soon after post-petition.

10   And all that we are asking the Court for permission to do

11   today is those who want to participate in the settlement

12   with us, let us consummate that transaction with them.

13   Those who do not want to participate in this settlement, we

14   understand.  We're not going to do anything to circumscribe

15   their rights to pursue their medical claim on the schedule

16   that they have agreed to.

17          Again, Your Honor, 58 percent of the first lien

18   lenders want to litigate with us.  We understand that.

19   We're prepared to do so on that schedule.  42 percent of the

20   first lien lenders want to enjoy the benefits of the

21   settlement and the debtors would like to take advantage of

22   that given the very demonstrable and compelling support for

23   the estate.  With that, Your Honor, the debtors would be

24   prepared to turn to our evidence.

25          MR. WOFFORD:  Briefly, Your Honor, good afternoon.

1    I think the -- Keith Wofford from Ropes & Gray on behalf of

2    CSC in their capacity as indenture trustee.

3              I'd like to start by saying that I think that the

4    best way to proceed is to get quickly on to the evidence

5    because I think the under brooding of our contentions as the

6    trustee that this settlement should not be approved are that

7    when you look at the facts and the law that gave rise, and

8    the approach that gave rise to this settlement, you're going

9    to find out that there are infirmities in it with respect to

10   both people who have opted in and the people who stayed out

11   that give pause to the ability to approve it, and frankly,

12   infirmities that are not necessary even if the debtor wanted

13   to achieve the aims that it says are its business reasons

14   for doing it.

15             That is, we've already -- not only is this

16   settlement infirm, but in fact, the infirmities that are in

17   it were easily avoidable by the debtors and that they

18   merely, in fact, structured it this way for their own

19   reasons that this Court shouldn't tolerate.  And I think

20   that goes both to the securities and the bankruptcy

21   objections.  So I think what we would like to do is go on to

22   the evidence, have the evidence be presented and spend the

23   time explaining as this gets woven together at closing.

24             THE COURT:  Okay, that's fine.

25             MR. MCGANN:  Good afternoon, Your Honor.  Andrew

1   McGann, Kirkland & Ellis for the debtors.  Before we call

2   our first witness, and let me just preview for the Court,

3   we're going to call two witnesses: David Ying, the financial

4   advisor to the debtors, he's with Evercore; and then we're

5   going to call Mr. Keglevic, who Your Honor obviously has

6   met.

7           But before we turn to the witnesses, I just wanted

8   to share with the Court some agreements on evidence that we

9   have between the parties, if that's all right.

10          THE COURT:  Okay.

11          MR. MCGANN:  The parties have agreed that the

12  following information and documents can be admitted into

13  evidence for purposes of these -- of this motion.

14          Paul Keglevic's first day declaration, which is

15  docket number 98, and specifically the following paragraphs,

16  as opposed to the entire thing: paragraphs 87 to 94, which

17  describe the EFIH debt; paragraphs 156 to 179, which

18  describe the restructuring negotiations leading up to and

19  including the consummation of the RSA; and then paragraphs

20  15 through 17, which is in Exhibit A to his declaration, and

21  that describes the EFIH DIP financing motion.

22          We've also agreed that David Ying's supplemental

23  declaration can come into evidence, that's docket 610 that

24  was filed on May 25th.  And that's in tab 12 of a binder we

25  have for the Court.  And speaking of that, do you want me to

1    hand up, Your Honor, two binders that have some tab

2    materials that you can refer to?

3              THE COURT:  Yes, please.  All right, and what's

4    that?

5              MR. MCGANN:  Binder 10.

6              THE COURT:  Do you have a separate report tab?

7    Thank you.

8              MR. MCGANN:  Yes, we're delivering a set for the

9    clerk.  So, Mr. Ying's supplemental declaration I just

10   referred to, they can go into evidence by agreement, Your

11   Honor, it's tab 12 in the binder.

12             THE COURT:  All right.

13             MR. MCGANN:  And they're numbered sequentially.

14   We've also agreed that --

15             THE COURT:  Which parts of the -- can you identify

16   the portions again?

17             MR. MCGANN:  Of the Keglevic declaration?

18             THE COURT:  Yes.

19       (Pause)

20             THE COURT:  All right so --

21             MR. MCGANN:  Okay, so do you want me to recap?

22             THE COURT:  Yeah, let's back up because --

23             MR. MCGANN:  Sure.

24             THE COURT:  -- I lost you there.

25             MR. MCGANN:  All right, in Mr. Keglevic's first

1    day declaration, again that's docket 98 --

2              THE COURT:  Right.

3              MR. MCGANN:  -- we've agreed that the following

4    paragraphs can come into evidence: 87 through 94 --

5              THE COURT:  Okay, hold on.  Okay.

6              MR. MCGANN:  -- 156 through 179.

7              THE COURT:  Okay.

8              MR. MCGANN:  All right, and then after the

9    execution page, there's an Exhibit A, which contains some

10   additional numbered paragraphs, Your Honor, and that's also

11   part and parcel of Mr. Keglevic's testimony in that

12   declaration.  And with respect to that, we've agreed that

13   paragraphs 15 through 17 can come into evidence.  And again,

14   that describes the EFIH DIP financing motion.

15             THE COURT:  All right.  Hang on, let me -- I'm

16   having a little trouble with locating it.  Is it --

17             MR. MCGANN:  Right.

18             THE COURT:  Let's see, the page numbers --

19             MR. MCGANN:  It would be -- it begins on page, if

20   you look at the numbering at the top --

21             THE COURT:  Yeah, that'd be great.

22             MR. MCGANN:  -- page 88.  That's the beginning of

23   the numbered paragraphs of Exhibit A.

24             THE COURT:  Okay, I see that.  And what

25   paragraph --

1          MR. MCGANN:  That's paragraphs 15 through 17 which

2     appear on pages 94 and 95 at the top of the document.

3          THE COURT:  Okay, I got that.

4          MR. MCGANN:  All right.

5          THE COURT:  Thank you, sorry.

6          MR. MCGANN:  Okay, no problem.  Next we have in

7     the binders now in tab 12 --

8          THE COURT:  Uh-huh.

9          MR. MCGANN:  -- you will find David Ying's

10    supplemental declaration dated May 25th.

11         THE COURT:  Yes.

12         MR. MCGANN:  All right, we've agreed that the

13    entirety of that can come into evidence.

14         THE COURT:  Okay.

15         MR. MCGANN:  There's a few more items, but I

16    should say, Your Honor, that the binders we've given you,

17    also by agreement, it's just a collection of the -- largely

18    the pleadings that relate, the briefs and the motions that

19    relate to this.  So we're not offering the entirety of these

20    binders.

21         But moving right along, the declaration of

22    Christopher Kearns, financial advisor to the indenture

23    trustee here, that's docket number 694.  That appears in tab

24    15 in the binders.  It's an exhibit to CSC trust company's

25    objection.

1           THE COURT:  Exhibit A?

2           MR. MCGANN:  Yes, Your Honor.

3           THE COURT:  And the entirety of that?

4           MR. MCGANN:  Yes.

5           THE COURT:  Okay.

6           MR. MCGANN:  Maybe not lastly -- maybe lastly for

7    a moment, we've got at the end of the binders, this will be

8    in volume 2, tabs 21, 22, and 23.

9           THE COURT:  They're admitted?

10          MR. MCGANN:  They are.  That's the RSA in tab 21,

11   the indenture for the 6th and 7/8th's notes in tab 22.

12          THE COURT:  All right.

13          MR. MCGANN:  And the indenture for the 10 percent

14   notes is tab 23.

15          THE COURT:  Okay.

16          MR. MCGANN:  I've been informed that the indenture

17   trustee intends to exhibit some images from the EFH website,

18   which they've shared with us.  We have no objection to it.

19   I suspect we're going to see them on the screen during your

20   presentation.

21          MR. MARTIN:  We may, Your Honor.  It depends on

22   how the examination goes, but we did share it with the

23   debtors in advance.

24          THE COURT:  Okay.

25          MR. MCGANN:  So, if it comes up, there'll be no

1    objection.  We'll address it then.

2            And then lastly, I think, there are three letters

3    from the SEC that the indenture trustee intends to offer.

4    We object to those and I would suggest that we go ahead with

5    our witnesses and we wait to see if those, in fact, get used

6    and take them up in turn.

7            MR. MARTIN:  Your Honor, for the record, Ross

8    Martin, Ropes & Gray again for CSC Trust Company in

9    Delaware, indenture trustee for the 10 percent EFIH first

10   lien notes.

11           I'm happy to defer the argument on the SEC

12   letters.  We're, in the first instance, citing them as legal

13   authority.  I'm happy to put that off until later.  Just for

14   clarity of the record I would point out that they are at tab

15   -- they are in tab B -- I'm sorry tab 15, excuse me, Your

16   Honor, Exhibits B, C, and D.

17           THE COURT:  This was agreed.  Okay, I know what

18   you're talking about.

19           MR. MARTIN:  Right.  And I -- we've worked really

20   hard, Your Honor, to try to have a pretty clean, agreed

21   record here.  So I'm just trying to just be very precise so

22   the Court knows what's in dispute.  And I've got one more.

23           THE COURT:  Well, for what it's worth, I've

24   already read them.

25           MR. MCGANN:  We're not objecting to you reading

1    them.  You're going to need to read them to understand why

2    they can't come into evidence.

3              THE COURT:  All right.  Got it.

4              MR. MARTIN:  I would point out two more things

5    just for clarity given the volume of paper in the case

6    overall and we've, as I said, tried to consolidate this.  In

7    the binder at tab 7, Your Honor, is a declaration of

8    Mr. Horton, which was attached to one of the pleadings that

9    is relevant to the hearing today and that is not in

10   evidence.  The debtors have decided not.  So, I just didn't

11   want there to be confusion, Your Honor.  Again, I'm sure

12   you've read it but that is -- even though that declaration

13   is in the binder, it is not in evidence.

14             THE COURT:  All right.

15             MR. MARTIN:  And similarly, there was an original

16   affidavit of Mr. Ying to the original settlement motion and

17   that is also not in evidence.  Is that correct?

18             MR. MCGANN:  Right, we haven't offered those.

19   That's right.

20             THE COURT:  Okay.

21             MR. MCGANN:  Okay.  All right, thank you, Your

22   Honor.

23             With that the debtor -- I should say one other

24   housekeeping matter.  We have marked for the record the EFIH

25   first lien DIP facility chart that was displayed during

1    Mr. Hessler's remarks before lunch as debtor's demonstrative

2    number one, it may be referred to during the hearing --

3              THE COURT:  Okay.

4              MR. MCGANN:  -- if that's all right.  Do you want

5    a hard copy of it, Your Honor?

6              THE COURT:  Yeah, it's not on the screen anymore,

7    so a hardcopy will be fine.  Thank you.  And one for

8    Ms. Werkheiser.  You got one?  Okay.  We're good.

9              MR. MCGANN:  Counsel for the indenture trustee has

10   just reminded me of yet another housekeeping matter, I

11   apologize, Your Honor.

12             There is a designation of confidentiality over the

13   deposition testimony of both Mr. Ying and Mr. Keglevic.

14   That's the process by which the parties in these cases are

15   proceeding in the first instance with respect to

16   depositions.  And then to the greatest extent we can, we've

17   removed that designation where it need not be applied.

18             In order to facilitate this hearing, rather than

19   flyspeck the entirety of the deposition transcripts, because

20   they, themselves, are not coming into evidence, we simply

21   agreed that if they need to confront the witness with them

22   or make reference to them, we can on the spot say whether

23   there's really any confidentiality issue that needs to be

24   pressed, if that's all right with Your Honor.

25             I don't anticipate that's going to happen.  In

1    other words, I don't think we're going to be asserting

2    confidentiality given what I think the issues are going to

3    be with respect to the testimony, but we thought that might

4    be the fast way to do it.

5              THE COURT:  All right.  If there's an issue, we'll

6    deal with it.  I'm not sure how we deal with it, but we'll

7    try.  I can tell you right now, I'm not emptying the

8    courtroom.

9              MR. MCGANN:  I wasn't going to ask you to, so I

10   think we're going to avoid that problem.

11             THE COURT:  All right.

12             MR. MARTIN:  Just for the record, Your Honor,

13   again, Ross Martin from Ropes & Gray.

14             There is a pending motion to seal the objection

15   that we filed with respect to this motion.  The debtors have

16   agreed that the objection itself can be unredacted, but not

17   the deposition transcripts yet.  We don't believe anything

18   should be.

19             My understanding is the United States Trustee has

20   an issue with that, but it is true the deposition

21   transcripts in total are not coming in today and there are

22   not designations.  We're going to use them on cross and I

23   think -- my expectation, Your Honor, is there's not going to

24   be any problem with it and, you know, we're prepared to tell

25   them the page and line numbers on the spot.  They should be

1    able to clear and we can put the testimony up on the video

2    screen.

3                THE COURT:  All right.  We'll see how it plays

4    out.

5                MR. MARTIN:  Thank you.

6                MR. MCGANN:  Thank you, Your Honor.

7                THE COURT:  Let's keep moving here.

8                MR. MCGANN:  Yeah, the debtors call

9    Mr. David Ying.

10               THE COURT:  All right.

11          (Witness sworn)

12               THE CLERK:  Please state your full name for the

13   record.

14               MR. YING:  David Ying, Y-I-N-G.

15               THE CLERK:  Take a seat (indiscernible - 2:08:13).

16               THE COURT:  I'm going to say it for the last time

17   and if I continue to have violations, I'm going to hang up

18   the telephone.  You must mute your lines.  If I continue to

19   hear noise on the telephone lines, I'm going to cut them all

20   off.  Go ahead.

21               MR. MCGANN:  Thank you, Your Honor.

22                         DIRECT EXAMINATION

23   BY MR. MCGANN:

24   Q    Mr. Ying, good afternoon.

25   A    Good afternoon.

1    Q    Am I correct that you've not testified in Judge

2    Sontchi's courtroom before?

3    A    That's correct.

4    Q    Would you tell the Court where it is you work?

5    A    I work at Evercore.

6    Q    And what is Evercore's and your role in these cases?

7    A    Evercore is an investment bank and we have been acting

8    as the financial advisor to the debtor since July of 2012.

9    Q    Did Evercore and you, personally, Mr. Ying, advise and

10   assist the debtor in obtaining the first lien DIP that was

11   the subject of proceedings earlier today?

12   A    Yes, we did.

13   Q    And did you, yourself, play a lead role in advising

14   EFIH regarding the DIP financing that we've talked about

15   today?

16   A    Yes, I did.

17   Q    You're aware, of course, we're here on with respect to

18   a motion by EFIH seeking approval of a settlement of certain

19   make-whole claims by first lien noteholders, right?

20   A    Yes.

21   Q    What has been your role with regard to -- with respect

22   to advising the debtor with respect to this proposed

23   settlement?

24   A    Well, I've been an active participant along with the

25   rest of the personnel at Evercore who make up our team in

1    conjunction with the company and their -- particularly their

2    finance team, along with the assistance of counsel, Kirkland

3    & Ellis, and we've been actively engaged in a running

4    dialogue with the first lien noteholders and their advisors

5    dating back to September of 2013.

6    Q    And you were -- when you talk about a running dialogue,

7    sir, are you talking about negotiations over the scope and

8    content of what resulted in the proposed settlement?

9    A    Yes, I am.

10   Q    And have you provided advice and assistance to the

11   debtors here, again, with respect to the proposed settlement

12   in terms of the impact on the business of its terms and

13   financial consequences to the debtor, both positive and

14   negative?

15   A    Yes, all of those issues, yes.

16   Q    All right.  Would you please tell the Court very

17   briefly your educational background?

18   A    I graduated in 1976 with a Bachelor of Science from the

19   Sloan School at Massachusetts Institute of Technology.  And

20   I graduated in 1978 with an MBA in finance from the Wharton

21   School at University of Pennsylvania.

22   Q    And after completing your education, did you then move

23   promptly into the world of providing advice to companies

24   undergoing restructurings?

25   A    Yes, I've been an investment banker or in the private

1    equity business ever since 1978.

2    Q    And would you just lift off, in order for the Court,

3    the institutions where you've applied your trade since

4    before the time you arrived at Evercore?

5    A    It's a long list, but I was at various firms called

6    Scherson & Liemenbergers (ph).  I was at Drexel Burnham from

7    '85 to 1990.  Smith Barney in the early '90s.  Donaldson,

8    Lufkin & Jenrette in the mid-'90s.  A private equity firm

9    called JLL Partners from '97 to 2003.  A boutique advisory

10   firm called Miller Buckfire and Ying.  And then I joined

11   Evercore in 2005.

12   Q    All right.  And what is your role and position at

13   Evercore?

14   A    I am the head of the firm's restructuring and debt

15   advisory group, and that group provides restructuring advice

16   to a broad range of companies, boards, managements,

17   shareholders, and creditors, and our debt advisory business

18   provides advice in terms of accessing the debt capital

19   markets to a wide range of companies to satisfy their debt

20   financing needs.

21   Q    Okay, you've been in that role since joining Evercore

22   in 2005?

23   A    Yes, I have.

24   Q    Have you previously advised debtors, both before going

25   -- well, I should say companies undergoing restructuring

1    outside of Court and then debtors undergoing restructuring

2    in Court?

3    A    Yes, I have.  My most recent active assignments where

4    I've been personally involved include Ally Financial, which

5    is a $200 billion in asset financial institution, formerly

6    known as General Motors Acceptance Corporation.  We advise

7    them on a wide range of capital raising and asset sales, but

8    most relevant to this discussion, we advise them on their

9    exiting a mortgage origination and servicing subsidiary

10   called ResCap, which was accomplished through a bankruptcy

11   filing that had over $15 billion of liabilities and Ally was

12   able to extinguish low claims, both direct and third party

13   claims, as part of that process.

14           Prior to that, I advised a company called CIT

15   Group, which is -- was at the time about a 60 billion in

16   asset financial institution.  50 billion of debt.  We took

17   them through a fully prepackaged bankruptcy.

18           Prior to that, I advised a company Lyondell

19   Chemical Company, worldwide chemical business, for

20   approximately 25 billion of debt.  And we took them through

21   a bankruptcy process.

22   Q    Okay, thank you.  All right, I want to turn now briefly

23   to some aspects of the DIP facility and then we'll turn to

24   the settlement.  Is that all right?

25   A    Yes.

1    Q    Could you tell the Court first what's the amount and

2    the type of debt?

3    A    The DIP facility is in the amount of $5.4 billion.  It

4    is a first priority priming lien on all of the assets of

5    EFIH.

6    Q    And, generally, what will the proceeds -- what are the

7    debtors' intentions with respect to the use of the proceeds

8    from the DIP facility?

9    A    Of that $5.4 billion, 4.4 billion of it is earmarked

10   for the refinancing and the settlement of claims on all of

11   the EFIH first lien notes, which are currently 4 billion in

12   principal amount outstanding.

13   Q    Let me just stop you there.  Would you say -- what

14   portion of that repays the first lien debt?

15   A    Well, of the 4.4 billion -- well, of the 5.4 billion,

16   again, 4.4 billion of that DIP is earmarked to retire and

17   extinguish or settle the claims on 4 billion of existing

18   first lien EFIH notes.  In addition to that 4.4 billion,

19   that remaining billion dollars is earmarked for several

20   things.  250 million of it is earmarked to help supplement

21   the 1.9 billion of proceeds on the proposed second lien DIP,

22   which will be used to retire the 2.15 billion principal

23   amount of second lien notes.

24   Q    And let me just stop you there, Mr. Ying, that assumes

25   Court approval on a motion with respect to second lien

1    noteholders that the Court has not yet heard, correct?

2    A    Yes, of course.  All of this is subject to Court

3    approval.

4    Q    Okay.  I'm sorry, continue.

5    A    That's quite all right.  And in addition to that 250

6    million, there's approximately an additional 350 million

7    which is earmarked for the proposed settlement of the

8    alleged make-whole claims on behalf of the second lien

9    noteholders.  That leaves out of the billion I just

10   described, 400 million of additional cash that would go on

11   the balance sheet of EFIH to supplement the cash position at

12   EFIH today.

13   Q    Okay, and what is the interest rate on the DIP

14   facility?

15   A    The interest rate on the DIP facility is LIBOR subject

16   to a one percent rate interest rate four plus 3.25 percent,

17   for a total of 4.24 percent.

18   Q    How does that rate compare to the interest rates on the

19   debt that will be repaid subject to Court's -- the Court's

20   approval?

21   A    Of the 4 billion principal amount of first lien notes,

22   approximately 500 million carries a coupon of 6.875 percent

23   and 3.5 billion carries an interest rate of 10 percent.

24   Q    Okay.  And so by retiring that debt with the DIP

25   facility, does the debtor achieve savings?

1    A    Yes.  We estimate that as a result of the proposed

2    refinancing of the first lien notes with the DIP facility,

3    that the EFIH estate will be saving approximately $14

4    million a month and over the course of a 12 month period, it

5    will be saving $173 million.

6    Q    It may seem obvious, but I'm going to ask you, what are

7    the debtors' business needs, if any, to close on the DIP

8    facility as soon as reasonably possible?

9    A    Well, every day that the debtor waits, the interest

10   rate on the existing first lien notes is paid at their

11   respective contract rates.  And every day that the debtor

12   waits, there's that much less value in the estate for the

13   benefit of much more junior creditors who are not fully

14   covered by the asset values at EFIH.

15            MR. MCGANN:  Okay, thank you.  Your Honor, may I

16   approach to give him his (indiscernible - 2:17:25)?

17   BY MR. MCGANN:

18   Q    Mr. Ying, I've handed you what we've marked as debtors'

19   demonstrative number 1, the EFIH first lien DIP facility.

20   You're familiar with that?

21   A    Yes, I am.

22   Q    And you were here in the courtroom when Mr. Hessler

23   reviewed it for the Court?

24   A    Yes, I was.

25   Q    Is this accurate?

1    A    Yes.

2    Q    All right, I want to have you describe maybe in more

3    general or simple terms, if possible, the components of this

4    DIP facility.  Can you do that for me?

5    A    Yes --

6    Q    We'll start with the roll-up amounts, if we can call it

7    that.

8    A    Yes.  Well, as Mr. Hessler and others have described,

9    certain existing first lien noteholders were approached

10   prepetition and slightly after the filing date and they

11   agreed to settle their claims.  And in addition since the

12   exchange offer was launched, an additional 455 million of

13   first lien noteholders have tendered their first lien notes

14   into the exchange offer.

15          When you add up those components, I believe the

16   number is 1 billion, 830 million of first lien notes --

17   claims have been rolled into the DIP, which represents 42

18   percent of the outstanding.

19   Q    Okay and then what is the next principal component?

20   A    The second principal component is that the debtor went

21   out and approached certain of the existing first lien

22   noteholders and other constituencies in the capital

23   structure and arranged for first lien DIP financing from

24   them.  And those participants were PIMCO in the amount of a

25   billion 450, Fidelity in the amount of 500 million, GSO in

1    the amount of 50 million, and Wamco in the amount of 250

2    million.  Those numbers add up to $2.25 billion and those

3    participants are providing financing in the DIP.

4    Q    Okay, so we've got a component of the 1.830 billion you

5    just described and now the 2.25 billion.  What's the third

6    and final component?

7    A    The third and final component is the Deutsche Bank led

8    group of banks who have agreed to place the remaining

9    billion 325 of the 5.4 billion DIP with institutional

10   investors.

11   Q    Okay, so let's turn to and just focus on as we start to

12   talk about the proposed settlement, the 1.83 billion

13   component, okay?

14   A    Yes.

15   Q    What, in general -- well, let me take a step back.  A

16   portion of that is earmarked to pay make-whole settlements

17   to the extent noteholders choose to accept the offered

18   terms, correct?

19   A    That's correct.

20   Q    What is being resolved with the proposed settlement?

21   A    Well, the exchange offer, if I may address that issue,

22   really --

23        (Audio is at 2:20 p.m.)

24        THE COURT:  We're having transcription trouble.

25        MR. MCGANN:  Yeah, he'll tell us.

```
1              THE COURT:  We're good?  All right.

2              You may proceed.

3              THE WITNESS: Okay.  Actually, would you mind

4     asking the question again?

5     BY MR. MCGANN:

6     Q    Sure.  We're going to turn now to the economics of the

7     proposed settlement.  And I'd like to just start generally

8     by asking you to describe what the proposed settlement

9     resolves with respect to the noteholders?

10    A    Well, the noteholders are alleging that they're due a

11    make-whole premium and the only reference to a make-whole

12    premium in the indenture is in the optional redemption

13    provision.  And he optional redemption provision is at the

14    option of the borrower to exercise and the borrower never

15    has.

16    Q    Well, let me interrupt you there, because I don't want

17    to get into the underlying make-whole claim at the moment.

18    A    Sorry.

19    Q    That's all right.  I just simply want to -- I want to

20    ask you whether the proposed settlement has a -- and to the

21    extent it does, would you describe it for the Court -- a

22    rolling up of debt in the settlement of a claim component?

23    Does it have those?

24    A    Yes.  The --

25    Q    In what respect?
```

1    A    The exchange offer has been structured to really

2    accomplish two things.  One is for the settling first lien

3    noteholders to provide financing to the company so that it

4    can fund the first lien DIP, hence the exchange of existing

5    first lien notes into first lien DIP bank debt.  And

6    secondly, in connection with that participation in the first

7    lien DIP financing, noteholders who agree to exchange are

8    also settling their alleged make-whole claims.

9    Q    Okay.  Would you describe then for the Court the basic

10   terms of the proposed settlement?  That is the terms being

11   offered to the noteholders?

12   A    Yes.  Well, the exchange offer on the cover page of the

13   offering memorandum says that for every $100 dollars of

14   first lien notes that you, the holder own, you will receive

15   $105 of first lien DIP debt.

16          And for every dollar of accrued interest up to the

17   redemption date, you will receive 101 cents dollars of

18   accrued interest or excuse me.  Let me restate that, I

19   apologize.  For every dollar of accrued interest you own,

20   you will receive $1.01 of first lien DIP.

21   Q    Okay.  When did negotiations over this -- what resulted

22   in this settlement offer -- when did those negotiations

23   begin?

24   A    Well, again, we had discussions with holders and

25   equally importantly, the financial advisor and legal counsel

1    to the ad hoc group of first lien noteholders going back to

2    September of 2013 when the company at that time was thinking

3    of a possible bankruptcy filing as soon as November 1st,

4    2013.

5            Those discussions led to a series of exchanged

6    term sheets, concepts of first lien noteholders rolling into

7    a DIP facility and even potentially exit financing upon

8    confirmation of the bankruptcy plan, but we were never able

9    to have a closure on the terms of that transaction.  And

10   when --

11   Q    And over that period of time, from the fall 2013 when I

12   understand negotiations began in earnest; is that right?

13   A    Yes.

14   Q    And over that period of time, who did the debtors, who

15   were -- to your understanding from your involvement in the

16   process, who were the debtors negotiating with?

17   A    We were primarily negotiating with Ropes & Gray as

18   counsel to the ad hoc committee and Capstone as the

19   financial advisor.

20   Q    Okay.  And did there come a time when negotiations

21   involved Fidelity?

22   A    The negotiations with Fidelity on these terms only

23   really started in late January, early February of 2014.

24   Q    Okay.  And to your understanding, why was Fidelity

25   brought into the negotiations of this?

1    A    Well, Fidelity is a significant holder of debt at the

2    EFH unsecured level.

3    Q    What does it hold there?

4    A    I believe they owned, at the time of the filing,

5    approximately 72 percent of the outstanding unsecured debt

6    at EFH.

7    Q    Where else does it have holdings?

8    A    They are also a significant holder of second lien notes

9    at EFH.  I believe the amount is approximately 30 percent of

10   the $2.15 billion outstanding.  And I believe at the time of

11   the negotiations and the filing of the debtors, Fidelity

12   also owned approximately 12 percent or approximately $480

13   million of first lien EFIH notes.

14   Q    Okay.  Could you characterize for the Court the nature

15   of the negotiations with Fidelity over the -- what resulted

16   in the proposed settlement?

17   A    Yes.  Well, Fidelity was only willing to negotiate the

18   terms of their EFH position, which was a very important

19   position for us to resolve if we were also able to negotiate

20   settlement agreements with Fidelity with regard to both

21   their first lien and second lien EFIH note positions.

22   And --

23   Q    They --

24   A    I'm sorry, go ahead.

25   Q    Does the rollup aspect of the proposed settlement

1   affect in any way the fees the debtors are obligated to pay?

2   A    Yes.  Well, one of the key issues about negotiating the

3   deal with the first lien notes was that they really were

4   never going to take us seriously on this proposal to

5   refinance them at cheaper rates unless we could tell them

6   that we had another alternative, other than continuing to

7   talk to them.  Because every day we talked, they would earn

8   more above market interest and so they had no real incentive

9   to stop just talking and come to the table and strike a

10  deal.

11          So our only alternative to get them to truly come

12  to the table was to tell them that we can raise enough money

13  in a DIP to pay them off at par and if they still persisted

14  in their insistence on a make-whole claim, that litigation

15  of that claim could happen at a subsequent fate.

16  Q    All right.  And to the extent then that any noteholder

17  decides to accept the settlement, pending the Court's

18  approval of course, is there are savings to the debtors in

19  terms of financing fees?

20  A    Yes.  Well, as a result of that negotiation we also

21  said to the first lien noteholders, why don't we offer you a

22  package whereby you can help the company by financing the

23  DIP and we will pay you in DIP loans as opposed to cash.

24  And we can then package, if you will, the savings that the

25  company will incur by not going out and financing all $5.4

1    billion with the public markets and we can show with you the

2    cost of doing that, incurring a financing fee on all $5.4

3    billion in the settlement package.

4            So we are in essence in the settlement proposal

5    doing two things, we're sharing with the first lien

6    noteholders the financing fee, because they're helping the

7    company finance the DIP and we're giving them a settlement

8    fee for agreeing to extinguish and settle their alleged

9    make-whole claim.

10   Q    And that's all built into the term of the settlement

11   offer that you just described a few moments ago?

12   A    That is correct.

13   Q    Is the settlement offer available to all holders of

14   notes, be it 6-7/8ths percent notes or 10 percent notes on

15   equal terms?

16   A    Yes, it is.

17   Q    What proportion of the EFIH first lien noteholders have

18   indicated an acceptance of the settlement offer?

19   A    Forty-two percent of the principal amount outstanding.

20   Q    Were EFIH unsecured creditors involved in the

21   negotiations over the settlement in any way?

22   A    Yes.  The ad hoc committee of EFIH unsecured

23   noteholders was a very active participant in the

24   negotiations that occurred between the company, the EFIH

25   unsecured noteholders and Fidelity on behalf of its

1    holdings, both at EFH and at EFIH.

2    Q    And to your understanding, why were the EFIH unsecured

3    noteholders involved in negotiating settlement terms the

4    debtors were going to offer to first lien noteholders?

5    A    Well, the EFIH unsecured noteholders are the junior

6    most creditor at EFIH.  They are either the beneficiaries or

7    the losers, to the extent that more money has to be incurred

8    to satisfy the claims to the more senior creditor at EFIH,

9    which include both the first lien notes and the second lien

10   notes.

11   Q    Do they support the settlement?

12   A    Yes, they do.

13   Q    Does their support of the settlement have any effect on

14   your assessment of whether the proposed settlement terms are

15   within the range of reasonableness from the debtors'

16   perspective?

17   A    I do think that's the -- their support of the

18   settlements are a very important ingredient in reaching a

19   consensual deal and I think it's additional reinforcement of

20   the decision to support the settlements by the company and

21   make the offers that we've made.

22   Q    Based on your involvement in the negotiating process

23   from the outset, in your experience in advising companies

24   undergoing restructurings, do you believe the first lien

25   settlement offers a reasonable exercise of the debtors'

1    business judgment?

2    A    Yes, I do.

3    Q    And would you tell the Court why that is?

4    A    Well, we are settling alleged make-whole claims at

5    significantly reduced amounts relative to the alleged

6    amounts.  So we're settling claims at cents on the dollar.

7    And I believe that the more that we can eliminate obstacles

8    in future litigation with respect to issues relating to just

9    the overly secured creditors, it gives the debtor greater

10   ability to focus on the more important and central issues to

11   the ultimate restructuring of the company, which is, how

12   does the company de-lever, who should own the equity of the

13   company and how do we exit this bankruptcy where we preserve

14   asset value with a healthy feasible capital structure.

15   Q    And based on your involvement in these negotiations and

16   your role in advising the debtors throughout the process as

17   you've described, do you believe the debtors could have

18   obtained settlements of the order in which they have so far

19   by offering materially lower terms?

20   A    No.  I think the negotiations that have been had

21   between ourselves and the debtors and the various holders

22   has been very vigorous.  People have fought hard over the

23   terms.  There's been lots of back and forth and I think

24   these are the best possible terms that we could accomplish.

25   Q    You understand, Mr. Ying, that one of the complaints

1    the indentured trustee has made here is that the holders of

2    10 percent notes, to the extent they're willing to accept

3    the proposed settlement, are getting a different percentage

4    recovery of their alleged make-whole claim than would

5    accepting holders of the 6-7/8ths percent notes?  You

6    understand that that's a claim they're making?

7    A    I am aware of their argument.

8    Q    All right.  Is there any difference in the offer that

9    the debtors are making to these noteholders?

10   A    The offer as expressed as a percentage of the principal

11   amount of debt outstanding are identical.

12   Q    Okay.  But is it the case that different noteholders,

13   depending on the terms of their notes, may recover if they

14   accept the settlement, a different proportion of their

15   alleged make-whole claim?

16   A    Yes.  If you look at the --

17   Q    Go ahead and explain that, if that --

18   A    Sure.  Sure.  If you look at the offers at when

19   expressed as a percentage of the alleged make-whole claims,

20   the offers are different.

21        The specific numbers to my recollection are that

22   the settlement offer, as it relates to the 10 percent notes,

23   because they have a higher coupon and a longer maturity,

24   represents approximately 20 cents on the alleged make-whole

25   dollar, whereas the same dollar settlement for the 6-7/8ths

1    notes, which have a lower coupon and a shorter maturity

2    represents approximately a 52 cent on the dollar -- on the

3    alleged make-whole dollar offer.

4    Q    Okay.  So, in terms of percent recover of the alleged

5    make-whole claim there's a difference in outcome between

6    accepting noteholders of the different types of notes, true?

7    A    When expressed as a percentage of make-whole amounts,

8    yes.

9    Q    And you're familiar with the fact that Mr. Kerns

10   submitted a declaration in these proceedings that calculates

11   a difference with regard to this outcome of the kind you're

12   talking about, right?

13   A    Yes, I remember that.

14   Q    But he comes up with a different differential, right?

15   A    That's correct.

16   Q    Did he get it right?

17   A    Actually, I don't think he did.  He highlights that

18   there are some different assumptions.  One is the date of

19   the make-whole calculation.  I believe we used a settlement

20   date of June 11th, he used a settlement date of June 7th.

21   He uses treasury rates, which is the discount rate one uses

22   to present value the cash flows to calculate the make-whole

23   as of a different date from us.  And he includes in the

24   future cash flows of certain of the debt securities the

25   additional interest which is paid to bondholders to the

1    extent that certain debt issues, which were sold under Rule

2    144(a) have not been able to become registered securities

3    pursuant to the filing and effectiveness of the shelf

4    registration statement.  And we do not include those

5    additional interest payments in our calculation.

6            But, most importantly, Mr. Kerns calculates his

7    percentages of make-whole claims because he uses the

8    settlement offer of 105 or a five point premium in his

9    calculation.

10           And what's clear in the exchange offer document is

11   that we are offering people the opportunity to exchange into

12   new first lien DIP loans.  And what's clear in the

13   documentation is the new first lien DIP loan is being priced

14   at LIBOR plus 3.25 percent and will be sold to investors at

15   a price of 99 for every $100 of principal amount that people

16   receive.

17           That 1 point discount is called original issue

18   discount, OID, and therefore the offer to exchanging first

19   lien noteholders is that for every $100 of principal amount

20   of old first lien notes, they'll receive $105 worth of first

21   lien DIP loan.  One point of that five points is in

22   recognition of the one point of OID that is on the first

23   lien DIP loan.  And the remaining 4 points is the settlement

24   offer.

25   Q    Okay.  Do you believe that it's reasonable for the 10

1    percent noteholders to get a lower percentage recovery of

2    their make-whole claim than the 6-7/8ths percent noteholders

3    under these circumstances?

4    A    Well, the way I would address that issue is to say that

5    we are asking the noteholders to do two things.  One is,

6    please finance the first lien DIP and two, please give us

7    your consent to waive any alleged rights to any make-whole

8    claim.

9             If I were to normalize the 6-7/8ths offer to equal

10   20 percent of their make-whole claim, which is the inference

11   from the complaint by the first lien noteholders, the fee

12   that I would be paying to the 6-7/8ths would be 20 percent

13   of their alleged make-whole claim, which is 20 percent of 8

14   points, which would equal 1.6 points.  And that 1.6 points

15   wouldn't even cover the financing costs or the fees that

16   we're paying to people like Fidelity, PIMCO, et cetera to

17   provide DIP financing to the company.

18            I think that the 6-7/8ths investor would find that

19   offer to be totally unsatisfactory given the fact that we're

20   asking them to both provide financing and to waive their

21   make-whole settlement, or excuse me, waive their make-whole

22   argument.

23   Q    Thank you.  You mentioned PIMCO.  Did the settlement

24   amounts in the way they differed in outcome in the way

25   you've described, did that affect negotiations with PIMCO

1    with respect to its participation and financing?

2    A    Well, with respect to PIMCO, they were in the unusual

3    position of holding a substantial amount of first lien notes

4    that were more -- and their ownership in those first lien

5    notes between the 6-7/8ths and the 10 percents were

6    disproportionately weighted to the 6-7/8ths.

7         Again the 6-7/8ths represent $500 million or I

8    think 12-1/2 percent of the outstanding $4 billion in first

9    lien notes.  PIMCO's weighting was more like 35 percent as I

10   recall.

11        However, what the company did when they negotiated

12   with PIMCO about their potential participating in the RSA

13   pre petition is that the company also negotiated with PIMCO,

14   their participation as a backstop lender in the first lien

15   DIP and the terms upon which PIMCO agreed to provide $1.450

16   of backstop financing is unusual.  They agreed to provide

17   that financing without any up front commitment fees.

18        As people may recall, the Deutsche Bank group, to

19   provide a backstop financing or committed financing, we had

20   to ask the Court to approve a commitment fee for them on the

21   first day of the case, which was approved.

22        And so I think it's ordinary, customary for

23   backstop providers to get up front commitment fees, but

24   PIMCO did not do so.

25   Q    Okay.  And in your judgment, could the company have

1    gone into the market and gotten a billion four five of

2    backup commitment of the kind you described for no upfront

3    commitment fee?

4    A    I think that would have been extraordinarily difficult.

5    Q    You understand, do you not, that the first lien trustee

6    has also, he's raised a complaint or a concern, as they

7    alleged, that PIMCO and Fidelity are getting a different

8    settlement in some fashion on account of their make-whole

9    claim than other noteholders?  Are you familiar with that

10   concern they've expressed?

11   A    I've heard that concern, yes.

12   Q    Do you agree with that?

13   A    No, I do not.

14   Q    Why not?

15   A    Because as its fully disclosed in all the documentation

16   Fidelity and PIMCO and WAMCO are all doing something above

17   and beyond exchanging their existing first lien notes

18   pursuant to our proposal to have them participate in the

19   first lien DIP and waive their make-whole claim, they are

20   all providing incremental financing to the company.

21   Q    All right.  Do you believe -- and would you recommend -

22   - in fact, let me start that and ask you, did you recommend

23   to the debtors that they should make this settlement

24   proposal and it made sense for their business irrespective

25   of the other aspects of the RSA that were negotiated at the

1    same time?

2    A    Yes, I have.

3    Q    All right.  So on a standalone basis, do you believe

4    that this proposed settlement is a sound exercise of the

5    debtors' business judgment?

6    A    Yes, I do.

7              MR. MCGANN:  Thank you, Your Honor.

8              MR. MARTIN:  Good afternoon, Your Honor.  Again,

9    Ross Martin from Ropes & Gray for the 10 percent first lien

10   notes trustee.

11                      CROSS-EXAMINATION

12   BY MR. MARTIN:

13   Q    Good afternoon, Mr. Ying.

14   A    Good afternoon.

15   Q    Mr. Ying, I'd like to start with your calculation that

16   the 6-7/8 holders are getting approximately 52 percent

17   recovery on their disputed make-whole claim and that the 10

18   percent noteholders are getting approximately 21 percent.

19              Is that your testimony?

20   A    Yes, it is.

21   Q    Okay.  And your testimony on that was based on what you

22   called a settlement at 104; is that correct?

23   A    A 4 point premium or settlement payment, yes.

24   Q    Now, I'd like to refer to the chart that Mr. McGann

25   handed you that was used in court this morning.  You have

1    that in front of you?

2    A    Yes, I do.

3    Q    Okay.  And if you'd go to the right-hand column on that

4    chart, you'll see that the settlements are listed at 105; is

5    that correct?

6    A    It sure is.

7    Q    Now, you testified a few minutes ago that you did not

8    think that Mr. Kerns did it correctly because in fact the

9    settlement is at 104; is that correct?

10   A    That's correct.

11   Q    Okay.  And you attributed that to the original issued

12   discount, correct?

13   A    Yes, I did.

14   Q    The amount of that original issue discount is 1 point.

15   Is that correct, sir?

16   A    It is 1 percent of the principal amount of the first

17   lien DIP.

18   Q    And so 4 plus 1 is 5; is that not correct, sir?

19   A    That is correct.

20   Q    Okay.  And if you use 5 points on the make-whole

21   settlement, would Mr. Kerns' arithmetic be correct that the

22   6-7/8ths are getting approximately 62 percent and that the

23   10 percents are only getting 25 percent?

24   A    Well, I can't argue with the use of the mathematics

25   that you describe, but I would say that if I'm paying you in

1    99 cent dollars, I would hardly view that 105 cents was

2    worth 105 cents.  I'd suggest to you that it's really only

3    worth 104 cents.  And that's the point I'm trying to make.

4    Q    Even on your math, sir -- even on your math, sir,

5    aren't the 10 percent notes getting less than half of the

6    amount the 6-7/8ths notes are getting?

7    A    I'll repeat what you said to me.  Yes, as a percentage

8    of alleged make-whole claim, 4 points represents 21 percent

9    of the alleged make-whole claim on the tens and it

10   represents 50 percent of the make-whole claim on the 6-

11   7/8ths.

12   Q    Now, I want to go back to a couple of other things that

13   you said.  You said that -- if I recall correctly -- that

14   Fidelity and PIMCO were providing the financing for no

15   commitment fee; is that correct?

16   A    That is correct.

17   Q    Okay.  So going back to this chart, the green chart

18   we've all been looking at today.  The one -- you're

19   referring on that fee to the 1.75 percent funding fee; is

20   that correct?

21   A    That is correct.

22   Q    So that's part of their -- since it's not part of the

23   financing, it's part of the settlement with them; is that

24   correct?

25   A    Actually, would you please ask the question, because I

1    think there's a confusing in what you're calling an upfront

2    commitment fee versus a funding fee or financing fee.

3    Q    Okay.  You said they are providing the backstop without

4    a fee.  In that case, were you referring to the 1.75 percent

5    funding fee?

6    A    No.  I was saying that both PIMCO and WAMCO are

7    providing backstop financing and they are not getting a

8    upfront commitment fee.  They are being paid a financing fee

9    if we exercise their backstop amounts.

10   Q    Okay.  The ability to backstop was not offered to any

11   of the other noteholders in the tender; is that correct sir?

12   A    Well, the only parties who would sign a confidentiality

13   agreement so that we could talk to them pre petition were

14   Fidelity and PIMCO and WAMCO came into the transaction

15   shortly after we had filed bankruptcy when all of the terms

16   of the RSA were now in the public domain.

17   Q    Okay.

18   A    No other holders, as far as I can tell, were willing to

19   sign a confidentiality agreement to talk to the company.

20   Q    But, sir, post petition, is when the debtors conducted

21   the tender offer; is that correct?

22   A    I believe that the debtors commenced the exchange offer

23   the Tuesday following the filing of the company in Delaware.

24   Q    And that was the first time, on the petition date and

25   in the tender offer that any other holders, besides those

1    confidential parties, heard about this deal; is that

2    correct?

3    A    Well, I think they would have heard about the deal had

4    they read the RSA, which was filed on the filing date, but

5    you're right.  Once the exchange offer document was filed

6    and I think there was a notice in the Court, it was

7    obviously the exchange offer started and people were free to

8    consider the offer.

9    Q    Fair enough, but all of those events were post the

10   filing of the bankruptcy; is that correct?

11   A    Yes, that is correct.

12   Q    Okay.  But in the tender, in the offer, none of those

13   other parties were offered the ability to participate in the

14   backstop; is that correct?

15   A    We had secured sufficient backstop financing so that if

16   no one wanted to participate in our offer, we could still

17   have sufficient funding to refinance them out.

18           And as I said earlier, being able to tell people

19   that we can refinance you out at par and litigate your make-

20   whole claim at some point in the future was an instrumental

21   element of providing the maximum negotiating dynamic to

22   hopefully get people to agree to the settlement.

23   Q    And only backstop parties were able to get the funding

24   fee; is that correct?

25   A    Only backstop parties if we draw their capital, they'll

1    get the full funding fee, yes.

2    Q    Now, Mr. Ying, what's the approximate total amount of

3    the disputed make-whole for the first lien notes?  Is that

4    about $700 million?

5    A    According to the way we've calculated the make-whole as

6    of June 11th, we think the dollar amount is approximately

7    $690 million.

8    Q    Okay.  And would the folks who tendered in and how much

9    is going to remain in the make-whole dispute?

10   A    I think pursuant to the mix of securities that have

11   tendered or agreed to roll their first lien notes into first

12   lien DIP loan, we've eliminated about $260 million of the

13   $690 million and that therefore leaves $430 million of

14   alleged make-whole claim calculated as of June 11th.

15   Q    Okay.  Now, was it your testimony a few minutes ago in

16   questioning by Mr. McGann that one of the advantages to

17   settlement is it would eliminate litigation?

18   A    I think my testimony I said that we are settling

19   alleged make-whole claims at cents on the dollar and that

20   is, I think, beneficial to the debtor.

21        Obviously we would hope that enough people

22   participated in the settlement that we would avoid future

23   make-whole litigation.  Clearly if people are insisting on

24   not participating and litigating, we will have to go forward

25   and litigate.

1    Q    And in your experience, sir, would you expect that a

2    litigation over $490 million be substantially differently

3    conducted and cost the debt substantially less than the

4    litigation over the $690 million?

5            MR. MARTIN:  Excuse me, Your Honor, can I restate

6    the question?

7            THE COURT:  Sure.

8    BY MR. MARTIN:

9    Q    Would you expect that litigation over $430 million

10   would be conducted substantially different than the

11   litigation over -- by the debtors, than the litigation over

12   the $690 million?

13   A    I don't consider myself a litigation cost expert, but I

14   suspect that you will prosecute the case with all great

15   vigor irrespective of the dollar amounts.

16   Q    Mr. Ying, you testified to your extensive professional

17   experience in restructuring.  Have you ever been involved

18   any other Chapter 11 case where a debtor in possession

19   launched a tender offer for its own securities?

20   A    No, I have not.

21   Q    Are you aware of any cases in which a debtor in

22   possession launched a tender offer for its own securities?

23   A    I believe you asked me the same question during my

24   deposition and my answer was the only other case I'm aware

25   of is American Airlines.

1    Q    Okay.  And in the American Airlines, isn't it true that

2    the debtors sought permission for the tender prior to

3    launching the tender?

4    A    That is my understanding, yes.

5    Q    And isn't it true that in American Airlines, there was

6    no objection to the ability under the Bankruptcy Code or the

7    securities laws to do such a tender after the commencement

8    of a bankruptcy case?

9    A    I'm not familiar enough to know the details, but I

10   presume that that's correct.

11   Q    Okay.  And is it also the case that in American

12   Airlines that tender offer was commenced after court

13   approval of a disclosure statement in that case?

14   A    Actually, again I'm not as familiar with the specifics

15   around that case, so I do not know that for a fact.

16   Q    Okay.

17          MR. MARTIN:  Your Honor, just one moment.  That's

18   all I have, Your Honor.

19          THE COURT:  Thank you.

20          Your counsel might have redirect or no.

21                  REDIRECT EXAMINATION

22   BY MR. MCGANN:

23   Q    Mr. Ying, are first lien noteholders entirely free to

24   accept or reject the proposed settlement?

25   A    Yes, they are.

```
 1    Q    Is there anything coercive about it?

 2    A    Nothing that I know of.  No.

 3              MR. MCGANN:  Thank you.  That's all.

 4              THE COURT:  You may step down.

 5              THE WITNESS: Thank you.

 6              THE COURT:  Proceed.

 7              MR. MCGANN:  Your Honor, the debtors now call Paul

 8    Keglevic.

 9              THE COURT:  Go ahead.

10              MR. MCGANN:  Proceed?  Thank you, Your Honor.

11              PAUL KEGLEVIC, WITNESS, PREVIOUSLY SWORN

12                      DIRECT EXAMINATION

13    BY MR. MCGANN:

14    Q    Mr. Keglevic, I know this is becoming old hat for you,

15    so I'm going to cut right to the chase if that's all right.

16    A    Yes, sir.

17    Q    You're familiar with the DIP financing, the EFIH DIP

18    financing that's been the subject of discussion today?

19    A    I am.

20    Q    And you're familiar with the proposed EFIH first lien

21    make-whole claim --

22    A    I am.

23    Q    -- make-whole settlement --

24    A    Both.

25    Q    Thank you.  Did you play a role in negotiating those
```

1    agreements?

2    A    Yes.

3    Q    Just describe for the Court please your role and

4    responsibilities for the debtors in that regard.

5    A    I was actively involved in the strategy to determine

6    what the settlement offer would be and people, largely my

7    treasurer and Mr. Ying, under my direction, conducted the

8    negotiations.

9    Q    All right.  Did you on behalf of the debtors approve

10   the proposed settlement of the make-whole claim by the --

11   make-whole claim of the first lien noteholders?

12   A    I'm sorry, could you rephrase?

13   Q    Yeah.  Did you approve the proposed settlement offer

14   that we're discussing here today?

15   A    Yes.  I recommended it to the board who I think

16   ultimately approved it.

17   Q    Who did the company negotiate the terms with?

18   A    Initially Fidelity, but even before we negotiated the

19   terms, we were -- we effectively were trying to figure the

20   ability of the estate to pay it, you know, recognizing that

21   we had to have enough cash flow under our plan post petition

22   to have a confirmable plan.

23        So we really started with affordability, took into

24   consideration counsel's advice about the litigation.  And

25   then, you know, obviously we -- that probably set a limit as

1    to what we thought we could pay or what we were willing to

2    pay.  And then negotiations began with Fidelity and then

3    finally with PIMCO and WAMCO.

4    Q    Now, Mr. Ying has described the terms of the proposed

5    settlement, we don't need to go back through that, but I'd

6    like to ask you, do you believe, based on your participation

7    in the negotiations, whether you were able -- whether the

8    company would have been able to get better terms to achieve

9    the level of participation that it's achieved so far?

10   A    No.  We're very happy with the terms.

11   Q    What conclusion did you reach with regard to whether

12   the proposed settlement terms are within a range of

13   reasonableness from the debtors' perspective?

14   A    As I said, we considered the -- our litigation risk.

15   Based on advice of counsel, we looked at the affordability

16   of the settlement and the cash flow upon emergence and the

17   ability to reduce the cost of the DIP by having settling

18   first lien lenders rollup into the DIP, which as Mr. Ying

19   described ultimately reduced the cost of the settlement to

20   us.  Because to the extent we had no settling parties that

21   didn't roll into the DIP, we would have paid that to the

22   banks.

23            So effectively that gave us 1.75 that we were

24   happy to share in -- with the first lien holders as a

25   settlement, because we would have paid that same 1.75 to

1    somebody to conduct the strategy that we had developed with

2    respect to reducing the amount of the indebtedness and

3    reducing the amount of the interest expense at the EFIH

4    estate, which is critical to the -- to its emergence from

5    bankruptcy.

6    Q    Did you offer the same terms to all noteholders?

7    A    We did.

8    Q    Why?

9    A    We started with a simplistic standpoint that in a

10   capital markets we were offering the same to everybody, plus

11   we were trying to get everybody to participate into the DIP.

12   And to the extent we could have eliminated litigation risk

13   that would have been a positive as well.

14   Q    If the Court approves the proposed DIP and proposed

15   make-whole settlement, what happens to noteholders who elect

16   not to accept the settlement offer?  What happens to their

17   notes?

18   A    My understanding is they have the rights to reserve to

19   pursue the alleged make-whole in a course -- in a time table

20   that has been agreed to between the parties.

21   Q    And do their notes get paid in full with accrued

22   interest?

23   A    Yes.  If the DIP is approved and the settlements are

24   approved, they will get the par value of their notes, plus

25   accrued interest.

1    Q    There was a question to Mr. Ying a few moments ago

2    pointing out the fact that not all noteholders have agreed

3    to enter into the settlement; is that right?

4    A    That's correct.

5    Q    And it leaves some amount of make-whole claim to be

6    litigated, true?

7    A    It does.

8    Q    Does that change your judgment about whether the

9    proposed settlement that we're here today seeking approval

10   of is beneficial for the debtors?

11   A    No.  We had the make-whole exposure, the ability to get

12   any level of settlement gives us the ability to start

13   capturing interest savings, which benefit the estate in the

14   long run.

15            MR. MCGANN:  That's all I have, Your Honor.

16            THE COURT:  Thank you.

17            MR. MARTIN:  Again, for the record, Your Honor,

18   Ross Martin, Ropes & Gray for the 10 percent first lien

19   notes trustee.

20                      CROSS-EXAMINATION

21   BY MR. MARTIN:

22   Q    Good afternoon, Mr. Keglevic.

23   A    Good afternoon, Mr. Martin.

24   Q    Mr. Keglevic, when is the company planning to close on

25   the EFIH first lien settlement if it's approved?

1    A    I believe in a matter of days after its approved.

2    Q    Do you have a planned date for that?

3    A    We do.  I don't recall it off the top of my head.

4    Q    Is it next week?

5    A    It's next week.

6    Q    Is it the beginning of next week?

7    A    As I said, I don't remember the exact date.  I thought

8    it was within five days, but I'm not exactly sure.

9    Q    You're raising a $5.4 billion financing and you don't

10   have a specific date targeted for closing next week?

11   A    We have a specific date targeted and I know my

12   treasurer and my lawyers who are going to close the DIP know

13   exactly the date and terms.

14   Q    Okay.  You are the debtors' co-chief restructuring

15   officer, correct?

16   A    I am.

17   Q    And did you give a deposition in this matter -- I know

18   you've given a number of depositions in the case, but

19   specifically with respect to the EFIH first lien settlement

20   in our New York offices last Thursday?

21   A    I did.

22   Q    Okay.  And are you on the board of managers of EFIH?

23   A    I am.

24   Q    Okay.  And it's correct that EFIH first started

25   negotiating over a first lien redemption premium settlement

1    back in September 2013?

2    A    Yes.

3    Q    Okay.  And that was with a group of first lien holders?

4    I think that was the testimony earlier.

5    A    Yes, it was.

6    Q    Okay.  And you were involved in that then?

7    A    I was.

8    Q    Okay.  And PIMCO was in that group at the time; is that

9    correct?

10   A    I believe so.

11   Q    Okay.  And there was a set of discussions that took

12   place there in September and October 2013; is that correct?

13   A    There were.

14   Q    Okay.

15   A    But no settlement was obviously reached?

16   A    No settlement was reached.

17   Q    And did discussions restart around February 2014 with

18   that group?

19   A    That sounds about right?

20   Q    Okay.  And again, PIMCO was in that group; is that

21   right?

22   A    They were.

23   Q    Okay.  There was even a face to face meeting in Dallas

24   with a number of members, including principals of that group

25   regarding that; isn't that correct?

1    A    There was a meeting including your firm and principals

2    that I attended, yes.

3    Q    Okay.  And obviously no settlement was reached; is that

4    correct?

5    A    Right.  We actually did not talk specific terms of

6    settlements.  There were no bids and no offers.

7    Q    Okay.

8    A    Just -- excuse me, sir.  Just the willingness to

9    negotiate and speak was we all determined that at that

10   meeting.

11   Q    Okay.  So is it correct that EFH first reached an

12   agreement for the 105 settlement component on the first lien

13   make-whole in early in -- April 2014?

14   A    That sounds about right.

15   Q    Okay.  And that was with Fidelity, correct?

16   A    Yes.  Fidelity was the first noteholder that we

17   negotiated with.

18   Q    Okay.  And at the time that 105 number was reached with

19   Fidelity, they had about 10 percent of the first lien notes;

20   is that correct?

21   A    Yes, that sounds about right.

22   Q    And they also had about a third of the second lien

23   notes; is that correct?

24   A    Yes.

25   Q    And they also had bonds at the parent company level,

1     EFH; is that correct?

2     A     Yes, a little over 70 percent if I remember correctly.

3     Q     And they also had PIK or unsecured notes; is that

4     correct?

5     A     I don't remember that as clearly, but maybe -- actually

6     they did.  A small portion, I think 4 percent of the

7     outstanding issue.

8     Q     Now, when EFIH first reached that agreement with

9     Fidelity for the 105 (indiscernible) premium settlement, was

10    that an agreement independent of Fidelity's other holdings

11    or was it part of an overall settlement with Fidelity?

12    A     We were always negotiating with Fidelity on all of the

13    elements, but as you can imagine, different elements got

14    resolved at different times.

15          I was not specifically in those negotiations, so I

16    don't remember if this one -- the order in which it got

17    settled, but I think it's fair to say, their interests were

18    to settle all aspects of the capital structure, not just the

19    10 percent notes if that's your question.

20    Q     Do you know whether Fidelity ever made any proposals

21    just directed at the 105 or were they making global

22    proposals in the negotiations?

23    A     As I said, as I understood it, while the negotiations

24    were on all of the issues, there were specific discussions

25    on just what they would take for that settlement.

1    Q    But are you aware whether they made any proposals that

2    while they indicated 105, did not include discussion of any

3    other topic?

4    A    No.  I think it's fair to say that at least it was my

5    belief and the belief of the parties negotiating that we

6    needed to reach agreements on all of the elements.

7    Q    Okay.  And the negotiation between EFIH and Fidelity or

8    maybe the debtors and Fidelity, the way you're putting it,

9    that ultimately led to the RSA were a complex series of

10   negotiations?

11   A    They were.

12   Q    Okay.  And there were multiple elements to the Fidelity

13   settlement; is that correct?

14   A    There were.

15   Q    And in fact the deal ultimately reached with Fidelity

16   addressed each of Fidelity's holdings and there aren't any

17   remaining disputes under the RSA with Fidelity?

18   A    I believe that's correct.

19   Q    So they're covered in the first lien settlement and the

20   second lien settlement and also a deal on the EFH unsecured

21   bonds; is that correct?

22   A    That's correct.  And the small piece they own in the

23   EFIH PIKs.

24   Q    Okay.  And it also included an agreement regarding the

25   so-called Encore tax sharing agreement or the Encore TSA as

1    it's referred to; is that correct?

2    A    They were one of the parties that would have to agree

3    to the tax sharing agreement.  The Court is the other party

4    that would have to agree.

5    Q    Okay.

6              THE COURT:  What's my fee?

7         (Laughter)

8              THE COURT:  I'll take a smaller percentage.

9         (Laughter)

10             THE COURT:  Go ahead.  Actually, I'm going to ask

11   -- I need a short recess, so we're going to take about ten

12   minutes.

13             MR. MARTIN:  Thank you, Your Honor.

14        (Recess at 3:05 p.m.)

15             THE CLERK:  All rise.

16             THE COURT:  Please be seated.  Just have a second,

17   let everyone get settled.

18             Okay, you can proceed.

19             MR. MARTIN:  Again, just for the record Ross

20   Martin from Ropes & Gray, Mr. Keglevic.

21                    CROSS-EXAMINATION (Resumed)

22   BY MR. MARTIN:

23   Q    So I think we had just finished a question -- a series

24   of questions about the components of Fidelity, parts of the

25   restructuring support agreement, and I think it was your

1    testimony, those were all basically negotiated

2    simultaneously; is that correct?

3    A    Yes.

4    Q    And so ultimately the deal that was struck with

5    Fidelity was an entire package together?

6    A    It had individual elements and -- but I think you can

7    look at that as a package.  We considered each element

8    individually.

9    Q    And you're -- but your intent was to get a global deal

10   with respect to all of their positions, correct?

11   A    It was our intent, and I think it was their intent as

12   well.

13   Q    Okay.  Now the reason you wanted a global package deal

14   with Fidelity on all elements of its holdings was because

15   Fidelity had a unique place in the capital structure; is

16   that correct?

17   A    That's correct.

18   Q    And you don't know whether they would have agreed to

19   the 105 on the first lien make-whole settlement by itself do

20   you?

21   A    I don't, you'd have to ask them.

22   Q    And the same is true for the 50 cents on the second

23   lien make-whole; is that correct?

24   A    You mean the 50 percent?

25   Q    That's correct.

1    A    Of the make-whole settlement?  No, that same answer

2    you'd have to ask them.

3    Q    And the same for their treatment of their parent

4    company bond?

5    A    Same answer, you'd have to ask them.

6    Q    Okay.  Well, let me just ask the question again.  You

7    don't -- you, sir -- I'm not asking whether you know what

8    they thought, I'm asking whether you know whether they would

9    have taken the deal in the RSA for their parent company

10   bonds on a standalone basis.

11   A    Their indication was they wanted to settle it all, but

12   we -- we were able to settle it all so we never got to the

13   situation where we had to call the question.

14   Q    Okay.  Let me ask you one additional item on this.

15   With respect to the Encore TSA amendment, was that

16   negotiated between EFH and EFIH?

17   A    Yes.

18   Q    Do you recall, sir, that we had that deposition last

19   Thursday?  I would ask, sir --

20        MR. MARTIN:  Your Honor, we'll put a thing up on

21   the screen in just a minute.  This is going to be page 109,

22   line 1 to page 10 of line 1.

23   BY MR. MARTIN:

24   Q    While they're checking that I will ask you when we put

25   this up if you --

1            THE COURT:  You may be the one person.  Do you

2    have the screen there?  Do you have a screen there?

3            THE WITNESS:  I don't.

4            THE COURT:  He's the one person that doesn't have

5    a screen.

6            MR. MARTIN:  Can you see it up there, Your Honor?

7            THE WITNESS:  We'll see.

8    BY MR. MARTIN:

9    Q    Whether you remember this question I asked.

10            THE COURT:  Is this video?

11            MR. MARTIN:  Yes, Your Honor.  It should be.

12    Ready?  Oh wait, hold on.

13            THE COURT:  I tell you what, hang on.  Hang on for

14    a sec.

15        (Court confers with clerk)

16    BY MR. MARTIN:

17    Q    I just want -- the question pending is whether you

18    remember this question and answer.  And you can play it.

19            MR. MCGANN:  Your Honor, I'm sorry, but object

20    because we just have -- I've now lost what it is

21    (indiscernible - 3:24:32).

22            MR. MARTIN:  Certainly.  I believe the question

23    was, was the Encore TSA negotiated between EFH and EFIH and

24    the answer was yes.

25            THE COURT:  Right.

1          (Video Deposition Played)

2    BY MR. MARTIN:

3    Q    Now moving on to the TSA settlement that you mentioned

4    earlier.  Who are the parties to the TSA settlement?

5    A    Generally it's EFH agreeing to allow the TSA to move to

6    -- to redirect payments through EFIH instead of from, you

7    know, to exclude EFIH to EFH.  So it's generally what we

8    need.  I think in the RSA we've said it had to be the

9    majority of the holders of EFH as well as be approved by the

10   Bankruptcy Court.  So ultimately -- and I assume the company

11   would be another party to the settlement -- those would be

12   the key settlement parties.

13          I don't recall if EFH -- EFIH is also a settlement

14   party.  Obviously it would be to the benefit of EFIH if this

15   were to occur.

16   Q    Well was this negotiated between EFH and EFIH?

17   A    It was negotiated between the company who represented,

18   you know, EFIH, and Fidelity who effectively in that case as

19   the majority debt holder represented EFH.

20        (Audio stopped)

21          MR. MCGANN:  Your Honor, just for the record I

22   object (indiscernible - 3:26:07).

23          THE COURT:  Well let's have -- well you'll have an

24   opportunity to redirect.  Go ahead.

25   BY MR. MARTIN:

1    Q    The pending question is whether you recall that

2    question -- those questions and answers?

3    A    I do.

4    Q    Okay.  Was the discussion with Fidelity about 105 cents

5    as the first lien make-whole number before EFIH started

6    negotiated with PIMCO on it's own about the 105?

7    A    Yes, I believe we came to closure with them before we

8    started negotiating with PIMCO.

9    Q    And that PIMCO negotiation started in late April 2014;

10   is that right?

11   A    Yes, that sounds right.

12   Q    And at the start of the discussion with PIMCO was 105

13   the initial proposal of the company for the EFIH first lien

14   note make-whole component of the settlement?

15   A    I was not in the negotiations, but I believe we started

16   lower, but ultimately PIMCO I think -- as I recall they

17   wanted an MFM and we had agreed to Fidelity at 105, so

18   effectively that would have gotten them the same 105 and

19   that's where we got to.

20   Q    Do you -- you had agreed with Fidelity at 105 and you

21   started with PIMCO at a lower number; is that correct?

22   A    I believe we did, yes, but I was not in those

23   negotiations.

24   Q    Okay.  Did you know at the time PIMCO held 6 and 7/8ths

25   notes?

1    A    Yes.

2    Q    And that was approximately 70 percent of the 6 and

3    7/8ths notes?

4    A    I don't recall the percentage, but that sounds about

5    right.

6    Q    It was more than half?

7    A    That sounds about right.

8    Q    Okay.  And did you know at the time that Fidelity had

9    6 and 7/8ths notes?

10   A    Yes.

11   Q    Do you recall whether PIMCO ever made any proposals to

12   you solely around the 105 retention premium settlement and

13   not including the DIP financing component?

14   A    I would -- I don't think I'd know that answer.

15   Q    Okay.  Do you recall whether the company ever made any

16   proposals that were just 105 without the financing component

17   or did they all always include the financing component?

18   A    I'm not sure I know that answer.

19   Q    And so you don't know whether PIMCO would have taken

20   the 105 for the 6-7/8ths without the backstop fee or the DIP

21   backstop funding fee as well?

22   A    Well, I can tell you our perspective.  Our perspective

23   was that because they owned a disproportionate amount of

24   these 6-7/8ths and we were paying them 105, we were trying

25   to get some additional value from them to effectively

1       compensate for the difference that you and Mr. Ying talked

2       about.

3               And the one billion four fifty backstop which

4       saved us 50 BPS that we would have had to have paid to

5       Deutsche Bank, we looked at that as being the quid pro quo

6       for keeping it 5 points in each and an appropriate way to

7       extract value and give PIMCO the 5 points on the 6-7/8ths.

8       Q    Was there a point, Mr. Keglevic, whether it was March

9       or April that the company had a full financing commitment

10      for the $5.4 billion entirely from a third party?

11      A    I'm sorry, can you give me the timeframe that you asked

12      me?

13      Q    Whether it was March or April towards the bankruptcy

14      filing?

15              THE COURT:  Can you repeat the question?  I'm

16      sorry.

17              MR. MARTIN:  Certainly, Your Honor.

18      BY MR. MARTIN:

19      Q    Mr. Keglevic, was there a time in say, March or April

20      and immediately prior to the bankruptcy filing where the

21      company had a full commitment for the $5.4 billion financing

22      from third parties, not settling parties?

23      A    I'm not exactly sure.  I believe the answer is yes.

24      Q    And has PIMCO historically been a common financing

25      source for the company?

1    A    We have -- I mean, as a whole -- we've done

2    transactions with PIMCO on the EFIH side, yes.  But I don't

3    know what you mean by common financing source.

4    Q    Let me ask this question, you recall when the company

5    issued the 6-7/8ths notes, I think that was in 2012; is that

6    correct?

7    A    Yes.

8    Q    And PIMCO owns, you testified a minute ago, maybe 70

9    percent of those notes?

10    A    Yes, sir.

11    Q    And were those just initially sold to PIMCO in that

12    offering, they were placed with them directly; do you

13    recall?

14    A    I don't recall if they were part of the initial book or

15    they accumulated, you know, more in the market.  My guess

16    was they were part of the initial book, but I'd have to go

17    back and double check.

18    Q    Would you ordinarily think in your role as CFO that if

19    you were doing a -- if a $5.4 billion financing was being

20    syndicated in the United States, that PIMCO would be one of

21    the potential lenders?

22    A    Sure.

23    Q    Now, I'd like to go back to the time when you were

24    negotiating with PIMCO as part of the group prior to the

25    time you were negotiating with them on their own.

1          When they were part of a group, did they ever

2     indicate that they would accept 105 for the redemption

3     premium settlement?

4     A     When I was in -- the meetings I attended, we did not

5     get into bid asks.

6     Q     Do you have any reason to believe that at that time

7     that they would have taken 105?

8     A     That's pure speculation on my part since we didn't

9     discuss it.

10    Q     Now, after PIMCO agreed to the backstop financing and

11    the 105, EFIH then decided to make the 105 offer to all the

12    first lien holders, correct?

13    A     Yes.

14    Q     Okay.  And was it your view that out of fairness you

15    would offer the same 105 to all 6-7/8ths holders?

16    A     Yes.

17    Q     Regardless of whether or not they were so-called,

18    anchor tenants, in your mind?

19    A     Yes.  We -- I recognized that we did not, you know,

20    that effectively there was a small group of the 6-7/8ths

21    that were not the -- were not PIMCO and were not WAMCO and

22    not Fidelity that effectively were getting a slightly higher

23    recovery without putting up the unique value that those

24    parties were.  But in the scheme of the overall settlement,

25    we still thought it was a fair offer and it was better to go

1    to the market with a one deal for all and giving everybody

2    in each class the same offer than to start differentiating.

3    Q    So the 105 was an appropriate settlement for EFIH for

4    all the 6-7/8ths bonds from the company's perspective that

5    was an appropriate level to settle the make-whole claims?

6    A    We thought that was a reasonable settlement offer, yes.

7    Q    Now, let's go back how you got into the -- I want to

8    back track again a little bit to how you got into the RSA in

9    the first instance.  Your plan was to make that offer to all

10   holders after Fidelity and PIMCO were brought in as, I think

11   your term is anchored tenants, that's correct?

12   A    Yes.  Generally speaking when we've done exchange

13   offers in the market before, I believe one of the success

14   factors if you get some of the big holders and some of the

15   holders with the right reputations to sign onto the deal in

16   advance of launching, which gives smaller holders and others

17   confidence that in fact the big holders did their job, they

18   evaluated it, they think it's fair and you get more

19   likelihood of a follow on than if you launch without having

20   anybody effectively, as I call it, an anchor tenant before

21   you launch.

22   Q    So you get those folks on board and you get momentum

23   and other folks follow along?

24   A    That's a good word for it.

25   Q    I'd like you to turn to tab 6 in the binder.

1    A    I don't have a binder.

2    Q    Oh, I'm sorry.

3         THE COURT:  He doesn't have a binder.

4         (Counsel Confer)

5    BY MR. MARTIN:

6    Q    I apologize.  Now, do you recall Mr. Keglevic, that

7    both the second lien trustee and the first lien trustee

8    filed motions earlier in this case seeking various relief --

9    excuse me -- seeking various relief in respect to the tender

10   offers?

11   A    Yes.

12   Q    And do you recognize this as the debtors' objection to

13   that motion by the first lien trustee?

14   A    I do.

15   Q    Okay.  And if you'd turn to page 20 and I think it's

16   paragraph 37.

17   A    Yes.

18   Q    If you could read the sentence for me allowed, it's

19   about in the middle of the paragraph starts at the end of a

20   line that says -- starts, "in any event" and please read

21   that sentence allowed.

22   A    In any event, Fidelity's identity should be irrelevant

23   to the considerations of a party deciding whether to settle

24   its own make-whole claim.

25   Q    Was the brief wrong?

1    A    I didn't write this.

2    Q    Sir, the 5 points above the 100 percent of principal is

3    consideration for the redemption premium settlement; is that

4    correct?

5    A    I'm sorry, could you rephrase?

6    Q    Certainly.  The 5 points above the 100 percent of

7    principal that is the 5 of the 105, the 5 is the

8    consideration for the redemption premium settlement; is that

9    correct?

10   A    Well it's 4 plus the 1 of OID is 5, yes.

11   Q    Okay.  And at the time you proposed the 105 number in

12   the tender, that this resulted in a lower percentage

13   recovery for the 10 percent notes than it did for the 6-

14   7/8ths notes; is that correct?

15   A    Yes.

16   Q    And in your roles as CFO and co-chief restructuring

17   officer, do you regularly track the trading prices of EFIH's

18   bonds?

19   A    Yes.

20   Q    About how often do you check?

21   A    It depends.  I don't have a routine schedule, but I

22   take note if it periodically.

23   Q    Okay.  Once a week, more than once a week?

24   A    It depends on the week.

25   Q    Okay.

1    A    Not as much recently.

2    Q    Okay.  But, let's go back to April 2014, the month

3    before the bankruptcy filing, do you know whether the

4    trading price of the 10 percent first lien EFIH notes ever

5    dropped to 105 or below during that month?

6    A    I don't recall.

7    Q    Do you have any knowledge that it was at any time in

8    April below -- at or below 105?

9    A    I don't have that knowledge.

10   Q    Are you aware that at any time in April -- strike the

11   question.

12           Are you aware whether at anytime from April 1st,

13   2014 to today whether that trading price has been above 105?

14   A    I'd like to have the information in front of me before

15   answering.  I haven't looked since petition.

16           MR. MARTIN:  One moment, Your Honor.

17           THE COURT:  Okay.

18           MR. MARTIN:  We'll come back to that, Your Honor.

19           THE COURT:  Thank you.

20   BY MR. MARTIN:

21   Q    In general the 6-7/8ths notes would have a lower

22   trading price than the 10 percent notes, is that right?

23   A    Yes.

24   Q    And that's because they have a lower coupon and they

25   also have a lower make-whole redemption premium alleged; is

1    that correct?

2    A    I don't want to speculate why the market prices

3    securities the way they do, but it has a lower interest rate

4    and it does have a lower make-whole claim.

5    Q    Are you aware of whether at anytime, the 6-7/8ths have

6    ever traded at 105?

7    A    I'd have to look again.  I don't recall.

8    Q    So, going back to the lower percentage recovery for the

9    tens than the 6-7/8ths, which you said you knew at the time,

10   was your primary justification for that differential

11   treatment that it was just simpler?

12   A    No.  I think I described it.  Simplicity was one of the

13   things we took note of.  Second, we thought the 10 percent

14   offer was fair.  Third, we thought we were getting -- even

15   though there was a slightly higher payment to the 6-7/8ths,

16   the majority of the group was giving us something else for

17   which we were happy to compensate them for.  And that the

18   minimal amount of the people that were riding the coat tails

19   without the extra value was not significant enough to

20   override and have us change the offer.

21        I'd also suggest that all the discussions we had

22   with the group that you asked me to talk about before, we

23   never had in any of those dialogues and discussions a

24   discussion of two separate settlements for two separate

25   tranches.  It just had never come up in all of the

1    discussions we had with that group prior to us launching the

2    exchange process.  So, that's the way we evaluated it from

3    my seat.

4    Q    But it was your testimony before that in fact those

5    discussions never got even to an exchange of potential

6    numbers; is that correct?

7    A    No.  But there were discussion of -- I'm just saying

8    there was never a suggestion that if we got in the numbers

9    we'd have to consider the two tranches separately.

10   Q    So, Mr. Keglevic I'm going to ask you to take a look at

11   the video and see if you remember the following question and

12   answer and it's 88 line 20 to 89, line 22.

13            MR. MCGANN:  Your Honor, this doesn't impeach his

14   testimony, but (indiscernible - 3:42:47)

15            THE COURT:  Well, if he gets to show it to him,

16   (indiscernible - 3:42:57).

17            MR. MARTIN:  You want me to show it, Your Honor?

18            THE COURT:  You going to play it?

19            MR. MARTIN:  Yes.  Go ahead.

20       (Audio Played)

21   Q    You mentioned that -- you mentioned the value that

22   PIMCO and Fidelity could bring in the reputations and et

23   cetera.  Is that the -- did you mention that because the

24   company's negotiation of the settlement now has one figure

25   applied to both sets of notes was consideration -- was a

1    benefit to those parties?

2    A    We thought 5 -- the 5 points was driven by simplicity.

3    We were aware that that resulted in a different make-whole

4    percentage for the groups that owned the 6-7/8ths.  And as

5    we thought about whether we should lower that amount or

6    whether we were still good with 5 given simplicity and the

7    value that these other parties brought -- and I'll speak

8    specifically to WAMCO or excuse me, PIMCO for a moment.

9    That billion four fifty backstop saved us 50 BPS.

10            So the fact that there was, you know, could be

11   considered a slightly higher settlement, we thought there

12   was good value associated with the overall agreement and

13   deal and instead of lowering the 6-7/8ths we agreed to keep

14   it at 5, recognizing the value and the fact that we --

15   typically a simple offer is always easier than a more

16   complicated one.

17       (Audio Stopped)

18   BY MR. MARTIN:

19   Q    And that was your testimony last Thursday?

20   A    That was.

21   Q    Okay.  Now, a disproportionate amount of the 6-7/8ths

22   have accepted the deal as compared to the holders of 10

23   percent notes; is that correct?

24   A    that's correct.

25   Q    Okay.  About 97 percent of the 6-7/8ths accepted; is

1    that correct?

2    A    It sounds about right.

3    Q    Okay.  And about 34 percent of the 10 percent holders

4    accepted; is that correct?

5    A    That sounds about right.

6    Q    And in terms of the tender are that you have to accept

7    both.  You can't just accept for your 6-7/8ths and not your

8    tens; is that correct?

9    A    Yes.

10   Q    Okay.  And the 34 percent that accepted in the tens is

11   comprised of Fidelity's 10 percent, PIMCO's 20 percent, plus

12   WAMCO and a few others; is that correct?

13   A    I believe the number on this schedule is that you're

14   getting to the net that we got 455 more in total beyond

15   those parties, across both series.

16   Q    But as compared to the overall amount of tens,

17   essentially the folks that have accepted are the vast --

18   excuse me.  Strike that, Your Honor.

19           The vast majority of the tens who have accepted

20   also have 6-7/8ths; is that correct, sir?

21   A    Yes, I think that's right.

22   Q    Have you ever evaluated the first lien settlement on a

23   standalone basis?

24   A    Yes.

25   Q    Isn't it true that at the time EFIH decided to proceed

1    with the first lien settlement by itself at the last

2    hearing, with the other components of the RSA delayed to

3    June 30, you have not done an evaluation of the merits of

4    the first lien settlement independently?

5    A    I'm not aware of that -- I'm not sure what -- could you

6    repeat that question?  I'm not sure what you're getting at.

7    Q    Certainly.  Isn't it true that at the time EFIH decided

8    to proceed with the first lien settlement by itself, which

9    was at the time of the last hearing --

10   A    Uh-huh.

11   Q    -- with the other components of the RSA delayed to June

12   30th that you have not done an evaluation of the merits of

13   the first lien settlement independently?

14   A    I don't know what the source of that was.  As I said,

15   we had in the negotiations with the parties, we had

16   determined that based on the amount of money EFIH had to

17   spend, the litigation risk we had, the benefits of allowing

18   them to roll up into the first lien DIP, in my mind that's

19   an evaluation of the benefits of the first lien offer.

20          So, I don't know what other analysis or benefits

21   that your statement refers to.  There may have been some,

22   but I -- as I testified, we had done that in advance as part

23   of the negotiations.

24          MR. MARTIN:  It's going to be page 78 line 5 to

25   page 79, line 21.

1          THE COURT:  You can go ahead and play it.

2      (Audio Played)

3  Q    I'm simply asking for you -- if you as a CFO were

4  evaluating the merits of various settlement proposals,

5  you -- I believe your testimony is that you made the

6  decision to settle the first lien -- to enter the first lien

7  settlement; correct?

8  A    Correct.

9  Q    So you're able to evaluate the merits of that

10  settlement, correct?

11  A    I am, yes.

12  Q    And what I'm asking you is, do you believe that you or

13  somebody in your shoes has the ability to evaluate the

14  merits of that first lien settlement independent of the

15  merits of anything else that the debtors put in their

16  settlement motion?

17          UNIDENTIFIED SPEAKER:  Object to speculation about

18  what other people in his shoes might do, but if you're

19  asking about his own judgment when he -- when he approved

20  this, fine.

21          THE WITNESS:  Those kind of decisions, since we're

22  talking not just about a finance matter, we're talking about

23  what to include in a motion and what not to include in a

24  motion, separations and the Court and impacts it may have on

25  other elements of the case, I would consult with counsel and

1    my team and make sure I have not done that and I would not

2    do that as the CFO by myself.

3            I rarely make decisions by myself as the CFO

4    without consulting different functional groups.  And in this

5    case, we're talking about a specific motion in a bankruptcy

6    court. I would get my co-CRO and our counsel involved before

7    I would answer that question.

8            I have just not thought through that hypothetical

9    and I'm not prepared to give an answer today without that

10   support.

11       (Audio Stopped)

12   BY MR. MARTIN:

13   Q    Now, was that your testimony last Thursday?

14   A    It was.

15   Q    Okay.  And that was after the decision had been made to

16   proceed with the first lien settlement on its own?

17   A    It was after.

18   Q    Okay.  Changing topics, sir, and going to something you

19   mentioned before, the most favored nations clause.  Isn't it

20   true that the most favored nations clause protection is not

21   available to any holder other than PIMCO and Fidelity?

22   A    I believe that's correct.

23   Q    And it's also true that no other holder, besides PIMCO

24   and Fidelity were offered the opportunity to participate in

25   those funding fees that they're getting for the portion of

1    the backstop fee fund; is that correct?

2    A    No.  Nobody else was restrict -- or in a position for

3    us to have that negotiation with, so nobody else has that

4    opportunity.

5    Q    I'd like to direct your attention now, so I'm going to

6    talk about the tender offer itself.  I'd like to direct you

7    to tab 2 of the binder, please.  Is this the information

8    memorandum, which was the tender offer document circulated

9    to holders to get -- to seek their entry into the 105

10   settlement?

11   A    Yes, that's Exhibit A.

12   Q    And you reviewed and approved this document before it

13   was released?

14   A    Yes.

15   Q    And the first lien tender offer had a so-called ten day

16   step down period; is that right?

17   A    That's right.

18   Q    And after that 10 day early tender period, the

19   settlement offer reduced from 105 to 103 and 1/4; is that

20   correct?

21   A    Yes.

22   Q    Okay.  So that step-down reflects a 35 percent

23   reduction in the amount being offered for the make-whole

24   component; is that right?

25   A    That's right.

1    Q    Now, in the information memorandum, the debtors did not

2    set forth the calculations of the proposed redemption

3    premium settlement; is that right?

4            MR. MCGANN:  Objection.  Not relevant.

5    (Indiscernible - 3:52:02)

6            MR. MARTIN:  I'll rephrase it, Your Honor.

7            THE COURT:  Can you move the mic a little, just

8    point it a little more towards counsel?  Okay.  That's fine.

9    That's good.

10           MR. MARTIN:  I'll withdraw the question, Your

11   Honor.

12           THE COURT:  All right.

13           MR. MARTIN:  I'll ask it again.  I think I -- he's

14   not answering directly.  I'll ask it again a different way.

15   BY MR. MARTIN:

16   Q    The information memorandum didn't include calculations

17   of what holders might assert the make-whole premium to be;

18   is that correct?

19   A    I believe that's correct.

20   Q    And it did not include calculations showing what

21   percentage of the asserted amount, whether it's the amount

22   the company calculated, Mr. Ying's 52 percent or Mr. Kerns'

23   62 percent, it didn't show those calculations either, did

24   it?

25   A    It did not.

1    Q    And the debtors did not disclosure in the information

2    memorandum that the 10 percent notes were receiving less

3    than half the amount of consideration for the redemption

4    premium settlement as a percentage of the asserted make-

5    whole as compared to the 6-7/8ths notes, did it?

6    A    No, it did not.

7    Q    Okay.  There was no disclosure as to the amount of 6-

8    7/8ths held by parties to the RSA, those so-called anchor

9    tenants; is that correct?

10   A    That's correct.

11   Q    Okay.  Nor does the information memorandum disclose

12   that the 105 settlement was negotiated as part of a global

13   deal by Fidelity that addressed all of their positions in

14   the capital structure; isn't that correct?

15   A    That's correct.

16   Q    Okay.  The information memorandum does not disclose

17   that the very parties who negotiated the 105 also negotiated

18   a most favored nations clause that is not available to

19   parties joining a tender; isn't that correct?

20   A    I believe that's correct.

21   Q    There was no disclose in the information memorandum as

22   to the amount of the backstop fees or the so-called funding

23   fees payable to PIMCO or Fidelity; isn't that correct?

24   A    Well, they didn't get paid for the backstop, but they

25   got a funding fee if, you know, 1.75 just like every other

1    holder would have if they rolled into the first lien DIP.

2    That was the value of the billion four fifty.  We didn't pay

3    them a backstop fee.

4            We would have had to have paid the bank, --

5    Deutsche Bank 50 BPs and both WAMCO and PIMCO provided us

6    that backstop without any fees.

7            So the only fees that were received were the 1.75,

8    which was encompassed in the 105 that every holder would

9    have gotten if they rolled into the first lien DIP.

10   Q    Are you saying that other holders would have gotten 105

11   plus the 175 basis points?

12   A    No, the 105 included the 175 basis points.

13   Q    But they're getting 175 basis points on the new money;

14   isn't that correct?

15   A    Every holder gets the roll up piece would have gotten

16   175.  PIMCO and WAMCO got -- who are putting up new money,

17   175 as well.

18   Q    The information memorandum also doesn't discuss the

19   rights of holders of first lien notes under the applicable

20   collateral trust agreement or the inter-creditor agreement

21   as people refer to it; is that correct?

22   A    I don't recall that specific provision.  I don't think

23   it does, but I don't recall.

24   Q    Isn't it true that nowhere in the information

25   memorandum is the term EFIH first lien settlement even

1    defined?  If you'd like to take a moment, you can look.

2    A    I'll accept subject to check.

3         MR. MARTIN:  I have no further questions, Your

4    Honor.

5         MR. MCGANN:  May I proceed, Your Honor?

6         THE COURT:  Yes.

7              REDIRECT EXAMINATION

8    BY MR. MCGANN:

9    Q    Mr. Keglevic, you were asked some questions about a

10   settlement involving tax sharing payments from Encore to EFH

11   and EFIH, do you remember that?

12   A    Yes.

13   Q    And you're aware that that's not relief that the

14   debtors are seeking here today in this motion, correct?

15   A    Correct.

16   Q    You were asked whether Fidelity would have accepted the

17   proposed settlement offer here today, absent the other

18   transactions it was agreeing to enter into with the debtors

19   that are described in the RSA; do you recall that?

20   A    I do.

21   Q    And as I recall, your testimony was you don't know

22   whether they would have accepted it.

23   A    I do not.

24   Q    Let me ask you, the debtors are prepared to accept that

25   settlement because they've made the proposal on a standalone

1    basis, true?

2    A    Yes.  It's not linked to the RSA.

3    Q    Why is that?

4    A    Because we think, for the reasons I've stated before,

5    the interest savings, the elimination of litigation risk,

6    the ability to roll them into the first lien DIP to reduce

7    fees there, all provide value to the estate.

8    Q    You were asked some questions about when you came to

9    that determination and do you recall that your attention was

10   drawn to a long question and a long answer in your

11   deposition from last week, correct?

12   A    I do.

13   Q    And you were describing -- and I'm just going to do

14   this to go quickly -- you were describing how you would

15   consult with counsel about decisions, whether to separate

16   motions and when to bring motions on with respect to

17   procedures in the Court.  Do you recall generally that your

18   testimony was about that?

19   A    Yes.

20   Q    All right.  And when you talk about evaluating the

21   wisdom or lack of wisdom of seeking approval of this motion

22   today, rather than in conjunction of any other aspect of the

23   RSA; is that what you were referring to?

24   A    No.  That was -- that question embodied, if I recall,

25   the ability to separate certain things from certain motions

1    in front of the Court and that's why I didn't want to make a

2    legal determination or, you know, evaluate what the Court

3    could or could not do.  That was, at least, my

4    interpretation of that question and why at the end of my

5    response, I referred to my legal counsel, et cetera.

6    Q    Okay.  So let me then for purposes of my question,

7    because I want to come back to that topic briefly.  Let me

8    separate out bankruptcy court procedure, when particular

9    motions get filed and jut focus on the economics of the

10   proposed make-whole settlement.  Okay?

11          Did you at any time consider this anything but a

12   reasonable settlement on a standalone basis for the debtors?

13   A    I always believed it was reasonable basis.  I had input

14   from Mr. Ying.  I discussed this with my EFH board, my EFIH

15   board.  We discussed the economics of the settlement with

16   EFIH PIK unsecured notes and I did the analysis that I

17   talked about.

18          So, yes we absolutely looked at this.  And in

19   fact, we had considered this proposal before -- in

20   September/October, we were going with a similar approach if

21   we had been successful in getting the deal we originally

22   referred to as Olympus, which was to keep the company

23   together deal and that's why we were negotiating with the

24   first liens way back then.

25          So, we always thought saving the interest and then

1    ultimately refining that to have them roll up to the DIP,

2    which came later, were positives and was a good business

3    judgment for the estate.  And I had many discussions with

4    the parties that I discussed about this.

5    Q    You were also asked at the very end of the examination,

6    you were asked some questions about the information

7    memorandum that's part of the settlement, right?

8    A    Yes.

9    Q    And one of the questions you were asked was, whether in

10   the information memorandum the company calculated

11   noteholders' make-whole claims; do you recall that question?

12   A    Yes.

13   Q    And I think your answer was it did not calculate for

14   the holders of notes what their make-whole claims may or may

15   not be, right?

16   A    Right.

17   Q    Has anyone contacted the company since the tender was

18   launched to ask for further information about what their

19   claims against the company might be on account of their own

20   view of the make-whole?

21   A    No.  And in fact, the meetings we had with the

22   clientele in September they told us what the make-whole

23   calculation was and they knew exactly what the claims were

24   and, you know, these are qualified institutional banks.

25   Q    What does that mean when you say qualified --

1    A    That means they can enter into financial transactions

2    that aren't publicly available to other people.  And that

3    means they are sophisticated institutional investors that

4    have the ability to take riskier transactions than a common

5    person who is not a qualified institutional bank.

6         At least that's my general understanding.  I'm

7    sure there's more to it, but they are big institutions,

8    sophisticated, represented by counsel.

9         We haven't had a phone call about the offering

10   memorandum from accepting -- somebody who accepted the

11   settlement, somebody who didn't accept the settlement and I

12   don't -- I had no doubt in my mind in September, that the

13   parties we were talking to when we were talking about the

14   initial meetings both in September and February that I went

15   through that the size of the make-whole was absolutely

16   discussed.  So I'm a little surprised that that would be a

17   concern of that group.

18   Q    You were also asked in that regard, a series of

19   questions about other aspects of transactions that the

20   debtors proposed to enter into that involved Fidelity.  Do

21   you remember that generally?

22   A    Yes.

23   Q    And whether aspects of those other transactions were

24   disclosed in the information memorandum; do you remember

25   that?

1   A    I do.

2   Q    Is the restructuring support agreement something that's

3   referred to and discussed in the information memorandum?

4   A    I believe so.

5   Q    And does the restructuring support agreement, or

6   proposed restructuring support agreement disclose the

7   transactions that are proposed by the debtors to be entered

8   into with Fidelity across all tranches of its participation

9   in the capital structure?

10  A    Yes, it does.

11  Q    Has anyone contacted you, any of these qualified

12  institutional buyers or their lawyers to say they don't know

13  what the RSA is or where to find it in the Court's docket or

14  from the debtor?

15  A    No.  And I know that the offering memorandum was, you

16  know, hard copy went to all the holders.

17  Q    Okay.  Thank you.

18          MR. MCGANN:  That's all I have, Your Honor.

19          THE COURT:  Okay.  Thank you, Mr. Keglevic.

20          MR. MARTIN:  Can I ask two brief questions on

21  (indiscernible - 4:02:50) redirect?

22          THE COURT:  Yes.

23          MR. MARTIN:  I'm going to make it one, Your Honor.

24                    RECROSS-EXAMINATION

25  BY MR. MARTIN:

1    Q    Mr. Keglevic, the 6-7/8ths holders get the 62 percent

2    regardless of whether they hold any 10 percent bonds; isn't

3    that correct?

4             MR. MCGANN:  Your Honor, this is beyond the scope

5    of redirect.

6             THE COURT:  How is this beyond the scope or how is

7    this within the scope of redirect?

8             MR. MARTIN:  I recalled him asking about the

9    differential treatment, but I'll withdraw the question, Your

10   Honor.

11            THE COURT:  All right.  Thank you.  All right.

12   You can step down, sir.

13            THE WITNESS:  Thank you.

14            MR. MCGANN:  Your Honor, that concludes the

15   evidence from the debtors.  And with Your Honor's

16   permission, may we excuse Mr. Keglevic?

17            THE COURT:  Any opposition?

18            MR. MARTIN:  I have no objection.

19            THE COURT:  Very good.

20            MR. MCGANN:  Appreciate it, thank you.

21       (Pause)

22            MR. MCGANN:  Your Honor --

23            THE COURT:  I think on the evidence, I'm sorry,

24   were there any documents you wanted to include into

25   evidence?

1          MR. MCGANN:  Oh, I'm sorry if I wasn't clear.  No,

2     that concludes the evidence from the debtors.

3          THE COURT:  Okay.  I just wanted to make sure,

4     thank you.

5          MR. MCGANN:  Yeah, thank you.

6          MR. MARTIN:  I think the only additional thing

7     from the trustee, Your Honor, is maybe just argument about

8     whether the SEC letters come in.  We're not intending to

9     call any other witnesses.  Mr. Kearnes' (ph) affidavit is

10    in.  They're welcome to cross him.  I don't know, do you

11    intend to cross Mr. Kearnes?

12         MR. MCGANN:  No, Your Honor.

13         THE COURT:  Okay.

14         MR. MARTIN:  I'm happy talking about the SEC

15    letters, and I don't think this will take very long, Your

16    Honor.

17         THE COURT:  Okay.  Go ahead.  Tell me -- wait a

18    minute, let me get it in familiar.  Exhibit 15 --

19         MR. MARTIN:  Tab 15, Exhibits B, C and D, Your

20    Honor.

21         THE COURT:  All right.

22         MR. MARTIN:  I've got three copies if you just

23    want to --

24         THE COURT:  That's okay, I've got it right here.

25    The less I have up here, the better.

1          Okay.  Go ahead.

2          MR. MARTIN:  Your Honor, let me start with first

3   of all, I don't think is an evidentiary question.  I'll talk

4   about it as an evidentiary question in a moment, but we

5   cited these as legal authority, they're available on the

6   SEC's website.  The weights of that legal authority is fair

7   for the other side to dispute and argue about it and the

8   Court to consider, but these are statements by people at a

9   government agency, you know, discussing points of what they

10  think is appropriate and not, and it's legal authority.

11  It's like an SEC no action letter, these are comment

12  letters.

13          So in the first instance, we've cited them the way

14  we did cite them just as legal authority.  But to the extent

15  the framework is instead evidence, just very briefly four

16  points.

17          One, they're not hearsay.  We're offering them not

18  for the question of whether the tendered offers discussed in

19  those letters were illusory because they could be withdrawn

20  at any time, but for the statement of the SEC staff people,

21  that they were concerned about illusory tender offers.

22          So they're not being offered for the truth of the

23  statement in the letter itself.  Even beyond that if they

24  are hearsay, if the Court were to determine that's not

25  correct, they are business records, they are public records.

1           And lastly, from discussions with Mr. McGann

2     because we talked about this issue beforehand to see if we

3     could work it out, I understand that they also object

4     because you can't tell from these what happened and what the

5     underlying tendered terms were.  These are public companies

6     seeking to do tender offers, they can check that out.  They

7     have that, and they can go check.

8           We're simply making the point that this is a

9     concern of the securities regulators.  And I would offer --

10    just one moment, Your Honor.  Just so the record's complete,

11    and I have provided Mr. McGann a copy of this, a case from

12    the district court in the Western District of Pennsylvania.

13    It is Option Resource Group against Chambers Development

14    Company, 967 F.Supp. 846, that's 967 F.Supp. 846 for the

15    proposition that statements like this from the SEC are

16    admissible hearsay within those exceptions.

17          Unless you have questions, Your Honor, that's it.

18          MR. MCGANN:  Andrew McGann for the debtors, Your

19    Honor.  These are inadmissible.  They are -- they have been

20    offered for the truth of the content, in fact, the comments

21    revealed that.  They're cited in their objection to

22    demonstrate a position that they allege the SEC takes.

23          And comments from counsel were that they believed

24    this reflects an SEC viewpoint on the lusory (ph) tender

25    offers.  The only way to find that out is to read the

1    content of an out of court statement.

2          The mere fact that these things were said whatever

3    they say to people to an in-house lawyer at Google three or

4    four years ago has no relevance in this dispute.  It has no

5    independent significance.  Who cares what the SEC said to

6    Google.

7          The question is, what is the SEC's legal position

8    on these tender offers.  They can cite case law, they can

9    cite regulation, we've had briefing.  That's how the legal

10   issue is determined.

11         If they want to prove that the SEC takes a

12   particular position on tendered offers, they need to do it

13   in a non-hearsay fashion, or they need to cite genuine

14   sources of law.  These are letters from staff attorneys in

15   the Division of Finance.  And if you read the letters, Your

16   Honor mentioned you had, these are midcourse discussions

17   about tender offers.  So we don't know how this turned out.

18         I don't have a burden to come in and research what

19   happened here, they do.  If they're going to claim that

20   something happened with respect to a Google tender offer, or

21   scientific games tender offer, I don't even know if these

22   tender offers were even launched, nor does the Court.  And

23   that's what's unfair here.

24         How in the world can you rely on this, Your Honor,

25   for -- and to draw conclusions about what the securities

1    laws say, when you don't even know if this was in a Chapter

2    11 setting.  I don't believe it was.  Nothing about these

3    letters indicates it was.

4              THE COURT:  Google in Chapter 11 I'm a little

5    surprised.

6              MR. MCGANN:  Right, well, there you go.  We're all

7    guessing here as to what happened.

8              The case counsel cited really makes our point.  If

9    you look at --

10             THE COURT:  You don't need to say anymore.

11             MR. MCGANN:  Okay.

12             THE COURT:  I'm not going to admit them.  I think

13   they're hearsay and to the extent they're not hearsay, I

14   don't agree that the exceptions are applicable, so I'm

15   denying the motion -- denying entering them into evidence,

16   sustain the objection.  There we go.

17             Anything else?

18             MR. MARTIN:  Just for the record, Your Honor,

19   nothing further from the 10 percent trustee.

20             THE COURT:  All right.  I guess we can go into

21   argument then.

22             MR. HESSLER:  Thank you, Your Honor.  For the

23   record, Steve Hessler of Kirkland & Ellis, proposed counsel

24   to the debtors.

25             Your Honor, I'm going to be very brief in closing.

1    There's a very strange disconnect it seems to the first lien

2    trustee's case.  Their clients opposed the settlement, they

3    don't have to settle, and there's no prejudice to them if

4    the settlement's approved.

5              They (indiscernible) 42 percent of the first lien

6    noteholders that are not their clients.  They support the

7    settlement.  They want to be cashed out on their make-whole

8    claim at the price offered.  And they are the losers here if

9    the settlement's denied.

10             So (indiscernible) Court that the first lien

11   trustee is trying to defeat a settlement on behalf of

12   parties that are not their clients to the detriment of

13   parties that are not their clients with no discernible

14   benefit to their clients.

15             And so why are they doing that?  The only obvious

16   reason that we can think of is they're looking for leverage.

17   They're looking for litigation leverage to potentially

18   negotiate a higher make-whole settlement for their clients.

19   That's their prerogative to do so, but that is not the

20   settlement that's before the Court today.  That's a

21   litigation that's going to take place this fall or

22   potentially a settlement in advance of that, but that's not

23   what we're here on today.

24             Here's what is at issue in this motion, a

25   settlement that's before the Court that is to be evaluated

1    under the governing legal standard of Bankruptcy Rule 9019

2    which requires the debtors to prove the proposed transaction

3    is a reasonable exercise of their business judgment.

4         Extensive testimony from Mr. Ying and Mr. Keglevic

5    established, we believe three things quite clearly.  There

6    are hundreds of millions of dollars in interest savings to

7    be obtained by approving the settlement, that's one.

8         Two, approving the settlement facilitates the $5.4

9    billion DIP that was preliminary approved earlier today at

10   better than market rates.

11        Three, approving this settlement allows the

12   debtors to take a critical early step towards a successful

13   restructuring.  Everybody is very aware this is an enormous

14   case.  There are a huge number of very complicated issues,

15   the sooner we can start solving them one at a time, it's

16   going to be the benefit of everyone involved, and it's

17   certainly going to be to the benefit of the estate when we

18   can get off $170 million of interest expense over the next

19   12 months.  So that is what is before the Court.

20        Your Honor, we don't believe that any of the

21   evidence that we put forward was contradicted by anything

22   that has come in this hearing from the first lien trustee.

23   They have not contradicted any of the evidence that supports

24   the decision by the debtors to enter into the settlement.

25        Likewise, we don't think that the first lien

1    trustee has offered any evidence of its own that impugns the

2    debtors' decision to pursue this settlement.

3            So given that sort of disconnect, Your Honor, as

4    to the motion that's before the Court, and the evidence that

5    is before the Court, I need to otherwise reserve our rights

6    to potentially argue on rebuttal once we have an opportunity

7    to hear the first lien trustee's view of the evidence before

8    the Court and their arguments against the settlement.

9            THE COURT:  Okay.

10           MR. WOFFARD:  Your Honor, again, thank you, Keith

11   Wofford from Ropes & Gray on behalf of CSC.

12           Much of the debtors' time and argument has been

13   spent on the question of motivations.  And let me step back

14   a little bit and talk about the legal standard.  The legal

15   standard correctly with respect to settlements involves the

16   bilateral transaction between the debtors and settlement

17   parties.

18           We agree with that and we also agree because we

19   think the debtors owe all of the money, a hundred cents,

20   that it is not surprising that they come forward and say

21   that 60 cents or 55 cents or 62 cents is a good deal for

22   them.  That's not the controversial part, Your Honor.

23           The controversial part is that we believe the

24   settlement standard involves more than that, not just the

25   bilateral discussion between the debtor and the settling

1    parties, but third parties as well, at least in settlements

2    like this.  So allow me to talk a little bit what is and

3    what is not, in our legal view, allowed in preplanned

4    settlements.

5            In order to properly interpret the precedence,

6    Your Honor, we need to discuss the breadth of the word

7    settlement.  Because the different scope of what may be in

8    what is labeled a settlement drives the appropriate approach

9    to weighing whether a settlement should be approved.

10           So in our view, there are two categories of what

11   you could call a settlement.  The first is simply an

12   agreement on the amount of a claim.  Okay.  Leaving for

13   later in the case the issue of during the plan process, how

14   the allowed claim is treated, and how that's ultimately

15   paid.

16           The second type of settlement includes both an

17   allowance of a claim, and provides for its treatment and may

18   even provide for the distribution on that claim.  An actual

19   distribution that would, in fact, remove the prepetition

20   claim from the bankruptcy case entirely.

21           So when you have this lateral type of settlements,

22   that type of settlement raises a greater concern with

23   respect to fairness to non-settling creditors.  They raise

24   greater needs for notice, greater needs for disclosure and

25   opportunity to object, and they present the greatest

1      potential, Your Honor, for altering the statutory rules of

2      bankruptcy equality and treatment of priority.

3              So the settlement we have here is that latter

4      type.  It provides for a treatment on the make-whole claim,

5      and a distribution of a new debt security in exchange for

6      that claim, which removes the claim from the case.

7              Now, the Third Circuit has not weighed in directly

8      on the issue that is exactly this type of settlement, you

9      know, that -- but this type of settlement is something the

10     Fifth Circuit and Aweco (ph) and the Second Circuit in

11     Iridium applied additional scrutiny in those cases.  And

12     both those cases, those circuit courts remanded and vacated

13     the settlement approval by lower courts.

14             So I know the debtors said a lot about us ignoring

15     the legal standard, but the fact of the matter is, there is

16     a broader standard with settlements like this, that they've

17     completely ignored, the Iridium approach and the Aweco

18     approach to settlements.

19             So that brings us to the answer to the question of

20     why do we care, because the inquiry here is broader than

21     does the debtor save money.  We don't dispute it, because we

22     think they owe us all the money.

23             So now, the debtors have two main contentions.

24     The first is that we, as trustee, acting on behalf of a

25     group of 10 percent holders, who voluntarily quote/unquote

1    refused the offer shouldn't care.

2           The second contention of the debtors is that so

3    long as the settlement is not in a plan of reorganization,

4    or cannot be proven to be a sub rosa plan, the debtors can

5    make any offer that they please.  We disagree with both of

6    these.

7           The first problem is that the debtors' offer was

8    admittedly discriminatory, the debtors have gone through and

9    said that pretty clearly in their testimony.  There is no

10   dispute of substance between Mr. Ying's calculation of the

11   redemption premium under the two indentures and Mr.

12   Current's (ph) calculation under the applicable premium.

13          At some points, you know, through this case,

14   repeatedly since the first day, they've referred to the

15   settlement as 105, we referred to it as 105, today they

16   refer 104, 4 plus 1, the fact of the matter is,

17   notwithstanding some dates and calculation noise, we have

18   substantive agreement that the make-whole premium on the 10

19   percent notes is much bigger than the make-whole premium on

20   the 6 and 7/8ths percent notes, and they're paying the same

21   amount of percentage recovery, or pardon me, the same amount

22   of cash on the dollar on both, which nets a much greater

23   recovery on the 6 and 7/8ths claims.

24          Now, the debtors and all the case law they cite,

25   point to no case allowing such a divergent classified offer

1    of treatment to claims based on identical legal rights.

2           Our issue is that they simply offered the 62 and a

3    half cent settlement to every 6 and 7/8ths percent

4    bondholder, and thinks they are clearly willing to support

5    that settlement going to any bondholder in that group, and

6    they support it as a fair and valid reasonable treatment of

7    the make-whole claim, but that offer should be made to all

8    holders, the first lien debt; unless the debtors can

9    demonstrate under the Iridium standard that the difference

10   in treatment is both minor and that other factors weighed

11   heavily in favor of the departure from parity.

12          Of course, the debtors cannot and have not shown

13   this because the divergence is not minor, it's virtually

14   double, depending on whose math you decide to use, but in

15   either case, it's a dramatic divergence.

16          So there's no dispute here that what the debtors

17   seek is a treatment of claims.  Not only are the liquidation

18   damages' claims undisputed, Your Honor, the settlement

19   provides for a most favored nation status for certain first

20   lien holders.

21          What that means, and I think you're familiar with

22   this, Your Honor, is that if the debtors settle a make-whole

23   claim with another non-RSA holder, there's an improvement in

24   the RSA holder settlement to match.  So, again, not a claim

25   settlement, that's a treatment and they didn't protect the

1    treatment vis-à-vis others in the class.

2              I call your attention to the order that's been

3    handed up, not handed up, forgive me, that was filed in the

4    docket at Docket No. 730, and you'll see at the end of that

5    order in the summary of terms, the reference to the most

6    favored nation plus, which I was just referring in case you

7    wanted to look back at it.

8              The difference in offers (indiscernible) between

9    these two, we believe between these two classes, in terms of

10   the settlement percentage being offered because it's so

11   dramatic is enough for it to be denied by the Court.

12             Now, the debtor sort of blow past this, and they

13   say we have reasons to do it, and you know, what, it's okay

14   to just differentiate, and why do we care.  So look, here's

15   the problem.

16             Under the debtors' reading of the precedence, they

17   say Iridium doesn't apply, they say it's only the bilateral

18   standard and Martin McMatters (ph).  But if you read

19   literally their reading of their precedence, the debtors

20   literally can say the following.

21             We hereby offer holders of bonds with last names

22   beginning with the letters A through L 90 cents on the

23   dollar, and we offer all holders of last names beginning

24   with M through Z 10 cents on the dollar.  And if these

25   (indiscernible) offers are outside the plan, any difference

1    is justified, and those who receive the lesser offer, even

2    if they have the same claim have no grounds to object,

3    because they didn't take the offer.  We simply disagree that

4    that is the law.

5            Beyond the clear differences in the offer

6    treatment, the trustee objects to the debtors' ability to

7    disclose the difference in offers.  We've talked about that

8    extensively, and we'll talk about it a little bit more when

9    we talk about the securities law issues.

10           This problem, the objective problem, and the first

11   prong of the unequal treatment issue, Your Honor, but

12   there's a second problem, which is that although the debtors

13   have admitted that they believe 62 and a half cents is an

14   appropriate first lien make-whole treatment, the actual

15   number for purposes of measuring treatment to those left out

16   may be even higher.

17           That is, as we detailed in our papers, there are

18   additional buckets of consideration that go to the RSA and

19   to no other holders.  And I know they say the back stop fees

20   are a gift from, you know, our most sophisticated financial

21   institutions, but we simply don't believe it.  We think that

22   they're very smart, they act in their own interest, and

23   they're lending new money to make money, and to say it is a

24   gift rather than a detriment that they exchange for, you

25   know, higher consideration on another bond, we simply think

1    Your Honor should take that for what it is.  Which is a post

2    hope rationale for what was done.

3            The fact of the matter is, we would presume that

4    the negotiating parties in the RSA side, negotiated multiple

5    buckets of consideration for themselves, each of which has

6    independent value.  Okay.

7            So while the debtors maintain these other buckets

8    constitute separate consideration, at a minimum, the debtors

9    should've presented the holders and the Court on an apples-

10   to-apples basis what the first lien treatment would've been,

11   or perhaps actually is, if those other forms of

12   consideration had been allocated the make-whole statement

13   rather than elsewhere, as there's no way to tell what

14   quote/unquote should be in what bucket.

15           We all know from the testimony that was adduced

16   today that each of the creditors in the RSA had different

17   pockets.  Certain pockets they had a greater proportion of

18   the bonds in question, and therefore, greater -- a lesser

19   need to share with others, if consideration were allocated

20   to those buckets.

21           Conversely, in there -- where there were buckets

22   where they had lesser participation vis-à-vis other holders,

23   they had less incentive to allocate consideration of those

24   buckets.  It's simple math and everyone knows it.

25           So this brings us to the third problem of the

1    equal treatment problem, which is that the equal treatment

2    between these two bonds was not arbitrary, and it was not a

3    random act by the debtors, and they've admitted as much.  In

4    fact, it was motivated by desire to gain support for those

5    identified RSA bondholders.

6            The purpose in structuring the treatment, it

7    wasn't just an objective difference that happened out of

8    happenstance, but the actual purpose and structuring the

9    treatment difference is another ground to reject the entire

10   settlement based on the unequal treatment.

11           Three facts in our view are undisputed, Your

12   Honor.  First, that 75 percent of the bonds getting the

13   better treatment were owned by RSA holders.  Everybody

14   admits that.

15           The second fact that's undisputed, Your Honor, is

16   that debtors ignored this ownership concentration when they

17   agreed to the settlement.  Now, they say perhaps they

18   weren't focused on it, but certainly they knew about it when

19   folks signed, and you know, they knew, we believe, about the

20   involvement of those holders in those bonds.

21           So the third undisputed piece is that the debtor

22   didn't disclose those two facts in their tendered offer

23   materials.  So they had a group of bonds getting better

24   treatment who were at the table, you know, they knew that

25   those people were getting the better deal and they didn't

1    tell anybody.

2            Okay.  So what is subject to date and what is now

3    undisputed, Your Honor, is why the debtors gave the better

4    offer to some but not to all.  Clearly the debtors think

5    that better offer is justified under the merits, that's why

6    they swore under oath that they were comfortable giving to

7    everybody.

8            But the debtors think the better offer is

9    justified, the question is, they want to know why the

10   testimony says that they did this.  Well, the testimony was

11   pretty clear why it was structured that way.  They gave the

12   better offer to the RSA parties and the small subset of

13   others, because among other reasons, they wanted the de

14   facto endorsement of those parties and the reputation of the

15   RSA holders to gain quote/unquote momentum for the lesser

16   offer, and to get other holders to follow on.

17           That is, you know, when Mr. Keglevic was

18   questioned about, you know, nobody to -- what is --

19   attorneys' papers said, nobody should care what Fidelity

20   gets, you know, which was in response to our earlier

21   objection where we said well what about, you know, this

22   consideration going to these other parties, and that it was

23   an intent to bring people along and stampede them and sort

24   of influence them as the pied piper.  We wrote that in our

25   first objection.

1          The debtor said, people look in their own pocket,

2     it's not irrelevant, but don't worry, Mr. Keglevic's

3     testimony today he said, I didn't write that, which was a

4     pretty clear repudiation and it was directly in

5     contradiction with his own testimony.

6          So although again I'm sure they will debate the

7     characterizations, it's pretty clear to us why they did what

8     they did, and that's part of the source of the unequal

9     treatment, and we think as far as reviewing the settlement

10    impugns the ability to approve the settlement in that

11    unequal treatment.

12         So before we get off of unequal treatment, there

13    are a couple of arguments in the citations of the debtors

14    that do merit response.

15         The first argument is that the deviation in the

16    offers from the equal treatment is insignificant.  Here the

17    bond issue in question, although the numbers in this case

18    are astronomical, the bond issue in question, the 6 and

19    7/8ths bonds is a $500 million, that is a half a billion

20    dollar bond issue.

21         And dictating the treatment of a class that size

22    is not de minimus.  Second, the three and a half billion

23    dollars of other bonds are the ones who failed to receive

24    that offer.  That is, in our view of the world, it's a class

25    treatment, you have to offer it to everybody else, you have

1    basically three and a half billion dollars of bonds who are

2    left out.

3              Now, the debtors may say they wouldn't have given

4    that offer, that's fine, but the fact of the matter is, the

5    offer they did give is unequal and that's what we think is

6    not permitted.

7              The debtors admit to the discrimination here that

8    have been alleged.  What they really are saying is that it's

9    clearly discriminated, but it's justified because of

10   savings.  But under Iridium, what we're saying here is the

11   higher scrutiny, the third party scrutiny incorporates the

12   unfair discrimination test, and that test is not dependent

13   upon whether the debtors can save money as part of the

14   discrimination.  And it's not a defense, and I know defense

15   is a little bit of a pejorative term, but the fact of the

16   matter, it simply is not legal justification.

17             It's legal justification under the Martin factors,

18   under the binary factors between debtor and settling

19   creditor, but it's not part of the factors of unfair

20   discrimination and doesn't excuse it.

21             Second, the cases cited by the debtors don't

22   justify these differential offers.  The most relevant cases

23   cited by the debtors is the Dana (ph) case from the Second

24   Circuit.

25             And the key difference of our case from Dana,

1    which has some rather -- it sounds pretty close to on point,

2    and in some ways may be influential to you, Your Honor, is

3    that the Dana case concerned a settlement respect to the

4    claim amounts awarded to asbestos claims.  Okay.

5            Settlements over amounts of claim of tort claim

6    are chiefly concerned with whether the debtor is liable, the

7    degree of injury, perhaps even contributory acts to the

8    plaintiff or other parties.  But there is simply no

9    similarity of tort claimants, one to another, that is akin

10   to the similarity among holders of bonds in a single or a

11   pair of bond issues.

12           And because of that lack of similarity, although

13   they invoke Dana as a precedent, it's clear that when the

14   courts are looking at that type of settlement, meaning a

15   Dana court-claimant type of settlement, that's much more

16   binary, and the debtors, of course, must be afforded a

17   greater flexibility in arriving at that settlement, and

18   perhaps not be subject to so much scrutiny.

19           So it's obvious why that was different, Your

20   Honor, and shouldn't be binding in this case.

21           The other thing is that in Dana, the plan

22   treatment for the claims was considered separately from the

23   settlement.  The other case cited by the debtors was

24   Columbia Gas.

25           Similarly, that was a settlement that didn't

1    dictate a plan treatment.  And in that case, the objectors

2    only raised a potential discrimination issue because of lack

3    of information.

4           Here we have both a proven and actual

5    discrimination issue together with the additional problem

6    that the reason for the discrimination was an attempt to

7    benefit itself by influencing others in the tender offer

8    and, also, to benefit the RSA parties.

9           So the Court may be curious as to whether the

10   trustee thinks that the proposed settlement structure raises

11   priority concerns in addition to equal treatment concerns

12   because a number of these cases talk about priority.  It

13   does -- and it raises priority concerns of a particular

14   variety, namely that since the consideration is payable in

15   DIP loans, exchange holders are being given the opportunity

16   not only for preferred economics, but also the opportunity

17   to achieve those economics in a secured and priority

18   position.

19          So while the disfavored offerees currently appear

20   to be adequately protected, the Court should be mindful that

21   creating this precedent enhance the likelihood of priority

22   concerns with -- under the Iridium standard perhaps later in

23   this case or perhaps in another case.

24          Lastly on the equal treatment issues, let's go

25   back a little bit to the -- why do you care and are you

1    really just trying to obstruct things because, in fact, we

2    do have very good reason to care and we are not here simply

3    to obstruct.

4            We strongly dispute that the only way to cut off

5    this interest expense, even if it mattered to the equal

6    treatment analysis, which it's not, but if the only way to

7    cut off the interest expense was to do this settlement deal,

8    that would be one thing.  But, in fact, that's not the only

9    way.  The trustee has been constructive and non-

10   obstructionist with respect to the DIP order and the primary

11   concern of the trustee given our view of our rights under

12   the make-hole has been making sure that that claim is not

13   unfairly treated by procedural stuff, what I might argument

14   is chicanery.

15           So because the trustee knows the spring for make-

16   hole claims, we understand the debtors' eagerness to reduce

17   their claim exposure.  But there's a simple way to do this

18   without approving the settlement, Your Honor.  The debtors'

19   chart shows billions of dollars in offered lending

20   commitments.  Let them take this all out in cash at par and

21   make a balance offer, that is, at a uniform level, to

22   satisfy the make-hole claim.

23           Now perhaps they might make that offer payable in

24   DIP loans, perhaps they do it in cash, but in any event, the

25   perceived need to stop the interest burn or even to avoid

Page 235

1      the specter of our make-hole claims doesn't require that you

2      approve a settlement that contains a prohibited treatment.

3      And effectuating a settlement like that, an alternative

4      settlement, an alternative approach that stops the interest,

5      could be done and put forward consensually without undue

6      delay.

7              So all that is clearly off the table, based on our

8      view of unfair discrimination, is just this business of a

9      tiered settlement on equal claims that is done, you know,

10     both objectively in a manner that doesn't stand up and

11     actually is done for a purpose that we don't think is a

12     proper one under the code.  So that's unequal treatment,

13     Your Honor.

14             Let me briefly take a moment.  I don't know if you

15     want me to continue or --

16             THE COURT:  Keep going.

17             MR. WOFFORD:  Okay.  By the way, when the debtors

18     come up in rebuttal they're probably going to refer to the

19     interest burn from my closing speech.

20             But in any event, sub rosa of the plan.  Let's

21     start with the sub rosa plan discussion and the discussion

22     about the relief that's formally being sought today.

23             The parties here have been referring to a first

24     lien settlement.  There's, in fact, no motion pertaining

25     solely to the first lien settlement.  Rather, the form of

1    order most recently filed refers to the original settlement

2    motion filed on May 15th at Docket Number 472.  This motion,

3    which the debtors seeks to get approved in part today,

4    included the first lien settlement, the second lien

5    settlement and the Oncor TSA intercompany claims settlement.

6           The debtors simultaneously sought, as you may

7    recall, the first lien DIP containing hundreds of millions

8    of dollars of roll up of second lien debt and the second

9    lien DIP that also converts, by mandatory conversion,

10   roughly to two-thirds of the equity of the reorganized

11   company.

12          That package of relief, which was sought basically

13   on the first day of the case, is clearly a sub rosa plan.

14   Maybe not even sub rosa since it's been on the side of the

15   billboard since the first day.  The only question is

16   whether, Your Honor, whether by disassembling this plan into

17   six or seven Lego blocks or, in this case, not even breaking

18   a block of heart (sic), but just seeking the relief on

19   different omnibus hearing days, whether that differentiation

20   is sufficient to change the conclusion that it's sub rosa

21   plan relief.

22          So the debtors did correctly quote the sub rosa

23   plan standard in Capmark.  The settlement, to be a sub rosa

24   plan, as you are well aware, is that the settlement to be

25   such a sub rosa plan was disposed of all claims against the

1    estate or restrict the right of creditors.

2          So the debtors' package of first day relief, if

3    considered together, sought to dispose of roughly $4 billion

4    of first lien debt, 2.2 billion of second lien debt, the

5    unsecured pick date including a de facto equity conversion

6    and valuation, and billions of dollars in intercompany

7    claims, and what's more, did all of this for a balance sheet

8    rather than operating company, meaning you didn't have

9    employee claims or trade claims or those other sorts of

10   things.

11         So there's little or nothing left to do other than

12   to wait for regulatory and tax approvals if the first day

13   relief is approved as a package.  And, frankly, that's what

14   the debtors are seeking to achieve, which is an integrated

15   --

16         THE COURT:  Well, they've got to litigate with

17   you.

18         MR. WOFFORD:  I don't see that as a major dispute,

19   Your Honor.

20         THE COURT:  Okay.

21         MR. WOFFORD:  I mean, you do have to litigate with

22   us, but that's going to be over in September.

23         THE COURT:  Well, we know that now, right?  I mean

24   -- keep going.  I'm sorry.

25         MR. WOFFORD:  No.  No.  I agree they do have to

1    litigate with us.  But, you know, looking at that versus the

2    totality of the claims in the case, I mean, that is

3    relatively small.

4            Okay.  So debtors only asked for approval of the

5    peace relief.  The Court -- look, the Court can ignore the

6    request for a global deal, but while the global deal is

7    still intact, we believe that the sub rosa plans for

8    scrutiny should apply to this initial first lien step.  It

9    would be one thing if the rest of the deal were derailed or

10   somewhere else, but everyone is proceeding on the assumption

11   that -- or at least from the debtors' perspective that

12   they're proceeding on that global path.  And so we actually

13   do believe sub rosa scrutiny is appropriate.

14           Now once that analysis comes into play, Your

15   Honor, as we state in our papers, the first lien settlement

16   we believe would not survive, not least of which because,

17   you know, fair, equal treatment and solicitation problems

18   that we've spent a good time talking about.

19           So with that, Your Honor, I would like to move on

20   to the tender offer and securities' law issues.

21           THE COURT:  Okay.

22           MR. WOFFORD:  And our issue here is pretty clear.

23   In our view, there's no specific authority allowing the

24   debtors to conduct a tender offer under the Bankruptcy Code.

25   Now we and the debtors differ fundamentally on the

1    explanation of why this is so.  Our view is that the plan

2    process is the intended regime to resolve classes of

3    similarly situated claims and that Congress didn't create or

4    intend a two-part menu including 1125 on the one hand and

5    pre-planned tender offers settlement combinations on the

6    other.

7            Now there are a number of reasons that we think

8    our view is correct, and the first is some of the history of

9    the Bankruptcy Code and the Chandler (ph) Act and that act's

10   intention to remedy some of the procedure -- abuses of the

11   old protective committees.  And this Court cited quite a bit

12   of that history in its Premier International Holdings

13   opinion at 423 B.R. 58.

14           Under the air of equity receivership process --

15   and I'll skip to the end, but the end result of a lot of

16   those abuses or what were perceived abuses and issues was

17   that the bankruptcy process had a bunch of reforms in the

18   Chandler Act that were carried on in great part through the

19   code today.  And two of the touchstones of those were

20   approval in advance, number one, and equal treatment of

21   creditors.  And there are other things that were part of

22   that process, obviously, but those were two very important

23   ones.

24           And part of the issue -- and this gets to, again,

25   the why we care and the voluntariness issue.  Part of the

1    issue that was being remedied as Your Honor so simply

2    described in your opinion about the Chandler Act and the

3    genesis of it, was that under the old receivership process

4    creditors were presented with a Hobson's choice.  And they

5    either had to deposit their bonds and get a recovery

6    dictated by others or they withdrew their bonds or didn't

7    deposit their bonds and they got the recovery that was a

8    product of basically the scraps after a credit bid sale from

9    the bonds that were deposited.

10            Now the rebuttal from the debtors will be, well,

11   this isn't as compulsory as that.  But when you have the --

12   what I believe are coercive elements of this offer, the

13   prospect that you get an offer that says we're going to drop

14   a make-hole decision on you in 30 days hence,  which was in

15   their original intent; when you get the people who are

16   participating in the offer are getting paper that leap frogs

17   you into a senior super secured priority position; you know,

18   when you start having those sorts of elements in these

19   offers, it all of a sudden starts sounding like the

20   "voluntariness" that characterized that old Hopson's choice.

21   Okay.

22            So that's really the genesis of the problem here

23   and why we think that in order to have a proper protection

24   of creditors, you have to preserve those Chandler Act

25   protections of not just having this "voluntariness" that

1      puts you between a rock and a hard place perhaps, but,

2      rather, if there's going to be voluntariness, there has to

3      be advanced approval of something like a tender offer if

4      it's permitted at all from the Bankruptcy Court.

5              Okay.  So the Bankruptcy Code provides, as we

6      said, a couple of means of getting these class-wide

7      settlements.  There is the plan process in this pretext.

8      Okay.  The reason that the debtors approach should not be

9      permitted is actually made very clear by their response to

10     our emergency motion.  Okay.

11             At paragraph 27 the debtors' response to our

12     emergency motion, they got into the issue of what

13     protections are and aren't available to holders in this

14     tender offer process.  And they say, look, we're not going

15     through the approval process for 1125(b) and a solicitation.

16     The securities' log are a viable alternative in Chapter 11

17     because under 363(b) we can do whatever a normal business

18     would do subject to court approval.

19             Here's the problem.  There's a gap in the

20     protections the holders have provided.  And the gap is

21     highlighted by that paragraph 27, which is DIP tender

22     offers, Your Honor, are not subject -- and this is

23     paraphrasing the debtors' language -- not subject under

24     14(e) to SEC pre-approval of disclosure.

25             So the disclosure vetting, the protective

1    substitute that the debtors are positing is adequate and the

2    debtors' proposed approach is neither conducted by the SEC

3    nor required by the securities law.  So there's no pre-

4    approval.  There's no SEC scrutiny at the time.  You know, I

5    -- at that point then what are we left with?  We're left

6    with the Bankruptcy Court.

7           But wait a second.  The debtors have removed from

8    this process the one protection that they did propose, which

9    was the Bankruptcy Court's supervision in vetting which is

10   necessary, in our view, because they said the SEC doesn't do

11   it.  And the debtors' original motion to approve this

12   settlement, please look back at the form of order.  It

13   sought a determination that "the first lien opt-in

14   materials" and the related opt-in procedures are approved.

15   That's in the form of order at page 2, paragraph 2.  That

16   protection was taken away in the form of order filed on

17   Monday at I believe it was Docket 7 -- hold on.  I believe

18   it was Docket 730.

19           So now in the order instead of having at least

20   some court protection or some court supervision of the

21   materials, the introduction refers to approving the first

22   lien opt-in materials, but, in fact, the decrial paragraph

23   in the settlement order says that there's approval of the

24   settlement, not approval of the materials themselves.  So

25   now those protections are gone.

1          Just as an aside as to the cases they referenced

2     supposedly vindicating this tender offer process as

3     voluntary in bankruptcy, the debtors only cite three cases

4     in support of the concept that it's permitted.  The first is

5     Standard Oil which is a typical 364(f) case.  That has no

6     relevance here because that's talking about an offering and

7     whether a DIP facility offering is an offering of

8     securities, and that isn't subject to registration.  We

9     agree with that safe harbor.

10          This is very different here.  We're actually

11     having a tender offer for outstanding bonds, which is the

12     other side of the transaction.

13          The other two cases are AMR and Kodak, both those

14     -- both of those cases are very recent.  In both of those

15     cases there were no objections contesting the basic use of

16     tender offers in bankruptcy, and in both cases the debtors

17     appear to have sought prior approval of the tender offer

18     materials.  So neither case, Your Honor, therefore, is

19     precedent for what they're seeking to do here.

20          So the actual disclosures themselves, because

21     they've made -- the debtors have made great pains to say,

22     hey, no one's coming in here complaining, although if you

23     weren't disclosed to I don't know how you would actually

24     know to come in and complain, but set that aside for a

25     minute.

1              There are a number of issues that the record and

2     particularly the testimony today reaffirmed with respect to

3     the issues in the disclosure.  The primary themes are these:

4              As we said earlier, the debtors seek to create a

5     regime where they effectively police themselves.  There's no

6     adequate information protection and there's no RCC scrutiny.

7              Number two, the debtors disclosed at the outset of

8     the tender that the amount of support there was for the

9     offer was X percent -- I believe it was 32 percent --  but

10    didn't disclose the proportion of that initial support that

11    was getting the better deal.  We think that's  material to a

12    hypothetical investor.  Frankly, I think Mr. Keglevic's

13    testimony implies that they think it's important to a

14    hypothetical investor.  The debtors' pleadings seem to

15    disagree, but it is important.  It should have been

16    disclosed.

17             Third, Your Honor, the debtors have generally

18    admitted or denied any linkage between the various, you

19    know, buckets of consideration that they've given the RSA

20    parties and the agreement of those parties to support the

21    deal at 105 cents.  The fact of the matter is that linkage

22    should have been disclosed.  If they negotiated a global

23    package of consideration, then you should tell people, hey,

24    they took this deal for the package of consideration, not

25    they took "the deal" which is a subset of the consideration.

1    The two concepts are inconsistent.  If the incentive to do

2    the deal was the package, to say that it's one discreet part

3    and the other wholly should follow on with that part based

4    upon those initial holder's sign on, that to us is a little

5    bit too liberal with disclosure.

6            Third, the debtors keep insisting in their

7    testimony and documents that they have offered the same

8    terms to everybody, even though, you know, the global terms

9    to the IRSA deal make that clear not to be the case.  But

10   the parties who are depicted as arm's length negotiator's

11   over the first lien deal negotiated all these buckets of

12   consideration for themselves.

13           So when you say a deal is arm's length, Your

14   Honor, the key thing is that the portion that matters to the

15   non-insider -- insider is too hard -- the non-RSA holders is

16   not necessarily at arm's length.

17           So even if the co-mingling of consideration were

18   permissible, Your Honor, the information memorandum simply

19   doesn't allow holders to evaluate the incentives to the

20   extent they're influenced by those holders, to evaluate

21   whether they are following their lead based upon their

22   evaluation of the first lien settlement or something else.

23   And, frankly, it doesn't allow holders to see exactly what

24   the consideration that should have been allocated to the

25   first lien consideration was.

1          So those are the reasons, Your Honor, that we

2     believe that from a securities' perspective both the regime

3     that the debtors are proposing and the actual execution upon

4     that regime fall short.

5          Your Honor, I guess I would reserve now -- I guess

6     we'll talk about issues of waiver of the stay later.  I

7     think we'll just rest on our papers on that.  And, you know,

8     I would just note that clearly they're not closing the deal

9     today and, you know, even if there was some showing that was

10    going to be made for a stay, I think it could only be stayed

11    -- or pardon me -- only be shown as an initial matter with

12    respect to the time that they need to close the deal when

13    they would actually close it; that is, no waiver of the stay

14    is appropriate at least until the scheduled closing date

15    and, frankly, it may not be appropriate even further than

16    that given the significance of the issues here.

17         Thank you, Your Honor.

18         MR. HORWITZ:  Good evening, Your Honor.  Gregory

19    Horowitz from Kramer Levin on behalf of the EFIH second lien

20    trustee.

21         Your Honor, I get up because as we did submit a

22    brief on the EFIH first lien settlement motion to highlight

23    the fact that there is a legal issue.  The settlement motion

24    raises a legal issue, legal issues, and a factual issue.  On

25    the legal issue, the legal issue is essentially the same

1    legal issue that is going to be raised in connection with

2    our objection to the second lien settlement motion coming up

3    on June 30th.  We gave briefing on that fact -- on that

4    legal issue where we are substantially in agreement with the

5    first liens and with the points that Mr. Wofford just ably

6    made.

7            But I want and need to briefly highlight some of

8    those legal issues as we see them, and then I also want to

9    talk briefly about the distinction of the factual issues

10   with I think is very important and I began to broadcast

11   before lunch.

12           Your Honor, the legal issue that's in common here

13   or the primary legal issue that's in common here between the

14   first objection to their settlement and our objection to the

15   second lien settlement is simple.  It's can the debtors

16   implement a discriminatory settlement offer through a tender

17   offer during the bankruptcy case that could not be

18   implemented consistent with 1123(a)(4) in a plan.

19           And there's no dispute that a discriminatory

20   settlement offer of the sort addressed here could not

21   lawfully be implemented in connection with a plan.  The

22   debtors admit it.  And I would refer the Court to the

23   debtors' reply on to the first objection to their settlement

24   motion, Docket Number 737 at page 11 where the debtors

25   write, "Even if the debtors were required to provide the

1      same settlement terms to all similarly situated parties as

2      Section 1123(a)(4) would require under a plan, the first

3      lien settlement could still be approved."

4           MR. HESSLER:  Your Honor, I'm sorry.  I'll just

5      note that we would have to object to this on the grounds

6      that what was filed by the second lien trustee was the sort

7      of statement of reservation of rights to make these

8      arguments on June 30th.  It's not an objection to the first

9      lien settlement.  It was not styled as an objection to the

10     first lien settlement.  We already got the preview of issues

11     that they set forth in what was a broader statement earlier

12     today than a mere objection to what's going to be coming

13     forward in the DIP.

14          So given the lateness of the hour, we would offer

15     that this is inappropriate to go into, a lengthy

16     dissertation about objections that are soon to be argued at

17     a later hearing on a later settlement.

18          MR. HORWITZ:  Your Honor, we are a party in

19     interest.  This is the same legal issue.  I have no doubt

20     that if the debtors convinced Your Honor to rule, we would

21     believe incorrectly, that -- but as the debtors are urging

22     the debtors can implement a discriminatory settlement offer

23     through a tender offer because it's not in connection with a

24     plan.  When we get up to make the same argument on June

25     30th, we -- I have no doubt they will argue your Court --

1    Your Honor has already ruled on it.  It's law of the case.

2    I have no choice but to get up here and --

3            THE COURT:  Well, I don't know if it would be law

4    of the case, but I understand your position as to, you know,

5    having made a decision I'm likely to follow it again.  So

6    I'll allow you to be heard.

7            MR. HORWITZ:  Thank you, Your Honor.

8            I am not going to be lengthy.  I wanted to make

9    the point.  But I think that it is not disputed that the

10   debtors could not implement a discriminatory settlement

11   offer at the plan stage.  The debtors have admitted as much.

12   We, in our brief, cited the Judge Micvah's (ph) decision

13   from the D.C. Circuit in AOB which establishes that

14   principal as well.

15           Having acknowledged that principal, the question

16   then becomes, can the debtors implement the same otherwise

17   impermissible settlement offer through a tender offer before

18   confirmation that they could not do in connection with

19   confirmation.

20           The first assert, we agree with them that that

21   cannot be done.  Settlement review goes beyond the mere

22   reasonableness factors under 9019.  Iridium and Owako (ph)

23   stand for the proposition that in addition to the settlement

24   considerations, those reasonableness considerations, a

25   debtor cannot accomplish a result through the principal --

1       through a settlement process that would not -- that is not

2       consistent with fundamental bankruptcy principles.

3              It is true that Iridium and Owako, the fundamental

4       bankruptcy principal that was involved there was fair and

5       equitable absolute priority.  But the principal applies

6       equally, should apply equally to equality of treatment under

7       1123(a)(4).

8              We highlighted in our brief -- and I think it's

9       important to highlight the importance of the Third Circuit's

10      decision in Combustion Engineering on this regard, Your

11      Honor.

12             In Combustion Engineering, the Third Circuit

13      emphasized that the principal of equality of treatment --

14      I'm actually reading here from 391 F.3d 190 t 241 says, "We

15      consider the bankruptcy scheme as an integrated whole in

16      order to evaluate whether the plan confirmation is

17      warranted.  Viewing the Combustion Engineering pre-packed

18      bankruptcy as a whole, the record reveals that it may lack

19      the requisite equality of distribution among creditors."

20             The Court made it clear that the equality of

21      distribution principal applies not only to confirmation, but

22      to what the debtor does not only throughout the case, but as

23      was the case in Combustion Engineering and indeed as is the

24      case here, to settlement agreements that are structured and

25      entered into prior to the bankruptcy process.

1            In Combustion Engineering the Third Circuit

2      reversed confirmation of a plan and remanded for

3      consideration of whether that settlement negotiated prior to

4      the petition date violated the equality principal.  Instead,

5      it held that -- the Court found that -- the Bankruptcy Court

6      found that it did.  The plan could not be confirmed.

7            If Combustion Engineering establishes, as it does,

8      that the equality principal is effective throughout the

9      bankruptcy process and even before, it follows, certainly

10     together with the principals of Iridium and Owako, that it

11     must apply to settlements done during the bankruptcy process

12     and that the debtors cannot use this extremely novel

13     procedure of a tender offer launched at the outset of a

14     bankruptcy to implement a discriminatory settlement offer.

15            Your Honor, that's the legal issue.

16            The factual issue is whether or not the settlement

17     offer at issue was discriminatory, and as I emphasized

18     immediately before lunch we have not reached that issue with

19     regard to the second lien settlement.

20            We have specifically reserved on one -- on all of

21     the issues, but in particular I was highlighting one of the

22     package of goodies as we called it that Fidelity is getting

23     explicitly as part of its second lien make-hole, the right

24     to participate in first lien DIP and the right to get the

25     $8.75 million fee.

1           There are others -- other goodies, including the

2       right to participate in the now demonstrably valuable

3       sweetheart pick sponsored second lien DIP, nine -- to the

4       tune of nine percent together with a fee associated with

5       that, most favored nations clause.

6           We will show that all of these package of goodies

7       together add up to considerably enhanced recovery for

8       Fidelity on its make-hole.  This is a different issue than

9       the factual issue presented today with regard to the first

10      lien settlement.

11          As to the question of whether the first lien

12      settlement, in fact, embodies impermissible or unjustifiable

13      discrimination, we take no position.  The only thing I note,

14      Your Honor, is that we need an opportunity on June 30th to

15      show -- and we will show that the discrimination in

16      treatment involved in our settlement is extremely different,

17      I would say fundamentally different both in degree and in

18      kind from the discrimination that the first (indiscernible)

19      sought to prove here today.

20          Again, make no -- take no position as to whether

21      or not the firsts have shown that there is unjustifiable

22      discrimination here.  I merely point out they're totally

23      different issues and it is entirely possible for the Court

24      to reach that issue and decide that the treatment for the

25      firsts is justified without reaching the legal issue that we

1    are going to raise again on June 30th and together with our

2    factual showing are going to use to show that the treatment

3    of our -- in our settlement is improper.

4              THE COURT:  Thank you.

5              MR. HORWITZ:  Thank you, Your Honor.

6              MR. HESSLER:  Thank you, Your Honor.  Steve

7    Hessler of Kirkland & Ellis on behalf of the debtors.

8              Your Honor, I have three very brief points and

9    none of them are repeats of points that we made earlier this

10   evening -- or earlier today, not morning, but this evening.

11             Your Honor, first with regard to Iridium that has

12   been referenced, Iridium is an absolute priority case.  And

13   it stands for the pretty straightforward principal that you

14   can't use 9019 to pay more to junior creditors than they may

15   have been entitled to under a plan.

16             What we're doing here, Your Honor, is we are

17   paying (indiscernible) creditors in full.  No junior

18   creditor is objecting to what we are proposing to do.  To

19   the contrary, the parties that are effectively paying for

20   this settlement, which is the EFIH unsecured -- they are the

21   junior creditors -- they fully support this settlement and

22   they are the ones who are effectively paying for the

23   settlement.  So if there was a party that was otherwise

24   feeling that they were being economically discriminated

25   against, it would have been the EFIH unsecureds.  They

1   recognize this is a good deal for the estate and they

2   support it and I believe they filed a joinder to that

3   effect.

4          Your Honor, the only party that is objecting to

5   the settlement is, again, some dissident holders from the

6   same class and the trustee on behalf of the same class.

7   There's no absolute priority issue in this case, Your Honor,

8   much less is there an absolute priority violation.

9          Secondly, Your Honor, there has been a lot of

10  focus today from the first lien trustee on the differential

11  and consideration received between the six and seven-eighths

12  and the ten percent, notwithstanding the fact that it's un-

13  rebutted it was the equality of offer, but there was

14  differential consideration given to the mathematics involved

15  in the maturity date and the relevant make-hole calculation.

16         Your Honor, the debtors have not denied the

17  existence of this mathematical reality.  We have not said

18  that it does not exist.  To the contrary, both Mr. Yearing

19  (ph) and Mr. Keglevic testified that they understood the

20  differential and, in fact, they considered it both necessary

21  and beneficial to getting the deal done given the facts and

22  circumstances at issue.

23         And differential consideration, Your Honor, is not

24  discriminatory.  Discriminatory would be putting forth a

25  settlement and telling parties, you have to take it or leave

1    it.  You know, we're going to give more to one party and

2    refuse to give it to you.  That was not the Hobson's choice

3    here.  The Hobson's choice is this is a settlement, would

4    you like it.  If not, there is an alternative path forward.

5    We know that there was a significant group of creditors that

6    want to litigate their make-hole.  We believe they, in fact,

7    bought their claims for the purpose of litigating their

8    make-hole.  We're going to find out if that's the case.

9           But they were not faced with certain treatment A

10   versus certain treatment B.  They were told, would you like

11   this settlement; if not, you retain all rights as you've

12   already expressed to us that you believe you're entitled to

13   100 cents on the dollar on your make-hole.  And then they

14   will have all opportunity to vindicate their rights on that

15   front.

16           That's it, Your Honor.

17           With regard to the governing legal standard, Mr.

18   Wofford made reference to some -- there's a binary standard

19   versus a -- I'm sorry -- there's binary settlements versus

20   trilateral settlements and that there is supposedly

21   differing governing standards for those.  We respectfully

22   disagree and we respectfully do not believe that there's

23   support for a trilateral settlement standard.  We think that

24   what is being put before the Court today is an invocation to

25   actually create new law on that front and we would

1      respectfully request that the Court decline that invitation.

2              If there are no further questions from the Court,

3      Your Honor, we --

4              THE COURT:  I don't have any.

5              MR. HESSLER:  -- rest.

6              THE COURT:  All right.  Thank you.

7              Well, I'm going to approve the settlement for a

8      number of reasons.

9              One, I think I have a fundamental disagreement

10     with the objectors and I think it's fair to say that I side

11     with the debtors here.  I don't view this as a

12     discriminatory settlement.

13             I don't view the fact that both sets of creditors

14     are being offered 105 cents -- 105 percent of principal plus

15     101 percent on their accrued interest as somehow

16     discriminatory because one class might have some contracts,

17     claims that are disputed that are slightly different from

18     another class that might have contract claims that are

19     slightly different.  One side has ten percent interest, the

20     other has six and seven-eighths, but they're both getting

21     paid 101 cents on accrued interest.

22             So there aren't incidents of discriminatory

23     treatment here and it certainly isn't unfair discriminatory

24     treatment when we look at simply the fact of the difference

25     between the realization on what the make-hole premium might

1    or might not be.

2            So as a result, I think a lot of the objection

3    just falls away with -- based on my disagreement.

4            Now there are creditors who are getting something

5    other than the 105/101 or the 104/OID and those are the

6    PINCO (ph) and Fidelity and WANCO (ph), but they're

7    providing additional consideration in exchange for the

8    different treatment that they are getting.  They have agreed

9    -- PINCO and Fidelity and GSO all had backstop commitments.

10   WANCO stepped into a backstop commitment.  And the parties

11   who did that, (a) like I said, did not have to spend the

12   commitment fee and (b) are getting paid a funding fee just

13   as Deutsche Bank, for example, is getting paid fees of an

14   un-public amount.

15           But that's not extraordinary.  That's simply the

16   fact that they have made a separate agreement to backstop

17   and they're actually coming in and they're paying new money

18   and on the new money they're getting a fee.

19           Now the complaint is that one of timing.  Hey,

20   they got that sweetheart deal to make a DIP loan at below

21   market interest, which was an opportunity everybody was

22   jumping at.  Why, well, because they're the ones we were

23   able to kind of deal with.

24           Now it's -- the evidence is clear that there have

25   been negotiations going on with everybody for a long time

1    and some parties agreed to confidentiality agreements, et

2    cetera, but to say that there wasn't an opportunity to

3    engage in settlement; there wasn't back forth I think is

4    unfair and I don't think the facts justify that.

5              Now it may be that one party snapped at a

6    settlement a little soon -- a little earlier than the other

7    party, and maybe the party that didn't snap is a little

8    annoyed because they wish they had.  But, look, these are

9    sophisticated parties.  You guys knew what you were doing

10   and I'm not going to hold something against PINCO and

11   Fidelity, et cetera for reaching a deal sooner than others

12   reached a deal.

13             And the reality is that by the time we got to the

14   filing, no (indiscernible) commitment was needed.  And as a

15   result -- and those that participated, and WANCO came late

16   to that and was allowed to participate.  But there wasn't

17   any need to open it up to other parties because the debtors

18   had achieved what they needed to achieve.  And as a result,

19   they did not have to provide the additional consideration to

20   other parties because it simply wasn't necessary.

21             So the 105 -- however you calculate it --

22   treatment, even though it's offered to the ten and the six

23   and seven-eighths and the economics are different based on

24   accrued interest and the economics are different based on

25   alleged make-hole premiums or asserted make-hole premiums I

1     don't think is discriminatory.  I don't think that the

2     differential treatment for the funding fees, et cetera is in

3     any way discriminatory because it's supported by separate

4     consideration.

5              I don't find the favored nations clause to be

6     particularly troubling in connection with this -- with this

7     specific settlement.  I'm going to expressly reserve the

8     right to think about that again in the context of the second

9     lien settlement where there are some different allegations.

10    But here I don't see that -- this as a problem.

11             And, you know, at the end of day, look, if you

12    lean on the make-hole in September you -- you're making --

13    you know, you could say you're making all these people that

14    settled look like idiots because you got a much better

15    recovery.  People make decisions.  They make decisions based

16    on their understanding, their risk, willingness, et cetera.

17             And I haven't heard anything about discrimination

18    or about any kind of unsupported activity that would make me

19    look at this settlement as anything other than under the

20    normal reasonable exercise of business judgment, lowest

21    range of reasonableness which I think is -- personally I

22    think is too low.  I think about it in the concept of

23    exercise of business judgment.  The record clearly supports

24    that this was a reasonable exercise of the debtors' business

25    judgment.

1          Now let me talk a little bit about the SEC

2     exchange offer mechanism.  And I'm going to expressly

3     reserve on that, too.  I have concerns about whether that is

4     an acceptable way to proceed and to have proceeded.  I

5     haven't had an opportunity to really frankly, you know, sit

6     down and really think about it in an organized matter.

7          In this instance, in either the first lien

8     settlement I'm not troubled, but I want to make it -- it's

9     -- because -- for the reason -- the primary reason is that

10    the parties associated with this transactions are very well

11    represented.  The deal was on the table as of the petition

12    date.  It was all there for sophisticated parties to figure

13    out.  And by the motions and lawsuits and everything I've

14    seen, which is perfectly fine, people got their head around

15    it real fast.  It wasn't something that people had a problem

16    with.

17         I -- so I'm not going to disapprove or I'm not

18    going to deny this settlement based on the use of this

19    exchange offer, tender offer approach.  But I am completely

20    reserving my rights on that in connection with any further

21    discussions and I certainly would not want this ruling on

22    this specific settlement to in any way be deemed a

23    precedential or cited to me and really, you know, frankly

24    anyone else because it's something where my thinking is

25    really going to have to develop, frankly.

```
1              And I'm not saying ultimately I'm going to have a
2       problem with it or not.  But it's something that I'm
3       cogitating about and thinking about, and in the specific and
4       unique facts and circumstances of this first lien settlement
5       I'm not troubled by it and I'm not going to deny approval of
6       the settlement based on that.  But that is wholly without
7       prejudice to any further rulings in connection with that.
8              So for all those reasons, I overrule the
9       objections and I will approve the settlement.  And I'm
10      hoping that having ruled on the merits we have an order
11      that's not controversial.
12             MR. MARTIN:  We do not have a -- well, we
13      controvert it, Your Honor, but we understand the ruling that
14      the order -- form of order is fine given the --
15             THE COURT:  Form of order is fine.  All right.
16      Thank you.  Obvious -- oh, having said all that I want to
17      hear from the debtor about why you need the waiver.
18             MR. HESSLER:  I'm happy to do so, Your Honor, and
19      then when we get to the order there is -- there is one
20      change in the order we consider to be not controversial.
21      I'll explain it at that time, then.
22             Your Honor, the reason why we're asking for the
23      6004 -- the relief from 6004(h), the standard is pretty
24      clear.  Both we and the first lien trustee stated the
25      governing standard on it.  And the waiver is predicated on a
```

1    showing of a sufficient business need in order to get the

2    waiver of the 14 day stay pending appeal.

3           There are a couple, one of them is very much front

4    and center and, we think, extraordinarily sufficient and

5    that is the DIP order requires the un-stayed entry of the

6    settlement order.  And the DIP must be closed -- a separate

7    requirement -- the DIP must be closed within five business

8    days of entry of the DIP order.  So our DIP, notwithstanding

9    today's approval order, if we don't close on the DIP, is

10   going to -- the commitment's actually going to expire next

11   Friday.

12          And it came up in the testimony, but the targeted

13   closing date of the DIP as well as the consummation of the

14   repayment to the first and the settling first, that is to be

15   next Thursday.  That's Thursday, June 11th, I believe, or

16   I'm sorry, June 12th, Thursday, June 12th, Your Honor.  So

17   if we have a 14 day stay and we can't go forward on this,

18   notwithstanding the interest expense burn that's going to

19   continue to accrue, the much more immediate issue is --

20          THE COURT:  All right.

21          MR. HESSLER:  -- as to our DIP.

22          THE COURT:  All right.

23          MR. MARTIN:  Your Honor, Ross Martin, Ropes & Gray

24   for the trustee.  If I could be heard briefly on the 6004

25   stay issue.

1              A couple of points, Your Honor.  One, the five

2      days kicks in under their agreement from the entry of the

3      Dip order.  That is true.  If the Court doesn't enter the

4      DIP order, the commitment is open for 110 days from April

5      28th or something.  It shortens.  The entry of the order

6      actually shortens the period of the bank's commitment.

7              Now it is also true that the RSA parties have a 75

8      day window from the signing of the RSA.  But it's an unusual

9      circumstance the way this is constructed, and I don't think

10     there's any dispute about that.

11             Now as we've indicated, we don't have any problems

12     with a DIP loan that primes.  We've worked all that out.

13     But there's a very real question here about the

14     appropriateness of that stay.

15             I would also offer one other thing, Your Honor.

16     There is no testimony about when they're planning to close.

17     In fact, the CFO of the company said he didn't know and at

18     least I believe in the Filene's case in this -- not in --

19     not before Your Honor, but in the Delaware Bankruptcy Court

20     the stay was at least set for the time of the closing to

21     allow parties to proceed with a stay pending appeal, which

22     would be our present intention to do so just to make the

23     record clear.

24             But with no evidence in the record about when they

25     plan to close, at best it's five business days, but frankly

1    there's no evidence at all that they don't have a waiver of

2    that in light of the 110 day commitment or anything else.

3    That -- that's what we would say on that, Your Honor.

4           THE COURT:  Well, I'm certainly not comfortable

5    holding this thing out for two weeks, but at the same time I

6    think that some period of time would be appropriate for the

7    trustee to seek a stay pending appeal.  And just so the

8    record is clear, I deny the stay pending appeal, and the

9    stay that I will allow is in the context of the 6004

10   limitation.

11          So I will shorten the stay through June 11, which

12   would allow for a Thursday closing on the 12th and would

13   allow me to enter the DIP order today -- would allow me to

14   enter the DIP order today, would allow for a closing on the

15   12th, and would give my colleagues across the street three

16   days to respond, if necessary, to any stay pending appeal at

17   that level.

18          MR. HESSLER:  Your Honor, I don't think we need

19   more than 60 seconds.  If we can -- just everybody circle up

20   and confirm that we think this is all fine for everybody

21   involved with --

22          THE COURT:  Sure.

23          MR. HESSLER:  We appreciate it, Your Honor.  Thank

24   you.

25       (Pause)

1              THE COURT:  I -- this is very important.  If the

2      air conditioner turns off, there is a button right near the

3      back.

4          (Laughter)

5              THE COURT:  Press it until the fan comes on.

6      That's the most important thing I'm going to say all day.

7              MR. HESSLER:  Your Honor, we appreciate and

8      understand your ruling, and it does work from the debtors'

9      perspective.  As to the order itself, can I approach with a

10     redline and clean?

11             THE COURT:  Yes.

12         (Pause)

13             THE COURT:  This is redline from what?

14             MR. HESSLER:  From the last version that --

15             Your Honor, I'll -- while I'm handing out some

16     copies, to be clear, what was -- this is a redline against

17     the last version filed.  All that is deleted is prior

18     paragraph 5 which provided for authorization to pay the

19     backstop fees of Fidelity and PINCO.  The simply reason for

20     this deletion is that was now in the DIP order that was

21     approved earlier today and to be docketed now today.  So

22     that's -- it just ended up in a different document.  It

23     doesn't need to be in this one as well.

24             UNIDENTIFIED SPEAKER:  We have no objection to

25     that, Your Honor.

1            THE COURT:  Okay.  So all we have to do is

2    interlineate paragraph 8 to reflect the ruling I just made,

3    correct, to say effective immediately enforceable as of June

4    12th, 2014?

5            MR. HESSLER:  It sounded like you were going to

6    give us the day before.

7            THE COURT:  Well, I was saying through -- the stay

8    would be through the 11th.  So I'm trying to figure out how

9    to tweak your language.  So it says, terms and conditions of

10   this order shall be immediately effective and enforceable

11   upon its entry.  So instead of saying upon its entry, can we

12   say as of June 12th, 2014?

13           MR. HESSLER:  So we have -- I'm --

14           THE COURT:  As of 12 -- as of --

15           MR. HESSLER:  Well, but the --

16           THE COURT:  -- 12:01 a.m.?

17           MR. HESSLER:  Yeah.  12:01 a.m.  Perfect.  Thank

18   you, Your Honor.

19           THE COURT:  Oh, wait.  I'm marking up the wrong

20   thing.  Hang on.

21           MR. HESSLER:  Your Honor, if we could ask that it

22   say for the reasons stated on the record.

23           THE COURT:  Okay.

24       (Pause)

25           THE COURT:  Okay.  It now reads, "For the reasons

1      set forth on the record at the hearing, notwithstanding the

2      possible applicability of Bankruptcy Rule 6004(h), 7062,

3      9014 or otherwise, the terms and conditions of this order

4      shall be immediately effective and enforceable as of June

5      12th, 2014 at 12:01 a.m."

6             Okay.

7             MR. HESSLER:  Your Honor, could you read that -- I

8      apologize.  Could you just read that one more time?  We just

9      have a little confusion over what it said here.  We heard it

10     two different ways.

11            THE COURT:  All right.  I'm sorry.

12            "For the reasons set forth on the record at the

13     hearing, notwithstanding the possible applicability of

14     Bankruptcy Rule 6004(h), 7062, 9014 or otherwise, the terms

15     and conditions of this order shall be immediately effective

16     and enforceable as of June 12th, 2014 at 12:01 a.m."

17            UNIDENTIFIED SPEAKER:  One second, Your Honor.

18            THE COURT:  What did I do wrong, Norm?

19        (Laughter)

20            UNIDENTIFIED SPEAKER:  Go ahead.  You tell him,

21     Norm.

22            MR. PERNICK:  Your Honor, I don't think I would

23     have said it that way.  I wouldn't know whether -- I would

24     have to see the (indiscernible) ruling.  So right before

25     paragraph 1 where it says, it is hereby ordered that, I

1    wondered if before that it should say, for the reasons set

2    forth on the record it is hereby ordered that, since you

3    have a transcript.

4            THE COURT:  Oh, you want it there, too?

5            MR. PERNICK:  Yes, please.

6            THE COURT:  All right.

7            MR. PERNICK:  Thank you.

8        (Pause)

9            THE COURT:  I have added that clause right after

10   "therefore" and "it is hereby ordered that."   Okay.

11           UNIDENTIFIED SPEAKER:  Yes, Your Honor.

12           MR. HESSLER:  May I ask, Your Honor, just to

13   confirm with that ruling the DIP order is now being

14   docketed?

15           THE COURT:  It's going to be in just a sec.

16           Would you have that and have Leslie go down and

17   get them both on the docket right away.

18           MR. HESSLER:  Do you care which is docketed first?

19           UNIDENTIFIED SPEAKER:  The settlement order,

20   please.

21           MR. HESSLER:  If you could get the settlement

22   order docketed and then the DIP.  Thank you.

23           Thank you very much, Your Honor.  With that, I

24   believe we're done with the two EFIH motions.

25           THE COURT:  Okay.  We have the hedging motion.  We

1   have the -- wait a minute.  I've got a list here.  We've got

2   the hedging order, the critical vendor order, and the

3   schedule extension motion and scheduling of RSA hearing to

4   deal with in the next 37 minutes.

5           UNIDENTIFIED SPEAKER:  Your Honor, may the trustee

6   be excused?

7           THE COURT:  Can you hang on?  It would be

8   disruptive.  I just -- just hang tight.  I want to see if we

9   can get --

10           UNIDENTIFIED SPEAKER:  We can stay here, Your

11   Honor.

12           UNIDENTIFIED SPEAKER:  That's why we asked.

13           THE COURT:  -- get this moving.

14           MR. SCHARTZ:  Good afternoon.  Brian Schartz from

15   Kirkland & Ellis on behalf of the debtors.

16           We have those three items that you just mentioned

17   and then Mr. Ward wants to say quickly one thing on the

18   record in respect of an order that was entered two days ago.

19   So we'll let him say that and then I'll jump into the

20   trading order very quickly.

21           THE COURT:  All right.  Quickly.

22           MR. WARD:  All right, Your Honor.  This is Matthew

23   Ward.  With respect to the TDSB order that was entered in --

24   right after that order was entered, we immediately went into

25   the DIP and I didn't want to interrupt the traffic flow.

1    But the order provides for payments of certain cure amounts

2    and our client, Centerpoint, just wanted to clarify that

3    those cure are not set in stone and they're still subject to

4    being negotiated.  We're working with the debtors to do a

5    true-up and they also don't include amounts that have

6    already been paid under the prior order that -- the income

7    order that Your Honor entered.

8              So we just wanted to clarify that and I think that

9    the debtors and Kirkland is on board with that.

10             THE COURT:  All right.  I need someone in Kirkland

11   to say, okay.

12             MR. SCHARTZ:  It's okay.

13             THE COURT:  All right.  Very good.  Thank you.

14             MR. WARD:  Thank you.

15             THE COURT:  Thank you, Rachel.  Thank you.

16             MR. SCHARTZ:  Again, Brian Schartz for the record

17   on behalf of the debtors.

18             We're going to go through quickly the trading

19   order.  If you'll recall yesterday recalling Mr. Husnick

20   (ph) and Ms. Schwartz from the U.S. Trustee's Office had an

21   exchange at the podium regarding a settlement and resolution

22   of the trading order that would put final relief with

23   respect to hedging and trading activities in one place and

24   proprietary relief in another with the bulk of the

25   proprietary relief being heard at the June 30th hearing.

1          All of that was agreed to in principal as of

2     yesterday, but the devil was in the details.  After I would

3     probably say seven or eight hours of conversations with the

4     Office of the U.S. Trustee -- they made themselves extremely

5     available and we thank them for that, especially as I

6     understand that Ms. Schwartz was supposed to have a day off.

7     So we are very appreciative of their efforts.

8          But the orders are very, very important to the

9     company.  And the product of today's efforts is essentially

10    two orders that I'll hand up to you in just a second.  Mr.

11    Shepacarter is doing one last review.  And I'll hand them up

12    to you in just a second.  But before I do that I want to

13    walk through just the concepts of what we did.

14          So if you recall the conversation yesterday was

15    about hedging and trading activities.  So that's, you know,

16    transactions that the company enters into to basically hedge

17    against commodity prices, natural gas, diesel fuel, uranium,

18    et cetera.

19          The U.S. Trustee's Office was comfortable with

20    that relief on a final basis.  And so we now have one order

21    that deals with that relief on a final basis, and it's

22    important the company get that relief today because there

23    are a number of counterparties that are waiting for the

24    final order to be entered.

25          With respect to proprietary trading, so that's

1    trades that the company enters into largely for profit,

2    there's going to be a separate order that takes all of that

3    relief to June 30th except for two types of very narrow

4    bands of relief that the U.S. Trustee's Office has agreed

5    to.

6            The first is the company, to the extent that a

7    counterparty to a proprietary trade does not terminate, has

8    the authority to continue that trade in the order course of

9    business.  Those trades are, of course, subject to the safe

10   harbor provision.  So if the counterparty doesn't terminate

11   and they also sign a continuation agreement that says that

12   we -- you're going to live by your rules, the debtor will

13   have authority to post collateral and pay prepetition

14   amounts on account of that transaction.

15           The second type of narrow relief that's provided

16   in the form of that order is to say that if a counterparty

17   to a proprietary trade unwinds that trade, then the company

18   can enter into a new trade to help mitigate the risk

19   associated with that termination.

20           We've talked at length with the Office of the

21   United States Trustee about this relief.  They are agreeable

22   to it.  We've shared it with the RSA parties.  We've shared

23   it with the TCH DIP lenders.  We've shared it with counsel

24   to White & Case.  We've shared it with counsel to Morrison &

25   Forrester, as counsel to the committee and I believe as I

1    stand up here -- please, anyone correct me if I'm wrong --

2    that we have agreement on the form of both of those orders.

3            So if you would give me just one second and let me

4    confirm with Mr. Shepacarter that all is in shape, and I'll

5    hand up the orders in just a moment.

6        (Pause)

7            MR. O'BRIEN:  May I approach?

8            THE COURT:  Yes.

9            We've got two different --

10           MR. O'BRIEN:  Yes.  One is the -- this is the

11   first -- this is with regard to the trading.

12           THE COURT:  All right.

13           MR. O'BRIEN:  And that's with respect to --

14           THE COURT:  Okay.  And that's a brand new order.

15           MR. O'BRIEN:  Exactly.

16           THE COURT:  And this is blackline.  Is that

17   correct?

18           MR. O'BRIEN:  Yes.

19           THE COURT:  Okay.

20           Let's do this.  You don't need to walk me through

21   the changes, but we -- at some point we'll take a brief

22   recess and I'll actually read the orders and as long as --

23           MR. O'BRIEN:  Okay.

24           THE COURT:   I can't imagine there would be an

25   issue, but, of course, I need to look at them before I sign

1    them.  And if they are what you say they are, I would be

2    happy to approve them.  And we'll get them docketed today.

3    But --

4              MR. O'BRIEN:  Excellent.  That's fine.

5              THE COURT:  -- I'm going to need a chance to read

6    them.

7              MR. O'BRIEN:  Appreciate it.

8              THE COURT:  You're welcome.  It shouldn't take

9    long.

10             MR. SASSOWER:  I think that -- for the record,

11   Edward Sassower of Kirkland & Ellis -- the rest can go

12   quick.  We have not been able to make progress on critical

13   vendors.  We're going to adjourn that motion until June

14   30th.  The debtors believe that they can live with the

15   interim bucket of $30 million between now and then.

16             THE COURT:  All right.  I'll so order a

17   continuance to the interim order to that date.

18             MR. SASSOWER:  Thank you.

19             On Silfa's (ph), earlier today I believe Your

20   Honor entered a bridge order through Monday, I believe,

21   hoping that we could get a sign off on the extension of the

22   RSA assumption motion to July 18th.  Typically, amending the

23   RSA -- we've amended it a few times already -- takes a

24   number of days.  So what I would ask is that the bridge

25   order go out a little bit beyond Monday while we figure that

1    out.  I am confident that we will be able to get to July

2    18th, but it may take several days for people to review the

3    amendment and execute it.

4              THE COURT:  Do you have a clean copy?  I think

5    that the previous -- has the bridge order been on the

6    docket?

7              MR. SASSOWER:  It is.

8              THE COURT:  Yeah.  Let me -- if somebody will give

9    me a clean I'll mark it up and we'll supplement it and make

10   it through July 16th -- June 16th.

11             MR. SASSOWER:  That would be perfect.  Thank you,

12   Your Honor.

13             THE COURT:  That -- is that the -- and that would

14   resolve everything?

15             MR. SASSOWER:  That would resolve everything, Your

16   Honor.

17             THE COURT:  Okay.  I tell you what, we'll take a

18   recess.  I'll go back.  I'll read these orders.  In the

19   interim, if you could get an order to Ms. Werkheiser (ph)

20   that I can mark up or you can mark up and send back on the

21   schedules, take care of that while I'm off the bench.  And

22   it shouldn't take more than ten minutes at the most I would

23   think to look at these.

24             MR. SASSOWER:  We will do so.  Thank you, Your

25   Honor.

1              UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

2              (Recess taken at 5:29 p.m.; resume at 5:40 p.m.)

3              THE COURT:  All rise.  Please be seated.

4              Where did everybody go?

5          (Laughter)

6              THE COURT:  Let's see.  If you're old enough and

7     you grew up in Philadelphia you'll say, they went to

8     Benson's, right?  Isn't that what it was?

9              UNIDENTIFIED SPEAKER:  (Indiscernible)

10             THE COURT:  Yeah. Benson's.  We're old.

11             UNIDENTIFIED SPEAKER:  We are.

12             THE COURT:  I have signed both hedging orders and

13    they're being docketed, and I have signed the schedules

14    order extending that time and it's being docketed.  And I

15    don't think we have anything else.

16             MR. SASSOWER:  That's all we have, Your Honor.

17             THE COURT:  Okay.

18             MR. SASSOWER:  Have a terrific weekend and thank

19    you for the last two days.  We really appreciate it.

20             THE COURT:  You're welcome.  And that's -- if you

21    could just do your best, please, to return the premises to

22    their pristine condition and take as many of your trash as

23    you can, and Leslie will make sure all the chairs get put

24    where they belong.

25             So thank you very much.  We're adjourned.  I'll

1      see you on June 30th.

2              MR. HESSLER:   Thank you.

3          (A chorus of thank you.)

4          (Whereupon, these proceedings concluded at 5:41 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21                              * * * * *

22

23

24

25

1                          I N D E X

2                      W I T N E S S E S

3    WITNESS                    BY                    PAGE

4    DAVID YING             MR. MCGANN              139

5                          MR. MARTIN              163

6                          MR. MCGANN              170

7

8    PAUL KEGLEVIC          MR. MCGANN              171

9                          MR. MARTIN              175

10                         MR. MCGANN              206

11                         MR. MARTIN              211

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                         I N D E X

 2                       R U L I N G S

 3    DESCRIPTION                                          PAGE

 4    Motion of Energy Future Holdings Corp., et al.,        36

 5    for Entry of an Order Extending the Debtors' Time

 6    to File Schedules of Assets and Liabilities, Schedules

 7    of Current Income and Expenditures, Schedules of

 8    Executory Contracts and Unexpired leases, and

 9    Statement of Financial Affairs

10

11    Motion of Energy Future Holdings Corp., et al.,        65

12    for Entry of an Order Authorizing the RSA Debtors

13    to Assume the Restructuring Support Agreement and

14    Modifying the Automatic Stay

15

16    Motion of Wilmington Savings Fund Society, FSB for     65

17    Leave to Conduct Discovery Pursuant to Rule 2004 of

18    the Federal Rules of Bankruptcy Procedure of Energy

19    Future Holdings Corporation, its Affiliates, and

20    Certain Third Parties (the "2004 Motion")

21

22     Motion for Cash Collateral                            79

23

24    Motion to approve the EFIH first line DIP and the     123

25    Motion to approve the EFIH first lien settlement
```

1    Ruling Approving Settlement                    256

2    Ruling on Stay Pending Appeal                  264

3    Ruling on Hedge Orders and Scheduling Order    276

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2    We, Jamie Gallagher, Dawn South, Nicole Yawn, and Melissa

3    Looney certify that the foregoing transcript is a true and

4    accurate record of the proceedings.

5    Jamie
     Gallagher

Digitally signed by Jamie Gallagher
DN: cn=Jamie Gallagher, o, ou,
email=digital1@veritext.com, c=US
Date: 2015.03.18 11:30:57 -04'00'

6    _____

7    Jamie Gallagher

8    Dawn South

Digitally signed by Dawn South
DN: cn=Dawn South, o, ou,
email=digital1@veritext.com, c=US
Date: 2015.03.18 11:31:31 -04'00'

9    _____

10   Dawn South - AAERT CET**D-408

11   Nicole Yawn

Digitally signed by Nicole Yawn
DN: cn=Nicole Yawn, o, ou,
email=digital1@veritext.com, c=US
Date: 2015.03.18 11:32:13 -04'00'

12   _____

13   Nicole Yawn

14   Melissa
     Looney

Digitally signed by Melissa Looney
DN: cn=Melissa Looney, o, ou,
email=digital1@veritext.com, c=US
Date: 2015.03.18 11:33:55 -04'00'

15   _____

16   Melissa Looney - AAERT CET**D-607

17   Sheila Orms

Digitally signed by Sheila Orms
DN: cn=Sheila Orms, o, ou,
email=digital1@veritext.com,
c=US
Date: 2015.03.18 11:35:09 -04'00'

18   _____

19   Sheila Orms

20   Sherri L
     Breach

Digitally signed by Sherri L Breach
DN: cn=Sherri L Breach, o, ou,
email=digital1@veritext.com, c=US
Date: 2015.03.18 11:36:18 -04'00'

21   _____

22   Sherri L. Breach - AAERT CERT*D-397

23   Veritext

24   330 Old Country Road, Suite 300

25   Mineola, NY 11501