Page 1

1   UNITED STATES BANKRUPTCY COURT
2   DISTRICT OF DELAWARE
3
4
5   In re:                          :
                                    :   Chapter 11
6   ENERGY FUTURE HOLDING CORP.,    :
    et al.,                         :   Case No. 14-10979 (CSS)
7                                   :
            Debtors.                :   (Jointly Administration
8   _____       :   Requested)
                                    :
9                                   :
    DELAWARE TRUST COMPANY as       :
10  INDENTURE TRUSTEE,              :
                                    :
11      Plaintiff,                  :   Adv. Proc. No.
                                    :   14-50363 (CSS)
12      v.                          :
                                    :
13  ENERGY FUTURE INTERMEDIATE      :
    HOLDING COMPANY LLC and EFIH    :
14  FINANCE INC.                    :
                                    :
15          Defendants.             :
    _____  :
16
17                      United States Bankruptcy Court
18                      824 North Market Street
19                      Wilmington, Delaware
20                      March 13, 2015
21                      2:09 PM - 5:27 PM
22  B E F O R E :
23  HON CHRISTOPHER S. SONTCHI
24  U.S. BANKRUPTCY JUDGE
25  ECRO OPERATOR:  LESLIE MURIN

1    HEARING re Plaintiff-Trustee's Motion for Summary Judgment

2    [Adv. D.I. 178; filed February 13, 2015] AND EFIH Debtors'

3    Cross-Motion for Summary Judgment [Adv. D.I. 175; filed

4    February 13, 2015]

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

1  A P P E A R A N C E S :

2  VENABLE LLP

3       Attorney for PIMCO

4

5  BY:  JEFFREY S. SABIN

6       JAMIE L. EDMONSON

7

8  MORGAN, LEWIS & BOCKIUS

9       Attorney for PIMCO

10

11  BY:  PATRICK STRAWBRIDGE

12       CHRISTOPHER L. CARTER

13

14  MORRISON & FOERSTER LLP

15       Attorney for PIMCO

16

17  BY:  CHARLES L. KERR

18

19  POTTER ANDERSON & CORRON, LLP

20       Attorney for Deutsche Bank New York

21

22  BY:  JEREMY RYAN

23       R. STEPHEN McNEILL

24

25  SHEARMAN & STERLING LLP

1        Attorney for Deutsche Bank New York

2

3   BY:  NED SCHODEK

4

5   PACHULSKI STANG ZIEHL & JONES LLP

6        Attorney for ComputerShare

7

8   BY:  LAURA DAVIS JONES

9

10  KRAMER LEVIN NAFTALIS & FRANKIL, LLP

11        Attorney for ComputerShare

12

13  BY:  GREGORY A. HOROWITZ

14

15  WILMERHALE

16        Attorney for Delaware Trust Company

17

18  BY:  PHILIP CANTER

19

20  KIRKLAND & ELLIS LLP

21        Attorney for Debtors

22

23  BY:  ANDREW MCGAAN

24

25  COLE SCHOTZ P.C.

1        Attorney for Delaware Trust Company

2

3   BY:  NORMAN L. PERNICK

4

5   WILMER CUTLER PICKERING HALE & DORR LLP

6            Attorney for Delaware Trust Company

7

8   BY:  PHILIP D. ANKER

9        DAVID GRINGER

10

11  ROPES & GRAY LLP

12       Attorney for Delaware Trust Company

13

14  BY:  KEITH H. WOFFORD

15       D. ROSS MARTIN

16

17  MONTGOMERY MCCRACKEN WALKER & RHOADS, LLP

18       Attorney for Eastside Committee

19

20  BY:  MARK A. FINK

21

22  MORRIS, NICHOLS, ARSHT & TUNNELL LLP

23       Attorney for Sponsors

24

25  BY:  ANDREW R. REMMING

```
 1   KIRKLAND & ELLIS LLP
 2        Attorney for Debtors
 3
 4   BY:  ANDREW MCGAAN
 5        RICHARD U. S. HOWELL
 6        MIKE PETRINO
 7
 8   RICHARDS, LAYTON & FINGER
 9        Attorney for the Debtors
10
11   BY:  DAN J. DEFRANCESCHI
12        JASON M. MADRON
13
14   SULLIVAN & CROMWELL LLP
15        Attorney for Eastside Committee
16
17   BY:  CHIANSAN MA
18        BRIAN D. GLUCKSTEIN
19
20   DRINKER BIDDLE & REATH LLP
21        Attorney for Delaware Trust Company
22
23   BY:  JAMES H. MILLAR
24
25   AKIN GUMP STRAUSS HAUER & FELD
```

1        Attorney for EFIH Ad Hoc Committee

2

3   BY:  ABID QUERSHI

4

5   CHIPMAN BROWN CICERO & COLE LLP

6        Attorney for EFIH Ad Hoc Committee

7

8   BY:  ANN M. KASHISHIAN

9

10  POLSINELLI

11       Attorney for TCEH Committee

12

13  BY:  JUSTIN K. EDELSON

14

15  KLEHR HARRISON HARVEY BRANZBURG LLP

16       Attorney for UMB Bank Indenture Trustee

17

18  BY:  RAY H. LEMISCH

19

20  CROSS & SIMON, LLC

21       Attorney for Fidelity

22

23  BY:  MICHAEL J. JOYCE

24

25  (Unknown Law Firm)

```
 1        Attorney for WSFS, Trustee
 2   BY:  (Unknown)
 3
 4   ALSO PRESENT TELEPHONICALLY:
 5   SAM GREENE
 6   MATTHEW KIMBLE
 7   SCOTT L. ALBERINO
 8   NII-AMAR AMAMOO
 9   ARIEL BARZIDEH
10   ROBERT J. BOLLER
11   PEG A. BRICKLEY
12   PHILIP E. BROWN
13   STEPHEN BUMAZIAN
14   CHRIS CARTY
15   KEVIN COCO
16   MARK A. CODY
17   KENT COLLIER
18   GREN DAY
19   ADAM M. DENHOFF
20   IRA DIZENGOFF
21   STACECY DORE
22   DAVID M. DUNN
23   BRADLEY FEINGERTS
24   BARRY FELDER
25   JEFF FINGER
```

1    PARTRICK FLEURY

2    CHARLES GARRISON

3    MEGGIE GILSTRAP

4    SETH GOLDMAN

5    DAVID GRINGER

6    XIAOYU GU

7    MARK F. HEBBELN

8    ANGELA K. HERRING

9    IAN HOLMES

10   SANDRA HORWITZ

11   NATASHA HWANGPO

12   DENNIS L. JENKINS

13   ISAAC JONAS

14   ANNA KALENCHITIS

15   HAROLD KAPLAN

16   CHRIS D. KENNY

17   CHARLES KOSTER

18   STUART KOVENSKY

19   AARON KRIEGER

20   MICHELE F. KYROUZ

21   CATHERINE LOTEMPIO

22   NAOMI MOSS

23   JOANNA S. NEWDECK

24   BRIAN PACHECO

25   RICHARD PENDONE

1  ABID QURESHI

2  MATTHEW ROOSE

3  JEFF ROSENBAUM

4  ERIK SCHNEIDER

5  GEORGE W. SHUSTER, JR.

6  FREDRIC SOSNICK

7  ANDREW M. THAU

8  MATTHEW UNDERWOOD

9  WARREN USATINE

10  KEVIN M. VAN DAM

11  THOMAS WALPER

12  MICHAEL J. WALSH

13  LINDSAY ZAHRADKA

14  JOSEPH ZALEWSKI

15  LAUREN BITZIN

16  JAE SEON CHOI

17  BERET FLOM

18  ASHUTOSH HABBU

19  JEFFREY LEVITAN

20  PAUL POSSINGER

21  JEREMY COFFEY

22  MARITA ERBECK

23  DANIEL J. HARRIS

24  MICHAEL G. LINN

25  JEFFREY M. CLINSKY

1    TUVIA PERETZ

2    AMER TIWANA

3    FRANK F. VELOCCI

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    P R O C E E D I N G S

2              THE CLERK:  All rise.

3              THE COURT:  Please be seated.  All right.  Good

4     afternoon.  I assume you've divvied up how you'd like to

5     proceed?

6              MR. MCGANN:  I think we have.

7              MR. ANKER:  We have, Your Honor.  Philip Anker for

8     Delaware Trust Company.  Mr. McGann and I spoke and since we

9     are the Plaintiff here, although there are cross-movants, I

10    think we've agreed that I will go first.

11             MR. MCGANN:  Yeah.  Andrew McGann for the Debtors,

12    Your Honor, good afternoon.  I'm not sure who else is

13    speaking, but one thing we haven't talked about, because we

14    don't know about Your Honor's timing, is what -- if there's

15    outside limits that we need to work within, because we could

16    easily accommodate that.

17             THE COURT:  Well, I don't want to set any

18    artificial limits, and I know we're starting later than

19    anticipated and I apologize, and thank you for your

20    patience.  So, certainly aren't going to go any later than

21    6:00.

22             MR. MCGANN:  I think we can easily --

23             THE COURT:  And hopefully, we won't have to go

24    that far but we're not going to go any later than 6:00.

25             MR. MCGANN:  We can, I think, easily get it in.
```

1          THE COURT:  Okay.

2          MR. ANKER:  Good afternoon, Your Honor, and I may

3    disagree with Mr. McGann about a lot today, but I think I

4    speak for both of us in thanking the Court.  I know it's

5    been a long day already for the Court and it's Friday, and

6    we very much appreciate the attention that the Court has

7    devoted and will devote to this matter.

8          For the record, Philip Anker, Wilmer Cutler

9    Pickering Hale and Dorr for Delaware Trust Company as First

10   Lien Trustee on the EFIH side.

11         Your Honor, we have some demonstratives, we've

12   shared them with Mr. McGann, he has some as well, which he

13   has been good enough to share with us.  May I approach and

14   had this up to Your Honor and to Your Honor's law clerk?

15         THE COURT:  Yes.  Thank you.

16         MR. ANKER:  Your Honor, I hope not to use the full

17   two hours, and I know Mr. Horowitz for the EFI Second Liens

18   would like to speak.  To the extent I don't use up my full

19   time, I'd like to reserve whatever is left for rebuttal.

20   More than anything, I'd like to address any questions the

21   Court has, but unless the Court wants me to start elsewhere,

22   I thought I might start by setting the stage, and I think

23   it's a pretty important stage.

24         We are here on phase one of this litigation.  As

25   Your Honor will recall, at EFIH's request, the Court last

1    summer bifurcated this litigation.  There are two key,

2    salient aspects of phase one.  The first is that the Court

3    is to decide, and I'm quoting Your Honor's word, "whether

4    the noteholders are entitled to a make-whole or in the

5    alternative, damages under the indenture and state law,

6    without consideration of whether EFIH might have any

7    bankruptcy law defenses," and second, the Court is to

8    assume, solely for purposes of phase one and putting the

9    intentional evasion issue aside, that EFIH is solvent and

10   able to pay its Creditors in full.

11          Those two points are related.  Your Honor may

12   recall, the way the bifurcation came about is we moved for

13   discovery regarding solvency.  Your Honor issued an opinion

14   last summer in which you said solvency is potentially

15   relevant here, because if the EFIH Debtors are solvent,

16   then, and I quote Your Honor's opinion, "the Court is able

17   to follow the approach in Gencarelli, the First Circuit

18   case, and similar precedent to enforce the terms of the

19   contract under state law."  What the First Circuit said in

20   Gencarelli, and I quote it, is "when the Debtor is solvent,

21   the bankruptcy rule is that when there is a contractual

22   provision, valid under state law, the bankruptcy court will

23   enforce that contractual provision."  I will come back to

24   that proposition, because I think it foursquare decides this

25   matter.

1          I'm going to focus on state law.  I will, at

2     times, go into several bankruptcy law to address arguments

3     that the Debtor has put at issue, arguments that I think,

4     frankly, are not proper as part of phase one, but I will

5     address them.

6          The question here is whether the First Lien

7     noteholders are entitled to either the make-whole or

8     damages, under state law, and to understand that question,

9     to answer that question, you have to start by understanding

10    what our claim is and what it is not.  Our claim put simply

11    is that EFIH holds the make-whole prescribed and specified

12    in the indenture, or damages or breach, or for denial of the

13    rights under the indenture in common law, because it

14    redeemed the notes on June 19, 2014.

15         On that day, six weeks into its bankruptcy, it

16    repaid all interest, principal, and all the interest other

17    that some disputed interest, and it did so by refinancing

18    the notes, by borrowing at a lower interest rate.  There is

19    no dispute, conceded by their witnesses at deposition, that

20    on the very same day, June 19, 2014, through the very same

21    mechanism, a refinancing, for the very same reason, interest

22    rates had declined, EFIH had repaid the First Lien notes, it

23    would owe the make-whole.

24         The question here boiled down to its essence is,

25    does the fact that this company and this issuer is in

1   bankruptcy, change the result?  And the question really, and

2   I will come down to this, is whether one sentence in the

3   indenture changes in the result and allows one to put on

4   blinders and ignore the rest of the indenture.  The answer

5   to that question, I submit respectfully, is a redemption is

6   a redemption, whether it occurs inside or outside of

7   bankruptcy.  The indenture doesn't draw a distinction in

8   describing a redemption between whether it occurs in our out

9   of bankruptcy, and if that were not dispositive, the purpose

10  of a make-whole, which is to protect the noteholders against

11  a reduction in interest rates and having to reinvest in a

12  lower interest rate environment, applies precisely here.

13          I've told you what our Claim is.  Let me say what

14  it is not.  Hopefully, this will shorten the matter for

15  today.  It is not that EFIH owes the make-whole because it

16  filed for bankruptcy April 29, 2014, six weeks before it

17  redeemed.  Had it, after it filed, simply continued to pay

18  interest or had interest accrue and pay at the end of the

19  case, and ultimately reinstated the notes as it was lawfully

20  allowed to do under 1124, no make-whole would be due.

21          I wanted to begin by setting the stage and saying

22  what our Claim is and isn't because I think it informs the

23  analysis.  The Debtors make much in their brief, and in

24  their PowerPoint presentation, they will make much of the

25  notion that there's some conflict between the optional

1   redemption provision 307 of the indenture and the

2   acceleration provision 602, and they say 602 is more

3   specific and it is the governing provision.

4          I think that's a false conflict.  I think New York

5   law says you have to read an indenture as a whole, and I'm

6   not going to shy away from any provision in this indenture,

7   but I am going to start the analysis, and I am going to

8   start the argument at 307, and the reason why it's

9   appropriate to start the analysis with a redemption

10  provision is our claim turns on the fact that they redeemed

11  on June 19th, not that they filed for bankruptcy and

12  temporarily the debt was accelerated.

13         307, Your Honor, is the section, and the only

14  section in the indenture, giving EFIH a right to redeem the

15  notes.  Section 2.01(d) of the indenture says, and I quote,

16  "the note shall not be redeemable, other than is provided in

17  Article 3 hereof," and Section 307(c), Article 3 is in Title

18  Redemption, Article 307(c), which is the no-call, says, and

19  I quote, "except pursuant to clause (a), or clause (b) of

20  this Section 307, the notes shall not be redeemable at the

21  issuer's option prior to December 1, 2015."  Now, that'd be

22  that be the pursuant sections, 307(a) and (b), (b) as in

23  equity claw back that purely allowed EFIH to redeem only up

24  to 50 percent of the notes and as to all but a very small

25  portion of the notes at issue, it expired on December 1, I

1    believe, 2013, so it is not the issue.

2            307(a) is the only section, and if I could go to

3    demonstrative number five, let's look at the language in

4    that section.  It's entitled Notes Make-Whole Redemption, so

5    when everyone uses the shorthand, Your Honor, make-whole,

6    it's picked up in the very provision, and it says that any

7    time prior to December 1, 2015, the issuer may redeem the

8    notes at a redemption price equal to 100 percent of the

9    principal, plus the applicable premium," that's the defined

10   term for the make-whole, "as of an accrued interest up to

11   the date of redemption."

12           Let's start -- there's two requirements there.

13   One it's got to redeem, and two it's got to do so prior to

14   December 1, 2015.  There's no issue as to the latter, so let

15   me just quickly knock it off.  The Debtors announced in

16   November 2013 that they intended to put EFIH into bankruptcy

17   in an 8-K and redeem the notes in the bankruptcy.  They, on

18   the first day of this bankruptcy, April 29th, filed a motion

19   seeking that relief, and most importantly, they completed

20   it.  They effected the redemption on June 19, 2014, which is

21   more than six months prior to December 1, 2015.

22           So the only question is, was that a redemption?

23   The indenture doesn't define that term, and New York law,

24   and New York law governs here, Your Honor, the indenture has

25   a governing law provision prescribing that New York law

1   governs, New York law says you look to the common

2   understanding of the term.

3           The Second Circuit last year, in the Chesapeake

4   decision, said redemption is, and I quote, citing a leading

5   treatise, "repayment of a debt security at or before

6   maturity."  I say it's quoted a treatise.  It quoted

7   Barron's Dictionary of Finance and Investment Terms.  In the

8   Third Circuit in an old decision, but it tells you how well-

9   established this is, in the Felin v. Kyle case from 1939,

10  cited in our papers, said redemption is, quote, "paying

11  back," end quote, or satisfying ones indebtedness.

12          EFIH cites no case law to the contrary, and

13  there's lots of other case law and financial treatises that

14  define the term the same.  Indeed, what EFIH does, though it

15  doesn't cite case law, is, and I give it credit for this, in

16  moments of candor, in moments perhaps where its guard was a

17  little bit down, admitted the reality here.

18          Let us turn to demonstrative number two.  This is

19  its answer, in this very case.  The complaint tells a story,

20  tells the facts, Your Honor, of how EFIH had planned for

21  this bankruptcy and this redemption for a while, and it then

22  alleges, quote, "Accordingly, prior to the petition date,

23  EFIH contemplated and obtained commitments for financing to

24  redeem the 10 percent notes."  The answer was one word:

25  "Admitted."

1          I took Mr. Horton, the Treasurer's deposition,

2     30(b)(6) deposition, and Mr. Horton, I didn't even ask a

3     question that led to it, let's go to demonstrative number

4     three.  I was asking Mr. Horton about the numbers, how much

5     the redemption was, and he said, "I have that," it says "I

6     have the," but I think he meant "that," "as of the

7     redemption date, so that's the kind of math I have in my

8     head," and I asked him, "I'm sorry, as of the redemption

9     date meaning what date?" "As of the date we repaid.  The

10    repayment date."

11         Now, those two examples deal with our repayment of

12    the redemption of our notes, but the Debtors have

13    acknowledged the same point in their securities SEC filings.

14    This as it relates to the Second Lien note, Your Honor knows

15    better than I do, that they withdrew their motion this

16    summer to do a Second Lien deal.  When they did, they filed

17    an 8-K.

18         Let's go to demonstrative number four, and in

19    that, a filing under the Securities laws, the Debtor said

20    the following: "EFIH reserves the right to redeem the

21    outstanding EFIH Second Lien Notes," I think they said at a

22    later time and that's what the ellipsis is, "but is under no

23    obligation to do so."  In short, EFIH redeemed the notes

24    prior to December 15.  It repaid the debt security

25    satisfying indebtedness.

1          Under the terms of the indenture, it therefore

2     owes the make-whole.  Our case is that simple, that

3     straightforward.  Your Honor, if all that mattered today was

4     our case in chief, we really would get home long before 6:00

5     PM because I'd sit down right now.  Everything else I'm

6     going to say today, with respect to our make-whole claim as

7     opposed to our alternative claims for damages are responses

8     to arguments made by the Debtors, arguments that I

9     respectfully submit, in the end, obfuscate what is this

10    simple, straightforward analysis.

11          As I read it, and Mr. McGann may have a different

12    way of characterizing it, I think there really are three

13    groups of arguments the Debtors make.  One is,

14    notwithstanding everything I've just shown you in the common

15    law understanding, the term "redemption" really has a

16    different meaning here, and what they did on June 19th was

17    not a redemption.

18          The second argument is, even if it wasn't a

19    redemption, I'm not right in what I told you earlier about

20    307.  There's really a third requirement, first -- to

21    trigger the make-whole.  First, the Debtor must redeem,

22    second it must do so prior to December 1, 2015 and third, it

23    has to be optional or volitional, and they say this was not.

24          And the third is that, even if 307 is triggered,

25    as I said earlier, they say, "Well, it's in conflict with

1    602, the acceleration provision, and that's the specific

2    provision, that's the governing provision" in their words.

3          All three arguments boil down, however, to one

4    proposition.  It is that this Debtor filed for bankruptcy,

5    that caused the debt under the automatic acceleration

6    provision to accelerate, it insured, it was due and payable,

7    and as a result, they say the noteholders aren't entitled to

8    a make-whole.  Every argument turns on that, every argument

9    turns on one sentence.  I'm going to take them in turn.

10          I'm going to spend more of my time on the first

11   because frankly, it dictates the answer to the second and

12   third, and I'm going to start, Your Honor, not with the

13   simplest and easiest, which is probably not the most wise

14   advocacy strategy, but I think it makes sense here because I

15   think, at the end of the day, there's a real simple answer

16   here.

17          They say there was no redemption because 307

18   applies, only if EFIH has not defaulted and the notes have

19   not accelerated.  Before going to the words, let's step back

20   and think about that proposition.  They're -- what we're

21   talking about here is claim allowance, whether we have a

22   valid claim and how much it is, and their proposition is

23   that the noteholders agreed to accept less money, hundreds

24   of millions of dollars of less money, simply because they

25   defaulted.  I can't think of another example of that.

1          In bankruptcy, Creditors often don't get paid in

2     full, unsecured Creditors, but the dollar amount of their

3     claim, what they're owed, is no less in bankruptcy than it

4     is outside, unless you have, you know, 502(b)(6), a

5     situation where the special rules in bankruptcy change them.

6     But as a matter of contract it's never that way, indeed it's

7     the opposite.  Often, what credit agreements provide is that

8     the rate of interest bumps up upon default, to default

9     interest.  And here, contractual acceleration provides no

10    benefit to the noteholders of any meaningful sort.  As the

11    Third Circuit has made clear, we can file a Proof of Claim

12    for the full amount in any event.  That's Oaktree.  And of

13    course, because of the automatic stay, we can't collect.

14          Let's go to the next point, which is, after

15    stepping -- after putting common sense on the table, let's

16    look at the words.  Let's go back to demonstrative five.

17    The language is, at any time prior to December 1, 2015, the

18    issuer may redeem.  There's two significant parts of that,

19    those words, Your Honor.  The first is, it uses the word

20    "redeem".  It doesn't use the word "pre-pay."  Many Courts

21    have said "pre-pay" means a payment before maturity, but the

22    word "redeem" as the Second Circuit explicitly held in

23    Chesapeake, includes a payment, quote, "at or before

24    maturity."

25          Second is tied to December 1, 2015.  If the idea

1   here was, this redemption provision doesn't -- isn't

2   triggering, if EFIH is in bankruptcy, it could have said,

3   "prior to the earlier of December 1, 2015 or such date as

4   the issuer becomes the subject of a proceeding under Title

5   11."  It could simply add a proviso, "prior to December 1,

6   2015, provided, however, if EFIH is the subject of an

7   insolvency proceeding, this provision shall not govern," or

8   it could have said, "prior to maturity, whether stated or

9   accelerated."  It said none of that.  And the authors here

10  knew how to carve payments out.

11          I don't have a slide on this, Your Honor, but one

12  of the more significant provisions of this indenture is

13  Article 9, in particular Section 902.  Article 9 is entitled

14  "Amendment to the Indenture".  It may be "Modification" but

15  I think it's "Amendment," and what it does it creates three

16  different categories of changes to the indenture.  Certain

17  things, ministerial things, can be changed by the Trustee,

18  with the consent of the Trustee, with the company, without

19  any approval of a single noteholder.

20          A second category are things that require the vote

21  of at least the majority and dollar amount, 50.1 percent of

22  the noteholders, and then there's a very narrow third

23  category.  The most central things that can't be changed at

24  all over the objection of any noteholder, even if it owes

25  0.0001 percent of the issuance, without its approval.

1    Things like reducing the interest rate, extending maturity,

2    providing for payment in a currency other than cash in U.S.

3    dollars, and one of those things it says is you can't change

4    the redemption provisions, which tells you how important

5    they are.

6           But for these purposes, for where I am now in the

7    argument, what's most important is what it then says.  It

8    says, "for the avoidance of doubt, payments under three

9    different sections, 309, 410, 414, are not redemptions."

10   You look at those three provisions, none of them is a

11   payment in bankruptcy when they decide, when the Debtor

12   decides to call the notes.  They're the antithesis of that.

13          Although there's three sections, they deal with

14   really two situations.  Both are situations where the

15   noteholders are given the option to clip the notes for the

16   company and elect to do so.  One is a change in control.  If

17   there's a change in control, the indenture says the

18   noteholders can, if they want, put the notes to the company

19   and if so, if they elect to be paid early, no redemption, no

20   payment of the make-whole.

21          The other is an asset sale, an extraordinary asset

22   sale.  The noteholders can put the notes to the company and

23   -- in which case they forfeit the right, having demanded

24   early payment to the make-whole.  There's no carve out,

25   nowhere in this indenture, saying a redemption doesn't

1    include a payment post-bankruptcy.

2            In that regard, and one thing we generally agree

3    on, is what the seminal cases are.  The case law

4    overwhelmingly is in our favor.  Let's put Momentive aside,

5    I will get to it.  It's a case in which Judge Drain at the

6    end said, "under the facts presented to you, a solvent

7    Debtor, the noteholders would have a valid claim.  They have

8    a valid claim among other things, for breach of their right

9    to rescind acceleration."  That's -- and I'm going to get an

10   amendment, is a simple and easy way to dispose of this case.

11           But putting that case aside, I submit there's

12   three cases that are critical:  Judge Gerber's decision in

13   Chemtura, Judge Olack's decision in Premiere Biloxi, and

14   Judge Lifland's decision in Calpine.  EFIH ignores Chemtura,

15   at least it did in its opening brief, didn't cite it.  In

16   its reply, it simply says that Judge Gerber's analysis there

17   was, and I quote, "misdirected," end quote.  As for Premiere

18   Biloxi and Calpine, I'll give them credit - they deal with

19   those cases, but they misread them.

20           Why do I say these cases are critical?  Why do I

21   say they support us?  Because they all deal with the

22   following situation: an indenture they use the "r" word, the

23   "redeem" word, not the "pre-pay" word.  In two cases with an

24   absolute no-call, the Debtor may not call the notes, in the

25   third case, Chemtura with a make-whole.  In all three cases

1    with an identical - identical - automatic acceleration

2    provision to ours, and in all three cases the Debtor going

3    into bankruptcy, and in every one of the cases, the Court

4    holds that the payment post-bankruptcy made by the company

5    as interest rates are declining, is an optional redemption

6    notwithstanding the automatic acceleration.

7            Let's start with Chemtura, demonstrative seven.

8    Here's the language of that.  "At any time, and from time to

9    time prior to the maturity date," which was a defined term,

10   it is defined to June 1, 2016, "the company may at its

11   option redeem all or any portion of the securities of the

12   make-whole price."  Look at the acceleration language,

13   separate section.  "If an addendum default involving

14   bankruptcy occurs and is continuing, all outstanding

15   securities shall become immediately due and payable."

16           Now, this came up in a 9019 settlement, Your Honor

17   and I will acknowledge it's not an adjudication on the

18   merits, but it came up at plan confirmation with the equity

19   committee objecting to a substantial settlement and payment

20   of the make-whole.  And what the Court said, Judge Gerber,

21   and I've known a Judge Gerber a long time, although it was a

22   9019 settlement, in his usual way, he canvassed the case

23   law.  It's an opinion that has a table of contents and goes

24   on for many, many, many pages, so he was as thorough as

25   thorough can be, although this was a 9019 settlement.  He

1    said, and I quote, "the bond holders would have

2    substantially the better argument that there was a trigger

3    of the make-whole," end quote, because, and I resume the

4    quote, "the notes referred to payment before the maturity

5    date defined as June 1, 2016."

6         Indeed he said, and I quote, "the notes could have

7    made the make-whole applicable to payment before a small

8    immaturity, but instead referred to the payment before a

9    specified date."  That's in page 601 of the reported opinion

10   in note 180.  That is on all fours with our case.

11        Let's look at Calpine.  It's demonstrative number

12   nine, please.  Now, we say Calpine I here.  It went up on

13   appeal and I'm going to deal with the appeal decision.

14   Calpine I is a reference to the Bankruptcy Court Judge

15   Lifland's decision, Calpine II is a reference to the

16   District Court's opinion.  We have the same language except

17   here, Your Honor, it's an absolute no-call.  I want to make

18   sure Your Honor under -- we all understand the difference.

19        An indenture might say, as ours does, "except as

20   provided in 307(a), the issuer may not redeem," and then

21   307(a) says you can redeem, but you have to pay the make-

22   whole.  Or it could have an absolute flat, "you may not

23   redeem."  This was an absolute flat, "you may not redeem."

24   So it said, "Issuers may not redeem all or any part of the

25   notes before, prior to April 1, 2007."  It had the same

1    acceleration language, after bankruptcy filing, the notes

2    are due and payable immediately.

3            The Court held, and this is the part of the

4    decision you will hear form the Debtor, the Court held that

5    no make-whole was due.  It held that no make-whole was due

6    because it was a no-call provision and it didn't specify a

7    make-whole.  That isn't relevant here because our indenture

8    does specify a make-whole.  But what is relevant is the

9    Court said there were damages for breach of the no-call.

10           Well, look at the way the no-call is written.

11   "Issuers may not redeem prior to April 1, 2007," and what

12   the issuers did is they filed for bankruptcy prior to April

13   1, 2007, they invoked the automatic acceleration provision,

14   and they said, "We can pay without incurring any damages

15   because this optional redemption provision has been

16   triggered," and Judge Olack said, "No, you're wrong.  That

17   is a redemption, notwithstanding automatic acceleration."

18           The decision read properly is flatly contrary to

19   their argument.  This -- now, Calpine goes up on appeal.

20   And I will say, Your Honor, the decision by the District

21   Court says it's affirming the Bankruptcy Court but I will be

22   candid, it clearly disagreed with the Bankruptcy Court that

23   damages were available.

24           So I think it's fair to say, although Judge

25   Daniels said he was affirming, he was at least in part

1    reversing.  Why did the District Court reverse and what does

2    it tell us?  What Judge Daniels said on appeal is, a no-call

3    cannot be enforced in bankruptcy, therefore, because it

4    can't be enforced in bankruptcy, there can't be any damages.

5           That rationale has been criticized by Judge Gerber

6    in Chemtura, Judge Olack in Premier Biloxi, and by Judge

7    Drain in Momentive, who said he clearly agreed with Judge

8    Gerber that of course, the mere fact that you can't get

9    specific performance as a Creditor, as a noteholder if the

10   Debtor may not redeem, doesn't mean you can't get damages in

11   bankruptcy.

12          So the rationale is both being criticized and is

13   irrelevant to the dispute before us today, because the

14   dispute before us today, at least in large part, deals with

15   a specific make-whole.  Indeed, Judge Daniels said in his

16   opinion, that, were the notes to specify that a make-whole

17   was due, they would have been.

18          On -- it's Star 9 of the opinion, this 2010

19   (indiscernible) 5200 at Star 5, he said -- and let me back

20   up, Your Honor.  There was a make-whole provision, but it

21   had expired.  The time period it covered expired before the

22   payout occurred.  And he wrote, "While the first and second

23   priority notes did require payment of premiums in the event

24   of early payment, damages were still inappropriate for the

25   repayment of those notes because the premiums were

1    inapplicable when the Debtor repaid the notes on March 29,

2    2007."  Here, in our case, the Debtor, EFIH, redeemed on

3    June 19, 2014, sixteen months before December 1, 2015, when,

4    to use his words, "the premiums were applicable," so the

5    rationale doesn't apply.

6            Let's now -- and by the way, I also should note, a

7    further appeal was taken and the matter was settled with a

8    substantial payout to the noteholders, pending appeal to the

9    Second Circuit.  Let's now look at Premier Biloxi.  It,

10   again, this is demonstrative eight, entailed the same facts

11   as Calpine.  Absolute no-call, same acceleration provision,

12   Court again says, you're not entitled to a make-whole

13   because you didn't specify you were entitled to a make-

14   whole.  You just have a no-call, but the Court awards

15   damages, and it said, quote, that "the Debtor breached the

16   no-call provision against redeeming the notes prior to

17   February 1, 2008."  Those -- that required the Court to say,

18   notwithstanding automatic acceleration, this is a

19   redemption.  Those cases, on the central argument, are

20   flatly, flatly contrary to the Debtor's argument.

21           Let's turn to the cases they cite.  Let's turn to

22   demonstrative six.  They cite AMR.  AMR, which is

23   demonstrative six, had explicit language saying that no

24   make-whole would be due.  It had it in the involuntary

25   redemption section, which said, except as provided in

1   Section 303, a make-whole would be due, and then 303 said no

2   make-whole would be due in the event of default or

3   acceleration.  And in the remedy section, where it said if

4   an event of default shall have occurred, then the unpaid

5   principal, together with accrued but unpaid interest, but

6   for the avoidance of doubt, without make-hold amount, shall

7   be due and payable.

8           Let's turn to Solutia, a case the Debtor cites.

9   And here I don't have a slide, Your Honor, I apologize.

10  Solutia, which the Debtors cite, I will be candid.  I'm

11  mystified.  It was a case where there was no make-whole

12  provision, there was no 307(a) equivalent in our indenture.

13  There was also no no-call provision. There was no 307(c).

14  And what the Court simply held is that in the absence of a

15  make-whole, in the absence of a no-call, the company can pay

16  off the notes, because they accelerated, and it can pay them

17  off after acceleration without paying anything because you

18  didn't require a make-whole and you didn't have a no-call.

19          Indeed, the Court explicitly said, Judge Abrams --

20  I'm sorry, Judge Beatty, I go by her prior name -- that the

21  situation in front of her was not the situation in this

22  case.  Footnote 13 of the recorded opinion, and I quote,

23  "nor is this Court concerned with a situation in which a

24  Debtor in possession seeks to pay off a secured debt

25  containing a pre-payment clause," ours is actually a

1    redemption clause, but continuing the quote, "containing a

2    pre-payment clause prior to confirmation."  She then cites

3    Calpine and Premier Entertainment Biloxi.  So, she

4    explicitly distinguishes those cases because those were

5    cases that had a no-call and the case in front of her

6    didn't.  Our case has both a no-call and a make-whole

7    provision.

8            Now, Your Honor, let me turn to one other point

9    here, before getting to what I think, and I apologize for

10   taking this long, is really dispositive here.  The Debtors

11   say, well, it can't have been a redemption because if you

12   look at Article 3, we had to provide notice for there to be

13   a redemption.  There's three answers.  One is, and I don't

14   mean to be glib, but it is reminiscent of the boy who

15   murders his parents and then pleads for mercy as an orphan.

16           The notion that one can breach a provision of the

17   indenture and therefore get a free ride as to another

18   provision by failing to give notice, get a free ride on

19   paying the make-whole, is pretty extraordinary, and I recite

20   the Court to the NML Capital v. Republic of Argentina case

21   cited in our brief.  There, the indenture required both at

22   maturity, payment of all principal and separately, payment

23   of semi-annual, they call it biannual, interest until the

24   notes were paid in full, and Argentina said, the notes have

25   matured.  We don't have to continue to pay biannual

1    interest, and the New York Court of Appeals, highest Court

2    in New York, said the following: "Nothing in the language

3    chosen by the drafters suggests that breach of the first

4    obligation was intended to relieve the issuer of the duty to

5    fulfill the second."

6              952 Northeast Second at 490 to 491.  There's two

7    other responses.  One response to the notice argument is, as

8    the Second Circuit held in Chesapeake, redemption is the act

9    of repaying, not the giving of notice.  That's the central

10   holding.  And third, this is all a red herring.  EFIH gave

11   notice.  It filed a pay on November 1, 2013 saying that it

12   was going to redeem, it filed the Debtor in Possession

13   motion on April 29, 2014 saying it was going to redeem, and

14   it then, as you remember, Your Honor, this redemption was

15   effected through a tender offer where noteholders could, if

16   they wanted, accept a settlement.  A tender offer memo went

17   out on May 6, 2014.

18             That brings me to what I think, I wanted to set

19   that forth because I use the central sort of analysis, but

20   it brings me to what I think is the easy dispositive point.

21   This whole argument, this second argument they make, the

22   third argument they make, all turn on the proposition that

23   EFIH's bankruptcy filing automatically accelerated the

24   notes.  But that ignores the elephant in the room.

25             Let's go to demonstrative five, and let's now look

1    at the acceleration provision.  The immediately next

2    sentence after automatic acceleration says the following:

3    "the holders of at least the majority of the notes may waive

4    any existing default and rescind any acceleration with

5    respect to the notes and its consequences, so long as such

6    rescission would not conflict with any judgment of a Court

7    of competent jurisdiction."  The noteholders sent such a

8    notice on June 4th, saying that the notice was effective

9    unless there was a determination that the automatic stay

10   applied, in which case it was subject to relief from the

11   stay.

12          And as Your Honor may remember, when you approved

13   the pay-off of the First Lien notice, there was explicit

14   language that we insisted on in the order, providing that

15   the fact that it was paid wouldn't change the analysis.  You

16   would treat today as if a payment hadn't occurred, and the

17   rescission was being made before payoff.  It was attempted

18   before payoff.

19          I want to pause and reiterate what I said.  If

20   Your Honor accepts that that rescission was effected,

21   indeed, you don't even have to accept that it was effected,

22   you'd accept that we'd have a right under the contract to

23   that rescission, you hold that the parenthetical, "so long

24   as such rescission would not conflict with any judgment of a

25   Court of competent jurisdiction," doesn't apply.  This

Page 36

1    matter is resolved.

2            Every argument they make turns on acceleration,

3    and under New York law, it is quite clear.  We cited the in

4    re Trusteeship created by JER CRE CDO 205-1 Limited case,

5    from the Southern District, decided December 31, 2013,

6    rescission of acceleration means that it's as if the

7    acceleration never occurred.  Quote, "putting an end to it

8    as though it never were."  Indeed, our indenture, Section

9    604 specifies that upon a waiver of default, quote, "such

10   default shall cease to exist."

11           In Momentive, a case they champion, Judge Drain

12   said, the noteholders have a valid claim for denial of the

13   right to rescind.  He held in that case, which involved an

14   insolvent Debtor, that the stay applied and shouldn't be

15   lifted to allow the notice to go out, and I'm going to touch

16   on that in a minute, but he said in any event, even if the

17   stay isn't lifted, the noteholders have a valid claim for

18   denial of the right to exercise their contractual right.

19           But he said in this case involving an insolvent

20   Debtor, I'm going to interpret that claim to be subject to

21   502(b)(2) as a claim for un-matured interest, and therefore

22   disallowing bankruptcy.  But he made it quite clear, because

23   he cited Solutia -- I'm sorry, he cited Calpine, Chemtura

24   and Premier Biloxi with approval, he stressed those were

25   solvent Debtor cases, and in the solvent Debtor case, that

1    would be a valid claim that I'd allow.  And that is

2    consisted with the law of the Circuit.

3           Your Honor, one of the decisions we cited, and I

4    want to stress at the outset, it is an unpublished opinion,

5    so it is not binding on you, is Judge Ambro's decision in In

6    re Stephan, S-T-E-P-H-A-N, 588 Fed Aps 143, decided at the

7    very end of last year, less than three months ago.  That was

8    a case where a Debtor in bankruptcy objected to the claim of

9    a secured lender.

10           The secured lender said, I'm under-secured, I'm

11   entitled to a deficiency claim, and the Debtor said, hold on

12   a second.  Under applicable state law, there the law of the

13   State of New Jersey, you must foreclose, and you're only

14   entitled to a deficiency claim if the result of a

15   foreclosure does not pay you in full.  And the automatic

16   stay had barred the lender from foreclosing.

17           Judge Ambro, in a unanimous opinion for the panel

18   wrote, that can't be right.  A claim in bankruptcy includes

19   a right to payment whether fixed or contingent.  The stay

20   can never affect the amount of a claim.  The stay can never

21   affect the validity of a claim.  It simply affects the right

22   to enforce rights to collect on it.

23           So just as there, the fact that the stay barred

24   the Creditor from exercising its (indiscernible) or right,

25   there to bring a foreclosure proceeding, the fact that that

1    was true didn't affect the allowance of the claim, so to

2    here, even if Your Honor were to conclude that the stay

3    barred us from rescindment, we have a claim for denial of

4    the right to rescind.  And in a solvent Debtor case, whether

5    that claim is secured or unsecured, it's allowed, and it is

6    solvent, there's enough money to go around.

7             In Premier Biloxi, which they cite and quote,

8    Judge Olack said the following at 445(b)(r)626, "the parties

9    agree that the claimants never rescinded any alleged

10   automatic acceleration, although they could have under

11   Section 602," and Section 602 of that indenture, like 602 of

12   ours, said that noteholders could rescind unless doing so --

13   except they can't do so if the decision, quote, "would

14   conflict with any judgment or decree," and yet the Court

15   upheld that they could rescind.

16            So what this comes down to, if you want to put

17   every other issue aside, is whether this one parenthetical

18   in the demonstrative in Section 602, "so long as such

19   rescission would not conflict with any judgment of a Court

20   of competent jurisdiction," applies.  If it doesn't and we

21   have the right to rescind, we have a claim.  They say that

22   that parenthetical, means we don't have the right to

23   rescind, and what they cite to is the automatic stay.

24            I'm going to try to be brief.  First, the

25   automatic stay is not, let's look at the words, a judgment.

1    Under New York Law, a judgment is something one can take an

2    appeal from.  New York CPLR is clear on that.  One cannot

3    appeal the entry of the automatic stay.  If one brings a

4    motion for relief from stay and it's denied, one may be able

5    to appeal, but one can't appeal the entry of the stay.  Two,

6    it's not entered by a Court.  The automatic stay is a

7    product of statute.

8              To be sure, there are cases in which Courts have

9    said the automatic stay has the force of, or is analogous

10   to, or is similar for contempt purposes, to a Court order,

11   but here for contract, what it has to be is a judgment of a

12   Court.  It's not a judgment and it was entered by Congress,

13   not, respectfully, by Your Honor.  And there's no question,

14   if you continue with the language, about competent

15   jurisdiction.  The automatic stay applies worldwide, without

16   any concerns about limitations of a personal jurisdiction of

17   any Court.

18             Indeed, Your Honor, it is evident that there was

19   no attempt in this indenture, to give an unnatural meaning

20   to the phrase, "judgment of a Court of competent

21   jurisdiction."  The indenture refers, in several other

22   sections, to statutory provisions.  Section 101 defines

23   consolidated net income, using the word statute, and by the

24   way, using the word judgment as separate terms.  Section 101

25   also defines environmental law, again using the word

1    statute, and the word judgment to mean different things.

2    The indenture also refers, 601(a) and 406 are other

3    provisions.  They refer to statutes but no reference here in

4    602.  The indenture also refers in several of those sections

5    to a stay, Sections 406, 1101, but not here.  The authors of

6    this indenture knew how to make this parenthetical apply to

7    a statute, to the automatic stay, but they didn't.

8             Indeed, construing this parenthetical to mean that

9    it covers the automatic stay, would render -- would nullify

10   the central provision of this rescission right.  As is

11   evident from the quote, it applies to any, any acceleration.

12   Not just a declared acceleration, but any acceleration

13   including an automatic acceleration, by reason of bankruptcy

14   filing.  If the parenthetical meant that you can't rescind

15   when the automatic stay goes into effect, well the stay goes

16   into effect in every single bankruptcy case.  So it wouldn't

17   apply to any acceleration because it would never application

18   in bankruptcy, and that would violate the basic rule of

19   contract instruction that you're supposed to give -- effect

20   every provision.

21            Finally, what that provision is designed to get it

22   is pretty obvious and has nothing to do with the stay.

23   Section 602 is part of Article 6.  It deals with rights and

24   remedies of the noteholders in the even that EFIH defaults.

25   One of the things it says is, that if there is a default,

1   the minority of the noteholders, minimally 30 percent in

2   dollar amount, may accelerate the debt.  And so you can have

3   a situation where 30 percent accelerate, they then seek to -

4   - they then get a judgment for the full principal amount,

5   and what this is saying is, once they do that, the majority

6   can't come in and unscramble the egg and deny that judgment

7   its effect.

8          Your Honor, I'm going to spend only one or two

9   minutes on the next point, which is in any -- because you

10  don't need to reach it for the reasons I just said, that

11  it's good enough that we have a claim for denial of our

12  right, but the stay shouldn't apply here anyway, or the

13  Court should give a release.

14          First, they say that the stay applies because we

15  are exercising control over property of the Debtor, but this

16  indenture didn't give the Debtor a right to accelerate the

17  notes.  It provided for automatic acceleration, subject to

18  our right to rescind.  The case is thus fundamentally

19  different from AMR, where as I showed you the language

20  earlier, the Court stressed that the indenture there gave

21  the Debtor the absolute right to pay off the note upon

22  bankruptcy without paying the make-whole, or Solutia, where

23  Judge -- I keep wanting to say Judge Abrams -- Judge Beatty

24  said -- pointed out that there, the rescission right only

25  applied to a declared acceleration, one of those where the

1    noteholders have to declare it, not automatic.

2           We're also not seeking to collect a claim.  Think

3    about that argument, that we're violating the stay because

4    we're seeking a collective claim.  We sent a notice waiving

5    default, rescinding acceleration.  It was the antithesis of

6    seeking a collective claim.  We did that on June 4.  We

7    filed the motion on May 15, the stay applicability motion,

8    but we sent the notice on June 4.  It was their act on June

9    19 to redeem us that caused the make-whole to come due.  Had

10   they simply allowed that notice to sit out there and not

11   redeemed us, we wouldn't have collected one penny more.  It

12   is their action, not ours.

13          Finally, if the Court were to ever have to get to

14   the issue, there's ample cause here for relief from the

15   stay.  Let me go back to what Your Honor said at the

16   beginning, and I said -- that's why I said it was

17   dispositive.  Your Honor said, quoting Gencarelli, "When the

18   Debtor is solvent, the bankruptcy rule is that where there

19   is a contractual provision valid under state law, the

20   Bankruptcy Court will enforce the contractual provision.

21   That right of rescission is a provision of contract, valid

22   under state law." The New York Courts have said so.

23          Giving relief from the stay here if you had to,

24   and you don't have to reach it, would be fully consistent

25   within, and it would be the logical extension of what you

1  said this summer in Gencarelli, and frankly, it's not going

2  to open up Pandora's box.  We're dealing with a solvent

3  Debtor and we're not talking about seeking relief from the

4  stay to foreclose, and, at a fire sale, selling the Debtor's

5  interests and all of its property in Encore.  We're seeking

6  relief wherever needed, simply to send a notice to preserve

7  our contract rights.

8       We cited Judge Schwartzman's decision in Texaco.

9  By the way, they don't cite a single case, not one, saying

10  that relief from the stay should not be granted in these

11  circumstances.  There, the noteholders were seeking to send

12  a notice, or the Trustee, to accelerate, because upon

13  acceleration a higher rate of interest applied, and Judge

14  Schwartzman said, and he focused on the fact that the

15  Debtors there are not seeking to control property.  They're

16  simply seeking to send a notice that would preserve their

17  rights under state law.  He called it, and I would quote,

18  "ministerial," and he granted relief from the stay.

19       Your Honor, let me just say one other thing on

20  this issue and then move on.  AMR and Momentive cases, which

21  they cite, are cases in which the Court declined to grant

22  relief from the stay to permit rescission and held that the

23  stay applied precisely because those courts concluded that

24  if rescission were committed, the noteholders would have a

25  valid state law claim to the make-whole.  And so their

1   premise is exactly that we have the state law right and

2   exactly it would make the make-whole due.  And their reason

3   for not giving relief from the stay in that case -- they

4   never sort of really deal with the alternative claim issue.

5   Momentive does, but it says it is a valid alternative claim,

6   that is, for denial of a right, but it's subject to

7   502(b)(2).  Both Courts stress that other Creditors of the

8   relevant Debtor would be hurt.  Both Courts are assuming

9   insolvency.  We have precisely the opposite circumstance.

10          Let me try quickly to move through the other two

11   arguments.  The first by the Debtor is that this, even if

12   there was a redemption, was not optional.  Now, it is true

13   that the heading of 307 is entitled "Optional Redemption."

14   It's also true that Section 13-15 of the indenture specifies

15   that section headings are for convenience only.  But I'm

16   going to take the argument head-on and not rely exclusively

17   on 13-15.  This is an argument where the Debtors are asking

18   you to blink reality.  Mr. Horowitz in his papers supporting

19   our motion said that the Debtor's argument does violence to

20   the English language.  I'm going to give him credit. I think

21   it's right and I think it's an apt way of putting it.  Let's

22   go over, briefly, what the facts were here.

23          Let's go to demonstrative ten, if we can get it

24   up.  EFIH, by its own -- EFIH planned, for a long time, to

25   file this motion.  It announced it on November 1, 2013.  A

1    motion, that is, on the first day of the case to take out

2    the noteholders without paying their make-whole.  It didn't

3    do so because we declared a default.  We never declared a

4    default.  We didn't file an involuntary.  They did so --

5    what we did do is we sent them a notice waiving any default

6    and rescinding any acceleration, and the Debtors then filed

7    their motion saying, we are executing this refinancing on a

8    non-consensual basis.  For them to say that we forced them

9    to do it is pretty rich.

10            They say the reason they did it is they took

11   advantage of an opportunity to obtain a highly favorable

12   interest rate.  It went from 10 percent to 4 and a quarter.

13   Lots of the other debt, all the debt of all the Debtors, $42

14   billion, has acceleration provisions, yet even though

15   they're required to pay us, it wasn't optional per se,

16   somehow, all the rest hasn't been paid, other than, I gather

17   yesterday, they paid out a small amount of the Second Lien

18   debt.  And let's look at, when they did so, they filed a

19   motion, you may remember, before Your Honor.  You heard it

20   last week, about how they thought so hard about their

21   options and their alternatives and concluded that $750

22   million, was the right number, yet they didn't have that

23   their option?

24            Let's go back to, just if you could, demonstrative

25   four.  This is what they said in their SEC filing this past

1   summer.  "EFIH reserves the right to redeem the outstanding

2   Second Lien Note, but is under no obligation to do so."  How

3   is it not optional when they're under no obligation to do

4   so?  The Debtor's argument requires Your Honor not merely to

5   blink reality -- let me say why I make the blink reality

6   claim.

7           Your Honor, imagine that interest rates had moved

8   in the opposite direction, and when the Debtors went around

9   and thought about a DIP, they couldn't get a DIP at four and

10  a quarter, they were only able to get a DIP at fourteen and

11  a quarter.  Their argument that this isn't optional is that

12  they would have come before this Court and said, "Please let

13  us refinance from ten percent to fourteen and a quarter

14  because we are obligated to do so."  No one in this

15  courtroom believes that to be what would happen.  They

16  redeemed because they thought that they were taking

17  advantage of a reduction in interest rates.  They acted at

18  their option.

19          Let's focus on this issue, as a matter of state

20  contract law in the first instance, and as a matter of

21  bankruptcy law in the second.  They want you to cherry pick

22  them both.  They say that they didn't act at their option

23  because their debt accelerated, but the very next sentence

24  of the indenture gave us the right to rescind.  They want

25  you for the purposes of optionality to focus on one sentence

1   in the indenture, and excise the next one.  They're cherry

2   picking.

3            They then say, well, wait a second, how about

4   bankruptcy law?  That second sentence isn't effective.  You

5   can't rescind because of the automatic stay.  Well, as I

6   said, that's not right.  But let's assume it is right, Your

7   Honor?  The automatic stay was a two-way street.  It also

8   prevented from foreclosing, and at the end of the

9   bankruptcy, they had the right under 1124 to reinstate us.

10  So if you want to really analyze this as a matter of Federal

11  bankruptcy law, they absolutely had options.

12           Your Honor, you cited in your opinion this past

13  summer on the relevance of solvency, the article by Scott

14  Charles and Emil Kleinhaus.  Here's what they say on this

15  issue.  This is 15 ABI Law Review, 537-552, quote, "Where a

16  contractual provision imposes a fee for voluntary

17  redemption, it is hard to dispute that the provision should

18  apply to a mid-case refinancing and that exploiting Debtor

19  borrower conditions.

20           In that situation, since the borrower has the

21  option to de-accelerate, and enjoys the protection of the

22  automatic stay, such a redemption would indisputably be

23  voluntary," end quote.  That is our case on all fours, with

24  one exception.  This is not a mid-case redemption, it was a

25  beginning of the case redemption, it's even stronger.

1                 I was looking at their slides.  They're going to

2    cite you the Southside case for the proposition that this

3    was not voluntarily.  Southside is a case in which the

4    lender brought foreclosure proceedings.  Let's change the

5    case.  They didn't file a motion on the first date of the

6    bankruptcy to refinance us, we brought a motion for relief

7    from the stay to foreclose and Your Honor granted it, and we

8    then foreclosed on Encore, their interest in Encore, and we

9    said we can take -- get -- from the proceeds, we can not

10   only pay us back our principal and our interest, but in

11   addition our optional redemption premium.

12                I wouldn't be in front of you if those were the

13   facts.  If we acted inconsistent with, if we took action

14   that forced us to pay them back, if we forced the payment,

15   then you can say that's not optional.

16                And that brings me to the key cases.  Again,

17   Chemtura, Calpine, Premier Biloxi, all say that the action -

18   - that the act of the Debtor, post-acceleration, was

19   optional.  They say hold on a second, what about these New

20   York State cases that say that, following acceleration,

21   there's no right to a pre-payment penalty -- or pre-payment

22   premium?  There's two things to say about those cases.

23                First, almost all of them deal with pre-payment,

24   and some of them deal with a situ -- all of them, Northwest,

25   Southside, LHD, all of them deal with situations in which

1    the lender brings foreclosure proceedings, or after the

2    Debtor goes into bankruptcy, brings a motion for relief from

3    the stay to foreclose.  The word "pre-pay" may well imply

4    prior to maturity, but here, the word was "redeem" and

5    redeem means a payment at our before maturity, and in any

6    event, we rescinded, so the debt didn't mature as a matter

7    of contract, and we did the opposite of coercing them to

8    pay.  We said we waive the default, we rescind the

9    acceleration.

10           Let's go now to the third argument, and again,

11   I'll try to be brief on this one.  This is the 602 override,

12   307.  Well, first again, if Your Honor agrees that we can

13   rescind or at least have a claim for the denial of the right

14   to rescind, then the whole argument goes away because 602 is

15   inapplicable.  But beyond that, there's no language in any

16   of these sections, let's turn to 307 and 602.  That's

17   demonstrative number five, I believe.  307 says, "at any

18   time the issue before -- prior to December 1, 2015, the

19   issuer may redeem."  It doesn't say "subject to 602," it

20   doesn't say "except as provided in 602," it's absolute.

21           Let's look at 602.  It just says that, "in the

22   case of bankruptcy, the note shall be due and payable."  It

23   doesn't say the following:  "notwithstanding any of the

24   contrary contained in this indenture, including without

25   limitation Section 307, in the event of a bankruptcy under

1    automatic acceleration, the Debtor may repay the notes by

2    paying principal plus interest, without paying the make-

3    whole."   I looked at you because I just made that up on the

4    fly.   Any lawyer worth their salt could dictate that

5    provision in three seconds.

6              THE COURT:   Only a lawyer could dictate --

7              [LAUGHTER]

8              MR. ANKER:   Well, Your Honor, let me say on that

9    regard, and I'm going to try to keep count, let me tell you

10   how many super peremptory, "notwithstanding any of the

11   contrary provisions there are in this indenture," 101

12   definition of (indiscernible) equivalence, 101 definition of

13   consolidated income, 101 definition of indebtedness, 306,

14   309, 403(a) 403(c), 407, 409(f), 410(c), 412(b), 414,

15   501(b), 501(d), 607, 707.   Sixteen times, the authors of

16   this indenture knew how to write such a provision, but they

17   didn't write it here.   They didn't write it here.

18              The New York Court of Appeals in the MML case

19   said, look.   That was the case involving what -- there were

20   two parts to that case, but the second part of the case

21   deals with what happens if notes accelerate and you have

22   this separate provision that provides for biannual interest

23   payments?   Does the noteholder still have to make biannual

24   interest payments such that the noteholders -- I'm sorry,

25   does the issuer have to make those payments such that the

1    noteholders are entitled to interest on it, even after the

2    debt accelerated?

3           And the Court said, and I quote, "The consequences

4    of acceleration of the debt depends upon the language chosen

5    by the parties in the pertinent loan agreement.  While it is

6    understood that acceleration advances the maturity date of

7    the debt, we are unaware of any rule of New York law

8    declaring that other terms of the contract not necessarily

9    affected by acceleration automatically cease to be

10   enforceable upon acceleration."

11          I will finally note Chemtura, Calpine, and Premier

12   Biloxi all contained an automatic acceleration provision,

13   and yet, none of those Courts said it overrode the optional

14   redemption provision.

15          Your Honor, let's step back a second.  I've told

16   you why I think when you read the words, our writing -- our

17   reading is right and their reading is wrong, but it seems to

18   me the one thing that New York law says is that the Court

19   should step back.  It should do a reality check.  It should

20   ask itself the question, "Does this reading make sense?  Am

21   I about to go down a path of coming up with a reading that

22   just defies commercial reality and what commercial parties

23   would do?"  I'm going to be quick.  We spent a lot of time

24   in our papers on this and I'll try to really truncate it.

25   Make-whole provisions like this are absolutely standard.

1    They existed in every indenture the Debtors issued, all any

2    of the Debtors, from 2007 forward.

3              Their standard and high-yield debt because of a

4    fundamental essence of a high-yield instrument.  Its

5    fundamental guts is the following: it's a fixed-rate

6    instrument.  It's not -- the interest rate doesn't float and

7    it's non-amortizing.  Most of the notes here were exchanged

8    and issued in 2010 and they didn't mature until 2020, so the

9    noteholders committed their capital for ten years at 10

10   percent per annum, and they took the risk that interest

11   rates would go up.

12             And if they did, if interest rates went to twelve

13   or thirteen or fourteen percent for comparable debt, their

14   paper would have traded below par, and we wouldn't be

15   standing up here today because they wouldn't be seeking to

16   redeem us.  They wouldn't have redeemed us.  And there's no

17   ability under those circumstances for the noteholders to put

18   the notes to the company, but there's got to be a symmetry,

19   and the symmetry is the issuer is taking interest rate risk

20   as well.  If interest rates go down, it can't say that the

21   noteholders, "We're calling all the notes," because

22   otherwise it would be a one-way street.

23             And therefore, you historically have absolute no-

24   call provisions.  You just saw two, Premier Entertainment

25   and Calpine.  But what evolved was issuers saying, "I want

1    some flexibility.  I want to be able to refinance," and so

2    what was worked out was a compromise.  "Yes, you can

3    refinance, but if you do, you have to pay a make-whole."

4    That make-whole compensates the noteholders for the loss of

5    the interest and the income they were expecting to receive,

6    and having to reinvest in a lower interest rate environment.

7    EFIH's basic argument here, from a standpoint of concept, as

8    opposed to words, is this: the noteholders cared about that

9    but they were willing to give it all up in the event of

10   bankruptcy.  Does that make any commercial sense?

11          The concern, the harm, the injury, that the make-

12   whole is designed to do, losing the future income stream and

13   having to invest, reinvest in a lower interest rate

14   environment applies today to these noteholders.  The fact

15   that EFIH was in bankruptcy when they were refinanced,

16   doesn't make a whit of difference in terms of the basic

17   purpose.  Their only answer is they say, "Well, maybe,

18   maybe, maybe, you could have a situation in which

19   noteholders think bankruptcy is so remote that they're

20   willing to take that risk."  They actually speculate that in

21   their reply brief.  Maybe.  Not a shred of evidence of that,

22   but there's a lot of shred of evidence -- more than shred of

23   evidence to the contrary.

24          These notes were issued pursuant to prospectuses.

25   The prospectuses have what are called risk factor

1    disclosures.  You've seen them in lots of prospectuses.

2    They go on and on and on about bankruptcy risks involving

3    EFIH.  Maybe this exchange if EFIH becomes bankrupt will be

4    done as a fraudulent transfer, maybe it'll be treated as a

5    preference, maybe some of the income will be deemed OID and

6    it'll be a loss in a bankruptcy.  Maybe in a bankruptcy, you

7    won't be able to get relief from a state of foreclosed.

8    Maybe you won't get post-petition interest.  Not one

9    disclosure, not one about the position they are taking

10   today.

11           Let's talk about the drafting history for one

12   minute.  And Your Honor, I think you can decide this on the

13   plain wording of the document, but I want to spend -- you

14   could also consider extrinsic evidence, and unless it

15   creates a genuine issue of disputed fact, you can grant

16   summary judgment.  Again, I'm going to truncate dramatically

17   what we said in our brief.  The Debtors here took -- EFIH

18   took the make-whole provision from prior EFH and EFIH

19   indentures, issued many years earlier, which in turn were

20   borrowed from an indenture of First Data, a third party.  No

21   one spoke to at the company First Data, what does this make-

22   whole provision mean?

23           And indeed, and I want to say this clearly and

24   emphatically, the deposition testimony including the sworn

25   testimony of Mr. Keglevic, the Chief Financial Officer and

1    Co-Restructuring Officer in this company, is that at the

2    time EFIH issued its indenture of this First Lien Debt, EFIH

3    had never even considered the question whether it could file

4    for bankruptcy and refinance this debt without paying the

5    make-whole.

6            The Debtors point to testimony by another

7    individual, Mr. Moldovan, who speculated that I suspect

8    someone must have thought of it, but he couldn't remember a

9    single conversation, couldn't point to a single document.

10   The entire positions the Debtors are asserting here is a

11   gotcha.  It doesn't reflect even their thinking at the time,

12   let alone an agreement.

13           They marketed the make-whole as critical to this

14   transaction.  Let's go to demonstrative twelve.  They put

15   out one-page summaries that have the make-whole, they focus

16   on it on the cover page of the indenture.  But here, they

17   had a summary.  This is one of these short documents, and in

18   the principal terms, the terms that warrant emphasis on the

19   one-page summary, "the offerer may also redeem any of the

20   new EFH senior secured notes at any time prior to December

21   1, 2005, at a price equal to 100 percent of the principal

22   amount plus accrued interest and a make-whole premium."  Not

23   one suggestion that the result would be different in

24   bankruptcy.

25           Indeed, I told you that there were disclosures

1    about bankruptcy in the prospectus?  Those disclosures, if

2    you could turn to demonstrative twelve, Your Honor, strongly

3    intimated that the make-whole would be due.  It said, "in

4    the event that EFIH becomes the subject of a bankruptcy

5    proceeding, the noteholders will have a claim against EFIH

6    for any outstanding principal, premium and interest."  The

7    only premium provided in the indenture is the make-whole.

8           Now, EFIH tries to sweep all of this under the rug

9    and say it wasn't the sole author of these documents.

10   That's right.  There were dealer-managers.  They were

11   appointed by EFIH.  They included Goldman Sachs, who is one

12   of the principal -- whose private equity arm was one of the

13   principal owners of the Debtor.  They were paid by the

14   Debtor.  They were hired to facilitate the transaction.

15   They didn't buy any notes and take any risk.

16          Your Honor, what EFIH does point to, and it brings

17   us back to the point I began at the beginning about what our

18   claim is and isn't, is the negotiation of a different

19   indenture, by a different Debtor, after the issuance of most

20   of the EFIH notes.  Later in 2010, TCEH issued due notes.

21   And there was a discussion with a single lender, Oaktree,

22   about the terms of that refinancing.  The Debtors have this

23   in conclusions of law, findings of fact as due with.  But

24   one thing is clear.  There was never, never, never any

25   disclosure, any discussion by the company, with -- by EFIH,

1    with a single noteholder about what the -- about the

2    discussion with TCEH.  So even if the Debtors in that

3    discussion with the TCEH lender Oaktree expressed the view

4    that we can refinance in bankruptcy without paying the make-

5    whole, that wouldn't matter because it was never expressed

6    to a single EFIH First Lien noteholder.

7              But, in any event, that is not - is not - what

8    TCEH said.  Let's go to demonstrative thirteen, and this

9    goes to what our case is and what our case is not.  This was

10   a term sheet created, demonstrative number thirteen, by

11   Oaktree, and what it asks for is five-year make-whole

12   applies to any acceleration of the debt, including upon a

13   bankruptcy filing.  In other words, it didn't matter whether

14   there was a redemption.

15             The mere fact of filing for bankruptcy would cause

16   the make-whole to come due.  Mr. Keglevic acknowledged at

17   deposition, that's exactly what he understood Oaktree to be

18   asking.  The Debtor said no, that isn't our claim.  Our

19   claim, again, is not that the right way to read our

20   indenture is that the mere filing for bankruptcy for EFIH

21   made the make-whole due.  It is that their decision, which

22   they didn't have to make, to redeem us, is what triggered

23   the make-whole.  And let's focus on what happened -- what

24   the document says, or documents say, about that subject.

25             Oaktree was represented in this matter by the

1    Debevoise law firm and the indenture Trustee for the TCEH

2    notes forwarded it to the company, and its counsel in email.

3    This is demonstrative 14.  And here's what TCEH -- I'm

4    sorry, Oaktree, through its counsel, said.  "If we don't

5    make this change, and we keep the old language in the

6    indenture," which is exactly what was in the EFIH First Lien

7    indenture, "then the Second Lien noteholders," that is on

8    the T side, "will only be entitled to receive a make-whole

9    in the event of a refinancing and bankruptcy to the extent

10   they are over-secured."

11            So if there's a redemption, if there's a

12   refinancing in bankruptcy, yes, even under the old language,

13   you get the make-whole as long as you're over-secured.  And

14   while the TCEH Seconds are obviously not over-secured, the

15   Debtor has admitted, EFIH in its answer, that EFIH First

16   Lien noteholders are.

17            Your Honor, I'm going to quickly -- so what that

18   story tells you is that nothing about the T side really says

19   much other than, when it came to what we are fundamentally

20   claiming, that we are entitled to a make-whole because they

21   redeemed us, Oaktree said that was its view and the Debtors

22   never, ever responded, it never, ever disagreed.

23            Let me spend one minute on the intentional evasion

24   doctrine.  You don't have to reach this because, as for all

25   the reasons we've said we're entitled to the make-whole, we

1    have a claim for a breach in any event.  Nothing about the

2    acceleration causes the make-whole not to be due.

3            But if Your Honor had a differing view, New York

4    case law says that if a Debtor deliberately accelerates at a

5    circumstance where, for example, you have a pre-payment

6    provision, that would cause the make-whole not to come due,

7    that the make-whole only applies if it's a pre-payment, and

8    by accelerating, there's a default and the debt moves up.

9    If the Debtor intentionally defaults, then the make-whole is

10   due and that's true, all the intent to avoid payment of the

11   make-whole doesn't have to be the sole reason, just a

12   principal reason for the default.

13           Here, let's quickly focus on what happened pre-

14   petition and then post-.  The Debtors from 2012 to 2013

15   pursued a restructuring plan, Project Olympus, that would

16   have put TCEH in bankruptcy but kept EFIH out.  They

17   repeatedly represented to their Creditors, they filed

18   statements, financial assurances to their lenders, that EFIH

19   was solvent.  Indeed, in January of 2013, EFIH dividended,

20   the Debtors caused EFIH to dividend, 7 billion - $7 billion

21   dollars in notes and cash - to EFH, something it couldn't do

22   unless EFIH was solvent at the time.  It made it clear, and

23   we cited all the documents, that it did intend to refinance

24   the EFIH debt, but out of Court, with payment in full of all

25   make-wholes.

1           But then, and this is why we're here today, the

2     TCEH First Liens and the EFIH unsecured PICs wrote to the

3     Debtor and met with the Debtors and said, "We want you to

4     put EFIH in bankruptcy and then litigate their make-whole,

5     because if you litigate their make-whole and they lose,

6     there'll be more value for us."  The EFIH PICs wanted all

7     the input.  And EFIH agreed.  On November 1, 2014, it filed

8     a 10k, or an 8-K in which it said, we intend to put EFIH in

9     bankruptcy because, quote, "there is value in not paying the

10    make-whole," end quote.

11          EFIH says it filed because it had liquidity

12    concerns.  Maybe.  It filed a 10Q for the third quarter

13    saying it had twelve months of liquidity, and it never

14    sought to sell Encore pre-petition, and it's admitted the

15    reason it didn't was to protect the tax position of its

16    parent, EFH, but let's put all that aside.  Let's assume for

17    a minute you would not find, at least on summary judgment,

18    that the filing for bankruptcy was an intentional default,

19    to the extent that that default would require a payment of

20    the make-whole, which, for the reasons I said, it doesn't.

21          Let's focus on post-petition what's happened.  We

22    sent them a notice saying we waive the default.  We waive

23    the default.  We rescind acceleration, and they said, we

24    don't accept it.  We don't accept it.  We're not going to

25    consent.  You can't rescind acceleration.  The sole reason,

1    the only reason, they are doing that, is to avoid payment of

2    the make-whole.  They've already redeemed us.  The only

3    issue is the make-whole.  The only reason they're doing

4    that, that was intentional default.

5           One minute on the alternative claims and then I

6    will rest.  First, if Your Honor looks at the indentures,

7    and I would refer you to Sections 603 and 610, they make it

8    clear that the make-whole is not an exclusive remedy.  603

9    says, quote, "If an event of default occurs and is

10   continuing, the Trustee may pursue any available remedy to

11   collect payment of principal premium pending an interest on

12   the notes and to enforce payment of any and all the notes."

13   Section 610 says, quote, "Every right and remedy shall be,

14   to the extent permitted by law, be cumulative and

15   additionally, every other right and remedy given hereunder

16   or now, or hereafter existing at law or in equity or

17   otherwise."

18          This case is like Premier Biloxi where the Court

19   awarded the noteholders a claim, as I mentioned, for breach

20   of the no-call, and unlike Solutia where the Court didn't,

21   the Court in Premier Biloxi, 455-BR-636 said the following,

22   quote, "Solutia is distinguishable from the facts of this

23   case because the indenture at issue here expressly says

24   that, quote, 'all the remedies are cumulative, to the extent

25   permitted by law'."  End of quote of the indenture, end of

1    quote of the opinion.  Just like ours.  We have three

2    additional claims beyond the claim for the make-whole.  One

3    I've already discussed, if we cannot rescind because you

4    hold the view and that stay applies, we have a claim for

5    denial of the right to rescind, just like in the Stephan

6    case, decided by Judge Ambro.  Judge Drain recognized there

7    would be such a claim in Momentive, he said it should be

8    disallowed in an insolvent case because of 502(b)(2), I

9    frankly think he was wrong on the 502(b)(2) analysis, but

10   that doesn't matter here.  Here, we're dealing with a

11   solvent case, and in phase one, we're only deciding state

12   law issues.

13          The second claim is for breach of the no-call,

14   307(c).  Such a claim was allowed, as I mentioned, in both

15   Premier Biloxi and Calpine.  Here, 307(c) says, and I quote,

16   "Except pursuant to clause (a) or (b) of this Section 307,

17   the note shall not be redeemable if the issuer's option

18   prior to December 1, 2015."  Now, I will acknowledge that is

19   not an absolute no-call.

20          It has exceptions.  Except pursuant to clause (a)

21   or (b) of this section.  But we know clause (b), the equity

22   claw, doesn't apply and as to (a), it permits redemption

23   only if they pay the make-whole.  Well, if they're not going

24   to pay the make-whole, how is it not a breach of 307(c)?

25   Except pursuant to clause (a) or (b) of this Section 307.

1   They're not invoking either, because they don't pay us the

2   make-whole, then it goes on to say, quote, "The note shall

3   not be redeemable at the issuer's option prior to December

4   1, 2015."  They redeemed, at their option, prior to December

5   1, 2015, so they breached.

6           The final is the New York rule of perfect tender.

7   That sort of is the origin of all of this.  It basically

8   says, if I write a loan agreement, and it says you will pay

9   me in ten years, and you have to pay interest in between,

10  you can't pay me early unless there's a pre-payment

11  provision allowing it.  To be sure, this note allowed

12  payment early if, if, if, they paid us the make-whole, but

13  they haven't.

14          And for the reasons we've discussed, the

15  acceleration provision didn't allow them to pay early, to

16  pay prior to the state of maturity, particularly where we

17  rescinded acceleration.  So they violated the perfect tender

18  rule because the only condition, the only exception to the

19  perfect tender rule, you can pay prior to the state of

20  maturity, prior to December 1, 2015, if you pay us a make-

21  whole.  If Your Honor doesn't award us a make-whole, then

22  they've breached that provision.

23          Your Honor, this isn't the occasion on this

24  alternative claims to decide what the dollar amount of the

25  claims would be.  I think they're the amount of the make-

1    whole.  It isn't the occasion to decide whether they are

2    secured or unsecured claims.  I think when you read the

3    granting clause and you look at the make-whole provision,

4    they're plainly secured.  Those are issue -- and we reserve

5    all rights to say they're secured or in the alternative,

6    unsecured.

7              This is a case in phase one, or an occasion just

8    to decide whether we have a claim.  We can deal with

9    solvency, the nature of the claim, the dollar amount of the

10   claim, in phase two, although I strongly suspect that the

11   parties, frankly, are not going to come back to you for

12   phase two because they will negotiate those issues out

13   because the answers, I think, are pretty obvious.  I will

14   reserve the rest of my time and again, I meant what I said.

15   I realize this has been a long day for Your Honor and we

16   really appreciate it.  Thank you, Your Honor.

17             THE COURT:  Good afternoon.

18             MR. HOROWITZ:  Good afternoon, Your Honor.  For

19   the record, Gregory Horowitz from Kramer Levin Naftalis &

20   Frankel, on behalf of the EFIH Second Liens, indenture

21   Trustee as intervener in this action.  I will be brief, Your

22   Honor, and actually, in order to soften the blow of me even

23   taking a few minutes, I'm going to give you a gift of time

24   right off at the outset.

25             The EFIH Second Lien noteholders have, obviously,

1    a very strong interest in the outcome of these proceedings.

2    Our indenture is very similar to the First Lien indenture.

3    Up until a week ago, I guess, or maybe a couple of days ago,

4    we had a potential for a make-whole claim in the invent that

5    we will redeem.  Now that Your Honor has approved the

6    partial pay-down motion, there is a portion of EFIH Second

7    Lien notes that have been redeemed, and here comes the gift.

8            We had previously taken the position that there

9    was no justiciable controversy in the declaratory judgment

10   to action, and there were cross-motions which were scheduled

11   to be argued before the Court next week on the 18th in the

12   afternoon.  In light of the partial pay-down, we agree that

13   there is now a live justiciable controversy.  And I think

14   that the Debtor's counsel can confirm this, but I think

15   we're an agreement that there's no longer any reason to go

16   forward with those motions.

17           We'll work out an agreement, which I think will

18   involve us amending our declaratory judgment complaint and

19   we'll work out a schedule for proceeding with that Second

20   Lien make-whole action going forward.  So, the ten minutes I

21   take this afternoon, Your Honor, I hope will be more than

22   offset by the fact that I've just given you an afternoon.

23           THE COURT:  I'm so thankful.

24           [LAUGHTER]

25           MR. HOROWITZ:  Thank you, Your Honor.

1          THE COURT:  No, I thank you for the notice.  I

2    truly appreciate it, and I guarantee you that by Monday

3    morning at noon, I'll have three different people who want

4    that time.

5          MR. HOROWITZ:  They can thank me as well, Your

6    Honor.  [LAUGHS] So Your Honor, getting back to what I was

7    saying, we obviously have a strong interest in the outcome

8    of this case.  While our indenture is very similar and the

9    issues highly overlap, the language in our automatic

10   acceleration provision is somewhat stronger.  It's a

11   distinction that has some significance that was reflected in

12   the difference in the settlement proposals that the Debtors

13   made at the outset of the case.

14          But to be very clear, Your Honor, we think that

15   the language in the First Lien indenture is crystal clear

16   and entitles the First Lien noteholders to a make-whole

17   under these circumstances, and it would certainly follow

18   that if Your Honor agrees with us and with the First Lien

19   holders, the Second Lien holders would also be entitled to a

20   make-whole on their partial pay down and on any pay down in

21   the future.

22          As with the briefing, Your Honor, Mr. Anker has

23   put me in an awkward position again because his argument has

24   been so comprehensive that there's not much more for me to

25   add, and I don't want to be duplicative.  But I do want to,

1    as we did in our briefing, give sort of a 30,000 foot

2    overview on a couple of issues upon -- a perspective on this

3    case that we think is important.  As in the brief, I want to

4    separately highlight what we believe is the fundamental

5    absurdity of the Debtor's position, that the automatic

6    acceleration provisions in these indentures give rise to an

7    option to redeem these otherwise unredeemable notes early as

8    a result of the bankruptcy.

9            We believe that it's absurd to contend that the

10   automatic acceleration provision can be taken as

11   representing a choice by the noteholders to sacrifice

12   ongoing interest or a make-whole payment in favor of getting

13   early payment.  And as Mr. Anker made clear, that is

14   fundamentally absurd because as everyone knows, this case,

15   that the facts of this case have made abundantly clear, the

16   automatic acceleration provision does absolutely nothing to

17   facilitate early payment of the notes.

18           The automatic stay prevents the noteholders from

19   taking any action, the Debtors have a right to reinstate the

20   notes, and by the way, Your Honor, I would take note, we

21   didn't mention this in our brief but it's interesting to

22   take note of footnote 7 on page 20 of the Debtor's brief

23   where they make the point that the automatic acceleration

24   provision doesn't even add anything to the automatic

25   acceleration if it's affected as a result of the bankruptcy

1    code on the petition date.

2          In fact, the Debtors take the position in that

3    footnote that they would have the same right to redeem

4    without paying a make-whole even if there were no automatic

5    acceleration provision in the indentures by virtue of the

6    automatic acceleration under the bankruptcy law.  I think,

7    Your Honor, that that highlights the point, that as a matter

8    of logic, the Debtors really can't hang their case on any

9    idea that there's been any implicit or explicit choice, by

10   the noteholders, to prefer acceleration, to continue

11   collection of interest, or in the alternative, a make-whole.

12          Certainly that can't be the case here, where all

13   of the relevant indentures have explicit rescission rights

14   and all of the relevant noteholders have sought to exercise

15   those rescission rights.  We also think it's equally absurd

16   to contend that the automatic acceleration provision is

17   inserted here as an intended to way to benefit the borrower

18   by giving it the right and option to redeem notes early

19   without paying a make-whole in bankruptcy, where they can

20   see that they have no such option outside of bankruptcy.

21          If there was any intent to create a special option

22   in bankruptcy to redeem without a make-whole, it would

23   obviously not be appropriate to do it in this backhanded,

24   surreptitious way of just putting in an automatic

25   acceleration provision.  By -- AMR is an interesting

1   contrast, Your Honor.  If there was an intention to give an

2   option to pre-pay in bankruptcy, the AMR indenture is a

3   perfect example of how you would do it.  You'd say upon

4   automatic acceleration, the notes are pre-payable without

5   any make-whole.  That language is listed in AMR.  Also, Your

6   Honor, obviously, if the borrowers had thought they -- the

7   borrowers thought they had bargained for such a right in

8   bankruptcy, it would have been incumbent upon them to

9   disclose that option in their offering materials,

10  particularly in offering materials where, as Mr. Anker

11  showed you, the make-whole, the lack of callability without

12  a make-whole was prominently featured.  There was no such

13  disclosure.

14          Now, Your Honor, the only case that we are aware

15  of, the only case that any party has cited that has actually

16  held that an automatic acceleration applies without any

17  affirmative acts by lenders to foreclose, to accelerate to

18  foreclose, to effect collection early, constitutes a waiver

19  of contractual make-whole -- this is Momentive.  And here's

20  where I'm going to depart slightly from Mr. Anker in that

21  I'm going to be less diplomatic.  With great respect to

22  Judge Drain, Your Honor, I respectfully submit that

23  Momentive was wrongly decided.  To state the obvious,

24  Momentive is not a controlling precedent in this Court.

25  It's merely persuasive, potentially persuasive authority,

1    and I recognize that Momentive is a decision from a very

2    intelligent and very distinguished jurists.

3            Likewise, Chemtura, and, for example, School

4    Specialty's, were decisions with persuasive authority here

5    from equally distinguished jurists.  In the case of

6    Momentive, Your Honor, I think as an example of even one of

7    the best judges making -- presenting a flawed analysis, and

8    again, with great respect, I think the explanation for it is

9    that the Momentive analysis was driven by an equitable

10   policy goal, a desire for a rule that would create a

11   presumption against awarding make-wholes where Debtors are

12   insolvent, where a Debtor is insolvent, and the make-whole

13   would come at the expense of unsecured Creditors.

14           We don't agree that that would be a good policy

15   consideration because it would make it harder for companies

16   to borrow on a secured basis, but even if one assumes that

17   that is a good -- first of all, let me take a step back.  In

18   light of that, Judge Drain crafted an analysis in Momentive

19   that I think very explicitly draws a distinction between

20   solvent and insolvent Debtors as to the right of make-whole,

21   and as Mr. Anker pointed out, under the facts of this case,

22   even under the Momentive analysis, the First Lien

23   noteholders and the Second Lien noteholders when it comes to

24   this, will clearly be entitled to a make-whole.

25           But, I don't believe that the distinction between

1    solvency and insolvency drawn in Momentive was a sound

2    analysis.  There were a number of issues in there but I want

3    to cut to the most important one, Your Honor, which is that

4    -- excuse me a second -- the Momentive opinion is expressly

5    premised on the notion that an automatic acceleration

6    provision represents a decision by lenders to be paid early

7    in preference to continuing to collect interest.

8              As I've just discussed, Mr. Anker discussed, that

9    premise is illogical.  Momentive is the only case I'm aware

10   of that finds that that -- that the automatic acceleration

11   provision in and of itself represents that decision, in the

12   absence of any actual steps taken by the lenders.  Momentive

13   further relies on the belief that, under controlling New

14   York law, there is some sort of quasi-rule of explicitness

15   that requires a clear and unambiguous clause calling for the

16   payment of prepayment premium even in the event of

17   acceleration.

18             That characterization of New York law, Your Honor,

19   is an error and I think we can trace how the error evolved.

20   Momentive relies entirely on cases such as Northwest v.

21   Mutual, which is, by the way, the only actual New York state

22   Court case cited in any of these opinions.  Cases that say

23   that, where a lender seeks to foreclose, the lender calls an

24   event of default, seeks to foreclose, seeks to accelerate,

25   those actions give rise to a presumption that the lender

1    does not -- that the lender prefers pre-payment, and that

2    presumption is sufficient to require explicit language

3    saying, if you want to foreclose and collect a make-whole,

4    you have to say so explicitly.

5            Momentive took the unprecedented step of

6    generalizing that rule to say that lenders cannot

7    affirmatively seek pre-payment while simultaneously seeking

8    a make-whole.  I'm sorry -- generalizing the rule that

9    lenders cannot affirmatively seek pre-payment while

10   simultaneously seeking a make-whole, generalizing that to a

11   situation where, in fact, the lenders have not taken any

12   affirmative act, cases like this.

13           In other words, Momentive would create a rule that

14   make-wholes are never recoverable in bankruptcy, absent

15   express language.  There is no legal basis for such a rule,

16   Your Honor.  And indeed, the logic behind the original and

17   the actual rule of explicitness was like we said in our

18   original brief, would counsel exactly the opposite

19   conclusion.  The concept behind the rule of explicitness is

20   that where someone wants to contract for a result that's

21   contrary to public policy to the default set of rules, you

22   have to do so explicitly.  Here, the policy of New York law

23   is very clear.

24           The policy of rule of perfect tender is that,

25   absent explicit language, a lender is entitled to be paid in

1   accordance with the schedule provided under the loan

2   agreements, here provided under the notes.  Any deviation

3   from that presumption should be justified by explicit

4   language.  Here, Your Honor, the Debtors are saying that the

5   automatic acceleration provision, which says nothing about

6   bankruptcy, says nothing about the ability to redeem without

7   paying a make-whole, should be taken as creating an

8   exception to the rule of perfect tender, as giving the

9   Debtor a right to pre-pay, in contravention of the --

10  without paying the contractually required make-whole.

11  That's not justified here, Your Honor.  And that's all I

12  wanted to add to Mr. Anker's (indiscernible).

13          THE COURT:  Thank you.  Mr. McGann?

14          MR. MCGANN:  Andrew McGann for the Debtors, Your

15  Honor.  Good afternoon, again.  I've got a binder of our

16  exhibits and the PowerPoint that I'm going to refer to.  Can

17  I approach and hand those to you?

18          THE COURT:  Yes.  Thank you.

19          (JUDGE AND MR. MCGANN CONFERRING WITH CLERK

20  REGARDING TECHNICAL MALFUNCTION.)

21          THE COURT:  I'm going to take a short recess.

22          (Recess)

23          THE CLERK:  All rise.

24          THE COURT:  Please be seated.  My apologies.  I'm

25  really embarrassed on behalf of the Court and I apologize

1    for the technical problems, but we'll do it the old-

2    fashioned way, with paper.

3              MR. MCGANN:  That's quite all right, Your Honor.

4    I pre-date the video screens in Courtrooms, so I should --

5              THE COURT:  So do I.

6              MR. MCGANN:  And you have a copy, then, of the

7    demonstrative that I'll be referring to, correct?

8              THE COURT:  Yes.

9              MR. MCGANN:  Okay, thank you, Your Honor.  Again,

10   it's Andrew McGann on behalf of the Debtor, specifically

11   EFIH and EFIH Finance, the issuers of the indenture here.

12   At the outset, I'd like to tell the Court what I'm going to

13   cover.  I think I'm going to spend less time than Mr. Anker

14   did because one thing that the parties agree on, there's a

15   few things we do agree on, is that the contract language,

16   the indenture language here, is unambiguous.

17             And I'm going to cut right to it and show that, on

18   a plain reading of the indenture, no make-whole is due here,

19   nor are damages as a backdoor way to get a make-whole

20   permitted here either.  And then I'll spend a little time

21   addressing some of the other issues that Mr. Anker spent

22   most of his time on, which is other ways to try to get to a

23   make-whole because the indenture, as I think I will be able

24   to show the Court, doesn't provide one.

25             There is no case that's provided any of the relief

1    the Trustee is seeking here on any indenture like this one.

2    No case.  And we'll talk about some of the -- I'll talk

3    about some of the cases specifically, but none provides any

4    of the relief they're seeking here on an indenture with

5    language like this one.  So the key question is, whether the

6    indenture obligates the Debtors here to pay something called

7    the Applicable Premium, capital A, capital P, does the

8    indenture obligate the Debtors to pay the Applicable Premium

9    under these circumstances?  That's the question the Court

10   has to decide, so what circumstances are we talking about?

11           Well, if you turn to Page four of the handout,

12   this is a quote from the Bankruptcy Court's decision in the

13   AMR case where the Court says, "in analyzing whether a make-

14   whole amount is due, the Court turns first to the provision

15   of the indentures that most specifically addresses the

16   circumstances before the Court," and in that case, the

17   provision was 401(g), "which provides that filing voluntary

18   bankruptcy constitutes an event of default.  The

19   consequences of such a default are set forth in the

20   indentures." And similarly, the Momentive decision, which

21   came down last September, Judge Drain said the acceleration

22   provision is deemed critically important, so that's where

23   I'm going to start.

24           So if we turn to page five, this is 602 that Mr.

25   Anker spent some time talking about.  This is the

1    acceleration provision in the indenture here, and it

2    provides, as the Court has already seen, that in any event

3    of default, and this is the first paragraph of the

4    acceleration provision, "in any event of default other than

5    an event of default specified in Clause 6 or 7 of Section

6    601(a) hereof, occurs and is continuing under this

7    indenture."  Bear with me.

8            And if we turn, then, to page six, this is an

9    excerpt from Section 601, which are the events of default,

10   or one of the events of default being referred to there or

11   accepted from the general acceleration provision, and that

12   is 601(a)6 1, filing of bankruptcy.  That is the provision,

13   therefore, that is critically important here, according to

14   the way the indenture is set up and according to the way the

15   Courts who have construed this language said the Court ought

16   to begin here, and so we begin here.

17           And it provides, if you turn to page seven, the

18   second paragraph of the acceleration provision, the first

19   paragraph, by the way, provides for events of default,

20   referred to in 601, upon which the lenders can declare an

21   acceleration.  The second paragraph talks about the

22   situation when that is not the case, notwithstanding or

23   foregoing in the case of an event of default arising under

24   Clause 6 or 7, the bankruptcy provisions, all outstanding

25   notes shall be due and payable immediately, without further

1    action or notice.  Second paragraph, stand alone paragraph

2    in the acceleration provision.

3            So upon the filing last April in the bankruptcy in

4    this case, the First Lien Notes were due and payable

5    immediately, "without further action or notice."  I'm going

6    to get to Article 3, which contains the optional redemption

7    provisions, but it also contains a number of provisions that

8    require a lot of action and a lot of notice in order to

9    trigger an optional redemption under Article 3.

10           The critical acceleration provision says that it

11   is accelerated, due and payable without further action or

12   notice, without any action or notice.  So if you turn to

13   paragraph, sorry, page eight, the indenture defines this

14   thing called an Applicable Premium, and this is the

15   definition from Section 101.  Now, Mr. Anker, I don't think

16   you mentioned the phrase Applicable Premium in the entire 90

17   minutes you spoke.  It doesn't appear anywhere in the

18   acceleration provision.  It's not there at all.  The only

19   place -- and this, by the way, is the make-whole.  This is

20   the formula for paying a premium that you pay the issuer

21   odds to trigger the optional redemption in Article 3, paid

22   early.

23           One of the ways you, under certain circumstances,

24   you look to the Applicable Premium.  If you turn to page

25   nine, 307(a), so a sub-part of Article 3, this is the

1    optional redemption provision, this is the only place in the

2    entire indenture where the phrase, the defined term,

3    Applicable Premium appears.  And it provides that, as 307(c)

4    says, I don't have that hear in front of you, but that's

5    what Mr. Anker characterized as kind of a no-call provision,

6    but it provides, a little later on, except pursuant to

7    Clause (a), which we're looking at here, or (b), which I

8    agree with Mr. Anker is not applicable here, except pursuant

9    to Clause (a) or (b) in this Section 307, the notes shall

10   not be redeemable at the issuer's option, prior to December

11   1st, 2015.

12          So, like the heading above 307, Optional

13   Redemption, Article 3 deals with a circumstance in which the

14   issuer opts to engage in a redemption and then sets forth

15   the rules about how to provide notice and trigger the

16   redemption, and whether and to what extent a premium is due.

17   And under this optional redemption in this indenture, there

18   are -- there is a sliding scale.  There's an Applicable

19   Premium that is due pursuant to the formula in the

20   definitions section of 101, if the issuer opts to redeem

21   before December 1st of 2015, and then after that, any time

22   up to maturity the issuer opts to redeem, there's a

23   different sliding scale of premiums that are paid after

24   December 1st, 2015, set forth in Article 3.

25          So, if you look at page ten, what I've done here

1    is just that side-by-side 307(a) and 602.  307(a) the

2    optional redemption, which we argue is not triggered here,

3    and it's not applicable to the Court's analysis, and 602,

4    the automatic acceleration provision, which again, has none

5    of the actions or notices that are required under Article 3

6    to engage in an optional redemption, mentions the applicable

7    premium not at all.

8            That means on the face of the indenture, one isn't

9    due.  Because there was a Chapter 11 filing here, it

10   triggered an automatic acceleration, no debate about any of

11   that.  The notes became due and payable immediately.  When

12   the Debtors sought permission to pay them off in the Court

13   and did pay them off in June, it was pursuant to this

14   acceleration provision and it was not an optional

15   redemption, and that's why there's no mention of the

16   applicable premiums, why not make-whole payment is due.

17           Now, what have courts done with this language or

18   language very much like it when there's a -- there's no

19   reference in the automatic acceleration provision, specific

20   or implied, to an Applicable Premium or other make-whole

21   premium in the contractually provided-for language?  What

22   have they done?  And so we've pulled out here some of the

23   key cases, beginning with New York law on page twelve.

24           Now, I know that when Mr. Horowitz becomes a Judge

25   in New York someday, he clearly is going to change New York

1    law, but I'm going to deal with what New York law is today

2    in the reported cases.  A number of cases, not just those

3    cited here, but in re: Southside in the Eastern District of

4    New York, the Bankruptcy Court, quote, "As a general rule, a

5    lender is not entitled to pre-payment consideration after a

6    default unless the parties' agreement expressly requires

7    it."

8              And the source, as Mr. Horowitz said, one of the

9    sources in New York law for that pronouncement is the

10   Northwestern Mutual case, from the Nassau County Supreme

11   Court in 2006, and it said, "a pre-payment premium will not

12   be enforced under default circumstances in the absence of a

13   clause which so states."

14             This is not a lonely decision, Momentive found the

15   same thing, the Premier case at page 627 of that opinion

16   found the same thing, case after case, looking at automatic

17   acceleration provisions where make-whole claims or premium

18   claims or pre-payment claims were made, have concluded that,

19   under New York law, which governs here and governed in all

20   these cases, if there's not a specific or explicit

21   requirement that the make-whole be paid, it isn't payable

22   under the indenture.

23             So we turn to page thirteen.  This is two excerpts

24   from the Momentive opinion, MDM Silicones, "the option for

25   the make-whole premium as noted, must be specific if the

1    parties want it to apply even after the acceleration of the

2    debt."   Next quote, "Thus the first in 1.5 the Lien Holders

3    right to an Applicable Premium or make-whole hinges on

4    whether the relevant sections of their indentures and notes

5    provide with sufficient clarity for the payment of such

6    premium after the maturity of the notes has been

7    accelerated," close quote.

8             As Your Honor may appreciate, in the Momentive

9    case, Judge Drain's dealing with an indenture that's almost

10   identically worded to the one that's in front of this Court,

11   and found that under New York law, the absence of any

12   reference to the payment of a premium, much less the defined

13   term "Applicable Premium" in the critically important

14   automatic acceleration provisions in Article 6, doom their

15   claim to a make-whole on the face of the indenture.  That's

16   what that case held looking at the same language in the line

17   on controlling New York law.

18             If you turn to page fourteen of the handout,

19   here's the operative language from the indenture in the

20   Momentive case.  There at the top of the page, and that's

21   Exhibit 5, that's taken from Exhibit 5 in our exhibits for

22   our motion in your binder, Your Honor, and this is the

23   actual indenture Judge Drain was dealing with, and it

24   provides slightly differently than the indenture here, in

25   the automatic acceleration provision, the comparable one is

1    602 here.  But in Momentive, "if an event of default

2    specified in Section 601(f) or (g)," which are the

3    bankruptcy default provisions, "with respect to the company

4    occurs, the principal of, premium if any, and interest on

5    all the notes shall, ipso facto, become and be immediately

6    due and payable without any declaration or other act on the

7    part of the Trustee and the holders."

8             So, the only difference is, there's a reference to

9    "premium, if any" language in the Momentive indenture that

10   we don't see in this indenture's automatic acceleration

11   provision in the second paragraph of 602.  And what the

12   Court found there is, notwithstanding the addition of that

13   additional language, unless the party, quoting from the

14   Court, "unless the parties have clearly and specifically

15   provided for payment of a make-whole, in this case the

16   applicable premium, notwithstanding the acceleration or

17   advancement of the original maturity date of the notes, a

18   make-whole will not be owed."

19            So again, the decision in Momentive and its

20   application of New York law to an indenture nearly identical

21   to this one, including specifically the phrase or term

22   Applicable Premium defined in that indenture but not

23   mentioned or referred to whatsoever in that indenture's

24   Article 6 automatic acceleration provisions, led the Court,

25   following New York law saying the make-whole isn't due on

1    the face of the indenture.

2            THE COURT:  What about -- and maybe I'm jumping

3    ahead to where you're going to get, but what about this

4    proposition asserted by Mr. Anker that you can say all that

5    in Momentive, but there's a distinction between solvent and

6    insolvent, and having said all that, Judge Drain says,

7    "However, if this was a solvent Debtor, we'd have a

8    different result."

9            MR. MCGANN:  I will get to it, but let me answer

10   the question right now.  There is no reference in the

11   indenture language, you're talking about construing the

12   contract?

13           THE COURT:  Right.

14           MR. MCGANN:  There is no reference to solvency or

15   insolvency having any bearing on this question, number one.

16   Number two, with respect to Judge Drain's decision to deny

17   the claim for a make-whole, the solvency or insolvency of

18   the Debtor didn't matter.  What Mr. Anker is referring to is

19   some dicta in that opinion, after Judge Drain had rejected a

20   claim for, like here, no-call damages on the grounds that

21   there wasn't a no-call provision in that indenture, just

22   like there isn't one here and I'll come to that in more

23   detail, rejected the claim for damages under a claimed

24   violation of the perfect tender rule of New York, same claim

25   being made here, he rejected that one.

1           And then he said in dicta, referring to potential

2      rescission damages, that maybe they'd be able to recover

3      rescission damages under that dicta.  But he never ruled

4      that they were entitled to rescission damages.  He never got

5      there, for the reason Mr. Anker referred to, is he concluded

6      that --

7           THE COURT:  Insolvent in the (indiscernible),

8      right.

9           MR. MCGANN:  Yes.  So what -- as a result of the

10     way he approached it in that opinion, he never rendered a

11     decision that they were entitled, that is the Trustee, was

12     entitled to rescission damages there.  He looked ahead and

13     said, look, this isn't a solvent Debtor case or maybe that

14     would make a difference, and I'm going to come to that and

15     explain why it doesn't, but that it doesn't stand for a

16     holding that rescission damages should be awarded.

17          That is the only place where the solvency seemed

18     to come up or matter in this opinion.  With respect to the

19     make-whole claim, it doesn't matter at all.

20          THE COURT:  Okay.

21          MR. MCGANN:  And for a reason I think Mr. Anker

22     would agree with me on is we're looking at whether, under

23     New York law, which governs the terms of this indenture, the

24     Trustee would be entitled to a make-whole.  And so, you get

25     outside of the bankruptcy context and you simply say, "Look,

1     under New York law, does this indenture provide for a make-

2     whole?"  And we can see that it doesn't, from the case law

3     and from the language of the indenture.  And solvency and

4     insolvency has no bearing on it.

5              If you turn, Your Honor, to page fifteen, which is

6     an excerpt from the Solutia opinion, and here, we're dealing

7     with an indenture that doesn't have, like Momentive's,

8     almost exactly the same language that we see in the

9     indenture in this case, but there, the Court points out,

10    again, relying on New York law and applying New York law

11    that it also lacked explicitness and specificity, and as a

12    consequence, no make-whole is due, but it also refers here,

13    and I'm just going to read this first one, "by

14    incorporating," and it gets to something else that both Mr.

15    Horowitz and Mr. Anker referred to.

16              The Solutia Court says, "by incorporating a

17    provision for automatic acceleration, the 2009 noteholders

18    made a decision to give up their future income stream in

19    favor of having an immediate right to collect their entire

20    debt.  Because the 2000 notes were automatically

21    accelerated, any payment at this time would not be a

22    prepayment.  Prepayment only occurred prior to the maturity

23    date."

24              And the point I want to make here, and a number of

25    other Courts have -- and I'll come to a couple others --

1   have said something similar.  When a Court's being asked to

2   construe a contract, and look at the language the parties

3   negotiated and signed, there is a decision that's been made

4   by the Trustee in agreeing to the automatic acceleration

5   language here, which provides for immediate payment, without

6   any reference to the Applicable Premium, which they could

7   have easily done.

8           They could have easily said, "without further

9   action or notice, due and payable immediately," and what's

10  due and payable immediately?  The notes and the Applicable

11  Premium, because when the notes are due and payable by an

12  optional redemption, as Article 3 says they are, the

13  language is, and I'm quoting now from 307(a), "the issuer

14  may redeem all or part of the notes at a redemption price

15  equal to 100 percent of the principal amount of the notes

16  redeemed, plus," underline plus, "the Applicable Premium."

17  So the acceleration provision, when they agreed the

18  language, that it's due and payable immediately without

19  anything further being done or said, they don't include

20  language like that in there at all.

21          This is the deal they struck and what we're

22  hearing a lot of in the Courtroom, is that somehow, now that

23  the consequence of that deal has arrived, it somehow doesn't

24  make economic sense, or it doesn't make sense for the

25  Trustee.

```
 1              But as the Courts have said, when you look at the

 2      language, it reflects, actually, the trade off they make.

 3      And I'll come back to the commercial reasonableness argument

 4      in a minute, but because I think it doesn't bear on the

 5      decision Your Honor needs to make whatsoever, and I'll

 6      explain why.  But again, Solutia says that none of the

 7      clauses in the indenture there have the explicitness that's

 8      expected of a post-acceleration yield maintenance clause for

 9      it to be enforced.

10              If you turn to page 60, this is the Calpine

11      decision in the District Court, and there, too, what Mr.

12      Anker referred to as a -- he said pure, no fault provision,

13      none of the notes required the payment of a premium in the

14      event of a repayment pursuant to acceleration.  But he went

15      on to say that -- and this is the second quote from Star 4

16      of the District Court's opinion on Calpine, the notes could

17      have provided for the payment of premiums in the event of a

18      payment pursuant to acceleration.

19              Parties frequently provide for damages in these

20      situations precisely because acceleration deprives borrowers

21      of the payment streams for which they contracted.  Without

22      such a provision, however, no damages are recoverable after

23      acceleration.

24              So the Courts have heard these arguments over and

25      over, and have pointed out that the parties should be held
```

1    to the bargain they struck.  So, lastly, then, with respect

2    to the language of the indenture, Your Honor, on page

3    seventeen, the acceleration provision again from 602 of this

4    indenture in the second paragraph, our language, it's not a

5    question of ambiguity.  We agree on that.  And it's really

6    not a question of specificity or explicitness which New York

7    law indisputably requires, even if it makes people unhappy,

8    there's nothing in here that calls for the payment of a

9    premium, or the Applicable Premium, as defined in the

10   indenture.

11          This should be the end of the analysis, no make-

12   whole is due on this language under New York law or under

13   the cases that have confronted this same problem.  But

14   obviously there's more.  We heard a lot of discussion about

15   how, if the Court's not going to award a make-whole, you

16   ought to provide through damages the same recovery that they

17   contracted that they wouldn't seek, wouldn't be entitled to

18   under the indenture.

19          And before I turn to those, I want to talk just

20   briefly about the parol evidence that the Trustee is relying

21   on here and the claim that the Debtors filed intentionally

22   to evade the make-whole.  I'm going to address those two

23   points, and then I'm going to turn to these damage claims.

24   The Trustee submitted three expert reports in connection

25   with this motion and Mr. Anker hasn't addressed that we have

1    a separate motion to strike those under rule 702 in the

2    Daubert decision, and I'm not going to rehearse those

3    arguments here, but I do want to say -- I do want to comment

4    that in our view, they're flatly inadmissible, but the go to

5    this issue of commercial reasonableness that the Trustee and

6    Mr. Horowitz have both talked about.

7                And this is something, again, the Courts have

8    heard before.  In the AMR decision, the Bankruptcy Court

9    heard arguments about the business purposes of make-whole

10   provisions, why they make sense and why they're included in

11   high-yield debt instruments or high-yield debt indentures,

12   and absolutely brushed it aside.  And I'm referring to the

13   District Court's opinion in page 303 and 304 where the Court

14   said, "the entitlement to such payments," that is referring

15   to make-whole payments, "the entitlement to such payments,

16   however, is a matter of contract, not policy," so no matter

17   the degree to which the Trustee can develop arguments that

18   it would make more sense if they were entitled to a make-

19   whole premium in this setting, and it's hard to imagine why

20   they would have signed the indenture that they did for

21   commercial reasons.

22                The Courts have spoken loud and clear that that is

23   not evidence that's admissible or appropriate for helping

24   the Court to construe what the language in an unambiguous

25   contract means.

1              The Second Circuit in AMR, and affirming the

2     District Court, came to much the same conclusion, and it

3     said specifically that agreements like this provide benefits

4     to both parties.  The Trustee argues that, and I think Mr.

5     Horowitz did as well, that it makes no sense to imagine that

6     the Trustee would negotiate for and obtain the right under

7     an optional redemption provision to collect an Applicable

8     Premium, a make-whole premium, upon an early payment, before

9     maturity, the issuer decides to refinance because there's

10    better interest rates, that's the deal.

11             You have to pay pursuant to the formula of this

12    premium.  It makes no sense that in bankruptcy they would

13    give that up.  But that sets up a false analysis.  Who says

14    that that was the trade off?  When these indentures were

15    negotiated, all the terms were on the table.  The amount of

16    the loan, the maturity dates, interest rates, any number of

17    puts and takes that are involved, and it is, in this case,

18    we have, and we've seen it in the Oaktree negotiations

19    involving the TCEH Second Lien debt referred to in our

20    papers, evidence we think Your Honor need not turn to, but I

21    simply want to address the commercial reasonableness claim

22    here, that there's something unreasonable about the result

23    dictated by the indenture.

24             We saw in emails from Mr. Keglevic a flat

25    rejection of the demand that a make-whole premium be payable

1    upon acceleration in bankruptcy.  And so it didn't get into

2    the indenture in that instance.  It happens, as well as,

3    it's sort of remarkable that the Trustee can argue that this

4    makes no commercial sense, that this result would obtain,

5    when case after case after case have held on this language

6    or similar language that make-whole premiums weren't due as

7    a result of the negotiated language -- as a result of the

8    language negotiated by the parties.  It's happened time and

9    again.

10           So at the time when parties are negotiating these

11   agreements, they have clearly agreed the language, which the

12   Courts have repeatedly found, Calpine and Solutia and

13   Momentive, AMR, did not provide for a make-whole premium, a

14   pre-payment premium or an Applicable Premium, it hardly

15   matters what you call it, upon automatic acceleration in

16   bankruptcy.  So I think the commercial reasonableness, or

17   unreasonableness argument, goes nowhere here for those

18   reasons.

19           The Trustee has argued that EFIH filed bankruptcy,

20   or that there's evidence it filed bankruptcy for the purpose

21   of avoiding the make-whole.  It's in their papers and he

22   alluded to it a bit at the end of his argument.  And in this

23   stage, a summary judgment setting, I want to just be very

24   specific, I don't want to spend much time on this, but it's

25   quoted in our papers, both Paul Keglevic, the company's CFO,

1   and Anthony Horton, its Treasurer, testified as to the

2   reason why EFIH filed for bankruptcy.

3           Mr. Keglevic testified that EFIH would no longer

4   be able to pay its bills, quote unquote.  And Mr. Horton

5   testified the reason was that EFIH was, quote, "going to run

6   out of cash," close quote.  Now, Mr. Anker shared that with

7   Your Honor and sort of smirked and said, "Well, maybe."  And

8   under Rule 56, cynicism about that is insufficient to create

9   a disputed issue of material fact.

10          There is, in this record, no evidence, none, that

11   contradicts the sworn testimony of those individuals who run

12   the finance team that was directly involved in the decision

13   to file bankruptcy, nothing that undermines their subjective

14   belief, and there's no objective evidence to show that

15   EFIH's liquidity or its ability to pay its bills are somehow

16   different than what they said it was.

17          So I think that that needs to be rejected out of

18   hand, and this evidence, or argument, rather, that there was

19   an awareness within EFIH during the many months it was

20   negotiating with Creditors over different ways to

21   restructure, be it outside of bankruptcy or ultimately in

22   bankruptcy, an awareness as to how the indentures worked and

23   whether an applicable premium would be payable if the notes

24   were refinanced in bankruptcy, which it's not, that that

25   somehow lends credence to the notion that they filed for the

1    purposes of avoiding paying the make-whole.  And the Premier

2    Court dealt with that.

3            They litigated that issue, because in Premier,

4    there was a clause in the indenture that talks about the

5    willfulness in taking actions to intentionally avoid paying

6    the make-whole.  A clause -- no such clause exists, as Your

7    Honor knows, in this indenture.  And there, the Court said

8    that advance awareness of that kind of the consequences of

9    Chapter 11 filing when it comes to whether a make-whole is

10   due or not is insufficient evidence to prove that there was

11   an intent to avoid the make-whole by filing for bankruptcy.

12           So, I think it's a non-issue here because the

13   Trustee has failed to carry the burden of bringing forth any

14   sufficient evidence to contradict the reasons that are in

15   the record for why EFIH filed bankruptcy.

16           Now, I'd like to turn to the alternative theories,

17   the sort of backdoor ways in which the Trustee is attempting

18   to collect through a damage claim what the indenture doesn't

19   give it, in terms of a make-whole or an applicable premium.

20           First, there's a claim for damages of breach of a

21   so-called no-call provision, and the Trustee there is

22   referring to Section 307(c) in Article 3 as part of the

23   optional redemption, and it provides, referred to this

24   before, "except pursuant to Clause (a) or (b) of Section

25   307, the note shall not be redeemable at the issuer's

1    option, prior to December 1, 2015."

2           And what that means is clear from the language.

3    By saying "except pursuant to Clause (a) or (b)," Clause (a)

4    or (b) are the ways in which the -- describe the ways in

5    which the issuer can optionally redeem, prior to December

6    1st, 2015, and the consequences, which is the requirement to

7    pay the applicable premium.  Rather than prohibiting the

8    calling of the notes, it simply describes and refers to the

9    way in which, at any time prior to maturity, at any time,

10   the issuer can call the notes in whole or in part, and this

11   exact argument was made in the Momentive case.

12          And the Court there held that this language, this

13   exact language, is not a no-call provision.  And so, the

14   payment in this case, however one characterizes it, does not

15   breach any obligation of the issuer in the indenture not to

16   repay the notes.  And as a consequence, there can be no,

17   under state law, damage claim, for breach of a no-call

18   provision because we simply don't have a no-call provision

19   in the indenture, Momentive held that on the same language,

20   and we don't have an obligation not to repay the notes at

21   any time in the indenture.  So there's no breach of contract

22   here, however one chooses to characterize the repayment that

23   occurred.

24          The perfect tender rule argument, which as Mr.

25   Anker said is sort of the font of this no-call provisions,

1    really in trying a perfect tender rule, Momentive rejected

2    this too and for good reason.  Under New York law, the

3    parties can agree in their lending agreements to modify the

4    perfect tender rule, and this indenture is a classic

5    example, the one in Momentive was too, and they can change

6    the rule, the perfect tender rule and say, well, absent the

7    parties saying anything New York's common law perfect tender

8    rule would govern and you have to pay precisely on time and

9    the way the lending agreement requires.

10           But here, they've got this elaborate set in

11   Article 3 and Article 6 of provisions that govern how and

12   when repayment is made and what the consequences are, it

13   modifies the perfect tender rule, it doesn't apply here.

14   The question is, is the repayment that was made a breach of

15   any obligation of the issuer, such that damages are

16   recoverable, and the answer is no, for the reasons I've

17   said.  Now, Mr. Anker said a number of times that EFIH was

18   arguing there was a conflict between 307(a), the optional

19   redemption provision, and Section 602, the automatic

20   acceleration provision.  We've said nothing of the sort.  In

21   fact, I'm saying just the opposite.  They're absolutely

22   harmonious.

23           There are situations in which the issuer can

24   optionally redeem, can pay early and follow the rules in

25   Article 3 to do that.  But the indenture also says that if

1    the issuer triggers, by filing a Chapter 11 petition of

2    bankruptcy, then the automatic acceleration provision

3    governs, and it says what happens, that is the debt becomes

4    due and payable and if you pay there, we have no

5    requirement.  There's no requirement here to pay an

6    Applicable Premium.  There's no conflict whatsoever.  We're

7    simply not in the optional redemption provision with the

8    repayment that was made last June.  We're in the automatic

9    acceleration provision.

10          The other damage claim asserted here is for

11   something called rescission damages.  No court has ever

12   awarded damages for breach of a rescission right upon the

13   payment of a debt after automatic acceleration after

14   bankruptcy in this setting.  There's no decision.  Now, we

15   talked a little while ago, you asked about Judge Drain's

16   opinion in Momentive, and of course, it's not a holding the

17   rescission damages are recoverable here.  What the Court did

18   say, as I said a few minutes ago, was dispense with the no-

19   call claim for the reasons I just outlined.  There is no no-

20   call provision, that's what Judge Drain held.  There's no

21   perfect tender violation.

22          And then he referred to two solvent Debtor cases

23   that had been argued, that had been put before him, that is

24   Premier and Chemtura, and said that if the rescission

25   damages were recoverable as in -- as those cases have

1    argued, as the Judge in those cases had found, that you

2    would -- that under 502(b)(2), they would not be

3    recoverable.  What the Court did not do is accept the

4    Trustee's theory, that is, there was an effort to rescind

5    there, and the automatic stay prohibited it, and the Court

6    would not lift the stay and did not award rescission

7    damages.

8              Now, the Trustee has argued that the automatic

9    stay shouldn't apply.  There is case after case, AMR.

10   Solutia, Momentive, have all found that the automatic stay

11   which arises upon the filing of the bankruptcy precludes the

12   Trustee from giving a notice of rescission.  So Mr. Anker

13   said, well, it's just a ministerial act, it's a mere notice.

14   We're not pursuing a claim.  And that's not really a

15   credible argument in the light of what the courts have said.

16             In AMR, the Court said, the Second Circuit, said,

17   the sole purpose of rescission in this setting is to

18   increase the value of the Trustee's claim.  And the Court in

19   Solutia said something very similar, quote, this is at page

20   44 of the Solutia opinion, quote, the filing of the notice

21   of rescission is "a direct attempt to get more property from

22   the Debtor and the estate," that's at page 45, I'm sorry,

23   Your Honor, page 44 the Court found, that the notice of

24   rescission violates the automatic stay.

25             The only purpose for filing the notice of

```
 1   rescission is not ministerial.  It is to undo the

 2   acceleration and then have the Court declare the payment an

 3   optional redemption under Article 3 in order to expand their

 4   claim.  They've already been paid all their principal, all

 5   of their accrued interest, and now as their experts are

 6   arguing, the amount would be $431 million, so they want to

 7   expand their claim by $431 million dollars.  And that is, as

 8   the Court in Momentive held, satisfies 362(a)3 as an attempt

 9   or an act, rather, to obtain possession of property of the

10   estate or property from the estate or exercise control over

11   property of the estate.  So it violates the automatic stay,

12   as AMR and Solutia have both held.

13           Now, in the Trustee's papers, they've argued that

14   the way the Court - and I want to come to this issue of

15   solvency and insolvency - the way the Court ought to look at

16   this is solely with respect to the state law rights that

17   they have outside of bankruptcy.  That is, as Mr. Anker

18   pointed out, referring to some testimony in the discovery

19   hearing, well, what if EFIH had not filed for bankruptcy and

20   refinanced last June outside of bankruptcy?  Would they be

21   entitled to rescind?  And the answer is yes, they would

22   apparently, because there's a rescission right there.

23           But, we're not outside of bankruptcy.  The

24   indenture provisions envision, among many other

25   potentialities, a Chapter 11 filing.  It's incorporated in
```

1    the way the indenture works.  It's in 601, there's

2    references to bankruptcy law in events of default, including

3    a Chapter 11 filing, and consequences in 602 of a bankruptcy

4    filing.  You don't have an automatic acceleration that makes

5    the notes due and payable immediately without further action

6    or notice, absent a bankruptcy filing.

7            And as a consequence, we can't live in a world

8    that pretends like that didn't happen.  This payment was

9    made pursuant to a section that only is triggered in a

10   bankruptcy filing, and as the drafters of the indenture

11   would surely have known and agreeing about the consequences

12   of a bankruptcy filing, that along with it would come the

13   automatic stay.  The automatic stay would preclude

14   rescission, not in every case, it doesn't make the

15   rescission rights in this indenture meaningless or

16   superfluous at all.

17           The rescission right is the third paragraph in

18   paragraph 602.  The first paragraph talks about a whole

19   series of defaults which do not accelerate the debt unless

20   the Trustee declares the acceleration.  So in the case of a

21   bankruptcy filing where the automatic stay is in place and

22   the debt is accelerated automatically as a consequence of

23   this contract language.  They can't rescind because of the

24   stay, and they knew that when they signed the agreement, and

25   that's the limit of the limit on their rescission right.

1    And it doesn't deny them something that they're not -- that

2    they would otherwise be entitled to under state law, because

3    there can again be no automatic acceleration of the kind

4    that occurred here outside of a bankruptcy context.

5              So the Trustee argues, well, you ought to lift the

6    stay and give us this damage claim, give us this, you know,

7    stack of the make-whole recovery that the indenture doesn't.

8    And their argument is simply because EFIH is presumed to be

9    solvent for the purposes of these proceedings.  But no Court

10   holds that.  No Court holds that the automatic stay should

11   be lifted every time a solvent Debtor files under Chapter

12   11.  And the cases that the Trustee, and they're working

13   overtime here, because the cases that they're citing to

14   attempt to establish a rule that the automatic stay should

15   be lifted if the Debtor is solvent are bizarre, to say the

16   least.

17             One of the cases, and they just relied on a few,

18   but here's a couple of examples.  In re: Novak from the

19   Eastern District in New York in 1989, this was an individual

20   farmer who filed under Chapter 11 and the Court found there

21   was a lack of good faith in the bankruptcy filing because

22   the farmer, under the Chapter 12, evidently there's

23   accelerated due dates for filing a plan and moving through

24   the bankruptcy process, a fairly new provision of the code

25   dating back just to the 1980s.  And the Court found, well

1    there was a lack of good faith, the farmer had filed an

2    unconformable plan and sat and did nothing, and was

3    continuing to use the property, avoiding paying his debts

4    and there was a whiff of bad faith there, and there was no

5    holding in that case that because the farmer was solvent,

6    the automatic stay didn't apply, or should be lifted.

7              They cite Clawton vs. Mixon, a Fourth Circuit

8    case, 1994.  That's another bizarre case.  An individual

9    files for bankruptcy under Chapter 11 after a 16-year

10   divorce battle when the Florida Courts finally ordered him

11   to pay his wife, and then he turns and files for bankruptcy

12   and there's -- he's got $6 million dollars in assets and

13   $700,000 dollars in liabilities and the Court finds that he

14   likely filed for bankruptcy in bad faith and was abusing the

15   Court system to try to avoid, after all these years, paying

16   his wife and yes, he was solvent, the Court lifted the stay,

17   but it did not establish any rule of the kind the Trustee is

18   arguing should apply here, which is, well, if EFIH is

19   solvent, you have to lift the stay.  There's just no such

20   rule of law.

21             And then lastly, they've argued, well, there's a

22   reason to lift the stay for cause here, they've argued in

23   their papers, because the -- if we presume EFIH to be

24   solvent as we're doing here, expanding their claim by $431

25   million, well, that's not going to hurt them.  It's not

Page 102

```
1    going to hurt any other Creditor, and I would submit, Your

2    Honor, that it's just too narrow a view of the effect, a

3    solvency in this setting, because of the Debtor's

4    obligations in Chapter 11 are much broader than just the

5    Creditors.

6              As Your Honor knows, the obligations run to

7    protecting the estate, the value of the estate for Creditors

8    and equity holders as well.  It's not simply to referee the

9    chase between Creditors for a limited pie, so even if EFIH

10   is solvent, and we're presuming it is, we have obligations

11   here to control the size to the extent the law permits, of

12   claims for the benefit of the entire estate, not simply

13   whether one Creditor's ox is getting gored versus another.

14             THE COURT:  Isn't the question -- say that I agree

15   with everything you said, and when I come to this issue of,

16   should the stay be lifted --

17             MR. MCGANN:  Yeah.

18             THE COURT:  -- to allow an exercise of the

19   rescission right, and assume that if I -- that if the

20   rescission right is allowed to occur, that that would

21   arguably give rise to the make-whole piece.  Isn't the

22   question of whether to lift the stay or not inherently a

23   factual question that really is beyond the ability to decide

24   on summary judgment?

25             MR. MCGANN:  I think Your Honor may be right.  I
```

1    think there's sufficient undisputed evidence in the record

2    now that they have not established cause to lift the stay,

3    and by that I mean, their argument is right, that the only

4    issue Your Honor should be thinking about is whether lifting

5    the stay here in fact will hurt other Creditors or not, and

6    they posited it won't.

7            They haven't carried their burden to lift the

8    stay.  That's how I would characterize it, and the reason I

9    say that is, well, Your Honor, as in the parties have agreed

10   the solvency would be assumed, page one of this dispute.  We

11   weren't talking about the application of the automatic stay

12   or lifting the stay very much at that point.  The reality

13   is, who knows where this case goes?  Who knows if, today,

14   the Trustee can increase its claim after having been paid

15   everything it's owed, then increase its claim and get this

16   premium of $431 million dollars, whether it will actually

17   affect the ability of other Creditors to collect later or

18   not.  There are insufficient facts, there won't be tomorrow

19   sufficient facts to know that, so the answer is, the Trustee

20   is putting forth in its motion to --

21           THE COURT:  That's today.  One of the elements

22   that the Court considers in trying to decide whether cause

23   to lift the automatic stay has been established, is damaged

24   to other Creditors, but not the sole --

25           MR. MCGANN:  Right, it's the argument they've

1    made.

2              THE COURT:  Right.

3              MR. MCGANN:  The absence of such damage, so I'm

4    focused on the reason they provided, which is EFIH is

5    presumed solvent, therefore that the stay doesn't apply, and

6    that's just not an accurate statement of law.  Secondly,

7    well, if you lift the stay and you presume EFIH is solvent,

8    that presumes they can pay all their Creditors and no one

9    gets hurt, and I'm saying as a factual matter, we can't

10   ignore, despite the presumption we're making of solvency for

11   purposes of the dispute at this time, the Court has no way

12   of knowing if that's in fact going to damage another

13   Creditor.  And while I agree there's other considerations,

14   they haven't pressed any others.

15             THE COURT:   Mm hmm.

16             MR. MCGANN:  So, whether or not you say it's a

17   factual issue that prevents you from deciding it, I would

18   characterize it, and again, maybe so, but I would

19   characterize it as the Trustee has failed to put forward

20   sufficient evidence to support its claim that the stay

21   should be lifted, so for that reason, that request should be

22   denied, needs to be denied at this time.  And lastly, Your

23   Honor, the -- I do want to address this language in the

24   rescission right for two points on this, and I'll be very

25   brief.  And then I want to talk about this notion of

1    redemption, briefly, and then I'll wrap up.

2           But with respect to rescission, in the rescission

3    provision of the indenture, the third paragraph of 602,

4    there is this parenthetical carve out, so there is no

5    absolute right in the language of the contract to rescind.

6    The parenthetical reads, quote, "so long as such rescission

7    would not conflict with any judgment of a Court of competent

8    jurisdiction," and we have cited cases in our papers, I

9    won't belabor it, that the automatic stay while it arises

10   automatically by force of statute, it has been characterized

11   by a number of Courts as operating as an injunction by this

12   Court, or a self-executing injunction, and in those

13   instances it operates, for these purposes, very much like an

14   injunction, an injunction is a judgment of the Court.

15          And it qualifies their ability, so to rescind

16   under these circumstances, not under all circumstances.

17   Again the rescission right here applies to a much broader

18   set of acceleration possibilities than the one we're

19   confronted with here, which is the automatic acceleration

20   because of a bankruptcy filing, which comes with the

21   automatic stay and no one can pretend like the drafters of

22   this indenture didn't know that.  So there's language in the

23   contract that limits their ability to rescind under this

24   setting.

25          And then lastly --

1                 THE COURT:  Let me ask you that.

2                 MR. MCGANN:  Yeah.

3                 THE COURT:  If we -- if I find that the automatic

4      stay is a judgment for purposes of that parenthetical, again

5      it's the automatic stay can be lifted, so your argument that

6      it's a -- if the automatic stay qualifies as a judgment

7      under that parenthetical, that that means the rescission is

8      never available or would the Court still be faced with the

9      issue of whether to lift the stay, i.e. the judgment, at

10     which point the right to rescission might be enforceable?

11                MR. MCGANN:  I would argue the former, that the

12     way the language of the indenture works, is that the right

13     to rescind didn't arise.  They sent their notice of

14     rescission on June 4th and the facts on the ground at the --

15     on June 4th of last year -- the facts on the ground at the

16     time were, Chapter 11 filing, automatic acceleration, due

17     and payable immediately, notice of rescission, this language

18     in the contract says your right to rescind never matured.

19     Pay off June 19th is not a breach, as they phrase it, of any

20     rescission right.  It never matured, end of story.  Later,

21     if they were to come and convince you you ought to lift the

22     stay, now we're into a world that I'd have to give more

23     thought to because that's -- that now is retroactive to a

24     time when they didn't have the right.

25                THE COURT:   Right.

1            MR. MCGANN:  So that's why I say the former.  I

2     think the way, is a matter of contract interpretation, it's

3     written, the right to rescind never matured so it could not

4     have been breached, but that's really my last point which

5     is, there's no breach here of any kind, and this is

6     something that might have been helpful had the Momentive

7     opinion delved into whether there was in fact a right to

8     damages for a so-called breach of rescission in that case,

9     which he didn't do.  The Court was just writing in dicta

10    there.

11            There might be more guidance on this.  But unlike

12    -- let's compare this to the no-call setting.  In a classic

13    no-call situation, that we looked at, say, in Calpine or

14    Premier, the issuers made a promise not to call the note and

15    pay it before the date certain, and then does, and those

16    Courts have said, "Well, we're going to look at this as a --

17    you've breached the promise and we're going to look at

18    whether damages are recoverable or not," and in Calpine, the

19    Court ultimately said no, because the contract provision

20    which was alleged to have been breached was unenforceable

21    there.  But that's the structure of the contract argument.

22    We're living under state law world here.

23            Here on rescission, the rescission damages claim

24    is strange.  There is no promise the issuer made here to do

25    an act or refrain from doing an act that its Chapter 11

1    filing breached, where the application of the automatic stay

2    that prevented the rescission notice breached.  That wasn't

3    an action of the Debtor, so there is no promise here that

4    the Debtor failed to fulfill that would give rise under

5    state law to a damage recovery.  The frustration of the

6    rescission right that's being claimed here is one of two or

7    both the language of the rescission provision, which we just

8    talked about in our view limits the ability under this

9    setting to rescind.  It says you don't have the right to

10   rescind here.  No breach at all.  No even theoretical.

11          Or, if you disagree with that formulation on the

12   contract language and say well, really what frustrated their

13   ability to rescind is the automatic stay.  Again, that's not

14   a breach by the issuer.  So I think Your Honor is being

15   pushed out on a limb and being asked to award rescission

16   damages where there isn't a provision of the contract that

17   anyone can rightly and convincingly point to that was

18   breached here.

19          Okay, I'd like to then wrap up, Your Honor, with a

20   couple final points.  If you turn now to page 20 of the

21   presentation, Mr. Anker argued at length about the meaning

22   of the word "redemption", and I think that's a red herring

23   here.  I think that, when you look at form -- or substance

24   rather than form, what's going on in section 307, when you

25   look at the structure of this indenture, at least the

1    provisions that matter here Article 6, Article 3, Section

2    307, the optional redemption thing, is a pre-payment

3    premium.  There's no other way to look at it.

4              Calling it a redemption gives it no magic license

5    here.  All it does is say if you pay before, all or part of

6    the notes, before December 1st, 2015, you have to pay the

7    applicable premium, go to Section 101, there's a formula,

8    here's how you calculate it.  And if you pay after December

9    1, 2015, you then go to 307(d), which says from and after

10   December 1, 2015, the issuer may redeem the notes in whole

11   or in part at the redemption prices expressed below.  So

12   what's happening here is 307(a) through (d) lays out the

13   rules under which the issuer can, at its option, pay all or

14   part of the notes early.

15             This formula run all the way -- the formula for

16   calculating additional payment that would be due under those

17   circumstances runs all the way up to maturity.  So there's

18   no magic to the definitial fight over what's a redemption.

19   More importantly, what redemption means is a function of

20   what it means in this contract, not what it means in the

21   Chesapeake decision, or not what it means in securities

22   disclosures or small r redemption or the word redeem as used

23   in testimony.  None of that informs or should inform the

24   Court of what redemption means here, and if it has any

25   consequences that matter.

1          So, if you look at -- and I'm going to return to

2     some of that language, but before I do, I'm just going to

3     stick with my slide here.  What is happening, then, in 602?

4     Why is that not an optional redemption within the meaning of

5     the indenture?  And it's because it commands repayment

6     immediately, says it's due and payable immediately, and New

7     York law, in the Southside decision which Mr. Anker when

8     seeing the slide said, oh, that, you can't really pay

9     attention, that was a foreclosure case, but in Southside,

10    the Court said a borrower's repayment after acceleration is

11    not considered voluntary.

12          But in AMR, the Court said the same thing.  It's

13    not voluntary when the Debtor pays after automatic

14    acceleration, when a contractor calls for the debt to be due

15    and payable immediately.  Not voluntary.  If you turn to

16    page 21, the indenture itself in a number of places

17    distinguishes between redemption and acceleration.  So

18    again, no matter what people who have said elsewhere, that

19    documents that are not part of this indenture may reflect,

20    what the indenture does, and I've drawn the Court's

21    attention to 601 and 1004 and 1101 and called out the

22    example in 601 but the others are much the same, this

23    happens to be the introductory language to the listing of

24    the events of default.

25          Default in payment when due and payable upon

1    redemption, acceleration or otherwise, and it goes on from

2    there.  So the drafters of the indenture have used the terms

3    acceleration and redemption differently.  Because they have

4    redemption provisions as they choose to use it in this

5    indenture, called the optional redemption provisions, 307,

6    and the acceleration provisions in Article 6, and payment

7    can be due and payable either as a redemption or as an

8    acceleration.

9              If you turn to page 22, we're calling out here

10   Black's Law Dictionary, which defines redemption as the

11   repurchase of a bond before maturity, but we readily

12   concede, and the Trustee worked hard to find other

13   dictionaries and other secondary sources that define

14   redemption differently, including payment at or after

15   maturity.  You can find any number of uses of the term

16   redemption, which is used colloquially, as I'm sure Your

17   Honor appreciates, to mean pay back.

18             But what matter is, how is the term used here in

19   the indenture, and the fact that the drafters use

20   acceleration and redemption side-by-side as different

21   concepts, harmonizes and marries up section 6, Article 6 and

22   Article 3, and to further buttress that conclusion, if you

23   look -- and we haven't really looked at any of these yet,

24   but if you look at Section 303 and 304, very operative

25   provisions of the redemption article, if you want to engage

1    in a 307 optional redemption, there's this nosebleed section

2    of notices and dates and deadlines and information that has

3    to be supplied, in advance, before you do it, Ts have to be

4    crossed, Is have to be dotted, in order to engage in an

5    optional redemption, none of which did happen here, none of

6    which can happen after an acceleration following bankruptcy,

7    which says, in exact words, "due and payable immediately

8    without further action or notice," distinguishing it from

9    the optional redemption rules, which are full of

10   requirements of action and notice to engage in the optional

11   redemption.

12           So, contrary to the argument that we're pushing a

13   conflict here, we think the indenture actually reads quite

14   harmoniously, and it works together very well, and there is

15   a difference between acceleration and redemption, and the

16   words are used differently here, and the circumstances are

17   different.

18           Your Honor, if you turn, finally, to page 25, we

19   just lined up the cases where on almost identical

20   acceleration language, the Courts have declined to award the

21   make-whole recovery that the Trustee seeks here.  So,

22   notwithstanding how they feel about the commercial

23   reasonableness of an indenture that doesn't provide for an

24   early payment premium or a make-whole or Applicable Premium,

25   Court after Court after Court have held parties to the deal

1  they made on essentially the exact same language, and as the

2  District Court in Calpine said, no make-whole is recoverable

3  here, nor are any damages as a substitute for a make-whole,

4  because they're not provided for in the indenture and no

5  breach has occurred.  Thank you.

6          THE COURT:  Thank you.  Mr. Anker, I'll give you

7  15, 20 minutes maximum?

8          MR. ANKER:  Thank you, Your Honor, and I

9  appreciate your time at the end of the day.  Mr. McGann said

10  two things with which I entirely concur and they go to the

11  same point, and I think I got them exactly right, but don't

12  hold me to the words.  He said "parties should be held to

13  the bargain they struck," and to the end he said that "you

14  hold parties to the deal they made."  I agree.  The deal the

15  parties made here was that a bankruptcy filing accelerated

16  the debt, except that the noteholders had the right to

17  rescind any acceleration.

18          Mr. McGann says that we'll give meaning to that

19  provision, because there are other accelerations, failure to

20  pay principal, failure to pay interest, but this indenture

21  provided that the noteholders have the right to rescind any

22  acceleration, and it is in contrast to many other

23  indentures, like the one in Solutia, that only provided for

24  the right to rescind a declared acceleration, so it carved

25  out an automatic acceleration.

1          Here, what the parties bargained for, if you're

2     going to hold them to the bargain, is the right to rescind

3     that acceleration, and that rescission, as a matter of New

4     York law, has the effect of making the acceleration null and

5     void, thereby, this is not under 602, it is most assuredly

6     an optional redemption.

7          Your Honor asked, and Mr. McGann cited cases about

8     the stay, as I said earlier, I don't think you need to reach

9     the question of whether to give relief for it to rescind,

10    because if we're denied that right, we get a claim, and I

11    want to take both parts of that.  First, and I'll do it

12    backwards, on the relief point, Mr. McGann didn't cite

13    Texaco.  He disparaged the cases we cited saying, "Those are

14    cases in individual Debtors who acted improperly in filing."

15    Texaco didn't act improperly in filing.  It was casing a

16    judgment from Pennzoil that was absolutely crippled it.  No

17    one disputes it filed for legal reasons, and Judge

18    Schwartzman granted relief from the stay saying, "given the

19    solvency of that Debtor and that the only effect of their

20    giving of the notice will be to increase the claim amount to

21    allow the Creditors to have their state law rights, that is

22    cause."  Your Honor this summer said, citing Gencarelli,

23    when there is a valid provision under state law, the job of

24    the Court in a solvent case is to enforce it.

25          Let's take -- back to the special leave from stay.

1    Let's move back to the first point, which is, even if you

2    don't have to -- you don't have to give relief from the

3    stay, because we simply have a claim for the denial.  Mr.

4    McGann makes the creative argument that, how is it that we

5    the Debtors have breached that right?  Well, they haven't

6    consented to relief from the stay, but more importantly,

7    it's a red herring, to use a phrase I'll borrow from Mr.

8    McGann.

9           If you look at the Stephan case, Judge Ambro's

10   decision that we cited, that I will readily acknowledge

11   again is not binding, 588 Fed Aps 143, there, what happened,

12   as I mentioned earlier, is the lender wasn't able to, under

13   -- because of the automatic stay -- foreclose under state

14   law, and therefore meet the requirement under state law

15   before you get a default judgment, and Judge Ambro said,

16   "But you still have a contingent claim."  The claim there

17   was the claim for the default judgment, so too here, the

18   claim isn't for -- the logic would go as simple as this.

19          If we could rescind, because we're being denied

20   the right to rescind.  If we could rescind, then there's no

21   automatic acerbation, and every argument they've made goes

22   out the door and this is unquestionably an optional

23   redemption because there's been no rescission and therefore

24   we're entitled to the make-whole.  So the denial of the

25   right to rescind, denying us our state law right, denies us

1    the ability --

2              THE COURT:  But if the state law right is denied,

3    it's denied by the operation of the automatic stay.

4              MR. ANKER:  Correct.

5              THE COURT:  And you don't get damages -- I mean,

6    the case law is clear on that, that you don't get damages

7    for operation of the automatic stay if you're a Creditor.

8              MR. ANKER:  Correct, Your Honor.

9              THE COURT:  It is what it is.

10             MR. ANKER:  Correct, Your Honor.  But I think

11   that's what I mean when I was saying -- I think that's not

12   the right way to analyze it.  The way to analyze it is, do

13   we get claim for denial of what we would be entitled to

14   under the indenture, if we were entitled to stay relief?

15   It's just like Stephan.  In Stephan, and I hope I'm

16   pronouncing that case right, if the Creditor had gotten

17   relief from the stay, it would have been able to perfect its

18   right to a default judgment.

19             The damage is its inability to get the default

20   judgment provided for by contract.  So too here, if we get

21   relief from the stay, or the denial of it is denying us the

22   ability to rescind, and because we can't rescind, if you

23   hold an automatic acceleration bars the right to optional

24   redemption, then we're denied the make-whole.  So it's not a

25   damage that flows directly from violation -- from the denial

1   of the stay.  It's that the denial of the stay denies us the

2   ability to collect what we would otherwise be entitled to

3   under the contract.  It is really the Stephan case on all

4   fours.  I hope I've explained that, and I hope that makes

5   sense to Your Honor.

6           Mr. McGann says that the Court is -- and Your

7   Honor is, is the question, the Court may be presuming

8   solvency, but we don't know what in the end the case -- the

9   facts will turn out on the ground.  I agree we don't know

10  what the facts are that will turn out on the ground, but I

11  think Your Honor solved that problem through the

12  bifurcation.  If Your Honor were to issue an order that were

13  to say -- or issue an opinion presuming solvency, the

14  noteholders are entitled to the make-whole, that would not

15  entitle us today to send a demand letter and demand payment,

16  nor would it be an order that would decide that the Debtors

17  are solvent and it certainly wouldn't be an order deciding

18  that if they were insolvent, we are entitled to the make-

19  whole.  So the issue would remain.

20          As I say, I don't want to say -- I say that with

21  some trepidation because I don't want to suggest to the

22  Court you've got a lot more work to do.  Notwithstanding how

23  diligent you are, I suspect the parties would negotiate that

24  out because I don't think there's an real serious question

25  here of solvency, but no one is suggesting, that an order

1    entered today granting relief to the noteholders as to phase

2    one, would unconditionally require payment if that decision

3    turned on presumed solvency.

4            Mr. McGann suggest that, well, there's other

5    issues and I think what he's alluding to is other Debtors,

6    but as Your Honor well knows, there have been no substantive

7    consolidation here and under the Owens Corning test in the

8    circuit, it seems to me fanciful to suggest that there ever

9    would be.

10            I didn't hear Mr. McGann -- now let me move past

11    the rescission point.  Let me say one thing on rescission.

12    I heard Mr. McGann say there are cases that say the

13    automatic stay operates like a judgment.  I think that's a

14    direct quote.  But that's not the language of the

15    parenthetical.  The language of the parenthetical is not

16    that the right to rescind is denied if there's something out

17    there that sort of looks like the judgment of the Court.  It

18    has to be the judgment of a Court of competent jurisdiction,

19    and the one way to know that the automatic stay is not that,

20    is it comes into effect upon a petition, not merely upon an

21    order for relief.  So in an involuntary case, it occurs

22    immediately upon the filing of the petition, even before

23    there's a statutory order for relief.  US -- Mr. McGann

24    argued that solvency doesn't matter as to the make-whole.  I

25    disagree with that.

1          One factor in solvency, and I think it is the most

2     significant factor, is when -- for cause, is whether other

3     Creditors would be harmed.  And if there is solvency, then

4     there is cause to grant relief from the stay, and if there's

5     cause to grant relief from the stay, then this is optional

6     redemption and we're entitled to the make-whole and you

7     don't have to get to the alternative damage theory, so it

8     does matter.

9          Let me now move on to, sort of, arguments that

10    don't have anything to do with rescission.  Mr. McGann -- I

11    didn't hear Mr. McGann once say we didn't act at our own

12    option, we didn't act voluntarily.  I didn't hear him say,

13    we didn't really, seeing what we said in our answer, Mr.

14    Horton testified inaccurately, or that our SEC filing, the

15    8-K, was inaccurate, when we admitted that as the Second

16    Liens, we have the right but not the obligation to redeem.

17    I never heard him say, we didn't act voluntarily, that we

18    didn't have choices, that we didn't do this simply to take

19    advantage of a reduction in interest rates.  Obviously, all

20    of that is true.  Plainly, they did.

21         Let's talk one second about the case law.  Mr.

22    McGann said when he began that no Court has ever awarded a

23    make-whole or damages under facts like these.   Well, hold

24    on a second.  Chemtura, on exactly our facts said that the

25    noteholders are substantially the Debtor of the argument,

1    they're entitled to the make-whole.  Calpine, where there

2    was automatic acceleration, said, nevertheless, this is an

3    optional redemption triggering damages, Judge Lifland's

4    decision.  Premier Biloxi said, notwithstanding automatic

5    acceleration, this is an optional redemption triggering

6    damages.

7            And Momentive, I'll leave it to Your Honor to read

8    the decision.  I think it's pretty clear that Judge Drain

9    said that, in the event that that Debtor was solvent, there

10   would be a rescission claim.  Indeed, Your Honor, not in his

11   recorded decision, which he dictated on a Friday, but on the

12   day of argument, and we gave you the transcript, he -- where

13   the argument occurred on the make-whole, he said, and this

14   is a paraphrase.  We have the exact quote but I don't want

15   to represent it as a quote.  In a solvent Debtor case it's

16   like there's not even a bankruptcy.  All the Bankruptcy

17   Court is there to do is to enforce the parties' contract

18   rights.  He accepted precisely the analysis that you

19   accepted this summer, and that the Courts in Calpine and

20   Premier Biloxi themselves accepted.

21           Mr. McGann says, and this is the point I didn't

22   make earlier, and I apologize, that 602 controls because

23   there was an automatic acceleration.  Let's put the

24   rescission aside.  If you look at the language of 602, it's

25   our slide 5, I think it's Mr. McGann's -- I apologize, Your

1    Honor, I think it's Mr. McGann's slide number 10, so it's

2    either our slide 5 or slide 10.  It says in the case of a

3    bankruptcy filing, all notes shall be due and payable.

4              Well, the notes themselves, the body of the

5    document of the notes provides that if the Debtor redeems,

6    if EFIH redeems the notes prior to December 1, 2015, the

7    make-whole will be due.  So even 602 on its face, by

8    incorporating the notes, provides for the very same answer.

9    Mr. McGann says, and I was surprised that he made the

10   argument, although he didn't respond to any of the points we

11   made at the outset, this wasn't a 307 redemption.  We didn't

12   give any of the notice.

13             Well, they did give notice, as I said earlier, and

14   I didn't hear any response.  They filed an 8-K, they filed a

15   motion saying that they were going to redeem first day of

16   this case, and then they sent out notice to all the holders

17   with their tender offer.  In any event, I will just refer

18   back to the NML case and the common sense.  The indenture

19   doesn't say, "You must give notice, EFIH, before redeeming,

20   provided however, if you fail to do that and you breach,

21   guess what? Good news.  You won't have to then pay the make-

22   whole."  One breach excuses a second.  Two wrongs don't make

23   a right.

24             I will refer the Court back to the NML case where

25   the Court, under New York law, the highest Court of the

1    state, rejected that very argument and said the failure to

2    comply with one provision surely doesn't exclude breach of

3    another.  And as I say, Chesapeake says, the Court holding

4    Chesapeake, which is what the issue was about, that

5    redemption is the actual payment, not the giving of notice

6    in any event.

7            Mr. McGann says that the parties could have

8    provided that the make-whole was due upon automatic

9    acceleration, and I think that's right.  The parties could

10   have said the mere filing for bankruptcy triggers the make-

11   whole.  That isn't our argument.  Our argument is the

12   redemption triggers the make-whole, and that is what this

13   indenture does say.  Mr. McGann never disputes that nothing

14   in 307 says, in any way, shape or form, that it is

15   inapplicable in the event of a bankruptcy filing.  Mr.

16   McGann -- and that brings me to the TCEH point, where I

17   think Mr. McGann -- I hope I was understandable and it was a

18   conscious decision not to deal with the argument.

19           What the Oaktree lender was asking for there on

20   the TCEH side, and what I agree, the Debtor said no to, was

21   that upon the mere filing for bankruptcy or any other

22   acceleration, whether or not the Debtors redeemed, the make-

23   whole would be due.  That it rejected.  What it didn't

24   reject was the language -- and it never disputed Oaktree's

25   own construction that if there was a bankruptcy, that mere

1    fact would make the make-whole due, but if subsequently it

2    redeemed, yes the make-whole would be due.  That it never

3    fought and that is our contention.

4          Mr. McGann says -- let me go back and I will -- I

5    hope I'm not repeating myself here, but I'm looking at my

6    notes quickly, Your Honor.  Mr. McGann said, this indenture

7    says if an issuer files for bankruptcy, it triggers the

8    automatic acceleration and that is not a voluntary

9    redemption and no case holds to the contrary.  I simply

10   submit that can't be reconciled with Chemtura, Calpine, or

11   Premier Biloxi.

12         Finally, let me briefly touch on the so-called

13   other claims.  Mr. McGann says this is not an absolute no-

14   call, and he and I agree on that.  The 307(c) says, "except

15   as provided in (a) or (b), the Debtor may not redeem."  I

16   agree that they could redeem under (a) and he acknowledges

17   (b) as not applicable, but if they're redeeming under (a),

18   they owe us the make-whole.  That's what (a) says.  So if

19   they're not paying the make-whole, how is that not a breach

20   of the no-call provision that says, except if you do it

21   under (a), you may not redeem prior to December 1, 2015?

22         They flatly acted contrary to that provision, and

23   they've also flatly acted contrary to the rule of perfect

24   tender because yes, I will admit it again, this indenture

25   did allow payment prior to a state of maturity, if, but only

1    if, the applicable premium, or after December 1, 2015, the

2    stated premiums, and Mr. McGann is right, there's additional

3    lower premiums thereafter that are specified, are paid, none

4    of which were.  Your Honor, let me just look at my notes for

5    one minute.  I think I'm done.

6          Oh, let me just say one other thing on the New

7    York cases and again, I hope I'm not repeating myself.  I

8    certainly think the Court should look at cases like

9    Southside, Northwestern, LHD.  What I will simply stress is

10   that every one of those cases doesn't use the redeem word,

11   it uses pre-pay, and Mr. McGann said they're synonymous but

12   what those cases say is by definition, a payment cannot be a

13   pre-payment if the debt has accelerated the maturity date

14   has now occurred.  Redemption has a different meaning.

15         He doesn't deny that there are lots of treatises

16   and lots of cases that say redemption means a payment at or

17   prior to maturity and that had to be the analysis in

18   Chemtura, Calpine or Premier Biloxi because otherwise, the

19   Courts couldn't have found the violation of the no-call or

20   in triggering a make-whole.  And finally, those are all

21   cases where the lender affirmatively took steps to

22   accelerate the debt, filing either outside of bankruptcy a

23   foreclosure action, or in bankruptcy, seeking relief from

24   the stay.

25         I don't dispute that there can be circumstances in

1   which a lender acts inconsistent with the premise that I

2   want my notes to remain outstanding or if you pay me now,

3   you need to pay the make-whole.  As I think I said in my

4   opening remarks, if we had filed a motion for relief from

5   stay to foreclose, I wouldn't be standing up here making

6   this argument.  But at the end of the day, to say that this

7   was not a voluntary act by the Debtors to redeem is simply a

8   blink reality of what happened here.  Thank you, Your Honor.

9            THE COURT:  Thank you.  Mr. Horowitz, anything?

10           MR. HOROWITZ:  I didn't think you were going to

11   give me an opportunity.

12           THE COURT:  Well, I'll give you a brief

13   opportunity.

14           MR. HOROWITZ:  I don't even know if it's worth it,

15   Your Honor, but Mr. McGann did suggest that I had

16   misrepresented New York law.  Mr. Anker touched on this, but

17   if you go through LHD, which is really the earliest of these

18   cases, does say that -- does refer to the Debtor -- to the

19   borrowers, sorry -- the lender's act of seeking to foreclose

20   as having been an act that establishes that it prefers

21   accelerated payment to the opportunity to earn interest over

22   a period of years.  Subsequently, the State Court in

23   Northwestern Mutual cited LHD, referred to specifically the

24   fact that it was a foreclosure situation and said, in this

25   foreclosure situation, the fact that the borrower -- sorry,

1    the lenders actions have established a preference for pre-

2    payment.

3            It was only when you got to Momentive that the

4    Court there referred to the acceleration provision as having

5    represented a -- the acceleration provision in and of

6    itself, without any further acts by the lenders, as

7    representing the -- this is a quote from Judge Drain's

8    decision, the desire, "rather than being compensated under

9    the contract for the frustration of its desire to be paid

10   interest over the life of the loan, the lender has, by

11   accelerating, instead chosen to be paid early."

12           What I was suggesting before and I guess -- I

13   gather I must have been -- done a poor job, was that this

14   was a new step and an unjustifiable step to take the

15   position that acceleration provision in and of itself,

16   absent any act by the lender, is sufficient to give rise to

17   a presumption that the lender has waived the right -- has

18   intentionally waived the right to a make-whole and I think

19   that's a new and unjustified interpretation of New York law.

20           THE COURT:  Thank you.

21           MR. HOROWITZ:  Thank you, Your Honor.

22           THE COURT:  Mr. McGann?

23           MR. MCGANN:  Thank you, Andrew McGann for the

24   Debtors, Your Honor, very briefly.  Mr. Anker took issue

25   with the first thing I said, which is that no case has

1    provided the Trustee with any of the relief we're seeking

2    here, based on any indenture like this, and I stand by that.

3    Chemtura, Calpine and Premier don't say anything different.

4    Chemtura wasn't -- it was a 9019 approval of a settlement,

5    the Court didn't issue a ruling as Mr. Anker in his initial

6    remarks conceded, adjudicating any of these claims.

7             Calpine, the language he likes in Calpine was

8    Judge Lifland's language, which I think Your Honor

9    appreciates was overturned by the District Court there, and

10   in Premier, it was an absolute no-call provision that led to

11   the award of damages, breach of a no-call there, which we

12   don't have here.  I think we have an agreement on that.  I

13   certainly didn't concede that it's any kind of no-call in

14   our indenture.  I said that Mr. Anker characterized it as

15   something less than an absolute no-call, in fact it is not a

16   no-call.

17            The Momentive Court, reviewing the same language,

18   as I said, arrived at the same conclusion.  This is not a

19   no-call.  Mr. Anker said, well, surely there's a breach of

20   this 307(c), what he argues is a no-call, he said surely

21   that's breached when a payment is made under the

22   acceleration provisions of Article 6, but he left out, when

23   he characterized what 307(c) says, the key language, and

24   I'll read the entire provision again.  It's short.  "Except

25   pursuant to Clause (a) or (b) of this Section 307, the note

1    shall not be redeemable at the issuer's option," that's the

2    part he left out, "prior to December 1, 2015," and our

3    argument is, the payment, under the automatic acceleration

4    provision in Article 6 that occurred here, was not optional,

5    and we cited the cases to you.  A payment after an automatic

6    acceleration upon a bankruptcy filing is, as a matter of

7    law, not voluntary or optional.  The provision in the

8    contract commands that it's due and payable immediately.

9    Thank you.

10           THE COURT:  Thank you.  Thank you very much.  I

11   will endeavor to issue a decision as quickly as I possibly

12   can.  It's obviously an extremely complicated matter, I'm

13   thoroughly apprised, and I will do the best I can, and

14   you'll hear from me as soon as you hear from me.

15           [LAUGHTER]

16           THE COURT:  Anything else?  All right, thank you

17   very much.  Have a pleasant weekend.  We're adjourned.

18           MR. ANKER:  Thank you.

19           MR. HOROWITZ:  Thank you.

20           MR. MCGANN:  Thank you.

21

22

23

24

25                    * * * * *

1                    C E R T I F I C A T I O N

2

3    I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    Sonya

7    Ledanski Hyde

Digitally signed by Sonya Ledanski
Hyde
DN: cn=Sonya Ledanski Hyde, o, ou,
email=digital1@veritext.com, c=US
Date: 2015.03.20 15:29:06 -04'00'

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  March 20, 2015