**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re ) | Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., ) *et al.*, ) | Bankruptcy Case No. 14-10979 (CSS) (Jointly Administered) |
| *Debtors.* ) | |
| DELAWARE TRUST COMPANY ) as INDENTURE TRUSTEE, ) | |
| *Plaintiff,* ) | Adversary Proceeding No. 14-50363 (CSS) |
| v. ) | |
| ENERGY FUTURE INTERMEDIATE ) HOLDING COMPANY LLC and ) EFIH FINANCE INC. ) | |
| *Defendants.* ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT[1]**

## I.    INTRODUCTION & PROCEDURAL HISTORY[2]

1.      This adversary proceeding relates to a series of 10% First Lien Notes issued by Energy

Future Intermediate Holding Company LLC and EFIH Finance Inc., with original maturity of 2020,

pursuant to an Indenture dated August 17, 2010.  The original indenture was supplemented as of

January 29, 2013.

2.      On April 29, 2014, the EFIH Debtors filed petitions for relief under chapter 11 of the

Bankruptcy Code.  The EFIH Debtors sought approval of debtor-in-possession financing, in part, to

repay all of the outstanding Notes and settle certain Noteholders' claims (the "DIP Motion").  (No.

14-10979, D.I. 74, 858, 859.)  The non-settling Noteholders are represented by the Trustee, the

---

[1] The Court hereby makes the following findings of fact and conclusions of law pursuant to Fed. R. Bank. P.
7052, which is applicable to this matter by virtue of Fed. R. Bankr. P. 9014.  To the extent any findings of fact
constitute conclusions of law, they are adopted as such.  To the extent any conclusions or law constitute findings of
fact, they are adopted as such.

[2] Capitalized terms in the Introduction and Procedural History section not otherwise defined in this section are defined
below.

Plaintiff in this adversary proceeding.

3.      On May 13, 2014, the Trustee objected to the DIP Motion, arguing that the Noteholders were entitled to a secured claim for an amount described in the Indenture as the "Applicable Premium" because: (i) an Optional Redemption would occur when the Notes were repaid; (ii) the EFIH Debtors intentionally defaulted by filing bankruptcy to avoid paying the Applicable Premium, and (iii) the repayment would be a breach of the Noteholders' purported right to rescind the Notes' acceleration.  (No. 14-10979, D.I. 421.)

4.      On May 15, 2014, the Trustee initiated this adversary proceeding.  (No. 14-10979, D.I. 470; No. 14-50363, D.I. 1.)  The Complaint contained the claims from the May 13 objection, plus (a) an unsecured claim for breach of a purported "no-call" covenant in the Indenture; and (b) three unsecured claims, one for each of the three counts raised in its May 13 objection.  (Compl. ¶ 76.) The Trustee also simultaneously filed a motion seeking a declaration that it could decelerate the Notes without violating the automatic stay.  (No. 14-10979, D.I. 473 ("Stay-Applicability Motion").)  On June 4, 2014, the Trustee sent a purported notice of deceleration to the EFIH Debtors.

5.      On June 6, 2014, the Court approved the DIP financing, the EFIH Debtors' use of the DIP financing to pay the outstanding EFIH First Lien Noteholders, and the settlement resolving certain Noteholders' claims for the Applicable Premium.  (No. 14-10979, D.I. 858 (Order Approving EFIH First Lien Settlement),[3] 859 (Order approving use of DIP financing).)  The Noteholders who chose not to accept the settlement are pursuing claims for an Applicable Premium in this adversary proceeding.  (No. 14-50363, D.I. 9, 10.)  These Noteholders have been paid their full principal and accrued interest using DIP financing, which was funded on June 19, 2014.

---

[3] The non-settling Noteholders appealed the Court's Order approving the EFIH First Lien Settlement.  The district court, in an order dated February 19, 2015, affirmed this Court's Order and dismissed the non-settling Noteholders' appeal.  (No. 14-00723, D.I. 50 (D. Del. 2015).)

6.      On September 12, 2014, the Court bifurcated this adversary proceeding. (D.I. 128)[4] This is Phase One of the litigation in which the Court will determine (1) whether EFIH is "liable under applicable non-bankruptcy law for … a Redemption Claim," including the "make-whole" or other "damages … under any 'no-call' covenant, 'right to de-accelerate,'" or applicable law, and (2) "whether the Debtors intentionally defaulted in order to avoid paying an alleged make-whole premium or other damages."  (Id. at 2-3.)  Except with respect to the Trustee's claim that EFIH intentionally defaulted to evade payment of the make-whole, "the Court will assume solely for the purposes of Phase One that the EFIH Debtors are solvent and able to pay all allowed claims of their creditors in full."  (*Id.*)  If the Court finds EFIH liable for a Redemption Claim, and if EFIH contests that it is, in fact, solvent, Phase Two will determine "(a) whether the EFIH Debtors are insolvent, and, if so, whether that insolvency gives rise to any defenses arising under the Bankruptcy Code in favor of the EFIH Debtors that bar or limit the amount of the Redemption Claim, and (b) the dollar amount of … any Redemption Claim."  (*Id.*)

7.      The parties conducted full discovery on the Phase One issues, including the production of documents, multiple fact witness depositions, production of expert reports, and multiple expert witness depositions.  Thereafter, the EFIH Debtors and the Trustee submitted cross-motions for summary judgment, seeking to resolve all of the claims raised in the contested matter, the adversary complaint, and the Stay-Applicability Motion.  (D.I. 175, 176, 178, 179.)

---

[4] References in this opinion to "D.I.," without further description, shall refer to docket entries in this adversary proceeding, No. 14-50363.

8.      As set forth below, the Court will grant, in part, and deny, in part, the EFIH Debtors' motion for summary judgment, and deny in its entirety the Trustee's motion for summary judgment. More specifically, the Court holds as follows:

a.      The plain language of the Indenture does not require payment of an Applicable Premium upon a repayment of the Notes, following an acceleration under section 6.02 of the Indenture, arising from a default for the commencement of "proceeding to be adjudicated bankrupt or insolvent" under section 6.01(a)(6)(i) of the Indenture.

b.      The EFIH Debtors' filing of bankruptcy, which gave rise to the default at issue, was not an intentional default under the Indenture.

c.      The Trustee's right under Section 6.02 of the Indenture to waive the automatic default arising from the EFIH Debtors' bankruptcy filing and rescind the acceleration of the Notes is not barred by the language in the Indenture extinguishing that right if rescission would "conflict with any judgment of a court of competent jurisdiction" because the automatic stay under section 362 of the Bankruptcy Code is not a "judgment of a court."

d.      The Trustee's attempt to waive the default and decelerate the Notes by sending notice of same on June 4, 2014, was barred by the automatic stay under section 362(a)(3) and (6) of the Bankruptcy Code.

e.      If the Court were to lift the automatic stay, *nunc pro tunc* to a date

on or before the repayment of the Notes on June 19, 2014, to allow

the Trustee to waive the default and decelerate the Notes than

EFIH's refinancing would be an Optional Redemption under section

3.07 of the Indenture and the Applicable Premium (also referred to

as Redemption Claim) would be due and owing to the non-settling

Noteholders.

f.   A genuine issue of material fact exists that requires a trial on the

merits as to whether the Trustee can establish cause to lift the

automatic stay, *nunc pro tunc* to a date on or before June 19, 2014,

to allow the Trustee to waive the default and decelerate the Notes.

g.   The Trustee has no claim for (i) breach of the "no-call" provision of

section 3.07(c) of the Indenture; (ii) violation of the "perfect tender"

rule under New York law; nor (iii) breach of the right to waive the

default and decelerate the Notes.

## II.    FINDINGS OF FACT

9.    The parties' cross-motions for summary judgment implicate various provisions in the

Indenture dated August 17, 2010 governing the EFIH 10.000% Senior Secured Notes Due 2020

("Indenture").  (March 2, 2015 Romanowicz Am. Decl. in Support of Defs.' Mot. for SJ (D.I. 197)

("Romanowicz Am. Decl."), Ex. 1) (execution version of Indenture).)   That Indenture was

supplemented, as of January 29, 2013, but the parties agree that the provisions of that supplement are

not relevant here.   Additionally, EFIH issued certain 6.875% Senior Secured Notes Due 2012,

pursuant to a separate 2012 indenture.  That 2012 indenture is substantially identical in all relevant aspects to the Indenture.

### A.    The Parties

10.    Plaintiff is the indenture trustee (the "Trustee" or "Indenture Trustee") for the 10.000% Senior Secured Notes due 2020 ("Notes"), representing Noteholders who did not accept a settlement offer in connection with the repayment of the Notes at the outset of these chapter 11 cases. (*See* No. 14-10979, D.I. 74.)  Defendants are Energy Future Intermediate Holding Company, LLC and EFIH Finance, Inc. (collectively "EFIH," the "EFIH Debtors," or "Defendants").

11.    In addition, the following parties are intervenors in this adversary proceeding: UMB, N.A., as indenture trustee for certain senior unsecured notes issued by EFIH (D.I. 13); Fidelity Management & Research Company (D.I.  14); the ad hoc committee of holders of certain unsecured EFIH toggle notes (D.I. 15); Pacific Investment Management Company LLC, investment manager for certain holders of the Notes (D.I. 16); Computershare Trust Company, N.A., and Computershare Trust Company of Canada, the indenture trustee for certain EFIH senior secured second lien notes (D.I. 19); the ad hoc group of holders of the so-called "Legacy Notes" issued by EFH Corp. (D.I. 18); the Official Committee of Unsecured Creditors of EFH Corp. and EFIH (D.I. 207); and the Official Committee of Unsecured Creditors of Energy Future Competitive Holdings Company LLC, Texas Competitive Electric Holdings Company LLC and their direct and indirect subsidiaries, and EFH Corporate Services Company (D.I. 227).

### B.    Negotiation of the EFIH Notes

12.    In the summer of 2010, EFIH negotiated and ultimately executed a debt exchange that involved the issuance of $2.18 billion of Notes.  EFIH and the so-called "Dealer Manager" investment banks, who represented the interests of the lenders who would be accepting the new Notes, were the principal negotiators of the offering and execution documents, including the governing Indenture that

is at the center of the parties' cross-motions for summary judgment.  (Moldovan Tr. 40:22-41:20, 47:17-21.)[5]  The Indenture Trustee for the Notes was involved in this process as well; the lead negotiating parties sent the Trustee (and its counsel) drafts of key issuing documents, such as the description of the Notes and the actual global note certificate representing the 10% Note, and solicited (and accepted many of) the Trustee's proposed changes.  (Moldovan Tr. 41:16-20; March 2, 2015 Madron Decl. in Support of Defs.' Memo. in Opposition to Pl.'s Mot. for SJ (D.I. 205) ("<u>Madron Decl.</u>"), Exs. 19-21 (email communications transmitting draft documents to Indenture Trustee).)

13.    Many terms and conditions of the Indenture were modeled on other indentures governing previous debt issuances by EFIH and EFH Corp. in 2009 and 2007, respectively. (Moldovan Tr. 143:11-20.)  Like the Indenture, these previous agreements included an "Optional Redemption" provision providing for the payment of an "Applicable Premium" under certain circumstances upon an early, voluntary repayment of the Notes.  (Indenture § 3.07.)  Such "call protections" are common features in the indentures governing the type of high-yield debt issued by the EFH corporate family.

### C.    The August 2010 EFIH Debt Exchange

14.    The "August 2010 Exchange" called for exchanging outstanding 11.250%/12.000% Senior Toggle Notes due 2017 and 10.875% Senior Notes due 2017 issued by EFH Corp. in 2007 and guaranteed by EFIH (the "<u>Old Notes</u>") for up to $2.18 billion aggregate principal amount of Notes, as well as an aggregate of $500 million in cash.   (Press Release (July 30, 2010), http://www.sec.gov/Archives/edgar/data/1023291/000119312510171555/dex992.htm.)   The EFIH Debtors also announced plans to amend the indenture governing any Old Notes that would remain outstanding after the August 2010 Exchange was executed.  These amendments called for eliminating

---

[5] Deposition transcripts referenced herein are cited as "Deponent Tr. Page:line"

substantially all of the restrictive covenants contained in the existing indenture and the Old Notes, eliminating certain events of default, and modifying covenants regarding mergers and consolidations, in addition to other changes.  (*Id.*)  99.51% of the Old Notes agreed to participate in the exchange, and the requisite number of holders also agreed to the proposed amendments.  (*Id.*)

15.     Therefore, the EFIH Debtors issued the new EFIH Notes pursuant to the Indenture dated August 17, 2010 between EFIH and the Bank of New York Mellon Trust Company, N.A., as trustee.  (Press Release (August 18, 2010), http://www.sec.gov/Archives/edgar/ data/1023291/000119312510191917/d8k.htm.)  The Indenture is governed by New York Law. (Indenture § 13.08.)  Plaintiff later succeeded Bank of New York Mellon Trust Company, N.A., as the indenture trustee.

### D.     Key Provisions of the Notes Indenture

16.     These cross motions for summary judgment call for the Court to interpret the meaning of the Indenture, including section 3.07 ("Optional Redemption"), section 6.01 ("Events of Default"), section 6.02 ("Acceleration"), and the definition of "Applicable Premium" in section 1.01 ("Definitions").  Each is discussed below:

17.     In section 3.07, the Indenture specifies what constitutes an Optional Redemption. Section 3.07(a) states:

> At any time prior to December 1, 2015, the Issuer may redeem all or a part of the Notes at a redemption price equal to 100% of the principal amount of the Notes redeemed plus the Applicable Premium as of, and accrued and unpaid interest to, the date of redemption (the "Redemption Date") . . . .

(Indenture § 3.07(a).)

18.     The Applicable Premium referenced in section 3.07(a) is defined in section 1.01:

> "Applicable Premium" means, with respect to any Note on any Redemption Date, the greater of: (1) 1.0% of the principal amount of such Note; and (2) the excess, if any, of (a) the present value at such Redemption Date of (i) the redemption price of such Note at December 1, 2015 (such redemption price as set forth in the table appearing

8

under Section 3.07(d) hereof), plus (ii) all required interest payments due on such Note through December 1, 2015 (excluding accrued but unpaid interest to the Redemption Date), computed using a discount rate equal to the Treasury Rate as of such Redemption Date plus 50 basis points; over (b) the principal amount of such Note.

(*Id.* § 1.01.)

19.    The Indenture also specifies certain Events of Default as well as the consequences of such Events of Default.  Section 6.01 defines the various Events of Default and, relevant here, sections 6.01(a)(6) and (a)(7) specify Events of Default related to bankruptcy.   In particular, section 6.01(a)(6)(i) states that an Event of Default occurs when EFIH "commences proceedings to be adjudicated bankrupt or insolvent."  (*Id.* § 6.01(a)(6)(i).)

20.    The acceleration clause in section 6.02  explains the consequences of this bankruptcy-caused Event of Default:

[I]n the case of an Event of Default arising under clause (6) or (7) of Section 6.01(a) hereof [including EFIH's bankruptcy filing], all outstanding Notes shall be due and payable immediately without further action or notice.

(*Id.* § 6.02, ¶ 2.)

21.    By contrast, for an Event of Default unrelated to a bankruptcy filing, the Indenture provides an option to accelerate the Notes.  (*Id.* § 6.02, ¶ 1.)  Specifically, for non-bankruptcy defaults, the Trustee or holders of at least 30% of the Notes "may declare the principal, premium, if any, interest and any other monetary obligations on all the then outstanding Notes to be due and payable immediately."  (*Id.*)  This optional right to accelerate the Notes, however, does not apply to a bankruptcy default; instead, acceleration upon a bankruptcy default is automatic.  (*Id.*)

22.    Finally, in the event of an acceleration of the Notes, the Trustee possesses a qualified right effectively to decelerate the Notes through the act of rescission:

The Holders of at least a majority in aggregate principal amount of the Notes by written notice to the Trustee may on behalf of all the Holders waive any existing Default and its consequences under the Indenture except a continuing Default in the

payment of interest on, premium, if any, or the principal of any Note (held by a non consenting Holder) and rescind any acceleration with respect to the Notes and its consequences (so long as such rescission would not conflict with any judgment of a court of competent jurisdiction).

(*Id.* § 6.02, ¶ 3.)

### E.    EFIH's Decision to File for Chapter 11 Protection

23.    One of the issues before the Court is whether the Debtors intentionally defaulted in order to avoid paying an alleged make-whole premium or other damages.  Both sides assert that there is no genuine issue of material fact as to why EFIH filed bankruptcy, which gave rise to the default. As discussed below, the Court agrees; thus, this issue is appropriate for summary judgment.

### i.    The EFIH Debtors' Position

24.    The EFIH Debtors argue that there is no genuine issue of material fact as to why EFIH filed for bankruptcy – they were running out of cash.  For many months before EFIH ultimately filed for chapter 11 protection, the EFH corporate family pursued restructuring strategies that would involve seeking bankruptcy protection for TCEH but keeping EFIH out of bankruptcy. (*See, e.g.*, Pl. App'x, A-112 (May 29, 2013 EFIH Unsecured Creditors Advisor Presentation calling for recapitalizing EFIH "out-of-court"); Horton Tr. 94:17-24.)   This strategy, known as "Project Olympus," was an effort to obtain the consent of key creditor constituencies to a consensual, prepackaged transaction that would minimize the amount of time spent in a restructuring, avoid potentially significant tax impacts, and maintain the EFH corporate family in one consolidated group. (8-K Filing of EFH (October 15, 2013).)  This effort was ultimately unsuccessful, and all of the Debtors, including the EFIH Debtors, filed a bankruptcy petition on April 29, 2014.

25.    After the company's attempts to pursue Project Olympus failed on November 1, 2013, it was clear that EFIH would have to join the rest of the EFH corporate family in filing for bankruptcy. As the company's Treasurer stated at his deposition, "We're going to have to file EFIH now regardless

of what . . . anyone else is saying because we're running out of cash. . . .  Project Olympus isn't

happening, . . . EFIH is going to have to file. . . ." (Horton Tr. 190:19-191:2.)  EFIH's Executive Vice

President and CFO further explained that by April 28, 2014, the day before EFIH filed for bankruptcy,

the company had run out of cash to satisfy its interest obligations coming due on June 1 of that year.

(Keglevic Tr. 52:25-53:14.)  Mr. Keglevic also testified at the June 5, 2014 hearing that the DIP was

needed, in part, to provide liquidity to fund operations.  (Hr'g Tr. 96:14-20, 100:12-101:3 (June 5,

2014))  The EFIH Debtors did not see "any ability to issue debt or get equity to increase the amount

of cash" needed to meet those interest obligations.  (*Id.* 172:14-173:4.)

### ii.    The Trustee's Position

26.    The Trustee counters at length that there is no genuine issue of material fact as to why

the EFIH Debtors filed bankruptcy - it was to avoid having to pay the Applicable Premium.  First, the

Trustee asserts that foregoing liability on the Applicable Premium was a reason for the bankruptcy

filing.  Second, the Trustee counters EFIH's position that liquidity issues ultimately required EFIH to

file for bankruptcy.  The Trustee asserts that EFIH avoided the most obvious potential source of

liquidity for EFIH outside of bankruptcy, a sale of EFIH's equity stake in its principal assets, including

its interest in Oncor Holdings.

27.    As discussed above, from late 2012 until November 2013, the Debtors pursued a plan

known as "Project Olympus." (Horton Tr. 124:8-20.)  The goal was to put TCEH into bankruptcy and

convert its first-lien debt into EFH equity, but to "keep EFH and EFIH out of bankruptcy." (Horton

Tr. 94:6-95:3, 122:9-124:7; Keglevic Tr. 39:10-14.)  EFIH's senior executives believed this approach

made sense because they were convinced that EFIH was solvent. (Horton Tr. 125:4-13; Keglevic

Affidavit at 26-28.)

28.    In stage 1 of Project Olympus, EFH would raise $2 billion of equity and use it to

refinance EFIH first lien, second lien and unsecured notes (the so-called "PIK Notes") while TCEH
was in bankruptcy.  (Horton Tr. 166:14-22; Horton Ex. 14 at -2605, -2606; Horton Ex. 15 at 5648.)
In stage 2, after TCEH emerged from bankruptcy, all remaining EFIH first-lien and second-lien debt
would be refinanced.  (Horton Tr. 166:23-167:11; Horton Ex. 15 at 5648.)  In both stages, EFIH
would use the optional redemption provisions of the Indenture for the Notes and pay the required
make-whole.  (Horton Tr. 153:19-154:3, 162:25-163:22; Horton Ex. 14 at 2605, 2606; Horton Ex. 15
at 5648; Keglevic Tr. 84:22-86:25 ("To the extent we called it, we would of course follow the
indenture which said a call premium was due.").)  During this period, the Debtors "were continuously
looking for opportunities" to "refinance the first lien debt" through an optional redemption that EFIH
admits would have triggered the make-whole.  (Horton Tr. 70:18-71:23, 122:12-20; Horton Ex. 9;
Horton Ex. 10.)  But, in the Debtors' view, any restructuring "require[d]" the "agreement" of two
creditor groups:  the "TCEH 1st lien creditors" and the "EFIH/EFH unsecured creditors," i.e., the
holders of the PIK Notes.  (Horton Ex. 16 at 2696.)

29.    In March 2013, the TCEH first-lien noteholders presented the Debtors with proposals
that would put EFIH into bankruptcy.  (Keglevic Tr. 87:9-88:25.)  They proposed an "alternative
refinancing case," in which "significant value could be unlocked" if EFIH did not pay the make-whole
after it filed for bankruptcy.  (Keglevic Ex. 6 at 0825); *see also* (Millstein & Co., Project Olympus
Preliminary Discussion Materials May 2013, SP_MW_000000741 ("If EFIH and EFH file for
bankruptcy, thereby accelerating the maturity of the EFIH debt, the Company may be able to refinance
EFIH without paying make-whole premiums, resulting in substantial savings compared to the
Company's forecast.").)  In the view of these creditors, there was "more value through potentially
going into bankruptcy and either negotiating or winning make-wholes than a settlement outside of
bankruptcy." (Keglevic Tr.  90:7-17.)

30.     In addition, the Debtors had proposed that the PIK noteholders convert their debt to equity.  (Horton Tr. 186:9-187:25.)  Those PIK noteholders evidently viewed that equity as valuable.  (Ying Tr. (6/23) 120:24-123:18; Horton Tr. 188:4-189:22.)   Because that equity would be more valuable if EFIH could refinance its debt without paying a make-whole, they too pushed the Debtors to contest the Noteholders' right to a make-whole.  (Horton Tr. 189:11-22.)

31.     On October 15, 2013, EFIH filed an 8-K with the SEC disclosing a restructuring proposal from the TCEH first-lien noteholders, in which, among other things, EFIH would file for bankruptcy and "refinance" the EFIH Notes without paying "any make-whole amount." (Horton Ex. 19 at 2-3 & Ex. 99.2; *id.* Ex. 99.2 at 1 (proposing that TCEH first-lien noteholders receive 100% of EFH equity); Horton Tr. 206:3-208:17.)

32.     On October 24, 2013, the EFIH PIK noteholders sent the Debtors a restructuring proposal that likewise provided, among other things, for EFIH to file bankruptcy, refinance the Notes and "disallow … any make-whole fee."  (Horton Ex. 17 at 6084, 6088; *id.* at 6086, 6088 (proposing that PIK noteholders receive up to 94.9% of EFIH equity); Horton Tr. 191:20-197:25.)

33.     The Debtors agreed that "[t]here [was] value in not paying the [make-whole]" on the EFIH First Lien Notes.  (Horton Tr. 96:12-22; *see id.* 97:21-98:2.)  On November 1, 2013, the Debtors filed an 8-K with the SEC disclosing their own proposal whereby, among other things, EFIH would file for bankruptcy and refinance the Notes without paying "any make-whole amount."  (Horton Ex. 20 (EFIH 8-K) at 4, Ex. 99.1 at 2; Horton Tr. 184:9-23, 213:13-219:13.)  This was the first time EFIH had publicly suggested that it would, or could, refinance the Notes in bankruptcy without paying a make-whole.  The Debtors ultimately memorialized this plan in a Restructuring Support Agreement (the "RSA") with certain creditors, including the PIK noteholders, who were to receive most of the EFH equity.  (Keglevic Affidavit at 71-72, 75-76; No. 14-10979, D.I. 98 (RSA term sheet) at 2-4.)

34.     In the October 2012 and December 2012 dealer manager agreements for the EFIH

6.875% Notes and in the January 2013 exchange for the Notes, EFIH's executives represented to the

Dealer Managers that EFIH was "solvent."[6]  At no point did the Debtors conclude that EFIH's assets

were worth less than its liabilities.  (Horton Tr. 270:9-271:24; Keglevic Tr. 158:4-15, 169:24-170:11.)

EFIH had not missed any payment on the Notes or otherwise defaulted.  (Horton Tr. 80:23-81:16;

Keglevic Tr. 52:17-53:14, 189:15-190:2.)

35.     Before filing for bankruptcy, EFIH solicited, negotiated, and obtained commitments

for, and obligated itself to pay commitment and other fees on, $5.4 billion in DIP financing.  (No.14-

50363, D.I. 27 ¶¶ 3, 15, 31-34.)  On the Petition Date, EFIH filed and served the EFIH First Lien DIP

Motion seeking authority for the DIP financing.  Ultimately, EFIH obtained $5.4 billion in DIP

financing, most of which it used to pay off the outstanding principal and interest (other than disputed

interest) on the Notes.

36.     EFIH sought authority to, and did, redeem the Notes because it had "the opportunity

to pay [them] off and … replac[e] [them] with DIP financing, … lower[ing] the interest costs."

(Keglevic Tr. 182:22-183:23.)  The DIP financing bore an interest rate of 4.25% (Horton Tr. 37:18-

20; Keglevic Tr. 184:15-20), substantially less than the interest rate that EFIH was paying on the

Notes (10% for most of the Notes; 6.875% for the rest).  (Horton Tr. 37:21-25; Keglevic Tr. 184:21-

25).  Mr. Keglevic testified that "by paying it sooner we could replace it with cheaper cost of money."

(Keglevic Tr. 186:10-187:1.)  The refinancing's purpose, as EFIH explained, was "to take advantage

of highly favorable debt market conditions to refinance the EFIH First Lien Notes," "saving an

---

[6] *See* Horton Tr. 129:12-135:23, 151:23-152:22, 162:15-24, 176:12-177:15, 181:6-17; Keglevic Tr. 153:3-8, 162:23-163:18, 174:22-175:6, 207:13-208:1; Horton Ex. 13 (Oct. 18, 2012 dealer manager agreement) at 0018, 0030 (EFIH representation that it is solvent); Keglevic Ex. 9 (EFIH Dec. 21, 2012 dealer manager agreement) at 9706 (EFIH representation that it is solvent); Horton Ex. 14 (Feb. 2013 presentation) at 2554 (referring to a "solvent" EFIH); Horton Ex. 15 (March 2013 presentation) at 5602 (same).

estimated $13 million in interest per month." (No. 14-10979, D.I. 74 at 4 ¶ 4; Horton Tr. 40:9-41:13, 44:15-20, 89:11-24; Horton Ex. 5 (Goldstein Decl.) at 5 ¶ 9.)

37.     On June 19, 2014, EFIH paid all outstanding principal and accrued interest (other than disputed amounts of interest and any make-whole or comparable damages) on the First Lien Notes, and the Notes were then cancelled.[7]

38.     Prior to filing bankruptcy, EFIH did not market its assets to avoid bankruptcy. (Horton Tr. 226:13-228:1; Keglevic Tr. 54:16-55:21, 57:2-58:5, 60:8-61:12.)  EFIH did not pursue a possible sale of its interest in Oncor because it wanted to limit the tax liabilities of a separate entity, its parent EFH.  *See, e.g.*, Omnibus Tax Memorandum (No. 14-10979, D.I. 2296 at 12 ("The principal goal of all the Debtors . . . was to keep EFH, TCEH, and EFIH together as a single consolidated group for federal income tax purposes and to *avoid* a taxable separation . . . [that] would trigger a tax liability of potentially $7 *billion* or more for EFH.")); Ruling on Bid Procedures, Nov. 3, 2014 Tr. at 13:1-6 ("There can be no question that the debtors' proposed tax structure that calls for a complicated tax-free deconsolidation of the E side and T side of the balance sheet was the fundamental element of the RSA, and is the debtors' preferred structure for the sale of the Oncor business. . . .".)

## III.    CONCLUSIONS OF LAW

### A.    Jurisdiction and Venue

39.     The Debtors commenced these chapter 11 cases on April 29, 2014 (the "Petition Date").  Venue in the United States Bankruptcy Court for the District of Delaware was proper as of the Petition Date pursuant to 28 U.S.C. §§ 1408 and 1409 and continues to be so in the context of this adversary proceeding.  This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 11 U.S.C. § 157(b).

---

[7] No. 14-10979, D.I. 859 (DIP Financing Order) ¶ 12 (directing Trustee to reduce Notes in customary manner following payment).

B.      **Standard for Summary Judgment**

40.      Federal Rule of Civil Procedure 56, made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7056, directs that summary judgment should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits "show that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also In re Delta Mills, Inc.*, 404 B.R. 95, 103 (Bankr. D. Del. 2009). Summary judgment is designed "to avoid trial or extensive discovery if facts are settled and the dispute turns on an issue of law." *Delta Mills*, 404 B.R. at 104.

41.      Here, the parties agree that there are no material facts in dispute, and that the questions necessary to resolve this proceeding are purely legal in nature. The Court mostly agrees. As discussed below, however, there is a genuine issue of material fact as to whether cause exists to lift the automatic stay, *nunc pro tu*nc to a date on or before June 19, 2014, to allow the Trustee to decelerate the Notes. Otherwise, summary judgment is appropriate at this stage. *Niagara Frontier Transit Metro Sys., Inc. v. Cnty. of Erie*, 212 A.D.2d 1027 (1995) (citing *W.W.W. Assoc., Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990) ("Where the contract is unambiguous on its face, it should be construed as a matter of law and summary judgment is appropriate.")); *Green Mach. Corp. v. Zurich Am. Ins. Grp.*, No. CIV. A. 99-3048, 2001 WL 1003217, at \*6 (E.D. Pa. Aug. 24, 2001) ("Whether a contract provision is ambiguous is a question of law for the court."), *aff'd sub nom. Green Mach. Corp. v. Zurich-Am. Ins. Grp.*, 313 F.3d 837 (3d Cir. 2002).

C.      **Contract Interpretation Under New York Law**

42.      Under New York law, which governs the Indenture, the Court need not look "outside the four corners" of a complete document to determine what the parties intended. *W.W.W.*, 566 N.E.2d at 642; *see also R/S Assocs. v. N.Y. Job Dev. Auth.*, 771 N.E.2d 240, 242 (N.Y. 2002) (applying same principle). Here, neither party has alleged that the Indenture is an incomplete document, so it is

not necessary to resort to extrinsic evidence to interpret it. Moreover, neither party contends that any term in the Indenture is ambiguous—instead, each party relies on its own "plain reading" of the indenture in reaching competing results. A contract is not ambiguous merely because the parties offer different constructions of the same term. *Sayers v. Rochester Tel. Corp. Supp. Mgmt. Pension Plan,* 7 F.3d 1091, 1095 (2d Cir. 1993). The Court finds that the Indenture is not ambiguous.

43.    Having reached the conclusion that the Indenture is unambiguous, the Court relies on long-recognized canons of interpretation to determine its meaning. First, "[t]he best evidence of what parties to a written agreement intend is what they say in their writing." *Schron v. Troutman Sanders LLP*, 986 N.E.2d 430, 433 (N.Y. 2013) (internal quotation marks and citation omitted). Second, should there be an inconsistency between a specific and general provision of a contract, the specific controls. *Muzak Corp. v. Hotel Taft Corp.*, 133 N.E.2d 688, 690 (N.Y. 1956); *Waldman v. New Phone Dimensions, Inc.*, 487 N.Y.S.2d 29, 31 (N.Y. App. Div. 1985). Third, "[a] reading of the contract should not render any portion meaningless." *See Beal Sav. Bank v. Sommer*, 865 N.E. 2d 1210, 1213 (N.Y. 2007) (quotation marks and citations omitted); *Barrow v. Lawrence United Corp.*, 538 N.Y.S.2d 363, 365 (N.Y. App. Div. 1989) ("Contracts are also to be interpreted to avoid inconsistencies and to give meaning to all of its terms.").

**D.    The Plain Language Of The Indenture Does Not Require Payment Of The Applicable Premium**

44.    The Trustee seeks a declaratory judgment that EFIH's refinancing of the Notes constituted a redemption requiring payment of the Applicable Premium as a secured claim. (Compl. ¶¶ 51-57, 74-76.)[8]

45.    The Court begins its analysis with the most relevant provision, the acceleration

---

[8] A secured claim is allowable only if, in the first instance, it is "provided for under the agreement . . . under which such claim arose." 11 U.S.C. § 506(b); *see id.* § 502(b); *HSBC Bank USA, N.A. v. Calpine Corp.*, No. 07-3088, 2010 WL 3835200, at *5 (S.D.N.Y. Sept. 15, 2010) (citing *Travelers Cas. & Sur. Co. of Am.*, 549 U.S. 443, 450 (2007)).

provision of section 6.02 of the Indenture.  Under section 6.02, "in the case of an Event of Default arising under clause (6) or (7) of Section 6.01(a) hereof, all outstanding Notes shall be due and payable immediately without further action or notice."  Here, EFIH's filing for bankruptcy was an Event of Default arising under clause (6) of Section 6.01(a).  Thus, the Notes were automatically accelerated on the Petition Date and became due and payable immediately without further action or notice of the Trustee or any Noteholder. (Indenture § 6.02, ¶ 2.)

46.     There is no reference in Section 6.02 to the payment of the "Applicable Premium" upon an automatic acceleration, nor is section 3.07 incorporated into section 6.02.  The parties included the concept of an Applicable Premium in only one instance (an optional redemption under section 3.07).  It is not mentioned in section 6.02 or anywhere else in the Indenture.

47.     Under New York law, an indenture must contain express language requiring payment of a prepayment premium upon acceleration; otherwise, it is not owed.  *See Northwestern Mut. Life Ins. Co. v. Uniondale Realty Assocs.*, 816 N.Y.S.2d 831, 836 (N.Y. Sup. Ct. 2006) ("A prepayment premium will not be enforced under default circumstances in the absence of a clause which so states."); *In re South Side House, LLC*, 451 B.R. 248, 268 (Bankr. E.D.N.Y. 2011) ("[A] lender is not entitled to prepayment consideration after a default unless the parties' agreement expressly requires it."), *aff'd U.S. Bank Nat'l Ass'n v. South Side House, LLC*, No. 11-4135, 2012 WL 273119 (E.D.N.Y. Jan. 30, 2012); *In re Premier Entm't Biloxi LLC*, 445 B.R. 582, 626; Hr'g Tr. 36:9-14, *In MPM Silicones, LLC, et al.*, No. 14-22503, 2014 WL 4436335, at *13-14 (Bankr. S.D.N.Y. Sept. 9, 2014) ("*Momentive*").

48.     The parties certainly could have bargained for such a provision.  In many other cases—including cases decided before August of 2010, when this Indenture was negotiated—clauses specifically requiring post-acceleration payment of a make-whole, prepayment premium, or certain

costs were upheld.  *See, e.g.*, *United Merchs. & Mfgrs., Inc. v. Equitable Life Assurance Soc'y of the United States (In re United Merchs. & Mfrs., Inc.)*, 674 F.2d 134, 141-43 (2d Cir. 1982); *Parker Plaza W. Partners v. Unum Pension & Ins. Co.*, 941 F.2d 349, 355-56 (5th Cir. 1991); *Teachers Ins. & Annuity Ass'n of Am. v. Butler*, 626 F. Supp. 1229, 1230 (S.D.N.Y. 1986); *In re AE Hotel Venture*, 321 B.R. 209, 217-20 (Bankr. N.D. Ill. 2005); *In re Vanderveer Estates Holdings, Inc.*, 283 B.R. 122, 126-27 (Bankr. E.D.N.Y. 2002); *In re Fin. Ctr. Assocs. of E. Meadow L.P.*, 140 B.R. 829, 834-35 (Bankr. E.D.N.Y. 1992); *In re Schaumburg Hotel Owner*, 97 B.R. 943, 952-54 (Bankr. N.D. Ill. 1989).  The Indenture here was negotiated at arm's length between sophisticated parties who were represented by counsel.  The Court is unwilling to "read[] into agreements between sophisticated parties provisions that are not there."  *In re Solutia*, 379 B.R. 473, 485 n.7 (Bankr. S.D.N.Y. 2007).[9]

49.    The EFIH Debtors' reading is also correct based on well-accepted canons of contract interpretation.  Under established principles of New York law, "a specific provision . . . governs the circumstance to which it is directed, even in the face of a more general provision."  *In re AMR Corp.*, 730 F.3d 88, 99 (2d Cir. 2013) (citation omitted), *cert. denied*, 134 S.Ct. 1888 (2014); *Muzak Corp.*, 133 N.E.2d at 690 ("Even if there was an inconsistency between a specific provision and a general provision of a contract (we find none), the specific provision controls.").  As the Second Circuit has reasoned, "[i]n analyzing whether a Make-Whole Amount is due, the Court turns first to the provision of the Indentures that most specifically addresses the circumstances before the Court.  That provision is Section 4.01(g), which provides that the filing of a voluntary bankruptcy constitutes an event of default."  *In re AMR Corp.*, 485 B.R. 279, 289 (Bankr. S.D.N.Y. 2013), *aff'd* 730 F.3d 88 (2d Cir. 2013).  Here, that specific provision is section 6.02.  Nowhere in section 6.02 is there a reference to

---

[9] Because this Court does not find that an ambiguity exists, it is not necessary to consider the question whether the Indenture need to be construed against the EFIH Debtors. *Wallace v. 600 Partners Co.*, 658 N.E.2d 715, 717 (N.Y. 1995) ("The rules governing the construction of ambiguous contracts are not triggered unless the court first finds an ambiguity.").

Applicable Premium, to Optional Redemption, section 3.07, or anything that would support the

Trustee's position that the Applicable Premium is owed upon a bankruptcy event of default and

acceleration.

50.    Comparing the relevant language in the governing Indenture with language from other

cases compels the conclusion that the Indenture does not provide for a make-whole premium

following a bankruptcy acceleration.

- *Calpine*: "In the case of an Event of Default specified in clause (10) or (11) of Section 6.01 [which includes a bankruptcy filing], *all outstanding Notes will become due and payable immediately without further action or notice*." (Romanowicz Decl., Ex. 2 § 6.02 ¶ 1, *In re Calpine Corp.*, No. 05-60200 (Bankr. S.D.N.Y. 2007) (Dkt. No. 3481-4), *overruled by HSBC Bank USA, N.A. v. Calpine Corp.*, No. 07-3088, 2010 WL 3835200 (S.D.N.Y. Sept. 15, 2010) (emphasis added)); *HSBC Bank USA, N.A. v. Calpine Corp.*, No. 07-3088, 2010 WL 3835200, at *4-*5 (S.D.N.Y. Sept. 15, 2010) ("*Calpine II*").

- *Premier*: "In the case of an Event of Default specified in clause (j) [commencement of a voluntary bankruptcy case] . . . of § 6.01 hereof, with respect to Premier . . . *all outstanding Notes will become due and payable* immediately *without further action or notice*." (Romanowicz Decl., Ex. 3, at 73 (§ 6.02 ¶ 2), *In re Premier Entm't Biloxi LLC*, No. 07-05043 (Bankr. S.D. Miss.) (Dkt. No. 6-1 to -3) (emphasis added)); *In re Premier Entm't Biloxi LLC*, 445 B.R. at 626-632.

- *Momentive*: "If an Event of Default specified in Section 6.01(f) or (g) [which includes a bankruptcy filing] with respect to the Company occurs, *the principal of, premium, if any, and interest on all the Notes shall ipso facto become and be immediately due and payable without any declaration or other act* on the part of the Trustee or any Holders." (Romanowicz Decl., Ex. 5, at 92, *In re MPM Silicones, LLC, et al.*, No. 14- 22503 (Bankr. S.D.N.Y. June 18, 2014) (Dkt. No. 464-1) (emphasis added)); *Momentive*, 2014 WL 4436355, at *13-14.

- *Solutia*: "If an Event of default specified in 6.01(7) occurs with respect to the Company or any Subsidiary Guarantor [which includes filing a bankruptcy petition] *the principal of and premium, if any, and accrued interest, if any, on the Notes then outstanding shall become and be immediately due and payable without any declaration or other act* on the part of the Trustee or any Holder.'" (Romanowicz Decl., Ex. 4, at 11/70 (§ 6.02 ¶ 1), *In re Solutia*, No. 03-17949 (Bankr. S.D.N.Y. 2007) (Dkt. No. 4211-1 to -2) (emphasis added)); *In re Solutia Inc.*, 379 B.R. at 488.

51.    In each of these cases, the court found no make-whole obligation was created by

acceleration provisions substantially similar to the language before the Court. The Court agrees with the holdings in these cases and finds that the acceleration provision in the Indenture does not include clear and unambiguous language that a make-whole premium (here the "Applicable Premium") is due upon the repayment of the Notes following a bankruptcy acceleration. Because the Indenture does not specify that the Applicable Premium is owed after automatic acceleration, the Applicable Premium is not owed.

52.     In contrast, the Trustee's reading of the Indenture does not give meaning to each provision. Both parties have argued that the Indenture must be read as a whole giving meaning to each provision. The Court agrees. *See Beal Sav. Bank v. Sommer*, 865 N.E. 2d 1210, 1213 (N.Y. 2007) (A reading of the contract should not render any portion meaningless.") (citations omitted); *Barrow v. Lawrence United Corp.*, 538 N.Y.S.2d 363, 365 (N.Y. App. Div. 1989) ("Contracts are also to be interpreted to avoid inconsistencies and to give meaning to all its terms."). A review of section 3.07, one of the sections upon which the Trustee heavily relies, does not change the Court's reading of section 6.02. The Trustee argues that section 3.07, the "Optional Redemption" provision, is a wholesale bar to any repayment before December 1, 2015. This reading is strained for a number of reasons.

53.     As an initial matter, the Trustee looks to Article 3, "Redemption," instead of Article 6, "Defaults and Remedies," to determine the Debtors' obligations and the Trustee's remedies upon a default. This defies the canons of contract interpretation. Further, the Trustee asks this Court to conclude, contrary to New York law, that because section 3.07 does not include language expressly disclaiming the effect of section 6.02, section 3.07 must control.[10]  This argument fails on the same

---

[10] The Trustee cites to *NML Capital v. Republic of Argentina*, 952 N.E.2d 482, 492 (N.Y. 2011) for the proposition that absent specific language indicating that the parties intended for 3.07(c) to terminate upon acceleration, section 3.07(c) still applies after acceleration. This is not the law. In *NML Capital*, the Second Circuit stated that Argentina had not pointed to any language indicating that the biannual interest payment terminated upon acceleration of the debt.

grounds.

54.     "Optional Redemption" under section 3.07 is an act separate and apart from automatic acceleration.  This is evident in part from the noticing scheme outlined in Article 3, "Redemption." (*See* Indenture §§ 3.01-3.06 (requiring written notice prior to redemption and outlining procedures for same).)  This noticing scheme specifies a detailed process for advance notice of redemption, including the "Redemption Date," the Notes to be redeemed, and more.  No part of this notice process is required to be followed when the Notes become "due and payable immediately without further action or notice" under section 6.02.

55.     In other words, under the Indenture, redemption and acceleration are not the same thing.  The Indenture in various places distinguishes between the two concepts:

- "(a) An 'Event of Default' . . . means . . . (1) default in payment when due and payable, upon *redemption*, *acceleration* or otherwise, of principal, or premium, if any, on the Notes . . . ." (Indenture § 6.01(a)(1) (emphasis added).)

- "The due and punctual payment of the principal, premium, if any, and interest on the Notes when and as the same shall be due and payable, whether on an Interest Payment Date, at maturity, by *acceleration*, repurchase, *redemption* or otherwise . . . ." (*Id.* § 10.04 (emphasis added).)

- "[T]he principal, premium, if any, and interest on the Notes shall be promptly paid in full when due, whether at maturity, by *acceleration*, *redemption* or otherwise . . . ." (*Id.* § 11.01 (emphasis added).)

56.     When the EFIH Debtors filed for bankruptcy, the Notes automatically accelerated and became due and payable immediately.   Under New York law, "a borrower's repayment after acceleration is not considered voluntary."  *South Side*, 451 B.R. at 268; *see also AMR*, 730 F.3d at 103 (rejecting the claim that an accelerated repayment was a "voluntary redemption").  This is because

---

*Id.* at 263.  It did not state that there must be specific language indicating that the parties intended for a provision to terminate upon acceleration.

"[a]cceleration moves the maturity date from the original maturity date to the acceleration date and that date becomes the new maturity date." *Solutia*, 379 B.R. at 484.

57.     "Prepayment can only occur prior to the maturity date," *Id.* at 488 (emphasis omitted), and "acceleration, by definition, advances the maturity date of the debt so that payment thereafter is not prepayment but instead is payment made after maturity." *In re LHD* Realty *Corp.*, 726 F.2d 327, 330-31 (7th Cir. 1984). "Once the maturity date is accelerated to the present, it is no longer possible to prepay the debt before maturity." *Northwestern Mutual*, 816 N.Y.S.2d at 834 (quoting *Rodgers v. Rainier Nat'l Bank*, 757 P.2d 976 (Wash. 1988)); *see also Solutia*, 379 B.R. at 488 ("Because the 2009 Notes were automatically accelerated, any payment at this time would not be a prepayment."). Acceleration therefore "does not trigger the [Trustee's] right to prepayment consideration" under the Optional Redemption provision. *South Side*, 451 B.R. at 268. Thus, the Trustee's claim that the EFIH Debtors' repayment was an optional redemption must fail. For these reasons, the Trustee is not entitled to an Applicable Premium.

### E.     The EFIH Debtors' Bankruptcy Filing Was Not An Intentional Default Under The Indenture

58.     The Trustee also seeks judgment for an allowed secured claim arguing that EFIH's default was done with intent to deny the Trustee the Applicable Premium. (Compl. ¶¶ 58-65, 74-76.) The Court disagrees with the Trustee that it would be entitled to any relief.

59.     First, unlike in some cases, the Indenture does not contain a provision stating that a premium will be owed if EFIH intentionally causes an event of default to avoid paying the Applicable Premium. *Compare with Premier*, 445 B.R. at 591 ("If an Event of Default occurs . . . by reason of any willful action . . . with the intention of avoiding the prohibition on redemption of the Notes . . . an additional premium shall also become due."); and *South Side*, 451 B.R. at 269-70 ("[P]arties may agree that a borrower's repayment of the debt after acceleration . . . will be deemed an evasion of the

parties' prepayment agreement.")

60.     Second, the Trustee has the burden of supplying "sufficient evidence (not mere allegations)" for a reasonable factfinder to conclude that the EFIH Debtors intentionally defaulted. *United States v. Jamas Day Care Ctr. Corp.*, 152 Fed. Appx. 171, 173 (3d Cir. 2005) (quoting *Olsen v. GE Astrospace*, 101 F.3d 947, 950 (3d Cir. 1996)).  A material fact is one that could "alter the outcome of the case."  *Argus Mgmt. Group v. GAB Robins, Inc. (In re CVEO Corp.)*, 327 B.R. 210, 214 (Bankr. D. Del 2005) (quoting *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995)).  It is genuine when it is "triable," that is, when reasonable minds could disagree on the result.  *Id.* at 210 (quoting *Matsushita Elec. Indus Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

61.     Viewing all factual inferences in a light most favorable to the Trustee, its argument is nonetheless insufficient to create a genuine issue of material fact as to why the EFIH Debtors filed bankruptcy.  While it is certainly the case that the EFIH Debtors planned pre-petition and followed through after filing bankruptcy to use the default created by that filing to refinance the Notes without having to pay the Applicable Premium, that is not enough to counter the overwhelming evidence that the Debtors filed bankruptcy because they were facing a severe liquidity crisis.  The collapse of Project Olympus doomed a T-side only bankruptcy and to suggest that the Debtors refused to market and sell Oncor, which may be worth $18 billion, to avoid having to pay a $400 million make-whole premium stretches the bounds of credulity.  The EFIH Debtors are no different than any other debtor that is forced into bankruptcy because of financial reasons but decides to use the tools provided by that bankruptcy, such as the power to reject unprofitable leases, for business reasons.  The Trustee has presented insufficient evidence to rebut that put forth by the EFIH Debtors.  There is no genuine issue of material fact – the EFIH Debtors did not file bankruptcy in an intentional effort to default

under the Indenture so that the Applicable Premium would not be due.

### F.    The Trustee's Right To Rescind Acceleration

62.    The Trustee asserts that the Noteholders had an "absolute right" to rescind the automatic acceleration of the Notes.  Based on this theory, the Trustee also seeks a declaratory judgment that it is entitled to an allowed secured claim in the amount of the Applicable Premium, for breach of the alleged right to rescind.  (Compl. ¶¶ 69, 73.)  The Trustee's qualified right of rescission raises a number of issues.

### i.    The Trustee's right to rescind the acceleration of the Notes is not barred because the automatic stay under section 362 of the Bankruptcy Code is not a "judgment of a court."

63.    First, while the Trustee has the right under Section 6.02 of the Indenture to waive the automatic default arising from the EFIH Debtors' bankruptcy filing and rescind the acceleration of the Notes, that right is not absolute.  Section 6.02 of the Indenture, the relevant provision, reads:

> The Holders of at least a majority in aggregate principal amount of the Notes by written notice to the Trustee may on behalf of all the Holders waive any existing Default and its consequences under the Indenture except a continuing Default in the payment of interest on, premium, if any, or the principal of any Note (held by a non consenting Holder) and rescind any acceleration with respect to the Notes and its consequences (*so long as such rescission would not conflict with any judgment of a court of competent jurisdiction*).

(Indenture § 6.02, ¶ 3 (emphasis added).)

64.    Thus, the Trustee may not rescind acceleration of the Notes if so doing would "conflict with any judgment of a court of competent jurisdiction."  The EFIH Debtors argue that the right to rescind incorporates and is expressly limited by judicial orders, including the automatic stay. *In re Gruntz*, 202 F.3d 1074, 1082 (9th Cir. 2000) ("The automatic stay is an injunction issuing from the authority of the bankruptcy court, and bankruptcy court orders are not subject to collateral attack in other courts."); *In re San Angelo Pro Hockey Club, Inc.*, 292 B.R. 118, 124 (Bankr. N.D. Tex. 2003) ("The automatic stay is self-executing injunction, and therefore, for contempt purposes,

constitutes an order issuing from the bankruptcy court.").

65.     The Court disagrees.  The automatic stay is not a "judgment of a court of competent jurisdiction."  It is prescribed by statute, not by any court, and applies in every bankruptcy case automatically without any court order.  *See* 11 U.S.C. § 362(a); *In re James*, 257 B.R. 673, 678 (B.A.P. 8th Cir. 2001) ("[T]he stay is a statutory provision and not a court order[.]"); *In re Alberts*, 381 B.R. 171, 176 (Bankr. W.D. Pa. 2008) ("The 'automatic stay' is a statutory injunction … that … arises without … court order.").  Nor is the automatic stay a "judgment" under New York law, which provides that a judgment is "the determination of the rights of the parties in an action or special proceeding,"  NY CPLR § 5011, and is appealable as of right.[11]  NY CPLR § 5701(a)(1).  The fact that a bankruptcy filing gives rise to an automatic stay, by contrast, cannot be appealed.

66.     Thus, the Trustee's right to rescission is not barred by section 6.02 of the Indenture as a result of the imposition of the automatic stay.[12]

### ii.     The automatic stay bars the Trustee's rescission notice.

67.     Second, the automatic stay bars the Trustee's rescission notice of June 4, 2014.  Upon filing its voluntary chapter 11 petition, EFIH's assets, including its rights under the Indenture, became subject to the automatic stay.  11 U.S.C. § 362(a).  Sending a notice of rescission is an act to "collect, assess or recover" on a claim, especially when the Noteholders have already been paid their full principal and accrued interest.  *Id.* § 362(a)(6); *see also Momentive*, 2014 WL 4436335, at *19 ("[T]he automatic stay does, in fact, apply to the sending of a rescission notice."); *AMR Corp.*, 485 B.R. at

---

[11] *See also* Fed. R. Civ. P. 54(a) ("Definition; Form. 'Judgment' as used in these rules includes a decree and any order from which an appeal lies."); Black's Law Dictionary 970 (10th ed. 2014) ("judgment" means "[a] court's final determination of the rights and obligations of the parties in a case.  The term judgment includes an equitable decree and any order from which an appeal lies.").

[12] Moreover, even were the automatic stay a judgment under section 6.02 of the Indenture, the automatic stay can always be lifted.  In that case, rescission would no longer conflict with a judgment of the Court because the stay/judgment would simply cease to exist.

294 ("Any deceleration of these notes, however, is barred by the automatic stay imposed by the filing of this bankruptcy."), *aff'd* 730 F.3d 88 (2d Cir. 2013); *Solutia*, 379 B.R. at 485 ("[W]here the indenture provides for an automatic acceleration any attempt at deceleration would violate the automatic stay.").

###### iii.    If the Court were to lift the automatic stay the Applicable Premium would be due.

68.    Third, if the Court were to lift the automatic stay, *nunc pro tunc* to a date on or before the repayment of the Notes on June 19, 2014, to allow the Trustee to waive the default and decelerate the Notes than EFIH's refinancing would be an Optional Redemption under section 3.07 of the Indenture and the Applicable Premium would be due and owing to the non-settling Noteholders.

69.    Had EFIH refinanced the debt on the same day (June 19, 2014), on the same terms, outside of bankruptcy, on which it redeemed the Notes in bankruptcy, it would have owed the Applicable Premium.  The only thing that stands in the way of owing the Applicable Premium is that the bankruptcy caused an automatic default that accelerated the debt.  The Trustee, however, had the right to waive that default and decelerate the Notes, which it attempted to do by sending a rescission notice on June 4, 2014.  That notice, however, was void *ab initio* as a result of the automatic stay. Were the Court, however, to lift the automatic stay*, nunc pro tunc* to a date on or before June 19, 2014, to allow the Trustee's rescission notice to take effect then the automatic default would be waived, the Notes would no longer be immediately due and the refinancing would require payment of the Applicable Premium.

70.    Were the Court, however, either not lift the stay or do so, but not *nunc pro tunc* to a date on or before June 19, 2014, the date the Notes were paid, then the Applicable Premium would not have been owed at the time the Notes were paid in full.  At most, the Trustee and the Noteholders would have a damages claim for denial of the rescission right.  Whether such a claim exists is

discussed below.

> **iv.    A genuine issue of material fact exists as to whether the Trustee can establish cause to lift the automatic stay.**

71.    Fourth, a genuine issue of material fact exists as to whether the Trustee can establish cause to lift the automatic stay, *nunc pro tunc* to a date on or before June 19, 2014, to allow the Trustee to waive the default and decelerate the Notes, i.e., to give effect to the June 4, 2014 notice.

72.    The Stay-Applicability Motion requests a determination that the automatic stay would not bar the Noteholders from rescinding acceleration or, in the alternative, that the stay should be lifted.  The Court has already held that the automatic stay applies to the June 4 rescission notice.  There is a genuine issue of material fact precluding summary judgment as to whether cause exists to lift the automatic stay.

73.    The Bankruptcy Code authorizes bankruptcy courts to grant relief from the stay for "cause."  11 U.S.C. § 362(d)(1).  Courts are to determine "cause" based on the totality of the circumstances in each particular case.  *In re Wilson*, 116 F.3d 87, 90 (3d Cir. 1997).  The factors courts generally use in determining whether cause exists are (1) whether any great prejudice to either the bankrupt estate or the debtor will result from a lifting of the stay; (2) whether the hardship to the non-bankrupt party by maintenance of the stay considerably outweighs the hardship to the debtor; and (3) the probability of the creditor prevailing on the merits.  *In re Downey Fin. Corp.*, 428 B.R. 595, 609 (Bankr. D. Del. 2010).

74.    The Trustee argues that, as a matter of law, cause exists to lift the automatic stay because at this stage of the proceedings the EFIH Debtors are presumed to be solvent.  The Trustee cites to a number of cases in support of its argument.  *See, e.g., Claughton v. Mixson,* 33 F.3d 4 (4th Cir. 1994); and *In re Texaco, Inc.*, 81 B.R. 804 (Bankr. S.D.N.Y. 1988).  These cases do not stand for the proposition that a debtor's solvency is, as a matter of law, cause to lift the automatic stay.  While

a debtor's solvency may, in certain cases, be a relevant consideration in determining whether cause exists to lift the automatic stay it is not the sole factor to be considered by the Court.

75.     The Trustee further argues that lifting the automatic stay would not prejudice either the bankruptcy estate or the debtor because doing so would simply hold the EFIH Debtors to their bargain and there can be no harm to a solvent estate.  The Court disagrees.  Several courts have held that lifting the automatic stay to trigger liability under a make-whole claim may harm a debtor or its estate and that analysis does not depend solely on whether that estate is insolvent.  *See, e.g.*, *In re AMR Corp.*, 485 B.R. 279, 295 (Bankr. S.D.N.Y. 2013); *In re AMR Corp.*, 730 F.3d 88, 112 (2d Cir. 2013), and *Momentive*, 2014 WL 4436335, at *23.  Moreover, "denial" of the Noteholders' contractual right to rescission does not, in and of itself, establish cause to lift the aoutomatic stay.

76.     While the Trustee cannot meet its burden on summary judgment that cause exists to lift the stay, the Court cannot hold on summary judgment, as urged by the EFIH Debtors, that cause does not exist.  In short, there is a genuine dispute of material fact as to whether cause exists to lift the automatic stay.

**G.      The Trustee has no claim for (i) breach of the 'no-call' provision of section 3.07(c) of the Indenture; (ii) violation of the "perfect tender" rule under New York law; nor (iii) breach of the right to waive the default and decelerate the Notes.**

77.     The Trustee asserts claims for various breaches of the Indenture.  No such claims exist.

**i.      Breach of no-call provision**

78.     The Trustee argues it should be entitled to a claim for damages arising from the Debtors' breach of section 3.07(c) of the Indenture's No-Call Provision.  (Compl. ¶¶ 74-76.)  The Court disagrees.

79.     As an initial matter, the Trustee appears to concede that section 3.07(c) is *not* a "no-call" provision prohibiting repayment.  (Pl.'s Memo. in Support of Mot. for SJ 66. ("Pl. Br.").)  The

Trustee characterizes 3.07(c) as requiring payment of a make-whole premium if the Notes are repaid (under any circumstances) before December 1, 2015. But Section 3.07(c) provides only that redemptions at the EFIH Debtors' option, as defined by that section, require paying the Applicable Premium.

80.    The court in *Momentive* analyzed a nearly identical provision. The indenture there provided: "the Note shall not be redeemable at the option of MPM prior to October 15, 2015," which language, the court found, was "no more than an introduction or framing device for the notes' elective redemption provisions." *Momentive*, 2014 WL 4436335, at *16. The same is true here.

81.    Because the Notes were not optionally redeemed, section 3.07(c) does not apply, and the Court finds that the Trustee is not entitled to damages based on a breach of "no-call" theory.

### ii.    "Perfect Tender" claim

82.    The Trustee also asserts that repayment pursuant to section 6.02 of the Indenture breached New York's common-law "perfect tender" rule. (Pl. Br. 66-67.) The Court disagrees.

83.    Under the perfect tender" rule, "a [borrower] has no right to pay off his obligation prior to its stated maturity date in the absence of a prepayment clause." *Arthur v. Burkich*, 131 A.D.2d 105, 106 (N.Y. App. Div. 1987). The Trustee claims that section 6.10 of the Indenture ("Rights and Remedies Cumulative"), which states that "every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy," requires this Court to find the EFIH Debtors liable for damages under the rule of perfect tender.

84.    In a subsequent opinion, the *Momentive* court explained that the perfect tender rule does not apply if, as was the case there, the indenture modified the common-law rule. Bench Ruling Tr. 16:19-17:9, *In re MPM Silicones, LLC, et al.*, No. 14-08247 (Bankr. S.D.N.Y. Oct. 14, 2014) (Dkt. No. 60).) The Court agrees. Section 6.02 of the Indenture makes payment of the Notes automatic and mandatory before the Notes' stated maturity. This provision directly modifies the

common-law "perfect tender" rule, and the Trustee therefore is not entitled to damages.

### iii.        Claim for denial of right of rescission

85.     The Trustee also argues that it is entitled to a claim for the denial of the right to rescind acceleration, which constituted a breach of the Indenture giving rise to damages in the amount of the make-whole that the Noteholders would have been entitled to receive if their contractual right to rescind had been honored.  The Court disagrees.

86.     Oversecured creditors have allowed claims for "reasonable fees, costs, or charges" when those amounts are "provided for under the agreement . . . under which such claim arose." *See* 11 U.S.C. § 506(b).   The Indenture here does not provide for any fee, cost, or charge for breach of the purported right to rescind.  The Trustee merely asserts a vague claim for damages arising out of its inability to decelerate the Notes.

87.     As several courts have explained, secured claims are not allowed for breach of contract damages unless those damages are specifically provided for in the Indenture.  For example, in *Continental Securities* the lender sought damages for the alleged breach of a no-call provision. *Cont'l Secs. Corp. v. Shenandoah Nursing Home P'ship*, 188 B.R. 205, 215 (W.D. Va 1995), *aff'd*, 104 F. 3d 359 (4th Cir. 1996) (per curiam).  The court denied the secured claim, however, because the note there did not include any penalty provision for breach of the no-call provision.  *Id.*  Similarly, in *Vest Associates* a lender acknowledged that the note at issue did not provide for a make-whole premium upon post-acceleration repayment, but the lender nonetheless asserted a secured claim for the adverse tax consequences allegedly caused by the prepayment.  *In re Vest Assocs.*, 217 B.R. 696, 699 (Bankr. S.D.N.Y. 1998).  The court denied the claim because the damages sought were not provided for in the loan agreement.  *Id.*  Here, as in *Continental* and in *Vest*, the damages sought for the asserted breach of the alleged right to rescind are not set forth in the Indenture, and they cannot therefore be allowed as a secured claim.

88.     The cases the Trustee cites are inapposite. *See In re Rodriguez*, 629 F.3d 136, 141-42 (3d Cir. 2010) (finding that underlying agreement provided for an enforceable state law claim); *In re Chemtura Corp.*, 439 B.R. 561, 603 (Bankr. S.D.N.Y 2010) (noting first the requirement that a claim must be valid under applicable non-bankruptcy law).

### H.     Counts I-IV of the Complaint

89.     Before the Court are cross motions for summary judgment on the Complaint filed by the Trustee.  Having addressed the relevant factual and legal issues raised by the parties, the Court now turns to the Complaint.

### i.     Count I

90.     Count I of the Complaint seeks a declaratory judgment that the EFIH Debtors' refinancing of the Notes constitutes a redemption under section 3.07 of the Indenture requiring payment of the Applicable Premium as an allowed secured claim. (Compl. ¶¶ 51-57.)  The Court has held that where, as here, the Notes were paid following an acceleration under section 6.02 of the Indenture arising from a default for the commencement of "proceeding to be adjudicated bankrupt or insolvent" under section 6.01(a)(6)(i) of the Indenture, the plain language of the Indenture does not require payment of an Applicable Premium.  The Court has also held that if it were to lift the automatic stay, *nunc pro tunc* to a date on or before the repayment of the Notes on June 19, 2014, to allow the Trustee to waive the default and decelerate the Notes than EFIH's refinancing would be an Optional Redemption under section 3.07 of the Indenture and the Applicable Premium would be due and owing to the non-settling Noteholders.  As a result, were the Court to grant relief from the automatic stay as outlined above, it could enter judgment in favor of the Trustee on Count I.  Thus, the Court will grant summary judgment in favor of the EFIH Debtors on Count I of the Complaint without prejudice to the Court's right to reinstate Count I and enter judgment in favor of the Trustee if, and only if, the Court deems it appropriate upon entry of an order lifting the automatic stay, *nunc pro tunc* to a date

on or before the repayment of the Notes on June 19, 2014, to allow the Trustee to waive the default and decelerate the Notes.

### ii.        Count II

91.    Count II of the Complaint seeks a declaratory judgment that the EFIH Debtors' default under the Notes with an intent to deny payment of the Applicable Premium requires payment of the Applicable Premium as an allowed secured claim. (Compl. ¶¶ 58-65.) The Court has held that the EFIH Debtors did not file bankruptcy in an intentional effort to default under the Indenture so that the Applicable Premium would not be due.  Thus, the Court will enter summary judgment in favor of the EFIH Debtors on Count II of the Complaint.

### iii.       Count III

92.    Count III of the Complaint seeks a declaratory judgment that the EFIH's Debtors' denial of the Noteholders' right to rescind acceleration of the Notes under section 6.02 of the Indenture gives rise to an allowed secured claim. (Compl. ¶¶ 66-73.)   The Court has held that while the Noteholders have a right of rescission under section 6.02 of the Indenture their attempt to exercise that right was a violation of the automatic stay.  As such, there can be no claim for breach of contract arising from operation of the automatic stay.  Moreover, secured claims are not allowed for breach of contract damages unless those damages are specifically provided for in the Indenture, which is not the case here.  Thus, the Court will enter summary judgment in favor of the EFIH Debtors on Count III of the Complaint

### iv.       Count IV

93.    Count IV of the Complaint seeks a declaratory judgment that EFIH's refinancing gives rise to an unsecured claim for the same reasons set forth in Counts I-III as well as for breach of section 3.07(c) of the Indenture's "no-call" provision, violation of New York's "perfect tender rule" and denial of the right to rescission.  (Compl. ¶¶ 74-76.)  The Court has ruled that the EFIH Debtors'

are entitled to summary judgment on Counts I-III (although without prejudice as to Count I) and there is no claim for breach of section 3.07(c) of the Indenture's "no-call" provision, violation of New York's "perfect tender rule" and denial of the right to rescission. The sole avenue for relief in connection with the denial of the right to rescission is to seek relief from the automatic stay, which, if granted, might give rise to a claim under Count I. Thus, the Court will grant summary judgment in favor of the EFIH Debtors on Count IV of the Complaint.

## I.    The Stay-Applicability Motion

94.    The parties have also sought summary judgment on the Stay-Applicability Motion, which requests a determination that the automatic stay would not bar the Noteholders from rescinding acceleration or, in the alternative, that the stay should be lifted to give effect of the rescission. The Court has held that the right of rescission is not barred by the automatic stay but the issuance of the notice of rescission was a stay violation and void *ab initio*. The Court has further held that if it were to lift the automatic stay, *nunc pro tunc* to a date on or before the repayment of the Notes on June 19, 2014, to allow the Trustee to waive the default and decelerate the Notes than EFIH's refinancing would be an Optional Redemption under section 3.07 of the Indenture and the Applicable Premium would be due and owing to the non-settling Noteholders. In that instance, the Court could reinstate Count I of the Complaint, which is why summary judgment on Count I is being granted in favor of the EFIH Debtors without prejudice. Finally, the Court has held that a genuine issue of material fact exists as to whether the Trustee can establish cause to lift the automatic stay. Thus, the Court will grant summary judgment, in part, in favor of the EFIH Debtors on the Stay-Applicability Motion in that the automatic stay is applicable and the issuance of the notice of rescission was a stay violation. The Court will not grant summary judgment in favor of either party on the Stay-Applicability Motion on the issue of whether the Trustee can establish cause exists to lift the automatic stay.

## IV.    CONCLUSION

95.    For the reasons and to the extent set forth above, the EFIH Debtors' motion for summary judgment is granted, in part, and denied, in part, and the Trustee's motion for summary judgment is denied in its entirety.  Summary judgment is entered in favor of the EFIH Debtors on Counts I-IV of the Complaint, provided, however, that entry of summary judgment on Count I of the Complaint is without prejudice, summary judgment is entered, in part, in favor of the EFIH Debtors on the Stay-Applicability Motion, and summary judgment is not entered on the Stay-Applicability Motion solely to the issue of whether cause exists to lift the automatic stay.

96.    An order will be issued.

Dated: March 26, 2015

Sontchi, J._____