## EXHIBIT B

**Power Purchase Agreement**

██████████ POWER PURCHASE AGREEMENT BETWEEN
███████████
AND
LUMINANT ENERGY COMPANY LLC

This ██████████ POWER PURCHASE AGREEMENT (this "PPA") is entered into this 20th day of February, 2015 ("Effective Date"), by and between (i) ██████ ("Seller"), ████████████████████████████████████., and (ii) Luminant Energy Company LLC ("Company"), a limited liability company. Seller and Company are hereinafter referred to individually as a "Party" and collectively as the "Parties".

WHEREAS ████████████████████████████████████
████████████████████████████████████████

WHEREAS ████████████████████████████████████
████████████ and

WHEREAS Seller desires to sell and deliver to Company at the Point of Delivery ███████ ███████████████ and all associated Environmental Attributes.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, the Parties agree to the following:

## ARTICLE 1- DEFINITIONS AND RULES OF INTERPRETATION

1.1    Rules of Construction.    Except as otherwise provided in this PPA, the capitalized terms listed in this Article shall have the meanings set forth herein whenever the terms appear in this PPA. Words not otherwise defined herein that have well known and generally accepted technical or trade meanings are used herein in accordance with such recognized meanings. In addition, the following rules of interpretation shall apply:

(A)    References to "Articles," "Sections," or "Exhibits" shall be to articles, sections, or exhibits of this PPA.

(B)    The Exhibits attached hereto are incorporated in and are intended to be a part of this PPA; provided, that in the event of a conflict between the terms of any Exhibit and the terms of this PPA, the terms of this PPA shall take precedence.

(C)    The Parties shall act reasonably and in accordance with the principles of good faith and fair dealing in the performance of this PPA.

(D)    Use of the words "include" or "including" or similar words shall be interpreted as "including but not limited to" or "including, without limitation."

1.2    Definitions.    The following terms shall have the meanings set forth herein:





"Affiliate" of any named person or entity means any other person or entity that controls, is under the control of, or is under common control with, the named entity. The term "control" (including the terms "controls", "under the control of" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management of the policies of a person or entity, whether through ownership interest, by contract or otherwise.

"Ancillary Services" has the meaning set forth in the ERCOT Protocols as applicable to ▇▇▇▇▇▇▇.

"Applicable Law" means all applicable laws, statutes, treaties, codes, ordinances, regulations, certificates, orders, licenses and permits of any Governmental Authority, now in effect or hereafter enacted, amendments to any of the foregoing, interpretations of any of the foregoing by a Governmental Authority having jurisdiction, and all applicable judicial, administrative, arbitration and regulatory decrees, judgments, injunctions, writs, orders, awards or like actions (including those relating to human health, safety, the natural environment or otherwise).

"Approval Date" has the meaning set forth in Section 6.1.



"Bankruptcy Event" means with respect to a Party, that either:

(i) such Party has (A) applied for or consented to the appointment of, or the taking of possession by, a receiver, custodian, trustee or liquidator of itself or of all or a substantial part of its property; (B) admitted in writing its inability, or be generally unable, to pay its debts as such debts become due; (C) made a general assignment for the benefit of its creditors; (D) commenced a voluntary case under any bankruptcy law; (E) filed a petition seeking to take advantage of any other law relating to bankruptcy, insolvency, reorganization, winding up, or composition or readjustment of debts; (F) failed to controvert in a timely and appropriate manner, or acquiesced in writing to, any petition filed against such Party in an involuntary case under any bankruptcy law; or (G) taken any corporate or other action for the purpose of effecting any of the foregoing; or

(ii) a proceeding or case has been commenced without the application or consent of such Party in any court of competent jurisdiction seeking (A) its liquidation, reorganization, dissolution or winding-up or the composition or readjustment of debts or, (B) the appointment of a trustee, receiver, custodian, liquidator or the like of such Party under any bankruptcy law, and such proceeding or case has continued undefended, or any order, judgment or decree approving or ordering any of the foregoing shall be entered and continue unstayed and in effect for a period of sixty (60) days.

Notwithstanding (i) and (ii) above, Bankruptcy Event shall not include the Chapter 11 Proceeding.

2



"Business Day" means any calendar day that is not a Saturday, a Sunday, or a day on which commercial banks in Dallas, Texas or New York, New York are authorized or required to be closed.



"Chapter 11 Proceeding" means the jointly administered bankruptcy cases under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C., of Energy Future Holdings Corp., et al., Case No. 14-10979 (CSS) in the United States Bankruptcy Court, District of Delaware.

"Code" means the U.S. Internal Revenue Code of 1986, including applicable rules and regulations promulgated thereunder, as amended from time to time.



"Conditions" shall have the meaning set forth in Section 4.5.



3



"Costs" means, with respect to the Non-Defaulting Party, brokerage fees, commissions and other similar third party transaction costs and expenses reasonably incurred by such Party either in terminating any arrangement pursuant to which it has hedged its obligations or entering into new arrangements which replace the PPA; and all reasonable attorneys' fees and expenses incurred by the Non-Defaulting Party in connection with the termination of this PPA.

"Court Approval" has the meaning set forth in Section 6.1.



"Day" means a calendar day.



"Defaulting Party" means the Party in default under Section 11.1 or 11.2, as applicable.

"Early Termination Date" shall have the meaning set forth in Section 11.3(A).

"Environmental Contamination" means the introduction or presence of Hazardous Materials at such levels, quantities or location, or of such form or character, as to constitute a violation of federal, state or local laws or regulations, and present a material risk under federal, state or local laws and regulations that the Site will not be available or usable for the purposes contemplated by this PPA.

"Environmental Attributes" means any and all credits, certificates, benefits, emissions reductions, offsets, and allowances, howsoever entitled, directly attributable to ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, including any and all environmental air quality credits, renewable energy certificates, emissions reductions, off-sets, allowances, or other benefits as may be created or under any existing or future statutory or regulatory scheme (federal, state, or local). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

"ERCOT" means the Electric Reliability Council of Texas, Inc. or its successor in function.

4

"ERCOT Protocols" means the document, including any attachments, guides and other binding documents or exhibits referenced in that document, as amended from time to time, that contains the scheduling, operating, planning, reliability, and settlement (including customer registration) policies, rules, guidelines, procedures, standards, and criteria of ERCOT and as approved by ERCOT, as amended from time to time.



"Event of Default" has the meaning set forth in Article 11.

"Force Majeure" shall have the meaning set forth in Article 13.

"Forced Outage" means any condition ████████████ that requires immediate removal ███████████████████ from service.

"Generation Resource" shall have the meaning set forth in the ERCOT Protocols.

"Good Utility Practice(s)" means the practices, methods, and acts that, at a

5

particular time, in the exercise of reasonable judgment in light of the facts known or that should reasonably have been known at the time a decision was made, would have been expected to accomplish the desired result in a manner consistent with Applicable Law, applicable NERC and ERCOT requirements, regulation, permits, codes, standards, equipment manufacturer's recommendations, reliability, safety, environmental protection, economy, and expedition.

"Governmental Authority" means any federal, state, local or municipal governmental body; any governmental, quasi-governmental, regulatory or administrative agency, commission, body or other authority exercising or entitled to exercise any administrative, executive, judicial, legislative, policy, regulatory or taxing authority or power; or any court or governmental tribunal.



"Hazardous Materials" means any substance, material, gas, or particulate matter that is regulated by any local governmental authority, any applicable State, or the United States of America, as an environmental pollutant or dangerous to public health, public welfare, or the natural environment including, without limitation, protection of non-human forms of life, land, water, groundwater, and air, including any material or substance that is defined as a "hazardous substance" pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §9601 et seq. (42 U.S.C. §9601).

"Maintenance Outage" means an equipment outage that is not a Forced Outage

and that is initiated by Seller to perform work on components that cannot prudently be postponed until the next Planned Outage.

████████████████████████████████████████

"MW" means megawatt.

"MWh" means megawatt hour.

"MWh Rate" means the price per MWh for each year as set forth in Exhibit G.

"NERC" means North American Electric Reliability Corporation.

████████████████████████████████████████

"Non-Defaulting Party" shall have the meaning set forth in Section 11.3.

████████

"Operating Committee" means one representative each from Company and Seller pursuant to Section 9.8.

"Operating Procedures" means those procedures developed pursuant to Section 9.8, if any.

████████████████████████████████████████

"Operating Rules" shall have the meaning set forth in Section 7.3.

████████████████████████

"Planned Outage" an outage that is planned at least forty-five (45) days in advance with Company in accordance with Section 9.1, other than a Maintenance Outage.

████████████████████

"PPA" means this ████████ Power Purchase Agreement between Seller and Company, including the Exhibits attached hereto.



"PUCT" means the Public Utility Commission of Texas.

7

"QSE" means Qualified Scheduling Entity as such term is defined in the applicable ERCOT Protocols.

"QSE Contractor" means a third party hired by Company to perform QSE services on its behalf.



"Settlement Period" shall be as defined within the ERCOT protocols.



"Term" means the period of time during which this PPA shall remain in full force and effect, and which is further defined in Article 2.

"Termination Payment" means an amount equal to the present value of the economic loss (including the deprivation of an economic benefit) to it resulting from termination of this PPA, determined in a commercially reasonable manner and including Costs, expressed in U.S. Dollars, which such party incurs as a result of the termination of this PPA.



## ARTICLE 2 - TERM AND TERMINATION



This PPA shall become effective as of the date of its execution, and shall remain in full force and effect subject to early termination or any provisions set forth herein.

## ARTICLE 3 -



3.1



3.2

3.3

3.4

3.5

(i)

(ii)

(iii)



(i)

(ii)

**ARTICLE 4**

4.1

4.2

4.3

4.4

4.5



(A)

(B)

(C)

(D)

4.6

## ARTICLE 5 – DELIVERY AND METERING

5.1     Delivery Arrangements.

        (A)      Seller shall be responsible for all actions and related costs required to deliver the ███████████████████████████ to Company at the Point of Delivery. Seller shall be deemed to be in control of the █ up to and until delivery and receipt at the Point of Delivery and Company shall be deemed to be in control of such energy from and after delivery and receipt at the Point of Delivery. Title and risk of loss related to the ██████████████████ shall transfer from Seller to Company at the Point of Delivery.

        (B)      Company shall be responsible for receiving ████████████████ at the Point of Delivery and for all ████████████████ from the Point of Delivery to points beyond the Point of Delivery. Company shall arrange and be responsible for transmission service at and from the Point of Delivery and shall schedule or

arrange for scheduling services with █████████████ to receive the product at the Point of Delivery.

### 5.2    Curtailment.



### 5.3    Electric Metering Devices.

(A) ████████████████████████████████████ Seller shall provide Company with reasonable advance notice of, and permit a representative of Company to witness and verify, such inspections and tests, provided, however, that Company shall not unreasonably interfere with or disrupt the activities of Seller and shall comply with all of Seller's safety standards. Upon request by Company, Seller shall perform additional inspections or tests of any Electric Metering Device and shall permit a qualified representative of Company to inspect or witness the testing of any Electric Metering Device. The actual expense of any such requested additional inspection or testing shall be borne by Company, unless upon such inspection or testing an Electric Metering Device is found to register inaccurately by more than the allowable limits established in this Article, in which event the expense of the requested additional inspection or testing shall be borne by Seller. If requested by Company in writing, Seller shall provide copies of any inspection or testing reports to Company.



and tests.

### 5.4    Adjustment for Inaccurate Meters.

If an Electric Metering Device fails to register, or if the measurement made by an Electric Metering Device is found upon testing to be inaccurate by more than ████████████████, an adjustment shall be made correcting all measurements by the inaccurate or defective Electric Metering Device, ████████████████████████, for both

13

the amount of the inaccuracy and the period of the inaccuracy, in the following manner:

(A) 

(B)    In the event that the Parties cannot agree on the actual period during which the inaccurate measurements were made, the period during which the measurements are to be adjusted shall be the shorter of (i) ▮▮▮▮ or (ii) ▮▮▮▮.

(C)    To the extent that the adjustment period covers a period of deliveries for which payment has already been made by Company, Seller shall use the corrected measurements as determined in accordance with this Article to recompute the amount due for the period of the inaccuracy and shall subtract the previous payments by Company for this period from such re-computed amount. If the difference is a positive number, the difference shall be paid by Company to Seller; if the difference is a negative number, that difference shall be paid by Seller to Company.

## ARTICLE 6 - CONDITIONS PRECEDENT

6.1.    <u>Conditions Precedent for Both Parties</u>.    Notwithstanding Article 2, the obligations under this PPA shall not become effective and either Party shall have the right to terminate this PPA, without any further financial or other obligation, if (1) the Company has not filed the motion to approve by the filing deadline required for a March 2015 hearing on such approval in connection with the Chapter 11 Proceeding, or (2) the Company has not received on or before March 31, 2015 the necessary approval(s) ("Court Approval") from the US Bankruptcy Court to purchase energy from Seller pursuant to and without modification of the terms and conditions of this PPA (the date of such approval, the "<u>Approval Date</u>"). If approval is not received by the Bankruptcy Court on or before March 31, 2015, or if the Bankruptcy Court denies the motion to approve the PPA as written or as may otherwise be amended meeting with the mutual agreement of the Parties, either Party may terminate this this PPA and neither Party shall have any further obligations to the other Party. Company shall provide Seller with prompt notice of its filing the motion to approve (or of its decision not to file such a motion to approve) by the filing deadline for a March 2015 hearing, and of Court Approval or of any denial of such approval by the US Bankruptcy Court.



14

**ARTICLE 7 – SALE AND PURCHASE OF ███████ ENERGY**

7.1    <u>Energy Payment Rate</u>.







7.2 ▮▮▮▮▮ <u>Curtailed Energy</u>.

(A) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

(B) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

(C) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

7.3 <u>Compliance</u>. Each Party shall comply with all applicable ERCOT Protocols, NERC reliability standards and PUCT rules ("<u>Operating Rules</u>"). In the event of a Party's failure (the "<u>Responsible Party</u>") to comply with such Operating Rules (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮), which failure causes the other Party to incur charges or penalties under the Operating Rules, the Responsible Party, in accordance with Section 7.2, shall ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. In the event both Parties cause charges or penalties to be incurred, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Both Parties agree that they will use commercially reasonable efforts and exercise reasonable diligence to minimize any charges or penalties incurred by failing to comply with the Operating Rules.

## ARTICLE 8 - BILLING AND PAYMENT

8.1 <u>Billing Invoices</u>. The billing period under this PPA shall be the calendar month. No later than the fifth Day after the end of each month ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, Seller shall provide Company by email, a statement showing the payment amount due Seller by Company for the power provided by Seller and purchased by Company, under this PPA, during the previous calendar month billing period.

8.2 <u>Metered Billing Data</u>. All billing data based on metered deliveries to Company shall be collected by the Electric Metering Device(s) in accordance with Article 5.

8.3  <u>Payments</u>.    Unless otherwise specified herein, payments due under this PPA shall be due and payable by check or by electronic funds transfer, as designated by the owed Party, on or before the twentieth (20th) Day after the end of the month to which the invoice relates. If the amount due is not paid on or before the due date it will be deemed delinquent and will accrue interest at the Interest Rate. If the due date occurs on a Day that is not a Business Day, the late payment charge shall begin to accrue on the next succeeding Business Day.

**ARTICLE 9 - OPERATIONS**



9.3    <u>Qualified Scheduling Entity (QSE)</u>.

    (A)    Company, as the QSE ▮▮▮▮▮▮ will be responsible for:

        (1)    submitting operating plans, output schedules, and all energy offers, bids and trades related to energy, capacity, and ancillary services in accordance with ERCOT Protocols;

        (2)    relaying in a timely manner to Seller all ERCOT dispatch instructions,

18

deployment messages, and notices concerning ███████

(3)    transmitting to ERCOT in a timely manner, appropriate data regarding the status of ████████ as provided by the Seller; and

(4)    providing QSE settlement and billing services.

(B)    ████████████████████████████████████████████

████████████    Company's responsibilities as Seller's QSE shall be included as part of Company's direct obligations to Seller under this PPA, shall be consistent with standards outlined by ERCOT for a QSE for the scheduling of power from ████████ for delivery hereunder, managing the impact of Seller's actual production not matching the amount scheduled and settling ERCOT statements on Seller's behalf. If at any time Company as a QSE is not performing in accordance with the requirements of this PPA, including without limitation ██████████████, Seller in its discretion may (in addition to its other rights and remedies available under this PPA), if Company fails to cure such failure within ███████████after receipt of written notice thereof from Seller, replace the QSE function being performed under this PPA by Company with equivalent services from a third-party QSE for such period of time as is necessary for Company to cure the default (which cure shall be evidenced by written notice from Company to Seller that Company is capable and willing to again perform the QSE functions). Company shall cooperate with Seller in effecting the replacement of Company with such third party QSE, and shall reimburse Seller the reasonable costs thereof until such failure is cured by Company as provided above in this paragraph. In addition to any damages defined in Section 7.3 that may result from lost production due to Company's failure to perform any of its obligations under this Section, such reimbursement of reasonable costs by Company shall be Seller's sole remedy for Company's failure to perform its QSE obligations under this PPA. Upon giving of such notice of cure by Company, Seller shall transfer such QSE services from the third party QSE back to Company. Seller and Company shall cooperate in effecting the replacement of such third party QSE with Company as soon as reasonably practicable after notice of cure by Company. To that end, Seller shall use reasonable commercial efforts to negotiate third-party QSE services containing termination provisions consistent with the intent of this paragraph. For purposes of this PPA, the QSE function and obligations include scheduling services under any successor to ERCOT.

(C)    Notwithstanding the foregoing, Company shall have the right to enter into contracts and maintain arrangements with a QSE Contractor in order to enable Company to perform QSE services with respect to this PPA. References above in this Section 9.3 to Company acting as QSE shall also be deemed to include any QSE Contractor retained by Company. Seller shall not have any obligation or liability to any QSE Contractor retained by Company, and Company shall be solely responsible for engaging and paying any and all such QSE Contractors.

(D)    EXCEPT AS EXPRESSLY SET FORTH IN THIS PPA OR THE ERCOT PROTOCOLS, IN RESPECT OF PROVIDING THE QSE SERVICES, NEITHER COMPANY NOR ANY QSE CONTRACTOR SHALL BE DEEMED TO HAVE (I) ASSUMED AN AGENCY OR FIDUCIARY RELATIONSHIP WITH, OR DUTY OF LOYALTY TO, SELLER, NOR (II) MADE TO SELLER ANY REPRESENTATION OR WARRANTY (IMPLIED OR EXPRESS) REGARDING OPERATIONAL OR OTHER RESULTS IMPACTING ███████████ OR THE BUSINESS OF SELLER.

9.4    ████████████████████████████████████████████
██████

9.5    NERC Obligations.  Seller shall be wholly responsible for its own compliance with NERC Reliability Standards effective for both the ███████████████████████ ███████████████████████.  This PPA in no way delegates such obligations to the Company.  Company shall be wholly responsible for its own compliance with NERC Reliability Standards effective for the ███████████████.  This PPA in no way delegates such obligations to the Seller.

9.6    Energy Production Forecast.  Seller shall provide Company with non-binding annual, monthly, weekly and daily production estimates ███████████████████████ ███████████████ ██ ████████.



9.7    ████████████████████████

(A)    ████████████████████████████████████

(B)    ████████████████████████████████████

9.8    Operating Committee and Operating Procedures.

(A)    Company and Seller shall each appoint one representative and one alternate representative to act in matters relating to the Parties' performance obligations under this PPA and to develop operating arrangements ████████████████████ █████████████ hereunder. Such representatives shall constitute the "Operating Committee", and shall be specified in Exhibit D. The Parties shall notify each other in writing of such appointments and any changes thereto. The Operating Committee shall have no authority to modify the terms or conditions of this PPA.

(B)    ████████████████████████████████████

9.9    ████████████████████████████████████

9.10    Environmental Attributes.  To the full extent allowed by law, Company shall own and be entitled to claim all Environmental Attributes as they may accrue ████████

██████████████████ during the Term and delivered and sold to Company hereunder. Seller shall execute such documents and make such filings as Company may reasonably request to fulfill the purposes of this Section 9.10.

**ARTICLE 10 -** ████████████████████





## ARTICLE 11-DEFAULT AND REMEDIES

11.1    <u>Events of Default of Seller</u>.

(A)    Any of the following shall constitute an Event of Default of Seller upon its occurrence and no cure period shall be applicable:

(1)    A Bankruptcy Event has occurred with respect to Seller;



(2)

(3)

(B)    Any of the following shall constitute an Event of Default of Seller upon its occurrence but shall be subject to cure within thirty (30) Days after the date of written notice from Company to Seller ████████████████:

(1)    ████████████████████████████;

(2)    Seller's failure to make any payment due to Company under or in connection with this PPA;

(3)     Seller's failure to comply with any other material obligation under this PPA, which would result in a material adverse impact on Company;

(4)     Any representation or warranty made by Seller in this PPA shall prove to have been false or misleading in any material respect when made or ceases to remain true during the Term if such cessation would reasonably be expected to result in a material adverse impact on Company.

11.2   Events of Default of Company.

(A)     Any of the following shall constitute an Event of Default of Company upon its occurrence and no cure period shall be applicable:

(1)     A Bankruptcy Event has occurred with respect to Company other than the Chapter 11 Proceeding and Company fails to or has failed to continue satisfying its payment obligations under this PPA in full.

(B)     Any of the following shall constitute an Event of Default of Company upon its occurrence but shall be subject to cure within thirty (30) Days after the date of written notice from Seller to Company:

(1)     Company's failure to make any payment due hereunder.

(2)     Company's failure to comply with any other material obligation under this PPA, which would result in a material adverse impact on Seller.

(3)     Any representation or warranty made by Company in this PPA shall prove to have been false or misleading in any material respect when made or ceases to remain true during the Term if such cessation would reasonably be expected to result in a material adverse impact on Seller.

11.3   Remedies.

(A)  If an Event of Default with respect to a Defaulting Party shall have occurred and be continuing, the other Party (the "Non-Defaulting Party") shall have the right (i) to designate a day, no earlier than the day such notice is effective and no later than 20 days after such notice is effective, as an early termination date ("Early Termination Date") to accelerate all amounts owing between the Parties and to liquidate and terminate the PPA, (ii) withhold any payments due to the Defaulting Party under this PPA and (iii) suspend performance.  The Non-Defaulting Party shall calculate, in a commercially reasonable manner, a Termination Payment as of the Early Termination Date.



(B)  As soon as practicable after a liquidation, notice shall be given by the Non-Defaulting Party to the Defaulting Party of the amount of the Termination Payment and whether the Termination Payment is due to or due from the Non-Defaulting Party.  The notice shall include a

written statement explaining in reasonable detail the calculation of such amount. The Termination Payment shall be made by the Party that owes it within two (2) Business Days after such notice is effective.

## ARTICLE 12 - CONTRACT ADMINISTRATION AND NOTICES

12.1     Notices in Writing.  Notices required by this PPA shall be addressed to the other Party, including both the other Party's Representative for Notices and representative on the Operating Committee, at the addresses noted in Exhibit D as either Party updates them from time to time by written notice to the other Party. Any notice, request, consent, or other communication required or authorized under this PPA to be given by one Party to the other Party shall be in writing, and shall either be hand delivered or mailed (or sent via courier), postage prepaid, to the representative of said other Party. If mailed, the notice, request, consent or other communication shall be simultaneously sent by facsimile or other electronic means. Any such notice, request, consent, or other communication shall be deemed to have been received by the close of the Business Day on which it was hand delivered or transmitted electronically (unless hand delivered or transmitted after such close in which case it shall be deemed received at the close of the next Business Day).

12.2     Representative for Notices.     Each Party shall maintain a designated representative to receive notices. Such representative may, at the option of each Party, be the same person as that Party's representative or alternate representative on the Operating Committee, or a different person. Either Party may, by written notice to the other Party, change the representative or the address to which such notices and communications are to be sent

12.3     Authority of Representatives.     The Parties' representatives designated above shall have authority to act for its respective principals in all technical matters relating to performance of this PPA and to attempt to resolve disputes or potential disputes. However, they, in their capacity as representatives, shall not have the authority to amend or modify any provision of this PPA.



12.4

12.5

12.6

12.7     Billing and Payment Records. To facilitate payment and verification, Seller and Company shall keep all books and records necessary for billing and payments in accordance with the provisions of Article 9 and grant the other Party reasonable access during normal business hours to those records.

12.8     Examination of Records.     Company may audit and examine the Seller's financial, operating procedures, equipment manuals, ▇▇▇▇▇▇▇▇▇ and data kept by the

Seller relating to transactions under and administration of this PPA, at any time during the period the records are required to be maintained, from time to time upon request and during normal business hours.

## ARTICLE 13-FORCE MAJEURE

13.1 <u>Definition of Force Majeure.</u>





13.2 <u>Applicability of Force Majeure.</u>

(A) Neither Party shall be responsible or liable for any delay or failure in its performance under this PPA, nor shall any delay, failure, or other occurrence or event become an Event of Default, to the extent such delay, failure, occurrence or event is caused by Force Majeure, provided that:

(1) the non-performing Party gives the other Party prompt written notice describing the particulars of the occurrence of the Force Majeure;

(2) the suspension of performance is of no greater scope and of no longer duration than is required by the Force Majeure;

(3) the non-performing Party proceeds with reasonable diligence to remedy its inability to perform and provides weekly progress reports to the other Party describing actions taken to end the Force Majeure; and

(4) when the non-performing Party is able to resume performance of its obligations under this PPA that Party shall give the other Party written notice to that effect.

(B) Except as otherwise expressly provided for in this PPA, the existence of a condition or event of Force Majeure shall not relieve the Parties of their obligations under this PPA (including payment obligations) to the extent that performance of such obligations is not precluded by the condition or event of Force Majeure.

13.3 <u>Limitations on Effect of Force Majeure.</u> In no event will any delay or failure of performance caused by Force Majeure extend this PPA beyond its stated Term. In the event that any delay or failure of performance caused by Force Majeure affecting Seller continues for

an uninterrupted period of ████████████████████████████████████████

████████████████████████████████████████████, the Party not claiming Force Majeure may, at any time following the end of such period, terminate this PPA upon written notice to the affected Party, without further obligation by either Party except as to costs and balances incurred prior to the effective date of such termination.

## ARTICLE 14-REPRESENTATIONS AND WARRANTIES

14.1     <u>Seller's Representations and Warranties</u>.  Seller hereby represents and warrants as follows:



(B)     The execution, delivery, and performance of its obligations under this PPA by Seller have been duly authorized by all necessary corporate action, and do not and will not:

(1)     require any consent or approval by any governing body of Seller, other than that which has been obtained and is in full force and effect (evidence of which shall be delivered to Company upon its request);

(2)     violate any Applicable Law, or violate any provision in any formation documents of Seller, the violation of which could have a material adverse effect on the ability of Seller to perform its obligations under this PPA;

(3)     result in a breach or constitute a default· under Seller's formation documents or bylaws, or under any agreement relating to the management or affairs of Seller or any indenture or loan or credit agreement, or any other agreement, lease, or instrument to which Seller is a party or by which Seller or its properties or assets may be bound or affected, the breach or default of which could reasonably be expected to have a material adverse effect on the ability of Seller to perform its obligations under this PPA; or



(C)     This PPA is a valid and binding obligation of Seller except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other similar laws now or hereafter in effect relating to creditors' rights generally.

(D)     The execution and performance of this PPA will not conflict with or constitute a breach or default under any contract or agreement of any kind to which Seller is a party or any judgment, order, statute or regulation that is applicable to Seller of ████████.

26

(E)    Seller shall obtain and maintain all permits, consents, approvals, licenses, authorizations, or other action required by any Governmental Authority authorizing Seller's execution, delivery and performance of this PPA pursuant to this PPA and such documents, approvals and authorizations shall remain in full force and effect.

(F)    Seller shall comply with all Applicable Laws, regulations and regulatory requirements in effect or that may be enacted during the Term.





14.3    <u>Company's Representations and Warranties</u>.  Subject to Article 6, Company hereby represents and warrants as follows:

(A)    Company is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Texas and is qualified in each other jurisdiction where the failure to so qualify would have a material adverse effect upon the business or financial condition of Company.  Company has all requisite power and authority to conduct its business, to own its properties, and to execute, deliver, and perform its obligations under this PPA.

(B)    The execution, delivery, and performance of its obligations under this PPA by Company have been duly authorized by all necessary corporate action, and do not and will not:

(1)    require any consent or approval of Company's shareholders;

(2)    violate any Applicable Law, or violate any provision in any corporate documents of Company, the violation of which could have a material adverse effect on the ability of Company to perform its obligations under this PPA;

(3)    result in a breach or constitute a default under Company's corporate charter or bylaws, or under any agreement relating to the management or affairs of Company, or any indenture or loan or credit agreement, or any other agreement, lease, or instrument to which Company is a party or by which Company or its properties or assets may be bound or affected, the breach or default of which could reasonably be expected to have a material adverse effect on the ability of Company to perform its obligations under this PPA; or

(4)

(C)     This PPA is a valid and binding obligation of Company except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other similar laws now or hereafter in effect relating to creditors' rights generally.

(D)     The execution and performance of this PPA will not conflict with or constitute a breach or default under any contract or agreement of any kind to which Company is a party or any judgment, order, statute, or regulation that is applicable to Company.

(E)     Except for the Court Approval, all approvals, authorizations, consents, or other action required by any Governmental Authority to authorize Company's execution, delivery and performance of this PPA, have been duly obtained and are in full force and effect.

## ARTICLE 15 – INSURANCE

15.1   Evidence of Insurance.     Commencing on the date on which Seller is required to provide ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, Seller shall obtain and maintain the insurance coverages described in Exhibit E.  Seller shall, on upon request of Company (but no more frequently than ▮▮▮ per calendar year), provide Company with evidence that such insurance coverages for ▮▮▮▮▮▮ are in being maintained in accordance with the requirements herein.

15.2   Term and Modification of Insurance. If any insurance required to be maintained by Seller hereunder ceases to be reasonably available and commercially feasible in the commercial insurance market, Seller shall provide written notice to Company, accompanied by a certificate from an independent insurance advisor of recognized national standing, certifying that such insurance is not reasonably available and commercially feasible in the commercial insurance market for electric generating plants of similar type, geographic location and capacity. Upon receipt of such notice, Seller shall attempt to obtain other insurance that would provide comparable protection against the risk to be insured.

## ARTICLE 16 - INDEMNITY

16.1   Each Party (the "Indemnifying Party") agrees to indemnify, defend and hold harmless the other Party (the "Indemnified Party") from and against all third party claims, demands, losses, liabilities, penalties, and expenses (including reasonable attorneys' fees) for personal injury or death to persons and damage to the Indemnified Party's real property and tangible personal property or facilities or the property of any other person or entity to the extent arising out of, resulting from, or caused by a breach by Indemnifying Party of its obligations under this PPA, violation of any Applicable Laws, or by the negligent or tortious acts, errors, or omissions of the Indemnifying Party, its Affiliates, its directors, officers, employees, or agents. Nothing in this Section shall enlarge or relieve Seller or Company of any liability to the other for any breach of this PPA. This indemnification obligation shall apply notwithstanding any negligent or intentional acts, errors or omissions of the Indemnified Party, but the Indemnifying Party's liability to pay damages to the Indemnified Party shall be reduced in proportion to the percentage by which the Indemnified Party's negligent or intentional acts, errors or omissions caused the damages.   Neither Party shall be indemnified for its damages resulting from its sole negligence, intentional acts or willful misconduct. These indemnity provisions shall not be construed to relieve any insurer of its obligation to pay claims consistent with the provisions of a valid insurance policy.

16.2   Promptly   after   receipt   by   a   Party   of   any   claim   or   notice   of   the

commencement of any action, administrative, or legal proceeding, or investigation as to which the indemnity provided for in this Article may apply, the Indemnified Party shall notify the Indemnifying Party in writing of such fact. The Indemnifying Party shall assume the defense thereof with counsel designated by such Party and satisfactory to the Indemnified Party, provided, however, that if the defendants in any such action include both the Indemnified Party and the Indemnifying Party and the Indemnified Party shall have reasonably concluded that there may be legal defenses available to it which are different from or additional to, or inconsistent with, those available to the Indemnifying Party, the Indemnified Party shall have the right to select and be represented by separate counsel, at the Indemnifying Party's expense, unless a liability insurer is willing to pay such costs.

16.3     If the Indemnifying Party fails to assume the defense of a claim meriting indemnification, the Indemnified Party may at the expense of the Indemnifying Party contest, settle, or pay such claim, provided that settlement or full payment of any such claim may be made only following consent of the Indemnifying Party or, absent such consent, written opinion of the Indemnified Party's counsel that such claim is meritorious or warrants settlement.

16.4     Except as otherwise provided in this Article, in the event that a Party is obligated to indemnify and hold the other Party and its successors and assigns harmless under this Article 16, the amount owing to the Indemnified Party will be the amount of the Indemnified Party's actual loss net of any insurance proceeds received by the Indemnified Party following an effort by the Indemnified Party to obtain such insurance proceeds.

16.5     If fines, penalties or legal costs are assessed against either Party ("X") by any court or governmental agency due to the other Party's ("Y") failure to comply with all Applicable Laws, regulations or other regulatory requirements, Y shall indemnify and hold harmless Company from and against any and all fines, penalties, losses, liabilities, damages, claims and costs (including reasonable attorneys' fees and court costs) arising out of or incurred as a result, directly or indirectly, of such failure.

## ARTICLE 17 - ASSIGNMENT

17.1     No Assignment Without Consent.  Except as permitted in this Article 17, neither Party shall assign this PPA or any portion thereof, without the prior written consent of the other Party, which consent shall not be unreasonably withheld or delayed; provided, however, that Company's consent shall not be required for Seller to assign this PPA ▓▓▓▓▓▓▓▓▓▓ and either Party may, without the consent of the other Party (and without relieving itself from liability hereunder), (i) transfer, sell, pledge, encumber or assign this PPA or the accounts, revenues or proceeds hereof ▓▓▓▓▓▓▓▓, (ii) transfer or assign this PPA to an affiliate of such Party which affiliate's creditworthiness is equal to or higher than that of such Party, or (iii) transfer or assign this PPA to any person or entity succeeding to all or substantially all of the assets whose creditworthiness is equal to or higher than that of such Party.



## ARTICLE 18 – MISCELLANEOUS

18.1    <u>Waiver</u>.  The failure of either Party to enforce or insist upon compliance with or strict performance of any of the terms or conditions of this PPA, or to take advantage of any of its rights thereunder, shall not constitute a waiver or relinquishment of any such terms, conditions, or rights, but the same shall be and remain at all times in full force and effect.

18.2    <u>Taxes</u>.

(A)    

(B)    The Parties shall cooperate to minimize tax exposure; however, neither Party shall be obligated to incur any financial burden to reduce taxes for which the other Party is responsible hereunder.  All electric energy delivered by Seller to Company hereunder shall be sales for resale, with Company reselling such electric energy.  Company shall obtain and provide Seller with any certificates required by any Governmental Authority, or otherwise reasonably requested by Seller to evidence that the deliveries of electric energy hereunder are sales for resale.

18.3    <u>Rate Changes</u>.  The terms and conditions and the rates for service specified in this PPA shall remain in effect for the term of the transaction described herein.  Absent the agreement of the Parties to the proposed change, the standard of review for changes to any portion of this PPA proposed by a non-party, or the PUCT acting sua sponte, will be the strictest standard of review permissible to preserve the intent of the Parties to uphold the sanctity of contracts without modification, which in no event will be lower than the "public interest" standard of review set forth in High Plains Natural Gas Co. v. Railroad Commission, Tex. Civ. App. – Austin 1971, writ ref'd n.r.e.).

18.4    <u>Service Contract</u>.  The Parties acknowledge and agree that, for accounting and tax purposes, this PPA is not and shall not be construed as a capital lease and, pursuant to Section 7701(e)(3) of the Code, this PPA is and shall be deemed to be a service contract.

18.5    <u>No Third Party Beneficiaries</u>.  Nothing in this PPA shall be construed to create any duty to, or standard of care with reference to, or any liability to, any person not a party to this PPA.

18.6    <u>Relationship of the Parties</u>.

(A)    This PPA shall not be interpreted to create an association, joint venture, or partnership between the Parties nor to impose any partnership obligation or liability upon either Party.

(B)    Seller shall be solely liable for the payment of all wages, taxes, and other costs related to the employment of persons to perform such services, including all federal, state, and local income, social security, payroll, and employment taxes and statutorily mandated workers' compensation coverage.  None of the persons employed by Seller shall be considered employees of Company for any purpose; nor shall Seller represent to any person that he or she is or shall become a Company employee.

18.7    <u>Survival of Obligations</u>.    Cancellation, expiration, or earlier termination of this PPA shall not relieve the Parties of obligations that by their nature should survive such cancellation, expiration, or termination, prior to the term of the applicable.

18.8    Severability. In the event any of the terms, covenants, or conditions of this PPA, its Exhibits, or the application of any such terms, covenants, or conditions, shall be held invalid, illegal, or unenforceable by any court or administrative body having jurisdiction, all other terms, covenants, and conditions of the PPA and their application not adversely affected thereby shall remain in force and effect; provided, however, that Company and Seller shall negotiate in good faith to attempt to implement an equitable adjustment in the provisions of this PPA with a view toward effecting the purposes of this PPA by replacing the provision that is held invalid, illegal, or unenforceable with a valid provision the economic effect of which comes as close as possible to that of the provision that has been found to be invalid, illegal or unenforceable.

18.9    Complete Agreement: Amendments. The terms and provisions contained in this PPA constitute the entire agreement between Company and Seller with respect to ▓▓▓▓▓ and shall supersede all previous communications, representations, or agreements, either verbal or written, between Company and Seller with respect to the sale of ▓▓▓▓▓▓▓▓. This PPA may be amended, changed, modified, or altered, provided that such amendment, change, modification, or alteration shall be in writing and signed by both Parties hereto.

18.10    Binding Effect. This PPA, as it may be amended from time to time pursuant to this Article, shall  be binding upon and inure to the benefit of the Parties hereto and their respective successors-in-interest, legal representatives, and assigns permitted hereunder.

18.11    Headings.    Captions and headings used in this PPA are for ease of reference only and do not constitute a part of this PPA.

18.12    Counterparts.    This PPA may be executed in any number of counterparts, and each executed counterpart shall have the same force and effect as an original instrument.

18.13    Governing Law.    The interpretation and performance of this PPA and each of its provisions shall be governed and construed in accordance with the laws of the State of Texas.

18.14    Limitation of Remedies, Liability and Damages EXCEPT AS SET FORTH HEREIN, THERE IS NO WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND ANY AND ALL IMPLIED WARRANTIES ARE DISCLAIMED.  THE PARTIES CONFIRM THAT THE EXPRESS REMEDIES AND MEASURES OF DAMAGES PROVIDED IN THIS AGREEMENT SATISFY THE ESSENTIAL PURPOSES HEREOF. FOR BREACH OF ANY PROVISION FOR WHICH AN EXPRESS REMEDY OR MEASURE OF DAMAGES IS PROVIDED, SUCH EXPRESS REMEDY OR MEASURE OF DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY, THE OBLIGOR'S LIABILITY SHALL BE LIMITED AS SET FORTH IN SUCH PROVISION AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED. IF NO REMEDY OR MEASURE OF DAMAGES IS EXPRESSLY PROVIDED HEREIN OR IN A TRANSACTION, THE OBLIGOR'S LIABILITY SHALL BE LIMITED TO DIRECT ACTUAL DAMAGES ONLY, SUCH DIRECT ACTUAL DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED. UNLESS EXPRESSLY HEREIN PROVIDED, NEITHER PARTY SHALL BE LIABLE FOR CONSEQUENTIAL, INCIDENTAL, PUNITIVE, EXEMPLARY OR INDIRECT DAMAGES, LOST PROFITS OR OTHER BUSINESS INTERRUPTION DAMAGES, BY STATUTE, IN TORT OR CONTRACT, UNDER ANY INDEMNITY PROVISION OR OTHERWISE.  IT IS THE INTENT OF THE PARTIES THAT THE LIMITATIONS HEREIN IMPOSED ON REMEDIES AND THE MEASURE OF DAMAGES BE WITHOUT REGARD TO THE CAUSE OR CAUSES RELATED THERETO, INCLUDING THE NEGLIGENCE OF ANY PARTY, WHETHER SUCH NEGLIGENCE BE SOLE, JOINT OR CONCURRENT, OR ACTIVE OR PASSIVE.   TO THE EXTENT ANY DAMAGES REQUIRED TO BE PAID HEREUNDER ARE LIQUIDATED, THE PARTIES

ACKNOWLEDGE THAT THE DAMAGES ARE NOT A PENALTY, ARE DIFFICULT OR IMPOSSIBLE TO DETERMINE, OR OTHERWISE OBTAINING AN ADEQUATE REMEDY IS INCONVENIENT AND THE DAMAGES CALCULATED HEREUNDER CONSTITUTE A REASONABLE APPROXIMATION OF THE HARM OR LOSS.

18.15    Confidentiality.  Subject to Section 18.16, each Party agrees  not to disclose to a third party (other than a Party's outside counsel, consultants, accountants, lenders and prospective lenders, investors and prospective investors, prospective purchasers and other agents having a need to know, who agree to maintain the confidentiality of the information) or use for purposes other than related to this PPA, any non-public information of the other Party, including the terms of this PPA, proprietary information provided by one Party to the other pursuant to the. terms of this PPA; and any other information which has been designed as "confidential" by the disclosing party (collectively, "Proprietary Information"), unless the receiving Party obtains the prior written consent of the disclosing Party.  Without limiting the generality of the foregoing, each Party shall observe the same safeguards and precautions with regard to Proprietary Information of the other Party, which such Party observes with respect to its own information of the same or similar kind. Notwithstanding the foregoing either Party may disclose any Proprietary Information that (a) becomes public information through no wrongful act of the receiving Party; or that is provided to the receiving Party by a third party without restriction known to the receiving Party and without breach of this PPA, or (b) the receiving Party is required to disclose to comply with an Applicable Laws or in the case of Company, such information may be disclosed by Company in connection with any regulatory proceeding in its sole discretion. To the extent such Proprietary Information is required to be provided pursuant to Applicable Laws, the Party required to provide such Proprietary Information shall use commercially reasonable efforts to notify the other Party as soon as practicable.



18.16

18.17

18.18



*[Signature Page(s) follows.]*

IN WITNESS WHEREOF, the Parties have executed this PPA as of the date first written above.

Seller: 

Company:  Luminant Energy Company LLC

By: _Stephen J. Muscato_ JD

Name: Stephen J. Muscato

Title: Chief Commercial Officer

Exhibits

| | |
|---|---|
| Exhibit A | |
| Exhibit B | |
| Exhibit C | |
| Exhibit D | |
| Exhibit E | |
| Exhibit F | |
| Exhibit G | |

Exhibit D
Operating Committee

Luminant Energy
- Operating Committee
  - primary representative – Director of QSE Operations (initially Bryan Ross)
    - Desk Phone – 214-875-8015
    - ▪ <span>▮▮▮▮▮▮▮▮▮▮▮▮</span>
    - Email – bryan.ross@luminant.com
  - alternate representative – Manager of Real-Time Operations (initially Bobby Thompson)
    - Desk Phone – 214-875-8752
    - ▪ <span>▮▮▮▮▮▮▮▮▮▮▮▮</span>
    - Email – bobby.thompson@luminant.com
- Representative for Notices
  - Contract Administration
    - Desk Phone – 214-812-4600
    - Email – contract_admin@luminant.com
    - Mailing Address: 1601 Bryan Street, 27th Floor, Dallas, TX 75201

