**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| Energy Future Holdings Corp., *et al.*,[1] | ) |
| | ) Case No. 14-10979 (CSS) |
| Debtors. | ) |
| | ) (Jointly Administered) |
| | ) |

**REPLY IN SUPPORT OF MOTION OF THE OFFICIAL COMMITTEE OF TCEH
UNSECURED CREDITORS FOR ENTRY OF AN ORDER GRANTING EXCLUSIVE
STANDING AND AUTHORITY TO COMMENCE, PROSECUTE, AND SETTLE
CERTAIN CLAIMS FOR DECLARATORY JUDGMENT, AVOIDANCE AND
RECOVERY OF LIENS, SECURITY INTERESTS, OBLIGATIONS, FEES,
AND INTEREST PAYMENTS, AND DISALLOWANCE OF CLAIMS**

---

[1]The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, which are being jointly administered, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://efhcaseinfo.com.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................... 1

BACKGROUND ....................................................................................... 4

ARGUMENT ............................................................................................ 6

I.    THE TCEH COMMITTEE SHOULD BE GRANTED EXCLUSIVE
SETTLEMENT AUTHORITY TO SETTLE THE CLAIMS ......................... 6

    A.    The Exclusive Right to Settle Claims Furthers and Is Consistent with a
Grant of Exclusive Derivative Standing to Pursue Such Claims ........................ 6

    B.    Unique Circumstances  Here, Including the Debtors' Inherent Conflicts
and Prior Agreement To Release All Potential Estate Claims Against the
First Lien Transferees For No Value, Support Granting the TCEH
Committee Exclusive Settlement Authority ......................................... 8

    C.    The Debtors Should Not Be Granted Exclusive Settlement Authority and
the Case Law Does Not Require It .................................................... 12

    D.    The Debtors Should Not Be Permitted to Settle the Claims Without the
TCEH Committee's Consent .......................................................... 13

    E.    Granting the TCEH Committee Exclusive Settlement Authority Will
Complement, Rather than Interfere with Plan Negotiations or Exclusivity ........ 17

II.    THE TCEH COMMITTEE SATISFIES THE REQUIREMENTS FOR
STANDING ..................................................................................... 20

    A.    The TCEH Committee Has Asserted Colorable Claims ..................................... 20

    B.    Properly Pled Claims Subject to Further Factual Analysis Should Not Be
Dismissed on a Colorability Standard ............................................... 23

    C.    The LBO Claims Are Not Time-Barred ............................................ 25

        1.    The IRS is a Valid "Triggering Creditor" and Factual Disputes as to
Whether the IRS Held a Claim Against Each Debtor as of the
Petition Date Cannot be Adjudicated at this Stage ................................... 26

        2.    Count I of the Proposed Complaint is Not Time-Barred Because the
TCEH Committee May Step Into the Shoes of the IRS ............................. 28

            a.    The Plain Language of Section 544(b)(1) Permits the TCEH
Committee to Stand in the Shoes of the IRS ..................................... 29

            b.    The First Lien AHG's Sovereign Immunity Argument Ignores
the Derivative Nature of Section 544(b) and Has Been Rejected
by Other Courts .................................................................... 32

    D.    Section 546(e) Is Not a Defense to the Claims .................................. 34

# TABLE OF CONTENTS
### (continued)

**Page**

|   |   |   |   |
|---|---|---|---|
|   | 1. | Application of the Section 546(e) Defense is a Fact-Based Inquiry Not Suitable for Adjudication at this Stage | 35 |
|   | 2. | The First Lien AHG Seeks to expand the Scope of Section 546(e) | 36 |
|   |   | a.  Count I | 36 |
|   |   | b.  Counts II and III | 41 |
| III. | ALL CLAIMS ARE PROPERLY PLED | | 42 |
| A. | Constructive Fraudulent Conveyance Claims | | 44 |
|   | 1. | 2007 Solvency | 47 |
|   | 2. | Reasonably Equivalent Value | 52 |
|   |   | a.  2007 Fraudulent Conveyance Claims | 53 |
|   |   | b.  2011 Fraudulent Conveyance Claims | 55 |
|   |   | c.  2013 Fraudulent Conveyance Claims | 60 |
| B. | Intentional Fraudulent Conveyance Claims | | 63 |
| C. | Equitable Subordination Claims | | 66 |
| D. | Disallowance of Claims Under Section 502(d) Is Appropriate | | 68 |
| E. | Unperfected Interests | | 70 |
| F. | Bank Accounts | | 72 |
| G. | Tax Attributes | | 73 |
| H. | Preference Claims | | 76 |
| I. | Declaratory Judgments regarding the Debtors' Stipulations | | 79 |
| J. | The TCEH Committee is Not Impacted by the Ratification Doctrine | | 82 |
| IV. | THE TCEH COMMITTEE SHOULD BE GRANTED SOLE STANDING | | 83 |
| CONCLUSION | | | 84 |

# TABLE OF AUTHORITIES

**Page(s)**

Cases

*ACC Bondholder Grp. v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*,
    361 B.R. 337 (S.D.N.Y. 2007)...........................................................................13, 14

*Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.)*,
    330 B.R. 364 (Bankr. S.D.N.Y. 2005) ............................................................ passim

*Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.)*,
    365 B.R. 24 (Bankr. S.D.N.Y. 2007)................................................................46, 79

*Adelphia Recovery Trust v. HSBC Bank USA, NA (In re Adelphia Recovery Trust)*,
    634 F.3d 678 (2d Cir. 2011)...........................................................................82, 83

*Alberts v. HCA Inc. (In re Greater Se. Cmty. Hosp. Corp. I)*,
    365 B.R. 293 (Bankr. D.C. 2006) ..............................................................30, 31, 33

*Argus Mgmt. Grp. v. Gab Robins, Inc. (In re CVEO Corp.)*,
    327 B.R. 210 (Bankr. D. Del. 2005) (Walrath, J.) ................................................77

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).........................................................................................20, 42

*Autobacs Strauss, Inc. v. Autobacs Seven Co. (In re Autobacs Strauss, Inc.)*,
    473 B.R. 525 (Bankr. D. Del. 2012) (Sontchi, J.).................................................42

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).........................................................................................20, 42

*Brandt v. B.A. Capital Co. LP (In re Plassein Int'l Corp.)*,
    366 B.R. 318 (Bankr. D. Del. 2007) (Gross, J.), *aff'd*, 388 B.R. 46 (D. Del. 2008),
    *aff'd*, 590 F.3d 252 (3d Cir. 2009).........................................................................35

*Bresson v. Comm'r of Internal Revenue*,
    213 F.3d 1173 (9th Cir. 2000) ...............................................................................31

*Brinkmeier v. BIC Corp.*,
    733 F. Supp. 2d 552 (D. Del. 2010).......................................................................66

*Buckley v. Goldman, Sachs & Co.*,
    No. 02-cv-11497-RGS, 2005 WL 1206865 (D. Mass. May 20, 2005)...................38

*Burtch v. Masiz (In re Vaso Active Pharms., Inc.)*,
    Adv. No. 11-52005 (CSS), 2012 Bankr. LEXIS 4741 (Bankr. D. Del. Oct. 9, 2012)
    (Sontchi, J.) .......................................................................................................52, 64

*Canadian Pac. Forest Prods. Ltd. v. J.D. Irving, Ltd. (In re Gibson Grp., Inc.)*,
    66 F.3d 1436 (6th Cir. 1995) ............................................................................... 7

*Cent. Green Co. v. United States*,
    531 U.S. 425 (2001) ........................................................................................... 15

*Charys Liquidating Trust v. McMahan Secs. Co. (In re Charys Holding Co.)*,
    443 B.R. 628 (Bankr. D. Del. 2010) (Shannon, J.) ............................................ 47

*Chem. Bank v. Affiliated FM Ins. Co.*,
    169 F.3d 121 (2d Cir. 1999) ............................................................................... 82

*Crawford v. Zambrano (In re Zambrano Corp.)*,
    478 B.R. 670 (Bankr. W.D. Pa. 2012) ............................................................... 77

*Crescent Res. Litig. Trust v. Duke Energy Corp.*,
    500 B.R. 464 (W.D. Tex. 2013) ................................................................... 36, 37

*Devaney v. Chester*,
    813 F.2d 566 (2d Cir. 1987) ............................................................................... 63

*Dobin v. Hill (In re Hill)*,
    342 B.R. 183 (Bankr. D.N.J. 2006) .................................................................... 64

*Ebner v. Kaiser (In re Kaiser)*,
    525 B.R. 697 (N.D. Ill. 2014) ..................................................................... passim

*EPLG I, LLC v. Citibank, N.A. (In re Qimonda Richmond, LLC)*,
    467 B.R. 318 (Bankr. D. Del. 2012) (Walrath, J.) ............................. 39, 41, 42, 47

*Finkel v. Polichuk (In re Polichuk)*,
    506 B.R. 405 (Bankr. E.D. Pa. 2014) ........................................................... 31, 42

*Finkel v. Polichuk (In re Polichuk)*,
    Adv. No. 10-0031ELF, 2010 WL 4878789 (Bankr. E.D. Pa. Nov. 23, 2010) ........ 30

*Fontenot v. Upjohn Co.*,
    780 F.2d 1190 (5th Cir.1986) ............................................................................. 42

*Forman v. Deutsch Atkins, P.C. (In re Russ Cos.)*,
    Adv. No. 13-01432, 2013 Bankr. LEXIS 3229 (Bankr. D.N.J. Aug. 5, 2013)........ 79

*Friedman v. Am. Capital, Ltd. (In re Barton-Cotton, Inc.)*,
    Adv. No. 11-00079, 2012 Bankr. LEXIS 3114 (Bankr. D. Md. July 9, 2012)........ 54

*FTI Consulting, Inc. v. Sweeney (In re Centaur, LLC)*,
    Adv. Proc. No. 12-50423 (KJC), 2013 Bankr. LEXIS 3404
    (Bankr. D. Del. Aug. 19, 2013) (Carey, J.) ................................................. 36, 45, 47

iv

*G-I Holdings, Inc. v. Those Parties Listed on Exhibit A (In re G-1 Holdings, Inc.),*
    313 B.R. 612 (Bankr. D.N.J. 2004) ...............................................................32, 64

*Greenspan v. Orrick, Herrington & Sutcliffe LLP (In re Brobeck, Phleger & Harrison LLP),*
    408 B.R. 318 (Bankr. N.D. Cal. 2009) .................................................................78

*Harrison v. N.J. Cmty. Bank (In re Jesup & Lamont, Inc.),*
    507 B.R. 452 (Bankr. S.D.N.Y. 2014) .......................................................55, 56, 61

*Holm v. C.M.P. Sheet Metal, Inc.,*
    455 N.Y.S.2d 429 (N.Y. App. Div. 1982) .............................................................82

*HLI Creditor Trust v. Metal Techs. Inc. (In re Hayes Lemmerz Int'l, Inc.),*
    337 B.R. 49 (Bankr. D. Del. 2006) (Lindsey, P.) .................................................78

*In re Adams Golf, Inc. Sec. Litig.,*
    381 F.3d 267 (3d Cir. 2004).............................................................................25, 35

*In re Allegheny Int'l, Inc.,*
    118 B.R. 282 (Bankr. W.D. Pa. 1990) ..................................................................19

*In re Burlington Coat Factory Secs. Litig.,*
    114 F.3d 1410 (3d. Cir. 1997)...............................................................................66

*In re Centaur, LLC,*
    No. 10-10799 (KJC), 2010 WL 4624910 (Bankr. D. Del. Nov. 5, 2010)
    (Carey, J.)......................................................................................16, 21, 23

*In re Dewey & Leboeuf LLP,*
    No. 12-12321 (MG), 2012 Bankr. LEXIS 5536 (Bankr. S.D.N.Y. Nov. 29, 2012)..........24, 49

*In re Exide Techs.,*
    303 B.R. 48 (Bankr. D. Del. 2003) (Carey, J.) ...............................................13, 15

*In re Global Indus. Techs., Inc.,*
    645 F.3d 201 (3d Cir. 2011)..................................................................................18

*In re Matco Elecs. Grp., Inc.,*
    287 B.R. 68 (Bankr. N.D.N.Y. 2002) ....................................................................12

*In re Ontos, Inc.,*
    No. 05-11708-RGS, 2006 U.S. Dist. LEXIS 4198 (D. Mass. Feb. 3, 2006), *aff'd sub nom, Morley v. Ontos, Inc. (In re Ontos, Inc.),* 478 F.3d 427 (1st Cir. 2007)...........................7

*In re Optim Energy, LLC,*
    No. 14-10262 (BLS), 2014 WL 1924908 (Bankr. D. Del. May 13, 2014) (Shannon, J.), *aff'd sub nom., Walnut Creek Mining Co. v. Cascade Inv., LLC (In re Optim Energy, LLC),* Cir. No. 14-738-LPS, 2015 WL 1190152 (D. Del. Mar. 13, 2015)................20

v

*In re PWS Holding Corp.*,
   303 F.3d 308 (3d Cir. 2002)..................................................................................33

*In re Refco, Inc. Secs. Litig. v. CSFB*,
   09-CIV-2885 (GEL), 2009 U.S. Dist. LEXIS 129944 (S.D.N.Y. Nov. 13, 2009) ................83

*In re RNI Wind Down Corp.*,
   348 B.R. 286 (Bankr. D. Del. 2006) (Sontchi, J.)....................................................8

*In re S. Air Transp., Inc.*,
   294 B.R. 293 (Bankr. S.D. Ohio 2003)....................................................................69

*In re Trades Publ'g Inc.*,
   Adv. Proc. No. 10-2531 (MBK), 2011 Bankr. LEXIS 4738 (Bankr. D.N.J. Oct. 11,
   2011) ...........................................................................................................................56

*In re Tribune Co.*,
   464 B.R. 126 (Bankr. D. Del. 2011) (Carey, J.) .....................................................64

*In re Tribune Co. Fraudulent Conveyance Litig.*,
   499 B.R. 310 (S.D.N.Y. 2013)..................................................................................38

*Lehman Bros. Holdings Inc. v. Official Comm. Of Unsecured Creditors (In re Lehman
   Bros. Holdings Inc.)*,
   469 B.R. 415 (Bankr. S.D.N.Y. 2012) ...............................................................36, 37, 38

*MC Asset Recovery LLC v. Commerzbank AG (In re Mirant Corp.)*,
   Adv. No. 05-04142, 2010 Bankr. LEXIS 6389 (Bankr. N.D. Tex. Apr. 22, 2010)................57

*MC Asset Recovery, LLC v. S. Co.*,
   No. 06-cv-0417-BBM, 2006 WL 5112612 (N.D. Ga. Dec. 11, 2006) ....................................26

*Melaragno v. CitiMortgage, Inc. (In re Sandman)*,
   Adv. No. 12-1060, 2013 Bankr. LEXIS 3100 (Bankr. W.D. Pa. Aug. 1, 2013) ....................77

*Mellon Bank, N.A. v. Metro Commc'ns, Inc.*,
   945 F.2d 635 (3d Cir. 1991)......................................................................................53

*Mellon Bank, N.A. v. Official Comm. Of Unsecured Creditors (In re R.M.L., Inc.)*,
   92 F.3d 139 (3d Cir. 1996)..................................................................................56, 58

*Mervyn's LLC v. Lubert-Adler Group IV, LLC (In re Mervyn's Holdings, LLC)*,
   426 B.R. 488 (Bankr. D. Del. 2010) (Gross, J.)........................................................38

*Moreland v. United States*,
   No. 3:11-cv-358-L, 2013 WL 3283700 (N.D. Tex. June 28, 2013) ........................................42

vi

*Mukamal v. Cosmos, Inc. (In re Palm Beach Fin. Partners, L.P.),*
    Adv. No. 11-02970-BKC-PGH-A, 2013 Bankr. LEXIS 5664 (Bankr. S.D. Fla. July
    30, 2013) ...................................................................................................................54, 59

*Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery,*
    330 F.3d 548 (3d Cir. 2003) .......................................................................................7

*Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re
    Cybergenics Corp.),*
    226 F.3d 237 (3d Cir. 2000) ......................................................................................30

*Official Comm. of Unsecured Creditors of Heilig-Meyers Co. v. Wachovia Bank, N.A. (In
    re Heilig-Meyers Co.),*
    297 B.R. 46 (Bankr. E.D. Va. 2003) ..........................................................................55

*Official Comm. of Unsecured Creditors v. Clark (In re Nat'l Forge Co.),*
    326 B.R. 532 (W.D. Pa. 2005) ...................................................................................24

*Official Comm. of Unsecured Creditors v. UMB Bank, N.A. (In re Residential Capital,
    LLC),*
    501 B.R. 549 (Bankr. S.D.N.Y. 2013) .......................................................................75

*Official Comm. of Unsecured Creditors of Wash. Mut., Inc. v. Corcoran (In re Wash.
    Mut., Inc.),*
    Adv. No. 10-53158 (MFW), 2013 Bankr. LEXIS 2885 (Bankr. D. Del. July 16, 2013)
    (Walrath, J.) ..........................................................................................................46, 60

*Orr v. Yuhas (In re Yuhas),*
    104 F.3d 612 (3d Cir. 1997) ......................................................................................77

*Osherow v. Porras (In re Porras),*
    312 B.R. 81 (Bankr. W.D. Tex. 2004) ........................................................................32

*Pardo v. Avanti Corporate Health Sys., Inc. (In re APF Co.),*
    274 B.R. 634 (Bankr. D. Del. 2001) (Walsh, J.)........................................................66

*Pension Transfer Corp. v. Beneficiaries under the Third Amendment to Fruehauf Trailer
    Corp. Retirement Plan No. 003 (In re Fruehauf Trailer Corp.),*
    444 F.3d 203 (3d Cir. 2006)........................................................................................52

*Phillips v. Cnty. of Allegheny,*
    515 F.3d 224 (3d Cir. 2008).......................................................................................20

*Riederer v. Kutak Rock, LLP (In re Brooke Corp.),*
    Adv. No. 10-06246, 2011 Bankr. LEXIS 3854 (Bankr. D. Kan. Sept. 29, 2011) ...................46

*Ritz Camera & Image, L.L.C. v. Canon U.S.A., Inc. (In re Ritz Camera & Image, L.L.C.),*
    Adv. Proc. No. 12-50986 (KG), 2014 Bankr. LEXIS 454 (Bankr. D. Del. Feb. 4,
    2014) (Gross, J.)........................................................................................................46

vii

*Rosener v. Majestic Mgmt., Inc. (In re OODC, LLC)*,
    321 B.R. 128 (Bankr. D. Del. 2005) (Walrath, J.) ................................................53

*Schaps v. Bally's Park Place, Inc.*,
    58 B.R. 581 (E.D. Pa. 1986), *aff'd sub nom.*, *Bally Park Place Hotel & Casino v.*
    *Rush*, 815 F.2d 693 (3d Cir. 1987), *aff'd*, 815 F.2d 695 (3d Cir. 1987) ................................26

*Scheuer v. Rhodes*,
    416 U.S. 232 (1974), abrogated on other grounds by, *Harlow v. Fitzgerald*, 457 U.S.
    800 (1982) ................................................................................................................20

*Scott v. Nat'l Century Fin. Enters. (In re Balt. Emergency Servs. II)*,
    432 F.3d 557 (4th Cir. 2005) ......................................................................................7

*Sebelius v. Cloer*,
    133 S.Ct. 1886 (2013) ................................................................................................29

*Senior Transeastern Lenders v. Official Comm. of Unsecured Creditors (In re TOUSA,*
    *Inc.)*,
    680 F.3d 1298 (11th Cir. 2012) ................................................................................61

*Shearer v. Tepsic (In re Emergency Monitoring Techs, Inc.)*,
    347 B.R. 17 (Bankr. W.D. Pa. 2006) ......................................................................31

*Sikirica v. US Foods, Inc. (In re Damon's Int'l, Inc.)*,
    500 B.R. 729 (Bankr. W.D. Pa. 2013) ......................................................43, 46, 54

*Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs., Ltd.)*,
    337 B.R. 791 (Bankr. S.D.N.Y. 2005) ....................................................................46

*Silverman v. Sound Around, Inc. (In re Allou Distribs., Inc.)*,
    392 B.R. 24 (Bankr. E.D.N.Y. 2008)........................................................................276

*Smart World Techs., LLC v. Juno Online Servs. (In re Smart World Techs., LLC)*,
    423 F.3d 166 (2d Cir. 2005)................................................................................8, 9

*Thaler v. Korn*,
    Case No. 13-CV-3768 (SJF), 2014 U.S. Dist. LEXIS 37152 (E.D.N.Y. Mar. 19,
    2014) ........................................................................................................................69

*Tourtellot v. Huntington Nat'l Bank (In re Renegade Holdings, Inc.)*,
    457 B.R. 441 (Bankr. M.D.N.C. 2011)................................................................56, 61

*Tronox Inc. v. Anadarko Petrol. Corp. (In re Tronox Inc.)*,
    450 B.R. 432 (Bankr. S.D.N.Y. 2011) ....................................................................45

*TWA Inc. Post Confirmation Estate v. Bd. of Cnty. Comm'rs (In re TWA Inc. Post
Confirmation Estate)*,
    Adv. No. 03-70106 (PJW), 2003 Bankr. LEXIS 1431 (Bankr. D. Del. Nov. 3, 2003)
    (Walsh, J.) ................................................................................................79

*United States v. Dupree*,
    919 F. Supp. 2d 254 (E.D.N.Y. 2013) ........................................................73

*United States v. Ron Pair Enters, Inc.*,
    489 U.S. 235 (1989)..........................................................................29, 31

*United States v. Summerlin*,
    310 U.S. 414 (1940)................................................................................30

*Wagner v. Ultima Homes, Inc. (In re Vaughan Co.)*,
    498 B.R. 297 (Bankr. D.N.M. 2013) ....................................................32, 34

*Wagner v. Wilson (In re Vaughan Co.)*,
    Adv. Proc. No. 12-01142-J, 2013 Bankr. LEXIS 978 (Bankr. D.N.M. Mar. 11, 2013)..........36

*Wedtech Corp. v. KMG Main Hurdman (In re Wedtech Corp.)*,
    81 B.R. 240 (S.D.N.Y. 1987)....................................................................24

*Weyandt v. Fed. Home Loan Mortg. Corp. (In re Weyandt)*,
    544 Fed. Appx. 107 (3d Cir. 2013)..............................................................6

*Wyle v. C.H. Rider & Family (In re United Energy Corp.)*,
    944 F.2d 589 (9th Cir. 1991) ....................................................................58

*Xechem, Inc. v. Bristol-Myers Squibb Co.*,
    372 F.3d 899 (7th Cir. 2004) ....................................................................25

*Zazzali v. AFA Fin. Grp., LLC (In re DBSI, Inc.)*,
    477 B.R. 504 (Bankr. D. Del. 2012) ..........................................................35

*Zazzali v. Mott (In re DBSI, Inc.)*,
    445 B.R. 344 (Bankr. D. Del. 2011) (Walsh, J.)......................................44, 45

*Zazzali v. Swenson (In re DBSI, Inc.)*,
    Adv. No. 10-54649 (PJW), 2011 Bankr. LEXIS 1677, 2011 WL 1810632 (Bankr. D.
    Del. May 5, 2011) (Walsh, J.)....................................................................64

## STATUTES

11 U.S.C. § 101(54) ......................................................................................77

11 U.S.C. § 544(b)(1) ..............................................................................26, 29

11 U.S.C. § 546(e) ......................................................................................34

11 U.S.C. § 548(a)(1)(B) ...........................................................................................58

11 U.S.C. §§ 548(a)(1)(B)(i)-(ii) (2014)...................................................................44

26 U.S.C. § 6502(a)(1)..........................................................................................28, 29

26 U.S.C. § 6901 .........................................................................................................29

DEL. CODE ANN. TIT. 6, §§ 1304, 1305, and 1307....................................................44

IRC Sections 355, 358, 361, 362, 368 .......................................................................76

IRC §§ 1001, 1011, 1012 ...........................................................................................75

**OTHER AUTHORITIES**

2-101 Collier on Bankruptcy P101.54 (16th ed. 2015)...............................................78

4-502 Collier on Bankruptcy P 502.05[2][a] (16th ed. 2015)....................................69

5 Collier on Bankruptcy P 552.02[2](a) (16th ed. 2015) ...........................................75

*In re Adelphia Commc's Corp.*,
   02-41729-REG (Bankr. S.D.N.Y. Aug. 4, 2005) [Dkt. No. 8048] .........................16

Transcript of Proceedings,
   *In re Fedders N. Am., Inc.*, No. 07-11176 (BLS) (Bankr. D. Del. Mar. 24, 2008)
   (Shannon, J.) [Dkt. No. 933]...................................................................................20

Transcript of May 28, 2014 Deposition of Paul Keglevic ......................................9, 21

Chesapeake Energy Corporation Closes Acquisition of Appalachian Basin Natural Gas
   Producer Columbia Natural Resources, LLC, PRNewswire-First Call, November 16,
   2005; Range Resources, (2006 Annual Report, *available at*
   http://www.sec.gov/Archives/edgar/data/315852/000095013407004234/d43924e10vk
   .htm. ........................................................................................................................50

Dynegy Inc., First Quarter 2008 Results, at 22, *available at* http://library.corporate-
   ir.net/library/14/147/147906/items/328577/CBBD9FB4-8296-4C12-9FEF-
   8BD386ACB311_Q108.pdf.....................................................................................49

EIA Supplemental Tables to the Annual Energy Outlook 2008, Table 104 Lower 48 Gas
   Production and Wellhead Prices by Supply Region, , *available at*,
   http://www.eia.gov/oiaf/archive/aeo08/supplement/supref.html.............................49

F.R.C.P. Rule 8(a)(2)-(3) ...........................................................................................43

CPUC, 2008 Market Price Referent, *available at*
   http://www.cpuc.ca.gov/PUC/energy/Renewables/mpr ..........................................49

x

Treasury Regulations 1.1502-6(a), 301.7701-2(c)(2)(iii)(A) ..........................................................28

The Official Committee of Unsecured Creditors (the "TCEH Committee") of Energy Future Competitive Holdings Company LLC ("EFCH"), EFCH's direct subsidiary, Texas Competitive Electric Holdings Company LLC ("TCEH"), their direct and indirect subsidiaries, and EFH Corporate Services Company, hereby files this reply (the "Reply") in further support of the *Motion Of The Official Committee Of Unsecured Creditors For Entry Of An Order Granting Exclusive Standing And Authority To Commence, Prosecute, And Settle Certain Claims For Declaratory Judgment, Avoidance And Recovery Of Liens, Security Interests, Obligations, Fees, And Interest Payments, And Disallowance Of Claims* [Dkt. No. 3593] (the "Standing Motion").[2]

## **PRELIMINARY STATEMENT**

1.      The Objectors turn a straight-forward question—whether colorable claims exist (and clearly they do)—into a preemptive defense based on facts not in evidence, all while mischaracterizing the Standing Motion as a pure litigation tactic.  The Ad Hoc Committee of TCEH First Lien Creditors (the "First Lien AHG") even goes so far as to claim that the Standing Motion was filed purely to "exert leverage" or "insert roadblocks" into the plan settlement process.  But the opposite is true.  The First Lien AHG required a Challenge Deadline in the Cash Collateral Order and refused to further extend that deadline, notwithstanding requests that they do so.  Thus, the Standing Motions were filed to preserve rights to bring valid and valuable claims against first lien creditors that otherwise would have been lost in the absence of the Motions.

2.      The TCEH Committee would have preferred to focus its efforts on negotiating a plan that consensually resolves these issues and maximizes value for the benefit of all creditors.  The First Lien AHG is exerting its own form of leverage by compelling litigation over these issues.  As the TCEH Committee expected, the dispute over these claims has distracted the

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Standing Motion.

parties from engaging in substantive plan negotiations.  Given the obvious benefits of dialogue among the TCEH stakeholders, the TCEH Committee has no objection to the Debtors' suggestion that, following the disposition of these motions, further litigation should be stayed to permit focused plan negotiations, provided that if the Debtors file a plan and disclosure statement, then any hearing on such matters are likewise delayed.

3.      Granting the Standing Motion will foster plan discussions by providing the TCEH Committee with a true seat at the table to protect the interests of the TCEH Debtors' unsecured creditors.  The Debtors are limited in their ability to effectively negotiate a settlement of these claims due to their prior conduct.  Both in the RSA and the Cash Collateral Order, the Debtors treated these claims as having no value.  The Debtors did not analyze, evaluate, or even identify the claims at issue before trivializing them by simply waiving them for nothing in return.  In addition, the Debtors suffer from inherent internal conflicts that cloud their independent judgment.  Specifically, EFH is a holder of First Lien Debt and thus a potential defendant with respect to the claims identified in the Proposed Complaint.  The LBO-related claims also call into question other transactions, including intercompany transactions and claims against the sponsors, which are currently under investigation.

4.      Thus, to ensure the fair and efficient resolution of these claims, the TCEH Committee should be granted exclusive authority to settle the claims.  It would be fundamentally unfair to grant the TCEH Committee exclusive derivative standing to pursue the claims and at the same time deprive it of exclusive settlement authority.  The TCEH Committee, as a statutory fiduciary for all unsecured creditors of the TCEH Debtors' estates, is the one proper party to resolve these matters.

5.      Since its formation, the TCEH Committee has been diligently investigating potential claims to maximize recoveries for the benefit of unsecured creditors.  As a result, the

2

TCEH Committee has identified good cause to challenge the Debtors' Stipulations in the Cash Collateral Order. The TCEH Committee's efforts culminated in the filing of the Standing Motion and Proposed Complaint, setting forth over 70 pages of detailed allegations in support of claims seeking to avoid, object to, or otherwise challenge the Stipulations. The claims asserted in the Standing Motions are colorable, and if successful, will materially benefit the TCEH Debtors' unsecured creditors.

6.      In response to the Standing Motions, the Objectors collectively submitted approximately 700 pages of briefing and exhibits highlighting numerous disputed factual issues. These factual issues cannot and should not be resolved in a summary proceeding such as this. Indeed, the Debtors have acknowledged in their Objection that the majority of the TCEH Committee's claims are highly fact intensive and complex. Put simply, factual disputes of this nature are not ripe for adjudication under the colorability standard that applies here, and the Court is not required to conduct a mini-trial on the merits at this juncture. The question is whether the Proposed Complaint states colorable claims and whether the TCEH Committee is entitled to offer evidence to support of such claims—the answer is a resounding yes.

7.      The mountain of alleged "evidence" submitted by the Objectors places at issue material disputed facts that are not yet ripe for determination. In support of their arguments, the Objectors have further cherry-picked facts not properly before the Court. They also misconstrue the law in fashioning arguments most favorable to their defenses. For example, to counter the argument that the TCEH Debtors were insolvent as of and as a result of the LBO, the Objectors cite to data from the post-LBO period without acknowledging that, as alleged in the Proposed Complaint, many of these subsequent market changes were foreseeable and that, at the time of the LBO, the Debtors failed to properly consider known risk factors that could and did result in lower future natural gas prices. Similarly, the Objectors fail to appreciate the difference

3

between providing value and reasonably equivalent value—while certain of the "indirect benefits" allegedly received by the TCEH Debtors may have some value, determining whether such value is reasonably equivalent is a highly fact intensive inquiry.  As alleged in the Proposed Complaint, reasonably equivalent value was not provided to the TCEH Debtors in exchange for the transfers.  The evidence, including expert testimony, must be weighed after standing is granted.

8.      As described in this Reply, the TCEH Committee submits that it should be granted the exclusive authority to prosecute and settle these colorable claims on behalf of the TCEH Debtors' estates.

## BACKGROUND

9.      On February 19, 2015, the TCEH Committee filed the Standing Motion to bring claims against the First Lien Transferees.  Contemporaneously, the ad hoc group of certain holders of approximately $2.7 billion of 10.25% Fixed Senior Notes due 2015 (including Series B) and 10.50%/11.25% Senior Toggle Notes due 2016 issued by TCEH and TCEH Finance, Inc. (the "Unsecured AHG") filed the *Motion Of The AHG Of TCEH Unsecured Noteholders For Entry Of An Order Granting Standing And Authority To Commence, Prosecute, And Settle Certain Claims For Declaratory Judgment, Avoidance And Recovery Of Liens, Security Interests, Obligations, Fees, And Interest Payments, And Disallowance Of Claims* [Dkt. No. 3603] (the "Unsecured AHG Motion"), and the official committee of unsecured creditors of EFH, EFIH, EFIH Finance Inc., and EECI, Inc. (the "EFH Committee") filed the *Motion Of The EFH Official Committee For Entry Of An Order Granting Derivative Standing And Authority To Prosecute And Settle Claims On Behalf Of The Luminant Debtors' Estates* [Dkt. No. 3605] (the "EFH Committee Motion", and collectively with the Standing Motion and the Unsecured AHG Motion, the "Standing Motions").

4

10.     Subsequently, the following responses to the first lien Standing Motions were filed (collectively, the "Objections"):

- Response and Limited Objection of Wilmington Savings Fund Society, FSB to Certain Motions for Standing [Dkt. No. 3725] (the "WSFS Response");

- Debtors Omnibus Objection to Standing Motions [Dkt. No. 3726] (the "Debtors' Objection");

- Omnibus Objection of CCP Credit Acquisition Holdings, L.L.C., Centerbridge Special Credit Partners, L.P., and Centerbridge Special Credit Partners, II, L.P. to the Standing Motions [Dkt. No. 3729] (the "Centerbridge Objection");

- Omnibus Objection Of Wilmington Trust, N.A., As Successor TCEH First Lien Administrative Agent And Successor TCEH First Lien Collateral Agent, To The Motions For Derivative Standing [Dkt. No. 3731] (the "Wilmington Objection");

- Omnibus Objection of Ad Hoc Committee of TCEH First Lien Creditors to Standing Motions [Dkt. No. 3732] (the "First Lien AHG Objection");

- Objection Of The AHG Of TCEH Unsecured Noteholders To The Motion Of The EFH Official Committee For Entry Of An Order Granting Derivative Standing And Authority To Prosecute And Settle Claims On Behalf Of The Luminant Debtors Estates [Dkt. No. 3734] (the "Unsecured AHG Objection"); and

- Objection of Law Debenture Trust Company of New York, as Indenture Trustee, to the Motion of the EFH Official Committee for Entry of an Order Granting Derivative Standing and Authority to Prosecute and Settle Claims on Behalf of the Luminant Debtors Estates [Dkt. No. 3741] (the "Law Debenture Objection").[3]

11.     The Debtors, CCP Credit Acquisition Holdings, L.L.C., Centerbridge Special Credit Partners, L.P., and Centerbridge Special Credit Partners, II, L.P. (collectively, "Centerbridge"), Wilmington Trust, N.A. ("Wilmington"), and the First Lien AHG (collectively, the "Objectors") were the only parties that opposed the relief requested in the Standing Motion. For the reasons set forth herein, the Objections should be overruled and the TCEH Committee

---

[3] The TCEH Committee also filed the Omnibus Response to (I) Motion Of The Ad Hoc Group Of TCEH Unsecured Noteholders For Entry Of An Order Granting Standing And Authority To Commence, Prosecute, And Settle Certain Claims For Declaratory Judgment, Avoidance And Recovery Of Liens, Security Interests, Obligations, Fees, And Interest Payments, And Disallowance Of Claims; and the (II) Motion Of The EFH Official Committee For Entry Of An Order Granting Derivative Standing And Authority To Prosecute And Settle Claims On Behalf Of The Luminant Debtors' Estates [Docket No. 3733] (the "TCEH Committee's Response").

should be granted standing to prosecute the claims raised in the Standing Motions (collectively, the "Claims") and exclusive settlement authority to consensually resolve them.

## ARGUMENT

## I.    THE TCEH COMMITTEE SHOULD BE GRANTED EXCLUSIVE SETTLEMENT AUTHORITY TO SETTLE THE CLAIMS

12.    The Debtors and the First Lien AHG assert that, while the TCEH Committee should be granted exclusive standing to litigate the Claims to judgment (to the extent the Court authorizes derivative standing), the TCEH Committee should not be granted the exclusive right to settle those Claims.  These Objectors, who negotiated the Cash Collateral Order and/or benefit directly from the releases it contains, argue that the Debtors must retain sole authority to settle, without the TCEH Committee's consent, the very same Claims they have already released.  This argument, which is a transparent attempt by the Objectors to short circuit the prosecution of any Claims against the First Lien Transferees, defies justice and common sense, and is contrary to law.  In fact, the Objectors do not cite to any case in which a court has permitted a debtor to settle claims being prosecuted by a committee without such committee's consent.

### A.    The Exclusive Right to Settle Claims Furthers and Is Consistent with a Grant of Exclusive Derivative Standing to Pursue Such Claims

13.    It would be fundamentally inconsistent with the purpose of derivative standing to grant one party exclusive standing to pursue claims, yet allow another party (with conflicted interests) to settle those claims.  An official committee granted derivative standing stands in the estate's shoes with respect to the claims it is authorized to pursue precisely because the debtor-in-possession has proven unwilling or incapable of acting in the estate's best interests with respect to those claims.  S*ee Weyandt v. Fed. Home Loan Mortg. Corp. (In re Weyandt)*, 544 Fed. Appx. 107, 110 (3d Cir. 2013) ("[W]hen a trustee fails to comply with his or her fiduciary duties, the bankruptcy court is empowered under the Bankruptcy Code to use its equitable

6

powers to confer derivative standing on another party." (citation omitted)); *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 572 (3d Cir. 2003) ("derivative standing is a prudent way for bankruptcy courts to remedy lapses in a trustee's execution of its fiduciary duty.").

14.     Thus, granting an official committee derivative standing is analogous to appointing a trustee, albeit for the very limited purpose of controlling the disposition of discrete claims.  In order to be granted derivative standing, a committee must show, among other things, that the litigation will benefit the estate generally and not advance the interests of a particular constituent of that estate.  *Scott v. Nat'l Century Fin. Enters. (In re Balt. Emergency Servs. II)*, 432 F.3d 557, 562 (4th Cir. 2005) (recognizing that the standards for granting derivative standing ensure that "a would-be derivative suit would not simply advance the interests of a particular plaintiff at the expense of other parties to the bankruptcy proceeding."); *Cybergenics*, 330 F.3d at 567 (noting that a committee that receives derivative standing recovers property for the benefit of the estates, not just the committee's constituents); *Canadian Pac. Forest Prods. Ltd. v. J.D. Irving, Ltd. (In re Gibson Grp., Inc.)*, 66 F.3d 1436, 1442 (6th Cir. 1995) (noting that a grant of derivative standing means that a creditor stands in the shoes of the debtor-in-possession, which is appropriate when it "would further Congress's intent that a debtor's assets be marshalled and preserved when to do so would further the goal of reorganization.").

15.     Unquestionably, a chapter 11 trustee is authorized to pursue and settle claims on behalf of a debtor's estate, even though the estate still owns the claims.  *See, e.g.*, *In re Ontos, Inc.*, No. 05-11708-RGS, 2006 U.S. Dist. LEXIS 4198, at * 14 (D. Mass. Feb. 3, 2006), *aff'd sub nom*, *Morley v. Ontos, Inc. (In re Ontos, Inc.)*, 478 F.3d 427 (1st Cir. 2007) ("[I]t would be a strange and illogical interpretation of the law that recognized on the one hand the exclusive right of the Trustee to prosecute a fraudulent transfer claim, while on the other hand denying him the

7

power to settle or compromise that very same claim.").  A debtor out of possession has the right

to be heard and to object to a proposed settlement of any claims, but because the chapter 11

trustee has stepped into the debtor's shoes vis-à-vis the estate, ***only*** the trustee is allowed to

control the disposition of those claims.  *See, e.g.*, *In re RNI Wind Down Corp.*, 348 B.R. 286, 293

n.6 (Bankr. D. Del. 2006) (Sontchi, J.) ("Because the trustee has the exclusive right to prosecute

the derivative actions, the trustee is the only party with the right to settle the actions.").

16.     Logically then, where a committee holds exclusive derivative standing to pursue

claims, it is the committee that has the right to control the disposition of those claims—whether

through litigation or settlement—and it is the debtor that has the right to oppose a proposed

disposition of those claims, not the other way around.  The Debtors and the First Lien AHG raise

a number of arguments opposing this clear logic, based on strained statutory interpretation,

misapplied case law, and unsupported assertions that the Debtors need to retain settlement

authority to effectively negotiate a plan.  As discussed below, all of these arguments fail.

**B.      Unique Circumstances  Here, Including the Debtors' Inherent Conflicts and
Prior Agreement To Release All Potential Estate Claims Against the First
Lien Transferees For No Value, Support Granting the TCEH Committee
Exclusive Settlement Authority**

17.     Courts have held that, in unique circumstances such as those present here, a court

may in fact grant a committee exclusive authority to settle claims.  *See e.g.*, Transcript of

Hearing at 111:7-22, *In re TOUSA, Inc.*, No. 08-10928 (Bankr. S.D. Fla. May 22, 2008) (denying

committee's request for exclusive settlement authority without prejudice to the committee's right

to renew its request upon a showing that the debtor was "impeded or precluded from acting in an

efficient manner with respect to the resolution of the litigation….") (*attached as* Debtors' Obj. at

Exh. B); *Smart World Techs., LLC v. Juno Online Servs. (In re Smart World Techs., LLC)*, 423

8

F.3d 166, 177 (2d Cir. 2005) (noting that "in certain, rare cases, unjustifiable behavior by the debtor-in-possession may warrant a settlement over the debtor's objection….").[4]

18.    All Objectors concede that the Debtors cannot pursue the majority of the Claims the TCEH Committee has identified because the Debtors have waived the right to do so.  As a practical matter, a party that has refused to prosecute claims has no credible leverage to settle them for value.  Similarly, a party that has already agreed to settle a claim for nothing lacks leverage to then try to settle the same claim at a higher amount.  That is exactly the scenario presented here.

19.    By their own admission, the Debtors struggled for over a year to negotiate the terms of a restructuring with, among other parties, the First Lien AHG, prior to filing for bankruptcy.  *See Declaration Of Paul Keglevic, Executive Vice President, Chief Financial Officer, And Co-Chief Restructuring Officer Of Energy Future Holdings Corp., et al., In Support Of First Day Motions* [Dkt. No. 98] ("First Day Decl.") ¶¶ 156-66.  The product of that extensive effort was a restructuring support agreement (the "RSA"), pursuant to which the Debtors agreed to release all potential estate claims against the First Lien Transferees for no value.  *See* RSA, attached as Exh. D to First Day Decl.; Restructuring Term Sheet, Exh. A to RSA, at p. 20-21 (releasing all estate claims against the "Released Parties" including the "Consenting TCEH First Lien Creditors" (which includes the First Lien AHG)).  In agreeing to the RSA, the Debtors did not even attempt to assess the potential value of the claims they were releasing.  *See* Transcript of May 28, 2014 Deposition of Paul Keglevic, at 224:15-225:8 ("Q:  At any time have you seen a valuation of the defined term -- any action which would fit the definition of "Avoidance

---

[4] In *Smart World*, the Court further observed "that a debtor-in-possession pursuing litigation is much less likely to be acting for reasons antithetical to the interests of the estate than a debtor-in-possession who refuses to sue its own principals; accordingly, a party who seeks to displace the debtor faces a heavier burden in the former case than in the latter." *Id.* The facts in this case—where the Debtors have already waived the Claims, demonstrated a willingness to settle them for no value, and appear to ignore important conflicts related to the Claims—raise the latter scenario, suggesting that this is exactly the kind of "rare case" contemplated by the *SmartWorld* court.

Actions" in the interim cash collateral order. . ? . . . A: I have not seen any evaluation of potential

avoidance actions.  Q. So at this time do you have in your mind any number between zero and 25

billion how much those avoidance actions could be worth?  A. I do not.  Q. All right. And have

you seen any schedule that anybody has prepared for you as to what potential claims would fit

the definition of "Avoidance Actions"?  A. I have not.").  Notwithstanding the Debtors' failure to

investigate, Hugh Sawyer, the independent director for the TCEH Debtors, approved the RSA on

behalf of the TCEH Debtors.

20.	The plan contemplated under the RSA would have provided the TCEH Debtors'

unsecured creditors with virtually no recoveries, and as a result of the proposed plan releases,

unsecured creditors would be left with no meaningful mechanism to seek to increase their

recoveries.  *See* Restructuring Term Sheet at p. 2 (providing that holders of general unsecured

claims against the TCEH Debtors with an aggregate face amount of approximately $7.7 billion

would share in the value of the TCEH Debtors' unencumbered assets, which was estimated by

the Debtors to be less than $350 million cash).  The Debtors ultimately withdrew the RSA, but

only after months of strenuous opposition by nearly all TCEH creditors except the First Lien

Transferees, which resulted in the Court raising serious questions about the RSA.  Any

suggestion that the Debtors will now be able to achieve a better result by repeating the same

failed exercise of negotiating directly with the First Lien Transferees is simply implausible.

21.	The Debtors' inability to effectively negotiate a settlement of the Claims against

the First Lien Transferees goes beyond their waiver and prior agreements to settle the Claims for

zero.  The Debtors suffer from inherent internal conflicts that bear directly on the Claims at issue

here.  Specifically, EFH holds approximately $19 million of the First Lien Debt and is a potential

defendant to the Claims identified in the Proposed Complaint.  It cannot negotiate a settlement

from the position of both a plaintiff and a defendant.  Further, certain of the claims against the

10

First Lien Transferees arise out of the LBO transaction. Those LBO-related challenges call for legal and factual determinations that will necessarily carry over into various LBO-related inter-Debtor disputes. As just one example, a legal determination on the applicability of the extended fraudulent transfer look-back period applicable to the Claims against the First Lien Transferees will govern the applicability of the extended look-back period on the inter-Debtor transactions that occurred at the same time. Invariably, one Debtor benefits from the ruling; another is harmed. Because of this overlap, the Debtors would not be the appropriate parties to compromise and settle the Claims against the First Lien Transferees. Moreover, and notwithstanding these conflicts, the Debtors have continued to allow their conflicted management and professionals to negotiate a global settlement that would resolve these Claims under a plan of reorganization.

22.     The Debtors contend that the TCEH Committee does not need exclusive settlement authority because creditors will "have a say" in any potential resolution of the Claims through the ability to object to a Bankruptcy Rule 9019 motion or plan. (Debtors' Obj. ¶ 29.) However, what is at issue is not the right of creditors to weigh in on whether the Debtors have maximized value for creditors (they always have that right), but whether the Debtors can possibly maximize value for the estates by retaining the ability to settle claims to which they have already assigned zero value. The answer to that question is plainly no.[5] Value for the estates will be maximized only if the TCEH Committee is granted derivative standing to assert the Claims on behalf of the TCEH Debtors' estates and maintain full control over both the prosecution and court-approved settlement of those Claims.

---

[5] Moreover, while the TCEH Committee values a prompt resolution of these cases, granting the TCEH Committee exclusive settlement authority would avoid a situation where obtaining a fair and appropriate recovery for these Claims is compromised by the Debtors' desire for a quick exit from bankruptcy.

**C.      The Debtors Should Not Be Granted Exclusive Settlement Authority and the Case Law Does Not Require It**

23.      Despite the foregoing authority establishing that a committee may be granted exclusive settlement authority with respect to derivative claims, the Debtors assert that they are the only party legally entitled to retain settlement authority because only a trustee or debtor in possession can propose a settlement under Bankruptcy Rule 9019.  (Debtors' Obj. ¶ 27.)  In support of this position, the Debtors point to a single inapposite Supreme Court case holding that a trustee, and not an individual creditor, can surcharge a secured creditor under Bankruptcy Code section 506(c).  (*Id.*)  This argument is wrong.

24.      *First*, the TCEH Committee is not an individual creditor, but is a statutory fiduciary that, if given standing, will be furthering the interests of the TCEH Debtors' estates, not just individual creditor interests.  *Second*, while it is true that individual creditors do not ordinarily have the authority to act on behalf of a debtor, the grant of derivative standing to assert claims on behalf of a debtor is a well-established exception to that general rule.  The authority to settle the claims as to which standing is granted is merely a corollary to that exception.  *Third*, the TCEH Committee is seeking derivative standing because the TCEH Committee believes it is in the best interests of the estates to pursue the Claims and the Debtors have already waived the right to pursue them.  The Debtors' waiver calls into question whether the Debtors could ever propose a settlement that would satisfy the standards for approval under Bankruptcy Rule 9019.  Those standards include, among other things, that the settlement be negotiated at arm's length and be in the best interests of the debtors' estates.  *See, e.g., In re Matco Elecs. Grp., Inc.*, 287 B.R. 68, 78 (Bankr. N.D.N.Y. 2002) (rejecting a settlement of claims being prosecuted by the committee in a pending adversary proceeding where the settlement was proposed by the debtors over the committee's objection upon a finding that "the committee was not a party to the

12

bargaining that yielded this compromise, thus raising the inference that the settlement was not

the result of arms-length bargaining as it involved only insiders."); *In re Exide Techs.*, 303 B.R.

48, 71 (Bankr. D. Del. 2003) (Carey, J.) (rejecting settlement of claims asserted in the

committee's adversary proceeding where a settlement was proposed by the debtors over the

committee's objection based on a conclusion that the settlement was not at arm's length and not

in the best interests of creditors).

> **D.     The Debtors Should Not Be Permitted to Settle the Claims Without the
> TCEH Committee's Consent**

25.     To the extent this Court determines that the Debtors should maintain the right to

settle the Claims, the TCEH Committee submits that this Court should, at a minimum, prohibit

the Debtors from settling the Claims without the TCEH Committee's consent.  Requiring the

TCEH Committee's consent to settlement provides more protection than simply allowing the

Debtors to settle claims pursuant to Bankruptcy Rule 9019.  But because the Debtors have

already abdicated their responsibility to maximize value with respect to the Claims against the

First Lien Transferees and continue to ignore the obvious conflicts they face with respect to

negotiating a settlement of those Claims, the imposition of a greater protection is both necessary

and appropriate (even though it is doubtful whether a settlement negotiated by the Debtors could

satisfy even the lower Bankruptcy Rule 9019 standards).

26.     The Objectors have not cited to any case in which a debtor was permitted to settle

claims that were the subject of an action brought by a committee granted derivative standing,

where the settlement was then agreed to over the committee's objection.  In fact, it appears that

in those cases where the debtor has attempted to do so, the settlement was not approved. *See,*

*e.g.*, *ACC Bondholder Grp. v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 361

B.R. 337, 355 (S.D.N.Y. 2007) ("*Adelphia*") (holding that, where the bankruptcy court granted a

noteholders' committee, among other parties, standing to litigate intercreditor claims, those claims could not be settled absent the committee's consent).

27.    In *Adelphia*, the bankruptcy court granted standing to various parties, including a committee (the "ACC Noteholders Committee"), to litigate intercreditor claims.  *Id*. at 343.  The bankruptcy court directed the debtors to remain neutral in the dispute, but gave them the ability to propose a settlement, subject to other parties' rights to object to the compromise as well as to assert that the debtors had no authority to compromise those issues.  *Id*.  After months of negotiations, many parties (but not the ACC Noteholders Committee) agreed to a global settlement that compromised the claims of the ACC Noteholder Committee.  *Id*. at 344.  The ACC Noteholders Committee objected to the plan proposed by the debtors embodying the global settlement, but the bankruptcy court overruled that objection and confirmed the plan.  *Id*. at 345.

28.    On appeal, the district court granted a stay of confirmation, finding that the ACC Noteholders Committee had established a substantial likelihood that no valid settlement had been reached and that the confirmation order approving the "settlement" should therefore be reversed. *Id*. at 354-55.  The *Adelphia* court held that, because the bankruptcy court gave the ACC Noteholders Committee, among others, the authority to litigate the intercreditor dispute, "*[i]t is beyond cavil that this includes the authority to settle those disputes*."  *Id*. at 355 (emphasis added).  Based on this conclusion, the district court held that the debtors' agreement to settle was "immaterial."  *Id*. at 357 n.90.  Significantly, the *Adelphia* court's ruling was not dependent on a finding that the ACC Noteholders Committee was granted exclusive settlement authority— neither the bankruptcy court nor the district court ruled on that point.  Instead, the district court held that "authority to litigate and settle (for the ACC Debtor) was vested in the ACC Noteholders Committee," and, as a result, "the ACC Noteholders Committee's consent to settle may not have been sufficient, but certainly was necessary."  *Id*. at 355, 357 n.90.  Thus, at a

14

minimum, the TCEH Committee must consent to any settlement of the Claims for which it is granted derivative standing.

29.     The cases cited by the Objectors do not lead to a different conclusion.  For example, in *In re Exide Technologies*, 303 B.R. at 67, the court held that the debtor was not barred from proposing a settlement of the committee's adversary proceeding in a plan.[6] However, the court then rejected the proposed settlement based on a conclusion that it was not at arm's length and not in the best interests of creditors.  The *Exide* court engaged in little analysis of the issue of whether the committee's consent was required, but in rejecting the settlement, the Court emphasized the unsecured creditors' "resounding rejection" of the proposed settlement, noting that "[a]n important element in many of the cases in which courts approved plan settlements that had not been negotiated with the opposing party is that the settlements were negotiated with and/or supported by the Creditors Committee, while the party opposing the settlement was typically the debtor or an equity holder." *Id.* at 70 (noting that 71.82% in number and 96.14% in amount of the general unsecured creditors voted against the Plan).  Thus, in rejecting the compromise, the Court noted that "the proposed settlement was not the result of arms-length bargaining with the unsecured creditors, who are plaintiffs in the action and are directly affected by it.  Instead, it is the result of discussions between the Prepetition Lenders and the Debtor only." *Id.* at 71.

30.     As discussed above, the Court reached a similar determination in *In re Adelphia Commc'ns Corp.*, 361 B.R. 337, in which the official committee was granted standing and, on appeal, the district court ruled that a settlement could not be reached without the committee's

---

[6] Because the court's discussion of whether the plan could implement a settlement of claims over the objection of the committee prosecuting those claims was not necessary to its decision, it is dictum, and need not (and should not) be followed.  *See, e.g. Cent. Green Co. v. United States*, 531 U.S. 425, 431 (2001) (reasoning that a prior proposition by the Court "was unquestionably dictum" because it was not essential to the disposition of any of the issues contested in the case).

consent.  The Objectors cited to an earlier decision in that case, *In re Adelphia Commc's Corp.*, 02-41729-REG (Bankr. S.D.N.Y. Aug. 4, 2005) [Dkt. No. 8048], in which the ad hoc committee was denied standing to assert the claims.  There, the court never reached the question of whether an unofficial committee (much less an official committee) with standing to prosecute claims should also have exclusive authority to settle them.

31.     The Objectors also cite to *In re Centaur, LLC*, in which the Court initially entered an order permitting the debtors to retain settlement authority with respect to claims being prosecuted by the committee on behalf of the estates. *In re Centaur, LLC*, No. 10-10799 (KJC), 2010 WL 4624910 (Bankr. D. Del. Nov. 5, 2010) (Carey, J.).[7]  However, the Court ultimately entered an order confirming the debtor's plan and approving a settlement that had been agreed to by ***both*** the debtors and the committee.  *See* Case No. 10-10799 (KJC) (Feb. 18, 2011) [Dkt. No. 1350] (annexed hereto as <u>Exhibit 1</u>).  Thus, even in the cases cited by the Objectors, either the debtors were not permitted to settle claims that were the subject of a committee's derivative action over the committee's objection, or the court approved the settlement with both the debtors' and committee's consent.

32.     Finally, the Debtors argue that the cases cited in the Standing Motion in support of the TCEH Committee's request for exclusive settlement authority are not relevant because no party objected to the entry of those orders, and in certain cases, the debtor even supported granting the committee exclusive settlement authority.  (Debtors' Obj. ¶ 31.)  These cases ***are*** relevant, however, because they demonstrate that the common sense request made by the TCEH Committee should be uncontroversial and is, in fact, routinely granted.  As set forth above, case

---

[7] Notably, there is nothing in the decision that suggests the debtors were disabled from pursuing the claims themselves, and, in fact, the court was careful to note that the requirement that a debtor have "unjustifiably failed" to bring suit "does not require an improper motive" or even a conflict.  *Id.* at *5, n.12.  "Rather, a debtor's failure to bring a claim is deemed to be unjustifiable when the committee has presented a colorable claim that on appropriate proof would support recovery, and the action is likely to benefit the reorganization estate." *Id.* (citations omitted).

law permits, and weighs strongly in favor of granting the TCEH Committee exclusive settlement

authority, and at a minimum, the Debtors should not be permitted to settle the Claims without the

TCEH Committee's consent.

> **E.**    **Granting the TCEH Committee Exclusive Settlement Authority Will Complement, Rather than Interfere with Plan Negotiations or Exclusivity**

33.    Despite the foregoing authority, the Debtors rely on Bankruptcy Code section

1123(b)(3)(A), which provides that a plan "may" include settlement of claims belonging to a

debtor or estate, to oppose the TCEH Committee's request for settlement authority.  However,

that provision does not grant debtors an absolute, unfettered right to settle claims through a plan.

34.    Moreover, granting the TCEH Committee exclusive settlement authority would in

no way interfere with the Debtors' plan exclusivity.  Exclusivity only shields the Debtors from

the proposal of competing plans; it does not give the Debtors carte blanche to propose an

otherwise unconfirmable plan.  The Claims primarily involve an intercreditor dispute among

TCEH creditors, and do not require the input of the Debtors on behalf of "all constituents" in

order to be resolved.  The settlement of those Claims could be, but is not necessarily, a

foundational element of a plan.  If the Claims cannot be settled, they can instead be placed into a

litigation trust and resolved post-confirmation.  The Debtors acknowledge this fact, but warn that

litigating the Claims would likely produce a worse outcome than allowing the Debtors to settle

the Claims.  This argument holds little weight.  As discussed above, the Debtors have already

demonstrated that they placed no value on the Claims, making it improbable that they can

negotiate a reasonable settlement, whereas the TCEH Committee has determined through an

extensive investigation that the Claims have meaningful value.  In seeking standing, which the

Debtors do not oppose, the TCEH Committee has already weighed the potential merits of the

Claims against the risks and costs of litigation and determined that it is nonetheless in the best interests of the TCEH Debtors' estates to pursue the Claims.

35.     At most, the grant of exclusive settlement authority to the TCEH Committee would limit the Debtors' ability to confirm a plan that purported to settle the TCEH Committee's Claims without the TCEH Committee's consent.  This is no different from the strict limitations on a debtor's ability to confirm a plan that grants third party releases without the consent of the releasing creditor.  *See, e.g.*, *In re Global Indus. Techs., Inc.*, 645 F.3d 201, 206 (3d Cir. 2011) (In order for a reorganization plan that includes an injunction barring third-party claims against non-debtors to be approved, the injunction must be "both necessary to the reorganization and fair under 11 U.S.C. § 105(a)." (internal citations omitted)).

36.     Understandably, the Debtors would prefer to achieve a plan through consensus, as would the TCEH Committee.  The Bankruptcy Code facilitates building consensus around the terms of a restructuring plan by giving debtors certain rights to control the restructuring process (implemented through, among other things, plan exclusivity) and negotiate consensual treatment of claims (pursuant to Bankruptcy Rule 9019), but those powers are not absolute.  They are tools to help a debtor maximize recoveries for the benefit of the estate and creditors.  If employing those tools will not maximize recoveries, a debtor is not entitled to use them.  Authorizing the Debtors to retain settlement authority implies that the Debtors will be able to propose a settlement of the Claims that satisfies the requirements of Bankruptcy Rule 9019 (whether under a plan or otherwise) even if the TCEH Committee is not a party to the settlement.  As set forth above, that is highly unlikely, if not altogether impossible, under the circumstances of this case.  Moreover, permitting the Debtors to go through the exercise of preparing and seeking confirmation of a plan that is premised on a settlement that is incapable of being approved could lead to a massive waste of time, effort, and expense, and should be avoided.  Far from stifling

18

plan negotiations, granting the TCEH Committee exclusive settlement authority will help facilitate productive plan negotiations by ensuring that the necessary parties are at the table, and that the Debtors' plan exclusivity is put to good use.

37.     *In re Allegheny Int'l, Inc.*, 118 B.R. 282 (Bankr. W.D. Pa. 1990) ("*Allegheny*") serves as a model for the potential resolution of Claims in these cases.[8]  In *Allegheny*, the bankruptcy court approved a plan settlement of certain claims against the debtors' banks, which were being prosecuted derivatively by the creditors' committee, over the objection of the equity committee.  The court stated that it recognized very early in the case that the litigation "would have a crucial role in the bargaining related to any plan of reorganization." *Id*. at 308.  When the debtor decided not to pursue these causes of action, the court invited the creditors' committee to pursue them. *Id*.  The debtor was joined as a party defendant, and the equity committee also intervened. *Id*. at 309, 312.  After many months of extensive discovery and negotiations between the creditors' committee and the banks, a settlement of the litigation was proposed as an integral part of the debtor's plan. *Id*. at 308-09.  The negotiating parties had "the benefit of input from the debtor and debtor's counsel regarding a range of settlement terms," but the settlement was negotiated by the creditors' committee itself. *Id*. at 309.

38.     Similarly, if the TCEH Committee is granted exclusive settlement authority, it may negotiate a settlement of the Claims with the assistance of the Debtors in those negotiations as the TCEH Committee deems appropriate.  Any settlement that is ultimately reached can be incorporated into the Debtors' plan (assuming the Debtors retain exclusivity during the settlement process).

---

[8]     The Debtors cite *Allegheny* for the proposition that, pursuant to Bankruptcy Code section 1123(b), only a plan proponent has the right to settle claims belonging to a debtor under a plan.  (Debtors' Obj. ¶ 28.)  However, as explained below, *Allegheny* holds no such thing.  To the contrary, *Allegheny* supports the proposition that a committee may be granted exclusive authority to settle claims it is prosecuting on behalf of an estate, and that such a settlement may be incorporated in a plan proposed by the debtors.

ny-1178665

## II.      THE TCEH COMMITTEE SATISFIES THE REQUIREMENTS FOR STANDING

### A.      The TCEH Committee Has Asserted Colorable Claims

39.      The Claims asserted in the Standing Motions are colorable and will benefit the

estate if pursued.  Courts have held that the colorability standard "is a relatively easy one" and

mirrors the standard applicable in a motion to dismiss for failure to state a claim.  *Adelphia*

*Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.)*, 330 B.R. 364, 376

(Bankr. S.D.N.Y. 2005); *In re Optim Energy, LLC*, No. 14-10262 (BLS), 2014 WL 1924908, at

*6 (Bankr. D. Del. May 13, 2014) (Shannon, J.), *aff'd sub nom., Walnut Creek Mining Co. v.*

*Cascade Inv., LLC (In re Optim Energy, LLC)*, Cir. No. 14-738-LPS, 2015 WL 1190152 (D. Del.

Mar. 13, 2015).[9]  The motion to dismiss standard requires that a complaint contain "sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678 (2009), (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007)).  The issue, therefore, "is not whether a plaintiff will ultimately prevail but whether the

claimant is entitled to offer evidence to support the claims."  *Scheuer v. Rhodes,* 416 U.S. 232,

236 (1974), abrogated on other grounds by, *Harlow v. Fitzgerald,* 457 U.S. 800, 814–15 (1982);

*see also Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (the motion to dismiss

---

[9] Some courts have applied an even lower standard to the colorability analysis. *See* Transcript of Proceedings at 97, *In re Fedders N. Am., Inc.*, No. 07-11176 (BLS) (Bankr. D. Del. Mar. 24, 2008) (Shannon, J.) [Dkt. No. 933], 97:11-12; 99:25-100:4; 101:5-9, the relevant portions of which are annexed hereto as Exhibit 2 (declining to apply a Rule 12(b)(6) standard because the standing motion  "is at a stage prior to the commencement of litigation", commenting that the "ruling…is in no respect a conclusion, or a comment, or a determination, or a finding that some, most, or all of the claims and causes of action that have been articulated may or may not be subject to dismissal under Rule 12" and holding that "as a practical matter, judicial economy and the principle of allowing the Court to rule on matters on the merits, leads me to make that determination that I will consider them on a Rule 12 motion, and I will not preclude today the filing of, of the complaint."); *Adelphia Commc'ns Corp. v. Bank of Am. (In re Adelphia Commc'ns Corp.)*, 330 B.R. at 377-78 (noting that "the claims to be asserted should be 'plausible' or 'not without some merit,' and . . .  the requisite inquiry would be 'much the same as that undertaken when a defendant moves to dismiss a complaint for failure to state a claim'" but holding that defendants' "legal contentions, while they will likely result in 12(b)(6) dismissal of some of the claims, fall far short of being 'show-stopper' issues that could presage defeat for the Creditors' Committee in the litigation as a whole, especially before factual inquiry.") (quotations and citations omitted).  The TCEH Committee submits that it has met both standards here.

20

standard "'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of 'the necessary element.") (quoting *Twombly*, 550 U.S. at 556).

40.     Here, the TCEH Committee has diligently investigated potential claims seeking to avoid, object to, or otherwise challenge the TCEH Debtors' Stipulations, including potential claims against the First Lien Lenders (as defined in the Cash Collateral Order).  (Ward Decl. to Standing Motion ¶ 2.)  These efforts culminated in the TCEH Committee filing the Standing Motion and Proposed Complaint, setting forth over 70 pages of detailed allegations in support of the Claims against the First Lien Transferees.  These Claims, if successful, would result in the avoidance of liens, security interests, and obligations securing over $24 billion in obligations, as well as avoidance and recovery of over $2.4 billion in fees and interest.  Notably, the Debtors did not conduct any investigation into these Claims and did not evaluate their merits prior to entering into the Stipulations in the Cash Collateral Order that waive the Debtors' right to pursue the Claims.  (*See* Transcript of May 28, 2014 Deposition of Paul Keglevic, at 224:22-225:8 (admitting that he had "not seen any evaluation of potential avoidance actions" and had no sense of their potential value).)

41.     Once the moving party presents colorable claims for relief that with appropriate proof would support recovery, the court must then decide whether the debtor unjustifiably failed to bring suit so as to give the moving party derivative standing.  *In re Centaur, LLC*, 2010 WL 4624916, at *6.  Of course, here the question of whether the Debtors unjustifiably failed to bring the Claims is an easy one because the Debtors explicitly abdicated the responsibility to investigate and bring any claims in the Cash Collateral Order.

42.     Putting aside the Debtors' waiver of the Claims, which should eliminate the need for further inquiry, in determining whether a debtor's refusal to bring suit is unjustified, a movant need not demonstrate a likelihood of success on the merits.  Rather, the Court need only

assess whether the litigation could reasonably be a sensible expenditure of estate resources, and

not a "hopeless fling."  As the *Adelphia* court stated:

> It is plain that on Housecraft and STN motions the **Committees do not have to show a likelihood of success on the merits**. Rather, those proposing to pursue litigation on behalf of an estate must give the Court comfort that their litigation will be a **sensible expenditure of estate resources**. That means, as a practical matter, providing the Court with a predicate for concluding that the claims will, if proven, provide a basis for recovery, and that **the proposed litigation will not be a hopeless fling**. It also means, as a practical matter, that the **prospective rewards can reasonably be expected to be commensurate with the litigation's foreseeable cost. But no more than that is required** . . . .

*In re Adelphia Commc'ns Corp.*, 330 B.R. at 386 (emphasis added).  The *Adelphia* court further

explained the purpose of the Court's gatekeeper role:

> It is not for the protection of defendants sued or to be sued by a committee on behalf of an estate, whose defenses can be fully and fairly considered in the plenary litigation to be prosecuted-just as they would if the defendants had been sued by a debtor (or a nondebtor) directly. Rather, **the purpose of the bankruptcy court's gatekeeper role is to protect the estate, to ensure that the litigation reasonably can be expected to be a sensible expenditure of estate resources, and will not impair reorganization**.

*Id.* (emphasis added).

43.     Here, the question of whether prosecuting the Proposed Complaint is a sensible

expenditure of estate resources must be viewed in light of the Cash Collateral Order, which

provides that the TCEH Committee is not permitted to use cash collateral to litigate claims

against the first lien creditors.  (Cash Collateral Order ¶ 16.)  The First Lien AHG has asserted

that they have liens on substantially all of the TCEH Debtors' assets, including all of their cash.[10]

Thus, the TCEH Committee's professionals are not being paid on a current basis for the litigation

---

[10] *See* First Lien AHG Obj. ¶ 107 ("all cash generated by the TCEH Debtors constitutes identifiable process of the TCEH First Lien Creditors' other Collateral.").  In addition, the First Lien AHG has even asserted that "Segregated Cash", which the Debtors have stated is unencumbered, is subject to their liens.  (*See* Cash Collateral Order ¶ 10.)

ny-1178665

due to the limitations set forth in the Cash Collateral Order (*Id.* ¶ 16)[11] and will be paid if there is

a consensual resolution or upon a further order of this Court.

44.     For the reasons described herein and in the Standing Motions, the Claims easily

surpass the colorability requirement and, notwithstanding the probable costs of litigation, which

are not being paid on a current basis, the Claims are a sensible expenditure of resources that

would not impair reorganization and, to the contrary, would likely benefit the estate if pursued.

**B.     Properly Pled Claims Subject to Further Factual Analysis Should Not Be Dismissed on a Colorability Standard**

45.     The Objectors have collectively submitted approximately 700 pages of briefing

and exhibits, arguing that the TCEH Committee's Claims are not colorable due to a plethora of

factual disputes.  The Objectors, however, miss the mark on the colorability standard applicable

at this stage of the process.  A colorability analysis, as set forth above, does not require the Court

to hold a mini-trial on the merits.  *See In re Centaur, LLC*, No. 10-10799 (KJC), 2010 WL

4624910, at *6 (the court "should not hold a de facto mini-trial on the merits….").

46.     Despite the mountain of pages submitted by the Objectors, the simple fact

remains that the Claims relating to, among others, solvency, reasonably equivalent value,

intentional fraudulent transfers, and equitable subordination, require significant factual analysis

and would require additional discovery and the presentation of evidence before this Court,

including in some instances, expert witnesses.  Indeed, the Debtors have acknowledged that

many of the Claims are highly fact intensive and complex.  (*See* Debtors' Obj. ¶¶ 14-15

(establishing the Debtors' insolvency as a result of the LBO will be "highly fact-intensive" and

"will likely require significant discovery and will be hotly contested"); ¶¶ 17-18 (Claims relating

---

[11] The Cash Collateral Order provides that "the Carve Out and such collateral proceeds and loans under the DIP Documents may be used for allowed fees and expenses, in an amount not to exceed $500,000 in the aggregate (the "Investigation Fund"), incurred solely by the Creditors' Committee in investigating any potential Challenges during the Challenge Period; provided further, however, that the Creditors' Committee may not use the Investigation Fund to initiate, assert, join, commence, support, or prosecute any actions or discovery with respect thereto." (*Id.*)

to the 2011 Transactions and 2013 Amendment are "factually and legally complex" and present "a disputed mixed question of fact and law"); ¶ 21 ("Equitable subordination is a fact-intensive determination").)

47.     Competing factual allegations are not ripe for adjudication on the colorability or motion to dismiss standard.  *See e.g., In re Adelphia Commc'ns Corp.*, 330 B.R. at 381 (holding that the committee has satisfactorily pled "an issue of fact, plainly inappropriate for determination under Rule 12(b)(6)."); *In re Dewey & Leboeuf LLP*, No. 12-12321 (MG), 2012 Bankr. LEXIS 5536, at *22 (Bankr. S.D.N.Y. Nov. 29, 2012) (granting the committee's standing motion and holding that "[the defendants] vigorously contest the allegations made by the Unsecured Committee, but the present Motion is not the place to resolve what will likely be disputed issues of fact and law."); *Official Comm. of Unsecured Creditors v. Clark (In re Nat'l Forge Co.)*, 326 B.R. 532, 547-548 (W.D. Pa. 2005) (granting the committee's standing motion and holding that defendants' challenges to the committee's claims "are in the nature of factual disputes more appropriately resolved on a fully developed record."); *Wedtech Corp. v. KMG Main Hurdman (In re Wedtech Corp.)*, 81 B.R. 240, 242 (S.D.N.Y. 1987) (denying motion to dismiss in light of factual issues to be further developed).  The TCEH Committee has investigated and asserted well-pled facts, and the Objectors allege their own view of the facts— but this dispute does not change the colorability of the Claims and cannot be adjudicated on the merits at this preliminary stage.

48.     Similarly, to the extent the Objectors believe they have defenses to one or more of the Claims, consideration of such defenses is also not appropriate on a standing motion (with a standard similar to a motion to dismiss) where the defense has not been established on the face of the complaint.  "Orders under Rule 12(b)(6) are not appropriate responses to the invocation of defenses, for plaintiffs need not anticipate and attempt to plead around  all potential defenses.

24

Complaints need not contain any information about defenses and may not be dismissed for that omission." *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004). *See also In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 277 (3d Cir. 2004) ("an affirmative defense may not be used to dismiss a plaintiff's complaint under Rule 12(b)(6)"). Here, the Objectors have raised two defenses, arguing that (i) the TCEH Committee's constructive fraudulent conveyance Claims arising from the 2007 LBO are time-barred, and (ii) certain of the Claims are protected by the section 546(e) safe harbor. However, neither defense has been established on the face of the Proposed Complaint. Thus, the Court should not consider the defenses at this time.[12]

49.     Accordingly, the TCEH Committee submits that the Claims as pled satisfy the colorability requirements and, due to their inherent factual nature, dismissal cannot be considered at this stage. The continued prosecution of the Claims would be in the best interests of the Debtors' estates.

### C.     The LBO Claims Are Not Time-Barred

50.     The First Lien AHG argues that the TCEH Committee's constructive fraudulent conveyance Claims arising from the 2007 LBO are time-barred. (First Lien AHG Obj. ¶¶ 25-46.) Specifically, the First Lien AHG asserts that (i) the IRS is not a valid "triggering creditor" for the vast majority of the TCEH Debtors, due to the fact that many of the TCEH Debtors are disregarded entities for tax purposes (First Lien AHG Obj. ¶ 27), and (ii) the TCEH Committee cannot avail itself of the ten-year statute of limitations period available to the IRS because, in pursuing a private cause of action, the TCEH Committee would not be acting in a "sovereign capacity" (First Lien AHG Obj. ¶ 26.)

---

[12] Nonetheless, as discussed below, the TCEH Committee believes that both defenses also fail on the merits.

51.      The First Lien AHG's arguments fail, and the Claims arising from the 2007 LBO

are timely, for two primary reasons.  First, the TCEH Committee has adequately alleged, after

investigation, that the IRS was a creditor of certain of the Debtors at the time of the 2007 LBO

and as of the Petition Date.  Any factual dispute regarding the existence of an IRS claim against

any individual Debtor sufficient to make the IRS a valid "triggering creditor" for purposes of

section 544(b) of the Bankruptcy Code is a factual question that should be left for discovery and

litigation.  Second, the First Lien AHG's assertion that principles of sovereign immunity deny

the TCEH Committee the ability to step into the shoes of the IRS ignores the plain language of

section 544(b), and, in any event, has been expressly rejected by other bankruptcy courts.

> **1.      The IRS is a Valid "Triggering Creditor" and Factual Disputes as to Whether the IRS Held a Claim Against Each Debtor as of the Petition Date Cannot be Adjudicated at this Stage**

52.      Section 544(b)(1) of the Bankruptcy Code permits a trustee to "avoid any transfer

of an interest of the debtor in property or any obligation incurred by the debtor that is voidable

under applicable law by a creditor holding an unsecured claim…."  11 U.S.C. § 544(b)(1).  To

bring a claim under section 544(b), the trustee must identify a creditor or class of creditors on

whose rights the trustee is depending, sometimes referred to as the "triggering creditor."  *See*

*Silverman v. Sound Around, Inc. (In re Allou Distribs., Inc.)*, 392 B.R. 24, 31 (Bankr. E.D.N.Y.

2008) ("The trustee must identify a 'triggering creditor' that qualifies under this definition at the

time of the fraudulent transfer.").[13]

53.      In the Proposed Complaint, the TCEH Committee alleges that the IRS qualifies as

a "triggering creditor" for purposes of section 544(b) of the Bankruptcy Code, specifically

---

[13] *See also MC Asset Recovery, LLC v. S. Co.*, No. 06-cv-0417-BBM, 2006 WL 5112612, at *3 (N.D. Ga. Dec. 11, 2006) ("[I]n order to maintain an avoidance action under § 544(b), a trustee must demonstrate the existence of a so-called 'golden' or 'triggering' creditor: (1) an unsecured creditor, (2) who holds an allowable unsecured claim under section 502, and (3) who could avoid the transfers at issue under applicable (i.e., state) law."); *Schaps v. Bally's Park Place, Inc.*, 58 B.R. 581, 584 (E.D. Pa. 1986), *aff'd sub nom., Bally Park Place Hotel & Casino v. Rush*, 815 F.2d 693 (3d Cir. 1987), *aff'd*, 815 F.2d 695 (3d Cir. 1987).

identifying the taxes and interest owed by certain TCEH Debtors for the tax year 2006, which

remained outstanding as of the October 2007 LBO as well as the Petition Date. (*See* Proposed

Complaint ¶ 109.) Specifically, the TCEH Committee identified the following TCEH Debtors as

those eligible to bring constructive fraudulent conveyance claims relating to the 2007 LBO: (i)

EFCH, (ii) TXU Retail Services Company, (iii) Luminant Energy Company LLC, (iv) Luminant

Generation Company LLC, and (v) Luminant Mining Company LLC (collectively, the "Count I

Debtors").[14]  (*See* Proposed Complaint ¶ 14.)  To support this contention, the TCEH Committee

conducted significant diligence regarding potential IRS claims for the years leading up to the

2007 LBO and the bankruptcy filing.  Ultimately, the TCEH Committee determined that the

Count I Debtors were in fact liable for unpaid tax liabilities for tax year 2006, a fact that has been

confirmed by the Debtors.

54.    Ignoring the specific allegations in the Standing Motion and Proposed Complaint,

the First Lien AHG simply counters that the IRS cannot serve as a "triggering creditor" because

"substantially all of TCEH's current subsidiaries have been disregarded entities since 2006" and,

as a result they are "essentially ignored for federal income tax purposes."  (First Lien AHG Obj.

¶ 30.)

55.    It is true that certain of the Count I Debtors *currently* are limited liability

companies that are disregarded entities for purposes of calculating tax liabilities today.  However,

the First Lien AHG ignores the fact that each of the Count I Debtors was a corporation and a

member of the EFH consolidated tax group in 2006, thus jointly and severally liable for the

consolidated group's federal income taxes in 2006.  *See, e.g.*, Proof of Claim No. 5037,

Luminant Energy Company LLC, Case No. 14-11023 (CSS) (stating that that "Debtor is

---

[14] The TCEH Committee is continuing to investigate the IRS claims against the TCEH Debtors.  If the TCEH Committee is granted standing to bring claims arising from the 2007 LBO, additional debtors eligible to bring claims may be identified.

severally liable for the tax liability of Consolidated Grp"). The IRS Treasury Regulations make

clear that, if a regarded entity was severally liable for a historical tax liability, a subsequent

conversion to a limited liability company (making it a disregarded entity for tax purposes) does

not extinguish that entity's liability for the historical tax obligation. *See* Treasury Regulations

1.1502-6(a), 301.7701-2(c)(2)(iii)(A). Indeed, a review of the Debtors' public claims register

reveals that the IRS has filed Claim Nos. 5037, 5041, 5043, 5056, and 5059 against the Count I

Debtors for amounts due for tax year 2006. *See, e.g.*, Proof of Claim No. 5037, Luminant

Energy Company LLC, Case No. 14-11023(CSS) (identifying liability for tax period 12/31/2006

in the amount of approximately $141 million with an additional $45 million due on account of

interest accrued to the Petition Date).

56. Accordingly, the TCEH Committee has properly alleged that the IRS was a viable

"triggering creditor" of the Count I Debtors at the time of the 2007 LBO and as of the Petition

Date. Any dispute regarding the validity of the IRS claims is a factual question that should not

be considered or resolved by the Court at this stage. *See, e.g.*, *In re Adelphia Commc'ns Corp.*,

330 B.R. at 381 (noting that "a determination on a [standing] motion that claims are colorable

simply satisfies a condition for permitting the issues to be decided where they should be

decided—in plenary litigation itself, where the need to prove allegations will remain, and where

factual and legal claims and defenses will be considered on their individual merits.").

### 2.    Count I of the Proposed Complaint is Not Time-Barred Because the TCEH Committee May Step into the Shoes of the IRS

57. The fraudulent conveyance Claims in Count I of the Proposed Complaint relating

to the 2007 LBO are not time-barred because the TCEH Committee may apply the ten-year

statute of limitations applicable to the IRS as an unsecured creditor of certain of the TCEH

Debtors as of the 2007 LBO and the Petition Date. *See* 26 U.S.C. § 6502(a)(1). Pursuant to the

Internal Revenue Code (the "IRC"), the IRS may first assess a tax liability within 3-6 years after the tax return was filed (with certain limited exceptions), depending on whether the IRS is assessing the taxpayer, an initial transferee, or a subsequent transferee.  26 U.S.C. § 6901. Following the assessment period, the IRS is subject to a ten-year statute of limitations for collection of the tax liability, measured from the time of the assessment.  26 U.S.C. § 6502(a)(1). "An avoidance action under section 544(b) is timely if the unsecured creditor's claim was timely under the applicable nonbankruptcy law at the time the bankruptcy petition was filed, and the trustee brings the action within the time specified in section 546(a)."  *Ebner v. Kaiser (In re Kaiser)*, 525 B.R. 697, 708 (N.D. Ill. 2014) ("Kaiser") (citations omitted).

### a. The Plain Language of Section 544(b)(1) Permits the TCEH Committee to Stand in the Shoes of the IRS

58.    The Supreme Court has stated that "[t]he task of resolving [a] dispute over the meaning of [a statute] begins where all such inquiries must begin: with the language of the statute itself."  *United States v. Ron Pair Enters, Inc.*, 489 U.S. 235, 241 (1989) (citation omitted).  ("[A]s long as the statutory scheme is coherent and consistent, there generally is no need for a court to inquire beyond the plain language of the statute." (*id*. at 240-241); *see also Sebelius v. Cloer*, 133 S.Ct. 1886, 1895 (2013).

59.    With this principle of statutory construction in mind, section 544 states that "the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 . . . ."  11 U.S.C. § 544(b)(1).  Noticeably absent from this provision, however, is any condition or limitation on an estate representative's ability to step into the shoes of a creditor holding an allowable unsecured claim.  *Kaiser*, 525 B.R. at 713 ("The

view that the statute of limitations available to the IRS may not be invoked by a bankruptcy trustee has no basis in the plain language of section 544(b).").

60.     In addition, section 544(b) allows a bankruptcy trustee to bring an avoidance action "if there is an unsecured creditor of the debtor that actually has the requisite nonbankruptcy cause of action", but pursuant to this provision, "the transfer is avoided in its entirety for the benefit of all creditors, not just to the extent necessary to satisfy the individual creditor actually holding the avoidance claim." *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.)*, 226 F.3d 237, 243 (3d Cir. 2000).  As a result, a trustee "stands in the shoes of an actual unsecured creditor and becomes subject to the same rights and limitations that the actual unsecured creditor would be subject to outside of bankruptcy." *Kaiser*, 525 B.R. at 708 (citing *In re Cybergenics Corp.*, 226 F.3d at 751).

61.     Moreover, when asserting a fraudulent conveyance claim pursuant to section 544(b) and applicable state law, the trustee or estate representative may avail itself of the statute of limitations period available to any actual creditor as of the commencement of the case.  *See Finkel v. Polichuk (In re Polichuk)*, Adv. No. 10-0031ELF, 2010 WL 4878789, at *4, n.9 (Bankr. E.D. Pa. Nov. 23, 2010).  With respect to government creditors, such as the IRS, "the statute of limitations provided by federal law to the specific creditor in question trumps any statute of limitations set forth in the applicable state fraudulent transfer law under the Supreme Court's ruling in [*Summerlin*]."  *Alberts v. HCA Inc. (In re Greater Se. Cmty. Hosp. Corp. I)*, 365 B.R. 293, 302 (Bankr. D.C. 2006); *see United States v. Summerlin*, 310 U.S. 414, 416 (1940) ("[T]he United States is not bound by state statutes of limitation or subject to the defense of laches in enforcing its rights.").  As a result, courts have held that the *Summerlin* rule applies to fraudulent transfer actions that may be brought by an unsecured governmental creditor.  *See In re Greater Se. Cmty. Hosp. Corp. I*, 365 B.R. at 302 ("Numerous courts have held the *Summerlin*

rule applies to fraudulent transfer actions brought by an unsecured governmental creditor.") (collecting cases); *Bresson v. Comm'r of Internal Revenue*, 213 F.3d 1173, 1177-79 (9th Cir. 2000) ("Because the United States is here acting in its sovereign capacity in an effort to enforce rights ultimately grounded on federal law, the rule of *Summerlin* will not allow the 'extinguishment' of a valid, fully accrued claim by the IRS brought under the [California Uniform Fraudulent Transfer Act].").

62.     It is well-established that an IRS claim may serve as a predicate unsecured claim under Bankruptcy Code section 544(b) and provide an extended statute of limitations to an estate representative bringing a state law fraudulent conveyance claim.  Applying the plain language of section 544(b)(1), *see Ron Pair Enters., Inc.*, 489 U.S. at 240-41, bankruptcy courts from numerous jurisdictions around the country have concluded that a trustee or estate representative may use the extended statute of limitations period available to the IRS to assert state law fraudulent conveyance claims.  *See, e.g.*, *Kaiser*, 525 B.R. at 714 ("The court is not convinced that 'a creditor holding an unsecured claim' should be read to exclude the IRS, and that in so choosing the IRS, a trustee should not be subject to the benefits as well as the burdens of that choice.  There is, based on the plain language of the statute, no reason to force the Trustee to choose anything other than the best rights available to her."); *Finkel v. Polichuk (In re Polichuk)*, 506 B.R. 405, 427 (Bankr. E.D. Pa. 2014) ("Generally speaking, the IRS is an unsecured creditor that is able to avail itself of the avoidance provisions of PUFTA and the Trustee may properly use the IRS's status as a creditor."); *In re Greater Se. Cmty. Hosp. Corp. I*, 365 B.R. at 299-306 ("If an unsecured creditor of the estate could have avoided a transaction under state law despite the existence of a state statute of limitations on that claim because the creditor was acting in a 'governmental capacity,' so too can the estate representative avoid the transfer under § 544(b)."); *Shearer v. Tepsic (In re Emergency Monitoring Techs, Inc.)*, 347 B.R. 17, 19 (Bankr. W.D. Pa.

31

2006) (denying motion to dismiss complaint on grounds that IRS was a creditor in existence as of petition date that would not have been bound by four-year statute of limitations); *Osherow v. Porras (In re Porras)*, 312 B.R. 81, 97 (Bankr. W.D. Tex. 2004) ("[T]he IRS is entitled to bring the fraudulent transfers in its own name, and so would be entitled to whatever statute of limitations applies to it.  Under [*Summerlin*], the United States is neither bound by the state statutes of limitation nor is subject to the defense of laches . . . ."); *c.f. G-I Holdings, Inc. v. Those Parties Listed on Exhibit A (In re G-1 Holdings, Inc.)*, 313 B.R. 612 (Bankr. D.N.J. 2004) (holding that the committee could bring a fraudulent transfer action on behalf of the New Jersey Department of Environmental Protection and take advantage of the NJDEP's ten-year statute of limitations period for asserting fraudulent transfer action); *but see Wagner v. Ultima Homes, Inc. (In re Vaughan Co.)*, 498 B.R. 297, 303 (Bankr. D.N.M. 2013).

63.     In sum, the language of section 544(b)(1) is clear, unambiguous, and places "no conditions on which unsecured creditor a trustee may choose as the golden creditor." *See Kaiser*, 525 B.R. at 711 (citation omitted).  The TCEH Committee has sufficiently alleged that the IRS was a viable creditor of certain of the TCEH Debtors as of the 2007 LBO and the Petition Date. Accordingly, the TCEH Committee may apply the ten-year statute of limitations available to the IRS, in accordance with the plain language of section 544(b) and consistent with the cases cited above.

>   **b.     The First Lien AHG's Sovereign Immunity Argument Ignores the Derivative Nature of Section 544(b) and Has Been Rejected by Other Bankruptcy Courts**

64.     To attempt to get around the plain language of section 544(b), the First Lien AHG argues at length that the *nullum tempus* doctrine precludes the TCEH Committee from adopting the rights available to the IRS.  (First Lien AHG Obj. ¶¶ 24-46.)  The majority of courts that

have directly considered the interplay between section 544(b) and the IRS extended statute of limitations period have rejected the application of the *nullum tempus* doctrine.

65.     Most recently in *Kaiser*, a December 2014 opinion, the Bankruptcy Court for the Northern District of Illinois determined that the policy considerations embodied in the *nullum tempus* doctrine did not override the plain language of section 544(b) of the Bankruptcy Code. In so holding, the *Kaiser* court stated as follows:

> In this court's view, [the analysis regarding sovereign immunity and the *nullum tempus* doctrine]-though undoubtedly correct in most instances-is simply misplaced here.  The view that the statute of limitations available to the IRS may not be invoked by a bankruptcy trustee has no basis in the plain language of section 544(b).  It is well established that suits by the Trustee under section 544(b) are derivative; the Trustee steps into the shoes of a creditor and enforces the rights of that creditor for the benefit of the bankruptcy estate.

525 B.R. at 713; *Greater Se. Cmty. Hosp. Corp. I*, 365 B.R. at 304 ("The unsecured creditor's ability to trump the applicable state statute of limitations might derive from its sovereign immunity, but the estate's representative's ability to override that same limitation derives from § 544(b)."); *Polichuk*, 506 B.R. at 426-27 (rejecting the argument that permitting trustee to assert rights of the IRS is "tantamount to delegating to the Trustee the taxing power of the federal government" because the "trustee is merely using the IRS' status as an entity that holds a valid claim against the Debtor as of the commencement of the case" to apply a longer statute of limitations period).

66.     To prosecute fraudulent conveyance claims relating to the 2007 LBO, the TCEH Committee would be stepping into the shoes of the IRS as a creditor of certain of the TCEH Debtors for the benefit of their estates.  *See In re PWS Holding Corp.*, 303 F.3d 308, 314 (3d Cir. 2002) ("[section] 544(b) places the debtor in possession in the shoes of its creditors, giving it the right to prosecute individual creditors' fraudulent transfer claims for the benefit of the

33

bankruptcy estate."). As in *Kaiser*, the court should reject the notion that principles of sovereign immunity trump the plain language of section 544(b) and the derivative nature of claims brought pursuant to that section.[15]

67.     For the foregoing reasons, Count I of the Proposed Complaint is not time-barred and the TCEH Committee should be granted standing to prosecute such Claims.

### D.     Section 546(e) Is Not a Defense to the Claims

68.     The First Lien AHG argues that section 546(e) of the Bankruptcy Code provides a defense to (i) Count I of the Proposed Complaint, in which the TCEH Committee alleges constructive fraudulent conveyance Claims relating to the 2007 LBO, and (ii) the portions of Counts II and III of the Proposed Complaint that relate to Prepayment Benefit and the granting of liens and security interests in connection with the First Lien Notes. (*See* First Lien AHG Obj. ¶¶ 70-76, 95-96).[16]  This defense is premised on a flawed and overly expansive reading of the statutory safe harbor.

69.     The First Lien AHG must prove three elements to qualify for safe harbor treatment: (i) a transfer, (ii) a securities contract, and (iii) a showing that the transfer was made "in connection with" the securities contract.[17]  *See* 11 U.S.C. § 546(e).  The creation of a lien is among the defined categories of "transfers" within section 101(54) of the Bankruptcy Code, and

---

[15] The First Lien AHG also cites *Vaughan* to argue that the Court should deny the TCEH Committee standing to pursue Count I of the Proposed Complaint because permitting an estate representative to invoke *nullum tempus* would "eviscerate the UFTA's four-year look back period in most bankruptcy courts."  (First Lien AHG Obj. ¶ 42.); *Vaughan*, 498 B.R. at 305.  The *Kaiser* court rejected this "slippery slope" argument based upon the plain language of section 544(b) and "actual experience."  525 B.R. at 711-12 ("The language of section 544 is clear and without limitation other than that expressly set forth therein.  The court therefore declines to place policy concerns above the plain language of the statute. . . .  The slippery slope the Moving Defendants point to is a logical fallacy that actual experience has disproven . . . .  [T]he cases addressing this [issue] are few and far between.") (citing cases).

[16] The First Lien AHG does not assert a section 546(e) defense to any of the other transfers associated with the 2011 Transactions described in Count II, including the payment of (i) over $800 million in fees, (ii) over $530 million in incremental interest under the Credit Agreement, and (iii) approximately $420 million in incremental interest on the First Lien Notes.

[17] There appears to be no dispute that the transfers at issue here do not qualify as "settlement payments" under section 546(e).

the Merger Agreement is a "securities contract" as defined in section 741(7) of the Bankruptcy

Code.  However, contrary to the contention of First Lien AHG (*see* First Lien AHG Obj. ¶ 75),

the liens granted to the First Lien Collateral Agent for the benefit of the Secured Parties were not

provided "in connection with" the Merger Agreement, as that phrase is utilized in Bankruptcy

Code section 546(e).  Indeed, the First Lien AHG has not identified another factually analogous

case that applies section 546(e) to protect from avoidance the contested transfers (and associated

obligations) provided to a lender in a financing transaction, even when certain loan proceeds

were used to fund an LBO merger.

> **1.    Application of the Section 546(e) Defense Is a Fact-Based Inquiry Not Suitable for Adjudication at this Stage**

70.    In its Proposed Complaint, the TCEH Committee has alleged that liens and

security interests were granted to the First Lien Collateral Agent in connection with the Security

Agreement and Credit Agreement, and neither agreement constitutes a securities contract.  Thus,

application of the section 546(e) defense is inappropriate, especially at this stage of the

proceedings.  *C.f. Zazzali v. AFA Fin. Grp., LLC (In re DBSI, Inc.)*, 477 B.R. 504, 515 (Bankr.

D. Del. 2012) ("Courts in this district have considered the 546(e) defense at the motion to

dismiss stage where the defense is clearly established on the face of the complaint.") (citing

*Brandt v. B.A. Capital Co. LP (In re Plassein Int'l Corp.)*, 366 B.R. 318, 323-25 (Bankr. D. Del.

2007) (Gross, J.), *aff'd*, 388 B.R. 46 (D. Del. 2008), *aff'd*, 590 F.3d 252 (3d Cir. 2009)); *In re*

*Adams Golf, Inc. Sec. Litig.*, 381 F.3d at 277 ("an affirmative defense may not be used to dismiss

a plaintiff's complaint under Rule 12(b)(6).").

71.    This defense cannot be established, if at all, without further analysis after standing

has been granted.  Thus, to the extent the First Lien AHG seeks to assert section 546(e) as an

affirmative defense, the Court will need to review the facts and circumstances surrounding the

2007 LBO to determine if the statutory safe harbor applies.  At this stage, however, such a "fact-based inquiry" is premature.  *See Zazzali v. AFA Fin. Group, LLC (In re DBSI, Inc.)*, 477 B.R. at 516 ("without any factual details on the TIC sales agreements, I cannot say that the Transfers were made in connection with 'securities contracts.'").  *See also FTI Consulting, Inc. v. Sweeney (In re Centaur, LLC)*, Adv. Proc. No. 12-50423 (KJC), 2013 Bankr. LEXIS 3404, at *13 (Bankr. D. Del. Aug. 19, 2013) (Carey, J.) ("Whether the §546(e) safe harbor applies to the transfers in question [either partnership distributions or settlement payments] also requires a determination of fact and is not suitable for disposition on a motion to dismiss under Fed. R. Bankr. P. 7012(b)(6)."); *Wagner v. Wilson (In re Vaughan Co.)*, Adv. Proc. No. 12-01142-J, 2013 Bankr. LEXIS 978 (Bankr. D.N.M. Mar. 11, 2013) (holding that the section 546(e) defense "was premature at the motion to dismiss stage because the facts supporting the defense do not appear plainly on the face of the complaint.").

### 2.      The First Lien AHG Seeks to Expand the Scope of Section 546(e)

72.      The First Lien AHG is asking this Court to expand the permissible scope of the section 546(e) safe harbor.  For the reasons stated below, this effort to expand existing precedent, especially at this stage of the litigation, should be rejected.

### a.      Count I

73.      In support of its attempt to expand the scope of the section 546(e) safe harbor to protect the granting of liens and security interests from the TCEH Debtors to the First Lien Transferees, the First Lien AHG cites *Crescent Res. Litig. Trust v. Duke Energy Corp.*, 500 B.R. 464 (W.D. Tex. 2013) and *Lehman Bros. Holdings Inc. v. Official Comm. Of Unsecured Creditors (In re Lehman Bros. Holdings Inc.)*, 469 B.R. 415 (Bankr. S.D.N.Y. 2012) (*see* First Lien AHG Obj. ¶¶ 75-76).  Yet, neither of these cases dealt with the nuanced issue before the Court.  In *Duke Energy*, the issue was whether a transfer of loan proceeds from the debtor

36

("Crescent") to the debtor's indirect equity owner ("Duke"), which occurred contemporaneous with the sale of equity interests in Crescent to a third party, was protected from avoidance because the funds were distributed to Duke allegedly in connection with a securities contract (*i.e.*, Duke's contract with a third party for the sale of equity securities in Crescent). The Court held that the transfer of loan proceeds from Crescent to Duke was a transfer made "in connection with a securities contract" because (i) the distribution from Crescent to Duke was, by its terms, a dividend to an indirect parent that was closely tied to the sale agreement and not a standalone dividend, and (ii) the contract sales price was determined only after calculating the difference between Crescent's estimated market value and the amount of the dividend from Crescent to Duke. *See* 500 B.R. at 476. No party disputed that the transfer of liens from Crescent to the bank under the loan transaction, which proceeds were used, in part, to fund the dividend. Thus, the court never addressed the question at issue here—whether the liens and security interests granted to the lenders pursuant to a secured financing arrangement could be avoided.

74.     In *Lehman Brothers*, the court addressed the avoidability of collateral pledges and the perfection of liens provided to a lender in connection with certain clearance agreements, which indisputably were securities contracts. Leading up to Lehman's bankruptcy filing, JPMorgan, as LBI's clearing bank, required Lehman to both provide additional liens in JPMorgan's favor and post billions of dollars of collateral in order for JPMorgan to continue to clear and settle LBI's securities trades. *See* 469 B.R. 415. Lehman's creditors' committee attempted to avoid and recover these transfers as being constructively fraudulent. The court held that the section 546(e) safe harbor applied because the transfers of liens and collateral were made in connection with the clearance agreements. Specifically, the court protected (i) the granting of liens under the clearance agreements because such agreements are themselves securities contracts, and (ii) the perfection of liens pursuant to ancillary documents (which were not

37

securities contracts) because the ancillary documents were executed "in connection with" the clearance agreement (a securities contract). *See* 469 B.R. at 440-441. *Lehman Brothers* is thus distinguishable because the contract under which the contested transfers were made—the clearance agreements—unquestionably were "securities contracts."

75.    In contrast with the analysis in *Lehman Brothers*, there is no dispute here that the Credit Agreement is ***not*** a securities contract.  The 2007 LBO was a three-step transaction: (1) the TCEH Debtors entered into the Credit Agreement, Security Agreement, and related documents, and received loan proceeds in exchange for negotiated collateral protections, (2) the TCEH Debtors transferred $21 billion of secured and unsecured loan proceeds to Merger Sub, and (3) Merger Sub aggregated funds from multiple sources and transferred approximately $32 billion to the Paying Agent for distribution to the equity shareholders of TXU Corp.  In bringing constructive fraudulent conveyance Claims, the TCEH Committee only proposes to collapse steps (1) and (2), ***not*** step (3).[18]

76.    Application of the section 546(e) defense is a fact intensive exercise.  It calls for a careful examination of the phrase "in connection with."  The Security Agreement was executed

---

[18] The First Lien AHG would have this court believe that if it collapses the financing and merger transactions, then it has no choice but to find that the granting of liens in favor of the First Lien Collateral Agent (for the benefit of the Secured Parties) under the Security Agreement was done "in connection with" the merger and the related purchase of securities.  (*See* First Lien AHG Obj. ¶ 75.)  However, the TCEH Committee has not argued that the granting of liens and security interests must be collapsed with the distribution to shareholders.  The TCEH Committee argues in a more focused manner that the Credit Agreement and Security Agreement transactions must be collapsed with the upstreaming of funds, none of which involve a "securities contract".  There is also no case law squarely on point that addresses the potential avoidance of liens, security interests, and obligations granted under a Credit Agreement that was entered into at the time of an LBO merger.  In addition, the First Lien AHG fails to demonstrate how their position furthers the stated purpose of the safe harbor.  "Congress enacted section 546(e) in order to provide certainty to securities transactions and, in so doing, to enhance the stability of the nation's financial markets." *In re Tribune Co. Fraudulent Conveyance Litig.*, 499 B.R. 310, 317 (S.D.N.Y. 2013).  Section 546(e) was not intended to immunize any and all transactions associated with or related to a securities contract. *See Mervyn's LLC v. Lubert-Adler Group IV, LLC (In re Mervyn's Holdings, LLC)*, 426 B.R. 488, 500 (Bankr. D. Del. 2010) (Gross, J.) (notwithstanding the interdependence or relatedness of a series of contested transactions, court held that "as a general rule, section 546(e) does not apply to 'collapsed' transactions").  "The object that Congress sought to accomplish by enacting § 546(e) was to protect the operation of the security industry's clearance and settlement system." *See, e.g.*, *Buckley v. Goldman, Sachs & Co.*, No. 02-cv-11497-RGS, 2005 WL 1206865, at *7 (D. Mass. May 20, 2005).  In fact, "Congress has repeatedly indicated that it did not enact section 546(e) to protect market stability to the exclusion of all other policies." *In re Tribune Co. Fraudulent Conveyance Litig.*, 499 B.R. at 318.

in connection with a financing transaction memorialized in the Credit Agreement—not the Merger Agreement.  Therefore, the transfer of liens granted by the TCEH Debtors to the First Lien Collateral Agent (for the benefit of the Secured Parties) pursuant to section 2 of the Security Agreement is sufficiently removed from any securities contract and distinguishable from the transfers at issue in *Duke Energy* and *Lehman Brothers*.  *See EPLG I, LLC v. Citibank, N.A. (In re Qimonda Richmond, LLC)*, 467 B.R. 318, 322-323 (Bankr. D. Del. 2012) (Walrath, J.) (holding that the debtor's payments to Citibank to collateralize Citibank's exposure under a letter of credit were independent from any securities transaction, even though the letter of credit was used to retire certain bonds).  And the transfer of funds from the TCEH Debtors to Merger Sub does not qualify for protection under the section 546(e) safe harbor because neither party qualifies as a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency under section 546(e).

77.      Tellingly, the Security Agreement, which is the operative document granting the First Lien Collateral Agent liens on the TCEH Debtors' assets, does not reference the merger at all.  This is explained by the nature of the agreement itself.  The Security Agreement is a bilateral agreement between the lenders, and the borrower and guarantors that provides the lenders with the necessary protections to ensure repayment of the financing provided under the Credit Agreement.  The transfers contemplated by the Security Agreement are distinct from the transactions contemplated under the Merger Agreement.  Thus, unlike the protected transfers in *Lehman Brothers*, the transfer of liens to the First Lien Collateral Agent here does not constitute a "transfer . . . in connection with a securities contract."

78.      The Merger Agreement also supports a determination that the merger transaction was not consummated in connection with the TCEH Debtors' financing transaction.  None of the TCEH Debtors was a signatory to the Merger Agreement or a participant in the negotiation of the

39

terms.  Rather, the Merger Agreement was signed by TXU Corp., Texas Energy Future Holdings

Limited Partnership, and Texas Energy Future Merger Sub Corp, and the financing was arranged

by Texas Energy Future Holdings Limited Partnership, the non-debtor parent of EFH Corp. *See*

Merger Agreement, §6.15 ("Parent shall use its reasonable best efforts to take, or cause to be

taken, all actions to do, or cause to be done, all things necessary, proper or advisable to arrange

the Debt Financing….; Parent shall keep the Company [EFH Corp.] informed on a reasonably

current basis of the status of its efforts to arrange the Debt Financing").

79.     The TCEH Committee submits, following careful investigation, that the financing

transactions, while essential for funding, were nonetheless distinct and separate from the Merger

Agreement.  Whether the financing documentation should be treated as tied to the Merger

Agreement is a pivotal issue that requires a comprehensive review of the totality of the

circumstances surrounding the 2007 LBO.  Without doubt, the financing was an important

component of a series of transactions that enabled the 2007 LBO to be consummated.  The

financing may have facilitated the safe harbored Merger Agreement, but it was not connected to

the merger in the manner contemplated by section 546(e).  The phrase "in connection with" can

become a slippery slope, and when read too liberally, may yield profoundly unfair outcomes that

are detrimental to creditor recoveries.  If viewed expansively, the phrase may indiscriminately

sweep together contemporaneous transactions that are not truly connected with a securities

contract.  The assessment requires a careful analysis of the language and purpose of the statute

and an application of that language to agreements that may or may not be connected to one

another.  The Court should not apply an overly expansive reading of section 546(e) that would

preemptively deny standing to pursue these valuable Claims arising out of the 2007 LBO,

especially without consideration of all the evidence as the First Lien AHG proposes.  Any

determination regarding the applicability of section 546(e) should only be made **after** granting standing to the TCEH Committee, not before.

### b.      Counts II and III

80.      The First Lien AHG also raises a section 546(e) defense to Counts II and III, which includes Claims relating to the Prepayment Benefit and the grant of liens and security interests associated with the issuance of the First Lien Notes.  (*See* First Lien AHG Obj. ¶¶ 95-96.)  However, the First Lien AHG's position hinges on an unsupported assertion concerning the existence of a securities contract.  The First Lien AHG fails to establish this element of the defense.

81.      The First Lien AHG states that "[u]pon information and belief, certain financial institutions served as underwriters for the private offering of the First Lien Notes pursuant to a note purchase agreement…"  (*See* First Lien AHG Obj. ¶ 96.)  The First Lien AHG then argues that this alleged note purchase agreement is a contract for the purchase of a security.  *Id*. Notably absent from the Objection is any mention of the date, title, parties to the purported note purchase agreement, or even a description of the material terms of the agreement that demonstrate the existence of any such agreement and how such agreement comports with the relevant statutory definitions within the Bankruptcy Code.  There is also no mention of any note purchase agreement in the Proposed Complaint.

82.      The missing agreement is a critical defect in the alleged section 546(e) defense. The notes themselves and the Indenture are not considered "securities contracts" as defined in the Bankruptcy Code, and the existence of such a note purchase agreement would be a necessary prerequisite to the assertion of any section 546(e) defense.  *See EPLG I, LLC v. Citibank, N.A. and U.S. Bank, N.A.*, 467 B.R. at 322-23.  In *Qimonda*, at issue was whether a deposit and debit from the debtor's account, where the funds were subsequently remitted to an indenture trustee to

retire bonds pursuant to an earlier redemption notice from the debtor, were transfers made "in connection with" a securities contract.  The bankruptcy court held that it was "not persuaded that the bonds and indenture were properly considered securities contracts within the definitions of the Bankruptcy Code", and therefore, the court could not conclude that the deposit and debit of funds from the debtor's account were transfers made "'in connection with a securities contract' and protected by section 546(e)."  *Id.*

83.     The First Lien AHG's Objection suffers from the same infirmity.  There is nothing in the record to establish the existence of a securities contract.  *See In re Polichuk*, 506 B.R. 405, 426 n.15 (Bankr. E.D. Pa. 2014) (citing *Moreland v. United States*, No. 3:11-cv-358-L, 2013 WL 3283700, at *2 (N.D. Tex. June 28, 2013)) ("if the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor.") (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir.1986)); *Autobacs Strauss, Inc. v. Autobacs Seven Co. (In re Autobacs Strauss, Inc.)*, 473 B.R. 525, 570-71 (Bankr. D. Del. 2012) (Sontchi, J.) (holding that where an affirmative defense goes to the merits of the complaint, not the sufficiency of the complaint, a motion to dismiss was not the appropriate forum to argue the issue).

84.     For these reasons, the First Lien AHG has failed to demonstrate that the affirmative defense provided by section 546(e) is a bar to the Proposed Complaint or that the Claims asserted therein are not colorable.

## III.   ALL CLAIMS ARE PROPERLY PLED

85.     The TCEH Committee submits that the Proposed Complaint provides sufficient facts that, accepted as true, state plausible claims for relief, as required by *Iqbal*, 556 U.S. 662 and *Twombly*, 550 U.S. 544.  Rule 8 of the Federal Rules of Civil Procedure requires that the

plaintiff submit "a short and plain statement of the claim showing that the pleader is entitled to relief" and "a demand for the relief sought, which may include relief in the alternative or different types of relief." F.R.C.P. Rule 8(a)(2)-(3). On a standing motion, where the standard is akin to that applicable on a Rule 12(b)(6) motion, Delaware courts have eschewed line-by-line or claim-by-claim analysis in favor of a more general analysis of the litigation as a whole. *See In re Adelphia Commc'ns Corp.*, 330 B.R. at 376.

86.     Here, the TCEH Committee filed the Standing Motion and Proposed Complaint setting forth over 70 pages of detailed allegations in support of the Claims against the First Lien Transferees. This is not a case where a plaintiff files a bare-bones complaint and crosses its fingers hoping to survive a motion to dismiss. Rather, the TCEH Committee conducted an investigation and specifically alleged in great detail facts supporting each cause of action, including, among others, the circumstances surrounding the 2007 LBO, the 2011 Transactions, and the 2013 Amendment, the preferential transfers leading up to the Debtors' inevitable bankruptcy filing, and the First Lien Transferees' behavior resulting in the inequitable extraction of liens, security interests, obligations, fees, payments and favorable treatment in bankruptcy from the TCEH Debtors, injury to creditors, and an unfair advantage for the First Lien Transferees. The TCEH Committee further asserts that these Claims, if successful, would result in the avoidance of liens and security interests securing over $24 billion in obligations granted to the First Lien Transferees, as well as avoidance and recovery of over $2.4 billion in fees and interest.

87.     Once standing is granted, a final resolution of these Claims would require significant factual analysis, additional discovery, and the presentation of evidence before this Court, including, in some instances, expert witnesses. Thus, a final determination on the Claims is not appropriate at this juncture. *See Sikirica v. US Foods, Inc. (In re Damon's Int'l, Inc.)*, 500

B.R. 729, 738 (Bankr. W.D. Pa. 2013) (holding that the "factual basis for the allegations can be developed during discovery and if necessary presented at trial.") (citations omitted); *Zazzali v. Mott (In re DBSI, Inc.)*, 445 B.R. 344, 349 (Bankr. D. Del. 2011) (Walsh, J.) (holding that factual determinations are "not appropriate for resolution in a motion to dismiss."); *Adelphia Commc'ns Corp. v. Bank of Am. (In re Adelphia Commc'ns Corp.)*, 330 B.R. at 381 (holding that the committee has satisfactorily pled "an issue of fact, plainly inappropriate for determination under Rule 12(b)(6).").

88.     Accordingly, for the reasons set forth herein, the TCEH Committee has investigated and asserted well-pled facts and colorable Claims, and the TCEH Committee should be granted standing to pursue the Claims.  The allegations supporting the Claims, which are not ripe at this stage for adjudication on the merits, are set forth below.

## A.     Constructive Fraudulent Conveyance Claims

89.     Constructive fraudulent transfer claims require the trustee to show that: (i) the debtor received less than reasonably equivalent value for the transfer; and (ii) the debtor either (a) was insolvent on the date of the transfer or became insolvent as a result of the transfer; or (b) was engaged in, or about to engage in, a business transaction for which any property remaining with the debtor was an unreasonably small capital; or (c) intended to incur or believed it would incur debts beyond its ability to pay when those debts matured.  *See e.g.*, 11 U.S.C. §§ 548(a)(1)(B)(i)-(ii) (2014); DEL. CODE ANN. TIT. 6, §§ 1304, 1305, and 1307.

90.     The Objectors argue, without a full factual record, that the Court should not grant standing on certain of the Claims because (i) at least with respect to 2007, the TCEH Debtors were solvent,[19] and (ii) the TCEH Debtors received reasonably equivalent value in exchange for

---

[19] The Objectors do not appear to dispute that the TCEH Debtors were insolvent at the time of the 2011 Transactions and the 2013 Amendment.

(a) the incurrence of obligations in excess of $24 billion secured by liens and security interests in connection with the Credit Agreement, (b) the transfer of over $2 billion in fees and costs associated with the 2011 Transactions, and (c) the transfer of approximately $370 million in the form of a Fee Note and interest associated with the 2013 Amendment.  The TCEH Committee has alleged just the opposite, but in any event, these determinations cannot be reached without a full evidentiary record.

91.    <u>First</u>, the Proposed Complaint adequately alleges that the 2007 LBO rendered each of the TCEH Debtors insolvent at the time of and immediately following the LBO, both on a balance sheet basis and with regard to their remaining unreasonably small assets.  (*See* Proposed Complaint ¶¶ 34-47.)  The Objectors argue that the 2007 LBO did not render the TCEH Debtors insolvent, identifying various data points not in evidence, including natural gas prices in 2008, the Debtors' hedging activity, the Debtors' weighted average cost of capital (WACC) as it was reflected in various third party reports, historical trading prices of the Debtors' debt securities, and details relating to the global financial crisis in 2008.

92.    As noted in the Debtors' Objection, and as reinforced by the Objectors' submission of these facts, determining whether the LBO rendered the TCEH Debtors insolvent will be "highly fact-intensive" and "will likely require significant discovery and will be hotly contested."  (*See* Debtors' Obj. ¶¶ 14-15.)  These issues of fact are plainly inappropriate for determination under the colorability standard or Rule 12(b)(6).  *See FTI Consulting, Inc. v. Sweeney (In re Centaur, LLC)*, 2013 Bankr. LEXIS 3404, at *12 ("whether the company was insolvent at the time of the transfers at issue 'is generally a factual determination not appropriate for resolution in a motion to dismiss.'") (quoting *Zazzali v. Mott (In re DBSI, Inc.)*, 445 B.R. at 349); *Tronox Inc. v. Anadarko Petrol. Corp. (In re Tronox Inc.)*, 450 B.R. 432, 439 (Bankr. S.D.N.Y. 2011) ("The real dispute is the factual question whether Tronox was insolvent or

undercapitalized following the IPO.  Since the insolvency of Tronox is a hotly contested factual question, it follows that this branch of the motion to dismiss must be denied."); *Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.)*, 365 B.R. 24, 37 (Bankr. S.D.N.Y. 2007) ("the Court does not believe that the insolvency issue can be considered under the present 12(b)(6) motions, for several reasons"); *Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs., Ltd.)*, 337 B.R. 791, 808 (Bankr. S.D.N.Y. 2005) ("Solvency or insolvency is ordinarily a question of fact"); *Riederer v. Kutak Rock, LLP (In re Brooke Corp.)*, Adv. No. 10-06246, 2011 Bankr. LEXIS 3854, at *13 (Bankr. D. Kan. Sept. 29, 2011) (declining to dismiss complaint because the trustee's insolvency calculations "raise only factual matters which cannot be the basis for a motion to dismiss.").

93.    Second, whether the TCEH Debtors received reasonably equivalent value in exchange for the transfers is a factually and legally complex question that cannot be resolved on a colorability or motion to dismiss standard.  (*See* Debtors' Obj. ¶¶ 17-18 (Claims relating to the 2011 Transactions and 2013 Amendment are "factually and legally complex" and present "a disputed mixed question of fact and law").  *See e.g.*, *Ritz Camera & Image, L.L.C. v. Canon U.S.A., Inc. (In re Ritz Camera & Image, L.L.C.)*, Adv. Proc. No. 12-50986 (KG), 2014 Bankr. LEXIS 454, at *12 (Bankr. D. Del. Feb. 4, 2014) (Gross, J.) (declining to dismiss constructive fraudulent conveyance claims on the basis that additional evidence was required to determine whether payments made under a settlement agreement reflect the reasonably equivalent value of a business relationship); *Sikirica v. US Foods, Inc. (In re Damon's Int'l, Inc.)*, 500 B.R. at 738 ("Whether the Debtor received reasonably equivalent value in exchange for the Transfers 'is an issue of fact to be determined under the circumstances of the transfers,' and the 'factual basis for the allegations can be developed during discovery and if necessary presented at trial.'") (citations omitted); *Official Comm. of Unsecured Creditors of Wash. Mut., Inc. v. Corcoran (In re Wash.*

46

*Mut., Inc.*), Adv. No. 10-53158 (MFW), 2013 Bankr. LEXIS 2885, at *18 (Bankr. D. Del. July

16, 2013) (Walrath, J.) ("Determining reasonably equivalent value is largely an issue of fact.");

*FTI Consulting, Inc. v. Sweeney (In re Centaur, LLC)*, 2013 Bankr. LEXIS 3404, at *11 ("[t]he

issue of 'reasonably equivalent value' requires a factual determination that cannot be made on a

motion to dismiss.") (quoting *EPLG I, LLC v. Citibank, N.A.*, 467 B.R. at 327); *Charys*

*Liquidating Trust v. McMahan Secs. Co. (In re Charys Holding Co.)*, 443 B.R. 628, 638 (Bankr.

D. Del. 2010) (Shannon, J.) ("reasonably equivalent value is a fact intensive determination that

typically requires testing through the discovery process.").

### 1.    2007 Solvency

94.    In addition to submitting a mountain of additional data and raising factual

disputes not properly before the Court or relevant to a colorability consideration, the Objectors

have cherry-picked facts to support the argument that the Debtors were solvent in 2007,

emphasizing certain market changes post-LBO that the TCEH Committee alleges were

foreseeable at the time of the October 2007 LBO and downplaying other facts relating to 2007

and 2008 identified by the TCEH Committee that reflect a much darker view of the Debtors'

financial condition than the Objectors would like to portray.  As discussed in more detail below,

the TCEH Committee alleges in the Proposed Complaint that the proliferation of shale gas (and

resulting sustained natural gas price decrease) was foreseeable at the time of the LBO.  Once the

risk associated with a sustained natural gas price decrease is taken into account, it becomes clear

that both on a balance sheet basis and with regard to their remaining unreasonably small assets,

the TCEH Debtors were insolvent at the time of and immediately following the LBO.

95.    In response, the First Lien AHG highlights the fact that the TCEH Debtors

accessed the capital markets and issued $6.75 billion of new unsecured notes to refinance the

unsecured bridge facility that was created in connection with the LBO, arguing that the debt

issuance and subsequent trading history provides a "powerful indicator" of the TCEH Debtors' solvency. (First Lien AHG Obj. ¶ 54.) However, there is no evidence that the financial markets appreciated how dependent the TCEH Debtors' financial results were to natural gas prices, and the level of risk taken by the Debtors and the first lien lenders in betting that natural gas prices would increase.

96.     Indeed, it is even unclear whether the Debtors, the First Lien Transferees, or Sponsors fully appreciated the TCEH Debtors' sensitivities to small changes in natural gas prices. The First Lien AHG admits that the 2007 LBO and the Sponsors' equity investments were "predicated, in part, on a belief that the price of natural gas would climb (or, at a minimum, not significantly decline) following the Closing Date." (First Lien AHG Obj. ¶ 5.) This belief was patently unreasonable. As described in the Proposed Complaint, the Debtors and Duff & Phelps ("D&P") failed to properly consider or ignored various known factors that reasonably could be expected to lower the future price of natural gas, including (i) the significant increasing levels of natural gas exploration and development pre-LBO, which would increase supply and put downward pressure on prices in the future term, and (ii) the substantial evidence beginning in early 2007 that the development of unconventional shale gas reserves could have a material impact on natural gas prices as the markets adjusted to increased supply. (*See* Proposed Complaint ¶¶ 40-41.)

97.     The impact of these forecasting failures is evident in the 2007 D&P reports. In 2007, D&P prepared "Sensitivity Case Projections", which sensitized, among other assumptions, a "$1.00 downward shift to the forward curve of natural gas prices." Even though the D&P sensitivity analysis reflected EBITDA declines of several hundred million dollars per year resulting from, among other things, this $1.00/mmbtu downward shift, sensitivities greater than $1.00/mmbtu (either increases or decreases in natural gas prices) were not considered over a long

48

time period, beyond the Debtors' ability to hedge. Thus, the LBO parties failed to account for the very realistic scenario in which natural gas prices decrease by more than $1.00/mmbtu. The TCEH Debtors' consideration of only a $1.00/mmbtu downward decline was inadequate to assess the potential impact of decreased natural gas prices on the proposed post-LBO capital structure.[20]

98.     The First Lien AHG further argues that neither the "global financial crisis" nor the "increased development and exploitation of hydraulic 'fracking'" could have been foreseen at the time of the 2007 LBO, and these unforeseen events "derailed the TCEH Debtors' financial outlook and ultimately rendered them insolvent." (First Lien AHG Obj. ¶ 12.)[21] These statements are simply wrong. Fracking was not an unknown phenomenon in October 2007. Indeed, as the TCEH Committee will show at trial, there was significant evidence available in the market prior to the LBO that shale gas could have a material impact on future natural gas prices. For example, as early as 2002, Mitchell Energy, a leader in fracking techniques at the time, was sold to Devon Energy for $3.2 billion, and Devon combined its expertise in horizontal drilling with Mitchell's fracking techniques to boost production. In 2006, oil and gas company Range Resources tripled its position in the Fort Worth Basin Barnett Shale and established a leading acreage position in the Appalachian Shale Basin consisting of 400,000+ acres. Between

---

[20] While the First Lien AHG argues that the Debtors' natural gas hedges limited their natural gas exposure for a six-year period following the LBO, the impact and sufficiency of the Debtors' hedging practices is a fact-intensive question that cannot be resolved at this juncture. *See In re Dewey & Leboeuf LLP*, 2012 Bankr. LEXIS 5536 (declining to dismiss claims involving disputed issues of fact and law.).

[21] Notwithstanding the First Lien AHG's argument that the court must focus on information available at the time of the transaction, the First Lien AHG muddies the record with data that was published after the 2007 LBO. *See e.g.*, First Lien AHG Obj. n. 13 (EIA, Annual Energy Outlook 2008, at 116 (2008); and EIA Supplemental Tables to the Annual Energy Outlook 2008, Table 104 Lower 48 Gas Production and Wellhead Prices by Supply Region, *available at*, http://www.eia.gov/oiaf/archive/aeo08/supplement/supref.html)) (published in June 2008) (last visited Mar. 31, 2015); n. 14 CPUC, 2008 Market Price Referent, *available at* http://www.cpuc.ca.gov/PUC/energy/Renewables/mpr) (issued on October 28, 2008 (last visited Mar. 31, 2015), includes assumptions from May 2008); n. 15 (Dynegy Inc., First Quarter 2008 Results, at 22, *available at* http://library.corporate-ir.net/library/14/147/147906/items/328577/CBBD9FB4-8296-4C12-9FEF-8BD386ACB311_Q108.pdf) (last visited Mar. 31, 2015) (published May 2008, reporting on first quarter 2008 results).

49

2004 and 2007, the number of gas wells drilled in Fayetteville, Arkansas jumped from 13 to

more than 600.  By early 2007, major players in the oil and gas industry placed meaningful bets

on shale gas and fracking technology.  *See e.g.*, Chesapeake Energy Corporation Closes

Acquisition of Appalachian Basin Natural Gas Producer Columbia Natural Resources, LLC,

PRNewswire-First Call, November 16, 2005; Range Resources, (2006 Annual Report at p. 6,

*available at*

http://www.sec.gov/Archives/edgar/data/315852/000095013407004234/d43924e10vk.htm.) (last

visited Mar. 31, 2015).[22]  Thus, despite evidence of the potential for shale gas proliferation in

early 2007, the Debtors' designed a post-LBO capital structure that was insufficient to withstand

the impact of the sustained natural gas price decline caused by the proliferation of shale gas.

99.    Similarly, the First Lien AHG's argument regarding the 2008 economic downturn

is a red herring.  While the 2008 economic recession likely impacted the Debtors' performance

in the short term, their post-LBO capital structure and increased sensitivity to natural gas price

reductions due to the huge debt burden placed on the company as part of the LBO was the

primary factor resulting in the insolvency of the TCEH Debtors.[23]  Regardless, at the time of the

LBO, the Debtors were aware of the potential for an economic downturn in 2008, as the D&P

2007 PPA acknowledged potential headwinds with respect to the broader economy in 2007,

---

[22] There are numerous other examples of the proliferation of shale gas prior to the closing of the LBO.  As the TCEH Committee will be able to demonstrate at trial, in 2007, Shell Exploration and Production, a division of Royal Dutch Shell, signed a 50/50 joint exploration agreement with Encana Oil & Gas relating to the emerging Haynesville Shale in Louisiana and Texas.  In 2007, total shale production equaled approximately 6% of all U.S. gas produced, and major shale gas transactions (i.e., sales and joint ventures) totaled $6.1 billion.

[23] The First Lien AHG also highlights the fairness opinion (the "Lazard Opinion") issued by Lazard Frères & Co. LLC ("Lazard"), the TCEH Committee's financial advisor.  The Lazard Opinion is irrelevant to this analysis for at least two reasons.  First, the Lazard Opinion was not prepared for the purpose of determining solvency—it was prepared to value the assets for the sellers in connection with negotiating the 2007 LBO.  Second, the Lazard Opinion was prepared using management's projections and expressly does not reflect Lazard's view as to the forecasts or assumptions.

including references to declining GDP forecasts, slowing consumer confidence, and expert predictions of further declines in the housing market.

100.    In addition, as alleged in the Proposed Complaint, it appears that D&P treated the risks associated with the TCEH Debtors' sensitivities to small natural gas price reductions in calculating the TCEH Group's weighted average cost of capital ("WACC") inconsistently between its 2007 and 2008 reports.  Specifically, beginning in 2008 and beyond, D&P utilized a 5% company-specific risk premium when determining the TCEH Group's WACC.  Notably, however, that 5% risk premium was not included in D&P's 2007 reports.[24]  If D&P had incorporated this same risk premium in the D&P 2007 Opinion and the D&P 2007 PPA consistent with all of its reports starting in December 2008, the resulting enterprise valuations would have showed that the TCEH Group had negative equity value and thus, was balance sheet insolvent at the time of the LBO.

101.    The TCEH Committee has not asked this Court to use hindsight in finding that the LBO rendered the TCEH Debtors insolvent.  Rather, the TCEH Committee has simply argued that the Debtors and their advisors failed to consider information that was publicly available at the time of the 2007 LBO, which, if considered, would have led the Debtors to conclude that the TCEH Group was insolvent on a balance sheet basis as of the date of the LBO and/or left with unreasonably small assets following the LBO.

102.    Accordingly, the TCEH Committee has raised colorable Claims relating to the LBO and, in support of those Claims, adequately alleged that the TCEH Debtors were insolvent, both on a balance sheet basis and with regard to their remaining unreasonably small assets, both at the time of and immediately following the LBO as a result thereof.

---

[24] The Committee is continuing to investigate other potential flaws in D&P's 2007 analysis.

## 2.    Reasonably Equivalent Value

103.    In analyzing whether a debtor received reasonably equivalent value, courts follow a two-step approach, first evaluating whether "based on the circumstances that existed at the time of the transfer [or obligation] it was 'legitimate and reasonable' to expect some value accruing to the debtor", and second, "if the court finds that the debtor received any value, the court must engage in a *fact-driven comparison* between such value and the transfer or obligation sought to be avoided to determine 'whether the debtor got roughly the value it gave.'" *Burtch v. Masiz (In re Vaso Active Pharms., Inc.)*, Adv. No. 11-52005 (CSS), 2012 Bankr. LEXIS 4741 (Bankr. D. Del. Oct. 9, 2012) (Sontchi, J.) (quotations omitted) (emphasis added); *Pension Transfer Corp. v. Beneficiaries under the Third Amendment to Fruehauf Trailer Corp. Retirement Plan No. 003 (In re Fruehauf Trailer Corp.)*, 444 F.3d 203, 212-13 (3d Cir. 2006) ("Fruehauf") ("If a court determines that the debtor gained at least some value as a result of the transfer, what follows is a comparison: whether the debtor got roughly the value it gave.") (Centerbridge Obj. ¶ 42; First Lien AHG Obj. ¶ 78; Wilmington Obj. ¶ 41.)

104.    While the Objectors cite to various cases in support of the argument that both direct and indirect benefits, including the creation of "breathing room," may be sources of value, (*see* Centerbridge Obj. ¶ 51, n. 33; First Lien AHG Obj. ¶¶ 78-79; Wilmington Obj. ¶¶ 42, 44), the Objectors fail to address the second part of the test—which involves a fact-driven comparison between such value and the value of the transfer sought to be avoided.  The Objectors thus conflate two distinct issues—whether the First Lien Transferees conferred value upon the TCEH Debtors, and whether such value was "reasonably equivalent" to the value of the transfers made by the TCEH Debtors.

105.    Here, the Proposed Complaint sufficiently alleges that the TCEH Debtors did not receive reasonably equivalent value in exchange for the liens, security interests, obligations, fees,

ny-1178665

and incremental interest that they transferred for the benefit of the First Lien Transferees because, among other things, the TCEH Debtors neither retained the proceeds of the loans under the Credit Agreement and the First Lien Notes, nor received the benefits of the illusory maturity date extensions.

### a.    2007 Fraudulent Conveyance Claims

106.    The First Lien AHG asserts, in support of the argument that the TCEH Debtors received reasonably equivalent value in exchange for the pledge of substantially all of their assets, that the TCEH Debtors received "dollar for dollar" reasonably equivalent value for the incurrence of obligations and transfer of liens because they "actually received the cash proceeds of the loans." (First Lien AHG Obj. ¶ 66.)  This analysis fails to address, however, the fact that the TCEH Debtors retained almost none of the loan proceeds because the loan proceeds were transferred immediately to Merger Sub's account for no consideration.  (Standing Mot. ¶¶ 4, 24; Proposed Complaint ¶ 115.)

107.    The law is clear that where, as here, a debtor does not retain loan proceeds, the debtor does not necessarily receive "dollar for dollar" reasonably equivalent value when it has pledged assets in support of the loan. "[B]ecause the fraudulent conveyance laws are intended to protect the debtor's creditors, a lender cannot hide behind the position, although sympathetic, that they have parted with reasonable value. The purpose of the laws is estate preservation; thus, the question whether the debtor received reasonable value must be determined from the standpoint of the creditors." *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 646 (3d Cir. 1991) (determining that the debtor did not receive any "direct" benefits from extending the guaranty and security interest collateralizing that guaranty because it did not receive the proceeds of the LBO acquisition loan); *Rosener v. Majestic Mgmt., Inc. (In re OODC, LLC)*, 321 B.R. 128, 140 (Bankr. D. Del. 2005) (Walrath, J.) (declining to dismiss constructive fraudulent

conveyance claim where movant alleged that the debtors failed to receive reasonably equivalent value for the purchase price paid in an LBO and the additional secured debt imposed on the debtors' assets); *Friedman v. Am. Capital, Ltd. (In re Barton-Cotton, Inc.)*, Adv. No. 11-00079, 2012 Bankr. LEXIS 3114, at *16 (Bankr. D. Md. July 9, 2012) (holding that a transfer of security interest was made without fair consideration where movant "alleged that Debtor was caused to grant a security interest in all of its assets in exchange for the money transferred to Debtor by Defendants, and a large part of that consideration was transferred back to Defendants or Sellers and did not remain with Debtor.").

108.    The First Lien AHG further argues that the TCEH Debtors received reasonably equivalent value because approximately $5 billion of the loan proceeds were used to repay antecedent TCEH debt and reduce contractual obligations.  (First Lien AHG Obj. ¶¶ 67-69.) However, the First Lien AHG ignores that these obligations belonged to TCEH alone.  The Proposed Complaint alleges that $4.43 billion was used to repay pre-existing long-term notes and short-term credit facilities for which only TCEH, and in some cases, TXU Electric Delivery Company (n/k/a Oncor Electric Delivery Company LLC), were borrowers.  (Proposed Complaint ¶ 115.)  No party has alleged that any of the Guarantors received a benefit from such repayment. Further, even assuming the $5 billion were treated as "value" given to the TCEH Debtors collectively, $5 billion is not "reasonably equivalent" to the security interests granted by the TCEH Debtors to secure the $20.478 billion borrowed under the Credit Agreement.

109.    "A reduction of an antecedent debt does not simply constitute reasonably equivalent value as a matter of law." *Mukamal v. Cosmos, Inc. (In re Palm Beach Fin. Partners, L.P.)*, Adv. No. 11-02970-BKC-PGH-A, 2013 Bankr. LEXIS 5664, at *53 (Bankr. S.D. Fla. July 30, 2013) (citation omitted) .  *See also Sikirica v. US Foods, Inc. (In re Damon's Int'l, Inc.)*, 500 B.R. at 738 (declining to dismiss constructive fraudulent conveyance claims where "the

54

Trustee's allegations also gave sufficient notice to the Defendant that the payments were alleged to be in satisfaction of antecedent debt but received less than reasonably equivalent value in exchange."); *Harrison v. N.J. Cmty. Bank (In re Jesup & Lamont, Inc.)*, 507 B.R. 452, 472-73 (Bankr. S.D.N.Y. 2014) (denying motion for summary judgment and holding that "[t]o the extent JLSC owed an antecedent debt . . ., there was some value to JLSC. Whether it constituted reasonably equivalent value cannot be determined on this record."); *Official Comm. of Unsecured Creditors of Heilig-Meyers Co. v. Wachovia Bank, N.A. (In re Heilig-Meyers Co.)*, 297 B.R. 46, 52 (Bankr. E.D. Va. 2003) ("The court does not accept defendants' broad assertion that reduction of antecedent debt is reasonably equivalent value as a matter of law. Rather, reasonably equivalent value is a case by case issue of fact that depends upon the circumstances of the transfer.").

110.    None of the factual disputes are ripe for adjudication on this Motion, and the TCEH Committee has raised colorable Claims that the TCEH Debtors did not receive reasonably equivalent value in exchange for the transfer of liens and security interests securing over \$24 billion in obligations in connection with the Credit Agreement.

### b.    2011 Fraudulent Conveyance Claims

111.    The Objectors raise several arguments as to why the TCEH Debtors received reasonably equivalent value in exchange for the substantial fees and interest paid in connection with the 2011 Transactions.  However, each of the Objectors' arguments simply raises more factual disputes, and in any event, are unavailing, as set forth below.

112.    <u>First</u>, the First Lien AHG argues that the TCEH Debtors "obtained critical breathing room" due to the amendment of the financial maintenance covenant and the maturity extensions.  (*See* First Lien AHG ¶ 79-80).  The First Lien AHG neither attempts to quantify the value of such "breathing room" nor points to any fact in the record indicating that the alleged

55

"breathing room" was reasonably equivalent to the over $2 billion paid by the TCEH Debtors.

"When considering a value dependent upon a contingent event, a court takes into consideration the likelihood of that event occurring. . . . However, if at the time of a transfer there is a chance that the transfer 'will generate a positive return,' value will be conferred. ***Further, if that value approximates the value of what the debtor transferred, there will be reasonably equivalent value***." *Harrison v. N.J. Cmty. Bank (In re Jesup & Lamont, Inc.)*, 507 B.R. at 472 (Bankr. S.D.N.Y. 2014) (citing *Mellon Bank, N.A. v. Official Comm. Of Unsecured Creditors (In re R.M.L., Inc.)*, 92 F.3d 139, 156 (3d Cir. 1996).

113.    Thus, while a Court may indisputably consider both direct and indirect benefits in evaluating whether a debtor received reasonably equivalent value, the quantification of indirect benefits requires a highly fact intensive determination that cannot be made under the colorability or motion to dismiss standard. *See Tourtellot v. Huntington Nat'l Bank (In re Renegade Holdings, Inc.)*, 457 B.R. 441, 448 (Bankr. M.D.N.C. 2011) ("Even if it could be concluded from the facts before the court that the Debtors received some value as a result of indirect benefits flowing from the transaction, those facts fall short of providing a basis for quantifying any such value and concluding as a matter of law that any such value was reasonably equivalent to the obligation incurred by the Debtors."). *See also In re Trades Publ'g Inc.*, Adv. Proc. No. 10-2531 (MBK), 2011 Bankr. LEXIS 4738, at *27-30 (Bankr. D.N.J. Oct. 11, 2011) (denying summary judgment "due to the existence of a genuine dispute of material fact concerning whether the [d]ebtor…received reasonably equivalent value [in the form of direct and indirect benefits] in exchange for the property transferred and obligations incurred.").

114.    Second, the First Lien AHG asserts that the 2011 Extension ensured the TCEH Debtors' continued access to nearly $4 billion in liquidity.  (*See* First Lien AHG Obj. ¶ 81.) However, the value of TCEH's continued access to capital, and a determination regarding

whether such value is "reasonably equivalent" to the over $2 billion paid by the TCEH Debtors

in connection with the 2011 Transactions, requires further factual analysis and cannot be

determined at this juncture.  *See MC Asset Recovery LLC v. Commerzbank AG (In re Mirant*

*Corp.)*, Adv. No. 05-04142, 2010 Bankr. LEXIS 6389, at *88 (Bankr. N.D. Tex. Apr. 22, 2010)

(finding that a debtor's guaranty has some value because it made a credit facility available to the

debtor's indirect subsidiary, but declining to dismiss fraudulent conveyance claim on the basis

that "the question of the value received by the debtor for the issuance of its guaranty is

'inherently fact-laden, turning, as it often does, on the case-specific circumstances surrounding

the debtor's decision to enter into the particular transaction'" (citation omitted)).

115.    Third, the First Lien AHG asserts that the 2011 Extension was akin to a

refinancing, which would have cost the TCEH Debtors significantly more in additional fees and

interest.  (*See* First Lien AHG Obj. ¶ 82.)  Putting aside that there is absolutely no evidence to

substantiate the First Lien AHG's assertion that fees for a refinancing would be greater, a

comparison of the fees associated with an actual transaction against fictional fees associated with

a hypothetical transaction is irrelevant for purposes of determining whether the actual transaction

conferred reasonably equivalent value on the TCEH Debtors.  Moreover, the First Lien AHG

ignores the fact that the TCEH Debtors were unable to simply consummate the 2011 Extension.

Rather, to garner the support of the first lien lenders for a maturity extension, the TCEH Debtors

needed to consummate a series of transactions, including, among others, the $1.6 billion debt

prepayment, the issuance of $1.75 billion in First Lien Notes, and the BLT Transaction, each of

which carried hefty fees resulting in a total cost to the TCEH Debtors in excess of $2 billion.

116.    Fourth, the First Lien AHG submits various data points in support of its argument

that a yield enhancement of 192 basis points is reasonable in light of comparable fees procured in

other amend and extend transactions.  (*See* First Lien AHG Obj. ¶ 83, n.60.)  The TCEH

Committee, however, has adequately alleged that the First Lien Transferees received unusually high fees in connection with the 2011 Transactions and did not provide the TCEH Debtors with reasonably equivalent value in exchange for such fees.  It is without question that whether a transaction fee is reasonable as compared to similar transaction fees obtained in the market by comparable companies during a similar time period is a fact intensive inquiry that cannot be resolved on a motion to dismiss.

117.    Fifth, the First Lien AHG contends that, as a result of the 2011 Transactions, the TCEH Debtors' unsecured creditors benefited by receiving approximately $1.4 billion in interest payments from April 2011 through the Petition Date.  (*See* First Lien AHG Obj. ¶ 84.)  Tellingly, the First Lien AHG does not cite to a single case in support of the argument that value *to the debtor* can be measured by value *paid by* that debtor *to certain creditors*.  While the law clearly requires that "*whether the debtor received reasonable value* must be determined from the standpoint of the creditors", the question of what certain creditors may have gained or lost through the transaction is irrelevant.  *In re R.M.L., Inc.,* 92 F.3d at 150 (citations omitted and emphasis added); *Wyle v. C.H. Rider & Family (In re United Energy Corp.)*, 944 F.2d 589, 597 (9th Cir. 1991) (holding that the reasonably equivalent value analysis is "directed at what the debtor surrendered and what the debtor received irrespective of what any third party may have gained or lost.") (internal quotations omitted).  Thus, the issue is not whether *certain creditors* received any benefit from the transaction—it is whether the debtor's estate generally received reasonably equivalent value.  *See* 11 U.S.C. § 548(a)(1)(B) ("The trustee may avoid any transfer . . . of an interest of the debtor in property . . . *if the debtor* . . . received less than a reasonably equivalent value in exchange for such transfer or obligation") (emphasis added).  Here, it is clear that the right to pay certain creditors $1.4 billion over a three year period does not constitute reasonably equivalent value to the TCEH Debtors.

118.    <u>Finally</u>, the First Lien AHG argues that the TCEH Debtors received reasonably equivalent value in connection with the issuance of First Lien Notes and the par prepayment because (i) the TCEH Debtors received the proceeds from the issuance of First Lien Notes, and (ii) the prepayment of antecedent debt constitutes "per se" reasonably equivalent value.  (*See* First Lien AHG Obj. ¶¶ 88-94.)  Based on the facts at issue here, the First Lien AHG is simply wrong.

119.    The Proposed Complaint alleges that "the lenders required the TCEH Note Issuers to use the net proceeds to prepay approximately $1.6 billion aggregate principal amount of the loans under the Credit Agreement at par" and further alleges that "the remaining proceeds were used to pay approximately $150 million in fees, expenses, and transaction costs associated with the 2011 Transactions."  (*See* Proposed Complaint ¶ 69.)  Thus, taking the facts set forth in the Proposed Complaint as true (as required), it appears that the TCEH Debtors did not, in fact, receive the proceeds from the issuance of the First Lien Notes and therefore, did not receive reasonably equivalent value for the transfer of liens as collateral for the First Lien Notes.  *See Metro Commc'ns*, 945 F.2d at 646 (determining that the debtor did not receive any direct benefits from extending the guaranty and security interest because it did not receive loan proceeds).

120.    Moreover, as discussed *supra*, "[a] reduction of an antecedent debt does not simply constitute reasonably equivalent value as a matter of law." *Mukamal v. Cosmos, Inc. (In re Palm Beach Fin. Partners, L.P.)*, 2013 Bankr. LEXIS 5664, at *53.  Particularly where, as here, (i) the TCEH Debtors could have repurchased the debt on the open market at a discount and there was no contractual requirement to prepay the debt at par at that time, and (ii) the majority of the TCEH Debtors were guarantors under the Credit Agreement and likely did not benefit on a "dollar for dollar" basis for the par prepayment of debt under the Credit Agreement, the First

59

Lien AHG cannot establish in a summary proceeding such as this that each of the TCEH Debtors received reasonably equivalent value for the par prepayment as a matter of law.[25]

121.    In sum, the TCEH Committee has adequately pled that the TCEH Debtors paid the First Lien Transferees over $2 billion in fees and interest associated with the 2011 Transactions, and while the 2011 Transactions extended the maturity dates on a *portion* of the first lien debt, the TCEH Debtors did not receive reasonably equivalent value because, at all times, the almost $4.5 billion in debt left to mature on its original terms vastly exceeded the TCEH Debtors' ability to pay, rendering the extensions illusory.  Thus, any determination regarding whether the direct and indirect benefits received by the TCEH Debtors constitutes "reasonably equivalent value" is a factual question that cannot be determined under the colorability standard or Rule 12(b)(6).  *See Official Comm. of Unsecured Creditors of Wash. Mut., Inc. v. Corcoran (In re Wash. Mut., Inc.)*, 2013 Bankr. LEXIS 2885.

### c.    2013 Fraudulent Conveyance Claims

122.    Notably, none of the Objectors disputes the TCEH Committee's assertion that the Fee Note constituted *a 57% fee* on the aggregate amount of the extended loans.  Rather, the Objectors raise various arguments as to why the TCEH Debtors received reasonably equivalent value in exchange for the $340 million Fee Note and $30 million in interest paid in connection with the 2013 Amendment.  (*See* Centerbridge Obj ¶¶ 42-52; Wilmington Obj. ¶¶ 38-47.) However, each of the Objectors' arguments, raising additional factual disputes, fails for the reasons set forth below.

---

[25] In further support of its argument, the First Lien AHG refers to the market's reaction to the 2011 Transactions, asserting that the TCEH Debtors received "substantial benefits" from the 2011 Transactions because the market believed it did.  (*See* First Lien AHG Obj. ¶ 85-86.)  The First Lien AHG's submission of facts not in evidence only further supports the TCEH Committee's assertion that reasonably equivalent value requires a factual determination that cannot be made on a motion to dismiss.

123.     Certain Objectors argue that the 2013 Amendment benefitted the TCEH Debtors because it gave them the ability to wait one year for a rebound in the energy markets, including a potential increase in the price of natural gas.  (*See* Centerbridge Obj. ¶ 48; Wilmington Obj. ¶ 47.)  In support of this argument, Centerbridge offers various calculations regarding potential increases in natural gas prices and associated fluctuations in the company's EBITDA.  (*Id.*)  As noted above, while indirect benefits may constitute value, this type of indirect benefit is difficult to quantify without the aid of expert witnesses, and therefore cannot be resolved at this juncture. *See Tourtellot v. Huntington Nat'l Bank (In re Renegade Holdings, Inc.)*, 457 B.R. at 446 (even if indirect benefits are shown, the facts "fall short of providing a basis for quantifying any such value and concluding as a matter of law that any such value was reasonably equivalent to the obligation incurred by the Debtors.").

124.     Centerbridge further argues that the 2013 Amendment (i) allowed the TCEH Debtors to avoid a going concern audit qualification, which would have constituted an event of default under the Credit Agreement resulting in a 2013 bankruptcy filing, and (ii) gave the TCEH Debtors "runway" to successfully negotiate the RSA, which allegedly has been a "catalyst" in moving the Debtors towards a confirmable plan, notwithstanding its termination and the millions of dollars spent litigating the abandoned transactions thereunder.  (*See* Centerbridge Obj. ¶¶ 45, 50.)  However, any such benefits have not been quantified, and as a result, the Court cannot and should not determine that they constitute reasonably equivalent value as a matter of law.  "The opportunity to avoid a default or bankruptcy may not necessarily constitute 'reasonably equivalent value.'"  *Harrison v. N.J. Cmty. Bank (In re Jesup & Lamont, Inc.)*, 507 B.R. at 472 (citation omitted).  *See also Senior Transeastern Lenders v. Official Comm. of Unsecured Creditors (In re TOUSA, Inc.)*, 680 F.3d 1298 (11th Cir. 2012) (affirming the bankruptcy court's

61

determination that, even if the avoidance of default and bankruptcy constitute "value", they did not confer reasonably equivalent value).[26]

125.    Finally, Centerbridge argues that there was no lien transferred in connection with the 2013 Amendment to be avoided, and therefore "[t]he estates and their unsecured creditors were not harmed at all."  (*See* Centerbridge Obj. ¶¶ 53-57.)  However, this argument is neither factually nor legally correct.  To the extent the First Lien Transferees are oversecured, the First Lien Transferees will recover in full the amounts previously loaned to TCEH, as well as the additional $340 million loaned in the form of the Fee Note (meaning, the First Lien Transferees will receive $340 million more than if the Fee Note is avoided).  However, even if the First Lien Transferees are undersecured, the First Lien Transferees will recover in full to the extent of their security interests and assert the remaining amounts as a deficiency claim—including the additional $340 million loaned in the form of the Fee Note—to be recovered *pro rata* with unsecured creditors.[27]  In each scenario, ***the recoveries for both secured and unsecured creditors change***, despite the fact that the TCEH Debtors did not grant new assets as collateral in connection with the amendment.  Even in a case of this magnitude, a $340 million claim, which otherwise would be entitled to share *pro rata* with unsecured creditors, is still a substantial claim.  Thus, regardless of whether the First Lien Debt is oversecured or undersecured, the First Lien

---

[26] In addition, some of the Objectors' arguments regarding the 2013 Amendment are similar to the arguments made relating to the 2011 Transactions.  For example, Wilmington and Centerbridge argue that the TCEH Debtors received certain benefits by entering into the 2013 Amendment, including (i) "breathing room" and continued access to capital (Wilmington Obj. ¶ 44-46; Centerbridge Obj. ¶ 45), (ii) satisfaction of antecedent debt (Centerbridge Obj. ¶ 45), and (iii) payments of $1.085 billion in interest to junior creditors during the extended maturity period (Centerbridge Obj. ¶ 50).  For the reasons described in paragraphs 112-121 *supra*, whether these benefits constitute reasonably equivalent value under section 548 of the Bankruptcy Code cannot be determined on a motion to dismiss.  Centerbridge also argues, similar to the arguments made relating to the 2011 Transactions, that the capital markets endorsed the 2013 Amendment because the trading prices of TCEH debt increased once the 2013 Amendment was announced.  For the reasons described in footnote 25 *supra*, this fact does not reflect that the TCEH Debtors received reasonably equivalent value for the 2013 Amendment.

[27] In this scenario, the 2013 Claim is akin to an objection to a $340 million unsecured claim.

Transferees who were party to the 2013 Amendment will benefit from the transaction to the detriment of unsecured creditors.

126.    Accordingly, for the reasons set forth herein, the TCEH Committee has raised colorable Claims that the TCEH Debtors did not receive reasonably equivalent value in exchange for the $340 million Fee Note and $30 million in incremental interest associated with the 2013 Amendment.  Any determination regarding whether the indirect benefits received by the TCEH Debtors constitutes "reasonably equivalent value" is a factual question that cannot be determined at this time.

## B.    Intentional Fraudulent Conveyance Claims

127.    Certain Objectors argue that the Proposed Complaint does not meet the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure ("Rule 9(b)") because the TCEH Committee must show actual intent on the part of the debtor and must state its claims with particularity.  (*See* Centerbridge ¶ 58-60; Wilmington Obj. ¶ 17-20.)[28]  Counts IV and VI, however, easily meet the Rule 9(b) requirements and state the allegations of intentional fraud with sufficient particularity.[29]  "Because actual fraud is rarely proven by direct evidence, as individuals are rarely willing to admit such an intent, courts may infer actual intent by examining

---

[28] Wilmington further argues that a "higher degree of particularity" should be applied because the TCEH Committee had access to discovery prior to filing the Proposed Complaint.  (Wilmington Obj. ¶ 21.)  This assertion, however, is unsupported by law.  Indeed, in the single case cited by Wilmington in support of this proposition, the Court is actually considering whether to apply the typical Rule 9(b) standard or a more relaxed standard that may be applied to claims brought by a trustee.  *See Devaney v. Chester*, 813 F.2d 566, 569 (2d Cir. 1987) ("Appellants argue that a more relaxed standard of pleading should apply to their fraud claims, citing several bankruptcy cases which have required less particularity in pleading when claims were asserted by a trustee. The rationale for relaxing the particularity requirement in such cases is that the trustee is a "third party, who is pleading fraud on secondhand information". However, even the so-called relaxed standard does not eliminate the particularity requirement, although we recognize that the degree of particularity required should be determined in light of such circumstances as whether the plaintiff has had an opportunity to take discovery of those who may possess knowledge of the pertinent facts." (internal quotations omitted)).

[29] The TCEH Committee respectfully requests that, to the extent this Court determines that any additional facts described herein must also be alleged in the Proposed Complaint to meet the Rule 9(b) requirements, the Court grant the TCEH Committee standing to bring the claim and permit the TCEH Committee to add such facts to the complaint prior to the Challenge Deadline.

63

the circumstances and considering whether various 'badges of fraud' are present." *Dobin v. Hill (In re Hill)*, 342 B.R. 183, 198 (Bankr. D.N.J. 2006) (citing *In re G-I Holdings, Inc.*, 313 B.R. at 640-41); *Zazzali v. Swenson (In re DBSI, Inc.)*, Adv. No. 10-54649 (PJW), 2011 Bankr. LEXIS 1677, 2011 WL 1810632, *2 (Bankr. D. Del. May 5, 2011) (Walsh, J.) (to adequately allege fraudulent intent in the absence of direct evidence, a plaintiff may plead circumstantial evidence, or badges of fraud, that permit the inference of fraudulent intent).

128.    Courts have held that "[t]he presence or absence of any single badge of fraud is not conclusive.  The proper inquiry is whether the badges of fraud are present, not whether some factors are absent. Although the presence of a single factor . . . may cast suspicion on the transferor's intent, the confluence of several in one transaction generally provides conclusive evidence of an actual intent to defraud.  Additionally, a court may consider other factors relevant to the transaction."  *Burtch v. Masiz (In re Vaso Active Pharms., Inc.)*, 2012 Bankr. LEXIS 4741, at *32 (citation omitted).  "If the 'natural consequence' of a debtor's actions is that its creditors were hindered, delayed or defrauded, a court is more likely to find that an intentional fraudulent transfer occurred." *In re Tribune Co.*, 464 B.R. 126, 162 (Bankr. D. Del. 2011) (Carey, J.) (citations omitted).

129.    Here, the TCEH Committee alleges, upon information and belief, that the TCEH Debtors, through the EFH Executive Committee, the TCEH Board of Directors, and the EFCH Board of Directors, entered into the 2013 Amendment and agreed to pay $340 million plus interest under the Fee Note at a time when each of the TCEH Debtors was indisputably insolvent (Proposed Complaint ¶ 145), knowing full well that the TCEH Debtors would "be unable to pay the outstanding debts as they became due" (*Id*. ¶ 145) and would "need to file for bankruptcy prior to the earliest extended maturity date under the Credit Agreement" (*Id*. ¶ 144).

130.    Upon information and belief, the TCEH Debtors did not enter into the 2013 Amendment because they were motivated by the desire to continue in business through the extended maturity.  In fact, it appears that the TCEH Debtors had all but resigned themselves to an inevitable bankruptcy filing at some point in the near future.  (*Id.*)  Indeed, the TCEH Debtors had acknowledged publicly in their 2010 Annual Report that they "may have difficulty successfully implementing any refinancing of our debt due to our financial position as reflected in our balance sheet and the valuation analyses . . ."  Surely, the TCEH Debtors did not believe that a refinancing of the remainder of their almost $4 billion in term loans (which remained in existence following the 2013 Amendment) would be any easier given the TCEH Debtors' further declining financial position.

131.    Instead, upon information and belief, the TCEH Debtors negotiated the terms of and entered into the 2013 Amendment with First Lien Transferees while contemporaneously negotiating the potential terms of the Debtors' RSA with the First Lien Transferees, which, if approved, would have released potential estate claims against the First Lien Transferees for no value, provided unsecured creditors of the TCEH Debtors with virtually no recoveries, and offered plan releases that would have left unsecured creditors with no meaningful mechanism to seek to increase their recoveries.  (*See* RSA, attached as Exh. D to First Day Decl.; Restructuring Term Sheet, Exh. A to RSA, at p. 2, 20-21.  *See also* Proposed Complaint ¶ 82 (alleging that in July 2012, the Debtors hired restructuring advisors, and in October 2012, the EFH Executive Committee, the TCEH Board, and the EFCH Board separately met to discuss restructuring alternatives, the timing of events and related contingencies, and a strategy for discussing such alternatives with certain TCEH creditors), ¶ 82 (the EFH Executive Committee discussed "the importance of moving quickly with a consensual approach" to restructuring, as well as "a plan of action to obtain the support of the first lien holders prior to a potential filing.").)

132.    The TCEH Committee has not yet had the opportunity to conduct depositions or request responses to interrogatories.  However, the TCEH Committee believes that this next step in its investigation could uncover additional evidence regarding the TCEH Debtors' effort to curry favor with the First Lien Transferees during the RSA negotiations, which culminated in an RSA that offered virtually nothing for TCEH unsecured creditors.   Certainly, the circumstances surrounding the 2013 Amendment as pled in the Complaint raise questions sufficient to demonstrate, on appropriate proof, that an intentional fraudulent conveyance occurred.  The TCEH Committee should be given the opportunity to conduct the necessary discovery to see if such claims are viable.[30]

133.    Accordingly, the TCEH Committee submits that the intentional fraudulent conveyance allegations are sufficient to meet the heightened pleading standard of Rule 9(b), particularly where, as here, the TCEH Committee has not yet had the opportunity to conduct depositions or request responses to interrogatories.  *See Brinkmeier v. BIC Corp.*, 733 F. Supp. 2d 552, 563 (D. Del. 2010) ("As stated by the Third Circuit, the court may apply a relaxed Rule 9(b) standard if essential information is in a defendant's 'knowledge or control'. . . .") (citing *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1418 (3d. Cir. 1997)).

C.    **Equitable Subordination Claims**

134.    Certain Objectors argue that the Proposed Complaint does not adequately allege egregious misconduct by the First Lien Transferees sufficient to state a claim for equitable

---

[30] Wilmington further asserts that the Proposed Complaint fails to (i) identify which of the TCEH Debtors made the fraudulent transfer, and (ii) allege that each transferor's state of mind was to act with intent to defraud its creditors. (Wilmington ¶¶ 29-30.)  The Proposed Complaint, however, specifically alleges that the EFH Executive Committee, the TCEH Board of Directors, and the EFCH Board of Directors discussed and approved the 2013 Amendment and entered into the aforementioned negotiations with the First Lien Transferees.  These allegations are sufficient to meet the heightened pleading standard of Rule 9(b).  *See e.g., Brinkmeier v. BIC Corp.*, 733 F. Supp. 2d at 559 ("Plaintiffs are not required to plead the 'date, place or time' of the fraud, if they have 'an alternative means of injecting precision and some measure of substantiation into their allegations of fraud.'") (quotations omitted); *Pardo v. Avanti Corporate Health Sys., Inc. (In re APF Co.)*, 274 B.R. 634, 638 (Bankr. D. Del. 2001) (Walsh, J.) (same).

subordination.  (*See* Centerbridge Obj. ¶¶ 48-49; First Lien AHG Obj. ¶¶ 97-100.)  The Objectors' assertions are unavailing for the reasons described herein.

135.    The TCEH Committee submitted over 70 pages of detailed allegations in support of the Claims against the First Lien Transferees, detailing, among other things, the activities undertaken by the First Lien Transferees that resulted in injury and harm to unsecured creditors and conferred an unfair advantage on the First Lien Transferees, including, for example, the extraction of (i) unusually high fees and interest in support of illusory maturity extensions (Proposed Complaint ¶¶ 23-98), (ii) certain additional benefits relating to the 2011 Transactions, such as the par prepayment of loans when not contractually required, and the repositioning of debt in the Debtors' subsequent bankruptcy by demanding the exchange of unsecured EFH debt for secured EFIH debt (a structurally senior entity, which is the beneficiary of equity and cash flows from non-debtor Oncor Electric Delivery Holding Company LLC) at a substantially higher interest rate, which also had the effect of reducing the lenders' exposure to any existing or potential tax claims at the tax-paying entity, EFH (Proposed Complaint ¶¶ 43-79), (iii) an exorbitant 57% fee in connection with the 2013 Amendment, plus additional interest payments that may constitute preferential transfers, ***contemporaneous with*** the parties' negotiations regarding the terms of the RSA for the Debtors' inevitable bankruptcy filing (Proposed Complaint ¶¶ 89-98), and (iv) illusory maturity extensions to carry the First Lien Transferees beyond the four and six year look back periods for fraudulent conveyances under Delaware, Texas, and New York state law.  (Proposed Complaint ¶ 176.)  Collectively, these activities resulted in the First Lien Transferees receiving substantial sums of cash prepetition, as well as significantly larger claims in the bankruptcy cases, both of which will result in a lower distribution to unsecured creditors at the end of these cases.

136.    Even the Debtors have acknowledged that "[e]quitable subordination is a fact-intensive determination…." (*See* Debtors' Obj. ¶ 21.) Thus, the TCEH Committee submits that, at this juncture, it has properly pled colorable Claims relating to equitable subordination.[31]

### D.    Disallowance of Claims Under Section 502(d) Is Appropriate

137.    Pursuant to section 502(d) of the Bankruptcy Code, the TCEH Committee seeks to disallow the First Lien Transferees' claims "until such time as the TCEH Committee's claims [] have been finally resolved" (the "502(d) Claim"). (Proposed Complaint ¶ 216.) Wilmington contends that the First Lien Transferees' claims cannot be disallowed under section 502(d) because the TCEH Committee has not yet obtained a judgment. (*See* Wilmington Obj. ¶¶ 54-58.) For the reasons set forth herein, Wilmington's argument should be rejected.

138.    Under the Cash Collateral Order, the First Lien Transferees are granted claims against the Debtors relating to the First Lien Debt (without defense, counterclaim, or offset of any kind) and are excused from filing proofs of claim because the Debtors' Stipulations are deemed to constitute a properly filed proof of claim. (Cash Collateral Order ¶¶ F(i), 23.) The Stipulations became binding on the TCEH Debtors upon entry of the Cash Collateral Order. (*Id.* ¶ 15.) Further, the Stipulations become binding on all other parties unless a party in interest (including the TCEH Committee) objects to the Stipulations on or before the Challenge Deadline. (*Id.* ¶ F(ii)(c).) Thus, the TCEH Committee filed the Standing Motion for authority to commence the adversary proceeding and object to the First Lien Transferees' claims in a timely manner pursuant to the Cash Collateral Order.

---

[31] The TCEH Committee further submits that, in light of the inequitable conduct described in the Proposed Complaint, it would be unfair to allow the First Lien Transferees to share *pro rata* in the recoveries obtained from the First Lien Transferees on account of the Claims through their deficiency claims. Accordingly, the TCEH Committee requests that, at a minimum, the Court grant standing to the TCEH Committee to allow it to seek to equitably subordinate the deficiency claims of the First Lien Transferees with respect to any recoveries on the Claims.

139.    Wilmington's case law regarding dismissal of the 502(d) Claim prior to judgment (Wilmington Obj. ¶¶ 55, 57) is distinguishable because in this case, the TCEH Committee is constrained by the Stipulations in the Cash Collateral Order, which bar the TCEH Committee from challenging the First Lien Transferees' claim after the Challenge Deadline.   Understanding that the TCEH Committee's Claims have not yet been finally resolved, the TCEH Committee nonetheless contends that it should be granted standing to pursue its 502(d) Claim in light of the Stipulations in the Cash Collateral Order, which necessitate that the TCEH Committee either assert the 502(d) Claim at this time or be forever barred from asserting such Claim.

140.    The TCEH Committee has asserted colorable Claims against the First Lien Transferees under sections 105, 502, 506, 544, 547, and 551 of the Bankruptcy Code.   Other courts, in an effort to ensure the effectuation of the purpose of section 502(d), have allowed a plaintiff to maintain a 502(d) claim in advance of a final determine on its claims.   *See Thaler v. Korn*, Case No. 13-CV-3768 (SJF), 2014 U.S. Dist. LEXIS 37152, at *22 (E.D.N.Y. Mar. 19, 2014) (declining to dismiss plaintiff's 502(d) claim and finding that such claim "is neither moot nor premature"); *In re S. Air Transp., Inc.*, 294 B.R. 293, 296-97 (Bankr. S.D. Ohio 2003) ("[T]he Court concludes that the preference matter must be adjudicated prior to the Court determining if the claim can be allowed or disallowed. For purposes of judicial economy, the Court further concludes that it shall hold its determination on the Objection in abeyance until the 11 U.S.C. § 547(b) claims pending in Adversary Proceeding No. 00-2301 are finally adjudicated."); *see also* 4-502 Collier on Bankruptcy P 502.05[2][a] (16th ed. 2015) ("To assure the effectuation of the purpose of this section, a claim may be disallowed at least temporarily and for certain purposes, subject to reconsideration, simply upon the allegation of an avoidable transfer. But to prevent abuse of this section this initial disallowance should be made by judicial

determination, whether it be obtained in a claim objection or by some form of a declaratory judgment action.").

141.    Mindful of the case law in this jurisdiction, the TCEH Committee is not asking the Court to rule on the 502(d) Claim in advance of the other Claims in the adversary proceeding. Rather, in asserting the 502(d) Claim, the TCEH Committee merely contends that, if it prevails on any of the other Claims in the adversary proceeding and otherwise satisfies the requirements of section 502(d), then the Court may apply those judgments to disallow the First Lien Transferees' claims.[32]  To dismiss the 502(d) Claim at this juncture would be to deny the TCEH Committee the benefits and relief afforded under section 502(d) of the Bankruptcy Code.  Such a result would be inequitable.

142.    Accordingly, the TCEH Committee respectfully requests that it be granted standing to pursue its 502(d) Claim.

### E.    Unperfected Interests

143.    Wilmington argues that the TCEH Committee's claim for avoidance of unperfected liens and security interests is not colorable because it fails to put the First Lien Collateral Agent on notice of the liens and security interests that were not perfected.  (*See* Wilmington Obj. ¶¶ 59-63.)  However, Wilmington ignores the fact that information regarding the TCEH Debtors' assets are squarely within the control of the Debtors and the First Lien Collateral Agent—not the TCEH Committee.

144.    Upon information and belief, the First Lien Collateral Agent is aware of the identity of the assets on which it holds liens and security interests for the benefit of the Secured Parties.  Indeed, to perfect a security interest in real property, the First Lien Collateral Agent

---

[32] To the extent necessary, the TCEH Committee reserves all rights to request that the Claim for disallowance be heard at an earlier time.

should have recorded a collateral filing in the appropriate local recordation offices, and similarly, to perfect a security interest in As-Extracted Collateral, the First Lien Collateral Agent should have recorded a collateral filing in the appropriate local recordation offices in the jurisdictions in which such assets are held.  Thus, upon information and belief, the First Lien Collateral Agent can simply compare Schedules 2 and 3 to its records to determine which liens are being challenged.

145.    Moreover, Schedules 2 and 3 to the Proposed Complaint reflect that the TCEH Committee identified for each asset (i) the relevant Debtor, and (ii) the locations of real property and As-Extracted Collateral, as reflected in "the Debtors' Schedule of Assets and Liabilities." Thus, to the extent the First Lien Collateral Agent did not maintain its own record of the security interests, it could compare Schedules 2 and 3 to the complete list of real property and As-Extracted Collateral reflected in the Debtors' schedules to identify those that the TCEH Committee asserts are unperfected.[33]

146.    The TCEH Committee chose to identify the real property and As-Extracted Collateral that *is* perfected in the Proposed Complaint to ensure that each asset is carefully considered, particularly in light of the Challenge Deadline.  If the Proposed Complaint had been drafted as Wilmington suggests, then to the extent the TCEH Debtors were to amend their Schedules of Assets and Liabilities after the Challenge Deadline to identify new real property and As-Extracted Collateral that is allegedly subject to the First Lien Transferees' liens, the TCEH Committee would no longer have the right to dispute the perfection of any such liens.

---

[33] For informational purposes only, the TCEH Committee has attached as <u>Exhibit 3</u> to this Reply a complete schedule of real property and As-Extracted Collateral that the TCEH Committee believes is unperfected based on the information currently available to the TCEH Committee.  This list should not be deemed to limit the real property and As-Extracted Collateral that may be subject to avoidance, and the TCEH Committee reserves all rights to amend this list.  This list previously has been provided to counsel for the former First Lien Collateral Agent.

Thus, out of an abundance of caution, the TCEH Committee drafted the counts in such a way as to protect the interests of the unsecured creditors.

147.     Accordingly, the TCEH Committee submits that Count XVIII is colorable and the First Lien Transferees have received adequate notice of the liens and security interest that are not properly perfected.

### F.     Bank Accounts

148.     The First Lien AHG asserts that the First Lien Transferees have a properly perfected security interest in cash, wherever it resides (whether in a deposit account or otherwise) because all cash generated by the TCEH Debtors constitutes identifiable proceeds of the First Lien Transferees' other collateral.  (*See* First Lien AHG Obj. ¶¶ 105-107.)[34]

149.     The Proposed Complaint, however, alleges that the First Lien Transferees do not have a lien on the Deposit Accounts because (i) the definition of "Collateral" under section 2 of the Security Agreement expressly excludes "assets specifically requiring perfection through control agreements (other than the Deposit L/C Loan Collateral Account)", and (ii) the deposit accounts identified on Schedule 1 to the Proposed Complaint are not in the possession of the First Lien Collateral Agent, and thus are excluded from the First Lien Transferees' collateral because perfection would require a control agreement in the First Lien Collateral Agent's favor pursuant to UCC Article 9.  The Proposed Complaint further alleges that, to the extent the First Lien Transferees have a validly existing lien on the deposit accounts identified on Schedule 1, such lien is unperfected and avoidable because the deposit accounts are neither in the possession of the First Lien Collateral Agent, nor in a deposit account subject to the requisite control agreement.

---

[34] The First Lien AHG acknowledged that there is a "possible exception" for Segregated Cash (First Lien AHG Obj. at n. 72.)

150.    At issue is whether cash in the deposit accounts constitutes "identifiable proceeds" of the First Lien Transferees' other collateral.  There are currently no facts in the record on this point.  Indeed, the TCEH Committee has raised Claims regarding the validity of the First Lien Transferees' liens and security interests on all collateral by the constructive fraudulent conveyance claim relating to the 2007 LBO.  In addition, the TCEH Committee has alleged Claims regarding the scope of the First Lien Transferees' liens and security interests on various categories of collateral, including, among other things, real property, As-Extracted Collateral, and vehicles, calling into question the First Lien Transferees' collateral pool and the proceeds thereof.   Thus, this factual issue is not ripe for determination on a motion to dismiss standard.  *See United States v. Dupree*, 919 F. Supp. 2d 254, 281-82 (E.D.N.Y. 2013) (holding that "Amalgamated's ability to trace the proceeds of its collateral . . . to specific and identifiable funds in the Chase Bank accounts is a question of fact that is not subject to the instant motion to dismiss. Rather, at this juncture, . . . Amalgamated need only plead enough facts to make a plausible claim to the relief sought . . . .").

151.    Accordingly, the TCEH Committee has asserted a colorable claim that the cash in the deposit account is not subject to the First Lien Transferees' liens.

### G.    Tax Attributes

152.    The First Lien AHG argues that the Tax Attributes, including any increase in the tax basis of the TCEH Debtors' assets that arises postpetition, are subject to the First Lien Transferees' liens.  (*See* First Lien AHG Obj. ¶¶ 108-111.)  However, the First Lien AHG's arguments are unavailing, for the reasons set forth below.

153.    In Count XVII of the Complaint, the TCEH Committee seeks a declaration that the First Lien AHG's lien does not encumber a limited universe of tax attributes—"(i) Tax Attributes that arose *after* the Petition Date related to tax year 2014, and (ii) Tax Attributes that

will arise in 2015 (and subsequent taxable years) before the Debtors' emergence from protection under Chapter 11 of the Bankruptcy Code (collectively, the '<u>Unencumbered Tax Attributes</u>')." (*See* Proposed Complaint ¶ 261.)  It is uncontested that the TCEH Debtors are continuing to generate new net operating losses (NOLs) after the Petition Date.  Indeed, the First Lien AHG acknowledges that their collateral includes only tax refunds, NOLs, and other tax attributes to the extent the First Lien AHG "acquired rights in such tax attributes before the Petition Date."  (*See* First Lien AHG Obj. ¶ 109.)  Absent from the Objection is any suggestion that the First Lien Transferees' prepetition lien attaches to Tax Attributes generated after the Petition Date that do not relate back to prepetition activities.  Instead, the First Lien AHG cites one case for the proposition that a lien can attach to a debtor's right to receive a tax refund resulting from NOLs generated prepetition even though a tax return is filed postpetition, *see id.*, but such a holding is irrelevant to the issue before the Court.  Accordingly, the TCEH Committee believes, as described in the Proposed Complaint (*see* ¶¶ 258-268), that the NOLs and associated Tax Attributes generated postpetition (and the value thereof) are not a part of the First Lien AHG's collateral pursuant to section 552(b) of the Bankruptcy Code, and any associated value inures to the benefit of the unsecured creditors of the TCEH Debtors.

154.    The First Lien AHG also misconstrues the relief requested as it relates to the Tax Basis Step-Up.  The TCEH Committee recognizes that if the First Lien AHG were to foreclose on the collateral, then there could be an increase in the tax basis of the Collateral.  However, the First Lien AHG's ability to foreclose on the collateral is far from certain given the considerable regulatory restrictions associated with ownership of a nuclear power plant, as well as the related

financial commitments imposed upon a nuclear power plant's owners.  Therefore, the only practical way for the First Lien AHG to recover its collateral is through a chapter 11 process.[35]

155.    One possible restructuring scenario is to dispose of the TCEH Debtors' assets in a taxable sale or exchange.  In this instance, the acquiror (i.e., the First Lien AHG) will take a cost basis in the asset being acquired, which is generally equal to the asset's fair market value at such time.[36]  More importantly, the First Lien AHG's ability to realize the greater basis in the assets will only be made possible through the Debtors' postpetition restructuring efforts, and the addition of estate resources.  As noted by the court in *Residential Capital*, "[s]ection 552(b) is intended to cover after-acquired property that is directly attributable to prepetition collateral, ***without addition of estate resources***."[37]  Therefore, the imposition of the automatic stay is not impeding the ability of the First Lien AHG to realize a step up in tax basis (*see* Obj. ¶111); rather, it is the regulations governing the unique set of collateral that makes foreclosing on the assets a significant challenge.  Since a step up in tax basis will only be realized upon a transfer of the assets, and in this instance, an asset transfer can be accomplished only through the addition of estate resources, the future value the First Lien Transferees may realize from a step up in tax basis in the collateral is a product of the estates' efforts and the estate must be compensated by the First Lien AHG in order to receive such future tax benefits.  *See Residential Capital*, 501 B.R. at 612 (finding that prepetition lenders did not have a lien on goodwill generated postpetition, because the debtors did not simply take collateral and convert it into goodwill without any other resources; rather, the debtors improved the value of the assets through negotiating settlements with certain counterparties).

---

[35] At a minimum, the question of whether a foreclosure is a realistic option is a factual determination that cannot be made at this stage.

[36] *See* IRC §§ 1001, 1011, 1012.

[37] *Official Comm. of Unsecured Creditors v. UMB Bank, N.A.* (*In re Residential Capital, LLC*), 501 B.R. 549, 612 (Bankr. S.D.N.Y. 2013), *quoting* 5 Collier on Bankruptcy P 552.02[2][a] (16th ed. 2015) (emphasis in original).

156.    An alternative restructuring scenario that has been discussed among the parties[38] is a tax-free spin-off of the assets to the first lien creditors that does not provide an enhanced basis to the new asset owners. [39]  In this scenario, in addition to the rationale set forth above, the First Lien AHG can realize a greater tax basis in the collateral if the TCEH Debtors' Unencumbered Tax Attributes are utilized to offset any gain created through the modified spin-off.  As a result, but for the utilization of the Unencumbered Tax Attributes, the First Lien AHG is not able to achieve a greater tax basis in its collateral.

157.    Accordingly, the TCEH Committee asserts that the Tax Basis Step-Up is not part of the First Lien Transferees' collateral because it is only realized through either the use of the Unencumbered Tax Attributes created after the Petition Date or the addition of estate resources that places the purported collateral outside the realm of being considered a proceed or product of the First Lien AHG's prepetition collateral.

## H.    Preference Claims

158.    The First Lien AHG asserts that the TCEH Committee's preference Claims fail because (i) the $188 million was transferred between two TCEH accounts, thereby not improving the First Lien Transferee's collateral position (First Lien AHG Obj. ¶102), and (ii) the First Lien Transferees may assert the "ordinary course of business" defense to the $216 million interest payment (*Id*. ¶ 103.)  Each of these arguments fail as a matter of fact and law.

159.    <u>First</u>, the term "transfer" is defined in section 101(48) of the Bankruptcy Code as "(A) the creation of a lien; (B) the retention of title as a security interest; (C) the foreclosure of a debtor's equity of redemption; or (D) each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with—(i) property; or (ii) an interest in

---

[38] *See Declaration of Paul Keglevic, Executive Vice President, Chief Financial Officer, and Co-Chief Restructuring Officer of Energy Future Holdings, Corp., et al., in Support of First Day Motions* at ¶¶ 17, 162-170 [Docket No. 98].

[39] *See* IRC Sections 355, 358, 361, 362, 368.

property." 11 U.S.C. § 101(54). The Third Circuit has recognized that the definition of "transfer" is broad. *See Orr v. Yuhas (In re Yuhas)*, 104 F.3d 612, 615 (3d Cir. 1997) (referring to the "broad definition" of "transfer"). *See also Melaragno v. CitiMortgage, Inc. (In re Sandman)*, Adv. No. 12-1060, 2013 Bankr. LEXIS 3100, at *10 (Bankr. W.D. Pa. Aug. 1, 2013) ("the concept of a 'transfer' under the Bankruptcy Code is extremely broad…."); *Crawford v. Zambrano (In re Zambrano Corp.)*, 478 B.R. 670, 690 (Bankr. W.D. Pa. 2012) ("'Transfer' has a broad definition"); *Argus Mgmt. Grp. v. Gab Robins, Inc. (In re CVEO Corp.)*, 327 B.R. 210, 214 (Bankr. D. Del. 2005) (Walrath, J.) (acknowledging that the requirement under section 547(b)(1) that a transfer be made to or for the benefit of a creditor is "loosely construed by the courts").

160.    Based on this definition of "transfer," the transfer of $188 million from a TCEH unencumbered bank account to an allegedly encumbered TCEH bank account[40] would constitute "a transfer of an interest in the debtor in property." Here, if a transfer was in fact made into a TCEH encumbered bank account, then the recoveries for both the First Lien Transferees and unsecured creditors would change as a result of the transfer, despite the fact that TCEH did not transfer the funds directly into an account in the name of the First Lien Collateral Agent or First Lien Transferees. In essence, the transfer was a transfer of new collateral for the benefit of the First Lien Transferees. Accordingly, this transfer of $188 million enabled the First Lien Transferees to receive more than they would receive if the case were a case under chapter 7 of this title, to the detriment of TCEH unsecured creditors. Indeed, "the hallmark of a 'transfer' is a change in the rights of the transferor with respect to the property after the transaction."

---

[40] As reflected in the Proposed Complaint, the Debtors identify in the Cash Management Motion that the JPM Unencumbered Account and the Segregated Cash account are not part of the prepetition collateral securing the First Lien Debt, but the Debtors did not so indicate with respect to the TCEH Main Account, thereby implying that this account is part of the prepetition collateral securing the First Lien Debt. (*See* Proposed Complaint ¶ 105.) The TCEH Committee has challenged this assertion in the Proposed Complaint.

*Greenspan v. Orrick, Herrington & Sutcliffe LLP (In re Brobeck, Phleger & Harrison LLP)*, 408 B.R. 318, 338 (Bankr. N.D. Cal. 2009).  *See also* 2-101 Collier on Bankruptcy P101.54 (16th ed. 2015) (noting that the term "transfer" "also includes transactions in which title to property is changed in a way that could affect creditors although ultimate ownership remains intact….").

161.    Second, while as discussed below, the First Lien AHG's assertion of the ordinary course defense should not be considered at this time, the TCEH Committee believes that it would be able to successfully overcome an ordinary course defense to the transfer of $216 million.  At a minimum, there are no facts establishing this affirmative defense on the face of the Proposed Complaint, and thus, granting the TCEH Committee standing to pursue the claim is appropriate.

162.    To determine whether a transfer was made in the ordinary course of business, courts look at the consistency of the transactions between the debtor and the creditor before and during the preference period.  Factors considered include: "(1) the length of time the parties have engaged in the type of dealing at issue; (2) whether the subject transfer was in an amount more than usually paid; (3) whether the payments were tendered in a manner different from previous payments; (4) whether there appears any unusual action by either the debtor or creditor to collect or pay on the debt; and (5) whether the creditor did anything to gain an advantage (such as gain additional security) in light of the debtor's deteriorating financial condition."  *HLI Creditor Trust v. Metal Techs. Inc. (In re Hayes Lemmerz Int'l, Inc.)*, 337 B.R. 49, 58 (Bankr. D. Del. 2006) (Lindsey, P.).

163.    As discussed *supra*, depositions or interrogatories may reveal additional facts regarding the TCEH Debtors' efforts to curry favor with the First Lien Transferees during the RSA negotiations, particularly in light of the fact that the Debtors and First Lien Transferees were negotiating the terms of the RSA, including choosing the Petition Date, at the same time as these preference payments were made.  In addition, the earlier transfer of $188 million from an

78

unencumbered account to an encumbered account to facilitate the $216 million interest payment was unusual.

164.    For these reasons, the preference Claims alleged in the Proposed Complaint are colorable.  Indeed, "courts have specifically determined that preference exceptions listed under 11 U.S.C. § 547(c) cannot be used to dismiss a plaintiff's complaint under Rule 12(b)(6)." *Forman v. Deutsch Atkins, P.C. (In re Russ Cos.)*, Adv. No. 13-01432, 2013 Bankr. LEXIS 3229, at *15 (Bankr. D.N.J. Aug. 5, 2013).  *See also Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.)*, 365 B.R. at 73 (declining to dismiss preference claims because the ordinary course defense raised "factual issues, inappropriate for determination on a motion under Rule 12(b)(6)"); *TWA Inc. Post Confirmation Estate v. Bd. of Cnty. Comm'rs (In re TWA Inc. Post Confirmation Estate)*, Adv. No. 03-70106 (PJW), 2003 Bankr. LEXIS 1431, at *3 (Bankr. D. Del. Nov. 3, 2003) (Walsh, J.) (declining to dismiss preference claims on a motion to dismiss because "even if the Defendant had properly discussed all of the elements of § 547(c)(2), it would still have the burden of presenting evidence establishing those elements.").

165.    Accordingly, the TCEH Committee has raised colorable Claims regarding the preferential transfers of $188 million and $216 million pursuant to section 547 of the Bankruptcy Code.

## I.    Declaratory Judgments regarding the Debtors' Stipulations

166.    Certain Objectors argue that various declaratory judgments requested in the Proposed Complaint are not ripe for judgment at this time.  (*See* Debtors' Obj. ¶¶ 49-52; First Lien AHG Obj. ¶¶ 112-113; Wilmington Obj. ¶¶ 64-75.)  However, the Objectors fail to acknowledge that the issues set forth in the declaratory judgments have been placed in controversy by the TCEH Debtors' Stipulations in the Cash Collateral Order.  Further, paragraph 15 of the Cash Collateral Order provides that the TCEH Debtors' Stipulations will be binding on

all parties in interest unless the TCEH Committee (or another party in interest) files a Challenge before the Challenge Deadline.[41]

167.    For example, the requests for declaratory judgment that (i) certain deposit accounts, rabbi trust accounts, avoidance actions, commercial tort claims, and tax attributes are unencumbered (Counts XV-XVIII), and (ii) the Stipulations do not expand the scope of the First Lien Transferees' liens (Count XXI) are ripe because the TCEH Debtors' Stipulations specifically provide that "[t]he Prepetition First Lien Obligations are secured by first priority security interests in and liens on (the 'Prepetition First Priority Liens') the 'Collateral,' as defined in the First Lien Credit Agreement (the 'Prepetition Collateral'), including substantially all of the TCEH Debtors' assets, including accounts receivable and cash to the extent that such cash constitutes proceeds of other Prepetition Collateral (the 'Cash Collateral')."  (*See* Cash Collateral Order ¶ F(i)(e).)

168.    Further, the requests for (i) disallowance of unaccreted original issue discount (Count IX), (ii) recharacterization of adequate protection payments (Count X), and (iii) a declaratory judgment that the First Lien Transferees are not entitled to adequate protection claims because (a) there has been no diminution in the value of the First Lien Transferees' collateral after the Petition Date, and (b) the Debtors' use of cash collateral for the limited purposes set forth in the Cash Collateral Order will not result in a diminution in value of the First Lien Transferees' collateral (Count XIX), are ripe because the TCEH Debtors' Stipulations provide that the claims of the First Lien Transferees are valid in the stated amounts and not subject to offset, recharacterization, or avoidance.  Specifically, the TCEH Debtors' Stipulations provide:

---

[41] The TCEH Committee would be willing to discuss a resolution with the Debtors and First Lien Transferees regarding the TCEH Committee's ability to bring certain of these claims at a later time, notwithstanding the TCEH Debtors' Stipulations.

As of the Petition Date, the TCEH Debtors were ***truly and justly indebted*** to the First Lien Lenders pursuant to the First Lien Credit Agreement, ***without defense, counterclaim, or offset of any kind***, in the aggregate principal amount of $22,635,987,924 plus accrued and unpaid interest with respect thereto (which, as of the Petition Date, was $227,283,333) and any additional fees, costs, and expenses (including any attorneys', financial advisors', and other professionals' fees, expenses, and indemnities that are chargeable or reimbursable under the First Lien Credit Agreement) and all other Obligations (as defined in the First Lien Credit Agreement) owing under or in connection with the First Lien Credit Agreement, including, without limitation, any and all obligations owing to the First Lien Credit Agent (as defined below); and

As of the Petition Date, the TCEH Debtors were ***truly and justly indebted*** to the holders of the First Lien Notes pursuant to the First Lien Notes Indenture, ***without defense, counterclaim, or offset of any kind*** in the aggregate principal amount of $1,750,000,000 plus accrued and unpaid interest with respect thereto (which as of the Petition Date was $65,965,278) and any additional fees, costs, and expenses (including any attorneys', financial advisors', and other professionals' fees and expenses that are chargeable or reimburseable under the First Lien Notes Indenture) and all other Obligations (as defined in the First Lien Notes Indenture) owing under or in connection with the First Lien Notes Indenture" (collectively, the "Notes Obligations").

***no offsets, challenges, objections, defenses, claims, or counterclaims of any kind or nature*** to any of the Prepetition First Priority Liens or Prepetition First Lien Obligations exist, and ***no portion of the Prepetition First Priority Liens or Prepetition First Lien Obligations is subject to any challenge or defense including***, without limitation, ***impairment, set-off, right of recoupment, avoidance, attachment, disallowance, disgorgement, reduction, recharacterization, recovery, subordination (whether equitable or otherwise)***, counterclaims, or cross-claims, pursuant to the Bankruptcy Code or applicable nonbankruptcy law;

(*See* Cash Collateral Order ¶¶ F(i)(a)-(b), F(iv)(d)) (emphasis added).

169.    Finally, the requests for declaratory judgments that (i) the First Lien Transferees are not entitled to any postpetition interest and fees unless the Court determines that they are oversecured creditors, (ii) if the Court determines the First Lien Transferees are oversecured creditors, postpetition interest and fees should be allowed solely to the extent of the excess value of the collateral, and (iii) any award of postpetition interest should be at the contractual, non-

default rate of interest (Counts XX-XXII) are ripe because the Debtors' Stipulations provide that "the Prepetition First Lien Obligations constitute legal, valid, binding, and non-avoidable obligations of the TCEH Debtors" (*see* Cash Collateral Order ¶ F(iv)(c)).

170.    Thus, the TCEH Committee has a fiduciary obligation to unsecured creditors to bring these Claims now, prior to expiration of the Challenge Deadline, to preserve the Claims for the benefit of the TCEH Debtors' estates and creditors.  Moreover, each of the declaratory judgment requests raises an important issue that will need to be addressed in connection with plan confirmation.  Accordingly, there is no reason to delay this Court's consideration of the issues.

### J.    The TCEH Committee is Not Impacted by the Ratification Doctrine

171.    The First Lien AHG contends that "the holders of the TCEH Unsecured Notes are precluded from avoiding the transactions relating to the 2007 Acquisition pursuant to the 'ratification doctrine,' which bars creditors that participated in an allegedly fraudulent transaction from subsequently avoiding it as a fraudulent conveyance."  (First Lien AHG Obj. ¶ 54 n.41.)  It is not clear whether this argument is directed at the TCEH Committee's Standing Motion or the Unsecured AHG Motion.  Regardless, this position reflects an overly broad application of the ratification doctrine.

172.    Courts applying the doctrine have suggested that mere involvement in a complex fraudulent transaction is not enough to bar a creditor from later seeking its avoidance.  *Adelphia Recovery Trust v. HSBC Bank USA, NA (In re Adelphia Recovery Trust)*, 634 F.3d 678, 693 (2d Cir. 2011) ("The intent required for ratification 'must be clearly established and may not be inferred from doubtful or equivocal acts or language.") (citing *Chem. Bank v. Affiliated FM Ins. Co.*, 169 F.3d 121, 128 (2d Cir. 1999) (quoting *Holm v. C.M.P. Sheet Metal, Inc.*, 455 N.Y.S.2d 429, 432 (N.Y. App. Div. 1982))).  "Where the allegedly ratifying party's silent acquiescence to

82

a transaction credibly appears to have resulted from the complexity of the situation rather than intent, ratification does not occur." *Adelphia Recovery Trust v. HSBC Bank USA, NA (In re Adelphia Recovery Trust)*, 634 F.3d at 693-94.

173.    Here, the TCEH Committee is seeking standing on behalf of all unsecured creditors of the TCEH Debtors, including trade creditors and holders of the later issued TCEH Second Lien Notes.  As a result, even if the ratification doctrine would preclude certain individual creditors from asserting claims, it does not bar the TCEH Committee from asserting such claims.  *In re Refco, Inc. Secs. Litig. v. CSFB*, 09-CIV-2885 (GEL), 2009 U.S. Dist. LEXIS 129944, at *40 (S.D.N.Y. Nov. 13, 2009) (noting that, for purposes of establishing a trustee's standing to bring an avoidance action, the existence of "[a] single legitimate creditor is sufficient to 'trigger' standing.").

## IV.    THE TCEH COMMITTEE SHOULD BE GRANTED SOLE STANDING

174.    As recognized by many of the Objectors, the TCEH Committee should be the only party granted standing to prosecute the Claims raised in the Standing Motions.  (*See e.g.*, Debtors' Obj. ¶¶ 37-48; First Lien AHG Obj., at 7-8, ¶¶123-125; Wilmington Obj., at 5; WSFS Response ¶¶ 1-5.)  The TCEH Committee is the only statutory fiduciary for *all* unsecured creditors of the TCEH Debtors' estates, and the TCEH Committee has demonstrated that it is ready, willing, and able to prosecute the Claims.[42]

175.    Granting the Unsecured AHG and the EFH Committee's requests for standing is unnecessary, and would result in duplicative litigation and increased costs to the Debtors' estates that would, paradoxically, further jeopardize recoveries of the TCEH Debtors' creditors.  In recognition of this fact, the parties are discussing a potential agreement that would resolve the

---

[42] The arguments set forth in the TCEH Committee's Response to the Unsecured AHG Motion and the EFH Committee Motion are incorporated herein by reference.

separate Standing Motions in favor of the TCEH Committee being the sole party with standing to prosecute and settle the Claims.[43]  Furthermore, to ensure that the interests of the EFH Committee's constituents (to the extent they are creditors of the TCEH Debtors) are being adequately represented, the TCEH Committee will revise the Proposed Complaint to incorporate the additional Claims against the First Lien Transferees that were proposed to be asserted in the EFH Committee Motion.

176.     Finally, the TCEH Committee has no objection to the Debtors' suggestion that following the disposition of the Standing Motions, further litigation should be stayed to permit focused plan negotiations, provided that if the Debtors file a plan and disclosure statement, then any hearing on such matters are likewise delayed.

## **CONCLUSION**

177.     For the reasons set forth above, there is ample reason to vest the TCEH Committee with standing to prosecute the Claims against the First Lien Transferees and exclusive settlement authority to resolve such Claims.

WHEREFORE, the TCEH Committee respectfully requests that the Court enter an order, substantially in the form of the revised proposed order (a copy of which will be submitted to the Court prior to the hearing), granting the TCEH Committee the exclusive standing and authority to commence, prosecute, and settle Claims against the First Lien Transferees arising out of the factual allegations set forth above and in the Proposed Complaint, and grant such other and further relief as the Court may deem just and proper.

*(Remainder of Page Intentionally Left Blank)*

---

[43] If finalized, the TCEH Committee anticipates that this agreement will be memorialized in a revised proposed order granting the Standing Motion.

ny-1178665

Dated: Wilmington, Delaware
April 1, 2015

**MORRISON & FOERSTER LLP**
Brett H. Miller
James M. Peck
Lorenzo Marinuzzi
Todd M. Goren
Samantha Martin
250 West 55th Street
New York, New York 10019-9601
Telephone:  (212) 468-8000
Facsimile:  (212) 468-7900
E-mail:        brettmiller@mofo.com
                   jpeck@mofo.com
                   lmarinuzzi@mofo.com
                   tgoren@mofo.com
                   smartin@mofo.com


    */s/ Christopher A. Ward*
**POLSINELLI PC**
Christopher A. Ward (Del. Bar No. 3877)
Justin K. Edelson (Del. Bar No. 5002)
Shanti M. Katona (Del. Bar No. 5352)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Facsimile:  (302) 252-0921
E-mail:        cward@polsinelli.com
                   jedelson@polsinelli.com
                   skatona@polsinelli.com

*Attorneys for the Official Committee of*
*TCEH Unsecured Creditors*

85