**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Energy Future Holdings Corp., *et al.*,[1] | Case No. 14-10979 (CSS) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date:  April 14, 2015 at 9:30 a.m.** |
| | **Reply Deadline:  April 1, 2015 at 4:00 p.m.** |
| | **Re: Docket Nos. 3603, 3726, 3729, 3731 & 3732** |

## OMNIBUS REPLY OF THE AD HOC GROUP OF TCEH
## UNSECURED NOTEHOLDERS TO STANDING OBJECTIONS

The ad hoc group (the "Ad Hoc Group") of certain holders of approximately $2.7 billion

of 10.25% Fixed Senior Notes due 2015 (including Series B) and 10.50%/11.25% Senior Toggle

Notes due 2016 issued by TCEH[2] and TCEH Finance, Inc. (the "Unsecured Notes") hereby files

this reply (the "Reply") in further support of its Motion of the Ad Hoc Group of TCEH

Unsecured Noteholders for Entry of an Order Granting Standing and Authority to Commence,

Prosecute, and Settle Certain Claims for Declaratory Judgment, Avoidance and Recovery of

Liens, Security Interests, Obligations, Fees, and Interest Payments, and Disallowance of Claims

[Docket No. 3603] (the "Motion"); and in response to (i) the Debtors' Omnibus Objection to

Standing Motions [Docket No. 3726] (the "Debtors' Objection"), (ii) the Omnibus Objection of

CCP Credit Acquisition Holdings, L.L.C., Centerbridge Special Credit Partners, L.P., and

Centerbridge Special Credit Partners, II, L.P. to the Standing Motions [Docket No. 3729] (the

---

[1]    The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810.  The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201.  Due to the large number of debtors in these chapter 11 cases, which are being jointly administered on an interim basis, a complete list of the debtors (the "Debtors") and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://efhcaseinfo.com.

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion (as defined below).

"Centerbridge Objection"), (iii) the Omnibus Objection of Wilmington Trust, N.A., as Successor

TCEH First Lien Administrative Agent and Successor TCEH First Lien Collateral Agent, to the

Motions for Derivative Standing [Docket No. 3731] (the "Wilmington Trust Objection"), and

(iv) the Omnibus Objection of the Ad Hoc Committee of TCEH First Lien Creditors (the "TCEH

First Lien Committee") to Standing Motions [Docket No. 3732] (the "TCEH First Lien

Objection" and together with the Debtors' Objection, the Centerbridge Objection and the

Wilmington Trust Objection, the "Objections").[3]  In reply to the Objections and in further

support of the Motion, the Ad Hoc Group respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      As the Court will appreciate from the volume of papers before it on the Motion

and the companion motion of the TCEH Committee (together, the "Standing Motions"), the

issues at bar go far beyond a typical lien challenge proceeding arising out of a cash collateral

order.  Indeed, "the Debtors" (a misnomer that will be addressed below) go so far as to threaten

that these cases "hang in the balance" of the Standing Motions.  What is really at issue here may

be important, but it is not new.  Indeed, from the first days of these chapter 11 cases (the

"Cases"), there has been a live dispute over the ability of "the Debtors" and certain holders of

First Lien Debt to agree amongst themselves that all First Lien Debt claims against the TCEH

Debtors should be allowed in full without regard to the existence of more than $8 billion in

unsecured funded debt claims and their statutory fiduciaries.  That is exactly the deal that the

Debtors and the TCEH First Lien Committee attempted to push through in their now-defunct

---

[3]      Because the substantive legal objections raised in the Centerbridge Objection and the Wilmington Trust
Objection are subsumed in the TCEH First Lien Objection, the Ad Hoc Group responds only to those objections as
raised in the TCEH First Lien Objection.

RSA, and the deal that they are trying to preserve via their objections to the Standing Motions, albeit by slightly different avenues.

2.      The TCEH First Lien Committee, for its part, adopts the typical approach to marginalizing any potential challenges to their lien positions.  It simply asserts by fiat that all of the TCEH Debtors' assets are, in fact, their collateral and then refuses to yield an inch, all the time exuding the confidence that the entirety of the Proposed Complaint is "but a scratch."  As set forth in Section I, infra, and as more fully set forth in the incorporated reply of the TCEH Committee, each of the Claims asserted in the Proposed Complaint is plainly colorable under applicable law and, in toto, undermines in a fundamental way all assertions of lien superiority. There is surely no basis in the current record from which the Court can conclude, as the first lien objectors contend it should, that litigation should not proceed and that the more than $24 billion of secured claims at issue must be allowed without any offset or counterclaim.  In short, the Court's review of the past, reaching back to the 2007 LBO, is going to be both necessary and proper in these cases.

3.      The objection interposed by the "the Debtors," however, is far more out-of-the-ordinary and far more troubling from a case management perspective.  From the outset of these cases, the Ad Hoc Group has noted the existence of material conflicts between the T-side and the E-side that could be potentially outcome determinative of T-side unsecured creditor recoveries. The existence of actual conflicts has since been noted by the Court and the Office of the United States Trustee, and eventually culminated in a detailed set of procedures embodied in two Court orders that were intended to address the significant structural impediments of having two classes of Debtors operate with one set of CROs and one set of section 327(a) counsel.  Once again, and despite these prophylactic protections, "the Debtors" have displayed a near-total disregard for

Americas 90456754

their T-side and E-side conflicts.  As Section II, <u>infra</u>, makes clear, two "Debtors"—EFH and

EFIH—have actual, material conflicts with the TCEH Debtors over the very issues raised in the

Proposed Complaint and have no legitimate basis for weighing in on a lien challenge to secured

debt of the TCEH Debtors.  Specifically, both EFH and EFIH will eventually be direct targets of

LBO-related claims brought by the TCEH Debtors, who transferred tens of billions of dollars of

value to EFH and EFIH for no consideration in 2007.  Notwithstanding the overlap between the

Claims at bar and the inter-Debtor claims that will follow, the two CROs represented by one set

of counsel have objected to both Standing Motions, entreating the Court to give them sole

authority to settle all claims raised in the Proposed Complaint, including all Claims related to the

LBO.  They have even gone so far as to have their joint counsel file a pleading detailing issues

with and defenses to LBO-related Claims that are facially beneficial to EFH and EFIH and

directly adverse to the interests of the TCEH Debtors.  To make matters worse, the one party

charged by the Court with actually preventing these types of conflicts—Mr. Hugh Sawyer—has

not appeared on the Standing Motions, essentially electing to deprive the TCEH Debtors of any

independent voice in the matter.

4.      Given all the foregoing, the Court should grant the Standing Motions, including

the relief sought with respect to having settlement authority vested with the actual beneficiaries

of the Claims (as defined below) at issue, and should overrule all of the Objections.

## REPLY

### I.      All Of The Claims Asserted In The Proposed Complaint Are Colorable

5.      The TCEH First Lien Committee, and to a lesser extent the Debtors, argue that

none of the claims asserted in the Proposed Complaint (the "Claims") are colorable and,

therefore, no party should be granted standing to pursue any of them.  Under the terms of the

4

Final Order (A) Authorizing Use of Cash Collateral for Texas Competitive Electric Holdings Company LLC and Certain of Its Debtor Affiliates, (B) Granting Adequate Protection, and (C) Modifying the Automatic Stay [Docket No. 855] (the "Cash Collateral Order"), the effect of the Court granting that objection would be to have all claims of the TCEH first lien creditors allowed as secured claims against each of the TCEH Debtors in the principal amount of at least $24,385,987,924 as of the Petition Date.  See Cash Collateral Order at ¶ F(i)(a)-(b).  The Claims, however, are indisputably colorable and must be pursued in order to establish an appropriate, judicially-determined, allowed secured claim amount at each estate and to preserve and protect unencumbered estate value for the benefit of the TCEH Debtors and their unsecured creditors.

6.      As the TCEH First Lien Committee properly recognizes, the "colorable claim" standard at the very least is no more restrictive than the standard for dismissing a complaint for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Rule 12(b)(6)").  See In re Centaur, LLC, No. 10-10799 (KJC), 2010 WL 4624910, at * 4 (Bankr. D. Del. Nov. 5, 2010).  Under that standard, a complaint need only contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)); see also Paul v. Intel Corp. (In re Intel Corp. Microprocessor Antitrust Litig.), 496 F. Supp. 2d 404, 407 (D. Del. 2007) ("The purpose of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case.") (citing Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993)).[4]

---

[4]      Certain courts have set an even lower standard for determining "colorability" of claims.  See Adelphia Commc'ns Corp. v. Bank of Am. (In re Adelphia Commc'ns Corp.), 330 B.R. 364, 376 (Bankr. S.D.N.Y. 2005) (discussing courts' application of a "facially defective" standard, a "plausible" standard and a "not without some merit" standard); see, e.g., Official Comm. of Unsecured Creditors of America's Hobby Ctr., Inc. v. Hudson United Bank (In re America's Hobby Ctr., Inc.), 223 B.R. 275, 288 (Bankr. S.D.N.Y. 1988); In re Colfor, Inc., No. 96-60306, 1998 WL 70718, at *2 (Bankr. N.D. Ohio Jan. 5, 1998).

7.      Despite having conceded the Rule 12(b)(6) standard, the TCEH First Lien Objection nonetheless seeks to have the Court assume substantial, disputed facts outside the four corners of the Proposed Complaint when resolving the Standing Motions.  For example, the TCEH First Lien Committee argues that alleged preference claims based on prepetition interest payments are not colorable because, as a factual matter, the interest obligations were incurred on an arm's-length basis in the marketplace and payment of such interest was ordinary course. TCEH First Lien Objection at 60-61.  Similarly, the TCEH First Lien Committee asserts that junior creditors cannot have a colorable claim with respect to unencumbered cash because, even if that cash was held in an uncontrolled deposit account, such cash constitutes "proceeds" of other collateral.  Id. at 61-63.  Asserted facts such as these, which exist outside the Proposed Complaint, should not be considered by the Court in assessing the Standing Motions.  PW Enters. v. N.D. Racing Comm'n (In re Racing Servs., Inc.), 540 F.3d 892, 900 (8th Cir. 2008) ("[A] creditor's claims are colorable if they would survive a motion to dismiss"); In re Archdiocese of Milwaukee, 483 B.R. 855, 858 (Bankr. E.D. Wis. 2012) (same); G-I Holdings, Inc. v. Those Parties Listed on Exhibit A (In re G-I Holdings, Inc.), 313 B.R. 612, 631 (Bankr. D.N.J. 2004) ("Further, in ascertaining whether a plaintiff has stated a cognizable claim, the court also examines the facts as alleged by the plaintiff for any dispositive affirmative defenses.") (citation omitted) (emphasis added).

8.      Notwithstanding that the Court can properly ignore all of the myriad of facts asserted by the TCEH First Lien Committee in its objection, the Ad Hoc Group understands that the TCEH Committee will be responding to that objection both on the facts and the law, and hereby incorporates herein all such responses.  But, because of the key importance of certain legal issues to the recoveries of members of the Ad Hoc Group—most notably with respect to the

6

applicable statute of limitations, the application of section 546(e) of the Bankruptcy Code, and

whether the first lien lenders' prepetition security interests attach to certain postpetition assets—

the Ad Hoc Group addresses certain specific colorability issues below.

### A. Fraudulent Conveyance Claims Related To The LBO Are Not Time Barred

9.      Many of the Objections question whether any of the Claims related to the LBO

are colorable based on the existence of potential statute of limitations affirmative defenses.

Although the LBO occurred six and one-half years prior to the Petition Date, the Claims relating

to the LBO are not plainly time barred for two reasons:  (1) because certain TCEH Debtors can

invoke a ten-year limitations period available to the Internal Revenue Service (the "IRS") for the

collection of assessed taxes, and (2) because equitable tolling principles will allow the TCEH

Debtors to bridge between the Petition Date and any expiry of the last applicable state statute of

limitations.

### 1. The IRS Is A Valid Triggering Creditor, And Thus, A Ten-Year Statute Of Limitation Applies

10.      With respect to the IRS limitations period, the TCEH Debtors "may avoid any

transfer of an interest of the debtor in property or any obligation incurred by the debtor that is

voidable under applicable law by a creditor holding an unsecured claim . . . ."  11 U.S.C.

§ 544(b)(1).  A party that seeks to avoid a transfer under section 544(b)(1) must identify an

actual creditor in existence as of the commencement of the case with a viable cause of action

against the transferee that is not time-barred or otherwise invalid—often referred to as the

"triggering" creditor.  See Bakst v. Probst (In re Amelung), 436 B.R. 806, 809 (Bankr. D.S.C.

2010); Alberts v. HCA Inc. (In re Greater Se. Cmty. Hosp. Corp. I), 365 B.R. 293, 301-02

(Bankr. D.D.C. 2006); In re 9281 Shore Rd. Owners Corp., 187 B.R. 837, 852 (E.D.N.Y 1995);

see also Faulkner v. Kornman (In re Heritage Org., LLC), 413 B.R. 438, 459 (Bankr. N.D. Tex.

2009); Turner v. Phoenix (In re Imageset, Inc.), 299 B.R. 709, 715 (Bankr. D. Me. 2003)

(referring to such creditor as the "golden creditor"); In re Turner, 78 B.R. 166, 170 (Bankr. M.D.

Tenn. 1987).

11.     Here, the Proposed Complaint alleges that the IRS has filed proofs of claim

against certain Debtors for outstanding corporate taxes related to tax year 2006.[5]  These Debtors

can stand in the shoes of the IRS when prosecuting avoidance claims on behalf of their estates,

and can take advantage of the IRS's ten-year statute of limitations.  See Proposed Complaint at

37-38.  Accordingly, the IRS is a valid triggering creditor as to those Debtors that were corporate

members of the EFH consolidated tax group.

12.     In an effort to avoid the consequences of well-settled authority directly on point,

the TCEH First Lien Committee appeals to factually irrelevant case law discussing the "*nullum

tempus*" doctrine.  The vast majority of courts that have considered the issue have concluded that

private litigants may invoke the rights and privileges of the federal government for purposes of

avoiding a fraudulent transfer.  The concept is not a new one: estate representatives have

repeatedly been permitted to rely on extended limitations periods provided under applicable

federal laws in prosecuting fraudulent conveyance claims, and such extended periods "trump[ ]

any statute of limitations set forth in the applicable state fraudulent transfer law."  See In re

---

[5]       The IRS has filed proofs of claim for outstanding corporate taxes related to tax year 2006 against Luminant Energy Company LLC [Claim No. 5037], TXU Retail Services Company [Claim No. 5041], Energy Future Competitive Holdings Company LLC [Claim No. 5043], Luminant Generation Company LLC [Claim No. 5056], and Luminant Mining Company LLC [Claim No. 5059], ████████████████████████████████ ████████████████████████████.  The IRS has also filed proofs of claim for outstanding corporate taxes related to tax year 2006 against Oak Grove Management Company LLC [Claim No. 5038], TXU SEM Company [Claim No. 5039], Generation SVC Company [Claim No. 5052], Luminant Energy Tracing Company California [Claim No. 5053], TCEH Finance, Inc. [Claim No. 5054], Luminant ET Services Company [Claim No. 5055], TXU Energy Retail Company LLC [Claim No. 5063], 4Change Energy Holdings LLC [Claim No. 5069], 4Change Energy Company [Claim No. 5070], and Texas Competitive Electric Holdings Company LLC [Claim No. 5072], each of which is also a TCEH Debtor.

8

Greater Se. Cmty. Hosp. Corp. I, 365 B.R. at 302 (citing United States v. Summerlin, 310 U.S. 414 (1940)); see also Tronox, Inc. v. Kerr McGee Corp. (In re Tronox Inc.), 503 B.R. 239, 273 (Bankr. S.D.N.Y. 2013) (finding that under section 544(b), the plaintiffs could rely on the six-year limitations period in the Fair Debt Collection Practices Act as "applicable law" for purposes of avoiding transfers that occurred outside the Oklahoma Uniform Fraudulent Transfer Act's four-year statute of limitations).  By stepping into the government creditor's shoes under section 544(b) of the Bankruptcy Code, the estate representative inherits the same rights of avoidance that the government creditor would have if it were asserting a claim on its own behalf, including the benefits of any extended limitations periods to which such creditor may be entitled.  See Ebner v. Kaiser (In re Kaiser), 525 B.R. 697, 708 (Bankr. N.D. Ill. 2014) ("A trustee stands in the shoes of an actual unsecured creditor and becomes subject to the same rights and limitations that the actual unsecured creditor would be subject to outside of bankruptcy"); In re Greater Se. Cmty. Hosp. Corp. I, 365 B.R. at 301-02, 306 (stating that section 544(b) allows the trustee to "use statutes of limitations available to any creditor in whose shoes he stands in bringing the action" and an estate representative "can utilize the extended statute of limitations available to unsecured governmental creditors assuming that such creditors existed as of the petition date") (citing Osherow v. Porras (In re Porras), 312 B.R. 81, 97 (Bankr. W.D. Tex. 2004); In re G–I Holdings, Inc., 313 B.R. at 636).

13.    More specifically, as the TCEH First Lien Committee acknowledges, courts have approved private litigants' use of the collection period available to the IRS under 26 U.S.C. § 6502(a).[6]  See, e.g., In re Kaiser, 525 B.R. at 711 (finding that that the plain language of

---

[6]    26 U.S.C. § 6502(a) provides that "[w]here the assessment of any tax imposed by [the IRC] has been made within the period of limitation properly applicable thereto, such tax may be collected . . . by a proceeding in court, but only if . . . the proceeding begun . . . within 10 years after the assessment of the tax . . . ."  26 U.S.C. § 6502(a).

Americas 90456754

section 544 allows the trustee to avail itself of the IRS's statute of limitations); In re Polichuk, 506 B.R. 405, 419 (Bankr. E.D. Pa. 2014) ("Because the trustee may step into the shoes of the IRS, she may seek to avoid transfers that occurred as far back as [ten years prior to the filing of the petition]."); Levey v. Gillman (In re Republic Windows & Doors, LLC), No. 08-34113, 2011 WL 5975256, at *9-10 (Bankr. N.D. Ill. Oct. 17, 2011) (noting that the "generous IRS limitation" would be available to the trustee upon the IRS's filing of its claim); Hunt v. Hunt (In re Hunt), 136 B.R. 437, 450-51 (Bankr. N.D. Tex. 1991), abrogated on other grounds, Compuadd Corp. v. Tex. Instruments Inc. (In re Compuadd Corp.), 137 F.3d 880 (5th Cir. 1998) (finding that trustees were not barred by applicable state statutes of limitations in bringing fraudulent transfer action because they acquired the status of the United States by standing in the shoes of the IRS pursuant to section 544(b)); see also In re Porras, 312 B.R. at 97 (rejecting affirmative defense that trustee's fraudulent transfer action was barred by state statute of limitations and declaring that "the Trustee under § 544(b) may use statutes of limitations available to any creditor in whose shoes he stands in bringing the [fraudulent transfer] action") (emphasis added). Other than a single, flawed outlier case, discussed below, none of the cases cited by the TCEH First Lien Committee supports its contention that the party seeking to avail itself of the government's extended statute of limitations may only do so if it is acting in a sovereign capacity or to enforce a public interest or right.  Put simply, "[w]ithin section 544, there are no conditions on which unsecured creditor a trustee may choose as the golden creditor."  In re Kaiser, 525 B.R. at 711 (emphasis added).

14.    In fact, the TCEH First Lien Committee's arguments that the "*nullum tempus*" doctrine can only be invoked to enforce public rights and protect public interests have been flatly rejected.  In Greater Southeast Community Hospital Corp. I, the defendants insisted that the

10

chapter 11 trustee could not avail itself of the extended statute of limitations available to the IRS

and other government creditors because the trustee was not acting in a governmental capacity.

365 B.R. at 303.  The court specifically rejected this contention and declared that:

> If an unsecured creditor of the estate could have voided a
> transaction under state law despite the existence of a state statute
> of limitations on that claim because the creditor was active in a
> "governmental capacity," so too can the estate representative avoid
> the transfer under § 544(b). The unsecured creditor's ability to
> trump the applicable statute of limitations might derive from its
> sovereign immunity, but the estate representative's ability to
> override that same limitation derives from § 544(b).  The focus of
> the court in determining who is acting in a "governmental
> capacity" is the unsecured creditor, not the estate representative.

Id. at 304.  Thus, the Greater Southeast court made clear that the trustee or other estate

representative need not be acting in a governmental capacity or in the public interest to assume

the government creditor's ability to override state statutes of limitations.

15.    In an attempt to provide legal support for their argument on this point, the TCEH

First Lien Committee relies primarily on a single outlier case: Wagner v. Ultima Homes, Inc. (In

re Vaughan Co.), 498 B.R. 297 (Bankr. D.N.M. 2013).  Vaughan, however, should not guide this

Court.  First, it relies in part on case law that actually undermines its holding.[7]  Second, it has not

been adopted by any court, and has been the subject of express criticism.  See In re Kaiser, 525

---

[7]    Vaughan relies in part on Marshall v. Intermountain Electric Co., Inc., 614 F.2d 260, 263 n.3 (10th Cir. 1980).  Marshall, in turn, cites Occidental Life Insurance Co. v. EEOC, 432 U.S. 355 (1977), in which the Supreme Court found that the state limitations statute was not applicable to the Equal Employment Opportunity Commission's action seeking relief for a private individual in the form of reinstatement and backpay.  Id. at 262-63. Marshall states that Occidental "effectively fashioned a new rule . . . [that] when an action is brought by the government to enforce private as well as public rights, state statutes of limitations do not apply to bar the action . . . ."  Id. at 263 (emphasis added).  Thus, the Vaughan court's reliance on Marshall to support the notion that the bankruptcy trustee should not be immunized from state statutes of limitations in bringing an action that involves no public rights or interest is misplaced.

Vaughan also relies in part on SEC v. Calvo, 378 F.3d 1211, 1218 (11th Cir. 2004), which states only that where "the government's action vindicates a private interest, the defense of [state law statute of limitations] is typically available."  Id. at 1218 (emphasis added).  Calvo does not state that this is a blanket rule.

11

B.R. at 713 (finding the <u>Vaughan</u> analysis correct in most instances, but "simply misplaced" in the context of section 544(b)).

16.     Unable to offer any persuasive decisions on point, the TCEH First Lien Committee ultimately seeks to have the Court rely on vague policy arguments that support what seems to have been the operating assumption leading into these Cases—that the LBO should have been "home free" six years and a day after its closing.  <u>See</u> TCEH First Lien Objection at 26-30.  Such arguments, however, are insufficient to overcome either the plain language of the Bankruptcy Code or the overwhelming case law supporting the position that the Internal Revenue Code is "applicable law" for purposes of section 544(b)(1).  <u>See</u> <u>In re Kaiser</u>, 525 B.R. at 713 ("[T]he <u>Vaughan</u> analysis is based, in part, on policy considerations. This court is, however, not a court of policy.").

**2.     The Proposed Complaint Alleges A Colorable
Claim For Equitable Tolling Of Applicable State Statutes**

17.     The Court need not necessarily rely on the IRS limitations period to find that the Claims relating to acts in 2007 are colorable.  Equitable tolling of a statute of limitations is appropriate where, among other reasons, a plaintiff has been prevented from asserting its rights within the relevant limitations period.  <u>See</u> <u>Kocian v. Getty Ref. & Mktg. Co.</u>, 707 F.2d 748, 753 (3d Cir. 1983).  Courts have recognized that such conditions can exist when a subsidiary is dominated or controlled by the party seeking to invoke the defense.  "Adverse domination" in such instances acts to toll the applicable statute of limitations for so long as the alleged wrongdoers remain in control, on the theory that the plaintiff cannot reasonably be expected to pursue a claim against them.  <u>In re Equivest St. Thomas, Inc.</u>, No. 07-30011(JKF), 2010 WL 4343616, at *6 (Bankr. D.V.I. Nov. 1, 2010) (internal quotation omitted); <u>see also</u> <u>Fed. Deposit Ins. Corp. v. Bird</u>, 516 F. Supp. 647, 652 (D.P.R. 1981) (stating that the premise underlying the

12

adverse domination doctrine is that a corporation controlled by culpable directors will not cause the corporation to bring a lawsuit against themselves).

18.    Here, there is ample justification for such equitable tolling with respect to the Claims.  As alleged in the Proposed Complaint, following the LBO, the TCEH Debtors became responsible for approximately $20 billion of secured debt and $6.75 billion of unsecured debt in a transaction that rendered them insolvent.  Proposed Complaint at 13.  ████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████.  Specifically, in early 2011, recognizing that the TCEH Debtors faced certain defaults in 2013 and 2014, the conflicted board members caused the TCEH Debtors to solicit consent for various maturity extensions rather than file chapter 11 petitions.  As set forth in the Proposed Complaint, with the consent of a requisite amount of first lien lenders, the TCEH Debtors extended certain term loans and letter of credit loans with 2014 maturities to 2017, and extended certain revolving loans with 2013 maturities to 2016.  Id. at 21.  The extensions, however, made no economic sense: in exchange for extensions they never even utilized, the TCEH Debtors paid consenting creditors approximately $2 billion in fees, incremental interest expense and prepayment benefits, but left approximately $4.5 billion of debt outstanding on its original terms that the TCEH Debtors were ultimately unable to support.  See id. at 3, 28-29.

19.    A "plausible" explanation of these facts is that the partial extensions within the state limitations period were an attempt to delay an inevitable default until after the limitation periods lapsed.  ████████████████████████████████████

████████████████████████████████████



20.     The first lien lenders, for their part, are alleged to have enabled the conflicted Debtors to manipulate the maturity of the LBO debt, and thereby foreclose the opportunity for avoidance actions of their LBO debt, by agreeing to significant yield enhancements that were not available in the market at the time.  They also used their leverage to reduce their exposure by requiring an early pay down by TCEH of $1.6 billion in LBO debt at par as a condition to the effectiveness of the extension transactions.  Proposed Complaint at 24-25.  Under these facts, they should not be permitted to use the lapse of a state statute of limitations as an affirmative defense to the alleged 2007 avoidance actions.

21.     In sum, the existence of a potential equitable tolling of state limitations periods can be used by the TCEH Debtors to support the colorability of the Claims on the facts alleged.

**B.     The Section 546(e) "Safe Harbor" Does Not Protect
Transfers Made And Obligations Incurred In Connection
With The LBO Or 2011 "Amend And Extend" Transactions**

22.     At pages 45 to 48 and 56 to 57 of the TCEH First Lien Objection, the TCEH First Lien Committee further contends that the claims with respect to the LBO and the 2011 "amend

14

and extend" transactions asserted in the Proposed Complaint are, as a matter of law, subject to a section 546(e) safe harbor defense.  The TCEH First Lien Committee is wrong.

23.      Section 546(e) of the Bankruptcy Code provides that a transfer otherwise avoidable as a constructively fraudulent transfer under section 544 of the Bankruptcy Code is not subject to avoidance if, among other things, the transfer is "made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency in connection with a securities contract . . . ."  11 U.S.C. § 546(e).  According to the TCEH First Lien Committee, the issuance of certain of its holders' debt in 2007 is subject to section 546(e) because the Court can, as a matter of law, "collapse" the funding of the Senior Secured Facilities with the payments made pursuant to the Merger Agreement (which is a necessary element to Count I of the Proposed Complaint).  TCEH First Lien Objection at 47.  In addition, the TCEH First Lien Committee argues that because additional first lien notes were issued in 2011 pursuant to a securities contract and the proceeds of such notes were used to repay outstanding first lien bank debt, the transfers made and liens incurred in connection with that transaction are also protected by section 546(e).  Id. at 56-57.  The TCEH First Lien Committee, however, does not cite any Third Circuit authority for the proposition that section 546(e) protects every element of a leveraged buy-out of public stock or issuance of debt contemporaneous with a securities contract.  Indeed, it cannot, as courts in the Third Circuit, including this Court, have held that each element of a transaction must be analyzed independently to determine the applicability of section 546(e).

24.      In Mervyn's LLC v. Lubert-Adler Group IV, LLC (In re Mervyn's Holdings, LLC), a debtor sought to set aside a series of security transactions, initiated by its parent, that had divested the debtor of certain assets.  426 B.R. 488, 493-94 (Bankr. D. Del. 2010) (Gross, J.)  In

that case, a group of private equity sponsors had formed a vehicle ("Mervyn's Holdings") prepetition to purchase the stock of the debtor, using the debtor's real estate to secure the debt used to fund the sale. Id. at 493. All of the loan proceeds were then paid to the debtor's parent, and the sponsors of the deal then caused Mervyn's Holdings to transfer the real estate to a bankruptcy remote entity that leased the real estate back to the debtor at a substantially increased rate to service the acquisition debt. Id. After filing for bankruptcy protection, the debtor commenced an adversary proceeding against its former parent and other defendants to avoid the foregoing transactions. Id. Even after collapsing the several steps of the leveraged buy-out transaction, the court declined to apply section 546(e) to protect the sale of the debtor from avoidance. Id. at 500. The court stated that it "firmly believes that because of the multiple conveyances made surrounding the [transaction], section 546(e) does not apply." Id. at 500; see also Michaelson v. Farmer (In re Appleseed's Intermediate Holdings, LLC), 470 B.R. 289, 302 (D. Del. 2012) (holding that the section 546(e) safe harbor does not protect dividend payments even if it would apply to other transactions in the overarching leveraged buyout).

25.    Under Mervyn's Holdings, the appropriate inquiry to determine the applicability of section 546(e) is whether the specific transaction to be avoided was made by, to, or for the benefit of a financial institution, in connection with a securities contract. Whether a transfer was made in connection with a securities contract is a matter of fact that is not the proper subject of adjudication at this time. Notwithstanding that reservation, when viewed independently, each transaction that the TCEH First Lien Committee asserts is protected by the section 546(e) safe harbor was plainly not made in connection with a securities contract.

26.    First, the liens, security interests, and obligations that the Ad Hoc Groups seeks to avoid by Count I of the Proposed Complaint were incurred pursuant to the Credit Agreement.

16

The Proposed Complaint alleges that the Credit Agreement was a private agreement between TCEH, as borrower, and Citibank, N.A., as administrative agent and collateral agent, and various other lenders and other agents.  Proposed Complaint at 10.  Moreover, the Proposed Complaint alleges that the proceeds of the Credit Agreement were used to fund several payments unrelated to the Merger Agreement.  Id. at 13-14.  A private credit agreement is not a "securities contract" as defined by section 741(7) of the Bankruptcy Code, nor is it a "security" as defined by section 101(49) of the Bankruptcy Code.  See 11 U.S.C. §§ 741(7), 101(49).  As such, section 546(e) is not applicable to the liens, security interests and obligations incurred under the Credit Agreement.

27.    Second, the first lien notes and the fees and incremental interest paid as a result of the 2011 Extension were not made in connection with a securities contract.  The Proposed Complaint alleges that in 2011 the parties amended the Credit Agreement to extend the maturity dates for a portion of the debt owed under that agreement.  Proposed Complaint at 21.  As compensation for the partial extension, among other things, the Debtors were required to prepay $1.6 billion of indebtedness under the Credit Agreement at an above market price, pay the Defendants over $800 million in fees, and agree to yield enhancements that caused the Defendants to receive approximately $950 million in incremental interest and a $330 million Prepayment Benefit.  Id. at 28.  To fund the prepayment and its costs, TCEH issued the First Lien Notes pursuant to a private indenture.  Id. at 25-26.  Bonds and indentures are not security contracts under section 741(7).  See 11 U.S.C. § 741(7); In re Quimonda Richmond, LLC, 467 B.R. 318, 323 (Bankr. D. Del. 2012) (holding bonds and indenture do not qualify as "securities contracts").  Moreover, for the reasons stated above, the repayment of debt under a credit agreement is not a transfer made in connection with a securities contract.  As such, the Bank

17

Debt Repayment (as defined in the TCEH First Lien Objection) and the incurrence of the liens

and obligations under the First Lien Notes are not protected from avoidance by the section

546(e) "safe harbor."

28.    Third, as noted, any attempt to collapse those credit transactions into other

transactions involving securities contracts, such as the Merger Agreement, requires a detailed

factual inquiry not appropriate for resolution by the Court at this stage.

### C.    The TCEH Debtors' Postpetition Tax Attributes Are Not Encumbered By Prepetition Liens

29.    At pages 67 to 69 of the Proposed Complaint, Count XVII seeks a determination

that the Unencumbered Tax Attributes utilized (and the value thereof) and the Tax Basis Step-Up

(and the value thereof), including the value resulting from the TCEH Debtors' postpetition

reorganization efforts, are not subject to the TCEH first lien creditors' prepetition liens and

security interests and do not represent proceeds, products, offspring or profits of the TCEH first

lien creditors' prepetition collateral.  The TCEH First Lien Committee contends that this claim is

not colorable because the TCEH first lien creditors, as a matter of law and fact, have liens on all

tax attributes generated by the TCEH Debtors postpetition, including any increase in the tax

basis of the TCEH Debtors' assets.  See TCEH First Lien Objection at 63.  According to the

TCEH First Lien Committee, such tax assets are general intangibles subject to prepetition liens

or, in the alternative, constitute an "intrinsic and inseparable component" of the tangible

collateral (such as the applicable power plants, coal mines and retail operations).[8]  Id. at 64-65.

---

[8]    To support this latter contention, the TCEH First Lien Committee relies primarily on the case of U.S. Bank National Ass'n v. Lewis & Clark Apartments, LP (In re Lewis & Clark Apartments, LP), 479 B.R. 47 (B.A.P. 8th Cir. 2012).  Such reliance, however, is misplaced.  That case is factually distinguishable in that it relates to tax credits that the court concluded were inseparable from the underling real property asset because the tax credits were compensation for having to operate that property in accordance with the restrictions that accompanied the credit.  Id. at 50, 53.  In other words, the tax credits compensated the property owner (and any purchaser) for the impairment of value resulting from the restrictions on use of the property.  Id. at 53 (citing In re Creekside Senior Apts., LP, 477 B.R. 40 (B.A.P. 6th Cir. 2012).  The Post-Petition Tax Attributes and the Tax Basis Step-Up (each as defined below)

The TCEH First Lien Committee further claims that "any tax attributes that arise upon the TCEH First Lien Creditors' exercise of their remedies against the TCEH Debtors' assets . . . are independent of the TCEH Debtors' postpetition activities." Id. at 66 n.74. Beyond being contrary to the facts as alleged in the Proposed Complaint, which are assumed to be true for purposes of the Motion, such arguments have no basis in applicable law.

30.     Section 552(a) of the Bankruptcy Code sets forth the general rule that property acquired by the estate or debtor after the commencement of the case, i.e., "after-acquired" property, is not subject to a secured creditor's prepetition lien. See 11 U.S.C. § 552(a); In re Exide Techs., Inc., 299 B.R. 732, 752 (Bankr. D. Del. 2003). Section 552(b) of the Bankruptcy Code, however, provides an exception to this rule whereby a prepetition lien may extend to "property of the debtor acquired before the commencement of the case and to proceeds, products, offspring, or profits of such property." See 11 U.S.C. § 552(b)(1); In re Prof'l Ins. Mgmt., 130 F.3d 1122, 1129 (3d Cir. 1997). The tax attributes and step-up in tax basis at issue are neither prepetition collateral nor proceeds, products, offspring or profits thereof.[9]

31.     First, the tax attributes at issue plainly did not exist as of the Petition Date. As alleged, before the TCEH Debtors emerge from chapter 11, they will realize the value of certain tax attributes related to the tax year 2014 and that will arise in 2015 and subsequent taxable years (together, the "Postpetition Tax Attributes"). Proposed Complaint at 67. As also alleged, upon

---

are not similarly linked with the TCEH Debtors' assets that the TCEH first lien creditors claim as their collateral, because the Post-Petition Tax Attributes and Tax Basis Step-Up are not compensation for some restriction or impairment of the underlying assets. Rather, they arise incidentally from the operation of those assets following the Petition Date (and discussed further herein).

[9]     The term "tax attributes" includes, but is not limited to: current year deductions; net operating losses and net operating loss carrybacks and carryovers; current year general business credits and general business credit carryovers; alternative minimum tax credit carryovers; current year capital losses and capital loss carrybacks and carryovers; current year foreign tax credits and foreign tax credit carryovers; excess charitable contributions; recovery of tax benefits items; any method of accounting; investment credit carryovers; recovery exclusions; any claim of right; basis of property, holding period and character of assets; and any other tax attributes under the Internal Revenue Code, United States Treasury Regulations or applicable law.

19

the Debtors' contemplated transfer of the TCEH Debtors' equity or assets to the TCEH first lien

creditors, by which EFH will recognize a gain for federal income tax purposes, TCEH and its

first lien creditors would receive the benefit of a step-up in tax basis in such assets (the "Tax

Basis Step-Up") through application of these Postpetition Tax Attributes.  Id. at 68.  The Tax

Basis Step-Up would provide TCEH's first lien creditors with future material tax benefits

through their ownership of the TCEH Debtors' equity or assets, which tax benefits could be

valued in excess of $2 billion.  Id.   By definition, the Postpetition Tax Attributes could not have

existed on the Petition Date, could only come into existence thereafter, and can only be realized

after the Petition Date.  Likewise, the Tax Basis Step-Up is an asset that will come into existence

only when gain is recognized for federal income tax purposes upon consummation of a plan of

reorganization.  Accordingly, the Postpetition Tax Attributes and Tax Basis Step-Up are after-

acquired property shielded from prepetition liens by virtue of section 552.

32.    Second, the Postpetition Tax Attributes and the Tax Basis Step-Up also are not

"proceeds," "products," "offspring" or "profits" of prepetition collateral for purposes of section

552(b)(1).  In any litigation of the Claims, the TCEH First Lien Committee will bear the burden

of demonstrating that any tax attributes generated postpetition, and any step-up in tax basis,

represent "proceeds" of their original collateral in order to invoke the section 552(b)(1)

exception.  See Official Comm. of Unsecured Creditors v. UMB Bank, N.A. (In re Residential

Capital, LLC), 501 B.R. 549, 612 (Bankr. S.D.N.Y. 2013) ("ResCap").  It cannot satisfy such

burden.

33.    "Section 552(b) is intended to cover after-acquired property that is directly

attributable to prepetition collateral, without the addition of estate resources."  Id. at 612

(emphasis in original).  Thus, a debtor's assets that arise postpetition do not qualify as

20

"proceeds" of prepetition collateral for purposes of section 552(b) to the extent that they result

from the input by the debtor of postpetition effort and resources.  See id. ("The Debtors did not

merely take some [of the secured creditors'] Collateral and convert it into goodwill without any

other resources.  That means that the goodwill is not the proceeds of the [secured creditors']

Collateral."); In re Premier Golf Props., LP, 477 B.R. 767, 776 (B.A.P. 9th Cir. 2012) (finding

that debtor's postpetition revenues were not "proceeds" where they were largely the result of the

debtor's labor and own operational resources); Johnson v. Cottonport Bank, 259 B.R. 125, 129

(W.D. La. 2000) ("When a debtor grants a security interest in the right to receive a stream of

future payments, the security interest continues post-bankruptcy if . . . the debtor need not do

anything after bankruptcy to make them continue."); In re Cafeteria Operators, L.P., 299 B.R.

400, 405 (Bankr. N.D. Tex. 2003) (finding that secured creditor's security interest did not flow to

cash generated by debtors that stemmed from debtors' "post-petition toil and effort").

34.    In ResCap, for example, the secured creditors asserted that their prepetition liens

extended to goodwill generated after the petition date because such goodwill represented

"proceeds" of their prepetition collateral.[10]  See ResCap, 501 B.R. at 612.  The court found that

even if the secured creditors' collateral was used to generate goodwill postpetition, debtor

resources were used as well.  Id.  (noting that "the Debtors improved the value of the assets sold

to [the purchaser] by negotiating settlements with government entities and RMBS Trustees").

Because the debtors' estates expended time, effort and expense in carrying out these activities to

generate goodwill, the court determined that any goodwill generated postpetition was not subject

to the secured creditors' prepetition liens.  See id.

---

[10]    Notably, the assets at issue in ResCap (goodwill) are similar to those at issue in the instant case (tax attributes).  Goodwill is an intangible asset that represents the difference between the book value of assets and the fair value of the assets acquired and the liabilities assumed.  501 B.R. at 610.  Capital gains likewise represent the difference between the purchase price of an asset and its tax basis.  See Kool, Mann, Coffee & Co. v. Coffey, 300 F.3d 340, 368 n.2 (3d Cir. 2002).

Americas 90456754

35.     Similar to the goodwill in <u>ResCap</u>, the Postpetition Tax Attributes and Tax Basis Step-Up here do not constitute "proceeds" of First Lien Creditors' collateral because the value attributable thereto is alleged to tie directly to the manner in which the Debtors have conducted, and will conduct, their postpetition activities and is entirely dependent on the addition of estate resources.  The Postpetition Tax Attributes derive at least in part from the Debtors' postpetition activities and reorganization efforts, given that the Debtors' estates will have expended time, effort and expense in reorganizing TCEH in a way that will allow it to benefit from the Postpetition Tax Attributes and resulting Tax Basis Step-Up.[11]  That is a factual issue that must await trial.

36.     The TCEH First Lien Committee's objection with respect to the determination sought by the Ad Hoc Group squarely supports the pleaded declaratory judgment claim.  The TCEH First Lien Committee takes the position that the Postpetition Tax Attributes and Tax Basis Step-Up are inherent in their collateral (or their remedies with respect thereto) and existed as of the Petition Date, as opposed to arising from the TCEH Debtors' postpetition activities.  TCEH First Lien Objection at 64, 66 n.74.  By contrast, the Ad Hoc Group takes the positions that (i) the Postpetition Tax Attributes arose only after the Petition Date, and (ii) the Tax Basis Step-Up will arise only when the Debtors' postpetition reorganization efforts reach a conclusion resulting in recognition of gain for federal income tax purposes.  Proposed Complaint at 68.  Accordingly, there is an actual case or controversy as to how the Postpetition Tax Attributes and Tax Basis Step-Up came (or will come) to be that the Court must determine in order to determine the extent of the TCEH first lien creditors' liens and security interests.

---

[11]     This conclusion is also sound bankruptcy policy.  Value generated postpetition by a debtor's postpetition efforts and resources should be available to support the debtor's reorganization for the benefit of all stakeholders.  <u>See</u> American Bankruptcy Institute, Commission to Study the Reform of Chapter 11, 2012-2014 Final Report and Recommendations at 232-34.  Accordingly, the Postpetition Tax Attributes and Tax Basis Step-Up should remain unencumbered because they arise from the Debtors' expenditure of time, effort, money and property.

II.     **"The Debtors" Should Not Retain Any Authority To Settle The Claims**

37.     Independent of whether some creditor party should be granted standing to purse the Claims, the Debtors argue that they should have the <u>only</u> voice in deciding whether to settle them in a plan of reorganization.  Specifically, the Debtors seek to have this Court order that only they should have the sole right to compromise the validity, priority and extent of the First Lien Debt claims, leaving the real parties in interest to that dispute (the TCEH Debtors' $8 billion in unsecured creditors) with a mere right to object to any such proposed settlement. Debtors' Objection at 13, 17.  The Court should deny that request.

A.     **The Bankruptcy Code and Bankruptcy Rules Do Not Vest A Debtor With An Inalienable Right To Settle  Claims**

38.     As an initial matter, the Debtors assert two statutory arguments for the proposition that a debtor must always retain authority to settle claims against it.  Neither is applicable here. Rule 9019 of the Federal Rules of Bankruptcy Procedure, which speaks of a "trustee" settling a claim, does not prohibit a court from granting a party other than a trustee the right to settle estate claims.  <u>See</u> Fed. R. Bankr. P. 9019.  Indeed, when a party is granted derivative standing to be the representative of the estate bringing claims and causes of action, it legally and logically follows that such party should also be granted the right to settle such claims.  <u>See</u> <u>In re Smart World Techs., LLC</u>, 423 F.3d 166, 175 (2d Cir. 2005).  Were the Debtors' textual analysis correct, no third party could ever be granted derivative standing, as sections 544, 547, 548 and similar sections of the Bankruptcy Code all speak to a "trustee" having the power to avoid transfers.  <u>See, e.g.</u>, 11 U.S.C. § 544(b) (providing "the trustee may avoid any transfer . . ."); 11 U.S.C. § 547(b) (same); 11 U.S.C. § 548(a)(1) (same).  None of those statutory provisions refers to an entity acting on behalf of a "trustee," and yet the Third Circuit in <u>Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery</u> explicitly found that derivative standing

23

was expressly contemplated by the Bankruptcy Code.  See Official Comm. of Unsecured

Creditors of Cybergenics Corp. v. Chinery, 330 F.3d 548, 566-67 (3d Cir. 2003).

39.    Similarly, whether the Debtors should retain the right to settle the Claims is not,

as they contend, an issue of statutory exclusivity.  According to the Debtors, because the

settlement or resolution of the Claims will be a foundational element of any plan of

reorganization, depriving the Debtors of full and complete authority with respect to such Claims

would be an end run around exclusivity.  See Debtors' Objection at 14, 17.  The Debtors are

incorrect, and simply conflate their exclusive right to propose a plan of reorganization under

section 1121 of the Bankruptcy Code with an exclusive ability to settle the Claims.  The Ad Hoc

Group (like the TCEH Committee) has not yet sought authority to propose a plan of

reorganization—which is the only right granted exclusively to the Debtors under section 1121 of

the Bankruptcy Code and this Court's Second Order Extending the Debtors' Exclusive Periods to

File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the

Bankruptcy Code [Docket No. 3504].  In point of fact, although numerous issues affecting plan

resolution are outside a debtor's control, such as the need to obtain regulatory approval for a

merger or rate change, no court has ever held that those requirements are an affront to

exclusivity.

40.    The Debtors' expansive and unprecedented view of their exclusive right to file a

plan of reorganization would have particularly perverse results here that could draw into question

whether continued exclusivity would be appropriate at all.  As noted above, by insisting on sole

authority to settle, the Debtors are essentially seeking to have this Court sanction a process by

which "the Debtors" would compromise approximately $24 billion of contested First Lien Debt

claims and effectuate that settlement in a plan over the objections of the TCEH Committee, the

24

Ad Hoc Group, and indeed all holders of the more than $8 billion of unsecured claims against the

TCEH Debtors.  Granting the Debtors authority to prosecute such a plan, which is what their

objection seeks, would disenfranchise every single one of the real parties in interest to the

dispute, and turn resolution over to the Debtors who, as set forth below, have already shown a

fervent willingness to bury the past and obtain rapid closure of the Cases at all costs.  If, as the

Debtors contend, a "trustee" alone has the right to settle the Claims (in a plan or otherwise), then

the appropriate remedy under circumstances like those present here would be to seek the

appointment of a new "trustee" under section 1104 of the Bankruptcy Code.  Surely that cannot

be the result that the Debtors desire.

### B.    The Debtors Are Fundamentally Incapable Of Acting As The Fiduciary To Settle The Claims

41.    Whatever might happen in other cases with other debtors who have stipulated to

the validity of secured claims in a cash collateral order, these Debtors, acting through one set of

counsel and two CROs, are particularly inappropriate guardians of unsecured recoveries at the

expense of secured debt holders.  "The Debtors" here are hopelessly conflicted, and although one

might have given them the benefit of the doubt before the Court determined that certain actual

conflicts existed between the T-side and E-side estates,[12] and before the Court entered the Case

Matters Protocol and K&E Retention Order (each defined below), the Debtors continue to act

with knowing disregard of the actual conflicts that are plainly manifest here.

42.    First, certain non-TCEH Debtors are indisputably potential defendants with

respect to claims and causes of action arising out of the LBO, based on the very same facts and

---

[12]    See Nov. 3, 2014 Hr'g. Tr. at 13:25-14:8 (Sontchi, J.) (concluding that "there can be no question that [certain of the relief requested in the Debtors' bidding procedures motion] raises actual internal conflicts among the debtors' estates," and "the continued insistence by the debtors . . . that these conflicts are only potential ignores reality.")

25

circumstances that give rise to and support many of the Claims asserted in the Proposed

Complaint.  For example, as alleged in the Proposed Complaint, TCEH incurred over $27 billion

in funded debt obligations in connection with the LBO.  Proposed Complaint at 9-14.  ███████

████████████████████████████████████████████████████████████████

████████████████████████.  Id.  At the time of, and immediately following such

affiliate transfers, TCEH was insolvent.  Id. at 14-17.  While it is true that the Claims here are

asserted against holders of First Lien Debt, the inter-Debtor LBO claims arise out of the same

facts and circumstances alleged.  As such, it will be impossible for "the Debtors" to determine

whether to press or settle the Claims without having to place the interests of one set of Debtors

ahead of another set of Debtors with respect to their own LBO-related claims.[13]

43.    Second, "the Debtors" have already supported, on substantive grounds, a

complete settlement of all of the Claims for no consideration.  As the Court will recall,

independent of the Cash Collateral Order, the Debtors' now-defunct RSA proposed to allow all

First Lien Debt claims in full for no consideration other than an affirmative vote.  In contrast,

under the RSA, the Debtors offered the TCEH unsecured creditors a recovery of less than $350

million consisting solely of unencumbered assets other than the Claims—a recovery to which the

TCEH unsecured creditors were already entitled.  See Declaration of Paul Keglevic, Executive

Vice President, Chief Financial Officer, and Co-Chief Restructuring Officer of Energy Future

Holdings Corp., et al., in Support of First Day Motions [Docket No. 98], Ex. E (Pre-submission

Memo) to Ex. A (Restructuring Term Sheet) to Ex. D (Restructuring Support Agreement), at 4

("The TCEH debt held by junior creditors . . . will be cancelled in exchange for the recovery . . .

---

[13]    In addition, as discussed in the Motion, the TCEH Debtors' boards approved certain transactions that are subject to avoidance, and there are serious questions concerning such board members' and management's exercise of their fiduciary duties—questions that board members and management have significant incentive to squelch rather than entertain.

of less than $350 million cash."); id., Ex. A (Restructuring Term Sheet) to Ex. D (Restructuring

Support Agreement), at 13 ("Allowed General Unsecured Claims against the TCEH Debtors,

each Holder thereof shall receive its Pro Rata share of the TCEH Unsecured Claim Fund."); id.,

Ex. A (Definitions) to Ex. A (Restructuring Term Sheet) to Ex. D (Restructuring Support

Agreement), at 47 (defining "TCEH Unsecured Claim Fund" as "Cash in an amount equal to the

value of the unencumbered assets of TCEH").  In other words, under the RSA, the Debtors were

willing to settle the Claims—which are also unencumbered assets of the TCEH Debtors—for

nothing and to distribute to the TCEH Debtors' unsecured creditors only that which they already

would have otherwise received under the best interests test of section 1129(a)(7) of the

Bankruptcy Code.

     44.    The RSA settlement was not, as some have attempted to spin it, a mere "catalyst"

intended to drive better resolution of the Claims.  On the contrary, "the Debtors" steadfastly

maintained that a settlement of the Claims for nothing was a reasonable exercise of their business

judgment and actually maximized the value of the TCEH Debtors' estates.  See Motion of

Energy Future Holdings Corp., et al., for Entry of an Order Authorizing the RSA Debtors to

Assume the Restructuring Support Agreement and Modifying the Automatic Stay [Docket No.

505] at 2, 4, 21, 23 (providing that the restructuring contemplated in the RSA, "if consummated,

will maximize the value of the Debtors estates," that the Debtors' "reasonable business judgment

is that the terms of the [RSA] represent the best terms available for each of [the Debtors']

respective restructuring," that the RSA restructuring "will maximize the value of the Debtors'

enterprise for the benefit of the Debtors' estates, creditors, and other parties in interest," and that

the Debtors "have exercised reasonable business judgment in deciding to assume the [RSA].")

Having consistently staked out the position that the Claims have no value, the Debtors cannot

now be relied upon to settle the Claims for any appropriate amount above zero.  Simply, how can "the Debtors" ever credibly take the position in settlement discussions that colorable Claims must be settled for fair consideration when they already agreed that zero is the "best term available?"

45.    Third, EFH is itself a holder of First Lien Debt.[14]  Over this fact, persons who owe dual fiduciary duties to EFH and the TCEH Debtors, such as the two CROs and Kirkland & Ellis LLP ("K&E"), simply cannot appropriately settle the Claims.  Indeed, by filing the Debtors' Objection on behalf of "the Debtors," K&E is actively representing one client—EFH—which holds an interest (the First Lien Debt) that is directly adverse to another client—TCEH—in direct contravention of this Court's Order Authorizing the Retention and Employment of Kirkland & Ellis LLP and Kirkland & Ellis International LLP as Attorneys for the Debtors and Debtors in Possession Effective *Nunc Pro Tunc* to the Petition Date [Docket No. 2052] (the "K&E Retention Order").  See K&E Retention Order at 4 ("K&E may not represent the applicable Debtor(s) in litigating or otherwise advising the applicable Debtor(s) with respect to the Actual Conflict Matter" (defined to include "any potential conflict between or among the Debtors, whether or not resulting from intercompany or other claims, [that] becomes an actual conflict . . . .")).  It is not even clear why K&E appeared on behalf of EFH and EFIH in the filed pleading, in that neither estate has any legitimate interest in participating in an action challenging liens on assets they do not own.

46.    Fourth, the measures that have been put in place to address Actual Conflict Matters, like the Claims here, are plainly not working.  Pursuant to the Stipulation and Agreed Order Regarding a Protocol for Certain Case Matters [Docket No. 2051] (the "Case Matters

---

[14]        The Debtors recently disclosed that EFH (or EFIH) holds approximately $19 million of the First Lien Debt. See Form 10-Q of Energy Future Holdings Corp. for the quarterly period ended September 30, 2014, at 18.

Protocol") and the K&E Retention Order, both of which were negotiated by numerous parties over a period of months, Actual Conflict Matters should be within the exclusive purview of Mr. Sawyer. "The Debtors" and their conflicted advisors should be taking no position with respect to such matters. <u>See</u> Case Matters Protocol at 2-4 ("The independent directors of EFIH, EFCH and TCEH, and EFH, respectively . . . , are authorized to seek to retain separate advisors of his or her choosing . . . to advise or otherwise represent the applicable Debtor (a) if he or she determines it is necessary or prudent to do so with respect to any Notice Matter . . . ." (defined to include "material potential claims or causes of action of EFCH and/or any of its direct or indirect subsidiaries . . . , including, but not limited to, inter-debtor issues, rights, claims, or defenses")); <u>see also</u> K&E Retention Order at 4.

47.    However, despite the clear edicts in the Case Matters Protocol and the K&E Retention Order, "the Debtors," through their joint objection, make multiple statements directly contrary to the interests of the TCEH Debtors and their estates regarding the Claims. Specifically, a significant portion of the Debtors' Objection is devoted to highlighting the following potential defenses:

- unsecured creditors cannot establish that the TCEH Debtors were rendered insolvent as a result of the LBO given the significant effect of macroeconomic factors in the energy markets and broader economy at the time;

- unsecured creditors are time-barred from asserting avoidance claims in connection with the LBO;

- the TCEH Debtors received reasonably equivalent value in connection with the 2011 and 2013 amendment and extension transactions;

- many of the payments that unsecured creditors seek to unwind constitute settlement payments protected by the section 546(e) safe harbor provision of the Bankruptcy Code; and

Americas 90456754

- unsecured creditors benefited from the LBO, and it would be inequitable to strip liens and subordinate claims of secured creditors while leaving unsecured notes and other funded debt intact.

Debtors' Objection at 8-12.  Each of these arguments on its face serves to further the economic interests of EFH and EFIH, both of which have extensive exposure with respect to claims arising out of the LBO.  In disregarding this Court's orders, "the Debtors" and their counsel have inappropriately put the interests of their non-TCEH Debtor clients before those of their TCEH Debtor clients.

48.     The prejudice to the TCEH Debtors' estates that has resulted, and will continue in the future, from the actions of the Debtors' CROs and conflicted counsel is exactly the type of harm the Case Maters Protocol and the K&E Retention Order were designed to prevent.  But such measures and the presence of Mr. Sawyer as the independent director for the TCEH Debtors have not resolved the problem.  Instead, perhaps consistent with his prior inability to conceive of any conflict ever ripening between any Debtors, Mr. Sawyer has sat silently by, permitting the Debtors and their conflicted advisors to file pleadings on Actual Conflict Matters and thereby undermine the Claims to the detriment of the TCEH Debtors' estates.  Indeed, Mr. Sawyer has not appeared on the Motion, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[15]  Effectively, his refusal to act, in deference to "the Debtors," has deprived the TCEH Debtors of any independent voice as to whether the Claims should proceed.

49.     Mr. Sawyer's inaction perhaps should be unsurprising as he has already telegraphed his view of the Claims through his previous support of the RSA (which views he

---

[15]     Until Mr. Sawyer designates the Claims a conflict matter (or "Notice Matter" within the meaning of the Case Matters Protocol), he does not have exclusive authority with respect to that conflict matter, and thus "the Debtors" remain in conflict with respect to the Claims.  Remarkably, in the six months since entry of the Case Matters Protocol and the K&E Retention Order, not a single notice of conflict matters has been filed with the Court, and this is not for lack of conflict matters in these Cases.

Americas 90456754

formed without investigation and in sole reliance on advice from the Debtors' conflicted

advisors).  In defending his decision to approve the RSA and compromise the Claims for

nothing, Mr. Sawyer ███████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████. In sum, Mr. Sawyer's prior positions with

respect to the Claims and his inaction in the face of Actual Conflict Matters make him no more

capable of settling the Claims than the Debtors' conflicted CROs and conflicted advisors.  Thus,

even if he were to act now and properly identify the Claims as Actual Conflict Matters, he cannot

be given exclusive authority to settle.

**C.**    **The Debtors' Retention Of Any Authority
To Settle The Claims Is Inappropriate Given The
Particular Facts And Circumstances Of These Cases**

50.    Given the Debtors' past attempt to settle the Claims for nothing in connection

with the RSA, their improper attacks on the Claims, and Mr. Sawyer's continued inaction with

31

respect to Actual Conflict Matters, the Ad Hoc Group believes it actually would be value destructive to give the Debtors authority to settle the same Claims that they have actively, consistently and publicly undermined over the objection of the entire body of unsecured creditors of the TCEH Debtors.

51.     Given these facts, the case examples cited by the Debtors do not support their request to maintain control.  See Debtors' Objection at 15.  In each of the cases cited, the debtor had not already questioned the validity or value of the estate claims at issue.  See, e.g., In re Centaur, LLC, Case No. 10-10799 KJC (Bankr. D. Del. Nov. 21, 2010) [Docket No. 447] (debtors did not object to committee standing to pursue claims and did not contest that claims were colorable); In re Exide Techs., 303 B.R. 48, 54 (Bankr. D. Del. 2003) (same).  Indeed, in one of the cases cited by the Debtors, the debtor went so far as to "determine[] not to take an advocacy position" on the claims in question due to conflicts of interest and admitted in their characterization of such claims that some prepetition transfers "may be considered a fraudulent conveyance" and noted that creditors "could seek to recover" on those claims.  In re Adelphia Commc'ns. Corp., No. 02-41729 (Bankr. S.D.N.Y July 2, 2005) [Docket No. 7895], at ¶¶ 8, 11.  In addition, in In re Allegheny International, Inc., which the Debtors cite for "approving settlement of claims over equity committee's objection even where committee could have derivatively pursued claims," the equity committee did pursue such claims, and the court approved that settlement only after the creditors' committees had conducted "many months of extensive discovery and negotiations," "because [the] litigation ha[d] been clearly adversarial," and because it was therefore "satisfied that the negotiations were conducted at arm's length."  118 B.R. 282, 309 (Bankr. W.D. Pa 1990).

32

### III.    At The Very Least, The Ad Hoc Group Should (1) Be Permitted To Intervene As A Party In The TCEH Committee's Action, And (2) Have A Consent Right With Respect To Any Settlement Of The Claims

52.    In both the Debtors' Objection and the TCEH First Lien Objection, the objectors have sought to disqualify the Ad Hoc Group as an appropriate party to prosecute the Claims, ostensibly on the basis that the Ad Hoc Group is not a fiduciary for all the TCEH Debtors' unsecured creditors.  See Debtors' Objection at 18; TCEH First Lien Objection at 72.  In addition, the TCEH Committee has noted that it should be the sole party with the right to prosecute and settle the Claims as the TCEH Committee is a fiduciary to all unsecured creditors of the TCEH Debtors.  See Omnibus Response of the Official Committee of TCEH Unsecured Creditors to (I) Motion of the Ad Hoc Group of TCEH Unsecured Noteholders for Entry of an Order Granting Standing and Authority to Commence, Prosecute, and Settle Certain Claims for Declaratory Judgment, Avoidance and Recovery of Liens, Security Interests, Obligations, Fees, and Interest Payments, and Disallowance of Claims; and (II) Motion of the EFH Official Committee for Entry of an Order Granting Derivative Standing and Authority to Prosecute and Settle Claims on Behalf of the Luminant Debtors' Estates [Docket No. 3733] (the "Committee Omnibus Response") at 3.[16]  In all instances, however, the objectors overlook the key importance of the Unsecured Notes to the TCEH Debtors' Cases and resolution of the Claims.

53.    The gravamen of the Proposed Complaint is that the Court should avoid liens asserted against the operating assets of the TCEH Debtors.  Substantially all of those assets exist at estates other than EFCH and TCEH, the two holding companies at the top of the TCEH Debtor stack.  By virtue of scheduled guaranty claims, the Unsecured Notes constitute the vast majority,

---

[16]    In an effort to resolve these objections, the Ad Hoc Group and the TCEH Committee have agreed to work together to craft an appropriate solution that allows both parties to participate in the prosecution and settlement of the Claims.  As the TCEH Committee acknowledges, this is consistent with the conduct between the two parties throughout these cases, and in particular during the first lien investigation.  See Committee Omnibus Response at 8.

Americas 90456754

if not all, of the scheduled unsecured debt at each of the operating TCEH Debtors.  In fact, in

only a handful of instances do the schedules of assets and liabilities of those TCEH Debtors

identify <u>any</u> third party general unsecured claims other than the Unsecured Notes.[17]  In the

aggregate, the "other" general unsecured claims asserted against the operating TCEH Debtors

total approximately $144 million, meaning that the Unsecured Notes represent more than 98% of

the relevant unsecured claims at those estates.

      54.      As such, it remains crucial that representatives of the holders of the Unsecured

Notes be allowed to participate directly in any litigation with respect to the Claims and have a

meaningful say with respect to any potential settlement of them.  To that end, the Ad Hoc Group

and the TCEH Committee have agreed that, should the TCEH Committee be granted

standing, the Ad Hoc Group should be permitted to intervene as a party in any adversary

proceeding commenced by the TCEH Committee and should have the right to participate in

discovery and be heard.

      55.      The issue, if any, is the extent to which the Unsecured Notes should have a voice

with respect to any settlement of the Claims prior to a judicial resolution.  The Ad Hoc Group

proposes that any settlement on behalf of the TCEH Debtors' estates should be subject to the

advance written consent of the Ad Hoc Group, which consent shall not be unreasonably

withheld.  That consent right is appropriate here.  Again, only three creditor constituencies other

than the holders of the Unsecured Notes could potentially have a meaningful say in the

resolution of the Claims at the operating TCEH Debtors.  Holders of First Lien Debt, in their

---

[17]      Only the amended schedules of assets and liabilities of the following TCEH Debtors reflect third party unsecured claims other than the Unsecured Notes:  4 Change Energy Company, EFCH, Luminant Big Brown Mining Company LLC, Luminant Energy Company LLC, Luminant Holdings Company LLC, Luminant Mining Company LLC, NCA Resources Development Company LLC, Oak Grove Management Company LLC, Sandow Power Company LLC, TCEH, TXU Energy Retail Company LLC, TXU Energy Solutions Company LLC, and TXU Retail Services Company.

34

capacity as prospective holders of unsecured deficiency claims, however, would be hopelessly conflicted from negotiating a settlement on which they stand on both sides as secured and unsecured creditors.  Holders of TCEH Second Lien Debt, represented by Wilmington Savings Fund Society, FSB ("WSFS") as the indenture trustee, cannot adequately participate in deciding whether and on what terms to settle any of the Claims under the express terms of their intercreditor agreement with holders of the First Lien Debt.  See Intercreditor Agreement at § 6.2.  WSFS itself acknowledges in its limited objection that it has abided by its obligations under that agreement, see Response and Limited Objection of Wilmington Savings Fund Society, FSB to Certain Motions for Standing [Docket No. 3725] at 5, and it presumably will continue to do so.  Accordingly, holders of TCEH Second Lien Debt will effectively have no voice in settlement decisions.  And, holders of the approximately $342 million in "other" unsecured claims at the TCEH Debtors (approximately $198 million at EFCH and approximately $144 million at the operating subsidiaries of TCEH), are not incentivized to recover for the benefit of creditors of all of the TCEH Debtors.  For example, trade vendors or contract claimants of individual TCEH Debtors have claims against only those particular subsidiaries (e.g., Luminant Generation or TXU Energy).[18]

56.    There is no legitimate reason why the Ad Hoc Group should not be granted a reasonable consent right over any settlement of the Claims.  For all TCEH Debtors other than TCEH and EFCH, the holders of Unsecured Notes constitute approximately 98% percent of the beneficiaries of the Claims (exclusive of secured creditors' deficiency claims).  At the two holding companies, the holders of Unsecured Notes constitute approximately 84% of the unsecured creditor body (exclusive of such deficiency claims).  As it is comprised of holders of

---

[18]    Similarly, holders of TCEH Pollution Control Revenue Bonds have claims against TCEH only, and not any of its subsidiaries.

Americas 90456754

more than half of the Unsecured Notes, the Ad Hoc Group should have a reasonable consent right with respect to any settlement of the Claims.  Any objection to the requested reasonable consent right can only be premised on an expectation that the Claims would ultimately be settled in a manner that is objectionable to nearly all unsecured creditors, and the Ad Hoc Group sees no legitimate reason for preserving that possibility.

57.    In sum, if the TCEH Committee is granted standing to pursue and settle the Claims, then at a minimum the Ad Hoc Group should be permitted to intervene in any such action and the Ad Hoc Group should be granted a reasonable consent right over any settlement of the Claims.

## CONCLUSION

WHEREFORE, the Ad Hoc Group respectfully requests that the Court (i) enter an order granting the TCEH Committee exclusive standing and authority to commence, prosecute, and settle claims against holders of First Lien Debt arising out of the factual allegations set forth in the Proposed Complaint on the terms described herein, including permitting the Ad Hoc Group to intervene and granting the Ad Hoc Group a consent right with respect to any proposed settlement, (ii) overrule the Objections, and (iii) grant such other and further relief as the Court may deem just and proper.

*[Remainder of page left intentionally blank.]*

36

Dated: Wilmington, Delaware
April 1, 2015

FOX ROTHSCHILD LLP

By: /s/ L. John Bird
Jeffrey M. Schlerf (No. 3047)
John H. Strock (No. 4965)
L. John Bird (No. 5310)
919 North Market St., Suite 300
Wilmington, DE 19801
Telephone:  (302) 654-7444
Facsimile:  (302) 463-4971
jschlerf@foxrothschild.com
jstrock@foxrothschild.com
lbird@foxrothschild.com

and

WHITE & CASE LLP
Thomas E Lauria (admitted *pro hac vice*)
Matthew C. Brown (admitted *pro hac vice*)
Southeast Financial Center, Suite 4900
200 South Biscayne Blvd.
Miami, FL 33131
Telephone:  (305) 371-2700
Facsimile:  (305) 358-5744
tlauria@whitecase.com
mbrown@whitecase.com

J. Christopher Shore (admitted *pro hac vice*)
Gregory M. Starner (admitted *pro hac vice*)
1155 Avenue of the Americas
New York, NY 10036
Telephone:  (212) 819-8200
Facsimile:  (212) 354-8113
cshore@whitecase.com
gstarner@whitecase.com

*Counsel to the Ad Hoc Group of TCEH Unsecured
Noteholders*