# EXHIBIT A

# EXHIBIT A

*Signed & Executed by KEC Though contemporaneous signing*

*#515*

*KK*

# MASTER COAL PURCHASE AND SALE AGREEMENT

### by and between

### KENNECOTT COAL SALES COMPANY

#### as Seller,

#### and

### TXU ENERGY TRADING COMPANY LP

#### as Buyer,

#### dated effective as of

#### March 22, 2002

*Karen dist*

# TABLE OF CONTENTS

ARTICLE I Definitions...................................................................................................................1

    1.1. "Acceptable Substitute Coal Sources".........................................................................1
    1.2. "Agreement"..................................................................................................................1
    1.3. "ASTM"........................................................................................................................1
    1.4. "Btu".............................................................................................................................1
    1.5. "Buyer".........................................................................................................................1
    1.6. "Buyer Deficiency".......................................................................................................1
    1.7. "Confirmation".............................................................................................................1
    1.8. "Confirmation Price".....................................................................................................2
    1.9. "Contract Price"............................................................................................................2
    1.10. "Contract Quantity"....................................................................................................2
    1.11. "Delivery Term".........................................................................................................2
    1.12. "Electronic Means".....................................................................................................2
    1.13. "Event of Default".......................................................................................................2
    1.14. "Guaranteed Quality Specifications"..........................................................................2
    1.15. "Interest Rate".............................................................................................................2
    1.16. "Loading Facilities".....................................................................................................2
    1.17. "Material Adverse Change".........................................................................................2
    1.18. "Performance Assurance"...........................................................................................3
    1.19. "Point of Delivery".....................................................................................................3
    1.20. "Rail Carrier" or "Rail Carriers" or "Railroad".........................................................3
    1.21. "Rail Transportation Agreement"...............................................................................3
    1.22. "Replacement Price"...................................................................................................3
    1.23. "Sales Price"...............................................................................................................3
    1.24. "Seller".......................................................................................................................3
    1.25. "Seller's Coal Reserves".............................................................................................3
    1.26. "Seller Deficiency".....................................................................................................3
    1.27. "Seller's Mine"...........................................................................................................3
    1.28. "Specified Btu Value".................................................................................................3
    1.29. "Specified $SO_2$ Value".................................................................................................3
    1.30. "Sub-Standard Coal"...................................................................................................4
    1.31. "Term".........................................................................................................................4
    1.32. "Ton"...........................................................................................................................4
    1.33. "Trace Elements".......................................................................................................4
    1.34. "Transaction"..............................................................................................................4
    1.35. "Unit Train" or "train"...............................................................................................4

ARTICLE II General Terms and Conditions of Purchase and Sale.............................................4

    2.1. Procedure to Enter into Binding Transaction.................................................................4
    2.2. Source of Coal...............................................................................................................5
    2.3. Representations and Warranties of Seller......................................................................6
    2.4. Representations and Warranties of Buyer......................................................................6
    2.5. Cost of Transportation. ................................................................................................7
    2.6. Contingencies to Agreement.........................................................................................7

2.7. Resale by Buyer. ............................................................................................8

ARTICLE III Term ...................................................................................................9

ARTICLE IV Quantity of Coal and Scheduling of Deliveries ...................................10

4.1. Contract Quantity. ........................................................................................10
4.2. Reduction in Contract Quantity. ..................................................................10
4.3. Forecasting of Deliveries. ............................................................................10
4.4. Scheduling of Deliveries. .............................................................................11

ARTICLE V Price of Coal .......................................................................................11

5.1. Base Price. ....................................................................................................11
5.2. Adjustments. .................................................................................................12
5.3. Complete Consideration Paid for Coal. .......................................................15

ARTICLE VI Invoicing and Payment ......................................................................15

6.1. Invoices. ........................................................................................................15
6.2. Payment by Buyer. ........................................................................................16

ARTICLE VII Quality of Coal .................................................................................16

7.1. Coal Quality Specifications. .........................................................................16
7.2. Sub-Standard Coal. .......................................................................................17

ARTICLE VIII Events of Default and Remedies .....................................................18

8.1. Event of Default. ...........................................................................................18
8.2. Seller Deficiency. ..........................................................................................19
8.3. Buyer Deficiency. ..........................................................................................20
8.4. Exclusive Remedy. ........................................................................................20

ARTICLE IX Limitation of Liability .......................................................................21

ARTICLE X Delivery; Title and Risk of Loss; Insurance; Indemnity......................22

10.1. Delivery. ......................................................................................................22
10.2. Title and Risk of Loss. ...............................................................................22
10.3. Insurance. ....................................................................................................22
10.4. Indemnity. ...................................................................................................23
10.5. Third Party Claims. .....................................................................................24

ARTICLE XI Coal Sampling and Analysis ..............................................................25

11.1. Testing and Analysis Determinations. ........................................................25
11.2. Sampling. .....................................................................................................25
11.3. Analysis. ......................................................................................................27
11.4. Disputed Analysis. ......................................................................................27
11.5. Trace Elements Analysis. ............................................................................28

ARTICLE XII Coal Loading Procedures .................................................................28

12.1. Loading. .......................................................................................................28
12.2. Train Size and Minimum Trainload Lading Weight.....................................30

12.3. Weighing and Determination of Weights. ...........................................31
12.4. Breakdown of Scales.........................................................................31
12.5. Scale Errors. ...................................................................................32
12.6. Weight Limits, Excess Weight and Charges.........................................33
12.7. Reimbursement for Loading and Transportation Charges and Costs. .................33

ARTICLE XIII Notice of Loading, Weighing and Analysis..................................34

13.1. Notice of Loading, Weights and Departure. ........................................34
13.2. Notice of Sample Analysis. ...............................................................35

ARTICLE XIV Force Majeure .........................................................................35

14.1. Force Majeure Defined. ...................................................................35
14.2. Effect of Force Majeure. ..................................................................36

ARTICLE XV Material Adverse Change .........................................................38

ARTICLE XVI Governmental Approvals .........................................................38

ARTICLE XVII Notices and Addresses .........................................................39

17.1. Notices. .......................................................................................39
17.2. Effective Date of Notice. .................................................................39
17.3. Addresses and Recipients. ...............................................................40

ARTICLE XVIII Assignments .......................................................................42

18.1. Consent Required for Assignment, or Sale. .........................................42
18.2. Exempt Assignments. ......................................................................43
18.3. Government Approval. .....................................................................44
18.4. Assignee Bound. ............................................................................44

ARTICLE XIX Confidentiality........................................................................44

19.1. Scope............................................................................................44
19.2. Confidential...................................................................................44
19.3. Exceptions.....................................................................................45
19.4. Specific Performance. .....................................................................46
19.5. Continuing Effectiveness. ................................................................46

ARTICLE XX Miscellaneous .........................................................................46

20.1. Records and Audits. ........................................................................46
20.2. Inspections. ...................................................................................46
20.3. Non-Waiver....................................................................................46
20.4. Election of Remedies. .....................................................................47
20.5. Entire Agreement; Amendments.........................................................47
20.6. No Third-Party Beneficiaries. ...........................................................47
20.7. Inurement. ....................................................................................47
20.8. Severability; Effect of this Agreement................................................47
20.9. Choice of Law.................................................................................48

## MASTER COAL PURCHASE AND SALE AGREEMENT

This MASTER COAL PURCHASE AND SALE AGREEMENT is made and entered into effective as of March _, 2002, by and between Kennecott Coal Sales Company, an Oregon corporation and a subsidiary of Kennecott Energy Company (hereinafter called "Seller"), and TXU Energy Trading Company LP (hereinafter called "Buyer"), a Texas limited partnership. Seller and Buyer may be referred to in this Agreement (as defined in Article I) individually as a "Party" and collectively as the "Parties."

In consideration of the mutual covenants and agreements set forth herein, together with other good and valuable consideration, the receipt and sufficiency of which Buyer and each Seller acknowledges, the Parties agree as follows:

### ARTICLE I
### Definitions

1.1. "Acceptable Substitute Coal Sources" means those mines or coal sources, if any, specified for a particular Transaction in the Confirmation for such Transaction.

1.2. "Agreement" means this Master Coal Purchase and Sale Agreement and any effective Confirmation.

1.3. "ASTM" means the American Society for Testing and Materials.

1.4. "Btu" means British Thermal Unit and "MMBtu" means one million Btu's.

1.5. "Buyer" means TXU Energy Trading Company LP, a Texas limited partnership.

1.6. "Buyer Deficiency" has the meaning set forth in Section 8.3.

1.7. "Confirmation" means a written, fully-executed confirmation of a Transaction, which will be substantially in the form of the attached Exhibit "A," and which will bind the Parties to perform such Transaction, in accordance with the terms and conditions set forth therein and in this Master Coal Purchase and Sale Agreement.

1.8. "<u>Confirmation Price</u>" means the base price for coal purchased and sold pursuant to a specific Transaction as specified in the Confirmation for such Transaction.

1.9. "<u>Contract Price</u>" means the Confirmation Price for coal purchased and sold pursuant to a specific Transaction, as adjusted in accordance with Section 5.2.

1.10. "<u>Contract Quantity</u>" means the quantity of coal that any Seller agrees to sell, and Buyer agrees to purchase, pursuant to a specific Transaction as specified in the Confirmation for such Transaction, subject to adjustment in accordance with Section 4.2.

1.11. "<u>Delivery Term</u>" means the period specified in a Confirmation and is the period in which Seller will sell and deliver, and Buyer will purchase and accept, coal in accordance with this Master Coal Purchase and Sale Agreement and the Confirmation for a particular Transaction.

1.12. "<u>Electronic Means</u>" refers to the electronic transmission of information to be transmitted and received by means of a computer and modem in the form of an ASCI text file or other mutually agreed upon electronic format.

1.13. "<u>Event of Default</u>" has the meaning set forth in Article VIII.

1.14. "<u>Guaranteed Quality Specifications</u>" means the guaranteed quality specifications of the coal to be purchased and sold pursuant to a particular Transaction as set forth in the Confirmation for such Transaction.

1.15. "<u>Interest Rate</u>" means the rate of two percent over the prime lending rate as published from time to time in the *Wall Street Journal*, but in no event to exceed the maximum lawful rate.

1.16. "<u>Loading Facilities</u>" means Seller's equipment and facilities at such Seller's Mine, or, if one or more Acceptable Substitute Coal Sources are designated in a Confirmation, the equipment and facilities at an Acceptable Substitute Coal Source from which coal is being delivered under such Transaction, that are used for the loading of coal purchased hereunder.

1.17. "<u>Material Adverse Change</u>" has the meaning set forth in Article XV.

2

1.18. "Performance Assurance" has the meaning set forth in Article XV.

1.19. "Point of Delivery" has the meaning set forth in Section 10.2.

1.20. "Rail Carrier" or "Rail Carriers" or "Railroad" means a "Class I" railroad (as such term is defined in 49 C.F.R. Part 1201), with which Buyer has contracted or will contract for the transportation of the coal to be purchased hereunder.

1.21. "Rail Transportation Agreement" means each rail transportation agreement between a Rail Carrier and Buyer, which provides, or will provide, for the transportation of the coal to be purchased hereunder.

1.22. "Replacement Price" has the meaning set forth in Section 8.2.

1.23. "Sales Price" has the meaning set forth in Section 8.3.

1.24. "Seller" means Kennecott Coal Sales Company, an Oregon corporation.

1.25. "Seller's Coal Reserves" means those coal reserves owned, leased or controlled by Seller located at such Seller's Mines.

1.26. "Seller Deficiency" has the meaning set forth in Section 8.2.

1.27. "Seller's Mine" means each Seller's coal mine specified in a Confirmation for a particular Transaction (or if more than one such mine is specified, any such mine), and "Seller's Mines" means, if more than one such mine is specified, all such Seller's coal mines specified in a Confirmation for a particular Transaction.

1.28. "Specified Btu Value" means the average Btu content of the coal to be purchased and sold pursuant to a particular Transaction as set forth in the Confirmation for such Transaction to be used for base price adjustment for Btu content purposes pursuant to Section 5.2.1.

1.29. "Specified $SO_2$ Value" means the average $SO_2$ content of the coal to be purchased and sold pursuant to a particular Transaction as set forth in the Confirmation for such Transaction to be used for base price adjustment for $SO_2$ content purposes pursuant to Section 5.2.2.

3

1.30. "Sub-Standard Coal" means any coal delivered by Seller pursuant to this Agreement that fails to meet the Guaranteed Quality Specifications set forth in the Confirmation for a particular Transaction, or that is not free of impurities as provided in Section 7.1 hereof.

1.31. "Term" means the term of this Master Coal Purchase and Sale Agreement as specified in Article III.

1.32. "Ton" means 2000 pounds.

1.33. "Trace Elements" means the level of the following specific elements in Seller's coal (as reported on a dry coal basis): antimony, arsenic, barium, beryllium, boron, cadmium, chloride, chromium, cobalt, copper, fluoride, lead, lithium, manganese, mercury, molybdenum, nickel, selenium, silver, strontium, tin, vanadium, and zinc.

1.34. "Transaction" means a sale by Seller, and a purchase by Buyer, of coal from each such Seller's Coal Reserves and/or, if one or more Acceptable Substitute Coal Sources are designated in the Confirmation for such Transaction, from an Acceptable Substitute Coal Source, as specifically agreed to pursuant to Article II of this Master Coal Purchase and Sale Agreement, as evidenced by a Confirmation and which sale and purchase is to be performed under this Master Coal Purchase and Sale Agreement and the Confirmation.

1.35. "Unit Train" or "train" means a train as described in Section 12.2, which is utilized to transport the coal purchased hereunder.

### ARTICLE II
### General Terms and Conditions of Purchase and Sale

2.1. Procedure to Enter into Binding Transaction. From time to time during the Term hereof, the Parties may, but are not obligated to, agree to one or more Transactions and the terms of any such Transaction will be specified on a Confirmation substantially in the form of the attached Exhibit "A." If the Parties desire to enter into any Transaction, it being agreed that neither Party

is obligated to enter into any Transaction, then, in addition to the terms and conditions set forth in this Master Coal Purchase and Sale Agreement, the Parties will agree on the specific terms and conditions of a particular Transaction, which terms and conditions will include the following: (i) the Delivery Term of the Transaction, (ii) the Confirmation Price, (iii) the Contract Quantity, (iv) the Guaranteed Quality Specifications, (v) the Specified Btu Value, (vi) the Specified $SO_2$ Value, (vii) Seller's Mine or Seller's Mines and Acceptable Substitute Coal Sources (if any) from which the coal will be mined and delivered, and (viii) any other terms and provisions agreed upon by the Parties.  Upon the execution of the Confirmation by Buyer and Seller, the terms and provisions of such Confirmation will constitute an integrated part of this Master Coal Purchase and Sale Agreement and will be read and construed as one with this Master Coal Purchase and Sale Agreement.  The terms of this Master Coal Purchase and Sale Agreement and the executed Confirmations will govern all purchases and sales of coal from Seller to Buyer that are entered into on the date of this Agreement and thereafter during the Term hereof unless the Parties agree otherwise in writing.  In the event of a conflict between the terms of this Master Coal Purchase and Sale Agreement and any Confirmation, the terms of the Confirmation will prevail.

2.2. Source of Coal.  The coal to be delivered by Seller under this Agreement shall be from Seller's Coal Reserves at Seller's Mine or Seller's Mines as specified in the Confirmation executed with respect to such Transaction.  In no event shall Seller substitute any coal from any other source or supply hereunder, unless expressly agreed in writing by Buyer, which agreement may be withheld or granted in Buyer's sole discretion; provided, however, Seller has the right to supply coal from any Acceptable Substitute Coal Sources (if any such Acceptable Substitute Coal Sources are permitted for a particular Transaction as specified in the Confirmation for such Transaction), provided that such substitute coal shall be:  (i) provided in complete compliance with all terms of this Agreement (including, without limitation, all Guaranteed Quality

5

Specifications for such Transaction), and (ii) priced at the Contract Price for such Transaction as adjusted in accordance with this Agreement.

2.3. Representations and Warranties of Seller. In addition to any other representations and warranties contained in this Agreement, Seller hereby represents and warrants to Buyer, as of the date set forth at the outset of this Master Coal Purchase and Sale Agreement and, by executing a Confirmation, as of the date of such Confirmation, that each Seller:

2.3.1. is a corporation, duly organized, validly existing, and in good standing under the laws of its state of incorporation and is duly qualified as a foreign corporation and is authorized to transact business in the State of Texas;

2.3.2. has full power, lawful authority and all other rights and authority necessary for it to accomplish, execute and fulfill all of its obligations and duties hereunder;

2.3.3. will convey to Buyer, with good and marketable title, free and clear of all liens, charges and encumbrances, all coal sold by it pursuant to this Agreement;

2.3.4. has all necessary permits, licenses and authorizations to enable it to mine, deliver and sell the coal to be delivered hereunder and to operate its mining facilities;

2.3.5. will supply all coal required to be supplied by it under this Agreement and in conformance with all quality specifications stated herein; and

2.3.6. subject to all of the terms and contingencies set forth in this Agreement, will, at the time it enters into a Transaction, have the reserves, production capacity, financial resources, equipment and facilities to mine sufficient coal to supply all of its customers, including Buyer, throughout the Delivery Term of each Transaction.

2.4. Representations and Warranties of Buyer. In addition to any other representations and warranties contained in this Agreement, Buyer hereby represents and warrants to Seller, as of

6

the date set forth at the outset of this Master Coal Purchase and Sale Agreement and, by executing a Confirmation, as of the date of such Confirmation, that Buyer:

2.4.1.  is a limited partnership duly organized and validly existing under the laws of the State of Texas;

2.4.2.  has full power, lawful authority and all other rights and authority necessary for Buyer to accomplish, execute and fulfill all of its obligations and duties hereunder; and

2.4.3.  subject to all of the terms and contingencies set forth in this Agreement, Buyer has the financial resources, equipment and facilities to receive and accept the Contract Quality as set forth in any effective Confirmation.

2.5. Cost of Transportation.  Except as otherwise provided herein or in any effective Confirmation, Buyer shall pay all costs for the transportation of the coal from the Point of Delivery.

2.6. Contingencies to Agreement.  This Agreement is contingent upon (a) Buyer or an affiliate of Buyer possessing and maintaining, during the Term, all regulatory and governmental permits and approvals deemed necessary by Buyer, in its commercially reasonable judgment, for the purchase, transportation and use of the coal covered hereunder by Buyer or an affiliate of Buyer, and for the related facilities or equipment of Buyer or an affiliate of Buyer, and (b) Seller possessing and maintaining, during the Term, all regulatory and governmental permits and approvals deemed necessary by Seller, in its commercially reasonable judgment, for the production, loading and sale of the coal covered by any Confirmation, and for the related facilities of Seller.  If at any time during the Term: (i) any such permit or approval deemed necessary by either Party is terminated, canceled, voided, expires or otherwise becomes ineffective or additional permits or approvals that such Party deems necessary are required, and

7

(ii) such Party (or in the case of Buyer, an affiliate of Buyer) is unable to acquire such permit or approval on reasonable terms (and without the obligation to make significant capital expenditures), then this Agreement shall be, at the affected Party's option, upon written notice to the other Party, voidable in its entirety, whereupon Buyer and Seller shall be released from any future liabilities, obligations and conditions contained in this Master Coal Purchase and Sale Agreement and in any effective Confirmation, except for the obligation to pay for any coal previously delivered to and accepted by Buyer under this Agreement.

2.7. <u>Resale by Buyer</u>. Unless otherwise limited in the Confirmation, Buyer has the right to ship or use the Coal delivered under this Agreement at any location or for any such purpose Buyer designates. The Parties agree, unless specifically provided otherwise in a specific Confirmation, Buyer may resell the coal purchased under a particular Transaction to another party ("Buyer's Customer"). The Parties agree that Buyer's Customer may perform some of Buyer's obligations; nevertheless, Buyer shall remain liable for all of Buyer's obligations hereunder. In addition, Buyer agrees to the following:

2.7.1 Buyer shall inform Seller at least twenty-four (24) hours in advance of arrival of each Unit Train at the mine of the identification number of the Unit Train, identification of Buyer's Customer, and destination of such Unit Trains.

2.7.2 The loading of such Unit Train shall be in accordance with the loading provisions set forth herein unless Buyer notifies Seller in advance of different loading provisions and such different loading provisions are in general accordance with general operating parameters in the mine's region, and do not, in Seller's reasonable opinion, impose an undue operating or economic burden on Seller.

2.7.3 All information to be supplied by Seller to Buyer under this Agreement including but not limited to analysis, weights, train manifest and invoicing information shall be

8

supplied to Buyer and Buyer shall be responsible for transmitting such information to Buyer's Customer.  Buyer is specifically released from its confidentiality obligations with respect to quality, testing and weighing information provided by Buyer to Buyer's Customer.

2.7.4  If Buyer claims a Force Majeure event at or associated with Buyer's or any of its affiliates' generating stations, such claim shall not apply to coal taken under this Agreement and sold by Buyer to Buyer's Customer.  Force Majeure events occurring at or associated with non-affiliated generating stations or other non-affiliated facilities to which Buyer has resold Coal shall not affect the Contract Quantity obligation of the Buyer under this Agreement.

**ARTICLE III**
**Term**

Subject to the other terms, conditions and contingencies contained herein, including, without limitation, the termination rights contained in Articles II, XIV and XV of this Master Coal Purchase and Sale Agreement, this Master Coal Purchase and Sale Agreement shall be effective as of the date set forth at the outset hereof and shall continue in effect until canceled by either Party with at least 30 days written notice to the other Party; provided that, except to the extent otherwise provided in this Agreement: (i) the rights and obligations of any Party accrued under this Master Coal Purchase and Sale Agreement and any specific Transaction will not be prejudiced and will be preserved until satisfied, and (ii) no cancellation of this Master Coal Purchase and Sale Agreement pursuant to this Article III will be effective as to any Transaction that has not been fully performed until all Parties have fulfilled all their obligations under this Master Coal Purchase and Sale Agreement and any Confirmation with respect to such Transaction.

9

## ARTICLE IV
## Quantity of Coal and Scheduling of Deliveries

4.1. Contract Quantity. Subject to the other terms and conditions contained in this Master Coal Purchase and Sale Agreement and in any effective Confirmation, Seller shall sell, and Buyer shall purchase, the minimum Contract Quantity set forth in any effective Confirmation, and Buyer may purchase and Seller will sell additional coal up to the maximum Contract Quantity stated in the Confirmation.

4.2. Reduction in Contract Quantity. The quantity of coal that Buyer is obligated to purchase and that Seller is obligated to sell and deliver pursuant to any effective Confirmation will be reduced by each of the following quantities:

4.2.1.    The quantity of coal scheduled by Buyer pursuant to Section 4.4 that Seller fails to sell and deliver or Buyer fails to purchase and accept due to an event of Force Majeure, unless scheduled during an event of Force Majeure concerning which proper notice had been delivered by Seller to Buyer (in which case Section 4.2.2 will apply).

4.2.2.    A quantity each day (or any part thereof) on which a Force Majeure event occurs or remains in effect equal to the Contract Quantity for any particular period for which a quantity is stated in the Confirmation for such Transaction and during which the Force Majeure event occurs or remains in effect divided by the number of days in such period (for example, if the Contract Quantity is 400,000 Tons for a period of July through December, the daily quantity reduction would be 4000,000/184 or 2174 Tons per day).

4.2.3.    At Buyer's option on a train-by-train basis, pursuant to Article VII, a quantity equal to the quantity of Sub-Standard Coal delivered by Seller.

4.3. Forecasting of Deliveries. Upon execution of this Agreement and at least thirty (30) days prior to the beginning of each subsequent calendar quarter during the Delivery Term of a

Transaction, Buyer shall advise Seller of the quantity of coal that Buyer estimates that it will purchase from Seller during such quarter.  The estimate is to be provided to assist Seller in its planning, will be non-binding, and shall not in any manner affect:  (a) Buyer's obligation to purchase the minimum Contract Quantity pursuant to any Transaction, or (b) Seller's obligation to tender and sell the maximum Contract Quantity pursuant to any Transaction.  The monthly quantity of coal to be delivered by Seller pursuant to any effective Confirmation shall be an amount mutually agreed upon by the Parties.

4.4. <u>Scheduling of Deliveries</u>.  Deliveries of coal under each Transaction shall be scheduled by Buyer (or Rail Carrier as authorized by Buyer) by notice reasonably prior to the arrival of a Unit Train at Seller's Mine or, if more than one of Seller's Mines are specified as the source of coal in any Transaction, at the Seller's Mine designated by Buyer or Rail Carrier as the source of supply for such Unit Train or at an Acceptable Substitute Coal Source (if permitted under the Transaction) from which coal is being delivered under such Transaction if designated by Seller upon reasonable prior notice.  Seller will make coal available and will operate, or cause to be operated, the Loading Facilities seven days per week, twenty-four hours per day, throughout the Delivery Term of each Transaction.

**ARTICLE V**
**<u>Price of Coal</u>**

5.1. <u>Base Price</u>.  The base price of coal delivered by Seller from Seller's Coal Reserves at Seller's Mine, or from each of Seller's Coal Reserves at Seller's Mines, or from an Acceptable Substitute Coal Source if permitted under such Transaction, to Buyer in accordance with each Transaction shall be the Confirmation Price.  The Confirmation Price for each Transaction will be F.O.B. Seller's Mine, inclusive of all federal, state or any other levies of any kind (including, without limitation, any royalties, state severance and ad valorem production taxes, sales and use

11

taxes, ad valorem property taxes, the cost of regulatory compliance, reclamation fees, Black Lung benefits and statutory levies of any kind) for coal with an average Btu content specified as the "Specified Btu Value" in the Confirmation for such Transaction and with an average $SO_2$ content specified as the "Specified $SO_2$ Value" in the Confirmation for such Transaction. To the extent that any of the foregoing are directly assessed against or charged to Buyer, Seller will promptly reimburse Buyer for such levies. Subject to the adjustments specified in this Master Coal Purchase and Sale Agreement, the Confirmation Price specified in each Confirmation is firm for the particular Transaction.

5.2. Adjustments.

5.2.1. Btu Content Adjustment. The Confirmation Price will be adjusted on a trainload basis when the weighted average Btu content of any trainload of coal delivered from Seller's Coal Reserves at Seller's Mine or Seller's Mines, or from an Acceptable Substitute Coal Source from which coal is being delivered if permitted, pursuant to such Transaction differs from the Specified Btu Value. The Confirmation Price will be adjusted by multiplying the Confirmation Price per Ton for such Transaction by a fraction, the numerator of which will be the weighted average Btu content of that particular trainload of coal and the denominator of which will be the Specified Btu Value for such Transaction. The weighted-average Btu content of each trainload shall be based upon Seller's analysis of Seller-obtained samples from each train in accordance with Article XI, subject to Buyer's right to dispute such analysis as provided in this Agreement.

5.2.2. $SO_2$ Content Adjustment. The Confirmation Price for each Transaction will be adjusted on a trainload basis when the weighted average $SO_2$ content of any trainload of coal delivered from Seller's Coal Reserves at Seller's Mine or Seller's Mines, or from

an Acceptable Substitute Coal Source from which coal is being delivered if permitted, pursuant to such Transaction differs from the Specified $SO_2$ Value for such Transaction and such adjustment to the Confirmation Price (the "$SO_2$ Content Adjustment") will be calculated for such coal as follows:

$SO_2$ Content Adjustment to the Confirmation Price in Dollars Per Ton = (Specified $SO_2$ Value – Weighted Average Pounds $SO_2$/MMBtu in Trainload) x (Weighted Average As-Received Btu/pound in Trainload ÷ 1,000,000) x Value of $SO_2$ Allowance.

Where:

Pounds $SO_2$/MMBtu = % sulfur x 20,000

Btu/lb.

and

The Value of $SO_2$ Allowance is the arithmetic average per-Ton dollar value of a $SO_2$ emission allowance as published in each Monday's edition (or the following Tuesday's edition if any Monday falls on a holiday) of "Coal Daily" for the month of delivery.

If the $SO_2$ Content Adjustment results in a negative number, the Confirmation Price of such coal will be reduced by such amount, and if the $SO_2$ Content Adjustment results in a positive number, the Confirmation Price of such coal will be increased by such amount. The weighted-average $SO_2$ content of each trainload shall be based upon Seller's analysis of Seller-obtained samples from each train in accordance with Article XI, subject to Buyer's right to dispute such analysis as provided in this Agreement.

5.2.3.   Governmental Impositions Adjustment.  If any governmental impositions (including, without limitation, all federal, state and any other levies of any kind, state severance and ad valorem production taxes, ad valorem property taxes, state sales and use taxes, the cost of regulatory compliance, reclamation fees and Black Lung benefits), laws, rules or regulations (including the interpretation of any of the foregoing) that affect a

13

particular Transaction are enacted or amended effective after the "Applicable Law Date" specified for such Transaction, which affect the cost of producing and selling coal subject to such Transaction prior to the end of the Delivery Term for such Transaction ("Governmental Impositions"), Seller will immediately give written detailed notice and supporting documentation to Buyer and any such increase or decrease will be included as an adjustment to the Confirmation Price for such coal; provided, however, that if any single increase or the aggregate of the increase of such costs exceeds the mutually agreeable amount specified in the Confirmation for such Transaction (the "Imposition Cap" or, if not so specified in the Confirmation, the Imposition Cap will be 10 cents per Ton of coal), Buyer, at its sole discretion, may elect to bear such increased cost or to terminate such Transaction. Seller's failure to give proper notice within a commercially reasonable time after any such increase in costs will constitute a waiver of Seller's right to adjust the Confirmation Price with respect to such costs. If Buyer elects to terminate any Transaction as provided in this Section 5.2.3, Buyer will give Seller written notice of its election to terminate within 15 days after receiving Seller's notice of the increase adjustment to the Confirmation Price. If Buyer so elects to terminate, Seller may elect to waive the inclusion of such increase adjustment to the Confirmation Price in excess of the Imposition Cap, and the Transaction will remain in full force and effect if Seller provides Buyer written notice of its election to waive the inclusion of such increase adjustment to the Confirmation Price in excess of the Imposition Cap within 5 business days after receipt of Buyer's notice of termination. If Seller does not elect to waive the inclusion of such increase adjustment to the Confirmation Price in excess of the Imposition Cap, the Transaction will terminate effective 5 business days after Seller's receipt of Buyer's notice of its election to terminate and Buyer will not be liable for any increase above the

14

Imposition Cap on any coal purchased prior to such termination. If any Transaction is terminated by Buyer pursuant to this Section 5.2.3, then, with respect to such Transaction, Buyer and Seller shall both be released from any future liabilities, obligations and conditions contained herein and in the Confirmation for such Transaction from and after the effective date of such termination, except the obligation to pay for any coal previously delivered to and accepted by Buyer.

5.3. <u>Complete Consideration Paid for Coal</u>. The Parties hereto agree that the Contract Price paid by Buyer pursuant to the terms of this Article V shall be the full and complete consideration payable for the coal purchased hereunder, and in no event will Buyer ever be liable for any further expenses or costs beyond the specific Contract Price calculated in accordance with the applicable Confirmation and this Master Coal Purchase and Sale Agreement. Seller expressly waives any right to recover or charge any further fees, costs or expenses related to coal purchased under this Agreement other than the Contract Price.

**ARTICLE VI**
**Invoicing and Payment**

6.1. <u>Invoices</u>. On or before the twenty-fifth day of each month of the Delivery Term (or, if such day is not a Business Day, on the next Business Day following such day) with respect to during the first fifteen days of such month, and on or before the tenth day following each month of the Delivery Term (or, if such day is not a Business Day, on the next Business Day following such day) with respect to the sixteenth day through the remainder of the preceding month, Seller shall send Buyer an invoice indicating the amount due Seller for all coal delivered to the Point of Delivery and accepted by Buyer during the period covered by such invoice, provided that such invoice by Seller shall be subject to verification by Buyer. Each invoice shall show specifically the Confirmation Price, the Contract Price (or the agreed price, if any, for Substandard Coal

15

accepted by Buyer pursuant to Section 7.2.1), quantities of coal delivered, trainload I.D., dates of

deliveries and any adjustments pursuant to Section 5.2, together with detailed calculations of

such adjustments and support therefore, which result in the adjustment of such stated

Confirmation Price due to Btu content, $SO_2$ content or Governmental Impositions.

6.2. <u>Payment by Buyer</u>.  Buyer shall pay the invoices within ten (10) days from its receipt,

subject to verification.  Payments will be made, at Buyer's option, by either: (a) Electronic Data

Interchange, or (b) electronic payment of funds (including wire transfer and ADH) to Seller's

account specified in a particular Transaction in the Confirmation for such Transaction, or to such

other bank account as Seller shall from time to time designate in writing to Buyer at least thirty

(30) days in advance.

**ARTICLE VII**
**<u>Quality of Coal</u>**

7.1. <u>Coal Quality Specifications</u>.  Seller agrees to sell and deliver to Buyer pursuant to this

Agreement coal sized to 2" x 0" (without an excessive amount of fines), and warrants that such

coal will be substantially free of impurities, including, but not limited to, rock, wood, tramp

metal, synfuel, and other debris.  All coal delivered by Seller to Buyer under this Agreement shall

be the quality of coal resulting from good and workmanlike mining practices and Seller warrants

that all coal delivered pursuant to a particular Transaction shall meet, on an as-received basis and

which shall apply and be calculated on a trainload basis, the Guaranteed Quality Specifications

set forth in the Confirmation for such Transaction.

Neither the coal purchased hereunder nor the railcar in which the coal is to be transported

shall be sprayed or washed with any substance or otherwise treated, including, without limitation,

sprays, washes or treatments for dust suppression or to enhance the loading or unloading of the

coal, unless such procedure is specifically authorized in writing by Buyer.

16

7.2. <u>Sub-Standard Coal</u>.  Seller shall notify by actual telephonic communication in person (it being agreed that there must be actual verbal, direct communication and leaving a voice-mail or recorded message does not constitute notice) to one of the persons specified by Buyer in Section 17.3 "For Telephonic Notice Regarding Sub-Standard Coal" if any Unit Train contains Sub-Standard Coal and of the actual quality analysis of such coal.  Buyer shall have the option, within twenty-four (24) hours of Buyer's actual receipt of the verbal notice that the coal is Sub-Standard Coal and of the quality analysis of such coal, of either: (i) rejecting such Sub-Standard prior to unloading the coal, or (ii) accepting the Sub-Standard Coal upon mutually-agreeable terms.   If Buyer and Seller fail to timely reach mutual agreement upon terms under which Buyer would accept such Sub-Standard Coal (including any failure to agree because Seller has not been able to directly verbally communicate with Buyer as specified), Buyer shall be deemed to have elected to reject that shipment only.  If Buyer timely rejects, or is deemed to have rejected, such Sub-Standard Coal, Seller shall be responsible for promptly transporting the rejected coal to an alternative destination determined by Seller and promptly unloading such coal.  Seller shall reimburse Buyer for all costs and expenses associated with the transportation, storage, handling, removal and unloading of such Sub-Standard Coal, including, without limitation, all transportation costs relating to such coal, including both the transportation from Seller's Mine and any additional costs to transport and unload such coal assessed by the Rail Carrier in addition to its normal fees under the Rail Transportation Agreement, together with any unloading or other additional fees; provided that, Seller will return Buyer's railcars (in the same condition as when received by Seller) within four days after Seller's receipt, unless otherwise agreed in good faith by the Parties in writing.

The delivery of Sub-Standard Coal by Seller shall not apply towards the Contract Quantity; however, Buyer shall also have the sole option to reduce the Contract Quantity for such

17

Transaction by the amount of such Sub-Standard Coal delivered at the Point of Delivery, whether or not Buyer accepts same. Seller's payments to Buyer as provided herein for the transportation charges for such Sub-Standard Coal shall be in addition to, and not in lieu of, any other remedies available to Buyer elsewhere in this Agreement or at law or in equity.

## ARTICLE VIII
## Events of Default and Remedies

8.1. Event of Default. "Event of Default" means: (i) the failure of either Party to make when due, any payment required hereunder if such failure is not remedied within five working days after notice of such failure is given to the defaulting Party by the other Party; (ii) the delivery by Seller to Buyer of Sub-Standard Coal under this Agreement of three (3) trains or more in any twelve-month period; (iii) the failure by Seller to properly load, or properly cause the loading, under this Agreement of four (4) trains or more in any twelve-month period; (iv) the failure of either Party to comply with any or all of its respective material obligations (other than those specified in this Section 8.1 as Events of Default) in good faith as herein set forth and such non-compliance is not cured within five days after notice thereof to defaulting Party; (v) either Party (a) filing a petition in bankruptcy and such petition is not withdrawn or dismissed for 30 days after such filing; (b) having such a petition filed against it, and such petition is not withdrawn or dismissed within thirty (30) days after such filing; or (c) becoming otherwise insolvent or unable to pay its debts as they become due; (vi) the failure of either Party to provide Performance Assurance within three days after notice is given by the other Party or the failure to maintain such Performance Assurance as required; or (vii) the failure of a Party's guarantor to perform any covenant set forth in its guaranty, or such guaranty shall expire or be terminated or shall cease to guarantee the obligations of such Party hereunder, or such guarantor shall become subject to any of the events specified in (v) (a), (b) or (c). Subject to the limitations set forth in the provisions

18

of 8.2 through 8.4 of this Article VIII, if an Event of Default occurs, the non-defaulting Party may, for so long as such Event of Default is continuing, (A) establish by notice to the defaulting Party a date on which this Agreement shall terminate early, and the non-defaulting Party shall calculate, using the formula described in Section 8.2 or 8.3 below, as applicable, and otherwise in a commercially reasonable manner, its damages, including any associated costs, resulting from the early termination of this Agreement, which damages and costs, if any, shall be paid by the defaulting Party to the non-defaulting Party within five working days of the defaulting Party's receipt of notice of the damages amount, and/or (B) suspend performance of its obligations under this Agreement until such Event of Default is cured, and/or (C) except as limited in this Agreement, exercise any remedy available at law or equity. The failure of the Parties to agree on an adjustment of the Confirmation Price in accordance with this Agreement shall not constitute grounds for rescission or termination of this Agreement.

8.2. <u>Seller Deficiency</u>. "Seller Deficiency" means: (i) any part of the Contract Quantity that Seller fails to deliver under a Transaction, unless excused by Force Majeure or Buyer's failure to perform, and (ii) any part of the Contract Quantity that, but for an early termination, was to be delivered after a notice of early termination of this Agreement pursuant to Section 8.1. Seller shall pay Buyer for each Ton of such Seller Deficiency an amount equal to the positive difference, if any, obtained by subtracting the Contract Price for the Seller Deficiency from the Replacement Price. "Replacement Price" means the price at which Buyer, acting in a commercially reasonable manner, purchases substitute coal for quantities of coal up to the Seller Deficiency (plus additional transportation charges, if any, incurred by Buyer as a result of taking delivery of substitute coal at a location other than the relevant Delivery Point) or, absent such a purchase, the market price for such quantity of coal (F.O.B., Delivery Point) as determined by Buyer in a commercially reasonable manner. The Parties agree that Buyer shall not be required

19

to enter into a replacement transaction in order to determine the Replacement Price. Such payment shall be paid within five working days after the Party obligated to make the payment receives an invoice.

8.3. Buyer Deficiency. "Buyer Deficiency" means: (i) any part of the Contract Quantity that Buyer fails to purchase under a Transaction, unless excused by Force Majeure or Seller's failure to perform, and (ii) any part of the Contract Quantity that, but for an early termination, was to be delivered after a notice of early termination of this Agreement pursuant to Section 8.1. Buyer shall pay Seller for each Ton of the Buyer Deficiency an amount equal to the positive difference, if any, obtained by subtracting the Sales Price from the Contract Price. "Sales Price" means the price at which Seller, acting in a commercially reasonable manner, resells (if at all) quantities of coal up to the Buyer Deficiency (including additional transportation charges, if any, incurred by Seller as a result of delivering coal at a location other than the relevant Delivery Point) or, absent such a sale, the market price for such quantity of coal (F.O.B., Delivery Point), as determined by Seller in a commercially reasonable manner. The Parties agree that Seller shall not be required to enter into a replacement transaction in order to determine the Sales Price. Such payment shall be paid within five working days after the Party obligated to make the payment receives an invoice.

8.4. Exclusive Remedy. Each Party hereby stipulates that the payment obligations set forth in 8.2 and 8.3 above are reasonable in light of the anticipated harm and the difficulty of estimation or calculation of actual damages and each Party hereby waives the right to contest such payments as an unreasonable penalty or otherwise. In the event that either Seller or Buyer fails to pay any such amounts when due, such amounts will bear interest at the Interest Rate until paid, and the other Party shall have the rights set forth in Section 8.1. The remedy set forth in Sections 8.2 and 8.3 of this Article VIII shall be the sole and exclusive remedy of the aggrieved Party for the failure of the other to deliver or accept, as the case may be, all or any part of the Contract

20

Quantity pursuant to any Transaction prior to an early termination of this Agreement, and all other damages and remedies are hereby waived as to such failure(s), except as set forth in Article IX below.

## ARTICLE IX
### Limitation of Liability

THE PARTIES CONFIRM THAT THE EXPRESS REMEDIES AND MEASURES OF DAMAGES PROVIDED IN THIS AGREEMENT SATISFY THE ESSENTIAL PURPOSES HEREOF.  FOR BREACH OF ANY PROVISION FOR WHICH AN EXPRESS REMEDY OR MEASURE OF DAMAGES IS PROVIDED, UNLESS OTHERWISE PROVIDED, SUCH EXPRESS REMEDY OR MEASURE OF DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY, THE OBLIGOR'S LIABILITY SHALL BE LIMITED AS SET FORTH IN SUCH PROVISION AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED.  IF NO REMEDY OR MEASURE OF DAMAGES IS EXPRESSLY PROVIDED HEREIN, EACH PARTY SHALL HAVE THE RIGHT TO RECOVER AGAINST THE OTHER ALL DIRECT LOSSES OR DAMAGES RESULTING FROM DEFAULT UNDER, OR BREACH OF, THIS AGREEMENT AND ANY CONFIRMATION BY THE OTHER.  EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, EACH PARTY WAIVES ANY AND ALL RIGHTS WHICH IT MAY HAVE TO RECOVER AGAINST THE OTHER FOR SPECIAL, CONSEQUENTIAL, PUNITIVE OR INDIRECT LOSS OR DAMAGE, INCLUDING LOST PROFITS, RESULTING FROM ANY DEFAULT UNDER, OR BREACH OF, THIS AGREEMENT AND ANY CONFIRMATION.

IF SELLER FAILS TO PROPERLY LOAD RAILCARS IN ACCORDANCE WITH SECTIONS 12.2 AND 12.6 UNDER THIS AGREEMENT AND THAT FAILURE IS THE

PROXIMATE CAUSE OF LOSS OR DAMAGE (INCLUDING SPECIAL, CONSEQUENTIAL, PUNITIVE OR INDIRECT), SELLER HEREBY INDEMNIFIES BUYER AND ITS AFFILIATES FOR ALL SUCH CLAIMS AND JUDGMENTS, EXCEPT FOR BUYER'S LOST PROFITS. THIS INDEMNIFICATION IS LIMITED SOLELY TO SELLER'S FAILURE TO PROPERLY LOAD RAILCARS AS DEFINED IN SECTION 12.2 AND 12.6 AND DOES NOT INCLUDE ANY LOSSES, CLAIMS, OR JUDGMENTS TO THE EXTENT RESULTING FROM THE NEGLIGENCE OF BUYER OR BUYER'S RAIL CARRIER. SELLER AND BUYER WAIVE THE RIGHT, IF ANY, TO RECOVER PUNITIVE DAMAGES EXCEPT TO THE EXTENT PAYABLE TO UNRELATED THIRD-PARTIES.

### ARTICLE X
### Delivery; Title and Risk of Loss; Insurance; Indemnity

10.1. <u>Delivery</u>. Buyer shall purchase the coal sold and purchased hereunder from Seller, F.O.B. at the Point of Delivery.

10.2. <u>Title and Risk of Loss</u>. The title to and risk of loss of coal shall pass to Buyer when the last car in a Unit Train loaded with Seller's coal or coal from an Acceptable Substitute Coal Source has passed the property line of Seller's Mine or the mine of an Acceptable Substitute Coal Source, which location is the "Point of Delivery" for coal purchased hereunder.

10.3. <u>Insurance</u>. Seller shall continuously carry and maintain throughout each Delivery Term specified for a Transaction, with competent and qualified insurers, worker's compensation, liability and property damage insurance covering the coal to be sold hereunder, Seller's operations in connection with such coal, and all of the liabilities assumed under this Agreement, in amounts equal to or greater than the amounts customarily carried by coal mining companies in the area of Seller's Mine with operations similar in size to that of Seller. Seller shall also carry

22

such other types of insurance as are customarily carried by operators of mines similar in size to that of Seller.

10.4. Indemnity.

10.4.1.  Seller agrees to and shall defend, protect, indemnify and hold harmless Buyer, its affiliates and each of their respective directors, officers, employees, servants, agents, successors and assigns, from and against all claims, losses, expenses, damages, demands, judgments, causes of action, suits and liability in tort, contract, or any other basis, and of every kind and character whatsoever (hereinafter in this section collectively referred to as "Claims") for personal injury, death, or property damage of any party, arising out of or incident to, or related in any way to, directly or indirectly: (i) Seller's failure to perform its obligations pursuant to this Master Coal Purchase and Sale Agreement and each Confirmation, (ii) any work, services or materials to be performed or supplied under this Master Coal Purchase and Sale Agreement and each Confirmation, (iii) any activities of any party while on any premises owned, controlled, or operated by Seller (excluding, however, any Claims to the extent arising from Rail Carrier's or Buyer's negligence or willful misconduct), including, but not limited to, Claims arising out of or resulting from:  (1) any condition of the premises, (2) any operations being conducted on the premises, or (3) the imperfection or defective condition, or application, whether latent or patent, of any commodity or equipment sold, supplied, utilized or furnished by Seller, and (iv) Seller's use of Buyer's railcars or equipment pursuant to Section 7.2.2.

10.4.2.  Buyer agrees to and shall defend, protect, indemnify and hold harmless Seller, its affiliates and each of their respective directors, officers, employees, servants, agents, successors and assigns, from and against all Claims for personal injury, death, or

property damage of any party, arising out of or incident to, or related in any way to, directly or indirectly: (i) Buyer's failure to perform its obligations pursuant to this Master Coal Purchase and Sale Agreement and each Confirmation, and (ii) Buyer's willful or negligent acts or omissions.

10.4.3. The indemnity obligations as provided in this Section 10.4 shall survive the termination of this Agreement.

10.5. <u>Third Party Claims</u>. If a third party shall assert a claim against the indemnified Party or commence an action to which the indemnifying Party is not a party in any court of competent jurisdiction or before any governmental body empowered to decide such claim of which the indemnified Party has actual knowledge and that claim might reasonably be expected to require indemnification under this Agreement, the indemnified Party shall give prompt notice thereof to the indemnifying Party, describing in reasonable detail the nature of the claim to the extent disclosed, the name of the claimant, and other such information as the indemnifying Party shall reasonably request. The indemnifying Party shall notify the Party requesting indemnification with thirty days after such notice, whether the indemnifying Party: (i) elects to assume the defense or indemnified portion of such claim at the indemnifying Party's sole cost and expense, by retaining competent counsel reasonably acceptable to the indemnified Party, or (ii) asserts that such claim is not subject to indemnity under this Agreement. The indemnified Party shall have the right to assume or join any defense at no cost to the indemnifying Party; provided, however, that if the indemnified Party is, in the reasoned judgment of its counsel, entitled to assert a defense or claim which conflicts with a defense of the indemnifying Party or which the indemnifying Party is not entitled to assert for any reason, the indemnifying Party shall not have the right to direct the defense of such claim, but shall be pay for the reasonable cost of the indemnified Party's defense costs and expenses.

24

## ARTICLE XI
## Coal Sampling and Analysis

11.1. Testing and Analysis Determinations. The testing and analysis procedures set forth in this Article XI shall be used to determine whether coal delivered pursuant to this Agreement meets the Guaranteed Quality Specifications for such coal and to determine the Btus per pound and the pounds of $SO_2$ per MMBtu for adjustments to the price pursuant to Section 5.2.

11.2. Sampling.    Sampling of the coal delivered pursuant to this Agreement shall be performed in the following manner:

11.2.1. Seller shall maintain and operate, or cause to be maintained and operated, sampling equipment and facilities needed to obtain representative trainload samples that comply with the currently applicable ASTM sampling procedures in effect as of the day of sampling. Seller shall obtain at Seller's Mine, or from an Acceptable Substitute Coal Source if specified for such Transaction, a minimum of one representative sample from each trainload of coal loaded hereunder. If Seller delivers coal that has been layer-loaded or otherwise consists of coal from different lots of coal, Seller shall ensure that there is at least one representative sample from each different lot of coal. For the purposes of this Section 11.2, a "lot" refers to each segregated quantity of coal loaded into a Unit Train which was mined from each distinct and separate coal seam deposit and which has not been blended with other coal prior to loading in a Unit Train. A "lot" also refers to each segregated quantity of coal loaded into a Unit Train that has been blended prior to placing such coal in the load-out silo.

11.2.2. Seller shall provide Buyer with a stop-belt bias test report for each of the sampling systems at any time such test is performed during the Term. Seller will provide to Buyer notice of any dynamic performance test of each sampling system whenever

performed by Seller or for Seller or other mine owner or operator; provided that a dynamic performance test of each sampling system shall be performed at least semi-annually. Buyer shall have the right, at Buyer's sole cost and expense, to have a representative present at any and all times to observe any bias testing or dynamic performance test and Seller shall provide reasonable notice that will allow Buyer or its representative to be present. Upon Buyer's request, Seller will provide Buyer with copies of the results of any such dynamic performance test.

11.2.3. Seller shall obtain, or cause to be obtained, representative samples of coal in accordance with Section 11.2.1 hereof. Buyer shall have the right, at Buyer's sole cost and expense, to have a representative present at any and all times to observe the sampling. All sampling procedures shall be conducted in compliance with the currently applicable ASTM standards in effect as of the day of sampling.

11.2.4. Each sample shall be divided into at least three (3) parts and put in suitable airtight containers. One part shall be forwarded promptly to Buyer at the address specified in Section 17.3 for analysis by Buyer, one part shall be retained for analysis by Seller, and one part shall be retained, or caused to be retained, by Seller in one of the containers, properly sealed and labeled, as an umpire sample split to be analyzed under Section 11.3 upon either Party's request if a dispute arises due to a difference between Buyer's and Seller's analyses which exceeds ASTM reproducibility limits. Seller shall pay all costs and expenses related to the storing of umpire sample splits. Each Party assumes the cost of the analysis of its sample.

11.2.5. Seller shall retain the umpire sample splits for a thirty (30) day period after Buyer's sample was sent to Buyer and may thereafter discard any umpire sample splits

that Buyer has not specifically requested by written notice to Seller under Article XVII

that Seller retain for analysis under Section 11.4.

11.3. <u>Analysis</u>. Analysis of the coal shall be performed in accordance with ASTM

standards in the following manner:

11.3.1. Seller shall maintain or utilize analytical laboratories staffed by individuals

that are competent to perform accurate and reliable analyses.  Buyer shall have the right,

at Buyer's sole cost and expense, to have a representative present during any sample

preparation and coal analysis conducted by, or for, Seller or by or for the mine operator of

an Acceptable Substitute Coal Source if permitted under such Transaction, on coal sold to

Buyer.

11.3.2. Within forty-eight (48) hours of the gathering of samples, at Seller's sole

cost and expense, Seller shall analyze, or cause to be analyzed, each trainload coal sample

to determine the coal quality at the sampling site, reported on both an as-received basis

and a dry basis, for the $SO_2$, sulfur, ash, $Na_2O$ (expressed in percentage of coal ash),

moisture and Btu-value of the coal, and the results shall be transmitted to Buyer pursuant

to Section 13.2.  Seller shall provide an analysis for each individual sample, together with

a composite analysis, if required by Section 11.2.1, of all samples taken from each

trainload, including appropriate weighting values.

11.4. <u>Disputed Analysis</u>. The results of the sampling and analysis by Seller shall be accepted

as the quality and characteristics of the coal delivered hereunder in the trainloads represented by

such samples unless Buyer notifies Seller that the results Buyer's analysis are different and

provides Seller a copy of such results.  If a dispute arises due to a difference between Buyer's and

Seller's analyses which exceeds ASTM reproducibility limits, then, at the request of either Party,

an analysis of the umpire split of such sample shall be made by an independent commercial

27

testing laboratory mutually selected by the Parties. The selected independent commercial testing laboratory shall analyze the umpire split of such sample utilizing the standards set forth in this Article XI and the analysis results of such selected laboratory shall be final and binding on the Parties as to the quality and characteristics of the trainload of coal represented by such sample. The cost of the analysis of the umpire sample split shall be borne equally by the Parties.

11.5. <u>Trace Elements Analysis</u>. Seller shall obtain for each of Seller's Mines and for each of the Acceptable Substitute Coal Sources if permitted under a Transaction from which coal is being delivered under a Transaction and furnish to Buyer the complete results of an analysis of Trace Elements with sampling to be performed on one occasion in the calendar quarter, unless specified otherwise by Buyer, on the first delivery of coal from each of Seller's Mines and from each of the Acceptable Substitute Coal Sources if permitted under any Transaction from which coal is being delivered under this Agreement in such calendar year (with sampling to be in accordance with currently applicable ASTM sampling procedures and analysis to be performed by third parties competent to perform accurate and reliable analysis).

## ARTICLE XII
## Coal Loading Procedures

12.1. <u>Loading</u>.

12.1.1. <u>Loading, Loading Facilities and Weighing</u>. Seller agrees to properly load, or cause to be loaded, all railcars, and to provide and properly maintain, or cause to be provided and properly maintained, Loading Facilities at each of Seller's Mines specified for a Transaction, and at each of the Acceptable Substitute Coal Sources if permitted under a Transaction from which coal is being delivered under this Agreement, capable of loading up to 138 railcars with coal in accordance with this Agreement in four hours or less unless otherwise agreed for such Transaction, on a twenty-four hour per day, seven day per week basis during the Delivery Term

of the Transaction, and Seller further agrees to execute all loading and weighing procedures required herein.

      12.1.2. <u>Loading Time</u>. Subject to the provisions of Section 12.1.4 and Article XIV, Seller will be allowed four (4) hours for loading each train at Seller's Mine, and at each of the Acceptable Substitute Coal Sources specified in a Confirmation for a Transaction, upon actual placement of the first railcar under the mine loading chute, or at such time as the train is constructively placed pursuant to Section 12.1.3, and ending when the operator of Seller's Mine or of an Acceptable Substitute Coal Source if permitted under a Transaction from which coal is being delivered under this Agreement, has released the train to the Railroad.

      12.1.3. <u>Constructive Placement</u>. Subject to the provisions of Section 12.1.4 and Article XIV, if the actual placement of trains at Seller's Mine, or at an Acceptable Substitute Coal Source permitted under a Transaction from which coal is being delivered under this Agreement, for loading is prevented due to any cause attributable to Seller or to the operator of such permitted Acceptable Substitute Coal Source from which coal is being delivered under this Agreement, such trains will be considered constructively placed for purposes of Section 12.1.2 as determined by Railroad and the holding time shall be included as part of the loading time; provided, however, that no train shall be considered constructively placed nor shall the holding time of such a train be included as part of the loading time to the extent that actual placement of such train is delayed by bunched trains. For purposes of this Section 12.1.3, the term "bunched train" shall mean empty trains which arrived at Seller's Mine, or at an Acceptable Substitute Coal Source permitted under a Transaction from which coal is being delivered under this Agreement, prior to the Buyer's train in question and for which the loading free time for such empty trains has not expired. Constructively placed trains will be held at the available hold-point and the specified time allowed for loading will begin to accrue upon arrival of the train at the hold-point.

The time required for movement from the hold-point to the Loading Facilities will not be included in the computation of the loading time.

12.1.4. <u>Loading Disability</u>. A "Loading Disability" shall mean any of the following events that are beyond Seller's reasonable control, are not the result of Seller's negligence and that directly result in the inability to load coal hereunder into a train at the Loading Facilities: (i) an act of God; (ii) a strike or other labor disturbance; (iii) a riot or other civil disturbance; (iv) snow and/or ice accumulation sufficient to immobilize train operations or prevent loading of such train; (v) an act or regulation of local, state or federal government authorities; or (vi) mechanical or electrical breakdown, explosion or fire (including shutdown for emergency maintenance which may be necessary to mitigate or eliminate the imminent threat of explosion, fire or mechanical or electrical breakdown), or accident affecting the Loading Facilities or affecting Rail Carrier's locomotives or other railroad equipment. If any Loading Disability occurs that lasts for a period in excess of one and one-half hours, Seller shall notify Rail Carrier by telephone: (i) within one and one-half hours after the commencement of the Loading Disability, of the time of such commencement and the nature of the Loading Disability, and (ii) within one and one-half hours after the termination of the Loading Disability, of the termination thereof, except that telephone notification pursuant to (i) and (ii) are not required if the Loading Disability lasts less than one and one-half hours. A Loading Disability that lasts more than 24 hours shall be deemed a Force Majeure as set forth in Article XIV.

12.1.5. <u>Bill of Lading</u>. A Bill of Lading or other shipping document designated or approved by Railroad will be issued by Seller for each movement hereunder and will be transmitted by Electronic Means.

12.2. <u>Train Size and Minimum Trainload Lading Weight</u>. Unless otherwise specified in the Confirmation for a Transaction, Buyer will provide Unit Trains of not less than one hundred and

five (105) cars or more than one hundred and thirty-eight (138) cars unless otherwise specified in the Confirmation for a Transaction. Seller agrees to load, or cause to be loaded, all Unit Trains such that the actual loaded weight of each individual railcar of a train, as determined by certified tare scales and batch weigh system at Seller's Mine, or by certified commercial scales at an Acceptable Substitute Coal Source permitted under a Transaction, from which coal is being delivered under this Agreement, averages not less than ninety-nine percent (99%) of the train's maximum capacity, but in no event will any individual railcar be loaded to a weight greater than 286,000 pounds gross weight per car on rail (which weight includes the car weight); provided, however, that Seller will load, or cause the loading of, any Unit Train at less than 99% of the train's maximum capacity if notified in advance by Buyer in writing under Article XVII. If the trainload lading weight falls below the applicable level, then, in addition to (and not in lieu of) other remedies available to Buyer, any resulting charges incurred by Buyer from the Rail Carrier (including, without limitation, any minimum transportation charges incurred due to Seller's failure to load (or cause to be loaded) railcars to the applicable weight) shall be passed through to Seller.

12.3. <u>Weighing and Determination of Weights</u>. Seller will be responsible for the weighing of loaded trains at Seller's Mine, or at an Acceptable Substitute Coal Source permitted under a Transaction from which coal is being delivered under this Agreement, at no charge to Rail Carrier or Buyer. Scales shall be subject to inspection and certification by Railroad, its agent, Buyer, or such other appropriate authority, in accordance with the National Institute of Standards and Technology Handbook 44 (or its successor). As used in this Article XII, the word "scales" includes weigh bins as well as scales.

12.4. <u>Breakdown of Scales</u>. If any Unit Train or portion thereof cannot be weighed due to a breakdown or malfunction of Seller's Mine scales, or of the scales at an Acceptable Substitute

Coal Source permitted under a Transaction from which coal is being delivered under this Agreement, the weight-per-railcar of such shipment will be determined by the average weight-per-railcar of the last ten (10) Buyer trains weighed at such Seller's Mine, or at such Acceptable Substitute Coal Source permitted under a Transaction from which coal is being delivered under this Agreement, prior to breakdown or malfunction of the scales; provided that Buyer has no obligation to load or accept coal if it has prior knowledge of the breakdown or malfunction of such scales. If fewer than ten (10) trains were weighed hereunder at such Seller's Mine, or at such Acceptable Substitute Coal Source permitted under a Transaction from which coal is being delivered under this Agreement, prior to breakdown or malfunction of the scales, the weight-per-railcar will be determined by the average weight-per-railcar of all previous trains weighed hereunder at such Seller's Mine, or at such Acceptable Substitute Coal Source permitted under a Transaction from which coal is being delivered under this Agreement, prior to breakdown or malfunction of the scales.

12.5. Scale Errors. If the scales used at any Seller's Mine, or at an Acceptable Substitute Coal Source permitted under a Transaction from which coal is being delivered under this Agreement, are determined under Section 12.3 above to be in error in excess of a scale tolerance of 0.5%, hereunder from Seller's Mine, or from an Acceptable Substitute Coal Source permitted under a Transaction from which coal is being delivered under this Agreement, since the last preceding test but not to exceed three (3) months, shall be adjusted, either upward or downward, as the case may be, by the amount of the scale error. If it is possible to determine when such error began, weights for such Seller's Mine, or for such Acceptable Substitute Coal Source permitted under a Transaction from which coal is being delivered under this Agreement, shall be adjusted for the entire period from the date the error began until the date of the scale test. Seller

or Buyer, as appropriate, shall promptly pay the other for charges associated with the adjusted weights.

12.6. <u>Weight Limits, Excess Weight and Charges.</u>  Seller agrees not to load or allow the loading of railcars in excess of two hundred eighty-six thousand (286,000) pounds gross weight per car on rail or such lesser weight as notified in advance by Buyer in writing under Article XVII.  No train shall leave Seller's Mine, or an Acceptable Substitute Coal Source permitted under a Transaction from which coal is being delivered under this Agreement, if any railcar is loaded in excess of two hundred eighty-six thousand (286,000) pounds gross weight on rail or such lesser weight as notified in advance by Buyer in writing under Article XVII.  Upon discovery that any railcar is loaded in excess of such maximum weight, Seller shall immediately remove, or cause to be removed, sufficient quantities of coal from any overloaded railcar such that the loaded weight of the railcar does not exceed the maximum limitation.  In addition to (and not in lieu of) other remedies available to Buyer, Seller shall pay any and all additional charges, penalties or assessments levied against Buyer by any Rail Carrier as a result of such overloading or delay and Seller shall indemnify Buyer for damages of any nature that are caused as a result of an overloaded railcar.

12.7. <u>Reimbursement for Loading and Transportation Charges and Costs.</u>  In addition to Buyer's termination rights, Seller shall reimburse Buyer for any costs or losses incurred or suffered by Buyer as a result of Seller's failure to properly load, or cause the loading of, the coal into the railcars or to release such railcars in conformance with Buyer's schedule provided pursuant to Article IV hereof, including, without limitation, any demurrage or other charges incurred by Buyer as a result of Seller's failure to timely load and release, or cause the timely loading and releasing of, railcars, and further including any charges, losses or damages that result from Seller's failure to properly and timely give any notice, or timely perform any sampling or

analysis as required herein, or Seller's failure to load, or cause the loading of, the railcars to the capacity required herein, or perform any other action required by the terms hereof.  In addition, any charge, penalty or assessment incurred by Buyer from Rail Carrier due to delay, failure to properly load the coal into the railcar or to release such railcar in accordance with this Agreement, which relates to a Loading Disability or to an event of Force Majeure attributable to Seller, or Seller's Mine, an Acceptable Substitute Coal Source permitted under a Transaction from which coal is being delivered under this Agreement, or Loading Facilities, shall be borne by Seller.

**ARTICLE XIII**
**Notice of Loading, Weighing and Analysis**

13.1. Notice of Loading, Weights and Departure.  For each train, Seller shall:

13.1.1. provide to Rail Carrier, at such time and by such means as Rail Carrier designates, the individual railcar weights (both net and gross) and the entire train weight (both net and gross); and

13.1.2. within twenty-four hours of the completion of loading of each train, provide to Buyer, by Electronic Means at the e-mail address specified in Section 17.3, the date and precise time of the train's departure from the Point of Delivery, the location of the Loading Facilities, the date and time at which loading of the train began, the date and time at which loading of the train was completed and the train was released to Railroad, the individual railcar initials and numbers, the manner of determining the railcar weights (in the event of a breakdown of scales), the destination, the route, individual railcar weights (both net and gross) and the entire train weight (both net and gross), together with any other information reasonably requested by Buyer.

13.2. <u>Notice of Sample Analysis</u>. Within forty-eight hours of the completion of the loading of each train, Seller shall conclude the analysis of each coal sample it is required to analyze pursuant to Section 11.3.2 and shall transmit the results of such analysis to Buyer by Electronic Means at the e-mail address specified in Section 17.3.

**ARTICLE XIV**
**<u>Force Majeure</u>**

14.1. <u>Force Majeure Defined</u>. The term "Force Majeure" as used herein shall mean acts of God, acts of the public enemy, insurrections, riots, labor disputes, boycotts, fires, explosions, storms, tornadoes, high winds, landslides, floods, washouts, earthquakes, breakdowns or repairs of, or damage to, any equipment or facilities at Seller's Mine or at an Acceptable Substitute Coal Source (if permitted under a Transaction) from which coal is being delivered under this Agreement, the Loading Facilities, or Buyer's or its affiliates' generating facilities, or the equipment or facilities of Rail Carrier or any other railroad, or loading, unloading or transporting equipment or facilities used to transport or handle the coal, interruptions to or failures of transportation, unscheduled outages or shutdowns of Buyer's or its affiliates' generating facilities or equipment, breakage of or damage to transmission lines, failure of electric equipment due to sleet, ice or other unavoidable causes, accidents to or failures of electric substations, transformers or switching devices, and other breakdowns or repairs of, damage to or interruptions caused by transmission or power systems interconnected with Buyer's or its affiliates' generating facilities, acts of civil, judicial or military authorities, acts of local, state, or federal agencies, governmental authorities, or regulatory bodies (including environmental laws or regulations), including, without limitation, acts by regulatory bodies making the use of the coal by Buyer or its affiliates impossible or impractical without substantially changing or altering Buyer's or its affiliates' coal utilization or generating or coal handling equipment, or without incurring penalties or other

35

expense, together with any other causes beyond the reasonable control of such Party, whether foreseeable or unforeseeable, which wholly or partly prevent the mining, crushing, delivering and/or loading of the coal by Seller, or the receiving, transporting, accepting, unloading, burning or utilization of the coal by Buyer or its affiliates or by Rail Carrier; provided, however, that for an event to qualify as a Force Majeure event hereunder, the Party suffering same must give written notice to the other Party within a reasonably prompt time of such Party's discovery of the event. If the Party suffering such event shall give written notice more than 48 hours after such Party's discovery of the event, the Force Majeure event shall only excuse the Party's performance hereunder as specified in Section 14.2 for the 48-hour period immediately preceding the other Party's receipt of such notice, together with the time period thereafter, during which the Force Majeure event remains in effect. The Party suffering the Force Majeure event must give written notice to the other Party promptly upon the conclusion or remedy of such event. Any change in a Party's economic condition including, but not limited to, a Party's increased cost of doing business, a Party's ability to buy coal from or sell coal to others at a more favorable price, or any decrease or increase in demand for electricity and coal shall not constitute an event of Force Majeure.

14.2. <u>Effect of Force Majeure</u>. If either Party experiences an event of Force Majeure, and such Party gives to the other Party written notice thereof, in accordance with Section 14.1 above (which shall be in addition to and not in lieu of the notice to be provided in Section 12.1.4 with respect to a Loading Disability affecting the loading of trains), then, except as expressly provided in this Agreement to the contrary, the obligations of the Party giving such notice (other than the obligations of a Party to pay or expend money in connection with the performance of this Agreement) shall, to the extent affected by the Force Majeure event, be suspended for the period commencing upon the beginning of the Force Majeure event, and ending upon the cessation of

such event of Force Majeure, and, during the continuance thereof, the corresponding obligations of the Party receiving the notice shall be equally suspended; provided, however, that:  (i) the Party giving such notice shall use its reasonable efforts to eliminate, or if Buyer, cause its affiliate to use reasonable efforts to eliminate, such event of Force Majeure insofar as reasonable with a minimum of delay; (ii) if the event of Force Majeure relates to an Acceptable Substitute Coal Source permitted under such Transaction, Seller will immediately commence delivery of coal from the Seller's Mine or Seller's Mines specified for such Transaction or from another Acceptable Substitute Coal Source permitted under such Transaction; (iii) the settlement of strikes or labor-related lockouts shall be entirely within the good faith discretion of the Party hereto having the difficulty; and (iv) neither Buyer nor its affiliates shall be required to enter into new rail transportation arrangements.  Should either Party hereto fail for a consecutive period of ninety (90) days to perform its obligations under this Master Coal Purchase and Sale Agreement or any Transaction because of an event of Force Majeure, the other Party may, at its option, terminate any affected Transaction upon written notice to the Party experiencing the event of Force Majeure and, thereafter, both Parties shall be released from all obligations under such Transaction (or Transactions) which would have otherwise arisen after such date of termination. In the event of a condition of Force Majeure affecting the performance of either Party hereto pursuant to any Transaction, the Delivery Term for such Transaction shall not be extended and the Contract Quantity for such Transaction shall be reduced by that volume of coal for which either deliveries by Seller or purchases by Buyer are excused as a result of such condition of Force Majeure, unless otherwise mutually agreed in writing.

## ARTICLE XV
## Material Adverse Change

If either Party (the "affected Party") experiences a Material Adverse Change, the affected Party shall provide notice to the other Party (the "non-affected Party") and shall maintain, for so long as the Material Adverse Change is continuing, Performance Assurance with the non-affected Party in an amount equal to the sum of (in each case rounding upwards for any fractional amount to the next $250,000) the aggregate of termination damages that would be owed to the non-affected Party calculated as if each Transaction were being terminated early in accordance with Article VIII (the amount of said Performance Assurance to be adjusted at the beginning of each calendar quarter to reflect amounts owing at that point in time). "Material Adverse Change" means an event or occurrence that constitutes or would result in a material adverse effect on the results of operations, financial condition or business of a Party's business taken as a whole, other than as a result of seasonal changes, general economic conditions or other conditions affecting the industry in which the Party or its customers operate, including but not limited to, fluctuations in coal prices and legislative or regulatory conditions. "Performance Assurance" means: (i) an irrevocable letter of credit in a form, and from an institution, reasonably acceptable to the non-affected Party, or (ii) a guaranty in a form, and from a creditworthy party, reasonably acceptable to the non-affected Party, or (iii) such other credit support acceptable to the non-affected Party in its sole discretion.

## ARTICLE XVI
## Governmental Approvals

In respect to governmental approvals necessary for the consummation and performance of this Agreement, Seller and Buyer agree that:

(1)    Subject to the terms of Section 2.6, Seller shall, at its own cost, be responsible for obtaining and maintaining in force any and all licenses, permits or

approvals necessary for the performance of this Agreement, or the production, sale and loading of coal to be delivered hereunder, and for the delivery of such coal to Buyer at the Point of Delivery.

(2)    Subject to the terms of Section 2.6, Buyer (or its affiliates) shall, at its own cost, be responsible for obtaining and maintaining in force any and all licenses, permits or approvals necessary for the performance of this Agreement or to enable Buyer (or its affiliates) to purchase, accept and utilize the coal delivered by Seller hereunder.

Each Party shall afford the other Party all reasonable assistance in applying for or obtaining any approval, permit, license, authorization or certificate necessary for the purposes of this Agreement.

## ARTICLE XVII
### Notices and Addresses

17.1. <u>Notices</u>.  Except as expressly provided otherwise herein, any notice or other written communication required or permitted to be given hereunder shall be in writing and:

17.1.1. delivered personally to the Party to whom directed; or

17.1.2. sent by registered mail, postage prepaid, return receipt requested; provided that any notice of termination of this Master Coal Purchase and Sale Agreement or Transactions as allowed in this Agreement shall be required to be sent only in the manner designated "For Written Notices Required by This Agreement and Other Legal Notices" in Section 17.3 below.

17.2. <u>Effective Date of Notice</u>.  Except as expressly provided otherwise herein, any notice to be given hereunder or other written communication shall be effective on the date of receipt of the notice at the address set forth in Section 17.3 below, if received during normal business hours of

the addressee, and, if not received during normal business hours, then on the first business day of the addressee after such receipt.

17.3. <u>Addresses and Recipients</u>.  The addresses and representatives of the Parties, until a different address or representative is specified by written notice to the other Party, are as follows:


SELLER:

For Routine Communications:

> Kennecott Energy Company
> P.O. Box 3009
> 505 S. Gillette Avenue (zip 82716)
> Gillette, WY  82717-3009
> Attention:  Clayton Walker (or succeeding representative)
> Telephone No.:  307.687.6101
> Facsimile No.:  307.687.6009


For Written Notices Required by This Agreement and Other Legal Notices:

> Kennecott Energy Company
> P.O. Box 3009
> 505 S. Gillette Avenue (zip 82716)
> Gillette, WY  82717-3009
> Attention:  Legal Department


For Invoices and Other Payment, Financial and Accounting Matters:

> Kennecott Coal Sales Company
> P.O. Box 3009
> 505 S. Gillette Avenue (zip 82716)
> Gillette, WY  82717-3009
> Attention: Accounts Payable
> Telephone No.: 307.687.6000
> Facsimile No.: 307.687.6015

BUYER:

For Routine Communications:

TXU Energy Trading Company LP
Mr. Allen Childress (or any succeeding representative)
1717 Main Street
Suite 1900
Dallas, Texas 75201
Telephone #: 214-875-9739
Fax #: 214-875-9051
E-mail: allen.childress@txu.com

For Written Notices Required by This Agreement and Other Legal Notices:

TXU Energy Trading Company LP
Mr. Matt Goering (or any succeeding representative)
1717 Main Street
Suite 1900
Dallas, Texas 75201

For Invoices, Payments and Other Financial and Accounting Matters:

TXU Energy Trading Company LP
Mr. Marc Desgraves (or any succeeding representative)
1717 Main Street
Suite 2000
Dallas, Texas 75201

For Telephonic Notice Regarding Sub-Standard Coal:

TXU Energy Trading Company LP
Mr. Allen Childress (or any succeeding representative):  214.875.9739 (office
    telephone) or 214.543.5459 (cellular telephone)
Mr. Matt Goering (or any succeeding representative):  214.875.9933 (office
    telephone) or 214.543.1872 (cellular telephone)

For Coal Samples:

> TXU Electric Company
> c/o Commercial Testing & Engineering Co.
> 2804 Hackathorne Lane
> Gillette, Wyoming 82716
> Attention: Connie Christianson
> Telephone No.: 307-682-7917

For Shipping Notices and Coal Sample Analyses:

> E-mail: wcoal1@txu.com

### ARTICLE XVIII
### Assignments

18.1. <u>Consent Required for Assignment, or Sale</u>.  Without the prior written consent of the other Party hereto, neither Party may assign any of its rights or obligations under this Agreement, except that, without prior written consent from the other Party:

18.1.1. Buyer and Seller shall each have the right to assign all of their respective rights and obligations under this Agreement to any affiliate of Buyer or Seller (as the case may be), or to a lessor, trust, corporation or other entity utilized or owned by Buyer or Seller or, in the case of Buyer, to any party that acquires (by purchase, exchange, lease or otherwise) all or any portion of Buyer's or its affiliates' generating facilities, or, in the case of Seller, to any Party that acquires Seller's Coal Reserves in accordance with Section 18.1.2 hereof; provided that, the assigning Party or assignee will give written notice to Seller within thirty days after such assignment; and further provided that if: (i) the acquiring party has an Investment Grade Rating (for the purposes of this Article, "Investment Grade Rating" meaning that such party has a debt or credit rating from Moody's, Fitch, Standard & Poor or other nationally recognized rating agency in its top four generic debt ratings without regard to qualifications within such category such as "+" or "-"), or (ii) the acquiring party provides a guaranty of its obligations under this

Agreement by a party with an Investment Grade Rating, Buyer shall have no obligations for the performance of, and Buyer shall automatically be fully and finally released from any liabilities or obligations with respect to, the Buyer obligations under this Agreement from and after the effective date of the acquisition by such party; and

18.1.2. Seller may dispose of its interest in and to Seller's Coal Reserves by merger, reorganization, consolidation, sale, transfer or otherwise (hereafter individually or collectively called a "transfer"); provided, however, that no such transfer shall be effective hereunder unless Seller provides at least sixty (60) days advance written notice to Buyer and the transferee agrees in writing to fully perform all obligations under this Agreement.

18.2. Exempt Assignments. The consent of the other Party is not required where a Party wishes to dispose of its interest in this Agreement by merger, reorganization, consolidation with, or by a sale or transfer to, a wholly-owned subsidiary of such Party, the direct or indirect parent company which wholly owns or controls such Party or a wholly-owned or controlled subsidiary of such parent company or if such Party pledges, collaterally assigns or hypothecates its interest, or grants a security interest, in this Agreement in connection with any financing or loan arrangement (hereinafter called "exempt assignment"). Except as otherwise provided in this Agreement, neither such an exempt assignment nor any other assignment shall in any way relieve the assigning Party (or surviving party in a merger, reorganization or consolidation), whether Seller or Buyer, from any obligation under this Agreement, except that, if the acquiring party has an Investment Grade Rating or provides a guaranty of its obligations under this Agreement by a party with an Investment Grade Rating, the assigning Party shall have no obligations for the performance of, and such Party shall automatically be fully and finally released from any

43

liabilities or obligations with respect to, its obligations under this Agreement from and after the effective date of the acquisition by such party.

18.3. <u>Government Approval</u>. No assignment of any interest may take place under this Article XVIII unless all necessary consents to the proposed assignment have first been obtained from all appropriate governments and government boards, commissions, departments, and authorities.

18.4. <u>Assignee Bound</u>. In any assignment permitted hereunder, the assignee shall assume the obligations of the assignor and the assignor shall, as a condition of such transfer, require the assignee to agree in writing to be bound by the terms and provisions herein, in the same manner and to the same extent as though the assignee had been a Party in the first instance.

**ARTICLE XIX**
**<u>Confidentiality</u>**

19.1. <u>Scope</u>. Each Party agrees, for itself, its parent, subsidiary, and affiliates, together with their respective directors, officers, employees, agents and representatives, including, without limitation, attorneys, accountants, and consultants, to keep confidential: (a) this Agreement, (b) all negotiations concerning this Master Coal Purchase and Sale Agreement and any agreed-upon or proposed Confirmations and Transactions, and (c) all documents, data, drawings, studies, projections, plans and other information, whether written or oral, that relate to this Agreement.

19.2. <u>Confidential</u>. "Confidential" means that information or a document, including the content, substance, or effect of the information or document, may not be disclosed, discovered, or distributed to any other person, corporation, or other entity, except: (a) under the valid order of an administrative or judicial officer having jurisdiction, which order must be opposed unless opposition to it is waived in writing by each Party to this Agreement, or (b) as provided in Section 19.3. A Party is not required to oppose any order requiring disclosure in any judicial or administrative proceeding by appeal, separate legal proceeding, or extraordinary measures if it

44

gives the other Party written notice of the order, and the other Party does not, within ten days after receiving the notice, agree to pay the reasonable costs of any opposition by appeal, separate legal proceeding, or extraordinary measures.

19.3. Exceptions.

19.3.1. A Party's obligations under this Article do not extend or apply to any information: (a) that is already in, or that comes into, the public domain other than through a violation of this Agreement; (b) that is in the Party's possession before the effective date of this Agreement; or (c) provided by a Party to a third party which is necessary to secure a loan or financing or in connection with a potential investment in such Party, provided that such third party agrees in writing to maintain such information in strict confidence.

19.3.2. Either Party may, without violating this Article, disclose matters that are made confidential by this Agreement to: (i) governmental officials and parties involved in any proceeding in which either Party is seeking a permit, certificate, or other regulatory approval or order necessary or appropriate to carry out this Agreement or as required by any law, regulation or order, including the disclosure requirements of the federal securities laws or request of the SEC or representatives thereof, but the disclosing Party shall make reasonable efforts to restrict public access to the information disclosed, and (ii) any party with which such Party is discussing a transaction pursuant to which its interest in this Agreement might be assigned or transferred, in whole or part, provided such party agrees in writing to comply with the provisions of this Article XIX.

19.3.3. Buyer may also disclose any such documents or other information as it deems necessary or advisable to state and recover its costs through its rates from its customers or to obtain any other regulatory approval or action that it deems necessary or

advisable, but Buyer shall make reasonable efforts to restrict public access to the information disclosed.

19.4. Specific Performance. It will be impossible or very difficult to measure in terms of money the damages that would accrue due to any breach of this Article, or any failure to perform any obligation contained in this Article, and, for that reason, among others, each Party is entitled to specific performance of this Article or to seek other injunctive or equitable relief. If either Party institutes any proceeding to enforce any part of this Article, the other Party hereby waives any claim or defense that an adequate remedy at law exists.

19.5. Continuing Effectiveness. This Article shall remain effective for two years after the termination of this Agreement.

# ARTICLE XX
## Miscellaneous

20.1. Records and Audits. Seller shall keep and maintain coal analyses and books and records related to its performance of this Agreement for a minimum of two (2) years. Upon request, Seller shall notify Buyer in writing of the place at which such records are held so that Buyer and its duly authorized representatives may examine and audit them at reasonable times.

20.2. Inspections. Buyer and its designated representatives shall at all reasonable times have access, at Buyer's sole cost and expense, to each Seller's Mine and any Acceptable Substitute Coal Source if specified for such Transaction, for the purposes of observing any mining, loading, sampling or testing operation, or the verification of Seller's source of coal, or any other reasonable purpose in connection with this Agreement.

20.3. Non-Waiver. The failure of either Party hereto to insist in any one or more instances upon strict performance of any provisions of this Agreement by the other Party hereto, or to take advantage of any of its rights hereunder, shall not be construed as a waiver by such Party of any

46

such provisions or the relinquishment by such Party of any such rights; nor shall such failure be construed as a waiver or relinquishment concerning any subsequent failure by the other Party to comply with such provision, but, rather, such provision shall continue and remain in full force and effect.

20.4. Election of Remedies. In no event shall the pursuit by either Party of one remedy constitute an election of remedies so as to foreclose or inhibit such Party's pursuit of any other available remedy.

20.5. Entire Agreement; Amendments. This Master Coal Purchase and Sale Agreement, together with each Confirmation, embodies all the terms of the agreement between the Parties with respect to the subject matter hereof, and supersedes and replaces any and all written or oral arrangements, correspondence, conversations, agreements, and documents made or exchanged between the Parties prior to the execution of this Agreement regarding such subject matter. Any modification, alteration, or amendment of this Agreement shall be in writing, dated on or subsequent to the date hereof, and duly executed by both Parties.

20.6. No Third-Party Beneficiaries. This Agreement is not intended to, and shall not, create rights, remedies, or any benefits of any character whatsoever, in favor of any persons, corporations, associations or entities other than the Parties hereto.

20.7. Inurement. This Agreement shall inure to the benefit of and be binding upon the Parties hereto, together with their respective successors and permitted assigns.

20.8. Severability; Effect of this Agreement. Any provision of this Agreement prohibited or unenforceable by reason of any applicable law shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof. To the extent, however, that the conflicting provisions of any such applicable law may be waived, such

provisions are hereby specifically waived by the Parties hereto to the full extent permitted by law, in order that this Agreement shall be enforced as written.

20.9. <u>Choice of Law</u>.   The Parties hereto agree that this Agreement and the terms and conditions set forth herein shall be governed by, and construed according to, the laws of the State of Texas, without regard to the principles of conflicts of laws thereof that would require the application of the laws of another jurisdiction.

IN WITNESS WHEREOF, the Parties hereto have caused their duly authorized officers to execute this Agreement in their respective corporate names, effective as of the date first set forth above.

Seller:

**KENNECOTT COAL SALES COMPANY**

By: _____
Name: _____
Title: _____

Buyer:

TXU ENERGY TRADING COMPANY LP

By TXU Energy Trading Management Company LLC, Its General Partner

By: _____
Name: V. J. Horgan
Title: President

## **Guaranty**

Kennecott Energy Company hereby: (i) represents and warrants that it has all corporate authority and approval to execute this guaranty, and (ii) guarantees all obligations of Kennecott Coal Sales Company under this Master Coal Purchase and Sale Agreement and each Transaction entered into under, and each Confirmation executed pursuant to, this Master Coal Purchase and Sale Agreement.

KENNECOTT ENERGY COMPANY

By: _____
Name: _____
Title: _____

## EXHIBIT "A"
## CONFIRMATION

**Buyer:** TXU Energy Trading Company LP          **Seller:** Kennecott Coal Sales Company

**Seller's Mine(s):**

**Acceptable Substitute Coal Sources:**

**Contract Quantity:**

**Confirmation Price:**          $          /Ton

**Delivery Term:**

**Specified Btu Value:**          __ _ Btus per pound of coal.

**Specified SO$_2$ Value:**          ____ pounds of SO$_2$/MMBtu.

**Applicable Law Date:**

**Imposition Cap:**

**Guaranteed Quality Specifications:**

| | |
|---|---|
| Calorific Value in Btu/pound: | Not less than __ or greater than ___. |
| Sulfur | Less than ._%. |
| Pounds of SO$_2$/MMBtu: | Not more than ___ pounds. |
| Ash (in percentage of total coal weight): | Less than _._%. |
| Na$_2$O (expressed in percentage of coal ash): | Greater than _% but less than _%. |
| Total Moisture (expressed in percentage of total coal weight): | Less than __%. |

**Electronic Payment Instructions:**

**Other Terms and Conditions:**

*This Confirmation is subject to all of the terms and conditions contained in that Master Coal Purchase and Sale Agreement dated effective as of March 22, 2002 between Seller and Buyer, all of which are hereby incorporated herein by reference.*