# EXHIBIT I

CONFIDENTIAL AND PROPRIETARY

EXECUTION VERSION

# Renewable Energy and Renewable Energy Credits

# Purchase Agreement

# Between

# TXU PORTFOLIO MANAGEMENT COMPANY LP

# and

# AIRTRICITY FOREST CREEK WIND FARM, LLC

# Dated as of March 10, 2006

SD\508314.17

ARTICLE I. DEFINITIONS ................................................................................................................ 1

ARTICLE II. SCOPE AND QUANTITY ........................................................................................... 5

ARTICLE III. TERM AND TERMINATION ..................................................................................... 6

    Section 3.01    Production Term and Delivery Period ............................................................ 6

    Section 3.02    Option to Extend Production Term ................................................................. 7

    Section 3.03    Termination .................................................................................................... 7

ARTICLE IV. RENEWABLE RESOURCE FACILITY ..................................................................... 8

    Section 4.01    Renewable Resource Facility ......................................................................... 8

    Section 4.02    Interconnection .............................................................................................. 9

    Section 4.03    Transmission ................................................................................................. 9

    Section 4.04    Metering ........................................................................................................ 9

    Section 4.05    Communications and Telemetry .................................................................. 10

    Section 4.06    Regulatory Compliance .............................................................................. 10

    Section 4.07    Modifications to Renewable Resource Facility .......................................... 11

    Section 4.08    Exclusion of Liability .................................................................................. 11

    Section 4.09    Project Review and Construction Status ...................................................... 12

    Section 4.10    Naming Rights ............................................................................................. 12

ARTICLE V. RENEWABLE RESOURCE FACILITY OPERATION ............................................ 14

    Section 5.01    General Requirements .................................................................................. 14

    Section 5.02    Quarterly Meeting ....................................................................................... 16

    Section 5.03    Delivery and Title ....................................................................................... 16

    Section 5.04    Instructed Backdown. .................................................................................. 17

    Section 5.05    Access to Facility ........................................................................................ 17

    Section 5.06    Qualified Scheduling Entity Services .......................................................... 17

ARTICLE VI. PAYMENTS, RECORDS, AND BILLINGS ........................................................... 19

    Section 6.01    Price and Monthly Payments ...................................................................... 19

    Section 6.02    Annual Reconciliation ................................................................................. 20

    Section 6.03    Effect of Outages and Force Majeure .......................................................... 23

    Section 6.04    Governmental Impositions ........................................................................... 23

    Section 6.05    Records ........................................................................................................ 23

    Section 6.06    Billing ......................................................................................................... 24

Section 6.07   Interest on Past Due Amounts ..................................................... 24

Section 6.08   Corrections ............................................................................... 24

Section 6.09   Precommercial Energy ............................................................... 25

ARTICLE VII. OUTAGES ................................................................................ 26

Section 7.01   Outages .................................................................................... 26

Section 7.02   Interruptions or Curtailments for Forced Outage or Scheduled Outage ....... 26

ARTICLE VIII. DEFAULT, TERMINATION AND FORCE MAJEURE ..................... 26

Section 8.01   Force Majeure ........................................................................... 26

Section 8.02   Events of Default and Termination .............................................. 28

Section 8.03   Remedies for Failure to Accept Delivery or Schedule and Seller's Failure to
                Deliver .................................................................................... 31

Section 8.04   No Consequential Damages ......................................................... 32

ARTICLE IX. REPRESENTATIONS AND WARRANTIES .................................... 32

Section 9.01   Representations and Warranties of Seller ...................................... 32

Section 9.02   Representations and Warranties of Buyer ...................................... 33

Section 9.03   Limitation on Warranties ............................................................ 33

ARTICLE X. SECURITY ................................................................................. 33

Section 10.01   Security Required ..................................................................... 33

Section 10.02   Security Amount ...................................................................... 37

Section 10.03   Downgrade Event ..................................................................... 38

Section 10.04   Grant of Security Interest and Remedies ..................................... 38

Section 10.05   Financial Information ................................................................ 40

Section 10.06   Release and Replenishment of Security ....................................... 41

Section 10.07   Incorporation of Rights ............................................................ 41

ARTICLE XI. CONFIDENTIALITY .................................................................. 41

Section 11.01   Scope .................................................................................... 41

Section 11.02   Confidential ............................................................................ 42

Section 11.03   Exceptions .............................................................................. 42

Section 11.04   Specific Performance ................................................................ 42

ARTICLE XII. MISCELLANEOUS ................................................................... 43

Section 12.01   Subject to Regulation ............................................................... 43

Section 12.02   Assignment ............................................................................. 43

Section 12.03   Time Is of Essence ................................................................... 44

ii

Section 12.04  Notices ................................................................................................ 44

Section 12.05  No Rights of Third Parties ................................................................... 45

Section 12.06  Subject to Applicable Laws ................................................................ 45

Section 12.07  No Partnership .................................................................................... 45

Section 12.08  Amendment ......................................................................................... 46

Section 12.09  No Waiver ........................................................................................... 46

Section 12.10  Captions .............................................................................................. 46

Section 12.11  Complete Agreement .......................................................................... 46

Section 12.12  Governing Law ................................................................................... 46

Section 12.13  Liquidated Damages ........................................................................... 46

Section 12.14  Severability ........................................................................................ 46

Section 12.15  Exhibits ............................................................................................... 47

Section 12.16  Construction ........................................................................................ 47

Section 12.17  Delivery of Copy of Agreement ......................................................... 47

Section 12.18  Execution in Counterparts .................................................................. 47

Section 12.19  Imaged Agreement .............................................................................. 48

Section 12.20  Effective Date ..................................................................................... 48

SD\508314.17
84105.000300 DALLAS 187754v2

# Renewable Energy and Renewable Energy Credits Purchase Agreement

This Renewable Energy and Renewable Energy Credits Purchase Agreement ("Agreement") dated as of March 10, 2006, is between **TXU Portfolio Management Company LP** ("Buyer"), a Texas limited partnership with offices in Dallas, Dallas County, Texas, and **Airtricity Forest Creek Wind Farm, LLC**, a Delaware limited liability company ("Seller"), with offices in Irving, Dallas County, Texas. Buyer and Seller may be referred to herein individually as "Party" or together as "Parties".

WHEREAS, Seller agrees to produce, deliver, and sell to Buyer, and Buyer agrees to take and purchase from Seller, renewable energy credits and the renewable electric energy that produces those credits under this Agreement's provisions

THEREFORE, in consideration of the promises made in this Agreement, the Parties hereby agree as follows:

## Article I.  Definitions

Definitions

Terms defined herein and the section containing such definition are listed below:

| | |
|---|---|
| Acceptable Credit Rating | 10.01E |
| Agreement Term | 4.02 |
| After-Tax Basis | 5.04 |
| Agreement | Preamble |
| Annual Deficiency | 6.02C |
| Annual Excess | 6.02B |
| Annual Full-Price Excess | 6.02B(1) |
| Annual Half-Price Excess | 6.02B(3) |
| Annual Quantity | 6.01B |
| Annual Quantity Range | 6.01B |
| Applicable Law | 12.06 |
| ATC | 4.07D |

1

| | |
|---|---|
| Business Day | 6.06A |
| Buyer | Preamble |
| Capacity | 4.01A |
| Certification Date | 4.01B |
| Communications and Telemetry Equipment | 4.05 |
| Confidential | 11.02 |
| Consequential Damages | 8.04 |
| CPT | 3.01 |
| Cross Default | 10.01I |
| Cross Default Amount | 10.01I |
| Curtailment Bank | 6.02C |
| Default Notice | 4.10A |
| Defaulting Party | 8.02A |
| Deficiency Payment | 6.02D |
| Deficiency Rate | 6.02F |
| Delivery Point | 4.02 |
| Downgrade Event | 10.03 |
| Downgraded Party | 10.03 |
| Early Termination | 8.02B |
| Early Termination Date | 8.02B |
| Effective Date | 12.20 |
| End of Initial Term | 3.01C |
| Environmental Attributes | 2.02 |
| ERCOT | 2.01 |
| ERCOT ISO | 4.07D |

2

| | |
|---|---|
| ERCOT Barred Issue | 6.08 |
| ERCOT Protocols | 12.17D |
| Event of Default | 8.02A |
| Extended Term | 3.02 |
| Federal Funds Rate | 6.07 |
| Force Majeure | 8.01A |
| Forced Outage | 7.01B |
| Full Price | 6.01A(1) |
| Full Security | 3.03C |
| Full Security Date | 3.03C |
| Governmental Charges | 6.04 |
| Guarantor | 10.01E |
| Imaged Agreement | 12.20 |
| Instructed Backdown | 5.04 |
| Interconnection Agreement | 4.02 |
| Intercreditor Agreement | 10.01A |
| Lender | 8.02D |
| Metering Equipment | 4.04 |
| Moody's | 10.01C |
| Mortgaged Property | 10.04A |
| MW | 4.01A |
| MWh | 4.01A |
| Net Deficiency | 6.02C(2)(ii) |
| Net Energy | 2.02 |
| Net Full-Price Excess | 6.02B(4) |

| | |
|---|---|
| Net Half-Price Excess | 6.02B(4) |
| Non-Defaulting Party | 8.02B |
| OOME Down Service | 6.01A(3) |
| "Operation Phase Security" | 10.02 |
| Option | 3.02 |
| Party / Parties | Preamble |
| Per Diem Payments | 4.01B |
| Production Term | 3.01A |
| Program Administrator | 4.06 |
| Project | 4.01A |
| PUCT | 2.02 |
| QSE | 4.04 |
| RECs | 2.02 |
| Renewable Energy | 2.02 |
| Renewable Resource Facility | 4.01A |
| Replacement Energy | 6.01A(4) |
| Sales Price | 8.03 |
| Scheduled Outage | 7.01A |
| Security | 10.01 A & B |
| Seller | Preamble |
| S&P | 10.01C |
| Start Date | 3.01B |
| Step-In Period | 10.05 |
| Step-In Right | 10.05 |
| Survival | 10.08 |

4

| | |
|---|---|
| Take-Over Date | 10.01(J) |
| Termination Payment | 8.02E |
| Transferred RECs | 6.02D |
| Turbine Deficiency Payment | 4.01C |
| Wind Turbine | 4.01A |

## Article II.  Scope and Quantity

### Section 2.01   Purchase and Sale Obligation

Seller shall sell and deliver to the Delivery Point, and Buyer shall schedule, purchase and accept at the Delivery Point, all of the Net Energy, RECs and Environmental Attributes produced by the Renewable Resource Facility during the Production Term, in each case subject to the other provisions of this Agreement.  In addition and subject to the other provisions of this Agreement, Seller transfers to Buyer, and Buyer accepts from Seller, any right, title and interest that Seller may have in and to any current or future defined characteristic, certificate, tag, credit, ancillary service attribute, or accounting construct, including any accounting construct counted towards any current or future resource adequacy or reserve requirements, associated with the electric generation capability and capacity of the Renewable Resource Facility or the Renewable Resource Facility's capability and ability to produce energy, if any, existing during the Production Term.  Unless otherwise specifically provided in this Agreement, when the term "REC" or "RECs" is used, such term shall be deemed to include all Environmental Attributes associated with such REC or RECs under applicable law.   Unless  (i) Buyer is in default of this Agreement, (ii) Buyer is excused from taking Net Energy or RECs under any provision of this Agreement, or (iii) Seller receives a directive from the Electricity Reliability Council of Texas (including successors and other entities performing similar functions in the future, "ERCOT"), or is otherwise prevented by ERCOT from delivering Net Energy or RECs at the Delivery Point to Buyer, Seller shall sell and deliver all RECs and Net Energy produced by the Renewable Resource Facility exclusively to Buyer.

### Section 2.02   Product To Be Sold and Purchased

The combination of RECs and Net Energy is called "Renewable Energy." One MWh of Net Energy, together with the REC produced by that MWh of Net Energy, is one MWh of Renewable Energy. "Net Energy" for a period is the amount of electric energy in MWh produced by the Renewable Resource Facility and delivered to the Delivery Point in that period, as metered by the Metering Equipment.   Subject to Section 2.01 above which includes Environmental Attributes in RECs for purposes of this Agreement, "REC" or "RECs" shall have the meaning set forth in the rules of the Public Utilities Commission of Texas (the "PUCT"), TAC, Title 16, Part 2, Chapter 25, Subchapter H, Division 1 (Section 25.173(a)(11)). "Environmental Attributes" shall mean, in the generation of energy, the fuel, emissions, air quality or other environmental characteristics, credits, benefits, reductions, offsets and allowances, resulting from the generation of the energy applicable to the RECs sold hereunder or the avoidance of the emission of any gas, chemical or other substance to the air, soil or water attributable to such generation or arising out of legislation or regulation concerned with oxides of

5

nitrogen, sulfur or carbon, with particulate matter, soot or mercury, and the EA Reporting Rights. Notwithstanding the foregoing, RECs and Environmental Attributes exclude any and all state and federal production tax credits, investment tax credits and other similar credits generated by the Renewable Resource Facility. "EA Reporting Rights" shall mean the right to report to any agency, authority or other entity that Buyer has purchased and/or owns the RECs.

### Section 2.03    Filing and Reporting

Seller shall timely comply with all filing and reporting requirements pertaining to the RECs and Environmental Attributes produced by the Renewable Resource Facility and transferred to Buyer hereunder, and shall execute and deliver to Buyer such documentation as may be reasonably requested by Buyer from time to time to evidence the transfer of title and delivery of RECs and Environmental Attributes to Buyer, to the extent the same are transferable under Applicable Law, and with respect to Environmental Attributes, to the extent identified by Buyer or known to Seller.

### Section 2.04    Reduction in RECs because of Regulatory Change

Notwithstanding any other provision of this Agreement to the contrary, the elimination, reduction, or change in the nature or legal characteristics (including with respect to tradability or transferability) of RECs as a result of regulatory changes shall not relieve Buyer of its obligations to purchase Net Energy at the Full Price hereunder, nor shall any such event relieve Seller from the obligation to transfer and deliver to Buyer any modified, revised or new product created in lieu of a REC to the extent transferable, and any Environmental Attributes associated with such Net Energy (or to otherwise compensate Buyer for the lost benefit thereof, to the extent Seller can realize a benefit from the retained Environmental Attributes, if not transferable).

## Article III. Term and Termination

### Section 3.01    Production Term and Delivery Period

A.      Production and delivery of Net Energy from the Renewable Resource Facility under this Agreement shall begin at or after the start of the Production Term and shall stop at the end of the Production Term. The "Production Term" starts at the beginning of the hour that ends at 0100 central prevailing time ("CPT") on the Start Date and stops at 2400 CPT on the End of Initial Term, unless it is terminated earlier under another provision of this Agreement or unless a Party exercises the extension option set out in Section 3.02 below.

B.      Seller will make commercially reasonable efforts to achieve commercial operation of the Renewable Resource Facility prior to January 1, 2007, including expediting, to the extent commercially reasonable, the installation and operation of the transmission interconnection. The term "Start Date" means the earlier of the date the Renewable Resource Facility achieves commercial operation or January 1, 2007, extended to compensate for any delay in the ability of a Party to deliver or receive Net Energy caused by an event of Force Majeure.

C.      The "End of Initial Term" is December 31, 2022, extended by (i) any delay in the Start Date for reasons of Force Majeure pursuant to Section 3.01B and (ii) the length of any event of

Force Majeure of sufficient magnitude to curtail all or substantially all of the production of Net Energy by the Renewable Resource Facility or the reception of Net Energy at the Delivery Point.

## Section 3.02    Option to Extend Production Term

Buyer has an option the ("Option") to extend the Production Term by an additional period of five (5) years as provided in this Section 3.02. Buyer, at its sole discretion, may elect or decline to elect to exercise its Option. At least eighteen calendar months prior to the End of Initial Term, Buyer must notify Seller in writing whether it exercises its Option, and if Buyer fails to so notify Seller, Buyer shall conclusively be deemed to have elected not to exercise its Option. If Buyer elects to exercise its Option, the term of this Agreement shall be extended for an additional five (5) years' period without further action by the Parties (the "Extended Term"). Depending on the election of Buyer, the future relationship and applicable pricing is described in Section 6.01A(2) of this Agreement.

## Section 3.03    Termination

A.    If either Party fails to provide the Full Security due on or before the Full Security Date, the other Party may terminate this Agreement by delivering notice of termination to the Party failing to provide the Full Security. The "Full Security" is the amount of Security required on and after the Full Security Date as shown in the table in Section 10.02. The "Full Security Date" means the earlier of (i) July 1, 2006 and (ii) the date selected by Seller (which may not be earlier than ten days after receipt of notice of such date by Buyer); provided that the notice indicating the date selected by Seller shall include a certification by Seller that on or before such date Seller has entered into arrangements with its Lenders to provide financing sufficient to complete the construction of the Renewable Resource Facility.

B.    In the event of a termination of this Agreement in accordance with Section 3.03A above, the terminating Party shall be entitled to retain, as liquidated damages for such failure, and not a penalty, the amount of Security that has been provided or which is required to be provided by the non-terminating Party prior to or as of the date of termination. Any such Security not provided prior to such termination date shall be paid by the non-terminating Party to the terminating Party within five (5) Business Days after termination.

C.    The remedies provided by this Section 3.03 are the sole and exclusive remedies of each party for a termination of this agreement pursuant to this Section 3.03. Upon the posting of Full Security by Seller and the full and complete discharge and satisfaction of Seller's obligations set forth in this Section 3.03, Buyer shall, upon request of Seller, promptly provide to any prospective purchaser of Seller (or any of Seller's interest in the Renewable Resource Facility) a statement executed by a duly authorized officer of Buyer providing that Seller has satisfied the terms and conditions of this Section 3.03.

SD\508314.17

## Article IV.  Renewable Resource Facility

**Section 4.01    Renewable Resource Facility**

A.      Seller shall, at its sole cost and expense, design, construct, own, and operate a wind-powered generation facility (the "Renewable Resource Facility" or the "Project"), consisting of 54 2.3MW wind generation turbines manufactured by Siemens Power Generation (each a "Wind Turbine") with a total nameplate electrical generating capacity ("Capacity") of approximately one hundred twenty-four and two-tenths (124.2) megawatts ("MW") (the "Design Capacity") and anticipated average net annual generation of 436,700 megawatt-hours ("MWh"), located in Sterling, Howard and Glasscock Counties, Texas.  Information about the Renewable Resource Facility is attached as Exhibit 4.01.  Exhibit 4.01 shall be supplemented by Seller by providing a description or plat showing the boundaries of the Renewable Resource Facility and including specifications of, and pertinent data about, its equipment and protective features, not later than the Full Security Date.  Before the Start Date, Seller shall supplement Exhibit 4.01 with a one-line diagram of the Renewable Resource Facility and, within 180 days of the Start Date, an update that includes the as-built specifications of the Renewable Resource Facility.

B.      The "Certification Date" is the date that the Renewable Resource Facility has received certification by the Public Utility Commission of Texas ("PUCT") under PUCT Substantive Rule §25.173 as eligible to receive RECs. Seller shall give Buyer prompt written notice of the PUCT's certification of the Renewable Resource Facility accompanied by a copy of the PUCT order granting such certification.  For each turbine generator included in the determination of the Design Capacity that is not certified and ready for continuous operation on or before January 1, 2007, Seller will provide to Buyer, as payment to reflect the lower than expected level of performance, a fee of fifty dollars ($50.00) per MW per day (the "Per Diem Payments") until the earlier of the Certification Date or September 30, 2007 for each MW of nameplate Capacity on each turbine generator included in the determination of the Design Capacity not ready for continuous operation.  Turbine generators will be deemed ready for continuous operation when the turbine generator supplier provides Seller and Buyer with documentation that states the turbine generator is ready for continuous operation and is released for production.  In the event the aggregate Capacity of turbine generators in service on September 30, 2007 is less than seventy-nine (79) MW or the Operation Phase Security has not been posted by Seller as required by Section 10.02, Buyer may, at any time thereafter, but not later than October 31, 2007, terminate this Agreement by giving written notice to Seller and to any Lender at addresses previously provided by Seller.  If Buyer terminates this Agreement under the terms of this Section 4.01B notwithstanding Seller diligently pursuing installation of at least seventy-nine (79) MW of Capacity, Buyer shall be entitled to retain as sole and exclusive damages any Security which has been provided by Seller or which Seller is obligated to provide to Buyer as of the termination date, reduced by any Per Diem Payments paid before the termination date.  Any such Security not provided prior to such termination date shall be paid by Seller to Buyer within five (5) Business Days after termination, reduced as applicable by any prior Per Diem Payments.

C.      In the event this Agreement is not terminated pursuant to Section 3.03 or 4.01B, (i) for each MW of Capacity not in service and certified by the PUCT for REC production by September 30, 2007, Seller shall pay Buyer $100,000 (reduced by any Per Diem Payments actually made pursuant to Section 4.01B) (the "Turbine Deficiency Payment") and the Annual

8

Quantity Range and the Security required will be reduced pro rata based on the number of Wind Turbines actually in service on September 30, 2007), compared to the number of Wind Turbines assumed in the Design Capacity as set forth in Section 4.01(A). The Turbine Deficiency Payment shall be Buyer's sole remedy with respect to the uninstalled Capacity represented by such payment.

D.      The dates and deadlines set forth in this Section 4.01 shall be delayed to the extent the construction of the Renewable Resource Facility is delayed by Force Majeure.

## Section 4.02    Interconnection

Seller has executed a transmission interconnection agreement with TXU Electric Delivery Company that is dated November 18, 2006, relating to the interconnection of the Renewable Resource Facility to the ERCOT transmission system (the "Interconnection Agreement"). Seller has provided Buyer a true and correct copy of the Interconnection Agreement. Seller shall, at its own expense, make all arrangements necessary to interconnect the Renewable Resource Facility with the ERCOT transmission or distribution system (deemed to include transmission or distribution facilities installed pursuant to the Interconnection Agreement, if any) throughout the Agreement Term. The "Agreement Term" shall begin on the Effective Date and shall end at the end of the Production Term. The "Delivery Point" is the interconnection between the Renewable Resource Facility and the ERCOT transmission or distribution system.

## Section 4.03    Transmission

Seller shall be responsible for delivering energy sold to Buyer hereunder to the Delivery Point. Seller shall, at its expense, schedule and provide, by purchasing or arranging for, all services, if any, necessary to deliver energy sold to Buyer hereunder to the Delivery Point.

Buyer shall be responsible for accepting energy sold to Buyer hereunder at the Delivery Point and taking such energy from the Delivery Point. Buyer shall, at its expense, schedule and provide, by purchasing or arranging for, all services, if any, necessary for receipt of energy sold to Buyer hereunder at the Delivery Point and for taking such energy from the Delivery Point.

## Section 4.04    Metering

Seller is responsible, at its expense, for providing meters ("Metering Equipment") to measure the Net Energy delivered from the Renewable Resource Facility to the Delivery Point. The Metering Equipment shall be qualified as an ERCOT Polled Settlement Meter (as defined in the ERCOT Protocols) and connected to the ERCOT Meter Data Acquisition System (as defined in the ERCOT Protocols), unless otherwise determined by Seller. All Metering Equipment and Metering Equipment maintenance shall be in accordance with applicable standards as published in the most recent version of the ERCOT Protocols. It is recognized that at the date hereof, it is ERCOT's responsibility to read meters for settlement purposes. Seller consents to allowing Buyer and its Qualified Scheduling Entity ("QSE") to read the Metering Equipment for informational purposes. Any adjustment to prior meter readings shall be made and settled in accordance with ERCOT Protocols, and the amount of Net Energy shall be appropriately adjusted to reflect such adjustment to prior meter readings.

### Section 4.05   Communications and Telemetry

Seller shall, at Seller's expense, design, install, own, maintain, and control the "Communications and Telemetry Equipment." The "Communications and Telemetry Equipment" is the telemetering, communications, and data acquisition equipment that is necessary for the effective operation of the Renewable Resource Facility in compliance with the ERCOT Protocols or as required by this Agreement. Buyer may inspect and review Seller's Communications and Telemetry Equipment. The Communications and Telemetry Equipment may include communication and data transmission (telemetering) facilities operable from any single location designated by Buyer. If any Communications and Telemetry Equipment needs to be added, modified, or changed to effectively operate Seller's power supply in accordance with this Section 4.05, then Buyer shall notify Seller in writing of those additions, modifications, or changes, and Seller shall make them, at Seller's expense. The Renewable Resource Facility also shall include:

A.     one full data circuit for telemetered data originating at the Renewable Resource Facility and terminating at Buyer's offices located at 1717 Main Street in Dallas, Texas 75201;

B.     one full business voice circuit that terminates in the Metering Equipment to use in maintaining and operating the billing meter;

C.     one full business voice circuit in the Renewable Resource Facility's control room, including facsimile capability compatible with the equipment used by Buyer;

D.     a facsimile machine in the Renewable Resource Facility's control room; and

E.     one full data circuit originating at the Renewable Resource Facility and terminating at Buyer's office to transmit real-time weather data, including wind speed, humidity and temperature, collected by Seller's monitoring equipment on its meteorological data acquisition equipment located at the Renewable Resource Facility.

### Section 4.06   Regulatory Compliance

A.     Seller shall comply with all legal and regulatory requirements for it to fulfill its obligations under this Agreement, including (as and when applicable) but not limited to:

(1).     Completing the registration process with the PUCT's Program Administrator described in PUCT Substantive Rule §25.173 (the "Program Administrator");

(2).     Receiving and maintaining certification as a Renewable Energy Resource from the PUCT;

(3).     Filing a report quarterly with the Program Administrator of the amount of Net Energy generated by the Renewable Resource Facility;

(4).     Acquiring and maintaining a REC trading account with the Program Administrator during the Production Term;

(5).     Certification and registration as a power generating company; and

    (6).    Completed asset registration with ERCOT.

B.    Buyer shall comply with all legal and regulatory requirements for it to fulfill its obligations under this Agreement, including (as and when applicable) but not limited to:

    (1).    Completing the registration process with the Program Administrator ; and

    (2).    Acquiring and maintaining a REC trading account with the Program Administrator during the Production Term.

## Section 4.07    Modifications to Renewable Resource Facility

After the Annual Quantity is established pursuant to Section 6.01B, Seller shall provide advance written notice to Buyer of any plans to modify the Renewable Resource Facility that would materially change or modify its output of RECs or Net Energy and shall, at Buyer's written request, give Buyer a written description of the proposed modification and a written explanation of the effect of the proposed modification on the Renewable Resource Facility's generating capacity and reliability.  With the exception of actions taken by Seller consistent with Section 5.01A, Seller may not otherwise modify the Renewable Resource Facility in any way that would materially increase or decrease the output of RECs or electric energy of the Renewable Resource Facility deliverable under this Agreement without Buyer's prior written consent. Notwithstanding the foregoing, Seller may increase the Capacity of the Renewable Resource Facility in accordance with Section 6.02D below.  For purposes of this Section 4.07, development of physically separate facilities held under a separate entity that would include new equipment that may share certain common facilities with the Renewable Resource Facility shall not be deemed part of the Renewable Resources Facility.

## Section 4.08    Exclusion of Liability

Buyer, by inspection of the Renewable Resource Facility or by its comment or failure to comment on, or by review of, plans for construction or modification of the Renewable Resource Facility, (1) is not responsible for strength of materials, design, adequacy, or compatibility of the Renewable Resource Facility, and (2) does not assume any responsibility or liability for damages or physical injury to:

A.    either Party's real or personal property or electrical equipment;

B.    the real or personal property of third persons or entities not a Party to this Agreement;

C.    any persons who may come in contact with or upon either Party's facilities; or

D.    any other persons or property, real or personal.

Buyer's inspection, review, comment, or failure to comment is not an endorsement or warranty of the Renewable Resource Facility.

### Section 4.09    Project Review and Construction Status

Seller shall give Buyer written monthly progress reports evaluating the progress on development and construction of the Renewable Resource Facility, beginning on the date of this Agreement. Seller shall include, in each monthly written report:

A.      project master schedule;

B.      bar charts with status reporting;

C.      summary engineering and procurement schedules and status reports;

D.      commissioning (startup) schedule;

E.      engineer's reports, if any; and

F.      reports from all third parties involved in the engineering and construction of the Renewable Resource Facility.

If Seller is providing progress reports to its Lender(s) that substantially comply with the foregoing requirements, the Seller may submit those reports to Buyer in satisfaction of the requirements of this Section 4.09. Upon reasonable request, Seller shall allow Buyer to inspect the construction site and, subject to reasonable restrictions by the turbine manufacturer consistent with its normal operating procedures, the turbine manufacturer's manufacturing facility.

### Section 4.10    Naming Rights

A.      In recognition of the value of the RECs produced from the Renewable Resource Facility and the need for Buyer to sell those credits, along with certain marketing and advertising value, Seller agrees that Buyer may, commencing on the first anniversary of the Certification Date, market the Renewable Resource Facility under a name and logo selected by Buyer, subject to approval by Seller, which shall not be unreasonably withheld. Such name may state that such wind center is marketed by Buyer or its designee. On and after the first anniversary of the Certification Date, the Renewable Resource Facility shall not be referred to by Seller by any name other than that designated by Buyer and approved by Seller or, at any time no name has been designated by Buyer and approved by Seller, by the "Default Name," which shall be Forest Creek Wind Farm. On and after the first anniversary of the Certification Date, the Default Name shall be in effect and shall be the name of the Renewable Resource Facility until the initial designation of a name by Buyer is effective, and during any period thereafter that Buyer advises Seller it has withdrawn a name and not designated a new name. Buyer shall, at any time after the Effective Date, advise Seller in writing of the initial name selected by Buyer to apply to the Renewable Resource Facility on and after the first anniversary of the Certification Date. Buyer may change the name designated by it at any time and from time to time during the remaining Production Term, but not more often than once in any three (3) year period, with the first opportunity to change the name occurring on the expiration of three (3) years after designation and approval of the initial name. A name may be withdrawn by Buyer at any time without regard to any three year limitation. Seller shall notify Buyer in writing within five (5) Business Days after submission of a name for approval if Seller does not approve such name. Failure to

12

so notify Buyer within such period shall constitute approval by Seller of the name selected by Buyer. Seller shall approve a name selected by Buyer unless (i) such name includes the name of an entity a substantial part of whose business is the ownership, development, construction and/or operation of wind generation plants in direct competition to Seller, provided that the inclusion in the name of a marketing affiliate of any such entity of some or all of the name of a direct competitor shall not provide grounds for disapproval, or (ii) the name includes or associates with an organization that in Seller's reasonable judgment, reasonably demonstrated to Buyer, has an unfavorable business or environmental reputation in the energy industry or with the public generally. Further, Buyer shall not include in any name any of the entity names or related affiliates set forth on Exhibit 4.10A of this Agreement. Exhibit 4.10A may be amended by Seller, but not more often than once every three (3) years, and no amendment of Exhibit 4.10A shall contain the name of any then current assignee of Buyer of rights under this Section 4.10. Exhibit 4.10A shall contain the names of no more than four (4) entities.

B.      Subject to the provisions of Section 4.10A above, commencing on the first anniversary of the Certification Date, Buyer may transfer the rights granted by this Section 4.10 related to the use of such name for marketing and advertising, placing and maintaining signage, media visits, Project tours and all other activities and purposes set forth in Section 4.10 of this Agreement to a third party without the consent of Seller as long as such third-party is not listed on Section 4.10A and such third party agrees to comply with the requirements of this Section 4.10.

C.      Subject to the proviso to this sentence, Seller shall provide Buyer a license to use a reasonable amount of property at a prominent location reasonably selected by Buyer on the Project site, which location shall not interfere with the construction, operation or maintenance of the Project, to construct and to display one sign of a size selected by Buyer reflecting the name selected by Buyer which at Seller's election will also state the facility is owned and operated by Seller (utilizing only Seller's registered legal name or d/b/a) and an additional sign located at each entrance to the Project site reflecting the name selected by Buyer; provided that (i) to the extent Seller's lease of the Project site does not permit Seller to provide to Buyer the licenses contemplated hereunder for signs reflecting the Name, Seller shall use commercially reasonable efforts to procure rights under its lease of the Project site to enable Seller to provide such licenses to Buyer and (ii) Seller shall not be required to approve any sign or location, or grant any license, that would cause Seller to be in default under its lease of the Project site. In the event Buyer elects to revise the signage, public materials or communications as described below, Seller and Buyer shall, at Buyer's cost, revise all applicable signage not located at the Project site and other public materials and communications to reflect the Name. The statement on a sign reflecting ownership and operation of the Renewable Resource Facility by Seller shall appear only within a strip occupying not more than the lower ten percent (10%) of the sign's surface area and shall be consistent with the design, style and color of the sign selected by Buyer. Seller shall not erect any additional sign within one hundred (100) yards of any sign erected by Buyer. Seller shall furnish, at its expense, electric power as necessary to adequately illuminate such signs. Buyer shall be responsible for the cost of construction and maintenance of any such sign. At Buyer's cost, Seller and Buyer shall revise all applicable signage not located at the Project site and other public materials and communications to reflect the name selected by Buyer from time to time in accordance with this Section 4.10.

SD\508314.17

D.    Buyer shall be allowed to publicly disclose the nature of its relationship with the Project and the fact that it purchases the RECs from the Project under a long-term power/REC purchase commitment.  Where either Party intends to issue a press release concerning the Project, the other Party shall be given time to review and comment on such press release.  No press release issued by a Party shall contain the name of the other Party or any of its affiliated companies without the prior written consent of such other Party.

E.    Seller shall provide general information on the Project and existing photographs of the Project to Buyer which may use such information and materials in its customer communications, marketing materials, and public communications, provided that Seller shall not be obligated to disclose any information to Buyer if such disclosure would, in the good faith judgment of Seller, be a violation of any contract to which Seller or any of its affiliates is a party or by which any such person or other entity is legally bound.  This information would include, without limitation, history of the Project, the major parties involved, and publicly available generation statistics (MWh, if allowed under contract, equivalent emissions avoided, etc.), technical statistics, and environmental and permitting history and such other public information as may reasonably be requested by Buyer.  Buyer shall provide attribution of Seller on any reproduction or issuance of any photograph provided by Seller to Buyer.  Seller is not obligated to provide any information that is subject to any confidentiality restriction.

F.    Buyer shall be allowed reasonable opportunity to provide media visits and periodic public tours of the Project, with advance notice to Seller, which visits and tours may be escorted by Seller at Seller's discretion.  Seller's personnel shall accompany such tour and, at their reasonable discretion, shall cancel or reschedule the tour should conditions pose a safety hazard or affect the operations of the Renewable Resource Facility.

G.    Buyer, at its cost and subject to the other restrictions set forth in this Section 4.10, may enhance the marketing of the Project or its participation therein, utilizing additional signage, advertising, web-based viewing of the Project, and other promotional efforts so long as such activities comply with the requirements of this Section 4.10.

H.    Buyer shall defend, indemnify, and hold harmless Seller from and against all direct costs, claims, losses, damages, and expenses (other than those incurred in entering into this Agreement), including attorneys' fees, court costs and litigation expenses suffered or incurred by Seller as a result of the exercise of the marketing rights provided by this Section 4.10.

### Article V.  Renewable Resource Facility Operation

### Section 5.01    General Requirements

A.    Seller shall adequately staff the Renewable Resource Facility to monitor, operate, and maintain the equipment and shall provide Buyer a contact name and number for a Project representative available 24 hours per day, seven days per week. Seller shall maintain and insure Seller's business and the Renewable Resource Facility in accordance with prudent industry practices (and in the case of casualty insurance maintained by Seller, for so long as Security is provided in the form of an interest in the Renewable Resource Facility, insurance in the amount of the greater of that which is in accordance with prudent industry practice or the full

14

replacement value of the Renewable Resource Facility); provided, however, in no event shall abandonment of two or more Wind Turbines in the aggregate during the Production Term qualify as prudent industry practice. Except during any period in which Security is provided in the form of a collateral interest in the Renewable Resource Facility pursuant to Section 10.01A(C) or 10.01J hereof, in the event that (i) two or more Wind Turbines in the aggregate suffer a casualty (whether at the same or different times) to the extent replacement is necessary, due to an event of Force Majeure or other event resulting in a total loss and (ii) Seller is unable after diligent efforts at the time of the loss to obtain an unqualified opinion from a nationally recognized law firm that the Federal Production Tax Credit is available for replacement Wind Turbines, then Seller shall be excused from any obligation to replace a lost Wind Turbine upon the payment to Buyer of liquidated damages in the amount of $100,000 per lost MW of Capacity (excluding Capacity attributable to the first Wind Turbine lost or otherwise abandoned) beginning in the first year of the Production Term, reduced uniformly each year down to $75,000 per lost MW in year ten (10) and thereafter for the remainder of the Production Term. Such obligation to replace lost Wind Turbines shall not apply, and liquidated damages shall not be payable, if Seller, having purchased and maintained comprehensive casualty insurance in accordance with prudent industry standards, is unable to obtain insurance proceeds to cover the cost of replacement, less applicable deductibles; provided, however, if Seller is excused from paying liquidated damages with respect to any such lost Wind Turbine that is not replaced, Seller will not be excused from any Annual Quantity obligation attributable to such Wind Turbine.

B.      Seller shall report to Buyer, on a timely basis, those items and/or conditions reasonably requested by Buyer for Buyer's internal planning. At the Effective Date of this Agreement, the information supplied shall include, without limitation, the following:

(1).     daily plan for the next day, including (1) capability released and available for operation and (2) after July 1, 2006 and until the Certification Date, a list of the turbines determined by the supplier of such turbines as being ready for continuous operation (the "Daily Plan"); which Daily Plan for the next day shall be received by Buyer's generation controller by 9:00 a.m. CPT and (3) test energy scheduled;

(2).     notification to Buyer, as soon as reasonably practicable, if any event or circumstance causes five percent (5%) or more of the generating units in the Renewable Resource Facility to be not available for generation, or if any event or circumstance causes previously unavailable generating units constituting five percent (5%) or more of the generating units in the Renewable Resource Facility to be made available;

(3).     overhaul or Scheduled Outage plans for the year (updated monthly);

(4).     any scheduled or planned transmission or switchyard clearances or maintenance plans for the next twelve (12) months (updated monthly);

(5).     telemetered real-time weather data transmitted through the data feed referred to in Section 4.05E hereof, which data shall be in a form that can be utilized and interpreted by Buyer.

SD\508314.17

C.     Seller is responsible to see that the maintenance and operation of the Renewable Resource Facility are conducted in material compliance with the applicable then-current guidelines of ERCOT.

D.     Buyer acknowledges and agrees that any information provided by Seller pursuant to a Daily Plan is Seller's reasonable estimate only, and that Seller shall not be liable in the event that the actual amount of energy delivered to Buyer, or the number of Wind Turbines available for operation, differs from the estimates provided for any reason whatsoever, and Seller shall not be liable for any losses, penalties, charges, expenses or other costs incurred or suffered by Buyer (including in Buyer's capacity as Seller's QSE) as a result thereof.

**Section 5.02   Quarterly Meeting**

Seller shall cause one of its representatives to attend a quarterly meeting with Buyer at a mutually agreeable location in which (a) the production of the Renewable Resource Facility is discussed, (b) Seller shall provide Buyer with documentation provided to the Program Administrator consistent with the verified metered readings of Net Energy at the Delivery Point, in connection with the award of RECs to the Renewable Resource Facility based on verified meter readings, (c) the outlook for the current compliance period production of RECs is discussed, and (d) Buyer's performance as the QSE, together with any other material matters requested to be discussed by either Party, are discussed.

**Section 5.03   Delivery and Title**

A.     Subject to Section 2.01, Seller shall deliver all Net Energy generated by the Renewable Resource Facility, net of that required for operation of the Renewable Resource Facility, to the Delivery Point.

B.     Seller remains in possession of the Net Energy and is responsible for delivery of the Net Energy to the Delivery Point. Buyer assumes possession and title of, and risk of loss for, the Net Energy at the Delivery Point and is responsible for delivery of the Net Energy past the Delivery Point.

C.     Except as otherwise specifically provided in this Agreement (including, without limitation, the elimination, reduction or change in nature or legal characteristics with respect to transfer or tradability of RECs as contemplated in Section 2.04), Seller shall deliver a REC to Buyer for each MWh of Net Energy delivered to Buyer. Title to the Environmental Attributes and RECs shall transfer to Buyer when Buyer takes title to the associated Net Energy. Seller shall execute and deliver necessary instruments and follow all prescribed regulatory procedures to effect the award of RECs, and shall transfer and deliver the RECs to Buyer, to the extent permitted by Applicable Law. Notwithstanding the preceding sentence hereof, unless otherwise specifically provided in this Agreement, Seller shall not be responsible for providing a REC (exclusive of any Environmental Attributes, for which Seller remains responsible to transfer to Buyer) for any MWh of Net Energy for which a REC is not awarded by the Program Administrator after Seller has taken all reasonable actions to have such a REC awarded and transferred, and Seller does not represent that it has marketable title to any REC until issuance thereof by the PUCT or its designee. Seller shall evidence transfer of title to RECs (including any Environmental Attributes) as soon as practicable after delivery of Net Energy.

16

### Section 5.04   Instructed Backdown.

Seller shall upon instruction of Buyer, cause up to ninety (90) percent of the available-to-run wind turbines in the Renewable Resource Facility to be out-of-service and not producing Net Energy (such event being referred to as "Instructed Backdown"). Seller agrees that upon notice of the Instructed Backdown, to cause the wind turbines to be out-of-service within a thirty (30) minute period. Buyer may select any percentage of the available-to-run wind turbines to include in this Instructed Backdown so long as it does not exceed ninety (90) percent of the available-to-run wind turbines. Buyer will provide Seller thirty (30) minutes notice prior to the end of any period of Instructed Backdown. During the period of an Instructed Backdown, (i) Seller will be credited with an amount of Renewable Energy attributable to each of the turbines taken out of service as a result of the Instructed Backdown, for purposes of payment of Renewable Energy, equal to the average Net Energy MW output per turbine of all of the in-service wind turbine generators for each hour during the Instructed Backdown (or, if no wind turbine generators are in service, the amount of Net Energy that Seller could have delivered to the Delivery Point from the turbines taken out of service as a result of the Instructed Backdown during the applicable period based upon wind conditions at the Renewable Resource Facility during such period and applicable power curves for such turbines) and (ii) such Net Energy shall be included as an Annual Quantity Adjustment as provided in Section 6.03. For each MWh of Renewable Energy credited hereunder, Buyer shall pay Seller an amount equal to the sum of (i) the then current amount of the Federal Production Tax Credit (on a per MWh basis) on an After-Tax Basis, plus (ii) the Full Price. "After-Tax Basis" shall mean, with respect to any payment to be received by Buyer or Seller, the amount of such payment (the base payment) supplemented by a further payment (the additional payment) to either Buyer or Seller, as applicable, so that the sum of the base payment plus the additional payment shall, after deduction of the amount of all Federal, state and local income taxes required to be paid by Buyer or Seller (as applicable) in respect of the receipt or accrual of the base payment and the additional payment (taking into account the net present value of any reduction in such income taxes resulting from tax benefits realized by the recipient as a result of the payment or the event giving rise to the payment), be equal to the amount required to be received. Such calculations shall be made on the basis of the highest generally applicable Federal, state and local income tax rates applicable to the corporation for whom the calculation is being made for all relevant periods, and shall take into account the deductibility of state and local income taxes, if any, for Federal income tax purposes. An ERCOT ISO instruction shall not be an Instructed Backdown for purposes of this Section 5.04.

### Section 5.05   Access to Facility

Buyer may enter the Renewable Resource Facility at any reasonable time after giving Seller reasonable advance notice to inspect the Renewable Resource Facility or Metering Equipment.

### Section 5.06   Qualified Scheduling Entity Services

Seller will notify ERCOT 60 days in advance of initial production of its intent to use Buyer as its QSE for its obligations to deliver Renewable Energy to Buyer under this Agreement and will continue to use Buyer as its QSE for the term of the Agreement, and Buyer shall act as Seller's QSE. Buyer's responsibilities as Seller's QSE shall be included as part of Buyer's direct obligations to Seller under this Agreement, shall be consistent with standards outlined by ERCOT for a QSE for the scheduling of power from the Renewable Resource Facility for delivery hereunder, managing the impact of Seller's actual production not matching the amount

17

scheduled and settling ERCOT statements on Seller's behalf. If requested by Seller from time to time, Buyer shall provide notice to ERCOT that the Renewable Resource Facility is a wind powered facility, and should not be curtailed except for system reliability issues that cannot be resolved through economic means, and Buyer shall not bid or schedule Net Energy in a manner contrary to such notice. If at any time Buyer as a QSE is not performing in accordance with the requirements of this Agreement, including without limitation failure to schedule Net Energy, Seller in its discretion may (in addition to its other rights and remedies available under this Agreement), if Buyer fails to cure such failure within three (3) Business Days after receipt of written notice thereof from Seller, replace the QSE function being performed under this Agreement by Buyer with equivalent services from a third-party QSE for such period of time as is necessary for Buyer to cure the default (which cure shall be evidenced by written notice from Buyer to Seller that Buyer is capable and willing to again perform the QSE functions). Buyer shall cooperate with Seller in effecting the replacement of Buyer with such third party QSE, and shall reimburse Seller the reasonable costs thereof until such failure is cured by Buyer as provided above in this paragraph. In addition to any damages defined in Section 8.03 that may result from lost production due to Buyer's failure to perform any of its obligations under this Section, such reimbursement of reasonable costs by Buyer shall be Seller's sole remedy for Buyer's failure to perform its QSE obligations under this Agreement. Upon giving of such notice of cure by Buyer, Seller shall transfer such QSE services from the third party QSE back to Buyer. Seller and Buyer shall cooperate in effecting the replacement of such third party QSE with Buyer as soon as reasonably practicable after notice of cure by Buyer. To that end, Seller shall use reasonable commercial efforts to negotiate third-party QSE services containing termination provisions consistent with the intent of this paragraph. For purposes of this Agreement, the QSE function and obligations include scheduling services under any successor to ERCOT.

Notwithstanding the foregoing, Buyer shall have the right to enter into contracts and maintain arrangements with a QSE Contractor in order to enable Buyer to perform QSE services with respect to this Agreement. References above in this Section 5.06 to Buyer acting as QSE shall also be deemed to include any QSE Contractor retained by Buyer. Seller shall not have any obligation or liability to any QSE Contractor retained by Buyer, and Buyer shall be solely responsible for engaging and paying any and all such QSE Contractors.

Notwithstanding anything to the contrary herein, Buyer acknowledges that Seller may, at its option and at any time during the term of this Agreement and upon forty-five (45) days notice, request to perform or have an affiliate perform the QSE function being performed under this Agreement by Buyer and Buyer shall take such actions as are necessary to transfer such QSE function to Seller; provided that, as a condition to such transfer, Seller shall have demonstrated to the reasonable satisfaction of Buyer that such transfer of the QSE function will not result in additional costs to, or loss of benefits to, Buyer as provided in this Agreement.

EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT OR THE ERCOT PROTOCOLS, IN RESPECT OF PROVIDING THE QSE SERVICES, NEITHER BUYER NOR ANY QSE CONTRACTOR SHALL BE DEEMED TO HAVE (I) ASSUMED AN AGENCY OR FIDUCIARY RELATIONSHIP WITH, OR DUTY OF LOYALTY TO, SELLER, NOR (II) MADE TO SELLER ANY REPRESENTATION OR WARRANTY

(IMPLIED OR EXPRESS) REGARDING OPERATIONAL OR OTHER RESULTS IMPACTING THE FACILITIES OR THE BUSINESS OF SELLER.

### Article VI. Payments, Records, and Billings

**Section 6.01   Price and Monthly Payments**

A.      Pricing

(1).     Buyer shall pay Seller monthly for all RECs and Net Energy measured by the Metering Equipment and produced by the Renewable Resource Facility in the preceding calendar month. Unless otherwise specifically provided herein, for each calendar year of the term of this Agreement, the price for each MWh of Renewable Energy produced (the "Full Price") is as set forth in Exhibit 6.01A, attached to and made a part of this Agreement.

(2).     Buyer has an Option to extend the Production Term and the Agreement Term an additional 5 years in accordance with Section 3.02 and this Section 6.01A(2). Buyer's Option is priced at the Full Price (as escalated) as set forth in Exhibit 6.01A, attached hereto and made a part of this agreement.

(3).     In the event Buyer receives compensation, in funds or in kind, from ERCOT for Seller providing OOME Down Service, then Buyer shall pay to Seller monthly 60% of the amounts (net of Buyer's cost, if any), not to exceed the sum of (i) the then current amount of the Federal Production Tax Credit on an After-Tax Basis plus (ii) the Full Price as to any MWh that Buyer acting as QSE under the terms of this Agreement receives from ERCOT, or if compensation is in kind, the market value of such in-kind compensation as reasonably determined by Buyer; provided that Buyer has received a MWh and a REC or their equivalent from ERCOT or Seller.  If Buyer receives compensation from ERCOT that includes or is based upon only energy without a REC attached, then the amount payable above to Seller above shall be reduced by the market value of such REC, as reasonably determined by Buyer. "OOME Down Service" has the meaning as defined in the ERCOT Protocols as that term may be revised by ERCOT from time to time. Seller shall supply all information required by ERCOT to substantiate the verifiable costs of OOME Down Service to Buyer in a timely manner. Payment of amounts described in this Section 6.01A(3) will be made in the next monthly payment settlement that occurs after receipt of said funds from ERCOT.

B.      The "Annual Quantity during the Production Term shall be determined as below:

(1).     The "Annual Quantity" for the period from the Start Date through December 31, 2006, shall be zero.

(2).     The "Annual Quantity" for the period from January 1, 2007, through the End of Initial Term, as the same may be extended other than through exercise by a Party of its option to extend the Production Term as provided in Section 3.02 hereof, shall be determined by Seller with notice thereof to Buyer within five (5) calendar days of the end of the final power performance testing by the EPC contractor, but not later than

September 30, 2007 (such date to be extended to the extent the deadline for paying the Turbine Deficiency Payment is extended beyond September 30, 2007 pursuant to Section 4.01C), and shall not be less than 393,030 MWh, and may not exceed 502,205 MWh (as adjusted pursuant to Section 4.01C, the "Annual Quantity Range"). Seller shall provide Buyer the results of the final power performance testing and documentation of the basis of determination of the Annual Quantity. After Seller determines the Annual Quantity for the years 2007 through the End of Initial Term, and notwithstanding the Annual Quantity Range, the Annual Quantity for the year 2007 only shall be adjusted to reflect the actual number of turbines installed and in commercial operation prior to June 1, 2007 and the time during the year they were placed in commercial operation. An example of the adjustment and redetermination of the Annual Quantity for the calendar year 2007 is set forth in Exhibit 6.01B, attached to and made a part of this Agreement.

(3).    The "Annual Quantity" for the period of any Extended Term shall be determined by Seller with notice thereof to Buyer no later than twenty four (24) months prior to the end of the Production Term based upon the immediately preceding five (5) years historical operating results, normalized for any Force Majeure events under this Agreement.

## Section 6.02    Annual Reconciliation

A.    At the end of each calendar year, beginning at the end of 2007, the amount of Net Energy produced in that year shall be compared to the Annual Quantity. For the calendar year 2007 only, the comparison will be between the amount of MWhs produced in 2007 and fifty percent (50%) of the Annual Quantity, prorated for that portion of 2007 for which the Renewable Resource Facility is in commercial operation (the "2007 Annual Quantity").

B.    If the amount of MWhs produced in a calendar year exceeds the Annual Quantity (or the 2007 Annual Quantity, as applicable), the difference between the amount of MWhs produced and the Annual Quantity (or the 2007 Annual Quantity, as applicable) is called the "Annual Excess" for that year.

(1).    For each of 2006 and 2007, the "Annual Full-Price Excess" equals the Annual Excess for each year.

(2).    For each year after 2007, if the Annual Excess is 15% or less of the Annual Quantity, then the "Annual Full-Price Excess" equals the Annual Excess.

(3).    For each year after 2007, if the Annual Excess is greater than 15% of the Annual Quantity, then the "Annual Full-Price Excess" equals 15% of the Annual Quantity, and the "Annual Half-Price Excess" equals the difference between the Annual Excess and 15% of the Annual Quantity.

(4).    The "Net Full-Price Excess" for a year is the sum of the Annual Full-Price Excess for that year plus the Net Full-Price Excess for the previous year (it being understood that the Net Full-Price Excess for the year prior to the first year of commercial operations of the Renewable Resource Facility is zero). The "Net Half-Price Excess" for a year is the sum of the Annual Half-Price Excess for that year plus the Net Half-Price Excess for the

previous year (it being understood that the Net Half-Price Excess for the year prior to the first year of commercial operations of the Renewable Resource Facility is zero).

C.      If the amount of MWhs produced in a calendar year is less than 90% of the Annual Quantity (or the 2007 Annual Quantity, as applicable), the difference is called the "Annual Deficiency." The Annual Deficiency is then compared to the Net Full-Price Excess for the previous year as set forth below.

(1).     If the Net Full-Price Excess for the previous year is greater than the Annual Deficiency, then the difference is the Net Full-Price Excess for the current year and the Net Half-Price Excess for the current year is equal to the Net Half-Price Excess for the previous year.

(2).     If the Net Full-Price Excess for the previous year is less than the Annual Deficiency, then the difference is the Annual Half-Price Deficiency for the current year, and the Net Full-Price Excess for the current year is zero. The Annual Half-Price Deficiency is then compared to the Net Half-Price Excess for the previous year.

(i).     If the Net Half-Price Excess for the previous year is greater than the Annual Half-Price Deficiency for the current year, then the difference is deemed to be the Net Half-Price Excess for the current year.

(ii).    If the Net Half-Price Excess for the previous year is less than the Annual Half-Price Deficiency for the current year, then the difference is the Net Deficiency for the current year, and the Net Half-Price Excess for the current year is deemed to be zero.

(iii).   Subject to sub-paragraphs (iv) and (v) below, Buyer shall only be required to pay Seller one-half of the Full Price for each MWh by which the Net Half-Price Excess for the previous year is less than the Net Half-Price Excess for the current year.

(iv).    To the extent the Curtailment Bank has sufficient balance at the end of any calendar year to cover the following payment, Seller shall be entitled to the Full Price for the entire Annual Half-Price Excess for that year and the balance in the Curtailment Bank shall be reduced by one-half (1/2) of the Full Price per MWh (plus the corresponding Federal Production Tax Credit per MWh grossed up on an After-Tax Basis), times the number of MWh by which the Net Half-Price Excess for the previous year is less than the Net Half-Price Excess for the current year. To the extent the balance in the Curtailment Bank is exhausted by such payments, only the payment described in Section 6.02(2)(iii) above shall be due for any remaining quantity.

(v).     At the end of any calendar year in which the Curtailment Bank contains a balance and there exists a Net Half-Price Excess for which Seller has been paid only one-half of the Full Price, Buyer shall reimburse Seller the other half of the Full Price for each MWh of Net Half-Price Excess to the extent the balance in the

21

Curtailment Bank permits, and the balance in the Curtailment Bank shall decrease by the amount of the reimbursement.

(vi).    "Curtailment Bank" means a nominal dollar amount equating to the value of all quantities of Net Energy which Seller could have delivered at the Delivery Point but did not due to a curtailment resulting from an ERCOT directive that excuses Buyer's performance pursuant to Section 7.02, valued at the Full Price plus the current (at the time of the curtailment or ERCOT directive) grossed up amount (on an After-Tax Basis) of the Federal Production Tax Credit.  The balance in the Curtailment Bank shall not include amounts for which Seller was reimbursed pursuant to Section 6.01A(3).  The balance in the Curtailment Bank shall be adjusted from time to time pursuant to Section 6.02C(2)(iv) and Section 6.02D.

D.    If there is a Net Deficiency for a calendar year, then the Seller may elect to obtain and transfer RECs to Buyer that were not produced at the Renewable Resource Facility to completely or partially offset the Net Deficiency, provided that the amount of RECs so obtained and transferred (the "Transferred RECs") for any one calendar year may not exceed twenty percent (20%) of the number of MWh comprising the Annual Quantity.  In such event, Seller shall make that transfer of RECs within thirty days after Buyer gives Seller written notice of the Net Deficiency for a year. Seller shall pay Buyer a Deficiency Payment equal to the product of (i) the difference in MWh between (A) the Net Deficiency, and (B) the MWh of Transferred RECs, if any, times (ii) the Deficiency Rate, the payment so calculated then being reduced by any available amounts in the Curtailment Bank (the balance in the Curtailment Bank being reduced accordingly).  The aggregate liability of Seller under this Section 6.02D shall in no event exceed five million dollars ($5,000,000) in the aggregate for the duration of the Production Term including any Extended Term.  The Deficiency Payment includes the value of all of the RECs transferred in lieu of payment (valued at market value, as reasonably determined by Buyer, at the time of transfer) and the total amount of Deficiency Payments paid. If there is an Annual Deficiency in any year, then Seller may, with proper notification and a description of the addition to Buyer, increase the Capacity by adding wind turbines to the Renewable Resource Facility; provided, however, the total Capacity after such increase shall not exceed a MW rating that would reasonably be expected to produce an expected Annual Quantity in excess of the amount set in Section 6.01B.  Example calculations of Net Deficiency payments and the annual reconciliation for hypothetical years 2003 through 2011 are set forth in Exhibit 6.02D.

E.    Any Deficiency Payment shall be made in three equal monthly installments, beginning on the later of (i) February 1 immediately following the year for which the Net Deficiency occurred, or (ii) thirty days after Buyer gives Seller written notice of the Net Deficiency for a year.

F.    The Deficiency Rate is the lesser of MWh amount in PUCT Substantive Rule §25.173 (such amount being $50.00/MWh as of the date of this Agreement) as the same may be revised from time to time, or 125% of the annual average market value of energy and RECs applicable to Buyer.

### Section 6.03    Effect of Outages and Force Majeure

The calculations under this Article VI are made based upon the actual amount of Net Energy, whether or not the production of Net Energy is affected by Forced Outages or Scheduled Outages as described in Article VII. For purposes of the calculations under this Article VI, the Annual Quantity shall be reduced by the amount of MWh not produced by the Renewable Resource Facility in a calendar year due to an event of Force Majeure, Instructed Backdowns, instruction from the ERCOT ISO or as a result of suspensions permitted under this Agreement due to a default by Buyer.

### Section 6.04    Governmental Impositions

Seller shall pay or cause to be paid all taxes, assessments or other governmental impositions imposed by any government authority ("Governmental Charges") on or with respect to Renewable Energy arising prior to the Delivery Point (other than taxes in the nature of franchise or income taxes imposed on or incurred by Buyer). Buyer shall pay or cause to be paid all Governmental Charges imposed after the Effective Date of this Agreement on or with respect to Renewable Energy at and after the Delivery Point (other than taxes in the nature of franchise or income taxes imposed on or incurred by Seller). In the event Seller is required by law or regulation to remit or pay Governmental Charges which are Buyer's responsibility hereunder, Buyer shall promptly reimburse Seller for such Governmental Charges. If Buyer is required by law or regulation to remit or pay Governmental Charges which are Seller's responsibility hereunder, Seller shall promptly reimburse Buyer for such Governmental Charges. Nothing shall obligate or cause a Party to pay or to be liable to pay any Governmental Charges for which it is exempt under Applicable Law.

### Section 6.05    Records

A.    Buyer shall create and keep (i) meter records and other records needed to show the amounts due from Buyer to Seller under this Agreement and (ii) records of amounts due by Seller to Buyer under this Agreement.

B.    Seller shall create and keep (i) meter records and other records needed to show the amount of RECs and Net Energy generated at the Renewable Resource Facility, (ii) maintenance records and operating logs of the generating, control, and protective equipment at the Renewable Resource Facility and (iii) records relating to Federal Production Tax Credits.

C.    Buyer shall maintain each day's QSE records for a period of one (1) year, or for such longer period as may be prescribed by ERCOT Protocols.

D.    Each Party shall maintain records relating to its performance under this Agreement including, without limitation, any payments with respect to, restrictions on or curtailments of Net Energy produced or that could have been produced by the Renewable Resource Facility and including with respect to Buyer those records relating to the QSE function being performed by Buyer to the extent they relate to the Renewable Resource Facility, that it is required to create and keep under this Section 6.05 according to generally accepted accounting practices, consistently applied, where applicable. Except as otherwise specifically provided herein, each Party shall keep and maintain those records for four years after the respective records are created,

SD\508314.17

and the other Party may inspect and audit those records during normal business hours upon reasonable advance written notice.

## Section 6.06   Billing

A.      Buyer shall provide Seller monthly with settlement data in Buyer's possession as may be needed by Seller to prepare monthly statements. Within 10 days after the end of a month, Seller shall send to Buyer an invoice detailing all amounts due from Buyer to Seller, based upon the meters in the Metering Equipment, and all amounts due from Seller to Buyer under this Agreement for the month. All invoices under this Agreement shall be due and payable in accordance with each Party's invoice instructions on or before the later of the twentieth (20th) day of each month following the month in which the amounts due were incurred or ten (10) days after the date the invoice is received, or, if such day is not a Business Day, then on the next Business Day. In the event actual amounts due are not known to Seller by the statement mailing date, Seller shall estimate the amounts due based on the best available information, and payment shall be made based upon such estimated quantities, subject to adjustment at the time payment is due for the next monthly invoice that is prepared at least 10 days after accurate information is available. Each Party will make payments by electronic funds transfer, or by other mutually agreeable method(s), to the account designated by the other Party. A "Business Day" is any day that is not a Saturday, Sunday, or a holiday observed by Buyer's Dallas office.

B.      Either Party may offset payments due by the other Party hereunder against payments owed to such Party (such as billing or meter adjustments and Net Deficiency Payments), other than breach of contract claims for which no predetermined remedy is stated, indemnity claims and similar unliquidated claims. If the invoice shows a net amount due from Seller to Buyer or a net amount due from Buyer to Seller, the payment is due by the payment date set forth in Section 6.06A. above. If any portion of a payment is disputed, the entire amount of the payment shall be paid as billed, and adjustment shall be made by one Party to the other, as applicable, in the next monthly billing cycle after resolution of such dispute.

## Section 6.07   Interest on Past Due Amounts

Any payments due by Seller to Buyer under this Agreement that are not paid when due and any payments due by Buyer to Seller that are not paid when due bear interest, compounded monthly, from the due date until paid, at the lesser of the Federal Funds Rate or the highest rate allowed by Applicable Law. "Federal Funds Rate" shall mean, for any day, the rate set forth for such day in the weekly statistical release designated as H.15(519), or any successor publication, published by the Board of Governors of the Federal Reserve System, plus two percent (2%). In computing the highest rate allowed by Applicable Law, the weekly rate ceiling computed under Article 5069-1D.002 of the Texas Revised Civil Statutes applies.

## Section 6.08   Corrections

Each Party has the right, at its sole expense and during normal working hours, to examine the records of the other Party to the extent reasonably necessary to verify the accuracy of any statement, charge or computation made pursuant to this Agreement or any representation made or other obligation performed or to be performed hereunder. If requested, a Party shall provide to the other Party statements evidencing the quantity of Net Energy and RECs delivered at the Delivery Point. If there are errors in billings or payments under this Agreement due to metering

24

or billing errors, then the billings or payments shall be corrected, provided that the Party asserting the error gives the other Party notice of the error within one year after the date of the bill or payment affected. Any corrections shall include interest at the Federal Funds Rate from the date that the incorrect payment was made until the date of the corrected bill or corrected payment, as the case may be. Notwithstanding the above, payment adjustments resulting from adjustment or corrections of measured quantities by ERCOT shall be made without payment of interest. It is recognized by the Parties hereto that ERCOT has some established time periods for disputing certain matters, and the Parties expressly desire to be bound by such periods in their performance under this Agreement. Therefore, notwithstanding the above, in the event a Party is barred from disputing and correcting or adjusting with ERCOT billing or settlement issues (an "ERCOT Barred Issue"), then, except for those matters of which the other Party timely notified such Party in time for such Party to preserve dispute rights with ERCOT, the other Party shall be barred for all purposes from disputing any portion of any statement, or invoice, to the extent that such Party is unable to receive adjustment from or dispute such matter with ERCOT because it is an ERCOT Barred Issue, even if the other Party's notice is given within the one (1) year period set forth above in this paragraph. Buyer shall forward to Seller a copy of the settlement data and billing information within three (3) days after receipt from ERCOT. Upon written request from Seller, Buyer shall dispute settlement statements and invoices from ERCOT regarding the Renewable Resource Facility in accordance with the ERCOT Protocols. Until such time as ERCOT records are available, the best available data in the possession of the Parties shall be used as the basis for any billings or adjustments hereunder, such data to be adjusted in the next regular billing occurring more than two (2) Business Days after (without application of interest charges) ERCOT records become available.

## Section 6.09   Precommercial Energy

The Parties recognize that the Renewable Resource Facility may be completed in phases and that electric energy may be produced prior to the Take-Over Date. Provided that the Metering Equipment and the Communications and Telemetry Equipment are in place and recognized by the ERCOT ISO, Buyer will pay Seller, as hereinafter provided, the Full Price for all Net Energy delivered to Buyer prior to the Take-Over Date provided Seller has obtained or later obtains certification that the Net Energy will have an associated Renewable Energy Credit and the Take-Over Date occurs. Seller will make commercially reasonable efforts to: (i) maximize the production of precommercial energy from the Renewable Resource Facility and (ii) obtain early certification of the wind turbines so that Renewable Energy Credits are produced during precommercial operation phases. Buyer will pay Seller on the scheduled payment date in the month following the month of deliveries 50% of the Full Price for all Net Energy delivered to Buyer prior to the Take-Over Date. For all Net Energy that qualifies for an associated Renewable Energy Credit, Buyer shall pay to Seller the remaining 50% of the Full Price associated with such electric energy in the next invoicing cycle after the later of the Take-Over Date or the month in which such Net Energy qualifies for an associated Renewable Energy Credit.

## Article VII.  Outages

**Section 7.01    Outages**

A.      The Renewable Resource Facility and the transmission facilities connecting the Renewable Resource Facility to the Delivery Point will suffer, from time to time, scheduled outages for construction, maintenance, repairs, or inspection ("Scheduled Outage").

B.      The Renewable Resource Facility and the transmission facilities connecting the Renewable Resource Facility to the Delivery Point will be subject, from time to time, to Forced Outages.  "Forced Outages" within the Renewable Resource Facility include any reduction or cessation of generation, transmission, or distribution caused by breakdown or malfunction of equipment, machinery, and facilities at the Renewable Resource Facility which are not the result of Force Majeure, and without regard to whether caused by negligence or misconduct by Seller. Seller shall promptly give notice to Buyer of any Forced Outage known to Seller.

**Section 7.02    Interruptions or Curtailments for Forced Outage or Scheduled Outage**

Seller and Buyer agree that Scheduled Outages and Forced Outages on Seller's side of the Delivery Point that prevent Seller from satisfying its obligations under Section 2.01 will excuse each Party from its obligations under Section 2.01 to the extent Seller is so prevented, but shall not result in a reduction of the Annual Quantity. With the exception of outages due to system reliability directives from the ERCOT ISO not directly resulting from the failure of Buyer to perform its obligations under Section 5.06, Force Majeure, Instructed Backdown and Seller Event of Default under this Agreement entitling Buyer to suspend purchases of Net Energy, Buyer shall not be excused for failure to take and purchase Net Energy which could have been produced by the Renewable Resource Facility and delivered to Buyer but for Buyer's unexcused failure.  Seller shall diligently perform scheduled maintenance on its facilities and shall diligently pursue correction of any event of Forced Outage.

## Article VIII.  Default, Termination and Force Majeure

**Section 8.01    Force Majeure**

A.      "Force Majeure" shall mean any event which wholly or partly prevents or delays the performance of any obligation arising under this Agreement, but only if and to the extent (i) such event is not within the reasonable control, directly or indirectly, of the Party affected, (ii) such event, despite the exercise of reasonable diligence, cannot be prevented, avoided or overcome by such Party, (iii) the Party affected has taken all reasonable precautions and measures in order to avoid the effect of such event on such Party's ability to perform its obligations under this Agreement and to mitigate the consequences thereof, and (iv) such event is not the direct or indirect result of a Party's negligence or the failure of such Party to perform any of its obligations under this Agreement or to comply with Applicable Law or as a result of a change in Applicable Law or governmental action other than clause (e) in the next sentence below with respect to Seller.  A Force Majeure Event may include, but is not limited to, any of the following:  (a) acts of God or the public enemy, war, whether declared or not, blockade, insurrection, riot, civil disturbance, public disorders, rebellion, violent demonstrations, revolution, sabotage or terrorist action; (b) any effect of natural elements, including fire,

subsidence, earthquakes, floods, lightning, tornadoes, storms, or similar occurrence or other natural calamities; (c) environmental and other contamination at or affecting the Renewable Resource Facility; (d) explosion, accident or epidemic; (e) governmental action or inaction that affects the construction or operation of the Renewable Resource Facility; (f) general strikes, lockouts or other collective or industrial action by workers or employees, or other labor difficulties; (g) the unavailability of labor, fuel, power or raw materials, a delay by the transmission provider under the Interconnection Agreement, and any event affecting the ability of any supplier, contractor or other person (including under any engineering, procurement, interconnection or construction agreement for the Renewable Resource Facility) to the Renewable Resource Facility to fulfill its obligations to Seller and the Renewable Resource Facility so long as, in each case, the cause thereof otherwise would qualify as Force Majeure; (h) nuclear emergency, radioactive contamination or ionizing radiation or the release of any hazardous waste or materials; and (j) air crash, ship wrecks, train wrecks or other failures or delays of similar transportation. Notwithstanding the above, Force Majeure shall not include any breakage or malfunction of equipment, machinery or facilities at or within the Renewable Resource Facility as a result of design, construction, fabrication, manufacturing (including inherent defects), maintenance or similar issues.

B.       The provisions of this paragraph 8.01B shall apply only at such time as Buyer is required to obtain transmission under an approved tariff in order to accept delivery of Net Energy at the Delivery Point, and different classes, priorities or categories of transmission are available to Buyer at the delivery point in quantities requested by Buyer. In such instance, if Buyer purchases transmission service of less than the highest priority which was available to Buyer and which Buyer could have purchased at such time, then Buyer shall be entitled to claim Force Majeure for curtailment of transmission service only if the highest priority service which Buyer could have purchased is also curtailed due to "force majeure" or "uncontrollable force" or a similar term defined in the transmission provider's tariff.

C.       If either Party is wholly or partly unable to perform any of its obligations under this Agreement because of Force Majeure (other than any obligation to make any payment under this Agreement), that Party is excused to the extent that its performance is affected by the Force Majeure if:

(1).     the nonperforming Party gives the other Party notice of such Force Majeure orally or by fax as soon as reasonably practicable after the occurrence of Force Majeure, which shall be followed as soon as reasonably practicable thereafter, but in no event later than ten (10) days after the Force Majeure begins, with a written explanation of the Force Majeure and its effect on the nonperforming Party's performance;

(2).     the suspension of performance is of no greater scope and of no longer duration than the Force Majeure requires; and

(3).     the nonperforming Party uses its reasonable efforts to remedy its inability to perform.

When the nonperforming Party can resume performance of its obligations under this Agreement, that Party shall give the other Party written notice to that effect. Except as

SD\508314.17

specifically provided otherwise herein, no Force Majeure condition extends this Agreement's term. In the event a Force Majeure occurs, the Annual Quantity shall be decreased as provided in Section 6.03.

D.    Any excuse of non-performance due to a Force Majeure condition cannot last longer than 365 consecutive days except upon the performing Party's written consent, which the performing Party may give or withhold in its sole discretion.

E.    Notwithstanding anything herein to the contrary, lack of money, economic conditions, changes in market conditions or inability to obtain transmission service if necessary to take delivery of energy at the Delivery Point shall not constitute Force Majeure or otherwise excuse performance, nor shall Out of Merit order dispatches (as described in the ERCOT Protocols), Scheduled Outages, Forced Outages or directives or any other curtailment by ERCOT or by a replacement transmission system operator of delivery of Net Energy at the Delivery Point by ERCOT constitute Force Majeure

**Section 8.02    Events of Default and Termination**

A.    An "Event of Default" shall mean, with respect to a Party (a "Defaulting Party"), the occurrence of any of the following:

(1).    the failure to make, when due, any payment required pursuant to this Agreement if such failure is not remedied within ten (10) days after written notice;

(2).    any material representation or warranty made by such Party in this Agreement is false or misleading in any material respect when made or when deemed made or repeated, and the condition or event causing such representation or warranty to be false or misleading is not corrected within ten (10) Business Days after written notice such that the warranty or representation is no longer false or misleading;

(3).    the failure to perform any material covenant or obligation set forth in this Agreement if such failure is not remedied within twenty (20) days after written notice, and the failure of performance has a material adverse effect on the ability of the other Party to exercise its rights and privileges under this Agreement;

(4).    such Party (1) files a petition or otherwise commences, authorizes or acquiesces in the commencement of a proceeding or cause of action under any bankruptcy, insolvency, reorganization or similar law, or has any such petition filed or commenced against it, (2) makes an assignment or any general arrangement for the benefit of creditors, (3) otherwise becomes bankrupt or insolvent (however evidenced), (4) has a liquidator, administrator, receiver, trustee, conservator or similar official appointed with respect to it or any substantial portion of its property or assets, or (5) is generally unable to pay its debts as they fall due;

(5).    the failure of such Party to provide and maintain the Security required in this Agreement if such failure is not remedied within five (5) Business Days after written notice (and in the case of Seller, after written notice both to Seller's lender at such address as may be provided by Seller from time to time and to Seller); or

28

(6).    such Party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all of its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer, the resulting, surviving or transferee entity fails to assume all the obligations of such Party under this Agreement to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other Party.

B.    Subject to the termination and/or expiration of applicable cure procedures by the methods and parties discussed in paragraphs (C) and (D) below, if an Event of Default with respect to a Defaulting Party shall have occurred and be continuing, the other Party (the "Non-Defaulting Party") shall have the right (i) to designate a day no earlier than the date of the notice and no later than 20 days after such notice is effective, as an early termination date ("Early Termination Date") to accelerate all amounts owing between the Parties and to liquidate and terminate this Agreement (the "Early Termination"), (ii) withhold any payments due to the Defaulting Party under this Agreement and/or (iii) suspend performance, including any payments due by the Non-Defaulting Party to the Defaulting Party.  Any notice of termination given by Buyer to Seller shall also be given contemporaneously by Buyer to any Lender at addresses previously provided by Seller to Buyer in writing.  Notwithstanding the above, if, by the Early Termination Date, the Defaulting Party has cured the breach, misrepresentation or default, then it shall be conclusively deemed that no default shall have occurred, and this Agreement is not terminated.  Buyer shall not exercise its remedies under this Agreement unless and until all of the requirements of D., below, have been satisfied with respect to any Lenders.

C.    For any breach, misrepresentation, or default described by subparagraphs (A)(2) and (A)(3) above, if the breach, misrepresentation, or default cannot reasonably be cured within the applicable cure period provided herein, and if the Defaulting Party begins work or other efforts to cure the breach, misrepresentation, or default prior to the expiration of the cure period and then continuously prosecutes the curative work with reasonable diligence, then the cure period prior to the occurrence of the Event of Default, and any Early Termination Date that may have been declared with respect thereto, shall be extended so long as such curative work is prosecuted with reasonable diligence, and when the curative work is completed, then the breach, misrepresentation, or default specified in the notice ceases to exist and it shall be conclusively deemed that no default shall have occurred, and this Agreement is not terminated.

D.    A person not affiliated with Seller that is providing debt financing for Seller or its upstream affiliates in connection with the Renewable Resource Facility ("Lender") may cure any of Seller's defaults under this Agreement to the same extent and within the same time periods as are available to Seller hereunder, and the effect of that cure is the same as if Seller had cured the default. In the event of a breach of this Agreement by a Party with respect to subsections 8.02A(1) or A(5) above, the Party not in breach may upon five (5) Business Days notice to the breaching Party suspend performance under this Agreement, including delivery by or offtake of Net Energy from the Renewable Resource Facility, until such time as the breaching Party's performance is corrected.  Notwithstanding the above, and without affecting Buyer's right to suspend performance (including without limitation payment for Renewable Energy delivered) for such failure as set forth above, any of Seller's lenders with respect to whom Buyer has executed an agreement or consent as contemplated in Section 12.02B of this Agreement may cure any default of Seller under Section 8.02A(5) within twenty (20) Business Days after expiration of

Seller's cure period set forth in Section 8.02A(5), and Buyer shall not declare an Early Termination hereunder to be effective before the expiration of such Lender's cure period.

E.      In the event of an Early Termination declared by a Party, the other Party shall owe the Termination Payment as the sole and exclusive remedy and measure of damages for the Early Termination.    "Termination Payment" shall mean the actual or direct damages reasonably determined by the Non-Defaulting Party if this Agreement is terminated due to an Event of Default by the Defaulting Party. In the case of a termination by Seller due to an Event of Default by Buyer, such damages shall include, without limitation by enumeration, the net present value of the difference, if positive, between (x) the amount that Buyer would have been required to pay to Seller pursuant to this Agreement for delivery of all Renewable Energy that would have been delivered by Seller hereunder during the remainder of the Production Term (absent termination of this Agreement, and based on an assumption as to the amount thereof calculated using reasonable projections based on historical performance and taking into consideration other factors such as, without limitation, anticipated deterioration in performance of Seller's equipment and facilities) and (y) the net amount, if any, payable to Seller by a third party pursuant to any replacement power purchase agreement that Seller using commercially reasonable efforts under the circumstances and at commercially reasonable prices enters into for the replacement of such sale of Renewable Energy, provided that, as and to the extent Seller is unable to remarket all or a portion of such Renewable Energy for reasons other than Force Majeure or Forced Outage affecting Seller or a force majeure, forced outage or similar event however denominated affecting Seller's purchaser, then the net amount described in clause (y) shall be $0 and the damages owed by Buyer shall also include the then current grossed up amount of the Federal Production Tax Credit (such amount being paid to Seller on an After-Tax Basis) for each MWh of such Energy that Seller was unable to remarket; provided, further, that in the event Seller is unable to remarket such Renewable Energy, Seller shall take all reasonable actions, including monetization of the Federal Production Tax Credits in the Renewable Resource Facility, to mitigate its damages, and the amounts received shall be credited against Buyer's payment obligation.  In the case of a termination by Buyer due to an Event of Default by Seller, such damages shall include the net present value of the difference, if positive, between (x) the sum of the amount that Buyer would be required to pay to a third party pursuant to any replacement power purchase agreement (without regard to whether Buyer enters into a replacement power purchase agreement) using commercially reasonable efforts and at commercially reasonable prices under the circumstances, for Renewable Energy that would have been delivered by Seller hereunder during the remainder of the Production Term (absent termination of this Agreement, but assuming that the Production Term was extended for the additional five year period pursuant to Section 3.02 and based on an assumption as to the amount thereof calculated using reasonable projections based on historical performance and taking into consideration other factors such as, without limitation, anticipated deterioration in performance of Seller's equipment and facilities), and (y) the amount that Buyer would have been required to pay to Seller pursuant to this Agreement for such Renewable Energy but assuming that the Production Term was extended for the additional five year period pursuant to Section 3.02 at the price for the Option set forth in Section 6.01A(2).

**Section 8.03    Remedies for Failure to Accept Delivery or Schedule and Seller's Failure to Deliver**

If Buyer fails to schedule, purchase and/or take delivery of all or part of the Net Energy produced or that could have been produced by the Renewable Resource Facility absent such failure and such failure is not excused under the terms of this Agreement or by a Seller Event of Default, then Buyer shall pay Seller, on the date payment would otherwise be due in respect of the month in which the failure occurred, an amount for such deficiency equal to the positive difference, if any, obtained by subtracting the Sales Price from the Full Price. The invoice for such amount shall include a written statement explaining in reasonable detail the determination of the quantities of Net Energy produced and sold to a third party, if any, in either event as a result of Buyer's failure to accept delivery, and the calculation of such amount. "Sales Price" means the price at which Seller, using commercially reasonable efforts under the circumstances, resells at the Delivery Point any Net Energy not accepted at the Delivery Point by Buyer, deducting from such proceeds (1) the sum of (i) any costs reasonably incurred by Seller in reselling such Net Energy and (ii) additional transmission charges, if any, reasonably incurred by Seller in delivering such Net Energy to the third party purchasers (including the ERCOT balancing pool), or (2) in the absence of a sale, the "Sales Price" shall be deemed to be $0 to the extent of such inability to remarket after using commercially reasonable efforts to do so and the liquidated damages owed by Buyer shall also include the then current grossed up amount of the Federal Production Tax Credit (such amount being paid to Seller on an After-Tax Basis). If payment is made hereunder for any period during which Seller was unable to remarket power to a third party purchaser, the quantity for which payment shall be made shall be reasonably determined, taking into consideration, among other things, the wind conditions during the period of non-production. In the event Buyer makes payment as set forth herein, no default shall be deemed to have occurred as a result of Buyer's failure to schedule or accept delivery of such Net Energy, and all such quantities of Net Energy shall be credited against the Annual Quantity.   To the extent Seller sells such Net Energy to a third party, and RECs are produced as a result of the production and sale of such Net Energy, such RECs shall be assigned and delivered to Buyer following payment of the amounts due and owing by Buyer pursuant to this Section 8.03.

In the event that Seller fails to deliver to Buyer the full amount of the Net Energy available for delivery to the Delivery Point, Buyer was ready, willing and able to take delivery of such Net Energy at the Delivery Point, and such failure is not excused pursuant to Section 2.01 or 7.02 of this Agreement, then Seller shall pay to Buyer as liquidated damages an amount equal to the positive difference, if any, between (i) the amount, if any, that Buyer would have paid (at commercially reasonable prices) for replacement Renewable Energy and (ii) the amount that would have been payable by Buyer to Seller hereunder if such Renewable Energy had been delivered by Seller. In the event Seller makes payment (or credits the above amount against any invoice due and owing by Buyer to Seller) as set forth herein, no default shall be deemed to have occurred as a result of Seller's failure to deliver, and all such quantities of Net Energy shall be credited against the Annual Quantity.

The damages provided in this Section 8.03 shall be the sole and exclusive remedy of a Party for any failure of the other to satisfy its obligation under Section 2.01, unless such Party terminates this Agreement pursuant to Section 8.02, in which case this Section 8.03 shall not apply and such Party's remedies shall be as set forth in Section 8.02.

31

### Section 8.04   No Consequential Damages

EXCEPT FOR MONETARY PAYMENTS EXPRESSLY NAMED OR DIRECTLY CONTEMPLATED BY THIS AGREEMENT AS REMEDIES FOR FAILURE OF A PARTY TO PERFORM HEREUNDER, NEITHER PARTY (NOR ANY OF THEIR AFFILIATES AND ITS OR THEIR OFFICERS, DIRECTORS, SHAREHOLDERS, PARTNERS OR MEMBERS) IS LIABLE TO THE OTHER FOR ANY SPECIAL, INDIRECT, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES UNDER, ARISING OUT OF, DUE TO, OR IN CONNECTION WITH ITS PERFORMANCE OR NONPERFORMANCE OF THIS AGREEMENT OR ANY OF ITS OBLIGATIONS HEREIN, WHETHER BASED ON CONTRACT, A TORT, STRICT LIABILITY, WARRANTY, INDEMNITY OR ANY OTHER CAUSE, WHETHER OR NOT A PARTY HAD KNOWLEDGE OF THE CIRCUMSTANCES THAT RESULTED IN THE SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES, OR COULD HAVE FORESEEN THAT SUCH DAMAGES WOULD OCCUR (COLLECTIVELY, "CONSEQUENTIAL DAMAGES"); PROVIDED THAT THE FOREGOING SHALL NOT LIMIT A DEFAULTING PARTY'S OBLIGATION TO MAKE OR A NON-DEFAULTING PARTY'S RIGHT TO RECEIVE ANY TERMINATION PAYMENT OR OTHER LIQUIDATED PAYMENT FOR WHICH IT IS LIABLE, OR THE EXPRESS DAMAGE PROVISIONS PROVIDED IN ANY SECTION OF THIS AGREEMENT. THE PARTIES CONFIRM THAT THE EXPRESS REMEDIES AND MEASURES OF DAMAGES PROVIDED IN THIS AGREEMENT REASONABLY APPROXIMATE THE ACTUAL DAMAGES SUFFERED BY A PARTY AND ARE NOT A PENALTY. UNLESS OTHERWISE PROVIDED HEREIN, FOR BREACH OF ANY PROVISION FOR WHICH AN EXPRESS MONETARY REMEDY OR MEASURE OF DAMAGES IS PROVIDED, SUCH EXPRESS MONETARY REMEDY OR MEASURE OF DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY, THE OBLIGOR'S LIABILITY SHALL BE LIMITED AS SET FORTH IN SUCH PROVISION, AND ALL OTHER DAMAGES AT LAW OR IN EQUITY ARE WAIVED.

### Article IX.   Representations and Warranties

### Section 9.01   Representations and Warranties of Seller

Besides the other representations, obligations, and warranties of Seller, Seller now represents and warrants unconditionally to Buyer that:

A.     Seller is a limited liability company duly organized, validly existing, and in good standing under Delaware law and is duly authorized to do business in Texas.

B.     Except for such permits and regulatory approvals as will be obtained in due course prior to the Production Term, Seller has the full power and lawful authority to accomplish, execute, and fulfill all of its obligations and duties under this Agreement.

C.     The major items to be installed at the Renewable Resource Facility shall be newly manufactured and current technology.

D.     The Interconnection Agreement is in full force and effect and shall be maintained in full force and effect through the term of this Agreement.

32

E.    It has purchased, reserved, secured or otherwise ensured the availability of all Wind Turbines necessary to timely complete installation of the Renewable Resource Facility and holds title to the instrument(s) conveying such right.

## Section 9.02    Representations and Warranties of Buyer

Besides the other representations, obligations and warranties of Buyer, Buyer now represents and warrants unconditionally to Seller that:

A.    Buyer is a limited partnership duly organized, validly existing, and in good standing under Texas law and is duly authorized to do business in Texas.

B.    Except for such permits and regulatory approvals as will be obtained in due course prior to the Production Term, Buyer has the full power and lawful authority to accomplish, execute, and fulfill all of its obligations and duties under this Agreement.

C.    Buyer has all regulatory authorizations necessary for it to legally perform its obligations under this Agreement.

## Section 9.03    Limitation on Warranties

EXCEPT AS SET FORTH IN THIS AGREEMENT, THERE IS NO WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND ANY AND ALL IMPLIED WARRANTIES ARE DISCLAIMED.

**Article X.  Security**

## Section 10.01 Security Required

To secure performance under this Agreement, Seller and Buyer shall be obligated to provide and maintain Security for their respective obligations to the other Party hereunder as hereinafter provided.

A.    Seller shall deliver to Buyer, on or before the initial date set forth in Section 10.02, and maintain in effect continuously thereafter during the Agreement Term and thereafter until all obligations of Seller hereunder have been indefeasibly paid and performed, Security in the amounts set forth in Section 10.02 ("Seller's Security Amount").  Seller shall provide written evidence satisfactory to Buyer that the Security is in effect, including without limitation, the operative documents that create the Security. "Security," as to Seller, means, at Seller's option, one of the following:  (A) a letter of credit in an amount equal to Seller's then-applicable Security Amount; (B) a guaranty from a Guarantor, as hereinafter defined; or (C) after the Take-Over Date only, Seller may, at its option and in lieu of (A) or (B) above, either (1) provide the Seller's then-applicable Security Amount in the form of a letter of credit, plus a collateral interest with right of foreclosure (subject to the terms of any intercreditor or similar arrangements from time to time applicable to Buyer) and step-in rights in the Renewable Resource Facility as described in Section 10.04, below for the balance of the required security, or (2) if a Lender does not have a security interest or other encumbrance on the Renewable Resource Facility at such time, and for so long as such a security interest or other such encumbrance does not arise, provide Seller with a first priority security interest with right of foreclosure (subject to the terms of any intercreditor or similar arrangements from time to time applicable to Buyer) and step-in

33

rights in the Renewable Resource Facility as described in Section 10.04 below, respectively, as the required Security. In the event Seller is unable at any time or elects not to provide Security in the form of 10.01A.(C)(2) above, Seller shall provide Security in the form of (A), (B) or (C)(1), above. Each guaranty shall be substantially in the form attached hereto as Exhibit 10.01B. Notwithstanding anything in this Agreement to the contrary, so long as Security is provided by Seller pursuant to Section 10.01A(C)(2) above, during the period beginning on the Take-Over Date, Seller shall not create or permit to exist any debt (other than Permitted Debt, as such term is defined in that certain Collateral Agency and Intercreditor Agreement dated as of the date hereof, by and among Seller, Buyer and the other parties thereto (the "Intercreditor Agreement")) or lien (other than Permitted Liens, as such term is defined in the Intercreditor Agreement). Seller shall have the right from time to time upon and after the termination of the Intercreditor Agreement, with the consent of Buyer (not to be unreasonably withheld) to attach an exhibit to this Agreement incorporating such terms defined by reference to the Intercreditor Agreement so as to preserve the meaning of such terms as they existed immediately prior to the termination of the Intercreditor Agreement, with only such changes as are necessary to reflect changes in parties, document names and other terms defined within such definitions. Once Seller makes its initial election as to the type of Security to be provided in accordance with this Section, substitution or replacement of such Security shall be subject to the terms of Section 10.01G below.

B.    Buyer shall deliver to Seller on or before the initial date set forth in Section 10.02, and maintain in effect continuously thereafter during the Agreement Term and thereafter until all obligations of Buyer hereunder have been indefeasibly paid and performed, Security in the amounts set forth in Section 10.02 ("Buyer's Security Amount"). Buyer shall provide written evidence satisfactory to Seller that the Security is in effect, including without limitation, the operative documents that create the Security. "Security," as to Buyer, means a guaranty from TXU Energy Company LLC or a replacement Guarantor provided pursuant to Section 10.03 hereof, which guaranty shall be capped at the Buyer's Security Amount in effect from time to time and be substantially in the form attached hereto as Exhibit 10.01B.

C.    Any letter of credit provided as Security under any Section of this Agreement shall be irrevocable and payable to the Party entitled to receive the Security, and otherwise be substantially in the form attached hereto as Exhibit 10.01C(1). The issuing bank shall be reasonably acceptable to the Party entitled to receive the Security, organized under the laws of the United States (or any political subdivision thereof), have assets of at least $10 billion, and have a long term debt rating or deposit rating of at least A3 by Moody's Investor Services, Inc. ("Moody's") and A- from Standard & Poor's Rating Group, a Division of McGraw-Hill, Inc. ("S&P") or a similar successor rating using the criteria for investment grade ratings in effect as of the date hereof by S&P and Moody's.

D.    Subject to any provisions of this Agreement specifying the form or substance of Security, the Security provided by a Party shall be in a form and substance reasonably acceptable to the other Party, consistent with this Article X, and maintained at the expense of the Party obligated to provide such Security.

E.    "Guarantor" means with respect to either Party, an entity guaranteeing the obligations of payment of such Party hereunder that (i) has a minimum net worth of at least $2.5 billion

SD\508314.17

(including the net worth of any upstream guarantor of that Party's Guarantor) at the time of issuance of such guaranty, (ii) has the consent of the other Party as hereinafter provided to act as Guarantor for such Party, and (iii) and meets or exceeds the following ratings ("Acceptable Credit Rating"): BBB- by S&P, Baa3 by Moody's and BBB- by Fitch, Inc., if a Party or its proposed Guarantor, as applicable, is rated by all three rating agencies, or if a Party or its proposed Guarantor, as applicable, is rated by only two of such rating agencies, if such entity meets at least such ratings by such two rating agencies, or if a Party or its proposed Guarantor, as applicable, is rated by only one of such rating agencies, if such entity meets at least such rating by such one rating agency. In the event such proposed Guarantor is an affiliate of the guaranteed Party, the other Party may not unreasonably withhold consent, but if such proposed Guarantor is not an affiliate of the guaranteed Party, the other Party may withhold consent to such Guarantor for any reason. Seller expressly approves TXU Energy Company LLC to be a Guarantor for Buyer.

F.     The Acceptable Credit Rating parameters shall be confirmed by a written certificate of one duly authorized officer of the applicable Guarantor delivered to the other Party (i) on or before the forty-fifth (45th) calendar day following the end of each of the applicable Guarantor's fiscal quarters, (ii) on or before the ninetieth (90th) calendar day following the end of each of the applicable Guarantors' fiscal years, (iii) within fifteen (15) calendar days following a Party's request in the event of the public disclosure of any event that has or is reasonably likely to have a material adverse effect on the current or future financial condition of the applicable Guarantor (including, without limitation, any downgrade or negative action with respect to any rating of the applicable Guarantor or its obligations), and (iv) within five (5) calendar days of any event (or combination of events) that the applicable Guarantor knows or reasonably should know will result in the Acceptable Credit Rating parameters not being met.

G.     So long as no Event of Default has occurred and is continuing, and no event has occurred which, with the passage of time or giving of notice or both, would constitute an Event of Default, in either case with respect to the Party providing Security, from time to time with the prior written consent of the Party entitled to receive Security (which consent shall not be unreasonably withheld or denied) and provided such Security is permitted to be provided hereunder at such time, a Party may replace its existing Security with another form of Security permitted in this Section. Notwithstanding the above, a Party obligated to provide Security shall pay to the Party entitled to receive such Security the full amount of the required Security as cash Security if any Security is not replaced by the Party obligated to provide Security no later than twenty (20) Business Days prior to its expiration or termination with Security in a form permitted by this Article X, failing which the Party entitled to receive such Security may immediately exercise any rights it may have under any expiring or terminating Security.

H.     In the event that an Event of Default occurs under this Agreement and a letter of credit has been provided as Security, the Non-Defaulting Party shall have the right to draw against such letter of credit in an amount necessary to cure such default(s), to compensate the Non-Defaulting Party for any and all damages resulting from any such default (including but not limited to reasonable attorneys' fees to enforce any rights arising under this Agreement as a result of such default(s)), and to provide reasonable security to the Non-Defaulting Party for damages that could arise from such default(s). With respect to a guaranty provided as Security, payment or



performance shall be made or performed by the Guarantor in accordance with the terms of such guaranty.

I.      Following delivery of a Guaranty in accordance with Section 10.01A or 10.01B, and so long as such guaranty is in effect, if a Cross Default occurs with respect to a Party's Guarantor, the Party whose obligations hereunder are guaranteed by such Guarantor shall, within three (3) Business Days after receipt of notice from the other Party, provide Security in lieu of and in replacement for such guaranty.  Failure to provide such Security within such period shall be an Event of Default hereunder.  For purposes of this Section, a "Cross Default" is defined as the occurrence and continuation of (1) a default, event of default or other similar condition or event in respect of a Guarantor under one or more agreements or instruments, individually or collectively, relating to indebtedness for borrowed money in an aggregate amount of not less than 3% of shareholders/stockholders equity of, or partnership or member interests in such entity, as applicable ("Cross Default Amount"), which results in such indebtedness becoming, or becoming capable at such time of being declared, immediately due and payable or (2) a default by a Guarantor in making on the due date therefor one or more payments, individually or collectively, in an aggregate amount of not less than the applicable Cross Default Amount.

J.      In addition to, and not in lieu of, Security required by other provisions hereof, on the Effective Date and until the date on which (i) the turbine generator supplier provides Seller and Buyer with documentation that states all turbine generators are ready for continuous operation and are released for production, (ii) the Certification Date has occurred and (iii) Seller has delivered a notice to Buyer certifying that Seller has accepted the turbine generator supplier's request that the Seller take over the Renewable Resource Facility pursuant to the turbine supply agreement between the turbine generator supplier and Seller (or its applicable affiliate) (the "Take-Over Date"), Seller and its affiliates shall grant to Buyer a lien on the Renewable Resource Facility and all real property interests, personal property, fixtures, improvements, equipment, contracts, permits and any other property relating to the Renewable Resource Facility and, at any time a collateral interest is provided pursuant to this Section 10.01J, such collateral interest shall include a pledge of the direct ownership interests in Seller and the immediate owner of Seller, which lien shall (1) secure obligations of Seller under this Agreement in an aggregate amount not greater than $49,000,000 and (2) be subordinate and junior in all respects to the security interests and liens of the Lenders that provide equipment financing (including turbine financing), construction financing, bridge financing, or project financing for the development, construction, installation, operation, and/or maintenance of the Renewable Resource Facility, to duly perfected purchase money liens retained by vendors on equipment and other components of the Renewable Resource Facility and to any workers', mechanics', suppliers' or similar liens or tax liens, in each case arising in the ordinary course of business that are either not yet due and payable or that have been released by means of a performance bond posted within ten (10) Business Days of the commencement of any proceeding to foreclose such lien.  Seller shall execute such documents as may reasonably be requested by Buyer to evidence and perfect such lien and Buyer shall execute such documents as may reasonably be requested by Seller to evidence the subordination of its collateral interest.  The collateral interest described in this Section 10.01J shall be granted to Buyer pursuant to (x) a mutually acceptable Deed of Trust, Security Agreement, and Assignment and Financing Statement containing standard and customary terms and conditions, (y) mutually acceptable pledge agreements relating to the pledge of the direct ownership interests in Seller and the immediate owner of Seller described

36

above and (z) a mutually acceptable Security Agreement containing standard and customary terms and conditions. During the period set forth in this Section 10.01J, Seller or its Affiliates must maintain minimum equity in the assets of the Renewable Resource Facility (valued at the cost thereof to Seller, or if lower, its affiliates) of not less than $15,000,000, and Seller agrees that it will not create or maintain any debt on the Renewable Resource Facility in excess of the amounts required to pay the costs associated with the design, development, supply, construction, testing and operation of the Renewable Resource Facility (including, without limitation, the direct cost of assets, aggregate labor costs relating to the Renewable Resource Facility, interest during construction and any applicable fees, costs and expenses payable to the Lender and its advisors in connection with the foregoing).

**Section 10.02  Security Amount**

The Parties shall maintain Security in the amounts set forth below during the periods as set forth below, which Security shall be delivered to the other Party not later than the initial date such Security is required to be maintained as provided below:

| Period: | Seller Security Amount | Buyer Security Amount |
|---|---|---|
| Within five (5) days after execution of this Agreement and until the Full Security Date* | Letter of Credit in the amount of $12,500,000 plus a $36,500,000 lien conforming to the requirements of Section 10.01J | $1,250,000 |
| At Full Security Date and until the Take-Over Date | Letter of Credit in the amount of $12,500,000 plus a $36,500,000 lien conforming to the requirements of Section 10.01J | $49,000,000 |
| At and after the Take-Over Date ("Operation Phase Security") | $25,000,000 so long as Security is provided pursuant to Section 10.01A(A) or $49,000,000 so long as Security is provided pursuant to Section 10.01A(B), or Letter of Credit in the amount of $8,333,000 plus a $49,000,000 lien conforming to the requirements of Section 10.01A(C)(1) so long as Security is provided pursuant to Section 10.01A(C)(1), or a $25,000,000 security interest in the Renewable Resource Facility as provided in accordance with Section 10.01A(C)(2) | $49,000,000** $345,000/MW*** |

*Such amount shall be maintained until the Full Security is provided.
**As of the Full Security Date, extending through year ten (10) of the Production Term
***Applies to years 11-15 of the Production Term and any option term

37

## Section 10.03 Downgrade Event

At any time Buyer or Seller has provided a letter of credit as part or all of its Security required hereunder and a Downgrade Event in respect of such Party (the "Downgraded Party") shall occur, and either (i) such Downgrade Event is not cured within three (3) Business Days of notice to the Downgraded Party from the other Party or (ii) the Downgraded Party does not, within three (3) Business days after notice from the other Party of such Downgrade Event, replace the letter of credit provided by the Downgraded Party with a new letter of credit or other acceptable Security meeting the requirements herein, then an Event of Default shall have occurred with respect to the Downgraded Party. A "Downgrade Event" shall mean, with respect to either Party, the occurrence of any of the following events with respect to such Party's letter of credit issuer: (i) the issuer of a letter of credit shall fail to maintain a Credit Rating of at least "A-" by S&P or "A3" by Moody's and assets of at least $10 billion, (ii) the issuer of the Letter of Credit shall fail to comply with or perform its obligations under such Letter of Credit if such failure shall be continuing after the lapse of any applicable grace period, if any; (iii) the issuer of such Letter of Credit shall disaffirm, disclaim, repudiate or reject, in whole or in part, or challenge the validity of, such Letter of Credit; (iv) such Letter of Credit shall expire or terminate, or shall fail or cease to be in full force and effect at any time during the term of this Agreement; or (v) any event analogous to an event specified in Section 8.02A(4) of this Agreement shall occur with respect to the issuer of such Letter of Credit.

## Section 10.04 Grant of Security Interest and Remedies

A.      During any period that Seller provides a collateral interest in the Project as part of its Security pursuant to Section 10.01A(C), the following terms shall apply: The collateral interest in the Project shall consist of a security interest secured by a deed of trust on the Mortgaged Property (as herein defined) granted to Buyer to secure the obligations of Seller under this Agreement, which obligations of Seller secured by such lien on the Mortgaged Property shall not exceed (i) an aggregate amount equal to $49,000,000 at any time Seller provides Security pursuant to Section 10.01A(C)(1) hereof, or (ii) an aggregate amount equal to $25,000,000 at any time Seller provides Security pursuant to Section 10.01A(C)(2) hereof. The collateral interest shall be granted to Buyer pursuant to a mutually acceptable Deed of Trust, Security Agreement, and Assignment and Financing Statement containing standard and customary terms and conditions. Seller shall name Buyer as an additional insured under insurance policies acquired in accordance with Section 5.01A. If Seller grants a lien to Buyer pursuant to Section 10.01A(C)(2) hereof, Seller shall have the continuing right to grant an additional lien against the Mortgaged Property to a lender for the sole purpose of securing a working capital line of credit not to exceed $4 million, which shall be pari passu with the lien of Buyer. The "Mortgaged Property" means the Renewable Resource Facility and all real property interests, personal property, fixtures, improvements, equipment, contracts, permits and any other property relating to the Renewable Resource Facility and, at any time the Security is provided pursuant to Section 10.01A(C)(1), the "Mortgaged Property" shall include the equity interest(s) in Seller and all collateral pledged to a Lender under a lien which is superior to Buyer's lien (including any equity interests in Seller's Affiliates pledged to such Lenders), which equity pledge or pledges will be evidenced by a mutually acceptable pledge agreement or pledge agreements and shall be subordinate and junior to the equity pledge or pledges provided to Seller's Lenders as described below. For the avoidance of doubt, the parties agree that if the Security is provided pursuant to Section 10.01A(C)(2), Buyer shall not be entitled to any lien on or collateral interest in the equity

38

interests of Seller or any of its Affiliates but instead shall receive a first priority lien on the Renewable Resource Facility via the Deed of Trust described above. If provided pursuant to Section 10.01A(C)(1), the collateral interest granted to Buyer shall be subordinate and junior, in all respects, to the security interests and liens of the Lenders that provide project financing for the development, construction, installation, operation, and/or maintenance of the Renewable Resource Facility. Notwithstanding the above, Seller shall ensure that Buyer's collateral interest provided pursuant to Section 10.01A(C)(1) shall never be subordinated to more than the lesser of (a) $75,000,000 or (b) 40.00% of the total debt and equity (any classes) of the Project. At Seller's request, Buyer shall execute such documents as may be necessary to evidence the subordination of its collateral interest. Buyer shall cooperate with Seller's (and its Lender's) reasonable requests in providing Security in whole or in part in the form of a lien under this Agreement, including entering into an intercreditor or other arrangement with the Lender and Buyer in form and substance satisfactory to Lender, Buyer and Seller. At any time at or after the Full Security Date Buyer is granted a collateral interest in the Project as Security hereunder (including Section 10.01(J) hereof), Seller shall, at its sole cost furnish to Buyer a mortgagee's title insurance policy from an issuer acceptable to Buyer in an amount not less than the sum of the total amount of the liens on the Renewable Resource Facility senior to or pari passu with those of Buyer, plus the amount of the Full Security, insuring the title of the Project and naming Buyer as the sole beneficiary. At any time on or after the Effective Date Buyer is granted a collateral interest in the Project as Security hereunder (including under Section 10.01(J) hereof), Seller shall certify monthly to Buyer that there is no occurrence or event of default or other similar condition or event (however described) under one or more agreements or instruments secured by liens that is or are superior to the lien granted Buyer pursuant hereto, with any Lender, which has resulted in indebtedness to such Lender becoming, or becoming capable of being declared, due and payable under such agreements or instruments before it would otherwise have been due and payable. Seller certifies that it has included all development assets related to the Renewable Resource Facility it or its affiliates hold in the Mortgaged Property.

B.     Step-In Right. The provisions of this Section 10.04B shall apply only at such times as Buyer possesses a collateralized security interest in the Project. In addition to all other remedies set forth in this Article X, and elsewhere herein, and subject to the terms of the Intercreditor Agreement for so long as such agreement remains in effect and thereafter the consent of the Lenders (which consent shall not be unreasonably withheld, and which will be documented in the agreements between Buyer and Lenders contemplated in Sections 10.04A and/or 12.02B), Buyer shall also have, at all times during the term of this Agreement, the continuing right, but not the obligation, as to any Event of Default at such time as such Event of Default results in an entitlement of Buyer to terminate this Agreement, to assume immediately the operation of the Renewable Resource Facility and exercise all powers and rights of Seller with respect thereto (the "Step-In Right"); in which event, Buyer shall have during such period(s) (the "Step-In Period") no obligation to continue payments to Seller, but shall, instead, pay costs associated with Buyer's operation of the Renewable Resource Facility during the Step-In Period, and shall pay, as appropriate, amounts due to the Lenders, with set-offs, as appropriate, for costs and expenses incurred as to the Step-In Period, the monthly sum of which payments to all parties shall not exceed the amount Buyer would have otherwise paid to Seller; and, as to which Step-In Period, Seller hereby grants to Buyer the continuing and unrestricted authority and license to so operate the Renewable Resource Facility and exercise all such powers and rights of Seller for the

Step-In Period; provided, however: (1) Buyer shall be liable only for costs incurred by it during the Step-In Period, and not for any of Seller's obligations, regardless of when accrued or incurred; (2) Buyer's exercise of its Step-In Right shall be as an agent of Seller and shall not operate, or be deemed, to transfer to it any equity or ownership rights in or to the Renewable Resource Facility, or any obligation in connection therewith; (3) Seller agrees to indemnify Buyer against, and hold it harmless from, any costs, expenses or liabilities of any kind, arising out of or in connection with Buyer's exercise of its Step-In Right, or as a result of any action, or omission, of Buyer occurring during the Step-In Period, other than those expressly identified in this paragraph relating to its operation of the Renewable Resource Facility, unless caused by Buyer's gross negligence or willful misconduct; and (4) Seller acknowledges and agrees that Buyer will incur irreparable harm as a result of failing to obtain the output from the Renewable Resource Facility, and Seller hereby agrees to cooperate fully with Buyer's exercise of its Step-In Right, including, without limitation, the execution and delivery of all necessary assignments, documents, licenses and rights required in connection therewith, and Seller hereby irrevocably waives any right to object to any legal or equitable relief which Buyer may seek in the enforcement of its Step-In Right and the operation of the Renewable Resource Facility during the Step-In Period; provided further, that Buyer shall have the option of continuing such operation of the Renewable Resource Facility and exercise of the rights associated therewith until such time, if ever, as Buyer and the Lenders agree that Seller is capable in all respects of resuming operation of the Renewable Resource Facility, in which event of Seller's resumption of operation, Buyer's Step-In Right shall remain in effect and continue to be available throughout the remaining term hereof on the same basis as set forth above. The rights granted herein shall terminate upon payment in full by Seller of all termination payments, if any, due to Buyer pursuant to Article VIII of this Agreement. Buyer's operation of the Renewable Resource Facility is in mitigation of its damages, and shall not relieve Seller of its Net Energy delivery or Annual Quantity obligations.

### Section 10.05 Financial Information

If requested by a Party, the other Party shall deliver (i) within 120 days following the end of each fiscal year, a copy of such Party's annual report, or if such Party does not have publicly available financial statements and is providing a Guaranty, its Guarantor's annual report, containing audited financial statements of such entity for such fiscal year, and (ii) within 60 days after the end of each of its first three fiscal quarters of each fiscal year, a copy of such Party's or its Guarantor's, as applicable, quarterly report containing unaudited financial statements of each such entity for such fiscal quarter. During any period in which Buyer has been granted and holds a collateral interest in the Renewable Resource Facility pursuant to Section 10.01A and Section 10.04 hereof, Seller shall, upon request from Buyer, provide Buyer at least quarterly with financial statements of Seller, in addition to financial statements of Seller's Guarantor, if applicable. In all cases the statements shall be for the most recent accounting period and prepared in accordance with generally accepted accounting principles; provided, however, that should any such statements not be available on a timely basis due to a delay in preparation or certification, such delay shall not be an Event of Default so long as such Party diligently pursues the preparation, certification and delivery of the statements. To the extent a Party's Guarantor's Acceptable Credit Rating depends on the rating of its parent, the foregoing financial information requirements shall be satisfied by providing financial information of the Guarantor's parent.