## Section 10.06  Release and Replenishment of Security

A.      Each Party shall release its interest in the Security provided by the other Party promptly after this Agreement is terminated or expires, and after the other Party has fully performed its obligations hereunder.

B.      If Seller accesses or draws on the Security provided by Buyer and applies any of it to Buyer's obligations, then within five (5) Business Days after it receives written notice from Seller of such access and application, Buyer shall provide additional Security in an amount necessary to restore the amount of the Security to the level required under this Agreement.

C.      If Buyer accesses or draws on the Security provided by Seller and applies any of it to Seller's obligations, then within five (5) Business Days after it receives written notice from Buyer of such access and application, Seller shall provide additional Security in an amount necessary to restore the amount of the Security to the level required under this Agreement.

## Section 10.07  Incorporation of Rights

Seller agrees to incorporate into its financing agreements, service agreements, supply agreements, interconnection and transmission agreements, together with all other permits, licenses and agreements material to the ownership or operation of the Renewable Resource Facility (but only to the extent permitted by Applicable Law), all terms, provisions and conditions required to implement, and empower Buyer to exercise all of the right and remedies provided to Buyer in this Agreement; and Seller agrees and covenants to take no subsequent actions, or make any subsequent amendments or agreements, which will contravene or impair in any way Buyer's rights hereunder.

## Section 10.08  Survival

This Article X survives the termination or expiration of this Agreement.

## Article XI.  Confidentiality

## Section 11.01  Scope

Each Party agrees, and shall cause its parent, subsidiary and affiliated corporations, and its and their respective directors, officers, employees and representatives, as a condition to receiving confidential information hereunder, to keep confidential (a) this Agreement, (b) all negotiations concerning this Agreement, (c) all documents, data, drawings, studies, projections, plans and other information, whether oral or written, that relate to economic benefits to or amounts payable by either Party under this Agreement.  The provisions of this Section 11.01 shall survive and shall continue to be binding upon the Parties for period of one (1) year following the date of termination of this Agreement.   Notwithstanding the foregoing, information shall not be considered confidential which (i) was in the public domain prior to disclosure, (ii) was lawfully in a Party's possession or acquired by a Party outside of this Agreement, which acquisition was not known by the receiving Party to be in breach of any confidentiality obligation, or (iii) developed independently by a Party based solely on information that is not considered confidential under this Agreement.

## Section 11.02  Confidential

"Confidential" means that information or a document, including the content, substance, or effect of the information or document, may not be disclosed, discovered, or distributed to any other person, corporation, or other entity, (a) except under the valid order of an administrative or judicial officer having jurisdiction, which order, subject to Section 11.03B and C below, shall be opposed unless opposition to it is waived in writing by each Party to this Agreement, or (b) except as provided in Section 11.03. A Party is not required to oppose any order requiring disclosure in any judicial or administrative proceeding by appeal, separate legal proceeding, or extraordinary measures if it gives the other Party written notice of the order, and the other Party does not, within 10 days after receiving the notice, agree to pay the reasonable costs of any opposition by appeal, separate legal proceeding, or extraordinary measures.

## Section 11.03  Exceptions

Either Party may, without violating this Article XI, disclose matters that are made confidential by this Agreement:

A.       to actual or prospective, co-owners, Lenders, underwriters, contractors, suppliers, and others involved in construction, operation, and financing transactions and arrangements for a Party or its subsidiaries, affiliates, or parent, if the Party making the disclosure obtains, as a condition precedent to the disclosure, a confidentiality agreement with the person, corporation, or other entity to whom the disclosure is being made with terms substantially the same as this Article XI; and

B.       to governmental officials and parties involved in any proceeding in which either Party is seeking a permit, certificate, or other regulatory approval or order necessary or appropriate to carry out this Agreement, but the Party making the disclosure shall make reasonable efforts to restrict public access to the information disclosed, by protective order or otherwise; to governmental officials or the public as required by any law, regulation, or order, including without limitation laws or regulations requiring disclosure of financial information, information material to financial matters, and filing of financial reports, but the Party making the disclosure shall make reasonable efforts to restrict public access to the information disclosed, by protective order or otherwise.

Buyer may also disclose any documents or other information made confidential under this Agreement as it deems necessary or advisable to obtain any regulatory approval or action that it deems necessary or advisable, including without limitation the awarding of renewable energy credits, but Buyer shall make reasonable efforts to restrict public access to the information disclosed, by protective order or otherwise.  Additionally, subject to the obligation to maintain the confidentiality of information disclosed to third parties and as it applies to disclosures to non-governmental third parties pursuant to Section 11.03, either Party may disclose any documents or other information made confidential under this Agreement as necessary to perform such Party's obligations under this Agreement.

## Section 11.04  Specific Performance

It will be impossible or very difficult to measure in terms of money the damages that would accrue due to any breach of this Article XI, or any failure to perform any obligation contained in

42

this Article XI, and, for that reason, among others, each Party is entitled to injunctive relief with respect to or specific performance of this Article XI. If either Party institutes any proceeding to enforce any part of this Article XI, the other Party now waives any claim or defense that an adequate remedy at law exists.

## Article XII.  Miscellaneous

### Section 12.01  Subject to Regulation

This Agreement may be subject to regulation by regulatory authorities having jurisdiction. The Parties do not intend by this paragraph to confer or extend jurisdiction over this Agreement to any regulatory authority.

### Section 12.02  Assignment

A.      Except as otherwise specifically provided herein, this Agreement may not be assigned by a Party without the prior written consent of the other Party, which consent shall not be unreasonably withheld.  This Agreement shall inure to and be binding upon the Parties hereto and their permitted successors and assigns.

B.      Seller may assign this Agreement for collateral security purposes without the consent of Buyer.  Buyer shall cooperate with Seller's reasonable requests in effecting any assignment of this Agreement for collateral security purposes, including entering into a customary direct agreement and consent with the Lender in form and substance reasonably satisfactory to Buyer and the Lender.  In addition, Seller anticipates that, prior to the completion of construction of the Renewable Resource Facility, it will seek one or more additional investors to make an investment in the Renewable Resource Facility to provide additional funds to finance or refinance the construction, operation and use of the Renewable Resource Facility and, in connection therewith, Buyer agrees to enter into and provide such additional investors with such documentation as Seller and such additional investors reasonably request and which are reasonably satisfactory to Buyer in form and substance, which documents may include customary estoppels, consents, notices, legal opinions and other corporate deliverables.  In the event Seller assigns this Agreement for collateral security purposes or requests that Buyer enter into or provide documentation to such additional investors, Seller shall promptly reimburse Buyer for all direct and indirect costs, including without limitation, attorneys' fees, incurred by Buyer in connection therewith.

C.      [Intentionally deleted.]

D.      Either Party may assign this Agreement to an affiliate of such Party without the consent of the other Party, provided that such affiliate is at least as creditworthy as the assignor.  Any such assignment shall not be effective as to the non-assigning Party until the non-assigning Party receives written notice of such assignment from the assigning Party.

E.      No assignment of this Agreement releases the assignor from any liability under this Agreement unless the non-assigning Party consents to such release.

F.      Any attempted assignment in violation of this Section 12.02 is void and ineffective.

## Section 12.03  Time Is of Essence

Time is of the essence with regard to performance of this Agreement.

## Section 12.04  Notices

A.     Except as set forth otherwise below, any notices, demands, or requests required or authorized by this Agreement, or any other instrument or document required or authorized to be tendered or delivered by either Party, shall be in writing and personally delivered or sent by certified mail, return receipt requested, postage prepaid to:

(1).     All operational notices (including notices of Forced Outages) and notices provided under Section 8.02 shall be in writing (including by facsimile) except that routine operational notices and communications and notices during an emergency or other unforeseen event may be made in person or by telephone, and sent to:

| If to Buyer : | If to Seller: |
|---|---|
| Attn: QSE Coordinator | Airtricity Forest Creek Wind |
| TXU Portfolio Management Company LP | Farm LLC |
| 1717 Main Street, Suite 2000 | c/o Philip K. Dutton |
| Dallas, Texas 75201 | 4425 W. Airport Frwy., Ste. 590 |
| Telephone: (214) 875-9778 | Irving, TX 75062 |
| Facsimile: (214) 875-9069 | Telephone: (972) 255-2500 |
| | Facsimile: (972) 255-2533 |

(2).     Notices for statement and billing purposes (billing statements may be sent by regular mail) shall be sent to:

| If to Buyer: | If to Seller: |
|---|---|
| TXU Portfolio Management Company LP | Airtricity Forest Creek Wind |
| Attn: Settlements | Farm LLC |
| 1717 Main Street, Suite 2000 | c/o Philip K. Dutton |
| Dallas, Texas 75201 | 4425 W. Airport Frwy., Ste. 590 |
| Karen Chapel (214) 875-9393 | Irving, TX 75062 |
| Scott Young (214) 875-9654 | |

(3).   Information concerning electronic funds transfers:

If to Buyer:

Bank of America, N.A.
Dallas, Texas
ABA No. 111000012
for credit to
TXU Portfolio Management Company  LP
Account No. 375041499

If to Seller:

Bank of America/Fleet Bank
Acct No- 9421205371
ABA 021404465

(4).   All other notices, including administrative notices, shall be sent to:

If to Buyer:

Manager, Contract Administration
TXU Portfolio Management Company  LP
1717 Main Street, Suite 2000
Dallas, Texas 75201
Facsimile: (214) 875-5356

If to Seller:

Airtricity Forest Creek Wind
Farm LLC
c/o Philip K. Dutton
4425 W. Airport Frwy., Ste. 590
Irving, TX  75062
Facsimile: (972) 255-2533

B.     The person to receive notices or the address for such notices may be changed by written notice from one Party to the other Party under this Section 12.04. Any written notice, demand, or request given under this Section 12.04 is deemed to be given upon the earlier of (i) actual receipt, or (ii) three (3) days after deposit in the U.S. mail, properly addressed, and with adequate first class postage.

## Section 12.05  No Rights of Third Parties

This Agreement is intended only for the Parties' benefit. Nothing in this Agreement may be construed to create any duty to, any standard of care concerning, or any liability to, any person not a Party to this Agreement.

## Section 12.06  Subject to Applicable Laws

This Agreement is subject to applicable federal, state, and local laws, ordinances, rules, and regulations and to any legislative or administrative actions of any agency, department, authority, political subdivision or other governmental instrumentality and any decrees, judgments or orders of any court ("Applicable Law").  Nothing in this Agreement may be construed as a waiver of any right to question or contest any law, ordinance, rule, regulation, or asserted regulatory jurisdiction. Each Party agrees to comply with all applicable ERCOT Protocols.

## Section 12.07  No Partnership

This Agreement is not intended to create and does not create an association, joint venture, or partnership between the Parties or to impose any partnership obligation or liability upon either Party. Neither Party has any right, power, or authority to enter any agreement or undertaking for,

SD\508314.17

or act on behalf of, or to act as or be an agent or representative of, or to otherwise bind, the other Party.

## Section 12.08  Amendment

This Agreement may be amended any time, but only by a written agreement signed by both Parties to this Agreement.

## Section 12.09  No Waiver

The waiver of a breach of any provision of this Agreement does not waive any other breach of that provision or of any other provision.

## Section 12.10  Captions

The captions of the various articles and sections of this Agreement are for convenience and reference only and do not limit or define any terms and provisions of this Agreement.

## Section 12.11  Complete Agreement

This Agreement (with its Exhibits) represents the Parties' final and mutual understanding concerning its subject matter. It replaces and supersedes any prior agreements or understandings, whether written or oral. No representations, inducements, promises, or agreements, oral or otherwise, have been relied upon or made by any Party, or anyone on behalf of a Party, that are not fully expressed in this Agreement. An agreement, statement, or promise not contained in this Agreement is not valid or binding.

## Section 12.12  Governing Law

This Agreement shall be governed by, construed and enforced in accordance with laws of the State of Texas, other than those laws which would refer a dispute hereunder to another jurisdiction. The Parties agree to non-exclusive jurisdiction of the federal district court in the Borough of Manhattan, State of New York. Each Party irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceedings with respect to such documents brought in any such court, and further irrevocably waives, to the fullest extent permitted by law, any claim that any such suit, action or proceedings brought in any such court has been brought in any inconvenient forum.

## Section 12.13  Liquidated Damages

To the extent any payment required to be made pursuant to this Agreement is deemed to be liquidated damages, the Parties acknowledge that the damages are difficult or impossible to determine, that such payment constitutes a reasonable approximation of such damages, and in no event is such payment to be deemed to be a penalty.

## Section 12.14  Severability

In the event any provision of this Agreement is held to be void, unlawful, or otherwise unenforceable, that provision will be severed from the remainder of the Agreement, and replaced automatically by a provision containing terms as nearly like the void, unlawful, or unenforceable provision as possible; and the Agreement, as so modified, will continue to be in full force and effect. If the application of any provision of this Agreement to any person or circumstance is

SD\508314.17

held to be void, unlawful, or unenforceable, then that provision remains valid, lawful, and enforceable as applied to other persons and circumstances.

### Section 12.15 Exhibits

The Exhibits attached to this Agreement are incorporated in this Agreement and made a part of this Agreement as if repeated verbatim in this Agreement.

### Section 12.16 Construction

In this Agreement, the following rules of construction apply, unless expressly provided otherwise or unless the context clearly requires otherwise:

A.    The singular includes the plural, and the plural includes the singular. The present tense includes the future tense, and the future tense includes the present tense. Words importing any gender include the other gender.

B.    The word "shall" denotes a duty. The word "may" denotes a privilege or discretionary power. The phrase "may not" denotes a prohibition. References to "writing" include printing, typing, lithography, and other means of reproducing words in a tangible visible form. The words "including," "includes," and "include" are deemed to be followed by the words "without limitation."

C.    References to Articles, Sections (or subdivisions of Sections), Exhibits, annexes, appendices, or schedules are to this Agreement, unless expressly stated otherwise. References to statutes, tariffs, or regulations include all statutes, tariffs, or regulations consolidating, amending, or replacing the statute, tariff, or regulation referred to. References to industry publications (such as IEEE 519) include all publications consolidating, amending, or replacing the publication referred to. References to agreements and other contractual instruments include all subsequent amendments and other modifications to the instruments, but only to the extent the amendments and other modifications are not prohibited by this Agreement. References to persons or entities include their respective successors and permitted assigns and, for governmental entities, entities succeeding to their respective functions and capacities.

D.    Capitalized terms not otherwise defined in this Agreement shall have the meaning as set forth in the ERCOT Protocols, as they may be amended from time to time. The term "ERCOT Protocols", as used by ERCOT, refers to the rules that guide the operation, market, and settlement functions of the ERCOT Independent System Operator, as amended from time to time.

### Section 12.17 Delivery of Copy of Agreement

Buyer has delivered a copy of this Agreement to Seller for its review; that delivery does not constitute an offer to Seller. This Agreement is not effective until a copy executed by Seller is delivered to and executed by Buyer.

### Section 12.18 Execution in Counterparts

This Agreement may be executed in counterparts, and any counterpart containing an original signature is considered an original as to the Party signing the counterpart.  Additionally, a facsimile transmission of a signature from either Party is considered an original signature.

47

### Section 12.19  Imaged Agreement

Any original executed Agreement may be photocopied and stored on computer tapes and disks (the "Imaged Agreement").  The Imaged Agreement, if introduced as evidence on paper, and all computer records of the foregoing, if introduced as evidence in printed format, in any judicial, mediation or administrative proceeding, will be admissible as between the Parties to the same extent and under the same conditions as other business records originated and maintained in documentary form.  Neither Party shall object to the admissibility of the Imaged Agreement (or photocopies of the transcription of the Imaged Agreement) on the basis that such were not originated or maintained in documentary form under either the hearsay rule, the best evidence rule or other rule of evidence.

### Section 12.20  Effective Date

This Agreement shall become effective on the date first written above (the "Effective Date").

### Section 12.21  Forward Contract

The Parties acknowledge and agree that this Agreement and all transactions hereunder constitute "forward contracts" within the meaning of the United States Bankruptcy Code.

### Section 12.23  Survival

Any provision of this Agreement which by its terms requires performance to occur or to continue after the termination of this agreement shall survive the termination hereof and shall continue in full force and effect until performance has been completed in full.

[SIGNATURE PAGE FOLLOWS]

SD\508314.17

Executed as of the date first stated above.

**Airtricity Forest Creek Wind Farm, LLC**
**By:**

        **TXU Portfolio Management Company LP**
        **By TXU Portfolio Optimization**
        **Company LLC, Its General Partner**

By: _____

    Name: Ciaran O'Brien
    Title:  Senior Vice President - Finance

Date: March _____, 2006

        By: _____

           Name: Manu Asthana
           Title:  Vice President

        Date: March 10, 2006

[REC AGREEMENT SIGNATURE PAGE]

Executed as of the date first stated above.

**Airtricity Forest Creek Wind Farm, LLC**

**TXU Portfolio Management Company LP**

**By: TXU Portfolio Optimization Company LLC, Its General Partner**

By: _____

Name: _____ Declan Flanagan _____

Title: _____ Senior Vice President _____

Date: _____ 3/10/06 _____

By: _____

Name: _____ Manu Asthana _____

Title: _____ Vice President _____

Date: _____

[REC AGREEMENT SIGNATURE PAGE]

**EXHIBIT 4.01 – Description of Renewable Resource Facility**

The Project is a 124.2 MW nameplate wind generation project to be located in Glasscock, Howard and Sterling Counties, Texas, approximately 18 miles to the southeast of Big Spring, Texas. A total of 54 of the Siemens 2.3 MW Mk II wind turbine generators will be used on the site. Each turbine has three blades with a swept-area diameter of 93m and will be mounted on an 80m tubular steel tower. The Project will be connected to the ERCOT 138KV transmission system at the new McDonald Ranch substation, located directly adjacent to property leased for the Project.

[EXHIBIT 4.01]

SD\508314.17

**Exhibit 4.10A**

**Companies Excluded from Naming Rights**

[EXHIBIT 4.10A]

SD\508314.17

# Exhibit 6.01A

## PPA Full Price by Year

| Year | Price |
|------|-------|
| 2006 | $35.50 |
| 2007 | $36.21 |
| 2008 | $36.93 |
| 2009 | $37.67 |
| 2010 | $38.43 |
| 2011 | $39.19 |
| 2012 | $39.98 |
| 2013 | $40.78 |
| 2014 | $41.59 |
| 2015 | $42.43 |
| 2016 | $43.27 |
| 2017 | $44.14 |
| 2018 | $45.02 |
| 2019 | $45.92 |
| 2020 | $46.84 |
| 2021 | $47.78 |
| 2022 | $48.73 |
| 2023 | $49.71 |
| 2024 | $50.70 |
| 2024 | $51.72 |
| 2026 | $52.75 |
| 2027 | $53.81 |
| 2028 | $54.88 |

[EXHIBIT 6.01A]

**EXHIBIT 6.01B**

**EXAMPLE OF REDETERMINATION
OF YEAR 2006 ONLY
ANNUAL QUANTITY**

**Assumption:**

1. Seller has sufficient number of wind turbines in commercial operation starting January 1, 2007 to equal 111.5 MW of nameplate capacity.

2. Seller has been delayed on quantity number one of wind turbines equal to 5 MW and they were eventually put into commercial operation starting February 1, 2007. This is a period of 31 days missing as compared to January 1, 2007.

3. Seller has been delayed on quantity number two of wind turbines equal to 7.5 MW and they were eventually put into commercial operation starting April 1, 2007. This is a period of 91 days missing as compared to January 1, 2007.

4. Seller has determined the Annual Quantity to be 436,000 MWh for years 2007 through 2022 as per Section 6.01B(2).

**Adjustment Calculation:**

Step 1:     Determine amount of MW days of operation missing

7.5 MW times 91 days = 682.5 MW days

5MW times 31 days =   155 MW days

Step 2:     Determine amount of MW days expected for Calendar year 2006

124.2 MW times 366 days = 45,457.2 MW days

Step 3:     Determine adjustment factor

Adjustment Factor = (Total MW days – MW days missing)

Total MW days

= (45,457 – 682.5-155)/45,457

= 44,619.7/45,457

=0.98158

Step 4:     Determine new 2006 Annual Quantity

Revised 2006 AQ = 436,000 x 0.98158

= 427,969.05

[EXHIBIT 6.01B]

**EXHIBIT 6.02D**

**TXU RECPA SECTION 6.02 ANNUAL RECONCILIATION WORKSHEET**

| Year | Annual Quantity | Quantity Produced | Annual Excess/ (Deficiency) | Annual Full-Price Excess | Annual Half Price Excess | Annual Deficiency | Net Full Price Excess | Net Half Price Excess | Annual Half-Price Deficiency | Net Deficiency |
|---|---|---|---|---|---|---|---|---|---|---|
| 2006 | 0 | 25,000 | 25,000 | 25,000 | 0 | 0 | 25,000 | 0 | 0 | 0 |
| 2007 | 100,000 | 100,000 | 50,000 | 50,000 | 0 | 0 | 75,000 | 0 | 0 | 0 |
| 2008 | 436,400 | 455,000 | 18,600 | 18,600 | 0 | 0 | 93,600 | 0 | 0 | 0 |
| 2009 | 436,400 | 425,000 | (11,400) | 0 | 0 | 0 | 93,600 | 0 | 0 | 0 |
| 2010 | 436,400 | 350,000 | (86,400) | 0 | 0 | 86,400 | 7,200 | 0 | 0 | 0 |
| 2011 | 436,400 | 275,000 | (161,400) | 0 | 0 | 161,400 | 0 | 0 | 154,200 | 154,200 |
| 2012 | 436,400 | 455,000 | 18,600 | 18,600 | 0 | 0 | 18,600 | 0 | 0 | 0 |
| 2013 | 436,400 | 460,000 | 23,600 | 23,600 | 0 | 0 | 42,200 | 0 | 0 | 0 |
| 2014 | 436,400 | 450,000 | 13,600 | 13,600 | 0 | 0 | 55,800 | 0 | 0 | 0 |
| 2015 | 436,400 | 425,000 | (11,400) | 0 | 0 | 0 | 55,800 | 0 | 0 | 0 |
| 2016 | 436,400 | 475,000 | 38,600 | 24,210 | 14,390 | 0 | 80,010 | 14,390 | 0 | 0 |

**Half-Price Trigger**   15%

**Deficiency**   90%

[EXHIBIT 6.02D]

SD\508314.17

## EXHIBIT 10.01B

## <u>GUARANTY</u>

To induce Airtricity Forest Creek Wind Farm, LLC ("Counterparty") to enter into the Renewable Energy and Renewable Energy Credits Purchase Agreement dated as of March 10, 2006 (the "Energy Agreement") with TXU Portfolio Management Company LP (the "Company"), the undersigned (the "Guarantor") hereby irrevocably and unconditionally guarantees the punctual payment when due of all obligations of the Company to Counterparty now or hereafter existing or arising in connection with the Energy Agreement, interest, if any, on the obligations and including any and all expenses (including reasonable attorneys' fees) reasonably incurred by Counterparty in enforcing its rights under this Guaranty (the "Obligations"), as limited below; provided that the Guarantor shall not be liable for any expenses of Counterparty if no payment under this Guaranty is due. This is a guaranty of payment and not merely of collection. The Guarantor's obligation to make a guarantee payment may be satisfied by payment of the required amounts by the Guarantor or by causing the Company to pay such amounts to the Counterparty.

The liability of the Guarantor under this Guaranty shall be unconditional irrespective of (i) any lack of enforceability of any Obligations, (ii) any change of the time, manner or place of payment, or any other term, of any Obligations, (iii) any law, regulation or order of any jurisdiction affecting any term of any Obligations or Counterparty's rights with respect thereto, (iv) the insolvency, receivership, reorganization or bankruptcy of the Company, and (v) the merger or consolidation of Company with or into another entity, the loss of the Company's separate legal identity or the cessation of the Company's existence. The Guarantor waives promptness, diligence, and notices (except the Payment Notice (as defined below)) with respect to any Obligations in this Guaranty and any requirement that Counterparty exhaust any right or take any action against the Company. Except for those defenses expressly waived hereby, Guarantor reserves the right to assert any and all defenses which the Company may have to payment of the Obligations. In the event that any payment of Company in respect of any Obligations is rescinded or recovered from Counterparty as a preference or fraudulent transfer under the Federal Bankruptcy Code, or any applicable state law, the Guarantor shall remain liable hereunder in respect to such Obligations as if such payment had not been made.

This is a continuing guaranty and shall remain in full force and effect until the earlier of (i) _____, or (ii) until the fifth business day after written notice has been received by Counterparty from the Guarantor that it has been revoked, but any notice shall not release the Guarantor from any liability as to any Obligations existing at the time of receipt of such notice or expiry.

Upon failure of Company to pay all or any portion of the Obligations, Counterparty shall provide Guarantor with a written demand for payment (the "Payment Notice"). The liability of the Guarantor under this Guaranty with respect to the aggregate principal amount of Obligations shall not exceed the lesser of the principal amount of Obligations outstanding or $__,000,000 (U. S. Dollars).

The Guarantor shall be subrogated to all of Counterparty's rights against the Company in respect of any amounts paid by the Guarantor pursuant to the provisions of this Guaranty.

No failure or delay on the part of Counterparty to exercise, and no delay in exercising, any right, remedy or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise by Counterparty of any right, remedy or power hereunder preclude any other or future exercise of any right, remedy or power. Each and every right, remedy and power hereby granted to Counterparty or allowed it by law or other agreement shall be cumulative and not exclusive of any other, and may be exercised by Counterparty from time to time.

The Guarantor may not assign its rights, interest or obligations hereunder to any other person without the prior written consent of the Counterparty and any purported assignment absent such consent is void.

All notices or other communications given or required to be given hereunder shall be in writing at the addresses below either by certified mail, return receipt requested, in person, or by overnight courier service, each of which shall be effective upon receipt.

The Guarantor's address for notices is:

[EXHIBIT 10.01B]

TXU Energy Company LLC
Attention:  Credit Department
1601 Bryan Street, Suite 9-015D
Dallas, TX  75201

The Counterparty's address for notices is:

_____
_____
_____
_____

Guarantor and Counterparty may change its address for notices by giving notice to the other party in accordance with the provisions stated above.

This Guaranty shall be governed by the laws of the State of Texas, without regard to principles of conflicts of Laws.

_____
Guarantor
By:
By:
Date

EXHIBIT 10.01C(1) - Form of Standby Letter of Credit

**Beneficiary:**                    Name:

                                    Address:

We hereby open our Irrevocable Standby Letter of Credit Number _____ in your favor by order and account of _____"Applicant"_____ available by your draft(s) at sight, drawn on _____ for an aggregate amount of $_____ USD (_____ U.S. Dollars) when accompanied by a Statement signed by an authorized representative of [BENEFICIARY] stating that "[BENEFICIARY] is entitled to draw on this Letter of Credit No. _____under the provisions of the [Name of the Contract] dated _____ between Buyer Company LP and _____."

In the event this instrument is not renewed thirty (30) days prior to the expiry date, [BENEFICIARY] shall be entitled to draw upon presenting the above statement.[subject to approval by Buyer Credit]

        We hereby engage with drawers, endorsers and bonafide holders that any drawing, which is in full compliance with this Letter of Credit, will be duly honored upon presentation at this office on or before the expiry date _____. We shall effect payment two Business Days after receipt of documents in strict conformity with the terms of this Letter of Credit . As used herein "Business Day" shall mean any day on which banking institutions in New York are open for business.

Special Conditions:

Partial drawings and multiple drawings are allowed.

All bank charges and commissions are for applicant's account.

Except as so far as expressly stated herein, this credit is subject the 'Uniform Customs and Practice for Documentary Credits' (1993 Revision) International Chamber of Commerce Publication No. 500. If this Letter of Credit expires during an interruption of business as described in Article 17 of said Publication 500 the bank hereby agrees to effect payment if this credit is drawn against within 30 days of after the resumption of business.

**For further assistance please contact::**

[EXHIBIT 10.01C(1)]

**A**

Execution Version

**First Amendment to
Renewable Energy and Renewable Energy Credits Purchase Agreement**

This **FIRST AMENDMENT TO RENEWABLE ENERGY AND RENEWABLE ENERGY CREDITS PURCHASE AGREEMENT** (this "Amendment") is made and entered into as of this ___31st___ day of  July, 2006, by and among **AIRTRICITY FOREST CREEK WIND FARM, LLC**, a Delaware limited liability company ("Seller") and **TXU PORTFOLIO MANAGEMENT COMPANY LP**, a Texas limited partnership ("Buyer").  Capitalized terms used but not defined herein shall have the meanings given them in the PPA (as hereinafter defined).

## RECITALS

**WHEREAS**, Seller is developing and will own and operate an approximately one hundred twenty-four and two-tenths megawatt (124.2 MW) wind power project (the "Forest Creek Project"), located in Sterling, Glasscock and Howard Counties, Texas;

**WHEREAS**, Buyer and Seller have entered into that certain Renewable Energy and Renewable Energy Credits Purchase Agreement dated as of March 10, 2006 (the "PPA") pursuant to which, among other things, Seller agrees to produce, deliver and sell to Buyer, and Buyer agrees to take and purchase from Seller, renewable energy credits and the renewable energy that produces those credits;

**WHEREAS**, Airtricity Sand Bluff Wind Farm, LLC, a Delaware limited liability company ("Sand Bluff") is developing and will own and operate an approximately ninety megawatt (90 MW) wind power project (the "Sand Bluff Project"), which Sand Bluff Project is adjacent to or in the vicinity of the Forest Creek Project (the Forest Creek Project and the Sand Bluff Project are sometimes referred to individually as a "Project" or collectively as the "Projects");

**WHEREAS**, the Projects will share ownership of certain real estate entitlements and certain electrical and communication facilities required for the transmission of electricity from each Project, including an estimated six mile transmission line from the Projects' switchyard to the McDonald Road 138KV Switching Station;

**WHEREAS**, Seller and TXU Electric Delivery Company ("TXUED") have entered into that certain ERCOT Standard Generation Interconnection Agreement dated as of  November 17, 2005 and amended as of January 13, 2006 (the "Forest Creek IA");

**WHEREAS,** Sand Bluff  intends to enter into interconnection arrangements with TXUED  (the "Sand Bluff IA," and, together with the Forest Creek IA, the "Interconnection Agreements");

**WHEREAS**, pursuant to ERCOT Protocols, Seller and Sand Bluff intend to utilize generation meter splitting wherein each Project shall share the same point of interconnection under their respective Interconnection Agreements and shall utilize the same ERCOT Polled Settlement Meter (the "EPSM"), as that term is defined in the ERCOT Protocols, as their respective points of delivery of electrical output from their respective Projects, with data from such EPSM being "virtually split" between such two Projects; and

**WHEREAS**, Seller and Buyer therefore desire to amend the PPA to accommodate such generation meter splitting and other changes related thereto.

**NOW THEREFORE**, in consideration of the mutual promises contained herein and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto hereby agree as follows:

**AGREEMENT**

1.    <u>Interconnection Agreement</u>.  The first sentence of <u>Section 4.02</u> of the PPA is hereby deleted and replaced with the following sentence:

> Seller has executed a transmission interconnection agreement with TXU Electric Delivery Company that is dated November 17, 2005, and amended as of January 13, 2006 relating to the interconnection of the Renewable Resource Facility to the ERCOT transmission system (the "Interconnection Agreement").

2.    <u>Metering Equipment</u>.  Section 4.04 of the PPA is hereby deleted in its entirety and replaced with the following:

**Section 4.04.  Metering.**

Seller shall arrange for meters ("Metering Equipment") that shall be qualified as ERCOT Polled Settlement Meters ("EPSMs") to measure the Net Energy delivered from the Renewable Resource Facility to the Delivery Point.  The EPSMs shall meter the total net output of the Renewable Resource Facility and that certain wind generation facility commonly known as the Airtricity Sand Bluff Project (the "Sand Bluff Project") combined.  The Metering Equipment shall be connected to the ERCOT Meter Data Acquisition System (as defined in the ERCOT Protocols), unless otherwise determined by Seller.  Seller shall comply with all Metering Equipment and Metering Equipment maintenance requirements published in the most recent version of the ERCOT Protocols.

Seller shall utilize Generation Meter Splitting, as currently outlined in Section 10.3.2.1 *et seq.* of the ERCOT Protocols, in the measurement of such Net Energy, such that aggregate data from a qualified EPSM connected to the ERCOT Meter Data Acquisition System (as defined in the ERCOT Protocols), shall be allocated to Seller's "virtual generator meter" by a Master Qualified Scheduling Entity ("Master QSE") utilizing Real-Time signals of the MWs of generation from Seller's Revenue Quality Meter that measures the output of the Renewable Resource Facility independently of the Sand Bluff

2

Project. For purposes hereof, such "Revenue Quality Meter" shall have the meaning given in §2.1 of the ERCOT Protocols. All Metering Equipment and Metering Equipment maintenance shall be in accordance with applicable standards as published in the most recent version of the ERCOT Protocols. It is recognized that at the date hereof, it is ERCOT's responsibility to read meters for settlement purposes. Seller consents to allowing Buyer, its Qualified Scheduling Entity ("QSE") and its Master QSE or Buyer's designated QSE Subcontractor, as provided for herein, to (a) read the Metering Equipment at Seller's Revenue Quality Meter located at the high side of the Forest Creek step-up transformer; and (b) review Seller's virtual generation meter information associated with the Net Energy for informational purposes, as provided for in the ERCOT Protocols. Any adjustment to prior meter readings shall be made and settled in accordance with ERCOT Protocols, and the amount of Net Energy shall be appropriately adjusted to reflect such adjustment to prior meter readings.

3.    Master Qualified Scheduling Entity. Buyer agrees that independent of, and in addition to, its obligations as Seller's QSE as more fully set forth in Section 5.06 of the PPA, Buyer shall cooperate and coordinate with the Master Qualified Scheduling Entity ("Master QSE") providing services on behalf of the Projects in accordance with this Agreement and the ERCOT Protocols §10.3.2.1 *et seq.* as amended from time to time. Buyer shall provide information and take other action as reasonably requested by the Master QSE or Seller to facilitate performance of the Master QSE obligations set forth in the ERCOT Protocols. Seller shall designate, in Seller's sole discretion, a Master QSE qualified by ERCOT to perform the Master QSE services for both the Forest Creek Project and the Sand Bluff Project.

4.    Exhibit 6.01A. Exhibit 6.01A of the PPA is hereby amended as follows:

In the column titled "Year," the year "2024" appears twice in successive rows. The second such row is hereby deleted and replaced with the following row:

| Year | Price |
|------|-------|
| 2025 | $51.72 |

5.    Notices. Section 12.04A of the PPA is hereby amended as follows:

The electronic funds transfer instructions for Buyer are hereby deleted and replaced with the following:

(3)    Information concerning electronic fund transfers:

If to Buyer:

3

JPMorgan Chase Bank
Dallas, Texas
ABA No. 021000021
For credit to
TXU Portfolio Management Company LP
Account No. 0000 088 063 18059

The address for other notices for Buyer is hereby deleted and replaced with the following:

(4)    All other notices, including administrative notices, shall be sent to:

If to Buyer:

Manager, Contract Administration
TXU Portfolio Management Company LP
1717 Main Street, Suite 2000
Dallas, Texas 75201
Facsimile:  (214) 875-9066

6.    Exhibit 6.02D.  Exhibit 6.02D of the PPA is hereby replaced with a new Exhibit 6.02D attached to this Amendment.

7.    Miscellaneous

a.    Amendments.  Except as expressly set forth herein, the PPA shall remain unmodified and is hereby ratified and confirmed in each and every respect.  All references in the PPA to the "Agreement" shall be deemed to refer to the PPA as amended hereby.

b.    Counterparts.  This Amendment may be executed in multiple counterparts, each and all of which shall be deemed an original agreement, and all of which shall constitute one agreement, notwithstanding that all parties are not signatories to the original or the same counterpart, to be effective as of the day and year first above written.

c.    Governing Law.  This Amendment shall be governed by and construed in accordance with the laws of the State of Texas.

d.    Additional Documents.  Each party hereto, upon the reasonably request of any other party hereto, agrees to perform any further acts and execute and deliver any documents which may be reasonably necessary to carry out the provisions of this Amendment.

e.    Validity.  Should any portion of this Amendment be declared invalid and unenforceable, then such portion shall be deemed to be severable from this Amendment and shall not affect the remainder hereof, and the parties hereto shall work together in good faith to replace such invalid or unenforceable provision.

**[Remainder of Page Intentionally Left Blank]**

4

**IN WITNESS WHEREOF,** the parties hereto have executed this First Amendment to Renewable Energy and Renewable Energy Credits Purchase Agreement effective as of the date first above written.

**Seller:**          AIRTRICITY FOREST CREEK WIND FARM, LLC, a Delaware limited liability company

By: _____
Name: Ciaran O'Brien
Title: Senior Vice President-Finance

**Buyer:**          TXU PORTFOLIO MANAGEMENT COMPANY LP, a Texas limited partnership

By:     TXU PORTFOLIO OPTIMIZATION COMPANY, LLC, its General Partner

By: _____
Name: _____
Title: _____

5

**IN WITNESS WHEREOF**, the parties hereto have executed this First Amendment to Renewable Energy and Renewable Energy Credits Purchase Agreement effective as of the date first above written.

Seller:          AIRTRICITY FOREST CREEK WIND FARM, LLC,
                 a Delaware limited liability company


                 By: _____
                 Name: _____
                 Title: _____


Buyer:           TXU PORTFOLIO MANAGEMENT COMPANY
                 LP,  a Texas limited partnership

                 By:    TXU PORTFOLIO OPTIMIZATION
                        COMPANY, LLC, its General Partner


                 By: _____
                        Name:  Mike McCall
                        Title:   Chairman of the Board, President
                                 and Chief Executive

SD\S34145.7

EXHIBIT 6.02D

TXU RECPA SECTION 6.02 ANNUAL RECONCILIATION WORKSHEET (Example covering
years 1-10 only)

| Year | Annual Quantity | Quantity Produced | Annual Excess/ (Deficiency) | Annual Full-Price Excess | Annual Half Price Excess | Annual Deficiency | Net Full Price Excess | Net Half Price Excess | Annual Half-Price Deficiency | Net Deficiency |
|---|---|---|---|---|---|---|---|---|---|---|
| 2006 | 0 | 25,000 | 25,000 | 25,000 | 0 | 0 | 25,000 | 0 | 0 | 0 |
| 2007 | 100,000 | 100,000 | 50,000 | 50,000 | 0 | 0 | 75,000 | 0 | 0 | 0 |
| 2008 | 436,400 | 455,000 | 18,600 | 18,600 | 0 | 0 | 93,600 | 0 | 0 | 0 |
| 2009 | 436,400 | 425,000 | (11,400) | 0 | 0 | 0 | 93,600 | 0 | 0 | 0 |
| 2010 | 436,400 | 350,000 | (86,400) | 0 | 0 | 86,400 | 7,200 | 0 | 0 | 0 |
| 2011 | 436,400 | 275,000 | (161,400) | 0 | 0 | 161,400 | 0 | 0 | 154,200 | 154,200 |
| 2012 | 436,400 | 455,000 | 18,600 | 18,600 | 0 | 0 | 18,600 | 0 | 0 | 0 |
| 2013 | 436,400 | 460,000 | 23,600 | 23,600 | 0 | 0 | 42,200 | 0 | 0 | 0 |
| 2014 | 436,400 | 450,000 | 13,600 | 13,600 | 0 | 0 | 55,800 | 0 | 0 | 0 |
| 2015 | 436,400 | 425,000 | (11,400) | 0 | 0 | 0 | 55,800 | 0 | 0 | 0 |
| 2016 | 436,400 | 536,400 | 100,000 | 65,460 | 34,540 | 0 | 121,260 | 34,540 | 0 | 0 |

...

| Half-Price Trigger | 15% |
|---|---|

| Deficiency | 90% |
|---|---|

6

**First Amendment to**
**Renewable Energy and Renewable Energy Credits Purchase Agreement**

This **FIRST AMENDMENT TO RENEWABLE ENERGY AND RENEWABLE ENERGY CREDITS PURCHASE AGREEMENT** (this "Amendment") is made and entered into as of this ___31st___ day of July, 2006, by and among **AIRTRICITY FOREST CREEK WIND FARM, LLC**, a Delaware limited liability company ("Seller") and **TXU PORTFOLIO MANAGEMENT COMPANY LP**, a Texas limited partnership ("Buyer"). Capitalized terms used but not defined herein shall have the meanings given them in the PPA (as hereinafter defined).

## RECITALS

**WHEREAS**, Seller is developing and will own and operate an approximately one hundred twenty-four and two-tenths megawatt (124.2 MW) wind power project (the "Forest Creek Project"), located in Sterling, Glasscock and Howard Counties, Texas;

**WHEREAS**, Buyer and Seller have entered into that certain Renewable Energy and Renewable Energy Credits Purchase Agreement dated as of March 10, 2006 (the "PPA") pursuant to which, among other things, Seller agrees to produce, deliver and sell to Buyer, and Buyer agrees to take and purchase from Seller, renewable energy credits and the renewable energy that produces those credits;

**WHEREAS**, Airtricity Sand Bluff Wind Farm, LLC, a Delaware limited liability company ("Sand Bluff") is developing and will own and operate an approximately ninety megawatt (90 MW) wind power project (the "Sand Bluff Project"), which Sand Bluff Project is adjacent to or in the vicinity of the Forest Creek Project (the Forest Creek Project and the Sand Bluff Project are sometimes referred to individually as a "Project" or collectively as the "Projects");

**WHEREAS**, the Projects will share ownership of certain real estate entitlements and certain electrical and communication facilities required for the transmission of electricity from each Project, including an estimated six mile transmission line from the Projects' switchyard to the McDonald Road 138KV Switching Station;

**WHEREAS**, Seller and TXU Electric Delivery Company ("TXUED") have entered into that certain ERCOT Standard Generation Interconnection Agreement dated as of November 17, 2005 and amended as of January 13, 2006 (the "Forest Creek IA");

**WHEREAS,** Sand Bluff  intends to enter into interconnection arrangements with TXUED (the "Sand Bluff IA," and, together with the Forest Creek IA, the "Interconnection Agreements");

**WHEREAS**, pursuant to ERCOT Protocols, Seller and Sand Bluff intend to utilize generation meter splitting wherein each Project shall share the same point of interconnection under their respective Interconnection Agreements and shall utilize the same ERCOT Polled Settlement Meter (the "EPSM"), as that term is defined in the ERCOT Protocols, as their respective points of delivery of electrical output from their respective Projects, with data from such EPSM being "virtually split" between such two Projects; and

**WHEREAS**, Seller and Buyer therefore desire to amend the PPA to accommodate such generation meter splitting and other changes related thereto.

**NOW THEREFORE**, in consideration of the mutual promises contained herein and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto hereby agree as follows:

## AGREEMENT

1.      Interconnection Agreement.  The first sentence of Section 4.02 of the PPA is hereby deleted and replaced with the following sentence:

> Seller has executed a transmission interconnection agreement with TXU Electric Delivery Company that is dated November 17, 2005, and amended as of January 13, 2006 relating to the interconnection of the Renewable Resource Facility to the ERCOT transmission system (the "Interconnection Agreement").

2.      Metering Equipment.  Section 4.04 of the PPA is hereby deleted in its entirety and replaced with the following:

### Section 4.04.  Metering.

Seller shall arrange for meters ("Metering Equipment") that  shall be qualified as ERCOT Polled Settlement Meters ("EPSMs") to measure the Net Energy delivered from the Renewable Resource Facility to the Delivery Point.  The EPSMs shall meter the total net output of the Renewable Resource Facility and that certain wind generation facility commonly known as the Airtricity Sand Bluff Project (the "Sand Bluff Project") combined.  The Metering Equipment shall be connected to the ERCOT Meter Data Acquisition System (as defined in the ERCOT Protocols), unless otherwise determined by Seller.  Seller shall comply with all Metering Equipment and Metering Equipment maintenance requirements published in the most recent version of the ERCOT Protocols.

Seller shall utilize Generation Meter Splitting, as currently outlined in Section 10.3.2.1 *et seq.* of the ERCOT Protocols, in the measurement of such Net Energy, such that aggregate data from a qualified EPSM connected to the ERCOT Meter Data Acquisition System (as defined in the ERCOT Protocols), shall be allocated to Seller's "virtual generator meter" by a Master Qualified Scheduling Entity ("Master QSE") utilizing Real-Time signals of the MWs of generation from Seller's Revenue Quality Meter that measures the output of the Renewable Resource Facility independently of the Sand Bluff

2

Project. For purposes hereof, such "Revenue Quality Meter" shall have the meaning given in §2.1 of the ERCOT Protocols. All Metering Equipment and Metering Equipment maintenance shall be in accordance with applicable standards as published in the most recent version of the ERCOT Protocols. It is recognized that at the date hereof, it is ERCOT's responsibility to read meters for settlement purposes. Seller consents to allowing Buyer, its Qualified Scheduling Entity ("QSE") and its Master QSE or Buyer's designated QSE Subcontractor, as provided for herein, to (a) read the Metering Equipment at Seller's Revenue Quality Meter located at the high side of the Forest Creek step-up transformer; and (b) review Seller's virtual generation meter information associated with the Net Energy for informational purposes, as provided for in the ERCOT Protocols. Any adjustment to prior meter readings shall be made and settled in accordance with ERCOT Protocols, and the amount of Net Energy shall be appropriately adjusted to reflect such adjustment to prior meter readings.

     3.    <u>Master Qualified Scheduling Entity</u>. Buyer agrees that independent of, and in addition to, its obligations as Seller's QSE as more fully set forth in <u>Section 5.06</u> of the PPA, Buyer shall cooperate and coordinate with the Master Qualified Scheduling Entity ("<u>Master QSE</u>") providing services on behalf of the Projects in accordance with this Agreement and the ERCOT Protocols §10.3.2.1 *et seq.* as amended from time to time. Buyer shall provide information and take other action as reasonably requested by the Master QSE or Seller to facilitate performance of the Master QSE obligations set forth in the ERCOT Protocols. Seller shall designate, in Seller's sole discretion, a Master QSE qualified by ERCOT to perform the Master QSE services for both the Forest Creek Project and the Sand Bluff Project.

     4.    <u>Exhibit 6.01A</u>. <u>Exhibit 6.01A</u> of the PPA is hereby amended as follows:

In the column titled "Year," the year "2024" appears twice in successive rows. The second such row is hereby deleted and replaced with the following row:

| Year | Price |
|------|-------|
| 2025 | $51.72 |

     5.    <u>Notices</u>. <u>Section 12.04A</u> of the PPA is hereby amended as follows:

The electronic funds transfer instructions for Buyer are hereby deleted and replaced with the following:

(3)    Information concerning electronic fund transfers:

If to Buyer:

3

> JPMorgan Chase Bank
> Dallas, Texas
> ABA No. 021000021
> For credit to
> TXU Portfolio Management Company LP
> Account No. 0000 088 063 18059

The address for other notices for Buyer is hereby deleted and replaced with the following:

(4)  All other notices, including administrative notices, shall be sent to:

> If to Buyer:
>
> Manager, Contract Administration
> TXU Portfolio Management Company LP
> 1717 Main Street, Suite 2000
> Dallas, Texas 75201
> Facsimile:  (214) 875-9066

6.    Exhibit 6.02D.  Exhibit 6.02D of the PPA is hereby replaced with a new Exhibit 6.02D attached to this Amendment.

7.    Miscellaneous

a.    Amendments.  Except as expressly set forth herein, the PPA shall remain unmodified and is hereby ratified and confirmed in each and every respect.  All references in the PPA to the "Agreement" shall be deemed to refer to the PPA as amended hereby.

b.    Counterparts.  This Amendment may be executed in multiple counterparts, each and all of which shall be deemed an original agreement, and all of which shall constitute one agreement, notwithstanding that all parties are not signatories to the original or the same counterpart, to be effective as of the day and year first above written.

c.    Governing Law.  This Amendment shall be governed by and construed in accordance with the laws of the State of Texas.

d.    Additional Documents.  Each party hereto, upon the reasonably request of any other party hereto, agrees to perform any further acts and execute and deliver any documents which may be reasonably necessary to carry out the provisions of this Amendment.

e.    Validity.  Should any portion of this Amendment be declared invalid and unenforceable, then such portion shall be deemed to be severable from this Amendment and shall not affect the remainder hereof, and the parties hereto shall work together in good faith to replace such invalid or unenforceable provision.

**[Remainder of Page Intentionally Left Blank]**

**IN WITNESS WHEREOF**, the parties hereto have executed this First Amendment to Renewable Energy and Renewable Energy Credits Purchase Agreement effective as of the date first above written.

**Seller:**   AIRTRICITY FOREST CREEK WIND FARM, LLC,
a Delaware limited liability company

By: _____
Name:  Ciaran O'Brien
Title:  Senior Vice President-Finance

**Buyer:**   TXU PORTFOLIO MANAGEMENT COMPANY
LP, a Texas limited partnership

By:  TXU PORTFOLIO OPTIMIZATION
   COMPANY, LLC, its General Partner

   By: _____
   Name: _____
   Title: _____

**IN WITNESS WHEREOF**, the parties hereto have executed this First Amendment to Renewable Energy and Renewable Energy Credits Purchase Agreement effective as of the date first above written.

**Seller:**        AIRTRICITY FOREST CREEK WIND FARM, LLC, a Delaware limited liability company

By: _____

Name: _____

Title: _____

**Buyer:**        TXU PORTFOLIO MANAGEMENT COMPANY LP, a Texas limited partnership

By:      TXU PORTFOLIO OPTIMIZATION COMPANY, LLC, its General Partner

By: _____

Name: Mike McCall

Title:     Chairman of the Board, President and Chief Executive

5

**EXHIBIT 6.02D**

**TXU RECPA SECTION 6.02 ANNUAL RECONCILIATION WORKSHEET (Example covering years 1-10 only)**

| Year | Annual Quantity | Quantity Produced | Annual Excess/ (Deficiency) | Annual Full-Price Excess | Annual Half Price Excess | Annual Deficiency | Net Full Price Excess | Net Half Price Excess | Annual Half-Price Deficiency | Net Deficiency |
|------|-----------------|-------------------|------------------------------|---------------------------|---------------------------|-------------------|------------------------|------------------------|-------------------------------|----------------|
| 2006 | 0 | 25,000 | 25,000 | 25,000 | 0 | 0 | 25,000 | 0 | 0 | 0 |
| 2007 | 100,000 | 100,000 | 50,000 | 50,000 | 0 | 0 | 75,000 | 0 | 0 | 0 |
| 2008 | 436,400 | 455,000 | 18,600 | 18,600 | 0 | 0 | 93,600 | 0 | 0 | 0 |
| 2009 | 436,400 | 425,000 | (11,400) | 0 | 0 | 0 | 93,600 | 0 | 0 | 0 |
| 2010 | 436,400 | 350,000 | (86,400) | 0 | 0 | 86,400 | 7,200 | 0 | 0 | 0 |
| 2011 | 436,400 | 275,000 | (161,400) | 0 | 0 | 161,400 | 0 | 0 | 154,200 | 154,200 |
| 2012 | 436,400 | 455,000 | 18,600 | 18,600 | 0 | 0 | 18,600 | 0 | 0 | 0 |
| 2013 | 436,400 | 460,000 | 23,600 | 23,600 | 0 | 0 | 42,200 | 0 | 0 | 0 |
| 2014 | 436,400 | 450,000 | 13,600 | 13,600 | 0 | 0 | 55,800 | 0 | 0 | 0 |
| 2015 | 436,400 | 425,000 | (11,400) | 0 | 0 | 0 | 55,800 | 0 | 0 | 0 |
| 2016 | 436,400 | 536,400 | 100,000 | 65,460 | 34,540 | 0 | 121,260 | 34,540 | 0 | 0 |

...

| Half-Price Trigger | 15% | | Deficiency | 90% |
|---|---|---|---|---|

6

**Second Amendment to**
**Renewable Energy and Renewable Energy Credits Purchase Agreement**

This **SECOND AMENDMENT TO RENEWABLE ENERGY AND RENEWABLE ENERGY CREDITS PURCHASE AGREEMENT** (this "Amendment") is made and entered into as of this 19th day of August, 2010, by and between **FOREST CREEK WIND FARM, LLC** (f/k/a Airtricity Forest Creek Wind Farm, LLC), a Delaware limited liability company ("Seller") and **LUMINANT ENERGY COMPANY LLC** (f/k/a TXU Portfolio Management Company LP), a Texas limited liability company ("Buyer") (each a "Party" and collectively the "Parties").  Capitalized terms used but not defined herein shall have the meanings given them in the PPA (as hereinafter defined).

## RECITALS

**WHEREAS**, Buyer and Seller have entered into that certain Renewable Energy and Renewable Energy Credits Purchase Agreement dated as of March 10, 2006, as amended (the "PPA") pursuant to which, among other things, Seller agrees to produce, deliver and sell to Buyer, and Buyer agrees to take and purchase from Seller, renewable energy credits and the renewable energy that produces those credits;

**WHEREAS**, Seller and Buyer desire to amend the PPA as hereinafter provided.

**NOW THEREFORE**, in consideration of the mutual promises contained herein and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties hereby agree as follows:

## AGREEMENT

1.  Article 1 Definitions.  The following definitions shall be inserted in Article 1:

    "Operating Rules"           Section 12.06

    "Good Utility Practice" means the practices, methods, and acts (including the practices, methods, and acts engaged in or approved by a significant portion of the generation industry and/or NERC) followed by a prudent operator of wind generating facilities similar to the Renewable Resource Facility in the United States during the relevant time period, or any of the practices, methods, and acts which, at a particular time, in the exercise of reasonable judgment in light of the facts known at the time a decision was made, could have been expected to accomplish the desired result  at a reasonable cost in a manner consistent with Applicable Law, equipment manufacturer's specifications, reliability, safety, environmental protection, economy, and expedition.  Good Utility Practice is not intended to be limited to the optimum practice, method, or act, to the exclusion of

all others, but rather is intended to include acceptable practices, methods, and acts generally accepted in the industry.

2.    <u>Section 5.04</u>. Section 5.04 shall be deleted in its entirety and replaced with the following:

"Upon instruction of Buyer, Seller shall cause up to one hundred percent (100%) of the available-to-run Wind Turbines in the Renewable Resource Facility to curtail production of Net Energy in accordance with Good Utility Practice (such event being referred to as "Instructed Backdown"). Seller agrees, upon receipt of notice of the Instructed Backdown, to cause the output of the Wind Turbines to be curtailed to the Base Point level instructed by the Buyer (the "Base Point Instruction") at a ramp rate consistent with the Resource Asset Registration Form ("RARF") of the Renewable Resource Facility or otherwise required by ERCOT. During the period of an Instructed Backdown, Seller, for purposes of calculating the Annual Quantity, will be credited with an amount of Renewable Energy equivalent to what the Wind Turbines could have generated during the applicable period based upon the Real Time Production Potential ("RTPP") value required by ERCOT, or other methodology agreed upon by the Parties in writing, had the Instructed Backdown not occurred less any Renewable Energy generated by Seller above the Base Point Instruction.

In the event Buyer curtails Seller under an Instructed Backdown and Seller does not generate Renewable Energy in excess of the Base Point Instruction, Buyer shall pay Seller (i) the sum of (a) the then current amount of the Federal Production Tax Credit, if applicable, on an After-Tax Basis and (b) the Full Price, multiplied by (ii) the difference between (a) the Real Time Production Potential value (MWhs) and (b) the Base Point Instruction (MWhs).

In the event Buyer curtails Seller under an Instructed Backdown and Seller generates an amount of Renewable Energy in excess of the Base Point Instruction, Buyer shall pay Seller (i) the sum of (a) the then current amount of the Federal Production Tax Credit, if applicable, on an After-Tax Basis and (b) the Full Price multiplied by (ii) the difference between (a) the Real Time Production Potential value (MWhs) and (b) the actual amount of Renewable Energy generated by the Renewable Resource Facility (MWhs). In addition, for the Renewable Energy generated by Seller in excess of the Base Point Instruction, Buyer shall pay Seller the Full Price only and Seller shall pay Buyer, in addition to any penalties or other charges as described in Section 12.06, the positive difference, if any, between (i) zero and (ii) the locational marginal price at the Delivery Point.

"<u>After-Tax Basis</u>" shall mean, with respect to any payment to be received by Buyer or Seller, the amount of such payment (the base payment) supplemented by a further payment (the additional payment) to either Buyer or Seller, as applicable, so that the sum of the base payment plus the additional payment shall,

after deduction of the amount of all Federal, state and local income taxes required to be paid by Buyer or Seller (as applicable) in respect of the receipt or accrual of the base payment and the additional payment (taking into account the net present value of any reduction in such income taxes resulting from tax benefits realized by the recipient as a result of the payment, other than Federal Production Tax Credits, or the event giving rise to the payment), be equal to the amount required to be received. Such calculations shall be made on the basis of the highest generally applicable Federal, state and local income tax rates applicable to the corporation for whom the calculation is being made for the period in which the payment is made, and shall take into account the deductibility of state and local income taxes, if any, for Federal income tax purposes. An ERCOT instruction shall not be an Instructed Backdown for purposes of this Section 5.04."

3.    Section 5.06. Section 5.06 shall be amended by deleting the third sentence thereof.

4.    Section 12.06. Section 12.06 shall be amended by adding the following at the end of Section 12.06:

"Each Party shall comply with all applicable ERCOT Protocols, NERC reliability and PUCT standards ("Operating Rules"). In the event of a Party's failure (the "Responsible Party") to comply with such Operating Rules (including the failure to fully comply with an Instructed Backdown), which failure causes the other Party to incur charges or penalties under the Operating Rules, the Responsible Party, in accordance with Section 6.06, shall either pay such charges or penalties or reimburse the other Party if the other Party has paid such charges or penalties. In the event both Parties cause charges or penalties to be incurred, each Party shall pay its proportionate share of such charges or penalties."

5.    Section 12.16 D. Section 12.16 D shall be amended by adding "including the ERCOT Nodal Protocols," after "Operator," and before "as amended".

6.    Miscellaneous

a.    Amendments. Except as expressly set forth herein, the PPA shall remain unmodified and is hereby ratified and confirmed in each and every respect. All references in the PPA to the "Agreement" shall be deemed to refer to the PPA as amended hereby.

b.    Counterparts. This Amendment may be executed in multiple counterparts, each and all of which shall be deemed an original agreement, and all of which shall constitute one agreement, notwithstanding that all parties are not signatories to the original or the same counterpart, to be effective as of the day and year first above written. A facsimile transmission of a signature from either Party is deemed an original signature hereunder

c.    Governing Law. This Amendment shall be governed by and construed in accordance with the laws of the State of Texas without reference to conflict of laws rules.

      d.     <u>Additional Documents</u>.  Each Party, upon the reasonably request of any other Party, agrees to perform any further acts and execute and deliver any documents which may be reasonably necessary to carry out the provisions of this Amendment.

      e.     <u>Validity</u>.  Should any portion of this Amendment be declared invalid and unenforceable, then such portion shall be deemed to be severable from this Amendment and shall not affect the remainder hereof, and the Parties shall work together in good faith to replace such invalid or unenforceable provision.

**[Remainder of Page Intentionally Left Blank]**

**IN WITNESS WHEREOF,** the Parties have executed this Second Amendment to Renewable Energy and Renewable Energy Credits Purchase Agreement effective as of the date first above written.

Seller:

FOREST CREEK WIND FARM, LLC,
a Delaware limited liability company

By: _____
Name: _____
Title: _____

Buyer:

LUMINANT ENERGY COMPANY LLC,
a Texas limited liability company

By: _____
Name: _____
Title: _____

**EXECUTION VERSION**

### Third Amendment to
### Renewable Energy and Renewable Energy Credits Purchase Agreement

**THIS THIRD AMENDMENT TO RENEWABLE ENERGY AND RENEWABLE ENERGY CREDITS PURCHASE AGREEMENT** (this "3rd Amendment") is made and entered into as of this **11** day of May, 2011 by and between **FOREST CREEK WIND FARM, LLC** ("3rd Amendment Effective Date"), (f/k/a Airtricity Forest Creek Wind Farm, LLC), a Delaware limited liability company ("Seller") and **LUMINANT ENERGY COMPANY LLC** (f/k/a TXU Portfolio Management Company LP), a Texas limited liability company ("Buyer") (each a "Party" and collectively the "Parties"). Capitalized terms used but not defined herein shall have the meanings given them in the PPA (as hereinafter defined).

### RECITALS

**WHEREAS,** Buyer and Seller have entered into that certain Renewable Energy and Renewable Energy Credits Purchase Agreement dated as of March 10, 2006, as amended (the "PPA" or "Agreement") pursuant to which, among other things, Seller agrees to produce, deliver and sell to Buyer, and Buyer agrees to take and purchase from Seller, renewable energy credits and the renewable energy that produces those credits;

**WHEREAS,** Seller and Buyer desire to amend the PPA as hereinafter provided.

**NOW THEREFORE,** in consideration of the mutual promises contained herein and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties hereby agree as follows:

### AGREEMENT

1.    **Article 1 Definitions.**  The following definitions shall be inserted in Article 1 of the PPA:

"3rd Amendment" means the Third Amendment to Renewable Energy and Renewable Energy Credits Purchase Agreement, made and entered into as of May **11**, 2011 by and between Buyer and Seller.

"3rd Amendment Effective Date" is defined in the preamble to the 3rd Amendment.

"3rd Amendment Posting Requirements" is defined in Section 10.02.

"3rd Amendment Seller Posting Requirements" is defined in Section 10.02.

"50% Price Drop" means a situation in which the End Marked Price is determined to be a price that is less than $15.09.

"End Marked Price" is the Marked Price as of the settlement date October 31, 2016 for the Marked Period November, 2016 through October, 2017.

"ICE" means the electronic energy and commodity exchange operated by Intercontinental Exchange.

**1**

"Initial Marked Price" is $30.18, such amount being the Marked Price as of the settlement date March 31, 2011 for the Marked Period April 2011 through March 2012 which amount was determined utilizing the weighted average of the prices set out in Exhibit A to this 3rd Amendment.

"Lower Posting Requirements" is defined in Section 10.02.

"Lower Seller Posting Requirements" is defined in Section 10.02.

"Marked Period" means (i) with respect to the Initial Marked Price, the prompt 12 month period following the settlement date March 31, 2011, such period being April 2011 through March 2012 and (ii) with respect to the End Marked Price, the prompt 12 month period following the settlement date October 31, 2016, such period being November, 2016 through October, 2017.

"Marked Price" means for a given Marked Period, the price of power calculated using the 24-hour weighted average around-the-clock (ATC) price per MWh of electricity for delivery stated in U.S. Dollars for the relevant prompt 12 month Marked Period based on the prices published by ICE under the headings "ERCOT West 345KV Hub (RT) Off-Peak" for off-peak data and "ERCOT West 345KV Hub (RT)" for on-peak, or any successor heading, including without limitation, any ERCOT West Zone revisions adopted by ICE as delivered by data@theice.com.

"Non-Investment Guarantor" means Texas Competitive Electric Holding LLC or another entity consented to by the Seller that provides a guaranty of any of the obligations of payment of Buyer hereunder where such entity, as of the date of providing such guaranty, does not satisfy the requirements of a Guarantor as described in Section 10.01(E) (i) and (iii) of this Agreement. In the event such entity is an affiliate of Buyer, Seller may not unreasonably withhold consent, but if such proposed entity is not an affiliate of the Buyer, the Seller may withhold consent for any reason.

2.      **Section 10.01(A) Seller Security.** Section 10.01(A) of the PPA shall be amended to replace the definition of the term "Security" with the following definition:

"Security," as to Seller, means, at Seller's option, one of the following: (A) a cash pledge or letter of credit in an amount equal to Seller's then-applicable Security Amount; (B) a guaranty from a Guarantor, as hereinafter defined or a replacement Guarantor provided pursuant to Section 10.01(E) hereof; or (C) after the Take-Over Date only, Seller may, at its option and in lieu of (A) or (B) above, either (1) provide the Seller's then-applicable Security Amount in the form of a cash pledge or letter of credit, plus a collateral interest with right of foreclosure (subject to the terms of any intercreditor or similar arrangements from time to time applicable to Buyer) and step-in rights in the Renewable Resource Facility as described in Section 10.04, below for the balance of the required security, or (2) if a Lender does not have a security interest or other encumbrance on the Renewable Resource Facility at such time, and for so long as such a security interest or other such encumbrance does not arise, provide Buyer with a first priority security interest with right of foreclosure (subject to the terms of any intercreditor or similar arrangements from time to time applicable to Buyer) and step-in rights in the Renewable Resource Facility as described in Section 10.04 below, respectively, as the required Security.

**2**

3.    **Section 10.01(B) Buyer Security.** Section 10.01(B) of the PPA shall be amended to replace the definition of the term "Security" with the following definition:

"Security," as to Buyer, means (A) a cash pledge or letter of credit in an amount equal to the then applicable Buyer's Security Amount and a guaranty from a Non-Investment Guarantor; or (B) a guaranty from a Guarantor or a replacement Guarantor provided pursuant to Section 10.01(E) hereof, which guaranty shall be capped at the Buyer's Security Amount in effect from time to time and be substantially in the form attached hereto as Exhibit 10.01B.

4.    **Section 10.01(E) Definition "Guarantor."**    Section 10.1(E) shall be amended by striking the last sentence of such section.

5.    **Section 10.02 Security Amount.** Section 10.2 of the PPA shall be replaced in its entirety with the following:

6.    **Section 10.02 Security Amount.**

The Parties shall maintain Security in the amounts set forth below during the periods as set forth below, which Security shall be delivered to the other Party not later than the initial date such Security is required to be maintained as provided below.

On or before thirty (30) days after October 31, 2016 the Seller shall (unless the Parties otherwise agree) calculate the End Marked Price and submit the result of such calculation to the Buyer.

If, based on such calculation (or agreement of the Parties), a 50% Price Drop is determined to exist the Security requirements of the Parties shall be and remain the 3rd Amendment Posting Requirements, as defined hereinafter for the balance of the Production Term. If a 50% Price Drop is not determined to exist, then, within thirty (30) days after receipt of Seller's calculations, the Buyer shall, at its option, elect in writing whether the Security requirements of the Parties shall (A) remain in the amount of the 3rd Amendment Posting Requirements for the balance of the Production Term or (B) be adjusted to the amount of the Lower Posting Requirements for the balance of the Production Term.

| Period | Seller Security Amount | Buyer Security Amount |
|---|---|---|
| Within five (5) days after execution of this Agreement and until the Full Security Date | Letter of Credit in the amount of $12,500,000 plus a $36,500,000 lien conforming to the requirements of Section 10.01J | $1,250,000 |
| At Full Security Date and until the Take-Over Date | Letter of Credit in the amount of $12,500,000 plus a $36,500,000 lien conforming to the requirements of Section 10.01J | $49,000,000 |
| At and after the Take-Over Date ("Operation Phase Security") until the 3rd Amendment Effective Date. | $25,000,000 so long as Security is provided pursuant to Section 10.01A(A) or $49,000,000 so long as Security is provided pursuant to Section | $49,000,000 |

| Period | Seller Security Amount | Buyer Security Amount |
|---|---|---|
| | 10.01A(B), or Letter of Credit in the amount of $8,333,000 plus a $49,000,000 lien conforming to the requirements of Section 10.01A(C)(1) so long as Security is provided pursuant to Section10.(C)(C)(1), or a $25,000,000 security interest in the Renewable Resource Facility as provided in accordance with Section 10.01A(C)(2) | |
| At and after the 3rd Amendment Effective Date until: January 1, 2017 and At and after January 1, 2017 until the last day of the Production Term where (i) a 50% Price Drop has occurred, or (ii) Buyer did not elect the Lower Posting Requirements. In each case with right of substitution of collateral permitted without consent of the Party receiving Security. | A cash pledge or Letter of Credit in the amount of $25,000,000 so long as Security is provided pursuant to Section 10.01A(A) or A $49,000,000 from a Guarantor so long as Security is provided pursuant to Section 10.01A(B), or A cash pledge or Letter of Credit in the amount of $8,333,000 plus a $49,000,000 lien conforming to the requirements of Section 10.01A(C)(1) so long as Security is provided pursuant to Section 10.01A(C)(1) or A $25,000,000 security interest in the Renewable Resource Facility conforming to the requirements of 10.01(A)(C)(2) so long as Security is provided pursuant to Section 10.01A(C)(2) (the foregoing, collectively the "3rd Amendment Seller Posting Requirements") | A Cash Deposit or Letter of Credit in the amount of $25,000,000 plus a $24,000,000 guaranty from a Non-Investment Guarantor so long as Security is provided pursuant to Section10.01B(A) or So long as Security is provided pursuant to Section 10.01B(B), a guaranty from a Guarantor in the amount of (i) $49,000,000 until January 1, 2017 then (ii) $343,000/MW during years at and after January 1, 2017 until January 1, 2022 and any option term. (the foregoing, collectively with the 3rd Amendment Seller Posting Requirements, the "3rd Amendment Posting Requirements") |
| At and after January 1, 2017 where no 50% Price Drop has occurred & Buyer has elected the Lower Posting Requirements. | A cash pledge or Letter of Credit in the amount of $15,000,000 so long as Security is provided pursuant to Section 10.01A(A) or | A Cash Deposit or Letter of Credit in the amount of $15,000,000 plus a $14,400,000 guaranty from a Non-Investment Guarantor so long as Security is provided pursuant |

4

Case 14-10979-CSS   Doc 4075-2   Filed 04/07/15   Page 43 of 45

| Period | Seller Security Amount | Buyer Security Amount |
|---|---|---|
| In each case with right of substitution of collateral permitted without consent of the Party receiving Security. | A $29,400,000 guaranty from a Guarantor so long as Security is provided pursuant to Section 10.01A(B), <br><br> or <br><br> A cash pledge or Letter of Credit in the amount of $5,000,000 plus a $29,400,000 lien conforming to the requirements of Section 10.01A(C)(1) so long as Security is provided pursuant to Section 10.01A(C)(1) <br><br> or <br><br> A $15,000,000 security interest in the Renewable Resource Facility conforming to the requirements of 10.01(A)(C)(2) so long as Security is provided pursuant to Section 10.01A(C)(2)) <br><br> (the foregoing, collectively, the "Lower Seller Posting Requirements") | to Section 10.01B(A) or <br><br> A $29,400,000 guaranty from a Guarantor so long as Security is provided pursuant to Section 10.01B(B) <br><br> (the foregoing, collectively with the Lower Seller Posting Requirements, the "Lower Posting Requirements") |

7.    **Miscellaneous**

a.    **Amendments.** Except as expressly set forth herein, the PPA shall remain unmodified and is hereby ratified and confirmed in each and every respect. All references in the PPA to the Agreement" shall be deemed to refer to the PPA as amended hereby.

b.    **Counterparts.** This 3rd Amendment may be executed in multiple counterparts, each and all of which shall be deemed an original agreement, and all of which shall constitute one agreement, notwithstanding that all parties are not signatories to the original or the same counterpart, to be effective as of the day and year first above written. A facsimile transmission of a signature from either Party is deemed an original signature hereunder

c.    **Governing Law.** This 3rd Amendment shall be governed by and construed in accordance with the laws of the State of Texas without reference to conflict of laws rules.

d.    **Additional Documents.** Each Party, upon the reasonable request of any other Party, agrees to perform any further acts and execute and deliver any documents which may be reasonably necessary to carry out the provisions of this 3rd Amendment.

e.    **Validity.** Should any portion of this 3rd Amendment be declared invalid and unenforceable, then such portion shall be deemed to be severable from this 3rd Amendment and shall not affect the remainder hereof, and the Parties shall work together in good faith to replace such invalid or unenforceable provision.

**[Remainder of Page Intentionally Left Blank]**

3rd Amendment to Renewable Energy and Renewable Energy Credits Purchase Agreement

**IN WITNESS WHEREOF**, the Parties have executed this Third Amendment to Renewable Energy and Renewable Energy Credits Purchase Agreement effective as of the date first above written.

FOREST CREEK WIND FARM, LLC,
a Delaware limited liability company

By: _____

Name: _____

Title: _____

LUMINANT ENERGY COMPANY LLC,
a Texas limited liability company

By: _____

Name: _____

Title: _____

**6**

Exhibit A
Initial Marked Price

| Settlement Date | Prompt Months | On-Peak Price | On-Peak Hours | Off-Peak Price | Off-Peak Hours | ATC Price | ATC Hours |
|---|---|---|---|---|---|---|---|
| 31-Mar-11 | Apr-11 | $28.38 | 336 | $15.77 | 384 | $21.65 | 720 |
| 31-Mar-11 | May-11 | $32.48 | 336 | $19.44 | 408 | $25.33 | 744 |
| 31-Mar-11 | Jun-11 | $44.40 | 352 | $23.77 | 368 | $33.86 | 720 |
| 31-Mar-11 | Jul-11 | $55.30 | 320 | $30.16 | 424 | $40.97 | 744 |
| 31-Mar-11 | Aug-11 | $55.71 | 368 | $30.38 | 376 | $42.91 | 744 |
| 31-Mar-11 | Sep-11 | $41.41 | 336 | $25.04 | 384 | $32.68 | 720 |
| 31-Mar-11 | Oct-11 | $31.86 | 336 | $16.39 | 408 | $23.38 | 744 |
| 31-Mar-11 | Nov-11 | $32.91 | 336 | $16.93 | 385 | $24.38 | 721 |
| 31-Mar-11 | Dec-11 | $34.49 | 336 | $17.74 | 408 | $25.30 | 744 |
| 31-Mar-11 | Jan-12 | $37.92 | 336 | $26.66 | 408 | $31.75 | 744 |
| 31-Mar-11 | Feb-12 | $37.78 | 336 | $26.56 | 360 | $31.98 | 696 |
| 31-Mar-11 | Mar-12 | $34.91 | 352 | $21.46 | 391 | $27.83 | 743 |
| 12 month Average | | | | | | $30.18 | |

7