**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re:  D.I. 3963, 4075** |

**DEBTORS' REPLY TO LIMITED OBJECTION OF FOREST
CREEK WIND FARM, LLC TO THE MOTION OF ENERGY
FUTURE HOLDINGS CORP.,** *ET AL.***, FOR ENTRY OF AN
ORDER AUTHORIZING LUMINANT ENERGY COMPANY LLC
TO REJECT A CERTAIN EXECUTORY CONTRACT WITH FOREST
CREEK WIND FARM, LLC, EFFECTIVE** *NUNC PRO TUNC* **TO MARCH 24, 2015**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this reply (this "Reply") to the objection (the "Objection") of Forest Creek Wind Farm, LLC ("Forest Creek") [D.I. 4075] to the *Motion of Energy Future Holdings Corp.,* et al.*, for Entry of an Order Authorizing Luminant Energy Company LLC to Reject a Certain Executory Contract with Forest Creek Wind Farm, LLC, Effective* Nunc Pro Tunc *to March 24, 2015* [D.I. 3963] (the "Motion"), authorizing Luminant Energy Company LLC ("Luminant") to reject the Renewable Energy and Renewable Energy Credits Purchase Agreement dated as of March 10, 2006, including any amendments or modifications thereto, between Luminant and Forest Creek (the "Contract").  In support of this Reply, the Debtors submit the *Supplemental Declaration of Robert Frenzel in Support of the Debtors' Reply to Limited Objection to the Motion of Energy Future Holdings Corp.,* et al.*, for Entry of an Order Authorizing Luminant Energy Company*

---

[1]  The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810.  The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201.  Due to the large number of debtors in these chapter 11 cases, which are being jointly administered, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

*LLC to Reject a Certain Executory Contract with Forest Creek Wind Farm, LLC, Effective* Nunc Pro Tunc *to March 24, 2015* (the "Supplemental Frenzel Declaration").  In further support of this Reply, the Debtors respectfully state as follows.

**Preliminary Statement**

1. The Court should overrule the Objection and authorize the Debtors to reject the Contract *nunc pro tunc* to March 24, 2015.  Forest Creek does not object to the rejection of the Contract; instead, Forest Creek argues that the effective date of the rejection should be delayed until after the hearing.  But this would be an inequitable result.  It would penalize the estates and provide Forest Creek a potential windfall.

2. The Debtors seek to reject the Contract because it provides for the sale of wind-generated electricity to the Debtors at above-market prices.  The Debtors provided Forest Creek ample notice of the impending rejection during the months of negotiations that preceded the March 24, 2015 filing of the Motion.  Yet, in the Objection, Forest Creek relies on a series of regulatory barriers to shield it from *nunc pro tunc* relief.  The barriers, however, are not a valid basis to preclude or delay rejection under the relevant caselaw.  Moreover, they are largely self-imposed: Forest Creek could have taken reasonable steps to both satisfy these requirements and resell its power as desired.

3. Meanwhile, failure to grant *nunc pro tunc* relief would result in significant harm to the estates.  Forest Creek may assert in the future that the later effective date of rejection would require the Debtors to pay the full (off-market) Contract price for wind power in the period between March 24, 2015, and April 15, 2015.  Given the months of advance notice that Forest Creek had of the impending rejection and its failure to take reasonable steps both before

and after the Motion was filed, the Debtors submit that it would be highly inequitable to allow Forest Creek to profit as a result.

4.     For these reasons, as further described below, the Debtors request that the Court overrule the Objection and grant the relief requested in the Motion on a *nunc pro tunc* basis.

**Background**

5.     On March 24, 2015, the Debtors filed the Motion, together with a proposed order approving the rejection of the Contract *nunc pro tunc* to the date of the filing of the Motion, March 24, 2015 (the "Proposed Order").  On April 7, 2015, Forest Creek filed the Objection to the Motion.

6.     TXU Portfolio Management Company LP entered into the Contract with Airtricity Forest Creek Wind Farm, LLC, as of March 10, 2006, to purchase wind power.  Debtor Luminant is the successor in interest to TXU Portfolio Management Company LP, and Forest Creek is the successor in interest to Airtricity Forest Creek Wind Farm, LLC, under the Contract.  Luminant was required to secure the Contract with (a) a $25 million letter of credit (which has been fully drawn as of March 24, 2015) and (b) a $24 million guarantee from its parent, Texas Competitive Electric Holdings Company LLC, which expired on December 31, 2014.

7.     Under Electric Reliability Council of Texas ("ERCOT") protocols, a "Qualified Scheduling Entity" (a "QSE") is responsible for submitting bids and offers to buy energy in the ERCOT energy market for all entities that own or control a generation resource ("Resource Entities") that it represents; *i.e.*, the QSE is responsible for selling power on behalf of the Resource Entity.  A "Decision Making Entity" (a "DME") for a Resource Entity has decision-making authority over how the power produced by the Resource Entity is dispatched

and priced. Under the Contract, Luminant was to act as the QSE and the DME for the power generated by Forest Creek. *See* Contract § 5.06.

8. Upon determining that continuing to perform under the Contract was not in the best interests of the estate, Luminant entered into negotiations with Forest Creek regarding a potential amendment to the Contract. Throughout the course of these negotiations, which lasted several months, Luminant repeatedly informed Forest Creek that, if the two parties were unable to reach an agreement, the Debtors would reject the Contract. As early as the week of March 9, 2015, Luminant informed Forest Creek that, if the parties could not come to a suitable agreement, Luminant would move to reject the Contract in advance of the April 14, 2015 hearing scheduled in these chapter 11 cases. Accordingly, when the negotiations failed to result in an agreement, the Debtors filed the Motion on March 24, 2015, which was served on Forest Creek by overnight mail. *See* Affidavit of Service [D.I. 4047]. After filing the Motion, the Debtors continued to provide Forest Creek with opportunities to assume QSE responsibilities related to the Contract. This includes sending, on April 1, 2015, a draft letter agreement to transfer QSE responsibilities to Forest Creek's affiliate, E.ON Global Commodities North America LLC.

9. Notwithstanding these facts and disclosures, Forest Creek filed the Objection to the Motion.[2] In the Objection, Forest Creek argues that Luminant is not entitled to *nunc pro tunc* relief because Luminant has not complied with the applicable ERCOT protocols to transition its roles as QSE and DME under the Contract. Specifically, Forest Creek argues that rejection of the Contract cannot be effective until April 15, 2015, because that is the earliest possible date that ERCOT will approve a change of the QSE.

---

[2] The Debtors are engaged in a dialogue with Forest Creek and hope to be able to resolve the Objection in advance of the hearing on the Motion.

4

**Argument**

I. **Under Applicable Law, Luminant Is Entitled to Reject the Contract** *Nunc Pro Tunc* **to March 24, 2015.**

10. Courts may approve *nunc pro tunc* rejection of executory contracts and unexpired leases "after balancing the equities" and concluding that they weigh in favor of the debtor. *See In re Chi-Chi's, Inc.*, 305 B.R. 396, 399 (Bankr. D. Del. 2004); *In re Fleming Cos., Inc.*, 304 B.R. 85, 96 (Bankr. D. Del. 2003) (finding that rejection has been allowed *nunc pro tunc* to the date of the motion); *see also Thinking Machs. Corp.*, 67 F.3d at 1028 ("In the section 365 context, . . . bankruptcy courts may enter retroactive orders of approval, and should do so when the balance of equities preponderates in favor of such remediation."); *In re Jamesway Corp.*, 179 B.R. 33, 36-37 (S.D.N.Y. 1995) (indicating that section 365 does not include "restrictions as to the manner in which the court can approve rejection" and finding that the bankruptcy court did not abuse its discretion in authorizing retroactive rejection).

11. Here, the equities favor granting the Debtors *nunc pro tunc* relief to reject the Contract. *First*, Forest Creek had ample notice of the rejection. *Second*, applicable regulatory requirements did not preclude either Luminant from rejecting the Contract or Forest Creek from taking steps to transfer QSE responsibilities and resell its power. *Third*, failure to grant *nunc pro tunc* relief could provide Forest Creek with an inequitable windfall. Therefore, Luminant respectfully submits that the Court should grant the requested relief and authorize Luminant to reject the Contract *nunc pro tunc* to March 24, 2015.

    A. **Forest Creek Had Ample Notice of the Rejection.**

12. Courts have held that *nunc pro tunc* relief may be granted as long as the debtor has given notice of its unequivocal intention to reject an executory contract or lease as of a certain date. *See In re Fleming Co.*, 304 B.R. 85, 96 (Bankr. D. Del. 2003) ("To grant nunc pro

tunc rejection, the Debtors must have stated an unequivocal intent to reject the leases."); *In re Joseph C. Spiess Co.*, 145 B.R. 597, 606 (Bankr. N.D. Ill. 1992) ("[R]ejection of a lease should be retroactive to the date that trustee takes affirmative steps to reject said lease such as serving notice of a motion to reject."); *In re Mid Region Petroleum, Inc.*, 111 B.R. 968, 970 (Bankr. N.D. Okla. 1990) ("[T]he effective date of rejection was the date the Trustee gave unequivocal notice to [the counterparty] of his intent to reject.").

13. Here, Luminant repeatedly informed Forest Creek of its intention to reject the Contract. Over months of negotiations, the Debtors repeatedly told Forest Creek that they intended to reject the Contract if they could not reach a satisfactory resolution. As early as the week of March 9, 2015, the Debtors told Forest Creek that they intended to file the Motion to reject the Contract in advance of the April 14, 2015 hearing scheduled in these chapter 11 cases. And on March 24, Luminant filed and promptly served the Motion on Forest Creek, and subsequently offered to provide Forest Creek assistance in the transition of QSE services. This is sufficient notice to justify *nunc pro tunc* relief to March 24, 2015.

### B. Luminant's QSE Obligations Under the Contract Do Not Preclude Either Luminant from Rejecting the Contract on a *Nunc Pro Tunc* Basis or Forest Creek From Taking Steps to Transfer QSE Responsiblities.

14. The Third Circuit has held that regulations governing an executory contract, in and of themselves, do not serve as basis to preclude a debtor's rejection of a contract. In *Sharon Steel Corp.*, the debtor sought to reject a gas service agreement with a public utility. *In re Sharon Steel Corp. v. Nat'l Fuel Gas Distribution Corp.*, 872 F.2d 36, 37 (3d Cir. 1989). The public utility argued that the governing regulations from the state public utility commission had ordered the public utility to continue delivering gas to the debtor, despite the debtor's rejection of the service agreement. *Id.* at 39. The Third Circuit rejected this argument, holding that the public utility's regulatory obligations were "not relevant to [a section] 365 analysis" and the

6

debtor's rejection of the service agreement under section 365 merely relieved the parties "from their respective obligations *under the contract*." *Id.* at 40 (emphasis in original). Importantly, the fact that the counterparties to an executory contract may be subject to regulatory requirements does not preclude the debtor's ability to reject such a contract. *Id.* at 40; *see also In re Wheeling-Pittsburgh Steel Corp.*, 72 B.R. 845, 848 (Bankr. W.D. Pa. 1987) (holding that the debtor was entitled to reject an electrical supply contract as a matter of bankruptcy law without regard to state public utility law because, "to the extent that state public utility laws conflict with the bankruptcy laws regarding rejection of executory contracts, it is clear that the state laws must give way to the federal bankruptcy laws by virtue of the Supremacy Clause.").

15. Nor can the terms of an executory contract limit a debtor's ability to reject the contract. *In re Ames Department Stores*, 306 B.R. 43, 51–52 (Bankr. S.D.N.Y. 2004) ("[I]t would frustrate the entire purpose of rejection if, in order to reject and thereby be relieved of a burdensome executory contract, the debtor were required, as a condition of doing so, to comply with one of the very aspects of the agreement that is burdensome.").

16. Here, Forest Creek incorrectly argues that the Contract can only be rejected once Luminant takes the necessary steps to transfer QSE services to Forest Creek under ERCOT protocols and terminates its role as the DME. This is false. The case law is clear that neither state regulatory requirements nor the terms of an executory contract may preclude a debtor from rejecting an executory contract.

17. Moreover, Forest Creek had the ability to satisfy both the regulatory requirements and the terms of the Contract upon receiving notice of the Debtors' termination. **First**, the Contract is explicit that Forest Creek may itself "replace the QSE function" performed by Luminant under the Contract with services from a third-party QSE, either in the event of a

breach by Luminant or "at its option and at any time during the term" of the Contract.[3]  So it is simply incorrect to say that Forest Creek had no alternative but to continue supplying its power to Luminant.

18.  ***Second***, Forest Creek neglects to describe the various actions it could have taken, and responsibilities it was subject to, under the applicable regulatory protocols.  As an initial matter, nothing prevented Forest Creek from selling its power to a third party through a QSE-to-QSE trade entered into the ERCOT market information system.  Moreover, ERCOT Protocol § 16.2.3.3 provides that, upon notice of a QSE's intention to terminate its QSE services, a Resource Entity (in this case, Forest Creek) may affiliate itself with a new QSE or act as its own emergency QSE, at which time the terminating QSE "will no longer be responsible" for QSE services to the Resource Entity.[4]  There are publicly-known listings of QSEs available on short notice,[5] and Forest Creek's affiliate company, E.ON Global Commodities North America LLC, is itself qualified to act as a QSE.[6]  Finally, Forest Creek, not Luminant, is the party with

---

[3]  Contract § 5.06.

[4]  *See* ERCOT Protocol § 16.2.3.3 ("Effective at 2400 on the Termination Date specified by the QSE, the QSE may no longer provide QSE services for or represent the terminated LSE or Resource.  The QSE is responsible for settlement obligations that the QSE has incurred on behalf of the terminated LSE or Resource before the termination. The QSE must participate in Real-Time Operations through the Termination Date and provide updates pursuant to these Protocols for the Operating Day which is the Termination Date.  Notwithstanding the foregoing, if, before the Termination Date, the LSE/Resource:

(a)  Affiliates itself with a new QSE, or

(b)  Fulfills ERCOT's creditworthiness requirements in order to become an Emergency QSE,

the QSE that provided notice of the intent to terminate representation of the LSE/ Resource will no longer be responsible for the terminated LSE/Resource upon the effective date of the new QSE's representation of that LSE/Resource, or the LSE/Resource qualifying as an Emergency QSE.").

[5]  *See* QSE Services Available on Short Notice, ERCOT, *available at* http://www.ercot.com/services/programs/qse/index.html.

[6]  *See* Qualified Scheduling Entity List, Market Participants, ERCOT (Mar. 10, 2015), *available at* http://www.ercot.com/mktparticipants/index.html.

8

.

the obligation to notify ERCOT of any change in the DME under the Contract.[7]  Forest Creek's failure to take reasonable remedial actions does not bear on the equities that support *nunc pro tunc* relief.

**II.    Denying *Nunc Pro Tunc* Relief on the Contract Would Provide a Windfall to Forest Creek.**

19.    If it prevails in the Objection, Forest Creek may seek to assert an administrative expense at Contract pricing for power delivered to Luminant between March 24, 2015, and April 15, 2015.  This is not a valid basis for Forest Creek to object to *nunc pro tunc* relief.  *See At Home Corp.*, 392 F.3d at 1075 (holding that the bankruptcy court had the discretion to consider the landlord's improper motivation in "running the administrative rent" in denying the landlord's opposition to debtor's motion for *nunc pro tunc* lease rejection relief).

20.    Moreover, this could provide a windfall to Forest Creek.  Specifically, had Forest Creek been able to resell power to another party for the period between March 24, 2015, and April 15, 2015, which it argues is why the Court cannot grant *nunc pro tunc* relief, Forest Creek would only have received market pricing for such a sale.  This is much lower than the price under the Contract.  Therefore, denial of *nunc pro tunc* relief could result in an unwarranted and inequitable windfall to Forest Creek at the cost of the Debtors' estates and other creditors.  *See Ames Dep't Stores*, 306 B.R. at 51–52 ("The ability to reject provides the trustee or debtor-in-possession with the means to relieve the estate of the duty to perform on burdensome obligations at the expense of all of the estate's other creditors, and to avoid the incurrence of additional administrative expenses which lack a corresponding benefit to the estate.").

---

[7]    *See* Managed Capacity Declaration, Resource Entities, ERCOT (Nov. 17, 2014), *available at* http://www.ercot.com/services/rq/re/index.html ("Each Resource Entity . . . shall notify ERCOT of any known changes in decision-making authority . . . .").

**Reservation of Rights**

21.     Notwithstanding anything herein, in the Motion, or in the Proposed Order, or the eventual outcome of this matter, the Debtors reserve the right to object on any basis to any claim filed by Forest Creek relating to the Contract, including any claims for administrative expenses pursuant to the Bankruptcy Code or otherwise.  Regardless of whether the Contract is rejected *nunc pro tunc* to March 24, 2015, any claim for the "actual, necessary costs and expenses of preserving the estate" (*i.e.*, any administrative expense relating to the Contract) should be determined by looking to market pricing for the power, rather than Contract pricing, particularly after the Debtors informed Forest Creek that they did not want the power supplied under the Contract.  *See Sharon Steel*, 872 F.2d at 42–3 (affirming bankruptcy court's finding that utility provider's administrative expense claim should be computed under the lower market rate, rather than debtor's higher contract rate, because that rate represented the "reasonable value" of the utility's service to the debtor during the course of the bankruptcy proceedings); *Matter of Cont'l Airlines, Inc.*, 146 B.R. 520, 528 (Bankr. D. Del. 1992) ("The key to valuation of an administrative expense claim is a recognition of its equitable rather than legal nature. The claim is valued on use, not the lease or contract terms."); *see also Zagata Fabricators, Inc. v. Superior Air Prods.*, 893 F.2d 624, 627 (3d Cir. 1990) ("[A] debtor is generally required to pay only a reasonable value for the use and occupancy of the landlord's property, which may or may not equal the amount agreed upon in the terms of the lease.").

**Conclusion**

For the reasons set forth above, the Debtors respectfully request that the Court deny Forest Creek's Objection and enter the Proposed Order.

[*Remainder of page intentionally left blank.*]

Wilmington, Delaware
Dated:   April 9, 2015

/s/ *Joseph C. Barsalona II*
**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
Joseph C. Barsalona II (No. 6102)
920 North King Street
Wilmington, Delaware 19801
Telephone:   (302) 651-7700
Facsimile:    (302) 651-7701
Email:    collins@rlf.com
             defranceschi@rlf.com
             madron@rlf.com
             barsalona@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:   (212) 446-4800
Facsimile:    (212) 446-4900
Email:    edward.sassower@kirkland.com
             stephen.hessler@kirkland.com
             brian.schartz@kirkland.com

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Chad J. Husnick (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:    (312) 862-2200
Email:    james.sprayregen@kirkland.com
             marc.kieselstein@kirkland.com
             chad.husnick@kirkland.com
             steven.serajeddini@kirkland.com

*Co-Counsel to the Debtors and Debtors in Possession*