# WILMERHALE

April 13, 2015

**Philip D. Anker**

+1 212 230 8890 (t)
+1 212 230 8888 (f)
philip.anker@wilmerhale.com

Hon. Christopher S. Sontchi
United States Bankruptcy Court
  for the District of Delaware
824 North Market Street, 5th Floor
Wilmington, Delaware 19801

Re:   *In re Energy Future Holdings Corp.*, Case No. 14-10979, and *Del. Trust Company v. Energy Future Intermediate Holding Co. LLC et al.*, Adv. Pro. No. 14-50363

Dear Judge Sontchi:

      We are counsel to Delaware Trust Company ("Trustee"), indenture trustee for the first lien notes ("Notes") issued by Energy Future Intermediate Holding Company LLC and EFIH Finance, Inc. ("EFIH"), and to holders of the Notes ("Noteholders"). We write at the Court's invitation to discuss (i) why the trial of the lift-stay issue should be deferred for a relatively brief period, and (ii) how we believe the trial should proceed.

      **I.**     **The Timing for Trial.** The issue to be tried is whether cause exists to modify the stay to permit the Noteholders to rescind acceleration of the Notes under the indenture. As the Court has held, were cause to exist, "the automatic default would be waived, the Notes would no longer be immediately due and the refinancing would require payment of the Applicable Premium." Findings of Fact and Conclusions of Law Regarding Cross-Motions for Summary Judgment, March 26, 2015 (No. 14-10979, D.I. 3984 ("Findings/Conclusions")), ¶ 69.

      Courts determine whether cause exists "based on the totality of circumstances in each particular case," weighing three principal factors: "(1) whether any great prejudice to either the bankruptcy estate or the debtor will result from a lifting of the stay; (2) whether the hardship to the non-bankrupt party by maintenance of the stay considerably outweighs the hardship to the debtor; and (3) the probability of the creditor prevailing on the merits." *Id.* ¶ 73. The Court has already resolved the third factor in favor of the Trustee, ruling that if the Noteholders may exercise their contractual right to rescind acceleration, they are entitled to the makewhole. *Id.* ¶ 90. Thus, the triable issues come down to a weighing of any harm to EFIH if the stay is lifted against the harm to the Noteholders if it is not.

      The trial should be delayed for a relatively short time so that it can be a single hearing based on the actual facts regarding EFIH's financial condition. Mr. McGaan acknowledged that EFIH intends to present evidence addressing the effect of modifying the automatic stay on "the debtor and debtor's constituents in the reorganization process." Tr. 4/8/2015 at 35-36. Because EFIH is presumed to be solvent and able to pay all of its creditors in full in any event, EFIH apparently intends to focus on the supposed effect of lifting the stay on *other* debtors and their creditors (and shareholders). While the Trustee and Noteholders do not believe that the effect (if

WILMERHALE

April 13, 2015
Page 2

any) of their contract right on the estates of *other, non-substantively consolidated debtors* is legally relevant, EFIH evidently intends to make that supposed effect the centerpiece of its case. To respond, the Trustee and Noteholders need discovery on the extent of EFIH's solvency. That discovery cannot take place in time to permit the trial to occur next week. It would be fundamentally unfair to allow EFIH to present the evidence it intends to offer—that Oncor's value "needs" to be used to satisfy claims against or interests in other debtors—without giving the Trustee and the Noteholders the opportunity to develop a record that, in fact, EFIH is solvent by hundreds of millions or even billions of dollars and that other junior constituencies— including EFIH's equity owner, EFH, and the Sponsors (or their designee)—are likely to obtain massive distributions on account of EFIH's interest in Oncor, on which the Trustee has a first-priority, oversecured lien.

Mr. McGaan's assertion that the Noteholders and Trustee have already had the opportunity to take such discovery is simply false. It was EFIH—in response to the Trustee's efforts to obtain discovery on EFIH's financial condition—that proposed the bifurcation in the first place. And it was EFIH that, after obtaining that bifurcation, objected to a Rule 30(b)(6) deposition noticed by the Trustee on issues relating to EFIH's financial condition on the ground "the valuation of the EFIH Debtors and Reorganized Debtors is a subject of the—potential— Second Phase of this proceeding, not this one." EFIH Debtors Oct. 21, 2014 Objections at 9 (attached as Ex. 1). Indeed, in its letter brief urging bifurcation, EFIH argued that discovery on its financial condition should be delayed to Phase Two because "[w]ith a solvent debtor, issues as to fairness amongst creditors, in sharing a limited pie, no longer apply; the allowance of claims under a make-whole provision, or for damages for breach of a no-call, no longer comes at the expense of other creditors." No. 14-50363, D.I. 127 at 3-4 (quoting *In re Chemtura*, 439 B.R. 561, 605 (Bankr. S.D.N.Y. 2010)).

Nor is it credible for EFIH to contend that the consideration of *legal* issues regarding the stay in the Phase One summary judgment briefing provided the opportunity to take discovery on the *facts* surrounding EFIH's financial condition. As an initial matter, while the Trustee and Noteholders responded to EFIH's legal arguments about the stay, they never wavered that the "automatic stay under federal bankruptcy law" was "irrelevant to the state-law issues in Phase One." No. 14-50363, D.I. 280 at 60. More importantly, in accordance with this Court's Bifurcation Order, the parties assumed EFIH's solvency for purposes of the summary judgment briefing, and EFIH steadfastly refused to permit discovery on its financial condition. In any event, if Mr. Keglevic now plans to testify as to how payment of the makewhole may harm the Debtors' current global restructuring efforts, it would have been impossible to take discovery regarding that assertion until now, when the Debtors are expected to file a plan incorporating the Oncor bid process, which they have largely kept under wraps.

There can be no real question that a trial can be conducted most efficiently following targeted discovery. In the trials to date in these Chapter 11 cases, pre-trial discovery has allowed sharp, focused evidentiary presentations, rather than forcing parties to seek critical information for the first time with a live witness in Court. Just as important, under the Debtors' bid

WILMERHALE

April 13, 2015
Page 3

procedures, the so-called stalking horse bid for Oncor, as well as other information about the bid process, will soon be known and become public. This should eliminate (or at least minimize) any issues about confidential information.

A trial on stay-relief, which likely could be held in late May or June, would also allow for manageable discovery and trial time. It is unlikely that there would need to be a full valuation trial (there would likely be no need to build up from the bottom layer of financial information) because there will be (i) actual bids for Oncor and (ii) very likely a filed plan and disclosure statement. There might be some testimony about potential alternative structures and how those structures could further increase value—for example, many observers have noted that the value of Oncor could increase by billions of dollars were it to become a REIT and thereby enjoy the associated favorable tax treatment—but the evidentiary presentation should be far less extensive than a typical valuation trial at confirmation of a contested, standalone plan of reorganization.

Focused discovery should provide substantial evidence regarding EFIH's solvency. Although the Trustee has not been permitted such discovery to date, it notes the following, to give the Court some sense of the "numbers":

- The Debtors have publicly posted to their reorganization website a term sheet for a plan that contemplates that all *junior* E-side constituencies, both at EFIH and at EFH, will receive payment of the full amount of their notes—several billion dollars in total—*plus* some or all of the postpetition interest they assert, and a percentage of their makewhole claims. It also calls for the Sponsors to receive distributions. *See* Draft Global Term Sheet (attached as Ex. 2).

- Last summer, Nextera made an offer that implied a value of greater than $18 billion for Oncor, but EFIH declined to designate it as the stalking horse because EFIH believed that other bids could be higher.

- Major investment bank analysts have recently valued Oncor at $21.9 billion, and potentially higher based on alternative structures. *See Addressing the Elephant in the Room – Our Thoughts on Oncor* (Citi Research, United States), Mar. 26, 2015, at 4 (attached as Ex. 3).

- The EFIH second lien, EFIH unsecured PIK, and structurally subordinated EFH notes all trade today above par—as high as 117% for the second liens, 121% for the PIKs, and 104% for the EFH notes. *See* Bloomberg Data (attached as Ex. 4).

- The financial press has reported that the EFIH second liens, the EFIH PIKs and the EFH noteholders have been discussing a plan that would give them the lion's share of the equity in a reorganized EFIH. Based on a notional value for Oncor of $18.5 billion, the EFH notes and the EFIH PIKs would receive 120 cents on the dollar, while the EFIH second liens would receive 127 cents on the dollar. That plan also provides for a third-party to operate EFIH on an incentive-basis, in which it would be compensated only if the value of Oncor increased to

WILMERHALE

April 13, 2015
Page 4

$19 billion, suggesting that the $18.5 billion valuation is only a floor. *See E-Side Creditors draft Hunt-family sponsored POR that values Oncor at USD 18.5bn* (attached as Ex. 5).

 Nevertheless, at the recent status conference, Mr. McGaan argued that the exact value of EFIH may remain uncertain until the Oncor auction process is complete and a plan has been confirmed. That may be true, but there is highly probative evidence that can be developed in short order through targeted discovery. As noted, there already are indications of Oncor's considerable value: the Debtors have already received (but not disclosed to the Trustee) bids for EFIH's interest in Oncor, the second round of bids is to occur today, and the Debtors are scheduled next month to file a motion for approval of the bid they consider the stalking horse.

 Mr. McGaan likewise suggested that Oncor's value today is irrelevant because any relief from the stay must be "*nunc pro tunc*" to a date on or before June 19, 2014. But the Trustee and Noteholders filed their stay-relief motion before the Court entered its Order approving the repayment of the principal balance of the Notes, and the plain language of that Order, as negotiated by the Noteholders and Trustee with EFIH, specified that the repayment would have no effect on the stay-relief motion. *See* No. 14-10979, D.I. No. 859 ¶ 40(b). In any event, the question of whether granting relief from the stay will cause EFIH (or any other Debtor) "great harm" can only be evaluated as of today, not based on some hypothetical valuation of EFIH back in June 2014. Indeed, in urging bifurcation, EFIH argued precisely the opposite of what it now contends: "[D]iscovery concerning the Debtors' solvency in the context of potential bankruptcy-related defenses and damages (the Phase Two issue) would address the Debtors' financial condition at the time the claims are allowed—not prior to the bankruptcy filing." No. 14-50363, D.I. 187 at 3-4. And, even if that were not the case, the Trustee and Noteholders still would need discovery to respond to EFIH's arguments that stay relief will harm "the debtor and debtor's constituents in the reorganization process."

 The Trustee and Noteholders are not interested in dragging this litigation out or going on a fishing expedition. Discovery can be targeted (and, of course, EFIH can object to any discovery that it views as unduly burdensome); to the extent necessary, the parties can update expert reports; and the Trustee expects that the case can be ready for trial in relatively short order. Counsel will work in good faith to propose a reasonable schedule.

 **II. The Conduct of the Trial.** As noted, the Trustee and Noteholders expect that the trial will focus on the harm if the Noteholders are denied their contractual right to rescind acceleration as compared to any legally-cognizable harm to EFIH if the Noteholders are permitted to do so. The Trustee and Noteholders have not finally determined the evidence they will present at trial. But, in addition to moving various documents into evidence and designating deposition excerpts, the Trustee and Noteholders anticipate calling the following witnesses:

 <u>Christopher Kearns.</u> As financial adviser to the Trustee, Mr. Kearns is a percipient witness to a material amount of evidence, such as the Debtors' restructuring proposals and recovery waterfalls. He is also an expert in two distinct areas. First, there are aspects of the

April 13, 2015
Page 5

harm to the Noteholders on which he will testify, and on which he has already submitted an expert report. Second, Mr. Kearns will testify regarding the extent of EFIH's solvency and its consequences. On this latter subject, if the Court agrees to the short extension of the trial that the Trustee seeks, Mr. Kearns can provide a supplemental expert report. Otherwise, the Trustee asks that Mr. Kearns be permitted to testify without providing such a report based on the information currently available, as contemplated by Bankruptcy Rule 9014, because the remaining factual lift-stay issue the Court has identified arises in a contested matter.

<u>Michiel McCarty and James Cacioppo.</u> These are two experts. Expert testimony is admitted on stay-relief motions to assess the relative harms to the parties. *See, e.g.*, *In re Opelika Mfg. Corp.*, 66 B.R. 444, 450 (Bankr. N.D. Ill. 1986); *In re Monroe Park*, 17 B.R. 934, 936 (Bankr. D. Del. 1982). Here, the testimony will address the harm to the Noteholders if they are denied the right to rescind, explaining the significance of the makewhole to the overall economics of the Notes and the loss the Noteholders have suffered by having to reinvest their capital in a much lower interest rate environment.

<u>One or more of the Debtors' designated deponents.</u> They would be called as hostile witnesses and questioned about a number of matters, including the substantial benefits that EFIH has already obtained by refinancing the Notes; the lack of any effect that granting relief from the stay would have on EFIH's "operations" (it is an intermediate holding company); the relatively small size of the makewhole at issue compared to EFIH's overall debt and assets; and the fact that, when it entered into the indenture for the Notes, EFIH understood and agreed that the Noteholders had the right to rescind acceleration and did not think (let alone disclose to the Noteholders) that this right might be challenged in bankruptcy.

<u>One or more holders of the Notes</u>. They would testify about the significance of the makewhole and the right to rescind acceleration in their decision to purchase the Notes, and about the harm they will suffer if the Noteholders are denied relief from the stay and receive nothing on their makewhole claim. They would also testify about their reliance on the separate credit of EFIH, the first lien position of the Notes, and EFIH's evident solvency.

We hope that this letter has been helpful to the Court.

         Respectfully submitted,

         <u>/s/ Philip D. Anker</u>
         Philip D. Anker
         Charles C. Platt
         Wilmer Cutler Pickering Hale and Dorr LLP

         Keith H. Wofford
         D. Ross Martin
         Ropes & Gray LLP