**<u>EXHIBIT 1</u>**

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY LLC ("EFCH")**
**TEXAS COMPETITIVE ELECTRIC HOLDINGS COMPANY LLC ("TCEH")**
**MINUTES OF JOINT MEETING OF DISINTERESTED MANAGER OF THE BOARDS OF EFCH AND TCEH**

| | |
|---|---|
| Date: | April 1, 2015 at 12:30 p.m. Eastern Time |
| Location: | Teleconference |
| EFCH: | Hugh E. Sawyer |
| TCEH: | Hugh E. Sawyer |

| Others: | Thomas Walper (*MTO*) | Seth Goldman (*MTO*) | Kevin Allred (*MTO*) |
|---|---|---|---|
| | Stephen Rose (*MTO*) | Bradley Schneider (*MTO*) | Emily Bussigel (*MTO*) |
| | Bradley Robins (*GH*) | Eric Mendelsohn (*GH*) | Stephanie Shideler (*GH*) |

Mr. Hugh Sawyer, the sole disinterested manager of the Boards of Managers of EFCH and TCEH (the "Disinterested Manager"), was in attendance.  Also present were representatives from Munger, Tolles & Olson LLP ("MTO"), independent counsel to EFCH and TCEH reporting to the Disinterested Manager with respect to Conflict Matters (as defined in the resolution herein), and Greenhill & Co. LLC ("Greenhill"), independent financial advisor to EFCH and TCEH reporting to the Disinterested Manager with respect to Conflict Matters (together with MTO, the "Independent Advisors").  Seth Goldman acted as secretary.  At 12:47 p.m. Eastern Time, following waiver of notice, the meeting of the Disinterested Manager of the Boards of EFCH and TCEH was called to order.

The Disinterested Manager referenced the materials provided to him, including a presentation dated April 1, 2015 and a draft "Joint Statement of the Summary of Settlement of Intercompany Claims" (the "Joint Statement") (attached hereto in final version as **Exhibit A**) regarding settlement of  prepetition intercompany claims, causes of action and disputes, including, without limitation, avoidance actions (the "Prepetition Intercompany Claims").  The Disinterested Manager confirmed that he had received and reviewed these materials in advance of the meeting.  Goldman of MTO referenced additional materials previously provided to the Disinterested Manager, including (i) MTO presentation to Proskauer Rose LLP ("Proskauer") (independent counsel to the disinterested directors of Energy Future Holdings Corporation ("EFH")), dated March 5, 2015 (attached hereto as **Exhibit B**); (ii) Proskauer presentation to MTO, dated March 11, 2015 (attached hereto as **Exhibit C**); (iii) MTO presentation to Cravath, Swaine & Moore LLP ("Cravath") (independent counsel to the disinterested manager of Energy Future Intermediate Holding Company LLC ("EFIH")), dated March 16, 2015 (attached hereto as **Exhibit D**); and (iv) memorandum from Cravath titled, "EFIH Preliminary Response to T-Side Claims and Defenses," received March 20, 2015 (attached hereto as **Exhibit E**).  The Disinterested Manager confirmed that he received and reviewed these materials on prior occasions, had received additional copies of these materials on March 28, 2015, and reviewed them again in advance of this meeting.

The Independent Advisors and the Disinterested Manager discussed the contents of the April 1, 2015 presentation, which was revised after discussion at the April 1 meeting and is attached hereto in final form as **Exhibit F**.

**Diligence Conducted:**  In reference to the summary in the April 1, 2015 presentation, Walper of MTO noted that, since their retention, the Independent Advisors and the Disinterested Manager discussed the investigation of Prepetition Intercompany Claims, governance, the bankruptcy case, the Oncor bid process, Conflict Matters, and the plan process, among other issues, on an almost daily basis.  In addition, Walper noted that the Disinterested Manager, in his capacity as a member of the EFCH/TCEH boards, regularly interacted with senior management of the Debtors about the Prepetition Intercompany Claims and also interacted with senior management of the TCEH operating businesses and received reports about the performance of these businesses.

Walper of MTO and Robins of Greenhill reviewed the investigative work performed by the Disinterested Manager and the Independent Advisors since the Independent Advisors' retention in mid-November 2014, including:

- Independent Advisors meetings with other advisors to the Debtors more than a dozen times on diligence related to Prepetition Intercompany Claims;

1

- Independent Advisors review of documents, work product, and diligence materials prepared by Kirkland & Ellis LLP, Sidley Austin LLP, Evercore Group L.L.C., and Zolfo Cooper, LLC on behalf of the Debtors;
- Independent Advisors review of the Debtors' data rooms for the restructuring and for the Oncor sale process and the Debtors' responses to additional diligence requests;
- Independent Advisors review of the Debtors' legacy production database, including documents identified using targeted search terms relevant to the Prepetition Intercompany Claims;
- Independent Advisors review of tax structuring and tax claim issues, including the private letter ruling request, the competitive tax allocation agreement and related documents, and historical tax sharing practices, settlements, financial records, and securities disclosures;
- Independent Advisors interviews of Debtor personnel and discussions with the CROs (Stacey Doré and Paul Keglevic);
- Independent Advisors requests for and review of additional material from the Debtors; and
- Independent Advisors meetings with, and solicitation of input from, advisors to TCEH creditor constituencies and other constituencies, including over twenty five meetings with TCEH creditor constituencies between November 18, 2014 and March 30, 2015 regarding the Prepetition Intercompany Claims and other issues.

There was discussion of the Disinterested Manager's identification of Conflict Matters, in consultation with the Independent Advisors, and the report of the identified Conflict Matters to the EFCH/TCEH boards of managers on February 25, 2015 and creditor constituencies on March 17, 2015.

Walper detailed the Independent Advisors' meetings with and presentations to conflicts counsel for the disinterested directors of EFH (the "EFH Disinterested Directors") and disinterested manager of EFIH (the "EFIH Disinterested Manager," and together with the EFH Disinterested Directors, the "Other Disinterested Board Members") regarding the Prepetition Intercompany Claims and certain tax structuring issues, and the responses received from conflicts counsel for the Other Disinterested Board Members. There was also discussion of the Disinterested Manager's meetings and negotiation sessions, both with and without the Independent Advisors present, with the Other Disinterested Board Members. In total, there were at least 15 meetings with the EFH Disinterested Directors and their advisors and at least 7 meetings with the EFIH Disinterested Manager and his advisors.

**Intercompany Claims:** Walper referred to the list of Prepetition Intercompany Claims set forth in the presentation. Walper noted that the list of claims was consistent with the lists of claims discussed in meetings with:

- The EFCH/TCEH Boards of Managers;
- Advisors to the Other Disinterested Board Members;
- Advisors to the TCEH Official Committee of Unsecured Creditors;
- Advisors to the TCEH First Lien Creditors;
- Advisors to the TCEH Ad Hoc Group of Unsecured Creditors; and
- Advisors to the EFH equity holders.

The Disinterested Manager stated that he had educated himself on the Prepetition Intercompany Claims through meetings and consultation with the Independent Advisors, input from the TCEH creditor constituents, and meetings, presentations, and negotiations with the Other Disinterested Board Members and their advisors.

**Settlement:** Walper referred to the draft Joint Statement provided in advance to the Disinterested Manager, and the Disinterested Manager confirmed that he received and reviewed the draft statement. Walper described the terms of the settlement, including certain modifications to the draft statement previously reviewed by the Disinterested Manager. The Disinterested Manager confirmed that the terms described by Walper were consistent with his understanding of the settlement.

Mendelsohn of Greenhill led discussion of the financial model of the settlement set forth in the April 1 presentation. Mendelsohn noted that the model compares the settlement value to recoveries in certain litigation scenarios. The Disinterested Manager asked about the assumptions used to create the litigation scenarios and Mendelsohn described the assumptions, and sensitivities and ranges considered for the assumptions, related to (i) the cost of litigating the Prepetition Intercompany Claims, (ii) the costs and benefits of delaying the reorganization, (iii) the accruing claims for postpetition interest (net of reduced make-whole claims) for EFIH and EFH creditors, and (iv) the value of a future recovery on Prepetition Intercompany Claims after litigation to judgment of such claims. There also was discussion of the incremental benefit of having a claim against EFIH rather than EFH in different scenarios and the claims that EFIH and EFH asserted against TCEH.

In addition, the Independent Advisors and the Disinterested Manager discussed the potential qualitative considerations that could attend delaying bankruptcy to pursue litigation of the Prepetition Intercompany Claims, including: (i) customer retention; (ii) reduced ability to contract with counterparties to hedge against TCEH business risks; (iii) employee retention; (iv) underinvestment in assets; (v) the use of managerial time and attention for litigation instead of for business operations; (vi) value of TCEH; and (vii) change in the marketing environment for Oncor. Mendelsohn noted that this was not an exhaustive list of such considerations.

The Disinterested Manager stated that in his business judgment, informed by his direct involvement in negotiations with the Other Disinterested Board Members, and by his review of the materials described herein and extensive consultation with the Independent Advisors, the settlement should be authorized.

Goldman of MTO reviewed the proposed resolutions with Sawyer.

Following further discussion, on motion, the Disinterested Manager adopted the following resolutions for each of EFCH and TCEH:

> WHEREAS, EFCH and TCEH adopted resolutions on November 7, 2014 and December 9, 2014, designating Hugh Sawyer as the Disinterested Manager of EFCH and TCEH with respect to matters on which there is an actual conflict of interest between EFCH, TCEH, or their subsidiaries, on the one hand, and another Debtor, on the other hand, (such matters, "<u>Conflicts Matters</u>") and, delegated to the Disinterested Manager the authority to, among other things, decide Conflict Matters, and to retain independent advisors to advise EFCH and TCEH (as directed by the Disinterested Manager) on Conflict Matters and on whether any matter constitutes a Conflict Matter;

> WHEREAS, the Disinterested Manager retained Munger Tolles & Olson LLP ("<u>MTO</u>") as legal counsel on November 16, 2014 and Greenhill & Co. LLC ("<u>Greenhill</u>," and together with MTO, the "<u>Independent Advisors</u>") as financial advisor on November 17, 2014 to advise on Conflict Matters and on whether any matter constitutes a Conflict Matter;

> WHEREAS, as of February 25, 2015 and subject to ongoing review, the Disinterested Manager determined that the following matters constitute Conflict Matters: (1) intercompany claims, including intercompany tax claims between EFCH and TCEH and their subsidiaries, on one hand, and non-EFCH and TCEH debtors, on the other hand; (2) intercompany tax planning, structuring, and settlement issues, such as use of net operating losses, basis step-up, and taxable or non-taxable transactions; (3) claims against equity sponsors as related to intercompany claims, settlement of intercompany claims, allocation of litigation or settlement proceeds, or indemnification; (4) the plan of reorganization as related to Conflict Matters, including claim settlement, allocation of litigation or settlement proceeds, and tax structuring issues; (5) the Oncor bid process as related to Conflict Matters including intercompany claim settlement, allocation of litigation or settlement proceeds, separation agreements, bankruptcy court mandated approval, and tax structuring issues; and (6) requests for standing to prosecute EFCH and TCEH estate causes of action as related to Conflict Matters, including claim settlement;

> WHEREAS, the forgoing list of matters is not comprehensive and the evaluation of Conflict Matters and whether a certain matter constitutes a Conflict Matter is dynamic and subject to ongoing review and evaluation;

WHEREAS, beginning in November 2014, the Independent Advisors conducted diligence regarding, among other things, prepetition intercompany claims, causes of action and disputes, including, without limitation, avoidance actions under 11 U.S.C. §§ 544, 547, and 548 (the "Prepetition Intercompany Claims"), and updated the Disinterested Manager regarding the progress and substance of the diligence;

WHEREAS, the Independent Advisors met with the independent advisors to the disinterested board members of EFH and EFIH (the "Other Disinterested Board Members") and other constituents in the Energy Future Holdings chapter 11 case to discuss the Prepetition Intercompany Claims and other issues;

WHEREAS, the Disinterested Manager met and negotiated (both with and without the Independent Advisors present) with the Other Disinterested Board Members on March 24-26, 2015, among other dates, regarding settlement of the Prepetition Intercompany Claims, among other issues, and reached an understanding with the Other Disinterested Board Members on settlement of the claims subject to authorization at a meeting of the Disinterested Manager of the EFCH/TCEH boards of managers to be convened (the "Settlement");

WHEREAS, the Settlement is to be incorporated into a joint plan of reorganization for EFH, EFIH, EFCH/TCEH, and their subsidiaries that provides for the spin-off of TCEH in a tax-free transaction (with a partial step-up in tax basis), and the tax-free reorganization of EFH and EFIH through one of three possible scenarios, each of which may include a REIT structure: sale to a third party; backstopped recapitalization by existing stakeholders in the EFH case; or stand-alone reorganization;

WHEREAS, the Independent Advisors and the advisors to the Other Disinterested Board Members drafted a Joint Statement of Summary of Settlement of Intercompany Claims (the "Joint Statement"), a final copy of which is attached hereto as **Exhibit A**;

WHEREAS, the Disinterested Manager and the Independent Advisors discussed the work conducted by the Independent Advisors on the Prepetition Intercompany Claims and other Conflict Matters, including their meetings with third parties and diligence;

WHEREAS, the Disinterested Manager and the Independent Advisors discussed the meetings with TCEH creditor constituencies and other constituents in the Energy Future Holdings chapter 11 case to discuss the Prepetition Intercompany Claims and other Conflict Matters;

WHEREAS, the Disinterested Manager and the Independent Advisors discussed considerations relevant to the Settlement;

WHEREAS, the Disinterested Manager has reviewed the terms of the Settlement as described in the Joint Statement attached hereto, the presentation provided in advance of the meeting, the presentations among the Independent Advisors and the advisors to the Other Disinterested Board Members, and various other documents; and

WHEREAS, the Disinterested Manager has determined that it is in the best interests of EFCH, TCEH, and their respective subsidiaries, creditors, and other parties-in-interest for EFCH and TCEH to pursue and implement the Settlement, including incorporating the settlement into a plan of reorganization under chapter 11;

NOW, THEREFORE, BE IT,

RESOLVED, that in the judgment of the Disinterested Manager, EFCH and TCEH shall be and hereby are authorized, empowered, and directed to pursue and implement the Settlement as described in the Joint Statement, including incorporating the Settlement in a plan of reorganization under chapter 11 for EFCH and TCEH and their subsidiaries;

RESOLVED, that in the judgment of the Disinterested Manager, EFCH and TCEH shall be and hereby are authorized, empowered, and directed to issue the Joint Statement;

RESOLVED, that any officers of EFCH or TCEH (collectively, acting alone or with one or more other officers of EFCH or TCEH, the "Authorized Officers") (or their respective designees or delegates) are hereby authorized, empowered, and directed to take any and all actions that they deem necessary or proper to carry out these resolutions as directed by the Disinterested Manager with respect to Conflict Matters;

RESOLVED, that MTO (or its respective designees or delegates) is hereby authorized, empowered, and directed to make non-material modifications to the Joint Statement in a manner that it deems necessary or proper to carry out these resolutions and that is substantially consistent with these resolutions before its issuance, and to make material modification only as directed by the Disinterested Manager;

RESOLVED, that the Disinterested Manager received sufficient notice of the actions and transactions relating to the matters contemplated by the foregoing resolutions, as may be required by the organizational documents of the EFCH and TCEH, or hereby waives any right to have received such notice; and

RESOLVED, that each of the Authorized Officers (and their designees and delegates) be and hereby are authorized, empowered, and directed to take all actions or to not take any action in the name of EFCH or TCEH with respect to the actions and transactions contemplated by these resolutions hereunder as the sole shareholder, partner, member or managing member of each direct subsidiary of EFCH or TCEH, in each case as directed by the Disinterested Manager with respect to Conflict Matters.


There being no further business to come before the meeting, it was adjourned at 2:16 p.m. Eastern Time.

/s/ Seth Goldman
Seth Goldman
Acting Secretary

**<u>EXHIBIT A</u>**

April 3, 2015

**JOINT STATEMENT OF SUMMARY OF SETTLEMENT OF INTERCOMPANY CLAIMS**

The respective disinterested directors and managers of Energy Future Holdings Corp. ("EFH"), Energy Future Intermediate Holding Company LLC ("EFIH"), and Energy Future Competitive Holdings Company LLC and Texas Competitive Electric Holdings Company LLC (collectively, "TCEH"), have agreed to a settlement of prepetition intercompany claims, causes of action and disputes, including, without limitation, avoidance actions pursuant to 11 U.S.C. §§ 544, 547 and 548 ("Settlement").  These claims, causes of action and disputes have been designated by the disinterested directors and managers as "Conflict Matters" (as such term is defined in the applicable board resolutions of EFH, EFIH, and TCEH) subject to the sole control of the disinterested directors and managers.

The Settlement is subject to Bankruptcy Court approval under 11 U.S.C. § 1123(b) and Federal Rule of Bankruptcy Procedure 9019 as part of a joint plan of reorganization for EFH, EFIH, TCEH and their subsidiaries in the jointly administered bankruptcy cases captioned *In re Energy Future Holdings Corp., et al.*, Case No. 14-10979 (CSS) (the "EFH Case").

The following summary of the Settlement is qualified in its entirety by the terms of a plan of reorganization to be filed, which will incorporate and detail the following terms:

- TCEH shall have an allowed unsecured non-priority claim of $700,000,000 against EFH, which claim shall receive the same form of distributable value as all other unsecured non-priority EFH creditors under any plan of reorganization (the "TCEH Claim").

- After full satisfaction of all allowed administrative, priority and secured claims against EFH, the next $1,410,000,000 of distributable value from the EFH estate shall be distributed as follows:  (a) EFH shall retain 49.645% for distribution on account of allowed unsecured claims and interests (other than the TCEH Claim); (b) TCEH shall receive 49.645% on account of the TCEH Claim (i.e. up to $700,000,000 million of the first $1,410,000,000 of distributable value for unsecured creditors from the EFH estate); and (c) the EFH equity holders shall receive 0.709%.

- Distributable value from the EFH estate in excess of $1,410,000,000 shall be distributed as follows: (a) TCEH shall receive 50%, until TCEH receives an additional $105,000,000, for a total distribution to TCEH of $805,000,000; and (b) EFH shall retain 50% for distribution on account of allowed unsecured claims and interests (other than the TCEH Claim).

- Once TCEH has received a total of $805,000,000 in distributable value, all remaining distributable value from the EFH estate shall be retained by EFH and distributed in accordance with the terms of the plan of reorganization.

April 3, 2015

- The sharing of distributable value between EFH's stakeholders and TCEH as described above shall not be affected by the total amount of allowed unsecured claims against EFH. If allowed claims of creditors of EFH (other than TCEH) are less than $700,000,000, EFH shall remain entitled to the same percentages of distributable value from the EFH estate as described above.  If allowed claims of creditors of EFH (other than TCEH) are greater than $700,000,000, TCEH shall remain entitled to the same percentages of distributable value from the EFH estate as described above, up to a maximum aggregate distribution of $805,000,000 to TCEH.

- Other than the allowed claim and distribution right of TCEH in the EFH estate as described above, there will not be any allowed prepetition claims between any of EFH, EFIH, and TCEH or any of their subsidiaries, including Oncor Electric Distribution Holdings Company LLC and its subsidiary.

- Each of (a) the disinterested directors of EFH, (b) the disinterested manager of EFIH, and (c) the disinterested manager of TCEH may (without the consent of the other disinterested managers or disinterested directors, as applicable) terminate the Settlement if any of them determines, after consultation with counsel, that termination of the Settlement would be consistent with the exercise of their fiduciary duties.

The plan of reorganization to be filed will provide for the spin-off of TCEH in a tax-free transaction (with a partial step-up in tax basis), and the tax-free reorganization of EFH and EFIH through one of three possible scenarios, each of which may include a REIT structure: sale to a third party; backstopped recapitalization by existing stakeholders in the EFH Case; or stand-alone reorganization.

This statement and summary are being furnished on a confidential basis to the advisors to the official unsecured creditors' committees and the other organized stakeholder constituencies in the EFH Case, to the full boards of EFH, EFIH, and TCEH, and to Kirkland & Ellis LLP and Evercore Group L.L.C.

This statement is subject to all confidentiality agreements and Federal Rule of Evidence 408.

Disinterested Directors of Energy Future
Holdings Corp.

Disinterested Manager of Energy Future
Intermediate Holding Company LLC

Disinterested Manager of Energy Future
Competitive Holdings Company LLC and
Texas Competitive Electric Holdings Company
LLC

**<u>EXHIBIT B</u>**



## Energy Future Competitive Holdings Company LLC

## Texas Competitive Electric Holdings Company LLC

# Presentation to Proskauer Rose LLP

## March 5, 2015

**PRIVILEGED & CONFIDENTIAL / SUBJECT TO RULE 408**

LOS ANGELES  |  SAN FRANCISCO  |  MTO.COM

# Topics



I.      Intercompany Tax Claim

II.     Preferential Tax Payment

III.    TCEH Intercompany Notes Claim

IV.     EFH Holdings of TCEH Debt

V.      Timing of Bankruptcy / Amend & Extend

VI.     Sponsor Fees & Shared Services

VII.    LBO Claims

VIII.   Claims Against EFIH

IX.     Basis Step-Up Claim

**PRIVILEGED & CONFIDENTIAL / SUBJECT TO RULE 408**

# Part I



# Intercompany Tax Claim

# Tax Claim



The decision to reflect $754 million tax sharing payable from EFH to TCEH on the books and records is most powerful evidence of its validity

There is substantial evidence supporting this decision:

- SEC filings
- Disclosures to investors
- Audited financial statements
- Management materials
- Company practice
- Communications of knowledgeable employees
- Bankruptcy schedules

PRIVILEGED & CONFIDENTIAL / SUBJECT TO RULE 408

# Tax Claim:  SEC Filings



- A November 6, 2012 8-K and all subsequent yearly and quarterly reports for EFH and EFCH describe the Competitive Tax Allocation Agreement ("TAA") as follows:

> EFH Corp. and its subsidiaries (including EFCH and TCEH) are bound by a Federal and State Income Tax Allocation Agreement, which provides, among other things, that any corporate member or disregarded entity in the group is required to make payments to EFH Corp. in an amount calculated to approximate the amount of tax liability such entity would have owed if it filed a separate corporate tax return.

- Condensed consolidating balance sheets included in EFCH's 2013 10-Q's and 10-K reflect separate TCEH claim.  The 10-K balance sheet reads:

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY LLC AND SUBSIDIARIES**
**Condensed Consolidating Balance Sheets**
**December 31, 2013**
**(millions of dollars)**

|  | Parent Guarantor | Issuer | Other Guarantors | Non-guarantors | Eliminations | Consolidated |
|---|---|---|---|---|---|---|
| Liability to EFH Corp. under the Federal and State Income Tax Allocation Agreement | (5) | (754) | 1,294 | -- | -- | 535 |

**PRIVILEGED & CONFIDENTIAL / SUBJECT TO RULE 408**

# Tax Claim:  Disclosures to Investors



- Notes for the Q4 12 EFH Investor Call Q&A (notes prepared by Molly Sorg (investor relations) and call led by John Young and Paul Keglevic) (EFH03041132):

> The tax sharing agreements provide, among other things, that a disregarded entity is required to make payments to EFH in an amount calculated to approximate the amount of tax liability such entity would have owed if it filed a separate corporate tax return.

- Discussion Deck for 2012 Edison Electric Institute Financial Conference (EFH02659408)
  - Registered participants included: Michael Carter, Stacey Doré, Anthony Horton, Paul Keglevic, Molly Sorg, John Young

> o  EFH and certain of its subsidiaries (including EFCH, EFIH, and TCEH, but not including Oncor Holdings and Oncor) are bound by a tax sharing agreement, which provides for the allocation of income tax liabilities among the parties thereto. EFH, Oncor Holdings and Oncor are parties to a separate tax sharing agreement, which governs the computation of federal income tax liability between EFH, on one hand, and Oncor Holdings, Oncor and the other ring-fenced entities, on the other hand.
>
>   –  The tax sharing agreements provide, among other things, that a ==disregarded entity is required to make payments to EFH in an amount calculated to approximate the amount of tax liability such entity would have owed if it filed a separate corporate tax return.==

PRIVILEGED & CONFIDENTIAL / SUBJECT TO RULE 408

# Tax Claim:  Audited financial statements



Audited financial statements, including those listed at the bottom of the slide, have almost identical disclosures:

6.      INCOME TAXES

EFH Corp. files a US federal income tax return that includes the results of Generation.  EFH Corp. and its subsidiaries (including Generation) are bound by a Federal and State Income Tax Allocation Agreement, which provides for the computation of income tax liabilities and benefits, and, among other things, that Generation and any other subsidiaries under the agreement is required to make payments to EFH Corp. in an amount calculated to approximate the amount of tax liability such entity would have owed if it filed a separate corporate tax return.

- Luminant Generation  2013 Consolidated Financial Statements (EFH-DEL00000246)
- TCEH 2012 Consolidated Financial Statements (EFH00988395)
- TCEH 2013 Consolidated Financial Statements (EFH03951507)
- Luminant Mining  2013 Combined Financial Statements (EFH-DEL00000447)
- Luminant Mining 2012 Combined Financial Statements (EFH-DEL00000417)

# Tax Claim: Management Material



Interpretation of TAA submitted by management to board supports intercompany tax claim

- Transaction Decision Paper approved by Keglevic and Howard describes all signatories as group members and refers to stand alone tax liability calculated for each entity (EFH03344498)

3. **Transaction Overview**

The proposed transaction would adopt a TSA in writing between the Common Parent (EFH) and the affiliated group members listed in Table 1 below. The parties to the executed agreement include SEC Registrants, regular corporate entities (i.e. EFH FS Holdings Company or EFH Properties Company), and certain single member limited liability companies (LLC's) that are typically disregarded for federal income tax purposes, but which will be electing members of this tax sharing agreement. The ==parties to the TSA are referred to as the "TSA group members."== The agreement will be effective as of January 1, 2010, among the Common Parent and the TSA group members.

**Table 1: TSA group members**

| |
|---|
| Luminant Generation Company LLC |
| Texas Competitive Electric Holdings Company LLC |

4. **Valuation and Financial Analysis**

...

As stated above, tax liabilities of TSA group members with positive taxable income will be larger than recorded under the previous method, which allowed for offsets of brother/sister company losses before final separate return tax liability was determined and recorded. ==Under the new TSA methodology, a TSA group member's tax liability will be equal to its separate return tax liability, as if it filed its own tax return.== Likewise, a TSA group member with a taxable loss will only receive benefit to the extent its loss is offset by income in the EFH consolidated group. The TSA will not change in any way the actual tax the consolidated group pays.

# Tax Claim:  Company Practice



Company records examined by Grant Thornton support the intercompany tax claim

- Historical practices analyzed by Grant Thornton indicate that intercompany tax sharing payables and receivables generally were calculated on an entity-by-entity basis

- Claims settlement practices may have included some type of "netting" as a payment convenience—not the type of "netting" that some argue is required by the language of the TAA

# Tax Claim: Employee Communications



Knowledgeable tax employees interpreted tax sharing on a stand-alone basis for all entities, including disregarded entities

February 15, 2011 email from EFH to Luminant
Re: Income Tax Assumptions (EFH01624975)

- <u>Sender</u>:  Boyd Lovelace (EFH senior tax director)
- <u>Recipients Include</u>:
  - Matthew Goering (VP Luminant)
  - Mark Settle (Luminant)
  - John Poulton (Luminant Senior Analyst)

"I believe the better answer for Luminant from a tax projection perspective is to determine the cash taxes that will be paid on a Luminant stand-alone basis, not the consolidated basis . . . . The reason I say this is because Luminant has a tax sharing arrangement with EFH that calls for Luminant to pay EFH the taxes it would owe on a stand-alone basis."

# Tax Claim:  TAA Ambiguous

MUNGER TOLLES & OLSON LLP

"Netting" interpretation ignores significant ambiguities within the four-corners of the TAA

- "Member" is not defined in TAA

- "Member" is used to refer to both regarded corporations and disregarded entities

- Disregarded entities added to TAA  as new "members" (e.g., EFH04414834)

ANNEX A

ADMISSION OF NEW GROUP MEMBER

THIS AGREEMENT is made as of the 4th day of January, 2013 between Energy Future Holdings Corp. ("EFH"), a Texas corporation, and TXU Energy Receivables Company LLC (the "New Member").

RECITALS:

WHEREAS, EFH is the common parent of an affiliated group of corporations within the meaning of section 1504(a) of the Internal Revenue Code of 1986, as amended from time to time (the "Code"); and

WHEREAS, EFH and the members of its affiliated group within the meaning of section 1504(a) of the Code and certain entities disregarded for federal income tax purposes as an entity separate from a member of such affiliated group (the "Group") executed the Federal and State Income Tax Allocation Agreement Among the Members of the Energy Future Holdings Corp. Consolidated Group (the "Agreement") as of the 28th day of September, 2012, to allocate federal and state income tax liability and Texas margin tax liability among them; and

WHEREAS, the New Member has become a member of the Group since the Group executed the Agreement;

NOW, THEREFORE, the parties hereto agree as follows:

The New Member shall by its execution of this Admission of New Group Member become subject to the terms of the Agreement effective as of the date first stated above.

Energy Future Holdings Corp.

By _____
Carla A. Howard
Senior Vice President & General Tax Counsel

TXU Energy Receivables Company LLC

By _____
Kevin M. Ashby
Tax Signing Officer

# Part II



# Preferential Tax Payment

# Preferential Tax Payment



Less than a year before filing for bankruptcy, TCEH paid EFH $84.4 M for "smaller issues" resulting from a settlement with the IRS for the 1997 to 2002 tax years

Payment satisfies all insider preference elements

- (1) Payment
- (2) To an insider
- (3) Within 1 year prior to bankruptcy
- (4) Insolvency
- (5) Recovery greater than would be received in chapter 7 liquidation

Ordinary course defense will not apply given unique nature of audit settlements

# Part III



# TCEH Intercompany Notes Claim

# TCEH Intercompany Notes Claim



## Background

- EFH and TCEH entered intercompany notes in October 2007
- EFH determined the terms of the notes – no independent fiduciary negotiated for TCEH
- Interest rate was set at LIBOR plus 500 bps – which at the time was approximately 10%
- As market conditions and EFH creditworthiness changed, the interest rate on notes did not compensate TCEH for the risk of lending to EFH
- EFH/TCEH board never considered changing interest rate
- No evidence that TCEH considered demanding repayment before 2012

## TCEH has straightforward fraudulent transfer claim

- TCEH was insolvent
- The interest rate on the intercompany notes did not provide reasonably equivalent value to TCEH

# TCEH Intercompany Notes Claim



- Other evidence of lack of reasonably equivalent value
    - Absence of arms-length negotiations
    - EFH has confirmed that it borrowed from TCEH because the rate was lower than was available in the market

- TCEH Insolvency
    - By the fourth quarter of 2008:
        - EFH had recorded a goodwill impairment of approximately $8B attributable to TCEH
        - Duff & Phelps calculated the TCEH enterprise value to be approximately $25B, implying that debt exceeded asset value by approximately $4.5B
        - TCEH unsecured notes were trading at approximately 35% discount to par

# TCEH Intercompany Notes Balances over Time



**The Notes payable by EFH to TCEH carried an average effective interest rate of 5.9% with an average balance outstanding in excess of $1.0 billion**



### Intercompany Notes over Time

- ~$8bn TCEH goodwill impairment
- 2010 10-K notes that outstanding debt exceeds enterprise value
- Apr-11: SG&A Note repaid with proceeds from downstream loans[1]
- Apr-11: SG&A note amended to include EFCH and EFIH guarantee
- May-09: P&I Note reissued with added EFCH and EFIH guarantee
- Feb-12 / Aug-12: Secured EFIH debt issued to repay Intercompany Notes[2]
- Nov-2008: P&I Note voided

Legend: ■ SG&A Note  ■ P&I Note

### Intercompany Notes Balances and Interest Payments

($ in millions)

| Year | Average Debt Outstanding | Interest Paid | Average Interest Rate (%) |
|---|---|---|---|
| 2007 | $24 | $0 | 10.0% |
| 2008 | 410 | 32 | 7.9% |
| 2009 | 935 | 50 | 5.3% |
| 2010 | 1,588 | 85 | 5.3% |
| 2011 | 1,542 | 82 | 5.2% |
| 2012 | 789 | 42 | 5.2% |
| 2013 | 698 | 3 | 5.2% |
| **Total / Average** | **$1,022** | **$295** | **5.9%** |

(1) TCEH repaid $770 million of intercompany borrowings to EFH. EFH reduced the SG&A Note by $770 million
(2) Feb-2012: $1.15 billion 11.75% Second Lien Notes issued, of which $950 million dividended up to EFH. Aug-2012: $250 million 6.875% Senior Secured First Lien Notes and $600 million 11.75% Senior Secured Second Lien Notes issued, of which $680 million dividended up to EFH

Source: Restructuring data room

17

*Confidential / Subject to Privilege & Attorney Work Product Controlled by Disinterested Manager of EFCH &TCEH / DRAFT – SUBJECT TO MATERIAL REVISIONS*

# Historical Rates and Select Comparable Rates

MUNGER
TOLLES &
OLSON
LLP

From November 2007 to January 2013, TCEH received average annual interest of 5.9% relative to an average YTM on EFH unsecured third party debt of between 15.8% and 17.2%[1], [2]



**Rates from November 2007 to January 2013**

Dec-08: TCEH $8bn goodwill impairment

Feb-10: Downstream loans issued

May-09: P&I Note reissued with added EFCH and EFIH guarantee

Apr-11: SG&A note amended to include EFCH and EFIH guarantee

Intercompany Notes — EFH 10.875% 2017 Notes (EFIH / EFCH Guarantee)[1]
EFH 5.55% 2014 Notes (No Guarantee)[2] — EFIH 11.75% Second Lien 2021 Notes[3]
EFH Money Pool Rate

Note: Represents the time period in which the Intercompany Notes were outstanding
(1) YTM of 10.875% Senior Notes due November 2017 (unsecured, EFIH / EFCH guarantee)
(2) YTM of 5.55% Series P Senior Notes due November 2014 (unsecured, no guarantee)
(3) EFIH 11.75% Senior Secured Second Lien Notes due 2021; proceeds from February 2012 issuance were used to reduce the Intercompany Notes balance
(4) YTM of 5.55% Series P Senior Notes due November 2014 from Nov-07 until May-09 (when EFCH and EFIH guarantees were added to the P&I Note); YTM of 10.875% Senior Notes due November 2017 thereafter
(5) YTM of 5.55% Series P Senior Notes due November 2014 from Nov-07 until April-11 (when EFCH and EFIH guarantees were added to the SG&A Note); YTM of 10.875% Senior Notes due November 2017 thereafter

Source: AdvantageData

### Summary Interest Rate Statistics

| | Intercompany Notes: 1M Libor + 5.00% | Third Party Yields | | | |
| | | EFH 10.875% 2017 Notes | EFH 5.55% 2014 Notes | P&I Note[4] | SG&A Note[5] |
|---|---|---|---|---|---|
| High | 10.246% | 25.339% | 46.642% | 32.118% | 32.118% |
| Low | 5.185% | 9.749% | 9.049% | 9.049% | 9.049% |
| **Average** | **5.867%** | **15.816%** | **17.155%** | **16.133%** | **15.890%** |

Confidential / Subject to Privilege & Attorney Work Product Controlled by Disinterested Manager of EFCH &TCEH / DRAFT – SUBJECT TO MATERIAL REVISIONS

# Interest Recalculation
## Daily Reset of Rates between October 2007 and January 2013





(1) Accrued at New York prejudgment interest on fraudulent transfer actions (9%)
(2) YTM of unsecured, unguaranteed EFH yields (5.55% Series P Senior Notes due November 2014) applied to P&I Note and SG&A Note during the period that each security was unguaranteed; following amendments that added guarantees to each security, the YTM of unsecured, guaranteed EFH yields (10.875% Senior Notes due November 2017) is applied in those periods
(3) Represents difference between unpaid interest and actual interest
(4) Money pool rate applied

Source: Restructuring data room; AdvantageData

19

Confidential / Subject to Privilege & Attorney Work Product Controlled by Disinterested Manager of EFCH &TCEH / DRAFT – SUBJECT TO MATERIAL REVISIONS

# TCEH Intercompany Notes Claim



- Potential defenses to liability are unlikely to succeed

  o "Demand" feature of the intercompany notes does not justify lower interest rate
    - EFH was not going to demand repayment from itself
    - EFH viewed the notes as 5-7 year loans
    - No evidence that TCEH board considered demanding repayment before 2012
    - TCEH never demanded repayment
  o Senior creditor "acknowledgment" does not create a defense
    - TCEH has many other creditors who have never acknowledged the notes were arms-length
    - TCEH paid the senior creditors for this concession
  o TCEH was harmed
    - TCEH was exposed to EFH credit risk without adequate compensation

# Part IV



# EFH Holdings of TCEH Debt

# EFH Holdings of TCEH Debt:  No Setoff



EFH cannot set off its $284 million of TCEH unsecured notes or $19 million of TCEH First Lien Debt against TCEH's claims against EFH for at least four reasons:

- <u>First</u>, EFH cannot set off claims against fraudulent transfer liabilities because the debts are not mutual,  *In re Singh* (Bankr. E.D.N.Y. 2010), and section 502(d) disallows all EFH claims until it has repaid any preferences or fraudulent transfers

- <u>Second</u>, under section 553, setoff in bankruptcy is limited to that available under applicable non-bankruptcy law.  The TCEH unsecured notes indenture bars setoff and, although setoff is permitted under the TCEH First Lien Credit Agreement, it requires that a lender share any setoff benefit ratably with other lenders

- <u>Third</u>, first priority security interest prevents setoff

- <u>Fourth</u>, setoff would be inequitable.  *See In re Bevill, Bresler & Schulman Asset Mgmt. Corp.* (3d Cir. 1990)

PRIVILEGED & CONFIDENTIAL / SUBJECT TO RULE 408

# EFH Holdings of TCEH Debt:  No Setoff

MUNGER
TOLLES &
OLSON LLP

| Indenture | Credit Agreement |
|---|---|
| • Indenture does not specifically address setoff | • § 13.8(b) provides lender with right, upon event of default, "to set-off . . . against [the amount owing from borrower] and all . . . claims . . . owing by such Lender . . . to or for the credit of Borrower" |
| • "No-action" clause (§ 6.06) bars a noteholder from pursuing individual remedies without support of other noteholders | |
| • "No-action" clause also bars a noteholder from obtaining "a preference or priority" over other holders | • § 13.8(a) provides, however, if lender receives a payment of its loans via setoff, in greater proportion than other lenders receive, the benefited lender must allow the other lenders to share in the benefit ratably |
| • EFH thus barred from using setoff to receive greater recovery than other noteholders (to the detriment of the other noteholders) | • If EFH does setoff its TCEH First Lien debt, it will be required to share such amounts with other lenders |

PRIVILEGED & CONFIDENTIAL / SUBJECT TO RULE 408

# EFH Holdings of TCEH Debt:
# Subordination & Interest Payments



EFH holdings may be equitably subordinated and disallowed

- EFH acquired the debt at a significant discount to par
- Case law recognizes that controlling a restructuring and benefitting from any discount in the market for a company's debt is a valuable asset and a corporate opportunity that cannot be usurped by insiders, *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims* (3d Cir. 1998)

EFH also has exposure for interest payments received:

- One year before petition date: $30M
- Four years before petition date:  $110M

# Part V



# Timing of Bankruptcy / Amend & Extend

# "Amend and Extend" Transaction



- EFH and the Sponsors face exposure for breach of fiduciary duty and/or aiding and abetting a breach of fiduciary duty
- TCEH's financial condition in 2011
  - TCEH was balance-sheet insolvent by approximately $10B
  - "Shale revolution" was already well underway – no reasonable basis to expect natural gas prices to recover in time for TCEH to repay or refinance its debt
  - TCEH unsecured was trading at less than 40%
- TCEH's board had a fiduciary duty to maximize TCEH's value
  - No evidence that EFH or TCEH board considered bankruptcy or cost of not filing bankruptcy
  - EFH did not retain restructuring advisors
  - Efforts were aimed at preserving EFH/Sponsor option value
- TCEH incurred nearly $2B in fees and incremental interest expense for a partial and limited extension of its first lien debt
  - Transaction left more than $4.5B of debt maturing in 2013 and 2014
  - "Springing maturity" provision rendered extension highly uncertain

# "Amend and Extend" Transaction





April 15, 2011

# "Amend and Extend" Transaction



- "Entire fairness" standard places burden on defendants to demonstrate fair process and fair outcome
  - Sponsors stood on both sides of the transaction
    - Sponsors dominated EFH/TCEH board (3 out of 5 directors)
    - KKR, Goldman, and TPG were significant debt holders (>$800M financial interest)
- TCEH's LLC Agreement is not a defense
  - TCEH LLC Agreement was not amended to eliminate fiduciary duties until August of 2011
  - To the extent that the amendment purports to be retroactive, it is avoidable as a fraudulent conveyance
- TCEH's potential damages are readily quantifiable
  - $800M of aggregate extension fees and costs
  - $530M of incremental interest expenses on extended debt
  - $423M in incremental interest expense on the TCEH 11.5% Senior Secured Notes
  - $110M in amendment fees

PRIVILEGED & CONFIDENTIAL / SUBJECT TO RULE 408

# Part VI



# Sponsor Fees & Shared Services

# Sponsor Fees



- TCEH has a strong claim against EFH based on its misallocation of fees paid to the Sponsors
  - EFH paid 100% of sponsor fees in 2008 and 2009
  - In 2010, EFH began allocating 100% to TCEH
    - No reasoned basis for this re-allocation
    - No evidence that "benefit" of Sponsor services accrued to TCEH
    - Report commissioned by EFH recommended against allocating sponsor fees to TCEH

- EFH is liable for amount of sponsor fees that TCEH paid from 2010 to 2013:
  - Equitable indemnity/contribution
  - Constructive fraudulent transfer
    - Management agreement is potentially avoidable

- EFH liability is readily quantifiable
  - Total fees paid by TCEH in 4 years before bankruptcy:  $141M

PRIVILEGED & CONFIDENTIAL / SUBJECT TO RULE 408

# Shared Services



- TCEH has constructive fraudulent transfer claims arising from (1) overallocation of shared services costs to T-Side; (2) improperly allocated costs; and (3) overallocation of restructuring fees and expenses pre-petition

- Allocation of shared services costs
    - Before 2014, no shared service costs were allocated to EFIH
    - This supports a claim against EFH and EFIH for up to $110M
- Overpayment for allocated services
    - TCEH also has a claim for unnecessary or excessive corporate overhead costs that should not have been allocated to TCEH in the first place
- Allocation of pre-petition restructuring fees
    - Restructuring fees and expenses were largely allocated based on the face value of debt
        - 75% to TCEH
        - 20% to EFIH
        - 5% to EFH
    - This methodology unfairly penalized TCEH and does not reflect a fair allocation of value or services by restructuring advisors
    - Fees and expenses should be re-allocated; a claim of at least $20M

PRIVILEGED & CONFIDENTIAL / SUBJECT TO RULE 408

# Part VII



LBO Claims

# LBO Claims



TCEH has claims against EFH and/or the Sponsors arising from the following transfers:

- $21B dividend from EFCH/TCEH to EFH
- Liens transferred to first lien lenders
- $123M dividend from EFCH/TCEH to EFH
- $300M merger fee

Constructive fraudulent transfer

- EFCH/TCEH did not receive reasonably equivalent value for any of the transfers
- There is a triable issue on insolvency
- EFCH/TCEH can step into the shoes of the IRS under section 544 to avoid state law statutes of limitations
- Section 546(e) does not apply to all the transfers and may not apply to any of them

**PRIVILEGED & CONFIDENTIAL / SUBJECT TO RULE 408**

# TCEH Insolvency



There is a triable issue as to whether the LBO rendered EFCH and TCEH insolvent

- EFH management viewed Sponsor investment as a *"massive bet"* on long term natural gas prices
- TXU management recognized that LBO-levels of debt created a *"significant insolvency risk"*
  - Concluded that EFH could not manage LBO-levels of debt as a public company
- TCEH was inadequately capitalized to withstand downturn in natural gas prices (25-year average = $3.50)
- LBO debt exceeded TXU management assessment of its debt capacity
- Duff & Phelps solvency report is subject to multiple criticisms

**PRIVILEGED & CONFIDENTIAL / SUBJECT TO RULE 408**

# TCEH Insolvency





| STRATEGIC TRANSACTIONS COMMITTEE<br>EVALUATION OF STRATEGIC OPTIONS | | | |
|---|---|---|---|
| Date: | January 29, 2007 | SLT sponsor: | John Wilder |
| Frequency: | As requested | Author: | David Poole, David Campbell |
| Purpose/action required: | Provide framework for evaluating TXU's strategic options; Information only | | |

drive more than $25/share of value. In the base case, significant value is destroyed because of the higher WACC. While this model would be extremely advantageous in the high NG world, in the low NG world, this option potentially creates significant insolvency risk for equity owners. While it may be possible for the SG to raise this

# Dividends and Related Transfers



Potential claim against EFH and/or Sponsors as entities for whose benefit the transfers were made

- Precedent for claim against LBO sponsors as beneficiaries of LBO-related transfers.  *In re Buckhead Am.* (D. Del. 1994)
- Precedent for affirmative recovery of decline in collateral value from beneficiaries of liens.  *In re Tousa* (11th Cir. 2012)

TCEH can challenge the liens granted on its assets (and those of its subsidiaries) as constructive fraudulent transfers

- EFH and Sponsors were beneficiaries of the transfers

# LBO Merger Fee



Sponsors received $300 million "merger fee" at closing of LBO

- TXU Merger Sub transferred the merger fee to Sponsors
- TCEH has a strong claim for constructive fraudulent transfer
  - Merger Fee was not negotiated at arms-length
  - Alleged "services" Sponsors performed did not benefit and in fact harmed TCEH (e.g., raising significant debt)
  - Significantly higher than fees in comparable transactions
- EFH could be obligated to indemnify the Sponsors for liability

**PRIVILEGED & CONFIDENTIAL / SUBJECT TO RULE 408**

# Statute of Limitations & 546(e)



## Statute of Limitations

- EFCH and/or TCEH can invoke the IRS's immunity from state law statutes of limitations pursuant to 11 U.S.C. § 544(b)
  - o EFCH was a corporation until 2013 IRS has filed a proof of claim against TCEH
- Nearly every court to consider the issue – including a court in the Third Circuit – has held that a trustee may step into the shoes of the IRS.
  - o The only court to take a contrary view, *In re Vaughan* (Bankr. D.N.M. 2013), failed to address the text of section 544(b) and instead relied on policy considerations.

## Section 546(e) "Safe Harbor"

- EFCH/TCEH have claims to avoid dividends to EFH:

  - o Dividends are not entitled to protection under section 546(e). *In re Appleseed's Intermediate Holdings, LLC*, (D. Del. 2012)

- Delaware bankruptcy court has held that section 546(e) "does not apply to 'collapsed transactions.'" *In re Mervyn's Holdings, LLC*, 426 B.R. 488 (Bankr. D. Del 2010)

# Part VIII



# Claims Against EFIH

# Claims Against EFIH



TCEH has substantial claims against EFIH which will be structurally senior to EFH and receive recovery before payment to EFH

- "Make-whole" transactions
  - o $159M payment from Luminant to EFIH in September 2012
  - o Other potential claims against EFIH/Oncor relating to "make-whole" agreements

- Shared services and sponsor fee allocations

- Repayment of Oncor debt in LBO
  - o TCEH repaid disproportionate share of joint credit facility

- Dividend of Oncor to EFH

- Avoidance claim for interest on TCEH debt

# Part IX



# Basis Step-Up Claim

# Sensitivity Analysis: Full vs. Partial Step-up in Basis



**Value of Full Step-up versus Partial Step-up in Basis**[1]

| Delta Between Full and Partial Step-up in Basis | | | | | | |
|---|---|---|---|---|---|---|
| | | Illustrative TCEH Value ($mm) | | | | |
| | | **$13,000** | **$14,500** | **$16,000** | **$17,500** | **$19,000** |
| **Discount Rate** | **6.0%** | $363 | $678 | $992 | $1,307 | $1,622 |
| | **7.0%** | $337 | $630 | $922 | $1,215 | $1,507 |
| | **8.0%** | $315 | $587 | $860 | $1,133 | $1,406 |
| | **9.0%** | $294 | $549 | $804 | $1,060 | $1,315 |
| | **10.0%** | $276 | $515 | $754 | $994 | $1,233 |

- A taxable transaction would provide the T-Side with additional value ranging from $276M to $1,622M depending on TCEH's enterprise value and the discount rate

- Assumes value associated with partial step-up fully available to TCEH

Note: Simplified calculations for illustrative purposes.  Analysis is dependent on available NOL balance, among other factors.  Based on range of discount rates and discounted to December 31, 2015
(1)    Assumes Company-provided MACRS depreciation of step-up in basis, 35% tax rate, and sufficient net income available to realize tax benefits for illustrative purposes
(2)    Based on ~$4.6 billion NOL estimate as of emergence and ~$6.7 billion tax basis
Source: Company presentation and filings, restructuring data room

42

*Confidential / Subject to Privilege & Attorney Work Product Controlled by Disinterested Manager of EFCH &TCEH / DRAFT – SUBJECT TO MATERIAL REVISIONS*

# Basis Step-Up



## A taxable transaction is feasible

- Whether TCEH "checks the box" to become a regarded entity is controlled by the TCEH disinterested manager

- The reverse veil-piercing claim that would be necessary to impose liability for any stranded tax on TCEH is not accepted in Delaware

- Holding TCEH/EFCH liable or denying a step-up in basis requires change in IRS regulations and the internal revenue code

- Bankruptcy courts have approved stranded tax transactions

- Under the Tax Allocation Agreement, capital gains income does not trigger allocation to EFCH/TCEH and the agreement is subject to rejection or avoidance

**<u>EXHIBIT C</u>**



# Energy Future Holdings Corp.
# Presentation to Munger Tolles & Olson LLP

**Proskauer Rose LLP**

March 11, 2015



PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408



# Topics

I. Intercompany Tax Claim by EFH

II. Alleged Preferential Tax Payment

III. Alleged TCEH Intercompany Notes Claim

IV. EFH Holdings of TCEH Debt

V. Timing of Bankruptcy / Amend & Extend

VI. Sponsor Fees & Shared Services

VII. Alleged LBO Claims

VIII. Certain Alleged Claims Against EFIH

IX. Basis Step-Up Claim

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408





# Part I

# Intercompany Tax Claim by EFH

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408

Proskauer



# Intercompany Tax Claims

- Undisputed intercompany tax claim is liability from TCEH to EFH of no less than $535 million.

- Amount should be $930 million liability owed to EFH.
  - $535 million plus $395 million regarding the AMT Credits.

- In no event does EFH owe TCEH $754 million.

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408





# TCEH Tax Liability to EFH

- There is compelling evidence supporting the TCEH tax sharing liability to EFH of at least $535 million:
  - SEC reporting.
  - Historical practice.
  - The language of the TAA.
  - Senior management views.

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408





# SEC Reporting

- The EFH payable and the TCEH payable are reflected on the Company's books and records and, as discussed in more detail below, in the Company's SEC filings.
    - The SEC documents report a **single** net payable or net receivable between TCEH and EFH for each period beginning in at least 2008.

- "As of September 30, 2014, we had current income tax liabilities of $17 million **and we had $535 million in noncurrent income tax liabilities payable to EFH Corp. as of the Petition Date** reported as LSTC." EFCH 10-Q, filed November 2014, at page 38.

- "As of December 31, 2013, we had current income tax liabilities of $21 million and noncurrent income tax liabilities of $535 million payable to EFH Corp." 2013 10-K of EFCH, at page 156.

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408

Proskauer



# SEC Reporting (cont'd)

- "As a result, EFC Holdings had an income tax payable to EFH Corp. of $33 million at December, 31, 2008 and an income tax receivable of $211 million at December 31, 2007." 200810-K of EFCH, at page 158.

- Financial statements reflecting direct liability from Luminant entities to EFH are not inconsistent with the operation of the TAA or the pooling of tax payables and receivables at the subgroup and group parent levels (as used by GT).
  - These financial statements presume that all entities are in a net income situation.
  - In that case, each subsidiary would be considered to have made a payment to EFH as if the entity had filed federal and state income tax returns as a stand-alone corporation.

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408





# Historical Practice

- TCEH's subsidiaries calculate their own net tax liability by business unit ("BU") and then net payables and receivables at subgroup and group parent levels.

- All tax attributes, including NOLs and other tax assets, were calculated and tracked at the BU level, after which there would be "a 'pooling' of NOLs at the Subgroup level," among the various BUs with gains and losses. For subsidiaries of TCEH, there would be a second pooling "between the Subgroup Parents and the Ultimate Subgroup Parent, TCEH." Grant Thornton at 72-76.

  - AMT liabilities and cash payments were pooled in the same manner. See Grant Thornton at 101-105 and 143-151.

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408

Proskauer



# Historical Practice (cont'd)

- Then, following this roll up of all tax assets to the subgroup and group parent levels, a single cash payment (or liability) with EFH would be calculated at subgroup and group parent levels.

  – "An aggregation or 'roll-up' of the net tax payables and receivables occurred amongst the Subgroup Parents in the TCEH Money Pool." Grant Thornton at 144.c.i.

- The illustration in Grant Thornton 145, taken from the actual settlement of Q4 2011 in which there were both payables and receivables among the BUs, presents the roll-up of various BU's into TCEH netting the payables and receivables within the TCEH group to reach a single receivable amount.

- The separate payables between EFH, Luminant and TCEH are merely interim book entries which were to be netted once the IRS settlement was finalized.

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408





# Historical Practice (cont'd)

- Treatment of the 1997-2002 audit and the calculation and settlement of the $84 million intercompany payment confirms the net payable.

> 197 Consistent with the settlement methodology for quarterly payments, it appears that intercompany payable/receivables associated with the $84 Million Payment was aggregated and settled through Subgroup Parent TCEH. The wire transfer of the $84 Million Payment appears consistent with other settlement payments made in the normal course of business between TCEH and EFH Corp in the settlement of quarterly estimate payments. Grant Thornton at 197.

- Grant Thornton at Paragraphs 211, 212 and 214 makes clear that TCEH's un-netted tax claims were outside of the norm and given their contingent nature would have been settled on a net basis when the liability was finally fixed and an amount became due and payable.

> 212 We understand that the hypothetical "net" of these two transactions would be a payable due to EFH Corp of approximately $535 million. EFH Group tax personnel have advised that there are no other instances they can recall in which tax payables and receivables remained "un-netted" as separate payables in opposite directions between a Subgroup Parent (and Members) and the EFH Corp (or other Ultimate Parent) in this manner. Grant Thornton at 212.

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408





# Language of the TAA

- The language of the TAA supports a net calculation of tax payables.
- The tax liability of the EFH group first is allocated among its corporate "members" (currently only EFH and at the relevant times both EFH and EFCH) and then only amounts allocated to such "members" are further allocated down to subsidiaries that are disregarded entities. See Section 1.2 of the TAA.
  - Consistent with the method actually used for netting tax payables and receivables.
- References in the TDP and other internal documents to "**_TSA_** group members" does not mean that such entities are "members" of the TAA.
- Contrast the Oncor TSA which makes a specific point of calculating the separate tax liability of the entities as if Oncor Holdings, a disregarded entity, was a corporation.

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408





# Senior Management Views

- Paul Keglevic, the CFO and CRO of all Debtor entities, has stated that in his view the TCEH claim is not valid and a "net" of the payables between EFH and TCEH is the proper result.
  - This is consistent with the view expressed in Section 2 of the TDP:

> A properly drafted tax allocation or sharing agreement should provide an acceptable method for both financial and tax accounting purposes, thus eliminating the need to have one method for financial reporting purposes and a different method for tax reporting purposes. In addition, providing for intercompany tax payments pursuant to a written agreement should provide proper documentation for cash tax payments to and cash tax receipts from the members of the consolidated group.

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408

Proskauer



# TCEH Has No Claims

- TCEH has no claim against EFH:
  - TCEH and its subsidiaries' tax liabilities are combined for a single net liability to EFH.
  - The claims regarding the AMT Credits do not properly belong to TCEH.
  - The years at issue pre-date the TAA and in the absence of an agreement there would be no liability to TCEH.
  - EFH is a mere paying agent for underlying tax claims and not substantively liable.

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408





# Net Liability

- Tax liabilities under the TAA are netted resulting in a net liability to EFH of at least $535 million.

    – As acknowledged in the 10-Q and other SEC documents cited above, TCEH had a net liability to EFH of $535 million.

    – In addition, despite being properly accrued for GAAP purposes, these liabilities remain entirely contingent on the IRS settlement and do not equal a due and enforceable claim.

    The underlying tax accounting, however, appeared consistent and in compliance with the rules of FIN 48.                    :

    Grant Thornton at 214

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408





# $395 Million of the TCEH Claim is Attributable to the 1997-2002 Settlement

- $395 Million of the TCEH Claim is attributable to AMT Credits absorbed as part of the 1997-2002 Settlement.
  - TCEH has no claim to AMT credits.
  - The TAA does not provide for payment to members where tax attributes are absorbed in a fashion unrelated to the recognition of income.

173 Specifically, the reduction of an attribute due to COD income exclusion is not treated as *using* the attribute to *offset* COD income for Federal income tax law.  Indeed, the COD income is excluded whether or not there are sufficient tax attributes to "cover" the excluded COD income – and any such excess excluded COD income is commonly referred to as "black hole COD income."  In the normal course of NOL usage, a tax attribute, such as an NOL carryforward, is used to offset subsequent taxable income (*i.e.,* a deduction against taxable income); likewise, the use of an AMT credit carryforward is used to offset a subsequent Federal income tax liability to the IRS.

Grant Thornton at 173.

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408





# Claims Relate to Pre-TAA Years

- The TAA does not apply to adjustments for years before 2010.

  > 6.4   In order to reflect the parties' course of dealing since January 1, 2010, this
  > Agreement shall be effective for all open taxable years beginning after December 31, 2009,

  TAA Section 6.4

PRIVILEGED & CONFIDENTIAL/SUBJECT
TO FRE RULE 408

Proskauer



# EFH is Merely A Paying Agent

- Based upon the TAA, EFH is merely an agent that (a) collects cash from members who use tax benefits of other members and (b) pays cash to members with the tax benefits.

> *Step 3*:  The additional amount allocated to members or disregarded entities pursuant to Step 2 of this paragraph 1.2 shall be paid by such members, or disregarded entities that are parties hereto, to the Common Parent on behalf of those other members that had items of income, deductions, net operating losses, or tax credits to which such total is attributable pursuant to a

TAA Section 1.2 Step 3.

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408

Proskauer



# Part II

# Alleged Preferential Tax Payment

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408





# Alleged $84.4 Preferential Tax Payment

- The $84.4M that TCEH paid EFH for "smaller issues" resulting from a settlement with the IRS for the 1997 to 2002 tax years was made in the ordinary course of business and the "subjective" test of the ordinary course of business defense (i.e., whether a transfer was ordinary between the parties to the transfer) is satisfied.  It is not dispositive that the payment arose out of an audit settlement.

- The payment is shielded by the subjective ordinary course of business defense on account of the prior course of dealing between the parties, the amount of the payment, the timing of the payment, the circumstances of the payment and the means of the payment, each of which reflects the consistency with which tax payments historically were made between and among the debtors.

- As reflected in the Grant Thornton "Report on Certain Tax Methods and Practices," the tax expense/benefit and corresponding liabilities/receivables resulting in the $84.4M payment were calculated, "trued up," recorded, adjusted and paid consistently with the debtors' historic  accounting methods and practices.

- Application of the ordinary course of business defense here supports its underlying rationale, which is to "leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or [its] creditors during the debtor's slide into bankruptcy."  *Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.)*, 78 F.3d 30, 41 (2d Cir.1996) (quoting H.R.Rep. No. 95-595 (1978) at 373, Reprinted in 1978 U.S.C.C.A.N. 5963, 6329).

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408





# Part III

# Alleged TCEH Intercompany Notes Claim

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408





# Alleged TCEH Intercompany Notes Claim

**Background**

- The intercompany notes were entered into in October 2007 in conjunction with the LBO, permitting TCEH to extend loans to EFH for general corporate purposes (the SG&A note) and for the payment of principal and interest on EFH's debt (the P&I note).

- The intercompany notes provided for an interest rate of LIBOR + 5%.
  - The intercompany notes were originally priced in 2007 based upon contemplation of several appropriate factors including market considerations and rates on both EFH and TCEH debt.
  - LIBOR + 5% was market rate of interest in October 2007.

- Loans extended pursuant to the intercompany notes were fully paid off as of January 30, 2013.

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408





# Alleged TCEH Intercompany Notes Claim (cont.)

## Reasonably Equivalent Value

The intercompany notes reflect terms comparable to those unrelated parties would have negotiated in the market and loans extended pursuant to the intercompany notes were made for reasonably equivalent value.

- Since the intercompany notes were payable on demand, there was no long-term risk.
  - TCEH management regularly considered its investment in the notes.
  - Repayment was not demanded for several reasons, including:
    - TCEH's projected ability to meet its liquidity cushion.
    - EFH/EFIH had sufficient liquidity to repay notes if needed
    - EFIH had collateral value sufficient to support the ability to repay TCEH and the demonstrated ability to raise proceeds as needed by TCEH.
    - Repayment of notes would trigger TCEH Cash Flow Sweep, taking liquidity out of TCEH – a significantly negative consequence.
  - EFH routinely made significant pay downs on the intercompany notes.
  - Interest rates were determined by contract and could not simply be rewritten "on demand."
  - Paydown of $770 million at the time of the credit agreement amendment ("Amend & Extend").

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408





# Alleged TCEH Intercompany Notes Claim (cont.)

- The intercompany notes were guaranteed by EFCH and EFIH.

- In February 2010, TCEH and EFH entered into the TCEH note, permitting TCEH to borrow up to $770 million from EFH.  The TCEH note had a stated interest rate of LIBOR + 3.5%.

  - Thus, EFH was lending money to TCEH at an even lower rate than that at which TCEH was lending money to EFH.  The TCEH rate was comparable to the TCEH revolver rate at the time. Accordingly, affiliated loans were entered into at rates used in third party transactions.

- In April 2011, lenders under TCEH's credit agreement expressly agreed that loans made pursuant to the intercompany notes were at "arm's length," and thus for reasonably equivalent value.

  - While creditors not party to the TCEH credit agreement may not have given their express consent, 99% of the lenders under the TCEH credit agreement did consent – indicative of appropriateness of interest rate and other terms.

  - If other existing creditors at the time of the publicized/disclosed credit agreement amendment did not believe the loans were for reasonably equivalent value, none of them sought a judicial determination to that effect. Only Aurelius, which first became a TCEH creditor in January 2011 when it purchased another creditor's interest, made such a claim.  Aurelius' claim was dismissed.

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408





# Alleged TCEH Intercompany Notes Claim (cont.)

– The April 2011 credit agreement amendment did not trigger a right for TCEH to demand or renegotiate the intercompany notes.  EFH was not a party to the credit agreement amendment.

## Standing

- In the context of a well-publicized transaction like an LBO, a trustee doesn't have standing to bring a state law fraudulent transfer claim under Section 544 if the unsecured creditors, as here, knew or should have known of the transaction. *U.S. Bank Nat. Ass'n. Verizon Comm'n Inc.*, 479 B.R. 405 (Bankr. N.D. Tex. 2012).

  – The EFH LBO was widely publicized.

  – The intercompany notes were entered into in conjunction with the LBO.

  – The intercompany notes, interest and outstanding balances were routinely disclosed by TCEH in public filings.

  – Post-LBO creditors had at least constructive knowledge of the intercompany notes and their terms.

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408





# Alleged TCEH Intercompany Notes Claim (cont.)

**Statute of Limitations**

- No basis to look back more than four years prior to the filing for bankruptcy.

**Interest Recalculation**

- A claim for unpaid interest, if permitted, would be limited, at best, to an "interest delta" on loan balances outstanding within the four-year reach back period, i.e., from April 30, 2010 to January 30, 2013.

- The unpaid "nominal interest" for this time period, even assuming a 10.875% interest rate (the interest rate for the EFH money pool), would be approximately $200 million.
  - Adjusting for taxes (assuming a 35% tax rate, including Texas state tax) would reduce the amount to $130 million.
  - Adjusting for a 50% litigation risk would reduce the amount to $65 million.

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408





# TCEH Intercompany Notes Claim (cont.)

- The wrong money pool rate was used in calculating an alleged "interest delta." The TCEH money pool rate (the rate at which TCEH loaned money to its affiliates) was LIBOR + 4%, up to the time of the 2011 Amend & Extend, and LIBOR + 5.03% up to the time the SG&A Note and P&I Note were fully repaid in 2013.
  - Even if one maintains a differential of 100 basis points, all one would have is a 103-basis point increase from April 2011 until time of repayment in January 2013, which represents negligible sum, particularly after factoring tax impact and litigation risk (i.e., approx. $19.6M before tax effect and litigation risk).
- Accordingly, EFH paid TCEH virtually the same interest rate that TCEH received from its subsidiaries in its own money pool.
- EFH paid a higher interest rate to TCEH than the interest rate TCEH paid to EFH.
- Market yield or trading prices of loans by itself is irrelevant.
- The LIBOR + 5% rate – which was virtually the same rate that TCEH was charging its own subsidiaries – was a proper market rate in 2007 and at all times through repayment in 2013.

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408





# TCEH Intercompany Notes Claim (cont.)

**CLAIM SUPPOSEDLY RELATED TO INTEREST ARBITRAGE–USING FUNDS BORROWED FROM TCEH AT A "LOWER INTEREST RATE" TO PURCHASE TCEH DEBT ON THE OPEN MARKET PAYING AT A HIGHER INTEREST RATE**

- No evidence that any funds EFH borrowed from TCEH under the SG&A and P&I Notes were used by EFH to purchase any TCEH Notes.
  - The P&I note was entered into to allow EFH to make principal and interest payments on EFH-issued debt, thus using such borrowings to purchase TCEH debt might have violated the provisions of the note—no evidence that it happened.

- No contract or statute prohibits EFH from "making a profit" on funds it borrowed from TCEH (if, in fact, any profit was made).

- This issue has been previously addressed in terms of supporting the propriety of the SG&A and P&I loans.

- Irrespective of lack of evidence that below market interest rate lending occurred, any damages associated with this claim are de minimus.
  - Difference between interest payments received on TCEH debt and interest paid on comparable amount of Intercompany Note debt is approximately $30M, before deducting tax impact and litigation risk.

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408





# Part IV

# EFH Holdings of TCEH Debt

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408





# EFH Holdings of TCEH Debt

**Setoff**

- Setoff of EFH prepetition note claims against TCEH claims is permissible pursuant to section 553(a).

  - The debts are mutual as between EFH and TCEH.

  - EFH's note claims and all of TCEH's alleged claims arose prior to the commencement of the chapter 11 cases.

  - None of the exceptions to section 553(a) are applicable.

  - New York law, which governs the first-lien credit agreement and the unsecured indenture, provides for setoff of mutual debts.

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408





# EFH Holdings of TCEH Debt (cont.)

- The unsecured indenture (10.25% Senior Notes due 2015) does not preclude EFH from setting off its note claims against the claims asserted by TCEH.

  - Section 6.06 only restricts an individual noteholder from exercising any remedy under the indenture upon the occurrence of an Event of Default. Section 6.06 is expressly subject to Section 6.07.

  - Section 6.07 effectively eliminates the restrictions of Section 6.06 once the notes become due and payable.  Section 6.07 provides in relevant part that "[n]otwithstanding any other provision of this Indenture, the right of any Holder of a Note to receive payment … on the Note, on or after the respective due dates expressed in the Notes …, or to bring suit for the enforcement of any such payment on or after such respective dates, shall not be impaired…."

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408





# EFH Holdings of TCEH Debt (cont.)

– Pursuant to Section 6.02 of the Indenture, the Notes became automatically due and payable upon the filing of TCEH's chapter 11 petition.  EFH is therefore free to take action to obtain payment on its Notes without regard to the rights or actions of the other noteholders (subject only to section 362(a)).

– Additionally, exercising the right of setoff to obtain payment of a valid debt does not constitute "use of the Indenture" to prejudice or obtain a preference or priority over any other noteholder under Section 6.06 (which, in any event, is qualified by Section 6.07).

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408

Proskauer



# EFH Holdings of TCEH Debt (cont.)

- The first lien Credit Agreement expressly allows individual noteholders to exercise setoff rights upon the occurrence of an Event of Default. Though the Credit Agreement arguably precludes EFH from obtaining any payment on its first lien loan claims in greater proportion than the other lenders, EFH is, at a minimum, permitted to exercise setoff rights for the percentage of its claims equal to the ultimate recovery to the TCEH first lien creditors.

- Although EFH might not be able to set off its debt claims against a fraudulent transfer judgment, TCEH asserts other claims against EFH which, if valid, would give rise to mutual debts subject to setoff.  EFH denies that it received or benefitted from any alleged fraudulent transfer of assets or obligations of TCEH.

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408

Proskauer›



# EFH Holdings of TCEH Debt (cont.)

- EFH's setoff of its debt claims against TCEH's alleged claims would not trigger the "inequity" concerns discussed in the cited case of *In re Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 896 F.2d 54 (3rd Cir. 1990).  That decision merely noted that equity could preclude Party A from offsetting a debt it owes to Party B by returning to Party B property to which it was already entitled (i.e., property held in trust or converted by Party A), or where Party A otherwise has unclean hands.  The Third Circuit found no such inequity in that case and allowed the setoff.  Although TCEH asserts contractual and other causes of action against EFH, there is no allegation that EFH is holding TCEH's property.  EFH otherwise vigorously denies that is has committed any tortious or other misconduct against TCEH.  As in *Bevill*, there is no equitable reason for denying EFH a right of setoff.

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408





# EFH Holdings of TCEH Debt (cont.)

**Equitable Subordination**

- Equitable subordination requires the court to find that (a) EFH engaged in inequitable conduct, (b) resulting in injury to creditors or an unfair advantage to EFH, and (c) subordination of its claims is not inconsistent with the Code.

    - There is no evidence that EFH engaged in any inequitable misconduct against TCEH or its creditors by acquiring TCEH notes.

        - EFH did not acquire its claims for any improper purpose (e.g., to obtain control over TCEH's restructuring, which was the linchpin of the *Citicorp* case).
        - The Third Circuit expressly declined to adopt the rule that an insider's purchase of a debtor's debt at a discount in bankruptcy is "per se" improper, even where the insider is a fiduciary (which EFH, as an indirect equity holder, is not). *Citicorp Venture Capital, Ltd. v. UCC*, 160 F.3d 982, 987 (3d Cir. 1998).

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408





# EFH Holdings of TCEH Debt (cont.)

- EFH's debt purchases have not resulted in any injury to creditors or unfair advantage to EFH.

  - EFH's positions in TCEH debt do not give it any control over TCEH's restructuring or any of its classes of claims for plan voting purposes.

  - EFH's positions do not give rise to a conflict of interest by EFH acting in a fiduciary capacity to TCEH, as EFH is not a fiduciary.

- As EFH has not committed any inequitable misconduct against TCEH in connection with its holdings of TCEH debt, subordination of such holdings is not consistent with the equitable policies of the Bankruptcy Code.

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408

Proskauer



# EFH Holdings of TCEH Debt (cont.)

- The Third Circuit's decision in Citicorp is inapposite:

  – Citicorp acquired debtor notes postpetition; EFH did not

  – Citicorp acquired its notes at less than 20% of par; no evidence has been presented regarding the price EFH paid for the notes

  – Citicorp acquired the debt to gain a blocking position in the debtors' unsecured creditor class to the detriment of the debtor and its shareholders; EFH's holdings fail to constitute a blocking position, and there is no evidence of any other improper purpose motivating the debt purchase

  – Citicorp conceded that it has a fiduciary duty to the debtor; TCEH is controlled by a board of managers, not by EFH.  No evidence to demonstrate that EFH breached any fiduciary duty, if it even had one.

  – Citicorp was found to have tried to "wrest from the prepetition creditors the valuable assets of [the debtor]"; no such facts are present here

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408





# EFH Holdings of TCEH Debt (cont.)

- Other egregious factors, such as Citicorp's withholding of material financial information from the committee and failing to inform the court of its pending debt purchases, are absent here

**Interest Payments**

- TCEH cannot recover one year of interest payments as any such payments were made in the ordinary course of TCEH's business and financial affairs.

- TCEH cannot recover four years of interest payments, as there is no basis to avoid payment of valid antecedent debt as fraudulent transfers.

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408





# Part V

# Timing of Bankruptcy/Amend & Extend

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408

Proskauer



# Timing of Bankruptcy/Amend & Extend

## TCEH Received Significant Value for the Credit Agreement Amendment

- Extension of debt maturities reduced TCEH's default risk (resulting in higher trading values across its capital structure).

- The Credit Agreement Amendment gave TCEH (including TXU Energy and Luminant Energy) greater financial flexibility, including through relaxed maintenance covenants.

- TCEH obtained ratification by its lenders that TCEH had not defaulted under the Credit Agreement and that the Intercompany Notes were made at arm's length, which, under Texas law, means they were made for reasonably equivalent value.
  - TCEH thus achieved a defense against fraudulent transfer claims on those loans, including the eventual litigation initiated by Aurelius (or others).

- Had bankruptcy been filed earlier, significant payments made by EFH on the Intercompany Notes may have become susceptible to avoidance claims as insider preferences.
  - $700 million on January 30, 2013.

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408





# Timing of Bankruptcy/Amend & Extend (cont.)

- $300 million on February 28, 2012.
- $650 million on February 6, 2012.
- $770 million on April 7, 2011.

## A Breach of Fiduciary Duty Claim Against EFH Regarding the Credit Agreement Amendment Is Questionable at Best

- An indirect parent company does not owe a fiduciary duty to a solvent wholly-owned indirect subsidiary. *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 191 (Del. Ch. 2006) *aff'd sub nom.*, *Trenwick Am. Litig. Trust v. Billett*, 931 A.2d 438 (Del. 2007).

- Even assuming insolvency, there is no uniform view concerning whether a parent company owes a fiduciary duty to a wholly-owned subsidiary.

- Assuming insolvency, and assuming that the court will accept that a fiduciary duty was owed by EFH to TCEH, a board may take action to pursue a strategy it believes will increase the corporation's value even if that involves the incurrence of additional debt, without breaching any fiduciary duty.

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408





# Timing of Bankruptcy/Amend & Extend (cont.)

- Courts have rejected a cause of action for "deepening insolvency." *In re Conex Holdings, LLC*, 514 B.R. 405, 415 (Bankr. D. Del. 2014) (Sontchi, J.).

- Decisions affecting the value of the entity as a whole are subject to the business judgment rule. *Quadrant Structured Products Co. v. Vertin*, 102 A.3d 155, 187-88 (Del. Ch. 2014).

- A lower standard of review than "entire fairness" should apply in any event because the transaction was conditioned on the affirmative vote of a majority interest of creditors. *In re Orchard Enterprises, Inc. Stockholder Litig.*, 88 A.3d 1, 24 (Del. Ch. 2014).

  - EFH does not stand on both sides of this transaction because it was not a party to the Amend & Extend agreements.

- A claim for aiding and abetting still requires the identification of a fiduciary (i.e., a person or entity other than EFH) that breached its duty, and EFH's knowing participation in that breach.

## Section 546(e) Safe Harbor

- Section 546(e) safe harbor also operates to bar constructive fraudulent transfer claims related to the April 2011 Credit Agreement Amendment transaction. Liens created through the issuance of $1.75 billion of new TCEH first lien notes in connection with the 2011 Credit Agreement Amendment transactions may be covered by the safe harbor: the creation of a lien qualifies as a "transfer" under section 101(54)(A), the initial purchasers of the TCEH first lien notes qualify as "financial participants," and the notes indenture is a "securities contract."

  - *See, e.g., In re Quebecor World (USA) Inc.*, 453 B.R. 201, 212 n.7 (Bankr. S.D.N.Y. 2011) (recognizing the "comprehensive language" of the statute, and holding that a purchase agreement for privately issued notes is a "securities contract").

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408





# Part VI

## Sponsor Fees & Shared Services

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408





# Sponsor Fees & Shared Services

**Beginning in 2010, Sponsor Fees Were Properly Allocated to TCEH**.

- The June 8, 2009 Huron Report recommended performing a "necessity and benefit" test for corporate costs and allocating qualifying costs to business units.
  - Current officers and directors confirm that the "necessity and benefit" test for sponsor fees was applied annually (after Huron Report) and fees were appropriately allocated.

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408

Proskauer



# Sponsor Fees & Shared Services (cont.)

- TCEH received significant benefits from the sponsors' ongoing provision of financial and analytical services in many areas, including the following:
  - capital structure and financing;
  - retail strategy, liquidity preservation and hedging strategies;
  - new power plants and whether to buy or mine fuel;
  - regulatory strategy and lobbying;
  - ongoing board service and related efforts in that capacity, for which sponsor representatives received no compensation (non-sponsor related board members or managers did receive compensation for such efforts); and
  - post-recession and post-natural gas price decline analyses of counterparty issues (Luminant's former CEO credited the Sponsors with conceiving an innovative hedging concept employed during the financial meltdown).

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408





# Sponsor Fees & Shared Services (cont.)

- Sponsor fees for post-LBO advisory services are a normal component of LBO deals.

- The sponsor fees were discounted, and, according to the 2008 and 2011 Dechert studies, were well within the norm for a transaction of this nature and scale.

- EFH paid 100% percent of the sponsor fees in 2008 and 2009 (a clearly disproportionate share given later allocation analyses), and would be entitled to an offset against any claim by TCEH that TCEH paid a disproportionate share of sponsor fees in any subsequent year.  This reduces any TCEH claim – if one even exists – to a negligible number.

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408

Proskauer



# Sponsor Fees & Shared Services (cont.)

- TCEH received fair value in the form of ongoing high-value financial services and support from three highly regarded Sponsors, each recognized for having deep and broad reservoirs of financial market knowledge and experience.

- Oncor was ring-fenced and independent, and thus received far less sponsor advice and consultation, if any.

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408

Proskauer



# Sponsor Fees & Shared Services (cont.)

- The Management Agreement is not avoidable.
  - The Management Agreement was executed with TXU's knowledge.
  - The Management Agreement was executed with the knowledge and consent of lenders and investors.
  - The Management Agreement was publicly filed with the SEC.
  - The Management Agreement remained operative without objection until the bankruptcy filings.
  - The Management Agreement was entered into outside the range of applicable statutes of limitation.

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408





# Sponsor Fees & Shared Services (cont.)

**Shared Services Expenses Were Properly Allocated**

- The June 8, 2009 Huron Report recommended performing a "necessity and benefit" test for shared services and allocating qualifying costs to business units.  Prior to the Huron Report, the allocation to EFH was approximately 18%.  Huron Report reasoned this was too great, and recommended a far lower percentage figure (5%).
  - Current officers and directors confirm that the "necessity and benefit" test for shared services expenses was applied annually and expenses were appropriately allocated.
  - TCEH (via TXU, Luminant and other business units) directly participated in the annual budgeting process through which anticipated and desired services were negotiated and periodically revisited and adjusted.
  - TCEH has not identified any specific expenses which TCEH contends were improperly allocated to it.

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408





# Sponsor Fees & Shared Services (cont.)

- Having paid 18% for shared services prior to 2009 – when 5% was appropriate – EFH would be entitled to an offset against any claim by TCEH that TCEH paid a disproportionate share of expenses in any subsequent year – if ever such a claim could exist.

- EFIH has no independent operations or employees, and required only minimal corporate services.  Further, Oncor was independent.

- Allocation of pre-petition restructuring fees based on face value of debt reasonably reflected the need for, and application of, professional and financial services to restructuring strategies and complexities.
  - Company legal and executive personnel believe that TCEH was fairly allocated its share of assigned expenses.

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408





# Sponsor Fees & Shared Services (cont.)

**TCEH Is Not Entitled to Any Claim Regarding the $300M Transaction Fee Paid to the Sponsors at the Time of the LBO**

- The claim is barred by applicable statutes of limitation.

- The fee was paid by EFH, not TCEH.
  - Countless references in various documents reflect that fact, including, pages 170 and 171 of the Sidley memo, the October 10, 2007 Management Agreement between EFH and the Sponsors (at paragraph 3), the spreadsheet from the Funds Transfer memo, dated October 10, 2007 (with specific line item reference to EFH), and of equal importance, the Funds Flow Memorandum, which reflects that EFH, through its bridge financing had funds available and transferred funds to Merger Sub to make this payment.
  - There is no evidence that TCEH paid this fee.

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408





# Part VII

## Alleged LBO Claims

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408





# Alleged LBO Claims

- To make a challenge to the LBO, creditors face a significant hurdle regarding the timeliness of any claims.
    - The T-side must persuade the court that not only should it be permitted to stand in the shoes of the IRS, which is not bound by expired state law statutes of limitations ("SOL") (and instead can rely on a 10-year SOL), but also that the IRS is in fact a creditor of each Debtor on whose behalf it seeks to assert an avoidance action, a fact that may well not be true for some claims under consideration here.
    - While there is some split of authority (and no decided cases in Delaware) on the permitted use of a 10-year SOL by non-IRS claimants, barring non-IRS creditors from using a 10-year SOL furthers commercial expectations.
    - If a trustee or other non-IRS creditor could recover transfers made up to 10 years before the petition date, it would eviscerate the far shorter look back periods permitted by virtually all 50 states in most bankruptcy cases, and create transactional instability (*Vaughn*).

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408





# Alleged LBO Claims (cont.)

- Even if TCEH could get over the SOL hurdle, it would also need to demonstrate that the TCEH debtors were insolvent in 2007 at the time of the LBO (i.e. solvency is a defense to fraudulent transfer claims). This is an incredibly fact-intensive (and expensive) inquiry and would be countered by, among other facts, the Duff & Phelps contemporaneous solvency opinion at the time of the LBO.

- To overcome that solvency opinion, any challenger must show that the opinion was untrue or unreasonable *at the time* it was rendered (e.g. 11 USC § 548(a)(1)(B)).

- The collapse of energy and natural gas prices, as well as the Great Recession, could not have been predicted back in 2007, although substantial hedging transactions were in place designed to protect against such a turn of events.

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408





# Alleged LBO Claims (cont.)

- Section 546(e) also stands as a bar to LBO related claims. Section 546(e) bars the avoidance of "settlement payment[s]" or "transfers made by or to (or for the benefit of) a . . . financial institution . . . in connection with securities contracts."  11 U.S.C. § 546(e).

  – As "transfers" made in connection with the TCEH Credit Agreement, the $21 billion in LBO-related liens are protected by section 546(e).

    – A "securities contract," as defined in the Bankruptcy Code, includes "any extension of credit for the clearance or settlement of securities transaction."  11 U.S.C. § 741(7)(A)(v). Additionally, the TCEH Credit Agreement financed payouts to former TXU shareholders, which constitute "the transfer of cash or securities made to complete a securities transaction."  In re Resorts Int'l, 181 F.3d 505, 515 (3d Cir. 1999).  Moreover, the Bankruptcy Code defines "transfer" to include "the creation of a lien."  11 U.S.C. § 101(54)(A).

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408

Proskauer



# Alleged LBO Claims (cont.)

- There also is a compelling argument that the "obligations" should be protected from avoidance where, as here, they are connected to a lien transfer also covered by section 546(e). *See Lehman Bros. Holdings, Inc. v. JPMorgan Chase Bank*, N.A. (*In re Lehman Bros. Holdings, Inc.*), 469 B.R. 415, 422 (Bankr. S.D.N.Y. 2012) ("[D]ismissal also is appropriate as to those counts seeking to avoid 'obligations' even though that term does not appear in section 546(e) of the Bankruptcy Code.") (Peck, J.).

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408

Proskauer



# Part VIII

## Certain Alleged Claims Against EFIH

PRIVILEGED & CONFIDENTIAL/SUBJECT
TO FRE RULE 408

Proskauer



# Certain Alleged Claims Against EFIH

**Alleged Disproportionate Payment by TCEH on pre-LBO Debt – Supposed Claim Against Oncor**

- TXU Energy and Oncor were borrowers under a single credit agreement financed by approximately two dozen lenders.
    - The maximum amount that could be borrowed at any time was $3,500,000,000. (Section 1.01, "Total Commitment").
    - Oncor had a sub-limit pursuant to which it could not borrow more than $2,800,000,000 at any time. (Section 2.01(a)).
    - Pre-LBO letters of credit were rolled into new credit facilities at the time of the LBO.

- The credit agreement does not have a provision that imposes joint and several liability on the borrowers.
    - Additionally, regulatory policy appears to have prevented the imposition of joint and several liability on Oncor. At the time of the LBO, the Texas Public Utility Commission made clear that Oncor could not be placed, under any circumstances, in a position in which it would be responsible for the debts of its parent or sister entities. There is no reason to believe that regulatory policy would have been inapplicable at the time of the formation of the credit agreement years earlier, eliminating any likelihood that Oncor and TXU Energy were jointly and severally liability under that agreement.

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408





# Certain Alleged Claims Against EFIH (cont.)

- EFH (or its predecessor-in-interest) kept a running total of borrowings by TXU Energy and Oncor.
  - On October 9, 2007, Oncor had a total outstanding balance of $385 million.
  - On October 8, 2007, TXU Energy had a total outstanding balance of $1.655 billion.
  - The next day, on October 9, TXU Energy borrowed an additional $400 million for a total balance of $2.055 billion.
    - The TXU Energy totals appear to include borrowings under both the $3.5 billion credit facility and other facilities to which Oncor was either not a party or had no outstanding balance.
    - Under the $3.5 billion credit facility alone, TXU Energy had a total outstanding balance of $1.515 billion as of early October 2007.

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408





# Certain Alleged Claims Against EFIH (cont.)

- There is documentation that shows wire transfer repayments of debt by TXU Energy and Oncor.
  - On October 9, 2007, TXU Energy paid off $1,517,415,074.09 on the credit facility upon which Oncor had also drawn.
    - The wire transfer was made to JPMorgan Chase Bank with the "Purpose" listed as "$3.5 billion Credit Facility Tranche A - $1.6 m Facility" and the "Reference" listed as "Tranche A."
  - On October 9, 2007, Oncor paid off $385,557,802.45.
    - The wire transfer was made to JP Morgan Chase Bank with the "Purpose" listed as "3.5 billion Credit Facility" and the "Reference" identified as "Oncor Credit Facility Termination Pmt."

- Oncor has no liability for any portion of TXU Energy's repayment.

- The statute of limitations applicable to the claim has run.

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408

Proskauer



# Certain Alleged Claims Against EFIH (cont.)

**Dividend of Oncor to EFH**

- This transaction took place in 2005

- It was a pre-LBO  transaction

- It falls outside any applicable Statute of Limitations

- Any challenge here is incredibly fact-intensive and creates risk of transactional instability

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408





# Certain Alleged Claims Against EFIH (cont.)

**"Make-whole" transaction – $159M payment from Luminant to EFIH in September 2012.**

- The Luminant make-whole claim relates to a prepayment in 2012 by Luminant to Oncor of approximately $159M. Under two make whole agreements, Luminant was obligated to make payments to Oncor totaling approximately $212M between 2012 and 2016. In 2012, EFIH purchased these obligations from Oncor for approximately $159M and then Luminant paid EFIH the same amount in full satisfaction of its obligations under the make whole agreements.

- The payment is not an avoidable insider preference because it was made more than one year before the filing of the Chapter 11 case and it cannot be attacked as a fraudulent conveyance because a payment on an antecedent debt is not avoidable as a fraudulent conveyance. Luminant/TCEH also received reasonably equivalent value for the money it paid – the discharge of a large obligation at a substantial discount.

- This deal was functionally cash flow neutral.  If Luminant had not bought out the make-whole claims in 2012 for $159M, Luminant would have paid through 2014 about $155M under the terms of the deal that was in place for 10 years prior to 2012, and would still have owed $53M in 2015 and 2016 – instead, Luminant obtained a discharge of the ENTIRE amount of the make-whole for $159M.
    - Reasonably equivalent value must be assessed at the time of the transaction, not later (*Fruehauf Trail*, 3rd Circuit 2006; *Peltz*, BK case in Delaware).

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408





# Part IX

## Basis Step-Up Claim

PRIVILEGED & CONFIDENTIAL/SUBJECT
TO FRE RULE 408





# Basis Step-Up Claim

- Asset sale is not feasible.

- EFH can file "check the box" elections for its subsidiaries as the owner of such subsidiaries.

- Bankruptcy courts only approve a stranded tax liability where there was no viable alternative for completing the bankruptcy.
  - See, e.g. *In re Inner City Media Corp.*, No. 11-13967 (SCC) (Bankr. S.D.N.Y. Aug. 19, 2011).

- Income realized in a taxable sale would be subject to the TAA.
  - There is approximately $15.9 billion in accumulated depreciation in TCEH which would be recaptured as ordinary income.

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408





# Basis Step-Up Claim (cont'd)

- Value to TCEH if EFH "gifts" its NOLs to TCEH
  - NOLs projected to be approximately $5 billion.
  - NOLs are property of EFH estate and TCEH is not entitled to any of the NOLs.
  - If EFH utilizes its NOLs for the benefit of the future shareholders of TCEH in connection with a tax free spin, the present value of those NOLs is estimated to be between $875 million and $1 billion.

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408

Proskauer



# Basis Step-Up Claim (cont'd)

- TCEH, as debtor in possession, would breach its fiduciary duties by allowing the T-Side First Lien Lenders to conduct a taxable asset transaction.

  - The automatic stay should not be lifted to allow the lenders to conduct state law foreclosure actions, because the validity, priority and extent of their liens are subject to avoidance and challenge.

  - No section 363 sale should be approved by TCEH – if the Lenders insist upon a sale, TCEH should file a plan and implement the sale under 1123 and 1129.

  - Lenders rights to credit bid should be limited to assets with a properly perfected lien.

  - Lenders rights to credit bid should be limited to tax basis of assets, due to their inequitable conduct in making a $20 billion plus loan on assets with a tax basis of less than $10 billion.

PRIVILEGED & CONFIDENTIAL/SUBJECT TO FRE RULE 408



**<u>EXHIBIT D</u>**



# Energy Future Competitive Holdings Company LLC

# Texas Competitive Electric Holdings Company LLC

# Presentation to Cravath, Swaine & Moore LLP

## March 16, 2015

**PRIVILEGED & CONFIDENTIAL / SUBJECT TO RULE 408**

LOS ANGELES  |  SAN FRANCISCO  |  MTO.COM

# Topics



I.   Shared Services

II.  Reimbursement (Make-Whole) Agreements

III. Repayment of Oncor Debt by TCEH

IV. Dividend of Oncor

V.  Basis Step-Up Claim

VI. Response to EFIH Claims

**PRIVILEGED & CONFIDENTIAL / SUBJECT TO RULE 408**

# Part I



# Shared Services

# Shared Services



- TCEH has claims against EFIH for constructive fraudulent transfer, contribution, indemnity, and unjust enrichment claims based upon:
    - Overallocation of shared services costs, including corporate overhead
    - Overallocation of restructuring fees and expenses prepetition
- Overallocation of shared services costs
    - Since at least 2010, shared services costs have been substantially overallocated to the T-Side
    - Historically, EFH paid approximately 18% of shared services expenses
    - Starting in fiscal year 2010, EFH began pushing down most of these costs to its business units – in practice, this meant allocating costs to the T-Side
        - No shared services costs were allocated to EFIH before 2014
        - Share of costs allocated to Oncor declined materially over same period

PRIVILEGED & CONFIDENTIAL / SUBJECT TO RULE 408

# Historical Allocation of Shared Services

**MUNGER TOLLES & OLSON LLP**

**Shared services expenses increased from $117 million in 2008 to $289 million in 2013**
**The percentage of shared services expenses allocated to the T-side increased from 59% in 2008 to 87% in 2013 whereas allocations to both EFH Corporate and Oncor declined**



Shared Services by Allocation to Business Unit ($mm)

No historical allocation to EFIH



Shared Services by Allocation to Business Unit (%)

Note: TCEH represents historical expenses allocated to Luminant and TXU Energy

Source: Company data room

**PRIVILEGED & CONFIDENTIAL / SUBJECT TO RULE 408**

5

# Shared Services: Potential Corporate Overhead[1]

MUNGER TOLLES & OLSON LLP

- Shared services include a number of corporate overhead cost categories that are likely unrelated to underlying individual business unit operations
- While EFIH is generally viewed as a pass-through entity, EFIH should have been allocated, at minimum, its proportionate share of certain corporate overhead expenses after 2010.

| Selected Categories | 2010 – 2013 Total | Actual Allocation | | | | Potential Reallocation to EFIH | | |
|---|---|---|---|---|---|---|---|---|
| | | EFH | Oncor | TCEH | EFIH | 20% | - | 40% |
| Corporate Board & Related Expenses | $18 | ~$0 / 0% | ~$0 / 1% | $18 / 99% | $0 / 0% | $4 | - | $7 |
| TXU Corporate Controller & Admin | $25 | ~$0 / 0% | $2 / 6% | $24 / 94% | $0 / 0% | $5 | - | $10 |
| Corporate Planning | $11 | ~$0 / 1% | $2 / 19% | $9 / 81% | $0 / 0% | $2 | - | $4 |
| Finance & Investor Relations | $16 | ~$0 / 2% | ~$0 / 0% | $16 / 98% | $0 / 0% | $3 | - | $7 |
| Corporate Secretary & Governance | $7 | ~$0 / 0% | ~$0 / 2% | $7 / 98% | $0 / 0% | $1 | - | $3 |
| Corp. Development & Strategy | $10 | ~$0 / 0% | ~$0 / 0% | $10 / 100% | $0 / 0% | $2 | - | $4 |
| Business Services Administration | $23 | $1 / 3% | $3 / 12% | $19 / 85% | $0 / 0% | $5 | - | $9 |
| Corporate Tax | $29 | ~$0 / 0% | $7 / 26% | $22 / 74% | $0 / 0% | $6 | - | $12 |
| External Affairs | $62 | $13 / 20% | ~$0 / 1% | $49 / 79% | $0 / 0% | $12 | - | $25 |
| Sponsor Fees[2] | $141[2] | $0 / 0% | $0 / 0% | $141 / 100% | $0 / 0% | $28 | - | $57 |
| Total | $345 | $14 / 4% | $14 / 4% | $317 / 92% | $0 / 0% | $69 | - | $138 |
| Underallocation | | | | | | ($69) | - | ($138) |

(1) Preliminary assessment.  Subject to further diligence
(2) Represents cash share only.  Total expenses of $152 million

# Allocation of Prepetition Restructuring Fees

MUNGER TOLLES & OLSON LLP

- Restructuring fees and expenses were largely allocated based on the face value of debt
  - o This methodology unfairly penalized TCEH and did not fairly allocate fees based on the prepetition focus of the restructuring
  - o Per the Interim Compensation Order, post-petition fees are allocated based on direct and indirect benefits conferred to the Debtors
  - o Reallocating prepetition fees based on post-petition allocation percentages confirms that EFIH was underallocated > $25 million



Note: Advisors that work exclusively for one constituency not included. Includes Alvarez & Marsal, Deloitte & Touche, Epiq, Enoch Kever, Ernst & Young, Evercore, Filsinger, Gibson Dunn, Kirkland & Ellis, McDermott Will & Emery, Perry Street, PwC, Richards Layton, Sidley Austin, Thompson & Knight and certain advisors classified as "Other" by the Debtors (Advanced Discovery, Bryan Cave, Cousins Chipman & Brown, Cross and Simon, Haynes and Boone, Shearman & Sterling, Hunton & Williams, Bingham McCutchen and Potter Anderson Corroon); Reallocated fee numbers apply cumulative post-petition average fee percentage allocations, as disclosed in monthly fee statements filed through 3/1/2015. Allocations based on both direct and indirect fees as defined in the Interim Fee Order.  Pre-petition fees  and allocations per Company (Deloitte prepetition fees as disclosed in retention application filed 5/29/2014)
Source: Court filings (Monthly Fee Statements filed to date), diligence materials

# Part II



# Reimbursement (Make-Whole) Agreements

# Reimbursement Agreements



- Background
  - In connection with deregulation, EFCH, Luminant, Oncor, and other TXU entities entered into a Master Separation Agreement dated as of December 14, 2001 ("MSA")
    - Pursuant to the MSA, EFCH transferred certain regulatory assets to Oncor
    - Oncor subsequently securitized the regulatory assets
- Tax Reimbursement Agreement (2002)
  - Luminant agrees to reimburse Oncor for federal income tax associated with the Generation-Related Regulatory Assets
- Interest Reimbursement Agreements (2002 and 2004)
  - Under the 2002 agreement, Luminant agreed to reimburse Oncor for the "financing costs" incurred by Oncor as a result of carrying Generation-Related Regulatory Assets on its books
  - Under the 2004 agreement, Luminant agreed to reimburse Oncor for "the difference between the present value and book value of the Generation-Related Regulatory Assets"

**PRIVILEGED & CONFIDENTIAL / SUBJECT TO RULE 408**

# Reimbursement Agreements



- Settlement of Reimbursement Agreement

  - In 2012, Oncor decided that it wanted to reduce its credit exposure to Luminant in anticipation of T-Side restructuring

  - Oncor therefore proposed that Luminant buy out its remaining obligations under the Reimbursement Agreements

  - In an effort to minimize its exposure to an avoidance claim when Luminant filed for bankruptcy, Oncor insisted that Luminant make any settlement payment directly to EFIH rather than to Oncor

  - Oncor thus agreed to assign its purported rights under the Reimbursement Agreements to EFIH in exchange for $159M

  - Luminant paid the same amount ($159M) as settlement consideration directly to EFIH

  - In the event of a bankruptcy, Oncor would have an unsecured claim and would be subject to insider preference and fraudulent transfer liability for payments received in the year before the petition date

PRIVILEGED & CONFIDENTIAL / SUBJECT TO RULE 408

# Reimbursement Agreements



- TCEH has claims against EFIH and Oncor to avoid the $159M settlement payment as a fraudulent transfer

  - Insider fraudulent transfer claim

    - Under the UFTA (adopted in Texas and Delaware), a transfer is fraudulent as to present creditors if the transfer was made (1) to an insider (2) for an antecedent debt, (3) the debtor was insolvent at the time, and (4) the insider had reasonable cause to believe that the debtor was insolvent.

    - All of these elements are satisfied

    - Luminant's estate can avoid the one-year statute of limitations by stepping into the shoes of the IRS under 11 U.S.C. § 544(b), *see In re Porras*, 312 B.R. 81 (Bankr. W.D. Tex. 2004)

  - By stepping into the shoes of the IRS, Luminant's estate can avoid other payments made under the Reimbursement Agreements during the period that Oncor had "reasonable cause to believe" that Luminant was insolvent

    - EFIH/Oncor Exposure:  more than $309M (with 4-year reach-back period)

**PRIVILEGED & CONFIDENTIAL / SUBJECT TO RULE 408**

# Reimbursement Agreements



o   Actual fraudulent transfer

    o   Luminant has a claim to avoid the $159M settlement in September 2012 as an actual fraudulent transfer

    o   Several statutory and non-statutory badges of fraud are present:

        o   Transfer to an insider

        o   Luminant was insolvent and Oncor was aware of its financial condition

        o   The transaction was structured in anticipation of a potential avoidance claim in the event that Luminant filed for bankruptcy

        o   Oncor received more from the settlement than it would have received on a claim against Luminant's bankruptcy estate, *see Quadrant Structured Prods. Co. v. Vertin*, 102 A.3d 155, 169 (Del. Ch. 2014) (denying motion to dismiss actual fraudulent transfer claim on analogous facts)

# Part III



# Repayment of Oncor Debt by TCEH

# Repayment of Joint Credit Facility



- Background

  o Before the LBO, TCEH and Oncor were joint borrowers under $4.5B of joint credit facilities

  o As of the LBO, amounts outstanding under the joint credit facilities were approximately $2.4B

  o In the LBO, TCEH repaid approximately $2B of the joint credit facility, while Oncor repaid approximately $385M

- TCEH has a claim against Oncor for fraudulent transfer based on payment of debt for which Oncor was jointly liable

  o TCEH can avoid state law statutes of limitations by stepping into the shoes of the IRS under 11 U.S.C. § 544(b)

  o There is at least a triable issue as to whether the LBO rendered TCEH insolvent

**PRIVILEGED & CONFIDENTIAL / SUBJECT TO RULE 408**

# Repayment of Joint Credit Facility



- Oncor was jointly liable with TCEH for all borrowings under the revolving credit agreements

  o   The revolving credit agreements are governed by New York law

  o   Under New York law, when two or more entities take on an obligation, there is a presumption of joint liability, and express words of severance are required to overcome the presumption.  *See Dallas Gas Partners, L.P. v. Prospect Energy Corp.*, 733 F.3d 148, 160 (5th Cir. 2013) (applying New York law)

  o   The TCEH/Oncor revolving credit agreements do not contain any express words of severance

**PRIVILEGED & CONFIDENTIAL / SUBJECT TO RULE 408**

# Part IV



# Oncor Dividend

# Oncor Dividend



- Oncor was formerly a wholly-owned subsidiary of EFCH (f/k/a TXU US Holdings)

  o EFCH dividended its shares in Oncor to EFH

  o EFCH did not receive any consideration from EFH for the dividend

  o There is evidence that this dividend may have occurred as part of the October 2007 LBO

    o Exhibit 21 to EFH's 10-K for 2006 reflects that, as of December 31, 2006, Oncor remained a subsidiary of EFCH

- To the extent that the dividend can be collapsed into the LBO transaction, the dividend is vulnerable to challenge as a constructive fraudulent transfer

  o EFCH clearly did not receive reasonably equivalent value

  o No contemporaneous solvency analysis in connection with the dividend

  o EFCH can step into the shoes of the IRS under 11 U.S.C. §544(b) to avoid state law statutes of limitations on avoidance actions

## Part V



# Basis Step-Up Claim

# Taxable Sale



- A tax-free transaction requires TCEH to forgo the value of a full step-up in basis

- A TCEH taxable sale is a viable alternative to a tax-free spin of TCEH

  o Whether TCEH "checks the box" to become a regarded entity is controlled by the TCEH independent manager

  o Bankruptcy courts have approved stranded tax transactions

  o The Tax Allocation Agreement is subject to rejection or avoidance

- A taxable sale of TCEH would prevent a tax-free transfer of Oncor through an EFH reorganization

- A taxable sale of TCEH could allocate material liability to EFIH

  o For example, assume that TCEH, a disregarded entity, has $10 of ordinary income and $100 of capital gain, EFIH, a disregarded entity, has $10 of ordinary income, and EFH Corporation has no independent items of income or loss

  o Under these facts, there is a Consolidated Tax Liability of $42 (assuming a 35% tax rate) and under the first step of the TAA, it would be allocated first to EFH Corporation and then sub-allocated to its disregarded entities, TCEH and EFIH, based on their proportionate share of the EFH Group's ordinary income

  o No additional amount would be allocated under the second step of the TAA

  o 50% (10/20) of the $42 would therefore be allocated to EFIH, making EFIH liable for $21 under the TAA

# Sensitivity Analysis: Full vs. Partial Step-up in Basis



**Value of Full Step-up versus Partial Step-up in Basis[1]**

| Delta Between Full and Partial Step-up in Basis | | | | | | |
|---|---|---|---|---|---|---|
| | | Illustrative TCEH Value ($mm) | | | | |
| | | $13,000 | $14,500 | $16,000 | $17,500 | $19,000 |
| **Discount Rate** | 6.0% | $363 | $678 | $992 | $1,307 | $1,622 |
| | 7.0% | $337 | $630 | $922 | $1,215 | $1,507 |
| | 8.0% | $315 | $587 | $860 | $1,133 | $1,406 |
| | 9.0% | $294 | $549 | $804 | $1,060 | $1,315 |
| | 10.0% | $276 | $515 | $754 | $994 | $1,233 |

- A taxable transaction would provide the T-Side with additional value ranging from $276M to $1,622M depending on TCEH's enterprise value and the discount rate

- Assumes value associated with partial step-up fully available to TCEH

Note: Simplified calculations for illustrative purposes.  Analysis is dependent on available NOL balance, among other factors.  Based on range of discount rates and discounted to December 31, 2015
(1)    Assumes Company-provided MACRS depreciation of step-up in basis, 35% tax rate, and sufficient net income available to realize tax benefits for illustrative purposes
(2)    Based on ~$4.6 billion NOL estimate as of emergence and ~$6.7 billion tax basis
Source: Company presentation and filings, restructuring data room

# Part VI



# Response to EFIH Claims

# Repayment of TCEH Intercompany Notes



- Relevant Timeline:

    o October 2007:  EFH and TCEH entered the original intercompany notes (P&I and SG&A)

    o November 2008:  EFH used some of the proceeds from the sale of a minority interest in Oncor to pay off the P&I Note in full

    o May 2009:  EFH and TCEH entered into a new P&I Note, but with the addition of a guarantee from EFIH

    o April 7, 2011:  EFIH guaranteed SG&A Note

    o February 2012:  EFIH issued $1.15B in new debt and dividended $950M to EFH, which EFH used to repay a portion of P&I Note

    o August 2012:  EFIH issued $850M of new debt; $680M of proceeds were held in escrow for EFH to repay TCEH intercompany notes

    o January 2013:  EFH paid approximately $700M to TCEH in satisfaction of remaining obligations under the intercompany notes

PRIVILEGED & CONFIDENTIAL / SUBJECT TO RULE 408

# Repayment of TCEH Intercompany Notes



- EFIH has asserted that it has avoidance claims based upon the February and August 2012 dividends that financed the repayment of intercompany notes (the "Challenged Transfers")

- Three purported claims

  o "Insider" fraudulent transfer

  o Constructive fraudulent transfer

  o Preference

- As demonstrated on the following slides, these claims lack merit for several reasons:

  o EFIH was solvent at the time of the Challenged Transfers

  o EFIH received reasonably equivalent value in exchange for the transfers

  o Any preference claim is time-barred

  o Even if EFIH could avoid the Challenged Transfers, recovery would not confer a benefit on EFIH estate

**PRIVILEGED & CONFIDENTIAL / SUBJECT TO RULE 408**

# Repayment of TCEH Intercompany Notes



- Solvency is an essential element of any potential claim to avoid the Challenged Transfers

- Here, the evidence is overwhelming that EFIH was solvent when it made the Challenged Transfers

  - Contemporaneous with the February 2012 and January 2013 transfers, EFIH management prepared solvency calculations showing that EFIH was balance-sheet solvent by a substantial margin

  - During the same period, EFIH represented to underwriters of the debt offerings that it was solvent under all three solvency tests

  - Market evidence further supports EFIH solvency at the time of the Challenged Transfers

    - EFIH access to the credit markets

    - Trading prices of EFIH unsecured debt

  - Deloitte issued clean audit opinions for EFIH

  - EFIH is currently solvent

**PRIVILEGED & CONFIDENTIAL / SUBJECT TO RULE 408**

# Repayment of TCEH Intercompany Notes

- EFIH represented to underwriters that it was solvent under all three applicable tests:
  - o Balance-sheet
  - o Adequacy of capital
  - o Ability to pay debts



Energy Future Holdings Corp.
Energy Future Intermediate Holding Company LLC
EFIH Finance Inc.

Dealer Manager Agreement

December 21, 2012

c/o Goldman Sachs, & Co.
200 West Street
New York, New York 10282

Ladies and Gentlemen:

Energy Future Intermediate Holding Company LLC, a Delaware limited liability company ("EFIH"), and EFIH Finance Inc. a Delaware corporation ("EFIH Finance"), plan, on the terms and subject to the conditions described in the Offer Material (as defined below) to make offers

(bb)    EFIH, at the Commencement Date and immediately after the Exchange Date, will be Solvent. As used herein, the term "Solvent" means, with respect to EFIH on a particular date, that on such date (i) the fair market value of the assets of EFIH is greater than the total amount of liabilities (including contingent liabilities) of EFIH, (ii) the present fair salable value of the assets of EFIH is greater than the amount that will be required to pay the probable liabilities of EFIH on its debts as they become absolute and matured, (iii) EFIH is able to realize upon its assets and pay its debts and other liabilities, including contingent obligations, as they mature and (iv) EFIH does not have unreasonably small capital.

# Repayment of TCEH Intercompany Notes



- Market evidence reinforces the conclusion that EFIH was solvent at the time of the Challenged Transfers

  - EFIH unsecured debt was trading near par



  - There was robust demand for EFIH debt issued in February 2012 and August 2012

    - Investors were aware that proceeds of debt issuances would be used to repay intercompany notes

# Repayment of TCEH Intercompany Notes



- Even if EFIH could prove that it was insolvent at the time of the Challenged Transfers, its claims would fail for other reasons

- Insider fraudulent transfer
  - o EFIH cannot show that TCEH had any reason, let alone "reasonable cause," to believe that EFIH was insolvent at the time of the Challenged Transfers, Del. Code Ann. tit. 6, §1305; *see also* Texas Bus. & Comm. §24.006(b) (same)

- Constructive Fraudulent transfer
  - o EFIH guaranteed the TCEH intercompany notes and therefore received reasonably equivalent value
  - o Guarantees provided in 2009 and 2011 are not avoidable

- Preference
  - o Any preference claim is untimely:  One-year reach-back period for insider preference claims is a substantive element of the claim and cannot be tolled
  - o Earmarking:  Proceeds of debt issued by EFIH in February 2012 and August 2012 were earmarked for repayment of intercompany notes (thereby discharging EFIH guarantee obligations)

PRIVILEGED & CONFIDENTIAL / SUBJECT TO RULE 408

# Repayment of TCEH Intercompany Notes



- Even if EFIH could avoid the Challenged Transfers, it could not recover from TCEH

- To recover on an avoidance action, EFIH must show that recovery would benefit the estate (*Adelphia Recovery Trust v. Bank of Am., N.A.*, 390 B.R. 80 (S.D.N.Y. 2008))

- As noted above, EFIH guaranteed the obligations of EFH to TCEH under the TCEH intercompany notes
  - If a court avoided the Challenged Transfers, TCEH would have a claim against EFIH based on these guarantees
  - TCEH would recover 100% on its guarantee claim against EFIH
  - The parties would be left in the same position that they would have been in absence of avoidance and recovery
  - Accordingly, the EFIH estate would not benefit from recovery

**PRIVILEGED & CONFIDENTIAL / SUBJECT TO RULE 408**

# EFIH Holdings of TCEH Debt:  No Setoff



- EFIH holds approximately $79M of 10.25% TCEH Unsecured notes due 2015
- EFIH will not be able to setoff these debt holdings against its liability on claims by TCEH and Luminant
  - EFIH cannot setoff TCEH notes until it has repaid liability on avoidance actions (11 U.S.C. § 502(d))
  - EFIH cannot setoff TCEH notes against avoidance action liability to Luminant (lack of mutuality)
  - The indenture for the 10.25% unsecured notes bars setoff
    - "No-action" clause (§ 6.06) bars a noteholder from pursuing individual remedies without support of other noteholders
    - "No-action" clause also bars a noteholder from obtaining "a preference or priority" over other holders
    - EFIH thus is barred from using setoff to receive greater recovery than other noteholders (to the detriment of the other noteholders)

**PRIVILEGED & CONFIDENTIAL / SUBJECT TO RULE 408**

**<u>EXHIBIT E</u>**

### EFIH PRELIMINARY RESPONSE TO T-SIDE CLAIMS AND DEFENSES

Counsel for Energy Future Competitive Holdings Company LLC ("**EFCH**") and Texas Competitive Electric Holdings Company LLC ("**TCEH**") (the "**T-Side**") presented their view of intercompany claims against Energy Future Intermediate Holdings Company LLC ("**EFIH**") and the T-Side's defenses to EFIH's intercompany claims against the T-Side on March 16, 2014. This memorandum responds at a high level to that presentation, discussing the T-Side's claims in the order in which the T-Side presented its claims and defenses. This memorandum is not intended to waive EFIH's ability or right to assert any additional or more detailed defenses or to waive any claim, defense, or legal right if matters are not resolved consensually.

### I.     T-Side Claims Against EFIH

T-Side counsel presented five claims against EFIH, each of which is discussed below. In summary, the T-Side might have a legal basis for its claims for misallocation of shared services and restructuring fees, if there were any such misallocation, but the history of shared services allocations shows that EFIH paid all or nearly all its fair share. EFIH does not have liability on buyout of the Reimbursement (Make-Whole) Agreements, as it was merely facilitating an agreement that was reached between Oncor and Luminant whereby Luminant was able to settle its outstanding liabilities under the Reimbursement (Make-Whole) Agreements at a 20.5% discount rate. Any claim with respect to the joint credit facility claims would be a claim only against Oncor, not EFIH, and Oncor and TCEH each repaid their respective shares of the borrowings. The only evidence arguably supporting the T-Side's fourth claim for the transfer of Oncor to EFIH is a simple typographical error; none of the operative documents suggest otherwise. Finally, the T-Side's loss in basis step-up does not give rise to a legal claim, only a request for consideration and negotiated compensation.

A.      **Shared Services**

The T-Side asserts claims against EFIH for "overallocation" of (i) shared services costs and (ii) prepetition restructuring fees and expenses. The T-Side assserted claims for constructive fraudulent transfer, contribution, indemnity, and unjust enrichment to recover any overallocation but does not address how it would meet the elements for any of those claims. If some limited reallocation of shared services costs and prepetition fees to EFIH were appropriate, the allocation methods the T-Side proposed do not take account of the actual use of services.

1.      <u>Allocation of shared service costs.</u>

The T-Side claims that "[s]ince at least 2010, shared service costs have been substantially overallocated to the T-Side." (T-Side Presentation at 4.) The T-Side argues that EFIH "should have been allocated, at minimum, its proportionate share of certain corporate overhead expenses after 2010." (T-Side Presentation at 6.) The T-Side suggests that EFIH's proportionate share of the corporate overhead expenses is between 20% and 40% of the corporate overhead expenses. EFIH disagrees.

*First*, EFH determined the shared services costs from 2010 through 2013 by specified allocation methods, including: time required, share of total business services' billings, assets, embedded controller headcount, and multifactor formulas. (*See* 1.1.10.1.1 PEO-2012 Business Services SLA.) The allocations to the T-Side were made under those allocation methods, and the T-Side has not identified why any of those methods resulted in an "overallocation" to the T-Side. The T-Side points to the percentage amounts paid by the T-Side, but the T-Side does not identify what, if anything, was improper about the allocation methods that were used. The T-

Side proposes to use face value of debt or enterprise value as the allocation method.[1] The T-Side has not explained why either of those metrics more fairly allocates shared services costs than the allocation methods that were used.

The T-Side properly bears the lion's share of the shared services, as it uses them the most. EFIH has few, if any, employees and is effectively a single asset holding company for a ring-fenced, independent-board controlled company. It uses little of the services. In addition, Oncor has its own corporate services so it too makes less use of shared services but pays separately for what it receives.

*Second*, the T-Side proposes to reallocate a portion of shared services that fall into a grouping, which the T-Side has invented, called "potential corporate overhead", which are those services that, according to the T-Side, are "likely unrelated to underlying individual business unit operations". (T-Side Presentation at 6.)[2] "[U]nrelated to underlying individual business unit operations" should not be the starting point for any reallocation; the starting point should be whether the shared services actually involve or service the business unit.

There are some service categories in the T-Side's list that do not involve EFIH. For example, "External Affairs" covers costs related to political and government lobbying and public policy advocacy. (*See* 1.1.10.1.1 PEO-2012 Business Services SLA at 68-79.) EFIH, as a holding company, does not use those services, and thus EFIH should not be allocated any portion of those costs. "Corporate Secretary & Governance" relates to coordination of EFH board and committee meetings, physical security, effective training to address employee safety,

---

[1] It is not clear whether the T-Side proposes to use the petition date to assess face value of debt and enterprise value or use some other date.

[2] The T-Side's potential corporate overhead list is composed of ten "Selected Categories" of shared services. The names of those ten Selected Categories do not all match the categories in the historical shared services spreadsheet. For example, "Corporate Board & Related Expense" is not a category on the historical spreadsheet. In addition, it is difficult to determine which shared services within a category have been included to arrive at the totals in the T-Side's chart on slide 6 of the T-Side's presentation.

training regarding the Code of Conduct, and ethics and compliance matters. (*See* 1.1.10.1.1 PEO-

2012 Business Services SLA at 49.) Those services are not ones that EFIH as a holding company

uses.

      The T-Side's list also includes a category called "Corporate Board & Related Expenses",

which is not a specifically listed category in the historical shared costs spreadsheet. That

category seems to correspond with certain costs that are part of the Business Services

Administration category in the historical spreadsheet.[3] Those costs include the following:

"Board of Directors Expense", "Board of Directors – Non Cash", "Board of Directors Comp –

Cash". On their face those descriptions would suggest that they should be allocated across the

business units. However, under the 2014 SLA, which re-evaluated the methods of allocation and

includes allocations to EFIH, the allocation of these costs is again 100% to TCEH as it was in

2010-2013. (*See* 1.1.10.2.1 PEO-EFIH SSA at 40.) Thus, EFIH should not have any responsibility

for those costs.

      The T-Side's list also includes the LBO "Sponsor Fees". EFIH should not have any

responsibility for paying any portion of those fees, because EFIH was not involved in the LBO

debt financing. To the extent EFIH issued debt during the Liability Management Program for

which the Sponsors may have been involved, EFIH issued that debt for the benefit of EFH and

the T-Side. As a result, EFIH believes those fees should be borne by EFH and the T-Side, not

EFIH.

      *Third*, to the extent shared services are reallocated for any shared service category, EFIH

should be allocated only a portion for the services within any category that it used, not the total

costs across the category. The 2014 SLA is instructive on this point. It allocates to EFIH a portion

---

[3] "Business Services Administration" is also listed as a selected category on the T-Side's list.

of the costs for only six categories of services and only for certain services within those six

categories.[4] (*See* 1.1.10.2.1 PEO-EFIH SSA.)

*Fourth*, reallocating 20% to 40% to EFIH regardless of the category of shared service or

the year is not a better method of allocation. The 2014 SLA allocation methods are more accurate

than the 20% to 40% the T-Side proposed. For example, for certain expenses such as Treasury

Administration and Investor Relations, the 2014 SLA uses the "Face Value of Debt Method" to

allocate percentages, and for 2014, the Face Value of Debt Method results in 20% of both of

those costs to EFIH. (*See* 1.1.10.2.1 PEO-EFIH SSA at 29-30.) However, EFIH's outstanding debt

was not always 20%; it was much less in 2010, 2011 and 2012. Thus, EFIH's percentage of those

expenses would be less in 2010 than in 2014. Therefore, applying 20% for all four years would

not result in a fair allocation. In addition, it does not appear that enterprise value was ever used

as a method of allocation from 2010-2013 for any of the shared services for which EFIH has been

allocated a percentage of costs under the 2014 SLA.[5]

The numbers the T-Side presented using the 20% to 40% allocation shifted the costs too

far. Based on an April 2014 presentation on the allocation of shared services under the 2014

SLA, EFIH's fair portion of shared services was approximately 1.5% of the annual shared

services costs. That amount for 2014 was about $4.3 million. (*See* 1.4.10.1.3 PEO-EFIH Service

Bill Allocations 4.11.14 at 3.) That amount was consistent with the estimate Michael Carter

provided during due diligence meetings with Conflicts Counsel; he stated that EFIH's

allocation would be approximately $4 million per year.

---

[4] The six categories (and the specific services within the category where EFIH has an allocation for 2014) are: (1) Business Services Administration (Business Service Administration and Sponsor Fees); (2) Corporate Tax (Corporate Tax Project); (3) Corporate Consolidation (Corporate Consolidations); (4) Treasury (Treasury Administration and Investor Relations); (5) Corporate Controller (Controller Administration); and (6) Legal Services (Internal Legal).

[5] In addition, EFIH's total enterprise value is not 40% of the combined enterprise values of the T-Side and EFIH, as the T-Side argues. EFIH's total enterprise value is significantly less and has varied from year-to-year.

*Last*, it is unclear what portion, if any, of shared services costs to be reallocated to EFIH should benefit the T-Side, as opposed to EFH or Oncor.

> 2.    Allocation of Restructuring Fees.

The T-Side argues that it was "overallocated" prepetition restructuring fees. EFIH understands prepetition restructuring fees were billed directly to a company if the services could be directly allocated to the company (*e.g.*, EFH, EFIH, TCEH). Prepetition restructuring services that could not be allocated to a specific company were allocated based on the face amount of debt. (T-Side Presentation at 7.) The T-Side argues that using the face amount of debt was unfair because the T-Side had the most debt and the allocation was not based on the prepetition focus of the restructuring.

Using outstanding debt to allocate prepetition restructuring fees that could not be directly allocated to a particular company is not inherently unfair. The percentages of outstanding debt that were used for the allocation were 20% for EFIH, 75% for the T-Side and 5% for EFH, which is consistent with how some of the shared services costs are allocated in the 2014 SLA using the same percentages. Indeed, the T-Side even proposed using 20% for reallocating shared services costs because it was the value of the outstanding debt for EFIH.

The T-Side proposes that the prepetition restructuring fees should based more on "the prepetition focus of the restructuring". (T-Side Presentation at 7.) EFIH, while open to considering a reallocation, believes that the T-Side had the most outstanding debt and has a complicated capital structure so it should bear a large portion of the prepetition restructuring costs. By contrast, EFIH was a holding company with a relatively straightforward capital structure with less debt, so less restructuring services were needed. Indeed, if prepetition restructuring fees should be "based on the prepetition focus of the restructuring", EFIH would

have a claim that *it* was overallocated, since its restructuring needs were minimal compared to

EFH's and the T-Side's.

The T-Side argues that the post-petition fee allocation percentages "confirm" that EFIH

was underallocated prepetition restructuring fees. (T-Side Presentation at 7.) EFIH's

understanding of the post-petition restructuring fee allocation is that if the fees cannot be

directly allocated to a specific estate, they are allocated based on the percentages of

restructuring fees that are billed directly to the estates. Thus, if one estate receives more

attention in a particular period, and thus has more direct billings, its share of the shared fees

will increase. Here, EFIH received more attention shortly after the petition was filed, but that

attention has now shifted to the T-Side. Using the percentages for post-petition fees therefore

would be skewed against EFIH as they simply reflect where the attention has been, not on the

overall appropriate allocation.

Even if there were to be a reallocation of prepetition restructuring fees, it is not clear

how much of the reallocation amount should be paid to the T-Side, as opposed to EFH.

### B.    Reimbursement (Make-Whole) Agreements

The T-Side asserts that it has both a constructive fraudulent transfer claim and an actual

fraudulent transfer claim against EFIH and Oncor to avoid the $159 million Oncor make-whole

settlement payment. EFIH is not responsible for any claims the T-Side might have against

Oncor.

### 1.    The settlement payment was made beyond the reach-back period.

T-Side can bring claims related to the Oncor make-whole payment only if it can step into

the shoes of the IRS and use the 10-year reach-back. (T-Side Presentation at 11.) The ability to

use that statute is unclear. *In re Vaughan Co.*, 498 B.R. 297, 305 (D.N.M. 2013) (holding that a

trustee who sought to avoid transfers under New Mexico's UFTA could not make use of the IRS

reach-back).

2.    <u>There is virtually no evidence of actual intent.</u>

There is virtually no evidence to support an actual fraudulent transfer claim. *First*, there

is no direct evidence of intent to hinder, delay, or defraud. *Second*, as to circumstantial evidence

and as the T-Side acknowledges, there are at most four badges of fraud (including insolvency,

discussed below). Courts often dismiss claims that are based on only a few badges of fraud,

particularly where, as here, many other badges point in the opposite direction. *See ASARCO*

*LLC v. Americas Mining Corp.*, 396 B.R. 278, 374 (S.D. Tex. 2008); *In re Gulf Fleet Holdings, Inc.*, 491

B.R. 747, 767-68 (Bankr. W.D. La. 2013); *In re Midway Games Inc.*, 428 B.R. 303, 325 (Bankr. Del.

2010). And the statute is clear that the court may consider the presence or absence of all badges.

Del. Code Ann. tit. 6 § 1306(b).

3.    <u>There was reasonably equivalent value and no reasonable cause to
believe Luminant was insolvent.</u>

A constructive fraudulent transfer claim requires proof of that the debtor did not receive

reasonably equivalent value. Del. Code Ann. tit. 6 §§ 1304(a)(2), 1305(a); 11 U.S.C. § 548(a)(1)(B).

Luminant likely received reasonably equivalent value in the transaction. To satisfy its

antecedent debt owing to Oncor, Luminant paid $159 million, which represented a present

value discount of Luminant's remaining obligation of $212 million at a 20.5% present value

discount rate. Further, EFIH would not have had reasonable cause to believe Luminant was

insolvent at the time, as Deloitte issued a clean audit opinion for that year.

    4.    <u>Any payments made under the Reimbursement Agreements are not recoverable from EFIH.</u>

Any payments under the Reimbursement Agreements to Oncor the T-Side seeks to recover should be made against Oncor, not EFIH. Other than the $159 million settlement payment, EFIH did not receive payments under the Reimbursement Agreements.

## C.    Repayment of Joint Credit Facility

The T-Side asserts a constructive fraudulent transfer claim against Oncor based on the repayment of joint credit facilities at the time of the LBO closing. (T-Side Presentation at 15.) The T-Side bases its claim on the general background presumption of joint liability, unless the governing contract states otherwise. But the TCEH/Oncor revolving credit agreements at issue provide for several—not joint—repayment obligations for "each Borrower" to "each Lender". (*See* TXU Energy Company and TXU Electric Company Revolving Credit Agreement (Mar. 31, 2005), at 25; *see also* EFCH/TCEH Credit Agreement (Oct. 10, 2007), at 181 *and* Oncor Revolving Credit Agreement (Oct. 10, 2007), at 79.) Thus, the T-Side's claim for repayment is without merit.

## D.    Oncor Dividend

The T-Side argues that there might be evidence that the Oncor Dividend occurred as part of the October 2007 LBO, based on Exhibit 21 to EFH's 10-K for year-end 2006 that purports to show Oncor as a subsidiary of EFCH. (T-Side Presentation at 17.) To the contrary, there is simply an error in that exhibit.

Company management stated that the location of TXU Electric Delivery Company (Oncor) in the Subsidiary Hierarchy in EFH's 2006 10-K is an indentation error. TXU Electric Delivery Company was not a subsidiary of TXU US Holdings Company in 2006. Company management was not sure whether the error was in the original Word document or whether it

was done by the financial printer, but it was just a mistake. The Subsidiary Hierarchy in EFH's

2005 10-K shows TXU Electric Delivery properly positioned as a subsidiary of TXU Corp, and

not of TXU US Holdings.

### E.    Basis Step-Up Claim

The T-Side does not assert a legal basis for the claim; there is none. Discussions on this

matter, if any, would be based on other considerations.

## II.    T-Side Responses To EFIH Claims

EFIH has claims against TCEH for the repayment of the TCEH Intercompany Demand

Notes. In October 2007, EFH issued a P&I Note and a SG&A Note (collectively the "**Demand**

**Notes**"), which were payable on demand to TCEH. EFIH and EFCH guaranteed the P&I Note in

May 2009 and the SG&A Note in April 2011. In February 2012, EFIH issued $1.15 billion of debt

and dividended $950 million of the proceeds to EFH, which in turn used that money to pay

down the P&I Note. In August 2012, EFIH issued $850 million of debt and put $680 million of

the proceeds in escrow. On January 30, 2013, EFIH dividended the $680 million to EFH, which

in turn used the money to satisfy the obligations under the Demand Notes. The offering

memoranda for the EFIH debt issuances in February and August 2012 state that proceeds from

the offerings would be dividended to EFH for EFH to repay the Demand Notes. The T-Side

maintains that EFIH does not have a valid fraudulent transfer or preference claim.

### A.    EFIH Has a Valid Fraudulent Transfer Claim Against TCEH as the Entity for whose Benefit a Fraudulent Transfer was Made.

Under § 550(a)(1), a trustee may recover from the entity "for whose benefit" an avoided

transfer was made. Here, EFIH has fraudulent transfer avoidance claims against EFH for the

February 2012 and January 2013 dividends under 11 U.S.C. § 548(a)(1)(B). EFIH may recover

from TCEH because the dividends were made to EFH for TCEH's benefit.

1.    <u>EFIH has valid fraudulent transfer claims against EFH.</u>

EFIH has fraudulent transfer claims under 11 U.S.C. § 548(a)(1)(B) as well as under the Delaware UFTA, Del. Code Ann. tit. 6 § 1305. The dividends satisfy the elements of § 548(a)(1)(B) because EFIH did not receive reasonably equivalent value from EFH in exchange for the dividends and EFIH was insolvent or in a distressed financial condition when it made the dividends.

The dividends also satisfy the elements under the Delaware UFTA for an insider preference. EFIH made a transfer to an insider (EFH) for the benefit of a creditor (TCEH) on account of an antecedent debt (the guarantee on the Demand Notes) when EFIH was insolvent and when EFH had reasonable cause to believe that EFIH was insolvent. *See* Del. Code Ann. tit. 6 § 1305(b).

a.    *EFIH was insolvent in February 2012 and January 2013.*

The T-Side offered five arguments regarding EFIH's solvency. (T-Side Presentation at 24.) Solvency is measured "on the date that such transfer was made". 11 U.S.C. § 548(a)(1)(B)(ii).

*First*, the T-Side argues that "[c]ontemporaneous with the February 2012 and January 2013 transfers, EFIH management prepared solvency calculations showing that EFIH was balance-sheet solvent by a substantial margin." (T-Side Presentation at 24.) Those calculations were not formal solvency analysis. It is also not clear when EFIH management performed those informal calculations. Furthermore, any informal calculations would have been based on Duff & Phelps' valuations of Oncor, but those valuations were not as of the dates of the dividend transactions.[6]

---

[6] The valuation date for a Duff & Phelps valuation report closest to any of the dividend payments dates was December 1, 2012. That valuation date is too late to be of any relevance to the February 2012 dividend. December 1, 2012 is not a meaningful valuation date for the January 2013 dividend either, as EFIH continued to issue debt in December 2012 and January 2013.

PRIVILEGED AND CONFIDENTIAL

To be sure, EFIH's insolvency in February 2012 might be a close call, but the numbers do support a finding of EFIH being insolvent in February 2012. EFIH, in February 2012, had almost $3.9 billion of its own debt, had guaranteed more than $1.8 billion of EFH's debt and had guaranteed the Demand Notes under which more than $640 million was outstanding at the time. The value of EFIH's stake in Oncor in February 2012 was between $4.6 and $5.6 billion.

By January 2013, EFIH's debt had increased substantially. EFIH had more than $7.7 billion of its own debt, had guaranteed $54 million of EFH debt, and at the time of the dividend had the guarantees on the Demand Notes under which approximately $700 million remained outstanding. The value of EFIH's stake in Oncor was between $5.1 billion and $6.2 billion.

Even if EFIH was balance-sheet solvent, EFIH was insolvent under the cash-flow test in February 2012 and January 2013. In February 2012, depending on underlying assumptions, EFIH was facing a cash-flow shortfall of almost $4 billion by 2013, with an implied price to earnings multiple required for refinancing of almost 14 times. In January 2013, EFIH was facing a cash flow shortfall of almost $8.7 billion within one year with an implied price to earnings multiple required for refinancing of more than 28 times.

*Second*, the T-Side argues that EFIH represented to underwriters that it was solvent, but a representation does not make it so. The representations might have expressed management's belief, but there were no formal solvency analyses done, and any informal calculations management did were based on Oncor valuations that were not as of the time of the dividends.

The representations also are not a defense to EFIH's claims under the Delaware UFTA. The UFTA determines whether EFH, despite whatever representations EFIH made, had "reasonable cause to believe" EFIH was insolvent. It imposes an objective test. By virtue of its management of EFIH, EFH had "reasonable cause to believe" that EFIH was insolvent if the underlying facts would have shown insolvency. *See* 3 Collier on Bankruptcy ¶ 60, 53 (14th ed.)

(stating that reasonable cause to believe exists when a "state of facts is brought to the creditor's notice, respecting the affairs and pecuniary condition of the debtor, as would lead a prudent business person to the conclusion that the debtor is insolvent"); *see also In re Henwood & Nowak*, 27 F.2d 888, 889 (D. Mass. 1928) (a subsidiary corporation receiving payment from its insolvent parent corporation within four months of bankruptcy was chargeable with knowledge of the insolvency of the parent).

*Third*, that EFIH was able to access credit markets and how the market responded does not establish that EFIH was solvent at the time of the dividend in February 2012 or January 2013. As the court in *In re Tronox* stated, the fact that a company was able to issue secured debt to the market "does not deserve any weight in the solvency analysis". 503 B.R. 239, 298 (Bankr. S.D.N.Y. 2013).

The T-Side also argues that EFIH's unsecured debt was trading "near par". (T-Side Presentation at 26.) The only information the T-Side provides is on EFIH 11.25/12.25% Senior Toggle Notes which were issued in December 2012. The T-Side provides no information about the trading of EFIH debt throughout 2012. Furthermore, EFH unsecured debt guaranteed by EFIH (*see* EFH 10.875% Notes and EFH 11.25/12.2% PIK Notes), which can be viewed as a proxy for EFIH unsecured debt, was trading at a significant discount throughout 2012 and into January 2013.

The T-Side's last argument that EFIH is "currently solvent" is not simply relevant. For there to be a constructive fraudulent transfer, EFIH need only be insolvent "on the date that such transfer was made". 11 U.S.C. § 548(a)(1)(B)(ii). That EFIH might have become solvent after the transaction is of no moment.

         b.      *EFIH did not receive reasonably equivalent value.*

EFIH received nothing from EFH in exchange for the dividends and thus did not receive reasonably equivalent value. The T-Side argues EFIH received reasonably equivalent value because EFIH was released as the guarantor of the Demand Notes. The T-Side can prevail on that argument only if the two transactions—EFIH's dividends to EFH and EFH's payment to TCEH—are collapsed. The collapsing doctrine is an equitable doctrine to protect general creditors, not to preserve otherwise voidable transactions. *See generally Chase Manhattan Mortgage Corp. v. Shapiro (In re Lee)*, 530 F.3d 458 (6th Cir. 2008) (refusing to collapse separate transfers to permit assertion of earmarking defense). A court looking at these transactions may treat the dividends simply as dividends.

Furthermore, because the transfers were structured as dividends rather than direct payments by EFIH to TCEH, EFIH lost its contribution claim against EFH as the principal obligor of the Notes. EFIH did not receive anything for the loss of its contribution claim against EFH and thus did not receive reasonably equivalent value.

        2.       <u>EFH was not a mere conduit</u>.

The mere conduit defense does not apply here. Although the Offering Memoranda stated that proceeds from the issuances would dividended to EFH to repay the Demand Notes, EFH was not bound to use the funds from the dividend to repay the Demand Notes. EFH could have redirected the funds for its own use. Accordingly, EFH exercised dominion and control over the funds dividended by EFIH and therefore was not a mere conduit. *See In re Lambertson Truex, LLC*, 458 B.R. 155, 158-59 (Bankr. D. Del. 2011).

**B.      EFIH Has Valid Preference Claims for the Dividends.**

Alternatively, EFIH may avoid the dividend payments as preferences under 11 U.S.C. § 547(b). The February 2012 and January 2013 dividends were made for the benefit of a creditor,

TCEH, a fact made clear in the February 2012 and August 2012 offering memoranda. The dividends were made on account of the guarantees of the Demand Notes, which constitute antecedent debts. *See In re Nirvana Rest. Inc.*, 337 B.R. 495, 502 (Bankr. S.D.N.Y. 2006). The dividends were also made when EFIH was insolvent. The January 2013 dividend was made within the one-year reach-back period covered by the tolling agreement. The February 2012 dividend would be actionable under the UFTA provision for preferential transfers to an insider, Del. Code Ann. tit. 6, §1305(b), if the IRS ten-year reach-back period applies.

The T-Side argues that the one-year reach-back period for insiders is a substantive element and cannot be tolled. But reach-back periods in the bankruptcy code are statutes of limitation that may be tolled, both in equity and by agreement of the parties. *See In re Stanwich Financial Services Corp.*, 291 B.R. 25, 28 (Bankr. D. Conn. 2003); *see also Young v. United States*, 535 U.S. 43, 49-50 (2002) ("It is hornbook law that limitations periods are customarily subject to equitable tolling …. That is doubly true when [Congress] is enacting limitations periods to be applied by bankruptcy courts, which are courts of equity and apply the principles and rules of equity jurisprudence.") (internal quotation marks omitted).

The T-Side's earmarking defense is also inapplicable. Although the offering memoranda for the February 2012 and August 2012 offerings state that EFIH would dividend the proceeds to EFH and EFH would use the proceeds to pay down the Demand Notes, EFIH was not required to make the dividends to EFH. Therefore, there was no agreement for purposes of the earmarking defense. *See In re Winstar Communs. Inc.*, 554 F.3d 382, 401-02 (3d Cir. 2009). The fact that EFIH was not obligated to make the dividends to EFH can be seen in the escrow agreement for the August 2012 offering, which contains no mandate that the funds be used solely for the purpose of repayment of the Demand Notes.

### C.    Recovery of the Dividends Would Benefit EFIH's Estate.

Recovery of the dividends used to pay off the Demand Notes would benefit EFIH's estate. Whether an avoidable transfer action is for the benefit of the estate is determined as of the petition date. *In re Asarco LLC*, 513 B.R. 499 (S.D. Tex. 2014). Here, EFIH was insolvent as of the petition date. As a result, TCEH would not recover 100% on its hypothetical revived guarantee claim, because the claim would be treated as a general unsecured claim. The recovery would result in a net benefit to EFIH.

Furthermore, only an "allowed" claim may share in distribution. 11 U.S.C. § 502(a). Section 502(d) requires the court to "disallow any claim of an entity from which property is recoverable" under the avoidance provisions of the Bankruptcy Code unless the entity "has paid the amount" for which it is liable. 11 U.S.C. § 502(d). Here, EFIH's avoidable transfer claims against the T-Side bar the T-Side's claims against EFIH until the T-Side returns the value of the dividends. The disallowance of the T-Side's claims under § 502(d) provides a benefit to the EFIH estate as well.

**EXHIBIT F**

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY LLC**
**TEXAS COMPETITIVE ELECTRIC HOLDINGS COMPANY LLC**

Disinterested Manager Meeting

April 1, 2015

*Highly Confidential*

# Topics

I.   **Diligence**

II.   **Prepetition Intercompany Claims**

III.   **Settlement**

*Highly Confidential*

**3**

# Part I

# Diligence

*Highly Confidential*

**4**

# Diligence

- **Overview**
    - MTO, Greenhill, and the Disinterested Manager have conferred almost daily since November 16, 2014 regarding, among other matters, the governance process, the bankruptcy case, the Oncor bid process, conflict matters, intercompany claims, the plan process, and the work and advice of MTO and Greenhill on those matters.
    - On November 18, 2014, the Disinterested Manager, MTO, and Greenhill met with the professionals to the TCEH Creditors Committee, second lien TCEH creditors, the unsecured TCEH creditors, and the first lien TCEH creditors on what they viewed as conflict matters in the bankruptcy cases and the material issues in the bankruptcy cases, including, among other matters, aspects of the governance process, intercompany claims, the plan process, the bid procedures hearing, and the November 3 Court ruling on the Oncor bid procedures motion.
    - MTO and Greenhill have reported to and discussed with the Disinterested Manager information and diligence gathered in the course of their work and in the course of their various meetings with the Debtors and with constituents in the cases, including meetings and presentations on intercompany claims between TCEH, EFH, and EFIH.

*Highly Confidential*

# Diligence

- **Disinterested Manager Meetings Related to Intercompany Claims**
  - Following extensive diligence beginning in November 2014, the Disinterested Manager met, among other times, with MTO and Greenhill regarding the investigation and analysis of intercompany claims on the following dates:

    | | |
    |---|---|
    | • February 17, 2015 | • March 18, 2015 |
    | • February 18, 2015 | • March 24, 2015 |
    | • March 13, 2015 | • March 25, 2015 |
    | • March 15, 2015 | • March 26, 2015 |
    | • March 16, 2015 | |

  - The Disinterested Manager met with the disinterested directors of EFH on the following occasions:
    - February 18, 2015
    - March 20, 2015
    - March 24, 2015
    - March 25, 2015
    - March 26, 2015

  - The Disinterested Manager also met with the disinterested manager of EFIH

  - The Disinterested Manager participated in a presentation to EFCH/TCEH boards of managers on Conflict Matters and intercompany claims on February 25, 2015

- **Boards of Managers of EFCH/TCEH**
  - The Disinterested Manager, in his capacity as a member of the EFCH/TCEH boards, has regularly interacted with senior management of the Debtors about the intercompany claims

  - The Disinterested Manager, in his capacity as a member of the EFCH/TCEH boards, has also interacted with senior management of the TCEH operating businesses and received reports about the performance of these businesses

*Highly Confidential*

# Diligence

- **Presentations and Meetings on Intercompany Claims Against EFH**

  - The Disinterested Manager reviewed with MTO and Greenhill a presentation for EFH on TCEH's claims against EFH, dated March 5, 2015

  - EFH provided a responsive presentation dated March 11, 2015, which the Disinterested Manager reviewed and discussed with MTO and Greenhill

  - MTO and Greenhill also had several meetings with Proskauer and reported to the Disinterested Manager on those meetings.  These included meetings on the following dates:

    - February 19, 2015
    - March 5, 2015
    - March 9, 2015
    - March 11, 2015
    - March 12, 2015
    - March 16, 2015
    - March 18, 2015

    - March 20, 2015
    - March 22, 2015
    - March 23, 2015
    - March 24, 2015
    - March 25, 2015
    - March 26, 2015

*Highly Confidential*

# Diligence

- **Presentations and Meetings on Intercompany Claims Against EFIH**

  - The Disinterested Manager reviewed with MTO and Greenhill a presentation to EFIH on TCEH's claims against EFIH, dated March 16, 2014

  - EFIH provided a responsive memorandum on March 20, 2015, which the Disinterested Manager reviewed and discussed with MTO and Greenhill

  - MTO and Greenhill also had several meetings with Cravath and reported to the Disinterested Manager on those meetings.  These included meetings on the following dates:

    - January 9, 2015
    - February 24, 2015
    - March 6, 2015
    - March 16, 2015
    - March 19, 2015
    - March 25, 2015

*Highly Confidential*

# Diligence

- MTO, at the request of the Disinterested Manager, engaged in extensive diligence regarding intercompany claims, including:

  - Meetings and calls with advisors to the Debtors and to TCEH creditor groups

  - Review of documents, work product, and diligence materials prepared by Kirkland and Sidley on behalf of the Debtors

  - Review of the Debtors' data rooms for the restructuring and for the Oncor sale process and responses to diligence inquiries

  - Searches on the Debtors' legacy production database

  - Review of tax structuring and claim issues, including the private letter ruling request, the competitive tax allocation agreement and related documents, and historical tax sharing practices, settlements, financial records, and SEC disclosures

  - Interviews of the Debtors' personnel

  - Requests for and review of additional materials from Debtors

  - Meeting with and soliciting input from TCEH creditor constituents regarding intercompany claims

*Highly Confidential*

# Diligence

- **Meetings with the Debtors' Advisors:** MTO met with the Debtors' advisors for background, relevant facts, documents, and prior work product and analysis, relating to intercompany claims:

  - November 17, 2014 with Kirkland, Evercore
  - December 10, 2014 with Kirkland, Evercore
  - December 17, 2014 with Kirkland
  - December 23, 2014 with Kirkland
  - January 2, 2015 with Kirkland
  - January 6, 2015 with Kirkland
  - January 12, 2015 with Kirkland
  - January 19, 2015 with Sidley
  - January 28, 2015 with Kirkland
  - January 29, 2015 with Kirkland
  - February 3, 2015 with Kirkland, Evercore
  - February 5, 2015 with Kirkland
  - February 25, 2015 with Kirkland
  - March 2, 2015 with Kirkland
  - March 5, 2015 with Zolfo, consultant to Sidley
  - March 24, 2015 with Kirkland
  - March 25, 2015 with Kirkland

*Highly Confidential*

# Diligence

- **Meetings with the TCEH Creditor Constituents and Other Constituents:** MTO met with the advisors to various TCEH creditor constituents and other constituents (and principals where noted):
  - November 18, 2014 with TCEH Creditors Committee, TCEH First Liens, TCEH Second Liens, TCEH Ad Hoc Unsecureds
  - November 19, 2014 with TCEH Creditors Committee, TCEH Second Liens, TCEH Ad Hoc Unsecureds
  - November 25, 2014 with TCEH Creditors Committee, TCEH Second Liens, TCEH Ad Hoc Unsecureds
  - December 2, 2014 with TCEH Creditors Committee, TCEH First Liens, TCEH Second Liens, TCEH Ad Hoc Unsecureds
  - December 4, 2014 with TCEH Creditors Committee, TCEH Second Liens, TCEH Ad Hoc Unsecureds
  - December 5, 2014 with TCEH Creditors Committee, TCEH Second Liens, TCEH Ad Hoc Unsecureds
  - December 10, 2014 with TCEH Creditors Committee, TCEH Second Liens, TCEH First Liens
  - December 11, 2014 with TCEH Ad Hoc Unsecureds
  - December 17, 2014 with TCEH Creditors Committee, TCEH Second Liens, TCEH Ad Hoc Unsecureds
  - January 6, 2015 with TCEH Creditors Committee
  - January 8, 2015 with EFH Equity Holders Tax Counsel
  - January 14, 2015 with TCEH Creditors Committee (including members of the TCEH Creditors Committee)
  - February 4, 2015 with TCEH Creditors Committee, TCEH Second Liens
  - February 5, 2015 with TCEH Creditors Committee, TCEH First Liens, TCEH Second Liens
  - February 11, 2015 with TCEH Creditors Committee

(continued on next slide)

*Highly Confidential*

# Diligence

- **(Cont.) Meetings with the TCEH Creditor Constituents and Other Constituents:**

  - February 13, 2015 with TCEH Creditors Committee
  - February 23, 2015 with TCEH Creditors Committee, TCEH First Liens
  - March 3, 2015 with TCEH Creditors Committee
  - March 4, 2015 with TCEH First Liens
  - March 9, 2015 with EFH Equity Holders
  - March 10, 2015 with EFH Equity Holders
  - March 11, 2015 with TCEH Ad Hoc Unsecureds
  - March 12, 2015 with TCEH Creditors Committee, TCEH First Liens, TCEH Ad Hoc Unsecureds
  - March 12, 2015 with EFH Equity Holders
  - March 13, 2015 with TCEH Creditors Committee
  - March 17, 2015 with TCEH Creditors Committee, TCEH Ad Hoc Unsecureds
  - March 19, 2015 with TCEH First Liens
  - March 23, 2015 with Fidelity
  - March 25, 2015 with EFH Equity Holders
  - March 26, 2015 with EFH Equity Holders
  - March 26, 2015 with TCEH Creditors Committee
  - March 27, 2015 with TCEH Creditors Committee, TCEH Second Liens, TCEH Ad Hoc Unsecureds
  - March 27, 2015 with TCEH Creditors Committee
  - March 30, 2015 with TCEH Creditors Committee

- MTO also participates in weekly / bi-weekly tax calls with the Debtors, Kirkland, and advisors to the TCEH Creditors Committee, TCEH Second Liens, and the TCEH Ad Hoc Unsecureds.

*Highly Confidential*

# Diligence

- **Review of Prior Work:**  MTO received and reviewed the work product of advisors to the Debtors, including:

  - Kirkland memorandum on intercompany transactions and potential claims arising from the liability management program

  - Kirkland memorandum on intercompany transactions and potential claims arising from transactions other than the liability management program

  - Kirkland memorandum on tax issues and tax structuring in a plan of reorganization

  - The Private Letter Ruling submission

  - Prior board materials and presentations for TCEH and joint board meetings

  - Sidley memoranda on the potential claims arising from the 2007 leveraged buyout, the relevant legal authority, and the relevant factual background

  - Sidley presentations to the TCEH and joint boards on the 2007 leveraged buyout and claims against the sponsors

  - Sidley interview memoranda and core documents used in preparing its reports on the 2007 leveraged buyout

  - Grant Thornton report on intercompany tax allocation practices

  - Zolfo materials prepared in connection with work of Sidley on the potential claims arising from the 2007 leveraged buyout

*Highly Confidential*

# Diligence

- **Review of Debtors' Data Rooms:**  MTO received access to the data rooms for the restructuring and for the Oncor sale process

  - MTO reviewed the documents posted to the restructuring data room and Oncor sale data room that were relevant to intercompany claims

- **Review of Legacy Database:**  MTO received access to the legacy discovery production database

  - MTO reviewed documents in the database identified by targeted investigation and diligence

  - MTO ran several dozen search strings on the document database designed to find the documents most relevant to the intercompany claims, and reviewed the documents identified by the search terms

  - MTO reviewed the Debtors' privilege logs for additional documents and reviewed selected materials

- **Diligence Requests to the Debtors:**  MTO reviewed additional information and documents provided by the Debtors in response to more than a dozen MTO supplemental diligence requests

*Highly Confidential*

# Diligence

- **Interviews of Debtors' Personnel:**  MTO and Greenhill have met with personnel from the Debtors regarding facts relating to intercompany claims:

    - December 17, 2014: Tony Horton (SVP & Treasurer), Michael Carter (SVP, Corporate Planning & Assistant Treasurer), Andy Wright (VP & Deputy General Counsel)

    - January 28, 2015: Horton, Carter, Wright, Kris Moldovan (VP & Assistant Treasurer)

    - January 29, 2015: Carla Howard (VP & General Tax Counsel), Kevin Ashby (Senior Director, Tax)

    - February 3, 2015: Horton, Carter, Wright, Moldovan

    - March 24, 2015: Howard, Ashby

    - March 24, 2015: Horton, Carter, Wright, Moldovan

- MTO and Greenhill have had multiple discussions with Stacey Doré (General Counsel) and Paul Keglevic (CFO) regarding intercompany claims

*Highly Confidential*

# Overview of Greenhill's Key Diligence Performed

**Since Greenhill's Retention on November 17, 2014**

**Since Greenhill's retention in November 2014, Greenhill has engaged in extensive diligence in connection with representing the TCEH and EFCH Disinterested Manager**

- **Since its retention in November 2014, Greenhill has performed extensive diligence in connection with the assignment.  Key diligence areas include:**
  - ‣ Oncor sale process (including bidding procedures)
  - ‣ Analysis of plan frameworks and plan proposals
  - ‣ Analysis of tax considerations
  - ‣ Analysis in support of MTO's investigation of potential intercompany claims

- **In support of its diligence, Greenhill has reviewed a substantial number of documents**
  - ‣ Review of the Consolidated Debtors' data room for the restructuring, data room for the Oncor sale process, and prior board materials and presentations as provided
  - ‣ Review of supplemental documents, work product and diligence materials provided by Evercore
  - ‣ Review of documents of the Consolidated Debtors' legacy production database as provided by MTO
  - ‣ Review of Zolfo work product prepared in connection with Sidley's LBO analysis

- **Greenhill has also engaged in diligence sessions with the Consolidated Debtors and its advisors as well as advisors to the various constituents**
  - ‣ Meetings and calls with advisors to the Consolidated Debtors, advisors to the TCEH creditor constituents and other advisors are listed on the following pages

- **Greenhill has also met with advisors to the other independent directors to discuss and negotiate potential intercompany claims**

*Highly Confidential*

# Timeline of Greenhill Diligence Meetings

### Since Greenhill's Retention on November 17, 2014

In addition to the meetings listed, Greenhill professionals have had regular discussions and calls with MTO and the Disinterested Manager

Further, Greenhill has participated in regularly scheduled EFH and TCEH Board Meeting calls as well as Evercore's bi-weekly sale process updates

| Date | Meeting Form | Parties Attending (other than GHL and MTO) | Topic(s) |
|---|---|---|---|
| Nov. 17 | Call | Cravath, Evercore, Kirkland & Ellis | Overview Discussion |
| Nov. 18 | In-Person | Houlihan, White & Case | Overview Discussion |
| Nov. 18 | In-Person | Millstein, Paul Weiss | Overview Discussion |
| Nov. 21 | In-Person | Evercore | Overview Discussion |
| Nov. 21 | Call | Houlihan | Overview Discussion |
| Nov. 25 | Call | Lazard | Overview Discussion |
| Nov. 25 | Call | Millstein | Overview Discussion |
| Nov. 26 | Call | Houlihan | Overview Discussion |
| Dec. 2 | In-Person | Evercore, Houlihan, Lazard, Millstein | Global Plan Settlement Discussions |
| Dec. 2 | In-Person | Blackstone, Wachtell | Global Plan Settlement Discussions |
| Dec. 8 | In-Person | Evercore | Overview Discussion |
| Dec. 10 | In-Person | Cravath, Evercore, Kirkland & Ellis, Proskauer | Global Plan Settlement Discussions |
| Dec. 10 | In-Person | Brown Rudnick, Evercore, Kirkland & Ellis, Peter J. Solomon | Global Plan Settlement Discussions |
| Dec. 10 | In-Person | Evercore, Kirkland & Ellis, Millstein, Paul Weiss | Global Plan Settlement Discussions |
| Dec. 10 | In-Person | Evercore, Kirkland & Ellis, Lazard, Morrison & Foerster | Global Plan Settlement Discussions |
| Dec. 11 | In-Person | Evercore, Houlihan, Kirkland & Ellis, White & Case | Global Plan Settlement Discussions |
| Dec. 18 | In-Person | Evercore | Valuation & Sale Process |
| Jan. 2 | Call | Evercore | Sale Process |
| Jan. 6 | In-Person | Lazard, Morrison & Foerster | Overview Discussion |
| Jan. 6 | In-Person | EFH, EFIH and TCEH independent advisors | Plan Process and Sale Process |
| Jan. 7 | Call | Guggenheim | Global Plan Settlement Discussions |
| Jan. 8 | In-Person | Brown Rudnick, Houlihan, Lazard, Morrison & Foerster, White & Case | Plan Process |
| Jan. 14 | Call | Millstein | Global Plan Settlement Discussions |
| Jan. 15 | In-Person | Lazard, Morrison & Foerster | Global Plan Settlement Discussions |
| Jan. 21 | Call | Centerview | Global Plan Settlement Discussions |
| Jan. 22 | In-Person | Evercore | Global Plan Settlement Discussions |
| Jan. 23 | Call | Evercore | Global Plan Settlement Discussions |
| Jan. 29 | Call | Zolfo | Potential Conflict Claims |
| Jan. 30 | Call | Lazard | Global Plan Settlement Discussions |
| Feb. 1 | Call | Millstein | Global Plan Settlement Discussions |
| Feb. 3 | In-Person | Company representatives, EFH, EFIH and TCEH independent advisors, Evercore, Kirkland & Ellis | Potential Conflict Claims |
| Feb. 4 | In-Person | Brown Rudnick, FTI, Lazard, Morrison & Foerster | Potential Conflict Claims |
| Feb. 5 | In-Person | Paul Weiss | Global Plan Settlement Discussions |
| Feb. 7 | Call | Evercore | Global Plan Settlement Discussions |
| Feb. 7 | Call | Centerview | Global Plan Settlement Discussions |
| Feb. 11 | Call | Kirkland & Ellis, Lazard, Morrison & Foerster | Global Plan Settlement Discussions |
| Feb. 11 | Call | Morrison & Foerster, Lazard | REIT Discussion |
| Feb. 12 | Call | Evercore | Global Plan Settlement Discussions |
| Feb. 12 | Call | Millstein | Global Plan Settlement Discussions |
| Feb. 13 | Call | Evercore | Global Plan Settlement Discussions |
| Feb. 19 | Call | Evercore | Global Plan Settlement Discussions |

*Highly Confidential*

# Timeline of Greenhill Diligence Meetings

### Since Greenhill's Retention on November 17, 2014 (cont'd)

| Date | Meeting Form | Parties Attending (other than GHL and MTO) | Topic(s) |
|---|---|---|---|
| Feb. 23 | In-Person | Kirkland & Ellis, Evercore, Lazard, Morrison & Foerster | Global Plan Settlement Discussions |
| Feb. 23 | In-Person | Cravath | Potential Conflict Claims |
| Mar. 3 | Call | Evercore | Sale Process |
| Mar. 3 | In-person | Millstein | Global Plan Settlement Discussions |
| Mar. 5 | In-Person | Proskauer / Solic | Potential Conflict Claims |
| Mar. 5 | In-Person | Zolfo, Solic, Proskauer, Cravath | Potential Conflict Claims |
| Mar. 5 | In-Person | Evercore | Sale Process |
| Mar. 6 | Call | Evercore | Sale Process |
| Mar. 6 | Call | Cravath and Goldin | Potential Conflict Claims |
| Mar. 9 | Call | Evercore | Diligence Requests |
| Mar. 10 | Call | Sponsor Professionals | Potential Conflict Claims |
| Mar. 10 | Call | Company representatives, K&E | Potential Conflict Claims |
| Mar. 10 | Call | Evercore | Sale Process |
| Mar. 11 | In-Person | Proskauer, Solic | Potential Conflict Claims |
| Mar. 12 | In-Person | Kirkland & Ellis, Evercore, Millstein, Paul Weiss | Tax Summit |
| Mar. 12 | In-Person | Kirkland & Ellis, Evercore, Morrison & Foerster, Lazard | REIT Discussion |
| Mar. 12 | In-Person | Kirkland & Ellis, Evercore, White & Case, Houlihan | REIT Discussion |
| Mar. 12 | In-Person | Proskauer, Solic | Potential Conflict Claims |
| Mar. 12 | Call | Sponsor Professionals | Potential Conflict Claims |
| Mar. 13 | Call | Millstein | Global Plan Settlement Discussions |
| Mar. 16 | Call | Proskauer, Solic | Potential Conflict Claims |
| Mar. 16 | Call | Houlihan | Global Plan Settlement Discussions |
| Mar. 16 | Call | Cravath, Goldin | Potential Conflict Claims |
| Mar. 17 | Call | Evercore | Global Plan Settlement Discussions |
| Mar. 17 | In-Person | TCEH UCC Professionals | Potential Conflict Claims |
| Mar. 17 | In-Person | TCEH Unsecureds Professionals | Potential Conflict Claims |
| Mar. 22 | Call | Solic, Proskauer | Global Plan Settlement Discussions |
| Mar. 23 | Call | Solic, Proskauer | Global Plan Settlement Discussions |
| Mar. 24 | Call | Company representatives, Kirkland & Ellis | Tax Diligence |
| Mar. 24 | In-person | Company representatives, Kirkland & Ellis, Evercore, Proskauer, Solic, Cravath, Goldin | Potential Conflict Claims / Global Plan Settlement Discussions |
| Mar. 24 | Call | Company representatives, Kirkland & Ellis | Potential Conflict Claims |
| Mar. 25 | In-person | Company representatives, Kirkland & Ellis, Evercore, Proskauer, Solic, Cravath, Goldin | Potential Conflict Claims / Global Plan Settlement Discussions |
| Mar. 26 | In-person | Company representatives, Kirkland & Ellis, Evercore, Proskauer, Solic, Cravath, Goldin | Potential Conflict Claims / Global Plan Settlement Discussions |
| Mar. 30 | Call | FTI Consulting, Morrison & Foerster | Potential Conflict Claims |

*Highly Confidential*

Part II

# Prepetition Intercompany Claims

*Highly Confidential*

# Potential TCEH Claims

| Claim | Potential Defendant(s) |
|---|---|
| Claims related to intercompany tax sharing, including unpaid tax sharing obligations for TCEH-generated NOLs, audit settlements, and avoidable transfers | EFH |
| Claims related to allocation of shared services and related transfers, including letters of credit, use of unencumbered cash, allocation of restructuring fees, allocations of pension and OPEB obligations, and rabbi trust funds held in an account at EFH | EFH, EFIH, Oncor |
| Claims related to sponsor fees and other payments to sponsors | EFH, Sponsors, EFIH, Oncor |
| Claims related to underpayment of interest by EFH on TCEH intercompany notes | EFH, TCEH Directors, EFH Directors, Sponsors |
| Claims related to the entry into the TCEH Credit Agreement and amendments and extensions of that agreement | EFH, TCEH Directors, EFH Directors, Sponsors |
| Claims related to 2007 LBO, including claims related to the use and transfer of TCEH borrowings | EFH, Sponsors |

*Highly Confidential*

# Potential TCEH Claims (cont.)

| Claim | Potential Defendant(s) |
|---|---|
| Claims related to TCEH-issued debt held by EFH and EFIH, including subordination or recharacterization, and avoidance of interest payments | EFH, EFIH |
| Claims related to allocation of value resulting from tax-free spin-off of TCEH and reduced step-up in tax basis of TCEH assets | EFH, EFIH |
| Claims related to dividend of shares of Oncor to EFH | EFH, EFIH |
| Claims related to the Reimbursement (Make Whole) Agreements between Luminant and Oncor | EFIH, Oncor |
| Claims related to payments by TCEH retail businesses to Oncor for transmission and delivery services | Oncor |
| Claims related to TCEH's repayment of joint credit facility with Oncor in 2007 | EFIH, Oncor |
| Substantive consolidation of estates | EFH, EFIH |

*Highly Confidential*

# Potential EFH and EFIH Claims

| Claim | Potential Plaintiff(s) |
|---|---|
| Holdings of debt issued by TCEH and setoff of those holdings against claims asserted by TCEH | EFH, EFIH |
| Claims related to dividends from EFIH to EFH that EFH used to repay the TCEH Intercompany Notes in February 2012 and January 2013 | EFIH |
| Claims related to intercompany tax sharing | EFH |

*Highly Confidential*

# Part III

# Settlement

*Highly Confidential*

# Disinterested Manager Authority

- On November 7, 2014, the Debtors filed a notice of the existence of actual conflicts between the Debtors and that EFH, EFIH, and EFCH/TCEH would engage independent counsel for conflict matters.

- Pursuant to his delegated authority, Hugh Sawyer, as the Disinterested Manager of EFCH and TCEH, engaged Munger, Tolles & Olson LLP as counsel on November 16, 2014 and Greenhill & Co. as financial advisor on November 17, 2014, on conflict matters.

- The EFCH and TCEH boards adopted further resolutions on conflict matters on December 9, 2014 by which, among other things, EFCH and TCEH:

  - Defined a "Conflict Matter" as any matter "on which an actual conflict exists between EFCH or its direct and indirect subsidiaries, on the one hand, and any other Debtor, on the other hand"

  - Delegated to the Disinterested Manager "the authority to review and act upon" any Conflict Matter and "the authority to investigate and determine whether any matter constitutes a Conflict Matter"

  - Delegated to the Disinterested Manager "the authority to make all decisions, and to implement or direct the implementation of all such decisions . . . with respect to Conflict Matters"

*Highly Confidential*

# Determination of Conflict Matters

- The following matters have been determined to constitute Conflict Matters as defined in the December 9, 2014 resolutions of the Boards of EFCH and TCEH:

  - Intercompany claims, including intercompany tax claims, between EFCH/TCEH and their subsidiaries, on the one hand, and non-EFCH/TCEH Debtors, on the other hand

  - Intercompany tax planning, structuring, and settlement issues such as use of net operating losses, basis step-up, and taxable or non-taxable transactions

  - Claims against equity sponsors as related to intercompany claims, settlement of intercompany claims, allocation of litigation/settlement proceeds, or indemnification

  - Plan of reorganization as related to conflict matters including claim settlement, allocation of litigation/settlement proceeds, and tax structuring issues

  - Oncor bid process as related to conflict matters including intercompany claim settlement, allocation of litigation/settlement proceeds, separation agreements, bankruptcy court mandated approval, and tax structuring issues

  - Requests for standing to prosecute EFCH/TCEH estate causes of action as related to conflict matters including claim settlement

- The foregoing is not comprehensive; the evaluation of conflict matters and what matters constitute a conflict matter is dynamic and subject to ongoing review and evaluation

*Highly Confidential*

# Settlement Terms

- The settlement will settle prepetition intercompany claims, causes of action and disputes, including, without limitation, avoidance actions pursuant to 11 U.S.C. §§ 544, 547, and 548 ("Settlement").  These claims, causes of action and disputes have been designated by the disinterested directors and managers as "Conflict Matters" (as such term is defined in the applicable board resolutions of EFH, EFIH, and EFCH/TCEH) subject to the sole control of the disinterested directors and managers.

- The Settlement is subject to Bankruptcy Court approval under 11 U.S.C. § 1123(b) and Federal Rule of Bankruptcy Procedure 9019 as part of a joint plan of reorganization for EFH, EFIH, TCEH and their subsidiaries in the jointly administered bankruptcy cases captioned *In re Energy Future Holdings Corp., et al.*, Case No. 14-10979 (CSS) (the "EFH Case").

*Highly Confidential*

# Settlement Terms (cont.)

- The following summary of the Settlement is qualified in its entirety by the terms of a plan of reorganization to be filed, which will incorporate and detail the following terms:

  - TCEH shall have an allowed unsecured non-priority claim of $700M against EFH, which claim shall receive the same form of distributable value as all other unsecured non-priority EFH creditors under any plan of reorganization (the "TCEH Claim").

  - After full satisfaction of all allowed administrative, priority and secured claims against EFH, the next $1.41B of distributable value from the EFH estate shall be distributed as follows:  (a) EFH shall retain 49.645% for distribution on account of allowed unsecured claims and interests (other than the TCEH Claim); (b) TCEH shall receive 49.645% on account of the TCEH Claim (i.e., up to $700M of the first $1.41B of distributable value for unsecured creditors from the EFH estate); and (c) the EFH equity holders shall receive 0.709%.

  - Distributable value from the EFH estate in excess of $1.41B shall be distributed as follows: (a) TCEH shall receive 50%, until TCEH receives an additional $105M, for a total distribution to TCEH of $805M; and (b) EFH shall retain 50% for distribution on account of allowed unsecured claims and interests (other than the TCEH Claim).

  - Once TCEH has received a total of $805M in distributable value, all remaining distributable value from the EFH estate shall be retained by EFH and distributed in accordance with the terms of the plan of reorganization.

*Highly Confidential*

# Settlement Terms (cont.)

- (Cont. Summary)

  - The sharing of distributable value between EFH's stakeholders and TCEH as described above shall not be affected by the total amount of allowed unsecured claims against EFH.  If allowed claims of creditors of EFH (other than TCEH) are less than $700M, EFH shall remain entitled to the same percentages of distributable value from the EFH estate as described above.  If allowed claims of creditors of EFH (other than TCEH) are greater than $700M, TCEH shall remain entitled to the same percentages of distributable value from the EFH estate as described above, up to a maximum aggregate distribution of $805M to TCEH.

  - Other than the allowed claim and distribution right of TCEH in the EFH estate as described above, there will not be any allowed prepetition claims between any of EFH, EFIH, and TCEH or any of their subsidiaries, including Oncor Electric Distribution Holdings Company LLC and its subsidiary.

  - Each of (a) the disinterested directors of EFH, (b) the disinterested manager of EFIH, and (c) the disinterested manager of TCEH may (without the consent of the other disinterested managers or disinterested directors, as applicable) terminate the Settlement if any of them determines, after consultation with counsel, that termination of the Settlement would be consistent with the exercise of their fiduciary duties.

  - The plan of reorganization to be filed will provide for the spin-off of TCEH in a tax-free transaction (with a partial step-up in tax basis), and the tax-free reorganization of EFH and EFIH through one of three possible scenarios, each of which may include a REIT structure: sale to a third party; backstopped recapitalization by existing stakeholders in the EFH Case; or stand-alone reorganization.

*Highly Confidential*

# Illustrative Recovery Scenarios Under Settlement

### TCEH Recovery from EFH (December 31, 2015 Emergence)



Note: (1) Assumes illustrative settlement percentages of 0% of EFIH First Lien Notes Make Whole, 100% of EFIH Second Lien Notes Post-petition Interest, 20% of EFIH Second Lien Notes Make Whole, 25% of EFIH Unsecured Notes Post-petition Interest, 20% of EFIH Unsecured Notes Make Wholes, 25% of EFH LBO Notes Post-petition Interest, 25% of EFH Unsecured Notes Post-petition Interest and 12.5% of EFH Unsecured Notes Make Whole

*Highly Confidential*

# Select Delayed Emergence Considerations
## Select Quantitative Considerations for TCEH Recovery from EFH

| Description | | Monthly Range ($mm) |
|---|---|---|
| **Professional Fees** [1] | ▪ Up to $35 million of run-rate professional fees per month<br>  ▸ 60% at TCEH (~$21mm / month), 20% at EFIH (~$7mm / month), 20% at EFH (~$7mm / month)<br>  ▸ Assumed to be reduced by 50% in delayed emergence scenario | $30 - $35<br>($15 - $17.5 at 50%) |
| **Litigation Fees** | ▪ Potential additional fees associated with protracted litigation<br>  ▸ Estimated at an additional ~$6.25mm per month | ~$6.25 |
| **EFIH / EFH Potential Post-petition Interest Claims** [2] | ▪ Increase in post-petition interest claims during litigation<br>  ▸ EFIH<br>    – Second Lien PPI of ~$20mm per month at 100%<br>    – PIK and LBO Notes PPI of, collectively, ~$6mm per month at 25% settlement and ~$23mm at 100%<br>  ▸ EFH<br>    – Unsecureds PPI of ~$1mm per month at 25% settlement and ~$4mm at 100% | $20 - $47 |
| **EFIH / EFH Potential Make Whole Claims** [2][3] | ▪ Decrease in potential make whole claims<br>  ▸ EFIH<br>    – First Lien MW: no change<br>    – Second Lien MW: ~$3 million decrease per month at 20% settlement and ~$14 million decrease at 100%<br>    – PIK MW: ~$1 million decrease per month at 20% settlement and ~$4 million decrease at 100%<br>  ▸ EFH<br>    – Unsecureds MW: De minimis decrease per month at 12.5% settlement and ~$1 million at 100% | $0 - $(19) |
| **EFH NOLs** [4] | ▪ Additional NOLs potentially available to increase the partial step-up in basis or offset taxable gain<br>  ▸ Potential ~$15 million of additional value per month<br>  ▸ Uncertain beneficiary of value; assumed 50% of NOLs generated utilized by TCEH | $0 - $(15)<br>($0 - $8 at 50%) |
| **Time Value of Money** | ▪ Effect of delayed receipt of recovery<br>  ▸ Discounted at 5% for illustrative purposes | N/A |

Note:
(1) Based on Consolidated Debtors forecast as of January 23, 2015
(2) Implied monthly numbers based on change from December 2015 to December 2016. Subject to change if different time periods compared
(3) Range based on full allowed claim and no allowed claim
(4) Range based on ability to use NOLs to increase the partial step-up in basis or offset taxable gain and on existence of sufficient taxable income to utilize additional depreciation
(5) The analyses on the following pages reflect $420mm in additional professional fees and $150mm litigation costs offset by additional $160mm present value associated with NOLs through 12/31/2017.  These amounts reflect TCEH professional fees of $252mm, litigation costs of $75mm and present value associated with NOLs of $160mm; and EFH / EFIH professional fees of $168mm and litigation costs of $75mm

*Highly Confidential*

# Illustrative Litigation Recovery Scenarios
### TCEH Recovery from EFH at Various Litigated Claim Amounts

*($ in millions)*



**PV of TCEH Recovery at Various Claim Amounts and 12/31/17 Emergence Date ($18.5bn Oncor valuation)** (1)(2)

*(Present Value of TCEH Recovery from EFH)*

①  $18.5bn Oncor TEV
②  $19.0bn Oncor TEV
③  $19.5bn Oncor TEV

$700mm claim / $592 million TCEH Recovery from EFH under Potential Settlement Scenario

*(Illustrative TCEH Claim Amount)*

Note: Based on illustrative settlement percentages (described previously) for post-petition interest and make wholes through 12/31/2017
(1) Reflects $420mm in additional professional fees and $150mm litigation costs offset by additional $160mm present value associated with NOLs through 12/31/2017. These amounts reflect TCEH professional fees of $252mm, litigation costs of $75mm and present value associated with NOLs of $160mm; and EFH / EFIH professional fees of $168mm and litigation costs of $75mm
(2) Amounts discounted to 12/31/15 illustrative emergence date for comparative purposes; assumes illustrative 5.0% discount rate

Emergence Date: —— 12/31/2017

*Highly Confidential*

# Illustrative Litigation Recovery Scenarios (cont'd)

### TCEH Recovery from EFH at Various Litigated Claim Amounts

*($ in millions)*



**PV of TCEH Recovery at Various Claim Amounts and 12/31/17 Emergence Date ($19.0bn Oncor valuation)** [1][2]

*(Present Value of TCEH Recovery from EFH)*

① $18.5bn Oncor TEV

② $19.0bn Oncor TEV

③ $19.5bn Oncor TEV

*$700mm claim / $805 million TCEH Recovery from EFH under Potential Settlement Scenario*

*(~$12,000 million claim required)*

*(Illustrative TCEH Claim Amount)*

Note: Based on illustrative settlement percentages (described previously) for post-petition interest and make wholes through 12/31/2017
(1)  Reflects $420mm in additional professional fees and $150mm litigation costs offset by additional $160mm present value associated with NOLs through 12/31/2017. These amounts reflect TCEH professional fees of $252mm, litigation costs of $75mm and present value associated with NOLs of $160mm; and EFH / EFIH professional fees of $168mm and litigation costs of $75mm
(2)  Amounts discounted to 12/31/15 illustrative emergence date for comparative purposes; assumes illustrative 5.0% discount rate

Emergence Date:  ——— 12/31/2017

*Highly Confidential*

# Illustrative Litigation Recovery Scenarios (cont'd)
### TCEH Recovery from EFH at Various Litigated Claim Amounts

*($ in millions)*



**PV of TCEH Recovery at Various Claim Amounts and 12/31/17 Emergence Date ($19.5bn Oncor valuation)** (1)(2)

*(Present Value of TCEH Recovery from EFH)*

| 1 | $18.5bn Oncor TEV |
| 2 | $19.0bn Oncor TEV |
| 3 | $19.5bn Oncor TEV |



*(Illustrative TCEH Claim Amount)*

Emergence Date: —— 12/31/2017

Note: Based on illustrative settlement percentages (described previously) for post-petition interest and make wholes through 12/31/2017
(1) Reflects $420mm in additional professional fees and $150mm litigation costs offset by additional $160mm present value associated with NOLs through 12/31/2017. These amounts reflect TCEH professional fees of $252mm, litigation costs of $75mm and present value associated with NOLs of $160mm; and EFH / EFIH professional fees of $168mm and litigation costs of $75mm
(2) Amounts discounted to 12/31/15 illustrative emergence date for comparative purposes; assumes illustrative 5.0% discount rate

*Highly Confidential*