EXHIBIT B



**Energy Future Competitive Holdings Company LLC**

**Texas Competitive Electric Holdings Company LLC**

# Presentation to Cravath, Swaine & Moore LLP

## March 16, 2015

**PRIVILEGED & CONFIDENTIAL / SUBJECT TO RULE 408**

LOS ANGELES  |  SAN FRANCISCO  |  MTO.COM

# Topics



I.   Shared Services

II.  Reimbursement (Make-Whole) Agreements

III. Repayment of Oncor Debt by TCEH

IV.  Dividend of Oncor

V.   Basis Step-Up Claim

VI.  Response to EFIH Claims

# Part I



# Shared Services

**PRIVILEGED & CONFIDENTIAL / SUBJECT TO RULE 408**

# Shared Services



- TCEH has claims against EFIH for constructive fraudulent transfer, contribution, indemnity, and unjust enrichment claims based upon:
  - o Overallocation of shared services costs, including corporate overhead
  - o Overallocation of restructuring fees and expenses prepetition
- Overallocation of shared services costs
  - o Since at least 2010, shared services costs have been substantially overallocated to the T-Side
  - o Historically, EFH paid approximately 18% of shared services expenses
  - o Starting in fiscal year 2010, EFH began pushing down most of these costs to its business units – in practice, this meant allocating costs to the T-Side
    - o No shared services costs were allocated to EFIH before 2014
    - o Share of costs allocated to Oncor declined materially over same period

**PRIVILEGED & CONFIDENTIAL / SUBJECT TO RULE 408**

# Historical Allocation of Shared Services

**Shared services expenses increased from $117 million in 2008 to $289 million in 2013**

**The percentage of shared services expenses allocated to the T-side increased from 59% in 2008 to 87% in 2013 whereas allocations to both EFH Corporate and Oncor declined**





No historical allocation to EFIH



Note: TCEH represents historical expenses allocated to Luminant and TXU Energy

Source: Company data room

# Shared Services: Potential Corporate Overhead[1]

MUNGER
TOLLES &
OLSON
LLP

- Shared services include a number of corporate overhead cost categories that are likely unrelated to underlying individual business unit operations
- While EFIH is generally viewed as a pass-through entity, EFIH should have been allocated, at minimum, its proportionate share of certain corporate overhead expenses after 2010.

| Selected Categories | 2010 – 2013 Total | Actual Allocation | | | | Potential Reallocation to EFIH | | |
|---|---|---|---|---|---|---|---|---|
| | | EFH | Oncor | TCEH | EFIH | 20% | - | 40% |
| Corporate Board & Related Expenses | $18 | ~$0 / 0% | ~$0 / 1% | $18 / 99% | $0 / 0% | $4 | - | $7 |
| TXU Corporate Controller & Admin | $25 | ~$0 / 0% | $2 / 6% | $24 / 94% | $0 / 0% | $5 | - | $10 |
| Corporate Planning | $11 | ~$0 / 1% | $2 / 19% | $9 / 81% | $0 / 0% | $2 | - | $4 |
| Finance & Investor Relations | $16 | ~$0 / 2% | ~$0 / 0% | $16 / 98% | $0 / 0% | $3 | - | $7 |
| Corporate Secretary & Governance | $7 | ~$0 / 0% | ~$0 / 2% | $7 / 98% | $0 / 0% | $1 | - | $3 |
| Corp. Development & Strategy | $10 | ~$0 / 0% | ~$0 / 0% | $10 / 100% | $0 / 0% | $2 | - | $4 |
| Business Services Administration | $23 | $1 / 3% | $3 / 12% | $19 / 85% | $0 / 0% | $5 | - | $9 |
| Corporate Tax | $29 | ~$0 / 0% | $7 / 26% | $22 / 74% | $0 / 0% | $6 | - | $12 |
| External Affairs | $62 | $13 / 20% | ~$0 / 1% | $49 / 79% | $0 / 0% | $12 | - | $25 |
| Sponsor Fees[2] | $141[2] | $0 / 0% | $0 / 0% | $141 / 100% | $0 / 0% | $28 | - | $57 |
| **Total** | **$345** | **$14 / 4%** | **$14 / 4%** | **$317 / 92%** | **$0 / 0%** | **$69** | **-** | **$138** |
| **Underallocation** | | | | | | **($69)** | **-** | **($138)** |

(1) Preliminary assessment.  Subject to further diligence
(2) Represents cash share only.  Total expenses of $152 million

PRIVILEGED & CONFIDENTIAL / SUBJECT TO RULE 408

6

# Allocation of Prepetition Restructuring Fees

- Restructuring fees and expenses were largely allocated based on the face value of debt
  - This methodology unfairly penalized TCEH and did not fairly allocate fees based on the prepetition focus of the restructuring
  - Per the Interim Compensation Order, post-petition fees are allocated based on direct and indirect benefits conferred to the Debtors
  - Reallocating prepetition fees based on post-petition allocation percentages confirms that EFIH was underallocated > $25 million



Note: Advisors that work exclusively for one constituency not included. Includes Alvarez & Marsal, Deloitte & Touche, Epiq, Enoch Kever, Ernst & Young, Evercore, Filsinger, Gibson Dunn, Kirkland & Ellis, McDermott Will & Emery, Perry Street, PwC, Richards Layton, Sidley Austin, Thompson & Knight and certain advisors classified as "Other" by the Debtors (Advanced Discovery, Bryan Cave, Cousins Chipman & Brown, Cross and Simon, Haynes and Boone, Shearman & Sterling, Hunton & Williams, Bingham McCutchen and Potter Anderson Corroon); Reallocated fee numbers apply cumulative post-petition average fee percentage allocations, as disclosed in monthly fee statements filed through 3/1/2015. Allocations based on both direct and indirect fees as defined in the Interim Fee Order.  Pre-petition fees  and allocations per Company (Deloitte prepetition fees as disclosed in retention application filed 5/29/2014)
Source: Court filings (Monthly Fee Statements filed to date), diligence materials

PRIVILEGED & CONFIDENTIAL / SUBJECT TO RULE 408

7

# Part II



# Reimbursement (Make-Whole) Agreements

# Reimbursement Agreements



- Background
  - In connection with deregulation, EFCH, Luminant, Oncor, and other TXU entities entered into a Master Separation Agreement dated as of December 14, 2001 ("MSA")
    - Pursuant to the MSA, EFCH transferred certain regulatory assets to Oncor
    - Oncor subsequently securitized the regulatory assets
- Tax Reimbursement Agreement (2002)
  - Luminant agrees to reimburse Oncor for federal income tax associated with the Generation-Related Regulatory Assets
- Interest Reimbursement Agreements (2002 and 2004)
  - Under the 2002 agreement, Luminant agreed to reimburse Oncor for the "financing costs" incurred by Oncor as a result of carrying Generation-Related Regulatory Assets on its books
  - Under the 2004 agreement, Luminant agreed to reimburse Oncor for "the difference between the present value and book value of the Generation-Related Regulatory Assets"

# Reimbursement Agreements



- Settlement of Reimbursement Agreement

    - In 2012, Oncor decided that it wanted to reduce its credit exposure to Luminant in anticipation of T-Side restructuring

    - Oncor therefore proposed that Luminant buy out its remaining obligations under the Reimbursement Agreements

    - In an effort to minimize its exposure to an avoidance claim when Luminant filed for bankruptcy, Oncor insisted that Luminant make any settlement payment directly to EFIH rather than to Oncor

    - Oncor thus agreed to assign its purported rights under the Reimbursement Agreements to EFIH in exchange for $159M

    - Luminant paid the same amount ($159M) as settlement consideration directly to EFIH

    - In the event of a bankruptcy, Oncor would have an unsecured claim and would be subject to insider preference and fraudulent transfer liability for payments received in the year before the petition date

PRIVILEGED & CONFIDENTIAL / SUBJECT TO RULE 408

# Reimbursement Agreements



- TCEH has claims against EFIH and Oncor to avoid the $159M settlement payment as a fraudulent transfer
  - Insider fraudulent transfer claim
    - Under the UFTA (adopted in Texas and Delaware), a transfer is fraudulent as to present creditors if the transfer was made (1) to an insider (2) for an antecedent debt, (3) the debtor was insolvent at the time, and (4) the insider had reasonable cause to believe that the debtor was insolvent.
    - All of these elements are satisfied
    - Luminant's estate can avoid the one-year statute of limitations by stepping into the shoes of the IRS under 11 U.S.C. § 544(b), *see In re Porras*, 312 B.R. 81 (Bankr. W.D. Tex. 2004)
  - By stepping into the shoes of the IRS, Luminant's estate can avoid other payments made under the Reimbursement Agreements during the period that Oncor had "reasonable cause to believe" that Luminant was insolvent
    - EFIH/Oncor Exposure:  more than $309M (with 4-year reach-back period)

# Reimbursement Agreements



o  Actual fraudulent transfer

- o  Luminant has a claim to avoid the $159M settlement in September 2012 as an actual fraudulent transfer

- o  Several statutory and non-statutory badges of fraud are present:

  - o  Transfer to an insider

  - o  Luminant was insolvent and Oncor was aware of its financial condition

  - o  The transaction was structured in anticipation of a potential avoidance claim in the event that Luminant filed for bankruptcy

  - o  Oncor received more from the settlement than it would have received on a claim against Luminant's bankruptcy estate, *see Quadrant Structured Prods. Co. v. Vertin*, 102 A.3d 155, 169 (Del. Ch. 2014) (denying motion to dismiss actual fraudulent transfer claim on analogous facts)

# Part III



# Repayment of Oncor Debt by TCEH

# Repayment of Joint Credit Facility



- Background

    o  Before the LBO, TCEH and Oncor were joint borrowers under $4.5B of joint credit facilities

    o  As of the LBO, amounts outstanding under the joint credit facilities were approximately $2.4B

    o  In the LBO, TCEH repaid approximately $2B of the joint credit facility, while Oncor repaid approximately $385M

- TCEH has a claim against Oncor for fraudulent transfer based on payment of debt for which Oncor was jointly liable

    o  TCEH can avoid state law statutes of limitations by stepping into the shoes of the IRS under 11 U.S.C. § 544(b)

    o  There is at least a triable issue as to whether the LBO rendered TCEH insolvent

# Repayment of Joint Credit Facility



- Oncor was jointly liable with TCEH for all borrowings under the revolving credit agreements

  o The revolving credit agreements are governed by New York law

  o Under New York law, when two or more entities take on an obligation, there is a presumption of joint liability, and express words of severance are required to overcome the presumption. *See Dallas Gas Partners, L.P. v. Prospect Energy Corp.*, 733 F.3d 148, 160 (5th Cir. 2013) (applying New York law)

  o The TCEH/Oncor revolving credit agreements do not contain any express words of severance

# Part IV



# Oncor Dividend

# Oncor Dividend



- Oncor was formerly a wholly-owned subsidiary of EFCH (f/k/a TXU US Holdings)

  o EFCH dividended its shares in Oncor to EFH

  o EFCH did not receive any consideration from EFH for the dividend

  o There is evidence that this dividend may have occurred as part of the October 2007 LBO

    o Exhibit 21 to EFH's 10-K for 2006 reflects that, as of December 31, 2006, Oncor remained a subsidiary of EFCH

- To the extent that the dividend can be collapsed into the LBO transaction, the dividend is vulnerable to challenge as a constructive fraudulent transfer

  o EFCH clearly did not receive reasonably equivalent value

  o No contemporaneous solvency analysis in connection with the dividend

  o EFCH can step into the shoes of the IRS under 11 U.S.C. §544(b) to avoid state law statutes of limitations on avoidance actions

# Part V



# Basis Step-Up Claim

# Taxable Sale



- A tax-free transaction requires TCEH to forgo the value of a full step-up in basis

- A TCEH taxable sale is a viable alternative to a tax-free spin of TCEH

  - Whether TCEH "checks the box" to become a regarded entity is controlled by the TCEH independent manager

  - Bankruptcy courts have approved stranded tax transactions

  - The Tax Allocation Agreement is subject to rejection or avoidance

- A taxable sale of TCEH would prevent a tax-free transfer of Oncor through an EFH reorganization

- A taxable sale of TCEH could allocate material liability to EFIH

  - For example, assume that TCEH, a disregarded entity, has $10 of ordinary income and $100 of capital gain, EFIH, a disregarded entity, has $10 of ordinary income, and EFH Corporation has no independent items of income or loss

  - Under these facts, there is a Consolidated Tax Liability of $42 (assuming a 35% tax rate) and under the first step of the TAA, it would be allocated first to EFH Corporation and then sub-allocated to its disregarded entities, TCEH and EFIH, based on their proportionate share of the EFH Group's ordinary income

  - No additional amount would be allocated under the second step of the TAA

  - 50% (10/20) of the $42 would therefore be allocated to EFIH, making EFIH liable for $21 under the TAA

PRIVILEGED & CONFIDENTIAL / SUBJECT TO RULE 408

# Sensitivity Analysis: Full vs. Partial Step-up in Basis



**Value of Full Step-up versus Partial Step-up in Basis**[1]

| Delta Between Full and Partial Step-up in Basis | | | | | |
|---|---|---|---|---|---|
| | | Illustrative TCEH Value ($mm) | | | |
| | | **$13,000** | **$14,500** | **$16,000** | **$17,500** | **$19,000** |
| **Discount Rate** | **6.0%** | $363 | $678 | $992 | $1,307 | $1,622 |
| | **7.0%** | $337 | $630 | $922 | $1,215 | $1,507 |
| | **8.0%** | $315 | $587 | $860 | $1,133 | $1,406 |
| | **9.0%** | $294 | $549 | $804 | $1,060 | $1,315 |
| | **10.0%** | $276 | $515 | $754 | $994 | $1,233 |

- A taxable transaction would provide the T-Side with additional value ranging from $276M to $1,622M depending on TCEH's enterprise value and the discount rate

- Assumes value associated with partial step-up fully available to TCEH

Note: Simplified calculations for illustrative purposes.  Analysis is dependent on available NOL balance, among other factors.  Based on range of discount rates and discounted to December 31, 2015
(1)   Assumes Company-provided MACRS depreciation of step-up in basis, 35% tax rate, and sufficient net income available to realize tax benefits for illustrative purposes
(2)   Based on ~$4.6 billion NOL estimate as of emergence and ~$6.7 billion tax basis
Source: Company presentation and filings, restructuring data room

# Part VI



# Response to EFIH Claims

# Repayment of TCEH Intercompany Notes



- Relevant Timeline:

  o October 2007:  EFH and TCEH entered the original intercompany notes (P&I and SG&A)

  o November 2008:  EFH used some of the proceeds from the sale of a minority interest in Oncor to pay off the P&I Note in full

  o May 2009:  EFH and TCEH entered into a new P&I Note, but with the addition of a guarantee from EFIH

  o April 7, 2011:  EFIH guaranteed SG&A Note

  o February 2012:  EFIH issued $1.15B in new debt and dividended $950M to EFH, which EFH used to repay a portion of P&I Note

  o August 2012:  EFIH issued $850M of new debt; $680M of proceeds were held in escrow for EFH to repay TCEH intercompany notes

  o January 2013:  EFH paid approximately $700M to TCEH in satisfaction of remaining obligations under the intercompany notes

# Repayment of TCEH Intercompany Notes



- EFIH has asserted that it has avoidance claims based upon the February and August 2012 dividends that financed the repayment of intercompany notes (the "Challenged Transfers")

- Three purported claims

  - "Insider" fraudulent transfer

  - Constructive fraudulent transfer

  - Preference

- As demonstrated on the following slides, these claims lack merit for several reasons:

  - EFIH was solvent at the time of the Challenged Transfers

  - EFIH received reasonably equivalent value in exchange for the transfers

  - Any preference claim is time-barred

  - Even if EFIH could avoid the Challenged Transfers, recovery would not confer a benefit on EFIH estate

**PRIVILEGED & CONFIDENTIAL / SUBJECT TO RULE 408**

# Repayment of TCEH Intercompany Notes



- Solvency is an essential element of any potential claim to avoid the Challenged Transfers

- Here, the evidence is overwhelming that EFIH was solvent when it made the Challenged Transfers

  o Contemporaneous with the February 2012 and January 2013 transfers, EFIH management prepared solvency calculations showing that EFIH was balance-sheet solvent by a substantial margin

  o During the same period, EFIH represented to underwriters of the debt offerings that it was solvent under all three solvency tests

  o Market evidence further supports EFIH solvency at the time of the Challenged Transfers

    o EFIH access to the credit markets

    o Trading prices of EFIH unsecured debt

  o Deloitte issued clean audit opinions for EFIH

  o EFIH is currently solvent

# Repayment of TCEH Intercompany Notes

- EFIH represented to underwriters that it was solvent under all three applicable tests:
  - Balance-sheet
  - Adequacy of capital
  - Ability to pay debts



Energy Future Holdings Corp.
Energy Future Intermediate Holding Company LLC
EFIH Finance Inc.

Dealer Manager Agreement

December 21, 2012

c/o Goldman Sachs, & Co.
200 West Street
New York, New York 10282

Ladies and Gentlemen:

Energy Future Intermediate Holding Company LLC, a Delaware limited liability company ("EFIH"), and EFIH Finance Inc. a Delaware corporation ("EFIH Finance"), plan, on the terms and subject to the conditions described in the Offer Mater[...] (as defined below) to make offers

(bb)   EFIH, at the Commencement Date and immediately after the Exchange Date, will be Solvent. As used herein, the term "Solvent" means, with respect to EFIH on a particular date, that on such date (i) the fair market value of the assets of EFIH is greater than the total amount of liabilities (including contingent liabilities) of EFIH, (ii) the present fair salable value of the assets of EFIH is greater than the amount that will be required to pay the probable liabilities of EFIH on its debts as they become absolute and matured, (iii) EFIH is able to realize upon its assets and pay its debts and other liabilities, including contingent obligations, as they mature and (iv) EFIH does not have unreasonably small capital.

# Repayment of TCEH Intercompany Notes



- Market evidence reinforces the conclusion that EFIH was solvent at the time of the Challenged Transfers

  o EFIH unsecured debt was trading near par



  o There was robust demand for EFIH debt issued in February 2012 and August 2012

    o Investors were aware that proceeds of debt issuances would be used to repay intercompany notes

PRIVILEGED & CONFIDENTIAL / SUBJECT TO RULE 408

# Repayment of TCEH Intercompany Notes



- Even if EFIH could prove that it was insolvent at the time of the Challenged Transfers, its claims would fail for other reasons
- Insider fraudulent transfer
  - EFIH cannot show that TCEH had any reason, let alone "reasonable cause," to believe that EFIH was insolvent at the time of the Challenged Transfers, Del. Code Ann. tit. 6, §1305; *see also* Texas Bus. & Comm. §24.006(b) (same)
- Constructive Fraudulent transfer
  - EFIH guaranteed the TCEH intercompany notes and therefore received reasonably equivalent value
  - Guarantees provided in 2009 and 2011 are not avoidable
- Preference
  - Any preference claim is untimely:  One-year reach-back period for insider preference claims is a substantive element of the claim and cannot be tolled
  - Earmarking:  Proceeds of debt issued by EFIH in February 2012 and August 2012 were earmarked for repayment of intercompany notes (thereby discharging EFIH guarantee obligations)

# Repayment of TCEH Intercompany Notes



- Even if EFIH could avoid the Challenged Transfers, it could not recover from TCEH
- To recover on an avoidance action, EFIH must show that recovery would benefit the estate (*Adelphia Recovery Trust v. Bank of Am., N.A.*, 390 B.R. 80 (S.D.N.Y. 2008))
- As noted above, EFIH guaranteed the obligations of EFH to TCEH under the TCEH intercompany notes
  - If a court avoided the Challenged Transfers, TCEH would have a claim against EFIH based on these guarantees
  - TCEH would recover 100% on its guarantee claim against EFIH
  - The parties would be left in the same position that they would have been in absence of avoidance and recovery
  - Accordingly, the EFIH estate would not benefit from recovery

# EFIH Holdings of TCEH Debt:  No Setoff



- EFIH holds approximately $79M of 10.25% TCEH Unsecured notes due 2015
- EFIH will not be able to setoff these debt holdings against its liability on claims by TCEH and Luminant
  - EFIH cannot setoff TCEH notes until it has repaid liability on avoidance actions (11 U.S.C. § 502(d))
  - EFIH cannot setoff TCEH notes against avoidance action liability to Luminant (lack of mutuality)
  - The indenture for the 10.25% unsecured notes bars setoff
    - "No-action" clause (§ 6.06) bars a noteholder from pursuing individual remedies without support of other noteholders
    - "No-action" clause also bars a noteholder from obtaining "a preference or priority" over other holders
    - EFIH thus is barred from using setoff to receive greater recovery than other noteholders (to the detriment of the other noteholders)

PRIVILEGED & CONFIDENTIAL / SUBJECT TO RULE 408