**EXHIBIT C**

SUBJECT TO FED. RULE OF EV. 408                                     PRIVILEGED AND CONFIDENTIAL

1

### EFIH PRELIMINARY RESPONSE TO T-SIDE CLAIMS AND DEFENSES

Counsel for Energy Future Competitive Holdings Company LLC ("**EFCH**") and Texas Competitive Electric Holdings Company LLC ("**TCEH**") (the "**T-Side**") presented their view of intercompany claims against Energy Future Intermediate Holdings Company LLC ("**EFIH**") and the T-Side's defenses to EFIH's intercompany claims against the T-Side on March 16, 2014. This memorandum responds at a high level to that presentation, discussing the T-Side's claims in the order in which the T-Side presented its claims and defenses. This memorandum is not intended to waive EFIH's ability or right to assert any additional or more detailed defenses or to waive any claim, defense, or legal right if matters are not resolved consensually.

**I.    T-Side Claims Against EFIH**

T-Side counsel presented five claims against EFIH, each of which is discussed below. In summary, the T-Side might have a legal basis for its claims for misallocation of shared services and restructuring fees, if there were any such misallocation, but the history of shared services allocations shows that EFIH paid all or nearly all its fair share. EFIH does not have liability on buyout of the Reimbursement (Make-Whole) Agreements, as it was merely facilitating an agreement that was reached between Oncor and Luminant whereby Luminant was able to settle its outstanding liabilities under the Reimbursement (Make-Whole) Agreements at a 20.5% discount rate. Any claim with respect to the joint credit facility claims would be a claim only against Oncor, not EFIH, and Oncor and TCEH each repaid their respective shares of the borrowings. The only evidence arguably supporting the T-Side's fourth claim for the transfer of Oncor to EFIH is a simple typographical error; none of the operative documents suggest otherwise. Finally, the T-Side's loss in basis step-up does not give rise to a legal claim, only a request for consideration and negotiated compensation.

SUBJECT TO FED. RULE OF EV. 408                                    PRIVILEGED AND CONFIDENTIAL

2

### A. Shared Services

The T-Side asserts claims against EFIH for "overallocation" of (i) shared services costs and (ii) prepetition restructuring fees and expenses. The T-Side asssserted claims for constructive fraudulent transfer, contribution, indemnity, and unjust enrichment to recover any overallocation but does not address how it would meet the elements for any of those claims. If some limited reallocation of shared services costs and prepetition fees to EFIH were appropriate, the allocation methods the T-Side proposed do not take account of the actual use of services.

#### 1. Allocation of shared service costs.

The T-Side claims that "[s]ince at least 2010, shared service costs have been substantially overallocated to the T-Side." (T-Side Presentation at 4.) The T-Side argues that EFIH "should have been allocated, at minimum, its proportionate share of certain corporate overhead expenses after 2010." (T-Side Presentation at 6.) The T-Side suggests that EFIH's proportionate share of the corporate overhead expenses is between 20% and 40% of the corporate overhead expenses. EFIH disagrees.

*First*, EFH determined the shared services costs from 2010 through 2013 by specified allocation methods, including: time required, share of total business services' billings, assets, embedded controller headcount, and multifactor formulas. (*See* 1.1.10.1.1 PEO-2012 Business Services SLA.) The allocations to the T-Side were made under those allocation methods, and the T-Side has not identified why any of those methods resulted in an "overallocation" to the T-Side. The T-Side points to the percentage amounts paid by the T-Side, but the T-Side does not identify what, if anything, was improper about the allocation methods that were used. The T-

SUBJECT TO FED. RULE OF EV. 408                                          PRIVILEGED AND CONFIDENTIAL

3

Side proposes to use face value of debt or enterprise value as the allocation method.[1] The T-Side has not explained why either of those metrics more fairly allocates shared services costs than the allocation methods that were used.

The T-Side properly bears the lion's share of the shared services, as it uses them the most. EFIH has few, if any, employees and is effectively a single asset holding company for a ring-fenced, independent-board controlled company. It uses little of the services. In addition, Oncor has its own corporate services so it too makes less use of shared services but pays separately for what it receives.

*Second*, the T-Side proposes to reallocate a portion of shared services that fall into a grouping, which the T-Side has invented, called "potential corporate overhead", which are those services that, according to the T-Side, are "likely unrelated to underlying individual business unit operations". (T-Side Presentation at 6.)[2] "[U]nrelated to underlying individual business unit operations" should not be the starting point for any reallocation; the starting point should be whether the shared services actually involve or service the business unit.

There are some service categories in the T-Side's list that do not involve EFIH. For example, "External Affairs" covers costs related to political and government lobbying and public policy advocacy. (*See* 1.1.10.1.1 PEO-2012 Business Services SLA at 68-79.) EFIH, as a holding company, does not use those services, and thus EFIH should not be allocated any portion of those costs. "Corporate Secretary & Governance" relates to coordination of EFH board and committee meetings, physical security, effective training to address employee safety,

---

[1] It is not clear whether the T-Side proposes to use the petition date to assess face value of debt and enterprise value or use some other date.

[2] The T-Side's potential corporate overhead list is composed of ten "Selected Categories" of shared services. The names of those ten Selected Categories do not all match the categories in the historical shared services spreadsheet. For example, "Corporate Board & Related Expense" is not a category on the historical spreadsheet. In addition, it is difficult to determine which shared services within a category have been included to arrive at the totals in the T-Side's chart on slide 6 of the T-Side's presentation.

training regarding the Code of Conduct, and ethics and compliance matters. (*See* 1.1.10.1.1 PEO-2012 Business Services SLA at 49.) Those services are not ones that EFIH as a holding company uses.

The T-Side's list also includes a category called "Corporate Board & Related Expenses", which is not a specifically listed category in the historical shared costs spreadsheet. That category seems to correspond with certain costs that are part of the Business Services Administration category in the historical spreadsheet.[3] Those costs include the following: "Board of Directors Expense", "Board of Directors – Non Cash", "Board of Directors Comp – Cash". On their face those descriptions would suggest that they should be allocated across the business units. However, under the 2014 SLA, which re-evaluated the methods of allocation and includes allocations to EFIH, the allocation of these costs is again 100% to TCEH as it was in 2010-2013. (*See* 1.1.10.2.1 PEO-EFIH SSA at 40.) Thus, EFIH should not have any responsibility for those costs.

The T-Side's list also includes the LBO "Sponsor Fees". EFIH should not have any responsibility for paying any portion of those fees, because EFIH was not involved in the LBO debt financing. To the extent EFIH issued debt during the Liability Management Program for which the Sponsors may have been involved, EFIH issued that debt for the benefit of EFH and the T-Side. As a result, EFIH believes those fees should be borne by EFH and the T-Side, not EFIH.

*Third*, to the extent shared services are reallocated for any shared service category, EFIH should be allocated only a portion for the services within any category that it used, not the total costs across the category. The 2014 SLA is instructive on this point. It allocates to EFIH a portion

---

[3] "Business Services Administration" is also listed as a selected category on the T-Side's list.

of the costs for only six categories of services and only for certain services within those six categories.[4] (*See* 1.1.10.2.1 PEO-EFIH SSA.)

*Fourth*, reallocating 20% to 40% to EFIH regardless of the category of shared service or the year is not a better method of allocation. The 2014 SLA allocation methods are more accurate than the 20% to 40% the T-Side proposed. For example, for certain expenses such as Treasury Administration and Investor Relations, the 2014 SLA uses the "Face Value of Debt Method" to allocate percentages, and for 2014, the Face Value of Debt Method results in 20% of both of those costs to EFIH. (*See* 1.1.10.2.1 PEO-EFIH SSA at 29-30.) However, EFIH's outstanding debt was not always 20%; it was much less in 2010, 2011 and 2012. Thus, EFIH's percentage of those expenses would be less in 2010 than in 2014. Therefore, applying 20% for all four years would not result in a fair allocation. In addition, it does not appear that enterprise value was ever used as a method of allocation from 2010-2013 for any of the shared services for which EFIH has been allocated a percentage of costs under the 2014 SLA.[5]

The numbers the T-Side presented using the 20% to 40% allocation shifted the costs too far. Based on an April 2014 presentation on the allocation of shared services under the 2014 SLA, EFIH's fair portion of shared services was approximately 1.5% of the annual shared services costs. That amount for 2014 was about $4.3 million. (*See* 1.4.10.1.3 PEO-EFIH Service Bill Allocations 4.11.14 at 3.) That amount was consistent with the estimate Michael Carter provided during due diligence meetings with Conflicts Counsel; he stated that EFIH's allocation would be approximately $4 million per year.

---

[4] The six categories (and the specific services within the category where EFIH has an allocation for 2014) are: (1) Business Services Administration (Business Service Administration and Sponsor Fees); (2) Corporate Tax (Corporate Tax Project); (3) Corporate Consolidation (Corporate Consolidations); (4) Treasury (Treasury Administration and Investor Relations); (5) Corporate Controller (Controller Administration); and (6) Legal Services (Internal Legal).

[5] In addition, EFIH's total enterprise value is not 40% of the combined enterprise values of the T-Side and EFIH, as the T-Side argues. EFIH's total enterprise value is significantly less and has varied from year-to-year.

SUBJECT TO FED. RULE OF EV. 408                    PRIVILEGED AND CONFIDENTIAL
                                                                             6

*Last*, it is unclear what portion, if any, of shared services costs to be reallocated to EFIH should benefit the T-Side, as opposed to EFH or Oncor.

        2.        Allocation of Restructuring Fees.

The T-Side argues that it was "overallocated" prepetition restructuring fees. EFIH understands prepetition restructuring fees were billed directly to a company if the services could be directly allocated to the company (*e.g.*, EFH, EFIH, TCEH). Prepetition restructuring services that could not be allocated to a specific company were allocated based on the face amount of debt. (T-Side Presentation at 7.) The T-Side argues that using the face amount of debt was unfair because the T-Side had the most debt and the allocation was not based on the prepetition focus of the restructuring.

Using outstanding debt to allocate prepetition restructuring fees that could not be directly allocated to a particular company is not inherently unfair. The percentages of outstanding debt that were used for the allocation were 20% for EFIH, 75% for the T-Side and 5% for EFH, which is consistent with how some of the shared services costs are allocated in the 2014 SLA using the same percentages. Indeed, the T-Side even proposed using 20% for reallocating shared services costs because it was the value of the outstanding debt for EFIH.

The T-Side proposes that the prepetition restructuring fees should based more on "the prepetition focus of the restructuring". (T-Side Presentation at 7.) EFIH, while open to considering a reallocation, believes that the T-Side had the most outstanding debt and has a complicated capital structure so it should bear a large portion of the prepetition restructuring costs. By contrast, EFIH was a holding company with a relatively straightforward capital structure with less debt, so less restructuring services were needed. Indeed, if prepetition restructuring fees should be "based on the prepetition focus of the restructuring", EFIH would

have a claim that *it* was overallocated, since its restructuring needs were minimal compared to EFH's and the T-Side's.

The T-Side argues that the post-petition fee allocation percentages "confirm" that EFIH was underallocated prepetition restructuring fees. (T-Side Presentation at 7.) EFIH's understanding of the post-petition restructuring fee allocation is that if the fees cannot be directly allocated to a specific estate, they are allocated based on the percentages of restructuring fees that are billed directly to the estates. Thus, if one estate receives more attention in a particular period, and thus has more direct billings, its share of the shared fees will increase. Here, EFIH received more attention shortly after the petition was filed, but that attention has now shifted to the T-Side. Using the percentages for post-petition fees therefore would be skewed against EFIH as they simply reflect where the attention has been, not on the overall appropriate allocation.

Even if there were to be a reallocation of prepetition restructuring fees, it is not clear how much of the reallocation amount should be paid to the T-Side, as opposed to EFH.

**B.    Reimbursement (Make-Whole) Agreements**

The T-Side asserts that it has both a constructive fraudulent transfer claim and an actual fraudulent transfer claim against EFIH and Oncor to avoid the $159 million Oncor make-whole settlement payment. EFIH is not responsible for any claims the T-Side might have against Oncor.

1.    <u>The settlement payment was made beyond the reach-back period.</u>

T-Side can bring claims related to the Oncor make-whole payment only if it can step into the shoes of the IRS and use the 10-year reach-back. (T-Side Presentation at 11.) The ability to use that statute is unclear. *In re Vaughan Co.*, 498 B.R. 297, 305 (D.N.M. 2013) (holding that a

trustee who sought to avoid transfers under New Mexico's UFTA could not make use of the IRS reach-back).

        2.       <u>There is virtually no evidence of actual intent.</u>

There is virtually no evidence to support an actual fraudulent transfer claim. *First*, there is no direct evidence of intent to hinder, delay, or defraud. *Second*, as to circumstantial evidence and as the T-Side acknowledges, there are at most four badges of fraud (including insolvency, discussed below). Courts often dismiss claims that are based on only a few badges of fraud, particularly where, as here, many other badges point in the opposite direction. *See ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 374 (S.D. Tex. 2008); *In re Gulf Fleet Holdings, Inc.*, 491 B.R. 747, 767-68 (Bankr. W.D. La. 2013); *In re Midway Games Inc.*, 428 B.R. 303, 325 (Bankr. Del. 2010). And the statute is clear that the court may consider the presence or absence of all badges. Del. Code Ann. tit. 6 § 1306(b).

        3.       <u>There was reasonably equivalent value and no reasonable cause to believe Luminant was insolvent.</u>

A constructive fraudulent transfer claim requires proof of that the debtor did not receive reasonably equivalent value. Del. Code Ann. tit. 6 §§ 1304(a)(2), 1305(a); 11 U.S.C. § 548(a)(1)(B). Luminant likely received reasonably equivalent value in the transaction. To satisfy its antecedent debt owing to Oncor, Luminant paid $159 million, which represented a present value discount of Luminant's remaining obligation of $212 million at a 20.5% present value discount rate. Further, EFIH would not have had reasonable cause to believe Luminant was insolvent at the time, as Deloitte issued a clean audit opinion for that year.

    4.    <u>Any payments made under the Reimbursement Agreements are not recoverable from EFIH.</u>

Any payments under the Reimbursement Agreements to Oncor the T-Side seeks to recover should be made against Oncor, not EFIH. Other than the $159 million settlement payment, EFIH did not receive payments under the Reimbursement Agreements.

    **C.**    **Repayment of Joint Credit Facility**

The T-Side asserts a constructive fraudulent transfer claim against Oncor based on the repayment of joint credit facilities at the time of the LBO closing. (T-Side Presentation at 15.) The T-Side bases its claim on the general background presumption of joint liability, unless the governing contract states otherwise. But the TCEH/Oncor revolving credit agreements at issue provide for several—not joint—repayment obligations for "each Borrower" to "each Lender". (*See* TXU Energy Company and TXU Electric Company Revolving Credit Agreement (Mar. 31, 2005), at 25; *see also* EFCH/TCEH Credit Agreement (Oct. 10, 2007), at 181 *and* Oncor Revolving Credit Agreement (Oct. 10, 2007), at 79.) Thus, the T-Side's claim for repayment is without merit.

    **D.**    **Oncor Dividend**

The T-Side argues that there might be evidence that the Oncor Dividend occurred as part of the October 2007 LBO, based on Exhibit 21 to EFH's 10-K for year-end 2006 that purports to show Oncor as a subsidiary of EFCH. (T-Side Presentation at 17.) To the contrary, there is simply an error in that exhibit.

Company management stated that the location of TXU Electric Delivery Company (Oncor) in the Subsidiary Hierarchy in EFH's 2006 10-K is an indentation error. TXU Electric Delivery Company was not a subsidiary of TXU US Holdings Company in 2006. Company management was not sure whether the error was in the original Word document or whether it

was done by the financial printer, but it was just a mistake. The Subsidiary Hierarchy in EFH's 2005 10-K shows TXU Electric Delivery properly positioned as a subsidiary of TXU Corp, and not of TXU US Holdings.

### E. Basis Step-Up Claim

The T-Side does not assert a legal basis for the claim; there is none. Discussions on this matter, if any, would be based on other considerations.

## II. T-Side Responses To EFIH Claims

EFIH has claims against TCEH for the repayment of the TCEH Intercompany Demand Notes. In October 2007, EFH issued a P&I Note and a SG&A Note (collectively the "**Demand Notes**"), which were payable on demand to TCEH. EFIH and EFCH guaranteed the P&I Note in May 2009 and the SG&A Note in April 2011. In February 2012, EFIH issued $1.15 billion of debt and dividended $950 million of the proceeds to EFH, which in turn used that money to pay down the P&I Note. In August 2012, EFIH issued $850 million of debt and put $680 million of the proceeds in escrow. On January 30, 2013, EFIH dividended the $680 million to EFH, which in turn used the money to satisfy the obligations under the Demand Notes. The offering memoranda for the EFIH debt issuances in February and August 2012 state that proceeds from the offerings would be dividended to EFH for EFH to repay the Demand Notes. The T-Side maintains that EFIH does not have a valid fraudulent transfer or preference claim.

### A. EFIH Has a Valid Fraudulent Transfer Claim Against TCEH as the Entity for whose Benefit a Fraudulent Transfer was Made.

Under § 550(a)(1), a trustee may recover from the entity "for whose benefit" an avoided transfer was made. Here, EFIH has fraudulent transfer avoidance claims against EFH for the February 2012 and January 2013 dividends under 11 U.S.C. § 548(a)(1)(B). EFIH may recover from TCEH because the dividends were made to EFH for TCEH's benefit.

1. <u>EFIH has valid fraudulent transfer claims against EFH.</u>

EFIH has fraudulent transfer claims under 11 U.S.C. § 548(a)(1)(B) as well as under the Delaware UFTA, Del. Code Ann. tit. 6 § 1305. The dividends satisfy the elements of § 548(a)(1)(B) because EFIH did not receive reasonably equivalent value from EFH in exchange for the dividends and EFIH was insolvent or in a distressed financial condition when it made the dividends.

The dividends also satisfy the elements under the Delaware UFTA for an insider preference. EFIH made a transfer to an insider (EFH) for the benefit of a creditor (TCEH) on account of an antecedent debt (the guarantee on the Demand Notes) when EFIH was insolvent and when EFH had reasonable cause to believe that EFIH was insolvent. *See* Del. Code Ann. tit. 6 § 1305(b).

        a.     *EFIH was insolvent in February 2012 and January 2013.*

The T-Side offered five arguments regarding EFIH's solvency. (T-Side Presentation at 24.) Solvency is measured "on the date that such transfer was made". 11 U.S.C. § 548(a)(1)(B)(ii).

*First*, the T-Side argues that "[c]ontemporaneous with the February 2012 and January 2013 transfers, EFIH management prepared solvency calculations showing that EFIH was balance-sheet solvent by a substantial margin." (T-Side Presentation at 24.) Those calculations were not formal solvency analysis. It is also not clear when EFIH management performed those informal calculations. Furthermore, any informal calculations would have been based on Duff & Phelps' valuations of Oncor, but those valuations were not as of the dates of the dividend transactions.[6]

---

[6] The valuation date for a Duff & Phelps valuation report closest to any of the dividend payments dates was December 1, 2012. That valuation date is too late to be of any relevance to the February 2012 dividend. December 1, 2012 is not a meaningful valuation date for the January 2013 dividend either, as EFIH continued to issue debt in December 2012 and January 2013.

To be sure, EFIH's insolvency in February 2012 might be a close call, but the numbers do support a finding of EFIH being insolvent in February 2012. EFIH, in February 2012, had almost $3.9 billion of its own debt, had guaranteed more than $1.8 billion of EFH's debt and had guaranteed the Demand Notes under which more than $640 million was outstanding at the time. The value of EFIH's stake in Oncor in February 2012 was between $4.6 and $5.6 billion.

By January 2013, EFIH's debt had increased substantially. EFIH had more than $7.7 billion of its own debt, had guaranteed $54 million of EFH debt, and at the time of the dividend had the guarantees on the Demand Notes under which approximately $700 million remained outstanding. The value of EFIH's stake in Oncor was between $5.1 billion and $6.2 billion.

Even if EFIH was balance-sheet solvent, EFIH was insolvent under the cash-flow test in February 2012 and January 2013. In February 2012, depending on underlying assumptions, EFIH was facing a cash-flow shortfall of almost $4 billion by 2013, with an implied price to earnings multiple required for refinancing of almost 14 times. In January 2013, EFIH was facing a cash flow shortfall of almost $8.7 billion within one year with an implied price to earnings multiple required for refinancing of more than 28 times.

*Second*, the T-Side argues that EFIH represented to underwriters that it was solvent, but a representation does not make it so. The representations might have expressed management's belief, but there were no formal solvency analyses done, and any informal calculations management did were based on Oncor valuations that were not as of the time of the dividends.

The representations also are not a defense to EFIH's claims under the Delaware UFTA. The UFTA determines whether EFH, despite whatever representations EFIH made, had "reasonable cause to believe" EFIH was insolvent. It imposes an objective test. By virtue of its management of EFIH, EFH had "reasonable cause to believe" that EFIH was insolvent if the underlying facts would have shown insolvency. *See* 3 Collier on Bankruptcy ¶ 60, 53 (14th ed.)

(stating that reasonable cause to believe exists when a "state of facts is brought to the creditor's notice, respecting the affairs and pecuniary condition of the debtor, as would lead a prudent business person to the conclusion that the debtor is insolvent"); *see also In re Henwood & Nowak*, 27 F.2d 888, 889 (D. Mass. 1928) (a subsidiary corporation receiving payment from its insolvent parent corporation within four months of bankruptcy was chargeable with knowledge of the insolvency of the parent).

*Third*, that EFIH was able to access credit markets and how the market responded does not establish that EFIH was solvent at the time of the dividend in February 2012 or January 2013. As the court in *In re Tronox* stated, the fact that a company was able to issue secured debt to the market "does not deserve any weight in the solvency analysis". 503 B.R. 239, 298 (Bankr. S.D.N.Y. 2013).

The T-Side also argues that EFIH's unsecured debt was trading "near par". (T-Side Presentation at 26.) The only information the T-Side provides is on EFIH 11.25/12.25% Senior Toggle Notes which were issued in December 2012. The T-Side provides no information about the trading of EFIH debt throughout 2012. Furthermore, EFH unsecured debt guaranteed by EFIH (*see* EFH 10.875% Notes and EFH 11.25/12.2% PIK Notes), which can be viewed as a proxy for EFIH unsecured debt, was trading at a significant discount throughout 2012 and into January 2013.

The T-Side's last argument that EFIH is "currently solvent" is not simply relevant. For there to be a constructive fraudulent transfer, EFIH need only be insolvent "on the date that such transfer was made". 11 U.S.C. § 548(a)(1)(B)(ii). That EFIH might have become solvent after the transaction is of no moment.

      b.  *EFIH did not receive reasonably equivalent value.*

EFIH received nothing from EFH in exchange for the dividends and thus did not receive reasonably equivalent value. The T-Side argues EFIH received reasonably equivalent value because EFIH was released as the guarantor of the Demand Notes. The T-Side can prevail on that argument only if the two transactions—EFIH's dividends to EFH and EFH's payment to TCEH—are collapsed. The collapsing doctrine is an equitable doctrine to protect general creditors, not to preserve otherwise voidable transactions. *See generally Chase Manhattan Mortgage Corp. v. Shapiro (In re Lee)*, 530 F.3d 458 (6th Cir. 2008) (refusing to collapse separate transfers to permit assertion of earmarking defense). A court looking at these transactions may treat the dividends simply as dividends.

Furthermore, because the transfers were structured as dividends rather than direct payments by EFIH to TCEH, EFIH lost its contribution claim against EFH as the principal obligor of the Notes. EFIH did not receive anything for the loss of its contribution claim against EFH and thus did not receive reasonably equivalent value.

     2.  <u>EFH was not a mere conduit</u>.

The mere conduit defense does not apply here. Although the Offering Memoranda stated that proceeds from the issuances would dividended to EFH to repay the Demand Notes, EFH was not bound to use the funds from the dividend to repay the Demand Notes. EFH could have redirected the funds for its own use. Accordingly, EFH exercised dominion and control over the funds dividended by EFIH and therefore was not a mere conduit. *See In re Lambertson Truex, LLC*, 458 B.R. 155, 158-59 (Bankr. D. Del. 2011).

  **B.**  **EFIH Has Valid Preference Claims for the Dividends.**

Alternatively, EFIH may avoid the dividend payments as preferences under 11 U.S.C. § 547(b). The February 2012 and January 2013 dividends were made for the benefit of a creditor,

TCEH, a fact made clear in the February 2012 and August 2012 offering memoranda. The dividends were made on account of the guarantees of the Demand Notes, which constitute antecedent debts. *See In re Nirvana Rest. Inc.*, 337 B.R. 495, 502 (Bankr. S.D.N.Y. 2006). The dividends were also made when EFIH was insolvent. The January 2013 dividend was made within the one-year reach-back period covered by the tolling agreement. The February 2012 dividend would be actionable under the UFTA provision for preferential transfers to an insider, Del. Code Ann. tit. 6, §1305(b), if the IRS ten-year reach-back period applies.

The T-Side argues that the one-year reach-back period for insiders is a substantive element and cannot be tolled. But reach-back periods in the bankruptcy code are statutes of limitation that may be tolled, both in equity and by agreement of the parties. *See In re Stanwich Financial Services Corp.*, 291 B.R. 25, 28 (Bankr. D. Conn. 2003); *see also Young v. United States*, 535 U.S. 43, 49-50 (2002) ("It is hornbook law that limitations periods are customarily subject to equitable tolling …. That is doubly true when [Congress] is enacting limitations periods to be applied by bankruptcy courts, which are courts of equity and apply the principles and rules of equity jurisprudence.") (internal quotation marks omitted).

The T-Side's earmarking defense is also inapplicable. Although the offering memoranda for the February 2012 and August 2012 offerings state that EFIH would dividend the proceeds to EFH and EFH would use the proceeds to pay down the Demand Notes, EFIH was not required to make the dividends to EFH. Therefore, there was no agreement for purposes of the earmarking defense. *See In re Winstar Communs. Inc.*, 554 F.3d 382, 401-02 (3d Cir. 2009). The fact that EFIH was not obligated to make the dividends to EFH can be seen in the escrow agreement for the August 2012 offering, which contains no mandate that the funds be used solely for the purpose of repayment of the Demand Notes.

C.     **Recovery of the Dividends Would Benefit EFIH's Estate.**

Recovery of the dividends used to pay off the Demand Notes would benefit EFIH's estate. Whether an avoidable transfer action is for the benefit of the estate is determined as of the petition date. *In re Asarco LLC*, 513 B.R. 499 (S.D. Tex. 2014). Here, EFIH was insolvent as of the petition date. As a result, TCEH would not recover 100% on its hypothetical revived guarantee claim, because the claim would be treated as a general unsecured claim. The recovery would result in a net benefit to EFIH.

Furthermore, only an "allowed" claim may share in distribution. 11 U.S.C. § 502(a). Section 502(d) requires the court to "disallow any claim of an entity from which property is recoverable" under the avoidance provisions of the Bankruptcy Code unless the entity "has paid the amount" for which it is liable. 11 U.S.C. § 502(d). Here, EFIH's avoidable transfer claims against the T-Side bar the T-Side's claims against EFIH until the T-Side returns the value of the dividends. The disallowance of the T-Side's claims under § 502(d) provides a benefit to the EFIH estate as well.