## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*, | ) | Chapter 11 |
| *Debtors.* | ) | Case No. 14-10979 (CSS) |
| | ) | (Jointly Administered) |
| DELAWARE TRUST COMPANY, as | ) | |
| INDENTURE TRUSTEE, | ) | |
| *Plaintiff,* | ) | |
| v. | ) | Adversary Proceeding |
| ENERGY FUTURE INTERMEDIATE HOLDING | ) | No. 14-50363 (CSS) |
| COMPANY LLC and EFIH FINANCE INC. | ) | |
| *Defendants.* | ) | |
| | ) | |

## PLAINTIFF-TRUSTEE'S AND NOTEHOLDERS' TRIAL BRIEF

WILMER CUTLER PICKERING HALE AND DORR LLP

Philip D. Anker
Charles C. Platt
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: 212-230-8800
Facsimile: 212-230-8888
Philip.Anker@wilmerhale.com
Charles.Platt@wilmerhale.com

Dennis L. Jenkins
George W. Shuster Jr.
60 State Street
Boston, MA 02109
Telephone: 617-526-6000
Facsimile: 617-526-5000
Dennis.Jenkins@wilmerhale.com
George.Shuster@wilmerhale.com

ROPES & GRAY LLP

Keith H. Wofford
Mark Somerstein
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: 212-596-9000
Facsimile: 212-596-9090
Keith.Wofford@ropesgray.com
Mark.Somerstein@ropesgray.com

D. Ross Martin
Andrew Devore
800 Boylston Street, Prudential Tower
Boston, MA 02199-3600
Telephone: 617-951-7000
Facsimile: 617-951-7050
Ross.Martin@ropesgray.com
Andrew.Devore@ropesgray.com

DRINKER BIDDLE & REATH LLP

James H. Millar
1177 Avenue of the Americas
41st Floor
New York, NY 10036-2714
Telephone: 212-248-3264
Facsimile: 212-248-3141
James.Millar@dbr.com

COLE SCHOTZ P.C.

Norman L. Pernick (Bar No. 2290)
J. Kate Stickles (Bar No. 2917)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone: 302-652-3131
Facsimile: 302-652-3117
npernick@coleschotz.com
kstickles@coleschotz.com

Warren A. Usatine
Court Plaza North
25 Main Street
Hackensack, NJ 07602
Telephone: 201-489-3000
Facsimile: 201-489-1536
wusatine@coleschotz.com

*Counsel for Plaintiff-Trustee Delaware Trust Company*

Dated: April 15, 2015

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................................................. iii

PRELIMINARY STATEMENT .................................................................................... 1

ARGUMENT .................................................................................................................. 3

I.     THE COURT SHOULD LIFT THE AUTOMATIC STAY TO
PERMIT THE TRUSTEE AND THE NOTEHOLDERS TO
RESCIND ACCELERATION .................................................................. 3

     A.    The Bankruptcy Code Authorizes the Court to Lift the Stay
for "Cause"......................................................................................... 3

     B.    The Court Does Not Need to Reach Any "*Nunc Pro Tunc*"
Issues.................................................................................................. 4

     C.    Cause Exists to Modify the Stay to Permit the Trustee and
the Noteholders to Rescind Acceleration........................................ 5

          1.    The Hardship to the Trustee and the Noteholders by
Maintaining the Stay Considerably Outweighs the
Hardship to EFIH .................................................................. 5

               a.    The make whole is material to the Noteholders'
recovery.................................................................. 6

               b.    The make whole is critical to the Noteholders'
bargain.................................................................... 9

               c.    EFIH Never Disclosed to the Noteholders that
the Make Whole and the Right to Rescind
Would Not Be Enforceable in Bankruptcy ........... 12

               d.    The Noteholders Relied on the Make Whole
When They Agreed to Take a Haircut in the
Exchange Offer for the Notes ............................... 13

               e.    The Noteholders Relied on EFIH's Corporate
Separateness.......................................................... 14

               f.    The Noteholders Have Had to Reinvest in a
Lower Interest-Rate Environment......................... 14

               g.    EFIH's Argument That Maintaining the Stay
Will Not Harm the Noteholders Because the
Notes Were "Accelerated" by Operation of
Bankruptcy Law Is Without Merit. ....................... 15

          2.    Modifying the Stay Will Not Result in Any "Great
Prejudice" to EFIH or Its Estate........................................ 19

               a.    Modifying the Stay Will Not Harm the Value
of EFIH's Estate................................................... 20

i

b. Modifying the Stay Will Not Prejudice EFIH's Creditors............................................................... 22

c. Modifying the Stay Will Not Prejudice EFIH Itself ..................................................................... 35

d. Modifying the Stay Will Not Prejudice EFIH's Shareholder, EFH................................................... 38

e. Modifying the Stay Will Not Prejudice Creditors of Other Debtors or the Sponsors, Whose Interests Are Not Legally Relevant to the Lift-Stay Motion ............................................... 39

f. Modifying the Stay Will Not Prejudice EFIH or Its Estate Because the Stay Does Not Operate to Disallow the Noteholders' Contingent Make-Whole Claim............................ 44

3. The Court Has Already Held that the Trustee Will Prevail on the Merits ............................................................50

4. Lifting the Stay Is Consistent With the Policies Underlying the Automatic Stay. .......................................50

D. Cause Exists to Lift the Stay for Lack of Adequate Protection ........................................................................52

II. THE COURT SHOULD ALSO MODIFY THE AUTOMATIC STAY TO PERMIT EFFECTIVENESS OF THE RESCISSION NOTICE SOLELY AS TO THE SECOND LIEN TRUSTEE AND SECOND LIEN NOTEHOLDERS. .........................................................53

CONCLUSION.............................................................................................................57

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Borman v. Raymark Indus., Inc.*, 946 F.2d 1031 (3d Cir. 1991) ...............................3, 50

*Butner v. United States*, 440 U.S. 48 (1979)...........................................................47, 49

*Campbell v. Countrywide Home Loans, Inc.*, 545 F.3d 348 (5th Cir. 2008) .................46

*Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106 (1939)....................................38

*Claughton v. Mixson*, 33 F.3d 4 (4th Cir. 1994).....................................................27, 28

*Foust v. Munson S.S. Lines,* 299 U.S. 77 (1936) ....................................................55, 56

*Grede v. Bank of New York*, 2009 WL 188460 (N.D. Ill. Jan. 27, 2009) .....................43

*Hazen First State Bank v. Speight*, 888 F.2d 574 (8th Cir. 1989) ...............................48

*HSBC Bank USA, N.A. v. Calpine Corp.*, 2010 WL 3835200 (S.D.N.Y.
        Sept. 15, 2010) .................................................................................................16, 18

*In re 4848, LLC*, 490 B.R. 343 (Bankr. E.D. Wis. 2013) ...........................................38

*In re Adelphia Commc'ns Corp.*, 365 B.R. 24 (Bankr. S.D.N.Y. 2007),
        *aff'd*, 390 B.R. 64 (S.D.N.Y. 2008) ...................................................................43

*In re AMR Corp.*, 485 B.R. 279 (Bankr. S.D.N.Y. 2013), *aff'd*, 730 F.3d
        88 (2d Cir. 2013)...........................................................................................34, 35

*In re AMR Corp.*, 730 F.3d 88 (2d Cir. 2013), *cert. denied*,
        134 S. Ct. 1888 (2014)................................................................9, 34, 35, 52

*In re Armstrong World Indus., Inc.*, 106 F. App'x 785 (3d Cir. 2004).........................27

*In re Augie/Restivo Baking Co.*, 860 F.2d 515 (2d Cir. 1988)................................40, 42

*In re Chemtura Corp.*, 439 B.R. 561 (Bankr. S.D.N.Y. 2010).....................10, 16, 25, 30, 31

*In re Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*, 791 F.2d 524 (7th
        Cir. 1986) ....................................................................................................31, 32

*In re Continental Airlines, Inc.*, 152 B.R. 420 (D. Del. 1993)............................3, 37, 50

*In re Coletta*, 380 B.R. 140 (Bankr. E.D. Pa. 2007), *aff'd*, 336 F. App'x
        202 (3d Cir. 2009)..............................................................................................5

*In re Dow Corning Corp.*, 456 F.3d 668 (6th Cir. 2006)..........................................................32, 33

*In re Downey Fin. Corp.*, 428 B.R. 595 (Bankr. D. Del. 2010)..................................................4, 50

*In re Edgins*, 36 B.R. 480 (B.A.P. 9th Cir. 1984)...........................................................................49

*In re Exide Techs.*, 607 F.3d 957 (3d Cir. 2010) ...........................................................................49

*In re Fasano/Harriss Pie Co.*, 43 B.R. 864 (Bankr. W.D. Mich. 1984) ),
    *aff'd*, 70 B.R. 285 (W.D. Mich. 1987), *aff'd*, 848 F.2d 1930 (6th
    Cir. 1988) ................................................................................................................................46

*In re Fernstrom Storage & Van Co.*, 938 F.2d 731 (7th Cir.1991) ...............................................55

*In re Flora Mir Candy Corp.*, 432 F.2d 1060 (2d Cir. 1970) ..................................................40, 42

*In re Forum Health*, 444 B.R. 848 (Bankr. N.D. Ohio 2011)...................................................40, 42

*In re Gencarelli*, 501 F.3d 1 (1st Cir. 2007) ...........................................................................8, 29, 39

*In re Global Indus. Techs., Inc.*, 645 F.3d 201 (3d Cir. 2011) .......................................................8

*In re Grossman's Inc.*, 607 F.3d 114 (3d Cir. 2010) ......................................................................44

*Idaho Power Co. v. FERC*, 312 F.3d 454 (D.C. Cir. 2002).............................................................8

*In re Integrated Telecom Express, Inc.*, 384 F.3d 108 (3d Cir. 2004)..........................................24

*In re Jean-Francois*, 516 B.R. 699 (E.D.N.Y. 2014) .......................................................................5

*In re LHD Realty Corp.*, 726 F.2d 327 (7th Cir. 1984) .................................................................17

*In re LightSquared Inc.*, 504 B.R. 321 (Bankr. S.D.N.Y. 2013) ..................................................43

*In re Los Angeles Dodgers LLC*, 465 B.R. 18 (D. Del. 2011)...................................................9, 30

*In re Metropolitan Hosp.*, 131 B.R. 283 (E.D. Pa. 1991) ................................................................5

*In re M.J. & K. Co.*, 161 B.R. 586 (Bankr. S.D.N.Y. 1993)..........................................................48

*In re MPM Silicones, LLC*, 2014 WL 4436335 (Bankr. S.D.N.Y.
    Sept. 9, 2014) ...........................................................................................................9, 19, 35, 52

*In re Myers*, 491 F.3d 120 (3d Cir. 2007).......................................................................................5

*In re New Century TRS Holdings, Inc.*, 407 B.R. 576 (D. Del. 2009).........................................42

*In re Novak*, 103 B.R. 403 (Bankr. E.D.N.Y. 1989).....................................................................29

*In re O'Brien Envtl. Energy, Inc.*, 188 F.3d 116 (3d Cir. 1999) ....................................37

*In re Oakwood Homes Corp.*, 449 F.3d 588 (3d Cir. 2006) ..........................................18

*In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005) ...............................................41, 42

*In re Premier Auto. Servs., Inc.*, 343 B.R. 501 (Bankr. D. Md. 2006), *aff'd*,
    492 F.3d 274 (4th Cir. 2007) ...........................................................28

*In re Premier Entm't Biloxi LLC*, 445 B.R. 582 (Bankr. S.D. Miss. 2010) ...............16, 19, 31, 35

*In re Pursuit Athletic Footwear, Inc.*, 193 B.R. 713 (Bankr. D. Del. 1996) ...................................4

*In re Regency Holdings (Cayman), Inc.*, 216 B.R. 371 (Bankr. S.D.N.Y.
    1998) .................................................................................40

*In re RNI Wind Down Corp.*, 348 B.R. 286 (Bankr. D. Del. 2006) ................................4

*In re Rodriguez*, 629 F.3d 136 (3d Cir. 2010) ........................................44, 46

*In re Scalera*, 521 B.R. 513 (Bankr. W.D. Pa. 2014) ........................................4

*In re Schewe*, 94 B.R. 938 (Bankr. W.D. Mich. 1989) ................................48

*In re The SCO Group, Inc.*, 395 B.R. 852 (Bankr. D. Del. 2007) ................................50

*In re Thorpe Insulation Co.*, 677 F.3d 869 (9th Cir. 2012) ........................................8

*In re Shady Grove Tech Ctr. Assocs. L.P.*, 227 B.R. 422 (Bankr. D. Md.
    1998) .................................................................................38

*In re Skyler Ridge*, 80 B.R. 500 (Bankr. C.D. Cal. 1987) ........................................17

*In re Solutia*, 379 B.R. 473 (Bankr. S.D.N.Y. 2007) ........................................18, 34

*In re Stephan*, 588 Fed. App'x 143 (3d Cir. 2014) ........................................45, 46

*In re Stranahan Gear Co.*, 67 B.R. 834 (Bankr. E.D. Pa. 1986) ........................................4

*In re Texaco, Inc.*, 81 B.R. 804 (Bankr. S.D.N.Y. 1988) ........................................8, 25, 26, 39

*In re Trans World Airlines, Inc.*, 322 F.3d 283 (3d Cir. 2003) ........................................52

*In re Tribune Co.*, 418 B.R. 116 (Bankr. D. Del. 2009) ........................................3

*In re Trico Marine Servs., Inc.*, 450 B.R. 474 (Bankr. D. Del. 2011) ........................................16, 17

*In re Washington Mut., Inc.*, 2012 WL 1563880 (Bankr. D. Del. Feb. 24,
    2012) .................................................................................43

*In re Washington Mut., Inc.*, 461 B.R. 200 (Bankr. D. Del. 2011)................................................43

*In re Wcislak*, 446 B.R. 827 (Bankr. N.D. Ohio 2011)................................................................49

*Integrated Solutions, Inc. v. Service Support Specialties, Inc.*, 124 F.3d
    487 (3d Cir. 1997)...........................................................................................................48

*Izzarelli v. Rexene Prods. Co.*, 141 B.R. 574 (Bankr. D. Del. 1992) ...........................................56

*Johnson v. Home State Bank*, 501 U.S. 78 (1991)................................................................44, 46

*McCartney v. Integra Nat'l Bank North*, 106 F.3d 506 (3d Cir. 1997) ........................................57

*Moody v. Amoco Oil Co.*, 734 F.2d 1200 (7th Cir. 1984)..............................................................48

*Ruskin v. Griffiths*, 269 F.2d 827 (2d Cir. 1959) ........................................................................33

*Tenn. Elec. Power Co. v. Tenn. Valley Auth.*, 306 U.S. 118 (1939).................................................8

*Travelers Cas. & Sur. Co. v. Pac. Gas & Elec. Co.*, 549 U.S. 443 (2007).....................................47

*Winters v. George Mason Bank*, 94 F.3d 130 (4th Cir. 1996) ......................................................49

## STATUTES

11 U.S.C.

    § 101(5)...............................................................................................................................44
    § 301(a)..............................................................................................................................39
    § 361...................................................................................................................................53
    § 362(a)(6) .........................................................................................................................56
    § 362(c)...............................................................................................................................46
    § 362(d)..............................................................................................................................55
    § 362(d)(1) ...................................................................................................... *passim*
    § 362(g)................................................................................................................................4
    § 502(b)(1) ......................................................................................................18, 39, 45, 47
    § 506(b)(6) .........................................................................................................................11
    § 541(a)(1) ...................................................................................................................39, 52
    §§ 725-726 .........................................................................................................................38
    § 726...................................................................................................................................39
    §§ 1121-1123 .....................................................................................................................39
    § 1129(a)(7) .......................................................................................................................40
    § 1129(b)............................................................................................................................40
    § 1129(b)(2) .......................................................................................................................38

## LEGISLATIVE MATERIAL

H.R. Rep. No. 95-595, *reprinted in* 1978 U.S.C.C.A.N. 5963 ......................................................47

**OTHER AUTHORITIES**

3 *Collier on Bankruptcy* (16th ed. 2014) ........................................................................................55

Charles, Scott K. & Emil A. Kleinhaus, *Prepayment Clauses in*
      Bankruptcy, 15 Am. Bankr. Inst. L. Rev. 537 (2007)...........................................10, 12, 31

Plaintiff Delaware Trust Company ("<u>Trustee</u>"), indenture trustee for first lien notes ("<u>Notes</u>") issued by Energy Future Intermediate Holding Company LLC and EFIH Finance Inc. (together, "<u>EFIH</u>"), and the undersigned holders of the Notes ("<u>Noteholders</u>"),[1] respectfully submit this trial brief.

## PRELIMINARY STATEMENT

The issue to be tried is whether cause exists to modify the automatic stay to permit the Trustee and the Noteholders to rescind acceleration of the Notes.[2]

The Court has already held that the Trustee and the Noteholders have the right to do so as a matter of contract. In its summary judgment ruling, the Court found that "the Trustee has the right under Section 6.02 of the Indenture to waive the automatic default arising from the EFIH Debtors' bankruptcy filing and rescind the acceleration of the Notes." Findings of Fact and Conclusions of Law Regarding Cross-Motions for Summary Judgment, No. 14-10979, D.I. 3984 ("*Findings/Conclusions*") ¶¶ 63-66. The Court further concluded that if it were to lift the stay "to allow the Trustee to waive the default and decelerate the Notes th[e]n EFIH's refinancing would be an Optional Redemption under section 3.07 of the Indenture and the Applicable Premium would be due and owing to the non-settling Noteholders." *Id.* ¶¶ 68-69, 90, 94. Thus, the Court has held that, as a matter of state contract law, the Trustee and the Noteholders have the right to rescind acceleration and to be paid the make whole.

---

[1] The Noteholders consist of: BlueMountain Capital Management, LLC; Cyrus Capital Partners L.P.; Halcyon Asset Management LLC; Luxor Capital Group, LP; Nomura Securities International, Inc.; Southpaw Credit Opportunity Master Fund LP; VR Advisory Services Ltd; Waveny Capital Management, LP; and Whitebox Advisors LLC.

[2] Although the Trustee and Noteholders respectively disagree in part with the Court's summary judgment ruling, the Trustee and the Noteholders will not re-argue the summary judgment motions here and reserves all of their rights and arguments, including with respect to any appeal.

EFIH, a *solvent* debtor, now seeks to use the automatic stay that arose upon its bankruptcy filing to block the Trustee and the Noteholders from exercising their state-law right to rescind acceleration.  It does so in an effort to deny them the make whole it owes under the terms of the parties' contract.  EFIH thus seeks to use the stay, not as a shield to preserve and protect the assets of its estate, but as a sword to create for itself a right that it failed to bargain for at the negotiating table.  And, because it is presumed solvent (and almost surely is in fact solvent by hundreds of millions, or even billions, of dollars), EFIH seeks to do so to benefit junior constituencies—including the *equity holder of EFIH, Energy Future Holdings Corp. ("EFH"), and even EFH's equity holders, the Sponsors*, in *non-substantively consolidated cases*—that have no lawful claim to EFIH's assets on which the Trustee has a first lien.  Denying relief from the stay would give EFIH and those junior constituencies an unjust windfall in contravention of both corporate and bankruptcy law.

Doing so would also be highly prejudicial to the Trustee and the Noteholders.  It would deny them their bargained-for right to rescind acceleration.  They would lose not only the yield they contracted to obtain—as a result of EFIH's refinancing of the Notes— but also the make whole designed to compensate them for that loss.  The harm to the Noteholders from the loss of that make whole—amounting to some 20% of their overall investment—far outweighs the impact on EFIH and its estate from lifting the stay. Indeed, EFIH has already benefitted significantly from lower interest rates as a result of the refinancing, and will continue to do so.

Because cause exists, the Court should modify the stay to permit the Trustee and the Noteholders to rescind acceleration.

2

## ARGUMENT

I.   **THE COURT SHOULD LIFT THE AUTOMATIC STAY TO PERMIT THE TRUSTEE AND THE NOTEHOLDERS TO RESCIND ACCELERATION**

A.   **The Bankruptcy Code Authorizes the Court to Lift the Stay for "Cause"**

The Bankruptcy Code authorizes the Court to lift the automatic stay for "cause, including the lack of adequate protection of an interest in property of such party in interest." *See* 11 U.S.C. § 362(d)(1).  Courts determine whether cause exists "based on the totality of the circumstances in each particular case." *Findings/Conclusions* ¶ 73. The factors courts generally use in determining whether cause exists are:  "(1) whether any great prejudice to either the bankrupt estate or the debtor will result from a lifting of the stay; (2) whether the hardship to the non-bankrupt party by maintenance of the stay considerably outweighs the hardship to the debtor; and (3) the probability of the creditor prevailing on the merits." *Id.*

In determining whether "cause" exists, courts also "consider the policies underlying the automatic stay." *In re Continental Airlines, Inc.*, 152 B.R. 420, 424 (D. Del. 1993).  Those policies are "designed to prevent certain creditors from gaining a preference for their claims against the debtor; to forestall the depletion of the debtor's assets due to legal costs in defending proceedings against it; and, in general, to avoid interference with the orderly liquidation or rehabilitation of the debtor." *Borman v. Raymark Indus., Inc.*, 946 F.2d 1031, 1036 (3d Cir. 1991) (internal quotation marks omitted); *accord Continental*, 152 B.R. at 426; *In re Tribune Co.*, 418 B.R. 116, 127 (Bankr. D. Del. 2009).

On a motion to lift the stay, "(1) the party requesting such relief has the burden of proof on the issue of the debtor's equity in property; and (2) the party opposing such relief has the burden of proof on all other issues."  11 U.S.C. § 362(g); *see In re Downey Fin. Corp.*, 428 B.R. 595, 609 (Bankr. D. Del. 2010).  Here, there is no issue about EFIH's equity in property; the Trustee and Noteholders are not seeking to foreclose on, or otherwise take from EFIH, any such property.  Accordingly, while the Trustee and Noteholders may need to make an initial showing of cause, the ultimate burden of proof rests squarely on EFIH.  *In re RNI Wind Down Corp.*, 348 B.R. 286, 299 (Bankr. D. Del. 2006); *In re Pursuit Athletic Footwear, Inc.*, 193 B.R. 713, 718 (Bankr. D. Del. 1996); *In re Scalera*, 521 B.R. 513, 517 (Bankr. W.D. Pa. 2014); *In re Stranahan Gear Co.*, 67 B.R. 834, 837 (Bankr. E.D. Pa. 1986).

**B.     The Court Does Not Need to Reach Any "*Nunc Pro Tunc*" Issues**

Contrary to the suggestion of EFIH's counsel at the recent status conference (4/8/2015 Hrg. Tr. 33-35), the question presented is whether the Court should grant relief from the stay today, not whether it should do so retroactive to June 19, 2014.  This is not a case in which a claimant took actions in violation of the stay without first seeking relief and obtaining protection from the Court and then seeks relief from the stay *ex post facto*.  To the contrary, the Trustee filed its stay-relief motion *before* the Court entered its order approving the repayment of the Notes.  And the plain language of that order, as negotiated by the Trustee and EFIH, expressly provided that the repayment would have no "evidentiary," let alone "preclusive," "effect" on the stay-relief motion and the

question of "whether … any acceleration of the EFIH First Lien Notes is subject to rescission."  A-207 (No. 14-10979, D.I. 859, ¶ 40(b)).[3]

Accordingly, the stay-relief motion is to be decided as if the Notes had not yet been repaid.  There is no need to consider whether some additional showing would be required to lift the stay *nunc pro tunc*.[4]

### C.    Cause Exists to Modify the Stay to Permit the Trustee and the Noteholders to Rescind Acceleration.

In light of the Court's statements at the April 14 hearing that the Court would be assisted by presentation of evidence focusing on the harm to the Trustee and the Noteholders from denying relief from the stay, this brief will focus first on that factor.

### 1.    The Hardship to the Trustee and the Noteholders by Maintaining the Stay Considerably Outweighs the Hardship to EFIH

This factor—whether the hardship to the Trustee and the Noteholders by maintenance of the stay considerably outweighs the hardship or prejudice to EFIH—supports lifting the stay.

---

[3] Paragraph 40(b) of the DIP Order provides that "Nothing in this Final Order or the transactions contemplated hereby (including, without limitation, the closing of the EFIH First Lien Repayment) shall have any precedential, evidentiary, law of the case, or preclusive effect with respect to any present or future dispute concerning … any claim … in connection with, the EFIH First Lien Repayment, whether in connection with [the Adversary Proceeding, the Stay-Applicability Motion], or any other claims objection or other proceeding, including, without limitation, whether (i) any acceleration of the EFIH First Lien Notes is subject to rescission by majority holders thereof pursuant to the terms of the EFIH First Lien Indentures …."

[4] Relief *nunc pro tunc* would be warranted in any event.  The factors courts consider weigh in favor of granting relief *nunc pro tunc* here:  "(1) whether the creditor was aware of the filing or encouraged violation of the stay; (2) whether the debtor engaged in inequitable, unreasonable, or dishonest behavior; and (3) whether the creditor would be prejudiced."  *In re Myers*, 491 F.3d 120, 129 (3d Cir. 2007).  First, the Trustee and Noteholders were aware of EFIH's bankruptcy filing, which is why they *filed a motion for relief from the stay <u>before</u> the DIP Order was granted and obtained protection in that order reserving their rights*.  Second, it would be inequitable, among other things, for EFIH now to disavow that reservation of rights, to which it specifically agreed and on which the Trustee and Noteholders relied.  Finally, the Trustee and Noteholders would clearly be prejudiced by denying relief, as discussed below.  Courts have granted relief from the stay *nunc pro tunc*.  *See In re Coletta*, 380 B.R. 140 (Bankr. E.D. Pa. 2007), *aff'd*, 336 F. App'x 202 (3d Cir. 2009); *In re Jean-Francois*, 516 B.R. 699, 704 (E.D.N.Y. 2014); *In re Metropolitan Hosp.*, 131 B.R. 283, 291 (E.D. Pa. 1991).

### a.    The make whole is material to the Noteholders' recovery.

If stay relief is denied, the Noteholders will be denied their contract right to rescind acceleration and, upon such rescission, to obtain the make whole that EFIH owes as a result of EFIH's optional redemption of the Notes.  The make whole is approximately $431 million.  *See* A-403-404 (Kearns Report at 27-28).[5]  That is a loss of hundreds of millions of dollars.

EFIH suggests in its April 13 letter to the Court that this loss does not "considerably outweigh" the harm to EFIH and its estate because lifting the stay would impose a hardship of equal magnitude on EFIH—the same $431 million, which it would owe if the stay were lifted and acceleration rescinded.  Adv. No. 14-50363, D.I. 261, at 4.  EFIH is wrong for multiple reasons.

*First*, comparing the relative hardship in absolute dollar terms is an apples to oranges comparison.  In ***percentage*** terms, the hardship to the Noteholders is dramatically greater.  The make whole is approximately ***20%*** of the Noteholders' principal investment.  A-403-404 (Kearns Report at 27-28).  Denying relief from the stay will materially reduce the Noteholders' recoveries.

By contrast, as discussed below, the make whole is, at most, only approximately ***5%*** of EFIH's total debt, and—based on the most low-end valuation of Oncor that is

---

[5] Mr. Kearns calculated the make-whole amount of $431 million using a higher rate of interest that was triggered prepetition, as of January 30, 2014, with respect to some of the Notes when EFIH failed to register the Notes as it agreed.  *See* A-403 (Kearns Report) at 27.  If instead the make whole were calculated without using the higher rate that includes the "additional interest" triggered by the failure to register, the make whole would be approximately $6 million less, or $425 million.  *See id.*  Whatever the outcome of this make-whole litigation, it does not affect the Noteholders' independent claim for payment of the "additional interest" that has accrued at the increased rate since January 30, 2014 (which EFIH did not pay on June 19, 2014).  The Trustee and the Noteholders reserve all rights with respect to such claim (as well as any other claim owed under the Indenture that has not been paid, including interest on interest for amounts that were not timely paid when interest was due on June 1, 2014).

remotely possible—approximately **_2%_** of the Oncor asset value.  Thus, denying relief from the stay will harm the Noteholders far more than granting relief from the stay would harm EFIH—20% in the case of the Noteholders' investment, versus 2% in the case of the Oncor value, or a 10:1 ratio.  And that is especially so since EFIH is solvent and able to pay all of its creditors in any event.  Indeed, it is likely to make enormous distributions to its equity holder.

Moreover, as also discussed below, even those numbers overstate the impact of the make whole to EFIH.  EFIH has realized substantial benefits by redeeming the Notes that offset the "cost" of the make whole.  Those benefits include approximately $170 million in interest savings realized to date, as well as additional interest savings of some $17 million per month that it will continue to enjoy in the future.  *See infra* part I.C.2.c.

EFIH *chose* to redeem the Notes, knowing that it might owe the make whole as a result.  The Noteholders moved for relief from the stay to the extent necessary to rescind acceleration *before* EFIH obtained approval to redeem the Notes.  EFIH was free to cancel the proposed redemption, just as it later canceled the proposed Second Lien refinancing.  Had it elected not to redeem the Notes, it would owe no make whole, regardless whether acceleration were rescinded.  Thus, the Noteholders are not seeking to retroactively increase the size of their claim.  Rather, it was *EFIH* that made the independent choice to proceed with the redemption, *even though it knew that doing so might trigger its obligation to pay the make whole if the Court so held in this litigation.* EFIH did so because it determined that it would nonetheless *benefit* from refinancing the Notes.  It should not be heard now to argue otherwise.

***Second***, EFIH's argument that any harm to the Noteholders from denying relief from the stay is purportedly the same as the harm to EFIH from lifting the stay—$431 million in each case—was equally true in *Texaco*, yet the court there lifted the stay to permit the noteholders in that case and their trustee to exercise a similar contractual right to the one the Noteholders and the Trustee seek to exercise here. As discussed below, the indenture trustee in *Texaco* sought relief from the stay to accelerate in order to preserve the noteholders' right under the indenture to a higher interest rate. Thus, it was equally true in *Texaco* that the impact to the noteholders and the debtor from denying or granting relief was the same in absolute dollar terms—namely, the increased amount of interest that would be owed upon exercise of the noteholders' rights. But the *Texaco* court nonetheless recognized that the harm to the noteholders from denying them their contract rights outweighed the harm to the debtor and its estate—which, like EFIH here, was solvent—and accordingly lifted the stay. *See infra* part I.C.2.b.

***Third***, as discussed below, the basic rule of law that *Texaco*, *Gencarelli* and a long line of other cases stand for is that where the debtor is solvent, creditors are entitled to enforce their state-law rights, even if that would increase the amount of claims against the debtor. *See infra* part I.C.2.b. The fundamental premise underlying these cases is that creditors are harmed when they are denied their bargained-for contract rights against the debtor and cannot assert and obtain payment of their full claims. Indeed, deprivation of a party's contractual rights is a paradigm injury-in-fact.[6] The *Texaco* and *Gencarelli* line of cases likewise recognizes that the harm to creditors from denying their state-law rights considerably outweighs the impact to a solvent debtor, which suffers little or no

---

[6] *See, e.g.*, *Tenn. Elec. Power Co. v. Tenn. Valley Auth.*, 306 U.S. 118, 137-38 (1939); *In re Global Indus. Techs., Inc.*, 645 F.3d 201, 210-15 (3d Cir. 2011) (en banc); *In re Thorpe Insulation Co.*, 677 F.3d 869, 887 (9th Cir. 2012); *Idaho Power Co. v. FERC.*, 312 F.3d 454, 460 (D.C. Cir. 2002).

legally cognizable "harm."  As this Court noted in its discovery ruling in this litigation

last summer, in "case[s] involv[ing] solvent debtor[s], the equities strongly favor holding

the debtor to his contractual obligations so long as those obligations are legally

enforceable under applicable non-bankruptcy law."  Opinion, No. 14-50363, D.I. 105, at

12 (quoting *In re Los Angeles Dodgers LLC*, 465 B.R. 18, 32-33 (D. Del. 2011)).

It is only where the debtor is insolvent, and hence that enforcing one creditor's

rights may come at the expense of the debtor's other *creditors*, that courts have found that

the harm from denying a creditor's contract rights may be outweighed by the harm to the

debtor and its other *creditors*.  Thus, as discussed below, the only two cases denying stay

relief to rescind acceleration—*AMR* and *Momentive*—both focused on the harm *to the*

*debtor and its estate*, emphasizing the harm to the debtor's "*other creditors*."  *In re AMR*

*Corp.*, 730 F.3d 88, 112 (2d Cir. 2013) (emphasis added), *cert. denied*, 134 S. Ct. 1888

(2014); *In re MPM Silicones LLC*, 2014 WL 4436335, at *23 (Bankr. S.D.N.Y. Sept. 9,

2014) (rescinding "significantly impacts the debtor's estate *and creditors*" (emphasis

added)).  Neither court questioned the proposition that denying a creditor its valid state-

law contract rights imposes a substantial hardship on the creditor.  *See infra* part I.C.2.b.

And where, as here, the debtor is solvent, that hardship considerably outweighs any

potential hardship to the debtor.

### b.    The make whole is critical to the Noteholders' bargain.

Denying relief from the stay would also impose considerable hardship on the

Noteholders because, as the Trustee's fact and expert witnesses will testify, the make

whole is essential to the economic bargain the Noteholders struck with EFIH.

As the Trustee will show at trial, the Noteholders committed their capital to EFIH

in non-amortizing Notes at a fixed rate of interest.  By lending at a fixed rate of interest,

the Noteholders assumed the downside risk that interest rates would rise and they would lose the opportunity to invest at those higher rates.  In exchange, the Noteholders bargained for EFIH's promise to pay interest through December 1, 2015, at a fixed rate of interest, or a make whole of equivalent value if EFIH refinanced before that date.  That basic bargain allocated interest-rate risk:  if rates rose, EFIH would benefit; if rates fell, the Noteholders would benefit.

The make whole is essential to preserving the Noteholders' benefit of the bargain. If EFIH could refinance the Notes before December 1, 2015 to take advantage of declining interest rates without paying the make whole, the Noteholders would lose the benefit of the fixed-rate interest payments they contracted to receive through that date. That would force them to reinvest in a dramatically lower-interest rate environment.  And it would shift all interest-rate risk—of both rising and falling rates—to the Noteholders. The make whole avoids this harm.  As its name implies, it simply makes the Noteholders whole.  It protects them against the loss of the yield they negotiated to receive in exchange for their assumption of the risks they assumed in lending to EFIH at a fixed interest rate on a long-term, non-amortizing basis.  *See In re Chemtura Corp.*, 439 B.R. 561, 596 (Bankr. S.D.N.Y. 2010) ("[A] make-whole provision … compensate[s] the lender for … the loss that a lender might suffer if the bond were redeemed in an environment where prevailing interest rates are lower than those the parties bargained for at the time the bond was issued."); Scott K. Charles & Emil A. Kleinhaus, *Prepayment Clauses in Bankruptcy*, 15 Am. Bankr. Inst. L. Rev. 537, 538, 545 (2007) ("[Makewholes] are usually used in fixed-rate loan agreements because … they …

protect a lender from a decline in market rates—the critical risk posed to fixed-rate lenders.").

Indeed, it is no different in concept from a lease termination payment that compensates a landlord for the loss of re-letting the premises at much lower rates after the tenant vacates the space as rental values in the market drop. Yet, the Bankruptcy Code recognizes that the loss of that bargain constitutes damages (even where the debtor is insolvent). *See* 11 U.S.C. § 506(b)(6).

The importance of the make whole to the Noteholders' bargain is reflected in the fact that the make-whole redemption provision is one of the few terms of the Indenture—along with principal, interest rate and maturity—that cannot be amended without the consent of every single Noteholder. Indenture § 9.02(2). Its significance is also reflected in the fact that virtually all fixed-rate high-yield bond indentures include similar make-whole provisions—including all indentures issued by the Debtors since 2007. A269-270 (Moldovan Tr. 72:3-8, 75:20-76:5). And its importance is likewise reflected in the fact that a fixed-rate note without a make-whole provision (or other call protection) commands a materially higher interest rate (if high-yield financing for such a note is even available at all).

The significance of the make whole to the Noteholders' bargain is no different in bankruptcy. That EFIH happened to refinance the Notes in bankruptcy has nothing to do with that basic bargain because the parties face the same interest-rate risk, with the same associated costs and benefits, whether EFIH is in or out of bankruptcy. The economic loss that the Noteholders face from the June 19, 2014 refinancing is no less simply

because EFIH redeemed the Notes in bankruptcy; they still lost their contracted income stream and are left to reinvest in a dramatically lower interest-rate environment.

Accordingly, denying relief from the stay would impose considerable hardship on the Noteholders.  If EFIH is permitted to redeem the Notes before December 1, 2015, without paying the make-whole, it will have converted a call-protected bond into a freely-callable bond, fundamentally upsetting the basic bargain the Noteholders struck when they acquired (and priced) the Notes and costing the Noteholders some 20% of the economic value of the deal they struck with EFIH.  *See* Indenture § 2.01(d) ("The Notes shall not be redeemable other than as provided in Article 3 hereof."); Charles & Kleinhaus, 15 Am. Bankr. Inst. L. Rev. at 552 (noting that if debtor could "refinance its debt on more favorable terms" "within bankruptcy" without paying an agreed make whole, "the debtor would effectively have an option for which it did not bargain: It could deaccelerate if interest rates go up, thus depriving a lender of the opportunity to reinvest at higher interest rates, but it could repay without penalty if interest rates go down, thus forcing the lender to reinvest at lower interest rates without receiving a [make whole]").

> **c.**     **EFIH Never Disclosed to the Noteholders that the Make Whole and the Right to Rescind Would Not Be Enforceable in Bankruptcy**

Denying relief from the stay would also impose considerable hardship on the Noteholders because, as the Trustee will show at trial, the Noteholders' understanding and expectation, based on EFIH's marketing materials when it issued the Notes, was that the make whole, as well as their right to rescind acceleration, would be enforceable in or out of bankruptcy.  By contrast, as discussed below, the evidence will show that EFIH had no expectation at the time it entered into the Indenture that the Noteholders' right to rescind acceleration and their right to the make whole would be unenforceable in

bankruptcy.  A-323, A-354 (Horton Tr. 84:14-85:13, 356:14-357:4).  For this reason as well, the hardship to the Noteholders from denying relief from the stay considerably outweighs the hardship to EFIH.

> **d.**    **The Noteholders Relied on the Make Whole When They Agreed to Take a Haircut in the Exchange Offer for the Notes**

Denying relief from the stay would be particularly hard on the Noteholders because they relied on the make whole as a primary inducement to acquire the Notes in the Debtors' exchange offer.

As the Trustee will show at trial, a majority of the Notes were issued pursuant to an exchange offer in 2010 in accordance with the Debtors' "liability management" program.  The Noteholders took a "hair cut" in that exchange.  The 2010 exchange swapped old EFH notes for the new EFIH First Lien Notes (and cash).  That exchange paid the old EFH noteholders less than 80 cents on the dollar.  A-279-281, A-328 (Moldovan Tr. 133:23-134:23, 135:8-137:11, 138:12-21; Horton Tr. 116:24-117:15).

As the Trustee's expert witnesses will testify, participating in the exchange offer and accepting a hair-cut on the old EFH notes made economic sense only if the new EFIH Notes included the make whole.  Without that call protection, the economics of the deal would have been substantially worse for the Noteholders, and it would have made little economic sense for the Noteholders to accept the exchange offer.  Thus, denying relief from the stay to dishonor the call protection on which they relied in accepting the exchange offer would impose particular hardship on the Noteholders.

### e. The Noteholders Relied on EFIH's Corporate Separateness

Denying relief from the stay would also impose considerable hardship on the Noteholders because they relied on EFIH's corporate separateness when they invested in the Notes.

As the Trustee will show at trial, the Notes were issued pursuant to an Indenture and prospectus providing that the Notes were senior debt obligations of EFIH and were secured by first-priority liens on EFIH's assets, including its interest in Oncor. EFIH further disclosed in the prospectus for the Notes that EFIH and its assets were separate from the other Debtors and their assets, and that the creditors of those other Debtors, including EFH and TCEH, would not have claims directly against EFIH or its assets. Thus, the Noteholders invested in the Notes in reliance on the expectation that they would have first claim to EFIH's assets, including its interest in Oncor.

Accordingly, denying relief from the stay in order to distribute EFIH's assets to creditors of other Debtors, or to the Sponsors, would fundamentally upset the Noteholders' contractual expectations. Lifting the stay, by contrast, would not impose any hardship on EFIH which had no expectation that it could distribute its assets to the Sponsors or to creditors of other Debtors until it had first satisfied its contractual obligations to its own, first-lien creditors, the Noteholders. Here again, the balance of harms tips decidedly in favor of the Noteholders and lifting the stay.

### f. The Noteholders Have Had to Reinvest in a Lower Interest-Rate Environment

Denying relief from the stay would also impose considerable hardship on the Noteholders because they have had to reinvest their capital in a dramatically lower interest-rate environment.

14

The Noteholders bargained with EFIH for the payment of interest on the Notes through December 1, 2015 at a rate of 10.0% (or an increased rate if certain of the Notes were not timely registered). Interest rates are much lower today. Indeed, EFIH obtained $5.4 billion in DIP financing at an interest rate of 4.25%.

As the Trustee will show at trial, after EFIH repaid the Notes on June 19, 2014, the Noteholders have not been able to reinvest their principal in other investments of comparable credit quality at interest rates anywhere close to the 10.0% rate they bargained to receive from EFIH. The very purpose of the make whole is to compensate the Noteholders for this reinvestment risk and cost of replacing their contracted income in a lower interest-rate environment.

Denying the Noteholders that bargained-for compensation will therefore impose considerable hardship on the Noteholders. By contrast, lifting the stay will not impose any hardship of that magnitude on EFIH, which agreed that it would pay that compensation in exchange for obtaining the valuable right to redeem the Notes before December 1, 2015. As noted, EFIH has already benefitted substantially from exercising that right and will continue to do so. For this reason as well, EFIH cannot meet its burden to prove that the balance of harms weighs in favor of maintaining the stay.

> **g.    EFIH's Argument That Maintaining the Stay Will Not Harm the Noteholders Because the Notes Were "Accelerated" by Operation of Bankruptcy Law Is Without Merit.**

At the April 8 status conference, EFIH's counsel suggested that EFIH will seek to re-argue a point from its summary judgment briefing. *See* 4/8/2015 Hrg. Tr. at 18; EFIH Br., D.I. 176, at 20 n.7, 46-47. EFIH suggested that it will argue, again, that the stay should not be lifted because, even if the Trustee were to rescind the *contractual*

acceleration of the Notes under section 6.02 of the Indenture, the Notes would nonetheless remain accelerated by *operation of bankruptcy law* under section 502 of the Bankruptcy Code.  Hence, EFIH reasons, the make whole still would not be due, and the Noteholders would therefore suffer no hardship from being denied the right to rescind.

That argument ignores what this Court has already held.  In its summary judgment rule, this Court made clear that if it lifted the stay "to allow the Trustee to waive the default and decelerate the Notes th[e]n EFIH's refinancing would be an Optional Redemption under section 3.07 of the Indenture and the Applicable Premium would be due and owing to the non-settling Noteholders."  *Findings/Conclusions* ¶¶ 68-69, 90, 94.  Thus, this Court has already held that if the stay is lifted, the make whole *will* be due.

In any event, as the Trustee argued in its summary judgment briefing, and as this Court evidently already concluded, EFIH's argument is without merit.  Numerous cases have allowed make wholes (or comparable claims) in bankruptcy, notwithstanding the operation of bankruptcy law that arises in every bankruptcy case.  *See* Trustee Reply Br., Adv. No. 14-50363, D.I. 222-1 at 15-17, 19 (discussing *Chemtura*, *Biloxi*, *Calpine*).

Thus, a court in this District recently concluded that an indenture trustee held "an allowable claim for the Make-Whole Premium" in the debtor's bankruptcy case.  *In re Trico Marine Servs.*, *Inc.*, 450 B.R. 474, 477-78, 481 (Bankr. D. Del. 2011).[7]  As here, the indenture there did not include explicit language in the acceleration clause providing

---

[7] *See also In re Trico Marine Servs.*, No. 10-12653 (Bankr. D. Del.), Dkt. 942-2 (indenture) § 3.03 ("At its option, the Shipowner may redeem the Obligations, in whole or in part, at any time, at the redemption prices specified in the Obligations[.]"); Dkt. 942-1 (note) at 3 ("[T]his Obligation[] may be redeemed … at the option of the Shipowner … at a redemption price equal to 100% of the principal amount hereof, together with … the applicable Make-Whole Premium").

that the make whole would be due upon acceleration.[8]  But unlike here, the debtor's

bankruptcy filing was not a default triggering acceleration.  Thus, the notes there had *not*

been *contractually* accelerated.   Rather, the "acceleration" at issue in that case arose

solely by operation of bankruptcy law.  *Id.*[9]  Yet, the court held that, notwithstanding that

acceleration of the notes *by operation of bankruptcy law*, the make whole was due.

Similarly, in *In re LHD Realty Corp.*, 726 F.2d 327 (7th Cir. 1984), the court held

that the lender there "accelerate[d] its loan and thereby waived its right to a prepayment

premium" by moving for relief from the stay to foreclose.  *Id.* at 332.  But it emphasized

that "if the lender wishes to preserve its right to a premium, it must forbear from

exercising its acceleration option and await the trustee's or the debtor's decision.  Should

the trustee or the debtor then decide to repay the loan, the lender would presumably be

able to enforce an otherwise valid prepayment premium."  *Id.*  That would not have been

true if the mere fact of the bankruptcy filing itself operated to "accelerate" the debt and

waive the premium.

Other courts have likewise rejected EFIH's argument.  *See, e.g.*, *In re Skyler

Ridge*, 80 B.R. 500, 507 (Bankr. C.D. Cal. 1987) (rejecting argument that the "automatic

acceleration of a debt upon the filing of a bankruptcy case" by operation of bankruptcy

law "eliminates the right to a [make whole] premium"; that argument would mean "such

a clause could never be enforced in a bankruptcy case," and "[n]either the Bankruptcy

Code nor case law compels so drastic a result").

---

[8] *See also In re Trico Marine Servs.*, No. 10-12653 (Bankr. D. Del.), Dkt. 942-2 (indenture) §§ 6.01, 6.02 (providing that, upon acceleration, "the entire unpaid principal amount of the Outstanding Obligations and all unpaid interest thereon shall become due and payable").

[9] *See also In re Trico Marine Servs.*, No. 10-12653 (Bankr. D. Del.), Dkt. 942-2 (indenture) §§ 6.01, 6.02 (providing for acceleration only for payment defaults, which had not occurred); *Trico*, 450 B.R. at 477 ("the Debtors have made all Mandatory Redemption Payments as and when due").

17

Indeed, the Trustee is not aware of *any* case that has disallowed a make whole based solely on "acceleration" arising by operation of bankruptcy law.  The only cases EFIH cited when it previously made this argument at summary judgment—*Calpine* and *Solutia*—each involved a *contractual* acceleration triggered by the bankruptcy filing.  *See HSBC Bank USA, N.A. v. Calpine Corp.*, 2010 WL 3835200, at *3 (S.D.N.Y. Sept. 15, 2010) (*"According to the terms of the notes*, a voluntary bankruptcy filing constitutes an event of default that accelerates and matures the notes …." (emphasis added)); *In re Solutia*, 379 B.R. 473, 478 (Bankr. S.D.N.Y. 2007) ("*Section 6.02 of the Original Indenture* provides that if an event of default [for bankruptcy] occurs the principal of and premium, if any, and accrued interest … shall become immediately due and payable…." (emphasis added)).

"Acceleration" by *operation of bankruptcy law* is not the same as a *contractual* acceleration.  Unlike a *contractual* acceleration, the "acceleration" of debt arising as a matter of bankruptcy law does not advance the maturity of the debt.  It merely permits a creditor to file a proof of claim for the full debt, *even if the debt is "unmatured*."  *See* 11 U.S.C. § 502(b)(1) ("the court … shall allow such claim … except to the extent that such claim is unenforceable … under any agreement or applicable law *for a reason other than because such claim is contingent or unmatured*" (emphasis added)).

The Third Circuit and numerous other courts have so held.  *See In re Oakwood Homes Corp.*, 449 F.3d 588, 602 (3d Cir. 2006) (noting although "[t]he general rule of both the Bankruptcy Code and § 502(b) … is acceleration to the date of filing of the bankruptcy petition, *for the purpose of filing a claim*," "we must … reject our dissenting colleague's theory that … future principal is accelerated … and becomes presently due

debt" (emphasis added)); *In re Premier Entm't Biloxi LLC*, 445 B.R. 582, 630 (Bankr.

S.D. Miss. 2010) ("The automatic acceleration of a debt under the Bankruptcy Code

allows a lender to file a proof of claim for the unmatured principal amount of the debt

under § 502 without violating the automatic stay, but such acceleration is relatively

limited and does not change the maturity date of the debt."); *MPM*, 2014 WL 4436335, at

*23 ("[A] contractual acceleration provision goes well beyond the acceleration that

occurs as a matter of bankruptcy law with respect to the determination of claims against

the estate"; the latter permits a creditor "to file a claim against a debtor for the entire

amount of the debt, *despite the actual maturity date or terms of the contract*";

"[h]owever, a *contractual* acceleration provision advances the maturity date of the debt"

(internal quotation marks omitted) (first emphasis added; second emphasis in original)).

EFIH's argument that lifting the stay would be futile is without merit.

### 2.    Modifying the Stay Will Not Result in Any "Great Prejudice" to EFIH or Its Estate.

The second factor—whether any "great prejudice" to either EFIH or its

bankruptcy estate will result from lifting the stay—also weighs in favor of lifting the stay.

To assess whether "great prejudice" will result to EFIH and its estate, it is

important to bear in mind the limited relief sought.  The Trustee and Noteholders seek to

lift the stay solely for a single purpose:  to rescind acceleration.  They do not seek to

foreclose on collateral.  They do not seek immediate collection from the estate.  They

merely seek to exercise their contract right to rescind acceleration and assert a claim in

EFIH's bankruptcy case for the make whole that EFIH owes as a result of its optional

redemption of the Notes.  They do not seek payment of that claim now, but simply to

assert a claim that would be addressed in a plan of reorganization or otherwise resolved

through the bankruptcy process, like the claim of any other creditor.  Granting that

limited relief will not result in any "great prejudice" to EFIH or its estate.

> a.    **Modifying the Stay Will Not Harm the Value of EFIH's Estate.**

Modifying the stay will not diminish the value of any property of EFIH's

bankruptcy estate.  If EFIH is held to the terms of its bargain and acceleration is

rescinded, it will owe the make whole as a result of its optional redemption of the Notes.

Recognizing that *claim* against EFIH (a liability) will not reduce the value of the *assets*

that EFIH owns.

EFIH is an intermediate holding company.  It has no physical operations.  A-150

(Keglevic First-Day Affidavit ¶ 53).  It has no employees or customers.  Its only cash

expenses are interest on the DIP facility and professional fee administrative expenses.

No. 14-10979, D.I. 3527 at 2-3.  Its primary asset is its 100% ownership of Oncor

Electric Delivery Holdings Company LLC (itself a holding company), which, in turn,

owns approximately 80% of Oncor Electric Delivery Company LLC ("Oncor").  *Id.*

EFIH's value is principally derived from its indirect ownership in Oncor and dividend

distributions from Oncor.  *Id.*

Oncor is not a debtor in these cases.  It operates a regulated electricity distribution

and transmission business that is "ring-fenced" from the Debtors.  It has independent

management.  It is not liable for any of EFIH's debt.  Its property is not collateral

securing any of EFIH's debt, including the First Lien Notes.  A-151-152 (Keglevic First-

Day Affidavit) ¶¶ 56-59.

Accordingly, lifting the stay for the limited purpose of allowing the Trustee to

rescind acceleration and assert a claim for the optional-redemption make whole against

EFIH's bankruptcy estate will have no effect on the value of EFIH's assets.  EFIH will still own its financial interest in Oncor.  The value of the Oncor business will not change.  Oncor will not be liable for the make whole.  It will continue operating its business.  No employee of EFIH or Oncor will lose his or her job.  No customer of EFIH or Oncor will be lost.  No contract of EFIH or Oncor will be breached.  EFIH's assets will remain the same.

Indeed, because the stay would be lifted solely for the limited purpose of rescinding acceleration, it would otherwise remain in effect as to all other acts.  Thus, for example, the Trustee would be stayed from taking any act to foreclose on EFIH's assets.  The stay would therefore continue to serve its primary function:  protecting the assets of EFIH's estate from creditor collection actions outside of bankruptcy, thereby allowing EFIH to maximize the value of its estate for the benefit of all creditors.

That is exactly what EFIH is doing now.  It is pursuing a sale of its interest in Oncor to the highest and best bidder under bidding and auction procedures approved by the Court.  *See* Order Approving Revised Bidding Procedures, No. 14-10979, D.I. 3295.  Lifting the stay for the limited purpose of rescinding acceleration would not prevent EFIH from completing that sale process and selling its interest in Oncor to the highest and best bidder.

In short, EFIH cannot meet its burden of showing that its estate will suffer any "great prejudice" if the stay is lifted, because rescinding acceleration will not affect EFIH's assets or its ability to maximize the value of those assets.

### b.    Modifying the Stay Will Not Prejudice EFIH's Creditors.

Lifting the stay also will not prejudice EFIH's creditors.  In Phase One of this litigation, "the Court will assume … that the EFIH Debtors are solvent and able to pay all allowed claims of their creditors in full."  Adv. Case No. 14-50363, D.I. 128 at 3. Accordingly, lifting the stay for the limited purpose sought here—to permit the Noteholders to rescind acceleration and assert a claim for the make whole that EFIH owes as a result of its optional redemption of the Notes—will not reduce the recovery of any other creditor of EFIH.

Although the Trustee has not been permitted in Phase One to take discovery on EFIH's solvency and financial condition, the publicly available information suggests that EFIH is not only solvent, but almost surely is by billions of dollars.  For example:

- On April 14, 2015, the Debtors filed a plan of reorganization and disclosure statement that contemplates that all junior E-side constituencies, both at EFIH and at EFH, will receive payment of the full amount of their notes—several billion dollars in total—*plus* some or all of the postpetition interest they assert, and a percentage of their make-whole claims.  It also calls for the Sponsors to receive distributions.  *See* No. 14-10979, *Joint Plan of Reorganization*, D.I. 4142, at Art. III(B); *Disclosure Statement*, D.I. 4143, at 6-18.

- Last July, Nextera made an offer that implied a value of greater than $18 billion for Oncor, but EFIH declined to designate it as the stalking horse because EFIH believed that other bids could be higher.[10]

- Major investment bank analysts have recently valued Oncor at $21.9 billion, and potentially higher based on alternative structures.  *See Addressing the Elephant in the Room – Our Thoughts on Oncor* (Citi Research, United States), Mar. 26, 2015, at 4 (No. 14-10979, D.I. 4129, Ex. 3).

- The EFIH second lien, EFIH unsecured PIK, and structurally subordinated EFH notes all trade today above par—as high as 117% for the second liens,

---

[10] Nextera made that offer, which implied solvency, within one month of EFIH's refinancing of the Notes. Thus, contrary to EFIH's suggestion in its April 13 letter to the Court, it is not correct that "EFIH's financial condition (and related value) has changed since the Trustee sent its rescission notice on June 4, 2014" in any material way for present purposes; EFIH was solvent then, and it remains so now.

121% for the PIKs, and 104% for the EFH notes. *See* Bloomberg Data (No. 14-10979, D.I. 4129, Ex. 4).

- The financial press has reported that the EFIH second liens, the EFIH PIKs and the EFH noteholders have been discussing their own plan that would give them the lion's share of the equity in a reorganized EFIH. Based on a notional value for Oncor of $18.5 billion, the EFH notes and the EFIH PIKs would receive 120 cents on the dollar, while the EFIH second liens would receive 127 cents on the dollar. That plan also provides for a third party to operate EFIH on an incentive-basis, in which it would be compensated only if the value of Oncor increased to $19 billion, suggesting that the $18.5 billion plug valuation is only a floor. *See Energy Future E-Side Creditors draft Hunt-family sponsored POR that values Oncor at USD 18.5bn*, Debtwire, Mar. 27, 2015 (No. 14-10979, D.I. 4129, Ex. 5).

Accordingly, because EFIH is presumed (and evidently in fact is) solvent, lifting the stay to permit the Noteholders to assert a claim for the make whole will not prejudice EFIH's other creditors. EFIH's estate will still have sufficient value to pay all of its creditors in full in any event.

In this regard, while solvency may not be dispositive *as a matter of law* on a motion to lift the stay, it is highly relevant, particularly in the context of a holding company. When a debtor is *insolvent*, paying one creditor may hurt other creditors because there is not enough money to pay everyone in full. That dynamic may lead creditors of an insolvent debtor to compete with each other to grab the debtor's assets before the money runs out. That could potentially destroy the debtor's going-concern value and reduce recoveries for all creditors as a group. And it could lead to an inequitable distribution, as faster-moving creditors get paid in full, while slower-moving creditors of equal priority get nothing.

The automatic stay is bankruptcy law's principal solution to that problem. It stays creditors' individual collection actions. That allows the going-concern value of the

debtor's assets to be maximized.   And it allows that value to be distributed equitably among all creditors, in accordance with their state-law entitlements and priorities.[11]

When a debtor is *solvent*, however, the calculus fundamentally changes.  To be sure, the automatic stay may still play an important role.  For instance, even when the debtor is solvent, permitting a secured creditor to foreclose on critical operating assets could nonetheless destroy the debtor's going-concern value and potentially render the debtor insolvent, to the detriment of the debtor's other creditors.  And preventing a race to the courthouse allows the bankruptcy court time to sort out creditors' entitlements under state law.

But those concerns are not present here.  The Trustee and Noteholders do not seek to foreclose.  And the stay has served its function by allowing the Court to determine the Trustee's and Noteholders' entitlements under state law—namely, to rescind acceleration and be paid the make whole owed as a result of EFIH's optional redemption of the Notes. All they seek now is to have their state-law entitlement to that claim recognized in EFIH's bankruptcy case.

Where the debtor is *solvent*, allowing one creditor a claim in the bankruptcy proceedings for the amount it is lawfully owed does not hurt the debtor's other creditors. The concern about unequal distribution that underlies the stay, by definition, disappears when the debtor can pay all of its creditors 100% of their claims.  EFIH acknowledged that very point in its submission seeking bifurcation:  "With a solvent debtor, issues as to

---

[11]  *See, e.g.*, *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 121 (3d Cir. 2004) ("The basic problem that bankruptcy law is designed to handle, both as a normative matter and as a positive matter, is that the system of individual creditor remedies may be bad for the creditors *as a group* when there are not enough assets to go around." (internal quotation marks omitted)); *id.* at 122 ("Creditors that fear an impending default may seek to protect their claims, triggering 'the chaotic mix of self-help repossession and judicial execution available at state law' to which the Bankruptcy Code provides an alternative.").

fairness amongst creditors, in sharing a limited pie, no longer apply; the allowance of claims under a make-whole provision … no longer comes at the expense of other creditors."  Adv. No. 14-50363, D.I. 127 at 3-4 (quoting *In re Chemtura Corp.*, 439 B.R. 561, 605 (Bankr. S.D.N.Y. 2010)).

In these circumstances, courts have recognized that solvency is a critical factor in determining that cause exists to lift the stay.  Perhaps the closest case to the facts of this case is *Texaco*.

There, as here, an indenture trustee sought to exercise a right under a bond indenture.  *In re Texaco, Inc.*, 81 B.R. 804, 805 (Bankr. S.D.N.Y. 1988).  There, as here, the debtor took affirmative action post-petition to reduce the interest it promised to pay the noteholders (there, by lowering the contract interest rate prospectively; here, by refinancing).  And there, as here, the trustee and the noteholders sought to exercise the rights they had bargained for under the indenture to protect themselves in response to just such action by the debtor.  Although the particular right at issue there was slightly different—the trustee sought to deliver a notice of acceleration, rather than deceleration—its effect was the same as here:  to preserve the noteholders' claim against the debtor's attempt to reduce the amount it owed them.  *See id.*

There, too, the trustee sought relief from the stay "solely for the limited purpose of being allowed to deliver [the] Notice."  *Id.*  It did not seek to foreclose or "enforce collection at this time"; it sought "only to preserve whatever rights the holders of the Notes may have" under their contract with the debtor.  *Id.*

And there, as here, the debtor was solvent.  To be sure, when Texaco filed for bankruptcy, it was reeling from entry of a staggering $10 billion judgment against it; no

one doubted the good faith of its bankruptcy filing.  But, much as here, Texaco's evident

solvency became apparent as the bankruptcy proceeded.  It ultimately proposed a plan

providing for "a 100% payment to unsecured creditors, together with interest."  *Id.* at

806.

Under these circumstances, the court lifted the stay, emphasizing the debtor's

solvency as the key factor.  It explained:

> "*In view of the fact that Texaco proposes to pay all unsecured creditors in full*, together with prepetition and post-petition interest, there is no reason why Texaco should be allowed to modify the rights of the Noteholders by unilaterally lowering the post-petition interest rate and at the same time preventing the Noteholders from preserving whatever rights they might have to receive post-petition interest pursuant to their original contract. Texaco should not use the automatic stay as a shield when it seeks to take aggressive action to lower interest rates and then prevent the Indenture Trustee from responding to the consequences of Texaco's own conduct."

*Id.* (emphasis added).

The court further stressed that stay relief was appropriate where, as here, the

trustee sought only limited relief:

> "The relief sought by [the trustee] is ministerial in nature; there will be no effort to obtain any immediate enforcement of the Noteholders' rights to the prejudice of other creditors because no payment is sought.  The delivery of a Notice of Acceleration without a demand for payment will not give the Noteholders a leg up over other unsecured creditors …."

*Id.*

Precedent in this District has also cited a debtor's solvency as a key factor in

finding cause to lift the stay.  In *In re Armstrong World Industries*, the court lifted the

stay to permit asbestos claimants to continue their prepetition lawsuit against the debtor

and its insurers in another court.  The court explained:

> I'm persuaded by the fact that this is a solvent debtor.  Yes, insurance coverage is implicated in various asbestos claims, but we do have a solvent debtor here and for that reason, I think they can withstand the additional litigation of the Maertin

plaintiffs in the forum they choose.  So I'm going to grant the application as to the stay as to these plaintiffs[.]

*In re Armstrong World Indus.*, No. 00-4471, Hrg. Tr. at 39 (D. Del. Nov. 7, 2001),

attached as Exhibit 1.

The *Armstrong* court subsequently issued a Memorandum Order setting forth the

reasons why it found that "cause" existed to lift the stay under section 362(d)(1):

> The Court finds the following to be persuasive in deciding the instant Motion:
> 1.  The Debtor is a solvent, going concern, that sought Chapter 11 protection in furtherance of its effort to manage numerous asbestos claims.
> 2.  The Maertin litigation … indicates a high likelihood of success for the Maertin Plaintiffs.
> 3.  In the circumstances the Debtor exists operationally and financially, the Court finds that:  a) no undue prejudice would inure to the Debtor by permitting the Maertin litigation to move forward; b) there would be minimal, if any, impact on the Debtor's resources available to pay other pre and post petition claimants.

No. 00-4471, Mem. Order at 2-3 (D. Del. Dec. 10, 2001), attached as Exhibit 2.

The Third Circuit affirmed.  *In re Armstrong World Indus., Inc.*, 106 F. App'x

785 (3d Cir. 2004) (unpublished).[12]  Although it noted that an intervening stipulation of

the parties substantially mooted the appeal, it went on to state that:

> We can, for the most part, dispose of any remaining issues by noting that the District Court explained why relief from the automatic stay was appropriate as well as findings of fact supporting that relief in its December Order.  We can affirm substantially for the reasons set forth therein.

*Id.* at 787.

The debtor's solvency was similarly a key factor supporting relief from the stay in

*Claughton v. Mixson*, 33 F.3d 4 (4th Cir. 1994).  *Claughton* affirmed an order lifting the

stay to permit a creditor to enforce a judgment against the debtor's estate.  The Fourth

Circuit noted that "[f]ollowing a two-day evidentiary hearing, the bankruptcy court found

that the debtor's estate contained sufficient assets to pay in full all of the debtor's

---

[12] The decision indicates that it is non-precedential.

creditors after distribution to [the moving creditor]," and "[a]ccordingly, the court lifted the stay 'for cause,' pursuant to 11 U.S.C. § 362(d)(1)." *Id.* at 5. Affirming, the Court of Appeals held that the bankruptcy court had "properly exercised the discretion granted to it pursuant to section 362(d)(1)." *Id.* It noted that "the bankruptcy court correctly concluded that the debtor is solvent." *Id.* at 5 n.2. And it explained that "[t]he court's decision did not harm the rights of the bankruptcy estate's creditors because the bankruptcy estate retained sufficient assets to pay in full all of the debtor's creditors pursuant to a plan of reorganization." *Id.* at 5.

To be sure, the Fourth Circuit also questioned the debtor's good faith in filing the bankruptcy case. *Id.* at 6. But *Claughton* turned primarily on considerations of solvency, not bad faith. *Id.* After noting the debtor's possible bad faith, the Fourth Circuit emphasized that "*[g]iven the solvency of the debtor's estate*, we think the bankruptcy court correctly exercised its equitable power." *Id.* (emphasis added). And in rejecting the debtor's argument that the bankruptcy court abused its discretion in lifting the stay, the Court of Appeals stated that "[w]ere this a typical bankruptcy case involving an *insolvent* debtor, we would agree with the debtor." *Id.* at 6 n.4 (emphasis added). "Here, however, the debtor is *solvent* and thus able to pay all of his creditors in full from the property not awarded to [the moving creditor]. We accordingly reject the debtor's argument." *Id.* (emphasis added).

Other courts have also cited a debtor's solvency as a critical factor weighing in favor of lifting the stay. *See, e.g.*, *In re Premier Auto. Servs., Inc.*, 343 B.R. 501, 521 (Bankr. D. Md. 2006) (lifting stay where "solvent" debtor filed case with bad faith intent to "invok[e] the automatic stay" to "delay creditors"), *aff'd*, 492 F.3d 274 (4th Cir. 2007);

*In re Novak*, 103 B.R. 403, 413-15 (Bankr. E.D.N.Y. 1989) (lifting stay where "solvent" debtor sought to "remain[] under the Section 362 stay" and "block[] [creditor] from satisfaction of [its] claim").

This case law is rooted in the fundamental principle of bankruptcy law—one this Court has already recognized—that creditors should be allowed to exercise their state-law rights, including rights to what they are owed under their contracts with the debtor, where the debtor is solvent.

As this Court explained in its discovery ruling in this litigation last summer, "[w]hile solvent debtor cases are 'somewhat of a rarity,' the available precedent consistently defers to previously contracted bargains and provisions when dealing with solvent debtors in varying situations." A-235 (Opinion, No. 14-50363, D.I. 105, at 13.) Accordingly, the Court concluded that "[i]f … the terms of the indenture are found to require the payment of a makewhole premium, the solvency or insolvency of the Debtor will come into play"; "[i]f the Debtor is solvent, the Court is able to follow the approach utilized in *Gencarelli* and similar precedent to enforce the terms of the contract under state law." A-236-237 (Opinion, No. 14-50363, D.I. 105, at 14-15). As *Gencarelli* held, "[w]hen the debtor is solvent, the bankruptcy rule is that where there is a contractual provision, valid under state law, … the bankruptcy court will enforce the contractual provision." *In re Gencarelli*, 501 F.3d 1, 7 (1st Cir. 2007) (internal quotation marks omitted).

Courts have applied that rule in the context of allowing make-whole claims. Thus, as the Court noted in its discovery ruling, "within the case of *Gencarelli v. UPS Capital Bus. Credit*, the First Circuit decided that since the debtor was solvent, the pre-

bargained contractual prepayment penalty would be enforced, regardless of its reasonableness as decided under Section 506(b) of the Code."  A-234 (Opinion, No. 14-50363, D.I. 105, at 12).  As *Gencarelli* explained, "[b]ecause Gencarelli is solvent and the bankruptcy estate possesses funds sufficient to pay all claims (secured and unsecured) in full, no useful purpose would be served by inquiring into whether the prepayment penalties are reasonable (and, thus, deserving of priority) within the contemplation of section 506(b)."  501 F.3d at 8.  While "the balance of the equities may be different if … *creditors* are at risk of collateral damage" in an "*insolvent* debtor" case, "[t]his is a *solvent* debtor case and, as such, the equities strongly favor holding the *debtor* to his contractual obligations as long as those obligations are legally enforceable under applicable non-bankruptcy law."  *Id.* at 7 & n.3 (emphasis added in first, third and fourth instances).

As the Court also observed in its discovery ruling, "[t]he District of Delaware, as well as other courts, have tended to agree with the holding of *Gencarelli*."  A-234 (Opinion, No. 14-50363, D.I. 105, at 12).  Thus, "[w]ithin *In re Los Angeles Dodgers LLC*, the District Court found that a contractual provision was not unenforceable merely because a debtor was in bankruptcy"; "[a]s the case involved a solvent debtor, 'the equities strongly favor holding the debtor to his contractual obligations so long as those obligations are legally enforceable under applicable non-bankruptcy law.'"  *Id.* (quoting *In re Los Angeles Dodgers LLC*, 465 B.R. 18, 32-33 (D. Del. 2011)).

Similarly, the Court noted in its discovery ruling that "[w]ithin the case of *In re Chemtura Corp.*, the [court] discussed the treatment of makewhole claims with regard to a solvent debtor … and largely agreed with the principles set forth in Charles and

Kleinhaus' article." A-233-234 (Opinion, No. 14-50363, D.I. 105, at 11-12). *Chemtura* approved a settlement allowing a make-claim in substantial part, stating that "since we have a solvent debtor, I think the bondholders are likely to get whatever they're entitled to under state law." 439 B.R. 561 at 606. It explained:

> With a solvent debtor, issues as to fairness amongst creditors, in sharing a limited pie, no longer apply; the allowance of claims under a make-whole provision, or for damages for breach of a no-call, no longer comes at the expense of other creditors.

*Id.* at 605 (citing Charles & Kleinhaus, 15 Am. Bankr. Inst. L. Rev. at 584).

Likewise, "[w]ithin the case of *In re Premier Entm't Biloxi LLC*, the [court] noted that because the debtors were shown to be solvent, the claimants were entitled to pursue an unsecured claim for damages for the Debtor's breach of the terms of the indenture, enforcing a valid contractual obligation." A-234 (Opinion, No. 14-50363, D.I. 105, at 12). The *Premier* court thus awarded the noteholders damages for breach of an indenture's no-call provision, citing "the long line of cases" endorsing the principle "that when a debtor is solvent, bankruptcy courts generally will enforce the debtor's contractual obligations to the extent they are valid under applicable state law." *In re Premier Entm't Biloxi LLC*, 445 B.R. 582, 636-37, 646 (Bankr. S.D. Miss. 2010).

Courts have applied that principle in contexts where the result is—as here—to increase the amount of a creditor's claim against the debtor's estate.

For example, in a frequently cited case, the Seventh Circuit held that where the debtor was solvent and able to "pay[] off all of the [debtor's] creditors," the debenture holders were entitled to enforce their right under the indenture to accelerate the debt. *In re Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*, 791 F.2d 524, 526 (7th Cir. 1986). The court of appeals so held even though, as here, the exercise of that right would occur

31

*post-petition* and would *increase the amount of the debenture holders' claim* against the debtor's estate. *See id.* at 525-26 (noting indenture trustee declared the acceleration one month *after* the bankruptcy filing, and that giving it effect would increase the claim from $24 million to $56 million).

As this Court noted in its discovery ruling, "[t]he Seventh Circuit pointed out [in *In re Chicago*] that the nature of the equity court did not provide judges with 'free-floating discretion to redistribute rights in accordance with … personal views of justice and fairness, however enlightened those views may be." A-234 (Opinion, No. 14-50363, D.I. 105, at 12 (quoting *Chicago*, 791 F.2d at 528)). Instead, "'[i]f the bankrupt is solvent the task for the bankruptcy court is simply to enforce creditors' rights according to the tenor of the contracts that created those rights.'" *Id.* As the Seventh Circuit explained, "[t]he only good reason for refusing to give a creditor in reorganization all that he bargained for when he extended credit is to help other creditors, the debtor's assets being insufficient to pay all creditors in full." *Chicago*, 791 F.2d at 527. That reason has no application where—as here—"[a]ll of the [debtor's] creditors will be paid in full." *Id.*

Similarly, this Court noted in its discovery ruling that the "Sixth Circuit agreed with this proposition within *In re Dow Corning Corp.*, whereby the court applied the presumption that the contracted-for default interest rate would be paid to unsecured claim holders in a solvent debtor case." A-235 (Opinion, No. 14-50363, D.I. 105, at 13 (citing *In re Dow Corning Corp.*, 456 F.3d 668, 679-80 (6th Cir. 2006)). Applying a default rate of interest would *increase* the size of the creditors' claim against the debtor' estate. Nonetheless, the Sixth Circuit explained that "in solvent debtor cases, rather than considering equitable principles, courts have generally confined themselves to

determining and enforcing whatever pre-petition rights a given creditor has against the debtor." *Dow Corning*, 456 F.3d at 679.  Accordingly, the Sixth Circuit agreed that it "should enforce [the creditors'] rights under the contract, including their right to interest awarded at the default rate as set forth in the terms of their contract," because "[t]o do otherwise … would violate § 1129(b)'s fair and equitable standard" and "the absolute priority rule."  *Id.*

As this Court also recounted in its discovery ruling, the Second Circuit similarly held "within the case of *Ruskin v. Griffiths*, … that the claimholder was entitled to the benefit of the higher interest rate previously contracted for through a variable interest rate provision."  A-235 (Opinion, No. 14-50363, D.I. 105, at 13 (citing *Ruskin v. Griffiths*, 269 F.2d 827, 830-31 (2d Cir. 1959), and noting that courts have continued to be follow *Ruskin* under the current Bankruptcy Code)).  *Ruskin* held that a secured creditor was entitled to a default rate of interest (6% instead of 4%) after the creditor accelerated the debt *post-petition* in response to the debtor's bankruptcy default, even though allowing such interest would *increase the size of the creditor's claim* against the debtor's estate. 269 F.2d at 829-30.  The Second Circuit concluded that "[w]hen a debtor is solvent, 'it seems … the opposite of equity to allow the debtor to escape the expressly-bargained-for result of its act.'"  A-235 (Opinion, No. 14-50363, D.I. 105, at 13 (citing *Ruskin*, 269 F.2d at 830-31)).

In short, as this Court has previously observed, "the cases show that when a debtor is solvent, certain contractual terms, such as the payment of a makewhole premium, can be enforced under state law, and the EFIH Debtors may not rely on the

33

Bankruptcy Code to 'deny payment of a redemption premium otherwise required' by the terms of the indenture."  A-236 (Opinion, No. 14-50363, D.I. 105, at 14.)

To be sure, as the Court noted in its summary judgment ruling, two decisions— *AMR* and *Momentive*—have declined to lift the stay to permit an indenture trustee to rescind acceleration and assert a make-whole claim.  *Findings/Conclusions* ¶ 75.[13]  But both courts emphasized that lifting the stay in those cases would prejudice the debtor's other *creditors*—a key factor not at issue here, where EFIH is presumed (and is in fact) solvent.

Thus, in *AMR*, the Second Circuit explained that it found no abuse of discretion in the bankruptcy court's "conclusion that lifting the automatic stay would serve only to increase the size of [the trustee's] claim . . . , harming the estate *and [the debtor's] other creditors*."  *In re AMR Corp.*, 730 F.3d 88, 112 (2d Cir. 2013) (emphasis added).  It explained that "[o]ne of the principal purposes of the automatic stay is to preserve the property of the debtor's estate for the benefit of all the *creditors*."  *Id.* (emphasis added) (internal quotation marks omitted); *see also In re AMR Corp.*, 485 B.R. 279, 295 (Bankr. S.D.N.Y. 2013) ("deceleration would serve only to increase the size of [the trustee's]

---

[13] In its April 13 letter to the Court, EFIH incorrectly suggests that a third case did so as well, citing *In re Solutia*, 379 B.R. 473 (Bankr. S.D.N.Y. 2007).  *Solutia* did not address whether cause existed to lift the stay to permit rescission.  In a footnote, it denied the noteholders' "oral motion" to vacate the stay retroactively as "untimely," noting that, unlike here, the noteholders waited more than a year after the debtor sought to redeem the notes before seeking relief.  *See id.* at 483-484 & n.7.

claim" "to the detriment of the estate *and the Debtors' other creditors*" (emphasis added)).[14]

*MPM* similarly emphasized that the debtor there was insolvent and that, as a result, "sending … [a] deceleration notice significantly impacts the debtor's estate *and creditors* … by enhancing claims by potentially hundreds of millions of dollars." *In re MPM Silicones, LLC*, 2014 WL 4436335, at *23 (Bankr. S.D.N.Y. Sept. 9, 2014) (emphasis added).  Judge Drain agreed with, but distinguished, *Chemtura* and *Premier Entertainment Biloxi* on grounds that "[t]he debtors in both cases (unlike here) were solvent and, therefore, the courts found them to be subject to an exception to [the Bankruptcy] Code's disallowance of claims." *Id.* at *17.  Judge Drain made clear that had the debtor in *MPM* been solvent he would have reached the opposite result:  "the point about solvency is it's really not like a bankruptcy"; "[y]ou are doing it just to finalize the contractual arrangements, but other than that, there's no bankruptcy."  A-249 (*MPM* Hrg. Tr. dated Aug. 19, 2014) at 142.

### c. Modifying the Stay Will Not Prejudice EFIH Itself

Lifting the stay will not result in any "great prejudice" to EFIH itself.  Allowing the make whole will not increase EFIH's debt significantly, given its other debt and, most importantly, the far greater value of its assets.  As noted, the make whole is approximately $431 million.  As the Trustee will show at trial, that amount represents

---

[14] *AMR* is distinguishable for additional reasons.  Unlike here, the indenture in that case expressly gave the debtor the right to pay off the Notes "without Make-Whole Amount."  730 F.3d at 99-100.  Accordingly, the Second Circuit found that the trustee sought to lift the stay in order to "increase the size of [its] claim []to an amount *greater* than that to which it is entitled pursuant to the Indentures." *Id.* at 112 (emphasis added).  Here, by contrast, as noted above, the Court has held that the Trustee is entitled under the terms of the Indenture to rescind acceleration, and that upon such rescission, the make whole would be due as a result of EFIH's optional redemption of the Notes.  Furthermore, the bankruptcy court stressed that the *AMR* noteholders did not move for relief from the stay until more than a year had passed in the Chapter 11 case, whereas the Trustee and the Noteholders here moved for such relief in the first month of the bankruptcy case.  485 B.R. at 295.

only approximately **_5%_** of EFIH's total debt, and approximately **_2%_** of the value of the

Oncor assets at the very low end valuation of some $18 billion, implied by the Nextera

offer.[15]  As the Court observed in its summary judgment ruling, that amount is not

terribly significant to EFIH's overall enterprise.  *Findings/Conclusions* ¶ 61 ("[T]o

suggest that the Debtors refused to market and sell Oncor, *which may be worth $18*

*billion*, to avoid having to pay a $400 million make-whole premium stretches the bounds

of credulity." (emphasis added)).

Furthermore, even those numbers overstate the impact of the make whole.  The

allowance of the make whole will generate an offsetting net operating loss for EFIH and

the other Debtors that they can use to shelter future income.  Moreover, EFIH has

realized substantial benefits by redeeming the Notes.  As the Trustee will show at trial, by

refinancing the 10% notes with DIP financing at 4.25%, EFIH has already realized close

to $170 million in interest savings (or more), and will continue to realize additional

savings in the future.  Indeed, the future interest savings through the stated maturity of

the Notes in 2020 at EFIH's current borrowing rate would amount to an additional $1.16

billion in reduced interest savings.  Even if EFIH had redeemed the Notes on the first

date that it could have done so without paying the make whole (December 1, 2015), it

would have had to pay a premium of five percent of the principal balance.  EFIH has

---

[15] The value of EFIH's interest in Oncor is less than the aggregate value of the Oncor assets both because
Oncor has its own debt and because EFIH has "only" an indirect 80% interest in the equity of Oncor.  At an
$18 billion valuation, the equity value of Oncor is approximately $11.7 billion (after deducting net debt of
approximately $6.3 billion), 80% of which is approximately $9.4 billion.  Thus, at an $18 billion valuation,
the make whole is less than 5% of the value of EFIH's interest in Oncor, and an even smaller percentage of
EFIH's total assets (which include, in addition to its interest in Oncor, cash, and EFH notes with a principal
balance of approximately $1.3 billion).  And, of course, at a higher valuation for Oncor, the make whole is
an even further reduced percentage of EFIH's interest in Oncor and its total assets.

avoided these costs.  The net impact of the make whole on EFIH is thus even less

signfcant in light of these offsetting benefits.

In other contexts, the Third Circuit has held that a debtor does not suffer legally

cognizable "prejudice" by simply allowing a creditor to assert its state-law claim—even

if the creditor has failed to comply with the bankruptcy court's procedures.  In particular,

in allowing a creditor to file a late proof of claim, the Third Circuit has held that the

debtor was not "prejudiced" merely because the claim would increase the total amount of

claims against the debtor.  *See In re O'Brien Envtl. Energy, Inc.*, 188 F.3d 116, 128 (3d

Cir. 1999) ("[W]e cannot see how [the debtor] would be prejudiced, in the legal sense, by

[the debtor's] having to pay [the creditor's] claim ….").

So, too, here, EFIH will not suffer "great prejudice" if it is held to the terms of its

bargain.  When EFIH entered into the Indenture, it *agreed* that the Noteholders would

have the right to rescind acceleration.  And as the Trustee will show at trial, EFIH had no

expectation—let alone disclosed to the Noteholders—that this right might be subject to

limitation in bankruptcy.  A debtor, particularly one that is solvent, should not be

permitted "to avoid [its] contract by hiding behind the automatic stay."  *Continental*, 152

B.R. at 425.

Indeed, EFIH agreed with the Trustee that it would not use the stay to avoid its

obligations under the Indenture.  *See* Indenture § 4.06 ("[EFIH] … covenant[s] … that

[it] *shall not* at any time *insist upon … any stay*, extension or usury *law* … that may

affect … the performance of this Indenture … *and … shall not, by resort to any such law,

hinder, delay or impede the execution of any power herein granted to the Trustee*.")

(emphasis added).  It did so as part of a "liability management program" and exchange

offer to obtain the noteholders' agreement to a restructuring of the debt.  Where, as here,

the debtor is a "sophisticated business person" and "[t]he effect on unsecured creditors is

negligible," there is "an emerging trend to enforce such stay waiver agreements," and

"the more recent decisions have concluded that a prepetition agreement waiving defenses

to relief from [the] stay may be *considered as a factor* in deciding whether relief from

stay for cause should be granted."  *In re 4848, LLC*, 490 B.R. 343, 348-49 (Bankr. E.D.

Wis. 2013) (lifting stay); *In re Shady Grove Tech Ctr. Assocs. L.P.*, 227 B.R. 422, 425-26

(Bankr. D. Md. 1998) (lifting stay for cause based on debtor's pre-petition contractual

waiver of stay where debtor was "sophisticated" and "there are no … creditors[] which

would be adversely affected").

### d.    Modifying the Stay Will Not Prejudice EFIH's Shareholder, EFH

The most that EFIH can say is that lifting the stay to permit the Trustee and the

Noteholders to enforce their lawful claim against EFIH will reduce the amount of excess

value remaining from EFIH's assets to distribute to EFIH's shareholder EFH.  But that

cannot constitute "great prejudice" to *EFIH* or *its* estate.

A *shareholder* is not prejudiced when its debtor pays its debts to its *creditors*.  To

the contrary, the bedrock principle underlying both corporate law and the Bankruptcy

Code's absolute priority rule is that creditors are entitled to be paid in full before any

value is distributed to shareholders.  *See* 11 U.S.C. § 1129(b)(2); *id.* §§ 725-726; *Case v.

Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 114-17 (1939).  Denying the Trustee and

the Noteholders relief from the stay for the purpose of distributing more value to EFIH's

*shareholder EFH*—when the Noteholders have not been paid the full amount they are

owed—would contravene this rule of law.  Accordingly, for this reason as well, EFIH

cannot meet its burden to show that it will suffer "great prejudice" from lifting the stay.

<blockquote>

**e.**     **Modifying the Stay Will Not Prejudice Creditors of Other Debtors or the Sponsors, Whose Interests Are Not Legally Relevant to the Lift-Stay Motion**

</blockquote>

At the April 8 status conference, EFIH's counsel suggested that EFIH intends to

present evidence of the effect that lifting the stay would have on the "debtor's

constituents in the reorganization process."  4/8/2015 Hrg. Tr. at 35-36.  Given EFIH's

substantial solvency, it appears that considerable value—hundreds of millions, if not

billions, of dollars—will flow from EFIH to its equity holder EFH and its separate

stakeholders, including even the Sponsors, even if the Trustee and the Noteholders are

allowed to exercise their contractual right to rescind acceleration.

But, in any event, the supposed effect of the Noteholders' make-whole claim on

the estates of other, *non-substantively consolidated* Debtors—such as EFH or TCEH—or

on the Sponsors, is not relevant to the stay-relief motion.

The basic rule of law that *Texaco*, *Gencarelli* and the long line of precedent

discussed above stand for, including in the lift-stay context, is that in solvent debtor

cases, creditors are entitled to their valid state-law claims and rights, irrespective of the

effect on the debtor's equity holders.  The only potential difference here is that EFIH's

equity holder, EFH, happens itself to be a debtor in its own bankruptcy case, with its

own, separate creditors and equity holders.

But that distinction cannot matter unless EFIH is substantively consolidated with

EFH (and/or the other Debtors).  In the absence of substantive consolidation, EFIH's

estate and its creditors are separate from the estates and creditors of the other Debtors—

let alone the Sponsors.  *See* 11 U.S.C. §§ 301(a), 502(b)(1), 541(a)(1), 726, 1121-1123,

1129(a)(7), 1129(b).  Whether lifting the stay will cause "great prejudice to either the bankrupt estate or the debtor" must, therefore, be determined in terms of the prejudice to that "debtor"—here, *EFIH* and *its* estate—not to other debtors and their estates.

The creditors of EFH and the other Debtors, as well as the Sponsors, have no cause to complain if EFIH's assets are distributed to the Noteholders on account of their make-whole claim.  The Indenture is a contract with EFIH, under which EFIH gave the Noteholders the right to rescind any acceleration and agreed, in the event of rescission, to pay the Noteholders the make whole if (as happened) it elected to redeem the Notes before December 1, 2015.  In contrast, the creditors (and equity holders) of the other Debtors have no claim against EFIH.

As a matter of law, parties who have no lawful claim to EFIH's assets—like the creditors of EFH or TCEH, or the Sponsors—cannot claim to be "prejudiced" if EFIH's assets are distributed first to those parties, like the Noteholders, who do.  *In re Regency Holdings (Cayman), Inc.*, 216 B.R. 371, 375 (Bankr. S.D.N.Y. 1998) (absent substantive consolidation, "the parent's creditors have no claim to the subsidiary's assets, and *vice versa*"); *id.* at 376 (rejecting argument that "parent[ debtor] … can legitimately use the subsidiary[-debtor]'s assets to pay its own creditors," which would "eviscerate[] the absolute priority rule"); *accord In re Augie/Restivo Baking Co.*, 860 F.2d 515, 517-19, 521 (2d Cir. 1988); *In re Flora Mir Candy Corp.*, 432 F.2d 1060, 1062-63 (2d Cir. 1970); *In re Forum Health*, 444 B.R. 848, 862 (Bankr. N.D. Ohio 2011) ("A creditor with a claim against one debtor has no right to distribution from the estate of any other debtor.").

To hold otherwise would effect a substantive consolidation. But no party has moved to substantively consolidate the estates of EFIH and the other Debtors, much less offered proof sufficient to overcome this Circuit's strong presumption against substantive consolidation.

As the Third Circuit has held, "respecting entity separateness is a fundamental ground rule[] … [and] the general expectation of state law and the Bankruptcy Code." *In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2005) (internal quotation marks omitted). Thus, the proponents of substantive consolidation bear a heavy burden to prove that "(i) prepetition [the Debtors] disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors." *Id.* And substantive consolidation can never be used "to deprive one group of creditors of their rights while providing a windfall to other creditors." *Id.* at 200.

There is no basis for substantive consolidation here. The $42 billion in funded debt obligations of the Debtors were issued pursuant to debt agreements and offering materials that disclosed to investors which particular Debtor or Debtors would be liable for each issue of debt and which particular assets backed repayment of that debt. The creditors of EFH and TCEH, as well as the Sponsors, invested with the understanding that they would have no claim to EFIH's assets until its creditors, including the Noteholders, were paid in full.

Accordingly, denying the Trustee relief from the stay so that more value can be distributed to the creditors of EFH and/or TCEH, or the Sponsors, would contravene the

41

law of this Circuit.  The Debtors are not free to disregard that law merely because they

claim it is purportedly necessary to reach agreement with the creditors of EFH and TCEH

or the Sponsors on a plan of reorganization.  "Mere benefit to the administration of the

case … is hardly a harm calling substantive consolidation into play," and "it may not be

used … to disadvantage tactically a group of creditors in the plan process or to alter

creditor rights."  *Owens Corning*, 419 F.3d at 211.  As the Second Circuit explained, in a

decision endorsed by the Third Circuit in *Owens Corning* (*id.* at 210):

> [W]e held that [substantive] consolidation [of a parent and 12 subsidiaries] was
> inequitable to [one subsidiary's] debenture creditors because, in consolidation, the
> assets of their debtor would be distributed to the creditors of all thirteen
> companies, robbing them of the benefit of their bargain.  We did so even though
> the denial of consolidation would thwart an otherwise desirable arrangement
> among creditors under Chapter XI.  As Judge Friendly stated in *Flora Mir*, 'The
> nub of counsel's argument was that only consolidation will permit the quick
> consummation of an arrangement under Chapter [XI].  That may indeed be
> desirable *but not at the cost of sacrificing the rights of [the subsidiary's]
> debenture holders.*'"

*Augie/Restivo*, 860 F.2d at 520-21 (quoting *Flora Mir*, 432 F.2d at 1063 (emphasis in

original)).

Courts have held in a variety of contexts that bankruptcy relief may not be

decided in a manner that effects a substantive consolidation *sub silentio*.  *See, e.g.*, *Forum

Health*, 444 B.R. at 852, 854 (finding "cause" for dismissal of solvent debtors' Chapter

11 cases and rejecting argument of other insolvent debtors and their creditors "that the

assets of [the solvent debtors] can and must be distributed to creditors of the other

Debtors"); *In re New Century TRS Holdings, Inc.*, 407 B.R. 576, 591-92 (D. Del. 2009)

(reversing confirmation of Chapter 11 plan that had the effect of substantively

consolidating separate debtors).

Moreover, denying stay relief would not only run afoul of the substantive-consolidation rules, but it would also constitute an impermissible "equitable disallowance" of the Noteholders' claim.  EFIH seeks to deny the Noteholders *any* recovery on their make-whole claim, so that *all* of that value can be distributed to stakeholders of other debtors.  That would effectively disallow the claim, not based on any invalidity under applicable non-bankruptcy law—the Court has already held the right to rescind is enforceable under the contract and state law—but based on the purported "equities" of allowing creditors at EFH or other Debtors to recover more through the reorganization process.  But if "equitable disallowance" can ever be a permissible remedy under the Bankruptcy Code—and substantial authority holds that it cannot[16]—it requires at a minimum, a showing of "extreme instances" of "inequitable conduct" by the creditor (here, the Trustee and the Noteholders).  *In re Adelphia Commc'ns Corp.*, 365 B.R. 24, 72-73 (Bankr. S.D.N.Y. 2007), *aff'd*, 390 B.R. 64 (S.D.N.Y. 2008).  No such misconduct has been, or could be, shown here.

In short, denying relief from the stay here on the ground that doing so will enhance the excess value of Oncor available to distribute to creditors of Debtors other than EFIH, and the Debtors' ultimate shareholders, the Sponsors, would be contrary to settled law.  For this reason as well, EFIH cannot meet its it burden to show that it and its estate will suffer "great prejudice" if the stay is lifted.

---

[16] *See, e.g.*, *In re LightSquared Inc.*, 504 B.R. 321, 339-344 (Bankr. S.D.N.Y. 2013) ("[T]he Court holds that equitable disallowance is not permitted under the Bankruptcy Code."); *Grede v. Bank of New York*, 2009 WL 188460, at *8 (N.D. Ill. Jan. 27, 2009) (same).  Although *In re Washington Mut., Inc.*, 461 B.R. 200 (Bankr. D. Del. 2011), held to the contrary, *see id.* at 256-57, that decision was subsequently vacated.  *See In re Washington Mut., Inc.*, 2012 WL 1563880, at *31 (Bankr. D. Del. Feb. 24, 2012).  In any event, it agreed that disallowance on equitable grounds is limited to "extreme instances."  461 B.R. at 257 (citing *Adelphia*, 365 B.R. at 73).

       **f.**      **Modifying the Stay Will Not Prejudice EFIH or Its Estate Because the Stay Does Not Operate to Disallow the Noteholders' Contingent Make-Whole Claim.**

Lifting the stay to permit the Noteholders to assert a claim for the make whole will also not result in any "great prejudice" to EFIH and its estate because, even if relief were denied, the stay would not operate to disallow that claim.

"The Bankruptcy Code defines 'claim' very broadly to mean … '*right to payment, whether or not such right is* reduced to judgment, liquidated, *fixed, contingent,* matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured …." *In re Rodriguez*, 629 F.3d 136, 138-39 (3d Cir. 2010) (quoting 11 U.S.C. § 101(5)) (emphasis added). "Congress intended by this language to adopt the broadest available definition of 'claim.'" *Id.* at 139 (quoting *Johnson v. Home State Bank*, 501 U.S. 78, 83 (1991)). Thus, "a 'claim' can exist under the [Bankruptcy] Code [by virtue of the terms 'contingent,' 'unmatured,' and 'disputed,'] before a right to payment exists under state law." *Id.* (quoting *In re Grossman's Inc.*, 607 F.3d 114, 121 (3d Cir. 2010) (en banc)) (alterations in original).

Here, at the time EFIH filed for bankruptcy, the Noteholders had a right to payment of the make whole under the Indenture that was contingent on the exercise of their right to rescind acceleration and on EFIH's election to redeem the Notes. EFIH redeemed the Notes on June 19, 2014. Thus, the only remaining contingency was rescission of acceleration. The Noteholders sought to "fix" that contingency by sending a notice of rescission on June 4, 2014. This Court held, however, that the Noteholders were prevented from doing so by the automatic stay. *Findings/Conclusion* ¶¶ 67, 69.

But the fact that the stay prevented the Noteholders from "fixing" their contingent claim to the make whole does not operate to disallow that claim. Section 502(b) of the

Bankruptcy Code provides that the court "shall allow [a creditor's] claim … except to the extent that such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason *other than because such claim is contingent* or unmatured."  11 U.S.C. § 502(b)(1) (emphasis added).

Accordingly, lifting the stay to permit the Trustee to rescind acceleration would not result in any "great prejudice" to EFIH and its estate.  Even if the stay were not lifted and the Noteholders' claim to the make whole remained contingent, that claim would still be allowable under section 502(b)(1) of the Bankruptcy Code.

The Third Circuit's decision in *In re Stephan*, 588 Fed. App'x 143 (3d Cir. 2014) (unpublished)[17], is on point.  In that case, the debtor sought to disallow a mortgage lender's deficiency claim.  The debtor argued the claim was unenforceable under state law because state law required the lender to foreclose before it could collect a deficiency claim.  And the stay barred the lender from foreclosing.  *See id.* at 143.  Thus, there, as here, the lender's state-law claim was contingent on the lender's exercise of its state-law rights (there, to foreclose; here, to rescind acceleration).  There, as here, the automatic stay barred the lender from exercising those state-law rights to "fix" the contingency.  And there, as here, the debtor argued that the lender's claim was disallowable as a result.

The Third Circuit rejected that argument.  Writing for the panel, Judge Ambro explained:

> Section 502 disallows the claim if it is unenforceable, unless the only reason it is unenforceable is that it is 'contingent or unmatured.'  A mortgage interest in a property that has not yet been foreclosed is a classic contingent right to payment.
>
> [The debtor] does not dispute that [the lender] would have a right to payment if it followed proper foreclosure proceedings …. Rather, he maintains that, by virtue

---

[17] The Court's decision notes that it is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

> of the automatic stay, [the lender's] right to payment no longer exists, as it cannot proceed to reduce its right to judgment pursuant to New Jersey law.  Agreeing with [the debtor] would turn the automatic stay into a device that eliminates all contingent claims, a result that is in tension with the Bankruptcy Code's 'broadest available definition of claim.'

*Id.* at 143-44 (quoting *Johnson*, 501 U.S. at 83).  The Third Circuit thus rejected the debtor's argument and affirmed the allowance of the lender's deficiency claim.  *Id.* at 144.

Similarly, in *In re Rodriguez*, 629 F.3d 136 (3d Cir. 2010), the Third Circuit held that enforcing the stay does not operate to modify a creditor's substantive rights.  It thus agreed with the Fifth Circuit that "staying [the creditor's] attempt to collect pre-petition escrow amounts does not bar [the creditor] from asserting its contractual rights in the bankruptcy court."  *See id.* at 142 (quoting *Campbell v. Countrywide Home Loans, Inc.*, 545 F.3d 348, 354 (5th Cir. 2008)).  The Third Circuit explained that "the stay does not determine a creditor's claim but merely suspends an action to collect the claim outside the procedural mechanisms of the Bankruptcy Code."  *Id.* (quoting *Campbell*, 545 F.3d at 354).[18]

As these holdings demonstrate, the automatic stay is not intended to disallow creditors' substantive state-law entitlements.  As a stay, it is simply a procedural device that suspends individual collection actions.  It is temporary and lasts only during the bankruptcy process.  *See* 11 U.S.C. § 362(c).  As discussed above, it is designed to give

---

[18] So, too, in *In re Fasano/Harriss Pie Co.*, 43 B.R. 864 (Bankr. W.D. Mich. 1984), *aff'd*, 70 B.R. 285 (W.D. Mich. 1987), *aff'd*, 848 F.2d 1930 (6th Cir. 1988), the court rejected an argument that the stay voided a creditor's substantive state-law rights.  The creditor there sought to exercise a right of setoff.  Although the automatic stay barred the creditor from obtaining a judgment against the debtor, the court held that the creditor could nonetheless set-off its claim against the debtor, even though that claim remained "unmatured" and "unliquidated" by reason of the stay.  "To hold to the contrary would permit the use of the automatic stay as a sword, thus destroying an otherwise valid right of setoff, rather than as a shield to preserve the status quo."  *Id.* at 870 n.14.

the debtor breathing room to pursue an orderly process to maximize the value of its assets and to distribute that value equitably among its creditors according to their state-law entitlements.  It is not designed as a permanent bar to void a creditor's substantive rights against the debtor.  The House Report to the 1978 Bankruptcy Code makes this clear.  *See* H.R. Rep. No. 95-595, at 342 (1978) ("As with all other paragraphs of subsection (a) [of section 362], this paragraph does not affect the rights of creditors.  It simply stays its enforcement pending an orderly examination of the debtor's and creditors' rights."), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6295.

Rather, what claims a creditor has to the debtor's assets are governed by section 502 of the Bankruptcy Code.  And under that provision, the "'basic federal rule' in bankruptcy is that state law governs the substance of claims, Congress having 'generally left the determination of property rights in the assets of a bankrupt's estate to state law.'" *Travelers Cas. & Sur. Co. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450-51 (2007) (quoting *Butner v. United States*, 440 U.S. 48, 54, 57 (1979)).  There is no provision in section 362 of the Bankruptcy Code that overrides section 502 and authorizes the court to disallow a creditor's valid state-law entitlement.  And that is true, even where, as here, the creditor's claim is contingent at the time of the bankruptcy filing.  As noted, section 502(b)(1) mandates that a court "shall" allow the claim, *even if* it is "contingent."

By the same token, the automatic stay is not intended to expand the debtor's rights in property.  EFIH has no right under *the contract* to block the Noteholders from rescinding acceleration.  Instead, it is attempting to use the automatic stay to create a new right that it failed to win at the negotiation table.  But the stay does not allow it to do so.  As one court explained:

> Any right created in Debtor's estate by the Agreement is protected by the automatic stay. The nature and extent of those rights, if any, are fixed by state law. The filing of a petition under the Code does not expand those rights. … Thus whatever rights a debtor has in property at the commencement of the case continue in bankruptcy—no more, no less.

*In re M.J. & K. Co.*, 161 B.R. 586, 593 (Bankr. S.D.N.Y. 1993) (citations and internal quotation marks omitted) (lifting stay for cause to permit law school to exercise its state-law right to deliver a notice terminating the debtor-bookstore's license).

That principle has been applied in numerous cases. For example, in *In re Schewe*, 94 B.R. 938 (Bankr. W.D. Mich. 1989), the court lifted the stay for "cause" to permit a landlord to exercise its state-law right to deliver a notice terminating the debtor's lease. It explained:

> [I]n its role as a collective debt-collection device, bankruptcy law should not create rights. Instead, it should act to ensure that the rights that exist are vindicated to the extent possible. … Absent the Debtors' Chapter 13 case, it is unquestioned that the Defendants would be permitted to serve a notice to quit …. This state law right is not vitiated by the bankruptcy filing except for the delay occasioned by the automatic stay. This court will not create new debtors' rights nor will it rely upon equity when such reliance is not warranted. The court will not impose a new lease agreement upon the parties. The court therefore holds that … 'cause' exists to modify the stay to permit the lessor to exercise its rights.

*id.* at 950 (internal quotation marks omitted); *see also Hazen First State Bank v. Speight*, 888 F.2d 574, 576 (8th Cir. 1989) ("The automatic stay provided for by section 362(a) does not enlarge the rights of individuals under a contract …."); *accord Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1213 (7th Cir. 1984) ("Section 362 does not give a debtor greater rights in a contract.").

That principle is fundamental to bankruptcy law. As the Third Circuit has explained, an "important purpose of the Bankruptcy Code … [is] upholding the fundamental principle that the estate succeeds only to the nature and the rights of the property interest that the debtor possessed pre-petition." *Integrated Solutions, Inc. v.*

*Service Support Specialties, Inc.*, 124 F.3d 487, 495 (3d Cir. 1997). "[E]xpanding the pre-petition rights of the debtor in the property of the estate simply because the debtor has commenced bankruptcy proceedings … is akin to providing the debtor with a 'windfall merely by reason of the happenstance of bankruptcy,' *Butner*, 440 U.S. at 55, … an outcome clearly in tension with the purposes of the Code and existing caselaw." *Id.*

In short, EFIH cannot meet its burden to show that lifting the stay to permit the Noteholders to rescind acceleration and assert their optional-redemption make-whole claim would result in any "great prejudice" to EFIH and its estate, because the stay would not disallow that claim even if relief were denied. EFIH may not use the stay as a sword to deprive the Noteholders of what they are lawfully owed under the parties' contract in order to provide itself with a windfall. Under the terms of the Indenture and as a matter of state law, EFIH did not have the right to prevent the Noteholders from rescinding acceleration. The automatic stay cannot and does not operate to give EFIH that right. *See In re Wcislak*, 446 B.R. 827, 830 (Bankr. N.D. Ohio 2011) ("It is a basic [tenet] of bankruptcy law that § 362 was intended to be used only as a shield, protecting debtors and their estates; it was not intended to operate as a sword by debtors for their monetary gain."); *Winters v. George Mason Bank*, 94 F.3d 130, 136 (4th Cir. 1996) ("Section 362 is a shield, not a sword."); *In re Edgins*, 36 B.R. 480, 485 (B.A.P. 9th Cir. 1984) ("The shield of 11 U.S.C. Section 362, which is procedural … should not be used as a sword to divest other parties of legitimate interests in property …."); *cf. In re Exide Techs.*, 607 F.3d 957, 967-68 (3d Cir. 2010) (rejecting debtor's attempt to use 11 U.S.C. § 365 to

"take back … rights it bargained away" and "make[] bankruptcy more a sword than a shield").

### 3. The Court Has Already Held that the Trustee Will Prevail on the Merits

The third factor—the probability of the creditor prevailing on the merits—also weighs in the Trustee's favor.

As the Court noted in *Downey*, "[e]ven a slight probability of success on the merits may be sufficient to support lifting an automatic stay in an appropriate case." *Downey*, 428 B.R. at 610 (quoting *In re The SCO Group, Inc.*, 395 B.R. 852, 859 (Bankr. D. Del. 2007)).

Here, however, there is far more than a "slight probability of success on the merits." As in *Downey*, "[t]his factor clearly favors [the Noteholders] because they have already won on the merits." *Id.* The Court has already held that if the stay is lifted, the Noteholders will be entitled to the make whole. *See Findings/Conclusions* ¶¶ 68-69, 90, 94. Here, too, EFIH cannot meet its burden to show that the stay should be maintained.

### 4. Lifting the Stay Is Consistent With the Policies Underlying the Automatic Stay.

As noted above, in determining whether cause exists to lift the stay, in addition to considering the parties' competing interests under the three-factor test discussed above, "courts generally consider the policies underlying the automatic stay." *Continental*, 152 B.R. at 424. Those policies seek (1) "to prevent certain creditors from gaining a preference for their claims against the debtor," (2) "to forestall the depletion of the debtor's assets due to legal costs in defending proceedings against it," and (3) "in general, to avoid interference with the orderly liquidation or rehabilitation of the debtor." *Borman*, 946 F.2d at 1036. These policies weigh in favor of lifting the stay.

*First*, lifting the stay will not allow the Noteholders to gain a preference for their make-whole claim against EFIH. Because EFIH is solvent and can pay all of its creditors in full, lifting the stay will not allow the Noteholders to obtain payment of their claim at a higher percentage than EFIH's other creditors (though, even if it did, that would simply flow from the fact that the Trustee and the Noteholders have a first lien on EFIH's assets). All of EFIH's creditors will be paid 100 cents on the dollar. And they will all be paid at plan confirmation. By definition, there can be no preference.

*Second*, lifting the stay will not deplete EFIH's assets due to legal costs in defending proceedings against it. If the stay is lifted, EFIH will not be required to incur any expense defending litigation in another court. The Trustee will simply rescind acceleration, and its claim will be paid as part of EFIH's bankruptcy case.

Furthermore, the Court held in the summary judgment ruling that if the stay is lifted and acceleration rescinded, the Court could enter judgment for the Trustee on Count I of the complaint. That would end the litigation and avoid any further litigation expense for either party. Even were EFIH to seek to appeal that ruling, any further litigation expenses it would incur would not deplete its assets in any material amount. As noted, Oncor is worth more (potentially substantially more) than $18 billion. And in any event, EFIH willingly chose to incur any such expenses by commencing this litigation when it filed the Contested Matter on the first day of its bankruptcy case.

*Third*, lifting the stay will not interfere with the orderly liquidation or reorganization of EFIH. As noted, the Trustee does not seek to foreclose on EFIH's interest in Oncor. It simply seeks to preserve the Noteholders' right to a claim in EFIH's bankruptcy case for what they are owed under their contract with it. The effect of that

51

claim is no different from that of any other proof of claim filed by any other creditor in

EFIH's bankruptcy case.  The Trustee's make whole claim will no more interfere with an

orderly auction of EFIH's interest in Oncor, or the plan process, than will the claim of

any other creditor.  EFIH will still be able to maximize the value of its assets.

### D.    Cause Exists to Lift the Stay for Lack of Adequate Protection

Section 362(d)(1) provides that "lack of adequate protection of an interest in

property" is "cause" to lift the stay.  The term "interest in property" has been construed to

encompass a broad range of property interests beyond a lien or security interest.  *In re*

*Trans World Airlines, Inc.*, 322 F.3d 283, 289-90 (3d Cir. 2003) (holding that unsecured

successor-liability claims were an "interest in … property" under 11 U.S.C. § 363(f)).

Thus, for example, section 541(a)(1) of the Bankruptcy Code provides that

property of the estate includes "all legal or equitable *interests* of the debtor *in property.*"

11 U.S.C. § 541(a)(1) (emphasis added).  Courts have held that such "interests .. in

property" include a debtor's rights under its contracts.  *AMR*, 730 F.3d at 102.  Thus, both

*AMR* and *Momentive* reasoned that sending a rescission notice was an act to exercise

control over property of the estate—namely, the debtor's contract rights under the

indenture.  *AMR*, 730 F.3d at 102-03 ("[R]escind[ing] acceleration … affect[s] [the

debtor's] contract rights, and thus the property of the estate.  *See* 11 U.S.C. § 541(a)(1)

…."); *MPM*, 2014 WL 4436335, at *19.  That is, these courts reasoned that the debtor's

contract rights were "interests … in property," and hence property of the estate protected

by the stay.

If a debtor's rights under an indenture are "interests … in property," then the

noteholders' rights under that same indenture are likewise an "interest in property."  And

if the stay operates to void those rights and eliminate their value—here, the right to

rescind acceleration—the Noteholders lack adequate protection of that interest in property.

Accordingly, cause exists to lift the stay under section 362(d)(1) for lack of adequate protection of the Noteholders' interest in property.  Alternatively, if stay relief were denied, the Noteholders would be entitled to adequate protection of their constitutionally protected interests.  *See* 11 U.S.C. § 361; No. 14-10979, D.I. 473, at 26-27.  Such protection would, at a minimum, include a claim against EFIH's estate for the value of the make whole the Court has held the Noteholders would be entitled to receive upon the exercise of their right under the Indenture to rescind acceleration.[19]

## II.    THE COURT SHOULD ALSO MODIFY THE AUTOMATIC STAY TO PERMIT EFFECTIVENESS OF THE RESCISSION NOTICE SOLELY AS TO THE SECOND LIEN TRUSTEE AND SECOND LIEN NOTEHOLDERS.

Even if this Court were to deny relief from the stay as against the Debtors, it should still modify the automatic stay to permit the rescission notice to be effective for all other purposes—specifically here for purposes of allowing the Trustee and Noteholders to pursue claims under the Collateral Trust Agreement, dated as of November 16, 2009 (the "CTA"), against the indenture trustee (the "Second Lien Trustee") for the second lien notes issued by EFIH (the "Second Lien Notes"), and, to the extent asserted in the future, the holders of those Second Lien Notes ("Second Lien Noteholders").  Black-letter law prevents the use of the automatic stay to impair creditor claims against third parties.

The CTA, which is an intercreditor subordination agreement between the first-lien and second-lien noteholders, provides that the Second Lien Trustee and the Second Lien

---

[19] Although it may be more appropriate for another proceeding, the Trustee and the Noteholders note here that they reserve all rights with respect to any claim under section 507(b) of the Bankruptcy Code.

Noteholders must turn over certain amounts ("proceeds of collateral" and "proceeds of Sales of Collateral", each as defined in the CTA) to the Trustee and/or Noteholders, until all obligations with respect to the Notes are paid in full in cash ("Discharge of Parity Lien Obligations," as defined in the CTA).  The Second Lien Trustee and Second Lien Noteholders have already received such proceeds—in respect of the partial paydown of the Second Lien Notes previously approved by this Court (the "Partial Paydown")—and will receive further proceeds in the future, whether under the Debtors' proposed reorganization plan or otherwise.  The Trustee has a separate adversary proceeding pending against the Second Lien Trustee seeking a declaratory judgment regarding turnover and damages for failure to turnover.  Adv. No. 14-50410.  The merits of the turnover claims are not at issue in this contested matter.

The Trustee believes that the CTA provides that the obligations that give rise to the Second Lien Noteholders' turnover obligations include those that would be payable even if they are disallowed as against EFIH because of its bankruptcy filing.  However, the Second Lien Trustee and the Second Lien Noteholders may argue that one interpretation of this Court's Summary Judgment Opinion is that such amounts are not payable for purposes of the CTA, because of this Court's ruling on the effect of the stay on the delivery of the rescission notice from the Noteholders (nondebtors) to the Trustee (another nondebtor).

Accordingly, even if this Court does not lift the stay in order to allow a makewhole claim against EFIH, it should lift the stay for purposes of the CTA.  There is ample "cause" to modify at least that limited aspect of the stay.  Section 362(d)(1) of the Bankruptcy Code provides for broad and flexible forms of stay relief, that expressly

include not only terminating or annulling the entire automatic stay, but also "modifying, or conditioning" targeted stay components. *See* 11 U.S.C. §362(d). Narrowly-tailored stay modification to give effect to the rescission notice for purposes of the CTA, if necessary, would cause no prejudice to the EFIH Debtors' estates or reorganization, while averting the substantial hardship to the First Lien Trustee and First Lien Noteholders that would result from permitting the non-debtor Second Lien Trustee or Second Lien Noteholders to use the automatic stay to evade their intercreditor obligations.

A well-established line of cases provides a direct analogy. Often creditors have, in addition to a claim against the estate, a claim against a third-party nondebtor insurance company. Under applicable nonbankruptcy law in a number of states, a creditor must sue the debtor in order to also be able to sue and otherwise seek to collect from the insurance company. As long ago as 1936, the Supreme Court held that in this precise circumstance, the stay should be lifted so as to allow the creditor to actually file a state court lawsuit nominally against the debtor, so that it could recover from the insurer, while the automatic stay remained in place as to collection against the debtor. *Foust v. Munson S.S. Lines,* 299 U.S. 77, 87 (1936) (allowing wrongful death action against bankrupt defendant to proceed despite stay, solely for the amount of insurer liability). The Seventh Circuit has specifically relied on the *Foust* case for the same situation under the Bankruptcy Code. *In re Fernstrom Storage & Van Co.*, 938 F.2d 731, 735 (7th Cir.1991). S*ee also* 3 *Collier on Bankruptcy* ¶¶ 362.07[3][a], 362.03[5][b] & n.69 (16th ed. 2014) (collecting cases holding that an absence of direct interest of the debtor or its estate in insurance proceeds removes the proceeds from the scope of the automatic stay).

The seminal Third Circuit lift-stay decision, the *Rexene* case, specifically adopted the Seventh Circuit's *Fernstrom* methodology for analyzing whether "cause" exists to modify or lift the stay. *Izzarelli v. Rexene Prods. Co.*, 141 B.R. 574, 576 (Bankr. D. Del. 1992).

The facts of the EFIH case present, if anything, a more compelling case than those earlier decisions for "cause" to lift or modify the stay with respect to the CTA. Under *Foust* and *Fernstrom*, the creditor is *actually allowed to sue the debtor in state court*, the quintessential act prevented by the stay, for the limited purpose of collecting from the third party insurer. Here, under the contract, the rescission notice was delivered by the Noteholders to another nondebtor party (the Trustee). There was no (i) lawsuit commenced against EFIH or (ii) direct action against the debtor at all. Indeed, the Court's Summary Judgment Opinion held only that the rescission notice was an act to collect or assess a claim against the debtor (11 U.S.C. § 362(a)(6)) and therefore having the rescission notice be effective as to the CTA is exactly the opposite—an act to collect against third parties (the Second Lien Trustee and Second Lien Noteholders who, by contract, have agreed to make the Trustee and First Lien Noteholders whole in various circumstances).

The EFIH Debtors would be unaffected if the rescission notice applies *solely against the Second Lien Trustee and Second Lien Noteholders*. To the extent that modification of the stay is necessary at all for the turnover obligations of the CTA to be in force, that outcome would only impact the allocation of recoveries between two groups of creditors. It would not increase the amount of Second Lien Trustee claims against the EFIH Debtors' estates because the order approving the Partial Paydown expressly

recognized that the amount of the Partial Paydown has already been applied to satisfy the

EFIH Debtors' corresponding obligations on the Second Lien Notes. *See* Order (a)

Authorizing Partial Repayment of EFIH Second Lien Notes; (B) Approving EFIH DIP

Consent; and (C) Authorizing Consent Fee, No. 14-10979, D.I. 3855, ¶ 6.

The Third Circuit has recognized that the stay should be modified in situations

such as those here with respect to claims against non-debtors:

> It is universally acknowledged that an automatic stay of proceedings accorded by
> § 362 may not be invoked by entities such as sureties, guarantors, co-obligors, or
> others with a similar legal or factual nexus to the ... debtor. As one court has
> reasoned, a primary rationale for refusing to extend the automatic stay to
> nonbankrupt third parties is to insure that creditors obtain 'the protection they
> sought and received when they required a third party to guaranty the debt.'

*McCartney v. Integra Nat'l Bank North*, 106 F.3d 506, 509-10 (3d Cir. 1997) (internal

citations omitted).

## CONCLUSION

For these reasons and the evidence and arguments the Trustee will advance at

trial, the Court should enter an order that, if EFIH is solvent, the Trustee and the

Noteholders are entitled to (1) relief from the stay to permit the Trustee and the

Noteholders to exercise their right under Section 6.02 of the Indenture to rescind

acceleration, (2) judgment for the Trustee and the Noteholders on Count I of the

Complaint declaring that EFIH owes the make whole, and (3) modifying the automatic

stay such that the Noteholders' rescission notice can be effective for all purposes under

the Collateral Trust Agreement.

Dated:  April 15, 2015

COLE SCHOTZ, P.C.

*/s/* Norman L. Pernick
Norman L. Pernick (Bar No. 2290)
J. Kate Stickles (Bar No. 2917)
500 Delaware Avenue, Suite 1410
Wilmington, DE  19801
Telephone: 302-652-3131
Facsimile:  302-652-3117
npernick@coleschotz.com
kstickles@coleschotz.com

Warren A. Usatine
Court Plaza North
25 Main Street
Hackensack, NJ 07602
Telephone: 201-489-3000
Facsimile:  201-489-1536
wusatine@coleschotz.com

WILMER CUTLER PICKERING HALE AND DORR LLP

Philip D. Anker
Charles C. Platt
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: 212-230-8800
Facsimile:  212-230-8888
Philip.Anker@wilmerhale.com
Charles.Platt@wilmerhale.com

Dennis L. Jenkins
George W. Shuster Jr.
60 State Street
Boston, MA 02109
Telephone:  617-526-6000
Facsimile: 617-526-5000
Dennis.Jenkins@wilmerhale.com
George.Shuster@wilmerhale.com

ROPES & GRAY LLP

Keith H. Wofford
Mark Somerstein
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: 212-596-9000
Facsimile:  212-596-9090
Keith.Wofford@ropesgray.com
Mark.Somerstein@ropesgray.com

D. Ross Martin
Andrew Devore
800 Boylston Street, Prudential Tower
Boston, MA  02199-3600
Telephone: 617-951-7000
Facsimile: 617-951-7050
Ross.Martin@ropesgray.com
Andrew.Devore@ropesgray.com

DRINKER BIDDLE & REATH LLP

James H. Millar
1177 Avenue of the Americas
41st Floor
New York, NY 10036-2714
Telephone:  212-248-3264
Facsimile:   212-248-3141
James.Millar@dbr.com

*Counsel for Plaintiff-Trustee Delaware Trust Company*