```
1    UNITED STATES BANKRUPTCY COURT
2    DISTRICT OF DELAWARE
3
4
5    In re:                          :
                                     :    Chapter 11
6    ENERGY FUTURE HOLDINGS          :
     CORP., et al.,                  :    Case No. 14-10979(CSS)
7                                    :
              Debtors.              :    (Jointly Administered)
8    _____ :
     ENERGY FUTURE INTERMEDIATE      :
9    HOLDING COMPANY LLC and EFIH    :
     FINANCE INC.,                   :
10                                   :
              Plaintiffs,            :
11                                   :    Adversary Proceeding
        v.                           :    No. 14-51002(CSS)
12                                   :
     UMB BANK, N.A., as INDENTURE    :
13   TRUSTEE,                        :
                                     :
14            Defendant.             :
     _____:
15
16
17
                           United States Bankruptcy Court
18
                           824 North Market Street
19
                           Wilmington, Delaware
20
21
22                         April 14, 2015
23                         10:39 AM
24
25
```

```
 1    B E F O R E :

 2    HON CHRISTOPHER S. SONTCHI

 3    U.S. BANKRUPTCY JUDGE

 4

 5    ECR OPERATOR:   LESLIE MURIN

 6

 7

 8    HEARING re Motion of Pallas Realty Advisors, Inc. for Entry

 9    of an Order Extending the Deadline to File Proof of Claim,

10    or Alternatively Allowing Late-Filed Proof of Claim [D.I.

11    2602; filed October 28, 2014]

12

13    HEARING re Motion of energy Future Holdings Corp., et al.,

14    for Entry of an Order Authorizing Luminant Generation

15    Company LLC to Reject a Water Contract with Tarrant Regional

16    Water District, Effective Nunc pro Tunc to the Petition Date

17    [D.I. 2662; filed October 30, 2014]

18

19    HEARING re Debtors' First Omnibus (Non-Substantive)

20    Objection to (Amended and Superseded, Exact duplicate, and

21    Insufficient Documentation) Claims Pursuant to Section

22    502(b) of the Bankruptcy Code, Bankruptcy Rules 3001, 3003,

23    and 3007, and Local Bankruptcy Rule 3007-1 [D.I. 2808; filed

24    November 18, 2014]

25
```

1    HEARING re Debtors' Third Omnibus (Non-Substantive)

2    Objection to (No Supporting Documentation) Customer Claims

3    Pursuant to Section 502(b) of the Bankruptcy Code,

4    Bankruptcy Rules 3001, 3003, and 3007, and Local Bankruptcy

5    Rule 3007-1 [D.I. 2992; filed December 12, 2014]

6

7    HEARING re Debtors' Fourth Omnibus (Substantive) Objection

8    to Certain Substantive Duplicate and No Liability Claims

9    Pursuant to Section 502(b) of the Bankruptcy Code,

10   Bankruptcy Rules 3001, 3003, and 3007, and Local Bankruptcy

11   Rule 3007-1 [D.I. 2994; filed December 12, 2014]

12

13   HEARING re Debtors' Sixth Omnibus (Non-Substantive)

14   Objection to (Insufficient Documentation) Claims Pursuant to

15   Section 502(b) of the Bankruptcy Code, Bankruptcy Rules

16   3001, 3003, and 3007, and Local Bankruptcy Rule 3007-1 [D.I.

17   3212; filed January 9, 2015]

18

19   HEARING re Debtors' Seventh Omnibus (Substantive) Objection

20   to Certain No Liability Claims Pursuant to Section 502(b) of

21   the Bankruptcy Code, Bankruptcy Rules 3001, 3003, and 3007,

22   Local Bankruptcy Rule 3007-1 filed by DeAnna & Gerald

23   Edwards [D.I. 3388; filed January 28, 2015]

24

25   HEARING re Debtors' Eighth Omnibus (Non-Substantive)

Page 4

1    Objection to (Insufficient Documentation) Claims Pursuant to

2    Section 502(b) of the Bankruptcy Code, Bankruptcy Rules

3    3001, 3003, and 3007, and Local Bankruptcy Rule 3007-1 [D.I.

4    3381; filed January 27, 2015]

5

6    HEARING re Debtors' Tenth Omnibus (Substantive) Objection to

7    (Certain No Liability) Claims Pursuant to Section 502(b) of

8    the Bankruptcy Code, Bankruptcy Rules 3001, 3003, and 3007,

9    and Local Bankruptcy Rule 3007-1 [D.I. 3473; filed February

10   6, 2015]

11

12   HEARING re Motion for Summary Judgment filed by Mary LaCour

13   [D.I. 3750; filed March 2, 2015]

14

15   HEARING re Motion to Compel the Production of Documents

16   [D.I. 3752; filed March 2, 2015]

17

18   HEARING re Debtors' Twelfth Omnibus (Non-Substantive)

19   Objection to (Insufficient Documentation) Claims Pursuant to

20   Section 502(b) of the Bankruptcy Code, Bankruptcy Rules

21   3001, 3003, and 3007, and Local Bankruptcy Rule 3007-1 [D.I.

22   3896; filed March 13, 2015]

23

24   HEARING re Application of Energy Future Holdings Corp., et

25   al., for an Order Authorizing the Debtors to Retain and

1   Employ Enoch Kever PLLC as Special Counsel for Certain

2   Regulatory and Legislative Matters, Effective Nunc Pro Tunc

3   to March 1, 2015 [D.I. 3960; filed March 24, 2015]

4

5   HEARING re Application of the EFH Official Committee for an

6   Order (A) Authorizing the Retention and Employment of

7   Kinsella Media, LLC as Asbestos Noticing Expert to the EFH

8   Official Committee Nunc Pro Tunc to March 27, 2015 and (B)

9   Waiving Certain Information Requirements Pursuant to Local

10  Rule 2016-2(h) [D.I. 4056; filed April 3, 2015]

11

12  HEARING re Motion of Energy Future Holdings Corp., et al.,

13  for Entry of an Order (A) Setting Bar Dates for Filing Non-

14  Customer Proofs of Claim and Requests for payment Under

15  Section 503(b)9) of the Bankruptcy Code, (B) Approving the

16  Form of and Manner for Filing Non-Customer Proofs of Claim

17  and Requests for Payment Under Section 503(b)(9) of the

18  Bankruptcy Code, and (C) Approving Notice Thereof [D.I.

19  1682; filed July 23, 2014]

20

21  HEARING re Motion of the Official Committee of Unsecured

22  Creditors for Entry of an Order Granting Exclusive Standing

23  and Authority to Commence, Prosecute, and Settle Certain

24  Claims for Declaratory Judgment, Avoidance and Recovery of

25  Liens, Security Interests, Obligations, Fees, and Interest

1   Payments and Disallowance of Claims (Redacted)[D.I 3593,

2   filed February 19, 2015]

3

4   HEARING re Motion of the Ad Hoc Group of TCEH Unsecured

5   Noteholders for Entry of an Order Granting Standing and

6   Authority to Commence, Prosecute, and Settle Certain Claims

7   for Declaratory Judgment, Avoidance and Recovery of Liens,

8   Security Interests, Obligations, Fees, and Interest

9   Payments, and Disallowance of Claims (Sealed)[D.I. 3596;

10  filed February 19, 2015]

11

12  HEARING re Motion of the EFH Official Committee for Entry of

13  an Order Granting Derivative Standing and Authority to

14  Prosecute and Settle Claims on Behalf of the Luminant

15  Debtors' Estate [D.I. 3605; filed February 19, 2015]

16

17  HEARING re Motion to Intervene filed by Amber Lambert, Timmy

18  K. Thale, Jonathon Rich, and Wayne Albright [D.I. 3898;

19  filed March 13, 2015]

20

21  HEARING re Motion of Energy Future Holdings Corp., et al.,

22  for Entry of an Order Authorizing Luminant Energy Company

23  LLC to Reject a Certain Executory Contract with Cloud Peak

24  Energy Resources LLC, Effective Nunc Pro Tunc to March 24,

25  2015 [D.I. 3961; filed March 24, 2015]

1    HEARING re Motion of Energy Future Holdings Corp., et al.,

2    for Entry of an Order Authorizing Luminant Energy Company

3    LLC to Reject a Certain Executory Contract with Forest Creek

4    Wind Farm, LLC, Effective Nunc Pro Tunc to March 24, 2015

5    [D.I. 3963; filed March 24, 2015]

6

7    HEARING re Adversary Complaint for Declaratory Judgment of

8    Energy Future Intermediate Holding Company LLC and EFIH

9    Finance Inc. [D.I. 3039/Adv. D.I. 1; filed December 16,

10   2014]

11

12

13

14

15

16

17

18

19

20

21

22

23

24   Transcribed by:  Dawn South, Melissa A. Looney, and Pamela

25   A. Skaw

1   A P P E A R A N C E S :

2   KIRKLAND & ELLIS

3        Attorney for the Debtors

4

5   BY:  EDWARD SASSOWER, ESQ.

6        CHAD HUSNICK, ESQ.

7        MARK MCKANE, ESQ.

8        ANDY MCGANN, ESQ.

9        STEVEN SERAJEDDINI, ESQ.

10       BRIAN SCHATZ, ESQ.

11       BRYAN STEPHANY, ESQ.

12

13  RICHARDS, LAYTON & FINGER

14       Attorneys for the Debtors

15

16  BY:  DAN DEFRANCESCHI, ESQ.

17       JASON MADRON, ESQ.

18

19  BAYARD

20       Attorney for IT for TCEH First Lien

21

22  BY:  GIANCLAUDIO FINIZIO, ESQ.

23

24

25

1  KLEHR HARRISON HARVY BRANZBURG LLP

2       Attorney for UMB Bank

3

4  BY:  RAYMOND H. LEMISCH, ESQ.

5

6  FOLEY

7       Attorney for UMB Bank

8

9  BY:  BARRY FELDER, ESQ.

10

11  SHERMAN & STERLING

12       Attorney for Deutsche Bank New York

13

14  BY:  NED S. SCHODEK, ESQ.

15

16  POTTER ANDERSON CARROON LLP

17       Attorney for Deutsche Bank New York

18

19  BY:  R. STEPHEN MCNEILL, ESQ.

20

21  HAYNES AND BOONE

22       Attorneys for Forest Creek

23

24  BY:  IAN PECK, ESQ.

25       DIANA LIEBMANN, ESQ. (TELEPHONIC)

1    CROSS & SIMON

2        Attorney for Fidelity

3

4    BY:  MIKE JOYCE, ESQ.

5

6    UNITED STATES DEPARTMENT OF JUSTICE

7        Attorney for the U.S. Trustee

8

9    BY:  RICHARD L. SCHEPACARTER, SQ.

10

11   AKIN GUMP STRAUSS HAUER & FELD

12        Attorney for UMB Bank

13

14   BY:  ROBERT BOLLER, ESQ.

15

16   VENABLE

17        Attorney for PIMCO

18

19   BY:  JAMES EDMONSON, ESQ.

20

21   MORGAN LEWIS

22        Attorney for PIMCO

23

24   BY:  PATRICK STRAWBRIDGE

25

1   ASHBY & GEDDES

2         Attorney for WSFS, Trustee

3

4   BY:  GREG TAYLOR, ESQ.

5

6    CRAVATH, SWAINE & MOORE

7         Attorney for EFH Special Counsel

8

9   BY:  RICHARD LEVIN, ESQ.

10

11   STRAUSS & LEE P.C.

12         Attorney for EFH Special Counsel

13

14   BY:  JOSEPH H. HUSTON, JR., ESQ.

15

16   POLSINELLI

17         Attorneys for TCEH Committee

18

19   BY:  CHRIS WARD, ESQ.

20         JUSTIN EDELSON, ESQ.

21

22

23

24

25

```
1   MORRISON & FOESTER

2        Attorneys for TCEH Committee

3

4   BY:  BRETT MILLER, ESQ.

5        TODD GOREN, ESQ.

6        DAN HARRIS, ESQ.

7

8   WHITE & CASE

9        Attorney for TCEH Ad Hoc Group

10

11  BY:  CHRISTOPHER SHORE, ESQ.

12

13  MUNGER, TOLLES & OLSON

14       Attorney for TCEH Disinterested Manager

15

16  BY:  THOMAS WALPER, ESQ.

17

18  O'KELLY ERNST & BIELLI, LLC

19       Attorney for EFH Corp.

20

21  BY:  DAVID KLAUDER, ESQ.

22

23

24

25
```

```
 1   PROSKAUER ROSE

 2        Attorney for EFH Corp.

 3

 4   BY:  MARK THOMAS, ESQ.

 5

 6   PAUL, WEISS, RIFKIND, WHARTON & GARRISON

 7        Attorneys for the Ad Hoc Committee of TCEH First Lien

 8        Creditors

 9

10   BY:  ALAN KORNBERG, ESQ.

11        JACOB ADLERSTEIN, ESQ.

12

13   YOUNG CONAWAY STARGATT & TAYLOR, LLP

14        Attorneys for the Ad Hoc Committee of TCEH First Lien

15        Creditors

16

17   BY:  PAULINE MORGAN, ESQ.

18        RYAN BARTLEY, ESQ.

19

20   PACHULSKI STANG ZIEHL & JONES

21        Attorney for EFIH Second Lien Indenture Trustee

22

23   BY:  LAURA DAVIS JONES, ESQ.

24

25
```

1   WILMER HALE

2        Attorney for EFIH First Lien Indenture Trustee

3

4   BY:  PHILIP ANKER, ESQ.

5

6   COLE SCHOLTZ

7        Attorney for EFIH First Lien Indenture Trustee

8

9   BY:  KATE STICKLES, ESQ.

10

11  BROWN RUDNICK LLP

12       Attorneys for WSFS

13

14  BY:  EDWARD WEISFELNER, ESQ.

15       JEFFREY JONAS, ESQ.

16

17  BLANK ROME

18       Successor First Lien Administrative Agent and

19       Collateral Agent

20

21  BY:  MICHAEL DEBAECKE, ESQ.

22

23

24

25

1    KRAMER LEVIN

2         Attorney for EFIH Second Lien Indenture Trustee

3

4    BY:  JOSHUA BRODY, ESQ.

5

6    ROPES & GRAY

7         Attorney for EFIH Second Lien Indenture Trustee

8

9    BY:  ROSS MARTIN, ESQ.

10

11   PATTERSON BELKNAP WEBB & TYLER

12

13   BY:  DANIEL LOWENTHAL, ESQ.

14

15   DRINKER BRIDDLE & ROTH

16         Attorney fir Citibank DIP Agent

17

18   BY:  HOWARD A. COHEN, ESQ.

19

20   SULLIVAN & CROMWELL

21         Attorney for E Side Committee

22

23   BY:  BRIAN GLUECKSTEIN, ESQ.

24

25

1    FARNAN LLP

2         Attorney for Forest Creek

3

4    BY:   BRIAN FARNAN, ESQ.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2               THE CLERK:  All rise.

 3               THE COURT:  Please be seated.  Good morning.

 4               MR. SASSOWER:  Good morning, Your Honor.  Edward

 5     Sassower of Kirkland & Ellis on behalf of the debtors for

 6     the record.

 7               Your Honor, there's a lot to go over this morning.

 8     I thought what I'd first do is tick through the agenda --

 9               THE COURT:  Okay.

10               MR. SASSOWER:  -- and then give my status report,

11     and then we can go through the items on the agenda.

12               THE COURT:  Okay.

13               MR. SASSOWER:  Your Honor, there are five items up

14     for today's hearing.

15               The first item -- or the five items that were on

16     today's agenda that were originally on for today's hearing.

17               The first item relates to the motions filed by the

18     TCEH official committee, the EFH official committee, and the

19     ad hoc group of TCEH unsecured noteholders on February 19th

20     seeking standing to prosecute certain claims on behalf of

21     the TECH debtors.

22               As I'll discuss in a moment as part of a

23     stipulation that the debtors filed this morning the standing

24     motions are being adjourned.

25               I want to be clear that the stipulation we filed
```

1    this morning is not up for Court approval today, we'll be

2    coming back to the Court to seek approval hopefully on the

3    May 4th omnibus hearing, if Your Honor will so permit.

4              THE COURT:  I do have a -- at some point I want to

5    say something about that, but we can do it whenever you'd

6    like to fit it in.

7              MR. SASSOWER:  Okay.  If you don't want to cloud

8    the omnibus hearings with substantive hearings we'll --

9              THE COURT:  No, no.

10             MR. SASSOWER:  -- we'll find a different date.

11             THE COURT:  No, I might as well do it now.

12             Spending the weekend and yesterday going over the

13   briefing with care it became obvious to me that at least for

14   part of the issues I would be uncomfortable ruling from the

15   bench in that I might need to take at least part of the

16   standing motions under advisement.  And we haven't built

17   that into the record -- or we haven't built that into the

18   mechanism yet.  The deadline was to expire Friday I think.

19             So, I don't want to gum up the works, and I read

20   what the stipulation said about when the hearing would be in

21   June -- well it didn't say when the hearing would be in June

22   -- but I wanted to raise this with the parties.

23             I certainly don't want to interfere with what is a

24   very delicate negotiation, but I'm going to be uncomfortable

25   with two or three days to make the decision.  So either in

```
 1    -- however, I'm not asking -- I wouldn't ask for a carte

 2    blanche, you know, period of time to make a decision.  So, I

 3    would ask that either in setting the date we give -- the

 4    date of the hearing as opposed to where the deadline expires

 5    we go sufficient time for me to produce something if not in

 6    writing at least an oral presentation that has some

 7    opportunity for nuance to develop or we build something into

 8    when the deadline is that gives, to the extent I take it

 9    under advisement, an additional period of time to -- for the

10    Court to make a decision.

11            So, I know you've already signed up your

12    stipulation and that -- I was going to -- if we were going

13    forward on the merits today I was going to raise this issue

14    with the parties and in a judicially kind way ask the

15    parties to agree to some sort of period of time for me to

16    make a decision, at least on part of the issues in any

17    event, so, I was going to address this one way or the other.

18    So, I put that out there.

19            I would preferably like 30 days.  I can live with

20    14 if I have to, but I just -- I wanted to throw that out

21    there for the parties --

22            MR. SASSOWER:  Okay.

23            THE COURT:  -- to figure out in connection with

24    either when the June hearing gets scheduled or tweaking, to

25    the extent possible, the stipulation to give the Court some
```

1    time to make a decision on the merits if I'm in the

2    unfortunate position of ever having to make a decision on

3    the merits.

4            MR. SASSOWER:  Understood, Your Honor.  That's

5    very helpful and we aim to please.

6            So why don't I suggest this.  I'm sure at some

7    point today we'll take a recess and then parties can convene

8    during that recess and talk through your comments.

9            There's some other moving pieces.  The scheduling

10   order -- the proposed schedules order that's attached to the

11   scheduling motion we filed last night still has some dates

12   that need to be filled in, we need to layer in the mediation

13   concept, it's not in there yet.  So there are other aspects

14   of the stip that are still moving around or ancillary parts

15   of the stip that are still moving around.

16           So, I understand exactly what you're asking for,

17   I'm sure we'll be able to accommodate, and I'd like to just

18   have a moment to confer with all the professionals --

19           THE COURT:  Sure.

20           MR. SASSOWER:  -- at an appropriate time.

21           THE COURT:  Okay.

22           MR. SASSOWER:  I don't think we need to take a

23   break now because --

24           THE COURT:  No.

25           MR. SASSOWER:  -- the hearing will go on for a

1    while, so I'm sure there'll be a break at some point along

2    the way.

3            THE COURT:  Okay.

4            MR. SASSOWER:  Okay.  The second item on the

5    agenda relates to sort of outstanding issues on the various

6    make-whole litigations.  I understand that Your Honor plans

7    to rule today on whether the trial on the EFIH first lien

8    make-whole litigation will be moving forward on

9    April 20th --

10           THE COURT:  Yes.

11           MR. SASSOWER:  -- and whether a hearing date can

12   be set on the EFIH unsecured noteholders' motion to dismiss

13   the EFIH debtors' make-whole action, and my partner, Andy

14   McGann, is here today if you'd like to hear from the debtors

15   on any of those issues.

16           THE COURT:  Well on the former issue I did receive

17   the briefs -- or the letters and I appreciate that and I

18   reviewed them all, and I'm ready to rule on what we're going

19   to do.

20           We are going to have the stay relief hearing on

21   April 20th.  There will be no evidence whatsoever on

22   solvency or degree of solvency of the debtors.  I am

23   comfortable that I at least at this stage can make a

24   decision with the existing and agreed presumption of

25   solvency that's been the basis for the Phase I trial.

1           What I'm most interested in, and you know, frankly

2     the primary reason that I was unable to make a ruling on

3     stay relief on summary judgment is I would like evidence of

4     creditor harm.   I think I have the information I need, at

5     least 99 percent of the way to get there in figuring out

6     what debtor harm may or may not be based on the presumption

7     of solvency, but I have no feel for the other side of the

8     coin, and that's really why we need a hearing.

9           So, I don't think we need to continue the hearing,

10    I don't think we need discovery into solvency, I don't want

11    evidence in the solvency or degree of solvency, what I'm

12    really interested in is the flip side.

13          Of course the debtors can make their case if they

14    want to talk about negotiation impact or plan impact, I

15    think that would be somewhat relevant, but I think the

16    debtors' side of the coin will frankly be rather limited

17    because there's a presumption of solvency.

18          So that's my ruling on what we're going to do on

19    April 20th and I pause here to ask if anybody has any

20    questions.

21          Okay.   I have one more question.  Having said all

22    that and having -- are the motions in limine still a live

23    dispute that I need to decide?

24          Mr. Anker is rising, Mr. McGann is rising.

25          MR. MCGANN:   Andrew McGann for the debtors.   Good

1  morning, Your Honor.

2        I don't believe so, but of course our position

3  going in was that the three expert reports and the opinions

4  that were proffered weren't admissible to begin with, and

5  now that the issues have been narrowed to those that were

6  described in your order and as you further elaborated on

7  this morning, I think more emphatically you don't need to

8  address them because it's not admissible, but Mr. Anker may

9  have a different view, so.

10        MR. ANKER:  Good morning, Your Honor, Philip

11  Anker, Wilmer Cutler Pickering Hale and Dorr for the first

12  lien trustee and certain first lien holders.

13        We do have a different view.  Frankly, the way we

14  largely propose to address creditor harm is to have our

15  witnesses talk about the significance of the make-whole in

16  the overall economics of the (indiscernible) thesis, the

17  fact that obviously we are today in a much lower interest

18  rate environment so that noteholders who got -- who paid

19  their principal are unable to reinvest in anything like a

20  ten percent, which was the coupon on most of the notes here

21  with a similar credit.  So they absolutely are going to

22  testify.

23        There also will be testimony on the simple and I

24  would have thought largely indisputable proposition that the

25  make-whole here just as a matter of math represents about 20

1    percent of the overall economics of the holders, but we'd be

2    presenting that through expert testimony.

3              There certainly is some testimony that we would

4    have offered had the Court found the underlying agreement by

5    way of example to be ambiguous, the indenture, that we will

6    not offer now, but I think the way, and frankly the only way

7    fairly to proceed, is we will, I would ask, be able to put

8    our experts on, if Mr. McGann has objections to the lines of

9    questions as irrelevant or beyond expertise he's free to ask

10   them, but we do intend to put on our expert witnesses.

11             I would also say that if the Court, and I guess

12   this is perhaps a bit of asking for clarification, Your

13   Honor, if the debtors are going to put on a case talking

14   about the effect of granting relief from the stay to allow

15   us to rescind, and just as our contractual right to rescind,

16   on the plan negotiations that by definition will get into

17   sort of the way the waterfall works here and all of the

18   value that as we understand the debtors' plan is going to

19   ultimately go to the not only EFIH's equity holder, EFH, not

20   only the T side, but frankly to the sponsor, and we can put

21   that on without putting on any evidence of solvency, but it

22   will sort of assume, if you will, hypothetical recovery

23   levels for Oncor.  We can put on that evidence if the debtor

24   is going to put on evidence on, you know, the effect on the

25   plan, but it strikes me that it is at least largely

1    intertwined with degree of solvency if only that the

2    waterfall -- obviously the impacts on the waterfall is

3    materially different depending on the ultimate recovery from

4    Oncor.  We're happy to put that on if the Court wants it.

5            We frankly would prefer to push that off if the

6    Court is not able to decide otherwise in Phase I so we have

7    an opportunity to take real discovery on that issue, that's

8    what we think would be fair and appropriate.

9            But if the Court is going to let the debtor put on

10   testimony frankly over our objection on sort of the effect

11   on the plan I think we are going to need to put on expert

12   testimony ourselves with respect to that question, or one

13   might view Mr. Kerns in that regard as a fact witness since

14   he obviously observed the plan negotiations.

15           THE COURT:  Okay.  Thank you.

16           Mr. McGann?

17           MR. MCGANN:  I think -- thank you, Your Honor.  I

18   think much of what Mr. Anker is talking about is

19   relitigating issues that have already been decided or are

20   matters that should be inadmissible in this pleading given

21   the scope of it that Your Honor has described.

22           And maybe process wise to make it simpler or more

23   direct for the Court I would propose that Mr. Anker is still

24   bound, he can do it by letter, if it's acceptable to Your

25   Honor, the opinions that he intends to elicit from experts,

1    we can respond by letter, and when we show up for the

2    hearing maybe Your Honor can be in a position to decide the

3    in limine motions in that focused way, and if your decision

4    is as to some of these I'll let the expert take the stand,

5    and if there's objectionable questions we'll hear it then,

6    we can get to issues quickly.

7            THE COURT:  Well, I certainly -- if the motion in

8    limine is a live issue, which is fine, or motions, I can't

9    remember, that's fine and I'll make a decision and we'll

10   start with that, including a presentation.  I'll give people

11   an opportunity to orally present the issues.

12           If the parties can work together in a way to

13   present something to me that would focus the inquiry, which

14   would make preparation easier, that's fine.  There's a lot

15   to do in six days to make that happen, so, I don't want to

16   force a whole new briefing schedule or letter schedule if

17   it's -- I don't want to force that on people.

18           So hopefully it wouldn't be a problem to sort of

19   figure that out amongst yourselves and present something to

20   the Court, but I suppose if you can't do that by the end of

21   the week I could ask for written submissions on Friday that

22   would help me proceed for Monday morning.

23           MR. MCGANN:  Yeah, where I was coming from -- and

24   that certainly works too.  Where I was coming from is the

25   expert reports were submitted obviously in advance of the

1    summary judgment proceeding that had a whole bunch of other

2    issues that are no longer in front of you.  Mr. Anker's

3    letter from yesterday identifies the testimony I think in a

4    summary fashion --

5              THE COURT:  Right.

6              MR. MCGANN:  -- we can live with that and simply

7    respond in a pointed way to that and maybe that narrows the

8    issues and simplifies the presentation.

9              MR. ANKER:  Your Honor, obviously if the Court

10   wants written submissions we will provide written

11   submissions.  I certainly --

12             THE COURT:  Well, I'm not jumping up and down

13   wanting written submissions, and I don't want to put people

14   through something that is unnecessary.

15             MR. ANKER:  Look, we're happy to, if it's helpful

16   to the Court, provide written submissions.  I certainly

17   don't want a world in Mr. McGann, as he just suggested,

18   makes a written submission and we don't and we don't have an

19   opportunity to respond.

20             We're going to have our experts testify about harm

21   to the creditors, about the harm that they will suffer if

22   they lose 20 percent of their overall investment and the

23   basic bargain that underlie, unlay, I don't know what the

24   past tense is, underlay the investment from the beginning

25   where investors here took a huge haircut when they did the

1    exchange in 2010.  We will put on testimony focused on harm

2    addressing the very issue Your Honor wants to have testimony

3    on.

4            If the Court wants written submissions we're happy

5    to give them.  We're happy to simply have the witnesses

6    testify and Your Honor can make a judgment and Mr. McGann

7    can object to what they -- you know, to whether their

8    testimony is either appropriate or probative with respect to

9    the issues.

10           So we're happy to proceed however Your Honor

11   prefers.

12           THE COURT:  I don't really want written

13   submissions, unless there's some sort of, you know, mutual

14   identification or limitation.

15           So if you have something you guys can agree on and

16   you want to provide that to me ahead of time that's fine,

17   otherwise we'll figure it out on Monday and we'll have a

18   classic bankruptcy hearing, we'll make it up as we go along.

19       (Laughter)

20           MR. ANKER:  Your Honor, let me raise a different

21   question.  I --

22           THE COURT:  Oh, and I'm sorry to interrupt.

23           In connection with getting into waterfalls or plan

24   negotiations or effect on the plan I really want to avoid

25   that to the extent possible.  If the debtors open the door

1    on that we will address the -- your ability to explore that,

2    and obviously you'll be given a fair opportunity to counter

3    whatever evidence the debtor puts on in connection with

4    effect on the plan adverse or what have you, and if that

5    means getting into some of the waterfalls and the

6    (indiscernible) Oncor valuations so be it, but I'll have to

7    decide that based on what the debtors put in.

8          MR. ANKER:  Your Honor, we would ask obviously

9    just so the record is clear that that evidence be excluded

10   and the debtor not be permitted at this stage to put in it.

11         In the alternative we would ask for an opportunity

12   to depose this week in the next few days whomever the debtor

13   intends to put on the stand with respect to those issues.

14         THE COURT:  Well, I'll address that Monday, and if

15   it looks like a break is appropriate to give you an

16   opportunity to depose before cross-examination I'll give you

17   that opportunity.

18         MR. ANKER:  Thank you, Your Honor.

19         THE COURT:  So get your sleep now.  Okay.

20   Anything else on that?  All right, thank you.

21         Mr. McGann, sorry.

22         MR. MCGANN:  Yes, on a related but different

23   subject did you want to talk now about the scheduling of a

24   hearing on the PIC motion -- ripeness motion?  We have an

25   adversary on file seeking declaratory judgment on --

1           THE COURT:  And I just got the binders on that

2     last week, right?

3           MR. MCGANN:  Yes, that sounds right.

4           THE COURT:  Okay.

5           MR. MCGANN:  Everything is completed.

6           THE COURT:  Well people -- I assume oral argument

7     is requested and you'd rather -- sooner rather than later.

8           MR. MCGANN:  We're not because there's a bunch of

9     moving parts in the various discussions we're not falling

10    over ourselves, but if you had something of a few weeks down

11    the road we have talked with counsel for the PICs, we're

12    looking at maybe two hours.  If you had some options we

13    could confer and get back to chambers.

14          THE COURT:  Let me hear from --

15          MR. BOLLER:  Good morning, Your Honor.  Robert

16    Boller from Akin Gump on behalf of UMB.

17          I don't really have anything to add here.  A

18    couple weeks out, two hours that's fine.

19       (Pause)

20          THE COURT:  Can we take two hours on the May 4

21    omnibus and do it then?

22          UNIDENTIFIED SPEAKER:  Yes.

23          THE COURT:  All right.  I'll hear it on the May 4

24    omnibus.  Now all I have to do is find a law clerk that

25    doesn't have anything to do for the next four weeks.  Three

1    weeks.  Okay.

2                 MR. SASSOWER:  For the record  Edward Sassower.

3                 The third item on the agenda relates to a

4    contested contract rejection motion for Forest Creek Wind

5    Farm, LLC, and that's docket entry 3963, and my colleague,

6    Steve Serajeddini, will present this motion at the

7    appropriate time.

8                 The fourth item on the agenda relates to a motion

9    to intervene filed at docket entry 3898.  My partner Chad

10   Husnick will present the debtors' objection to this motion

11   at the appropriate time.

12                The final item on today's agenda is a motion by

13   the EFH committee to retain Kinsella Media, LLC as an

14   asbestos noticing expert, that's docket entry 4056.  The

15   debtors have no objection to the requested relief, and I

16   understand that the EFH committee has a proposed order for

17   Your Honor reflecting changes they've discussed with the

18   U.S. Trustee.

19                THE COURT:  You submitted that under

20   certification, correct.

21                MR. GLUECKSTEIN  Your Honor, Brian Glueckstein

22   from Sullivan & Cromwell on behalf of the EFH committee.

23                We did submit the revised form of order, the

24   blackline yesterday, which reflects the changes that the

25   United States Trustee requested and you signed off on a

1    moment ago.

2           THE COURT:  I signed that order this morning so I

3    was asking just to make sure that there hadn't been any

4    additional changes.

5           MR. GLUECKSTEIN  Thank you, Your Honor.  I had not

6    seen it on the docket yet.  There have been no further

7    changes, and so thank you.

8           THE COURT:  Okay.  That order has been signed.

9           MR. SASSOWER:  Lastly I'd note, Your Honor, that

10   as reflected on the agenda the hearing on the debtors'

11   motion to establish a bar date for asbestos claims has been

12   adjourned to the May 4th omnibus.

13          THE COURT:  Isn't there a -- don't we have a -- so

14   this -- dealing with what I just dealt with in connection

15   with the motion, the PIC motion, that takes care of the

16   scheduling conference, correct?  That was item 22 on the

17   agenda.

18          MR. SASSOWER:  Yes, it does.

19          THE COURT:  Okay.  All right.

20          MR. SASSOWER:  Now, Your Honor, I'd like to

21   provide you with an update on everything we've been up to

22   since the last hearing.  We've been pretty busy.

23          THE COURT:  Go ahead.

24          MR. SASSOWER:  Okay.  So first yesterday,

25   April 13th, was the deadline by which potential bidders were

1    required to submit a second round bid.  The debtor received

2    bids late last night and are in the process of analyzing

3    them.

4              Second, as Your Honor saw, this morning the

5    debtors filed a plan of reorganization, a related disclosure

6    statement, a disclosure statement motion, and perhaps most

7    importantly a scheduling motion seeking to establish a

8    definitive timeline for bringing these Chapter 11 cases to a

9    conclusion.

10             In addition the directors and managers, who we

11   commonly refer to as the DDs, through their conflict matters

12   advisors, who we commonly refer to as the DDAs or

13   essentially the director advisors, it just becomes a

14   mouthful so I'll just use those for short, they filed

15   statements in support of the plan this morning as well.  And

16   the DDAs are also present in the court today and will follow

17   me to podium, they'd like to address Your Honor.

18             The debtors also filed a proposed stipulation,

19   regarding among other things, certain aspects of the plan

20   process and an adjournment on the standing motions, and the

21   proposed stipulation reflects the support of the TCEH

22   official committee, the ad hoc committee of the TCEH first

23   lean noteholders, Wilmington Savings Fund Society on behalf

24   of the TCEH second lien notes, the ad hoc group of the TCEH

25   unsecured noteholders, and the indenture trustee for the

1    TCEH unsecured notes.

2            And the final document that we filed this morning

3    was a motion to seal certain aspects of the stipulation.

4    And the scheduling motion and the proposed stipulation,

5    which we may revise shortly per Your Honor's comments this

6    morning, and the seal motion are all noticed up for the

7    May 4th hearing.

8            The filings early this morning were the product of

9    months of hard work.  As I stated at the last hearing on

10   February 12th the debtors' chief restructuring officer

11   circulated a 50-plus page draft global term sheet and a

12   draft of the scheduling motion to the various major creditor

13   constituencies.  That version of the term sheet did not

14   include numbers and was not subject to FRE correlate or

15   confidentiality.

16           Following the February 12th circulation the

17   debtors and their advisors solicited feedback from the

18   various major creditor constituencies regarding the term

19   sheet and the scheduling motion.  Based on these

20   discussions, and as the debtors continue to refine their own

21   views as the best maximized value for the estates, on

22   March 9th the CRO circulated a revised term sheet, this time

23   with numbers, and a revised schedules motion.  The March 9th

24   circulation is subject to FRE correlate and confidentiality.

25           Again, the debtors continue to solicit feedback on

1    the revised term sheet and the revised scheduling motion

2    from the various major creditor constituencies, and based on

3    these discussions on March 27th the debtors circulated a

4    draft disclosure statement and a further revised scheduling

5    motion to the various creditor constituencies.  And like the

6    March 9th circulation the March 27th circulation is also

7    subject to FRE correlate and confidentiality.

8            All of this activity spurred plan negotiations

9    between the debtors and the creditors and amongst the

10   creditor groups themselves.  Moreover, because of the DD and

11   DDA infrastructure that the debtors had in place the debtors

12   were in a position to negotiate amongst themselves a

13   settlement of intercompany claims.

14           To that end the DDs and the DDAs began a seven-

15   month long process -- plan negotiation process which

16   culminated in a three-day summit in Dallas held on

17   March 24th, March 25th, and March 26th.  That negotiation

18   produced an intercompany claim settlement whereby TCEH would

19   have a $700 million claim against EFH and participate in up

20   to another $105 million of excess proceeds at EFH should

21   they be available.

22           The DDAs announced the settlement on April 3rd

23   pursuant to a joint statement, and the DDA settlement is

24   embodied in the plan, and that joint statement was attached

25   to some of the pleadings -- or statements in support of the

1    plan that the DDAs filed this morning.

2         Also on April 3rd the debtors circulated an

3    updated version of the plan documents that incorporated the

4    DDA settlement and DD settlement.  On April -- the April 3rd

5    distribution was important because under the case matters

6    protocol that Your Honor approved on September 16th the

7    debtors were required to give ten-days notice to certain

8    creditor constituencies of any plan and disclosure statement

9    that they intended to file.

10        We also shared the distribution not only with the

11   people who were intended or who are obligated to see the

12   stuff under the protocol, but also a variety of other

13   stakeholders on a professional eyes only basis, and all of

14   that was subject to FRE correlate and confidentiality.

15        As the debtors had hoped would happen the

16   April 3rd distribution of the plan documents kicked off the

17   flurry of activity between the debtors and the creditors and

18   amongst the creditor groups themselves.  Although the

19   creditors have not yet signed onto the plan we've listened

20   to creditor feedback and where possible incorporated those

21   views in the plan documents.

22        As I've said many times, the debtors ultimate goal

23   is to file a fully consensual plan of reorganization.  We're

24   not there yet, but we're going to keep trying and we hope to

25   be there one day soon.

1          The plan currently provides for a tax-free spin of

2     TCEH with a partial step up in tax basis and a tax-free

3     reorganization of EFH and EFIH through one of three possible

4     scenarios.  A backstop recapitalization by existing

5     shareholders -- stakeholders, a sale to a third party, or a

6     stand-alone reorganization.

7          It's important to note that that optionality of

8     the plan is designed to work hand and hand with the auction

9     process while allowing flexibility to accommodate any other

10    restructuring alternative that maximizes value.

11         Importantly the plan contains an unconditional

12    fiduciary out that'll allow the debtors to explore any and

13    all other restructuring alternatives that have been the

14    potential to better maximize the value of the debtors'

15    estates.  And the debtors are fully prepared to amend,

16    supplement, or even replace the plan and related documents

17    altogether, as needed.

18         To that end there's recently been a significant

19    interest level regarding the potential use of a real estate

20    investment trust or a REIT structure for EFIH's interest in

21    Oncor.  In particular the possibility of a restructure has

22    been the focus of discussions amongst certain potential

23    bidders, the debtors, various major creditor constituencies,

24    and in particular the ad hoc group of TCEH unsecured

25    noteholders and the TCEH official committee.

1          To allow parties to explore such an alternative

2     the plan provides that an EFH or EFIH restructuring may be

3     executed through a REIT.  Moreover, the debtors are working

4     closely with these parties to facilitate their diligence

5     efforts around a potential restructuring, again, whether EFH

6     is recapitalized through a third-party sale or REIT, a

7     creditor back proposal, or some combination of these, the

8     debtors' sole interest is in maximizing the value for all

9     stakeholders, and the debtors have designed a plan to

10    accommodate any of these options and are prepared to revise

11    the plan if it's further -- if it's needed to further

12    accommodate any of these options.

13          The April 3rd distribution also kicked off

14    negotiations that resulted in the stipulation filed this

15    morning.  Both the stipulation that's not up for today and

16    won't be heard until May 4th or some other day.

17          I do think it's helpful to quickly cover the main

18    points in order to provide the Court with additional

19    context.

20          First perhaps most significantly the stipulation

21    reflects broad base support amongst the TCEH creditor

22    constituencies, the first liens, as well as the junior

23    creditors.

24          One issue that the stipulation covers is the

25    treatment of plan distributions.  The April 3rd draft of a

1    plan included the (indiscernible) base settlement which

2    provides up to $105 million of value from EFH to TCEH, but

3    it also included a partial allocation of the $105 million as

4    between the TCEH first lien holders and the TCEH junior

5    creditors.

6            Following the April 3rd distribution these parties

7    request that the debtors not include that allocation in the

8    plan that was filed this morning in order to further

9    facilitate their negotiations.  The plan -- as a result the

10   plan filed this morning does not yet allocate between the

11   TCEH first lien creditors and the TCEH junior creditors the

12   value flowing from EFH to TCEH.

13           The plan also provides for a guaranteed

14   distribution from the TCEH first lien creditors to the TCEH

15   junior creditors.  The April 3rd stipulation of the plan

16   included an amount for the guaranteed distribution.

17           Following the April 3rd circulation the TCEH first

18   lien creditors and the TCEH junior creditors requested that

19   debtors not yet provide the amount of the guaranteed

20   distribution.

21           As a result the plan filed this morning preserves

22   a construct of the guaranteed distribution from the TCEH

23   first lien creditors to the TCEH junior creditors, but does

24   not specify the amount of the guaranteed distribution.

25           Per the terms of the stipulation the debtors will

1    fill in those two numbers that they took out of the plan no

2    later than five days before the disclosure statement

3    hearing.  We're hopeful that by the time we do so we'll have

4    consensus around those two numbers, but if we don't in order

5    to move forward with the disclosure statement hearing the

6    debtors will fill the numbers back in themselves.

7            The stipulation also modifies certain dates that

8    were included in the March 27th circulation of the

9    scheduling motion.

10           As modified by the stipulation the scheduling

11   motion proposes many of the critical dates designed to

12   achieve plan confirmation before the end of this year,

13   including starting the confirmation hearing on

14   November 18th, subject of course to the Court's availability

15   on that day.  We believe that this dynamic is vital to the

16   plan process because it will focus all parties, the debtors

17   included, on the negotiations.

18           The stipulation provides that the ad hoc committee

19   of TCEH first lien lenders supports the dates set forth in

20   the scheduling motion as revised by the stipulation, it

21   further provides that the TCEH official committee has agreed

22   not to object to the relief sought in the scheduling motion.

23           Wilmington Savings Fund Society and the TCEH

24   unsecured ad hoc committee have reserved their rights to

25   object to the scheduling motion.

1              As this Court has noted on numerous occasions

2     these Chapter 11 cases are enormously complex and large;

3     however, the debtors believe that the time is right to begin

4     a determined march towards confirmation that will serve the

5     interest of all stakeholders, creditors, customers, vendors,

6     employees, and regulators alike.

7              The stipulation further provides that the

8     scheduling motion will -- or the proposed order approving

9     the scheduling motion will be revised to contemplate plan

10    mediation.

11             Specifically if the scheduling motion is approved

12    the parties will either consensually appoint a plan mediator

13    or submit a list of proposed mediators to Your Honor in

14    advance of the May 4th hearing and ask Your Honor to appoint

15    a mediator.

16             Importantly the debtors would not have agreed to

17    participate in plan mediation in the absence of defined

18    confirmation timeline as reflected in the filed scheduling

19    motion.

20             As I noted at the beginning of the hearing the

21    proposed scheduling order is still in flux, there's still

22    some dates that need to be agreed to and we still need to

23    layer in the mediation concept, so we'll be filing a revised

24    proposed scheduling order in the coming days.  We also may

25    be filing a revised stipulation in the coming days per your

1   comments this morning.

2          With respect to the standing motions the

3   stipulation extends the challenge deadline to seek standing

4   under the TCEH cash collateral order which spurred the

5   filing of the standing motions as Your Honor noted to

6   June 30th, and the standing motions will be adjourned to a

7   hearing in June to be scheduled, but again, that provision

8   of the certification is in flux per your comments this

9   morning.

10          Last the stipulation contains certain confidential

11   information regarding the auction process, and this

12   information has been filed under seal to preserve the

13   integrity of the auction process.  We'll take up the motion

14   for seal at the May 4th hearing or whenever Your Honor is

15   prepared to hear such a motion.

16          Ultimately, Your Honor, the stipulation balances

17   the competing considerations that have driven these

18   Chapter 11 cases for nine months.  The stipulation allows

19   the debtors and their stakeholders to continue to pursue

20   value maximizing restructuring objections while driving

21   these Chapter 11 cases towards a conclusion.

22          With that, Your Honor, I'm happy to answer any

23   questions you may have or I'm prepared to yield the podium

24   to the DDAs.  I think Mark Thomas of Proskauer is going to

25   go first.

1           THE COURT:  All right.

2           MR. SASSOWER:  Thank you, Your Honor.

3           MR. THOMAS:  Good morning, Your Honor, Mark Thomas

4    of Proskauer Rose.

5           Your Honor, we are counsel to EFH Corp., the

6    ultimate parent debtor and debtor in possession reporting to

7    and acting at the direction of the disinterested directors.

8    Those disinterested directors are Don L. Evans and Billy

9    Williamson.

10          Your Honor, as noted by Mr. Sassower very, very

11   early this morning while I was sound asleep we filed docket

12   number 4147, and docket number 4147 is the statement of the

13   disinterested directors regarding the proposed settlement of

14   conflict matters as part of a plan of reorganization.  That

15   statement, Your Honor, attaches as Exhibit 1 the April 1st

16   minutes of the meetings of the disinterested directors that

17   approved the settlement.  It attaches as Schedule A to

18   Exhibit 1 the list of settled conflict matters.

19          And, Your Honor, I'm not going to repeat the

20   entirety of this statement that was filed this morning, I'll

21   summarize a few high point, but the settled matters that are

22   listed on Schedule A to Exhibit 1 are an extensive list of

23   factually intensive, incredibly and complicated intercompany

24   claims and causes of action that could be asserted against

25   the various debtors' estates against each other.  And one of

1   the settled matters also is the tax basis step up issue

2   which has been front and center of this case for a very long

3   time, Your Honor, and since we've been involved in this case

4   the consensus of all the parties in interest, especially on

5   the EFH side of the case, is that a tax-free reorganization

6   must be accomplished.

7           Your Honor, Schedule B to the minutes is a non-

8   exhaustive list of the diligence meetings and negotiations

9   that were concluded and done by the disinterested directors

10  and their advisors.

11          We, Proskauer, have been engaged since November of

12  2014, and the disinterested directors engaged Sola Capital

13  (ph) as financial advisors in December of 2014, and our

14  diligence included numerous extensive formal and informal

15  meetings with parties in interest, creditors, the debtors,

16  professional advisors, and other constituents who were

17  organized at least on the E side in terms of our diligence.

18          Your Honor, Schedule C to the minutes is an

19  illustrative waterfall that was used during the

20  negotiations.

21          And finally Exhibit 2 to the minutes -- I'm sorry

22  -- to the statement, Your Honor, is the joint statement that

23  was issued on April 3rd by all three groups of disinterested

24  directors and their advisors that sets forth the principal

25  terms of the settlement.

1          As discussed by Mr. Sassower the headline of the

2     settlement is that the TCEH estate will be granted an

3     allowed non-priority general unsecured claim in the amount

4     of $700 million against the EFH estate, and that claim will

5     be subject to certain sharing percentages under a waterfall.

6          Your Honor, however, again, as Mr. Sassower noted,

7     this settlement is part of and embodied in the plan of

8     reorganization that was filed today, and the settlement is

9     subject to confirmation of the plan.  And likewise the

10    disinterested directors have maintained a fiduciary out that

11    if they determine that there is a transaction or a plan that

12    is in furtherance of their fiduciary duties as the

13    disinterested directors of the EFH estate the settlement

14    will not go forward and they can exercise a fiduciary out.

15          THE COURT:  Thank you.

16          MR. THOMAS:  Thank you, Your Honor.

17          MR. WALPER:  Good morning, Your Honor, Thomas

18    Walper, Munger, Tolles & Olson on behalf of the EFCH and

19    TCEH estates for the purposes of representing the

20    disinterested manager at his direction.

21          On November 7th and then on December 9th of last

22    year the EFC and TCEH boards of managers delegated the

23    authority to the disinterested manager, Mr. Huge Sawyer

24    (ph)m to identify and act on matters in which there existed

25    an actual conflict between the TCEH debtors on the one hand

1    and the other debtors.  Mr. Sawyer then retained my Munger,

2    Tolles & Olson, as well as Greenhill as a financial advisor.

3              After the resolutions were approved by the board

4    and the advisors were retained at Mr. Sawyer's direction

5    there was immediate and significant work to determine and

6    identify the conflict matters and to investigate those

7    matters.  That included, and you will be able to confirm by

8    the time records, significant review of materials prepared

9    by the debtors advisors, including K&E, Sidley, Evercore,

10   Ensolfo Cooper (ph), had many meetings with those advisors.

11   It included reviewing the documents in the debtors' data

12   room, the legacy database as relevant to conflict matters.

13   It involved a meeting with the debtors' employees and

14   interview of them with respect to their knowledge of the

15   conflict matters.  There was extensive research done on the

16   analysis of tax issues, including the tax structuring and

17   tax sharing issues.

18              Mr. Sawyer and his advisors also sought input from

19   TCEH creditor groups, including the TCEH official committee,

20   the TCEH first liens, the TCEH second liens, as well as the

21   ad hoc group of TCEH unsecured creditors.

22              You know, essentially Mr. Sawyer has met with his

23   professionals nearly every day since their retention for the

24   purpose of analyzing and understanding the conflict issues

25   and in working through the process of the independent

1    managers.

2            On February 25th of this year Mr. Sawyer met with

3    the TCEH board and outlined a number of what he had

4    concluded a non-exhaustive list of conflict matters.  That

5    list after that date was shared with the various T side

6    creditor constituents.

7            During March there was an approximate 30-day

8    period during which all of the disinterested advisors along

9    side of their disinterested managers and directors set out

10   to negotiate matters which were actual conflicts.  Many of

11   those meetings, as Mr. Sassower and Mr. Thomas referenced,

12   were in person and discussions at times became tempered and

13   I think to describe them arduous would be an understatement.

14            THE COURT:  I'm sorry, I'm going to interrupt.

15   Somebody on the telephone I can hear your typing.  Mute your

16   phones or hang up.  Go ahead.

17            MR. WALPER:  Thank you, Your Honor.

18            These negotiations culminated in a meeting that

19   Mr. Sawyer had on April 1st in which he concerned whether or

20   not it would be appropriate to enter into a settlement that

21   would compromise all of the conflict matters that he had

22   determined and to incorporate those in a plan of

23   reorganization.

24            Importantly the terms of that settlement, as the

25   others have noted, would provide for a tax-free spin of TCEH

1    and for a partial step up in basis.

2            A key to the interest of a lot of the T side

3    constituents, the tax-free reorganization of EFH and EFIH

4    could be executed through a number of scenarios, including

5    in particular a real estate investment trust, a REIT

6    structure, but through that sale to a third party, maxed out

7    recap, and a stand-alone reorganization.

8            Again, this was very, very key to Mr. Sawyer when

9    he was considering whether or not a settlement would be

10   appropriate of the conflicts.

11           Unlike in the RSA, and importantly, this provided

12   for a very significant payment by the E side to the T side

13   by allowing a $700 million unsecured claim, and as have been

14   described, an additional $105 million as to recoveries on

15   the E side over $1.41 billion.

16           Last night -- the pause was I think a lack of

17   sleep, so I apologize, Your Honor -- but last night

18   Mr. Sawyer had prepared and directed our filing of a

19   statement much like the statement that was referenced by

20   Mr. Thomas which very specifically outlines in a very

21   transparent way details of the process that were undergone

22   in order to reach that settlement.  It includes his minutes,

23   it includes presentations that were made to him in

24   connection with his disinterested manager meeting when he

25   made that determination, and it has been filed at docket

1    number 4145.

2            So thank you, Your Honor, for your time.

3            THE COURT:  You're welcome.

4            MR. LEVIN:  Good morning, Your Honor, Richard

5    Levin, Cravath, Swaine & Moore on behalf of Energy Future

6    Intermediate Holding Company LLC to conflict matters

7    reporting to and acting at the direction of the

8    disinterested manager, Charles Cremons (ph).

9            Your Honor, my story, the EFIH story is --

10   parallels very closely to the two stories that you just

11   heard.  We've detailed them in the statement of support that

12   we also filed this morning.

13           It is the story of Cravath and EFIH's financial

14   advisor, Gold & Associates, and Mr. Cremons working

15   diligently on the conflict matters, investigating,

16   analyzing, researching, negotiating, and reaching resolution

17   on all of these matters in much the same manner that EFH

18   disinterested directors and TCEH disinterested managers did.

19           I won't go through all the details on that here,

20   it's all in the filing that we submitted, and I can say that

21   Mr. Cremons with respect to conflict matters supports the

22   settlement that has been reached subject to the fiduciary

23   out as noted and the plan to the extent -- Mr. Cremons

24   supports the plan generally of course, but specifically with

25   respect to conflict matters supports the plan in his

1    capacities as the disinterested manager.

2              THE COURT:  Very good.  Thank you.

3              MR. LEVIN:  Thank you.

4              MR. GLUECKSTEIN:  Good morning, Your Honor, Brian

5    Glueckstein, Sullivan & Cromwell on behalf of the EFH

6    official committee.

7              I just want to note a few points for the record

8    and for Your Honor from the perspective of the EFH committee

9    with the litany of documents that Mr. Sassower reviewed this

10   morning.

11             Just first with respect to the standing motion

12   just so the record is clear the EFH committee had pending --

13   has pending standing motions to pursue a limited set of

14   avoidance claims that was subject to today's hearing as

15   well.

16             The EFH committee is not a party to the

17   stipulation that was filed between the debtor and the T side

18   creditor constituents that Mr. Sassower outlined this

19   morning, and we didn't actually see it until yesterday.

20             Nonetheless we have agreed obviously at this point

21   to our adjournment of our standing motion with the

22   understanding that the challenge period as provided in the

23   cash collateral order would be extended until the end of

24   June.

25             The EFH committee continues to reserve its rights

1     relating to the make-whole litigation.

2             There are three key issues from the committees'

3     perspective.

4             First maximizing value requires the prompt

5     disposition of Oncor for its highest value while maintaining

6     all necessary flexibility with respect to the plan

7     structure, and certainly maximizing the value of Oncor in a

8     timely fashion remains the most important issue.

9             This plan starts however from a fundamentally

10    flawed premise, in our view, that have been pervasive

11    throughout these cases.  That the threat of a taxable

12    deconsolidation of the businesses requires a substantial

13    transfer in value to the T side at the expense of the E side

14    creditors.

15            In fact we would submit, Your Honor, what is

16    really necessary is a valuation of the TXU Illuminate assets

17    in order to our view confirm that there really is not a

18    substantial tax problem with the magnitude that has been

19    eluded to over the many months of this case requiring that

20    transferred value.

21            There's been no effort to date to challenge the

22    valuation assumptions of the T side creditors or to market

23    those assets, and we believe that is in fact necessary.

24            The plan, as we've heard this morning,

25    incorporates this global settlement of the intercompany

1    claims between the T side and the E side debtors and

2    resolving this tax-free deconsolidation issue that has been

3    now approved subject to the fiduciary out by the independent

4    directors at each of the estates.  That settlement offers to

5    provide to the T side, and it's an offer at this point, an

6    allocation -- for their allocation a $700 million pari passu

7    claim against the EFH estate plus EFH's NOL tax attributes,

8    which we believe has significant value, without even any

9    indication that the offer may be accepted by the economic

10   stakeholders on the T side.

11           As we've heard repeatedly this morning this

12   settlement is contingent on confirmation of this plan that

13   was filed by the debtors, which itself is subject to a

14   fiduciary out.

15           And so while the independent directors have

16   pointed to this fiduciary out as a source of comfort to the

17   committee when our concerns were voiced after we learned of

18   the magnitude of the settlement, certainly the TCEH

19   independent director has that same right.

20           And so, Your Honor, we would submit due to the

21   contingent and truly determinable nature of this settlement

22   EFH (indiscernible) believes litigation must be promptly

23   commence with respect to the intercompany claims in order to

24   protect the rights of the EFH estate and its creditors.

25           The debtors have commenced litigation at this

1    point with respect to all other material disputed claims,

2    including make-wholes and others, but that they have not

3    done so with respect to the intercompany claims, instead

4    apparently intending to use that as currency to provide

5    value to the T side at the E side creditors' expense.

6         With the mandate of the EFH independent directors

7    and their advisors now to defend this proposed settlement

8    they're not in a position to prosecute the necessary

9    intercompany claims litigation and therefore the EFH

10   committee reserves all its right with respect to these

11   issues, including to seek to pursue claims objections and

12   any related litigation.

13        Your Honor, just final point with respect to the

14   settlement and process.  As is outlined in the statements

15   filed over night despite the detail that's included in them

16   we continue to have concerns about whether or not, at least

17   the EFH independent directors, acted with all of the

18   available facts, and we have made those points clear to

19   counsel for the directors, and we certainly at this point,

20   while it's after the fact, are engaged in discussions with

21   them on all of these issues.

22        We are mainly concerned about the process.

23   Certainly the EFH committee has the same -- essentially the

24   same fiduciary (indiscernible) as the independent directors,

25   to maximize value at the EFH estate.  Although the

1    committee, the difference is the committee is representative

2    of the actual creditors that have money at risk in these

3    cases, yet we had no involvement in this purported

4    settlement.  We've repeatedly and formally requested that

5    the independent directors involve the EFH committee in the

6    process, but those requests were denied.  (Indiscernible)

7    that we heard that we would have an opportunity to object on

8    the 9019 reasonableness standard, there's no substitute for

9    meaningful participation.

10            Nonetheless, as we've heard this in a lot of ways

11   we view as nothing more than a starting point for friendly

12   negotiations, and as we move forward the EFH committee

13   intends to continue to work with all stakeholders on a plan

14   of reorganization that can be presented to the Court for

15   confirmation hopefully with this committees' support in a

16   reasonably short time.

17            Thank you, Your Honor.

18            THE COURT:  You're welcome.

19            MR. KORNBERG:  Good morning, Your Honor, Alan

20   Kornberg of Paul, Weiss, Rifkind, Wharton & Garrison on

21   behalf of the ad hoc committee of TCEH first lien creditors.

22            Your Honor, the filing by a debtor of a proposed

23   reorganization plan is a very significant development in a

24   Chapter 11 case, in these cases however, as you've heard, no

25   party has agreed to the debtors' plan, and whether that plan

1    as it evolves proves to be the key that unlocks consensus

2    and which has proven so elusive to date remains to be seen.

3            In any event we believe the debtors' plan should

4    be developed and considered on a relatively fast track and

5    that is why we support the debtors' effort in obtaining a

6    scheduling order.

7            While the stipulation filed today that

8    Mr. Sassower described does reflect agreement by diverse

9    parties on a number of significant issues and is progress it

10   does not reflect any agreement on specific plan terms, any

11   agreement on the type plan or plans that should resolve

12   these cases, and more specifically from the perspective of

13   the T side, whether its plan should be based on a taxable or

14   tax-free restructuring of TCEH.

15           As we've reported previously the ad hoc committee

16   of TCEH first lien creditors has been working tirelessly

17   prepetition and post-petition with relevant constituencies

18   to explore possible consensual plan alternatives.  That work

19   has gone on for a very long time, and as Mr. Sassower

20   described had been particularly intense at the moment and we

21   will continue to work very hard.  It goes without saying,

22   however, that the success of these efforts, of our efforts

23   and those of many other parties in interest, cannot be

24   guaranteed.  Indeed it is seemed at times as if achieving a

25   tax-free restructuring of TCEH is a bit like fitting a

1    square peg into a round hole.

2         Because the challenges presented this these cases

3    are daunting we have for some time encouraged the debtors

4    and other parties to consider plan mediation, and we are

5    pleased that that suggestion has been embraced.  We hope

6    that the mediation will start soon and we look forward to

7    participating a progress designed to be focused, efficient,

8    swift, and successful.

9         Nonetheless, as is recited explicitly in numerous

10   places in the stipulation described today, the members of

11   the ad hoc committee of TCEH first lien creditors reserve

12   all their rights with respect to the debtors' plan, the

13   disclosure statement, and all of the other issues concerning

14   the conduct of these cases.

15        Thank you, Your Honor.

16        THE COURT:  Mr. Miller?

17        MR. MILLER:  Good morning, Your Honor, Brett

18   Miller, Morrison & Foerster, on behalf of the T side

19   committee.

20        I feel like this the backwards day.  Here we are

21   on a day where the T side is all in agreement on a

22   stipulation that stops litigation or at least adjourns

23   litigation and heads us towards mediation and the E side

24   committee is actually asking to litigate, but that will play

25   itself out over the next couple months I think.

1              The T side committee has worked very closely with

2     the debtors, the TCEH DDA, the first liens, the second

3     liens, and the unsecured creditors on the T side to come up

4     with what we think is an important first step in the process

5     of resolving not only the T side intercompany claims, but we

6     think potentially a solution for the entire case with an

7     alternative plan.

8              It's mentioned in the stipulation, Mr. Sassower

9     mentioned the REIT option, it is something that is moving

10    full steam ahead of the T side, certainly between the T side

11    committee and the ad hoc unsecured committee joined by the

12    second liens, who are also on the T side creditors'

13    committee.

14             We think that the T side alternative REIT plan

15    will provide the most value to creditors throughout the

16    capital structure.  We hope that the debtors stick to their

17    words of continuing to provide us due diligence as well as

18    other information necessary to foster that plan, and that we

19    will hold them to those burdens as even though they've filed

20    their own plan they do have a fiduciary out and the plan

21    that was filed has the different mechanisms for achieving

22    confirmation.

23             We're cautiously optimistic that the mechanism

24    that includes the REIT plan will be a successful one here

25    and provide the most value to unsecured creditors and likely

1    everyone in the capital structure.

2           Success has many parents and the efforts over the

3    last weekend really have been monumental in getting the

4    stipulation done, but there's a long way to go and we hope

5    that this being the first step does lead to a new effort in

6    this case to have a consensual plan that gets confirmed

7    somewhere along the timeline, whether it's on November 18th

8    or not too vague to say right now, but we are pointed in the

9    right direction.

10          Thank you.

11          THE COURT:  Thank you.

12          MR. WEISFELNER:  Good morning, Your Honor, Ed

13   Weisfelner, Brown Rudnick on behalf of WSFS, the second lien

14   indenture trustee.

15          Your Honor, I think today is fairly remarkable in

16   the sense that there does appear to be a consensus among

17   (indiscernible) true for the T side now it is true to the E

18   side, and the consensus that we've reached is that we all

19   hate the plans that they filed.  So in that regard the

20   debtor has succeeded in bringing all the creditors together

21   on the same page.

22          Your Honor, 700- or $805 million going over from

23   the E side to the T side we believe is woefully

24   insufficient.  The allocation between the first liens and

25   the junior T side creditors that was suggested in the plan

1    outlined, not the one that got filed, but the one that got

2    circulated, we believe is unacceptable, and the value that

3    would flow to the E side seconds and PICs and the legacy

4    holders on account of their make-wholes and their premiums

5    we think is unsupportable.

6         It reminds me of the metaphor that Mr. Shaw put on

7    the record very early in this case about this case being an

8    airline where the E side creditors were sitting in first

9    class and the T side creditors were sitting in coach.  First

10   class was arguing about whether they got steak and lobster

11   and we were wondering when they were going to pass around

12   the nuts.

13        Now it looks like from the E side constituency

14   they're talking about their steak, their lobster, which I

15   equate to being payment in full, and they want to know, you

16   know, when they get their dessert, which would constitute

17   payment of premiums be it either in the form of post-

18   petition interest or make-whole.

19        Your Honor, I think it's important that you

20   understand that from the T side perspective there are

21   parallel paths that we intend to pursue, hopefully with the

22   cooperation of all of the T side creditors as well as the

23   debtor, and that is to explore in detail what many of us

24   consider to be a value maximizing transaction that has been

25   described by some of debtors' counsel as presenting an

1    elegant solution to this case, and that is this REIT

2    structure.

3              It should come as no surprise to Your Honor that

4    among the critical building blocks for this restructure is

5    the raising of many billions of dollars of debt and equity.

6    People generally get the raise many billions of dollars of

7    debt and equity so long as they have the requisite

8    information available to present to potential investors,

9    whether part of the capital structure already or new

10   elements to the capital structure.  And in that regard, and

11   while I want to appear to be optimistic, one of the critical

12   issues for all of us that sign the stipulation is to ensure

13   that the information flow that comes from our debtors and

14   the facilitation of the transactions that we need from our

15   debtor in terms of information, in terms of tax

16   considerations be free flowing.

17             And, Your Honor, while again I'm hoping that the

18   degree of good faith and fair dealing among the parties that

19   has developed recently will continue, what's critical to us

20   in terms of timing, because we can't take forever to come up

21   with a REIT structure quite obviously, but our ability to

22   fulfill the goal here within a timely fashion is very much

23   dependent on getting information in an appropriate and

24   timely fashion from the people that are in charge of that

25   information, those are our debtors.

1          Now, Your Honor, in order to balance our desire to

2     spend time and effort formulating a restructure and raising

3     the requisite debt and equity we've been asked to

4     simultaneously consider a plan construct along the lines of

5     what the debtors has filed so that we don't find ourselves

6     three or four months from now with a failed restructure and

7     no fallback position and no progress between the parties on

8     a plan.  And, Your Honor, that's the reason for the T side

9     plan mediation.

10          Understanding where the DDAs and the DDs and the

11     K&Es and the other alphabet parties have come out at least

12     preliminarily on allocation of value and allowance of

13     claims, we do think that a mediation among the T side

14     creditors as to how to allocate that value so that we could

15     conceptually flip into a plan should a restructure, which is

16     the value maximizing a transaction from everyone's

17     perspective, doesn't come to fruition I think is a

18     worthwhile endeavor so we don't find ourselves back to

19     square one some time in the future.  And that's what we

20     intend to do.

21          My last sort of clarion call and concern over and

22     above letting Your Honor know that we will diligently

23     monitor the debtors' compliance with reasonable discovery

24     requests in a timely fashion, and discovery is a bad word to

25     use, it's diligence requests, the other concern we all have

1    is the potential convergence of the process that we've

2    undertaken and the Oncor sale process that's currently under

3    way that has bids due -- or had bids due last night.  And

4    Your Honor knows that many of us don't have very much in the

5    way of transparency into that process, but suffice it to say

6    that in our view if there are third parties that are bidding

7    on Oncor with a view towards an ultimate REIT structure,

8    that's the value that is going outside of the confines of

9    the current creditors of this estate to third parties that

10   could otherwise in a self-financed REIT structure be made

11   available to the current creditors of this estate.

12           And while I appreciate the debtors' desire to

13   maintain maximum optionality by pursuing all alternatives

14   simultaneously, my concern is that unless we're very, very

15   careful, and by that I mean the terms and conditions of any

16   stalking horse bid that would either directly or indirectly

17   put a crimp in all of the professionals' ability to

18   carefully consider and ultimately effectuate a REIT

19   structure that doesn't give away value to the third parties

20   but instead retains that value for current creditors, that's

21   something we all need to be vigilant about.

22           So, Your Honor, again, while I think on the T side

23   level there is progress being made, an agreement to

24   collectively work on parallel paths towards either a

25   consensual plan through the help of a mediator or more

1    promising the ability to structure a REIT transaction, which

2    will require a significant amount of debt and equity

3    financing we think is feasible and quite possible, I want to

4    make sure that as we continue to keep open our optionality

5    we not crash into each other.  We'll come back to Your Honor

6    I promise in the event that this we think there are

7    obstacles being purposefully or mistakenly put into our

8    path.

9              Thank you.

10             THE COURT:  You're welcome.  Mr. Shore, good

11   morning.

12             MR. SHORE:  Good morning, Your Honor, Chris Shore

13   from White & Case, on behalf of the ad hoc group.  I'm

14   looking forward to using to telestrator at some point.

15             You know, two things -- I'll start here with two

16   things I've learned over the past 23 years.  Anniversaries

17   are important and sometimes the past is not always the past.

18             We are a year into the case now, and I think it's

19   instructive to look back for a moment, because it does

20   inform everybody as to what we mean with a new plan on file.

21             Because the committee wasn't here on the first

22   days I gave Mr. Miller my first day deck that debtors'

23   counsel worked through with Your Honor, and in that deck and

24   in the presentation the Court was enthusiastically told

25   about the tremendous consensus around the RSA, about the

1    RSA's value maximizing transaction, and the clear path that

2    the debtors had to an exit in February 2015.  As we sit here

3    today thank goodness TCEH and the TCEH debtors avoided that.

4              First that RSA had a release of all interdebtor

5    claims and would have abandoned at least $805 million of

6    value that there are in those claims.  That's the out of the

7    box proposal by the DDAs and the DDs and whatever they are

8    about where they think an appropriate deal is.

9              Also in that RSA, given where we are today, the E

10   side creditors would have been grossly overpaid thereby

11   devaluing the TCEH claims into the E side.  Not only in the

12   form of overpayments of the make-wholes, but that

13   convertible DIP structure which would have given all of the

14   upside in any kind of Oncor transaction to a group of

15   creditors who had a fixed dollar amount of claims.

16             Without irony the debtors and now the new slate of

17   spokes people for the debtors have come forward with the

18   same promise of a consensual plan to exit that they filed

19   last night, except that this time there's tremendous dissent

20   across the capital structure.  I don't think any creditor or

21   creditor body has said anything positive about the plan or

22   the proposed settlement, and different than the RSA that was

23   filled and talked about last year at this time we're looking

24   at a 2016 exist at best under the proposed plan that just

25   got filed.

1          The merits of a plan for another -- the merits of

2     the plan are for another day and I'm not going say much

3     except suffice it to say that other people have said in our

4     view Mr. Sawyer is still on the wrong planet with the

5     settlement that he has cut.  He's missing key points, he is

6     again agreeing to release estate claims for no

7     consideration.  The only debtor who is getting anything is

8     TCEH, and he's way out in front of his creditor body.

9          In fact if you read that presentation or the

10    series of presentations that are filed it's hard to match up

11    the presentations with the dollar figure that was agreed to

12    except in one key respect.  Where the debtors have been in

13    these cases and their independence is not necessarily

14    focusing on what is a value maximizing transaction, but what

15    is a transaction that has a realistic possibility of getting

16    done over the objections of people within the exclusive

17    periods were the debtors to file a plan?

18          I will say this about the doggedness with which

19    the debtors and their slates of professionals and people who

20    act on their behalf had pursued a plan within exclusivity.

21    We do not believe it was Congress's intend in shortening the

22    exclusive periods to put debtors in a position where they

23    make a talismanic approach to filing any plan whatsoever

24    within the exclusive periods under all circumstances in all

25    cases and no matter what the creditors think.  On the

1    contrary in our view Congress intended that what would

2    happen in the different cases is that the creditors would be

3    given an opportunity to speak.

4         It's not that hard to propose a plan that

5    distributes value in a way that nobody accepts with a blide

6    (ph) statement if you don't like it you fix it, and with

7    respect to the ad hoc group almost alone in these cases you

8    can fix it without any estate funding.  We know how to fight

9    that, we will fight that, but let's move away from the plan

10   that just got filed.

11        It's springtime again, I stand up here and start

12   talking about another Mr. Lauria plan that he's out there

13   working on.

14        We've talked about throughout the case the

15   importance of setting the table right and we are at an

16   interesting time in the case.  Currently there may be ten

17   players around the table talking about what kind of plan

18   would work, and unlike before when the table was set wrong

19   everybody is looking around the table at everybody else's

20   knife contemplating the consequences of not getting on board

21   a deal, wondering whether they're the one who is going to

22   end up with nine knives in their back, a typical New York

23   dinner party during election session.  But that's the way a

24   table gets set and gets people to engage, and it's taken a

25   year to get there.  It required diligence into claims, it

1    required the filing of a complaint -- or a proposed

2    complaint against the first liens, it required engaging on T

3    side, E side claims, it required the prospect that if we

4    couldn't get it done it was going to take a long time to get

5    it done.  The table is set.

6              I told the Court months ago that if he got the

7    opportunity Mr. Lauria would cook up a deal, and he's at it.

8    It's gone through several important iterations over the past

9    several months, but currently the construct is an

10   $11 billion debt and equity raise that makes the E side

11   irrelevant, everybody gets what their legal entitlement is

12   as determined by the Court, and gets everybody out in

13   months, not years.

14             So importantly we want to get that done.  Let's

15   simplify the debate without relitigating the bidding

16   procedure issues.  The contemplation of the bidding

17   procedures motion was always that the debtors would let the

18   purchaser do what they wanted with the assets even if that

19   meant flipping into a REIT.

20             The premise of an alternative plan is to create

21   more distributable value by getting a REIT done within the

22   Chapter 11 and capture that ecreted (ph) value for the

23   creditors of the existing debtors and not third-party

24   bidders.  And since that concept was raised we've heard the

25   typical debtor responses over time.  Too much execution

1    risk.   Too big.   Where's your committed financing?   We have

2    a bird in the hand that we just can't leave aside.   It's

3    going to be the largest distressed M&A ever.   It's going to

4    be the largest utility REIT ever.   Everybody coming forward

5    with explanations as to why it can't be done.

6           I'll say this, if everybody is living where they

7    say they live right now around that table a deal can get

8    done and the manifestation of that is the stipulation that

9    was filed late last night where everybody is agreeing in

10   principal to a two-month time out to focus not on fighting

11   each other, but rather on working for a massive plan which

12   creates huge amounts of distributable value and will allow

13   these cases to exit in months, not years.

14          The key is here unlike some other debtors in some

15   other cases, including cases in front of Your Honor, these

16   debtors have said now, okay, we will support you in trying

17   to get that plan done.   We take that at face value and look

18   forward to devoting all or time to doing that.

19          As the Court knows though from here to a real RSA

20   with tremendous creditor support throughout the capital

21   structure it's a delicate, difficult process of removing

22   hurdles and avoiding new issues, and it requires a debtor

23   team that actually means it when it says we are committing

24   to make this work and that they do so with the same

25   enthusiasm that they exuded on the first days of these

Page 70

1   cases.

2         To be clear we're not here, we may need to be

3   back, we may have to start the process of in chambers

4   conferences with Your Honor to talk about where the deal is,

5   but we're grateful that the case is now a year in on its

6   anniversary finally getting back to the level playing field

7   that we talked about on the first day.

8         THE COURT:  Thank you.

9         MR. SERAJEDDINI:  Good morning, Your Honor.

10        THE COURT:  Good morning.

11        MR. SERAJEDDINI:  Steven Serajeddini of Kirkland &

12   Ellis on behalf of the debtors.

13        Your Honor, the next item on today's agenda --

14        THE COURT:  No, we're going to take -- sorry, I

15   didn't know you were where you were heading.

16        MR. SERAJEDDINI:  Oh.

17        THE COURT:  We're taking a break.

18        MR. SERAJEDDINI:  Oh.

19      (Recessed at 12:03 p.m.; reconvened at 12:23 p.m.)

20        THE COURT:  Please be seated.  She really pelts

21   that doesn't she?  Before she had kids, she was so quiet.

22        All right.  Let's continue.

23        MR. SERAJEDDINI:  Good morning, again, Your Honor.

24   Steven Serajeddini of Kirkland and Ellis on behalf of the

25   debtors.  Your Honor, the next item on today's agenda is the

1    debtor's motion to reject their energy purchase agreement

2    with Forest Creek Wind Farm, LLC.

3            Debtors filed the motion to reject this contract

4    effective nunc pro tunc to March 24th, 2015, the filing date

5    of the motion.

6            The motion was supported by a declaration of

7    Robert Frenzel, CFO of Luminant Energy Company.  On April

8    7th, 2015 Forest Creek filed a limited objection to the

9    reduction motions and a declaration of Travis Carmen.  And

10   on April 9th, 2015, the debtors filed a reply.  The reply

11   was supported by a supplemental Frenzel declaration.

12           Your Honor, the parties have stipulated to a

13   factual record for today's hearing.  The record will consist

14   of the two Frenzel declarations, docket numbers 3964 and

15   4103 and the Carmen declaration, docket number 4076.

16           In addition, the debtors have agreed to the

17   following three stipulated facts.  And I'm sorry, debtors

18   and Forest Creek.  The parties did not discuss the effective

19   date of the rejection of the contract during their pre

20   March 24th negotiations.  The April 1, 2015 draft letter

21   agreement referenced in paragraph 4 of the Frenzel

22   declaration included retroactive relief -- retroactive

23   effect of the rejection.  And number three; although

24   Luminant sold scheduled power from Forest Creek at market

25   pricing during the disputed period, it also suffered burdens

1    related to its services as a (indiscernible) including

2    claims Forest Creek may assert against Luminant it its

3    Chapter 11 case.

4            So Your Honor, Mr. Frenzel is in the courtroom

5    today and available to testify to the extent Your Honor has

6    any questions of him.  Otherwise, this would constitute the

7    record for today's hearing and we ask that you admit the

8    declarations into evidence.

9            THE COURT:  Okay.  They're admitted.

10           MR. SERAJEDDINI:  Thank you, Your Honor.

11       (Declarations were received)

12           MR. SERAJEDDINI:  So unless Your Honor has any

13   further questions at this point, I'll turn to argument.

14           THE COURT:  Go ahead.

15           MR. SERAJEDDINI:  Okay.  Thank you.  Your Honor,

16   the debtors seek to reject the contract here because it

17   provides for the sale of electricity to the debtors at

18   significantly above market rates.  The debtors' business

19   judgment in seeking a reject is not a dispute today.

20   Instead, Forest Creek objects only to the debtors' requested

21   date of rejection.

22           The debtors' requested that date to be March 24th,

23   the date of the filing of the motion.  Forest Creek seeks to

24   have that rejection effective as of April 15th, tomorrow.

25           Your Honor, we respectfully submit that March 24th

1    is the appropriate rejection date.  The legal standard for

2    retroactive relief is based upon a balancing of the

3    equities.  As I'll explain, the equities here justify the

4    relief for multiple reasons.

5              First, the debtors provided Forest Creek ample

6    notice of the rejection before and upon its filing.

7              Second, Forest Creek is not prejudiced in any way

8    by the relief.

9              And third, the debtors will suffer meaningful harm

10   if the Court were to deny relief.

11             Your Honor, Forest Creek had ample notice here.

12   The uncontroverted facts are as follows.  Debtors began

13   settlement discussion s in December of last year with Forest

14   Creek.  In the months that followed the debtors sent over a

15   proposal that reflected market pricing and attempted to

16   obtain a consensual resolution with Forest Creek.

17             By the week of March 9th, the debtors made clear

18   to Forest Creek that they would be moving to reject the

19   contract in the coming weeks.

20             On March 24th, the debtors filed and served the

21   motion on Forest Creek.  Since then, the parties have had

22   additional discussions aimed at a resolution and Forest

23   Creek had full time and opportunity, we believe, to take any

24   steps it feel -- it felt it needed to in advance of this

25   rejection.

1           The crux of Forest Creek's argument is that it

2    will somehow be harmed if the debtors' requested relief is

3    granted because the debtors' didn't take certain actions.

4           Your Honor, Forest Creek will not be harmed here.

5    Debtors have and will continue to comply with the regulatory

6    obligations in these Chapter 11 cases.  And in accordance

7    with these regulatory obligations, since the date of

8    rejection, the debtors have continued to service a qualified

9    scheduling entity, which you will hear referred to as a QSE

10   for short -- for Forest Creek's power.  This means that the

11   debtors have continued to schedule and sell Forest Creek's

12   power into the ERCOT market in the intervening period

13   waiting for Forest Creek to take steps to transition the

14   services.

15          Yet Forest Creek somehow argues that it was harmed

16   because the debtors didn't terminate these services sooner.

17   This appears to be so Forest Creek could sell its power on

18   the market sooner, but power would have sold at market

19   prices, which is exactly what the debtors did during the

20   intervening period and what Forest Creek could seek, if it

21   chooses to, assert as an administrative expense request in a

22   Chapter 11 cases.

23          So in other words, all the debtors could hear was

24   help Forest Creek cover its costs at the same prices that

25   Forest Creek would have received on its own, notwithstanding

1    Forest Creek's inaction.

2            Forest Creek also incorrectly characterizes its

3    lack of alternatives under the protocols after the

4    rejection, which I'll clarify just for the record.

5            As I laid out in our papers, under ERCOT

6    regulation Forest Creek could have scheduled and sold its

7    power in a number of ways the past several weeks.

8            They could have entered into a QSE to QSE sale,

9    which is effectively where Forest Creek's parent company and

10   operator, Ion (ph), which is certified QSE could have simply

11   bought the power from Luminant and scheduled and sold it as

12   it wished.

13           Forest Creek could have also sought to designate a

14   new QSE on short notice or operated as its own QSE under

15   ERCOT protocols.

16           Ultimately, Your Honor, this regulatory overlay is

17   just a red herring.  This dispute is about a recovery from

18   the estates and that is the final element of the equities at

19   play here.

20           As I explained, if Forest Creek had got what it

21   alleged wanted and it had a replacement QSE in place as of

22   the motion filing date, it would have only been able to sell

23   power at the market price.  But instead, it filed its

24   objection and is going likely to seek to use its later

25   rejection date, if granted, to bolster its claim for an

1    administrative expense at the contract rate.

2          So in other words, Forest Creek is seeking to use

3    its own inaction to obtain a windfall to the detriment of

4    other unsecured creditors of the TCEH debtors.

5          This, we submit, would be a highly inequitable

6    result, Your Honor, and would create a perverse incentive

7    for other senioraly (sic) situated counterparties.

8          For these reasons, Your Honor, we ask that you

9    overrule the objection and grant the motion effective March

10   25th, 2015, the motion filing date.

11         Unless Your Honor has any further questions of me,

12   I'll cede the podium and reserve for rebuttal.

13         THE COURT:  Okay.  No questions.

14         MR. SERAJEDDINI:  Thank you.

15         MR. PECK:  Good afternoon, Your Honor.

16         THE COURT:  Good afternoon.

17         MR. PECK:  I'm Ian Peck with Haynes and Boone.  My

18   local counsel is Brian Farnan of the Farnan Law Firm.

19         On the phone with me today, I have Ms. Diana

20   Liebmann who is a partner of our firm.  She is an energy

21   regulatory lawyer.  So I'm going to address the Court, but

22   to the extent you have some technical questions about the

23   applicability of ERCOT protocols, how those work,

24   Ms. Liebmann is available to answer those questions and

25   probably can do so much better and more efficiently than I

1    can.

2              We have a very simple argument today that's made

3    slightly more complicated by the regulatory overlay.  The

4    simple argument is that we don't believe that retroactive

5    effect of the rejection is equitable under the facts and

6    circumstances here today.

7              We also don't believe that retroactive rejection

8    is permitted by the applicable ERCOT protocols.  As noted at

9    the onset, our position is supported by the declaration of

10   Travis Carmen, who is the vice president of market

11   operations and compliance for Forest Creek and that's at

12   document 40 -- docket number 4076.

13             As noted, the debtors intend to reject our power

14   purchase agreement between Luminant and my client, Forest

15   Creek Wind Farm.

16             There are three key players in this relationship.

17   Forest Creek, the owner and operators of the farm.  There's

18   Luminant, the exclusive purchaser of output from the wind

19   farm.  Luminant simply pays Forest Creek for the power

20   that's out within the facility.  And finally, ERCOT and

21   you've probably encountered them before in this case, but

22   just to refresh your memory, Your Honor, ERCOT is the

23   Electric Reliability Council of Texas.  They're a clearing

24   house and they're the clearing house here in to which

25   Luminant sells the power output from the facility.

1            And just to kind of close the loop on ERCOT and we

2      explain this in our pleadings.  ERCOT was delegated the

3      responsibility for making rules regarding production and

4      delivery of electricity by the public utility commission of

5      Texas, pursuant to the public utility regulatory act.  All

6      development statutes are cited in our objection, Your Honor.

7            That gives the ERCOT protocols the force of law.

8      As of right now, under those protocols -- and I'll get into

9      a little more detail about them in a minute -- Luminant is

10     the only entity that's authorized to designate the schedule

11     and delivery of power from our facility into the ERCOT

12     (indiscernible).

13            Both my client and Luminant are bound to follow

14     the ERCOT protocols.  Why?  As I mentioned the protocols

15     have the force of law and there are penalties for non-

16     compliance.

17            In addition, paragraph 17 of the Court's June 6,

18     2014 trading order makes it clear that ERCOT can enforce

19     those protocols during this case.

20            In addition, following those protocols are a

21     condition to participation in the ERCOT market.  And because

22     of that, both parties agreed to comply with those protocols

23     pursuant to section 4.06 of the contract at issue and likely

24     several other agreements between the parties and ERCOT.

25            Now the critical concept that we're going to talk

1    about is the -- what's called the QSE I think is what the

2    regulatory (indiscernible) call it.  That's the QSE, the

3    qualified scheduling entity.  The ERCOT protocols only allow

4    a single point of contact and that is the QSE.

5            In the agreement the parties agreed that Luminant

6    would be the QSE for this contract.  The agreement is the

7    sole source of Luminant's right to be the QSE here and

8    because of all those things; Luminant is designated as the

9    single point of contact, the QSE with ERCOT.

10           So what does all that mean?  Only Luminant can

11   sell power from the plant.  Only Luminant can be paid for

12   the sale of power from the plant.

13           Now, what do the ERCOT protocols say about

14   termination of someone as a QSE.  It's pretty clear it's a

15   prospective process.  It requires 12 days advance notice and

16   a clearly defined termination date.  ERCOT essentially flips

17   the switch at midnight on the designated termination date.

18   You're the QSE today, at midnight the switch is flipped,

19   you're not the QSE tomorrow, someone else is.

20           So as noted in the Carmen declaration, upon

21   receipt of the motion Forest Creek reached out to ERCOT and

22   said, hey we have a problem here.  We've got a contract

23   that's going to be rejected and attempted to obtain the

24   earliest possible termination of Luminant is the QSE.

25           And as noted in the declaration, ERCOT indicated

1    that the earliest possible date to terminate Luminant as the

2    QSE is midnight on April 15th, tomorrow.

3          So our position, Your Honor, Luminant is free to

4    reject the agreement.  I don't think anyone else has

5    objected.  Certainly we don't object to the fact that

6    they're trying to reject the agreement, but it should not be

7    permitted to reject it retroactively.

8          Relief would rewrite history and leave us

9    retroactively without a QSE in place during the notice

10   period, which is March 24th through April 15, so who cares?

11   Well, this would constitute, again, retroactively, a

12   violation of the ERCOT protocols.

13         We think it would be a violation by Luminant and

14   maybe they think it would be a violation by us, but in any

15   event, we're very concerned that having a retroactive

16   decision that eliminates a QSE from this critical time

17   period would result in some sort of ERCOT penalty or other

18   enforcement action.  Because essentially what would happen

19   we create a (indiscernible) that during this time period

20   there was no QSE in place and power was sold into the

21   market.  Someone did it without a QSE in place, again,

22   retroactively and that's not permitted.

23         So who is the QSE under the debtors' stance from

24   March 24th to April 15th?  I would suppose they would say

25   they are, but if retroactive relief is granted, they

1    apparently weren't.  Again, (indiscernible) source of their

2    authority to act in that way.

3            It brings up several questions.  Who gets paid for

4    power sold into the market during that time and who has to

5    return funds if ERCOT ultimately determines that there was

6    an overpayment to the QSE?

7            In addition to the regulatory overlay,

8    retroactivity permits Luminant to control all sales during

9    the March 24th to April 15th time period to Forest Creek's

10   exclusion.  They are depriving Forest Creek of its assets

11   during this time period.  They are making all decisions

12   relating to the cover of Forest Creek's damages.  Although

13   they indicate they are trying to be helpful in that regard,

14   they have not offered to pay those funds to us, so the

15   absence of visibility and the absence of control is very

16   troubling under the equities of this case.

17           Ostensibly they're selling to the market and

18   receiving money but we just don't know.  They are clearly

19   receiving some benefit for the asset during the notice

20   period, but we don't know what it is.

21           And, Your Honor, sort of harkening to the cases

22   that talk about this, there was a landlord who wants

23   retroactively to reject a lease but continues to use the

24   space to run its business in the interim.  I'm sorry, Your

25   Honor, the tenant.  Let me start over there, Your Honor.

1           There is a tenant who wants to retroactively

2     reject, but continues to use the space to run its business

3     in the interim.  That is not equitable and there are several

4     cases cited in our papers that explain that.

5           Turning to the legal standard for nunc pro tunc

6     relief, section 365 does not directly address whether courts

7     may grant retroactive rejection.

8           Some courts do not permit retroactive relief at

9     all.  Those that do, including some courts within this

10    circuit, allow retroactivity based upon the Court's

11    equitable powers.  Nunc pro tunc relief is not awarded

12    automatically.  Some courts refer to the relief as

13    extraordinary.

14          The courts balance the equities in determining

15    whether to grant it and of course, the debtors of the moving

16    parties have the burden to show that the relief is

17    appropriate.

18          Most of the cases turned on one of two sort of

19    critical isthmuses.  One, who captured the benefit from the

20    contract in question during the notice period?  In other

21    words, in my analogy that I stumbled through earlier, did

22    the tenant give the keys back to the landlord or keep the

23    premises during the retroactive period.  That's the fact

24    pattern in the TW case and the Chee Chees (ph) case in which

25    a retroactive objection was not permitted.

1          The other issue that the cases turn on is whether

2     the intent to reject retroactively is clear.  Here we don't

3     have an issue with that one.  We got the motion, for the

4     first time we realized they wanted to reject retroactively.

5     We understood it.  Notice is not an issue.

6          A few notes about the control of the wind farm

7     during the (indiscernible) period here, Luminant has

8     exclusive control of the production, the sale and delivery

9     of the wind power generated by the facility.  ERCOT protocol

10    section 3.1.4.1 makes clear that only one entity may service

11    the QSE and under the contract, Luminant is that QSE.

12    Neither Forest Creek or any other party can sell the power

13    generated by the facility.

14          THE COURT:  I'm sorry, did you say Luminant runs

15    the wind farm?

16          MR. PECK:  Forest Creek runs the wind farm,

17    Luminant controls what is done with the output from the wind

18    farm.

19          I should point out in the original Frenzel

20    declaration, the debtors' state -- well the debtors state by

21    motion and Mr. Frenzel says in his declaration, that Forest

22    Creek has the ability to control the output. That's simply

23    not true as noted in the Travis Carmen declaration, it is

24    Luminant that controls the output.

25          Not only do they have that control, but as stated

1    here, they're using that control to sell the  power that's

2    been marketed to (indiscernible).

3            Luminant has not complied with ERCOT's protocols

4    to end its role as the QSE.  Luminant's disregard for the

5    ERCOT protocols may subject the bankruptcy estate of Forest

6    Creek is a liability and as noted at the outset, Luminant

7    did agree to comply with those protocols.

8            This is a binary system, Your Honor.  QSE is the

9    only means to which the renewable resources (indiscernible),

10   the wind farm, can participate I the ERCOT market.  You're

11   the QSE until ERCOT says you're not.

12           Here, ERCOT says Luminant is the QSE until April

13   15th.  What the regulatory (indiscernible) is not equipped

14   to deal with is a retroactive change.  As you say,

15   (indiscernible) was rejected back on March 24th.  We have no

16   idea how ERCOT will (indiscernible).

17           THE COURT:  This isn't about whether they were the

18   QSE for the last two weeks.  This is about whether they pay

19   contract rate for the power and resale at a lower amount or

20   whether they sale at the market rate and I assume -- and

21   I'll have a question about this -- pay you as a pass through

22   for that market rate.

23           So this isn't about who the QSE is.  Nothing I'm

24   going to do is going to say who the QSE is or isn't.  All

25   I'm asked to do is to reject the contract.  And all that

1    really comes down to is pricing, right?

2                MR. PECK:  In one respect, yes.  I mean, I think -

3    - and that issue will be teed up.  I think that's going to

4    be round two of our discussion, the issue that you just

5    mentioned.  It's not teed up for today, but what the rate

6    is, when do they pay, what are our damages for the --

7                THE COURT:  And they are what they are and --

8                MR. PECK:  Exactly.

9                THE COURT:  I mean, there's no question that you

10   haven't had anyone other than Luminant as a QSE until

11   tomorrow at midnight, I assume you've made arrangements for

12   someone else to take over.

13               MR. PECK:  That's correct, Your Honor.  That's

14   correct.  But I think one thing to keep in mind -- I think

15   you're right, ERCOT is not going to listen to you on who the

16   QSE is necessarily, but your decision does have an impact.

17   If you do grant retroactive relief, ERCOT, I think it's fair

18   to say will be fairly confused by what to do about that,

19   because they now have a situation where someone was selling

20   power into the market on April 14th, for example, that

21   really shouldn't have been doing it.

22               So your ruling doesn't drive what ERCOT does,

23   necessarily, but it certainly has an impact on how they're

24   going to deal with us going forward.

25               Just a few points in reply to the debtors'

1    response.  Again, there's a lot of discussion in their

2    response about the ample notice of rejection.  Before March

3    24th, as stipulated at the beginning of the hearing, we

4    didn't know that they were going to seek retroactive

5    rejection, therefore we couldn't have taken any steps before

6    March 24th to do anything about this retroactive issue, but

7    as noted, we did receive notice -- it was clear that they

8    were going to seek it retroactively once they filed the

9    motion.

10            But ample notice is not the issue driving many of

11    the decisions on the subject.  It's who captures the value

12    during the notice period and here the debtors are capturing

13    that value.

14            There's some discussion about Forest Creek's

15    inaction and again, the only --

16            THE COURT:  What value were they capturing?

17            MR. PECK:  Well, they are selling the power into

18    the market and receiving payment for that power.

19            THE COURT:  Right and you'll have a claim for

20    whatever power they sold.  I mean, it's your power.  Right?

21    So they're not actually, again, and maybe that's what

22    they'll say as the next hearing on damages, but what I

23    thought I heard was that in effect are acting as a pass

24    through, so they're not capturing any value.  They're simply

25    not losing value by "overpaying" you for the power.

1           MR. PECK:  Well, I guess two points in response.

2     One, we don't have visibility to what they're doing with the

3     power, so we're assuming that they're selling it into the

4     market and making reasonable decisions on what to do with

5     that power, but we don't have that control at this point,

6     because they're still acting as the QSE.

7           So I'm assuming what you're saying --

8           THE COURT:  Well, there's a way to measure.  All

9     right, all right.  I assume there's a way to measure how

10    much power you're putting into the system, so you know

11    you're creating -- I'm going to make up a number that makes

12    no sense because I don't know what I'm talking about -- but

13    you're putting 100 megawatts, which is way too much I'm

14    sure, into this system everyday -- you know that, right?

15    There are meters, so you know what power is going into the

16    system.  What you don't know is what Luminant is doing with

17    it.

18           Now, if market price -- if they have to serve as

19    your QSE or QSE or whatever it is during this period,

20    they're taking whatever electricity the wind is generating

21    it through the meter into their power and sitting on it, not

22    actually -- I'm sure it goes into the grid, but actually not

23    charging anybody for it, that's not reasonable.  That's not

24    how a QSE would -- so what would your damages be?

25           Well, your damages would be what would have

1   happened if they had been reasonable, which is market

2   pricing.  So we have a way to figure out what's going on.

3   You know how much power you're putting in the system.  We

4   know they have to act reasonably, which would be at the

5   least, to sell it at market prices.  If they didn't sell it

6   at market prices, then you get damages and they'll have to

7   pay you.  If they didn't sell it at market prices or sold it

8   below market or didn't sell it at all, you would get

9   damages.

10          Your (indiscernible) here is whatever the market

11   price is.  If they sold it greater than market price, maybe

12   we'd get into an argument about whether you should capture

13   that value or not, if it's somewhere between the floor and

14   your contract price.  I don't know.  Frankly, I'm open for

15   arguments on that.

16          But the point I'm trying to make is it's not the

17   unknown you say it is.  You know how much power you're

18   putting in the system.  They have an obligation to act

19   reasonably with that power.  They are your QSE until they're

20   not your QSE under the ERCOT regulations.  And if they're

21   acting unreasonably as your QSE you have damages, so you're

22   not harmed.  You're harmed, because you're not selling it at

23   the contract rate. I mean, that's the harm.

24          MR. PECK:  Right.  But Your Honor how I would

25   reply to that is the value that they're capturing can be

1  adjusted by you when we litigate the claims as you said.  We

2  could take the position that they sold into the wrong

3  market.  They sold into the day ahead market instead of the

4  real time market and that was unreasonable or whatever the

5  issue may be.

6          So the value they're holding now and we could come

7  to you and say, make them give that value to us or make them

8  give more value to us or whatever.  You're absolutely right

9  about that.  What we can't deal with is the regulatory piece

10  of it.  That's something that we can't solve today through

11  any kind of interim order or delay, because we're going to

12  create -- if the Court were to grant this motion -- this

13  fictional retroactivity that eliminates them from that QSE

14  role.  And you might say, well weren't they serving in that

15  QSE role?

16          THE COURT:  What would happen if your contract

17  expired?  So I assume you have a contract to provide cell

18  power and they have a contract to buy it as produced at X

19  dollars per unit for a period of two years.

20          You get to the end of that two years, contract

21  expires, you don't have a new QSE lined up, what happens?

22          MR. PECK:  If we didn't have a new QSE lined up

23  and they're obligation to serve as QSE was over?

24          THE COURT:  well, right, because the contract

25  expired.

1          MR. PECK:  We would have to shut down the plant.

2          THE COURT:  Okay.  You would have no ability to

3     produce?

4          MR. PECK:  That's my understanding.

5          MS. LIEBMANN:  Your Honor, if I may, this is Diana

6     Liebmann from Haynes and Boone and that exact situation that

7     you raised actually occurred between Forest Creek's parent

8     company Ion and Luminant once before.  The contract was

9     terminating for a different facility and during that time

10    period, when the contract terminated, the switch over to the

11    QSE could not occur because it was not consistent with the

12    ERCOT network operations model.

13          And so what the parties did is they entered into

14    an agreement.  They gave all the proper notice to ERCOT.

15    They made an effective date for the actual transition of the

16    QSE because they all recognized that the parties could not

17    be without a QSE.  And that a QSE was obligated to give

18    ERCOT the 12 business day notice that they require and are

19    requiring in this instance as well to switch the QSE over.

20          And that's very significant too, because

21    particularly in power -- and we don't know how the power is

22    being sold because that's within Luminant's control, but

23    particularly with respect to transactions that occur in the

24    real time market, settlement in real time or we call it the

25    settlement systems or the payment systems through ERCOT,

1    that doesn't happen in the real time market until 55 days

2    after the operating day and that can be trued up more than

3    180 days after the operating day.

4              If you are the QSE of record for a given unit

5    during a period of time, then you have to always be on the

6    hook to ERCOT to make those settlements for those operating

7    days.  And in this instance, if there's retroactive relief

8    provided, it's unclear how ERCOT will settle the dollars

9    that now belong to a resource that has no QSE during that

10   time period and that's not something that ERCOT has ever

11   dealt with before.

12             There was some discussion earlier that we might do

13   some kind of QSE to QSE trade, but that's a complete

14   misreading of the ERCOT protocol, because in order to do a

15   QSE to QSE trade, you would either have to be a QSE or have

16   a different QSE.  And our only QSE is Luminant and we

17   couldn't even be an emergency QSE because emergency QSE

18   relief is only available when a QSE has exited the market.

19             If Luminant had done a Chapter 7, then we could be

20   an emergency QSE, but we can't because their QSE

21   qualification with ERCOT has not been suspended.

22             So we're required to us them and they're required

23   to use us pursuant to the protocol until such time as ERCOT

24   switched them in the ERCOT's network operations model.

25             THE COURT:  This is where I'm confused and maybe

1    you can help me out.  Why aren't they simply -- your QSE --

2    I had this acronym and I pity the Court reporter.  Why can't

3    -- why aren't they simply the QSE until tomorrow when there

4    is a change over, regardless of when I reject?  I don't

5    understand.  Because they can't --

6            MS. LIEBMANN:  Because, Your Honor, they --

7            THE COURT:  Go ahead.

8            MS. LIEBMANN:  Because, Your Honor, they can't

9    transition over the rejection until it's gone through the

10   ERCOT processes.  ERCOT runs its days on a 2400 schedule

11   with all of the software to settle or payout or report what

12   goes into the operating plans at each generator and each

13   load on the market on a 15 minute increment basis for every

14   operating day.

15           And so they do those cutter -- those transitions

16   at midnight and that's the earliest opportunity that we

17   could get ERCOT to do it was before the timeline that is

18   actually drafted into the protocols because we raised this

19   issue.  So we've been working very hard with ERCOT to try to

20   do that even though ERCOT had advised Luminant that they

21   needed to give this 12 business day notice.  And we haven't

22   had that, but there -- if you don't have a QSE of record,

23   you can't sell into the market and you can't be paid in the

24   market.  And that's a and problem with respect to compliance

25   as well, because you're not -- you don't have a designated

Page 93

1  QSE, so that subjects Forest Creek to liability and arguably

2  Luminant to liability for failure to follow the protocol.

3          THE COURT:  Well, why don't I just put in my order

4  that they're the QSE until midnight on April 15th?  Wouldn't

5  that solve the problem?

6          MS. LIEBMANN:  Well, if they continue as the QSE

7  then they are still part of the -- they would still need to

8  perform under the terms of the contract, because that

9  requires them there to -- they have the managed capacity

10  declaration for this facility that requires them to transact

11  in the market for that capacity and you couldn't just be

12  that they would -- they would have to do it in accordance

13  with your protocols and the terms of the agreement.

14          THE COURT:  All right.  So what I'm hearing you

15  say is as a matter of regulatory law, that you simply -- I

16  simply can't divorce the contract from the QSE obligations?

17  I can't say, hey contract rejected on March 24th, but you

18  can still act as QSE for 12 business days and whatever you -

19  - however you act as QSE during that time has to be

20  reasonable and consistent with the law and you have to pay

21  for any power you sell, but we're really doing here is

22  cutting off the contract rate.

23          You say I can't do that as a matter of regulatory

24  law because the ability to be a QSE requires a contract and

25  if there's no contract you can't be a QSE and you have to

1    have  QSE.

2              MS. LIEBMANN:  And that's what ERCOT -- when you

3    go to ERCOT and you say, I'm going to sign up this QSE, and

4    ERCOT says, on what authority is this QSE going to act for

5    you and that's what you have to show them is that contract.

6    And until you have an agreement in place that puts you and a

7    QSE in a relationship together, they're not allowed to be

8    the registered QSE and they're not allowed to sign the

9    managed capacity declaration.

10             THE COURT:  So again, to back track a little bit

11   in this previous event, where the contract expired what

12   happened again?  Did they continue to act as QSE?  Did you

13   have to get an emergency QSE in there?  Did you have to

14   (indiscernible).  What exactly happened?

15             MS. LIEBMANN:  They couldn't get an emergency QSE

16   in place because emergency QSE is only available if the QSE

17   that represented the resource no longer functions in the

18   market, it's been suspended by ERCOT.  And so emergency QSE

19   wasn't an option there either because 6-2-12 of the protocol

20   deals with how you define the emergency QSE and the

21   suspension.

22             But instead, what they did is they entered into an

23   agreement between the parties that said that they would

24   continue forward as a QSE in compliance with the ERCOT

25   protocol and it had other terms for how the power would be

1    dispatched and requiring all the ERCOT requirements to be

2    met.  And to -- essentially it was like a contract extension

3    of the prior agreement with some of the terms changed,

4    including some of the pricing terms.

5            THE COURT:  All right.  So the parties negotiated

6    an amended contract, but there was a contract in place.

7            MS. LIEBMANN:  Correct.

8            THE COURT:  Now, what happens -- ask you another

9    hypothetical.  What happens if we assume that the debtors

10   and Forest Creek are in a contract and the debtors --

11   Luminant is operating as the QSE and everything is going

12   along fine and then Luminant breaches the contract in some

13   way?

14            Either -- and it's a material breach of some way,

15   either they're not paying you what they're supposed to be

16   paying you or some action happens which is a material

17   breach, which would excuse your continued performance under

18   the contract if you so choose.  However, they continue --

19   even though there's been this breach -- you continue to

20   produce power, they continue to take the power, act as the

21   QSE, go through the market -- how would ERCOT treat that?

22            In other words, there's been a breach, everybody

23   acknowledges there's been a breach, but the parties continue

24   to operate under the contract and until something else

25   happens.  So say there's been this breach and you decide,

1    you know, I can't live with these people anymore, I'm going

2    to get an alternative QSE in place and you give all the

3    notice you're supposed to give under the statutes and rules

4    and do a substitution.  But because there was a contract and

5    that contract was in place, although in breach, during the

6    period between the breach occurred and when you substitute

7    out a QSE, what would -- would there be an effect on the

8    regulations about the actions as QSE during that time

9    period?  Do you understand the question?

10             MS. LIEBMANN:  Your hypothetical -- I do.  And

11   your hypothetical is not very different from what happened

12   with this very contract last year, because last year Forest

13   Creek wanted to change the QSE from Luminant to another QSE

14   and Luminant did not agree to do that even though Forest

15   Creek felt like it had the right to do it under the contract

16   and we could not change QSEs with ERCOT.  ERCOT didn't

17   change the QSE because we had an agreement and they were not

18   going to get into that dispute.  So it would have had to

19   have been litigated because the contract was the basis for

20   them becoming the QSE to begin with.

21             THE COURT:  Okay.  Thank you.  Thank you.

22             MR. PECK:  Well, assuming Your Honor has read

23   enough about --

24             MS. LIEBMANN:  Thank you.

25             MR. PECK:  -- QSEs for the moment, let me just

1   wrap up by saying, none of these problems would exist if

2   Luminant had just filed a prospective ordinary motion to

3   reject the contract, asked for a hearing today.  I guess we

4   would have had maybe an eight hour issue since the QSE is

5   going to transfer at midnight tonight, but those problems

6   wouldn't be at issue.

7              Instead, they want to pretend like they're the QSE

8   all the way through April 15th, sell the power into the

9   market, receive payment, but ignore their obligations under

10  the contract to pay us apparently.  That is inequitable

11  and --

12             THE COURT:  Let's talk about what a rejection is.

13  Rejection is a Court authorized breach of the contract.  So

14  if I sign a rejection order and I say, this contract is

15  rejected as of March 24th or 5th, all that really has the

16  legal effect of is saying, they breached on March 24th.  And

17  we're under this hypothetical I was laying out to your

18  colleague where they're in breach but they're continuing to

19  otherwise act because they're continuing to act as this QSE

20  until you get a substitute.

21             So we get into an argument not about whether they

22  were your QSE, not about whether a contract existed, but

23  what the effects of a breach of the contract is by the

24  debtors.  And what that really comes down to, right, is what

25  kind of claim you have for your lost profits.  Is it an

1      unsecured claim?  The fact that you were entitled to sell

2      the power at "X" plus "Y" and it was sold at "X" or that an

3      administrative claim, the fact that you were supposed to

4      sell it "X" plus "Y" and they sold at "X".

5              It's not that your claim goes away.  It's not that

6      there's no contract.  But there's a Court authorized breach

7      of the contract which turns the damages into unsecured

8      damages as opposed to administrative expense damages.

9              So we're not doing violence to the ERCOT

10     Regulations or the QSE Regulations at all.  And, as a matter

11     of fact, if we -- if the ERCOT Regulations were that they

12     had to continue to act as QSE until you found a substitute,

13     no matter how long that took, they'd still have to do that

14     because they're still a party to a contract.  They've

15     breached but that breach doesn't excuse performance in

16     connection with how they interact with ERCOT.

17             MR. PECK:  I certainly understand what you're

18     saying, Your Honor.  I mean, I think --

19             THE COURT:  If you disagree, it's okay.

20             MR. PECK:  Yeah.  No.  I do disagree.  I

21     understand what you're saying but I think the difference,

22     and Ms. Liebmann may need to jump back in because this goes

23     back to what she just said, but I don't know that the breach

24     caused by the rejection is so minor that ERCOT says, oh, it

25     was just a breach so we don't care.

```
 1              THE COURT:  Well, let's assume it's a material

 2    breach.  I mean, I'm not saying it's an immaterial breach in

 3    any way.  It doesn't get much more material than not paying

 4    you the contract price.

 5              MR. PECK:  That's right.

 6              THE COURT:  If that's no material, I don't know

 7    what is.

 8              MR. PECK:  Right.  So I don't -- I mean, have --

 9    not being, you know, I guess able to tell what ERCOT's going

10    to do after a retroactive rejection.  I can't tell you for

11    sure whether they will view that as a penalty or no.  But

12    that's the risk we're worried about.

13              THE COURT:  So if they view it as a penalty, I

14    assume that means they -- you get hit with a penalty.

15              MR. PECK:  I believe they're monetary penalties.

16    I believe they're suspension and other types of actions they

17    could take.

18              THE COURT:  And that would be against you because

19    you were operating without a QSE.

20              MR. PECK:  Perhaps, yes.  That's the risk we're

21    worried about.  And that why we contacted ERCOT.

22              THE COURT:  And you would say, well, Judge, that's

23    fine and you would - and Judge, you're going to tell me,

24    okay; you have a damages claim but that's not fair because

25    you're giving me an unsecured damages claim, not a secured
```

1    damages claim.  And Luminants, on the T side, and -- we just

2    heard two hours about we don't know what that claim will be

3    worth.

4              MR. PECK:  That's correct, Your Honor.  All that

5    could be avoided with a normal prospective rejection of the

6    contract.  And, by the way, the debtor could still argue --

7    I mean, they act like we're automatically going to be

8    entitled to an admin claim.  I don't know that that's the

9    case under the case law.

10             We're still going to have to come back and argue

11   that, you know, we're entitled to the contract rate.

12   They're entitled to pay the market rate and will hash that

13   out in front of you in round two.  So that can be dealt with

14   later as well.

15             The impact isn't so significant that your ruling

16   today sets all the other claims and reliefs in motion.  But

17   it does protect us from a potential violation of (inaudible

18   - 1:03:57).

19             THE COURT:  Well, what would their defense be?  I

20   mean, what would their defense be to an administrative

21   expense claim when there was a contract in place that set

22   the price?  They sold the power.  How would they -- what

23   defense, creative or not creative, would they have to not

24   paying the contract?

25             MR. PECK:  I think it'd be tough but I don't want

1    to make their arguments for them.  But I think it would be a

2    tough road.  I think it would be something based on the

3    benefit to the estate.

4              THE COURT:  I assume if I were to ask somebody how

5    much money we're talking about here, I would be told it's

6    confidential.

7              MR. PECK:  I don't that we have visibility into

8    that number.

9              THE COURT:  Because you don't know what the stock

10   market price is?

11             MR. PECK:  Correct, Your Honor.

12             THE COURT:  Okay.

13             MR. PECK:  Thank you, Your Honor.

14             THE COURT:  You're welcome.

15             MR. SERAJEDDINI:  Your Honor, just a few points

16   about all that, about the back and forth --

17             THE COURT:  Well, let me ask you a couple

18   questions.

19             MR. SERAJEDDINI:  Sure.

20             THE COURT:  I assume you're selling this power.

21   You're not just letting it go to waste.

22             MR. SERAJEDDINI:  Yes.  Your Honor, the record

23   reflects that we sold the power at market pricing.

24             THE COURT:  Okay.  And you would acknowledge that

25   you can't sell -- you can't get the power for free and sell

1    it at market prices.  You actually are going to have to pay

2    Forest Creek for the power you sold.

3            MR. SERAJEDDINI:  Agreed, Your Honor.  I think

4    that would be government standards (indiscernible -

5    1:05:16).

6            THE COURT:  Right.  So whether or not -- now I

7    don't know if there is some sort of -- of course, you

8    wouldn't have a contract so what the contract said about

9    being able to take a QSE as opposed to just serving as a

10   pass-thru.  So maybe there's ERCOT Regulations that deal

11   with that.  So let's just assume they're -- let's just

12   assume you're a pass-thru and you don't get to charge one

13   percent or whatever is the maintenance fee.  That

14   complicates things.

15           So you're just -- so you are taking the power.

16   You are not paying the market -- you're not paying the

17   contract price for the power.  You're selling it on market.

18   You acknowledged that you're acting as a QSE so you would be

19   required, pursuant to that pass-thru, to pass on the market

20   price of the power to Forest Creek, assuming you're not

21   otherwise entitled to some sort of piece of the action for

22   serving as the intermediary.

23           MR. SERAJEDDINI:  That's correct, Your Honor.

24           THE COURT:  Okay.

25           MR. SERAJEDDINI:  These contracts are intended to

1    -- it's basically we buy the power at a fixed price and we

2    sell it at market price, is how these things work.  It's a

3    hedging type arrangement.

4              THE COURT:  Alright.  So --

5              MR. SERAJEDDINI:  And we get a marginal fee for

6    the accrual.

7              THE COURT:  Now, assuming that I authorize your

8    rejection effective -- there are two dates.  Is it the 24th

9    or the 25th?

10             MR. SERAJEDDINI:  Twenty-fourth.

11             THE COURT:  Okay.  Assume I authorize your

12   rejection through the 24th and you've continued to sell the

13   power at market rates between the 24th and the 15th when the

14   QSE is switched over and you owe something, market price,

15   possibly minus a fee to Forest Creek; is that an

16   administrative expense claim or is that an unsecured claim

17   because of the rejection of the contract?

18             MR. SERAJEDDINI:  So, Your Honor, I think the

19   answer is that Forest Creek would certainly assert an

20   administrative expense claim in at least that amount.  We'd

21   have to go back -- we didn't brief that for today, but we'd

22   have to go back and confirm that that was, in fact, the

23   benefit to the estate.

24             The way you've laid it out, I think there is a

25   more than colorable argument that that was the benefit to

1   the estate over the intervening period and so I think that

2   that would be a strong administrative expense claim.

3              THE COURT:  Even though the contract's been

4   rejected regardless of the contract you're nonetheless

5   operating "X" contract and if -- on a post-petition basis/

6              MR. SERAJEDDINI:  Right.  And, Your Honor, I just

7   -- I do want to clarify that after April 15th, we're talking

8   about purely unsecured claims.

9              THE COURT:  Well, after April 15th, they have a

10  new QSE so --

11             MR. SERAJEDDINI:  No.  I Understood that.  But

12  I --

13             THE COURT:  Oh, I see.

14             MR. SERAJEDDINI:  (Inaudible - 1:08:10).

15             THE COURT:  Okay.  Your point -- yeah, yeah, yeah,

16  yeah. Your rejection -- okay.  So they enter into a new

17  contract with somebody else and they were supposed to pay

18  you $15 a unit under your contract.  The market price is 10.

19  They go out and they find somebody at 13 that cover that --

20  that delta between 15 and 13 on post April 15th basis would

21  be an unsecured claim because that's the rejection damages

22  claim.

23             MR. SERAJEDDINI:  Exactly.

24             THE COURT:  But the -- when you were actually

25  providing -- I mean, when you were actually getting their

1    product, their electric and selling it to somebody else on a

2    post-petition basis, contract or not, it'd be hard to argue

3    that's a non-administrative expense claim.

4              MR. SERAJEDDINI:  I agree, sir.

5              THE COURT:  How is it -- how is it fair or

6    equitable to seek nunc pro tunc relief when you didn't

7    provide any advance notice to the other side you were going

8    to seek nunc pro tunc relief?  And this is different, isn't

9    it, from the situation where a tenant walks in and hands

10   over the keys?  You haven't given the landlord advance

11   notice there either.  Landlord has a right, you know, has to

12   cover and mitigate its damages but you've caught the

13   landlord flatfooted but you, nonetheless, turnover

14   everything.  Left it in broom clean condition; turned the

15   keys over; given the property back in any way that you could

16   possibly have and not use it.  That's all that happens here;

17   right?  You're not able to turn the keys over because you

18   have this 12-day period.

19             MR. SERAJEDDINI:  Agreed.

20             THE COURT:  So how is it fair and equitable?

21             MR. SERAJEDDINI:  So the reason it's fair, Your

22   Honor, is had we given the 12 days of notice and the

23   termination of the QSE services would have happened on

24   March 24th under the ERCOT Regulations, these guys, then,

25   would have just been selling the power at the market price.

1    It's not a situation --

2            THE COURT:  Well, we don't know that; do we?  We

3    don't know what they would have been able to accomplish in

4    the 12-day period between when you gave them notice and when

5    the effective date would be.  They -- it's possible they

6    could have arranged to buy it from somebody else.

7            MR. SERAJEDDINI:  Understood, Your Honor.  What

8    I'll say is that they're --

9            THE COURT:  And you can sell this --

10           MR. SERAJEDDINI:  -- for the record, if I may.

11           THE COURT:  And I'm -- oh, you want to hold me to

12   the evidence.

13       (Laughter)

14           THE COURT:  You hold me to the evidence.

15           MR. SERAJEDDINI:  Apologies.  Apologies.

16       (Laughter)

17           THE COURT:  I'm speculating and assuming and

18   probably it doesn't matter but -- that there -- the fact

19   that this is a renewable resource, i.e., wind, that there's

20   a delta between the stock market for electricity in general

21   and what you can sell this stuff for because there are rules

22   and regulations in place about how much of the electricity

23   that a company sells has to come from renewable resources.

24           MR. SERAJEDDINI:  I was actually discussing that

25   exact issue with Mr. (indiscernible - 1:11:19).  And he told

1    me (indiscernible - 1:11:19), say, if he was called up to

2    testify, was, we sell our renewable power at the market

3    rate.  That's what we've always done.  We've sold this power

4    at the market rate.

5            There is something else that's being transferred

6    in this contract and those are renewable energy credits.

7    But those things are dirt cheap and, you know, they can

8    obviously assert whatever administrative expense they want

9    for that delta, as well, because it's a clean power, so

10   there is a credit transfer as well.

11           THE COURT:  So this is really -- this is a debtor

12   that just bet wrong on the price of power, entered into a

13   long term contract with what is now above market rates and

14   wants out of it and nothing different from any tenant debtor

15   I've ever had.

16           MR. SERAJEDDINI:  Exactly, Your Honor.

17           THE COURT:  I kept interrupting you.  I'm sure you

18   had other points.

19           MR. SERAJEDDINI:  Well, the only other point, Your

20   Honor, and I agree with everything you've just said, the

21   only point I want to clarify is that I agree fully with the

22   Court on this point is there is a distinction between

23   rejection and termination.  Here, no disputes termination.

24   Termination happened on April 15th.  Nobody's (indiscernible

25   - 1:12:26) been operating unauthorized (indiscernible -

1   1:12:28) because we don't think there's any regulatory

2   exposure to the estate.  So -- what has happened is the

3   Court ordered breach, or what we're requesting is a Court

4   ordered breach, on March 24th and there are damages for

5   that.  So --

6           THE COURT:  Okay.

7           MR. SERAJEDDINI:  -- that's it.

8           THE COURT:  I would correct that and say, Court

9   authorized, not Court ordered.

10          MR. SERAJEDDINI:  Understood.  Yeah.

11          THE COURT:  Any final words?

12          MR. PECK:  No.  I think we'll stop there, Your

13  Honor.  I think you hit the nail on the head with the tenant

14  example.  I think it's no (indiscernible - 1:13:00) than

15  that and (indiscernible - 1:13:03).  Thank you, Your Honor.

16          THE COURT:  Alright.  I'm obviously going to

17  authorize the rejection.  That's not in dispute.  I am going

18  to authorize the rejection nunc pro tunc to March 24th.

19          I would like something in the order that makes it

20  clear that notwithstanding the rejection, the debtors or

21  Luminant or however you want to define it continues to act,

22  or continued to act as the QSE through whatever the agreed

23  date is, at midnight or whatever the agreed termination is.

24          And I do that based on, you know, on an

25  understanding of what rejection is and, again, rejection is

1     a Court authorized breach by the debtors that gives rise to

2     damages.  And what rejection really is about is about

3     managing damages.  It's about turning what would otherwise

4     be administrative expense claims into unsecured claims and,

5     in some instances, real estate leases for example, it's

6     about limiting the actual amount of the claim to between one

7     to three years as opposed to fifteen or twenty or twenty-

8     five years on a long term lease.

9              These are tools designed to accomplish exactly

10    what's going on here which is to, with all due respect, help

11    the debtors get out of a bad business decision and replace

12    above market types of use of products or services with

13    market products or services.  That's what rejection is all

14    about.  It's about getting out of bad contracts.

15             If -- and assumption's all about keeping the ones

16    that are good.  And it's a powerful tool but it's a tool

17    that's in the Bankruptcy Code which is federal law and

18    federal law, at least in the context of the Bankruptcy Code

19    itself, would trump the regulations otherwise applicable

20    under State law.  So, in this instance, I think it's

21    appropriate to terminate the services on nunc pro tunc.

22             Now it is true that -- terminate the services,

23    excuse me, reject the contract nunc pro tunc.  And I need to

24    be careful because that's the whole point.

25             With regard to the equities of providing advance

1    notice, I think that it is significant and it makes it a

2    harder call than it would otherwise be that no advance

3    notice was given of the rejection date and, as a result, the

4    12 business day period that was put in place had to be on a

5    post-rejection basis and not a pre-rejection basis.

6            But that really goes down to the claim itself not

7    the coverage, or the ability to cover under the contract.

8    There's going to be a claim.  There's no question there's

9    going to be a claim and under a rejected contract, if --

10   where there is, in effect, at least with regard to pricing,

11   a contract that's been breached, no debtor can get somebody

12   else's product, turn around and sell it to somebody, a third

13   party, and not pay for it to the party it came from.

14   Whether that's an unsecured claim or administrative claim is

15   a different issue.  But there's no question that the debtor

16   can't simply refuse to pay for what it sold.  Whether that's

17   an administrative claim or an unsecured claim, we're going

18   to have to fight about at a later date and I'm -- hopefully

19   we won't have to fight about it.  But if we do, we do.  And

20   I'll make a decision.

21           But the reality is between March 24th and April

22   15th, Forest Creek is going to have a claim against the

23   debtors for whatever power generated by Forest Creek that

24   the debtors have sold.  The delta between that market price

25   and the contract price that will be an unsecured claim.  The

1    market price, I think, would be an administrative expense

2    claim.

3           That's my understanding of what I'm doing. Now,

4    I'm not predetermining any claims or claim amounts or claim

5    classification.  That's my understanding of what I'm doing.

6    I think that's an appropriate understanding and I think it's

7    an appropriate use of the rejection power.  And I don't

8    think it does violence in any way to what I understand the

9    regulations of ERCOT to be with regard to who can be a QSE

10    and when that QSE is in place.

11           There is, in effect, a contract here; a contract

12    under which services are being provided as a QSE.  It's a

13    breached contract and damages for failure to operate

14    appropriately under that contract will be recoverable.  The

15    real question is, are they unsecured or are they

16    administrative and what the amount is.

17           So the clarification in the order that I

18    requested, I'll grant the motion nunc pro tunc and ask for

19    an order to be sent over under COC and I'd ask you to share

20    that proposed order with opposing counsel in an effort to

21    make sure that it's consistent with my ruling that provides,

22    hopefully, the clarity that I'm requesting.

23           MR. PECK:  (Inaudible - 1:18:59) Your Honor.

24           THE COURT:  Docket 19.

25           MR. HUSNICK:  Good afternoon, Your Honor.

1          The last item is the motion to intervene filed by

2     four -- purportedly filed by four individuals, Timmy Phail

3     (ph), Amber Lambert, Wayne Albright and Jonathan Rich.  Your

4     Honor, there is no reason to believe that this motion was

5     filed by a gentleman by the name of Jonathan A. Riches who

6     has quite the legacy of filing unsubstantiated lawsuits

7     across the country.  There are articles that he's filed

8     motions to intervene in over 3,000 cases and I actually

9     understand that this afternoon there's another motion being

10    heard in this Tropicana bankruptcy case pending in front of

11    Judge Garrett (ph).

12          THE COURT:  He just filed one in the Suntec case

13    as well.  So that --

14          MR. HUSNICK:  Your Honor, I'm happy to -- we put

15    some legal argument in the papers.  I'm happy to summarize

16    but I'm not sure you want --

17          THE COURT:  I've read all the papers.  Is there

18    anyone present in Court or on the phone for the petitioners?

19          Alright.  This is -- for all of the arguments that

20    the debtors put in their papers, first of all, there's

21    nothing here to intervene in so it's just wholly

22    inappropriate from the beginning.  Second, it's clearly part

23    of an abuse of process, a longstanding abuse of process by a

24    vexatious litigant and, as a result, it is a motion, the

25    debtors' motion that should be granted with prejudice which

1    is what the order says.  So I will grant the motion and sign

2    the order.

3                MR. HUSNICK:  Your Honor, deny the motion with

4    prejudice.

5                THE COURT:  Deny the motion, I'm sorry, deny the

6    motion to intervene -- I'm sorry, deny the motion to

7    intervene with prejudice.  I'm tired already.

8                MR. HUSNICK:  Thank you, Your Honor.

9                THE COURT:  I've no stamina.  I thought I'd be

10   here all day and I'm claiming to be tired at one twenty.

11   Not so good.

12               Do you have an order?

13               MR. HUSNICK:  I -- no, Your Honor, I don't have it

14   with me so if I could submit it to chambers.  Do I have it?

15   It was attached to the brief.

16               THE COURT:  I have a double-sided copy.  Can you

17   just sent over a copy?

18               MR. HUSNICK:  We can, Your Honor.  I apologize for

19   that.

20               Your Honor, then that clears up the agenda.  There

21   was one last item that we wanted to circle back with you

22   about regarding the challenge period.  Your Honor, during

23   the break we discussed with counsel to various parties a

24   stipulation that are involved in the cash collateral order.

25   Your Honor, we've, based on Your Honor's request, agreed

1   that the challenge period extension under the cash

2   collateral order will be to the later of June 30 or 30 days

3   after the hearing on standing.

4           THE COURT:  That's very helpful.  I truly

5   appreciate an accommodation by counsel on what is obviously

6   a business point and one that is a very delicate situation

7   and I am -- thank you.  I truly appreciate it.

8           MR. HUSNICK:  You're welcome, Your Honor.  Thank

9   you.

10          THE COURT:  Anything else?

11          MR. HUSNICK:  I believe that's it, Your Honor.

12          THE COURT:  Alright.  Very good.  We're adjourned.

13      (Chorus of thank you)

14      (Whereupon the Court recessed at 1:22 p.m.)

15

16                          * * * * *

17

18

19

20

21

22

23

24

25

1                              I N D E X

2                         E X H I B I T S

3        PARTY      NO    DESCRIPTION              ID.        EVID.

4                          Declaration of Robert

5                            Frenzel               --          72

6                          Declaration of Travis

7                            Carmen                --          72

8

9                              RULINGS

10                                                            PAGE

11      Court's Ruling                                        21

12      Rejection Motion                                      108

13      Motion to Intervene                                   113

14

15

16

17

18

19

20

21

22

23

24

25

Page 116

1                       C E R T I F I C A T I O N

2

3    We, Dawn South, Melissa Looney and Pamela A. Skaw, certify

4    that the foregoing transcript is a true and accurate record

5    of the proceedings.

6    Dawn South    Digitally signed by Dawn South
                   DN: cn=Dawn South, o=Veritext, ou,
                   email=digital@veritext.com, c=US
7    _____Date: 2015.04.15 09:45:35 -04'00'

8    Dawn South

9    AAERT Certified Electronic Transcriber CET**D-408

10   Melissa Looney   Digitally signed by Melissa Looney
                      DN: cn=Melissa Looney, o=Veritext,
                      ou, email=digital@veritext.com, c=US
11   _____Date: 2015.04.15 10:01:03 -04'00'

12   Melissa Looney

13   AAERT Certified Electronic Transcriber CET**D-607

14   Pamela A. Skaw   Digitally signed by Pamela A. Skaw
                      DN: cn=Pamela A. Skaw, o=Veritext,
                      ou, email=digital@veritext.com, c=US
15   _____Date: 2015.04.15 10:04:15 -04'00'

16   Pamela A. Skaw

17   AAERT Certified Electronic Transcriber (Cert Number)

18

19   Date:  April 15, 2015

20

21

22   Veritext Legal Solutions

23   330 Old Country Road

24   Suite 300

25   Mineola, NY 11501