Page 1

```
1    UNITED STATES BANKRUPTCY COURT
2    DISTRICT OF DELAWARE
3
4
5    In re:                        :
                                   :    Chapter 11
6    ENERGY FUTURE HOLDINGS        :
     CORP., et al.,                :    Case No. 14-10979(CSS)
7                                  :
              Debtors.            :    (Jointly Administered)
8    _____ :
     DELAWARE TRUST COMPANY as     :
9    INDENTURE TRUSTEE,            :
                                   :
10            Plaintiff,           :
                                   :    Adversary Proceeding
11      v.                         :    No. 14-50363(CSS)
                                   :
12   ENERGY FUTURE INTERMEDIATE    :
     HOLDING COMPANY LLC and EFIH  :
13   FINANCE INC.,                 :
                                   :
14            Defendants.          :
     _____:
15
16
17
                         United States Bankruptcy Court
18
                         824 North Market Street
19
                         Wilmington, Delaware
20
21
22
                         April 20, 2015
23
                         10:20 AM
24
25
```

1    B E F O R E :

2    HON CHRISTOPHER S. SONTCHI

3    U.S. BANKRUPTCY JUDGE

4

5    ECR OPERATOR:  LESLIE MURIN

6

7

8    HEARING RE:  Joint Motion of CSC Trust Company of Delaware,

9    as Indenture Trustee, and Certain EFIH 10% First Lien

10   Noteholders, for Confirmation that the Automatic Stay Does

11   Not Apply or, Alternatively, for Limited Relief from the

12   Automatic Stay, solely regarding rescission of Acceleration

13   [D.I. 473; filed May 15, 2014] the "Stay-Applicability

14   Motion")-

15

16

17

18

19

20

21

22

23

24   Transcribed by:  Melissa A. Looney, Debra McCostlin, Lynne

25   Blanchette, Tracey Williams, and Lisa Bar-Leib

1   A P P E A R A N C E S :

2   KIRKLAND & ELLIS

3        Attorney for the Debtors

4

5   BY:  ANDY MCGAAN, ESQ.

6        MIKE ESSER, ESQ.

7        RICHARD HOWELL, ESQ.

8

9   RICHARDS, LAYTON & FINGER

10        Attorneys for the Debtors

11

12   BY:  DAN DEFRANCESCHI, ESQ.

13        JASON MADRON, ESQ.

14

15   SHERMAN & STERLING

16        Attorney for Deutsche Bank New York

17

18   BY:  NED S. SCHODEK, ESQ.

19

20   POTTER ANDERSON CARROON LLP

21        Attorney for Deutsche Bank New York

22

23   BY:  R. STEPHEN MCNEILL, ESQ.

24        JEREMY W. RYAN, ESQ.

25

1   AKIN GUMP STRAUSS HAUER & FELD

2       Attorney for UMB Bank

3

4   BY: CHRISTOPHER COSBY, ESQ.

5

6   VENABLE

7       Attorney for PIMCO

8

9   BY:  JAMES EDMONSON, ESQ.

10      JEFFREY SABIN, ESQ.

11

12  MORGAN LEWIS

13      Attorney for PIMCO

14

15  BY:  JULIA FROST-DAVIES, ESQ.

16

17  MORRISON & FOERSTER

18      Attorneys for TCEH Committee

19

20  BY:  KAYVAN SADEGHI, ESQ.

21

22  WHITE & CASE

23      Attorney for TCEH Ad Hoc Group

24

25  BY:  CHRISTOPHER SHORE, ESQ.

```
 1   PACHULSKI STANG ZIEHL & JONES

 2        Attorney for EFIH Second Lien Indenture Trustee

 3

 4   BY:  LAURA DAVIS JONES, ESQ.

 5

 6   WILMER HALE

 7        Attorney for EFIH First Lien Indenture Trustee

 8

 9   BY:  PHILIP ANKER, ESQ.

10        CHARLES PLATT, ESQ.

11        DAVID GRINGER, ESQ.

12

13   COLE SCHOLTZ

14        Attorney for EFIH First Lien Indenture Trustee

15

16   BY:  KATE STICKLES, ESQ.

17        NORMAN PERNICK, ESQ.

18

19   KRAMER LEVIN

20        Attorney for EFIH Second Lien Indenture Trustee

21

22   BY:  JOSHUA BRODY, ESQ.

23        GREG HOROWITZ, ESQ.

24        ALICE BYOWITZ, ESQ.

25
```

1    ROPES & GRAY

2        Attorney for EFIH Second Lien Indenture Trustee

3

4    BY:  ROSS MARTIN, ESQ.

5        KEITH WOFFORD, ESQ.

6

7    DRINKER BIDDLE & REATH

8        Attorney fir Citibank DIP Agent

9

10   BY:  HOWARD A. COHEN, ESQ.

11       JAMES MILLER, ESQ.

12

13   SULLIVAN & CROMWELL

14       Attorney for E Side Committee

15

16   BY:  BRIAN GLUECKSTEIN, ESQ.

17

18   FOX ROTHSCHILD

19       Attorney for TCEH Ad Hoc Group

20

21   BY:  JOHN BIRD, ESQ.

22

23   MONTGOMERY MCCRACKEN

24       Attorney for EFH Committee

25   BY:  MARK FINK, ESQ.

1                    P R O C E E D I N G S

2            THE CLERK:  All rise.

3            THE COURT:  Please be seated.  Good morning.  I

4     apologize for the delay.  It's Monday.  All right.  How

5     should we proceed?

6            MR. MCGAAN:  Good morning, Your Honor.  Andrew

7     McGaan for the debtors.  And before I answer your question,

8     I just want to introduce two folks here, two colleagues of

9     mine.  Richard -- I don't know if you've met them or not.

10    Richard Howell and Michael Esser who would participate in

11    the hearing.

12            THE COURT:  Okay.  Welcome.

13            MR. MCGAAN:  Did you want to hear argument on the

14    motion to exclude the experts or limit their testimony?

15            THE COURT:  Yeah, let's deal with that first.

16            MR. MCGAAN:  We filed a motion as Your Honor

17    knows, it's fully briefed, in advance of the summary

18    judgment argument to exclude the three experts designated by

19    the trustee.  And of course the ground has shifted in light

20    of Your Honor's ruling on summary judgment, which I believe

21    moots a good part of the Dalbert motion, but only because it

22    should moot the relevance before we even get into the

23    standards for the admissibility of the experts themselves

24    and the testimony.  It moots the relevance of much of what

25    they disclosed in their report.  And I want to briefly talk

1    about that, but there's another new element.

2            Since Your Honor's -- since the briefing on the

3    Dalbert motion, since Your Honor's summary judgment ruling,

4    counsel for the trustee has communicated to us that they

5    would like to put these experts on to testify to new

6    opinions that weren't disclosed in their reports, that were

7    disclaimed in their deposition testimony.  And by that I

8    mean they were asked explicitly, does your report contain

9    all of your testimony and all of the opinions you intend to

10   give in this case and he said that it did.

11           At least in the case of Mr. Kearns, maybe it's

12   true for the other experts as well, indicated that if he

13   were going to add opinions, if he were going to be asked by

14   counsel for the trustee to offer new opinions, additional

15   ones, other than, again what was disclosed in his report and

16   we had the opportunity to depose him on, we'd be given

17   notice of what those opinions were in a supplemental report

18   which never happened.

19           So two pieces, the proper disclosure of experts

20   and their opinions and whether they're relevant.  And

21   secondly, whether they should be permitted to come up with

22   new opinions today undisclosed.

23           With regard to the disclosed opinions -- and I'll

24   talk about each expert in turn and I'll try to be brief,

25   because I think there's some repetitions with the point I'm

1    going to make.  But I'll begin with Mr. Kearns.  Am I

2    pronouncing that right?  Is it Kearns or Kearns?

3              UNIDENTIFIED SPEAKER:  Kearns.

4              MR. MCGAAN:  Mr. Kearns if you're here.

5              THE COURT:  Hang on, Mr. McGaan.  I'm sorry.

6    What's going on?

7              THE CLERK:  Somebody on the phone is talking.

8              THE COURT:  Please mute your phones if you're

9    going to be on the telephone.  If your phones aren't muted

10   and we hear noise, we'll have to cut you off and you'll have

11   to come into court if you want to participate.  Sorry,

12   Mr. McGaan.

13             MR. MCGAAN:  Mr. Kearns' report discloses -- and

14   there's really to be no debate about this.  It discloses

15   five opinions and these are the five opinions that we

16   examined him on.

17             He disclosed that he was going to testify and

18   offer opinions about the purpose and design of call

19   protection or specifically make-whole provisions generally

20   in the market.  That he was going to testify, secondly, to

21   the fact that the make-whole discount here and the indenture

22   here is the same as in other indentures -- and this is by

23   the way, Your Honor, pages 5 and 6 of his report.

24             Do you have his report or would you like me to

25   hand it up?

1              THE COURT:  I don't have his report with me, so

2     yes please.  I have --

3              MR. MCGAAN:  I've got a binder with it.

4              THE COURT:  -- I have my own summary, which is

5     what I'm working off of, but if you're going to -- if

6     there's some specific reference that comes up, this would be

7     helpful.  For now I'll work off my notes.

8              MR. MCGAAN:  Okay.  Thirdly he disclosed he was

9     going to testify that the make-whole provision in the

10    indentures here was standard and customary in the industry.

11             Fourth, he was going to testify to his calculation

12    of the make-whole amount.  He arrives at a conclusion that

13    it's 431 million.  I'm going to come back to that one.

14             And lastly, fifthly, he discloses that he's going

15    to testify that the make-whole provision was a significant

16    and material part of the bargain between the parties and

17    this indenture.

18             So let me set aside the fourth on the calculation

19    of the make-whole.  One, two, three and five -- all of those

20    are mooted by Your Honor's summary judgment ruling.

21             The parties bargain is memorialized as a matter of

22    law and he indenture -- Your Honor's construed the indenture

23    for purposes of this case.  So there's no relevance under

24    the standards that Your Honor is grappling with at today's

25    hearing.  That is a motion to lift the stay under the

1   bankruptcy code.  There's no relevance to the purpose of

2   make-whole provisions generally, how this -- the make-whole

3   provision and this indenture compares with others in the

4   industry, whether it's standard and customary and so forth,

5   whether it's -- whether it was an important or an

6   unimportant part of the bargain.  All of that should be

7   excluded.

8          In fact, it's not even clear to me that the

9   trustee intends to even pursue those opinions because they

10  don't bear on the standard that Your Honor set forth in your

11  ruling that we are litigating here today with regard to

12  lifting the stay.

13         Now with regard to his calculation of the make-

14  whole payment, I don't believe it's necessary to put him on

15  the stand to do that either.  We're perfectly willing to

16  stipulate, for purposes of this hearing, that the

17  calculation of the make-whole is $431 million and we're not

18  going to dispute that.  That's a phase 2 issue.  That is if

19  Your Honor were to lift the stay, make some other decisions

20  entitling -- that lead to an entitlement of the trustee to

21  claim the make-whole, the bifurcation order permits us to

22  take a microscope to the calculation of the make-whole

23  amount.  Say well is 431 the right number or is it a

24  different number?

25         But I think for purpose of the harm balancing that

1     Your Honor has to engage in, in connection with this

2     hearing, we're perfectly willing to accept 431 million as

3     the operative calculation of the make-whole.

4              And if that's the case, there's no need to put an

5     expert on to explain how he calculated it.  We're simply not

6     going to dispute it for those purposes.

7              The next two experts, Mr. Casiopo (ph) was

8     designated to testify about again five opinions all of which

9     are mooted for the same reasons by Your Honor's summary

10    judgment ruling.  He disclosed in connection with his report

11    that he was going to offer views that make-wholes are

12    generally essential parts of the bargains for investors in

13    this market.

14             He was going to offer an opinion that the

15    bankruptcy of the issuer doesn't change the party's bargain.

16    He's going to offer an opinion that's inadmissible as a

17    legal opinion, of course, but he was going to offer an

18    opinion that the repayment of the debt here is an optional

19    redemption.  That's a position Your Honor has already

20    rejected.

21             He's going to offer an opinion that the auto

22    acceleration clause in the indenture doesn't nullify the

23    claim to a make-whole here, again a position that Your Honor

24    rejected already and then lastly an opinion that the

25    trustee's lack of entitlement to a make-whole under the

1   plain terms of the indenture is something that should have

2   been disclosed at the time of the negotiation and marketing

3   of the notes.  Issue also that was briefed and litigated in

4   connection with the summary judgment ruling.

5          All of those opinions should be excluded from this

6   hearing, because they're simply not relevant, again, to the

7   standard governing, lifting the stay.

8          I'm going to come back to the new opinions we

9   think that they intend to offer with regard to these experts

10   in a moment.

11          Then lastly, Mr. McCarty.  He's been disclosed to

12   us and again, we were able to depose him on three --

13   offering three opinions.  That the make-whole provision in

14   this indenture was, in his view, a critical component of the

15   party's bargain.

16          That it would not be commercially reasonably, in

17   his words, to construe the indenture the way Your Honor has

18   already construed it.

19          And that the redemption or the payoff of the first

20   lien notes here was well planned by the debtor.  Again, an

21   issue litigated and resolved in Your Honor's summary

22   judgment motion.

23          So again, with Mr. McCarty, the disclosed opinions

24   are all not relevant and should be excluded for that reasons

25   from this hearing.

1          Now, there is a set of -- there's some inkling of

2     some new opinions that the trustee may seek to elicit if

3     he's permitted to call these witnesses.  Not disclosed in

4     their reports, we did not have an opportunity to depose them

5     on it.  They should be of course, excluded for that reason,

6     utterly unfair.

7          But with respect to Mr. Kearns, we've been told in

8     the -- it's been revealed, I guess, in the joint pre-trial

9     memorandum from Trustee, their parts of it, that they would

10    seek to elicit testimony from Mr. Kearns about restructuring

11    proposals in this case of waterfalls and that they would

12    do -- if I understand their disclosure in the joint pre-

13    trial, they would do it as a fact witness.

14          Your Honor said -- you'll recall, I'm sure -- last

15    Tuesday at the omnibus hearing when you were addressing the

16    scope of this proceeding today that you wanted to avoid

17    hearing, to the greatest extent possible, anything about

18    restructuring proposals and waterfalls and we took, in part,

19    those comments to be directed at the Debtor who may have an

20    interest in discussing harm to the Debtor in doing that.

21          We take it very seriously.  We don't intend to put

22    on evidence of other restructuring proposals, waterfalls,

23    Oncor bidding procedures.  We don't intend to open the door

24    Your Honor referred to and it certainly wouldn't be

25    appropriate then to bring in a financial advisor for one

1    creditor to begin talking about those same issues in light

2    of the direction Your Honor had given both the parties about

3    the scope of this hearing.

4         The second new opinion that I believe they intend

5    to elicit from Mr. Kearns is, in the words of the Trustee,

6    the extent -- I'm quoting from the pre-trial order -- "the

7    extent of EFIH's solvency and its consequences."  And again,

8    last Tuesday we took this very seriously.  I think both

9    parties should be taking it seriously in preparing for

10   today's hearing.  Your Honor said there will be no evidence

11   whatsoever on solvency or degree of solvency.  We don't

12   intend to offer that evidence and we don't think that we

13   should -- the Trustee should be entitled to do it either

14   particularly when it's being dropped on us through an

15   undisclosed expert opinion.

16        With regard to Mr. Cacioppo and Mr. McCarty, the

17   new opinion that we believe they intend to offer based on

18   information, again, from the Trustee and the joint pre-trial

19   memorandum is a harm to the noteholders if they're denied

20   the right to rescind.  That's what the joint pre-trial

21   memorandum says.  Neither of these gentlemen, Mr. Cacioppo

22   and Mr. McCarty, disclosed that they were going to offer any

23   opinions of that kind at all.  No opportunity to examine

24   them about it, to explore the bases if there are any bases

25   for that, what their opinion is, the extent of it.

1          I understand from some of Mr. Anker's comments --

2    maybe it was last week, maybe it was in the joint pre-trial

3    memorandum -- that they would argue, well, let's treat this

4    as a contested matter and let us put experts up and give

5    undisclosed opinions.  But that doesn't really work here

6    because what he's carving out, the lift-stay dispute as a

7    contested matter, was included in Your Honor's bifurcation

8    order with the make-whole dispute and the discovery schedule

9    was set out and we were given the disclosures through formal

10   expert reports and the opportunity to explore it and in

11   depositions in advance of the summary judgment motion where

12   these issues where Your Honor has found a fact dispute or he

13   would like further evidence were being litigated.

14          So that's not license, after Your Honor says we

15   need to have a hearing on this one issue, lift-stay, it's

16   not license to say well, then when our experts testified

17   under oath that their recourse represented the entirety of

18   their opinions and they had no others to offer in these

19   proceedings, that now they can do that.

20          So for those reasons we'd ask that they be

21   precluded from offering those new opinions, Your Honor.  And

22   I think if -- I should add that that would -- if I've

23   guessed right about the surprise new opinions, if Your Honor

24   accepts the argument then there would be no need to hear

25   testimony from these experts.  There would be no entitlement

Page 17

1    to put them on at all.  Thank you.

2            THE COURT:  You're welcome.

3            MR. ANKER:  Good morning, Judge Sontchi.  Philip

4    Anker, Wilmer, Cutler, Pickering, Hale and Dorr for the

5    Trustee.

6            I actually start my analysis here in a somewhat

7    similar place to Mr. McGaan but I get to precisely the

8    opposite result.  I think he said the ground has shifted.

9    That's right.  Your Honor has issued a summary judgment

10   ruling and if you look at Mr. McGaan's -- I should say

11   EFIH's motion to exclude and I'm focusing on their reply

12   briefs, their principal argument was that the opinions

13   really went to the extent they did construing the terms of

14   the indenture and Your Honor has already construed the

15   indenture.

16           Your Honor has held that if there is an

17   acceleration or subject to rescission of the acceleration,

18   there is no right for the noteholders to get the make-whole

19   but if they are able to rescind then this is an optional

20   redemption and they are.  What we're left with, as Your

21   Honor noted, is a motion for relief from the automatic stay

22   as to which the Court looks to, as Your Honor said in the

23   opinion, "a totality of the circumstances" and as to which

24   among the critical factors are the harm to the noteholders

25   and, conversely, whether the harm to the Debtor, in this

1    case EFIH, greatly outweighs that harm.

2         It is in that context that these expert reports

3    are today presented and they speak very much to that issue.

4    In fact, their relevance and importance is greater today,

5    not lesser today.  Mr. McGaan says opinions offered about

6    the importance of make-wholes to investors about their

7    centrality to the fundamental investment thesis for

8    investors are irrelevant.  Well, they may irrelevant to the

9    construction of the document.  What does the contract say?

10   Because Your Honor may have -- Your Honor has resolved that

11   question, but they go very much to the harm.  If you have a

12   provision that no one cares about, that's just boilerplate

13   on a contract, that isn't part of the bargain, then the harm

14   to the parties seeking to enforce that provision is less.

15        If, conversely, that provision is at the fundamental

16   guts of the entire transaction from the investor's

17   standpoint, it very much speaks to the harm to them.  Our

18   experts -- and by the way, they are all in the courtroom.

19   Ms. Kearns is in the third row here.  Stand up if you would.

20   Mr. McCarty is in the back row there and

21   Mr. Cacioppo is, I think, in the same row but up closer to

22   the aisle.  Their opinions speak to the following questions.

23        First, that these are at their core fixed-rate

24   non-amortizing notes.  They don't have a floating rate of

25   interest.  The way one protects investors when you have a

1    fixed rate instrument where interest rates may go down and

2    the company otherwise would call is to have a no-call

3    provision either in absolute bar or, alternatively, a make-

4    whole.  Otherwise, as they say in their reports, these are a

5    "heads you win issue or tails we lose" transaction where

6    interest rates move in the opposite direction.  If interest

7    rates go up and therefore the investors are now holding

8    paper that pays them a yield less than what the market would

9    and the notes trade down from par, there's nothing in these

10   indentures that give them the right to put.  So they testify

11   in opine about the general bargain.

12          Let me interject something here, although I didn't

13   hear Mr. McGaan utter the words directly, I heard him say

14   they talk about a bargain generally and I think that what is

15   implicit in that although we didn't explicitly say it is

16   that even if that they may be relevant to the harm question

17   with respect to investors in general in high yield debt, it

18   doesn't speak to this particular deal.  All of the evidence

19   -- and the investors, I'm sorry, and the experts base their

20   opinion on -- are out of the mouths of their witnesses

21   sitting in the back row that the Debtor took this indenture

22   from indenture of a different company first data that

23   precisely the same provisions were in every single indenture

24   of this indenture and that they are all market and standard.

25          Indeed, the Debtor has said it has no evidence

1    about the negotiation of this indenture and, indeed, in

2    deposition its fact witness just testified that they

3    understood when they entered into the indenture that the

4    right to rescind was fully enforceable and our experts then

5    speak to the question of harm to the company when the

6    company itself never thought that these provisions that it

7    now relies on were anything -- or doesn't rely on and seeks

8    to evade were anything but enforceable.

9              Secondly, our experts talk to the nature of

10   investors in these instruments.  Mr. Cacioppo notes that the

11   overwhelming of majority of investors in high yield debt --

12   I should say the majority, overwhelming probably overstates

13   the case -- are pension funds, insurance companies and the

14   like who have liabilities that mature on fixed dates and

15   they need to have a fixed flow of income that matches or

16   else they have a real problem with how they go about things

17   and he testifies about how the make-whole protects against

18   that harm.

19             Third, they opine about reinvestment risks.  That

20   is the risk that when -- if a note were callable and no

21   make-whole was paid, the investor then has to reinvest and

22   can't find a comparable credit instrument paying the same

23   yield.  That is the risk that fundamentality make-wholes are

24   designed to compensate against and they will testify about

25   the circumstances today which they provide in their report.

1    Mr. Kearns, in his report, provides the exact backup in

2    Exhibit D of his report of the calculation of the make-whole

3    and what the future stream would of have been of payments

4    had the notes not been called and he talks about the

5    reinvestment risk and the lower interest rate environment we

6    are in today.

7              Fourth, they talk about in opine about the fact

8    that most of these notes came out of an exchange in 2010

9    where notes issued by EFH but guaranteed by EFIH in 2007

10   were exchanged.  They talk about how that transaction

11   involved a 20 plus percent haircut.  The noteholders walked

12   away from 20 percent of what they were owed and they talked

13   about how that would not make any economic sense and the

14   noteholders would be harmed if they didn't get the security

15   of the make-whole to guarantee them what they were scheduled

16   to receive in the new notes.

17             Fifth, they provide real numbers.  Mr. McGaan says

18   we don't need the calculation of the 431 and I'm happy to

19   hear he'll stipulate to that, but there is testimony, and

20   it's in Mr. Kearns report, that that number represents the

21   present value of the lost future income stream.  That's real

22   numbers and real math and he will testify that there are no

23   comparable investment opportunities and were none as of

24   June 19, 2014 when these were called, these notes.

25             Sixth, they opine that there is no difference in

1    the economic harm to the noteholders merely because the

2    Debtor is in bankruptcy.  It's not as if there's an

3    insurance company out there called the "when your issuer

4    goes into bankruptcy and calls your notes and doesn't pay a

5    make-whole, I will pay you the difference."  The economic

6    harm is the same and they opine to it.

7            And finally, on the disclosure question, that goes

8    to the harm to the Debtors.  If the Debtors understood --

9    and goes to the equities -- if the Debtors understood and

10   bargained for the right to call in bankruptcy, if they

11   understood that was the deal then they should have disclosed

12   it but they didn't disclose it and I don't accuse them, Your

13   Honor, of securities fraud.  The testimony and what the

14   experts opine on as based on that record is that the company

15   never thought of this issue and this is entirely a got you

16   windfall after the fact.  Having said -- so the notion that

17   these are new opinions is simply false and their relevance

18   is apparent.

19           Having said that, Your Honor, were these opinions

20   written with a lift-stay motion front and center?  Candidly,

21   that wasn't what they were written with front and center but

22   they speak to the harm and in one sense I'm sympathetic to

23   Mr. McGaan and in another sense I couldn't be more

24   unsympathetic to Mr. McGaan.

25           Your Honor, in the bifurcation order, said that

1   Phase One would decide whether we were -- my client was

2   entitled to the redemption claim as a matter of quote

3   "applicable non-bankruptcy law."  And that Phase Two would

4   decide whether bankruptcy law provided any defenses to the

5   payment of that claim assuming the Debtor were insolvent.

6   And that followed on the heels of Your Honor's ruling in the

7   summer.

8          THE COURT:  You've said this before and I'm

9   curious and wondering why then you moved for summary

10  judgment on stay relief?

11         MR. ANKER:  I moved because Mr. McGaan made the

12  argument that we're not entitled to it and we legally

13  briefed it but, Your Honor, our briefs are chock full of

14  statements saying we thought that that as a fact issue was

15  for Phase Two.  And I'll make that representation to the

16  Court.  We said it in our brief because we believed it.  We

17  understood the facts relating to harm and the facts relating

18  to whether there would be any defenses would be a Phase Two

19  issue and I don't lightly say things to courts that I don't

20  believe to be true in my heart.  That was absolutely -- and

21  we said it in our pleadings and it's what the order said.

22         And so, Your Honor, I'm unsympathetic -- I'm

23  sympathetic to Mr. McGaan in the sense that, frankly, I

24  think what Your Honor decided in your summary judgment

25  ruling is that we do have a stay for right to the make-whole

1    but that right may be subject to disallowance in bankruptcy

2    because of the automatic stay.

3              And I came before you and asked that we proceed to

4    Phase Two and I'm prepared to -- and I was going to -- we

5    have everything in this room, make everyone available for

6    new depositions and I'm happy to take new depositions of

7    them.  I'm happy to provide supplemental reports.  But to

8    say today, as Mr. McGaan has, that when a central issue in

9    this matter is harm to investors -- and I'm prepared to put

10   on testimony, fact and expert witnesses, going directly to

11   the question Your Honor asked, what is the harm, how much

12   did you lose, what did you lose in terms of the future

13   payments and what were your future opportunities and did

14   this go to the core of the bargain?  That's precisely what

15   we propose to testify to put on evidence including through

16   our experts.

17             Your Honor, to be clear and for the record, we do

18   object and we think it is improper to proceed to trial today

19   on the fact issues as to lift-stay and I want that to be

20   clear for the record.  But we heard Your Honor loud and

21   clear that you wanted to.  We're prepared to do so and we're

22   prepared to have your experts testify.  Mr. McGaan didn't

23   ask for a second round of depositions.  He has, actually,

24   asked for a couple of fact witnesses and we will get to that

25   in a minute.  But as these experts heeded, we're prepared to

1    go forward today in light of Your Honor's ruling and put

2    them on.  Their relevance is what I just spoke to.  If there

3    are individual questions that Your Honor thinks or Mr.

4    McGaan thinks go to the terms of the contract rather than

5    the harm to the noteholders, that is the subject of an

6    objection at the time and a ruling by Your Honor on

7    exclusion.

8            I commit to you their testimony will be grounded

9    in their report and it will go to harm which is the

10   fundamental issue.  Their opinions on harm are in their

11   original report.  I'm happy to go through them page by page

12   if Your Honor would like but by way of example only, Mr.

13   Kearns, paragraph 53, set forth the amount of principal held

14   by the non-settling holders.  So what they were owed.

15           He included the calculation of the make-whole

16   using the methodology set forth in the indenture.  So that

17   goes to what it is they haven't received.  He concluded that

18   the make-whole was material.  It represents 19 percent or 20

19   percent of the principal of the note.  That goes to harm.

20   That's paragraph 57.  He explained that the loss of the

21   make-whole would be economically significant here because

22   it's designed to compensate for the loss that future

23   interest that investors would have received at least through

24   the first call date at the contractually agreed rate of

25   interest.  That's paragraph 59B.

1          He points out, and Mr. McGaan is right, that the

2     make-whole here is standard.  That goes to harm.  Imagine

3     that this was not standard and this was a super profitable

4     non-competitive investment.  Hard to imagine why EFIH would

5     have agreed to it if it wasn't standard, if it wasn't

6     market, but if it wasn't one might say that you really

7     haven't been harmed because you got a sweetheart deal.

8          Mr. Kearns testimony, expert opinion, is that this

9     calculation of the make-whole, T plus 50, is absolutely

10    standard within the EFH series of companies and across high-

11    yield issuers.  Indeed, if anything, there are some

12    indentures that provide for discount rates that are lower, T

13    plus 30, for example, which produces a higher rather than

14    lower make-whole.  Mr. Kearns talks about in his opinion and

15    opines about reinvestment risk which he explains as the risk

16    that the investor, and I quote, "must invest proceeds

17    received if the bond is called when market rates of interest

18    are lower than the rates specified in the bond."  Paragraph

19    30B.

20          Mr. Kearns also opines about quote "The very real

21    cost that are incurred in finding a suitable replacement

22    investment and the situation in which an investor may have

23    to invest in lower yielding securities while they search for

24    investment opportunities."  Paragraph 35B.  His testimony of

25    the actual rate of return, that is what the noteholders

1   would have received is set forth exactly in Exhibit B to his

2   report.

3          Mr. McCarty uses what he terms "bond math", pages

4   29 and pages 30, to illustrate exactly the yield to the

5   holders and the yield they are not getting.  He has a chart

6   explaining if you allow the make-whole versus not allowing

7   the make-whole what they would receive and what the harm is

8   and he also -- my apologies for the adaptation -- talks

9   about the haircut in the 2007 exchange and how that

10  fundamentally affected the economics of the transaction.

11         He sets forth the underlying economics that stand

12  behind high-yield debt, paragraphs 30 to 35, and he goes

13  through all of that in detail.  He also points out and does

14  an analysis of how the harm is not lessened one iota, one

15  penny, by the fact that this company is in bankruptcy.  He

16  also talks about the harm to investors by reason of the

17  decline in interest rates that occurred over time, paragraph

18  73.

19         Mr. Cacioppo in his report -- and I believe, Your

20  Honor, what I'm giving you is page numbers rather than

21  paragraphs.  I'm told that's right.  On page 7 explains that

22  investors in high-yield debt receive fixed interest payments

23  on a monthly basis and the principal average doesn't

24  amortize.  He explains that owners are principally, as I

25  said earlier, this page 7, institutional investors like

1   pension funds, insurance companies and mutual funds all of

2   which need to match their future liabilities to the income

3   and therefore the loss of that income going forward

4   fundamentally harms them.

5            He talks about call risk, page 8.  He explains all

6   about reinvestment risk where he says on page 9 where an

7   investor re-finds his debt in a lower interest rate

8   environment quote "It would therefore be unlikely that an

9   investor would be able to find a comparable rate of return

10  on a comparable investment."

11           If the noteholders here had been able on June

12  19th, 2014 to find a company called EFIH mirror company that

13  owned an 80 percent interest in a utility like Oncor and get

14  that at 10 percent, I still would argue that we've been

15  harmed because we lost our contractual right to the make-

16  hold but Your Honor might say, hold on a second, you could

17  invest with the same credit risk and get the same return.

18  That is counter-factual because the -- and our experts will

19  testify about this -- the only time companies like this,

20  like EFIH, redeem is when interest rates have declined or

21  their credit has improved such that there are not comparable

22  opportunities in the market to invest at the same credit

23  risk.  If there were, they wouldn't have been able to get a

24  dip at 4.25 percent.

25           Mr. Cacioppo talks about the harm to holders who

1    have to reinvest at lower and lower rates as interest rates

2    go down and that the make-whole quote "compensates the

3    bondholder for the reinvestment risk that early redemption

4    creates."  That's on page 10.  But he talks about the "heads

5    you win issue or tails I lose" that when interest rates go

6    in the other direction they can't put the notes to the

7    company and they take on that risk of that happened, page 9.

8            He illustrates the typical math that an investor

9    in high-yield debt performs going to the harm.  That's on

10   page 11.  He assesses the terms of the 2010 exchange

11   including the -- I set the haircut at 20 percent -- he

12   through his math and analysis says it's 21.5 to 28 percent

13   and he talks about how it was the heart of the bargain from

14   the standpoint of the noteholders when they did the exchange

15   that they were guaranteed 58 points of interest over five

16   years with a make-whole, pages 17 to 18.  And he too says

17   that the fact opines that the filing for bankruptcy doesn't

18   reduce the harm one iota and one dollar.  He has a

19   calculation, this is page 41 on his report, setting forth

20   exactly the economics behind the make-whole and the harm to

21   the investors.

22           So, Your Honor, let me say one last thing.  Mr.

23   McGaan speculates that we're going to have our experts talk

24   about the waterfall and the like.  We do want to make a

25   proffer on that issue or an offer of proof I think is

1    technically the right term.  We understand Your Honor said

2    unless they open the door, EFIH, you don't want to hear

3    testimony on super-solvency.  But we do think that when it

4    comes to balancing the harms, Your Honor should understand

5    that under the waterfall here, at levels that people think

6    are realistic, the notion that they put in their brief which

7    is that EFH will be harmed, the shareholder, we think it

8    pretty clear that that box is going to be clear and EFH

9    creditors are likely to be paid in full, if not a shortfall.

10   But we think it likely they're going to be paid in full and

11   that under this waterfall the ultimate owners of EFH, the

12   three private equity firms potentially are walking away with

13   billions of dollars.  We do want to make an offer of proof

14   on that so we have a record on that issue.  But we

15   appreciate that Your Honor said that in the absence of the

16   Debtor opening the door that testimony will not come in and

17   therefore that would come in purely on our end as an offer

18   of proof.  What we are asking them to testify to goes

19   instead to the very harm and the very guts.

20            I should have said one other thing at the outset,

21   Your Honor.  My partner, Charles Platt, who's with me, and I

22   initially introduced you --

23            MR. PLATT:  Good morning, Your Honor.

24            MR. ANKER:  -- would examine Mr. Cacioppo and

25   Mr. McCarty.  I would examine Mr. Kearns.  Mr. Platt is also

1    available to discuss the 702 Daubert reliability issues but,

2    frankly, I don't hear Mr. McGaan to be relying on those so I

3    wanted to focus myself on the relevancy issues.  This is

4    critical to our case and we need to be able to put the

5    evidence on, Your Honor.  One moment.

6              MR. PERNICK:  One moment, Your Honor.

7              MR. ANKER:  Your Honor, I mentioned earlier that

8    it seemed to me -- and this goes to the offer of proof which

9    I understand is not the central issue, but if you simply

10   look at their trial grid, they say on pages 3 to 4, quote,

11   "Further, there can be no reasonable debate that every penny

12   of the Trustee's 431 million claim reduces the value of

13   other EFIH stakeholder recoveries including recoveries by

14   equity which includes stakeholders of EFH" as offer of proof

15   will go to whether it is likely that that box will be

16   cleared in any event.

17             And then later on page 4, quote from the brief of

18   the EFIH, "It requires no evidence and the Court can take

19   judicial notice of the fact" -- they then speculate that

20   somehow Your Honor's ruling will lead to make-wholes for

21   others -- "that exposing EFIH to approximately 900 million

22   or more expanded claims will have a major affect on their

23   reorganization process and will benefit a few creditors at

24   the expense of other stakeholders."  So our offer of proof

25   will, in part, go to that issue but I don't think that's the

1    heart of what Your Honor wants to hear now on the motions in

2    limine.  I do want to clarify on that question.

3            THE COURT:  Okay.  Thank you.

4            MR. MCGAAN:  Andrew McGaan for the Debtors again,

5    Your Honor.

6            Yes, the ground has shifted and what I meant by

7    that is it has greatly narrowed.  After the summary judgment

8    ruling, Your Honor disposed of a number of issues for which

9    we had reserved three days beginning the date of try if they

10   were not resolved on summary judgment.  So only one issue

11   remains which is the lift-stay dispute and in that sense the

12   ground has shifted.  And because it's narrowed, just about

13   everything, if not everything, that Mr. Anker described that

14   he would like to elicit from his experts is irrelevant and

15   it's -- the argument that they would like to put on

16   testimony from experts who have admitted that they were not

17   involved in the negotiation of the indenture and indeed he

18   spoke to none of the people who negotiated these indentures.

19   That the make-whole here is the fundamental guts of the

20   transaction, and for that reason, because it is of such

21   great importance to the people who actually negotiated and

22   executed the indenture, the harm is greater.  And,

23   respectfully, that makes no sense.

24           Your Honor has construed the indenture, as you're

25   well familiar, and in your ruling, you say at paragraph 48,

1    "The parties certainly could have bargained for such a

2    provision, that is a make-whole in the circumstances of an

3    acceleration of the debt after a Chapter 11 filing.  But

4    they did not."  You went on to say, "The Court is unwilling

5    to read into agreements between sophisticated parties

6    provisions that are not there."

7            If we're going to have a debate now, apparently,

8    about how important the provision that they still insist is

9    a feature of the indenture, and Your Honor has ruled that

10   under these circumstances it's not.  And so what is the

11   relevance of how important they feel the make-whole is, when

12   it's simply not in the agreement?  They have misread the

13   agreement if, indeed, they read it that way at all.

14           Similarly, the argument about testimony from

15   experts about the 2010 exchange and whether or not there was

16   a haircut there and whether -- and as Mr. Anker said, they

17   want to testify that it would make no economic sense for the

18   lenders to engage in that exchange without the security of

19   the make-whole.  Your Honor didn't rule that there's no

20   make-whole in this indenture at all.  Your ruling is that

21   under these circumstances, the plain language of the

22   indenture doesn't provide a make-whole recovery.

23           Again, this is re-litigating issues that have been

24   resolved in the summary judgment.  So what?  Let's assume

25   for the sake of argument that we can round up and bring into

1    the courtroom all of the note holders who actually engaged

2    -- not experts -- but actually engaged in that exchange, and

3    they said, "You know what I thought at the time?  I thought

4    there would be a make-whole payment due me if this borrower

5    went into bankruptcy and the debt was accelerated and they

6    repaid it.  That's what I thought."

7              Well, that's directly contradictory to the

8    agreement that they put in writing and signed and that Your

9    Honor had for purposes of this case construed.  So what's

10   the relevance?  It doesn't go to the harm.

11             Let's take a step back here.  The harm here is

12   that they want $431 million.  So post-petition, they want to

13   get Your Honor to bless a lifting of the stay so that they

14   can rescind and so that they can then characterize the

15   repayment as an optional redemption and get $431 million

16   that the indenture didn't otherwise entitle them to.  That's

17   the maximum extent to their damage, or their harm here.

18   That's it.

19             Now, Mr. Anker said that there'll be testimony

20   about the lower interest rate environment and I suppose

21   we'll hear at some point maybe about what sort of return the

22   lenders did earn with their $2.3 billion that was repaid to

23   them in June of 2014.  There are some amounts -- it is a

24   notable fact what the markets were and the interest rates at

25   the time -- there's no dispute that it was in one sense --

1    not in every sense, but in one sense -- a lower-interest-

2    rate environment.

3            When the debtors moved to repay this debt, they

4    argued to the Court that there would be an interest savings

5    as they could replace it with a lower-interest DIP loan.  A

6    different instrument, of course.  Different security

7    features, of course.  But a lower interest rate nonetheless.

8            The -- you asked Mr. Anker why did you move for

9    summary judgment on the lift stay feature if it, as he's

10   arguing now, requires a whole new scope of discovery and a

11   whole different thing then they had disclosed and litigated

12   before the summary judgment proceeding.  And I think the

13   answer is in their papers.  They believe that as a matter of

14   law, they were entitled to have the stay lifted.

15           They misread the cases and argued to Your Honor

16   that if, in the case of a solvent debtor, Your Honor has to

17   lift the stay, end of the analysis.  And Your Honor engaged

18   with that argument and rejected it.  But that's why they

19   moved for summary judgment.  And now that they have learned

20   they were wrong about that legal argument, they want to re-

21   litigate these summary judgment issues that are resolved --

22   the purpose of the make-whole, whether it's in the deal, how

23   important it is to them.

24           But none of that has any bearing on the fact that

25   when you calculate, as Mr. Kearns has done -- and, again,

1   because we're willing to accept for purposes of this

2   proceeding -- they want $431 million.  It's not more

3   complicated than that.  And that drains directly out of the

4   Debtor's estate.

5           THE COURT:  Okay.

6           MR. MCGAAN:  That's why I think this is a frolic

7   and a detour of grand proportions to re-litigate all these

8   issues about the meaning and the intentions and the feelings

9   about it.  The negotiation of the make-whole of the

10  indenture and what was or wasn't in the indentures.  And

11  this issue that there'll be testimony to the Debtor's

12  bankruptcy doesn't make their harm any less.  We've not

13  argued that it does.  The $431 million isn't a different

14  amount of money whether we're in bankruptcy or not.

15          With regard to the offer of proof, I don't know --

16  I don't know how we wended into that one, but --

17          THE COURT:  You don't need to address that.

18          MR. MCGAAN:  Okay.

19          THE COURT:  Let me take that point -- I'm ready to

20  rule.  Let me take that last point first.  I made it clear,

21  and I continue to make it clear, that I'm assuming solvency,

22  that I don't want any testimony as to the extent of

23  solvency.  I'm not interested in hearing arguments from

24  either side whether this clears the table or the debt at the

25  EFH level.

1          And I'm not interested in hearing anything about

2    restructuring proposals.  Now, if somebody opens the door,

3    we'll address it at that time.  But, hopefully, as that door

4    is being opened, I'll immediately slam it shut, because I

5    really don't want to hear about that from either side.

6          With regard to the fact that whether these are new

7    opinions or not, as articulated to me, I don't really

8    believe they are new opinions.  They may be focused more

9    specifically on harm as opposed to contract interpretation,

10   arguments, if you will.  But I am going to hold the experts

11   to their previously disclosed topics of their opinions.  And

12   I think Mr. Anker did a nice job of going through what those

13   were and tying them into what is relevant for today's

14   purposes.

15         And if they stray off of those opinions and start

16   offering new opinions based on new facts and Mr. McGaan

17   raises that, I'm going to exclude that testimony.

18         I think that the automatic stay and whether it

19   should be lifted to allow the right -- the State law right

20   and contractual right of rescission to occur and decelerate

21   the notes has been in this phase one from day one, and it

22   was certainly subject to the summary judgment briefs that

23   were put in front of the Court.  And I found that there was

24   an issue of material -- a genuine issue -- of material fact

25   as to whether cause exists to lift the automatic stay and

1    that I couldn't enter summary judgment based on the law.  So

2    I think it is perfectly fair to have a hearing on whether

3    cause exists to lift the automatic stay.

4              I don't think we need to get into phase two.  And

5    I think this is something that really does go to the State

6    law, because it's a State law right in the contract to

7    rescind.  And the question of the interplay of that with the

8    automatic stay, I think is a fair issue for phase one and

9    has been raised by both parties in connection with phase

10   one.

11             Now, to deal with the motions in limine.  I'm

12   going to grant it in part and deny it in part.  And I'll say

13   this about it.  I think that the things that I'm going to

14   allow the experts to go forward on may be broad and may go

15   to, sort of, broader issues of, you know, what make-wholes

16   are about.  But I think they are important and specific to

17   harm.

18             One of the measures of harm is economic damages.

19   Another measure of harm, or what goes into that measure of

20   harm, is the expectations of the parties when they entered

21   into the contract and the investment expectations of the

22   parties when they entered into the contract.  And, again,

23   just to be specific, I ruled that there is an applicable

24   premium that can be paid under certain circumstances.

25             What I ruled was that the bankruptcy accelerated

1    the debt, which made it not an applicable premium due, but

2    the debt could be decelerated by rescission, and what we're

3    talking about today is whether that debt should be

4    decelerated and whether cause exists to lift the stay to

5    allow that to occur.

6         So I don't think it's accurate to say that none of

7    these issues are relevant for the purposes of what we're

8    here for today.

9         So going through it, starting with Mr. McCardie,

10   he offered, as we said, three opinions, and I'm going to

11   allow the first two to be the subject of testimony and not

12   the third.  The third was in refinancing the notes.  The

13   EFIH engaged in a well planned optional redemption of the

14   notes to reduce its interest rates.  I've already dealt with

15   that, and I don't think that goes to harm in connection with

16   creditor harm on whether to lift the automatic stay.

17       However, the other two opinions which were that the

18   call protection provisions in this case, including the

19   provisions for make-whole payments were standard in the high

20   yield debt market and were a critical component of a bargain

21   struck by investors in the EFIH is relevant.

22       And the second, the refinancing the notes in

23   bankruptcy does not have a different economic effect on the

24   note holder than a redemption outside of bankruptcy.  It is

25   not commercially reasonable to understand the bargain in

1   this case is permitting the EFIH to compel note holders to

2   accept repayment of the notes, principal and accrued

3   interest prior to December 1, 2015, without payment of the

4   make-whole.  I'll allow that expert testimony.

5            With regard to Mr. Cacioppo --

6            MR. ANKER:  Cacioppo.

7            THE COURT:  Cacioppo.

8            MR. ANKER:  Your Honor, I will just say this at

9   the outset, because at some point I may call as an adverse

10  witness one of the debtors, I am hideously bad on butchering

11  (indiscernible).  I'm telling you what I think is the

12  correct pronunciation, Cacioppo?

13            UNIDENTIFIED SPEAKER:  Right, yeah.

14            THE COURT:  All right.  Well --

15            MR. ANKER:  Perfect.

16            THE COURT:  -- I'll mess it up.  So my apologies.

17  But having lived 48 years with Sontchi, I have limited

18  sympathy for many people's names being mispronounced.  But

19  Mr. Cacioppo offered five expert opinions, and I will allow

20  number one, two, and five.  But not three and four, and

21  three and four were EFIH refinancing notes was an optional

22  redemption.  I've already dealt with that.  And number four

23  was the automatic acceleration provision does not nullify

24  the make-whole.  I've already dealt with that.

25            I will allow it on the car protection provisions,

1    including the make-whole payment were an essential part of

2    the bargain for the investors.  I will allow it on the

3    bankruptcy.  The issuer does not change the call protection

4    bargain.  And that the failure to pay the make-whole was a

5    material risk that was not disclosed.

6            Now, on that last opinion, again, I think the

7    focus there should be I wasn't going to allow that.  But,

8    Mr. Anker talked me into it in focusing on debtor harm and

9    the fact that if, you know, the fact that if the Debtors

10   really thought this was something out there that might be a

11   problem, they would have articulated it.  So I'll allow it

12   for those purposes.

13           For Mr. Kearns, I'll allow all of his expert

14   testimony, including the testimony regarding the calculation

15   of the make-whole amount of $431 million.  Not to resolve

16   the dispute about whether it should be $425 or $431 and what

17   the delta is on that $6 million, but as a calculation of the

18   underlying economics of the transaction.  So that'll deal

19   with that.

20           So we will have testimony from all three experts.

21   Now, to plan the day, how do we intend to proceed?  Have you

22   talked it over --

23           MR. MCGAAN:  Your Honor --

24           THE COURT:  Oh, you had another issue, I'm sorry.

25           MR. MCGAAN:  Yeah.

1          THE COURT:  Oh, and let me just say, we have three

2     days.  I don't have any more than three days, so the parties

3     are going to have to work to get their case in in three days

4     and that means direct testimony of the experts can't take

5     all three days.  So we need to be focused.  And we'll start

6     more timely tomorrow and the day after at 10:00, and we'll

7     go to somewhere between 5:00 and 6:00 each day, with a short

8     lunch break.

9          MR. MCGAAN:  What time do you want to start in the

10    mornings, did you say?

11         THE COURT:  10:00.  10:00.  I had said 9:30

12    before, I apologize, but, unfortunately, I had some personal

13    issues that require me to be a little later than I usually

14    am this week, so I won't be able to start at 9:30.

15         MR. MCGAAN:  The remaining issue I think before we

16    begin, Your Honor, is a request that we made of the Trustee

17    to take two very short depositions.  On Wednesday night,

18    they disclosed to us for the first time the names of two

19    representatives of holders of the notes that they intend to

20    call during this proceeding, and we contacted them on Friday

21    and said could we take two short depositions on Sunday, and

22    they declined to produce them on Sunday.

23         We'd like to ask Your Honor to order them to

24    produce them at some point during these proceedings -- it's

25    at noon, this evening -- for two very short depositions.

1    And the rationale for this request, and why they weren't

2    deposed earlier, is we received no disclosure of these

3    individuals at any time until Wednesday night.  Now, there

4    were Rule 26 disclosures in this case, and the Trustee

5    supplemented their Rule 26 disclosure last September.  So

6    the original Rule 26 disclosure didn't say anything about

7    this -- last June -- anything about note holders at all.

8         Last September, they disclosed that as among the group

9    of the individuals and entities that may have discoverable

10   information about this dispute, represent -- and this is

11   their words -- representatives of holders, current or

12   former, of the ten percent senior secured notes due 2020

13   issued by EFIH.  So no disclosure of any individual at all,

14   and we've taken a look back at their recession notice they

15   filed last June which has attachments to it that at least as

16   of that time discloses some information about the holders of

17   the notes.

18              And at that time, it disclosed 59 separate funds

19   spread across 23 different entities.  And no disclosure of

20   who the fund managers are, who's responsible for this

21   investment and maintaining it, acquiring it, whether to sell

22   it.  So we're talking about a disclosure here that built

23   into it is potentially hundreds of individuals.  So, no, we

24   didn't know, and it wasn't disclosed to us, that John Green

25   and Ethan Auerbach (phonetic) were going to be called to

1    testify at anytime in these proceedings until Wednesday

2    night.

3            So we know what -- from the pretrial memorandum --

4    what the Trustee has told us, is they would testify to the

5    significance of the make-whole and the right to rescind

6    acceleration.  Secondly, harm that the note holders will

7    suffer if they can't collect the make-whole here.  And then

8    reliance on the separate credit of EFIH.  So all we need,

9    because this is utterly new and we have no opportunity to

10   depose these people, is a very short deposition to know what

11   they're going to say and what the basis for it is before we

12   proceed.  So that's our request.

13           MR. ANKER:  Your Honor, for the record, Philip

14   Anker again.  Your Honor, Mr. McGaan, who I've grown to

15   respect a great deal in this matter tells you about two

16   percent of the story here.  Mr. Green is employed by

17   Halcyon.  It has been a member of the steering committee of

18   EFIH first lien holders and signed the rescission notice

19   from the veritable get-go.  Mr. Auerbach is at Blue

20   Mountain, which which has been a member of the steering

21   committee identity, disclosed in the 20-19from the get-go.

22           We provided that Rule 26 disclosure, and the

23   Debtors never followed up.  At the telephone conference on

24   April 8, I specifically said that we were going to call note

25   holders.  And the answer was why we -- I mean, we didn't

1    know specifically who.  But they never followed up and said,

2    "Can you tell us who?  Can we get by date X so we can take a

3    deposition?"

4              In the letter -- and indeed at that hearing -- you

5    may recall I kept saying on the telephone, "I'd like to push

6    off this hearing.  I have more discovery."  And Mr. McGaan

7    said, "Mr. Anker never said until now that he didn't have

8    adequate information to contest the issue.  It was

9    sufficient when he argued as a matter of law."  I never said

10   I don't have sufficient discovery.  My hands are tied.

11   Well, what's good for the goose, is good for the gander, and

12   Mr. McGaan never, when I came before the Court and orally

13   said we would, in fact -- I then put it in a letter --

14              THE COURT:  That's -- I'm not buying that

15   argument.  If you want to use these witnesses, you need to

16   make them available for a deposition.  You can do it this

17   afternoon.  You can do it this evening.  But prior to having

18   them on the witness stand, they need to be made available

19   for deposition.

20              MR. ANKER:  We --

21              THE COURT:  We often -- we often operate by the

22   seat of our pants in bankruptcy court without prior

23   depositions, but there's more than adequate time to prepare

24   witnesses in this incidence and identify them ahead of time.

25   So if you want to use them, they have to be made available.

1          MR. ANKER:  Yeah.  Your Honor, the order in which

2    we were intending to present the witnesses was Mr. Kearns

3    first then probably Mr. Green, then Mr. McCardie, and Mr.

4    Auerbach.  I think what I would propose, particularly given

5    that Your Honor has three days, but not more than three

6    days, is that we do those depositions this evening so that

7    we can go through the day, and we will just change somewhat

8    the order.

9          I should say that we envision having seven total

10   witnesses.  Mr. Kearns, Mr. McCardie, and Mr. Cassiopo, our

11   three experts, Mr. Auerbach and Mr. Green, the two fact

12   witnesses, and then we will, I think, call as in our case in

13   chief, but as hostile witness, Mr. Horton from the company,

14   from EFIH, the controller, and Mr. Moldavan (phonetic), who

15   works with Mr. Horton.  Both of them were deposed and both

16   were identified as Rule 26 witnesses.

17         I would suggest we will just work out of order

18   today and so that we get through the day.  Rather than have

19   depositions this afternoon, I would propose that we have the

20   depositions this evening.

21         THE COURT:  All right.  Is that acceptable?

22         MR. MCGAAN:  Yes, it is, Your Honor.

23         THE COURT:  Okay.  And who do the Debtors intend

24   to call?

25         MR. MCGAAN:  We have notified the Trustee that we

1   would, of course, examine Mr. Horton and Mr. Moldavan at the

2   time they call them it's in -- as part of our case.  And

3   that we may call Mr. Teglevich (phonetic) and that's it.

4              THE COURT:  Okay.

5              MR. ANKER:  Your Honor, one procedural matter in

6   that regard.  It certainly would be acceptable to us were --

7   and we will call Mr. Horton by way of example as a hostile

8   witness -- I'd be perfectly fine with us, to move things

9   along, to have EFIH's cross of Mr. Horton in our case in

10  chief combined with their direct of Mr. Horton if they are

11  going to put him on in their case.  And we would then just

12  do a redirect/cross.  It's simply a way of moving

13  efficiently, rather than have the witness on the stand

14  twice.  And we'd be happy to do that with Mr. Moldavan, as

15  well.

16             MR. MCGAAN:  Yeah, that's what I intended that we

17  didn't have to go through the choreography of bringing him

18  back.

19             THE COURT:  Okay.  That's fine.

20             MR. ANKER:  And, Your Honor, we are the Plaintiff.

21  Obviously, Your Honor knows the law that the burden of proof

22  is ultimately on them, but I would propose, unless the Court

23  wants to proceed differently, that we begin with our case

24  before --

25             THE COURT:  I think that makes sense.

1           MR. ANKER:  -- the Debtor's.

2           MR. MCGAAN:  I do, too, Your Honor.  The law also

3    requires that he make a prima facie case, so I have no

4    objection to that.

5           THE COURT:  Okay.  Very good.

6           MR. ANKER:  With that, is -- Mr. McGaan if we're

7    done with preliminary matters, I can put on my first

8    witness.  I'm assuming, Your Honor, with the level of briefs

9    you have, the last thing you want is oral argument and a

10   introduction.  I, obviously, would love to have an

11   opportunity to close.

12          THE COURT:  Of course.

13          MR. ANKER:  Our first witness is Mr. Kearns.

14          THE COURT:  Okay.  Let's -- we're going to call

15   Mr. Kearns and we're going to take a very short recess --

16   we'll call Mr. Kearns and proceed -- to give everyone an

17   opportunity to get reorganized, including myself.  And then

18   we'll proceed.  All right?  So a very short recess.

19          MR. ANKER:  Thank you, Your Honor.

20       (Recess)

21       (Reconvened.)

22          THE CLERK:  All rise.

23          THE COURT:  Please be seated.  You had -- take the

24   stand, sir, and remain standing for your affirmation.

25          THE CLERK:  Please raise your right hand.

1        (Witness Sworn)

2             THE CLERK:  Please state and spell your name for

3    the record.

4             THE WITNESS:  Christopher John Kearns.

5    K-E-A-R-N-S.

6             THE CLERK:  Thank you.

7             THE WITNESS:  Thank you.

8             MR. ANKER:  Your Honor, before I begin examining

9    Mr. Kearns, just two preliminary matters.  One is we have a

10   notebook that includes a couple of demonstratives he will be

11   referring to, as well as his expert report.  I'd be happy to

12   -- I'd like to hand a copy up to Your Honor, as well as give

13   Mr. McGaan a copy.

14            THE COURT:  Okay.

15            MR. ANKER:  May I do so?

16            THE COURT:  Yes.  If you could have a copy --

17   actually, if you two extras or.

18            MR. ANKER:  May I approach, Your Honor?

19            THE COURT:  Yes.

20            MR. ANKER:  Your Honor, the second housekeeping

21   matter that I hope I am accurate in my representation.  I

22   don't want to make it while Mr. McGaan doesn't have an

23   opportunity to listen to me.  During the break, we spoke,

24   and I think Mr. McGaan agreed that he is not going to

25   challenge the qualifications of any of our three experts

1    and, therefore, I'm not going to -- I propose to move things

2    along, not to go through the formal tendering of them as an

3    expert and open with voir dire.

4              MR. MCGAAN:  That's right, Your Honor.  We would

5    have challenged qualifications in our motion, and we

6    intended to do it, and we do not.  Nor does he need under

7    formal procedure to tender them anyways, but he's right.

8    We're not -- he doesn't need to spend time on that.

9              THE COURT:  Okay.  Great.

10             MR. ANKER:  Thank you, Your Honor.

11             THE COURT:  Thank you.

12   DIRECT EXAMINATION

13   BY MR. ANKER:

14   Q    Good morning, Mr. Kearns.

15   A    Good morning.  Good morning, Your Honor.

16             THE COURT:  Good morning.

17   BY MR. ANKER:

18   Q    By whom are you employed?

19   A    I am an executive director and managing member of the

20   firm for Capstone Advisory Group, LLC.

21   Q    I'm going to use the shorthand, Capstone.  Would that

22   -- you'll refer understand I'm referring to Capstone

23   Advisory Group, LLC?

24   A    Sure.

25   Q    Okay.  What is Capstone?

1    A     Capstone is a boutique financial services firm which

2    provides services, really, in three platforms.  One is for

3    structuring a bankruptcy, which is our core competency.

4    Two, are litigation support and expert testimony in an array

5    of commercial matters.  And three is valuation services.

6    Q     Has Capstone served as a financial advisor to any

7    constituency in these Chapter 11 cases?

8    A     Oh, yes.

9    Q     And who is that constituency?

10   A     We service as financial advisor to the indentured

11   trustee, to counsel for the indentured trustee, and to

12   certain note holders for the EFIH first lien notes.

13   Q     So the indentured trustee who is the plaintiff in the

14   matter that is before the Court today with respect to the

15   lift stay motion?

16   A     Yes.

17   Q     Okay.  Have you ever served as an expert witness

18   before?

19   A     I have, yes.

20   Q     Are you being compensated for being here today?

21   A     I am, yes.

22   Q     And what --

23   A     At least, I hope so.

24   Q     -- what are -- at what rate are you being compensated?

25   A     My standard hourly rate of $895 an hour.

1    Q    Is your compensation at all contingent upon the outcome

2    of this lift stay trial?

3    A    It is not.

4    Q    Okay.  Can you briefly provide the Court with your

5    educational background?

6    A    Sure.  It's a long time ago.  I graduated with a

7    Bachelor in Business Administration in Accounting with

8    Honors from Iona College in 1978.  I am a certified public

9    accountant in the State of New York.  I also certifications

10   as a certified turnaround professional, a certified

11   insolvency reorganization advisor, and as a certified fraud

12   examiner.

13   Q    Are you familiar with an organization called the AICPA?

14   A    I am, yes.

15   Q    Are you an -- can you describe what that is, and if I

16   can ask a compound question, are you a member?

17   A    It is the American Institute of Certified Public

18   Accountants, and yes, I am a member for quite a while.

19   Q    How long have you been with Capstone?

20   A    I co-founded Capstone.  The firm has been around for a

21   little over 11 years.

22   Q    So that brings me back to 2004?

23   A    It does.

24   Q    Okay.  Can you briefly describe your responsibilities

25   at Capstone?

1    A    Sure.  I co-manage the firm, so part of my

2    responsibilities involve running the firm, but my primary

3    responsibility is really your client-related.  Your Honor, I

4    do work in each of the three platforms that I mentioned.

5    That being bankruptcy restructuring, litigation support and

6    expert testimony, and valuation.  In the restructuring

7    context, as is outlined in my CV, I have been involved as an

8    advisor, a chief restructuring officer, a trustee in a lot

9    of matters over the course of my career.

10   Q    Very briefly, can you set forth your employment history

11   prior to joining to Capstone but after graduating from

12   college?

13   A    Well, working backwards, I've been with Capstone since

14   its founding in 2004.  From 2004 working backwards to about

15   1990, I was the senior managing director and leader of the

16   New York office for FTI and was part of the firm which FTI

17   acquired, which initially started its restructuring

18   practice.  So that gets me back to roughly 1990.

19          For the three years prior, I was employed by

20   Bristol-Myers Squibb.  My last position at Bristol-Myers

21   Squibb was as a corporate officer, I was assistant

22   controller of the company.

23          My first ten years of my career I spent in the

24   audit practice and in the merger and acquisition practice

25   for Arthur Anderson from 1978 to 1988.

1    Q    Mr. Kearns, you mentioned that one of the core

2    competencies is the bankruptcy and restructuring area. In

3    what roles have you been involved in?  And let's focus on

4    Chapter 11 cases.

5    A    Chapter 11 cases, I've been the adviser to the debtor

6    in cases like Starter, Schwinn GT.  I have been the adviser

7    to the official committee of unsecured creditors in Nortel,

8    in Mirant Energy, in MF Global.  Adviser to lenders or ad

9    hoc groups of lenders in matters in addition to this matter,

10   including Kodak, NRG and Dynegy, Spirit Telecom.  There are

11   a whole host of other matters over the course of my career,

12   but I think in terms of name recognition, those are probably

13   the larger ones.

14   Q    Have you advised constituencies or otherwise been

15   involved in cases that have presented issues of either make-

16   wholes or no calls?

17   A    Yes, I have.

18   Q    Can you describe briefly for the Court that experience?

19   A    Certainly.  I was the principal adviser to the senior

20   lenders in the Chemtura matter, so my guys were the guys

21   actually structurally senior to the noteholders who had

22   make-whole at issue in that case.  But more specifically, I

23   have testified in connection with make-whole and no call

24   matters, this would be my fifth time, Your Honor.  The four

25   prior times were in School Specialty, in the Premiere Biloxi

1    matter, in Momentive and in Calgene, which is a subsidiary

2    of Calpine.

3    Q    Mr. -- in each of those matters, were you qualified to

4    testify as an expert?

5    A    I was, yes.

6    Q    In any of those matters was your testimony excluded?

7    A    No.

8    Q    Has your testimony been excluded in any matter that you

9    can recall?

10   A    No.

11   Q    Mr. Kearns, are you familiar with the term high-yield

12   debt?

13   A    Sure.

14   Q    Can you describe briefly to the Court what you

15   understand that term to mean?

16   A    A high-yield debt essentially comprises indebtedness

17   where the borrower is rated less than an investment grade,

18   which under the S&P scale is triple B.  So double B and

19   below.

20   Q    You said rated, rated by whom less than investment

21   grade?

22   A    By credit rating.  The scale I gave was a Standard &

23   Poor's scale.

24   Q    Does Moody's also rate it?

25   A    It does.  It uses a different euphemism in terms of its

1    scale, but it is analogous to the S&P scale.

2    Q    Prepetition, the EFIH first lien notes that were

3    outstanding, were they high-yield or investment grade or

4    something else?

5    A    They were high yield.

6    Q    There's also I think in the evidence of this -- the

7    record of this bankruptcy case evidence that there was

8    second lien EFIH notes, as well as unsecured or payment in

9    kind or PIK notes.  Were those investment grade high-yield

10   or something else?

11   A    All high-yield.

12   Q    I think there's also evidence in the general record of

13   these bankruptcy cases that the sister -- a sister company,

14   TCEH, also issued bonds.  Were those high-yield investment

15   grade or something else?

16   A    I believe Your Honor wants us to move along, maybe we

17   can make this simple.  To my knowledge, all of the

18   indebtedness in the entirety of the EFH corporate family was

19   high-yield.

20   Q    Are you familiar with the phrase call protection?

21   A    Yes.

22   Q    Can you describe for the Court your understanding of

23   the term call protection as it relates to in particular

24   high-yield debt?

25   A    Sure.  Call protection in the context of high-yield is

1    a relatively standard term.  If you think of it as the bond

2    entitles the investor to a stream of payments in the form of

3    interest payments, because specifically in the fixed-income

4    world the principal is paid at the end of the tenure of

5    maturity.  So the call protection gives the noteholder

6    protection that that stream of payments as part of the bond

7    will exist at least until the earliest point at which the

8    borrower can call the bond.  And typically, today at least,

9    call protection is expressed in terms of initial call date

10   and calls thereafter, as is the case in these bonds.

11            In bygones, there certainly were more of a

12   propensity for bonds to not be callable at all, as was the

13   case for example in Calpine, but since then and as is laid

14   out in my report, Your Honor, in terms of the study that

15   we've looked at, there's certainly more of a -- in the

16   marketplace there has been more of a propensity toward what

17   we call make-whole calls, meaning a make-whole up to an

18   initial call date and then a call.  So the call protection

19   is -- well, I'm sorry, I think I answered your question.

20   Q    You have.  I think you said that historically in bygone

21   days there were often prohibitions against a call, is there

22   a term of art that is used for such a provision?

23   A    That would be a no-call provision.

24   Q    And then you said that, if I heard you right, the more

25   common form of call protection today is not an absolute no

1   call, but rather a provision that provides for a make-whole;

2   did I understand you correctly?

3   A    Well, Bloomberg calls it make-whole call, which would

4   be an initial call date and prior to that initial call date

5   a mechanism to provide the noteholders with an ability to be

6   made whole in the event that there is an early redemption of

7   the note even preceding the first call date.

8   Q    Are make-whole provisions today -- well, let's back up.

9   You're aware that the EFIH first lien notes at issue were

10  issued between 2010 and 2013?

11  A    As a result of the two exchanges, yes.

12  Q    During that time period, were make-whole provisions

13  common in the high-yield debt market?

14  A    Yes.  In my report I think I refer to them as standard

15  and customary, but that's right.

16  Q    Did you do a study of how common and frequent those

17  provisions were?

18  A    We did, yes.

19  Q    And can you briefly describe for the Court the result

20  of that study?

21  A    Certainly.  And the study is outlined, Your Honor, in

22  my report starting at paragraph 39.  We looked -- we used

23  Bloomberg, which is an accepted data source in the fixed-

24  income world, and we ran a search, we ran screens and looked

25  for all issuances by U.S. corporate issuers from January

1      1st, 2007, which approximates the date of the original LBO

2      here, through the date we used was December 10th, 2014.

3      There's no magic to that date other than it was a cutoff

4      just prior to the release of my report, which was back in

5      January.

6              And we identified then per the Bloomberg study

7      U.S. corporate issuers that issued secured notes, first

8      lien, one and a half, second, and third lien notes.  And

9      that study found 1,641 issuances that fit that screening

10     criteria.

11              We then analyzed that screening criteria to

12     determine whether for each of the individual issuances per

13     Bloomberg there was an initial call date, whether there were

14     make-wholes, the way in which the make-wholes were

15     determined in terms of reinvestment rates, and then as a

16     spot check to ensure that the Bloomberg -- what Bloomberg

17     was telling us made sense.  We randomly selected roughly 50

18     indentures and matched up the economic terms that we were

19     searching for to get comfortable that the Bloomberg study

20     was correct.  So we were literally looking to see if make-

21     wholes and calls existed, and then got more specific and

22     looked to see whether the toggles -- and I'm sure we'll talk

23     more about that -- in determining the make-whole were

24     standard and customary, were market, and those toggles as

25     against what is in these indentures.

1   Q    And what conclusion did you reach?  Let's focus now not

2   on the toggles, but on whether or not the make-whole -- an

3   existence of the make-whole was standard and customary in

4   high-yield debt.

5   A    My overall conclusion was that, yes, the existence of

6   make-whole call protection is standard and customary in

7   high-yield debt.  And, Your Honor, if you look at paragraphs

8   40 and 41 of my report, 41 slices it further and it looks at

9   first lien notes at $500 million or more at issue, the six

10  and seven eighths in this case were at 500 million, and as

11  we all know the tens were at I think at issue 1.3 billion

12  and 2.2 billion.

13            And what you see on the chart, Your Honor, in

14  paragraph 41 is that 93 percent of issuances that are first

15  lien that were issued by U.S. corporate issuers per

16  Bloomberg between 2007 and 2014, 93 percent of them had

17  make-whole and call protection, and then of those 97 percent

18  of them had reinvestment rates, which is a critical toggle

19  in calculating the make-whole, at the Treasury-plus-50

20  spread or less.  Our notes have a spread of T-50.  To the

21  extent that, all else being equal, the spread to Treasury is

22  below T-50, as I said, all else being equal, the calculated

23  amount of the make-whole per the contract would actually be

24  higher.

25  Q    Mr. Kearns, let's step back a second.  When an issuer

1   repays a note prior to maturity, doesn't it have to repay

2   the principal?

3   A     Sure.

4   Q     Doesn't it have to repay all accrued interest up to

5   that point in time?

6   A     Yes.

7   Q     So don't the noteholders get back the full amount of

8   their money?

9   A     The noteholders do not get the benefit of the bargain

10   because, in the event that that payment particularly is

11   rendered early, the noteholders have what's called repayment

12   lists.  As we discussed earlier, the noteholder has a right

13   through the note to a stream of interest payments at a fixed

14   rate.  An early payment then puts the noteholder at risk to

15   find a comparable issue or like paper that would have

16   similar credit characteristics and returns.  And hence the

17   risk particularly in a circumstance as we have now where we

18   have an overall market environment with low prevailing

19   interest rates.

20   Q     Mr. Kearns, I think this may be implicit in your last

21   answer, but let's have a clear record.  Is it typical with

22   high-yield debt to have a fixed rate of interest or a

23   floating rate of interest, as many of us have in our

24   mortgages?

25   A     Well, certainly there are floaters in the high-yield

1    world, but I think it's more typical and certainly was in

2    this case typical that the rate of interest is fixed.

3    Q     The rate of interest -- now, let me be clear here.

4    There are EFIH first lien notes that were issued at ten

5    percent per annum and there were separate EFIH first lien

6    notes issued with an interest rate of six and seven eighths,

7    right?

8    A     Correct.

9    Q     Were those both, both sets, fixed the interest rate for

10   the entire term?

11   A     They were.  And within the tens there are really two

12   CUSIPs, and I'm sure we'll talk more about that as well,

13   because one of the CUSIPs arguably now has a rate that's

14   higher than ten.

15   Q     Okay.  One of the CUSIPs reflects an issuance of notes

16   in what year?  What is the first year?

17   A     2010.

18   Q     Okay.  What was the --

19   A     Those would be the AA5s.

20   Q     And what was the year of the exchange giving rise to

21   the other ten percent note?

22   A     2013.

23   Q     What was the stated maturity date of both of notes?

24   A     2020.

25   Q     Okay.  So let's focus on the first one, the ones issued

1    in 2010 to 2020, they bore an annual rate of interest of ten

2    percent per annum over that whole life?

3    A    Yes.

4    Q    Okay.  If interest rates go up -- let's imagine we're

5    not in the world we're in today, but no one could have

6    predicted it back in 2010, and we're in an inflationary

7    period and the market rate of interest today is 15 percent -

8    - not ten percent, 15 percent -- would the noteholders have

9    had the right under the terms of this indenture to put -- to

10   say to the company, I want to get my money back so I can

11   invest at 15 percent?

12   A    No.

13            UNIDENTIFIED SPEAKER:  Object to the extent it

14   calls for a legal conclusion.

15            THE COURT:  It doesn't call for a legal

16   conclusion.  Overruled.

17   BY MR. ANKER:

18   Q    Now, there are some put provisions, as you understand

19   it -- and I'm not asking your legal opinion, Mr. Kearns --

20   where there's a change in control, for example, but other

21   than in the instance of a change in control or an asset

22   sale, as you understand it, are there any circumstances in

23   which the noteholders can get out of the deal, whether

24   interest rates increase or for any other reason?

25   A    Well, we can quibble on whether that's a put versus a

1    mandatory payment, but from a commercial perspective the

2    noteholders contracted to lend money for a ten-percent

3    return -- a ten-percent coupon, rather, and really don't

4    have the right to put.  They bear the risk.  In the event

5    that -- they have the interest rate risk -- in the event

6    that, as you posit, general market conditions are such that

7    rates rise, the value of that note in the secondary market

8    would be worth less than par.

9    Q    Okay.  You anticipated I think my next question, but

10   let me ask it so again we have a clear record.  In your

11   experience, you've been doing this for 30-plus years, do

12   interest rates sometimes go up, do they sometimes go down?

13   A    Yes.  I'm not sticking my neck out there, I don't

14   think, Judge.

15        (Laughter)

16   Q    When interest rates go up, all other things being

17   equal, is there a predictive consequence for the trading

18   price of the notes that are held at the lower interest rate?

19   A    In the secondary market, those notes would trade below

20   par, meaning the implied yield would change.

21   Q    And below par means that below 100 cents on the dollar?

22   A    Correct.

23   Q    So at least on a mark-to-mark basis, the holder of that

24   note in that circumstance will have suffered a -- will have

25   earned a gain or suffered a loss?

1    A    In terms of a mark, the noteholder would have suffered

2    a loss, all else being equal, because the interest rate risk

3    embedded in the note went the wrong way for the noteholder.

4    Q    Okay.  I've been asking you a series of questions

5    assuming the interest rates move up.  Let's posit a

6    different hypothetical, interest rates go in the opposite

7    direction, they go down.  How does a make-whole protect an

8    investor in that situation?

9    A    In the event, as we have in this marketplace, that

10   prevailing interest rates decline, as we discussed earlier

11   in the context of call protection and make-whole, a make-

12   whole call provision protects the noteholder from the risk

13   of being redeemed early and protects for that repayment

14   risk.  Because as I said a bit ago, an early repayment at a

15   coupon like ten is such that from a credit perspective there

16   may not be alternatives of like paper in the marketplace for

17   the noteholders to redeploy capital.

18   Q    You mentioned earlier that in the bygone days there

19   were things called no-calls, absolute prohibitions, and now

20   what's common is a make-whole.  In your experience in the

21   high-yield market, how common is a provision that simply

22   says the issuer at any time can call without having to pay a

23   make-whole the notes simply because interest rates decline

24   or its crediting grows?

25   A    As is laid out in my study, Your Honor, if 93 percent

1    of first lien notes in excess of $500 million that have been

2    issued in the last seven years include make-whole call

3    protection that certainly would imply that the inverse is

4    the case and maybe seven percent of those notes are

5    callable.  So the answer to your question is, it certainly

6    is foreseeable or possible that in the marketplace there are

7    callable notes, but it's very uncommon.

8    Q    And did your study -- was your study limited to high-

9    yield debt?

10   A    No.  My study was for secured debt per Bloomberg,

11   meaning that it would include investment grade and high-

12   yield debt.

13   Q    With respect to high-yield debt in particular, which is

14   what we're talking about here, would you expect based on

15   your experience that the incidence of freely callable notes

16   without any requirement of payment of a make-whole would be

17   greater or less than the seven percent for the aggregate of

18   high-yield and investment grade notes?

19   A    Well, given what we've discussed, which is that the

20   note is an entitlement to a fixed stream of payments, and

21   that among other risks, credit risks and interest rate

22   risks, the noteholder would have repayment risks, you know,

23   the make-whole obviously is critical to protect the

24   noteholder from that repayment risk.  So all that said,

25   because by definition high-yield debt would be priced above

1     investment grade debt I would expect, back to your question,

2     that substantially all of secured high-yield indebtedness

3     would have some form of make-whole call protection.

4     Q    Mr. Kearns, you used the term, you used it several

5     times, repayment risk.  Have you ever heard the term

6     reinvestment risk?

7     A    Yes.

8     Q    Are you -- do you use the terms interchangeably?

9     A    Apparently, yes.  I'm looking at my report, Your Honor,

10    and I apologize if I have been calling it repayment risk.  I

11    do characterize it in a number of places as reinvestment

12    risk.

13    Q    Okay.  Let's focus on the debtor here, EFIH.  You've

14    already testified it issued secured first lien notes that

15    first were issued in 2010 as part of an exchange?

16    A    Yes.

17    Q    And when did the prior notes then issue, the notes --

18    when I say the prior notes, let's create a clear record, the

19    notes that were exchanged for the new EFIH first lien ten-

20    percent notes?

21    A    I believe they arose as part of the original LBO

22    transaction in 2007.

23    Q    And did those notes include a make-whole provision?

24    A    They did.

25    Q    Mr. Kearns, I should have asked you this earlier.  Have

1    you looked at the indentures for all of the high-yield notes

2    issued by EFIH, EFH, TCEH, or any other debtors, any of the

3    other debtors in these jointly administered cases?

4    A    Yes.

5    Q    What percentage of those indentures, starting with the

6    leveraged buyout in 2007, included a make-whole provision?

7    A    We can make this simple in the interest of time, all of

8    them.  And, Your Honor, there is an exhibit, Exhibit C in my

9    report, which looks at the current corporate family of

10   indentures and it is fair to say that they all contain make-

11   whole call protection.  And in addition, with the exception

12   of Oncor with a discount rate, the reinvestment rate is

13   lower in each case, as you see in Exhibit C to my report,

14   the reinvestment rate is calculated at a spread of 50 basis

15   points to Treasury.

16   Q    Mr. Kearns, there also -- well, let's back up.  What

17   was the face about approximately of the note -- the ten-

18   percent notes that were the subject of the exchange in 2010?

19   A    Two point two billion, I believe.

20   Q    What was the face amount approximately of the ten-

21   percent notes that were the subject of the exchange in 2013?

22   A    Approximately 1.3 billion.

23   Q    So if I'm doing my math in my head, you're the

24   accountant, I think that gets us to 3.5 billion?

25   A    It does.

1    Q    Okay.  And then there's also six and seventh eighths

2    notes, what years were they issued?

3    A    The six and seventh eighths were issued, from the best

4    of my recollection, I'll say 2012 in a placement.

5    Q    And what was the approximate face amount of those

6    notes?

7    A    500 million.

8    Q    So together you get to about 4 billion in face amount

9    of notes, just under?

10   A    Yes, 3 billion 985, I think the number is.

11   Q    Did any of these notes, the ten percent or the six and

12   seven eighths, provide for any amortization, any payment of

13   principal at any point in time until stated maturity or the

14   call?

15   A    Well, I think it's just typical with a high-yield fixed

16   income security, the answer there is no.  The principal is

17   paid at the end, at maturity.

18   Q    Now, you're aware that at the outset of this Chapter 11

19   case EFIH sought to and obtained permission to refinance its

20   first lien EFIH debt?

21   A    Yes.

22   Q    Okay.  When did, just so we have a clear record, EFIH

23   file for bankruptcy, as you recollect?

24   A    Late April, 2014, I think the 29th.

25   Q    Okay.  When -- and what date were the notes repaid?

1    I'm going to try to avoid using the word redeemed, so I

2    don't get an objection from the other side, but if I use

3    that term, my apologies in advance.  What date were they

4    repaid by the debtor?

5    A    And I'll try and do the same.  The notes were repaid on

6    June 19th, 2014.

7    Q    When they were repaid on June 19th, 2014, what did the

8    noteholders obtain?

9    A    The noteholders were repaid their principal, the AA5s

10   were repaid all of their accrued interest, and the AK CUSIP

11   was repaid all of its accrued interest at ten percent.

12   There's a small amount related to the registration rights

13   that were not paid.  The six and seven eighths noteholders

14   were paid their principal, their accrued interest, and I

15   believe also were repaid their registration right default

16   interest.

17   Q    Okay.

18           THE COURT:  When you say accrued interest, accrued

19   interest as of the repayment date?

20           THE WITNESS:  Yes, Your Honor.

21   BY MR. ANKER:

22   Q    Mr. Kearns, there was a settlement proposal made by the

23   debtor to settle the outstanding potential claim for a make-

24   whole, right?

25   A    You're talking about the exchange offer?

1    Q    Yes.

2    A    Yes.

3    Q    And what was that settlement proposal?

4    A    The exchange offer for the six and seven eighths notes

5    settled the make-whole at roughly 62 percent of the make-

6    whole.  For the tens, the offer was for 25 percent of the

7    make-whole, and in each case as part of the exchange invited

8    those holders to participate in the first lien BPs.

9    Q    Okay.  Did a majority of the six and seven eighths

10   holders accept that settlement at 62 percent, I think?

11   A    I think it's 62 and a half, 62.  The answer to your

12   question is substantially all of them tendered, yes.

13   Q    So that's the 500 million --

14   A    Almost all --

15   Q    -- the six and seven --

16   A    -- of it, yes.

17   Q    -- eighths?

18   A    Yes.

19   Q    As to the ten-percent notes, the three and a half

20   billion, approximately what percentage of those holders

21   accepted the settlement proposal?

22   A    Roughly one third.

23   Q    So two thirds, as you understand it, did not?

24   A    Of the -- let make sure I have this right, so I can

25   get it precisely for the record.  2,298,000,000 in aggregate

1    principal did not participate.

2    Q    And that 2,298,000,000, as you understand it, consists

3    almost entirely of holders of the ten-percent notes as

4    distinguished from the six-and-seven-eighths notes?

5    A    Yes, it's the tens.

6    Q    Now, you mentioned -- I keep using the term ten percent

7    and you say it's really a little bit higher because of a reg

8    right, if I heard you right, issue.  Can you briefly explain

9    that issue to the Court?

10   A    Sure.  As I mentioned, Your Honor, within the tens

11   there are two CUSIPs.  There are the AA5s, which were part

12   of the 2010 exchange, and the AK3s, which were part of the

13   2013 exchange.  The AK3s included a provision which provided

14   for an increase in the stated rate of interest by I believe

15   50 basis points in the event that the borrower did not

16   register those notes by a date certain, which was I believe

17   in January of 2014.  That registration did not occur.  So as

18   I understand it from counsel, by contract the reg right

19   default kicked in such that by, let's call it February of

20   2014, the AK5s would have had a coupon rate of the ten

21   percent plus 50 BPs for the reg right, so ten and a half.

22   Q    Mr. Kearns, I'm going to take you up through now,

23   because I just want to make sure I have created a clear

24   record up until now.  Did the ten-percent notes include a

25   make-whole provision?

1    A    Yes.

2    Q    Did they -- this may be a different way of asking the

3    same question and let's just focus on outside of bankruptcy.

4    Outside of bankruptcy, did the ten-percent notes permit EFIH

5    to call the notes prior to the first call date without

6    paying a make-whole?

7    A    Without paying a make-whole?  No.

8    Q    What was the first call date on those notes?

9    A    December 1st of 2015.

10   Q    December 1st of 2015.

11   A    Right.

12   Q    And if the notes were called on December 1, 2015, did

13   the indenture specify what amount the issuer would have to

14   pay if it called the notes that day rather than held them to

15   their stated maturity in 2020?

16   A    They did, yes.  The first call was at 5 percent

17   principal and as is typical in an indenture beyond the first

18   call date, the call percentages step down over time, such

19   that by 2018 the notes would be callable at par.

20   Q    Okay.  Now, I asked you earlier about the benefits or

21   protections of -- to a noteholder from having a make-whole

22   provision.  Do make-whole provisions benefit borrowers as

23   well?

24   A    Yes, they do.

25   Q    How?  Why?

1    A    As we talked about a little earlier, Your Honor,

2    obviously the note provides the bondholders with a stream of

3    payments called interest.

4              To the extent that the notes -- let's say

5    theoretically all else being equal -- are callable at any

6    time, one would expect from an economic perspective, the

7    noteholders to require a much higher rate of interest than

8    that which is reflected in an indenture where the

9    noteholders have make-whole call protection.

10             Which means -- in an answer to your question, Mr.

11   Anker, that from the perspective of the borrower, the cost

12   of the debt, the interest cost would be less, all else being

13   equal, in an indenture that includes make-whole call

14   protection than a note which would be fully callable at any

15   time.

16   Q    What about your -- Mr. Kearns, if I understood your

17   answer, you were distinguishing and describing the benefits

18   to the borrower of having a make-whole provision as opposed

19   to a totally freely callable note.  Are the benefits to the

20   borrower of having the make-whole provision as opposed to a

21   different form of call protection an absolute no call?

22   A    Sure.  As is implied by your question, a no call is

23   just that.  The notes can't be callable for the life of the

24   notes whereas notes which include call provisions or make-

25   whole call provisions do provide the borrower with the

1    flexibility to call the notes based on the contract,

2    depending on the economic circumstances, prevailing market

3    rates, interest rates, rather and/or change in the credit

4    quality of the borrower.

5    Q    Let's now do a little bit on the numbers if we could.

6    I think you testified -- let me not put words in your mouth.

7    What was the principal balance of the 10 percent notes that

8    did not accept the settlement?

9    A    In the aggregate $2,298,000,000.

10   Q    $2,298,000,000?

11   A    Correct.

12   Q    Was that $2,298,000,000 repaid through the noteholders

13   on or about June 19, 2014?

14   A    It was.

15   Q    Okay.  Putting aside disputed interest relating to the

16   Ridge (phonetic) rights issue, I think Judge Sontchi asked

17   you this question.  Was interest that had accrued from the

18   prior payment date -- the last payment date prior to

19   bankruptcy of interest -- through June 19, 2014 repaid to

20   those holders?

21   A    Yes, it was.

22   Q    Was any make-whole amount repaid to those holders?

23   A    To the non-participating holders, no.

24   Q    Okay.  Now, have you calculated the amount of the make-

25   whole that if the Court were to grant relief from the stay

1   and determine that the noteholders may rescind, they would

2   be due per the terms of the indenture?

3   A    I have, yes.

4   Q    And let's, again, let's do apples to apples.  Let's

5   ignore the settling noteholders.  Let's just focus on the

6   $2,298,000,000 in non-settling noteholders, how much is

7   that?

8   A    That in total is -- Your Honor, I'm looking at Exhibit

9   D to my report, $440.8 million, $441 million rounded.

10          MR. ANKER:  And, Your Honor, I think -- can we put

11  Exhibit B up on the screen if we could?

12          Your Honor, if it's helpful we have it up on the

13  screen for a moment.

14  BY MR. ANKER:

15  Q    You'll -- under -- at the bottom of the page in yellow,

16  there is the number 430.79 next to the words "applicable

17  premium."

18  A    Yes.

19  Q    Is that $430,790,000?

20  A    Yes.  This is --

21  Q    And you've rounded that to 431 million?

22  A    Correct.  The schedule is in millions, right.

23  Q    And you used the word applicable premium next to it.

24  Why do you use that term?

25  A    I followed the language in the indenture in section

1    307(a) and the related definitions to the indenture and

2    that's the way it is -- the make-whole is posited in the

3    indenture.

4    Q    Does the indenture specify how one calculates the make-

5    whole?

6    A    It does, yes.

7    Q    Can you describe briefly for the Court how that

8    calculation works under the indenture?

9    A    Sure.  The indenture requires that the make-whole be

10   calculated by basically determining the sum of the present

11   values of the lost coupon and call premium payments.  And

12   the present value is determined at a discount rate, which is

13   specified in the indenture and that discount rate is

14   treasuries plus 50 basis points.  And the indenture goes on

15   to discuss the way in which the amount for treasuries is

16   determined.

17   Q    And how does it specify the amount of the treasury rate

18   is to be determined?

19   A    Well, I believe it -- in terms of the use of the

20   treasury rate looks to the stated market -- then existing

21   market rate in whole years.  So since the note -- well, that

22   wasn't entirely clear, so let me try and clean that up.

23        From the date of redemption, June 19th, 2014 to

24   the first call date, it was a little less than a year and a

25   half, seventeen and a half months.  So consequently the one

1   year treasury is closer in that timeframe than the two year

2   treasury.

3          So per the indenture I then used the treasury rate

4   that existed per the indenture two days prior to the

5   redemption date.  And you see, Your Honor, in the box in the

6   second set of boxes you see treasury rate.  The one year

7   treasury at that time was 11 basis points.  To that I add

8   the spread per contract of 50 basis points, which results in

9   the discount rate of 61 basis points.

10  Q   I think you may have testified to this, Mr. Kearns, but

11  let me make sure.  That discount rate and that methodology

12  for calculating the make-whole, that is you discount the

13  future payments through up to and including the first call

14  date back to present value using the discount rate of

15  treasuries plus 50 basis points.  Was that unique to this

16  particular 10 percent indentures with respect to the --

17  let's focus first on the debtors collectively?

18  A   No.  And to cut through it, the methodology to

19  calculate the make-whole, meaning the sum of the present

20  values of the lost payments at a discount rate that is

21  standard stuff.

22  Q   It was standard in -- how was it found in all of the

23  indentures for high yield bonds issued by everyone of the

24  debtors since 2007?

25  A   Yes.  And I go beyond that and say this is the standard

1    approach to determining a make-whole based on the treatises

2    that I cite and certainly based on any of the instances

3    where I've been asked to determine a make-whole.

4    Q    So it's not just standard for the EFH set of companies,

5    but across the financial markets?

6    A    This methodology is market, yes.

7    Q    Okay.  Now, I think you mentioned that Oncor may have a

8    different rate.  Let's lay a predicate.  What is Oncor?

9    A    Oncor is the regulated utility subsidiary to the

10   corporate org chart, 80 percent of which is owned by EFIH.

11   Q    And did Oncor issue its own notes?  Has it?

12   A    It has, yes.

13   Q    And do they provide for the payment of make-wholes in

14   the event of early calls?

15   A    Oncor's notes are investment grade, but they do indeed

16   have make-whole provisions, yes.

17   Q    And what discount rate do they provide in calculating

18   the make-whole?

19   A    T50 or less.

20   Q    Some of them are T30?

21   A    I believe so, yes.

22   Q    Okay.  Now let's just do this math and make sure.  T30

23   lead to as compared to T50, lead to a higher make-whole or a

24   lower make-whole?

25   A    Well, all else being equal, a T30 would be a lower

1    discount rate, meaning when you run through the calculation,

2    the make-whole would be higher.

3    Q    By the way, has Oncor itself -- which is not in

4    bankruptcy -- ever in fact redeemed early and paid make-

5    whole?

6    A    I believe so yes, in 2012.

7    Q    Now let's focus on the numbers a slightly different

8    way.  Let's ask ourselves or I want to ask you a question --

9    series of questions that ultimately goes to this.  What

10   would the noteholders have been entitled to receive had the

11   notes not been redeemed on June 19, 2014?  Let me ask it

12   that open ended and you can take it from there.

13   A    Well, I'm looking at Exhibit B.  The simple answer to

14   your question is a strand of interest payments which on a

15   per annum basis aggregate about $234 million.  Theoretically

16   through the life of the notes, but as we've discussed the

17   notes have call dates, which start at 12-1-2015 at 5 percent

18   and then step down per annum such that the notes would have

19   been callable at par by 2018.

20          That said, all else being equal, given that we are

21   in an extremely low interest market environment, a rational

22   borrower would have on a cost benefit basis in my view,

23   called these notes at the first opportunity which would have

24   been -- in terms of the most economically rationally point

25   in time, 12-1-2015.

1          So consequently the noteholders in this case would

2    have expected coupon payments through 12-1-2015 and then the

3    call premium.  And, Your Honor, you can see that if you look

4    at the table in Exhibit B in the top half of the box, you

5    see the required interest payment column 105.2, 116.9,

6    116.9, that aggregates $339 million of payments that would

7    have been due between the redemption date and the first call

8    date.  The call premium is $115 million.

9          So the streaming of payments in nominal dollars

10   would have been $454 million due the call date and we can

11   calculate that or derive that by looking at the column that

12   says optimal price of the notes, the 2751.6 which would have

13   been the total stream of payments, including the principal

14   payment minus the principal amount redeemed of 2297.6.  The

15   difference between the two is the stream of loss payments

16   $454 million, 115 of which is the call payment and the rest

17   is the interest.

18   Q    Now, that number is $454 million, but you testified

19   earlier that the make-whole -- the future payments would be

20   $454 million until the first call date, but the make-whole

21   is 431 million.  What explains the difference?

22   A    Well, the make-whole is meant to protect the

23   noteholders from reinvestment risk, so as is standard and as

24   we discussed the make-whole, that stream of payments is then

25   present valued to the redemption date for each of those

1    streams of payments -- these are the individual coupon

2    payments and the call payment -- and the discount rate used

3    to determine the net present value is the T50.  So the

4    difference between 454 which is a nominal amount and the

5    make-whole of 431 is the impact of the present value at 61

6    basis points per the contract.

7    Q    Now, that analysis, Mr. Kearns, assumes that EFIH would

8    have exercised its right on the first call date, December 1,

9    2015 to call the notes at a price of 105, right?

10   A    Right.  Right.

11   Q    Just so we have a clear record, let's make -- I

12   understand you think that's a reasonable assumption.  Assume

13   that the company didn't act that way and kept the notes

14   outstanding until their maturity in 2020.  What amount of

15   interest would the noteholders then have expected to

16   receive?  And again, I want to focus on the non-settling

17   $2.298 billion principal amount of EFIH 10 percent notes.

18   A    Well, and answer your question in looking at Exhibit B,

19   those noteholders would have received two semi-annual coupon

20   payments per year of $116.9 million, so annual interest of

21   $234 million a year, I think you asked me through maturity?

22   A    Yes.

23   Q    That's six years from the redemption date, give or

24   take, so six times 234, let's call it 1.3 billion, 1.4

25   billion in absolute dollars.

1  Q    So by calculating what the noteholders would have

2  received, assuming that the notes are called on the first

3  call date of December 1, 2015, you actually produce a

4  materially lower amount to the investors than if you would

5  assume the notes remained outstanding to maturity, right?

6  A    That's correct.

7  Q    Okay.  Now, we -- the reinvestment, I'm sorry, the reg

8  right issue, do your calculations on Exhibit B assume that

9  the interest rate on some of the notes, in fact, increased

10 from 10 percent?

11 A    It does, yes.  It's not on the screen, Your Honor, but

12 if you look at pages 2 and 3 of Exhibit B are the components

13 by CUSIP (ph) that roll up to page 1.  And if you look at

14 page 3, you'll see after the AK3 notes that calculates the

15 make-whole at the 10.5 percent interest rate.

16 Q    And did you take that into account in doing your

17 calculations?

18 A    I did.  And as I think I discussed somewhere in my

19 report, the impact of the make-whole is $6 million.

20 Q    Okay.  So had you not done that, the make-whole would

21 have been instead of approximately 431 million, 425 million?

22 A    Correct, which I think is consistent with the plan term

23 sheet that the debtor circulated early March.

24 Q    Okay.  Now, one thing we haven't taken into account in

25 this analysis is that the noteholders got back

1    $2,298,000,000 plus some accrued interest on June of 2014,

2    right?

3    A    That's right.

4    Q    Now, did you look at -- well let's back up.  Can you

5    briefly describe for the Court the state of the high yield

6    debt market at June 19, 2014?  And Mr. Kearns, if I can

7    avoid an objection, I'm going to ask a compound question.

8    And --

9    A    Well, maybe I'll object.  Go ahead.

10    Q    And it stayed up 'till today if it differs?

11    A    I think it's fair to say that for the last few years,

12    that the general market conditions -- no secret, it's just a

13    fact Your Honor, it's not a opinion, we're in a low interest

14    environment.

15    Q    Let's talk about some of the salient characteristics of

16    this note.  Was it secured or unsecured?

17    A    Pardon me, it was secured.

18    Q    What lien priority did it have?

19    A    First lien priority on the collateral, which is the 80

20    percent interest in Oncor.

21    Q    So it's secured by an equity interest in a utility?

22    A    Yes.

23    Q    Which has a historically stable or instable flow of

24    income and cash flow?

25    A    I think it's safe to say utility has a fairly stale

1    flow -- income and cash flow.

2    Q    Okay.  The debtors have stipulated -- let me ask you --

3    do you understand whether the debtors have stipulated for

4    purpose of this proceeding whether the first lien notes are

5    over secured or under secured?

6    A    I believe that the debtors have stipulated that these

7    notes are over secured and I would say wildly over secured.

8    Q    Okay.  Now --

9         MR. HOWELL:  Object and move to strike as to the

10   degree in which it's stipulated as to the security that

11   notes --

12        MR. ANKER:  Your Honor, I'm happy to clarify, ask

13   the question.  I'm happy to take the word wildly out of the

14   record if you want it out of the record.

15        THE COURT:  I want it out of the record.

16   BY MR. ANKER:

17   Q    Is it fair to say that the notes were over secured?

18   A    Yes.

19   Q    Okay.  By a substantial margin?

20        MR. HOWELL:  Object.

21        THE COURT:  Sustained.

22        MR. HOWELL:  Objection.

23        THE COURT:  Sustained.

24        MR. ANKER:  Okay.

25   BY MR. ANKER:

1   Q    As of June 2014, was there in the market comparable

2   credit quality investments over secured first lien debt

3   secured by equity in utility in a first lien position

4   bearing a coupon -- let me back up.  I didn't ask you the

5   predicate question.

6        What was the period from June 19 to the first call

7   date?

8   A    Seventeen and a half months.

9   Q    Is that significant that that was the period in

10  evaluating a comparable investment opportunity?

11  A    I believe it is, yes.

12  Q    Why?

13  A    There's something called maturity risk in the

14  marketplace, Your Honor.  And generally, if you envision a

15  bond curve, a typical bond curve, where long-term rates are

16  higher than short-term rates, rates rise over time, the

17  shorter the duration, the lower the yield.  So consequently,

18  a comparable or like paper with 17 and a half months to go

19  until the first call date.  Based on market conditions at

20  the time were nowhere near 10 percent.

21  Q    Okay.  So what were they like?

22  A    Well, we did look to see if there were like notes,

23  holdcos for utilities with high yield.  And the answer is

24  they're gaunt.  There are some holdcos that own utilities,

25  NextEra, ITC, that those companies are investment grade.  So

1    I don't view those as comparable because these notes are

2    high yield.

3        So consequently, the short answer to your question is

4    that there really isn't anything out there that is like

5    paper with comparable tenor, comparable credit risk and

6    coupon.

7    Q    What is --

8            MR. HOWELL:  Objection, Your Honor.  Move to

9    strike on the basis that it's not a disclosed opinion in the

10   report and there were no specifics provided regarding any

11   inquiry and to available other investment vehicles in Mr.

12   Kearns' report.

13           MR. ANKER:  Mr. Kearns' report talks entirely

14   about reinvestment risk and the lower rate environment that

15   was being faced by the holders.

16           THE COURT:  Can you be specific?

17           MR. ANKER:  I'm sorry, Your Honor.  I couldn't

18   hear you.

19           THE COURT:  Be specific in the report.

20           MR. ANKER:  Certainly.  I apologize, Your Honor.

21   My copy here with me is not annotated.  I wish it was.

22   Pages 19 through 21, Your Honor, talk entirely about the

23   reinvestment risk and, in particular, the risk in a lower

24   interest rate environment.

25           MR. HOWELL:  Your Honor, there's discussion of

1    that concept, generally.  There's no evidence put in the

2    report whatsoever of any specific investment vehicle or of

3    any attempts by Mr. Kearns to investigate whether there were

4    comparable investment vehicles available at the time on June

5    19, 2014.

6              MR. ANKER:  Your Honor, paragraphs 30(b) and 35(b)

7    talk about the investment risk.  Moreover, we gave the

8    plaintiffs the Bloomberg data, the entire database, which

9    Mr. Kearns bases his testimony.  That was given to them in

10   production in advance of the deposition so they could

11   question the witness about it.

12             THE WITNESS:  Your Honor, I know there's no

13   question pending of the witness but Mr. Anker said 35(b).  I

14   think he meant 36(b).

15             MR. ANKER:  I apologize.  Response?

16             MR. HOWELL:  Your Honor, to the extent that Mr.

17   Kearns is going to testify about the general concept and

18   reinvestment risk as one of his opinions, we accept your

19   rules, of course, and understand that that's why you come

20   in.  However, he's required to disclose in his report the

21   bases for his opinions.  And if he doesn't have any bases --

22   he made in the opinion.  If you look at 30(b), if you look

23   at 35(b), there's no specifics.  This is all in a general

24   high level discussion of what reinvestment risk is and there

25   are no -- there is no evidence in the report of any specific

1   investment or that Mr. Kearns made an attempt to look at it.

2   The fact that we had 1641 indentures in a Excel basic

3   spreadsheet in no way indicates to us what he looked at or

4   what he tried to find in terms of comparable investment.

5           MR. ANKER:  Your Honor, on January 12, 2015, we

6   sent to the debtors prior to the deposition not only the

7   expert reports but, in addition -- and I'm looking at the e-

8   mail:  the trading data relied on by Mr. Kearns in his

9   report, that trading data is the trading prices and yields

10  by Bloomberg of double D notes which is exactly what he is

11  testifying to.  We gave them that data in advance of his

12  deposition.  I'm happy to hand up the e-mail.  So they've

13  had it from the beginning.

14          MR. HOWELL:  Again, Your Honor.  Same objection.

15  A database of 1641 indentures --

16          THE COURT:  Different database.  It's a different

17  database he's talking about.

18          MR. ANKER:  It is a different database.  It's a

19  database of the Bloomberg, of the yields of DD high yield

20  debt.  And I'll ask the witness to confirm my understanding,

21  but that's my understanding.

22          THE COURT:  I'll overrule the objection.  And

23  you'll --

24          MR. ANKER:  I have to remember back where I was

25  and I actually don't recall where I was -- if you don't

1    mind, I would appreciate it if -- I just would -- I

2    apologize, Your Honor, for losing the flow.  You know what?

3    I think I can lay a predicate and go on.

4    BY MR. ANKER:

5    Q    Mr. Kearns, did you take a look at -- let's back up.

6    Why do you mention and why is it important to focus on

7    whether a reinvestment opportunity would be a comparable

8    credit?

9    A    Well, in the context of like paper, as I mentioned in

10   particular, Your Honor, on 36(b), "It may be impossible" --

11   I'm reading from my report:  "It may be impossible for the

12   investor to find a bond from a comparable issuer on

13   otherwise comparable terms paying as high a rate of

14   interest.  So theoretically, when the money comes back to

15   the holders, I think we said there are 59 funds, for

16   example.  Those holders have investment options.  Those

17   options would range from -- and I'm not trying to be cute,

18   Your Honor -- putting money under the mattress, investing in

19   treasuries, on the one end.  Two, deploying that capital in

20   the marketplace on the other end.  Theoretically, you're

21   investing in other names or other issues that did not have

22   the same credit risk, have more risk.  I mean,

23   theoretically, you could put it under the mattress.  You can

24   go out to the track and bet the ponies.  Neither of those

25   comprises like paper to this issuer.

1        So you think of it almost like in an M&A contest for

2   trading comps, Your Honor.  That's what I'm talking about

3   here but from a credit perspective.

4   Q    So the noteholders could have, for example -- I use a

5   different analogy or different metaphor than betting on the

6   ponies.  They could have bought a lottery ticket.  If that

7   had come in, they would have earned a heck of a lot more

8   than 10 percent.  Is it in your world when you evaluate

9   reinvestment risk, do you simply look at the potential

10  upside of an investment without looking at the downside of

11  risk that that investment carries?

12  A    Well, certainly there's an obvious risk for reward

13  proposition, to the lottery ticket, or to investing in high

14  yield note to the extent it's out there that has different

15  credit characteristics which, obviously would entail

16  different credit risk than the EFIH person does.

17  Q    Is it common for experts in your world when looking at

18  reinvestment risk to look for investments that carry the

19  same, as close as you can, credit profile as the subject

20  company, the subject investment.

21  A    Well, in this context -- and I've testified to other

22  matters along these lines -- the way in which I think about

23  it in terms of almost a mitigation of damages approach, Your

24  Honor, if you will, is like paper.

25  Q    Now I referenced -- said that we turned over a database

1    of DD Bloomberg, of DD paper.  Can you explain what that

2    database consisted of?

3    A    Sure.  Your Honor, we talked a little bit earlier about

4    the study that I conducted.  And that study came from

5    Bloomberg.  All the data from Bloomberg is downloaded into

6    an Excel file which then enables one to slice and dice that

7    file based on credit ratings, based on yields, based on

8    yes/nos as we've talked about in the existence of make-

9    wholes.  And in the context of Mr. Anker's question, there

10   is an ability to manipulate that Excel file to slice it to

11   look at DD issuers and determine what the composite yield is

12   in that study for those DD issuers.  And as for Bloomberg,

13   there is an ability to take those issuers and run it to

14   determine the maturity risk.  So differently, that database

15   in the native file that we produced is such that one can

16   determine for a DD secured issuer what the implied yield is

17   for those issuers with a maturity of 17.5 months to go

18   analogous to the maturity here pursuant to the make-whole.

19   Q    And what was that yield as of June 19, 2014?

20   A    Roughly two percent.

21   Q    Versus -- and that -- just so we're talking about

22   apples to apples.  That two percent compares at ten percent

23   interest on these notes?

24   A    That's right.

25   Q    Now I suspect my colleagues to my right will ask you.

1    But wasn't the debtor-in-possession financing -- after all,

2    that's also for EFIH at higher than that, at 4.25 percent

3    rata?

4    A    The stated rate of the DIP was 4.25, yes.  The date of

5    redemption in the marketplace as quoted by Bloomberg because

6    the DIP notes were trading at above par, the implied yield

7    on the DIP was approximately 3.6 percent.

8    Q    Well, let's create a record here.  The noteholder, the

9    non-settling noteholders had they settled had an opportunity

10   to buy into the DIP and -- at par, you receive 4.25 percent,

11   right?

12   A    Well, through the Exchange, one of the aspects of the

13   Exchange would have been to be a DIP lender at a 4.25, yes.

14   Q    But had they done so, they would have to walk away from

15   75 percent of their make-whole claim, right?

16   A    For the 10s, that's right.  For the 6-7/8ths, it would

17   have been less.

18   Q    But the non-settlers are overwhelmingly, you said, the

19   10 percent, right?

20   A    Correct.

21   Q    Okay.  So another option would have been for the

22   investors not to walk away from 75 percent of their make-

23   whole, but to buy into the debtor-in-possession loan in the

24   secondary market, right?

25   A    Right.

1  Q    In the secondary market, right after the syndication of

2  that loan, what was the trading price of the DIP?

3  A    I believe it was 101.5, give or take.

4  Q    So the investor would have had to pay more than par to

5  get that note, right?

6  A    On the redemption date, that's right.

7  Q    And how does that fact, that price, correlate with your

8  statement that the yield on those notes was not 4.25 percent

9  but 3.61 percent?

10 A    The standard way to calculate the yield is the coupon

11 payment, the interest payment divided by the price.  And so,

12 the applied yield were one to have purchased the DIP in the

13 open market on the redemption date was 3.6 percent.

14 Q    Mr. Kearns, do you have an opinion as to whether the

15 noteholders here suffered harm when their notes were repaid

16 on June 19, 2014?

17 A    I do, yes.

18 Q    What is that opinion?

19 A    That opinion is as a result of this reinvestment risk

20 and mindful of the prevailing market at the time of the

21 redemption that the noteholders suffered real demonstrable

22 harm.

23 Q    Okay.  Have you done an analysis -- have you created a

24 demonstrative that shows sort of on the page the analysis

25 you just went through looking at the DD and the DIP as well

1    as alternative investments?

2    A    Yes.

3    Q    Can I ask you to turn to --

4              MR. ANKER:  And can we put up on the screen the

5    first demonstrative which is -- Your Honor, it says page 2

6    on the bottom, I think.  I don't know what page 1 was.  It

7    may have been a title.  But it's on the tab that says

8    "Demonstratives".  I think page 1 may have been a title page

9    and we took it out.  So --

10             THE COURT:  Right there.

11             MR. ANKER:  -- eliminate that.  Pardon me, Your

12   Honor?

13             THE COURT:  I have it.

14             MR. ANKER:  Okay.  Thank you, Your Honor.

15   BY MR. ANKER:

16   Q    Can you explain Mr. Kearns, rather than me take you

17   through line by line, can you briefly explain this page?

18             MR. HOWELL:  Objection.  Your Honor, same

19   objection as before as to this demonstrative, and the next

20   page of demonstrative  that again relies on the DD credit

21   Excel sheet which is not something that Mr. Kearns disclosed

22   as relying upon and his materials relied in his report is

23   not something that he had disclosed in his report.

24             MR. ANKER:  Your Honor --

25             THE COURT:  Well, I've already overruled that and

1    I'll overrule it again.

2              MR. ANKER:  Thank you, Your Honor.

3    BY MR. ANKER:

4    Q    Mr. Kearns, I think my question to you was ask you to

5    explain this demonstrative.

6    A    Sure.  Your Honor, as we talked about ad nauseum, the

7    make-whole itself, the calculated make-whole of 431 million

8    dollars is the liquidated damages for the contract.

9    However, I also considered -- and this lays out some

10   alternatives -- separate from the contract what the -- what

11   a range of damages would be for a holder of the 10 percent

12   notes, taking into consideration, renewed investment list

13   and using as is laid out here -- and I'd be happy to walk

14   the Court through it -- proxies for like paper, to determine

15   then the difference between the loss stream of payments --

16   you see in the top box the 454 million, Your Honor, which we

17   talked a little about a little bit with respect to the make-

18   whole calculation -- as against interest that could have

19   been realized from reinvesting the proceeds in, as I said,

20   proxies for like paper.  And that's what this demonstrative

21   shows as a range.

22   Q    Mr. Kearns, you've got four alternatives here.  We've

23   talked about two of them, the EFIH DIP and the DD rated

24   credit.  You've also got single D.  And then on the high

25   end, the Oncor unsecured debts.  Do you have an opinion on

1    which of these are the most comparable?

2    A    Sure.  Let me walk through it.  If you can envision it

3    as a goal post, Your Honor, one upright being the EFIH DIP

4    which has a yield of 3.61 percent.  Arguably, that yield is

5    higher than like paper because the tenor of the DIP is

6    beyond the 17 and a half months, and the amount of the DIP,

7    the 5.4 billion, exceeds the first lien notes.  Hence part

8    of my conclusion as to why the first lien notes were over

9    secured.  So the 3.61 is a goal post and maybe it's a bit

10   high.

11          The other goal post, on the far right, the Oncor

12   senior unsecured notes, what we consider there, Your Honor,

13   is the most junior set of notes within Oncor itself.  And of

14   those notes where the yield is adjusted for a maturity of 17

15   and a half months as you see on reinvestment rate line, is

16   .78 percent.  Now just as, I think the EFIH DIP yield, the

17   one upright is probably a little too high, this note,

18   frankly, is too low because it is a senior indebtedness at

19   Oncor which is obviously structurally senior to the EFIH

20   first lien notes.  But those frame the goal posts.

21          The two other pieces going down, I guess, the

22   middle of the field, the D rated and the DD rated, we used

23   the Bloomberg indices, composite indices for single D and

24   double D.  Why did I use those rates?  Well, the DIP, Your

25   Honor, when issued, had a rating of DD minus.  These notes,

1    through the Exchange and prior to downgrades by the rating

2    agencies, really more tied to the overall stress of the

3    corporate parent were rated single D.  So hence, a range, if

4    you will, of D to DD.  And each case looking at what the

5    lien investment rate would be or like paper than considering

6    the tenor, if you will, from the redemption date to the

7    first call date of 17 and a half months.  So those are the

8    two uprights.  One is certainly too low.  One's maybe a

9    little high.  And then I have the two alternatives in the

10   middle.

11   Q    Mr. Kearns, did you ever have a conversation with

12   anyone at EFIH and their financial group about the company's

13   view as to what was comparable to the EFIH first lien notes

14   in terms of rated paper?

15   A    Yes.

16   Q    With whom?

17   A    Mr. Horton.

18   Q    What position does Mr. Horton hold with EFIH?

19   A    He is the treasurer of the company.

20   Q    And what did he say to you?

21   A    Well, in the context of discussions that we had pre-

22   petition, it was his view that the notes, particular the

23   DIP, would be DD.

24   Q    That the DIP would be DD.

25   A    And the notes.

1    Q    Okay.  The notes meaning the --

2    A    The first lien notes.  Sorry.

3    Q    Thank you.  Mr. Kearns, can we turn to the second of

4    your demonstratives?

5    A    Sure.

6    Q    And can you explain what this is?

7    A    Sure.  This is an example.  And I used the DD rate

8    column, Your Honor -- that runs through a step analysis on

9    the nominal amount of the loss stream of payments in the

10   event that the Court were to conclude that like paper is DD.

11   In other words, approximating the credit rating of the DIP.

12   And I should point out, Your Honor, also that these are the

13   Bloomberg composites where if one were to use the Bloomberg

14   utility composites, the yields would be slightly lower.  But

15   I used the Bloomberg composites.  And what you see -- I'm

16   looking from left to right, Your Honor.  In terms of the

17   stream, you'll see and hopefully you'll recognize these

18   numbers from my testimony.  The total stream of interest

19   payments in nominal dollars over the 17 and a half months

20   from June 19, 2014 through the first call date aggregates

21   349 million dollars.  To that, you add the call payment that

22   would have been due.  And you get to the middle bar which

23   we've talked about which is the loss stream of payments and

24   nominal dollars or 454 million dollars.

25           As a deduction, ostensibly as a mitigation of

1    damages for reinvestment in like paper, were the holder to

2    have redeployed its capital and to DD rated paper, borrowing

3    the composite for the market place and considering the

4    duration, the 17 and a half months, the interest on that

5    paper, which is at, roughly, 1.74 percent that would have

6    been realized during that 17-month period in nominal dollars

7    if 58.1.  So -- and again nominal dollars, this would show

8    the net of mitigation for reinvestment damages of 395.9

9    million dollars.

10   Q    Mr. Kearns, one more set of questions and then I want

11   to move a few documents into evidence.  You've testified

12   that the make-whole here was, as you calculated, 431 million

13   dollars for the non-settling noteholder, right?

14   A    I did, yes.

15   Q    And you testified to the principal amount they were

16   owed was 2 billion 298 million -- I'm sorry -- 2 billion 298

17   million dollars.  I did say that correctly.

18   A    Yes.

19   Q    Okay.  Have you done a calculation and is it in your

20   report as to the percentage of the make-whole as compared to

21   the overall principal for the non-settling holders?

22   A    Yes, I have.

23   Q    And what is that percentage?

24   A    That percentage is approximately 19 -- the make-whole

25   comprises approximately 19 percent of the principal.

1   Q    Do you have an opinion and did you express it in your

2   report as to whether the make-whole is material to the

3   overall economics and investment for the holders?

4   A    I do.  And, Your Honor, it's on page 7 of my report.

5   Q    And what is that opinion?

6   A    That opinion is that a 19 percent of principal balance

7   which comprises almost two years worth of interest at the

8   coupon rate -- I'm sure you're not surprised to hear me say,

9   Your Honor, that that is materially significant to the

10  holders.

11           MR. ANKER:  Your Honor, we would move into

12  evidence the two demonstratives.  We have numbered them here

13  as numbers 141 -- Plaintiff's 141 and then the bar graph

14  would be 142.

15           MR. HOWELL:  We object, Your Honor, on the basis

16  that they're hearsay and as previously stated on the basis

17  that they are based on information not included or relied

18  upon in Mr. Kearns' report.

19           THE COURT:  Well, they're demonstratives.  They're

20  not --

21           MR. ANKER:  They were put in as demonstratives,

22  Your Honor.  It seems to me he's testified to that.  And for

23  the sake of the -- I mean, I have in trials just treated

24  demonstratives as demonstratives.  I've also seen Courts

25  take them into evidence when a witness testifies orally as

1     to their accuracy.  We can call them demonstratives if Your

2     Honor would prefer.

3               THE COURT:  I prefer that.

4               MR. ANKER:  Okay.  Can we call -- can we then have

5     a list of demonstratives and call these Plaintiffs'

6     Demonstrative 1.  That would be the one that -- the first

7     one that is entitled "Illustrative Impact of Lost Stream of

8     Payments To Non-Participating First Lien Ten Percent

9     Noteholders Through 12/1/2015," and the -- I'm sorry, they

10    both have the same heading.  The one which has the numbers,

11    the first one you looked at would be Plaintiffs'

12    Demonstrative 1 and the one that has the bars graph would be

13    Plaintiffs' Demonstrative 2.

14              THE COURT:  That's fine.

15              MR. HOWELL:  No objection to that.

16              THE COURT:  That's fine.

17    (Plaintiffs' Demonstrative 1 and Plaintiffs' Demonstrative 2

18    received into evidence.)

19              MR. ANKER:  We would also move into evidence Mr.

20    Kearns' expert report excluding those portions, Your Honor,

21    dealing with opinion -- well, no.  As to Mr. Kearns, you did

22    not exclude any of his opinions.  So we would move the

23    entirety of his report into evidence.

24              MR. HOWELL:  We object to the introduction of an

25    expert report into evidence.  It's classic hearsay.  We

1    don't think it's appropriate.

2              THE COURT:  I agree.  The report itself isn't the

3    evidence.  It's not the purpose of the report.  So motion

4    denied.

5              MR. ANKER:  May I just have one moment, Your

6    Honor?  I think I may be prepared to pass the witness.

7              THE COURT:  Go right ahead.

8              MR. ANKER:  I just want to make sure I didn't miss

9    anything.

10        (Pause)

11             MR. ANKER:  Pass the witness, Your Honor.

12             THE COURT:  Okay.  Thank you.  Is anyone -- before

13   I turn it over to debtors, does anyone else have any

14   questions for the witness?

15             MR. ANKER:  Your Honor, one other -- I apologize,

16   Your Honor, for interrupting.  We also used and Mr. Kearns

17   referred to Exhibit B in his report as a demonstrative.  I

18   understand Your Honor's ruling that they don't come in as

19   exhibits.  But can we mark Exhibit B as Plaintiffs'

20   Demonstrative 3?

21             THE COURT:  All three pages?

22             MR. ANKER:  Yes, Your Honor.

23             THE COURT:  No objection -- I'm sorry.

24             MR. HOWELL:  No objection for the use of that if

25   they're just claiming that it's Plaintiffs' Demonstrative 3.

1            THE COURT:  Very good.

2            MR. ANKER:  Thank you.

3            THE COURT:  Mr. Horowitz, any questions?

4            MR. HOROWITZ:  No questions, Your Honor.

5            THE COURT:  Okay.  Very good.  All right.  Before

6    cross then, we'll take the lunch break.  Let's try to

7    reconvene as closely to 1:45 as possible.  I know that's a

8    short break but we, unfortunately, got a little bit of a

9    late start.

10           During the break, sir, since you're subject to

11   examination, you may not discuss the substance of your

12   testimony with any person.

13           THE WITNESS:  I understand, Your Honor.

14           THE COURT:  Very good.

15           MR. ANKER:  Your Honor, may we -- I recognize Your

16   Honor can't vouch for security but may we leave our books

17   and papers here?

18           THE COURT:  Oh, of course, yes.

19           MR. MCGAAN:  Did you say 1:45?

20           THE COURT:  Yes.  All right.  We're adjourned till

21   1:45.

22       (Recess at 12:53 p.m.)

23               THE CLERK:  All rise.

24               THE COURT:  Please be seated.  You may

25   proceed.

1   CROSS-EXAMINATION

2   BY MR. HOWELL:

3   Q    -- and Ellis for the debtors.  Good afternoon,

4   Mr. Kearns.

5   A    Good afternoon.

6   Q    You testified as part of your direct exam that you

7   served as an expert witness on a handful of other cases

8   involving either no call or make-whole issues, correct?

9   A    That's right, yes.

10  Q    And those were the school specialty and the Calgene and

11  the Premiere Entertainment and Momentive cases, correct?

12  A    Correct.

13  Q    And in the Momentive case you offered multiple reports

14  in that case, correct?

15  A    Yes.

16  Q    And in Momentive, you gave an opinion in that case

17  regarding the purpose of make-whole provisions in notes like

18  this, correct?

19  A    Yes.

20  Q    And that opinion was substantially similar to the type

21  of opinion that you've given here today that make-whole --

22  about the purpose of make-whole provisions in these sort of

23  notes, correct?

24  A    That's probably right, yes.

25  Q    And you also gave an opinion in Momentive relating to

1    the benefits to both an issuer and to a noteholder that

2    arise when you include a make-whole premium as part of your

3    expert report in Momentive, correct?

4    A    Yes.

5    Q    And again, that's something that you testified about

6    today, the benefits to both the issuer and to the noteholder

7    from having make-whole call protection in a high yield debt

8    vehicle, correct?

9    A    Right.

10   Q    And in Momentive, you also gave an opinion there that

11   the terms in the Momentive indenture the way to the make-

12   whole call protection were a market or standard and

13   customary just like the opinion you've given today that the

14   terms in the EFH corporate family of indentures were

15   standard and customary, correct?

16   A    A little different study, but the ultimate conclusion,

17   you're characterizing it correctly, yes.

18   Q    Now, you also talked on direct about the study that you

19   did looking -- you and your team looking at Bloomberg data

20   for over 1600 secured indentures.  Do you recall that

21   testimony?

22   A    Yes.

23   Q    And as part of your work in this engagement, you

24   reviewed multiple terms.  I think you called them screens

25   from those 1600 secured indentures that your team compiled

1    from Bloomberg, correct?

2    A    We'll use screens to analyze the data, yes.

3    Q    And some of the screens you looked at were, for

4    instance, whether or not there was even a make-whole

5    protection at all, correct?

6    A    Correct.

7    Q    Another screen you looked at was what was the first

8    call date for those indentures that did have make-whole

9    protection, correct?

10   A    That's right, yes.

11   Q    Another screen you looked at was, what would be the

12   make-whole spread in this case, T plus 50 for all of the

13   indentures that did have make-whole call protection,

14   correct?

15   A    Yes.

16   Q    And of course, you looked -- another screen that you

17   looked at was the coupon rate for all of those 1641, I

18   believe, secured indentures, correct?

19   A    Yes.  That was part of the screen too.

20   Q    And your team then randomly sampled around 60 of those

21   indentures to make sure that the data from the Bloomberg

22   study was correct and it matched your actual review of those

23   60 randomly selected indentures, correct?

24   A    That's right.

25   Q    Now one provision that you did not include in your

1    survey was a survey of the acceleration provisions in the

2    various 1641 indentures, correct?

3    A    That's correct.   My survey, my analysis was focused on

4    the toggles and the terms of the make-whole call provisions.

5    Q    And in fact for the project that you did to produce

6    your expert opinions in this case, you only looked at the

7    acceleration provisions in the EFH corporate family of

8    indentures, correct?  You didn't look at any other

9    acceleration provisions in other indentures, correct?

10   A    By look at, you mean read the language and what is 602

11   in this indenture and so on?  I believe that's right.

12   Q    And as part of your survey, you also did not include a

13   review of the rescission provisions to the extent they

14   existed and the 1641 secured indentures, correct?

15   A    Well, we certainly discussed this in my deposition and

16   what I said then, which I'll say now is indentures as we all

17   know have standard terms.  It wouldn't surprise me if all

18   1641 indentures have issues, address things like default

19   provisions, amatory prepayments, acceleration and

20   rescission, but I did not read the specific language, no.

21   Q    So to answer my question, you did not include a review

22   of those rescission provisions across the 1641 indentures,

23   correct?

24   A    In terms of a specific rate of rescission provisions,

25   that's correct.

```
1    Q    And so you can't say for sure one way or another how
2    many of them had rescission provisions and how many of those
3    rescission provisions look like the one here, correct?
4    A    Well, as I testified earlier, it wouldn't surprise me
5    if virtually all of them have acceleration and rescission
6    provisions which was one part of your question.  The other
7    part in terms of the exact language, then I would agree
8    that.
9    Q    Now, you testified in direct that the make-whole
10   provision was, I believe you said an important part of the
11   bargain, correct?
12   A    Yes.
13   Q    You call it a material and significant part of the
14   bargain, correct?
15   A    I believe I did, yes.
16   Q    Now, you were not personally involved in the
17   negotiations of the EFIH tender sent notes, correct?
18   A    That's correct.
19   Q    You didn't have any conversations with any of the
20   noteholders about the negotiation of the EFIH 10 percent
21   indenture, correct?
22   A    In connection with the exchanges, that's correct.
23   Q    And you haven't had any conversations with counsel who
24   were involved in the negotiation of the EFIH 10 percent
25   indenture related to the negotiation of those indentures,
```

```
 1    correct?

 2    A    That's right.

 3    Q    And you can't speak to what individual holders would

 4    have evaluated before deciding to invest in the EFIH 10

 5    percent notes, correct?

 6    A    I'm not sure I agree with that.  I mean, as you and I

 7    discussed in my deposition, I believe the holder would look

 8    at the terms on a global basis, acceleration, rescission,

 9    default language and make-whole language.  So I'm not -- the

10    way you characterized that -- your question, I'm not sure I

11    agree with that.

12    Q    Okay.  Well, you recall giving a deposition in this

13    case as we just talked about, correct?

14    A    I do, yes.

15    Q    Okay.

16            MR. HOWELL:  And may I approach and hand Mr.

17    Kearns a copy of his deposition transcript?

18            THE COURT:  Yes.

19    BY MR. HOWELL:

20    Q    And Mr. Kearns, I'll focus your attention page 124,

21    lines 7 through 13 of that deposition, which we can also

22    bring up on the screen if that helps.  And let me know when

23    you're there, page 124, line 7 through 13.

24    Q    Are  there, sir?

25    A    I am, yes.
```

1  Q    Okay.  And did I ask you this question and did you give

2  this answer?

3  "Q   Do you know whether the holders who you've interacted

4  with had an opportunity to review the indentures before

5  investing in the EFIH 10 percent notes?

6  "A   I can't answer that in terms of what individual holders

7  would have evaluated before deciding to invest."

8          Did I ask you that question and did you give that

9  answer, sir?

10  A    You did, although the context of the question, I think,

11  is different than you're leading, but yes.

12          THE COURT:  Could you do me a favor and answer the

13  questions?

14          THE WITNESS:  Yes, Your Honor.  That is the answer

15  I gave, yes.

16  BY MR. HOWELL:

17  Q    Now, Mr. Kearns, you testified at some length on your

18  direct examination that one of the opinions in your report

19  calculates the make-whole amount in this case, correct?

20  A    Yes.

21  Q    And that make-whole amount is contractually established

22  at the time the debt is issued, correct?

23  A    Yes.

24  Q    And you would agree, I think you said this on direct,

25  that you would turn to the indenture to determine the

1    calculation for the make-whole amount, correct?

2    A    Yes.

3    Q    And here you in fact turn to the indenture and

4    calculated the make-whole amount pursuant to reading the

5    indenture with respect to the determination of the

6    applicable premium, correct?

7    A    That's right, yes.

8    Q    And here, the applicable premium calculation specifies

9    what you called a reinvestment rate, right?

10   A    It does, yes.

11   Q    Reinvestment rate here is T plus 50 or I believe 61

12   basis points in your calculation, correct?

13   A    Yes.

14   Q    And where in here the applicable premium calculation

15   specifies a reinvestment rate it serves as a liquidated

16   damages amount, correct?

17   A    Yes.

18   Q    Now, you calculated the make-whole amount to be $431

19   million, correct?

20   A    I did, yes.

21   Q    And that amount relates only to the non-settling

22   noteholders, correct?

23   A    Or the 10 percents, yes.

24   Q    So that number is based on your calculation the harm to

25   the non-settling noteholders as a result of the debtor

1    repaying the notes on June 19, 2014, correct?

2    A    Yes.

3    Q    And as you described in your direct one of the issues

4    that you talked about was reinvestment risk, correct?

5    A    Yes.

6    Q    And I think during your direct you pointed us to

7    paragraph 36(b) of your report where you said -- and I'll

8    just read to you from your report, though I'm happy to give

9    you a copy if you'd --

10   A    No, I have it in front of me, thank you, Mr. Howell.

11   Q    So at 36(b) in your report, you write, moreover if

12   interest rates have declined in the market, it may be

13   impossible for the investor to find a bond from a comparable

14   issuer or otherwise comparable terms paying this high rate

15   of interest.  You said that, right?

16   A    I did.

17   Q    And that kind of encapsulates this concept of

18   reinvestment risk, right?

19   A    It does, yes.

20   Q    And then you go on to say a make-whole call provision

21   compensates the investors for the very real costs that are

22   incurred in finding a suitable replacement investment in the

23   situation in which an investor may have to invest in lower

24   yielding securities while they search for reinvestment

25   opportunities.  You said that, correct?

1    A    Yes, I did.

2    Q    And you still agree with that, right?

3    A    Yes.

4    Q    So the make-whole amount simply makes the investor

5    whole for any loss associated with reinvestment risk, right?

6    A    Yes.

7    Q    Now, during your direct you presented -- and I think it

8    was on the first demonstrative chart that you gave -- but

9    you probably had four different kind of reinvestment

10   scenarios that produced a different range of net loss,

11   stream of payments that went from 333.7 million up to $428

12   million, right?

13   A    Yes.  I have it in front of me.

14   Q    And those assume four different reinvestment scenarios,

15   correct?

16   A    They do, yes.

17   Q    And each of those reinvestment scenarios assumes a

18   different reinvestment vehicle, right?

19   A    Yes.

20   Q    And all four of those, of course, are lower than $431

21   million, correct?

22   A    They are, yes.

23   Q    Now one of those included Oncor senior unsecured notes.

24   You see that?

25   A    Yes.

1    Q     Now, the rating for the 10 percent paper immediately

2    prior to the petition date here was Triple C; is that

3    correct?

4    A     I believe so, yes.

5    Q     And the rating for Oncor notes would be A or A-,

6    correct?

7    A     Oncor is investment grade, yes.

8    Q     Mr. Kearns, did you speak to any noteholders about what

9    specific investments they made upon receiving their 2.298

10   billion on June 19, 2014?

11   A     Individual noteholders, is that your question?

12   Q     Yes.

13   A     No.

14   Q     And Mr. Kearns, do you know whether any of the

15   individual noteholders had credit default swaps protecting

16   their investments in EFIH notes?

17   A     I do not.

18            MR. HOWELL:  I have nothing further, Your Honor.

19            THE COURT:  Okay.  Thank you.  Redirect?

20   REDIRECT EXAMINATION

21   BY MR. ANKER:

22   Q     Mr. Kearns -- again, for the record, Philip Anker,

23   Wilmer Cutler Pickering Hale and Dorr.

24            Mr. Kearns, did you and your team have an

25   opportunity to review the depositions of fact witnesses

1   taken in this matter?

2   A    I read them, yes.

3   Q    So you read Mr. Keglevich's deposition?

4   A    I did, yes.

5   Q    You read Mr. Gordon's (ph) deposition?

6   A    Yes.

7   Q    Mr. Moldivant's (ph) deposition?

8   A    I did, yes.

9   Q    Was the full documentary record made available to you

10  and your team?

11  A    I believe so, yes.

12  Q    Okay.  Do you believe that you need to interview any

13  current or former holders of the EFIH first lien notes to

14  give any of your opinions that you've given on the stand

15  today?

16  A    Can you ask that again, Mr. Anker?

17  Q    Sure.

18  A    I want to make sure I have the full question.

19  Q    Mr. Howell asked you whether you had interviewed

20  individual holders of the notes and I think you testified,

21  no I have not.  And my question to you is, do you believe

22  that you needed to interview any of those holders to render

23  the opinions that you have rendered today?

24  A    I took Mr. Howell's question to pertain to the holders

25  at the time of the exchange, which is why I said, no I have

1    not.  And the simple answer to your question is, no I don't

2    think that's necessary given the record that exists in this

3    case.

4    Q    Why is it unnecessary?

5    A    I was able to read through the deposition transcripts

6    for each of the debtors' fact witnesses on the matter and so

7    it would be a like to have, not a have to have.

8    Q    Okay.  Mr. Kearns, I think Mr. Howell actually also

9    asked whether you had spoken to any of the current holders

10   about what they did when they got back their 2,298,000,000

11   and I think you said, no.  So let me ask you whether you

12   think it was necessary for any of the opinions you've given

13   on financial harm to have interviewed those holders?

14   A    No.

15   Q    Why not?

16   A    Because there's a spectrum of holders, different

17   investment criteria.  It's possible that the capital wasn't

18   redeployed on day 1 and if so to something that is other

19   than like paper.  Hence the damage analysis, Your Honor, the

20   way that I posited it here similar to the way I did it in

21   Premiere Biloxi and Calgene, which is to look at damages net

22   of a reinvestment in like paper.  Because beyond that, as I

23   testified on direct, though this profile of the investment

24   would be entirely different than this paper.

25   Q    Mr. Kearns, Mr. Howell asked you about paragraph 37(b),

1    as in boy, of your -- did I say 37 -- 36(b), as in boy of

2    your report and I note there you say, a make-whole call

3    provision compensates the investors for the very real costs

4    that are occurred in finding a suitable replacement

5    investment.  In the situation in which an investor may have

6    to invest in lower yield securities while they search for

7    reinvestment opportunities.

8              With respect to the four different investment

9    vehicles that you looked at in what is now Plaintiff's

10   Demonstrative 1 and Plaintiff's Demonstrative 1 -- does that

11   assume immediate reinvestment on June 19 of every one of

12   those dollars?

13   A    Yes it does.  And, Your Honor, there is actually a note

14   "G" on that demonstrative.  And it says, assumes the holder

15   will be able to reinvest the capital on June 19th, 2014, so

16   that's correct.

17   Q    If they couldn't redeploy it that day because they

18   couldn't find suitable investments and it took them some

19   period of time, would the loss that they suffered be greater

20   or lesser?

21   A    Well, on across the capital basis, it would be greater

22   because the money would be then sitting under the mattress,

23   so to speak, waiting to be deployed into an appropriate

24   vehicle.

25   Q    Mr. Howell asked you about your deposition testimony on

1   page 124, line 7-13.  And I think you said you thought the

2   context there was different from the question that

3   Mr. Howell had asked.  Can you explain what you meant by

4   that?

5   A    Yeah.  If you just give me a minute please, so I can

6   read before and after.  So the question was do you know

7   whether the holders with whom I've interacted had an

8   opportunity to review the indentures and I had said no, but

9   I took the question to be a broader spectrum, meaning the

10  secondary holders as well as the original holders.  So I

11  can't talk to what each individual investor would have

12  looked at or evaluated in the context of bad (indiscernible)

13  provisions and the like before deciding to invest.

14  Q    Mr. Kearns, Mr. Howell asked you a series of questions

15  about whether you looked at the acceleration provision of

16  various indentures.  Does the specific language of the

17  acceleration provision bear on any of the opinions you've

18  given about the financial harms of the noteholders if they

19  are not entitled to rescind acceleration and do not receive

20  their make-whole?

21  A    In the context of financial harm, no it does not.

22  Q    Why not?

23  A    The noteholders were repaid their premium and interest

24  on the -- I'll use the word, I'm sorry, Your Honor --

25  redemption date of June 19th.  The economic loss to those

1    holders is real loss, as I've demonstrated with the

2    reinvestment risk and that would be the case, whether

3    repayment happened inside of the bankruptcy or outside of

4    the bankruptcy.

5    Q    Mr. Howell asked you -- this will be, I think hopefully

6    my final question -- whether investors -- let me back up.

7    Let me predicate it.

8              How many -- have you interacted in all your

9    matters over the years with holders of high yield debt?

10   A    Yes.

11   Q    How many?  Just give the Court --

12   A    Oh, I don't know.  Hundreds.

13   Q    How many of them, who you've encountered, have not

14   cared about what their rate of return is on their

15   investments?

16   A    I think they all care of they won't be high yield

17   investors very long.

18              MR. ANKER:  That's all I have, Your Honor.

19              THE COURT:  All right.  Thank you, sir.

20              MR. HOWELL:  Nothing further, Your Honor.

21              THE COURT:  Yeah, we generally don't do recross.

22   We're going to do direct -- but it will change up when we do

23   Mr. Horton and Mr. Merkle (ph)?

24              UNIDENTIFIED SPEAKER:  Molva (ph).

25              THE COURT:  Molva, sorry.  Thank you.

1          THE WITNESS:  Your Honor, thank you.  Rebox the

2     binders?

3          THE COURT:  Just leave them.

4          THE WITNESS:  Thank you.

5          MR. ANKER:  Your Honor, just a housekeeping

6     matter.  During the break we gave your assistant of

7     Plaintiff's demonstratives 1, 2 and 3 they simply have

8     labels on them, Plaintiff's demonstrative 1, 2 and 3.

9     Hopefully that's helpful to the Court in maintaining a clean

10    record.

11         THE COURT:  Okay.  That's fine.  Hang on to those.

12         Yes, sir?

13         MR. PLATT:  Good afternoon, Your Honor.  Charles

14    Platt for Wilmer Hale.  I'd like to hand out first some

15    demonstratives we'll be using with the next witness.

16         THE COURT:  Okay.

17        (Pause)

18         MR. PLATT:  Your Honor, the Plaintiff calls

19    Michiel McCarty.

20         THE COURT:  Okay.  Actually I said to leave those

21    documents up at the witness stand, but why don't we get rid

22    of --

23         Come on up, sir.

24         -- why don't we get rid of Mr. Kearns' documents,

25    because otherwise, it will get too crowded up there.  So my

Page 122

1    apologies.

2             Sir, if you'd take the stand and remain standing,

3    please.

4        (Witness Sworn)

5             THE CLERK:  Please state and spell your name for

6    the record.

7             THE WITNESS:  Michiel McCarty, M-I-C-H-I-E-L

8    M-C-C-A-R-T-Y.

9             THE CLERK:  Thank you.

10   DIRECT EXAMINATION

11   BY MR. PLATT:

12   Q    Good afternoon, Mr. McCarty.

13   A    Good afternoon, Mr. Platt.

14   Q    You've already been qualified to act as an expert with

15   respect to certain opinions, so let's just give the Court a

16   brief background of who you are.  Would you please state

17   your full name?

18   A    Michiel McCarty.

19   Q    And are you currently employed, sir?

20   A    Yes, I am.

21   Q    Where are you employed?

22   A    I am employed at M M Dillon and Company.

23   Q    What's your role there?

24   A    I am the chairman and chief executive officer.

25   Q    How long have you been employed at M M Dillon?

1    A    At Dillon and its predecessor's a little over 11 years.

2    Q    Very simply, what does M M Dillon do?

3    A    M M Dillon is an integrated investment bank.  That

4    means that we represent corporate clients in the issuance of

5    debt and equity.  We advised on restructurings and advise on

6    mergers and acquisitions.

7    Q    Does M M Dillon's business involve high yield debt?

8    A    It does, yes.

9    Q    Okay.  Could you please give a brief description of

10   your education after high school?

11   A    I graduated from Vanderbilt University with a degree in

12   physics with honors and went on to graduate school at

13   Wharton School of Business University of Pennsylvania, where

14   I received an MBA in finance.

15   Q    Were you employed after attending the Wharton School of

16   Business?

17   A    I was.

18   Q    Give us a brief description of your employment after

19   Wharton School up to the time when you became employed by

20   M M Dillon.

21   A    I went straight from Wharton to work for Citicorp in

22   the merchant banking group where I was involved in the

23   issuance of debt, advising on restructurings and advising on

24   mergers and acquisitions.

25            I left Citicorp to go work for Dillon Read and had

1    similar roles as an active investment banker and responsible

2    for several different divisions of Dillon Read, including

3    the division that was in charge of the issuance of debt and

4    equity for corporate clients.

5              I left in 1991 to go to S.G. Warburg where I

6    headed investment banking for North and South America for

7    S.G. Warburg and sat on the management committee.  And left

8    upon the sale of S.G. Warburg to UBS in late 1995 to go to

9    work for Gleacher, which was ultimately bought by RBS where

10   I was an investment banker and responsible for several

11   different groups, including the establishment of a high

12   yield group and a principle group oriented towards investing

13   in high yield.

14             And that takes us up to late 2003 which is the

15   employment I'm at now.  There was a predecessor company

16   called CRT Capital, which stands for Credit Research and

17   Trading, one of the leading traders of distressed, high

18   yield bonds where I went to establish an investment banking

19   business, which is the business I have today.

20   Q    Have you ever served as an expert witness before?

21   A    I have.  In fact, the first time was here in Delaware

22   way back in 1994.

23   Q    And is there a list of your expert assignments in your

24   report?

25   A    There is, in the appendix.

1    Q    Okay.  Is there any case in which you've offered an

2    expert opinion where you've not been permitted to testify?

3    A    No, there's not.

4    Q    Please tell us with respect to your experience with the

5    issuers of high yield debt, what sort of activities you've

6    been involved in.

7    A    I've been involved in pretty much every activity.  We

8    call them deal captains when you run a transaction.  So

9    since 1982 I've been a deal captain on transactions.  My

10   first high yield debt was done in 1984 in the early days of

11   high yield.  And I've either completed or evaluated a very

12   large number of high yield transactions from the issuer

13   side.

14   Q    Please tell us what experience you have from the

15   investor's perspective with high yield debt?

16   A    From the investor side I have set up a principle

17   activity at Gleacher which was in Gleacher Nat West to

18   invest in high yield notes as a principal.  It now is called

19   Warhill (ph).  We did it jointly with the Prinsker (ph)

20   family in Chicago.

21        And then at CRT we had a high yield investment

22   vehicle which was called Harbor View which had outside

23   investors on our own capital and I had oversight on both of

24   those.

25        In addition to that I sat in for 12 years, the

1    investment committee of Vanderbilt endowment, which has

2    investments in approximately 50 different funds and had

3    oversight on those funds, many of them high yield investors.

4    Q    In your work with high yield debt, have you had any

5    responsibility for doing strategic reviews of high yield

6    debt?

7    A    I have.  On four occasions I was tasked by my firms --

8    four different firms, 84, 91, 97 and 2005 to look at the

9    strategy of the high yield market and the various components

10   in that collective for examinations on a strategic basis.

11           I talked to something like 1600 investors, several

12   hundred issuers, a large number of lawyers, bankers and

13   various parties.

14   Q    Let's move on from the background, Mr. McCarty to a

15   brief summary of the opinions that you expect to give here

16   today.  Please summarize those for the Court?

17   A    Given the narrow nature of what we're dealing with

18   today, which is the lifting -- the cause for lifting the

19   automatic stay -- I've restricted my opinions to three very

20   focused issues.

21           The first of which is whether the payment of the

22   make-whole is needed in addition to principal and interest

23   for the investors to be protected from their loss of the

24   defined cash flow stream.

25           The second is whether there are quantifiable

1    financial losses associated to the investors of not paying

2    the make-whole.  And finally, do either of those opinions

3    change if the company or issuer is in bankruptcy.

4    Q    All right.  Let's start then with some basic principles

5    of high yield debt, Mr. McCarty.  What is high yield debt,

6    as you understand it?

7    A    Not to repeat Mr. Kearns, it is obviously not rates

8    investment grade, but more significantly, for me as an

9    advisor, it carries a higher degree of risk, of default and

10   thus a higher payment of interest rates, that's why it's

11   called high yield.

12   Q    Are there investors who customarily invest in high

13   yield debt?

14   A    Yes.  It's an institutional market.  It's a market that

15   includes a large number of different types of institutions.

16   Q    What type of institutions?

17   A    Insurance companies, endowments, pension funds, mutual

18   funds are common investors in the market place.

19   Q    Do pension funds and insurance companies have

20   particular investment objectives that they're pursuing when

21   they invest in high yield debt?

22   A    Yes, they do.  All of those that I mentioned do what I

23   call matching of assets and liabilities and that's a

24   critical component where they're trying to take and match

25   the flow of cash they would get from high yield notes to

1    liabilities that they have for putting cash out the door to

2    people they have obligations to.

3    Q    What sort of liabilities or obligations do these

4    pension funds and insurance companies have to the people who

5    entrust money to them?

6    A    Maybe I'll give you a historical reference that gives

7    the perspective.  Back in the 80s there were a thing called

8    GICs, guaranteed investment contracts where insurance

9    companies put out agreements to people like you and me to

10   pay amounts to -- it's a set amount every quarter or every

11   semi-annual period for a defined period of time.  Those are

12   now called annuities.

13   Q    Other than annuities, are there other types of

14   obligations or liabilities that the underlying funds or

15   companies have?

16   A    Yes.  There's pension obligations.  I imagine the

17   majority of the people in this room -- probably a declining

18   number -- have defined pensions and they get payments every

19   month for their pension plan and the matching for pension

20   groups with high yield is what I'm referring to with that

21   asset liability match.

22   Q    So what happens if these investors in high yield debt

23   can't earn enough cash to meet the obligations?

24   A    Then that's a problem.  They can't make their payments

25   because they don't get their payments in.  It's a very

1    simple market, cash in, cash out.

2    Q    And who gets affected when these high yield investors

3    can't match obligations and assets?

4    A    Ultimately the people who are being paid by the

5    insurance companies and pension funds and fixed obligations

6    that are being paid out.

7    Q    Can you give an example of what would happen with

8    respect to an income annuity person?

9    A    Well, income annuity, you hope to receive it for your

10   life and hopefully it's a long time.  And if you have a

11   group that's guaranteed that payment who can't have a

12   matching payment coming forward, then they wouldn't receive

13   it.

14   Q    Now let's go back a little bit to some basic

15   principles.  High yield debt typically has a fixed interest

16   rate?

17   A    It almost universally has a fixed interest rate, yes.

18   Q    And what does it mean to have a fixed interest rate?

19   A    That's a good point.  We get so tied up in our jargon.

20   It just means that the cash paid every semi-annual period

21   for the life of the note is exactly the same.  It doesn't

22   vary.  It's fixed.  Cash is paid in the same amount.

23   Q    All right.  And is there an average maturity associated

24   with high yield debt?

25   A    The most typical is seven years.  There's some five,

1    there's some tens, but the center of the market is seven

2    years.

3    Q    Okay.  And just bear with me about the basics here,

4    what exactly is maturity?

5    A    In high yield debt maturity is when you pay the

6    principal back.  Until you pay the principal back at the

7    very end of the maturity, you're only paying interest, the

8    defined fixed amount of interest every semi-annual period.

9    Q    Okay.  And in terms of the payback and the principal,

10   is the principal amortizing or non-amortizing?

11   A    We refer to it as non-amortizing which is different

12   than other types of debt.

13   Q    Okay.  And what does it mean to non-amortize?

14   A    That means that you're not going to retire the

15   principal at all, it's going to stay outstanding for the

16   life of the note.

17   Q    And is that different than other types of debt?  Can

18   you give us an example of an amortizing principal?

19   A    Again, I would imagine the majority of us in the room

20   have mortgages and mortgages are amortized.  When you make a

21   payment in a mortgage, you pay part interest and part

22   principal.  That's not true in high yield.

23   Q    Let's bring it down to the notes that are at issue

24   here.  Were the EFIH first lien notes non-amortizing debt

25   with a fixed interest rate?

1    A    They were clearly fixed interest rate, non-amortizing

2    debt.

3    Q    And were they for a defined length of time to maturity?

4    A    They were, yes.

5    Q    Can you tell us what the terms were, sir?

6    A    The terms on the 2010 exchange notes were 10 percent

7    coupon paid semi-annual and the maturity was pushed out

8    three years from the original period.

9    Q    Okay.  So you got this combination of a fixed interest

10   rate and a non-amortizing debt and a time for maturity, what

11   is it that investors are looking for economically when they

12   combine those three components into high yield debt?

13   A    They're looking for what I refer to as a very well

14   defined stream of cash flow for the period of the debt.

15   Q    And why is a stream of cash flow important?

16   A    Again, the reason high yield debt, in my mind, has

17   grown so successfully to a giant market today is because it

18   allows investors to match and that match is the key element.

19   Q    Does a defined stream of cash help investors and

20   issuers value high yield debt?

21   A    It's one of the critical components in valuing it, yes.

22   Q    All right.  We're going to talk a little bit more about

23   that in a second, but let's talk about interest rate and

24   credit risk that Mr. Kearns was touching on.  Is there a

25   risk for a high yield investor in agreeing to a fix rate for

1   a defined period of time into the future?

2   A    Yes, there is.  It can go both ways, in a declining

3   interest rate environment or in an increasing interest rate

4   environment.

5   Q    All right.  Well, what does an investor do when it

6   invests in high yield debt?  Do they have a right to get in

7   or get out?

8   A    It is locked in for life of the note, so they have a

9   defined fixed interest they're going to receive no matter if

10  interest rates go up or down.

11  Q    So what is the risk for an investor in the event that

12  interest rates go up?

13  A    Well, the real risk is that they can't take their money

14  and reinvest it at a higher rate and so they forego that and

15  that actually causes them a loss.

16  Q    And is there also a risk for the investor in high yield

17  debt with respect to the issuers credit rating or financial

18  condition?

19  A    Sure.

20  Q    What is that risk?

21  A    If the credit rating of a company -- financial

22  condition is probably a better word.  If the financial

23  condition deteriorates, the high yield investor is locked

24  in.  And so if you had a floating rate, it might go up, but

25  the company gets in worse condition, the investor's stuck.

1    He can't increase his rate.  It is what it is.

2    Q    So when the investor is locked in because either

3    interest rates go up or the issuers credit rating or

4    financial condition goes down, does the issuer benefit from

5    that?

6    A    No.

7    Q    The issuer benefit from the investor being committed?

8    A    The issuer benefits, yes.

9    Q    How does the issuer benefit?

10   A    Well, the issuer benefits in that if he wasn't locked

11   in and his credit rating or financial condition goes down,

12   then he would have to pay a higher rate and so he has the

13   reciprocal.

14   Q    All right.  Well, let's look at a chart that we have

15   marked as Plaintiff's Exhibit 4.  It's the demonstrative

16   exhibit for -- well it's not offered yet, so it's still just

17   an exhibit.

18          And that's the first exhibit Your Honor, in your

19   notebook for Mr. McCarty.  It has the title, allocation of

20   risks.

21          THE COURT:  Uh-huh.

22   BY MR. PLATT:

23   Q    Do you see this chart, Mr. McCarty?

24   A    I do.

25   Q    And what does this chart depict?

1    A     This depicts for two different groups, the issuer on

2    the left, and the investor on the right, the benefits of the

3    various changes in interest rates and financial condition of

4    the company.

5    Q     So does it allocate risks and benefit or show the

6    allocation of risk and benefit in high yield transactions?

7    A     It does.

8    Q     Now, is there such a thing as high yield debt that can

9    be redeemed whenever the issuer wants?

10   A     I've never come across it.  I've done these for 30

11   years and I've never done one that's redeemed whenever they

12   want.

13   Q     And why is high yield debt not freely callable or

14   redeemable by the issuer?

15   A     Well, the basis of the market is that the investor has

16   committed its money for the life of the note and the ability

17   to have symmetry of risks is a key element of them being

18   willing to do that.  So if it was freely callable, it would

19   break that symmetry.

20   Q     And in the event that an issuer wanted freely callable

21   debt where it could basically repay or redeem the notes

22   whenever it wanted, what would be the economic effect with

23   respect to those notes?

24   A     Well, if you could do it, it would be extraordinarily

25   more expensive.

1    Q    Uh-huh.  And what do you mean by "extraordinarily

2    expensive"?

3    A    A much higher rate that you would have to pay as an

4    issuer.

5    Q    Now, is there a circumstance where the issuer actually

6    bargains for the right to have more freely callable debt

7    than would otherwise be the case?

8    A    Yes, and it's both the cost schedule, which is kind of

9    centered upon half the life of the note, where they have a

10   cost schedule that they can call the debt with a declining

11   amount, and also during that non-call period which is after,

12   is an option to be able to step in and pay a make-whole to

13   retire it.

14   Q    Okay.  And those are the call protection provisions

15   that Mr. Kearns was talking about earlier?

16   A    Yes, those are the two.

17   Q    Okay.  Let's focus for a second on the make-whole

18   payment, what is your understanding of what a make-whole

19   payment means?

20   A    Well, I've been around, actually, since before the

21   Court ever called make-wholes, so I don't think who made up

22   make-whole, but they were called "yield maintenance" in the

23   original days.  And the idea was to be able to compensate

24   the investor for their lost interest or lost potential

25   earnings.

1   Q    And why are these payments now called a "make-whole

2   payment"?

3   A    They literally do make the investor whole on a

4   calculated basis for what they had originally committed to

5   when they put out their money.

6   Q    Okay.  And you heard Mr. Kearns talk about something

7   called a reinvestment risk, what does a reinvestment risk

8   mean to you?

9   A    It's particularly when it's in a declining

10  interest-rate environment, like we have over the past five

11  years when you put out money and you unexpectedly get it

12  back, you have to reinvest it and redeploy it.  And if it's

13  at a lower rate, then you have a negative risk.

14  Q    Okay.  And how does a make-whole protect against that

15  risk?

16  A    The make-whole is designed to be able to compensate for

17  that risk; that's the calculation based off of a market

18  rate.

19  Q    Okay.  Now, you heard Mr. Anker ask the question

20  earlier, well, don't investors get their principal and their

21  accrued interest in the event of an early refinancing?

22  What's your answer as to whether or not that makes the

23  investors whole or not?

24  A    No, it does not.

25  Q    Why not?

1   A    Because it does not compensate them for their lost

2   missing, if I call it a gap of cash.  It's a simple cash

3   shortfall.

4   Q    And does it also compensate them for the reinvestment

5   risk that you talked about?

6   A    And that is what creates the gap, is the reinvestment

7   risk.

8   Q    Okay.  Is there any windfall that investors receive if

9   the make-whole is paid?

10  A    No, the idea of a windfall here is something that I

11  just don't understand.  It is really for the investor, a

12  very mathematic calculation of what they lost.

13  Q    Now, going back to the EFIH notes for a second, did

14  EFIH pay all accrued interest on the notes as of June of

15  '14, June of 2014, do you know?

16  A    I believe they paid principal and accrued interest,

17  yes.

18  Q    Okay.  And what does the term "accrued interest mean"?

19  A    That means that it hasn't yet been paid, but it has

20  been earned up to that date.

21  Q    And if the notes had not been repaid in June of 2014,

22  would that interest still be accruing on the notes?

23  A    Yes, it would.

24  Q    Let's go back to general principles, again.  How do

25  make-wholes relate to that interest rate risk and credit

1   risk you were talking about earlier where we looked at the

2   chart?

3   A    Well, make-wholes, and the reason they came about, were

4   really an ability to create a symmetry of allowing the

5   issuer to have some financial flexibility to retire, but in

6   doing so, compensate the investors appropriately.

7   Q    So it was meant to benefit the issuer?

8   A    Originally, that was the idea.  The market was a

9   no-call provider.  The first of many high-yield deals I did

10  were no-call for life and the financial community allowed

11  the investors to have some flexibility, and thus, the

12  make-wholes.

13  Q    Tell us how the make-whole protection evolved over time

14  as requested by the issuer?

15  A    You know, originally, I think it came out of the

16  insurance company market and I did a deal way back in the

17  insurance company market for Nash Engineering and it was a

18  make-whole-like provision to give some flexibility.  The

19  high-yield market imported that from the private place in

20  the insurance market, and starting in the late '80s, early

21  '90s, it started to become not common, but it occurred and

22  it occurred as really more a common element toward the end

23  of the '90s because it was attractive to issuers because

24  they had the ability to get out.

25  Q    How common are make-whole provisions in the marketplace

1    today, sir?

2    A    I did a slightly different sample than Mr. Kearns.  I

3    think I had 1,320 in my sample.  I had slightly different

4    criteria, and they are the standard.  They are everything in

5    the marketplace.

6    Q    Let me ask you to look at what has been marked as

7    Plaintiff's Demonstrative Exhibit 5.  That's in the book as

8    the second demonstrative.

9    A    I'm looking at it, yes.

10   Q    What does it depict?

11   A    This depicts at 91 percent of high-yield bonds, 1,312

12   in my sample had make-whole provisions that allowed the

13   issuer to redeem the bonds early before the call schedule.

14   Q    And are the conclusions that you reach in this chart

15   consistent with your experience, sir?

16   A    Absolutely.  In fact, all the other ones, you really

17   had no ability to call.  So really 100 of issues in the

18   high-yield market in my sample were of similar nature.

19   Q    Okay.  And I told you that I was going for get back to

20   the question of how investors and issuers value high-yield

21   debt; do you remember that?

22   A    I do.

23   Q    And are make-wholes considered when high-yield debt is

24   valued both by issuers and by investors?

25   A    Absolutely.

1    Q    And what is the standard way that issuers and investors

2    value high-yield debt?

3    A    If you had a Bloomberg machine in here and propped it

4    up, then the first thing you would see is a yield to first

5    call, which is the standard measurement of bonds, high-yield

6    bonds.

7    Q    What does it mean, "yield to first call"?

8    A    Yeah, maybe I better explain that, sorry.  They make

9    the assumption that the bonds will are recalled and called

10   in at that first date, usually half the maturity.  They may

11   not be, but that's the assumption that everybody makes,

12   because it's out of their control at their point.  So it

13   measures what your yield would be to that date that it is

14   called in, half the maturity, and they pay the call premium

15   at that point.

16   Q    Okay.  And was there a first-call date in this case?

17   A    There was; it was half the life, essentially

18   December 1st, 2015.

19   Q    That was for the ten percent notes?

20   A    That's -- those are the notes that I'm focused on,

21   which are the 2010 exchange, yes.

22   Q    Okay.  And what was the -- if we were valuing the yield

23   to first call from the time that the notes were repaid in

24   June of 2014 to December 1st, 2015, would that be the period

25   that we are talking about?

1    A    That would be the yield to first call, traditionally,

2    yes.

3    Q    Okay.  And now how would this yield to first call

4    analysis that you're talking about, evaluation analysis, be

5    effected if the issuer wanted the option not to pay the

6    make-whole before that first-call date?

7    A    Well, if you had unlimited call, the first call would

8    be the first day of issue.  It would be very hard to have

9    anything other than that assumption because it's freely

10   callable at that point.  So it would be very hard to

11   calculate anything, other than the yield.

12   Q    Okay.  Well, if the issuer wanted this option to not

13   pay the make-whole before the first-call date, would that

14   option be worth something?

15   A    Oh, sure.

16   Q    What would be -- how would you value your risk?

17   A    Well, number one, it's a one-way option, so one-way

18   options in my marketplace are very valuable.  It would carry

19   a lot of, either costs from their side or value to the

20   investor if they gave it up.

21   Q    And what were the issuer have to pay or offer up for

22   such a transaction in the economic sense for the other side,

23   the investor?

24   A    Since I've never done one, never seen an analysis, it's

25   a little hard, the theoretical, but it would be a very large

1    number.  It would be very, very expensive.

2    Q    And is there any indication in the record that that

3    sort of value or that sort of compensation is paid by the

4    issuer to the investor in connection with this so-called

5    option?

6    A    Not with --

7              MR. HOWELL:  Object to the foundation, to the

8    extent that he can't say what that number would have been

9    anyway.

10             MR. PLATT:  I'll withdraw the question, Your

11   Honor.

12   BY MR. PLATT:

13   Q    Now, let's talk about the exchange offer here that

14   occurred in 2010.  Did you reach any conclusions as to

15   whether or not the make-whole protection was included in the

16   2010 exchange?

17   A    Yes.

18   Q    And did you examine the circumstances surrounding that

19   exchange?

20   A    Yes, I did.

21   Q    Did you look at the first-lien notes and the offering

22   materials?

23   A    I did.

24   Q    Can you briefly explain the circumstances surrounding

25   the 2010 exchange?

1    A    I won't take the Court through all the details of the

2    exchange, but it was a typical asset liability management by

3    a company where they asked the investors to take a reduction

4    in their principal and interest, what I call a "haircut," of

5    about 30 percent, and for that, they got additional

6    collateral.  The give-get was please reduce and take a

7    haircut, you're going to get more collateral.  You're

8    also -- with the interest rate reduction down to 10 percent,

9    the two notes that they exchanged were significantly higher,

10   so that was the basic trade that went on.

11   Q    And was there any collateral associated with the

12   exchange?

13   A    As I said, they increased collateral, and to be

14   specific, they got collateral in Oncor, which is an utility,

15   which has had high value and put them in, very obviously at

16   that point, an over-collateralized position.

17   Q    And did EFIH conduct any study of what it was receiving

18   as part of this exchange?

19   A    Sure.  I've read the depositions of Mr. Horton and his

20   associates, and they thought they were trying to get the

21   best terms they could in the 2010 exchange and did.  It was,

22   from an outsider's standpoint, it was a balanced trade.

23   Q    Okay.  So with respect to the ten percent interest rate

24   that was paid, was there something unusual about that rate

25   in the market, with respect to this exchange?

1   A    Well, I don't know unusual.  When I do exchanges, you

2   have to have one point that you can define.  We call it

3   "putting a post in the ground"; and that definition is your

4   new exchanged notes have to trade at par.  If you don't do

5   that, everything else is too variable.

6            And so when they did the exchange, the notes

7   traded at par, so ten percent interest is what cleared the

8   market and had the new notes trade at par.  That's a key

9   element of any exchange.

10  Q    Okay.  So in the event that after the 2010 exchange, we

11  look at the trading history and we see the notes trading at

12  par, what does that tell us?

13  A    Par, just so we're clear, is 100 percent of face, and

14  to me, that tells you that for those notes, for that issuer

15  at that time, that was the market.

16  Q    Let's talk a little bit about the consequences for

17  investors if the make-whole is not paid.  Have you done any

18  analysis as to what the consequences are for investors in

19  the event that debt is financed -- refinanced early?

20  A    I have, yes.

21  Q    And what has been the results of your analysis?

22  A    The analysis -- again, the bond market is a pretty

23  simple market; it's a cash-on-cash market, so I have gone

24  through and followed the cash and the yields for the

25  investors associated with the 2010 exchange.

1   Q    And have you done any assessment of the reinvestment

2   risks associated in the event that the make-whole was not

3   paid?

4   A    I have.

5   Q    Did EFIH investors suffer a loss of a defined stream of

6   cash or income over time?

7   A    Yes, they did.

8   Q    And what exactly did they lose?

9   A    They had a defined period, life of the note that they

10  got.  They had a defined interest rate and when it was

11  retired last year, they lost that and had to reinvest it.

12  Q    And were there also, again, were there reinvestment

13  risks or losses associated with what happened to the EFIH

14  investors?

15  A    Yes, there were.

16  Q    What were they?

17  A    They were substantial.  The ability, if you followed

18  the cash, was -- I assumed a slightly different rate than

19  Mr. Kearns; I just took the DIP rate -- but they invested

20  that at 4.25 in my examples.

21  Q    And were there even further financial consequences for

22  those investors who were part of the 2010 exchange, in your

23  opinion?

24  A    There were.  I mean it was particularly hard on them

25  because they took a haircut.  This isn't like a new issue

1    where you're trying to look at the impact of a new issue,

2    with new money going in.  These investors have already taken

3    a 30 percent haircut.  They had to drag along 20 percent of

4    the old notes.  So it had a particularly difficult position

5    on them, and particularly, because they had collateral on

6    them, which was important.

7    Q    Now, did these financial losses and consequences go

8    away when the investors received all of their principal and

9    all of their accrued interest in June of 2014?

10   A    No.

11   Q    Why not?

12   A    You really need to be able to pay the make-whole, plus,

13   in addition to the principal and interest, to be able to get

14   back to that defined cash flow stream that they gave up.

15   Q    Let's look at a demonstrative that we've marked as

16   demonstrative Exhibit 6.  I think that's the third

17   demonstrative in your book.

18   A    I've got it in front of me, yes.

19   Q    Do you recognize this chart, sir?

20   A    I do.  It came out of my report.

21   Q    And what does this demonstrative tell us?

22   A    The first column marked "expected return" is taking the

23   date of the refinancing last year and calculating a yield to

24   that call, if you will, being that's the first call from the

25   original issue, and that would have been 13.78 percent.

1   Q    Okay.  Let's break that down so I can understand it.

2   We're looking at the left-hand column, are we, on this

3   demonstrative?

4   A    That's correct.

5   Q    And that's the one in blue?

6   A    That's correct.

7   Q    And it has, down in the bottom "bargain," what does

8   that mean?

9   A    Mine doesn't say bargain.

10  Q    Oh sorry.  The one I have does say bargain.

11       Does anybody else have --

12       UNIDENTIFIED SPEAKER:  Expected return.

13  BY MR. PLATT:

14  Q    Expected return.

15  A    Mine says "expected return."

16  Q    Expected return, pardon me.  What does it mean when it

17  says "expected return"?

18  A    That's the full payment of interest through the life

19  until retirement last year, plus the make-whole.  So that is

20  the expected return that investors thought in 2010 in

21  exchange they were getting to that date of first call.

22  Q    Okay.  And that's the yield to first call analysis you

23  were talking about earlier?

24  A    The first call in this case being the date that the

25  issuer decided to refinance.

1   Q    And the expected return was 13.78 percent, is that what

2   your chart shows?

3   A    That is the correct amount, yes.

4   Q    And that's what your analysis led to?

5   A    Just a pretty simple cash analysis of the interest

6   payments in the make-whole to the original amount.

7   Q    Okay.  Let's look at the right-hand column that's in

8   red that says at the bottom "not allowing make-whole"; what

9   does that column represent?

10  A    It's the same calculation, expect you don't pay the

11  make-whole.  You pay the interest up to the date of

12  refinancing and that's all you pay, and then you get your

13  principal and interest back and that ten percent is it.

14  Q    All right.  And what's the difference between the

15  expected return for the 2010 noteholders and what they

16  actually got when the notes were repaid in June of 2010?

17  A    On the bond market we refer to basis points, which is

18  points of interest; that's 378 basis points difference

19  between the two items, which is significant in anybody's

20  market.

21  Q    And you heard Mr. Kearns talking about reinvestment

22  risks and what was comparable in the market at the time.

23  Could an investor just go out and find a comparable credit

24  with a comparable rate in June of 2014 and somehow mitigate

25  this 3.78 loss?

1    A    Well, if you take the period in question, which is

2    really an important point here, it has significantly

3    declining interest rates that went almost to zero for the

4    risk-free rate -- never before in history.  And so during

5    this time, it was very obvious in the market that you

6    couldn't go out and duplicate that rate.

7    Q    Okay.  Let's look at the demonstrative Exhibit 7.  It's

8    in your book, Mr. McCarty.

9    A    Okay.

10   Q    This is the one that has at the top, the reading "The

11   make-whole compensates to a loss."

12   A    I've got it in front of me.

13   Q    Okay.  And would you please walk us through this chart.

14   Let's go step-by-step.  In the left-hand bar graph, the one

15   that has down at the bottom, "2010 exchange expected cash";

16   what does that bar represent?

17   A    I guess I should introduce this slide.  I had a partner

18   for a long time who always said, If you can't say it on one

19   page, you can't say it.

20   Q    Yeah.

21   A    This says it, to me, for an economic analysis of what

22   we're talking about today, on one page, and it's in the

23   language of the bond market; it's about cash only.  This is

24   purely cash in/cash out.  I took -- just to make it easy for

25   everybody to follow here -- I took a hypothetical investor

1    who invested $20 million, and that's why the axis on the

2    left there starts at $20 million; that's the original

3    invested amount that went out the door, and I followed it

4    from the original LVO in November of 2007 all the way for

5    all the analysis to first -- original first call date of the

6    2010 notes.  I had to pick a date that you went to the same

7    date for all of them.

8              So December, 2015, cash that's load (ph), the

9    left-hand column is what investors I believe expected to

10   receive in cash for their $20 million.  They get back $11.23

11   million more than they invested over the life, a little over

12   eight years, of the investment.

13   Q    Let me stop you there.  So that black bar that runs

14   across horizontally, what does that represent?

15   A    That's the load of the bar, if you will, on the left,

16   the 31.23; that's the amount they actually got back last

17   summer, extrapolated to December 1st, 2015, reinvested, if

18   you will, and so 29.18 is the number that, on the same date

19   analysis, that investors got, instead of 31.23.

20   Q    Okay.  Let's go to the middle bar, what does that show?

21   A    It shows two things.  There's two different colors on

22   it, so let me explain it.  The first part of it, up to the

23   black bar you referred to, is the amount of principal and

24   interest paid and then reinvested to the first call date,

25   which is similar for all the cases, December 1st, 2015.  So

1    that's what the investors actually got, compared to what

2    they should have gotten.

3    Q    Well, and what they expected, there's a 31.23 number

4    and what they actually got is 31.04, assuming the make-whole

5    was paid.  Why is there a difference there?

6    A    Well, the make-whole doesn't fully compensate for it.

7    It comes close.  Their market rates are slightly different

8    than the rates assumed in the make-whole, so there's a

9    slight difference, but it, essentially, in a rounding basis,

10   is wall.

11   Q    Okay.  So that's two signs of looking at this issue

12   from the hypothetical investor standpoint, but there's a

13   third bar graph over on the right that looks like it's much

14   taller.  Can you explain that, please.

15   A    Here, as a control element, we wanted to be able to

16   look at the original investor, if he declined the 2010

17   exchange and still recovered his money.  He got back 38

18   million.  Obviously, the people who took the exchange, they

19   didn't get the 38 million apiece.

20   Q    Now, there's the one little part of the middle bar

21   graph that has a different color -- it's not in blue, it's

22   in gold or something -- orange.

23   A    Or red or --

24   Q    Or red -- yeah, on mine, it's different, of course.

25   And if you took out that make-whole section, what would be

1  left?

2  A     The make-whole section there is the additive depiction

3  to the 31.04.  You get down to the 29.18 million that they

4  got back for their 20 million investment.

5  Q     Okay.  So this hypothetical investor who put in $20

6  million would get 29.18 at the June, 2014, repayments; is

7  that right?

8  A     And reinvested until December of 2015.  So everybody is

9  on a standard date.

10  Q     Okay.

11  A     You can't do these types of comparisons unless you

12  stick to a standard date.

13  Q     Okay.  And what this hypothetical investor lost was the

14  1.86; that's in that red section.

15  A     That's the make-whole for just that investor.

16  Q     For just that investor who put in 20 million?

17  A     That's correct.

18  Q     Okay.  Now, let's look at the next graph, set of graphs

19  that's in Plaintiff's Demonstrative 8.  And could you tell

20  us overall what this graph shows us.

21  A     This is exactly the same analysis as the previous one,

22  and all it does is grows it up for the difference between

23  the $20 million investor and the $4.5 billion total amount.

24  Q     Okay.

25  A     So it's all the same analysis; it's just taking that

1    theoretical investor of 20 million and saying, let's do it

2    for the whole issue for EFH.

3    Q    And what was the 2010 exchange expected cash for the

4    whole issue, the whole 4.5?

5    A    That was seven -- a little over $7 billion on the 4.5.

6    Q    And what is the actual plus make-whole graph show here?

7    A    Just under seven billion, so, again, it's slightly

8    below the expected.  The difference is the number, 425,

9    which was our kind of standard calculation of the

10   make-whole.

11   Q    And the 4.25 is the make-whole that is --

12   A    It's -- 425 million is the difference.

13   Q    And how about the bar way over on the right?

14   A    That's if the original investor kept the 2007 notes and

15   got recovery.

16   Q    So is it fair to say that this chart also analyzes the

17   financial consequences for the first-lien noteholders in

18   terms of the cash that they're not receiving when the

19   make-whole is not paid?

20   A    In my business cash is the whole issue, this is, to me,

21   the central point.

22   Q    And it's the central point because, do they have an

23   expectation of receiving that cash at the beginning of their

24   investment?

25   A    They did.

1            MR. HOWELL:  Object to foundation.

2            THE COURT:  Foundation?

3            MR. PLATT:  The foundation, Your Honor, is

4    everything he said up until this point, but let me ask the

5    question in a less-leading way.

6    BY MR. PLATT:

7    Q    Was there an expectation that investors would be

8    receiving a certain amount of cash with respect to this

9    high-yield debt?

10            MR. HOWELL:  Object to the foundation.  Same

11    objection.

12            THE COURT:  Overruled.

13            THE WITNESS:  Yes, there was an expectation in the

14    original 2010 bargain, very clear.

15    BY MR. PLATT:

16    Q    And is there another type of investment based on a cash

17    stream for a defined period of time that would help

18    illustrate the consequences of what happens when a

19    make-whole is not paid?

20    A    Yeah, I think the other side of the equation is

21    comparable.  If I bought an annuity from a group and they

22    stopped payment, I expected it to be outstanding for my life

23    and hopefully I live this long -- I'm in my 80s -- and they

24    stop paying at 75.  It's not expected that it stops before

25    maturity.

1   Q    So what are the cash consequences for the pension funds

2   and the insurance companies and the other types of high

3   yield investors in the event that a make-whole like this is

4   not paid?

5   A    It creates a mismatch of assets and liabilities, which

6   is really a critical element out there.

7   Q    Let's talk about the consequences for the issuer when

8   the make-whole is not paid.  Have you done any analysis of

9   that?

10  A    I have.  I have looked at what would be the impact on

11  the issuer.  Obviously, he doesn't pay the make-whole, so

12  he's not out 425 million.

13  Q    Are there other benefits that the issuer has or will

14  receive as a result of not paying the make-whole?

15  A    Well, I can go all the way back.  He got the haircut

16  originally, and that was part of the bargain, so he got the

17  haircut of 30 percent off and principal and interest.  He

18  got a low-interest rate for the last four and a half years.

19  He got the benefit of that.  He got the benefit of interest

20  since retirement last summer until December, 2015.  So it's

21  a stack-up of benefits that he gets.

22  Q    And are there benefits going forward?

23  A    There are.  Because -- well, beyond even the first

24  call.

25  Q    And how does all this relate to that balancing of risks

1    that you were talking about earlier?

2    A    Well, it's definitely becoming unbalanced.  As I said

3    earlier, I think symmetry is broken, and symmetry is what

4    the high-yield market is about.

5    Q    And let me ask you to look at the final chart or set of

6    charts in the book, which we have marked as demonstrative

7    Exhibits 9 and 10.

8    A    I have it in front of me, yes.

9    Q    And I'm going to ask you to look at both of these

10   charts as they work together, and through the miracle of

11   electronics, can you tell us what this chart depicts.

12   A    If we can go back to the original one --

13   Q    Yes.

14   A    -- and the balance, on the EFIH side, they reduced the

15   interests, payments and principal, the haircut I referred

16   to.  They extended out the maturity for an additional three

17   years and they improved their liquidity.  This was part of

18   an effort to try to save them back in 2010 and they got what

19   they needed in the exchange.

20           You know, the noteholders, they took a substantial

21   haircut to their principal and interest, but they got what

22   is nearly a guarantee return.  They got a very

23   well-collateralized senior first-lien piece of paper for the

24   security being a utility that was A-rated or above, so

25   that's pretty much a guarantee in my world, and they got a

1   right to a make-whole, so that was protected.  That stream

2   was protected.

3            So that, to me, was a very balanced trade.  I

4   think it was a smart trade for investors and a smart trade

5   for the company.  They all got what they needed and it was a

6   good deal.

7   Q    Based on market terms that existed at the time?

8   A    It was a market deal for both sides of the equation and

9   I think that the company came out no better than the

10  investors and the investors, no better than the company in

11  2010.

12  Q    And if the noteholders hadn't gotten call protection

13  back in 2010, would the deal still have balance or symmetry

14  or proportionality?

15  A    No, it would not.

16  Q    Why not?

17  A    Number one, I go back to my principal statement of

18  exchange rate exchange robbers (ph).  That new piece of

19  paper would never have traded at par, and without it trading

20  at par, I don't think the exchange would have occurred.  It

21  wouldn't have been a balanced trade.  You wouldn't have had

22  the transaction.

23  Q    Okay.  And let's look at what happened when the

24  make-whole was not paid.  Can you explain in this chart?

25  A    Yeah, the graphics are pretty obvious.  If you take

1    away the make-whole, it is an unbalanced, imbalanced risk,

2    and it is one, again, I don't think that would have been

3    able to have been completed under those terms.

4    Q    Now, does the fact that the issuer has filed for

5    bankruptcy change your conclusion from an economic

6    standpoint?

7    A    No, I mean cash loss of the defined stream for

8    investors is the same whether it's in bankruptcy or out of

9    bankruptcy, and I don't think that anybody can deny that, so

10   that's the same.  And this whole issue of acceleration and

11   rescission, to me -- again, I've been around long enough

12   before there was automatic acceleration and there used to be

13   a food fight in Delaware and everybody else in bankruptcy

14   court as everybody grabbed collateral.  My view of

15   acceleration, and all the deals that I've been on from an

16   issuer's side and an investor's side, is it protects

17   investors and it has a paired right to it, rescission.  And

18   I've been involved with issuers who have had their

19   acceleration rescinded and it is always paired.  So without

20   pairing and the cash is the same, I don't think that

21   bankruptcy changes my opinion at all.

22   Q    Let me ask you to look at page 25 of your report,

23   Mr. McCarty.  You talk about your opinion that the

24   refinancing of the notes in bankruptcy does not have a

25   different economic effect on a noteholder than it would

1    outside of bankruptcy.  Do you see that on page 25?

2    A    I do.

3    Q    And in that paragraph 49, in the second sentence you

4    talk about the basic rationale for a make-whole provision.

5    Does the basic rationale for a make-whole provision change

6    simply because the issuer has filed for bankruptcy?

7    A    No, it's pretty consistent with what I just said; it's

8    to establish symmetry, the sharing of the risk between the

9    issuer and the investor.  It protects the investors against

10   loss of their future cash.  That's it to me.

11   Q    Okay.  And if you flip over the page, page 26, in the

12   carryover paragraph about halfway down where you talk about

13   economic reasons, can you think of any economic reason why

14   the make-whole protection that was provided here would apply

15   outside of bankruptcy and not in bankruptcy?

16   A    Again, it doesn't make any sense to me.

17           THE COURT:  Then why the heck did the documents

18   get drafted the way they got drafted?

19           THE WITNESS:  If you want my opinion --

20           THE COURT:  Yeah, yes.

21           THE WITNESS:  I think this is a carryover from old

22   documents that have been around a long time.  This whole

23   issue of payment and bankruptcy wasn't a big deal for

24   anybody because high-yield notes started out as subordinated

25   notes; they were never highly collateralized, and so people

1    were -- had no focus on getting paid in bankruptcy.  That's

2    what I think has happened.  Firstly, notes are very new in

3    the marketplace, the last 10 to 12 years, and I think it's

4    carryover documents.

5    BY MR. PLATT:

6    Q    Now, does the economic harm change as a result of

7    bankruptcy?

8    A    No, it's the same cash loss.

9    Q    Okay.  And does the right to rescission change in the

10   event of bankruptcy?

11   A    No, not at all.  I mean this was a, you know,

12   over-collateralized first lien, who we were assuming is

13   solvent, so rescission is still the same.

14   Q    And remember we talked about the free one-way option.

15   Does the option just suddenly redeem these notes or repay

16   these notes and suddenly get this one-way option changed

17   because of this bankruptcy?

18   A    In my world, options are always valuable; that's what

19   the markets are about.  And to have a one-way option you

20   don't pay for is something I've never seen in anything.

21   It's an option that I don't think anybody knew existed.

22   Q    Let me ask you a few final questions, Mr. McCarty about

23   the disclosures that were made with respect to the EFIH

24   first-lien notes.  Let me ask you some background questions

25   first.  You have represented issuers in connection with

1    high-yield debt transactions?

2    A    A very large number, yes.

3    Q    And have you participated in the preparation of

4    offering materials in connection with those issuances?

5    A    Yes, working for the issuer.

6    Q    Have you been involved in or prepared risk-factor

7    disclosures in connection with those issuances?

8    A    In assistance with counsel, yes.

9    Q    And have you helped issuers make determinations as to

10   what risk factors are material or not?

11   A    Absolutely.

12   Q    Do you have any opinion with respect to the risk-factor

13   disclosures that were made with respect to the first-lien

14   notes in 2010?

15             MR. HOWELL:  Object to the extent it calls for an

16   opinion not in his report, nor laid out in his discussion of

17   what his opinion would be.

18             MR. PLATT:  Well, I think it is discussed in his

19   report, Your Honor, at some point.

20             THE COURT:  Is it in there?

21             THE WITNESS:  Yes, it is.

22             MR. PLATT:  If you start on page 34 and you

23   continue on to page 38, I think you'll see a lengthy

24   description of the disclosures of this material.

25             THE COURT:  I missed that report.

1          MR. PLATT:  Paragraphs 66 through 70.

2          THE COURT:  Reply?

3          MR. HOWELL:  Again, my understanding of the

4     question was asking for an analysis of the risk factors --

5     there's a list of risk factors put in his report, but I

6     thought he was giving an opinion as to what risk factors

7     should have been made, and I may have misunderstood the

8     question.

9     BY MR. PLATT:

10    Q    Yeah, that was not my question.  I was just asking the

11    open question first as to whether the expert has formed in

12    opinions as to the risk factor disclosures in the EFIH

13    offering materials.

14    A    Yes, I familiarized myself particularly about

15    bankruptcy disclosures.  I think there were ten specific

16    disclosures in that prospectus.  Again, this was an exchange

17    offer, rather than an issuing or an offering document, so it

18    was an SCC registered document for the exchange and there

19    were ten specific bankruptcy disclosure items in there.

20    Q    Okay.  And was there any disclosure about the risk that

21    the rescission right might be challenged in the event of a

22    bankruptcy?

23    A    No, there was none.

24    Q    Was there any disclosure about whether the noteholders'

25    right to receive a make-whole might be challenged in the

1    event of bankruptcy?

2    A    No, there wasn't.

3    Q    Was there any --

4           THE COURT:  Where are we going with this?

5           MR. PLATT:  I was going to ask a follow-up

6    question, Your Honor.

7    BY MR. PLATT:

8    Q    Given the disclosures that were actually made, do you

9    have an opinion as to whether or not EFIH expected that the

10   noteholders' right to rescission did not apply in the event

11   of bankruptcy?

12          THE COURT:  That's not in his list of opinions.

13          MR. PLATT:  I will withdraw the question then,

14   Your Honor.

15   BY MR. PLATT:

16   Q    And I will simply ask, what opinions in your report did

17   you have with respect to disclosures, sir?

18   A    That I -- I had in there that if the market had been

19   informed through clear disclosures that the make-whole would

20   not be paid in the event of a bankruptcy, they likely would

21   have traded in normal course at a discount.

22   Q    Thank you, Mr. McCarty.

23          MR. PLATT:  No further questions.

24          THE COURT:  Okay.  Cross?

25   CROSS-EXAMINATION

Page 164

1    BY MR. HOWELL:

2    Q    Good afternoon, Mr. McCarty.

3    A    Good afternoon.

4    Q    I want to start with something you covered to some

5    degree of detail there in your direct examination, which is

6    this concept that the 2010 exchange was a haircut; do you

7    remember that testimony?

8    A    I do, yes.

9    Q    And you talked at some length about the 2010 exchange;

10   is that right?

11   A    That's right.

12   Q    Now, you understand that in the 2010 exchange, the

13   notes that were exchanged were 2007 unsecured EFH bonds for

14   2010 first lien EFIH secured bonds, correct?

15   A    Yes, I think there were two trenches of 2007s that were

16   exchanged.

17   Q    Both of those trenches were unsecured notes, correct?

18   A    That's correct.

19   Q    And both of those notes that were changed were in EFH

20   and not in EFIH, correct?

21   A    Yes, they were for a different issuer, correct.

22   Q    And you're aware that in addition to the notes that the

23   parties changed, the 2007 notes, there was also a cash

24   payment at the time?

25   A    I think it was $500 million, yes.

1  Q     And, of course, as part of the exchange, the

2  noteholders got a new lien on the company's assets that they

3  previously didn't have, correct?

4  A     For the newly issued notes.  They had a drag-along of

5  about 19.46 percent that they kept in their old notes.

6  Q     And the notes, the EFH 2007 notes, those were trading

7  below par at the time of the exchange, correct?

8  A     That's correct.

9  Q     They were trading around seventy cents on the dollar at

10  that time, correct?

11  A     Plus or minus, correct.

12  Q     And it's true that in terms of the fair market value of

13  those notes, there was actually a five percent boost for

14  those exchanging from the 2007 EFH to the 2010 EFIH,

15  correct?

16  A     Consistent with every exchange I've ever done, there's

17  always a boost, correct.

18  Q     And you described it not only as a haircut, but also as

19  a balanced trade, right?

20  A     All the terms and conditions put together with the

21  collateral, the reduction in principal and interests and the

22  increase in collateral, yes, I think it was a balanced

23  trade.

24  Q     And you said that ultimately you thought it was a

25  market deal because it exited (ph) and was trading right at

```
 1    par, right?

 2    A    Yes.

 3    Q    Now, you weren't personally involved in the

 4    negotiations around the 2010 exchange, correct?

 5    A    I was not.

 6    Q    And you didn't speak with the holders of the

 7    ten-percent notes about the negotiation of that exchange,

 8    did you?

 9    A    I did not.

10    Q    And you didn't speak with any holders of notes about

11    the negotiations of the 2007 EFH notes, correct?

12    A    I did not.

13    Q    And you didn't speak to any of the lawyers who

14    negotiated the EFIH ten percent exchange, correct?

15    A    Not about that transaction, no.

16    Q    Nor about the drafting of the EFH 2007 notes, correct?

17    A    Nope.

18    Q    And it's standard practice for you in these cases that

19    you haven't spoken to any noteholders or counsel or the

20    issuer as part of your expert work here, correct?

21    A    Not associated the expert work, no.

22    Q    And you testified a bit about the specific de-

23    acceleration or rescission language in the indenture,

24    correct?

25    A    That's correct.
```

1   Q    But it's your experience that investors in the EFIH ten

2   percent bonds would have made their commitments prior to

3   reviewing the indenture, correct?

4   A    They would, generally, yes.  On a term sheet, many

5   investors look at a term sheet of an exchange offer.

6   Q    And that's your understanding of general practice, in

7   your opinion, is that general practice, people make

8   commitments prior to reading the indenture, correct?

9   A    The -- prior to reading the indenture, there's usually

10  a summary in the term sheet and they rely on what are

11  usually standard documents.

12  Q    And not just generally, but specifically in this case,

13  your experience is that investors in the EFIH ten percent

14  bonds would have made their commitments prior to reviewing

15  the indentures, correct?

16  A    In most cases.  There may have been some holdouts, but

17  as I understand it, from the company's testimony, they had

18  negotiations with the majority of holders well prior to even

19  going public with the documents, so, yes.

20  Q    And you haven't spoken to any of the investors who

21  bought the ten percent notes, about whether or not they had

22  the opportunity to review the indenture before making their

23  investment, correct?

24  A    No, I have not.

25  Q    Now, you talked a little bit about your study that you

1    did of 1,312 bond offerings, correct?

2    A    That's correct.

3    Q    And I believe you said that in your study you didn't

4    find any bond offerings that didn't have call protection; is

5    that right?

6    A    That's correct.

7    Q    Now, you didn't review the indenture for every one of

8    the 1,312 bond offerings referred to in your report,

9    correct?

10   A    No.  In our industry there's a standard, which is

11   Bloomberg, which everybody trades on, and I relied on

12   Bloomberg's definition of them.

13   Q    And so you pulled -- kind of similar to what Mr. Kearns

14   was talking about, you looked at certain screens or certain

15   beta sets from Bloomberg like whether or not there was a

16   call protection at all and what the first call date was,

17   things like that, right?

18   A    Yes, but we obviously had slightly different screens

19   because we came up with a smaller sample size.

20   Q    But like Mr. Kearns, one of the screens that you did

21   not use was a screen to review the acceleration language in

22   those 1,312 agreements, correct?

23   A    I did not.

24   Q    And you also didn't have a screen to look at the

25   rescission language in the 1,312 agreements, correct?

1   A    I did not.

2   Q    I'd like, if I could, and I may have to ask a favor of

3   Mr. Platt, if we could bring up, I believe it is Plaintiff's

4   Demonstrative 6.

5         MR. HOWELL:  I appreciate it.  We didn't get a

6   copy until today, so we don't have one in our file.

7         THE WITNESS:  Is that the one?

8         MR. HOWELL:  That is not the one I'm referring to.

9         THE WITNESS:  Okay.

10        MR. HOWELL:  It's Plaintiff's Demonstrative 6, the

11  title is the Investor's Agreement -- yes, thank you.

12  BY MR. HOWELL:

13  Q    Now, there were two bar charts, one says, "Expected

14  returns," the other says, "Not allowing make-whole."  Do you

15  see that?

16  A    I do.

17  Q    And I believe Mr. Platt misspoke for a second and said

18  that the left bar might be called "Bargain," do you remember

19  that?

20  A    I do.

21  Q    Now, you also talked about the expected return in terms

22  of what you said the investor should have gotten.  Do you

23  remember that testimony?

24  A    I'm not sure I used that, but, yeah, I think I get the

25  same meaning.

1    Q    Now, ultimately you would agree with me, wouldn't you,

2    that the bargain would be the deal that was struck between

3    the parties, right?

4    A    Yes, I guess.

5    Q    And typically the bargain, the deal that would be

6    struck between the parties would be memorialized in the

7    indenture, right?

8    A    The indenture is the document, yes.

9    Q    And if I want to know what the investors should have

10   gotten, you would agree with me that I should go and look at

11   the indenture that controls the bargain, correct?

12   A    I think that's probably fair.

13   Q    I would then like to go to the next demonstrative,

14   which was Plaintiff's Demonstrative 7.  And I just want to

15   be clear here to make sure I understand.  This third column

16   here, "Original," this combines -- or this assumes that an

17   EFH 2007 unsecured noteholder would have held their note up

18   until June 19, 2014, correct?

19   A    No.  It actually in the detail in the appendix says

20   that it goes to first call, which I believe is 2012, and

21   then it is reinvested from there.  But you're following a

22   similar logic, it's just we did it at first call.

23   Q    No, I appreciate the clarification.  It's up until

24   December 1, 2015, correct?

25   A    That's the reinvestment, yes, up until December 1st,

Page 171

1   2015.

2   Q    But of course the vast majority of the 2007 noteholders

3   did participate in the exchange in 2010, correct?

4   A    They did -- well, other than the drag-along, which they

5   had to keep the 19.6 percent.

6   Q    And, again, you called that a balanced trade, correct?

7   A    That's correct.

8   Q    And those notes at that time were trading well below

9   par, correct?

10  A    They were.

11  Q    And if we could turn finally to Plaintiffs'

12  Demonstrative 9, please.

13  A    Is that the one --

14  Q    That is the first balance risk chart mixed with the

15  scales that are (indiscernible).

16  A    Okay.

17  Q    Now, there in the left column, Mr. McCarty, you have

18  reduced interest payments and principal.  That's the haircut

19  you were referring to, correct?

20  A    That is correct, the haircut.

21  Q    Thank you.  And the extended maturity, that also came

22  out of that 2010 exchange, correct?

23  A    That's three years additional, both on the make-whole

24  and the maturity, yes.

25  Q    Now, you also said that one thing that was important

1    was that the noteholders got a right to a make-whole as part

2    of the balanced trade in 2010, correct?

3    A    Yes.

4    Q    Now, the make-whole language that was in the 2010

5    indenture, that's the same make-whole language substantially

6    that was in the 2007 EFH unsecured indenture, correct?

7    A    The only difference in the two, one was over-

8    collateralized, one was uncollateralized, which makes the

9    value of the make-wholes different.

10   Q    Well, the language with respect to the optional

11   redemption provision and the acceleration provisions, those

12   were all the same, correct?

13   A    That's correct.

14   Q    So the call protection was the same in the 2007

15   indenture as the 2010 indenture, correct?

16   A    I was trying to be -- from an economic basis, the call

17   protection from an economic basis was not quite the same

18   because one involves a collateralized first lien security.

19   Q    And you didn't put on the right side of this balanced

20   risk area the $500 million cash payment, correct?

21   A    No.  I've netted it out with the substantial haircut as

22   the terms of -- a summary of the terms of the 2010

23   agreement.

24   Q    And you didn't put on the right side here the fact that

25   there was the boost that we talked about, the five-percent

Page 173

1    increase in fair market value as of the exchange, correct?

2    A     No.

3              MR. HOWELL:  I have no further questions.

4              THE COURT:  Redirect?

5              MR. PLATT:  May I have one moment, Your Honor?

6         (Pause)

7    REDIRECT EXAMINATION

8    BY MR. PLATT:

9    Q    Mr. McCarty, do you have any understanding as to

10   whether or not the noteholders in 2010 has an expectation

11   with respect to the make-whole?

12             MR. HOWELL:  Objection, foundation.

13             MR. PLATT:  Well, I'm just following up on his

14   point, Your Honor, that there was apparently a lack of some

15   expectation.

16             THE COURT:  Overruled.

17             THE WITNESS:  Yes.  And I think it relates to what

18   I was trying to clarify in his cross.  Given that they had a

19   security now that was senior, first lien over-

20   collateralized, I think the expectation was that the defined

21   cash flow would continue and, if it didn't, there would be a

22   make-whole.

23   BY MR. PLATT:

24   Q    And did you look and see whether or not there are make-

25   whole provisions in the 2007 indenture?

1    A     Sure, they were the same.

2    Q     They were the same?  And did you also look to see

3    whether or not the 2007 notes had a EFIH guaranty associated

4    with them?

5    A     They did.

6    Q     Mr. Howell asked you several questions about whether or

7    not it was a balanced trade in 2010.  Do you have any

8    opinion as to whether or not the trade in 2010 would have

9    been balanced if the noteholders had been told that they

10   weren't going to get a make-whole in the event that EFIH

11   filed for bankruptcy?

12   A     Yeah, I've done -- I've looked at more than 100

13   exchange offers, I don't think that they would have

14   completed the exchange offer if they had disclosed that, it

15   wouldn't have happened.

16   Q     And Mr. Howell asked you whether or not you spoke to

17   anyone about the 2010 exchange, do you remember that

18   question?

19   A     I did.

20   Q     Did you read any depositions or documents with respect

21   to the 2010 exchange?

22   A     I did.  I read Mr. Horton and his associates'

23   description in detail about the 2010 exchange.

24   Q     And was there anything more that you felt you needed to

25   know after reading the depositions and the documents about

1    the 2010 exchange that might require you to speak to some

2    noteholders who held notes back then?

3    A    One of the great things about the bond market, it's

4    about cash.  I could follow the cash and I could read the

5    documents and I could read the depositions, I knew what I

6    needed to know.

7    Q    And similarly with respect to the commonality of make-

8    whole provisions, Mr. Howell was asking you about the

9    Bloomberg data that you relied on.  Did you rely on anything

10   else in coming to the conclusion that make-whole provisions

11   are standard in the industry?

12   A    Besides my study and besides my 40 years of experience

13   in going through it and dealing with 1,600 institutions, I

14   didn't think I needed to do anything more to confirm it.

15   Q    Did you see anything in the deposition testimony about

16   that subject?

17   A    I did see Mr. Horton said he got the best deal he could

18   possibly get and they got standard terms.

19          MR. PLATT:  No further questions.  Thank you, Mr.

20   McCarty.

21          THE COURT:  Thank you, sir.  You may step down.

22          THE WITNESS:  Thank you.  Would you like me to

23   take the binder with me?

24          THE COURT:  Yes, if you don't mind returning them

25   to counsel, that would be helpful.  Thank you.

1            MR. ANKER:  Your Honor, would you -- I'm ready to

2    call the next witness or we can take a five-minute break,

3    whatever you'd like.

4            THE COURT:  Who's next?  Just so we know.

5            MR. ANKER:  I think we're going to call Mr. Horton

6    to the stand.

7            THE COURT:  All right.  We'll take a short recess

8    then.

9        (Recess at 3:26 p.m.)

10            THE COURT:  Please be seated.  Sorry for the

11    delay.

12            Next witness, Mr. Horton.

13            MR. ANKER:  Your Honor, the next witness is

14    Anthony Horton from the debtors.

15            THE COURT:  Okay.

16            THE CLERK:  Please raise your right hand.

17        (Witness Sworn)

18            THE CLERK:  Please state and spell your name for

19    the record.

20            THE WITNESS:  Anthony Horton, last name

21    H-O-R-T-O-N.

22            THE CLERK:  Thank you.

23            MR. ANKER:  Your Honor, we have a series of

24    binders, they will look very large.  I am very hopeful that

25    we will go through a minority of them, but in case we need

1    to we have a large group of binders.  We have left a set

2    with Mr. Horton, together with his deposition transcript.

3    May I approach with the sets we have?

4                THE COURT:  Yes.

5                MR. ANKER:  I should add, Your Honor, these are

6    also binders that were put together in the expectation that

7    we intend to call Mr. Moldovan (ph) and also if the debtors

8    call Mr. Keglovich we will cross-examine him.  So they would

9    be inclusive binder sets through all three of those

10   witnesses.

11               THE COURT:  Okay.  All right, lift with your legs,

12   Mr. Anker.

13               MR. ANKER:  If I may, Your Honor?

14               THE COURT:  I said, lift with your legs.

15               MR. ANKER:  Thank you, Your Honor.

16        (Pause)

17               THE COURT:  Okay.

18   DIRECT EXAMINATION

19   BY MR. ANKER:

20   Q    Good afternoon, Mr. Horton.

21   A    Good afternoon, Mr. Anker.

22               THE COURT:  You're going to need to talk into the

23   microphone.

24               THE WITNESS:  Yes, sir.  Good afternoon, Mr.

25   Anker.

1    BY MR. ANKER:

2    Q     Good afternoon.  You and I met when I took your

3    deposition I guess some point last year, right, sir?

4    A     Yes, sir, in December.

5              THE COURT:  I can't hear you.

6              THE WITNESS:  Yes, sir, in December.  Sorry, Your

7    Honor.

8    BY MR. ANKER:

9    Q     And other than that one occasion, you and I have not

10   met, am I right?

11   A     That is correct.

12   Q     Mr. Horton, can you briefly describe the position you

13   hold, I was going to say with EFIH, but if it's different

14   for different debtors, if you could let the Court know?

15   A     In general, I am the treasurer of EFH, EFIH and TCEH.

16   Q     And you became treasurer in 2004, am I right, sir?

17   A     That is correct.

18   Q     And can you briefly -- you're also senior vice

19   president, are you not, of EFIH?

20   A     Of EFH, in TCEH and EFIH, yes, sir.

21   Q     Okay.  And can you briefly outline your

22   responsibilities as senior vice president and treasurer?

23   A     Yes, primarily responsible for capital raise, liquidity

24   management, debt compliance, investor relations, insurable

25   risk, those would be the primary responsibilities.

1   Q    The first two you mentioned were capital raise and

2   liquidity management, I believe?

3   A    Yes, sir.

4   Q    I take it the issuance of high-yield debt, including

5   the EFIH first lien notes that are the subject of today's

6   motion, comes within both the capital raise part of your

7   responsibility and the liability management part of your

8   responsibility?

9   A    Yeah, I think I said liquidity management, but it would

10  fall within that category of capital raise either in the

11  high-yield market, the leveraged loan market.  Yes, sir.

12  Q    And so you've been involved in the debt issuances and

13  the raising of capital by EFIH, EFH and TCEH, right?

14  A    I have indeed.

15  Q    And it's fair to say that the raising capital and, I'll

16  use your term, liquidity management has been a significant

17  portion of your responsibilities since  -- certainly since

18  the leveraged buyout in 2007, am I right, sir?

19  A    Yes, sir.

20  Q    Okay.  And you played a role in the negotiation of some

21  of the terms of the debt issuances, am I right?

22  A    That is correct.

23  Q    Okay.  And in your capacity as treasurer for EFH, EFIH

24  and TCEH, I take it you're generally familiar with the

25  corporate structure of the various debtors?

1    A    I am indeed.

2    Q    And I would take it you're generally familiar with the

3    different assets and liabilities of the different debtors?

4    A    I am.

5    Q    And you're generally familiar with the different

6    operations of the different debtors?

7    A    That is correct.

8    Q    Okay.  I want to spend a little bit of time talking

9    about the different debtors.  You understand that we

10   represent -- I represent Delaware Trust, which is the

11   indenture trustee to the first lien notes issued by two of

12   the debtors, Energy Future Intermediate Holding Company and

13   EFIH Financing?

14   A    Yes, sir.

15   Q    Okay.  And those two companies commonly go by the

16   acronym EFIH?

17   A    Yes, sir.

18   Q    Okay.  And those -- well, one of those companies, and

19   maybe you can help me understand which one, owns

20   approximately 80 percent of Oncor Holdings, which in turn

21   owns Oncor the operating entity, right?

22   A    I would describe it in that manner, yes, sir.

23   Q    Okay.  Now, Mr. Horton, this is an exhibit I'm going to

24   ask you to look at.  Can you look at Plaintiff Exhibit 30?

25   And I think if you look at your binders, we've condensed

1    your set, Mr. Horton, so that they are smaller than the set

2    the Judge has.  The set with you are only ones we think we

3    will potentially go over with you.  So if you look I think

4    at the first volume of --

5    A    Volume 1 to 5?

6    Q    Yes.

7    A    Okay.

8    Q    I think you'll find -- well, if you have all five, then

9    I was wrong, you have a full set, my apologies.  Go to

10   Plaintiff Exhibit No. 30.  And tell me when you're there,

11   sir.

12           THE COURT:  I think it's in Volume 2.

13           UNIDENTIFIED SPEAKER:  It is.

14           MR. ANKER:  I apologize, Your Honor.  It's in

15   Volume 1 of my condensed set, my bad.

16           THE WITNESS:  You said Exhibit 30?

17           MR. ANKER:  30, yes, sir.

18           THE WITNESS:  Yes, sir.

19   BY MR. ANKER:

20   Q    Okay.  Can you identify this document?

21           Mr. Horton, let me tell you what I think it is, it

22   may help you, which I think it is the prospectus for the

23   EFIH notes issued as part of the 2010 exchange that we just

24   had some testimony about.

25   A    I would agree with that.

1    Q    Okay.  Can I ask you to turn to -- do you see at the

2    bottom, there's a stamping that sort of says page 1 of 734,

3    page 2 of 734?

4    A    I do.

5    Q    Okay.  Can I ask you to turn to page 27 of 734?

6    A    I'm there.

7    Q    And you'll see there, make sure you're on the same page

8    with each other, an organizational structure chart?

9    A    Yes, sir.

10   Q    Okay.  And does that accurately depict the

11   organizational structure of the various EFH companies?

12   A    At quick glance, yes, sir.  I believe so.

13   Q    And what I think it shows is that Energy Future's

14   intermediate holding company, EFIH, owns 80 percent of Oncor

15   Holdings which, in turn, owns a hundred percent of Oncor.

16   Do you see that, sir?

17   A    Yes, sir.  I do.

18   Q    Okay.  And I think it also shows that TCEH owns no

19   interest in Oncor; right?

20   A    That is correct.

21   Q    And it shows that Energy Future Holdings Corp., the

22   parent of EFIH, owns an interest in EFIH only through its

23   equity interest -- I'm sorry.  I garbled that.

24        I believe that what this shows is that EFH owns an

25   interest in Oncor only through, derivatively, through its

1    equity interest in EFIH; right?

2    A     Yes.  It has an indirect ownership through EFIH.

3    Q     Okay.  And so that EFIH's interest in Oncor is

4    structurally senior to EFH's interest; right?

5    A     That is correct.

6    Q     Okay.  And a chart substantially like this was

7    included, and I'm not asking you, Mr. Horton, if every box

8    looked identical, a chart like this, substantially like this

9    was included in each of the debtors' prospectuses and

10   offering memoranda for debt issued by EFH, TCEH and EFIH;

11   right?

12   A     I don't know that specifically but I would gather, yes.

13   Q     Okay.  As best as you know.

14   A     As best as I know, yes.

15   Q     We're going to put them all in evidence and obviously

16   when I ask you something similar like that if it turns out

17   there's one that isn't, I'm not going to hold it against

18   you.

19   A     I appreciate that.

20   Q     But as best as you recollect, they had an organization

21   chart like this; right?

22   A     Yes, sir.

23   Q     Okay.  So it's fair to say that the debtors made it

24   clear to their creditors at TCEH, that TCEH had no call on

25   the assets of Oncor; right?

1    A     That's correct.

2    Q     And it's fair to say that they told their creditors at

3    EFH that EFH only had an interest that was structurally

4    junior and subordinate to the creditors of EFIH; right?

5    A     That's correct.

6    Q     Okay.  EFIH itself is a holding company; right?

7    A     It is.

8    Q     It has no -- it owns equity in Oncor Holdings but it

9    doesn't, itself, have any operations; right?

10   A     That's correct.

11   Q     Okay.  And Oncor Holdings is itself a holding company

12   which has no operations; right?

13   A     That is correct as well.

14   Q     And neither Oncor Holdings nor Oncor, the operating

15   entity, are in bankruptcy; right?

16   A     They are not.

17   Q     They are ring fenced; right?

18   A     That is correct.

19   Q     And what do you mean by ring fenced?

20   A     Ring fenced does effectively, a legal term as well as a

21   term they use with rating agencies whereby these entities

22   are ring fenced from a capital structure and a legal

23   structure from the rest of the entities, the organization of

24   EFH, which includes EFH, EFIH and TCEH.

25   Q     So Oncor itself, and when I use the term Oncor here,

1    I'm including Oncor Holdings, isn't liable on any of the

2    EFIH first lien debt; right?

3    A    That is correct.

4    Q    And it's not liable on any of the second lien or PIP

5    debt at EFIH; right?

6    A    That is correct as well.

7    Q    And it's not liable on any of the EFH debt; right?

8    A    That is correct.

9    Q    And it's not liable on any of the TCEH debt; right?

10   A    That is correct.

11   Q    It's not liable, like Mr. Keglevich in his first day

12   affidavit said there was $42 billion of funded indebtedness

13   for all of the debtors; it's not liable, Oncor or Oncor

14   Holdings, for any of that debt; right?

15   A    Only for its own debt.

16   Q    Okay.  Now can you just -- we've established, I think,

17   that EFIH's principal asset is its equity ownership in Oncor

18   Holdings; right?

19   A    That is correct.

20   Q    Okay.  And can you briefly, for the record, describe

21   what Oncor -- what Oncor the operating entity is?

22   A    Oncor, the operating entity, owns the transmission and

23   distribution system within, primarily, north Texas.  So it

24   transmits power for the generators and through the retail

25   operators in Texas.  So it's primarily what we would

1    describe as an infrastructure company.

2    Q    Okay.  And what is TCEH then?

3    A    TCEH is an unregulated power generation and retail

4    business.  They generate electricity through our nuclear

5    facilities, our lignite and call facilities and sell to the

6    retail consumers both industrial and residential consumers,

7    ultimately, electricity.

8    Q    A different and distinct line of business from the

9    Oncor business that EFIH holds an interest in, right?

10   A    That's correct.

11   Q    Okay.  And I understand, Mr. Horton, you're not a

12   lawyer and I promise you, I will never ask you for a legal

13   opinion.  From your understanding EFIH and TC -- and EFH are

14   different legal entities?

15   A    From my understanding, yes, sir.

16   Q    And EFIH is a different legal entity from TCEH, to your

17   understanding; right?

18   A    Yes, sir.

19   Q    TCEH has its own employees; does it not?

20   A    It does.

21   Q    Now, EFIH owns the equity in both EFIH and through

22   another holding company, in TCEH; right?

23   A    That is correct.

24   Q    But EFH, itself, is also a holding company; right?

25   A    I would describe it as a holding company.

1   Q    I'm sorry, you would or would not?

2   A    I would.  Yes, sir.

3   Q    Okay.  Now collectively, as I said, I think

4   Mr. Keglevich said at the beginning of the case, all of the

5   debtors had $42 billion in funded indebtedness.  That sound

6   about right to you?

7   A    Sounds about right.

8   Q    Okay.  But it's not that all of the debtors were liable

9   for all 42 billion; right?

10  A    That's correct.

11  Q    Okay.  EFH was liable for some debt.  TCEH was liable

12  for some different debt and EFH was liable for some

13  different debt; right?

14  A    Yes.  I would add that there were guarantees from EFCH

15  up to the debt of EFH and EFCH also guaranteed debt down at

16  the TCEH level.  So I just want to make that distinction.

17  Q    Sure.  There was approximately --

18  A    And, if you don't mind, also there was some debt at

19  EFIH, at EFH that was guaranteed the LBO debt that was

20  guaranteed by EFIH, EFIH to EFH.

21  Q    Okay.

22  A    Characterized as the LBO debt.

23  Q    Okay.  That LBO debt, the debt in which the primary

24  obligor was EFH but the guarantor was EFIH was at a

25  principal balance of approximately $60 million as of the

1    petition date?

2    A    That's about correct.  Yes.

3    Q    Putting that 60 million, which I think we acknowledge,

4    is a relatively small in the bigger picture of things here,

5    we --

6    A    I will grant you that one.

7    Q    I'm sorry.

8    A    I will grant you that one.

9    Q    EFIH did not -- putting that aside, that 60 million,

10   any of the EFH debt outstanding as of the petition date;

11   right?

12   A    That is correct.

13   Q    And it didn't guarantee any of the TCEH debt even to

14   the tune of one penny; right?

15   A    At one point in time, there was an intercompany note

16   that was guaranteed by EFIH that was paid off and at the

17   petition date none, none was guaranteed by EFIH.

18   Q    Okay.  And the debtors never, to your knowledge, and

19   I'm going to use the debtors collectively here, suggested to

20   their EFH creditors, other than on the $60 million

21   guarantee, LBO debt, that EFIH was liable to them; right?

22   A    That's correct.

23   Q    And never suggested to them that you, EFH, are not

24   creditors, or anything but structurally junior to the

25   creditors of EFIH; right?

1    A    I think that we would describe it as EFH owned the

2    equity of EFIH.

3    Q    So that EFH was -- so the EFH creditors were

4    structurally subordinate or structurally junior to the

5    creditors of EFIH; right?

6    A    As the treasurer, I would describe it as that.

7    Q    And I just asked you the question about EFH; the

8    debtors never suggested to the TCEH creditors that EFIH was

9    liable for any of their debt; right?

10   A    Say that again.

11           THE COURT:  Would you mind repeating that?  I'm

12   sorry.

13           MR. ANKER:  Sure.  Go ahead.

14           THE COURT:  I just said the same thing he said.

15   Could you say that again?

16           MR. ANKER:  Certainly, Your Honor.  I'll -- and

17   certainly reword it.

18   BY MR. ANKER:

19   Q    To the best of your knowledge, none -- no one at the

20   debtors ever suggested to any TCEH creditors, TCEH one

21   holders, you know, EFIH has guaranteed your debt.

22   A    That's correct.

23   Q    Okay.

24   A    That I'm aware of.

25   Q    And never suggested -- none of the debtors ever

1   suggested to TCEH creditors that TCEH had any equity

2   interest in Oncor; right?

3   A    I'm not aware of that at all.

4   Q    Okay.  And am I right that EFIH files its own 10Ks, Qs

5   and other filings with the Securities and Exchange

6   Commission?

7   A    That's my understanding.

8   Q    And EFH does as well?  Files its own?

9   A    Yes.

10  Q    And TCEH files as well?

11  A    I think that's through EFCH but I'd have to verify that

12  with the lawyers.

13  Q    Okay.  But each is a -- directly or indirectly, each of

14  these three entities, EFIH, EFH and TCEH are separate

15  filers; right?

16  A    Yes.

17  Q    And each maintains its own separate books and records;

18  right?

19  A    That's correct.

20  Q    Okay.  Now let's move to a different subject if I could

21  now that we've talked about the difference in the debtors

22  and I want to focus, for a moment, on EFIH.  And I want for

23  -- to focus, I want to give you a road map, Mr. Horton, of

24  where I'm going, not on the liability side of a balance

25  sheet, if you will, but on the asset side of a balance

1    sheet.  Okay?

2    A    Okay.

3    Q    EFIH, because it's a holding company has no customers;

4    right?

5    A    No, sir.

6    Q    And I understand you do work and so do the other senior

7    officers for all of the companies, but does EFIH have any of

8    its own solely EFIH employees?

9    A    I'm not aware of any.  No, sir.

10   Q    Okay.  So is it -- but EFIH's principal asset we've

11   discussed is its 80 percent equity interest, give or take,

12   in Oncor Holdings; right?

13   A    That is correct.

14   Q    Okay.  Since EFIH has no separate employees, is it

15   reasonable for me to assume that if the Court grants the

16   motion for relief from stay, no employee of EFIH is going to

17   lose their job?

18   A    There are no employees so therefore the conclusion

19   would be that no one would lose their job from EFIH.

20   Q    I thought it followed as well but I wanted to make sure

21   I wasn't missing anything.

22        And since EFIH has no customers, no -- EFIH will lose

23   no customers by reason of the grant of this motion; right?

24   A    No, sir.

25   Q    Okay.  And EFIH won't lose any asset.  You're not aware

1    of any provision that says, upon the grant of the relief

2    from a motion for relief from stay, so that the noteholders

3    may -- first lien noteholders may rescind, EFIH immediately

4    forfeits its 80 percent equity interest in Oncor; right?

5    There is no such provision that you're aware of.

6    A    I have not been advised of that.  No, sir.

7    Q    Okay.  So -- and EFIH has other assets.  It has, for

8    example, the notes.  It owns some notes in which EFH is the

9    obligor; right?

10   A    That's correct.

11   Q    And you're not aware of anything that says that those

12   notes get forfeited.  EFIH has rights and the notes

13   disappear in thin air if our motion is granted; right?

14   A    I'm not aware of that.

15   Q    Okay.  And, so, EFIH won't be forced, if this motion is

16   granted, to cease operations; right, because it has no

17   operations; right?

18   A    It has no operations.  I don't know the impact of

19   lifting the stay on Oncor, the operating company, and the

20   implications of all the case and so forth but --

21   Q    Okay.  So --

22   A    So I can't speculate too far is all I'm saying.

23   Q    I was about to ask you that.  Just let me so we have a

24   clear record.

25        You're not in a position today to provide testimony

1    that there will be any effect whatsoever on Oncor's

2    operations or Oncor's business if this motion is granted;

3    right?

4    A    That's correct.

5    Q    Okay.  Now, you're aware that EFIH is a party to a

6    debtor-in-possession financing loan in the approximately

7    principal amount of 5.4 billion?

8    A    Yes, sir.

9    Q    Again, we can all look at the documents.  I know you're

10   not a lawyer.  I'm asking you your business understanding.

11   Is it your business understanding or isn't it your business

12   understanding that the grant of this motion -- let me --

13   I've asked you a completely garbled question.

14       Will the grant of this motion, to your understanding,

15   constitute an event of default under that debtor-in-

16   possession loan?

17   A    You know, I have not studied that or asked that

18   question so --

19   Q    No one's advised you that it would, right?

20   A    No, sir.

21           MR. MCGAAN:  We'll object, Your Honor, to the

22   extent it's calling for advice from counsel.  I think we're

23   getting beyond what -- the question gets well beyond the

24   subordinates job duties are in the company in terms of legal

25   effects of a Court order that hasn't been (indiscernible).

1    BY MR. ANKER:

2    Q    I certainly, Mr. Horton, don't want to ask you anything

3    that goes into substance of counsel, focusing on business

4    people, Mr. Keglevich, no one has ever suggested to you that

5    the grant of this motion would constitute an event of

6    default under the debtor-in-possession loan; right?

7    A    No one has come to me and said that.

8    Q    Okay.  And you're not aware, as you sit here, of any

9    default that it would create; right?

10   A    As I sit here today, no, sir.

11   Q    Okay.  Now one thing the grant of this motion will do

12   is provide an additional claim -- I'm now switching from the

13   asset side of the balance sheet to the liability side of the

14   balance sheet, against EFIH and you've been in the courtroom

15   today and you've heard it's in the approximate amount of 431

16   million, including the dispute five of six million.  And

17   that's consistent with your understanding of the numbers?

18   A    That's consistent with the numbers and the issues at

19   hand.

20   Q    And I'm not going to ask you a question about degree of

21   solvency.  I've heard the Court, loud and clear, on that

22   issue.  But the assumption for these -- for this phase one

23   trial, is that EFIH is solvent and, in particular, able to

24   pay all of its creditors, in full, whether or not we are

25   granted -- and, I think --

1           MR. MCGAAN:  I object, Your Honor.  If he wants to

2    ask the witness a question about the presumptions set forth

3    in your bifurcation order, it reads differently than

4    Mr. Anker's characterization.

5           MR. ANKER: Mr. Horton and Mr. McGaan, I'm

6    referring to page 3 of the carryover paragraph on page 2.

7           MR. MCGAAN:  I have it.

8    BY MR. ANKER:

9    Q    Let me read you the language.  With the exception of

10   litigation, if any, concerning the EFH, EFIH debtors, excuse

11   me, let me start again.

12        With the exception of litigation, if any, concerning

13   the EFHIF debtors at the time of the bankruptcy filing, the

14   Court will assume solely for the purpose of phase one that

15   the EFIH debtors are solvent and able to pay all allowed

16   claims of their creditors in full.

17        I take it that EFIH does not intend to pay its

18   creditors more than in full; right?

19   A    Yeah and I -- my apologies.  I don't know the

20   description as in full.  We've got undisputed claims and we

21   have disputed claims so I don't know if that encompasses

22   both and I apologize I just don't know what that definition

23   is.

24   Q    Okay.

25   A    Maybe you do and you can explain to it to me.

1    Q    Okay.  Posit, take as an assumption that EFIH will have

2    enough money, even if our make-whole is paid, to pay all of

3    its creditors, whether they are currently disputed or

4    undisputed, every penny they are owed, including full post-

5    petition interest and other post-petition contractual

6    entitlement.

7            Does EFIH have any intent to pay them any more

8    than that?

9    A    I would say, no, sir.

10   Q    Okay.

11   A    Under that --- again, I don't know if that's a

12   hypothetical or a factual statement.

13   Q    Okay.  Now let's talk a little bit about the

14   liabilities.  And, Mr. Horton, we have with us -- may I,

15   Your Honor? -- some calculators and I think I'm going to ask

16   you if I can burden you to do some math with me so may I

17   approach, Your Honor?

18            THE COURT:  Yes.

19   BY MR. ANKER:

20   Q    And, Mr. Horton, I may also submit, if the Court will

21   allow me, to put up some numbers on a piece of pad so we all

22   have it in front of us.  And I'll try to make it so that the

23   Court can see and also Mr. McGaan can see.  I'll turn it

24   this way.

25            And I apologize right now, Your Honor, literally, this

1   statement is true, the worst grade I ever got and the only

2   course I came close to flunking was second grade penmanship

3   and I was almost held back but I will do my best to make

4   this semi-legible.  I will not say legible.

5        Today you testified the make-whole is about 425 to $431

6   million.  There is a --

7   A    I agree with that math.

8   Q    Okay.  There is first lien, debtor-in-possession

9   financing outstanding here; right?

10  A    There is.  Yes, sir.

11  Q    And how much is that?

12  A    First lien?  5.4 billion.

13  Q    5.4 billion, right?

14  A    That's correct.

15  Q    So I'm going to try to get the right number of zeroes.

16  5-4-0-0-0-0-0-0-0.  Did I get that right?

17  A    Yes.  And I understand your previous comment about

18  second grade.  I have the same issue so it's not a

19  criticism.

20  Q    Touché', Mr. Horton, touché'.  On days like this, it's

21  actually fun to have a little bit a levity and I genuinely

22  appreciate it.

23  A    No worries, sir.

24  Q    Now that loan is essentially current today; right?  The

25  debtors pay interest current; right?

1    A     That's correct.

2    Q     Okay.  In addition, there's second lien debt; right?

3    A     That's correct.

4    Q     And there was a recent pay down of that second lien

5    debt; am I right?

6    A     That is correct.

7    Q     What is the current principal balance of that second

8    lien debt?

9    A     I believe, and I'm doing this from memory, I apologize.

10   I have a lot of numbers in my head.  I think it's 1.8

11   billion, is the number.

12   Q     Okay, 1.8, 1-8-0-0-0-0-0-0-0-0.  Now there, because

13   you've paid interest recently, you're largely current on

14   that loan; right?

15   A     That's correct.

16   Q     Okay.  There's a little bit of post-petition interest

17   that's accrued since the pay down but not a lot; right?

18   A     Right.

19   Q     Now there's also, what we sometimes call and I think

20   you call, the PIP notes, the unsecured notes.  Let's talk

21   about principal balance at the moment and let's put -- let's

22   put interest aside.  What is that?

23   A     I have that number roughly 1.6 billion.

24   Q     Okay.  Now I understand there is a controversy about

25   whether those holders are, in light of the post-petition

1    interest, if EFIH is solvent at the contract rate or the

2    federal judgment rate but it certainly at the contract rate

3    it would increase the debt a fair amount; right?

4    A    Yes.

5    Q    By -- do you have an approximate amount?

6    A    I don't off the top of my head.

7    Q    Well, what was the coupons stated on those notes?

8    Twelve percent; right, or approximately?

9    A    That's correct.  That's correct.

10   Q    Okay.  So 12 percent and we're not 10 months into the

11   case.  Twelve percent on a billion, eight, why don't we do

12   it as of -- let's back up.

13            THE COURT:  A billion six.

14   A    I'm sorry.  Which numbers are you on?  The billion six.

15   Q    The billion six.  I apologize.

16   A    You had a question that --  I'm sorry.

17   Q    I was going to ask you, as of today, what is the

18   interest, even forgetting about interest on interest and

19   compounding and the like.

20   A    Roughly a hundred and ninety-two.  I think that's what

21   I got.

22   Q    Okay.  Million; right?

23   A    Yes, sir.

24   Q    Okay.  And the debtors don't project to emerge from

25   bankruptcy until, at the earliest, the very end of this

1    calendar year; right, the end of December of 2015?

2    A    That's correct.

3    Q    And, indeed, it may roll into the 2016; right, before

4    the companies emerge.

5    A    That's correct.

6    Q    Okay.  And so interest would continue to accrue.  But

7    I'm not even going to add that on here.  What -- one other

8    element we have -- there's also a potential make-whole

9    claims where the second liens, and there's also a potential

10   make-whole claims for the PIPs; right?

11   A    That's correct.

12   Q    Okay.  And that would add more debt; right?

13   A    That's correct.

14   Q    Okay.  Let's put all that aside.  There's also --

15   A    About 500, 515 million something like that.

16   Q    Depending on when the make-whole -- when they were

17   taken out, whether the make-wholes were allowed.

18   A    Let's - 12/31/15, let's just assume that date.

19   Q    Let's -- but you mentioned earlier there's 60 million

20   in guaranteed debt; right?

21   A    That's correct.

22   Q    Okay.  So let's add that 60 million.  Now putting aside

23   all of the disputed make-wholes, all of the post-petition

24   interest that's either accrued to date; can you add those

25   numbers up for me and just tell the Court what the

1   approximate --

2   A    Roughly the numbers are eight -- total debt is roughly

3   8.9 billion.

4   Q    $8.9 billion.  Now the 425 or 431 million, if you add

5   that to 8.9 billion, how much of an increase in the total

6   debt of the EFIH does that represent?

7   A    Are you asking me as a percentage or --

8   Q    Yes, as a percentage.

9   A    -- my perspective as a treasurer which --

10  Q    I'm sorry.

11  A    As a treasurer, it would be a lot of money on an over-

12  levered company already but as you were trying to get to

13  some percentage --

14  Q    I was trying to get to a percentage, Mr. Horton.

15  A    Okay.  Sorry.

16       (Pause.)

17  A    I think this was in your brief but I'll verify it at

18  five -- 4.8 percent.  I think you guys quoted five, but I

19  got it.

20  Q    4.8 percent.

21  A    Right.

22  Q    And if we added in all the disputed make-wholes of the

23  seconds and the PIPs, the 4.8 percent would decline to a

24  lower percentage; right.

25  A    I would have thought it would increased.

1    Q     If you increase you denominator --

2    A     Oh, you're asking also to increase both at the same

3    time; yeah.

4    Q     My statement is correct; is it not, sir?

5    A     I'll take it as, yes.

6    Q     Okay.  Now the debtors, in their opposition, you

7    obviously looked at my brief, I presume you looked at the

8    brief that the company filed, they talk about the effect of

9    this motion on EFH.  So let's do a little bit more in math

10   and add the EFH.

11   A     Uh-huh.

12   Q     We're now at $8.9 billion.  But that includes the 60

13   million in LBO guaranteed debt.  Are there other notes at

14   EFH?

15   A     Yes, sir.

16   Q     Approximately a billion eight in notes at EFH?

17   A     I don't characterize it as a billion eight.

18   Q     Okay.  Let's go through this because I think we

19   probably understand the facts the same.

20        EFH has issued notes, some of which are held by third

21   party creditors and some of which the owner of the note, the

22   creditor, is EFIH; right?

23   A     There -- EFIH does hold some notes.  It's roughly a

24   billion three, just rounding --

25   Q     Okay.

1   A    And we're doing a lot of rounding here but a billion

2   three.

3   Q    Okay.  And the notes that are not held by EFIH, that

4   are third party notes, are how much?

5   A    Roughly 650.

6   Q    Six fifty?  So if you add those two together, I was

7   wrong, I thought it was a billion eight.  So it's a billion,

8   nine fifty; right.

9   A    Yes, sir.

10  Q    Am I right, sir?

11  A    Roughly.  And, again, I'm doing this off the top of my

12  head and we're rounding numbers and so forth.  I don't think

13  this order of magnitude of change is going to matter.

14  Q    And also EFH just agreed, obviously, subject to Court

15  approval and the like, to a settlement under which TCEH

16  would have an allowed claim against EFH of 700 million;

17  right?

18  A    When you said, agreed, my apologies.  Agreed with whom?

19  Q    I'm sorry.  You're absolutely right.

20       There is a pending announced settlement of the

21  independent directors to settle claims that TCEH might have

22  intercompany against EFH by giving TCEH an allowed claim

23  into the EFH debtors in the amount of $700 million; right?

24  A    That's correct.

25  Q    And the debtors current plan of reorganization

1    embodies, incorporates, that settlement; right?

2    A    That's correct.

3    Q    Okay.  So let's add that 700 million.  Can you tell me

4    now to get through -- when you add EFIH and EFH, what the

5    total debt is, excluding the disputed make-whole, and post-

6    petition interest claims?

7    A    Well, maybe we should back up before starting to now

8    talk about the plan of reorganization that we filed, the 700

9    million and then what was ultimately decided around the 1.3,

10   $1.2 billion of debt held at EFIH.

11   Q    I don't --

12   A    Because that -- I do think you referred to that and if

13   you look at that debt that's held by EFIH, I think the

14   concept in the plan of reorganization is EFIH would release

15   that claim.

16   Q    Okay.  So the --

17   A    You would agree with that, I think

18   Q    The concept in the plan is that of this billion, nine

19   hundred fifty million in EFH notes, those owned by EFIH

20   would be released; right?

21   A    That's correct.

22   Q    But they are a liability as of today, right?

23   A    They are.  You just referred to the plan and that's why

24   I was trying to --

25            THE COURT:  You can't have it both ways.  The 700

1   million is not a liability today.

2           THE WITNESS:  That's my --

3           MR. ANKER:  All right.

4           THE COURT:  That's his point.

5           MR. ANKER:  Okay.

6   BY MR. ANKER:

7   Q    Let's change this line down from a billion, 950 to --

8   how much were the third-party amounts?

9   A    Roughly, 650 --

10  Q    650?

11  A    -- all liability.  Not the total liabilities at that

12  level, the 700 as you were saying.

13  Q    Okay.  So why don't we add the 700 and the 650 to the

14  eighth line and tell me how much debt you have?

15  A    So you're at nine, 950 --

16  Q    I'm sorry, sir, how much?

17  A    9.95 billion.  And I can't read that, I guess that's a

18  700 on top of it.

19  Q    That's the 700 here.  So aren't you at over 10 billion?

20  A    If I add the 700, I was going there next, but yes,

21  you're over 10 billion.

22  Q    So what number do you get, can you give me a number?

23  A    If you would like me to do that, I'm happy to do it.

24  Let's be precise.

25          (Pause)

1    A    10.2 billion -- 10.25 billion.

2    Q    And if you add a $450 million -- $425 million make-

3    whole, that's less than 4.35 percent of that balance, right?

4    A    I can do that math, if you'd like for me to, again.

5    Q    Well --

6    A    Again, now we're talking about the plan and the

7    implications on the plan of that $431 million, which is

8    going to the equity holder -- would have gone to the equity

9    holder at EFH, EFIH's equity holder, EFH, and the

10   distributable value and the importance of -- if you don't

11   mind -- the 700 million claim that EFH and the 700 million

12   claim from TCEH, and that distributable value and the

13   implications to the overall plan, it's a big number.  It's

14   not a big number -- and I get your point -- it's not a big

15   number relative to the 432 million versus 10.25 billion in

16   debt, but I've added in the 700.

17        So now we're kind of getting into the plan and

18   that's an area I don't want to get into, but it's a big

19   number in terms of distributable value and the impact to the

20   equity at EFH and the implications to EFIH in how that

21   ultimately impacts the bankruptcy and getting everyone out

22   of bankruptcy.  I don't know, but it's a big number.

23        MR. ANKER:  Your Honor, I would move to strike the

24   answer both as nonresponsive and, second, given Your Honor's

25   instructions.  I'm simply asking him to do a percentage

1    calculation for me.

2          THE COURT:  Well, I'm not going to strike it as

3    nonresponsive.  He's clarifying why your math doesn't make

4    any sense.  His point is that -- you know, we can all do,

5    it's 4.2 percent, you know, whatever, 431 million is 4.2

6    percent, it is $10.25 billion.  His point is, I believe,

7    that once you start invoking the plan these numbers that are

8    the basis of the calculation don't necessarily make sense.

9          MR. ANKER:  Okay.

10          THE COURT:  So --

11          MR. ANKER:  Let me ask the question differently.

12    BY MR. ANKER:

13    Q    Would you be more comfortable, Mr. Horton, if I took

14    the 700 million off the table, so that's not part -- that's

15    pursuant to the plan, let's eliminate the 700 million as

16    well.  And even if you exclude the full amount of the notes

17    held by -- issued by EFIH and only focused on the 650

18    million held by third-party creditors, you're going to get

19    to about over nine and a half billion dollars, right?

20    A    Yes, sir.

21    Q    And the 431 million make-whole claim increases that

22    dollar amount by less than five percent, right?

23    A    Yeah, I think that's -- I think that's correct.

24    Without even going to the calculator, I think we can do that

25    math.

1  Q    Now, let's focus for a moment on the assets of EFIH and

2  sort of look at this claim against those assets.   EFIH holds

3  cash, does it not?

4  A    Yes, sir.

5  Q    How much cash does it hold today after paying down the

6  second lien debt?

7  A    I recall it's roughly -- I'd have to look it up,

8  honestly.

9  Q    Several hundred million dollars?

10  A    Yes, several hundred million dollars.

11  Q    Like 300, 400?

12  A    I think the number is closer to 400, but I just don't

13  know --

14  Q    Okay.

15  A    -- off the top of my head.

16  Q    Let's use 400 million.  And in addition, EFIH -- I

17  understand under the plan it will be forgiven -- EFIH has a

18  billion, 2.5 claim against EFH for the notes, right?

19  A    Are you referring to the notes that EFIH holds of EFH?

20  Q    Right.

21  A    I thought we struck that on the previous slide.

22  Q    Right.

23  A    We're going to bring that back now?

24  Q    Right.

25  A    Okay.

1   Q     We're talking about the assets, I want to talk about

2   the assets.  EFIH has an asset of a billion, three in notes

3   issued by EFH, right?

4   A     That's correct.

5   Q     And EFH, in addition to having a derivative interest in

6   Oncor, also has its own cash, right?

7   A     That's correct.

8   Q     Okay.  How much cash does EFH hold?

9   A     It's roughly 300 million-ish.

10  Q     Okay.  And excluding the 700 million that's in the

11  plan, TCEH, of the liabilities on the book today of EFH,

12  EFIH represents more than two thirds of the claims, right?

13  A     Okay.

14  Q     Right?

15  A     I think doing your math.

16  Q     Okay.

17  A     Again, I'd like to see the full math, but I'm trying to

18  follow you here on the fly --

19  Q     Okay.

20  A     -- about your two thirds.

21  Q     Well, I thought you told me earlier that there's a

22  billion, 950 million in total EFH notes, including those

23  held by EFIH, right?

24  A     Okay.

25  Q     And if 650 million is held by third parties, then that

1    means by my math 1,300,000,000 is held by EFIH, right?

2    A    Okay.

3    Q    And one billion, three is approximately two thirds of

4    one billion, five --

5    A    Okay, I follow where you got your math.  Okay.  Thank

6    you.

7    Q    And what did you say the cash at EFH was?

8    A    Again, I'm going to need to look back and get precise

9    numbers, but we're talking 300, 350 million --

10   Q    All right.

11   A    -- is what I recall.

12   Q    If two thirds of that is an asset of EFH, EFIH because

13   it has the claims -- how about if I use the low end and add

14   $200 million here.  Now, the other asset of EFIH is Oncor.

15   And I think one of the things the Court doesn't want to hear

16   today is evidence on the value of Oncor and I don't propose

17   to put it on.  But you would acknowledge that the NextEra

18   bid implied a value north of 18 billion, right?

19              MR. MCGAAN:  Objection, Your Honor.  That question

20   goes into what he said he wasn't going to go into.

21              THE COURT:  Yeah, you just said you weren't going

22   to ask it and then you asked the question.

23              MR. ANKER:  I wasn't going to go higher up, I

24   wanted to just get the low-end number, Your Honor.

25              THE COURT:  Well, I don't know if it's a low-end

1    or a high-end number, nobody knows.

2              MR. MCGAAN:  Right.

3              MR. ANKER:  Well, can I ask my question without --

4    I'll take my editorializing at the beginning out?

5              THE COURT:  All right.

6              MR. ANKER:  Okay.

7    BY MR. ANKER:

8    Q    Am I right that the NextEra bid implied a value for

9    Oncor of north of 18 billion?

10   A    My apologies, which NextEra bid?

11   Q    The most -- the bid --

12             MR. MCGAAN:  Your Honor --

13             THE COURT:  Yeah, all right.  We're not going

14   there, we're not going there.  They're solvent.

15             MR. ANKER:  Okay.

16        (Pause)

17   BY MR. ANKER:

18   Q    Now, Mr. Horton, if the make-whole claim -- if relief

19   from the stay is granted and the make-whole claim is

20   allowed, and so there's a 425 to $431 million liability, you

21   understand, do you not, that that will generate -- and

22   again, I'm asking you for your understanding, not legal

23   advice -- a net operating loss in like amount for the

24   debtors?

25   A    I saw that in someone's brief or testimony and I don't

1    know the exact tax implication, whether that would create a

2    NOL or not, particularly in this case and the complications

3    around tax.  And we've certainly seen the complications of

4    the tax here.  Maybe you guys have a -- some of the analysis

5    that you could share with us that I could see and we could

6    take it to the tax team. I don't know.

7    Q    You have never heard anyone at the company say to you

8    that if there's a payment of a make-whole here that will

9    generate a net operating loss for the debtors?

10   A    There's cancellation of indebtedness income.  There's

11   black hole rules.  I don't mean to be evasive to your

12   question, I just don't know the complexities of the tax

13   situation here.

14   Q    All right.  I'm going to move on then.

15   A    Okay.

16   Q    I'm going to move on then, Mr. Horton, (indiscernible)

17   to you.

18   A    I appreciate it.

19   Q    But Mr. Horton, I want to make sure I understand the

20   chronology here, because it goes also to something related

21   to this.  You are aware, are you not, that the first lien

22   note holder sent a Notice of Rescission?  The subject of

23   today is whether that notice relief from stay will be given

24   so that notice will be given effect early in this bankruptcy

25   hits, right?

1    A    Yes, sir.  I am -- I am aware of that.

2    Q    And I'm happy to show it to you if you want.  It's

3    PX100.

4    A    Is it in one of the binders, sir?

5    Q    It is.  It's in binder four.  Four or five, I believe,

6    sir.

7    A    Thank you.

8    Q    Are you there?

9         MR. MCGAAN:  It's four.

10   BY MR. ANKER:

11   Q    I'm sorry.  I thought I said four or five.

12   A    You did say four or five.  Is it four?

13   Q    It's five or four, yes.

14   A    Yes, sir.  Is there a particular section?  I'm sorry.

15   Q    No.  Actually the very first line, which says June 4,

16   2014.

17   A    What's the --

18   Q    I'm sorry.  It's specific number 100.  Did I not -- I

19   apologize Mr. Horton if I did not mention.

20   A    No.  I didn't hear it, but maybe someone else --

21   Q    I apologize.

22         THE COURT:  Did you find it?

23         THE WITNESS:  Yes, sir.  I apologize --

24         THE COURT:  That's okay.

25         THE WITNESS:  -- to keep you waiting for me.

1           THE COURT:  Now we're waiting for a question.

2    BY MR. ANKER:

3    Q    Well, I'm sorry.  Did you -- you -- okay.  Is it -- am

4    I right that the debtors received this notice and were aware

5    of it on or about June 4th, 2014?

6    A    Yes, sir.

7    Q    Okay.

8    A    I was aware of it.

9    Q    Okay.  And --

10   A    I was made aware of it.

11   Q    -- I'll represent to you that the note holders filed

12   their motion to lift the automatic stay on May 15th, 2014.

13   You were aware of that, right?

14   A    I don't know the exact date, but I was aware that you

15   did file that.

16   Q    And the debtors repaid the first lien notes on June 19,

17   2014, right?

18   A    That is correct.

19   Q    Okay.  And so when EFIH repaid the first lien notes, it

20   was aware that the note holders had sent a notice of the

21   acceleration and had filed a motion for relief from stay to

22   the extent necessary to give effect to that notice, right?

23   A    Again, I am aware of this rescission notice.  I'm not

24   -- I think I read in some -- in a brief, one of the briefs,

25   that you had filed relief of the stay.  I think that day

1    sounds correct to me.

2    Q    Okay.

3    A    And we did pay off the --

4    Q    Okay.

5    A    -- debt on June 19th of 2014.

6    Q    And so when the company paid off the principal balance

7    and accrued interest on the notes on June 19, it knew that

8    it was possible that the Court would ultimately grant relief

9    from stay and the first lien note holders would be entitled

10   to a make-whole, right?

11              MR. MCGAAN:  Object, Your Honor.  I object to

12   possible.  And this implicates legal advice the company may

13   have given about whether it was at all possible.

14              MR. ANKER:  I'm happy to ask the question without

15   asking for legal advice.

16   BY MR. ANKER:

17   Q    Putting -- I'm just asking for a simple fact.  Putting

18   legal aside -- legal advice aside, when EFIH repaid the

19   notes on June 19, it knew that the note holders had sought

20   permission to rescind, and that motion might be granted,

21   right?

22

23   A    Again, I don't know what the probability of that

24   would -- would have been, and so, you know, could it have

25   occurred?  I -- I guess.  Clearly we're here today, and

1    it's --

2    Q    Okay.

3    A    -- it's plausible.  I -- I don't know to the degree

4    it's plausible.

5    Q    And in fact, the debtors had filed a motion to

6    refinance their second lien debt, but they later withdrew

7    that motion, right?

8    A    Yes, sir.  We did.

9    Q    But the debtors didn't withdraw their first lien

10   motion, right?

11   A    That's correct.

12   Q    Okay.  And one of the reasons -- well, the debtors

13   achieved -- I shouldn't say the debtors -- EFIH achieved a

14   number of benefits, accomplished a number of benefits, by

15   deciding to go forward and refinance the first lien debt,

16   right?

17   A    Benefits -- in -- in -- the benefits that we got were

18   the interest savings.  Yes, sir.

19   Q    Okay.  Let's -- again, if I -- I apologize, but let's

20   do a little bit of math again.  The interest on the first

21   lien notes was a blend between the 10 percent and the 6 and

22   seven-eights, right?

23   A    That's correct.

24   Q    And the new interest on the debtor in possession loan

25   was about 4.25 percent, right?

1    A     That's correct.

2    Q     Lower than either of the two other -- of the

3    pre-existing first-lien debt, right?

4    A     That's correct.

5    Q     And the debtors said in their motion papers that they

6    would be achieving an interest savings of 14.4 billion --

7    I'm sorry, $14.4 million dollars per month, right?

8    A     That's approximately, yes.

9    Q     Okay.  But that 14.4, I take it, is comparing the

10   interest at 4.25 percent on 5.4 billion in debtor in

11   possession financing to the interest at the blended rate

12   between the 10 percent notes and the 6 and seven-eighth

13   notes on a smaller principal balance of under $4 billion

14   dollars, right?

15   A     I think it is comparing the 4 billion -- apples-to-

16   apples 4 billion of savings versus -- 4 billion of first-

17   lien debt that was taken out at the rate of 4.25 backing

18   that out of as a cost and backing into a savings.

19   Q     We'll go through the math maybe with a different

20   witness.  I'm not sure that's right, Mr. Horton, but I'm

21   going to move this along.

22   A     You had a number of 17 million.  Mine's at 14 and -- 14

23   and a half, 15.  I think your math was only 4 billion as

24   well.

25   Q     Let's not debate it.  Let's move on with a question,

1   okay?

2   A    Okay.

3   Q    So the debtors achieved a savings, by their voluntary

4   action, of 14.4 million per month.  And why don't we take

5   that out all the way -- you said you don't think the debtors

6   will emerge prior to December 31 of 2015.  Why don't we take

7   it out to the first call date of December 1, 2015 under the

8   old notes.  And can you tell me how much that savings was

9   between June 19, 2014 and December 1, 2015?

10  A    So you're asking from our numbers the 14.5 million?

11  Q    Yes, sir.

12  A    So --

13  Q    Yes, sir.  Yes sir.  Based on your numbers.

14  A    Okay.

15  Q    So 14.4 or 14.5, whichever you think is accurate, seven

16  months --

17  A    Seventeen point eight months -- eighteen months

18  roughly?

19  Q    Yes, sir.

20  A    Okay.  $261 million.

21  Q    $261 million?

22  A    That's correct.

23  Q    And in addition, had the debtors not reviewed, and had

24  they instead called the notes on the first call day of

25  December 1, 2015, they would have owed a 5 percent call

1    payment, right?

2    A    That's correct.

3    Q    Okay.  And why don't we calculate that 5 percent, and

4    let's do it on the lower -- well, let's do it on the 10

5    percent down, the 3.5 billion -- actually let's do it on the

6    entire 4 billion, which I think is the right way to analyze

7    it.

8    A    Well, let me make a pause.  I've settled with a

9    substantial number of holders.  We're talking about your

10   $431 million make-whole.

11   Q    You --

12   A    So maybe that's the math I have in my head, and that's

13   causing confusion.

14   Q    Your point is a fair one.  Let's do apples to apples.

15   A    Yes.

16   Q    Because your point is accurate.

17   A    It's two -- so you have $2.3 billion.

18   Q    Your point is fair.

19   A    Okay.

20   Q    I think it's totally fair.  That 5 percent of 2.3

21   billion is about 115 million?

22   A    Say that again, I apologize.

23   Q    The 5 percent call premium that would have to have been

24   paid out of the company savings, the benefit --

25   A    Yes, about 115, that's correct.

1   Q     -- is about 115 million, right?

2   A     Yes.

3   Q     And in addition, the debtors borrowed -- the debtors

4   were able to borrow is not just enough yet to cover the

5   first lien debt, preexisting first lien debt, but 5.4

6   billion, right?

7   A     We borrowed 5.4 billion, yes.

8   Q     Right.  And as a result of that, the debtors were able

9   to refinance the second lien debt, right?

10  A     That's correct.

11  Q     And the debtors --

12  A     750 million.

13  Q     I'm sorry?

14  A     750 million.

15  Q     And the debtors have said in their papers that that

16  provided a benefit to them, a savings of -- if they emerge

17  on December 1, it's another $66 million, right?

18  A     I apologize.  I'm not sure where we're going here.  You

19  have $2.3 billion dollars of principal outstanding, 431

20  million of make-whole.  On your $2.3 billion dollars that is

21  outstanding, if we were to calculate the savings, and I did

22  a little calculation over the last few days, had my team do

23  it, it's roughly $8.5 million per month on your principal

24  amount of your note holders at 2.3 billion, okay?

25  Q     Let me --

1   A    Your 431 includes the 115 million PVed of the

2   redemption premium.  So I'm just trying to get

3   apples-to-apples.

4   Q    Okay.  Mr. Horton, please, listen to my question, if

5   you would, and see if you can answer it --

6   A    Okay.

7   Q    Okay?

8   A    Yes, sir.

9   Q    I'm trying to understand not a loss to my clients, but

10  the benefit to the debtors to support his balance according

11  to each side.  The benefit the debtors achieved by redeeming

12  and I'm asking you to follow it.  Am I right that the

13  debtors borrowed 5.4 billion in first lien debt, more than

14  was needed to take out the first lien notes?

15         MR. MCGAAN:  Objection, Your Honor, to the

16  preparatory comments there, because the witness was

17  testifying about benefits to the debtor.  You said a

18  different view than the examiner does.  So if you could just

19  re-ask the question --

20         MR. ANKER:  I'll -- Let me reframe the question.

21         MR. MCGAAN:  -- without the editorial part.

22         MR. ANKER:  I'm happy to reframe the question,

23  Your Honor,.

24         THE COURT:  Okay.  Let's just -- let me just say

25  something.  Mr. Horton needs to answer the questions that

1    are asked --

2              THE WITNESS:  Yes, sir.

3              THE COURT:  -- but has a right to clarify and

4    explain his answers.  So you've been interrupting a little

5    bit.  I want you to stop that.  You've been interrupting Mr.

6    Anker a little bit.  I want you to stop that.

7              THE WITNESS:  Yes, sir.

8              THE COURT:  Let's try to answer the questions, and

9    you can explain your answers.

10             THE WITNESS:  Yes, sir.

11             THE COURT:  You do not -- he doesn't get a say,

12   you know, yes or not.  This isn't Perry Mason.  It doesn't

13   work that way.

14             THE WITNESS:  I understand.  Yes, sir.

15             THE COURT:  Okay.

16   BY MR. ANKER:

17   Q    Mr. Horton, the debtors, by refinancing the first lien

18   debt, were able to borrow not  more than was needed to take

19   out that debt?

20   A    We borrowed $5.4 billion dollars.

21   Q    And the debtors --

22   A    And we took out $4 billion dollars the first lien debt.

23   We paid a premium of five points to settling parties, which

24   is a couple hundred million dollars, plus accrued interest

25   on another couple hundred million dollars.  So that's 4.4

1    billion.  That's where 4.4 billion of the 5.4 billion went.

2    Q    Okay.

3    A    Is that helpful to you?

4    Q    Yes.  And that left about $1 billion dollars, right?

5    A    Roughly $1 billion dollars, yes, sir.

6    Q    And the debtors have recently used $750 million dollars

7    of that billion to pay down second lien debt that was

8    accruing interest at rates north of 10 percent, right?

9    A    Yes, sir.

10   Q    And the debtors in their motion papers seeking Court

11   approval touted that, that pay down would benefit them by

12   assuming they emerged at the end of this year $66 million

13   dollars, right?

14   A    That's approximately right.

15   Q    Okay.  So when you look at the benefits to the debtors

16   they already achieved, can you add up those three set of

17   numbers for me?

18   A    It's through the end of the year?

19   Q    It is.

20   A    Okay.  And the 115 is your five points on the

21   redemption price, is that correct?

22   Q    Correct, sir.

23   A    Okay.  And then the 261 please?

24   Q    I think you testified that the 261 is the 14.2 million

25   in interest savings for the 17.5 to 18 months between June

1    19, 2014 and December 1, 2015.

2    A    Okay. $442 million is what those numbers imply.

3    Q    I'm sorry, 442?

4    A    Yes, sir.

5    Q    $442 million dollars.  Mr. Horton, I'm going to change

6    subjects now.

7    A    If, you don't mind, if we go back, 261 is on the full 4

8    billion, is that correct?

9    Q    No, I don't believe so, Mr. Horton.  I mean, you can do

10   the math again.  I didn't understand your testimony to do

11   that.

12   A    Yeah, on your -- if I just focused on your $2.3 billion

13   dollars of principle, my savings that I calculate on only

14   the $2.3 billion is 8.5 million a month.

15   Q    Okay.

16   A    Okay, so if we do the $8.5 million per month, times the

17   17.8 months, it's $151 million.

18   Q    Okay.

19   A    So again we got apples and oranges here and that's why

20   I was trying to clarify earlier, and I didn't mean to

21   interrupt you at all, but that's, we've got a lot of apples

22   and oranges here, and I understand the complexity.

23   Q    Let's try to --

24           THE COURT:  I'm sorry I need to interrupt for a

25   moment, we're having a -- do you need the mic here?

1            I'm going to put a lapel mic on you, we're losing

2     you when you're wandering around, which is fine I don't

3     mind.

4            MR. ANKER:  Do I put this in my pocket?

5            THE COURT:  Give it back.

6            MR. ANKER:  I will do my best, Your Honor, not to

7     steal from the United States of America.

8            THE COURT:  We appreciate that.  Very good.  Thank

9     you.

10    BY MR. ANKER:

11    Q    Mr. Horton, I understand your point about apples and

12    oranges, but I want, if you would to walk though it with me,

13    but me answer my questions, if you would, you can answer and

14    have explanations, but let's go through it.  The debtors

15    achieved by reason of refinancing the debt, a savings of

16    $14.4 million per month right, that's what they said in

17    their motion papers, right?

18    A    Okay.

19    Q    And $14.4 million per month times 17.5 or eighteen

20    months is how you got to the $261 million, right?

21    Q    Okay.

22    A    And the debtors also avoided paying just my group, just

23    the non-set lien holders a premium on December 1, of

24    $115,000,000 right?

25    Q    That's correct.

1    A    And the debtors were also able to borrow additional

2    money because they took out the first lien notes that has

3    allowed them to use a partial refinancing of the second

4    liens, which was -- were achieved by year-end $66,000,000

5    dollars in savings, right?

6    A    Yes, sir, and we paid $200,000,000 of settlement to the

7    settlement parties that you also need to subtract from the

8    $442.

9    Q    I'll leave it --

10   A    This is apples and oranges.

11   Q    -- I'll leave it to the Court to decide whether it

12   needs to subtract that.

13              THE COURT:  Can you explain that?

14              THE WITNESS:  Yes, sir, so when I raise the $5.4

15   billion, and then we did the settlement offer

16   for --  and I may had overstated that again because we're

17   doing this on the fly but we paid five points, 105, we paid

18   five percent to the settling parties, and we paid 101 other

19   accrued interest and the math I recall was roughly, 200 for

20   the settling parties, it could have been slightly  -- could

21   have been slightly less than that, but that was the point,

22   sir.

23              THE COURT:  Okay.

24   BY MR. ANKER:

25   Q    If the settling -- if the total debt was about $3.895

1   billion, is that right sir?

2   A    Yes, sir.

3   Q    Okay, and if the non-settling was $2.3 billion, that

4   would suggest that the debt was about a billion six, 3.9

5   minus 2.3.

6   A    I think that's correct.  So I just don't have the math

7   in front of me, I think it's a hundred million dollars,

8   something like that instead.

9   Q    Okay.  Let's just do this because you raised the

10  subject, Mr. Horton.  The total first lien debt prior to the

11  redemption was just under $3.9 billion, right?

12  I recall it being 3.895.

13  A    It's roughly 4 billion.  We just round it to 4.

14  Q    Okay.  Just round.  I'll give you the benefit of the

15  rounding it to 4, if you want.  The amount of this

16  nonsettling was $2.3 billion, right?

17  A    That's correct.

18  Q    Okay, four minus 2.3, I think it's really 3.9 minus 2.3

19  but let's use your number, is 1.7,right?

20  A    Okay.

21  Q    Okay, you paid five points, you think, on the make-

22  whole, five percent of 1.7 equals about $850 million, right?

23  A    That's fine.  That's correct.  I'm sorry.  The

24  $85,000,000.

25  Q    $85,000,000.  So you also were out-of-pocket an extra

1    $85,000,000, and you would subtract that, but let me ask you

2    a question, you also, therefore, avoided the potential

3    obligation if the Court were to rule our way, but you would

4    owe the full 20 percentage points rather than five

5    percentage points on the make-whole of the settling parties,

6    right?

7    A    They settled that amount and negotiated numbers,

8    so --

9    Q    Okay.  All right, Mr. Horton, let me turn to a

10   different subject.  You testified earlier, that you were

11   involved in the negotiation of the -- you're involved in the

12   raising of capital, including the first lien debt, right?

13   A    Yes, sir.

14   Q    Okay.  And when negotiating the first lien debt, the

15   debtors try to get, balancing that that you always have to

16   do trade-offs, tried to get the best overall package they

17   could, right?

18   A    That's correct.

19   Q    Okay, obviously you have to give here to get there, I

20   get that, and I think His Honor understands that, but

21   overall the debtors were trying to get the best deal they

22   could, right?

23   A    Overall, yes, sir.

24   Q    Okay.  And certain terms of that debt were of

25   particular importance to the debtors, right?

1    A    You're talking about the debt financing or just the

2    exchange?

3    Q    No, I'm sorry.  I apologize.  I'm talking about the

4    first lien debt, so I'm talking about the exchange back in

5    2007.

6    A    I'm with you.

7    Q    Okay, certain terms were more important than others,

8    right?

9    A    That's correct.

10   Q    And one term that was obviously important was the

11   maturity date, right?

12   A    Yes, sir.

13   Q    Then in the 2010 exchange, that got extended, right,

14   from what it had been.

15   A    It did.

16   Q    And that was something the debtors viewed as a benefit,

17   right?

18   A    Yes.  It was a part of our overall, if you would allow

19   me to explain, this was part of our overall liability

20   management program, which included extended maturities,

21   improving or increasing liquidity, capturing discount,

22   trying to again, just part of our overall liability

23   management programs.

24   Q    Okay.  And another term that was important, and I think

25   you just suggested it, was the interest rate, right?  Lower

1    the interest rate, the better for the debtors, all other

2    things being equal, right?

3    A    Yes.

4    Q    Okay.  And as part of that exchange, the interest rate

5    went down from higher than 10 percent to 10 percent, right?

6    A    Yeah, I think it wasn't a significant change, but

7    it did change.

8    Q    Okay, and it's fair to say that you understood.  I

9    mean, you didn't speak to every investor, but you understood

10   the interest rate was also an important consideration for

11   investors, right?

12   A    I spoke to three principle investors, negotiated the

13   transaction it was represented more than 50 percent of the

14   class.

15   Q    And my question was is it fair to say that you thought

16   that the interest rate was an important economic term for

17   the investor.

18   A    It was one of the important terms, yeah.

19   Q    Okay.  And by the way, we had testimony earlier today,

20   but it was from all of our witnesses, that the EFIH first

21   lien debt was high-yield debt, you would agree with that

22   characterization?

23   A    Yes, I think I agree with the characterization that

24   high-yield debt is characterized as sub-investment grade,

25   and clearly, this was sub-investment grade debt.

```
 1   Q    Okay.

 2           THE COURT:  I'm sorry, are we done with the easel?

 3           MR. ANKER:   We are, is it in your way?

 4           THE COURT:   Can we -- I miss seeing Mr. Horowitz,

 5   I can't stand it.

 6           Thank you.  Thank you.

 7   BY MR. ANKER:

 8   Q    We also was testifying today, I just want to confirm it

 9   from the standpoint of the debtor witness, that all of the

10   high-yield debt issued by EFIH, EFH, TCEH from the time of

11   the leverage buyout in 2007, up to the bankruptcy filing,

12   included a make-whole provision.  Is that right?

13   A    I wouldn't say all of it, you'd have to include

14   the, for example, the TCEH Leverage Loans, which are quite

15   substantial in our first lien lenders can speak to that

16   quite extensively, and there's no make-whole in that, and it

17   was a vast majority of the financing at TCH, roughly $24/$25

18   billion of financing that you could actually pay down at

19   par --

20   Q    Okay.

21   A    -- with no make-whole.

22   Q    With the respect to the bonds, the high-yield bonds, is

23   it accurate that starting with 2007 and the leverage buyout,

24   all of the debt issued by EFIH, EFH, and TCEH included a

25   make-whole.
```

1   A     That's my understanding, yeah.

2   Q     Okay, we were talking about things that matter to the

3   companies that accompany, and again, I'm focusing on the

4   exchange in 2010, in particular.  From the company's

5   standpoint, the ability to call the debt before it's dated

6   maturity, that is the right to call it, even if that meant

7   paying make-whole was important?

8   A     I don't know that that would have been the most

9   important consideration.  Again, our most important

10  considerations are the ones I outlined.  I think the way we

11  viewed it, it was standard, I think your witnesses testified

12  to the fact that a make-whole is standard in the high-yield

13  debt.  It's difficult to have a call provision in the debt,

14  in this case, you know, non-call 5 with a maturity of 10.

15  Q     Well, you certainly would agree that the ability to

16  call the debt, prior to maturity, even if that requires the

17  payment of a make-whole can be important to an issuer like

18  EFIH, right?

19  A     Depending on where interest rates are, yes, it can be

20  important, and a very low interest rate market, call

21  features, paying up for call features isn't as important,

22  right, because of the probability that interest rates are

23  going to go down and demand the ability to call and you're

24  paying for that call feature, typically it's been my

25  experience call -- call provisions cost 25 to 50 basis

1    points.  So you don't want to pay for that if you're in a

2    very low interest rate environment, so my answer to your

3    question is it depends on what the interest rate market is.

4    Q    Okay.  And you understood that from the investor's

5    standpoint having some form of call protection was

6    important.

7    A    Yes.

8    Q    Okay, and certainly the company, if it could have

9    bargained for it, would have, and by the company I mean,

10   EFIH, what have been happier, were there freely callable

11   notes without any requirement of the payment of any make-

12   whole or call premium, right?

13   A    Can we look at the prices, and I'll tell you whether

14   I'd been happy, and again, that's consistent with your --

15   Q    Okay, let me reframe my question.  If in fact, no other

16   terms have changed, the interest rate remained constant, the

17   maturity remained the same, having -- the company would have

18   preferred, EFIH would have preferred to have the right to

19   call the notes early without having to pay a make-whole at

20   all, right?

21   A    It's always good to have options, particularly when

22   there's no cost.

23   Q    But the company knew, EFIH knew, with respect to the

24   2010 exchange and all the other EFIH debt, that it couldn't

25   put in a free call provision without that making other terms

1    of the note much less acceptable to the debtor, right?

2    A    So I think that would relate more directly to the price

3    than, as you described, other terms.  And I think the way

4    we would -- I would characterize it, obviously, we were in a

5    very fluid and dynamic market condition in general.  This

6    was a large LBO, and we felt like it was valuable to have

7    call provisions on those, and it was worth the price.

8    Q    Let me see if I can ask my question a different way

9    because I'm not sure I got an answer to it.

10   A    And I'm sorry if you did not, not to be --

11   Q    No reason -- no need for you to apologize.  The company

12   didn't believe in connection with any of the exchanges or

13   issuances that led to the EFIH first-lien debt that it could

14   provide that the notes would be freely callable without any

15   make-whole unless the interest rates were substantially

16   higher, right?

17   A    It would certainly have been higher.

18   Q    Okay.  And Mr. Horton, this may just be a different way

19   of saying you're trying to get the best overall deal you

20   can.  You've heard the term a deal-less market, a dead

21   issuances market, haven't you, sir?

22   A    I don't know the context.  I'm sorry.

23   Q    Okay.  Is it fair to say that the overall package of

24   terms in the EFIH first-lien notes were in the company's

25   view, in EFIH's view, market?

1    A    I think if you consider the collateral, you know, the

2    provisions in the indenture and the pricing, it was all

3    considered, from my perspective, to be market.

4    Q    Okay.  Well, you mentioned the liability management

5    program and I think you said -- I know you said in

6    deposition.  I think you said earlier that there were three

7    goals in that program.  Am I right about that?

8    A    Yes, sir.

9    Q    What were the three goals?

10   A    Okay.  To extend maturities, to capture discount, and

11   by that I mean to the extent securities were trading below

12   par and there were reasons for them to be trading below par.

13   And to improve or maintain our liquidity discussion.

14   Q    And the Debtors achieved all of those goals in the 2010

15   exchange leading to the issuance of about 2.18 billion in

16   EFIH first-lien notes, right?

17   A    I think -- I believe that's correct.

18   Q    Okay.

19   A    And I'm only qualifying slightly on the liquidity.  I

20   don't know if it was --

21   Q    Okay.

22   A    You know, my goal was specifically to have nothing --

23   Q    And I think Mr. Howell in cross of one of our witnesses

24   asked this question, you understood that there was an

25   indenture that governed, along with the notes, the rights of

1    the noteholders and also the rights and obligations of the

2    company, right, of EFIH?

3    A    Yes.

4    Q    And EFIH understood that it was a completely -- and

5    again, I'm asking you from a business standpoint as someone

6    who's involved in the deal at the time.  EFIH understood

7    that it was an integrated agreement, right?

8    A    I would agree with that.

9    Q    And where all of the terms were important, right?

10   A    That's correct.

11   Q    Okay.  And EFIH didn't consciously put any term in the

12   agreement that it thought was unenforceable, right?

13   A    I think if you read my testimony and my deposition, we

14   put -- we had a market-based agreement.  We agreed to the

15   terms.  Obviously we had underwriters, we had exchange

16   agents, we had direct conversations with the principals,

17   three of the principals that owned more than 50 percent of

18   the notes and our belief was that it was enforceable.  I

19   can't say that it was enforceable in all scenarios but in

20   general we felt like the agreement and the terms were, you

21   know, were fair and enforceable.

22   Q    Okay.  Do you recall at the time of the 2010 exchange

23   -- and I don't want you talking about legal advice --

24   thinking that any term in that agreement, in the indenture,

25   was unenforceable under any particular circumstance?

```
 1   A    There was no particular circumstance that I was aware

 2   of --

 3   Q    Okay.

 4   A    -- that one of the provisions was not enforceable.

 5   Q    Okay.  And you knew that one of the provisions of the

 6   indenture was that it had an acceleration provision, right,

 7   where the debt accelerated under certain circumstances?

 8   A    I was generally aware of that.

 9   Q    Okay.  Which -- if I could get you to turn to Plaintiff

10   Exhibit 33.

11   A    Yes, sir.

12   Q    Which I think in your binder, I'm told, is binder

13   three.

14   A    Okay.

15   Q    And Mr. Horton, can you identify this document?  It's

16   entitled Energy Futures, an Immediate Holding Company, LLC

17   and EFIH Finance 10 Percent Secured Notes --

18   A    I'm sorry.  I don't mean to interrupt.  I didn't hear

19   which exhibit.

20   Q    I apologize.  I thought I mentioned it and I may be

21   getting tired at the end of the day.  33.

22   A    (Indiscernible).

23   Q    33.

24   A    Thank you, sir.

25   Q    You're having to bear with terrible handwriting and my
```

1    not giving exhibit numbers.

2    A    Okay.

3    Q    33.

4    A    Yes, sir.

5    Q    Okay.  Can you identify Claimant's Exhibit 33?

6    A    Yes, sir.  It's the indenture -- yeah, the indenture

7    associated with the exchange as of August 17th, 2010.

8    Q    So this is the indenture governing the ten percent

9    notes that were the subject of the exchange that took place

10   in 2010, right?

11   A    That's correct, sir.

12   Q    Okay.  And I asked you about a acceleration provision.

13   If you could turn to Section 6.02, sir.

14           THE COURT:  No page number?

15           MR. ANKER:  Let me get it for you, Your Honor.  It

16   is on page number 99 of 147.

17   BY MR. ANKER:

18   Q    Are you there, Mr. Horton?

19   A    Yes, sir.  I'm on page 99 of 107.

20   Q    Of 147.

21   A    147.

22   Q    And if you could turn to the third paragraph under

23   Section 6.02.

24   A    Yes, I'm there.

25   Q    Let me read it.  "The holders of at least a majority in

1    aggregate principal and aggregate notes, by written notice

2    of a trustee, may, on behalf of all the holders, waive any

3    existing deferral and its consequences under the indenture

4    except to continue in default and the payment of interest on

5    premium, if any, or the principal of any note (held by a

6    non-consenting holder) and of singular acceleration with

7    respect to the notes and its consequences (so long as such

8    rescission would not conflict with any judgment of competent

9    jurisdiction)," right?

10   A    That's correct.

11   Q    And that was one of the provisions that as of the time

12   of this exchange and the issuance of the ten percent debt

13   you thought was enforceable, right, sir?

14   A    I don't -- I did not focus on this so for you to say at

15   that point in time I felt like this was enforceable, this

16   was not an area in the discussions, negotiations that ever

17   rose to my attention.

18   Q    So from your standpoint, whether this provision was --

19   from your standpoint you didn't enter -- you didn't

20   negotiate this deal from the standpoint of the company

21   saying what's critical to me, what's important to me is this

22   right to rescind the unenforceable, right?

23   A    I have a team that works on these type of transactions

24   and I rely on my team, both the underwriters, the

25   underwriter's counsels, the exchange agent, my direct team,

1    my internal counsel.  I rely upon them to provide me with

2    strong advice and confirmation that we have a document that

3    works and applies to the law.

4    Q    Okay.  Mr. Horton, I want to ask a question and avoid,

5    I want to be precise, a privilege objection.  Did you

6    receive advice -- I'm not asking you of the substance of it

7    -- from any lawyer or anyone else at the time of its

8    issuance of this provision as to whether this provision was

9    or was not enforceable?

10             MR. MCGAAN:  Object, Your Honor.  This is invading

11   the privilege.

12             MR. ANKER:  I'm simply asking, Your Honor, what

13   would all be required under privilege law which is was there

14   any discussion.  I'm not asking what the advice was.

15             MR. MCGAAN:  There's no logging of discussions.

16   He can't put potential content of witness and say was this

17   discussed with counsel or wasn't it?

18             THE COURT:  Yeah, I agree.  Sustained.

19             MR. ANKER:  Okay.

20   BY MR. ANKER:

21   Q    Now, Mr. Horton, it's fair to say that you understood

22   that this -- that the noteholders had a right to rescind

23   acceleration even if that acceleration was triggered by an

24   EFIH bankruptcy, right?

25   A    Not at that point in time, no, sir.  The topic did not

1    come up.  We did not discuss this topic.

2    Q    Okay.  Mr. Horton, maybe --

3    A    I did not.  Others may have, I did not.  It did not

4    come up in the negotiations with the three principal

5    holders.

6    Q    You as the treasurer understand or understood that the

7    holders had an ability to waive and prevent a default and

8    rescind acceleration, right?

9    A    I knew that, yes, sir, in general from other

10   transactions and so forth.

11   Q    Okay.  And you said you never communicated with any

12   holder of the EFIH first-lien notes that this right to

13   rescind acceleration might be limited in a bankruptcy or any

14   other context, right?

15   A    There are a lot of provisions in this document that I

16   did not communicate directly with the holders of the notes

17   about.

18   Q    Mr. Horton, let me ask my question, if I could --

19   A    Including this one.

20   Q    Okay.

21   A    And let me finish just to answer that.

22   Q    I apologize.  I thought you were done, my apologies.

23   Okay.  So I think you just told me that you didn't

24   communicate with any holder of the EFIH first-lien notes

25   that this provision might be unenforceable in the event of

1    bankruptcy.  Are you aware prior to the Debtor's beginning

2    bankruptcy planning for this matter any communication by any

3    representative of EFIH with any holder of the first-lien

4    notes in any way suggesting that this provision might be

5    unenforceable in bankruptcy?

6    A    No, sir.

7    Q    Okay.  Now, Mr. Horton, let me turn your attention to

8    Section 4.06 of the indenture, if I could.  That's on page -

9    - that is on page 66 of 147 and continuing onto 67 of 147.

10   And tell me, Mr. Horton, when you're there.

11   A    You're on page 66 of 147?

12   Q    Yeah, Section 4.06.  It begins on the very bottom of

13   the page and carries over to the next page.

14   A    Yes, sir.  I see it.

15   Q    And you see it says the issuer in each of the

16   guarantors -- it's title is Stay Extension and Usury Laws,

17   right?

18   A    Yes, sir.

19   Q    And it then says the issuer on each of the guarantors

20   covenants, to the extent that they may lawfully do so, that

21   they shall not at any time insist upon, plead or in any

22   manner whatsoever claim or take the benefit or advantage of

23   any stay extension or usury law whenever enacted nor at any

24   time hereafter enforced that may affect the covenants or

25   performance of this indenture.  And the issuer on each of

1    the guarantors, to the extent they may lawfully do so,

2    hereby expressly waives all benefits or advantage of any

3    such law and covenants that they shall not resort to any

4    such law, hinder, delay or impede the execution of any power

5    herein granted to the trustee but shall suffer and permit

6    the execution of every such power as though no such law has

7    been enacted."  Did you have any communications, you

8    personally, with any holder of the EFIH first-lien notes

9    suggesting that that provision might not be enforceable in

10   bankruptcy?

11   A    No, sir, I did not.

12   Q    To you knowledge, did any member of your -- I'm sorry.

13   I meant to say any member of your staff, but let me ask a

14   broader question.  To your knowledge, did anyone

15   representing EFIH, any employee, anyone else, ever have any

16   discussion with any holder of any first-lien EFIH notes

17   expressing the view that that provision might not be

18   enforceable in bankruptcy?

19   A    Not that I'm aware of.

20   Q    Mr. Horton, I asked you the last set of questions about

21   this provision 4.06 and the 6.02 rescission about

22   communications with a holder of the notes.  I neglected to

23   ask you those questions about the trustee, the indenture

24   trustee.  So I'm going to try to ask a broad question and if

25   you need me to break it into four parts, I will.  Did you,

1    Tony Horton, personally, or to your knowledge, any other

2    representative of EFIH at any point in time have any

3    discussion with any representative of the indenture trustee

4    for the EFIH first-lien notes, in addition to substance, you

5    or that other representative conveyed that in the event of a

6    bankruptcy of EFIH either the rescission right or this

7    provision with respect to not seeking the enforcement of any

8    stay might be unenforceable?  I hope that wasn't garbled.  I

9    hope it was understandable.

10   A    It wasn't but it was a long question and you did use

11   the term at any time.

12   Q    Prior to the beginning of bankruptcy planning?

13   A    Not that I'm aware of.

14   Q    Okay.  Mr. Horton, the company took seriously -- and I

15   don't mean this at all a facetious question.  The company

16   took seriously its obligation to provide full and fair

17   disclosure in the prospectus and offering memoranda for

18   these notes, right?

19   A    Yes, I would assume so.

20   Q    Okay.  And in fact, there were -- I don't want to take

21   you through all the documents if I could help it.  There

22   were representations that you made to the dealer managers in

23   connection with this exchange and the later exchange that

24   the offering memoranda had no material misrepresentations

25   and no omissions in material fact, right?

1    A    I think generally speaking, yes.

2    Q    Okay.  And in fact, if you go back to the 2007 exchange

3    -- I'm sorry -- not exchange.  The 2007 issuance of the

4    notes later of which were exchanged for the 2010 notes, they

5    had essentially not risk disclosures about bankruptcy,

6    right?

7    A    Not that I'm aware of.

8    Q    Okay.  But when it came to 2010, there were a lot of

9    disclosures about risks associated with a potential EFIH

10   bankruptcy filing, right?

11   A    There were disclosures, yes, sir.

12   Q    Okay.  And I don't want to go through them all page by

13   page but could you turn back to PX, Plaintiff Exhibit No.

14   30?  That's in the same binder you have.  The Exhibit No.

15   30, sir.

16   A    In the same binder?

17            THE COURT:  No, it's not.

18            MR. ANKER:  I'm sorry, Your Honor.  I'm looking at

19   a different set of binders.  I apologize.  Which binder

20   number is it in?  It's in binder number two.  I apologize.

21            THE COURT:  While he's doing that, Mr. Anker,

22   we're going to have to break relatively soon for the day and

23   if you're not finished you're not finished which is fine.

24   I'm not trying to force you to wind up but --

25            MR. ANKER:  I probably have, Your Honor, ten

1    minutes although I'd then like to consult just to make sure

2    I haven't missed anything.  Really your call.

3              THE COURT:  Well, we could continue.  I'm going to

4    double that and say 20 because I always do.

5              MR. ANKER:  You're a generous man.

6              THE COURT:  That's fine.  But if we're going to go

7    much longer than that we'll just have to break for the day.

8              MR. ANKER:  Okay.  Thank you.

9    BY MR. ANKER:

10   Q    Mr. Horton, can you turn to page 49 of 734?  Tell me

11   when you're there.

12   A    I'm there, sir.

13   Q    And you'll see there's a heading Risk Factors, right?

14   A    Yes, sir.

15   Q    And this is -- let's back up.  This is the offering

16   memorandum for the ten -- the prospectus, excuse me, for the

17   ten percent notes that issued in August of 2010 as part of

18   the exchange?

19   A    I believe so.  Yes, sir.

20   Q    Well, look at the very first page.  I think you can

21   confirm that, Mr. Horton.

22   A    I think that's the manager agreement.

23   Q    Well, Mr. Horton, if you turn to page 1 or 734 on

24   Plaintiff Exhibit No. 30 you'll see that --

25   A    I see where you are.  I apologize.

1  Q    So let me ask the question again.  This is the

2  prospectus for the EFIH first-lien notes that were issued in

3  2010 as part of the exchange, correct?

4  A    Yes, sir.  That's correct.

5  Q    Okay.  And as is standard with a prospectus or offering

6  memorandum, there's a section called Risk Factors, right?

7  A    That's correct.

8  Q    And what the company -- I say the company -- what EFIH

9  sought to do there was to disclose all material risks that

10  it, at the time, thought existed, right?

11  A    I believe so.

12  Q    Okay.  I don't mean this as an insulting question but

13  I'm going to ask it.  Certainly this company -- I've taken

14  your deposition.  I've also taken Mr. Teglevich's

15  (phonetic).  Certainly this company -- I've taken

16  Mr. Moldova (phonetic) -- wasn't there saying, you know,

17  there's 92 material risks but let's not disclose ten of

18  them.  Let's only disclose 82.  Your goal was to disclose

19  every material risk you thought existed, right?

20  A    That's correct.

21  Q    Okay.  As a good honorable company should.  So let's

22  now look at the risk factors.  They begin on page 39 of 734,

23  right?

24  A    Yes.

25  Q    Okay.  And they go all the way to page 89 of 734,

```
 1   right?

 2   A    I'll take your word for it.  I'm flipping there.  Yes,

 3   sir.

 4   Q    So that's 31 pages single-spaced, right?

 5   A    Yes, sir.

 6   Q    Okay.  And there were a bunch of disclosures about

 7   bankruptcy risk, weren't there?

 8   A    There were several disclosures.

 9   Q    Let's turn to page 49 of 734.  Tell me when you're

10   there.

11   A    What was the page again?

12   Q    49 of 734.

13   A    Yes, sir.  I'm there.

14            MR. ANKER:  May I just have one second, Your

15   Honor?

16   BY MR. ANKER:

17   Q    If you look at the -- and I apologize, Mr. Horton.  My

18   vision is not what it was and I need to go to an eye doctor,

19   so my apologies for having to go talk to my colleagues.

20   A    Mine is giving out as well, so don't worry.

21   Q    It comes with age.  If you go to the first disclosure,

22   the one that begins in bold and italics "if the offerer

23   completes the exchange offer," do you see that one, the very

24   first disclosure?

25   A    On page 49, sir.
```

1    Q    Yes.  Do you see in bold and italics, "if the offerer

2    completes the exchange offer"?

3    A    Yes.

4    Q    Okay.  Now I want you to go down all the way to the

5    very end of that paragraph -- one, two, three, four, five,

6    six, seven lines from the bottom, the last four words are

7    "in the event."  Do you see that?

8             MR. ANKER:  Can we put this up on the screen?  It

9    might be easier.  I'm sure we can.  My apologies, Your

10   Honor.

11   BY MR. ANKER:

12   Q    Are you there, Mr. Horton?

13   A    I'm sorry.  I didn't know if we were putting it on the

14   screen or you wanted me to look here.

15   Q    Okay.  Do you see seven lines from the end of that

16   paragraph, the last four words are "in the event of"?  The

17   first word on the line is collateral, okay?

18   A    I do see that.

19   Q    Okay.  And tell me if I'm -- I think I'm reading this

20   right.  "In the event of the offerer's bankruptcy,

21   liquidation or insolvency, the proceeds from any sales of

22   the collateral or other assets securing any of our future

23   debt will be first applied to satisfy the secured claims of

24   the holders of the EFH 9.7 notes, the EFH 10 percent notes,

25   the EFIH 9.75 notes and the new EFIH Senior Secured notes."

1    And it goes on, right?

2    A    That's correct.

3    Q    So that was a disclosure about a potential risk in the

4    event of bankruptcy, right?

5    A    That's correct.

6    Q    Okay.  And then if you flip to page 51 of 734 --

7              THE COURT:  Are you going to go through all of

8    them?  Are you going to go through every one of the

9    bankruptcy related disclosures?

10             MR. ANKER:  I'm going to try to short circuit it,

11   Your Honor.

12   BY MR. ANKER:

13   Q    There were around ten such disclosures, Mr. Muldova?

14   Or Mr. Horton, I apologize.  I only did it once.

15   A    You insulted him, not me.

16   Q    I meant my apologies to both of you.  I'm right, am I

17   not?  There were about ten different disclosures?

18   A    I have not counted them.  I will trust you.

19   Q    I'm not going to lie to you as an officer of the court,

20   Mr. Horton.

21   A    I know this.

22   Q    But there was no disclosure here that -- in these risk

23   factors anywhere that, in fact, there was any risk that upon

24   a bankruptcy the right of rescission might be limited,

25   right?

1    A     That's my understanding.

2    Q     Okay.  And that's because, Mr. Horton, the company --

3    not because the company hid anything.  It's because the

4    company didn't have that view at the time, right?

5    A     Again, we do these transactions with the company, the

6    company's finance, legal team, our exchange agent, the

7    exchange agent who is in the market on a regular basis,

8    their underwriter's counsel, their counsel.  Again, we had

9    conversations with -- and I had direct negotiations with

10   three of the counter-parties who had more than 50 percent of

11   the holdings.  They had their legal counsel.  I think the

12   focus was there.

13   Q     Mr. Horton, I want to --

14   A     And I'm not -- I'm giving you an idea of the process

15   that we went through.  Was ten enough, was eleven enough,

16   was twelve enough?  Was that the most -- was that issue, you

17   know, important enough to the holders, to the underwriters?

18   It just didn't come up, sir.

19   Q     Okay.  Mr. Horton, if I could ask you to turn --

20           MR. ANKER:  I'm going to skip all the disclosures

21   and I'm going to give back many of those 20 minutes, Your

22   Honor.

23   BY MR. ANKER:

24   Q     If I could ask you to turn to -- I'm going to ask you

25   to turn to page 168 of 734.

1    A    I'm sorry?

2    Q    168 of 734.  And tell me when you're there.

3    A    I'm there, sir.

4    Q    Are you there, sir?

5    A    Yes, sir.

6    Q    Okay.  And you'll see that --

7            MR. ANKER:  Can I have one second, Your Honor?

8    BY MR. ANKER:

9    Q    Mr. Horton, back to page 168 of 734.  Are you there,

10   sir?

11   A    Yes, sir.  I am.

12   Q    And you'll see in the very first paragraph at the very

13   top, the second sentence beginning on the second line says

14   the "indenture will provide that the holders of a majority

15   in aggregate principal amount of the outstanding notes by

16   notice to the trustee and the MBF of the holders of all the

17   notes waive any existing default and its consequences under

18   the indenture except the continuing default and the payment

19   of interest on premiums on or the principal of any note held

20   by a non-consenting holder."  Did I read that correctly?

21   A    Yes, sir.  I do believe.

22   Q    And are you aware of any other provision in this

23   prospectus discussing the right of rescission or any

24   limitation thereon?

25   A    Sir, I'm not familiar enough with the document to say

1    there none other.

2    Q    Are you aware of any other as you sit here today?

3    A    No.

4    Q    Okay.

5              MR. ANKER:  May I have one moment, Your Honor?  I

6    may be able to pass the witness and I assume we'll break for

7    the day.

8              THE COURT:  Yes.

9              THE COURT:  Your Honor, I would pass the witness.

10             THE COURT:  Okay.  All right.  Thank you.  We're

11   going to break for the day and we'll start as promptly as

12   possible tomorrow at 10:00 a.m. with Mr. Horton's cross

13   examination/direct examination by Mr. McGaan.

14             Puts you, actually, in a wonderful position which

15   is that because you're under oath and under examination you

16   may not discuss the substance of your testimony with any

17   person --

18             THE WITNESS:  Yes, sir.

19             THE COURT:  -- until tomorrow.

20             THE WITNESS:  Understood.

21             THE COURT:  Okay.  So you can't go have a meeting

22   with Mr. McGaan.  You can go have dinner.

23             THE WITNESS:  That's a blessing.

24             THE COURT:  Okay.  Don't take that personally.

25             THE WITNESS:  No offense to Mr. McGaan.

1          MR. MCGAAN:  I know it's not, Your Honor.

2          MR. ANKER:  I feel better now that I'm not the

3    only recipient of the zing.

4          THE COURT:  If you could -- you are free to leave

5    the boxes, the notebook, et cetera.  If you could please

6    police your areas for water bottles and trash and what not

7    and don't leave a big mess for the cleaning people I would

8    truly appreciate it.  And of course, if you're using the

9    breakout rooms which you'll find and certainly are

10   encouraged to do, please make sure you don't leave a mess

11   there, as well.  I'd appreciate that.  See you tomorrow at

12   10:00 a.m.  Thank you.

13         MR. ANKER:  Thank you, Your Honor.

14        (Proceedings concluded at 5:31 p.m.)

15

16

17

18

19

20

21

22

23

24

25

Page 255

1                          I N D E X

2

3                        E X H I B I T S

4    NO.   DESCRIPTION                        ID.     EVID.

5    1     Demonstrative                              102

6    2     Demonstrative                              102

7

8                          WITNESSES

9                                                    PAGE

10   CHRISTOPHER KEARNS

11         Direct Examination                         50

12         Cross Examination                         105

13         Redirect Examination                      115

14

15   MICHIEL MCCARTY

16         Direct Examination                        122

17         Cross Examination                         164

18         Redirect Examination                      173

19   ANTHONY HORTON

20         Direct Examination                        177

21

22

23

24

25

Page 256

1                    C E R T I F I C A T I O N

2

3      I, Melissa Looney certify that the foregoing transcript is a

4      true and accurate record of the proceedings.

5      Melissa Looney

       Digitally signed by Melissa Looney
       DN: cn=Melissa Looney, o=Veritext,
6      ou, email=digital@veritext.com, c=US
       Date: 2015.04.21 16:25:54 -04'00'
       _____

7      Melissa Looney

8      AAERT Certified Electronic Transcriber CET-607

9

10

11

12     Date:  April 21, 2015

13

14

15

16

17

18

19

20

21

22      Veritext Legal Solutions

23      330 Old Country Road

24      Suite 300

25      Mineola, NY 11501

**&**

**&**   3:2,9,15 4:1,17
4:22 5:1 6:1,7,13
55:22

**1**

**1**   40:3 73:12 82:8
83:3,13 95:6,8
102:6,12,17 117:18
118:10,10 121:7,8
170:24 181:5,15
182:2 218:7,9,25
220:17 223:4,5
224:1 225:23
246:23 255:5
**1,300,000,000**   210:1
**1,312**   139:11 168:1
168:8,22,25
**1,320**   139:3
**1,600**   175:13
**1,641**   59:9
**1-8-0-0-0-0-0-0-0-0-0**
198:12
**1.2**   204:10
**1.3**   60:11 68:22
82:24 204:9
**1.4**   82:24
**1.6**   198:23
**1.7**   227:19,22
**1.74**   100:5
**1.8**   198:10,12
**1.86**   152:14
**10**   2:9 28:14 29:4
75:7 78:16 82:17
83:10 86:20 91:8
93:19 96:11 109:20
109:24 110:4 111:5
112:23 115:1 131:6
143:8 156:7 160:3
199:10 205:19,21
216:21 217:12
219:4 223:8 230:5,5
232:14 237:17
249:24
**10.2**   206:1
**10.25**   206:1,15
207:6

**10.5**   83:15
**100**   64:21 139:17
144:13 174:12
213:18
**101**   226:18
**101.5**   94:3
**102**   255:5,6
**105**   82:9 226:17
255:12
**105.2**   81:5
**107**   238:19
**10:00**   42:6,11,11
253:12 254:12
**10:20**   1:23
**10ks**   190:4
**10s**   93:16
**10th**   59:2
**11**   1:5 29:10 33:3
51:7 52:21 54:4,5
69:18 78:7 123:1
**11.23**   150:10
**115**   81:8,16 219:21
219:25 220:1 221:1
223:20 255:13
**115,000,000**   225:24
**11501**   256:25
**116.9**   81:5,6 82:20
**12**   89:5 125:25
160:3 199:10
**12-1-2015**   80:17,25
81:2
**12/1/2015**   102:9
**12/31/15**   200:18
**122**   255:16
**124**   110:20,23 119:1
**12:53**   104:22
**13**   110:21,23
**13.78**   146:25 148:1
**14**   137:15 217:22,22
**14-10979**   1:6
**14-50363**   1:11
**14.2**   223:24
**14.4**   217:6,7,9 218:4
218:15 225:16,19
**14.5**   218:10,15
**141**   101:13,13

**142**   101:14
**147**   238:16,20,21
242:9,9,11
**15**   2:13 63:7,8,11
217:23
**151**   224:17
**15th**   214:12
**1600**   106:20,25
126:11
**164**   255:17
**1641**   89:2,15 107:17
108:2,14,18,22
**168**   251:25 252:2,9
**17**   29:16 86:18 97:6
97:14 98:7 99:19
100:4,6 217:22
**17.5**   92:17 223:25
225:19
**17.8**   224:17
**173**   255:18
**177**   255:20
**17th**   238:7
**18**   29:16 210:18
211:9 223:25
**19**   21:24 25:18
75:13,19 80:11 84:6
86:6 87:22 88:5
92:19 94:16 99:20
100:24,25 101:6
113:1 115:10
118:11 170:18
214:16 215:7,19
218:9 224:1
**19.46**   165:5
**19.6**   171:5
**1978**   52:8 53:25
**1982**   125:9
**1984**   125:10
**1988**   53:25
**1990**   53:15,18
**1991**   124:5
**1994**   124:22
**1995**   124:8
**19th**   28:12 70:6,7
77:23 118:15
119:25 215:5

**1:45**   104:7,19,21
**1st**   59:1 73:9,10
140:18,24 150:17
150:25 170:25

**2**

**2**   11:18 83:12 95:5
100:16,16 102:13
102:17 121:7,8
181:12 182:3 195:6
255:6
**2,298,000,000**   71:25
72:2 75:9,10,12
76:6 84:1 117:10
**2.18**   235:15
**2.2**   60:12
**2.298**   82:17 115:9
**2.3**   34:22 219:17,20
220:19,20,24
224:12,14 227:3,16
227:18,18
**2.3.**   227:5
**2.5**   208:18
**20**   1:22 21:11,12
25:18 29:11 146:3
150:1,2,10 152:4,5
152:16,23 153:1
228:4 246:4 251:21
**20-19from**   44:21
**200**   210:14 226:19
**200,000,000**   226:6
**2003**   124:14
**2004**   52:22 53:14,14
178:16
**2005**   126:8
**2007**   21:9 27:9 59:1
60:16 67:22 68:6
78:24 150:4 153:14
164:13,23 165:6,14
166:11,16 170:17
171:2 172:6,14
173:25 174:3
179:18 229:5
231:11,23 245:2,3
**2007s**   164:15
**2010**   21:8 29:10
33:15 58:10 62:17
63:1,6 67:15 68:18

72:12 131:6 140:21
142:14,16,25
143:21 144:10,25
145:22 147:20
148:15,16 149:15
150:6 151:16 153:3
154:14 156:18
157:11,13 161:14
164:6,9,12,14
165:14 166:4 171:3
171:22 172:2,4,15
172:22 173:10
174:7,8,17,21,23
175:1 181:23
229:13 232:4
233:24 235:14
236:22 238:7,10
245:4,8 246:17
247:3
**2012**  69:4 80:6
170:20
**2013**  58:10 62:22
68:21 72:13
**2014**  2:13 21:24
28:12 34:23 59:2
60:16 69:24 70:6,7
72:17,20 75:13,19
77:23 80:11 84:1,6
86:1 88:5 92:19
94:16 99:20 113:1
115:10 118:15
137:15,21 140:24
146:9 148:24 152:6
170:18 213:16
214:5,12,17 215:5
218:9 224:1
**2015**  1:22 40:3 73:9
73:10,12 82:9 83:3
89:5 140:18,24
150:8,17,25 152:8
155:20 170:24
171:1 200:1 218:6,7
218:9,25 224:1
256:12
**2016**  200:3
**2018**  73:19 80:19

**2020**  43:12 62:24
63:1 73:15 82:14
**21**  87:22 256:12
**21.5**  29:12
**2297.6.**  81:14
**23**  43:19
**234**  80:15 82:21,24
**24**  231:17
**25**  71:6 158:22
159:1 231:17
232:25
**26**  43:4,5,6 44:22
46:16 159:11
**261**  218:20,21
223:23,24 224:7
225:20
**27**  182:5
**2751.6**  81:12
**28**  29:12
**29**  27:4
**29.18**  150:18 152:3
152:6
**298**  100:16,16
**29th**  69:24

**3**

**3**  31:10 69:10 83:12
83:14 103:20,25
121:7,8 195:6
**3.5**  68:24 219:5
**3.6**  93:7 94:13
**3.61**  94:9 97:4,9
**3.78**  148:25
**3.895**  226:25
**3.895.**  227:12
**3.9**  227:4,11,18
**30**  26:13 27:4,12
64:11 88:6,22
134:10 143:5 146:3
155:17 180:24
181:10,16,17
245:14,15 246:24
**300**  208:11 209:9
210:9 256:24
**307**  77:1
**30b**  26:19
**31**  218:6 248:4

**31.04**  151:4
**31.04.**  152:3
**31.23**  150:16 151:3
**31.23.**  150:19
**33**  237:10,21,23
238:3,5
**330**  256:23
**333.7**  114:11
**339**  81:6
**34**  161:22
**349**  99:21
**35**  27:12 88:6,13,23
**350**  210:9
**35b**  26:24
**36**  88:14 90:10
113:7,11 118:1
**37**  117:25 118:1
**378**  148:18
**38**  151:17,19 161:23
**39**  58:22 247:22
**395.9**  100:8
**3:26**  176:9

**4**

**4**  31:10,17 69:8
133:15 213:15
217:13,15,16,16,23
219:6 222:22 224:7
227:13,13,15
**4.06**  242:8 243:21
**4.06.**  242:12
**4.2**  207:5,5
**4.25**  28:24 93:2,4,10
93:13 94:8 145:20
153:11 216:25
217:10,17
**4.35**  206:3
**4.4**  222:25 223:1
**4.5**  152:23 153:4
**4.5.**  153:5
**4.8**  201:18,20,23
**40**  60:8 175:12
**400**  208:11,12,16
**41**  29:19 60:8,8,14
**42**  185:12 187:5,9
**425**  41:16 83:21
153:8,12 155:12
197:5 201:4 206:2

211:20
**428**  114:11
**430,790,000**  76:19
**430.79**  76:16
**431**  10:13 11:17,23
12:2 21:18 31:12
34:12,15 36:2,13
41:15,16 76:21
81:21 82:5 83:21
96:7 100:12 112:18
114:20 194:15
197:5 201:4 206:7
207:5,21 211:20
219:10 220:19
221:1
**432**  206:15
**440.8**  76:9
**441**  76:9
**442**  224:2,3,5 226:8
**450**  206:2
**454**  81:10,16,18,20
82:4 96:16 99:24
**473**  2:13
**48**  32:25 40:17
**49**  159:3 246:10
248:9,12,25
**4th**  214:5

**5**

**5**  9:23 73:16 80:17
139:7 181:5 218:25
219:3,20,23 232:14
**5-4-0-0-0-0-0-0-0-0**
197:16
**5.4**  97:7 193:7
197:12,13 217:10
220:5,7 221:13
222:20 223:1
226:14
**50**  26:9 59:17 60:19
60:20,22 68:14
72:15,21 77:14 78:8
78:15 107:12
112:11 126:2
230:13 232:25
236:17 251:10
255:11

**500**  60:9,10 66:1
  69:7 71:13 164:25
  172:20 200:15
**51**  250:6
**515**  200:15
**53**  25:13
**57**  25:20
**58**  29:15
**58.1.**  100:7
**59**  43:18 90:15
**59b**  25:25
**5:00**  42:7
**5:31**  254:14

## 6

**6**  9:23 41:17 83:19
  146:16 169:4,10
  216:21 217:12
**6-7/8ths**  93:16
**6.02**  238:13 243:21
**6.02.**  238:23
**60**  107:20,23 187:25
  188:3,9,20 200:19
  200:22 202:12
**602**  108:10
**607**  256:8
**61**  78:9 82:5 112:11
**62**  71:5,10,11,11
**650**  203:5 205:9,10
  205:13 207:17
  209:25
**66**  162:1 220:17
  223:12 242:9,11
**66,000,000**  226:4
**67**  242:9
**6:00**  42:7

## 7

**7**  27:21,25 101:4
  110:21,23 149:7
  153:5 170:14
**7-13**  119:1
**70**  162:1
**700**  203:16,23 204:3
  204:8,25 205:12,13
  205:18,19,20
  206:11,11,16
  207:14,15 209:10

**702**  31:1
**73**  27:18
**734**  182:2,3,5
  246:10,23 247:22
  247:25 248:9,12
  250:6 251:25 252:2
  252:9
**75**  93:15,22 154:24
**750**  220:12,14 223:6
**78**  97:16

## 8

**8**  28:5 44:24 152:19
**8.5**  220:23 224:14
  224:16
**8.9**  201:3,4,5 202:12
**80**  28:13 79:10
  84:19 180:20
  182:14 191:11
  192:4
**80s**  128:7 138:20
  154:23
**82**  247:18
**824**  1:18
**84**  126:8
**85,000,000**  227:24
  227:25 228:1
**850**  227:22
**89**  247:25
**895**  51:25

## 9

**9**  28:6 29:7 156:7
  171:12
**9.7**  249:24
**9.75**  249:25
**9.95**  205:17
**900**  31:21
**90s**  138:21,23
**91**  126:8 139:11
**92**  247:17
**93**  60:14,16 65:25
**950**  205:7,15 209:22
**97**  60:17 126:8
**985**  69:10
**99**  238:16,19

## a

**a.m.**  253:12 254:12
**aa5s**  62:19 70:9
  72:11
**aaert**  256:8
**ability**  58:5 92:10
  92:13 134:16 138:4
  138:24 139:17
  145:17 232:5,15,23
  241:7
**able**  13:12 17:19
  28:9,11,23 31:4
  42:14 117:5 118:15
  135:12,23 136:16
  146:12,13 151:15
  158:3 194:23
  195:15 220:4,8
  222:18 226:1 253:6
**absence**  30:15
**absolute**  19:3 57:25
  65:19 74:21 82:25
**absolutely**  23:20
  26:9 139:16,25
  161:11 203:19
**accelerated**  34:5
  38:25 237:7
**acceleration**  2:12
  12:22 17:17,17 33:3
  40:23 44:6 108:1,7
  108:9,19 109:5
  110:8 119:15,17,19
  158:10,12,15,19
  166:23 168:21
  172:11 214:21
  237:6 238:12 239:6
  240:23,23 241:8,13
**accept**  12:2 36:1
  40:2 71:10 75:8
  88:18
**acceptable**  46:21
  47:6 234:1
**accepted**  58:23
  71:21
**accepts**  16:24
**accompany**  232:3
**accomplished**
  216:14

**account**  83:16,24
**accountant**  52:9
  68:24
**accountants**  52:18
**accounting**  52:7
**accrue**  200:6
**accrued**  40:2 61:4
  70:10,11,14,18,18
  75:17 84:1 136:21
  137:14,16,18 146:9
  198:17 200:24
  215:7 222:24
  226:19
**accruing**  137:22
  223:8
**accuracy**  102:1
**accurate**  39:6 49:21
  218:15 219:16
  231:23 256:4
**accurately**  182:10
**accuse**  22:12
**achieved**  216:13,13
  218:3 221:11
  223:16 225:15
  226:4 235:14
**achieving**  217:6
**acknowledge**  188:3
  210:17
**acquired**  53:17
**acquiring**  43:21
**acquisition**  53:24
**acquisitions**  123:6
  123:24
**acronym**  180:16
**act**  82:13 122:14
**action**  218:4
**active**  124:1
**activities**  125:5
**activity**  125:7,17
**actual**  26:25 107:22
  153:6
**ad**  4:23 6:19 54:8
  96:6
**adaptation**  27:8
**add**  8:13 16:22 78:7
  99:21 177:5 187:14
  200:7,12,22,24

201:4 202:10 203:6
204:3,4 205:13,20
206:2 210:13
223:16
**added** 201:22
206:16
**addition** 54:9 68:11
89:7 125:25 126:22
146:13 164:22
198:2 208:16 209:5
218:23 220:3 244:4
**additional** 8:14
143:5 156:16
171:23 194:12
226:1
**additive** 152:2
**address** 36:17 37:3
108:18
**addressing** 14:15
**adequate** 45:8,23
**adjourned** 104:20
**adjusted** 97:14
**administered** 1:7
68:3
**administration**
52:7
**admissibility** 7:23
**admitted** 32:16
**advance** 7:17 16:11
70:3 88:10 89:11
**advantage** 242:22
243:2
**adversary** 1:10
**adverse** 40:9
**advice** 193:22
211:23 215:12,15
215:18 236:23
240:2,6,14
**advise** 123:5
**advised** 54:14 123:5
192:6 193:19
**adviser** 54:5,6,8,19
**advising** 123:23,23
**advisor** 14:25 51:6
51:10 52:11 53:8
127:9

**advisory** 50:20,23
**affect** 31:22 242:24
**affidavit** 185:12
**affirmation** 48:24
**afternoon** 45:17
46:19 105:3,5
121:13 122:12,13
164:2,3 177:20,21
177:24 178:2
**age** 248:21
**agencies** 98:2
184:21
**agent** 6:8 239:25
251:6,7
**agents** 236:16
**aggregate** 66:17
71:25 75:9 80:15
239:1,1 252:15
**aggregates** 81:6
99:20
**ago** 52:6 65:14
**agree** 103:2 109:7
110:6,11 111:24
114:2 170:1,10
181:25 197:7
204:17 230:21,23
232:15 236:8
240:18
**agreed** 25:24 26:5
49:24 203:14,18,18
236:14
**agreeing** 131:25
**agreement** 33:12,13
34:8 169:11 172:23
236:7,12,14,20,24
246:22
**agreements** 33:5
128:9 168:22,25
**ahead** 45:24 84:9
103:7 189:13
**aicpa** 52:13
**air** 192:13
**aisle** 18:22
**ak** 70:10
**ak3** 83:14
**ak3s** 72:12,13

**ak5s** 72:20
**akin** 4:1
**al** 1:6
**alice** 5:24
**allocate** 134:5
**allocation** 133:19
134:6
**allow** 27:6 37:19
38:14 39:5,11 40:4
40:19,25 41:2,7,11
41:13 196:21
229:18
**allowed** 138:10
139:12 195:15
200:17 203:16,22
211:20 226:3
**allowing** 27:6 138:4
148:8 169:14
**allows** 131:18
**alternative** 95:1
**alternatively** 2:11
19:3
**alternatives** 65:16
96:10,22 98:9
**amatory** 108:19
**america** 124:6
225:7
**american** 52:17
**amortization** 69:12
**amortize** 27:24
130:13
**amortized** 130:20
**amortizing** 18:24
130:10,10,11,18,24
131:1,10
**amount** 10:12 11:23
25:13 36:14 41:15
60:23 61:7 68:20
69:5,8 70:12 73:13
75:22,24 77:15,17
81:14 82:4,14,17
83:4 97:6 99:9
100:15 111:19,21
112:1,4,16,18,21
114:4 128:10
129:22 130:8
135:11 148:3,6

150:3,16,23 152:23
154:8 193:7 194:15
199:3,5 203:23
207:16,22 211:23
220:24 227:15
228:7 252:15
**amounts** 34:23
128:10 205:8
**analogous** 56:1
92:18
**analogy** 91:5
**analysis** 17:6 27:14
29:12 35:17 82:7
83:25 94:23,24 99:8
108:3 117:19 141:4
141:4,24 144:18,21
144:22 147:22
148:4,5 149:21
150:5,19 152:21,25
155:8 162:4 212:4
**analyze** 107:2 219:6
**analyzed** 59:11
**analyzes** 153:16
**anderson** 3:20
53:25
**andrew** 7:6 32:4
**andy** 3:5
**anker** 5:9 17:3,4
23:11 30:24 31:7
32:13 33:16 34:19
35:8 37:12 40:6,8
40:15 41:8 44:13,14
45:7,20 46:1 47:5
47:20 48:1,6,13,19
49:8,15,18,20 50:10
50:13,17 63:17
70:21 74:11 76:10
76:14 85:12,16,24
85:25 87:13,17,20
88:6,13,15 89:5,18
89:24 90:4 95:4,11
95:14,15,24 96:2,3
101:11,21 102:4,19
103:5,8,11,15,22
104:2,15 115:21,22
116:16 120:18
121:5 136:19 176:1

176:5,13,23 177:5
177:12,13,15,19,21
177:25 178:1,8
181:14,17,19
189:13,16,18 194:1
195:5,8 196:19
205:3,5,6 206:23
207:9,11,12 210:23
211:3,6,7,15,17
213:10 214:2
215:14,16 221:20
221:22 222:6,16
225:4,6,10 226:24
231:3,7 238:15,17
240:12,19,20
245:18,21,25 246:5
246:8,9 248:14,16
249:8,11 250:10,12
251:20,23 252:7,8
253:5 254:2,13
**anker's**  16:1 92:9
195:4
**annotated**  87:21
**announced**  203:20
**annual**  63:1 82:19
82:20 128:11
129:20 130:8 131:7
**annuities**  128:12,13
**annuity**  129:8,9
154:21
**annum**  62:5 63:2
80:15,18
**answer**  7:7 35:13
44:25 61:21 66:5
69:16 71:11 74:10
74:17 80:13 82:18
86:23 87:3 108:21
111:2,6,9,12,14
117:1 136:22
206:24 221:5,25
222:8 225:13,13
233:2 234:9 241:21
**answered**  57:19
**answers**  222:4,9
**anthony**  176:14,20
255:19

**anticipated**  64:9
**anybody**  147:11
158:9 159:24
160:21
**anybody's**  148:19
**anytime**  44:1
**anyway**  142:9
**anyways**  50:7
**apiece**  151:19
**apologies**  27:8
40:16 70:3 122:1
181:9 195:19
203:18 211:10
241:22 248:19
249:9 250:16
**apologize**  7:4 42:12
67:10 87:20 88:15
90:2 103:15 181:14
195:22 196:25
198:9 199:15
213:19,21,23
216:19 219:22
220:18 229:3
234:11 237:20
241:22 245:19,20
246:25 248:17
250:14
**apparent**  22:18
**apparently**  33:7
67:9 173:14
**appendix**  124:25
170:19
**apples**  76:4,4 92:22
92:22 217:15,16
219:14,14 221:3,3
224:19,21 225:11
226:10
**applicability**  2:13
**applicable**  23:3
38:23 39:1 76:16,23
112:6,8,14
**applied**  94:12
249:23
**applies**  240:3
**apply**  2:11 159:14
163:10

**appreciate**  30:15
90:1 169:5 170:23
183:19 197:22
212:18 225:8 254:8
254:11
**approach**  49:18
79:1 91:23 110:16
177:3 196:17
**appropriate**  14:25
103:1 118:23
**appropriately**
138:6
**approval**  203:15
223:11
**approximate**  69:5
194:15 199:5 201:1
**approximately**
31:21 68:17,20,22
71:20 83:21 93:7
100:24,25 126:2
180:20 187:17,25
193:6 199:8 202:16
210:3 217:8 223:14
**approximates**  59:1
**approximating**
99:11
**april**  1:22 44:24
69:24 256:12
**area**  54:2 172:20
206:18 239:16
**areas**  254:6
**aren't**  205:19
**arguably**  62:13
97:4
**argue**  16:3 28:14
**argued**  35:4,15
36:13 45:9
**arguing**  35:10
**argument**  7:13,18
16:24 17:12 23:12
32:15 33:14,25
35:18,20 45:15 48:9
**arguments**  36:23
37:10
**arose**  67:21
**array**  51:4

**arrives**  10:12
**art**  57:22
**arthur**  53:25
**articulated**  37:7
41:11
**aside**  10:18 75:15
188:9 198:22
200:14,22 215:18
215:18
**asked**  8:8,13 24:3
24:11,24 35:8 67:25
73:20 75:16 79:3
82:21 116:19 117:9
117:25 118:25
119:3,14 120:5
143:3 174:6,16
189:7 193:13,17
210:22 222:1
235:24 238:12
243:20
**asking**  30:18 63:19
65:4 73:2 162:4,10
175:8 183:7 193:10
201:7 202:2 206:25
211:22 215:15,17
218:10 221:12
236:5 240:6,12,14
**aspects**  93:12
**assesses**  29:10
**assessment**  145:1
**asset**  63:21 128:21
143:2 185:17
190:25 191:10,25
194:13 209:2
210:12,14
**assets**  127:23 129:3
155:5 165:2 180:3
183:25 192:7 208:1
208:2 209:1,2
249:22
**assignments**  124:23
**assistance**  161:8
**assistant**  53:21
121:6
**associated**  114:5
127:1 129:23
143:11 144:25

145:2,13 166:21
174:3 238:7 245:9
**associates** 143:20
**associates'** 174:22
**assume** 33:24 82:12
83:5,8 114:14
118:11 191:15
195:14 200:18
244:19 253:6
**assumed** 145:18
151:8
**assumes** 82:7
114:17 118:14
170:16
**assuming** 23:5
36:21 48:8 65:5
83:2 151:4 160:12
223:12
**assumption** 82:12
140:9,11 141:9
194:22 196:1
**attachments** 43:15
**attempt** 89:1
**attempts** 88:3
**attending** 123:15
**attention** 110:20
239:17 242:7
**attorney** 3:3,16,21
4:2,7,13,23 5:2,7,14
5:20 6:2,8,14,19,24
**attorneys** 3:10 4:18
**attractive** 138:23
**audit** 53:24
**auerbach** 43:25
44:19 46:4,11
**august** 238:7
246:17
**auto** 12:21
**automatic** 2:10,12
17:21 24:2 37:18,25
38:3,8 39:16 40:23
126:19 158:12
214:12
**available** 24:5 31:1
45:16,18,25 87:11
88:4 116:9

**average** 27:23
129:23
**avoid** 14:16 70:1
84:7 240:4
**avoided** 225:22
228:2
**aware** 58:9 69:18
164:22 189:24
190:3 191:9,25
192:5,11,14 193:5
194:8 212:21 213:1
214:4,8,10,13,14,20
214:23 237:1,8
242:1 243:19
244:13 245:7
252:22 253:2
**axis** 150:1

**b**

**b** 2:1 27:1 55:18,18
76:11 80:13 81:4
82:18 83:8,12 88:6
88:6,13,14,22,23
90:10 103:17,19
113:7,11 117:25
118:1 255:3
**bachelor** 52:7
**back** 10:13 13:8
18:20 19:21 34:11
43:14 47:18 52:22
53:18 58:8 59:4
60:25 61:7 63:6,10
67:1 68:16 78:14
83:25 84:4 86:4
89:24 90:5,14
117:10 120:6
124:22 128:7
129:14 130:6,6
136:12 137:13,24
138:16 139:19
146:14 148:13
150:10,16 151:17
152:4 155:15
156:12,18 157:13
157:17 175:2 197:3
199:12 204:7
208:23 210:8 224:7
225:5 229:4 245:2

245:13 246:15
251:21 252:9
**background** 52:5
122:16 126:14
160:24
**backing** 217:17,18
**backup** 21:1
**backwards** 53:13
53:14
**bad** 40:10 119:12
181:15
**balance** 75:7 101:6
156:14 157:13
171:14 187:25
190:24,25 194:13
194:14 198:7,21
206:3 215:6 217:13
221:10
**balanced** 143:22
157:3,21 165:19,22
171:6 172:2,19
174:7,9
**balancing** 11:25
30:4 155:25 228:15
**bank** 3:16,21 4:2
123:3
**banker** 124:1,10
**bankers** 126:12
**banking** 123:22
124:6,18
**bankruptcy** 1:1,17
2:3 11:1 12:15 22:2
22:4,10 23:3,4 24:1
27:15 29:17 34:5
36:12,14 38:25
39:23,24 41:3 45:22
51:3 53:5 54:2 56:7
56:13 69:23 73:3,4
75:19 80:4 120:3,4
127:3 158:5,8,9,13
158:21,24 159:1,6
159:15,15,23 160:1
160:7,10,17 162:15
162:19,22 163:1,11
163:20 174:11
184:15 195:13
199:25 206:21,22

212:24 231:11
240:24 241:13
242:1,2,5 243:10,18
244:6,12 245:5,10
248:7 249:20 250:4
250:9,24
**bar** 2:25 19:3 99:22
101:13 149:14,16
150:13,15,20,23
151:13,20 153:13
169:13,18
**bargain** 10:16,21
11:6 12:15 13:15
18:13 19:11,14
24:14 29:13 39:20
39:25 41:2,4 61:9
109:11,14 147:7,9
147:10 154:14
155:16 169:18
170:2,5,11
**bargained** 22:10
33:1 233:9
**bargains** 12:12
135:6
**bars** 102:12
**base** 19:19
**based** 15:17 22:14
37:16 38:1 66:14
75:1 79:1,2 86:19
92:7,7,7 101:17
112:24 136:17
154:16 157:7
218:13 236:14
**bases** 15:24,24 88:9
88:21,21
**basic** 89:2 127:4
129:14 143:10
159:4,5
**basically** 77:10
134:21
**basics** 130:3
**basis** 27:23 44:11
64:23 68:14 72:15
77:14 78:7,8,9,15
80:15,22 82:6 87:9
101:15,16 110:8
112:12 118:21

126:10 134:15
136:4 148:17,18
151:9 172:16,17
207:8 232:25 251:7
**bear** 11:10 64:4
119:17 130:3
237:25
**bearing** 35:24 86:4
**becoming** 156:2
**beginning** 32:9
89:13 153:23 187:4
211:4 242:1 244:12
252:13
**begins** 242:12
248:22
**behalf** 239:2
**belief** 236:18
**believe** 7:20 11:14
15:4,17 23:20 27:19
35:13 37:8 56:16
67:21 68:19 70:15
72:14,16 77:19
79:21 80:6 85:6
86:11 94:3 107:18
108:11 109:10,15
110:7 112:11 115:4
116:11,12,21
137:16 150:9 168:3
169:3,17 170:20
179:2 182:12,24
198:9 207:6 213:5
224:9 234:12
235:17 246:19
247:11 252:21
**believed** 23:16
**benefit** 31:23 61:9
73:22 80:22 133:4,7
133:9 134:5,6 138:7
155:19,19 219:24
220:16 221:10,11
223:11 227:14
229:16 242:22
**benefits** 73:20
74:17,19 106:1,6
133:8,10 134:2
155:13,21,22
216:14,14,17,17

221:17 223:15
243:2
**best** 69:3 143:21
175:17 183:13,14
183:20 189:19
197:3 225:6 228:16
228:21 234:19
**bet** 90:24
**beta** 168:15
**better** 132:22 140:8
157:9,10 230:1
254:2
**betting** 91:5
**beyond** 73:17 78:25
97:6 117:22 155:23
193:23,23
**bid** 210:18 211:8,10
211:11
**bidding** 14:23
**biddle** 6:7
**bifurcation** 11:21
16:7 22:25 195:3
**big** 159:23 206:13
206:14,14,18,22
254:7
**bigger** 188:4
**billion** 34:22 60:11
60:12 68:19,22,24
69:8,10 71:20 82:17
82:24,25 97:7
100:16,16 115:10
152:23 153:5,7
185:12 187:5,9
193:7 197:12,13
198:11,23 199:11
199:13,14,15 201:3
201:4,5 202:12,16
202:17,24 203:1,7,7
204:10,18 205:7,17
205:19,21 206:1,1
206:15 207:6,19
208:18 209:2,22
210:3,4,18 211:9
217:6,10,13,15,16
217:16,23 219:5,6
219:17,21 220:6,7
220:19,20,24

221:13 222:20,22
223:1,1,1,4,5,7
224:8,12,14 226:15
227:1,3,4,11,13,16
231:18 235:15
**billions** 30:13
**biloxi** 54:25 117:21
**binder** 10:3 175:23
177:9 213:5 237:12
237:12 245:14,16
245:19,20
**binders** 121:2
176:24 177:1,6
180:25 213:4
245:19
**bird** 6:21
**bit** 65:14 72:7 75:5
92:3 96:17 97:9
104:8 129:14
131:22 144:16
166:22 167:25
180:8 196:13
197:21 198:16
202:9 216:20 222:5
222:6
**black** 150:13,23
212:11
**blanchette** 2:25
**blend** 216:21
**blended** 217:11
**bless** 34:13
**blessing** 253:23
**bloomberg** 58:3,23
59:6,13,16,16,19
60:16 66:10 88:8
89:10,19 92:1,5,5
92:12 93:5 97:23
99:13,13,15 106:19
107:1,21 140:3
168:11,15 175:9
**bloomberg's** 168:12
**blue** 44:19 147:5
151:21
**boilerplate** 18:12
**bold** 248:22 249:1
**bond** 26:17,18 27:3
57:1,6,8 86:15,15

90:12 113:13
144:22 148:17
149:23 168:1,4,8
175:3
**bondholder** 29:3
**bondholders** 74:2
**bonds** 56:14 57:10
57:12 78:23 124:18
139:11,13 140:5,6,9
164:13,14 167:2,14
231:22,22
**book** 139:7 146:17
149:8 156:6 209:11
**books** 104:16
190:17
**boost** 165:13,17
172:25
**bore** 63:1
**borrow** 220:4
222:18 226:1
**borrowed** 220:3,7
221:13 222:20
**borrower** 34:4
55:17 57:8 72:15
74:11,18,20,25 75:4
80:22
**borrowers** 73:22
**borrowing** 100:2
**bottles** 254:6
**bottom** 76:15 95:6
147:7 148:8 149:15
182:2 242:12 249:6
**bought** 91:6 124:9
154:21 167:21
**boutique** 51:1
**box** 30:8 31:15 78:5
81:4 96:16 183:7
**boxes** 78:6 254:5
**boy** 118:1,1
**bps** 71:8 72:21
**break** 42:8 49:23
104:6,8,10 121:6
134:19 147:1 176:2
243:25 245:22
246:7 253:6,11
**breakout** 254:9

| | | | |
|---|---|---|---|
| **brian** 6:16 | **c** | 60:17 63:15 65:11 | 136:1,7 140:9,14 |
| **brief** 8:24 23:16 | **c** 3:1 7:1 68:8,13 | 65:12,22 66:2 67:3 | 142:4 169:18 171:6 |
| 30:6 31:17 122:16 | 115:2 122:7,8,8 | 68:11 69:14 72:19 | 218:24 247:6 |
| 123:9,18 126:15 | 256:1,1 | 73:5,5,8,16,18,18 | **calling** 67:10 |
| 201:17 202:7,8 | **cacioppo** 15:16,21 | 74:9,13,21,21,22,24 | 193:22 |
| 211:25 214:24 | 18:21 20:10 27:19 | 74:25 75:1 77:11,24 | **calls** 22:4 54:16 |
| **briefed** 7:17 13:3 | 28:25 30:24 40:5,6 | 78:13 80:17 81:3,7 | 57:10,17 58:3 59:21 |
| 23:13 | 40:7,12,19 | 81:8,10,16,20 82:2 | 63:14 65:19 79:14 |
| **briefing** 8:2 | **calculate** 35:25 | 82:8,9,24 83:3 86:6 | 121:18 161:15 |
| **briefly** 7:25 52:4,24 | 78:19 81:11 94:10 | 86:19 98:7 99:20,21 | **calpine** 55:2 57:13 |
| 53:10 54:18 55:14 | 141:11 219:3 | 102:1,4,5 105:8 | **cancellation** 212:10 |
| 58:19 72:8 77:7 | 220:21 224:13 | 106:7,12 107:8,13 | **candidly** 22:20 |
| 84:5 95:17 142:24 | **calculated** 12:5 | 108:4 109:13 | **can't** 42:4 44:7 |
| 178:12,18,21 | 60:22 68:14 75:24 | 113:20 118:2 125:8 | 178:5 204:25 |
| 185:20 | 77:10 96:7 100:12 | 127:23 135:10,11 | 205:17 231:5 |
| **briefs** 17:12 23:13 | 112:4,18 136:4 | 135:14 137:2 138:9 | **capacity** 179:23 |
| 37:22 48:8 214:24 | **calculates** 77:4 | 138:10 139:13,17 | **capital** 65:17 90:19 |
| **bring** 14:25 33:25 | 83:14 111:19 | 140:5,7,14,16,23 | 100:2 117:17 |
| 110:22 130:23 | **calculating** 60:19 | 141:1,3,6,7,7,13 | 118:15,21 124:16 |
| 169:3 208:23 | 78:12 79:17 83:1 | 143:4 144:2 146:24 | 125:23 178:23 |
| **bringing** 47:17 | 146:23 | 146:24 147:21,22 | 179:1,6,10,13,15 |
| **brings** 52:22 | **calculation** 10:11 | 147:24 150:5,24 | 184:22 228:12 |
| **bristol** 53:20,20 | 10:18 11:13,17,22 | 155:24 157:12 | **capstone** 50:20,21 |
| **broad** 38:14 243:24 | 12:3 21:2,18 25:15 | 168:4,16,16 170:20 | 50:22,25 51:1,6 |
| **broader** 38:15 | 26:9 29:19 41:14,17 | 170:22 172:14,16 | 52:19,20,25 53:11 |
| 119:9 243:14 | 77:8 80:1 96:18 | 176:2,5 177:7,8 | 53:13 |
| **brody** 5:22 | 100:19 112:1,8,12 | 183:24 186:5 | **captain** 125:9 |
| **broken** 156:3 | 112:14,24 136:17 | 198:19,20 218:7,24 | **captains** 125:8 |
| **built** 43:22 | 137:12 148:10 | 218:25 219:23 | **capture** 235:10 |
| **bunch** 248:6 | 153:9 207:1,8 | 232:5,6,13,14,16,20 | **capturing** 229:21 |
| **burden** 47:21 | 220:22 | 232:21,23,24,25,25 | **car** 40:25 |
| 196:16 | **calculations** 83:8,17 | 233:5,12,19,25 | **care** 120:16 |
| **business** 52:7 123:7 | **calculator** 207:24 | 234:7 246:2 | **cared** 120:14 |
| 123:13,16 124:19 | **calculators** 196:15 | **callable** 20:20 57:12 | **career** 53:9,23 |
| 124:19 153:20 | **calendar** 200:1 | 66:5,7,15 73:19 | 54:11 |
| 186:4,8,9 193:2,10 | **calgene** 55:1 105:10 | 74:5,14,19,23 80:19 | **cares** 18:12 |
| 193:11,11 194:3 | 117:21 | 134:13,18,20 135:6 | **carries** 91:11 127:9 |
| 236:5 | **call** 9:18 14:3 19:2,2 | 141:10 233:10 | 242:13 |
| **butchering** 40:10 | 22:10 25:24 28:5 | 234:14 | **carroon** 3:20 |
| **buy** 93:10,23 | 39:18 40:9 41:3 | **called** 21:4,24 22:3 | **carry** 91:18 141:18 |
| **buying** 45:14 | 42:20 44:24 46:12 | 26:17 28:12 43:25 | **carryover** 159:12 |
| **buyout** 68:6 179:18 | 46:24 47:2,3,7 | 52:13 61:11 65:19 | 159:21 160:4 195:6 |
| 231:11,23 | 48:14,16 54:23 | 73:12,14 74:3 80:23 | **carving** 16:6 |
| **bygone** 57:20 65:18 | 56:20,23,25 57:5,8 | 83:2 86:13 106:24 | **case** 1:6 4:22 8:10 |
| **bygones** 57:11 | 57:9,9,17,18,18,18 | 112:9 124:16 | 8:11 10:23 12:4 |
| **byowitz** 5:24 | 57:21,23,25 58:1,3 | 125:18,22 127:11 | 14:11 18:1 20:13 |
| | 58:4,4,7 59:13 60:6 | 128:7,12 135:21,22 | 31:4 34:9 35:16 |

39:18 40:1 42:3
43:4 46:12 47:2,9
47:11,23 48:3 54:22
56:7 57:10,13 60:10
62:2 66:4 68:13
69:19 71:7 81:1
98:4 105:13,14,16
107:12 108:6
110:13 111:19
117:3 120:2 125:1
135:7 140:16
147:24 167:12
176:25 187:4
192:20 199:11
212:2 232:14
**cases** 35:15 51:7
54:4,5,6,15 56:13
68:3 105:7,11
150:25 166:18
167:16
**cash** 84:24 85:1
126:24 127:25
128:1,23 129:1,1,20
129:22 131:14,15
131:19 137:2,2
144:23,23,24 145:6
145:18 146:14
148:5 149:15,23,24
149:24 150:8,10
153:3,18,20,23
154:8,16 155:1
158:7,20 159:10
160:8 164:23
172:20 173:21
175:4,4 208:3,5
209:6,8 210:7
**casiopo** 12:7
**cassiopo** 46:10
**category** 179:10
**cause** 37:25 38:3
39:4 126:18
**causes** 132:15
**causing** 219:13
**cease** 192:16
**center** 22:20,21
130:1

**centered** 135:9
**central** 24:8 31:9
153:21,22
**centrality** 18:7
**cents** 64:21 165:9
**certain** 2:9 38:24
51:12 72:16 122:15
154:8 168:14,14
228:24 229:7 237:7
**certainly** 14:24 33:1
37:22 47:6 54:19
57:11,15 58:21
61:25 62:1 66:3,5
79:2 87:20 91:12
98:8 108:15 179:17
189:16,17 194:2
199:2 212:3 232:15
233:8 234:17
247:13,15 254:9
**certifications** 52:9
**certified** 52:8,10,10
52:11,17 256:8
**certify** 256:3
**cet** 256:8
**cetera** 254:5
**chairman** 122:24
**challenge** 49:25
**challenged** 50:5
162:21,25
**change** 12:15 41:3
46:7 63:20,21 64:20
75:3 120:22 127:3
158:5 159:5 160:6,9
203:13 205:7 224:5
230:6,7
**changed** 160:16
164:19,23 233:16
**changes** 134:3
158:21
**chapter** 1:5 33:3
51:7 54:4,5 69:18
**characteristics**
61:16 84:15 91:15
**characterization**
195:4 230:22,23
**characterize** 34:14
67:11 202:17 234:4

**characterized**
110:10 187:22
230:24
**characterizing**
106:17
**charge** 124:3
**charles** 5:10 30:21
121:13
**chart** 27:5 60:13
79:10 114:8 133:14
133:23,25 138:2
139:14 146:19
148:2 149:13
153:16 156:5,11
157:24 171:14
182:8 183:6,8,21
**charts** 156:6,10
169:13
**check** 59:16
**chemtura** 54:20
**chicago** 125:20
**chief** 46:13 47:10
53:8 122:24
**chock** 23:13
**choreography**
47:17
**christopher** 2:2 4:4
4:25 49:4 255:10
**chronology** 212:20
**circuit** 250:10
**circulated** 83:23
**circumstance** 61:17
64:24 135:5 236:25
237:1
**circumstances**
17:23 20:25 33:2,10
33:21 38:24 63:22
75:2 142:18,24
237:7
**cite** 79:2
**citibank** 6:8
**citicorp** 123:21,25
**claim** 11:21 12:23
23:2,5 31:12 70:23
93:15 194:12
203:16,22 204:15
206:11,12 207:21

208:2,18 211:18,19
242:22
**claimant's** 238:5
**claiming** 103:25
**claims** 31:22 195:16
195:20,21 200:9,10
203:21 204:6
209:12 210:13
249:23
**clarification** 170:23
**clarify** 32:2 85:12
173:18 222:3
224:20
**clarifying** 207:3
**class** 230:14
**classic** 102:25
**clause** 12:22
**clean** 77:22 121:9
**cleaning** 254:7
**clear** 11:8 24:17,20
24:21 30:8,8 36:20
36:21 61:21 62:3
64:10 67:18 69:22
72:23 77:22 82:11
144:13 154:14
163:19 170:15
183:24 192:24
194:21
**cleared** 31:16 144:7
**clearly** 131:1
215:25 230:25
**clears** 36:24
**clerk** 7:2 9:7 48:22
48:25 49:2,6 104:23
122:5,9 176:16,18
176:22
**client** 23:1 53:3
**clients** 123:4 124:4
221:9
**close** 48:11 91:19
151:7 197:2
**closely** 104:7
**closer** 18:21 78:1
208:12
**code** 11:1
**cohen** 6:10

cole 5:13
collateral 84:19
143:6,7,11,13,14
146:5 158:14
165:21,22 235:1
249:17,22
collateralized
143:16 156:23
159:25 160:12
172:8,18 173:20
colleagues 7:8
92:25 248:19
collect 44:7
collective 126:10
collectively 78:17
187:3 188:19
college 52:8 53:12
color 151:21
colors 150:21
column 81:5,11
99:8 146:22 147:2
148:7,9 150:9
170:15 171:17
combination 131:9
combine 131:12
combined 47:10
combines 170:16
come 8:21 9:11
10:13 13:8 30:16,17
88:19 91:7 103:18
121:23 134:10
194:7 241:1,4
251:18
comes 10:6 30:4
90:14 151:7 179:6
248:21
comfortable 59:19
207:13
coming 129:12
175:10
comment 197:17
comments 14:19
16:1 221:16
commercial 51:5
64:1
commercially 13:16
39:25

commission 190:6
commit 25:8
commitments 167:2
167:8,14
committed 133:7
134:16 136:4
committee 4:18
6:14,24 44:17,21
54:7 124:7 126:1
common 57:25
58:13,16 65:20,21
91:17 127:18
138:21,22,25
commonality 175:7
commonly 180:15
communicate
241:16,24
communicated 8:4
241:11
communication
242:2
communications
243:7,22
community 138:10
companies 20:13
26:10 28:1,19 79:4
86:25 127:17,19
128:4,9,15 129:5
155:2 180:15,18
182:11 191:7 200:4
232:3
company 1:8,12 2:8
19:2,22 20:5,6 22:3
22:14 27:15 28:12
28:12 29:7 46:13
53:22 56:13 63:10
82:13 91:20 98:19
122:22 124:15
127:3 132:21,25
134:4 138:16,17
143:3 157:5,9,10
180:12 182:14
184:6,11 186:1,22
186:24,25 191:3
192:19 193:24
201:12 202:8 212:7
215:6,12 219:24

233:8,9,17,23
234:11 236:2
237:16 239:20
244:14,15 247:8,8
247:13,15,21 251:2
251:3,4,5
company's 98:12
165:2 167:17
234:24 251:6
company's 232:4
comparable 20:22
21:23 28:9,10,21
61:15 86:1,10,18
87:1,5,5 88:4 89:4
90:7,12,13 97:1
98:13 113:13,14
148:22,23,24
154:21
compared 79:23
100:20 151:1
compares 11:3
92:22
comparing 217:9
217:15
comparisons
152:11
compel 40:1
compensate 20:24
25:22 135:23
136:16 137:1,4
138:6 151:6
compensated 51:20
51:24
compensates 29:2
113:21 118:3
149:11
compensation 52:1
142:3
competencies 54:2
competency 51:3
competent 239:8
competitive 26:4
compiled 106:25
completed 125:11
158:3 174:14
completely 193:13
236:4

completes 248:23
249:2
complexities 212:12
complexity 224:22
compliance 178:24
complicated 36:3
complications
212:2,3
component 13:14
39:20 127:24
components 83:12
126:9 131:12,21
composite 92:11
97:23 100:3
composites 99:13
99:14,15
compound 52:16
84:7
compounding
199:19
comprises 55:16
90:25 100:25 101:7
comps 91:2
concept 88:1,17
113:17 164:6
204:14,18
concerning 195:10
195:12
conclude 99:10
concluded 25:17
254:14
conclusion 10:12
60:1,5 63:14,16
97:8 106:16 158:5
175:10 191:18
conclusions 139:14
142:14
condensed 180:25
181:15
condition 132:18,22
132:23,25 133:4,11
134:3 234:5
conditions 64:6
84:12 86:19 165:20
conduct 143:17
conducted 92:4

conference  44:23
confirm  89:20
  175:14 231:8
  246:21
confirmation  2:10
  240:2
conflict  239:8
confusion  219:13
connection  12:1,10
  13:4 38:9 39:15
  54:23 109:22 142:4
  160:25 161:4,7
  234:12 244:23
consciously  236:11
consenting  239:6
  252:20
consequence  64:17
consequences  15:7
  144:16,18 145:21
  146:7 153:17
  154:18 155:1,7
  239:3,7 252:17
consequently  77:25
  81:1 86:17 87:3
consider  97:12
  235:1
consideration  96:12
  230:10 232:9
considerations
  232:10
considered  96:9
  139:23 235:3
considering  98:5
  100:3
consisted  92:2
consistent  83:22
  139:15 159:7
  165:16 194:17,18
  233:14
consists  72:2
constant  233:16
constituencies
  54:14
constituency  51:7,9
constitute  193:15
  194:5

construction  18:9
construe  13:17
construed  10:22
  13:18 17:14 32:24
  34:9
construing  17:13
consult  246:1
consumers  186:6,6
contacted  42:20
contain  8:8 68:10
content  240:16
contest  45:8 91:1
contested  16:4,7
context  18:2 53:7
  56:25 65:11 90:9
  91:21 92:9 98:21
  111:10 119:2,12,21
  234:22 241:14
contingent  52:1
continue  36:21
  161:23 173:21
  200:6 239:4 246:3
continuing  242:9
  252:18
contract  18:9,13
  25:4 37:9 38:6,21
  38:22 60:23 72:18
  75:1 78:8 82:6 96:8
  96:10 199:1,2
contracted  64:2
contracts  128:8
contractual  28:15
  37:20 196:5
contractually  25:24
  111:21
contradictory  34:7
control  63:20,21
  140:12 151:15
controller  46:14
  53:22
controls  170:11
controversy  198:24
conversation  98:11
conversations
  109:19,23 236:16
  251:9

conversely  17:25
  18:15
conveyed  244:5
copy  49:12,13,16
  87:21 110:17 113:9
  169:6
core  18:23 24:14
  51:3 54:1
corp  1:6 182:21
corporate  53:21
  56:18 58:25 59:7
  60:15 68:9 79:10
  98:3 106:14 108:7
  123:4 124:4 179:25
correct  40:12 59:20
  62:8 64:22 75:11
  76:22 83:6,22 93:20
  105:8,11,12,14,18
  105:23 106:3,8,15
  107:1,5,6,9,14,18
  107:22,23 108:2,3,8
  108:9,14,23,25
  109:3,11,14,17,18
  109:21,22 110:1,5
  110:13 111:19,22
  112:1,6,12,16,19,22
  113:1,4,25 114:15
  114:21 115:3,6
  118:16 147:4,6
  148:3 152:17
  164:14,17,18,20,21
  165:3,7,8,10,11,15
  165:17 166:4,11,14
  166:16,20,24,25
  167:3,8,15,23 168:1
  168:2,6,9,22,25
  170:11,18,24 171:3
  171:6,7,9,19,20,22
  172:2,6,12,13,15,20
  173:1 178:11,17
  179:22 180:7
  182:20 183:5 184:1
  184:5,10,13,18
  185:3,6,8,10,19
  186:10,23 187:10
  188:2,12,22 189:22
  190:19 191:13

192:10 193:4
  197:14 198:1,3,6,15
  199:9,9 200:2,5,11
  200:13,21 202:4
  203:24 204:2,21
  207:23 209:4,7
  214:18 215:1
  216:11,23 217:1,4
  218:22 219:2,25
  220:10 223:21,22
  224:8 225:25 227:6
  227:17,23 228:18
  229:9 235:17
  236:10 238:11
  239:10 247:3,4,7,20
  250:2,5
correctly  58:2
  100:17 106:17
  252:20
correlate  94:7
cosby  4:4
cost  26:21 74:11,12
  80:22 135:8,10
  217:18 232:25
  233:22
costs  113:21 118:3
  141:19
couldn't  38:1
  233:24
counsel  8:4,14
  51:11 72:18 109:23
  161:8 166:19
  175:25 193:22
  194:3 240:1,17
  251:8,8,11
counsels  239:25
counted  250:18
counter  28:18
  251:10
country  256:23
couple  24:24 49:10
  222:24,25
coupon  64:3 65:15
  72:20 77:11 81:2
  82:1,19 86:4 87:6
  94:10 101:8 107:17
  131:7

coupons  199:7
course  7:19 12:17
  14:5 35:6,7 47:1
  48:12 53:9 54:11
  88:19 104:18
  107:16 114:20
  151:24 163:21
  165:1 171:2 197:2
  254:8
court  1:1,17 7:3,12
  7:15 9:5,8,11 10:1,4
  17:2,22 23:8,16
  31:18 32:3 33:4
  35:4 36:5,17,19
  37:23 40:7,14,16
  41:24 42:1,11 45:12
  45:14,21,22 46:21
  46:23 47:4,19,22,25
  48:5,12,14,23 49:14
  49:16,19 50:9,11,16
  51:14 52:4 54:18
  55:14 56:22 58:19
  63:15 70:18 72:9
  75:25 77:7 84:5
  85:15,21,23 87:16
  87:19 89:16,22
  95:10,13,25 96:14
  99:10 101:19 102:3
  102:14,16 103:2,7
  103:12,21,23 104:1
  104:3,5,14,18,20,24
  110:18 111:12
  115:19 120:11,19
  120:21,25 121:3,9
  121:11,16,20
  122:15 126:16
  133:21 135:21
  143:1 154:2,12
  158:14 159:17,20
  161:20,25 162:2
  163:4,12,24 173:4
  173:16 175:21,24
  176:4,7,10,15 177:4
  177:11,14,17,22
  178:5,14 181:12
  189:11,14 191:15
  193:25 194:21

195:14 196:18,20
  196:23 199:13
  200:25 203:14
  204:25 205:4 207:2
  207:10 210:15,21
  210:25 211:5,13
  213:22,24 214:1
  215:8 221:24 222:3
  222:8,11,15 223:10
  224:24 225:5,8
  226:11,13,23 228:3
  231:2,4 238:14
  240:18 245:17,21
  246:3,6 250:7,19
  253:8,9,10,19,21,24
  254:4
courtroom  18:18
  34:1 194:14
courts  23:19 101:24
covenants  242:20
  242:24 243:3
cover  220:4
covered  164:4
create  67:18 93:8
  138:4 194:9 212:1
created  72:23 94:23
creates  29:4 137:6
  155:5
credit  20:22 28:17
  28:21,22 44:8 55:22
  61:16 65:15 66:21
  75:3 86:2 87:5 90:8
  90:22 91:3,15,16,19
  92:7 95:20 96:24
  99:11 115:15
  124:16 131:24
  132:17,21 133:3,11
  137:25 148:23
crediting  65:24
creditor  15:1 39:16
  202:22
creditors  30:9
  31:23 54:7 183:24
  184:2,4 188:20,24
  188:25 189:3,5,8,20
  190:1 194:24
  195:16,18 196:3

202:21 207:18
criteria  59:10,11
  117:17 139:4
critical  13:14 17:24
  31:4 39:20 60:18
  66:23 127:24
  131:21 155:6
  239:21
criticism  197:19
cromwell  6:13
cross  47:9,12 104:6
  105:1 163:24,25
  173:18 177:8
  235:23 253:12
  255:12,17
crowded  121:25
crt  124:16 125:21
csc  2:8
css  1:6,11
curious  23:9
current  43:11 68:9
  116:13 117:9
  197:24,25 198:7,13
  203:25
currently  122:19
  196:3
curve  86:15,15
cusip  70:10 83:13
cusips  62:12,13,15
  72:11
customarily  127:12
customary  10:10
  11:4 58:15 59:24
  60:3,6 106:13,15
customers  191:3,22
  191:23
cut  9:10 78:18
cute  90:17
cutler  17:4 115:23
cutoff  59:3
cv  53:7

d

d  7:1 21:2 76:9
  89:10 96:24 97:22
  97:23,24 98:3,4
  255:1

d.i.  2:13
dalbert  7:21 8:3
damage  34:17
  117:19
damages  38:18
  91:23 96:8,11 100:1
  100:8 112:16
  117:21
dan  3:12
data  19:22 58:23
  88:8 89:8,9,11 92:5
  106:19 107:2,21
  175:9
database  88:8 89:15
  89:16,17,18,19
  91:25 92:2,14
date  25:24 32:9
  45:2 57:9,18 58:4,4
  58:7 59:1,2,3,13
  62:23 69:25 70:3,19
  72:16 73:5,8,18
  75:18,18 77:23,24
  78:5,14 81:7,8,10
  81:20,25 82:8,23
  83:3 86:7,19 93:4
  94:6,13 98:6,7
  99:20 107:8 115:2
  119:25 137:20
  140:10,13,16 141:6
  141:13 146:23
  147:21,24 148:11
  150:5,6,7,18,24
  152:9,12 168:16
  188:1,10,17 200:18
  200:24 214:14
  218:7 229:11
  256:12
dated  232:5
dates  20:14 80:17
daubert  31:1
david  5:11
davies  4:15
davis  5:4
day  37:21 41:21
  42:6,7 46:7,18
  73:14 117:18
  118:17 141:8

185:11 214:25
218:24 237:21
245:22 246:7 253:7
253:11
**days** 32:9 42:2,2,3,5
46:5,6 57:21 65:18
78:4 125:10 135:23
197:20 220:22
**dd** 89:19 92:1,1,11
92:12,16 94:25
95:20 96:23 97:22
97:25 98:4,23,24
99:7,10 100:2
**de** 166:22
**dead** 234:20
**deal** 7:15 19:18
22:11 26:7 35:22
38:11 41:18 44:15
63:23 125:8,9
138:16 157:6,8,13
159:23 165:25
170:2,5 175:17
228:21 234:19,20
236:6 239:20
**dealer** 244:22
**dealing** 102:21
126:17 175:13
**deals** 138:9 158:15
**dealt** 39:14 40:22
40:24
**debate** 9:14 31:11
33:7 217:25
**debra** 2:24
**debt** 12:18 19:17
20:11 27:12,22 28:7
29:9 33:3 34:5 35:3
36:24 39:1,2,3,20
55:12,16 56:24
58:13 60:4,7 61:22
66:9,10,12,13,25
67:1 69:20 74:12
84:6 86:2 89:20
106:7 111:22 120:9
123:5,7,23 124:3
125:5,10,15 126:4,6
127:5,5,13,21
128:22 129:15,24

130:5,12,17,24
131:2,10,12,14,16
131:20 132:6,17
134:8,13,21 135:6
135:10 139:21,23
140:2 144:19 154:9
161:1 178:24 179:4
179:12,21 183:10
185:2,5,7,9,14,16
187:11,12,13,15,15
187:18,19,22,23,23
188:10,13,21 189:9
189:21 198:2,5,8
199:3 200:12,20
201:2,6 202:13
204:5,10,13 205:14
206:16 208:6 215:5
216:6,15 217:3,17
220:5,5,9 221:13
222:18,19,22 223:7
225:15 226:25
227:4,10 228:12,14
228:24 229:1,4
230:21,21,24,25
231:10,24 232:5,13
232:13,16 233:24
234:13 237:7
239:12 249:23
**debtor** 13:20 14:19
14:20 17:25 19:21
19:25 22:2 23:5
30:16 35:16 41:8
54:5 67:13 70:4,23
83:23 93:1,23
112:25 193:6,15
194:6 197:8 216:24
217:10 221:17
231:9 234:1
**debtor's** 242:1
**debtors** 1:7 3:3,10
7:7 22:8,8,9 32:4
35:3 40:10 41:9
44:23 46:23 68:2,3
78:17,24 85:2,3,6
89:6 103:13 105:3
117:6 176:14 177:7
178:14 179:25

180:3,6,9,12 183:9
183:23 185:13
187:5,8 188:18,19
189:8,20,25 190:21
195:10,13,15
197:25 199:24
202:6 203:23,25
211:24 212:9 214:4
214:16 216:5,9,12
216:13 217:5 218:3
218:5,23 220:3,3,8
220:11,15 221:10
221:11,13 222:17
222:21 223:6,10,15
225:14,22 226:1
228:15,21,25
229:16 230:1
235:14
**debtor's** 36:4,11
48:1
**debts** 96:25
**decelerate** 37:20
**decelerated** 39:2,4
**december** 40:3 59:2
73:9,10,12 82:8
83:3 140:18,24
150:8,17,25 152:8
155:20 170:24,25
178:4,6 200:1 218:6
218:7,9,25 220:17
224:1 225:23
**decide** 23:1,4
226:11
**decided** 23:24
147:25 204:9
**deciding** 110:4
111:7 119:13
216:15
**decisions** 11:19
**decline** 27:17 65:10
65:23 201:23
**declined** 28:20
42:22 113:12
151:16
**declining** 128:17
132:2 135:10 136:9
149:3

**deduction** 99:25
**default** 70:15 72:19
108:18 110:9
115:15 127:9
193:15 194:6,9
239:4 241:7 252:17
252:18
**defendants** 1:14
**defenses** 23:4,18
**deferral** 239:3
**define** 144:2
**defined** 126:24
128:11,18 130:8
131:3,14,19 132:1,9
145:5,9,10 146:14
154:17 158:7
173:20
**definitely** 156:2
**definition** 66:25
144:3 168:12
195:22
**definitions** 77:1
**defranceschi** 3:12
**degree** 15:11 85:10
123:11 127:9 164:5
194:20 216:3
**delaware** 1:2,8,19
2:8 124:21 158:13
180:10
**delay** 7:4 176:11
243:4
**delta** 41:17
**demand** 232:23
**demonstrable** 94:21
**demonstrated**
120:1
**demonstrative**
94:24 95:5,19,20
96:5,20 102:6,12,13
102:17,17 103:17
103:20,25 114:8
118:10,10,14 121:8
133:15 139:7,8
146:15,16,17,21
147:3 149:7 152:19
156:6 169:4,10
170:13,14 171:12

255:5,6
**demonstratives**
  49:10 95:8 99:4
  101:12,19,21,24,24
  102:1,5 121:7,15
**denied**  15:19 103:4
**denominator**  202:1
**deny**  38:12 158:9
**depending**  75:2
  200:16 232:19
**depends**  233:3
**depict**  133:25
  139:10 182:10
**depiction**  152:2
**depicts**  134:1
  139:11 156:11
**deployed**  118:23
**deploying**  90:19
**depose**  8:16 13:12
  14:4 44:10
**deposed**  43:2 46:15
**deposition**  8:7 20:2
  44:10 45:3,16,19
  88:10 89:6,12
  108:15 110:7,12,17
  110:21 116:3,5,7
  117:5 118:25
  175:15 177:2 178:3
  235:6 236:13
  247:14
**depositions**  16:11
  24:6,6,23 42:17,21
  42:25 45:23 46:6,19
  46:20 115:25
  143:19 174:20,25
  175:5
**derivative**  209:5
**derivatively**  182:25
**derive**  81:11
**describe**  52:15,24
  54:18 55:14 56:22
  58:19 77:7 84:5
  178:12 180:22
  185:20 186:1,25
  189:1,6
**described**  32:13
  113:3 165:18 234:3

**describing**  74:17
**description**  123:9
  123:18 161:24
  174:23 195:20
  255:4
**design**  9:18
**designated**  7:18
  12:8
**designed**  20:24
  25:22 136:16
**detail**  27:13 164:5
  170:19 174:23
**details**  143:1
**deteriorates**  132:23
**determination**
  112:5
**determinations**
  161:9
**determine**  59:12
  76:1 79:3 82:3
  92:11,14,16 96:14
  111:25
**determined**  59:15
  77:12,16,18
**determining**  59:23
  77:10 79:1
**detour**  36:7
**deutsche**  3:16,21
**dice**  92:6
**didn't**  33:19 34:16
  43:6,24 44:25 45:7
  47:17 168:3,4,7,24
  169:5 172:19,24
  173:21 175:14
  224:10,20 230:9
**difference**  21:25
  22:5 81:15,21 82:4
  96:15 148:14,18
  151:5,9 152:22
  153:8,12 172:7
  190:21
**different**  11:24
  19:22 35:6,6,11
  36:13 39:23 43:19
  55:25 65:6 73:2
  74:21 79:8 80:7
  89:16,16,18 91:5,5

91:14,16 106:16
  111:11 114:9,10,14
  114:18 117:16,24
  118:8 119:2 124:2
  124:11 126:2,8
  127:15 130:11,17
  134:1 139:2,3
  145:18 150:21
  151:7,21,24 158:25
  164:21 168:18
  172:9 178:13,14
  180:3,3,5,6,9 186:8
  186:14,16 187:12
  187:13 190:20
  217:19 221:18
  228:10 234:8,18
  245:19 250:17
**differently**  47:23
  92:14 195:3 207:11
**differs**  84:10
**difficult**  146:4
  232:13
**dillon**  122:22,25
  123:1,2,3,20,25
  124:2
**dillon's**  123:7
**dinner**  253:22
**dip**  6:8 28:24 35:5
  93:4,6,7,10,13 94:2
  94:12,25 96:23 97:3
  97:5,6,16,24 98:23
  98:24 99:11 145:19
**dire**  50:3
**direct**  42:4 47:10
  50:12 105:6 106:18
  109:9 111:18,24
  113:3,6 114:7
  117:23 120:22
  122:10 164:5
  177:18 236:16
  239:25 251:9
  253:13 255:11,16
  255:20
**directed**  14:19
**direction**  15:2 19:6
  29:6 65:7

**directly**  19:13 24:10
  34:7 36:3 190:13
  234:2 241:16
**director**  50:19
  53:15
**directors**  203:21
**disallowance**  24:1
**disappear**  192:13
**disclaimed**  8:7
**disclose**  22:12 88:20
  247:9,17,18,18
**disclosed**  7:25 8:6
  8:15,23 9:17 10:8
  12:10 13:2,11,23
  14:3 15:22 22:11
  35:11 37:11 41:5
  42:18 43:8,18,24
  44:21 87:9 95:21,23
  174:14
**discloses**  9:13,14
  10:14 43:16
**disclosure**  8:19
  14:12 22:7 43:2,5,6
  43:13,19,22 44:22
  162:19,20,24
  244:17 248:21,24
  250:3,22
**disclosures**  16:9
  43:4 160:23 161:7
  161:13,24 162:12
  162:15,16 163:8,17
  163:19 245:5,9,11
  248:6,8 250:9,13,17
  251:20
**discount**  9:21 26:12
  68:12 77:12,13 78:9
  78:11,12,14,20
  79:17 80:1 82:2
  163:21 229:21
  235:10
**discoverable**  43:9
**discovery**  16:8
  35:10 45:6,10
**discuss**  31:1 77:15
  104:11 241:1
  253:16

discussed 61:12
65:10 66:19 80:16
81:24 83:18 108:15
110:7 161:18
191:11 240:17
discussing 14:20
252:23
discussion 87:25
88:24 161:16
235:13 240:14
243:16 244:3
discussions 98:21
239:16 240:15
disposed 32:8
dispute 11:18 12:6
16:6,8,12 32:11
34:25 41:16 43:10
194:16
disputed 75:15
195:21 196:3
200:23 201:22
204:5
distinct 186:8
distinction 187:16
distinguished 72:4
distinguishing
74:17
distressed 124:17
distributable
206:10,12,19
distribution 185:23
district 1:2
divided 94:11
division 124:3
divisions 124:2
doctor 248:18
document 18:9
162:17,18 170:8
181:20 237:15
240:2 241:15
252:25
documentary 116:9
documents 100:11
121:21,24 159:17
159:22 160:4
167:11,19 174:20
174:25 175:5 193:9

244:21
doesn't 33:22 34:10
36:12 50:8 61:1,4
63:15 207:3 210:15
doing 14:20 64:11
68:23 83:16 126:5
138:6 198:9 203:1
203:11 209:15
226:17 245:21
dollar 29:18 64:21
165:9 207:22
dollars 30:13 81:9
82:25 96:8 99:19,21
99:24,24 100:6,7,9
100:13,17 118:12
207:19 208:9,10
217:7,14 220:19,20
222:20,22,24,25
223:4,5,6,13 224:5
224:13 226:5 227:7
don't 30:2 36:15,16
36:17,22 37:5,7
38:4 39:6,15 42:2
45:10 49:22 61:7
64:3,13 70:2 169:6
174:13 175:24
205:13 206:10,18
206:22 207:8
208:12 210:16,25
211:25 224:7,9
225:2 227:6 232:8
233:1 244:20
door 14:23 30:2,16
37:2,3 128:1 150:3
dorr 17:4 115:23
double 55:18 89:10
97:24 246:4
downgrades 98:1
downloaded 92:5
downside 91:10
drafted 159:18,18
drafting 166:16
drag 146:3 165:4
171:4
drains 36:3
drinker 6:7

dropped 15:14
due 34:4 39:1 43:12
76:2 81:7,10 99:22
duplicate 149:6
duration 86:17
100:4
duties 193:24
dynamic 234:5
dynegy 54:10

**e**

e 2:1,1 3:1,1 6:14
7:1,1 49:5 89:7,12
122:7 255:1,3 256:1
earlier 27:25 31:7
43:2 61:12 65:10,18
67:25 73:20 74:1
81:19 92:3 109:4
135:15 136:20
138:1 147:23 156:1
156:3 200:19
209:21 224:20
228:10 230:19
235:6
earliest 57:7 199:25
early 29:3 58:6
61:11,14 65:13,14
79:14 80:4 83:23
125:10 136:21
138:20 139:13
144:19 212:24
233:19
earn 34:22 128:23
earned 64:25 91:7
137:20
earnings 135:25
easel 231:2
easier 249:9
easy 149:24
economic 21:13
22:1,5 33:17 38:18
39:23 59:18 74:6
75:2 119:25 134:22
141:22 149:21
158:5,25 159:13,13
160:6 172:16,17
230:16

economically 25:21
80:24 131:11
economics 27:10,11
29:20 41:18 101:3
ecr 2:5
editorial 221:21
editorializing 211:4
edmonson 4:9
education 123:10
educational 52:5
efch 187:14,15
190:11
effect 39:23 134:22
158:25 193:1 202:8
212:24 214:22
effected 141:5
effectively 184:20
effects 193:25
efficiently 47:13
effort 156:18
efh 6:24 21:9 26:10
30:7,8,11 31:14
36:25 56:18 68:2
79:4 106:14 108:7
153:2 164:13,19
165:6,14 166:11,16
170:17 172:6
178:15,20 179:13
179:23 182:11,24
183:10 184:3,3,24
184:24 185:7
186:13,24 187:11
187:12,15,19,20,24
188:10,20,23 189:1
189:3,3,7 190:8,14
192:8 195:10 202:9
202:10,14,16,20
203:14,16,22,23
204:4,19 206:9,9,11
206:20 208:18,19
209:3,5,8,11,22
210:7,12 231:10,24
249:24,24
efh's 183:4
efhif 195:13
efih 1:12 2:9 5:2,7
5:14,20 6:2 18:1

21:9 26:4 28:12,20
30:2 31:13,18,21
39:13,21 40:1,21
43:13 44:8,18 46:14
51:12 56:2,8 58:9
62:4,5 67:13,19
68:2 69:19,20,22
73:4 79:10 82:7,17
91:16 93:2 96:23
97:3,16,19 98:12,13
98:18 109:17,20,24
110:4 111:5 115:16
116:13 130:24
137:13,14 143:17
145:5,13 156:14
160:23 162:12
163:9 164:14,20
165:14 166:14
167:1,13 174:3,10
178:13,15,19,20
179:5,13,23 180:13
180:16 181:23
182:14,22,22 183:1
183:2,10 184:4,6,24
185:2,5 186:9,13,16
186:21,21 187:19
187:20,20,24 188:9
188:16,17,21,25
189:2,5,8,21 190:4
190:14,22 191:3,7,8
191:14,16,19,22,22
191:25 192:3,7,12
192:15 193:5
194:14,23 195:10
195:15,17 196:1,7
199:1 201:6 202:22
202:23 203:3 204:4
204:10,13,14,19
206:20 207:17
208:1,2,16,17,19
209:2,12,23 210:1
210:12,14 214:19
215:18 216:13
230:20 231:10,24
232:18 233:10,18
233:23,24 234:13
234:24 235:16

236:2,4,6,11 237:17
240:24 241:12,24
242:3 243:8,15,16
244:2,4,6 245:9
247:2,8 249:25,25
efih's  15:7 17:11
  183:3 185:17
  191:10 234:25
efih's  47:9 206:9
eight  150:12 199:11
  201:2 202:16,17
  203:7 218:17
eighteen  218:17
  225:19
eighth  205:14
  217:12
eighths  60:10 62:6
  69:1,3,12 70:13
  71:4,9,17 72:4
eights  216:22
either  11:15 15:13
  19:3 36:24 37:5
  54:15 105:8 125:11
  127:2 133:2 141:19
  179:10 200:24
  217:2 244:6
electricity  186:4,7
electronic  256:8
electronics  156:11
element  8:1 131:18
  134:17 138:22
  144:9 151:15 155:6
  200:8
eleven  251:15
elicit  14:2,10 15:5
  32:14
eliminate  95:11
  207:15
ellis  3:2 105:3
embedded  65:3
embodies  204:1
emerge  199:24
  200:4 218:6 220:16
emerged  223:12
employed  44:16
  50:18 53:19 122:19
  122:21,22,25

123:15,19
employee  191:16
  243:15
employees  186:19
  191:8,14,18
employment  53:10
  123:18 124:15
enables  92:6
enacted  242:23
  243:7
encapsulates
  113:17
encompasses
  195:21
encountered  120:13
encouraged  254:10
ended  80:12
endowment  126:1
endowments
  127:17
energy  1:6,12 54:8
  180:12 182:13,21
  237:16
enforce  18:14
enforceable  20:4,8
  236:18,19,21 237:4
  239:13,15 240:9
  243:9,18
enforced  242:24
enforcement  244:7
engage  12:1 33:18
engaged  34:1,2
  35:17 39:13
engagement  106:23
engineering  138:17
ensure  59:16
entail  91:15
enter  38:1 239:19
entered  20:3 38:20
  38:22
entertainment
  105:11
entire  18:16 62:10
  88:8 219:6
entirely  22:15 72:3
  77:22 87:13,22
  117:24

entirety  16:17
  56:18 102:23
entities  43:9,19
  184:21,23 186:14
  190:14
entitle  34:16
entitled  15:13 23:2
  23:12 35:14 80:10
  102:7 119:19 215:9
  237:16
entitlement  11:20
  12:25 16:25 66:20
  196:6
entitles  57:2
entitling  11:20
entity  180:21
  184:15 185:21,22
  186:16
entrust  128:5
environment  21:5
  28:8 34:20 35:2
  61:18 80:21 84:14
  87:14,24 132:3,4
  136:10 233:2
envision  46:9 86:14
  97:2
equal  60:21,22
  64:17 65:2 74:5,13
  79:25 80:20 230:2
equals  227:22
equation  154:20
  157:8
equities  22:9
equity  30:12 31:14
  84:21 86:3 123:5
  124:4 182:23 183:1
  184:8 185:17
  186:21 189:2 190:1
  191:11 192:4 206:8
  206:8,9,20
esq  3:5,6,7,12,13,18
  3:23,24 4:4,9,10,15
  4:20,25 5:4,9,10,11
  5:16,17,22,23,24
  6:4,5,10,11,16,21
  6:25

essential  12:12 41:1
essentially  55:16
  140:17 151:9
  197:24 245:5
esser  3:6 7:10
establish  124:18
  159:8
established  111:21
  185:16
establishment
  124:11
estate  36:4
et  1:6 254:5
ethan  43:25
euphemism  55:25
evade  20:8
evaluate  91:8
evaluated  110:4
  111:7 119:12
  125:11
evaluating  86:10
evaluation  141:4
evasive  212:11
evening  42:25 45:17
  46:6,20
event  31:16 58:6
  61:10 64:4,5 65:9
  72:15 79:14 99:10
  132:11 134:20
  136:21 144:10,19
  145:2 155:3 160:10
  162:21 163:1,10,20
  174:10 193:15
  194:5 241:25 244:5
  249:7,16,20 250:4
everybody  140:11
  149:25 152:8
  158:13,14 168:11
evid  255:4
evidence  14:22
  15:10,12 16:13
  19:18,25 24:15 31:5
  31:18 56:6,7,12
  88:1,25 100:11
  101:12,25 102:18
  102:19,23,25 103:3
  183:15 210:16

evolved  138:13
exact  21:1 109:7
  212:1 214:14
exactly  27:1,4 29:20
  89:10 129:21 130:4
  145:8 152:21
exam  105:6
examination  50:12
  104:11 105:1
  111:18 115:20
  122:10 163:25
  164:5 173:7 177:18
  253:13,13,15
  255:11,12,13,16,17
  255:18,20
examinations
  126:10
examine  15:23
  30:24,25 47:1
  142:18 177:8
examined  9:16
examiner  52:12
  221:18
examining  49:8
example  25:12
  26:13 47:7 57:13
  63:20 90:16 91:4
  99:7 129:7 130:18
  192:8 231:14
examples  145:20
exceeds  97:7
excel  89:2 92:6,10
  95:21
exception  68:11
  195:9,12
excess  66:1
exchange  21:8 27:9
  29:10,14 33:15,18
  34:2 62:20 67:15
  68:18,21 70:25 71:4
  71:7 72:12,13 93:12
  93:13 98:1 116:25
  131:6 140:21
  142:13,16,19,25
  143:2,12,18,21,25
  144:6,9,10,25
  145:22 147:21

149:15 151:17,18
  153:3 156:19
  157:18,18,20
  162:16,18 164:6,9
  164:12 165:1,7,16
  166:4,7,14 167:5
  171:3,22 173:1
  174:13,14,17,21,23
  175:1 181:23 190:5
  229:2,4,13 230:4
  232:4 233:24
  235:15 236:15,22
  238:7,9 239:12,25
  244:23,23 245:2,3
  246:18 247:3
  248:23 249:2 251:6
  251:7
exchanged  21:10
  67:19 143:9 144:4
  164:13,16 245:4
exchanges  58:11
  109:22 144:1
  234:12
exchanging  165:14
exclude  7:14,18
  17:11 37:17 102:22
  207:16
excluded  11:7 13:5
  13:24 14:5 55:6,8
excluding  102:20
  204:5 209:10
exclusion  25:7
excuse  195:10
  246:16
executed  32:22
execution  243:4,6
executive  50:19
  122:24
exercised  82:8
exhibit  21:2 27:1
  68:8,8,13 76:8,11
  80:13 81:4 82:18
  83:8,12 103:17,19
  133:15,16,17,18
  139:7 146:16 149:7
  180:23,24 181:10
  181:16 237:10,19

238:1,5 245:13,14
  246:24
exhibits  103:19
  156:7
exist  57:7
existed  59:21 78:4
  108:14 157:7
  160:21 247:10,19
existence  60:3,5
  92:8
existing  77:20 217:3
  239:3 252:17
exists  37:25 38:3
  39:4 117:2
exited  165:25
expanded  31:22
expect  66:14 67:1
  74:6 126:15 148:10
expectation  153:23
  154:7,13 173:10,15
  173:20 177:6
expectations  38:20
  38:21
expected  81:2 82:15
  146:22 147:12,14
  147:15,16,17,20
  148:1,15 149:15
  150:9 151:3 153:3,8
  154:22,24 163:9
  169:13,21
expense  31:24
expensive  134:25
  135:2 142:1
experience  54:18
  64:11 65:20 66:15
  125:4,14 139:15
  167:1,13 175:12
  232:25
expert  8:24 12:5
  15:15 16:10 18:2
  24:10 26:8 40:4,19
  41:13 49:11 50:3
  51:4,17 53:6 55:4
  89:7 102:20,25
  105:7 106:3 108:6
  122:14 124:20,23
  125:2 162:11

166:20,21
**experts** 7:14,18,23
8:5,12,19 12:7 13:9
16:4,16,25 18:18
19:19 20:4,9 22:14
24:16,22,25 28:18
29:23 32:14,16
33:15 34:2 37:10
38:14 41:20 42:4
46:11 49:25 91:17
**explain** 12:5 72:8
92:1 95:16,17 96:5
99:6 119:3 140:8
142:24 150:22
151:14 157:24
195:25 222:4,9
226:13 229:19
**explained** 25:20
**explaining** 27:6
**explains** 26:15
27:21,24 28:5 81:21
**explanations**
225:14
**explicitly** 8:8 19:15
**explore** 15:24 16:10
**exposing** 31:21
**express** 101:1
**expressed** 57:9
**expressing** 243:17
**expressly** 243:2
**extend** 235:10
**extended** 156:16
171:21 229:13,20
**extension** 242:16,23
**extensively** 231:16
**extent** 14:17 15:6,7
15:25 17:13 34:17
36:22 60:21 63:13
74:4 88:16 91:14
108:13 142:8
161:15 193:22
214:22 235:11
242:20 243:1
**extra** 227:25
**extraordinarily**
134:24 135:1

**extrapolated**
150:17
**extras** 49:17
**extremely** 80:21
**eye** 248:18

### f

**f** 2:1 256:1
**face** 68:17,20 69:5,8
144:13
**faced** 87:15
**facetious** 244:15
**facie** 48:3
**facilities** 186:5,5
**fact** 9:21 11:8 14:13
16:12 18:4 20:2
21:7 22:16 23:14
24:10,19,24 27:15
29:17 31:19 34:24
35:24 37:6,24 41:9
41:9 45:13 46:11
80:4 83:9 84:13
89:2 94:7 108:5
112:3 115:25 117:6
124:21 139:16
158:4 172:24
215:17 216:5
232:12 233:15
244:20,25 245:2
250:23
**factor** 161:6,12
162:12
**factors** 17:24
161:10 162:4,5,6
246:13 247:6,22
250:23
**facts** 23:17,17 37:16
202:19
**factual** 28:18
196:12
**failure** 41:4
**fair** 38:2,8 68:10
84:11 85:17 153:16
165:12 170:12
173:1 179:15
183:23 184:2 199:3
219:14,18,20 230:8
230:15 234:23

236:21 240:21
244:16
**fairly** 84:25
**fall** 179:10
**false** 22:17
**familiar** 32:25
52:13 55:11 56:20
179:24 180:2,5
252:25
**familiarized** 162:14
**family** 56:18 68:9
106:14 108:7
125:20
**far** 97:11 192:22
**favor** 111:12 169:2
**feature** 33:9 35:9
232:24
**features** 35:7
232:21,21
**february** 72:19
**federal** 199:2
**feel** 33:11 254:2
**feelings** 36:8
**feld** 4:1
**felt** 174:24 234:6
236:20 239:15
**fenced** 184:17,19,20
184:22
**field** 97:22
**fifth** 21:17 54:24
**fifthly** 10:14
**fifty** 203:6,8 204:19
**fight** 158:13
**file** 69:23 92:6,7,10
92:15 169:6 214:15
**filed** 2:13 7:16
43:15 158:4 159:6
174:11 202:8 204:8
214:11,21,25 216:5
**filers** 190:15
**files** 190:4,8,10
**filing** 29:17 33:3
195:13 231:11
245:10
**filings** 190:5
**final** 120:6 156:5
160:22

**finally** 22:7 127:2
171:11
**finance** 1:13 123:14
237:17 251:6
**financed** 144:19
**financial** 14:25 51:1
51:6,10 79:5 98:12
117:13 119:18,21
127:1 132:17,21,22
133:4,11 134:3
138:5,10 145:21
146:7 153:17
**financing** 93:1
180:13 193:6 197:9
217:11 229:1
231:17,18
**find** 20:22 28:9,12
61:15 89:4 90:12
113:13 118:18
148:23 168:4 181:8
213:22 254:9
**finding** 26:21
113:22 118:4
**finds** 28:7
**fine** 47:8,19 102:14
102:16 121:11
225:2 227:23
245:23 246:6
**finger** 3:9
**finish** 241:21
**finished** 245:23,23
**fink** 6:25
**fir** 6:8
**firm** 50:20 51:1
52:20 53:1,2,16
**firms** 30:12 126:7,8
**first** 2:9 5:7,14 7:15
13:19 18:23 19:22
25:24 36:20 39:11
42:18 44:18 46:3
48:7,13 51:12 53:23
56:2 58:7,9 59:7
60:9,14 62:4,5,16
62:25 66:1 67:14,15
67:19 69:20 71:8
73:5,8,16,17 77:24
78:13,17 80:23 81:7

81:20 82:8 83:2
84:19 85:4 86:2,3,6
86:19 95:5 97:7,8
97:20 98:7,13 99:2
99:20 102:6,8,11
107:7 114:8 116:13
121:14 124:21
125:10 126:21
130:24 133:18
138:9 140:4,4,7,10
140:16,23 141:1,3,6
141:7,8,13 142:21
146:22,24 147:21
147:22,24 150:5,5
150:22,24 153:17
155:23 156:23
160:12,24,25
161:13 162:11
164:14 168:16
170:20,22 171:14
172:18 173:19
179:1,5 180:11
181:4 185:2,11
192:3 197:8,12
212:21 213:15
214:16,19 215:9
216:9,15,20 217:3
217:16 218:7,24
220:5,5 221:13,14
222:17,22 226:2
227:10 228:12,14
229:4 230:20
231:15 234:13,24
235:16 241:12,24
242:3 243:8,16
244:4 246:20 247:2
248:21,24 249:17
249:23 252:12
**firstly** 160:2
**fit** 59:9
**five** 9:15,15 10:19
12:8 29:15 40:19,20
129:25 136:10
165:13 172:25
176:2 181:8 194:16
201:18,18 207:22
210:4 213:5,11,12

213:13 222:23
223:20 226:17,18
227:21,22 228:4
249:5
**fix** 131:25
**fixed** 18:23 19:1
20:14,15 27:22 57:3
58:23 61:13,22 62:2
62:9 66:20 69:15
129:5,15,17,18,22
130:8,25 131:1,9
132:9
**flexibility** 75:1
138:5,11,18
**flip** 159:11 250:6
**flipping** 248:2
**floaters** 61:25
**floating** 18:24 61:23
132:24
**flow** 20:15 84:23,24
85:1,1 90:2 126:24
127:25 131:14,15
146:14 173:21
**fluid** 234:5
**flunking** 197:2
**fly** 209:18 226:17
**focus** 31:3 41:7 54:3
60:1 62:25 67:13
73:3 76:5 78:17
80:7 82:16 90:6
110:20 135:17
160:1 190:22,23
208:1 239:14
251:12
**focused** 37:8 42:5
108:3 126:20
140:20 207:17
224:12
**focusing** 17:11 41:8
194:3 232:3
**foerster** 4:17
**folks** 7:8
**follow** 149:25 163:5
175:4 209:18 210:5
221:12
**followed** 23:6 44:23
45:1 76:25 144:24

145:17 150:3
191:20
**following** 18:22
170:21 173:13
**food** 158:13
**force** 245:24
**forced** 192:15
**forego** 132:14
**foregoing** 256:3
**foreseeable** 66:6
**forfeited** 192:12
**forfeits** 192:4
**forgetting** 199:18
**forgiven** 208:17
**form** 57:2,25 67:3
74:21 233:5
**formal** 16:9 50:2,7
**formed** 162:11
**former** 43:12
116:13
**forth** 11:4,10 25:13
25:16 27:1,11 29:19
53:10 192:20 195:2
203:12 241:10
**forward** 25:1 28:3
38:14 129:12
155:22 216:15
**found** 16:12 37:23
59:9 78:22
**foundation** 142:7
154:1,2,3,10 173:12
**founded** 52:20
**founding** 53:14
**four** 40:20,21,22
54:24 96:22 114:9
114:14,20 118:8
126:7,8 155:18
213:5,5,9,11,12,12
213:13 227:18
243:25 249:5,6,16
**fourth** 10:11,18
21:7
**fox** 6:18
**frame** 97:20
**frankly** 23:23 31:2
97:18

**fraud** 22:13 52:11
**free** 149:4 160:14
233:25 254:4
**freely** 66:15 74:19
134:13,18,20 135:6
141:9 233:10
234:14
**frequent** 58:16
**friday** 42:20
**frolic** 36:6
**front** 22:20,21
37:23 113:10
114:13 146:18
149:12 156:8
196:22 227:7
**frost** 4:15
**fti** 53:16,16
**full** 23:13 30:9,10
61:7 116:9,18
122:17 147:18
181:9 194:24
195:16,18,20 196:4
207:16 209:17
224:7 228:4 244:16
**fully** 7:17 20:4
74:14 151:6
**fun** 197:21
**fund** 43:20
**fundamental** 18:7
18:15 25:10 32:19
**fundamentality**
20:23
**fundamentally**
27:10 28:4
**funded** 185:12
187:5
**funds** 20:13 28:1,1
43:18 90:15 126:2,3
127:17,18,19 128:4
128:14 129:5 155:1
**further** 16:13 31:11
60:8 115:18 120:20
145:21 163:23
173:3 175:19
**future** 1:6,12 21:3
21:21 24:12,13
25:22 28:2 78:13

81:19 132:1 159:10
180:12 182:21
249:22
**future's**  182:13
**futures**  237:16

**g**

**g**  7:1 118:14
**gain**  64:25
**gander**  45:11
**gap**  137:2,6
**garbled**  182:23
193:13 244:8
**gather**  183:12
**gaunt**  86:24
**general**  19:11,17
56:12 64:6 84:12
88:17,23 137:24
167:6,7 178:15
234:5 236:20 241:9
**generally**  9:19 11:2
12:12 19:14 86:14
88:1 120:21 167:4
167:12 179:24
180:2,5 237:8 245:1
**generate**  186:4
211:21 212:9
**generation**  186:3
**generators**  185:24
**generous**  246:5
**gentlemen**  15:21
**genuine**  37:24
**genuinely**  197:21
**getting**  27:5 147:21
160:1 193:23
206:17,21 237:21
**giant**  131:17
**gics**  128:8
**give**  8:10 16:4 19:10
48:16 49:12 82:23
94:3 111:1,8 113:8
116:14 119:5
120:11 122:15
123:9,18 126:15
128:6 129:7 130:18
138:18 143:6
190:23 191:11
205:22 214:22

225:5 227:14
228:19 251:21
**given**  8:16 15:2
16:9 46:4 66:19
80:20 88:9 105:21
106:13 116:14
117:2,12 119:18
126:17 163:8
173:18 206:24
212:23,24 215:13
**gives**  57:5 128:6
**giving**  27:20 62:20
110:12 162:6
203:22 238:1
248:20 251:14
**glance**  182:12
**gleacher**  124:9
125:17,17
**global**  54:8 110:8
**glueckstein**  6:16
**go**  18:11 19:1,7
20:16 24:14 25:1,4
25:9,11 29:2,5
31:15,25 34:10 38:5
38:14,14 42:7 44:19
44:21 46:7 47:17
50:2 63:4 64:12,12
64:16 65:6,7 78:25
84:9 86:18 90:3,24
92:17 103:7 113:20
123:25 124:5,8
129:14 132:2,10,12
132:24 133:3
137:24 146:7
148:23 149:6,14
150:20 155:15
156:12 157:17
170:10,13 176:25
180:15 181:3,9
189:13 202:18
210:20,23 216:15
217:19 224:7
225:14 232:23
245:2,12 246:6
247:25 248:18,19
248:21 249:4 250:7
250:8 253:21,22

**goal**  97:3,9,11,20
235:22 247:18
**goals**  235:7,9,14
**goes**  22:4,7,9 25:17
25:19 26:2 27:12
30:18 31:8 38:19
39:15 77:14 80:9
133:4,11 170:20
194:3 210:20
212:20 250:1
**going**  8:13,13 9:1,6
9:9,17,20 10:5,9,11
10:13,14 11:18 12:6
12:11,14,16,17,21
13:8 15:22 24:4,10
28:3 29:9,23 30:8
30:10 33:7 37:10,12
37:17 38:12,13 39:9
39:10 41:7 42:3
43:25 44:11,24
47:11 48:14,15
49:24 50:1,21 70:1
72:22 84:7 88:17
97:21 120:22
130:14,15 131:22
132:9 137:13
139:19 143:7 146:2
155:22 156:9 163:4
163:5 167:19
174:10 175:13
176:5 177:22
178:13 180:23
183:15,17 188:19
190:24 191:16
194:20 196:15
197:15 199:17
200:7 203:13
205:20 206:8 207:2
207:18,24 208:23
210:8,20,21,23
211:13,14 212:14
212:16 217:21
220:18 224:5 225:1
232:23 243:24
245:22 246:3,6
247:13 250:7,8,10
250:19 251:20,21

251:24 253:11
**gold**  151:22
**good**  7:3,6,21 17:3
30:23 45:11,11 48:5
50:14,15,15,16
104:1,5,14 105:3,5
121:13 122:12,13
129:19 157:6 164:2
164:3 177:20,21,24
178:2 225:8 233:21
247:21
**goose**  45:11
**gordon's**  116:5
**gotten**  151:2 157:12
169:22 170:10
**governed**  235:25
**governing**  13:7
238:8
**grabbed**  158:14
**grade**  55:17,21 56:3
56:9,15 66:11,18
67:1 79:15 86:25
115:7 127:8 197:1,2
197:18 230:24,25
**graduate**  123:12
**graduated**  52:6
123:11
**graduating**  53:11
**grand**  36:7
**grant**  38:12 75:25
188:6,8 191:23
192:1 193:12,14
194:5,11 215:8
**granted**  192:13,16
193:2 194:25
211:19 215:20
243:5
**grants**  191:15
**graph**  101:13
102:12 149:14
151:13,21 152:18
152:20 153:6
**graphics**  157:25
**graphs**  152:18
**grappling**  10:24
**gray**  6:1

**great** 32:21 44:15
  50:9 175:3
**greater** 18:4 32:22
  66:17 118:19,21
**greatest** 14:17
**greatly** 18:1 32:7
**green** 43:24 44:16
  46:3,11
**greg** 5:23
**grid** 31:10
**gringer** 5:11
**ground** 7:19 17:8
  32:6,12 144:3
**grounded** 25:8
**group** 4:23 6:19
  43:8 50:20,23 98:12
  123:22 124:12,12
  129:11 154:21
  177:1 225:22
**groups** 54:9 124:11
  128:20 134:1
**grown** 44:14 131:17
**grows** 65:24 152:22
**gt** 54:6
**guarantee** 21:15
  156:22,25 188:13
  188:21
**guaranteed** 21:9
  29:15 128:8 129:11
  187:15,19,20
  188:16,17 189:21
  200:20 202:13
**guarantees** 187:14
**guarantor** 187:24
**guarantors** 242:16
  242:19 243:1
**guaranty** 174:3
**guess** 14:8 97:21
  149:17 170:4 178:3
  205:17 215:25
**guessed** 16:23
**gump** 4:1
**guts** 18:16 30:19
  32:19
**guys** 54:20,20
  201:18 212:4

**h**

**h** 122:7 176:21
  255:3
**haircut** 21:11 27:9
  29:11 33:16 143:4,7
  145:25 146:3
  155:15,17 156:15
  156:21 164:6
  165:18 171:18,20
  172:21
**halcyon** 44:17
**hale** 5:6 17:4
  115:23 121:14
**half** 59:8 71:11,19
  72:21 77:25,25 81:4
  86:8,18 97:6,15
  98:7 99:19 100:4
  135:9 140:10,14,17
  155:18 207:19
  217:23
**halfway** 159:12
**hand** 9:25 48:25
  49:12 89:12 110:16
  121:14 147:2 148:7
  149:14 150:9
  176:16 194:19
**handful** 105:7
**hands** 45:10
**handwriting** 237:25
**hang** 9:5 121:11
**happen** 129:7
**happened** 8:18 29:7
  120:3 145:13
  157:23 160:2
  174:15
**happens** 128:22
  154:18
**happier** 233:10
**happy** 21:18 24:6,7
  25:11 47:14 49:11
  85:12,13 89:12
  96:13 113:8 205:23
  213:2 215:14
  221:22 233:14
**harbor** 125:22
**hard** 26:4 141:8,10
  141:25 145:24

**harm** 11:25 14:20
  15:19 17:24,25 18:1
  18:11,13,17 19:16
  20:5,18 22:1,6,8,22
  23:17 24:9,11 25:5
  25:9,10,19 26:2
  27:7,14,16 28:25
  29:9,18,20 30:19
  32:22 34:10,11,17
  36:12 37:9 38:17,18
  38:19,20 39:15,16
  41:8 44:6 94:15,22
  112:24 117:13
  119:21 160:6
**harmed** 21:14 26:7
  28:15 30:7
**harms** 28:4 30:4
  119:18
**hauer** 4:1
**he'll** 21:19
**head** 68:23 198:10
  199:6 203:12
  208:15 219:12
**headed** 124:6
**heading** 102:10
  246:13
**heads** 19:5 29:4
**hear** 7:13 9:10
  16:24 19:13 21:19
  30:2 31:2 32:1
  34:21 37:5 87:18
  101:8 178:5 210:15
  213:20 237:18
**heard** 19:13 24:20
  57:24 67:5 72:8
  136:6,19 148:21
  194:15,21 212:7
  234:20
**hearing** 2:8 7:11
  10:25 11:16 12:2
  13:6,25 14:15,17
  15:3,10 16:15 36:23
  37:1 38:2 45:4,6
**hearsay** 101:16
  102:25
**heart** 23:20 29:13
  32:1

**heck** 91:7 159:17
**heeded** 24:25
**heels** 23:6
**held** 17:16 25:13
  64:18 73:14 170:17
  175:2 197:3 202:20
  203:3 204:10,13
  207:17,18 209:23
  209:25 210:1 239:5
  252:19
**help** 131:19 154:17
  180:19 181:22
  244:21
**helped** 161:9
**helpful** 10:7 76:12
  121:9 175:25 223:3
**helps** 110:22
**he's** 35:9 50:7 207:3
**hid** 251:3
**hideously** 40:10
**high** 19:17 20:11
  26:10 27:12,22 29:9
  39:19 55:11,16 56:3
  56:5,9,11,14,19,24
  56:25 58:13 60:4,7
  61:22,25 65:21 66:8
  66:11,13,18,25 67:2
  68:1 69:15 78:23
  84:5 86:23 87:2
  88:24 89:19 90:13
  91:13 96:24 97:10
  97:17 98:9 106:7
  113:14 120:9,16
  123:7,10 124:11,13
  124:17 125:5,10,11
  125:12,15,18,21
  126:3,4,5,9 127:5,5
  127:11,12,21,25
  128:20,22 129:2,15
  129:24 130:5,22
  131:12,16,20,25
  132:6,16,23 134:6,8
  134:13 138:9,19
  139:11,18,20,23
  140:2,5 143:15
  154:9 155:2 156:4
  159:24 161:1 179:4

179:11 211:1
230:21,24 231:10
231:22 232:12
**higher** 26:13 60:24
62:14 72:7 74:7
79:23 80:2 86:16
93:2 97:5 127:9,10
132:14 133:12
135:3 143:9 210:23
230:5 234:16,17
**highly** 159:25
**hinder** 243:4
**historical** 128:6
**historically** 57:20
84:23
**history** 53:10
144:11 149:4
**hits** 212:25
**hoc** 4:23 6:19 54:9
**hold** 28:16,16 37:10
98:18 178:13
183:17 202:23
208:5 209:8
**holdcos** 86:23,24
**holder** 39:24 64:23
96:11 100:1 110:7
118:14 206:8,9,9
212:22 239:6
241:12,24 242:3
243:8,16,22 252:20
**holders** 25:14 27:5
28:25 34:1 40:1
42:19 43:7,11,16
44:6,18,25 51:12
71:8,10,20 72:3
75:20,22,23 87:15
90:15,16 100:21
101:3,10 110:3
111:3,6 116:13,20
116:22,24 117:9,13
117:16 119:7,10,10
120:1,9 166:6,10
167:18 189:21
198:25 214:11,20
215:9,19 219:9
220:24 225:23
238:25 239:2 241:5

241:7,16 249:24
251:17 252:14,16
**holding** 1:12 19:7
180:12 182:14
184:6,11 186:22,24
186:25 191:3
237:16
**holdings** 1:6 180:20
182:15,21 184:8,11
184:14 185:1,14,18
191:12 251:11
**holdouts** 167:16
**holds** 186:9 208:2
208:19
**hole** 212:11
**hon** 2:2
**honestly** 208:8
**honor** 7:6,16 9:23
10:24 11:10,19 12:1
12:19,23 13:17
14:14,24 15:2,10
16:12,14,21,23 17:9
17:14,16,21,22
18:10,10 22:13,19
22:25 23:13,22,24
24:11,17,20 25:3,6
25:12 27:20 28:16
29:22 30:1,4,15,21
30:23 31:5,6,7 32:1
32:5,8,24 33:9,19
34:9,13 35:15,16,17
40:8 41:23 42:16,23
44:13,14 46:1,5,22
47:5,20,21 48:2,8
48:19 49:8,12,18,20
50:4,10,15 53:3
54:24 56:16 57:14
58:21 60:7,13 65:25
67:9 68:8 70:20
72:10 74:1 76:8,10
76:12 78:5 81:3
83:11 84:13 85:12
86:14 87:8,17,20,22
87:25 88:6,12,16
89:5,14 90:2,10,18
91:2,24 92:3 95:5
95:12,14,18,24 96:2

96:6,16 97:3,12,25
99:8,12,16 101:4,9
101:11,15,22 102:2
102:20 103:6,11,15
103:16,22 104:4,13
104:15,16 111:14
115:18 117:19
118:13 119:24
120:18,20 121:1,5
121:13,18 133:18
142:11 154:3
161:19 163:6,14
173:5,14 176:1,13
176:23 177:5,13,15
178:7 181:14
189:16 193:21
195:1 196:15,17,25
206:23 210:19,24
211:12 215:11
221:15,23 225:6
228:20 238:15
240:10,12 245:18
245:25 248:15
249:10 250:11
251:22 252:7 253:5
253:9 254:1,13
**honor's** 7:20 8:2,3
10:20,22 12:9 13:21
16:7 23:6 25:1
31:20 103:18
**honorable** 247:21
**honors** 52:8 123:12
**honor's** 206:24
**hope** 49:21 51:23
129:9 244:8,9
**hopeful** 176:24
**hopefully** 37:3
99:17 120:5 121:9
129:10 154:23
**horizontally** 150:14
**horowitz** 5:23 104:3
104:4 231:4
**horton** 46:13,15
47:1,7,9,10 98:17
98:18 120:23
143:19 174:22
175:17 176:5,12,14

176:20 177:2,20
178:12 180:23
181:1,21 183:7
186:11 190:23
194:2 195:5 196:14
196:20 197:20
201:14 207:13
211:18 212:16,19
213:19 217:20
221:4,25 222:17
224:5,9 225:11
227:10 228:9
234:18 237:15
238:18 240:4,21
241:2,18 242:7,10
243:20 244:1,14
246:10,21,23
248:17 249:12
250:14,20 251:2,13
251:19 252:9
255:19
**horton's** 253:12
**host** 54:11
**hostile** 46:13 47:7
**hour** 51:25
**hourly** 51:25
**housekeeping** 49:20
121:5
**howard** 6:10
**howell** 3:7 7:10
85:9,20,22 87:8,25
88:16 89:14 95:18
101:15 102:15,24
103:24 105:2
110:16,19 111:16
113:10 115:18
116:19 117:8,25
118:25 119:3,14
120:5,20 142:7
154:1,10 161:15
162:3 164:1 169:5,8
169:10,12 173:3,12
174:6,16 175:8
235:23
**howell's** 116:24
**huh** 133:21 135:1
202:11

**hundred** 126:12
182:15 199:20
204:19 208:9,10
222:24,25 227:7
**hundreds** 43:23
120:12
**hypothetical** 65:6
149:25 151:12
152:5,13 196:12

**i**

**idea** 135:23 137:10
138:8 251:14
**identical** 183:8
**identified** 46:16
59:6
**identify** 45:24
181:20 237:15
238:5
**identity** 44:21
**ignore** 76:5
**illustrate** 27:4
154:18
**illustrates** 29:8
**illustrative** 102:7
**imagine** 26:2,4 63:4
128:16 130:19
**imbalanced** 158:1
**immediate** 118:11
237:16
**immediately** 37:4
115:1 192:3
**impact** 82:5 83:19
102:7 146:1 155:10
192:18 206:19
**impacts** 206:21
**impede** 243:4
**implicates** 215:12
**implication** 212:1
**implications** 192:20
206:7,13,20
**implicit** 19:15 61:20
**implied** 64:20 74:22
92:16 93:6 210:18
211:8
**imply** 66:3 224:2
**importance** 18:4,6
32:21 206:10

228:25
**important** 11:5
33:8,11 35:23 38:16
90:6 109:10 131:15
146:6 149:2 171:25
229:7,10,24 230:10
230:16,18 232:7,9,9
232:17,20,21 233:6
236:9 239:21
251:17
**imported** 138:19
**impossible** 90:10,11
113:13
**improper** 24:18
**improve** 235:13
**improved** 28:21
156:17
**improving** 229:21
**inadmissible** 12:16
**incidence** 45:24
66:15
**include** 66:2,11
67:23 72:24 74:24
106:2 107:25
108:12,21 231:13
**included** 16:7 25:15
68:6 72:13 101:17
114:23 142:15
183:7,9 229:20
231:12,24
**includes** 31:14
49:10 74:13 127:15
184:24 202:12
221:1
**including** 24:15
29:11 31:13 39:18
41:1,14 48:17 54:10
78:13 81:13 124:2
124:11 179:4 185:1
194:16 196:4
209:22 228:12
241:19
**inclusive** 177:9
**income** 20:15 21:21
28:2,3 57:3 58:24
69:16 84:24 85:1
129:8,9 145:6

212:10
**incorporates** 204:1
**increase** 63:24
72:14 133:1 165:22
173:1 199:3 201:5
202:1,2
**increased** 83:9
143:13 201:25
**increases** 207:21
**increasing** 132:3
229:21
**incurred** 26:21
113:22
**indebtedness** 55:16
56:18 67:2 97:18
185:12 187:5
212:10
**indenture** 1:9 2:9
5:2,7,14,20 6:2 9:21
10:17,22,22 11:3
12:22 13:1,14,17
17:14,15 19:21,22
19:23,24 20:1,3
25:16 32:17,22,24
33:9,20,22 34:16
36:10 63:9 73:13,17
74:8,13 76:2,25
77:1,3,4,8,9,13,14
78:3,4 106:11
108:11 109:21,25
111:25 112:3,5
166:23 167:3,8,9,22
168:7 170:7,8,11
172:5,6,15,15
173:25 180:11
235:2,25 236:24
237:6 238:6,6,8
239:3 242:8,25
243:23 244:3
252:14,18
**indentured** 51:10
51:11,13
**indentures** 9:22
10:10 19:10 26:12
32:18 36:10 59:18
59:25 68:1,5,10
78:16,23 89:2,15

106:14,20,25 107:8
107:13,18,21,23
108:2,8,9,14,16,18
108:22 109:25
111:4 119:8,16
167:15
**independent** 203:21
**indicated** 8:12
**indicates** 89:3
**indication** 142:2
**indices** 97:23,23
**indirect** 183:2
**indirectly** 190:13
**indiscernible** 40:11
119:12 171:15
193:25 212:16
237:22
**individual** 25:3
43:13 59:12 82:1
110:3 111:6 115:11
115:15 116:20
119:11
**individuals** 43:3,9
43:23
**industrial** 186:6
**industry** 10:10 11:4
168:10 175:11
**inflationary** 63:6
**information** 15:18
43:10,16 45:8
101:17
**informed** 163:19
**infrastructure**
186:1
**initial** 57:9,18 58:4
58:4 59:13
**initially** 30:22 53:17
**inkling** 14:1
**inquiry** 87:11
**inside** 120:3
**insist** 33:8 242:21
**insolvency** 52:11
249:21
**insolvent** 23:5
**instable** 84:23
**instance** 63:21
107:4

instances 79:2
institute 52:17
institutional 27:25
  127:14
institutions 127:15
  127:16 175:13
instructions 206:25
instrument 19:1
  20:22 35:6
instruments 20:10
insulted 250:15
insulting 247:12
insurable 178:24
insurance 20:13
  22:3 28:1 127:17,19
  128:4,8 129:5
  138:16,17,20 155:2
integrated 123:3
  236:7
intend 8:9 13:9
  14:21,23 15:4,12,17
  41:21 42:19 46:23
  177:7 195:17
intended 47:16 50:6
intending 46:2
intends 11:9
intent 196:7
intentions 36:8
interacted 111:3
  119:7 120:8
interchangeably
  67:8
intercompany
  188:15 203:22
interest 14:20 18:25
  19:1,6,6 21:5 25:23
  25:25 26:17 27:17
  27:22 28:7,13,20
  29:1,5,15 34:20,24
  35:1,4,5,7 39:14
  40:3 57:3 61:4,13
  61:19,22,23 62:2,3
  62:6,9 63:1,4,7,24
  64:5,12,16,18 65:2
  65:5,6,10,23 66:21
  68:7 70:10,11,14,16
  70:18,19 72:14 74:3

74:7,12 75:3,15,17
75:19 80:14,21 81:5
81:17 82:15,20 83:9
83:15 84:1,13,20,21
87:24 90:14 92:23
94:11 96:18 99:18
100:4 101:7 113:12
113:15 119:23
126:22 127:10
129:15,17,18 130:7
130:8,21,25 131:1,9
131:23 132:3,3,9,10
132:12 133:3 134:3
135:24 136:10,21
137:14,16,18,22,25
143:4,8,23 144:7
145:10 146:9,13
147:18 148:5,11,13
148:18 149:3
150:24 155:17,18
155:19 156:21
171:18 182:19,22
182:23,25 183:1,3,4
184:3 186:9 190:2
191:11 192:4 196:5
197:25 198:13,16
198:22 199:1,18,18
199:18 200:6,24
204:6 209:5 215:7
216:18,20,24 217:6
217:10,11 222:24
223:8,25 226:19
229:25 230:1,4,10
230:16 232:19,20
232:22 233:2,3,16
234:15 239:4
252:19
interested 36:23
  37:1
interests 156:15
  165:21
interject 19:12
intermediate 1:12
  180:12 182:14
internal 240:1
interplay 38:7

interpretation 37:9
interrupt 224:21,24
  237:18
interrupting 103:16
  222:4,5
interview 116:12,22
interviewed 116:19
  117:13
introduce 7:8
  149:17
introduced 30:22
introduction 48:10
  102:24
invading 240:10
inverse 66:3
invest 26:16,23
  28:17,22 63:11
  110:4 111:7 113:23
  118:6 119:13
  125:18 127:12,21
invested 145:19
  150:1,3,11
investigate 88:3
investing 90:18,21
  91:13 111:5 124:12
investment 18:7
  21:23 26:4,22,24
  28:10 38:21 43:21
  55:17,20 56:3,9,14
  66:11,18 67:1 79:15
  86:10,25 87:11 88:2
  88:4,7 89:1,4 90:16
  91:10,11,20 96:12
  98:5 101:3 113:22
  115:7 117:17,23
  118:5,8 123:3 124:1
  124:6,10,18 125:21
  126:1 127:8,20
  128:8 150:12 152:4
  153:24 154:16
  167:23 230:24,25
investments 86:2
  91:18 95:1 115:9,16
  118:18 120:15
  126:2
investor 20:21
  26:16,22 28:7,9

29:8 57:2 65:8
90:12 94:4 113:13
113:23 114:4 118:5
119:11 125:16
131:25 132:5,11,16
132:23 133:2,7
134:2,15 135:24
136:3 137:11
141:20,23 142:4
148:23 149:25
151:12,16 152:5,13
152:15,16,23 153:1
153:14 159:9
169:22 178:24
230:9,17
investor's 18:16
  125:15 132:25
  158:16
investors 12:12
  18:6,8,25 19:7,17
  19:19 20:10,11 24:9
  25:23 27:16,22,25
  29:21 39:21 41:2
  83:4 93:22 113:21
  118:3 120:6,17
  125:23 126:3,11,23
  127:1,12,18 128:22
  129:2 131:11,18,19
  136:20,23 137:8
  138:6,11 139:20,24
  140:1 143:3 144:17
  144:18,25 145:5,14
  145:22 146:2,8
  147:20 150:9,19
  151:1 154:7 155:3
  157:4,10,10 158:8
  158:17 159:9 167:1
  167:5,13,20 170:9
  230:11,12
investor's 169:11
  233:4
invests 132:6
invited 71:7
invoking 207:7
involve 53:2 123:7
involved 21:11
  32:17 53:7 54:3,15

109:16,24 123:22
125:6,7 158:18
161:6 166:3 179:12
228:11,11 236:6
**involves** 172:18
**involving** 105:8
**iona** 52:8
**iota** 27:14 29:18
**irrelevant** 18:8,8
32:14
**ish** 209:9
**isn't** 36:13 232:21
**issuance** 62:15
123:4,23 124:3
179:4 235:15
239:12 240:8 245:3
**issuances** 58:25
59:9,12 60:14 161:4
161:7 179:12,21
234:13,21
**issue** 11:18 13:3,21
16:15 18:3 19:5
22:15 23:14,19 24:8
25:10 29:5,25 30:14
31:9,25 32:10 36:11
37:24,24 38:8 41:24
42:15 45:8 54:22
58:9 60:9,11 61:15
67:17 72:8,9 75:16
79:11 83:8 130:23
141:8 145:25 146:1
146:25 151:11
153:2,4,20 158:10
159:23 194:22
197:18 251:16
**issued** 17:9 21:9
43:13 56:14 58:10
59:7 60:15 62:4,6
62:25 66:2 67:14,15
68:2 69:2,3 78:23
97:25 111:22 165:4
180:11 181:23
183:10 202:20
207:17 209:3
231:10,24 246:17
247:2

**issuer** 12:15 22:3
41:3 60:25 65:22
73:13 90:12,25
92:16 106:1,6
113:14 125:12
127:3 133:4,7,8,9
133:10 134:1,9,14
134:20 135:4,5
138:5,7,14 139:13
141:5,12,21 142:4
144:14 147:25
155:7,11,13 158:4
159:6,9 161:5
164:21 166:20
232:17 242:15,19
242:25
**issuer's** 158:16
**issuers** 26:11 58:25
59:7 60:15 92:11,12
92:13,17 125:5
126:12 131:20
132:17 133:3
138:23 139:20,24
140:1 158:18
160:25 161:9
**issues** 15:1 16:12
24:19 31:1,3 32:8
33:23 35:21 36:8
38:15 39:7 42:13
54:15 90:21 105:8
108:18 113:3
126:20 139:17
194:18
**issuing** 162:17
**italics** 248:22 249:1
**itc** 86:25
**items** 148:19 162:19
**it's** 33:10,12 35:22
36:2 38:6 39:6
42:24 47:2,12 52:6
62:1 66:7 69:15
71:11 72:5,7 84:13
169:10 170:22,23
175:3 178:13
179:15 181:12,14
206:13,13,14,18,22
207:5 208:7 209:9

210:25 213:18
224:17 227:7,13,18
230:8 232:5,13,24
233:21
**i'd** 45:5 47:8 49:11
49:12 169:2 208:7
209:17 233:14
**i'll** 37:4 38:12 40:4
40:16 41:11,13 69:4
70:5 179:15 211:4
221:20 226:9,11
227:14
**i'm** 14:14 36:19,21
36:23 37:1,17 38:11
38:13 39:10 40:11
41:24 45:14 48:8
50:1,21,22 57:19
59:22 62:12 63:19
64:13 67:9 68:23
70:1 72:22 169:8,24
173:13 176:1
180:23 205:16,23
206:25 207:2
209:17 210:8
211:22 224:3,5,24
225:1 227:23 229:3
229:3,6 231:2 232:3
234:9,10
**i've** 39:14 40:22,24
44:14 53:13 54:5
65:4 172:21 174:12
174:12 206:16

### j

**james** 4:9 6:11
**january** 58:25 59:5
72:17 89:5
**jargon** 129:19
**jason** 3:13
**jeffrey** 4:10
**jeremy** 3:24
**job** 37:12 191:17,19
193:24
**john** 6:21 43:24
49:4
**joining** 53:11
**joint** 2:8 14:8,12
15:18,20 16:2

**jointly** 1:7 68:3
125:19
**jones** 5:1,4
**joshua** 5:22
**judge** 2:3 17:3
64:14 75:16 181:2
**judgment** 7:18,20
8:3 10:20 12:10
13:4,22 16:11 17:9
23:10,24 32:7,10
33:24 35:9,12,19,21
37:22 38:1 199:2
239:8
**judicial** 31:19
**julia** 4:15
**june** 21:24 28:11
34:23 43:7,15 70:6
70:7 75:13,19 77:23
80:11 84:1,6 86:1,6
88:4 92:19 94:16
99:20 113:1 115:10
118:11,15 119:25
137:14,15,21
140:24 146:9
148:16,24 152:6
170:18 213:15
214:5,16 215:5,7,19
218:9 223:25
**junior** 97:13 184:4
188:24 189:4
**jurisdiction** 239:9

### k

**k** 49:5
**kate** 5:16
**kayvan** 4:20
**kearns** 8:11 9:1,2,2
9:3,4,13 14:7,10
15:5 18:19 21:1,20
25:13 26:8,14,20
30:25 35:25 41:13
46:2,10 48:13,15,16
49:4,9 50:14 54:1
55:11 60:25 61:20
63:19 67:4,25 68:16
70:22 72:22 74:16
78:10 82:7 84:6
87:12,13 88:3,9,17

89:1,8 90:5 94:14
95:16,21 96:4,22
98:11 99:3 100:10
101:18 102:20,21
103:16 105:4
110:17,20 111:17
115:8,14,22,24
117:8,25 119:14
121:24 127:7
131:24 135:15
136:6 139:2 145:19
148:21 168:13,20
255:10
**keep** 72:6 171:5
213:25
**keglevich** 185:11
187:4 194:4
**keglevich's** 116:3
**keglovich** 177:8
**keith** 6:5
**kept** 45:5 82:13
153:14 165:5
**key** 131:18 134:17
144:8
**kicked** 72:19
**kind** 15:23 56:9
113:17 114:9 135:8
153:9 168:13
206:17
**kirkland** 3:2
**knew** 160:21 175:5
215:7,19 233:23,23
237:5 241:9
**know** 7:9 34:3
36:15,16 38:15 41:9
43:24 44:3,10 45:1
60:11 66:22 88:12
90:2 95:6 104:7
108:17 110:22
111:3 115:14 119:6
120:12 137:15
138:15 144:1
156:20 160:11
170:9 174:25 175:6
176:4 178:14
183:12,13,14
189:21 192:18

193:9,17 195:19,21
195:22 196:11
206:22 207:4,5
208:13 210:25
212:1,6,12 214:14
215:23,24 216:3
222:12 232:8,14
234:22 235:1,5,20
235:22 236:21
247:16 249:13
250:21 251:17
254:1
**knowledge** 56:17
188:18 189:19
243:12,14 244:1
**knows** 7:17 47:21
211:1
**kodak** 54:10
**kramer** 5:19

**l**

**l** 122:7
**labels** 121:8
**lack** 12:25 173:14
**laid** 57:13 65:25
96:13 161:16
**language** 33:21
76:25 108:10,20
109:7 110:9,9
119:16 149:23
166:23 168:21,25
172:4,5,10 195:9
**lapel** 225:1
**large** 125:12 126:12
127:15 141:25
161:2 176:24 177:1
234:6
**largely** 198:13
**larger** 54:13
**lastly** 10:14 12:24
13:11
**late** 69:24 104:9
124:8,14 138:20
**laughter** 64:15
**laura** 5:4
**law** 10:22 23:3,4
35:14 37:19 38:1,6
38:6 45:9 47:21

48:2 240:3,13
242:23 243:3,4,6
**lawfully** 242:20
243:1
**laws** 242:16
**lawyer** 186:12
193:10 240:7
**lawyers** 126:12
166:13 190:12
**lay** 79:8 90:3
**lays** 96:9
**layton** 3:9
**lbo** 59:1 67:21
187:19,22,23
188:21 202:13
234:6
**lead** 11:20 31:20
79:23,23
**leader** 53:15
**leading** 111:11
124:17 154:5
235:15
**learned** 35:19
**leave** 104:16 121:3
121:20 226:9,11
254:4,7,10
**led** 148:4 234:13
**left** 17:20 99:16
123:25 124:5,7
134:2 147:2 149:14
150:2,9,15 152:1
169:18 171:17
177:1 223:4
**legal** 12:17 35:20
63:14,15,19 184:20
184:22 186:12,14
186:16 193:24
211:22 215:12,15
215:18,18 236:23
251:6,11 256:22
**legally** 23:12
**legible** 197:4,4
**legs** 177:11,14
**leib** 2:25
**lend** 64:2
**lender** 93:13

**lenders** 33:18 34:22
54:8,9,20 231:15
**length** 111:17 131:3
164:9
**lengthy** 161:23
**leslie** 2:5
**lessened** 27:14
**lesser** 18:5 118:20
**letter** 45:4,13
**let's** 33:24 34:11
48:14 54:3 58:8
60:1,25 61:21 62:25
63:4 65:5 67:13,18
68:16 72:19 73:3
205:7,24 207:15
208:1,16 224:23
225:14 227:9,19
**level** 36:25 48:8
88:24 187:16
205:12
**levels** 30:5
**leverage** 231:11,14
231:23
**leveraged** 68:6
179:11,18
**levered** 201:12
**levin** 5:19
**levity** 197:21
**lewis** 4:12
**liabilities** 20:14
28:2 127:23 128:1,3
128:14 155:5 180:3
196:14 205:11
209:11
**liability** 128:21
143:2 179:7 190:24
194:13 204:22
205:1,11 211:20
229:19,22 235:4
**liable** 185:1,4,7,9
185:11,13 187:8,11
187:11,12 188:21
189:9
**license** 16:14,16
**lie** 250:19
**lien** 2:9 5:2,7,14,20
6:2 13:20 44:18

51:12 56:2,8 58:9
59:8,8 60:9,15 62:4
62:5 66:1 67:14,19
69:20 71:8 84:18,19
85:4 86:2,3 97:7,8
97:20 98:5,13 99:2
102:8 116:13
130:24 142:21
153:17 156:23
160:12,24 161:13
164:14 165:2
172:18 173:19
179:5 180:11 185:2
185:4 192:3 197:8
197:12 198:2,4,8
208:6 212:21
214:16,19 215:9
216:6,9,15,21 217:3
217:17 220:5,5,9
221:13,14 222:17
222:22 223:7
225:23 226:2
227:10 228:12,14
229:4 230:21
231:15 234:13,24
235:16 241:12,24
242:3 243:8,16
244:4 247:2
**liens** 200:9 226:4
**life** 63:2 74:23
80:16 129:10,21
130:16 132:8
134:16 135:9
138:10 140:17
145:9 147:18
150:11 154:22
**lift** 10:25 11:19 16:6
16:15 22:20 24:19
32:11 35:9,17 37:25
38:3 39:4,16 51:15
52:2 177:11,14
214:12
**lifted** 35:14 37:19
**lifting** 11:12 13:7
34:13 126:18,18
192:19

**light** 7:19 15:1 25:1
198:25
**lightly** 23:19
**lignite** 186:5
**limine** 32:2 38:11
**limit** 7:14
**limitation** 252:24
**limited** 2:11 40:17
66:8 241:13 250:24
**line** 95:17,17 97:15
110:23 119:1 186:8
205:7,14 213:15
249:17 252:13
**lines** 91:22 110:21
249:6,15
**liquidated** 96:8
112:15
**liquidation** 249:21
**liquidity** 156:17
178:23 179:2,9,16
229:21 235:13,19
**lisa** 2:25
**list** 96:12 102:5
124:23 162:5
163:12
**listen** 49:23 221:4
**lists** 61:12
**literally** 59:20
136:3 196:25
**litigate** 35:21 36:7
**litigated** 13:3,21
16:13 35:11
**litigating** 11:11
33:23
**litigation** 51:4 53:5
195:10,12
**little** 42:13 52:21
72:7 74:1 75:5
77:24 92:3 96:17,17
97:17 98:9 104:8
106:16 123:1
129:14 131:22
141:25 144:16
150:11 151:20
153:5 167:25 180:8
196:13 197:21
198:16 202:9

216:20 220:22
222:4,6
**live** 154:23
**lived** 40:17
**llc** 1:12 50:20,23
237:16
**llp** 3:20
**load** 150:8,15
**loan** 35:5 93:23
94:2 179:11 193:6
193:16 194:6
197:24 198:14
216:24
**loans** 231:14
**locked** 132:8,23
133:2,10
**logging** 240:15
**logic** 170:22
**long** 52:6,19 86:15
120:17 122:25
129:10 149:18
154:23 158:11
159:22 239:7
244:10
**longer** 246:7
**look** 17:10 31:10
43:14 60:7 81:3
83:12,13 84:4 86:22
88:22,22 89:1 90:5
91:9,18 92:11 108:8
108:10 109:3 110:7
117:21 126:8
133:14 139:6
142:21 144:11
146:1,15 148:7
149:7 151:16
152:18 156:5,9
157:23 158:22
167:5 168:24
170:10 173:24
174:2 176:24
180:24,24,25 181:3
193:9 204:13 208:2
208:7 210:8 223:15
233:13 246:20
247:22 248:17
249:14

**looked** 57:15 58:22
58:24 59:22 68:1
89:3 102:11 107:3,7
107:11,16,17 108:6
118:9 119:12,15
138:1 155:10
168:14 174:12
183:8 202:7,7
**looking** 59:20 67:9
76:8 80:13 81:11
82:18 89:7 91:10,17
94:25 98:4 99:16
106:19,19 131:11
131:13 139:9 147:2
151:11 245:18
**looks** 17:22 60:8
68:9 77:20 151:13
**looney** 2:24 256:3,7
**lose** 19:5 24:12,12
29:5 145:8 191:17
191:19,22,25
**losing** 90:2 225:1
**loss** 25:20,22 28:3
64:25 65:2 81:15
96:15 99:9,23 114:5
114:10 118:19
119:25 120:1
126:23 132:15
145:5 148:25
149:11 158:7
159:10 160:8
211:23 212:9 221:9
**losses** 127:1 145:13
146:7
**lost** 21:21 28:15
77:11 78:20 102:7
135:24,24 137:1,12
145:11 152:13
**lot** 53:8 91:7 141:19
198:10,17 201:11
203:1 224:21
241:15 245:8
**lottery** 91:6,13
**loud** 24:20 194:21
**love** 48:10
**low** 61:18 80:21
84:13 97:18 98:8

155:18 210:13,24
210:25 232:20
233:2
**lower** 21:5 26:12,14
26:18,23 28:7 29:1
29:1 34:20 35:1,5,7
64:18 68:13 79:24
79:25 83:4 86:17
87:14,23 99:14
113:23 114:20
118:6 136:13
201:24 217:2 219:4
229:25
**lunch** 42:8 104:6
**lvo** 150:4
**lynne** 2:24

**m**

**m** 122:7,8,22,22,25
122:25 123:2,2,3,3
123:7,7,20,20
**m&a** 91:1
**machine** 140:3
**madron** 3:13
**magic** 59:3
**magnitude** 203:13
**mail** 89:8,12
**maintain** 235:13
**maintaining** 43:21
121:9
**maintains** 190:17
**maintenance**
135:22
**major** 31:22
**majority** 20:11,12
71:9 128:17 130:19
167:18 171:2
231:17 238:25
252:14
**making** 167:22
233:25
**man** 246:5
**manage** 53:1
**management** 124:7
143:2 178:24 179:2
179:7,9,16 229:20
229:23 235:4

**manager** 246:22
**managers** 43:20
244:22
**managing** 50:19
53:15
**mandatory** 64:1
**manipulate** 92:10
**manner** 180:22
242:22
**map** 190:23
**march** 83:23
**margin** 85:19
**mark** 6:25 64:23,23
65:1 103:19
**marked** 133:15
139:6 146:15,22
156:6
**market** 1:18 9:20
12:13 19:8,24 26:6
26:17 28:22 39:20
58:13 59:24 61:18
63:7 64:6,7,19
65:21 75:2 77:20,21
79:6 80:21 84:6,12
86:1,19 93:24 94:1
94:13,20 100:3
106:12 113:12
126:9 127:14,14,18
129:1 130:1 131:17
134:15 136:17
138:8,16,17,19,20
139:18 143:25
144:8,15,22,23,23
148:17,20,22 149:5
149:23 151:7 156:4
157:7,8 163:18
165:12,25 173:1
175:3 179:11,11
232:20 233:3 234:5
234:20,21,25 235:3
236:14 251:7
**marketing** 13:2
**marketplace** 57:16
65:9,16 66:6 86:14
90:20 93:5 138:25
139:5 141:18 160:3

**markets** 34:24 79:5
160:19
**martin** 6:4
**mason** 222:12
**match** 28:2 127:24
128:21 129:3
131:18,18
**matched** 59:18
107:22
**matches** 20:15
**matching** 127:23
128:19 129:12
**material** 10:16
25:18 37:24,24 41:5
101:2 109:13
161:10,24 244:24
244:25 247:9,17,19
**materially** 83:4
101:9
**materials** 95:22
142:22 161:4
162:13
**math** 21:22 27:3
29:8,12 68:23 79:22
196:16 197:7 202:9
206:4 207:3,25
209:15,17 210:1,5
216:20 217:19,23
219:12 224:10
226:19 227:6
**mathematic** 137:12
**matter** 10:21 16:4,7
23:2 24:9 35:13
44:15 45:9 47:5
49:21 51:14 54:9,20
55:1,8 116:1 117:6
121:6 132:9 203:13
232:2 242:2
**matters** 48:7 49:9
51:5 53:9 54:9,11
54:24 55:3,6 91:22
120:9
**mattress** 90:18,23
118:22
**mature** 20:14
**maturities** 229:20
235:10

**maturity** 57:5 61:1
62:23 69:13,17
73:15 82:14,21 83:5
86:13 92:14,17,18
97:14 129:23 130:4
130:5,7 131:3,7,10
140:10,14 154:25
156:16 171:21,24
229:11 232:6,14,16
233:17
**maximum** 34:17
**mba** 123:14
**mbf** 252:16
**mccardie** 39:9 46:3
46:10
**mccarty** 13:11,23
15:16,22 18:20 27:3
30:25 121:19 122:7
122:12,18 126:14
127:5 133:19,23
149:8 158:23
160:22 163:22
164:2 171:17 173:9
175:20 255:15
**mccostlin** 2:24
**mccracken** 6:23
**mcgaan** 3:5 7:6,7
7:13,16 9:4,5,12,13
10:3,8 17:7 18:5
19:13 21:17 22:23
22:24 23:11,23 24:8
24:22 25:4 26:1
29:23 31:2 32:4,4
36:6,18 37:16 41:23
41:25 42:9,15 44:14
45:6,12 46:22,25
47:16 48:2,6 49:13
49:22,24 50:4
104:19 193:21
195:1,5,7 196:23
210:19 211:2,12
213:9 215:11
221:15,21 240:10
240:15 253:13,22
253:25 254:1
**mcgaan's** 17:10

**mcneill** 3:23
**mean** 8:8 44:25
  55:15 90:22 101:23
  108:10 110:6
  129:18 130:13
  135:1 136:8 137:18
  140:7 145:24 147:8
  147:16 158:7
  160:11 184:19
  212:11 224:9,20
  230:9 233:9 235:11
  237:18 244:15
  247:12
**meaning** 36:8 57:17
  64:20 66:11 78:19
  80:1 99:1 119:9
  169:25
**means** 42:4 64:21
  74:10 123:4 129:20
  130:14 135:19
  137:19 210:1
**meant** 32:6 81:22
  88:14 119:3 138:7
  232:6 243:13
  250:16
**measure** 38:19,19
**measurement** 140:5
**measures** 38:18
  140:13
**mechanism** 58:5
**meet** 128:23
**meeting** 253:21
**melissa** 2:24 256:3
  256:7
**member** 44:17,20
  50:19 52:16,18
  243:12,13
**memoranda** 183:10
  244:17,24
**memorandum** 14:9
  15:19,21 16:3 44:3
  246:16 247:6
**memorialized** 10:21
  170:6
**memory** 198:9
**mention** 90:6
  213:19

**mentioned** 31:7
  53:4 54:1 65:18
  72:6,10 79:7 90:9
  127:22 179:1
  200:19 235:4
  237:20
**merchant** 123:22
**merely** 22:1
**merger** 53:24
**mergers** 123:6,24
**merkle** 120:23
**mess** 40:16 254:7,10
**met** 7:9 178:2,10
**metaphor** 91:5
**methodology** 25:16
  78:11,18 79:6
**mf** 54:8
**mic** 224:25 225:1
**michael** 7:10
**michiel** 121:19
  122:7,18 255:15
**microphone** 177:23
**microscope** 11:22
**middle** 97:22 98:10
  99:22 150:20
  151:20
**mike** 3:6
**miller** 6:11
**million** 10:13 11:17
  12:2 31:12,21 34:12
  34:15 36:2,13 41:15
  41:17 60:9,10 66:1
  69:7 71:13 76:9,9
  76:21 80:15 81:6,8
  81:10,16,18,20,21
  82:20,21 83:19,21
  83:21 96:7,16 99:21
  99:24 100:9,12,16
  100:17 112:19
  114:11,12,21 150:1
  150:2,10,11 151:18
  151:19 152:3,4,6,16
  152:23 153:1,12
  155:12 164:25
  172:20 187:25
  188:3,9,20 194:16
  194:16 197:6

  199:22 200:15,19
  200:22 201:4
  202:13 203:16,23
  204:3,9,19 205:1
  206:2,2,7,11,11,15
  207:5,14,15,18,21
  208:9,10,16 209:9
  209:10,22,25 210:9
  210:14 211:20
  217:7,22 218:4,10
  218:20,21 219:10
  219:21 220:1,12,14
  220:17,20,23 221:1
  222:24,25 223:6,12
  223:24 224:2,5,14
  224:16,17 225:16
  225:19,20 227:7,22
**millions** 76:22
**mind** 90:1 131:16
  175:24 187:18
  189:11 206:11
  224:7 225:3
**mindful** 94:20
**mine** 7:9 147:9,15
  151:24 248:20
**mine's** 217:22
**mineola** 256:25
**minority** 176:25
**minus** 81:14 97:25
  165:11 227:5,18,18
**minute** 24:25 119:5
  176:2
**minutes** 246:1
  251:21
**miracle** 156:10
**mirant** 54:8
**mirror** 28:12
**mismatch** 155:5
**mispronounced**
  40:18
**misread** 33:12
  35:15
**misrepresentations**
  244:24
**missed** 161:25
  246:2

**missing** 137:2
  191:21
**misspoke** 169:17
**misunderstood**
  162:7
**mitigate** 148:24
**mitigation** 91:23
  99:25 100:8
**mixed** 171:14
**moldavan** 46:14
  47:1,14
**moldivant's** 116:7
**moldova** 247:16
**moldovan** 177:7
**molva** 120:24,25
**moment** 13:10 31:5
  31:6 76:13 103:5
  173:5 190:22
  198:21 208:1
  224:25 253:5
**momentive** 55:1
  105:11,13,16,25
  106:3,10,11
**monday** 7:4
**money** 36:14 61:8
  63:10 64:2 90:14,18
  118:22 128:5
  132:13 134:16
  136:5,11 146:2
  151:17 196:2
  201:11 226:2
**montgomery** 6:23
**month** 100:6 128:19
  217:7 218:4 220:23
  224:14,16 225:16
  225:19
**monthly** 27:23
**months** 77:25 86:8
  86:18 92:17 97:6,15
  98:7 99:19 100:4
  199:10 218:16,17
  218:17 223:25
  224:17 225:20
**moody's** 55:24
**moot** 7:22
**mooted** 10:20 12:9

moots 7:21,24
morgan 4:12
morning 7:3,6 17:3
  30:23 50:14,15,15
  50:16
mornings 42:10
morrison 4:17
mortgage 130:21
mortgages 61:24
  130:20,20
motion 2:8,14 7:14
  7:16,21 8:3 10:25
  13:22 16:11 17:11
  17:21 22:20 50:5
  51:15 103:3 179:6
  191:16,23 192:2,13
  192:15 193:2,12,14
  194:5,11 202:9
  214:12,21 215:20
  216:5,7,10 217:5
  223:10 225:17
motions 32:1 38:11
mountain 44:20
mouth 75:6
mouths 19:20
move 19:6 35:8 47:8
  50:1 56:16 65:5
  85:9 87:8 100:11
  101:11 102:19,22
  126:14 190:20
  206:23 212:14,16
  217:21,25
moved 23:9,11 35:3
  35:19
moving 47:12
muldova 250:13
multiple 105:13
  106:24
murin 2:5
mute 9:8
muted 9:9
mutual 28:1 127:17
myers 53:20,20

**n**

n 3:1 7:1 49:5
  176:21 255:1 256:1

name 49:2 54:12
  122:5,17 176:18,20
names 40:18 42:18
  90:21
narrow 126:17
narrowed 32:7,12
nash 138:17
nat 125:17
native 92:15
nature 20:9 126:17
  139:18
nauseum 96:6
near 86:20
nearly 156:22
necessarily 207:8
necessary 11:14
  117:2,12 214:22
neck 64:13
ned 3:18
need 12:4 16:15,24
  20:15 21:18 28:2
  31:4 36:17 38:4
  42:5 44:8 45:15,18
  50:6,8 116:12
  146:12 176:25
  177:22 210:8
  224:24,25 226:7
  234:11 243:25
  248:18
needed 116:22
  126:22 156:19
  157:5 174:24 175:6
  175:14 221:14
  222:18
needs 221:25
  226:12
negative 136:13
neglected 243:22
negotiate 239:20
negotiated 32:18,21
  166:14 228:7
  230:12
negotiating 228:14
negotiation 13:2
  20:1 32:17 36:9
  109:20,24,25 166:7
  179:20 228:11

negotiations 109:17
  166:4,11 167:18
  239:16 241:4 251:9
neither 15:21 90:24
  184:14
net 82:3 100:8
  114:10 117:21
  211:23 212:9
netted 172:21
never 8:18 20:6
  22:15 44:23 45:1,7
  45:9,12 134:10,11
  141:24,24 149:4
  157:19 159:25
  160:20 186:12
  188:18,23 189:8,25
  212:7 241:11
new 3:16,21 8:1,5
  8:14,22 13:8 14:2
  15:4,17 16:21,23
  21:16 22:17 24:6,6
  35:10 37:6,8,16,16
  44:9 52:9 53:16
  67:19 144:4,8
  145:25 146:1,2
  157:18 160:2 165:2
  216:24 249:25
newly 165:4
nextera 86:25
  210:17 211:8,10
nice 37:12
night 42:17 43:3
  44:2
nine 203:8 204:18
  205:15 207:19
ninety 199:20
noise 9:10
nol 212:2
nominal 81:9 82:4
  99:9,19,24 100:6,7
non 18:24 23:3
  25:14 26:4 75:23
  76:6 82:16 93:9,18
  100:13,21 102:8
  112:21,25 130:10
  130:11,13,24 131:1
  131:10 135:11

225:23 227:3
  232:14 239:6
  252:20
nonresponsive
  206:24 207:3
nonsettling 227:16
noon 42:25
nope 166:17
normal 163:21
norman 5:17
nortel 54:7
north 1:18 124:6
  185:23 210:18
  211:9 223:8
nos 92:8
notable 34:24
note 20:20 25:19
  34:1 39:24 40:1
  43:7 44:6,24 51:12
  58:7 61:1,13 62:21
  64:7,24 65:3 66:20
  68:17 74:2,14,19
  77:21 84:16 91:14
  94:5 97:17 118:2,13
  129:21 130:16
  132:8 134:16 135:9
  145:9 170:17
  188:15 202:21
  212:22 214:11,20
  215:9,19 220:24
  234:1 239:5 252:19
notebook 49:10
  133:19 254:5
noted 17:21
noteholder 57:5
  61:12,14 65:1,3,12
  66:22,24 73:21 93:8
  100:13 106:1,6
  158:25 170:17
noteholders 2:10
  15:19 17:18,24
  21:11,14 22:1 25:5
  26:25 28:11 29:14
  54:21 58:5 61:7,9
  61:11 63:8,23 64:2
  65:17 70:8,9,13
  74:7,9 75:12 76:1,5

76:6 80:10 81:1,23
82:15,19 83:1,25
91:4 93:9 94:15,21
102:9 109:20
112:22,25 115:8,11
115:15 119:18,23
148:15 153:17
156:20 157:12
162:24 163:10
165:2 166:19 171:2
172:1 173:10 174:9
175:2 192:2,3 236:1
240:22
notes   10:7 13:3,20
18:24 19:9 20:10
21:4,8,9,16,24 22:4
29:6 37:21 39:12,14
39:22 40:2,21 42:19
43:12,17 51:12 56:2
56:8,9 58:9 59:7,8
60:9,20 62:4,6,15
62:23 64:18,19
65:23 66:1,4,7,15
66:18 67:14,17,17
67:18,19,20,23 68:1
68:18,21 69:2,6,9
69:11,25 70:5 71:4
71:19 72:3,4,16,24
73:4,5,8,12,14,19
74:4,23,24,24 75:1
75:7 79:11,15 80:11
80:16,17,18,23
81:12 82:9,13,17
83:2,5,9,14 85:4,7
85:11,17 86:22 87:1
89:10 92:23 93:6
94:8,15 96:12 97:7
97:8,12,13,14,20,25
98:13,22,25 99:1,2
105:17,23 109:17
110:5 111:5 113:1
114:23 115:5,16
116:13,20 125:18
127:25 130:23,24
131:6 134:21,23
137:13,14,21,22
140:19,20,23

142:21 143:9 144:4
144:6,8,11,14 146:4
148:16 150:6
153:14 158:24
159:24,25 160:2,15
160:16,24 161:14
164:13,17,19,22,23
165:4,5,6,6,13
166:7,10,11,16
167:21 171:8 174:3
175:2 179:5 180:11
181:23 192:8,8,12
192:12 198:20,20
199:7 202:13,16,20
202:23 203:3,4
204:19 207:16
208:18,19 209:2,22
214:16,19 215:7,19
216:21 217:12,13
218:8,24 221:14
226:2 233:11,19
234:14,24 235:16
235:25 236:18
237:17 238:9 239:1
239:7 241:12,16,24
242:4 243:8,16,22
244:4,18 245:4,4
246:17 247:2
249:24,24,25,25
252:15,17
notice   8:17 31:19
43:14 44:18 212:22
212:23,24 214:4,20
214:22,23 239:1
252:16
notified   46:25
notion   22:16 30:6
november   150:4
nrg   54:10
nuclear   186:4
nullify   12:22 40:23
number   11:23,24
21:20 32:8 40:20,22
67:11 69:10 76:16
81:18 112:24
125:12 126:12
127:15 128:18

141:17 142:1,8
150:18 151:3 153:8
157:17 161:2
197:15 198:11,23
205:22,22 206:13
206:14,15,19,22
208:12 210:24
211:1 213:18
216:14,14 217:22
219:9 227:19
238:14,16 245:20
245:20
numbered   101:12
numbers   21:17,22
27:20 75:5 80:7
99:18 101:13
102:10 194:17,18
196:21 198:10
199:14 200:25
201:2 203:12 207:7
210:9 218:10,13
223:17 224:2 228:7
238:1
ny   256:25

o

o   2:1 7:1 176:21,21
256:1
oath   16:17 253:15
object   24:18 63:13
84:9 85:9,20 101:15
102:24 142:7 154:1
154:10 161:15
193:21 195:1
215:11,11 240:10
objection   25:6 48:4
70:2 84:7 85:22
87:8 89:14,22 95:18
95:19 102:15
103:23,24 154:11
173:12 210:19
221:15 240:5
objectives   127:20
obligation   228:3
244:16
obligations   128:2,3
128:14,16,23 129:3
129:5 236:1

obligor   187:24
192:9
obtain   70:8
obtained   69:19
obvious   91:12 149:5
157:25
obviously   47:21
48:10 66:23 74:2
91:15 97:19 127:7
143:15 151:18
155:11 168:18
183:15 202:7
203:14 228:19
229:10 234:4
236:15
occasion   178:9
occasions   126:7
occur   37:20 39:5
72:17
occurred   27:17
118:4 138:21,22
142:14 157:20
215:25
offense   253:25
offer   8:14 9:18
12:11,14,16,17,21
13:9 15:12,17,22
16:18 29:25 30:13
30:17 31:8,14,24
36:15 70:25 71:4,6
141:21 142:13
162:17 167:5
174:14 226:15
248:23 249:2
offered   18:5 39:10
40:19 105:13 125:1
133:16
offerer   248:22
249:1
offerer's   249:20
offering   13:13
16:21 37:16 142:21
161:4 162:13,17
183:10 244:17,24
246:15 247:5
offerings   168:1,4,8

offers  174:13
office  53:16
officer  53:8,21
  122:24 250:19
officers  191:7
official  54:7
offs  228:16
oh  41:24 42:1 51:8
  104:18 120:12
  141:15 147:10
  202:2
okay  7:12 10:8 32:3
  36:5,18 46:23 47:4
  47:19 48:5,14 49:14
  50:9,25 51:17 52:4
  52:24 62:15,18,25
  63:4 64:9 65:4
  67:13 69:1,22,25
  70:17 71:9 73:20
  75:15,24 79:7,22
  83:7,20,24 85:2,8
  85:19,24 86:21
  93:21 94:23 95:14
  99:1 100:19 102:4
  103:12 104:5
  110:12,15 111:1
  115:19 116:12
  117:8 121:11,16,20
  123:9 125:1 130:3,9
  130:13 131:9
  135:14,17 136:6,14
  136:19 137:8,18
  139:19 140:16,22
  141:3,12 143:23
  144:10 147:1,22
  148:7 149:7,9,13
  150:20 151:11
  152:5,10,13,18,24
  157:23 159:11
  160:9 162:20
  163:24 169:9
  171:16 176:15
  177:11,17 178:21
  179:20,23 180:8,15
  180:18,23 181:7,20
  182:1,5,10,18 183:3
  183:6,13,23 184:6

184:11 185:16,20
186:2,11 187:3,8,11
187:21,23 188:18
189:23 190:4,13,20
191:1,2,10,14,25
192:7,15,21 193:5
194:8,11 195:24
196:1,10,13 197:8
198:2,12,16,24
199:10,22,24 200:6
200:12,14,22
201:15 202:6,18,25
203:3 204:3,16
205:5,13 207:9
208:14,25 209:8,10
209:13,16,19,24
210:2,5,5 211:6,15
212:15 213:24
214:3,7,9,19 215:2
215:4 216:2,12,19
217:9 218:1,2,14,20
219:3,19 220:24
221:4,6,7,24 222:15
223:2,15,20,23
224:2,15,16,18
225:18,21 226:23
227:3,9,14,18,20,21
228:9,14,19,24
229:7,24 230:4,8,19
231:1,20 232:2
233:4,8,15 234:18
234:23 235:4,10,18
235:21 236:11,22
237:3,5,9,14 238:2
238:5,12 240:4,19
241:2,11,20,23
242:7 244:14,20
245:2,8,12 246:8
247:5,12,21,25
248:6 249:4,15,17
249:19 250:6 251:2
251:19 252:6 253:4
253:10,21,24
old  146:4 159:21
  165:5 218:8 256:23
omissions  244:25

omnibus  14:15
once  207:7 250:14
oncor  14:23 28:13
  68:12 79:7,8,9,11
  80:3 84:20 96:25
  97:11,13,19 114:23
  115:5,7 143:14
  180:20,21 182:14
  182:15,19,25 183:3
  183:25 184:8,11,14
  184:14,25,25 185:1
  185:13,13,17,21,21
  185:22 186:9 190:2
  191:12 192:4,19
  209:6 210:14,16
  211:9
oncor's  79:15 193:1
  193:2
one's  98:8 193:19
ones  8:15 54:13
  62:25 139:16 181:2
  232:10
open  14:23 30:2
  50:3 80:12 94:13
  162:11
opened  37:4
opening  30:16
opens  37:2
operate  45:21
operating  180:21
  184:14 185:21,22
  192:19 211:23
  212:9
operations  180:6
  184:9,12 192:16,17
  192:18 193:2
operative  12:3
operator  2:5
operators  185:25
opine  19:11 20:19
  21:7,25 22:6,14
opines  26:15,20
  29:17
opinion  12:14,16,17
  12:18,21,24 15:4,15
  15:17,25 17:23
  19:20 26:8,14 41:6

63:19 84:13 87:9
88:22 94:14,18,19
96:25 101:1,5,6
102:21 105:16,20
105:21,25 106:10
106:13 125:2
145:23 158:21,23
159:19 161:12,16
161:17 162:6 163:9
167:7 174:8 186:13
opinions  8:6,9,13
  8:14,17,20,22,23
  9:15,15,18 11:9
  12:8 13:5,8,13,23
  14:2 15:23 16:5,18
  16:21,23 17:12 18:5
  18:22 22:17,19
  25:10 37:7,8,11,15
  37:16 39:10,17
  40:19 88:18,21
  102:22 108:6
  111:18 116:14,23
  117:12 119:17
  122:15 126:15,19
  127:2 162:12
  163:12,16
opportunities  21:23
  24:13 26:24 28:22
  113:25 118:7
opportunity  8:16
  14:4 15:23 16:10
  44:9 48:11,17 49:23
  80:23 86:10 90:7
  93:9 111:4 115:25
  119:8 167:22
opposed  37:9 74:18
  74:20
opposite  17:8 19:6
  65:6
opposition  202:6
optimal  81:12
option  93:21 135:12
  141:5,12,14,17
  142:5 160:14,15,16
  160:19,21
optional  12:18
  17:19 34:15 39:13

40:21 172:10
**options** 90:16,17
    141:18 160:18
    233:21
**oral** 48:9
**orally** 45:12 101:25
**orange** 151:22
**oranges** 224:19,22
    225:12 226:10
**order** 11:21 15:6
    16:8 22:25 23:21
    42:23 46:1,8,17
    193:25 195:3
    203:13
**org** 79:10
**organization** 52:13
    183:20 184:23
**organizational**
    182:8,11
**oriented** 124:12
**original** 25:11 43:6
    59:1 67:21 119:10
    131:8 135:23
    146:25 148:6 150:2
    150:4,5 151:16
    153:14 154:14
    156:12 170:16
**originally** 136:4
    138:8,15 155:16
**ostensibly** 99:25
**outcome** 52:1
**outline** 178:21
**outlined** 53:7 58:21
    232:10
**outset** 30:20 40:9
    69:18
**outside** 39:24 73:3
    73:4 120:3 125:22
    159:1,15
**outsider's** 143:22
**outstanding** 56:3
    70:23 82:14 83:5
    130:15 154:22
    188:10 197:9
    220:19,21 252:15
**outweighs** 18:1

**overall** 60:5 61:18
    98:2 100:21 101:3
    152:20 206:13
    228:16,21,23
    229:18,19,22
    234:19,23
**overrule** 89:22 96:1
**overruled** 63:16
    95:25 154:12
    173:16
**oversight** 125:23
    126:3
**overstated** 226:16
**overstates** 20:12
**overwhelming**
    20:11,12
**overwhelmingly**
    93:18
**owe** 228:4
**owed** 21:12 25:14
    100:16 196:4
    218:25
**owned** 28:13 79:10
    189:1 204:19
    236:17
**owner** 202:21
**owners** 27:24 30:11
**ownership** 183:2
    185:17
**owns** 180:19,21
    182:14,15,18,22,24
    184:8 185:22
    186:21 192:8

**p**

**p** 3:1,1 7:1
**p.m.** 104:22 176:9
    254:14
**pachulski** 5:1
**package** 228:16
    234:23
**pad** 196:21
**page** 25:11,11 27:20
    27:21,25 28:5,6
    29:4,7,10,19 31:17
    76:15 83:13,14
    94:24 95:5,6,8,8,17
    95:20 101:4 110:20

110:23 119:1
    149:19,22 158:22
    159:1,11,11 161:22
    161:23 182:2,3,5,7
    195:6,6 238:14,16
    238:19 242:8,9,11
    242:13,13 245:12
    245:13 246:10,20
    246:23 247:22,25
    248:9,11,25 250:6
    251:25 252:9 255:9
**pages** 9:23 27:3,4
    29:16 31:10 83:12
    87:22 103:21 248:4
**paid** 20:21 30:9,10
    38:24 57:4 69:17
    70:13,14 80:4 129:4
    129:6,20,22 131:7
    137:9,16,19 142:3
    143:24 144:17
    145:3 150:24 151:5
    153:19 154:19
    155:4,8 157:24
    160:1 163:20
    188:16 196:2
    198:13 215:6
    219:24 222:23
    226:6,17,17,18
    227:21
**paired** 158:17,19
**pairing** 158:20
**pants** 45:22
**paper** 19:8 61:15
    65:16 86:18 87:5
    90:9,25 91:24 92:1
    96:14,20 97:5 98:5
    98:14 99:10 100:1,2
    100:5 115:1 117:19
    117:22,24 156:23
    157:19
**papers** 35:13
    104:17 217:5
    220:15 223:10
    225:17
**par** 19:9 64:8,20,21
    73:19 80:19 93:6,10
    94:4 144:4,7,8,12

144:13 157:19,20
    165:7 166:1 171:9
    231:19 235:12,12
**paragraph** 25:13,20
    25:25 26:18,24
    27:17 32:25 58:22
    60:14 113:7 117:25
    159:3,12 195:6
    238:22 249:5,16
    252:12
**paragraphs** 27:12
    27:21 60:7 88:6
    162:1
**pardon** 84:17 95:11
    147:16
**parent** 98:3 182:22
**part** 7:21 10:16
    11:6 14:18 18:13
    31:25 38:12,12 41:1
    47:2 53:1,16 57:6
    67:15,21 71:7 72:11
    72:12 97:7 105:6
    106:2,23 107:19
    108:12 109:6,7,10
    109:13 130:21,21
    143:18 145:22
    150:22 151:20
    155:16 156:17
    165:1 166:20 172:1
    179:6,7 181:23
    207:14 221:21
    229:18,19,22 230:4
    246:17 247:3
**partial** 226:3
**participate** 7:10
    9:11 71:8 72:1
    171:3
**participated** 161:3
**participating** 75:23
    102:8
**particular** 19:18
    56:23 66:13 78:16
    87:23 90:10 98:22
    127:20 194:23
    213:14 228:25
    232:4 236:25 237:1

**particularly** 15:14
46:4 61:10,17 136:9
145:24 146:4,5
162:14 212:2
233:21
**parties** 10:16,21
15:2,9 18:14 33:1,5
38:9,20,22 42:2
126:13 164:23
170:3,6 209:25
222:23 226:7,18,20
228:5 251:10
**partner** 30:21
149:17
**parts** 12:12 14:9
243:25
**party** 193:5 202:21
203:4 205:8 207:18
**party's** 12:15 13:15
**pass** 103:6,11 253:6
253:9
**pause** 103:10
121:17 173:6
177:16 201:16
205:25 211:16
219:8
**pay** 22:4,5 41:4
65:22 73:14 94:4
128:10 130:5,6,21
133:12 135:3,12
137:14 140:14
141:5,13,21 146:12
148:10,11,12
155:11 160:20
194:24 195:15,17
196:2,7 197:25
198:4,17 215:3
223:7,11 231:18
233:1,19
**payback** 130:9
**paying** 20:22 73:6,7
90:13 113:14 127:1
130:7 154:24
155:14 208:5
225:22 232:7,21,24
**payment** 11:14 23:5
34:4 40:3 41:1 56:8

61:10,14 64:1 66:16
69:12 75:18,18
79:13 81:5,14,16
82:2 94:11,11 99:21
126:21 127:10
129:11,12 130:21
135:18,19 136:2
147:18 154:22
159:23 164:24
172:20 212:8 219:1
232:17 233:11
239:4 252:18
**payments** 21:3
24:13 27:22 39:19
57:2,3,6 61:13
66:20 74:3 77:11
78:13,20 80:14 81:2
81:6,9,13,15,19,24
82:1,2,20 96:15
99:9,19,23 102:8
114:11 128:18,24
128:25 136:1 148:6
156:15 171:18
**payoff** 13:19
**pays** 19:8
**pending** 88:13
203:20
**penmanship** 197:2
**pennsylvania**
123:13
**penny** 27:15 31:11
188:14 196:4
**pension** 20:13 28:1
127:17,19 128:4,16
128:19,19 129:5
155:1
**pensions** 128:18
**people** 30:5 32:18
32:21 44:10 128:2,4
128:9,17 129:4
151:18 159:25
167:7 194:4 254:7
**people's** 40:18
**percent** 21:11,12
25:18,19 28:13,14
28:24 29:11,12
43:12 44:16 60:14

60:16,17 62:5,21
63:2,7,8,8,11 64:2,3
65:25 66:4,17 67:20
68:18,21 69:11
70:11 71:5,6,10,19
72:3,6,21,24 73:4
73:16 75:7 78:16
79:10 80:17 82:17
83:10,15 84:20
86:20 91:8 92:20,22
92:22 93:2,7,10,15
93:19,22 94:8,9,13
96:11 97:4,16 100:5
100:25 101:6 102:8
109:20,24 110:5
111:5 115:1 131:6
139:11 140:19
143:5,8,23 144:7,13
146:3,3,25 148:1,13
155:17 165:5,13
166:7,14 167:2,13
167:21 171:5
172:25 180:20
182:14,15 191:11
192:4 199:8,10,11
201:18,20,23 206:3
207:5,6,22 216:21
216:25 217:10,12
218:25 219:3,5,20
219:23 223:8
226:18 227:22
230:5,5,13 236:17
237:17 238:8
239:12 246:17
249:24 251:10
**percentage** 68:5
71:20 100:20,23,24
201:7,8,13,14,24
206:25 228:4,5
**percentages** 73:18
**percents** 112:23
**perfect** 40:15
**perfectly** 11:15 12:2
38:2 47:8
**performance**
242:25

**performs** 29:9
**period** 58:12 63:7
86:6,9 100:6 118:19
128:11,11 129:20
130:8 131:8,14
132:1 135:11
140:24 145:9 149:1
154:17
**permission** 69:19
215:20
**permit** 73:4 243:5
**permits** 11:21
**permitted** 8:21 14:3
125:2
**permitting** 40:1
**pernick** 5:17 31:6
**perry** 222:12
**person** 91:16
104:12 129:8
253:17
**personal** 42:12
**personally** 109:16
166:3 243:8 244:1
253:24
**perspective** 64:1
65:15 74:6,11 91:3
125:15 128:7 201:9
235:3
**pertain** 116:24
**petition** 34:12 98:22
115:2 188:1,10,17
196:5,5 198:16,25
200:23 204:6
**ph** 12:7 83:13 116:5
116:7 120:23,24
125:19,19 150:8
157:18 165:25
177:7
**phase** 11:18 23:1,3
23:15,18 24:4 37:21
38:4,8,9 194:22
195:14
**philip** 5:9 17:3
44:13 115:22
**phone** 9:7
**phones** 9:8,9

**phonetic** 43:25
46:14 47:3 75:16
247:15,16
**phrase** 56:20
**physics** 123:12
**pick** 150:6
**pickering** 17:4
115:23
**picture** 188:4
**piece** 156:23 157:18
196:21
**pieces** 8:19 97:21
**pik** 56:9
**pimco** 4:7,13
**pip** 185:4 198:20
**pips** 200:10 201:23
**place** 17:7 100:3
127:18 138:19
238:9
**placement** 69:4
**places** 67:11
**plain** 13:1 33:21
**plaintiff** 1:10 47:20
51:13 121:18
180:24 181:10
237:9 245:13
246:24
**plaintiff's** 101:13
118:9,10 121:7,8
133:15 139:7
152:19
**plaintiffs** 88:8
102:5,11,13,17,17
103:19,25 171:11
**plaintiff's** 169:3,10
170:14
**plan** 41:21 83:22
128:19 203:25
204:8,14,18,23
206:6,7,13,17 207:7
207:15 208:17
209:11
**planned** 13:20
39:13
**planning** 242:2
244:12

**platforms** 51:2 53:4
**platt** 5:10 30:21,23
30:25 121:13,14,18
122:11,13 133:22
142:10,12 147:13
154:3,6,15 160:5
161:18,22 162:1,9
163:5,7,13,15,23
169:3,17 173:5,8,13
173:23 175:19
**plausible** 216:3,4
**played** 179:20
**plead** 242:21
**pleadings** 23:21
**please** 7:3 9:8 10:2
48:23,25 49:2
104:24 119:5 122:3
122:5,16 123:9
125:4,14 126:16
143:6 149:13
151:14 171:12
176:10,16,18 221:4
223:23 254:5,10
**plus** 21:11 26:9,13
60:19 64:11 72:21
77:14 78:15 84:1
107:12 112:11
146:12 147:19
153:6 165:11
222:24
**pocket** 225:4
227:25
**point** 8:25 34:21
36:19,20 40:9 42:24
57:7 61:5 68:19
69:13 80:24 99:12
129:19 140:12,15
141:10 143:16
144:2 149:2 153:21
153:22 154:4
161:19 173:14
178:3 188:15 205:4
206:14 207:4,6
218:17 219:14,16
219:18 225:11
226:21 239:15
240:25 244:2

**pointed** 113:6
**points** 26:1 27:13
29:15 68:15 72:15
77:14 78:7,8,9,15
82:6 112:12 148:17
148:18,18 222:23
223:20 226:17
227:21 228:4,5
233:1
**police** 254:6
**ponies** 90:24 91:6
**poor's** 55:23
**portion** 179:17
**portions** 102:20
**posit** 64:6 65:5
196:1
**posited** 77:2 117:20
**position** 12:19,23
53:20 86:3 98:18
143:16 146:4
178:12 192:25
253:14
**possession** 93:1,23
193:6,16 194:6
197:8 216:24
217:11
**possible** 14:17 66:6
104:7 117:17 215:8
215:12,13 253:12
**possibly** 175:18
**post** 34:12 97:3,9,11
144:3 196:4,5
198:16,25 200:23
204:5
**posts** 97:20
**potential** 70:23 91:9
135:24 200:8,9
228:2 240:16 245:9
250:3
**potentially** 30:12
43:23 181:3
**potter** 3:20
**power** 185:24 186:3
243:4,6
**practice** 53:18,24
53:24 166:18 167:6
167:7

**pre** 14:8,12 15:6,18
15:20 16:2 98:21
217:3
**preceding** 58:7
**precise** 205:24
210:8 240:5
**precisely** 17:7 19:23
24:14 71:25
**precluded** 16:21
**predecessor** 124:15
**predecessor's** 123:1
**predicate** 79:8 86:5
90:3 120:7
**predicted** 63:6
**predictive** 64:17
**preexisting** 220:5
**prefer** 102:2,3
**preferred** 233:18
233:18
**preliminary** 48:7
49:9
**premiere** 54:25
105:11 117:21
**premium** 38:24
39:1 76:17,23 77:11
81:3,8 106:2 112:6
112:8,14 119:23
140:14 219:23
221:2 222:23
225:23 233:12
239:5
**premiums** 252:19
**preparation** 161:3
**preparatory** 221:16
**prepare** 45:23
**prepared** 24:4,9,21
24:22,25 103:6
161:6
**preparing** 15:9
**prepayments**
108:19
**prepetition** 56:2
**present** 21:21 46:2
77:10,12 78:14,19
81:25 82:3,5
**presented** 18:3
54:15 114:7

**president** 178:19,22
**presume** 202:7
**presumptions** 195:2
**pretrial** 44:3
**pretty** 30:8 125:7
  144:22 148:5
  156:25 157:25
  159:7
**prevailing** 61:18
  65:10 75:2 94:20
**prevent** 241:7
**previous** 152:21
  197:17 208:21
**previously** 37:11
  101:16 165:3
**price** 64:18 81:12
  82:9 94:2,7,11
  223:21 234:2,7
**priced** 66:25
**prices** 89:9 233:13
**pricing** 235:2
**prima** 48:3
**primarily** 178:23
  185:23,25
**primary** 53:2
  178:25 187:23
**principal** 17:12
  25:13,19 27:23 40:2
  54:19 57:4 61:2
  69:13,16 70:9,14
  72:1 73:17 75:7
  81:13,14 82:17
  100:15,21,25 101:6
  125:18 126:22
  130:6,6,9,10,15,18
  130:22 136:20
  137:16 143:4 146:8
  146:13 148:13
  150:23 155:17
  156:15,21 157:17
  165:21 171:18
  185:17 187:25
  191:10 193:7 198:7
  198:21 215:6
  217:13 220:19,23
  239:1,5 241:4

252:15,19
**principally** 27:24
**principals** 236:16
  236:17
**principle** 124:12
  125:16 224:13
  230:12
**principles** 127:4
  129:15 137:24
**prinsker** 125:19
**prior** 40:3 45:17,22
  53:11,19 54:25 58:4
  59:4 61:1 67:17,18
  73:5 75:18,18 78:4
  89:6 98:1 115:2
  167:2,8,9,14,18
  218:6 227:10
  232:16 242:1
  244:12
**priority** 84:18,19
**private** 30:12
  138:19
**privilege** 240:5,11
  240:13
**probability** 215:23
  232:22
**probably** 20:12
  46:3 54:12 97:17
  105:24 114:9
  128:17 132:22
  170:12 202:19
  245:25
**problem** 20:16
  41:11 128:24
**procedural** 47:5
**procedure** 50:7
**procedures** 14:23
**proceed** 7:5 24:3,18
  41:21 44:12 47:23
  48:16,18 104:25
**proceeding** 1:10
  14:16 35:12 36:2
  42:20 85:4
**proceedings** 16:19
  42:24 44:1 254:14
  256:4

**proceeds** 26:16
  96:19 249:21
**process** 31:23
  251:14
**produce** 42:22,24
  83:3 108:5
**produced** 92:15
  114:10
**produces** 26:13
**production** 88:10
**professional** 52:10
**proffer** 29:25
**profile** 91:19
  117:23
**profitable** 26:3
**program** 229:20
  235:5,7
**programs** 229:23
**prohibitions** 57:21
  65:19
**project** 108:5
  199:24
**promise** 186:12
**promptly** 253:11
**pronouncing** 9:2
**pronunciation** 40:12
**proof** 29:25 30:13
  30:18 31:8,14,24
  36:15 47:21
**propensity** 57:12,16
**proper** 8:19
**proportionality** 157:14
**proportions** 36:7
**proposal** 70:22 71:3
  71:21
**proposals** 14:11,18
  14:22 37:2
**propose** 24:15 46:4
  46:19 47:22 50:1
  210:16
**proposition** 91:13
**propped** 140:3
**prospectus** 162:16
  181:22 244:17
  246:16 247:2,5

252:23
**prospectuses** 183:9
**protect** 65:7 66:23
  81:22 136:14
**protected** 126:23
  157:1,2
**protecting** 115:15
**protection** 9:19
  39:18 40:25 41:3
  56:20,23,25 57:5,6
  57:9,18,25 60:6,17
  65:11 66:3 67:3
  68:11 74:9,14,21
  106:7,12 107:5,9,13
  135:14 138:13
  142:15 157:12
  159:14 168:4,16
  172:14,17 233:5
**protections** 73:21
**protects** 18:25
  20:17 65:12,13
  158:16 159:9
**provide** 20:25 21:17
  24:7 26:12 33:22
  52:4 58:5 69:12
  74:25 79:13,17
  192:25 194:12
  234:14 240:1
  244:16 252:14
**provided** 23:4
  44:22 72:13 87:10
  159:14 220:16
**provider** 138:9
**provides** 21:1 51:2
  58:1 74:2
**provision** 10:9,15
  11:3 13:13 18:12,14
  18:15 19:3 33:2,8
  40:23 57:22,23 58:1
  65:12,21 67:23 68:6
  72:13,25 73:22
  74:18,20 107:25
  109:10 113:20
  118:3 119:15,17
  138:18 159:4,5
  172:11 192:1,5
  231:12 232:13

233:25 237:6
238:12 239:18
240:8,8 241:25
242:4 243:9,17,21
244:7 252:22
**provisions** 9:19
11:2 19:23 20:6
33:6 39:18,19 40:25
58:8,12,17 63:18
73:22 74:24,25
79:16 105:17,22
108:1,4,7,9,13,19
108:22,24 109:2,3,6
119:13 135:14
138:25 139:12
172:11 173:25
175:8,10 232:25
234:7 235:2 237:4,5
239:11 241:15
**proxies** 96:14,20
**public** 52:8,17
167:19
**pulled** 168:13
**purchased** 94:12
**purely** 30:17 149:24
**purpose** 9:18 11:1
11:25 35:22 85:4
103:3 105:17,22
195:14
**purposes** 10:23
11:16 12:6 34:9
36:1 37:14 39:7
41:12
**pursuant** 92:18
112:4 207:15
**pursue** 11:9
**pursuing** 127:20
**push** 45:5
**pushed** 131:7
**put** 8:5 11:14 12:4
14:21 16:4 17:1
19:10 24:9,15 25:1
29:6 30:6 31:4
32:15 34:8 37:23
45:13 47:11 48:7
63:9,18,25 64:4
75:6 76:10 88:1

90:23 95:4 101:21
128:9 136:5,11
143:15 152:5,16
162:5 165:20
172:19,24 177:6
183:15 196:21
198:21,22 200:14
210:17 225:1,4
233:25 236:11,14
240:16 249:8
**puts** 61:14 253:14
**putting** 75:15 90:18
128:1 144:3 188:3,9
200:22 215:17,17
249:13
**pved** 221:1
**px** 245:13
**px100** 213:3

**q**

**qs** 190:4
**qualifications** 49:25
50:5
**qualified** 55:3
122:14
**qualifying** 235:19
**quality** 75:4 86:2
**quantifiable** 126:25
**quarter** 128:10
**question** 7:7 18:11
19:16 20:5 22:7
24:11 32:2 38:7
52:16 57:19 64:9
66:5 67:1 71:12
73:3 74:10,22 75:17
80:8,14 82:18 84:7
85:13 86:5 87:3
88:11,13 92:9 96:4
108:21 109:6
110:10 111:1,8,10
115:11 116:18,21
116:24 117:1 119:2
119:6,9 120:6
136:19 139:20
142:10 149:1 154:5
162:4,8,10,11 163:6
163:13 174:18
189:17 193:13,18,23

194:20 195:2
199:16 207:11
210:19,22 211:3
212:12 214:1
215:14 217:25
221:4,19,20,22
228:2 230:15 233:3
233:15 234:8
235:24 240:4
241:18 243:14,24
244:10,15 247:1,12
**questions** 18:22
25:3 65:4 80:9
100:10 103:14
104:3,4 111:13
119:14 160:22,24
163:23 173:3 174:6
175:19 221:25
222:8 225:13
243:20,23
**quibble** 63:25
**quick** 182:12
**quite** 52:18 172:17
231:14,16
**quote** 23:2 26:16,20
28:8 29:2 31:10,17
**quoted** 93:5 201:18
**quoting** 15:6

**r**

**r** 2:1 3:1,23 7:1 49:5
122:8 176:21 256:1
**raise** 48:25 176:16
178:23 179:1,6,10
226:14
**raised** 38:9 227:9
**raises** 37:17
**raising** 179:13,15
228:12
**ran** 58:24,24
**randomly** 59:17
107:20,23
**range** 90:17 96:11
96:21 98:3 114:10
**rata** 93:3
**rate** 18:23,24 19:1
21:5 25:24 26:25
28:7,9 34:20 35:2,7

51:24,25 55:24
61:14,22,23 62:2,3
62:6,9,13 63:1,7
64:5,18 65:2 66:21
68:12,12,14 72:14
72:20 74:7 77:12,13
77:17,20,21 78:3,6
78:9,11,14,20 79:8
79:17 80:1 82:2
83:9,15 87:14,24
90:13 93:4 97:15
98:5 99:7 101:8
107:17 108:24
112:9,11,15 113:14
120:14 129:16,17
129:18 130:25
131:1,10,23,25
132:3,3,14,24 133:1
133:12 135:3
136:10,13,18
137:25 143:8,23,24
145:10,18,19
148:24 149:4,6
155:18 157:18
199:1,2,2 217:11,17
229:25 230:1,4,10
230:16 232:20
233:2,3,16
**rated** 55:17,20,20
96:23 97:22,22 98:3
98:14 100:2 156:24
**rates** 19:1,6,7 26:12
26:17,18 27:17
28:20 29:1,1,5
34:24 39:14 59:15
60:18 61:19 63:4,24
64:7,12,16 65:5,6
65:10,23 75:3,3
86:15,16,19 97:24
113:12 127:7,10
132:10,12 133:3
134:3 149:3 151:7,8
223:8 232:19,22
234:15
**rating** 55:22 97:25
98:1 99:11 115:1,5
132:17,21 133:3,11

184:21
ratings 92:7
rational 80:21
rationale 43:1
  159:4,5
rationally 80:24
rbs 124:9
reach 60:1 139:14
  142:14
read 33:5,13 108:10
  108:20 113:8 116:2
  116:3,5 117:5 119:6
  123:25 124:2
  143:19 174:20,22
  175:4,5 195:9
  205:17 214:24
  236:13 238:25
  252:20
reading 90:11 112:4
  149:10 167:8,9
  174:25 249:19
reads 195:3
ready 36:19 176:1
real 20:16 21:17,21
  21:22 26:20 94:21
  113:21 118:3 120:1
  132:13
realistic 30:6
realized 96:19
  100:6
really 9:14 16:5
  17:13 26:6 37:5,7
  38:5 41:10 51:2
  53:3 62:11 64:3
  72:7 87:4 98:2
  137:11 138:4,22
  139:16,17 146:12
  149:2 155:6 227:18
  246:2
reason 14:5 27:16
  32:20 63:24 131:16
  138:3 159:13
  191:23 225:15
  234:11
reasonable 31:11
  39:25 82:12 191:15

reasonably 13:16
reasons 12:9 13:24
  16:20 159:13
  216:12 235:12
reath 6:7
rebox 121:1
recall 14:14 45:5
  55:9 89:25 106:20
  110:12 208:7
  210:11 226:19
  227:12 236:22
recalled 140:9
receive 21:16 27:7
  27:22 80:10 82:16
  93:10 119:19 129:9
  129:12 132:9 137:8
  150:10 155:14
  162:25 240:6
received 25:17,23
  26:17 27:1 43:2
  82:19 83:2 102:18
  123:14 146:8 214:4
receiving 115:9
  143:17 153:18,23
  154:8
recess 48:15,18,20
  104:22 176:7,9
recession 43:14
recipient 254:3
reciprocal 133:13
recognition 54:12
recognize 99:17
  104:15 146:19
recollect 69:23
  183:20
recollection 69:4
reconvene 104:7
reconvened 48:21
record 22:14 24:17
  24:20 30:14 44:13
  49:3 56:7,12 61:21
  64:10 67:18 69:22
  71:25 72:24 82:11
  85:14,14,15 93:8
  115:22 116:9 117:2
  121:10 122:6 142:2
  176:19 185:20

192:24 256:4
records 190:17
recourse 16:17
recovered 151:17
recoveries 31:13,13
recovery 33:22
  153:15
recross 120:21
red 148:8 151:23,24
  152:14
redeem 28:20
  134:21 139:13
  160:15
redeemable 134:14
redeemed 65:13
  70:1 80:4,11 81:14
  134:9,11
redeeming 221:11
redemption 12:19
  13:19 17:20 23:2
  29:3 34:15 39:13,24
  40:22 58:6 77:23
  78:5 81:7,25 82:23
  93:5 94:6,13,21
  98:6 119:25 172:11
  221:2 223:21
  227:11
redeploy 65:17
  118:17 136:12
redeployed 100:2
  117:18
redirect 47:12
  115:19,20 173:4,7
  255:13,18
reduce 29:18 39:14
  143:6
reduced 156:14
  171:18
reduces 31:12
reduction 143:3,8
  165:21
refer 50:22 58:14
  130:11 131:13
  148:17
reference 10:6
  128:6

referenced 91:25
referred 14:24
  103:17 150:23
  156:15 168:8
  204:12,23
referring 49:11
  50:22 128:20 169:8
  171:19 195:6
  208:19
refinance 69:19
  147:25 216:6,15
  220:9
refinanced 144:19
refinancing 39:12
  39:22 40:21 136:21
  146:23 148:12
  158:24 222:17
  225:15 226:3
reflected 74:8
reflects 62:15
reframe 221:20,22
  233:15
reg 72:7,18,21 83:7
regard 8:23 11:11
  11:13 13:9 15:16
  36:15 37:6 40:5
  47:6
regarding 2:12
  41:14 87:10 105:17
register 72:16
registered 162:18
registration 70:12
  70:15 72:17
regular 251:7
regulated 79:9
reinvest 20:21 29:1
  118:15 132:14
  136:12 145:11
reinvested 150:17
  150:24 152:8
  170:21
reinvesting 96:19
reinvestment 20:19
  21:5 26:15 28:6
  29:3 59:15 60:18
  67:6,11 68:12,14
  81:23 83:7 87:14,23

88:18,24 90:7 91:9
91:18 94:19 97:15
100:1,8 112:9,11,15
113:4,18,24 114:5,9
114:14,17,18
117:22 118:7,11
120:2 136:7,7 137:4
137:6 145:1,12
148:21 170:25
**rejected** 12:20,24
35:18
**relate** 137:25
155:25 234:2
**related** 53:3 70:12
77:1 109:25 212:20
250:9
**relates** 56:23
112:21 173:17
**relating** 23:17,17
75:15 105:25
**relations** 178:24
**relative** 206:15
**relatively** 57:1
188:4 245:22
**release** 59:4 204:14
**released** 204:20
**relevance** 7:22,24
10:23 11:1 18:4
22:17 25:2 33:11
34:10
**relevancy** 31:3
**relevant** 8:20 13:6
13:24 19:16 37:13
39:7,21
**reliability** 31:1
**reliance** 44:8
**relied** 89:8 95:22
101:17 168:11
175:9
**relief** 2:11 17:21
23:10 75:25 191:16
192:1,2 211:18
212:23 214:21,25
215:8
**relies** 20:7 95:20
**rely** 20:7 167:10
175:9 239:24 240:1

**relying** 31:2 95:22
**remain** 48:24 122:2
**remained** 83:5
233:16,17
**remaining** 42:15
**remains** 32:11
**remember** 89:24
139:21 160:14
164:7 169:18,23
174:17
**render** 116:22
**rendered** 61:11
116:23
**renewed** 96:12
**reorganization**
31:23 52:11 203:25
204:8,14
**reorganized** 48:17
**repaid** 34:6,22
69:25 70:4,5,7,9,10
70:11,15 75:12,19
75:22 94:15 119:23
137:21 140:23
148:16 214:16,19
215:18
**repay** 35:3 61:1,4
134:21 160:15
**repaying** 113:1
**repayment** 12:18
34:15 40:2 61:11
65:13,14 66:22,24
67:5,10 70:19 120:3
**repayments** 152:6
**repays** 61:1
**repeat** 127:7
**repeating** 189:11
**repetitions** 8:25
**replace** 35:5
**replacement** 26:21
113:22 118:4
**reply** 17:11 162:2
**report** 7:25 8:8,15
8:17 9:13,23,24
10:1 12:10 20:25
21:1,2,20 25:9,11
27:2,19 29:19 49:11
57:14 58:14,22 59:4

60:8 67:9 68:9,13
76:9 83:19 87:10,12
87:13,19 88:2,20,25
89:9 90:11 95:22,23
100:20 101:2,4,18
102:20,23,25 103:2
103:3,17 106:3
111:18 113:7,8,11
118:2 124:24
146:20 158:22
161:16,19,25 162:5
163:16 168:8
**reports** 8:6 14:4
16:10 18:2 19:4
24:7 89:7 105:13
**represent** 43:10
123:4 148:9 149:16
150:14 180:10,10
201:6 214:11
**representation**
23:15 49:21
**representations**
244:22
**representative**
242:3 244:2,3,5
**representatives**
42:19 43:11
**represented** 16:17
160:25 230:13
**representing**
243:15
**represents** 21:20
25:18 209:12
**request** 42:16 43:1
44:12
**requested** 138:14
**require** 42:13 74:7
175:1
**required** 81:5 88:20
240:13
**requirement** 66:16
233:11
**requires** 31:18
35:10 48:3 77:9
232:16
**rescind** 15:20 17:19
20:4 34:14 38:7

44:5 76:1 119:19
192:3 215:20
239:22 240:22
241:8,13
**rescinded** 158:19
**rescission** 2:12
17:17 37:20 39:2
44:18 108:13,20,22
108:24 109:2,3,5
110:8 158:11,17
160:9,13 162:21
163:10 166:23
168:25 212:22
214:23 239:8
243:21 244:6
250:24 252:23
**research** 124:16
**reserved** 32:9
**residential** 186:6
**resolve** 41:15
**resolved** 13:21
18:10 32:10 33:24
35:21
**resort** 243:3
**respect** 14:7 19:17
44:15 51:14 66:13
78:16 96:17 112:5
118:8 122:15 125:4
129:8 132:17
134:23 143:23,25
154:8 160:23
161:12,13 163:17
172:10 173:11
174:20 175:7
231:22 233:23
239:7 244:7
**respectfully** 32:23
**response** 88:15
**responsibilities**
52:24 53:2 178:22
178:25 179:17
**responsibility** 53:3
126:5 179:7,8
**responsible** 43:20
124:1,10 178:23
**rest** 81:16 184:23

**restricted** 126:19
**restructuring** 14:10
 14:18,22 37:2 53:5
 53:6,8,17 54:2
**restructurings**
 123:5,23
**result** 17:8 58:11,19
 94:19 112:25
 155:14 160:6 220:8
**results** 78:8 144:21
**retail** 185:24 186:3
 186:6
**retire** 130:14
 135:13 138:5
**retired** 145:11
**retirement** 147:19
 155:20
**return** 26:25 28:9
 28:17 34:21 64:3
 120:14 146:22
 147:12,14,15,16,17
 147:20 148:1,15
 156:22 169:21
**returning** 175:24
**returns** 61:16
 169:14
**revealed** 14:8
**review** 107:22
 108:13,21 111:4
 115:25 119:8
 167:22 168:7,21
**reviewed** 106:24
 218:23
**reviewing** 167:3,14
**reviews** 126:5
**reward** 91:12
**reword** 189:17
**richard** 3:7 7:9,10
**richards** 3:9
**rid** 121:21,24
**ridge** 75:16
**right** 7:4 9:2 11:23
 15:20 16:23 17:9,18
 19:10 20:4 22:10
 23:25 24:1 26:1
 27:21 28:15 30:1
 37:19,19,20 38:6

40:13,14 44:5 46:21
48:18,25 50:4,7
57:24 58:15 61:12
62:7 63:9 64:4
70:15,24 71:24 72:8
72:8,18,21 73:11
76:22 82:8,9,10,10
83:5,8 84:2,3 92:24
92:25 93:11,15,16
93:19,24,25 94:1,5
94:6 95:10 97:11
99:16 100:13 103:7
104:5,20 105:9,24
106:9 107:10,24
108:11 110:2 112:7
112:9 113:15,18
114:2,5,12,18
120:19 127:4
129:23 131:22
132:5,6 133:14
134:2 135:6 148:7
148:14 151:13
152:7 153:13 157:1
158:17 160:9
162:21,25 163:10
164:10,11 165:19
165:25 166:1 168:5
168:17 170:3,7
172:1,19,24 176:7
176:16 177:11
178:3,10,16 179:13
179:18,21 180:21
182:19 183:1,4,11
183:21,25 184:4,6,9
184:12,15,17 185:2
185:5,7,9,14,18
186:9,17,22,24
187:6,7,9,13 188:11
188:14,21,25 189:5
189:9 190:2,4,15,18
191:4,12,23 192:4,9
192:13,16,17 193:3
193:19 194:6,9
195:18 196:25
197:9,13,15,16,24
197:25 198:2,5,14
198:17,18 199:3,8

199:22 200:1,3,10
200:12,20 201:21
201:24 202:22
203:8,10,17,19,23
204:1,20,22 205:3
206:3 207:19,22
208:18,20,22,24
209:3,6,12,14,23
210:1,10,18 211:2,5
211:8,13 212:14,25
214:4,13,17,22
215:10,21 216:7,10
216:16,22,25 217:3
217:7,14,20 219:1,6
220:1,6,8,9,17
221:12 222:3 223:4
223:8,13,14 225:16
225:17,20,24 226:5
227:1,11,16,19,22
228:6,9,12,17,22,25
229:8,11,13,17,25
230:2,5,11 231:12
232:6,18,22 233:12
233:18,20 234:1,16
235:7,16 236:2,7,9
236:12 237:6
238:10 239:9,13,22
239:22 240:22,24
241:8,12,14 242:17
244:6,18,25 245:6
245:10 246:13
247:6,10,19,23
248:1,4 249:20
250:1,4,16,24,25
251:4 252:23
253:10
**rights** 70:12 75:16
 192:12 235:25
 236:1
**ring** 184:17,19,20
 184:22
**rise** 7:2 48:22 62:20
 64:7 86:16 104:23
**risk** 20:20,23 21:5
 26:15,15 28:5,6,17
 28:23 29:3,7 41:5
 61:14,17 64:4,5

65:2,12,14 66:24
67:5,6,10,12 81:23
86:13 87:5,14,23,23
88:7,18,24 90:22,22
91:9,11,12,16,18
92:14 94:19 113:4
113:18 114:5 120:2
127:9 131:24,25
132:11,13,16,20
134:6 136:7,7,13,15
136:17 137:5,7,25
138:1 141:16 149:4
158:1 159:8 161:6
161:10,12 162:4,5,6
162:12,20 171:14
172:20 178:25
245:5 246:13 247:6
247:19,22 248:7
250:3,22,23
**risks** 20:19 66:21
 66:21,22,22 133:20
 134:5,17 145:2,13
 148:22 155:25
 245:9 247:9,17
**road** 190:23 256:23
**robbers** 157:18
**role** 122:23 179:20
**roles** 54:3 124:1
**roll** 83:13 200:3
**room** 24:5 128:17
 130:19
**rooms** 254:9
**ropes** 6:1
**rose** 239:17
**ross** 6:4
**rothschild** 6:18
**roughly** 53:18
 59:17 71:5,22 92:20
 100:5 198:23
 199:20 201:2,2
 202:23 203:5,11
 205:9 208:7 209:9
 218:18 220:23
 223:5 226:19
 227:13 231:17
**round** 24:23 33:25
 227:13,14

rounded 76:9,21
rounding 151:9
  202:24 203:1,12
  227:15
row 18:19,20,21
  19:21
rule 33:19 36:20
  43:4,5,6 44:22
  46:16 228:3
ruled 33:9 38:23,25
rules 88:19 212:11
ruling 7:20 8:3
  10:20 11:11 12:10
  13:4 17:10 23:6,25
  25:1,6 31:20 32:8
  32:25 33:20 103:18
run 80:1 92:13
  125:8
running 53:2
runs 99:8 150:13
ryan 3:24

**s**

s 2:2 3:1,18 7:1 49:5
  255:3
s&p 55:18 56:1
s.g. 124:5,7,8
sabin 4:10
sadeghi 4:20
safe 84:25
sake 33:25 101:23
sale 63:22 124:8
sales 249:21
salient 84:15
sample 139:2,3,12
  139:18 168:19
sampled 107:20
sat 124:7 125:25
satisfy 249:23
save 156:18
savings 35:4 216:18
  217:6,16,18 218:3,8
  219:24 220:16,21
  223:25 224:13
  225:15 226:5
saw 211:25
saying 23:14 45:5
  153:1 192:22

205:12 234:19
  239:21 247:16
says 15:21 16:14
  18:5 21:17 28:6
  29:12,16 65:22
  81:12 95:5,7 118:14
  147:15,17 148:8
  149:21 169:13,14
  170:19 182:2 192:1
  192:11 213:15
  242:15,19 252:13
scale 55:18,22,23
  56:1,1
scales 171:15
scc 162:18
scenarios 114:10,14
  114:17 236:19
schedule 16:8 76:22
  135:8,10 139:13
scheduled 21:15
schodek 3:18
scholtz 5:13
school 54:25 105:10
  123:10,12,13,15,19
schwinn 54:6
scope 14:16 15:3
  35:10
screen 76:11,13
  83:11 95:4 107:7,11
  107:16,19 110:22
  168:21,24 249:8,14
screening 59:9,11
screens 58:24
  106:24 107:2,3
  168:14,18,20
search 26:23 58:24
  113:24 118:6
searching 59:19
seat 45:22
seated 7:3 48:23
  104:24 176:10
second 5:2,20 6:2
  15:4 24:23 28:16
  39:22 49:20 56:8
  59:8 60:25 78:6
  99:3 126:25 131:23
  135:17 137:13

139:8 159:3 169:17
  185:4 197:2,18
  198:2,4,7 200:9
  206:24 208:6 216:6
  220:9 223:7 226:3
  248:14 252:7,13,13
secondary 64:7,19
  93:24 94:1 119:10
secondly 8:21 9:20
  20:9 44:6
seconds 201:23
secret 84:12
section 76:25
  151:25 152:2,14
  213:14 238:13,23
  242:8,12 247:6
secured 43:12 59:7
  66:10 67:2,14 84:16
  84:17,21 85:5,5,7,7
  85:17 86:2,3 92:16
  97:9 106:20,25
  107:18 108:14
  164:14 237:17
  249:23,25
securing 249:22
securities 22:13
  26:23 113:24 118:6
  190:5 235:11
security 21:14
  33:18 35:6 69:16
  85:10 104:16
  156:24 172:18
  173:19
see 59:20,22 60:13
  68:13 78:5,6 81:3,5
  83:14 86:22 96:16
  97:15 99:15,17
  114:24 133:23
  140:4 144:11 159:1
  161:23 169:15
  173:24 174:2
  175:15,17 182:1,7
  182:16 196:23,23
  209:17 212:5 221:5
  234:8 242:14,15
  246:13,24,25
  248:23 249:1,7,15

249:18 252:6,12
  254:11
seeing 231:4
seek 14:2,10
seeking 18:14
  223:10 244:7
seeks 20:7
seen 101:24 141:24
  160:20 212:3
selected 59:17
  107:23
sell 43:21 186:5
semi 82:19 128:11
  129:20 130:8 131:7
  197:4
senior 43:12 53:15
  54:19,21 97:12,18
  97:19 114:23
  156:23 173:19
  178:18,22 183:4
  191:6 249:25
sense 21:13 22:22
  22:23 23:23 32:11
  32:23 33:17 34:25
  35:1,1 47:25 59:17
  141:22 159:16
  207:4,8
sent 89:6 109:17
  212:22 214:20
sentence 159:3
  252:13
separate 43:18 44:8
  62:5 96:10 190:14
  190:17 191:14
september 43:5,8
series 26:10 65:4
  80:9 119:14 176:23
seriously 14:21 15:8
  15:9 244:14,16
served 51:6,17
  105:7 124:20
serves 112:15
service 51:10
services 51:1,2,5
set 10:18 11:10 14:1
  16:9 25:13,16 27:1
  29:11 53:10 78:6

79:4 97:13 100:10
125:16 128:10
152:18 156:5 177:1
181:1,1,2,9,15
195:2 223:16
225:23 243:20
245:19
**sets** 27:11 62:9
168:15 177:3,9
**setting** 29:19
**settle** 70:23 203:21
**settled** 71:5 93:9
219:8 228:7
**settlement** 70:22
71:3,10,21 75:8
203:15,20 204:1
226:6,7,15
**settlers** 93:18
**settling** 25:14 76:5
76:6 82:16 93:9
100:13,21 112:21
112:25 222:23
226:18,20,25 227:3
228:5
**seven** 46:9 60:10
62:6 66:2,4,17
69:12 70:13 71:4,9
71:15 72:4 129:25
130:1 153:5,7
216:22 217:12
218:15 249:6,15
**seventeen** 77:25
86:8 218:17
**seventh** 69:1,3
**seventy** 165:9
**share** 212:5
**shareholder** 30:7
**sharing** 159:8
**sheet** 83:23 95:21
167:4,5,10 190:25
191:1 194:13,14
**sherman** 3:15
**shifted** 7:19 17:8
32:6,12
**shore** 4:25
**short** 42:7,17,21,25
44:10 48:15,18

86:16 87:3 104:8
176:7 250:10
**shorter** 86:17
**shortfall** 30:9 137:3
**shorthand** 50:21
**show** 100:7 134:5
150:20 153:6 213:2
**shows** 94:24 96:21
148:2 150:21
152:20 182:13,18
182:21,24
**shut** 37:4
**side** 6:14 36:24 37:5
70:2 125:13,16
141:19,22 154:20
156:14 158:16,16
172:19,24 190:24
190:25 194:13,13
221:11
**sides** 157:8
**signed** 34:8 44:18
**significance** 44:5
**significant** 10:15
25:21 86:9 101:9
109:13 148:19
179:16 230:6
**significantly** 127:8
143:9 149:2
**signs** 151:11
**similar** 17:7 61:16
105:20 117:20
124:1 139:18
150:25 168:13
170:22 183:16
**similarly** 33:14
175:7
**simple** 56:17 68:7
80:13 117:1 129:1
137:2 144:23 148:5
215:17
**simply** 12:5 13:6
22:17 31:9 33:12
47:12 65:21,23 91:9
114:4 121:7 123:2
159:6 163:16
206:25 240:12

**single** 19:23 96:24
97:23 98:3 248:4
**singular** 239:6
**sir** 48:24 104:10
110:24 111:9
120:19 121:12,23
122:2,19 131:5
139:1,15 146:19
163:17 175:21
177:24 178:3,4,6,16
178:20 179:3,11,18
179:19 180:14,17
180:22 181:11,17
181:18 182:9,12,16
182:17 183:22
186:15,18 187:2
191:5,9,24 192:6
193:8,20 194:10
196:9 197:10,23
199:23 202:4,15
203:9,10 205:16
207:20 208:4 213:1
213:4,6,14,23 214:6
216:8,18 218:11,13
218:13,19 221:8
222:2,7,10,14 223:5
223:9,22 224:4
226:6,14,22 227:1,2
228:13,23 229:12
234:21 235:8
237:11,24 238:4,6
238:11,13,19
239:13 240:25
241:9 242:6,14,18
243:11 245:11,15
246:12,14,19 247:4
248:3,5,13,25
251:18 252:3,4,5,10
252:11,21,25
253:18
**sister** 56:13,13
**sit** 194:8,10 253:2
**sitting** 19:21 118:22
**situation** 26:22 65:8
113:23 118:5
212:13

**six** 60:9 62:6 69:1,3
69:11 70:13 71:4,9
71:15 72:4 82:23,24
194:16 199:13,14
199:15 203:6 227:4
249:6
**sixth** 21:25
**size** 168:19
**skip** 251:20
**slam** 37:4
**slice** 92:6,10
**slices** 60:8
**slide** 149:17 208:21
**slight** 151:9
**slightly** 80:7 99:14
139:2,3 145:18
151:7 153:7 168:18
226:20,21 235:19
**small** 70:12 188:4
**smaller** 168:19
181:1 217:13
**smart** 157:4,4
**solely** 2:12 191:8
195:14
**solutions** 256:22
**solvency** 15:7,11,11
30:3 36:21,23
194:21
**solvent** 35:16
160:13 194:23
195:15 199:1
211:14
**somebody** 9:7 37:2
**someone's** 211:25
**somewhat** 17:6 46:7
**sontchi** 2:2 17:3
40:17 75:16
**soon** 245:22
**sophisticated** 33:5
**sorry** 9:5,11 19:19
41:24 57:19 83:7
87:17 99:2 100:16
102:9 103:23
119:24 120:25
140:8 147:10
176:10 178:6
182:23 187:1 188:7

189:12 199:14,16
201:10,15 203:19
205:16 213:11,14
213:18 214:3 217:7
220:13 224:3,24
227:23 229:3 231:2
234:10,22 237:18
243:12 245:3,18
249:13 252:1
**sort** 34:21 38:15
94:24 105:22 125:5
128:3 142:3,3 182:2
208:2
**sought** 69:19
215:19 247:9
**sound** 187:5
**sounds** 187:7 215:1
**source** 58:23
**south** 124:6
**spaced** 248:4
**speak** 18:3,22 19:18
20:5 22:22 110:3
115:8 118:23 166:6
166:10,13 175:1
230:9 231:15
**speaker** 9:3 40:13
63:13 120:24
147:12 181:13
**speaking** 245:1
**speaks** 18:17
**specialty** 54:25
105:10
**specific** 10:6 38:16
38:23 59:21 87:16
87:19 88:2,25
108:20,24 115:9
119:16 143:14
162:15,19 166:22
213:18
**specifically** 9:19
37:9 44:24 45:1
54:22 57:3 167:12
183:12 235:22
**specifics** 87:10
88:23
**specified** 26:18
77:13

**specifies** 112:8,15
**specify** 73:13 77:4
77:17
**spectrum** 117:16
119:9
**speculate** 31:19
192:22
**speculates** 29:23
**spell** 49:2 122:5
176:18
**spend** 50:8 180:8
**spent** 53:23
**spirit** 54:10
**spoke** 25:2 32:18
49:23 174:16
230:12
**spoken** 117:9
166:19 167:20
**spot** 59:16
**spread** 43:19 60:20
60:20,21 68:14 78:8
107:12
**spreadsheet** 89:3
**squibb** 53:20,21
**stable** 84:23
**stack** 155:21
**staff** 243:13
**stakeholder** 31:13
**stakeholders** 31:14
31:24
**stale** 84:25
**stamping** 182:2
**stand** 11:15 18:19
27:11 45:18 47:13
48:24 116:14
121:21 122:2 176:6
231:5
**standard** 10:10
11:4,10 13:7 19:24
26:2,3,5,10 39:19
51:25 55:22 57:1
58:14 59:24 60:3,6
78:21,22,25 79:4
81:23 94:10 106:12
106:15 108:17
139:4 140:1,5 152:9
152:12 153:9

166:18 167:11
168:10 175:11,18
232:11,12 247:5
**standards** 7:23
10:24
**standing** 48:24
122:2
**standpoint** 18:17
29:14 143:22
151:12 158:6 231:9
232:5 233:5 236:5
239:18,19,20
**stands** 124:16
**stang** 5:1
**start** 17:6 37:15
42:5,9,14 80:17
104:9 127:4 161:22
164:4 195:11 207:7
253:11
**started** 53:17
138:21 159:24
**starter** 54:6
**starting** 39:9 58:22
68:5 138:20 204:7
231:23
**starts** 150:2
**state** 37:19 38:5,6
49:2 52:9 84:5
122:5,16 176:18
**stated** 62:23 69:13
72:14 73:15 77:20
93:4 101:16 199:7
**statement** 94:8
157:17 196:12
197:1 202:4
**statements** 23:14
**states** 1:1,17 225:7
**stay** 2:10,12,13
10:25 11:12,19 13:7
16:6,15 17:21 22:20
23:10,25 24:2,19
32:11 34:13 35:9,14
35:17 37:18,25 38:3
38:8 39:4,16 51:15
52:2 75:25 126:19
130:15 191:16
192:2,19 211:19

212:23 214:12,21
214:25 215:9
242:16,23 244:8
**stayed** 84:10
**steal** 225:7
**steering** 44:17,20
**step** 34:11 60:25
73:18 80:18 99:8
135:12 149:14,14
175:21
**stephen** 3:23
**sterling** 3:15
**stick** 152:12
**sticking** 64:13
**stickles** 5:16
**stipulate** 11:16
21:19
**stipulated** 85:2,3,6
85:10
**stop** 150:13 154:24
222:5,6
**stopped** 154:22
**stops** 154:24
**story** 44:16
**straight** 123:21
**strand** 80:14
**strategic** 126:5,10
**strategy** 126:9
**strauss** 4:1
**stray** 37:15
**stream** 21:3,21 57:2
57:6 61:13 66:20
74:2 81:13,15,24
96:15 99:9,17,18,23
102:7 114:11
126:24 131:14,15
131:19 145:5
146:14 154:17
157:1 158:7
**streaming** 81:9
**streams** 82:1
**street** 1:18
**stress** 98:2
**strike** 85:9 87:9
206:23 207:2
**strong** 240:2

**struck** 39:21 170:2
170:6 208:21
**structurally** 54:21
97:19 183:4 184:3
188:24 189:4,4
**structure** 179:25
182:8,11 184:22,23
**structuring** 51:3
**stuck** 132:25
**studied** 193:17
**study** 57:14 58:16
58:20,21 59:6,9,19
65:25 66:8,8,10
92:4,4,12 106:16,18
107:22 143:17
167:25 168:3
175:12
**stuff** 78:21
**sub** 230:24,25
**subject** 17:17 24:1
25:5 37:22 39:11
68:18,21 91:19,20
104:10 175:16
179:5 190:20
203:14 212:22
227:10 228:10
238:9
**subjects** 224:6
**submit** 196:20
**subordinate** 184:4
189:4
**subordinated**
159:24
**subordinates**
193:24
**subsidiary** 55:1
79:9
**substance** 104:11
194:3 240:6 244:4
253:16
**substantial** 85:19
145:17 156:20
172:21 219:9
231:15
**substantially** 67:2
71:12 105:20 172:5
183:6,8 234:15

**subtract** 226:7,12
228:1
**successfully** 131:17
**suddenly** 160:15,16
**suffer** 44:7 145:5
243:5
**suffered** 64:24,25
65:1 94:15,21
118:19
**sufficient** 45:9,10
**suggest** 46:17 227:4
**suggested** 188:19
188:23 189:8,20,25
190:1 194:4 229:25
**suggesting** 242:4
243:9
**suitable** 26:21
113:22 118:4,18
**suite** 256:24
**sullivan** 6:13
**sum** 77:10 78:19
**summarize** 126:16
**summary** 7:17,20
8:3 10:4,20 12:9
13:4,21 16:11 17:9
23:9,24 32:7,10
33:24 35:9,12,19,21
37:22 38:1 126:15
167:10 172:22
**summer** 23:7
150:17 155:20
**sunday** 42:21,22
**super** 26:3 30:3
**supplemental** 8:17
24:7
**supplemented** 43:5
**support** 51:4 53:5
221:10
**suppose** 34:20
**sure** 14:14 50:24
52:6 53:1 55:13
56:25 59:22 61:3
62:12 71:24 72:10
72:23 74:22 77:9
78:11 79:22 92:3
96:6 97:2 99:5,7
101:8 103:8 107:21

109:1 110:6,10
116:17,18 132:19
141:15 143:19
169:24 170:15
174:1 182:7 187:17
189:13 191:20
212:19 217:20
220:18 234:9 246:1
249:9 254:10
**surprise** 16:23
108:17 109:4
**surprised** 101:8
**surrounding**
142:18,24
**survey** 108:1,1,3,12
**suspect** 92:25
**sustained** 85:21,23
240:18
**swaps** 115:15
**sweetheart** 26:7
**switching** 194:12
**sworn** 49:1 122:4
176:17
**symmetry** 134:17
134:19 138:4 156:3
156:3 157:13 159:8
**sympathetic** 22:22
23:23
**sympathy** 40:18
**syndication** 94:1
**system** 185:23

---

**t**

**t** 26:9,12 60:20,22
107:12 112:11
122:8 176:21 255:3
256:1,1
**t30** 79:20,22,25
**t50** 79:19,23 82:3
**tab** 95:7
**table** 36:24 81:4
207:14
**tails** 19:5 29:5
**take** 11:22 14:21
24:6 29:7 31:18
34:11 36:19,20 42:4
42:17,21 45:2 48:15
48:23 72:22 80:12

82:24 83:16 85:13
90:5 92:13 94:3
95:16 101:25 104:6
122:2 127:24
132:13 143:1,3,6
149:1 157:25
175:23 176:2,7
179:4,24 180:2
191:11 195:17
196:1 202:5 211:4
212:6 217:9 218:4,6
221:14 222:18
242:22 244:20
248:2 253:24
**taken** 43:14 83:24
116:1 146:2 200:17
217:17 247:13,14
247:15
**takes** 124:14
**talk** 7:25 8:24 19:14
20:9 21:7,10 29:23
59:22 62:12 84:15
87:22 88:7 119:11
131:22,23 136:6
142:13 144:16
155:7 158:23 159:4
159:12 177:22
196:13 198:20
202:8 204:8 209:1
248:19
**talked** 21:12 41:8
41:22 74:1 92:3,8
96:6,17,23 99:23
106:18 110:13
113:4 126:11 137:5
160:14 164:9
167:25 169:21
172:25 190:21
**talking** 9:7 15:1
39:3 43:22 66:14
70:25 89:17 91:2
92:21 135:15 138:1
140:25 141:4
147:23 148:21
149:22 156:1
168:14 180:8 206:6
209:1 210:9 219:9

229:1,3,4 232:2
236:23
**talks**  21:4 26:14
27:8,16 28:5,25
29:4,13 87:13
**taller**  151:14
**tasked**  126:7
**tax**  212:1,3,4,6,12
**tc**  186:13
**tceh**  4:18,23 6:19
56:14 68:2 178:15
178:20 179:13,24
182:18 183:10,24
183:24 184:24
185:9 186:2,3,16,19
186:22 187:11,16
188:13 189:8,20,20
190:1,1,10,14
203:15,21,22
206:12 209:11
231:10,14,24
**tch**  231:17
**team**  106:19,25
107:20 115:24
116:10 212:6
220:22 239:23,24
239:25 251:6
**technically**  30:1
**teglevich**  47:3
**teglevich's**  247:14
**telecom**  54:10
**telephone**  9:9 44:23
45:5
**tell**  45:2 125:4,14
131:5 138:13
144:12 146:21
152:19 156:11
181:10,21 200:25
204:3 205:14 218:8
233:13 242:10
246:10 248:9
249:19 252:2
**telling**  40:11 59:17
**tells**  44:15 144:14
**ten**  43:12 53:23
62:4,14,21 63:1,8
64:2,3 65:15 67:19

68:17,20 69:11
70:11 71:19 72:3,6
72:20,21,24 73:4
92:22 102:8 140:19
143:23 144:7
148:13 162:15,19
166:7,14 167:1,13
167:21 238:8
239:12 245:25
246:16,17 247:17
250:13,17 251:15
**tender**  50:7 109:17
**tendered**  71:12
**tendering**  50:2
**tenor**  87:5 97:5
98:6
**tens**  60:11 62:11
71:6 72:5,10 130:1
**tenure**  57:4
**term**  30:1 55:11,15
56:23 57:1,22 62:10
67:4,5 70:3 72:6
76:24 83:22 86:15
86:16 137:18 167:4
167:5,10 179:16
184:20,21,25
229:10,24 230:16
234:20 236:11,24
244:11
**terms**  13:1 17:13
24:12 25:4 27:3
29:10 54:12 55:25
57:9,14 59:15,18
63:9 65:1 67:8 76:2
77:19 80:24 89:4
90:13 91:23 98:14
99:16 106:11,14,24
108:4,17,24 109:7
110:8 111:6 113:14
130:9 131:5,6
143:21 153:18
157:7 158:3 165:12
165:20 169:21
172:22,22 175:18
179:21 193:24
206:19 228:24
229:7 230:18

233:16,25 234:3,24
236:9,15,20
**terrible**  237:25
**testified**  16:16 20:2
54:23 67:14 75:6
78:10 81:18 91:21
100:11,15 101:22
105:6 106:5 109:4,9
111:17 116:20
117:23 166:22
197:5 223:24
228:10 232:11
**testifies**  20:17
101:25
**testify**  8:5 9:17,20
10:9,11,15 12:8
19:10 20:24 21:22
24:15,22 28:19
30:18 33:17 44:1,4
55:4 88:17 125:2
**testifying**  89:11
221:17 231:8
**testimony**  7:14,24
8:7,9 14:10 16:25
21:19 22:13 24:10
25:8 26:8,24 30:3
30:16 32:16 33:14
34:19 36:11,22
37:17 39:11 40:4
41:14,14,20 42:4
51:4 53:6 55:6,8
88:9 99:18 104:12
106:21 118:25
164:7 167:17
169:23 175:15
181:24 192:25
211:25 224:10
230:19 236:13
253:16
**texas**  185:23,25
**thank**  17:1 32:3
48:19 49:6,7 50:10
50:11 95:14 96:2
99:3 103:12 104:2
113:10 115:19
120:19,25 121:1,4
122:9 163:22

169:11 171:21
175:19,21,22,25
176:22 177:15
210:5 213:7 225:8
231:6,6 237:24
246:8 253:10
254:12,13
**that'll**  41:18
**that's**  34:6,7,16,18
35:18 36:6 44:12
45:14 47:3,16,19
50:4 58:15 62:13
63:25 71:13 168:2,6
170:12,25 171:7,18
171:23 172:5,13
204:23 205:2,4,17
205:19 206:3,18
207:14,14,23,23
209:4,7,10 224:19
224:21 225:16,25
227:6,17,23,23
228:18 229:9 232:1
233:14
**theoretical**  141:25
153:1
**theoretically**  74:5
80:15 90:14,20,23
**thereon**  252:24
**there'll**  34:19 36:11
**there's**  33:19 34:25
45:23 56:6,12 57:15
59:3 63:20 69:1
70:12 168:10
209:21 211:20
231:16 233:22
**thesis**  18:7
**they're**  44:11
211:14
**thin**  192:13
**thing**  29:22 30:20
35:11 48:9 83:24
128:7 134:8 140:4
171:25 189:14
194:11
**things**  20:16 23:19
38:13 47:8 50:1
64:16 65:19 108:18

150:21 168:17
175:3 188:4 210:15
230:2 232:2
**think** 8:25 11:25
13:9 15:8,12 16:22
17:8 18:21 19:14
23:24 24:18 29:25
30:3,5,7,10 31:25
35:12 36:6 37:12,18
38:2,4,5,8,13,16
39:6,15 40:11 41:6
42:15 46:4,12 47:25
49:24 54:12 56:6,12
57:1,19,20 58:14
60:11 61:20 62:1
64:9,14 68:24 69:10
69:15,24 71:10,11
75:6,16 76:10 78:10
79:7 82:12,21 83:18
83:22 84:11,25
88:14 90:3,15 91:1
91:22 95:6,8 96:4
97:16 103:1,6
106:24 111:10,24
113:6 114:7 116:20
117:2,8,11,12 119:1
120:5,16 135:21
138:15 139:3
146:16 154:20
156:3 157:4,9,20
158:2,9,20 159:13
159:21 160:2,3,21
161:18,23 162:15
164:15,25 165:22
169:24 170:12
173:17,20 174:13
175:14 176:5 179:9
180:25 181:2,3,8,12
181:21,22 182:13
182:18 185:16
187:3 188:3 189:1
190:11 193:22
194:25 196:15
198:10,19 199:20
201:17,18 202:18
203:12 204:12,13
204:17 207:23,23

207:24 208:12
209:15 210:15
214:24,25 217:15
217:23 218:5,15
219:6,20 223:24
227:6,7,18,21
228:20 229:24
230:6,23 232:10,11
234:2,3 235:1,5,6
235:17,23 236:13
237:12 241:23
245:1 246:20,22
249:19 251:11
**thinking** 236:24
**thinks** 25:3,4
**third** 18:19 20:19
39:12,12 59:8 71:22
146:16 151:13
170:15 202:20
203:4 205:8 207:18
209:25 238:22
**thirdly** 10:8
**thirds** 71:23 209:12
209:20 210:3,12
**thought** 20:6 22:15
23:14 34:3,3,6
41:10 119:1 143:20
147:20 162:6
165:24 191:20
201:25 203:7
208:21 209:21
213:11 230:15
236:12 237:20
239:13 241:22
247:10,19
**three** 7:18 10:19
13:12,13 30:12 32:9
39:10 40:20,21
41:20 42:1,2,3,5
46:5,5,11 49:25
51:2,5 53:4,19
71:19 103:21
126:19 131:8,12
156:16 171:23
177:9 190:14
202:24 203:2 209:2
210:3 223:16

230:12 235:6,9
236:17 237:13
241:4 249:5 251:10
**ticket** 91:6,13
**tied** 45:10 98:2
129:19
**till** 84:10 104:20
**time** 13:2 25:6
27:17 28:19 34:3,25
37:3 42:9,18 43:3
43:16,18 45:23,24
47:2 50:8 52:6
54:24 58:12 61:5
65:22 68:7 69:13
73:18 74:6,15 78:7
80:25 86:16,20 88:4
94:20 111:22
116:25 118:19
123:19 124:21
128:11 129:10
131:3,10 132:1
138:13 140:23
144:15 145:6
148:22 149:5,18
154:17 157:7
159:22 164:24
165:7,10 171:8
180:8 188:15
195:13 202:3
231:10 236:6,22
239:11,15 240:7,25
242:21,24 244:2,11
247:10 251:4
**timeframe** 78:1
**timely** 42:6
**times** 54:25 67:5
82:24 224:16
225:19
**tired** 237:21
**title** 95:7,8 133:19
169:11 242:16
**today** 8:22 11:11
14:16 18:3,4,5
20:25 21:6 24:8,18
25:1 39:3,8 46:18
51:14,20 57:8,25
58:8 63:5,7 84:10

105:21 106:6,13
116:15,23 124:19
126:16,18 131:17
139:1 149:22 169:6
192:25 194:10,15
197:5,24 199:17
204:22 205:1 208:5
209:11 210:16
212:23 215:25
230:19 231:8 253:2
**today's** 10:24 15:10
**today's** 37:13 179:5
**toggle** 60:18
**toggles** 59:22,24
60:2 108:4
**told** 14:7 27:21 44:4
139:19 174:9 184:2
209:21 237:12
241:23
**tomorrow** 42:6
253:12,19 254:11
**tony** 244:1
**top** 81:4 96:16
149:10 199:6
203:11 205:18
208:15 252:13
**topic** 240:25 241:1
**topics** 37:11
**total** 46:9 76:8
81:13 99:18 152:23
201:2,5 204:5
205:11 209:22
226:25 227:10
**totality** 17:23
**totally** 74:19 219:20
**touching** 131:24
**touché** 197:20,20
**touted** 223:11
**tracey** 2:25
**track** 90:24
**trade** 19:9 64:19
143:10,22 144:4,8
157:3,4,4,21 165:19
165:23 171:6 172:2
174:7,8 228:16
**traded** 144:7
157:19 163:21

**traders** 124:17
**trades** 168:11
**trading** 64:17 89:8
89:9,9 91:2 93:6
94:2 124:17 144:11
144:11 157:19
165:6,9,25 171:8
235:11,12
**traditionally** 141:1
**transaction** 18:16
19:5 21:10 27:10
32:20 41:18 67:22
125:8 141:22
157:22 166:15
230:13
**transactions** 125:9
125:12 134:6 161:1
239:23 241:10
251:5
**transcribed** 2:24
**transcriber** 256:8
**transcript** 110:17
177:2 256:3
**transcripts** 117:5
**transmission**
185:22
**transmits** 185:24
**trash** 254:6
**treasurer** 98:19
178:15,16,22
179:23 189:6 201:9
201:11 241:6
**treasuries** 77:14,15
78:15 90:19
**treasury** 60:19,21
68:15 77:17,20 78:1
78:2,3,6,7
**treat** 16:3
**treated** 101:23
**treatises** 79:1
**trenches** 164:15,17
**trial** 14:8,13 15:6
15:18,20 16:2 24:18
31:10 52:2 194:23
**trials** 101:23
**tried** 89:4 228:16

**triggered** 240:23
**triple** 55:18 115:2
**true** 8:12 23:20
130:22 165:12
197:1 256:4
**truly** 254:8
**trust** 1:8 2:8 180:10
250:18
**trustee** 1:9 2:9 5:2,7
5:14,20 6:2 7:19
8:4,14 11:9,20 14:2
14:9 15:5,13,18
17:5 42:16 43:4
44:4 46:25 51:11,11
51:13 53:8 180:11
239:2 243:5,23,24
244:3 252:16
**trustee's** 12:25
31:12
**try** 8:24 32:9 70:1,5
77:22 104:6 156:18
196:22 197:15
222:8 224:23
228:15 243:24
250:10
**trying** 90:17 127:24
143:20 146:1
172:16 173:18
201:12,14 204:24
209:17 221:2,9
224:20 228:21
229:22 234:19
245:24
**tuesday** 14:15 15:8
**tune** 188:14
**turn** 8:24 95:3 99:3
103:13 111:25
112:3 171:11
180:20 182:1,5,15
196:23 228:9 237:9
238:13,22 242:7
245:13 246:10,23
248:9 251:19,24,25
**turnaround** 52:10
**turned** 91:25
**turns** 183:16

**twelve** 199:8,11
251:16
**twice** 47:14
**two** 7:8,8 8:19
10:19 12:7 23:3,15
23:18 24:4 38:4
39:11,17 40:20
42:17,18,21,25
44:15 46:11 49:9,17
51:4 58:11 62:11
68:19,19 71:23
72:11 78:1,4 81:15
82:19 90:19 92:20
92:22 96:23 97:21
98:8,9 101:7,12
134:1 135:16 143:9
148:19 150:21,21
151:11 164:15
169:13 172:7 179:1
180:11,15 199:20
203:6 209:12,20
210:3,12 217:2
219:17 245:20
249:5
**tying** 37:13
**type** 105:20 127:16
154:16 239:23
**types** 127:15 128:13
130:12,17 152:11
155:2
**typical** 29:8 61:21
62:1,2 69:15 73:17
86:15 129:25 143:2
**typically** 57:8
129:15 170:5
232:24

**u**

**u.s.** 2:3 58:25 59:7
60:15
**ubs** 124:8
**uh** 133:21 135:1
202:11
**ultimate** 30:11
106:16
**ultimately** 47:22
80:9 124:9 129:4
165:24 170:1 186:7

204:9 206:21 215:8
**umb** 4:2
**unbalanced** 156:2
158:1
**uncollateralized**
172:8
**uncommon** 66:7
**underlying** 27:11
41:18 128:14
**understand** 14:12
16:1 30:1,4 31:9
39:25 50:22 55:15
58:2 63:18,22 71:23
72:2,18 82:12 85:3
88:19 103:18
104:13 127:6
137:11 147:1
164:12 167:17
170:15 180:9,19
186:11 191:6
197:17 198:24
202:19 208:17
211:21 212:19
221:9 222:14
224:10,22 225:11
241:6
**understandable**
244:9
**understanding**
56:22 89:20,21
135:18 162:3 167:6
173:9 186:13,15,17
190:7 193:10,11,12
193:14 194:17
211:22 232:1 251:1
**understands** 228:20
**understood** 20:3
22:8,9,11 23:17
74:16 230:8,9 233:4
235:24 236:4,6
240:21 241:6
253:20
**underwriter's**
239:25 251:8
**underwriters**
236:15 239:24
251:17

**undisclosed** 8:22
15:15 16:5
**undisputed** 195:20
196:4
**unenforceable**
236:12,25 239:22
241:25 242:5 244:8
**unexpectedly**
136:11
**unfair** 14:6
**unfortunately**
42:12 104:8
**unidentified** 9:3
40:13 63:13 120:24
147:12 181:13
**unimportant** 11:6
**unique** 78:15
**united** 1:1,17 225:7
**universally** 129:17
**university** 123:11
123:13
**unlimited** 141:7
**unnecessary** 117:4
**unregulated** 186:3
**unsecured** 54:7
56:8 84:16 96:25
97:12 114:23
164:13,17 170:17
172:6 198:20
**unsympathetic**
22:24 23:22
**unusual** 143:24
144:1
**unwilling** 33:4
**upright** 97:3,17
**uprights** 98:8
**upside** 91:10
**use** 45:15,25 50:21
67:8 70:2 76:24
77:19 91:4 97:24
99:13 103:24 107:2
119:24 168:21
179:16 184:21,25
188:19 208:16
210:13 226:3
227:19 244:10

**uses** 27:3 55:25
**usually** 42:13
140:10 167:9,11
**usury** 242:16,23
**utilities** 86:23,24
**utility** 28:13 79:9
84:21,25 86:3 99:14
143:14 156:24
**utter** 19:13
**utterly** 14:6 44:9

**v**

**v** 1:11
**valuable** 141:18
160:18 234:6
**valuation** 51:5 53:6
**value** 21:21 31:12
64:7 77:12 78:14
82:3,5 131:20
139:20 140:2
141:16,19 142:3
143:15 165:12
172:9 173:1 206:10
206:12,19 210:16
210:18 211:8
**valued** 81:25
139:24
**values** 77:11 78:20
**valuing** 131:21
140:22
**vanderbilt** 123:11
126:1
**variable** 144:5
**various** 108:2
119:16 126:9,13
134:3 179:25
182:11
**vary** 129:22
**vast** 171:2 231:17
**vehicle** 88:2 106:8
114:18 118:24
125:22
**vehicles** 87:11 88:4
118:9
**venable** 4:6
**verify** 190:11
201:17

**veritable** 44:19
**veritext** 256:22
**versus** 27:6 63:25
92:21 206:15
217:16
**vice** 178:18,22
**view** 13:14 80:22
87:1 98:13,22
125:22 158:14
221:18 234:25,25
243:17 251:4
**viewed** 229:16
232:11
**views** 12:11
**virtually** 109:5
**vision** 248:18
**voir** 50:3
**volume** 181:4,5,12
181:15
**voluntary** 218:3
**vouch** 104:16

**w**

**w** 3:24
**waiting** 118:23
213:25 214:1
**waive** 239:2 241:7
252:17
**waives** 243:2
**walk** 93:14,22
96:13 97:2 149:13
225:12
**walked** 21:11
**walking** 30:12
**wall** 151:10
**wandering** 225:2
**want** 7:8,13,25 9:11
24:19 29:24 30:2,13
32:2 33:17 34:12,12
35:20 36:2,22 37:5
42:9 45:15,25 48:9
49:22 63:10 72:23
80:8 82:16 85:14,15
100:10 103:8
116:18 134:12
159:19 164:4 170:9
170:14 180:8
187:16 190:22,22

190:23 194:2
206:18 209:1
210:15 212:19
213:2 222:5,6
225:12 227:15
231:8 233:1 236:23
240:4,5 244:20
245:12 249:4
251:13
**wanted** 14:16 24:21
31:3 134:20,22
141:5,12 151:15
191:20 210:24
249:14
**wants** 32:1 47:23
56:16 134:9 195:1
**warburg** 124:5,7,8
**warhill** 125:19
**wasn't** 36:10 41:7
43:24 210:20,23
230:6
**water** 254:6
**waterfall** 29:24
30:5,11
**waterfalls** 14:11,18
14:22
**way** 9:23 13:17
18:18,25 25:12
33:13 47:7,12 59:14
65:3 73:2 77:2,15
80:3,8 82:13 89:3
91:22 94:10 106:11
109:1 110:10
117:20,20 124:22
138:16 140:1
141:17,17 150:4
153:13 154:5
155:15 159:18
160:14,16,19
196:24 218:5 219:6
222:13 228:3
230:19 231:3
232:10 234:3,8,18
242:4 247:25 249:4
**ways** 132:2 204:25
**we've** 14:7 28:14
80:16 92:8 96:22

99:23 146:15
185:16 190:21
191:10 195:20
212:3
**wednesday** 42:17
43:3 44:1
**week** 16:2 42:14
**welcome** 7:12 17:2
**wended** 36:16
**went** 17:13 33:4
34:5 65:3 94:25
114:11 123:12,21
124:18 143:10
149:3 150:3,6 223:1
230:5 251:15
**weren't** 43:1 174:10
210:21
**west** 125:17
**we'd** 42:23 47:14
**we'll** 34:21 37:3
42:5,6 48:16,18
59:22 62:12 176:7
**we're** 33:7 36:1,14
39:2,7 43:22 48:6
48:14,15 50:8 63:4
63:5,6 66:14 176:5
206:6,17 208:23
209:1 210:9 211:13
211:14 224:25
225:1 226:16
**we've** 36:12 43:14
57:15 66:19 180:25
224:21
**wharton** 123:13,15
123:19,21
**whatsoever** 15:11
88:2 193:1 242:22
**what's** 34:9 45:11
61:11 65:20
**whichever** 218:15
**white** 4:22
**wholes** 12:11 18:6
20:23 31:20 38:15
54:16 59:14,14,21
79:13 92:9 135:21
137:25 138:3,12
139:23 172:9

**200**:17,23 201:22
**who's** 43:20 176:4
**wildly** 85:7,13
**williams** 2:25
**willing** 11:15 12:2
36:1 134:18
**wilmer** 5:6 17:4
115:23 121:14
**wilmington** 1:19
**win** 19:5 29:5
**wind** 245:24
**windfall** 22:16
137:8,10
**wish** 87:21
**withdraw** 142:10
163:13 216:9
**withdrew** 216:6
**witness** 14:13 20:2
40:10 45:18 46:13
47:8,13 48:8,13
49:1,4,7 51:17
70:20 88:11,12,13
89:20 101:25 103:6
103:11,14 104:13
105:7 111:14 121:1
121:4,15,21 122:4,7
124:20 154:13
159:19,21 161:21
169:7,9 173:17
175:22 176:2,12,13
176:17,20 177:24
178:6 181:16,18
195:2 205:2 213:23
213:25 217:20
221:16 222:2,7,10
222:14 226:14
231:9 240:16 253:6
253:9,18,20,23,25
**witnesses** 14:3
19:20 24:10,24
45:15,24 46:2,10,12
46:16 115:25 117:6
177:10 230:20
232:11 235:23
255:8
**wofford** 6:5

**wonderful** 253:14
**wondering** 23:9
**won't** 42:14
**word** 70:1 76:23
85:13 119:24
132:22 248:2
249:17
**words** 13:17 15:5
19:13 43:11 75:6
76:16 99:11 249:6
249:16
**work** 10:7 16:5 42:3
46:17 53:4 106:23
123:21,25 124:9
126:4 156:10
166:20,21 191:6
222:13
**working** 10:5 53:13
53:14 161:5
**works** 46:15 77:8
239:23 240:3
**world** 57:4 58:24
62:1 63:5 91:8,17
156:25 160:18
**worries** 197:23
**worry** 248:20
**worse** 132:25
**worst** 197:1
**worth** 64:8 101:7
141:14 234:7
**wouldn't** 170:1
174:15 231:13
**write** 113:11
**writing** 34:8
**written** 22:20,21
239:1
**wrong** 35:20 65:3
181:9 203:7

**x**

**x** 45:2 255:1,3

**y**

**y** 122:8
**yeah** 7:15 40:13
41:25 46:1 47:16
119:5 120:21 140:8
149:20 151:24

154:20 157:25
159:20 162:10
169:24 174:12
179:9 195:19 202:3
207:23 210:21
211:13 224:12
230:6,18 232:1
238:6 240:18
242:12
**year** 62:16,16,20
77:24 78:1,1,6
82:20,21 145:11
146:23 147:19
178:3 200:1 223:12
223:18 226:4
**years** 29:16 40:17
52:21 53:19,23
64:11 66:2 69:2
77:21 82:23 84:11
101:7 120:9 123:1
125:25 129:25
130:2 131:8 134:11
136:11 150:12
155:18 156:17
160:3 171:23
175:12
**yellow** 76:15
**yield** 19:8,17 20:11
20:23 26:11 27:4,5
27:12,22 29:9 39:20
55:11,16 56:3,5,9
56:11,14,19,24,25
58:13 60:4,7 61:22
61:25 64:20 65:21
66:9,12,13,18,25
67:2 68:1 69:15
78:23 84:5 86:17,23
87:2 89:19 91:14
92:11,16,19 93:6
94:8,10,12 97:4,4
97:14,16 106:7
118:6 120:9,16
123:7 124:12,13,18
125:5,10,11,12,15
125:18,21 126:3,4,5
126:9 127:5,5,11,13
127:21,25 128:20

128:22 129:2,15,24
130:5,22 131:12,16
131:20,25 132:6,16
132:23 134:6,8,13
135:22 138:9,19
139:11,18,20,23
140:2,4,5,7,13,22
141:1,3,11 146:23
147:22 154:9 155:3
156:4 159:24 161:1
179:4,11 230:21,24
231:10,22 232:12
**yielding**   26:23
  113:24
**yields**   89:9,19 92:7
  99:14 144:24
**york**   3:16,21 52:9
  53:16
**you'd**   176:3 206:4
  231:13
**you'll**   50:22 181:8
**you're**   32:24 58:9
  68:23 69:18 70:25
  170:21 177:22
  178:18 179:24
  180:2,5 181:10
  205:15,21 207:18
  225:2 228:11 229:1
  232:23 233:1
**you've**   64:11 67:13
  179:12 222:4,5

**z**

**zero**   149:3
**zeroes**   197:15
**ziehl**   5:1
**zing**   254:3