```
 1   UNITED STATES BANKRUPTCY COURT
 2   DISTRICT OF DELAWARE
 3
 4
 5   In re:                        :
                                   :    Chapter 11
 6   ENERGY FUTURE HOLDINGS        :
     CORP., et al.,                :    Case No. 14-10979(CSS)
 7                                 :
             Debtors.             :    (Jointly Administered)
 8   _____ :
     DELAWARE TRUST COMPANY as     :
 9   INDENTURE TRUSTEE,            :
                                   :
10            Plaintiff,           :
                                   :    Adversary Proceeding
11       v.                        :    No. 14-50363(CSS)
                                   :
12   ENERGY FUTURE INTERMEDIATE    :
     HOLDING COMPANY LLC and EFIH  :
13   FINANCE INC.,                 :
                                   :
14            Defendants.          :
     _____ :
15
16
17
                        United States Bankruptcy Court
18
                        824 North Market Street
19
                        Wilmington, Delaware
20
21
22
                        April 21, 2015
23
                        10:00 AM
24
25
```

1    B E F O R E :

2    HON CHRISTOPHER S. SONTCHI

3    U.S. BANKRUPTCY JUDGE

4

5    ECR OPERATOR:  LESLIE MURIN

6

7

8    HEARING RE:  Joint Motion of CSC Trust Company of Delaware,

9    as Indenture Trustee, and Certain EFIH 10% First Lien

10   Noteholders, for Confirmation that the Automatic Stay Does

11   Not Apply or, Alternatively, for Limited Relief from the

12   Automatic Stay, solely regarding rescission of Acceleration

13   [D.I. 473; filed May 15, 2014] the "Stay-Applicability

14   Motion")-

15

16

17

18

19

20

21

22

23

24   Transcribed by:  Melissa A. Looney, William Garling, Lynne

25   Blanchette, Tracey Williams, Pamela Skaw.

1   A P P E A R A N C E S :

2   KIRKLAND & ELLIS

3         Attorney for the Debtors

4

5   BY:  ANDY MCGAAN, ESQ.

6         MIKE ESSER, ESQ.

7         RICHARD HOWELL, ESQ.

8         MICHAEL SLADE, ESQ.

9

10  RICHARDS, LAYTON & FINGER

11        Attorneys for the Debtors

12

13  BY:  DAN DEFRANCESCHI, ESQ.

14        JASON MADRON, ESQ.

15

16  SHERMAN & STERLING

17        Attorney for Deutsche Bank New York

18

19  BY:  NED S. SCHODEK, ESQ.

20

21  POTTER ANDERSON CARROON LLP

22        Attorney for Deutsche Bank New York

23

24  BY:  R. STEPHEN MCNEILL, ESQ.

25        JEREMY W. RYAN, ESQ.

1    AKIN GUMP STRAUSS HAUER & FELD

2         Attorney for UMB Bank

3

4    BY: CHRISTOPHER CARTY, ESQ.

5

6    VENABLE

7         Attorney for PIMCO

8

9    BY:  JAMES EDMONSON, ESQ.

10        JEFFREY SABIN, ESQ.

11

12   MORGAN LEWIS

13        Attorney for PIMCO

14

15   BY:  JULIA FROST-DAVIES, ESQ.

16        PATRICK STRAWBRIDGE, ESQ.

17

18   MORRISON & FOERSTER

19        Attorney for TCEH Committee

20

21   BY:  KAYVAN SADEGHI, ESQ.

22

23

24

25

1   PACHULSKI STANG ZIEHL & JONES

2         Attorney for EFIH Second Lien Indenture Trustee

3

4   BY:  LAURA DAVIS JONES, ESQ.

5

6   WILMER HALE

7         Attorney for EFIH First Lien Indenture Trustee

8

9   BY:  PHILIP ANKER, ESQ.

10         CHARLES PLATT, ESQ.

11         DAVID GRINGER, ESQ.

12         ISLEY GOSTIN, ESQ.

13         JOEL MILLAR, ESQ.

14

15   COLE SCHOLTZ

16         Attorney for EFIH First Lien Indenture Trustee

17

18   BY:  KATE STICKLES, ESQ.

19         NORMAN PERNICK, ESQ.

20

21

22

23

24

25

 1   KRAMER LEVIN

 2        Attorney for EFIH Second Lien Indenture Trustee

 3

 4   BY:  JOSHUA BRODY, ESQ.

 5        GREG HOROWITZ, ESQ.

 6        ALICE BYOWITZ, ESQ.

 7

 8   ROPES & GRAY

 9        Attorney for EFIH Second Lien Indenture Trustee

10

11   BY:  ROSS MARTIN, ESQ.

12        KEITH WOFFORD, ESQ.

13

14   DRINKER BIDDLE & REATH

15        Attorney for Citibank DIP Agent

16

17   BY:  HOWARD A. COHEN, ESQ.

18        JAMES MILLER, ESQ.

19

20   SULLIVAN & CROMWELL

21        Attorney for E Side Committee

22

23   BY:  BRIAN GLUECKSTEIN, ESQ.

24

25

1    MONTGOMERY MCCRACKEN

2         Attorney for EFH Committee

3

4    BY:  MARK FINK, ESQ.

5

6    YOUNG CONAWAY

7         Attorney for the Ad Hoc Committee of

8         TCEH First Lien Creditors

9

10   BY:  PAULINE K. MORGAN ESQ.

11

12   POLSINELLI, PC

13        Attorney for TCEH

14

15   BY:  SHANTI KATONA, ESQ.

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              THE CLERK:  All rise.

3              THE COURT:  Please be seated.  Anything we need to

4        discuss before we start?

5              MR. ANKER:  Yes, Your Honor.  Just a -- Philip

6        Anker Wilmer Cutler Pickering Hale and Dorr for the trustee.

7        Just a few housekeeping matters I wanted to raise with the

8        Court.

9              First, before we pass the witness on Mr. Horton, I

10       wanted to -- and therefore otherwise, I would have to

11       examine him on authenticity of exhibits -- we have entered

12       into, I believe, a stipulation with the debtors with EFIH

13       that while it reserves its right to make relevancy

14       objections we propose to put into evidence, 99 percent of

15       which are set forth in the joint pretrial order -- there's

16       going to be one or two others.

17             And we, obviously, before the close of this trial

18       need to figure out a time and date for that to happen for us

19       to respond, unless we can work it out overnight.  They are

20       prepared to stipulate to the authenticity of those exhibits

21       and so I don't need to waste the Court's time and everyone

22       in this courtroom examining Mr. Horton with respect to

23       authenticity.

24             And I would simply like to get that on the record

25       and make sure that my understanding of our agreement is

1    correct.

2              MR. MCGAAN:  Good morning, Your Honor.  Andrew

3    McGaan for the debtors.  I see it slightly differently, but

4    I think we're trying to get to the same place.

5              We have a list -- proposed exhibit list from the

6    trustee of about 120, maybe 140 exhibits.  I think so far,

7    three have been put in, in this hearing.  So there's some

8    overkill going on here, but that's neither here nor there.

9    We've been through it.

10             I've told Mr. Anker I'll give him a list of those

11   that we object to on relevance grounds.  We're not objecting

12   to the authenticity other than relevance.  We're not

13   objecting to the foundation for admissibility of documents

14   out of EFIH files or EFH's files for that matter, the

15   debtors' files.  And that's a good bit of what's on this

16   list.

17             So I will get him a list of what we object to on

18   relevance grounds, something on the order of half of this,

19   we believe goes to issues that Your Honor said you're not

20   dealing with at this hearing.  So that will have to get

21   worked out and we'll talk, I suppose, tonight about that to

22   try to do it.

23             There's some -- there may be a very small number

24   on his list for which we do have a hearsay or authenticity

25   problem because they come neither from the trustee's files

1    or ours.  There's some media reports.  The extra witness

2    reports, I think are on the list and Your Honor ruled that

3    those wouldn't come into evidence already.  So we've got to

4    sort out some of the dogs and cats, but the big problem is a

5    chunk of them we take the position aren't relevant.  There's

6    a large chunk that we have no objection to.  We'll get them

7    a list today, even this morning and I think probably tonight

8    work it out and see whether we have to take more time with

9    the Court at all to referee that.

10                THE COURT:  Right.

11                MR. MCGAAN:  The witness issue that Mr. Anker is

12    referring to will not be a problem because if we end up

13    having to be here tomorrow, Mr. Horton will be here so we

14    don't have to hold him on the stand.  We can get through

15    other witnesses.

16                We won't take the position that if they've passed

17    the witness and we've moved on, they couldn't recall if they

18    had to, to lay a foundation.

19                THE COURT:  Okay.

20                MR. MCGAAN:  I don't think that would happen.

21                MR. ANKER:  Your Honor, that seems acceptable to

22    us and something we can work out with Mr. McGaan.  I will

23    say that if there are relevancy objections, we probably need

24    to have them resolved prior to the time we rest our case,

25    because I'd otherwise seek to lay a foundation with

1    witnesses.  I hope this evening we can lay a predicate.

2            I mean, by way of example, we have put in -- and I

3    didn't want to examine the witness about every such

4    document, every indenture throughout the capital structure

5    to show that in fact, it is right that the substantially the

6    same optional redemption, make-whole provision appears.

7            We can have an argument about relevancy.  I really

8    hope we can work this out as professionals tonight and not

9    bother the Court, but I do think we're going to have to --

10   if we can't get it resolved before we close our case, but I

11   will pledge that we will do everything we can to resolve it

12   this evening.

13           THE COURT:  All right.

14           MR. ANKER:  Secondly, Your Honor, you may recall

15   that I examined or asked a question of Mr. Horton about

16   whether were the make-whole claim to be allowed were relief

17   from stay granted, would that generate net operating losses

18   for the debtors and Mr. Horton said he didn't know.

19           There is a document which was given to us by the

20   debtors, prepared by the debtors' professionals and given to

21   other constituencies on a confidential basis.  I have

22   approached Mr. McGaan and I think we've worked something out

23   on it.  A redacted version of this document will be provided

24   to the Court.  It will be Plaintiff's Exhibit 141.  It is

25   dated March 17, 2015.

1          It is an analysis on tax matters prepared by the

2    debtors and their professionals.  We will redact everything

3    other than the following statement on page 5.  Any payment

4    of alleged -- and Mr. McGaan has agreed I can read this into

5    the record.  Any payment of alleged make-whole claims would

6    further increase the NOLs.  And I think Mr. McGaan will

7    stipulate that that statement, any payment of alleged make-

8    whole claims includes the make-whole claim of the EFIH first

9    liens.

10          It may be that the NOL would be for the benefit of

11   EFH, the parent, since it is a consolidated tax filer.  But

12   the statement includes reference to NOLs to be generated

13   from allowance of the make-whole at -- allowance of the

14   make-whole of the EFIH first liens.  And I would just ask if

15   I got any of that wrong on our agreement, that Mr. McGaan

16   let the Court know.  Otherwise, we will overnight, if not

17   sometime today, create a redacted version.

18          We will obviously show it to the debtors first to

19   make sure it comports with their understanding of the

20   redaction and it would be, as I mentioned, Plaintiff's

21   Exhibit 141.

22          MR. MCGAAN:  That's acceptable to the debtors,

23   Your Honor.  We are not waiving the confidentiality of the

24   document with the remainder of the document that we've

25   redacted and I think we have that agreement.

1              THE COURT:  Okay.

2              MR. ANKER:  Thank you.  Just one more housekeeping

3    matter.  I, as you know, went through, and block your vision

4    of Mr. Horowitz, some math yesterday with Mr. Horton.  We

5    would ask to mark those pages as Plaintiff's Demonstrative

6    number 11.

7              THE COURT:  Any objection?  All right, that's

8    fine.

9              MR. ANKER:  And we'll put a sticker on it and get

10   it to your colleagues later today.

11             Finally, we were likely to take one witness off

12   our list.  I'm sure that will displease the Court.

13   Mr. Moldovan who is a member of the financial group at of

14   the debtors and simply rely on designations of his

15   deposition.

16             Mr. McGaan has told me that the debtors intend to

17   call Mr. Moldovan and I think we have an agreement that we

18   can examine him if Mr. McGaan puts him on in cross as if it

19   were part of our case in chief, so the scope of our

20   examination of Mr. Moldovan, if he is put on the stand by

21   the debtors, will not be limited to the subject matter

22   raised by the debtors in their direct.  And again, if I have

23   that wrong, I'd appreciate knowing, otherwise I'd appreciate

24   a confirmation.

25             MR. MCGAAN:  Your Honor, I believe that's largely

1    right.  I don't want to agree to a blank check, but

2    certainly I'm not going to insist that Mr. Anker call Mr.

3    Moldovan in his case as a technicality.  We have a limited

4    area we'd like to inquire on.  If we're going to call him

5    and do it on our case and certainly not as a general matter

6    object to him getting into things he'd like to get into, but

7    I can see how far and wide that range is, but in general.

8              MR. ANKER:  I did not mean anything different from

9    that, Your Honor.

10             THE COURT:  Okay.

11             MR. ANKER:  With that, I think housekeeping

12   matters are done.

13             THE COURT:  All right.  Very good.  Anything else?

14   Good.

15             Mr. Horton.

16             MR. HORTON:  Yes.

17             THE COURT:  Please take the stand.  Please be

18   seated.  Your affirmation from yesterday is still in place.

19             Mr. McGaan, are you going to use the notebooks Mr.

20   Anker used?

21             MR. MCGAAN:  I don't think so.  You want me to

22   take them down?

23             THE COURT:  Yeah.  I can't see Mr. Horton, which

24   is worse than not being able to see Mr. Horowitz.

25             Thank you.  I appreciate it.

1          Very good.  Thank you.  Let's get started.

2          MR. MCGAAN:  Of course, now that I've done that,

3     we'll probably have to go to the binder.  All right.

4          (Previously Sworn)

5          (Cross-Examination)

6     BY MR. MCGAAN:

7     Q    Good morning, Mr. Horton.

8     A    Good morning.

9     Q    In your role as treasurer of EFIH, you've become

10    familiar with EFIH's proposed plan of reorganization?

11    A    I have.

12    Q    I don't want to get into the content of the plan or the

13    negotiations that led up to that version that's now on file

14    with the Court.  I just want you to explain to the Court

15    what role, if any, you played in the development of the

16    plan.

17          MR. ANKER:  Your Honor, objection.  I understood

18    the Court to be taking the plan discussions and development

19    off the table.  This is going to open up and entire line of

20    inquiry about the duty of solvency, how the plan work or

21    works.  And I understood the Court to be saying yesterday --

22          THE COURT:  Okay.

23          MR. ANKER:  -- it wasn't going to let it go down

24    that --

25          THE COURT:  Where are we headed with this?

1          MR. MCGAAN:  I'd like -- Mr. Anker asked Mr.

2     Horton about his roles and responsibilities with the company

3     and this is part of it.  I don't intend to get into solvency

4     or degree of solvency.

5          THE COURT:  All right.

6          MR. MCGAAN:  This is background into the role he's

7     playing at the company, which includes more than what Mr.

8     Anker elicited yesterday.

9          THE COURT:  Okay.  I'll give you some limited

10    latitude here, but I think Mr. Anker accurately stated --

11    and I cut him off yesterday in this sort of connection.

12    Also, we're getting noise on the telephone.

13          It's a privilege to be allowed to participate by

14    telephone in these court hearings.  You have to mute your

15    phone.  You interfere with the Court's conduct of the

16    hearing and if it continues, we have the ability to isolate

17    who is making the noise and we will cut you off.

18          MR. MCGAAN:  Yes, Your Honor, I have no intention

19    of going anywhere that Mr. Anker didn't go.

20          THE COURT:  Okay.

21          MR. MCGAAN:  I paid closed attention to that.

22    BY MR. MCGAAN:

23    Q    So Mr. Horton back to my question.  Will you just

24    describe generally to the Court -- well, first tell us do

25    you play any role within the company in your role as

1    treasurer in development of the plan or negotiations and the

2    company strategy?

3    A    Yes.  I have been involved with the restructuring plan,

4    restructuring alternatives of EFH, EFIH and TCEH since what

5    we characterized as project Olympus.  I report directly to

6    Paul Keglevic, the CFO and co-CRO.  I'm part of the CRO

7    team.  I've been involved in the development, the analysis,

8    the review of various alternatives and specifically this

9    plan.

10   Q    And do you expect to continue playing that kind of role

11   moving forward in these cases?

12   A    Yes, I do.

13   Q    All right.  Do you recall when Mr. McCarty was on the

14   stand yesterday?

15   A    Yes, sir.

16   Q    And do you recall he testified about the 2010 exchange

17   transaction?

18   A    I do.

19   Q    Do you recall specifically that he testified regarding

20   a haircut that noteholders took in that exchange

21   transaction?

22   A    I do.

23   Q    And you told Mr. Anker, if I recall correctly, that you

24   were directly involved in the 2010 exchange, correct?

25   A    Yes, sir.

1    Q    Would you describe for the Court what your role was in

2    the 2010 exchange transaction?

3    A    Along with my team and then me specifically, I worked

4    directly and negotiated directly with three large holders of

5    the 10 percent notes at EFIH that we intend to do an

6    exchange and then to -- at that point in time, they weren't

7    large holders, but obviously there were large holders in the

8    2007 LBO debt.

9          These counterparties were large institutions.  I

10   don't think it's confidential that it was Franklin (ph),

11   Wamco (ph) and Avenue (ph), obviously very large

12   sophisticated investors, a lot of different objectives in

13   their management of their funds.  So I negotiated directly

14   with them around terms, coupon, tenure, the exchange ratio

15   itself, had a lot of conversation with them regarding the

16   collateral package and some of their issues and if you'd

17   like to get into that further, I can.

18   Q    okay.  But for the moment, you spoke and dealt directly

19   with the noteholders who were participating or considering

20   participating in the exchange at that time, right?

21   A    Yes, sir.

22   Q    Was it your understanding at that time that the

23   noteholders who were agreeing to the exchange were taking a

24   haircut in the transaction?

25   A    I would not have described it as that.

1    Q    Why is that?

2    A    As we were negotiating the exchange ratio and their

3    desire to exchange from their 2007 LBO notes into the first

4    lien EFIH notes, we were actually paying them a premium to

5    their current market trading price, so we were actually

6    paying the premium, not taking the haircut.

7    Q    Okay. And what other -- what are the features if you

8    would describe to the Court in terms of the gives and the

9    gets in the exchange that leads you to the conclusion that

10   they weren't taking a haircut?

11   A    Well, again, they were in an unsecured position at EFH.

12   And it had limited restrictions around what we could do, for

13   example, with the proceeds from a sale of Oncor Electric

14   Delivery holding equity, we could have dividend that cash

15   out of EFIH into EFH and then reinvested it down to TCEH.

16   Q    Let me stop you there, because I didn't hear the first

17   thing you said.  You're referring to limited restrictions.

18   Are you talking about the holders of notes at EFH at the

19   time?

20   A    At -- these specific holders had limited restrictions

21   on what we could do with proceeds from sale of Oncor

22   Electric Delivery Holdings, equity, dividends that were

23   coming up from EFIH into EFH and that was a concern.  They

24   were unsecured.  We put them in a first lien secured

25   position at EFIH for the 80 percent ownership of Oncor

1    Electric Delivery Holdings.  So they were giving several

2    very valuable benefits from our perspective.  It took a lot

3    of flexibility away from the company when we gave them that

4    extra protection.  And for that, we captured some discount.

5    We got a maturity extension and we continued to manage our

6    liquidity.

7    Q    What were the EFI -- what were the EFH notes trading at

8    before the exchange?

9    A    What I recall is roughly 70 cents on the dollar.

10   Q    Okay.  And the exchange is -- Mr. McCarty testified

11   yesterday, they exchanged into notes trading at par?

12   A    Yes.  We -- again, we tried to, again, do a market

13   transaction -- market based transaction such that they would

14   trade at par.  Again, we gave them a five point premium.

15   They exchanged into the new notes and the new notes traded

16   near par.

17   Q    Did cash change hands in addition in this transaction?

18   A    Yes.  We also provided a $500 million pay down of the

19   notes.

20   Q    In your view then, after the exchange was completed,

21   the former holders of EFH unsecured notes end up with notes

22   less or the same or greater than fair market value?

23   A    I would say less than fair market value.

24   Q    All right.  By what degree?

25   A    I don't recall, but we had stripped the collateral,

1    excuse me, not their collateral, but some of their covenants

2    and the notes traded down as I recall.

3    Q    During these negotiations that you participated in, do

4    you recall any discussion with noteholders about whether

5    they would receive a make-whole in bankruptcy after an

6    automatic acceleration?

7    A    That conversation never came up.

8    Q    Yesterday -- you were in the courtroom all day

9    yesterday?

10   A    Yes, sir.

11   Q    Do you recall Mr. Anker arguing at one point, that the

12   make-whole provision, the call protection in the notes

13   was -- in his words -- a fundamental guts of the deal.  Do

14   you recall him saying that or using those words?

15   A    I don't know the specific words, but yes I understand

16   that he said it was a major factor in the transaction.

17   Q    Do you recall whether any noteholder or representative

18   of the noteholder at that time suggested to you or the

19   company that it was important to them that they ensure that

20   they could receive a make-whole if the notes were repaid in

21   bankruptcy after an automatic acceleration?

22   A    Not at all.

23   Q    How about this notion or how about the dispute we're

24   having here today?  Did it ever come up at that time, any

25   concern about whether they'd have to file a motion to lift

1    the stay after bankruptcy in order to get a make-whole?  Did

2    that every come up?

3    A    That conversation never came up.

4    Q    I thought I heard yesterday -- and maybe it was your

5    testimony Mr. Horton, I don't recall -- that the call

6    protection or make-whole language in the 2007 notes that

7    were exchanged in 2010 and the EFIH notes were the same?

8    A    Yes, sir.

9    Q    And the acceleration provision is the same?

10   A    Yes, sir.

11   Q    At the time of the negotiation of the 2010 exchange

12   transaction, was there any discussion that you participate

13   in with noteholders or the representatives about a change in

14   the legal landscape that might affect that language and how

15   it's interpreted by the Courts?

16   A    Again, no conversation came up regarding make-wholes,

17   acceleration.

18   Q    Well then what -- having participated in the

19   negotiations, what deal points did the noteholders or their

20   representatives express to you as important to them or key

21   to the transaction?

22   A    Again, in general, I would say the coupon, the tenure,

23   the call -- call tenure, the exchange ratio, the premium

24   that we would pay them to their current market trading

25   price.  The collateral package itself, understanding the

1   collateral package and understanding the restricted

2   payments, limitations on use of proceeds from asset sales at

3   Oncor, use of dividends from -- dividends coming from Oncor

4   to EFIH and the restrictions around those dividends and uses

5   of those dividends.

6   Q    In your experience negotiating transactions involving

7   high yield debt for the company, were you surprised at that

8   time that those were the issues that they raised in the

9   negotiations as most important to them?

10  A    Not at all.  I was not surprised.

11  Q    Yesterday, Mr. Anker asked you questions about interest

12  savings that EFIH obtained by virtue of repaying the first

13  lien notes.  Do you recall that generally?

14  A    Yes, sir.

15  Q    And he was at the flip chart doing some drawing and

16  asking you about the make-whole claims.  And I just want to

17  focus my questions on an aspect of that.

18        What was the principal amount of debt -- first

19  lien note debt that did not accept the offered make-whole

20  settlement in participation in the DIP?  What was the

21  principal amount that did not?

22  A    As we discussed yesterday, approximately $2.3 billion.

23  Q    And do you know what the interest savings to EFIH was

24  on a monthly basis for that amount of debt, that is the non-

25  settled noteholders debt?

1    A    Yes.  The way I look at it is I include the four and a

2    quarter of interest costs associated with the debt that we

3    used to repay the notes, plus our fees and amortization of

4    those fees.  And I get to a number of roughly $8.5, $9

5    million a year, excuse me, a month.

6    Q    And you ran that -- I think you said yesterday you ran

7    that through the -- what's called first call date?

8    A    That's correct.

9    Q    And again, what was the first call date?

10   A    December 1st, 2015.

11   Q    All right.  The note maturity -- stated maturity was

12   2020, correct?

13   A    That's correct.

14   Q    So why in looking at interest savings would you just

15   run it out to December 1, 2015, a first call date?

16   A    Well, obviously we would have the opportunity at

17   December 1st, 2015 to have gone ahead and called those notes

18   and captured that savings through that refinancing.  Again,

19   it would be dependent upon what interest rates were at that

20   point in time, but yes.

21   Q    You recall yesterday Mr. McCarty testified about this

22   same subject, that is EFIH replacing first lien notes with

23   lower interest DIP notes.  Do you remember that?

24   A    Yes, sir.

25   Q    I want to ask you about that.  Did EFIH receive   --

1   whatever the interest savings were by replacing the higher

2   interest debt, did they receive those in interest savings

3   regardless of whether the make-whole was due or not?

4   A    We did receive the interest savings.

5   Q    All right.  So if the make-whole had been payable, you

6   still would have received those interest savings?

7   A    That's correct.

8   Q    Is the amount of the interest savings achieved by EFIH

9   in obtaining the DIP financing?  Does the amount of that

10  interest savings vary at all depending upon whether the

11  first lienholders can expand their claim now by $431

12  million?

13  A    No, sir.

14  Q    Does the amount -- let me flip that around -- does the

15  amount of the make-whole claims being made here, does that

16  vary or change depending upon the interest savings that EFIH

17  was able to achieve through DIP financing?

18  A    No, sir.

19  Q    Now, Mr. McCarty was asked specifically, if the make-

20  whole is not payable here, if the Court decides not to lift

21  the stay and there is no opportunity to obtain the make-

22  whole, so he was asked, "If that happens," he was asked,

23  "what was the impact on the issuer?"

24          And his response was, "It's not out $431 million."

25          Do you remember that?

1    A    Yes, sir.

2    Q    All right.  I want to ask the flipside of that

3    question.  What if for some reason the Court determines that

4    the make-whole should be paid here, what's the impact on the

5    issuer?

6    A    $431 million.

7    Q    It is out 431 million?

8    A    Yes.

9    Q    You were asked some questions about this settling

10   noteholders in connection with the DIP financing that I was

11   just asking you about, right?

12   A    Yes, sir.

13   Q    And what was your involvement, if any, in -- what role

14   did you play and what degree of involvement did you have in

15   negotiating that make-whole settlement at the time?

16   A    I was directly involved with the several anchor

17   -- what we call anchor tenants in setting the terms of

18   settlement and ultimately raising the financing to pay that

19   settlement.

20   Q    We don't have to spend a lot of time on the details of

21   the settlement, but as I understand it the settling

22   noteholders had an opportunity to participate in the DIP

23   that was part of the settlement, correct?

24   A    That's correct, through an exchange settlement offer.

25   Q    And that was offered to all of the first lien

1  noteholders, correct?

2  A    Yes, sir.

3  Q    So each and every one of them had the opportunity to

4  participate in the DIP and the proposed make-whole

5  settlement, right?

6  A    That's correct.

7  Q    Do you recall Mr. McCarty yesterday testifying that in

8  assessing alternative investment opportunities for the

9  noteholders that he used the four and a quarter percent from

10 the DIP, do you remember that?

11 A    I do recall.

12 Q    What would you estimate the interest income on $2.3

13 billion would be at four and a quarter percent from the time

14 of repayment in June of 2014 through the first call date,

15 December 1st, 2015?

16 A    Yes, using the four and a quarter, it's roughly 140

17 million.

18 Q    And had the non-settling noteholders instead elected to

19 participate in the settlement that was offered, what

20 proportion of the $431 million make-whole claim would they

21 have been paid under the terms of the settlement?

22 A    It was roughly 20, 25 percent.

23 Q    So what does that equate to?

24 A    In dollar amounts, is that what you're asking me?

25 Q    Yeah.

1    A     Roughly 110 million, 115 million.

2    Q     All right.  So had they elected to participate in the

3    settlement, obviously they were free not to, but had they

4    elected to, they could have obtained approximately a $110

5    million payment for their make-whole claim, correct?

6    A     Yes, sir.

7    Q     And would have earned approximately how much on the DIP

8    interest rate?

9    A     140 million.  As was described yesterday, it depends on

10   exactly which day they came in.  It was slight -- it was

11   trading slightly above par, so those numbers might be

12   somewhat lower.

13   Q     Okay.  And if they had participated in the DIP at the

14   time it was offered, it would have been four and a quarter

15   percent, though --

16   A     That's correct.

17   Q     -- on the spot?

18   A     That's correct.

19   Q     So by choosing -- electing not to take that settlement

20   and participate in the DIP on those terms, they in effect

21   walked away from a potential gain of $250 million, right?

22   A     Approximately.

23   Q     Do you recall yesterday when Mr. Kearns was on the

24   stand he made some reference to having had a conversation

25   with you I think before the bankruptcy filing, do you recall

1    his testimony?

2    A    Yes, I do.

3    Q    Would you tell the Court what the -- just describe to

4    the Court the nature of the conversation and, in particular,

5    what is it you said to Mr. Kearns and in what context?

6    A    I was in several meetings with Mr. Kearns.  I think the

7    context in which he's describing this is we had

8    conversations with some of the first lienholders, principals

9    as well as their advisers, particularly as part of Project

10   Olympus, in post-Project Olympus, in trying to reach a

11   settlement with the parties.  It assumed that we had

12   restructured EFIH and EFH at that point in time, that we

13   were going to bring in capital and restructure the company.

14   Our purpose was to what we call the exercise of lend-and-

15   extend and that lend-and-extend would have taken their

16   current principal and their current interest and some of

17   their premium above par, which the notes were trading above

18   par, and blended that into a new ten-year security with new

19   call features.

20           At that time, we had actually gone to a couple of

21   the rating agencies and had the notes speculatively rated,

22   and they were assumed to be double B.

23   Q    And which notes specifically were speculatively rated

24   as double B, what were you referring to?

25   A    The first lien notes at EFIH.

1    Q    At the time of a proposal?

2    A    A proposal of a restructured EFIH.  So it would have

3    been post-restructuring EFIH, either in bankruptcy or out of

4    bankruptcy.

5    Q    Oh, okay.  So the conversation about the rating of

6    first lien notes was referring not to the notes they held at

7    the time, right?

8    A    That's correct.

9    Q    But to notes that actually never came to fruition; is

10   that fair?

11   A    That's correct.

12   Q    You were asked yesterday about -- Mr. Anker asked you

13   about what in the proposed plan of reorganization was being

14   proposed to pay towards the $431 million make-whole claim,

15   do you recall that?

16   A    I'm sorry, would you repeat the question?

17          MR. ANKER:  Your Honor, I don't recall ever asking

18   that question.

19          THE COURT:  Can you repeat the question for me

20   again?

21          MR. MCGAAN:  Yeah.  The question, Your Honor, is -

22   -

23   BY MR. MCGAAN:

24   Q    -- do you recall yesterday Mr. Anker asking you what

25   the proposed plan of reorganization proposes to pay towards

1    the $431 million make-whole claim?

2            MR. ANKER:  Objection.  A, on the ground that,

3    unless I'm having amnesia, I don't recall ever asking it,

4    but B, if there was (indiscernible) that Your Honor was

5    suggesting at some point.

6            THE COURT:  Yeah.

7            MR. MCGAAN:  Well, I do recall that being asked.

8    I can ask him whether he was asked it or not, I'll ask him

9    directly.  But, Your Honor, Mr. Anker went into what the

10   make-whole claims were by not only his client, but the other

11   creditors at EFIH, just in terms of what their amounts are

12   and that's all I want to elicit from the witness.

13           THE COURT:  Okay.  Why don't you elicit it without

14   referencing what Mr. Anker may or may not have asked --

15           MR. MCGAAN:  Sure.

16           THE COURT:  -- since you have the ability to treat

17   this like direct in any event.

18           MR. MCGAAN:  Thank you.

19           THE COURT:  I'll allow limited exploration of

20   this.

21           MR. MCGAAN:  Okay.

22   BY MR. MCGAAN:

23   Q    The proposed plan of reorganization proposes to pay

24   towards the 431 make-whole -- $431 million make-whole claim

25   how much?

1    A    Zero.

2    Q    And in the EFIH creditor stack there are other make-

3    whole claims that have been asserted, correct?

4    A    That is correct.

5    Q    What is the amount of the make-whole claim that the

6    second lienholders are asserting?

7            MR. ANKER:  Your Honor, this is -- I'm sorry, I

8    don't --

9            MR. MCGAAN:  No, I was done.

10            MR. ANKER:  -- have an objection.

11            MR. MCGAAN:  Oh, no objection?

12            MR. HOROWITZ:  I will object actually, because we

13    have not yet asserted a make-whole payment as to the portion

14    that hasn't been paid down.  If you want to ask with regard

15    to the paid-down portion, okay, but I don't think he should

16    ask it with regard to notes that have not been paid off.

17            THE COURT:  I think Mr. Horton is capable of

18    testifying as to what he thinks a make-whole claim may be

19    owed to your clients.

20            MR. HOROWITZ:  I agree, Your Honor, as it appears

21    to what paying pieces still remain for pay-downs, but the

22    question suggests that there was already an asserted make-

23    whole claim and that's not true with regard to the portion

24    that hasn't paid down.

25            MR. MCGAAN:  That's -- I'll ask about the assumed

1    date, but that's cross-examination.

2              THE COURT:  I agree.

3    BY MR. MCGAAN:

4    Q    Mr. Horton, when you look at the potential for having

5    to pay a make-whole claim to Mr. Horowitz's clients, how

6    much money are we talking about?

7    A    As of 12/31/15, approximately 400 million.

8    Q    Okay.  And if you assumed through the first quarter of

9    2016, does that change the amount?

10   A    Yes, sir, by approximately $50 million.

11   Q    So then it would be 350 million, give or take?

12   A    Yes, sir.

13   Q    All right.  And what is your perception of the make-

14   whole claim that the PIK noteholders have or will assert in

15   this case?

16   A    Approximately 113 million.

17   Q    Okay.  So if you add up the make-whole claims, what is

18   the total amount we're talking about?

19   A    Approximately $940 million.

20   Q    All right.  Do you recall yesterday when Mr. Anker was

21   at the flip chart totaling up debt at EFIH, do you recall

22   that?

23   A    Yes, I do.

24   Q    Okay.  And he had some questions about the size of the

25   make-whole claims relative to the debt at EFIH, do you

1    recall that?

2    A    I do.

3    Q    And during that testimony -- or during those questions

4    rather, you said, you testified that $431 million, quote,

5    "is a big number in terms of distributable value."  Do you

6    recall that testimony?

7    A    Yes, sir, I do.

8    Q    Okay.  And what do you mean when you describe $431

9    million as big?

10            MR. ANKER:  Your Honor, objection.  This is going

11   into the plan and (indiscernible) --

12            THE COURT:  No, it's not.  No, it's not,

13   overruled.

14            THE WITNESS:  My apologies, would you mind

15   repeating --

16            MR. MCGAAN:  Sure.

17            THE WITNESS:  -- the question?

18   BY MR. MCGAAN:

19   Q    When you testified that $431 million is a big number in

20   terms of distributable value, what did you mean when you

21   were describing in that context $431 million as a big

22   number?

23   A    I think once we pay the undisputed claims at EFIH and

24   the amount of cash that would be distributable to EFH, given

25   again the amount of debt that we would be paying off, that

1    could be a very significant number.

2              THE COURT:  You mean paying off through the plan?

3              THE WITNESS:  Yes, sir.

4              THE COURT:  All right, I'm going to strike the

5    answer.

6              THE WITNESS:  Yes, sir.

7    BY MR. MCGAAN:

8    Q    Let me ask you this.  Even though the total debt at

9    EFIH that you described yesterday is large compared to this

10   whole make-whole claim being asserted by Mr. Anker's clients

11   here, if the trustee is allowed to expand its claim now by

12   $431 million, does that complicate EFIH's restructuring

13   efforts in any way?

14             MR. ANKER:  Excuse me, Your Honor.  I'm not --

15             THE COURT:  I can't hear a word you're saying.

16             MR. ANKER:  I'm sorry, Your Honor.  Without

17   arguing, I just renew my objection.  He's talking about

18   complicating the reorganization, which goes into the whole

19   plan process.

20             MR. MCGAAN:  I have a response, Your Honor, I just

21   wanted to (indiscernible).  I think that question and the

22   response it elicits, Your Honor, is fair game for two

23   reasons.  One, at the hearing last week when you discussed

24   the scope of this proceeding, you said that the debtor would

25   be allowed to address in a limited fashion complications of

1    restructuring efforts at EFIH as a result of the make-whole

2    claim.  And I would add that in the trustee's -- that this

3    is legally relevant -- in the trustee's pretrial memorandum

4    at page 3, they argue that one of the things the Court

5    should consider when determining whether cause exists to

6    lift the stay or the policies underlying the stay, and they

7    quote a Third Circuit case, Borman v. Raymark Industries, to

8    the effect that the stay is designed to prevent among other

9    things interference with the orderly rehabilitation of the

10   debtor.

11          I don't intend to get into waterfalls or go any

12   farther than that, but I think we ought to be permitted to

13   ask the treasurer of the company if there is an impact or a

14   complication to restructuring at EFIH if they're obligated

15   to pay not only this make-whole claim as a result of a lift-

16   stay, there may be further lift-stay motions seeking to do

17   the same thing.

18          MR. ANKER:  May I be heard, Your Honor?  Thank

19   you, Your Honor.

20          Two things.  Mr. McGaan is right, I understood

21   Your Honor's rulings, including at the beginning of this

22   hearing, to limit the scope of these matters beyond what I

23   argued and, frankly, Mr. McGaan's brief, which his pretrial

24   brief is all about the purported effect of allowing the

25   make-whole not on EFIH, which is presumed solvent, but EFH.

1            Second, I would ask Your Honor to think about if

2      this line of inquiry is permitted what my cross is going to

3      be.  How is it that it's going to affect EFIH?  Isn't there

4      enough money to go there?  Haven't you done analyses that

5      show that there's plenty of money even at EFH that you can

6      reorganize everything and give billions to the sponsors?  I

7      know Your Honor is going to shut me down when I do that.  I

8      heard you loud and clear.  But you can't shut me down there,

9      respectfully, and allow this inquiry, it's got to work in

10     both directions.

11            MR. MCGAAN:  Your Honor, I think that Mr. Anker is

12     invoking a slippery slope that he wasn't paying attention to

13     yesterday when he asked about the level of debt at EFH and

14     elicited testimony about it, asked about TCEH's claim, which

15     I'm not going to ask about, proposed in the plan as a

16     settled claim.  I'm not going to ask about that, but he

17     elicited testimony about it.  And even in posing questions

18     to Mr. Horton talked about potential recoveries, I don't

19     know where this comes from, but asked him about potential

20     recoveries to equity holders at EFH.  I'm not going anywhere

21     down that slope.  But then for him to stand up now and say

22     this one question goes too far after he quite frankly made

23     his point is --

24            THE COURT:  All right.  I'll overrule the

25     objection.

1          MR. MCGAAN:  Do you want me to ask the question

2     again?

3          THE COURT:  Yes, please.

4          THE WITNESS:  Please.

5     BY MR. MCGAAN:

6     Q    I'm going to try to ask you the same question, but it

7     probably won't be exactly the same.  Even though as you

8     testified yesterday when Mr. Anker was at the flip chart

9     identifying debt at EFIH, even though the debt at EFIH is

10    large compared to the total make-whole claim being asserted

11    here of $431 million, if the stay is lifted and the Court

12    otherwise permits the first lien noteholders here to expand

13    their claim now by $431 million, does it complicate EFIH's

14    restructuring efforts?

15    A    The way I recall yesterday was there was a conversation

16    around the debt, we got into the claim of 700 million at

17    EFH.  And I think my response, I don't recall specifically,

18    but I think my response was $431 million relative to that

19    $700 million claim was quite significant and the

20    implications to being able to -- the distributable value

21    that was available to the estate made it complicated --

22    further complicated a very complex case in getting to a

23    consensual case given that EFH, the parent of EFIH, now had

24    431 million less of distributable value and the implications

25    of getting EFH and EFIH through bankruptcy made it more

1    troublesome.  I think that was the context of the answer.

2              MR. ANKER:  I apologize, Mr. Horton.  I would move

3    to this -- I'm sorry, Your Honor, I would move to strike the

4    answer and I guess renew my objection.  What I think we had

5    just heard testimony on is that allowing this make-whole may

6    affect the ability of EFH to make distributions and satisfy

7    the $700 million claim.  How can that come in and me not be

8    able to cross-examine on that and, frankly, put on a

9    rebuttal witness to the contrary?

10             MR. MCGAAN:  Well, respectfully, Your Honor, what

11   Mr. Horton just said is this is -- I am -- he repeated his

12   testimony from yesterday. It's Mr. Anker who raised the $700

13   million TCEH claim, I didn't.  I didn't want to go there.

14   But Mr. Horton's response to the question you permitted was

15   to say, this is what I said yesterday, and I'm not going to

16   follow up on that.

17             THE COURT:  Yeah.  Objection overruled, I'll allow

18   it.

19   BY MR. MCGAAN:

20   Q    Mr. Horton, who or which entities are harmed, in your

21   view, if the debtors are required to pay $431 million in an

22   expanded claim to the first lien noteholders now?

23   A    EFH and EFIH.

24   Q    Thank you, sir.

25             MR. MCGAAN:  That's all I have.

1      THE COURT:  All right.

2   REDIRECT EXAMINATION

3   BY MR. ANKER:

4   Q    Mr. Horton, good morning.

5   A    Good morning, Mr. Anker.

6   Q    Let me start with a subject that Mr. McGaan raised with

7   you in his examination about the discussions in 2010 and I

8   want to make sure I understand the facts.  The debtors in

9   their 2010 EFIH first lien note indenture included a

10  provision for a make-whole to be paid if the notes were

11  redeemed before December 1, 2015, right?

12  A    I would agree with that.

13  Q    Okay.  And the 2007 --

14  A    And you used the word redeemed, correct?

15  Q    I did.

16  A    Yes, sir.

17  Q    And the 2007 indenture for the notes that were

18  exchanged into the 2010 indenture had the very same make-

19  whole provision, other than the first call date I don't

20  think was December 1, 2015, it was an earlier date, right?

21  A    That is correct.

22  Q    Okay.  And so you and to your knowledge no one at the

23  company ever suggested that if the company redeemed those

24  notes, the 2010 EFIH notes prior to December 1, 2015, never

25  as part of those discussions suggested to any of those

1    noteholders that then an optional -- a make-whole would not

2    be payable, right?

3    A    That's correct.

4    Q    Okay.  And you never suggested to them, look, guys, we

5    might file for bankruptcy and, in the event of bankruptcy,

6    we'll be able to repay the notes, take our own action to

7    repay them early and not pay the make-whole, right?

8    A    That's correct.

9    Q    And you don't have any recollection of anyone else at

10   the company raising the subject, right?

11   A    That's correct.

12   Q    And so you have no ability as you sit here today,

13   because there was no discussion, to -- you're not suggesting

14   that the make-whole and the call protection was unimportant

15   to the noteholders, are you?

16   A    Unimportant?  I believe it was important.  I don't know

17   what the degree of importance, but --

18   Q    In --

19   A    -- I think all provisions in the indenture are

20   important to the noteholders.

21   Q    Okay.  You understood -- I think you testified to this

22   yesterday and I don't want to be repetitive, but I want to

23   make sure I'm right about this -- the company understood

24   that without providing call protection in those notes it

25   might not have been able to get the deal done at all or, if

1   it did, it would have been at a much higher interest rate,

2   right?

3          MR. MCGAAN:  Objection, Your Honor.  This

4   misstates the record, there was call protection in the

5   notes.

6          MR. ANKER:  Let me rephrase my question.

7   BY MR. ANKER:

8   Q   You understood that if the company had instead tried to

9   structure the 2010 notes so that there was no call

10  protection, they were freely callable without payment of a

11  make-whole, either the deal wouldn't get done at all or, if

12  it did, you would have had to pay much higher interest,

13  correct?

14  A   That is a possibility, I don't know that it would have

15  been much higher interest.  We did not have that

16  conversation.

17  Q   You didn't even try to have it, you didn't raise the

18  subject with the noteholders, right?

19  A   We did not.

20  Q   Okay.  And indeed, Mr. Horton, can I ask you to turn in

21  your binder, I think it's binder 3 --

22          MR. ANKER:  -- can I approach, Your Honor --

23          THE COURT:  Yes.

24          MR. ANKER:  -- and put the binders back up?

25          THE COURT:  Yes.

1          MR. MCGAAN:  Which exhibit?

2          MR. ANKER:  55.

3          MR. HOROWITZ:  Should I put them all back up or --

4          MR. ANKER:  Number 3 I think is the only binder I

5    need, right?

6          THE COURT:  Thank you, Mr. Horowitz.

7    BY MR. ANKER:

8    Q    If you would turn in binder 3 to Plaintiff Exhibit 55,

9    Mr. Horton?  Are you there, sir?

10   A    Yes, sir, I am there.

11   Q    Now, Mr. Horton, I don't want to confuse you at all and

12   I will -- if you look at the page 1, this is a presentation

13   relating -- an investor presentation not relating to the

14   2010 exchange, but a later issuance of first lien notes,

15   some of the six point seven eighths.  Do you see that on

16   page 1?

17   A    I do.

18   Q    But in fact the debtors created substantially similar

19   documents, did they not, for all of the offerings?

20   A    I can't answer that question, I'd have to look.

21   Q    Do you have a recollection that these were generally

22   created, Mr. Horton, in connection with exchange offerings

23   and initial issuances?

24   A    Again, it would be speculation that we did it in

25   general.  Each offering is different.  I just don't know

1   specifically what we did on each one of these offerings.

2   One is an exchange offer, this is a new issuance, and so the

3   similarities -- I would have to look back and reflect as to

4   how we presented.

5   Q    Okay.  Can you turn to page --

6   A    And I don't mean to be evasive, but it's a long time

7   ago, if you will, and totally different type transactions.

8   Q    Can you turn to page 4 of 24?

9   A    I'm happy to do that.

10  Q    Do you see it says at the top, "Offering Summary"?

11  A    Yes, sir.

12  Q    And I think -- I won't use the expression I used in my

13  deposition of you where I asked you have you ever heard the

14  expression don't bury the lead, and you said, no, I'm from

15  Texas, but you would fairly say that the offering summary is

16  intended by the company to highlight the principal terms of

17  the offering, right?

18  A    That's correct.

19  Q    Okay.  And if you go down to the -- I think it's the

20  fourth item is called "Call protection"?

21  A    Yeah, and I think when we did this presentation the

22  underwriters actually went through this slide with the

23  investors.

24  Q    Okay.  Do you see the line that says "Call protection,"

25  sir?

1   A    Sure.

2   Q    Okay.  And the first two letters are NC.  Does that

3   stand for no call?

4   A    Yes, sir.

5   Q    And then it says, "2.5," is that two and a half years

6   in that offering?

7   A    Yes, sir.

8   Q    And it then says, "Subject to T-plus-50 make-whole

9   call."  Do you see that?

10  A    I do.

11  Q    "Callable thereafter at a premium declining the par,"

12  right?

13  A    That's correct.

14  Q    And so the company thought that the call protection was

15  sufficiently important for investors that it highlighted it

16  on the very first page of this investor -- not the very

17  first page, on the summary page of this presentation, right?

18  A    In consultation with our underwriters and, to make the

19  record clear, along the way we did have conversations with

20  our underwriters about whether or not we could issue the

21  notes, these type of notes, without a call.

22  Q    And they said you couldn't, right?

23  A    It would cost -- it would be costly.  And we decided we

24  would go ahead and include a call provision.

25  Q    And when you say it would be costly, let's get a clear

1  record.  The rate of interest that would have been required

2  to be paid by the company would have been meaningfully

3  higher, right?

4  A    My experience has been 50 to -- 25 to 50 basis points

5  higher.

6  Q    Have you ever issued, Mr. Moldovan, high-yield bond

7  debt without --

8  A    Mr. Horton.

9  Q    -- any -- I'm sorry.

10 A    It's okay, it's okay.

11 Q    I'm going to do this throughout the hearing.  Mr.

12 Horton.  And I apologize --

13 A    It's not a problem.

14 Q    -- to both of you.

15 A    It's not a problem, sir.

16 Q    Mr. Horton, I thought you testified yesterday that the

17 company never, ever issued high-yield bond debt starting

18 with the 2007 leveraged buyout that did not have a make-

19 whole, right?

20 A    That's correct.

21 Q    So you don't know how much more expensive it would have

22 been if you had an absolute, freely callable note that the

23 day after issuance the company could call, right?

24 A    I don't know that off the top of my head and --

25 Q    But you know it would have been more money --

1          THE COURT:  Don't interrupt --

2          MR. ANKER:  I'm sorry?

3          THE COURT:  -- the witness.  Don't interrupt the

4    witness.

5          MR. ANKER:  I apologize, Your Honor.  I --

6          THE COURT:  Have you finished your answer, Mr.

7    Horton?

8          THE WITNESS:  Thank you, sir.  I don't know.  I

9    know I had conversations with the underwriters and, as I

10   said before, we felt like for the best execution we needed a

11   call and we needed a make-whole, yes, sir.

12   BY MR. ANKER:

13   Q    Let's go back to page 4.  Am I right that on this

14   offering summary there's not one word from the company about

15   the acceleration provision, right?

16   A    That's correct.

17   Q    There's not one word on this page about how in the

18   event of a bankruptcy the company may be able to  -- I'm not

19   going to use the word redeem -- repay the notes and then not

20   pay a make-whole, right?

21   A    That's correct, I have never seen that on --

22   Q    You took the next words out of my mouth.

23   A    Okay.

24   Q    I've been asking you a document, because it's the one I

25   have at hand, about a 2012 offering.  You've never seen a

1    document about any EFIH first lien notes that ever suggested

2    that the company could in the event of a bankruptcy pay off

3    the notes without paying the make-whole, right?

4    A    That's correct.

5    Q    All right.  Mr. Horton, I think there's a much less,

6    frankly, important subject -- but I want to make sure that

7    we have a clear record and the Judge appreciates it.

8    A    Can I put the notebook down?

9    Q    You may.

10          If you want me to put it down here on the side

11   here or just there where you are?

12   A    That's fine there.  Thank you.

13   Q    Okay.  In the 2010 exchange, it certainly is ripe that

14   Mr. McCarty used the term "haircut" and I think we may have

15   just a difference in semantics here.  You do acknowledge --

16   let's back up.

17          There was a principle balance in the old 2007

18   notes, right?

19   A    That's correct.

20   Q    And what was issued in exchange -- some of those old

21   notes were left behind.  Noteholders couldn't exchange 100

22   percent of their old notes for new notes and cash, right?

23   A    That's correct.

24   Q    So about 20 percent of the old notes were left behind?

25   A    That's correct.

```
 1   Q    Okay.  And those old notes that were left behind were

 2   stripped of their covenant protections, right?

 3   A    Some of them, yes.

 4   Q    Okay.  Some of the covenants were stripped, they were

 5   stripped as with all of the notes that were left behind,

 6   right?

 7   A    I'm sorry -- yes, of all of those notes, some of the

 8   covenants were.

 9   Q    As to those notes, the 80 percent that was exchanged,

10   the noteholders received a combination of cash plus new

11   notes, right?

12   A    That's correct.

13   Q    And the cash, the 500 million, plus the face amount of

14   the new notes was less than the face amount of the

15   80 percent of old notes exchanged, right?

16   A    The face amount, in total, was more than that.  I'm not

17   following your question.

18   Q    Okay.

19   A    I had $2.3 billion of new notes in the exchange.  The

20   amount of face value was disproportional to the notes that

21   were left behind.

22   Q    My question was not clear.  I now understand what you

23   were saying.

24            I want you to put aside, in your mind, the notes

25   that were left behind.
```

1    A    Okay.

2    Q    How much was -- I don't remember -- what was the old

3    issue, so let's take -- what was 100 percent of the old

4    issue and what was 80 percent of the old issue?

5    A    Eighty percent of the old issue -- can I pull out my

6    calculator?

7    Q    Yeah.

8    A    Somebody probably has it or we can --

9    Q    Just give me an approximation, if you would,

10   Mr. Horton, if you're comfortable.

11   A    All right.  Three point two billion, something like

12   that.

13   Q    So the notes that were exchanged at a face amount of

14   3.2 billion, right?

15   A    Again, I'm going this calculation here -- maybe in the

16   summary.

17   Q    Approximately 3.2 billion, right?

18   A    Okay.

19   Q    And what the new noteholder -- I'm sorry -- what the

20   exchanging noteholders got was 500 million in cash, right,

21   and did they get -- how much new notes did they get, face

22   amount?

23   A    Two point one eight billion.

24   Q    So 2.18 plus 500 million is about 2.6, right?

25   A    That's correct.

1    Q     And 2.6 is less than the 3.2 that was exchanged, right?

2    A     That's correct.

3    Q     So looking at the face amount, there was a -- I

4    understand your point about what they were trading at -- but

5    looking at the facing amount of the new debt and cash, there

6    was a haircut, right?

7    A     I do not know what purchase price those investors

8    bought those notes at.

9    Q     I'm sorry.

10   A     So was there a discount to the principal?  The answer

11   is yes.

12   Q     Thank you, sir.

13   A     Okay.

14   Q     You use the word "discount"; that's fine.

15   A     There was a discount, and as I described, and as part

16   of our liability management program, it was -- the

17   objectives were to capture discount, extend tender, and to

18   maintain liquidity.

19   Q     Okay.  And I take it you agree with Mr. McCarty that

20   the new notes with call protection traded at par, right?

21   A     That's correct.

22   Q     And do you agree with him that in terms of getting a

23   deal done, it's critical that the notes trade at par?

24   A     It's certainly an important part.

25   Q     I'll take important.

1          Now, let's switch subjects.  You mentioned that

2    every noteholder had an opportunity to participate, every

3    one of the first-lien noteholders had an opportunity to

4    participate in the DIP.  I take to participate in the DIP,

5    one had to agree to the make-whole settlement, right?

6    A    That's correct.

7    Q    Okay.  And so instead of an approximately 20 -- you had

8    to take approximately 25 percent of your potential

9    make-whole claim, right?

10   A    That's approximately the math.

11   Q    And you had to agree to convert and invest money in a

12   new investment that earned 4.25 percent per annum interest,

13   correct?

14   A    That's correct.

15   Q    Okay.  Now, I am really going to tread on this subject

16   lightly, because I've heard the Court.  You heard asked by

17   Mr. McGaan what was the -- what do you understand the amount

18   of the second-lien make-whole claim to be as of both, I

19   think December 31 of this year and March 31 of next year,

20   right?

21   A    That's correct.

22   Q    Okay.  And I think you said 400 million, as of

23   12/31/15, and 350 million, as of 3/31/16; is that right?

24   A    Approximately, yes.

25   Q    And I take it, therefore, that the claim declined 50

1    million over 90-some days, half a million to slightly more

2    than half a million dollars a day, if I just did the math

3    right in my head?

4    A    Okay.  Yes, sir.

5    Q    Now -- and the PIKs also have a make-whole claim; you

6    said it would be 113 million?

7    A    Yes, sir.

8    Q    What is that as of?

9    A    12/31/15.

10   Q    And what about if we go to 3/31/16?

11   A    That does not change.

12   Q    Okay.  So it's just a fixed premium at that point,

13   right?

14   A    That is correct.

15   Q    Now, you're aware, are you not, that the second liens

16   have not filed a motion for release from stay, at least as

17   of today?

18   A    That's my understanding.

19   Q    And your understanding that the PIKs of that filed the

20   motion for relief from stay, as to this day, right?

21   A    That's correct.

22   Q    And you are aware that the first-liens filed a motion

23   for release from stay very early in the bankruptcy debts?

24   A    Yes.

25   Q    Are the debtors prepared to stipulate today and

1    represent to the Court that they see no difference in that

2    fact -- that's an inarticulate question.  Are the debtors

3    prepared to stipulate today -- let me try to deal with

4    Mr. McGaan's, I think, about-to-be objection.

5             Mr. Horton, do you personally know whether there

6    is legal significance to the fact that one set of

7    noteholders, the EFIH first liens moved for relief from stay

8    at the outset of the case, and the second and the PIKs have

9    not?

10            MR. MCGAAN:  Object, Your Honor.

11            THE COURT:  Yeah, sustained.  I understand your

12   point; it's a legal one, frankly.

13            MR. ANKER:  I understand.

14   BY MR. ANKER:

15   Q    Let me ask this, Mr. Horton, putting -- I don't want to

16   invade the privilege -- have you participated in any

17   discussions without counsel present, perhaps with just you

18   and Mr. Keglevic or others, in which anyone has said, We, on

19   behalf of the debtors, in substance, concede that if the

20   first liens get their make-whole, the seconds and the PIKs

21   are entitled to theirs?

22   A    No, sir.

23   Q    And you also don't know, do you -- let's back up; and I

24   really am going to go very lightly here -- the plan has

25   proposed resolutions for less than payment in full of the

1    second lien and PIK make-wholes, right?

2    A    Yes.

3    Q    And you don't know, as you sit here today, that those

4    resolutions will prove to be unacceptable to the second is

5    liens or the PIKs, do you?

6    A    I do not.

7    Q    And it is a contemplation, is it not, that the second

8    liens and the PIKs will be paid whatever amount of their

9    make-whole at plan confirmation, right?

10   A    My apologies.  Would you ask the question again?

11   Q    Sure.  Under the plan, whatever percentage of the

12   second lien make-whole and the PIK make-whole would be

13   recognized, would be settled, would be paid upon emergence

14   from bankruptcy, correct?

15   A    That's my understanding.

16   Q    And it might be paid in a form of currency other than

17   cash, correct?

18   A    That, I do not know.

19   Q    Have you had any discussion -- again, I don't want to

20   invade the privilege -- with Mr. Keglevic or anyone else,

21   without counsel present, on whether there might be a

22   difference in outcome on allowability of a make-whole,

23   whether it is -- whether the repayment of the notes occurs

24   at the outset of the bankruptcy, as with the first liens

25   versus at the end of the case.

1         MR. MCGAAN:  Your Honor, I have an objection.  I'm

2    not sure if the witness, the answer was yes or no, but I

3    don't know how that conversation happens between business

4    people, particularly the co-restructuring officer, without

5    it being privileged, given the nature of the question.

6         MR. ANKER:  I'll withdraw it.  I think that's

7    actually legitimate.  I'll withdraw the question.

8    BY MR. ANKER:

9    Q    I take it you don't have any ability to answer that

10   question, Mr. Horton, without disclosing, indirectly,

11   communications with Counsel?

12   A    That is correct.

13   Q    Okay.  Now, you were asked by Mr. McGaan, a series of

14   questions about the effect, were this make-whole to be

15   allowed on the plan process; do you recall that?

16   A    I do.

17   Q    Okay.  Without recounting ancient history, the debtors

18   spent a lot of time pre-bankruptcy working on Project

19   Olympus, right?

20   A    That's correct.

21   Q    And ultimately, that was a proposal where EFIH would

22   not even be put in the bankruptcy at all, right?

23   A    That was the plan, yes.

24   Q    Right.  And there ended up not being a consensus around

25   that, and therefore, EFIH was put into bankruptcy, right?

1   A     That's correct.

2   Q     But when Project Olympus died on the vine, if I can use

3   that expression, you and Mr. Keglevic and Ms. Orray (ph) and

4   all the other senior management didn't say, Woe be us, we

5   give up, right, you tried to come up with a different

6   structure, right?

7   A     We came up with several structures, yes.

8   Q     And ultimately you came up with a structure that had a

9   restructuring support agreement -- embodied a restructuring

10  support agreement, right?

11  A     Yes.

12  Q     And I recall Mr. Keglevic's first-day affidavit talking

13  about how hard it was to get to that RSA, but you got to it

14  and it was going to be the foundation for the

15  reorganization; do you recall that?

16  A     It was part of the -- part of the reorganization, yes.

17  Q     And then that RSA ended up, because it's in proceedings

18  in court and otherwise, falling apart, right?

19  A     Yes, the Company cancelled the RSA, yes.

20  Q     I'm sorry, what?

21  A     The Company, yes, voted -- cannot continue with the

22  RSA -- to withdraw the RSA.

23  Q     And the next day you didn't file a motion to convert

24  these pages to Chapter 7, did you?

25  A     That's my understanding, yes.

1  Q    You didn't resign, Mr. Horton?  Mr. Keglevic didn't

2  resign.  Ms. Orray didn't resign.  No one resigned, right?

3  A    No, sir.

4  Q    No one threw up their hands and said, Woe be us, we

5  can't reorganize the amenities, right?

6  A    That's right.

7  Q    And you tried, and you're continuing to try to get to a

8  plan that works, right?

9  A    We are.

10  Q    And is it a fair surmise, on my part, that if the Court

11  allows the first liens their 431 make-whole, that the

12  debtors are then going to try to get to a plan that works

13  with those facts on the ground?

14  A    I suspect that we will continue to try to get a plan in

15  place.

16  Q    Mr. Horton, I actually did very much enjoy when you

17  told me you'd never heard the expression "don't bury the

18  lead."  You're from Texas, I hope this is not also a

19  northeastern expression -- I doubt it is -- have you heard

20  the expression "you play the cards you're dealt"?

21  A    I have heard that.

22  Q    And the debtors will play the cards they're dealt,

23  right?

24  A    We will.

25           MR. ANKER:  No further questions, Your Honor.

1           MR. MCGAAN:  We have none, Your Honor.

2           THE COURT:  Thank you, Mr. Horton.

3           THE WITNESS:  Thank you.

4           THE COURT:  All right.  Who's next?

5           MR. ANKER:  Your Honor, our proposed order for

6     this afternoon is Mr. Cacioppo, which we are going to

7     streamline considerably in light of your hearing from both

8     Mr. McCarty and Mr. Kearns, I think followed by Mr. Auerbach

9     and then Mr. Green.

10          THE COURT:  Okay.

11          MR. ANKER:  And both of them were deposed last

12    night, Your Honor, in accordance with your direction.

13          THE COURT:  Okay.  We'll take a very short recess

14    and then we'll turn to Mr. Cacioppo.

15       (Recessed at 11:12 a.m.; reconvened at 11:24 a.m.)

16          THE CLERK:  All rise.

17          THE COURT:  Please be seated.

18          Call your witness.

19          MR. PLATT:  Good morning, Your Honor.  Charles

20    Platt for WilmerHale.

21          We call James Cacioppo.

22          THE CLERK:  Please raise your right hand.

23       (Witness sworn)

24          THE WITNESS:  I do.

25          THE CLERK:  Please state and spell your name for

1    the record.

2              THE WITNESS:  James Anthony Cacioppo,

3    C-A-C-I-O-P-P-O.

4              THE CLERK:  Thank you.

5              MR. PLATT:  Your Honor, may I approach to hand up

6    this S notebook (ph)?  Thank you.

7    DIRECT EXAMINATION

8    BY MR. PLATT:

9    Q    Good morning, Mr. Cacioppo.

10   A    Good morning, Mr. Platt.

11   Q    Are you currently employed?

12   A    I am.

13   Q    Where are you employed?

14   A    At One East Capital Advisors.

15   Q    And how long have you been employed there?

16   A    Since 2006.

17   Q    What does One East Capital Partners do?

18   A    We manage funds on behalf of clients, investing in

19   annuities securities, including high yield.

20   Q    And can you give a brief description of your

21   background, educationally?

22   A    Well, since high school, I went to Colgate University

23   and graduated from there.  I worked for a few years, then I

24   went to Harvard Business School and graduated with an MBA

25   from Harvard Business School.

1    Q    What, briefly, was your employment history after

2    Harvard Business School?

3    A    I spent six years as an investment banker where I was

4    an underwriter for securities, including high yield, and

5    equities and we advised on restructurings and merges and

6    acquisitions.  And I did that for Smith Barney and Bankers

7    Trust, Wasserstein Perella, all of which have been bought

8    and are still around as part subsidiaries of major banks.

9    Q    All right.  And I'm going to ask you some questions

10   about your experience as an investor in high-yield debt.

11   Can you give us a very brief description of that experience.

12   A    As an investor, in 1995 -- so I graduated from business

13   school in '89 and sort of left banking in '95 and went to

14   the hedge fund business.  I worked, initially for Halcyon

15   for about five years.  I was an analyst and a co-head of

16   distressed and credit research, and was responsible for the

17   credit portfolio, including high yield.

18            And then I went on to -- and helped build up a

19   small hedge fund to a $5 billion hedge fund called the

20   Sandell Asset Management and managed the Castle rate funds.

21   And I founded the credit group and was the sole portfolio

22   manager of the president of the firm, and I built a group of

23   20 or 25 people and we managed a very large credit

24   portfolio.

25            And at One East, we took that formula and we

1   started a firm and do similar things.

2   Q     Now, at high -- at one capital east --

3   A     One East.

4   Q     One East capital --

5   A     Yeah?

6   Q     -- do you evaluate high-yield debt every day?

7   A     Yes.

8   Q     And you've been doing that for 20 years now?

9   A     Twenty years.

10  Q     How many actual potential transactions would you say

11  you evaluated in high-yield debt as an investor?

12  A     Over the 20 years, I would say thousands.

13  Q     Okay.  Now, in your experience as an investor, do

14  investors consider make-whole provisions when evaluating

15  high-yield debt?

16  A     They do.

17  Q     And is it an important part of their decision?

18  A     It is an important part of our decision.

19  Q     Why is it an important part of your decision?

20  A     Well, the call protection is the way that you guarantee

21  a stream of cash flows.  High-yield is a risky endeavor;

22  it's otherwise known as "junk bonds" in our business.

23  People have got away from that name because it doesn't sound

24  too good.  But they are risky and so when you put in money,

25  you can lose half of it; you can lose a third of it; you can

1    lose it all in certain cases.

2              And what the call protection does is guarantee

3    you, effectively, if the situation works out in your favor,

4    a stream of income for a fixed period of time to compensate

5    you for that risk.

6    Q    And are investors committed when they go into these

7    high-yield debt transactions?

8    A    Yes, you cannot get your money back.  You're committed

9    at -- the typical high-yield deal is ten years.  So the

10   typically is you're locked up for ten years.

11   Q    Do you, as an investor, ever investor in high-yield

12   debt without any make-whole provision?

13   A    Yeah, a make-whole is a fun little perk -- call it

14   protection.  In my career, I have never invested in

15   high-yield security that doesn't have call protection, and

16   in the last 10 or 15 years, make-whole has become a standard

17   part of that package.

18   Q    Okay.  Now, how exactly does an investor like yourself

19   value the make-whole and the call protection provisions in

20   high-yield debts?

21   A    Well, I like to use an example.  I like to you a

22   million dollars to make the math easy for myself.  So if you

23   take a ten percent note, for example, you -- again your use

24   a ten-year time frame -- you'd have five years of the

25   call -- the non-call period is typically five years, which

1   is where the make-whole comes into play during that non-call

2   period.  It gives a company flexibility to take the bonds

3   out early if they need to.

4           And so the way that's valued is, the situation

5   works out in your favor and the credit can perform and pay

6   you back, you're effectively guaranteed that stream of

7   payments.  So in my million-dollar example with a

8   ten-percent coupon and a five-year non-call period, you

9   would have ten plus ten plus ten plus ten plus ten, five

10  times or fifty -- so for a million dollars that would be

11  $500,000.  You would have a hundred thousand dollars for

12  five years.  And then you would also be entitled to the call

13  premium of five points because the call premium is very

14  standard, half the coupon on the first call date, and that's

15  another $500,000.  So you would be entitled to $550,000.

16          And for me, that sort of simplifies it.  So I get

17  $550,000 guaranteed for putting -- if it works out, and it's

18  not guaranteed in any sense of the real world guarantee --

19  but if it works out and the credit performs, you get that

20  sum of money and the risk you're taking is substantial

21  because you're typically right above the equity and a

22  substantial risk on the downside.  In financial crisis, such

23  as OA (ph), these things can trade at very, very low prices

24  and you get very poor recoveries and you can lose a lot of

25  money.

1          So that's the essential balance or trade that you

2    try to set up.

3    Q    Okay.  Now, if you encountered high-yield debt without

4    a make-whole provision, how would you, as an investor,

5    evaluate that type of debt?

6    A    So if you didn't have a make-whole, these days, that

7    means you don't have call protection, and you would look at

8    that situation and it would be very one-sided because the

9    minute the company does well -- it's interesting, as an

10   investor, they're always your friends when they're issuing

11   the bonds, but the minute you own them, you turn into their

12   enemy.  And so the minute it works out, they're going to

13   turn around and say, Okay, I'm going to take that away from

14   you.

15         So you would effectively, you would effectively

16   lose your upside completely.  So, for example, if you had

17   this ten-percent bond and the company got a big contract or

18   discovered a big oil well someplace and the credit

19   statistics improved dramatically, without the call

20   protection, you couldn't trade through par because they

21   could call you out at any time.  So that company would

22   probably turn around and redeem your bonds out and you would

23   say, Okay, I took all that risk, what if they missed all

24   those drilling -- they didn't hit a big oil well and they

25   kept missing?  I would have suffered substantial capital

1    loss.

2            But in a situation where the company did well, I

3    get -- I lose the bond.  So I think it's very hard to invest

4    in a situation like that, which is why it doesn't exist.  It

5    would probably require such a high interest rate that it

6    would make the high-yield market kind of a theoretical

7    thing; it would be hard for it to really happen.

8    Q    So, that's based on your experience.  Did you do

9    anything in preparing your reports in this case to confirm

10   that experience?

11   A    I did, and if you look at my report, we conducted

12   research and we cited that research in the report by

13   numerous experts --

14   Q    Okay.

15   A    -- or numerous publications and articles.

16   Q    Now, from your perspective as an investor, did the EFIH

17   first-lien noteholders suffer any financial loss in June of

18   2014 when EFIH refinanced early and didn't may the

19   make-whole?

20   A    They did.

21   Q    What was the loss that you believe the first-lien

22   noteholders suffered?

23   A    I put an exhibit in my presentation which went through

24   that.

25   Q    Well, let's -- before we get to that exhibit, can you

1    just give us an overall sense of the losses?

2    A     Okay, yeah.  They basically lost that stream of income

3    that we've been talking about, you know, that they signed up

4    for ten -- five years for non-call protection, ten points a

5    year for five years or 50 points, plus the buys, the five

6    percent they get for the call premium.  So they lost out the

7    remaining stream that they had, which we've established is

8    17 or 18 months.

9    Q     Okay.  And did the first-lien noteholders suffer any

10   reinvestment risks as a result of the --

11   A     Right.  I mean I think it's been talked about by some

12   of the other experts, so I'll be summary in nature, but the

13   credit markets have improved quite dramatically.  Interest

14   rates have gone down quite dramatically.  And at the time

15   that these notes were refinanced out, there's a lot of

16   participants, like myself, who don't consider high-yield

17   really investable because it doesn't really offer you a good

18   opportunity.  It's sort of a return-free risk, in the sense

19   you have risk and you don't get much return.

20          So to replace that ten-percent coupon for duration

21   of 18 months in a utility-type company, in a steady

22   business, and first-lien in secured notes doesn't exist;

23   it's a fantasy.

24   Q     Okay.  So you mentioned the study that you did.  Let's

25   take a look at Plaintiff's Demonstrative Exhibit 12; that's

1    the first one in your book, Mr. Cacioppo.

2    A    I have it.  Thank you, Mr. Platt.

3              Okay.  So in Exhibit --

4    Q    Well, let me ask you the first question, because I have

5    several, which is:  What does this exhibit show very

6    generally, then we'll walk through?

7    A    It's a calculation of the financial loss to the

8    investors when the -- when a make-whole is not honored.

9    Q    Okay.  And you have at the top some assumptions; is

10   that correct?

11   A    I do.  I do.

12   Q    Where did you get those assumptions?

13   A    So the assumptions are really what's gone on here.  You

14   start out at the top of the analysis.  We have the

15   redemption date, which is 6 -- June 19th, 2014; the date of

16   the first call, according to the indentures, December 1st,

17   2015; the call premium on the first date is 105; and the

18   coupon amount is -- it's semiannual, so it's paid twice a

19   year, so the -- it's five per semiannual or ten a year.

20   Q    Okay.  And then in the next section you talk about

21   treasury rates and adding 50 basis points.

22   A    That's correct.

23   Q    You've been getting there, sir.

24   A    That's how we calculate the discount rate, so the

25   investor is being compensated for a stream of income that it

1    will not receive.  So we get made whole for that.  And a

2    part of the standard sort of in the industry that's been

3    around for a very long time, as I have, as long as I've

4    being doing this, you use this 50 basis points as the

5    additional premium to the Treasury security of life

6    maturity.  And you get to that -- discount back that stream

7    to cash flows.

8         Q    Okay.  And then it's got future payments, date,

9    and days from redemption, and payments and so forth.  What

10   are the --

11        A    So these are the dates that the payments that the

12   investor was entitled to, these are the dates that they were

13   due.  And then the days from redemption is just how many

14   days that was, and so we went through and did the payments

15   and then we PD'd those payments.  So -- and the payments are

16   in the third column down.

17             And then the NPV is in the fourth column.  And so

18   the payments add up to five -- five points in December 1st,

19   2014, five points in June 1st, 2015, five points in December

20   1st, 2015.  And then you get paid the additional five

21   points, including your 100 points of principle back.  So

22   you've really got 20 points of interest and call premium,

23   and when you discount that back with that discount rate, you

24   get to 18.7 points.

25        Q    I may need some clarification here on -- what do

1    you mean by points?

2         A    Okay.  So we look at it as par.  I think this has

3    been discussed.  So if you look at my -- an example of -- my

4    $1 million example, the payments would be $500,000 each

5    time.  So the five points would correspond to -- wait, now,

6    I got that wrong.  That would be $50,000.

7         Q    Yes.

8         A    Excuse me.

9         Q    Right.

10        A    So that would be $50,000 per each payment, and

11   that would add up to about $200,000 of payments in that $1

12   million example that I like to use.  And it would get

13   discounted back and get you to $187,000.

14        Q    And the NPV, what does that stand for?

15        A    Net present value.

16        Q    Okay.  And that's the discounting back?

17        A    That's a discounting.  That's the math that we

18   learn in business school, and it's an extremely standard

19   part of doing international analysis.  It's kind of in the

20   first chapter of the book at business school.

21        Q    Okay.  And when it talks about the make whole

22   amount being 18.7 points in your example of somebody who

23   invested $1 million, what would that translate into?

24        A    That's $187,000 of lost compensation that the

25   investor would have foregone.

1      Q    Okay.  Now, from your investor's perspective, Mr.

2   Cacioppo, does the fact that EFIH filed for bankruptcy

3   before it made the repayments, the refinancing, alter your

4   conclusions?

5      A    It does not.

6           MR. ESSER:  Objection, Your Honor.  I'm sorry.  I

7   believe that opinion has been stricken by your order

8   yesterday.

9           MR. PLATT:  I don't think so, Your Honor.

10          MR. ESSER:  Your Honor struck opinion three, which

11   is EFIH's just refinancing of the notes in bankruptcy will

12   be understood by investors in the financial community to be

13   a redemption.  That redemption which was done to take

14   advantage of more favorable interest rates and was

15   undertaken over the objection of note holders was

16   "optional".

17          MR. PLATT:  I thought you said your number three

18   was the optional redemption that had been stricken, Your

19   Honor.

20          THE COURT:  Opinion three was stricken.  Opinion

21   three and opinion four.

22          MR. PLATT:  Yes.  And three is C, right?  The

23   EFIH's refinancing on the notes was an optional redemption?

24          THE COURT:  Well, it's my understanding, yes.

25          MR. PLATT:  Yes.

```
1              MR. ESSER:  I'm looking at --

2              THE COURT:  You need to identify yourself for the

3    record, by the way.

4              MR. ESSER:  Apologies, Your Honor.  Mike Esser of

5    Kirkland and Ellis for the Debtor.

6              MR. PLATT:  Yes, and so doesn't bankruptcy refer

7    to opinion B as in boy, "The bankruptcy of the issuer does

8    not change the call protection bargain with the investor?"

9    That's number two, that I thought Your Honor had allowed.

10             THE COURT:  I did.  So objection's overruled.

11             MR. PLATT:  Thank you, Your Honor.

12        BY MR. PLATT:

13        Q    So let me ask the question again, Mr. Cacioppo.

14   From your investor's perspective, does the fact the EFIH

15   filed for bankruptcy alter your conclusion?

16        A    It does not.  The loss is the same.  Whether

17   you're in bankruptcy or not, you lose the stream of

18   payments.

19        Q    Would an investor, in your experience, expect to

20   continue to receive the interest payments on the high yield

21   debt after EFIH filed for bankruptcy?

22        A    Yes.  In this case -- I've been involved in many

23   cases like this where the bonds remain outstanding, and

24   they're over-secured, it's been established.  And you would

25   receive your adequate protection payments and get paid the
```

1    bond -- get paid your bond interest -- until the case is

2    resolved.

3        Q    Now, with respect to your conclusions about how

4    bankruptcy doesn't alter your conclusions, did you look at

5    any information to support your opinion based on your

6    experience?

7        A    I did, yes.

8        Q    What did you look at?

9        A    I looked at some trading data, which really sort

10   of tried to demonstrate what the expectations in the

11   marketplace were at the time.

12       Q    All right.  Let me ask you to look at Plaintiff's

13   demonstrative Exhibit No. 13.

14       A    I have it.  Thank you.

15       Q    Okay.  And let me ask you a couple of background

16   questions before we dive into what your opinion is on this.

17   First, where did this trading data come from?

18       A    The trading data comes from the - originally will

19   come from Bloomberg.  And Bloomberg gets the pricing

20   information from a system called Trace.  Trace is a system

21   where bond dealers/broker dealers are from a regulator --

22   that might be FINRA, I forget which one.  It forces the

23   broker dealers to post their prices, and so it is a pricing

24   database that is very accurate and gives you the price of

25   bonds.  And what the Bloomberg graph -- what the Bloomberg

1    does, it just has an analytic tool that allows you to graph

2    it.

3         Q    Okay.  And let's look at the numbers on this

4    chart.  On the left-hand column, there's some numbers going

5    from 90 at the bottom up to 120 at the top.

6         A    Right.

7         Q    What do those numbers represent?

8         A    Those numbers are -- represent the price of the

9    bond.  Again, we focus in at 100 there, which is two lines

10   up from the bottom.  And that's par.  And we talk -- I think

11   it was established yesterday by Mr. McCarty or Chris Kearns

12   that the bond's trade is a percentage of par, so this is

13   basically demonstrating that on the left-hand side.

14        Q    Okay.  So the line that has 100 next to it shows

15   whether the trading is occurring above or below par?

16        A    Yeah.  That's the par amount, yes.

17        Q    Okay.  And then the dates at the bottom, what do

18   those represent?

19        A    The dates at the bottom, the August 10th date --

20   the August 2010, excuse me, that's a month and a year --

21   that was when the notes were issued.  And all the way

22   through April 2014, is when the notes were redeemed.

23        Q    Okay.  Well, they were redeemed in June -- at the

24   end --

25        A    Yes, June.  I'm sorry.  But you don't see it here,

1    because it's every, you know, it's every two months.

2         Q    Right.

3         A    Yeah.

4         Q    And do you recall what the --

5         A    It goes on 'til June

6         Q    -- date was of the filing of bankruptcy in this

7    case?

8         A    I --

9         Q    Do you recall it was the end of April 2000 --

10        A    Yeah, I -- that's right.

11        Q    Okay.  And then what was your understanding of the

12   news in the marketplace about the potential for EFIH's

13   bankruptcy during that time period reflected by this chart?

14        A    Well, generally, if one did their financial

15   analysis, you know, a company doing liability management has

16   bonds trading significantly below par, and if you look at --

17        Q    Well, let me ask you this -- to back up for a

18   second, Mr. Cacioppo --

19        A    Okay.

20        Q    -- because I want to establish a foundational

21   question first.

22        A    Okay.

23        Q    Did you do any research on what the news was in

24   the marketplace about the potential for EFIH --

25        A    I did.

1     Q     -- filing for bankruptcy --

2     A     I did.

3     Q     -- during the time period reflected in the chart?

4     A     I did, yes.

5     Q     Okay.  What did you determine as the reason --

6     A     It was pretty clear that the family companies were

7     -- was -- constantly in and out of the press with, you know,

8     the B word, as Mr. Keglevic likes to use, bankruptcy, so we

9     went there.

10     Q     Okay.  So then let's turn to the subject of

11     whether or not this trading data suggests anything about

12     whether investors in the marketplace believe that the make

13     whole applied in bankruptcy.

14     A     So I'll focus on the trading data and give you

15     some history.  But if you notice, it's quite volatile.  It's

16     up and down quite a bit and, you know, for example, if you

17     look at August 2011 when the bonds traded down to 95, that

18     was during the time that the, you know, U.S. Treasury -- the

19     U.S. Government -- was downgraded by Standard & Poors, and

20     the European banking system was under threat of, you know,

21     demise, really.  And these bonds held then pretty well, but

22     went down a lot.

23          And so if you go further to the right there to,

24     you know, about April of 2012, maybe February of 2012, even

25     December, they traded very, very significantly above par,

1    close to 110.  And then have traded through up to 115 and

2    then stayed at that level for quite a period of time.  And

3    it looks like it got as high as 116 or 117 on this graph in

4    the April/June timeframe of 2013.  But that's a very long

5    period of trading very, very significantly above par.

6        Q    And what does the fact that the high yield debt

7    here was trading significantly above par for that period of

8    time when people were talking about bankruptcy, what does

9    that suggest about what investors were thinking about the

10   make-whole provision?

11       A    Yeah.  So I think that investors in the

12   marketplace who were buying this debt certainly believe the

13   make whole was payable, you know, in bankruptcy.

14           MR. ESSER:  And, Your Honor, I'm sorry.  I'm going

15   to move to strike that as pure speculation.

16       BY MR. PLATT:

17       Q    Well, I'm going to ask.  What is your basis for

18   thinking that, Mr. Cacioppo?

19       A    All the research I've done.

20       Q    Okay.  But let's take your hypothetical example --

21           THE COURT:  Wait a minute --

22       Q    -- of the guy who invests --

23           THE COURT:  Wait a minute.  All the research

24   you've done?  You're going to need to be a little more

25   specific.

1            THE WITNESS:  Okay.  Well, I mean, I've reviewed

2      the articles, news articles, and, you know, just what was

3      really taking place and -- in the -- at the time.  And it's

4      -- I've researched this issue since 2007, and so I have a

5      well established, sort of, history and the name, and I feel

6      that, you know, trading prices are trading prices.  I have a

7      lot of experience with this.

8            MR. PLATT:  Can I try to lay a foundation, Your

9      Honor, with one more question?

10            THE COURT:  Yes.

11        BY MR. PLATT:

12        Q    With respect to that $1 million investor, can you

13      explain why a person, or why a person would not, invest the

14      $1 million if they thought there was no call protection

15      during this time period?

16        A    Okay.  So if you were paying 115 for this bond,

17      that's basically that example I was using, Your Honor, for

18      $1 million, would be -- means -- that you were paying

19      $1,150,000 for that bond.  And if the company could turn

20      around and pay it off in a short time period, you would lose

21      that, because you would get paid off at par if you were able

22      to get paid off without paying a make whole.  So the person

23      who is paying that day that amount is putting a lot of

24      capital at risk.  Fifteen percent of $150,000 on a $1

25      million bond, or 15 percent, it's a lot of money in the bond

1   market.

2          You know, you see some smaller mid-cap stocks that

3   move around like that.  But your bonds, it's much more rare.

4   And it's a really big deal in the bond market for something

5   to trade down 5, 10, 15 points.  And so to me, it's pretty

6   clear that the marketplace felt this.

7          MR. ESSER:  Your Honor, I'm going to renew my

8   objection.  I heard more speculation and no foundation.

9          THE COURT:  I'll allow the opinion.

10          MR. PLATT:  Thank you, Your Honor.

11      BY MR. PLATT:

12      Q    In your experience, Mr. Cacioppo, is it a

13   generally accepted method among financial professionals to

14   analyze trading prices as a way to draw conclusions about

15   market expectations?

16      A    Absolutely 100 percent.  I mean, it's -- there's a

17   whole field called technical analysis, where the big firms

18   and even smaller firms and Wall Street firms they have these

19   technicians and all they do is analyze charts.

20      Q    So let me ask you just a couple more questions,

21   Mr. Cacioppo.  I want to pick up on something that His Honor

22   asked Mr. McCarty yesterday, which is if call protection is

23   so important to investors, why don't all indentures say that

24   a make whole would be do, or at least provide for a make

25   whole, in an automatic acceleration?

1       A    Well, the indentures that I've become accustomed

2    to, which this deal represents -- I mean, certainly it's a

3    huge deal and it had a ton of indentures -- the standard --

4    it's really for the standard form indenture in terms of the,

5    you know, acceleration language and a lot of the other

6    provisions.

7               And it's been around since -- it's been

8    established since 2007 and it was based on the first data

9    deal, and those are two of the biggest deals ever.  And I've

10   seen this on a ton -- a lot of deals -- I shouldn't say

11   words like "tons" -- lots of deals.

12              And these are important provisions.  You know,

13   it's a rescission right to I think accelerate the bonds and,

14   you know, allow you to start your protections.  And we rely

15   upon these to, you know, avoid loss and so, I mean, I think

16   that's the important aspects.

17      Q    So just breaking it down, there's an automatic

18   acceleration part of these provisions and a rescission part

19   of these provisions?

20      A    That's correct, yeah.

21      Q    Okay.  How do they work together in your view?

22      A    Well, the automatic acceleration provision in my

23   view is, again, some of the investors, there's room -- a lot

24   of lawyers in this room, and sort of restructuring folks are

25   almost like lawyers, but --

1      Q    Now, I'm just asking you from your investor's

2   point of view.

3      A    Yeah.  The investor's point of view, I mean, the

4   acceleration provision is a bankruptcy provision.  And so I

5   don't even know a situation that I've ever been involved in

6   where my bonds have been accelerated that hasn't been a

7   bankruptcy.  So if the rescission doesn't work in a

8   bankruptcy, you know, I don't know why it's in this bond.  I

9   don't know why it's in all these bonds.  It's -- that's what

10  it's there for.

11             MR. ESSER:  Your Honor, again, I'm going to move

12  to strike this.  It's already been excluded as opinion 4 --

13             THE COURT:  Yeah.  Stricken.

14             MR. ESSER:  -- yesterday.

15             THE COURT:  Stricken.

16             MR. PLATT:  Thank you, Your Honor.

17             THE COURT:  And I don't even think it's proper

18  opinion testimony to begin with.  It's a legal question.

19  He's talking about interpreting the document.

20             MR. PLATT:  Your Honor, it was not meant for that

21  purpose.  It was meant for the purpose of when an investor

22  --

23             THE COURT:  What an investor understands the

24  documents to mean.

25             MR. PLATT:  No.  I'm asking from an investor's

1    perspective, Your Honor, whether or not when the investor

2    reads this, it has an economic meaning to them.

3                THE COURT:  Well, that's not what he testified.

4    So --

5                MR. PLATT:  Okay.  If I rephrase the question that

6    way, Your Honor, would it be admissible?

7                THE COURT:  No.  Thank you.

8                MR. ESSER:  Good morning, Your Honor, again, Mike

9    Esser of Kirkland and Ellis for the Debtors.

10                         CROSS-EXAMINATION

11       BY MR. ESSER:

12       Q    Good morning, Mr. Cacioppo.

13       A    Good morning.

14       Q    Mr. Cacioppo, you didn't speak with the holders of

15    the ten percent note as part of your assignment in this

16    case; is that correct?

17       A    I did not.

18       Q    You didn't speak with the holders as a 6.875

19    percent notes as part of your assignment in this case?

20       A    I did not.

21       Q    You understand that the current holders of the

22    notes could be different from the holders that originally

23    purchased the notes or exchanged for the notes in 2010,

24    correct?

25       A    Yes.

1        Q    You talk about the importance of call protection

2    on direct.

3            MR. ESSER:  Permission to approach, Your Honor.

4            THE COURT:  Yes.

5        BY MR. ESSER:

6        Q    Mr. Cacioppo, I'm going to hand you a copy of your

7    expert report.

8        A    I have it.

9        Q    Mr. Cacioppo, you stand behind the opinions

10   expressed in your report, correct?

11       A    Correct.

12           MR. ESSER:  If we could put page ten, paragraph

13   four of the report up.  If you could just blow that up for

14   me.

15       BY MR. ESSER:

16       Q    Mr. Cacioppo, you indicated in your report that

17   make whole payments are "designed to ensure that the lender

18   will suffer no financial loss by virtue of an early

19   redemption."  Correct?

20       A    Yup, that's what it says.

21       Q    And you further indicated that they compensate the

22   bond holder for the reinvestment risk that early redemption

23   creates, correct?

24       A    Correct.

25       Q    If we can move to page five, paragraph two.

```
1        A      Say that again.

2        Q      I'm sorry.  If we can move to page five, paragraph

3    two.

4               MR. ESSER:  And if you could just blow that up for

5    me.

6        BY MR. ESSER:

7        Q      Further, you wrote that "EFIH's refinancing of the

8    notes in bankruptcy without paying a make whole --

9        A      I'm not following you.  Hold on one second.

10              THE COURT:  I don't see it either.

11              THE WITNESS:  Yeah.  I see turning --

12       BY MR. ESSER:

13       Q      It's the highlighted portion there, and it says

14   "turning this --

15       A      Turning -- yeah.

16       Q      Sure.  "Turning this understanding on its head,

17   EFIH, the issuer, elected to refinance the notes in

18   bankruptcy without paying a make whole.  As a result, it was

19   able to obtain the very same economic benefits for itself

20   and caused the very same economic harm to the holders of the

21   notes that the call protection provisions were designed to

22   prevent."  Did I read that correctly?

23       A      You did.

24       Q      Thank you.  Mr. Cacioppo, you spoke about

25   reviewing the company's indentures.  As part of this
```

1    assignment, you didn't review a single indenture other than

2    the company's various indentures, correct?

3        A    I'm not sure that's true.  I might have reviewed

4    -- I did review some others.  But I do that every day for a

5    living, so I didn't feel a need to --

6        Q    Is your testimony that as part of this assignment

7    you did review other indentures?

8        A    I review them every day, so I actually do pick up

9    things and look at them just to see what, you know,

10   comparisons.  So I don't know, what's it part of the

11   assignment or my daily work, but I review other indentures.

12   As a daily --

13       Q    But not as part of this assignment?

14       A    -- as a daily -- it wasn't part of the assignment.

15   It wasn't in the document list.  Yes, you're correct.

16       Q    Thank you.

17            MR. ESSER:  No further questions.

18            THE COURT:  All right.  Redirect?

19            MR. PLATT:  No, Your Honor.  Thank you, Mr.

20   Cacioppo.

21            THE COURT:  Thank you.

22            THE WITNESS:  Thank you, sir.

23            THE COURT:  Thank you.

24        (Witness excused.)

25            MR. PLATT:  Your Honor, we can call our next

1    witness now or my own personal preference, but will others

2    can do whatever Your Honor wants, would be to take an early

3    lunch break.  Breakfast this morning at the hotel was really

4    bad.

5              THE COURT:  Where are you staying?

6              MR. PLATT:  We're staying at the Sheraton, and

7    it's a very nice set of rooms, but boy that's bad granola.

8              THE COURT:  Is there any objection to taking lunch

9    now?

10             MR. ESSER:  No, sir.

11             THE COURT:  All right.  We'll reconvene at 1:00

12   p.m.

13             MR. PLATT:  Thank you, Your Honor.

14        (Recessed at 12:01 p.m.)

15             THE COURT:  Please be seated.  Okay.

16             MR. ANKER:  Good afternoon, Your Honor, Philip

17   Anker again for the record.  And we would call Ethan

18   Auerbach.

19             You'll be pleased to know, Your Honor, I don't

20   propose to give Mr. Auerbach a single binder or document or

21   Your Honor a single binder or document in connection with

22   his examination.

23             THE COURT:  Outstanding.

24             THE CLERK:  Please raise your right hand.

25        (Witness Sworn)

1           THE CLERK:  Please state and spell your name for

2    the record.

3           THE WITNESS:  Ethan Auerbach, A-U-E-R-B-A-C-H.

4                     DIRECT EXAMINATION

5    BY MR. ANKER:

6    Q    Good afternoon, Mr. Auerbach.

7    A    Good afternoon.

8    Q    By whom are you employed?

9    A    Blue Mountain Capital Management.

10   Q    What is Blue Mountain Capital Management?

11   A    We're an investment manager.

12   Q    Okay.  If you could just talk a little bit into the

13   mike --

14   A    Sure.

15   Q    -- I have some sense that it may be hard for people to

16   hear.

17           Can you approximately give the Court a sense of

18   the total assets under management of Blue Mountain Capital?

19   A    Roughly $20 billion.

20   Q    And a sense of the number of different funds that

21   comprise that $20 billion in assets under management?

22   A    Around ten, give or take.

23   Q    Okay.  And does Blue Mountain invest in one particular

24   type of asset or security, or a broad spectrum?

25   A    A broad spectrum, primarily focused on credit, but

1    including loans, bonds, equities, a lot of other stuff.

2    Q    Does the credit -- or do the credit investments of Blue

3    Mountain include investments in both high-yield and

4    investment grade debt?

5    A    Yes, although we primarily focus on high-yield.

6    Q    And both secured and unsecured?

7    A    Yes.

8    Q    Can you give the Court a sense of the types of

9    underlying investors who invest in the Blue Mountain funds?

10   A    Sure, it's pension funds, sovereign wealth funds,

11   university endowments, insurance companies, individuals.

12   Q    You mentioned individuals.  Is it fair to say that the

13   categories you gave earlier, the pension funds, sovereign

14   wealth funds, insurance companies, and I think you mentioned

15   a fourth --

16   A    Endowments.

17   Q    -- endowments, do they make up the bulk of the client

18   base in terms of dollars?

19   A    Yes, significantly more than that.

20   Q    What position do you hold at Blue Mountain?

21   A    I'm a partner and a portfolio manager.

22   Q    What are your responsibilities as a partner and

23   portfolio manager?

24   A    Generally, identifying investments, conducting our

25   legal team of people that due diligence on the investments,

1    working on the investments over time, you know, making

2    decisions as to when to buy or sell investments.

3    Q    Okay.  You mentioned that on the credit side Blue

4    Mountain is more invested in high-yield than an investment

5    grade debt.  As of today, can you provide the Court a sense

6    of the amount of high-yield debt that Blue Mountain holds?

7    A    That would be in the single-digit billions.

8    Q    Single-digit billions?

9    A    In dollars, yes.

10   Q    So compared to the 20 billion under management,

11   certainly less than 50 percent?

12   A    I believe that's correct as of today, yes.

13   Q    Okay.  Have there been other periods of time where

14   let's say the high-yield market has been more favorable

15   where the percentage of the overall portfolios or the funds

16   invested in high-yield debt has been higher?

17   A    Yeah.  I mean, it fluctuates generally, you know,

18   within certain reasonable ranges based on the more

19   attractive opportunities for us.

20   Q    Okay.  Is all of that high-yield debt invested in

21   distressed securities?

22   A    No, the majority of it is not.

23   Q    The majority is not.

24        Let's focus on high-yield debt.  How does Blue

25   Mountain make a decision whether to invest in a particular

1   high-yield bond?

2   A    Really what -- ultimately, at the end of the day what

3   we're focused on is what our total return will be, as well

4   as the aggregate, the total dollar amount, as well as the

5   percentage amount of return.  And the, you know, key inputs

6   in determining that are the coupon, the price you paid for

7   the security, the maturity date, the call protection.

8   Essentially the, you know, various key components that

9   determine the expected cash flows from the security, as well

10  as all the other provisions of the document that would help

11  us understand what our downside risk would be, you know,

12  from the obvious ones such as what our collateral might be

13  or might not be, as well as the various protections that

14  essentially force the company to comply with those essential

15  principal terms of the indenture.

16  Q    I think you may have just touched on this.  You talked

17  about wanting to get the highest return; does Blue Mountain

18  also consider the flipside of the equation, the risk of any

19  investment?

20  A    Absolutely.

21  Q    Is there an attempt to balance the two, that is balance

22  return and risk?

23  A    Yeah.  I mean, as we evaluate different securities, you

24  know, naturally securities that tend to have the highest

25  return tend to have more risk associated with them and, you

1    know, our job essentially is to find securities where we

2    think the risk is reasonable for a given return.

3    Q    Now, one of the factors you said you consider in making

4    an investment is, if I recall the term you used, call

5    protection?

6    A    That's right.

7    Q    Okay.  We've had a lot of testimony about what call

8    protection is.  To move this along, can you give a very

9    brief statement of what it is in your world?

10   A    Yes, it's the protection against an early redemption or

11   an early repayment of the security.

12   Q    Why is that -- you said it's one of the key factors you

13   look at, why?

14   A    Well, I mentioned, you know, we focus on both total

15   return as well as aggregate amount of money, you know, that

16   we have to earn for our investors, and if a company were

17   able to issue bonds and one day later repay them at the same

18   price that we purchased them, we wouldn't make any money.

19   Q    What if interest rates go down or the company's credit

20   -- I'm sorry.  What if -- yeah, interest rates decline or

21   the company's credit improves, would you then make no money

22   or would you suffer a loss?

23   A    Well, if the company's credit improves, we would seek

24   to, you know, in the ordinary course, if we had call

25   protection or if the company had no right to call the bond

1    at all, the price of our bond would go up over time.  The

2    flipside, if the company's credit quality deteriorated, the

3    price of our bond would go down and we would lose money.

4    Q    When the credit quality of the company declines or when

5    interest rates go up, with respect to the high-yield in Blue

6    Mountain's portfolio, does Blue Mountain have the right to

7    put that debt back to the company?

8    A    No.

9    Q    Okay.  Does Blue Mountain account for its investments

10   on a mark-to-market basis?

11   A    Yes, we do.

12   Q    How often?

13   A    Daily.

14   Q    And so even if you don't sell a note, if it declines in

15   value, its trading price, you realize a loss through the

16   mark-to-market?

17   A    Well, we show a loss and an investor who redeemed from

18   one of our funds would suffer a loss.

19   Q    Okay.  Now, we've had a lot of testimony and you've

20   been in the courtroom about a make-whole.

21   A    Uh-huh.

22   Q    And make-whole is a form of call protection?

23   A    It was really a component of call protection that is

24   necessary to ensure the viability of the actual call

25   protection.  It essentially provides an alternative, you

1    know, it's just -- you know, a company can take two paths

2    with a security, one is to respect the call protection

3    itself and the other one is to compensate an investor for,

4    you know, a decision that they make to take a company -- to

5    take a bond out early by paying a make-whole.

6    Q    Of the high-yield bonds in the Blue Mountain

7    portfolios, what percentage, approximately, of them have

8    neither a no call nor a make-whole provision?

9    A    None to my knowledge.

10   Q    Zero percent?

11   A    I can't say for certainty that there isn't one, we have

12   a number of high-yield bonds.

13   Q    But as best as you know it's around zero?

14   A    Yeah.

15   Q    What percentage of them as of today have make-whole

16   rather than absolute no calls?

17   A    The substantial majority.  I can't tell you whether

18   it's 80 percent or 90 percent, but some number like that.

19   Q    We have heard testimony about reinvestment risk, does

20   call protection protect against reinvestment risk?

21   A    Yes, that's exactly what it's intended to do.

22   Q    Okay.  Mr. Auerbach, let me turn to EFIH in particular.

23   Does Blue Mountain as of today hold any EFIH first lien

24   debt?

25   A    Yes, we do.

1    Q    Now, principal has been paid back, but let's talk about

2    it to give the Court a sense as if it weren't paid back,

3    sort of the face amount.  Approximately how much in

4    principal balance does Blue Mountain hold?

5    A    About 650 million.

6    Q    $650 million?

7    A    Yes.

8    Q    Okay.  Are you a member of any steering committee with

9    respect to first lien holders of EFIH?

10   A    Yes.

11   Q    Since when has Blue Mountain been on that steering

12   committee?

13   A    I think officially since on or around March of 2014.

14   Q    Okay.  When did Blue Mountain first acquire EFIH first

15   lien notes?

16   A    In the fall of 2011.

17   Q    2011?

18   A    Yes.

19   Q    And you know that EFIH filed for bankruptcy in 2014,

20   April 29, 2014?

21   A    Yes.

22   Q    As of the petition date, as of April 29, 2014,

23   approximately how much first lien debt, EFIH first lien debt

24   did Blue Mountain hold?

25   A    As of the petition date, I think it was between four

1    and 500 million.

2    Q    Between four and 500 million?

3    A    Yes.

4    Q    And with respect to those bonds purchased over the

5    petition date, and I'm not asking you to get down to the

6    decimal point, what was the approximate average purchase

7    price that Blue Mountain had paid?

8    A    About 105, so five points above par.

9    Q    Let me make sure we have a clear record on that.  I

10   think we have evidence that the EFIH notes paid interest

11   twice a year.

12   A    That's right.

13   Q    And do you remember when it was?

14   A    I think it was December 1st and June 1st.

15   Q    Okay.

16   A    So in fact the actual price we would have paid, 105 --

17   when I said 105, that's what's referred to as a clean price,

18   what that means is it excludes accrued interest.  We would

19   have paid for any accrued interest on top of that.  So if we

20   were halfway -- you know, on average, you know, if we're

21   talking about bonds that we acquired in the first quarter of

22   2014, on average they would have had two points of accrued

23   interest, so we would have paid 107.

24   Q    Do you -- let's go back to the first purchase in 2011.

25   Did you understand that those notes had a make-whole

1    provision?

2    A    I did, yes.

3    Q    Would Blue Mountain have acquired those notes if there

4    was no make-whole provision?

5    A    I mean, if it had no call -- if it had no call

6    protection at all, we would not; if it had a bullet life to

7    maturity, we probably would have.

8    Q    Okay.  A bullet life to maturity meaning an absolute no

9    call, right?

10   A    Right.  I mean, we wouldn't have acquired it if it

11   didn't have call protection in some way, shape or form,

12   which it did.

13   Q    Okay.  With respect to the notes that Blue Mountain

14   acquired after 2011, the prior to April 19, April 29, 2014,

15   would Blue Mountain have called -- have purchased those

16   notes if they had been freely callable without a make-whole?

17   A    No.

18   Q    Would it have made any economic sense for Blue Mountain

19   to pay above par for the notes if they were freely callable

20   without a make-whole?

21   A    No.

22   Q    Why not?

23   A    Presumably, the company would have refinanced us

24   immediately, we would have lost the premium we paid.

25   Q    The premium meaning the amount above par?

1    A    That's correct.

2    Q    Okay.

3    A    And we also wouldn't have gone through the trouble,

4    even if they had been trading at par, we wouldn't have gone

5    through the trouble of buying notes just to have them called

6    away whenever the company's credit quality dropped.

7    Q    I'm going to try to go through this quickly.  Did you

8    understand, both when you made the initial purchase in 2011

9    and later purchases leading up to the petition date, that

10   the obligor was EFIH?

11   A    We did.

12   Q    Did you understand where EFIH was in the capital

13   structure of the EFH companies?

14   A    Yes.

15   Q    Did you understand that EFIH owned 80 percent of the

16   equity in Oncor Holdings, which in turn owned 100 percent of

17   the equity in EFIH?

18   A    I'm sorry, can you repeat that?

19   Q    I'm sorry, owned 100 percent of the equity in Oncor?

20   A    Yes.

21   Q    Were you relying on the separate credit of EFIH?

22   A    Yes.

23   Q    Did you have an understanding as to whether the first

24   lien notes were secured or unsecured?

25   A    We did, they were secured.

1   Q    Did you understand that they have first lien priority?

2   A    Yes, we did.

3   Q    Did you rely upon the fact that these notes were

4   secured and had a first lien priority?

5   A    Yes.

6   Q    Okay.  By the time of -- did you make purchases in 2014

7   itself leading up to April 29, 2014?

8   A    Yes, I did.

9   Q    Okay.  Let's focus on that time period, not back in

10  2011.  Did Blue Mountain have a view, not a certainty but a

11  view as to whether it was likely at that point that EFIH was

12  solvent?

13  A    We thought it was reasonably likely, it was frankly --

14  it was quite possible, we certainly didn't know for sure.

15  Q    Did the reasonable likelihood that it was solvent

16  factor into your decision?

17  A    It was one component, yes.

18  Q    Why?

19  A    What I would say -- again, what I -- all of our

20  purchases focused on, you know, our expectation that we

21  would receive a contractual cash flow stream over the life

22  of our investment, both providing a rate of return that was

23  acceptable as well as an aggregate, you know, dollar return.

24  And we always, you know, throughout the history of our

25  investing, it was our understanding that there was call

1   protection and there was a make-whole provision within the

2   call protection that would allow the issuer an alternative

3   if in fact -- if it decided to repay the notes before the

4   first call date.

5           What I would say it that after November 1st, 2014

6   the company made its intention known or at least put out a -

7   - let me rephrase that -- the company put out a terms sheet

8   which suggested that it had had discussions about

9   refinancing the first lien notes without having a make-whole

10  prior to the first call date.  And clearly, as a holder of

11  the first lien notes at that point, that was something that

12  was unfavorable and not expected from our perspective.

13      And we essentially at that point really tried to make

14  sure that the make-whole was what it says it was, which was

15  a promise to make us whole if in fact call protection wasn't

16  respected.  And as I think everyone is aware, there were a

17  few key elements of that, of the indenture that allowed us

18  to enforce the make-whole if in fact the bonds were called

19  prior to the first call date and one of those provisions was

20  the right to rescind our acceleration.  If in fact the

21  company did go into bankruptcy, our understanding was that

22  it was not -- that were the debtor insolvent, it was not a

23  right we would likely be able to use.

24  Q    But if the debtor was solvent, what was your

25  understanding?

1    A    Our general understanding was that it was reasonably

2    likely that we would be able to use that right, you know,

3    based on -- not that -- look, I'm not a lawyer, I don't know

4    for sure, but our understanding was that generally speaking

5    contractual relationships that were intended to provide a

6    benefit to us would be respected in the event the debtor was

7    solvent.  And again, that really -- you know, I think my

8    layperson's understanding of it was that the -- look, this

9    is a provision that was in the indenture to benefit bond

10   holders, both the acceleration and the rescission were

11   provisions that were intended to benefit us because it

12   essentially allowed us to -- it automatically accelerated

13   the bonds upon a bankruptcy, however it gave us the option

14   of either living without acceleration or rescinding it and

15   living with the original contract.  It was our intent -- it

16   was our understanding that, were the debtor solvent, it

17   would be likely that a court would respect that right that

18   we essentially had that was intended to benefit us.

19   Q    Okay.  Mr. Auerbach, I think when you gave your answer

20   you referred to a press release or an 8-K filed by the

21   debtors or EFIH on November 1, 2014, did you mean 2000 --

22   A    I meant 2013.

23   Q    Okay.  Between the petition date, April 29, 2014, and

24   June 19, 2014, the date of the repayment of the principal

25   and accrued interest on the notes, did Blue Mountain acquire

1   additional holdings in the EFIH first lien notes?

2   A    Yes.

3   Q    The position I think you -- what have they increased

4   from to what?  Go from sort of, if you can, as best you

5   recall?

6   A    You know, I don't have my notes in front of me,  I --

7   Q    Okay.  What was the position, as you recollect it,

8   around on the petition day?

9   A    I think I -- it was in -- between four and 500 million,

10  I believe.

11  Q    Okay.  As of the -- I'm sorry, and what was your

12  position as of June 19, 2014, approximately?

13  A    That I do know, it was 560 million.

14  Q    Okay.  Now, have you since the June 19, 2014 -- well,

15  let's back up.

16           On June 19, 2014, obviously principal and interest

17  was repaid, but there's still a contested right to a make-

18  whole.  Are the securities still trading?

19  A    Yes, they do.

20  Q    Have you acquired -- both bought and sold with respect

21  to the EFIH first lien notes since June 19, 2014?

22  A    Yes, we have both bought and sold.

23  Q    Is it fair to say, has the position net-net grown

24  slightly?

25  A    It has, yes.

1    Q    But is it fair to say that net-net the bulk of the

2    position was acquired prepetition and certainly prior to

3    June 19, 2014?

4    A    Yeah, roughly five sixths of it.

5    Q    Okay.  Now, with respect to the notes acquired between

6    April 29, 2014 and June 19, did Blue Mountain again pay a

7    price north of par?

8    A    Yes, we did.

9    Q    And what was that price approximately on average?

10   A    It was actually still roughly around 105.

11   Q    And again, 105 --

12   A    105 clean price and a higher dirty price, a higher

13   price --

14   Q    So 105 plus accrued interest, right?

15   A    Yes, that's right.

16   Q    Was the answer to that yes?

17   A    Yes.

18   Q    I didn't hear you, my apologies.

19          If Blue Mountain -- well, let's back up.  Did Blue

20   Mountain sign the rescission notice that was sent to the

21   indenture trustee and copied to the debtor?

22   A    Yes.

23   Q    Why?

24   A    Because we didn't want our bonds redeemed.

25   Q    I'm sorry?

1   A    Because we wanted to rescind the acceleration so our

2   bonds would not be redeemed.

3   Q    Was it the company's election to redeem you or did you

4   require the redemption?

5   A    It was the company's election.

6   Q    You didn't -- you still have to not -- you sought to

7   waive a default, not declare a default, right?

8   A    That's correct.

9   Q    You sought to de-accelerate, not accelerate, right?

10  A    Yes.

11  Q    If Blue Mountain -- let me back up.  If the Court

12  determines that relief from the stay cannot be granted and

13  as a result the acceleration cannot be rescinded and as a

14  result no make-whole is paid, will Blue Mountain be harmed?

15  A    Yes.

16  Q    How will it be harmed?

17  A    We thought we were entitled to a stream of contractual

18  payments through at least December 1st, 2015.  We didn't

19  receive that stream and we did not receive the alternative

20  make-whole, you know, that was intended to make us whole.

21  We also, you know, as I think has been well documented and

22  testified to by other witnesses, got the money back in an

23  environment where interest rates are extremely low and, you

24  know, investments of similar credit quality are not trading

25  at ten percent.

1           And furthermore, this was a large amount of money

2    for us and it was -- you know, there's -- aside from the

3    actual fact that there are very few securities that are of

4    similar attractiveness, it takes time to reinvest $561

5    million.

6    Q    Okay.  Let me break that down into some components.

7    Obviously, Blue Mountain got back the principal at par,

8    right?

9    A    Yes.

10   Q    At the time in June, 2014, to give the Court some sense

11   of the economic environment for alternative investments, was

12   Blue Mountain fully invested?

13   A    No, we were not.

14   Q    And just so we're clear on what that means, of the $20

15   billion in money under management, Blue Mountain hadn't

16   invested all that 20 billion?

17   A    No.

18   Q    How much did Blue Mountain have, if I could use the

19   euphemism, on the sidelines?

20   A    Over a billion dollars.

21   Q    Over $1 billion dollars?

22   A    Yes.

23   Q    Why?

24   A    I mean, there's a process that it takes to invest

25   money, you don't -- you know, we have to spend time trying

1   to identify new investments and, you know, there were not

2   enough investments that met the criteria that, you know, we

3   require to make at that time.

4   Q    So when you balance your risk and reward, your view was

5   that there weren't investments sufficiently attractive to

6   put to work all of the money you had under management?

7   A    Yeah, that's right.

8   Q    Okay.  Now, as to that one billion or so that you had

9   on the sidelines even before you got back your 560 million,

10  I assume you didn't literally put it under the mattress,

11  where was it?

12  A    It would have been in, you know, overnight money market

13  funds, things of that nature.

14  Q    That earned as of June, 2014 about what percentage on

15  an annualized basis?

16  A    About zero.

17  Q    Well, it's slightly above zero?

18  A    Not really.  I think it's probably less than a tenth of

19  a percent.

20  Q    Okay.  Now, you were deposed yesterday and one of the

21  questions I think you were asked was what did Blue Mountain

22  do with the 560 million that it got back.

23  A    Yes.

24  Q    First let me ask you a question.  You have a billion

25  already sitting in cash, you get another 560.  Have you ever

1    heard the expression money is fungible?

2    A    Yeah.

3    Q    What do you mean by that?

4    A    What I mean is that, you know, over the -- well, you

5    can't track -- you know, it's not as if we keep separate

6    dollars in a bank account, we identify the 561 million is

7    from the TX2 (ph) redemption, the other, you know, billion

8    dollars is from something else, it's all the same account.

9    Q    Is Blue Mountain fully invested as of today?

10   A    Some of our funds are, some are not.

11   Q    Okay.  Can one look at the period June 19, 2014 until

12   today, can you give the Court a sense of the overall net

13   return that Blue Mountain has achieved?

14   A    It's between two and three percent.

15   Q    Two to three percent, let me make sure, is that on an

16   annualized basis?

17   A    Yeah, it's the actual returns.

18   Q    Pardon me?

19   A    Those are the actual returns.

20   Q    Okay.  So that's over basically a nine-month period, on

21   an annualized basis it would be lower --

22   A    You would round it up to three or something.

23   Q    Pardon me?

24   A    You would round it up to three or so.

25   Q    Okay.  Now, one of the options that was available

1   potentially to Blue Mountain was to accept the settlement

2   that was offered for the make-whole, which was at 105?

3   A    That -- well, yes, that's right.

4   Q    And you could have then invested in the DIP, right?

5   A    Yes.

6   Q    And the DIP paid 4.25 percent --

7   A    Yes.

8   Q    -- annually?  Did Blue Mountain decide to do that?

9   A    No.

10  Q    Did Blue Mountain believe if they had done that it

11  would have been harmed?

12  A    Yes.

13  Q    Why?

14  A    Because we thought we were -- you know, our

15  understanding of the contract and what we were entitled to

16  was another year and a half of coupons at a ten-percent

17  coupon rate and a ultimate repayment at 105 on December 1st,

18  2015 and, you know, accepting the settlement that was

19  offered to us was substantially less than that.

20  Q    So you would have had to take basically -- you would

21  have had to walk away from about 75 percent of the make-

22  whole?

23  A    That's right.

24  Q    And you would have then had an opportunity to invest in

25  the DIP.  And you were here today when Mr. Horton was

1    examined by Mr. McGaan about the DIP?

2    A    Yes.

3    Q    Now, you could have invested in the DIP anyway on the

4    secondary market, right?

5    A    To some extent, yes.  I don't think that in reality we

6    wanted 561 million of the -- we would have been able to buy

7    that much, but we could have --

8    Q    Was the DIP --

9    A    -- bought some of it.

10    Q    My apologies, I thought you were done, Mr. Auerbach.

11    Was the DIP attractive when you're balancing risk and reward

12    to Blue Mountain?

13    A    Not to us, no.

14    Q    Why not?

15    A    We attempt to find returns that are higher than

16    -- when we would have bought it, it would have been, you

17    know, in the high threes in terms of the yield and that's --

18    frankly, we don't see too many investments very often that

19    have returns that are that low.

20    Q    You seek to achieve higher, but you have to take

21    greater risks to achieve a higher return, right?

22    A    That's right, yes.

23    Q    How many investment opportunities were there available

24    to Blue Mountain in June 19, 2014 that would have paid Blue

25    Mountain ten percent per annum or more fully secured, over-

1    secured, first lien paper, with a maturity to first call

2    date of about 18 months?

3    A    There's none to my knowledge.

4    Q    Have there been any to your knowledge that have arisen

5    between June 19, 2014 and today?

6    A    No.

7              MR. ANKER:  Pass the witness, Your Honor.

8              MR. SLADE:  Good afternoon, Your Honor, Michael

9    Slade for the debtors.  May I proceed?

10                    THE COURT:  Yes.

11                    CROSS-EXAMINATION

12   BY MR. SLADE:

13   Q    Good afternoon, Mr. Auerbach.

14   A    Good afternoon.

15   Q    Again, we met yesterday, but I'm Mike Slade, I

16   represent the debtors.

17   A    Okay.

18   Q    I have a few questions for you.

19   A    Sure.

20   Q    You testified on direct that you're a partner and

21   portfolio manager at Blue Mountain Capital; is that right?

22   A    Yes.

23   Q    And Blue Mountain employs roughly 300 people?

24   A    Yes.

25   Q    You testified on direct that you have about $20 billion

Page 110

1    in assets under management?

2    A    Yeah, that's about right.

3    Q    And Blue Mountain has hundreds of investors, right?

4    A    I -- yes.

5    Q    And there are thousands of different investments that

6    are covering the $20 billion of investments under

7    management, right?

8    A    Yes.

9    Q    Blue Mountain, I think you testified earlier, held

10   about $561 million of the EFIH's ten-percent notes at the

11   time that they were paid off, right?

12   A    That's right.

13   Q    And you were paid 100 percent of principal and accrued

14   interest at the time, right?

15   A    Yes, except for there was a small amount of money that

16   was held back as a legal contingency, but aside from that we

17   received (indiscernible).

18   Q    And at the time that the EFIH ten-percent notes were

19   repaid, that was about two to three percent of the total

20   assets under management from Blue Mountain, right?

21   A    That's right.

22   Q    And if the EFIH noteholders, the ten-percent

23   noteholders are awarded the make-whole, Blue Mountain will

24   get slightly more than $100 million, right?

25   A    That's right.

1   Q    And if that happens, that would be -- you testified on

2   direct that you focus on the total return in terms of the

3   total amount and the percentage return, right?

4   A    Yes.

5   Q    All right, I want to focus on that too.  And if you are

6   awarded a make-whole, you will get an additional

7   approximately 19 percent; is that fair?

8   A    Yes.  I think actually it's slightly higher than that,

9   but give or take.

10  Q    19 to 20 percent; is that correct?

11  A    Yeah, that sounds about right.

12  Q    And that is 19 percent of the debt that you owned on

13  the date that it was repaid and also on the make-whole

14  claims that you have bought since that time, right?

15  A    Yeah, that's right.

16  Q    Okay.  I think you testified on direct that your first

17  purchase of the EFIH ten-percent notes was in the fall of

18  2011, right?

19  A    That's right, yes.

20  Q    And you were not involved in negotiating any of the

21  provisions of the ten-percent indenture, right?

22  A    No.

23  Q    And you don't recall any discussions with any

24  representative of EFH or EFIH regarding the ten-percent

25  notes, do you?

1   A     No.

2   Q     Now, you could have called up somebody at the company

3   and asked them questions about whether your interpretation

4   of the indentures were right, couldn't you?

5   A     In reality, no.

6   Q     Whatever opportunity you had, you did not take; is that

7   fair?

8   A     No, no, that's not -- I mean, that's not entirely true.

9   I think that most companies are very careful that aside from

10  official offering documents they really don't like to, you

11  know, discuss the interpret -- contract interpretation with

12  respect to their debt.  I think -- I'm sure if you asked Mr.

13  Horton, he would tell you the same thing.  Look, if there's

14  a high-level question, am I reading the coupon correctly, am

15  I reading the, you know, maturity correctly, maybe that's

16  something that would, you know, be a very straightforward

17  question, but in terms of having a detailed discussion about

18  the nuances of the indenture, I don't think that's something

19  that companies generally engage in.

20  Q     Well, let me ask you the question a different way.

21  A     Yes.

22  Q     Did you try to reach out to the company and ask them

23  any questions about whether or not your reading of the

24  indenture was accurate?

25  A     I personally did not.  I don't know whether members of

1    my investment team did.  We occasionally do reach out and

2    ask those questions, I don't know whether we did on TX2s

3    (ph) or not.

4    Q    You're not aware of any specific discussions, are you?

5    A    No.

6    Q    Okay.  You testified on direct about the importance

7    that the make-whole has to your investment, I have a few

8    follow-up questions on that.

9    A    Please.

10   Q    So the make-whole is designed to ensure that the

11   lender, you, won't suffer financial harm due to a redemption

12   before the first call date.  That's basics, right?

13   A    Yes.

14   Q    Now, the make-whole was intended to compensate Blue

15   Mountain for the lost interest prior to the first call date,

16   as well as the call premium and the softer costs of

17   reinvestment, right?

18   A    Absolutely.

19   Q    And the failure to allow Blue Mountain to rescind

20   acceleration of the debt does not cause Blue Mountain any

21   harm other than its portion of the $431 million make-whole,

22   right?

23   A    That's right.

24   Q    Now, you testified a little bit on direct with Mr.

25   Anker about this, some of the -- well, let's just set the

1    table.  On or about June 19th of 2014, you got back 560

2    million plus interest, right?

3    A    Yes.

4    Q    Now, some of those funds have been reinvested, right?

5    A    Yes.

6    Q    And you don't know exactly which ones and you don't

7    know exactly where, right?

8    A    That's correct.

9    Q    And that's because, as Mr. Anker suggested, money is

10   fungible, right?

11   A    Absolutely.

12   Q    Okay.  You did have the opportunity to invest some of

13   the $560 million in the DIP, right?

14   A    At that time, I would have had -- yes, yes.

15   Q    And you chose not to, right?

16   A    Yes.

17   Q    And you chose not to reinvest in the DIP because the

18   yield wasn't sufficient to engender your interests, right?

19   A    Yeah.

20   Q    And generally speaking, if the yield is four and a

21   quarter percent, Blue Mountain wouldn't be interested in

22   investing at all regardless of credit risk, right?

23   A    Well, we actually -- we have some portfolio managers

24   who focus more on credit like that.  In terms of my focus,

25   it's not something that I would be interested in investing

1    in.

2    Q    And Blue Mountain has thresholds below which it

3    generally does not invest regardless of credit risk, right?

4    A    Right.

5    Q    And in terms of the investments that Blue Mountain has

6    made in 2014 and 2015, you don't know what the average

7    expected return on investment was, right?

8    A    There's a very -- it's a very heterogeneous sample of

9    investments, you know, I'm only responsible for a portion of

10   them, I can't give you a really good answer to that.

11   Q    And generally speaking, the range of expected return on

12   investment for investments that Blue Mountain has made since

13   repayment of the debt will range from three to four percent

14   at the bottom end to 20 to 30 percent at the top end, fair?

15   A    That's true, although when you asked me that question,

16   you know, I highlight that our expected returns take into --

17   you know, as I stated to you, they'll account for all the

18   risk and risk of loss that we may take on investments.

19   Q    Right.  The actual return could be higher or lower than

20   your expected return, right?

21   A    Absolutely.

22        THE COURT:  I think I've heard that on TV.

23        (Laughter)

24        MR. SLADE:  He said --

25        THE WITNESS:  Provide you a disclaimer and, you

1    know --

2              MR. SLADE:  Yes.

3              THE WITNESS:  -- exactly.

4    BY MR. SLADE:

5    Q    All right.  So you bought the first set of notes after

6    the exchange in 2010, right?

7    A    Yes.

8    Q    And you don't remember if you read the indenture before

9    buying the ten-percent notes, but you're sure that at least

10   one of the analysts on your staff did, true?

11   A    Our analysts always review the indentures of notes that

12   we -- you know, that we have purchased and I can tell you

13   I'm fairly certain that somebody would have.

14   Q    It's important to read the indenture, because then you

15   know what you're getting, right?

16   A    Yes.

17   Q    And your standard practice would be you want analysts

18   to review the indenture in detail and summarize the key

19   points to you, fair?

20   A    Yes.

21   Q    Now, between Blue Mountain's initial purchase of the

22   notes in 2011 and the payoff of those notes in 2014, Blue

23   Mountain was very active in buying and selling the notes,

24   fair?

25   A    Yeah.

1    Q    Blue Mountain made hundreds of different purchases of

2    ten-percent notes between the initial purchase in 2011 and

3    the payoff of the notes in 2014, right?

4    A    Yeah.

5    Q    And there wasn't any specific events during that time

6    period that caused you to want to buy more notes, right?

7    A    I think that -- well, really the changes in price and

8    changes in market conditions are really what I would point

9    to the most.

10   Q    In general, you bought notes when you thought that the

11   market was overestimating the risks, fair?

12   A    That's kind of what we -- that's pretty much what we do

13   for a living.

14   Q    And in addition to the indenture, you read many, many,

15   many other things to determine whether or not you should

16   invest, right?

17   A    Yeah.

18   Q    You read the prospectus, right?

19   A    Sure.

20   Q    I'm sorry, you have to answer --

21   A    Yes, yes.

22   Q    You read the exchange offer documents?

23   A    Yes.

24   Q    And you read pretty much all of the company's public

25   filings for the last seven, eight or nine years, right?

1    A    Well, what I told you is that during the process of

2    growing our position, you know, as we increase the size of

3    our position, we continued working on investments and read

4    incrementally more and more and become more and more

5    knowledgeable about the companies we invest in.

6    Q    Right.  And as you bought more and more and more of

7    EFIH ten-percent notes, one of the things you read were all

8    of the company's public filings for the last seven, eight or

9    nine years, right?

10   A    Key members of our team would have reviewed, I think I

11   said most of that, yes, or almost all of that.

12   Q    Okay.  Are you aware of any they didn't read?

13   A    No.

14   Q    Now, you testified on direct a little bit about the 8-K

15   that was issued by EFH on November 1 of 2013, do you recall

16   that?

17   A    I do.

18   Q    Okay.  The 8-K issued by the company on November 1 of

19   2013 contained several restructuring proposals that had been

20   floated by the company and by creditors, right?

21   A    Absolutely.

22   Q    And to you it suggested that there were negotiations

23   around refinancing the notes without paying a make-whole,

24   right?

25   A    Yes.

1   Q    And you understood that the company made a specific

2   proposal that was attached to the 8-K that included not

3   paying a make-whole, right?

4   A    Yeah.

5   Q    And it also included a restructuring proposal made by

6   the PIKs, right?

7   A    Yes.

8   Q    And that restructuring proposal also included no

9   payment of a make-whole to first lien creditors, right?

10  A    That's right.

11  Q    So as of November 1st of 2013, Blue Mountain understood

12  that restructuring proposals floated by the company and by

13  creditors both include not paying a make-whole, right?

14  A    Well, by the company and by creditors, both of whom

15  would benefit by the nonpayment of the make-whole, were

16  negotiating amongst themselves without the people who

17  actually would be affected by its input.  So, yes, it does

18  not surprise me whatsoever.

19  Q    Right.  You understood at the time, November 1st of

20  2013 -- well, I'll strike that -- you thought at the time,

21  November 1st --

22  A    Yes.

23  Q    -- of 2013, that EFIH and EFH were likely to file for

24  bankruptcy, right?

25  A    Yes, I knew it was certainly being considered and it

1    was a reasonably likely option.

2    Q    And you knew that it was at least reasonably likely

3    that in bankruptcy the company, the creditors or both would

4    fight the make-whole, right?

5    A    Yes.

6    Q    And you heard Mr. -- our last expert that testified, he

7    testified that once you own the notes, you and the issuer

8    are the enemy, and the issuer might try to call the make-

9    whole -- might try to call the notes and not pay the make-

10   whole at any time --

11   A    Well, I wouldn't say that's --

12   Q    -- do you remember that?

13   A    I did hear that testimony, I'm not sure I completely

14   agree with it, but --

15   Q    Okay.  But you understood as of at least November of

16   2013 that it was reasonably likely that there would be a

17   bankruptcy and that there would be a fight over whether or

18   not the make-whole was owed, right?

19   A    Well, actually, no, I would not say that that's the

20   case.  What I would say is that I knew that it was

21   reasonably likely there would be a bankruptcy and I knew

22   that it was possible that the issuer would call our notes

23   before their maturity in an attempt to not make -- not pay

24   us a make-whole, I absolutely couldn't have known if that

25   was what was going to happen.

1   Q    So you testified on direct with Mr. Anker that whenever

2   you make investment decisions what you're doing is you're

3   balancing the risks with the reward, right?

4   A    Yeah.

5   Q    All right.  And after November 1st of 2013, you knew

6   that one of the risks was there would be a fight over the

7   payment of the make-whole, right?

8   A    Yeah.

9   Q    And you continued to buy the notes anyway, right?

10  A    Yes.

11  Q    And you have continued to buy make-whole claims since

12  the notes were repaid in 2014, I think you testified to

13  that, right?

14  A    Yes.

15  Q    When was the last --

16  A    We both bought and sold that.  We -- very -- we've --

17  I'm sorry, go ahead.

18  Q    I apologize, I don't mean to cut you off.  Were you

19  finished?

20  A    No, I was going to say we have bought and sold, we've

21  probably done, I don't know, a hundred individual trades.

22  Q    When was the last time you bought a make-whole claim?

23  A    In the last few days.

24  Q    And currently you own about 650 principal amounts of

25  make-whole claims in the ten-percent notes, right?

1    A    Yes.

2    Q    That's about a hundred million more than you did on the

3    date of repayment?

4    A    Yes.

5    Q    Now, just a few more questions.  Mr. Auerbach, you

6    remain active in a high-yield debt market, do you agree?

7    A    Yeah.

8    Q    And you're familiar with the Momentive decision that

9    was entered by the Southern District of New York, right?

10   A    Yes.

11   Q    And you've actually changed the way that you negotiate

12   these high-yield bond deals since Momentive, right?

13   A    I think we have tried to be more clear when we have

14   influence, which is not all the time, and I think the market

15   in general has probably taken notice of these decisions and

16   tried to be more clear going forward.

17   Q    Right.  And sales --

18   A    I don't see how that --

19   Q    I apologize.

20   A    I'm sorry.

21   Q    I really don't mean to cut you off.  Go ahead.

22   A    No, please.

23   Q    Since Momentive, you have attempted to make clear in

24   the context of a bankruptcy acceleration that a make-whole

25   payment would be due, true?

Page 123

1    A    We have tried to.

2              MR. SLADE:  Your Honor, may I have a minute?

3              THE COURT:  Uh-huh.

4         (Pause)

5              MR. SLADE:  Nothing further.  Thank you, sir.

6              MR. ANKER:  I'm sorry, I thought -- I

7    misunderstood, I thought Mr. Slade was done.

8                        REDIRECT EXAMINATION

9    BY MR. ANKER:

10   Q    Mr. Auerbach, Mr. Slade asked you some questions trying

11   to put the dollars here in the context of the overall

12   portfolio.  If the make-whole is not -- if a right to

13   rescind is not honored, if the automatic stay is not lifted,

14   will the harm and the loss that Blue Mountain suffers be

15   material?

16   A    Yes.

17   Q    And how?  Explain that to the Court.

18   A    We -- if the bonds had never been called, we would have

19   received another -- using the principal balance of the bonds

20   at the time they were called, we would have received another

21   roughly year and a half of ten-percent coupons.  So we would

22   have received another $80 million in coupons and we would

23   have received another $25 million in call premiums, assuming

24   the bonds were called on the first call date, so roughly

25   $100 million.

```
1    Q    Mr. Slade asked you about different types of
2    investments.  I want to make sure -- I thought you testified
3    to this on direct:  Balancing risks and reward, you're
4    seeking to get more than what the DIP would pay, remind me
5    what has been the overall recovery earnings over the period
6    June 19, 2014, to the present?
7    A    In our largest fund, around two or three percent.  It
8    varies on the client.
9    Q    Mr. Slade pointed out that you've bought plans at
10   various points in time; indeed, even September of 2011, you
11   were buying on the secondary market, right?
12   A    Uh-huh.
13   Q    Yes?
14   A    Sorry.  September?  Yeah.
15   Q    From the very first purchase you did -- I said
16   September; you said fall of 2011 -- all of the purchases up
17   until the most recent are in the secondary market, correct?
18   A    Yes.
19   Q    You have an understanding -- and you're not a lawyer;
20   I'm not looking for a legal opinion -- but when you're
21   making these purchases, do you have an understanding as to
22   whether you're stepping into the shoes of the original
23   creditors?
24   A    Absolutely.  I think it's an overall to the functions
25   of the bond market.
```

Page 125

```
 1    Q    You be willing to pay my -- provide liquidity to this

 2    market if your rights were more limited than those of the

 3    original holder?

 4    A    No, of course not.

 5    Q    Do you believe that market could function at all if the

 6    rights of someone like, you purchasing on the secondary

 7    market, were different from those than the original holder?

 8              MR. SLADE:  Your Honor, objection; foundation.

 9              THE COURT:  Overruled.

10              THE WITNESS:  No, I don't see how one person would

11    be willing to buy something if they didn't think they had

12    the rights that the seller had.

13              MR. ANKER:  Further questions, Your Honor.

14              THE COURT:  Thank you, sir.

15              THE WITNESS:  All right.  Thanks.

16              MR. ANKER:  Your Honor, we would call as our next

17    witness, John Greene.

18              THE CLERK:  Please raise your right hand.

19         (Witness sworn)

20              THE WITNESS:  I do.

21              THE CLERK:  State and spell your name for the

22    record.

23              THE WITNESS:  John, J-O-H-N, Greene, G-R-E-E-N-E.

24              THE CLERK:  Thank you.

25              THE COURT:  Could your pull the microphone a
```

1    little closer?

2              THE WITNESS:  Sure.

3              MR. ANKER:  Your Honor, we have one demonstrative

4    that we may go over with Mr. Greene.

5              THE COURT:  Okay.

6              MR. ANKER:  Let me hand it to Mr. Clerk.

7              May I approach, Your Honor?

8              THE COURT:  Yes.

9              MR. ANKER:  Will one copy suffice for Your Honor

10   or would you like for me to --

11             THE COURT:  One's fine for me and one for

12   Ms. Birkhauser (ph) would be great.  Thank you.

13                      DIRECT EXAMINATION

14   BY MR. ANKER:

15   Q    Good afternoon, Mr. Greene.

16   A    Good afternoon.

17   Q    By whom are you employed, sir?

18   A    Halcyon Asset Management.

19   Q    And what is Halcyon Asset Management?

20   A    Halcyon is an asset manager.

21   Q    Now, are there also affiliated entities within the

22   Halcyon umbrella companies?

23   A    Yes.

24   Q    For purposes of today, I'm going to refer to Halcyon

25   to -- they're different legal entities, right?

1    A    Correct.

2    Q    Their structures are separate entities, right?

3    A    Yes.

4    Q    But I'm going to refer to Halcyon to refer to all of

5    the different entities.  Will you understand what I'm

6    referring to?

7    A    Yes.

8    Q    You said that Halcyon is an asset manager.  Can you

9    provide a little bit -- obviously that comes from the title,

10   Halcyon Asset Management.  I just need a few more notes, if

11   I can ask the question in that euphemistic way.

12   A    Sure.  Well, we invest money for institutional

13   investors and individuals across a variety of strategies,

14   including stocks, bonds, loans, asset bank bonds, and

15   including multiple investment strategies.

16   Q    Okay.  You said that you do that for various investors

17   or institutions.  Who are the underlying investors who

18   invest with Halcyon?

19   A    Predominately institutions that would include

20   endowments, pension plans, retirement systems, insurance

21   companies, and individuals, as well.

22   Q    I asked Mr. Auerbach about this question with respect

23   to BlueMountain, are the institution, in terms of dollars,

24   the predominate investors, as distinguished from the

25   originals?

Page 128

1    A    Yes.

2    Q    And, indeed, what is -- is the largest single investor

3    a state public pension fund?

4    A    Yes.

5    Q    Approximately how much money does Halcyon have under

6    management?

7    A    Across all strategies, about $11 billion.

8    Q    Eleven billion dollars.  And is all of that in one fund

9    or multiple funds or accounts?

10   A    They're multiple funds.

11   Q    What position do you hold or positions do you hold at

12   Halcyon?

13   A    Yeah, I am a managing principal partner, director of

14   research, and a portfolio manager.

15   Q    And how many funds are you the portfolio manager for?

16   A    Approximately half a dozen.

17   Q    Okay.  And how many -- how much in assets under

18   management do those funds have?

19   A    Approximately a billion dollars.

20   Q    Okay.  Can you briefly describe your responsibilities

21   as a portfolio manager, director of research, and the other

22   capacities in which you work at Halcyon?

23   A    Sure.  I'm primarily responsible for investment

24   selection, diligence and monitoring of investments.  I'm

25   also in charge of our research staff that also diligences

1   [sic] and monitors and selects investments for the

2   underlying portfolios.

3   Q    Do the funds that you manage, do the investments they

4   make included high-yield debt?

5   A    They do, yes.

6   Q    Dot other Halcyon funds also, from time to time, invest

7   in high-yield debt?

8   A    Yes, they do.

9   Q    Okay.  Of the portfolios that you're managing,

10  approximately what percent of the billion dollars under

11  management consists of high-yield debt?

12  A    Of course that changes a lot over time, but today,

13  roughly 10 to 20 percent of those portfolios are high-yield

14  debt.

15  Q    When investing in high-yield debt, does Halcyon perform

16  any due diligence?

17  A    Yes.

18  Q    Can you briefly describe that process for the Court.

19  A    Sure.  You know, we would undertake a typical credit

20  analysis which would include a liquidity analysis of the

21  issuer, its ability to pay, the valuation of the company to

22  understand how much actual value underpins the bond or how

23  much collateral in the case of a secured bond.  Then we

24  would also do an analysis of the financial situation of the

25  company.  We would look at annual and quarterly reports that

1    the issuer would put out.  We would also undertake an

2    analysis of the documentation, you know, the indentured, the

3    OM, and the like.

4    Q    By "OM," do you mean offering memorandum?

5    A    Yes, sorry.

6    Q    What terms are the central terms that matter to Halcyon

7    when it is investing in high-yield debt?

8    A    Sure.  Principal coupon maturity, call protection,

9    covenants, to name a few important ones.

10   Q    I'm not going to ask you what call protection means --

11   we've had enough evidence on that over the day -- over the

12   days -- but can you explain to the Court why call protection

13   is significant to Halcyon in making its investment decisions

14   in high-yield bonds?

15   A    Sure.  I mean at the end of the day, if you're

16   purchasing a bond, you're really just purchasing a future

17   stream of cash flows under a contract.  To understand what

18   that is, what that flow of income is, is critical to the

19   analysis.  When we do analysis of an investment, we try to

20   understand the risks that we're taking and trying to

21   understand the reward that we're getting, in other words,

22   the return.

23         And that return, the certainty of it is a critical

24   component of our analysis of the risks and reward that are

25   relevant to the investment.

1   Q    How does call protection impact the certainty of the

2   reward of the risk?

3   A    Sure.  As sever other witnesses have testified earlier,

4   that provides certainty to the bondholder that those coupon

5   payments, that stream of income, will come in a dollar

6   amount certain, or in other words, nominal terms; those

7   dollars will come -- flow to the bondholder over time.

8   Q    Although it doesn't protect you against the credit risk

9   of the particular issuer, right?

10  A    That's correct.  That's the risk that we underwrite and

11  we assume as bondholders.

12  Q    Okay.  I asked Mr. Auerbach whether Halcyon accounts

13  for its investments on a market-to-market basis -- I'm

14  sorry, I asked him if BlueMountain does.  Does Halcyon?

15  A    Indeed, we do.  We market-to-market daily, and we

16  generally cut NAS or net asset value on a monthly basis, so,

17  yes.

18  Q    So if you're holding a bond and it is a, we'll call it

19  10 percent, but interest rates go up to 15 percent -- we're

20  in the Jimmie Carter inflation days or whatever --

21  A    Oh, no.

22  Q    -- those days were.  What?

23  A    Oh, no.

24  Q    I lived, that I remember it all too well.

25       You would then have your -- your notes would then

1    trade to a discount-to-par, all notes being equal, right?

2    A    That's correct.  We would face a loss.

3    Q    And if the credit quality of the issuer goes down, you

4    would take a loss as well, right?

5    A    That's correct.  That's part of risk underwriting.

6    Q    I think I asked Mr. Auerbach that, but I think I

7    failed, and I needed to ask the follow-up question.  I've

8    asked you a theoretical question, in the real world, does

9    that happen?  Does Halcyon suffer losses in high-yield bonds

10   because either interest rates move against it or

11   alternatively the credit of the issuer declines?

12   A    Unfortunately, yes.  That's part of everyday real world

13   investing, in that we do face those risks.  Hopefully we

14   minimize those through our diligence process, but those are

15   the risks that we take, yes.

16   Q    Now, you joined Halcyon when, sir?

17   A    In March of 2002.

18   Q    Okay.  So you've been there 13 years?

19   A    That's correct.

20   Q    Okay.  I'm not asking a memory test -- you're not going

21   to remember every investment.  Are you aware of any

22   high-yield debt, high-yield bonds that Halcyon has purchased

23   that didn't have call protection?

24   A    Not bonds, no.

25   Q    Of the funds you are managing, are there any

1    investments today that don't have call protection?

2    A    Sure, but that's generally a very different market.

3    That would be really bank loans, and bank loans are a

4    different animal.  Bank loans generally don't have call

5    protection, but the crucial difference there is they would

6    have a floating-rate interest component to them, much like

7    the DIP that's been discussed earlier today, and they would

8    have tighter covenants, not just insurance covenants, but

9    maintenance covenants and they would generally sit first in

10   the capital stack and they're typically a different set of

11   investors.  So that's sort of a critical difference.

12            Halcyon has a very large bank loan business and

13   that's a big part of the high-yield market; those are

14   sub-investment grade issuers that participate in that market

15   as well, but that is a different market because it's not a

16   fixed-rate coupon instrument, with a fixed-bullet surety.

17   It's also -- those loans also have, generally, a maximum

18   surety of seven years versus a ten-year typical bullet

19   maturity, which would be a very typical thing in the

20   high-yield bonds market.

21   Q    Okay.

22   A    Another one would be asset batch securities.  Another

23   one -- everyone is familiar with a mortgage.  Generally,

24   people repay their mortgages if interest rates go down and

25   so that's another example that would be different, as well.

1    Q    Okay.  With respect to today -- high-yield bonds do --

2    what percentage of those bonds held by Halcyon have call

3    protection?

4    A    To my knowledge, all of them.

5    Q    And is that call protection, as it is today, typically

6    in the form of a make-whole, rather than a no-call?

7    A    Yes, that's correct.

8    Q    Okay.  Now, would Halcyon purchase -- you're a

9    portfolio manager, would you purchase high-yield bonds that

10   were freely cullable without no no-call and without any

11   requirement of a make-whole?  Whenever the issuer wanted to,

12   he could call the notes and pay them off for par, plus

13   accrued interest.

14   A    I think depending on the circumstance, if they were

15   performing credit and the bonds were trading like performing

16   bonds would or above, absolutely not, so the answer would be

17   no.

18   Q    Okay.  Let's focus on EFIH bonds.  Does Halcyon

19   currently hold any first-lien bonds issued by EFIH?

20   A    Yes, we do.

21   Q    Approximately, face amount, how much are those today?

22   A    Approximately 150 million.

23   Q    And is that just in the funds that you manage or across

24   all of the funds?

25   A    That's across all of the funds.

1    Q    With respect to the funds that you manage and which are

2    the billion under management, how much in face amount of the

3    bonds are there of EFIH, firstly?

4    A    I'm sorry, I don't know the breakdown, exactly.

5    Q    It's okay.

6    A    But it's a large portion of them.

7    Q    Okay.  Are you a member of the EFIH first-lien steering

8    committee?

9    A    Yes.

10   Q    Were you involved in Halcyon's decision to purchase

11   through EFIH, first lien notes?

12   A    Yes.

13   Q    When did Halcyon first purchase EFIH first-lien notes?

14   A    Very early, April 2014, I believe.  April 2nd or

15   April 3rd.

16   Q    So that was before the petition date?

17   A    That's correct.

18   Q    Okay.  And approximately how much in first-lien notes

19   did Halcyon own as of the petition date?

20   A    As of the petition date, I think there were

21   approximately 75 million.

22   Q    Okay.  And what price did Halcyon pay, on average, for

23   those notes?

24   A    Approximately 107 cents on the dollar, plus accrued

25   interest.

1    Q    Okay.  So on this accrued interest idea, I take it that

2    if you -- EFIH paid semiannually on the first-lien notes?

3    A    That's correct.

4    Q    So if you were buying three months into the six-month

5    period, 50 percent of the interest for that six-month

6    period, you would pay an additional -- well, you did pay an

7    additional 107; is that right?

8    A    That's right.  I said it would be about two and a half

9    points, because that's a quarter of ten, which would be the

10   coupon.

11   Q    Okay.  Did Halcyon purchase additional notes between

12   April 29, 2014, the petition date, and June 19, 2014, the

13   date of redemption?

14   A    Yes.

15   Q    How much, approximately, did you add to the position?

16   A    Approximately another $100 million face.

17   Q    Okay.  And today how much are you holding?

18   A    We own approximately $150 million face.

19   Q    So since June 19, 2014, on a net basis, you've reduced

20   the size of the petition by -- position by about $25 million

21   face?

22   A    Approximately, yes.

23   Q    Okay.

24   A    On that basis, yeah.

25   Q    Now, with respect to the notes purchased between

1   April 29 and June 19, what was Halcyon's average purchase

2   price?

3   A    It was about the same as it was pre-petition, 106 or

4   107 cents to the dollar, plus accrued interest.

5   Q    Okay.  Why did you agree to pay above par?

6   A    Well, we were buying that paper on a yield-to-call

7   basis with the expectation that we would receive our

8   contractual interests through the first call date.

9   Q    Well, the Company had announced -- you heard Mr. Slade

10  ask Mr. Auerbach -- the Company had announced in November,

11  2013, before your very first purchase, that it expected to

12  file for bankruptcy and would seek to litigate the

13  make-whole unless noteholders accepted a deeply discounted

14  settlement.  Why did you nevertheless pay above par?

15  A    Because I thought that we were entitled to that

16  make-whole and I am sure that the debtors wanted to do that.

17  It was obvious that it was in their economic interests to

18  try to do that.  I obviously disagree with that, so that's

19  the answer.

20  Q    Okay.  Let me ask you a few preliminary questions, and

21  I'm going to try to do this real fast:  You were obviously

22  aware that your obligor was EFIH?

23  A    Yes.

24  Q    Did you rely on the separate credit of EFIH?

25  A    Absolutely.

1   Q    You understood that these notes were secured and in a

2   first-lien priority position?

3   A    Yes.

4   Q    Did you rely on that security in the first-lien

5   position?

6   A    Yes.

7   Q    Did you, personally, review the indenture for the

8   first-lien notes?

9   A    I did.

10  Q    Did you read, among other provisions, the optional

11  redemption provision?

12  A    Yes.

13  Q    Did you read, among other provisions, the acceleration

14  provision?

15  A    Yes.

16  Q    Did you note that the acceleration provision provided

17  for automatic acceleration within a bankruptcy?

18  A    Yes.

19  Q    Did you also note that it provided that the

20  noteholders, by majority and dollar amount, could rescind

21  the acceleration?

22  A    Yes.

23  Q    Was that provision, the right to rescind, material to

24  your investment basis?

25  A    Yes.

1   Q    Did you have a view, going back to April, 2014, as to

2   whether EFIH was likely solvent?

3   A    Indeed, I did.  I believe that it was likely that EFIH

4   was solvent.

5   Q    And what was the basis -- and you obviously hadn't done

6   a formal valuation, Mr. Greene.  What was the basis of that

7   view?

8   A    Well, you know, as part of our typical underwriting and

9   diligence, we do do a valuation analysis because we're

10  buying debt of an issuer, and so we have to have a view on

11  the value of that obligor, which, indeed, we did.

12          So we, you know, we looked at what comparable

13  utilities trade and we -- comparable transactions.  We,

14  also -- I think a good marker of evidence is -- you know,

15  for valuation are trading comparables in the marketplace.

16  So we looked at where the EFIH PIK or payment-in-kind,

17  unsecured debt traded.  That traded materially above par.

18  We also looked at where the EFH debt traded and that traded

19  at prices that would indicate value was going above the EFIH

20  box to its parent holding company, EFH.  So, again, that's

21  another, you know, marker of solvency for the EFIH box.

22  Q    And when you -- I'm sorry, Mr. Greene, when you say

23  they were trading both the PIK notes and the -- the PIK

24  notes were trading above par and you noted that the EFIH

25  notes were trading at a value that implied that value was

1    flowing up out of the EFIH box.  Was that as of April, 2014?

2    A    Yeah.  Now, obviously that changed pretty dramatically.

3    The EFH unsecured notes, you know, before the filing and the

4    announcement of the RSA 1.0 or whatever you're going to call

5    it, those bonds were trading on 20 or 30 cents on the

6    dollar, and upon announcement of the filing and the RSA,

7    those bonds traded to 70 cents-plus on the dollar and now

8    they're trading above par.  So I think that was a pretty

9    good indication that there was material value there.

10   Q    Okay.  And why did -- and you're not a lawyer, are you,

11   Mr. Greene?

12   A    No.

13   Q    Why did solvency impact your analysis, with respect to

14   the EFIH notes?

15   A    Sure.  That was a very important part of it, actually.

16   Again, I'm not a lawyer, but I have been a stress investor

17   for a long period of time and I have had experience

18   investing in several large bankruptcy of solvent debtors.

19   Q    And can you give the Court -- can you identify some of

20   the names?

21   A    Sure.  W.R. Grace, DOW Corning, Owens Corning, ASARCO,

22   Chemtura, Calpine, General Growth Properties, among others.

23   Q    CalGen?

24   A    Well, we were sort of involved a little bit in CalGen,

25   but we were largely involved in Calpine Corporation.

1    Q    Okay.  What gives you the experience that you had in

2    those solvent debtor cases?

3    A    I think the big takeaway that I had from my experience

4    there is that solvent debtors are a little bit of a rare

5    breed and kind of a special case.  And my experience is

6    that, you know, that contractual rights and those things are

7    generally well-respected, and the ability to get all of the

8    bargained-for rights of solvent debtors is higher and that

9    can take form of, you know, default-rate interests,

10   post-petition interests, or make-wholes.

11   Q    One of the cases that's been referenced in this hearing

12   and Judge Sontchi referenced in his decision on summary

13   judgment, was the Momentive decision.  Are you familiar --

14   were you involved in the Momentive bankruptcy?

15   A    Yes, I was a Momentive first-lien bondholder.  I was on

16   the ad hoc bondholder committee, and I was also on the

17   steering committee of Momentive first-lien bonds.

18   Q    And those were one of the two issues of bonds that

19   sought payment of a make-whole in that case?

20   A    Indeed, yes.

21   Q    And you're aware, are you not, that Judge Drain issued

22   a decision following a four-day confirmation trial?

23   A    Yes, in fact, I attended those long four days of the

24   confirmation trial.

25   Q    And you're aware that Judge -- I'd rather was say Judge

1    Sontchi -- Judge Drain denied the make-whole in that case?

2              THE COURT:  You were just predicting the future.

3              MR. ANKER:  I'll ignore that.

4              THE COURT:  I will too.

5              MR. ANKER:  Pardon?

6              THE COURT:  I said I will too.

7    BY MR. ANKER:

8    Q    Mr. Greene --

9              THE COURT:  There was a question pending before

10   you go on.

11             MR. ANKER:  I actually totally have lost my train

12   of thought.  Give me one moment, Your Honor, and I'll get it

13   back.

14   BY MR. ANKER:

15   Q    Mr. Greene, you said that you attended the four days of

16   that trial; is that right?

17   A    Yes.

18   Q    And did you read the confirmation decision -- I'm

19   sorry, the confirmation soon after it came out?

20   A    Yes, I did.

21   Q    Now, you said that net net, you've reduced your

22   position in EFIH closely in notes since the petition date in

23   this case.  What did you do following the decision in

24   Momentive?

25   A    We actually -- following the decision in Momentive, we

Page 143

1    actually sold our Momentive position and bought more of EFIH

2    debt.

3    Q    Why?

4    A    What I heard Judge Drain say, not just in his decision,

5    but throughout the course of the four-day trial, was that

6    his decision may have been different if Momentive had been

7    solvent.  I don't know that this was in the final opinion,

8    but, you know, he said that the three decisions that counsel

9    there were citing, which were Chemtura, Calpine, and Premier

10   Biloxi, were all very different than Momentive in that all

11   of those were solvent debtor cases.

12              And at another time, he also said that, you know,

13   look, if Momentive had been solvent, this would have been a

14   different story and the bondholders would have had a right

15   to a make-whole.

16   Q    Mr. --

17              MR. HOWELL:  Objection, and move to strike on the

18   basis of hearsay in the answer.

19              MR. ANKER:  The statements are not being offered

20   for the truth of the matter asserted; they're being offered

21   for their effect on him as an investor that's going to

22   invest.

23              THE COURT:  Overruled.

24   BY MR. ANKER:

25   Q    Mr. Greene, let's talk finally about harm or loss to

1   Halcyon.  You got back, on June 19, 2014, all of the

2   principal and the accrued interest on your notes, as of that

3   day?

4   A    Yes.

5   Q    And if I recall your testimony, you had about $175

6   million, around there?

7   A    Correct.

8   Q    Okay.  When you got that $175 million and change back,

9   were you able to find investments of similar credit quality

10   of bearing a ten percent coupon with a maturity of seventeen

11   and a half months before the first call date?

12   A    No, I was not.

13   Q    Were you able to find -- I asked you at ten percent --

14   were you able to find investments of similar credit quality

15   earning anywhere approaching ten percent per annum?

16   A    Not even close.

17   Q    You're in the business of trying to make money, right?

18   A    Yes.

19   Q    Tell the Court balancing risk and reward, what the

20   overall rate of return of Halcyon has been for the period,

21   June 19, 2014 to today.

22   A    So on a composite basis for the funds that own the EFIH

23   first-lien debt, that was approximately negative two to

24   negative three return for that period of time.

25   Q    Now, did you participate in the settlement offer, under

1    which noteholders could agree to get the 105, but they would

2    have to walk away from 75 percent of the make-whole?

3    A    No.

4    Q    Why not?

5    A    I felt that that settlement offer was inadequate.

6    Q    Inadequate in light of what?

7    A    I thought it was a very small percentage of our

8    contractually entitled make-whole.

9    Q    But you would have also been able to participate in a

10   DIP, if you had done that?

11   A    I didn't think that the DIP was all that great.  It was

12   four and some change interest with a longer maturity than

13   what we had and, you know, the amount of the DIP was, at

14   $5.4 billion was more than the $4 billion space that we had,

15   you know, before that deal of securing our first-lien bonds.

16   So it was more debt against the same collateral at a much

17   lower rate for a longer period of time.  So those are three

18   material -- different terms that were materially worse than

19   the piece of paper that I had.

20   Q    Okay.  Mr. Greene, will Halcyon be harmed if the stay

21   is not lifted and it is not permitted -- the noteholders are

22   not permitted to rescind acceleration and you are paid the

23   make-whole?

24   A    Yes.

25   Q    How?

1    A    Well, we, obviously, got back our cash and we face the

2    reinvestment risk that I think you were alluding to in your

3    prior question.  So we were not able to adequately reinvest

4    that money and that is a real inopportune cost for us.  And

5    so that is the harm that we suffered.

6    Q    Okay.  Mr. Greene, did you create a demonstrative to

7    illustrate that harm?

8    A    Yes.

9    Q    Can we pull that up on the screen, if that's

10   possible -- do you have a hard copy?

11   A    I do, yes.

12           So I, mean I don't want to belabor the details

13   here.  I think a lot of this, you know, we've seen from

14   other witnesses, but the top box is the undiscounted cash

15   flows across the entire, you know, non-settling first-lien

16   bondholders, and by "nominal," I mean undiscounted.  So the

17   $450 million is not discounted, you know, in the

18   bottom-right, second-to-last column, the $450 million is not

19   discounted -- backed, using the T-plus 50 formula (ph), as

20   the present value.  And then if you look down to that

21   corresponding number of 431 in the box below, that number is

22   present valued at T-plus 50.  So the $454 million discounted

23   back at T-plus 50 is $431 million across the class of

24   non-settling first-lien bondholders.

25           Now, the next column over, the $30 million in the

1    top box and the $28 million in the bottom box, that's

2    Halcyon -- that represents Halcyon's portion of that.  In

3    other words, our approximately $150 million face of EFIH

4    first-lien debt, that's our portion of our damages.

5    Q    And you used 150, because even though you held 175

6    million as of the petition date, as of today, Halcyon owns

7    about 150 million net in -- holds 150 million face amount of

8    the EFIH first-lien notes?

9    A    That's right.  So, I mean those -- so since bonds are

10   negotiable instruments, that right would travel to whomever

11   we sold and we have that right of what we owned.

12   Q    Mr. Greene -- I should have brought this out just to

13   supply facts so the Court is aware of it -- does Halcyon

14   also own EFIH's second-lien bonds?

15   A    Yes.

16   Q    Approximately how much?

17   A    Approximately $150 million face.

18   Q    Okay.  Do you own any TXU bonds, does Halcyon?

19   A    Any other TXU bonds, no.

20   Q    No -- I'm sorry -- TCEH bonds?

21   A    No, we do not.

22   Q    Okay.

23         MR. ANKER:  Pass the witness, Your Honor.

24         Your Honor, I don't think I did this, and I want

25   to state on the record, that demonstrative is Plaintiff's

1    Demonstrative 14.

2              THE COURT:  Okay.

3              MR. HOWELL:  Good afternoon, Your Honor.

4              Rich Howell from Kirkland & Ellis for the debtors.

5    My I proceed?

6              THE COURT:  Yes.

7                         CROSS-EXAMINATION

8    BY MR. HOWELL:

9    Q    Good afternoon, Mr. Greene.

10   A    Afternoon, Mr. Howell.

11   Q    Halcyon first purchased EFIH ten percent first-lien

12   notes in very early April, 2014, correct?

13   A    Yes.

14   Q    And at the time that you first invested in the EFIH ten

15   percent first-lien notes, you were already aware that EFIH

16   was going to challenge paying the make-whole in bankruptcy,

17   correct?

18   A    Yes.

19   Q    And Halcyon continued to purchase EFIH ten percent

20   first-lien notes from that time of first investment until as

21   recently as a week ago, correct?

22   A    Yes.

23   Q    In fact, Halcyon has purchased dozens of EFIH ten

24   percent first-lien -- excuse me, Halcyon has made dozens of

25   purchases of EFIH ten percent first-lien notes since its

1    initial investment, correct?

2    A    That's accurate, yes.

3    Q    Halcyon purchased, I think you said on direct, EFIH ten

4    percent first-lien notes right after the Momentive decision,

5    correct?

6    A    Yes.

7    Q    And Halcyon has purchased EFIH ten percent first-lien

8    notes after the summary judgment ruling in this case on

9    March 26th, correct?

10   A    Yes.

11   Q    Since Halcyon's initial investment in EFIH ten percent

12   notes in early April, 2014, Halcyon has also sold EFIH ten

13   percent first-lien notes at a variety of times, correct?

14   A    Correct.

15            MR. HOWELL:  I would like to hand the witness what

16   has been marked as Plaintiff's Exhibit 100, if I could

17   approach, Your Honor?

18            THE COURT:  Okay.

19   BY MR. HOWELL:

20   Q    If we could pull up on the screen the first page of

21   Plaintiff's 100, Mr. Greene, do you recognize this document?

22   A    I do.

23   Q    This is the June 4 rescission notice that's been

24   discussed at some length in this last couple of days,

25   correct?

1    A    Correct.

2    Q    And on that first page, the noteholders have offered a

3    waiver of each and every default -- this is paragraph A,

4    kind of two-thirds of the way down the page where it says

5    they waive each and every default, that would otherwise

6    constitute a default pursuant to either Section

7    6.01(a)(6) or Section 6.01(a)(7) of the indentured; each

8    such default, individually, a bankruptcy default, do you see

9    that?

10   A    Yes.

11   Q    And it goes on to say, and its consequences with the

12   effect that no such default shall be deemed to have

13   occurred, correct?

14   A    Yeah.

15   Q    And then the next paragraph is where the noteholders

16   have said that they rescind any acceleration respect to the

17   notes and its consequences that would otherwise result from

18   any bankruptcy default, correct?

19   A    Yes.

20   Q    Now, you talked a little bit on direct about one of the

21   other ways that you can recover in a situation, you know,

22   where your credit risk goes bad, is through default

23   interest; do you recall that?

24   A    Yes.

25   Q    And do you know whether the noteholders here have

1    sought default interest through their proof of claim?

2    A    I don't recall.

3    Q    I'd like to turn to page 16 of Exhibit 100 and there we

4    see that this June rescission notice was signed by Halcyon,

5    correct?

6    A    Yes.

7    Q    And if you turn to page 17 we see a series of Halcyon

8    funds in the amount of principal amount that they held in

9    EFIH ten percent first-lien notes as of June 2, 2014,

10   correct?

11   A    Correct.

12   Q    And the reason that's divided into two tables, that's

13   just the two different (indiscernible) for the ten percent

14   notes, correct?

15   A    Correct.

16   Q    So the total amount that Halcyon owned of EFIH ten

17   percent first-lien notes on June 2nd, 2014, would be the

18   addition of those two tables and that's $192,700,000 in

19   principal as of that date, correct?

20   A    Yes.

21   Q    Now, at the time that the notes were repaid on June 19,

22   2014, you owned around 175 million in the face value of

23   notes, correct?

24   A    Correct.

25   Q    And today you own something close to 150 million in

```
                                                    Page 152

 1   face value of notes, correct?

 2   A     Approximately, yeah.

 3   Q     You said on direct you also had invested in Momentive

 4   notes; is that correct?

 5   A     Yes.

 6   Q     You had invested in notes with Calpine you said, as

 7   well?

 8   A     Yes.

 9   Q     Did you ever invest in notes with AMR?

10   A     No.

11   Q     And you think you had Halcyon -- Halcyon had between

12   100 to 150 million in face value in Momentive notes,

13   correct?

14   A     That sounds about right.

15   Q     Mr. Greene, you were one of 14 partners that owns

16   Halcyon, correct?

17   A     Yes.

18   Q     Halcyon currently has around 11 billion in assets under

19   management, correct?

20   A     Yes.

21   Q     About five billion of that is in hedge funds, correct?

22   A     Yes.

23   Q     You manage around a half dozen funds at Halcyon,

24   correct?

25   A     I'm the portfolio manager of about a half dozen, yes.
```

1    Q    And the funds you manage, I think you said on direct,

2    have about a billion in total assets under management,

3    correct?

4    A    Yes.

5    Q    And those would fit under that five billion in hedge

6    funds in terms of the categories at Halcyon, correct?

7    A    Yes.

8    Q    And at any given time, you might have dozens of

9    different investments inside of the portfolios that you're

10   managing, correct?

11   A    Yes.

12   Q    And some of the funds that you managed invested in EFIH

13   ten percent first-lien notes, correct?

14   A    Yes.

15   Q    Now, I think we've established multiple times that

16   there's around 2.3 billion in non-settling ten percent

17   first-lien notes, correct?

18   A    Yes.

19   Q    And you put together this PD-14, which if we could

20   bring that up on the screen?

21            THE CLERK:  I'm shut down, now.

22            MR. HOWELL:  Oh, I'm sorry.

23            UNIDENTIFIED SPEAKER:  We shut it down.

24            MR. HOWELL:  That's okay.

25            UNIDENTIFIED SPEAKER:  My apologies.

1          MR. HOWELL:  That's no problem.  It's no problem,

2    we can move on.

3    BY MR. HOWELL:

4    Q    So there's around 2.3 billion in non-settling EFIH ten

5    percent first-lien notes, correct?

6    A    Yes.

7    Q    And today you own around 150 million of that, correct?

8    A    Yes.

9    Q    So -- and I'm happy to give you a calculator -- but I

10   think that's around 6.5 percent of the non-settling

11   first-lien notes today?

12   A    That's correct.

13   Q    And you were in the courtroom yesterday, so you heard

14   this number, 431 million, a few times, right?

15   A    Sure.

16   Q    And, in fact, in PD-14, you put together a chart that

17   showed the amount, both non-present value and present value

18   of the amount that Halcyon would hope to get through the

19   make-whole, should the stay be lifted, correct?

20   A    Correct.

21   Q    And that amount, present value for Halcyon would be $28

22   million, correct?

23   A    Approximately, yes.

24   Q    And $28 million out of the 11 billion total at Halcyon

25   would be around -- and, again, I'm happy to give you a

1    calculator -- but would be around one quarter of one

2    percent, correct?

3    A    That, from what I can see, is correct.

4    Q    And even though the 28 million would only be around one

5    quarter of one percent of the total assets under management

6    at Halcyon, you still care about whether or not you get that

7    money, right?

8    A    Absolutely.

9    Q    And you still view yourself as harmed if you don't get

10   it, right?

11   A    Oh, absolutely.  Let me also add that, you know, of the

12   11 billion, not all of that is invested in the EFIH notes,

13   so it's actually a much lower denominator, so I think it

14   would, in fact, be more material.

15          But even if it were that, that would be material

16   and we would care, yes.

17   Q    You testified on direct, Mr. Greene, that you invested

18   in notes from many companies that were already in

19   bankruptcy, right?

20   A    Yes.

21   Q    And you've invested in notes from many companies that

22   were contemplating bankruptcy, correct?

23   A    Yes.

24   Q    And you were familiar at the time that Halcyon first

25   bought these notes with the concept of the automatic stay,

1    right?

2    A    Yes.

3    Q    And you testified on direct that you've been invested

4    in multiple solvent debtor cases, correct?

5    A    That's right.

6    Q    And you're not aware, as you sit here today, of any

7    situation in which you invested in notes that a solvent

8    debtor where the automatic stay was lifted for cause to

9    allow the payment of a make-whole, right?

10    A    In that narrow instance, no.

11    Q    And you were not involved in the negotiation of the

12    issuance of the ten percent EFIH first-lien notes in August,

13    2010, correct?

14    A    Correct.

15    Q    And Halcyon didn't own any of the EFH notes before the

16    2010 exchange, correct?

17    A    That's correct.

18    Q    In fact, you were not involved in the negotiation of

19    the issuance of any notes by the EFH corporate family from

20    2007 through the present, correct?

21    A    That's correct.

22    Q    And you never had any conversations with anyone at EFIH

23    about your interpretation of the indenture, correct?

24    A    Correct.

25    Q    You never told anyone at EFIH that, I think the fact

1    that EFIH is solvent in my opinion makes it more likely that

2    I'll be able to recover at the make-whole in bankruptcy,

3    correct?

4    A    Well, I mean we did send the rescission notice, so I do

5    think that we told someone about that, so yes.

6    Q    Did you ever have any conversations about that issue

7    with anyone at EFIH?

8    A    No.

9    Q    Now, before Halcyon first invested in the EFIH 10

10   percent first lien notes, you performed diligence on the

11   deal, correct?

12   A    Yes.

13   Q    You reviewed the indenture, right?

14   A    Sure.

15   Q    You reviewed the notes, correct?

16   A    Yes.

17   Q    You reviewed the offering memorandum, right?

18   A    Yes.

19   Q    And you also viewed the quarterly and annual public

20   security filings from EFIH, correct?

21   A    Yes.

22   Q    And you read those documents and other people on your

23   team read those documents as well as you, correct?

24   A    Correct.

25   Q    And you also consulted with counsel regarding the

1    meaning of those documents, correct?

2    A    Yes.

3    Q    One such counsel was Ropes and Gray, right?

4    A    Yes.

5    Q    Now, you received around 180 to $190 million in cash on

6    the repayment of the notes on June 19, 2014, I believe you

7    said in deposition; is that right?

8    A    It sounds right.

9    Q    None of the Halcyon funds you managed invested in the

10   first lien DIP here, correct?

11   A    Correct.

12   Q    You weren't interested, I think you said on direct, in

13   the DIP which was at four and change interest, right?

14   A    Correct.

15   Q    Now, Halcyon and some other areas of Halcyon, but not

16   funds that you managed, may have had some small interest in

17   the DIP, but nothing that you were involved, right?

18   A    That's correct.

19   Q    And over time, you deployed the $180 to $190 million in

20   cash that you got from the repayment on June 19, 2014 into a

21   variety of other investments within your portfolio, right?

22   A    Yes.

23   Q    And I think Mr. Auerbach said --

24   A    Well, I -- clarify that, not entirely.  Some of it

25   remained in cash.  Some funds were beyond their reinvestment

1    period, so that money never was reinvested, but in others it

2    was reinvested over time.

3    Q    And it was reinvested -- where it was reinvested across

4    a variety of investments within those funds, correct?

5    A    Yes.

6    Q    Not necessarily ones that would match the tenure or the

7    coupon or the other key criteria of the EFIH 10 percent

8    first lien notes, correct?

9    A    Correct.

10   Q    And I think you said the last time you purchased EFIH

11   10 percent first lien notes was less than a week ago.  Is

12   that true?

13   A    Around a week go.

14   Q    And you paid around 4 cents at that time, correct?

15   A    That's correct.

16           MR. HOWELL:  No further questions, Your Honor.

17           MR. ANKER:  Very briefly, Your Honor.

18                       REDIRECT EXAMINATION

19   BY MR. ANKER:

20   Q    Mr. Greene, I think the question was asked yesterday

21   about CDS, credit default swaps.  Did Halcyon have any

22   credit default swaps in place to mitigate against any

23   possible loss with respect to EFIH?

24           MR. HOWELL:  Objection.  Outside the scope of

25   cross.

1          THE COURT:  Agreed.

2          MR. ANKER:  Okay.  I'll move on.

3     BY MR. ANKER:

4     Q    Mr. Howell asked you about the solvent debtor cases you

5     invested in and whether in any of them the stay was lifted.

6     What was your experience in those cases as to -- your

7     experience as to whether the creditors' contract rights were

8     respected at the expense of equity?

9     A    You know, my experience was just that, the contract --

10    creditors' contract rights were respected ahead of equity.

11    Q    Okay.  Mr. Howell asked you whether in the

12    reinvestments you've made -- and I think he said some of

13    them didn't match the tenure and the coupon of the 10

14    percent notes.  Do you remember that question?

15    A    Yes.

16    Q    Did any of them match the 10 percent coupon for a

17    similar credit risk investment?

18    A    No.

19    Q    Finally, Mr. Howell asked you what the purchase price

20    was of the last investment you made and you said 4 cents.

21    Let's just try to put that in perspective.  The principal

22    has been paid back, right?

23    A    That's correct.

24    Q    So it's 4 out of the potential make-whole claim, which

25    is about 18 or 19, right?

1   A      That's correct.

2   Q      Okay.  One second.  Mr. Greene, you're not aware,

3   but -- and therefore I'm not asking you for a legal opinion,

4   do you understand as a business person, as a portfolio

5   manager that Halcyon owes fiduciary duties to its investors?

6   A      Yes, of course.

7   Q      And does it therefore have to care about the ultimate

8   recoveries that it gets for its investors?

9   A      Absolutely.

10            MR. ANKER:  Thank you, Your Honor.

11            THE COURT:  Thank you, sir.

12            THE WITNESS:  Thank you, Your Honor.  May I take

13   these with me?

14            THE COURT:  Yes.

15            MR. ANKER:  Your Honor, I think here is where we

16   are in the proceedings now.  We will want to introduce or

17   have sought to introduce both a series of document exhibits

18   and deposition excerpts.  I understand the debtors still

19   want to review our document exhibits for potential relevancy

20   objections.  I don't believe they've gotten them to us yet,

21   unless they've hit my Blackberry in the last hour.  I think

22   about an hour ago we got counter designations and objections

23   to the deposition designations, which we provided last week.

24   I've not had a chance to even -- no one on my team has a

25   chance to even glance at them.

1          So I don't think we can close the record on our

2     case in chief, if you will, because I need to move in those

3     matters and I haven't had time to look at what objections

4     there are and I haven't even received them on the documents.

5          And then secondly, I understood the debtors

6     intended to call Mr. Moldovan in their case in chief in

7     which case I was simply going to examine him as we had

8     talked about this morning.  But subject to those two points,

9     I'm prepared to turn the podium over to the debtors.

10          We also were going to ask if the Court would

11    simply take judicial notice -- not for the truth of the

12    matter asserted -- of the various pleadings in the

13    bankruptcy case and filings, so that we have a record that

14    includes everything in the bankruptcy.

15          And I'm happy to take those housekeeping matters

16    up at a later date.  I don't really understand how I can do

17    it now since I haven't even seen the objections for the

18    documents nor have I had an opportunity to review the

19    objections to the deposition designations.

20          THE COURT:  Okay.  I think that makes sense.  The

21    court of appeals will kill you if you include in your

22    appendix 5,000 docket entries as part of your record.  I

23    don't know how I can take judicial notice of the entire

24    docket.

25          MR. ANKER:  Understood, and let me have a

Page 163

1    conversation, if I could, with Mr. McGaan and try to come up

2    with a practical solution.

3                    MR. MCGAAN:  Well, it's been put out there,

4    Mr. Anker mentioned that this morning, that is the request

5    that Your Honor take judicial notice and we object to it for

6    not only the reasons Your Honor mentioned, but also --

7                    THE COURT:  And I haven't read everything on the

8    docket.

9                    MR. MCGAAN:  Well, it's vast and it's not

10   appropriate to do a blanket judicial notice.  It assumes

11   that the Court's actually noticed it and we of course --

12   there's a whole variety of things and it's utterly

13   impractical.

14                   THE COURT:  Yeah, it needs to be more focused.

15   You can have a conversation about that, but I'm certainly

16   not going to take judicial notice of substantially all the

17   pleadings filed in the last 12 months.  We're talking about

18   thousands of docket entries.  I don't know what we're up to

19   now, but Mr. Madron (ph) will be able to tell us.

20                   THE CLERK:  Around 4,000, Your Honor.

21                   THE COURT:  4,000.

22                   THE CLERK:  And counting.

23                   MR. MCGAAN:  And we certainly don't object to the

24   trustee keeping the case open for the housekeeping --

25                   THE COURT:  Okay.

1           MR. MCGAAN: -- matters on exhibits.

2           THE COURT:  So you're going to call Mr. Moldovan

3    then?

4           MR. MCGAAN:  Would you like me to do that now,

5    Your Honor?

6           THE COURT:  Let's take a very short recess, say

7    five or ten minutes and then we'll do that.

8       (Recessed at 2:45 p.m.)

9           THE COURT:  Please be seated.

10           THE CLERK:  Please raise your right hand.

11       (Witness Sworn)

12           THE CLERK:  Please state and spell your name for

13    the record.

14           THE WITNESS:  Kristopher Moldovan M-O-L-D-O-V-A-N.

15           MR. MCGAAN:  Good afternoon, Your Honor.  Andrew

16    McGaan for the debtors.  Debtors call Kristopher Moldovan

17    who conveniently has been sworn in.

18                     DIRECT EXAMINATION

19    BY MR. MCGAAN:

20    Q    Mr. Moldovan, will you tell the Court where you work?

21    A    Yes.  I work for technically Energy Future EFH

22    Corporate Services Company, but it's a holding -- it's a

23    company that's held by Energy Future Holdings, Corp.

24    Q    Do you have a -- what is your title and your

25    responsibilities there?

1    A    At EFH's Corporate Services I am vice president and

2    assistant treasurer.

3    Q    And do you have a position at EFIH?

4    A    I do.  I'm the assistant treasurer.

5    Q    And as assistant treasurer of EFIH, do you report to

6    Mr. Horton?

7    A    I do.

8    Q    What are your responsibilities generally in that

9    position at EFIH?

10   A    I directly oversee our corporate compliance group.  I

11   directly oversee our cash management group and I work hand

12   in hand with Mr. Horton with our finance team on finance

13   projects, including capital markets transactions.

14   Q    And do you recall -- you've been in the courtroom

15   throughout the hearing?

16   A    Yes, I have.

17   Q    And you recall there's been testimony on and off about

18   the 2010 exchange transaction, correct?

19   A    Correct.

20   Q    And were you involved in that as assistant treasurer in

21   EFIH?

22   A    Yes, I was.

23   Q    Do you recall Mr. Horton was asked questions in

24   connection with the 2010 exchange transaction about whether

25   anyone -- whether he or anyone at the company told any of

1    the noteholders or perspective noteholders about the

2    rescission provision -- company's review about the

3    rescission provision in 602 of the indenture and the limited

4    waiver provision in section 406.  Do you recall whether that

5    had come up and whether anything had been said to people

6    about that?

7    A    I do.

8    Q    And specifically he was asked whether he or others at

9    the company had told anyone that those provisions would in

10   some respect not be enforceable in bankruptcy.  Do you

11   remember that?

12   A    I do.

13   Q    I want to ask you with respect specifically to that,

14   were legal opinions provided in connection with the closing

15   of that transaction?

16   A    Yes.  There were several legal opinions.  There were, I

17   believe, a legal opinion required by the securities laws

18   that was filed as an exhibit to the registration statement

19   as an Exhibit 5 opinion.

20          There was another -- there were several opinions

21   from our external counsel and our internal counsel.  And I

22   believe there was an opinion delivered by the dealer

23   manager's counsel to the dealer managers.

24   Q    And did you review the opinions at the time?

25   A    I reviewed all of them except for we were never -- we

1    did not receive a copy of the opinion delivered from the

2    dealer manager counsel to the dealer managers.

3    Q    All right.  Was that consistent with your

4    responsibilities that things like opinion letters in

5    connection with financing transactions are something you

6    would review?

7    A    Yeah.  I would say that typically I oversee the

8    documentation of the transaction, the closing of the

9    transaction, so I familiarize myself with all the closing

10   documents, including legal opinions so that I typically find

11   that legal opinions are heavily negotiated and sometimes

12   some of the last things to be resolved and oftentimes the

13   business person needs to be in the loop on what the issues

14   are to help resolve those issues.

15   Q    And in your work in conjunction with Mr. Horton, are

16   these things that -- in your experience, are these things

17   that Mr. Horton typically would review in connection with

18   the deal transaction?

19   A    Not typically and he certainly wouldn't review early

20   drafts.  There probably have been occasions where opinion

21   issue has gotten to an impasse that the team would have to

22   raise the issue to Mr. Horton so he could speak with the

23   senior business person at the counterparty and I would

24   classify that to be in this case the dealer managers to help

25   try to resolve that at a business level.  But not typically

1   unless there was an impasse, he wouldn't be involved in that

2   process.

3   Q    All right.  I'd like to hand you Debtors' Exhibit 1.

4         MR. MCGAAN:  And Your Honor, if I could approach,

5   I'll provide a copy to you and the clerk.

6         THE COURT:  Yes.  Thank you.

7   BY MR. MCGAAN:

8   Q    Okay.  Can you tell the Court what Debtors' Exhibit 1

9   is?

10  A    This appears to be a copy of the final signed opinion

11  delivered by the, I believe they're called offerors here.

12  The offeror is the company -- EFIH's counsel, Simpson

13  Thatcher and Bartlett, delivered to the dealer managers.

14  Q    All right.  Well, let me ask you a couple questions to

15  get us all oriented.  The letter is from the law firm of

16  Simpson, Thatcher and Bartlett, correct?

17  A    Correct.

18  Q    And it indicates on the first page who Simpson Thatcher

19  Bartlett was representing at this time?

20  A    Correct.

21  Q    And were they representing EFIH?

22  A    They were.

23  Q    And this is dated August 17, 2010.  What -- is that

24  correct?

25  A    That's correct.

1   Q    What transaction was this opinion given in connection

2   with?

3   A    It was given in connection with what has been referred

4   to many times throughout the last two days as the August

5   2010 exchange.

6   Q    Okay.  And the word exchange appears down in the first

7   paragraph there, refers to it, correct?

8   A    That's correct.

9   Q    All right.  If you'd turn to page -- well let me ask

10  you this before we go off page 1, it's addressed to a set of

11  banks.  Who are the banks here?  Why would this letter be

12  written to them?

13  A    Those would have been the dealer managers that were the

14  financial institutions acting as dealer managers in the

15  transaction.

16  Q    Okay.  Now if we turn to page 4 and 5, actually 4, 5,

17  6, and 7, there's a set of numbered single spaced

18  paragraphs.  Can you tell the Court just in general, what

19  this set of single spaced paragraphs are?

20  A    Those are the actual legal opinions.  There's obviously

21  a lengthy lead in that gives some assumptions and then those

22  numbered paragraphs are the actual legal opinions being

23  delivered subject to the qualifications and assumptions both

24  before and after the opinions are stated.

25  Q    Okay.  And if you turn to page 5, I'd like to draw your

1   attention to the paragraphs numbered 4 and 5, and again just

2   in summary, what do these two opinions communicate to your

3   understanding?

4   A    It's both that the indenture and the notes themselves

5   have been duly authorized, effectively that they're

6   enforceable against the company in accordance with their

7   terms.

8   Q    That is the terms of the indenture and the terms of the

9   notes issued pursuant to the indenture.  Is that right, sir?

10  A    That's correct.

11  Q    Okay.  And if you turn now to page 7, you mentioned

12  that there were some qualifications.  Are the opinions given

13  specifically in paragraphs 4 and 5 that we just talked

14  about, qualified in any way on page 7?

15  A    They are.

16  Q    And please point out where and tell the Court what the

17  qualification is?

18  A    Well, there are several, but the specific one that

19  calls out the opinion paragraphs starts at the beginning of

20  the last paragraph beginning on page 7 and it says that the

21  opinions set forth in paragraphs 3, 4, 5, 6, 7, and 8 and of

22  course I think we just reviewed --

23  Q    Four and five.

24  A    -- 4 and 5 -- above are subject to the effects of

25  bankruptcy, insolvency, fraudulent conveyance,

1    reorganization, moratorium and other similar laws relating

2    to or affecting creditors' rights generally.

3    Q    Okay.  And again, the opinions given in paragraph 4 and

4    5 that are qualified here are opinions regarding the

5    enforceability of what?

6    A    Of the indenture and of the notes themselves.

7    Q    Okay.  And if someone that was -- was this a negotiated

8    opinion letter in connection with the deal?

9    A    Absolutely.

10   Q    Who participated in the negotiation of this letter?

11   A    Well, it would typically begin between the opinion

12   giver, who is Simpson Thatcher and the party receiving it,

13   which would have been the dealer managers.  The company

14   would certainly be involved to make sure that its outside

15   counsel was being reasonable in trying to facilitate a

16   closing.  And in this case, my -- at a point in the process,

17   the trustee's counsel would be involved in the negotiation

18   of this opinion letter as well.

19   Q    Who represented the trustee at the time?

20   A    My recollection in 2010, the trustee was being

21   represented by the firm of Winston and Strong.  The partner

22   that we dealt with the vast majority of the time was Jeff

23   Elkin.

24   Q    Okay.  And your recollection is that counsel Winston

25   and Strong on behalf of the trustee participated in

1    negotiating this?

2    A    I don't recall this specific opinion, but I don't

3    recall an opinion that was given in which they did not

4    participate in the negotiations.

5    Q    Okay.  Now, from your perch when this letter was being

6    negotiated through the time that it was finalized, what was

7    the significance of the limitation at the bottom of page 7

8    here that you just read out for the Court?

9    A    Well, this is --

10             MR. ANKER:  I'm sorry, Your Honor.  I object to

11   the question.  He's asking what the legal significance of --

12             THE COURT:  I can't hear you, Mr. Anker.

13             MR. ANKER:  I apologize, Your Honor.  I object to

14   the question.  It asks for an opinion on the legal

15   significance of the document.

16             MR. MCGAAN:  No it doesn't, Your Honor.  I asked

17   from his perch in the negotiations over this letter, what

18   significance that language had to him as a representative of

19   the company.

20             THE COURT:  Overruled.

21             THE WITNESS:  This opinion in and other opinions

22   like it where I've seen limitations, this indicates to me

23   that the opinion giver, in this case, our outside counsel,

24   was unwilling to give a legal opinion that the indenture and

25   I think by its nature the terms in the indenture would be

1    enforceable in the event of a bankruptcy or an insolvency.

2    BY MR. MCGAAN:

3    Q    All right.  And if you turn to page 8, there's another

4    limitation or carve out of some kind in the bottom paragraph

5    that refers to section 406 of the indenture.  Do you see

6    that?

7    A    It does.

8    Q    Can you tell the Court what -- first of all, what is

9    that language doing there?

10   A    The language in this opinion?

11   Q    Yeah.

12   A    Well, it's just again further carve outs to their

13   opinions.  This one takes it a step further.

14   Q    Well, what does it say?  Let's read it --

15   A    Oh, it says, in addition we express no opinion as to

16   the validity, legally binding effect and enforceability of

17   the waiver of rights and defenses contained in section 406

18   of the indenture.

19   Q    All right.  And is section 406 of the indenture the

20   same one that Mr. Horton was examined about in connection

21   with whether there were discussions with noteholders or

22   potential noteholders at the time of the exchange?

23   A    It was.

24   Q    All right.  Now, if you would please turn to the last

25   page, the signature page or the page with the signature on

1    page 10 towards the bottom there is a reference to who the

2    letter can be shared with in reference to the trustee.  Do

3    you see that?

4    A    I do.

5    Q    All right.  What does that tell you in connection with

6    whether the trustee saw this letter?

7    A    Well, typically opinion letters are limited to the

8    people who they're addressed.  And this particular paragraph

9    it says that it may not be relied upon by the addressees for

10   any other purpose or relied by or upon or furnished to any

11   other person.

12            However then it says that the trustee may rely on

13   paragraphs 1, 2, 4, 5, 6, 7, 8, and 11 and 12 subject to all

14   the qualifications, assumptions and limitations in the

15   document.

16   Q    Okay.  Now, you mentioned -- thank you.  You mentioned

17   a few moments ago before we walked through Exhibit 1 that

18   there was something called a section 5 opinion.  Do you

19   recall that?

20   A    An Exhibit 5 opinion, yes.

21   Q    Exhibit 5.  I'm sorry.

22            MR. MCGAAN:  May I approach, Your Honor?

23            THE COURT:  Yes.  Thank you.

24   BY MR. MCGAAN:

25   Q    Would you tell the Court what Debtors' Exhibit 2 is

1    please?

2    A    This is an opinion that's required by the rules and

3    regulations of the federal securities rules and regulations,

4    often referred to as Exhibit 5.  It's filed as Exhibit 5 to

5    registration statements in -- and in registered deals.

6    Q    Okay.  Was this -- so this document that I've handed

7    you shows that it comes from the SEC website.  Do you see

8    there at the bottom?

9    A    Yes.

10   Q    Publicly filed.

11   A    Yes.

12   Q    All right.  This is another letter from Simpson

13   Thatcher, correct?

14   A    It is.

15   Q    What's the date?

16   A    August 2nd, 2010.

17   Q    Was this opinion given in connection with any

18   particular transaction?

19   A    It was also given in connection with the August 2010

20   exchange.  The reason for the date change is these opinions

21   are required to be finalized and filed before the

22   registration statement is declared effective.

23   Q    All right.  And this letter to who?

24   A    It's addressed to Energy Future Intermediate Holding

25   company and EFIH finance.

1   Q    Okay.  And it says -- will you read the first sentence

2   of the last paragraph on page 1 that begins, "we have

3   examined"?

4   A    "We have examined the registration statement, the form

5   of the indenture which has been filed with the commission as

6   an exhibit to the registration statement and the old notes

7   and the indentures related thereto."

8   Q    All right.  What does the form of the indenture refer

9   to in this, in your mind?

10  A    At this time, you wouldn't sign the indenture until

11  such time as you close, which would have been on August

12  17th, so they don't have a signed indenture to review and so

13  they reviewed what was the form of the indenture at the

14  August 2nd, 2010 date, which also to my recollection would

15  have been filed with the SEC.

16  Q    Okay.  But specifically the form of the indenture, is

17  that the indenture that became the 10 percent note?

18  A    Yes.

19  Q    Now, what is the -- if you turn to page 2, can you just

20  describe for the Court what is the opinion that Simpson

21  Thatcher providing here in this SEC filing?

22  A    It says -- it's the same.  This says effectively that

23  the notes that are being issued will constitute valid and

24  legally binding obligations of EFIH and EFIH finance

25  enforceable against those parties in accordance with their

1  terms.

2  Q    Is this -- is there a qualification here also?

3  A    There is.

4  Q    What is the qualification that legal counsel provides

5  in this SEC filing?

6  A    It says our opinion set forth above is subject to the

7  effects of bankruptcy, insolvency, fraudulent conveyance,

8  reorganization, moratorium and other similar laws relating

9  to or affecting creditors' rights generally.

10 Q    Okay.  Thank you.  If you would turn now to a trustee

11 or Plaintiff's Exhibit 30 which is in the exhibit binder on

12 your desk.  Do you have that open in front of you?

13 A    I do.

14 Q    And just briefly, what is Exhibit 30?

15 A    This appears to be the final prospectus that was filed

16 in connection with the August 2010 exchange.

17 Q    All right.  Now, there was a reference in the Exhibit 5

18 opinion, Debtors' Exhibit 2.  The first thing I had you read

19 out from it is the description of what Simpson Thatcher

20 reviewed and one of the things it said it reviewed was the

21 registration statement, correct?

22 A    Correct.

23 Q    Is the Exhibit 5 opinion part of the registration

24 statement?

25 A    Yes.  It's an exhibit to the registration statement

1    that forms a part of it, yes.

2    Q    Is Trustee's Exhibit 30, Plaintiff's Exhibit 30, the

3    prospectus part of the registration statement?

4    A    Yes.

5    Q    So both these documents are filed together with the

6    SEC?

7    A    Yes.

8    Q    All right.  And I'd like you to turn to page 7 of 734

9    if you would please in Exhibit 30.  Are you there?  It's a

10   table of contents page?

11   A    I am.

12   Q    And this bottom part of the page is a section entitled

13   about this prospectus?

14   A    Yes.

15   Q    All right.  And would you read the first sentence to --

16   the first two sentences to the Court please if you can read

17   that tiny writing?

18   A    Sure.  This prospectus is part of the registration

19   statement that we have filed with the SEC.  You should read

20   this prospectus, including the annexes together with the

21   registration statement, the exhibits thereto and additional

22   information described under the heading, available

23   information.

24   Q    Who was this addressed to when it's saying you should

25   read this prospectus statement, et cetera?  Who, is your

1    understanding, that's speaking to?

2    A    To the parties for which the offer is being made, so at

3    the time it would have been the holders of the EFH notes.

4    Q    What was your expectation with regard to what potential

5    participants in the exchange offer would do?

6    A    Well, our expectation is that they would read the

7    entire prospectus and the registration statement.  It's,

8    frankly, our experience with investors and what they've told

9    us is very similar to what we heard today from Mr. Greene

10   and Mr. Auerbach, that they read all of our disclosures

11   carefully before investing in our debt.

12   Q    Okay.  And if they had then read the registration

13   statement and the public filings, they would have seen the

14   Exhibit 5 letter with the qualifications regarding the

15   effects of bankruptcy law?

16   A    Yes.

17   Q    Thank you.  That's all I have, Mr. Moldovan.

18                      CROSS-EXAMINATION

19   BY MR. ANKER:

20   Q    Good afternoon, Mr. Moldovan.

21   A    Good afternoon, Mr. Anker.

22   Q    You and I met when I took your deposition in Dallas?

23   A    We did.

24   Q    And, other than on that occasion, we have never met,

25   right?

1    A    That's correct.

2    Q    Now, you are a lawyer by training, are you not?

3    A    I have a law degree and practice as a lawyer, yes.

4    Q    But you are now functioning in a business role, in a

5    financial role, not in a legal role at EFIH and the other

6    debtors?

7    A    Since early 2010, yes.

8    Q    Let's start with the exhibits that McGaan showed you.

9    In Debtor's Exhibit 1 is the Simpson Thacher opinion letter

10   addressed to the dealer managers, right?

11   A    That's correct.

12   Q    And those dealer managers were selected by not the

13   noteholders or the trustee, but rather by the issuer, EFIH,

14   correct?

15   A    That's correct.

16   Q    And they were paid by EFIH, right?

17   A    I believe that's correct.

18   Q    And they were agents of EFIH, solicitation agents in

19   connection with the deal, right?

20   A    They were named solicitation agents.  I don't think --

21   and I'm not prepared to say that that made them an agent of

22   the company.

23   Q    Okay.  The law is what the law is.  They have is the

24   title and they were given the title by the company,

25   solicitation agents for the company, right?

1    A    They were given the title solicitation agents, yes.

2    Q    And one of the solicitation agents was Goldman

3    Sachs & Co., who's affiliate is one of the three

4    principal -- one of the three owners of EFH, right?

5    A    One of the dealer managers is a Goldman Sachs & Co.

6    and, yes, I believe they are affiliated with one of the -- I

7    don't know how their structure is, but I would consider them

8    affiliates, yes.

9    Q    An affiliate, the private equity arm of Goldman

10   Sachs & Co. is one of the three sponsors of EFH; am I

11   correct?

12            THE COURT:  I think he just answered that

13   question.

14            MR. ANKER:  Okay.  I'll move on.

15   BY MR. ANKER:

16   Q    Mr. Moldovan, was Exhibit 1, the Debtor's Exhibit 1,

17   attached to the registration statement?

18   A    No, it was not.

19   Q    Okay.  So when you were describing a document that was

20   available publicly to all potential investors, it was

21   Debtor's Exhibit 2, not Debtor's Exhibit 1, right?

22   A    That's correct.

23   Q    Okay.  And the language listed under Debtor's Exhibit 1

24   is -- the first paragraph that Mr. McGaan took you to was on

25   the bottom of page 7, I believe.  Are you there, sir?

1    A    I am.

2    Q    Okay.  And as you said, it says, our opinions set forth

3    in paragraphs 3, 4, 5, 6, 7, and 8 are subject to the

4    effects of bankruptcy and solvency, fraudulent conveyance,

5    reorganization, moratorium, and other similar laws relating

6    to or effecting creditors' rights generally.

7            Did I read that correctly?

8    A    I believe you did.

9    Q    Okay.  There's nothing else in this letter, nothing

10   specifically, that says, in the event of bankruptcy,

11   noteholders will not ask the company -- I'm sorry -- in the

12   event of bankruptcy, there will be an automatic acceleration

13   and the right to rescind acceleration will, or even may not

14   be honored, is there?

15   A    I don't believe that statement is in this opinion, no.

16   Q    Okay.  And I am not -- and I hope that the Court will

17   be thankful -- going to take you through the 48 pages,

18   single-space, of risk factor disclosures.  But you will

19   confirm, will you not, what Mr. Horton said, that with

20   respect to this offering, in the risk factor disclosures in

21   the offering memorandum, there is no disclosure that the

22   right to rescind may be limited in any way, shape or form in

23   bankruptcy?

24   A    I don't recall that statement being in the risk

25   factors.

1    Q    And you would agree, I take it with Mr. Horton, that

2    there were approximately ten other risk factor disclosures

3    relating to bankruptcy in that offering memorandum, correct?

4    A    Approximately.  I haven't counted them.

5    Q    Okay.  And the second -- let's go back to Exhibit 1 --

6    the second paragraph that Mr. McGaan took you to is on page

7    8, sir?

8    A    That's correct.

9    Q    And it says, In addition, we express no opinion as to

10   the validity, legally binding effect or enforceability of

11   the favor of rights and defenses contained in Section 4.06

12   of the indentured.  Did I read that correctly?

13   A    You did.

14   Q    So Simpson Thacher was not expressing an opinion one

15   way or the other, correct?

16   A    Well, I think these are carveouts to their opinion;

17   they're not saying it is unenforceable, but they are

18   expressly saying they are not willing to give an opinion

19   that it is.

20   Q    And, Mr. Moldovan, just to put it in context, 4.06 is

21   the provision, not the rescission provision, right?

22   A    It is not the rescission provision.

23   Q    The rescission provision is part of 6.02, right?

24   A    That's my recollection.

25   Q    Four zero six is the provision in which the debt -- the

1    EFIH waived any right to seek to enforce any stay arising by

2    operation of law, right?

3            MR. MCGAAN:  Object to the characterization.

4    BY MR. ANKER:

5    Q    Isn't that your understanding?

6    A    I believe that's the topic of the section.  It's

7    qualified by to the extent, legally enforceable, so that is

8    the topic that's covered by that section.

9    Q    Okay.  And Mr. Moldovan, although you're not today

10   functioning as a lawyer, you were a transactional lawyer for

11   many years?

12   A    Yes, I was.

13   Q    At Gibson, Dunn & Crutcher?

14   A    That's one of the firms I worked at.

15   Q    I actually don't remember from your deposition.  At

16   which other firms, sir?

17   A    I worked at Wildman Harrold Allen & Dixon, as well, in

18   Chicago.

19   Q    Okay.  And is it fair to say that in opinion letters

20   given on any deal, these sorts of carveouts that we see on

21   Exhibit 1 up here, as a matter of routine?

22   A    As to enforceability -- as to opinions that go to

23   enforceability of -- yes, I think exceptions for bankruptcy

24   are common.

25   Q    Now, let's turn to Exhibit 2.  Tell me if you're there,

1    sir, Debtor's Exhibit 2.

2    A    I am.

3    Q    Now, this is the one that was filed with the Securities

4    and Exchange Commission, correct?

5    A    That's correct.

6    Q    And the sentence that Mr. McGaan took you to is on page

7    2 of the opinion, and it's the second -- let's start with

8    the second full paragraph.  It reads, Based upon the

9    foregoing, and subject to the qualifications, assumptions

10   and limitations stated herein, we are of the opinion that

11   when the exchange notice had been duly executed,

12   authenticated, issued and delivered in accordance with the

13   provisions of the indenture upon the exchange, the exchange

14   notes will constitute valid and legally binding obligations

15   of the registrants enforceable against the registrants in

16   accordance with their terms.

17            Did I read that right?

18   A    I believe you did.

19   Q    And so that's a reference to the enforceability of the

20   notes themselves, not the indenture, right?

21   A    That is a reference to the notes themselves.  It's my

22   belief from this that if the indenture is unenforceable,

23   that this subsumes the fact that the indenture would be

24   enforceable as well.

25   Q    That's your interpretation?

1    A    That is my interpretation.

2    Q    And you would acknowledge, Mr. Moldovan, uses the word

3    "that the exchange notes will constitute a valid and legally

4    binding obligations," it doesn't refer to the indenture,

5    even though earlier in the same sentence, it refers to the

6    indenture, correct, sir?

7    A    And earlier in the opinion, about what was reviewed to

8    come to this conclusion, but, no, in the actual -- I will

9    agree that it says the exchange notes, and it does not refer

10   to the indenture in the part that you were reading from.

11   Q    And I asked you this earlier about Debtor's Exhibit

12   1 -- I think it's also true about Debtor's Exhibit 2, but

13   let me see if I'm right -- the qualification then appears in

14   the next paragraph.  Our opinion set forth above is subject

15   to the effects of bankruptcy and solvency, fraudulent

16   conveyance, reorganization, moratorium and other similar

17   laws relating to or effecting creditor rights generally,

18   general equitable proceedings -- I'm sorry -- general

19   equitable principles, whether considered in a proceeding, in

20   equity or at law, and an implied covenant of good faith and

21   fair dealing, that, too, is a standard boilerplate carveout

22   with respect to opinions on enforceability, is it not?

23   A    Well, I would -- I will say that I believe it is a

24   standard carveout for opinions on enforceability and debt --

25   in the offering of debt securities.  I'm not -- I can't tell

Page 187

1    you that every Exhibit 5 opinion on different types of

2    securities, transaction, but, yes, for an issuance of debt

3    securities, this is their standard carveout.

4    Q    Now, Mr. Moldovan, can I take you back to Exhibit -- to

5    Plaintiff's Exhibit 30, which Mr. McGaan asked you about.

6    Tell me when you're there, sir.

7    A    I'm at 30.

8    Q    Thirty is the prospectus, correct, sir, from the 2010

9    EFIH notes that were the subject of the exchange?

10   A    It was the prospectus delivered in connection with the

11   exchange offer.

12   Q    Okay.  And Mr. McGaan took you to the table of contents

13   which has the language about reading everything.  Can I turn

14   you to page 2 of 734.  Tell me when you're there, sir.

15   A    I'm there.

16   Q    Okay.  And you'll see a paragraph, I think it's the

17   fourth paragraph, it's the first one that is in bold type

18   face, begins, you are encouraged to carefully consider all

19   the information listed in this prospectus, including the

20   annexes hereto in its entirety, in particular, risk factors,

21   which is underlined, beginning on page 38.  Did I read that

22   correctly?

23   A    Yes, you did.

24   Q    And those are the risk factors that you described

25   earlier that provide no disclosure that, in the event of a

1    bankruptcy filing, EFIH may be able to redeem and the right

2    to rescind may be limited; right?

3    A    I believe you asked me if the risk factors in this

4    prospectus contained that specific language and, yes, you're

5    -- I think we are referring to the same risk factors you

6    referred to me earlier.

7    Q    Okay.  Mr. Moldovan, I'm not going to sort of move

8    from, if you will, my cross to a part of my direct, that I

9    was going to forego had you not been put on the stand.  So

10   blame opposing counsel.

11        You testified, when I took your deposition, not only in

12   your 30(b)(1), 30(b)(1) as a not -- witness with personal

13   knowledge, but as a 30(b)(6) witness to the company; right?

14   A    I did.

15   Q    And you were designated as the representative of the

16   company on a variety of subjects; right?

17   A    On more than one subject, yes.

18   Q    And those subjects, without getting exact words,

19   included the negotiation and -- of the EFIH first lien notes

20   and indentures; right?

21   A    That's correct.

22   Q    Okay.  And I asked you at that deposition about the

23   right to rescind -- well, let me ask you now.

24        The company, EFIH, understood that under this

25   indenture, the 2010 indenture, that the holders of the notes

1    have the right to waive any default and rescind any

2    acceleration; it that correct?  Is it?

3    A    I'm sorry.

4            THE COURT:  Are you reading from his deposition?

5            MR. ANKER:  Let me -- I'm framing the question

6    exactly as in the -- Well, let me ask it initially and then

7    if I get a different answer, I'll show his deposition.

8    BY MR. ANKER:

9    Q   Is it accurate that at the time of the 2010 exchange,

10   the holders -- the company understood that the holders of

11   the notes had the right to waive any default and rescind any

12   acceleration?

13   A   I don't understand the full context of your question.

14   My belief -- I have never considered the -- I shouldn't say,

15   I haven't considered, I have never thought that in a

16   bankruptcy that lenders could rescind an acceleration and

17   therefore effectively, in my mind, reinstate debt.  That's

18   not what I assumed bankruptcy, you know, my assumption

19   always, not being a bankruptcy lawyer, not consulting with a

20   bankruptcy lawyer, is that when the debt accelerated per the

21   bankruptcy automatically it stayed accelerated.

22           MR. ANKER:  May I approach, Your Honor, and show

23   Mr. Moldovan his deposition?

24           THE COURT:  Yes.

25           MR. ANKER:  Page 176, lines 25 to page 177, line

1    5.

2         Would it be helpful if the Court had a copy?

3         THE COURT:  Yes, it would.

4         MR. ANKER:  May I approach, Your Honor?

5         THE COURT:  Yes.  Thank you.

6    BY MR. ANKER:

7    Q    Mr. Moldovan, let me direct you to page 176, line 25;

8    if I could.

9    A    Okay.

10   Q    Are you there, sir?

11   A    I am.

12   Q    And is it accurate that I asked you the following

13   question, continuing onto page 177:

14        Question:  Okay.  And so the company understood that

15   under this indenture, the 2010 indenture, the holders of the

16   notes have the right to waive any default and rescind any

17   acceleration; right?

18        I asked you that question; did I not?

19   A    You did ask that question.

20   Q    And what was your answer that you gave on page 177,

21   line 5?

22   A    The answer that I gave was, yes.

23   Q    Okay.  Now, Mr. Moldovan, you just testified if I heard

24   a minute ago that you, in your own mind, assumed, at some

25   point, but you're not a bankruptcy lawyer, that in the event

1   of bankruptcy, noteholders would not be able to rescind

2   acceleration.  Did you communicate, we've talked about the

3   risk factor, did you, Kris Moldovan, communicate that view

4   to any EFIH first lien noteholder at any time prior to the

5   planning for bankruptcy, the Fall of 2013?

6   A    No.

7   Q    Did you do so at any time between the Fall of 2013 and

8   April 29, 2014, the petition date?

9   A    I'm sorry, could you restate what -- ask again what I

10  would have communicated?

11  Q    Did you communicate to any first lien noteholder that

12  the right to rescind -- let me strike that, because there

13  was, in fairness to you there's an 8K that comes out on

14  November 1st, 2013.

15       So prior to November 1st, 2013, did you, Kristopher

16  Moldovan, communicate to any EFIH first lien holder that it

17  was your view that the EFIH first lien noteholders would not

18  be able to rescind acceleration in the event that the

19  company went into bankruptcy?

20  A    I never communicated that specific -- that specific

21  view to any noteholder; no.

22  Q    Okay.  Did you ever communicate that specific view to

23  the indenture trustee for the first lien notes?

24  A    Not to my recollection.

25  Q    To your knowledge, as you sit here today, did any one,

Page 192

1    other than Kristopher Moldovan, employed by, retained by,

2    representing EFIH communicate that position in substance to

3    any holder of the EFIH first lien notes or to the indenture

4    trustee at any point prior to November 1st, 2013?

5    A    Not that -- you know, other than what I think is

6    implied by the opinion that was publicly filed, no; not that

7    specific belief.

8    Q    Okay.  And the opinion that was publicly filed that

9    you're referencing is debtor's Exhibit No. 2?

10   A    Correct.

11   Q    Okay.  Now, Mr. Moldovan, let me switch subjects for a

12   moment and just talk a little bit about some of the

13   economics of the transaction.

14        EF -- you would agree with Mr. Horton, would you not,

15   that on balance, EFIH sought in the 2010 exchange in the

16   other first lien debt offerings to get the best overall mix

17   it could get of terms; right?

18   A    Yes.

19   Q    Did -- if -- all else being equal, the interest rate on

20   the notes had remained 10 percent, it would have been better

21   for EFIH if the notes had been freely callable without any

22   requirement of payment of the make-whole; right?

23   A    Yes.  I believe in the situation where every other

24   provision of the transaction were the exact same other than

25   they were freely callable, yes, that would have been more

1    favorable to the debtors.  But, given our position of -- in

2    the liability management program, one of our stated goals

3    was to extend maturities, I can tell you that the value of

4    that freely callable security wasn't very much.

5    Q    If EFIH had been able to negotiate for the make-whole

6    amount to be zero and therefore callable at par, it would

7    have done so; right, sir?

8    A    It's -- I feel like that's the same question.  If

9    you're asking me would we have -- that's effectively a free

10   call which you just asked me and my answer is the same.  If

11   every other provision of the transaction were the exact same

12   and a lender came and said but we'll give you a free call,

13   the company would have accepted it.

14   Q    And -- I asked Mr. Horton -- you were in the courtroom

15   for my examination of him?

16   A    I was.

17   Q    I asked him about a document that I believe is

18   plaintiff's Exhibit 55.  I think Mr. Moldovan it's in your

19   binder three.

20   A    I only have one binder.

21   Q    I apologize.  May I --

22            THE COURT:  They're around the corner.  This is

23   two.

24            MR. ANKER:  May I approach, Your Honor?

25            THE COURT:  Yes.

1          MR. ANKER:  Okay.

2    BY MR. ANKER:

3    Q    Mr. Moldovan, do you now have Exhibit 55, plaintiff's

4    Exhibit 55 in front of you?

5    A    I do.

6    Q    Okay.  And can you describe for the Court what this

7    document is?

8    A    It appears to be the investor presentation that was --

9    or the slides that were the basis for the investor

10   presentation in connection with the August, 2010 exchange.

11   Q    Mr. Moldovan, I think if you look, it says August,

12   2012.

13   A    Or 2012, I'm sorry.

14   Q    Okay.  And that was not an exchange.

15   A    I'm sorry.  I should -- this was in connection with a

16   new cash issuance in August, 2012.  I'm sorry.  I looked at

17   the date wrong.

18   Q    It's two hundred -- totally understandable.  Two

19   hundred fifty million of the five hundred million

20   approximately in six and seven eighths first lien notes;

21   right?

22   A    That's correct.

23   Q    Okay.  And you're familiar with the term, a road show?

24   A    I am.

25   Q    Okay.  And a road show consists of when a company

1   seeking to issue re-debt goes out and talks to prospective

2   investors to try to gather up interest in the issuance;

3   right?

4   A    Correct.

5   Q    Okay.  And is it fair to say that this investor

6   presentation dated August, 2012, that's PX 55, was part of a

7   road show, if you will?

8   A    Well, no, it was part of an investor call.  There was a

9   time where we invited investors to dial in.  I believe this

10  presentation was made available for a short period of time.

11  I don't believe it was printable or -- but it was the basis

12  for a call that the company and the underwriters in this

13  case had with prospective investors.

14  Q    Okay.  So I take it that the reason you don't consider

15  this part of a road show is you think of a road show as

16  literally you go on the road and you physically appear at

17  the investor, whereas, this was telephonic?

18  A    Well, that's how you described road show so I was --

19  yes, as going out on the road.  So, yes, this was an

20  investor presentation made telephonically.

21  Q    But the goal was the same which is to elicit hopefully

22  investor interest in the debt issuance; right?

23  A    Well, I think to describe the terms of the proposed

24  transaction.

25  Q    And to describe them truthfully and accurately; right?

1    A    That's correct.

2    Q    And to describe all the material terms; right?

3    A    I don't know that I'd go that far.  I think this was to

4    describe enough of the terms to the investors to -- so that

5    they would be interested enough to learn more.  You know,

6    get a copy of the offering memorandum, read the risk

7    factors, get all the other information that's material.  For

8    instance, you know, there are a lot of things that are in

9    the offering memorandum that aren't in here but it's -- it

10   is a piece to see -- to get -- to peak somebody's interest

11   to go to take that next step.

12   Q    And can I ask you to turn to page four, Mr. Moldovan?

13   A    Sure.

14   Q    Of PX 55.

15   A    Sure.

16   Q    I asked Mr. Horton about this.  You'll see there's a

17   box on this one page summary called call protection; right?

18   A    Yes.

19   Q    And Mr. Horton's already testified that NC means no

20   call; 2.5 means two and a half years, subject to T plus 50

21   make-whole call; you agree with him that that's what the NC

22   and the 2.5 refers to?

23   A    Yes, I do.

24   Q    Okay.  And you would agree that this summary, it's not

25   the whole ball of wax.  It's not the whole indenture.  It's

1    not the whole prospectus.  It's meant to convey to the

2    investors the principal economic terms of the transaction of

3    the offering; right?

4    A    Well, yeah, I would say that often times, and I don't

5    recall in this situation, there's a preliminary offering

6    memorandum and this would be used, and often when that

7    preliminary offering memorandum is used most of these

8    provisions, if not all of them, are blank when they go out

9    and so I would say that this is a summary of the provisions

10   that would fill -- be proposed to fill in many of those

11   blanks and taken together with the rest of the terms, you

12   know, that there are other provisions, other than this, that

13   would make up their investment decision.

14   Q    Mr. Moldovan, I've shown you the investor presentation

15   for the 2012 offering.  Were there similar investor

16   presentations in connection with other note offerings for

17   the EFIH first lien notes?

18   A    With EFIH, I suspect there were but I cannot be

19   certain.

20   Q    As you sit here today, do you recall any investor

21   presentation for any of the EFIH first lien notes that

22   indicated anywhere in the document that the right to rescind

23   might be subject to limitation in bankruptcy?

24   A    I don't recall that statement being made in any

25   investor presentation.

1    Q     Do you recall any statement, in any of the investor

2    presentations, for any of the EFIH first lien notes that

3    were the company, EFIH, to file for bankruptcy, it might be

4    able to repay the notes without paying -- prior to the first

5    call date, without paying a make-whole?

6    A     Well, I think as I told you in my deposition, I believe

7    that these investor presentations refer you to, typically

8    refer you to the offering memorandum and it continued --

9    it's always been and continues to be the company's belief

10   that applicable premium, that's the word I use because I

11   deal in the denture, that applicable premium is due in one

12   and only one circumstance and that's under an optional

13   redemption under Section 3.07.  And so would I say that the

14   -- that we communicated that by directing them to an

15   offering memorandum where applicable premium is used only in

16   one section, yes.

17   Q     Mr. Moldovan, let me reframe my question as I think we

18   may have talked past each other.

19         Was there any investor presentation -- I'm not asking

20   whether a cross reference some other document, was there any

21   investor presentation that ever said on its face, that you

22   recall, for any EFIH first lien notes, that in the event of

23   bankruptcy, EFIH may be able to repay the notes prior to the

24   first call date without paying the make-whole?

25   A     Not within the actual investor presentation that was --

1    other than through the cross reference I described.

2            MR. ANKER:  May I have one moment, Your Honor?  I

3    may be done.

4        (Pause.)

5            MR. ANKER:  Your Honor, I'm done with my

6    examination of Mr. Moldovan.  Thank you, Mr. Moldovan.

7            THE WITNESS:  Thank you.

8            THE COURT:  Mr. McGaan.

9            MR. MCGAAN:  Thank you, Your Honor.

10                    REDIRECT EXAMINATION

11   BY MR. MCGAAN:

12   Q   Mr. Moldovan, Mr. Anker asked you whether -- I believe

13   he was referring to the 2010 exchange transaction, whether

14   any -- whether you had or whether you were aware someone at

15   the company had communicated to a noteholder or the

16   representatives, about whether the make-whole would be

17   recoverable or not in an acceleration in bankruptcy.  Do you

18   remember a question generally about that?

19   A   I remember him asking me if we -- about the

20   acceleration piece.

21   Q   And specifically whether you had communicated anything

22   about the company's view on the ability to collect the make-

23   whole after a bankruptcy acceleration.

24   A   I remember that line of questioning.

25   Q   I want to ask the flip side of it and whether, during

1    the negotiation of the 2010 exchange, any noteholder or

2    representative told you, in words or substance, that it was

3    important to them to ensure that they could obtain the make-

4    whole even if there was an acceleration in bankruptcy?

5    A    Not in that transaction.  There were no proposed

6    changes to the acceleration provision.  Nobody expressed

7    that concept to us, to me at all.

8    Q    Did the subject ever come up?

9    A    No.

10   Q    And then Mr. Anker asked you whether specifically

11   something like that had been communicated to the first lien

12   trustee itself.  Do you remember that?

13   A    I do.

14   Q    Let me give you what's -- what I'm going to mark as

15   debtor's Exhibit 3 --

16            MR. MCGAAN:  May I approach, Your Honor?

17            THE COURT:  Uh-huh.  Thank you.

18            MR. ANKER:  Your Honor, we would object to

19   questioning about this document if it does not bear a Bates

20   stamp and I was just -- just asked Mr. McGaan and was told

21   that it was not produced to us in discovery.  And I assure

22   you our document requests were quite broad.

23            MR. MCGAAN:  Your Honor, what -- this is an email

24   that shows the transmission of this -- the -- let me be more

25   specific.  This email shows the transmission of the debtor's

1    Exhibit 1, the August 17, 2010 Simpson Thatcher opinion

2    letter to the trustee itself.  So this document was provided

3    to them back at the date -- at the time of the email,

4    August 17, 2010.  One of the recipients of this is a

5    representative of the trustee in addition to trustee's

6    counsel at the time.

7              THE COURT:  Yeah, but where did you get it?

8              MR. MCGAAN:  I got it either yesterday or earlier

9    today after we heard in the courtroom examination from

10   Mr. Anker suggesting that maybe this kind of thing hadn't

11   been -- that is, bankruptcy limitations on the

12   enforceability of provisions in the indenture had not been

13   communicated to the trustee or noteholder representatives

14   when, in fact, it had been.

15             So, I'm simply following up on the cross-

16   examination of Mr. Moldovan to -- who was asked whether he

17   had a recollection of this, in fact, occurring and this

18   document shows that it did.

19             MR. ANKER:  Your Honor, to the extent that

20   Mr. McGaan is suggesting this document was communicated to

21   the trustee, it was communicated, apparently, to BNY Mellon,

22   that's a predecessor trustee.  That's not in the files of

23   Bell Order Trust Company.  It wasn't produced in discovery.

24   It's being brought up at trial --

25             THE COURT:  Yeah.

1            MR. ANKER:  -- and being used.

2            THE COURT:  It's unfair.  I'm not allowing the use

3    of this document.

4            MR. MCGAAN:  I have no further questions for

5    Mr. Moldovan.

6            THE COURT:  All right.  Mr. Anker, anything?  I

7    don't --

8            MR. ANKER:  Your Honor --

9            THE COURT:  I don't think -- I mean, I was just

10   asking Mr. Anker if he had any questions.  It would be very

11   narrow.  Any further questions?

12           MR. ANKER:  I do not, Your Honor --

13           THE COURT:  Okay.

14           MR. ANKER:  -- have any further questions.

15           THE COURT:  Thank you, sir.

16           THE WITNESS:  Thank you.

17           THE COURT:  Subject to the reservations earlier

18   about the documents and relevance, et cetera, that's it for

19   the witnesses.  Are you going to call Mr. Keglevic?

20           MR. MCGAAN:  No, Your Honor, we're not and that is

21   it for the debtor's witnesses.  We have -- well, I'm sorry,

22   you were saying something.  I just answered --

23           THE COURT:  No, no.  Go ahead.

24           MR. MCGAAN:  I was going to say that we've got

25   some counter designations to the deposition designations

1    that Mr. Anker's proposed so there's a little bit more for

2    our record too.  But subject to that, that is our

3    presentation.

4                THE COURT:  All right.

5                MR. ANKER:  Your Honor, I'm told by folks who

6    understand the Federal Rules better than I do that we need

7    to, an order, and frankly to the -- the debtors may as well,

8    to the extent that either side will ultimately want to

9    appeal your summary judgment ruling, make a motion for a

10   judgment as a matter of law and the stay relief in the

11   adversary contested matter under Rule 50(b).  I presume

12   having held this trial, Your Honor is going to weigh the

13   facts but I am told by my colleagues that we need to do that

14   to preserve the record so we can appeal if ultimately Your

15   Honor rules against us and similarly the debtors can appeal

16   if they rule against them.  And I'm told that the case on

17   that is Ortiz v. Jordan, 562 U.S. 180, 2011.  So we would so

18   move.

19                THE COURT:  Okay.

20                MR. MCGAAN:  First I've heard of it.  I'd like to

21   respond in the morning if we, after checking it out,

22   determine a response is necessary.

23                THE COURT:  Okay.  By the way, I still don't have

24   a revised order on the summary judgment.  You filed a motion

25   under Rule 59 and we had a discussion about it, had a status

1    conference and I know you've been busy doing other things.

2            MR. ANKER:  Mr. McGaan and his colleagues sent us

3    a proposal.  It didn't seem to us, given the case law, to

4    work.  We sent back a note to Mr. McGaan and his colleagues.

5    I'm losing track, a week ago?

6            We will, Your Honor, endeavor to try to get to an

7    agreement and if we are unable to, we'll obviously present

8    to the Court.  But we certainly will try to get to an

9    agreement.

10           THE COURT:  I just --

11           MR. MCGAAN:  I would add to that, Your Honor, that

12   I think I'm going to get this wrong, too, but I think our

13   response date to the motion was upon us and we had an

14   agreement to extend it because this hearing could well moot

15   the need to deal with that.  It may not and --

16           THE COURT:  The motion is pending so the appeal

17   period is not ticking so --

18           MR. ANKER:  That's right.  And on Mr. McGaan's

19   last point, their opposition would have been due yesterday,

20   the 20th.  They asked for and we consented to an extension

21   until, I think, the 23rd, if memory serves me right.  I'm

22   seeing affirmative shakes of the head.

23           THE COURT:  Okay.  I just wanted to make sure we

24   hadn't lost touch with it.  All right.

25           Well, that's going to be it for the day.  I'm sure

Page 205

1    you're tired.  I'm tired.  We'll reconvene tomorrow a 10 and

2    we'll clean up the record and hear argument.  Okay?

3            You can leave, again, like last night, you can

4    leave all your things overnight.  That's fine.  I don't

5    think it'll be a problem tomorrow but I do have a consumer

6    calendar call at 2 p.m. tomorrow.  I think we should be done

7    by them.  If not, we'll have to take a break and we'll have

8    to clear the tables at that time, if we have to do that.

9    But we'll deal with that in the morning if necessary.

10            MR. MCGAAN:  We're pretty comfortable we'll be out

11    of your way by then.

12            THE COURT:  All right.  Very good.

13        (Chorus of thank you.)

14            THE COURT:  You're welcome.  We'll see you

15    tomorrow.  We're adjourned.

16        (Whereupon the proceedings were concluded at 4:01 PM)

17

18

19

20

21

22

23

24

25

Page 206

1                    I N D E X

2                    WITNESSES

3                                                    PAGE

4    ANTHONY HORTON

5         Cross-Examination                          15

6         Redirect Examination                       40

7

8    JAMES CACIOPPO

9         Direct Examination                         60

10        Cross-Examination                          82

11

12   ETHAN AUERBACH

13        Direct Examination                         87

14        Cross-Examination                          109

15        Redirect Examination                       123

16

17   JOHN GREENE

18        Direct Examination                         126

19        Cross-Examination                          148

20        Redirect Examination                       159

21

22   KRISTOPHER MOLDOVAN

23        Direct Examination                         164

24        Cross-Examination                          179

25        Redirect Examination                       199

Page 207

```
1                 C E R T I F I C A T I O N

2

3      I, Melissa Looney certify that the foregoing transcript is a

4      true and accurate record of the proceedings.

5      Melissa Looney

6      _____

7      Melissa Looney

8      AAERT Certified Electronic Transcriber CET-607

9

10

11

12     Date:  April 22, 2015

13

14

15

16

17

18

19

20

21

22      Veritext Legal Solutions

23      330 Old Country Road

24      Suite 300

25      Mineola, NY 11501
```

Digitally signed by Melissa Looney
DN: cn=Melissa Looney, o=Veritext,
ou, email=digital@veritext.com, c=US
Date: 2015.04.22 11:01:56 -04'00'