1   UNITED STATES BANKRUPTCY COURT

2   DISTRICT OF DELAWARE

3

4

5   In re:                          :
                                    :    Chapter 11

6   ENERGY FUTURE HOLDINGS          :
    CORP., et al.,                  :    Case No. 14-10979(CSS)

7                                   :
            Debtors.                :    (Jointly Administered)

8   _____ :
    DELAWARE TRUST COMPANY as       :

9   INDENTURE TRUSTEE,              :
                                    :

10          Plaintiff,              :
                                    :    Adversary Proceeding

11      v.                          :    No. 14-50363(CSS)
                                    :

12  ENERGY FUTURE INTERMEDIATE      :
    HOLDING COMPANY LLC and EFIH    :

13  FINANCE INC.,                   :
                                    :

14          Defendants.             :
    _____ :

15

16

17
                        United States Bankruptcy Court

18
                        824 North Market Street

19
                        Wilmington, Delaware

20

21

22
                        April 22, 2015

23
                        10:02 AM

24

25

1    B E F O R E :

2    HON CHRISTOPHER S. SONTCHI

3    U.S. BANKRUPTCY JUDGE

4

5    ECR OPERATOR:  LESLIE MURIN

6

7

8    HEARING RE:  Joint Motion of CSC Trust Company of Delaware,

9    as Indenture Trustee, and Certain EFIH 10% First Lien

10   Noteholders, for Confirmation that the Automatic Stay Does

11   Not Apply or, Alternatively, for Limited Relief from the

12   Automatic Stay, solely regarding rescission of Acceleration

13   [D.I. 473; filed May 15, 2014] the "Stay-Applicability

14   Motion")-

15

16

17

18

19

20

21

22

23

24   Transcribed by:  Melissa A. Looney, Tracey Williams, Lynne

25   Blanchette, William Garling, Leigh David.

```
 1   A P P E A R A N C E S :

 2   KIRKLAND & ELLIS

 3        Attorney for the Debtors

 4

 5   BY:  ANDY MCGAAN, ESQ.

 6        MIKE ESSER, ESQ.

 7        RICHARD HOWELL, ESQ.

 8        MICHAEL SLADE, ESQ.

 9

10   RICHARDS, LAYTON & FINGER

11        Attorneys for the Debtors

12

13   BY:  DAN DEFRANCESCHI, ESQ.

14        JASON MADRON, ESQ.

15

16   SHERMAN & STERLING

17        Attorney for Deutsche Bank New York

18

19   BY:  NED S. SCHODEK, ESQ.

20

21   POTTER ANDERSON CARROON LLP

22        Attorney for Deutsche Bank New York

23

24   BY:  R. STEPHEN MCNEILL, ESQ.

25        JEREMY W. RYAN, ESQ.
```

1  AKIN GUMP STRAUSS HAUER & FELD

2       Attorney for UMB Bank

3

4  BY: CHRISTOPHER CARTY, ESQ.

5

6  VENABLE

7       Attorney for PIMCO

8

9  BY:  JAMES EDMONSON, ESQ.

10      JEFFREY SABIN, ESQ.

11

12 MORGAN LEWIS

13      Attorney for PIMCO

14

15 BY:  JULIA FROST-DAVIES, ESQ.

16      PATRICK STRAWBRIDGE, ESQ.

17

18 MORRISON & FOERSTER

19      Attorney for TCEH Committee

20

21 BY:  KAYVAN SADEGHI, ESQ.

22

23

24

25

1    PACHULSKI STANG ZIEHL & JONES

2        Attorney for EFIH Second Lien Indenture Trustee

3

4    BY:  LAURA DAVIS JONES, ESQ.

5

6    WILMER HALE

7        Attorney for EFIH First Lien Indenture Trustee

8

9    BY:  PHILIP ANKER, ESQ.

10       CHARLES PLATT, ESQ.

11       DAVID GRINGER, ESQ.

12       ISLEY GOSTIN, ESQ.

13       JOEL MILLAR, ESQ.

14

15   COLE SCHOLTZ

16       Attorney for EFIH First Lien Indenture Trustee

17

18   BY:  KATE STICKLES, ESQ.

19       NORMAN PERNICK, ESQ.

20

21

22

23

24

25

1   KRAMER LEVIN

2        Attorney for EFIH Second Lien Indenture Trustee

3

4   BY:   JOSHUA BRODY, ESQ.

5        GREG HOROWITZ, ESQ.

6        ALICE BYOWITZ, ESQ.

7

8   ROPES & GRAY

9        Attorney for EFIH Second Lien Indenture Trustee

10

11  BY:   ROSS MARTIN, ESQ.

12        KEITH WOFFORD, ESQ.

13

14  DRINKER BIDDLE & REATH

15        Attorney for Citibank DIP Agent

16

17  BY:   HOWARD A. COHEN, ESQ.

18        JAMES MILLER, ESQ.

19

20  SULLIVAN & CROMWELL

21        Attorney for E Side Committee

22

23  BY:   BRIAN GLUECKSTEIN, ESQ.

24

25

1    MONTGOMERY MCCRACKEN

2         Attorney for EFH Committee

3

4    BY:  MARK FINK, ESQ.

5

6    YOUNG CONAWAY

7         Attorney for the Ad Hoc Committee of

8         TCEH First Lien Creditors

9

10   BY:  PAULINE K. MORGAN ESQ.

11

12   POLSINELLI, PC

13        Attorney for TCEH

14

15   BY:  SHANTI KATONA, ESQ.

16

17

18

19

20

21

22

23

24

25

```
1                    P R O C E E D I N G S

2               THE CLERK:  All rise.

3               THE COURT:  Please be seated.  Good morning.

4               MR. MCGAAN:  Good morning, Your Honor.

5               THE COURT:  All right.  I think we have some

6     housekeeping logistics, evidence to deal with.

7               MR. ANKER:  Yes, Your Honor.  Philip Anker, Wilmer

8     Cutler Pickering Hale and Dorr for Delaware Trust Company

9     and various noteholders, EFIH first lien noteholders.

10              Your Honor, I'm pleased to report that overnight

11    with meet and confers with the debtor and their counsel, we

12    were able to take what was a quite wide and deep group of

13    disputes over exhibits and deposition designations and

14    narrow them as of about two minutes ago to literally a very

15    thin group.

16              Let me if I could, first, before getting to the

17    disputes just say what I think is undisputed.  Your Honor,

18    and obviously if I have this wrong, I assume counsel for the

19    debtors will inform the Court.  I understand that there is

20    no dispute that Plaintiff's Exhibits 1 through 37 and 39

21    through 77 should be admitted.  There is a dispute over 38.

22              We have withdrawn and therefore do not seek to

23    have admitted Plaintiff's Exhibits 78 and 79.  I understand

24    there to be no dispute that Plaintiff Exhibits 80 to 81

25    should come into evidence.  We have withdrawn Plaintiff
```

1    Exhibit 82.

2              I understand there to be no dispute that Plaintiff

3    Exhibit 83 should come into evidence.  We have withdrawn

4    Plaintiff Exhibits 84 to 85.

5              I understand there to be no dispute that

6    Plaintiff's Exhibits 86 to 89 should come into evidence.  We

7    have withdrawn Plaintiff Exhibit 90.

8              I understand there to be no dispute that Plaintiff

9    Exhibits 91 to 101 should come into evidence.  We have

10   withdrawn Plaintiff Exhibits 102, 103.

11             I understand that Plaintiff Exhibits 104 and 105

12   there is no dispute should come into evidence.  We have

13   withdrawn 106 to 110.

14             As to Plaintiff Exhibit 111, there is no dispute

15   that it should come into evidence, however the debtors

16   believe that it contains confidential information and

17   therefore should be filed with the Court under seal.  We

18   have no objection to proceeding that way.

19             Plaintiff Exhibit 112, I understand there to be no

20   dispute over its admissibility.  I understand we've

21   withdrawn 113 to 114.

22             Plaintiff Exhibits 115 to 117 I understand there

23   to be no dispute over admissibility.  We have withdrawn

24   Plaintiff Exhibits 118 to 120.  Plaintiff Exhibits 121 to

25   129 I understand there to be no dispute over their

Page 10

1   admission.  We have withdrawn Plaintiff Exhibits 130 to 133.

2          Plaintiff Exhibit 134 I understand there to be no

3   dispute as to its admission.  We have withdrawn Plaintiff

4   Exhibits 135 to 137.

5          Plaintiff Exhibits 138 to 140 are deposition

6   designations as to 98 percent of them there is no dispute,

7   but there is a dispute as to a few, so I'll go over that.

8          And then as to Plaintiff Exhibit 141, that is the

9   document that I referenced yesterday, Your Honor, where it's

10  the deck repaired by the debtors' professionals in this case

11  that has a line acknowledging that the payment of any make-

12  whole claim including to the EFIH first lien holders would

13  generate a net operating loss.  The debtors are fine with

14  having the title page or at least part of it come in with

15  the redaction of everything but that line and we're happy to

16  have that come in as is.

17         I don't think we have given Your Honor a copy of

18  that document.  And if I may approach, I'd be happy to hand

19  the Court a copy.

20         THE COURT:  Yes.  Thank you.

21         MR. ANKER:  There's a lot of redacting, Your

22  Honor.

23         THE COURT:  Okay.

24         MR. ANKER:  Let me just -- and, Your Honor, we are

25  prepared not to move for the Court to take judicial notice

1    of various filings in the docket.  I will say that I think

2    it is our position that we could have this argument down the

3    road either side ends up taking an appeal to the Third

4    Circuit or the district court that the record of the

5    bankruptcy case and obviously the record with respect to the

6    contested matter, the stay applicability motion and the

7    adversary, but more broadly with respect to the bankruptcy

8    case is fair game, that will be an issue for down the road.

9    But we don't think the Court needs to formally take judicial

10   notice of those matters.

11          With that, let me explain what the dispute centers

12   about.  Both the dispute with respect to the document, which

13   is Plaintiff Exhibit 38 and the dispute over the deposition

14   testimony all relate to that single document.  There came a

15   time not in relation to an EFIH indenture, but with respect

16   to a TCEH note offering after the 2010 EFIH offering of the

17   first lien debt where a particular holder asked for language

18   that would have provided that any event of default,

19   including but not limited to bankruptcy would automatically

20   cause the make-whole to come do, a covenant default, any

21   default.

22          The company declined to accept that.  There was

23   change to some degree in the language.  Much of that there

24   is now designation on, but there is one matter as to which

25   we are in disagreement.  In connection with that dispute,

1    that particular holder was represented by the law firm of

2    Debevoise and Plimpton and in particular by a bankruptcy

3    partner at that firm, My Chi To.  I hope I'm not butchering

4    her name.

5              She wrote an e-mail that that holder wrote it to

6    her client, but that holder then forwarded it to the debtor

7    and it was produced out of the debtors' files.  And in that

8    e-mail she stated that without any change in the language,

9    so precisely the language that is in the EFIH first lien

10   indenture -- and I will quote it -- she said the following:

11   Second lien noteholders will only be entitled to receive a

12   make-whole in the event of a refinancing and bankruptcy to

13   the extent that they are over secured.

14             I think we can put it up on the screen so Your

15   Honor can see the relevant language.  Your Honor, hopefully

16   it's on your screen.  It actually is not, I'm sorry it's

17   right here.

18             To the extent -- and I will confess, Your Honor, I

19   don't think at the end of the day expectations and what

20   people were thinking back in 2010 is the most salient point,

21   but the debtors made a big point of it yesterday.

22             To the extent that what matters in part to the

23   Court is what were people thinking at the time.  Here is

24   evidence of a sophisticated noteholder -- this was Oak Tree,

25   Your Honor -- represented by a leading law firm advising the

1    debtor that their view was that a make-whole would be due in

2    the event that the debtor refinanced as it did with us to

3    the extent that the noteholders were over secured.

4            Now, the TCEH noteholders are not hence the

5    concern that is expressed there, but we are, of course, over

6    secured.  The debtor has stipulated to that.  So to the

7    extent that expectations and what people were thinking back

8    then, long before much of the case law that has come out --

9    and this is by the way, Your Honor, October 2, 2010 right

10   after the first lien notes issuance or the exchanges to EFIH

11   is relevant.  This is direct evidence, goes to the debtor --

12   the debtor is saying nothing, do nothing, do not seek to

13   disabuse.

14           The testimony is basically, did you get this

15   document, did you in fact read it, did you in fact say

16   anything to Oak Tree.  Did you take any steps to disabuse

17   them?  No, no, no.

18           I'm happy to hand up the disputed excerpts, but I

19   think I fairly described what they are about and I think

20   without putting words in the debtors' mouth as to the

21   deposition transcripts they don't have an objection other

22   than the basic relevancy objection they have as to this

23   entire matter.  So I think without putting words into

24   Mr. McGaan's mouth and I haven't talked with him about this,

25   but I think that he would acknowledge that if Your Honor

1    agrees that the document comes in, then the relevant

2    deposition excepts would as well.

3            THE COURT:  Thank you.

4            MR. ESSER:  Good morning, Your Honor.  Mike Esser,

5    Kirkland and Ellis for the debtors.  I did want to echo

6    Mr. Anker's comments that last night we did reach a

7    substantial compromise.  I did want to provide the Court

8    with a little bit of context as to why we're raising this

9    one narrow issue.

10           The trustee began the day yesterday with an

11   exhibit list containing 141 documents containing thousands

12   of pages.  The debtors made 46 objections mostly to

13   relevance.  We compromised on all but one.  On the

14   deposition transcripts, which we are now just focusing on

15   the related testimony, the trustee originally designated

16   8,452 lines of deposition testimony.  The debtors objected

17   to roughly two-thirds of that, unsurprisingly because two of

18   the three witnesses testified yesterday.  We have

19   compromised on all of that except for this testimony related

20   to the My Chi To e-mail.

21           On that point, Your Honor, this document came up

22   at summary judgment.  You may recall it.  It had limited

23   relevance then.  It has no relevance with respect to this

24   narrow proceeding.  The document describes a lawyer's

25   communications with her client in interpreting the terms of

1   an unspecified draft, description of notes to be issued by

2   TCEH.  These comments attempting to interpret the

3   description of notes actually come at the very bottom of

4   this e-mail chain.

5          And if we can pull up the e-mail.  I want to point

6   out that the top e-mail here is actually sent from Julie

7   Hoffman Ramos at Bank of New York Mellon.  It was forwarded

8   to representatives of the company with an FYI.  The e-mail

9   below it -- and if we could just call out the e-mail that

10  was forwarded.

11         Your Honor, if we may approach and hand the entire

12  document to you so you can see how far down the relevant

13  language is.

14         So I'd like to call out this language at the

15  bottom here which was the language that was actually

16  forwarded to the debtors and called to the debtors'

17  attention which says, we just noticed that on a spreadsheet

18  on the spreadsheet was incorrect for G-M-A-M.  I am not sure

19  where the typo occurred.

20         So the actual operative call to action in this

21  e-mail related to its typo.  It had nothing to do with the

22  language the trustee is pointed out, which comes several

23  pages later down in the e-mail chain and to which no debtor

24  deponent or witness has indicated they have ever seen.  As

25  such, it is classic hearsay, Your Honor, and it cannot be

1    used for the effect on the listener because the debtor

2    simply never looked that far down in the e-mail chain.  As

3    such we ask that it be excluded --

4              THE COURT:  Where is it here?

5              MR. ESSER:  It's actually on -- if I may point to

6    the Bates number, Your Honor, it's EFIH MW several zeros and

7    then 84713.

8              MR. ANKER:  Page 3 of 5, Your Honor.

9              THE COURT:  Oh, I see.  Okay.  Who's Arman (ph)?

10             MR. ESSER:  Arman is a -- Arman is with Oak Tree

11   Capital, Your Honor, who is an exchanging party in the TCEH

12   second lien.

13             THE COURT:  Okay.  Okay.  I see it.

14             MR. ESSER:  There is related deposition testimony

15   no witness at any point indicated they had read or seen this

16   language before.  It is irrelevant to this proceeding and it

17   is hearsay, Your Honor.

18             THE COURT:  Thank you.

19             MR. ANKER:  Your Honor, just a couple of points

20   very briefly.  First the document that we're talking about

21   is in the debtors files.  It was filed to the debtors --

22   sent to the debtors.  The reason we have it is they produced

23   it.  That's the Bates stamp.

24             Second, there was no objection on hearsay grounds

25   and I'm certainly not offering this for the truth of the

1    matter asserted.  I don't think you should take this into

2    evidence to say that Ms. To was right in her legal

3    interpretation, but it goes to expectations of holders at

4    the time.

5         Third, to the extent that Mr. Esser said that the

6    underlying indenture as to which she was commenting is not

7    in evidence, it's Plaintiff Exhibit 11 and the optional

8    redemption and acceleration language is the same as in the

9    indenture for the EFIH first lien notes.  So the underlying

10   document is in evidence.  There's no dispute this came out

11   of the debtors' files.

12        But to the extent that the debtors have put in

13   issue what were people thinking back in 2010, what were

14   people reasonably thinking, here is independent evidence of

15   what a leading holder was thinking and more importantly, his

16   or its counsel.

17        Finally, I note that the --

18        THE COURT:  Is that the -- but the truth of the

19   matter asserted is what he's thinking, not -- in other

20   words, when I say, you know, I think that the document is

21   ambiguous, the statement is, "I think" that's the verb.  So

22   the truth of the matter you're asserting is what that person

23   thought, not whether or not it's actually ambiguous or not.

24        MR. ANKER:  I think that is accurate, Your Honor.

25   I will also note that the debtors themselves cited to and

1   extensively briefed these e-mail and its exchange in their

2   summary judgment papers.

3            THE COURT:  Yeah.  I thought it was irrelevant

4   then, I have to say.

5            Well, I'll allow it really just frankly out of an

6   abundance of caution.  I think that it is about as

7   irrelevant as it can be and still make it into evidence.  I

8   really don't view it as being particularly persuasive, but

9   there has been some discussion and some emphasis on the

10  fact -- really from both sides that none of this was

11  discussed and none of the people who are testifying today

12  when this was all discussed in 2010 and here you have

13  identical language, albeit with a different indenture and at

14  least some expression of what somebody thought or didn't

15  think at the time.

16           The implication about not disabusing them of that

17  fraud, I think that's where you really stretch it, but the

18  actual document itself and the deposition testimony, I will

19  allow and overrule the objection.

20           UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

21           MR. ANKER:  Your Honor, thank you.  To that

22  extent, what I would propose is I think we have a list of

23  all of the deposition designations that we could hand up

24  where the relevant provisions -- the relevant excerpts that

25  were in dispute are in yellow.  They will obviously now be

1    admitted.  I'm happy to hand that up now.  I'm happy also in

2    addition to file later today a clean copy so that it is part

3    of the record.

4              May I approach with a copy or would it be helpful

5    to the Court to hand up a copy with the yellow highlightings

6    for what was at issue?

7              THE COURT:  Yes.  Do that.  And the highlighting

8    indicates what?

9              MR. ANKER:  The highlighting were the -- those

10   excerpts in depositions that discussed this particular e-

11   mail chain that the debtors were objecting to and as to

12   which you have now overruled the objection.

13             THE COURT:  Oh, I see.

14             MR. ANKER:  So we'll file a copy today, Your

15   Honor, that will delete the yellow highlighting.  It will

16   all be clean, but this will consist of all the deposition

17   excerpts to be admitted.  It reflects lots of discussion

18   last night and agreement, withdrawals by us and agreements

19   by the debtor.

20             THE COURT:  You're going to delete them?

21             MR. ANKER:  No, this version reflects those

22   deletions, Your Honor.  I apologize.  This reflects the

23   agreed upon excerpts to come into evidence and I was simply

24   saying that there had previously been a longer list.

25             THE COURT:  I was confused about what you said.  I

1    thought you said were going to delete the highlighted

2    portions that you just got into evidence, so that's why I

3    was confused.

4              MR. ANKER:   And, Your Honor, we will, I think this

5    is in accordance with Your Honor's practice and I assume it

6    would be helpful, we will provide highlighted copies of the

7    actual excerpts so that you have them in highlighted form

8    and we obviously will provide those to Kirkland and Ellis

9    and make sure that we haven't made any mistakes.

10             We also will hopefully later today cause the

11   exhibit to be filed under seal to be filed under seal, but

12   at that point the record will be complete. And I think with

13   that, we are done with respect to the evidentiary matters.

14             I did have one other housekeeping matter before we

15   turn to the evidence and it is something that I raised

16   yesterday.  Out of an abundance of caution --

17             THE COURT:   I'm going to interrupt you for a

18   minute just because I don't want to lose track of what I'm

19   thinking.

20             In connection with the providing -- which would be

21   very helpful to provide the hard copy of the deposition

22   designations highlighted, I'd appreciate if you could

23   separate yellow for plaintiff, blue for defendant, however

24   you want to -- some sort of distinction between who is

25   designating what and a key so I know what color --

1             MR. MCGAAN:  We'll do that.

2             THE COURT:  That would be --

3             MR. ANKER:  We'll do that, Your Honor.  No problem

4      at all.

5             THE COURT:  And also, I'm going to make a formal

6      statement on the record as to the admission of the

7      documents, so was there any dispute between the list that

8      Mr. Anker went through on what's admitted and what's

9      withdrawn?

10            MR. HOROWITZ:  No, Your Honor.  No dispute.

11            THE COURT:  Okay.

12            MR. HOROWITZ:  That's a correct (indiscernible).

13            THE COURT:  All right.  So just so the record is

14     clear.  Docket -- Plaintiff Exhibits 1 through 36 are

15     admitted without objection.  38 is admitted over the

16     objection, which is overruled of the debtors.  39 to 77 are

17     admitted, 80 to 81 are admitted, 83 is admitted, 86 to 89

18     are admitted, 91 to 101 are admitted, 104 to 105 are

19     admitted.  111 is admitted under seal.  112 is admitted, 115

20     to 117 is admitted, 121 to 129 are admitted, 134 admitted,

21     the deposition designations will be admitted as agreed and

22     the objection to certain of them is overruled per the

23     record.  141 is admitted in redacted form and the balance of

24     plaintiff's exhibits were withdrawn.

25            (Plaintiff's Exhibits 1-36, 38, 39-77, 80-81, 83, 86-

```
1    89, 91-101, 104-105, 111, 112, 115-117, 121-129, 134, 141,

2    admitted)

3              MR. ANKER:  Thank you, Your Honor.

4              THE COURT:  And then we need to deal at some

5    point, Mr. McGaan with debtor exhibits, but I don't want to

6    jump ahead, because Mr. Anker has another matter, so I

7    don't --

8              MR. MCGAAN:  I'm happy to deal with debtors -- it

9    probably makes sense to deal with the evidentiary issues

10   first.

11             THE COURT:  There were only a few.  You just had

12   the two exhibits, correct?

13             MR. MCGAAN:  Correct, Your Honor.

14             THE COURT:  All right.  Any objection?

15             MR. ANKER:  No objection to their admission, Your

16   Honor.

17             THE COURT:  All right.  Debtor 1 and Debtor 2 are

18   admitted without objection.

19        (Debtors' Exhibits 1 and 2, admitted.)

20             MR. MCGAAN:  Thank you, Your Honor.

21             THE COURT:  Any other evidence that we need to

22   discuss before I close the evidentiary record?  I hear none,

23   okay so the evidentiary record is closed.

24             MR. ANKER:  Your Honor, before we get to closing

25   argument, as I raised yesterday out of an abundance of
```

1    caution, given the Court's summary judgment ruling, we

2    believe that to perfect the record, we need to and therefore

3    hereby do make a motion under Federal Rule of Civil

4    Procedure 52(b) and/or (c) as incorporated by Bankruptcy

5    Rule 7052 for judgment as a matter of law on the grounds set

6    forth in the summary judgment papers.

7              We fully understand that the Court decided at

8    summary judgment that it could not resolve this matter

9    entirely as a matter of law, but we believe or that the

10   supreme court's decision in Ortiz v. Jordan 562 U.S. 180

11   that it may be necessary to renew a prior summary judgment

12   argument that was denied at the close of evidence in order

13   to perfect all rights, including rights to appeal.

14             We therefore make this motion in the adversary

15   proceeding, in the so-called contested matter motion of the

16   debtors and in the stay applicability motion, including with

17   respect to rule of the lift stay because Rule 52 is

18   applicable both to adversary proceedings and contested

19   matters.

20             We understand the Court has already ruled.  We're

21   doing this as a housekeeping matter.  Obviously if Your

22   Honor wants to reconsider and grant us judgment as a matter

23   of law, we won't be unhappy, but we appreciate that the

24   Court has ruled and has taken the time to hear two days of

25   evidence.  So we make that motion, Your Honor.

1          MR. MCGAAN:  Andrew McGaan for Kirkland and Ellis

2     for the debtors, Your Honor.  Good morning.  We oppose the

3     motion for all of the reasons and the evidence in the record

4     thus far.  We are here at this hearing on the trustee's

5     motion to the extent we sought relief in the adversary

6     proceeding Your Honor had granted that summary judgment in

7     favor of my client without prejudice which leads us here

8     today, so we're here solely on a claim for relief brought by

9     the trustee.  So we're not making a similar motion for that

10    reason.  I'm not even sure that motion is necessary here,

11    but we don't have to have that debate.  We oppose entry of

12    judgment as a matter of law here for the reasons set forth

13    on the record.

14          THE COURT:  All right.  I'll take the issue under

15    advisement in connection with my ruling.  Any other

16    housekeeping matters?  No.  All right.  Very good.  Who am I

17    going to hear from?  Am I going to hear from Mr. Anker, Mr.

18    McGaan, Mr. Horowitz?

19          MR. HOROWITZ:  I need a couple minutes.

20          THE COURT:  All right.  Anyone else?

21          MR. GLUECKSTEIN:  Your Honor, briefly for the

22    (indiscernible).  Your Honor, Brian Glueckstein of Sullivan

23    and Cromwell.  With Your Honor's permission, I wish to

24    address the Court briefly on the (indiscernible).

25          THE COURT:  All right.

1          MR. SUDEGHI:  And, Your Honor, also Kayvan Sadeghi

2     from Morrison and Foerster on behalf of the additional

3     committee of unsecured creditors of TCEH (indiscernible).

4          THE COURT:  All right.  Okay.  Thank you.  So

5     we'll hear from -- let's hear from Mr. Anker, then Mr.

6     Horowitz and Mr. McGaan and then I'll hear from the two

7     committees.  Does that make sense?

8          MR. MCGAAN:  Yes.

9          THE COURT:  Okay.

10          MR. ANKER:  Good morning, Your Honor.  Again, for

11     the record, Philip Anker, Wilmer Cutler Pickering Hale and

12     Dorr for the trustee and for noteholders EFIH first lien

13     noteholders.

14          Your Honor, let me start, and I mean this quite

15     sincerely, by expressing my and our client's appreciation to

16     the Court and your staff.  I know how busy -- I think I know

17     how busy you are, I may not know quite how busy you are, and

18     we very much appreciate the attention, not only the time,

19     but the thought you have devoted to this matter and that

20     your law clerks and others have devoted to this matter.

21          Let me start with two what I would call stage-

22     setting points.  First, as Your Honor has repeatedly noted,

23     we are in phase one.  Phase one assumes that EFIH is

24     solvent.  We ask for nothing more than a lifting of the stay

25     conditioned on it proving to be true that EFIH is solvent

1    and able to pay all of its creditors in full.  If Your Honor

2    had concluded that that was completely irrelevant and we

3    were entitled to judgment anyway, I suppose we would have

4    wanted summary judgment, and to that extent I guess I am

5    asking for that relief with respect to my Rule 52 motion.

6    But as for the trial, we appreciate that any ruling here

7    will be conditioned on an ultimate determination of

8    solvency.  We don't think that's going to be a serious

9    issue, but we fully understand that the Court would not want

10   to issue a ruling here today based on solvency only to learn

11   six months from now or three months from now that there

12   isn't enough money to go around and at that point, oops,

13   what happened.

14           Second, we also recognize that, as the bifurcation

15   order provided, issues of damages.  How much is the right

16   amount of a make-whole?  Is there some possible challenge

17   under Section 506(b) to its calculation?  While again we

18   think those arguments, particularly in a solvent debtor

19   case, are not terribly weighty, we fully recognize they are

20   not to be resolved today.  The only issue today is whether

21   there is cause to grant relief from the stay for us to

22   assert a claim assuming solvency with the amount thereafter

23   to be determined.

24           Let me also deal with two other preliminary

25   matters before going to the guts of the argument.  One is

1     that while there is certainly a lot of disagreement between

2     us and EFIH, one thing we are in total agreement on is the

3     following.  In their trial brief, the EFIH debtors state the

4     following, quote, "The EFIH debtors have the burden of

5     proof."  We agree.  That is what Your Honor said in Downey,

6     it is what Section 11 U.S.C. 362(g) of the Bankruptcy Code

7     provides.  The only exception to that is that the burden of

8     proof would be on the movant if there were any issue about

9     the debtors' equity in property if we were seeking to

10    foreclose, we are not.

11          There are cases certainly and we recognize them

12    that say that the party moving has an initial burden to make

13    a prima facie case.  We think we have satisfied that burden

14    amply and, if Your Honor agrees, the ultimate burden falls

15    squarely on all issues on the debtors.

16          One other preliminary matter and here there is

17    disagreement -- at least there is today, there wasn't a few

18    weeks ago.  Although EFIH never raised the issue in its

19    summary judgment briefs and I think that's telling, EFIH now

20    suggests that the real question here and the real

21    requirement is that there be some additional showing as part

22    of this prima facie and that they have a lesser ultimate

23    burden because the relief being sought is nunc pro tunc.

24    With all due respect, I don't think that's right given the

25    history here.

1           The nunc pro tunc cases involve situations where a

2   party takes actions in violation of the automatic stay

3   without seeking, let alone obtaining, a court order giving

4   it protection.  Here we sought filing a motion for relief

5   from stay prior to, a month before the debtors redeemed us,

6   and we served the rescission notice.  We said explicitly it

7   was subject to relief from the stay to the extent the stay

8   were deemed necessary.  But we went further, we obtained an

9   order and it's Your Honor's DIP order.

10          And I appreciate that when you wrote your summary

11   judgment motion you didn't remember -- I think it's

12   paragraph 58 or page 58 -- of a highly negotiated order that

13   was submitted to you.  That paragraph says in simple

14   language that the granting of the motion and indeed the

15   refinancing of the notes and the payment of the notes will

16   have no effect.  Not only no preclusive effect, but no

17   evidentiary effect of any kind with respect to any of this

18   litigation, specifically including without limitation the

19   stay relief motion and whether we are entitled to rescind.

20          Think about the practicalities, Your Honor, at

21   that point.  If the debtors are right, we needed to stand up

22   and say, Your Honor, I know the debtors are saying they need

23   this relief immediately, I know they're saying they're going

24   to save all this money, you need to hold what we are on day

25   three of a hearing before you grant that relief.  The notion

1    behind that paragraph was to help the administration of this

2    case, to let the motion go forward, but at the same time

3    protect our rights.  And for the debtors now to say that's

4    not the case, I don't use this word lightly, is

5    disingenuous.  They didn't raise this point in their summary

6    judgment motion and that is telling about what they really

7    know the truth is and what was going on.

8            Let me move from there to what I would call the

9    guts of the matter.  Your Honor knows that on a lift-stay

10   motion one looks at the totality of the circumstances.  As

11   Your Honor told us and told the debtors, that's not

12   something to be decided at summary judgment.  I need facts,

13   I need evidence, I need context.  Well, the facts and the

14   evidence and the context here are quite extraordinary.  They

15   are not facts, they are not evidence, they are not context I

16   have ever run into before.

17           We have a solvent or at least presumed solvent

18   debtor.  We have a refinancing.  Remember, it wasn't our

19   action that caused the make-whole to come due, it was the

20   debtors' action to redeem us, taken at the outset of this

21   case with knowledge of what the terms of the contract were

22   and with knowledge that we were seeking relief from stay.

23   It was the debtors' act to refinance us at the outset of the

24   case.  I will -- maybe there are other cases out there, I

25   have never been in a case where a debtor refinanced debt

1    pursuant to a first stay motion in a case as opposed to a

2    plan confirmation or otherwise.

3            It's, third, a case with a timely motion filed at

4    the very outset of the case for relief from stay and a

5    timely rescission notice.  And it's a case where the Court

6    has already decided that as a matter of state contract law

7    we have the right to rescind.  The debtor said, no, we

8    didn't, that that right to rescind, which is in the very

9    same section as the acceleration section, is qualified by

10   the carve-out that we can't rescind if it would violate an

11   order of the Court, and they argued that the automatic stay

12   was such a provision and Your Honor rejected that argument.

13           So for all the language and rhetoric about how

14   we're seeking to increase our claim, we're seeking to get

15   something not owed to us, as a matter of state law, as a

16   matter of the contract, as a matter of what the parties

17   agreed to, Your Honor's ruling is 180 degrees the opposite.

18           Let me now move to the factors.  As Your Honor

19   knows, courts typically looked at three factors.  Is there

20   great harm for the debtor, great.  If there is great harm to

21   the debtor -- and I do read the case law to say only if the

22   debtor gets past that threshold -- then one looks to whether

23   the harm to the noteholders, the movant, is considerably

24   greater.  And, third, does the movant here, the noteholders,

25   have a likelihood of success on the merits.

1          Let me knock out the third.  I'm going to do these

2    in reverse order, because -- well, I want to deal with the

3    third first because I think it's the easiest and let's get

4    it out of the way.  I'm going to deal with the second, that

5    is harm to the noteholders, because, Your Honor, I heard you

6    loud and clear.  You said I'm 99 percent of the way there on

7    harm to the debtor, EFIH, in light of its solvency I need a

8    trial on harm to the noteholders.  So I want to deal with

9    that before harm to the debtors, but certainly the lack of

10   harm to the debtors is significant.

11         On the third factor, you said in Downey all that

12   is needed, in accordance with lots of law, is the reasonable

13   possibility that the movant would succeed on the merits.

14   And you noted there we have way more than that, it's clear

15   that the movant would prevail, that same analysis applies

16   here.  At the risk of doing something I'm going to do my

17   darnedest not to do this morning, which is repeat myself,

18   you have already held that under the contract, if relief

19   from stay is granted, we have the right to rescind and, if

20   we have the right to rescind, this is an optional redemption

21   and we are then due the make-whole, subject to whatever

22   506(b) or other arguments one might make about the dollar

23   amount.

24         The debtors' response to that is to reargue and

25   basically say, Your Honor, you erred.  You didn't err.

1    Their argument is that as a matter of -- we're all wasting

2    our time and all the case law out there is a waste of time,

3    because the mere fact of bankruptcy causes an acceleration

4    of the notes and that can't be rescinded.  I submit that

5    that proposition is wrong as a matter of law and is contrary

6    to the controlling law of this circuit.

7              In Oakwood Homes, the Third Circuit explained

8    that, and I quote, "the general rule of both the Bankruptcy

9    Code and 502(b) is acceleration to the date of filing of the

10   bankruptcy petition for the purpose of filing a claim.  We

11   must reject our dissenting colleague's theory that future

12   principal is accelerated and becomes presently due."  449

13   F.3d 588-602.

14             That view is in accordance with the words of the

15   statute.  The statute, 101, defines a claim as a right to

16   payment whether fixed or contingent, matured or un-matured.

17   If all debt matured immediately upon the bankruptcy filing,

18   the reference to un-mature debt would make no sense.

19             Section 502(b)(1) says, "Except as provided in

20   various sections, if an objection to a claim is made, the

21   court after notice shall allow the claim except to the

22   extent," quote, "'such claim is unenforceable against the

23   debtor and property of the debtor under any agreement or

24   applicable law for a reason other than because such claim is

25   contingent or un-matured.'"  If all debt matured, if the

1   principal came back, then that language in the statute makes

2   absolutely no sense whatsoever.

3           Judge Drain in Momentive, Judge Olack in Premier

4   Biloxi, all drew dramatic distinctions between contract

5   acceleration and its effect on the one hand and acceleration

6   simply for purposes of filing a proof of claim.

7           Judge Olack said the following:  "The automatic

8   acceleration of a debt under the Bankruptcy Code allows a

9   lender to file a proof of claim for the un-matured principal

10  amount of the debt under Section 502 without violating the

11  automatic stay, but such acceleration is relatively limited

12  and does not change the maturity date of the debt."  445

13  B.R. 582-630.

14          Judge Shannon in the Trico Marine case allowed a

15  claim for a make-whole where there was no contractual

16  acceleration.  The only acceleration there was under for

17  purposes of filing a proof of claim.  If their argument is

18  right, Judge Shannon missed the elephant in the room and his

19  entire opinion is wrong.

20  Skyler Ridge rejects the very argument they make.

21          I'm not going to go on on this point, we have

22  briefed it extensively.  The law is quite clear.

23          So let's go now -- the third factor overwhelmingly

24  favors us, because you have decided already that we will

25  prevail on the merits, subject to the 506(b) and other

1     issues, if you grant relief from the stay.

2          Let's now go to harm to the noteholders.  And

3     again I want to take that, if I could, out of order.  Let's

4     briefly review the evidence, because you wanted evidence.

5     If the stay relief motion is denied, the noteholders will be

6     denied their contract right to rescind and their contract

7     right then, because it will be an optional redemption, to

8     payment of the make-whole.  That will impose substantial

9     economic harm.                 Mr. Kearns testified that the

10    amount of the make-whole was $431 million as of June 19,

11    2014, and Mr. McGaan, as you will recall, when he argued the

12    motion in limine said to the Court.  For purposes of phase

13    one, we're prepared to stipulate to that number.  Now, I

14    understand he reserves his rights as to phase two and I'm

15    not going to quote it back to him if we get to phase two,

16    but that -- for purposes of this hearing, that we will lose

17    $431 million is not disputed.  That represents, as Mr.

18    Kearns testified, 19 percent, just under 20 percent of the

19    principal balance for the non-settling noteholders, 431 for

20    them compared to 2,298,000,000.  That is classic economic

21    injury and it is substantial.

22          Second, you've had substantial evidence,

23    uncontroverted evidence, that that amount is not a windfall,

24    it's not a penalty.  The noteholders made loans in which

25    they agreed to take on risk, risks that interest rates would

1    move against them, the credit of the issuer would move

2    against them, and in exchange they agreed to obtain a future

3    stream of payments.  That was the basic deal.

4           Mr. Kearns, Mr. Auerbach, Mr. Greene, I think Mr.

5    McCarty and Mr. Cacioppo, all testified not only about the

6    theory behind make-whole, but about the actual facts on the

7    ground in this case.

8           If we could call up Plaintiff Demonstrative No. 1?

9    This is Mr. Kearns' initial demonstrative showing the

10   reinvestment list here -- actually, this one just shows the

11   numbers and the reinvestment risk, and it shows the $454

12   million that would have been paid to the noteholders, which

13   gets discounted at T-plus-50 under the make-whole to 431.

14   And this shows various possible uses of those funds that the

15   noteholders could have put the money to and, as Mr. Kearns

16   testified uncontroverted, the two most plausible are the

17   single B or double B rating, which gets you to just under --

18   slightly under $400 million.  That is real money.

19          The evidence of the actual holders, Your Honor, is

20   -- can we go to Demonstrative 2 before we do that actually?

21   Demonstrative 2 is simply the presentation in graphic form

22   of the same point.  It shows and, again, it's uncontroverted

23   that the total interest payments that the noteholders didn't

24   receive from June 19, 2014 to December 1, 2015, the first

25   call date, were some $339 million.  They then would have

1    received the five-percent call payment on December 1, that's

2    another just under 115 million, that produces a total of 454

3    million.  Discounted back assuming an investment at a T-

4    plus-50 instrument, that would get you to the 431 million.

5    And if instead the reinvestment were in the double B credit,

6    it would be 58.1 million, leaving a net of just under $396

7    million.

8              But that's an expert.  What we did in this case

9    and, Your Honor, I think it's pretty unusual, is we put on

10   the witness stand real, live investors, two of the largest

11   in this credit.

12             Mr. Auerbach of Blue Mountain testified

13   uncontroverted to the harm he suffered.  He said, what do

14   you mean I could reinvest and get ten percent?  There was

15   nothing like that out there.  Indeed, I had $1 billion

16   parked on the sidelines earning zero -- not even earning T-

17   plus-50, earning -- I assume it's earning something, but he

18   said zero.  Because there was no investment out there given

19   the amount of money we manage that made any economic sense

20   given the balancing of risk and reward.  He also testified

21   uncontroverted that over the period of time from June 19 to

22   today the funds he manages and Blue Mountain manages have

23   earned two to three percent at most.

24             Mr. Greene of Halcyon testified that he too was

25   unable to find any investments of comparable credit quality

1    and duration paying anywhere close to ten percent.  Indeed,

2    he testified that his funds are down two to three percent

3    over that nine-month period.

4           Now, the debtors say, but you could have invested

5    in the DIP.  Can we go back to the first slide?  And if we

6    had, we'd still have $333.7 million in damages.  That's the

7    first column, Your Honor, on the left.  But think about it.

8    That would have required us to walk -- our holders to walk

9    away from 75 percent of their make-whole entitlement, the

10   settlement was about a 25-percent offer, and it would have

11   required them to invest in a debtor-in-possession loan

12   paying four and a quarter with no make-whole provision and a

13   greater principal amount and with longer maturity, all of

14   which increases risk.

15          Whatever one says, whether one says the right

16   number is 431, which is the contractual entitlement and I

17   think therefore is the right number, or anywhere else in

18   these goalposts, there is substantial economic harm and the

19   reinvestment risk is real, not theoretical.  This is not a

20   world in which investors could go back and get a comparable

21   credit, a comparable duration investment for ten percent.

22   Indeed, Your Honor, I wouldn't be here today if that were

23   true.

24          And the reason I know that is something that if we

25   step back and think about.  If the market out there was that

1     there were comparable issuers who were lending at ten

2     percent, they wouldn't have been able to get a DIP at four

3     and a quarter, because why would anyone lend into a DIP and

4     get four and a quarter if for comparable risk you could get

5     ten?  The fact that they got that DIP tells you loudly and

6     clearly what is going on in this market.

7          Third, the noteholders lost the benefit of their

8     bargain.  I'm not going to spend a lot of time on this, but

9     in addition to giving you real hard numbers we tried to put

10    on evidence about the basic premise behind a make-whole, it

11    makes the investor whole.  These are at their core two long-

12    term -- ten- year typically, the 2010 EFIH first lien notes

13    matured in 2020 -- long-term, fixed-interest rate, non-

14    amortizing loans of below investment grade companies with

15    limited covenants compared to bank debt.  That means that

16    the noteholder taking lots of risks.  He's taking the risk

17    that interest rates will move against him, they will go up

18    rather than down, he's taking the risk that the credit

19    quality of the issuer will decline rather than improve.

20         Under none of those circumstances can the

21    noteholder say, you know, that deal I made, EFIH, it's not a

22    good one, I want my money back so I can invest in something

23    else.  That's not the way it works, there's no right of put.

24    There is a right of call, but the right of call is subject

25    to the make-whole and if it weren't you would have a

1    complete imbalance.  You would have a, from the noteholder's

2    standpoint, heads-I-lose-tails-you-win issuer situation.

3    The make-whole is designed -- and, again, the evidence is

4    uncontroverted -- to provide symmetry, to provide balance

5    against that risk.

6              Again, the evidence is uncontroverted.  Mr. Horton

7    testified, Mr. Moldovan testified, we have make-wholes in

8    every one of the indentures for all of the debt -- all of

9    the high-yield bond debt of all of the debtors from those

10   seven, we knew we couldn't go to market unless we were

11   willing to increase the rate interest above one percent with

12   make-whole.  And so part of what the noteholders got for

13   that make-whole or part of what they paid for it is they

14   forewent even higher interest.  Again, no dispute in this

15   record.

16             Next, Your Honor, the evidence is uncontroverted -

17   - and I will say, we put on evidence on this, but frankly it

18   seems to me a matter of logic -- that the injury is no less

19   because EFIH is in bankruptcy.  The noteholders are -- let's

20   step back.  The make-whole is to protect them against the

21   fact that they weren't getting their interest and they

22   weren't getting the five percent at first call day.  EFIH is

23   in bankruptcy.  Are the noteholders getting the ten percent?

24   No, they are not.  Did they get the five-percent premium?

25   No, they did not.  The fact that the issuer is in bankruptcy

1    is entirely indifferent, immaterial, irrelevant to the

2    economic injury to the holder.

3         Finally, and I do want to spend less time on this,

4    because at the end of the day Your Honor said and I don't

5    disagree with you, the best evidence of the party's bargain

6    is the terms of the agreement.  And the terms of that

7    agreement, as Your Honor has interpreted it, provides that

8    upon automatic acceleration there is no make-whole due, I

9    have to live with that, but the debtors have to live with

10   the fact that the very next sentence in the indenture says

11   that we have a contractual right to rescind.  So that's the

12   bargain.

13         Having said that, both Mr. Auerbach and Mr. Greene

14   testified that they relied on the right of rescission, that

15   it was significant to their economic decision.  And plainly,

16   Your Honor, you have expert testimony to the same effect,

17   again, uncontroverted.

18         Finally, I'm not going to spend more than 30

19   seconds on this, it really goes to harm on the other side,

20   which is the argument that somehow EFH or others will be

21   harmed.  The evidence is absolutely uncontroverted that the

22   noteholders relied on the separate credit of EFIH that it

23   was structurally senior to EFH, that if they were in a first

24   lien position that they had first call on the assets of

25   Oncor.  Mr. Horton confirmed quite clearly that these

1    debtors never misled any of their creditors as to which

2    debtor owned which assets and who was your obligor if you

3    were buying EFIH debt versus buying EFH debt versus buying

4    TCEH debt.

5            I suggest to you that that is ample, substantial,

6    real concrete harm.  And I will reiterate what I said a

7    moment ago and here I will violate my rule of not repeating

8    myself.  We brought you real fact witnesses, real people who

9    live this, people who call me every day.  They told you what

10   in the real world the harm they suffer.

11           Let's talk about harm to EFIH.  And I do think

12   that again, although I'm doing this in reverse order, only

13   if they have great harm do you even have to get to the

14   question of the harm to us.  Let's focus on that harm and

15   let's put in context what we are seeking here.  And this is

16   -- more than anywhere, I think this is where we and the

17   debtors disagree.  The debtors ask you in their trial

18   briefs, page 2, "The Court should also consider as part of

19   its totality of the circumstances analysis the unusual

20   nature of the trustee's request to lift the automatic stay

21   to increase the value of its claim" -- it's actually to

22   exercise our contract rights, but let's call it that -- "not

23   simply to foreclose on collateral or liquidate the value of

24   a claim."

25           Really?  This would be an easier motion if we were

1    coming in front of you and saying, Your Honor, please grant

2    us relief from stay so we can foreclose on our 80-percent

3    interest in Oncor so the debtors no longer have any interest

4    in Oncor, so excess value can't flow up, assuming the

5    foreclosure sale doesn't produce excess value?  Really?

6            362(g) says on its face that the one issue that

7    the movant has the burden of proof on is that the debtor

8    doesn't have equity in the property.  That tells you

9    Congress' judgment that when you're seeking relief from stay

10   to foreclose you are seeking more problematic, more harmful

11   to the debtor relief, than when you're simply seeking to

12   exercise your contract right to file a proof of claim and

13   have that claim allowed in the bankruptcy and paid in

14   accordance with a plan.  We're not asking to be paid today,

15   we're not asking to foreclose, we're asking to have an

16   allowed claim to be dealt with as provided under the

17   Bankruptcy Code, nothing more.

18           Let's talk about harm to the debtor in that

19   context.  Uncontroverted, no interference with EFIH

20   operations, because it has no operations, no loss of

21   employees or customers for EFIH because it has none, no

22   impact on Oncor, which is (indiscernible) no impact on the

23   sale process.  You heard Mr. Horton yesterday say, meekly, I

24   think, look, I think it will affect the plan process in some

25   way.  You didn't hear him say in any way, shape or form that

1    granting us relief from the stay will have one iota of

2    effect on the debtors' efforts to maximize the value of

3    their assets through a sale of EFIH's 80-percent interest in

4    Oncor Holdings, not one suggestion of that.

5              The only effect of this motion will be that our

6    contract rights will be respected and the debtors will be

7    held to the -- EFIH will be held to the benefit of its

8    bargain and therefore the liabilities to which the debtor

9    agreed will be increased -- or will be greater than they

10   otherwise would, I should put it that way, by 431 million.

11             I'm sure it would be better for the debtors if

12   Your Honor could simply from a magic wand wipe out the DIP

13   so they don't have a $5.4 billion liability, or wipe out the

14   principal and everything else owed to Mr. Horowitz, but

15   that's not harm.  It's not harm to have to honor your legal

16   obligations, it's not harm to have to pay your debts.

17             Most -- let's talk about numbers and then get to

18   what I think is the elephant in the room on this factor,

19   which is solvency.  The debtors say, and you heard Mr.

20   Horton, that the total make-whole claims here when you add

21   the second lien's potential make-whole claim and the PIK

22   potential make-whole claim is some 900 million.  You know,

23   this is one of these slippery-slope-opening-Pandora's-Box

24   arguments that doesn't hold water.  EFIH has redeemed only

25   450 million.  They used the number 750, but the rest went to

1    interest of the second lien debt.  They have not filed a

2    motion to -- I don't think they are intending to -- to

3    redeem any of the rest of it.  They haven't filed any motion

4    to redeem the PIKs.  Unless and until they do, as Mr.

5    Horowitz said yesterday, he doesn't even have a right plan

6    for a make-whole.

7           They've offered settlements, maybe they will be

8    accepted by those parties.  They may pay them, they may

9    reinstate them, a plan confirmation, we have no idea.  They

10   may pay them out in currency pursuant to a plan.  And I

11   suspect you'll hear the debtors at that point argue if we

12   win there's a fundamental difference between paying first

13   lien noteholders in cash at the beginning, as to whether

14   that's a redemption of a bankruptcy, than paying in plan

15   currency through a plan at the end of the case.

16          The debtors, they haven't filed a motion for

17   relief from stay, nor have the PIKs, we filed it at the

18   outset.  So there is absolutely nothing in front of you to

19   suggest that in fact granting our motion will lead to

20   granting of motions and payment of make-wholes for the

21   seconds or the PIKs.  I also will note, since we're

22   presuming solvency, even if that's true, you have to presume

23   there's enough money to pay all of them.

24          Let's talk about the numbers relative.  I said

25   that our make-whole of 431 is 19 percent of our investment.

1    It's only five percent of EFIH's debt.  I think at this

2    point when I was working off the legal pad up front the

3    numbers even Mr. Horton completely agreed with.  And that

4    cost is offset by enormous benefits that the debtors have.

5    You just took in new evidence, a document that's coming out

6    of the debtors' mouth, saying that the payment of this make-

7    whole will generate a net operating loss.  You have Mr.

8    Horton's acknowledgment that they've saved 14.4 per month

9    since June 19, 2014 in interest.  He acknowledges that that

10   would add up to $261 million by December 1 and the first

11   call date, that they avoided the first lien premium, another

12   115 million, and that they used the DIP, which they

13   otherwise could not have obtained if they didn't redeem us,

14   to achieve savings when they paid down the second lien debt

15   of another $66 million.

16          Now, Mr. Horton did say something about how maybe

17   the plan process would be affected.  Your Honor, I was in

18   the courtroom a week ago when I heard Mr. Weisfeldner say

19   that there isn't a single creditor, a single constituency

20   who's happy with the debtors' plan.  And from what I heard

21   from everyone else who stood up, that statement seemed

22   right.  The debtors had Project Olympus, it went away.  The

23   debtors had their RSA, it went away.  And the sky didn't

24   fall and they keep working to get the consensus.  What

25   granting us relief from the stay will do is bring one issue

1     to certainty and that will help, not hinder plan

2     negotiations.

3          Finally, before I get to solvency, this is what

4     EFIH bargained for.  The evidence is quite unequivocal that

5     when EFIH entered into the initial indenture in 2010 the

6     debtors understood that the contract was integrated, they

7     thought every provision was enforceable, including

8     specifically the right of rescission, that they never

9     thought about and said to themselves, you know, this is a

10    great deal, but if we can go into bankruptcy and then

11    rescind -- and then -- I'm sorry, then refinance and not

12    have to pay the make-whole.

13         Indeed, and I want to be clear of the reason I

14    raise the point, there was disclosure after disclosure after

15    disclosure in the risk factors about bankruptcy, but none

16    about this.  I do not raise that point to suggest that they

17    had thought of this and they engaged in securities fraud, I

18    don't believe that.  I think they haven't thought of it and

19    I think that's compelling evidence.  I don't think Mr.

20    Horton said, you know, there's 11 bankruptcy risks, but

21    let's hide it from the noteholders and only disclose ten.

22    He didn't disclose it, advised by Simpson Thacher & Bartlett

23    and Gibson, Dunn & Crutcher, two terrific law firms, but as

24    the thought never crossed their mind.  So the evidence shows

25    that EFIH had no expectation when it entered into the

1    indenture that the right to rescind acceleration would be

2    enforceable.

3           Let's now go to what I think is the elephant in

4    the room on debtor harm and solvency.  Here again, our view

5    and the debtors' view could not be more different.

6           The debtor says in its brief, and this is on page

7    3, "Harm to EFIH's equity holder, EFH, is just as relevant

8    as harm to other creditors."  I think one of the things Your

9    Honor really has to confront here is whether you think that

10   is an accurate statement of law, because it goes to their

11   point about if we get 431 million and there's an extra $431

12   million liability and they're coextensive.  They're not as a

13   percentage, not looking relative to EFIH's debt versus the

14   loss to us, which is 19 or 20 percent of our investment, but

15   in absolute dollars it's right.  The more basic response is

16   that turns bankruptcy law and the absolute priority rule on

17   its head.

18          In a solvent debtor case, in a solvent debtor case

19   of a non-operating, liquidating (indiscernible) that isn't

20   going to exist and therefore only exists for purposes of

21   making distributions to its stakeholders, loss to equity is

22   given markedly, substantially less weight than harm to

23   creditors.  That is reflected in the long line of cases on

24   solvent debtor cases where creditors are allowed to enforce

25   their state law rights.  Not every one of them is an

1   automatic stay case, but in every single one of them where a

2   court says, yes, you can get your contract rate of post-

3   petition interest, Dow-Corning, yes, Gencarelli, we're going

4   to ignore 506(b), in every one of those cases the premise is

5   the debtor is solvent, so other creditors aren't going to

6   care whose ox is being gored, equity.  And what every one of

7   those cases stands for at its core is the right of creditors

8   is superior and given greater weight in bankruptcy than the

9   right of equity.  When you get down to equity, you look to

10  state law and state contract rights.

11          Mr. McGaan says -- the debtors say, I don't mean

12  to personalize it, there is no case on relief from stay in

13  these circumstances.  Well, we've cited I think six cases

14  with relief from stay insolvent debtors.  How many cases

15  have they cited where a court declined to provide relief

16  from stay in the event of a solvent debtor?  Zero.  How many

17  have we found in our research?  Zero.  Those cases include

18  Federal Court of Appeals authority, the Clauden (ph) case in

19  the Fourth Circuit.  They include precedent in this

20  district, Armstrong, Judge Farnan's decision affirmed by the

21  Third Circuit.

22          But I want to focus on the cases that are closest

23  and the single closest case under the code is Texaco and I

24  would argue the Judge Schwartzberg decision is on all fours.

25  That was a case where Texaco files for bankruptcy and the

1    debtor takes action the notes and its right under the

2    indenture to reduce the interest rate payable.  And the

3    noteholders say, but you defaulted, we want to send a notice

4    so we now move the interest rate back up, just like they

5    have taken action here to redeem us to cause us -- they take

6    an action post-petition that causes us to lose what we

7    bargained for.

8              And the question was, under the indenture the only

9    way the noteholders could in fact get the increased amount

10   was to serve a notice, there it's of acceleration, not de-

11   acceleration, I think that's a distinction without a

12   difference.

13             And at the beginning of the bankruptcy where it

14   wasn't evident that the debtors were insolvent Judge

15   Schwartzberg said no.  The first reported opinion is relief

16   from stay denied.  The second reported opinion is relief

17   from stay is granted.  He said, "The debtors have had time

18   to stabilize their businesses and file a plan of

19   reorganization which provides for 100 percent payment to

20   unsecured creditors with interest.  In view of the fact that

21   Texaco proposed to pay all unsecured creditors in full

22   together with prepetition and post-petition interest, there

23   is no reason why Texaco should be allowed to modify the

24   rights of the noteholders."

25             If you change the word from Texaco to EFIH, that

1    is on all fours.  He goes on to say the stay should be used

2    only as a shield, not as a sword.  Here too it is being used

3    as a sword because they took the action to redeem us.

4         Let me focus in on two other cases.  And I will

5    acknowledge neither is a Bankruptcy Code case and neither is

6    an automatic stay case, but they're both cases that Your

7    Honor cited in your discovery opinion last summer.  One is

8    Chicago Railroad, that's the case from the Seventh Circuit,

9    791 F.2d 524.

10        That's a case where under the old act noteholders

11   sought to sending notice post-petition that would increase

12   their entitlement.  Again, it's a notice of acceleration.

13   And, you know, this is '86, real money wasn't quite the same

14   then as it is today, but just think about proportionately.

15   They sought to increase their claim by sending that notice

16   from 24 million to 56 million, that's more than double.

17   We're not seeking, you know, nowhere near than that in this

18   case.  More than double their claim.

19        And they sought to send that notice post-petition

20   and the bankruptcy court said you can't.  And it went up --

21   actually, I'm not sure if it was a bankruptcy court or

22   district court at the lowest level.  It went up to the

23   Seventh Circuit and Judge Posner writing for the Seventh

24   Circuit affirmed.  He acknowledged that in a reorganization

25   in a bankruptcy proceeding even under the Act the court

1    would have equitable power to disallow that if it came --

2    the notice if it would come at the expense of other

3    creditors.

4           But here's what he said and, again, I want to read

5    it because it is on all fours.  "The only good reason for

6    refusing to give a creditor in reorganization all that he

7    bargained for when he extended credit is to help other

8    creditors, the debtors assets being insufficient to pay all

9    creditors in full."  But he went to say where, quote, "all

10   of the debtor's creditors will be paid in full.  The only

11   competing equities are those of the debtor's shareholders

12   and are weak."  And are weak.  791 F.2d at 527.

13          The other case and it's frankly the same fact

14   pattern, giving a notice post-petition under the Act which

15   will have the effect of crystalizing a contingent claim

16   increasing, if it weren't otherwise crystalized, the debtor

17   liabilities, is the Ruskin v. Griffith case, 269 F.2d 827

18   out of the Second Circuit.  Your Honor cited in your

19   discovery opinion, it comes out precisely in the same place.

20          The court said, quote, "It is important that the

21   debtor is not at the present time insolvent.  It has assets

22   more than sufficient to meet all the claims of its

23   creditors.  The burden of this payment will fall entirely on

24   the interests of the stockholders.  They cannot complain

25   that they are treated inequitably when their interest is cut

1    down by the payment of a sum to which the debenture holders

2    are clearly entitled by the express provisions of the trust

3    indenture."  It applies here.

4            Now, we've cited lots of other cases, I'm not

5    going to go into all of them.  I do want to briefly touch on

6    AMR and Momentive and for one second on Solutia.  The

7    debtors say that in Solutia the court denied relief from the

8    automatic stay.  It did so based on an oral motion filed one

9    year into the case, and Judge Beatty simply said that motion

10   was too little, too late.  We filed our motion one month

11   into this case.

12           In AMR and Momentive, the courts stressed that the

13   debtors there -- that the grant of relief there would affect

14   other creditors of that debtor.  That is the opposite of

15   what happens in a solvent debtor case.

16           Indeed, Judge Drain -- and like Mr. Greene, I was

17   in the courtroom that day -- not in his opinion but we've

18   given you the transcript, said the following -- and this is

19   where he said I agree with Premier Biloxi, I agree with

20   Judge Gerber (ph) in Chemtura, I agree with Judge Lifland in

21   Calpine.  But they're all distinguishable because those were

22   all solvent debtor cases, ours isn't, Momentive wasn't.  He

23   said the following, quote, "The point of that solvency is

24   it's really not like a bankruptcy.  You're doing it just to

25   finalize the contractual arrangements, but other than that

1    there's no bankruptcy."  Momentive hearing transcript,

2    August 19, 2014 at 142, it's in our summary judgment

3    appendix at A-249.

4            Your Honor, I'm not going to spend time on

5    substantive consolidation.  Look, there's no evidence in

6    this record, because you didn't want to hear it -- I don't

7    mean it that way -- you properly or you decided to have in

8    phase one, we don't have evidence of degree of solvency, so

9    Your Honor certainly can't sort of suppose that there would

10   be insufficient money if we get our make-whole to even pay

11   every creditor at EFH.

12           But even if that were right, even if there would

13   be -- and so the ox that is being gored are EFH bond

14   holders, rather than the ultimate three private equity firm

15   shareholders.  Even if that were right, here's, obviously,

16   the no substantive consolidation of the EFH and EFIH.  And

17   given the evidence you heard today, and given the law in

18   this Circuit, including Owens Corning, there won't be any.

19           Your Honor, we made other arguments in our briefs

20   including the argument that, frankly, we think that under

21   both Rodriguez and really the Onpoint case, although

22   unpublished and, therefore, not binding on you, is Judge

23   Ambrose's decision in the Stephan (phonetic) case decided

24   just a few months ago that what those cases stand for is, as

25   502(b)(1) says, we have -- even if the stay for relief were

1    not granted -- a claim subject to the contingency of the

2    stay being lifted, and what that case says, you know, we

3    think quite squarely and is on all fours, is that

4    contingency doesn't -- can't -- provide for disallowance of

5    the claim.

6              Otherwise, all contingent claims could be

7    disallowed, and the code says precisely the opposite.

8    Indeed in 502(b)(1), as I said earlier, and this is what

9    Judge Ambrose stresses in Stephan, it says, "If your claim

10   would be allowed under state law, it will be allowed now and

11   if the only reason it would be disallowed under state law is

12   because it's contingent, it does get allowed in federal

13   bankruptcy law."  That case was exactly our circumstances.

14   It was a case of a mortgage lender who filed a proof of

15   claim.  He said he was totally under water.

16             And the debtor, who's a Chapter 13 said, "You

17   can't -- you have no claim against me.  Because under New

18   Jersey state law, you have to first foreclose.  And only if

19   as a result of a foreclosure you have a deficiency, can you

20   have a claim against me."

21             And Judge Ambrose said, "Yes, the automatic stay

22   prevents you from foreclosing" -- just like you've held the

23   automatic stay unless you grant relief prevents us from

24   sending a notice -- "but nevertheless, you have a contingent

25   claim.  Your claim is contingent on being able to foreclose.

1    The State can't block that claim."  And so I would submit

2    that that is on point.  We've briefed it.

3            Let me just go back in conclusion.  This is an

4    extraordinary case.  I understand that there are cases out

5    there denying make wholes.  But they're not cases involving

6    fully solvent debtors.  They're not cases involving payment

7    on the first day of the bankruptcy, or virtually the first

8    day, a motion filed to redeem you.  They're not cases with

9    absolutely timely motions for relief from stay.

10            What Your Honor respectfully needs to decide here

11    is whether on these facts in these circumstances we are

12    entitled to relief from stay in phase one with all the

13    assumptions and caveats and protections that are there.  I

14    submit to Your Honor we've more than met our initial burden

15    to set forth a prima facie case and that the Debtors have

16    not met their burden on any, let alone all, of the three

17    factors.

18            We, therefore, ask that the Court grant us relief

19    from the stay, again, solely for purposes of phase one.

20    Unless Your Honor has questions, I'll cede the podium.

21            THE COURT:  I do not, thank you.  Mr. Horowitz?

22            MR. HOROWITZ:  Thank you, Your Honor.  For the

23    record, Gregory Horowitz from Kramer, Levin, Naftalis

24    Frankel on behalf of the EFIH's second lien indentured

25    trustee.  Your Honor, the second lien indentured trustee

1   supports the first lien trustee's motion to lift the stay,

2   or request to lift the stay, in the adversary proceeding and

3   by motion.  As always, Mr. Anker's been very comprehensive

4   and I can't promise that I will not be somewhat repetitious

5   of what he says, but I can promise I will be short, as short

6   as I can.

7           Your Honor, we carefully reviewed and gave thought

8   to your summary judgment opinion and particularly the

9   discussion of whether or not to lift the stay to allow the

10  rescission.  Candidly, we had felt that solvency alone would

11  be sufficient grounds to lift the stay, but having looked at

12  it, and given considerable thought, we've come to understand

13  why the Court didn't conclude the solvency while very

14  important is not alone sufficient cause.

15          Mr. Anker noted that neither side has been able to

16  find and site any cases rejecting a motion to lift stay on a

17  solvent debtor, with the solvent debtor.  But it is possible

18  to imagine cases, to imagine situations, where lifting a

19  stay would create harm to a solvent estate with no

20  counterbalancing harm to creditors.  For example, with a

21  secured lender who sought to lift the stay to foreclose on

22  assets that were necessary to a going concern and the lender

23  were adequately protected and continuing the stay would not

24  interfere with the lender's economic recovery.

25          In that situation, we're depriving the debtor of

1    the ability to operate as a going concern, would reduce

2    distributable value.  Even if the estate were solvent,

3    lifting the stay would harm equity.  And while, for all the

4    reasons Mr. Anker discussed, a harm to equity is less

5    important than a harm to creditors.  If there's no harm to

6    creditors, then some harm to equity does outbalance the

7    absence of harm to creditors, and we could understand that a

8    stay would reasonably continue to be imposed.

9            Here, there's manifest harm to creditors.  This

10   case is a first lien noteholders.  I just think it's very

11   predictably, and a motion to follow if it's not resolved,

12   we'll be talking about the second lien noteholders, as well.

13   Mr. Anker has put on an excellent case demonstrating that

14   the first lient noteholders will suffer substantial harm

15   from the imposition of the State to deprive them of their

16   rescission rights.  Most obviously it will deprive them of

17   their contractual make whole.

18            I think it's very significant and powerful that

19   there is compelling proof that the harm that's suffered by

20   the first lien noteholders from continuing the stay, it's

21   not depriving them of some windfall from the make whole,

22   it's a deprivation of compensation for an actual economic

23   harm that they're suffering.  Because by virtue of a lowered

24   interest rate environment, there is no way for them to make

25   anything close to being the rate of return that they

1    bargained for -- that was bargained for in the notes, the

2    guaranteed rate of return that was bargained for in the

3    notes.

4              And that leads me to the third.  They've also

5    proved, and that Mr. Anker said he doesn't think it's -- he

6    doesn't put that much weight on it, I think -- I actually

7    disagree slightly.  I think it's quite important.  The

8    holders were deprived of their reasonable expectation that

9    either the notes would perform to maturity or that the make

10   whole would be paid.

11             I want to be clear about what expectation I'm

12   talking about.  I'm talking about the specific expectation

13   that they would be entitled to a make whole in bankruptcy.

14   I agree that the evidence is pretty clear that nobody gave

15   or discussed, or at least nobody -- there was no discussion

16   of that specific issue, and I think it's probably creditable

17   that nobody specifically thought about bankruptcy at the

18   time that these indentures were negotiated.

19             But there was an expectation, and I think it's

20   clear from the way these documents are negotiated and the

21   economic expectations that lenders and borrowers form at the

22   time, that the notes would perform or there would be a make

23   whole.

24             This is -- I'll (indiscernible).  The same

25   expectation that Judge Lifland in (indiscernible) found was

1    a dashed expectation that did cause harm to the holders.

2    Even though Judge Lifland found that by virtue of

3    acceleration, there was no prepayment, no breach of the no

4    call, he did find that the holders were deprived, were --

5    suffered economic injury by virtue of their dashed

6    expectations in this regard.  And it's true that the

7    District Court reversed the notion that there's an

8    independent cause of action for those dashed expectations.

9    But the observation that is a harm to creditors remains.

10   And the harm to creditors is a salient point for purposes of

11   the balancing that Your Honor is looking to do.

12           I want to comment on the assertion that the

13   Debtors have made, and I think that -- I suspect that Your

14   Honor is concerned about that.  That expectation couldn't

15   have been reasonable in light of the acceleration language

16   in the indenture, that somehow holders should have known

17   that the notes would perform to maturity or they be paid a

18   make whole unless there was a bankruptcy.

19           I don't think that there's any way that holders

20   can be charged with knowledge of that fact, regardless of

21   how this Court comes out on the merits.  And, you know, with

22   regard to the language of the indenture and specifically the

23   impact of the acceleration provision, you clearly came out

24   against us, against the way I would -- was urging on the

25   summary judgment motion.

1            The law on that and the law on the ability to

2     rescind, both in general bankruptcy cases and, specifically,

3     in solvent bankruptcy cases, has not been clear.  I don't

4     think anyone could recently say that the law's been clear.

5     Reasonable people have differed on that.  That's why we're

6     here.  That's why the Debtors on the first day of bankruptcy

7     were offering significant settlements on the make whole

8     issues.  There is significant grounds for difference.

9            And given that, I also think in that regard that

10     the failure of EFH to disclose its apparent belief that

11     under -- that the indenture gave it a free option in

12     bankruptcy to repay without a make whole, I agree with Mr.

13     Anker, I don't think they ever actually formed that belief

14     until the situation presented itself.

15            But the failure to disclose that in the offering

16     memorandum prospectus materials, I think is highly relevant.

17     The offering memorandum has many disclosures about the legal

18     implications of (indiscernible), including the legal

19     implications of bankruptcy, notwithstanding the disclaimer

20     and the legal opinion letter attached to the registration

21     statement, I guess.

22            I don't (indiscernible) seriously being denied

23     that the asserted existence of a re-prepayment in bankruptcy

24     would have been a highly material act to investors.  And

25     disclosure of the risk that noteholders might not be able to

1    exercise their contractual rescission right in bankruptcy

2    was likely -- likewise had been material.

3            So the Debtor -- the creditors -- in this case,

4    the first lienholders, have suffered significant harm in

5    numerous respects.  And against these harms, the Debtor

6    argues that lifting the stay causes it an equal, a dollar-

7    for-dollar equivalent, injury in the form of increased

8    claims against the distributable values, the value of the

9    estate.

10           And first of all, as Mr. Anker has pointed out,

11   it's not true that the increase in claims in the form of the

12   allowed make whole, is dollar for dollar equal to even the

13   amount of liability that will exist against the estate,

14   whether or the -- the quantified injury to the estate, for a

15   couple of reasons.

16           One is, the quantification, just the economic

17   quantification, has to be offset by the substantial benefits

18   the debtor receives, both in terms of the interest saving

19   that it's already receiving.  And I understand that the

20   Debtors will probably respond that that's the benefit

21   they're already receiving -- that's not a benefit that they

22   would receive as the result of the lifting of the automatic

23   stay -- but the tax savings in the form of the operating

24   loss that they would realize upon payment of the make whole,

25   is a benefit that the Debtors will receive upon the lifting

1    of the stay, and a benefit that has to be offset against the

2    cost of the stay.

3             And this isn't a situation, Your Honor, with a

4    deeply insolvent debtor with no likelihood of ongoing

5    earnings to use (indiscernible) to offset.  This is a

6    situation with a presumed solvent debtor that is generating

7    significant taxable income, so this (indiscernible) will

8    have significant value.

9             THE COURT:  It's a holding company.

10            MR. HOROWITZ:  Well, it depends what happens in

11   the reorganization, Your Honor.  And I won't speculate on

12   that, because I think it's been clear that we're not getting

13   that.  But if EFIH were to reorganize this stand-alone

14   entity, then EFIH is the entity that A, will be paying the

15   make whole claim and B, will be attached there going

16   forward.  That's purely speculative.  But for somebody, that

17   (indiscernible) will have value.

18            So even if you're just weighing the dollar

19   quantification, Your Honor, the scales aren't even.  The

20   harm to the creditors, the harm to the noteholders, is

21   greater than the harm to the Debtor.  But to me, the most

22   important thing is the significance of the presumption of

23   solvency and what that means for where that injury is going

24   to be felt.  Any harm at all, it's necessarily only going to

25   be harm to equity.  That's the meaning of solvency.

1          The presumption of solvency here has to mean that

2    there may be sufficient distributable value of the FIH to

3    pay -- satisfy -- all EFIH creditors in full.  And that has

4    to be true even if other claims are allowed, even if as I

5    personally think it's highly -- it's very likely -- lifting

6    the stay will also mean that the second lien noteholder make

7    whole claim is going to be the latter.  Obviously, that's

8    why I'm standing here.

9          And even if the PIC claim is the (indiscernible),

10   even if any creditor claims, presuming solvency, we're

11   presuming there's enough distributable value to satisfy all

12   creditors and there will be value flowing up to equity, so

13   the only harm will be harm to equity.

14         Another impact of that, Your Honor, is that if

15   you're presuming solvency, I don't think one can take

16   seriously the assertion that allowing the make wholes would

17   make reorganization of the Debtor (indiscernible) discuss

18   this more difficult.  The Debtor here is EFIH.  If you've

19   got a debtor, particularly one that is not a going concern

20   debtor, if you have a debtor that has sufficient assets to

21   satisfy all creditors in full, it should not be difficult to

22   reorganize that debtor.

23         So the significance of the presumption of

24   insolvency is that any injury to the Debtor is, in fact,

25   merely a reduction and the recovery to equity.  And as Mr.

1    Anker argued, in any balancing of harms, harm to creditors

2    must outweigh harm to equity.  Not only is the harm to

3    equity dollar-wise smaller, it -- even if it were dollar-

4    wise equal -- it has to be considered to have significantly

5    less weight.  That it has to follow from, among other

6    things, the absolute priority rule.

7              And another way to look at it, Your Honor, I'm

8    going to suggest, is to consider the following summation.

9    Bankruptcy disputes generally fall into -- generally involve

10   one of two issues.  They fall into two categories, I should

11   say.  Issues relating to the size of the pie, and issues

12   relating to how the pie is split.  The pie size disputes are

13   disputes that will affect the distributable assets of the

14   estate.

15             So, for example, if you have an issue like the one

16   I discussed earlier where the lender sought to foreclose on

17   assets necessary to a going concern, that impacts the size

18   of the pie.  Because if you lift the stay and the debtor is

19   deprived of these assets, the size of distributable assets

20   is predictably going to diminish.  There will be less

21   available to satisfy all stakeholder claims.

22             Pie splitting disputes only involve -- don't

23   affect the size of the distributable assets.  They only

24   address how that pool of distributable assets is split.  And

25   where, as here, solvency is established a pie-splitting

1    dispute will only concern how much value is left over

2    correctly after the creditor claims are satisfied.

3           The issue here is whether or not the first lien

4    make whole claim is allowed.  Whether it's allowed or not,

5    is not going to affect the size of distributable assets of

6    the solvent debtor.  It's only going to affect how those

7    assets are split.

8           So I would submit it's not really harm to the

9    estate.  It's not affecting the size of the estate.  It's

10   only affecting how the assets of the estate are split.  And

11   in that regard, it's only affecting how their split with

12   regard to equity.

13          So where does that leave us?  The last time I

14   stood up here, Your Honor, on the summary judgment argument,

15   I said that while I -- clearly, I lost this one -- while I

16   thought that (indiscernible) was incorrectly decided, I

17   believed that the framework that was set forth there by

18   Judge (indiscernible) was one that would provide that make

19   wholes are allowed where debtors are solvent and the make

20   whole does not come at the expense of creditors.

21          I think going back to where I started, Your Honor,

22   reading your summary judgment opinion/discussion on lifting

23   the stay, you actually have a somewhat more nuanced analysis

24   of this -- nuanced -- did I -- nuanced analysis of this

25   where equity is not a completely controlling factor, but it

1   is very important in equitable considerations also factored

2   in the balancing.

3            So I think, perhaps, there could be a case,

4   perhaps, where allowing the make whole would create a true

5   windfall to creditors.  I was just thinking, I was remember

6   the first make whole case I was ever involved in 15 years

7   ago.  I was representing a secured pre-petition rescue

8   lender who had a make whole in a variable rate loan.  There,

9   the issue of reinvestment risk was very different, and the

10  whole question of whether or not allowing a make whole would

11  provide a windfall was completely different.

12           In this case, with the fixed rate instrument and

13  clear reinvestment risk, there can be no serious question of

14  a windfall.  But if the Court were to conclude that was a

15  creditor who would be able to take the money tomorrow and

16  without increased risk, reinvest it and get the same return,

17  maybe that would be, you would find there's somewhat less

18  equity on the creditors' side.

19           Similarly, if you had a situation where the Debtor

20  -- or the pre-petition, the issuer -- had expressly warned

21  in its offering materials of its position that the indenture

22  would give it an option to prepay in bankruptcy and that

23  rescission rate might not be exercisable in bankruptcy, the

24  equities might tilt a little bit towards the creditor --

25  towards the debtor's favor.

1          Or if you had a situation where otherwise the

2     creditor engaged in that (indiscernible) conduct.  As the

3     trial over the last few days has proven compellingly, none

4     of these factors are present here.  These were investors

5     with reasonable expectations who suffered real economic loss

6     and who were never warned, certainly, you know, prior to

7     when the debtor initially issued its (indiscernible), were

8     never warned that the debtor was going to take the position

9     that it could, and would, redeem in bankruptcy and try not

10    to pay the make whole.

11          The balancing, I believe, is not even close.  You

12    have substantial injury to creditors.  The only injury felt

13    is by the equity.  It's not equal in dollar amount, and

14    under these circumstances, I submit the balancing weigh

15    strongly in favor of avoiding the creditor injury.

16          THE COURT:  Thank you.

17          MR. HOROWITZ:  Thank you, Your Honor.

18          THE COURT:  We'll take a short recess before we

19    turn to Mr. McGann.

20      (Recess until 11:57 a.m.)

21          THE CLERK:  All rise.

22          THE COURT:  Please be seated.

23          Sorry about the delay.  I'm dealing with other

24    things, other cases.  All right.  You have my full,

25    undivided attention.

1            MR. MCGAAN:  Thank you.  Your Honor, good

2     afternoon.  Andrew McGaan, Kirkland & Ellis for the debtors.

3            I want to join Mr. Anker and thank the Court for

4     its evident preparation for this proceeding and the time

5     that you've given the parties, and I also want to extend my

6     thanks to the team representing the trustee.  We've been

7     able to work, I think, very well with them in resolving

8     disputes and preparing this case for a hearing, and I think

9     that everyone appreciates that.

10           THE COURT:  I would add that it's been a very

11     difficult case because the lawyering has been so good and it

12     makes my job eminently easier and eminently harder at the

13     same time, so I truly appreciate the professionalism and you

14     put a lot of evidence in and in a very organized short

15     period of time, and I appreciate that.

16           MR. MCGAAN:  Thank you, Your Honor.

17           What I intend to do is talk almost entirely about

18     the standard, the legal standard that Your Honor needs to

19     grapple with, which some subtleties as to balancing the

20     harms here that may or may not have arisen from lifting the

21     stay, and that is almost entirely a matter of economic harm,

22     so I'm going to spend some time on that.  But I'm also going

23     to talk about what I think the trustee has -- I know the

24     trustee has spent an enormous amount of time during the

25     hearing on this notion of dashed expectations, what

1    expectations were and whether they were fulfilled by the way

2    Bankruptcy Code worked at the time that EFIH filed.

3              I think I said at the outset, and I certainly feel

4    that way now, we believe that's rearguing the nature and

5    extent of the bargain that was struck and memorialized in

6    the indenture and that that was resolved in Your Honor's

7    summary judgment ruling, where in paragraph 21, Your Honor

8    held that the -- and I'm quoting from the opinion -- the

9    acceleration provision in the indenture does not include

10   clear and unambiguous language that would make-whole

11   premiums due upon the repayment of the notes following

12   bankruptcy acceleration; because the indenture does not

13   specify that the applicable premium is owed as automatic

14   acceleration, the applicable premium is not owed, close

15   quote.

16             That is a construction by the Court of the deal

17   that the parties made, and so our position is, as a legal

18   matter, having a lot of discussion about different

19   expectations than the one that's memorialized in the

20   agreement is not appropriate, but I want to talk about it

21   because, and I need to talk about it because, A, so much

22   time was spent on that, through the evidence that the

23   trustee was putting in, but also the argument that Mr. Anker

24   made at the beginning of these proceedings when we were

25   talking about the Dauber (ph) challenge to the experts.

1    Because that is not rearguing, of course, the ruling, but

2    instead in some way, a measure of harm and that Your Honor

3    ought to consider it in that context.  We think, again, as a

4    legal matter you should not, for reasons that I'll explain.

5    But the evidence itself in some respects, and important

6    respects is not coherent and is not credible and does not

7    add to the harm, so I'll go through that.  So I'll talk

8    about the economic harm and then I'll talk about the

9    expectations story.

10            And I think the reason why we heard so much about

11   the expectations story, the way whether retained experts or

12   certain noteholders think the high-yield market ought to

13   work out, they prefer it work inspect face of indenture

14   provisions like those here, is because they're not capable

15   of making the list say argument, satisfying the standard,

16   based on the economic harm.  So I'm going to go to that.

17            But let me begin by touching on three critical

18   cases that back up our argument that we've made throughout

19   these proceedings.  That there's no case that provides the

20   relief that the trustee is seeking here, specifically,

21   whether solvent or insolvent debtor case, where a creditor

22   is seeking to lift the stay and obtain a make-whole premium

23   after a bankruptcy is automatically accelerated, the very

24   thing Your Honor said that the indenture doesn't provide for

25   here.  In the cases most -- well, some of the cases, the

1   principal cases most closely on point, say some important

2   things that go directly to the argument the trustee made

3   here this morning.

4            So Momentive, almost exactly the same indenture

5   that Your Honor construed here, and in dealing with the lift

6   stay issues in Momentive, Judge Drain wrote that sending the

7   rescission notice, that is the very relief that the trustee

8   is seeking here, a permission to remove lift of stay to do

9   that, significantly impact the debtor's estate and

10  creditors.  So while it's an insolvent debtor case, Judge

11  Drain did not, in his opinion, justifying his reasoning and

12  rejecting the lift stay motion there, did not confine

13  himself to harm the creditors, which we interpret Your

14  Honor's ruling as saying that's why as a matter of law,

15  solvency doesn't end the debate here.  Nor did he say or

16  does any other case say that we can find, that the rights of

17  stakeholders or equity holders are less valued or less

18  important.  I think Delaware law says differently, and I'll

19  show you that.  So that's the Momentive opinion.

20           The effort to rescind and send a rescission notice

21  or the effort to lift the stay and send the rescission

22  notice significantly impacts the debtor's estate and

23  creditors, and there was a couple hundred million dollars;

24  here, it's more than double that.  But Your Honor said in

25  this case by enhancing claims by potentially hundreds of

1    millions of dollars -- now, that's directly contrary to

2    Mr. Anker's argument that what they're seeking here is

3    something other than enhancing their claim; in fact, Your

4    Honor said in your opinion that if you lift the stay and

5    permit the rescission to decelerate the debt, they will be

6    able to -- they'll have a $431 million claim, and that's

7    what Judge Drain observed.

8            But that's what going on here.  It's post-petition

9    effort under the Code to lift the stay to enhance claims.

10   And Judge Drain went on to say that it's this type of relief

11   that Courts have -- in his words -- routinely refuse to

12   permit under Section 362(d)(1).  So, again, contrary to the

13   argument the trustee is making that Courts have allowed this

14   relief, in Momentive, the Court said Courts, in fact,

15   routinely deny it, and that's what we see in the cases when

16   we review them.

17           So when you look at -- oh, let me finish on

18   Momentive.  Judge Drain also said that he concluded at the

19   automatic stay in that case should not be lifted to enable

20   the resurrection of a make-whole claim by means of a

21   rescission, and I point that out to Your Honor because, of

22   course, the use of the word "resurrection" is consistent

23   with his overall approach and I think it's consistent with

24   the approach that you took in your summary judgment ruling,

25   which is there is no claim.  It's that they don't have a

1    claim under the indenture.  They need to resurrect and bring

2    to life by a miracle a new claim that they don't have right

3    now and they didn't have at the time that the repayment

4    occurred.

5            And, similarly, in AMR, the Second Circuit wrote

6    that, again, on almost identical facts, effort to lift the

7    stay by creditors to obtain a make-whole payment after the

8    filing of Chapter 11, there, the Second Circuit said doing

9    that would serve only to increase the size of the claim to

10   an amount greater than that which is entitled pursuant to

11   the indentures, harming the estate and AMR's other

12   creditors.  Not -- I'm worried mostly about the creditors,

13   not only the creditors, but the estate and the creditors.

14   And the District Court below in AMR said much the same

15   thing, deceleration would serve only to increase the size of

16   the claims.

17           And in Solutia, the Court declined back in 2007,

18   even the hold hearing on the lift stay request, and it was

19   more than, as Mr. Anker suggests, it was more than the

20   observation that the Court made that it was somehow too

21   little too late.  The Court said, in addition, nothing --

22   quote, nothing in the Bankruptcy Code requires this Court to

23   provide the noteholders in that case with more than the

24   original indenture provides.

25           So not only can we not find a case that has

1     provided with the relief the trustee is seeking here, but

2     the cases that directly address this situation, including

3     cases involving indentures almost identical to this one,

4     have rejected the efforts on grounds that undermine the

5     principle pillars of the trustee's argument here.  And none

6     of them said that the insolvency of the debtor is what their

7     determination, their holding on the lift stay turned on.

8              So I want to turn now to the standard.  I'm going

9     to talk about it in two different ways.  But let me begin by

10    just putting it up in front of us.  The trustee's argument

11    this morning suggests that maybe if you don't get past the

12    first prong here, whether there's any great prejudice to the

13    bankrupt estate or the debtor that the case is over.  And I

14    don't read the law that way.  I don't read Your Honor's

15    decision that way.  I think it's a balancing of, I think

16    what the case says, and the case states a balancing of all

17    of these considerations, so I'm going to talk about each of

18    them.

19             But the focus is on, firstly, whether there's any

20    great prejudice to the bankrupt estate or the debtor, and

21    there's not in the legal standard that Your Honor's dealing

22    with today, an emphasis specifically on harm only to

23    creditors, which is why we believe the solvency presumption

24    here doesn't solve the problem.  With respect to the

25    economic harm, pretty straightforward.  They would obtain,

1    as Your Honor has already said, for successfully lifting the

2    stay, an additional $431 million claim at EFIH.

3            In addition, as I think Mr. Horowitz had very

4    candidly observed when he took the podium earlier, there is

5    potentially further consequences.  If Your Honor were to

6    lift the stay here, as Mr. Horowitz said, it's likely that

7    they would be entitled -- "they," the second-lien

8    creditors -- would be entitled to their $430 make-whole

9    claim and even projected that it would probably be the case

10   that the PIKs would come in and do the same thing, the PIK

11   noteholders, and seek their $113 million claim.

12           Now we don't have rulings on that and we may or

13   may not have to litigate that issue.  Your Honor, of course,

14   it's not going to resolve, but I don't think that the Court,

15   in supervising these jointly administered cases should turn

16   a blind eye to the reality that lifting the stay here has a

17   ripple effect, not only as I'm going to talk about in a

18   minute for the restructuring generally, but specifically

19   with respect to follow on make-whole claims that could

20   potentially add almost a billion dollars in claims at EFIH

21   that don't exist right now.

22           There was -- there was -- I wanted to address that

23   because there was a suggestion that equity -- and more than

24   a suggestion, an argument -- we heard this morning that the

25   equity interests somehow matter less here, that the solvency

1    presumption takes away maybe any concern that the Court

2    would have about harm to the estate because the presumption

3    is that the existing creditors would be paid in full.  But

4    that's not I believe what the law says about what the estate

5    is, and the duties of the debtor in protecting stakeholder

6    interests.  And so we've cited from Johns Manville here, a

7    reference to Section 541, and the fact that the bankrupt

8    estate is created for the benefit, not only of creditors,

9    but equity holders, also.  And it is the

10   debtor-in-possession's obligation to act to increase,

11   protect and increase the value of the estate in its

12   entirety, which includes equity holders.  So I don't believe

13   it's a fair argument and I don't think that it ought to

14   drive Your Honor's decision that, well, it's just equity

15   that may be impacted here by $431 million or maybe $950

16   million and that really doesn't matter.

17            In addition to the economic harm, there is the

18   great potential here for harms at a restructuring effort,

19   and I start here on this slide, Your Honor, with a quote

20   from a Third Circuit case which is cited at the outset of

21   the trustee's pretrial brief that argues Your Honor, and we

22   agree, that in considering the balancing of harms under the

23   lift-stay standard that controls here, the Court also ought

24   to be mindful and consider the policies underlying the

25   automatic stay under the Code.  And one of them is, as the

1    Borman (ph) case says, to avoid interference with the

2    orderly liquidation or rehabilitation of the debtor.  So it

3    is a valid legal consideration for Your Honor to turn to in

4    making your decision here.

5              Now, during the hearing, during the examination,

6    for example, of Mr. Horton, the trustee pursued a line of

7    reasoning that, well, if it doesn't destroy entirely the

8    debtor's efforts to restructure or if the debtor's

9    management team isn't prepared to resign en masse that the

10   make-whole is granted, that somehow this consideration

11   doesn't matter, and there's no law that says that.  It talks

12   about the policies to avoid interference with the orderly

13   rehabilitation of the debtor.  And it just begs your belief

14   and suggests that if a make-whole is awarded here on a lift

15   stay motion -- that's the consequence -- the draining of

16   $431 million out of EFIH or out of recoveries of EFH would

17   have no impact on this restructuring at all.

18             In fact, when Mr. Anker was making his argument,

19   he referred to Mr. Whitesfelmer (ph) being in court recently

20   in the wake of the debtor's filing of a proposed plan of

21   organization.  He referred to the fact that Mr. Whitesfelmer

22   said that no creditor is happy with the plan of

23   reorganization.  And that sort of is interesting because it

24   goes to the point that I want to make here regarding this

25   element harm to the restructuring.  There is, as Your Honor

1    has told us, you weren't going to take evidence on

2    waterfalls and inter-debtor claims and alternative plan

3    structures, and it seems to me that makes a lot of sense.

4    It doesn't preclude considering this, this kind of harm to

5    the restructuring effort, but it makes a lot of sense

6    because that's not a static proposition.

7            If you had taken a lot of evidence on that, you

8    would be taking a snapshot, in effect, of plans and

9    considerations and potential waterfalls that could in 30

10   days, 60, 90 days, change greatly and it really wouldn't

11   answer definitively the question.  But it doesn't mean that

12   you should ignore the direction from the Courts that this is

13   a consideration you, nonetheless, should have.  And I think

14   not; I think you should, and the reason is that having

15   presided over these cases, the interconnectedness of EFIH's

16   ability to restructure, that is its interconnectedness with

17   other debtors in this case, is self-evident, and that's why

18   we've heard references from the trustee to the spectre that

19   EFH sponsors might recover and that somehow influenced Your

20   Honor's decision or references to the unhappiness of other

21   creditors with the plan of reorganization.  None of that

22   would be -- would matter or could even be raised if this

23   interconnectedness was not driving these cases, because it

24   clearly does -- in fact, the equity here isn't just anybody;

25   the equity is EFH, one of the other principal debtors in

1    these cases.  And so sucking recovery out of EFH has, again,

2    in a self-relevant fashion, prejudicial effect on the

3    debtor's ability to successfully and efficiently to

4    reorganize.

5              I think it's interesting why you haven't heard

6    allusion to EFH sponsors here; of course, they're subject,

7    you know, to and consistent with Your Honor's directional

8    evidence about that, but they're not in the courtroom.  But

9    here is who's in the courtroom speaking against this motion,

10   the two statutory committees representing all the junior

11   creditors across all of the debtors here are here saying,

12   please don't lift the stay.  That, in and of itself, speaks

13   to this interconnectedness point that goes to burdens on the

14   ability of EFIH to successfully rehabilitate and the effect

15   of draining this kind of money out of the estate at this

16   point in time might have.

17             And, of course, you have Mr. Horton's testimony

18   that I put up on the screen, I think equally self-evident.

19   But when you talk about $431 million, not to mention the

20   950, of course, that's a big number in terms of

21   distributable value.  The suggestion that it's anything but

22   that is just not credible.

23             Now, Mr. Anker said something about -- in

24   reference to Mr. Horton's testimony, Mr. Anker suggested

25   that he was agreeing that the make-whole, the lift stay and

1    make-whole proceeding dispute here would have no effect on

2    the Oncor sales process.  I don't recall him saying that at

3    all, candidly.  In fact, I recall Your Honor being diligent

4    in preventing testimony about the Oncor sale process or

5    Oncor value.  So there's no evidence of that.

6           And one wonders, though, using common sense or

7    maybe more than common sense that a bankruptcy judge would

8    bring to such a proposition, is the idea that EFIH, the

9    ultimate owner of the economic interests in Oncor, the idea

10   that it may be expose to do almost a billion dollars in

11   additional claims, would have no effect on that process.

12   And, again, I grant there's no evidence on that, but it

13   just, again, beg belief that that's a non-event for people

14   involved in that process.  So, I raise that point and I'm

15   going to move off of it, because it is another element, in

16   addition to the $431 million claim that may be allowed here

17   if Your Honor lifts the stay, is another element, though

18   it's not been quantified, but there's another element of the

19   harm here that we believe the law asks Your Honor to

20   consider, and it works negatively against EFIH and it weighs

21   against lifting the stay.

22           Now I would like to turn to a second prong and

23   emphasize a different part of it.  So I put the standard

24   back up, and the second prong asks the Court in addition,

25   not that you'll never get here, but in addition, to ask

1    whether the hardship for the non-bankrupt party, in this

2    case, the trustee, by maintenance of the stay, considerably

3    outweighs hardship to the debtor.  And what I'm emphasizing

4    both in prong one and two here, is the causal event that may

5    or may not give rise to harm that Your Honor needs to

6    balance.  The legal standard talks, in prong one, about

7    great prejudice to the estate or the debtor that would

8    result from lifting the stay -- not from refinancing the

9    debt, but from lifting the stay.  And then the balancing

10   prong, number two, similarly talks about hardship to the

11   trustee by maintenance of the stay.

12            So what Your Honor, I believe, is being asked to

13   do here is say, well, with respect, specifically, to the

14   request to lift the stay, if I decline it -- and I'm going

15   to get into some of the evidence about those consequences,

16   because I think it's, again, self-evident, but witnesses

17   agreed to these appropriations -- if you decline to lift the

18   stay, then EFIH doesn't have to pay the additional $431

19   million in claims, period.  If you lift the stay, depending

20   on any further proceedings, it may be that the trustee

21   collects $431 million.  That is true whether or not there

22   was -- whether or not there was interest savings after the

23   refinancing, whether or not there was an ability to reinvest

24   the funds on the repayment; in other words, all that's

25   happened or didn't happen, regardless of whether the stay is

1   lifted or not.

2            So a focus of the evidence about reinvestment

3   opportunities and limitations or interest savings to the

4   debtor, I think, really are legally a red herring, because

5   they don't follow from the lift stay decision at all in the

6   standard, and I'm going to ask you to look at it that way.

7   But I'm still going to address, because Your Honor's had the

8   evidence, I'm still going to address whether it solves the

9   problem for the trustee here or not, and we believe it does

10  not.

11           First, summary of some of the evidence Your Honor

12  heard about whether the harms are imbalanced or not.  One of

13  the trustee's retained experts, Mr. Cacioppo, in his written

14  report -- not just from the stand, but in his written report

15  submitted some time ago, but reaffirmed here on the stand,

16  so it's about as thoughtful and considered a piece of

17  testimony that an expert can bring to the Court -- said that

18  with respect to the question of maintaining the stay, that

19  EFIH was able to obtain the very same economic benefits for

20  itself if the stay is not lifted and cause the very same

21  economic harm to the holders of the notes.  Now, one of the

22  purposes that Mr. Cacioppo was retained was to come in here

23  and talk about the relative harm to the parties with respect

24  to the lift stay motion, and in his considered opinion is

25  that they're the very same economic harm which makes perfect

1    sense.

2           Mr. Horton agreed in a number of times, but I've

3    called out part of his testimony, the impact to the issuer,

4    or to EFIH, if the Court lifts the stay is $431 million, and

5    similarly, Mr. Auerbach, from BlueMountain, one of the

6    noteholders, one of the recent noteholders, agreed that the

7    only harm to BlueMountain in its position as a noteholder if

8    the stay is not lifted is $431 million.

9           So their expert, Mr. McCarty summed it all up:

10   cash is the whole issue.  That's what the dispute is about;

11   where does the $431 million go as a consequence of lifting

12   or not lifting the stay.  And the trustee knows this, if

13   this damage is an equipoise in this fashion, setting aside

14   the harm to the restructuring effort of EFIH, they don't

15   satisfy the standard.  It is not considerably -- their harm

16   does not considerably outweigh the harm to EFIH; it stands

17   in perfect equipoise.

18           So, you've heard testimony, nonetheless, about

19   well, what is the interest savings that EFIH obtained not

20   from opposing a lift stay motion, but from refinancing the

21   notes, and Mr. Horton testified, well, it would be eight and

22   a half million dollars a month on the principal, the

23   non-settling noteholder principal, it would be eight and a

24   half million a month in the interest savings through the

25   first call.  Would be about $140 million.  And,

1    interestingly, had the noteholders chosen to participate in

2    the DIP, as part of the make-whole settlement -- obviously,

3    their free choice not to do so -- Mr. Horton testified that

4    they would have earned about $140 million under the DIP

5    interest rate at four and a quarter percent through the

6    first call date, and in addition to the decision not to

7    participate in the settlement, lost them an added $110

8    million in the make-whole portion, make-whole settlement

9    portion, for a grand total of $250 million that they gave up

10   by not doing it.

11          Were there other options?  Did they have other

12   goals and agendas?  Of course, they could do whatever they

13   would like with the money after they were paid, but there

14   was an opportunity that it sounds as if the noteholders,

15   none of them took.  We don't know who bought into is the

16   secondary market, the DIP in the secondary market, but there

17   was a $250 million opportunity that they said no to and

18   there was a $140 million interest savings at EFIH.  I still

19   maintain this is not relevant to the consideration of

20   whether the lift stay motion, the decision of the lift stay

21   motion harms the trustee greater or lesser than it does the

22   debtor.  But the evidence is a bit confusing here and it

23   doesn't add up to a clear picture that the harm would be

24   greater if Your Honor did consider reinvestment

25   opportunities and interest savings in your decision.  It

1    doesn't clearly point to the fact that the harm, the claimed

2    harm to the trustee and the noteholders, rather,

3    considerably outweighs the harm to the debtor.  It simply

4    isn't the case.

5            Another approach that was taken during the hearing

6    is this evoking what I consider to be pretty random

7    percentages to try to assess the harm that way, and again, I

8    think that's driven by a realization that the $400

9    million -- the $431 million make-whole claim stands in --

10   really didn't balance here, not considerably outweighing the

11   harm by any means.  So in an effort to look at it a way that

12   might give it a considerable outweighing under the standard,

13   the trustee put into evidence the percentages.  Well, the

14   make-whole claim is 18 to 20 percent of the non-settling

15   first noteholders' principal; that's only 5 percent of

16   EFIH's debt.

17           But there's also evidence, and we heard from two

18   noteholders, there's also evidence that the portion of the

19   make-whole claim that would go to BlueMountain is 25 percent

20   of its assets under management.  So if we're going to talk

21   about all of the debt of EFIH on one side of the ledger, why

22   not look at all of the assets of the noteholder on the other

23   side of the ledger.  I'm not sure this is the appropriate --

24   any of this is the appropriate approach for the Court to

25   take, but the point is that you can take any approach you

1    want and not one -- one is not more meaningful than the

2    other.

3              Mr. Greene from Halcyon testified that their

4    portion of the disputed make-whole here would amount to 2.5

5    percent of Halcyon's $11 billion in assets under management.

6    Is that a more fair comparison?  It's certainly less harm to

7    Halcyon than it would be to EFIH, looked at in that

8    artificial way.  But what's interesting to me about that is

9    that Mr. Greene testified that the .25 percent was material

10   and significant to Halcyon, even though it's only .25

11   percent.

12             If the trustee is arguing that if you look at the

13   make-whole claim as a percentage of EFIH's debt, where it's

14   only 5 percent, that's somehow insignificant, they won't

15   miss that; it's $431 million, so that means less to the

16   debtor here than it does to, say, Mr. Greene at Halcyon.

17   And that clearly isn't the case by his own testimony.

18             Now, I would like to turn, Your Honor, to the

19   claim that there was a harm to expectations here, and

20   contend with and address a few of the ways in which I think

21   the trustee probably built an expectation story here to add

22   to their claimed harm.  And the first has to do with this

23   issue of what did the indentures actually say or what did

24   people think that they said.  Again, Mr. McCarty testified

25   the indenture is the best evidence of the bargain and that's

1    where you have to go look if you wanted to know what the

2    parties agreed to or didn't agree to; that's been construed

3    here.

4             But he also said in his experience, his long

5    experience in the high-yield debt market, investors usually

6    don't read the indenture, and there's some other evidence

7    here that suggests that that's probably the case; in fact,

8    Mr. Horowitz even suggested that, in his view, people

9    probably didn't even think about it, you know, I think it's

10   fatal, the idea that there was an expectation, that there

11   would be a payment of a make-whole upon acceleration of a

12   bankruptcy if Mr. Horowitz is right and Mr. McCarty is right

13   that people weren't reading and thinking about the

14   indentures when they signed them.

15            But we had testimony -- oh, well, I should add my

16   next point here is the retained experts that came in here on

17   behalf of the trustee, not one of them -- they read

18   thousands of indentures, they look at Bloomberg data and

19   they talk about the indentures that they look at in their

20   banking practice on a daily basis -- not one of them read

21   the acceleration or rescission provisions in all of these

22   thousands of indentures; that was the testimony.  They

23   looked at the call provision, say like Article 3 in this

24   indenture that doesn't apply during the automatic

25   acceleration of bankruptcy.  It seems that that's what they

1    looked at; that is the portion of the indenture that the

2    trustee relies on.

3              But as Your Honor said in your ruling, where you

4    begin the analysis in construing this indenture is with the

5    most applicable and important provisions, which is the

6    acceleration and rescission provisions; that's what we're

7    having this fight about.  And their experts chose or were

8    told not to even read them.  So you don't have any

9    testimony, opinion or otherwise, about this vast high-yield

10   market and whether or how many indentures there are that are

11   like this one.

12             Mr. Anker very carefully asked and repeatedly,

13   numerous times to various witnesses, about the rarity of

14   high-yield debt instruments that have no call provisions and

15   he kept emphasizing that, no call provisions at all.

16   Wouldn't that be very expensive?  And some of his experts --

17   oh, I've never seen that, a high-yield debt instrument with

18   no call provisions.  But that isn't the one that's in front

19   of the Court.  This indenture has call provisions in it.  It

20   has elaborate call provisions.  It just doesn't have a

21   provision for an applicable premium on the specific

22   circumstance of the Chapter 11 filing of the issuer and the

23   automatic acceleration that flows from it.

24             But the noteholders witnesses differ from the

25   experience or observations, say, of Mr. McCarty.  They say

1    that they, personally -- and that is Mr. It was Mr. Greene

2    or Mr. Auerbach -- personally read all of the indentures,

3    every SCC filing, even public statements by the issuer

4    before they made their investment decision.  I think one of

5    them said that they had staff that did it.  And, of course,

6    if they read it all, and the issue here is expectations

7    about the enforceability of indenture provisions in case of

8    a bankruptcy, in fact, Mr. Anker argued at the outset of

9    this proceeding that the ability to maintain the make-whole

10   is the fundamental guts of the deal, of the bargain.  And

11   his witnesses testified that it's very important, call

12   provisions are very important, and the make-whole is very

13   important and the ability to, apparently, collect it even in

14   bankruptcy is very important.

15           And so we had testimony from the noteholders that

16   they went and read all of these filings and one has to ask

17   himself if they did that, and this was indeed true, that the

18   ability to collect the make-whole, even upon automatic

19   acceleration of the bankruptcy was so important, what did

20   they make of the issuer's legal opinion submit -- filed with

21   the SCC that addressed, specifically, the enforceability of

22   indenture provisions that carved out completely any

23   limitations from bankruptcy law and creditor rights law.

24   Carved it out completely and explicitly.  You'd think they

25   would say, well, wait a minute, not only did the issuer's

1    counsel submit in the registration statement and opinion

2    that described that carveout, they will not give me an

3    opinion that I can enforce the thing that's most important

4    to me here in bankruptcy, maybe I should ask someone

5    important during the 2010 exchange what about that.

6              And, of course, the unrebutted testimony is nobody

7    every spoke to anybody.  Mr. Moldovan, Mr. Horton, there's

8    no evidence that any of the purchasers of the notes or the

9    parties exchanging notes in the 2010 exchange transaction,

10   ever, in effect, ratified the argument that the trustee is

11   making here, that this is so vitally important, we need to

12   know what this carveout means.  We need to know why these

13   things aren't enforceable in bankruptcy or do you, indeed,

14   take the position that they are, and that never happened.

15             Even with all the room up here, I'm running out of

16   room.

17        (Laughter)

18             Another interesting aspect of the testimony, and

19   it's another aspect, in my categorization, but with respect

20   to the harm to expectations story, there's another aspect of

21   it we heard from the witnesses and that is something about

22   how the high-yield market works, and it wouldn't work or it

23   would be a lot more expensive, or it would collapse

24   altogether, I think one of the witnesses said, if there were

25   no make-wholes and they weren't enforceable at all times.

1    But the evidence about whether such animals exist is

2    entirely to the contrary.  I'll grant, because it's

3    irrelevant here, I'll grant that it may be true, because

4    there are no high-yield debt instruments that have zero call

5    protection in them, as again, that's not the indenture

6    before Your Honor, so who cares.

7            The evidence here, though, shows, if you start

8    with the published case law -- case law, by the way, that,

9    say, Mr. Greene from Halcyon testified he's very familiar

10   with; in fact, he sat in one of these courtrooms and

11   listened to the decision -- makes clear that there are

12   apparently a lot of these out there.  They have been

13   construed by Courts dating back to Judge Lifland's opinion

14   in Calpine, all the way up to Judge Drain's opinion in

15   Momentive, and most recently, Your Honor's opinion in this

16   case.  Looking at these indenture provisions that do not

17   find entitlement to a make-whole in the plain language of

18   the indenture, after an automatic acceleration in

19   bankruptcy.  This went back years and, in fact, I think,

20   Your Honor made that observation in your opinion.

21           And in the case of the noteholders who did come in

22   here, they weren't any of the noteholders from the 2010

23   exchange.  So we didn't hear from the other side of the

24   negotiation of the exchange transaction that led to the

25   creation of these notes, the perceptions they had.  We had

```
1      Mr. Greene and Mr. Auerbach who knew full well about the

2      litigation arbitris they were engaging in when purchasing

3      these notes.

4            It's interesting that -- and I can't help comment

5      upon the other uniqueness of calling a witness to the stand

6      to testify about these present in a courtroom where another

7      judge issued an opinion and describes him giving different

8      and additional reasons that appear in the published opinion,

9      in order, apparently to convince Your Honor that Momentive

10     was decided on different grounds than Judge Drain permitted

11     to be published.  It just seems absurd to me, but it also

12     contrasts with another lawyer representing Mr. Greene's

13     interests, because he testified that he also holds debt in

14     the second-lien trench at EFIH.

15           And Mr. Horowitz, in the summary judgment ruling,

16     did come here and say, well, if you had been in the

17     courtroom, Judge Drain gave different, additional reasons.

18     He said Judge Drain just got New York law wrong, which is a

19     different way to distinguish it than calling a witness who

20     sat in the courtroom and heard something different from what

21     the opinion says.  But the point is, other than the oddity,

22     the point is that these are sophisticated purchasers,

23     Mr. Auerbach and Mr. Greene, clearly sophisticated

24     purchasers who are buying these notes well after the

25     Momentive opinion was handed down, which construed the very
```

1    same indenture provision and exactly the way Your Honor

2    construed it here, after the issuance of the November, 2013,

3    EFIH 8(k)(ph), which said not only would EFH, EFIH only

4    consider and plan on not paying the make-wholes in the

5    reorganization, but other creditor constituencies were

6    pitching in proposals not to do it either, consistent with

7    the prevailing law.  They continued to buy after Your Honor

8    issued your summary judgment ruling here, allowing

9    make-whole claims.

10           So what is this notion that if there are

11   indentures that don't provide for a make-whole upon

12   automatic acceleration of a bankruptcy, nobody would buy

13   them?  We have two witnesses here that do aggressively,

14   intelligently buy them.  People have read all the

15   registration statements, they buy them.  People who heard

16   Judge Drain give his ruling in Momentive, they buy them.  So

17   the gloom and doom that Your Honor's construction of the

18   indenture here not providing for make-whole in circumstances

19   is somehow an outlier or wrongly decided or misunderstood

20   Momentive or misunderstood Calpine is just ludicrous.  It's

21   just not the case and it's not going to destroy any

22   high-yield market.  We heard a description about it; it's

23   working quite well.

24           The only evidence -- the only evidence about what

25   the issuer or its representatives told to purchasers of the

1    indenture that's at issue or the notes under the indenture

2    that's at issue here is Mr. Horton's testimony, that when

3    the exchange was negotiated -- and Mr. Moldovan's too, for

4    that matter -- this never came up.  They were never asked

5    what are the consequences?  I need additional language.  I

6    want to make it clearer.  I want to know if your view is

7    that we get the make-whole if you repay out of the

8    bankruptcy, but we -- are you really saying when I read

9    this, like Judge Sontchi has read it, that we don't get it

10   in bankruptcy?  Never came up.  That's the only evidence

11   about what the debtor did or did not say at the time.

12            So we have argument, based on risk factor

13   disclosures in the prospectus, that this wasn't -- the

14   operation of the automatic stay in bankruptcy wasn't

15   specifically disclosed to say Winston & Strawn and the

16   trustee's counsel, that the debtor didn't say to them,

17   you're aware that there's an automatic stay in bankruptcy;

18   instead, they gave them a legal opinion and said we're not

19   going to opine about what happens when you're in bankruptcy.

20   You're on your own.  You got to figure that out.

21            But there is no evidence, no direct evidence

22   whatsoever, that anyone from EFIH ever said we believe you

23   are entitled to the make-whole even after a bankruptcy

24   filing and notwithstanding the automatic acceleration, which

25   is why I think the grasping for a very-strained implication

1    from the absence of disclosure, is being pursued here.  And,

2    by the way, it's an argument -- Your Honor, may recall --

3    that was made before Judge Drain in Momentive and it was

4    rejected there, too.

5              So, last aspect, Your Honor -- I'm getting close

6    here -- but last aspect of the harm to expectations story,

7    another bucket, if you will, that I'd like to talk about is

8    testimony from both Mr. Horton and Mr. McCarty, and I'm

9    going to refer to Mr. Cacioppo, too.  They all kind of

10   cohere around what probably really happened here.  And I

11   know Your Honor will recall it, because it's one of the few,

12   maybe the only questions you asked of a witness in these

13   proceedings, and you turned to Mr. McCarty in the midst of

14   his testimony about how investors would expect and everybody

15   would expect and it would only make commercial sense to

16   expect that you would get a make-whole under this indenture

17   in bankruptcy.  You asked him, why is the indenture written

18   that way and he said very candid, unscripted moment, it's

19   probably a carryover language in the indenture from people

20   had no focus on getting paid in bankruptcy.  And I think

21   that's completely fatal to the story about expectations that

22   the market might have or individual investors might have.

23   Maybe he's exactly right.  We don't have full evidence of

24   that history, but, boy, he's been around for a long time.

25              And if, indeed, in the 2010 exchange, the

1    purchasers of the notes that are at issue here, had no focus

2    on getting paid in bankruptcy, out of the mouth of their own

3    expert, it really ends their case in terms of expectations

4    of anything being different than the way Your Honor read the

5    indenture in your summary judgment ruling.  And that's, of

6    course, utterly consistent with Mr. Horton's recollection

7    that there was no discussion with noteholders of any kind

8    about whether they would receive a make-whole in bankruptcy

9    after acceleration.  It never came up.  I guess Mr. McCarty

10   was right.

11            And it's interesting that -- I think Mr. Anker

12   asked Mr. Cacioppo about this issue maybe out of concern

13   of -- about the force of Mr. McCarty's admission, but

14   Mr. Cacioppo confirmed it; it's old language that was being

15   used and signed by people buying these indentures.  Now,

16   unfortunately for the trustee's position here, the Courts

17   have all along been construing this language and they can't

18   find one that said whether it was old or whether anybody

19   focused on it or not, people entered into valid contracts by

20   signing them.  They can't find an opinion where a Court

21   said, yeah, but we're going to read it differently.

22            Your decision in the summary judgment ruling, as

23   Your Honor saw, and from the cases you cite, and as Your

24   Honor saw from the briefings, is utterly consistent with the

25   overwhelming weight of authority here; in fact, all of the

1   authority on how to construe these.  There was no legally

2   cognizable, if I could use that labored phrase, legally

3   cognizable, expectation that anything different would happen

4   here.  And even when it was clear when the expectation is

5   admittedly clear, you have testimony from -- well, let me be

6   clear about that.  Even when it was clear that EFIH was

7   going to take the position and, in fact, did take the

8   position in connection with the Chapter 11 filing that no

9   make-whole was due, noteholders continued to buy these

10  things or at least the right to contest the make-whole.

11         The last prong, Your Honor, I'll speak to briefly

12  is success on the merits.  The trustee has argued this in

13  terms of, oh, this is a lay-down; they win no matter what,

14  and we don't agree.  We have two different kinds of

15  acceleration occurring here.  Your Honor addressed in the

16  summary judgment ruling the contractual acceleration, but,

17  of course, the Code automatically accelerates the debt, and

18  even if the stay is lifted, we're not aware of any authority

19  that says that exercising contractual rescission can

20  overcome or undue Bankruptcy Court -- bankruptcy law,

21  federal law acceleration.

22         And the trustee has hit this pretty hard, I just

23  wanted to make a couple comments.  The cases they cite -- I

24  don't want to spend a lot of time on this -- but I will just

25  start by directing Your Honor's attention to the District

1    Court's opinion in the Calpine case in the Southern District

2    in 2010 in which the Court said even without these automatic

3    acceleration provisions in the contract, the Code would

4    require the same result as the filing of a bankruptcy

5    petition renders all the Petitioner's outstanding debts due

6    and payable.  So the trustee's argument is well, it's just a

7    fiction that you've accelerated it for purposes of filing a

8    claim, but that's not what the District Court said in

9    Calpine, nor in AMR where, again, dealing with this issue, a

10   motion to lift the stay in order to rescind, Courts that

11   deal directly with this issue, including AMR, have said that

12   the debt is accelerated by operation of law and is due and

13   payable.

14          Mr. Anker -- and it's a little hard to convey from

15   the podium, but I invite Your Honor to read the Oakwood

16   Homes Corporation decision in the Third Circuit in 2006 that

17   Mr. Anker made reference to.  The quote they provided the

18   Court -- provided Your Honor, rather, in their pretrial

19   brief appears at page 18 and it's full of ellipsis, and if

20   you go read the actual quote from the opinion, you'll see

21   that unfortunately it's flagrantly misquoted.  There is not

22   an expression by the Third Circuit in that case that the

23   debt does not become due upon acceleration under the Code.

24   And I just invite Your Honor to compare the way they quote

25   it and fill in the ellipses from the opinions and you'll see

1    that that is not at all the point, the quote they cited for

2    is not at all the point that is being made there.

3              And, similarly in Momentive, Judge Drain points

4    out the difference between contract and Code acceleration,

5    but only to the effect that there are other rights that

6    could potentially arise if there's a contractual

7    acceleration provision to the benefit of one party or the

8    other, not that the Code's acceleration provision does not,

9    in fact, accelerate the debt and make it due and payable.

10   So that's the thrust of our argument, that it is not by any

11   means a slam dunk, that the third prong weighs in favor of

12   the trustee here.  The cases don't support the proposition

13   that if you lift the stay and they exercise their

14   contractual right to accelerate, they can overcome the

15   acceleration that occurs notwithstanding that under federal

16   law.

17             Also, Your Honor, this was briefed before you

18   issued your summary judgment ruling, and I know if you

19   believe that you considered and rejected it in your summary

20   judgment opinion, you will certainly tell us that.  The

21   reason we argue it now is because the summary judgment

22   opinion doesn't address it explicitly or implicitly, so we

23   just don't know, but obviously you will tell us one way or

24   the other.

25             I would like to conclude, then, Your Honor, with

Page 100

1    really the essential points that we make here.  The legal

2    standard focuses Your Honor only on harm that arises from

3    whether the stay is lifted or not; not from a recent

4    (indiscernible) transaction, and its consequences.  The

5    harm, at best, to the trustee and to EFIH is in perfect

6    equipoise; it's $431 million.  If that's permitted here,

7    there will be an aggressive pursuit for make-whole claims

8    that will total $950 million in added claims in EFIH, which

9    again, you don't know evidence from the witness stand and

10   sitting in your position, I respectfully suggest, to know

11   that that will greatly complicate EFIH's restructuring.

12            There's no scenario, under the evidence in this

13   case, Your Honor, the controlling case law, no scenario

14   under which the harms of the noteholders considerably

15   outweighs the harm to the debtors and so we respectfully

16   ask, Your Honor, that you deny the request to lift the stay.

17   Thank you.

18            THE COURT:  Thank you.

19            Go ahead.

20            MR. GLUECKSTEIN:  Good afternoon, Your Honor.

21            Brian Glueckstein from Sullivan & Cromwell on

22   behalf of the EFIH Committee.  Your Honor, I'll be fairly

23   brief.

24            The Committee, as you know, represents the

25   interests of the unsecured creditors of both EFIH and EFH,

1    and we are an intervenor in these proceedings, and we have

2    looked at the questions, as Mr. McGaan highlighted that are

3    actually before the Court today, and it's the question about

4    the stay relief.  We agree -- and I won't go through it;

5    Mr. McGaan did a very good job -- that sitting here and

6    seeing the testimony for the past two days, goes to much, to

7    many of the issues that, in my view, is attempting the re-

8    litigate the threshold questions that Your Honor already

9    decided about the effect of the acceleration, as well as

10   some of the issues concerning expectations, with respect to

11   whether a make-whole is due.  And I don't think there's any

12   question that the noteholders would like $431 million.  They

13   would like the make-whole to be paid.

14            But the question here is simply on stay relief,

15   and we have looked at that question carefully and we agree

16   with the debtor's position.  Your Honor, the standard, as

17   Mr. McGaan pointed out, looking at the totality of the

18   circumstances in this case, and only this case, and the

19   effect on the debtors and the debtor estate at the EFIH

20   level, includes the fact that Mr. Anker wants to say that

21   it's not a relevant consideration here.  But the equity

22   holder at EFIH is EFH, and the beneficiary of that certainly

23   are the creditors.

24            THE COURT:  Yes.

25            MR. GLUECKSTEIN:  And so the suggestion that we

1    have some neat restructuring of EFIH, as was made earlier

2    this morning, we certainly disagree with.  And I think, you

3    know, Mr. Anker pointed the Court, in an attempt to

4    distinguish the Momentive decision, Judge Drain's comments

5    about there could be some solvent debtor where there isn't

6    really a restructuring isn't really a bankruptcy; it's a

7    balance restructuring or some of that nature, was the

8    suggestion.  And I think, clearly, even that EFIH, as the

9    Court is well aware, is in a very complex restructuring,

10   including with respect to the disposition of the Oncor

11   interests.

12            And certainly, we have heard throughout the course

13   of this case and the testimony from the last two days from

14   Mr. Horton, that in his view, there would be harm to both

15   EFIH and EFH, and I think certainly while we are not talking

16   about the solvency of EFIH, and so for the purposes of this

17   phase one proceeding, the creditors at EFIH are presumed to

18   be paid, that does not end the inquiry with respect to harm

19   to that estate.  And, certainly, you know, we heard and it

20   was confirmed in the comments today, as much as Mr. Anker

21   suggested, well, we're only talking about the first-lien

22   note make-whole here, Mr. Horowitz then got up and said,

23   well, you know, if the judge, Your Honor grants his motion,

24   we'll have a motion of our own.  And so, certainly, I think

25   that the idea that we're talking about potentially upwards

1   of a billion dollars in make-whole claims is a very real

2   consideration in considering the harm to the EF -- potential

3   harm to the EFIH estate.

4          Certainly, we heard a great deal of testimony and

5   the trustee, as Mr. McGaan pointed out, goes to this issue

6   of expectation, expectation of the noteholders at the time

7   that they entered into this transaction.  We heard a lot

8   about the high-yield market and how that market works.  But

9   I don't think there's any question that the ten percent rate

10  of interest that we were hearing about, that the noteholders

11  weren't interested in receiving, they assumed a substantial

12  amount of risk.  Obviously, you don't get a ten percent rate

13  of interest without assuming risk.

14          And we certainly heard from Mr. Auerbach during

15  his testimony that at the time of November -- as late as --

16  as early as November, 2013, when EFIH's position to confess

17  to the make-whole was known, and up until a week ago in the

18  context that Mr. Greene continued to invest in these notes.

19  And so they brought -- they were buying litigation claims.

20  They assumed substantial risks back in their earlier

21  transactions and the current transactions and certainly, we

22  would submit, Your Honor, that while we have heard a great

23  deal of testimony about what the trustee's view in reading

24  of the indenture should be, that's not the issue that's

25  before the Court, and certainly we don't believe that

1    there's been a showing that, in any way, that the harm to

2    the noteholders outweigh the harm to the estate.

3            And from the position of the creditors, we believe

4    granting the lift stay motion, as requested, would result in

5    substantial harm to the estate, and so we would join with

6    the debtors in their request to deny the motion.  Thank you.

7            THE COURT:  Thank you.

8            MR. SADEGHI:  Good morning, Your Honor.

9            Again, Kayvan Sadeghi, from Morrison Foerster, on

10   behalf of the official committee of unsecured creditors of

11   TCEH.  And I would also like to thank the Court for hearing

12   us, as well, today.

13           First, we join in the arguments made by the

14   debtors, and I will also try to be brief.  I think that

15   arguments have all been made very well.  I just wanted to

16   quickly highlight a couple points.  The TCEH Committee

17   intervened in this adversary proceeding because we believe

18   the make-wholes could have a significant impact on plan

19   negotiations and on recoveries to the TCEH unsecured

20   creditors.  I heard Mr. Horowitz to say that reorganization

21   with this debtor should be easy, given that it's solvent.

22   That has not been our experience so far in these

23   proceedings.

24           We think this is also not just a waterfall issue.

25   We think this is a harm issue, and I will touch briefly on

1    the solvency presumption shortly, but throughout these

2    proceedings, Mr. Anker and Mr. McGaan have made reference to

3    the inter-debtor settlement embodiment proposed plan; that's

4    the settlement that would give the TCEH debtors a $700

5    million unsecured claim at EFH and the ability to recover

6    another $105 million, depending on the distributable value

7    at EFIH.  We think that settlement is inadequate, but it

8    does illustrate the potential harm to TCEH unsecured

9    creditors if make-whole claims are allowed.

10           First, as everyone's noted, the issue here today

11   is not so easily confined to the first-lien make-whole and,

12   you know, could potentially expose EFIH to a payment of up

13   to a billion dollars in make-whole claims, including

14   second-liens and the PIKs.  The payment of those

15   make-wholes, obviously, directly reduces the distributable

16   value to EFH, as the equity holder, and that, in turn,

17   reduces the available distribution on account of TCEH's

18   claims (indiscernible).

19           Second, and importantly, the claims under the

20   proposed plan do not accurately reflect the true claims held

21   by the TCEH debtors.  Your Honor was sensitive to this, I

22   think, when Mr. Anker walked Mr. Horton through some of the

23   on-the-fly math and introduced the proposed $700 million

24   TCEH claim to EFIH, as it was a fixed liability, which was

25   not -- not only is that settlement proposal inadequate to

1    account for the TCEH claims against EFH, but it fails to

2    recognize that the TCEH debtors have significant claims at

3    EFIH and at Oncor, as well.

4           We believe that on the litigated scenario, that

5    the TCEH debtors are very likely to be large creditors at

6    EFIH, and this could potentially call into question EFIH's

7    solvency and directly impair creditors at EFIH, if

8    make-whole claims were also allowed.

9           I understand that's not at issue in these

10   proceeding today and we don't think it's necessary for the

11   Court to reach those issues for the reasons outlined by the

12   debtors.  We think it's more than enough evidence on these

13   proceedings for you to find out that cause does not exist so

14   that the automatic stay, even if you presume solvency of

15   EFIH among other things, it would take money directly away

16   from the EFIH and EFH estates in order to pay claims for

17   holders like Halcyon and Blue Mountain who testified that

18   they purchased most of their holdings after they were aware

19   of the risks and continue to place bets for pennies on the

20   dollar in hopes that the Court will allow them to recover

21   more.

22          We agree with the statements of Mr. McGaan that,

23   you know, this is really only a harm if there is, you know,

24   some way that they expected something else and they had a

25   certainty of recovery.  If they were certain to recover this

1    and they don't recover it, that's a harm.  The fact is, as

2    you've recognized, the documents are at best ambiguous and

3    that was a risk that they undertook.  The fact that the risk

4    doesn't pan out in their favor is not a harm.  It's just not

5    what they would have liked.

6          And as Mr. McGaan noted, this really comes from

7    carry over provisions in an indenture that arose from what

8    Mr. McCarty believes was a situation where full recovery in

9    bankruptcy was not expected.  That's why language doesn't

10   clearly provide for a make-whole here.

11         We think it's really fundamentally unfair for the

12   trustee to ask the Court to essentially rewrite the terms of

13   the deal to be more clear on something that was left

14   ambiguous at the time.  You don't get a second bite at the

15   apple to do that in bankruptcy and if we start down that

16   road, where do you draw the line?

17         You know, there are tens of billions of dollars of

18   creditors that would like to follow suit, surely.  And that

19   would open the floodgates and make it very difficult to

20   confirm a plan here until all of the claims are resolved.

21         Finally, you know, if the Court disagreed -- well,

22   first I understand Mr. Anker to be asking for a conditional

23   ruling, he said, provided that, you know, it ultimately came

24   to pass that EFIH was in fact solvent.  But we think if the

25   Court were to disagree for any reason that the lift stay

1    should be denied even presuming solvency of EFIH, that the

2    proper course would be to defer any ruling on the lift stay

3    at least until a determination can be made that EFIH would

4    remain solvent even after allowance of the contingent

5    litigation claims that are held by the TCH debtors.

6            Of course, we don't think that's necessary.  We

7    think the harm to the EFIH and EFH estates and to the

8    reorganization efforts more generally is pretty stark here

9    and that's enough, so Court may not reach any further issue

10   and should refuse to lift the automatic stay and disallow

11   the first lien make-whole.

12           THE COURT:  Okay.

13           MR. SADEGHI:  Thank you.

14           THE COURT:  Thank you.  Mr. Anker, a reply?

15           MR. ANKER:  Yes, Your Honor, and I will try to be

16   brief.  I actually, as I listened to Mr. McGaan's remarks

17   and the remarks of counsel for the EFH committee and the T

18   side committee, think this really comes down to two issues.

19           I heard a lot about how you shouldn't rewrite the

20   contract.  I agree.  This is not a motion seeking relief

21   from stay so that we can reform the agreement.  It is a

22   motion seeking relief from stay so that we can enforce the

23   agreement as written.

24           Your Honor, in your summary judgment decision

25   said, quoting a case and stating a proposition, although I

1    don't think anyone would disagree within this room, this

2    paragraph 43.

3              "The best evidence of what parties to a written

4    agreement intends is what they say in their writing."  You

5    cited a New York case.  We agree.  This is a motion seeking

6    relief from the stay to enforce the contractually agreed

7    upon provision to rescind acceleration exactly as it is

8    written.  That is all it seeks.  That is what it seeks.

9              This Court held and what I hear Mr. McGaan and

10   others argue, it's as if this paragraph in this part of Your

11   Honor's opinion just wasn't there.  Your Honor held that the

12   contract provided the noteholders a contractual right to

13   rescind acceleration.  And as Your Honor will recall from

14   the argument in the cases, what is different about this

15   indenture from many is many indentures have a rescission

16   provision, but what they provide is a right to rescind

17   acceleration of a declared acceleration.

18             Here it provides for the right to rescind a

19   declared or automatic acceleration.  And, Your Honor, in

20   paragraph 69 explicitly found that the trustee had the right

21   to waive that default and de-accelerate the notes.  That was

22   the guts of your holding.

23             So this is not about whether we should reform the

24   contract because someone thought it meant something

25   different.  It's about relief from the stay to enforce the

1    terms of the contract.

2            That brings me to the second point.  Mr. McGaan

3    says and the debtors say, hold on, you shouldn't do that.

4    You shouldn't let them enforce their stay or rights because

5    that will harm EFIH, even though it's presumed to be

6    solvent.

7            But let's frame that issue right at the first

8    point.  The question is not should state law or our rights

9    be reformed.  The question is should the automatic stay be

10   used to change the result under the contract, to change the

11   result under state law?

12           Mr. McGaan says that the numbers are in equipoise.

13   If the noteholders get a claim of $431 million and assuming

14   solvency, therefore it would paid in 100-cent dollars, there

15   will be a liability of $431 million to the debtor, and 431

16   equals 431, hence there cannot be considerably greater harm

17   to the noteholders.

18           But the debtors, if they are solvent or a holding

19   company, a liquidating holding company, where the harm goes

20   to equity.  That point that the numbers were in equipoise

21   was true in Texaco.  That point that the numbers were in

22   equipoise was true in Chicago Milwaukee.  That point that

23   they were in equipoise was true in Ruskin.  That point that

24   they were in equipoise was in that point.  Every case

25   holding that where a debtor is solvent, creditors get to

1    exercise their state law rights, in every one of those cases

2    the numbers are in equipoise and the fundamental point that

3    those cases stand for is that the right of the creditor,

4    particularly a first lien creditor, is superior to that of

5    equity.

6            Of course the first lien creditor doesn't get paid

7    more than it would be entitled to under state law.  We

8    bargained for ten percent interest.  We're not entitled to

9    20.  We're not entitled to 30.  We're not entitled to 40.

10           Of course, if after honoring all state law rights

11   of all creditors, there's enough money for equity, equity

12   gets it, of course.  But the rule in bankruptcy reflected in

13   the absolute priority rule and reflected in this body of

14   case law is that you don't take away from the creditor

15   everything it is entitled to including its contract rights

16   solely for the benefit of equity.

17           Mr. McGaan didn't spend one minute on Texaco, not

18   one minute on Chicago-Milwaukee, not one minute on Ruskin,

19   not one minute on that whole body of case law that Your

20   Honor noted last summer.  And he didn't because he doesn't

21   have a way to deal with those cases in a way to get around

22   it.  On momentous -- look, Your Honor will read the

23   decision.  Your Honor will read the transcript.  I am not

24   remotely suggesting that things were whispered off the

25   record.

1           We're citing to what Judge Wren said in his

2      written decision where he distinguished the cases that go

3      our way involving solvent debtors and said they're right

4      that they're solvent debtors.  And what he explicitly said

5      on the transcript when he said when you have a solvent

6      debtor, all you're doing in bankruptcy is enforcing the

7      party's contract rights.

8           Your Honor, let me just touch on a couple of other

9      thoughts.  You've heard other holders on behalf of EFH say

10     we'd rather not have the stay lifted.  And you've heard the

11     suggestion by the TCEH committee that maybe EFIH is not

12     solvent because maybe they have litigation claims in the

13     EFIH.  That may be right.  We don't think it is.

14          But if it is and if it turns out that EFIH is not

15     solvent because there's valid claims by TCEHN, then your

16     granting relief from the stay to allow us to rescind

17     presuming that EFIH is solvent will have no effect

18     whatsoever.

19          Let me touch briefly on Mr. McGaan's argument on

20     bankruptcy acceleration.  Calpine, AMR, every case they've

21     cited there was an acceleration by contract.  I'm

22     comfortable representing because I've scoured the law that

23     there is not a single case out there finding that where

24     acceleration occurs by reason of the bankruptcy code and the

25     bankruptcy code only does acceleration to file a proof of

1    claim that that means that there cannot be a make-whole due

2    even where there's a provision in the agreement from writing

3    a contractual right to rescind acceleration.

4           No court has ever held that, TriCo Marine (ph),

5    Sub Cilentio (ph) is to the contrary, Skylar Ridge expressly

6    is to the contrary.  And I -- Your Honor will review Oakwood

7    Homes whether I invite you to or not.  There are no ellipses

8    there that matter.  The Court was quite explicit in saying

9    precisely what we've said.

10          But having said all of that, I really do think

11   that the benefit of this argument today is it really does

12   come down to those two points.  Do we have a state law

13   contractual right to rescind?  You've already so held.  And

14   that's what we're seeking relief from the stay to enforce,

15   nothing more, nothing less.

16          Do you, in balancing the harm where you have a

17   solvent debtor, take harm to the debtor and say it counts

18   equally where it's equity?  And is that fairly consistent

19   with what all this body of case law says and the automatic

20   stay says?

21          And is it -- I guess I would say there's a fair

22   point.  Mr. McGaan -- and I want to echo something he said

23   at the beginning.  I thank the Court at the outset and all

24   of your staff and colleagues.  And I agree with Mr. McGaan.

25   I should have thought -- thanked the debtor.  This has been

1    a difficult trial.  But it has been made less difficult by

2    the professionalism on the other side.  So I want to echo

3    that and thank Mr. McGaan personally.

4            Mr. McGaan says that when you look at harm, you

5    look purely at harm to the debtor from granting relief from

6    stay.  That's like saying when I enter into a contract and

7    someone pays -- gives me an asset, a piece of real property,

8    and I agree to pay for it in the future, that when you

9    analyze the transaction you can say, well, once you get to

10   that future point and now I owe the money, my payment is a

11   harm.  The fact that I got the asset before, let's put that

12   away.  That doesn't matter.  The bankruptcy code, of course,

13   defines fair value in 548 to include the satisfaction of an

14   antecedent debt.

15           And the Third Circuit has repeatedly said in the

16   late group of claim (ph) area in the O'Brian case among

17   others that a debtor suffers no legally compensable injury

18   by paying a legitimate liability.  Here you have that.

19           But you can't ignore the benefits as well.  Let's

20   step back a second.  Our notice of acceleration didn't cause

21   a make-whole to be due.  What caused the make-whole to be

22   due was the debtor, EFIH's, voluntary decision to redeem.

23   And that voluntary decision, I'm not criticizing it.  That

24   voluntary decision gave the debtor benefits, saved interest

25   on the first lien debt, saved call payment at the first call

Page 115

1    date, saved interest on the second lien debt.

2              To say that in balancing the harm one ignores all

3    of that is to ignore the reality of this transaction.

4              For those reasons, Your Honor, I do ask this Court

5    to grant relief from the stay.  Thank you.

6              THE COURT:  Thank you.  Mr. Horowitz, any final

7    comments?

8              MR. HOROWITZ:  Just two points, Your Honor.  The

9    first is just picking up, I think, on what Mr. Anker said.

10   Mr. Anker referred to a number of cases where the harms were

11   in equipoise and I think at the very end he pointed out this

12   is not such a case.  I think he was talking about the

13   benefits from interest, and as I predicted from the interest

14   savings, as I predicted Mr. McGaan made the point that those

15   interest savings benefits have already been realized or are

16   being realized regardless of whether the stay is being

17   lifted.

18             But it is pertinent, Mr. Anker was saying that

19   those are benefits the debtor received only by taking

20   advantage of its potential for redemption in bankruptcy.  So

21   this is really lifting the stay in that respect and just be

22   restoring the savings, the interest benefit, the savings

23   from the debtor at the expense of the first lien noteholders

24   back to them.

25             The second point though is that I mentioned in

1   addition that only as a result of lifting the stay would

2   debtors get the tax benefit.  I noticed that Mr. McGaan did

3   not talk about that at all.  I think the tax benefit is

4   undisputed.  The debtors have the burden on this motion to

5   lift the stay and they've done nothing to quantify it.  It's

6   undoubtedly significant.  So the numbers are not in

7   equipoise.

8           The second point I wanted to make was just an

9   observation about the committees, the two committees' roles

10   here.  I understand why Mr. Sadeghi for the TCH committee

11   would get up and oppose the lifting of the stay insofar as

12   the piece I would like to get value from EFIH and would like

13   to maximize the value coming up.  But they do not and he

14   did not purport to -- they do not represent the interests of

15   any EFIH creditor.

16          Mr. Glueckstein, and I hope I've got that name

17   right, by contrast did get up and say that his committee

18   represents EFIH and EFH unsecured creditors.  And I think

19   first of all it's important for Your Honor to know at least

20   as far as we know there is not a single EFIH creditor on

21   that committee.

22          And second, I do not understand how that

23   committee, I think it's quite extraordinary that they have

24   doing so, but how that committee can purport in the interest

25   of the EFIH creditors to support -- excuse me -- to oppose

1    lifting of the stay contingent on a solvency situation where

2    by definition all EFIH creditors will be paid in full.  And

3    moreover, he went on to say -- point out that one potential

4    consequence of lifting the stay here is that there would

5    also be an allowed make-whole claim for the PIKs who are

6    unsecured creditors.  So in other words he just got up and

7    purportedly on behalf of the EFIH creditors, one presumption

8    of solvency will be paid in full, made an argument that the

9    claims of EFIH unsecured creditors should be diminished.

10              I do not think this Court can take seriously the

11   notion that anyone other than Mr. Anker and I represent the

12   interests of EFIH creditors in this courtroom on this

13   motion.  The committees certainly do not.  And that's all I

14   wanted to say.

15              THE COURT:  Mr. McGaan, any final words?

16              MR. MCGAAN:  Briefly if I could, Your Honor.

17              THE COURT:  Yes.

18              MR. MCGAAN:  I just want to address Mr. Anker's

19   -- two points.  The -- briefly the idea that the relief

20   being sought here by -- in the lift stay motion is only to

21   enforce the contract as written.  And that's not really the

22   case.

23              The parties negotiated an indenture that

24   explicitly contemplates as one eventuality among many a

25   Chapter 11 filing.  It provides for acceleration in case of

1    a Chapter 11 filing.  Embedded in that, embedded in the

2    agreement, is the understanding clearly that with a Chapter

3    11 filing comes an automatic stay.

4           Once in Chapter 11, once automatic acceleration

5    occurs per the contract as well as the code in Chapter 11,

6    other factors imposed by federal law come into play.  The

7    trustee can't pretend like it wasn't in a contemplation of

8    the parties who executed an agreement that contemplates a

9    Chapter 11 filing in some circumstances.

10          That's the imposition of the stay.  And it is the

11   stay here that prohibits the rescission from being

12   exercised.  It's not that the debtor is using it against the

13   trustee.  The debtor didn't impose the stay.  Federal law

14   imposed the stay.

15          The issue is whether rescission is available in

16   Chapter 11.  Your Honor's ruled that it's not.  So the lift

17   stay motion seeks relief that changes the contemplation of

18   the contract by the court interjecting itself and looking at

19   the weighing of harms.  There's no right to rescission in

20   Chapter 11, even in the contemplation of the terms of the

21   indenture without going through a lift stay motion and

22   proving new elements that weren't in the contract before,

23   which is a balancing of harms under the prevailing standard

24   at this point in time.

25          So it isn't the case that they're simply seeking

1    to enforce the contract as written because the contract as

2    written contemplates a world post Chapter 11 filing which

3    does by terms of the contract say there's an acceleration.

4    But it does not say that the automatic stay doesn't apply.

5    So there is a change here that they're seeking by asking for

6    Your Honor's intervention.

7              And then lastly, Mr. Anker says that we don't have

8    an answer for the solvent debtor case to be decided.  It's

9    in our papers.  The principal answer is none of them are

10   lift stay cases.  Cases like Dow Corning and Gen Corelli

11   (ph) talk about the enforcement of rights that exist

12   explicitly in the contract in the solvent debtor case where

13   no one was seeking to lift a stay because the stay

14   prohibited in some fashion the vindication of a contract

15   right.

16             So in Dow Corning there's a provision for

17   attorney's fees and costs and expenses in the contract.  So

18   the contrast with this case is that Your Honor's construed

19   the contract and on its face it doesn't provide for the

20   make-whole.  That was your holding.

21             But in Dow Corning the contract did provide for

22   it, the claim their fees, costs, expenses.  There was no

23   motion to lift the stay.  The court simply said in the

24   solvent debtor case we're going to enforce the contract by

25   its terms.  Same thing in Gen Corelli, same thing in the

1    Chicago railroad case.  These aren't lift stay cases.  So it

2    is -- it's simply not -- it's not so that there is a body of

3    law out there that says that Your Honor should lift the stay

4    here simply because EFIH is presumed solvent.  Thank you.

5              THE COURT:  All right.  Thank you.  Briefly.

6              MR. GLUECKSTEIN:  Your Honor, if I may --

7              THE COURT:  Very briefly.

8              MR. GLUECKSTEIN:  (indiscernible), I want to

9    clarify the record in light of Mr. Horowitz's comments.

10   First, Your Honor, for the record, Brian Glueckstein,

11   Chilton and Cromwell, on behalf of the EFH committee.

12             First of all, so the record is clear, there are

13   members of the committee who have holdings at EFIH.  And we

14   are a fiduciary to both to the unsecured creditors of both

15   estates.  Certainly the holders and the trustee for the PIK

16   notes have a potential make-whole claim that has been talked

17   about during the course of these proceedings.  They're free

18   obviously to pursue that.  The committee represents the

19   creditor body as a whole in the interest of maximizing value

20   for the estate.

21             And so the suggestion by Mr. Horowitz that somehow

22   his view or Mr. Anker's view is somehow worth more is of no

23   merit and is not at all relevant to this case.  Thank you.

24             THE COURT:  Thank you.  All right.  Thank you,

25   very, very much.  This is a difficult decision and I am

1    going to take the matter under advisement.

2             In addition it's a lengthy and complicated record,

3    so I'm going to go back to the well on what worked so well

4    in connection with the summary judgment motion, which is I'm

5    going to ask for each side to submit proposed findings

6    conclusions of law citing to the record.  And in so doing if

7    the parties could confer ahead of time on a consistent way

8    to cite the record, I would appreciate that.

9             I don't want to set a time frame because you guys

10   can agree on a time frame that makes sense.  Obviously you

11   need time to do just the record, gather your thoughts and

12   submit them simultaneously.

13            I will also allow, having changed my mind on this

14   several times, and not to invite more briefing, but to

15   invite more briefing.  I don't think it's fair to simply ask

16   you to submit proposed findings without any argument to be

17   made as to why yours are right and the other side's are  --

18   well, that yours are right.  You won't know what the other

19   side's are so why yours are right.

20            But I don't want lengthy briefs.  So I will also

21   allow 25-page briefs in support of the proposed finding that

22   you submit.  So it will be submitted simultaneously, both

23   side simultaneously, and you'll submit both your proposed

24   finding and your supporting brief simultaneously to the

25   Court at a time that makes sense for the parties.

1           And I will diligently turn to it as soon as I

2      possibly can because it is important that this get decided

3      so that there is some certainty on this issue and that the

4      losing party can get busy with an appeal if that's how they

5      decide to proceed.

6           But this has been an open issue now for a year and

7      I want to get it decided as quickly as I can do so.  And I

8      -- with my small staff, we will do our best to accommodate

9      you as quickly a possible.

10          Anything else?

11          MR. ANKER:  Just one question.

12          THE COURT:  Yes.

13          MR. ANKER:  I heard you say you want proposed

14     findings.  Do you also want proposed conclusions of the law?

15          THE COURT:  Yes, proposed findings of fact and

16     conclusions of law.  Thank you.

17          MR. ANKER:  Thank you, Your Honor.

18          MR. MCGAAN:  Thank you, Your Honor.  I understand

19     your comments.  And can we just agree upon a deadline to

20     report back to the Court what the deadline will be?  There

21     may be, maybe not, but there may be a considerable

22     difference of view about how long we should take to get this

23     done.  And if we just agree to report back, I don't know, by

24     Wednesday, something like that, that either, hey, this is

25     what we're suggesting if it's okay with Your Honor.  This is

1    the due date.  And it -- or come back in and say we can't

2    agree.

3                THE COURT:  Can we do this?  If you -- can we do

4    this?  If you can't agree on a time frame can we address it

5    at the May 4 hearing?

6                MR. MCGAAN:  Yes.

7                MR. ANKER:  Certainly, Your Honor.  And I

8    certainly think we can agree to know whether we disagree on

9    a schedule by next Wednesday.  We will surely know by May 4.

10               THE COURT:  Okay.

11               MR. MCGAAN:  No, that's fine, Your Honor.

12               THE COURT:  Okay.

13               MR. ANKER:  Thank you, Your Honor, very much.

14               THE COURT:  You're welcome and to the extent that

15   there's an agreed order in connection with the follow up on

16   the summary judgment, you can submit it under certification

17   of counsel.  If you're not in agreement, that's fine as

18   well.  Maybe you can report to me on that at the May 4

19   hearing as well.

20               MR. ANKER: Thank you, Your Honor.

21               THE COURT:  And you can participate by phone if

22   you desire in connection with that May 4 hearing.  People

23   don't need to fly in or anything like that.

24               MR. MCGAAN:  I think Mr. Anker is coming back for

25   that granola that you have.

1           THE COURT:  At the Sheridan?  You need to stay at

2     the Hotel Dupont, Mr. Anker.  Although I'm not sure the

3     debtor -- I'm not sure of the fee -- well, you don't care

4     about the fee committee.  I'm not sure what the fee

5     committee will allow or not allow.  All right.  Anything

6     further?

7           Again, thank you.  Thank you very much.  If you

8     could endeavor to clean up and I'd ask local counsel if they

9     can endeavor to get their document people here in time to

10    clear this by 2:00 it would certainly be helpful since I

11    have my consumer calendar at 2:00 p.m.   Thank you.

12         (Whereupon, the proceedings concluded at 1:23 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                                    Page 125
1                        I N D E X

2                      E X H I B I T S

3     NO.        DESCRIPTION                ID.      EVID.

4     1-36       Plaintiff                            21

5     38         Plaintiff                            21

6     39-77      Plaintiff                            21

7     80-81      Plaintiff                            21

8     83         Plaintiff                            21

9     86-89      Plaintiff                            21

10    91-101     Plaintiff                            21

11    104-105    Plaintiff                            21

12    111        Plaintiff                            21

13    112        Plaintiff                            21

14    115-117    Plaintiff                            21

15    121-129    Plaintiff                            21

16    134        Plaintiff                            21

17    141        Plaintiff                            21

18    NO.        DESCRIPTION                ID.      EVID.

19    1          Debtor                               22

20    2          Debtor                               22

21

22

23

24

25
```

1                    C E R T I F I C A T I O N

2

3    I, Melissa Looney certify that the foregoing transcript is a

4    true and accurate record of the proceedings.

5    **Melissa**                Digitally signed by Melissa Looney
                                DN: cn=Melissa Looney, o, ou,
     **Looney**                 email=digital1@veritext.com, c=US
6    _____    Date: 2015.04.23 11:33:21 -04'00'

7    Melissa Looney

8    AAERT Certified Electronic Transcriber CET-607

9

10

11

12   Date:  April 23, 2015

13

14

15

16

17

18

19

20

21

22    Veritext Legal Solutions

23    330 Old Country Road

24    Suite 300

25    Mineola, NY 11501