## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.* | ) | Case No. 14-10979 (CSS) |
| | ) | |
| *Debtors.*[1] | ) | (Jointly Administered) |
| | ) | |
| | ) | **Hearing Date: June 1, 2015 at 10:30 am (ET)** |
| | ) | **Objection Deadline: May 22, 2015 at 4:00 pm (ET)** |

## MOTION FOR ORDER AUTHORIZING PAYMENT AND
## REIMBURSEMENT OF CERTAIN FEES AND EXPENSES OF UMB BANK, N.A.,
## AS THE EFIH UNSECURED INDENTURE TRUSTEE

UMB Bank, N.A., as indenture trustee ("UMB", the "EFIH Unsecured Indenture Trustee" or the "Movant") is the indenture trustee for all the outstanding and unpaid unsecured bond debt of Energy Future Intermediate Holding Company LLC ("EFIH") and EFIH Finance, Inc. (together with EFIH, the "EFIH Issuers"), aggregating over $1.5 billion in outstanding principal.

Movant files this motion (the "Motion") for entry of an order, substantially in the form attached hereto as Exhibit A, consistent with sections 105(a) and 363(b) of title 11 of the United States Code (the "Bankruptcy Code"), authorizing the Debtor obligors – the EFIH Issuers – to reimburse and pay solely as advances (i) the reasonable fees and expenses of the EFIH Unsecured Indenture Trustee and certain of its professionals incurred during the first nine months of this case through December 31, 2014 (itemized in Exhibit B hereto in the aggregate

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, which are being jointly administered, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

amount of \$3,235,801.67),[2] and (ii) thereafter on a reasonably periodic basis the reasonable fees and expenses of the EFIH Unsecured Indenture Trustee and certain of its professionals, in accordance with the terms of the Indentures (as defined below).[3] This requested relief is intentionally limited and non-prejudicial to any party in these cases. In particular, the requested advances are not only uniquely discreet, but, consistent with UMB's charging lien under its Indentures, would solely be remitted as credited against ultimate distributions on the notes for which UMB serves as indenture trustee.

## OVERVIEW

**Thus, to be clear, this Motion only involves the <u>timing</u> of – not the right to – payments owed to UMB and its professionals for their services in this case under the Indentures and the Trust Indenture Act. Unlike other core parties to the case, UMB and its professionals have received no reimbursement during the first year of the case (and now face another active year or more of involvement looking to an ultimate chapter 11 plan and, *inter alia*, regulatory and other approvals necessary for consummation). The Motion does not ask the Court to make any substantive determinations about the nature or priority of the EFIH Unsecured Indenture Trustee's post-petition fees and expenses, nor prejudice any party to the case.** Approval of the Motion will mitigate the exceptionally heavy and continuing demands, burdens and carrying costs placed on the EFIH Unsecured Indenture Trustee in serving in its representative capacity from the first days of the case under the

---

[2] In January 2015, EFIH Unsecured Indenture Trustee retained certain advisors to the ad hoc committee of holders of EFIH Senior Toggle Notes (the "<u>EFIH Ad Hoc Committee</u> "), *nunc pro tunc* to April 29, 2014, to provide services for the EFIH Unsecured Indenture Trustee on all matters related to these chapter 11 cases. The Trustee is not seeking reimbursement through this Motion for fees and expenses incurred by the EFIH Ad Hoc Committee's professionals. The Trustee, however, reserves the right to seek reimbursement for such fees and expenses. For the avoidance of doubt, nothing herein shall prejudice, nor be deemed a waiver of, the rights of the Trustee or any professional not listed in Exhibit B to seek reimbursement of such incurred fees and expenses.

[3] For the four months of January 2015 – April 2015, the EFIH Unsecured Indenture Trustee's professionals listed on Exhibit B incurred approximately \$1,263,610.85 in fees and expenses (also itemized in Exhibit B hereto).

Indentures (as defined below) and the Trust Indenture Act of 1939 (the "TIA"). UMB and its professionals have been careful to predominantly focus on the discrete motions and matters of direct interest to its noteholders and the ultimate disposition of these cases, and urgently pressed before the Court – now including the recent declaratory judgment action brought by EFIH against UMB – so their fees and expenses are comparatively directed and modest; i.e., a small percentage of those incurred by other major parties to the case. Thereby, the relief requested, among other things, is only fair and consistent with at least somewhat evening the playing field vis-à-vis the multitude of other parties and professionals in the case, including now the other two EFIH indenture trustees, who are generally being or have been compensated on a current basis.

Not only would the relief sought here solely affect the ultimate timing of payment to Movant, but it is absolutely consistent with certain understandings previously disclosed to the Court as reached between EFIH (and other major stakeholders) and UMB early in these cases, when case-dispositive motions were before the Court on an accelerated basis and there was no official committee representing creditors of EFH, EECI, Inc., EFIH and EFIH Finance Inc (the "E-Side"), as described further below.

This Motion is particularly appropriate and timely now given the current stage of these cases' development, and several recent factors which highlight the benign, non-prejudicial nature of the requested relief and that stretching reimbursement of UMB and its professionals to the end of this case is both inequitable and unnecessary:

(1) Lengthening of the Cases. While the cases were originally teed up on a fast-track to emerge from chapter 11 by late January 2015, they have now gone on well past that target and clearly promise to go through at least the end of 2015 and perhaps much longer to get to consummation. Thus, the Debtors have requested (and largely received) extensions of their exclusivity periods effectively through the full allowable

3

period under the Bankruptcy Code, going through December 2015, as is most recently mirrored in Debtor's scheduling motion filed April 14, 2015 and ordered as of May 4, 2015.

(2) <u>Reimbursement of All Other EFIH Trustees</u>.  With the partial repayment of the EFIH Second Lien Notes (as defined below) in an amount of up to $750 million pursuant to an order by the Court on March 10, 2015 (Docket No. 3855), all of the other indenture trustees for the EFIH bonds, other than UMB, will effectively have been reimbursed their outstanding fees and expenses.[4]

(3) <u>Mandatory Trustee Involvement</u>.   The EFIH Unsecured Indenture Trustee has consistently and affirmatively been called upon to perform its representative role, including being brought into the middle of the case on an expansive (and the Debtors have indicated, significant) basis, as evidenced, *inter alia*, by the Debtors' filing of a declaratory judgment action against UMB on December 16, 2014 for a determination of potentially hundreds of millions of dollars in make-whole, optional redemption and post-petition interest rights under the EFIH Senior Toggle Notes (defined below), for which UMB is the indenture trustee.  UMB's motion to dismiss has been briefed and oral argument went forward on May 4, 2015.

In further support of this Motion, the Movant respectfully represents as follows:

## JURISDICTION

1.     The Court has jurisdiction over this matter pursuant to, *inter alia*, 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012.  This matter is a core proceeding

---

[4] Upon information and belief the First Lien Trustee withheld for reimbursement over $20 million and the Second Lien Trustee indicated it would withhold approximately $15 million.

within the meaning of 28 U.S.C. § 157(b)(2), and UMB consents pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.    The bases for the relief requested in this Motion are, *inter alia*, sections 105(a) and 363(b) of the Bankruptcy Code.

## RELIEF REQUESTED

4.    By this Motion, UMB seeks entry of an order consistent with, *inter alia*, sections 105(a) and 363(b) of the Bankruptcy Code authorizing the EFIH Issuers (i) to reimburse on a current advance basis UMB's reasonable fees and expenses as the EFIH Unsecured Indenture Trustee, including those of its professionals listed in Exhibit B incurred at least to, and including, December 31, 2014 and (ii) going forward, on a reasonably periodic basis reimburse the reasonable fees and expenses of the EFIH Unsecured Indenture Trustee and certain of its professionals, in accordance with the terms of the Indentures.[5]  Such payments would <u>only constitute advances from the EFIH Issuers.</u>

---

[5] For the first over six months of these cases through October 31, 2014 (during which there was no functioning E-Side Creditors' Committee), the EFIH Unsecured Indenture Trustee incurred the following fees and expenses, aggregating $2,744,683.76:

> UMB: $102,966.25
> Foley & Lardner: $2,139,683.96
> Klehr Harrison: $86,194.04
> Gavin/Solmonese: $415,839.51

By way of comparison, during the roughly same six month period, the T-Side Official Creditors' Committee incurred total fees and expenses of approximately $20 million, or approximately $3.3 million per month.

5

5.     The relief requested is not only consistent with the best interests and administration of the Debtors' estates, but is in accordance with certain understandings reached between UMB and the EFIH Issuers earlier in these cases when no official committee was appointed to represent the interests of EFIH's unsecured creditors and UMB was confronted with accelerated, intensive, and potentially dispositive proceedings on a number of significant EFIH and E-Side Debtor issues.    These immediate issues included the Restructuring Support Agreement ("RSA"), which required, among other things, filing of a chapter 11 plan by June 13, 2014 (approximately six weeks after the chapter 11 filings) to be confirmed by January 29, 2015, and prompt adjudication of the debtor in possession financings (including allocation of ultimate ownership of the reorganization equity).    Immediately thereafter, Debtors filed and prosecuted a heavily contested bidding procedures motion, while contesting make-whole premiums on all EFIH secured bond debt.    More recently, on December 16, 2014, the EFIH Issuers filed an Adversary Complaint for Declaratory Judgment against UMB, to challenge or limit the right of UMB and EFIH Senior Toggle Notes (as defined below) to make-whole, optional redemption and contractual post-petition interest amounts.    As noted above, UMB's Motion to Dismiss was filed on February 5, 2015, has been briefed, and was argued on May 4, 2015.    The requested accommodation on indenture trustee fees and expenses hereunder is even more compelling now that what was originally teed up as a highly intensive, complex, but short-term case, seems likely, as reflected in such recent orders as those extending exclusivity, to extend for an additional year or more.    UMB has existing and ongoing statutory (the TIA) and contractual (the Indentures) obligations to represent its noteholders as a "prudent person" would. Consequently UMB needed and continues to need to remain highly engaged, with its

---

(Moreover, for the additional two-month period through December 31, 2014, additional trustee fees and expenses were approximately $491,117.91.)

6

professionals, in the progress and next phases of these cases.  That mandatory involvement would be facilitated and made less onerous with the relatively limited and modest relief requested in this Motion.

## BACKGROUND

### A.    The Debtors' Chapter 11 Cases.

6.    On April 29, 2014, each of the Debtors filed a voluntary petition with the Court under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").  The Debtors are operating their businesses and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.    The Debtors' Chapter 11 Cases have been consolidated for procedural purposes only, and are being jointly administered pursuant to Bankruptcy Rule 1015(b).  No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases.

### B.    UMB's Role as Indenture Trustee for the EFIH Unsecured Notes.

8.    UMB serves as the successor indenture trustee for: (i) the 11.25%/12/25% senior toggle notes due 2018 (the "EFIH Senior Toggle Notes") which were issued pursuant to an Indenture dated as of December 5, 2012 (as amended, the "EFIH Senior Toggle Notes Indenture") and (ii) the 9.75% senior notes due 2019 (together with the EFIH Senior Toggle Notes, the "EFIH Unsecured Notes"), which were issued pursuant to an Indenture dated as of November 9, 2009 (as amended, and collectively with the EFIH Senior Toggle Notes Indenture, the "Indentures").

9.    The combined aggregate outstanding principal amount of the EFIH Unsecured Notes is $1,568,249,000, which (with interest, premiums and other amounts) constitutes, by far,

7

the largest component, if not all, of the pool of unsecured claims against the estates of the EFIH Issuers.[6]

10.    UMB is a successor trustee appointed immediately before and in anticipation of the filing of the Debtors' Chapter 11 Cases.  While each of the Indentures provides for a charging lien, the EFIH Unsecured Indenture Trustee has not received any funds or distributions out of which to pay reasonable fees and expenses.

## C.    Formation of the T-Side Official Committee of Unsecured Creditors.

11.    Shortly after the commencement of these Chapter 11 Cases, the Office of the United States Trustee solicited unsecured creditors of all of the Debtors to submit applications for membership on an official committee of unsecured creditors (the "Original Committee"). UMB and American Stock Transfer and Trust Company, LLC, as indenture trustee ("AST") for the unsecured notes of Energy Future Holdings, Corp ("EFH")[7] each timely submitted completed questionnaires to the Office of the United States Trustee requesting such appointment, and attended the committee formation meeting.  However, not only were UMB and AST not selected to serve on the Original Committee, but no creditors of the E-Side debtors were selected to serve on the Original Committee.

---

[6] The first lien notes issued by the EFIH Issuers (the "First Lien Notes"), for which Delaware Trust Company ("Delaware Trust") serves as indenture trustee under an Indenture dated as of August 17, 2010, have been fully paid down as to principal and accrued interest, with only make-whole claims outstanding and subject to litigation.  Delaware Trust has, upon information and belief, held back at least $20 million from the above-referenced pay-down to cover its fees and expenses.  The Second Lien Notes were issued under an Indenture dated as of April 25, 2011.  Computershare serves as the successor indenture trustee for under an Indenture dated as of April 25, 2011 pursuant to which the 11% Senior Secured Second Lien Notes due 2021 and 11.75% Senior Secured Second Lien Notes due 2022 (together, the "Second Lien Notes") were issued by the EFIH Issuers.  The combined aggregate outstanding principal amount of the Second Lien Notes is approximately $2,156,392,000, which constitutes the largest remaining secured bond claim against the EFIH Debtor's estate.

[7] AST serves as successor indenture trustee under six separate indentures pursuant to which EFH issued six series of notes (the "EFH Unsecured Notes").  The combined aggregate outstanding principal amount of the EFH Unsecured Notes is $1,929,000,000 which constitutes, by far, the largest component, if not all, of the pool of unsecured claims against the estate of EFH.

8

12.     In fact, in a footnote to the Notice of Appointment of Committee of Unsecured Creditors, the United States Trustee expressly stated that the Original Committee would not represent the interests of unsecured creditors on the "E-Side" of the Debtors' corporate structure: Rather, "[t]he committee represents the interests of the unsecured creditors of only the TCEH Debtors and EFH Corporate Services Company and of no other debtors." [Docket No. 420]

**D.     Dealing with the Immediate Dispositive Motions and Proceedings Early in the Cases.**

13.     Immediately after the formation of the Original Committee, UMB and AST consulted with the Debtors and other major E-Side parties to these cases about options for the most economical and efficient, and least costly and dilatory, option for their necessary participation in these cases and to ensure adequate representation of E-Side creditor interests. The Debtors, UMB and AST came to an understanding that, instead of seeking delays and moving for an additional EFH/EFIH committee (which could take months) UMB and AST (who together represent as trustees practically all of the E-Side unsecured debt) would assume on an expedited basis the additional burden and cost of performing tasks normally undertaken by a committee (including retaining financial advisors), and that the Debtors would seek authority to compensate UMB and AST on a current basis. UMB retained Foley & Lardner LLP, Delaware counsel Klehr Harrison Harvey Branzburg LLP, and financial advisor Gavin/Solmonese LLC to provide such immediately required services.[8]

14.     The Debtors thereupon consulted with significant constituencies in the cases – particularly the Original Committee and necessary E-Side signatory parties under the RSA – all of whom approved the arrangement with UMB and all but one of whom approved the arrangement with AST. The Debtors proposed including the requested relief in the then-pending

9

motion and order relating to the Second Lien DIP facility, which was deemed appropriately related to the relief for the indenture trustees and was the next motion up for consideration by the Court. The proposed order filed by the Debtors with the Court included such relief for UMB. [Docket No. 1230]. However, the Second Lien DIP Motion and order were subsequently withdrawn for other reasons.

**E.      Formation of the E-Side Official Committee of Unsecured Creditors.**

15.      On July 23, 2014, AST filed its Motion Pursuant to 11 U.S.C. 1102(a)(1) and 105 for Appointment of an Official Committee Of Unsecured Creditors for EFH [Docket No. 1676]. Following the briefing and argument on AST's motion, on September 17, 2014, the Office of the United States Trustee issued a Solicitation of Interest for Serving on Unsecured Creditors' Committee for Energy Future Holdings Corporation, Energy Future Intermediate Holding Company, LLC & EFIH Finance, Inc. (the "E-Side Committee Solicitation"). Both UMB and AST timely submitted questionnaires in response to the E-Side Committee Solicitation and requested appointment to the committee.

16.      On October 27, 2014, the Office of the United States Trustee filed a Notice of Appointment of Committee of Unsecured Creditors [Docket No. 2570], announcing the formation of an E-Side creditors committee (the "E-Side Committee").

17.      Neither UMB nor AST (nor any large holder of E-Side funded indebtedness) was appointed to the new E-Side Committee, as originally constituted. Shortly after the formation of the E-Side Committee, UMB asked the E-Side Committee to allow it to participate in the E-Side Committee's activities as a non-voting, *ex-officio*, member. This request was denied. To complete the loop, UMB separately renewed its request to the Office of the United States Trustee

10

to be appointed as an official member of the E-Side Committee, which renewed request was
formally rejected on January 29, 2015.

18.    The members originally appointed to the E-Side Committee are apparently
holders of small and contingent claims – two asbestos exposure claimants, an individual
executive retiree asserting claims under a supplemental employee retirement plan for perhaps
$569,572, and two holders of, in aggregate, perhaps several hundred thousand dollars in
principal amount of unsecured notes held only by unaccredited investors.  (It was only upon the
resignation of one of the creditors on the E-Side Committee that AST, as trustee for EFH Notes
(including those of the resigning investor whom AST replaced), was added to the E-Side
Committee on January 15, 2015).  Although the claims held by the appointed members of the E-
Side Committee may merit recognition, the interests seemingly represented by these Committee
members do not include, *inter alia*, the over $1.5 billion of EFIH Senior Toggle Notes, for which
UMB is indenture trustee and which will undoubtedly be treated separately in any plan.  Thus,
while UMB hopes to work cooperatively with the E-Side Committee, UMB is not guaranteed the
type of information, representation and input it and its noteholders would generally have through
service on a committee.  Accordingly, UMB cannot curtail its involvement in these Chapter 11
Cases and cannot simply rely on or defer to the E-Side Committee to represent its constituents'
interests.

## BASIS FOR RELIEF REQUESTED

**A.    The EFIH Unsecured Indenture Trustee is Entitled to Reimbursement of its
Fees and Expenses and Advancing Funds to UMB to Perform Its Critical
Statutory and Contractual Services is in the Best Interests of the Debtors'
Estates.**

19.    These Chapter 11 Cases are extraordinary not only because of their magnitude
and complexity, but because so many significant, case-dispositive issues have been presented

11

from the outset for immediate consideration and action, particularly with respect to the E-Side Debtors.

20.     Early in these Chapter 11 Cases, the Debtors' efforts to move swiftly toward reorganization resulted in the Debtors seeking relief on a number of complex, case-dispositive issues affecting the E-Side Indenture Trustees, such as: the EFIH First Lien DIP Financing Motion [Docket No. 74]; the EFIH Settlements Motion [Docket No. 472]; and the EFIH Second Lien DIP Financing Motion [Docket No. 477].  The Debtors also sought early on, through their Motion for Entry of an Order Authorizing the RSA Debtors to Assume the Restructuring Support Agreement [Docket No. 505] (the "RSA Assumption Motion"), to commit to an aggressive schedule of milestones that required the Debtors to obtain approval of their principal motions on a rapid timeline, and to file a plan of reorganization by June 13, 2014 and confirm that plan no later than January 29, 2015.  Although the Restructuring Support Agreement was ultimately withdrawn in favor of the current proposed sale process, the ambitious pace it set early on required UMB and its professionals to work at full throttle during the early months of these Chapter 11 Cases.  Those responsibilities continue, but now it appears clear that what was teed up as a nine-month case, may extend out through 2015 and even into 2016.

21.     UMB, as well as its counsel and financial advisors, played an active role starting in the critical early stages of these cases.  In particular, UMB and its professionals were active in evaluating and weighing in on the Second Lien DIP Financing Motion, including performing substantial due diligence and negotiations regarding the terms of such a transaction.  During that process the second lien DIP financing transaction was modified to, *inter alia*, greatly reduce by upwards of $400 million the "break up" fees in that transaction, while at the same time imputing greater value to EFIH, reflected in the narrowing or equalizing of the proposed allocation of

12

reorganization equity between the EFIH Second Lien DIP and the EFIH Unsecured Noteholders. Those efforts also raised the possibility of a greater distribution to EFH Noteholders.

22.     That process resulted in the Debtors' withdrawal in August 2014 of the RSA Assumption Motion and Second Lien DIP Financing Motion, and for the Debtors to consider procedures that might facilitate competitive bidding for E-Side assets – particularly EFIH's 80% interest in Oncor – which the Debtors have indicated should provide sufficient proceeds to pay in full all of the E-Side debt.  Thus, on September 19, 2014 the Debtors filed a Bidding Procedures Motion [Docket No. 2087], requiring the EFIH Unsecured Indenture Trustee to analyze a proposed two-stage sale process, monitor numerous depositions, file limited objections and attend multi-day evidentiary hearings (among other things).  UMB, along with, *inter alia*, the EFIH Ad Hoc Committee, has actively worked to ensure that any proposed bidding process is carried out in a manner that ensures appropriate transparency for the relevant parties-in-interest and obtains maximum value for creditors, whether through a sale or reorganization.

23.     UMB also has been an active participant in the various litigations swirling around these cases, including monitoring written discovery, depositions, pleadings and hearings, and most recently culminating in the EFIH Issuers' filing, on December 16, 2014, of a declaratory judgment action against UMB relating to the level of premium and post-petition interest which may be owed on the EFIH Senior Toggle Notes under a Plan.

24.     UMB's continuing activity was particularly mandated in the crucial first six-plus months of the case before an E-Side Committee was even formed and remains as vital now and going forward for UMB to perform its statutory and contractual responsibilities to act as a "prudent person" under the TIA and under the Indentures, which would include reviewing and

evaluating the terms of each of the Debtors' major proposals and responses thereto that impact the Debtors or their stakeholders.[9]

25.     To perform its duties under the Indentures and the TIA, UMB has required from the first month of the case the services of counsel and financial advisors. The level of required services has been heightened by the fact that, until October 27, 2014 – through the first six-plus months of these cases – there was no E-Side Committee, and it was not until sometime in mid-November that that Committee had retained any professionals. Even now, although UMB asked for inclusion on the E-Side Committee, neither it nor any EFIH Senior Toggle Noteholder is on the E-Side Committee, which instead is predominantly composed of largely small and contingent creditors of EFH, and no significant EFIH creditor interests. UMB, which represents all of the outstanding EFIH Unsecured Notes, while hoping for and trusting there will be mutual cooperation, cannot absolutely or solely depend on or compel the E-Side Committee to provide the full range of information, input, and representation required by UMB and the EFIH Unsecured Noteholders. To date, communications with the E-Side Committee have been limited.

---

[9] Each of the Indentures provides that the Trustee is subject to the "prudent man" standard. *See, e.g.*, EFIH Senior Toggle Notes Indenture at §7.01 ("If an Event of Default has occurred and is continuing, the Trustee shall exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in its exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs."). In addition, section 315(c) of the TIA imposes similar "prudent man" duties upon the E-Side Indenture Trustees. 15 U.S.C. § 77ooo. The Trust Indenture Act establishes strong public policy in favor of the existence and compensation of indenture trustees. *See, e.g.*, Trust Indenture Act § 302 (15 U.S.C. § 77bbb) ("it is hereby declared that the national public interest, and the interest of investors in notes, ... are adversely affected -- (1) when the obligor fails to provide a trustee to protect and enforce the rights and to represent the interests of such investors ...").

**B. The Requested Relief is in the Best Interests of the Debtors' Estates and is Not Prejudicial to Any Party.**

26.     The relief requested herein makes particular sense given that the requested relief is and has already proven to be in the best interests of the Debtors' estates and is not prejudicial to any party because it only asks for advances against ultimate distributions.

27.     Payment of the reasonable fees and expenses of UMB, as EFIH Unsecured Indenture Trustee, and its professionals on a current basis – but <u>solely as advances</u> – only affects the timing of payment and does not prejudice creditors or other stakeholders.  Section 7.07 of each Indenture mandates the payment of the indenture trustee's reasonable fees and expenses and, in fact, specifically provides that such fees and expenses are secured by a charging lien against any distribution ultimately available on account of the Notes.[10]

---

[10] Each of the Indentures requires that any distribution made on account of such notes be paid out first "to the Trustee, its agents and attorneys for amounts due under Section 7.07 hereof, including payment of all compensation, expenses and liabilities incurred, and all advances made, by the Trustee and the costs and expenses of collection." *See* EFIH Senior Toggle Notes Indenture, at § 6.13(i).  Thus, the reasonable fees and expenses of the E-Side Indenture Trustees and their professionals must ultimately be paid in full before any amounts can be paid to the holders of the notes.

Each of the Indentures contain substantially similar provisions requiring that the issuer must pay the indenture trustee's fees and expenses, even going so far as to provide that in any bankruptcy payment of such fees and expenses are "intended to constitute expenses of administration." *See, e.g.,* EFIH Senior Toggle Notes Indenture, at §7.07:

> The Issuer and the Guarantors, jointly and severally, shall pay to the Trustee from time to time such compensation for its acceptance of this Indenture and services hereunder as the parties shall agree in writing from time to time. … . The Issuer and the Guarantors, jointly and severally, shall reimburse the Trustee promptly upon request for all reasonable disbursements, advances and expenses incurred or made by it in addition to the compensation for its services. Such expenses shall include the reasonable compensation, disbursements and expenses of the Trustee's agents and counsel. . . Notwithstanding anything to the contrary in Section 4.12 hereof, to secure the payment obligations of the Issuer and the Guarantors in this Section 7.07, the Trustee shall have a Lien prior to the Notes on all money or property held or collected by the Trustee, except that held in trust to pay principal and interest on particular Notes. Such Lien shall survive the satisfaction and discharge of this Indenture. When the Trustee incurs expenses or renders services after an Event of Default specified in clause (6) or (7) of Section 6.01(a) hereof occurs, the expenses and the compensation for the services (including the fees and expenses of its agents and counsel) are intended to constitute expenses of administration under any Bankruptcy Law.

PHIL1 4558893v.1

28.     As reflected in the competitive bidding for the equity of reorganized EFH in the course of the Second Lien DIP Financing Motion and pursuant to the Bidding Procedures Motion, as well as subsequent statements and Plan filings by the Debtors and their professionals, the EFIH Unsecured Notes are entitled to a recovery, and will likely receive a substantial distribution in these Chapter 11 Cases and which, in any event, is expected to be an amount sufficient to cover the EFIH Unsecured Indenture Trustee fees and expenses many times over. (For example, in the Debtors' Omnibus Reply to Objections to Bidding Procedures Motion filed October 14, 2014, at page 20, the Debtors indicated that they "already previously received offers that would satisfy the proposed minimum requirement . . . that it provide at least enough distributable value to pay all EFIH claims in full.")  Thus, even if only looking to assert its charging lien, the reasonable fees and expenses of the EFIH Unsecured Indenture Trustee and its professionals will not only be easily covered, but will only amount to a small percentage of eventual distributions.

29.     Moreover, what was originally teed up as a fast-track case now seems likely to extend out for another one or more years, depending on plan confirmation and possible regulatory proceedings, approvals and delays necessary to get to consummation.

**C. The Requested Relief is Not Only Consistent With the Bankruptcy Code and Pertinent Case Law, but Less A Stretch Than Such Customary Relief as Critical Vendor Payments.**

30.     As the Debtors explained in their first day critical vendor motion,[11] courts in the Third Circuit and elsewhere generally recognize that debtors may pay not only claims for post-petition services and administrative claims, but may also pay prepetition claims that are essential to the continued operation of the debtor's business. *See, e.g., In re Meridian Auto. Sys.-*

PHIL1 4558893v.1

16

*Composite Operations, Inc.*, 372 B.R. 710, 714 (Bankr. D. Del. 2007) (granting the debtor authority to pay prepetition obligations owed to certain critical vendors); *In re Primary Health Sys., Inc.*, 275 B.R. 709, 710 (Bankr. D. Del. 2002) (allowing payment of prepetition wages upon a finding that such relief was "essential to the continued operation of the Debtors' businesses"); *In re Just for Feet, Inc.*, 242 B.R. 821, 824-45 (Bankr. D. Del. 1999) (noting that debtors may pay prepetition claims that are essential to the continued operation of the debtor's business). Courts have relied on several legal bases in approving such relief.

31.    Courts generally recognize that debtors may pay prepetition (and post-petition) claims under section 363(b) of the Bankruptcy Code where there is a sound business purpose for the payment of such obligations, and where there is a "business justification, other than the mere appeasement of major creditors." *See, e.g.*, *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (granting debtor authority to pay prepetition wages); *Armstrong World Indus. Inc. v. James A. Phillips, Inc.*, (*In re James A. Phillips, Inc.*), 29 B.R. 391, 398 (Bankr. S.D.N.Y. 1983) (granting the debtor the authority to pay prepetition claims of suppliers who were potential lien claimants).

32.    Courts also recognize that current payments to prepetition creditors – let alone for post-petition services or administrative claims – are appropriate pursuant to section 105(a) of the Bankruptcy Code under the "doctrine of necessity" or the "necessity of payment" rule where such payments are necessary to the continued operation of the debtor's business. *See, e.g.*, *In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor); *In re Penn Cent. Transp. Co.*, 467 F.2d 100, 102 n.1 (3d Cir. 1972)

---

[11] Paragraphs 30-32 hereof are taken essentially verbatim from the Motion of Energy Future Holdings Corp., et al., For Entry Of Interim And Final Orders Authorizing The Debtors To Pay Prepetition Critical Vendor

17

(holding that the necessity of payment doctrine permits "immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims have been paid"); *In re Friedman's, Inc.*, No. 09-10161 CSS, 2011 WL 5975283, at *3 (Bankr. D. Del. Nov. 30, 2011) ("[M]ost courts will allow such payments [of prepetition claims] under the 'doctrine of necessity,' if the debtor establishes that in its business judgment making such payments is critical to the survival of the debtor's business"); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191-92 (Bankr D. Del. 1994) (noting that debtors may pay prepetition claims that are essential to the continued operation of the debtor's business). The rationale for the necessity of payment rule – the rehabilitation of a debtor in reorganization cases – is "the paramount policy and goal of Chapter 11." *Ionosphere Clubs*, 98 B.R. at 176; *Just for Feet*, 242 B.R. at 826 (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization.").

33.     Applying these principles, Courts have authorized a debtor to pay a creditor's professional expenses where there is good business reason to allow the transaction, and the payment is "in the best interests of the Debtors and all parties in interest." *United States Trustee v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp.)*, No. 02 CIV. 2854 (MBM), 2003 WL 21738964, at *12 (S.D.N.Y. July 28, 2003). In fact, in these Chapter 11 Cases, this Court previously entered an order authorizing the Debtors to pay certain necessary post-petition expenses of the Public Utility Commission of Texas and the Electric Reliability Council of Texas on similar grounds in connection with their anticipated active participation in these Chapter 11 Cases. [Docket No. 785]

34.     In fact, it would seem on its face to be less of a stretch under Bankruptcy Code sections 105(a) and 363(b) to authorize payment of post-petition, charging lien-secured,

Claims [Docket No. 29].

indenture trustee fees and expenses, which are certain to be ultimately paid, than is payment of pre-petition critical vendor claims, which, if not paid as such, could go largely or wholly unpaid as ordinary general unsecured claims.

## NOTICE

35.     The Movant has provided notice of this Motion on the date hereof via first class mail to: (a) counsel to the Debtors; (b) the United States Trustee; (c) counsel to the Original Committee; (d) counsel to the E-Side Committee; and (e) those parties that have requested notice pursuant to Bankruptcy Rule 2002. The Movant submits that, in light of the nature of the relief requested, no other or further notice need be given.

**WHEREFORE**, the Movant respectfully requests that the Court enter an order, substantially in the form attached hereto, authorizing Debtor EFIH (i) to reimburse on a current basis the reasonable fees and expenses of UMB, as EFIH Unsecured Indenture Trustee, and certain of its professionals listed in Exhibit B incurred at least to, and including, December 31, 2014 and (ii) to reimburse UMB, as EFIH Unsecured Indenture Trustee, and certain of its professionals after December 31, 2014, going forward, all in accordance with the terms of the Indentures, and granting the Movant such other and further relief as is just and proper.

19

Dated: May 8, 2015
      Wilmington, Delaware

By: */s/ Sean M. Brennecke*_____
Raymond H. Lemisch (DE Bar ID No. 4204)
Sean M. Brennecke (DE Bar ID No. 4686)
KLEHR HARRISON HARVEY
BRANZBURG LLP
919 Market Street, Suite 1000
Wilmington, Delaware 19801
Tel: (302) 426-1189
Fax: (302) 426-9193
E-mail: rlemisch@klehr.com
       sbrennecke@klehr.com

-  and

Harold L. Kaplan
Mark F. Hebbeln
Lars A. Peterson
FOLEY & LARDNER LLP
321 North Clark Street, Suite 2800
Chicago, IL  60654-5313
Tel: (312) 832-4500
Fax: (312) 832-4700
E-mail: hkaplan@foley.com
       mhebbeln@foley.com
       lapeterson@foley.com

Attorneys for UMB BANK, N.A.,
as indenture trustee

20