Page 1

1    UNITED STATES BANKRUPTCY COURT
2    DISTRICT OF DELAWARE
3
4    In re:                          :
                                     :    Chapter 11
5    ENERGY FUTURE HOLDINGS          :
     CORP.,  et al.,                 :    Case No. 14-10979 (CSS)
6                                    :
              Debtors.              :    (Jointly Administration
7    _____:    Requested)
     DELAWARE TRUST COMPANY as       :
8    INDENTURE TRUSTEE,              :
                                     :
9              Plaintiff,            :
                                     :
10       v.                          :    Adv. Proc. No.
                                     :    14-50363 (CSS)
11   ENERGY FUTURE INTERMEDIATE      :
     HOLDING COMPANY LLC and EFIH    :
12   FINANCE INC.                    :
                                     :
13            Defendants.            :
     _____:
14   ENERGY FUTURE INTERMEDIATE      :
     HOLDING COMPANY LLC and EFIH    :
15   FINANCE INC.                    :
                                     :
16            Plaintiffs,            :
                                     :
17       v.                          :    Adv. Proc. No.
                                     :    14-51002 (CSS)
18   UMB BANK, N.A., as INDENTURE    :
     TRUSTEE,                        :
19                                   :
              Defendant.            :
20   _____:
21                                   United States Bankruptcy Court
22                                   824 North Market Street
23                                   Wilmington, Delaware
24                                   May 4, 2015
25                                   9:41 a.m. - 3:45 p.m.

Page 2

```
 1   B E F O R E :

 2   HON CHRISTOPHER S. SONTCHI

 3   U.S. BANKRUPTCY JUDGE

 4

 5   ECRO OPERATOR:  LESLIE MURIN

 6

 7   HEARING re Motion of Energy Future Holdings Corp., et al.,

 8   for Entry of an Order (A) Setting Bar Dates for Filing Non-

 9   Customer Proofs of Claim and Requests for Payment Under

10   Section 503(b)(9) of the Bankruptcy Code, (B) Approving the

11   Forum of and Manner for Filing Non-Customer Proofs of Claim

12   and Requests for Payment Under Section 503(b)(9) of the

13   Bankruptcy Code, and (C) Approving Notice Thereof [D.I.

14   1682; filed July 23, 2014]

15

16   HEARING re Motion of Pallas Realty Advisors, Inc. for Entry

17   of an Order Extending the Deadline to File Proof of Claim,

18   or Alternatively Allowing Late-Filed Proof of Claim [D.I.

19   2602; filed October 28, 2014]

20

21   HEARING re Motion of Energy Future Holdings Corp., et al.,

22   for Entry of an Order Authorizing Luminant Generation

23   Company LLC to Reject a Water Contract with Tarrant Regional

24   Water District, Effective Nunc Pro Tunc to the Petition Date

25   [D.I. 2662; filed October 30, 2014]
```

Page 3

1    HEARING re Debtors' First Omnibus (Non-Substantive)

2    Objection to (Amended and Superseded, Exact Duplicate, and

3    Insufficient Documentation) Claims Pursuant to Section

4    502(b) of the Bankruptcy Code, Bankruptcy Rules 3001, 3003,

5    and 3007, and Local Bankruptcy Rule 3007-1 [D.I. 2808; filed

6    November 18, 2014]

7

8    HEARING re Debtors' Third Omnibus (Non-Substantive)

9    Objection to (No Supporting Documentation) Customer Claims

10   Pursuant to Section 502(b) of the Bankruptcy Code,

11   Bankruptcy Rules 3001, 3003, and 3007, and Local Bankruptcy

12   Rule 3007-1 [D.I. 2992; filed December 12, 2014]

13

14   HEARING re Debtors' Fourth Omnibus (Substantive) Objection

15   to Certain Substantive Duplicate and No Liability Claims

16   Pursuant to Section 502(b) of the Bankruptcy Code,

17   Bankruptcy Rules 3001, 3003, and 3007, and Local Bankruptcy

18   Rule 3007-1 [D.I. 2994; filed December 12, 2014]

19

20   HEARING re Debtors' Sixth Omnibus (Non-Substantive)

21   Objection to (Insufficient Documentation) Claims Pursuant to

22   Section 502(b) of the Bankruptcy Code, Bankruptcy Rules

23   3001, 3003, and 3007, and Local Bankruptcy Rule 3007-1 [D.I.

24   3212; filed January 9, 2015]

25

1    HEARING re Debtors' Seventh Omnibus (Substantive) Objection

2    to Certain No Liability Claims Pursuant to Section 502(b) of

3    the Bankruptcy Code, Bankruptcy Rules 3001, 3003, and 3007,

4    and Local Bankruptcy Rule 3007-1 [D.I. 3218; filed January

5    9, 2015]

6

7    HEARING re Debtors' Eighth Omnibus (Non-Substantive)

8    Objection to (Insufficient Documentation) Claims Pursuant to

9    Section 502(b) of the Bankruptcy Code, Bankruptcy Rules

10   3001, 3003, and 3007, and Local Bankruptcy Rule 3007-1 [D.I.

11   3381; filed January 27, 2015]

12

13   HEARING re Debtors' Tenth Omnibus (Substantive) Objection to

14   (Certain No Liability) Claims Pursuant to Section 502(b) of

15   the Bankruptcy Code, Bankruptcy Rules 3001, 3003, 3007, and

16   Local Bankruptcy Rule 3007-1 [D.I. 3473; filed February 6,

17   2015]

18

19   HEARING re Motion of the Ad Hoc Group of TCEH Unsecured

20   Noteholders for Entry of an Order Granting Standing and

21   Authority to Commence, Prosecute, and Settle Certain Claims

22   for Declaratory Judgment, Avoidance and Recovery of Liens,

23   Security Interests, Obligations, Fees, and Interest

24   Payments, and Disallowance of Claims (Sealed) [D.I. 3596;

25   filed February 19, 2015]

1    HEARING re Motion of the EFH Official Committee for Entry of

2    an Order Granting Derivative Standing and Authority to

3    Prosecute and Settle Claims on Behalf of the LUmimnant

4    Debtors' Estates [D.I. 3605; filed February 19, 2015]

5

6    HEARING re Debtors' Twelfth Omnibus (Non-Substantive)

7    Objection to (Insufficient Documentation) Claims Pursuant to

8    Section 502(b) of the Bankruptcy Code, Bankruptcy Rules

9    3001, 3003, and 3007, and Local Bankruptcy Rule 3007-1 [D.I.

10   3896; fled March 13, 2015]

11

12   HEARING re Motion of Energy Future Holdings Corp., et al.,

13   for Entry of an Order Authorizing Luminant Energy Company

14   LLC to Reject a Certain Executory Contract with Cloud Peak

15   Energy Resources, LLC, Effective Nunc Pro Tunc to March 24,

16   2015 [D.I. 3961; filed March 24, 2015]

17

18   HEARING re Debtors' Fourteenth Omnibus (Substantive)

19   Objection to (Certain Substantive Duplicate, No Liability,

20   and No Claim Asserted) Claims Pursuant to Section 502(b) of

21   the Bankruptcy Code, Bankruptcy Rules 3001, 3003, and 3007,

22   and Local Bankruptcy Rule 3007-1 [D.I. 4050; filed April 2,

23   2015]

24

25

1   HEARING re Debtors' Fifteenth Omnibus (Non-Substantive)

2   Objection to (Insufficient Documentation) Claims Pursuant to

3   Section 502(b) of the Bankruptcy Code, Bankruptcy Rule 3001,

4   3003, and 3007, and Local Bankruptcy Rule 3007-1 [D.I. 4052;

5   filed April 2, 2015]

6

7   HEARING re Motion for Entry of an Order Authorizing Energy

8   Future Holdings Corp., et al, to File Redacted Portions of

9   Stipulation and Agreed Order Regarding the Adjournment of

10   Standing Motions Under Seal [D.I. 4139; filed April 14,

11   2015]

12

13   HEARING re Debtors' Thirteenth Omnibus (Non-Substantive)

14   Objection to (Insufficient Documentation) Claims Pursuant to

15   Section 502(b) of the Bankruptcy Code, Bankruptcy Rules

16   3001, 3993, and 3007, and Local Bankruptcy Rule 3007-1 [D.I.

17   4003; filed March 27, 2015]

18

19   HEARING re Motion of Energy Future Holdings Corp., et al.,

20   for Entry of an Order Scheduling Certain Hearing Dates and

21   Deadlines and Establishing Certain Protocols in in

22   Connection with the Confirmation of Debtors' Plan of

23   Reorganization and the Approval of Debtors' Disclosure

24   Statement [D.I. 4138; filed April 14, 2015]

25

Page 7

1   HEARING re Plaintiff-Trustee's Motion to Alter or Amended

2   Judgment to Clarify that the Order Dated March 26, 2015 is

3   not a Final Judgment [D.I. 4065/Adv. D.I. 254; filed April

4   6, 2015]

5

6   HEARING re Adversary Complaint for Declaratory Judgment of

7   Energy Future Intermediate Holding Company LLC and EFIH

8   Finance Inc. [D.I. 3039/Adv. D.I. 1; filed December 16,

9   2014]

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Transcribed by:  Sonya Ledanski Hyde

2    A P P E A R A N C E S :

3

4    KIRKLAND & ELLIS LLP

5           Attorneys for Debtors (EFIH)

6

7    BY:  EDWARD SASSOWER, ESQ.

8        MARK MCKANE, ESQ.

9        MICHAEL PETRINO, ESQ.

10       MICHAEL KIESELSTEIN, ESQ.

11       ANDREW MCGAAN, ESQ.

12       JASON M. MADRON, ESQ.

13       CHAD J. HUSNICK, ESQ.

14       BRIAN SCHARTZ

15       JAMES H.M. SPRAYREGEN

16       STEPHEN E. HESSLER

17       STEVEN N. SERAJEDDINI

18       APARN YENAMANDRA [TELEPHONICALLY]

19

20   MCELROY, DEUTSCH, MULVANEY & CARPENTER LLP

21       Attorneys for Texas Competitive Electric Holdings Comp.

22

23   BY:  DAVID PRIMACK

24

25

1    RICHARDS, LAYTON & FINGER

2          Attorneys for Energy Future Intermediate Holding Co.

3

4    BY:  JASON M. MADRON

5          MARK D. COLLINS

6          DANIEL J. DEFRANCESCHI

7

8    KLEHR HARRISON HARVEY BRANZBURG

9          Attorneys representing UMB Bank, N.A., as indenture

10

11   BY:  RAYMOND HOWARD LEMISCH, ESQ

12

13   U.S.  TRUSTEE

14

15   BY:  ANDREA SCHWARTZ

16

17   MORRISON & FOERSTER LLP

18          Attorneys for the TCEH Committee

19

20   BY:  CHARLES LATHAM KERR

21          LORENZO MARINUZZI

22          TODD M. GOREN

23          DANIEL J. HARRIS [TELEPHONICALLY]

24

25

1    COLE SCHOTZ

2

3        BY:  NORMAN RENICK

4

5    ROPES & GRAY LLP

6

7    BY:  KEITH H. WOFFORD

8        ROSS MARTIN

9

10    WILMER HALE

11

12    BY:  PHILIP ANKER

13

14    SEWARD & KISSEL

15        Attorneys for Wilmington Trust TCEH First Lien

16

17    BY:  ARLENE ALVES

18        MARK KOTWICK

19

20    PERKINS COLE LLP

21        Attorneys for Delaware Trust Co. TCEH First Lien

22

23    BY:  TINA MOSS

24

25

1   LANDIS RATH & COBB LLP

2        Attorneys for ALCO

3

4   BY:  MATTHEW B. MCGUIRE

5

6   MCKOOL SMITH

7        Attorneys for ALCO

8

9   BY:  PETER GOODMAN

10

11  NIXON PEABODY

12        Attorneys for American Stock Transfer

13

14  BY:  RICHARD C. PEDONE

15

16  FOX ROTHSCHILD LLP

17        Attorneys for TCEH ad hoc noteholders

18

19  BY:  JEFFREY SCHLERF

20

21  WHITE AND CASE

22        Attorneys for ad hoc group of TCEH unsecured notes

23

24  BY:  CHRIS SHORE

25        TOM LAURIA

1    MUNGER TOLLES & OLSON LLP

2         Attorneys for T side disinterested conflicts counsel

3

4    BY:  TOM WOLPER

5

6    KRAMER LEVIN NAFTALIS & FRANKEL LLP

7         Attorneys for Second Lien Indenture trustee

8

9    BY:  JOSHUA BRODY

10        JENNIFER SHARNET

11

12   PACHULSKI STANG ZIEHL & JONES

13        Attorneys for Second Lien Indenture trustee

14

15   BY:  LAURA DAVIS JONES

16

17   DRINKER BIDDLE & REATH LLP

18        Attorneys for Citibank

19

20   BY:  HOWARD A. COHEN

21

22   PATTERSON BELKNAP

23        Attorneys for Debenture as Trustee

24

25   BY:  DAN LOWENTHAL

```
 1   MORRIS JAMES

 2

 3   BY:  STEPHEN MILLER

 4

 5   AKIN GROUP

 6

 7   BY:  ROBERT BOLLER

 8

 9   MORRIS NICHOLS

10

11   BY:  DEREK ABBOTT

12

13   VENABLE

14        Attorneys for PIMCO

15

16   BY:  JAMIE EDMONSEN

17        JEFFREY SABIN

18

19   MORGAN LEWIS

20        Attorneys for PIMCO

21

22   BY:  CHRISTOPER CARTER

23

24

25
```

1    REED SMITH LLP

2         Attorneys for NY Mellon

3

4    BY:  KIMBERLY E.C. LAWSON

5

6    MCELROY, DEUTSCH, MULVANEY & CARPENTER

7         Attorneys for TCEH

8

9    BY:  AARON APPLEBAUM

10

11   SULLIVAN CROMWELL

12        Attorney for E side committee

13

14   BY:  ALEXA KRANZLEY

15        BRIAN GLUECKSTEIN

16        ANDREW DIETESCH

17

18   MONTGOMERY MCCRACKEN WALKER & RHOADS

19        Attorneys for E side committee

20

21   BY:  MARK FINK

22

23

24

25

```
1   PAUL WEISS

2        Attorneys for Ad Hoc committee TCEH

3

4   BY:  BRIAN HERMANN

5        JACOB ALBERTSON

6

7   YOUNG & CONOWAY

8        Attorneys for Ad Hoc committee TCEH

9

10  BY:  PAULINE MORGAN

11       RYAN BARTLEY

12

13  SHEARMAN & STERLING LLP

14       Attorneys for Deutsche Bank

15

16  BY:  NED SCHODEK

17

18  POTTER ANDERSON

19       Attorneys for Deutsche Bank

20

21  BY:  R. STEPHEN MCNAIL

22

23

24

25
```

1  BROWN RUDNICK

2        Attorneys for WSFS

3

4  BY:  JEFF JONAS

5

6  O'KELLY ERNST & BIELLI, LLC

7        Attorneys for EFH

8

9  BY:  DAVID KLAUDER

10

11  ASHBY & GEDDES

12        Attorney for WSFS

13

14  BY:  BILL BOWDEN

15

16  POISINELLI

17        Attorneys for UCC T side

18

19  BY:  SHANTI KATONA

20        JUSTIN EDELSON

21

22

23

24

25

```
 1   SEWARRD KISSEL

 2        Attorneys for Wilm Trust

 3

 4   BY:  ARLENE ALVES

 5        MARK KOTWICK

 6

 7   BLANK ROME

 8        Attorneys for Wilm Trust

 9

10   BY:  MICHAEL DEBAECKE

11

12   CHIPMAN & BROWN

13        Attorneys for EFIH

14

15   BY:  MARK OLIVERE

16

17   AKIN GROUP

18        Attorneys for EFIC

19

20   BY:  SCOTT ALBERINO

21        ABID QURESHI

22

23   ALSO PRESENT TELEPHONICALLY:

24   SCOTT L. ALBERINO

25   PHIL ANKER
```

1    ROBERT J. BOLLER

2    PEG A. BRICKLEY

3    PHILLIP E. BROWN

4    MABEL BROWN

5    STEPHEN BURNAZIAN

6    EMILY A. BUSSIGEL

7    CHRIS CARTY

8    JAE SEON CHOI

9    MARIA CHUTCHIAN

10    MARK A. CODY

11    KENT COLLIER

12    ADAM M. DENHOFF

13    MATTHEW DIAZ

14    IRA DIZENGOFF

15    STACEY DORE

16    MICHELLE DREYER

17    DAVID M. DUNN

18    CATHERINE EISENHUT

19    JON EMSWILER

20    BENJAMIN D. FEDER

21    BRADLEY FEINGERTS

22    JEFF FINGER

23    MOSHE FINK

24    MICHAEL FIRESTEIN

25    MARK FLANNAGAN

1    PATRICK FLEURY

2    BERET FLOM

3    JULIA FROST-DAVIES

4    CHARLES GARRISON

5    MEGGIE GILSTRAP

6    RICHARD GITLIN

7    SETH GOLDMAN

8    ERICA GOODSTEIN

9    MATTHEW R. GRAY

10    SAM GREENE

11    BRIAN GUINEY

12    DANIEL J. HARRIS

13    MARK F. HEBBELN

14    ANGELA K. HERRING

15    IAN HOLMES

16    NATASHA HWANGPO

17    ANNA KALENCHITS

18    JAMES KATCHADURIAN

19    CHRIS D. KENNY

20    MATTHEW KIMBLE

21    CHARLES KOSTER

22    MICHELE F. KYROUZ

23    MICHAEL LEE

24    ROBERT K. MALONE

25    JONATHAN D. MARSHALL

```
1    JEFF MARWIL

2    JAMES H. MILLAR

3    HAL F. MORRIS

4    NAOMI MOSS

5    JOANNA S. NEWDECK

6    JEFFREY M. OLINSKY

7    MEREDITH S. PARKINSON

8    MEREDITH PFISTER

9    JASON T. PRAGER

10   ABID QURESHI

11   JASON ROSELL

12   JEFF ROSENBAUM

13   ERIK SCHNEIDER

14   ANDREW SORKIN

15   JOHN W. SPIEGEL

16   KATHERINE STADLER

17   ROBERT J. TANNOR

18   MARK TAUB

19   ANDREW M. THAU

20   MARK K. THOMAS

21   AMER TIWANA

22   MATTHEW J. TROY

23   CARL TULLSON

24   MATTHEW UNDERWOOD

25   KEVIN M. VAN DAM
```

1    MICHAEL J. WALSH

2    BRADY C. WILLIAMSON

3    JULIA M. WINTERS

4    APARNA YENAMANDRA

5    JOSEPH ZALEWSKI

6    DANIEL ZAZOVE

7    LOUIS A. CURCIO

8    MARITA ERBECK

9    MATTHEW JACOBSON

10   TUVIA PERETZ

11   KENNETH MAIMAN

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              CLERK:  All rise.

3              THE COURT:  Please be seated.  Good morning.

4              MR. SASSOWER:  Good morning, Your Honor.  Edward

5       Sassower of Kirkland & Ellis LLP, on behalf of the debtors.

6              Your Honor, today we're going to dispense with the

7       usual status report.  First, because we've got a lot to get

8       through today and we're trying to be efficient.  But second

9       and most importantly, the status of the case isn't

10      necessarily implicated by the scheduling motion and so

11      whatever I would say at the outset would be redundant of

12      what Mr. (indiscernible) has to say in connection with the

13      scheduling motion.

14             So, with your permission we'd like to dive right

15      into the agenda and start with the scheduling motion.

16             THE COURT:  Okay.

17             MR. SASSOWER:  Thank you, Your Honor.

18             MR. KIESELSTEIN:  Good morning, Your Honor.  Mark

19      Kieselstein of Kirkland & Ellis on behalf of the debtors.

20      It's good to be before Your Honor again.

21             Your Honor, when we filed the scheduling motion we

22      did so with three primary objectives.  First, Your Honor,

23      was the establishment of a detailed litigation timeline that

24      would culminate in a confirmation trial starting on or about

25      November 18th 2015.

1              Second, Your Honor, we looked to establish

2    intermediate dates and a protocol for the conduct of the

3    trial itself and those items are largely what, as you'll

4    hear, not completely uncontested.  And third, Your Honor,

5    was the establishment of a T side focused mediation process

6    that fit snuggly within the timeline that I'm going to talk

7    about, but does not extend that timeline.

8              To be clear, Your Honor, the mediation is

9    something the debtors agreed to in the context of the

10   broader schedule.  Those things are inextricably bound up

11   from the perspective of the debtors.

12             Your Honor, with your indulgence in terms of

13   presenting the motion, Mr. McKane and I are going to perform

14   a duet.  I'm going to address the need for the schedule and

15   the appropriateness of this schedule within the broad

16   confines of this very large restructuring.  I'm going to

17   address certain of the very few objections that attack the

18   fundamental premises of having a schedule at all or raise

19   purely bankruptcy issues.

20             Mr. McKane, whose lot in life is to oversee the

21   pretrial proceedings and the trial itself, will speak to

22   what I'm going to refer to in legislative terms as the line

23   item vetos and pet riders the various parties have attempted

24   to attach to the scheduling order, either to modify or

25   augment that.  And Mr. McKane will also address any

Page 24

1    questions Your Honor has about the specific litigation

2    deadlines and if Your Honor would like, to walking you

3    through a red line of the latest version of the order.

4              Now, Your Honor, what prompted the filing of the

5    scheduling motion, of course, was the filing of plan itself.

6    That occurred on April 13the and was discussed by Mr.

7    Sassower at the April 14th hearing.

8              Now, Your Honor, the merits of the plan, the

9    sufficiency of the disclosure statement, none of those of

10   course are before the court today on this purely procedural

11   motion despite the efforts in some quarters to pull those

12   issues forward.  Suffice it to say the debtors believe that

13   their plan is comprehensive and holistic, far from the

14   placeholder plan as described in one of the objections.

15             But the scheduling motion, of course, is a natural

16   accompaniment to the plan and we filed it on the heels of

17   filing the plan itself and that I think addresses, to the

18   extent that needed addressing, the question of why we filed

19   when we did.

20             So let me turn to the merits of the motion itself,

21   Your Honor.  With respect to the scheduling motion, Your

22   Honor, there are things we hold to be self-evident.  First,

23   these are extraordinarily large Chapter 11 cases.  As Your

24   Honor noted, they come with extraordinarily large and

25   complex capital structures.  Second, to the extent that we

1    are unable to achieve a consensual plan, which of course is

2    our unwavering and overriding objective, a contested

3    confirmation hearing will be a multi-week trial with many

4    active participants, many fact witnesses, many experts, many

5    documents.  In short, complex litigation.

6              And third, complex litigation, whether in or out

7    of Bankruptcy Court, is almost invariably guided and

8    organized with the assistance of a pretrial or scheduling

9    order, an order that charts the trajectory and sets the

10   cadence of all the necessary steps to ensure the pretrial

11   process is orderly and not chaotic, that the matter is trial

12   ready and most importantly it does what trials are meant to

13   do, allow the trier of fact, Your Honor, the best possible

14   vantage point to render an informed decision on the issues.

15   For a trial such as this you don't just show you up on the

16   appointed date.

17             Now with these verities in mind, the debtor some

18   three months ago circulated a proposed timetable to

19   approximately 18 key stakeholders laying out our vision of

20   how the confirmation should play out -- document discovery,

21   fact witness discovery, experts, pretrial motions and the

22   conduct of the trial itself.

23             First, it was phrased in terms of X date plus T

24   days, but ultimately having filed our plan on April 13 we

25   filled in specific dates for each of those stages.  And our

1    goal in crafting the schedule was three-fold.  First was to

2    afford the parties in interest as much time as possible to

3    insure a full and fair opportunity to put the debtors to

4    their proof and to afford the debtors a fair opportunity to

5    read and react to the challenges that would be raised and

6    the schedule we propose is multiples of what the code

7    requires, of course, befitting a case of this magnitude.

8             Second, Your Honor, was to construct a schedule

9    that gives meaning and life to the exclusivity that the code

10   in the first instance, and Your Honor through extensions to

11   date and we hope additional extensions, afforded the

12   debtors.  What the schedule contemplates and what the

13   debtors believe its actions in this case amply merit is that

14   one clear shot that the calendar will allow to confirm the

15   plan it believes is a value maximizing path out of Chapter

16   11 and to do so before the case descends into a post-

17   exclusivity state of nature.

18            Your Honor, exclusivity without the practical

19   ability to put a plan before the Court prior to closing of

20   the window, that's just words on the page.  It's an illusory

21   promise without meaning.  And third, Your Honor, even if you

22   put exclusivity aside, the outsized administrative costs of

23   these cases, professional fees averaging close to $1 million

24   a day and that includes weekends and holidays, demands that

25   we all do what we can to expedite the conclusions of these

1    cases.  That is settlement currency going up the chimney on

2    a daily basis.

3          Add to that the incalculable opportunity costs

4    embedded in management and other key personnel having to

5    devote so much time and energy to this restructuring as

6    opposed to the core business.  We believe the logic

7    impelling a need for a rational schedule is all-consuming

8    and we believe our motion satisfies and reconciles of three

9    goals and does so in a way that comports with due process

10   and then some.

11         Finally, Your Honor, before I turn to the various

12   creditor responses it's important to recognize that the

13   debtors sought, indeed it's not an exaggeration to say,

14   badgered and implored all of the various stakeholders for

15   feedback.  Some chose to engage.  Others felt like they

16   would be dignifying a plan that they took strong issue with

17   and kept their powder dry.  But there were many

18   opportunities for folks to provide feedback.  For those who

19   provided feedback we thank them and we accepted much of the

20   feedback and worked it into the proposed order.

21         So, as with the plan itself, which of course is

22   again not before the Court today, we have done our level

23   best to talk with and not dictate to our stakeholders.

24   Everything in this case seems to have a gestation period of

25   a large land mammal and this was no exception.  So, we're

1    here as soon as we were able to get here, Your Honor, and

2    the time left is the time that is left.

3            Now let me first note, Your Honor, the parties who

4    either affirmatively support or do not object to our

5    schedule as well as the key protocols for conduct of the

6    trial itself.  Now to be clear, some of these parties have

7    raised the kind of line item veto and parochial rider issues

8    that Mr. McKane will address.  Some of those parties also

9    took the opportunity to take some jabs at the plan itself.

10   Against, that wildly premature in the context of this

11   procedural motion and those will be dealt with in the

12   fullness of time.

13           But the parties that accept the concept of a

14   rational schedule and one that is basically on our timetable

15   include the EFH Official Committee, the TCEH Official

16   Committee, the EFIH first lien holders, the EFIH second lien

17   ad hoc committee, the ad hoc commitment of the FIH PIC

18   holders, Fidelity, which is the largest holder of EFH bonds

19   and has been very active in these cases and last and

20   certainly not least, the TCEH first lien ad hoc committee.

21   And again, some of those folks affirmatively support, some

22   chose not to file objections, others have filed, again,

23   these specific line item type objections.

24           That's quite a cross section of our capital

25   structure and it's frankly an unheard of degree of consensus

1    in this case.  We don't ascribe that to our persuasive

2    powers, but to the obvious logic that impels the need for a

3    rational schedule.

4           That said, I did want to speak briefly to the

5    objection filed by the TCEH unsecured ad hoc group.  It's

6    the only group I'm aware of that asserts that there should

7    not be a schedule at all and in taking that position they

8    make a couple of assertions that, how do I put this

9    delicately, are counter factual, Your Honor.  First they say

10   that setting a schedule and moving on our plan will preclude

11   consideration of plan alternatives.  Preclude consideration

12   of plan alternatives.  That's pretty strong talk.  But it's

13   pretty much, as the whole civilized world knows and as Mr.

14   Sassower announced and I believe Mr. Shore confirmed at the

15   April 14th hearing, the debtors are working directly with

16   the TCEH unsecured ad hoc group and the TCEH committee on

17   the REIT-based plan alternative.  Now that work has only

18   intensified over the last few weeks.  It's my honor and

19   pleasure to talk with my friend Mr. Luria about that very

20   plan alternative on an almost daily basis.

21          And it's interesting because I first saw the

22   reference to the preclusion of plan alternative

23   consideration on Tuesday morning and I saw it while I was a

24   phone call with Mr. Luria considering plan alternatives.

25   That process is ongoing and active.  And I understand

1    rhetoric and poetic license and all the rest, but I'd be

2    very surprised if Mr. Luria or Mr. Shore stood up and told

3    this Court that the debtor and their advisors have been less

4    than fully engaged in and facilitative of consideration of

5    that REIT alternative.  And again, not because we're nice

6    guys, though we think we are, but because that transaction,

7    if it works -- emphasis on if -- could very well lead to a

8    fully consensual and comprehensive resolution of these cases

9    and any sane person working on these cases would fervently

10   desire that outcome.

11          But the transaction is complex.  I'm not going to

12   get into detail about it, Your Honor, but suffice it to say

13   there are many aspects to it that we are in the process of

14   exploring and it may pan out and it may not.

15          Now we actually believe the debtor with

16   exclusivity could put on blinders, could pursue confirmation

17   of its plan on the table to the exclusion of all others,

18   exclusion being kind of the root of exclusivity, and

19   nevertheless be entitled to exactly the sort of procedural

20   relief we seek today.  But I can confidently represent to

21   the Court that is not what these debtors or their advisors

22   are doing and we will continue to devote the time and the

23   resources necessary to fully vet that alternative.  Again,

24   it may prove out, it my fizzle out, but if it's the latter

25   it will not be because it is territory the debtors refuse to

1    explore.

2              In sum, Your Honor, we not only can, we must and

3    we will consider plan alternatives as we move down the path

4    for its confirmation of our final plan.  There is more than

5    enough legal and financial talent in these cases to go down

6    multiple paths simultaneously, whether it's the Oncor sale

7    process, our filed plan or consideration of alternatives.

8              There are armies of lawyers on either sure, no pun

9    intended, Your Honor, who can handle this and many other

10   initiatives at the same time.

11             Now the second thing that the TCEH ad hoc has

12   asserted was that the file plan is such a placeholder that

13   it doesn't merit being braced with a schedule.  We believe

14   that's also counter factual.  Your Honor, the file plan

15   provides for a specific resolution of all claims against the

16   debtors and is flexible enough to accommodate a number of

17   Oncor sale and disputed make whole and interest rate

18   outcomes.  It offers settlements on those disputed claims.

19             Now it is true that a couple of the key numbers

20   are blank or TBD, but those numbers were removed not because

21   they are unknown or because the debtor has failed to develop

22   a position on those numbers.  Instead they were removed at

23   the specific request of various T side stakeholders.

24             For instance, the amount of the guaranteed

25   distribution to the T unsecured and T second lien creditors

1   is blank in the plan.  That amount, which under our

2   conception of the plan, would be paid regardless of the

3   outcome of the Oncor sale process or the E side make whole

4   and contract rate disputes was quantified by the debtors in

5   a draft plan that was distributed on a confidential Rule 408

6   basis to the key stakeholders on April 3rd.

7           Not surprisingly, the T first thought the number

8   was outrageously high and the unsecureds and second liens

9   thought it was insultingly low.  Such is life in Chapter 11.

10  That will no doubt be an issue for the mediator to deal

11  with.

12          Similarly, Your Honor, the plan provides for a

13  $700 million allowed claim of TCEH against EFH.  That number

14  was negotiated, not by Kirkland or by Evercore, but by and

15  among the disinterested directors for TCEH and EFH with the

16  assistance of their legal and financial advisors.

17          Now the T side allocation of the proceeds of

18  recoveries on that claim is also something that the T side

19  parties asked us to remove from the filed plan so they could

20  have an opportunity to work it out amongst themselves, a

21  request we were happy to comply with at least for now.  And,

22  again, presumably with the assistance of the mediator they

23  will attempt to hammer that out.  None of that makes this a

24  placeholder plan.  It is anything but.

25          I wanted to turn my attention to the EFH committee

1    pleading.  Again, they support the concept of a schedule as

2    I read their statement, but they want to attach a couple of

3    what in our view are unworkable and incoherent strings to

4    the schedule they otherwise support.

5              First, Your Honor, they insist that the

6    intercompany claim settlement between the disinterested

7    directors be put to this Court for its consideration at a

8    much earlier stage of the proceedings.  Now, aside from

9    being an inappropriate imposition on the debtors' exclusive

10   right the propose and pursue a plan of its choosing, it

11   would actually wrench a key component of the plan out of the

12   larger plan and force a trial at an earlier stage which

13   would completely disrupt the schedule that we propose.

14             There's no legal basis to force a debtor to front

15   run a settlement rather than have it considered in the

16   context of the larger plan.  Now the E committee will have

17   its day or weeks in court and the disinterested directors,

18   with their advisors, will then have to defend the propriety

19   of that interdebtor settlement from the perspective of each

20   of their individual estates.

21             Now I get that the E committee is chomping at the

22   bit to have at that settlement.  I can tell you that the T

23   committee and the T side creditors don't purport to be any

24   happier about that resolution than does the E committee, but

25   there is no basis in the case law for advancing that piece

1   of the case to the exclusion of the rest anymore than it

2   would make sense to front run valuation, best interests or

3   anything else that's a key hurdle for confirmation of this

4   plan.

5           Second, Your Honor, the E committee insists --

6   well, first, Your Honor, the E committee derides the

7   disinterested directors' settlement as illusory because each

8   of the disinterested directors have the fiduciary out.  Now

9   I'm not sure what that has to actually do with the

10  scheduling motion, but it was something they spent a fair

11  amount of time on.

12          Now of course we think that objection really

13  doesn't matter much nor is it of great moment because that

14  settlement is between fiduciaries.  It's between

15  disinterested directors of Chapter 11 debtors, whether

16  implicitly or explicitly they always have a fiduciary out to

17  reserve the right to change their minds and withdraw from a

18  settlement if circumstances materially change in their view.

19  That doesn't make it illusory.  That makes it subject to

20  what every Chapter 11 debtor has which is the prerogative to

21  step back, reconsider and do something that is better for

22  their stakeholders.

23          This is not like the settlement between a debtor

24  and a third-party.  If we had to deal with a third party and

25  they had the right to simply step away from the settlement,

1    I would understand the E committee's concerns.  But that's

2    just part and parcel of interdebtor settlements.

3              Finally, Your Honor, the E committee insists that

4    a bar date be set for the filing of intercompany proofs of

5    claim.  Now as we've said in our papers and we've cited

6    Kaiser and other cases, there is no requirement that proofs

7    of claim be filed for intercompany claims or that the lack

8    of a bar date would somehow preclude settlement of those

9    intercompany claims.  In fact, de rigueur for Chapter 11

10   debtors not to have bar dates applied to intercompany claims

11   because it can create a chaotic situation.

12             Now we know that Mr. Deitderich and the E

13   committee have already filed an objection to the scheduled

14   claim, the tax claim of the T estate versus EFH and clearly

15   what's going on here is that the E committee would like a

16   bunch of proofs of claim to be filed so they can objective

17   to them in the near-term and try to hijack the process and

18   have each of those claims dealt with on the merits, even

19   though they are the subject of a pending settlement that

20   lies at the heart of the debtors' filed plan, which of

21   course has been filed during our exclusivity period.  So we

22   see that as an end run around exclusivity.

23             I'm sorry.  So, one last thing, Your Honor, before

24   I hand it over to Mr. McKane.  Your Honor, we know there's a

25   degree of presumption in bringing a schedule, even one if it

1  were fully consensual to Your Honor as if it is a fate

2  accompli.  Your Honor's availability trumps all.  Those

3  facing this way are all fungible more or less, but there's

4  only one you, Your Honor and when I say you I mean your

5  chambers, your staff, your clerks and obviously any

6  adjustments that are required we will of course all

7  accommodate and I didn't mean to, again, have this schedule

8  be some sort of dictate to the Court.

9         So, Your Honor, unless you have questions for me

10  on my part of the presentation I would hand it over to Mr.

11  McKane.

12         THE COURT:  I have no questions.

13         MR. KIESELSTEIN:  Thank you.

14         MR. MCKANE:  Good morning, Your Honor.  For the

15  record Mark McKane of Kirkland & Ellis.  I have a

16  demonstrative that may aid the Court in reviewing the

17  schedule.  May I approach?

18         THE COURT:  Yes.  Thank you.  Can we have a copy

19  for Ms. (indiscernible)?

20         MR. MCKANE:  Yes I do.  I apologize about that.

21  Your Honor, picking up where Mr. Kieselstein left off, I

22  will address some of the line item modifications that have

23  been requested by some of the objectors.  But before I do

24  so, the debtors have resolved some of the objections and I

25  would like to highlight in particular that with respect to

1   the EFIH second lien indentured trustee the debtors have

2   made an agreement to take good faith efforts to file

3   additional information regarding the E side debtors by June

4   10th of this year in furtherance of 1125 of the Bankruptcy

5   Code and make certain other revisions in connection with the

6   disclosure statement hearing and order and at the

7   appropriate time if you'd like I can highlight where those

8   provisions are in the red line.

9           With that there are six objections that seek line

10  item modifications to the scheduling order and we request

11  that the Court overrule all those objections.  First, the E

12  side committee seeks the inclusion of a separate discovery

13  workstream on the valuation of the TCEH debtors' estates as

14  part of the disclosure statement hearing.  Now this is not

15  the first time in these proceedings that parties have

16  attempted to raise valuation issues before a confirmation

17  hearing, but as we've addressed this before, we believe that

18  enterprise valuation, specifically T side enterprise

19  valuation, is appropriate at confirmation, that this issue

20  is premature, especially at a schedule order, but also

21  premature at the disclosure statement stage.  We'll address

22  it then to the extent that the E side committee attempts to

23  take discovery at the disclosure statement stage, but

24  nonetheless our position is that is absolutely a

25  confirmation issue, certainly not a scheduling issue and

1    definitely not a disclosure statement issue either.

2            The second issue for a line item modification

3    comes from the EFH note indenture trustee and there the EFH

4    note indenture trustee seeks a collateral attack on the bid

5    procedures order.  We view that as frankly highly improper.

6    As the Court recalls probably from the disclosure statement

7    hearing, there was a significant dispute about --

8            THE COURT:  Bid procedures?

9            MR. MCKANE:  I'm sorry.  You're absolutely right.

10   The bid procedures here.  You're way ahead of me, Your

11   Honor.

12           You may recall that creditor constituencies at

13   that bid procedures hearing fought aggressively to find out

14   who would be let in under the tent during the auction

15   process and as a result of that hearing, the Court entered

16   an order that specifically stated that official committees

17   only would be allowed and their professionals' eyes only

18   basis and that was an important part of the order.

19           The filing of a plan is not a justification for

20   modifying that heavily negotiated order and we believe that

21   there is no basis to modify that order at this time.  We

22   would note that in addition to the EFH note indenture

23   trustee, the EFH committee filed a similar motion on April

24   23rd and sought expedited hearing of that motion.  Your

25   Honor denied that expedited timing.  That is scheduled to be

1    heard, Your Honor, I believe at the next omnibus hearing.

2    But nonetheless, for today's purposes we view there's no

3    basis to modify the bid procedures order because of the

4    filing of a scheduling order.

5           The third issue, Your Honor, as the EFH notes

6    indentured trustee attempts to raise or interject the make

7    whole issues that they have with a separate part of the

8    schedule.  Your Honor, we view that as unnecessary and

9    inappropriate, but we all acknowledge that there are

10   additional adversary proceedings that are ongoing as it

11   relates to make whole and post-petition interest issues and

12   if the EFH notes indentured trustee wants to tee up an

13   adversary proceeding to somehow advance their issues they

14   can do so, but there's no reason to modify the confirmation

15   scheduling order to do so and if it needs to be addressed at

16   confirmation we will do so at that time.

17          As you may have picked up from the motion that we

18   filed with the scheduling order, we have raised the issue of

19   sequencing the confirmation hearing and addressing it in

20   phases so that we present all of the evidence in different

21   parts.  We raised that issue with creditor constituencies

22   during that extenuated process that Mr. Kieselstein

23   discussed before filing the motion and we received good

24   positive feedback on that.

25          What we recommended is that at the initial pre-

1    trial conference we work and have meet and confers in

2    advance of that with creditor constituencies to discuss what

3    those phase ins may be and how we might better present the

4    evidence to Your Honor in a more comprehensive fashion to

5    enable you as the trier of fact to make your decisions and

6    any issues as it relates to whether a make whole issue a

7    post-petition interest issue on the E side needs to be tried

8    can be addressed at that time.  There's no need to modify

9    the scheduling order in advance to do so.

10              The fourth issue, Your Honor, relates to whether

11   modifications are appropriate to what are referred to as the

12   committee coordination provisions of the scheduling order

13   and that's specifically in paragraph 27 of the order.  The

14   (indiscernible) raised the issue as well as the TCEH ad hoc

15   group.  Your Honor, the coordination provisions in the

16   scheduling order come directly from the legacy discovery

17   protocol, that was the basis.  It worked well in legacy

18   discovery to have the official committee on the T side to

19   serve a coordinating function so as to avoid duplicative and

20   redundant discovery and that's all we're trying to do here.

21              Your Honor, the suggestion that somehow the

22   coordination procedures are an attempt to remove a

23   creditor's voice from the process are absolutely misplaced.

24   We are not trying to take any creditor's discovery rights

25   away from them.  We're simply trying to avoid redundancy and

1   duplication and, in particular, the expressed language of

2   paragraph 27 of the discovery order makes clear that we're

3   not precluding any unsecured creditors from seeking

4   permissible discovery on issues that aren't already covered.

5   If you can work toget -- we encourage people to work

6   together.  We encourage people to come to one set of

7   discovery requests, but if you have separate issues that

8   aren't covered by those requests there's nothing in the

9   scheduling order that prevents and unsecured creditor from

10   filing a separate set of requests.  We just wanted to make

11   that clear for the record.

12          The fifth set of issues, Your Honor, relates to

13   the TCEH ad hoc group and they have a number of line item

14   issues that they raised.  The first that I want to address

15   is that the TCEH ad hoc group urges the Court to "strike the

16   provisions in the proposed order that purport to strongly

17   encourage the parties from refrain and engaging in

18   discovery."

19          Your Honor, that language does not exist in the

20   order and that's not what we're trying to do.  No one wants

21   discovery for discovery's sake.  Mr. Shore acknowledges that

22   in the ad hoc group's opposition.  No one is trying to

23   remove their voice.  We are simply asking for coordination

24   and we believe that's all we've attempted to do.  And to the

25   extent that they need clarifying language, if they would

Page 42

1    propose it obviously we would consider it.

2            The TCEH ad hoc group also asked for four specific

3    revisions to the proposed order and they get fairly mundane,

4    but the first is whether there should be additional time

5    between the date by which responses are due to discovery and

6    objections to the disclosure statement and this is all

7    disclosure statement stage issues.

8            And frankly, Your Honor, we don't think additional

9    time is necessary because we put the disclosure statement

10   out, we have an extended period of time well beyond what is

11   required under the code before the disclosure statement

12   hearing occurs and we are actively soliciting feedback from

13   our creditor constituencies as to whether additional

14   modifications or clarifying language or additional

15   disclosure is appropriate and we want that language and we

16   frankly think the more that we encourage -- what we seek

17   from the Court is an encouragement that creditors get

18   feedback to us if they have it as soon as they have it.

19   There's no need for delay on those issues.

20           The second issue that the TCEH ad hoc group has

21   raised specifically relates to the fact that expert

22   discovery and fact discovery close on the same day and for

23   that the demonstrative that we provided Your Honor I think

24   helps to illustrate our response to that.  And this was

25   specifically negotiated with the TCEH official committee and

1    one of the issues that they had was do we have enough time

2    to accomplish everything.

3            So one of the things we wanted to highlight is we

4    have the document, if you're looking at the lines

5    vertically, the document discovery phase, the deposition

6    phase and the expert discovery phase you will see that they

7    are sequenced.  There is undeniably overlap between the fact

8    discovery phase and the expert discovery phase, but we put

9    this document discovery out starting in May with substantial

10   completion of document productions for those initial sets of

11   requests by July 10 and substantial completion by August

12   3rd.  Those dates are important so we're going to push the

13   documents out because the official committee took a

14   reasonable position that they want documents before they

15   take depositions.  And so working with them we said fine,

16   we'll start the depositions as soon thereafter the

17   substantial completion date as possible.  That's why

18   depositions start on July 17th.

19           They had a concern that if we stop depositions by

20   the date of the expert reports there may be some additional

21   depositions that will continue to be need to be taken.  No

22   problem.  We'll allow additional fact depositions to run all

23   the way through to the end of the period.  But then experts

24   pick up and expert reports are due on September 4th.

25           So what we have, Your Honor, is a period of time

1    where documents are going to be reviewed and produced

2    through May, June, July.  Depositions kick off in mid-July.

3    We've got July and August to get most of your fact

4    depositions done.  Then expert reports come in in September

5    and you have experts -- the primary expert discovery

6    thereafter.  All of this enables the heavy lifting of

7    confirmation to discovery to be done one month before trial

8    begins and then you have a contained set of pretrial process

9    as well.

10          All of these dates are subject to modification

11   under a good cause standard that we've added, you know, upon

12   the request of creditors after we filed it to make clear

13   that that is the standard to adjust any of these dates, but

14   it is undeniably a reasonable, rational way to attack the

15   complex litigation that we could have if consensus doesn't

16   break out.

17          Finally, Your Honor, the TCEH ad hoc group raises

18   a question about the date for motions to compel for document

19   discovery and if Your Honor refers back to the demonstrative

20   in the second row on document discovery you'll see that the

21   motion to compel date is in September.  It's September 9th

22   and the reason -- Your Honor, the reason why it is before

23   the end of discovery is this is motions to compel as it

24   relates to documents or, you know, document responses or the

25   sufficiency of the document productions.

1          It is appropriately after completion of documents,

2     well after responses are filed so that parties have at least

3     a month to evaluate and negotiate whether motions to compel

4     are necessary.  But then importantly, you have the

5     opportunity to rule and to the extent that any additional

6     productions or responses are necessary by any party in

7     interest, there's enough time to complete that work and get

8     that done before fact discovery closes at the end of -- I'm

9     sorry, the end on October 9th.

10          So, in other words, by having a motion to compel

11    date approximately one month before the end of fact

12    discovery, but after the date that documents are produced,

13    you have an opportunity to address any issues.  The parties

14    have an opportunity to meet and confer and resolve any

15    issues before they come to you, but if you were to order

16    additional materials we could address those and have those

17    done and not lose our schedule and that was the biggest

18    issue for us, Your Honor.  We don't want gamesmanship and

19    brinksmanship where motions to compel are filed in the final

20    days of fact discovery jeopardizing the November trial date.

21          Your Honor, those are the primary issues that we

22    wanted to address as it relates to the line item adjustments

23    that we've heard from the creditor constituencies.  There is

24    one other issue as it relates to an objection filed from

25    Alcoa.  My partner Mr. Schartz has been aggressively

1   attempting to see if we can resolve those issues and, Your

2   Honor, the feedback I received is that it's looking good.

3           So with that if there are additional points I need

4   to address maybe I can reserve some time on rebuttal for

5   that potentially, but other than that if you have any

6   questions I'm happy to answer them and as it relates to the

7   red lines I can cover those at a later point if you want to.

8           THE COURT:  Okay.

9           MR. MCKANE:  Thank you, Your Honor.

10          MR. SHORE:  Good morning, Your Honor, Chris Shore

11  from White and Case.  This morning we had asked the debtors,

12  and I understand the Court has been approached about

13  potentially having an in chambers status conference.  The

14  debtors wanted to make their presentation first, but didn't

15  necessarily disagree with the notion of having the chambers

16  conference.

17          Consistent with how we've addressed issues with

18  the Court in the past, there's a lot going on.  There's a

19  lot that underlays obviously what's going on today and we

20  think it would be very beneficial for the Court to have a

21  full understanding of what's going on without having to do

22  this in a public setting given the number of people who are

23  outside the process.

24          THE COURT:  Okay.  All right.  Any objection by

25  the debtors?

1          MR. KIESELSTEIN:  No, Your Honor, we don't object.

2     Whether it's necessary or not, if it's important to them

3     they can do it if you're comfortable doing it.

4          THE COURT:  Yeah.  All right.  We'll do that, but

5     it's going to be a limited group of people with a limited

6     number of people because I don't have space.  So, I'll hear

7     the debtors, both official committees, the ad hoc group of

8     first lien lenders, TCEH first lien lenders and the ad hoc

9     group of TCEH unsecured note holders and (indiscernible) in

10    the mediation room.  That's all I'm hearing.

11         MR. LEMISCH:  Your Honor, the EFH indentured

12    trustee requests to be included.

13         THE COURT:  Yeah, I said no.  Sit down.  No more

14    than two people per group and local counsel need not be

15    included.  They can be, but they need not be included.  So

16    we'll do that in the mediation room which is right down the

17    hall.

18         MS. SCHWARTZ:  Your Honor, may the U.S. Trustee

19    participate?

20         THE COURT:  No.

21         [BREAK FOR OFF RECORD CONFERENCE]

22         CLERK:  All rise.

23         THE COURT:  Please be seated.  Okay.  Let's

24    proceed.  So, who wants to be heard next?

25         MR. SHORE:  Are there any other parties in support

1    of the motion?

2           THE COURT:  I'm sure there are, or at least

3    resolved.  Thank you, Mr. Shore.

4           MR. HERMANN:  Good morning, Your Honor.  Brian

5    Hermann from Paul Weiss Rifkind Wharton & Garrison on behalf

6    of the ad hoc committee of TCEH first lien creditors.  I'll

7    be very brief.  We are supportive of the debtors'

8    scheduling, which includes mediation, which we are also

9    supportive of.

10          We think that the timeline in this case needs to

11   be expedited, and we think the debtors' proposed timeline

12   and scheduling order will do that.  We also believed, Your

13   Honor, that nothing in the debtors' scheduling motion

14   precludes other parties, including the ad hoc unsecured

15   creditors committee, from pursuing alternative transactions.

16          And so, we would encourage Your Honor to enter the

17   order approving the debtors' scheduling.  And, again, that

18   is not to be taken as any support for us for the debtors'

19   plan, which we are not supportive of.  But we think moving

20   the case forward at this point makes sense.  Thank you, Your

21   Honor.

22          THE COURT:  You're welcome.

23          MR. MARINUZZI:  Morning, Your Honor.  Lorenzo

24   Marinuzzi, Morrison & Foerster, on behalf of the official T

25   side committee.  Your Honor, we filed a statement of no

1    objection and limited reservation of rights in connection

2    with the scheduling order.  But that really arose out of an

3    amended and restated stipulation agreed order regarding the

4    adjourn of standing motions, which is a matter that's going

5    to be heard later this morning or this afternoon.

6              And, in that stipulation, which the committee

7    signed, as well as the debtors, there is an important

8    provision, which is Paragraph 5.  And that Paragraph 5 is

9    intended to facilitate the formulation of an alternative

10   plan.  And you'll hear a lot today, Your Honor, about the

11   alternative transaction that unsecured creditors on the T

12   side are actively pursuing.  I think embedded in the

13   document, and also embedded in the scheduling order, has to

14   be the debtors' commitment to consider the dates in good

15   faith, consider its obligations in good faith.

16             And I'll just give you one example and one of the

17   reasons why we've reserved our rights.  Now, we're not

18   opposed to the schedule.  The schedule is as agreed to.  Is

19   it perfect?  Is it everything we wanted?  No, but it was --

20   arose out of a compromise that had its genesis in the

21   stipulation regarding standing motions.

22             What's very important, when we look at, for

23   example, the demonstrative that the debtors provided during

24   their opening arguments, that there's overlap between the

25   discovery and the ultimate preparation of expert reports,

1    which have to be prepared and submitted on the 4th of

2    September.  And when that overlap was addressed by the

3    Court, the response was document production will start in

4    May, June, and July, and so you'll have documents from May,

5    June, and July that you can give to your experts to prepare

6    their reports.

7              I don't have a lot of confidence that all of the

8    documents necessary for the expert reports will be produced

9    in May, June, and July.  And so, there's an important

10   reservation of rights in the order itself for us to come

11   back to Court if we find ourselves in a position where we

12   get jammed with documents and are unable to actually prepare

13   what needs to be done, discovery, depositions, expert

14   reports, et cetera.

15             So, we expect that the debtors will in fact comply

16   with the deadlines and actually exercise the good faith that

17   we expect them to exercise, and produce the documents and

18   produce the witnesses that we request in a timely fashion.

19   Thank you, Your Honor.

20             THE COURT:  Thank you.

21             MR. BRODY:  Good morning, Your Honor.  Josh Brody

22   from Kramer Levin on behalf of Computer Share, as EFI second

23   lien indenture trustee.  As Mr. McKane mentioned, we had

24   worked out, for the most part, I think, the objections that

25   we had raised with respect to the motion, although I think

1    we're still working out a couple of the wonderful language

2    issues that I'm hopeful will get resolved while the rest of

3    the hearing is ongoing.

4            I just wanted to -- would be remiss if I didn't

5    get up and tell Your Honor the objection that we raised with

6    respect -- it's really primarily with respect to the

7    disclosure statements.  And obviously we have some concerns,

8    even though we've resolved our objections for today, we have

9    some concerns with the information that is currently out

10   there and whether or not -- you know, if the debtors

11   actually put the information out there and make it available

12   with an amended disclosure statement.

13           But when the actual disclosure statement hearing

14   comes around, when everyone's in a position to have really -

15   - review that information and make an assessment as to

16   whether or not it's appropriate, at least to the test under

17   11.25, which, again, assuming that we can work out this last

18   language issue today, then for today we're resolved.  I just

19   wanted to make sure Your Honor was aware that's still an

20   issue that's out there.  Thank you.

21           MR. DIETRICK:  Hello, Your Honor.  Andy Dietrick,

22   Sullivan & Cromwell, for the EFH official committee.  I

23   should follow form and say at the outset that we hate the

24   plan.  The plan is not confirmable as to EFH.  It gives away

25   half the value of EFH to the T side in order to buy releases

1    for insiders against T side claims.  An army of

2    disinterested directors couldn't fix it, in part because

3    those disinterested directors themselves are some of the

4    insiders being released.

5            But, before the Court today is just a scheduling

6    motion.  We had four comments with respect to the scheduling

7    motion.  First, not directly related to scheduling, a

8    mediation, plan mediation provisions have been included in

9    the order.  These grew out of a standing dispute in which we

10   had a small part.

11           The parties initially determined that mediation

12   couldn't be piecemeal on standing issues, and requested an

13   order which authorizes the mediator, quote, "to mediate

14   issues regarding the terms of the plan," close quote.  There

15   were changes to this order proposed shortly before the

16   hearing that we've not had time to fully review.

17           We have no objection to plan mediation.  Sometimes

18   it works.  However, all key stakeholders should be involved

19   in any mediation that touches the pieces of this puzzle.

20   This is particularly important given the confidentiality

21   provisions of paragraph 17 of the proposed order that

22   prohibit discovery and the admissibility of information from

23   the mediation.  The only way for us to know what's going on

24   there, and for it to be fair to EFH, is to be involved.

25           Second, we requested a binding settlement as a

1    prudential threshold of seriousness for this plan.  And this

2    plan, from EFH's perspective, is essentially just an inter-

3    silo settlement.  To correct my colleague Mr. Kieselstein,

4    we did not ask for an earlier trial on the settlement.  We

5    simply asked for it to be taken seriously by the companies

6    involved and to make it a binding deal.

7            For the current settlement, it is illusory.  It

8    doesn't have a fiduciary out.  It has a discretionary

9    walkaway.  The language does not say we can terminate if we

10   need to because of our fiduciary duties.  It says we can

11   terminate at any time if we want to, if termination is

12   consistent with our fiduciary duties.  And that's a big

13   difference.

14           The settlement can be changed for any reason at

15   any time, the night before the disclosure statement hearing,

16   the night before the confirmation hearing.  Meanwhile, EFH

17   continues to be involved in the pursuit of this joint plan,

18   spending hundreds of millions of dollars and spending six

19   months.

20           What we ask is not a commitment to the plan.  We

21   recognize the debtors need to discard this plan.  We hope

22   the debtors will discard this plan soon in favor of

23   something viable.  But we do think that, contingent on the

24   confirmation of the plan, a binding settlement is a

25   prudential threshold of seriousness.  And it should be

1    required for commencing costly litigation about the plan.

2          Third, also to correct Mr. Kieselstein, we did not

3    yet request a bar date for inter-silo claims.  We will move

4    separately for that, and the Court can consider our papers.

5    Today we only request a list of inter-silo claims that does

6    not include the words without limitation.  We believe this

7    can be delivered to us before the commencement of disclosure

8    statement discovery.  We believe a fair date is one week

9    from today.  The list must be comprehensive and it must be

10   complete.  Every current list we have seen is nonexclusive

11   and implies undisclosed reasons for this decision.

12         This discovery is critical because inter-silo

13   claims are very different from intercompany claims, from a

14   disclosure perspective and from a substantive perspective.

15   Billions of dollars of bonds traded hands in Reliance on the

16   separation of two credit silos, E and T.  The E bond papers

17   say E creditors have recourse to E.  The T papers say T

18   creditors have recourse to T.

19         Intercompany claims between TCEH and Luminant,

20   between Luminant and TXU Energy, those are expected and

21   conventional and normal.  Inter-silo claims, moving value

22   from one group of creditors to another group of creditors

23   who have no expectation of the intermingling of those

24   assets, in estates that are not substantively consolidated

25   but pure -- mainly jointly administered?  Those raise a

1    completely different level of seriousness.

2           And I strongly disagree with Mr. Kieselstein's

3    assertion earlier in Court that there's no reason to treat

4    these with the dignity of the procedures for third-party

5    claims.  From EFH's perspective, they are third-party

6    claims.  The proceeds are used to pay T side creditors.  And

7    we have to be as careful with the allowance of those claims

8    and of EFH's fate as we are with the allowance of make-

9    wholes and post-petition interest and any other claim.

10          This discovery is also critical because the inter-

11   silo claim question, how to move money from E to T to buy

12   releases for insiders, goes to the heart of the conflict in

13   the case.  It is a pure, actual conflict matter.

14          Fourth, we asked for a commitment to receive

15   valuation discovery now, not at confirmation.  Why?  Why

16   isn't valuation a confirmation issue as it is in every other

17   case?  The reason is because this entire plan -- indeed, the

18   debtors' approach to this entire case -- rests on the need

19   for a tax-free reorganization.  The debtors' pleadings and

20   statements to the Court underscore that.  We believe the

21   record for the disinterested directors underscores that.

22          The burning need to get a plan filed, and a joint

23   plan filed, and pursue that joint plan, because if we don't

24   there is tax Armageddon.  And the debtors' tax memo still

25   stands uncontroverted in the public record of this case,

1    that there is a $7 billion tax problem if these cases are

2    taxably deconsolidated.

3           On the day's facts, that's simply false.  Taxes

4    will be paid or not paid upon a taxable sale of TCEH, based

5    on its fair market value.  That fair market value has

6    plummeted during this case and continues to plummet.

7    Meanwhile, the net operating losses of EFH grow $100 million

8    a month, by estimate.

9           At this time, the debtors' own liquidation value

10   attached to the disclosure statement -- the debtors' own

11   midpoint liquidation value -- would result in no cash taxes

12   due to EFH upon a taxable deconsolidation of the estates.

13   Let's pause on that.  If the T side were liquidated

14   tomorrow, no cash taxes are due.  The only tax concern to

15   EFH would be a going concern reorganization that somehow

16   results in a fair market value above basis plus NOLs.

17          But even if this were possible, it is not in the

18   first instance EFH's problem, because any taxes due, in our

19   view, will be paid first by T subs selling those assets.  In

20   short, we believe it is currently highly unlikely that EFH

21   will have taxable gain.  No gain, no need to wait for the T

22   side to reorganize.  And many new plan options are available

23   to EFH itself.  No gain, no pain.

24          But we can't wait six months to find this out,

25   whether there is or is not a tax problem that continues to

1    handcuff these estates together.  We may be wrong.  There

2    may still be.  But we need to know.  And we need to know

3    now, as does anyone expected to read the disclosure

4    statement and make an informed decision.

5              Finally, just a point of confirmation for the

6    record:  we have an understanding with the debtors but would

7    like to confirm that nothing in the scheduling order

8    restricts the E committee and the T committee from

9    separately conducting discovery.  And I think that's been

10   agreed.  Pending questions, Your Honor, I'll cede the

11   podium.

12             THE COURT:  Thank you.

13             MR. PEDONE:  Good morning, Your Honor.

14             THE COURT:  Good morning.

15             MR. PEDONE:  Richard Pedone, representing American

16   -- with Nixon Peabody, representing American Stock Transfer

17   indentured trustee for all of the unsecured bonds at EFH.

18   Your Honor, I want to begin by looking at the relief

19   requested in the form of order.  The debtors are asking you

20   -- each debtor is asking you to make a factual finding that

21   the proposed procedures are in the best interest of each

22   estate.  That actually hasn't -- no evidence has been put

23   forward, and we don't believe that finding can be made.

24             That aside, we do believe that procedures should

25   be put in place, procedures designed with thoughtfulness to

1    bring this case to an end.  At the first day hearing, Mr.

2    Sassower spoke about the importance of avoiding sequencing

3    every step in these cases.  He spoke about the need to get

4    the RSA approved and move forward with multiple tasks at

5    once.

6              And, at its core, that is what I am looking for

7    and AST is looking for, an amendment to the proposed orders

8    for the procedures.  We have an army of lawyers, as Mr.

9    Kieselstein outlined, sitting on all shores, capable of

10   proceeding with multiple issues at once.  Your Honor, we

11   want procedures that will get us all the way through

12   confirmation.

13             These procedures are designed to put off one key

14   set of issues that need to be determined.  And that is:  do

15   the claims between silos, or more specifically between EFH

16   and the T side estates, have any merit?  Mr. Kieselstein and

17   Mr. McKane spoke in terms of settling claims.  Repeatedly,

18   they used the word, "claims."  The claims don't exist today.

19             If we take a look at the debtors' schedules, the

20   schedules, reviewed by the disinterested directors, filed in

21   accordance with Rule 9011 and in accordance with the

22   continuing obligation under Delaware law to update them,

23   don't reflect claims between estates.  These estates,

24   coordinated by Kirkland, with disinterested directors each

25   having retained counsel, or separate debtors having retained

1    counsel, don't yet have any public record of these claims,

2    $1 billion in claims that are proposed to be settled.

3         I say $1 billion because the plan that's been put

4    out provides for a cash transfer of over $700 million,

5    potentially increasing.  In addition, turning to the tax

6    issue, it provides for a recognition and a transfer of value

7    because of some tax attributes at the T side.  Illusory tax

8    attributes are not claims that can be settled.  Before we

9    get to a 9019 hearing on the settlement of claims, we need

10   the claims out there.

11        The Bankruptcy Code requires, mandates, 502, that

12   claims be filed.  It's not an option.  Accurate schedules

13   are not an option in the case.  Why?  Because the Code has a

14   balance of due process for all creditors to look at various

15   issues.  Debtors sign the schedules under oath.  Creditors

16   sign claims under oath.  And then parties can look at them

17   and evaluate them, and they can object to them, just as the

18   EFH committee objected to the one tax claim that was filed.

19        That's the process, and that's the due process all

20   parties are entitled to.  And if we ignore that process as

21   we set the procedures for the establishment of a plan of

22   reorganization and confirmation of a plan of reorganization,

23   we're heading for a potential train wreck in December that

24   is not going to actually solve the problem.  The claims have

25   to have merit before they can be settled.

1           So, the debtors spoke about possibly, at a

2    pretrial conference on the eve of confirmation, discussing

3    sequencing.  They haven't yet come to terms with the claims

4    need to actually be determined ahead of time to be settled.

5           But more importantly, you're establishing

6    procedures on a plan of reorganization that is going to give

7    an illusory, unproven, unsettled dollar amount the right to

8    vote.  How is there going to be voting on amounts that are

9    not yet claims?  The procedures have it backward.

10          Your Honor, I would also like to note that the

11   procedures before you and the record before you don't

12   actually recognize the procedures as a conflict matter.  We

13   believe that the procedures actually should be treated as a

14   conflict matter, and you should be hearing from each

15   separate estate that the procedures are in their best

16   interest.

17          So, what is the settlement amount?  As the Court

18   think about what is going to occur and be part of this 9019

19   proceeding at the end of this case, we need to at least look

20   -- and what are the right procedures to get there, we need

21   to look at what we're settling.  I believe it begins on page

22   104 of the disclosure statement.  There's a rough listing of

23   a few lines describing each of the issues to be settled.

24          At the crux of it is a $700 million cash transfer

25   from the EFH estate down to the T side to be broken up in a

Page 61

1    mediation, if they have a successful mediation.  And I just

2    make a note:  the fact that they now need to mediate what is

3    going to end up going into the plan shows how far this plan

4    is from being ready to be confirmed.

5          But the 700 million, it's cash that is going to be

6    sent from the EFH estate down to the T side.  And what is it

7    in recognition of?  It's not in recognition of any dollar

8    amount that was explained by Mr. Keglevic in his first-day

9    affidavit.  It's not in recognition of any dollar amount

10   that you can discern even remotely from any securities

11   filings, either before or after this case began.  You can't

12   figure out that these amounts either existed or could have

13   come into existence.

14          And, as I noted, it's not a dollar amount that's

15   in the schedules, and it's not a dollar amount that's in any

16   claim that has been filed.  This is an expedience payment.

17   This is the independent directors -- disinterested

18   directors, not independent -- disinterested directors

19   throwing up their hands and saying, "We do not believe the

20   Bankruptcy Court can come up with procedures to resolve the

21   merits of the claims.  So, despite the fact that we didn't

22   require SEC disclosure of the amounts, despite the fact that

23   we didn't schedule, we're going to throw $1 billion over to

24   the other side."

25          And I believe that, sitting here today, as this

1    Court looks to formulate procedures in an informed manner to

2    get us through to confirmation quickly, looking at that past

3    record of their failure to recognize the existence of the

4    claims, we can determine, and this Court should determine,

5    that getting to the goal line here requires driving at the

6    merits of those claims, forcing the determination of those

7    claims, both because the Bankruptcy Code requires it, due

8    process requires it, but also because, in my experience --

9    and I believe this Court has seen it -- when you get to the

10   eve of a hearing on the merits, let's say a claims hearing

11   in August, the parties are going to be forced to come to

12   terms with the merits of it.

13          Mr. Shore and the group of creditors who may

14   benefit from more money being thrown down on the T side will

15   be forced to come to terms with the committee at a hearing

16   on the merits of the claims.  Now, whether that is by

17   estimation, so that they could then be voted and perhaps the

18   procedures could work, or actually a hearing on the merits

19   to determine each of the claims sequentially in a rational

20   order, I believe that the process of getting at the merits

21   and driving at the merits and having a hearing on the merits

22   will lead to the end resolution of the case.

23          Your Honor, turning back to just some details on

24   supporting why, as a matter of law, the schedules need to be

25   updated as requested and the bar date must be set, Section

1   521 makes filing of claims mandatory.  The bar date order

2   that was entered simply relieved the debtors, or did not

3   impose the debtors, of an order to comply with the filing of

4   claims by a particular date, the general bar date that was

5   set.

6           In no way has this Court acted to relieve the

7   debtors of filing intercompany claims.  That requirement

8   still exists under the Bankruptcy Code.  And that would be

9   page four of the order that was entered.  As I mentioned,

10  Rule 911(b) applies, and the Delaware rules require --

11  Delaware rules of attorney conduct require that those

12  schedules actually be updated on an ongoing basis.

13          Your Honor, Bankruptcy Rule 3002 and 3003 -- 3003

14  requires specifically that a creditor, any creditor, must

15  file a proof of claim.  It's not optional.  I don't believe

16  the Court has authority to permanently relieve debtors that

17  hold claims against other debtors in estates that have not

18  been substantively consolidated -- can get out of that

19  obligation.  That's a requirement, Your Honor, and I would

20  also note that the joint administration, the heavily

21  litigated joint administration at order in this case does

22  not relieve the debtors of the obligation under the

23  Bankruptcy Code Rule 3002.

24          Your Honor, turning to specific amendments to the

25  order that we're looking for, first, it's a series of

1    requests, on page 13 of our objection, requiring each debtor

2    to file their intercompany claims, the debtors to amend the

3    schedules and statements of affairs, and, when they do so,

4    to not include the three- or four-page exculpatory statement

5    that Kirkland & Ellis has included for each debtor, which

6    basically says, "We kind of think these are what the

7    schedules should be."

8              We want clear, definitive statements under oath,

9    as required by the Bankruptcy Code, of what the claims are.

10   And then we also request the actual hearings on the claims

11   to be scheduled as part of the procedures for the summer.

12             Second, Your Honor, and I won't belabor the point

13   that committee counsel before -- we believe, before the

14   debtors proceed with a plan of reorganization, they actually

15   should have a binding settlement.  And that should occur

16   before disclosure.  Creditors deciding to vote on disclosure

17   should actually know that the settlement is final in some

18   sort.  Yes, we're in an unusual situation where it's a

19   debtor settling with a debtor, and each debtor has a

20   fiduciary out.

21             But if we separate from the fact that these are

22   inter-debtor -- and we have to, because the estates have not

23   been substantively consolidated -- and we say, "Okay, the T

24   creditors, do they have a settlement that is binding?"  if

25   we just look at the settlement and what will go out

1    disclosure from the perspective of EFH, our counterparty,

2    unlike any other settlement in the case that I've seen, is

3    not even remotely bound.  The T side directors have a

4    complete walkaway and out if they change their mind at any

5    point.

6            And that's not a settlement that is either right

7    for litigation, nor is it right for being included the

8    disclosure statement.  So, I believe that the procedures

9    should require that the settlement become right and binding

10   a sufficient period of time before we actually get to a

11   disclosure statement, so that we don't have a solicitation

12   process that is a train wreck.

13           Finally, Your Honor, an issue that still needs to

14   be determined, and I primarily just want to reserve our

15   rights on, is with regard to the make-whole claim issues at

16   EFH.  I hope the dollar values in these cases -- and, in the

17   course of the cases, lead and reserve all rights with regard

18   to those actually becoming right.  We objected to the

19   procedures not including that, because we believe it's

20   important to reserve our rights.

21           And it will be -- it could be a significant

22   material issue that needs to be resolved.  We think it

23   belongs in the procedures; if the debtors want it taken up

24   separately, that's fine.

25           And finally, Your Honor, with regard to our other

1    points, including receiving sufficient information

2    concerning the bidding process to actually make informed

3    decisions in this case, so that we know where things are

4    moving, I'd rely on the arguments in our papers.  Thank you,

5    unless the Court has any questions.

6            THE COURT:  No.

7            MR. QURESHI:  Good morning, Your Honor.  For the

8    record, Abid Qureshi, Akin Gump Strauss Hauer & Feld on

9    behalf of the EFIH unsecured pick noteholders.  Very

10   briefly, Your Honor, I have just one comment with respect to

11   the revised order, and that relates to mediation.  And my

12   comments echo what Your Honor heard from Mr. Dietrick.

13           I don't think that the revised language in the

14   order that the debtors circulated this morning quite

15   captures the issue.  But, simply put, to the extent that the

16   mediator, Your Honor, decides, as in his discretion in the

17   proposed order, to expand the scope of that mediation, and

18   should it be expanded to include issues that impact the E

19   side of the house, then we obviously think that it's very

20   important that E side constituencies, our committee

21   included, be at the table for that mediation.

22           And, I think equally importantly, Your Honor, I

23   think it's important that we be included from the outset of

24   any consideration of issues that are going to impact the E

25   side.  So, I think there just needs to be some clarity.  Is

1    this a mediation that's going to be confined to inter-T side

2    issues or not?  And, if not, the appropriate parties need to

3    be included at the right time.  Thank you, Your Honor.

4              THE COURT:  Thank you.

5              MR. SHORE:  Good morning, Your Honor.  Chris Shore

6    from White & Case on behalf of the ad hoc group of TCEH

7    unsecured notes.  I've got three points to make today.

8    First, that the Court is not required to address scheduling

9    of the disclosure statement hearing and confirmation hearing

10   now.  Second, that the Court should not address scheduling

11   now, particularly with respect to confirmation and

12   discovery, as opposed to disclosure statement issues.  And

13   third, if the Court enters the schedule, it needs

14   substantial modification from even what was presented to the

15   Court this morning.

16             Let me start by clarifying the record as to how we

17   got here, because it seems like everyone comes in here with

18   some amnesia.  The debtors filed a plan of proposed

19   disclosure statement on April 14th.  In their reply, they

20   call it this:  "The plan is the only comprehensive global

21   restructuring proposed to date in this case that has the

22   support of the debtors, including the disinterested

23   directors."

24             And then they acknowledge that possibility of a

25   hypothetical -- of a globally supported, value maximizing

1    alternative.  But they level the following criticism:  "All

2    creditors, including the TCEH ad hoc group, have had more

3    than a year to formulate and propose their own

4    restructuring."  That view fundamentally summarizes, in our

5    view, the fundamental problem with the entire motion.

6         First, the debtors cannot possibly have forgotten

7    about the RSA.  That was a global restructuring supported by

8    the boards of all of the debtors, including Mr. Sawyer and

9    Mr. [KREMINS?].  So, this is the second global restructuring

10   proposal that's been put on file.

11        And I'll remind the Court that that proposal put

12   on a plan that gave $8 billion of TCEH unsecured debt their

13   pro rata share of as little as $150 million.  In short, the

14   mere fact that the debtors have filed a plan does not mean

15   it is a good plan or one worth pursuing.

16        Second, it's not true to say that we did not

17   propose a plan for a year.  We had one very distinct plan

18   formulated and executed upon in the last year, stopped the

19   RSA in its tracks, and opened up this process to a more open

20   and fair distribution of value throughout the capital

21   structure.

22        That took time, effort, millions of dollars in

23   fees, and obviously created an unfortunate "us versus them"

24   dynamic that's played out in the Court. Hopefully, we're

25   getting past that, but we shouldn't lose sight of the fact

1    that the litigation created, based on the plan on file, more

2    than $800 million in value that did not exist for my

3    constituency.

4            Third, the debtors' plan on file is not really a

5    plan of reorganization in a real sense of the word.  It is

6    a, for lack of a better term, "the best we got right now

7    subject to a fiduciary out."  For a year, we've been

8    critical of the debtors' insistence on placing an arbitrary

9    stake in the ground and then defending their actions in

10   doing so with reference to a fiduciary out.  They did it

11   with the RSA; they did it with the bid procedures; they're

12   doing it now.  It's not right.

13           At heart, the strategy is based upon a faux-

14   Solomonic belief that, if one threatens harm to the estate,

15   the rightful claimant will appear and do the right thing.

16   We will, as we've said before, appear and do the right thing

17   here, and I'll get to that in a bit.  But we are not the

18   mothers of the estate.  Under Delaware law, the directors

19   and the officers are the ones with the duties to us, and

20   they are the ones required to do the right thing in the

21   first instance.

22           In short, the law does not permit them to act like

23   Solomon in the analogy.  It requires them to act like the

24   mothers, preserving value even if it is against their

25   personal interests.

1          So, if a REIT plan, which I'll talk about, takes

2     more time and requires them to work harder and stay in

3     longer and live with a little bit more lack of clarity, so

4     be it.  No one said it was going to be easy or without risk

5     or without controversy, or entirely predictable on a

6     regimented march.  But that's exactly what underpins the

7     motion.

8          All that's before the Court right now is the

9     debtors' statement.  They had a plan on file.  That plan has

10    no support.  That plan is not necessarily the value

11    maximizing option relative to other structures.  But it's

12    time to march.

13         And here's where it goes really wrong:  they try

14    to justify the march as follows, and this comes from page

15    eight of their reply.  Quote, "The scheduling order will

16    facilitate discussions by imposing structure and reliable

17    deadlines."  Essentially, the position taken by the debtors

18    is, "If we schedule the execution of the estates, the

19    mothers will show up with a plan."  It's totally backwards.

20         So, let me turn to the misconceptions in the

21    motion.  The Court is not required to enter an order now.

22    At paragraphs 26-30 of the motion, the debtors discuss

23    Federal Rule of Civil Procedure 16 and conclude that the

24    Court must, underlined, enter a scheduling order.  That's

25    wrong.

1           Rule 16 only applies in contested matters and

2     adversaries.  There's been no objection to the plan on file,

3     so you don't have a contested matter in front of you.  In

4     any event, Rule 16(b) gives the Court 90 days after the

5     appearance of the defendant -- in this case, the objectors

6     to the motions -- to enter a scheduling order.  We're not

7     anywhere close to that timeline right now.

8           So, unlike any of the other issues that have been

9     before the Court, this is purely in your discretion as to

10    when you enter the scheduling order and what that scheduling

11    order says.  In seeking to take the discretion away from the

12    Court, the debtors make an argument that, if the Court

13    doesn't enter an order now and schedule a confirmation

14    hearing to be concluded in 2015, it will effectively be, by

15    a backdoor, depriving the debtors of their rights under

16    Section 1121 to exclusivity.

17          In essence, their argument that, in addition to

18    the right to file a plan with an exclusivity, they have a

19    statutory right to confirm one.  There is no support for

20    that, either in the statute or the case law.

21          In fact, the Third Circuit, as we quote in our

22    papers, although it said it in dictus, spoke to 1121 very

23    directly.  Quote, "1121 does not state that a debtor has a

24    right to have its plan considered exclusively."  The debtors

25    have a right, and all creditors and parties in interest are

1    enjoined during the exclusive periods, from filing their own

2    plan.  1121 does not at all deal with the confirmation

3    hearing or who appears or how it's done.

4              So, we don't need to address the debtors'

5    assumption that multiple plans are per se destructive.  It's

6    too early for that.  But I will say that it bespeaks an

7    irrational fear that, if there were a parliamentary vote

8    right now, the debtors would get a vote of no confidence.

9              But even were confirmation exclusivity a real

10   concept, the Court can address that later.  If, come

11   December, the Court is convinced that the debtors are moving

12   in the right direction with their plan, whatever it might

13   look like at that point, the existence of other plans on

14   file can be managed by the Court.  Among other things, any

15   alternative plan that would get filed in December could only

16   be solicited until the Court had a disclosure statement and

17   approved the disclosure statement.

18             And again, for the reasons I talked about before

19   that you're not required to do anything on the notice the

20   debtors are talking about, you can manage your way through

21   the possibility that with a confirmation hearing schedule

22   that other people would be able to solicit other plans or

23   conduct other confirmation discovery.

24             In other words, if the debtors are moving to a

25   March 2016 confirmation, the Court has at its discretion

1    multiple tools to solve the problem that the debtors have

2    posited, that they would be -- their ability to hold a

3    confirmation hearing would somehow be frustrated by the

4    existence of other plans.  You can solve it in a manner

5    other than setting down a march to a plan that nobody agrees

6    to right now.

7            Let me turn to the second point, which is the --

8    this -- essentially, this process doesn't have to be

9    (indiscernible) right now.  Even if the Court were inclined

10   to grant a scheduling order at some point, our view is we

11   should push this off until mid-June.

12           Mr. McKane said the long confirmation runway

13   everyone's been given is for the benefit of all the

14   creditors to allow a raft of discovery that inevitably he'll

15   tell me is harassing and overbroad and completely

16   unnecessary in the context of the case, and we'll have some

17   fun conference calls about that.

18           And I'll say it in a bit, but, if the debtors'

19   plan on file is up for confirmation, that may not be enough.

20   Right?  The whole process of this -- of the schedule that is

21   set up is all presumed on the debtors' ability to produce

22   documents and produce witnesses and move forward on this

23   schedule.  If it turns out that the task is too big, the

24   schedule's not going to work.

25           But the issue is:  what's the harm -- and they've

1    posited, "Let us put our stake in the ground.  What's the

2    harm of putting a stake in the ground right now?  And, if

3    you have to come back later and move the schedule, move the

4    schedule."  The harm here, as we laid out in our papers,

5    over -- particularly over the next six weeks, six to eight

6    weeks, is real.

7            As the debtors acknowledge, there is an

8    alternative plan percolating, premised on creating a REIT

9    within the bankruptcy.  All discussions to date have been

10   about selling Oncor to a bidder who can do with Oncor what

11   they want.  Fundamentally, the premise is, if value can be

12   created within the bankruptcy, let's do that and use that as

13   distributable value without the enterprise, because this

14   case needs more consideration to distribute around.

15           I'm not going to repeat the deal structure, unless

16   Your Honor has questions about it, or explain why using a

17   REIT structure here will maximize value.  But I will say

18   that the process that needs to be done over the next six to

19   eight weeks, unlike the debtors' plan -- the debtors' plan

20   is discovery-heavy now and negotiation at the end -- our

21   plan, particularly with the debtors' insistence that it be

22   fully baked, has to get fully baked now.

23           That requires plan support agreements, $11 billion

24   in debt and equity funding with backstop agreements, debt

25   commitments, organizational documents restructuring a

1   operating company and a property management company, putting

2   together all the property management agreements that are

3   necessary for that, and then starting the process of

4   obtaining PUC, IRS, NRC, and FERC approvals.

5          All of that is being negotiated right now.  There

6   are weekly meetings with principals throughout the country.

7   There is round-the-clock diligence going on.  There are

8   daily drafting sessions going on.  And our view is, and I

9   wouldn't be standing up taking all your time if I didn't

10  believe, that we've got one clear shot at this.  It is a

11  fragile process.  It is a process, as you know, in bringing

12  together a whole bunch of people towards an idea, which is

13  essentially what it is, it takes time and a great amount of

14  effort.

15         In the meantime, though, we're being asked to do a

16  ton of work to fight a plan, which will allow the

17  alternative plan to survive.  And it's not as easy as the

18  debtors say, "Well, we're going to produce some documents,

19  and then we're going to have some depositions."  You know,

20  this is a first lien standing prosecution.  And I'll come

21  back to that in a bit.

22         There's the inter-debtor claims; a standing

23  assertion, which has to be done in the near term.  There is

24  a huge amount of valuation discovery to be done, and I'll

25  come back as to why valuation is key.  And, of course, there

1    needs to be negotiations around the debtors' plan.  The

2    concept of the mediator right now is that we're going to be

3    negotiating around a T side solution that may or may not be

4    folded into some aspects of the debtors' plan.

5         Let me address one thing that Mr. Kieselstein

6    said, which I thought was an unfair criticism.  What I said

7    to you in the papers, and what I said now, is:  it's not

8    that we can't get the plan done.  But a plan like this does

9    not need more impediments.  I don't know where Mr.

10   Kieselstein thought we accused the debtors of saying they

11   were precluding other options.  They've been clear that they

12   will discuss with us.  They understand their fiduciary

13   obligations to do so.

14        Perhaps he read his opposition or reply papers and

15   didn't go back to the source.  But there is nowhere where we

16   said that the debtors are precluding alternatives.  The

17   problem here is that it is making those alternatives more

18   expensive and higher risk.

19        And I'm going to come back to the concept -- well,

20   I'll say it now.  What are we saving?  Right?  If you put on

21   one side the risk of getting in the way of a value

22   maximizing plan -- come back to that in second -- with what,

23   the possibility that the debtors are going to lose

24   exclusivity?  We've gone through that.  We've managed that.

25   What else is there?

1           We heard today that they -- there's a million-

2     dollar-a-day burn.  It doesn't seem particularly fair, as

3     the only creditor group who seems, in this case, to be

4     funding itself, to accuse us of somehow getting in the -- or

5     creating more problems with a million-dollar-a-day burn.

6           We do dispute the cost calculation, which was

7     submitted by Mr. Kieselstein without any analysis.  The

8     debtors are in fact building cash.  They had enough cash to

9     pay down more of the EFIH debt.  They're building NOLs,

10    which are being -- which we'll be able to use to offset

11    gains.

12          $1 million a day is a great headline number; in

13    the context of this case, it's not the real number, because

14    the possibility is -- and I'd like to not be so cynical as

15    to say that $1 million a day is being poured down a hole.

16    $1 million a day, what it costs to run a big reorganization.

17    And it's what is necessary to get the Plan A.

18          To be clear, our plan:  fully consensual on the T

19    side.  E side creditors get paid their legal entitlements in

20    full; that's why I've been sitting in the back, in the

21    adversary proceedings, on the E side.  There is an October

22    confirmation with no moving pieces and a confirmation of a

23    plan with billions of dollars of distributable value in

24    excess of what the debtors have on the table.  If that's the

25    product of a $1 million a day burn, so be it.

1             Third, let me address the possibility -- and I'll

2     be short -- that the Court may want to enter some scheduling

3     order now and request some modifications.  The plan on file

4     that the debtors are pursuing right now is essentially the

5     RSA.  Despite what they say about all the progress that's

6     been made, it is the RSA with two changes:  an up to $805

7     million pay-over from the E side to the T side, and reduced

8     E side settlements on the make-wholes and post-petition

9     interest.  That's the plan that's done.  And, like that RSA,

10    it raises significant issues, and ones that I'm going to

11    spend a lot of time taking discovery on with my team.

12            All of the facts of these issues are in the

13    possession of the debtors.  First:  is the inter-debtor

14    settlement that has been proposed appropriate?  And what do

15    we do about claims that weren't part of the settlement

16    discussions?  There is a protocol in place for creditors to

17    identify claims and seek standing.

18            There will be -- there has been claims

19    identification.  There will be a motion to pursue standing.

20    If standing is granted -- come back to this in a second --

21    if standing is granted, I don't know how this plan works,

22    because now you've got certain claims that are being

23    controlled by people who aren't the plan proponents.

24            The second big issue is:  what is the collateral

25    of the first?  The plan is premised -- the debtors' plan is

1    premised on taking the collateral and spinning it off in a

2    tax-free spin to the TCEH first.  But obviously, the subject

3    of what is their collateral is subsumed by pending standing

4    motions, which we've pushed off and will have to be

5    addressed.

6              And third:  what is the value of the collateral on

7    the T side, given the size of the claims in this case and

8    the movements in value?  One of the issues that the debtors'

9    plan presupposes, without a settlement between the

10   unsecureds and the secureds, is the size of the deficiency

11   claim of the first.  So, when that 805 comes over, how does

12   it get divvied up?

13             That deficiency claim can be in the billions of

14   dollars.  And until you determine the value of the

15   collateral, you're not going to be able to get to

16   deficiency, which is going to be important, certainly for

17   distributable value, but also for voting purposes in the

18   context of the plan.

19             The discovery with respect to those issues doesn't

20   match up with the proposed schedule in confirmation

21   discovery.  I'll give you a clear example.  So, I've got the

22   standing -- the letters identifying claims, inter-debtor

23   claims, for which standing can be sought.  Just got

24   exchanged last week.  There's still discovery over the next

25   month before the standing motions would have to be filed.

1          So, for example, I've asked to meet with the

2    debtors' principals to discuss the claims that we've laid

3    out.  Am I supposed to be sitting in a meeting with Mr.

4    Keglevic, talking about LBO-related claims, while I'm also

5    trying to get Mr. Keglevic to provide necessary

6    documentation with respect to a REIT lib plan?

7          Given the size of where we're vectoring towards on

8    the debtors' plan, it's not a, "Well, we'll just kind of

9    push that all off to September/October/November."  It's a

10   daily process.  It's been a daily process since the

11   beginning of this case.  and nobody has unlimited funds, not

12   the debtors, but certainly not the ad hoc group who's trying

13   to do other things.

14          So, here are my four quick things.  First, I'd

15   request that the Court -- and everyone's going to hate me

16   for this -- push the confirmation hearing until late

17   December.  That addresses all of the debtors' concerns with

18   respect to their losing exclusivity before they have their

19   confirmation hearing.  The parties can move out all of the

20   dates.  Your Honor can pick a date, the dates that work for

21   you in December, and we'll address the schedule accordingly.

22          But, even if it was a December 15 start or a

23   December 28 start, continued, we can work out what

24   adjustments need to be made.  That solves the debtors'

25   problem; it also solves our problem of being able to get all

1    the heavy lifting done in the next eight weeks.

2             Second, there need to be off-ramps in this order

3    relating to the standing issues in the mediation.  And I

4    identified that issue before.  We've got pending motion

5    before the Court to say that the ad hoc committee and/or the

6    official committee should be given standing to pursue the

7    claims against the first liens.

8             The granting of this relief can't be a backdoor to

9    denying that motion.  In other words, the debtors can't say,

10   in the context of that motion, "Well, you shouldn't be

11   granting standing to allow these claims to be pursued,

12   because there's no way for us to fit it into our

13   confirmation schedule if those claims are going to be

14   pursued right now."

15            So, there needs to be a harmonization between the

16   scheduling order and the two standing issues.  But also with

17   the mediation, it doesn't seem particularly fair to tell the

18   mediator, "You're coming in to mediate the march that's

19   being done right now, but you don't have any say as to when

20   and how that march should take place."

21            Third, as Mr. McKane highlighted, our view is the

22   sequencing doesn't work.  Having lived through dozens of

23   complex Chapter 11 confirmation hearings, the best way to do

24   it is to get the documents out, then take your depositions,

25   then take expert discovery.  That obviously doesn't always

1    work that way.  But, for an issue like valuation, it's going

2    to be key.

3            There needs to be a business plan, and there need

4    to be documents that are sent out around that business plan.

5    The debtors need to be questioned.  And the questioning

6    needs to be complete before the expert has to issue the

7    report.  If you look at their schedule that they have, the

8    expert reports are coming out in the middle of discovery.  I

9    don't know how that works.

10           And the debtors, who are essentially the parties

11   with all the information, can't use information flow to

12   impact the ability of people to prepare what is the hardest

13   -- going to be the hardest work in this case, their

14   valuation cases.  I don't know why they won't fix that.  I'm

15   going to implore them one last time to try to fix it.  But I

16   don't see that there's any way to have a scheduling order

17   have expert reports come out essentially a month before fact

18   discovery closes.

19           Finally, the order needs to -- I -- fix what are -

20   - sound little, but are really two philosophical issues.

21   The order should be clear that all creditors can participate

22   in the confirmation hearing as parties in interest.  The

23   case has been pretty efficient today on parties

24   coordinating, but there's no basis to exalt convenience over

25   the rights of participation.

1         I've got a proposed fix on that.  In paragraph 35

2    of their reply, they say, quote, "The order does not dictate

3    joint requests or impose allocations."  I think that concept

4    needs to be worked into the order.  In other words, the

5    default is that everybody's a party in interest, but the

6    buy-in is that people should try to coordinate.

7         And second -- and I don't -- you know, Mr. McKane

8    tried to make a little of it; I haven't seen it before.  The

9    Court is being ordered -- or asked to order, in two places,

10   that it encourages the parties to resolve their objections

11   and discourages expensive, time-consuming, and unnecessary

12   discovery or litigation.

13        I'm not sure what an order of encouragement is or

14   what it even means in the context of a federal court order.

15   We don't need to be ordered not to waste our money, if

16   that's what they're saying.  And the debtors don't need the

17   comfort of an order that says parties shouldn't waste their

18   money.

19        But we want to be clear:  a forced march to a

20   confirmation hearing on this plan will be expensive, time-

21   consuming, and, we hope, unnecessary.  That's just the fact

22   of where we are in the case.  You know, the debtors have

23   gotten themselves, having taken a year to pursue their other

24   agenda -- have gotten themselves where their may be no

25   quick, easy, efficient way out of bankruptcy.

1          We're hoping we've come up with a way to do that.

2     But, you know, a confirmation hearing on the issues that are

3     framed by that pleading is going to be expensive, time-

4     consuming, and people are going to run down rabbit holes and

5     just find themselves there.

6          So, I'd sum up as follows:  you get to inflection

7     points in cases.  I believe that we are at an inflection

8     point in the case.  My general view is that, when you're at

9     a place like this in a case, the last thing you want to do

10    is send people off on a schedule that requires them to start

11    deposing each other.  It's generally not a friendly

12    environment in which to try to get a deal done, particularly

13    where the decision-makers who are deciding to -- whether or

14    not to do a deal are the ones who are either forced to sit

15    in a deposition or produce the documents.

16         So, we are asking Your Honor either to deny the

17    motion without prejudice to it being heard in June or, at

18    worst, enter a scheduling order that ticks off everything,

19    at least related to confirmation, until June, with a

20    corresponding delay in the confirmation trial.  Thank you,

21    Your Honor.

22         THE COURT:  Thank you.  Mr. Jonas?

23         MR. JONAS:  Good afternoon, Your Honor.  I'll be

24    extremely brief.  Jeff Jonas for (indiscernible), the T side

25    second lien indenture trustee.  First of all, Your Honor, to

1    the extent the Court does enter a scheduling order, Mr.

2    McKane and I have spoken about just some very clarifying

3    language with respect to the plan participants, which is at

4    paragraphs 2 and 10.  And I think that'll be corrected, so I

5    won't address that.

6           With that said, Your Honor, generally, we agree

7    with Mr. Shore's comments.  I would just take one -- and

8    really make one comment to look at it differently, which is

9    -- well, not differently, but to focus on the fact that it

10   just seems to be completely at cross purposes to enter an

11   order that now provides for a mediation after the parties

12   have agreed to undertake that, when, at the same time,

13   undertake wholesale discovery.

14          We would suggest, Your Honor, at a minimum, the

15   Court push off the scheduling order to allow mediation to

16   take place without the overhang of extensive discovery.  I

17   think, if the Court were to do that, you could still

18   accommodate the debtors' fundamental request for a

19   confirmation hearing beginning in December or before the end

20   of the year and nevertheless give an opportunity for the

21   mediation to take place, I think, on the best basis

22   possible.  Thank you, Your Honor.

23          THE COURT:  Thank you.  Reply?

24          MR. MCKANE:  Thank you, Your Honor.

25          THE COURT:  I'm sorry, wait a minute.  There's a

1     gentleman in the back who wishes to be heard.

2              MR. GOODMAN:  Thank you.  Good afternoon, Your

3     Honor.  Peter Goodman on behalf of Alcoa.  Through the

4     efforts of Mr. Schartz at the Kirkland & Ellis firm, I

5     believe we've been able to resolve Alcoa's objection to the

6     protocols.  We're dotting our Is, crossing our Ts, and

7     trying to finalize a resolution of the objection.  But I

8     think we're very much there.  And I wanted to report that to

9     the Court.

10             THE COURT:  Thank you.

11             MR. MCKANE:  Morning, again, Your Honor -- it's

12    afternoon, at this point.  I apologize.  It's Mark McKane,

13    Kirkland & Ellis, on behalf of the debtors.  Just a few

14    points in response, and I'll start with Mr. Shore's

15    comments, because I do believe that there is, in some ways,

16    a fundamental disconnect here.

17             We believe that we can run down parallel paths.

18    We have been running down parallel paths this entire case.

19    What many people, including Mr. Shore, don't highlight for

20    the Court -- but we've been going through a substantial

21    discovery process for nine months.  We went through a legacy

22    discovery process where people were able to investigate all

23    the legacy claims, including intercompany claims, at the

24    same time that there were plan negotiations.  And plan

25    negotiations were running in tandem.  Why?  Different people

1    and different processes.  And that's totally to be expected

2    and understood.

3              There is -- in many ways, this concern about the

4    wholesale discovery overhang with mediation, this is

5    restructuring and litigation working together.  This is what

6    we do.  This is why Mr. Kieselstein will have conversations

7    with Mr. Lauria at the same time that Mr. Shore and I will

8    either be in conversations about discovery or possibly, you

9    know, be across from one another in a deposition.

10             But the notion that anyone, whether it be Mr. --

11   that anyone, the debtors would be sitting for a deposition,

12   you know, next week, based on our schedule, is a fiction.

13   Depositions don't start until July.  There is room that

14   we've structured in the schedule to allow dual paths to go

15   forward, whether it's dual paths about this plan or dual

16   paths about an alternative plan.

17             The debtors firmly believe, in an exercise of

18   their business judgment and their fiduciary duties, based on

19   the input from all of their advisors, that it is critical in

20   moving these cases forward that there by what we call

21   "tension on the line," that we have a plan, that we are

22   moving forward, that we are evaluating that plan, at the

23   same time that we consistently work other alternatives. That

24   is a fundamental premise of what we're trying to put forward

25   with this schedule.  That's why we have brought it forward

1    now.

2            And that's why we've asked for the entry of a

3    scheduling motion at the beginning, now, because we don't

4    want to lose the time that we have between the filing of our

5    plan and our disclosure statement and the entry of the

6    disclosure statement order in a few months.  That time is

7    precious and critical to us, not only because we're burning

8    $1 million a day, but because of what we need to do just to

9    maximize the time that we have together.  That's the

10   fundamental disconnect I think we have with some of our

11   creditor constituencies.

12           Going back to some of Mr. Shore's points, and then

13   I'll pick up some of the others, Your Honor, I understand

14   the view of, "Let's take a pause.  Let's step back.  Let's

15   not do anything until July, or June."  I think I heard June,

16   near June.  "Let's do nothing until near June and then enter

17   an order at that time."

18           Your Honor, I want -- hopefully, you can

19   appreciate what happens to the schedule in that

20   circumstance.  Setting aside the cost associated with it,

21   maybe the lost opportunities of time associated with it, if

22   this schedule were to be compressed on the front end, and we

23   were to lose six weeks of the process where we would kick

24   off and do certain discovery now, like confirmation

25   discovery, especially about enterprise valuation that may be

1    more document intensive, push that out now -- if we lose

2    that time and we don't start the confirmation process,

3    including the documents, which require some lead time and

4    heavy lifting, then you compress that schedule so that

5    depositions would be -- you know, you might not be done with

6    the document production when depositions start.

7            That's a fundamental tenet that the ad hoc group

8    and the official committee on the T side have been focused

9    on.  Let's get the documents out of the way first; then we

10   can proceed to depositions.

11           We've worked this schedule very closely, hammer

12   and tong, at times, in the negotiations with the official

13   committee of T side creditors, to get a schedule where we

14   will get the documents out front.  But to do so, we need to

15   kickstart that process now.  And that includes on enterprise

16   valuation.  We get the documents out of the way, and then

17   you proceed to depositions.

18           If we were to compress it by six weeks, we'd be in

19   a situation where you'd have overhang and overlap.  And

20   frankly, Your Honor, if that were the case, you know this;

21   we'd get it done.  You would tell us to get it done and we

22   would. But there'd have to be shared pain and sacrifice with

23   the creditors on that side.  And they'd have to acknowledge

24   that the documents would be rolling out at the same time

25   that depositions would be appearing.

1          You couldn't sequence it in the way that the

2     creditors want.  They can't have it both ways.  They can't

3     have the sequencing and not kickstart this until June.  And

4     that's a critical point for us.

5          Your Honor, one of the things Mr. Shore said that

6     -- is all of these documents, as it relates to the

7     intercompany settlement or the siloed settlements, to the

8     extent that -- you know, that Mr. Dietrick referred to it,

9     that they're in the possession of the debtors.  You know,

10    they were in the possession of the debtors until we blew

11    them out over nine months to all the creditors.  They've got

12    five million pages of all the legacy materials, including

13    all of the issues that they would need to evaluate the

14    settlement.  So, all of that is out.  We have to step back

15    and don't ignore all the work that we've done to date.

16         But it's not just paper.  Right?  The

17    disinterested directors, with their filing statements in

18    support of the plan, put forward, you know, the minutes that

19    they've filed, the presentations that went back and forth.

20    There is an ample body of information that is already out

21    there to enable creditors to start to evaluate the proposed

22    settlement that's part of the plan.  We can't lose sight of

23    that at this point.

24         Your Honor, to this request that we should put

25    everything off such that the trial does not start until

1    December, I think what we have to acknowledge here, Your

2    Honor, is every slippage that we have in terms of our

3    overall schedule or our process is cost and delay, and it's

4    something Mr. Kieselstein referred to.  It's currency for us

5    to help to drive a settlement.

6              Overall recoveries go down as this case continues.

7    And the more that we move out this schedule and ignore the

8    ability to go down parallel paths, the harder it is to drive

9    compromises, because we have less currency to do so.

10              With regards to Mr. Shore's point about off-ramps

11   for the standing motions, Your Honor, we put forward and had

12   a comprehensive plan where we were asked to take out certain

13   elements, certain elements that go directly to the pending

14   standing motion.  And to the extent that they're going to

15   bring another standing motion as it relates to the

16   intercompany issues, it completely ignores that the

17   disinterested directors already put forward a settlement of

18   those, and that that settlement is what we're asking the

19   Court to evaluate as part of the plan of reorganization.

20              We have a fully baked, comprehensive plan.  We

21   have agreed to facilitate negotiations in terms of

22   settlement and mediation, to take certain terms out, to not

23   make those public at this time.  But we have a view.  And we

24   had a -- we have a recommendation sponsored by the -- not

25   only the CROS, but the debtors in total.

1          THE COURT:  Well, let me -- wait a minute.  Wait a

2     minute.  Wait a minute.  So, are you saying that it's the

3     debtors' position that I shouldn't make a decision on the

4     standing motion on the -- against the first lien position?

5          MR. MCKANE:  Your Honor --

6          THE COURT:  Until after confirmation?

7          MR. MCKANE:  No, Your Honor, we know that it's

8     currently scheduled for July.  But what we have said is part

9     of a global comprehensive package.  We have prepared, we put

10    forward, and we'll discuss it with the mediator a way to

11    resolve that such that you never have to rule on the

12    standing motion.  That's why we're prepared to put forward

13    and have a mediator start as soon as possible, in the hopes

14    that maybe we can obviate some of the litigation in this

15    case.  That's our goal.

16          THE COURT:  Well, that's not my question.

17          MR. MCKANE:  Yeah.  Yeah.  And, Your Honor, just

18    to be clear, one of the issues that we felt most strongly

19    about in our papers is -- in opposition to the standing

20    motions, is who controls the ability to settle these cases.

21    And the debtors feel most strongly that they must,

22    regardless of what happens with the standing motions, retain

23    that ability to settle.

24          THE COURT:  No, no, I understand.  So, I spent a

25    whole weekend reading the standing papers, so I'm well aware

1   of them.  But I want you to address Mr. Shore's question,

2   and my question, which was:  is it going to be the debtors'

3   position that I simply shouldn't decide the standing motion

4   because you've settled it as part of the plan, there's

5   discovery in place, and you're going to decide at

6   confirmation whether or not to approve that?  And, at that

7   point, standing -- the standing issues would come back?

8   That can't be the case, because standing expires.

9             MR. MCKANE:  Right, right.  Your Honor, just -- we

10  want to be absolutely clear about this.  You may recall a

11  certain stipulation that we entered into that said that we

12  would need a ruling on the standing motion --

13            THE COURT:  Right.

14            MR. MCKANE:  At or before confirmation.  So,

15  that's not what I'm suggesting.

16            THE COURT:  Okay.

17            MR. MCKANE:  I don't want to have you mishear me.

18  What we were emphasizing is that we had a view as to how we

19  could resolve the issues on the T side between the

20  creditors.  We have put that forward.  They're aware of what

21  that is in terms of a confidential submission.  And we're

22  prepared to work very hard with the mediator to help drive

23  the settlement so as to resolve the standing issues and any

24  allocations of recovery that'll come -- that would come over

25  from the E side.  But that does not suggest that we -- you

1    can put the confirmation in front of standing when we've

2    agreed to do the opposite.

3              THE COURT:  All right.

4              MR. MCKANE:  Your Honor, let me turn to some of

5    the other objections.  I think I've addressed the key points

6    that Mr. Shore has raised.

7              Your Honor, with regards to the EFH official

8    committee's points, as it relates to the list of claims in

9    the material, we would just simply reiterate and emphasize

10   to Your Honor the amount of materials that are out and

11   available as in regards to this claim.  There's no need for

12   a separate introduction into the schedule about a claims

13   evaluation process when that's already baked into our

14   settlement.

15             And the notion that they're not aware of these

16   claims, based on all the work that we have provided to date

17   to allow them to evaluate them, and aid them in articulating

18   them -- one thing that we want to step back with, and we

19   highlighted in the reply, Your Honor, is it's not just about

20   just pushing out documents and not sitting down and talking

21   to folks.  We're meeting with the creditors.  We met with

22   creditors on the T side and the E side, and we've discussed,

23   and a lot of people have evaluated, all of these claims.

24             And we had a date by which the T side creditors,

25   the official committee and the ad hoc group, would come

1     forward and provide a list of claims.  There was no news

2     about those claims.  And the fact that the T side creditors

3     were able to do it fully illustrates that the E side

4     creditors are fully capable of doing it.

5            The official committee is very aware of what the

6     potential claims are on the intercompany, and they can

7     evaluate the settlement accordingly.  Our schedule provides

8     for that as part of plan confirmation.  It's as simple as

9     that.

10           As it relates to valuation discovery, I understand

11    their interest.  And I understand that their argument is

12    that there may be T side enterprise discoveries that they

13    want to do, and evaluate whether -- you know, whether there

14    is a tax issue or not.  We understand that, and we've

15    evaluated that issue.  Our schedule emphasizes:  let's put -

16    - let's start now.  We know the heavy lifting that it's

17    necessary to do enterprise valuation.

18           To Mr. Shore's point, we have put out a business

19    plan.  We put out a multiyear business plan.  We have

20    allowed their financial advisors to diligence that plan.

21    All of that has been already done, informally.  We will do

22    that process formally, and we will continue to push that

23    process forward.

24           But our schedule proposes that we start that now,

25    as part of the confirmation discovery.  It isn't a question

1     of whether we allow people access to information and

2     discovery.  It's a question of:  are we going to tee up a

3     separate hearing process in August for it?  We don't think

4     that's appropriate, based on our proposal, that this -- that

5     enterprise valuation issues, just like intercompany claims

6     issues, are all part of confirmation.

7           We can see what's in at that time.  But it doesn't

8     mean we're not going to allow people to take discovery on it

9     now.  In fact, that's what we're encouraging to -- that's

10    what we believe is appropriate.  And I think the E committee

11    believes that keeping this schedule is appropriate as well.

12          THE COURT:  Well, it seemed to me that part of the

13    plan is the inter-silo settlement.

14          MR. MCKANE:  Yes.

15          THE COURT:  And that discovery into the merits of

16    settling those claims is part of confirmation discovery.

17          MR. MCKANE:  Absolutely, Your Honor.  That's what

18    we've put forward.  It's a 9019 settlement that's baked in a

19    plan.  And (indiscernible) can be evaluated as part of that.

20          Your Honor, as relates to the issues that Mr.

21    Perdone raised for AST, all of his concerns about having a

22    claims bar date, a claims file date -- he never mentions the

23    case law.  Right?  And one of the things we addressed in our

24    reply is the case law, including the handling of claims as

25    part of a confirmation process.  And, frankly, in the reply

1    brief, we emphasize certain cases I thought he would attempt

2    to distinguish.  I heard nothing.

3           For example, the Nutriquest case from the Third

4    Circuit, which specifically said, in evaluating a

5    settlement, it's irrelevant whether our claim was filed.

6    Evaluate the settlement.  And that's exactly what we're

7    saying should be done here.  Let's evaluate the settlement

8    as part of a plan confirmation.  We'll give you full process

9    to do so.  Nothing more, nothing less.

10          Your Honor, as it relates to the scope of the

11   mediation, the mediation concept emanated out of the T side

12   as part of our negotiations with them.  And once they saw

13   the confidential suggestion in our plan as to how to

14   allocate certain recoveries between the secured creditors

15   and the unsecured creditors.

16          And, as a result of that, what has been proposed -

17   - and I believe the mediation proposal wasn't just today; it

18   was put forward before the objection deadline -- was that,

19   as an initial matter, the scope of mediation should be

20   limited to T side issues as it relates, you know,

21   specifically to allocation.  But we want to give and fully

22   empower the mediator to expand the scope as he believes or

23   she believes is appropriate.  And we fully support that.

24          So, once the mediator is selected and approved, to

25   the extent that the E side wants to participate or open up E

1    side issues, then E side creditors can request to come in.

2    And there may be parallel paths, again, Your Honor, where

3    there are T side portions to the mediation and E side

4    portions.

5            But, as an initial matter, given the -- of how the

6    concept of the mediation came forward, and the compromise

7    that was struck as part of the stipulation, our

8    recommendation and what we put forward in the order is that

9    we start with that issue first.  And we'll allow the

10   mediator full discretion to expand forward.

11           And once it's expanded forward, we understand that

12   E side creditors may have certain issues that they want to

13   present.  But not -- but, at first blush, we'd like to focus

14   on the T side issues at this time.  Hmm?

15           MR. KIESELSTEIN:  Can I raise an issue?

16           MR. MCKANE:  Your Honor, Mr. Kieselstein would

17   like to raise a point or two as well.  Thank you.

18           MR. KIESELSTEIN:  Good afternoon again, Your

19   Honor.  Mark Kieselstein on behalf of the debtors.  I will

20   be exceptionally brief.  I only wanted to address the one

21   point Mr. Shore made, commenting on the plan as Solomonic as

22   opposed to maternal.  I'm not sure I appreciate the fine

23   distinction.  We tried to be Solomonic in the sense that we

24   tried to be fair to everyone in how we comprehensively would

25   resolve all the various claims.  And I think the

1      disinterested directors, with their advisors, tried to do

2      the same.

3              And I heard Mr. Shore say, about the RSA -- and

4      I'm still relatively new to this, Your Honor; I'm worn out

5      by the repeated references to the RSA.  But, you know, maybe

6      they're not by their sell-by date.  But I will say he said

7      it's like the RSA except for the close to $1 billion of

8      value that would go to the T side under this formulation

9      that didn't go to them under the original RSA deal.  I think

10     that's a little bit like the inverse of, "How was the play,

11     Mrs. Lincoln?"

12             So, we've put together a plan that actually, we

13     think, delivers fair value all the way around the capital

14     structure.  Again, it's not a placeholder.  It merits a

15     schedule in the here and now so we can plot the course, all

16     while we work assiduously to explore the REIT alternative.

17     Thank you, Your Honor.

18             THE COURT:  Okay.  Thank you.  Just very briefly,

19     Mr. Shore.

20             MR. SHORE:  Very briefly.  I just want to

21     highlight -- Chris Shore again from White & Case.  I want to

22     highlight one thing, because I just don't think the debtors

23     get it.  The statement was made, "For the past year, we've

24     been operating on a parallel path."  Where has that path

25     gotten us?

1          We're a year into the case, we've got a plan on

2     file that is not only not supported by everybody but is

3     hated, vocally, by everybody.  We've got a totally upended

4     corporate governance where every third pleading on file is

5     an application for compensation.  We've got five million

6     pages of documents that were dumped, but there hasn't been a

7     single deposition on any of those issues.  The standing

8     motions have been on file, haven't been heard.

9          Respectfully, you didn't get an answer to your

10    question about how is that going to work.  We're going to

11    get up to confirmation; then we're going to have a standing

12    motion to say that the claims that the debtors are seeking

13    to settle all must be addressed by somebody else?  That

14    doesn't make any sense.

15         The best path out right now, in our view, is a

16    plan that's been put together by an ad hoc group of

17    creditors who, within the context of this capital structure,

18    are punching way above their weight, but who can put

19    together a plan that will make everything we've talked about

20    today -- discovery and all these other issues that the E

21    side raised -- completely irrelevant.

22         All we're asking for is to run it a different way

23    for six to eight weeks.  They want to run the parallel paths

24    because they think it maximizes value to have people

25    fighting while they're also trying to negotiate.  It hasn't

1    worked in this case today.

2              THE COURT:  Okay.  Thank you.  All right.  We are

3    going to break for lunch.  We will reconvene at 1:30 and

4    I'll give my ruling.

5              [BREAK]

6              CLERK:  Operator.

7              OPERATOR:  Yes, Madam Clerk, can you hear me?

8              CLERK:  Yes.  We are breaking for lunch,

9    reconvening at 1:30.  I'm going to hang up at this time, and

10   I'll call back and reconnect.

11             OPERATOR:  Okay.  Thank you.

12   (Recessed at 12:35 p.m.)

13             CLERK:  All rise.

14             THE COURT:  Please be seated.  Okie doke.  Sorry.

15   Hopefully this won't be too rambling.  There are a number of

16   sort of rulings to make.  I'll start big picture and then

17   try to deal with some of the more minutia, although not

18   meant to imply it's not important.

19             The overarching question is that should the Court

20   enter this order at all and I do believe it's appropriate to

21   set up a schedule in part at this point and that is to set

22   up a schedule in connection with the disclosure statement,

23   which is currently scheduled for hearing on July 20th and

24   there is proposed discovery and objections schedule that

25   there were some minor objections to by the ad hoc committee,

Page 102

1    but I agree with the debtors' response to those in

2    connection with the disclosure statement so I will schedule

3    at this point the disclosure statement piece.

4         In addition, the mediation provisions of the order

5    are acceptable and will be approved.  At this point I'm not

6    going to require participation by the E side committee or

7    any other E side creditors.  I think the primary focus here

8    is on the T side and the figuring out how to divvy up

9    whatever consideration might flow to the T side creditors,

10   figuring out how that plays out and that needs to be the

11   focus, at least initial focus, of the mediation.

12        The other thing is I'm very concerned with

13   frustrating the purpose of mediation by having too many

14   parties participate in mediation.  It's certainly not that

15   anybody would be doing anything inappropriate, but this

16   group becomes unwieldy as it gets larger.  Any group becomes

17   unwieldy as it gets larger.  So I don't think it would be

18   helpful and I think it would be counterproductive to include

19   the E side people in what is initially going to be a T side

20   discussion.

21        Now, certainly if the mediator and the parties in

22   consultation with the mediator or the mediator here himself

23   or herself decides that a broader scope is appropriate,

24   there's no question that if E side issues become subject to

25   mediation you can't mediate E side issues without E side

1    creditors or you mediate all you want, but you're not going

2    to get far.  It's a one-sided deal.

3            So, in that instance, obviously at a minimum, the

4    E side committee would need to be involved and it would be

5    appropriate probably to include other important E side

6    creditors, certainly anyone that's a fulcrum security needs

7    to be part of any kind of mediation.  But I'm okay with the

8    mediation order and I'm okay with the disclosure statement

9    piece.

10           I'm not at this time going to enter a discovery or

11   scheduling order in connection with confirmation of the plan

12   for several reasons.  First, while it has been the case to,

13   I don't even say dual track, multiple track different things

14   going on in this case in the last year, it has been

15   challenging, time-consuming and expensive to perform those

16   tasks.

17           We have an opportunity here with mediation and

18   also with active exploration of an alternative transaction,

19   if you will, to I think appropriately focus on those issues

20   more directly and delay, at least for some period of time,

21   this parallel tracking of litigation and discovery, at least

22   as it applies to confirmation.

23           I think it's appropriate and important to give the

24   mediation full opportunity to succeed, to allow the parties

25   to focus on other transactions to the extent that makes

1     sense.  I mean, they may not make sense.  They may fall

2     apart.  They may never come together.  I don't know.  But

3     there is some serious work being done in that end and I

4     think it appropriate to allow that to play out a little bit.

5            Also, we don't have an approved disclosure

6     statement and we're sort putting the cart before the horse

7     here in starting confirmation litigation over a plan where

8     we don't even have a disclosure statement approved.

9            Having said all that, I of course understand the

10    problem with managing such a colossal litigation in a finite

11    period of time and at least initially, while I'm delaying

12    the start, at this point I'm not prepared to force a delay

13    of the end game and I think as I sit here today I'm going to

14    keep the optionality available to start the confirmation

15    hearing as original requested on November 18th and I have

16    privately on my calendar set aside the requested 20 days of

17    confirmation hearing starting on November 18th and

18    concluding on December 23rd.

19            That schedule will remain on the Court's calendar

20    pending any future decision on how to proceed or not

21    proceed.  It may be that by delaying the start it ultimately

22    becomes unworkable and that the confirmation hearing will

23    have to begin at a later time.  I'll decide that as

24    appropriate when it comes up.

25            However, while I certainly understand and

1    appreciate the debtors' desire to schedule confirmation to

2    conclude before or simultaneously with the termination of

3    the statutory exclusivity period or the maximum statutory

4    exclusivity period, I don't think that chaos ensues the day

5    after exclusivity expires.  Even were there to the numerous

6    plans filed, filing of a plan in and of itself doesn't

7    really accomplish anything unless you get a disclosure

8    statement hearing and approval of a plan at a hearing and

9    confirmation procedures approved to allow you to solicit a

10   plan and ultimately confirmation of that plan.  And in this

11   case I don't think there's any question that that would take

12   a significant amount of time and there may be, and probably

13   would be, a prelude to that at the very least of some

14   discovery associated with whatever alternative plan or plans

15   may be filed.

16          I will, of course, decide motions on the merits as

17   they're presented to me, but having gone down a lengthy road

18   and being either in the middle or at the beginning of a

19   confirmation hearing, the process of which was started seven

20   months previous, I'm not going to stop the presses and

21   introduce chaos into the process simply because exclusivity

22   has expired and somebody has filed a plan.

23          So, while I'm going to keep the schedule intact on

24   my calendar and that's my intention and every intention if

25   possible to meet that schedule, I don't think it's the end

Page 106

1    of the world if that schedule doesn't make it.

2           So other sort of global issues on how the schedule

3    had been set up, there is a lot of overlap and I agree, I

4    think it was Mr. Shore who urged that, you know, and this is

5    the way you operate in litigation, you know, you do your

6    documents first.  You finish that.  You do your depositions

7    next.  You finish that.  Then you get into expert fact

8    reports being produced, excuse me, expert reports being

9    produced, fact discovery on experts, depositions etcetera

10   with regard to -- you know, you proceed in that order.

11          The way the schedule is currently contemplated,

12   and tightening it will only make it worse, there is

13   significant overlap.  I'm not going to rule on the merits of

14   a schedule that isn't in front of me at this point since

15   I've just said I'm not going to hear the schedule, but I

16   would encourage maintaining that structure to the extent

17   possible with the understanding that there may be some

18   overlap.

19          I would also -- well--I'm in a -- this is a --

20   I'm going to keep this line in the order that's been

21   included that Mr. Shore has a problem with about

22   discouraging wasteful discovery and encouraging people to

23   cooperate, etcetera.  It doesn't really have any force or

24   effect, but it does articulate my position.  There's been a

25   lot of documents, to say the least, there's been a

1    tremendous, mind blowing amount of paper, although none of

2    it was probably paper, that's been produced in this case and

3    that information is out there and the parties should really

4    think hard, I think, in discovery, additional discovery

5    about, you know, are they asking for it because they don't

6    want to look through what they already got or are they

7    asking for it because they don't have it?  And if they're

8    asking for it because they don't feel like looking through

9    what they already got and somebody brings that to my

10   attention they're not going to be given a second bite at

11   that apple.  We're not going to reproduce five million

12   pages.

13          Now I know there's a lot of stuff that might be

14   relevant, and valuation of course is one piece of it, in

15   connection with a plan that hasn't been -- wasn't part of

16   the legacy protocol.  But there's also an important part of

17   the plan process which is the settlement that's baked into

18   the plan, the intercompany settlement and claims, and I'll

19   get to more about that in a minute, and that certainly was,

20   at least to a certain extent if not fully, a subject of the

21   legacy discovery protocol.

22          So, you know, you don't get to sort of start from

23   scratch.  Nobody's going to be allowed to sort of redo

24   what's already been done.  You're going to have to dig in

25   and look at what's already been produced and any discovery

1    really is going to need to be focused on things that you

2    don't already have that are relevant to issues that are

3    going to be before the Court at confirmation.

4            Now, in connection with, before I get into some of

5    the more detailed stuff, in connection with how do we deal

6    with the next piece which is -- and I'm going to enter, you

7    know, at some point I'm going to enter -- if we're headed

8    down to confirming this plan we're going to have a

9    confirmation scheduling order.  So, we need to figure out

10   when to do that and, while the big things happening in the

11   case in mid-July are the disclosure statement on July 20th

12   and the plan mediation ends on July 20th and the Oncor bid

13   procedures will probably be right around that time, I don't

14   want to wait till then to have another discussion about

15   confirmation schedule.  I think that's too far down the

16   road.

17           So what I would suggest is that we have a further

18   status, and not just status, but possibly a hearing where we

19   actually enter a scheduling order for late-ish June and the

20   time I'm thinking about is that we have a fee hearing on

21   June 24th at 10:00.  I want to keep the fee hearing

22   separate.  I don't want to contaminate the fee hearing with

23   this, so we could -- and I already have something else for

24   that day, so if we could deal with this either on the 23rd

25   or the 25th that would be good.  Let me double check.  Yeah,

1    so Mr. McKane you're sort of -- or Mr. Kieselstein are sort

2    of the point people on this for the debtors.  Do you have a

3    preference?

4              MR. KIESELSTEIN:  I think that will work for us.

5    We may not all be able to attend, but we'll have critical

6    (indiscernible).  We're fungible after all, Your Honor.

7              THE COURT:  No.  No you're not.  Which date do you

8    prefer, the 23rd or the 25th?  Tuesday or Thursday.

9              MR. KIESELSTEIN:  Either is fine for us.

10              MR. MCKANE:  We'll make either work, Your Honor.

11              THE COURT:  Okay.  Let's do the 25th at 10:00 a.m.

12    and we'll call it a scheduling conference, not a status

13    conference.  At least at this point let's not turn that into

14    an omnibus.  That will be specific to this issue.  Okay.

15    Let me --

16              MR. MCKANE:  Your Honor, do you want submissions

17    in advance of that?  I suspect they might be helpful to you

18    and do you want to set a time for which either -- we can

19    kind of set that out -- either dueling or sequenced

20    submissions?

21              THE COURT:  Let me think about that.  What would

22    you be submitting?  We're not going to redo this hearing to

23    a certain extent.

24              MR. MCKANE:  Proposed schedules.

25              THE COURT:  Proposed schedules.  Oh, okay.  Yeah,

1    I certainly would want a proposed schedule submitted -- a

2    revised proposed schedule submitted ahead of time and people

3    have an opportunity to comment on that.  However, I'm going

4    to make a bunch of rulings now that I'm not going to remake

5    in June so we're narrowing the field of inquiry.  Mr. Shore?

6              MR. SHORE:  As I understand it, Your Honor, what

7    we'll do is we'll come back on that date and talk about

8    what's the end date for the schedule.  We can work out, you

9    know, given where we are at that time --

10             THE COURT:  Yeah, let me think about this.  Let me

11   think about submissions.  You asked me a question I hadn't

12   thought about.  Let me try to deal with some of the issues

13   that have been raised and narrow the inquiry.

14             First of all, talking about the E side committee

15   and the American Stock transfer issues, I don't believe,

16   want, think it appropriate to allow these concepts of, you

17   know, inter-silo or inter-creditor, excuse me, inter-debtor

18   or inter-silo claims to hijack confirmation and the

19   confirmation discovery schedule.

20             Baked into the plan is a settlement of

21   intercompany or inter-silo claims.  Whether that settlement

22   is appropriate is a confirmation issue not a scheduling

23   issue.  I don't think at this point it's appropriate to

24   require production of any kind of list of intercompany or

25   inter-silo claims or to force a bar date or to force debtors

Page 111

1    to file proofs of claim.  As a matter of fact I think that's

2    counterproductive.

3            There's more than enough information out there to

4    get an idea both from the legacy discovery and what the

5    directors did and have produced to have a basis to

6    understand why there may be claims and why those claims may

7    be settled.  I simply don't think it's necessary or

8    appropriate to force the issue so I'm not going to require a

9    bar date or claims to be filed or a list of claims to be

10   filed or the settlement to be binding or to have to pre-

11   settlement hearing or to force some fleshing out of the make

12   whole litigation issues other than as they arise

13   appropriately as they happen in front of the Court and I'm

14   certainly not going to make that happen before confirmation

15   or before disclosure statement and, you know, on a parallel

16   track.

17           I'm not also going to require valuation discovery

18   now on the T side or the E side.  That can be done in the

19   context of confirmation discovery so I'll overrule those

20   objections.

21           This idea that additional parties, whether they be

22   the note trustee or the EFH committee or some members should

23   get access to the details of what's going on in the Oncor

24   bid, I already ruled on this in November of last year.  My

25   ideas on this haven't changed.  I don't think it's

1    appropriate.  I think it's dangerous and I think it's all

2    coming out in due course so it's simply not appropriate and

3    certainly not appropriate in the context of a scheduling

4    order for confirmation.

5              I think the committee coordination provisions of

6    discovery have been fleshed out appropriately and it's very

7    clear that everybody has their individual rights and

8    nobody's required to cooperate if they don't want to

9    cooperate.  Father of two children, you cannot force

10   cooperation no matter how much Sesame Street you make them

11   watch, it just ain't going to happen.  So if they want to

12   coordinate and cooperate great, otherwise all rights are

13   reserved.

14             Let's see.  At this point, like I said, I'm not

15   going to push the confirmation hearing back, but we'll

16   discuss that at an appropriate time.  On this idea of off-

17   ramps, I was a little concerned.  I thought we were dancing

18   around that a little bit and nothing that I'm going to do in

19   the context of scheduling confirmation is going to interfere

20   with any decision I think is appropriate in connection with

21   the standing motions once they're put in front of me and I'm

22   certainly not going to allow challenge periods to expire

23   without making a decision based on a confirmation scheduling

24   order.  So, I think everyone's rights are appropriately

25   preserved there.

1           I've already mentioned the sequencing.  I think

2    Mr. Shore makes a very good point in as much as possible it

3    should maintain that, but that will become an issue of time

4    which may force some overlap that obviously should be

5    avoided as much as possible.

6           I didn't understand, Mr. Shore, your point about

7    all creditors being allowed to participate.  I thought all

8    creditors could participate so.

9           MR. SHORE:  I think that's addressed now in the

10   context of what Your Honor has said on the record --

11          THE COURT:  Okay, thank you.

12          MR. SHORE:  -- about cooperation.

13          THE COURT:  All right.  So just to sort of

14   reiterate, I'm overruling the E side committee and the

15   American Stock transfer objection in their entirety.  I've

16   made my rulings in connection with pushing back.  I've

17   talked a little bit about how the schedule should go forward

18   and be sequenced if at all possible.  I'm reserving the

19   right on when the actual hearing will start, but I am very

20   much holding the dates that I previously set aside based on

21   the initial schedule and hope we can meet those, but we'll

22   move it if appropriate and we'll discuss that at a future

23   time.

24          I've discussed mediation.  I think I've addressed

25   what I think are the salient issues that needed to be

1     addressed.

2              MR. MCKANE:  Your Honor, in evaluating how to

3     handle the conference on the 25th, one thing that we would

4     recommend is just submitting at least a proposed schedule

5     for discussion purposes maybe a week out on the 18th so that

6     we have the interlineated dates spelled out as well.

7     Obviously there will be cooperation and coordination with

8     the creditors in putting forward something.  But --

9              THE COURT:  Yeah, I think it would be appropriate

10    to have a target to shoot at.  Certainly, you know, if the

11    hearing date moves -- I'm not saying it will -- that might

12    need to be addressed.  It may be that you agree to move it

13    anyway, I don't know.  So you can talk about it, but it

14    certainly would be helpful to have a proposal by the debtors

15    as to what they think the appropriate schedule would be

16    filed before the hearing so people have an opportunity to

17    hate it because we want to make sure everybody has a full

18    opportunity to hate everything the debtors do in this case

19    and hopefully -- and maybe, you know, constructively comment

20    on it to the extent necessary.

21              So, with the disclosure statement issues and the

22    mediation issues if you want to submit a revised order

23    incorporating that and so of excising out the confirmation

24    piece I'll sign that.

25              MR. MCKANE:  We will.  We'll submit it hopefully

1    today.

2            MR. KIESELSTEIN:  One other point, Your Honor.  A

3    related matter to the scheduling order was the stipulation

4    which we just want to have a chance to absorb Your Honor's

5    order and see if there's any knock on effect.  We don't

6    necessarily think that there is and we're waiting for a sign

7    off from one or two parties on the final verbiage on that

8    anyway.  So assuming it doesn't create any issues, we would

9    just I guess plan on resubmitting that with a C&O or

10   something along those lines, Your Honor.

11           THE COURT:  The stipulation.  You mean the

12   mediation piece or do you mean the --

13           MR. SCHWARTZ:  Your Honor, it's a stipulation that

14   was filed, 4140, and it relates to the agreement between the

15   T side first lien creditors, the T side junior creditors

16   regarding, among other things, adjourning the standing

17   hearing.

18           THE COURT:  Oh, the standing hearing stipulation.

19           MR. SCHWARTZ:  Correct.  There are various

20   provisions in there related to mediation that we had updated

21   somewhat this morning and --

22           THE COURT:  Right, I saw those.

23           MR. SCHWARTZ:  But we need to chat with the other

24   parties because we haven't had final signoff on that yet.

25   But I think once we do we can submit that.

1            THE COURT:  Any objection?

2            MR. SHORE:  No.

3            THE COURT:  All right.  Anything else on that?

4            MR. SHORE:  The only thing, Your Honor, is we've

5    got I think a very early setting for a disclosure statement

6    objection that is later this month, right, for a disclosure

7    statement in July.  Consistent with Your Honor's ruling on

8    trying to hold things off for a bit we'll talk to them about

9    an adjournment for everybody.  I don't think anyone needs to

10   object two months prior to the hearing, but we'll come back

11   to you if that's a problem.

12           THE COURT:  All right, come back to me if that's a

13   problem.  We can do that on the phone.  You know, the timing

14   is important in the context of the discovery etcetera and we

15   are going to go forward with litigating and discovery in

16   connection with disclosure statements so only so much can be

17   pushed back and you can't have an objection deadline too

18   close to the hearing date anyway.  Okay?

19           MR. MCKANE:  Thank you, Your Honor.

20           THE COURT:  You're welcome.  So, if anyone wants

21   to leave.  No one wants to leave, right?  We'll take a few

22   minutes to shuffle and what's next?  Should we have --?

23           MR. MCKANE:  Your Honor, the make whole -- there's

24   a make whole motion to dismiss as it relates to EFIH secured

25   notes.

1           THE COURT:  Right, but I need to see Mr. McGaan

2    and Mr. Anker, so why don't I see them first and then I'll

3    hear the motion to dismiss?

4           MR. MCKANE:  If we could have a few minutes.

5           THE COURT:  Yeah, we'll take a very -- tell you

6    what, we'll take five minutes, then we'll re --

7           MR. MCGAAN:  I can tell you we've got agreement,

8    but we'll report that to you when you come back.

9           THE COURT:  Okay.  Very good.

10          MR. MCGAAN:  Thank you, Your Honor.

11          [BREAK]

12          THE COURT:  Mr. Qureshi.

13          MR. QURESHI: Good morning, Your Honor.

14          THE COURT:  Good morning or good afternoon.

15          MR. QUERISHI:  I should say good afternoon.  Abid

16   Qureshi, Akin Gump on behalf of the --

17          MAN 1: (indiscernible).

18          MR. QUERISHI:  Oh, my apologies.

19          THE COURT:  I was wondering, okay.  It's okay.  No

20   worries.  Mr. McGaan.

21          MR. MCGAAN:  Thank you, Your Honor.  Andrew McGaan

22   for the debtors.  We've reached agreement in fact just

23   recently with the first lien trustee on a due date.  I knew

24   it would take a little time, but we got there.  So the due

25   date we're proposing by agreement for the post-trial

1    submissions you asked for is May 20th.

2              THE COURT:  Okay.

3              MR. MCGAAN:  I won't share with you how that

4    sausage got made, but that's where we came out.  And there

5    is a pending Rule 59 motion the trustee filed to amend the

6    summary judgment order.

7              THE COURT:  Right.

8              MR. MCGAAN:  We've agreed to put that over to the

9    June 1 hearing and continue to discuss between ourselves

10   whether it's even going to be necessary depending on what

11   may or may not happen with the lift stay matter that's

12   before you.

13             THE COURT:  Okay.

14             MR. MCGAAN:  So, if that's acceptable we've put

15   that motion over.

16             THE COURT:  Okay.  Yes, Mr. Anker?

17             MR. ANKER:  Yeah, Mr. McGaan's reports on both

18   points are accurate, Your Honor.

19             THE COURT:  Okay.

20             MR. ANKER:  I've confirmed them from our

21   standpoint so if that's acceptable to the Court we don't

22   have to have a long hearing on status on those issues.

23             THE COURT:  Terrific.  I'm glad you were able to

24   agree.  That dates is fine and continuing the Rule 59 motion

25   to June 1 is fine.  If in the interim you reach some sort of

1    agreement as to something you can submit under certification

2    you're welcome to do so, otherwise we'll address it at that

3    time and, as you say, it may become moot based on whatever

4    ruling I may make, but we won't know that until I make a

5    ruling so I'm not going to promise that by June 1, but

6    hopefully -- I will not sit on this.  This needs to get

7    taken care of before I forget what happened in April.

8                MR. ANKER:  Thank you, Your Honor.

9                THE COURT:  You're welcome.  Thank you.

10               MR. MCGAAN:  And lastly, Your Honor, I want to

11   introduce to the Court Mike Petrino from our firm who is

12   going to handle the motion that's up next.

13               THE COURT:  Okay.  Thank you.

14               MR. MCGAAN:  Thank you.

15               THE COURT:  Welcome, Mr. Petrino.

16               MR. PETRINO:  Thank you, Your Honor.

17               THE COURT:  All right, Mr. Qureshi, sorry about

18   that.

19               MR. QURESHI:  All right, try it again.  Good

20   afternoon, Your Honor.  Abid Qureshi, Akin Gump on behalf of

21   the EFIH PIK note committee.  Your Honor, if I could hand up

22   a presentation, I've got a few slides that I intend to take

23   the Court through and the debtors have a copy.  May I

24   approach?

25               THE COURT:  Yes.

1              MR. QURESHI:  Now, Your Honor, we're before the

2      Court today on the PIK noteholders' motion to dismiss the

3      debtors' declaratory action adversary complaint.  Now, in

4      that complaint what the debtors ultimately seek is a

5      declaration from this Court that the PIK holders are not

6      entitled to any kind of a make whole premium and that any

7      post-petition interest, if payable at all, should be capped

8      at the federal judgment rate rather than be paid at the

9      contract rate.

10             The basis of our motion to dismiss, Your Honor, is

11     simply that neither of these dispute is right and that the

12     Court therefore lacks subject matter jurisdiction to

13     adjudicate these hypothetical claims at this time.  Now I'm

14     going to walk the Court through the applicable legal

15     standard.  I think it's quite clear in demonstrating that

16     the Court does not have jurisdiction.  But before I do that,

17     I want to talk for a minute, Your Honor, about how this

18     dispute sits within the present posture of these cases and a

19     little bit about some of the things we heard this morning

20     which I think bear upon this motion.

21             So, Your Honor, has in part approved the

22     scheduling motion that begins that begin to set forth the

23     path that at least the debtors hope to follow through to

24     confirmation of a plan.  And I want to be clear it's a plan,

25     it's not the plan and I think that was clear from the

Page 121

1    presentations this morning.

2            As the debtors have repeatedly said, and they said

3    it again this morning, they intend to continue to negotiate

4    with their creditor constituencies.  There's clearly no

5    consensus around the plan that is on file at present.  In

6    fact, I don't think I've heard or read a single constituency

7    utter a word in support of the debtors' current plan.

8            Now in that plan they propose a settlement of the

9    two issues which they also simultaneously wish to adjudicate

10   in this complaint.  They propose a settlement of the make

11   whole entitlement of the PIK noteholders and that

12   settlement, if that class votes in favor of their plan, is

13   to pay at five percent of the make whole amount and they

14   also propose a settlement with respect to post-petition

15   interest, again contingent on our class voting in favor of

16   the plan and that proposed settlement is that post-petition

17   interest would be paid at 25 percent of contract rate and if

18   our class votes to reject the plan then post-petition

19   interest, again assuming a solvent debtor, would be capped

20   at the federal judgment rate and there would be no make

21   whole payable at all.

22           So, to start with it's a little bit

23   counterintuitive it seems to us that at the same as they

24   propose a settlement in their plan they simultaneously

25   propose to ask this Court to litigate those very same issues

1   completely divorced from the confirmation context.

2           Now you heard Mr. McKane stand up this morning in

3   connection with the scheduling motion and state that with

4   respect to the EFH make whole and the EFH PPI claims that he

5   was quite content to have those issues litigated in

6   connection with confirmation.  And you heard Mr. Kieselstein

7   this morning urge the Court to consider the propriety of the

8   T side settlement of claims against the E side at the time

9   of confirmation and Mr. Kieselstein explained that there was

10  no basis to front run that issue, to deal with it ahead of

11  confirmation and I think his words were, and I don't have it

12  exactly, but to the effect of it makes no more sense to

13  front run that issue than it does to front run consideration

14  of the best interest of creditor's test and that's precisely

15  the point we make in our papers, Your Honor.  We couldn't

16  agree more.

17          So why are we here today?  Well, it seems to us

18  that what the debtor would like to do, our constituents'

19  theoretical contract rate entitlement to post-petition

20  interest is in the range of $400 million.  The make whole is

21  in the range of $100 million.  That is value that the

22  debtors would love to have definitively available to them

23  today to hand out to other constituencies in order to build

24  consensus.  Not surprisingly the debtors say it would be

25  very helpful to them in their plan process if they could get

1    that legal certainty now.

2              Now, it doesn't quite square with what they say in

3    their papers.  They say that this adversary proceeding does

4    not address how the trustee's claims will be treated under

5    any future plan.  But that's exactly what they're trying to

6    do, Your Honor.  They're trying to get legal certainty today

7    as to how they would have to treat our claims in a

8    hypothetical future plan.

9              Now, contrary to what the debtors suggest, Your

10   Honor, we're not trying to avoid the litigation of these

11   issues.  I fully recognize, Your Honor, that there is a

12   world in which perhaps these issues won't be resolved

13   consensually and I could be right back before Your Honor

14   having to litigate those issues in the future.

15             What we are saying is simply we cannot be

16   compelled legally to litigate those issues today because

17   they continue to be hypothetical.  We should not be

18   compelled to litigate those issues completely detached from

19   plan confirmation and devoid of any factual context and I

20   think the weight of the authorities on these points is

21   decidedly in our favor.

22             So, with that introduction, and I'm going to move

23   quite quickly through these slides, Your Honor, I recognize

24   there are a fair number of them, but I think we can go

25   through them fairly quickly.  Let's start with the legal

1    standard.

2          This Court only has subject matter jurisdiction

3    over ripe disputes and that is the case, Your Honor, no

4    matter how helpful the debtors might argue that a ruling

5    from Your Honor on these points might be.

6          Now, the party seeking a declaratory judgment,

7    here it's the debtors, they have the burden, Your Honor, of

8    establishing that this is a ripe dispute.  So

9    notwithstanding the fact that it is our motion to dismiss,

10   it is their burden to establish that these disputes are ripe

11   and that this Court therefore has subject matter

12   jurisdiction.

13         Now, we rely in our papers a fair bit on the Grace

14   Holdings decision.  That's the decision of the District

15   Court of Delaware and in that case there are a number of

16   Supreme Court decisions that are cited and what the Supreme

17   Court says again and again is that courts should not

18   adjudicate contingent future events that may or may not

19   occur as the debtors anticipate and for that matter events

20   that may or may not occur at all and that I think is quite

21   precisely the situation that we faced with here.

22         THE COURT:  I mean, we know, I don't have to

23   ignore reality, we know that at some point they're going to

24   pay something on your claim.

25         MR. QURESHI:  Well, Your Honor, even that I'm not

1    sure that we know because we don't know if we're going to

2    end up in a solvent estate.  We don't know what's going to

3    happen to the Oncor auction.  We don't know when

4    confirmation is going to be.  We don't know whose plan is

5    going to be approved for solicitation.  We don't know if

6    it's going to be more than one plan that is approved for

7    solicitation.  We don't know if the treatment that's going

8    to be suggested of our claims in that plan is something that

9    our class is going to vote in favor of.  Those are all

10   unknowns, Your Honor.  It is certainly theoretically

11   possible that at some point in this process a plan different

12   from what is on the table today will get proposed and that

13   our class votes in favor of that plan.  We can't discount

14   that.  That is, after all, the debtors' objective, to work

15   toward a fully consensual plan.

16          So, I think we're not asking the Court to ignore

17   reality in any way.  Your Honor will recognize we are going

18   to act in our economic self-interest.  There's no question

19   about that.  But what we're saying, Your Honor, is it is I

20   think impossible and inappropriate to try to assume all of

21   the facts that need to be assumed in order to fairly

22   litigate these issues and I'm going to deal with make whole

23   and post-petition interests separately, but I think the same

24   considerations really apply to both.

25          Your Honor, if I could just skip to the Third

1   Circuit test in Step-Saver.  So there the Third Circuit

2   developed a three factor test to determine ripeness

3   specifically in the context of declaratory judgment actions.

4   Three components of the test -- adversity of interest of the

5   parties, conclusiveness of the judgment and practical help

6   or utility of the judgment.

7            To be ripe that -- all three components of that

8   test must be satisfied, not just one.  And there is, of

9   course, a common string running through all of those tests,

10  Your Honor, and that is that where it is based on a

11  contingency it is unlikely that that test can be satisfied.

12           So I'm going to start first with adversity of

13  interests and here, Your Honor, I think that the Armstrong

14  case that's cited on slide seven, also a Third Circuit

15  decision, states it really much more clearly than I could.

16  Where the plaintiff's action is based on a contingency it is

17  unlikely that the parties' interests will be sufficiently

18  adverse.

19           Again, Your Honor, it's not a case of can we

20  assume a set of facts where X months down the road, and we

21  don't even know how far down the road, the interests will be

22  adverse, it's are the interests adverse today in order for

23  there to be jurisdiction and I think the answer clearly is

24  not necessarily so.

25           So, the conclusiveness of judgments prong of the

1    test, Your Honor, it distinguishes again between

2    hypothetical facts and actual fact and here the Grace court

3    holding took note of the fact that it is obviously the case,

4    Your Honor, that anytime the court is asked to rule on an

5    issue there will be some amount of additional certainty

6    injected into the process, some amount of conclusiveness

7    injected into the process.  But that alone is not enough to

8    overcome what is a contingent dispute.  And I think that's

9    very much the case here.

10         Now, we've cited a number of other cases, Your

11   Honor, that make that same point.  And on slide nine, again,

12   another quote from Grace Holdings and from TWA, that

13   whatever ruling Your Honor might be asked to make now is one

14   that may or may not hold, depending upon what happens down

15   the road.

16         Now, I want to switch to the last prong of step

17   savored, which is the practical help or utility.  And I

18   think this is one that Your Honor, the debtors rely upon

19   most heavily.  It's front and center in their complaint,

20   front and center in their opposition to our motion.  And

21   essentially their plea is, "Your Honor, help the debtors

22   out.  Help us all get to the promised land of a consensual

23   plan.  And by dealing with this -- with these issues now,

24   you will really assist the parties in getting there."  And

25   this is precisely what Judge Gerber addressed in the

1    Adelphia case that we quoted at some length in our

2    pleadings, the distinguishing feature between Adelphia and

3    the present case is that in Adelphia, it involved an effort

4    by a creditor constituency to have a dispute concerning an

5    ex-clause of adjudicated in advance of plan confirmation.

6           And there, Judge Gerber held that the fact that it

7    might facilitate negotiations doesn't confer jurisdiction on

8    the court.  The court either has subject matter jurisdiction

9    or it doesn't.  And in that case, the dispute was a

10   hypothetical one, and so, too, is it here.  And that's why

11   other courts, and we've cited at the bottom of slide 10, the

12   Antonelli case, goes so far as to say, "Even though refusing

13   to rule might inject additional complexity into the process

14   and might complicate negotiations, so be it."  Again, the

15   court either has subject matter jurisdiction or it doesn't.

16          And so, if Your Honor turns to the next slide, in

17   Adelphia, Judge Gerber described a number of the

18   contingencies that he believed in that case rendered the

19   request for declaratory judgment un-right.  And the ones

20   we've extracted on this page, Your Honor, are the ones, each

21   of which, is equally applicable here, whether the debtors

22   will continue to propose this plan.  Well, they couldn't

23   have been more clear about that this morning, Your Honor.

24   Whether this plan will secure acceptances by the requisite

25   number of creditors.  Again, we have no idea.  Whether the

1    plan will be amended in a way that addresses the sub-debt

2    holders' concern.  And here, too, we don't know what changes

3    may or may not come with respect to the proposed treatment

4    of these two issues.

5            Whether enterprise value is ultimately found by

6    the Court would be higher or lower than that now assumed by

7    the debtors, applicable to our case.  In the first instance,

8    that means, of course, whether we're going to have a solvent

9    debtor or not.  Whether as a consequence of any valuation

10   ruling, the debtors revise their plan.  Whether exclusivity

11   will be lifted and another constituency will propose a plan.

12   These are all contingencies that are equally applicable

13   here, Your Honor.

14           Now let's take a look at the trustee's proposed --

15   or not -- I shouldn't say proposed, the trustee's proof of

16   claim.  And we've extracted that at slide 12.  And what Your

17   Honor can see at slide 12 and 13 is the proof of claim along

18   with a fairly standard reservation of rights.  And that

19   reservation of rights, of course, reserves the ability of

20   the trustee to seek, among other things, a make whole and

21   post petition interest to the extent that those issues

22   become ripe further down the road.

23           THE COURT:  Yeah, except it doesn't contain the

24   words reservation or rights.  I mean, that's not what it

25   says.  It says.  It says, "The proof of claim makes claim to all

1    amounts, whether liquidated or un-liquidated, due under or

2    relating to the notes, or arising under the indenture,

3    including, but not limited to principal premiums, applicable

4    premium, pre-payment payments, et cetera, et cetera."

5    There's no, "And we reserve the right to make these claims."

6            MR. QURESHI:  Well--

7            THE COURT:  You are making the claim here for

8    post-petition interests and the make whole.

9            MR. QURESHI:  Well, again, Your Honor, not

10   necessarily so.  So, let me give a simple example.  If it

11   turns out to be the case that this is not a (indiscernible)

12   state, then I won't be before Your Honor filing the motion

13   seeking post-petition interest because all know that post-

14   petition interest is not payable in a--

15           THE COURT:  You say that, but you filed a claim

16   seeking it.

17           MR. QURESHI:  Well, certainly, Your Honor, the

18   claim that is filed leaves open the possibility that those

19   matters might be asserted, absolutely, and I think it needs

20   to.

21           THE COURT:  No, it doesn't leave open that they

22   might be asserted, it asserts it.

23           MR. QURESHI:  Well, Your Honor, for--

24           THE COURT:  "Makes claims to all amounts."

25           MR. QURESHI:  For purposes of ripeness, I don't

1   think that distinction matters, Your Honor, because what

2   matters is when we get to confirmation, right, will we know

3   if the debtor is going to be solvent, and therefore, if you

4   have a PPI issue or not.  Will we know if our constituency

5   votes in favor of whatever treatment is proposed under

6   whatever plan is before the Court at that time?  And

7   therefore, will we have to litigate that issue or not?  The

8   point of ripeness goes to whether the Court is being asked

9   now today to adjudicate an issue that is an actual

10  controversy.  And by all of the contingencies that I've

11  talked about, Your Honor, I think what those demonstrate is

12  that we don't know if it's going to be an actual issue when

13  we get to confirmation.

14          And, we can start with paragraph 78 of the

15  debtor's complaint, Your Honor, which is the operative can't

16  with respect to post-petition interests.  And of course, it

17  starts with, "If the debtors are found to be insolvent, then

18  they want a declaration that there's no entitlement to post-

19  petition interests."  But, if the debtors are solvent based

20  on legal and equitable principles, then they want a

21  declaration that interest is kept at the federal judgment

22  rate.  And so, they're expressly, in the complaint, asking

23  the Court to make certain assumptions and to assume certain

24  facts.  And I think that also holds true, Your Honor, if you

25  go onto the next slide, the fair and equitable test under

1    1129(b) of the Bankruptcy Code.

2           So again, is the Court going to have to address

3    this issue at confirmation or not?  Well, the Court is only

4    going to need to apply the fair and equitable tests to the

5    extent that our constituency has not accepted the proposed

6    treatment under the plan.  So, depending upon what happens,

7    there are many possibilities, where Your Honor will never

8    have to deal with these disputes.

9           So, just to sum up on the next slide, Your Honor,

10   what are the contingencies -- solvency that this plan --

11   because again, you're being asked now, Your Honor, to

12   address these issues in the context of the plan that's on

13   file, whether that is the plan that the debtors will pursue

14   without modification, and whether that is the plan that will

15   be approved for solicitation by this Court, whether our

16   constituencies vote to reject or accept that treatment.

17          And then, the equities of the case.  So, the

18   equities of the case -- I don't even understand, Your Honor,

19   how we can possibly litigate that issue today because the

20   equities of the case that will matter are the equities that

21   exist at confirmation, when we know, with respect to all of

22   the classes, who's getting what kind of a recovery and what

23   the equities actually are.  It's entirely unclear to me how

24   we can deal with the equities of the case today.

25          Now, Your Honor, is no doubt aware that Judge

1    Gross recently confronted a similar issue in the Nortel

2    case.  And in Nortel, what Judge Gross was asked to do by

3    way of a claim objection, was to rule on whether a --

4    whether post-petition interest should be capped at the

5    federal judgment rate, or whether the contract rate should

6    apply.  And Judge Gross declined to address the issue.  And

7    on slide 17, we've extracted a quote from that decision.

8    And what Judge Gross said is that it would require the Court

9    to issue an advisory opinion on an issue, which may never

10   arise, and if it does, only at a later date, and perhaps in

11   a different context.  In Nortel, Judge Gross found solvency

12   was not known at that time.  There was a -- there was no

13   plan on the table and no certainty as to whether that issue

14   would ever arise.  And respectfully, Your Honor, I think

15   that's exactly where we are here.

16          Now, I can, I think, skip through the next number

17   of slides pretty quickly, but I do want to just, before I do

18   that, pause on one issue that I think Your Honor is going to

19   hear from the debtors, with respect to solvency in

20   particular, and that is, the debtors are going to say,

21   "Well, you can decide these issues without a solvency

22   determination now, because Your Honor handled the solvency

23   issue in the first lien make whole by effectively

24   bifurcating the proceedings."  But I think there's a very

25   important distinction there, Your Honor, and that is that

1    the first lien make whole proceedings were bifurcated for

2    the purposes of efficiency.  There was no bifurcation for

3    purposes of somehow trying to create subject matter

4    jurisdiction or (indiscernible) subject matter jurisdiction

5    was never an issue with respect to the first lien because it

6    was the first liens that were asserting their claim.  It was

7    the first liens that were the plaintiffs in that adversary

8    proceeding.

9           And so, there, the underlying contractual dispute

10   was absolutely ripe and had clearly been asserted.  But

11   here, solvency is a contingency that controls whether

12   there's any entitlement to post-petition interest in the

13   first place.  So, when we talk about a plan constituency,

14   there are, in the next several slides, and again, I think we

15   can skip over them rather quickly, but the debtors, again,

16   could not be more clear about how things might change.  And

17   in a couple of places, they talk expressly not only about

18   the possibility of modifying the plan that's on the table,

19   but replacing it entirely.  And that just demonstrates, Your

20   Honor, that the futility in trying to litigate today on the

21   basis of a plan that we are almost certainly not going to

22   see in its present version be approved for solicitation.

23          Now, if Your Honor could move ahead to slide 24,

24   and I'm just taking Your Honor back to paragraph 78, because

25   I want to talk about this -- the equitable principles one

1   more time.  So the debtors, in their complaint, they

2   acknowledge that with respect to post-petition interests,

3   it's not a pure, narrow, legal issue that the Court can

4   decide today devoid of any fact.  They acknowledge that

5   there are equitable principles at play in a Court's

6   determination as to post-petition interest and the rate at

7   which post-petition interests should be paid.

8           And of course they do.  That's consistent with the

9   case law.  The next slide shows Dow Corning.  And Your

10  Honor, I don't intend to get into the merits of the post-

11  petition interest issue today.  But, Dow Corning says

12  there's a case specific fairness inquiry.  There are

13  equitable considerations that are at play.  And that's a --

14  the following slide has a couple of more cases that all talk

15  about the same thing.  It depends on the equities of the

16  case.

17          So, here we are in May -- and they want to get

18  going on this adversary proceeding, and undoubtedly tee up

19  summary judgment as quickly as they can.  Confirmation is

20  going to happen at the earliest, in December.  And they want

21  Your Honor to somehow address the equities of my

22  constituencies entitlement to post-petition interest today.

23  They want that decided when we don't know if the debtor is

24  solvent.  We certainly don't know the extent of solvency.

25  We don't know if, for example, there's going to be a

1    recovery to the EFIH equity holder at EFH.  We don't know if

2    this Court is going to approve some kind of a settlement of

3    T-side claims against the E-side.  We don't know how

4    (indiscernible) class is going to vote on whatever plan is

5    before the Court.  We don't know how other classes are going

6    to be treated.  We don't know who's getting what.  And so,

7    it just seems impossible for the Court today to address all

8    of those equities.

9            Now, I think it's also important to understand,

10   Your Honor, that this isn't a contract dispute as such.  On

11   the next slide, we have the relevant provision firm our

12   indenture, and I don't think, Your Honor, that there's any

13   dispute about what the indenture provides with respect to

14   the payment of post-petition interest.  It's slide 27, Your

15   Honor.

16           THE COURT:  Okay.

17           MR. QURESHI:  The dispute, Your Honor, is with

18   respect to under applicable bankruptcy law, and depending on

19   the circumstances in which we find ourselves at confirmation

20   is post-petition interest payable, and if so, at what rate.

21   It's a dispute that arises because of the provisions of the

22   code, not because of any inherent uncertainty regarding the

23   contract.

24           So, in short, Your Honor, if you are asked to rule

25   and agree to rule on this issue now outside of the context

1    of confirmation, there is an absolute possibility that that

2    ruling would be entirely moot, that the judicial resources

3    expended by Your Honor in mitigating what is a certainly, I

4    think it's fair to say, a complex issue that involves both

5    legal issues and factual issues, it could end up being moot.

6    It could end up being moot if the debtors turn out to be

7    insolvent.  It could end up being moot if the present plan

8    is not approved for solicitation.  It could end up being

9    moot if some different plan is proposed, perhaps even by

10   some -- somebody other than the debtors.  And at the end of

11   the day, it could end up being moot if whatever plan is

12   ultimately before the Court at confirmation is one in which

13   the PIC class of creditors votes in favor of whatever

14   treatment is on offer in that plan.

15            So, really, I don't think anything would

16   conclusively be decided if the Court were to agree to hear

17   this dispute now, because ultimately, it all rests on

18   contingencies.  Now, on slide 31, Your Honor, is paragraph

19   one of the debtor's complaint.  And this goes to the last of

20   the step saver factors, (indiscernible) help.  And they say

21   right in the complaint, and it's in paragraph one, I think

22   for a reason, that Your Honor should rule on these issues

23   now because it would help them move forward towards

24   reorganization, that it will provide all parties clarify,

25   beneficial with respect to the ongoing plan negotiations.

1          And in their opposition brief, they say exactly

2    the same thing.  And again, Your Honor, not to belabor the

3    point, but I think here, we really need to pay heed to Judge

4    Gerber's ruling in Adelphia, because I do think that what

5    Judge Gerber said in that case is right on the mark, and I

6    want to just take particular emphasis to one part of that

7    ruling, and that is, other than recognizing, as I think he

8    had to do, that no amount of assistance to the debtors in

9    their negotiations, no amount of assistance to the debtors

10   in coming up with a consensual plan can confer jurisdiction

11   where the jurisdiction doesn't exist, Judge Gerber also

12   recognized that bankruptcy courts would be beset with

13   requests for advisory opinions.  If it were the case that

14   Your Honor had subject matter jurisdiction over hypothetical

15   disputes.  We'd all love to know going into a negotiation,

16   what Your Honor might rule at the end of the day, if that's

17   an issue that we can't resolve, and we end up having to

18   litigate at confirmation.  We'd love to know that.

19          And it's not hard to conceive of circumstances in

20   this case where all kinds of disputes would be brought

21   before Your Honor because the parties would want to know

22   before trying to negotiate whether they're going to win or

23   lose at confirmation.  And that's not what the process

24   should be like, Your Honor, and that's certainly not a set

25   of circumstances that gives rise to subject matter

1   jurisdiction.

2          Now, I'm going to, I think, go very quickly

3   through the remaining counts of the complaint, Your Honor,

4   that deal with the PIC note holders entitlement to the make

5   whole, because with respect to (indiscernible), I don't

6   think that there is a meaningful distinction between PPI and

7   make whole.  So, if Your Honor jumps ahead to slide 35,

8   you'll see we've put on that page what I think are the

9   principle contingencies here.  The first one, are we going

10  to be prepaid or not?  Again, the adversary complaint pre-

11  supposes that that's going to be the case, but we don't know

12  that that's going to be the case.  And with respect to the

13  (indiscernible), Your Honor, these are exactly the same

14  contingencies that apply with respect to PPI.

15         And this is all very distinguishable from Your

16  Honor's litigation with respect to both the first lien and

17  the second lien make whole.  And on slides 36 and 37, we,

18  you know, briefly summarize those reasons.  The debtors

19  sought approval, with respect to the first lien, to pay off

20  the first liens by securing DIP financing.  As soon as that

21  happened, the first lien trustee sued, they actually were

22  repaid, there was never a dispute regarding likeness.

23         The second lien adversary, Your Honor, we'll

24  recall unfolded a little bit differently.  The debtors

25  sought approval of a second lien DIP announced their

1    intention to pay off the second lien notes, the second

2    lien's commencement adversary as a result.  The debtors

3    later withdrew that second lien DIP, and that in turn led

4    the second lien trustee to move to dismiss their own

5    complaint, because in their view, it was no longer ripe,

6    because obviously, they were no longer being proposed to be

7    paid down.  And following that, there was indeed a partial

8    pay down.  And the partial pay down solved the ripeness

9    issues and the second lien trustee, at that point, proceeded

10   with the adversary proceeding.

11          So, both of those litigations, Your Honor, are

12   completely different here.  We are unsecured creditors.  We

13   have not been prepaid.  We don't know if we will be prepaid.

14   We don't know when we might be prepaid.  And so, there's no

15   basis now to litigate that issue.

16          Now, I think the last point I need to make on

17   solvency, Your Honor, is just as it is relevant to payment

18   of post-petition interest, solvency, and I think also the

19   extent of solvency is relevant to make whole entitlement.

20   And so, for the same reasons that solvency isn't known, and

21   therefore, it's not appropriate to litigate post-petition

22   interest, at this stage, I think that's equally true with

23   respect to make whole.

24          So, Your Honor, let me finish with a couple of

25   thoughts.  Again,  Your Honor, I think it's quite clear why

1    the debtors want the relief that they're seeking, why they

2    want definitive rulings from this Court on our entitlement

3    to make whole of the post-petition interest.  They want a

4    certainty of their ability to take value that might

5    otherwise have to be set aside to pay those claims in order

6    to distribute it to other parties to build consensus.

7          It's somewhat curious that they focused on our

8    hypothetical make whole and post-petition interest

9    entitlement, when again, you heard this morning that with

10   respect to EFH, they're content to let that one ride through

11   to confirmation.  I don't know if that's because those make

12   wholes and PPI together theoretically amount to something in

13   the range of $300 million, whereas in the case of the

14   (indiscernible), it's more in the range of $500 million, so

15   they would, I guess, find $500 million to be definitively

16   available, a better tool to go off and try to build

17   consensus around the plan.

18         But, Your Honor, even if the debtors were right,

19   that if they had those legal rulings from Your Honor, and

20   therefore, if they had the ability, with certainty, to

21   spread that value around to other constituencies in order to

22   build consensus now, even if all of that would lead to a

23   consensual plan, that's just -- that type of piecemeal

24   litigation outside of the context of the plan is just not a

25   legally permissible way to achieve that kind of certainty.

1          No matter how helpful they say that this

2     litigation might be, it just doesn't confer subject matter

3     jurisdiction.  Now, there's also, Your Honor, I think a very

4     important point to be made about prejudice here.  The

5     debtors have demonstrated through the filing of this plan

6     that they're fully capable of doing what every debtor does

7     in every other large and complex case.  They propose in a

8     plan, whatever treatment they believe to be appropriate for

9     the creditors in that case.  And they then go on and

10    ultimately seek approval of that treatment in connection

11    with confirmation.  And they've done that here.  Their plan

12    proposes a settlement.  That's why I started at the outset,

13    Your Honor.

14          And it would no doubt be the case that when all

15    those mediation discussions take place over the next weeks

16    and months, and all the other negotiations that will

17    undoubtedly go on, if everybody could have in their back

18    pocket a ruling from Your Honor that would deliver to them

19    certainty with respect to whatever their issue is.

20          So, there's no prejudice to the debtors here.

21    There's no prejudice to any other party and interest,

22    because everybody will be able to fully and fairly litigate

23    these issues if and when they arise at the time of

24    confirmation.  For us, however, Your Honor, I think it is

25    very meaningfully different.  So, the PIC note holders will

1    be forced to litigate legal issues, factual issues,

2    equitable issues, in a complete, factual vacuum, completely

3    divorced from any understanding of what type of treatment is

4    proposed for us or for anybody else under any type of a

5    plan.

6              I don't even know, Your Honor, how the debtors

7    would be capable of providing the discovery that we think

8    we'd be entitled to in order to litigate these issues now,

9    because we can't litigate equitable fairness until we know

10   what kind of treatment we're going to be getting under a

11   plan.  And we simply don't know that yet.  And so, for all

12   those reasons, I think Your Honor, as much as there may be

13   some appeal to Your Honor of the debtor's view that these

14   are significant issues and that there's a lot of money at

15   stake in those issues, and so, please deal with them now so

16   that we can get on the road to a consensual plan, I think

17   the fact is, Your Honor, that legally, that's just not

18   permissible.  I think the case law coming from the Third

19   Circuit is very, very clear that in these circumstances,

20   there are just way too many contingencies and way too many

21   unknowns, such that this dispute is absolutely a

22   hypothetical one over which this Court has no subject matter

23   jurisdiction.  So unless the Court has any questions, I'll

24   hand it over to the debtors.

25             MR. PETRINO:  Good afternoon, Your Honor.

1          THE COURT:  Good afternoon.

2          MR. PETRINO:  Mike Petrino, with Kirkland & Ellis

3    for the debtors.  Your Honor, this is a very straightforward

4    issue.  The PICs filed an expansive proof of claim seeking,

5    among other things, a make whole premium and post-petition

6    interest.  The debtors seek, through the adversary

7    complaint, to value the PICs claim and fully resolve all

8    disputes implicated by that proof of claim.  Bankruptcy

9    courts routinely resolve claims objections and claims

10   valuations outside of confirmation.  And all the adversary

11   complaint seeks is clarity about the party's rights in the

12   context of the PICs claim for payment.  This is precisely

13   the purpose of a declaratory judgment action like this one.

14          And it's important to focus on the specific relief

15   that the PICs are requesting today.  They ask this Court to

16   hold that it lacks the constitutional power to value and

17   resolve these disputes regarding their proof of claim.  The

18   Court plainly has the legal authority to resolve this

19   dispute, and the practical reasons to proceed now are

20   obvious.  In fact, I didn't hear any dispute from opposing

21   counsel that there are practical benefits to proceeding now,

22   for the overall reorganization.  The Court has already

23   recognized the importance of resolving the first lien make

24   whole claim.

25          Well, resolving the PICs claim for approximately

1   $500 million of make whole and post-petition interest is

2   equally important to the overall restructuring effort, as

3   parties attempt to compromise claims, and creditors consider

4   whether to vote for the proposed plan.  And this leads to

5   another important practical point, and that is, it's

6   important to understand what the Court is not being asked to

7   rule on today.

8           Opposing counsel has raised issues about what is

9   discovery going to look like?  Well, we can't even get there

10  until we get past this gating issue that they've raised

11  about rightness.  And none of what this discovery going to

12  look like, none of that goes to the Court's -- the question

13  of the Court's constitutional power to hear this case.

14  Declaratory judgment has -- exists for the precise reason

15  that the debtors seek one here, and that is so that the

16  parties can have clarity on their rights in the context of

17  concrete disputes like this one.

18          Now, Your Honor rightly pointed out that on page

19  13 of the PICs' deck is an excerpt from their proof of

20  claim.  And in that proof of claim, they make claim to all

21  amounts, including pre-payment penalties, make whole

22  premiums, call premiums, and interest outstanding as of and

23  arising from or after April 29th, 2014.  So, they clearly

24  claimed both the make whole and post-petition interest.

25  I've heard a lot about how we don't know what the plan's

1    going to look like, but they made a claim for it, right?

2    And the Court can resolve claims objections and valued

3    claims outside of a proposed claim of confirmation, outside

4    of a confirmation hearing.

5            I would also say that, you know, sort of, the

6    opposing counsel was saying that, well, we haven't really

7    made a claim yet.  But, if they haven't made a claim yet,

8    then is it time barred?  I mean, they've -- I think it's

9    pretty clear that they've asserted a proof of claim, and

10   that the Court can resolve this issue now.  In fact, we cite

11   in our papers two places -- LaGuardia and Southside House,

12   where claims to make whole premiums were resolved outside of

13   a (indiscernible) organization.  The PICs tried to

14   distinguish that case by saying, "Well, we didn't have a

15   plan of" -- there was a plan of reorganization on file then

16   in those cases, and at the time they wrote their brief,

17   there was no plan of reorganization on file in this case,

18   but now there is.  So, the main way to distinguish whether a

19   make whole can be resolved outside of a -- the confirmation

20   context has fallen away.  In fact, their chief contingency

21   that they pointed out in their brief was, "Well, we don't

22   have a plan on file.  We don't have a plan on file."

23           Well, now there is a proposed plan on file, and

24   all we hear about is, "Well, the proposed plan might

25   change."  And so, we're facing a sort of cat and mouse game,

1   where they keep coming up with new contingencies and new

2   contingencies, but that's not the law.  The law requires the

3   Court to evaluate the three step saver factors, which we'll

4   go through, in the -- and to determine whether, under these

5   facts, the Court can enter this case.

6         Now, the opposing counsel sort of divided his

7   presentation into the make whole issues and the post-

8   petition interest issues.  So, you know, I kind of want to

9   mirror that, just so we're joining issue on these two

10  points.  When it comes to the make whole, I think we've

11  already hit that, right?  It's in their proof of claim.  And

12  the Court can -- excuse me -- can value that claim and can

13  resolve a claim objection outside of a plan of confirmation.

14  And we've cited cases that do that.

15        When it comes to post-petition interests, right,

16  we're -- I'm hearing -- what I heard from opposing counsel

17  was, "Well, we could settle.  We could -- the plan might

18  change.  We don't know how we're going to vote."  But all

19  claims could settle, right?  And if the potential that --

20  for a consensual resolution of claims could divest the Court

21  of jurisdiction, then can never hear any declaratory

22  judgment actions.  There was also -- there's also a

23  discussion of whether the PIC notes will be repaid as a

24  potential contingency.  And the Court said, in response, "We

25  don't have to ignore reality."  And that's exactly right.

1   And the Court is allowed to test the likelihood of the

2   contingencies that opposing counsel has cast up.  And so,

3   when it comes to the various contingencies that they're

4   asserting, the Court has the ability to peek behind the

5   curtain and see whether these are really valid

6   contingencies.  One issue, the--

7              THE COURT:  Well, he makes a point.  I made the

8   point, you know, look, if these unsecured notes are out of

9   the money with this debtor, we've got big problems in this

10  case that go well beyond this litigation, because we've just

11  destroyed the valuation thesis.  It's behind a lot of what's

12  been the basis for the fighting that's been going on and

13  continues to be the basis for the fighting that's going on.

14  But that's not to say that it's -- that we're so sure that

15  payment will be such that the debtor -- this debtor, in

16  particular, is solvent.

17             And since I don't have to ignore reality, i.e.,

18  they're going to get paid at some point, I don't know, as I

19  sit here today, whether they're going to get paid in full,

20  such that there would even be a contractual right to post-

21  petition interests, nor do I know when they're going to get

22  paid.  So those are -- aren't those contingencies, Mr.

23  Qureshi raises, that are important contingencies that I'm

24  not in a position, if I were to decide to hear this matter,

25  to make a judgment on.

1            MR. PETRINO:  I agree in part, that they're

2    important contingencies, but I disagree that that would

3    divest you of jurisdiction to hear this issue.  And of

4    course, solvency is an important issue in this case.  We are

5    eager to discuss how to handle discovery of solvency with

6    the PICs on this issue.  But, to say that the Court couldn't

7    take the case, wouldn't have the constitutional power to

8    address these issues is a, I think, a different question.

9    And we can -- we have dealt with solvency in the first lien

10   make whole.  We could potentially deal with it here, using

11   the same techniques, or perhaps, different techniques.

12            But, we can't have those conversations yet unless

13   we get past this important gating issue and get going on

14   discovery.  And so, I think the important -- right, so the

15   important issue is, maybe we can address that issue through

16   discovery.  And I think it's important to know that--

17            THE COURT:  Well--

18            MR. PETRINO:  Sorry, Your Honor.

19            THE COURT:  No, go ahead.

20            MR. PETRINO:  If there comes a time when there's a

21   genuine material fact that perhaps would preclude resolving

22   the case, well then, maybe we can cross that bridge when we

23   come to it.  But, I think it's important to realize that we

24   have addressed solvency before in other contexts.  We can do

25   it here and we'd like to have the conversation

1   (indiscernible) the PICs to get this going.  And I think

2   there's one important point to raise here, and that is, in

3   the reply brief, opposing counsel cited an order from Judge

4   Gross in Nortel -- well, I looked into it, and it turns out

5   that the Judge Gross reversed himself on the issue later in

6   the case.  And without a plan on file, without a

7   determination of solvency, the Court agreed to hear the

8   post-petition interest issue, and the Court specifically

9   said in a later memorandum opinion, and I've brought copies

10  to hand out, if Your Honor would like to look at them,

11  because they attach--

12          THE COURT:  Yes.

13          MR. PETRINO:  --they attach, there's -- so, there

14  are two things, Your Honor, and I have copies for

15  (indiscernible).  So one is a scheduling order

16  (indiscernible) interest issues, issued in -- on June 30th,

17  2014, the order that opposing counsel attached to their

18  reply brief was, I believe, in November of 2013.  So here's

19  this.  And then, the next thing is a -- an opinion regarding

20  debtor's motion to -- for a 9019 settlement to settle the

21  post-petition interest issue.  And I only provide this to

22  the Court, because it provides useful background information

23  about this dispute.  And I think the key quote is on page

24  25, where the Court said, "The Court agreed to hear the PPI

25  dispute ruling" -- excuse me.  "The Court agreed to hear the

1    PPI dispute despite ruling previously that it would not."

2    So I'd like to hand these up to Your Honor for--

3              THE COURT:  Right.

4              MR. PETRINO:  Now, Your Honor, opposing counsel

5    also spent some time discussing the standard, generally, in

6    -- and I'd just like to point out that the standard is not

7    mathematical certainty of future events occurring.  The

8    Court is able to weigh and probe the probability of a future

9    event.  And the standard is whether the probability of a

10   future event occurring is real and substantial.  And so,

11   there is a way here to get into the important issue of

12   solvency, taking discovery, or discussing -- perhaps

13   discovery isn't necessary.  Perhaps we can have a -- we

14   could resolve these issues another way.  But, we can't even

15   get there, if it's just full stop, you can't decide post-

16   petition interest issues ever, except outside of the context

17   of confirmation.  I don't think that's the law, and that's

18   not what Judge Gross agreed to do in the Nortel case.

19              Opposing counsel also discussed the Adelphia case,

20   and I think distinguished it in self.  He mentioned that it

21   was a case about an ex-clause.  It's not a case about how

22   much is a claim worth.  Here, we have a discrete dispute

23   about how much is a claim worth, right?  And while we might

24   not be able to fix the precise value of that claim until the

25   plan's effective date, the same thing is true in the first

1   lien make whole or the second lien make whole, if any make

2   whole were awarded.  And we wouldn't be able to figure out

3   exactly the precise dollar amount, but the Court can still

4   rule on those issues.  Those issues are still ripe.

5           Opposing counsel also mentioned Mr. Kieselstein's

6   comments earlier about taking issues in a piecemeal fashion.

7   I think there's a very important distinction between

8   litigating the settlement, the forms, the basis of the plan

9   before we've got -- even gotten to confirmation hearings

10  versus addressing this discreet issue, which again, has been

11  raised in their proof of claim.

12          I don't think I need to take the Court through the

13  step saver factors one by one, but I would just say that,

14  you know, opposing counsel's argument was really focused on

15  contingencies.  I don't -- I didn't hear much debate -- or I

16  don't think there's much grounds for debate today about

17  whether we are adverse, right, except to the extent that

18  they think contingencies play into adversity.  In some of

19  the papers, there was a -- some question as to whether

20  they're really adverse to us, but I think we've joined issue

21  on they're going to ask for a make -- they had asked for a

22  make whole payment.  They've had asked for post-petition

23  interest.  And I think it (indiscernible) belief to say that

24  they're going to leave $500 million on the table, right?

25  The Court doesn't have to ignore the reality.  We are

1    adverse on these issues.  And in fact, you know, in their

2    papers, right, they cite -- they stake out their position on

3    the post-petition interest issue.

4              And of course, when it comes to the -- you know,

5    the third factor -- well, when it comes to the third factor,

6    some practical help to the parties, I didn't hear much room

7    for debate about, you know, that this would be of practical

8    help to the parties.  I heard argument that benefit to the

9    reorganization by itself does not confer jurisdiction.  And

10   that, of course, is true.  But, it's also a relevant factor

11   that the Court can weigh.

12             And in the context of this discreet dispute, where

13   they've made a demand for payment for make whole and post-

14   petition interests, the Court has a jurisdiction to address

15   those issues.  So, Your Honor, as I said at the outset, this

16   issue was simple.  The PICs want a make whole premium and

17   they want post-petition interests.  And all the debtors seek

18   through this declaratory judgment is to determine how much

19   the claim is worth.

20             This is a straightforward question of claims

21   valuation, and one bankruptcy courts answer all the time

22   without concerns about Article Three rightness.  And the

23   EFIH debtors respectfully request that the Court deny the

24   PICs motion to dismiss.

25             THE COURT:  Thank you.

1           MR. GOREN:  Todd Goren, Morrison & Foerster on

2     behalf of the TCH Committee.  I just have one minute of Your

3     Honor.  And we agree with the debtors, that this is a

4     material issue that should be heard now.  You know,

5     (indiscernible) names a lot of contingencies, but I think if

6     you hooked everybody in the case up to a polygraph machine,

7     they'd agree that this is an issue that's very likely to be

8     -- need to be decided at some point absent resolution.  And

9     it's really just a question of timing.

10           But, I write primarily to address the third step

11    saver factor, which is the practical helper utility.  As the

12    debtors point out, deciding this issue is very material to

13    plan negotiations.  But, more importantly, with respect to

14    the alternative REIT plan we were discussing this morning, a

15    determination of this issue is critical in telling Mr. Shore

16    and his group how much money they need to go out there and

17    raise.

18           So this is really a very important issue that we

19    need an answer on sooner rather than later, and delaying it

20    to confirmation could materially impair the ability to

21    propose alternative plans.  So, for that reason, we believe

22    the issue is ripe, and we agree with the debtors that it

23    should go forward.  Thank you, Your Honor.

24           THE COURT:  Thank you.  Just give me a second.

25           MR. QURESHI:  Sure.

1          THE COURT:  I'm making a note.  Okay.

2          MR. QURESHI:  I'll be very brief, Your Honor.  Let

3    me start by just putting to bed the issue with respect to

4    Nortel.  Your Honor, I represent the official committee of

5    Nortel, and I'm very familiar with what the Court did in

6    that case, to the extent that Your Honor wants any further

7    clarification of after we're done today.  We can certainly

8    submit a supplemental letter on that issue.  But the long

9    story short, Your Honor, is that the post-petition interest

10   objection was originally scheduled as a joint hearing

11   between the Canadian court and the U.S. court, both were

12   supposed to hear the question of entitlement to PPI in both

13   Canada and the United States on the same day.

14          Judge Gross decided in advance of that hearing

15   that he was not going to proceed.  The Canadian court

16   decided that it would proceed.  The Canadian court did

17   proceed.  The Canadian court issued an order.  Judge Gross

18   did not.  Subsequent to that, Your Honor, the parties

19   reached a settlement in which the parties agreed at the rate

20   at which post-petition interest would be payable in the

21   event that there is a solvent debtor.  Judge Gross then held

22   a trial with respect to the 9019 approval of that

23   settlement.

24          So, there was no change of heart by Judge Gross in

25   deciding that it would be appropriate to deal with post-

1    petition interests on the merits outside of the plan

2    context.  Quite to the contrary, it was originally

3    scheduled, and then Judge Gross said, "No, I'm not going to

4    do that."  So, I want Your Honor to be perfectly clear with

5    respect to what happened there.  And in, I think in fact,

6    his ruling is quite instructive and quite relevant here.

7              Now, just a couple of other points, Your Honor.

8    If what the debtor were seeking here is simply a ruling from

9    Your Honor as to whether there should be post-petition

10   interest payable or not, that might be a different argument.

11   They certainly would have a better argument in that

12   circumstance that the Court has jurisdiction to hear that

13   dispute now.  But Your Honor, they want you to determine the

14   rate at which post-petition interest is payable.

15             And that rate absolutely involves equitable

16   considerations that I've talked about, I don't need to

17   repeat that, and a whole bunch of contingencies.  And I

18   could go well beyond what's listed in the slides.  I'll

19   raise one.  I suspect, Your Honor at some point, might hear

20   from Mr. Shore, that the T-side believes they have claims

21   that are structurally senior to the EFH PIC -- EFIH PIC note

22   holders.  So that's another possibility that we might have

23   to deal with.

24             And, Your Honor, also with respect to solvency,

25   and of course, we all hope that valuations continue to be

1    very robust in this case, and that there's plenty of value

2    to go around.  But, we should not, Your Honor, simply assume

3    the facts that exist today are going to be facts that exist

4    in eight months or in a year.  Last week, I was in front of

5    Judge Carey in the Endeavour case, where there's a

6    completely different situation in light of the precipitous

7    drop in oil prices.  So one does not know what's going to

8    happen and that is the whole point behind the case law that

9    says there has to be an actual case, a real adversity of

10   interests now.

11           Mr. Petrino suggested that perhaps there is no

12   debate about whether there is adversity of interests that

13   exists today.  There absolutely is.  Your Honor, in the

14   complaint itself, the debtors say the trustee is expected to

15   seek payment of a premium, that the trustee, they expect

16   that the trustee will seek post-petition interest.  Again,

17   Your Honor, I'm not trying to bury my head in the sand and

18   defy reality in some way, as I conceded at the outset, our

19   constituency absolutely will act in its self interest.  But,

20   we simply don't know what those circumstances are going to

21   be.

22           Now, Your Honor, let me end with this.  If I could

23   ask Your Honor to turn up slide three in the presentation,

24   and this is another hold quote from the Grace Holdings case,

25   from the district court.  And I'm focused, in particular, on

1    the bottom of the page, because I think that really sums it

2    up nicely.  "At the heart of the ripeness doctrine is the

3    consideration that courts should not adjudicate contingent

4    future events that may or may not occur as anticipated, or

5    indeed, that may not occur at all."  Respectfully, Your

6    Honor, we think it is inescapably the case here that this

7    litigation is premised upon future events that may or may

8    not occur as the debtors anticipate.

9            In fact, they're almost certainly not to occur as

10   the debtors anticipate, and that may or may not occur at

11   all.  We've heard a lot about a million dollars a day in

12   fees being consumed in this case, and I think the last thing

13   this court needs and the last thing the parties need is to

14   embark upon another expensive time consuming, both for the

15   court and for the parties litigation that might well under

16   any number of circumstances, prove to be entirely

17   unnecessary.

18            THE COURT:  Thank you.

19            MR. QURESHI:  Thank you.

20            THE COURT:  Anything else?  So I'm going to take a

21   recess.

22   (Recessed at 3:44 p.m.)

23            CLERK:  All rise.

24            THE COURT:  Please be seated.  All right, I was

25   going to open the (indiscernible), but I changed my mind, so

1    I'm going to take the matter under advisement and issue

2    something as soon as I reasonably can.  Anything else for

3    today?  No?  All right.  Thank you.  We're adjourned.

4              MAN 1:  Thank you.

5              MAN 2:  Thank you, Your Honor.

6    (Whereupon these proceedings concluded at 3:45 p.m.)

7

8                          *  *  *  *  *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 160

1            C E R T I F I C A T I O N

2

3    I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5
     Sonya                    Digitally signed by Sonya Ledanski Hyde
6                             DN: cn=Sonya Ledanski Hyde,
                              o=Veritext, ou,
     Ledanski Hyde            email=digital@veritext.com, c=US
7                             Date: 2015.05.05 14:13:31 -04'00'

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  May 5, 2015

## &

**&**  8:4,20 9:1,17
10:5,14 11:1 12:1,6
12:12,17 14:6,18
15:7,13 16:6,11
17:12 22:5,19 36:15
48:5,24 51:22 64:5
66:8 67:6 86:4,13
99:21 144:2 154:1

## 1

**1**  7:8 26:23 59:2,3
61:23 77:12,15,16
77:25 88:8 99:7
117:17 118:9,25
119:5 159:4
**10**  43:11 85:4
128:11
**100**  56:7 122:21
**104**  60:22
**10:00**  108:21
109:11
**10th**  37:4
**11**  1:4 24:23 26:16
32:9 34:15,20 35:9
74:23 81:23
**11.25**  51:17
**1121**  71:16,22,23
72:2
**1125**  37:4
**1129**  132:1
**11501**  160:23
**12**  3:12,18 129:16
129:17
**12:35**  101:12
**13**  5:10 25:24 64:1
129:17 145:19
**13the**  24:6
**14**  6:10,24
**14-10979**  1:5
**14-50363**  1:10
**14-51002**  1:17
**14th**  24:7 29:15
67:19
**15**  80:22
**150**  68:13

## 16 7:8 70:23 71:1,4

**1682**  2:14
**17**  52:21 133:7
**17th**  43:18
**18**  3:6 25:19
**18th**  22:25 104:15
104:17 114:5
**19**  4:25 5:4
**1:30**  101:3,9

## 2

**2**  5:22 6:5 85:4
159:5
**20**  104:16
**2013**  150:18
**2014**  2:14,19,25 3:6
3:12,18 7:9 145:23
150:17
**2015**  1:24 3:24 4:5
4:11,17,25 5:4,10
5:16,16,23 6:5,11
6:17,24 7:2,4 22:25
71:14 160:25
**2016**  72:25
**20th**  101:23 108:11
108:12 118:1
**23**  2:14
**23rd**  38:24 104:18
108:24 109:8
**24**  5:15,16 134:23
**24th**  108:21
**25**  121:17 150:24
**254**  7:3
**25th**  108:25 109:8
109:11 114:3
**26**  7:2
**26-30**  70:22
**2602**  2:19
**2662**  2:25
**27**  4:11 6:17 40:13
41:2 136:14
**28**  2:19 80:23
**2808**  3:5
**2992**  3:12
**2994**  3:18
**29th**  145:23

## 3

**30**  2:25
**300**  141:13 160:22
**3001**  3:4,11,17,23
4:3,10,15 5:9,21 6:3
6:16
**3002**  63:13,13,23
**3003**  3:4,11,17,23
4:3,10,15 5:9,21 6:4
63:13
**3007**  3:5,11,17,23
4:3,10,15 5:9,21 6:4
6:16
**3007-1**  3:5,12,18,23
4:4,10,16 5:9,22 6:4
6:16
**3039**  7:8
**30th**  150:16
**31**  137:18
**3212**  3:24
**3218**  4:4
**330**  160:21
**3381**  4:11
**3473**  4:16
**35**  83:1 139:7
**3596**  4:24
**36**  139:17
**3605**  5:4
**37**  139:17
**3896**  5:10
**3961**  5:16
**3993**  6:16
**3:44**  158:22
**3:45**  1:25 159:6
**3rd**  32:6 43:12

## 4

**4**  1:24
**400**  122:20
**4003**  6:17
**4050**  5:22
**4052**  6:4
**4065**  7:3
**408**  32:5
**4138**  6:24
**4139**  6:10

## 4140 115:14

**4th**  43:24 50:1

## 5

**5**  49:8,8 160:25
**500**  141:14,15 145:1
152:24
**502**  3:4,10,16,22 4:2
4:9,14 5:8,20 6:3,15
59:11
**503**  2:10,12
**521**  63:1
**59**  118:5,24

## 6

**6**  4:16 7:4

## 7

**7**  56:1
**700**  32:13 59:4
60:24 61:5
**78**  131:14 134:24

## 8

**8**  68:12
**800**  69:2
**805**  78:6 79:11
**824**  1:22

## 9

**9**  2:10,12 3:24 4:5
**90**  71:4
**9011**  58:21
**9019**  59:9 60:18
96:18 150:20
155:22
**911**  63:10
**9:41**  1:25
**9th**  44:21 45:9

## a

**a.m.**  1:25 109:11
**aaron**  14:9
**abbott**  13:11
**abid**  17:21 20:10
66:8 117:15 119:20
**ability**  26:19 73:2
73:21 82:12 91:8
92:20,23 129:19
141:4,20 148:4

154:20
**able** 28:1 72:22
  77:10 79:15 80:25
  86:5,22 95:3 109:5
  118:23 142:22
  151:8,24 152:2
**absent** 154:8
**absolute** 137:1
**absolutely** 37:24
  38:9 40:23 93:10
  96:17 130:19
  134:10 143:21
  156:15 157:13,19
**absorb** 115:4
**accept** 28:13 132:16
**acceptable** 102:5
  118:14,21
**acceptances** 128:24
**accepted** 27:19
  132:5
**access** 96:1 111:23
**accommodate**
  31:16 36:7 85:18
**accompaniment**
  24:16
**accompli** 36:2
**accomplish** 43:2
  105:7
**accurate** 59:12
  118:18 160:4
**accuse** 77:4
**accused** 76:10
**achieve** 25:1 141:25
**acknowledge** 39:9
  67:24 74:7 89:23
  91:1 135:2,4
**acknowledges**
  41:21
**act** 69:22,23 125:18
  157:19
**acted** 63:6
**action** 120:3 126:16
  144:13
**actions** 26:13 69:9
  126:3 147:22
**active** 25:4 28:19
  29:25 103:18

**actively** 42:12 49:12
**actual** 51:13 55:13
  64:10 113:19 127:2
  131:9,12 157:9
**ad** 4:19 11:17,22
  15:2,8 28:17,17,20
  29:5,16 31:11 40:14
  41:13,15,22 42:2,20
  44:17 47:7,8 48:6
  48:14 67:6 68:2
  80:12 81:5 89:7
  94:25 100:16
  101:25
**adam** 18:12
**add** 27:3
**added** 44:11
**addition** 38:22 59:5
  71:17 102:4
**additional** 26:11
  37:3 39:10 42:4,8
  42:13,14 43:20,22
  45:5,16 46:3 107:4
  111:21 127:5
  128:13
**address** 23:14,17,25
  28:8 36:22 37:21
  41:14 45:13,16,22
  46:4 67:8,10 72:4
  72:10 76:5 78:1
  80:21 85:5 93:1
  98:20 119:2 123:4
  132:2,12 133:6
  135:21 136:7 149:8
  149:15 153:14
  154:10
**addressed** 37:17
  39:15 40:8 46:17
  50:2 79:5 94:5
  96:23 100:13 113:9
  113:24 114:1,12
  127:25 149:24
**addresses** 24:17
  80:17 129:1
**addressing** 24:18
  39:19 152:10
**adelphia** 128:1,2,3
  128:17 138:4

151:19
**adjourn** 49:4
**adjourned** 159:3
**adjourning** 115:16
**adjournment** 6:9
  116:9
**adjudicate** 120:13
  121:9 124:18 131:9
  158:3
**adjudicated** 128:5
**adjust** 44:13
**adjustments** 36:6
  45:22 80:24
**administered** 54:25
**administration** 1:6
  63:20,21
**administrative**
  26:22
**admissibility** 52:22
**adv** 1:10,17 7:3,8
**advance** 39:13 40:2
  40:9 109:17 128:5
  155:14
**advancing** 33:25
**adversaries** 71:2
**adversary** 7:6 39:10
  39:13 77:21 120:3
  123:3 134:7 135:18
  139:10,23 140:2,10
  144:6,10
**adverse** 126:18,22
  126:22 152:17,20
  153:1
**adversity** 126:4,12
  152:18 157:9,12
**advisement** 159:1
**advisors** 2:16 30:3
  30:21 32:16 33:18
  87:19 95:20 99:1
**advisory** 133:9
  138:13
**affairs** 64:3
**affidavit** 61:9
**affirmatively** 28:4
  28:21
**afford** 26:2,4

**afforded** 26:11
**afternoon** 49:5
  84:23 86:2,12 98:18
  117:14,15 119:20
  143:25 144:1
**agenda** 22:15 83:24
**aggressively** 38:13
  45:25
**ago** 25:18
**agree** 85:6 102:1
  106:3 114:12
  118:24 122:16
  136:25 137:16
  149:1 154:3,7,22
**agreed** 6:9 23:9
  49:3,18 57:10 85:12
  91:21 94:2 118:8
  150:7,24,25 151:18
  155:19
**agreement** 37:2
  115:14 117:7,22,25
  119:1
**agreements** 74:23
  74:24 75:2
**agrees** 73:5
**ahead** 38:10 60:4
  110:2 122:10
  134:23 139:7
  149:19
**aid** 36:16 94:17
**ain't** 112:11
**akin** 13:5 17:17
  66:8 117:16 119:20
**al** 1:5 2:7,21 5:12
  6:8,19
**alberino** 17:20,24
**albertson** 15:5
**alco** 11:2,7
**alcoa** 45:25 86:3
**alcoa's** 86:5
**alexa** 14:14
**allocate** 97:14
**allocation** 32:17
  97:21
**allocations** 83:3
  93:24

**allow**  25:13 26:14
  43:22 73:14 75:16
  81:11 85:15 87:14
  94:17 96:1,8 98:9
  103:24 104:4 105:9
  110:16 112:22
**allowance**  55:7,8
**allowed**  32:13 38:17
  95:20 107:23 113:7
  148:1
**allowing**  2:18
**alter**  7:1
**alternative**  29:17
  29:20,22 30:5,23
  48:15 49:9,11 68:1
  72:15 74:8 75:17
  87:16 99:16 103:18
  105:14 154:14,21
**alternatively**  2:18
**alternatives**  29:11
  29:12,24 31:3,7
  76:16,17 87:23
**alves**  10:17 17:4
**amend**  64:2 118:5
**amended**  3:2 7:1
  49:3 51:12 129:1
**amendment**  58:7
**amendments**  63:24
**amer**  20:21
**american**  11:12
  57:15,16 110:15
  113:15
**amnesia**  67:18
**amount**  31:24 32:1
  34:11 60:7,17 61:8
  61:9,14,15 75:13,24
  94:10 105:12 107:1
  121:13 127:5,6
  138:8,9 141:12
  152:3
**amounts**  60:8 61:12
  61:22 130:1,24
  145:21
**ample**  90:20
**amply**  26:13
**analogy**  69:23

**analysis**  77:7
**anderson**  15:18
**andrea**  9:15
**andrew**  8:11 14:16
  20:14,19 117:21
**andy**  51:21
**angela**  19:14
**anker**  10:12 17:25
  117:2 118:16,17,20
  119:8
**anna**  19:17
**announced**  29:14
  139:25
**answer**  46:6 100:9
  126:23 153:21
  154:19
**anticipate**  124:19
  158:8,10
**anticipated**  158:4
**antonelli**  128:12
**anybody**  102:15
  143:4
**anymore**  34:1
**anytime**  127:4
**anyway**  114:13
  115:8 116:18
**aparn**  8:18
**aparna**  21:4
**apart**  104:2
**apologies**  117:18
**apologize**  36:20
  86:12
**appeal**  143:13
**appear**  69:15,16
**appearance**  71:5
**appearing**  89:25
**appears**  72:3
**apple**  107:11
**applebaum**  14:9
**applicable**  120:14
  128:21 129:7,12
  130:3 136:18
**application**  100:5
**applied**  35:10
**applies**  63:10 71:1
  103:22

**apply**  125:24 132:4
  133:6 139:14
**appointed**  25:16
**appreciate**  88:19
  98:22 105:1
**approach**  36:17
  55:18 119:24
**approached**  46:12
**appropriate**  37:7
  37:19 40:11 42:15
  51:16 67:2 78:14
  96:4,10,11 97:23
  101:20 102:23
  103:5,23 104:4,24
  110:16,22,23 111:8
  112:1,2,3,16,20
  113:22 114:9,15
  140:21 142:8
  155:25
**appropriately**  45:1
  103:19 111:13
  112:6,24
**appropriateness**
  23:15
**approval**  6:23
  105:8 139:19,25
  142:10 155:22
**approvals**  75:4
**approve**  93:6 136:2
**approved**  58:4
  72:17 97:24 102:5
  104:5,8 105:9
  120:21 125:5,6
  132:15 134:22
  137:8
**approving**  2:10,13
  48:17
**approximately**
  25:19 45:11 144:25
**april**  5:22 6:5,10,24
  7:3 24:6,7 25:24
  29:15 32:6 38:23
  67:19 119:7 145:23
**arbitrary**  69:8
**aren't**  148:22
**argue**  124:4

**argument**  71:12,17
  95:11 152:14 153:8
  156:10,11
**arguments**  49:24
  66:4
**arises**  136:21
**arising**  130:2
  145:23
**arlene**  10:17 17:4
**armageddon**  55:24
**armies**  31:8
**armstrong**  126:13
**army**  52:1 58:8
**arose**  49:2,20
**article**  153:22
**articulate**  106:24
**articulating**  94:17
**ascribe**  29:1
**ashby**  16:11
**aside**  26:22 33:8
  57:24 88:20 104:16
  113:20 141:5
**asked**  32:19 42:2
  46:11 53:5 55:14
  75:15 80:1 83:9
  88:2 91:12 110:11
  118:1 127:4,13
  131:8 132:11 133:2
  136:24 145:6
  152:21,22
**asking**  41:23 57:19
  57:20 84:16 91:18
  100:22 107:5,7,8
  125:16 131:22
**aspects**  30:13 76:4
**asserted**  5:20 31:12
  130:19,22 134:10
  146:9
**asserting**  134:6
  148:4
**assertion**  55:3
  75:23
**assertions**  29:8
**asserts**  29:6 130:22
**assessment**  51:15
**assets**  54:24 56:19

**assiduously** 99:16
**assist** 127:24
**assistance** 25:8
  32:16,22 138:8,9
**associated** 88:20,21
  105:14
**assume** 125:20
  126:20 131:23
  157:2
**assumed** 125:21
  129:6
**assuming** 51:17
  115:8 121:19
**assumption** 72:5
**assumptions** 131:23
**ast** 58:7 96:21
**attach** 23:24 33:2
  150:11,13
**attached** 56:10
  150:17
**attack** 23:17 38:4
  44:14
**attempt** 32:23
  40:22 97:1 145:3
**attempted** 23:23
  37:16 41:24
**attempting** 46:1
**attempts** 37:22 39:6
**attend** 109:5
**attention** 32:25
  107:10
**attorney** 14:12
  16:12 63:11
**attorneys** 8:5,21 9:2
  9:9,18 10:15,21
  11:2,7,12,17,22
  12:2,7,13,18,23
  13:14,20 14:2,7,19
  15:2,8,14,19 16:2,7
  16:17 17:2,8,13,18
**attributes** 59:7,8
**auction** 38:14 125:3
**augment** 23:25
**august** 43:11 44:3
  62:11 96:3
**authorities** 123:20

**authority** 4:21 5:2
  63:16 144:18
**authorizes** 52:13
**authorizing** 2:22
  5:13 6:7
**availability** 36:2
**available** 51:11
  56:22 94:11 104:14
  122:22 141:16
**averaging** 26:23
**avoid** 40:19,25
  123:10
**avoidance** 4:22
**avoided** 113:5
**avoiding** 58:2
**awarded** 152:2
**aware** 29:6 51:19
  92:25 93:20 94:15
  95:5 132:25

**b**

**b** 2:1,10,10,12 3:4
  3:10,16,22 4:2,9,14
  5:8,20 6:3,15 11:4
  63:10 71:4 132:1
**back** 34:21 44:19
  50:11 62:23 74:3
  75:21,25 76:15,19
  76:22 77:20 78:20
  86:1 88:12,14 90:14
  90:19 93:7 94:18
  101:10 110:7
  112:15 113:16
  116:10,12,17 117:8
  123:13 134:24
  142:17
**backdoor** 71:15
  81:8
**background** 150:22
**backstop** 74:24
**backward** 60:9
**backwards** 70:19
**badgered** 27:14
**baked** 74:22,22
  91:20 94:13 96:18
  107:17 110:20
**balance** 59:14

**bank** 1:18 9:9 15:14
  15:19
**bankruptcy** 1:1,21
  2:3,10,13 3:4,4,5,10
  3:11,11,16,17,17,22
  3:22,23 4:3,3,4,9,9
  4:10,15,15,16 5:8,8
  5:9,21,21,22 6:3,3,4
  6:15,15,16 23:19
  25:7 37:4 59:11
  61:20 62:7 63:8,13
  63:23 64:9 74:9,12
  83:25 132:1 136:18
  138:12 144:8
  153:21
**bar** 2:8 35:4,8,10
  54:3 62:25 63:1,4
  96:22 110:25 111:9
**barred** 146:8
**bartley** 15:11
**based** 29:17 56:4
  69:1,13 87:12,18
  94:16 96:4 112:23
  113:20 119:3
  126:10,16 131:19
**basically** 28:14 64:6
**basis** 27:2 29:20
  32:6 33:14,25 38:18
  38:21 39:3 40:17
  56:16 63:12 82:24
  85:21 111:5 120:10
  122:10 134:21
  140:15 148:12,13
  152:8
**bear** 120:20
**becoming** 65:18
**bed** 155:3
**befitting** 26:7
**began** 61:11
**beginning** 80:11
  85:19 88:3 105:18
**begins** 44:8 60:21
  120:22
**behalf** 5:3 22:5,19
  48:5,24 50:22 66:9
  67:6 86:3,13 98:19
  117:16 119:20

154:2
**belabor** 64:12 138:2
**belief** 69:14 152:23
**believe** 24:12 26:13
  27:6,8 29:14 30:15
  31:13 37:17 38:20
  39:1 41:24 54:6,8
  55:20 56:20 57:23
  57:24 60:13,21
  61:19,25 62:9,20
  63:15 64:13 65:8,19
  75:10 84:7 86:5,15
  86:17 87:17 96:10
  97:17 101:20
  110:15 142:8
  150:18 154:21
**believed** 48:12
  128:18
**believes** 26:15
  96:11 97:22,23
  156:20
**belknap** 12:22
**belongs** 65:23
**beneficial** 46:20
  137:25
**benefit** 62:14 73:13
  153:8
**benefits** 144:21
**benjamin** 18:20
**beret** 19:2
**beset** 138:12
**bespeaks** 72:6
**best** 25:13 27:23
  34:2 57:21 60:15
  69:6 81:23 85:21
  100:15 122:14
**better** 34:21 40:3
  69:6 141:16 156:11
**beyond** 42:10
  148:10 156:18
**bid** 38:4,8,10,13
  39:3 69:11 108:12
  111:24
**bidder** 74:10
**bidding** 66:2
**biddle** 12:17

**bielli** 16:6
**bifurcated** 134:1
**bifurcating** 133:24
**bifurcation** 134:2
**big** 53:12 73:23
    77:16 78:24 101:16
    108:10 148:9
**biggest** 45:17
**bill** 16:14
**billion** 56:1 59:2,3
    61:23 68:12 74:23
    99:7
**billions** 54:15 77:23
    79:13
**binding** 52:25 53:6
    53:24 64:15,24 65:9
    111:10
**bit** 33:22 69:17 70:3
    73:18 75:21 99:10
    104:4 112:18
    113:17 116:8
    120:19 121:22
    124:13 139:24
**bite** 107:10
**blank** 17:7 31:20
    32:1
**blew** 90:10
**blinders** 30:16
**blowing** 107:1
**blush** 98:13
**boards** 68:8
**body** 90:20
**boller** 13:7 18:1
**bond** 54:16
**bonds** 28:18 54:15
    57:17
**bottom** 128:11
    158:1
**bound** 23:10 65:3
**bowden** 16:14
**braced** 31:13
**bradley** 18:21
**brady** 21:2
**branzburg** 9:8
**break** 44:16 47:1
    101:3,5 117:11

**breaking** 101:8
**brian** 8:14 14:15
    15:4 19:11 48:4
**brickley** 18:2
**bridge** 149:22
**brief** 48:7 84:24
    97:1 98:20 138:1
    146:16,21 150:3,18
    155:2
**briefly** 29:4 66:10
    99:18,20 139:18
**bring** 58:1 91:15
**bringing** 35:25
    75:11
**brings** 107:9
**brinksmanship**
    45:19
**broad** 23:15
**broader** 23:10
    102:23
**brody** 12:9 50:21
    50:21
**broken** 60:25
**brought** 87:25
    138:20 150:9
**brown** 16:1 17:12
    18:3,4
**build** 122:23 141:6
    141:16,22
**building** 77:8,9
**bunch** 35:16 75:12
    110:4 156:17
**burden** 124:7,10
**burn** 77:2,5,25
**burnazian** 18:5
**burning** 55:22 88:7
**bury** 157:17
**business** 27:6 82:3
    82:4 87:18 95:18,19
**bussigel** 18:6
**buy** 51:25 55:11
    83:6

**c**

**c** 2:13 8:2 11:14
    21:2 22:1 160:1,1
**c&o** 115:9

**cadence** 25:10
**calculation** 77:6
**calendar** 26:14
    104:16,19 105:24
**call** 29:24 67:20
    87:20 101:10
    109:12 145:22
**calls** 73:17
**canada** 155:13
**canadian** 155:11,15
    155:16,17
**can't** 131:15 138:17
    143:9 145:9 149:12
    151:14,15
**capable** 58:9 95:4
    142:6 143:7
**capital** 24:25 28:24
    68:20 99:13 100:17
**capped** 120:7
    121:19 133:4
**captures** 66:15
**care** 119:7
**careful** 55:7
**carey** 157:5
**carl** 20:23
**carpenter** 8:20 14:6
**cart** 104:6
**carter** 13:22
**carty** 18:7
**case** 1:5 11:21 22:9
    26:7,13,16 27:24
    29:1 33:25 34:1
    46:11 48:10,20
    55:13,17,18,25 56:6
    58:1 59:13 60:19
    61:11 62:22 63:21
    65:2 66:3 67:6,21
    71:5,20 73:16 74:14
    77:3,13 79:7 80:11
    82:13,23 83:22 84:8
    84:9 86:18 89:20
    91:6 92:15 93:8
    96:23,24 97:3 99:21
    100:1 101:1 103:12
    103:14 105:11
    107:2 108:11
    114:18 124:3,15

**cadence** 126:14,19 127:3,9
    128:1,3,9,12,18
    129:7 130:11
    132:17,18,20,24
    133:2 135:9,12,16
    138:5,13,20 139:11
    139:12 141:13
    142:7,9,14 143:18
    145:13 146:14,17
    147:5 148:10 149:4
    149:7,22 150:6
    151:18,19,21,21
    154:6 155:6 157:1,5
    157:8,9,24 158:6,12
**cases** 24:23 26:23
    27:1 28:19 30:8,9
    31:5 35:6 56:1 58:3
    65:16,17 82:14 84:7
    87:20 92:20 97:1
    120:18 127:10
    135:14 146:16
    147:14
**cash** 56:11,14 59:4
    60:24 61:5 77:8,8
**cast** 148:2
**cat** 146:25
**catherine** 18:18
**cause** 44:11
**cede** 57:10
**center** 127:19,20
**certain** 3:15 4:2,14
    4:21 5:14,19 6:20
    6:21 23:17 37:5
    78:22 88:24 91:12
    91:13,22 93:11 97:1
    97:14 98:12 107:20
    109:23 131:23,23
**certainly** 28:20
    37:25 79:16 80:12
    102:14,21 103:6
    104:25 107:19
    110:1 111:14 112:3
    112:22 114:10,14
    125:10 130:17
    134:21 135:24
    137:3 138:24 155:7
    156:11 158:9

**certainty** 123:1,6
127:5 133:13 141:4
141:20,25 142:19
151:7
**certification** 119:1
**certified** 160:3
**cetera** 50:14 130:4
130:4
**chad** 8:13
**challenge** 112:22
**challenges** 26:5
**challenging** 103:15
**chambers** 36:5
46:13,15
**chance** 115:4
**change** 34:17,18
65:4 134:16 146:25
147:18 155:24
**changed** 53:14
111:25 158:25
**changes** 52:15 78:6
129:2
**chaos** 105:4,21
**chaotic** 25:11 35:11
**chapter** 1:4 24:23
26:15 32:9 34:15,20
35:9 81:23
**charles** 9:20 19:4
19:21
**charts** 25:9
**chat** 115:23
**check** 108:25
**chief** 146:20
**children** 112:9
**chimney** 27:1
**chipman** 17:12
**choi** 18:8
**chomping** 33:21
**choosing** 33:10
**chose** 27:15 28:22
**chris** 11:24 18:7
19:19 46:10 67:5
99:21
**christoper** 13:22
**christopher** 2:2
**chutchian** 18:9

**circuit** 71:21 97:4
126:1,1,14 143:19
**circulated** 25:18
66:14
**circumstance** 88:20
156:12
**circumstances**
34:18 136:19
138:19,25 143:19
157:20 158:16
**cite** 146:10 153:2
**cited** 35:5 124:16
126:14 127:10
128:11 147:14
150:3
**citibank** 12:18
**civil** 70:23
**civilized** 29:13
**claim** 2:9,11,17,18
5:20 32:13,18 33:6
35:5,7,14,14,16
55:9,11 59:18 61:16
63:15 65:15 79:11
79:13 94:11 97:5
111:1 124:24
129:16,17,25,25
130:7,15,18 133:3
134:6 144:4,7,8,12
144:17,24,25
145:20,20,20 146:1
146:3,7,7,9 147:11
147:12,13 151:22
151:23,24 152:11
153:19
**claimant** 69:15
**claimed** 145:24
**claims** 3:3,9,15,21
4:2,8,14,21,24 5:3,7
5:20 6:2,14 31:15
31:18 35:7,9,10,18
52:1 54:3,5,13,13
54:19,21 55:5,6,7
58:15,17,18,18,23
59:1,2,8,9,10,12,16
59:24 60:3,9 61:21
62:4,6,7,10,16,19
63:1,4,7,17 64:2,9

64:10 75:22 78:15
78:17,18,22 79:7,22
79:23 80:2,4 81:7
81:11,13 86:23,23
94:8,12,16,23 95:1
95:2,6 96:5,16,22
96:22,24 98:25
100:12 107:18
110:18,21,25 111:6
111:6,9,9 120:13
122:4,8 123:4,7
125:8 130:5,24
136:3 141:5 144:9,9
145:3 146:2,3,12
147:19,20 153:20
156:20
**clarification** 155:7
**clarify** 7:2 137:24
**clarifying** 41:25
42:14 67:16 85:2
**clarity** 66:25 70:3
144:11 145:16
**class** 121:12,15,18
125:9,13 136:4
137:13
**classes** 132:22
136:5
**clause** 128:5 151:21
**clear** 23:8 26:14
28:6 41:2,11 44:12
64:8 75:10 76:11
77:18 79:21 82:21
83:19 92:18 93:10
112:7 120:15,24,25
128:23 134:16
140:25 143:19
146:9 156:4
**clearly** 35:14 121:4
126:15,23 134:10
145:23
**clerk** 22:2 47:22
101:6,7,8,13 158:23
**clerks** 36:5
**clock** 75:7
**close** 26:23 42:22
52:14 71:7 99:7
116:18

**closely** 89:11
**closes** 45:8 82:18
**closing** 26:19
**cloud** 5:14
**cobb** 11:1
**code** 2:10,13 3:4,10
3:16,22 4:3,9,15 5:8
5:21 6:3,15 26:6,9
37:5 42:11 59:11,13
62:7 63:8,23 64:9
132:1 136:22
**cody** 18:10
**cohen** 12:20
**cole** 10:1,20
**collateral** 38:4
78:24 79:1,3,6,15
**colleague** 53:3
**collier** 18:11
**collins** 9:5
**colossal** 104:10
**come** 24:24 40:16
41:6 44:4 45:15
50:10 60:3 61:13,20
62:11,15 72:10 74:3
75:20,25 76:19,22
78:20 82:17 84:1
93:7,24,24 94:25
98:1 104:2 110:7
116:10,12 117:8
129:3 149:23
**comes** 38:3 51:14
67:17 70:14 79:11
104:24 147:10,15
148:3 149:20 153:4
153:5
**comfort** 83:17
**comfortable** 47:3
**coming** 81:18 82:8
112:2 138:10
143:18 147:1
**commence** 4:21
**commencement**
54:7 140:2
**commencing** 54:1
**comment** 66:10
85:8 110:3 114:19

**commenting** 98:21
**comments** 52:6
  66:12 85:7 86:15
  152:6
**commitment** 28:17
  49:14 53:20 55:14
**commitments** 74:25
**committee** 5:1 9:18
  14:12,19 15:2,8
  28:15,16,17,20
  29:16 32:25 33:16
  33:21,23,24 34:5,6
  35:3,13,15 37:12,22
  38:23 40:12,18
  42:25 43:13 48:6,15
  48:25 49:6 51:22
  57:8,8 59:18 62:15
  64:13 66:20 81:5,6
  89:8,13 94:25 95:5
  96:10 101:25 102:6
  103:4 110:14
  111:22 112:5
  113:14 119:21
  154:2 155:4
**committee's** 35:1
  94:8
**committees** 38:16
  47:7
**common** 126:9
**comp** 8:21
**companies** 53:5
**company** 1:7,11,14
  2:23 5:13 7:7 75:1
  75:1
**compel** 44:18,21,23
  45:3,10,19
**compelled** 123:16
  123:18
**compensation**
  100:5
**competitive** 8:21
**complaint** 7:6 120:3
  120:4 121:10
  127:19 131:15,22
  135:1 137:19,21
  139:3,10 140:5
  144:7,11 157:14

**complete** 45:7
  54:10 65:4 82:6
  143:2
**completely** 23:4
  33:13 55:1 73:15
  85:10 91:16 100:21
  122:1 123:18
  140:12 143:2 157:6
**completion** 43:10
  43:11,17 45:1
**complex** 24:25 25:5
  25:6 30:11 44:15
  81:23 137:4 142:7
**complexity** 128:13
**complicate** 128:14
**comply** 32:21 50:15
  63:3
**component** 33:11
**components** 126:4
  126:7
**comports** 27:9
**comprehensive**
  24:13 30:8 40:4
  54:9 67:20 91:12,20
  92:9
**comprehensively**
  98:24
**compress** 89:4,18
**compressed** 88:22
**compromise** 49:20
  98:6 145:3
**compromises** 91:9
**computer** 50:22
**conceded** 157:18
**conceive** 138:19
**concept** 28:13 33:1
  72:10 76:2,19 83:3
  97:11 98:6
**conception** 32:2
**concepts** 110:16
**concern** 43:19
  56:14,15 87:3 129:2
**concerned** 102:12
  112:17
**concerning** 66:2
  128:4

**concerns** 35:1 51:7
  51:9 80:17 96:21
  153:22
**conclude** 70:23
  105:2
**concluded** 71:14
  159:6
**concluding** 104:18
**conclusions** 26:25
**conclusively** 137:16
**conclusiveness**
  126:5,25 127:6
**concrete** 145:17
**conduct** 23:2 25:22
  28:5 63:11 72:23
**conducting** 57:9
**confer** 45:14 128:7
  138:10 142:2 153:9
**conference** 40:1
  46:13,16 47:21 60:2
  73:17 109:12,13
  114:3
**confers** 40:1
**confidence** 50:7
  72:8
**confidential** 32:5
  93:21 97:13
**confidentiality**
  52:20
**confidently** 30:20
**confined** 67:1
**confines** 23:16
**confirm** 26:14 57:7
  71:19
**confirmable** 51:24
**confirmation** 6:22
  22:24 25:3,20 30:16
  31:4 34:3 37:16,19
  37:25 39:14,16,19
  44:7 53:16,24 55:15
  55:16 57:5 58:12
  59:22 60:2 62:2
  67:9,11 71:13 72:2
  72:9,21,23,25 73:3
  73:12,19 77:22,22
  79:20 80:16,19
  81:13,23 82:22

  83:20 84:2,19,20
  85:19 88:24 89:2
  92:6 93:6,14 94:1
  95:8,25 96:6,16,25
  97:8 100:11 103:11
  103:22 104:7,14,17
  104:22 105:1,9,10
  105:19 108:3,9,15
  110:18,19,22
  111:14,19 112:4,15
  112:19,23 114:23
  120:24 122:1,6,9,11
  123:19 125:4 128:5
  131:2,13 132:3,21
  135:19 136:19
  137:1,12 138:18,23
  141:11 142:11,24
  144:10 146:3,4,19
  147:13 151:17
  152:9 154:20
**confirmed** 29:14
  61:4 118:20
**confirming** 108:8
**conflict** 55:12,13
  60:12,14
**conflicts** 12:2
**confronted** 133:1
**connection** 6:22
  22:12 37:5 49:1
  101:22 102:2
  103:11 107:15
  108:4,5 112:20
  113:16 116:16
  122:3,6 142:10
**conoway** 15:7
**consensual** 25:1
  30:8 36:1 77:18
  125:15 127:22
  138:10 141:23
  143:16 147:20
**consensually**
  123:13
**consensus** 28:25
  44:15 121:5 122:24
  141:6,17,22
**consequence** 129:9

**consider** 31:3 42:1
49:14,15 54:4 122:7
145:3
**consideration** 29:11
29:11,23 30:4 31:7
33:7 66:24 74:14
102:9 122:13 158:3
**considerations**
125:24 135:13
156:16
**considered** 33:15
71:24
**considering** 29:24
**consistent** 46:17
53:12 116:7 135:8
**consistently** 87:23
**consolidated** 54:24
63:18 64:23
**constituencies**
38:12 39:21 40:2
42:13 45:23 66:20
88:11 121:4 122:23
132:16 135:22
141:21
**constituency** 69:3
121:6 128:4 129:11
131:4 132:5 134:13
157:19
**constituents** 122:18
**constitutional**
144:16 145:13
149:7
**construct** 26:8
**constructively**
114:19
**consultation** 102:22
**consumed** 158:12
**consuming** 27:7
83:11,21 84:4
103:15 158:14
**contain** 129:23
**contained** 44:8
**contaminate** 108:22
**contemplated**
106:11
**contemplates** 26:12

**content** 122:5
141:10
**contested** 25:2 71:1
71:3
**context** 23:9 28:10
33:16 73:16 77:13
79:18 81:10 83:14
100:17 111:19
112:3,19 113:10
116:14 122:1
123:19 126:3
132:12 133:11
136:25 141:24
144:12 145:16
146:20 151:16
153:12 156:2
**contexts** 149:24
**contingencies**
128:18 129:12
131:10 132:10
137:18 139:9,14
143:20 147:1,2
148:2,3,6,22,23
149:2 152:15,18
154:5 156:17
**contingency** 126:11
126:16 134:11
146:20 147:24
**contingent** 53:23
121:15 124:18
127:8 158:3
**continue** 30:22
43:21 95:22 118:9
121:3 123:17
128:22 156:25
**continued** 80:23
**continues** 53:17
56:6,25 91:6 148:13
**continuing** 58:22
118:24
**contract** 2:23 5:14
32:4 120:9 121:17
122:19 133:5
136:10,23
**contractual** 134:9
148:20

**contrary** 123:9
156:2
**controlled** 78:23
**controls** 92:20
134:11
**controversy** 70:5
131:10
**convenience** 82:24
**conventional** 54:21
**conversation**
149:25
**conversations** 87:6
87:8 149:12
**convinced** 72:11
**cooperate** 106:23
112:8,9,12
**cooperation** 112:10
113:12 114:7
**coordinate** 83:6
112:12
**coordinated** 58:24
**coordinating** 40:19
82:24
**coordination** 40:12
40:15,22 41:23
112:5 114:7
**copies** 150:9,14
**copy** 36:18 119:23
**core** 27:6 58:6
**corning** 135:9,11
**corp** 1:5 2:7,21 5:12
6:8,19
**corporate** 100:4
**correct** 53:3 54:2
115:19
**corrected** 85:4
**corresponding**
84:20
**cost** 77:6 88:20 91:3
**costly** 54:1
**costs** 26:22 27:3
77:16
**couldn't** 128:22
149:6
**counsel** 12:2 47:14
58:25 59:1 64:13
144:21 145:8 146:6

147:6,16 148:2
150:3,17 151:4,19
152:5
**counsel's** 152:14
**counter** 29:9 31:14
**counterintuitive**
121:23
**counterparty** 65:1
**counterproductive**
102:18 111:2
**country** 75:6
160:21
**counts** 139:3
**couple** 29:8 31:19
33:2 51:1 134:17
135:14 140:24
156:7
**course** 24:5,10,15
25:1 26:7 27:21
34:12 35:21 36:6
65:17 75:25 99:15
104:9 105:16
107:14 112:2 126:9
129:8,19 131:16
135:8 149:4 153:4
153:10 156:25
**court** 1:1,21 22:3,16
24:10 25:7 26:19
27:22 30:3,21 33:7
33:17 36:8,12,16,18
37:11 38:6,8,15
41:15 42:17 46:8,12
46:18,20,24 47:4,13
47:20,23 48:2,22
50:3,11,20 52:5
54:4 55:3,20 57:12
57:14 60:17 61:20
62:1,4,9 63:6,16
66:5,6 67:4,8,10,13
67:15 68:11,24 70:8
70:21,24 71:4,9,12
71:12 72:10,11,14
72:16,25 73:9 78:2
80:15 81:5 83:9,14
84:22 85:1,15,17,23
85:25 86:9,10,20
91:19 92:1,6,16,24

93:13,16 94:3 96:12
96:15 99:18 101:2
101:14,19 108:3
109:7,11,21,25
110:10 111:13
113:11,13 114:9
115:11,18,22 116:1
116:3,12,20 117:1,5
117:9,12,14,19
118:2,7,13,16,19,21
118:23 119:9,11,13
119:15,17,23,25
120:2,5,12,14,16
121:25 122:7 124:2
124:11,15,16,17,22
125:16 127:2,4
128:8,8,15 129:6,23
130:7,15,21,24
131:6,8,23 132:2,3
132:15 133:8 135:3
136:2,5,7,16 137:12
137:16 141:2
143:22,23 144:1,15
144:18,22 145:6
146:2,10 147:3,5,12
147:20,24 148:1,4,7
149:6,17,19 150:7,8
150:12,22,24,24,25
151:3,8 152:3,12,25
153:11,14,23,25
154:24 155:1,5,11
155:11,15,16,17
156:12 157:25
158:13,15,18,20,24
**court's** 104:19
**courts** 124:17
128:11 138:12
144:9 153:21 158:3
**court's** 135:5
145:12,13
**cover** 46:7
**covered** 41:4,8
**crafting** 26:1
**create** 35:11 115:8
134:3
**created** 68:23 69:1
74:12

**creating** 74:8 77:5
**credit** 54:16
**creditor** 27:12
38:12 39:21 40:2
41:9 42:13 45:23
63:14,14 77:3 88:11
110:17 121:4 128:4
**creditor's** 40:23,24
122:14
**creditors** 31:25
33:23 41:3 42:17
44:12 48:6,15 49:11
54:17,18,22,22 55:6
59:14,15 62:13
64:16,24 68:2 71:25
73:14 77:19 78:16
82:21 89:13,23 90:2
90:11,21 93:20
94:21,22,24 95:2,4
97:14,15 98:1,12
100:17 102:7,9
103:1,6 113:7,8
114:8 115:15,15
128:25 137:13
140:12 142:9 145:3
**critical** 54:12 55:10
69:8 87:19 88:7
90:4 109:5 154:15
**criticism** 68:1 76:6
**cromwell** 14:11
51:22
**cros** 91:25
**cross** 28:24 85:10
149:22
**crossing** 86:6
**crux** 60:24
**css** 1:5,10,17
**culminate** 22:24
**curcio** 21:7
**curious** 141:7
**currency** 27:1 91:4
91:9
**current** 53:7 54:10
121:7
**currently** 51:9
56:20 92:8 101:23
106:11

**curtain** 148:5
**customer** 2:9,11 3:9
**cynical** 77:14

**d**

**d** 9:5 18:20 19:19
19:25 22:1
**d.i.** 2:13,18,25 3:5
3:12,18,23 4:4,10
4:16,24 5:4,9,16,22
6:4,10,16,24 7:3,3,8
7:8
**daily** 27:2 29:20
75:8 80:10,10
**dam** 20:25
**dan** 12:25
**dancing** 112:17
**dangerous** 112:1
**daniel** 9:6,23 19:12
21:6
**date** 2:24 25:16,23
26:11 35:4,8 42:5
43:17,20 44:18,21
45:11,12,20 54:3,8
62:25 63:1,4,4
67:21 74:9 80:20
90:15 94:16,24
96:22,22 99:6 109:7
110:7,8,25 111:9
114:11 116:18
117:23,25 133:10
151:25 160:25
**dated** 7:2
**dates** 2:8 6:20 23:2
25:25 35:10 43:12
44:10,13 49:14
80:20,20 113:20
114:6 118:24
**david** 8:23 16:9
18:17
**davies** 19:3
**davis** 12:15
**day** 26:24 33:17
42:22 58:1 61:8
77:2,5,12,15,16,25
88:8 105:4 108:24
137:11 138:16
155:13 158:11

**day's** 56:3
**days** 25:24 45:20
71:4 104:16
**de** 35:9
**deadline** 2:17 97:18
116:17
**deadlines** 6:21 24:2
50:16 70:17
**deal** 32:10 34:24
53:6 72:2 74:15
84:12,14 99:9
101:17 103:2 108:5
108:24 110:12
122:10 125:22
132:8,24 139:4
143:15 149:10
155:25 156:23
**dealing** 127:23
**dealt** 28:11 35:18
149:9
**debaecke** 17:10
**debate** 152:15,16
153:7 157:12
**debenture** 12:23
**debt** 68:12 74:24,24
77:9 129:1
**debtor** 25:17 30:3
30:15 31:21 33:14
34:20,23 57:20 64:1
64:5,19,19,19,22
71:23 75:22 78:13
79:22 110:17
121:19 122:18
129:9 131:3 135:23
142:6 148:9,15,15
155:21 156:8
**debtors** 1:6 3:1,8,14
3:20 4:1,7,13 5:4,6
5:18 6:1,13,22,23
8:5 22:5,19 23:9,11
24:12 26:3,4,12,13
27:13 29:15 30:21
30:25 31:16 32:4
33:9 34:15 35:10,20
36:24 37:1,3,13
46:11,14,25 47:7
48:7,11,13,17,18

49:7,14,23 50:15
51:10 53:21,22
55:18,19,24 56:9,10
57:6,19 58:19,25
59:15 60:1 63:2,3,7
63:16,17,22 64:2,14
65:23 66:14 67:18
67:22 68:6,8,14
69:4,8 70:9,17,22
71:12,15,24 72:4,8
72:11,20,24 73:1,18
73:21 74:7,19,19,21
75:18 76:1,4,10,16
76:23 77:8,24 78:4
78:13,25 79:8 80:2
80:8,12,17,24 81:9
82:5,10 83:16,22
85:18 86:13 87:11
87:17 90:9,10 91:25
92:3,21 93:2 98:19
99:22 100:12 102:1
105:1 109:2 110:25
114:14,18 117:22
119:23 120:3,4,23
121:2,7 122:22,24
123:9 124:4,7,19
125:14 127:18,21
128:21 129:7,10
131:17,19 132:13
133:19,20 134:15
135:1 137:6,10
138:8,9 139:18,24
140:2 141:1,18
142:5,20 143:6,24
144:3,6 145:15
153:17,23 154:3,12
154:22 157:14
158:8,10
**debtor's** 131:15
137:19 143:13
150:20
**december** 3:12,18
7:8 59:23 72:11,15
80:17,21,22,23
85:19 91:1 104:18
135:20

**decide** 93:3,5
104:23 105:16
133:21 135:4
148:24 151:15
**decided** 135:23
137:16 154:8
155:14,16
**decidedly** 123:21
**decides** 66:16
102:23
**deciding** 64:16
84:13 154:12
155:25
**decision** 25:14
54:11 57:4 84:13
92:3 104:20 112:20
112:23 124:14,14
126:15 133:7
**decisions** 40:5 66:3
124:16
**deck** 145:19
**declaration** 120:5
131:18,21
**declaratory** 4:22
7:6 120:3 124:6
126:3 128:19
144:13 145:14
147:21 153:18
**declined** 133:6
**deconsolidated**
56:2
**deconsolidation**
56:12
**default** 83:5
**defend** 33:18
**defendant** 1:19 71:5
**defendants** 1:13
**defending** 69:9
**deficiency** 79:10,13
79:16
**definitely** 38:1
**definitive** 64:8
141:2
**definitively** 122:22
141:15
**defranceschi** 9:6

**defy** 157:18
**degree** 28:25 35:25
**deitderich** 35:12
**delaware** 1:2,7,23
10:21 58:22 63:10
63:11 69:18 124:15
**delay** 42:19 84:20
91:3 103:20 104:12
**delaying** 104:11,21
154:19
**delicately** 29:9
**deliver** 142:18
**delivered** 54:7
**delivers** 99:13
**demand** 153:13
**demands** 26:24
**demonstrate** 131:11
**demonstrated**
142:5
**demonstrates**
134:19
**demonstrating**
120:15
**demonstrative**
36:16 42:23 44:19
49:23
**denhoff** 18:12
**denied** 38:25
**deny** 84:16 153:23
**denying** 81:9
**depending** 118:10
127:14 132:6
136:18
**depends** 135:15
**deposing** 84:11
**deposition** 43:5
84:15 87:9,11 100:7
**depositions** 43:15
43:16,18,19,21,22
44:2,4 50:13 75:19
81:24 87:13 89:5,6
89:10,17,25 106:6,9
**depriving** 71:15
**derek** 13:11
**derides** 34:6
**derivative** 5:2

**descends** 26:16
**described** 24:14
128:17
**describing** 60:23
**designed** 57:25
58:13
**desire** 30:10 105:1
**despite** 24:11 61:21
61:22 78:5 151:1
**destroyed** 148:11
**destructive** 72:5
**detached** 123:18
**detail** 30:12
**detailed** 22:23
108:5
**details** 62:23 111:23
**determination** 62:6
133:22 135:6 150:7
154:15
**determine** 62:4,4,19
79:14 126:2 147:4
153:18 156:13
**determined** 52:11
58:14 60:4 65:14
**deutsch** 8:20 14:6
**deutsche** 15:14,19
**develop** 31:21
**developed** 126:2
**devoid** 123:19
135:4
**devote** 27:5 30:22
**diaz** 18:13
**dictate** 27:23 36:8
83:2
**dictus** 71:22
**didn't** 144:20
146:14 152:15
153:6
**dietesch** 14:16
**dietrick** 51:21,21
66:12 90:8
**difference** 53:13
**different** 39:20
54:13 55:1 86:25
87:1 100:22 103:13
125:11 133:11
137:9 140:12

142:25 149:8,11
156:10 157:6
**differently**  85:8,9
139:24
**dig**  107:24
**dignifying**  27:16
**dignity**  55:4
**diligence**  75:7 95:20
**dip**  139:20,25 140:3
**direction**  72:12
**directly**  29:15 40:16
52:7 71:23 91:13
103:20
**directors**  32:15
33:7,17 34:7,8,15
52:2,3 55:21 58:20
58:24 61:17,18,18
65:3 67:23 69:18
90:17 91:17 99:1
111:5
**disagree**  46:15 55:2
149:2
**disallowance**  4:24
**discard**  53:21,22
**discern**  61:10
**disclosure**  6:23 24:9
37:6,14,21,23 38:1
38:6 42:6,7,9,11,15
51:7,12,13 53:15
54:7,14 56:10 57:3
60:22 61:22 64:16
64:16 65:1,8,11
67:9,12,19 72:16,17
88:5,6 101:22 102:2
102:3 103:8 104:5,8
105:7 108:11
111:15 114:21
116:5,6,16
**disconnect**  86:16
88:10
**discount**  125:13
**discourages**  83:11
**discouraging**
106:22
**discoveries**  95:12
**discovery**  25:20,21
37:12,23 40:16,18

40:20,24 41:2,4,7
41:18,21 42:5,22,22
43:5,6,8,8,9 44:5,7
44:19,20,23 45:8,12
45:20 49:25 50:13
52:22 54:8,12 55:10
55:15 57:9 67:12
72:23 73:14 74:20
75:24 78:11 79:19
79:21,24 81:25 82:8
82:18 83:12 85:13
85:16 86:21,22 87:4
87:8 88:24,25 93:5
95:10,25 96:2,8,15
96:16 100:20
101:24 103:10,21
105:14 106:9,22
107:4,4,21,25
110:19 111:4,17,19
112:6 116:14,15
143:7 145:9,11
149:5,14,16 151:12
151:13
**discovery's**  41:21
**discreet**  152:10
153:12
**discrete**  151:22
**discretion**  66:16
71:9,11 72:25 98:10
**discretionary**  53:8
**discuss**  40:2 70:22
76:12 80:2 92:10
112:16 113:22
118:9 149:5
**discussed**  24:6
39:23 94:22 113:24
151:19
**discussing**  60:2
151:5,12 154:14
**discussion**  102:20
108:14 114:5
147:23
**discussions**  70:16
74:9 78:16 142:15
**disinterested**  12:2
32:15 33:6,17 34:7
34:8,15 52:2,3

55:21 58:20,24
61:17,18 67:22
90:17 91:17 99:1
**dismiss**  116:24
117:3 120:2,10
124:9 140:4 153:24
**dispense**  22:6
**dispute**  38:7 52:9
77:6 120:11,18
124:8 127:8 128:4,9
134:9 136:10,13,17
136:21 137:17
139:22 143:21
144:19,20 150:23
150:25 151:1,22
153:12 156:13
**disputed**  31:17,18
**disputes**  32:4 124:3
124:10 132:8
138:15,20 144:8,17
145:17
**disrupt**  33:13
**distinct**  68:17
**distinction**  98:23
131:1 133:25 139:6
152:7
**distinguish**  97:2
146:14,18
**distinguishable**
139:15
**distinguished**
151:20
**distinguishes**  127:1
**distinguishing**
128:2
**distributable**  74:13
77:23 79:17
**distribute**  74:14
141:6
**distributed**  32:5
**distribution**  31:25
68:20
**district**  1:2 2:24
124:14 157:25
**dive**  22:14
**divest**  147:20 149:3

**divided**  147:6
**divorced**  122:1
143:3
**divvied**  79:12
**divvy**  102:8
**dizengoff**  18:14
**doctrine**  158:2
**document**  25:20
43:4,5,9,10 44:18
44:20,24,25 49:13
50:3 89:1,6
**documentation**  3:3
3:9,21 4:8 5:7 6:2
6:14 80:6
**documents**  25:5
43:13,14 44:1,24
45:1,12 50:4,8,12
50:17 73:22 74:25
75:18 81:24 82:4
84:15 89:3,9,14,16
89:24 90:6 94:20
100:6 106:6,25
**doesn't**  44:15 128:7
128:9,15 129:23
130:21 138:11
142:2 152:25
**doing**  30:22 47:3
69:10,12 95:4
102:15 142:6
**doke**  101:14
**dollar**  60:7 61:7,9
61:14,15 65:16 77:2
77:5 152:3
**dollars**  53:18 54:15
68:22 77:23 79:14
158:11
**don't**  129:2 130:25
131:12 132:18
135:10,23,24,25
136:1,3,5,6,12
137:15 139:5,11
140:13,14 141:11
143:6,11 145:25
146:21,22 147:18
147:25 148:17,18
151:17 152:12,15
152:16 156:16

157:20
**dore** 18:15
**dotting** 86:6
**double** 108:25
**doubt** 32:10 132:25
 142:14
**dow** 135:9,11
**dozens** 81:22
**draft** 32:5
**drafting** 75:8
**dreyer** 18:16
**drinker** 12:17
**drive** 91:5,8 93:22
**driving** 62:5,21
**drop** 157:7
**dry** 27:17
**dual** 87:14,15,15
 103:13
**due** 27:9 42:5 43:24
 56:12,14,18 59:14
 59:19 62:7 112:2
 117:23,24 130:1
**dueling** 109:19
**duet** 23:14
**dumped** 100:6
**dunn** 18:17
**duplicate** 3:2,15
 5:19
**duplication** 41:1
**duplicative** 40:19
**duties** 53:10,12
 69:19 87:18
**dynamic** 68:24

**e**

**e** 2:1,1 8:2,2,16
 14:12,19 18:3 22:1
 22:1 32:3 33:16,21
 33:24 34:5,6 35:1,3
 35:12,15 37:3,11,22
 40:7 54:16,16,17,17
 55:11 57:8 66:18,20
 66:24 77:19,21 78:7
 78:8 93:25 94:22
 95:3 96:10 97:25,25
 98:1,3,12 100:20
 102:6,7,19,24,25,25
 103:4,5 110:14

111:18 113:14
 122:8 136:3 160:1
**e.c.** 14:4
**eager** 149:5
**earlier** 33:8,12 53:4
 55:3 152:6
**earliest** 135:20
**early** 72:6 116:5
**easy** 70:4 75:17
 83:25
**echo** 66:12
**economic** 125:18
**ecro** 2:5
**edelson** 16:20
**edmonsen** 13:16
**edward** 8:7 22:4
**effect** 106:24 115:5
 122:12
**effective** 2:24 5:15
 151:25
**effectively** 71:14
 133:23
**efficiency** 134:2
**efficient** 22:8 82:23
 83:25
**effort** 68:22 75:14
 128:3 145:2
**efforts** 24:11 37:2
 86:4
**efh** 5:1 16:7 28:15
 28:18 32:13,15,25
 35:14 38:3,3,22,23
 39:5,12 47:11 51:22
 51:24,25 52:24
 53:16 56:7,12,15,20
 56:23 57:17 58:15
 59:18 60:25 61:6
 65:1,16 94:7 111:22
 122:4,4 136:1
 141:10 156:21
**efh's** 53:2 55:5,8
 56:18
**efi** 50:22
**efic** 17:18
**efih** 1:11,14 7:7 8:5
 17:13 28:16,16 37:1
 66:9 77:9 116:24

119:21 136:1
 153:23 156:21
**eight** 70:15 74:5,19
 81:1 100:23 157:4
**eighth** 4:7
**eisenhut** 18:18
**either** 23:24 28:4
 31:8 38:1 61:11,12
 65:6 71:20 84:14,16
 87:8 105:18 108:24
 109:9,10,18,19
 128:8,15
**electric** 8:21
**elements** 91:13,13
**ellis** 8:4 22:5,19
 36:15 64:5 86:4,13
 144:2
**emanated** 97:11
**embark** 158:14
**embedded** 27:4
 49:12,13
**emily** 18:6
**emphasis** 30:7
 138:6
**emphasize** 94:9
 97:1
**emphasizes** 95:15
**emphasizing** 93:18
**empower** 97:22
**emswiler** 18:19
**enable** 40:5 90:21
**enables** 44:6
**encourage** 41:5,6
 41:17 42:16 48:16
 106:16
**encouragement**
 42:17 83:13
**encourages** 83:10
**encouraging** 96:9
 106:22
**endeavour** 157:5
**ends** 108:12
**energy** 1:5,11,14
 2:7,21 5:12,13,15
 6:7,19 7:7 9:2 27:5
 54:20

**engage** 27:15
**engaged** 30:4
**engaging** 41:17
**enjoined** 72:1
**ensues** 105:4
**ensure** 25:10
**enter** 48:16 70:21
 70:24 71:6,10,13
 78:2 84:18 85:1,10
 88:16 101:20
 103:10 108:6,7,19
 147:5
**entered** 38:15 63:2
 63:9 93:11
**enterprise** 37:18,18
 74:13 88:25 89:15
 95:12,17 96:5 129:5
**enters** 67:13
**entire** 55:17,18 68:5
 86:18
**entirely** 70:5 132:23
 134:19 137:2
 158:16
**entirety** 113:15
**entitled** 30:19 59:20
 120:6 143:8
**entitlement** 121:11
 122:19 131:18
 134:12 135:22
 139:4 140:19 141:2
 141:9 155:12
**entitlements** 77:19
**entry** 2:8,16,22 4:20
 5:1,13 6:7,20 88:2,5
**environment** 84:12
**equally** 66:22
 128:21 129:12
 140:22 145:2
**equitable** 131:20,25
 132:4 134:25 135:5
 135:13 143:2,9
 156:15
**equities** 132:17,18
 132:20,20,23,24
 135:15,21 136:8
**equity** 74:24 136:1

erbeck 21:8
erica 19:8
erik 20:13
ernst 16:6
especially 37:20
  88:25
esq 8:7,8,9,10,11,12
  8:13 9:11
essence 71:17
essentially 53:2
  70:17 73:8 75:13
  78:4 82:10,17
  127:21
establish 23:1
  124:10
establishing 6:21
  60:5 124:8
establishment
  22:23 23:5 59:21
estate 35:14 57:22
  60:15,25 61:6 69:14
  69:18 125:2
estates 5:4 33:20
  37:13 54:24 56:12
  57:1 58:16,23,23
  63:17 64:22 70:18
estimate 56:8
estimation 62:17
et 1:5 2:7,21 5:12
  6:8,19 50:14 130:4
  130:4
etcetera 106:9,23
  116:14
evaluate 45:3 59:17
  90:13,21 91:19
  94:17 95:7,13 97:6
  97:7 147:3
evaluated 94:23
  95:15 96:19
evaluating 87:22
  97:4 114:2
evaluation 94:13
eve 60:2 62:10
event 71:4 151:9,10
  155:21
events 124:18,19
  151:7 158:4,7

evercore 32:14
everybody 100:2,3
  112:7 114:17 116:9
  142:17,22 154:6
everybody's 83:5
everyone's 51:14
  73:13 80:15 112:24
evidence 39:20 40:4
  57:22
evident 24:22
ex 128:5 151:21
exact 3:2
exactly 30:19 70:6
  97:6 122:12 123:5
  133:15 138:1
  139:13 147:25
  152:3
exaggeration 27:13
exalt 82:24
example 49:16,23
  79:21 80:1 97:3
  130:10 135:25
exception 27:25
exceptionally 98:20
excerpt 145:19
excess 77:24
exchanged 79:24
excising 114:23
exclusion 30:17,18
  34:1
exclusive 33:9 72:1
exclusively 71:24
exclusivity 26:9,17
  26:18,22 30:16,18
  35:21,22 71:16,18
  72:9 76:24 80:18
  105:3,4,5,21 129:10
exculpatory 64:4
excuse 106:8 110:17
  147:12 150:25
executed 68:18
execution 70:18
executory 5:14
exercise 50:16,17
  87:17
exist 41:19 58:18
  69:2 132:21 138:11

157:3,3
existed 61:12
existence 61:13
  62:3 72:13 73:4
exists 63:8 145:14
  157:13
expand 66:17 97:22
  98:10
expanded 66:18
  98:11
expansive 144:4
expect 50:15,17
  157:15
expectation 54:23
expected 54:20 57:3
  87:1 157:14
expedience 61:16
expedite 26:25
expedited 38:24,25
  48:11
expended 137:3
expensive 76:18
  83:11,20 84:3
  103:15 158:14
experience 62:8
expert 42:21 43:6,8
  43:20,24 44:4,5
  49:25 50:8,13 81:25
  82:6,8,17 106:7,8
experts 25:4,21
  43:23 44:5 50:5
  106:9
expire 112:22
expired 105:22
expires 93:8 105:5
explain 74:16
explained 61:8
  122:9
explicitly 34:16
exploration 103:18
explore 31:1 99:16
exploring 30:14
expressed 41:1
expressly 131:22
  134:17
extend 23:7

extended 42:10
extending 2:17
extensions 26:10,11
extensive 85:16
extent 24:18,25
  37:22 41:25 45:5
  66:15 85:1 90:8
  91:14 97:25 103:25
  106:16 107:20
  109:23 114:20
  129:21 132:5
  135:24 140:19
  152:17 155:6
extenuated 39:22
extracted 128:20
  129:16 133:7
extraordinarily
  24:23,24
extremely 84:24
eyes 38:17

**f**

f 2:1 19:13,22 20:3
  160:1
faced 124:21
facilitate 49:9 70:16
  91:21 128:7
facilitative 30:4
facing 36:3 146:25
fact 25:4,13,21 35:9
  40:5 42:21,22 43:7
  43:22 44:3 45:8,11
  45:20 50:15 61:2,21
  61:22 64:21 68:14
  68:25 71:21 77:8
  82:17 83:21 85:9
  95:2 96:9 106:7,9
  111:1 117:22 121:6
  124:9 127:2,3 128:6
  135:4 143:17
  144:20 146:10,20
  149:21 153:1 156:5
  158:9
factor 126:2 153:5
  153:5,10 154:11
factors 137:20
  147:3 152:13

**facts** 56:3 78:12
125:21 126:20
127:2 131:24 147:5
157:3,3
**factual** 29:9 31:14
57:20 123:19 137:5
143:1,2
**failed** 31:21
**failure** 62:3
**fair** 26:3,4 34:10
52:24 54:8 56:5,5
56:16 68:20 77:2
81:17 98:24 99:13
123:24 124:13
131:25 132:4 137:4
**fairly** 42:3 123:25
125:21 129:18
142:22
**fairness** 135:12
143:9
**faith** 37:2 49:15,15
50:16
**fall** 104:1
**fallen** 146:20
**false** 56:3
**familiar** 155:5
**far** 24:13 61:3
103:2 108:15
126:21 128:12
**fashion** 40:4 50:18
152:6
**fate** 36:1 55:8
**father** 112:9
**faux** 69:13
**favor** 53:22 121:12
121:15 123:21
125:9,13 131:5
137:13
**fear** 72:7
**feature** 128:2
**february** 4:16,25
5:4
**feder** 18:20
**federal** 70:23 83:14
120:8 121:20
131:21 133:5

**fee** 108:20,21,22
**feedback** 27:15,18
27:19,20 39:24
42:12,18 46:2
**feel** 92:21 107:8
**fees** 4:23 26:23
68:23 158:12
**feingerts** 18:21
**feld** 66:8
**felt** 27:15 92:18
**ferc** 75:4
**fervently** 30:9
**fiction** 87:12
**fidelity** 28:18
**fiduciaries** 34:14
**fiduciary** 34:8,16
53:8,10,12 64:20
69:7,10 76:12 87:18
**field** 110:5
**fifteenth** 6:1
**fifth** 41:12
**fight** 75:16
**fighting** 100:25
148:12,13
**figure** 61:12 108:9
152:2
**figuring** 102:8,10
**fih** 28:17
**file** 2:17 6:8 28:22
31:12,14 37:2 63:15
64:2 68:10 69:1,4
70:9 71:2,18 72:14
73:19 78:3 96:22
100:2,4,8 111:1
121:5 132:13
146:15,17,22,22,23
150:6
**filed** 2:14,18,19,25
3:5,12,18,24 4:4,11
4:16,25 5:4,16,22
6:5,10,17,24 7:3,8
22:21 24:16,18
25:24 28:22 29:5
31:7 32:19 35:7,13
35:16,20,21 38:23
39:18 44:12 45:2,19
45:24 48:25 55:22

55:23 58:20 59:12
59:18 61:16 67:18
68:14 72:15 79:25
90:19 97:5 105:6,15
105:22 111:9,10
114:16 115:14
118:5 130:15,18
144:4
**filing** 2:8,11 24:4,5
24:17 35:4 38:19
39:4,23 41:10 63:1
63:3,7 72:1 88:4
90:17 105:6 130:12
142:5
**filings** 61:11
**filled** 25:25
**final** 7:3 31:4 45:19
64:17 115:7,24
**finalize** 86:7
**finally** 27:11 35:3
44:17 57:5 65:13,25
82:19
**finance** 1:12,15 7:8
**financial** 31:5 32:16
95:20
**financing** 139:20
**find** 38:13 50:11
56:24 84:5 136:19
141:15
**finding** 57:20,23
**fine** 43:15 65:24
98:22 109:9 118:24
118:25
**finger** 9:1 18:22
**finish** 106:6,7
140:24
**finite** 104:10
**fink** 14:21 18:23
**firestein** 18:24
**firm** 86:4 119:11
136:11
**firmly** 87:17
**first** 3:1 10:15,21
22:7,22 24:22 25:23
26:1,10 28:3,16,20
29:9,21 32:7 33:5
34:6 37:11,15 41:14

42:4 46:14 47:8,8
48:6 52:7 56:18,19
58:1 61:8 63:25
67:8 68:6 69:21
75:20 78:13,25 79:2
79:11 80:14 81:7
84:25 89:9 92:4
98:9,13 103:12
106:6 110:14
115:15 117:2,23
126:12 129:7
133:23 134:1,5,6,7
134:13 139:9,16,19
139:20,21 144:23
149:9 151:25
**fit** 23:6 81:12
**five** 90:12 100:5
107:11 117:6
121:13
**fix** 52:2 82:14,15,19
83:1 151:24
**fizzle** 30:24
**flannagan** 18:25
**fled** 5:10
**fleshed** 112:6
**fleshing** 111:11
**fleury** 19:1
**flexible** 31:16
**flom** 19:2
**flow** 82:11 102:9
**focus** 85:9 98:13
102:7,11,11 103:19
103:25 144:14
**focused** 23:5 89:8
108:1 141:7 152:14
157:25
**foerster** 9:17 48:24
154:1
**fold** 26:1
**folded** 76:4
**folks** 27:18 28:21
94:21
**follow** 51:23 120:23
**following** 68:1
135:14 140:7
**follows** 70:14 84:6

**force** 33:12,14
104:12 106:23
110:25,25 111:8,11
112:9 113:4
**forced** 62:11,15
83:19 84:14 143:1
**forcing** 62:6
**foregoing** 160:3
**forget** 119:7
**forgotten** 68:6
**form** 51:23 57:19
**formally** 95:22
**forms** 152:8
**formulate** 62:1 68:3
**formulated** 68:18
**formulation** 49:9
99:8
**forth** 90:19 120:22
**forum** 2:11
**forward** 24:12
48:20 57:23 58:4
73:22 87:15,20,22
87:24,25 90:18
91:11,17 92:10,12
93:20 95:1,23 96:18
97:18 98:6,8,10,11
113:17 114:8
116:15 137:23
154:23
**fought** 38:13
**found** 129:5 131:17
133:11
**four** 42:2 52:6 63:9
64:4 80:14
**fourteenth** 5:18
**fourth** 3:14 40:10
55:14
**fox** 11:16
**fragile** 75:11
**framed** 84:3
**frankel** 12:6
**frankly** 28:25 38:5
42:8,16 89:20 96:25
**free** 55:19 79:2
**friend** 29:19
**friendly** 84:11

**front** 33:14 34:2
71:3 88:22 89:14
94:1 106:14 111:13
112:21 122:10,13
122:13 127:19,20
157:4
**frost** 19:3
**frustrated** 73:3
**frustrating** 102:13
**fulcrum** 103:6
**full** 26:3 46:21
77:20 97:8 98:10
103:24 114:17
148:19 151:15
**fullness** 28:12
**fully** 30:4,8,23 36:1
52:16 74:22,22
77:18 91:20 95:3,4
97:21,23 107:20
123:11 125:15
142:6,22 144:7
**fun** 73:17
**function** 40:19
**fundamental** 23:18
68:5 85:18 86:16
87:24 88:10 89:7
**fundamentally** 68:4
74:11
**funding** 74:24 77:4
**funds** 80:11
**fungible** 36:3 109:6
**further** 108:17
129:22 155:6
**furtherance** 37:4
**futility** 134:20
**future** 1:5,11,14 2:7
2:21 5:12 6:8,19
7:7 9:2 104:20
113:22 123:5,8,14
124:18 151:7,8,10
158:4,7

**g**

**g** 22:1
**gain** 56:21,21,23
**gains** 77:11
**game** 104:13 146:25

**gamesmanship**
45:18
**garrison** 19:4 48:5
**gating** 145:10
149:13
**geddes** 16:11
**general** 63:4 84:8
**generally** 84:11
85:6 151:5
**generation** 2:22
**genesis** 49:20
**gentleman** 86:1
**genuine** 149:21
**gerber** 127:25
128:6,17 138:5,11
**gerber's** 138:4
**gestation** 27:24
**getting** 62:5,20
68:25 76:21 77:4
127:24 132:22
136:6 143:10
**gilstrap** 19:5
**gitlin** 19:6
**give** 49:16 50:5 60:6
79:21 85:20 97:8,21
101:4 103:23
130:10 154:24
**given** 46:22 52:20
73:13 79:7 80:7
81:6 98:5 107:10
110:9
**gives** 26:9 51:24
71:4 138:25
**glad** 118:23
**global** 67:20 68:7,9
92:9 106:2
**globally** 67:25
**glueckstein** 14:15
**go** 31:5 64:25 76:15
87:14 91:6,8,13
99:8,9 113:17
116:15 123:24
131:25 139:2
141:16 142:9,17
147:4 148:10
149:19 154:16,23
156:18 157:2

**goal** 26:1 62:5
92:15
**goals** 27:9
**goes** 55:12 70:13
128:12 131:8
137:19 145:12
**going** 22:6 23:6,13
23:14,16,22 27:1
30:11 35:15 43:12
44:1 46:18,19,21
47:5 49:4 52:23
56:15 59:24 60:6,8
60:18 61:3,3,5,23
62:11 66:24 67:1
70:4 73:24 74:15
75:7,8,18,19 76:2
76:19,23 78:10
79:15,16 80:15
81:13 82:1,13,15
84:3,4 86:20 88:12
91:14 93:2,5 96:2,8
100:10,10,11 101:3
101:9 102:6,19
103:1,10,14 104:13
105:20,23 106:13
106:15,20 107:10
107:11,23,24 108:1
108:3,6,7,8 109:22
110:3,4 111:8,14,17
111:23 112:11,15
112:18,19,22
116:15 118:10
119:5,12 120:14
123:22 124:23
125:1,2,4,5,6,7,9,17
125:22 126:12
129:8 131:3,12
132:2,4 133:18,20
134:21 135:18,20
135:25 136:2,4,5
138:15,22 139:2,9
139:11,12 143:10
145:9,11 146:1
147:18 148:12,13
148:18,19,21
149:13 150:1
152:21,24 155:15

156:3 157:3,7,20
158:20,25 159:1
**goldman** 19:7
**good** 22:3,4,18,20
36:14 37:2 39:23
44:11 46:2,10 48:4
49:14,15 50:16,21
57:13,14 66:7 67:5
68:15 84:23 86:2
98:18 108:25 113:2
117:9,13,14,14,15
119:19 143:25
144:1
**goodman** 11:9 86:2
86:3
**goodstein** 19:8
**goren** 9:22 154:1,1
**gotten** 83:23,24
99:25 152:9
**governance** 100:4
**grace** 124:13 127:2
127:12 157:24
**grant** 73:10
**granted** 78:20,21
**granting** 4:20 5:2
81:8,11
**gray** 10:5 19:9
**great** 34:13 75:13
77:12 112:12
**greene** 19:10
**grew** 52:9
**gross** 133:1,2,6,8,11
150:4,5 151:18
155:14,17,21,24
156:3
**ground** 69:9 74:1,2
**grounds** 152:16
**group** 4:19 11:22
13:5 17:17 29:5,6
29:16 40:15 41:13
41:15 42:2,20 44:17
47:5,7,9,14 54:22
54:22 62:13 67:6
68:2 77:3 80:12
89:7 94:25 100:16
102:16,16 154:16

**group's** 41:22
**grow** 56:7
**guaranteed** 31:24
**guess** 115:9 141:15
**guided** 25:7
**guiney** 19:11
**gump** 66:8 117:16
119:20
**guys** 30:6

**h**

**h** 10:7 20:2
**h.m.** 8:15
**hal** 20:3
**hale** 10:10
**half** 51:25
**hall** 47:17
**hammer** 32:23
89:11
**hand** 35:24 36:10
119:21 122:23
143:24 150:10
151:2
**handcuff** 57:1
**handle** 31:9 114:3
119:12 149:5
**handled** 133:22
**handling** 96:24
**hands** 54:15 61:19
**hang** 101:9
**happen** 111:13,14
112:11 118:11
125:3 135:20 157:8
**happened** 119:7
139:21 156:5
**happening** 108:10
**happens** 88:19
92:22 127:14 132:6
**happier** 33:24
**happy** 32:21 46:6
**harassing** 73:15
**hard** 93:22 107:4
138:19
**harder** 70:2 91:8
**hardest** 82:12,13
**harm** 69:14 73:25
74:2,4

**harmonization**
81:15
**harris** 9:23 19:12
**harrison** 9:8
**harvey** 9:8
**hate** 51:23 80:15
114:17,18
**hated** 100:3
**hauer** 66:8
**haven't** 146:6,7
**he'll** 73:14
**head** 157:17
**headed** 108:7
**heading** 59:23
**headline** 77:12
**hear** 23:4 47:6
49:10 101:7 106:15
117:3 133:19
137:16 144:20
145:13 146:24
147:21 148:24
149:3 150:7,24,25
152:15 153:6
155:12 156:12,19
**heard** 39:1 45:23
47:24 49:5 66:12
77:1 84:17 86:1
88:15 97:2 99:3
100:8 120:19 121:6
122:2,6 141:9
145:25 147:16
153:8 154:4 158:11
**hearing** 2:7,16,21
3:1,8,14,20 4:1,7,13
4:19 5:1,6,12,18 6:1
6:7,13,19,20 7:1,6
24:7 25:3 29:15
37:6,14,17 38:7,13
38:15,24 39:1,19
42:12 47:10 51:3,13
52:16 53:15,16 58:1
59:9 60:14 62:10,10
62:15,18,21 67:9,9
71:14 72:3,21 73:3
80:16,19 82:22
83:20 84:2 85:19
96:3 101:23 104:15

104:17,22 105:8,8
105:19 108:18,20
108:21,22 109:22
111:11 112:15
113:19 114:11,16
115:17,18 116:10
116:18 118:9,22
146:4 147:16
155:10,14
**hearings** 64:10
81:23 152:9
**heart** 35:20 55:12
69:13 155:24 158:2
**heavily** 38:20 63:20
127:19
**heavy** 44:6 74:20
81:1 89:4 95:16
**hebbeln** 19:13
**heed** 138:3
**heels** 24:16
**held** 128:6 155:21
**hello** 51:21
**help** 91:5 93:22
126:5 127:17,21,22
137:20,23 153:6,8
**helper** 154:11
**helpful** 102:18
109:17 114:14
122:25 124:4 142:1
**helps** 42:24
**here's** 150:18
**hermann** 15:4 48:4
48:5
**herring** 19:14
**hessler** 8:16
**high** 32:8
**higher** 76:18 129:6
**highlight** 36:25
37:7 43:3 86:19
99:21,22
**highlighted** 81:21
94:19
**highly** 38:5 56:20
**hijack** 35:17 110:18
**hit** 147:11
**hmm** 98:14

**hoc** 4:19 11:17,22
  15:2,8 28:17,17,20
  29:5,16 31:11 40:14
  41:13,15,22 42:2,20
  44:17 47:7,8 48:6
  48:14 67:6 68:2
  80:12 81:5 89:7
  94:25 100:16
  101:25
**hold** 24:22 63:17
  73:2 116:8 127:14
  144:16 157:24
**holder** 28:18 136:1
**holders** 28:16,18
  47:9 120:5 139:4
  142:25 156:22
**holders'** 129:2
**holding** 1:11,14 7:7
  9:2 113:20 127:3
**holdings** 1:5 2:7,21
  5:12 6:8,19 8:21
  124:14 127:12
  157:24
**holds** 131:24
**hole** 77:15
**holes** 84:4
**holidays** 26:24
**holistic** 24:13
**holmes** 19:15
**hon** 2:2
**honor** 22:4,6,17,18
  22:20,21,22 23:1,4
  23:8,12 24:1,2,4,8
  24:21,22,24 25:13
  26:8,10,18,21 27:11
  28:1,3 29:9,18
  30:12 31:2,9,14
  32:12 33:5 34:5,6
  35:3,23,24 36:1,4,9
  36:14,21 38:11,25
  39:1,5,8 40:4,10,15
  40:21 41:12,19 42:8
  42:23 43:25 44:17
  44:19,22 45:18,21
  46:2,9,10 47:1,11
  47:18 48:4,13,16,21
  48:23,25 49:10

50:19,21 51:5,19,21
  57:10,13,18 58:10
  60:10 62:23 63:13
  63:19,24 64:12
  65:13,25 66:7,10,12
  66:16,22 67:3,5
  74:16 80:20 84:16
  84:21,23,25 85:6,14
  85:22,24 86:3,11
  88:13,18 89:20 90:5
  90:24 91:2,11 92:5
  92:7,17 93:9 94:4,7
  94:10,19 96:17,20
  97:10 98:2,16,19
  99:4,17 109:6,10,16
  110:6 113:10 114:2
  115:2,10,13 116:4
  116:19,23 117:10
  117:13,21 118:18
  119:8,10,16,20,21
  120:1,10,17,21
  122:15 123:6,10,11
  123:13,23 124:3,5,7
  124:25 125:10,17
  125:19,25 126:10
  126:13,19 127:1,4
  127:11,13,18,21
  128:16,20,23
  129:13,17 130:9,12
  130:17,23 131:1,11
  131:15,24 132:7,9
  132:11,18,25
  133:14,18,22,25
  134:20,23,24
  135:10,21 136:10
  136:12,15,17,24
  137:3,18,22 138:2
  138:14,16,21,24
  139:3,7,13,23
  140:11,17,24,25
  141:18,19 142:3,13
  142:18,24 143:6,12
  143:13,17,25 144:3
  145:18 149:18
  150:10,14 151:2,4
  153:15 154:3,23
  155:2,4,6,9,18

156:4,7,9,13,19,24
  157:2,13,17,22,23
  158:6 159:5
**honor's** 36:2 115:4
  116:7
**honor's** 139:16
**hooked** 154:6
**hope** 26:11 53:21
  65:16 83:21 113:21
  120:23 156:25
**hopeful** 51:2
**hopefully** 68:24
  88:18 101:15
  114:19,25 119:6
**hopes** 92:13
**hoping** 84:1
**horse** 104:6
**house** 66:19 146:11
**howard** 9:11 12:20
**huge** 75:24
**hundreds** 53:18
**hurdle** 34:3
**husnick** 8:13
**hwangpo** 19:16
**hyde** 8:1 160:3,8
**hypothetical** 67:25
  120:13 123:8,17
  127:2 128:10
  138:14 141:8
  143:22

**i**

**i.e.** 148:17
**ian** 19:15
**idea** 75:12 111:4,21
  112:16 128:25
**ideas** 111:25
**identification** 78:19
**identified** 81:4
**identify** 78:17
**identifying** 79:22
**ignore** 59:20 90:15
  91:7 124:23 125:16
  147:25 148:17
  152:25
**ignores** 91:16
**illusory** 26:20 34:7
  34:19 53:7 59:7

60:7
**illustrate** 42:24
**illustrates** 95:3
**impact** 66:18,24
  82:12
**impair** 154:20
**impediments** 76:9
**impelling** 27:7
**impels** 29:2
**implicated** 22:10
  144:8
**implicitly** 34:16
**implies** 54:11
**implore** 82:15
**implored** 27:14
**imply** 101:18
**importance** 58:2
  144:23
**important** 27:12
  38:18 43:12 47:2
  49:7,22 50:9 52:20
  65:20 66:20,23
  79:16 101:18 103:5
  103:23 107:16
  116:14 133:25
  136:9 142:4 144:14
  145:2,5,6 148:23
  149:2,4,13,14,15,16
  149:23 150:2
  151:11 152:7
  154:18
**importantly** 22:9
  25:12 45:4 60:5
  66:22 154:13
**impose** 63:3 83:3
**imposing** 70:16
**imposition** 33:9
**impossible** 125:20
  136:7
**improper** 38:5
**inappropriate** 33:9
  39:9 102:15 125:20
**incalculable** 27:3
**inclined** 73:9
**include** 28:15 54:6
  64:4 66:18 102:18
  103:5

**included** 47:12,15
47:15 52:8 64:5
65:7 66:21,23 67:3
106:21
**includes** 26:24 48:8
89:15
**including** 48:14
65:19 66:1 67:22
68:2,8 86:19,23
89:3 90:12 96:24
130:3 145:21
**inclusion** 37:12
**incoherent** 33:3
**incorporating**
114:23
**increasing** 59:5
**indenture** 1:8,18
9:9 12:7,13 38:3,4
38:22 50:23 84:25
130:2 136:12,13
**indentured** 37:1
39:6,12 47:11 57:17
**independent** 61:17
61:18
**indiscernible** 22:12
36:19 40:14 47:9
73:9 84:24 96:19
109:6 117:17
130:11 134:4 136:4
137:20 139:5,13
141:14 146:13
150:1,15,16 152:23
154:5 158:25
**individual** 33:20
112:7
**indulgence** 23:12
**inescapably** 158:6
**inevitably** 73:14
**inextricably** 23:10
**inflection** 84:6,7
**informally** 95:21
**information** 37:3
51:9,11,15 52:22
66:1 82:11,11 90:20
96:1 107:3 111:3
150:22

**informed** 25:14
57:4 62:1 66:2
**inherent** 136:22
**initial** 39:25 43:10
97:19 98:5 102:11
113:21
**initially** 52:11
102:19 104:11
**initiatives** 31:10
**inject** 128:13
**injected** 127:6,7
**input** 87:19
**inquiry** 110:5,13
135:12
**ins** 40:3
**insiders** 52:1,4
55:12
**insist** 33:5
**insistence** 69:8
74:21
**insists** 34:5 35:3
**insolvent** 131:17
137:7
**instance** 26:10
31:24 56:18 69:21
103:3 129:7
**instructive** 156:6
**insufficient** 3:3,21
4:8 5:7 6:2,14
**insultingly** 32:9
**insure** 26:3
**intact** 105:23
**intend** 119:22 121:3
135:10
**intended** 31:9 49:9
**intensified** 29:18
**intensive** 89:1
**intention** 105:24,24
140:1
**inter** 53:2 54:3,5,12
54:21 55:10 64:22
67:1 75:22 78:13
79:22 96:13 110:17
110:17,17,18,21,25
**intercompany** 33:6
35:4,7,9,10 54:13
54:19 63:7 64:2

86:23 90:7 91:16
95:6 96:5 107:18
110:21,24
**interdebtor** 33:19
35:2
**interest** 4:23 26:2
31:17 39:11 40:7
45:7 55:9 57:21
60:16 71:25 78:9
82:22 83:5 95:11
120:7 121:15,17,19
122:14,20 125:18
126:4 129:21
130:13,14 131:21
133:4 134:12 135:6
135:11,22 136:14
136:20 140:18,22
141:3,8 142:21
144:6 145:1,22,24
147:8 150:8,16,21
151:16 152:23
153:3 155:9,20
156:10,14 157:16
157:19
**interesting** 29:21
**interests** 4:23 34:2
69:25 125:23
126:13,17,21,22
130:8 131:16,19
135:2,7 147:15
148:21 153:14,17
156:1 157:10,12
**interfere** 112:19
**interim** 118:25
**interject** 39:6
**interlineated** 114:6
**intermediate** 1:11
1:14 7:7 9:2 23:2
**intermingling**
54:23
**introduce** 105:21
119:11
**introduction** 94:12
123:22
**invariably** 25:7
**inverse** 99:10

**investigate** 86:22
**involved** 52:18,24
53:6,17 103:4 128:3
**involves** 137:4
156:15
**ira** 18:14
**irrational** 72:7
**irrelevant** 97:5
100:21
**irs** 75:4
**ish** 108:19
**isn't** 136:10 140:20
151:13
**issue** 27:16 32:10
37:19,25,25 38:1,2
39:5,18,21 40:6,7
40:10,14 42:20
45:18,24 51:18,20
55:16 59:6 63:13,22
66:15 73:25 78:24
81:4 82:1,6 95:14
95:15 98:9,15
109:14 110:22,23
111:8 113:3 122:10
122:13 127:5 131:4
131:7,9,12 132:3,19
133:1,6,9,9,13,18
133:23 134:5 135:3
135:11 136:25
137:4 138:17
140:15 142:19
144:4 145:10
146:10 147:9 148:6
149:3,4,6,13,15,15
150:5,8,21 151:11
152:10,20 153:3,16
154:4,7,12,15,18,22
155:3,8 159:1
**issued** 150:16
155:17
**issues** 23:19 24:12
25:14 28:7 37:16
39:7,11,13 40:6
41:4,7,12,14 42:7
42:19 43:1 45:13,15
45:21 46:1,17 51:2
52:12,14 58:10,14

59:15 60:23 65:15
66:18,24 67:2,12
71:8 78:10,12 79:8
79:19 81:3,16 82:20
84:2 90:13 91:16
92:18 93:7,19,23
96:5,6,20 97:20
98:1,12,14 100:7,20
102:24,25 103:19
106:2 108:2 110:12
110:15 111:12
113:25 114:21,22
115:8 118:22 121:9
121:25 122:5
123:11,12,14,16,18
125:22 127:23
129:4,21 132:12
133:21 137:5,5,22
140:9 142:23 143:1
143:1,2,8,14,15
145:8 147:7,8 149:8
150:16 151:14,16
152:4,4,6 153:1,15
**item** 23:23 28:7,23
36:22 37:10 38:2
41:13 45:22
**items** 23:3
**it's** 127:19 131:12
132:23 135:3 136:9
136:14,21 137:4,21
138:19 140:21,25
141:7,14 144:14
145:5 146:8 147:11
148:11,14 149:16
149:23 151:15,21
153:10 154:9
**i'd** 151:2,6
**i'll** 143:23 155:2
156:18
**i'm** 134:24 139:2
147:16 148:23
155:1,5 156:3
157:17,25 158:20
159:1
**i've** 131:10 145:25
150:9 156:16

**j**

**j** 8:13 9:6,23 18:1
19:12 20:17,22 21:1
**jabs** 28:9
**jacob** 15:5
**jacobson** 21:9
**jae** 18:8
**james** 8:15 13:1
19:18 20:2
**jamie** 13:16
**jammed** 50:12
**january** 3:24 4:4,11
**jason** 8:12 9:4 20:9
20:11
**jeff** 16:4 18:22 20:1
20:12 84:24
**jeffrey** 11:19 13:17
20:6
**jennifer** 12:10
**jeopardizing** 45:20
**joanna** 20:5
**john** 20:15
**joined** 152:20
**joining** 147:9
**joint** 53:17 55:22,23
63:20,21 83:3
155:10
**jointly** 1:6 54:25
**jon** 18:19
**jonas** 16:4 84:22,23
84:24
**jonathan** 19:25
**jones** 12:12,15
**joseph** 21:5
**josh** 50:21
**joshua** 12:9
**judge** 2:3 127:25
128:6,17 132:25
133:2,6,8,11 138:3
138:5,11 150:3,5
151:18 155:14,17
155:21,24 156:3
157:5
**judgment** 4:22 7:2
7:3,6 87:18 118:6
120:8 121:20 124:6
126:3,5,6 128:19

131:21 133:5
135:19 144:13
145:14 147:22
148:25 153:18
**judgments** 126:25
**judicial** 137:2
**julia** 19:3 21:3
**july** 2:14 43:11,18
44:2,2,3 50:4,5,9
87:13 88:15 92:8
101:23 108:11,11
108:12 116:7
**jumps** 139:7
**june** 37:3 44:2 50:4
50:5,9 73:11 84:17
84:19 88:15,15,16
88:16 90:3 108:19
108:21 110:5 118:9
118:25 119:5
150:16
**junior** 115:15
**jurisdiction** 120:12
120:16 124:2,12
126:23 128:7,8,15
134:4,4 138:10,11
138:14 139:1 142:3
143:23 147:21
149:3 153:9,14
156:12
**justification** 38:19
**justify** 70:14
**justin** 16:20

**k**

**k** 19:14,24 20:20
**kaiser** 35:6
**kalenchits** 19:17
**katchadurian** 19:18
**katherine** 20:16
**katona** 16:19
**keep** 104:14 105:23
106:20 108:21
147:1
**keeping** 96:11
**keglevic** 61:8 80:4,5
**keith** 10:7
**kenneth** 21:11

**kenny** 19:19
**kent** 18:11
**kept** 27:17 131:21
**kerr** 9:20
**kevin** 20:25
**key** 25:19 27:4 28:5
31:19 32:6 33:11
34:3 52:18 58:13
75:25 82:2 94:5
150:23
**kick** 44:2 88:23
**kickstart** 89:15
90:3
**kieselstein** 8:10
22:18,19 36:13,21
39:22 47:1 53:3
54:2 58:9,16 76:5
76:10 77:7 87:6
91:4 98:15,16,18,19
109:1,4,9 115:2
122:6,9
**kieselstein's** 55:2
**kieselstein's** 152:5
**kimberly** 14:4
**kimble** 19:20
**kind** 28:7 30:18
64:6 80:8 103:7
109:19 110:24
120:6 132:22 136:2
141:25 143:10
147:8
**kinds** 138:20
**kirkland** 8:4 22:5
22:19 32:14 36:15
58:24 64:5 86:4,13
144:2
**kissel** 10:14 17:1
**klauder** 16:9
**klehr** 9:8
**knew** 117:23
**knock** 115:5
**know** 35:12,24
44:11,24 51:10
52:23 57:2,2 64:17
66:3 75:11,19 76:9
78:21 82:9,14 83:7
83:22 84:2 87:9,12

89:5,20 90:8,9,18
92:7 95:13,16 97:20
99:5 104:2 106:4,5
106:10 107:5,13,22
108:7 110:9,17
111:15 114:10,13
114:19 116:13
119:4 124:22,23
125:1,1,2,3,4,5,7
126:21 129:2
130:13 131:2,4,12
132:21 135:23,24
135:25 136:1,3,5,6
138:15,18,21
139:11,18 140:13
140:14 141:11
143:6,9,11 145:25
146:5 147:8,18
148:8,18,21 149:16
152:14 153:1,4,7
154:4 157:7,20
**known**  133:12
140:20
**knows**  29:13
**koster**  19:21
**kotwick**  10:18 17:5
**kramer**  12:6 50:22
**kranzley**  14:14
**kremins**  68:9
**kyrouz**  19:22

**l**

**l**  17:24
**lack**  35:7 69:6 70:3
**lacks**  120:12 144:16
**laguardia**  146:11
**laid**  74:4 80:2
**land**  27:25 127:22
**landis**  11:1
**language**  41:1,19
41:25 42:14,15 51:1
51:18 53:9 66:13
85:3
**large**  23:16 24:23
24:24 27:25 142:7
**largely**  23:3
**larger**  33:12,16
102:16,17

**largest**  28:18
**lastly**  119:10
**late**  2:18 80:16
108:19
**latest**  24:3
**latham**  9:20
**laura**  12:15
**lauria**  11:25 87:7
**law**  33:25 58:22
62:24 69:18,22
71:20 96:23,24
135:9 136:18
143:18 147:2,2
151:17 157:8
**lawson**  14:4
**lawyers**  31:8 58:8
**laying**  25:19
**layton**  9:1
**lbo**  80:4
**lead**  30:7 62:22
65:17 89:3 141:22
**leads**  145:4
**leave**  116:21,21
130:21 152:24
**leaves**  130:18
**led**  140:3
**ledanski**  8:1 160:3
160:8
**lee**  19:23
**left**  28:2,2 36:21
**legacy**  40:16,17
86:21,23 90:12
107:16,21 111:4
**legal**  31:5 32:16
33:14 77:19 120:14
123:1,6,25 131:20
135:3 137:5 141:19
143:1 144:18
160:20
**legally**  123:16
141:25 143:17
**legislative**  23:22
**lemisch**  9:11 47:11
**lenders**  47:8,8
**length**  128:1
**lengthy**  105:17

**leslie**  2:5
**letter**  155:8
**letters**  79:22
**let's**  129:14
**level**  27:22 55:1
68:1
**levin**  12:6 50:22
**lewis**  13:19
**liability**  3:15 4:2,14
5:19
**lib**  80:6
**license**  30:1
**lien**  10:15,21 12:7
12:13 28:16,16,20
31:25 37:1 47:8,8
48:6 50:23 75:20
84:25 92:4 115:15
117:23 133:23
134:1,5 139:16,17
139:19,21,23,25
140:1,3,4,9 144:23
149:9 152:1,1
**liens**  4:22 32:8 81:7
134:6,7 139:20
**lien's**  140:2
**lies**  35:20
**life**  23:20 26:9 32:9
**lift**  118:11
**lifted**  129:11
**lifting**  44:6 81:1
89:4 95:16
**light**  157:6
**likelihood**  148:1
**likeness**  139:22
**limitation**  54:6
**limited**  47:5,5 49:1
97:20 130:3
**lincoln**  99:11
**line**  23:22 24:3 28:7
28:23 36:22 37:8,9
38:2 41:13 45:22
62:5 87:21 106:20
**lines**  43:4 46:7
60:23 115:10
**liquidated**  56:13
130:1,1

**liquidation**  56:9,11
**list**  54:5,9,10 94:8
95:1 110:24 111:9
**listed**  156:18
**listing**  60:22
**litigate**  121:25
123:14,16,18
125:22 131:7
132:19 134:20
138:18 140:15,21
142:22 143:1,8,9
**litigated**  63:21
122:5
**litigating**  116:15
152:8
**litigation**  22:23
24:1 25:5,6 44:15
54:1 65:7 69:1
83:12 87:5 92:14
103:21 104:7,10
106:5 111:12
123:10 139:16
141:24 142:2
148:10 158:7,15
**litigations**  140:11
**little**  68:13 70:3
82:20 83:8 99:10
104:4 112:17,18
113:17 117:24
120:19 121:22
139:24
**live**  70:3
**lived**  81:22
**llc**  1:11,14 2:23 5:14
5:15 7:7 16:6
**llp**  8:4,20 9:17 10:5
10:20 11:1,16 12:1
12:6,17 14:1 15:13
22:5
**local**  3:5,11,17,23
4:4,10,16 5:9,22 6:4
6:16 47:14
**logic**  27:6 29:2
**long**  73:12 118:22
155:8
**longer**  70:3 140:5,6

**look** 49:22 58:19
59:14,16 60:19,21
64:25 72:13 82:7
85:8 107:6,25
129:14 145:9,12
146:1 148:8 150:10
**looked** 23:1 150:4
**looking** 43:4 46:2
57:18 58:6,7 62:2
63:25 107:8
**looks** 62:1
**lorenzo** 9:21 48:23
**lose** 45:17 68:25
76:23 88:4,23 89:1
90:22 138:23
**losing** 80:18
**losses** 56:7
**lost** 88:21
**lot** 22:7 23:20 46:18
46:19 49:10 50:7
78:11 94:23 106:3
106:25 107:13
143:14 145:25
148:11 154:5
158:11
**louis** 21:7
**love** 122:22 138:15
138:18
**low** 32:9
**lowenthal** 12:25
**lower** 129:6
**lumimnant** 5:3
**luminant** 2:22 5:13
54:19,20
**lunch** 101:3,8
**luria** 29:19,24 30:2

**m**

**m** 8:12 9:4,22 18:12
18:17 20:6,19,25
21:3
**mabel** 18:4
**machine** 154:6
**madam** 101:7
**madron** 8:12 9:4
**magnitude** 26:7
**maiman** 21:11

**main** 146:18
**maintain** 113:3
**maintaining** 106:16
**makers** 84:13
**making** 76:17
112:23 130:7 155:1
**malone** 19:24
**mammal** 27:25
**man** 117:17 159:4,5
**manage** 72:20
**managed** 72:14
76:24
**management** 27:4
75:1,2
**managing** 104:10
**mandates** 59:11
**mandatory** 63:1
**manner** 2:11 62:1
73:4
**march** 5:10,15,16
6:17 7:2 70:6,12,14
72:25 73:5 81:18,20
83:19
**maria** 18:9
**marinuzzi** 9:21
48:23,24
**marita** 21:8
**mark** 8:8 9:5 10:18
14:21 17:5,15 18:10
18:25 19:13 20:18
20:20 22:18 36:15
86:12 98:19 138:5
**market** 1:22 56:5,5
56:16
**marshall** 19:25
**martin** 10:8
**marwil** 20:1
**match** 79:20
**material** 65:22 94:9
149:21 154:4,12
**materially** 34:18
154:20
**materials** 45:16
90:12 94:10
**maternal** 98:22
**mathematical** 151:7

**matter** 25:11 34:13
49:4 55:13 60:12,14
62:24 71:3 97:19
98:5 111:1 112:10
115:3 118:11
120:12 124:2,4,11
124:19 128:8,15
132:20 134:3,4
138:14,25 142:1,2
143:22 148:24
159:1
**matters** 71:1 130:19
131:1,2
**matthew** 11:4 18:13
19:9,20 20:22,24
21:9
**maximize** 74:17
88:9
**maximizes** 100:24
**maximizing** 26:15
67:25 70:11 76:22
**maximum** 105:3
**mccracken** 14:18
**mcelroy** 8:20 14:6
**mcgaan** 8:11 117:1
117:7,10,20,21,21
118:3,8,14 119:10
119:14
**mcgaan's** 118:17
**mcguire** 11:4
**mckane** 8:8 23:13
23:20,25 28:8 35:24
36:11,14,15,20 38:9
46:9 50:23 58:17
73:12 81:21 83:7
85:2,24 86:11,12
92:5,7,17 93:9,14
93:17 94:4 96:14,17
98:16 109:1,10,16
109:24 114:2,25
116:19,23 117:4
122:2
**mckool** 11:6
**mcnail** 15:21
**mean** 36:4,7 68:14
96:8 104:1 115:11
115:12 124:22

129:24 146:8
**meaning** 26:9,21
**meaningful** 139:6
**meaningfully**
142:25
**means** 83:14 129:8
**meant** 25:12 101:18
**mediate** 52:13 61:2
81:18 102:25 103:1
**mediation** 23:5,8
47:10,16 48:8 52:8
52:8,11,17,19,23
61:1,1 66:11,17,21
67:1 81:3,17 85:11
85:15,21 87:4 91:22
97:11,11,17,19 98:3
98:6 102:4,11,13,14
102:25 103:7,8,17
103:24 108:12
113:24 114:22
115:12,20 142:15
**mediator** 32:10,22
52:13 66:16 76:2
81:18 92:10,13
93:22 97:22,24
98:10 102:21,22,22
**meet** 40:1 45:14
80:1 105:25 113:21
**meeting** 80:3 94:21
**meetings** 75:6
**meggie** 19:5
**mellon** 14:2
**members** 111:22
**memo** 55:24
**memorandum**
150:9
**mentioned** 50:23
63:9 113:1 151:20
152:5
**mentions** 96:22
**mere** 68:14
**meredith** 20:7,8
**merit** 26:13 31:13
58:16 59:25
**merits** 24:8,20
35:18 61:21 62:6,10
62:12,16,18,20,21

62:21 96:15 99:14
105:16 106:13
135:10 156:1
**met** 94:21
**michael** 8:9,10
17:10 18:24 19:23
21:1
**michele** 19:22
**michelle** 18:16
**mid** 44:2 73:11
108:11
**middle** 82:8 105:18
**midpoint** 56:11
**mike** 119:11 144:2
**millar** 20:2
**miller** 13:3
**million** 26:23 32:13
56:7 59:4 60:24
61:5 68:13 69:2
77:1,5,12,15,16,25
78:7 88:8 90:12
100:5 107:11
122:20,21 141:13
141:14,15 145:1
152:24 158:11
**millions** 53:18
68:22
**mind** 25:17 65:4
107:1 158:25
**minds** 34:17
**mineola** 160:23
**minimum** 85:14
103:3
**minor** 101:25
**minute** 85:25 92:1,2
92:2 107:19 120:17
154:2
**minutes** 90:18
116:22 117:4,6
**minutia** 101:17
**mirror** 147:9
**misconceptions**
70:20
**mishear** 93:17
**misplaced** 40:23
**mitigating** 137:3

**modification** 38:2
44:10 67:14 132:14
**modifications** 36:22
37:10 40:11 42:14
78:3
**modify** 23:24 38:21
39:3,14 40:8
**modifying** 38:20
134:18
**moment** 34:13
**money** 55:11 62:14
83:15,18 143:14
148:9 154:16
**montgomery** 14:18
**month** 44:7 45:3,11
56:8 79:25 82:17
116:6
**months** 25:18 53:19
56:24 86:21 88:6
90:11 105:20
116:10 126:20
142:16 157:4
**moot** 119:3 137:2,5
137:6,7,9,11
**morgan** 13:19
15:10
**morning** 22:3,4,18
29:23 36:14 46:10
46:11 48:4,23 49:5
50:21 57:13,14 66:7
66:14 67:5,15 86:11
115:21 117:13,14
120:19 121:1,3
122:2,7 128:23
141:9 154:14
**morris** 13:1,9 20:3
**morrison** 9:17
48:24 154:1
**moshe** 18:23
**moss** 10:23 20:4
**mothers** 69:18,24
70:19
**motion** 2:7,16,21
4:19 5:1,12 6:7,19
7:1 22:10,13,15,21
23:13 24:5,11,15,20
24:21 27:8 28:11

34:10 38:23,24
39:17,23 44:21
45:10 48:1,13 50:25
52:6,7 68:5 70:7,21
70:22 78:19 81:4,9
81:10 84:17 88:3
91:14,15 92:4,12
93:3,12 100:12
116:24 117:3 118:5
118:15,24 119:12
120:2,10,20,22
122:3 124:9 127:20
130:12 150:20
153:24
**motions** 6:10 25:21
44:18,23 45:3,19
49:4,21 71:6 79:4
79:25 91:11 92:20
92:22 100:8 105:16
112:21
**mouse** 146:25
**move** 31:3 54:3
55:11 58:4 73:22
74:3,3 80:19 91:7
113:22 114:12
123:22 134:23
137:23 140:4
**movements** 79:8
**moves** 114:11
**moving** 29:10 48:19
54:21 66:4 72:11,24
77:22 87:20,22
**multi** 25:3
**multiple** 31:6 58:4
58:10 72:5 73:1
103:13
**multiples** 26:6
**multiyear** 95:19
**mulvaney** 8:20 14:6
**mundane** 42:3
**munger** 12:1
**murin** 2:5

**n**

**n** 8:2,17 22:1 160:1
**n.a.** 1:18 9:9
**naftalis** 12:6

**names** 154:5
**naomi** 20:4
**narrow** 110:13
135:3
**narrowing** 110:5
**natasha** 19:16
**natural** 24:15
**nature** 26:17
**near** 35:17 75:23
88:16,16
**necessarily** 22:10
46:15 70:10 115:6
126:24 130:10
**necessary** 25:10
30:23 42:9 45:4,6
47:2 50:8 75:3
77:17 80:5 95:17
111:7 114:20
118:10 151:13
**ned** 15:16
**need** 23:14 27:7
29:2 40:8 41:25
42:19 43:21 46:3
47:14,15 53:10,21
55:18,22 56:21 57:2
57:2 58:3,14 59:9
60:4,19,20 61:2
62:24 67:2 72:4
76:9 80:24 81:2
82:3,5 83:15,16
88:8 89:14 90:13
93:12 94:11 103:4
108:1,9 114:12
115:23 117:1
125:21 132:4 138:3
140:16 152:12
154:8,16,19 156:16
158:13
**needed** 24:18
113:25
**needs** 39:15 40:7
48:10 50:13 65:13
65:22 66:25 67:13
74:14,18 76:1 81:15
82:3,6,19 83:4
102:10 103:6 116:9
119:6 130:19

158:13
**negotiate**  45:3
  100:25 121:3
  138:22
**negotiated**  32:14
  38:20 42:25 75:5
**negotiating**  76:3
**negotiation**  74:20
  138:15
**negotiations**  76:1
  86:24,25 89:12
  91:21 97:12 128:7
  128:14 137:25
  138:9 142:16
  154:13
**neither**  120:11
**net**  56:7
**never**  92:11 96:22
  104:2 132:7 133:9
  134:5 139:22
  147:21
**nevertheless**  30:19
  85:20
**new**  56:22 99:4
  147:1,1
**newdeck**  20:5
**news**  95:1
**nice**  30:5
**nicely**  158:2
**nichols**  13:9
**night**  53:15,16
**nine**  86:21 90:11
  127:11
**nixon**  11:11 57:16
**nobody's**  107:23
  112:8
**nols**  56:16 77:9
**non**  2:8,11 3:1,8,20
  4:7 5:6 6:1,13
**nonexclusive**  54:10
**normal**  54:21
**norman**  10:3
**nortel**  133:1,2,11
  150:4 151:18 155:4
  155:5
**north**  1:22

**note**  28:3 38:3,4,22
  38:22 47:9 60:10
  61:2 63:20 111:22
  119:21 127:3 139:4
  142:25 155:1
  156:21
**noted**  24:24 61:14
**noteholders**  4:20
  11:17 66:9 120:2
  121:11
**notes**  11:22 39:5,12
  67:7 116:25 130:2
  140:1 147:23 148:8
**notice**  2:13 72:19
**notion**  46:15 87:10
  94:15
**notwithstanding**
  124:9
**november**  3:6 22:25
  45:20 80:9 104:15
  104:17 111:24
  150:18
**nrc**  75:4
**number**  31:16 32:7
  32:13 41:13 46:22
  47:6 77:12,13
  101:15 123:24
  124:15 127:10
  128:17,25 133:16
  158:16
**numbers**  31:19,20
  31:22
**numerous**  105:5
**nunc**  2:24 5:15
**nutriquest**  97:3
**ny**  14:2 160:23

---

**o**

**o**  2:1 22:1 160:1
**o'kelly**  16:6
**oath**  59:15,16 64:8
**object**  28:4 47:1
  59:17 116:10
**objected**  59:18
  65:18
**objection**  3:2,9,14
  3:21 4:1,8,13 5:7,19
  6:2,14 29:5 34:12

35:13 45:24 46:24
  49:1 51:5 52:17
  64:1 71:2 86:5,7
  97:18 113:15 116:1
  116:6,17 133:3
  147:13 155:10
**objections**  23:17
  24:14 28:22,23
  36:24 37:9,11 42:6
  50:24 51:8 83:10
  94:5 101:24,25
  111:20 144:9 146:2
**objective**  25:2
  35:16 125:14
**objectives**  22:22
**objectors**  36:23
  71:5
**obligation**  58:22
  63:19,22
**obligations**  4:23
  49:15 76:13
**obtaining**  75:4
**obviate**  92:14
**obvious**  29:2 144:20
**obviously**  36:5 42:1
  46:19 51:7 66:19
  68:23 79:2 81:25
  103:3 113:4 114:7
  127:3 140:6
**occur**  60:18 64:15
  124:19,20 158:4,5,8
  158:9,10
**occurred**  24:6
**occurring**  151:7,10
**occurs**  42:12
**october**  2:19,25
  45:9 77:21 80:9
**offer**  137:14
**offers**  31:18
**officers**  69:19
**official**  5:1 28:15,15
  38:16 40:18 42:25
  43:13 47:7 48:24
  51:22 81:6 89:8,12
  94:7,25 95:5 155:4
**offset**  77:10

**oh**  109:25 115:18
  117:18
**oil**  157:7
**okay**  22:16 46:8,24
  47:23 64:23 93:16
  99:18 101:2,11
  103:7,8 109:11,14
  109:25 113:11
  116:18 117:9,19,19
  118:2,13,16,19
  119:13 136:16
  155:1
**okie**  101:14
**old**  160:21
**olinsky**  20:6
**olivere**  17:15
**olson**  12:1
**omnibus**  3:1,8,14
  3:20 4:1,7,13 5:6,18
  6:1,13 39:1 109:14
**once**  58:5,10 97:12
  97:24 98:11 112:21
  115:25
**oncor**  31:6,17 32:3
  74:10,10 108:12
  111:23 125:3
**ones**  69:19,20 78:10
  84:14 128:19,20
**ongoing**  29:25
  39:10 51:3 63:12
  137:25
**open**  68:19 97:25
  130:18,21 158:25
**opened**  68:19
**opening**  49:24
**operate**  106:5
**operating**  56:7 75:1
  99:24
**operative**  131:15
**operator**  2:5 101:6
  101:7,11
**opinion**  133:9 150:9
  150:19
**opinions**  138:13
**opportunities**  27:18
  88:21

**opportunity**  26:3,4
  27:3 28:9 32:20
  45:5,13,14 85:20
  103:17,24 110:3
  114:16,18
**opposed**  27:6 49:18
  67:12 98:22
**opposing**  144:20
  145:8 146:6 147:6
  147:16 148:2 150:3
  150:17 151:4,19
  152:5,14
**opposite**  94:2
**opposition**  41:22
  76:14 92:19 127:20
  138:1
**option**  59:12,13
  70:11
**optional**  63:15
**optionality**  104:14
**options**  56:22 76:11
**order**  2:8,17,22
  4:20 5:2,13 6:7,9,20
  7:2 23:24 24:3 25:9
  25:9 27:20 37:6,10
  37:20 38:5,16,18,20
  38:21 39:3,4,15,18
  40:9,12,13,16 41:2
  41:9,16,20 42:3
  45:15 48:12,17 49:2
  49:3,13 50:10 51:25
  52:9,13,15,21 57:7
  57:19 62:20 63:1,3
  63:9,21,25 66:11,14
  66:17 70:15,21,24
  71:6,10,11,13 73:10
  78:3 81:2,16 82:16
  82:19,21 83:2,4,9
  83:13,14,17 84:18
  85:1,11,15 88:6,17
  98:8 101:20 102:4
  103:8,11 106:10,20
  108:9,19 112:4,24
  114:22 115:3,5
  118:6 122:23
  125:21 126:22
  141:5,21 143:8

  150:3,15,17 155:17
**ordered**  83:9,15
**orderly**  25:11
**orders**  58:7
**organization**
  146:13
**organizational**
  74:25
**organized**  25:8
**original**  99:9
  104:15
**originally**  155:10
  156:2
**outcome**  30:10 32:3
**outcomes**  31:18
**outlined**  58:9
**outrageously**  32:8
**outset**  22:11 51:23
  66:23 142:12
  153:15 157:18
**outside**  46:23
  136:25 141:24
  144:10 146:3,3,12
  146:19 147:13
  151:16 156:1
**outsized**  26:22
**outstanding**  145:22
**overall**  91:3,6
  144:22 145:2
**overarching**  101:19
**overbroad**  73:15
**overcome**  127:8
**overhang**  85:16
  87:4 89:19
**overlap**  43:7 49:24
  50:2 89:19 106:3,13
  106:18 113:4
**overriding**  25:2
**overrule**  37:11
  111:19
**overruling**  113:14
**oversee**  23:20

**p**

**p**  8:2,2 22:1
**p.m.**  1:25 101:12
  158:22 159:6

**pachulski**  12:12
**package**  92:9
**page**  26:20 60:21
  63:9 64:1,4 70:14
  128:20 139:8
  145:18 150:23
  158:1
**pages**  90:12 100:6
  107:12
**paid**  32:2 56:4,4,19
  77:19 120:8 121:17
  135:7 140:7 148:18
  148:19,22
**pain**  56:23 89:22
**pallas**  2:16
**pan**  30:14
**paper**  90:16 107:1,2
**papers**  35:5 54:4,16
  54:17 66:4 71:22
  74:4 76:7,14 92:19
  92:25 122:15 123:3
  124:13 146:11
  152:19 153:2
**paragraph**  40:13
  41:2 49:8,8 52:21
  83:1 131:14 134:24
  137:18,21
**paragraphs**  70:22
  85:4
**parallel**  86:17,18
  91:8 98:2 99:24
  100:23 103:21
  111:15
**parcel**  35:2
**parkinson**  20:7
**parliamentary**  72:7
**parochial**  28:7
**part**  35:2 36:10
  37:14 38:18 39:7
  50:24 52:2,10 60:18
  64:11 78:15 90:22
  91:19 92:8 93:4
  95:8,25 96:6,12,16
  96:19,25 97:8,12
  98:7 101:21 103:7
  107:15,16 120:21
  138:6 149:1

**partial**  140:7,8
**participants**  25:4
  85:3
**participate**  47:19
  82:21 97:25 102:14
  113:7,8
**participation**  82:25
  102:6
**particular**  36:25
  41:1 63:4 133:20
  138:6 148:16
  157:25
**particularly**  52:20
  67:11 74:5,21 77:2
  81:17 84:12
**parties**  23:23 26:2
  28:3,6,8,13 32:19
  37:15 41:17 45:2,13
  47:25 48:14 52:11
  59:16,20 62:11 67:2
  71:25 80:19 82:10
  82:22,23 83:10,17
  85:11 102:14,21
  103:24 107:3
  111:21 115:7,24
  126:5,17 127:24
  137:24 138:21
  141:6 145:3,16
  153:6,8 155:18,19
  158:13,15
**partner**  45:25
**parts**  39:21
**party**  34:24,24 45:6
  55:4,5 83:5 124:6
  142:21
**party's**  144:11
**path**  26:15 31:3
  99:24,24 100:15
  120:23
**paths**  31:6 86:17,18
  87:14,15,16 91:8
  98:2 100:23
**patrick**  19:1
**patterson**  12:22
**paul**  15:1 48:5
**pauline**  15:10

**pause** 56:13 88:14
  133:18
**pay** 55:6 77:9 78:7
  121:13 124:24
  138:3 139:19 140:1
  140:8,8 141:5
**payable** 120:7
  121:21 130:14
  136:20 155:20
  156:10,14
**payment** 2:9,12
  61:16 130:4 136:14
  140:17 144:12
  145:21 148:15
  152:22 153:13
  157:15
**payments** 4:24
  130:4
**peabody** 11:11
  57:16
**peak** 5:14
**pedone** 11:14 57:13
  57:15,15
**peek** 148:4
**peg** 18:2
**penalties** 145:21
**pending** 35:19
  57:10 79:3 81:4
  91:13 104:20 118:5
**people** 41:5,6 46:22
  47:5,6,14 72:22
  75:12 78:23 82:12
  83:6 84:4,10 86:19
  86:22,25 94:23 96:1
  96:8 100:24 102:19
  106:22 109:2 110:2
  114:16
**percent** 121:13,17
**percolating** 74:8
**perdone** 96:21
**peretz** 21:10
**perfect** 49:19
**perfectly** 156:4
**perform** 23:13
  103:15
**period** 27:24 35:21
  42:10 43:23,25

65:10 103:20
  104:11 105:3,4
**periods** 72:1 112:22
**perkins** 10:20
**permanently** 63:16
**permissible** 41:4
  141:25 143:18
**permission** 22:14
**permit** 69:22
**person** 30:9
**personal** 69:25
**personnel** 27:4
**perspective** 23:11
  33:19 53:2 54:14,14
  55:5 65:1
**persuasive** 29:1
**pet** 23:23
**peter** 11:9 86:3
**petition** 2:24 39:11
  40:7 55:9 78:8
  120:7 121:14,16,18
  122:19 125:23
  129:21 130:8,13,14
  131:16,19 133:4
  134:12 135:2,6,7,11
  135:22 136:14,20
  140:18,21 141:3,8
  144:5 145:1,24
  147:8,15 148:21
  150:8,21 151:16
  152:22 153:3,14,17
  155:9,20 156:1,9,14
  157:16
**petrino** 8:9 119:11
  119:15,16 143:25
  144:2,2 149:1,18,20
  150:13 151:4
  157:11
**pfister** 20:8
**phase** 40:3 43:5,6,6
  43:8,8
**phases** 39:20
**phil** 17:25
**philip** 10:12
**phillip** 18:3
**philosophical** 82:20

**phone** 29:24 116:13
**phrased** 25:23
**pic** 28:17 137:13
  139:4 142:25
  147:23 156:21,21
**pick** 43:24 66:9
  80:20 88:13
**picked** 39:17
**picking** 36:21
**pics** 144:4,7,12,15
  144:25 146:13
  149:6 150:1 153:16
  153:24
**pics'** 145:19
**picture** 101:16
**piece** 33:25 102:3
  103:9 107:14 108:6
  114:24 115:12
**piecemeal** 52:12
  141:23 152:6
**pieces** 52:19 77:22
**pik** 119:21 120:2,5
  121:11
**pimco** 13:14,20
**place** 57:25 78:16
  81:20 84:9 85:16,21
  93:5 134:13 142:15
**placeholder** 24:14
  31:12 32:24 99:14
**places** 83:9 134:17
  146:11
**placing** 69:8
**plainly** 144:18
**plaintiff** 1:9 7:1
**plaintiff's** 126:16
**plaintiffs** 1:16
  134:7
**plan** 6:22 24:5,8,13
  24:14,16,17 25:1,24
  26:15,19 27:16,21
  28:9 29:10,11,12,17
  29:20,22,24 30:17
  31:3,4,7,12,14 32:1
  32:2,5,12,19,24
  33:10,11,12,16 34:4
  35:20 38:19 48:19
  49:10 51:24,24 52:8

52:14,17 53:1,2,17
  53:20,21,22,24 54:1
  55:17,22,23,23
  56:22 59:3,21,22
  60:6 61:3,3 64:14
  67:18,20 68:12,14
  68:15,17,17 69:1,4
  69:5 70:1,9,9,10,19
  71:2,18,24 72:2,12
  72:15 73:5,19 74:8
  74:19,19,21,23
  75:16,17 76:1,4,8,8
  76:22 77:17,18,23
  78:3,9,21,23,25,25
  79:9,18 80:6,8 82:3
  82:4 83:20 85:3
  86:24,24 87:15,16
  87:21,22 88:5 90:18
  90:22 91:12,19,20
  93:4 95:8,19,19,20
  96:13,19 97:8,13
  98:21 99:12 100:1
  100:16,19 103:11
  104:7 105:6,8,10,10
  105:14,22 107:15
  107:17,18 108:8,12
  110:20 115:9
  120:24,24,25 121:5
  121:7,8,12,16,18,24
  122:25 123:5,8,19
  125:4,6,8,11,13,15
  127:23 128:5,22,24
  129:1,10,11 131:6
  132:6,10,12,13,14
  133:13 134:13,18
  134:21 136:4 137:7
  137:9,11,14,25
  138:10 141:17,23
  141:24 142:5,8,11
  143:5,11,16 145:4
  146:15,15,17,22,22
  146:23,24 147:13
  147:17 150:6 152:8
  154:13,14 156:1
**plans** 72:5,13,22
  73:4 105:6,14
  154:21

**plan's** 145:25
  151:25
**play** 25:20 99:10
  104:4 135:5,13
  152:18
**played** 68:24
**plays** 102:10
**plea** 127:21
**pleading** 33:1 84:3
  100:4
**pleadings** 55:19
  128:2
**please** 22:3 47:23
  101:14 143:15
  158:24
**pleasure** 29:19
**plenty** 157:1
**plot** 99:15
**plummet** 56:6
**plummeted** 56:6
**plus** 25:23 56:16
**pocket** 142:18
**podium** 57:11
**poetic** 30:1
**point** 25:14 46:7
  48:20 57:5 64:12
  65:5 72:13 73:7,10
  84:8 86:12 90:4,23
  91:10 93:7 95:18
  98:17,21 101:21
  102:3,5 104:12
  106:14 108:7 109:2
  109:13 110:23
  112:14 113:2,6
  115:2 122:15
  124:23 125:11
  127:11 131:8 138:3
  140:9,16 142:4
  145:5 148:7,8,18
  150:2 151:6 154:8
  154:12 156:19
  157:8
**pointed** 145:18
  146:21
**points** 46:3 66:1
  67:7 84:7 86:14
  88:12 94:5,8 118:18

123:20 124:5
  147:10 156:7
**poisinelli** 16:16
**polygraph** 154:6
**portions** 6:8 98:3,4
**posited** 73:2 74:1
**position** 29:7 31:22
  37:24 43:14 50:11
  51:14 70:17 92:3,4
  93:3 106:24 148:24
  153:2
**positive** 39:24
**possession** 78:13
  90:9,10
**possibilities** 132:7
**possibility** 67:24
  72:21 76:23 77:14
  78:1 130:18 134:18
  137:1 156:22
**possible** 25:13 26:2
  43:17 56:17 85:22
  92:13 105:25
  106:17 113:2,5,18
  125:11
**possibly** 60:1 68:6
  87:8 108:18 132:19
**post** 26:16 39:11
  40:7 55:9 78:8
  117:25 120:7
  121:14,16,18
  122:19 125:23
  129:21 130:8,13,13
  131:16,18 133:4
  134:12 135:2,6,7,10
  135:22 136:14,20
  140:18,21 141:3,8
  144:5 145:1,24
  147:7,15 148:20
  150:8,21 151:15
  152:22 153:3,13,17
  155:9,20,25 156:9
  156:14 157:16
**posture** 120:18
**potential** 59:23 95:6
  147:19,24
**potentially** 46:5,13
  59:5 149:10

**potter** 15:18
**poured** 77:15
**powder** 27:17
**power** 144:16
  145:13 149:7
**powers** 29:2
**ppi** 122:4 131:4
  139:6,14 141:12
  150:24 151:1
  155:12
**practical** 26:18
  126:5 127:17
  144:19,21 145:5
  153:6,7 154:11
**prager** 20:9
**pre** 39:25 111:10
  130:4 139:10
  145:21
**precious** 88:7
**precipitous** 157:6
**precise** 145:14
  151:24 152:3
**precisely** 122:14
  124:21 127:25
  144:12
**preclude** 29:10,11
  35:8 149:21
**precludes** 48:14
**precluding** 41:3
  76:11,16
**preclusion** 29:22
**predictable** 70:5
**prefer** 109:8
**preference** 109:3
**prejudice** 84:17
  142:4,20,21
**prelude** 105:13
**premature** 28:10
  37:20,21
**premise** 74:11
  87:24
**premised** 74:8
  78:25 79:1 158:7
**premises** 23:18
**premium** 120:6
  130:4 144:5 153:16
  157:15

**premiums** 130:3
  145:22,22 146:12
**prepaid** 139:10
  140:13,13,14
**preparation** 49:25
**prepare** 50:5,12
  82:12
**prepared** 50:1 92:9
  92:12 93:22 104:12
**prerogative** 34:20
**present** 17:23 39:20
  40:3 98:13 120:18
  121:5 128:3 134:22
  137:7
**presentation** 36:10
  46:14 119:22 147:7
  157:23
**presentations** 90:19
  121:1
**presented** 67:14
  105:17
**presenting** 23:13
**preserved** 112:25
**preserving** 69:24
**presses** 105:20
**presumably** 32:22
**presumed** 73:21
**presumption** 35:25
**presupposes** 79:9
**pretrial** 23:21 25:8
  25:10,21 44:8 60:2
**pretty** 29:12,13
  82:23 133:17 146:9
**prevents** 41:9
**previous** 105:20
**previously** 113:20
  151:1
**prices** 157:7
**primack** 8:23
**primarily** 51:6
  65:14 154:10
**primary** 22:22 44:5
  45:21 102:7
**principal** 130:3
**principals** 75:6 80:2
**principle** 139:9

**principles** 131:20 134:25 135:5
**prior** 26:19 116:10
**privately** 104:16
**pro** 2:24 5:15 68:13
**probability** 151:8,9
**probably** 38:6 103:5 105:12 107:2 108:13
**probe** 151:8
**problem** 43:22 56:1 56:18,25 59:24 68:5 73:1 76:17 80:25,25 104:10 106:21 116:11,13
**problems** 77:5 148:9
**proc** 1:10,17
**procedural** 24:10 28:11 30:19
**procedure** 70:23
**procedures** 38:5,8 38:10,13 39:3 40:22 55:4 57:21,24,25 58:8,11,13 59:21 60:6,9,11,12,13,15 60:20 61:20 62:1,18 64:11 65:8,19,23 69:11 105:9 108:13
**proceed** 47:24 64:14 89:10,17 104:20,21 106:10 144:19 155:15,16 155:17
**proceeded** 140:9
**proceeding** 39:13 58:10 60:19 123:3 134:8 135:18 140:10 144:21
**proceedings** 23:21 33:8 37:15 39:10 77:21 133:24 134:1 159:6 160:4
**proceeds** 32:17 55:6
**process** 23:5 25:11 27:9 29:25 30:13 31:7 32:3 35:17

**38:15 39:22 40:23** 44:8 46:23 59:14,19 59:19,20 62:8,20 65:12 66:2 68:19 73:8,20 74:18 75:3 75:11,11 80:10,10 86:21,22 88:23 89:2 89:15 91:3 94:13 95:22,23 96:3,25 97:8 105:19,21 107:17 122:25 125:11 127:6,7 128:13 138:23
**processes** 87:1
**produce** 50:17,18 73:21,22 75:18 84:15
**produced** 44:1 45:12 50:8 106:8,9 107:2,25 111:5
**product** 77:25
**production** 50:3 89:6 110:24
**productions** 43:10 44:25 45:6
**professional** 26:23
**professionals** 38:17
**progress** 78:5
**prohibit** 52:22
**promise** 26:21 119:5
**promised** 127:22
**prompted** 24:4
**prong** 126:25 127:16
**proof** 2:17,18 26:4 63:15 129:15,17,25 144:4,8,17 145:19 145:20 146:9 147:11 152:11
**proofs** 2:9,11 35:4,6 35:16 111:1
**property** 75:1,2
**proponents** 78:23
**proposal** 68:10,11 96:4 97:17 114:14

**propose** 26:6 33:10 33:13 42:1 68:3,17 121:8,10,14,24,25 128:22 129:11 142:7 154:21
**proposed** 25:18 27:20 41:16 42:3 48:11 52:15,21 57:21 58:7 59:2 66:17 67:18,21 78:14 79:20 83:1 90:21 97:16 101:24 109:24,25 110:1,2 114:4 121:16 125:12 129:3,14,15 131:5 132:5 137:9 140:6 143:4 145:4 146:3,23,24
**proposes** 95:24 142:12
**proposing** 117:25
**propriety** 33:18 122:7
**prosecute** 4:21 5:3
**prosecution** 75:20
**protocol** 23:2 40:17 78:16 107:16,21
**protocols** 6:21 28:5 86:6
**prove** 30:24 158:16
**provide** 27:18 80:5 95:1 137:24 150:21
**provided** 27:19 42:23 49:23 94:16
**provides** 31:15 32:12 59:4,6 85:11 95:7 136:13 150:22
**providing** 143:7
**provision** 49:8 136:11
**provisions** 37:8 40:12,15 41:16 52:8 52:21 102:4 112:5 115:20 136:21
**prudential** 53:1,25
**public** 46:22 55:25 59:1 91:23

**puc** 75:4
**pull** 24:11
**pun** 31:8
**punching** 100:18
**pure** 54:25 55:13 135:3
**purely** 23:19 24:10 71:9
**purport** 33:23 41:16
**purpose** 102:13 144:13
**purposes** 39:2 79:17 85:10 114:5 130:25 134:2,3
**pursuant** 3:3,10,16 3:21 4:2,8,14 5:7,20 6:2,14
**pursue** 30:16 33:10 55:23 78:19 81:6 83:23 132:13
**pursued** 81:11,14
**pursuing** 48:15 49:12 68:15 78:4
**pursuit** 53:17
**push** 43:12 73:11 80:9,16 85:15 89:1 95:22 112:15
**pushed** 79:4 116:17
**pushing** 94:20 113:16
**put** 26:3,19,22 29:8 30:16 33:7 42:9 43:8 51:11 57:22,25 58:13 59:3 66:15 68:10,11 74:1 76:20 87:24 90:18,24 91:11,17 92:9,12 93:20 94:1 95:15,18 95:19 96:18 97:18 98:8 99:12 100:16 100:18 112:21 118:8,14 139:8
**putting** 74:2 75:1 104:6 114:8 155:3
**puzzle** 52:19

**q**

**quantified** 32:4
**quarters** 24:11
**querishi** 117:15,18
**question** 24:18
44:18 55:11 92:16
93:1,2 95:25 96:2
100:10 101:19
102:24 105:11
110:11 125:18
145:12 149:8
152:19 153:20
154:9 155:12
**questioned** 82:5
**questioning** 82:5
**questions** 24:1 36:9
36:12 46:6 57:10
66:5 74:16 143:23
**quick** 80:14 83:25
**quickly** 62:2 123:23
123:25 133:17
134:15 135:19
139:2
**quite** 28:24 66:14
120:15 122:5 123:2
123:23 124:20
140:25 156:2,6,6
**quote** 52:13,14
70:15 71:21,23 83:2
127:12 133:7
150:23 157:24
**quoted** 128:1
**qureshi** 17:21 20:10
66:7,8 117:12,13,16
119:17,19,20 120:1
124:25 130:6,9,17
130:23,25 136:17
148:23 154:25
155:2 158:19

**r**

**r** 2:1 8:2 15:21 19:9
22:1 160:1
**rabbit** 84:4
**raft** 73:14
**raise** 23:18 37:16
39:6 54:25 98:15,17

150:2 154:17
156:19
**raised** 26:5 28:7
39:18,21 40:14
41:14 42:21 50:25
51:5 94:6 96:21
100:21 110:13
145:8,10 152:11
**raises** 44:17 78:10
148:23
**rambling** 101:15
**ramps** 81:2 91:10
112:17
**range** 122:20,21
141:13,14
**rata** 68:13
**rate** 31:17 32:4
120:8,9 121:17,20
122:19 131:22
133:5,5 135:6
136:20 155:19
156:14,15
**rath** 11:1
**rational** 27:7 28:14
29:3 44:14 62:19
**raymond** 9:11
**reach** 118:25
**reached** 117:22
155:19
**react** 26:5
**read** 26:5 33:2 57:3
76:14 121:6
**reading** 92:25
**ready** 25:12 61:4
**real** 69:5 72:9 74:6
77:13 151:10 157:9
**reality** 124:23
125:17 147:25
148:17 152:25
157:18
**realize** 149:23
**really** 34:12 49:2
51:6,14 69:4 70:13
82:20 85:8 105:7
106:23 107:3 108:1
125:24 126:15
127:24 137:15

138:3 146:6 148:5
152:14,20 154:9,18
158:1
**realty** 2:16
**reason** 39:14 44:22
44:22 53:14 55:3,17
137:22 145:14
154:21
**reasonable** 43:14
44:14
**reasonably** 159:2
**reasons** 49:17 54:11
72:18 103:12
139:18 140:20
143:12 144:19
**reath** 12:17
**rebuttal** 46:4
**recall** 38:12 93:10
139:24
**recalls** 38:6
**receive** 55:14
**received** 39:23 46:2
**receiving** 66:1
**recess** 158:21
**recessed** 101:12
158:22
**recognition** 59:6
61:7,7,9
**recognize** 27:12
53:21 60:12 62:3
123:11,23 125:17
**recognized** 138:12
144:23
**recognizing** 138:7
**recommend** 114:4
**recommendation**
91:24 98:8
**recommended**
39:25
**reconciles** 27:8
**reconnect** 101:10
**reconsider** 34:21
**reconvene** 101:3
**reconvening** 101:9
**record** 36:15 41:11
47:21 55:21,25 57:6
59:1 60:11 62:3

66:8 67:16 113:10
160:4
**recourse** 54:17,18
**recoveries** 32:18
91:6 97:14
**recovery** 4:22 93:24
132:22 136:1
**red** 24:3 37:8 46:7
**redacted** 6:8
**redo** 107:23 109:22
**reduced** 78:7
**redundancy** 40:25
**redundant** 22:11
40:20
**reed** 14:1
**refer** 23:22
**reference** 29:22
69:10
**references** 99:5
**referred** 40:11 90:8
91:4
**refers** 44:19
**reflect** 58:23
**refrain** 41:17
**refuse** 30:25
**refusing** 128:12
**regard** 65:15,17,25
106:10
**regarding** 6:9 37:3
49:3,21 52:14
115:16 136:22
139:22 144:17
150:19
**regardless** 32:2
92:22
**regards** 91:10 94:7
94:11
**regimented** 70:6
**regional** 2:23
**reit** 29:17 30:5 70:1
74:8,17 80:6 99:16
154:14
**reiterate** 94:9
113:14
**reject** 2:23 5:14
121:18 132:16

**related** 52:7 80:4
84:19 115:3,20
**relates** 39:11 40:6
40:10 41:12 42:21
44:24 45:22,24 46:6
66:11 90:6 91:15
94:8 95:10 96:20
97:10,20 115:14
116:24
**relating** 81:3 130:2
**relative** 70:11
**relatively** 99:4
**released** 52:4
**releases** 51:25
55:12
**relevant** 107:14
108:2 136:11
140:17,19 153:10
156:6
**reliable** 70:16
**reliance** 54:15
**relief** 30:20 57:18
81:8 141:1 144:14
**relieve** 63:6,16,22
**relieved** 63:2
**rely** 66:4 124:13
127:18
**remain** 104:19
**remaining** 139:3
**remake** 110:4
**remind** 68:11
**remiss** 51:4
**remotely** 61:10 65:3
**remove** 32:19 40:22
41:23
**removed** 31:20,22
**render** 25:14
**rendered** 128:18
**renick** 10:3
**reorganization** 6:23
55:19 56:15 59:22
59:22 60:6 64:14
69:5 77:16 91:19
137:24 144:22
146:15,17 153:9
**reorganize** 56:22

**repaid** 139:22
147:23
**repeat** 74:15 156:17
**repeated** 99:5
**repeatedly** 58:17
121:2
**replacing** 134:19
**reply** 67:19 70:15
76:14 83:2 85:23
94:19 96:24,25
150:3,18
**report** 22:7 82:7
86:8 117:8
**reports** 43:20,24
44:4 49:25 50:6,8
50:14 82:8,17 106:8
106:8 118:17
**represent** 30:20
155:4
**representing** 9:9
57:15,16
**reproduce** 107:11
**request** 31:23 32:21
37:10 44:12 50:18
54:3,5 64:10 78:3
80:15 85:18 90:24
98:1 128:19 153:23
**requested** 1:7 36:23
52:12,25 57:19
62:25 104:15,16
**requesting** 144:15
**requests** 2:9,12
41:7,8,10 43:11
47:12 64:1 83:3
138:13
**require** 61:22 63:10
63:11 65:9 89:3
102:6 110:24 111:8
111:17 133:8
**required** 36:6 42:11
54:1 64:9 67:8
69:20 70:21 72:19
112:8
**requirement** 35:6
63:7,19
**requires** 26:7 59:11
62:5,7,8 63:14

69:23 70:2 74:23
84:10 147:2
**requiring** 64:1
**requisite** 128:24
**reservation** 49:1
50:10 129:18,19,24
**reserve** 34:17 46:4
65:14,17,20 130:5
**reserved** 49:17
112:13
**reserves** 129:19
**reserving** 113:18
**resolution** 30:8
31:15 33:24 62:22
86:7 147:20 154:8
**resolve** 45:14 46:1
61:20 83:10 86:5
92:11 93:19,23
98:25 138:17 144:7
144:9,17,18 146:2
146:10 147:13
151:14
**resolved** 36:24 48:3
51:2,8,18 65:22
123:12 146:12,19
**resolving** 144:23,25
149:21
**resources** 5:15
30:23 137:2
**respect** 24:21 36:25
50:25 51:6,6 52:6
66:10 67:11 79:19
80:6,18 85:3 121:14
122:4 129:3 131:16
132:21 133:19
134:5 135:2 136:13
136:18 137:25
139:5,12,14,16,19
140:23 141:10
142:19 154:13
155:3,22 156:5,24
**respectfully** 100:9
133:14 153:23
158:5
**response** 42:24 50:3
86:14 102:1 147:24

**responses** 27:12
42:5 44:24 45:2,6
**rest** 30:1 34:1 51:2
**restated** 49:3
**restricts** 57:8
**restructuring** 23:16
27:5 67:21 68:4,7,9
74:25 87:5 145:2
**rests** 55:18 137:17
**resubmitting** 115:9
**result** 38:15 56:11
97:16 140:2
**results** 56:16
**retain** 92:22
**retained** 58:25,25
**reversed** 150:5
**review** 51:15 52:16
**reviewed** 44:1
58:20
**reviewing** 36:16
**revise** 129:10
**revised** 66:11,13
110:2 114:22
**revisions** 37:5 42:3
**rhetoric** 30:1
**rhoads** 14:18
**richard** 11:14 19:6
57:15
**richards** 9:1
**ride** 141:10
**rider** 28:7
**riders** 23:23
**rifkind** 48:5
**right** 22:14 33:10
34:17,25 38:9 46:24
47:4,16 60:7,20
65:6,7,9,18 67:3
69:6,12,15,16,20
70:8 71:7,18,19,24
71:25 72:8,12 73:6
73:9,20 74:2 75:5
76:2,20 78:4 81:14
81:19 90:16 93:9,9
93:13 94:3 96:23
100:15 101:2
108:13 113:13,19
115:22 116:3,6,12

116:21 117:1 118:7
119:17,19 120:11
123:13 128:19
130:5 131:2 137:21
138:5 141:18 146:1
147:11,15,19,25
148:20 149:14
151:3,23 152:17,24
153:2 158:24 159:3
**rightful** 69:15
**rightly** 145:18
**rightness** 145:11
153:22
**rights** 40:24 49:1,17
50:10 65:15,17,20
71:15 82:25 112:7
112:12,24 129:18
129:19,24 144:11
145:16
**rigueur** 35:9
**ripe** 124:3,8,10
126:7 129:22
134:10 140:5 152:4
154:22
**ripeness** 126:2
130:25 131:8 140:8
158:2
**rise** 22:2 47:22
101:13 138:25
158:23
**risk** 70:4 76:18,21
**road** 105:17 108:16
126:20,21 127:15
129:22 143:16
160:21
**robert** 13:7 18:1
19:24 20:17
**robust** 157:1
**rolling** 89:24
**rome** 17:7
**room** 47:10,16
87:13 153:6
**root** 30:18
**ropes** 10:5
**rosell** 20:11
**rosenbaum** 20:12

**ross** 10:8
**rothschild** 11:16
**rough** 60:22
**round** 75:7
**routinely** 144:9
**row** 44:20
**rsa** 58:4 68:7,19
69:11 78:5,6,9 99:3
99:5,7,9
**rudnick** 16:1
**rule** 3:5,12,18,23
4:4,10,16 5:9,22 6:3
6:4,16 32:5 45:5
58:21 63:10,13,23
70:23 71:1,4 92:11
106:13 118:5,24
127:4 128:13 133:3
136:24,25 137:22
138:16 145:7 152:4
**ruled** 111:24
**rules** 3:4,11,17,22
4:3,9,15 5:8,21 6:15
63:10,11
**ruling** 93:12 101:4
116:7 119:4,5 124:4
127:13 129:10
137:2 138:4,7
142:18 150:25
151:1 156:6,8
**rulings** 101:16
110:4 113:16 141:2
141:19
**run** 33:15 34:2
35:22 43:22 77:16
84:4 86:17 100:22
100:23 122:10,13
122:13
**running** 86:18,25
126:9
**runway** 73:12
**ryan** 15:11

**s**

**s** 2:2 8:2 20:5,7 22:1
**sabin** 13:17
**sacrifice** 89:22
**sake** 41:21

**sale** 31:6,17 32:3
56:4
**salient** 113:25
**sam** 19:10
**sand** 157:17
**sane** 30:9
**sassower** 8:7 22:4,5
22:17 24:7 29:14
58:2
**satisfied** 126:8,11
**satisfies** 27:8
**sausage** 118:4
**saver** 126:1 137:20
147:3 152:13
154:11
**saving** 76:20
**savored** 127:17
**saw** 29:21,23 97:12
115:22
**sawyer** 68:8
**saying** 61:19 76:10
83:16 92:2 97:7
114:11 123:15
125:19 146:6,14
**says** 53:10 64:6
71:11 83:17 124:17
129:25,25 135:11
157:9
**schartz** 8:14 45:25
86:4
**schedule** 23:10,14
23:15,18 26:1,6,8
26:12 27:7 28:5,14
29:3,7,10 31:13
33:1,4,13 35:25
36:7,17 37:20 39:8
45:17 49:18,18
61:23 67:13 70:18
71:13 72:21 73:20
73:23 74:3,4 79:20
80:21 81:13 82:7
84:10 87:12,14,25
88:19,22 89:4,11,13
91:3,7 94:12 95:7
95:15,24 96:11
99:15 101:21,22,24
102:2 104:19 105:1

105:23,25 106:1,2
106:11,14,15
108:15 110:1,2,8,19
113:17,21 114:4,15
**schedule's** 73:24
**scheduled** 35:13
38:25 64:11 92:8
101:23 155:10
156:3
**schedules** 58:19,20
59:12,15 61:15
62:24 63:12 64:3,7
109:24,25
**scheduling** 6:20
22:10,13,15,21
23:24 24:5,15,21
25:8 34:10 37:10,25
39:4,15,18 40:9,12
40:16 41:9 48:8,12
48:13,17 49:2,13
52:5,6,7 57:7 67:8
67:10 70:15,24 71:6
71:10,10 73:10 78:2
81:16 82:16 84:18
85:1,15 88:3 103:11
108:9,19 109:12
110:22 112:3,19,23
115:3 120:22 122:3
150:15
**schlerf** 11:19
**schneider** 20:13
**schodek** 15:16
**schotz** 10:1
**schwartz** 9:15
47:18 115:13,19,23
**scope** 66:17 97:10
97:19,22 102:23
**scott** 17:20,24
**scratch** 107:23
**se** 72:5
**seal** 6:10
**sealed** 4:24
**seated** 22:3 47:23
101:14 158:24
**sec** 61:22
**second** 12:7,13 22:8
23:1 24:25 26:8

28:16 31:11,25 32:8
34:5 37:1 38:2
42:20 44:20 50:22
52:25 64:12 67:10
68:9,16 73:7 76:22
78:20,24 81:2 83:7
84:25 107:10
139:17,23,25 140:1
140:1,3,4,9 152:1
154:24
**section**   2:10,12 3:3
3:10,16,22 4:2,9,14
5:8,20 6:3,15 28:24
62:25 71:16
**secure**   128:24
**secured**   97:14
116:24
**secureds**   79:10
**securing**   139:20
**securities**   61:10
**security**   4:23 103:6
**see**   35:22 43:6
44:20 46:1 82:16
96:7 112:14 115:5
117:1,2 129:17
134:22 139:8 148:5
**seek**   30:20 37:9
42:16 78:17 120:4
129:20 142:10
144:6 145:15
153:17 157:15,16
**seeking**   41:3 71:11
100:12 124:6
130:13,16 141:1
144:4 156:8
**seeks**   37:12 38:4
144:11
**seen**   54:10 62:9
65:2 83:8
**selected**   97:24
**self**   24:22 125:18
151:20 157:19
**sell**   99:6
**selling**   56:19 74:10
**send**   84:10
**senior**   156:21

**sense**   34:2 48:20
69:5 98:23 100:14
104:1,1 122:12
**sent**   61:6 82:4
**seon**   18:8
**separate**   37:12 39:7
41:7,10 58:25 60:15
64:21 94:12 96:3
108:22
**separately**   54:4
57:9 65:24 125:23
**separation**   54:16
**september**   43:24
44:4,21,21 50:2
80:9
**sequence**   90:1
**sequenced**   43:7
109:19 113:18
**sequencing**   39:19
58:2 60:3 81:22
90:3 113:1
**sequentially**   62:19
**serajeddini**   8:17
**series**   63:25
**serious**   104:3
**seriously**   53:5
**seriousness**   53:1,25
55:1
**serve**   40:19
**sesame**   112:10
**sessions**   75:8
**set**   35:4 41:6,10,12
44:8 58:14 59:21
62:25 63:5 73:21
101:21,21 104:16
106:3 109:18,19
113:20 120:22
126:20 138:24
141:5
**seth**   19:7
**sets**   25:9 43:10
**setting**   2:8 29:10
46:22 73:5 88:20
116:5
**settle**   4:21 5:3 92:20
92:23 100:13
147:17,19 150:20

**settled**   59:2,8,25
60:4,23 93:4 111:7
**settlement**   27:1
33:6,15,19,22 34:7
34:14,18,23,25 35:8
35:19 52:25 53:3,4
53:7,14,24 59:9
60:17 64:15,17,24
64:25 65:2,6,9
78:14,15 79:9 90:7
90:14,22 91:5,17,18
91:22 93:23 94:14
95:7 96:13,18 97:5
97:6,7 107:17,18
110:20,21 111:10
111:11 121:8,10,12
121:14,16,24 122:8
136:2 142:12
150:20 152:8
155:19,23
**settlements**   31:18
35:2 78:8 90:7
**settling**   58:17 60:21
64:19 96:16
**seven**   105:19
126:14
**seventh**   4:1
**seward**   10:14
**sewarrd**   17:1
**shanti**   16:19
**share**   50:22 68:13
118:3
**shared**   89:22
**sharnet**   12:10
**shearman**   15:13
**shoot**   114:10
**shore**   11:24 29:14
30:2 41:21 46:10,10
47:25 48:3 62:13
67:5,5 86:19 87:7
90:5 94:6 98:21
99:3,19,20,21 106:4
106:21 110:5,6
113:2,6,9,12 116:2
116:4 154:15
156:20

**shore's**   85:7 86:14
88:12 91:10 93:1
95:18
**shores**   58:9
**short**   25:5 56:20
68:13 69:22 78:2
136:24 155:9
**shortly**   52:15
**shot**   26:14 75:10
**shouldn't**   129:15
**show**   25:15 70:19
**shows**   61:3 135:9
**shuffle**   116:22
**side**   12:2 14:12,19
16:17 23:5 31:23
32:3,17,18 33:23
37:3,12,18,22 40:7
40:18 48:25 49:12
51:25 52:1 55:6
56:13,22 58:16 59:7
60:25 61:6,24 62:14
65:3 66:19,20,25
67:1 76:3,21 77:19
77:19,21 78:7,7,8
79:7 84:24 89:8,13
89:23 93:19,25
94:22,22,24 95:2,3
95:12 97:11,20,25
98:1,1,3,3,12,14
99:8 100:21 102:6,7
102:8,9,19,19,24,25
102:25 103:4,5
110:14 111:18,18
113:14 115:15,15
122:8,8 136:3,3
156:20
**sided**   103:2
**sight**   68:25 90:22
**sign**   59:15,16
114:24 115:6
**signed**   49:7
**significant**   38:7
65:21 78:10 105:12
106:13 143:14
**signoff**   115:24
**silo**   53:3 54:3,5,12
54:21 55:11 96:13

110:17,18,21,25
siloed 90:7
silos 54:16 58:15
similar 38:23 133:1
similarly 32:12
simple 95:8 130:10
  153:16
simply 34:25 40:25
  41:23 53:5 56:3
  63:2 66:15 93:3
  94:9 105:21 111:7
  112:2 120:11
  123:15 143:11
  156:8 157:2,20
simultaneously
  31:6 105:2 121:9,24
single 100:7 121:6
sit 47:13 84:14
  104:13 119:6
  148:19
sits 120:18
sitting 58:9 61:25
  77:20 80:3 87:11
  94:20
situation 35:11
  64:18 89:19 124:21
  157:6
six 37:9 53:18 56:24
  74:5,5,18 88:23
  89:18 100:23
sixth 3:20
size 79:7,10 80:7
skip 125:25 133:16
  134:15
slide 126:14 127:11
  128:11,16 129:16
  129:17 131:25
  132:9 133:7 134:23
  135:9,14 136:11,14
  137:18 139:7
  157:23
slides 119:22
  123:23 133:17
  134:14 139:17
  156:18
slippage 91:2

small 52:10
smith 11:6 14:1
snuggly 23:6
solicit 72:22 105:9
solicitation 65:11
  125:5,7 132:15
  134:22 137:8
solicited 72:16
soliciting 42:12
solomon 69:23
solomonic 69:14
  98:21,23
solution 76:3
solutions 160:20
solve 59:24 73:1,4
solved 140:8
solvency 132:10
  133:11,19,21,22
  134:11 135:24
  140:17,18,19,20
  149:4,5,9,24 150:7
  151:12 156:24
solvent 121:19
  125:2 129:8 131:3
  131:19 135:24
  148:16 155:21
solves 80:24,25
somebody 100:13
  105:22 107:9
  137:10
somewhat 115:21
  141:7
sontchi 2:2
sonya 8:1 160:3,8
soon 28:1 42:18
  43:16 53:22 92:13
  139:20 159:2
sooner 154:19
sorkin 20:14
sorry 35:23 38:9
  45:9 85:25 101:14
  119:17 149:18
sort 30:19 36:8
  64:18 101:16 104:6
  106:2 107:22,23
  109:1,1 113:13
  118:25 146:5,25

147:6
sought 27:13 38:24
  79:23 139:19,25
sound 82:20
source 76:15
southside 146:11
space 47:6
speak 23:21 29:4
specific 24:1 25:25
  28:23 31:15,23 42:2
  63:24 109:14
  135:12 144:14
specifically 37:18
  38:16 40:13 42:21
  42:25 58:15 63:14
  97:4,21 126:3 150:8
spelled 114:6
spend 78:11
spending 53:18,18
spent 34:10 92:24
  151:5
spiegel 20:15
spin 79:2
spinning 79:1
spoke 58:2,3,17
  60:1 71:22
spoken 85:2
sponsored 91:24
sprayregen 8:15
spread 141:21
square 123:2
stacey 18:15
stadler 20:16
staff 36:5
stage 33:8,12 37:21
  37:23 42:7 140:22
stages 25:25
stake 69:9 74:1,2
  143:15 153:2
stakeholders 25:19
  27:14,23 31:23 32:6
  34:22 52:18
stand 122:2
standard 44:11,13
  120:15 124:1
  129:18 151:5,6,9

standing 4:20 5:2
  6:10 49:4,21 52:9
  52:12 75:9,20,22
  78:17,19,20,21 79:3
  79:22,23,25 81:3,6
  81:11,16 91:11,14
  91:15 92:4,12,19,22
  92:25 93:3,7,7,8,12
  93:23 94:1 100:7,11
  112:21 115:16,18
standpoint 118:21
stands 55:25
stang 12:12
start 22:15 43:16,18
  50:3 67:16 80:22,23
  84:10 86:14 87:13
  89:2,6 90:21,25
  92:13 95:16,24 98:9
  101:16 104:12,14
  104:21 107:22
  113:19 121:22
  123:25 126:12
  131:14 155:3
started 105:19
  142:12
starting 22:24 43:9
  75:3 104:7,17
starts 131:17
state 26:17 71:23
  122:3 130:12
stated 38:16
statement 6:24 24:9
  33:2 37:6,14,21,23
  38:1,6 42:6,7,9,11
  48:25 51:12,13
  53:15 54:8 56:10
  57:4 60:22 64:4
  65:8,11 67:9,12,19
  70:9 72:16,17 88:5
  88:6 99:23 101:22
  102:2,3 103:8 104:6
  104:8 105:8 108:11
  111:15 114:21
  116:5,7
statements 51:7
  55:20 64:3,8 90:17
  116:16

**states** 1:1,21 126:15
155:13
**status** 22:7,9 46:13
108:18,18 109:12
118:22
**statute** 71:20
**statutory** 71:19
105:3,3
**stay** 70:2 118:11
**step** 34:21,25 58:3
88:14 90:14 94:18
126:1 127:16
137:20 147:3
152:13 154:10
**stephen** 8:16 13:3
15:21 18:5
**steps** 25:10
**sterling** 15:13
**steven** 8:17
**stipulation** 6:9 49:3
49:6,21 93:11 98:7
115:3,11,13,18
**stock** 11:12 57:16
110:15 113:15
**stood** 30:2
**stop** 43:19 105:20
151:15
**stopped** 68:18
**story** 155:9
**straightforward**
144:3 153:20
**strategy** 69:13
**strauss** 66:8
**street** 1:22 112:10
**strike** 41:15
**string** 126:9
**strings** 33:3
**strong** 27:16 29:12
**strongly** 41:16 55:2
92:18,21
**struck** 98:7
**structurally** 156:21
**structure** 28:25
68:21 70:16 74:15
74:17 99:14 100:17
106:16

**structured** 87:14
**structures** 24:25
70:11
**stuff** 107:13 108:5
**sub** 129:1
**subject** 34:19 35:19
44:10 69:7 79:2
102:24 107:20
120:12 124:2,11
128:8,15 134:3,4
138:14,25 142:2
143:22
**submission** 93:21
**submissions** 109:16
109:20 110:11
118:1
**submit** 114:22,25
115:25 119:1 155:8
**submitted** 50:1 77:7
110:1,2
**submitting** 109:22
114:4
**subs** 56:19
**subsequent** 155:18
**substantial** 43:9,11
43:17 67:14 86:20
151:10
**substantive** 3:1,8
3:14,15,20 4:1,7,13
5:6,18,19 6:1,13
54:14
**substantively** 54:24
63:18 64:23
**subsumed** 79:3
**succeed** 103:24
**successful** 61:1
**sued** 139:21
**suffice** 24:12 30:12
**sufficiency** 24:9
44:25
**sufficient** 65:10
66:1
**sufficiently** 126:17
**suggest** 85:14 93:25
108:17 123:9
**suggested** 125:8
157:11

**suggesting** 93:15
**suggestion** 40:21
97:13
**suite** 160:22
**sullivan** 14:11
51:22
**sum** 31:2 84:6
132:9
**summarize** 139:18
**summarizes** 68:4
**summary** 118:6
135:19
**summer** 64:11
**sums** 158:1
**superseded** 3:2
**supplemental** 155:8
**support** 28:4,21
33:1,4 47:25 48:18
67:22 70:10 71:19
74:23 90:18 97:23
121:7
**supported** 67:25
68:7 100:2
**supporting** 3:9
62:24
**supportive** 48:7,9
48:19
**supposed** 80:3
155:12
**supposes** 139:11
**supreme** 124:16,16
**sure** 31:8 34:9 48:2
51:19 83:13 98:22
114:17 125:1
148:14 154:25
**surprised** 30:2
**surprisingly** 32:7
122:24
**survive** 75:17
**suspect** 109:17
156:19
**switch** 127:16

---

**t**

---

**t** 12:2 16:17 20:9
23:5 25:23 31:23,25
31:25 32:7,17,18
33:22,23 35:14

37:18 40:18 48:24
49:11 51:25 52:1
54:16,17,18,18 55:6
55:11 56:13,19,21
57:8 58:16 59:7
60:25 61:6 62:14
64:23 65:3 67:1
76:3 77:18 78:7
79:7 84:24 89:8,13
93:19 94:22,24 95:2
95:12 97:11,20 98:3
98:14 99:8 102:8,9
102:19 111:18
115:15,15 122:8
136:3 156:20 160:1
160:1
**table** 30:17 66:21
77:24 125:12
133:13 134:18
152:24
**take** 28:9 37:2,23
40:24 43:15 58:19
71:11 81:20,24,25
85:7,16,21 88:14
91:12,22 96:8
105:11 116:21
117:5,6,24 119:22
129:14 138:6 141:4
142:15 149:7
152:12 158:20
159:1
**taken** 43:21 48:18
53:5 65:23 70:17
83:23 119:7
**takes** 70:1 75:13
**talent** 31:5
**talk** 23:6 27:23
29:12,19 70:1 110:7
114:13 116:8
120:17 134:13,17
134:25 135:14
**talked** 72:18 100:19
113:17 131:11
156:16
**talking** 72:20 80:4
94:20 110:14

**tandem**  86:25
**tannor**  20:17
**target**  114:10
**tarrant**  2:23
**task**  73:23
**tasks**  58:4 103:16
**taub**  20:18
**tax**  35:14 55:19,24
    55:24 56:1,14,25
    59:5,7,7,18 79:2
    95:14
**taxable**  56:4,12,21
**taxably**  56:2
**taxes**  56:3,11,14,18
**tbd**  31:20
**tceh**  4:19 9:18
    10:15,21 11:17,22
    14:7 15:2,8 28:15
    28:20 29:5,16,16
    31:11 32:13,15
    37:13 40:14 41:13
    41:15 42:2,20,25
    44:17 47:8,9 48:6
    54:19 56:4 67:6
    68:2,12 79:2
**tch**  154:2
**team**  78:11
**techniques**  149:11
    149:11
**tee**  39:12 96:2
    135:18
**telephonically**  8:18
    9:23 17:23
**tell**  33:22 51:5
    73:15 81:17 89:21
    117:5,7
**telling**  154:15
**tenet**  89:7
**tension**  87:21
**tent**  38:14
**tenth**  4:13
**term**  35:17 69:6
    75:23
**terminate**  53:9,11
**termination**  53:11
    105:2

**terms**  23:12,22
    25:23 52:14 58:17
    60:3 62:12,15 91:2
    91:21,22 93:21
**terrific**  118:23
**territory**  30:25
**test**  51:16 122:14
    126:1,2,4,8,11
    127:1 131:25 148:1
**tests**  126:9 132:4
**texas**  8:21
**thank**  22:17 27:19
    36:13,18 46:9 48:3
    48:20 50:19,20
    51:20 57:12 66:4
    67:3,4 84:20,22
    85:22,23,24 86:2,10
    98:17 99:17,18
    101:2,11 113:11
    116:19 117:10,21
    119:8,9,13,14,16
    153:25 154:23,24
    158:18,19 159:3,4,5
**that's**  127:8 128:10
    129:24 132:12
    133:15 134:18
    135:8,13 138:16,23
    138:24 139:11,12
    140:22 141:11,23
    142:12 143:17
    147:2,25 148:12,13
    148:14 151:17,17
    154:7 156:22
**thau**  20:19
**theoretical**  122:19
**theoretically**  125:10
    141:12
**thereof**  2:13
**there's**  130:5
    131:18 133:24
    134:12 135:12,25
    136:12 140:14
    142:3,20,21 143:14
    147:22 149:20
    150:2,13 152:7,16
    157:1,5

**thesis**  148:11
**they'd**  154:7
**they're**  131:22
    138:22 141:1,10
    142:6 148:3,18,19
    148:21 149:1
    152:20,21,24 158:9
**they've**  142:11
    145:10 146:8,9
    152:22 153:13
**thing**  31:11 35:23
    69:15,16,20 76:5
    84:9 94:18 99:22
    102:12 114:3 116:4
    135:15 138:2
    150:19 151:25
    158:12,13
**things**  23:10 24:22
    43:3 66:3 72:14
    80:13,14 90:5 96:23
    103:13 108:1,10
    115:16 116:8
    120:19 129:20
    134:16 144:5
    150:14
**think**  24:17 30:6
    34:12 42:8,16,23
    46:20 48:10,11,19
    49:12 50:24,25
    53:23 57:9 60:18
    64:6 65:22 66:13,19
    66:22,23,25 83:3
    85:4,17,21 86:6
    88:10,15 91:1 94:5
    96:3,10 98:25 99:9
    99:13,22 100:24
    102:7,17,18 103:19
    103:23 104:4,13
    105:4,11,25 106:4
    107:4,4 108:15
    109:4,21 110:10,11
    110:16,23 111:1,7
    111:25 112:1,1,5,20
    112:24 113:1,9,24
    113:25 114:9,15
    115:6,25 116:5,9
    120:15,20,25 121:6

    122:11 123:20,24
    124:20 125:16,20
    125:23 126:13,23
    127:8,18 130:19
    131:1,11,24 133:14
    133:16,18,24
    134:14 136:9,12
    137:4,15,21 138:3,4
    138:7 139:2,6,8
    140:16,18,22,25
    142:3,24 143:7,12
    143:16,18 146:8
    147:10 149:8,14,16
    149:23 150:1,23
    151:17,20 152:7,12
    152:16,18,20,23
    154:5 156:5 158:1,6
    158:12
**thinking**  108:20
**third**  3:8 23:4 25:6
    26:21 34:24,24 39:5
    54:2 55:4,5 67:13
    69:4 71:21 78:1
    79:6 81:21 97:3
    100:4 125:25 126:1
    126:14 143:18
    153:5,5 154:10
**thirteenth**  6:13
**thomas**  20:20
**thought**  32:7,9 76:6
    76:10 97:1 110:12
    112:17 113:7
**thoughtfulness**
    57:25
**thoughts**  140:25
**threatens**  69:14
**three**  22:22 25:18
    26:1 27:8 64:4 67:7
    126:2,4,7 147:3
    153:22 157:23
**threshold**  53:1,25
**throw**  61:23
**throwing**  61:19
**thrown**  62:14
**thursday**  109:8
**ticks**  84:18

**tightening** 106:12
**till** 108:14
**time** 26:2 27:5 28:2
  28:2,12 30:22 31:10
  34:11 37:7,15 38:21
  39:16 40:8 42:4,9
  42:10 43:1,25 45:7
  46:4 52:16 53:11,15
  56:9 60:4 65:10
  67:3 68:22 70:2,12
  75:9,13 78:11 82:15
  83:11,20 84:3 85:12
  86:24 87:7,23 88:4
  88:6,9,17,21 89:2,3
  89:24 91:23 96:7
  98:14 101:9 103:10
  103:15,20 104:11
  104:23 105:12
  108:13,20 109:18
  110:2,9 112:16
  113:3,23 117:24
  119:3 120:13 122:8
  131:6 133:12 135:1
  142:23 146:8,16
  149:20 151:5
  153:21 158:14
**timeline** 22:23 23:6
  23:7 48:10,11 71:7
**timely** 50:18
**times** 89:12
**timetable** 25:18
  28:14
**timing** 38:25 116:13
  154:9
**tina** 10:23
**tiwana** 20:21
**today** 22:6,8 24:10
  27:22 30:20 46:19
  49:10 51:8,18,18
  52:5 54:5,9 58:18
  61:25 67:7 77:1
  82:23 97:17 100:20
  101:1 104:13 115:1
  120:2 122:17,23
  123:6,16 125:12
  126:22 131:9
  132:19,24 134:20

135:4,11,22 136:7
  144:15 145:7
  148:19 152:16
  155:7 157:3,13
  159:3
**today's** 39:2
**todd** 9:22 154:1
**toget** 41:5
**told** 30:2
**tolles** 12:1
**tom** 11:25 12:4
**tomorrow** 56:14
**ton** 75:16
**tong** 89:12
**tool** 141:16
**tools** 73:1
**total** 91:25
**totally** 70:19 87:1
  100:3
**touches** 52:19
**track** 103:13,13
  111:16
**tracking** 103:21
**tracks** 68:19
**traded** 54:15
**train** 59:23 65:12
**trajectory** 25:9
**transaction** 30:6,11
  49:11 103:18
**transactions** 48:15
  103:25
**transcribed** 8:1
**transcript** 160:4
**transfer** 11:12
  57:16 59:4,6 60:24
  110:15 113:15
**treat** 55:3 123:7
**treated** 60:13 123:4
  136:6
**treatment** 125:7
  129:3 131:5 132:6
  132:16 137:14
  142:8,10 143:3,10
**tremendous** 107:1
**trial** 22:24 23:3,21
  25:3,11,15,22 28:6
  33:12 40:1 44:7

45:20 53:4 84:20
  90:25 117:25
  155:22
**trials** 25:12
**tried** 40:7 83:8
  98:23,24 99:1
  146:13
**trier** 25:13 40:5
**troy** 20:22
**true** 31:19 68:16
  131:24 140:22
  151:25 153:10
  160:4
**trumps** 36:2
**trust** 1:7 10:15,21
  17:2,8
**trustee** 1:8,18 9:13
  12:7,13,23 37:1
  38:3,4,23 39:6,12
  47:12,18 50:23
  57:17 84:25 111:22
  117:23 118:5
  129:20 139:21
  140:4,9 157:14,15
  157:16
**trustee's** 7:1 123:4
**trustee's** 129:14,15
**try** 35:17 70:13
  82:15 83:6 84:12
  101:17 110:12
  119:19 125:20
  141:16
**trying** 22:8 40:20
  40:24,25 41:20,22
  80:5,12 86:7 87:24
  100:25 116:8 123:5
  123:6,10 134:3,20
  138:22 157:17
**ts** 86:6
**tuesday** 29:23 109:8
**tullson** 20:23
**tunc** 2:24 5:15
**turn** 24:20 27:11
  32:25 70:20 73:7
  94:4 109:13 137:6
  140:3 157:23

**turning** 59:5 62:23
  63:24
**turns** 73:23 128:16
  130:11 150:4
**tuvia** 21:10
**twa** 127:12
**twelfth** 5:6
**two** 47:14 54:16
  78:6 81:16 82:20
  83:9 98:17 112:9
  115:7 116:10 121:9
  129:4 146:11 147:9
  150:14
**txu** 54:20
**type** 28:23 141:23
  143:3,4

**u**

**u.s.** 2:3 9:13 47:18
  155:11
**ucc** 16:17
**ultimate** 49:25
**ultimately** 25:24
  104:21 105:10
  120:4 129:5 137:12
  137:17 142:10
**umb** 1:18 9:9
**un** 128:19 130:1
**unable** 25:1 50:12
**uncertainty** 136:22
**unclear** 132:23
**uncontested** 23:4
**uncontroverted**
  55:25
**undeniably** 43:7
  44:14
**underlays** 46:19
**underlined** 70:24
**underlying** 134:9
**underpins** 70:6
**underscore** 55:20
**underscores** 55:21
**understand** 29:25
  35:1 46:12 76:12
  88:13 92:24 95:10
  95:11,14 98:11
  104:9,25 110:6
  111:6 113:6 132:18

136:9 145:6
**understanding**
  46:21 57:6 106:17
  143:3
**understood** 87:2
**undertake** 85:12,13
**underwood** 20:24
**undisclosed** 54:11
**undoubtedly**
  135:18 142:17
**unfair** 76:6
**unfolded** 139:24
**unfortunate** 68:23
**unheard** 28:25
**united** 1:1,21
  155:13
**unknown** 31:21
**unknowns** 125:10
  143:21
**unlimited** 80:11
**unnecessary** 39:8
  73:16 83:11,21
  158:17
**unproven** 60:7
**unsecured** 4:19
  11:22 29:5,16 31:25
  41:3,9 47:9 48:14
  49:11 57:17 66:9
  67:7 68:12 97:15
  140:12 148:8
**unsecureds** 32:8
  79:10
**unsettled** 60:7
**unusual** 64:18
**unwavering** 25:2
**unwieldy** 102:16,17
**unworkable** 33:3
  104:22
**update** 58:22
**updated** 62:25
  63:12 115:20
**upended** 100:3
**urge** 122:7
**urged** 106:4
**urges** 41:15
**use** 74:12 77:10
  82:11

**useful** 150:22
**usual** 22:7
**utility** 126:6 127:17
  154:11
**utter** 121:7

**v**

**v** 1:10,17
**vacuum** 143:2
**valid** 148:5
**valuation** 34:2
  37:13,16,18,19
  55:15,16 75:24,25
  82:1,14 88:25 89:16
  95:10,17 96:5
  107:14 111:17
  129:9 148:11
  153:21
**valuations** 144:10
  156:25
**value** 26:15 51:25
  54:21 56:5,5,9,11
  56:16 59:6 67:25
  68:20 69:2,24 70:10
  74:11,13,17 76:21
  77:23 79:6,8,14,17
  99:8,13 100:24
  122:21 129:5 141:4
  141:21 144:7,16
  147:12 151:24
  157:1
**valued** 146:2
**values** 65:16
**van** 20:25
**vantage** 25:14
**various** 23:23 27:11
  27:14 31:23 59:14
  98:25 115:19 148:3
**vectoring** 80:7
**venable** 13:13
**verbiage** 115:7
**veritext** 160:20
**verities** 25:17
**version** 24:3 134:22
**versus** 35:14 68:23
  152:10
**vertically** 43:5

**vet** 30:23
**veto** 28:7
**vetos** 23:23
**viable** 53:23
**view** 33:3 34:18
  38:5 39:2,8 56:19
  68:4,5 73:10 75:8
  81:21 84:8 88:14
  91:23 93:18 100:15
  140:5 143:13
**vision** 25:19
**vocally** 100:3
**voice** 40:23 41:23
**vote** 60:8 64:16
  72:7,8 125:9 132:16
  136:4 145:4 147:18
**voted** 62:17
**votes** 121:12,18
  125:13 131:5
  137:13
**voting** 60:8 79:17
  121:15

**w**

**w** 20:15
**wait** 56:21,24 85:25
  92:1,1,2 108:14
**waiting** 115:6
**walk** 120:14
**walkaway** 53:9
  65:4
**walker** 14:18
**walking** 24:2
**walsh** 21:1
**want** 29:4 33:2
  41:14 42:15 43:14
  45:18 46:7 53:11
  57:18 58:11 64:8
  65:14,23 74:11 78:2
  83:19 84:9 88:4,18
  90:2 93:1,10,17
  94:18 95:13 97:21
  98:12 99:20,21
  100:23 103:1 107:6
  108:14,21,22
  109:16,18 110:1,16
  112:8,11 114:17,22
  115:4 119:10

120:17,24 127:16
  131:18,20 133:17
  134:25 135:17,20
  135:23 138:6,21
  141:1,2,3 147:8
  153:16,17 156:4,13
**wanted** 32:25 41:10
  43:3 45:22 46:14
  49:19 51:4,19 86:8
  98:20
**wants** 39:12 41:20
  47:24 97:25 116:20
  116:21 155:6
**waste** 83:15,17
**wasteful** 106:22
**watch** 112:11
**water** 2:23,24
**way** 27:9 36:3 38:10
  43:23 44:14 52:23
  58:11 63:6 72:20
  76:21 81:12,23 82:1
  82:16 83:25 84:1
  89:9,16 90:1 92:10
  99:13 100:18,22
  106:5,11 125:17
  129:1 133:3 141:25
  143:20,20 146:18
  151:11,14 157:18
**ways** 86:15 87:3
  90:2
**we've** 22:7 35:5,5
  37:17 41:24 44:3,11
  45:23 46:17 49:17
  51:8 52:16 69:7,16
  75:10 76:24,24 79:4
  80:2 81:4 84:1 86:5
  86:20 87:14 88:2
  89:11 90:15 94:1,22
  95:14 96:18 99:12
  99:23 100:1,3,5,19
  116:4 117:7,22
  118:8,14
**week** 25:3 54:8
  79:24 87:12 114:5
  157:4
**weekend** 92:25

**weekends** 26:24

**weekly** 75:6

**weeks** 29:18 33:17
74:5,6,19 81:1
88:23 89:18 100:23
142:15

**weigh** 151:8 153:11

**weight** 100:18
123:20

**weiss** 15:1 48:5

**welcome** 48:22
116:20 119:2,9,15

**went** 86:21 90:19

**we'd** 138:15,18
143:8 149:25

**we'll** 139:23 147:3

**we're** 107:11 129:8
143:10 146:25
147:9,16,18 148:14
155:7 159:3

**we've** 127:10
128:11,20 129:16
133:7 139:8 147:10
147:14 148:9,10
152:9,20 158:11

**wharton** 48:5

**what's** 148:11
156:18 157:7

**white** 11:21 46:11
67:6 99:21

**wholes** 55:9 78:8
141:12

**wholesale** 85:13
87:4

**who's** 132:22 136:6

**wildly** 28:10

**williamson** 21:2

**wilm** 17:2,8

**wilmer** 10:10

**wilmington** 1:23
10:15

**win** 138:22

**window** 26:20

**winters** 21:3

**wish** 121:9

**wishes** 86:1

**withdraw** 34:17

**withdrew** 140:3

**witness** 25:21

**witnesses** 25:4
50:18 73:22

**wofford** 10:7

**wolper** 12:4

**wonderful** 51:1

**wondering** 117:19

**won't** 130:12

**word** 58:18 69:5
121:7

**words** 26:20 45:10
54:6 72:24 81:9
83:4 122:11 129:24

**work** 29:17 32:20
40:1 41:5,5 45:7
51:17 62:18 70:2
73:24 75:16 80:20
80:23 81:22 82:1,13
87:23 90:15 93:22
94:16 99:16 100:10
104:3 109:4,10
110:8 125:14

**worked** 27:20 40:17
50:24 83:4 89:11
101:1

**working** 29:15 30:9
43:15 51:1 87:5

**works** 30:7 52:18
78:21 82:9

**workstream** 37:13

**world** 29:13 106:1
123:12

**worn** 99:4

**worries** 117:20

**worse** 106:12

**worst** 84:18

**worth** 68:15 151:22
151:23 153:19

**wouldn't** 149:7
152:2

**wreck** 59:23 65:12

**wrench** 33:11

**write** 154:10

**wrong** 57:1 70:13
70:25

**wrote** 146:16

**wsfs** 16:2,12

**x**

**x** 25:23 126:20

**y**

**yeah** 47:4,13 92:17
92:17 108:25
109:25 110:10
114:9 117:5 118:17
129:23

**year** 37:4 68:3,17
68:18 69:7 83:23
85:20 99:23 100:1
103:14 111:24
157:4

**yenamandra** 8:18
21:4

**young** 15:7

**you'll** 139:8

**you're** 132:11

**z**

**zalewski** 21:5

**zazove** 21:6

**ziehl** 12:12