**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

_____

| | |
|---|---|
| In re | ) |
| ENERGY FUTURE HOLDINGS CORP., *et al.*, | ) |
| *Debtors*. | ) |
| _____ | ) |
| DELAWARE TRUST COMPANY, as | ) |
| INDENTURE TRUSTEE, | ) |
| *Plaintiff*, | ) |
| v. | ) |
| ENERGY FUTURE INTERMEDIATE HOLDING | ) |
| COMPANY LLC and EFIH FINANCE INC. | ) |
| *Defendants*. | ) |
| _____ | ) |

Chapter 11
Case No. 14-10979 (CSS)
(Jointly Administered)

Adversary Proceeding
No. 14-50363 (CSS)

**PLAINTIFF-TRUSTEE'S AND NOTEHOLDERS' PROPOSED**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**
**ON MOTION FOR RELIEF FROM THE AUTOMATIC STAY**
**TO RESCIND ACCELERATION OF NOTES**

WILMER CUTLER PICKERING HALE AND DORR LLP

Philip D. Anker
Charles C. Platt
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: 212-230-8800
Facsimile: 212-230-8888
Philip.Anker@wilmerhale.com
Charles.Platt@wilmerhale.com

Dennis L. Jenkins
George W. Shuster, Jr.
60 State Street
Boston, MA 02109
Telephone: 617-526-6000
Facsimile: 617-526-5000
Dennis.Jenkins@wilmerhale.com
George.Shuster@wilmerhale.com

ROPES & GRAY LLP

Keith H. Wofford
Mark Somerstein
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: 212-596-9000
Facsimile: 212-596-9090
Keith.Wofford@ropesgray.com
Mark.Somerstein@ropesgray.com

D. Ross Martin
Andrew Devore
800 Boylston Street, Prudential Tower
Boston, MA 02199-3600
Telephone: 617-951-7000
Facsimile: 617-951-7050
Ross.Martin@ropesgray.com
Andrew.Devore@ropesgray.com

DRINKER BIDDLE & REATH LLP

James H. Millar
1177 Avenue of the Americas
41st Floor
New York, NY 10036-2714
Telephone: 212-248-3264
Facsimile: 212-248-3141
James.Millar@dbr.com

COLE SCHOTZ P.C.

Norman L. Pernick (Bar No. 2290)
J. Kate Stickles (Bar No. 2917)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone: 302-652-3131
Facsimile: 302-652-3117
npernick@coleschotz.com
kstickles@coleschotz.com

Warren A. Usatine
Court Plaza North
25 Main Street
Hackensack, NJ 07602
Telephone: 201-489-3000
Facsimile: 201-489-1536
wusatine@coleschotz.com

Dated: May 20, 2015

# TABLE OF CONTENTS

INTRODUCTION, PROCEDURAL HISTORY AND SUMMARY ...........................................1

FINDINGS OF FACT..........................................................................................................7

BACKGROUND ................................................................................................................7

    A.    The EFIH Notes .........................................................................................7

    B.    The High-Yield Bond Market..................................................................8

    C.    Call Protection .........................................................................................9

    D.    The Amount of the Makewhole Payment ...............................................10

    E.    EFIH's Debt Issuances...........................................................................11

    F.    The August 2010 Exchange ...................................................................15

    G.    The Noteholders' Right to Rescind Any Acceleration and Waive Any Default In The Indenture...................................................................16

    H.    Ownership of the Notes ..........................................................................20

    I.    The Refinancing of the Notes ................................................................20

I.    THE NOTEHOLDERS WILL SUFFER GREAT HARM IF THE STAY IS NOT LIFTED TO PERMIT RESCISSION ...........................................................21

II.    EFIH WILL NOT BE PREJUDICED BY RELIEF FROM THE STAY, AND TO THE EXTENT IT WILL BE HARMED AT ALL, THE HARM TO THE NOTEHOLDERS IS FAR GREATER ....................................................................29

    A.    Benefits to EFIH .....................................................................................29

    B.    Lack of Great Prejudice to EFIH If the Stay Is Lifted..........................31

    C.    Balancing the Harms..............................................................................34

III.    THE NOTEHOLDERS WILL PREVAIL ON THE MERITS IF THE STAY IS MODIFIED ...............................................................................................36

CONCLUSIONS OF LAW ...............................................................................................38

I.    JURISDICTION ......................................................................................38

II.    RELIEF FROM THE AUTOMATIC STAY ..................................................38

    B.    There Will be No Great Prejudice to EFIH and the Estate If the Stay Is Lifted......................................................................................40

    C.    The Hardship to the Trustee and the Noteholders By Maintaining the Stay "Considerably Outweighs" the Hardship to EFIH...............49

    D.    The Noteholders Are Likely to Prevail on the Merits...........................56

CONCLUSION..................................................................................................................60

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Borman v. Raymark Indus., Inc.*,
   946 F.2d 1031 (3d Cir. 1991) ................................................................................45

*Claughton v. Mixson*,
   33 F.3d 4 (4th Cir. 1994) .....................................................................................44

*Commodity Futures Trading Commission v. Weintraub*,
   471 U.S. 343 (1985) ............................................................................................44

*HSBC Bank USA, N.A. v. Calpine Corp.* (*"Calpine II"*),
   2010 WL 3835200 (S.D.N.Y. Sept. 15, 2010) .........................................................59

*Idaho Power Co. v. FERC*,
   312 F.3d 454 (D.C. Cir. 2002) .............................................................................49

*In re Adelphia Communications Corp.*,
   361 B.R. 337 (Bankr. S.D.N.Y. 2007) ....................................................................49

*In re All American Properties, Inc.*,
   2010 WL 1541694 (Bankr. M.D. Pa. Apr. 15, 2010) ...........................................51

*In re AMR Corp.*,
   485 B.R. 279 (Bankr. S.D.N.Y. 2013) ...................................................................59

*In re AMR Corp.*,
   730 F.3d 88 (2d Cir. 2013) .................................................................55, 56, 59, 60

*In re Armstrong World Indus.*,
   No. 00-4471, Mem. Order (D. Del. Dec. 10, 2001), *aff'd*, 106 F. App'x 785 (3d Cir. 2004)
   (unpublished) .....................................................................................................44

*In re Augie/Restivo Baking Corp.*,
   860 F.2d 515 (2d Cir. 1988) ................................................................................47

*In re Bock Laundry Machinery Co.*,
   37 B.R. 564 (Bankr. N.D. Ohio 1984) ..................................................................49

*In re Chemtura Corp.*,
   439 B.R. 561 (Bankr. S.D.N.Y. 2010) ...............................................................54, 55

*In re Chicago, Milwaukee, St. Paul & Pacific R.R. Co.*,
   791 F.2d 524 (7th Cir. 1986) .............................................................................53, 54

iv

*In re Coletta*,
  380 B.R. 140 (Bankr. E.D. Pa. 2007), *aff'd*, 336 F. App'x 202 (3d Cir. 2009)......................40

*In re Doors & More Inc.*,
  126 B.R. 43 (Bankr. E.D. Mich. 1991) ...................................................................................45

*In re Dow Corning Corp.*,
  456 F.3d 668 (6th Cir. 2006) ...............................................................................................54

*In re Downey Financial Corp.*,
  428 B.R. 595 (Bankr. D. Del. 2010) .................................................................................38, 56

*In re Gencarelli*,
  501 F.3d 1 (1st Cir. 2007)......................................................................................................54

*In re Global Indus. Technologies, Inc.*,
  645 F.3d 201 (3d Cir. 2011) (en banc)...................................................................................49

*In re Jean-Francois*,
  516 B.R. 699 (E.D.N.Y. 2014) ..............................................................................................40

*In re Johns-Manville Corp.*,
  36 B.R. 727 (Bankr. S.D.N.Y. 1984)......................................................................................45

*In re Los Angeles Dodgers LLC*,
  465 B.R. 18 (D. Del. 2011).....................................................................................................54

*In re Metropolitan Hospital*,
  131 B.R. 283 (E.D. Pa. 1991) ................................................................................................40

*In re Miller*,
  2012 WL 6041639 (Bankr. D. Colo. Dec. 4, 2012)................................................................51

*In re MPM Silicones, LLC*,
  2014 WL 4436335 (Bankr. S.D.N.Y. Sept. 9, 2014).........................................................55, 59

*In re Myers*,
  491 F.3d 120 (3d Cir. 2007)...................................................................................................40

*In re N.Y. Medical Group, P.C.*,
  265 B.R. 408 (Bankr. S.D.N.Y. 2001) ...................................................................................43

*In re Novak*,
  103 B.R. 403 (Bankr. E.D.N.Y. 1989)....................................................................................45

*In re O'Brien Environmental Energy, Inc.*,
  188 F.3d 116 (3d Cir. 1999)...................................................................................................43

*In re Oakwood Homes Corp.*,
   449 F.3d 588 (3d Cir. 2006)..........................................................................57

*In re Owens Corning*,
   419 F.3d 195 (3d Cir. 2005)..........................................................................47

*In re Premier Auto. Services, Inc.*,
   343 B.R. 501 (Bankr. D. Md. 2006), *aff'd*, 492 F.3d 274 (4th Cir. 2007)..............................45

*In re Premier Entertainment Biloxi LLC*,
   445 B.R. 582 (Bankr. S.D. Miss. 2010)....................................................55, 56, 59

*In re Pursuit Athletic Footwear, Inc.*,
   193 B.R. 713 (Bankr. D. Del. 1996) ...............................................................39

*In re Regency Holdings (Cayman), Inc.*,
   216 B.R. 371 (Bankr. S.D.N.Y. 1998) .............................................................47

*In re Ridgewood Apartments*,
   174 B.R. 712 (Bankr. S.D. Ohio 1994)............................................................59

*In re RNI Wind Down Corp.*,
   348 B.R. 286 (Bankr. D. Del. 2006) ...............................................................39

*In re Rodriguez*,
   629 F.3d 136 (3d Cir. 2010)..........................................................................48

*In re Scalera*,
   521 B.R. 513 (Bankr. W.D. Pa. 2014) .............................................................39

*In re SCO Group, Inc.*,
   395 B.R. 852 (Bankr. D. Del. 2007) ...............................................................51

*In re Skyler Ridge*,
   80 B.R. 500 (Bankr. C.D. Cal. 1987)..............................................................59

*In re Solutia*,
   379 B.R. 473 (Bankr. S.D.N.Y. 2007) ........................................................56, 59

*In re Stephan*,
   588 Fed. App'x 143 (3d Cir. 2014) (unpublished) ................................................48

*In re Stranahan Gear Co.*,
   67 B.R. 834 (Bankr. E.D. Pa. 1986) ...............................................................39

*In re Texaco, Inc.*,
   81 B.R. 804 (Bankr. S.D.N.Y. 1988)..................................................... *passim*

*In re Thorpe Insulation Co.*,
    677 F.3d 869 (9th Cir. 2012) ........................................................................49

*In re Tribune Co.*,
    418 B.R. 116 (Bankr. D. Del. 2009) ...........................................................50

*In re Trico Marine Services, Inc.*,
    450 B.R. 474 (Bankr. D. Del. 2011) ............................................................59

*In re Wilson*,
    116 F.3d 87 (3d Cir. 1997)...................................................................38, 50

*LaSalle National Bank v. Perelman*,
    82 F. Supp. 2d 279 (D. Del. 2000)...............................................................45

*RadLAX Gateway Hotel v. Amalgamated Bank*,
    132 S. Ct. 2065 (2012)................................................................................57

*Ruskin v. Griffiths*,
    269 F.2d 827 (2d Cir. 1959)........................................................................53

*Tennessee Electrical Power Co. v. Tennessee Valley Authority*,
    306 U.S. 118 (1939)....................................................................................49

**Statutes**

11 U.S.C. § 101(5)(A)........................................................................................57

11 U.S.C. § 362(d)(1) ........................................................................................38

11 U.S.C. § 362(g) .............................................................................................38

11 U.S.C. § 502(b) .............................................................................................43

11 U.S.C. § 502(b)(1).............................................................................48, 57, 58

11 U.S.C. § 547(b)(3) .........................................................................................43

11 U.S.C. § 548(a)(1)(B) ....................................................................................43

11 U.S.C. § 548(d)(2)(A) ....................................................................................43

11 U.S.C. § 725..................................................................................................44

11 U.S.C. § 726..................................................................................................44

11 U.S.C. § 1129................................................................................................46

11 U.S.C. § 1129(a)(2).......................................................................................43

11 U.S.C. § 1129(a)(7) ........................................................................................................ 43

11 U.S.C. § 1129(b) ..................................................................................................... 43, 44

28 U.S.C. § 157(b) .............................................................................................................. 38

28 U.S.C. § 1334(b) ............................................................................................................ 38

28 U.S.C. § 1408 ................................................................................................................. 38

28 U.S.C. § 1409 ................................................................................................................. 38

## INTRODUCTION, PROCEDURAL HISTORY AND SUMMARY

1.　　　This dispute relates to a series of First Lien Notes (the "Notes") issued by Energy Future

Intermediate Holding Company LLC and EFIH Finance Inc. (collectively "EFIH" or the "EFIH

Debtors").[1]  The vast majority of the Notes were issued pursuant to an indenture dated August 17,

2010 (supplemented as of January 29, 2013) (the "Indenture"), and promised repayment to the

Noteholders,[2] after 10 years, at a fixed interest rate of 10% annually.  Parties' Joint Pre-Trial

Memorandum, § III, Statement of Uncontested Facts, No. 14-10979, D.I. 4191 ¶ 7 ("Uncontested

Facts").

2.　　　On April 29, 2014 (the "Petition Date"), the EFIH Debtors and various affiliates

(collectively, with the EFIH Debtors, the "Debtors") filed voluntary petitions under Chapter 11

in this Court.  The Debtors' cases are being jointly administered, but their estates have not been

substantively consolidated.  Uncontested Facts ¶ 4.

3.　　　On the petition date, EFIH filed a motion (the "DIP Motion") for authority to borrow

$5.4 billion in debtor-in-possession financing (the "DIP Financing") and to use most of it to pay

off all principal and accrued interest (other than disputed interest) on the Notes.  Uncontested

Facts ¶ 11.  EFIH also offered to settle—for substantially less than the full amount of the

claims—any claims of the Noteholders for payment of the "Applicable Premium," or

"makewhole" as specified in the Indenture, or any related claims arising out of EFIH's

redemption of the Notes.  EFIH simultaneously commenced a contested matter seeking a

---

[1] The Court hereby makes the following findings of facts and conclusions of law pursuant to Fed. R. Bank. P. 7052, which is applicable to this matter by virtue of Fed. R. Bankr. P. 9014.  To the extent any findings of fact constitute conclusions of law, they are adopted as such.  To the extent any conclusions of law constitute findings of fact, they are adopted as such.

[2] Capitalized terms in this Introduction, Procedural History and Summary not otherwise defined are defined below.

determination that any Noteholders who did not agree (the "non-settling Noteholders") were not entitled to any makewhole or related claim (the "Contested Matter").  Uncontested Facts ¶ 11.

**4.**    On May 13, 2014, prior to the repayment of the Notes, Delaware Trust Company, indenture trustee for the Notes (the "Trustee"), objected to the DIP Motion.  Then on May 15, 2014, the Trustee commenced an adversary proceeding (No. 14-10979, D.I. 470; No. 14-50363, D.I. 1 (the "Adversary Proceeding")) seeking a declaratory judgment that EFIH's repayment of the Notes required it to pay a makewhole, or other damages.  That same day, the Trustee also filed a motion seeking (i) a determination that it could rescind acceleration of the Notes without violating the automatic stay, or (ii) in the alternative, relief from the automatic stay to rescind acceleration of the Notes.  (No. 14-10979, D.I. 473 (the "Stay-Applicability Motion")).

**5.**    On June 4, 2014, in accordance with the terms of the Indenture (PX 33 at 99), a majority in dollar amount of the Noteholders delivered a letter to the Trustee—copied to EFIH—stating that the Noteholders:  (a) waive each and every Default that would otherwise constitute a Default pursuant to either section 6.01(a)(6) or section 6.01(a)(7) of the Indenture (each such Default, individually, a 'Bankruptcy Default') and its consequences, with the effect that no such Default shall be deemed to have occurred; and (b) rescind any acceleration with respect to the Notes and its consequences that would otherwise result from any Bankruptcy Default, including, without limitation, any such acceleration pursuant to the second paragraph of section 6.02 of the Indenture and paragraph 12 of the back of the Notes, with the effect that no such acceleration shall be deemed to have occurred.  PX 100.  The letter further stated that in the event that "the automatic stay pursuant to Section 362 of the Bankruptcy Code applie[d] to stay the delivery and/or effectiveness" of the notice, "(i) [the notice was] conditioned upon entry of an order by a court of competent jurisdiction lifting the automatic stay to permit the delivery and/or

2

effectiveness of [the notice] (a 'Lift Stay Order'); and (ii) upon entry of a Lift Stay Order, the

waiver and rescission set forth above shall be effective as of the date of [the notice]."

Uncontested Facts ¶ 13; PX 100.

**6.**     The Court granted the DIP Motion on June 6, 2014 (No. 14-10979, D.I. 859).  The order

approved the repayment of the principal balance of and accrued interest on the Notes, but it

specified that "the rights of all parties are preserved with respect to the EFIH First Lien

Makewhole Claims."  No. 14-10979, D.I. 859 ¶ 12.  The order further provided that:

> Nothing in this Final Order (including, without limitation, any factual findings herein) or
> the transactions contemplated hereby (including, without limitation, the closing of the
> EFIH First Lien Repayment) shall have any precedential, evidentiary, law of the case, or
> preclusive effect with respect to any present or future dispute concerning the amount (if
> any) of EFIH First Lien Makewhole Claims or any other claims for damages of the EFIH
> First Lien Notes Trustee or the Prepetition EFIH Lien Creditors due or that may become
> due as a result of, or in connection with, the EFIH First Lien Repayment, whether in
> connection with the [Adversary Proceeding], the [Stay-Applicability Motion], or any
> other claims objection or other proceeding, including, without limitation, whether (i) any
> acceleration of the EFIH First Lien Notes is subject to rescission by majority holders
> thereof pursuant to the terms of the EFIH First Lien Indentures or (ii) whether the EFIH
> First Lien Notes could have been reinstated before the EFIH First Lien Repayment.

Uncontested Facts ¶ 14.

**7.**     With respect to the preserved claims, on September 12, 2014, the Court entered an order

bifurcating litigation of the Contested Matter, Adversary Proceeding, and Stay-Applicability

Motion into two phases.  (No. 14-50363, D.I. 128 (the "Bifurcation Order")).  Phase One

provides for the Court to determine (1) whether the Noteholders are entitled to a "Redemption

Claim" (the makewhole specified in the Indenture or other damages) under applicable non-

bankruptcy law, and (2) to the extent relevant, "whether the Debtors intentionally defaulted in

order to avoid paying an alleged make-whole premium or other damages."  *Id.* at 2-3.  Except as

to intentional default, the Court will assume "solely for the purposes of Phase One that the EFIH

Debtors are solvent and able to pay all allowed claims of their creditors in full."  *Id.* at 3.  If the

Court finds EFIH liable for a Redemption Claim and if EFIH then disputes its solvency, the

Court will then proceed to Phase Two to determine "(a) whether the EFIH Debtors are insolvent,

and, if so, whether that insolvency gives rise to any defenses arising under the Bankruptcy Code

in favor of the EFIH Debtors that bar or limit the amount of the Redemption Claim, and (b) the

dollar amount of … any allowed Redemption Claim." *Id.* at 2.

**8.**     On February 13, 2015, EFIH and the Trustee submitted cross-motions for summary

judgment on Phase One.  (No. 14-50363, D.I. 175, 176, 178, 179).  On March 26, 2015, the

Court entered its Findings of Facts and Conclusions of Law Regarding Cross-Motions for

Summary Judgment dated March 26, 2015 (No. 14-10979, D.I. 3984; No. 14-50363, D.I. 245

(the "Summary Judgment Findings of Facts and Conclusions of Law")) and related order (No.

14-10979, D.I. 3985; No. 14-50363, D.I. 246 (the "Summary Judgment Order")).

**9.**     The Summary Judgment Order granted summary judgment for EFIH on all four Counts

of the complaint in the Adversary Proceeding.  It specified, however, that the entry of summary

judgment on Count I of the complaint—The Trustee's motion for a "Declaratory Judgment that

EFIH's Refinancing of the 10% Notes Constitutes a Redemption Requiring Payment of the

Applicable Premium as an Allowed Secured Claim"—was without prejudice to the Court's right

to reinstate Count I and enter judgment therein in favor of the Trustee if the Court later entered

an order lifting the automatic stay to allow the Trustee to waive the default and decelerate the

Notes.  Summary Judgment Order ¶ 1.  In this regard, the Court granted EFIH partial summary

judgment on the Stay Applicability Motion, *id.* ¶ 2, having found that the Trustee's issuance of

the Rescission Notice was subject to the automatic stay.  Summary Judgment Findings of Fact

and Conclusions of Law ¶ 94.  However, the Court also found that the Trustee would have "the

right under Section 6.02 of the Indenture to waive the automatic default arising from the EFIH

4

Debtors' bankruptcy filing and rescind the acceleration" if the automatic stay were lifted. *Id.* at ¶ 63. As to whether stay relief should be granted, the Court held that "a genuine issue of material fact exists as to whether the Trustee can establish cause to lift the automatic stay" with respect to the Rescission Notice. *Id.* at ¶ 94. The Court also explained that if it ultimately lifted the automatic stay to allow the Noteholders to "waive the [bankruptcy] default and decelerate the Notes," then "EFIH's refinancing would be an Optional Redemption under section 3.07 of the Indenture and the Applicable Premium would be due and owing to the non-settling Noteholders." *Id.* ¶ 90.

**10.**     On April 20-22, 2015 the Court held a three-day trial to determine whether cause exists to lift the automatic stay to allow the Trustee to waive the default and rescind acceleration of the Notes.

**11.**     As set out in further detail below, based on the evidence presented at the trial, the Court finds that cause exists to lift the automatic stay for purposes of Phase One of the Stay Applicability Motion. First, the evidence does not establish that EFIH and its estate will suffer any great prejudice if the Noteholders are permitted to enforce their contractual right to rescind. EFIH is a holding company with no physical operations, employees, or customers. Granting relief from the stay, solely to allow the Noteholders to rescind acceleration of the Notes, will not cause EFIH to lose any property, nor will it cause any asset to diminish in value. As for its liabilities, the makewhole is a relatively small amount of EFIH's overall debt, some 5%. In any event, EFIH is presumed in Phase One to be solvent and able to pay all allowed claims of its creditors in full, even if it pays the Noteholders the full makewhole prescribed in the Indenture (and even if more junior creditors of EFIH are also ultimately allowed claims for makewholes set forth in the indenture for their notes).

12.     Second, the hardship to the Noteholder if they are not permitted to rescind acceleration considerably outweighs any hardship to EFIH.  The Noteholders have lost the stream of interest payments that they were promised by EFIH from June 19, 2014 until at least the First Call Date, December 1, 2015, along with the Redemption Premium of 5% above the face amount of the Notes that they were promised upon a redemption on that First Call Date.  This total loss alone exceeds $450 million for the non-Settling Noteholders.  The makewhole of roughly $431 million would compensate those Noteholders for that loss.  If these Noteholders are deprived of their contractual right to rescind acceleration and accordingly are not paid the makewhole, they will instead lose this sum, which totals nearly 19% of their total investment in the Notes.  And, while they have been able to reinvest the principal balance of their Notes since EFIH repaid the Notes on June 19, 2014, interest rates have declined dramatically since EFIH issued the Notes and, accordingly, the Noteholders have not been able to reinvest in notes of comparable risk and duration earning anywhere near 10% annually.  Moreover, the Noteholders are simply seeking to enforce a right that they possess under the plain language of the Indenture—the right to rescind the acceleration of the Notes.  In contrast, EFIH seeks to disallow that contract right, notwithstanding the plain language of the Indenture and EFIH's retention of all the attendant benefits from that contract, including the substantial savings it realized by refinancing the Notes at a dramatically lower interest rate and additional offsetting benefits in the form of net operating losses that EFIH (and EFH) may be able to use to shelter income from federal taxes if they are required to pay a makewhole.

13.     Third, that the Noteholders are merely seeking to enforce their contractual rights is also significant with respect to the final factor courts typically examine in deciding whether to grant relief from the stay: whether the party seeking relief from the stay is likely to prevail on the

merits if the stay is lifted.  This Court has already held that the Indenture permits the Noteholders to rescind acceleration and that, if they do rescind, they will be entitled to the makewhole. Summary Judgment Findings of Fact and Conclusions of Law ¶ 69.

**14.**     For these reasons, as amplified below, the Trustee's Stay-Applicability Motion is **GRANTED** for purposes of Phase One.  In accordance with the Bifurcation Order, the Court reserves for Phase Two whether in fact EFIH is solvent (if EFIH disputes that it is) and whether if it is not, that insolvency gives rise to any defenses, in whole or part, to the Noteholders' claim for the makewhole.

<u>**FINDINGS OF FACT**</u>

**BACKGROUND**

> **A.**    **The EFIH Notes**

**1.**     As of the Petition Date, the Debtors collectively had more than $42 billion in outstanding funded indebtedness.  4/20/2015 Trial Tr. 187:3-7 (Horton Test.).  Of that $42 billion, approximately $7.709 billion had been issued by the EFIH Debtors.  Uncontested Facts ¶ 10. $3.985 billion of the $7.709 billion in debt was first-lien debt—that is, the Notes; $2.156 billion consisted of second-lien debt (the "<u>Second Lien Notes</u>"); and the remaining $1.568 billion were in unsecured notes (the so-called "<u>PIK Notes</u>").  *Id.*

**2.**     Most—approximately $3.5 billion—of the Notes (and virtually all the Notes held by the non-settling Noteholders) were issued in August 2010 and again in January 2013 through exchange offers, bore an annual interest rate of 10%, and were scheduled to mature in 2020. Uncontested Facts ¶ 7.  Those 10% Notes were governed by the Indenture.  PX 33.  In 2012, EFIH issued for cash additional Notes due in 2017 in a total principal amount of approximately $500 million.  These Notes bore an annual interest rate of 6.875%.  Uncontested Facts ¶ 7.  The

indenture governing the 6.875% Notes was substantially identical in all relevant aspects to the Indenture for the 10% Notes.  Summary Judgment Findings of Fact and Conclusions of Law ¶ 9.

**3.**     The Notes (like the other bonds issued by EFIH) were considered "high-yield." 4/20/2015 Trial Tr. 230:19-25 (Horton Test.).  High-yield bonds are bonds rated by the major rating agencies as below investment-grade because they typically present a greater risk of default. 4/20/2015 Trial Tr. 127:4-11 (McCarty Test.); 4/20/15 Trial Tr. 55:11-56:1 (Kearns Test.).  To explain why the Noteholders will be harmed if the stay is not lifted to permit them to exercise their contractual right to rescind acceleration, it is helpful to first address the characteristics of the high-yield bond market and the role of call protection therein.

### B.     The High-Yield Bond Market

**4.**     Nearly all high-yield bonds—including the Notes—have two fundamental characteristics. First, the interest rate is fixed until maturity—that is, it does not float or otherwise change as interest rates move up or down in the market.  4/20/2015 Trial Tr. 129:14-17 (McCarty Test.); 4/20/15 Trial Tr. 61:20-62:2 (Kearns Test.).  Second, the debt does not amortize—that is, 100% of the principal balance is due at maturity.  4/20/2015 Trial Tr. 130:9-16 (McCarty Test.); 4/20/15 Trial Tr. 69:11-17 (Kearns Test.).

**5.**     An investor in high-yield debt contracts to receive a fixed payment of interest whenever interest is payable (typically, semi-annually) for the life of the bond.  4/20/2015 Trial Tr. 130:3-8 (McCarty Test.).  Those expected interest payments, when added together, constitute the investor's expected return on investment, or, in the industry parlance, the "yield."

**6.**     Because high-yield bonds offer a fixed income stream over a period of time, they are attractive to institutional investors like pension funds and insurance companies that must "match" their future income with their future obligations.  4/20/2015 Trial Tr. 127:12-18, 127:19-128:2

(McCarty Test.).  If these investors did not receive their expected cash flow, they would be unable to meet the obligations that they had incurred to retirees and policyholders, among others. 4/20/2015 Trial Tr. 128:22-129:1, 155:1-6 (McCarty Test.).

**7.**      Investment in high-yield debt involves an allocation of interest-rate risk: if rates in the market rise, the issuer benefits; if market rates fall, the noteholders benefit.  Specifically, if rates in the market rise, investors will receive a lower-than-market return, and the value of their debt will begin to trade on the open market below face value (known as "par").  4/20/2015 Trial Tr. 131:22-132:4 (McCarty Test.); 4/20/2015 Trial Tr. 64:23-65:3 (Kearns Test.).  The investors assume that risk, and typically cannot "put" the bonds to the issuer and reinvest its capital at the now higher interest rates prevailing in the market.  4/20/2015 Trial Tr. 132:16-133:1 (McCarty Test.).

**8.**      Conversely, if interest rates drop (or the issuer's credit improves), the debt is likely to trade on the open market above par.  4/20/2015 Trial Tr. 134:13-19 (McCarty Test.).  4/20/2015 Trial Tr. 134:13-19, 144:10-15 (McCarty Test.).

### C.      Call Protection

**9.**      Were high-yield bonds freely "callable" by the issuer whenever market rates of interest declined, the investor would be forced to bear the disproportionate risk of both increases and decreases in interest rates.  4/20/2015 Trial Tr. 134:13-19 (McCarty Test.); 4/21/2015 Trial Tr. 65:3-66:7 (Cacioppo Test.).  The investor would not only lose its guaranteed income stream until maturity, but would also face "reinvestment risk,"—the risk that the investor would be unable to find in the market a bond of comparable credit quality and duration that would generate a comparable return.  4/20/2015 Trial Tr. 136:6-13 (McCarty Test.); 4/20/2015 Trial Tr. 65:4-17 (Kearns Test.).

10.     To protect against these significant financial harms, high-yield debt is almost never freely callable by the issuer.  4/20/2015 Trial Tr. 134:8-12 (McCarty Test.); 4/20/2015 Trial Tr. 65:18-67:3 (Kearns Test.).  Instead, virtually all high-yield bonds contain some form of "call protection" provision.  4/20/2015 Trial Tr. 56:22-57:10 (Kearns Test.); 4/21/2015 Trial Tr. 65:3-66:7 (Cacioppo Test.); 4/21/2015 Trial Tr. 93:6-21 (Auerbach Test.); 4/21/2015 Trial Tr. 132:20-134:4, 134:8-17 (Greene Test.).

11.     Historically, call protection took the form of an absolute "no call."  That is, the issuer could not redeem the bond at all for at least several years.  4/20/2015 Trial Tr. 137:24-138:24 (McCarty Test.); 4/20/2015 Trial Tr. 57:11-23 (Kearns Test.).

12.     Over time, however, issuers have bargained for the flexibility to redeem bonds early. Today, most high-yield bonds have call protection provisions that permit the issuer to call the bonds, but only if the issuer pays the investor a makewhole or other sum that ensures investors will receive their promised yield for a specified period.  4/20/2015 Trial Tr. 137:24-138:6 (McCarty Test.); 4/20/2015 Trial Tr. 73:20-75:4 (Kearns Test.); 4/21/2015 Trial Tr. 63:11-17, 65:3-66:7 (Cacioppo Test.).

D.     The Amount of the Makewhole Payment

13.     As its name suggests, a makewhole payment "literally [] make[s] the investor whole" for what they had contracted to receive when they lent their money in the first place.  4/20/2015 Trial Tr. 136:1-5 (McCarty Test.).  A makewhole payment is *not* a windfall for the investor. Rather, makewhole payments are typically calculated pursuant to a standard formula consisting of a lump sum payment equal to the present value of the total of the remaining interest payments until a specified date (the "First Call Date"), plus a "premium" above the face amount of the notes that would be payable by the issuer upon its redemption of the Notes on that First Call Date

(the "Redemption Premium").  This formula approximates what the investor had contracted to receive from the issuer, and would have received but for the early repayment of the Notes, discounted to present value.  4/20/2015 Trial Tr. 135:17-25, 137:8-12 (McCarty Test.); 4/20/2015 Trial Tr. 77:4-79:6 (Kearns Test.).

14.     Significantly, makewhole provisions not only protect investors, but also benefit issuers. This is because for an issuer, the alternative to a makewhole provision is either an absolute no-call provision, 4/20/2015 Trial Tr. 138:13-24 (McCarty Test.), or paying a higher rate of interest on the notes.  4/20/2015 Trial Tr. 73:20-75:4 (Kearns Test.).  Freely callable bonds would require higher interest rates than bonds that are noncallable, or that are callable subject to a makewhole.  *See, e.g.*, 4/20/2015 Trial Tr. 134:20-135:4, 141:12-142:1 (McCarty Test.); 4/20/2015 Trial Tr. 234:11-17 (Horton Test.); 4/21/2015 Trial Tr. 45:18-46:5 (Horton Test.); 4/21/2015 Trial Tr. 65:3-66:7 (Cacioppo Test.).

### E.     EFIH's Debt Issuances

15.     All of the bonds issued by EFIH (indeed, by all of the Debtors) from 2007 to 2013 were high-yield and exhibited the typical characteristics of high-yield bonds discussed above.  See *supra* ¶ 3.  They had a fixed interest rate (for most of the Notes and for virtually all held by the non-settling Noteholders, 10% per annum), PX 115 at 40, and were non-amortizing.  4/20/2015 Trial Tr. 62:3-14, 69:11-17 (Kearns Test.).

16.     The Debtors' high-yield bonds also followed industry practice in that they were not freely callable.  Every bond issuance from 2007 to 2013 by any of the Debtors gave the Debtor the right to redeem the bonds during the first half of the tenor only if it paid the specified makewhole. 4/20/2015 Trial Tr. 231:22-232:1 (Horton Test.), 4/21/2015 Trial Tr. 46:16-20 (Horton Test.); 4/20/15 Trial Tr. 67:23-68:15 (Kearns Test.).

11

17.    The Indenture for the Notes was no exception.  It prohibited EFIH from redeeming the
Notes prior to December 1, 2015 unless it paid the Noteholders a "makewhole."  PX 33 at 61, 62
(Indenture § 3.07(a) and (c)); PX 33 at 53 (Indenture § 2.01(d) ("The Notes shall not be
redeemable other than as provided in Article 3 hereof.")).  Specifically, Section 3.07(c) of the
Indenture for the 2010 Notes provided that "[e]xcept pursuant to clause (a) or (b) of this Section
3.07, the Notes shall not be redeemable at the Issuer's option prior to December 1, 2015" (the
First Call Date for the Notes).  PX 33 at 62 (Indenture § 3.07(c)).  Section 3.07(a), entitled
"Notes Make Whole Redemption," set forth the only exception relevant in this case:[3]  EFIH
could redeem the Notes before December 1, 2015 (the First Call Date for the Notes) only if it
paid the "Applicable Premium":  "At any time prior to December 1, 2015, [EFIH] may redeem
all or a part of the Notes at a redemption price equal to 100% of the principal amount of the
Notes redeemed plus the Applicable Premium [i.e., the make-whole] as of, and accrued and
unpaid interest to, the date of redemption (the "Redemption Date")[.]"  PX 33 at 61 (Indenture §
3.07(a)).

18.    Starting on the First Call Date, December 1, 2015, EFIH could redeem the Notes
pursuant to a schedule of declining redemption payments.  PX 33 at 62.  Those payments (the
Redemption Premium) started at 5% above par if the redemption occurred on December 1, 2015
and declined to 1.667% above par in 2017.

19.    EFIH understood that these makewhole and redemption provisions were standard in the
high-yield bond marketplace from 2007-13.  4/20/2015 Trial Tr. 232:2-14 (Horton Test.).
Moreover, EFIH viewed makewhole provisions as beneficial to it, given the alternative of an
absolute no-call.  Indeed, EFIH paid a higher rate of interest to have the Notes be callable subject

---

[3] Section 3.07(b) is inapplicable.  It did not permit redemption of more than 50% of the Notes' principal, and in the
case of the 10% Notes, it expired on December 1, 2013.  PX 33 at 61 (Indenture § 3.07(b)).

to a makewhole payment, as opposed to not being able to call the Notes at all.  4/20/2015 Trial Tr. 232:15-233:3, 233:23-234:7 (Horton Test.).

20.      EFIH understood that call protection was also important to the Noteholders.  4/20/2015 Trial Tr. 233:4-7 (Horton Test.); 4/21/2015 Trial Tr. 41:12-17 (Horton Test.); 11/20/2014 Moldovan Dep. 82:13-83:4.  If EFIH could have bargained for the right to have the notes be freely callable, it would have done so.  4/20/2015 Trial Tr. 233:15-22 (Horton Test.); 4/21/2015 Trial Tr. 192:19-193:4 (Moldovan Test.).  But EFIH consulted with its dealer-managers[4] as to whether or not it could issue high-yield notes without call protection, and the dealer-managers told EFIH that to do so "would be costly."  4/21/2015 Trial Tr. 45:14-24 (Horton Test.).  That is, the rate of interest that would have been required to be paid by EFIH if the Notes had been freely callable would have been meaningfully higher.  4/21/2015 Trial Tr. 45:25-46:5 (Horton Test.).

21.      The parties' agreement as to the importance of the makewhole and redemption provisions was reflected in Article 9 of the Indenture.  That article addressed the manner in which the Indenture could be amended.  Section 9.01 of the Indenture allowed for certain, ministerial amendments that EFIH and the Trustee could make to the terms of the Indenture without the consent of any Noteholder.  PX 33 at 111 (Indenture § 9.01).  Section 9.02 specified other, more substantive modifications that required the consent of a majority in dollar amount of the Noteholders.  PX 33 at 112 (Indenture § 9.02).  But it then addressed a third category of potential modifications—those that addressed matters most central to an investment in the Notes—that could not be changed without the consent of each holder of the Notes.  The right to the makewhole upon the redemption of the Notes was one of the few terms—along with the

---

[4]  The dealer-managers were selected and paid by EFIH.  4/21/2015 Trial Tr. 180:12-17 (Moldovan Test.).  The dealer-managers were solicitation agents of EFIH in connection with the issuances.  *Id*. 180:18-181:1 (Moldovan Test.).  They included Goldman Sachs & Co., whose private-investment arm was one of the three sponsors of the Debtors.  11/20/2014 Moldovan Dep. 40:8-21; 12/9/2014 Horton Dep. 128:1-11; PX 26 at 1.

Indenture's provisions relating to the principal, interest rate, and stated maturity of the Notes—

that could not be amended without the consent of every single affected holder of the Notes. *See*

PX 33 at 113 (Indenture § 9.02(2)).

22.    In connection with the high-yield debt offerings by EFIH and its affiliates (EFH and

Texas Competitive Electric Holdings Company LLC ("TCEH")), the Debtors also issued

prospectuses or offering memoranda. 11/20/2014 Moldovan Dep. 43:5-11. The Debtors sought

to ensure that these materials did not contain any material misstatements of fact or omit a

material fact. *Id*. at 52:19-53:12. In these documents, EFIH regularly marketed to investors that

its high-yield bonds would provide investors with call protection and makewhole payments in

particular. *See* PX 1 at 1; PX 37 at 2; PX 39 at 3; PX 44 at 1; PX 52 at 6. For example, in its

investor presentation for the Notes issued in 2012, EFIH included a summary of the offering's

principal terms. 4/21/2015 Trial Tr. 44:12-18 (Horton Test.). One of the terms EFIH

highlighted was the "call protection" that investors would receive under the Indenture. EFIH

explained that the notes were noncallable for 2.5 years, subject to a T-plus 50 makewhole, and

then were callable thereafter at a Redemption Premium. 4/21/2015 Trial Tr. 44:19-45:13

(Horton Test.); PX 55 at 4; *see also* PX 39 at 3.

23.    At issuance, all of the key terms found in the Notes, including the call protection and

makewhole provisions, and the formula for calculating the makewhole amount, were "market."

4/20/2015 Trial Tr. 232:2-14, 234:23-235:3 (Horton Test.); 4/20/2015 Trial Tr. 60:1-24, 78-

22:80:2 (Kearns Test.). In particular, the interest rate for the Old Notes (as defined below) was

"market" at the time of their issuance in 2007. The interest rate on the new Notes issued in

2010—10% annually—was also "market" at the time and, as described below, it reflected a

reduction in the interest rate compared to the rate for the Old Notes. *Id*.

24.     The formula in the Indenture for calculating the makewhole was also standard compared to that commonly found in indentures for high-yield bonds issued by other companies. 4/20/2015 Trial Tr. 60:1-24 (Kearns Test.).  It required payment of a lump sum equal to the present value of the remaining interest payments until the First Call Date plus the Redemption Premium as of that date.  The discount rate was the sum of a comparable maturity Treasury bond yield and a fixed spread (50 basis points).  4/20/2015 Trial Tr. 77:4-79:6 (Kearns Test.).  All other makewhole provisions for any high-yield notes issued by any of the Debtors from 2007-2013 also used this same rate.  4/20/2015 Trial Tr. 78:22-80:2 (Kearns Test.).

F.     **The August 2010 Exchange**

25.     Most of the Notes were issued pursuant to an exchange offering in August 2010 (the "Exchange") that EFIH and its parent EFH undertook as part of a "liability management program" that sought to reduce the principal, extend maturity dates, and lower interest expense on the Debtors' funded indebtedness.  4/20/2015 Trial Tr. 229:13-22 (Horton Test.).  *Id.*  That Exchange called for holders of 11.25%/12% Senior Toggle Notes due 2017 and 10.875% Senior Notes due 2017 (collectively, the "Old Notes") issued in 2007 by a different Debtor, EFIH's parent EFH, but guaranteed by EFIH, to be exchanged for up to $2.18 billion in Notes, plus $500 million in cash.  4/21/2015 Trial Tr. 50:19-25 (Horton Test.); PX 36 at 3.

26.     The Noteholders were not permitted to exchange all of their Old Notes.  But, for every $1,000 face amount of Old Notes that a Noteholder could exchange, it received either $720 or $785 in new Notes.  PX 25A at 3.  Even with an additional $500 million cash payment, the Noteholders received only $2.68 billion in cash and face amount of new Notes, in return for $3.2 billion in face amount of Old Notes.  4/21/2015 Trial Tr. 50:2-18, 51:3-18 (Horton Test.).

27.     In return, the new Notes were secured by a first lien on EFIH's interest in Oncor (defined

below) and were considered oversecured.  4/20/2015 Trial Tr. 182:21-183:5, 189:3-6 (Horton

Test.); 4/20/2015 Trial Tr. 143:11-16 (McCarty Test.).   An additional benefit that the

Noteholders received was an extension of their protected interest payments from 2017 to 2020—

an extension of maturity that EFIH also wanted as part of its liability management program.

4/20/2015 Trial Tr. 229:13-23 (Horton Test.).

28.     Upon their issuance, the new Notes traded at par.  4/21/2015 Trial Tr. 51:19-24 (Horton

Test.); *see also* 4/20/2015 Trial Tr. 143:23-144:9 (McCarty Test.).  Absent call protection, the

Notes (including those that were the subject of the 2010 Exchange and the later exchange in

2013) would likely not have traded at par (let alone well above par, where they subsequently

traded).  4/20/2015 Trial Tr. 157:12-22 (McCarty Test.); 4/21/2015 Trial Tr. 78:12-79:19

(Cacioppo Test.).

### G.     The Noteholders' Right to Rescind Any Acceleration and Waive Any Default In The Indenture

29.     Article 6 of the Indenture provided rights and remedies that the Trustee and the

Noteholders were entitled to pursue, at their option, in the event that EFIH defaulted.  PX 33 at

96-97 (Indenture § 6.01).  These permitted actions included acceleration.

30.     Section 6.01 of the Indenture specified that EFIH's filing for bankruptcy protection

would be an "event of default."  PX 33 at 97 (Indenture § 6.01).  Section 6.02, in turn, provided

for "automatic acceleration" of the Notes in the event that EFIH defaulted by filing for

bankruptcy, PX 33 at 99 (Indenture § 6.01), but also gave the Noteholders the right to waive any

default and rescind any such "automatic acceleration" of the Notes that occurred.  Specifically,

Section 6.02 provided:

16

> "*The Holders of at least a majority in aggregate principal amount of the Notes* by written notice to the Trustee *may on behalf of all of the Holders waive **any** existing Default and its consequences under this Indenture* except a continuing Default in the payment of interest on, premium, if any, or the principal of any Note (held by a non-consenting Holder) *and rescind **any** acceleration with respect to the Notes and its consequences* (so long as such rescission would not conflict with any judgment of a court of competent jurisdiction)."

*Id.* (emphasis added).

31.     EFIH's executives have testified that, at the time EFIH entered into the Indenture with the Trustee, they understood Section 6.02 to mean what it says—that the Noteholders would have the contractual right to waive "<u>any</u>" default and rescind "<u>any</u>" acceleration.  4/20/2015 Trial Tr. 241:6-10 (Horton Test. "Q: You as the treasurer understand or understood that the holders had an ability to waive and prevent a default and rescind acceleration, right?  A: I knew that, yes, sir, in general from other transactions and so forth."); 12/9/2014 Horton Dep. 84:15-85:13 ("as the treasurer it appears to me there was an ability for the holders to waive that event of default [caused by EFIH filing for bankruptcy]."); 11/20/2014 Moldovan Dep. 176:25-177:5 (Q: "And so the company understood that under this indenture, the 2010 Indenture, the holders of the notes had the right to waive any default and rescind any acceleration, right?  A: Yes.").  More broadly, when EFIH entered into the Indenture, it believed that the Indenture was an integrated agreement, 4/21/2015 Trial Tr. 41:12-20 (Horton Test.), and that every term of the Indenture—including Section 6.02—was enforceable.  4/20/2015 Trial Tr. 236:11-21 (Horton Test.).

32.     At the time of the 2007 issuance of the Old Notes, the 2010 and 2013 exchanges, and the issuances of the 2012 Notes, no one at EFIH (or EFH) gave any consideration to whether it could refinance any of the bonds in bankruptcy without paying a makewhole, or gave any thought to whether the Noteholders' right to rescind acceleration would be subject to the automatic stay in

bankruptcy. *See, e.g.*, 12/9/2014 Horton Dep. 360:7-362:10, 363:7-366:17; 11/20/2014 Moldovan Dep. 128:25-130:7, 219:17-220:2.

**33.**     The Indenture's plain language confirms the understanding of EFIH's executives regarding the enforceability of the automatic acceleration provision.  Summary Judgment Findings of Fact and Conclusions of Law ¶ 43 ("The best evidence of what the parties to a written agreement intend is what they say in their writing.").  This Court has already held that the Noteholders had the contractual right to rescind acceleration.  And it has also found that even if the parties had contemplated that the right to rescind could be subject to the automatic stay, "the automatic stay can always be lifted.  In that case . . . the stay [] would simply cease to exist."  Summary Judgment Findings of Fact and Conclusions of Law ¶ 66 & n.12; *see also* PX 33 at 66 (Indenture § 4.06) (EFIH promised that, to the fullest extent permitted by law, it would not at any time, "insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of any stay.").

**34.**     Moreover, EFIH never warned any Noteholder or the Trustee—in either the 2010 or 2013 exchanges, or during the 2012 original issuance—that if it filed for bankruptcy, it might take the position that the Noteholders could not exercise their rescission right.  4/20/2015 Trial Tr. 241:22-242:6 (Horton Test.).  To the contrary, in the prospectus accompanying the Notes and in all subsequent offering materials thereafter, EFIH disclosed some 10 bankruptcy-related risk factors.  4/21/2015 Trial Tr. 183:1-4 (Moldovan Test.).  It never disclosed, however, that if EFIH filed for bankruptcy, the Noteholders might be unable to rescind acceleration.  4/20/2015 Trial Tr. 245:8-11, 250:22-251:1 (Horton Test); 4/21/2015 Trial Tr. 182:9-25 (Moldovan Test.).  The only mention of acceleration in the prospectus was on page 156, which noted that a bankruptcy filing would be an event of default that would automatically result in the acceleration of the Notes.  But

that statement was immediately followed by disclosure that the Noteholders had the right to waive any such default and its consequences under the Indenture, with no caveats. PX 30 at 156.

36.    In conjunction with its debt issuances, EFIH also created "pricing supplements" (term sheets) and investor presentations that were shared with investors. 11/20/2014 Moldovan Dep. 54:7-25; PX 55 at 4. Each pricing supplement highlighted that EFIH could call the Notes before the First Call Date only if it paid the specified makewhole amount. *Id.*; *see also* PX 2 at 4; PX 10 at 1; PX 39 at 3; PX 44 at 1; PX 59 at 9; PX 60 at 8-9. None qualified that statement by suggesting either that if EFIH filed for bankruptcy, it could redeem the Notes before December 1, 2015 without paying a makewhole, or that the Noteholders' rescission right might not be enforceable if EFIH filed for bankruptcy.

36.    At trial, EFIH introduced two "opinion letters" from its legal counsel issued at the time of the Exchange. DX 1; DX 2. Only one of the two letters was made available to any Noteholders, and the Court therefore gives no weight to the letter in DX 1. 4/21/2015 Trial Tr. 181:16-22 (Moldovan Test.). The other opinion letter, which was filed publicly with the Securities and Exchange Commission ("SEC"), DX 2, stated that the "Notes" would be "binding obligations" but caveated that counsel's opinion was "subject to the effects of bankruptcy, insolvency, fraudulent conveyance . . . and other similar laws relating to or affecting creditors' rights." But that qualification was limited to the enforceability of the Notes, not the Indenture, 4/21/2015 Trial Tr. 185:6-24 (Moldovan Test.); was nothing more than standard boilerplate language routinely included in such letters, *id*. at 186:11-187:3 (Moldovan Test.);[5] and included no specific discussion suggesting that the Noteholders' right to rescind acceleration would in

---

[5] To the extent DX 1 is relevant at all, it too contained boilerplate language that did not purport to qualify the terms of the Indenture, 4/21/2015 Trial Tr. 184:19-24 (Moldovan Test.), and made no disclosure that the Noteholders' rescission right might not be enforceable if EFIH filed for bankruptcy. *Id.* 182:9-15 (Moldovan Test.).

particular be limited in bankruptcy.  And, in any event, as this Court has already held, and as the parties are charged with knowing, the automatic stay can always be modified or lifted in its entirety.  Summary Judgment Findings of Fact and Conclusions of Law ¶ 66 & n.12.

**37.**     In short, if relief from the stay is not granted to permit the Noteholders to rescind acceleration, they will be denied their agreed-upon contract right under the Indenture.

### H.     Ownership of the Notes

**38.**     Between 2011 and June 19, 2014, the Notes traded above par.  4/21/2015 Trial Tr. 102:5-17 (Auerbach Test.); 4/21/15 Trial Tr. 135:22-25, 136:25-137:4 (Greene Test.).  Investors purchased the Notes at prices above their face value expecting that they would receive their contractual interest payments through the First Call Date.  4/21/15 Trial Tr. 138:19-141:10 (Greene Test.).  They would not have done so had the Notes been freely callable.  4/21/15 Trial Tr. 96:3-17 (Auerbach Test.); 4/21/15 Trial Tr. 134:8-17 (Greene Test.).

**39.**     In deciding to purchase the Notes, investors relied on the fact that the Notes were secured and had a first lien priority on EFIH's interest in Oncor.  4/21/15 Trial Tr. 97:23-98:5 (Auerbach Test.); 4/21/15 Trial Tr. 138:1-6 (Greene Test.).  Investors also relied on the separate credit of EFIH.  4/21/15 Trial Tr. 97:7-22 (Auerbach Test.); 4/21/15 Trial Tr. 137:20-25 (Greene Test.).

### I.     The Refinancing of the Notes

**40.**     On June 19, 2014, EFIH borrowed $5.4 billion in DIP Financing at an effective interest rate of 4.25 percent.  4/20/2015 Trial Tr. 193:5-8, 197:8-14, 216:12-18 (Horton Test).  This was a dramatically lower interest rate than the rates applicable for the Notes (or the Second Lien Notes, as defined below).  12/9/2014 Horton Dep. 37:21-25; *see also* PX 115 at 40 (weighted average interest rate on EFIH's debt in 2013 was 10.9%).  EFIH was able to refinance at this highly favorable rate because interest rates were far lower in June of 2014—and remain so

today—than they had been when the Notes were issued.  4/21/2015 Trial Tr. 67:9-23 (Cacioppo

Test.).

**41.**     EFIH used the proceeds from the DIP Financing to repay the Notes' principal and all

accrued interest (except certain amounts it disputed relating to "additional interest" for failure to

register certain issues of the Notes with the SEC and interest on that overdue interest).

4/20/2015 Trial Tr. 214:16-18 (Horton Test.).  EFIH repaid the principal balance and all

undisputed interest on the Notes as soon as the Court allowed it to do so, knowing that the

Noteholders had already sought to rescind the automatic acceleration and had moved to lift the

automatic stay to the extent necessary to do so.  4/20/2015 Trial Tr. 212:19-213:1, 214:19-215:5

(Horton Test.); *see also* PX 100 at 1 (rescission notice sent on June 4, 2014); Uncontested Facts

¶ 12 (Stay-Applicability Motion filed on May 15, 2014).  EFIH took the risk that the stay would

ultimately be lifted, in order to "lock in [the DIP Financing's] low pricing."  PX 87 at 11-12.

## I.     THE NOTEHOLDERS WILL SUFFER GREAT HARM IF THE STAY IS NOT LIFTED TO PERMIT RESCISSION

**42.**     Denying the Noteholders their contractual right to rescind acceleration would inflict

significant financial harm on the Noteholders.  "The only thing that stands in the way" of the

Noteholders receiving a makewhole payment is that the Notes automatically accelerated,

Summary Judgment Findings of Fact and Conclusions of Law ¶ 69, and if the stay is modified to

allow the Noteholders to rescind that acceleration, the Noteholders will be entitled to the

makewhole (subject to any defenses EFIH may have if it turns out to be insolvent).  *Id.*

Conversely, absent payment of the makewhole, the Noteholders will suffer material financial

loss because the Noteholders will receive substantially less cash than they contracted to receive

over the life of the Notes.  4/20/2015 Trial Tr. 136:19-137:3 (McCarty Test.); 4/21/2015 Trial Tr.

66:16-67:8 (Cacioppo Test.).  This harm is exacerbated where, as here, there were no

21

opportunities for reinvestment in a comparable investment paying a comparable interest rate at the time of the redemption because market interest rates had declined markedly.  *See supra* ¶ 40.

43.    EFIH's repayment of the Noteholders' principal and all accrued, undisputed interest did not make the Noteholders whole. 4/20/2015 Trial Tr. 70:7-20 (Kearns Test.).  The Noteholders were entitled under the Indenture to continue to receive accrued interest until at least the First Call Date, and a redemption payment if EFIH redeemed the Notes then (or to continue to receive accrued interest if it did not).  4/20/2015 Trial Tr. 56:22-57:19 (Kearns Test.).  Instead, they have received neither.  4/20/2015 Trial Tr. 60:25-61:19 (Kearns Test.).

44.    It is reasonable to assume that EFIH would have taken advantage of the significantly lower interest rates available in the market, 4/21/2015 Trial Tr. 24:14-20 (Horton Test.); 4/21/2015 Trial Tr. 103:16-25 (Cacioppo Test.), and redeemed the Notes on the First Call Date. 4/21/15 Trial Tr. 123:10-25 (Auerbach Test.); 4/21/15 Trial Tr. 146:6-147:4 (Greene Test.); 11/20/2014 Moldovan Dep. 215:15-20.  Based on that assumption, the interest payments that the non-settling Noteholders would have received from June 19, 2014 through December 1, 2015, would have totaled approximately $339 million.  4/20/2015 Trial Tr. 80:7-81:8 (Kearns Test.). In addition, the Redemption Premium that the non-settling Noteholders would have received on the First Call Date would have been approximately $115 million.  4/20/2015 Trial Tr. 218:23-220:2 (Horton Test.).[6]

45.    Absent the June 19, 2014 refinancing, the non-settling Noteholders would have therefore received $339 million in interest payments, plus the $115 million Redemption Premium, for a

---

[6] If EFIH had not chosen to redeem the Notes at the First Call Date, and it instead had kept the Notes outstanding until their stated maturity in 2020, the Noteholders would have received even more on their investment in the Notes. In particular, the Noteholders would have continued to receive semi-annual interest payments of $116 million for the next six years, totaling more than $1.4 billion. 4/20/2015 Trial Tr. 82:11-25 (Kearns Test.). Thus, the assumption that EFIH would in any event have called the Notes on the First Call Date causes the calculation of the harm to the Noteholders from EFIH's decision instead to redeem the Notes on June 19, 2014, to be less, not more, than it would otherwise be.  *Id.* at 83:1-6.

total of $454 million.  That sum when discounted to present value using the discount rate set

forth in the Indenture comes to $431 million, which is the same amount as the makewhole owed

under the Indenture as of June 19, 2014.  4/21/2015 Trial Tr. 146:6-147:4 (Greene Test.);

4/20/2015 Trial Tr. 76:4-22, 80:7-82:6 (Kearns Test.); 4/20/2015 Trial Tr. 194:11-19, 197:5-7

(Horton Test.).  The makewhole that those non-settling Noteholders would be owed if the stay

were lifted would compensate them for those lost payments.  4/20/2015 Trial Tr. 145:5-11

(McCarty Test.).

**46.**    The makewhole amount was material to the Noteholders relative to the overall principal

balance of the Notes.[7]  4/20/2015 Trial Tr. 101:1-10 (Kearns Test.).  Specifically, the makewhole

was, after being discounted to present value, 18.7 "points" on their overall investment.

4/21/2015 Trial Tr. 69:8-24 (Cacioppo Test.); 4/20/2015 Trial Tr. 100:19-25 (Kearns Test.).

Thus, for every million dollars a Noteholder invested in the Notes, the failure to pay a

makewhole would cost the investor $187,000.  4/21/2015 Trial Tr. 69:11-70:25 (Cacioppo Test.).

**47.**    To be sure, since June 19, 2014, the non-settling Noteholders have been able to reinvest

the principal of the Notes that they were repaid.  But the evidence is uncontroverted that because

of the lower-interest rate environment, the non-settling Noteholders have been unable to reinvest

the principal that they were paid in June of 2014 in a vehicle of comparable credit paying

anywhere near a 10% annual rate of interest.

**48.**    Mr. Kearns, one of the Noteholders' experts, testified about the yields on, what he termed,

"goalpost" investments as of June of 2014.  First, Mr. Kearns looked at senior unsecured notes

issued by Oncor, which were the most junior notes issued by Oncor itself.  4/20/2015 Trial Tr.

97:11-20 (Kearns Test.).  The yield on those notes, adjusted for a maturity of 17.5 months (the

---

[7] The outstanding principal balance of the Notes held by the non-settling Noteholders was approximately $2.298 billion.  4/20/15 Trial Tr. 75:5-11 (Kearns Test.).

period between the date of redemption of the Notes, June 19, 2014, and their First Call Date, December 1, 2015), was 0.78%. *Id.*; *see also* Plaintiff's Dem. 1. According to Mr. Kearns's calculation, had the non-settling Noteholders reinvested their repaid principal and accrued interest in the adjusted Oncor notes in June 2014, they would have suffered a net loss of $428 million when compared to the stream of payments the Noteholders would have received on the Notes through December 1, 2015. Mr. Kearns acknowledged, however, that the Oncor notes were somewhat less risky than the EFIH Notes and therefore, had a lower yield than an investment that could be considered comparable to the Notes. *Id.*

49.    As the opposite "goalpost," Mr. Kearns looked at the DIP Financing. The Noteholders had the opportunity to participate in the DIP Financing at par, but only if they accepted the Debtors' settlement offer to settle their makewhole claim for only 25 cents on the dollar. 4/21/2015 Trial Tr. 52:1-14 (Horton Test.). Had the non-settling Noteholders wanted to participate in the DIP Financing without agreeing to the settlement and giving up most of their makewhole claim, they would have had to purchase the debt on the secondary market, where the DIP notes traded above par, resulting in a lower yield of approximately 3.61%. 4/20/2015 Trial Tr. 92:24-94:13 (Kearns Test.). Moreover, Mr. Kearns opined, without contradiction, that the DIP Financing, which had a credit rating of BB minus, was, as of June 19, 2014, somewhat riskier than the Notes because the tenor of the DIP Financing was longer than 17.5 months and the amount of the DIP ($5.4 billion) exceeded the amount of the Notes; accordingly, a bond with comparable credit to the Notes would have a lower yield than the DIP Financing. 4/20/2015 Trial Tr. 96:22-97:10 (Kearns Test.). In any event, even if the non-settling Noteholders had reinvested their repaid principal and accrued interest in the DIP Financing (at 3.61%) in June 2014, they would still have suffered a net loss of $333.7 million when compared to the stream of

interest payments, plus the Redemption Premium, that the Noteholders would have received on the Notes through December 1, 2015. 4/20/2015 Trial Tr. 97:2-10 (Kearns Test.); Plaintiff's Dem. 1.

**50.** Mr. Kearns's testified, again without contradiction, that the most comparable investments to the Notes as of June 19, 2014—BB-rated bonds with a maturity of 17.5 months—fell between the two "goalposts." 4/20/2015 Trial Tr. 97:21-98:10 (Kearns Test.). These bonds matched the credit rating and the maturity of the Notes, assuming that EFIH would have redeemed the Notes on the First Call Date. 4/21/2015 Trial Tr. 29:23-25 (Horton Test. that Notes were rated "double B" by the rating agencies). As of June 2014, the composite implied yield on BB-rated bonds with a maturity of 17.5 months was 1.74%. 4/20/2015 Trial Tr. 91:25-92:24, 97:21-98:10 (Kearns Test.); Plaintiff's Dem. 1. Had the non-settling Noteholders reinvested their repaid principal and accrued interest in those BB-rated bonds in June 2014, they would have suffered a net loss of $395.9 million when compared to the stream of payments the Noteholders would have received on the Notes through December 1, 2015. 4/20/2015 Trial Tr. 97:21-98:10 (Kearns Test.); Plaintiff's Dems. 1 & 2.[8]

**51.** A demonstrative prepared by Mr. Kearns showing these calculations is reproduced below. EFIH did not dispute any of Mr. Kearns's calculations, the underlying data, or his conclusions.

---

[8] Mr. Kearns also reviewed Bloomberg indices for B-rated bonds, and testified that as of June 2014, the composite implied yield on B-rated bonds with a maturity of 17.5 months was 2.01%. Had the non-settling Noteholders reinvested their repaid principal and accrued interest in those B-rated notes in June 2014, they would have suffered net losses of $387 million when compared to the stream of payments the Noteholders would have received on the Notes through December 1, 2015. 4/20/2015 Trial Tr. 97:21-98:10 (Kearns Test.); Plaintiff's Dem. 1.

## Illustrative Impact of Lost Stream of Payments to Non-Participating 1st Lien 10% Noteholders through 12/1/15

**Illustrative Impact of Lost Stream of Payments to Non-Participating 1st Lien 10% Noteholders through 12/1/15**

($ in millions)

**Calculation of Lost Stream of Payments**

| | | |
|---|---|---|
| Non-Participating 1st Lien 10% Notes | $ | 2,297.6 |
| Coupon Rate | | 10.18% |
| Annual Interest Payments | $ | 233.9 |
| Years from First Call Date (6/19/14 through 12/1/14) | | 1.45 |
| Total Interest Payments To 1st Lien Noteholders | $ | 339.1 |
| Call Payment at 1st Call Date | | 114.9 |
| Total Payments to NP 1st Lien Noteholders | $ | 454.0 |

**Illustrative Reinvestment Scenarios (g)**

| | EFIH DIP (a) | | B Rated Credit (b) (e) | | BB Rated Credit (c) (e) (f) | | Oncor Sr. Unsec. Notes (d) | |
|---|---|---|---|---|---|---|---|---|
| Non-Participating 1st Lien 10% Notes | $ | 2,297.6 | $ | 2,297.6 | $ | 2,297.6 | $ | 2,297.6 |
| Reinvestment Rate | | 3.61% | | 2.01% | | 1.74% | | 0.78% |
| Annual Reinvestment Interest Payments | $ | 82.9 | $ | 46.2 | $ | 40.0 | $ | 17.9 |
| Years from First Call Date (6/19/14 through 12/1/14) | | 1.45 | | 1.45 | | 1.45 | | 1.45 |
| Total Reinvestment Interest Payments | $ | 120.3 | $ | 66.9 | $ | 58.1 | $ | 26.0 |
| | | | | | | | | |
| Total Payments to NP 1st Lien Noteholders | $ | 454.0 | $ | 454.0 | $ | 454.0 | $ | 454.0 |
| Total Reinvestment Interest Payments | | 120.3 | | 66.9 | | 58.1 | | 26.0 |
| Net Lost Stream of Payments | $ | 333.7 | $ | 387.0 | $ | 395.9 | $ | 428.0 |

(a) Per Bloomberg, EFIH DIP was quoted at 101.25 on June 19, 2014, yielding 3.61% through maturity.
(b) Bloomberg USD US Composite B BVAL Curve
(c) Bloomberg USD US Composite BB BVAL Curve
(d) Duration adjusted yield on Oncor Senior Unsecured 2.15% Notes maturity June 1, 2019.

(e)

| | 1 Year Rate | 2 Year Rate | Interpolated 1.45 Yr. Rate |
|---|---|---|---|
| Bloomberg US Comp. B Curve | 1.57% | 2.55% | 2.01% |
| Bloomberg US Comp. BB Curve | 1.43% | 2.13% | 1.74% |

(f) I utilized the Bloomberg Curve Fitter tool to calculate the interpolated rate of 2.021% based on the S&P rated BB-, BB and BB+ bonds used
   in my make whole analysis. Utilizing this rate in my model results in an approximate $9.3 million reduction to "Net Lost Stream of Payments"
   from $395.9 million to $386.6 million.
(g) Assumes the holder will be able to reinvest the capital on 6/19/14

**52.** Mr. Kearns' conclusions were corroborated by testimony from portfolio managers at two of the non-settling Noteholders that hold a significant portion of the outstanding Notes: Halcyon and BlueMountain. Both testified that they were not aware, as of June 19, 2014, of any investment opportunities of similar credit quality to the Notes, paying interest anywhere approaching 10% per annum. 4/21/2015 Trial Tr. 144:8-16, 160:11-17 (Greene Test.); 4/21/2015 Trial Tr. 108:23-109:6 (Auerbach Test.); 4/20/2015 Trial Tr. 145:12-20 (McCarty Test.); 11/20/2014 Moldovan Dep. 215:21-216:2.

**53.** The actual investment returns of these funds support this testimony. The overall rate of return between June 19, 2014 and the date of the trial for the Halcyon funds that owned the Notes, on a composite basis, was approximately negative two to negative three percent. 4/21/15

Trial Tr. 144:19-24 (Greene Test.).  Thus, Halcyon's harm was exacerbated, not mitigated, by

reinvesting.

54.    Between June 19, 2014 and the date of the hearing, the composite returns of the funds

managed by BlueMountain that held the majority of BlueMountain's position in the Notes was

between two and three percent positive.  4/21/15 Trial Tr. 106:11-14 (Auerbach Test.).  But,

while these BlueMountain funds did not lose money from reinvesting, their return was

significantly less than it would have been had they continued to receive accrued interest (and the

Redemption Premium) on the Notes, or payment of the makewhole.  Indeed, reflecting the lack

of comparable investment opportunities, the BlueMountain funds were not fully invested in the

market in June 2014 even before those funds received cash for the principal amount of the EFIH

Notes they held:  of BlueMountain's $20 billion under management, more than $1 billion was

not invested.  4/21/15 Trial Tr. 104:10-22 (Auerbach Test.).  That money was in a money market

account earning annual interest of less than a tenth of one percent.  4/21/15 Trial Tr. 105:8-19

(Auerbach Test.).  Thus, although money is fungible, much—if not all—of the money returned to

BlueMountain on June 19, 2014 necessarily generated little, if any, return.[9]

55.    Accordingly, based on the testimony of Mr. Kearns, the two Noteholder fact witnesses,

and other uncontroverted evidence that is part of the record, a non-settling Noteholder could not

have generated the same return as the Notes without taking on substantial additional risk.  The

requirement set forth in the Indenture that EFIH pay a makewhole if it redeemed the Notes

before December 1, 2015, existed to address this precise circumstance.  4/21/15 Trial Tr. 103:11-

---

[9] Even if the Noteholders were able to "mitigate" their financial loss somewhat through reinvesting, the Court is not determining in Phase One whether the amount of the makewhole specified in the Indenture—$431 million— constitutes the allowed amount of the Noteholders' claim or whether an alternative measure of "damages" may be appropriate—an issue the Court could potentially consider in Phase Two.  Rather, the Court merely finds that the Noteholders will suffer significant financial harm if the stay is not lifted to allow them to rescind acceleration.

104:5, 113:10-18 (Auerbach Test.); 4/21/15 Trial Tr. 145:20-146:5 (Greene Test.); 4/20/2015

Trial Tr. 145:12-20 (McCarty Test.); 4/20/2015 Trial Tr. 94:14-22 (Kearns Test.).  Depriving the

Noteholders of their right to rescind acceleration would therefore cause the Noteholders to suffer

the financial loss that the makewhole was intended to prevent.

**56.**    The contractual right to rescind acceleration was material to investors in deciding to

purchase the Notes.  4/21/15 Trial Tr. 98:13-100:18, 103:11-104:5 (Auerbach Test.); 4/21/15

Trial Tr. 138:13-25 (Greene Test.); *see also* 4/21/2015 79:20-80:20 (Cacioppo Test. that

rescission right is important to investors whenever notes can automatically accelerate).  If that

contractual right is denied because of the automatic stay, the Noteholders will suffer meaningful

financial harm.

**57.**    That harm is unchanged by the fact that EFIH filed for bankruptcy.  The Notes are

oversecured, and EFIH is presumed to be solvent, so there is no question for purposes of Phase

One that EFIH could pay the makewhole (and all other claims against it) in full.  4/20/2015 Trial

Tr. 160:6-13, 173:9-22 (McCarty Test.); 4/21/2015 Trial Tr. 72:19-73:2 (Cacioppo Test.).  The

Noteholders have lost the stream of payments (or makewhole) that they contracted to receive

from EFIH.  That loss was no less simply because EFIH was in bankruptcy.  4/20/2015 Trial Tr.

158:4-21 (McCarty Test.); 4/21/2015 Trial Tr. 72:13-18 (Cacioppo Test.); 4/20/2015 Trial Tr.

119:14-120:4 (Kearns Test.).

**58.**    In sum, unless this Court grants relief from the stay, the Noteholders will suffer a

substantial financial loss of as much as $431 million, which was a materially significant

percentage of their overall investment in the Notes.  The Noteholders have been unable to

reinvest their returned principal and accrued interest to generate a comparable return, at least

without assuming substantial additional risk.  And the Noteholders will be deprived of their

contractual right to rescind acceleration and, following such rescission, their contract right to the payment stream on the Notes, or, in the event of an optional redemption before December 1, 2015, as happened here, a comparable makewhole payment.

## II.    EFIH WILL NOT BE PREJUDICED BY RELIEF FROM THE STAY, AND TO THE EXTENT IT WILL BE HARMED AT ALL, THE HARM TO THE NOTEHOLDERS IS FAR GREATER

### A.    Benefits to EFIH

**59.**    EFIH voluntarily repaid the Notes knowing that the Court might decide to lift the stay to permit the Noteholders to rescind acceleration.  It did so because it believed that it would receive substantial benefits from refinancing the Notes even if the stay were ultimately lifted.

**60.**    By refinancing the Notes on June 19, 2014, EFIH achieved substantial interest savings. The annual interest rate on the DIP Financing was 4.25%; in contrast, EFIH had been paying a blend of between 10% and 6.875% per year on the Notes, with the vast majority of those Notes earning interest at 10% annually.  4/20/2015 Trial Tr. 216:19-217:4 (Horton Test.).

**61.**    As the Debtors' CFO Mr. Keglevic, testified, EFIH sought authority to, and did, refinance the Notes because it had "the opportunity to pay [them] off and . . . replac[e] [them] with DIP financing, . . . lower[ing]] the interest costs."  12/10/2014 Keglevic Dep. 182:22-183:23, 186:10-187:1 ("by paying [the Notes] sooner we could replace it with cheaper cost of money").

**62.**    EFIH has saved $14.4 million in interest costs each month since it refinanced the Notes. 4/20/2015 Trial Tr. 217:5-8 (Horton Test.); 12/9/2014 Horton Dep. 56:14-20, 60:18-61:11.  As a result, from the date of the repayment (June 19, 2014) to the First Call Date (December 1, 2015), EFIH will save approximately $260 million in interest payments.  4/20/2015 Trial Tr. 218:3-22 (Horton Test.).

63.     EFIH's monthly interest savings would have been even greater—more than $17 million per month—had it borrowed in the DIP Financing only enough to repay the Notes.  Instead, EFIH borrowed approximately $1.5 billion more than it needed to repay the Notes,  4/20/2015 Trial Tr. 220:3-14 (Horton Test.), and used some of those additional proceeds to partially pay down $750 million in principal, interest and other charges on its Second Lien Notes.  4/20/2015 Trial Tr. 198:4-6 (Horton Test.).  This saved EFIH at least an additional $66 million in interest payments through December 31, 2015, and will save it even more if EFIH does not emerge from bankruptcy (not only have a plan confirmed, but have it go effective) until sometime in 2016, as now appears likely.  4/20/2015 Trial Tr. 220:3-14, 222:17-223:5, 223:10-14 (Horton Test.); PX 112.

64.     Moreover, EFIH also has avoided the contractual obligation to pay the Redemption Premium it would have owed had it redeemed the Notes on December 1, 2015.  4/20/2015 Trial Tr. 218:23-220:2 (Horton Test.).  That payment would have been $115,000,000 in respect of the Notes held by the non-settling Noteholders, PX 53 at 5; PX 83 at 2, and even more— $199,250,000—for all the Notes held by all of the Noteholders.  *Id.*

65.     Thus, EFIH saved at least $441 million—$260 million in interest payments through December 1, 2015; $115 million for the Redemption Premium that would have been due the non-settling Noteholders had EFIH redeemed the Notes held by those holders on December 1, 2015, in accordance with the terms of the Indenture; and $66 million in interest payments on the Second Lien Notes (through December 31, 2015)—by refinancing the Notes before the First Call Date.  These benefits to EFIH *exceed* the full amount of the makewhole payment that could be due to the Noteholders (as of June 19, 2014), and EFIH's savings could be even greater if it does not emerge from bankruptcy until sometime in 2016.  As Mr. Horton admitted, EFIH keeps these

benefits whether it has to pay the makewhole or not.  4/21/2015 Trial Tr. 24:25-25:13 (Horton Test.).

66.    In addition to these interest savings, payment of the makewhole to the Noteholders will generate a net operating loss that EFIH and its parent EFH may use to shelter income for federal income tax purposes.  PX 141 at 5.

### B.    Lack of Great Prejudice to EFIH If the Stay Is Lifted

67.    If relief from the stay is granted, the Noteholders' contract claim for the makewhole will (subject to Phase Two of this litigation) be recognized as an allowed claim against EFIH.  The non-settling Noteholders will not be entitled to immediate payment.  Rather, their right to payment will remain subject to these bankruptcy proceedings, and their allowed claim will receive such treatment under a confirmed plan or otherwise as the law permits.

68.    Moreover, in Phase One of the Stay-Applicability Motion, EFIH is presumed solvent and able to pay all allowed claims of EFIH's creditors in full.  Uncontested Facts ¶ 17.  Thus, lifting the stay to allow the Noteholders to exercise their contractual right to rescind the Notes' acceleration will not reduce the recovery of any other creditor of EFIH.  To the contrary, EFIH will be able to pay the makewhole, and any other allowed claims in full.

69.    Granting relief from the stay for the Noteholders to rescind acceleration will also have no effect on any operations, employees, or customers of EFIH.  EFIH is an intermediate holding company.  4/20/15 Trial Tr. 184:6-7 (Horton Test.).  It has no physical operations, employees, or customers.  4/20/15 Trial Tr. 184:8-10, 191:3-9. (Horton Test.).

70.    In addition, lifting the stay will not cause EFIH to lose any assets or reduce the value of any of those assets.  4/20/2014 Trial Tr. 184:6-186:1, 186:8-10, 191:25-193:4 (Horton Test.); PX

52 at 14.  The Noteholders do not seek to foreclose on EFIH's interest in Oncor, or any of

EFIH's other assets.

**71.**     EFIH is a direct subsidiary of EFH.  PX 37 at 2.  EFIH's principal asset is its ownership

of 100% of Oncor Electric Delivery Holdings LLC ("Oncor Holdings"), a holding company,

which, in turn, holds an approximately 80% interest in Oncor Electric Delivery Company LLC

("Oncor"), a regulated electricity transmission and distribution company.  4/20 Trial Tr. 182:13-

17 (Horton Test.); PX 30 at 27; PX 52 at 5; PX 77 at 10.

**72.**     Neither Oncor Holdings nor Oncor is in bankruptcy.  4/20/2015 Trial Tr. 184:14-16

(Horton Test.).  Rather, Oncor Holdings and Oncor are "ring-fenced" from EFIH.  4/20/2015

Trial Tr. 184:17-18 (Horton Test.); PX 1 at 54-55.  Neither is liable for any debt of EFIH or of

any of the other Debtors.  4/20/2015 Trial Tr. 184:25-185:15 (Horton Test.)

**73.**     Accordingly, Oncor's operations will also not be affected if this Court grants the

Noteholders relief from the stay to rescind acceleration of the Notes.  4/20/2015 Trial Tr. 184:25-

185:15 (Horton Test.); PX 95 at 30.

**74.**     Therefore, the only potentially adverse effect for any of the Debtors' constituencies from

granting that relief is that the recovery that EFIH's equity holder EFH (and EFH's creditors and

shareholders) may obtain from EFIH's interest in Oncor may be reduced somewhat because

EFIH will first have to satisfy the Noteholders' claim for the makewhole.  4/20/2014 Trial Tr.

184:6-186:1, 186:8-10, 191:25-193:4 (Horton Test.).

**75.**     It is not clear, to the extent that it is even a relevant consideration, that EFH's creditors

(including TCEH, which may hold claims against EFH) will be affected at all if the stay is lifted

here.  EFIH is seeking to auction its interest in Oncor, and it is not known at this time what the

highest bid will be.  That bid may end up being sufficiently high to provide a dividend to EFH

that is sufficient to pay all EFH creditors in full even if the Noteholders receive the full $431

million makewhole amount specified in the Indenture.  The parties stipulated for purposes of

Phase One that EFIH is solvent, and the Court did not allow the Noteholders to present evidence

of the extent of that solvency.  4/20/2015 Trial Tr. 36:19-37:5 ("THE COURT: … I made it clear,

and I continue to make it clear, that I'm assuming solvency, that I don't want any testimony as to

the extent of solvency.  I'm not interested in hearing arguments from either side whether this

clears the table or the debt at the EFH level.").  The Court cannot, therefore, find that EFH's

creditors will be harmed if the stay is modified to permit the Noteholders to rescind acceleration.

**76.**     As for EFH's equity holders, the sponsors, they are three sophisticated private equity

firms, PX 30 at 23, and are charged with the knowledge that their right to recover from the value

of Oncor would be junior to that of EFIH's (and EFH's) own creditors.

**77.**     EFH's interest in Oncor is structurally subordinate to that of EFIH.  4/20/2015 Trial Tr.

183:3-5 (Horton Test.).  EFIH owns 80% of Oncor, whereas EFH owns merely the stock of

EFIH.  4/20/15 Trial Tr. 182:21-2 (Horton Test.).  When issuing its debt, EFH told its creditors

that EFH's interest in Oncor was structurally junior and subordinate to that of the creditors of

EFIH.  4/20/15 Trial Tr. 184:2-5 (Horton Test.); PX 52 at 8.  Indeed, when any of the Debtors

issued debt, it specified which Debtor would be obligated on the particular issuance.  4/20/2015

Trial Tr. 187:8-16 (Horton Test.).  The Debtors also specified which assets were owned by each

Debtor, including that only EFIH held a direct interest in Oncor Holdings.  4/20/2015 Trial Tr.

188:18-22 (Horton Test.).  Each of EFH, EFIH, and TCEH maintained its own separate books

and records, 4/20/2015 Trial Tr. 190:17-19 (Horton Test.), and made its own filings with the

SEC, 4/20/2015 Trial Tr. 190:4-16 (Horton Test.).

### C.    Balancing the Harms

**78.**    The Noteholders seek relief from the stay to *vindicate* their contractual right to rescind

acceleration as specified in the Indenture.  In contrast, EFIH seeks to maintain the stay to *deny*

the Noteholders that contractual right (and has the burden of demonstrating such maintenance is

appropriate).  This helps frame the Court's assessment of the relative harms suffered by the

parties.  If the Noteholders are not granted relief from the stay, their right under the Indenture

will be lost, whereas if the stay is maintained, EFIH will obtain a right that it did not bargain for

in the Indenture.

**79.**    The benefits that EFIH has already obtained (and will continue to obtain) from its

refinancing of the Notes are also significant in weighing the relative harms, as is the relative

financial importance to EFIH and the Noteholders from the stay relief issue.  Even if the full

$431 million will be payable by EFIH if this Court grants relief from the stay, that amounts to a

small percentage of EFIH's total debt—around 5% (and an even smaller percentage of the total

debt on the "E-side" of the Debtors, or of the indebtedness of all the Debtors as a whole).  By

contrast, the amount of the makewhole is a much larger percentage of the Noteholders' principal

investment—close to 19%.  4/20/2015 Trial Tr. 201:4-21 (Horton Test.); 4/20/2015 Trial Tr.

101:1-10 (Kearns Test.).

**80.**    EFIH speculates that if the Court grants the Noteholders relief from the stay, the holders

of the EFIH Second Lien Notes and PIK Notes may then seek relief from the stay to rescind

acceleration of their notes.  But whether those noteholders would be entitled to relief from the

stay to rescind acceleration, or any other relief, is not presented here.  EFIH does not concede

that the holders of either the Second Lien or PIK Notes would be entitled to rescind acceleration

and obtain payment of any makewhole under their indentures even if the Noteholders were

granted relief from the stay and paid their makewhole.  4/21/2015 Trial Tr. 54:15-22 (Horton

Test.).  Neither the holders of Second Lien Notes, nor the holders of the PIK Notes, have filed a

motion for relief from the stay, 4/21/15 Trial Tr. 53:15-24 (Horton Test.), and, with the exception

of a relatively small portion of the Second Lien Notes, PX 112, those notes have not yet even

been repaid by EFIH.  The amount of any potential makewhole that might under some

circumstances be payable to these holders declines every day and if sufficient time passes will be

nonexistent.  And these noteholders may settle their various claims, 4/21/2015 Trial Tr. 55:3-6

(Horton Test.); 4/21/2015 Trial Tr. 55:7-15 (Horton Test.), or otherwise receive treatment under

a plan that does not constitute a redemption.  All of this is unknown, and the Court of course

does not make any finding now whether and under what circumstances the Second Lien Notes

and the PIK Notes may be entitled to rescind acceleration of their notes and to payment of a

makewhole.  The Court's only point is that EFIH's speculation that it will be harmed if the Court

grants relief from the stay to permit the Noteholders to rescind the acceleration of their Notes,

because that may lead to similar relief from others, is just that—speculation.

**81.**     In any event, for purposes of Phase One, EFIH is presumed solvent and able to pay *all* of

its allowed claims in full.  Thus, even if EFIH must eventually pay a makewhole to the holders of

both the Second Lien Notes and the PIK Notes, it is presumed that EFIH will be able to pay

those claims in full.

**82.**     It is likewise entirely speculative that lifting the stay to allow the Noteholders to rescind

acceleration of the Notes will damage EFIH's efforts to have a plan confirmed.  As Mr. Horton

testified, EFIH will continue in its efforts to negotiate and propose a confirmable plan even if the

Noteholders' Stay-Applicability Motion is granted.  4/21/2015 Trial Tr. 58:10-15 (Horton Test.).

Before filing for bankruptcy, the Debtors spent substantial time working on "Project Olympus,"

which would have kept EFIH out of bankruptcy, and then spent many months developing a "Restructuring Support Agreement," which was the initial foundation for this bankruptcy. Both structures fell by the wayside. Both times, the Debtors continued to press on, and the Court expects that they will do the same here.

83.     Further, the Debtors' current filed plan provides for payment of the makewhole if it is allowed, undercutting any suggestion that the Debtors cannot reorganize if the make whole is allowed. *See* PX 124 Plan ¶ III(B)(19). And other parties in interest have been working on their own plans, including a REIT-based proposal by some TCEH creditors "that makes the E side irrelevant, [as] everybody gets what their legal entitlement is as determined by the Court." Hrg. Tr. (4/14/2015) 68:6-13 (Shore, TCEH Ad Hoc Group).

84.     Moreover, because EFIH's predominant asset is its interest in Oncor, which is currently being marketed to would-be buyers, any attempt to quantify the effect of paying a makewhole on a plan would be speculation. If Oncor's value is sufficiently high, there may be no harm whatsoever to any plan. Moreover, if a plan were in place, and even if the allowance of a makewhole claim necessitated revisions to that plan, the Court does not believe that the relatively small amount of this makewhole claim would preclude an orderly reorganization.

85.     In contrast to the ephemeral harms that EFIH may or may not suffer if the stay is lifted, the Noteholders have proven that they will suffer real, concrete financial loss if the stay is not modified to allow them to rescind acceleration. The hardship to the Trustee and the Noteholders by maintenance of the automatic stay considerably outweighs the prejudice, if any, to EFIH.

## III.     THE NOTEHOLDERS WILL PREVAIL ON THE MERITS IF THE STAY IS MODIFIED

86.     This Court has already held that the Noteholders have the contractual right to rescind acceleration and, were it to modify the stay to permit the Noteholders to exercise that right, "the

automatic default would be waived, the Notes would no longer be immediately due and the refinancing [of the Notes in June 2014] would require payment of the Applicable Premium." Summary Judgment Findings of Fact and Conclusions of Law ¶¶ 63-66, 69.  Accordingly, the Noteholders will prevail on the merits if this Court grants relief from the stay.

## CONCLUSIONS OF LAW

### I.       JURISDICTION

**1.**       The Court has jurisdiction over this Stay-Applicability Motion pursuant to 28 U.S.C. §

1334(b).  This proceeding concerns relief from the automatic stay and/or the allowance of a

claim against the bankruptcy estate of EFIH.  Therefore, it arises under the Bankruptcy Code or

in a case under the Code, and is a core proceeding pursuant to 28 U.S.C. § 157(b).

**2.**       Venue is proper pursuant to 28 U.S.C. §§ 1408-09.

### II.      RELIEF FROM THE AUTOMATIC STAY

**3.**       The Bankruptcy Code authorizes bankruptcy courts to grant relief from the stay for

"cause."  11 U.S.C. § 362(d)(1).  Courts are to determine "cause" based on "the totality of the

circumstances" in each particular case.  *In re Wilson*, 116 F.3d 87, 90 (3d Cir. 1997).  The factors

courts generally use in determining whether cause exists, a test developed in the context of

deciding whether to permit litigation to proceed outside the bankruptcy court,[10] are (1) whether

any great prejudice to either the bankrupt estate or the debtor will result from a lifting of the stay;

(2) whether the hardship to the non-bankrupt party by maintenance of the stay considerably

outweighs the hardship to the debtor; and (3) the probability of the creditor prevailing on the

merits.  *In re Downey Fin. Corp.*, 428 B.R. 595, 609 (Bankr. D. Del. 2010).

**4.**       On a motion to lift the stay, "(1) the party requesting such relief has the burden of proof

on the issue of the debtor's equity in property; and (2) the party opposing such relief has the

burden of proof on all other issues."  11 U.S.C. § 362(g).  Here, there is no issue about EFIH's

equity in property; the Trustee and Noteholders are not seeking to foreclose on any such property.

Accordingly, while the Trustee and Noteholders may need to make an initial showing of cause,

---

[10] *See In re Rexene Prods. Co.*, 141 B.R. 574, 576 (Bankr. D. Del. 1992) (citing *In re Fernstrom Storage & Van Co.*, 938 F.2d 731, 735 (7th Cir. 1991)).

the ultimate burden of proof rests on EFIH. *In re RNI Wind Down Corp.*, 348 B.R. 286, 299

(Bankr. D. Del. 2006); *In re Pursuit Athletic Footwear, Inc.*, 193 B.R. 713, 718 (Bankr. D. Del.

1996); *In re Scalera*, 521 B.R. 513, 517 (Bankr. W.D. Pa. 2014); *In re Stranahan Gear Co.*, 67

B.R. 834, 837 (Bankr. E.D. Pa. 1986).

**5.**     Though it made no such claim before this Court issued its summary judgment order,

EFIH now asserts that the standard for retroactive stay relief applies here.  The Court disagrees.

As discussed above, while EFIH has already repaid the Notes, the Trustee and the Noteholders

moved for relief from the stay to rescind acceleration before that repayment occurred.

Furthermore, the order granting EFIH's DIP Financing motion and authorizing repayment of the

Notes provided that the repayment would not have "any precedential, evidentiary, law of the case,

or preclusive effect" with respect to the Trustee's and Noteholders' pending motion for relief

from the stay, including whether "any acceleration of the EFIH First Lien Notes is subject to

rescission."  No. 14-10979, D.I. 859 ¶ 40(b).  That provision, to which EFIH agreed, benefitted

EFIH.  By deferring litigation of the Noteholders' Stay-Applicability motion while preserving

the Noteholders' rights, the Order allowed EFIH to avoid the potential burden and delay of

litigating that motion—which has involved extensive briefing, months of discovery, and a three-

day trial—before EFIH could obtain authorization to repay the Notes and begin saving on

interest expense.  Accordingly, under the terms of the order, the June 19, 2014 repayment is

without prejudice to the status quo that existed before the repayment, when granting relief from

the stay would have allowed the Noteholders to send a notice rescinding acceleration before they

were repaid, such that the repayment would be an optional redemption triggering the makewhole.

Thus, the Court may grant prospective relief from the stay with the same effect as if the Notes

had not yet been repaid.  There is therefore no need to consider retroactive relief.[11]

### B.    There Will be No Great Prejudice to EFIH and the Estate If the Stay Is Lifted

6.    The first factor the Court considers is whether lifting the stay will result in any great

prejudice to EFIH or to its estate.  The Trustee and the Noteholders presented substantial

evidence establishing a prima facie case that EFIH and its estate will not be greatly prejudiced if

relief is granted for the limited purpose of permitting the Trustee and the Noteholders to rescind

acceleration.  EFIH failed to meet its burden of proving that it will be greatly prejudiced if such

relief is granted.

7.    The Trustee and the Noteholders seek narrow relief.  They do not seek to foreclose on

collateral or to obtain immediate collection from the estate.  They seek relief from the stay for

the sole purpose of exercising their contractual right to rescind acceleration.  Such narrow relief

is "ministerial in nature."  *In re Texaco, Inc.*, 81 B.R. 804, 806 (Bankr. S.D.N.Y. 1988) (lifting

stay to permit indenture trustee to deliver a notice of acceleration without a demand for payment).

This case is thus unlike cases in which a creditor seeks to foreclose on the debtor's critical

operating assets or to pursue litigation of claims outside of the bankruptcy process, which could

interfere with an orderly liquidation or rehabilitation of the debtor.

---

[11] Relief *nunc pro tunc* would be warranted in any event.  The factors courts consider weigh in favor of granting relief *nunc pro tunc* here:  "(1) whether the creditor was aware of the filing or encouraged violation of the stay; (2) whether the debtor engaged in inequitable, unreasonable, or dishonest behavior; and (3) whether the creditor would be prejudiced."  *In re Myers*, 491 F.3d 120, 129 (3d Cir. 2007).  First, the Trustee and Noteholders were aware of EFIH's bankruptcy filing, which is why they filed a motion for relief from the stay *before* this Court issued its order approving the DIP Financing and obtained protection in that order reserving their rights.  Second, it would be inequitable for EFIH now to disavow that reservation of rights, to which it agreed and on which the Trustee and Noteholders relied.  Finally, the Trustee and Noteholders would be prejudiced by denying relief, as discussed below.  Courts have granted relief from the stay *nunc pro tunc*.  *See In re Coletta*, 380 B.R. 140 (Bankr. E.D. Pa. 2007), *aff'd*, 336 F. App'x 202 (3d Cir. 2009); *In re Jean-Francois*, 516 B.R. 699, 704 (E.D.N.Y. 2014); *In re Metropolitan Hosp.*, 131 B.R. 283, 291 (E.D. Pa. 1991).

**8.**      The Court has already held that the Noteholders have the right to rescind acceleration under the terms of the Indenture and state law.  EFIH agreed in the Indenture that the Trustee and the Noteholders may waive "any" default and rescind "any" acceleration of the Notes, including any such default and acceleration occasioned by EFIH's bankruptcy filing.  *See* Summary Judgment Findings of Facts and Conclusions of Law ¶¶ 63-66, 69.  Furthermore, as the Court has also held, if the Trustee and the Noteholders are permitted to enforce their right to rescind acceleration, the Notes will be decelerated and the June 19, 2014 refinancing will be an optional redemption requiring payment of the makewhole.  *See id.*  Accordingly, the Trustee and the Noteholders seek no more than that EFIH honor its contractual bargain and that they be allowed a claim in EFIH's bankruptcy case for what EFIH owes them under the Indenture as a matter of state law.

**9.**      Granting that limited relief will not result in any "great prejudice" to EFIH or its estate.  The unrebutted evidence at trial shows that recognizing the makewhole claim will not harm EFIH's operations, assets, or creditors.

**10.**     *No prejudice to EFIH's operations.*  As discussed above, EFIH is a holding company.  It has no physical operations, employees or customers.  Permitting the Noteholders to rescind acceleration therefore will not harm any business, employee or customer of EFIH.

**11.**     *No prejudice to EFIH's assets.*  As discussed above, EFIH will not lose its interest in Oncor if the Noteholders are not permitted to rescind acceleration.  Nor will the value of Oncor be diminished.  Oncor is "ring-fenced" from EFIH.  It has no liability for EFIH's debt to the Noteholders, including the makewhole.  And permitting the Noteholders to rescind acceleration, and therefore recognizing the makewhole, will not prevent EFIH from pursuing the on-going auction process to maximize Oncor's value.

41

**12.**    *No prejudice to EFIH's creditors.*  In Phase One, EFIH is presumed solvent and able to pay all allowed claims of its creditors in full.  Accordingly, if EFIH is solvent, recognizing the makewhole will not reduce the recovery of any other creditor of EFIH.

**13.**    EFIH introduced no evidence to the contrary.  It asserted that it would be greatly prejudiced if the stay is lifted because other noteholders (the holders of the Second Lien and PIK Notes) *might* then assert their own makewhole claims at some point in the future.  But as discussed above, that possibility is based on speculation.  EFIH does not concede that those noteholders would be entitled to rescind acceleration and obtain payment of any makewhole under their indentures, even if the First Lien Noteholders are granted relief from the stay and paid the makewhole specified in their Indenture.  Furthermore, the evidence shows that the circumstances surrounding any potential makewhole claims that may be brought by the holders of the Second Lien and PIK Notes are different from those involved here, and uncertain at present.  As noted, those other noteholders have not moved for relief from the stay to rescind acceleration; EFIH has not repaid any of their notes (other than a small portion of the Second-Lien Notes); and EFIH presented no evidence when, if ever, it will redeem those notes, making the existence and size of any potential makewhole claims, which decline in amount over time, speculative.  Accordingly, EFIH failed to introduce evidence establishing that lifting the stay to permit the Noteholders to rescind acceleration will prejudice EFIH by leading to similar relief, of comparable magnitude, for other noteholders.

**14.**    The only non-speculative effect of lifting the stay on EFIH will be the allowance of a claim by the Noteholders against EFIH that is valid under state law in accordance with a contract through which it has already enjoyed substantial benefits.  Moreover, even if it were assumed that the Second Lien and PIK Notes would also be entitled to relief from the stay (and would

have valid makewhole claims) were the stay lifted for the Noteholders to rescind acceleration, EFIH is presumed to be solvent and able to pay all allowed claims of all of its creditors in full, no matter the dollar amount of those claims.

15.     Under these circumstances, where the evidence shows that the only effect of lifting the stay on EFIH will be the allowance of a valid claim against it, and where EFIH is presumed solvent, lifting the stay will not result in any great prejudice to EFIH and its estate.  *See In re N.Y. Medical Group, P.C.*, 265 B.R. 408, 414 (Bankr. S.D.N.Y. 2001) (rejecting "the flawed premise that the payment of large allowed claims constitutes legal prejudice" and lifting stay to permit creditor to assert state-law claim against debtor); *see also In re O'Brien Envtl. Energy, Inc.*, 188 F.3d 116, 128 (3d Cir. 1999) (permitting creditor to file late proof of claim against reorganized debtor, concluding that "we cannot see how [the debtor] would be prejudiced, in the legal sense, by [the debtor's] having to pay [the creditor's] claim").  The Bankruptcy Code recognizes that a debtor's estate is not prejudiced when a solvent debtor pays a valid debt.  Thus, when a solvent debtor pre-petition pays what it validly owes a creditor, that payment cannot be avoided by the debtor and its estate in the bankruptcy.  *See* 11 U.S.C. § 547(b)(3) (paying antecedent debt is not a preference unless "made while the debtor was *insolvent*" (emphasis added)); *see also id.* §§ 548(a)(1)(B), 548(d)(2)(A) ("satisfaction of … antecedent debt of the debtor" is "value" and not a fraudulent transfer).  And when a solvent debtor seeks to confirm a plan of reorganization in bankruptcy, the Bankruptcy Code likewise provides that the debtor must post-petition pay all of its creditors in full before the debtor may retain any portion of the estate for itself and its equity holder.  *See id.* §§ 502(b), 1129(a)(2), 1129(a)(7), 1129(b).

16.     EFIH asserts that its estate will be greatly prejudiced if the stay is lifted because allowing the makewhole will reduce the dividend paid to EFIH's equity holder, EFH.  It argues that a

debtor-in-possession has a duty to act in the best interests of the estate as a whole, including both creditors and equity holders.  But while "the fiduciary duty of the trustee runs to shareholders as well as to creditors," "[o]ne of the painful facts of bankruptcy is that the interests of shareholders become subordinated to the interests of creditors."  *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985).  The Bankruptcy Code's absolute priority rule mandates that creditors must be paid in full before any value in the estate is distributed to equity.  *See* 11 U.S.C. §§ 725-726, 1129(b).  If the stay is lifted here and the Noteholders' claim is allowed, the dividend paid to EFH as an equity holder of EFIH may be somewhat less.  But EFIH and its estate will not be greatly prejudiced by the result that the Bankruptcy Code itself requires.

17.      Many cases involving a solvent debtor have lifted the stay to permit creditors to exercise their state-law rights, recognizing that the debtor and its estate are not "greatly prejudiced" if the debtor is required to honor its legal obligations to its creditors (and, in any event, that the hardship to the creditor from denying those rights considerably outweighs any hardship to the debtor).  *See In re Armstrong World Indus.*, No. 00-4471, Mem. Order (D. Del. Dec. 10, 2001) (lifting stay to permit creditors to sue debtor and insurers, finding that "[t]he Debtor is a solvent, going concern" and hence "no undue prejudice would inure to the Debtor" and "there would be minimal, if any, impact on the Debtor's resources available to pay other pre and post petition claimants"), *aff'd*, 106 F. App'x 785 (3d Cir. 2004) (unpublished); *Claughton v. Mixson*, 33 F.3d 4, 5-6 & nn. 2-4 (4th Cir. 1994) (affirming order lifting stay to permit creditor to enforce state-law judgment against debtor's estate; "[g]iven the solvency of the debtor's estate, we think the bankruptcy court correctly exercised its equitable power"; "[t]he court's decision did not harm the rights of the bankruptcy estate's creditors because the bankruptcy estate retained sufficient assets to pay in full all of the debtor's creditors pursuant to a plan of reorganization"); *In re*

*Premier Auto. Servs., Inc.*, 343 B.R. 501, 521 (Bankr. D. Md. 2006) (lifting stay where "solvent" debtor filed case with bad faith intent to "invok[e] the automatic stay" to "delay creditors"), *aff'd*, 492 F.3d 274 (4th Cir. 2007); *In re Novak*, 103 B.R. 403, 413-15 (Bankr. E.D.N.Y. 1989) (lifting stay where "solvent" debtor sought to "remain[] under the Section 362 stay" and "block[] [the creditor] from satisfaction of [its] claim"); *In re Texaco, Inc.*, 81 B.R. 804, 805 (Bankr. S.D.N.Y. 1988) (lifting stay to permit indenture trustee to exercise contractual right under indenture to deliver a notice of acceleration "[i]n view of the fact that Texaco proposes to pay all unsecured creditors in full").[12]

18.     EFIH also asserts that lifting the stay will greatly prejudice EFIH and its estate by purportedly hindering its restructuring effort.  To be sure, the stay is in part designed to "avoid interference with the orderly liquidation or rehabilitation of the debtor."  *Borman v. Raymark Indus., Inc.*, 946 F.2d 1031, 1036 (3d Cir. 1991) (internal quotation marks omitted).  But there is no evidence that any such interference will occur here.  As Mr. Horton acknowledged, if the stay is lifted and the makewhole is allowed, the Debtors "will continue to try to get a plan in place." 4/21/2015 Trial Tr. 58:10-15 (Horton Test.).

19.     At most, Mr. Horton testified that lifting the stay would "complicate[]" efforts to "get[] to a consensual case" because "EFH, the parent of EFIH, [would then have $]431 million less of distributable value" "relative to th[e] $700 million claim" of TCEH against EFH.  4/21/2015 Trial Tr. 38:6-39:1 (Horton Test.).  But that assertion does not establish that lifting the stay will interfere with an orderly liquidation or rehabilitation of EFIH, much less result in "great

---

[12] EFIH fails to cite any case denying a creditor relief from the stay to exercise its valid contract rights where the debtor was presumed to be solvent.  The cases EFIH has cited did not concern motions for relief from the stay.  *See In re Johns-Manville Corp.*, 36 B.R. 727, 740 (Bankr. S.D.N.Y. 1984) (denying motion to dismiss chapter 11 case because debtor's solvency was threatened by asbestos litigation); *LaSalle Nat'l Bank v. Perelman*, 82 F. Supp. 2d 279, 292-93 (D. Del. 2000) (holding debtor's management did not breach fiduciary duties to creditors by filing for bankruptcy and pursuing non-consensual restructuring proposals); *In re Doors & More Inc.*, 126 B.R. 43, 45-46 (Bankr. E.D. Mich. 1991) (denying debtor's choice of counsel as incompetent).

prejudice" to EFIH and its estate.  As a threshold matter, that testimony is outside the scope of

Phase One, in which EFIH's solvency is presumed.  Thus, the Court barred the Noteholders from

presenting evidence at trial as to whether "the extent of solvency" at EFIH would "clear[] the

table or the debt at the EFH level" or "anything about restructuring proposals."  4/20/2015 Trial

Tr. 36:19-37:5.

**20.**     In any event, the legal question is whether lifting the stay and allowing the makewhole

will interfere with EFIH's ability to achieve an "orderly liquidation or rehabilitation" in its

bankruptcy case, not whether doing so may "complicate" efforts to agree on any particular plan

that EFIH or its equity holder EFH may desire.  EFIH did not present any evidence establishing

that it will be unable to reorganize (or liquidate in an orderly fashion) if the stay is lifted.  To the

contrary, as noted, Mr. Horton testified that the Debtors will continue efforts to negotiate and

propose a confirmable plan.  Indeed, he admitted that this is what the Debtors did when prior

developments led them to abandon their earlier restructuring proposals embodied initially in

Project Olympus and later in the Restructuring Support Agreement.  4/20/2015 Trial Tr. 56:13-

58:9 (Horton Test.).

**21.**     As a matter of law, allowing a valid claim in a debtor's bankruptcy case does not

"interfere" with the "orderly liquidation or rehabilitation of the debtor."  The only way the

Bankruptcy Code permits a chapter 11 debtor to reorganize is through a plan that complies with

the requirements of section 1129.  *See* 11 U.S.C. § 1129.  If the makewhole is allowed, any

confirmable plan will have to allocate the "distributable value" from EFIH's estate first toward

payment of the makewhole.  *See id.* §§ 502(b), 1129(a)(2), 1129(a)(7), 1129(b).  That may

indeed prevent EFH and its structurally junior stakeholders (including the sponsors and TCEH

creditors) from re-allocating that value to themselves instead.  But that result does not "interfere" with any "liquidation or rehabilitation" of EFIH that would be lawful.

22.      EFH's desire to reach a consensual plan with TCEH's creditors or the sponsors cannot, as a matter of law, justify denying the Noteholders their valid contract entitlements against EFIH, so that EFIH's value can be re-allocated directly to EFH and indirectly to TCEH's creditors and the sponsors.  That would contravene the absolute priority rule and effect a substantive consolidation of EFIH with EFH, which may not be accomplished here, where no party has moved for substantive consolidation, nor made the evidentiary showing required to overcome this Circuit's presumption against substantive consolidation.[13]  *See In re Owens Corning*, 419 F.3d 195, 200, 210-211 (3d Cir. 2005) ("Mere benefit to the administration of the case … is hardly a harm calling substantive consolidation into play," and "it may not be used … to disadvantage tactically a group of creditors in the plan process or to alter creditor rights" or "to deprive one group of creditors of their rights while providing a windfall to other creditors"); *In re Augie/Restivo Baking Corp.*, 860 F.2d 515, 520-21 (2d Cir. 1988) (rejecting effort to "rob[] [noteholders] of the benefit of their bargain" by having "assets of their debtor … distributed to creditors" of its parent debtor, even though "denial of consolidation would thwart an otherwise desirable arrangement among creditors" of the parent; "The nub of counsel's argument was that only consolidation will permit the quick consummation of an arrangement under Chapter [XI]. That may indeed be desirable but not at the cost of sacrificing the rights of [the subsidiary's] debenture holders."); *In re Regency Holdings (Cayman), Inc.*, 216 B.R. 371, 375-76 (Bankr.

---

[13] The evidence introduced at trial does not indicate that there has been a disregard of corporate separateness, as required for substantive consolidation.  *See In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2005).  As discussed above, Mr. Horton testified that when the Debtors issued their $42 billion in funded indebtedness, they specified which Debtor would be obligated on any particular debt issuance and which assets each Debtor owned, including that only EFIH held a direct interest in Oncor Holdings.  In addition, Mr. Greene and Mr. Auerbach testified that they relied on EFIH's separate credit in investing in the Notes.

S.D.N.Y. 1998) (rejecting argument that, absent substantive consolidation, a "parent[ debtor] …

can legitimately use the subsidiary[-debtor]'s assets to pay its own creditors," which would

"eviscerate[] the absolute priority rule").

**23.**     Finally, EFIH and its estate will not be greatly prejudiced if the stay is lifted, so that the

Noteholders can rescind acceleration, and the makewhole is allowed because, even if stay relief

were denied, the stay would not operate to disallow the Noteholders' claim.  The Noteholders

would still have an allowable claim for the makewhole under the terms of their pre-petition

contract, albeit one that would be contingent on rescinding acceleration.  The Bankruptcy Code

provides that the Court "shall allow" an otherwise valid claim notwithstanding that it remains

"contingent."  11 U.S.C. § 502(b)(1) (providing that the court "shall allow [a creditor's] claim …

except to the extent that such claim is unenforceable against the debtor and property of the debtor,

under any agreement or applicable law for a reason *other than because such claim is contingent*

*or unmatured*") (emphasis added); *In re Stephan*, 588 Fed. App'x 143, 144 (3d Cir. 2014)

(unpublished) (rejecting argument that would "turn the automatic stay into a device that

eliminates all contingent claims" and affirming allowance of lender's deficiency claim even

though it was unenforceable under state law because it was contingent on obtaining a foreclosure

judgment and the automatic stay barred the lender from obtaining that judgment and thereby

fixing that contingency; "Section 502 disallows the claim if it is unenforceable, unless the only

reason it is unenforceable is that it is 'contingent or unmatured.'"); *In re Rodriguez*, 629 F.3d

136, 142 (3d Cir. 2010) (noting that "staying [the creditor's] attempt to collect pre-petition

escrow amounts does not bar [the creditor] from asserting its contractual rights in the bankruptcy

court"; "the stay does not determine a creditor's claim but merely suspends an action to collect

the claim outside the procedural mechanisms of the Bankruptcy Code"); *In re Bock Laundry*

*Mach. Co.*, 37 B.R. 564, 567-68 (Bankr. N.D. Ohio 1984) (holding that "no 'great prejudice' will result to the estate by allowing the Movants to proceed in state court" because "[t]he filing of a petition in bankruptcy cannot, by itself, mitigate the amount that may be owing to a claimant").

      C.      **The Hardship to the Trustee and the Noteholders By Maintaining the Stay "Considerably Outweighs" the Hardship to EFIH**

24.      The second factor the Court considers is whether the hardship to the Trustee and the Noteholders by maintenance of the stay considerably outweighs the hardship to EFIH.  The Trustee and the Noteholders presented substantial evidence establishing a prima facie case that the hardship to them from denying relief from the stay to rescind acceleration considerably outweighs any hardship to EFIH from lifting the stay.  EFIH failed to meet its burden to prove that the balance of harms weighs in favor of maintaining the stay.

25.      Denying the Noteholders relief from the stay would impose substantial harm on the Noteholders.  As discussed above, they would be deprived of their contractual right to rescind acceleration and consequently their right to receive the payments they contracted to receive through at least December 1, 2015—totaling $454 million—or, upon EFIH's optional redemption of the Notes before that date (as happened), the makewhole in approximately the same amount (on a present value basis) of $431 million.  Deprivation of a contract right to receive hundreds of millions of dollars is harm.  *See, e.g.*, *Tenn. Elec. Power Co. v. Tenn. Valley Auth.*, 306 U.S. 118, 137-38 (1939); *In re Global Indus. Techs., Inc.*, 645 F.3d 201, 210-15 (3d Cir. 2011) (en banc); *In re Thorpe Insulation Co.*, 677 F.3d 869, 887 (9th Cir. 2012); *Idaho Power Co. v. FERC*, 312 F.3d 454, 460 (D.C. Cir. 2002); *In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 351-52, 354 & nn.65, 76 (Bankr. S.D.N.Y. 2007) (threatened loss of noteholders' $250 million claim absent stay pending appeal was "irreparable harm").

26.     Furthermore, as discussed above, the uncontroverted evidence establishes that because of the lower-interest rate environment, the Noteholders have been unable to reinvest the principal that EFIH repaid to them on June 19, 2014 in investments of comparable credit quality and duration earning anywhere near the 10% annual return that EFIH promised to pay them.  As a result, the evidence shows, without contradiction, that the Noteholders have suffered hundreds of millions of dollars in net losses compared to the payments they would have received on the Notes through December 1, 2015.

27.     Accordingly, the evidence establishes actual, demonstrable harm to the Noteholders if the stay is maintained.  They will be deprived of their contract right to rescind acceleration, and thereby, their right to receive the makewhole, which was designed to compensate them for the losses they have incurred.

28.     That harm considerably outweighs any hardship to EFIH.  If relief from the stay is denied, the Noteholders will lose a makewhole equal to $431 million.  In comparison, the *net* effect on EFIH from granting stay relief will be far less than $431 million.  As discussed above, EFIH has saved at least $441 million by refinancing the Notes before the First Call Date—exceeding the amount of the makewhole—and will obtain additional tax benefits from payment of the makewhole.

29.     Those offsetting benefits must be taken into account in assessing the hardship to EFIH. The overriding standard for relief from the stay requires the Court to consider the totality of the circumstances and the equities.  *In re Wilson*, 116 F.3d 87, 90 (3d Cir. 1997) (directing courts to determine "cause based on the totality of the circumstances in each particular case"); *In re Tribune Co.*, 418 B.R. 116, 126 (Bankr. D. Del. 2009) ("Cause is a flexible concept and courts often conduct a fact intensive, case-by-case balancing test, examining the totality of the

50

circumstances" and "apply[ing] an equitable balancing test" (quoting *In re SCO Group, Inc.*, 395 B.R. 852, 856 (Bankr. D. Del. 2007)).  Here, the rescission notice sent by the Noteholders did not, in and of itself, trigger the makewhole.  Rather, the makewhole was triggered by EFIH's voluntary decision to redeem the Notes, made with full knowledge that the Court might grant the Noteholders' pending motion for relief from the stay to rescind acceleration.  That EFIH chose to go forward with the refinancing anyway demonstrates that any hardship to EFIH from lifting the stay was offset by substantial benefits that EFIH achieved.

30.     Accordingly, in weighing the totality of the circumstances and balancing the equities, the hardship to EFIH of lifting the stay to permit rescission, which will render the refinancing an optional redemption, must be assessed by considering both sides of that transaction—the cost of the attendant makewhole and the offsetting benefits realized from the refinancing.  *See In re All American Properties, Inc.*, 2010 WL 1541694, at *3 (Bankr. M.D. Pa. Apr. 15, 2010) (determining that harm to the debtor from lifting the stay was reduced because "it will have received [a] benefit" that offset its "costs"); *In re Miller*, 2012 WL 6041639, at *13 (Bankr. D. Colo. Dec. 4, 2012) (determining that "the harm to the Debtors if the stay is lifted" to permit creditor to foreclose was offset by the fact that "the Debtors have enjoyed the benefit of continuously residing at the Property post-petition without making a single mortgage payment"; "[a]fter balancing the equities in this case, … relief from the stay is proper for cause").

31.     Moreover, even if the impact to the Noteholders and to EFIH were the same in absolute dollar terms—$431 million—the harm to the Noteholders is considerably greater in relative terms.  As discussed above, the makewhole represents approximately 19% of the Noteholders' principal investment, whereas it is less than 5% of EFIH's overall debt.

32.     In any event, the harm to the Noteholders if they are denied the ability to enforce their

contract rights as senior creditors of EFIH considerably outweighs any hardship to EFIH if it is

denied the ability to escape its contractual obligations for the benefit of its equity holder EFH.  In

cases like this one involving solvent debtors, the balance of harms weighs heavily in favor of

respecting creditors' rights to be paid what they are validly owed under state law when doing so

comes only at the expense of equity.  As discussed above, numerous cases have lifted the stay to

permit creditors to enforce their state-law rights where the debtor was solvent.

33.     *Texaco* is on point.  There, as here, the trustee sought to enforce a right under the

indenture *post-petition* (sending a notice of acceleration) that would result in recognition of a

*larger* claim against the estate (locking in interest at the original contractually agreed rate of

10.75%, rather than the reduced rate of 8.25% that the debtor sought to impose post-petition).

*Texaco*, 81 B.R. at 805-06.  There, as here, the only thing that stood in the way of enforcing the

noteholders' state-law rights was the stay.  And there, as EFIH contends here, the harm to the

noteholders and the debtor from maintaining or lifting the stay was the same in absolute dollar

terms—the increased amount of interest that would be owed upon exercise of the noteholders'

rights.  Yet, the bankruptcy court lifted the stay.  It recognized that the harm to the noteholders

from denying their contract rights considerably outweighed the harm to the debtor's estate,

because the debtor was solvent and hence there would be no "prejudice [to] other creditors," but

rather only a reduced recovery for equity.  *Id.*  "In view of the fact that Texaco proposes to pay

all unsecured creditors in full . . ., there is no reason why Texaco should be allowed to modify

the rights of the Noteholders by unilaterally lowering the post-petition interest rate and at the

same time preventing the Noteholders from preserving whatever rights they might have to

receive post-petition interest pursuant to their original contract."  *Id.* at 806.

34.    *Texaco* is in accord with a long line of solvent-debtor cases holding that the rights of creditors to enforce their valid state-law rights outweigh any interest of the debtor and its equity holder in invoking bankruptcy law to deny those rights.  And that is so even where creditors seek to take action *post-petition* to *increase* the size of their claim recognized against the estate.

35.    For example, in *In re Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*, 791 F.2d 524 (7th Cir. 1986), as here, the noteholders sought to enforce a right under the indenture *post-petition* (to declare an acceleration) that would *more than double* the size of their claim (from $24 million to $56 million).  *See id.* 525-26, 528.  There, as here, the only thing that stood in the way of enforcing that right was the debtor's invocation of bankruptcy law (the "reorganization court['s] … power to … 'decelerate'" under the former Bankruptcy Act).  *See id.* at 526.  And there, as EFIH argues here, the harm to the noteholders and the debtor of enforcing or denying their contract rights was the same in absolute dollar terms—$32 million.  But the Seventh Circuit held that the noteholders were entitled to enforce their state-law rights.  It recognized that the balance of harms weighed heavily in favor of the noteholders where the debtor was solvent:

**"[a]ll of the [debtor's] creditors will be paid in full," and hence "[t]he only competing equities are those of [the debtor's] shareholders, and are weak.**"  *Id.* at 527 (emphasis added).

36.    The Second Circuit reached the same conclusion in *Ruskin v. Griffiths*, 269 F.2d 827 (2d Cir. 1959).  There, too, noteholders sought to exercise a right under the notes *post-petition* (to accelerate the debt) that would likewise *increase* the size of their claim against the debtor's estate (increasing 4% interest to 6% default rate).  *See id.* at 829-30.  There, again, the only thing potentially preventing the noteholders from enforcing that right was bankruptcy law (the "general rule in bankruptcy … that interest … ceases to accrue" during the proceedings).  *See id.* at 830-31.  And there as well, the court held that the noteholders were entitled to enforce their

53

contract rights.  It recognized that the balance of harms is fundamentally different when a debtor

is solvent and the question whether to honor a creditor's contract rights is no longer "a contest

between creditors" of the debtor, but "a contest between a debtor's creditor and its stockholders."

*See id.* at 830.  **"[Stockholders] cannot complain that they are treated inequitably when**

**their interest is cut down by the payment of a sum to which the debenture holders are**

**clearly entitled by the express provisions of the trust indenture."**  *Id.* at 832 (citation omitted)

(emphasis added).

37.        Other cases are in accord.  *See, e.g.*, *In re Gencarelli*, 501 F.3d 1, 7 & n.3 (1st Cir. 2007)

(noting that while "the balance of the equities may be different if … creditors are at risk of

collateral damage" in an "*insolvent* debtor" case, "[t]his is a solvent debtor case and, as such, the

equities strongly favor holding the debtor to his contractual obligations as long as those

obligations are legally enforceable under applicable non-bankruptcy law"; "When the debtor is

solvent, the bankruptcy rule is that where there is a contractual provision, valid under state

law, … the bankruptcy court will enforce the contractual provision." (internal quotation marks

omitted)); *In re Dow Corning Corp.*, 456 F.3d 668, 679-80 (6th Cir. 2006) ("[I]n solvent debtor

cases, … courts have generally confined themselves to determining and enforcing whatever pre-

petition rights a given creditor has against the debtor"); *In re Los Angeles Dodgers LLC*, 465 B.R.

18, 32-33 (D. Del. 2011) (stating that where the debtor is solvent, "the equities strongly favor

holding the debtor to his contractual obligations"); *In re Chemtura Corp.*, 439 B.R. 561, 605-06

(Bankr. S.D.N.Y. 2010) (approving a settlement allowing a make-claim in substantial part,

stating that "since we have a solvent debtor, I think the bondholders are likely to get whatever

they're entitled to under state law"; "[w]ith a solvent debtor, issues as to fairness amongst

creditors, in sharing a limited pie, no longer apply; the allowance of claims under a make-whole

54

provision, or for damages for breach of a no-call, no longer comes at the expense of other creditors."); *In re Premier Entm't Biloxi LLC*, 445 B.R. 582, 636-37, 646 (Bankr. S.D. Miss. 2010) (awarding noteholders damages for breach of indenture's no-call provision, citing "the long line of cases" endorsing the principle "that when a debtor is solvent, bankruptcy courts generally will enforce the debtor's contractual obligations to the extent they are valid under applicable state law").

38.     The fundamental principle applied in these cases is that bankruptcy-law limitations on a creditor's otherwise enforceable state-law rights, which may be necessary to protect other creditors in *insolvent*-debtor cases, do not carry the same force in *solvent*-debtor cases.  Courts have consistently recognized that the balance of harms weighs in favor of permitting creditors to vindicate their contractual (or other state-law) rights when a solvent debtor seeks to deny those rights for the benefit of its equity holder.

39.     EFIH's reliance on *AMR* and *Momentive* is misplaced.  Both courts emphasized that lifting the stay to permit rescission of acceleration in those cases would prejudice the debtor's other *creditors.  In re AMR Corp.*, 730 F.3d 88, 112 (2d Cir. 2013) (finding no abuse of discretion in bankruptcy court's "conclusion that lifting the automatic stay would serve only to increase the size of [the trustee's] claim . . . , harming the estate *and [the debtor's] other creditors*" (emphasis added)); *In re MPM Silicones, LLC*, 2014 WL 4436335, at *23 (Bankr. S.D.N.Y. Sept. 9, 2014) ("sending … [a] deceleration notice significantly impacts the debtor's estate *and creditors* … by enhancing claims by potentially hundreds of millions of dollars" (emphasis added)).  *AMR* explained that "[o]ne of the principal purposes of the automatic stay is to preserve … the debtor's estate for the benefit of all the *creditors*."  730 F.3d at 112 (emphasis added).  Similarly, *Momentive* approved of but distinguished *Chemtura* and *Premier*

55

*Entertainment Biloxi* on grounds that "[t]he debtors in both cases (unlike here) were solvent and, therefore, the courts found them to be subject to an exception to [the Bankruptcy] Code's disallowance of claims."  2014 WL 4436335 at *17.  Neither decision holds that, in the absence of harm to *creditors*, the balance of harms would nonetheless support denying the noteholders their contract rights for the benefit of a solvent debtor's equity holder.[14]  As discussed, the cases consistently hold to the contrary.[15]

### D.    The Noteholders Are Likely to Prevail on the Merits

**40.**    The third factor the Court considers is the probability that the Noteholders will prevail on the merits.  "[E]ven a slight probability of success on the merits may be sufficient to support lifting an automatic stay in an appropriate case."  *In re Downey Fin. Corp.*, 428 B.R. 595, 610 (Bankr. D. Del. 2010).

**41.**    Here, as in *Downey*, "[t]his factor clearly favors [the Trustee and the Noteholders] because they have already won on the merits."  *Id.*  The Court has already held that, under the Indenture, the "Trustee … had the right to waive [EFIH's bankruptcy] default and decelerate the Notes," and that "[w]ere the Court … to lift the automatic stay … to allow the Trustee's rescission notice to take effect then the automatic default would be waived, the Notes would no longer be immediately due and the refinancing would require payment of the Applicable

---

[14] EFIH's citation to *In re Solutia*, 379 B.R. 473 (Bankr. S.D.N.Y. 2007), is also misplaced.  *Solutia* did not address whether cause existed to lift the stay to permit rescission.  In a footnote, it denied the noteholders' "oral motion" to vacate the stay retroactively as "untimely," noting that, unlike here, the noteholders waited more than a year after the debtor sought to redeem the notes before seeking relief.  *See id.* at 483-484 & n.7.

[15] *AMR* is distinguishable for additional reasons.  Unlike here, the indenture in that case expressly gave the debtor the right to pay off the Notes in bankruptcy "without Make-Whole Amount."  730 F.3d at 99-100.  Accordingly, the Second Circuit found that the trustee sought to lift the stay in order to "increase the size of [its] claim [] to an amount greater than that to which it is entitled pursuant to the Indentures."  *Id.* at 112.  Here, by contrast, as noted above, the Court has held that the Trustee is entitled under the terms of the Indenture to rescind acceleration, and that upon such rescission, the make whole would be due as a result of EFIH's optional redemption of the Notes.  Further, the bankruptcy court in *AMR* stressed that the noteholders there did not move for relief from the stay until more than a year had passed in the Chapter 11 case, whereas the Trustee and the Noteholders here moved for such relief in the first month of the bankruptcy case.  485 B.R. at 295.

Premium." *See* Summary Judgment Findings of Facts and Conclusions of Law ¶ 69 (emphasis added); *see also id.* ¶¶ 63-66.

**42.**     EFIH nonetheless asserts that—even if the stay is lifted—the Trustee and the Noteholders cannot decelerate the Notes because, it contends, the Notes were "accelerated" by the Bankruptcy Code, such that "the filing of [EFIH's] bankruptcy petition render[ed] all [of EFIH's] outstanding debts due and payable." 4/22/14 Trial Tr. 97:11-99:16. The Court disagrees. The Bankruptcy Code simply allows a creditor to file a proof of claim for the full debt *even if that debt remains unmatured*. It defines a "claim" as "any right to payment, *whether or not such right is ...matured [or] unmatured*," and provides that a proof of claim shall be allowed in bankruptcy "except to the extent such claim is unenforceable … under any agreement or applicable law *for a reason other than because such claim is ... unmatured.*" 11 U.S.C. §§ 101(5)(A), 502(b)(1) (emphasis added). The Bankruptcy Code does not accelerate the maturity of all claims to the petition date. If it did, there would be no "unmatured" claims in bankruptcy—they would all "mature" as of the petition date—and the statute's provision allowing "unmatured" claims would be superfluous, contrary to settled principles of statutory construction. *See RadLAX Gateway Hotel v. Amalgamated Bank*, 132 S. Ct. 2065, 2071 (2012) (citing "the cardinal rule that, if possible, effect shall be given to every clause and part of a statute" (internal quotation marks omitted)).

**43.**     The Third Circuit recognized this point in *Oakwood Homes*. The notes there were not accelerated by contract and, by their terms, did not mature until nearly 2030, decades after the petition date. *In re Oakwood Homes Corp.*, 449 F.3d 588, 590 (3d Cir. 2006). The question was whether the principal of the debt due some 25 years later should be discounted to present value.

The dissent asserted that the answer was no, arguing—like EFIH—that the Bankruptcy Code "accelerat[ed] the principal," making it "presently due." *See id.* at 605-06 (Smith, J., dissenting).

44.    But the majority held to the contrary:  "[W]e must also reject our dissenting colleague's theory that the reason interest-bearing debt would not be discounted to present value is because future principal is accelerated (once post-petition interest is disallowed under § 502(b)(2)), and becomes presently due debt." *Id.* at 602.  The majority explained that § 502(b) permits a creditor's proof of claim to be allowed even if "*such claim is ... unmatured.*" *Id.* at 596 (quoting § 502(b)(1) (emphasis in original)).  Thus, "[t]he general rule of both the Bankruptcy Code and § 502(b), as our colleague notes correctly, is acceleration to the date of filing of the bankruptcy petition, *for the purpose of filing a claim*." *Id.* at 602 (emphasis added).  But because the Code's "acceleration" of claims does not advance the actual maturity date, "[w]e wholeheartedly agree that *future liabilities* must be reduced in some way to reflect the time value of money." *Id.* 601 (emphasis added).  Because the bankruptcy court *had* already discounted the noteholders' claim to present value (by disallowing unmatured interest under § 502(b)(2)), the Third Circuit held that the bankruptcy court had gone a step too far in *further* discounting the remaining principal— i.e., "*double* discounting." *Id.* at 599-602 (emphasis added).  But it emphasized that "[w]e do not hold here that 11 U.S.C. § 502(b) *never* authorizes discounting a claim to present value" and noted that "myriad cases [have] discounted to present value *non-interest* bearing claims." *Id.* at 598-99 & n.13 (emphases in original).  The Third Circuit's discussion of discounting "future liabilities" necessarily rejects EFIH's contention that the Bankruptcy Code makes all debt due on the petition date—that is, that there are no "future liabilities" in bankruptcy.

45.    Courts have applied this rule of law in the context of makewholes.  They have allowed makewholes in bankruptcy, notwithstanding the Bankruptcy Code's supposed "acceleration" of

58

debt.  *See, e.g.*, *In re Trico Marine Servs., Inc.*, 450 B.R. 474, 477-78, 481 (Bankr. D. Del. 2011); *see also In re Premier Entm't Biloxi LLC*, 445 B.R. at 630 ("The automatic acceleration of a debt under the Bankruptcy Code allows a lender to file a proof of claim for the unmatured principal amount of the debt under § 502 without violating the automatic stay, but such acceleration is relatively limited and does not change the maturity date of the debt."); *In re MPM Silicones*, 2014 WL 4436335, at *23 ("[A] contractual acceleration provision goes well beyond the acceleration that occurs as a matter of bankruptcy law with respect to the determination of claims against the estate"; the latter permits a creditor "to file a claim against a debtor for the entire amount of the debt, despite the actual maturity date or terms of the contract"; "[h]owever, a *contractual* acceleration provision advances the maturity date of the debt" (internal quotation marks omitted)); *In re Skyler Ridge*, 80 B.R. 500, 507 (Bankr. C.D. Cal. 1987) (rejecting argument that the "automatic acceleration of a debt upon the filing of a bankruptcy case" by operation of bankruptcy law "eliminates the right to a [makewhole] premium").

46.    By contrast, EFIH has cited no case that has disallowed a makewhole solely by reason of the Bankruptcy Code's purported "acceleration" of debt.  Every case EFIH cites for that purported proposition  involved *contractual* acceleration, and thus, as *AMR* stated, the courts did "not need to look beyond the controlling language of the operative contract."  *In re AMR Corp.*, 730 F.3d at 99 n.14.[16]

47.    Accordingly, EFIH has failed to meet its burden with respect to this factor as well.

---

[16] *See HSBC Bank USA, N.A. v. Calpine Corp.* ("*Calpine II*"), 2010 WL 3835200, at *3 (S.D.N.Y. Sept. 15, 2010) ("*According to the terms of the notes*, … bankruptcy … accelerates and matures the notes."); *In re AMR Corp.*, 485 B.R. 279, 290 n.7 (Bankr. S.D.N.Y. 2013) ("As the specific language of the Indentures makes clear the parties' intent here, … *the Court does not need to look beyond the controlling language of the operative contract.*"); *In re Ridgewood Apartments*, 174 B.R. 712, 720 (Bankr. S.D. Ohio 1994) ("*By the plain meaning of the Addendum [to the Note]*, the Court finds that 'prepayment' is required in order to invoke the prepayment penalty," which never occurred); *In re Solutia Inc.*, 379 B.R. 473, 478 (Bankr. S.D.N.Y. 2007) ("*Section 6.02 of the Original Indenture* provides that if an event of default [for bankruptcy] occurs the principal … shall become immediately due and payable").

## <u>CONCLUSION</u>

**48.**     For the reasons stated, and solely for purposes of Phase One and on the assumption that

EFIH is solvent, this Court grants relief from the stay to permit the Noteholders to rescind

acceleration of the Notes.

Dated:  _____ __, 2015