## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) |
| ENERGY FUTURE HOLDINGS CORP., *et al.*, | ) Chapter 11 |
| *Debtors.* | ) Case No. 14-10979 (CSS) |
| | ) (Jointly Administered) |
| DELAWARE TRUST COMPANY, as | ) |
| INDENTURE TRUSTEE, | ) |
| *Plaintiff,* | ) |
| v. | ) Adversary Proceeding |
| ENERGY FUTURE INTERMEDIATE HOLDING | ) No. 14-50363 (CSS) |
| COMPANY LLC and EFIH FINANCE INC. | ) |
| *Defendants.* | ) |
| | ) |

## PLAINTIFF-TRUSTEE'S AND NOTEHOLDERS' POST-TRIAL BRIEF

WILMER CUTLER PICKERING HALE AND DORR LLP
Philip D. Anker
Charles C. Platt
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: 212-230-8800
Facsimile:  212-230-8888
Philip.Anker@wilmerhale.com
Charles.Platt@wilmerhale.com

Dennis L. Jenkins
George W. Shuster Jr.
60 State Street
Boston, MA 02109
Telephone:  617-526-6000
Facsimile: 617-526-5000
Dennis.Jenkins@wilmerhale.com
George.Shuster@wilmerhale.com

ROPES & GRAY LLP
Keith H. Wofford
Mark Somerstein
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: 212-596-9000
Facsimile:  212-596-9090
Keith.Wofford@ropesgray.com
Mark.Somerstein@ropesgray.com

D. Ross Martin
Andrew Devore
800 Boylston Street, Prudential Tower
Boston, MA  02199-3600
Telephone:  617-951-7000
Facsimile: 617-951-7050
Ross.Martin@ropesgray.com
Andrew.Devore@ropesgray.com

DRINKER BIDDLE & REATH LLP
James H. Millar
1177 Avenue of the Americas
41st Floor
New York, NY 10036-2714
Telephone:  212-248-3264
Facsimile:  212-248-3141
James.Millar@dbr.com

COLE SCHOTZ P.C.
Norman L. Pernick (Bar No. 2290)
J. Kate Stickles (Bar No. 2917)
500 Delaware Avenue, Suite 1410
Wilmington, DE  19801
Telephone: 302-652-3131
Facsimile:  302-652-3117
npernick@coleschotz.com
kstickles@coleschotz.com

Warren A. Usatine
Court Plaza North
25 Main Street
Hackensack, NJ 07602
Telephone: 201-489-3000
Facsimile:  201-489-1536
wusatine@coleschotz.com

*Counsel for Plaintiff-Trustee Delaware Trust Company and the*
*undersigned Noteholders*

Dated:  May 20, 2015

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................ ii

PRELIMINARY STATEMENT ..........................................................................1

ARGUMENT ......................................................................................................2

I.     THE TRUSTEE AND NOTEHOLDERS HAVE A PROBABILITY OF
       PREVAILING ON THE MERITS. .........................................................................2

II.    LIFTING THE STAY WILL NOT RESULT IN ANY "GREAT
       PREJUDICE" TO EFIH OR ITS BANKRUPTCY ESTATE. ...............................6

III.   THE HARDSHIP TO THE TRUSTEE AND THE NOTEHOLDERS BY
       MAINTAINING THE STAY "CONSIDERABLY OUTWEIGHS" THE
       HARDSHIP TO EFIH. .........................................................................................13

CONCLUSION ...................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Borman v. Raymark Indus., Inc.*, 946 F.2d 1031 (3d Cir. 1991) .....................................10

*Claughton v. Mixson*, 33 F.3d 4 (4th Cir. 1994)........................................................20

*Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343 (1985)......................9

*HSBC Bank USA, N.A. v. Calpine Corp., ("Calpine II")*, 2010 WL
3835200 (S.D.N.Y. Sept. 15, 2010)...........................................................................5

*In re Adelphia Commc'ns Corp.*, 361 B.R. 337 (S.D.N.Y. 2007) .................................13

*In re All Am. Props., Inc.*, 2010 WL 1541694 (Bankr. M.D. Pa. Apr. 15,
2010) ..............................................................................................................................19

*In re AMR Corp.*, 485 B.R. 279 (Bankr. S.D.N.Y. 2013)........................................5, 7

*In re AMR Corp.*, 730 F.3d 88 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 1888
(2014)..........................................................................................................................5, 23

*In re Armstrong World Indus.*, No. 00-4471 (D. Del. Dec. 10, 2001), *aff'd*,
106 F. App'x 785 (3d Cir. 2004) ................................................................................20

*In re Augie/Restivo Baking Corp.*, 860 F.2d 515 (2d Cir. 1988) ................................12

*In re Bock Laundry Mach. Co.*, 37 B.R. 564 (Bankr. N.D. Ohio 1984).......................13

*In re Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*, 791 F.2d 524 (7th
Cir. 1986) ............................................................................................................21, 22, 23

*In re Doors & More Inc.*, 126 B.R. 43 (Bankr. E.D. Mich. 1991) ..........................9, 10

*In re Dow Corning*, 456 F.3d 668 (6th Cir. 2006)........................................................23

*In re Downey Fin. Corp.*, 428 B.R. 595 (Bankr. D. Del. 2010).................................2, 3

*In re Johns-Manville Corp.*, 36 B.R. 727 (Bankr. S.D.N.Y. 1984) ..........................9, 10

*In re Miller*, 2012 WL 6041639 (Bankr. D. Colo. Dec. 4, 2012), *aff'd*,
2013 WL 4776054 (D. Colo. Sept. 4, 2013)................................................................19

*In re MPM Silicones, LLC*, 2014 WL 4436335 (Bankr. S.D.N.Y. Sept. 9,
2014), *aff'd*, No. 14-cv-07492 (S.D.N.Y. May 4, 2015) ..................................5, 17, 23, 24

*In re N.Y. Med. Grp., P.C.*, 265 B.R. 408 (Bankr. S.D.N.Y. 2001)................................8

*In re Novak*, 103 B.R. 403 (Bankr. E.D.N.Y. 1989)......................................................20

*In re Oakwood Homes Corp.*, 449 F.3d 588 (3d Cir. 2006) .......................................4, 5

*In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005).......................................................12

*In re Premier Auto. Servs., Inc.*, 343 B.R. 501 (Bankr. D. Md. 2006), *aff'd*,
    492 F.3d 274 (4th Cir. 2007) ..............................................................................20

*In re Ridgewood Apartments*, 174 B.R. 712 (Bankr. S.D. Ohio 1994)...........................5

*In re SCO Grp., Inc.*, 395 B.R. 852 (Bankr. D. Del. 2007) ...........................................19

*In re Solutia Inc.*, 379 B.R. 473 (Bankr. S.D.N.Y. 2007)...........................................5, 7

*In re Stephan*, 588 F. App'x 143 (3d Cir. 2014)...........................................................13

*In re Texaco, Inc.*, 81 B.R. 804 (Bankr. S.D.N.Y. 1988)...........................7, 20, 21, 23

*In re Tribune Co.*, 418 B.R. 116 (Bankr. D. Del. 2009) ...............................................19

*In re Trico Marine Servs., Inc.*, 450 B.R. 474 (Bankr. D. Del. 2011) ...........................5

*In re Wilson*, 116 F.3d 87 (3d Cir. 1997).................................................................18, 19

*LaSalle Nat'l Bank v. Perelman*, 82 F. Supp. 2d 279 (D. Del. 2000)...........................10

*RadLAX Gateway Hotel v. Amalgamated Bank*, 132 S. Ct. 2065 (2012) ...................3-4

*Ruskin v. Griffiths*, 269 F.2d 827 (2d Cir. 1959) .....................................................22, 23

## STATUTES

11 U.S.C. § 101(5)(A)........................................................................................................3

11 U.S.C. § 362(d) .....................................................................................................17, 23

11 U.S.C. § 502(b) .........................................................................................3, 4, 8, 11, 12

11 U.S.C. § 547(b)(3) .......................................................................................................8

11 U.S.C. § 548.................................................................................................................8

11 U.S.C. § 725.................................................................................................................9

11 U.S.C. § 726.................................................................................................................9

11 U.S.C. § 1129...................................................................................................8, 9, 11

Plaintiff Delaware Trust Company ("Trustee"), indenture trustee for first lien

notes ("Notes") issued by Energy Future Intermediate Holding Company LLC and EFIH

Finance Inc. (together, "EFIH"), and the undersigned holders of the Notes

("Noteholders"),[1] respectfully submit this post-trial brief.

## PRELIMINARY STATEMENT

The Court should grant relief from the stay to permit the Noteholders to rescind

acceleration of the Notes.  First, the Trustee and the Noteholders will unquestionably

"prevail on the merits" if this Court modifies the stay.  It is law of the case that the

Noteholders have the right under the terms of the indenture for the Notes (the

"Indenture") to rescind acceleration and that, following such rescission, they will be

owed the makewhole.  EFIH's attempt to relitigate the Court's summary judgment ruling,

on grounds that the Bankruptcy Code purportedly accelerated the Notes in a manner that

the Noteholders cannot rescind, is contrary to the applicable statute and Third Circuit

(and other) law.  Second, the record evidence shows conclusively that EFIH and its estate

will suffer no "great prejudice" if the Noteholders are permitted to enforce their

contractual right to rescind.  There will be no reduction in operations, no loss of assets,

and no harm to creditors.  All that will happen is that EFIH will have to live up to its

contractual obligations under applicable state law, under circumstances in which it is

presumed solvent and able to satisfy those obligations (and all others owed to its

creditors) in full.  Third, the hardship to the Noteholders "considerably outweighs" any

impact to EFIH.  The Noteholders will be deprived of their bargained-for contract rights

---

[1] The Noteholders consist of: BlueMountain Capital Management, LLC; Cyrus Capital Partners L.P.;
Halcyon Asset Management LLC; Luxor Capital Group, LP; Nomura Securities International, Inc.;
Southpaw Credit Opportunity Master Fund LP; VR Advisory Services Ltd; Waveny Capital Management,
LP; and Whitebox Advisors LLC.

and lose a makewhole—worth nearly 19% of their investment—that was intended to compensate them for the hundreds of millions of dollars in losses they have incurred as a result of EFIH's refinancing of the 10% Notes in a far lower interest-rate environment. As the evidence shows, that harm, far from being in "equipoise" with any harm to EFIH, is far greater because EFIH has already obtained hundreds of millions of dollars in offsetting benefits from refinancing the Notes and will achieve additional tax benefits upon payment of the makewhole.  And in any event, the cases consistently hold that in a solvent-debtor case, the harm to creditors from being denied their contract rights far outweighs the loss to a debtor's equity holder of the windfall it would obtain from using bankruptcy law to evade the debtor's valid contractual obligations.  Denying stay relief under these facts—to benefit the debtor's equity holder at the expense of creditors with valid contractual rights—would be unprecedented and contrary to settled bankruptcy law.

## ARGUMENT

The Court may lift the stay for "cause" based on the "totality of the circumstances" and the three-factor balancing test.  Trustee Trial Br. [ECF No. 4178] 3-4. EFIH concedes it has the ultimate burden of proof.  EFIH Trial Br. [ECF No. 4179] 3.[2]

## I.    THE TRUSTEE AND NOTEHOLDERS HAVE A PROBABILITY OF PREVAILING ON THE MERITS.

"[E]ven a slight probability of success on the merits may be sufficient to support lifting an automatic stay in an appropriate case."  *In re Downey Fin. Corp.*, 428 B.R. 595,

---

[2]  There is no *nunc pro tunc* issue.  At summary judgment, EFIH did not even contend that there was, and its failure to do so is readily explainable.  The Noteholders had filed their lift-stay motion *before* EFIH obtained approval of the DIP financing and repayment of the Notes.  They agreed to defer litigation of the lift-stay motion, benefitting EFIH by avoiding the burden and delay of litigating this motion—which has involved extensive briefing, months of discovery, and a 3-day trial—before EFIH could obtain approval to repay the Notes and begin saving on interest expense, as it urgently sought.  But in exchange, the DIP Order provides that the Noteholders' rights in this litigation would not be prejudiced by such repayment. *See* Trustee Trial Br. 4-5.  Accordingly, the Court may grant prospective relief with the same effect as if the Notes had not yet been repaid.

610 (Bankr. D. Del. 2010).  Here, as in *Downey*, "[t]his factor clearly favors [the Trustee and the Noteholders] because they have already won on the merits."  *Id.*  The Court has already held that, under the Indenture, the "Trustee … had the right to waive [EFIH's bankruptcy] default and decelerate the Notes," and that "[w]ere the Court … to lift the automatic stay … to allow the Trustee's rescission notice to take effect then the automatic default would be waived, ***the Notes would no longer be immediately due** and the refinancing would require payment of the Applicable Premium*."  *Summary Judgment Findings/Conclusions* [ECF No. 3984] ¶ 69 (emphasis added); *id.* ¶¶ 63-66.

Ignoring this holding, EFIH contends that—even if the stay is lifted—the Trustee and the Noteholders cannot decelerate the Notes because they were purportedly "accelerated" by the Bankruptcy Code, such that "the filing of [EFIH's] bankruptcy petition render[ed] all [of EFIH's] outstanding debts due and payable."  (4/22/2015 Trial Tr. 97:11-99:16; EFIH Trial Br. 5-9.)  The Bankruptcy Code did no such thing.  Rather, it allows a creditor to file a proof of claim for the full debt *even if that debt remains unmatured*.  It defines a "claim" as any "right to payment, *whether or not such right is …matured [or] unmatured*," and provides that a proof of claim shall be allowed in bankruptcy "except to the extent that such claim is unenforceable … under any agreement or applicable law *for a reason other than because such claim is … unmatured*."  11 U.S.C. §§ 101(5)(A), 502(b)(1) (emphasis added).  If, as EFIH contends, the Bankruptcy Code accelerated the maturity of all claims to the petition date, there would be no "unmatured" claims in bankruptcy—they would all "mature" as of the petition date—and the statute's provision allowing "unmatured" claims would be superfluous, contrary to settled principles of statutory construction.  *See RadLAX*

3

*Gateway Hotel v. Amalgamated Bank*, 132 S. Ct. 2065, 2071 (2012) (citing "the cardinal rule that, if possible, effect shall be given to every clause and part of a statute").

The Third Circuit recognized this very point in *Oakwood Homes*. The notes there were not accelerated by contract and, by their terms, did not mature until nearly 2030, decades after the petition date. *In re Oakwood Homes Corp.*, 449 F.3d 588, 590 (3d Cir. 2006). The question was whether the principal of the debt due 25 years later should be discounted to present value. The dissent said no, arguing—like EFIH—that the Code "accelerat[ed] the principal," making it "presently due." *See id.* at 605-06.

But the majority rejected the notion that the statute, standing alone, accelerated the debt: "[W]e must also reject our dissenting colleague's theory that the reason interest-bearing debt would not be discounted to present value is because future principal is accelerated (once post-petition interest is disallowed under § 502(b)(2)), and becomes presently due debt." *Id.* at 602. The majority explained that § 502(b) permits a creditor's proof of claim to be allowed even if "*such claim is ... unmatured*." *Id.* at 596 (quoting § 502(b)(1) (emphasis in original)). Thus, "[t]he general rule of both the Bankruptcy Code and § 502(b), as our colleague notes correctly, is acceleration to the date of filing of the bankruptcy petition, *for the purpose of filing a claim*." *Id.* at 602 (emphasis added). But because the Code's "acceleration" of claims does not advance the actual maturity date, "[w]e wholeheartedly agree that *future liabilities* must be reduced in some way to reflect the time value of money." *Id.* at 601 (emphasis added). Because the bankruptcy court *had* already discounted the noteholders' claim to present value (by disallowing unmatured interest under § 502(b)(2)), the Third Circuit held that the bankruptcy court had gone a step too far in *further* discounting the remaining principal—i.e., "*double*

4

discounting." *Id.* at 599-602 (emphasis added). But it emphasized that "[w]e do not hold here that 11 U.S.C. § 502(b) *never* authorizes discounting a claim to present value" and noted that "myriad cases [have] discounted to present value *non-interest* bearing claims." *Id.* at 598-99 and n.13 (emphasis in original). The Third Circuit's discussion of discounting "future liabilities" necessarily rejects EFIH's contention that the Code makes all debt due on the petition date—i.e., that there are no "future liabilities" in bankruptcy.

Numerous courts have applied this rule of law in the context of makewholes, allowing makewholes notwithstanding the Code's supposed "acceleration" of debt. *See In re Trico Marine Servs., Inc.*, 450 B.R. 474, 477-78, 481 (Bankr. D. Del. 2011); Trustee Trial Br. 16-19. By contrast, no case has disallowed a makewhole solely by reason of the Code's purported "acceleration" of debt. Every case EFIH cites (EFIH Trial Br. 6-7; 4/22/2015 Trial Tr. 97-99) involved *contractual* acceleration, and thus the courts did "not need to look beyond the controlling language of the operative contract." *In re AMR Corp.*, 730 F.3d 88, 99 n.14 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 1888 (2014).[3]

Indeed, the *AMR* and *Momentive* courts each noted that, notwithstanding the operation of the Code, lifting the stay to permit contractual rescission *would* in fact "increase the size of [the trustee']s claim" to include the makewhole, just as the Court has held here. *Id.* at 112; *In re MPM Silicones, LLC*, 2014 WL 4436335, at *23 (Bankr. S.D.N.Y. Sept. 9, 2014), *aff'd*, No. 14-cv-07492 (S.D.N.Y. May 4, 2015), ECF No. 31.

---

[3] *See Calpine II*, 2010 WL 3835200, at *3 (S.D.N.Y. Sept. 15, 2010) ("*According to the terms of the notes*, … bankruptcy … accelerates and matures the notes."); *In re AMR Corp.*, 485 B.R. 279, 290 n.7 (Bankr. S.D.N.Y. 2013) ("As the specific language of the Indentures makes clear the parties' intent here, … *the Court does not need to look beyond the controlling language of the operative contract.*"); *In re Ridgewood Apartments*, 174 B.R. 712, 720 (Bankr. S.D. Ohio 1994) ("*By the plain meaning of the Addendum [to the Note]*, the Court finds that 'prepayment' is required in order to invoke the prepayment penalty," which never occurred); *In re Solutia Inc.*, 379 B.R. 473, 478 (Bankr. S.D.N.Y. 2007) ("*Section 6.02 of the Original Indenture* provides that if an event of default [for bankruptcy] occurs the principal … shall become immediately due and payable") (emphasis added in all).

## II.    LIFTING THE STAY WILL NOT RESULT IN ANY "GREAT PREJUDICE" TO EFIH OR ITS BANKRUPTCY ESTATE.

EFIH and its estate will suffer no "great prejudice" if the Noteholders are permitted to exercise their contractual right to rescind acceleration.  EFIH will simply have to honor its contractual bargain—its express agreement, set forth in the Indenture, that the Noteholders may waive "any" default and rescind "any" acceleration of the Notes, including any such default and acceleration occasioned by EFIH's bankruptcy filing.  All the Noteholders are seeking to do is to enforce that right—a right this Court has already held they have under the Indenture.  *See Summary Judgment Findings/Conclusions* ¶¶ 63-66, 69.  Contrary to EFIH's contentions, the Noteholders are not seeking to "create" a "new claim" or to "resurrect" a claim for a makewhole "that they don't have … under the indenture."  (4/22/2015 Trial Tr. 72-73.)  The Noteholders are simply seeking to enforce the terms of their pre-petition contract with EFIH exactly as it is written.

Honoring its contractual obligations and paying what it owes under the Indenture will not cause any "great prejudice" to EFIH and its estate.  The unrebutted trial evidence shows that respecting the Noteholders' contractual right to rescind acceleration will cause *no* harm—much less any "great prejudice"—to EFIH's operations, assets, and creditors:

- No harm to EFIH's operations.  EFIH is a holding company.  It has no physical operations, employees or customers.  Permitting the Noteholders to rescind acceleration will not harm any business, employee or customer of EFIH.  *See Proposed Findings* ¶ 69.

- No harm to EFIH's assets.  EFIH will not lose its interest in Oncor if the Noteholders are permitted to rescind acceleration.  Nor will the value of Oncor be diminished.  Oncor is "ring-fenced" from EFIH.  Oncor has no liability for EFIH's debt to the Noteholders, including the makewhole.  And permitting the Noteholders to rescind acceleration, and therefore recognizing the makewhole, will not prevent EFIH from pursuing the

6

Court-approved auction process to maximize Oncor's value.  *See Proposed Findings* ¶¶ 70-73.

- No harm to EFIH's creditors.  In Phase One, EFIH is presumed "solvent and able to pay all allowed claims of [its] creditors in full."  *Bifurcation Order* [ECF No. 128] at 3.  Accordingly, recognizing the makewhole will not reduce the recovery of any other creditor of EFIH.

In short, EFIH will suffer no serious prejudice if the stay is lifted—relief that *Texaco* described as "ministerial."  *In re Texaco, Inc.*, 81 B.R. 804, 806 (Bankr. S.D.N.Y. 1988).

EFIH introduced no evidence to the contrary.  Instead, it asked the Court to speculate about the possibility that other noteholders might allege their own makewhole claims at some point in the future.  (4/22/2015 Trial Tr. 75:3-21.)  But that argument *assumes* that EFIH will redeem those other notes at some future date.  In fact, EFIH has to date *not* redeemed any of those notes (other than a small portion of the Second-Lien Notes), and it introduced *no evidence* when, if ever, it will do so.

Moreover, Mr. Horton testified that, even if it does, EFIH does *not* concede it will be liable on any potential makewhole claims of the junior noteholders.  *See Proposed Findings* ¶ 80.  There are fundamental differences between the claim of the First Liens and the hypothetical claims of the Second Liens and the PIKs.  Unlike the First-Lien Noteholders, which moved to lift the stay at the outset of the case, the Second-Lien and PIK noteholders have never moved to lift the stay to rescind any acceleration of their notes.  *See id.* ¶ 80; *AMR*, 485 B.R. at 295 (denying lift-stay motion to rescind in part because it was filed a year into the bankruptcy case); *Solutia*, 379 B.R. at 484 n.7 (similar).  And, unlike the First-Lien Notes which were redeemed in cash early in the case, the Second-Lien and PIK notes may be reinstated at plan confirmation or may be satisfied through equity in a reorganized EFIH or other plan consideration in a transaction that may not constitute a redemption under the indentures for those notes.

7

Thus, the only non-speculative effect of lifting the stay on EFIH will be the allowance of a claim by the Noteholders against EFIH that is valid under state law. And although EFIH has filed for bankruptcy, it is presumed solvent and able to satisfy that obligation (and all others owed to its creditors) in full.

As a solvent debtor, EFIH cannot claim to be "greatly prejudiced" by having to honor legal obligations to its creditors. *See In re N.Y. Med. Grp., P.C.*, 265 B.R. 408, 414 (Bankr. S.D.N.Y. 2001) (rejecting "the flawed premise that the payment of large allowed claims constitutes legal prejudice" and lifting stay to permit creditor to sue debtor); Trustee Trial Br. 37. The Bankruptcy Code recognizes that a debtor's estate is not harmed when a solvent debtor pays a valid debt. Thus, when a solvent debtor pays what it validly owes a creditor pre-petition, the creditor's right to that payment cannot be avoided by the debtor and its estate in the bankruptcy. *See* 11 U.S.C. § 547(b)(3) (paying debt is not a preference unless "made while the debtor was *insolvent*" (emphasis added)); *see also id.* §§ 548(a)(1)(B), 548(d)(2)(A) ("satisfaction of … antecedent debt of the debtor" is "value" and not a fraudulent transfer). The Code likewise provides that, to confirm a plan, a solvent debtor must pay all of its creditors in full before the debtor may retain any portion of the estate for itself and its equity holder. *See id.* §§ 502(b), 1129(a)(2), 1129(a)(7), 1129(b).

EFIH nevertheless contends that EFIH's estate would be "greatly prejudiced" because allowing the Noteholders' claim would reduce the recovery to EFIH's equity holder EFH, and "complicate" EFIH's restructuring effort. Neither contention has merit.

*First*, a solvent debtor is not "greatly prejudiced" by having to satisfy the lawful claims of its creditors before it pays a dividend to its shareholder. To be sure, as EFIH

8

observes (EFIH Trial Br. 3; 4/22/2015 Closing Presentation 6), the estate exists "for the benefit of all creditors and equity holders of the debtor," *In re Johns-Manville Corp.*, 36 B.R. 727, 735 (Bankr. S.D.N.Y. 1984), and "a debtor-in-possession … is obligated to act … in the best interest of the entire estate, including the creditors and owners of the debtor estate," *In re Doors & More Inc.*, 126 B.R. 43, 45 (Bankr. E.D. Mich. 1991).  But it does not follow that equity's interest ranks equal with creditors' interest in the estate, or that a debtor may, let alone has a fiduciary duty to, maximize equity's dividend by dishonoring its legal obligations to its creditors.

Quite the contrary:  As the Supreme Court explained in a case that EFIH cited in its Closing Presentation (at 6), while "the fiduciary duty of the trustee runs to shareholders as well as to creditors," "[o]ne of the painful facts of bankruptcy is that the interests of shareholders become subordinated to the interests of creditors." *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985).  The Bankruptcy Code's absolute priority rule mandates that creditors must be paid in full before any value in the estate is distributed to equity.  *See* 11 U.S.C. §§ 725-726, 1129(b).  If the stay is lifted here and the Noteholders' claim is allowed, the dividend paid to EFH or its equity holders, the sponsors, may be somewhat less.  But EFIH and its estate are not "greatly prejudiced" by the result that the Bankruptcy Code itself requires.

Indeed, the cases involving solvent debtors have consistently lifted the stay, recognizing that the estate is not "greatly prejudiced" by permitting creditors to exercise their state-law rights (and, in any event, that the hardship to the creditor from denying those rights considerably outweighs any hardship to the debtor, as discussed below).  *See*

9

Trustee Trial Br. 25-29.  ***EFIH fails to cite any case—and the Trustee is not aware of any—denying stay relief where the debtor was presumed to be solvent.***[4]

*Second*, lifting the stay will not cause any "great prejudice" to EFIH by purportedly hindering its restructuring effort.  Of course, the stay is in part designed to "avoid interference with the orderly liquidation or rehabilitation of the debtor."  *Borman v. Raymark Indus., Inc.*, 946 F.2d 1031, 1036 (3d Cir. 1991).  But no such "interference" will occur here.  As Mr. Horton acknowledged, if the stay is lifted, the Debtors "will continue to try to get a plan in place."  (4/21/2015 Trial Tr. 58:10-15.)  At most, Mr. Horton testified that lifting the stay would "complicate[]" efforts to "get[] to a consensual case" because "EFH, the parent of EFIH, [would then have $]431 million less of distributable value" "relative to th[e] $700 million claim" of TCEH against EFH. (4/21/2015 Trial Tr. 38:6-39:1.)  But that conclusory assertion does not establish that lifting the stay will interfere with an orderly liquidation or rehabilitation of EFIH, much less result in "great prejudice" to EFIH and its estate.

As an initial matter, the Debtors' current filed plan provides for payment of the makewhole if it is allowed, undercutting any suggestion that the Debtors cannot reorganize if the make whole is allowed.  *See* PX 124 at 44 (Plan ¶ III(B)(19)).  And other parties in interest have been working on their own plans, including a REIT-based proposal by some TCEH creditors "that makes the E side irrelevant, [as] everybody gets what their legal entitlement is as determined by the Court."  4/14/2015 Hrg. Tr. 68:6-13

---

[4] The cases EFIH has cited did not concern motions for relief from the stay.  *See In re Johns-Manville Corp.*, 36 B.R. 727, 740 (Bankr. S.D.N.Y. 1984) (denying motion to dismiss chapter 11 case because debtor's solvency was threatened by asbestos litigation); *LaSalle Nat'l Bank v. Perelman*, 82 F. Supp. 2d 279, 292-93 (D. Del. 2000) (holding debtor's management did not breach fiduciary duties to creditors by filing for bankruptcy and pursuing non-consensual restructuring proposals); *In re Doors & More Inc.*, 126 B.R. 43,45-46 (Bankr. E.D. Mich. 1991) (denying debtor's choice of counsel as incompetent).

(Shore, TCEH Ad Hoc Group).  Even under the Debtors' proposal, Oncor's value may

well prove sufficient to pay all creditors of EFH, including whatever claim TCEH may

have, and to pay a dividend to EFH's private-equity sponsors.  At the very least, there is

no evidence that Oncor's value will *not* be sufficient to pay all E-side claims and to return

a substantial dividend to the sponsors.  To the contrary, the Court prevented the

Noteholders from taking discovery and presenting evidence at the Phase One trial to

refute any such suggestion.  (4/20/2015 Trial Tr. 36:19-37:5 ("THE COURT: … I made it

clear, and I continue to make it clear, that I'm assuming solvency, that I don't want any

testimony as to the extent of solvency.  I'm not interested in hearing arguments from

either side whether this clears the table or the debt at the EFH level.").)

  But, even if there were a plan in the works that depended on disallowing the

makewhole—and there is no evidence of that—Mr. Horton admitted that the Debtors

have previously re-doubled their efforts and simply revised their thinking when earlier

developments led them to abandon prior proposals embodied initially in Project Olympus

and later in the Restructuring Support Agreement.  (4/21/2015 Trial Tr. 56:13-58:9.)

Making adjustments as creditors' legal entitlements are sorted out is simply part of the

process of an "orderly rehabilitation"; it does not "interfere" with that process.  There are

many conceivable ways in which a debtor might wish to liquidate or reorganize, but the

only way the Bankruptcy Code permits a chapter 11 debtor to do so is through a plan of

reorganization that complies with the requirements of section 1129.  *See* 11 U.S.C. §

1129.  If the makewhole is allowed, any confirmable plan will have to allocate the

"distributable value" from EFIH's estate first toward payment of the makewhole.  *See id.*

§§ 502(b), 1129(a)(2), 1129(a)(7), 1129(b).  EFIH may contend that allowing the

makewhole will prevent EFH and its structurally junior stakeholders (including the sponsors and creditors of TCEH) from re-allocating that value to themselves instead. But that result does not "interfere" with any lawful "liquidation or rehabilitation" of EFIH.

EFH's desire to reach a consensual plan with creditors of TCEH or the sponsors cannot, as a matter of law, justify denying the Noteholders their valid contract entitlements against EFIH, so that EFIH's value can be re-allocated directly to EFH and indirectly to TCEH and the sponsors. Such a result would contravene the absolute priority rule and effect an improper substantive consolidation of EFIH with EFH, which has no basis on this record.[5] *See In re Owens Corning*, 419 F.3d 195, 210-211 (3d Cir. 2005) (substantive consolidation "may not be used … to disadvantage tactically a group of creditors in the plan process or to alter creditor rights"); *In re Augie/Restivo Baking Corp.*, 860 F.2d 515, 520-21 (2d Cir. 1988) (rejecting effort to "rob[] [noteholders] of the benefit of their bargain" by having "assets of their debtor … distributed to the creditors" of its parent debtor, even though "denial of consolidation would thwart an otherwise desirable arrangement among creditors" of the parent); Trustee Trial Br. 39-43.

In any event, EFIH and its estate will not be "greatly prejudiced" if the stay is lifted because, even if stay relief were denied, the stay would not operate to disallow the Noteholders' claim. To the contrary, the Noteholders would still have an allowable claim for the makewhole, albeit one that would be contingent on rescinding acceleration. Both the Bankruptcy Code, and the law of this Circuit, mandate that the Court "shall allow" that claim *notwithstanding that "contingen[cy]*." 11 U.S.C. § 502(b)(1) (emphasis

---

[5] There has been no disregard of corporate separateness required for substantive consolidation. Mr. Horton testified that when the Debtors issued their $42 billion in funded indebtedness, they specified which Debtor was obligated on any particular debt issuance and which assets each Debtor owned, including that only EFIH held a direct interest in Oncor Holdings. *See Proposed Findings* ¶ 77. And Messrs. Greene and Auerbach testified that they relied on EFIH's separate credit in investing in the Notes. *Id.* ¶ 39.

added); *In re Stephan*, 588 F. App'x 143, 144 (3d Cir. 2014) (unpublished) (rejecting argument that would "turn the automatic stay into a device that eliminates all contingent claims" and allowing lender's deficiency claim, even though it was unenforceable under state law because it was contingent on obtaining a foreclosure judgment and the stay barred the lender from obtaining that judgment and thereby removing that contingency) (Ambro, J.); *In re Bock Laundry Mach. Co.*, 37 B.R. 564, 567-68 (Bankr. N.D. Ohio 1984) ("no 'great prejudice' will result to the estate by allowing the Movants to proceed in state court" because "[t]he filing of a petition in bankruptcy cannot, by itself, mitigate the amount that may be owing to a claimant"); Trustee Trial Br. 44-50, 52-53.

## III.   THE HARDSHIP TO THE TRUSTEE AND THE NOTEHOLDERS BY MAINTAINING THE STAY "CONSIDERABLY OUTWEIGHS" THE HARDSHIP TO EFIH.

The Noteholders will suffer far greater harm if they are denied their state-law rights. They will be deprived of their contractual right to rescind acceleration and consequently their right to receive the payments they contracted to receive through at least December 1, 2015 or, upon EFIH's optional redemption of the Notes before that date (as happened), the makewhole. It is undisputed, for purposes of Phase One, that the amount of the makewhole owed to the Noteholders is $431 million. (4/20/2015 Trial Tr. 11:13-12:3.) Deprivation of a contract right to receive hundreds of millions of dollars is quintessential harm. *See, e.g.*, *In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 351-52, 354 & nn.65, 76 (S.D.N.Y. 2007) (threatened loss of noteholders' $250 million claim absent stay pending appeal was "irreparable harm"); Trustee Trial Br. 8.

Moreover, the uncontroverted evidence establishes that deprivation of that contract right will impose substantial economic harm on the Noteholders. If EFIH had

13

not voluntarily refinanced the Notes in June 2014, the Noteholders would have been entitled to receive:

- 10% coupon payments until December 1, 2015 of **$339 million**; plus

- a 5% redemption premium due on December 1, 2015 of **$115 million**;

- for a total stream of contract payments equal to **$454 million**.

*See Proposed Findings/Conclusions* ¶¶ 43-45.  Alternatively, upon an optional redemption before that "first call" date, as EFIH elected to effect, and the Noteholders' rescission of acceleration, the Noteholders would be entitled to receive a makewhole in approximately the same amount (on a present value basis).

But the Noteholders have received far less.  Since the redemption of their Notes, they have been unable to reinvest their funds in investments of comparable credit quality and duration with anywhere near the 10% coupon payable on the Notes.

- The Trustee's witnesses uniformly testified that there were no comparable investments available in the markedly lower-interest rate environment prevailing at the time EFIH refinanced the Notes.  *See id.* ¶¶ 48-55.

- Mr. Kearns' analysis of Bloomberg data showed that the implied yield on bonds with comparable credit risk (BB-credit ratings) and duration (17.5 months to the "first call date" of December 1, 2015) was a mere ***1.74%***.  *See id.* ¶ 50.

- Mr. Auerbach testified that the composite return for the relevant BlueMountain funds, a significant holder of the Notes, since June 19, 2014 was ***2% to 3%*** and that, because there were no comparable investment opportunities, BlueMountain already had $1 billion in cash earning essentially no return at all when EFIH redeemed the Notes.  *See id.* ¶ 54.

- Mr. Greene testified that the overall return for Halcyon, another significant holder of the Notes, since June 19, 2014 has been **negative**—approximately ***-2% to -3%***.  *See id.* ¶ 53.

The loss the Noteholders have suffered from being forced to reinvest in this low-rate environment has been substantial.  As the evidence showed, reinvesting the $2.3

billion repaid to the non-settling Noteholders in comparable bonds yielding 1.74% would

have led to losses of nearly $400 million:

- Lost contract payments at 10% to December 1, 2015:    $454 million

- Less reinvestment income at 2% to December 1, 2015:    - $58 million

- ***Actual loss:***                                    ***$396 million***

*See id.* ¶ 50.

EFIH offered no evidence to rebut any of this definitive proof of harm to the

Noteholders.  EFIH did not identify a single investment opportunity available in June

2014 of comparable credit quality and duration with a coupon anywhere near the 10%

coupon that the Notes paid.  The most it could do was point to the DIP financing.  But as

Mr. Kearns testified, the DIP financing was riskier (given its longer duration and higher

debt load), and in any event, had a far lower interest rate of 4.25% (and, if purchased on

the secondary market, an even lower yield of 3.61%).  *See id.* ¶ 49.  As Mr. Horton

acknowledged, investing in the DIP and accepting its required release of the makewhole

claim would have, at best, yielded $250 million in interest and makewhole settlement

payments through December 1, 2015.  (4/21/2015 Trial Tr. 26:9-28:22).  The Noteholders

thus would have undisputedly lost hundreds of millions of dollars by investing in the

DIP, as compared to what EFIH promised to pay them under the Indenture—a stream of

payments totaling $454 million, or the makewhole.

Simply put, the Noteholders will be harmed if the stay is maintained because they

will be deprived of their contract right to rescind acceleration, and thereby their right to

receive the makewhole that was designed to compensate them for these real—and

unrebutted—losses.  Those losses highlight why makewhole call protection is so critical

to the bargain underlying high-yield notes, and why that protection is virtually universal in the high-yield market and was featured in all of the Debtors' indentures. *See Proposed Findings* ¶¶ 12, 15-16.

Investors do not purchase a high-yield bond simply to get their principal back ten or more years in the future; they invest to earn an annual rate of return—here, 10%—at least through the date the applicable "call protection" expires. But the issuer has every incentive to refinance the notes as soon as interest rates fall, and—precisely because rates have fallen—the investor will likely be unable to reinvest in comparable bonds paying as high a coupon. Thus, the contract rights to rescind acceleration and to receive a makewhole upon the issuer's optional redemption are essential to preserve the benefit of the bargain (and functioning capital markets). *See id.* ¶¶ 4-13, 20-21, 30-35, 55-57.

At closing argument, EFIH's counsel nevertheless speculated that the Noteholders understood that their right to rescind would be subject to the stay were EFIH to file for bankruptcy. (4/22/2015 Trial Tr. 117:18-119:6.) But, as this Court has already held, the "best evidence of what parties to a written agreement intend is what they say in their writing." *Summary Judgment Findings/Conclusions* ¶ 43 (internal quotation marks omitted). And that evidence, as this Court has also already held, shows that the parties agreed in the Indenture that the Noteholders would have the right to rescind "*any*" acceleration—including a non-declared "automatic" acceleration triggered by a Chapter 11 filing—and that the sole exception to that right (for a conflicting court judgment) does not include the automatic stay. *See id.* ¶¶ 63-66, 69 (construing Indenture § 6.02); *see also* Trustee Trial Br. 37-38 (discussing EFIH's waiver of the protection of any stay, in Indenture § 4.06). In addition to the words of the Indenture, the only evidence of what

anyone understood at the time of execution of the Indenture is the testimony of EFIH's own executives that they understood that every term of the Indenture was enforceable and that the Noteholders would have the right to rescind "any" acceleration, exactly as the Indenture provided. *See Proposed Findings/Conclusions* ¶¶ 31, 33. EFIH's prospectus disclosures likewise failed to express any understanding that the right to rescind would be unenforceable in bankruptcy. *See id.* ¶¶ 34-36.

EFIH's argument also ignores the fact that, as the Court has observed, "the automatic stay can always be lifted." *Summary Judgment Findings/Conclusions* ¶ 66 n.12; *see* 11 U.S.C. § 362(d). There is no evidence that the Noteholders expected that the stay would prevent them from rescinding (and that the stay would not be lifted) if EFIH were solvent. To the contrary, Mr. Greene testified that, when Halcyon invested, it believed that EFIH was solvent and that it expected the right to rescind to be enforceable in bankruptcy, consistent with its experience (and the case law) that creditors' contract rights are respected in solvent-debtor cases. *See Proposed Findings/Conclusions* ¶¶ 38-39, 56. Mr. Auerbach of BlueMountain testified to the same effect. *See id.*[6]

Indeed, even in insolvent-debtor cases, courts frequently lift the stay to permit creditors to foreclose or to sue the debtor in state court, even though every creditor can be expected to know that its state-law right to foreclose or to sue the debtor operates against the backdrop of the Bankruptcy Code and may be subject to the stay in a bankruptcy. Courts do so precisely because they recognize that, notwithstanding that knowledge,

---

[6] The recent district court decision in *Momentive* is thus distinguishable. *In re MPM Silicones, LLC*, No. 7:14-cv-07492 (S.D.N.Y. May 4, 2015) (affirming confirmation orders). While it suggested that the parties there agreed that the right to rescind would be subject to the stay (*see id.*, slip op. at 26 n.12), as discussed above, the Indenture and the evidence here are to the contrary, and in any event, the stay can be modified in an appropriate case. The bankruptcy court in *Momentive* stressed that the debtor there was insolvent and that had it been solvent, the result would have been different; the district court said nothing to the contrary. *See In re MPM Silicones, LLC*, 2014 WL 4436335, at *17, *23.

creditors are nonetheless harmed if they are denied the state-law rights they bargained for outside of bankruptcy. The Third Circuit held in the *Wilson* decision cited by this Court in its summary judgment ruling (*Summary Judgment Findings/Conclusions* ¶ 73) that cause existed to lift the stay to permit a creditor to sue the debtor in state court— notwithstanding the general understanding that the right to sue the debtor is stayed in bankruptcy—because denial of that right would harm the creditor by resulting, as here, in the potential loss of the creditor's state-law claim. *In re Wilson*, 116 F.3d 87, 90 (3d Cir. 1997) (noting that the creditor could vindicate its claim only by appealing adverse trial ruling in state court, since bankruptcy court was bound to follow trial court's ruling).

In short, the evidence establishes actual, demonstrable harm to the Noteholders if the stay is maintained. That harm "considerably outweighs" any hardship to EFIH. The Noteholders will lose a makewhole equal to $431 million. The *net* effect on EFIH, in contrast, is far less than $431 million. By refinancing the Notes, EFIH has already realized (or will realize through December 2015) additional, substantial savings:

- $260 million in interest savings ($14.4 million per month through the "first-call date" of December 1, 2015);

- $115 million saved by avoiding the 5% call premium to redeem the Notes on the first-call date; and

- $66 million in additional interest savings (through year-end 2015) on the Second-Lien Notes by borrowing additional first-lien DIP financing to refinance a portion of those notes—a borrowing that EFIH could not have obtained if it had not redeemed the Notes.

*See Proposed Findings* ¶¶ 62-65. Those savings—totaling $441 million—*exceed* the amount of the makewhole. Paying the makewhole will also result in net operating losses that EFIH and EFH may use to offset any future federal income taxes. *See id.* ¶ 66.

18

These offsetting benefits cannot be ignored.  The overriding standard for relief from the stay requires the Court to consider the totality of the circumstances and the equities.  *Wilson*, 116 F.3d at 90 (directing courts to determine "cause based on the totality of the circumstances in each particular case"); *In re Tribune Co.*, 418 B.R. 116, 126 (Bankr. D. Del. 2009) ("Cause is a flexible concept and courts often conduct a fact intensive, case-by-case balancing test, examining the totality of the circumstances" and "apply[ing] an equitable balancing test" (quoting *In re SCO Grp., Inc.*, 395 B.R. 852, 856 (Bankr. D. Del. 2007))).  Here, the Noteholders' delivery of a rescission notice did not, in and of itself, trigger the makewhole.  Rather, the makewhole was triggered by EFIH's voluntary decision to refinance the Notes, made with full knowledge that the Court might grant the Noteholders' pending lift-stay motion to rescind acceleration.  That EFIH chose to go forward with the refinancing anyway demonstrates that any hardship to EFIH from lifting the stay is offset by substantial benefits that it expected to and did achieve.

Accordingly, in weighing the totality of the circumstances and balancing the equities, the "hardship" to EFIH of lifting the stay to permit rescission, which will render the refinancing an optional redemption, must be assessed by considering both sides of that transaction—the cost of the makewhole and the offsetting benefits realized from the refinancing.  *See, e.g.*, *In re All Am. Props., Inc.*, 2010 WL 1541694, at *3 (Bankr. M.D. Pa. Apr. 15, 2010) (harm to debtor from lifting the stay was reduced because "it will have received [a] benefit" that offset its "costs"); *In re Miller*, 2012 WL 6041639, at *13 (Bankr. D. Colo. Dec. 4, 2012) ("harm to the Debtors if the stay is lifted" to permit creditor to foreclose was offset by the fact that "the Debtors have enjoyed the benefit of continuously residing at the Property post-petition without making a single mortgage

19

payment"; "[a]fter balancing the equities in this case, … relief from stay is proper for cause"), *aff'd*, 2013 WL 4776054 (D. Colo. Sept. 4, 2013).

Moreover, even if the impact to the Noteholders and to EFIH were the same in absolute dollar terms—$431 million—the harm to the Noteholders is considerably greater in relative terms.  The makewhole represents 19% of the Noteholders' principal investment, but is less than 5% of EFIH's overall debt. *See Proposed Findings* ¶¶ 79.

In any event, EFIH's presumed solvency is again significant.  The law is clear that in solvent-debtor cases, the balance of harms weighs heavily in favor of respecting creditors' rights to be paid what they are validly owed under state law when doing so comes only at the expense of the debtor's shareholder.  Numerous cases have lifted the stay to permit creditors to enforce their state-law rights where the debtor was solvent. *See In re Armstrong World Indus.*, No. 00-4471, Mem. Order (D. Del. Dec. 10, 2001), *aff'd*, 106 F. App'x 785 (3d Cir. 2004) (unpublished); *Claughton v. Mixson*, 33 F.3d 4, 5-6 (4th Cir. 1994); *In re Premier Auto. Servs., Inc.*, 343 B.R. 501, 521 (Bankr. D. Md. 2006), *aff'd*, 492 F.3d 274 (4th Cir. 2007); *In re Novak*, 103 B.R. 403, 413-15 (Bankr. E.D.N.Y. 1989); *In re Texaco, Inc.*, 81 B.R. at 805; *see* Trustee Trial Br. 25-29.  **By contrast, EFIH has failed to cite a single case denying relief from the stay where the debtor was presumed to be solvent**.  It is thus not the Noteholders' request for stay relief that is "extraordinary" (EFIH Trial Br. 1); rather, what is "extraordinary" is EFIH's suggestion that such relief should be denied when the only effect of lifting the stay would be to allow a valid claim against a solvent debtor's estate.

Much as EFIH tries to ignore it, *Texaco* is directly on point and directly contrary to the arguments that EFIH has advanced here.  There, as here, the trustee sought *post-*

*petition* to enforce a right under the indenture (sending a notice of acceleration) that would result in a *larger* claim against the estate (locking in interest at original rate of 10.75%, rather than the 8.25% rate the debtor sought to implement post-petition). *Texaco*, 81 B.R. at 805-06.  There, as here, the only thing that stood in the way of enforcing the noteholders' state-law rights was the stay.  And there, as EFIH also argues here, the harm to the noteholders and the debtor from maintaining or lifting the stay was the same in absolute dollar terms—the increased amount of interest that would be owed upon exercise of the noteholders' rights.  Yet, the bankruptcy court lifted the stay.  It recognized that the harm to the noteholders from denying their contract rights considerably outweighed the harm to the debtor's estate, because the debtor was solvent and hence there would be no "prejudice [to] other creditors," but rather only a reduced recovery for equity.  *Id.*  "In view of the fact that Texaco proposes to pay all unsecured creditors in full . . ., there is no reason why Texaco should be allowed to modify the rights of the Noteholders by unilaterally lowering the post-petition interest rate and at the same time preventing the Noteholders from preserving whatever rights they might have to receive post-petition interest pursuant to their original contract." *Id.* at 806.

As the Trustee has briefed (Trial Br. 29-33), *Texaco* is in accord with a long line of cases holding that in solvent-debtor cases, the rights of creditors to enforce their valid state-law rights outweigh any interest of the debtor and its equity holder in invoking bankruptcy law to deny those rights.  And that is so even where creditors seek to take action *post-petition* to *increase* the size of their claim recognized against the estate.

For example, in *In re Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*, 791 F.2d 524 (7th Cir. 1986), as here, the noteholders sought to enforce a right under the indenture

*post-petition* (to declare an acceleration) that would *more than double* the size of their claim (from $24 million to $56 million). *See id.* 525-26, 528. There, as here, the only thing that stood in the way of enforcing that right was the debtor's invocation of bankruptcy law (the "reorganization court['s] … power to … 'decelerate'" under the former Bankruptcy Act). *See id.* at 526. And there, as EFIH argues here, the harm to the noteholders and the debtor of enforcing or denying their contract rights was the same in absolute dollar terms—$32 million. But the Seventh Circuit held that the noteholders were entitled to enforce their state-law rights. It recognized that the balance of harms weighed heavily in favor of the noteholders where the debtor was solvent: "[a]ll of the [debtor's] creditors will be paid in full," and hence **"*[t]he only competing equities are those of [the debtor's] shareholders, and are weak.*"** *Id.* at 527 (emphasis added).

The Second Circuit reached the same conclusion in *Ruskin v. Griffiths*, 269 F.2d 827 (2d Cir. 1959). There, too, noteholders sought *post-petition* to exercise a right under the notes (to accelerate the debt) that would likewise *increase* the size of their claim against the debtor's estate (increasing 4% interest to 6% default rate). *See id.* at 829-30. There, again, the only thing potentially preventing the noteholders from enforcing that right was bankruptcy law (the "general rule in bankruptcy … that interest … ceases to accrue" during the proceedings). *See id.* at 830-31. And there as well, the court held that the noteholders were entitled to enforce their contract rights. It recognized that the balance of harms is fundamentally different when a debtor is solvent and the question whether to honor a creditor's contract rights is no longer "a contest between creditors" of the debtor, but "a contest between a debtor's creditor and its stockholders." *See id.* at 830. **"*[Stockholders] cannot complain that they are treated inequitably when their***

***interest is cut down by the payment of a sum to which the debenture holders are clearly***

***entitled by the express provisions of the trust indenture."*** *Id.* at 832 (citation omitted).

      EFIH's only response is to say that "none of [these decisions] are lift stay cases."

(4/22/2015 Trial Tr. 119:7-10.)  That is simply wrong; *Texaco* is a lift-stay case, as are

many others the Trustee noted above, and *Chicago* and *Ruskin* addressed the analogous

legal principle under the old Bankruptcy Act.  But even those cases that do not involve

the stay bear on the question here.  The Court has held that the Noteholders have the right

to rescind as a matter of state contract law, and the only question is whether EFIH can

invoke federal bankruptcy law to deny them that right.  The fundamental principle

applied in all of these cases is that bankruptcy-law limitations on a creditor's otherwise

enforceable state-law rights, which may be necessary to protect other creditors in

*insolvent*-debtor cases, do not carry the same force in *solvent*-debtor cases.  Indeed, in

cases like *Dow Corning*, courts have held that creditors may enforce their contract rights

(there, to default interest at the contract rate) even in the absence of express language in

the Code so providing.  *In re Dow Corning*, 456 F.3d 668, 679-80 (6th Cir. 2006).  Thus,

if anything, this is an *easier* case, as Congress has granted this Court express authority to

modify the stay for cause.  *See* 11 U.S.C. § 362(d)(1).

      EFIH's reliance on *AMR* and *Momentive* is misplaced.  Both courts emphasized

the impact of lifting the stay on the debtor's other "*creditors*."  *AMR*, 730 F.3d at 112;

*MPM*, 2014 WL 4436335, at *23; Trustee Trial Br. 34-35.  *AMR* explained that "[o]ne of

the principal purposes of the automatic stay is to preserve … the debtor's estate for the

benefit of all the *creditors*."  730 F.3d at 112 (emphasis added).  Nowhere did it mention

harm to *equity*.  The same is true for *Momentive*, which distinguished (and approved of)

solvent-debtor cases but stressed that the case before it involved an insolvent debtor. 2014 WL 4436335, at *17, *23.  Neither court suggested that, in the absence of harm to *creditors*, it would have denied the noteholders' contract right to rescind for the benefit of equity, contrary to the long line of solvent-debtor cases respecting creditors' rights.

*     *     *

In the end, this dispute boils down to a few simple propositions.  <u>First</u>, it is the law of the case that the Noteholders "had the right" as a matter of contract to "decelerate the Notes" and that, if the automatic stay were modified to allow them to do so, "the automatic default would be waived, the Notes would no longer be immediately due and the refinancing would require payment of the Applicable Premium." *Summary Judgment Findings/Conclusions* ¶ 69.  EFIH's contrary contention—that the Bankruptcy Code itself accelerated the maturity date of the Notes, such that the Noteholders cannot rescind acceleration—not only amounts to reargument of a point this Court already rejected, but is contrary to the words of the statute, the controlling law of this Circuit, and numerous decisions from around the country.  <u>Second</u>, EFIH will suffer no "great prejudice" if the Noteholders are permitted to exercise their contractual right to rescind.  EFIH is a holding company.  It will lose no assets, business or operations.  And while the valid claims against it will include the makewhole, that is only a small percentage of its overall liabilities, and in any event, EFIH is presumed solvent and able to pay all allowed claims of all of its creditors in full, no matter the dollar amount of its liabilities.  <u>Finally</u>, the Noteholders will suffer far greater harm if they cannot rescind.  They will be denied a contractual right they bargained to obtain; will lose a makewhole that is central to this and any other high yield investment especially where, as here, interest rates have declined

24

markedly and there was no opportunity to reinvest in a comparable credit earning nearly the same rate of interest; and will forfeit nearly 19% of their investment.  That harm considerably outweighs any impact on EFIH, which has already obtained hundreds of millions of dollars in benefits from its voluntary refinancing of the Notes.  This is especially so because the law is crystal clear that where, as here, the debtor is solvent, the rights of creditors to exercise their contractual protections and to be paid what they are validly owed under state law trumps the rights, if any, of the debtor's equity holder to invoke federal bankruptcy law to deny those creditors their lawful rights and to obtain a windfall solely for the equity holder.

## CONCLUSION

The Trustee and the Noteholders submitted considerably more evidence than required to meet their prima facie case to support lifting the stay for cause, and EFIH submitted almost no evidence in response.  EFIH thus did not meet its burden of proof at trial.  Accordingly, the Court should enter an order that, if EFIH is solvent, the Trustee and the Noteholders are entitled to relief from the stay to permit the Trustee and the Noteholders to exercise their right to rescind acceleration, and preserving the parties' rights with respect to any and all issues to be determined in Phase Two.

Dated:  May 20, 2015

COLE SCHOTZ P.C.

*/s/* J. Kate Stickles

Norman L. Pernick (Bar No. 2290)
J. Kate Stickles (Bar No. 2917)
500 Delaware Avenue, Suite 1410
Wilmington, DE  19801
Telephone:  302-652-3131
Facsimile:  302-652-3117
npernick@coleschotz.com
kstickles@coleschotz.com

Warren A. Usatine
Court Plaza North
25 Main Street
Hackensack, NJ 07602
Telephone: 201-489-3000
Facsimile:  201-489-1536
wusatine@coleschotz.com


WILMER CUTLER PICKERING HALE AND DORR LLP

Philip D. Anker
Charles C. Platt
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: 212-230-8800
Facsimile:  212-230-8888
Philip.Anker@wilmerhale.com
Charles.Platt@wilmerhale.com

Dennis L. Jenkins
George W. Shuster Jr.
60 State Street
Boston, MA 02109
Telephone:  617-526-6000
Facsimile: 617-526-5000
Dennis.Jenkins@wilmerhale.com
George.Shuster@wilmerhale.com


ROPES & GRAY LLP

Keith H. Wofford
Mark Somerstein
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: 212-596-9000
Facsimile:  212-596-9090
Keith.Wofford@ropesgray.com
Mark.Somerstein@ropesgray.com

D. Ross Martin
Andrew Devore
800 Boylston Street, Prudential Tower
Boston, MA  02199-3600
Telephone: 617-951-7000
Facsimile:  617-951-7050
Ross.Martin@ropesgray.com
Andrew.Devore@ropesgray.com


DRINKER BIDDLE & REATH LLP

James H. Millar
1177 Avenue of the Americas
41st Floor
New York, NY 10036-2714
Telephone:  212-248-3264
Facsimile:   212-248-3141
James.Millar@dbr.com


*Counsel for Plaintiff-Trustee Delaware Trust Company and the undersigned Noteholders*