## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re )<br><br>ENERGY FUTURE HOLDINGS CORP., )<br>*et al.*,[1] )<br><br>_____*Debtors.*_____ )<br><br>DELAWARE TRUST COMPANY )<br>as INDENTURE TRUSTEE, )<br> )<br>_____*Plaintiff,*_____ )<br> )<br>v. )<br> )<br>ENERGY FUTURE INTERMEDIATE )<br>HOLDING COMPANY LLC and )<br>EFIH FINANCE INC. )<br> )<br>_____*Defendants.*_____ ) | Chapter 11<br>Bankruptcy Case No. 14-10979 (CSS)<br>(Jointly Administered)<br><br><br><br><br>Adversary Proceeding<br>No. 14-50363 (CSS) |

### EFIH DEBTORS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (*pro hac vice*)
Stephen E. Hessler (*pro hac vice*)
Brian E. Schartz (*pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

James H.M. Sprayregen, P.C. (*pro hac vice*)
Marc Kieselstein, P.C. (*pro hac vice*)
Chad J. Husnick (*pro hac vice*)
Steven N. Serajeddini (*pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

*Co-Counsel to the Debtors and Debtors in Possession*

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://ww.efhcaseinfo.com.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING STAY-APPLICABILITY MOTION[2]

### I.    INTRODUCTION & PROCEDURAL HISTORY[3]

1.    This adversary proceeding relates to a series of 10% First Lien Notes issued by Energy Future Intermediate Holding Company, LLC and EFIH Finance, Inc., with original maturity of 2020, pursuant to an Indenture dated August 17, 2010.   The Indenture was supplemented as of January 29, 2013.

2.    On April 29, 2014, the EFIH Debtors filed petitions for relief under chapter 11 of the Bankruptcy Code.   The EFIH Debtors sought and obtained approval of debtor-in-possession financing, in part, to repay all of the outstanding Notes and settle certain Noteholders' claims (the "DIP Motion").  (PX 94; PX 101; No. 14-10979, D.I. 858.)  The non-settling Noteholders are represented by the Trustee, the Plaintiff in this adversary proceeding.

3.    On May 13, 2014, the Trustee objected to the DIP Motion, arguing that the Noteholders were entitled to a secured claim for an amount described in the Indenture as the "Applicable Premium" because: (i) an Optional Redemption would occur when the Notes were repaid; (ii) the EFIH Debtors intentionally defaulted by filing bankruptcy to avoid paying the Applicable Premium, and (iii) the repayment would be a breach of the Noteholders' purported right to rescind the Notes' acceleration.  (No. 14-10979, D.I. 421.)

4.    On May 15, 2014, the Trustee initiated an adversary proceeding.  (No. 14-10979, D.I. 470; No. 14-50363, D.I. 1.)  Its Complaint contained the claims from the May 13 objection,

---

[2] The Court hereby makes the following findings of fact and conclusions of law pursuant to Fed. R. Bank. P. 7052, which is applicable to this matter by virtue of Fed. R. Bankr. P. 9014. To the extent any findings of fact constitute conclusions of law, they are adopted as such. To the extent any conclusions or law constitute findings of fact, they are adopted as such.

[3] Capitalized terms in the Introduction and Procedural History section not otherwise defined in this section are defined below.

plus (a) a claim for breach of a purported "no-call" covenant in the Indenture; and (b) three unsecured claims, one for each of the three counts raised in its May 13 objection.  (*Id.* ¶ 76.)

5.      The Trustee also simultaneously filed a motion seeking a declaration that it could decelerate the Notes without violating the automatic stay, or alternatively for relief from the automatic stay.  (No. 14-10979, D.I. 473 ("Stay-Applicability Motion").)  On June 4, 2014, the Trustee sent a purported notice of deceleration to the EFIH Debtors. (PX 100.)

6.      On June 6, 2014, the Court approved the DIP financing, the EFIH Debtors' use of the DIP financing to pay the outstanding EFIH First Lien Noteholders, and the settlement resolving certain Noteholders' claims for the Applicable Premium.  (No. 14-10979, D.I. 858 (Order Approving EFIH First Lien Settlement); PX 101 (Order approving use of DIP financing).)  On June 19, 2014, in accordance with the Order, the EFIH Debtors repaid all Noteholders their full principal and accrued interest (other than disputed amounts of interest and any make-whole payments) and paid the settling Noteholders an agreed upon amount to settle any remaining claims under the Notes.  The non-settling Noteholders are pursuing claims for the Applicable Premium in this adversary proceeding.  (No. 14-50363, D.I. 9, 10.)

7.      On September 12, 2014, the Court bifurcated this adversary proceeding.  (No. 14-50363, D.I. 128.)  This is Phase One of the litigation in which the Court will determine: (1) whether EFIH is "liable under applicable non-bankruptcy law for . . . a Redemption Claim," including the "make-whole" or other "damages . . . under any 'no-call' covenant, 'right to de-accelerate,'" or applicable law; and (2) "whether the Debtors intentionally defaulted in order to avoid paying an alleged make-whole premium or other damages."  (*Id*. at 2-3.)  The Court ruled that, except with respect to the Trustee's claim that EFIH intentionally defaulted to evade

payment of the make-whole,[4] "the Court will assume solely for the purposes of Phase One that the EFIH Debtors are solvent and able to pay all allowed claims of their creditors in full." (No. 14-50363, D.I. 128 at 3.)  If the Court finds EFIH liable for a Redemption Claim, and if EFIH contests that it is, in fact, solvent, Phase Two will determine "(a) whether the EFIH Debtors are insolvent, and, if so, whether that insolvency gives rise to any defenses arising under the Bankruptcy Code in favor of the EFIH Debtors that bar or limit the amount of the Redemption Claim, and (b) the dollar amount of . . . any allowed Redemption Claim." (*Id.*)

8.      The parties conducted full discovery on the Phase One issues, including the production of documents, multiple fact witness depositions, production of expert reports, and multiple expert witness depositions.  Thereafter, the EFIH Debtors and the Trustee submitted cross-motions for summary judgment, seeking to resolve all of the claims raised in the contested matter, the adversary complaint, and the Stay-Applicability Motion.  (No. 14-50363, D.I. 175, 176, 178, 179.)

9.      On March 26, 2015, the Court issued Findings of Fact and Conclusions of Law Regarding Cross-Motions for Summary Judgment (No. 14-10979, D.I. 3984; No. 14-50363, D.I. 245) (the "Summary Judgment Decision").  In the Summary Judgment Decision, the Court denied the Trustee's motion for summary judgment in its entirety and entered summary judgment in favor of the EFIH Debtors on Counts I-IV of the Complaint (provided, however, that entry of summary judgment on Count I of the Complaint was without prejudice) and entered summary judgment, in part, in favor of the EFIH Debtors on the Stay-Applicability Motion.  (*Id.* at ¶ 95.)  Summary judgment was not entered on the Stay-Applicability Motion solely to the issue of whether, as a factual matter, cause exists to lift the automatic stay.  (*Id.*)  On March 31,

---

[4] The Court has granted summary judgment in favor of the EFIH Debtors on this claim. (Summary Judgment Decision ¶¶ 8(b), 58-61, 91 (No. 14-50363, D.I. 246).)

2015, the Court issued an Order on the docket of this adversary proceeding which denied the Trustee's motion for summary judgment in its entirety and entered summary judgment in favor of the EFIH Debtors on Counts I-IV of the Complaint (provided, however, that entry of summary judgment on Count I of the Complaint was without prejudice) and entered summary judgment, in part, in favor of the EFIH Debtors on the Stay-Applicability Motion.  (No. 14-50363, D.I. 247.) Summary judgment was not entered on the Stay-Applicability Motion solely to the fact issue of whether cause exists to lift the automatic stay.  (*Id.*)[5]

10.     As part of the Summary Judgment Decision, the Court found that "[a] genuine issue of material fact exists that requires a trial on the merits as to whether the Trustee can establish cause to lift the automatic stay, *nunc pro tunc* to a date on or before June 19, 2014, to allow the Trustee to waive the default and decelerate the Notes."  (Summary Judgment Decision ¶ 8(f)).

11.     The parties conducted a trial from April 20 through April 22, 2015, on the merits whether the Trustee can establish cause to lift the automatic stay, *nunc pro tunc* or otherwise.

12.     As set forth below, the Court finds that, notwithstanding that the EFIH Debtors are deemed solvent for Phase One, cause does not exist to lift the automatic stay to allow the Trustee to waive the default and decelerate the Notes.  As a result, the Court will grant judgment in favor of the EFIH Debtors in this matter and deny the Trustee's motion to lift the automatic stay.  More specifically, the Court holds as follows:

---

[5] The Trustee has filed a Motion to Alter or Amend Judgment to Clarify that the Order Dated March 26, 2015 Is Not a Final Judgment.  (No. 14-50363, D.I. 254).  These Findings of Fact and Conclusions of Law along with the Court's forthcoming order dispense with any need to address that motion and, accordingly, it will be denied as moot.

a.      Notwithstanding that the EFIH Debtors are presumed solvent for Phase One, cause does not exist to lift the automatic stay to allow the Trustee to waive the default and decelerate the Notes.[6]

b.      Great prejudice to either the EFIH Debtors' estate or the EFIH Debtors, in the form of the loss of hundreds of millions of dollars, will result from a lifting of the automatic stay.

c.      The hardship to the Noteholders by maintenance of the automatic stay is, at most, equal to the hardship to the EFIH Debtors from lifting the automatic stay and therefore does not considerably outweigh the hardship to the EFIH Debtors.

d.      The Indenture governing the Notes operates against the backdrop of the Bankruptcy Code.  Therefore, the bargain to which the EFIH Debtors, Trustee, and Noteholders agreed contemplated the potential for the invocation of the automatic stay by the Bankruptcy Code.

e.      The Trustee has not demonstrated that it would succeed on the merits, because, even if the Court were to lift the automatic stay, the Trustee's attempt to decelerate the Notes would not be permitted due to the automatic acceleration of the Notes by operation of the Bankruptcy Code.

f.      Thus, final judgment will be entered in favor of the EFIH Debtors on all counts of the Complaint as well as on the Stay-Applicability Motion. There is no need for a Phase Two of this litigation.

---

[6] The Trustee argues that lifting the automatic stay would not be *nunc pro tunc*.  The Court need not address this argument as the Court finds insufficient cause to lift the automatic stay *nunc pro tunc* or otherwise.

RLF1 12027224v.1

## II.    FINDINGS OF FACT

13.    An Indenture dated August 17, 2010 (the "<u>Indenture</u>") governs the EFIH 10.000% Senior Secured Notes Due 2020.  (PX 33.)  That Indenture was supplemented as of January 29, 2013, but the parties agree that the provisions of that supplement are not relevant here.  EFIH also issued certain 6.875% Senior Secured Notes Due 2012 pursuant to a separate 2012 indenture.  That 2012 indenture is substantially identical in all relevant aspects to the Indenture.

### A.    The Parties

14.    Plaintiff is the indenture trustee (the "<u>Trustee</u>") for the EFIH 10.000% Senior Secured Notes due 2020 ("<u>Notes</u>"), representing Noteholders who did not accept a settlement offer in connection with the repayment of the Notes at the outset of these chapter 11 cases.  (*See* No. 14-10979, D.I. 74.)  Defendants are Energy Future Intermediate Holding Company, LLC and EFIH Finance, Inc. (collectively "<u>EFIH</u>," the "<u>EFIH Debtors</u>," or "<u>Defendants</u>").

### B.    Negotiation of the EFIH Notes

15.    In the summer of 2010, EFIH negotiated and ultimately executed a debt exchange that involved the issuance of $2.18 billion of Notes.  (4/20/15 Trial Tr. 68:16-19 (Kearns Test.), 235:14-17 (Horton Test.).)  EFIH and the "Dealer Manager" investment banks were the principal negotiators of the offering and execution documents, including the Indenture that is at the center of this dispute.  (11/20/14 Moldovan Dep. 40:22-41:13.)  Counsel to the original Trustee of the Notes was also involved in negotiations of the transaction, including the Indenture.  (4/21/15 Trial Tr. 171:7-23 (Moldovan Test.).)

16.    Many terms and conditions of the Indenture were modeled on other indentures governing previous debt issuances by EFIH and EFH Corp. in 2009 and 2007, respectively. (Moldovan Dep. 143:11-20.)    Like the Indenture, these previous agreements included an

"Optional Redemption" provision providing for the payment of an "Applicable Premium" under certain limited circumstances expressly specified in those agreements.  (PX 33 at § 3.07.)

### C.     The August 2010 EFIH Debt Exchange

17.     The "August 2010 Exchange" called for exchanging outstanding 11.250%/12.000% Senior Toggle Notes due 2017 and 10.875% Senior Notes due 2017 issued by EFH Corp. and guaranteed by EFIH (the "Old Notes") for up to $2.18 billion aggregate principal amount of 10% Notes, as well as an aggregate of $500 million in cash.  (4/20/15 Trial Tr. 235:14-17 (Horton Test.); 4/21/15 Trial Tr. 20:17-19 (Horton Test.).)

18.     The August 2010 Exchange was an arms' length transaction between EFIH, EFH, and the Noteholders.  One of the Trustee's experts described the exchange as a "balanced trade." (4/20/15 Trial Tr. 165:20-23 (McCarty Test.).)  At the time of the August 2010 Exchange, the Old Notes were trading at approximately seventy cents on the dollar.  (4/20/15 Trial Tr. 165:6-11 (McCarty Test.); 4/21/15 Trial Tr. 20:7-9 (Horton Test.).)  In the August 2010 Exchange, the Noteholders received the Notes (which granted additional security (first lien versus unsecured)) and $500 million in cash. (4/20/15 Trial Tr. 164:9-25 (McCarty Test.); 4/21/15 Trial Tr. 19:16-20:6 (Horton Test.).)  The exchange ratio in the August 2010 Exchange effectively gave the Noteholders a five point increase in terms of fair market value on the Old Notes.  (4/20/15 Trial Tr. 165:12:17 (McCarty Test.); 4/21/15 Trial Tr. 18:22-19:6 (Horton Test.).)

19.     The Notes are governed by an Indenture.  (PX 33.)  The Indenture is governed by New York law.  (*Id.* at § 13.08.)    The Indenture constitutes the bargain between the EFIH Debtors, the Noteholders, and the Trustee.  (4/20/15 Trial Tr. 170:1-12 (McCarty Test.).)

20.     The call protection provisions were generally the same in the Indenture as in the indenture governing the Old Notes.  (*E.g.*, PX 9; 4/20/15 Trial Tr. 172:4-13 (McCarty Test.); 4/21/15 Trial Tr. 22:4-10 (Horton Test.).)  EFIH's Treasurer, Anthony Horton, testified that

8

neither the Noteholders nor their representatives (including the Trustee) ever brought up during negotiations that they wanted or expected a make-whole payment following a bankruptcy acceleration.  (4/21/15 Trial Tr. 19:20-21:7, 21:17-22:2 (Horton Test.).)

21.    At the closing of the August 2010 Exchange, as is customary in issuances of securities, several written legal opinions were given by counsel to EFIH. (4/21/15 Trial Tr. 166:13-23 (Moldovan Test.).)  Simpson Thacher & Bartlett LLP, counsel to EFIH, negotiated the contents of its opinion with the dealer managers and the Trustee (including their respective counsel).  (*Id*. at 171:7-23.)   Among other things, Simpson Thacher opined that certain provisions of the Indenture were enforceable, but stated expressly that it was not opining on their enforceability in the event of a bankruptcy or insolvency.  (*Id*. at 172:5-173:1; DX 1 at 7.)  In the registration statement for the issuance of the Notes filed with the Securities & Exchange Commission, Simpson Thacher also provided an "Exhibit 5" opinion that contained similar opinions and qualifications regarding the enforceability of the Notes.  (DX 2 at 2; 4/21/15 Trial Tr. 176:19-177:9 (Moldovan Test.).)

### D.    Investors in the Notes

22.    Although the Notes were originally issued in the August 2010 Exchange, they continued to be freely traded from the time of the Exchange through trial.  At trial, the Court heard from two Noteholders: Ethan Auerbach from Blue Mountain Capital Management and John Greene from Halcyon Asset Management.

23.    Blue Mountain Capital Management ("Blue Mountain") is an investment manager with $20 billion in assets under management.  (4/21/15 Trial Tr. 87:10-11, 87:17-19 (Auerbach Test.).)  As of the repayment date of the Notes, June 19, 2014, Blue Mountain owned $561 million in face value of the Notes and, at the time of trial, owned roughly $650 million in face value of the Notes.  (*Id*. at 94:1-7, 110:9-12.)  Blue Mountain first purchased Notes in the fall of

9

2011.  (*Id*. at 111:16-19.)  Blue Mountain subsequently made hundreds of different purchases

and sales of the Notes between its first purchase in 2011 and repayment of the Notes in 2014.

(*Id*. at 117:1-4.)  Blue Mountain performed significant diligence on the transaction, and Mr.

Auerbach testified that it was important to read the Indenture to understand the bargain.  (*Id*. at

116:14-16.)  Blue Mountain also read a Form 8-K filed by EFIH with the SEC on November 1,

2013, that noted that the EFIH Debtors did not intend to pay any make-whole premiums on the

Notes, and Blue Mountain understood that restructuring proposals proposed by EFIH and by

certain creditors included not paying a make-whole premium.  (*Id*. at 118:18-119:18.)

24.    After November 1, 2013, Blue Mountain understood that a bankruptcy filing for

EFIH was reasonably likely and that the EFIH Debtors, the Debtors' creditors, or both would

fight the make-whole.  (*Id*. at 119:19-120:5.)  Blue Mountain continued to buy the Notes (or

claims related thereto) after November 1, 2013, up until days before the lift-stay trial.  (*Id*. at

121:5-10, 121:22-23.)  The amount that Blue Mountain believes it would recover in the form of a

make-whole payment should the automatic stay be lifted is slightly more than $100 million.  (*Id*.

at 110:22-25.)  That amount, $100 million, represents approximately 0.5% of Blue Mountain's

approximately $20 billion assets under management.  (*Id.* at 109:25-110:2.)  Blue Mountain

could have invested in the EFIH First Lien DIP but chose not to.  (*Id*. at 114:12-19.)

25.    Halcyon Asset Management ("Halcyon") currently has roughly $11 billion in

assets under management.  (*Id*. at 152:18-20 (Greene Test.).)  Mr. Greene is a partner who

manages portfolios in the hedge fund section of Halcyon.  (*Id*. at 152:15-17, 153:1-7.)  As of the

repayment date, June 19, 2014, Halcyon owned roughly $175 million in face value of the Notes

and, at the time of trial, owned closer to $150 million in face value of the Notes.  (*Id*. at 151:21-

152:2.)

26.     Halcyon first purchased Notes in early April, 2014.  (*Id*. at 148:11-13.)  At the time of this initial purchase, Mr. Greene was aware that EFIH was going to challenge paying the make-whole premium in bankruptcy.  (*Id*. at 148:14-18.)  Mr. Greene and other members of his team read the Indenture, the Notes, the Offering Memorandum, and EFIH's SEC filings.  (*Id*. at 157:13-24.)  Halcyon made dozens of purchases and sales of Notes (or claims relating thereto) between its initial purchase and the lift-stay trial in this case.  (*Id*. at 148:19-149:14.)  Mr. Greene testified that he was familiar with the automatic stay at the time Halcyon first invested in the Notes.  (*Id*. at 155:24-156:2.)  Mr. Green calculated the amount that Halcyon believes it would recover in the form of a make-whole payment, should the automatic stay be lifted, to be $28 million.  (*Id*. at 154:16-22.)  That amount, $28 million, would represent around 0.25% of the total assets under management at Halcyon.  (*Id*. at 154:24-155:3.)  Halcyon could have invested in the first lien DIP but chose not to.  (*Id.* at 158:9-14.)

## E.     Purpose of Make-Whole Call Protection

27.     At trial, the Trustee called several experts to opine on the purpose of make-whole call protection in high yield debt instruments.  The make-whole amount simply makes an investor whole for any loss associated with early repayment, including reinvestment risk.  (4/20/15 Trial Tr. 114:4-6 (Kearns Test.); 4/20/15 Trial Tr. 136:1-18 (McCarty Test.).)  Thus, make-whole call protection protects an investor for lost interest prior to the first call date, the call premium, and the softer costs of reinvestment.  (4/21/15 Trial Tr. 113:14-18 (Auerbach Test.).)

## F.     Repayment of the Notes

28.     On April 29, 2014, the EFIH Debtors filed petitions for relief under chapter 11 of the Bankruptcy Code.  The EFIH Debtors sought approval of debtor-in-possession financing, in part, to repay all of the outstanding Notes and settle certain Noteholders' claims.

11

29.     On June 4, 2014, the Trustee sent a purported notice of rescission to the EFIH Debtors.  (PX 100.)  The Court previously held that sending a notice of rescission is an act to "collect, assess or recover" on a claim, especially when the Noteholders have already been paid their full principal and accrued interest.  (Summary Judgment Decision ¶ 67.)  Thus, the Trustee's notice of rescission was void *ab initio* as a result of the automatic stay.  (*Id*. at ¶ 69.)

30.     On June 6, 2014, the Court entered an order approving the EFIH First Lien DIP, (PX 101.)  In that Order, the Trustee reserved certain rights as of June 6, 2014, including the right to argue that "any acceleration of the EFIH First Lien Notes is subject to rescission by majority holders thereof pursuant to the terms of the EFIH First Lien Indentures."  (*Id.* at ¶ 40(b).)

31.     On June 19, 2014, EFIH paid all outstanding principal and accrued interest (other than disputed amounts of interest and any make-whole payments) on the First Lien Notes. (4/20/15 Trial Tr. 70:5-20 (Horton Test.).)

32.     The Court previously held that when the EFIH Debtors filed for bankruptcy, the Notes automatically accelerated and became due and payable immediately.  (Summary Judgment Decision ¶ 56.)  Thus, the June 19, 2014 repayment was not an Optional Redemption under the Indenture and the Trustee was not entitled to the Applicable Premium under the express terms of the Indenture.  (*Id*. at ¶¶ 51, 57.)

33.     The Court also determined that a genuine issue of material fact existed as to whether the Trustee can establish cause to lift the automatic stay, *nunc pro tunc* to a date on or before June 19, 2014, to allow the Trustee to decelerate the Notes.  (*Id*. at ¶ 71.)

### G.     Economic Impact of Lifting or Maintaining the Automatic Stay

34.     One of the Trustee's experts, Christopher Kearns, calculated the make-whole amount as $431 million.  (4/20/15 Trial Tr. 112:18-20 (Kearns Test.).)  Mr. Kearns testified that

the make-whole calculation was the liquidated damages amount for the make-whole under the contract. (*Id*. at 96:4-21, 112:14-17.) The make-whole amount, or "Applicable Premium," is calculated pursuant to specific requirements in the Indenture. (*Id*. at 76:23-77:16.)

35.    Mr. Kearns also testified about a variety of reinvestment scenarios, assuming different rates of return from reinvesting the principal and interest paid to the Noteholders on June 19, 2014. (*Id*. at 114:7-13.) These scenarios resulted in a range of net loss from $333.7 million up to $428 million. (*Id*.) In addition to the reinvestment scenarios presented by Mr. Kearns, each of the Noteholders had the opportunity to participate in the DIP. (4/21/15 Trial Tr. 26:21-27:6 (Horton Test.).) EFIH's Treasurer, Anthony Horton, calculated that the Noteholders would have earned $140 million in interest with the DIP interest rate. (*Id*. at 27:12-17.) In addition, in June 2014, the non-settling Noteholders could have obtained approximately a $110 million settlement payment for their make-whole claims. (*Id*. at 27:18-28:6.)

36.    EFIH's Treasurer also testified that the Debtors' current proposed plan of reorganization proposes to pay nothing towards the make-whole amount. (4/21/15 Trial Tr. 31:23-32:1 (Horton Test.).) Mr. Horton further stated that the loss to EFIH of $431 million would be "quite significant" and would "further complicate[] a very complex case in getting to a consensual case given that EFH, the parent of EFIH, now had [$]431 million less of distributable value and the implications of getting EFH and EFIH through bankruptcy made it more troublesome." (*Id*. at 38:15-39:9.) $431 million is a "big number" or "a lot of money" for any company, particularly one like EFIH that is attempting to restructure through Chapter 11. (*See* 4/20/15 Trial Tr. 201:10-13, 206:2-22 (Horton Test.).)

37.    The EFIH Debtors received interest savings by virtue of repaying the Notes on June 19, 2014. EFIH's Treasurer calculated those interest savings to be roughly $150 million

from the repayment date through the first call date of December 1, 2015.  (4/20/15 Trial Tr. 224:12-17 (Horton Test.); 4/21/15 Trial Tr. 23:23-24:5 (Horton Test.).)  EFIH will receive those interest savings regardless of whether a make-whole is paid.  (4/21/15 Trial Tr. 24:25-25:18 (Horton Test.).)  And EFIH will receive those interest savings regardless of whether the automatic stay is lifted.  (*Id*.)

38.    Should the automatic stay also be lifted to allow for deceleration of the EFIH second lien and PIK notes, the EFIH Second Lien Noteholders would assert a make-whole claim of $350-400 million and the PIK Noteholders would almost inevitably assert their own make-whole claim of $113 million.  (*Id*. at 33:4-19.)

## III.    CONCLUSIONS OF LAW

### A.    Jurisdiction and Venue

39.    The Debtors commenced these chapter 11 cases on April 29, 2014 (the "Petition Date").  Venue in the United States Bankruptcy Court for the District of Delaware was proper as of the Petition Date pursuant to 28 U.S.C. §§ 1408 and 1409 and continues to be so in the context of this adversary proceeding.  This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 11 U.S.C. § 157(b).

### B.    Governing Standard

40.    The Bankruptcy Code authorizes bankruptcy courts to grant relief from the automatic stay for "cause."  11 U.S.C. § 362(d)(1).  Courts are to determine "cause" based on the totality of the circumstances in each particular case.  *In re Wilson*, 116 F.3d 87, 90 (3d Cir. 1997).  The factors courts generally use in determining whether cause exists are: (1) whether any great prejudice to either the bankrupt estate or the debtor will result from a lifting of the automatic stay; (2) whether the hardship to the non-bankrupt party by maintenance of the

14

automatic stay considerably outweighs the hardship to the debtor; and (3) the probability of the creditor prevailing on the merits. *In re Downey Fin. Corp.*, 428 B.R. 595, 609 (Bankr. D. Del. 2010).

41.      While the Trustee has again argued that, as a matter of law, cause exists to lift the automatic stay because (at this stage of the proceedings) the EFIH Debtors are presumed to be solvent, the Trustee has failed to cite any cases standing for that proposition.  While a debtor's solvency may, in certain cases, be a relevant consideration in determining whether cause exists to lift the automatic stay, it is not the sole factor to be considered by the Court.  (Summary Judgment Decision ¶ 74.)

42.      The EFIH Debtors have the burden of proof, 11 U.S.C. § 362(g)(2), but only after the Trustee makes a *prima facie* case that it is entitled to relief. *In re RNI Wind Down Corp.*, 348 B.R. 286, 299 (Bankr. D. Del. 2006) *aff'd*, 359 F. App'x 352 (3d Cir. 2010).  "A *prima facie* case requires a showing by the movant of 'a factual and legal right to the relief that it seeks.'" *RNI*, 348 B.R. at 299 (quoting *In re Elmira Litho, Inc.*, 174 B.R. 892, 902 (Bankr. S.D.N.Y. 1994)).  Failure to prove a *prima facie* case requires denial of the requested relief. *RNI*, 348 B.R. at 299.  To apply section 362(g)(2) differently "would force the debtor to prove a negative, that no cause exists." *In re Rexene Products Co.*, 141 B.R. 574, 577 (Bankr. D. Del. 1992).

43.      As previously held, this Court must consider whether to lift the automatic stay *nunc pro tunc* to a date on or before June 19, 2014, the date EFIH repaid the Notes.  (Summary Judgment Decision ¶¶ 8(e), 8(f), 41, 68-71, 90.)  The standard for retroactive automatic stay relief in the Third Circuit is: "(1) whether the creditor was aware of the filing or encouraged violation of the automatic stay; (2) whether the debtor engaged in inequitable, unreasonable, or

dishonest behavior; and (3) whether the creditor would be prejudiced." *See In re Myers*, 491 F.3d 120, 129 (3d Cir. 2007).

44.    The Trustee argues that the Court should not apply the *nunc pro tunc* standard because its reservation of rights in the June 6, 2014, EFIH First Lien DIP Order, (PX 101 ¶ 40(b)), preserved a right to not have to meet any additional showing required by the *nunc pro tunc* standard.  This is incorrect.  The Trustee violated the automatic stay on June 4, 2014, when it sent the rescission notice to the EFIH Debtors.  (Summary Judgment Decision ¶ 67, 68.)  The June 6, 2014, reservation of rights in the EFIH First Lien DIP Order reserved the Trustee's rights as of June 6, two days after the Trustee's automatic stay violation.  Even if the Court had decided the Trustee's lift-stay motion on June 6, 2014, the Court would still have needed to apply the *nunc pro tunc* standard to determine whether to lift the automatic stay retroactively to annul the Trustee's prior automatic stay violation.  Accordingly, the *nunc pro tunc* standard applies here.

45.    Under either the *nunc pro tunc* standard or the customary lift-stay factors, no cause exists to lift the automatic stay.

### C.    Great Prejudice Would Occur To The EFIH Debtors' Estate Or The EFIH Debtors Upon A Lifting Of The Automatic Stay

46.    Courts consider harm to the estate when assessing whether cause exists to lift the automatic stay.  *Downey*, 428 B.R. at 609.  The estate is defined broadly, 11 U.S.C. § 541, and is created "for the benefit of all creditors and equity holders of the debtor," *In re Johns-Manville Corp.*, 36 B.R. 727, 735 (Bankr. S.D.N.Y. 1984).  Accordingly, harm to EFIH's equity holder, EFH, is just as relevant as harm to other stakeholders (including EFIH's creditors) and should be considered as part of the Court's lift-stay analysis.  In fact, the EFIH Debtors have "a fiduciary duty to act in the best interest of the estate as a whole, including its creditors, equity interest holders and other parties in interest."  *LaSalle Nat. Bank v. Perelman*, 82 F. Supp. 2d 279, 292

(D. Del. 2000); *In re Gen. Growth Props., Inc.*, 409 B.R. 43, 64 (Bankr. S.D.N.Y. 2009) ("Delaware law . . . provides that the directors of a solvent corporation are authorized—indeed, required—to consider the interests of the shareholders in exercising their fiduciary duties."). The fact that a solvent corporation has commenced a chapter 11 case does not alter these well-settled principles. *See LaSalle Nat. Bank*, 82 F. Supp. 2d at 292 ("The fiduciary duties that a debtor owes the estate are comparable to the duties that the officers and directors of a solvent corporation owe their shareholders outside bankruptcy.").

47.    The Trustee has argued that, if EFIH is solvent and can pay its creditors' claims, there is no relevant harm to its estate. But the Trustee has cited to no authority suggesting that solvency alone provides "cause" to lift an automatic stay, and the Court does not agree that a solvent debtor's estate cannot suffer harm. (Summary Judgment Decision ¶ 75.) To do so would effectively remove equity holders from the "bankrupt estate."

48.    Therefore, the Court must consider whether great prejudice would result to either the EFIH Debtors or the EFIH Debtors' estate (including equity) as a result of lifting the automatic stay. It is clear that, should the automatic stay be lifted, the Notes decelerated, and the Trustee's requested make-whole claim be paid, that such payment would substantially reduce the value of other EFIH stakeholder recoveries, including recoveries to equity (i.e. EFH). The Trustee's expert, Mr. Kearns, calculated the make-whole amount at $431 million. (4/20/15 Trial Tr. 112:18-20 (Kearns Test.).) EFIH's Treasurer testified that the current proposed plan of reorganization proposes to pay nothing towards the make-whole amount. (4/21/15 Trial Tr. 31:23-32:1 (Horton Test.).) Lifting the automatic stay would, thus, cause nearly half a billion dollars to leave the estate. This was echoed in Mr. Horton's testimony as he explained that the impact on the issuer would be $431 million should the automatic stay be lifted. (*Id.* at 26:3-6.)

17

Regardless of whether those amounts are going to creditors, equity, or creditors of equity (or creditors of other Debtors in these Chapter 11 cases), there can be no dispute that hundreds of millions of dollars is a substantial amount of distributable value and the EFIH Debtors' estate will be greatly prejudiced by the loss of that amount.

49.     The Trustee argues that, as a legal matter, honoring state law obligations to permit the Noteholders to rescind contractual acceleration cannot constitute harm for the lift-stay analysis.  This is incorrect.  The automatic stay prohibits creditors from exercising their state law contract rights against the estate.  *See* 11 U.S.C. § 362(a).  By the Trustee's reasoning, the estate would never be harmed when creditors exercise their state law contract rights, and the automatic stay should therefore always be lifted.  If true, this would nullify the automatic stay and therefore the Trustee cannot be correct.

50.     In addition, Mr. Horton testified that, should the automatic stay also be lifted to allow for deceleration of the EFIH second lien and PIK notes, the EFIH Second Lien Noteholders will likely assert an additional make-whole claim of approximately $350-400 million and the PIK Noteholders a make-whole claim of approximately $113 million.  (*Id.* at 33:4-19.)  Thus, the EFIH estate could confront a total loss of over approximately $900 million in distributable value if the Court were to lift the automatic stay in each of those instances.  The Court need not decide the likelihood of such events, however, as $431 million is already a material sum, the loss of which would greatly prejudice the EFIH Debtors' estate.  Mr. Horton, who serves as Treasurer for both EFIH and EFH, testified that this prejudice would be felt by both entities.  (*Id.* at 39:20-23.)

51.     The estate would also likely suffer additional damage beyond the substantial economic loss detailed above in the form of a negative impact on restructuring and

18

reorganization. Though testimony was limited on this issue, Mr. Horton made clear that the loss of $431 million in distributable value would further complicate the Debtors' Chapter 11 proceedings. (*Id.* at 38:15-39:9.) This sentiment was echoed in argument by representatives for the Official Committees of Unsecured Creditors for both TCEH and EFH/EFIH. (4/22/15 Trial Tr. 100:20-108:11.) Although the Court appreciates the fact that the Debtors' reorganization effort will almost certainly be more difficult with hundreds of millions of dollars of distributable value removed from the EFIH Debtors' estate, it is again unnecessary to quantify those amounts given the clear prejudice to the estate from the loss of the first lien make-whole amount alone. Given the inherent interdependence of these restructurings, it is evident that permitting one creditor at EFIH to significantly expand its claims will greatly prejudice the restructuring at each of the major debtor entities, including the EFIH Debtors.

> **D.    The Harm To The Noteholders From Maintaining The Automatic Stay Does Not "Considerably Outweigh" The Harm To The EFIH Debtors From Lifting The Automatic Stay**

52.    The second prong of the cause analysis assesses "whether the hardship to the non-bankruptcy party by maintenance of the stay *considerably outweighs* the hardship to the debtor." *Downey*, 428 B.R. at 609 (emphasis added). The Court has considered both economic harm to the parties as well as harm to the parties' expectations.

*Economic Harm*

53.    If the Court declines to lift the automatic stay, the harm to the Noteholders is straightforward—it is, at most, the value of the Applicable Premium, or $431 million. If the Court lifts the automatic stay, the harm to the EFIH Debtor's estate, at the least, is the exact same approximately $431 million dollars. Thus, the harms resulting from lifting or maintaining the automatic stay are, in the best case for the Trustee, in equipoise and the EFIH Debtors have

demonstrated that the harm to the moving party (here the Noteholders) does not "considerably outweigh" the harm to the EFIH Debtors.

54.     Though unnecessary to reach this conclusion, the Court notes that the harm to the EFIH Debtors from lifting the automatic stay could eventually be much greater.   The EFIH Second Lien Trustee has already stated that it will be filing "shortly" its own motion to lift the automatic stay to rescind acceleration, (4/13/15 Ltr. G. Horowitz to Court, at 3 (No. 14-50363, D.I. 260); 4/22/15 Trial Tr. 63:1-8 (Closing)), and the Trustee for the EFIH Unsecured "PIK" Noteholders will likely seek to do the same to rescind the acceleration of the PIK Notes.   As noted above, this could expose the EFIH Debtors to the loss of upwards of approximately $900 million from its estate.   Moreover, the Court notes the obvious fact that exposing the EFIH Debtors to approximately $900 million or more in expanded claims will have a major effect on the Debtors' (including the EFIH Debtors') reorganization process and will benefit a few creditors at the expense of other stakeholders.   The Trustee argues that the effect of this loss of distributable value, however large, to EFIH's equity holder should be irrelevant or, at best, of little moment in this analysis.   The Court disagrees.   EFIH is wholly-owned by EFH, another major debtor in these cases.   The loss of distributable value to EFIH's equity holder significantly complicates and prejudices EFH's proposed jointly administered restructuring, which, in turn, makes EFIH's own restructuring more difficult.   The Court need not ignore the reality that every restructuring proposal made in these cases to date has needed to grapple with the interdependent restructurings of EFH and its two major subsidiaries, EFIH and TCEH.   Thus, if the Trustee were permitted to lift the automatic stay and expand its own claim by $431 million, it would cause great prejudice not only to the EFIH Debtors, but also to their equity holder, EFH, which, in turn would significantly complicate efforts to successfully restructure the Debtors (including the

EFIH Debtors).  To the extent that lifting the automatic stay here leads to follow on make-whole claims from other EFIH creditors, the loss to the EFIH estate and its other stakeholders would approach $1 billion and only compound the harm to the EFIH estate.

55.     Thus, while the applicable standard requires the harm to the Noteholders to considerably outweigh the harm to the EFIH Debtors in order to lift the automatic stay, the facts here demonstrate that the harm to the EFIH Debtors outweighs the harm to the Noteholders.

56.     Faced with the argument that the harms are, at best for the Noteholders, equal here, the Trustee has put forward multiple creative but unpersuasive arguments:

57.     First, the Trustee argues that the harm to the EFIH Debtors is actually less than the harm to the Noteholders on a percentage basis.  This argument fails for multiple reasons.  As an initial matter, the Trustee has pointed to no authority supporting this alternative approach to calculating harm.  Additionally, it is an improper apples-to-oranges calculation to look at the make-whole amount as a percentage of the EFIH Debtors' total debt vis-à-vis a percentage of the Noteholders' claim.  Taking such an approach would necessarily show that almost any claim is less important to a debtor (as a percentage of its overall debt) than to a creditor who has a claim for only a portion of that debt.  Finally, as the EFIH Debtors demonstrated at trial, $431 million would actually be a much larger percentage of the EFIH Debtors' total debt than make-whole recoveries would be to investors like Blue Mountain and Halcyon as a percentage of their overall invested assets.[7]  The concept that $431 million is not meaningful to a debtor with billions in debt is belied by the testimony of Mr. Greene at Halcyon who agreed that the $28 million (the amount he calculates as Halcyon's portion of the make-whole) was material to Halcyon even

---

[7] Blue Mountain stands to gain roughly $100 million should the automatic stay be lifted– an amount equal to approximately 0.5% of its assets under management.  Halcyon stands to gain $28 million should the automatic stay be lifted– an amount equal to approximately 0.25% of its assets under management.

though it is one quarter of one percent of its assets under management.  (4/21/15 Trial Tr. 154:16-155:16 (Greene Test.).)

58.    Second, the Trustee argues that EFIH will receive the benefit of a net operating loss ("NOL") to offset the loss from the Applicable Premium.  (1L Pre-Trial Br. 36; 4/20/15 Trial Tr. 211:18-212:14 (Horton Test.); PX 141.)  The Trustee has not presented sufficient evidence to demonstrate which entity might receive this tax benefit—EFIH or its parent EFH.  More importantly, for an NOL to have value, there must be income tax liability against which to use any NOLs.  The Trustee has not shown that EFIH or EFH are generating sufficient income such that any additional NOLs would provide any additional benefit to EFIH or its estate.

59.    Third, the Trustee argues that the EFIH Debtors' harm upon lifting the automatic stay would actually be less than $431 million because the EFIH Debtors have achieved significant interest savings by repaying the Notes.  This argument ignores the governing standard, which makes clear that the relevant inquiry is the harm that results from *lifting or from maintaining the automatic stay*; not what harm may or may not have resulted from the EFIH Debtors repaying the Notes on June 19, 2014.  *See Downey*, 428 B.R. at 609 (factors include: "(1) [w]hether any great prejudice to either the bankrupt estate or the debtor *will result from a lifting of the stay*; (2) [w]hether the hardship to the non-bankrupt party *by maintenance of the stay* considerably outweighs the hardship to the debtor…."  (emphasis added).

60.    The Court need not consider either the EFIH Debtors' interest savings or the Noteholders' ability to reinvest their principal and interest repaid on June 19, 2014.  Neither of those issues relate to the harm associated with lifting the automatic stay.  Instead, they focus on the harm to the parties associated with repaying the Notes before the first call date.  EFIH will receive the same interest savings regardless of whether the automatic stay is lifted, just as the

contractually provided make-whole calculation does not change based on the investment returns the Noteholders receive through reinvestment. (4/21/15 Trial Tr. 24:25-25:18 (Horton Test.).)

61.    Even if the Court were to consider interest savings to the EFIH Debtors on one hand and reinvestment benefits to the Noteholders on the other, the harm would remain similar to each. EFIH's Treasurer testified that the EFIH Debtors will receive approximately $150 million in interest savings for the period from the repayment date to the first call date. (4/20/15 Trial Tr. 224:12-17 (Horton Test.); 4/21/15 Trial Tr. at 23:23-24:5 (Horton Test.).) The Trustee's higher calculation is flawed: first, the Trustee improperly calculated interest savings from repaying *both* the settling and non-settling Noteholders; and second, the Trustee includes interest savings going beyond the first call date, while the Trustee's expert agrees that a rational borrower would have called the notes upon the first call date. (4/20/15 Trial Tr. 80:7-25 (Kearns Test.).)

62.    In terms of the reinvestment opportunities for the Noteholders, multiple witnesses testified that the non-settling Noteholders would have had an opportunity to invest in the first lien DIP. (4/21/15 Trial Tr. 26:20-27:6 (Horton Test.); 4/21/15 Trial Tr. 107:4-7, 108:3-9 (Auerbach Test.); 4/21/15 Trial Tr. 145:9-19 (Greene Test.).) The first lien DIP was offered at an interest rate of 4.25%. (4/21/15 Trial Tr. 28:13-18 (Horton Test.); 4/20/15 Trial Tr. 93:8-13 (Kearns Test.).) The non-settling Noteholders, as was their right, elected not to invest the money they were repaid in the DIP because they determined a 4.25% yield was not attractive enough to them.[8] (4/21/15 Trial Tr. 114:12-19 (Auerbach Test.); 4/21/15 Trial Tr. 158:9-14 (Greene Test.).) An investment at 4.25% would have earned the Noteholders $140 million between the repayment date and the first call date. (4/21/15 Trial Tr. 27:12-17 (Horton Test.).) In addition,

---

[8] Instead, representatives from both Blue Mountain and Halcyon testified that they reinvested capital in other investments that have returned less than the first lien DIP. (4/21/15 Trial Tr. 105:8-106:24 (Auerbach Test.); *see* 4/21/15 Trial Tr. 144:19-24 (Greene Test.).) That they made alternative, and apparently riskier, investment decisions does not alter the mitigation opportunity they had in the form of the first lien DIP.

the non-settling Noteholders could have obtained approximately a $110 million settlement payment for their make-whole claim in June of 2014.  (*Id*. at 27:18-28:6.)

63.    To be sure, there is some debate over exactly what reinvestment options the Noteholders could have utilized as well as the exact interest savings the EFIH Debtors received from repayment of the Notes.  The evidence above suggests that the Noteholders could have mitigated their harm at least as effectively, if not more so, than the EFIH Debtors, and that the Noteholders could have earned more through reinvestment than the EFIH Debtors saved through interest savings.  However, for reasons stated above, such an inquiry is unnecessary when evaluating the economic harm associated with lifting the automatic stay.  Instead, the harm to the EFIH Debtors associated with lifting the automatic stay is at least the amount of the Applicable Premium.  So, too, the harm to the Noteholders from maintaining the automatic stay is at most the amount of the Applicable Premium.

64.    The Trustee has failed to produce any evidence that the economic harm to the Noteholders from maintaining the automatic stay exceeds the $431 million make-whole calculation.  Instead, all of the Trustee's witnesses admitted that $431 million is a cap on the Noteholders' damage.  One of the Trustee's experts, Christopher Kearns, ran four harm scenarios based on reinvestment alternatives; each resulted in harm under $431 million.  (4/20/15 Trial Tr. 114:7-22 (Kearns Test.).)  Mr. Kearns admitted that he views the Applicable Premium as liquidated damages and testified that his make-whole calculation is his calculation of the harm to the Noteholders.  (*Id.* at 112:8-111:2.)  The Trustee's expert Michiel McCarty similarly testified that a make-whole payment would "literally . . . make the investor whole on a calculated basis for what they had originally committed to when they put out their money."  (*Id.* at 136:1-5 (McCarty Test.).)  Mr. McCarty explained that "cash is the whole issue" and the "central point"

24

of the transaction and pointed to no losses beyond cash to the Noteholders. (*Id.* at 153:16-21.) Additionally, Ethan Auerbach from Blue Mountain admitted that the failure to allow Blue Mountain to rescind acceleration of the debt does not cause Blue Mountain any harm other than its portion of the make-whole payment. (4/21/15 Trial Tr. 113:19-23 (Auerbach Test.).)

65.    Perhaps most directly on point, the Trustee's expert James Cacioppo wrote in his report and confirmed at trial that "EFIH, the issuer, elected to refinance the notes in bankruptcy without paying a make whole. As a result, it was able to obtain the very same economic benefits for itself and caused the very same economic harm to the holders of the notes that the call protections were designed to protect." (4/21/15 Trial Tr. 84:16-85:2 (Cacioppo Test.).)

66.    In summary, the economic harm to the EFIH Debtors' estate from lifting the automatic stay would be at least as great as the economic harm to the Noteholders from maintaining the automatic stay, and the EFIH Debtors have met their burden to show that the harm to the Noteholders does not "considerably outweigh" the harm to the EFIH Debtors. *Downey*, 428 B.R. at 609.

### Harm to Investor Expectations

67.    In addition to the evidence on economic harm, the Court also considered evidence regarding the alleged harm to the Noteholders' expectations. The Court finds insufficient harm to the Noteholders' expectations (if indeed, there was any) to change the previous analysis.

68.    The Trustee spent considerable time on various risk factors (included and not included) in the 2010 Offering Memorandum associated with the August 2010 Exchange. (PX 30.) The Court does not find the omission of a risk factor relating to the ability of a Noteholder to decelerate the Notes after a bankruptcy acceleration to be probative. (*See In re MPM Silicones, LLC*, No. 14-22503-RDD, 2014 WL 4436335, at *18 (Bankr. S.D.N.Y. Sept. 9,

25

2014).)  Instead, the only evidence presented from parties actually involved in negotiating the Indenture was that the issue of whether or not a make-whole premium would be paid following a bankruptcy acceleration was never raised by the Noteholders.  (4/21/15 Trial Tr. 19:20-22:3 (Horton Test.).)

69.    Through expert testimony and argument, the Trustee suggested Noteholder expectations were dashed because the 2010 Offering Memorandum did not include among its enumerated risk factors a risk factor stating that a Noteholder would not receive a make-whole payment following a bankruptcy-caused acceleration.  Yet anyone reading the customary legal opinions provided in connection with the August 2010 Exchange would have seen that outside counsel refused to opine that the terms of the Indenture, including the make-whole provisions, would be enforceable in the event of a bankruptcy.  (DX 1 at 5, 7, 8, 10; DX 2 at 2.)  And the actual investors that testified, who owned an aggregate of over $800 million in face value of the Notes at the time of trial, were sophisticated investors who did not purchase Notes until well after the August 2010 Exchange.  They testified that they performed extensive diligence on the Indenture, the Notes, and all of EFIH's public filings.  They purchased the Notes fully aware of both the implications of the automatic stay and of the EFIH Debtors' intent not to pay a make-whole premium in bankruptcy.  It cannot be said that these investors, hedge funds engaged in litigation arbitrage, suffered any added "expectation harm."  The Trustee did not present any other evidence of the alleged expectations of non-testifying investors, nor did the Trustee's experts make any effort to speak to such Noteholders.  (4/20/15 Trial Tr. 166:3-21 (McCarty Test.); 4/20/15 Trial Tr. 109:16-111:15 (Kearns Test.).)[9]

---

[9] The Trustee also suggests that the absence of a "no make-whole in bankruptcy" risk factor indicates that the Debtors believed that a make-whole payment would be made following a bankruptcy acceleration.  (*See* 4/22/2015 Trial Tr. 46:13-19 (Closing).)  There is no evidence in the record supporting this position.  To the contrary, EFIH's Assistant Treasurer testified that he "never thought that in a bankruptcy that lenders could rescind

70.     The Trustee also relies on broad arguments that the Noteholders would not have purchased the Notes if the Notes did not provide for "standard and customary" call protection. (*See e.g.* 4/20/15 Trial Tr. 58:12-60:24 (Kearns Test.); 157:12-22 (McCarty Test.).)  To be sure, the Indenture *does* provide for call protection, just not when the Notes are accelerated after a bankruptcy filing.  (Summary Judgment Decision ¶¶ 8(a), 51, 57.)  The Trustee nonetheless argues that automatic acceleration makes the bonds "freely callable" and therefore not market standard.  (4/20/15 Trial Tr. 134:13-25 (McCarty Test.); 4/21/15 Trial Tr. 96:13-24 (Auerbach Test.).)  But none of the Trustee's three experts reviewed the actual text of the rescission or acceleration provisions of any other indentures to determine whether failing to provide a make-whole premium after bankruptcy-caused automatic acceleration was market standard.  (4/20/15 Trial Tr. 107:25-108:4, 108:21-25 (Kearns Test.), *id.* ¶ 168:20-169:1 (McCarty Test.); 4/21/15 Trial Tr. 85:6-15 (Cacioppo Test.).)  Additionally, the Trustee's expert, Mr. Cacioppo, testified that the acceleration and rescission language in the Indenture is "the standard form indenture," and that this language has been used in "a ton . . . a lot of deals."  (4/21/15 Trial Tr. 80:1-11 (Cacioppo Test.).)  This evidence is consistent with the body of case law construing similar and identical "standard form indentures" and finding, like this Court did, that while they may contain some call protections, they do not entitle noteholders to make-whole payments upon bankruptcy-caused acceleration.  *See, e.g.*, *HSBC Bank USA, N.A. v. Calpine Corp.*, No. 07-3088, 2010 WL 3835200, at \*4-\*5 (S.D.N.Y. Sept. 15, 2010) (*Calpine II*); *MPM*, 2014 WL 4436335, at \*14; *In re Premier Entm't Biloxi LLC*, 445 B.R. 582, 626-632 (Bankr. S.D. Miss. 2010).

71.     The Court agrees that the best evidence of the bargain between the parties, and therefore the parties' expectations, is the governing contract—in this case, the Indenture.

---

an acceleration and therefore effectively, in my mind, reinstate debt."  (4/21/15 Trial Tr. 189:15-21 (Moldovan Test.).)

(4/20/15 Trial Tr. 170:1-12 (McCarty Test.).)  As the Court previously found, the bargain struck does not contemplate for the payment of the Applicable Premium after a bankruptcy-caused acceleration.  (Summary Judgment Decision ¶ 51.)[10]  In other words, the Trustee and the Noteholders bargained for the automatic acceleration of debt in the event of a bankruptcy default and must live with the consequences of their bargain.  They did not bargain for a make-whole premium in the event of an automatic acceleration following an event of default as a result of a bankruptcy filing by the EFIH Debtors, but they could have.  True, the Noteholders also bargained for the right to rescind acceleration, but that right was blocked by the automatic stay.  (*Id*. at ¶ 67.)

72.    In a recent ruling by Judge Briccetti in the Southern District of New York, in an appeal from the bankruptcy court's ruling in *In re MPM Silicones* ("Momentive"), the court addressed the identical issue now before this Court.  In *Momentive*, the trustee and noteholders also attempted to rescind a Code-mandated acceleration and also attempted to lift the automatic stay.  The court affirmed the bankruptcy court's refusal to lift the automatic stay, stating "[i]t matters not that the Senior Lien Noteholders' right to rescind the acceleration of the debt was canceled by the application of the automatic stay pursuant to section 362 of the Bankruptcy Code.  The Debtors correctly point out that all contracts signed among the parties operate against the backdrop of the relevant Bankruptcy Code provisions.  The potential for an automatic stay and the effect of the Code's automatic acceleration of the Notes upon the filing of a bankruptcy case is a part of the bargain to which the parties agreed."  (Memorandum Decision, *In re MPM Silicones, LLC*, No. 7:14-cv-07492-VB at 26, n.12 (S.D.N.Y. May 4, 2015) (Dkt. No. 31).)

---

[10] On multiple occasions the Trustee elicited evidence about whether various witnesses had ever seen an Indenture without call protection.  Such questions miss the mark.  There is no dispute here as to whether or not the Indenture contained make-whole call protection.  It did.  The Indenture did not, however, provide for a make-whole payment in the particular circumstance of repayment following an automatic acceleration following a default brought on by a bankruptcy filing.

73.     That observation applies equally here.   The Trustee and Noteholders here also negotiated contract terms that expressly contemplated that a bankruptcy filing by the Issuer (EFIH) was one of many possibilities.  The Trustee and Noteholders cannot now argue that the application of the automatic stay, a prominent Code provision that applies in all chapter 11 cases, was unexpected.  Nor did the court in *Momentive* reference the debtor's insolvency as a rationale for its refusal to lift the automatic stay.  It focused instead on the terms of the parties' written agreement.   The Court agrees with the reasoning in *Momentive* regarding the lack of any justification for lifting the automatic stay here.   As such, it would cause harm to the *EFIH Debtors'* expectations to now lift the automatic stay to allow the Noteholders to increase their claim by hundreds of millions of dollars.  Because the evidence demonstrates that the harm to the Noteholders is, at most, equal to the harm to the EFIH Debtors, the second factor of the *Downey* test weighs heavily against finding cause to lift the automatic stay.

**E.      The Trustee Has No Possibility Of Succeeding On the Merits Because the Bankruptcy Code Automatically Accelerated The Notes, And Bars The Trustee From Reinstating The Notes.**

74.     The Court has previously held that the Indenture provides the Noteholders with a contractual right to rescind the automatic acceleration that occurs under the Indenture. (Summary Judgment Decision ¶¶ 65-66.)  This ruling does not mean that the Trustee has already demonstrated that it will prevail on the merits, however.  Although the Trustee has a *state law* right to rescind *contractual* acceleration, the Notes were *also* accelerated by the straightforward operation of the Bankruptcy Code.  The Trustee has no legal authority to rescind the acceleration that occurred as matter of law to reinstate its debt, and accordingly, the Trustee also cannot succeed on the third prong of the lift-stay analysis.[11]  *See Downey*, 428 B.R. at 609.

---

[11] The Trustee's inability to succeed on the merits is also a failure to make a *prima facie* case for relief.  *See RNI*, 348 B.R. at 299.

75.    The Bankruptcy Code broadly defines "claims" to include any claims regardless of whether the claim is "reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed [or] undisputed . . . ." 11 U.S.C. § 101(5)(A).  Under section 502, claims are deemed allowed unless a party in interest objects, and will not be disallowed because it is unmatured (other than claims for unmatured interest).  *See* 11 U.S.C. § 502.  As a result, a filing for bankruptcy automatically accelerates the principal amount of all claims against a debtor.  *U.S. Trust Co. of N.Y. v. LTV Steel Co. (In re Chateaugay Corp.)*, 150 B.R. 529, 542 (Bankr. S.D.N.Y. 1993), *aff'd,* 170 B.R. 551 (S.D.N.Y. 1994) ("[Debtor's] Chapter 11 filing automatically, by operation of bankruptcy law, accelerated the entire principal amount of each Series of Bonds"); *In re Manville Forest Prods. Corp.*, 43 B.R 293, 297-98 (Bankr. S.D.N.Y. 1984) ("It is a basic tenet of the Bankruptcy Code that [b]ankruptcy operates as the acceleration of the principal amount of all claims against the debtor . . . .") (internal quotation marks omitted), *aff'd in part, rev'd in part on other grounds*, 60 B.R. 403 (S.D.N.Y. 1986).  Courts in other make-whole cases have held, or otherwise recognized, that the Code accelerated the notes at issue there.  *See In re AMR Corp.*, 485 B.R. 279, 290 n.7 (Bankr. S.D.N.Y. 2013), *aff'd*, 730 F.3d 88 (2d Cir. 2013); *In re Solutia Inc.*, 379 B.R. 473, 484-85 (Bankr. S.D.N.Y. 2007); *In re Calpine Corp. (Calpine I)*, 2007 WL 4326738, at *9 (S.D.N.Y. Nov. 21, 2007).

76.    The Trustee does not have the power to rescind the acceleration mandated by the Bankruptcy Code.  The only provision in the Code that authorizes debt to be decelerated and reinstated is section 1124(2)(B).  This provision permits a Chapter 11 debtor—not a creditor—to reinstate debt pursuant to a plan of reorganization.  *See* 11 U.S.C. § 1124(2)(B).  Because Congress specified that debt may be reinstated pursuant to a plan of reorganization, Congress should be understood to have intentionally precluded debt from being reinstated in other

contexts, like those here.  *See BFP v. Resolution Trust Corp.*, 511 U.S. 531, 537 (1994) ("[I]t is generally presumed that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another.").  Moreover, there is no authority holding that private parties may contract around the operation of the Bankruptcy Code in this context.  Nothing in the Indenture can be interpreted to override the Code's legal effect.

77.     The Code itself prevents the Trustee from reinstating debt outside of a plan of reorganization and over the EFIH Debtors' objections.  Other courts have addressed this same argument in very similar contexts.  These courts have held that no-call provisions, which prevent debts from being repaid before a certain date, cannot be enforced in bankruptcy to prevent debtors from repaying their debts.  *See Calpine II*, 2010 WL 3835200, at *3 (collecting cases and authorities).  Here, the Trustee similarly attempts to use its state law rescission right to reinstate a debt that the Code has accelerated and made due and payable on the Petition Date.  Here too that state law right cannot be enforced in bankruptcy.

## IV.     CONCLUSION

78.     For the reasons set forth above, the Court finds that cause does not exist to lift the automatic stay and grants judgment in favor of the EFIH Debtors on all counts of the Complaint.  The Court further finds that the Trustee's Stay-Applicability Motion should be denied.  A separate order will be issued.

BY THE COURT:

_____

Christopher S. Sontchi
United States Bankruptcy Court

Dated: _____, 2015

RESPECTFULLY PROPOSED AND SUBMITTED

Dated: May 20, 2015
     Wilmington, Delaware

*/s/ Jason M. Madron*

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
920 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 651-7700
Facsimile:    (302) 651-7701
Email:    collins@rlf.com
       defranceschi@rlf.com
       madron@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:    edward.sassower@kirkland.com
       stephen.hessler@kirkland.com
       brian.schartz@kirkland.com

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Chad J. Husnick (admitted *pro hac vice*)
Steven N. Serajeddini  (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:    james.sprayregen@kirkland.com
       marc.kieselstein@kirkland.com
       chad.husnick@kirkland.com
       steven.serajeddini@kirkland.com

Co-Counsel to the Debtors and Debtors in Possession