## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re )<br><br>ENERGY FUTURE HOLDINGS CORP., )<br>*et al.*,[1] )<br><br>*Debtors.* )<br>_____ )<br>DELAWARE TRUST COMPANY )<br>as INDENTURE TRUSTEE, )<br> )<br>*Plaintiff*, )<br> )<br>v. )<br> )<br>ENERGY FUTURE INTERMEDIATE )<br>HOLDING COMPANY LLC and )<br>EFIH FINANCE INC. )<br> )<br>*Defendants.* )<br>_____ ) | Chapter 11<br>Bankruptcy Case No. 14-10979 (CSS)<br>(Jointly Administered)<br><br><br><br><br>Adversary Proceeding<br>No. 14-50363 (CSS) |

## EFIH DEBTORS' POST-TRIAL BRIEF

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (*pro hac vice*)
Stephen E. Hessler (*pro hac vice*)
Brian E. Schartz (*pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

James H.M. Sprayregen, P.C. (*pro hac vice*)
Marc Kieselstein, P.C. (*pro hac vice*)
Chad J. Husnick (*pro hac vice*)
Steven N. Serajeddini (*pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

*Co-Counsel to the Debtors and Debtors in Possession*

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

**Table of Contents**

**Page**

I. No Cause Exists To Lift The Automatic Stay. ............................................................ 3

   A.   Legal Standard And Burden Of Proof.................................................................. 3

   B.   The EFIH Debtors' Estate, Including Its Equity Holders, Will Suffer Great Prejudice From Lifting The Automatic Stay. ...................................................... 5

        1.   The EFIH estate will suffer great prejudice if the stay is lifted. ................. 6

        2.   The Trustee's arguments fail to demonstrate that EFIH's estate will not suffer great harm from lifting the automatic stay. ........................ 8

        3.   The Trustee relies on inapplicable case law when it asserts that it merely seeks to enforce its state law rights. .......................................................... 10

   C.   Hardship To The Noteholders From Maintaining The Automatic Stay Does Not Considerably Outweigh The EFIH Debtor's Hardship From Lifting The Automatic Stay. ............................................................................................... 14

        1.   The financial harm to the Noteholders is the value of the Applicable Premium, the same harm to the EFIH Debtors. ........................................ 15

        2.   There is no harm to investor expectations. ................................................. 16

   D.   The Trustee Cannot Succeed On the Merits Because Debt Can Only Be Reinstated In Bankruptcy Through 11 U.S.C. § 1124(2)(B)............................. 20

II. Lifting The Stay Retroactively To Ratify The Trustee's Stay Violation Is An Extraordinary Remedy, Which Should Be Denied.................................................... 23

## Table of Authorities

**Page(s)**

**Cases**

*Claughton v. Mixson,*
  33 F.3d 4 (4th Cir. 1994) ................................................................................. 13

*Commodity Futures Trading Comm'n v. Weintraub,*
  471 U.S. 343 (1985) ......................................................................................... 5

*Fallick v. Kehr,*
  369 F.2d 899 (2d Cir. 1966) ........................................................................... 9

*Hansen, Jones & Leta, P.C. v. Segal*,
  220 B.R. 434 (D. Utah 1998) .......................................................................... 5

*HSBC Bank USA Nat'l Ass'n v. Calpine Corp. (Calpine II)*,
  No. 07 Civ 3088 (GBD), 2010 WL 3835200 (S.D.N.Y. Sept. 15, 2010) ......... 14, 20, 21

*In re 203 N. LaSalle St. P'ship*,
  246 B.R. 325 (Bankr. N.D. Ill. 2000) .............................................................. 9

*In re 4848, LLC*,
  490 B.R. 343 (E.D. Wis. 2013) ........................................................................ 10

*In re Aleris Intern., Inc.*,
  456 B.R. 35 (Bankr. D. Del. 2011) .................................................................. 8

*In re Am. Remanufacturers, Inc.*,
  451 B.R. 349 (Bankr. D. Del. 2011) ................................................................ 20

*In re AMR Corp.*,
  485 B.R. 279 (Bankr. S.D.N.Y. 2013),
  *aff'd* 730 F.3d 88 (2d Cir. 2013) ................................................................... 10, 11, 12, 20

*In re Atl. Bus. & Cmty. Corp.*,
  901 F.2d 325 (3d Cir. 1990) ............................................................................ 24

*In re Calpine Corp. (Calpine I)*,
  2007 WL 4326738 (S.D.N.Y. Nov. 21, 2007) ................................................. 20

*In re Chemtura*,
  439 B.R. 561 (Bankr. S.D.N.Y. 2010) ............................................................ 14

*In re Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*,
  791 F.2d 524 (7th Cir. 1986) .......................................................................... 14

*In re Coletta*,
  380 B.R. 140 (E.D. Pa. 2007) ......................................................................... 25

*In re Cont'l Airlines, Inc.*,
  152 B.R. 420 (D. Del. 1993) ........................................................................... 4

*In re DBSI, Inc.*,
   407 B.R. 159 (Bankr. D. Del. 2009) ............................................................................ 7

*In re Desai*,
   282 B.R. 527 (Bankr. M.D. Ga. 2002)....................................................................... 10

*In re Doors & More Inc.*,
   126 B.R. 43 (Bankr. E.D. Mich. 1991) ........................................................................ 5

*In re Dow Corning Corp.*,
   456 F.3d 668 (6th Cir. 2006) .................................................................................... 14

*In re Downey Fin. Corp.*,
   428 B.R. 595 (Bankr. D. Del. 2010) ................................................................. 4, 5, 14

*In re Elmira Litho, Inc.*,
   174 B.R. 892 (Bankr. S.D.N.Y. 1994)......................................................................... 4

*In re Gencarelli (UPS Capital Business Credit v. Gencarelli)*,
   501 F.3d 1 (1st Cir. 2007)........................................................................................ 13

*In re Jean-Francois*,
   516 B.R. 699 (E.D.N.Y. 2014) .................................................................................. 25

*In re Johns-Manville Corp.*,
   36 B.R. 727 (Bankr. S.D.N.Y. 1984)........................................................................... 5

*In re LHD Realty Corp.*,
   726 F.2d 327 (7th Cir. 1984) .................................................................................... 22

*In re Madison*,
   184 B.R. 686 (Bankr. E.D. Pa. 1995) .......................................................................... 9

*In re Manville Forest Prods. Corp.*,
   43 B.R 293 (Bankr. S.D.N.Y. 1984),
   *aff'd in part, rev'd in part on other grounds*, 60 B.R. 403 (S.D.N.Y. 1986) .............. 20

*In re Metropolitan Hosp.*,
   131 B.R. 283 (E.D. Pa. 1991) ................................................................................... 25

*In re MPM Silicones, LLC*,
   No. 7:14-cv-07492-VB (S.D.N.Y. May 4, 2015) ..................................................... 3, 5

*In re MPM Silicones, LLC*, 2014 WL 4436335 (Bankr. S.D.N.Y. Sept. 9, 2014)
   *aff'd* Mem. Decision, *In re MPM Silicones, LLC*,
   No. 7:14-cv-07492-VB (S.D.N.Y. May 4, 2015) ................................ 10, 11, 13, 18, 22

*In re Myers*,
   491 F.3d 120 (3d Cir. 2007) ..................................................................................... 25

*In re Novak*,
   103 B.R. 403 (Bankr. E.D.N.Y. 1989)....................................................................... 13

*In re Oakwood Homes Corp.*,
   449 F.3d 588 (3d Cir. 2006) ................................................................................ 21, 22

*In re Pease*,
   195 B.R. 431 (Bankr. D. Neb. 1996) ............................................................ 10

*In re Premier Automotive*,
   No. 05-20168, 2006 WL 4711334 (Bankr. D. Md. June 14, 2006),
   *amending* 343 B.R. 501 (Bankr. D. Md. 2006) ........................................... 13

*In re Premier Entm't Biloxi LLC*,
   445 B.R. 582 (Bankr. S.D. Miss. 2010) .................................................. 9, 13

*In re Rexene Products Co.*,
   141 B.R. 574 (Bankr. D. Del. 1992) .............................................................. 4

*In re RNI Wind Down Corp.*,
   348 B.R. 286 (Bankr. D. Del. 2006) *subsequently aff'd*,
   359 F. App'x 352 (3d Cir. 2010) .................................................................. 4

*In re SCO Grp., Inc.*,
   395 B.R. 852 (Bankr. D. Del. 2007) .............................................................. 4

*In re Shady Grove Tech Ctr. Assocs. Ltd. P'ship*,
   227 B.R. 422 (Bankr. D. Md. 1998) ............................................................ 10

*In re Shamblin*,
   890 F.2d 123 (9th Cir. 1989) ....................................................................... 24

*In re Soares*,
   107 F.3d 969 (1st Cir. 1997) ........................................................................ 23

*In re Solutia Inc.*,
   379 B.R. 473 (Bankr. S.D.N.Y. 2007) ........................................................ 20

*In re Texaco*,
   81 B.R. 804 (Bankr. S.D.N.Y. 1988) .......................................................... 12

*LaSalle Nat. Bank v. Perelman*,
   82 F. Supp. 2d 279 (D. Del. 2000) ................................................................ 5

*Ruskin v. Griffiths*,
   269 F.2d 827 (2d Cir. 1959) ......................................................................... 14

*U.S. Trust Co. of N.Y. v. LTV Steel Co. (In re Chateaugay Corp.)*,
   150 B.R. 529 (Bankr. S.D.N.Y. 1993),
   *aff'd*, 170 B.R. 551 (S.D.N.Y. 1994) ......................................................... 20

**Statutes**

11 U.S.C. § 362(d)(1) ........................................................................... 3, 8, 11

11 U.S.C. § 362(g)(2) ................................................................................. 4

11 U.S.C. § 362(k) .................................................................................... 25

11 U.S.C. § 541 ........................................................................................... 5

11 U.S.C. § 1124(2)(B) ............................................................... 3, 20, 21, 22

11 U.S.C. § 1124(2)(C) ................................................................................................... 22

**Other Authorities**

H.R. Rep. No. 95-595 (1977) ..................................................................................... 21, 22

S. Rep. No. 95-989 (1978) ............................................................................................ 21

## **INTRODUCTION**

The evidence submitted confirms exactly what the EFIH Debtors described in their pre-trial brief.  The EFIH Debtors and the Trustee bargained for an Indenture that does not provide for a make-whole premium (here, the Applicable Premium) following a bankruptcy-caused acceleration.  Part of that bargain was the reality—which the testifying Noteholders admit they knew and all Noteholders are presumed to have known—that an automatic stay would arise upon an EFIH bankruptcy filing and that the automatic stay would prevent the Noteholders from decelerating the Notes.  Now that the Court has confirmed the EFIH Debtors' interpretation of the Indenture, the Trustee's last resort is to request the extraordinary remedy of lifting the automatic stay for cause, a year after the principal and accrued interest (other than disputed amounts of interest) was fully repaid.  Under the applicable legal standard, cause does not exist to lift the automatic stay to provide the Noteholders with nearly half a billion dollars to which they are not otherwise entitled.

*First*, the EFIH estate will suffer great prejudice if the automatic stay is lifted, even though EFIH is deemed to be solvent for Phase One.  The law is clear that the lift-stay analysis must consider harm to the entire EFIH estate, including equity.  That harm is the value of the Applicable Premium, $431 million, which, assuming solvency, would be extracted directly from the potential recovery of EFIH's equity holder, EFH.  The Trustee cannot dispute that removing nearly *half a billion dollars* in distributable value from the EFIH estate would cause great harm.  What is more, were the automatic stay lifted here, other EFIH noteholders have made clear they will also move, on similar grounds, to lift the automatic stay and rescind acceleration of their EFIH notes, which, if added to the Trustee's claim, would expose the EFIH Debtors to new claims in excess of

$900 million.  The burden on the EFIH estate will have obvious and severe effects on EFH, EFH's creditors, and, in turn, on the EFIH Debtors' ability to reorganize as part of the Debtors' corporate reorganization—which is unquestionably great harm.

*Second*, there is no evidence that the Noteholders' harm from maintaining the automatic stay "considerably outweighs" the harm to the EFIH estate from lifting the automatic stay.  Instead, the financial harm is at best (from the Trustee's perspective) the same to both parties—the value of the Applicable Premium.  The Trustee has presented a series of ultimately unpersuasive arguments attacking the straightforward conclusion that the economic harm to both parties is the same.  Each of these arguments fails on its own merits, but also constitutes a red herring because the relevant inquiry is harm from *lifting the automatic stay* and harm from *maintaining the automatic stay*.  Questions about EFIH's interest savings from the refinancing or the Noteholders' ability to reinvest the funds they received when the Notes were repaid a year ago are irrelevant here.

Moreover, the Trustee claims that investors "expected" to receive the Applicable Premium in bankruptcy, but no evidence shows that the automatic stay is contrary to investor expectations.  The evidence instead shows the opposite.  Two sophisticated hedge fund investors testified that they purchased Notes (some even after the Court's Summary Judgment ruling) fully aware that the EFIH Debtors would contest paying a make-whole premium in bankruptcy and fully aware of the automatic stay.  In fact, there is no evidence that *any* Noteholder purchased the Notes expecting the Court to lift the automatic stay and permit rescission.  This is not surprising.  As the Southern District of New York explained earlier this month, affirming the bankruptcy court in *Momentive*, "all contracts signed among the parties operate against the backdrop of the relevant

2

Bankruptcy Code provisions.  The potential for an automatic stay upon the filing of a bankruptcy case is part of the bargain to which the parties agreed."  Mem. Decision, *In re MPM Silicones, LLC*, No. 7:14-cv-07492-VB, at 26, n.12 (S.D.N.Y. May 4, 2015) (Dkt. No. 31), attached as **<u>Exhibit 1</u>**.  The language of the Indenture itself therefore precludes the Trustee's arguments about harm to investor expectations.

*Additionally*, the Trustee has not demonstrated that it will succeed on the merits. Although the Court ruled that there is an issue of fact as to whether cause exists to lift the automatic stay to allow the Trustee to exercise its state law rescission right, the Court has not yet addressed whether, even if the automatic stay is lifted, that state law right can operate to rescind (and override) the automatic acceleration that occurs by the Bankruptcy Code.  As a matter of law, they cannot.  "Deceleration" to reinstate debts can only occur through 11 U.S.C. § 1124(2)(B), a specific and exclusive Code provision that does not apply here.  Accordingly, the Noteholders cannot reinstate the Notes.

The Court should deny the Trustee's motion to lift the automatic stay and grant summary judgment, with prejudice, in favor of the EFIH Debtors.

## BACKGROUND

The EFIH Debtors' Proposed Findings of Fact and Conclusions of Law, also submitted today, provide the factual and procedural background for this Post-Trial Brief.

## ARGUMENT

## I.    NO CAUSE EXISTS TO LIFT THE AUTOMATIC STAY.

### A.    Legal Standard And Burden Of Proof.

The Trustee requests that this Court lift the automatic stay "for cause, including the lack of adequate protection of an interest in property ...."  11 U.S.C. § 362(d)(1).  The Court has held that it should balance three factors to determine whether "cause" exists:

"(1) whether any great prejudice to either the bankrupt estate or the debtor will result

from a lifting of the stay; (2) whether the hardship to the non-bankrupt party by

maintenance of the stay considerably outweighs the hardship to the debtor; and (3) the

probability of the creditor prevailing on the merits."  (S.J. Decision[2] ¶ 73 (citing *In re*

*Downey Fin. Corp.*, 428 B.R. 595, 609 (Bankr. D. Del. 2010)).)[3]  Although the EFIH

Debtors are presumed solvent for Phase One of these proceedings, a debtor's solvency is

not, "as a matter of law, cause to lift the automatic stay," but "may, in certain cases, be a

relevant consideration in determining whether cause exists to lift the automatic stay."

(S.J. Decision ¶ 74.)

The EFIH Debtors have the burden of proof, 11 U.S.C. § 362(g)(2), but only after

the Trustee establishes a *prima facie* case.  *In re RNI Wind Down Corp.*, 348 B.R. 286,

299 (Bankr. D. Del. 2006) *subsequently aff'd*, 359 F. App'x 352 (3d Cir. 2010).  "A

*prima facie* case requires a showing by the movant of 'a factual and legal right to the

relief that it seeks.'"  *RNI*, 348 B.R. at 299 (quoting *In re Elmira Litho, Inc.*, 174 B.R.

892, 902 (Bankr. S.D.N.Y. 1994)).  The movant's failure to prove a factual and legal

right to relief requires denial of the lift-stay motion.  *RNI*, 348 B.R. at 299.  To apply

section 362(g)(2) differently "would force the debtor to prove a negative, that no cause

exists."  *In re Rexene Products Co.*, 141 B.R. 574, 577 (Bankr. D. Del. 1992).

---

[2] Citations to "S.J. Decision" refer to Findings of Fact and Conclusions of Law Regarding Cross-Motions for Summary Judgment, (No. 14-10979, D.I. 3984; No. 14-50363, D.I. 246).

[3] The Trustee incorrectly argues that the EFIH Debtors must satisfy each element of the test. (4/22/15 Trial Tr. 30:18-25 (Closing).)  The law is clear that the relevant standard is a balancing test.  *In re Cont'l Airlines, Inc.*, 152 B.R. 420, 424 (D. Del. 1993) ("In balancing the competing interests of the debtor and the movant, Courts consider three factors."); *In re Downey Fin. Corp.*, 428 B.R. 595, 608-09 (Bankr. D. Del. 2010) ("Courts conduct a fact intensive, case-by-case balancing test, examining the totality of the circumstances to determine whether sufficient cause exists to lift the stay." (internal quotations and citation omitted).); *In re SCO Grp., Inc.*, 395 B.R. 852, 857 (Bankr. D. Del. 2007) ("This Court has developed a three-prong balancing test ….").

Not only did the Trustee fail to satisfy the *Downey* standard, but it also failed to make a *prima facie* case for relief.  The stay arises automatically under the Code and bars rescission as a matter of law.  This fact was fully in the parties' contemplation when they executed an indenture providing, as this Court previously held, for no payment of a make-whole premium upon bankruptcy-induced acceleration.  *MPM*, Mem. Decision, at 26 n.12 (Ex. 1).  There is neither a factual nor legal basis for relief.

### B.    The EFIH Debtors' Estate, Including Its Equity Holders, Will Suffer Great Prejudice From Lifting The Automatic Stay.

The Trustee argues that considering the interests of equity in a lift-stay analysis "turns bankruptcy law and the absolute priority rule on its head."  (4/22/15 Trial Tr. 47:15-17.)  This ignores the clear wording of the relevant standard, which requires the Court to consider harm to the debtors *or the estate*.  *Downey*, 428 B.R. at 609.  The bankruptcy estate is defined broadly, 11 U.S.C. § 541, and is created "for the benefit of all creditors *and equity holders* of the debtor."  *In re Johns-Manville Corp.*, 36 B.R. 727, 735 (Bankr. S.D.N.Y. 1984) (emphasis added).  "In a Chapter 11 case, it is fundamental that a debtor in possession or a trustee is obligated to act not in his or her own best interest, but rather in the best interest of the entire estate, including the creditors and owners of the debtor estate."  *In re Doors & More Inc.*, 126 B.R. 43, 45 (Bankr. E.D. Mich. 1991); *see also Hansen, Jones & Leta, P.C. v. Segal*, 220 B.R. 434, 450 (D. Utah 1998) ("[T]he administration of the 'estate' must take into account the interests of the debtor corporation's shareholders as well as the creditors, and other parties in interest.") (citing *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985)).  Indeed, the EFIH Debtors have "a fiduciary duty to act in the best interest of the estate as a whole, including its creditors, equity interest holders and other parties in interest."  *See*

*LaSalle Nat. Bank v. Perelman*, 82 F. Supp. 2d 279, 292 (D. Del. 2000).

> **1.    The EFIH estate will suffer great prejudice if the stay is lifted.**

The harm to EFIH's estate is evident.  If the Court lifts the automatic stay and permits the Noteholders to make a claim for the Applicable Premium, approximately $431 million will flow from the estate to the Noteholders (although the specific amount would be fixed in any Phase Two of this litigation).  (PFF & CL[4] ¶ 48.)  As Mr. Horton, EFIH's Treasurer, testified, that is "a lot of money" for any company, especially one attempting to reorganize.  (*Id.* at ¶ 36.)

But the harm from lifting the automatic stay is still greater.  The EFIH Debtors have partially repaid the EFIH Second Lien Notes and seek to repay the remaining EFIH Second Lien Notes and EFIH Unsecured "PIK" Notes through a proposed plan of reorganization.  (Proposed Plan, No. 14-10979, D.I. 4142 at 42-43.)  The Second Lien Trustee has stated that it will seek to lift the automatic stay and reinstate its respective notes (PFF & CL ¶ 54), which could result in a further make-whole claim against the EFIH Debtors of approximately $400 million, (*id.* at ¶ 50).  And there is no reason to believe that the PIK Noteholders would forego an opportunity to seek a make-whole claim against the EFIH Debtors of approximately $113 million by similarly seeking to lift the automatic stay and reinstate their debt.  *Id.*  Nearly one billion dollars in additional claims would certainly harm EFIH's estate.

It is proper legally for the Court also to consider the obvious harm an additional $431 million (or up to $1 billion) in claims would have on EFIH's reorganization effort.  (PFF & CL ¶ 54.)  One of the purposes of the automatic stay is to "avoid interference

---

[4] Citations to "PFF & CL" refer to EFIH's Proposed Findings of Fact and Conclusions of Law submitted together with this Post-Trial Brief.

with the orderly . . . rehabilitation of the debtor." *In re DBSI, Inc.*, 407 B.R. 159, 166 (Bankr. D. Del. 2009). EFIH is wholly-owned by EFH, another major debtor in these cases. EFIH's ability to reorganize successfully is inextricably intertwined with EFH's, which, in turn, is inextricably intertwined with the reorganization of other Debtors (including TCEH). Demonstrating the inherent interdependence of these restructurings, counsel for both Official Committees—the E-side and T-side—appeared at the trial and opposed the Trustee's claim. (4/22/15 Trial Tr. 100:20-108:13.) It is painfully evident that permitting one creditor at EFIH to significantly expand its claims will reverberate throughout the entire EFH capital structure and greatly prejudice the restructuring of each of the major debtor entities. That risk of harm redounds directly to the detriment of EFIH's restructuring efforts. (PFF & CL ¶ 46.)

To date, none of the stakeholders in these cases has proposed any reasonable way for EFIH successfully to restructure independently of successful restructurings at EFH and TCEH. Contrary to the Trustee's red herring argument, this reality neither depends upon nor requires substantive consolidation. (1L Pre-Trial Br.[5] 39-40; 4/22/15 Trial Tr. 53:4-18 (Closing).) The numerous intercompany claims and potential tax liability make the need for a joint restructuring a certainty of all Debtors. Moreover, it is simply common sense (and not substantive consolidation) that higher claim amounts at EFIH make reorganization of EFIH, EFH, and all other Debtors more difficult, given a finite amount of money available to satisfy all claims at issue in these jointly administered cases. It simply cannot be disputed that a creditor's ability to expand its claims at EFIH by nearly half a billion dollars immediately prejudices EFIH and its equity holder, EFH,

---

[5] Citations to "1L Pre-Trial Br." refer to the Plaintiff-Trustee's and Noteholders' Trial Brief, (No. 14-50363, D.I. 264), filed on April 15, 2015.

in ways that extend beyond EFIH's significant loss of distributable value. (PFF & CL ¶ 51.)

The Trustee nonetheless argues that any effect on the EFIH Debtors' restructuring effort can be disregarded because the EFIH Debtors can re-start their efforts all over again. (4/21/15 Trial Tr. 56:17-58:24 (Horton Test.); 4/22/15 Trial Tr. 45:22-46:2 (Closing).) This ignores the complexities of these cases, but in any event, is not the relevant legal standard. Even where lifting the automatic stay will merely "affect [a debtor's] ability to consummate an effective reorganization," the harm sufficiently weighs in favor of the debtor for purposes of section 362(d)(1). *In re Aleris Intern., Inc.*, 456 B.R. 35, 47-48 (Bankr. D. Del. 2011).

### 2. *The Trustee's arguments fail to demonstrate that EFIH's estate will not suffer great harm from lifting the automatic stay.*

Lifting the automatic stay would clearly cause significant harm to EFIH's estate, and the Trustee has not demonstrated otherwise. ***First***, the Trustee argues that increasing its claim by $431 million would not harm EFIH's estate because the value of EFIH's *assets* would not be harmed. (1L Pre-Trial Br. 20-21.) This makes no sense. The question is not whether the intrinsic value of EFIH's interest in Oncor declines if liabilities increase, but whether EFIH's estate will lose value that could be distributed to all of its constituents, including equity. EFIH's estate consists of assets and liabilities; liabilities must be satisfied by assets; the greater the liabilities, the lower the distributable value for other constituencies after all liabilities are satisfied; and reducing the EFIH estates' distributable value by $431 million (or perhaps as much as nearly $1 billion) obviously constitutes harm.

***Second***, the Trustee claims that if EFIH must pay the $431 million Applicable

Premium, that will increase its net operating losses ("NOLs"), implying that somehow that is a "benefit" to EFIH.   (1L Pre-Trial Br. 36; 4/20/15 Trial Tr. 211:18-212:14 (Horton Test.).)  Preliminarily, the Trustee has not met its factual burden to show that any NOLs will in fact be generated or that they will be of any benefit to EFIH or EFH.[6] Further, the argument makes no sense.  The reason paying the premium might result in NOLs is that EFIH *would lose $431 million*, a harmful loss of cash that would far outweigh any speculative "benefit" from an increase in tax attributes that may or may not be needed or even usable.

*Third*, the Trustee claims that EFIH will suffer no harm because it agreed to waive the protection of the automatic stay.   (1L Pre-Trial Br. 37-38; PX 33 § 4.06.) Section 4.06 contains no such waiver, and if it did, the waiver would be unenforceable. As the EFIH Debtors explained in their pre-trial brief, section 4.06 states that the EFIH Debtors agree not to rely on "any stay ... law" to hinder the execution of any right by the Trustee, but only "*to the extent that [EFIH] may lawfully do so*."   (emphasis added). (EFIH Pre-Trial Br.[7] 7-9.)  Because "prebankruptcy agreements do not override contrary provisions of the Bankruptcy Code," EFIH could not and did not agree to waive the protections of the Bankruptcy Code's automatic stay.  *See In re 203 N. LaSalle St. P'ship*, 246 B.R. 325, 331 (Bankr. N.D. Ill. 2000); *see also Fallick v. Kehr*, 369 F.2d 899, 904 (2d Cir. 1966) (same); *In re Premier Entm't Biloxi LLC*, 445 B.R. 582, 628 (Bankr. S.D. Miss. 2010) (same); *In re Madison*, 184 B.R. 686, 690-91 (Bankr. E.D. Pa. 1995) (citing

---

[6] Besides being irrelevant, any NOLs that *may* be generated from a make-whole payment to an EFIH creditor have value only to the extent those NOLs can shelter taxable income.  But both EFH and EFIH are currently generating tax losses, not taxable income, and thus the existence of an income tax deduction for make-whole payments is akin to the delivery of more coal to Newcastle.  There is no evidence, nor could there be, that the potential for additional NOLs will be of any benefit to EFIH or EFH.

[7] Citations to "EFIH Pre-Trial Br." refer to EFIH Debtors' Pre-Trial Brief, (No. 14-50363, D.I. 265), filed on April 15, 2015.

cases). The Code "extinguishes the private right of freedom to contract around its essential provisions." *In re Pease*, 195 B.R. 431, 433-34 (Bankr. D. Neb. 1996).[8]

### 3. *The Trustee relies on inapplicable case law when it asserts that it merely seeks to enforce its state law rights.*

The Trustee indulges in a far-ranging discussion of cases arising from very different circumstances, (1L Pre-Trial Br. 22-29; 4/22/15 Trial Tr. 48:22-53:3), but the Trustee has *not cited one case* where a court lifted the automatic stay to permit a creditor to rescind a debt's acceleration (including Code-mandated acceleration) to pursue its claim. To the contrary, the courts in both *AMR* and *Momentive* denied similar attempts to lift the automatic stay to rescind accelerated debt and collect a make-whole premium. *In re MPM Silicones, LLC*, 2014 WL 4436335, at *23 (Bankr. S.D.N.Y. Sept. 9, 2014) *aff'd MPM*, Mem. Decision (Ex. 1); *In re AMR Corp.*, 485 B.R. 279, 295 (Bankr. S.D.N.Y. 2013), *aff'd* 730 F.3d 88, 112 (2d Cir. 2013).

The Trustee attempts to minimize these directly contrary holdings by emphasizing that they addressed insolvent debtors. (1L Pre-Trial Br. 34-35; 4/22/15 Trial Tr. 52:4-

---

[8] Some cases have nonetheless taken the view that pre-bankruptcy agreements to waive Code protections can be considered *as a factor* in whether to lift the automatic stay. *See, e.g.*, *In re Desai*, 282 B.R. 527, 532 (Bankr. M.D. Ga. 2002) (declining to enforce a pre-filing stay waiver and listing factors to consider, including "the consideration for the waiver"). But the cases the Trustee cites are clear, as is the law generally, that pre-petition automatic stay waivers are only enforceable where a specific bargain was struck for significant benefits, usually in the context of a restructuring agreement. The Trustee cites *In re 4848, LLC*, 490 B.R. 343, 348-50 (E.D. Wis. 2013), where the court upheld a pre-filing automatic stay waiver because it found that the waiver was an **essential term** in the forbearance agreement that preceded the bankruptcy and caused the lender to postpone foreclosing for years. The Trustee also cites *In re Shady Grove Tech Ctr. Assocs. Ltd. P'ship*, 227 B.R. 422, 425-26 (Bankr. D. Md. 1998), where the court upheld a pre-filing automatic stay waiver where "[t]he Waiver was granted by a sophisticated borrower represented by competent counsel, **in the context of a restructuring agreement**. **Substantial consideration was afforded** to the Debtor in the restructuring agreement by [the creditor]." (emphasis added). *See also generally id.* at 425 ("[T]he lender must demonstrate that **significant consideration was given** by the lender for The Waiver, **in the context of a restructuring agreement**….") (emphasis added). Here, there is no evidence that the language in sections 6.02 and 4.06 of the Indenture are any more than standard provisions in a lending agreement, not a restructuring agreement. In fact, the indenture in *Momentive* contained similar language, and there too the court refused to lift the automatic stay to permit the noteholders to reinstate their debt. *In re MPM Silicones, LLC*, 2014 WL 4436335, at *23 (Bankr. S.D.N.Y. Sept. 9, 2014), *aff'd* Mem. Decision, No. 7:14-cv-07492 (S.D.N.Y. May 4, 2015).

53:3 (Closing).)  But solvency played little, if any, role in Judge Drain's analysis in *Momentive*, which focused instead on the Trustee's post-petition attempt to enhance its claim through a rescission notice.  The opinion explained that the trustee's rescission notice sought to "create a *different* claim than existed on the petition date," 2014 WL 4436335, at *22 (emphasis in original), "enhancing claims potentially by hundreds of millions of dollars," *id.* at *23, which is "the type of action that courts have routinely refused to permit under section 362(d)(1)," *id.*  The court concluded its lift-stay discussion by holding, "the automatic stay should not be lifted to enable the resurrection of a make-whole claim by means of the rescission of the automatic acceleration provision provided for in Section 6.02 of the indentures."  *Id.*  Solvency was irrelevant to this reasoning and is similarly irrelevant here.[9]

The district court recently affirmed the *Momentive* decision on all grounds.  In its ruling, the court explained, "[i]t matters not that the Senior Lien Noteholders' right to rescind the acceleration of the debt was canceled by the application of the automatic stay pursuant to Section 362 of the Bankruptcy Code.  The Debtors correctly point out that all contracts signed among the parties operate against the backdrop of the relevant Bankruptcy Code provisions.  The potential for an automatic stay upon the filing of a bankruptcy case is a part of the bargain to which the parties agreed."  *MPM*, Mem. Decision, at 26 n.12 (Ex. 1).

Similarly, Judge Lane in *AMR* focused his analysis denying the lift-stay motion

---

[9] The Trustee also cites Judge Drain's comments during oral argument as evidence that he "would have reached the opposite result" in his written opinion were the debtor there solvent.  (1L Pre-Trial Br. 35 (citing Hr'g Tr., *MPM*, No. 14-22503 (Bankr. S.D.N.Y. Aug. 21, 2014) (Dkt. No. 900) at 142).)  Judge Drain said no such thing.  His comments were made when characterizing counsel's argument for unsecured breach of contract damages (which this Court and the district court in *Momentive* have already properly rejected).  There is no indication in his comments during oral argument, in his opinion read from the bench, or in his revised opinion published on Westlaw, that Judge Drain would have lifted the automatic stay and permitted the noteholders to reinstate their debt if the debtors were solvent.  *See* Hr'g Tr., *MPM*, No. 14-22503, (Bankr. S.D.N.Y. Aug. 21, 2014) (Dkt. No. 900) at 139:10-144:19.

on the trustee's attempt "to change the facts on the ground by seeking to lift the stay" because "deceleration would serve only to increase the size of [the trustee's] claim." *AMR*, 485 B.R. at 295.  While the court of course considered harm to creditors, it also expressly considered "the detriment to *the estate*" and "the obvious harm *to the estate*." *Id.* (emphasis added).

The reasoning in *Momentive* and *AMR* dovetails with the Trustee's primary case, *In re Texaco*, 81 B.R. 804, 805 (Bankr. S.D.N.Y. 1988), which presents the same reasoning in an inverse posture.  (1L Pre-Trial Br. 25-26; 4/22/15 Trial Tr. 48:22-50:3.) There, the court decided to *lift* (not maintain) the automatic stay, but the purpose was the same:  to preserve the petition-date status quo.  After the petition date, the debtor attempted to lower the contract rate of interest, presumably pursuant to the indenture. *Texaco*, 81 B.R. at 805.  The indenture did not have an automatic acceleration clause triggered on the petition date, and to preserve the higher interest rate in effect on the petition date, the court lifted the automatic stay to permit the trustee to send an acceleration notice.  *Id.*  This notice would have the effect of "preserv[ing] whatever rights the holder of the Notes may have, including the right to receive post-petition interest from the debtors, who have consistently maintained that they are solvent."  *Id.* at 805.  The court invoked solvency only to highlight that post-petition interest will be paid on the noteholders' claims—not that solvency, as a general matter, requires lifting the automatic stay.  Further, the court's sweeping language about the automatic stay as a shield, not a sword, is borne of a desire to preserve the status quo between the debtor and the noteholders as of the petition date.  So too here, the automatic stay protects the EFIH Debtors from the Trustee's attempt to take post-petition actions to "create a different

claim than existed on the petition date," *MPM*, 2014 WL 4436335, at \*22—irrespective of the EFIH Debtors' solvency.

The Trustee's remaining and extended discussion of other cases is misdirected. ***First***, its trio of bad-faith solvent-debtor cases remain inapposite where, as here, EFIH did not file in bad faith.[10]  (1L Pre-Trial Br. 28-29; 4/22/15 Trial Tr. 48:11-21 (Closing).) ***Second***, the Trustee reiterates its mantra that the Court should enforce its right to the Applicable Premium because the EFIH Debtors are presumed solvent.  (1L Pre-Trial Br. 29-31; 4/22/15 Trial Tr. 47:18-48:10 (Closing).)  But none of the Trustee's cited make-whole cases is a lift-stay case, nor does any hold that a creditor can rescind an acceleration of debt in bankruptcy.  In *Gencarelli*, unlike here, the contract indisputably and expressly provided for a make-whole premium, and accordingly, the debtor argued that the make-whole premium was unreasonable under section 506(b).  *In re Gencarelli (UPS Capital Business Credit v. Gencarelli)*, 501 F.3d 1, 3 (1st Cir. 2007).  The court held that, because the debtor was solvent, "the equities strongly favor" finding the make-whole premium reasonable under applicable law, but the court did not cite solvency as a reason to award a make-whole premium, in the first instance, or lift the automatic stay. *Id.* at 7.  The Trustee also sows confusion by citing *Premier*, which awarded, and *Chemtura*, which discussed awarding, damages for breach of a no-call provision by a solvent debtor.  *In re Premier Entm't Biloxi LLC*, 445 B.R. 582, 640 (Bankr. S.D. Miss.

---

[10] (*See* 1L S.J. Br. 62-63 (No. 14-50363, D.I. 179); EFIH S.J. Opp. Br. 35-36 (No. 14-50363, D.I. 204).)  *Claughton v. Mixson*, 33 F.3d 4, 5 (4th Cir. 1994), is a bizarre and messy divorce case in which a derelict husband filed for bankruptcy as "just another tactical move to delay further Mixson's recovery" on a sixteen-year-old equitable distribution judgment.  The two other cases cited, *In re Premier Automotive*, No. 05-20168, 2006 WL 4711334, at \*7 (Bankr. D. Md. June 14, 2006), *amending* 343 B.R. 501 (Bankr. D. Md. 2006), and *In re Novak*, 103 B.R. 403, 413 (Bankr. E.D.N.Y. 1989), both found that the bankruptcy filings were made in bad faith.  Because these cases were filed in bad faith, the automatic stay would not apply irrespective of whether the debtors were solvent.

2010); *In re Chemtura*, 439 B.R. 561, 606 (Bankr. S.D.N.Y. 2010). Here, the Court has already ruled that the Indenture does not contain a no-call provision and has also held that the Noteholders do not have an unsecured claim for breach of contract damages.[11] (S.J. Decision ¶¶ 8(g), 79-81, 92, 93.) These cases are unrelated to the question now before the Court: whether cause exists to lift the automatic stay.

*Third*, the Trustee relies on cases in which courts enforced state law contractual provisions against solvent debtors. (1L Pre-Trial Br. 31-33; 4/22/15 Trial Tr. 50:4-52:3 (Closing).) But none of these cases[12] holds, nor even discusses, enforcing state law rescission rights to decelerate debt or permitting creditors to take post-petition-action that alters the nature of their petition-date rights.

### C.    Hardship To The Noteholders From Maintaining The Automatic Stay Does Not Considerably Outweigh The EFIH Debtors' Hardship From Lifting The Automatic Stay.

The alleged harm to the Noteholders from maintaining the automatic stay does not "considerably outweigh" the harm to EFIH from lifting it. *See Downey*, 428 B.R. at 609. The Trustee ignores a simple but critical premise: the Court must analyze the harm to the parties that comes from *lifting or maintaining the automatic stay*. *Id*. If the Trustee is successful in lifting the automatic stay, the financial harm to the EFIH Debtors is the Applicable Premium (subject to Phase Two of this litigation). If the EFIH Debtors

---

[11] The district court's opinion in *Momentive* reinforces this Court's holding that "there can be no claim for breach of contract arising from operation of the automatic stay." (S.J. Decision ¶ 92.) The *Momentive* opinion explained that "the automatic stay—and not the Debtors—prevented the [noteholders] from exercising their right to rescind. This Court is not convinced that such a circumstance can lead to liability for breach of contract on the part of the debtors. *HSBC Bank USA Nat'l Ass'n v. Calpine Corp. (Calpine II)*, No. 07 Civ 3088 (GBD), 2010 WL 3835200, at *4 (S.D.N.Y. Sept. 15, 2010) ('Because Debtor's bankruptcy filing rendered the no-call provision in the notes unenforceable and liability cannot be incurred pursuant to an unenforceable contractual provision, Debtor did not incur any liability for repaying the notes.' (collecting cases)))." *MPM*, Mem. Decision, at 27 n.13 (Ex. 1.).

[12] *In re Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*, 791 F.2d 524, 526 (7th Cir. 1986); *In re Dow Corning Corp.*, 456 F.3d 668 (6th Cir. 2006); *Ruskin v. Griffiths*, 269 F.2d 827, 830-31 (2d Cir. 1959).

prevail and the automatic stay is maintained, the alleged financial harm to the Noteholders is the Applicable Premium.  The potential harm to both parties from lifting or maintaining the automatic stay is the same.  Faced with this critical problem, the Trustee reaches for three unsuccessful arguments: (1) that somehow the harm, while equal in dollar amount, is really more important to the Noteholders than to the EFIH estate; (2) that the Court should consider (overstated) interest savings to EFIH yet ignore reinvestment opportunities to the Noteholders; and (3) that maintaining the automatic stay harms investor expectations, allegedly tipping the balance of harms in the Noteholders' favor.  These arguments fail, and despite all of the testimony elicited during the three-day trial, the straightforward and commonsense result remains: the Applicable Premium is the only potential harm to either party.

### 1.    *The financial harm to the Noteholders is the value of the Applicable Premium, the same harm to the EFIH Debtors.*

The Applicable Premium is the relevant measure of financial harm.  The Trustee's own witnesses—its three experts, Messrs. Kearns, McCarty, and Cacioppo and one of the noteholders, Mr. Auerbach—confirmed that the Applicable Premium is the *entire* financial harm to the Noteholders.  (PFF & CL ¶¶ 63-64.)  The Trustee nonetheless attempted to demonstrate that the Noteholders' financial harm is greater.  ***First***, the Trustee misdirects the Court's attention to the benefits and harms of the June 19, 2014, repayment, such as the EFIH Debtors' interest savings from repaying the Notes, and the Noteholders' inability to reinvest its fully repaid principal at a comparable rate of return.  (*Id.* at ¶ 29, 35.)  But the EFIH Debtors would receive the same interest savings, and the Noteholders would face the same reinvestment challenges, *even if* the Applicable Premium had been paid on June 19, 2014.  The Trustee's complaint is not with the

repayment, only that the Applicable Premium was not also paid.

***Second***, the Trustee both argued and attempted to elicit testimony that, when the make-whole is viewed as a percentage of certain arbitrary amounts, the Noteholders' harm considerably outweighs the EFIH Debtors' harm.  The Trustee points out that the make-whole premium is 5% of EFIH's total debt (4/21/15 Trial Tr. 200:4-201:21 (Horton Test.)), but is 20% of the Noteholders' principal (4/21/15 Trial Tr. 111:5-15 (Auerbach Test.)).  (*See also* 1L Pre-Trial Br. 6-9, 35-36.)  If the legal standard required comparing arbitrary percentages, EFIH's harm considerably outweighs the Noteholders' harm, and not the other way around.  Blue Mountain's portion of the Applicable Premium is only 0.5% of its assets under management, and Halcyon's portion is even smaller, only 0.25% of its assets under management.  (PFF & CL ¶¶ 23-26, 57 & n.7.)  This is a far lower "percentage harm" than EFIH would experience.  Yet Mr. Greene admitted that even this 0.25% was "material" to his firm.  (*Id.* at ¶ 57.)  These percentages are, of course, entirely arbitrary, and there is no principle of law or logic that can credibly adjudicate which "percentage harm" is more important or more "material" for this lift-stay analysis.[13]

### 2.    *There is no harm to investor expectations.*

There is no evidence that investor expectations were harmed.  The best evidence of the investors' expectations is the text of the Indenture itself, and the Indenture does not provide for the Applicable Premium after a bankruptcy-caused acceleration.  (S.J. Decision ¶ 51.)  During the trial, the Court inquired why the Indenture would provide for a make-whole premium outside of bankruptcy, but not in bankruptcy.  (4/20/15 Trial Tr. 159:11-18 (McCarty Test.).)  The Trustee's expert, Mr. McCarty explained that the

---

[13] The "percentage harm" comparison cannot be the law because a creditor's claim will nearly always be smaller than the debtor's total amount of debt, thus skewing the comparison to nearly always show that a given amount causes more "percentage harm" to the creditor.  (*Id.* at ¶ 57.)

language used in the Indenture was "carryover" from a time when "people … had no focus on getting paid in bankruptcy." (*Id.* at 159:21-160:4.)  Against this backdrop, investors could not have reasonably expected this "carryover" language to provide them with a make-whole premium in bankruptcy.

Failing to find any dashed expectations from the Indenture's text, the Trustee instead relies on broad arguments about "commercial reasonableness."  The Trustee's witnesses testified that "call protection" is standard in the market, (*e.g.*, 4/20/15 Trial Tr. 58:12-60:24 (Kearns Test.)), and that the Notes would not have sold without it, (*id.* at 157:12-22 (McCarty Test.).)  To be sure, the Indenture *does* provide for call protection, just not when the Notes are accelerated after a bankruptcy filing.  (S.J. Decision ¶¶ 8(a), 51, 57.)  The Trustee argues, incorrectly, that this level of call protection makes the bonds "freely callable" and therefore commercially unreasonable.  (*Id.* at 134:13-25 (McCarty Test.)); 4/21/15 Trial Tr. 96:13-24 (Auerbach Test.).)  But none of the Trustee's three experts reviewed the actual text of the rescission or acceleration provisions of any other indentures to determine just how much call protection is standard in the market.  (PFF & CL ¶ 70.)

Further, none of the experts based his opinion on indentures like the Indenture here, which contains call protection in essentially all circumstances except where the noteholders accelerate or acceleration occurs automatically upon a bankruptcy filing.  (*Id.*)  Not only is there zero evidence that indentures like this one are commercially unreasonable, the evidence shows the exact opposite.  The Trustee called two witnesses who participated actively in a robust market for the Notes, after the EFIH Debtors publicly disclaimed any make-whole was due, after litigation was filed to disallow the

make-whole claim, and even after this Court ruled that the Indenture's language unambiguously fails to provide for a make-whole after automatic acceleration. (PFF & CL ¶¶ 23, 25, 69.) Indeed, Mr. Greene admitted that he was familiar with the concept of the automatic stay before Halcyon first purchased the Notes. (*Id.* at ¶ 26.) Additionally, Mr. Cacioppo testified that the acceleration and rescission language in the Indenture is "the standard form indenture," and that this language has been used in "a ton … a lot of deals." (4/21/15 Trial Tr. 80:1-11 (Cacioppo Test.).) This evidence is consistent with the body of case law construing similar and identical "standard form indentures" and finding, like this Court did, that while they may contain some call protections, they do not entitle noteholders to make-whole payments upon a bankruptcy-caused acceleration. *See, e.g.*, *MPM*, 2014 WL 4436335, at *14. Taken together, the evidence at the trial and the case law reject the Trustee's strained effort to show that the Indenture here, properly construed, is an unmarketable oddity. (PFF & CL ¶ 70.)

The Trustee also dwelled on the August 2010 transaction, an exchange involving certain notes issued by EFH and the EFIH Notes at issue here. (*Id.* at ¶¶ 17-20.) The Trustee did not elicit any testimony, however, from a single noteholder who participated in the August 2010 Exchange, nor did any of Trustee's experts speak with any of these noteholders. (*Id.* at ¶ 69.) There is therefore no competent fact or expert evidence that the exchanging noteholders expected to be paid a make-whole in bankruptcy. The evidence is to the contrary. Mr. Horton testified that he did not recall any discussion with Noteholders about whether they would receive the Applicable Premium in bankruptcy. (*Id.* ¶ 20.) And anyone reading the customary legal opinions provided in connection with the August 2010 Exchange would have seen that outside counsel refused to opine that the

terms of the Indenture, including the make-whole provisions, would be enforceable in the event of a bankruptcy or insolvency. (*Id.* at ¶¶ 68-69.)  The evidence also showed that the automatic acceleration language in the Indenture is *the same as* the acceleration language in the indenture for the exchanged EFH notes. (*Id.* at ¶ 19.)  Exchanging Noteholders therefore could not have been induced to invest in the new EFIH Notes by any alleged improvements to make-whole provisions which previously did not provide for payment in bankruptcy.

Further, the Trustee's arguments and the testimony it elicited were all framed generally to address whether investors expected to receive a make-whole premium.  But the relevant expectation is whether investors specifically expected the Court would lift the automatic stay and permit the Noteholders to rescind acceleration.  Of this, there is no evidence.  To the contrary, the Indenture expressly contemplates that EFIH might file for bankruptcy.  (PX 33 § 6.01(a)(6).)  In rejecting an identical attempt to lift the automatic stay, the district court affirmed *Momentive* explaining, "all contracts signed among the parties operate against the backdrop of the relevant Bankruptcy Code provisions.  The potential for an automatic stay upon the filing of a bankruptcy case is a part of the bargain to which the parties agreed."  *MPM*, Mem. Decision, at 26 n.12. (Ex. 1).  The Noteholders cannot now claim that they did not expect the automatic stay—a prominent and well-known feature of bankruptcy cases—would prevent them from exercising their state law right to rescind contractual acceleration.  Further still, the Noteholders could not have expected that they would be able to rescind acceleration and reinstate their debt in bankruptcy because, as discussed immediately below, debt can only be reinstated pursuant to 11 U.S.C. § 1124(2)(B).  In sum, there is no evidence that maintaining the

automatic stay harms investor expectations.

> **D.** **The Trustee Cannot Succeed On the Merits Because Debt Can Only Be Reinstated In Bankruptcy Through 11 U.S.C. § 1124(2)(B).**

The Court has held that the Indenture provides the Noteholders with a *contractual* right under state law to rescind the Indenture's automatic acceleration.  (S.J. Decision ¶¶ 63-66.)  Contrary to the Trustee's claims, (1L Pre-Trial Br. 50; 4/22/15 Trial Tr. 31:11-23 (Closing)), this ruling does not mean that the Trustee has already prevailed on the merits, because the Court has not yet addressed whether the Noteholders may exercise that right under the Bankruptcy Code.  They may not.

The Notes were accelerated by *both* the Indenture *and* the straightforward operation of the Bankruptcy Code.[14]  It is blackletter law that bankruptcy automatically accelerates the principal amount of all claims against the debtor.[15]  As courts in other make-whole cases have held, or otherwise recognized, the Code mandates that debts are accelerated.  *See Calpine II*, 2010 WL 3835200, at *3.[16]  And the legislative history confirms what the case law makes plain: that debts are mature and become due and payable upon filing a bankruptcy petition.  *See In re Oakwood Homes Corp.*, 449 F.3d

---

[14] EFIH made this argument in its summary judgment briefing, (EFIH S.J. Br. 20 n.7, 46-47 (No. 14-50363, D.I. 176)), but the Court has yet to rule on it.

[15] *In re Am. Remanufacturers, Inc.*, 451 B.R. 349, 367 (Bankr. D. Del. 2011) ("Even absent the [contract's] acceleration clause, [the debtor] would be obligated to pay the full amount outstanding under the [contract].  Upon a debtor's bankruptcy filing, the principal amount of all claims against the debtor is accelerated."); *see also U.S. Trust Co. of N.Y. v. LTV Steel Co. (In re Chateaugay Corp.)*, 150 B.R. 529, 542 (Bankr. S.D.N.Y. 1993), *aff'd*, 170 B.R. 551 (S.D.N.Y. 1994); *In re Manville Forest Prods. Corp.*, 43 B.R 293, 297-98 (Bankr. S.D.N.Y. 1984), *aff'd in part, rev'd in part on other grounds*, 60 B.R. 403 (S.D.N.Y. 1986).

[16] *See also In re AMR Corp.*, 485 B.R. 279, 290 n.7 (Bankr. S.D.N.Y. 2013), *aff'd*, 730 F.3d 88 (2d Cir. 2013); *In re Solutia Inc.*, 379 B.R. 473, 484-85 (Bankr. S.D.N.Y. 2007); *In re Calpine Corp. (Calpine I)*, 2007 WL 4326738, at *9 (S.D.N.Y. Nov. 21, 2007).

588, 603 n.19 (3d Cir. 2006).[17]

Therefore, even though the Trustee has the contractual right under state law to rescind the automatic acceleration that occurs under the Indenture, the Indenture does not and cannot provide the Trustee with the power to rescind the automatic acceleration that is mandated by the Bankruptcy Code.  The Noteholders' only available means to rescind this Code-based acceleration is 11 U.S.C. § 1124(2)(B), which provides that claims are impaired unless a plan of reorganization "reinstates the maturity of such claim or interest as such maturity existed before such default."[18]  Section 1124(2)(B) does not apply here where the Noteholders instead seek to reinstate debt outside of a plan of reorganization and over a debtor's objection.  Accordingly, the Noteholders' rescission notice cannot reinstate their debt in bankruptcy.[19]

The Trustee incorrectly argues that the binding law of this Circuit—contrary to the great weight of precedent—is that the Code does not accelerate debt.  (1L Pre-Trial Br. 18-19; 4/22/15 Trial Tr. 32:7-33:22 (Closing).)  The Trustee cites *In re Oakwood Homes Corp.*, 449 F.3d at 602-03, which stated, "we must also reject our dissenting colleague's theory that *the reason interest-bearing debt would not be discounted to*

---

[17] "The legislative history shows that § 502(b) and (b)(2) reflect **the basic bankruptcy law tenet** that '**bankruptcy operates as the acceleration of the principal amount** of all claims against the debtor.' H.R. Rep. No. 95-595, at 352-54. 'Simply stated, **the filing of a petition accelerates the principal amount of all unmatured claims against the debtor**, *whether or not* a clause in a prepetition agreement provides that a bankruptcy filing accelerates the maturity date.' 4-502 Collier on Bankruptcy ¶ 502.03 (emphasis added)."  *Oakwood Homes*, 449 F.3d at 603 n.19 (bold italics emphasis added, italics emphasis in original); *see also* S. Rep. No. 95-989, at 62-65 (1978) ("[B]ankruptcy operates as an acceleration of the principal amount of all claims against the debtor.").

[18] Notably, if the Trustee were correct and debts are not "mature" on the petition date, this provision would be without effect.

[19] To hold otherwise would mean that noteholders can use their contractual rescission rights under state law to force debtors not to repay notes in bankruptcy.  Enforcing a rescission provision in bankruptcy therefore has the same effect as enforcing a no-call provision that prohibits notes from being repaid before a certain date.  Courts have uniformly declined to enforce no-call provisions in bankruptcy.  *See Calpine II*, 2010 WL 3835200, at *3 (collecting cases and authorities).

*present value is because* future principal is accelerated … and becomes presently due debt." *Id.* at 602 (emphasis added). The Trustee quoted this language in its pre-trial brief but elided the italicized text. (1L Pre-Trial Br. 18.) The elided text shows that the majority opinion rejected the *validity* of the dissent's argument (that repayments of principal in bankruptcy should be discounted) but not the *soundness* of the dissent's premise that the Code accelerates debts. In fact, the majority expressly agreed that the Code mandates the acceleration of debt on the petition date, "The legislative history shows that § 502(b) and (b)(2) reflect the basic bankruptcy law tenet that 'bankruptcy operates as the acceleration of the principal amount of all claims against the debtor.'" *Oakwood Homes*, 499 F.3d at 603 n. 19 (quoting H.R. Rep. No. 95-595 (1977), at 352-54).

The Trustee unsuccessfully tries to avoid Code acceleration in two ways: pointing out that Code acceleration is different from contract acceleration and highlighting cases where make-whole premiums were awarded despite Code acceleration. (1L Pre-Trial Br. 15-19.) ***First***, there is no dispute that contractual and Code acceleration are different. As Judge Drain explained in *Momentive*, contractual acceleration, but not Code acceleration, can trigger other rights such as a right to damages under section 1124(2)(C) if debt is reinstated under section 1124(2)(B) and may provide the creditor a right to a different type or amount of interest under the relevant contract. *MPM* 2014 WL 4436335, at *23; *cf. In re LHD Realty Corp.*, 726 F.2d 327, 332 (7th Cir. 1984) (code acceleration does not provide right to foreclose). Nonetheless, *both* contractual and Code acceleration make debts due and payable on the petition date. *See* (S.J. Decision ¶ 45); *Oakwood Homes*, 449 F.3d at 603 n.19.

**Second**, the Trustee also argues that Code acceleration cannot deprive creditors of a make-whole premium because "[n]umerous cases have allowed makewholes (or comparable claims) in bankruptcy." (1L Pre-Trial Br. 16-18.) But *none* of the Trustee's "numerous cases" hold that noteholders can exercise state law rights to override the Code's mandated acceleration—the precise question at issue here. The Trustee's cases instead stand for uncontroversial propositions that are entirely beside the point: that, where the parties agree a make-whole is contractually owed, Code acceleration or contract acceleration will not disallow the claim;[20] that, where parties agree a fully secured make-whole premium is owed in bankruptcy, the premium should not be disallowed as unmatured interest under § 502(b)(2);[21] and that bankruptcy acceleration alone is not sufficient to permit a creditor to foreclose on a debt.[22] None of these cases cast any light on the argument that the Trustee is allegedly addressing: whether the Noteholders can use its state law right to rescind contract acceleration, in bankruptcy, to undo Code acceleration. They cannot.

## II. LIFTING THE STAY RETROACTIVELY TO RATIFY THE TRUSTEE'S STAY VIOLATION IS AN EXTRAORDINARY REMEDY, WHICH SHOULD BE DENIED.

The Court's lift-stay analysis occurs against a specific legally relevant backdrop. The Trustee and the Noteholders violated the automatic stay on June 4, 2014, by providing notice to EFIH that purported to rescind the automatic acceleration of the Notes. (S.J. Decision ¶¶ 8(d), 67, 92.) The Trustee now seeks the Court's blessing for this automatic stay violation, but retroactive stay relief is extraordinary. *In re Soares*, 107 F.3d 969, 977 (1st Cir. 1997); *see also In re Shamblin*, 890 F.2d 123, 126 (9th Cir.

---

[20] *In re Skyler Ridge*, 80 B.R. 500, 507 (Bankr. C.D. Cal. 1987).

[21] *In re Trico Marine Servs., Inc.*, 450 B.R. 474, 477-78, 481 (Bankr. D. Del. 2011).

[22] *In re LHD Realty Corp.*, 726 F.2d 327, 332 (7th Cir. 1984).

1989) ("Any equitable exception to the automatic stay should be narrow and applied only in extreme circumstances.").

The Trustee claims that its reservation of rights in the First Lien DIP Order means that it does not need to meet this standard. It further claims the EFIH Debtors seek to "disavow" that reservation of rights, (1L Pre-Trial Br. 5 n.4), and accuses the EFIH Debtors of being "disingenuous" because the EFIH Debtors "really know [what] the truth is and what was going on." (4/22/15 Trial Tr. 29:3-7 (Closing).) These bold accusations ignore why the reservation of rights does not provide the Trustee with rights that it never had. (EFIH Pre-Trial Br. 10-12.) The DIP Order preserved some of the Trustee's rights as of June 6, 2014. Its rights on that day *still would have required* seeking retroactive relief from the automatic stay. The chronology speaks for itself: on May 15, 2014, the Trustee filed its lift-stay motion (No. 14-10979, D.I. 473), on June 4, 2014, the Trustee violated the automatic stay anyway by delivering a notice to EFIH attempting to rescind the Notes' acceleration, (S.J. Decision ¶¶ 8(d), 67, 92), and on June 6, 2014, the Court entered the DIP Order containing the reservation of rights. (PX 101 at 57-58.) Any attempt to lift the automatic stay after violating it on June 4, 2014, is *by definition* a request for retroactive relief from the automatic stay. The June 6, 2014, reservation of rights did not cleanse the Trustee of its intentional automatic stay violation.[23]

Now, just as on June 6, 2014, the Trustee must meet the standard for retroactive

---

[23] In fact, corporate debtors may recover damages from creditors who commit a willful violation of the automatic stay. 11 U.S.C. § 362(k); *In re Atl. Bus. & Cmty. Corp.*, 901 F.2d 325, 329 (3d Cir. 1990) ("Although Section 362(h) refers to an individual, the section has uniformly been held to be applicable to a corporate debtor.")

stay relief.  *See In re Myers*, 491 F.3d 120, 129 (3d Cir. 2007).[24]  The Trustee admits in its pre-trial brief that it was fully aware of the automatic stay when the Trustee sent the June 4, 2014, rescission notice, (1L Pre-Trial Br. 5 n.4), which weighs *against* retroactive relief.  Further, the EFIH Debtors did not engage in any inequitable or dishonest behavior, such as filing multiple petitions in bad faith.  And finally none of the cases the Trustee cites is applicable here.[25]  The Trustee has not met this standard.

## **CONCLUSION**

For the foregoing reasons, the Court should deny the Trustee's motion to lift the automatic stay and grant summary judgment, with prejudice, in favor of the EFIH Debtors on Count I of the Trustee's adversary complaint.

---

[24] The three factors are: "(1) whether the creditor was aware of the filing or encouraged violation of the stay; (2) whether the debtor engaged in inequitable, unreasonable, or dishonest behavior; and (3) whether the creditor would be prejudiced." *Myers*, 491 F.3d at 129.

[25] In *Coletta*, a mortgage lender inadvertently violated the stay by foreclosing on property without knowing that the debtor had opportunistically filed for bankruptcy protection. *In re Coletta*, 380 B.R. 140 (E.D. Pa. 2007).  Similarly, in *Jean-Francois*, a mortgage lender foreclosed without knowledge of the debtor's petition, which the court found was filed in bad faith a mere 20 minutes before the foreclosure sale. *In re Jean-Francois*, 516 B.R. 699, 704 (E.D.N.Y. 2014).  Finally, *Metropolitan Hospital* does not address the standard for retroactive stay relief. *In re Metropolitan Hosp.*, 131 B.R. 283, 291 (E.D. Pa. 1991).  The case simply stands for the proposition that a creditor who obtains relief from the stay is entitled to a setoff of prepetition debt. *Id.* at 288.

Dated: May 20, 2015
   Wilmington, Delaware

*/s/ Jason M. Madron*

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
920 North King Street
Wilmington, Delaware 19801
Telephone:      (302) 651-7700
Facsimile:      (302) 651-7701
Email:          collins@rlf.com
                defranceschi@rlf.com
                madron@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          edward.sassower@kirkland.com
                stephen.hessler@kirkland.com
                brian.schartz@kirkland.com

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Chad J. Husnick (admitted *pro hac vice*)
Steven N. Serajeddini  (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          james.sprayregen@kirkland.com
                marc.kieselstein@kirkland.com
                chad.husnick@kirkland.com
                steven.serajeddini@kirkland.com

Co-Counsel to the Debtors and Debtors in Possession