# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
In Re:                                          :
                                                :
MPM SILICONES, LLC, et al.,                     :
                                 Debtors.        :          **MEMORANDUM DECISION**
-------------------------------------------------------------x
U.S. BANK NATIONAL ASSOCIATION,                 :          14 CV 7471 (VB)
as Indenture Trustee,                           :          14 CV 7472 (VB)
                                 Appellant,      :
                                                :
v.                                              :
                                                :
WILMINGTON SAVINGS FUND SOCIETY,                :
FSB, as Indenture Trustee, MOMENTIVE            :
PERFORMANCE MATERIALS INC.,                     :
MOMENTIVE PERFORMANCE MATERIALS                 :
WORLDWIDE INC., MOMENTIVE                        :
PERFORMANCE MATERIALS USA INC.,                 :
JUNIPER BOND HOLDINGS I LLC, JUNIPER            :
BOND HOLDINGS II LLC, JUNIPER BOND              :
HOLDINGS III LLC, JUNIPER BOND                  :
HOLDINGS IV LLC, MOMENTIVE                       :
PERFORMANCE MATERIALS QUARTZ, INC.,             :
MPM SILICONES, LLC, MOMENTIVE                    :
PERFORMANCE MATERIALS SOUTH                      :
AMERICA INC., MOMENTIVE                          :
PERFORMANCE MATERIALS CHINA SPV                 :
INC.,                                           :
                                 Appellees.      :
-------------------------------------------------------------x

-------------------------------------------------------------x
In Re:                                          :
                                                :
MPM SILICONES, LLC, et al.,                     :          14 CV 7492 (VB)
                                 Debtors.        :
                                                :
-------------------------------------------------------------x
BOKF, NA, solely as Trustee for the MPM         :
Escrow LLC and MPM Finance Escrow Corp.         :
8.875% First Priority Senior Secured Notes due  :
2020; WILMINGTON TRUST, NATIONAL                :
ASSOCIATION, solely as Trustee for the          :
Momentive Performance Materials Inc. 10%        :

1

Senior Secured Notes due 2020,                          :
                            Appellants,                 :
                                                        :
v.                                                      :
                                                        :
MOMENTIVE PERFORMANCE MATERIALS    :
INC., MOMENTIVE PERFORMANCE                :
MATERIALS WORLDWIDE INC.,                     :
MOMENTIVE PERFORMANCE MATERIALS    :
USA INC., JUNIPER BOND HOLDINGS I LLC,    :
JUNIPER BOND HOLDINGS II LLC, JUNIPER     :
BOND HOLDINGS III LLC, JUNIPER BOND        :
HOLDINGS IV LLC, MOMENTIVE                    :
PERFORMANCE MATERIALS QUARTZ, INC.,    :
MPM SILICONES, LLC, MOMENTIVE              :
PERFORMANCE MATERIALS SOUTH               :
AMERICA INC., and MOMENTIVE                  :
PERFORMANCE MATERIALS CHINA SPV        :
INC.,                                                      :
                            Appellees.                  :
--------------------------------------------------------------x

Briccetti, J.:

　　　　This case involves related appeals from proceedings in the United States Bankruptcy

Court for the Southern District of New York (Robert D. Drain, Judge), during which the Joint

Chapter 11 Plan (the "Plan") of Reorganization for Momentive Performance Materials Inc.

("MPM") and its affiliated debtors (collectively with MPM, the "Debtors") was confirmed.

　　　　The Debtors filed a Chapter 11 petition on April 13, 2014. After several months of

negotiations, Judge Drain held a multi-day confirmation hearing and issued a bench decision on

August 26, 2014, which was later corrected and modified in a bench decision on September 9,

2014. On September 11, 2014, Judge Drain issued a written order to effectuate the bench

decisions. These appeals stem from the September 9, 2014, bench decision and the September

11, 2014, written order (the "Orders").

Appellant U.S. Bank National Association ("U.S. Bank") contends the Bankruptcy Court erred in confirming the Plan despite the Plan's failure to provide any distributions to holders of subordinated notes (the "Subordinated Notes") issued pursuant to an indenture agreement dated December 4, 2006 (the "2006 Indenture").

Appellants BOKF, N.A., and Wilmington Trust, National Association, contend the Bankruptcy Court chose the wrong cramdown interest rate and erred in confirming the Plan despite the Plan's failure to provide a "make-whole" payment to holders of senior lien notes issued pursuant to indentures dated May 25 and October 25, 2012 (the "2012 Indentures").

For the following reasons, the Bankruptcy Court's Orders are AFFIRMED.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 158(a).

## BACKGROUND

MPM, together with its Debtor and non-Debtor subsidiaries (collectively, the "Company"), is one of the world's largest producers of silicones and silicone derivatives, which are used in the manufacture of a myriad of industrial and household products.  The Company began as the Advanced Materials business of General Electric Company ("GE").  In 2006, investment funds affiliated with Apollo Global Management, LLC (collectively, "Apollo"), acquired the Company from GE.

I.    Facts Leading up to Bankruptcy

At the time Apollo acquired the Company, the Debtors issued substantial debt obligations, including the Subordinated Notes.  The Subordinated Notes were issued pursuant to the 2006 Indenture,[1] which describes the relative ranking of the Subordinated Notes in comparison with other debt obligations issued by the Debtors.  The 2006 Indenture provides that

---

[1]    U.S. Bank is the Indenture Trustee for the Subordinated Noteholders under the 2006 Indenture.

the Subordinated Notes are "subordinated in right of payment . . . to the prior payment in full of

all existing and future Senior Indebtedness of the Company." (U.S. Bank Ex. D, § 10.01).

Senior Indebtedness is defined, in relevant part, as:

> all Indebtedness . . . unless the instrument creating or evidencing
> the same or pursuant to which the same is outstanding expressly
> provides that such obligations are subordinated in right of payment
> to any other Indebtedness of the Company[;] [the "Base
> Definition"] . . . provided, however, that Senior Indebtedness shall
> not include, as applicable:
>
> 4) any Indebtedness or obligation of the Company . . . that by its
> terms is subordinate or junior in any respect to any other
> Indebtedness or obligation of the Company . . . including any Pari
> Passu Indebtedness.

(Id., § 1.01).

In 2010, the Debtors issued springing second lien notes (the "Second Lien Notes"). The

Second Lien Notes were unsecured when issued, but would become secured if all second lien

notes issued in 2009 were redeemed. When the Second Lien Notes were issued, the Debtors

stated that "[p]rior to and following the Springing Lien Trigger Date, the [Second Lien]

Notes . . . will be senior indebtedness" and rank "senior in right of payment to . . . the

Company's existing subordinated notes." (Debtors' Subordinated Notes Ex. 3). In November

2012, the Second Lien Notes became secured by a junior lien—that is, the lien "sprung"—

because all of the second lien notes issued in 2009 were redeemed.

In 2012, the Debtors issued two additional classes of senior secured notes—the 1.5 Lien

Notes and the First Lien Notes (collectively, the "Senior Lien Notes"). The 1.5 Lien Notes were

issued at an interest rate of 10% pursuant to an indenture dated May 25, 2012, and the First Lien

Notes were issued at an interest rate of 8.875% pursuant to an indenture dated October 25, 2012.[2]  The Senior Lien Notes had a maturity date of October 15, 2020.

In addition, the Senior Lien Notes provide for the payment of a "make-whole" premium if the Senior Lien Notes are redeemed before October 15, 2015:

> [P]rior to October 15, 2015, the Issuer may redeem the [Senior Lien] Notes at its option, in whole at any time or in part from time to time . . . at a redemption price equal to 100% of the principal amount of the [Senior Lien] Notes redeemed plus the Applicable Premium as of, and accrued and unpaid interest and Additional Interest, if any, to the applicable redemption date.

(Senior Lien Appellants Ex. C1(A), ¶ 5).[3]  The Applicable Premium is the make-whole payment.

However, the 2012 Indentures, which govern the Senior Lien Notes, contain an acceleration provision.  The acceleration provision is triggered upon an "Event of Default," which includes the voluntary commencement of a bankruptcy proceeding.  (Senior Lien Appellants Ex. C1, §§ 6.01(f), 6.02).  If such an Event of Default is triggered, "the principal of, premium, if any, and interest on all the [Senior Lien] Notes shall ipso facto become and be immediately due and payable."  (Id., § 6.02).

The Senior Lien Notes, along with certain other debt (collectively, the "Senior Secured Loans") are secured by the same collateral (the "Common Collateral") as the Second Lien Notes. An intercreditor agreement (the "Intercreditor Agreement") governs the relationship between the classes of notes.  The Intercreditor Agreement provides that the Second Lien Notes are subordinated to the Senior Secured Loans with respect to their position in the Common

---

[2]      BOKF is the Indenture Trustee for the First Lien Noteholders, and Wilmington Trust is the Indenture Trustee for the 1.5 Lien Noteholders.

[3]      The indentures and notes governing the First Lien Notes and 1.5 Lien Notes are identical in all parts relevant to the disputes at issue in this case.  The Senior Lien Notes are attached as Exhibit A to each of the 2012 Indentures.

Collateral. (See U.S. Bank Ex. F § 2). Moreover, the Intercreditor Agreement provides that it does not alter the Second Lien Noteholders' rights as unsecured creditors. (Id. § 5.4).

II.    The Plan

The Plan provides no distributions to the holders of the Subordinated Notes.

The Plan also provides that if the holders of the Senior Lien Notes vote in favor of the plan, all outstanding principal and accrued interest on the Senior Lien Notes would be paid in cash to the Senior Lien Noteholders on the effective date of the Plan. (U.S. Bank Ex. A §§ 5.4(a), (b)(i); 5.5(a), (b)(1)).[4] However, no make-whole premium would be allowed. (Id. §§ 5.4(a); 5.5(a)). According to the Plan, if the holders of the Senior Lien Notes vote against the Plan, they would receive "Replacement . . . Notes [the "Replacement Notes"] with a present value equal to the Allowed amount of such holder's Claim," which could—at the Bankruptcy Court's discretion—include a make-whole premium. (Id. §§ 5.4(b)(ii); 5.5(b)(ii)). The Senior Lien Noteholders voted against the Plan. The Bankruptcy Court then determined the Senior Lien Noteholders were not entitled to a make-whole premium.

## DISCUSSION

I.    Legal Standard

The Court has jurisdiction to hear these appeals pursuant to 28 U.S.C. § 158(a). A district court reviews a bankruptcy court's conclusions of law de novo and its findings of fact under a clearly erroneous standard. See In re Ames Dep't Stores, Inc., 582 F.3d 422, 426 (2d Cir. 2009) (citing Momentum Mfg. Corp. v. Emp. Creditors Comm., 25 F.3d 1132, 1136 (2d Cir. 1994)).

---

[4]    To ensure the Debtors would have been prepared to cash-out the holders of the Senior Lien Notes had they voted to approve the Plan, the Debtors obtained financing that would have allowed them to do so.

II.      Subordination Dispute

On behalf of the Subordinated Noteholders, U.S. Bank contends the Plan violates Section

1129(b) of the Bankruptcy Code, which requires that a plan must be "fair and equitable[] with

respect to each class of claims or interests that is impaired under, and has not accepted, the plan."

11 U.S.C. § 1129(b)(1).  "One of the attributes of a fair and equitable plan is that if an unsecured

creditor is not paid in full, 'the holder of any claim or interest that is junior to the claims of [the

unsecured creditor] class will not receive or retain under the plan on account of such junior claim

or interest any property.'"  In re Coltex Loop Cent. Three Partners, L.P., 138 F.3d 39, 42 (2d Cir.

1998) (quoting 11 U.S.C. § 1129(b)(2)(B)(ii)).

The Subordinated Noteholders—unsecured creditors who were not paid in full under the

Plan—contend the Plan violates Section 1129(b) by denying them any recovery while providing

distributions to the Second Lien Noteholders.  Whether the Second Lien Noteholders are entitled

to recovery ahead of the Subordinated Noteholders turns on whether the Second Lien Notes are

Senior Indebtedness under the 2006 Indenture (which governs the Subordinated Notes).

The 2006 Indenture provides that the Subordinated Notes are "subordinated in right of

payment . . . to the prior payment in full of all existing and future Senior Indebtedness of the

Company."  (U.S. Bank Ex. D, § 10.01).  Senior Indebtedness is defined as:

> all Indebtedness . . . unless the instrument creating or evidencing
> the same or pursuant to which the same is outstanding expressly
> provides that such obligations are subordinated in right of payment
> to any other Indebtedness of the Company[;] [the "Base
> Definition"] . . . provided, however, that Senior Indebtedness shall
> not include, as applicable:
>
> 4) any Indebtedness or obligation of the Company or any
> Restricted Subsidiary that by its terms is subordinate or junior in

7

> any respect to any other Indebtedness or obligation of the
> Company . . . including any Pari Passu Indebtedness.

(Id., § 1.01).

U.S. Bank argues that according to the plain language of the Indenture, Senior

Indebtedness cannot include debt that is "subordinated in right of payment" (the "in right of

payment" clause) or "subordinate or junior in any respect" to any other debt (the "in any respect"

clause). Because the Second Lien Notes are secured by a junior lien, U.S. Bank argues they

cannot be Senior Indebtedness under the "in any respect" clause. The Debtors argue, and the

Bankruptcy Court held, that both clauses exclude payment subordination—rather than lien

subordination—from the definition of Senior Indebtedness, and thus the Second Lien Notes are

Senior Indebtedness.

The Court agrees with the Debtors and the Bankruptcy Court.

The "interpretation of Indenture provisions is a matter of basic contract law." In re AMR

Corp., 730 F.3d 88, 98 (2d Cir. 2013) (internal brackets omitted), cert. denied, 134 S. Ct. 1888

(2014). The parties agree New York law governs this contract dispute. When interpreting a

contract, "the intent of the parties governs." Crane Co. v. Coltec Indus., Inc., 171 F.3d 733, 737

(2d Cir. 1999) (quoting Am. Express Bank Ltd. v. Uniroyal, Inc., 164 A.D.2d 275, 277 (1st

Dep't 1990)). Intent is ascertained from the "plain meaning" of the language employed.

PaineWebber Inc. v. Bybyk, 81 F.3d 1193, 1199 (2d Cir. 1996) (quoting Tigue v. Commercial

Life Ins. Co., 219 A.D.2d 820, 821 (4th Dep't 1995)). When analyzing intent, "[t]he rules of

contract construction require [the Court] to adopt an interpretation which gives meaning to every

provision of the contract." Paneccasio v. Unisource Worldwide, Inc., 532 F.3d 101, 111 (2d Cir.

2008).

"In a dispute over the meaning of a contract, the threshold question is whether the contract is ambiguous." Lockheed Martin Corp. v. Retail Holdings, N.V., 639 F.3d 63, 69 (2d Cir. 2011). "Contract language is not ambiguous if it has a definite and precise meaning . . . concerning which there is no reasonable basis for a difference of opinion." Bayerische Landesbank, N.Y. Branch v. Aladdin Capital Mgmt. LLC, 692 F.3d 42, 53 (2d Cir. 2012) (internal quotation marks omitted). "If the parties' intent is unambiguously conveyed by the plain meaning of the agreement[], then interpretation is a matter of law." Crane Co. v. Coltec Indus., Inc., 171 F.3d at 737 (internal quotation marks omitted).

Before delving into the language of the 2006 Indenture, it is important to understand the difference between lien subordination and payment subordination. Under a lien subordination agreement, "the subordinating party agrees to demote the priority of its lien to that of another secured creditor, thereby delaying its recourse to the identified collateral until the other party's secured claim has been satisfied." Ryan E. Manns & Camisha L. Simmons, Safeguarding Enforcement of Lien Subordination Agreements, 32 AM. BANKR. INST. J. 52, 52 (2013). In contrast, payment, or debt, subordination, "entitles the senior creditor to full satisfaction of its superior debt before the subordinated creditor receives payment on its debt." In re First Baldwin Bancshares, Inc., 2013 WL 5429844, at *7 (S.D. Ala. Sept. 30, 2013). A recent article explains the difference between the two types of subordination:

> Lien subordination involves two senior creditors with security interests in the same collateral, one of which has lien priority over the other. To the extent of any value derived from the collateral (e.g., its liquidation proceeds upon a sale), the senior lien lender is repaid first from collateral proceeds, and the junior lien lender collects only from any remaining collateral value. If the collateral proceeds are insufficient to repay the senior lender in full, then both the senior lien and junior lien lenders, and all other unsecured senior creditors, rank equally in their right to repayment of their remaining debt from the other assets or resources of the borrower.

> By contrast, in payment subordination, the senior lender enjoys the
> right to be paid first from all assets of the borrower or any
> applicable guarantor, whether or not constituting collateral security
> for the senior or subordinated lenders. Because payment
> subordination depends only on the amount owed and not on the
> value of any particular collateral, it is a more fundamental form of
> subordination and is generally more advantageous to a senior
> lender.

Robert L. Cunningham & Yair Y. Galil, Lien Subordination and Intercreditor Agreements, THE
REV. OF BANKING & FIN. SERVICES, May 2009, at 49, 50.

An examination of the plain language of the definition of Senior Indebtedness reveals
that only indebtedness subject to payment subordination, and not indebtedness subject to lien
subordination, is excluded. The Base Definition of Senior Indebtedness excludes debt that is
"subordinated in right of payment" to any other debt. The words "in right of payment" clearly
refer only to payment subordination; thus, the Base Definition excludes only indebtedness
subordinated by payment from the definition of Senior Indebtedness.

Six provisos follow the Base Definition. The fourth of those provisos—the "in any
respect" clause—provides Senior Indebtedness cannot include debt that is "subordinate or junior
in any respect" to other debt. U.S. Bank rests much of its argument on this clause, as upon first
glance, it appears to be as broad as possible, thus encompassing both payment and lien
subordination. However, closer consideration reveals this is not the case.

First, the six provisos appended to the Base Definition of Senior Indebtedness must be
read in conjunction with the Base Definition. See, e.g., Adams v. Suozzi, 433 F.3d 220, 228 (2d
Cir. 2005) ("A written contract will be read as a whole, and every part will be interpreted with
reference to the whole"). As described above, the Base Definition excludes debt subordinated by
payment from the definition of Senior Indebtedness. The provisos can only clarify or augment
the Base Definition; they are not a substitute for the Base Definition. See Friedman v. CT Gen.

Life Ins. Co., 9 N.Y.3d 105, 114 (2007) ("The purpose of a proviso is to restrain the enacting clause, to except something which would otherwise have been within it, or in some measure to modify it"); White v. United States, 191 U.S. 545, 551 (1903) (the usual purpose of a proviso is to "restrain generality, and to prevent misinterpretation"). Thus, when looking to determine the meaning of the "in any respect" clause, the Court is mindful of the words the drafters of the 2006 Indenture chose to use in the Base Definition.

With that in mind, the "in any respect" clause unambiguously clarifies the Base Definition by ensuring the exclusion of indebtedness that is subordinated by payment to other indebtedness "by its terms," even if the instrument creating the indebtedness does not expressly create that subordination. See In re MPM Silicones, LLC, 2014 WL 4436335, at *7 (Bankr. S.D.N.Y. Sept. 9, 2014).[5] The "in right of payment" clause excludes indebtedness expressly subordinated in right of payment, while the "in any respect" clause excludes indebtedness subordinated in right of payment "by its terms."

Second, as the Bankruptcy Court correctly noted, if the "in any respect" clause is read— as U.S. Bank contends it must be—to encompass both payment and lien subordination, it would entirely subsume the exclusion of indebtedness "subordinated in right of payment" contained in the Base Definition. Such a construction violates bedrock principles of contract interpretation. See Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 63 (1995) ("a document should be read to give effect to all of its provisions and to render them consistent with each other");

---

[5]    This interpretation is strengthened by the reference to "Indebtedness" at the start of the "in any respect" clause. As the Bankruptcy Court correctly noted, "the parties distinguished liens, which secure indebtedness, from indebtedness itself in several instances in the indenture, including in the definition of 'Indebtedness' and 'Lien.'" In re MPM Silicones, LLC, 2014 WL 4436335, at *4. By excluding only "Indebtedness" subordinated "by its terms . . . in any respect" from the definition of Senior Indebtedness, the "in any respect" clause makes clear it applies only to payment subordination.

Galli v. Metz, 973 F.2d 145, 149 (2d Cir. 1992) ("Under New York law an interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible" (internal quotation marks omitted)). The structure of the definition of Senior Indebtedness renders this interpretation even more implausible; only a tortured interpretation of a contract could read a proviso as entirely subsuming language contained in the Base Definition.

U.S. Bank faults this interpretation of the "in any respect" clause, arguing it fails to give meaning to the words "in any respect." U.S. Bank is wrong. The "in any respect" clause excludes from the definition of Senior Indebtedness "any Indebtedness or obligation of the Company . . . that by its terms is subordinate or junior in any respect to any other Indebtedness." (U.S. Bank Ex. D, § 1.01). "In any respect," placed in context, makes clear that all types of payment subordination—no matter how that payment subordination is created—precludes an obligation from being Senior Indebtedness. It makes perfect sense that the drafters of the Indenture would have included the words "in any respect" when seeking to emphasize that all debt subordinated by right of payment through <u>any</u> non-explicit means is excluded from the definition of Senior Indebtedness.

U.S. Bank next argues this interpretation of Senior Indebtedness—just like the interpretation U.S. Bank proposes—also violates principles of contract construction by rendering the "in right of payment" clause superfluous. U.S. Bank contends debt subordinated in right of payment "by its terms" must include debt "expressly" subordinated in right of payment. However, this type of surplusage—if any exists—is far easier to swallow than that created by the interpretation U.S. Bank proposes. Reading the "in any respect" clause to apply to both lien and payment subordination substitutes the proviso entirely for the Base Definition. Reading the "in

any respect" clause to add ways in which payment subordination can be expressed allows the proviso to augment the Base Definition.

Thus, the plain language of the definition of Senior Indebtedness unambiguously provides that Senior Indebtedness excludes <u>only</u> debt subordinated by payment, and not debt secured by a junior lien. The "in any respect" clause augments the Base Definition, clarifying that the instrument creating the debt does not have to render that debt explicitly subordinated by right of payment to other debt; the debt is still excluded from the definition of Senior Indebtedness if it is "by its terms . . . in any respect" subordinated by right of payment.

Other considerations also militate in favor of this interpretation. The 2006 Indenture contains an anti-layering provision, which precludes the Debtors from incurring debt that is "subordinate in right of payment" to any other debt issued by Debtors, unless it is "<u>pari passu</u>" with or "subordinate in right of payment" to the Subordinated Notes. (U.S. Bank Ex. D § 4.13). Nothing contained in the anti-layering covenant prevents the Debtors from issuing debt that is secured by a junior lien but ranks senior in right of payment to the Subordinated Notes. It makes little sense that the anti-layering covenant itself would not prohibit Debtors from issuing such layered debt, but a proviso within the definition of Senior Indebtedness would provide that very same prohibition.[6]

_____

[6]     U.S. Bank relies upon an article published by Fitch Ratings in February 2006 to support its contention that the "in any respect" clause excludes debt secured by a junior lien from the definition of Senior Indebtedness. The article noted that, at the time, most anti-layering covenants did not preclude issuers from layering senior debt secured by a junior lien. (U.S. Bank Ex. L at 4-5). The article suggested that parties employ the phrase "subordinated in any respect" in anti-layering covenants should they wish to preclude the layering of such debt. However, that is not what the parties here did. Had the parties intended to follow this advice, logic dictates they would have done so in the anti-layering covenant itself—as the article suggests—rather than in a proviso to the definition of Senior Indebtedness. Moreover, there is no evidence in the record that the parties relied on the Fitch Ratings article, or any other source cited by U.S. Bank, when drafting the 2006 Indenture. And, as Judge Drain correctly pointed out, these sources date from

Moreover, U.S. Bank concedes that if the lien securing the Second Lien Notes had never

sprung, those Notes would constitute Senior Indebtedness. In U.S. Bank's view, the Second

Lien Notes were senior to the Subordinated Notes when they were unsecured, but became pari

passu with the Subordinated Notes when the junior lien sprang. As the Bankruptcy Court

correctly noted, this is an absurd result that should be avoided. See InterDigital Commc'ns Corp.

v. Nokia Corp., 407 F. Supp. 2d 522, 530 (S.D.N.Y. 2005) ("'A contract should not be

interpreted to produce a result that is absurd, commercially unreasonable or contrary to the

reasonable expectations of the parties'" (quoting In re Lipper Holdings, LLC, 1 A.D.3d 170, 171

(1st Dep't 2003)).

Thus, the 2006 Indenture provides that Senior Indebtedness unambiguously excludes

only debt subordinated by payment; it does not exclude debt secured by a junior lien.[7]

U.S. Bank also contends the Second Lien Notes are subordinated by payment to the

Senior Secured Loans by the Intercreditor Agreement. The Court does not agree. The

Intercreditor Agreement addresses only the relative priorities of the liens securing the Senior

Secured Loans and the Second Lien Notes. (See U.S. Bank Ex. F § 2 (entitled "Lien

---

just a few months before the issuance of the Subordinated Notes; thus, "there was no well
established standard form that might add a meaningful context to the [2006 I]ndenture's plain
terms and internal consistency." In re MPM Silicones, LLC, 2014 WL 4436335, at *8.

[7]     Even though the language of the Indenture is unambiguous, if the Court were to find the
definition of "Senior Indebtedness" lacked definite and precise meaning, the extrinsic evidence
in the record demonstrates the parties believed the Second Lien Notes were Senior Indebtedness.
The Debtors stated in multiple filings with the Securities and Exchange Commission—both at
the time of the issuance of the Second Lien Notes and thereafter—that the Second Lien Notes
were Senior Indebtedness; no Subordinated Noteholder—nor U.S. Bank—objected to this
characterization. This evidence demonstrates the parties considered the Second Lien Notes to be
Senior Indebtedness, and further supports the Court's ruling.

Priorities")).  Further, the Intercreditor Agreement provides that it does not alter the Second Lien

Noteholders' rights as unsecured creditors.  (Id. § 5.4).

Finally, U.S. Bank contends the "primary feature of the [Second Lien Noteholders']

subordination is the requirement that they must wait in line to have their <u>debt</u> paid as to a

substantial portion of the Debtor's assets," that is, the Common Collateral.  (U.S. Bank Mem. at

11).  Thus, even in the provisions of the Intercreditor Agreement that U.S. Bank contends

connote payment subordination, "[t]he focus still is on the collateral that was agreed to be

secured by the liens."  In re MPM Silicones, LLC, 2014 WL 4436335, at * 9.  That describes

lien—not payment—subordination.

Because the Second Lien Notes are Senior Indebtedness, the Plan—which provides no

distributions to the holders of the Subordinated Notes—does not run afoul of Section 1129(b)'s

fair and equitable requirement.[8]

III.    The Cramdown Interest Rate Dispute

BOKF, as Trustee for the First Lien Noteholders, and Wilmington Trust, as Trustee for

the 1.5 Lien Noteholders (collectively, the "Senior Lien Appellants") also contend the Plan

violates Section 1129(b)'s fair and equitable requirement.  See 11 U.S.C. § 1129(b).  To be "fair

---

[8]      Nor does the Plan violate the absolute priority rule by preserving certain intercompany
interests without paying the Subordinated Noteholders in full.  The "technical preservation of
equity is a means to preserve the corporate structure that does not have any economic substance
and that does not enable any junior creditor or interest holder to retain or recover any value under
the Plan.  The Plan's retention of intercompany equity interests for holding company purposes
constitutes a device utilized to allow the Debtors to maintain their organizational structure and
avoid the unnecessary cost of having to reconstitute that structure." In re Ion Media Networks,
Inc., 419 B.R. 585, 601 (Bankr. S.D.N.Y. 2009).  That the Second Circuit has rejected the
"gifting" doctrine does not undermine this reasoning; the court in In re Ion cited the "gifting"
doctrine only "[t]o the extent the preservation of the intercompany equity interests may be
deemed an allocation of value" to inappropriate interest holders.  Id. at 601 n.22.  Moreover, the
Court is not convinced—as Judge Drain pointed out—that the Subordinated Noteholders even
have standing to raise this issue.

and equitable" to fully secured creditors such as the Senior Lien Appellants, a plan must allow

the objecting class to "retain the liens" securing its claim and receive "deferred cash payments

totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan,

of at least the value of such holder's interest in the estate's interest in such property." Id.

§1129(b)(2)(A)(i); see also In re Cellular Info. Sys, Inc., 171 B.R. 926, 937 (Bankr. S.D.N.Y.

1994) ("At minimum, a fully secured creditor is treated fairly and equitably if it retains the lien

securing its claim and receives deferred cash payments which have a present value equal to the

amount of its claim.").

The Senior Lien Appellants contend the Plan violates Section 1129(b) by using the

"formula approach" to calculate the cramdown interest rate, and, in the alternative, by calculating

the cramdown interest rate under the formula approach incorrectly.

A.    Interest Rate Approach

Under the Plan, the Senior Lien Appellants will receive deferred cash payments; thus,

they are entitled to interest payments "to ensure that, over time, [they] receive[] disbursements

whose total present value equals or exceeds that of the allowed claim." Till v. SCS Credit Corp.,

541 U.S. 465, 469 (2004); see also Rake v. Wade, 508 U.S. 464, 472 n.8 (1993) ("When a claim

is paid off pursuant to a stream of future payments, a creditor receives the 'present value' of its

claim only if the total amount of the deferred payments includes the amount of the underlying

claim plus an appropriate amount of interest to compensate the creditor for the decreased value

of the claim caused by the delayed payments."). The parties dispute the appropriate cramdown

interest rate.

The Senior Lien Appellants contend the Court should determine the interest rate using an

"efficient market" approach. Under the efficient market approach, the cramdown interest rate is

based on the interest rate the market would pay on such a loan, in this case measured by "the rates on the exit and bridge financing the Debtors actually obtained." (Senior Lien Appellants' Mem. at 16). The Debtors contend the Court should use the formula approach laid out by the Supreme Court in Till v. SCS Credit Corp., 541 U.S. 465 (2004). Under the formula approach, the cramdown interest rate is calculated by augmenting a risk-free (or low risk) base rate "to account for the risk of nonpayment posed by borrowers in the[] financial position" of the debtor. Id. at 471.

The Court agrees with the Debtors and the Bankruptcy Court.

Although the Senior Lien Appellants correctly point out Till was decided in the context of a Chapter 13 bankruptcy—rather than a Chapter 11 bankrupcty—the Court finds much of Till's reasoning applicable in the Chapter 11 context. In Till, the Supreme Court rejected the efficient market approach because it "imposes significant evidentiary costs, and aims to make each individual creditor whole rather than to ensure the debtor's payments have the required present value." Till v. SCS Credit Corp., 541 U.S. at 477. Additionally, the Court noted the efficient market approach "overcompensates creditors because the market lending rate must be high enough to cover factors, like lenders' transaction costs and overall profits, that are no longer relevant in the context of court-administered and court-supervised cramdown loans." Id.

The Second Circuit, in a pre-Till opinion also in the Chapter 13 context, signaled its agreement with this reasoning. In In re Valenti, 105 F.3d 55 (2d Cir. 1997), the Second Circuit rejected the efficient market approach, stating that courts adopting such an "approach misapprehend the 'present value' function of the interest rate." Id. at 63. The court explained that the cramdown interest rate is meant "to put the creditor in the same economic position that it would have been in had it received the value of its claim immediately. The purpose is not to put

17

the creditor in the same position that it would have been in had it arranged a 'new' loan." Id. at

63-64.  The court continued: "[T]he value of a creditor's allowed claim does not include any

degree of profit.  There is no reason, therefore, that the interest rate should account for

profit. . . .  Otherwise, the creditor will receive more than the present value of its allowed claim."

Id. at 64.

The Court finds the Second Circuit's reasoning in Valenti applicable in the Chapter 11

context.  In fact, in Till, the Supreme Court explicitly stated: "We think it likely that Congress

intended bankruptcy judges and trustees to follow essentially the same approach when choosing

an appropriate interest rate" under any of the various provisions of the Bankruptcy Code

requiring a court to "discount a stream of deferred payments back to their present dollar rate."

Till v. SCS Credit Corp., 541 U.S. at 474 (internal brackets and quotation marks omitted).  The

Senior Lien Appellants have provided no good reason why the cramdown interest rate should

place Chapter 11 creditors—but not Chapter 13 creditors—in the same position they would have

been in had they arranged a new loan.  Similarly, the Senior Lien Appellants have provided no

good reason why the cramdown interest rate should allow Chapter 11 creditors—but not Chapter

13 creditors—to "receive more than the present value of [their] allowed claim." In re Valenti,

105 F.3d at 64.

The Senior Lien Appellants attempt to distinguish Till and Valenti by pointing to a

footnote in Till, which states that "when picking a cramdown rate in a Chapter 11 case, it might

make sense to ask what rate an efficient market would produce." Till v. SCS Credit Corp., 541

U.S. at 476 n.14.  The Senior Lien Appellants argue that the Till Court itself acknowledged its

reasoning might not apply as forcefully in the Chapter 11 context because unlike in the Chapter

13 context, there may be a "free market of willing cramdown lenders." Id.  However, whether

18

the market for a loan is truly efficient or not has no bearing on the Second Circuit's mandate in

Valenti that the Bankruptcy Code does not intend to put creditors in the same position they

would have been in had they arranged a new loan.  Moreover, the language in the Till footnote

certainly does not require the application of the efficient market approach in Chapter 11

proceedings.  All the footnote can fairly be read to suggest is that a court may want to consider

market rates in the Chapter 11 context.

     The Senior Lien Appellants also point to precedent from other Circuits, such as the Sixth

Circuit in In re American HomePatient, 420 F.3d 559 (6th Cir. 2005), cert. denied, 549 U.S. 942

(2006), in which courts chose to apply the efficient market rate in the Chapter 11 context.  See

id. at 568 (declining "to blindly adopt Till's endorsement of the formula approach for Chapter 13

cases in the Chapter 11 context" and instead holding if an efficient market exists, then the market

rate should apply).  However, as Judge Drain correctly pointed out, prior to Till, the Sixth

Circuit—unlike the Second Circuit—had applied the efficient market approach in determining

the appropriate cramdown rate.  Id. at 565-66; see also In re MPM Silicones, LLC, 2014 WL

4436335, at *28.  Because Till did not explicitly require the abandonment of the efficient market

approach in the Chapter 11 context, the Sixth Circuit decided to continue to use its previous

approach.  In re Am. HomePatient, 420 F.3d at 567-68 (finding Till did not hold the formula

approach is required in the Chapter 11 context).  Just as the Sixth Circuit filled the gaps in Till

using previous Sixth Circuit precedent, this Court must fill those same gaps by reference to

Second Circuit precedent.[9]

---

[9]    The Court is aware other bankruptcy and district courts in this Circuit have followed the
American HomePatient approach, concluding that when an efficient market exists for
comparable financing, that rate should be considered when determining the appropriate
cramdown interest rate.  However, these cases do not mandate that a bankruptcy court choose the
efficient market rate; they simply hold courts should consider whether an efficient market rate

The Senior Lien Appellants ask the Court to require the Bankruptcy Court to choose a
cramdown interest rate that would put them in the same position they would have been in had
they arranged a new loan.  This is contrary to both <u>Till</u> and <u>Valenti</u> and, thus, the Court declines
to do so.

B.    <u>Interest Rate Calculation</u>

The Senior Lien Appellants next contend the Bankruptcy Court erred in applying the
formula approach because it chose to use the 7-year Treasury rate, rather than the national prime
rate used by the Supreme Court in <u>Till</u>, as the base risk-free rate.  Judge Drain chose the Treasury
rate because it is "often used as a base rate for longer-term corporate debt such as the
[R]eplacement [N]otes."  <u>In re MPM Silicones, LLC</u>, 2014 WL 4436335, at *31.  In contrast, the
prime rate may be "a more appropriate base rate for consumers, although [the Second Circuit in]
<u>Valenti</u> chose the Treasury rate."  <u>Id</u>.  The Court agrees with Judge Drain that <u>Till</u> does not
obligate a bankruptcy court to choose the national prime rate as the risk-free base rate.  <u>See, e.g.</u>,
<u>In re Vill. at Camp Bowie I, L.P.</u>, 454 B.R. 702, 713 (Bankr. N.D. Tex. 2011) (noting "<u>Till</u>'s
direction to use a formula approach to fixing an interest rate does not require, from case to case,
use of the prime rate"); <u>see also</u> <u>Mercury Capital Corp. v. Milford CT Assocs. L.P.</u>, 354 B.R. at
13 (remanding for bankruptcy court to consider whether it is "appropriate to use the national

---

exists before determining the cramdown interest rate.  <u>See, e.g.</u>, <u>In re 20 Bayard Views, LLC</u>,
445 B.R. 83, 107-08 (Bankr. E.D.N.Y. 2011) (explaining "[c]ourts in this Circuit have concluded
that the two-step analysis described in <u>American HomePatient</u> is <u>an</u> appropriate way to
determine the interest rate that should apply in a Chapter 11 cramdown situation" but finding no
efficient market existed (emphasis added)); <u>Mercury Capital Corp. v. Milford CT Assocs., L.P.</u>,
354 B.R. 1, 12 (D. Conn. 2006) (holding the bankruptcy court "did not necessarily err as a matter
of law" in applying the formula approach but remanding for consideration of whether an efficient
market existed).  Judge Drain did, in fact, consider whether an efficient market rate exists in this
case, and concluded such a rate does not exist because the financing obtained by the Debtors
necessarily included a "built-in profit element" and "recovery for costs and fees."  <u>See</u> <u>In re</u>
<u>MPM Silicones, LLC</u>, 2014 WL 4436335, at *29.

prime rate or some other rate"). Thus, Judge Drain's choice of the 7-year Treasury rate is appropriate.[10]

Similarly, the risk premiums chosen by Judge Drain for both the First Lien Notes and the 1.5 Lien Notes are well within the bounds of reasonableness. The Senior Lien Appellants correctly point out that neither Till nor Valenti requires a risk premium of 1 to 3%. However, Judge Drain did not construe those cases to require that the risk premium fall in a specific range; instead, he stated he thought a risk premium of 1 to 3% is appropriate "unless there are extreme risks that . . . do not exist here." In re MPM Silicones, LLC, 2014 WL 4436335, at *31. Thus, Judge Drain considered whether to apply a risk premium higher than 3%, but decided not to do so. This Court will not disturb his well-reasoned determination of the proper rate to apply.

IV.    The Make-Whole Dispute

The Senior Lien Appellants additionally contend the Bankruptcy Court erred in failing to award them a "make-whole" premium. Whether the Senior Lien Appellants are owed a make-whole premium turns on language in both the 2012 Indentures and the Senior Lien Notes themselves. The Senior Lien Notes provide for the payment of a make-whole premium if the Senior Lien Notes are redeemed before October 15, 2015. However, the 2012 Indentures, which govern the Senior Lien Notes, contain an acceleration clause triggered by the voluntary commencement of a bankruptcy proceeding. (Senior Lien Appellants Ex. C1, §§ 6.01(f), 6.02).

---

[10]    In fact, Judge Drain added an additional amount "to the risk premium in light of the fact that the [D]ebtors used Treasury rates [rather than the prime rate] as the base rate." In re MPM Silicones, LLC, 2014 WL 4436335, at *32. He stated the adjustment "adequately [took] into account risks inherent in the [D]ebtors' performance of the [R]eplacement [N]otes above the essentially risk-free Treasury note base rates." Id.

The acceleration clause provides that in the event of a bankruptcy proceeding, "the principal of, premium, if any, and interest on all the [Senior Lien] Notes shall ipso facto become and be immediately due and payable." (Id., § 6.02).

The Senior Lien Appellants contend the Debtors' commencement of the Chapter 11 proceeding constituted a redemption of the Senior Lien Notes prior to October 15, 2015, such that the Senior Lien Noteholders are entitled to a make-whole payment. The Debtors contend that the acceleration provision was triggered when they filed for bankruptcy, negating the Senior Lien Appellants' right to a make-whole premium.

The Court agrees with the Debtors and the Bankruptcy Court that the Senior Lien Appellants are not entitled to a make-whole premium.

As described above, the "[i]nterpretation of Indenture provisions is a matter of basic contract law." In re AMR Corp., 730 F.3d at 98 (internal quotation marks omitted), cert. denied, 134 S. Ct. 1888 (2014). The parties agree New York law governs the interpretation of the 2012 Indentures and the Senior Lien Notes.

Section 6.01(f) of the 2012 Indentures provides that the commencement of a Chapter 11 proceeding is an Event of Default. See 2012 Indentures § 6.01(f) ("An 'Event of Default occurs if . . . the Company or any Significant Subsidiary pursuant to or within the meaning of any Bankruptcy Law commences a voluntary case."). Further, a Section 601(f) Event of Default triggers the acceleration clause contained in Section 6.02 of the 2012 Indentures. That acceleration clause provides:

> If an Event of Default (other than an Event of Default specified in Section 601(f) . . . ) occurs and is continuing, the Trustee or the Holders of at least 25% in principal amount of outstanding [Senior Lien] Notes, by notice to the Company may declare the principal of, premium, if any, and accrued but unpaid interest on all the [Senior Lien] Notes to be due and payable. . . . If an Event of

> Default specified in Section 6.01(f) . . . occurs, the principal of,
> premium, if any, and interest on all the [Senior Lien] Notes shall
> ipso facto become and be immediately due and payable without
> any declaration or other act on the part of the Trustee or any
> Holders. The Holders of a majority in principal amount of
> outstanding [Senior Lien] Notes by notice to the Trustee may
> rescind any such acceleration with respect to the Notes and its
> consequences.

(2012 Indentures § 6.02). Thus, acceleration can be invoked at the noteholders' option for

non-bankruptcy events, but acceleration is mandatory in the case of the voluntary filing of a

bankruptcy petition. See In re AMR Corp., 730 F.3d at 98-99 (finding a similar acceleration

clause provided noteholders with an option to invoke acceleration as a remedy for a

non-bankruptcy default but was mandatory with regard to the voluntary filing of a bankruptcy

petition).

Having determined the filing of the bankruptcy case triggered an automatic acceleration

of the Senior Lien debt, the Court must determine whether a make-whole payment is due to the

Senior Lien Noteholders under such circumstances. Under New York law, "[g]enerally, a lender

forfeits the right to a prepayment consideration by accelerating the balance of the loan. The

rationale most commonly cited for this rule is that acceleration of the debt advances the maturity

date of the loan, and any subsequent payment by definition cannot be a prepayment." U.S. Bank

Nat'l Ass'n v. S. Side House, LLC, 2012 WL 273119, at *4 (E.D.N.Y. Jan. 30, 2012) (internal

citations omitted). However, courts recognize an exception to this rule "when a clear and

unambiguous clause . . . calls for payment of the prepayment premium." Id. at *5 (internal

quotation marks omitted).

Two separate clauses of the agreements potentially provide for a make-whole provision

in the context of an acceleration of debt: first, the acceleration clause, and second, the make-

whole provision itself.

The acceleration clause does not clearly and unambiguously call for the payment of the make-whole premium in the event of an acceleration of debt. To the contrary, the acceleration clause provides the "premium, if any" shall become immediately payable upon the triggering of the acceleration clause. (2012 Indentures § 6.02). This language is not sufficient to create an unambiguous right to a make-whole payment. Courts allowing make-whole payments under these circumstances have largely required the contract to provide explicitly for a make-whole premium in the event of an acceleration of debt or a default. See, e.g., U.S. Bank Nat'l Ass'n v. S. Side House, LLC, 2012 WL 273119, at *7 (citing with approval a case in which "the court permitted prepayment premiums where the Note provided that '[u]pon the Lender's exercise of any right of acceleration . . . Borrower shall pay to Lender, in addition to the entire unpaid principal balance outstanding . . . (B) the prepayment premium.").

Neither does the make-whole provision contained in paragraph 5 of the Senior Lien Notes clearly and unambiguously call for the payment of the make-whole premium upon acceleration of debt. The Senior Lien Appellants contend that, under the make-whole provision, regardless of whether the voluntary commencement of the bankruptcy case was an Event of Default triggering a mandatory acceleration of the debt, the early payment of the debt constituted a redemption prior to October 15, 2015.

However, under New York law, the payment of debt pursuant to an acceleration clause does not constitute an early redemption. Instead, the automatic acceleration of the debt under Section 6.02 of the 2012 Indentures "changed the date of maturity from some point in the future . . . to an earlier date based on the debtor's default under the contract." In re AMR Corp., 730 F.3d at 103 (internal quotation marks and brackets omitted). Thus, "[w]hen the event of default occurred and the debt accelerated, the new maturity date for the debt was [the date of the

24

filing of the bankruptcy case]." Id. Consequently, the repayment of the debt in connection with

the bankruptcy proceeding is not a redemption because "'[p]repayment can only occur prior to

the maturity date.'" Id. (citing In re Solutia Inc., 379 B.R. 473, 488 (Bankr. S.D.N.Y. 2007)).[11]

Next, the Senior Lien Appellants argue the make-whole provision satisfies the

explicitness requirement because it contains a date certain—October 15, 2015—before which

redemption triggers the make-whole payment. They contrast this with a hypothetical provision

that would condition the triggering of a make-whole payment upon redemption before maturity,

and cite In re Chemtura Corp., 439 B.R. 561 (Bankr. S.D.N.Y. 2010), in support of this

distinction. However, the provision at issue in Chemtura required a make-whole payment if the

debt was repaid prior to its original maturity date. In re Chemtura Corp., 439 B.R. at 601. That

is specific enough to meet the clear and unambiguous requirement. See Scott K. Charles & Emil

A. Kleinhaus, Prepayment Clauses in Bankruptcy, 15 AM. BANKR. INST. L. REV. 537, 556 (2007)

---

[11]    The Senior Lien Appellants contend "prepayment" is different than "redemption" because a redemption is not limited to payments before maturity but "refers simply to the payment of notes, without regard to maturity." (Senior Lien Appellants Mem. at 33). However, the provisions at issue in In re AMR Corp. also provided for a make-whole premium if the debt was "redeem[ed]" early, see In re AMR Corp., 730 F.3d at 94 n.8, 103, but when the debt was automatically accelerated due to default, the court there held that the "post-maturity payment [was] not a voluntary redemption." Id. at 103; see also id. at 97 (noting the law in this Circuit "supports the conclusion that a payment of debt due upon acceleration is different from voluntary redemption"). Thus, the Second Circuit has rejected the very distinction the Senior Lien Appellants attempt to draw.

To be sure, the provisions at issue in In re AMR Corp. are different from those at issue here in one important respect: there, the make-whole provision signals that the acceleration clause controls when it applies. In re AMR Corp., 730 F.3d at 103 (noting the voluntary redemption payment provision "states that it operates '[e]xcept as otherwise provided in [the acceleration clause]'" (emphasis in In re AMR)). By contrast, here, the make-whole provision does not refer to the acceleration clause at all. This difference does not change the Court's conclusion that the repayment of the debt pursuant to the acceleration clause is not a redemption because "'[p]repayment can only occur prior to the maturity date." In re AMR Corp., 730 F.3d at 103 (citing In re Solutia Inc., 379 B.R. at 488).

(noting that for lenders who would like to ensure their right to a make-whole payment in the
event of acceleration of debt due to bankruptcy, "the optimal strategy is to negotiate a provision
that requires the borrower to pay a prepayment fee whenever debt is repaid prior to its <u>original</u>
maturity"). By contrast, the make-whole provision at issue here does not require a make-whole
payment if the debt is repaid prior to its original maturity.

The Senior Lien Appellants contend such a result "makes no commercial sense, contrary
to the tenet of New York contract law that courts should avoid interpretations that would be
absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties."
(Senior Lien Appellants Mem. at 26 (internal quotation marks omitted)). However, this result is
exactly what the Senior Lien Appellants bargained for under the 2012 Indentures. The Senior
Lien Appellants agreed to accelerate the debt owed to them in the event of a default, establishing
they "'preferred, sensibly no doubt, accelerated payment over the 'opportunity' to earn interest
from the . . . loan over a period of years.'" <u>U.S. Bank Nat'l Ass'n v. S. Side House, LLC</u>, 2012
WL 273119, at *4 (quoting <u>In re LHP Realty Corp.</u>, 726 F.2d 327, 331 (7th Cir. 1984)). Here,
the Senior Lien Appellants bargained for the acceleration of debt in the event of a default, and
must live with the consequences of their bargain.[12]

Neither the 2012 Indentures nor the Senior Lien Notes themselves clearly and
unambiguously provide that the Senior Lien Noteholders are entitled to a make-whole payment
in the event of an acceleration of debt caused by the voluntary commencement of a bankruptcy

---

[12]    It matters not that the Senior Lien Noteholders' right to rescind the acceleration of the
debt was canceled by the application of the automatic stay pursuant to Section 362 of the
Bankruptcy Code. The Debtors correctly point out that all contracts signed among the parties
operate against the backdrop of the relevant Bankruptcy Code provisions. The potential for an
automatic stay upon the filing of a bankruptcy case is a part of the bargain to which the parties
agreed.

case. Thus, the Bankruptcy Court correctly held that the Senior Lien Noteholders are not entitled

to a make-whole payment.[13]

---

[13]    Neither are the Senior Lien Noteholders entitled to damages in the amount of the make-whole premium under the perfect tender rule. First, the existence of the make-whole provision modified the perfect tender rule such that the common law remedy is unavailable. See, e.g., U.S. Bank Nat. Ass'n v. S. Side House, LLC, 2012 WL 273119, at *4; Charles & Kleinhaus, Prepayment Clauses in Bankruptcy, 15 AM. BANKR. INST. L. REV. at 543 ("While a no-call memorializes the common law default rule that prepayment is not permitted absent lender consent, a prepayment fee effectively opts out of that default rule."). Second, the Senior Lien Appellants claim these damages "for breach of contract," which occurred "when the Debtors redeemed the Notes and prevented the [Senior Lien] Noteholders from exercising their right to rescind acceleration." (Senior Lien Appellants Mem. at 39). However, the automatic stay—and not the Debtors—prevented the Senior Lien Appellants from exercising their right to rescind. The Court is not convinced such a circumstance can lead to liability for breach of contract on the part of the Debtors. See, e.g., HSBC Bank USA Nat'l Ass'n v. Calpine Corp., 2010 WL 3835200, at *4 (S.D.N.Y. Sept. 15, 2010) ("Because Debtor's bankruptcy filing rendered the no-call provision in the notes unenforceable and liability cannot be incurred pursuant to an unenforceable contractual provision, Debtor did not incur any liability for repaying the notes." (collecting cases)).

**CONCLUSION**

The Bankruptcy Court's Orders of September 9 and September 11, 2014, are

AFFIRMED.

The Clerk is instructed to terminate as moot the Debtors' motions to dismiss the appeals.

(Doc. #11 in 14-cv-7471, Doc. #11 in 14-cv-7472, and Doc. #18 in 14-cv-7492).[14]

The Clerk is further instructed to terminate the pending appeals and close these cases.

Dated: May 4, 2015
      White Plains, NY

SO ORDERED:

_____
Vincent L. Briccetti
United States District Judge

---

[14]    The Debtors have moved to dismiss these appeals as equitably moot.  However, the motions to dismiss the appeals as equitably moot are themselves mooted by this Court's decision to affirm the Orders of the Bankruptcy Court.  See In re Metromedia Fiber Network, Inc., 416 F.3d 136, 144 (2d Cir. 2005) ("Because equitable mootness bears only upon the proper remedy, and does not raise a threshold question of our power to rule, a court is not inhibited from considering the merits before considering equitable mootness.").