**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| *In re*: | : | Chapter 11 |
| | : | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*, | : | Case No. 14-10979 (CSS) |
| | : | |
| | : | Jointly Administered |
| | : | |
| Debtors. | : | **Hearing Date: June 1, 2015 at 10:30 a.m.** |
| | : | **Objections Due: May 22, 2015 by 4:00 p.m.** |

**THE ACTING UNITED STATES TRUSTEE'S OBJECTION TO THE MOTION FOR AN ORDER AUTHORIZING PAYMENT AND REIMBURSEMENT OF CERTAIN FEES AND EXPENSES OF UMB BANK, N.A., AS THE EFIH UNSECURED INDENTURE TRUSTEE (D.I. 4438)**

In support of his Objection to the Motion for an Order Authorizing Payment and Reimbursement of Certain Fees and Expenses of UMB Bank, N.A., as the EFIH Unsecured Indenture Trustee (D.I. 4438),[1] Andrew R. Vara, the Acting United States Trustee for Region 3, by and through his counsel, respectfully states as follows:

**I. JURISDICTION AND PROCEDURAL HISTORY**

1. The Court has jurisdiction to hear this Objection.

2. Pursuant to Section 586 of title 28, U.S. Code, the U.S. Trustee is charged with overseeing the administration of Chapter 11 cases filed in this District. 11 U.S.C. § 586. Under Section 586 and Section 307 of the Bankruptcy Code, Congress charged the U.S. Trustee with broad responsibilities in Chapter 11 cases and the standing to rise and be heard on any issue in any case or proceeding. 11 U.S.C. § 307; *see also United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.),* 33 F.3d 294, 295-96 (3d Cir. 1994) (the U.S. Trustee has "public interest standing" under 11 U.S.C. § 307, which goes beyond mere pecuniary interest).

---

[1] Unless otherwise defined herein, capitalized terms shall have the same meaning and context as those capitalized terms included in the Motion.

3.  Pursuant to 11 U.S.C. § 307, the U. S. Trustee has standing to be heard with regard to the above-referenced Objection.[2]

## II. PRELIMINARY STATEMENT

4.  In these cases, UMB Bank, N.A. ("UMB" or the "IT"), as an indenture trustee, is seeking to have certain of its fees and expenses and the fees and expenses of its professionals paid for by the Debtors' estates. The Motion proposes various inappropriate payment theories, including characterizing the payments as an "advance" against the distribution under a Chapter 11 plan that might be paid on the EFIH Unsecured Notes under the premise of a charging lien against that potential distribution. First and fatally to its Motion, UMB, as the indenture trustee for the EFIH Unsecured Notes, has no standing under Section 363(b) to bring such a motion, because in a chapter 11 proceeding Section 363(b) is only available to chapter 11 trustees and debtors-in-possession. Second, despite the theories and terminology, UMB's request circumvents the clear and unequivocal application of Sections 503(b)(3)(D), 503(b)(4), and 503(b)(5) of the Bankruptcy Code and the "substantial contribution" requirement applicable to such a request. Additionally, the Motion is flawed because the request is not supported by the

---

[2] Aside from the U.S. Trustee, parties-in-interest often have no motive to object to fee requests. *See*, *e.g.*, *In re Busy Beaver Bldg. Ctrs., Inc.*, 19 F.3d 833, 842-43 (3d Cir. 1994) (stating debtors often do not object to their own counsel's fees because the fees often come out of creditor recoveries—not the reorganized debtor's assets—or because the debtor is not inclined to object to the fees of attorneys who made it possible for the debtor to stay in business. Creditors often do not object to fee applications as a perceived professional courtesy or for fear of retaliation). *See also In re Armstrong World Industries, Inc.*, 366 B.R. 278, 281 n.2 (D. Del. 2007) (same). The debtor-in-possession has a general duty to act as fiduciary in the bankruptcy case. *In re Marvel Entm't Grp., Inc.*, 140 F.3d 463, 474 (3d Cir. 1998) ("The willingness of Congress to leave a debtor-in-possession is premised on an expectation that current management can be depended upon to carry out the fiduciary responsibilities of a trustee."). However, in partial recognition of other parties' reluctance to object to fee requests, Congress "granted the U.S. Trustee party-in-interest standing to provide a means for a more objective review of fees of professionals in reorganization cases." *In re Heck's, Inc.*, 112 B.R. 775, 785 (Bankr. S.D. W.Va. 1990), *aff'd in part*, *rev'd in part* by *In re Heck's Properties, Inc.*, 151 B.R. 739 (S.D. W.Va. 1992). When it expanded the U.S. Trustee Program nationwide in 1986, Congress understood that U.S. Trustees would have no pecuniary interest in any case and would function as impartial administrators. *See In re Columbia Gas Systems, Inc.*, 33 F.3d at 299 (*citing* H.R. Rep. No. 764, 99th Cong., 2d Sess. 27 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5227, 5240).

language of the underlying indentures, and cannot rightfully be compared to payments to a critical vendor.

### III. FACTS

*A.     Background.*

5.      On April 29, 2014, the Debtors commenced these Chapter 11 cases.

6.      According to Paul Keglevic, the Executive Vice President, Chief Financial Officer, and Co-Chief Restructuring Officer of Energy Future Holdings Corp. ("EFH Corp."), the Debtors are the largest generator, distributor, and retail electricity provider in Texas. *See* Declaration of Paul Keglevic, Executive Vice President, Chief Financial Officer, and Co-Chief Restructuring Officer of EFH Corp., e*t al.*, in Support of First Day Motions dated April 29, 2014 ("Keglevic Declaration") at ¶ 6. (D.I. 98).

*B.     The Debtors' Corporate Structure.*

7.      EFH Corp. is the parent company of each of the entities that compose EFH, including: (a) the entities composing TCEH (including TCEH's parent company, EFCH); (b) EFIH; (c) non-debtor Oncor Holdings (which is 100% owned by EFIH), Oncor, (which is approximately 80% owned by Oncor Holdings), and certain subsidiaries and affiliates of Oncor Holdings and Oncor; and (d) certain of EFH Corp.'s other direct and indirect debtor and non-debtor subsidiaries. *Id.* at ¶ 19.

8.      EFIH is a holding company and a direct, wholly-owned subsidiary of EFH Corp. *Id.* at ¶ 53. EFIH's primary asset is its 100% ownership of Oncor Holdings. *Id.* at ¶ 53. EFIH has no active business operations, and its capital structure is premised on the value derived from its indirect ownership of Oncor. *Id.* at ¶ 53.

9. EFCH is a Delaware limited liability company and the direct parent of TCEH. *Id.* at ¶ 1. TCEH is composed of: (a) the TCEH Debtors, including TCEH LLC; TCEH LLC's direct parent, EFCH; and most of the entities that compose TCEH, including the entities that compose Luminant's electricity generation, mining, commodity risk management and trading activities, and wholesale operations, TXU Energy and the other entities that compose the Debtors' retail operations, and TCEH Finance, Inc.; and (b) certain other entities that are not obligated on the TCEH Debtors' funded indebtedness. *Id.* at ¶ 22. TCEH's business operations also depend on certain services that are provided by EFH Corporate Services Company, a subsidiary of EFH Corp., which acts as a shared-services center for Luminant and TXU Energy. *Id.* at ¶ 22.

10. UMB serves as the successor indenture trustee for: (i) the 11.25%/12/25% senior toggle notes due 2018 (the "EFIH Senior Toggle Notes") which were issued pursuant to an Indenture dated as of December 5, 2012 (as amended, the "EFIH Senior Toggle Notes Indenture") and (ii) the 9.75% senior notes due 2019 (together with the EFIH Senior Toggle Notes, the "EFIH Unsecured Notes"), which were issued pursuant to an Indenture dated as of November 9, 2009 (as amended, and collectively with the EFIH Senior Toggle Notes Indenture, the "Indentures"). The combined aggregate outstanding principal amount of the EFIH Unsecured Notes is $1,568,249,000. Motion at ¶¶ 8-9.

11. UMB asserts that it is entitled to reimbursement for certain undocumented fees and expenses of $130,855, as well as another $2,563,493.56 in undocumented legal fees for Foley & Lardner, $98,910.65 in undocumented legal fees for Klehr Harrison and another $442,542.46 in undocumented financial advisor fees for Gavin Solmonese. The total fees and expenses are $3,235,801.67 through December 31, 2014. Motion at Schedule 1.

12.     UMB acknowledges that it has an existing and ongoing statutory obligation under the Trust Indenture Act of 1939 (the "TIA") and a contractual obligation under the Indentures to represent its noteholders as a "prudent person" would do so and to perform its duties under the Indentures and the TIA. Motion at ¶¶5, 25. Specifically, UMB states that each of the Indentures imposes a "prudent person" standard upon UMB and UMB recognizes that the TIA imposes similar "prudent man" duties upon the IT. *See,* 15 U.S.C. § 77ooo. *See also,* the Motion at ¶24, n. 9.

13.     The Motion is not the first attempt by UMB to have its fees and expenses paid as well as those of its professionals. As was identified and cited in the U.S. Trustees's Response to Motion of the EFH Notes Indenture Trustee for Appointment of an EFH Corp. Official Committee of Unsecured Creditors (D.I. 1769) (the "U.S. Trustee's Response"), Harold L. Kaplan wrote a letter to U.S. Trustee counsel dated July 31, 2014, setting forth his suggestion for an alternative to the U.S. Trustee's appointment of an "E-Side" creditors' committee, which alternative was to reimburse and pay the expenses of UMB and the EFH Notes Indenture Trustee currently. *See the U.S. Trustee's Response at* ¶¶ 25-26 and the Kaplan Letter dated July 31, 2014, ¶4, p. 1 a copy of which was annexed to the U.S. Trustee's Response as Exhibit C.

14.     UMB advances three theories for reimbursement for its expenses and the payment of its professionals fees, namely that, (a) it is entitled to the reimbursement of its fees and expenses because it performed certain services in these cases in accordance with its statutory and contractual services duties (Motion at ¶¶19-25), (b) it merely seeks an "advance" against the distributions that will (or at least may) ultimately be made to the EFIH Unsecured Noteholders because each Indenture secures the payment of the IT's reasonable fees and expenses as a result

of a charging lien against any such distribution (Motion at ¶¶27-28), and (c) the relief requested is akin to critical vendor payments in a Chapter 11 case. Motion at ¶¶30-34.

## IV. LAW AND ANALYSIS

### A.    UMB Lacks Standing Under Sections 363and 105 and the Motion is Procedurally Defective.

15.    Section 363(b) provides in pertinent part that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . ." 11 U.S.C. § 363(b)(1). In a Chapter 11 case, a debtor-in-possession has all the rights and shall perform all the functions and duties of a trustee subject to certain limitations or conditions. 11 U.S.C. § 1107(a). See, *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) ("Here, the statute appears quite plain in specifying who may use § 506(c)—'[t]he trustee.' It is true, however, as petitioner notes, that all this actually 'says' is that the trustee may seek recovery under the section, not that others may not. The question thus becomes whether it is a proper inference that the trustee is the only party empowered to invoke the provision. We have little difficulty answering yes.") (footnotes omitted). Later in the opinion, the Supreme Court stated that "[m]any provisions of the Bankruptcy Code that do not contain an express exclusion cannot sensibly be read to extend to all parties in interest. See, *e.g.,* § 363(b)(1) (providing that '[t]he trustee, after notice and a hearing, may use, sell, or lease ... property of the estate'); § 364(a) (providing that 'the trustee' may incur debt on behalf of the bankruptcy estate); § 554(a) (giving 'the trustee' power to abandon property of the bankruptcy estate)." *Hartford Underwriters Ins.*, 530 U.S. at 8.

16.    Thus to the extent that UMB, as an indenture trustee and not a case trustee or debtor-in-possession, attempts to invoke Section 363(b) to exercise a power or right reserved for

a trustee or debtor-in-possession, it has no standing to do so and the motion is therefore procedurally defective and fatally flawed.

17.     Additionally, UMB's invocation of Section 105(a) is of no effect. *See, Law v. Siegel*, 134 S. Ct. 1188, 1195 (2014) ("The Bankruptcy Court thus violated § 522's express terms when it ordered that the $75,000 protected by Law's homestead exemption be made available to pay Siegel's attorney's fees, an administrative expense. In doing so, the court exceeded the limits of its authority under § 105(a) and its inherent powers.").

18.     The Third Circuit has previously held that equitable principles cannot be used to otherwise circumvent clear congressional intent. *See, e.g.*, *United States Trustee v. Columbia Gas Sys. Inc. (In re Columbia Gas Sys. Inc.)*, 33 F.3d 294, 300 (3d Cir. 1994); *United States Trustee v. Price Waterhouse*, 19 F.3d 138, 142 (3d Cir. 1994). 11 U.S.C. § 105(a) can only be used to carry out provisions of the Bankruptcy Code, and cannot graft new provisions onto the statute that Congress neither enacted nor intended. *See Southern Ry. Co. v. Johnson Bronze Co.*, 758 F.2d 137, 141 (3d Cir. 1985) ("[S]ection 105(a) does not authorize the bankruptcy court to create rights not otherwise available under applicable law."). The general grant of equitable power contained in section 105(a) of the Bankruptcy Code cannot trump specific provisions of the Bankruptcy Code, and must be exercised within the parameters of the Code itself. *In re Combustion Engineering*, 391 F. 3d 190, 237 (3d Cir. 2004) *(citing generally Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988) ("Whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code.")). *Id.*

19.     The recovery of UMB's fees and expenses and those of its professionals are governed by Sections 503(b)(3)(D), (b)(4), and (b)(5)—not sections 363(b) and 105.

20.     For example, in a similar attempt to evade the operation of Section 503(b)(3)(D) and (b)(4), certain members of a creditors' committee tried to have their individual professional fee expenses paid through a Chapter 11 plan as "Administrative Expense Claims." *In re Lehman Bros. Holdings Inc.,* 508 B.R. 283 (S.D.N.Y. 2014) *motion to certify appeal denied,* No. 13 CIV. 2211 RJS, 2014 WL 3408574 (S.D.N.Y. June 30, 2014). The District Court, in reversing the Bankruptcy Court, held, *inter alia*, that Section 503(b) is the exclusive avenue for the payment of administrative expenses and Sections 503(b)(3) and 503(b)(4) work together to ensure payment for any professional fee expenses incurred as covered by Sections 503(b)(3)(A) through (E) but not (F). *Lehman Bros.,* 508 B.R. at 290-93.

21.     In particular, the Court stated that "neither the need for flexibility in bankruptcy cases, the consensual nature of section 6.7, nor a bankruptcy court's approval of a payment as 'reasonable' can justify a plan provision that is merely a backdoor to administrative expenses that § 503 has clearly excluded. The Bankruptcy Code is meant to be a 'comprehensive federal scheme . . . to govern' the bankruptcy process . . . , the federal scheme cannot remain comprehensive if interested parties and bankruptcy courts in each case are free to tweak the law to fit their preferences . . . ." *Lehman Bros.* 508 at 293-94 (footnote omitted) (citations omitted) (citing *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S.Ct. 2065, 2070–71 (2012)).

22.     As Sections 503(b)(3)(D), (b)(4), and (b)(5) specifically discuss and cover the payment of an indenture trustee fees and expenses, Sections 363(b) and 105(a) do not supersede those specific code sections. "Section 503(b)(5) also provides that an indenture trustee may be allowed administrative expenses for reasonable compensation for services rendered by the indenture trustee in making a substantial contribution to a Chapter 9 or 11 case. Under Section 503(b)(4), an administrative expense priority for professional services of an attorney for an

8

indenture trustee is only available when the indenture trustee's own expenses are allowable under Section 503(b)(3). Thus, an indenture trustee is not entitled to compensation for the services provided by its professionals, unless the indenture trustee's actions substantially contributed to the debtor's case. 11 U.S.C. § 503(b)(4)." *In re Northwestern Corp.*, 365 B.R. 453, 456 (D. Del. 2007).

23.     It is a canon of statutory construction that "the specific governs the general." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992).  This canon "is perhaps most frequently applied to statutes in which a general permission or prohibition is contradicted by a specific prohibition or permission. To eliminate the contradiction, the specific provision is construed as an exception to the general one." *RadLax Gateway Hotel, LLC v. Amalgamated Bank*, 132 S.Ct. 2065, 2071 (2012).  This canon "is not an absolute rule, but is merely a strong indication of statutory meaning that can be overcome by textual indications that point in the other direction." *Id.* Section 503(b)(3)(D) provides for a recovery for a creditor or indenture trustee who has made a substantial contribution in a case while Section 503(b)(4) generally provides for the allowance of attorney fees of the entities who are described in Section 503(b)(3), including creditors who have made a substantial contribution in a case.  Section 503(b)(5) provides for the allowance of reasonable compensation for services rendered by an indenture trustee for making a substantial contribution in a case under chapter 9 or 11.

24.     Accordingly, UMB's reliance upon Sections 363(b) and 105(a) is misplaced and should not be condoned or sanctioned.

B.  *The Unquestionable Application and Effect of Section 503(b)((3)(D), (b)(4) and (b)(5) Governs UMB's Fee and Expense Request.*

25. 11 U.S.C. § 503(b)(1)(A) states, in relevant part, that there shall be allowed, as administrative expenses, ". . . the actual, necessary costs and expenses of preserving the estate . . ." 11 U.S.C. §§503(b)(1(A). The statutory administrative expense provisions are interpreted narrowly "so as to keep fees and administrative costs at a minimum." *See Burlington N. R.R. v. Dant & Russell, Inc. (In re Dant & Russell, Inc.)*, 853 F.2d 700, 706 (9th Cir. 1988). Section 503(b)(1)(A) provides administrative expense priority treatment to "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case." Bankruptcy courts have broad discretion in determining whether to grant or deny administrative expense requests under section 503(b)(1)(A). *See Burlington*, 853 F.2d at 707.

26. Applicants under section 503(b)(1)(A) must prove three things: (i) that their costs and expenses were actually incurred (i.e., they are out-of-pocket expenses rather than "opportunity costs" or "services rendered"); (ii) that the estate received an actual benefit (i.e., not a conjectural, contingent, or potential benefit); and (iii) that there is a demonstrable causal connection between the applicant's actual expenses and a specific actual benefit received by the estate (i.e., the expenses were "necessary" to "preserving the estate"). *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 532 (3d Cir. 1999) (stating an applicant must prove connection between actual expense and actual benefit); *Burlington*, 853 F.2d at 706 (stating the benefit to estate must be actual, not potential). The Third Circuit has stated that an applicant under section 503(b)(1)(A) bears a "heavy burden." *Id.*; *see also, In re Women First Healthcare, Inc.*, 332 B. R, 115, 121 (Bankr. D. Del. 2005); *In*

10

*re Pinnacle Brands, Inc.*, 259 B.R. 46, 51 (Bankr. D. Del. 2001); *In re Mid-American Waste Sys., Inc.*, 228 B. R. 816, 821 (Bankr. D. Del. 1999).

27. In the present case, UMB's asserted expenses are administrative expenses not found under 11 U.S.C. § 503(b)(1)(A) but unequivocally governed by and falling under 11 U.S.C. § 503(b)(3)(D), § 503(b)(4) and § 503(b)(5).

28. Section 503(b)(3)(D) provides administrative expense status for the actual, necessary expenses of an indenture trustee that makes a substantial contribution in a chapter 11 case. Section 503(b)(4) provides administrative expense status for the reasonable fees and actual, necessary expenses of such entity's attorneys and accountants. Section 503(b)(3)(D) is narrowly construed. *See In re Worldwide Direct, Inc.*, 334 B.R. 112, 122 (Bankr. D. Del. 2005) (quoting *In re Granite Partners*, 213 B.R. 440, 445 (Bankr. S.D.N.Y. 1997)). Section 503(b)(3)(D) has two purposes: (1) to encourage creditors to participate meaningfully in the reorganization process; and (2) to minimize fees and administrative expenses and thereby maximize creditor recoveries. *Lebron v. Mechem Financial Inc.*, 27 F.3d 937, 944 (3d Cir. 1994).[3]

29. Because UMB chooses to side –step Section 503(b), UMB does not assert that it made a substantial contribution in these cases. However, such a showing is a threshold requirement to be met before UMB can be compensated its expenses and its professional fees. To

---

[3] UMB recognizes that it is required to exercise and assert its rights and remedies under law and the Indentures in order to fulfill its statutory and contractual obligations, similarly, the routine activities of an official committee member, with similar duties, do not rise to the level of a substantial contribution worthy of payment as an administrative expense. *See*, *e.g.*, *In re Worldwide Direct, Inc.*, 334 B.R. at 124 ("Routine activities of a Committee member do not rise to the level of a substantial contribution." Court denied application to the extent evidence showed applicant "was simply fulfilling its fiduciary duties as a Committee member and performing the routine Committee tasks delineated in section 1103(c)."); *In re Summit Metals, Inc.*, 379 B.R. 40, 66-67 (Bankr. D. Del. 2007) (denying substantial contribution to official committee member who had pursued additional committee counsel and sought committee authority to pursue claims against a defendant in shareholder lawsuits, "as these efforts are routine duties and powers delineated in section 1103(a) and (c).").

the extent that UMB acted solely for the benefit of its constituency of EFIH Unsecured Noteholders, and not on behalf of all unsecured creditors, UMB, as the EFIH Unsecured Notes IT, acted in its own interests in accordance with its fiduciary duties required under law and the Indentures and would not be entitled to a reimbursement under Section 503(b)(3)(D) in any event.

30. Section 503(b)(3)(D) refers to out-of-pocket expenses incurred by a creditor "in making a substantial contribution in a case under chapter 9 or 11[.]" Section 503(b)(5) uses the same substantial contribution standard. In determining whether he has made a "substantial contribution," the applicant bears an "especially difficult" burden. *See In re U.S. Lines, Inc.*, 103 B.R. 427, 430 (Bankr. S.D.N.Y. 1989). To carry this burden, a creditor must prove three things: (i) that his expenses were actually incurred; (ii) that the estate received an "actual and demonstrable benefit"; and (iii) that the benefit is "more than an incidental one arising from activities the applicant has pursued in protecting his or her own interests." *Lebron*, 27 F.3d at 944. Essentially, creditors seeking section 503(b)(3)(D) treatment must show a causal connection between their services and the benefit, just like applicants under section 503(b)(1)(A). *See In re Worldwide Direct, Inc.*, 334 B.R.112, 121 (Bankr. D. Del. 2005). Creditors are "presumed to be acting in their own interests"; the presumption is rebutted only if they "satisfy the court that their efforts have transcended self-protection." *See Lebron* 27 F.3d at 944. Unless the court finds that the creditor's actions "were designed to benefit others" rather than himself, the creditor cannot obtain administrative expense priority under subparagraph 503(b)(3)(D) even if there was a benefit to the estate. *Id.* at 946. The Third Circuit has held that "[t]he inquiry concerning the existence of a substantial contribution is one of fact, and it is the bankruptcy court that is in the best position to perform the necessary fact finding task." *Id.* As a

result, the bankruptcy court has broad discretion to determine whether an applicant has carried his burden of proof.

31.  Section 503(b)(4) refers to "reasonable compensation for professional services rendered by an attorney or accountant of an entity whose expense is allowable under paragraph (3)[.]" This provision only provides for compensation for services rendered by the "attorney of" a creditor; it does not provide for the hourly compensation for services rendered by the creditor himself.  Indeed, a creditor must actually have paid an attorney before he can obtain a subparagraph (b)(4) claim, as the Third Circuit "do[es] not read subsection (b)(4) to authorize a payment to a creditor in excess of the amount he or she was required to pay for those services." *See Lebron*, 27 F.3d at 947 n.5.  In addition, subparagraph (4) only applies to attorney services rendered for a creditor who is himself entitled to administrative expense priority under subparagraph (b)(3); attorney services rendered for a creditor who does not meet the subparagraph (b)(3) requirements cannot receive priority treatment under subparagraph (b)(4). *See Xifaras v. Morad (In re Morad)*, 328 B.R. 264, 269 (B.A.P. 1st Cir. 2005).  The same is true for subparagraph (b)(5).  *See In re Northwestern Corp.*, 365 B.R. 453, 456 (D. Del. 2007).

32.  Section 503(b)(4) provides for the administrative expense priority treatment of the legal fees of the attorney for an indenture trustee whose expenses are entitled to section 503(b)(3) priority treatment.  Thus, unless an indenture trustee has first received a section 503(b)(3) administrative expense, it cannot obtain section 503(b)(4) priority for such legal fees.[4]

---

[4] UMB can only seek its expenses as an administrative expense priority claim under section 503(b)(3)(D). But, however, due to the existence of section 503(b)(4) no legal services may ever be compensated under section 503(b)(3). The statutory construct expressly requires creditors to first prove that their actual out-of-pocket expenses, "other than compensation and reimbursement specified in [section 503(b)(4)]," may be afforded administrative expense priority under section 503(b)(3); only if they first make that showing can they seek administrative expense priority treatment for the fees incurred by their attorney. *See In re Worldwide Direct, Inc*., 334 B.R. at 120.

33. UMB has not disclosed what professional services were provided to it nor has it disclosed the nature of or reason behind the expenses that it allegedly incurred. As enunciated by the Third Circuit in *Busy Beaver*, Bankruptcy courts have an independent duty to review fee applications, regardless of whether any party in interest, including the U. S. Trustee, objects. *Busy Beaver Bldg. Ctrs.*, 19 F. 3d at 841.

34. The Bankruptcy Court serves a vitally important gate-keeping role in (i) enforcing the Bankruptcy Code's requirements that only reasonable fees be approved and paid and (ii) maintaining public confidence in the bankruptcy system itself. *In re Temple Ret. Cmty., Inc.*, 97 B.R. 333, 337 (Bankr. W.D. Tex. 1989); *see also In re Child World, Inc.,* 185 B.R. 14, 17 (Bankr. S.D.N.Y. 1995) ("the judiciary should retain control of fees, given the sensitivities they generate and the need to promote public confidence in the system."). Lastly, other parties in interest have the right under the Bankruptcy Code to review and object to fee applications. *McGuirl v. White*, 86 F.3d 1232, 1246 (D.C. Cir. 1996) ("many parties including the United States Trustee and creditors, as well as the bankruptcy court itself, have the right to object to fee applications.").

35. Accordingly, the asserted professional fees and expenses cannot be approved unless and until UMB files an application with the Court and demonstrates that they made a "substantial contribution" in the case pursuant to Section 503(b)(3)(D) or (b)(5). If and only if a "substantial contribution" is proven, then the standards as set forth in Section 330 of the Bankruptcy Code apply in determining the extent the fees and expenses of a professional are

---

Additionally, because Gavin Solmonese is a financial advisor and not an attorney or accountant, UMB cannot recover any of Gavin Solmonese's fees under Section 503(b)(4).

reimbursable under Section 503(b)(4). *See, e.g.*, *In re Wind N' Wave,* 509 F.3d 938, 944 (9th Cir. 2007); *In re Celotex Corp.*, 227 F.3d 1336, 1341 (11th Cir. 2000).

36.     As has been addressed previously, UMB is faced with a steep burden under section 503(b)(3)(D) – they have to rebut the presumption that everything they did in this case was done to benefit its own self-interest, such that every benefit that resulted was incidental and not a "substantial contribution." *See Lebron v. Mechem Financial Inc.*, 27 F.3d at 944. UMB is unable to rebut that presumption, so the section 503(b)(3)(D) or (b)(5) request would be properly denied. As a result, they cannot obtain section 503(b)(4) administrative expense treatment for their attorney fees, regardless of whether they actually paid for them or rendered them *pro se*.

37.     Additionally, since none of the theories forwarded by UMB permit for a creditor or indenture trustee to recover its expenses under applicable bankruptcy law, UMB cannot carry the heavy burden attendant to Section 503(b) and UMB's attempt to circumvent specific, pertinent and directly applicable bankruptcy code sections should not be allowed.[5]

### C.     *UMB'S Payment Advance Theory is Likewise Flawed and Not Only Does it Seek to Evade Sections 503(b)((3)(D), (b)(4), and (b)(5) it is Not Consistent with the Indentures*

38.     UMB also asserts that it should be awarded an "advance" of its fees and expenses under the Indentures based on the potential distribution to the holders of the EFIH Unsecured Notes because (i) the EFIH Noteholders will likely receive a substantial distribution in these Chapter 11 Cases, (ii) the distribution is expected to be sufficient to cover the IT fees and expenses, (iii) the Indentures require that any distribution made on account of the EFIH

---

[5] For example, it is not appropriate to "bootstrap" a request by seeking administrative expense treatment under myriad provisions of section 503(b) in the hope that if the request is denied under one provision it may be granted under another. *Cf. F/S Airlease II, Inc. v. Simon*, 844 F.2d 99, 108-09 (3d Cir. 1988), *cert. denied*, 488 U.S. 852 (1988) (stating a professional may not use § 503(b)(1)(A) when he cannot meet requirement for § 503(b)(2) claim).

Unsecured Notes be paid first to the IT and its agents and attorneys for compensation, expenses and liabilities incurred and (iv) the IT has a lien prior to the EFIH Unsecured Notes on all money or property held or collected by the IT. Motion at ¶¶27-28.

39. Notwithstanding the aforementioned obstacles and problems with standing and the clear and unequivocal application of sections 503(b)(3)(D), (b)(4), and (b)(5), the language in the Indentures cited by UMB leads to the conclusion that such an "advance" is not possible and at best premature.

40. First, under the language cited in the Indentures[6], the IT fees and expenses and those of its professionals must be reasonable. However, there has been no showing that such fees and expenses are reasonable. There is no description or identification of the services rendered. Moreover, given UMB's statement in the Motion that: "[a]s reflected in the competitive bidding for the equity of reorganized EFH in the course of the Second Lien DIP Financing Motion and pursuant to the Bidding Procedures Motion, as well as subsequent statements and Plan filings by the Debtors and their professionals, the EFIH Unsecured Notes are entitled to a recovery, and will likely receive a substantial distribution in these Chapter 11 Cases and which, in any event, is expected to be an amount sufficient to cover the EFIH Unsecured Indenture Trustee fees and expenses many times over." It seems to be more likely than not that UMB's fees and expenses, and those of its professionals, may not be reasonable especially if a recovery is highly likely or at worst, a foregone conclusion.

41. Additionally, the language of the Indenture states that "to secure the payment obligations of the Issuer and the Guarantors in this Section 7.07, the Trustee shall have a Lien

---

[6] UMB did not attach copies of the various Indentures so the language cited could be modified, clarified or subject to other provisions in the Indentures.

prior to the Notes on all money or property held or collected by the Trustee, except that held in trust to pay principal and interest on particular Notes. Such Lien shall survive the satisfaction and discharge of this Indenture." Motion at n. 10. This seems to indicate that the IT's lien arises or becomes effective only upon the IT actually collecting or holding funds from such a distribution. Since no distribution has occurred, the IT's lien is inchoate, has yet to arise and the IT's right to payment from such yet-to-be realized funds is prematurely asserted.

42. Lastly, the Indentures state that "[w]hen the Trustee incurs expenses or renders services after an Event of Default specified in clause ( 6) or (7) of Section 6.0l(a) hereof occurs, the expenses and the compensation for the services (including the fees and expenses of its agents and counsel) are intended to constitute expenses of administration under any Bankruptcy Law." This provision appears to lead directly to Section 503(b)(3)(D) because that is the Bankruptcy Code section that governs the payment of an indenture trustee's actual and necessary expenses as an administrative expense.

### D.     *UMB's fees and expenses are not akin to Critical Vendor Payments*

43. Critical vendor motions are generally filed by a debtor on the first day of its reorganization case because the debtor-in-possession seeks immediate relief to make payments of pre-petition debt to vendors whom the debtor-in-possession vital to its continued business operations pursuant to Chapter 11 of the Bankruptcy Code. The showing that the debtor is required to make is one of immediate and irreparable harm if these payments are not made. *See, e.g.*, *In re Just for Feet, Inc.,* 242 B.R. 821, 824-45 (Bankr. D. Del. 1999) (indicating that debtors may pay pre-petition claims that are essential to the continued operation of the debtor's business); Fed. R. Bankr. P. 6003.

44.     For example in the present cases, the Debtors outlined in its Critical Vendor Motion[7] that its several critical vendors generally fell into one of the following five categories: (a) vendors that provide goods and services related to planned maintenance outages; (b) vendors that provide services and related goods that are highly specialized and/or closely integrated with the Debtors' business operations and customer relationships; (c) sole source or geographically limited providers of critical goods; (d) vendors that provide goods and services related to regulatory compliance obligations; and (e) vendors that provide goods and services related to the Debtors' nuclear power plant at Comanche Peak. Critical Vendor Motion at ¶14.

45.     Specifically, the Debtors here stated that if they fail to honor their pre-petition obligations to the Critical Vendors, the Critical Vendors may deprive the Debtors of goods and services that are essential to their businesses at this critical time in their restructuring which could disrupt the Debtors operations, jeopardize key customer relationships, and undermine the Debtors' efforts to reorganize. Critical Vendor Motion at ¶42.

46.     It is incomprehensible to believe that the failure to pay the IT's fees and expenses in these would cause the Debtors irreparable and immediate harm or somehow be essential to the Debtors' business operations.

[Remainder of page left blank intentionally]

---

[7] On April 29, 2014 the Debtors filed several first day motions including a Motion For Entry of Interim and Final Orders Authorizing The Debtors to Pay Prepetition Critical Vendor Claims (D.I. 29) (the "Critical Vendor Motion").

## V. RESERVATION OF RIGHTS

47. The U. S. Trustee reserves and any all rights, remedies and obligations to, *inter alia*, complement, supplement, augment, alter, substitute and/or modify this Objection, file a Motion and conduct any and all discovery as may be deemed necessary or as may be required and to assert such other grounds as may become apparent.

WHEREFORE, the U.S. Trustee respectfully requests that this Court deny the Motion with prejudice and grant such other and further relief as this Court deems just and appropriate.

Respectfully submitted,

**ANDREW R. VARA**
**ACTING UNITED STATES TRUSTEE**

By: */s/Richard L. Schepacarter*
Richard L. Schepacarter
Andrea B. Schwartz
Timothy J. Fox, Jr.
Trial Attorneys
United States Department of Justice
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 N. King Street, Suite 2207, Lockbox 35
Wilmington, DE 19801
(302) 573-6491 (Tel.)
(302) 573-6497 (Fax)

Dated: May 22, 2015