IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | Hearing Date: June 1, 2015 at 10:30 a.m. |
| | ) | Objection Deadline: May 26, 2015 at 4:00 p.m. |
| | ) | |
| | | Re: Docket No. 4441 |

**LIMITED OBJECTION OF THE AD HOC GROUP OF TCEH UNSECURED NOTEHOLDERS TO THE THIRD MOTION OF ENERGY FUTURE HOLDINGS CORP., *ET AL.*, FOR ENTRY OF AN ORDER EXTENDING THE DEBTORS' EXCLUSIVE PERIODS TO FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF**

The ad hoc group of certain holders (the "Ad Hoc Group") of approximately $2.7 billion of 10.25% Fixed Senior Notes due 2015 (including Series B) and 10.50%/11.25% Senior Toggle Notes due 2016 issued by Texas Competitive Electric Holdings Company LLC ("TCEH") and TCEH Finance, Inc., by and through its undersigned counsel, hereby files its limited objection to the *Third Motion of Energy Future Holdings Corp.,* et al*., for Entry of an Order Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code* [Docket No. 4441] (the "Motion").[2]  In support of this objection, the Ad Hoc Group respectfully represents as follows:

---

[1] The last four digits of Energy Future Holdings Corp.'s federal tax identification number are 8810.  The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201.  Due to the large number of debtors in these chapter 11 cases, for which the debtors have requested joint administration, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Motion.

**PRELIMINARY STATEMENT**

1. As set forth herein, cause does not exist to extend the Debtors' exclusive periods to solicit acceptance and seek confirmation of their proposed plan (the "Debtors' Plan") beyond July 9, 2015. More than one month after its filing, and despite the Debtors' professed hope for a "determined march" to confirmation of it, the Debtors' Plan continues to lack public support from even a single creditor or party-in-interest in any of the Debtors' Cases. And, as evidenced by the volume of recently filed disclosure statement discovery notices, the continued prosecution of the Debtors' Plan promises only to sink these Cases in a litigation quagmire and forestall any near-term consensual exit.

2. To moot the need for the looming litigation and to provide a clear path to emergence, the Ad Hoc Group has continued its efforts to formulate a plan premised in part on the conversion of EFH into a REIT during the pendency of its bankruptcy case and the subsequent use of significantly-upsized distributable value to satisfy in full all E-side liabilities and make meaningful distributions to T-side general unsecured creditors (the "REIT Plan"). Critically, because this structure captures the value of a REIT conversion prior to emergence, the REIT Plan will obviate the need for the no-holds barred litigation presaged by the Debtors' Plan. All potential E-side objectors will be unimpaired, and there will be no need for the Debtors' divisive auction and proposed inter-Debtor settlement strategies to play out in this Court. The negotiations concerning that REIT Plan have progressed in certain material respects over the past several weeks – non-disclosure agreements with creditors holding more than $4 billion in claims across the capital structure have been negotiated and executed, and the restricted backstop parties continue to meet frequently with management of Oncor and other interested parties to push toward restructuring support agreements. Still, much remains to be done before the expiration of

the "runway" fostered by the Court and the resumption of full blown hostilities between and among the various constituencies.

3.  As can be expected, discussions concerning the formulation of the REIT Plan remain fragile and are highly sensitive to the Debtors' participation and cooperation. Publicly, the Debtors have endorsed the Ad Hoc Group's efforts and have committed on the record to providing whatever assistance may be needed. Nonetheless, the Debtors have also publicly vowed to continue their pursuit of their own unsupported litigation plan, having sought entry of a plan scheduling order, having committed to a disclosure statement hearing date, and, by the Motion, having sought to extend their Exclusive Periods.

4.  More troubling, however, are the Debtors' potential private efforts to quell REIT Plan negotiations as a means of forcing creditors to accede to their plan. Following the Court's ruling at the May 4, 2015 hearing which deferred scheduling of firm dates for a hearing on the Debtors' Plan, there have been numerous instances in which the Debtors have either delayed critical assistance to the REIT Plan without rational explanation, have apparently sought to frustrate others' participation in negotiations over that plan, or have conditioned moving forward on any REIT Plan absent agreement to incorporate key aspects of the Debtors' Plan as a "toggle." As set forth below, the Debtors' previously-granted exclusivity extensions should not be used as a means to coerce creditor votes for their divisive litigation plan. Nor do those extensions give the Debtors a legitimate basis to frustrate in any way the real possibility of a value-maximizing plan with significant creditor support. On the contrary, such behavior would constitute "cause" to terminate exclusivity entirely.

5.  Contemporaneous with this objection, the Ad Hoc Group has sought discovery from the Debtors concerning actions that seem designed to interfere with the REIT

Plan negotiations, and it intends to present at the hearing on the Motion any evidence garnered in that discovery that would support a termination of exclusivity. At the very least, absent a termination for cause, the Court should decline to extend exclusivity beyond July 9, 2015 and should direct the Debtors to negotiate, in good faith, all potential plans with their stakeholders while exclusivity remains in place.

## LIMITED OBJECTION

6.      By the Motion, the Debtors seek entry of an order extending (i) their Filing Exclusive Period through October 29, 2015 and (ii) their Soliciting Exclusive Period to December 29, 2015. The Debtors request that the Court exercise its discretion to extend the Exclusive Periods on the grounds that they already have filed a proposed chapter 11 Plan, a related Disclosure Statement, and a Scheduling Motion. Motion ¶ 1.

7.      Section 1121(b) of the Bankruptcy Code provides a debtor with an initial period during which no other party may file or solicit approval of a proposed plan of reorganization. 11 U.S.C. § 1121(b) ("Except as otherwise provided in this section, only the debtor may file a plan until after 120 days after the date of the order for relief under this chapter.").

8.      Congress intended this provision to be defensive in nature, to provide debtors with a reasonable opportunity to develop plan processes absent inappropriate creditor interference. <u>Geriatrics Nursing Home, Inc. v. First Fidelity Bank, N.A.(In re Geriatrics Nursing Home, Inc.)</u>, 187 B.R. 128, 131 (D.N.J. 1995) ("The exclusivity periods afford the debtor the opportunity to negotiate the settlement of its debts by proposing and soliciting support for its plan of reorganization without interference – in the form of competing plans – from its creditors or others in interest.").

9.      For this reason, Congress itself cautioned debtors against using exclusivity as a tactic to pressure their creditor constituencies into voting for a debtor-sponsored plan. S. Rep. No. 95-989, at 118 (1978) reprinted in 1978 U.S.C.C.A.N. 5787, 5904. ("[a]n extension should not be employed as a tactical device to put pressure on parties in interest to yield to a plan they consider unsatisfactory."); H.R. Rep. No. 95-595, at 231 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6191 (recognizing "the legitimate interests of creditors, whose money is in the enterprise as much as the debtors, to have a say in the future of the company.").

10.     To that end, section 1121 affords a debtor with only a limited period of statutory exclusivity, subject to extension only in the discretion of the bankruptcy courts. 11 U.S.C. § 1121(c) ("on request of a party in interest . . . and after notice and a hearing, the court may for cause reduce or increase the 120-day period or the 180-day period referred to in this section"). In determining whether cause exists to either extend or terminate exclusivity, bankruptcy courts have considered several factors including whether a debtor is making "good faith progress" toward reorganization. See In re Cent. Jersey Airport Servs., LLC, 282 B.R. 176, 184 (Bankr. D.N.J. 2002); Cont'l Cas. Co. v. Burns & Roe Enters. (In re Burns & Roe Enters.), No. 05-2529, 2005 WL 6289213, at *9 (D.N.J. Nov. 2, 2005).

11.     Mindful of the intent behind section 1121, courts have declined to find cause sufficient to extend exclusivity when a debtor seeks to wield its exclusivity authority as a sword rather than as a shield. See Century Glove, Inc. v. First Am. Bank of N.Y., 860 F.2d 94, 102 (3d Cir. 1988) (noting in dicta that "a broad exclusivity provision, holding that only the debtor's plan may be 'on the table,' takes this tool from creditors . . . . The history of § 1121 gives no indication that Congress intended to benefit the debtor in this way."); see also In re Sharon Steel Corp., 78 B.R. 762, 766 (Bankr. W.D. Pa. 1987) (declining to extend exclusivity

and noting that "the leverage accorded to the debtor by the period of exclusivity must give way to the legitimate interests of other parties in interest so that progress toward an effective reorganization of the debtor may be enhanced before it is too late. The proceeding must be opened up to substantial and significant input by the creditors in the event they can propose a means (possibly by proposal of a plan of reorganization) which will rescue the debtor from its precarious posture."); Marvin E. Jacob, Pamela B. Corrie, Una M. O'Boyle, <u>An Analysis of the Provisions of the Bankruptcy Reform Act of 1994 Relating to Cases Administered Under Chapter 11</u>, 4 J. Bankr. L. & Prac. 339, 341 (1995) ("The second general rule is that a debtor should not be allowed to use exclusivity as a sword to coerce creditors to accept unfavorable plan provisions for fear the case otherwise will languish in bankruptcy. Thus, exclusivity may be terminated when necessary to even the playing field.").

12. Here, the Debtors have made no secret that they intend to press forward with the solicitation of their plan despite universal outcry from their creditor constituencies. That strategy, which at this point may be borne more out of wounded pride than rational belief, portends to be expensive, futile, divisive, contentious, and, absent a sea change in creditor sentiment, a complete failure. To be sure, the Debtors currently have exclusivity and thus are free within the bounds of the Bankruptcy Code to pursue their own plan agenda. The foregoing authorities, however, make clear that the Debtors may <u>not</u> seek to interfere with any creditor-led efforts to develop a plan of reorganization that creates more value, has broad creditor consensus, and would obviate the need for the litigation that the Debtors' Plan surely will continue to engender. The Ad Hoc Group has, to date, trusted that the Debtors are keenly aware of the line between advocacy for their own plan and the undermining of other alternatives. As noted, however, there is a rising concern that certain Debtor personnel may have crossed the line by

6

placing roadblocks in the Ad Hoc Group's negotiations, and the limited discovery being propounded may provide greater clarity as to the Debtors' actions.

13. In sum, the present situation remains highly fluid. In the absence of a finding of cause to terminate the Court's current extension, the Ad Hoc Group respectfully requests that any further extension be a short one, consistent with the Court's efforts to foster more consensus and eliminate the "us-versus-the entire capital structure" dynamic that has plagued these Cases to date.

## CONCLUSION

14. WHEREFORE, the Ad Hoc Group requests that the Court (i) deny the Motion; (ii) grant an extension of the Debtors' exclusive period for filing a plan through July 9, 2015; (iii) direct that the Debtors engage in good faith negotiations with all creditor constituencies regarding any alternative plan structures; or (iv) grant such other and further relief as the Court may deem just and proper.

[*Remainder of page intentionally left blank*]

Dated: May 26, 2015
      Wilmington, Delaware

                FOX ROTHSCHILD LLP

By: */s/ L. John Bird*
    Jeffrey M. Schlerf (No. 3047)
    L. John Bird (No. 5310)
    919 North Market St., Suite 300
    Wilmington, DE 19801
    Telephone: (302) 654-7444
    Facsimile: (302) 463-4971
    jschlerf@foxrothschild.com
    lbird@foxrothschild.com

    and

    WHITE & CASE LLP
    Thomas E Lauria (admitted *pro hac vice*)
    Matthew C. Brown (admitted *pro hac vice*)
    Southeast Financial Center, Suite 4900
    200 South Biscayne Blvd.
    Miami, FL 33131
    Telephone: (305) 371-2700
    Facsimile: (305) 358-5744
    tlauria@whitecase.com
    mbrown@whitecase.com

    J. Christopher Shore (admitted *pro hac vice*)
    Gregory M. Starner (admitted *pro hac vice*)
    1155 Avenue of the Americas
    New York, NY 10036
    Telephone: (212) 819-8200
    Facsimile: (212) 354-8113
    cshore@whitecase.com
    gstarner@whitecase.com

    *Counsel to the Ad Hoc Group of TCEH Unsecured Noteholders*