# Exhibit D

```
                                                                    1

 1   UNITED STATES BANKRUPTCY COURT

 2   DISTRICT OF DELAWARE

 3

 4   In re:                            :
                                       :   Chapter 11
 5   ENERGY FUTURE HOLDINGS            :
     CORP., et al.,                    :   Case No. 14-10979 (CSS)
 6                                     :
            Debtors.                   :   (Jointly Administration
 7   _____   :   Requested)
     DELAWARE TRUST COMPANY as         :
 8   INDENTURE TRUSTEE,                :
                                       :
 9          Plaintiff,                 :
                                       :
10       v.                            :   Adv. Proc. No.
                                       :   14-50363 (CSS)
11   ENERGY FUTURE INTERMEDIATE        :
     HOLDING COMPANY LLC and EFIH      :
12   FINANCE INC.                      :
                                       :
13          Defendants.                :
     _____   :
14   ENERGY FUTURE INTERMEDIATE        :
     HOLDING COMPANY LLC and EFIH      :
15   FINANCE INC.                      :
                                       :
16          PlaintiffS,                :
                                       :
17       v.                            :   Adv. Proc. No.
                                       :   14-51002 (CSS)
18   UMB BANK, N.A., as INDENTURE      :
     TRUSTEE,                          :
19                                     :
            Defendant.                 :
20   _____   :

21                       United States Bankruptcy Court

22                       824 North Market Street

23                       Wilmington, Delaware

24                       May 4, 2015

25                       9:41 a.m. - 3:45 p.m.
```

Hearing (2015-05-04)

46

1   attempting to see if we can resolve those issues and, Your

2   Honor, the feedback I received is that it's looking good.

3           So with that if there are additional points I need

4   to address maybe I can reserve some time on rebuttal for

5   that potentially, but other than that if you have any

6   questions I'm happy to answer them and as it relates to the

7   red lines I can cover those at a later point if you want to.

8           THE COURT:  Okay.

9           MR. MCKANE:  Thank you, Your Honor.

10          MR. SHORE:  Good morning, Your Honor, Chris Shore

11  from White and Case.  This morning we had asked the debtors,

12  and I understand the Court has been approached about

13  potentially having an in chambers status conference.  The

14  debtors wanted to make their presentation first, but didn't

15  necessarily disagree with the notion of having the chambers

16  conference.

17          Consistent with how we've addressed issues with

18  the Court in the past, there's a lot going on.  There's a

19  lot that underlays obviously what's going on today and we

20  think it would be very beneficial for the Court to have a

21  full understanding of what's going on without having to do

22  this in a public setting given the number of people who are

23  outside the process.

24          THE COURT:  Okay.  All right.  Any objection by

25  the debtors?

1    posited, "Let us put our stake in the ground.  What's the
2    harm of putting a stake in the ground right now?  And, if
3    you have to come back later and move the schedule, move the
4    schedule."  The harm here, as we laid out in our papers,
5    over -- particularly over the next six weeks, six to eight
6    weeks, is real.
7              As the debtors acknowledge, there is an
8    alternative plan percolating, premised on creating a REIT
9    within the bankruptcy.  All discussions to date have been
10   about selling Oncor to a bidder who can do with Oncor what
11   they want.  Fundamentally, the premise is, if value can be
12   created within the bankruptcy, let's do that and use that as
13   distributable value without the enterprise, because this
14   case needs more consideration to distribute around.
15             I'm not going to repeat the deal structure, unless
16   Your Honor has questions about it, or explain why using a
17   REIT structure here will maximize value.  But I will say
18   that the process that needs to be done over the next six to
19   eight weeks, unlike the debtors' plan -- the debtors' plan
20   is discovery-heavy now and negotiation at the end -- our
21   plan, particularly with the debtors' insistence that it be
22   fully baked, has to get fully baked now.
23             That requires plan support agreements, $11 billion
24   in debt and equity funding with backstop agreements, debt
25   commitments, organizational documents restructuring a

1   operating company and a property management company, putting
2   together all the property management agreements that are
3   necessary for that, and then starting the process of
4   obtaining PUC, IRS, NRC, and FERC approvals.
5              All of that is being negotiated right now.  There
6   are weekly meetings with principals throughout the country.
7   There is round-the-clock diligence going on.  There are
8   daily drafting sessions going on.  And our view is, and I
9   wouldn't be standing up taking all your time if I didn't
10  believe, that we've got one clear shot at this.  It is a
11  fragile process.  It is a process, as you know, in bringing
12  together a whole bunch of people towards an idea, which is
13  essentially what it is, it takes time and a great amount of
14  effort.
15             In the meantime, though, we're being asked to do a
16  ton of work to fight a plan, which will allow the
17  alternative plan to survive.  And it's not as easy as the
18  debtors say, "Well, we're going to produce some documents,
19  and then we're going to have some depositions."  You know,
20  this is a first lien standing prosecution.  And I'll come
21  back to that in a bit.
22             There's the inter-debtor claims; a standing
23  assertion, which has to be done in the near term.  There is
24  a huge amount of valuation discovery to be done, and I'll
25  come back as to why valuation is key.  And, of course, there

1           So, for example, I've asked to meet with the
2    debtors' principals to discuss the claims that we've laid
3    out.  Am I supposed to be sitting in a meeting with Mr.
4    Keglevic, talking about LBO-related claims, while I'm also
5    trying to get Mr. Keglevic to provide necessary
6    documentation with respect to a REIT lib plan?
7           Given the size of where we're vectoring towards on
8    the debtors' plan, it's not a, "Well, we'll just kind of
9    push that all off to September/October/November."  It's a
10   daily process.  It's been a daily process since the
11   beginning of this case.  and nobody has unlimited funds, not
12   the debtors, but certainly not the ad hoc group who's trying
13   to do other things.
14          So, here are my four quick things. First, I'd
15   request that the Court -- and everyone's going to hate me
16   for this -- push the confirmation hearing until late
17   December.  That addresses all of the debtors' concerns with
18   respect to their losing exclusivity before they have their
19   confirmation hearing.  The parties can move out all of the
20   dates.  Your Honor can pick a date, the dates that work for
21   you in December, and we'll address the schedule accordingly.
22          But, even if it was a December 15 start or a
23   December 28 start, continued, we can work out what
24   adjustments need to be made.  That solves the debtors'
25   problem; it also solves our problem of being able to get all

1           We're hoping we've come up with a way to do that.
2   But, you know, a confirmation hearing on the issues that are
3   framed by that pleading is going to be expensive, time-
4   consuming, and people are going to run down rabbit holes and
5   just find themselves there.
6           So, I'd sum up as follows:  you get to inflection
7   points in cases.  I believe that we are at an inflection
8   point in the case.  My general view is that, when you're at
9   a place like this in a case, the last thing you want to do
10  is send people off on a schedule that requires them to start
11  deposing each other.  It's generally not a friendly
12  environment in which to try to get a deal done, particularly
13  where the decision-makers who are deciding to -- whether or
14  not to do a deal are the ones who are either forced to sit
15  in a deposition or produce the documents.
16          So, we are asking Your Honor either to deny the
17  motion without prejudice to it being heard in June or, at
18  worst, enter a scheduling order that ticks off everything,
19  at least related to confirmation, until June, with a
20  corresponding delay in the confirmation trial.  Thank you,
21  Your Honor.
22          THE COURT:  Thank you.  Mr. Jonas?
23          MR. JONAS:  Good afternoon, Your Honor.  I'll be
24  extremely brief.  Jeff Jonas for (indiscernible), the T side
25  second lien indenture trustee.  First of all, Your Honor, to

1  creditors or you mediate all you want, but you're not going
2  to get far.  It's a one-sided deal.
3         So, in that instance, obviously at a minimum, the
4  E side committee would need to be involved and it would be
5  appropriate probably to include other important E side
6  creditors, certainly anyone that's a fulcrum security needs
7  to be part of any kind of mediation.  But I'm okay with the
8  mediation order and I'm okay with the disclosure statement
9  piece.
10        I'm not at this time going to enter a discovery or
11 scheduling order in connection with confirmation of the plan
12 for several reasons.  First, while it has been the case to,
13 I don't even say dual track, multiple track different things
14 going on in this case in the last year, it has been
15 challenging, time-consuming and expensive to perform those
16 tasks.
17        We have an opportunity here with mediation and
18 also with active exploration of an alternative transaction,
19 if you will, to I think appropriately focus on those issues
20 more directly and delay, at least for some period of time,
21 this parallel tracking of litigation and discovery, at least
22 as it applies to confirmation.
23        I think it's appropriate and important to give the
24 mediation full opportunity to succeed, to allow the parties
25 to focus on other transactions to the extent that makes

```
 1   sense.  I mean, they may not make sense.  They may fall
 2   apart.  They may never come together.  I don't know.  But
 3   there is some serious work being done in that end and I
 4   think it appropriate to allow that to play out a little bit.
 5              Also, we don't have an approved disclosure
 6   statement and we're sort putting the cart before the horse
 7   here in starting confirmation litigation over a plan where
 8   we don't even have a disclosure statement approved.
 9              Having said all that, I of course understand the
10   problem with managing such a colossal litigation in a finite
11   period of time and at least initially, while I'm delaying
12   the start, at this point I'm not prepared to force a delay
13   of the end game and I think as I sit here today I'm going to
14   keep the optionality available to start the confirmation
15   hearing as original requested on November 18th and I have
16   privately on my calendar set aside the requested 20 days of
17   confirmation hearing starting on November 18th and
18   concluding on December 23rd.
19              That schedule will remain on the Court's calendar
20   pending any future decision on how to proceed or not
21   proceed.  It may be that by delaying the start it ultimately
22   becomes unworkable and that the confirmation hearing will
23   have to begin at a later time.  I'll decide that as
24   appropriate when it comes up.
25              However, while I certainly understand and
```