# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: D.I. 4582, 4585, 4586, 4588, 4590, 4592** |
| | ) | |

### DEBTORS' OMNIBUS REPLY TO OBJECTIONS
### AND RESPONSES FILED IN CONNECTION WITH THE THIRD
### MOTION OF ENERGY FUTURE HOLDINGS CORP., *ET AL.*,
### FOR ENTRY OF AN ORDER EXTENDING THE DEBTORS' EXCLUSIVITY PERIODS

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this omnibus reply (this "Reply") in support of the *Third Motion of Energy Future Holdings Corp.,* et al., *for Entry of an Order Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code* [D.I. 4441] (the "Exclusivity Motion") and in response to the objections (collectively, the "Objections" and the parties to the Objections, the "Objectors")[2] and statement (together, the "Statements")[3] related thereto.

---

[1]    The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

[2]    The Objections were filed by (a) the TCEH Committee [D.I. 4586] (the "TCEH Committee Objection"), joined by Law Debenture Trust Company of New York, as indenture trustee [D.I. 4592]; (b) the EFH Committee [D.I. 4585] (the "EFH Committee Objection"), joined by American Stock Transfer & Trust Company, LLC, as successor trustee [D.I. 4588]; (c) Wilmington Savings Fund Society, FSB, as successor trustee [D.I. 4582]; and (d) the ad hoc group of certain holders of unsecured TCEH notes (the "TCEH Unsecured Ad Hoc Group") [D.I. 4590] (the "TCEH Unsecured Ad Hoc Group Objection").

[3]    The statement was filed by the ad hoc committee of certain unaffiliated holders of first lien secured claims against the TCEH Debtors (the "TCEH First Lien Group") [D.I. 4587] (the "TCEH First Lien Statement").

### Preliminary Statement

1.      The Court should approve the Debtors' third—and, hopefully, last—request to extend the Exclusive Periods.  Though much paper has been filed in connection with the Exclusivity Motion, three overarching themes ultimately emerge from the Objections and the Statement. *First*, the Debtors have made enormous strides since the last extension of exclusivity was granted.  The Debtors filed a comprehensive plan of reorganization on April 14, 2015 [D.I. 4142] (the "Plan"), incorporating a hard-fought settlement of intercompany claims, materially advanced the Oncor sale process, and built support for key elements of the Plan. *Second*, all parties agree that the next several months are critical to the Debtors' ability to confirm a plan of reorganization and emerge from chapter 11.  *Third*, although the responding parties do not currently support the Plan, they are in active discussions with the Debtors and other stakeholders regarding the Plan, proposed modifications to the Plan, and potential alternative Plans.  This environment—one where there is discord regarding the Debtors' path forward and some (but by no means all) parties are still focusing on their own parochial agendas—is exactly the environment for which exclusivity was designed.

2.      As the Debtors have stated time and time again, their goal in these enormous and complex chapter 11 cases is to maximize recovery and facilitate a smooth exit from chapter 11— whether that is through the Plan as filed with the Court or as amended to reflect hoped-for compromise and consensus.  Exclusivity is—as Congress envisioned—the Debtors' most important tool to provide focus and a single frame of reference where vocal creditor constituencies with discrete points of view are best situated to settle their differences.

3.      Nothing in the objections remotely overcomes the Debtors' clear case for an extension of exclusivity. *First*, piecemeal, de minimis extensions of exclusivity, and with them, the perpetual looming threat of the expiration of exclusivity, undermine the very purpose of

2

exclusivity and will cast a shadow over the progress the Debtors and their stakeholders have made to date and anticipate making over the next several months. *Second*, the objectors' assertion that the Debtors are misusing their exclusive periods by prosecuting a Plan that lacks creditor support ignores reality. During the Debtors' current exclusivity period, they were, and continue to be: (a) engaged in robust discussions with potential bidders in the EFH-EFIH Transaction (as defined in the Exclusivity Motion); (b) exploring REIT-based alternative Plans with creditors, and are currently in active negotiations with Fidelity, in its capacity as a significant holder of EFH debt ("Fidelity") and the ad hoc group of EFIH second lien noteholders (the "EFIH Second Lien Group") regarding potential modifications to the Plan that would include a standalone equitization subject to higher or otherwise better plan alternatives; (c) in the early stages of Plan mediation with TCEH creditor constituencies. These actions, among others, are clear evidence that the Debtors are using their exclusivity periods to move these cases forward. *Third*, the suggestion in certain Objections that the Debtors should consider separate "TCEH" and "EFIH/EFH" plans of reorganization is flawed. The Debtors have thoroughly considered such alternatives and determined that they do not maximize value for many reasons, not the least of which is that separate plans could potentially trigger a tax liability that neither the E-side nor the T-side could bear.

4.    Ultimately, the Debtors request the relief described in the Exclusivity Motion to allow parties to remain focused on the EFH-EFIH Transaction, Plan mediation, and the Plan process. And, as the Court has already recognized, the Debtors need time to allow the plan process to develop (Hr'g Tr. at 40:13-22 (Bankr. D. Del. May 13, 2015)) (stating that now is the time to "put pencils down in connection with litigation [and] focus[] on some runway. . ."). For these reasons, and those set forth in the Exclusivity Motion, the Debtors respectfully request that

the Court overrule the Objections and grant the relief requested in the Exclusivity Motion to allow the Debtors the full runway afforded them by the Bankruptcy Code.

**Argument**

**I.    PIECEMEAL    EXTENSION    OF    EXCLUSIVITY    WILL    FORESTALL PROGRESS.**

5.    As virtually all of the responding parties have acknowledged, the next several months in these chapter 11 cases are critical.  Among other things, the Debtors are:  (a) in the early stages of mediation with the TCEH creditor constituencies over the Plan on file; (b) engaged in discussions with Fidelity and counsel for the EFIH Second Lien Noteholders regarding their potential support of the Plan with some modifications (within the confines of, and capitalizing on the flexibility in, the Plan); (c) advancing discussions with various creditor constituencies, including the TCEH Unsecured Ad Hoc Group, regarding a potential REIT alternative; (d) preparing for the scheduling conference the Court calendared for June 25, 2015 to discuss issues related to a confirmation timeline; and (e) preparing to file a motion to approve a stalking horse in connection with the EFH-EFIH Transaction (as defined in the Exclusivity Motion) to be heard on July 13, 2015.

6.    These upcoming milestones are undoubtedly significant and represent months (and in some cases, years) of focused work by the Debtors and their creditor constituencies.  But the result of these milestones should not dictate whether the Debtors need or are entitled to an extension of the exclusive periods.[4]

---

[4]    In addition, the TCEH First Lien Group rather unusually requested that the Debtors only seek an extension of their exclusive period to solicit votes on the Plan.  The TCEH First Lien Statement cited no case or statutory law in support of this proposition.  Notably, since the TCEH First Lien Group filed the TCEH First Lien Statement, an identically positioned group raised a similar argument in *Caesars' Entertainment Operating Company, Inc.*, Case No. 15-01145 (N.D. Ill. 2015).  There, the court rejected the argument and extended both the filing exclusivity period and the solicitation exclusivity period, noting that "as for limiting the extension to the solicitation period because the debtors have already filed a plan, I don't see the filing of a plan as a reason to

7.    *Ending exclusivity at the end of mediation would chill the mediation process.*
Parties will inevitably be disincentivized to fully engage in the mediation if the threat of
exclusivity expiration is looming.  Moreover, if the mediation is successful, the Debtors should
be afforded an opportunity to capitalize on their progress and file an amended Plan.  If the
mediation is unsuccessful, the Debtors should be afforded an opportunity to guide these chapter
11 cases toward a conclusion.

8.    *Ending exclusivity as of the stalking horse hearing may adversely affect the
Debtors' marketing efforts.*  Similarly, an extension of exclusivity until the stalking horse
hearing does nothing to mitigate the concern of potential bidders that the Debtors will be able to
complete the auction process and confirm a plan built around the successful bid.  That is, the
threat of impending exclusivity expiration may cause bidders to question the Debtors' timely
confirmation prospects and ultimately may depress the recoverable value from the auction
process.

9.    *Ending exclusivity as of the June 25 scheduling conference or other
intermediate dates would provide parties further opportunity to delay the establishment of a
clear schedule in these chapter 11 cases.*  Regardless of the form of the Debtors' restructuring—
whether it is the restructuring contemplated by the Plan or an amended or an alternative plan—
no party can argue that a restructuring can be consummated (as opposed to confirmed) before the
end of the Debtors' statutory exclusivity period.  Thus, using the June 25 scheduling conference
or any other intermediate dates as a barometer by which to measure the need for exclusivity is
inaccurate.  In fact, any plan confirmation scheduling order would be severely undermined in an
environment where competing plans can be put forward.  Creditors may then seek to delay

---

terminate the exclusive period for filing one.  We don't know whether it is the plan. It might well not be." Hr'g
Tr. 11:16 (Bankr. N.D. Ill. May 27, 2015).

confirmation of the Plan for no purpose other than to advance their own plans, undercutting the spirit of the scheduling order entered by the Court on May 18, 2015 [D.I. 4497] and any further scheduling order that the Court may enter.

10.    In short, bite-sized extensions of exclusivity would subvert the very purpose of exclusivity—providing parties with a single frame of reference, the Debtors' plan of reorganization, around which to reconcile their discrete points of view.

## II.    THE DEBTORS HAVE DEDICATED THEMSELVES TO FACILITATING A DIALOGUE WITH ALL PARTIES REGARDING THE PLAN AND ALTERNATIVE PLAN STRUCTURES AND WILL CONTINUE TO DO SO.

11.    The Debtors have been—and continue to be—committed to exploring all potential restructuring alternatives. Those alternatives are complicated and, as a consequence, the discussions regarding those alternatives are dynamic. That is the nature of any plan process, and that is especially the case with these Debtors.

### A.    The Debtors Continue to Engage in Good Faith With the TCEH Unsecured Ad Hoc Group Regarding a Potential REIT Alternative and With Other Creditor Groups Regarding Their Separate Plan Support Proposals.

12.    The Debtors have used their exclusivity to, among other things, materially advance the EFH-EFIH Transaction. The Debtors have received second round bids from potential bidders and anticipate executing an agreement regarding a stalking horse bid in the next few weeks. Thereafter, the stalking horse bid will be subject to an open marketing process that will culminate in the selection of the highest or otherwise best transaction.

13.    In further pursuit of maximizing distributable value under the Plan and, in some instances, as an outgrowth of the EFH-EFIH Transaction process, the Debtors have used their exclusivity to engage in discussions with all interested parties regarding modifications or amendments to the Plan, including, as described below, the TCEH Unsecured Ad Hoc Group and Fidelity and the EFIH Second Lien Group.

6

1.  **The Debtors Are Actively Discussing Critical Gating Items Regarding a REIT Alternative with the TCEH Unsecured Ad Hoc Group.**

14.     In the last several months, as the TCEH Committee noted, the "Debtors and their professionals have been accommodating" the efforts of the TCEH Unsecured Ad Hoc Group to investigate the viability of a REIT structure.  TCEH Committee Objection, ¶ 3.  Following entry of the last exclusivity extension order in mid-March, the Debtors tax advisors held sessions with, among others, the TCEH Unsecured Ad Hoc Group regarding a potential REIT structure. Additionally, the Debtors have conducted a series of scheduled (and ongoing) diligence calls among the Debtors, their professionals, Oncor, its professionals, and the TCEH Unsecured Ad Hoc Group regarding a REIT.  The Debtors have also facilitated ongoing one-on-one discussions between the TCEH Unsecured Ad Hoc Group and a variety of parties, including Oncor management and potential bidders.   Moreover, the Debtors' professionals negotiated a confidentiality agreement with the members of the TCEH Unsecured Ad Hoc Group to allow them direct access to confidential materials necessary to evaluate a REIT.

15.     The Debtors' efforts to date are a recognition that a REIT structure for EFIH's interest in Oncor has the potential to bring consensus across the E-side and T-side capital structures—*if it works*.  And therein lies the rub:  it is undisputed that the REIT structure is exceedingly complex and may be comparatively difficult to execute.

16.     As acknowledged by the TCEH Unsecured Ad Hoc Group, there are two primary complications regarding a REIT structure.[5]  First, it requires a substantial equity and debt financing commitment—approximately $11 billion, according to statements made by counsel for

---

[5]     Counsel to the TCEH Unsecured Ad Hoc Group stated as much in this Court and elsewhere, noting that the REIT structure is a "fragile process" that requires "time and a great amount of effort," not the least of which is executing "plan support agreements, equity funding with backstop agreements, debt commitments, and starting the process of obtaining . . . [regulatory] approvals."  Hr'g Tr. at 74:23-75:14 (Bankr. D. Del. May 13, 2015).

RLF1 12066084v.1

the TCEH Unsecured Ad Hoc Group on the record—that in and of itself contains commitment and execution risk. Hr'g Tr. at 74:23 (Bankr. D. Del. May 4, 2015). Consistent with market convention, each lender would participate in the equity commitment on a several basis, not a joint and several basis, thus creating the risk that the other lenders will fail to cure a funding default created by another lender or lenders. Second, it is undisputed that the REIT structure adds a layer of complexity to the regulatory approval process not present in non-REIT proposals that renders obtaining such regulatory approvals more challenging.

17.    Because the risks related to the REIT structure may not materialize until many months after confirmation, there is a real and tangible risk that a plan of reorganization that embodies a REIT structure could achieve confirmation but ultimately not be consummated. For this reason, the Debtors have insisted from the very outset of discussions around the REIT structure—and continue to insist—that any deal with the TCEH Unsecured Ad Hoc Group regarding a REIT structure must include a clear, unambiguous "toggle" structure that would, if properly constructed, allow the Debtors to pivot to an alternative structure that does not entail the risk of potential litigation. As explained to the professionals for the TCEH Unsecured Ad Hoc Group, this approach appropriately balances the need to explore a value-maximizing REIT alternative with the desire to advance these chapter 11 cases. Without a toggle, the Debtors could be back where they are today—indeed worse than they are today, after considering the hundreds of millions of dollars in additional professional fees and interest on funded debt, not to mention continued delay and distraction of the Debtors' key employees and management and the potential resulting harm to the Debtors' business operations—with the prospect of massive intercompany and legacy claim litigation (which would be settled under the Debtors' Plan).

18.    All parties have been working around the clock regarding a potential REIT

8

structure. Nonetheless, the need to mitigate the risk of failure to consummate a REIT through a toggle mechanism remains a gating item, as the Debtors have consistently made clear. The toggle will be neither easy nor cost-free. But it is essential. In any event, the current state of play has no bearing on whether the Court should or should not approve the Exclusivity Motion. At best, the current divide supports the Debtors' position: the Debtors have been—and remain ready and willing—to explore all potential alternatives in a thoughtful and constructive manner and will continue to do so.

### 2. The Debtors Are Engaged in Advanced Discussions with Fidelity and the EFIH Second Lien Group Regarding Potential Plan Modifications.

19.    The Debtors are currently in active negotiations with Fidelity and EFIH Second Lien Group on an amended plan of reorganization that would adopt the claim settlements embedded in the Debtors' proposed Plan, including the interdebtor settlements negotiated among the disinterested directors. This plan would provide that E-side creditors would convert their claims into equity of Reorganized EFH. At the stipulated enterprise value, all E-Side creditors would receive payment in full of par plus accrued prepetition interest, plus the Debtor's proposed settlement amounts on the disputed make whole and postpetition interest claims. Additionally, at the stipulated enterprise value, consistent with the interdebtor settlement, the plan would provide in excess of $700 million of value to TCEH for distribution to the T-side creditors. The plan also contemplates that certain E-side creditors will receive cash for the full allowed amount of their claims if they do not support the Plan. While this plan structure would require the Debtors to attempt a REIT conversion, importantly, it does not require a REIT conversion as a condition to the effective date (and the attendant execution risks that such a conversion would entail). These negotiations are ongoing and may lead to a confirmable plan of reorganization that will eliminate much litigation in these cases. Like the other alternatives, this plan would not preclude the

9

Debtors from pursuing an alternative transaction that provides for incremental value.

20.    The Debtors highlight these particular efforts as specific examples of global restructuring discussions that have progressed during their current exclusivity period and that the Debtors are optimistic will continue to progress in the coming weeks and months. In addition to these discussions, the Debtors continue to engage in Plan discussions with their other major creditor constituencies, including, among others, the TCEH First Lien Group, the ad hoc group of EFIH unsecured noteholders, the TCEH Committee, and the EFH Committee. No party has argued, nor could they argue, that a global restructuring can be consummated before the end of the Debtors' statutory period of exclusivity. Thus, the Debtors would use an extension of their exclusivity periods to continue productive Plan discussions with all creditor constituencies, including, among others, the TCEH Unsecured Ad Hoc Group, Fidelity, and the EFIH Second Lien Group.

**B.    The EFH Committee's Preferred Restructuring is Based on Unsubstantiated Assumptions.**

21.    While the EFH Committee seeks to limit the Debtors' exclusivity extension to 60 days, the EFH Committee's reason—an idealized path forward with a rapid sale of Oncor—is premised on faulty assumptions. *First*, the EFH Committee inaccurately states that its position reflects "consensus among stakeholders as to the preferred path forward" but, as far as the Debtors are aware, no significant creditors on the E-side support this position. EFH Committee Objection, ¶ 7. *Second*, the EFH Committee asserts that it may, in the future, argue that EFH and EFIH should move forward with their own plan of reorganization, without regard to the status of the TCEH Debtors' cases. *Id.* at ¶ 16. But this position ignores the significant tax implications that continue to be associated with a deconsolidated restructuring:

- *Use of NOLs to Offset Taxable Gain Carries Substantial Risk.*  In support of this proposition, the EFH Committee argues that a tax-free spin-off of the TCEH Debtors is no longer necessary because there are sufficient net operating losses ("NOLs") for EFH to offset any taxable gain resulting from such sale.    But there is no guarantee that the amount of NOLs will match the value of TCEH at the time of emergence or that the IRS will agree with the parties' position on value.    And whatever the magnitude of the tax risk associated with a taxable transaction, that risk is not worth taking for either EFH or TCEH if there are value-maximizing alternatives available that do not trigger taxable gain—e.g., the Debtors' Plan.  More importantly,   a taxable sale of the TCEH Debtors would likely make it more difficult, if not impossible, to reorganize EFH, EFIH, and Oncor within a REIT structure, the very structure that almost all parties in these cases have argued will increase EFH's value.

- *A "Check-the-Box" Election May Substantially Increase the Debtors' Taxable Income.*  The EFH Committee's argument that EFH should immediately make a "check-the-box" election for some or all of the TCEH Debtors ignores the substantial risk that such an election would entail.  Setting aside the potential inter-Debtor disputes, over efficacy, feasibility, and otherwise, that would almost certainly arise if EFH were to attempt to make a "check-the-box" election, such election could result in the creation of a multi-billion dollar "excess loss account" (an "ELA") in the stock of the "checked" entities equal to the difference between (1) the tax basis in the assets owned by the entity and (2) the liabilities that are treated as being assumed by the entity.[6]  Under section 1.1502-19 of the Treasury Regulations, if an ELA were to be created, billions of dollars of cancellation of indebtedness income that would otherwise be excluded from taxable income under section 108 of the IRC would, instead, be included in taxable income.  Such tax liability would likely be an administrative expense claim against *all* regarded entities in EFH's consolidated tax group, including EFH.  In other words, there is a substantial risk that if EFH makes a "check-the-box" election, its own liabilities will be increased.  As a result, making a "check-the-box" election is not a costless, riskless way for EFH to apply leverage to the TCEH Debtors, as the EFH Committee appears to suggest.

22.    The EFH Committee's misguided analysis of the tax implications associated with

pursuing an EFH-EFIH restructuring separate from a TCEH restructuring is especially surprising

in light of communications and diligence sessions between counsel to the EFH Committee and

the conflicts matter counsel to EFH Corp.  Contrary to the assertions of the EFH Committee,

there have been, and continue to be, numerous telephonic conferences, email exchanges, and

---

[6]    An ELA can be thought of as "negative basis" that does not currently create income or gain under the consolidated tax return provisions of the Treasury Regulations.  However, as discussed below, the applicable provisions of the Treasury Regulations provide that, upon certain events, an ELA will be triggered into income.  *See, e.g.*, Treas. Reg. ¶ 1.1502-19.

11

diligence sessions between such advisors to address, among other things, the tax consequences of various restructuring proposals.

23.    Ultimately, neither the negotiations around the TCEH Unsecured Ad Hoc Group's proposal nor the EFH Committee's wild speculations provide any basis to deny the relief requested.  Within the ambit of exclusivity, the Debtors will be best positioned to continue to engage in focused discussions with these constituencies.  In the absence of exclusivity, or with piecemeal extensions of exclusivity, the Debtors fear that parties will continue to cling to untenable proposals or otherwise be disincentivized to participate in comprehensive restructuring discussions (thereby undermining the very spirit of exclusivity).

### Conclusion

24.    Ultimately, the Debtors are determined to consummate a value-maximizing restructuring.  The Debtors are in the best position to accomplish this goal and exclusivity is the appropriate, Congressionally-approved tool for accomplishing this goal.  Despite the unfounded allegations in the Objections to the contrary, the Debtors' exclusivity has been a driver of global discussions.

25.    In the absence of exclusivity, there is a real risk that each creditor constituency will retreat to its own corner. An expiration of exclusivity, therefore, may best be characterized as an expiration of the Debtors' best opportunity to bring about a timely, efficient, value-maximizing restructuring.

26.    For the reasons set forth above and in the Exclusivity Motion, the Debtors respectfully request that the Court overrule the Objections and grant the relief requested in the Exclusivity Motion in accordance with the version of the order filed contemporaneously with this Reply.

RLF1 12066084v.1

Dated: May 29, 2015
Wilmington, Delaware

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
920 North King Street
Wilmington, Delaware 19801
Telephone:     (302) 651-7700
Facsimile:     (302) 651-7701
Email:         collins@rlf.com
               defranceschi@rlf.com
               madron@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:
               edward.sassower@kirkland.com
               stephen.hessler@kirkland.com
               brian.schartz@kirkland.com

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Chad J. Husnick (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:         james.sprayregen@kirkland.com
               marc.kieselstein@kirkland.com
               chad.husnick@kirkland.com
               steven.serajeddini@kirkland.com

Co-Counsel to the Debtors and Debtors in Possession