1   UNITED STATES BANKRUPTCY COURT

2   DISTRICT OF DELAWARE

3

4   In re:                          :

                                    :     Chapter 11

5   ENERGY FUTURE HOLDINGS          :

    CORP., et al.,                  :     Case No. 14-10979(CSS)

6                                   :

            Debtors.                :     (Jointly Administration

7   _____:     Requested)

8

9

10                                  United States Bankruptcy Court

11                                  824 North Market Street

12                                  Wilmington, Delaware

13

14                                  May 28, 2015

15                                  4:09 PM - 4:36 PM

16  B E F O R E :

17  HON CHRISTOPHER S. SONTCHI

18  U.S. BANKRUPTCY JUDGE

19

20

21

22

23

24

25  ECR OPERATOR:  LESLIE MURIN

1   HEARING re Discovery Dispute

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:   Sonya Ledanski Hyde

1    A P P E A R A N C E S :

2    RICHARDS, LAYTON & FINGER

3        Attorneys for the Debtors

4

5    BY:  MARK. D. COLLINS

6        DANIEL J. DEFRANCESCHI

7        JASON M. MADRON

8

9

10   KIRKLAND & ELLIS

11       Attorneys for the Debtors

12

13   BY:       EDWARD SASSOWER (TELEPHONIC)

14       STEPHEN HESSLER, ESQ. (TELEPHONIC)

15       BRIAN E. SCHARTZ

16       JAMES H.M. SPRYREGEN

17       MARC KIESELSTEIN

18       STEVEN N. SERAJEDDINI

19

20

21

22

23

24

25

1    ALSO PRESENT TELEPHONICALLY

2    JACOB A. ALDERSTEIN

3    SCOTT L. ALBERINO

4    ROBERT J. BOLLER

5    WILLIAM BOWNDEN

6    PEG A. BRICKLEY

7    TREVOR BROAD

8    JOSHUA BRODY

9    JOSEPH BUECHE

10   MARK A. CODY

11   HOWARD A. COHEN

12   KEN COLLIER

13   DANIEL DEFRANCESCHI

14   ADAM M. DENHOFF

15   HARRISON DENMAN

16   ANDREW DEVORE

17   STACY DORE

18   JUSTIN K. EDELSON

19   JAMIE EDMONSON

20   ERIN FAY

21   MARK A. FINK

22   MICHAEL FIRESTEIN

23   BRERT FLOM

24   CHRISTOPHER FONG

25   JONATHAN FRIEDMAN

Page 5

1    JULIA FROST-DAVIES

2    BRIAN GLUECKSTEIN

3    MARK F. HEBBELN

4    BRIAN HERMANN

5    ANGELA K. HERRING

6    NOAH HERTZ-BUNZL

7    PATRICK HOLOHAN

8    NATASHA HWANGPO

9    JEFFRY L. JONAS

10   LAURA D. JONES

11   HAROLD KAPLAN

12   MARC KIESELSTEIN

13   MARK D. KOTWICK

14   ARI D. KUNOFSKY

15   KIMBERLY LAWSON

16   RAYMOND LEMISCH

17   DANIEL A. LOWENTHAL

18   JASON M. MADRON

19   JEFF MARWIL

20   ANDY MCGAAN

21   MARK E. MCKANE

22   R. STEPHEN MCNEILL

23   BRETT H. MILLER

24   STEPHEN MILLER

25   PAULINE K. MORGAN

1   MICHAEL PASKIN

2   NORMAN L. PERNICK

3   MEREDITH PFISTER

4   DAVID PRIMACK

5   COLIN R. ROBINSON

6   JEFFREY S. SABIN

7   RICHARD SCHEPACARTER

8   JEFFREY M. SCHLERF

9   NED S. SCHODEK

10   J. CHRISTOPHER SHORE

11   JOHN W. SPIEGEL

12   MARK K. THOMAS

13   THOMAS WALPER

14   MICHAEL J. WALSH

15   CHRISTOPHER A. WARD

16   BRADY C. WILLIAMSON

17

18

19

20

21

22

23

24

25

```
 1                  P R O C E E D I N G S
 2           THE COURT:  Good afternoon, counsel. This is Judge
 3     Sontchi.
 4           MR. MCGANN:  Good morning.  Good afternoon.
 5           MR. MILLER:  Good afternoon, Your Honor.
 6           THE COURT:  Okay.
 7           MR. SHORE:  Good afternoon, Your Honor.
 8           THE COURT:  We're here at the request of debtor's
 9     counsel, Kirkland & Ellis, Mr. McGann, for a telephone
10     conference in connection with a discovery dispute about the
11     exclusivity motion, which is set up for June 1.
12           So, I did receive -- and thank you, and I
13     apologize for the short notice.  But there was a request
14     that this be heard either today or tomorrow, and I was
15     unavailable tomorrow.  And I had court this afternoon.  So,
16     I did receive the letter of submission from debtors, as well
17     as from the ad hoc group, and have had an opportunity to
18     review those.  So, thank you very much, and thank you for
19     submitting them in such short order.  I do appreciate it.
20           So, why don't I turn it over to, I guess, Mr.
21     McGann, or whoever at the debtors' side is going to do the
22     speaking?
23           MR. MCGANN:  Thank you, Your Honor, Andrew McGann
24     for the debtors.  Also on the phone, Mark Kieselstein for
25     the debtors.  Our request is to -- that the Court quash and
```

1    not permit the ad hoc group to go forward with two notices

2    of deposition, one for Mr. Keglevic and a second, a 30(b)(6)

3    notice directed at the debtors, for which, if it were

4    permitted to go forward, Mr. Keglevic would be the witness.

5    And secondly, to order that the debtors need not respond to

6    an overlapping document request that the ad hoc group issued

7    in connection with those.

8            And what the dispute is about, at its essence, is

9    whether, at this stage in the proceedings, or really at any

10   stage in the plan negotiations, the ad hoc group ought to be

11   permitted to come in and seek discovery from the CFO and co-

12   chief restructuring officer about negotiations with

13   competing -- parties with competing plans or competing

14   bidders to the proposal being put forward by the ad hoc

15   group.

16           The focus of discovery -- and we've had a chance

17   to talk with Mr. Shore since receiving the notices, at least

18   briefly, about this -- is set forth in the 30(b)(6) notice.

19   It's Topic 2, which is Exhibit A to our letter.  It's also

20   quoted in the letter the ad hoc group filed.  And what

21   they're after are communications the debtor may or may not

22   have had with other parties -- not the ad hoc group, other

23   parties -- about the ad hoc group's REIT-based proposal,

24   sent April 14th.

25           And they said -- in fact, they said in the letter

1      to Your Honor today -- that this is narrowly tailored to get

2      right at this.  And we've had a chance, again, today to talk

3      to Mr. Shore about what is it that they're concerned about,

4      what is -- being there's a practical way to resolve this, if

5      they think that the debtors have done something or said

6      something untoward.

7              And what they clarified for us is that they're

8      seeking, in particular, discovery into an alleged

9      conversation between Mr. Keglevic and a party that's an

10     actual or a potential bidder for Encore.  Now, we can't

11     reveal on the record, and I think the crux of our objection

12     is the ad hoc group, and other stakeholders for that matter,

13     shouldn't be entitled to either.

14             The ad hoc group, as I think Your Honor

15     appreciates, is a competing bidder for the Encore assets via

16     its REIT plan.  And the discovery they're seeking, to be

17     able to, in the midst of all this, haul Mr. Keglevic down in

18     front of a court reporter and examine him, and then cross-

19     examine him at the hearing on Monday, about discussions he

20     may or may not have had with other potential bidders and

21     plan competitors violates the confidentiality orders, I

22     think, that Your Honor approved in connection with the

23     Encore bidding process.

24             But more generally, to open this door would be

25     cancerous to the plan negotiation process overall.  And

1    we're just asking the Court to put a stop to it, because it

2    doesn't seek information, in our view, that goes to whether

3    a 120-day extension of exclusivity is appropriate here.  It

4    doesn't go to that at all.

5              And I think the objection filed by the ad hoc

6    group makes clear -- that is, the objection to the

7    exclusivity motion makes clear the degree of frustration

8    they have over the state of negotiations with the debtor in

9    particular over the Toggle proposal that Your Honor's heard

10   something about.  And so, clearly they're frustrated about

11   it.  They don't like it.

12             They're elevating it now in their objection to a

13   complaint that is impeding or undermining their proposal.

14   As we point out in our letter, they've said different things

15   outside the courtroom, but nonetheless it's a position

16   they're taking in Court.

17             And this is part and parcel of sort of bareknuckle

18   negotiation.  And if this kind of discovery is permitted

19   because they don't like the status of negotiations and they

20   want to advance it through the litigation process and say,

21   "Fine, we're going to take the man we're negotiating with

22   across the table and we're going to cross-examine him about

23   what he's said to other people," the effects of that, the

24   potential effects, the potential negative effects, I think,

25   are obvious.

1          I mean, how is it that we can conduct confidential

2     negotiations with parties almost all, if not all of whom,

3     are actual or potential Encore bidders who are competing

4     against, or may compete against, the proposal being put

5     forth by the ad hoc group?  If, at any moment, not just

6     today, not just Monday, but at any moment, we can get Mr.

7     Shore submitting deposition notices saying, "Now I want all

8     your emails and I want to ask you what you said to these

9     people," and if this is permitted, then he can go depose the

10    people sitting across the table from Mr. Keglevic.

11          And this raises another concern.  When we were in

12    Court in early May, debating whether we should -- whether

13    the Court should enter a confirmation discovery order, you

14    know, the ad hoc group took a very different position about

15    the utility of this very kind of litigation tactic.  And

16    we've quoted some of that on page four of our letter.

17          Then, negotiations were described as fragile by

18    the ad hoc group.  Then they told the court, you know, when

19    the -- and I'm just quoting -- "When you're at a place like

20    this in a case, the last thing you want to do is send people

21    off on a schedule that requires them to start deposing each

22    other."  Well, that was May 4th.

23          Now, the negotiations are continuing. And they

24    will continue.  There's no evidence here.  There's no

25    showing that the debtor has shut off anybody's proposal.  To

1    the contrary, we're open to all comers and want to keep it

2    that way.

3            This discovery is not seeking information relevant

4    to the exclusivity motion.  It is greatly detrimental to the

5    negotiating process.  And it is, I think, clearly, I would

6    submit, an effort by the ad hoc group to leverage their

7    position in these negotiations, which will continue to have

8    bumps in the road, which will continue to make different

9    parties, including the debtors, unhappy at times about the

10   status of things.

11           And the solution can't be, "I'll see you in Court.

12   I'm going to depose you about what you said to my

13   competitors in the bidding and negotiating process."  That

14   is unprecedented.  And we're just asking the Court to say no

15   here and not permit it.

16           THE COURT:  Thank you.

17           MR. SHORE:  Your Honor, Chris Shore.

18           THE COURT:  Go ahead.

19           MR. SHORE:  Sorry.

20           THE COURT:  Go ahead, sir.

21           MR. SHORE:  Sorry, Chris Shore.  Yeah, Chris Shore

22   from White & Case.  And thank you for having the conference.

23   Sorry for the delay in getting our letter.  I was actually

24   meeting with the mediator for the first time.

25           I'd like to clarify something before we talk.  As

1    I understand it, the only people on the phone are the

2    debtors, White & Case -- or Kirkland & Ellis, White & Case,

3    and the T-side committee.  Is anybody else on the phone?

4              THE COURT:  No, we have a list of five pages.

5              MR. MCGANN:  Your Honor?

6              THE COURT:  No need to speak.  We have at least

7    five pages of people on the phone, Mr. Shore.

8              MR. SHORE:  Okay.  Look, here's my problem.  The -

9    - you know, Mr. McGann wants to start out and accuse us of

10   trying to create problems.  We're in a terrible position

11   here, because what we're trying to do is get to the bottom

12   of a discussion that apparently -- well, admittedly occurred

13   between Mr. Keglevic and our potential plan sponsor on the

14   REIT side regarding our plan and why that party should stop

15   negotiating with us because of concerns about whether we

16   would ever fund and concerns about whether the debtors would

17   ever solicit a plan that they did with us, as a means to

18   force that party to become part of the debtors' plan.  In

19   other words, "Stop negotiating with them.  You better turn

20   your attention to us if you want to see the assets anytime

21   soon."

22             We found out about that conversation on Thursday.

23   Calls were immediately made to the debtors on Friday.  They

24   -- or Thursday night.  They said they would check into it.

25   They said a conversation had occurred, that there was a,

1    quote, "misunderstanding," and that it would be cleared up.

2           All I've been asking for is, if there are

3    documents relating to that, I want to see them.  And I want

4    Mr. Keglevic, who's their scheduled witness for the hearing

5    on Monday, prior to the hearing, to do exactly what Mr.

6    McGann -- to testify exactly as Mr. McGann said, that the

7    conversation was a misunderstanding, he never said that, he

8    didn't mean that, that's not the case.  It would resolve the

9    problem.

10           The debtors instead, after saying, "It was a

11   miscommunication; we'll clear it up," then took the position

12   that they would not produce him for a deposition and that he

13   was still going to appear.  They -- I don't think there's

14   any dispute, now that we've had our call, the discovery

15   sought is narrow.  We think it is relevant.

16           We laid out the authorities in our exclusivity

17   objection that a debtor can't -- it is not a level playing

18   field right now.  The debtor has the keys.  And if it

19   doesn't want to solicit a plan between now and their

20   requested extension through October and then into December,

21   anybody who wants to negotiate on an alternate plan is

22   benched for that period of time.  And it forces people to

23   negotiate on the debtor's plan, which is what both Congress

24   and the Third Circuit have said debtors should be using

25   exclusivity for.

1          The -- we had never received any written objection

2     to the discovery.  But Mr. McGann laid out some objections

3     in his letter to the Court and just now.  With respect to

4     the discovery, it's coming at a late date.  We just learned

5     of the conversations.  I don't know what else we can do.  If

6     he had the conversations this week, he had the conversations

7     this week.  It's not irrelevant, for the reasons I said.

8          It's not confidential.  The debtors -- I don't

9     know why they did it, but they chose to do it -- attached a

10    communication to the Court and filed on the docket an email

11    a month ago between Mr. Lauria and Mr. Kieselstein on the

12    Toggle issue, which is a plan negotiation, a nascent one at

13    that point, that was going on.  So, I don't know how the

14    debtors can claim that they had communications with somebody

15    else that that doesn't -- about our plan; that remains

16    confidential while ours doesn't.

17         And it's not prejudicial.  To be clear, we are not

18    a competing bidder.  The proposed plan would be to end the

19    auction because the E side gets taken out in full.  We --

20    the debtors know we're not a competing bidder.  We're not

21    trying to get involved in the bidding process.  We think

22    that -- for the reasons we said, we think the bidding

23    process is before, and we don't need to get into it.  The

24    bidding process is probably more divisive than anything

25    else.

1            But the one thing we're trying to get to the

2      bottom to -- and, quite frankly, a last-minute request for a

3      conference with the Court to quash the deposition of

4      somebody who is going to be in town on Sunday and is

5      available for a deposition on Sunday to clear the air and

6      state on the record that there was -- that he did not say

7      what was reported he said, and that of course the debtors

8      are, as Mr. McGann said, free to all comers.

9            Okay.  But we think it is relevant, and we think,

10     given, you know, the narrowing that's gone on, it is

11     appropriate discovery.

12            THE COURT:  Mr. --

13            MR. MCGANN:  May I respond, Your Honor?

14            THE COURT:  Yeah, Mr. McGann?

15            MR. MCGANN:  Okay, thank you, Your Honor.  Mr.

16     Kieselstein's on the phone.  This contretemps was raised by

17     Mr. Lauria with Mr. Kieselstein on May 19th, and Mr.

18     Kieselstein responded that night, not that there was a

19     misunderstanding, but that whatever was relayed to the ad

20     hoc group is something that was never said.  There's no

21     misunderstanding on Mr. Keglevic's part at all.

22            But this is -- because it's narrow, because Mr.

23     Keglevic's going to be in Wilmington -- he's a declarant on

24     the status of the case, as Your Honor may or may not have

25     seen by this point, but he submitted a declaration in

1    connection with the exclusivity motion, simply reporting on

2    the factual basis of the status of the case -- he'll be at

3    the hearing.

4           But the fact that they've narrowed the request or

5    he's going to be in Wilmington doesn't make this discovery

6    appropriate.  It's not relevant at all to whether

7    exclusivity should be extended or by what number of days or

8    weeks or months.  There's been no showing that it is.

9           But the -- what Mr. Shore can't sell is the

10   chilling effect that this kind of conduct has.  He says, "I

11   hear a rumor or report that something happened that I'm

12   unhappy with in connection with my negotiation, and, to

13   prove the negative, I get to summon executives from the

14   debtors to sit under oath and deny things."

15          Well, the debtors are conducting, as I'm sure Your

16   Honor appreciates, negotiations with a large number of

17   parties.  And if he's referring to a potential plan sponsor

18   that may work with or independently of the ad hoc group's

19   proposal, how in the world is the debtor not supposed to be

20   talking to them about the pluses and minuses of various plan

21   alternatives and impediments and challenges and

22   inefficiencies and whatever else may play into the competing

23   proposals?

24          And for Mr. Shore to say that we're not a

25   competing bidder is not really sensible.  They may not want

1    to be submitting a bid through the Court-approved auction

2    process, if they so desire to go that route.  But they're

3    proposing a plan that is an alternative to bids that are

4    being made in that process.  So, they are a competing party,

5    proposing a different economic result here than other

6    parties, including the one they're seeking to get discovery

7    of with regard to confidential discussions.

8              So, regardless of how narrow they make it, we're

9    getting into something that they're -- and I think it's

10   clear from Mr. Shore's comments.  They want to leverage

11   their position in the negotiations by saying that, if

12   anything else happens by the debtors, if anything else

13   happens that we're unhappy with in these negotiations, next

14   week, a month from now, we'll threaten to -- again, we'll

15   threaten, as they've done in their objection here, to move

16   to terminate exclusivity and issue deposition notices.

17             That's a precedent get set here.  "If we don't

18   like it, we hear a rumor, you're going to show up and deny

19   it under oath."  We just can't go down that path.  It is not

20   how these negotiations should work.  People are going to say

21   things; whether the rumor they heard is true or not, we

22   heard it from them; we checked with the source; it's not

23   true.  We ought to move on.

24             There's been no showing here that anybody -- the

25   unnamed potential plan sponsor, who should remain unnamed,

1    that Mr. Shore's referring to; Mr. Shore's group; other

2    groups -- nobody's been shut off.  The negotiations -- even

3    with this ugliness, the negotiations over the ad hoc group's

4    proposal continue.  And they will continue.

5            So, no potential bidder, competitor, or

6    alternative plan -- there's been no showing that anybody's

7    not welcome to have discussions and come forward and be

8    listened to by the debtor and responded to, none of that.

9    So, we really urge the Court to shut off this discovery for

10   these reasons.

11           MR. MILLER:  Your Honor, this is Brett Miller on

12   behalf of the T-side committee, from Morrison & Foerster.

13   In our papers, we make the point that we need to move this

14   process forward.  And the request at hand might be a little

15   too long.  And we've suggested in our papers, as well as in

16   discussions with the various parties, that there's no reason

17   why the June 1st hearing couldn't be put off to the next

18   date, through a bridge order.

19           I think this is a perfect reason why we really

20   need to focus on that and reschedule this hearing for some

21   time -- I think July -- June 25th is the next hearing

22   afterwards, because we're now operating in a vacuum where we

23   don't know what Mr. Keglevic said.

24           And even though it's being stated now on the

25   record that he didn't have this conversation, well, if it

1    wasn't for that, rushing to have a deposition on Sunday

2    night, which would be a very awkward deposition in terms of

3    how that will play out on Monday on the record, talking

4    about an unnamed -- a conversation with an unnamed sponsor,

5    I just would make the request to Your Honor, to the debtors,

6    and to all of the other parties that we seek a short

7    adjournment of this hearing to straighten out what was said

8    to whom and set some ground rules for going forward, so we

9    don't end up, like Mr. McGann said, (indiscernible) back to

10   Your Honor (indiscernible).

11            THE COURT:  All right.  Well, that's an issue that

12   the parties can discuss offline from me, and certainly can

13   raise in Court on the first.  I don't want to get -- and I

14   certainly understand the point of raising it in the context

15   of what we're talking about right now, but I don't want to

16   lose focus on the issue that actually is before me.  So, I

17   offer no --

18            MR. SHORE:  Your Honor?

19            THE COURT:  I offer no -- you know, no position on

20   whether there should be a continuance or not.  But I'm

21   certainly going to listen to anything that's presented to me

22   by consent, and I'll listen to arguments that include

23   arguments that a continuance might be appropriate in the

24   context of whether the motion should or shouldn't be granted

25   when I hear the motion on the first.  Mr. Shore?

1           MR. SHORE:  Yeah, just quickly two points, Your

2    Honor.  First, with respect to Mr. McGann's slippery slope

3    point that, if we open this up, then anybody can come back,

4    he's not focusing on what we have in front of us.  Mr.

5    Keglevic is a declarant for Monday.  In his declaration, in

6    paragraph 3 and in other places, he says the debtors will

7    continue to explore these alternatives with all interested

8    parties and creditor constituencies.

9           He's put the issue on the table, along with the

10   debtors in their papers, that they are open to all comers.

11   If I get information I in good faith believe that that's

12   actually not what they're doing, I don't see why we get

13   forestalled from doing it.  It doesn't open up the door for

14   everybody else.  It just means, if the debtors are going to

15   make representations to the Court, it better be true.

16          Second, with respect to the bidder piece, there's

17   a huge distinction between what the debtors are trying to do

18   with the bid process and what we're trying to do.  What the

19   debtors are trying to do is address the issue of Encore

20   through the votes of board members.  This is our bid; we

21   will accept this bid.

22          Our plan isn't that at all. Our plan is one of

23   just creditor suffrage.  That is, if we can put together a

24   deal that all of the creditors can agree on -- and we do

25   believe that, with a level playing field, we can get to that

Page 22

1    kind of deal -- it's kind of irrelevant what the boards want

2    to do at that point.  They've got $45 billion of debt that

3    they borrowed and they have to listen to their creditors

4    with respect to that.

5           So, it's not fair to say we are like a bidder.

6    We're not like a bidder at all.  We're a potential plan

7    proponent who is feeling, at this point, and perhaps

8    justifiably so, that the debtors are using the threat of six

9    months more of exclusivity to quell the creditor suffrage.

10          THE COURT:  Okay.  Mr. McGann, any final words?

11          MR. MCGANN:  Yeah.  One last thing, Your Honor.

12   Mr. Shore -- I didn't -- neglected to mention Mr. Shore

13   raised the complaint about the email we attached to the

14   letter in the -- from Mr. Lauria that expressed a different

15   view about the debtors' negotiating position on the Toggle

16   than the ad hoc group -- the way they characterized it in

17   their objection to the exclusivity motion.

18          It's simply the door they opened.  They can't go

19   in and file in the open court record characterizing the

20   negotiations and calling that particular feature part and

21   parcel of the debtors' efforts to wrongfully undermine their

22   plan proposal when it's directly contradicted by what

23   they're saying outside the courtroom.  And we would not have

24   done that but for the fact that we ought to be able to

25   protect our position on something like that.

1           But the slippery slope remains true and vivid

2    here, despite what Mr. Shore says.  There's going to be no

3    end to this if discussions and negotiations go in a

4    direction that makes a party unhappy, if they get to force--

5           THE COURT:  Okay.

6           MR. MCGANN:  Debtors' representatives to show up

7    and deny it.

8           THE COURT:  All right.  I am going to grant the

9    debtors' request, quash the deposition notices, and not

10   require the production of the documents.  I have concerns

11   about the slippery slope, as Mr. McGann has put it out.

12           I don't believe that, even though the debtors have

13   made certain representations in the declaration of Mr.

14   Keglevic about what they're willing to do, that getting into

15   this type of really sort of -- and, again, slippery slope is

16   a way to describe it, slippery slope of, you know, he

17   said/she said, if things might not be going the way people

18   think they should be going, is counterproductive to

19   negotiations and counterproductive to trying to reach a

20   consensus here, albeit it may be very, very difficult to

21   reach, and certainly inconsistent with the idea that the

22   debtors still have the exclusive right to propose and

23   solicit acceptances on plans of reorganization and that what

24   we should be focused on is whether that exclusivity right or

25   period should be extended.

1          One of the factors, if not -- but not certainly

2      the sole factor, there may be some bare relevance to what's

3      been put in front of me to that issue.  But it's just one

4      piece of a larger puzzle.  And the downside and negative

5      effects outweigh whatever bare relevance there could be in

6      connection with seeking that kind of discovery.

7          So, for those reasons, I will not allow the

8      discovery to go forward.  And we'll have a hearing on June

9      1st.  And I will deal with, you know, the thorny issue of

10     whether or not that is relevant for purposes of the actual

11     hearing on the 1st.

12          But, for the reasons I've already stated in

13     connection with the discovery, I'm not going to be inclined

14     -- at least as an initial matter as I sit here today, I'm

15     not inclined to allow exploration of that on the record at

16     the hearing, certainly not at the public hearing. But I'll

17     deal with that more fulsomely, if necessary, on June 1st.

18          MR. MCGANN:  Thank you.

19          THE COURT:  Okay?

20          MR. SHORE:  Thank you, Your Honor.

21          MR. MCGANN:  Thank you.

22          THE COURT:  You're welcome.  Thank you for making

23     yourself available, and I'll see you on June 1.  We're

24     adjourned.

25          MR. MILLER:  Thank you, Your Honor.

1          THE COURT:   Whew.   Nothing easy in this case.

2

3

4

5

6

7

8

9

10

11

12                              *  *  *  *  *

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 26

C E R T I F I C A T I O N

I, Sonya Ledanski Hyde, certified that the foregoing

transcript is a true and accurate record of the proceedings.

Sonya
Ledanski Hyde

Digitally signed by Sonya Ledanski
Hyde
DN: cn=Sonya Ledanski Hyde, o, ou,
email=digital1@veritext.com, c=US
Date: 2015.05.29 16:52:22 -04'00'

Sonya Ledanski Hyde

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501

Date:  May 29, 2015