1   UNITED STATES BANKRUPTCY COURT

2   DISTRICT OF DELAWARE

3

4   In re:                          :
                                    :    Chapter 11
5   ENERGY FUTURE HOLDINGS          :
    CORP., et al.,                  :    Case No. 14-10979(CSS)
6                                   :
              Debtors.             :    (Jointly Administered)
7   _____   :
    DELAWARE TRUST COMPANY as       :
8   INDENTURE TURSTEE,              :
                                    :
9           Plaintiff,              :
                                    :    Adversary Proceeding
10      v.                          :    No. 14-50363(CSS)
                                    :
11  ENERGY FUTURE INTERMEDIATE      :
    HOLDING COMPANY LLY and         :
12  EFIH FINANCE INC.,              :
                                    :
13          Defendants.             :
    _____:

14

15

16

17                          United States Bankruptcy Court

18                          824 North Market Street

19                          Wilmington, Delaware

20

21

22                          June 1, 2015

23                          10:45 AM

24

25

1    B E F O R E :

2    HON CHRISTOPHER S. SONTCHI

3    U.S. BANKRUPTCY JUDGE

4

5    ECR OPERATOR:   AL LUGANO

6

7

8    HEARING re Third Motion of Energy Future Holdings Corp., et

9    al., for Entry of an Order Extending the Debtors' Exclusive

10   Periods to File a Chapter 11 Plan and Solicit Acceptances

11   Thereof Pursuant to Section 1121 of the Bankruptcy Code

12   [D.I. 4441; filed May 11, 2015]

13

14

15

16

17

18

19

20

21

22

23

24   Transcribed by:  Dawn South, Lisa Beck, Linda S. Foley, and

25   Pamela A. Skaw

```
 1   A P P E A R A N C E S :

 2   KIRKLAND & ELLIS

 3        Attorney for the Debtors

 4

 5   BY:  EDWARD SASSOWER, ESQ.

 6        ANDY MCGANN, ESQ.

 7        MARC KIESELSTEIN, ESQ.

 8

 9   RICHARDS, LAYTON & FINGER

10        Attorneys for the Debtors

11

12   BY:  DANIEL DEFRANCESCHI, ESQ.

13        JASON MADRON, ESQ.

14

15   BAYARD

16        Attorney for IT for TCEH First Lien

17

18   BY:  TINA MOSS, ESQ.

19

20   KLEHR HARRISON HARVY BRANZBURG LLP

21        Attorney for UMB Bank

22

23   BY:  RAYMOND H. LEMISCH, ESQ.

24

25
```

Page 4

1    POTTER ANDERSON CARROON LLP

2        Attorney for Deutsche Bank New York

3

4    BY:  R. STEPHEN MCNEILL, ESQ.

5

6    CROSS & SIMON

7        Attorney for Fidelity

8

9    BY:  MICHAEK JOYCE, ESQ.

10

11   VENABLE

12       Attorneys for PIMCO

13

14   BY:  JEFFREY S. SABIN, ESQ.

15       JAMES EDMONSON, ESQ.

16

17   POLSINELLI

18       Attorneys for TCEH Committee

19

20   BY:  CHRIS WARD, ESQ.

21       JUSTIN EDELSON, ESQ.

22

23

24

25

1    MORRISON & FOESTER

2        Attorneys for TCEH Committee

3

4    BY:  BRETT MILLER, ESQ.

5        TODD GOREN, ESQ.

6        DAN HARRIS, ESQ.

7

8    MUNGER, TOLLES & OLSON

9        Attorney for TCEH Disinterested Manager

10

11   BY:  THOMAS WALPER, ESQ.

12

13   O'KELLY ERNST & BIELLI, LLC

14       Attorney for EFH Corp.

15

16   BY:  SHANNON J. DOUGHERTY, ESQ.

17

18   PAUL, WEISS, RIFKIND, WHARTON & GARRISON

19       Attorneys for the Ad Hoc Committee of TCEH First Lien

20       Creditors

21

22   BY:  ALAN KORNBERG, ESQ.

23       BRIAN HERMANN, ESQ.

24       JACOB ADLERSTEIN, ESQ.

25

1   YOUNG CONAWAY STARGATT & TAYLOR, LLP

2        Attorney for the Ad Hoc Committee of TCEH First Lien

3        Creditors

4

5   BY:  PAULINE MORGAN, ESQ.

6

7   PACHULSKI STANG ZIEHL & JONES

8        Attorney for EFIH Second Lien Indenture Trustee

9

10  BY:  LAURA DAVIS JONES, ESQ.

11

12  BROWN RUDNICK LLP

13       Attorney for WSFS

14

15  BY:  JEFFREY JONAS, ESQ.

16

17  KRAMER LEVIN NAFTALIS & FRANKEL

18       Attorneys for EFIH Second Lien Indenture Trustee

19

20  BY:  JOSHUA BRODY, ESQ.

21       JENNIFER SHARRET, ESQ.

22

23  PATTERSON BELKNAP WEBB & TYLER

24

25  BY:  DANIEL LOWENTHAL, ESQ.

Page 7

1    DRINKER BRIDDLE & ROTH

2         Attorney fir Citibank DIP Agent

3

4    BY:  HOWARD A. COHEN, ESQ.

5

6    SULLIVAN & CROMWELL

7         Attorney for E Side Committee

8

9    BY:  BRIAN GLUECKSTEIN, ESQ.

10

11   NIXON PEABODY

12        Attorney for American Steel Transfer

13

14   BY:  RICHARD PEDONE, ESQ.

15

16   REED SMITH LLP

17        Attorney for BNYM Indenture Trustee

18

19   BY:  KIMBERLY E.C. LAWSON, ESQ.

20

21   MORRIS JAMES

22

23   BY:  STEVE MILLER, ESQ.

24

25

1   SEWARD & KISSEL

2        Attorneys for Wilmington Trust as TECH First Line

3        Agent

4

5   BY:   ARLENE ACRES, ESQ.

6        MARK KOTWICK, ESQ.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2              THE CLERK:  All rise.

 3              THE COURT:  Please be seated.

 4              MR. SASSOWER:  Good morning, Your Honor.

 5              THE COURT:  Good morning.

 6              MR. SASSOWER:  For the record Edward Sassower of

 7    Kirkland & Ellis on behalf of the debtors.

 8              Your Honor, the only item on the agenda today is

 9    exclusivity, and since the status of the case is part and

10    parcel of the exclusivity argument we're going to dispense

11    of the status conference -- or status report and move

12    straight into the exclusivity argument, if that's okay with

13    Your Honor.

14              THE COURT:  That's fine.

15              MR. SASSOWER:  Okay.  So, I'll yield my podium to

16    my partner, Mr. Kieselstein.

17              MR KIESELSTEIN:  Good morning, Your Honor.

18              THE COURT:  Good morning.

19              MR KIESELSTEIN:  Marc Kieselstein, Kirkland &

20    Ellis LLP on behalf of the debtors.

21              Your Honor, as Mr. Sassower noted, the agenda

22    today is mercifully brief, even though the courtroom seems

23    to be full as usual.

24              THE COURT:  Well, I'm sure it'll be a brief

25    hearing then.
```

1          (Laughter)

2              MR KIESELSTEIN:  Let us hope, Your Honor.

3              Your Honor, this is the debtors motion for a third

4      extension of exclusivity to file and solicit acceptances on

5      a plan of reorganization.  The extension seeks the balance

6      of statutory exclusivity through October 29th and

7      December 29th respectively.

8              Your Honor, we filed the declaration of

9      Mr. Keglevic, who you know, in support of the motion, he is

10     in the courtroom today and available to testify if need be.

11             Your Honor, there were a number of objections

12     filed to the motion and two statements in support, and I

13     will address all of those shortly.

14             Significantly, Your Honor, none of the objections

15     ask that exclusivity lapse outright on June 23rd as it is

16     currently slated to do, rather objectors have asked for

17     miniaturized extensions of varying lengths of exclusively,

18     and I'll address the proposed rationing of exclusivity

19     shortly and why we think that's a bad idea.

20             But before I do that, Your Honor, I'd like to take

21     a step back and spend a minute or two talking about first

22     principals, the purpose of and the policy behind

23     exclusivity.

24             Now, Your Honor, Congress incorporated exclusivity

25     into the Bankrupt Code to create a powerful dynamic, one

1    where for at least some period of time plan negotiations

2    would be refracted through a single prism, that is the

3    debtor's view of what constitutes a fair value maximizing

4    plan of reorganization, and parties in interest would have

5    no choice but to attempt to coalesce around and negotiate

6    about the debtor's vision as to what that plan ought to look

7    like.  And in doing so Congress expressed a clear preference

8    for that construct over one where any party in interest

9    could remain in its neutral corner working up its own

10   idiosyncratic construct for how a case somehow resolved, and

11   in doing so Congress rejected the unfettered, open air,

12   bazaar -- bizarre I should say -- approach to exclusivity at

13   least for some period of time.

14           And, Your Honor, that makes perfect sense from a

15   policy perspective for many reasons, but I'm going to

16   mention just two.

17           First, Your Honor, Chapter 11 debtors are the only

18   fiduciaries to the estate writ large as opposed to the

19   understandably and unavoidably narrow agendas of specific

20   creditors who have duties to be sure, but only to their

21   institutions, their investors, their limited partners.

22           Under our system Chapter 11 debtors are presumed

23   to be attentive to and fully capable of discharging their

24   fiduciary duties in the broadest sense of the word.

25           Second and relatedly, Your Honor, in a case as

1    outsized as this one there are many, many parties with

2    claims in the tens of millions, hundreds of millions, and

3    billions of dollars who certainly would have the resources

4    if they had the latitude to seek to advance plans of their

5    own creation.

6            Under each of those scenarios, Your Honor, and

7    certainly in the scenario of our case, not everyone would

8    file a plan, we understand that, no one is saying that, but

9    one could easily envision, and we certainly heard a half

10   dozen or more potential plan constructs that people could

11   assert on their own.  And while all of the objectors here

12   purport to dislike our plan, from what we've heard they

13   dislike each others' plans that much more, which is why the

14   legislative history, Your Honor, made clear, and I'm

15   quoting, "If any unusually large company were to seek

16   reorganization," close quote, it goes onto talk about

17   further extensions being appropriate.

18           And I won't belabor the point, but obviously EFH

19   is certainly an unusually large company seeking

20   reorganization.  We've all talked about size and complexity,

21   it's undisputed.

22           Here, Your Honor, the cross fire among

23   diametrically opposed, narrowly drawn plans would be

24   withering, again, highlighting Congress's wisdom enforcing

25   parties to gather around a single table.

1          Now to be clear, Your Honor, exclusivity

2     extensions are a privilege, not a right, and they have to be

3     earned by a debtor.  If a debtor has abused the privilege of

4     exclusivity it can forfeit the right to further extensions,

5     and that's appropriate too, because we acknowledge, as we

6     must, that exclusivity empowers the debtor and constrains

7     everybody else.

8          So if a debtor has exploited the advantage by

9     refusing to engage with its stakeholders or by failure to

10    advance the case generally when it could reasonably do so

11    then it has not earned further extensions.  It has not, to

12    use the statutory language, demonstrated cause.

13          Fortunately, Your Honor, the facts of this case

14    demonstrate overwhelmingly that this debtor has been a

15    diligent steward of its exclusivity and has made very

16    significant progress, particularly in recent months.

17          Now Your Honor noted at the end of our telephonic

18    hearing last Thursday that, quote, "Nothing in this case is

19    easy," close quote, and indeed truer words may never have

20    been spoken, but it's our view that this motion is the

21    exception to that rule.

22          We think, all due respect to the objecting

23    creditors, that the debtors' conduct makes this an easy

24    call, and in reinforcing that statement I want to focus on

25    where we were on February 10 when we were last before Your

1  Honor seeking an exclusivity extension, by the way, one of

2  similar length to what we seek today, four months, and I

3  want to focus on what's been accomplished in that time.

4       Let's start with plan and disclosure statement.

5  Where were we on February 10th?  Well as of February 10th

6  the debtors' chief restructuring officers had circulated a

7  preliminary term sheet without any numbers.  That term sheet

8  did not reflect input from the disinterested directors, that

9  term sheet did not reflect substantive buy in from any of

10  the debtors' boards, that was an authorized trial balloon

11  conceptual in nature.

12       Where are we today?  Well obviously since

13  February 10 numerous iterations of that term sheet were

14  circulated, each one more refined and developed than the one

15  before, those were on March 9th, March 27th, and April 3rd,

16  those circulations also included drafts of the disclosure

17  statement, and the draft scheduling timeline we spoke about

18  last month, and all of that was filed on April 14th.

19       Subsequent to that Your Honor entered the

20  scheduling order as to the disclosure statement as well as

21  at least tentatively reserving dates towards the ends of the

22  year for a potential confirmation hearing.

23       Where were we on the disinterested directors

24  settlement on February 10th?  At that point the

25  disinterested directors, along with their advisors, were in

1    the throws of conducting intensive diligence into the

2    intercompany claims in this case, negotiations had not yet

3    commenced in earnest.

4          What has happened since?  Well the disinterested

5    directors and their advisors engaged in intensive one on

6    one, one on two, two on one negotiations around that three-

7    sided table and ultimately reached a settlement, a

8    comprehensive one, of all intercompany claims.  That was of

9    course incorporated into the plan that was filed on

10   April 14th, and is a central component of that plan of

11   reorganization.

12         Where were we on plan mediation on February 10th?

13   Well plan mediation was not even a gleam in anyone's eye as

14   of that date.  All that's happened on the mediation front

15   has happened since with the negotiation of the stipulation

16   that Your Honor ordered -- entered rather -- several weeks

17   back, the mediator, Mr. Barowitz (ph), has been appointed,

18   he has met with I think virtually all the significant

19   stakeholders on the T side, and as Your Honor knows the

20   mediation for the time being at least is T sides focused, he

21   has gone on what he's referred to us as a listening tour to

22   get everyone's perspective and points of view, and he will

23   proceed forward as he sees fit.  But I think it's fair to

24   say that the mediation process in full swing.

25         Where are we on alternative plan proposals?  Well,

1  Your Honor, we've talked a great deal about our discussions

2  with the TCH unsecured ad hoc group about a reconversion

3  plan.  Now back on February 10th there was no such plan, at

4  least not one that we were aware of or that had been

5  discussed with us.  In fact what we were talking about,

6  without getting into substance with the T unsecureds, were

7  various non-consensual type plans on the T side.

8         What has happened sense?  Your Honor, we have

9  engaged and deployed massive resources to facilitate the TCH

10  unsecured efforts, including providing diligence on tax,

11  real estate, and other matters, further educating the TCH

12  unsecured on the prospects of a conversion, we've

13  participated in many meetings, we have facilitated many

14  other meetings between the TCH unsecured and Oncor

15  management, as well as potential REIT sponsors, Your Honor,

16  and that cooperation continues through this day.

17         Now we know there's obviously been much written

18  about whether we're simply cooperating to the face of the

19  TCH unsecureds, but are truly engaged in some sort soft

20  double game where we're privately denigrating and trying to

21  diminish the prospects for that plan coming to fruition,

22  and, Your Honor, it's simply not so, and you'll hear no

23  evidence to that effect.

24         As I said at the last hearing, any sane person

25  would fervently desire that that plan actually work because

1   it solves a lot of issues on both sides of the capital

2   structure.  That was true then, it was true now, the fact

3   that we are in discussions and debates about various points

4   about the proposal, the toggle, this and that, I think is

5   not an indication of our lack of seriousness about this

6   proposal, but quite the opposite.

7         But that's not the only alternative plan structure

8   that's been discussed.  As was noted in the reply brief we

9   filed Friday as well as the statements of support that were

10  filed by Fidelity and the ad hoc group of E side second lien

11  holders, Your Honor, those constituencies at least have

12  indicated a willingness to embrace key aspects of the

13  debtors' plan, assuming we work out a number of other issues

14  with them, and to be clear those issues are in process, they

15  have not been worked out as of yet, we're hopeful they will

16  be.

17        But again, to the extent that, you know, part of

18  the reasons people have suggested is everybody hates our

19  plan and haters are going to hate, I think in fact we've

20  moved past that, Your Honor, and we in fact are garnering

21  support, at least the road to support for key elements of

22  our plan.

23        Your Honor, obviously there are other things going

24  on in the case on which we have made very substantial

25  progress.  On the Oncor sale process where were we on

1   February 10?  Well the ink was barely dry on the bidding

2   procedures order and continuing marketing efforts were under

3   way and the formal stalking horse process had really not

4   gotten going.

5             Where are we now?  Well since Feb 10 we have

6   received and evaluated and assessed both first and second

7   round bids, there have been continuing diligence sessions,

8   intensive negotiations with the bidders regarding deal

9   terms, as well as definitive documentation.  Those efforts

10  are ongoing and continual, and I would say, Your Honor, that

11  we anticipate filing a motion seeking approval of a stacking

12  horse in the next several weeks.  Excuse me, Your Honor.

13            And as Your Honor knows dates have been put in the

14  calendar for a stalking horse hearing in mid July.

15            What about make-wholes?  Those are an important

16  part of the defining the allowed claim universe on the E

17  side in these cases and it is related to many aspects of

18  plan recoveries, distribution and structures.  We have made

19  considerable process since Feb 10 on those as well.

20            On the EFIH first lien settlement on February 10

21  the district court had not yet ruled on the viability of

22  that settlement.  They have since issued that ruling with

23  respect to those who settled in connection with the RSA.

24            With regard to those who hadn't settled and with

25  whom we have been litigating as of Feb 10 the Court had

1    scheduled a trial on the EFIH first lien make whole claims,

2    but since then, as Your Honor is well aware, you granted the

3    debtors' motion for summary judgment in large part except

4    with respect to the issues related to the automatic stay.  A

5    trial was scheduled on that, discovery was obtained, and

6    that trial was held in late April, and facts -- proposed

7    findings of fact and conclusions of law were submitted to

8    Your Honor a couple of weeks back.

9         With regard to the PICs as of Feb 10 there had not

10   yet been motion practice on that litigation, but as Your

11   Honor knows the arguments on the motion to dismiss were

12   heard several weeks back.  So we are moving that important

13   piece of the case ahead as quickly as we can.

14        Obviously other important things have occurred,

15   including the pay down of the second lien notes by

16   $750 million, a variety of other initiatives.

17        Your Honor, I went through that update and

18   apologize for the length of it because I wanted to

19   demonstrate what the debtor has done with the gift of the

20   four months of exclusivity that Your Honor was good enough

21   to give us, and I think that can be summarized in a few

22   words.  Progress, momentum, focus, and engagement.  And

23   again, all of that occurred under the protective umbrella of

24   a four-month exclusivity extension, and those points are not

25   related.

1            Which leads me to the next issue I want to

2    discuss, and that is the 31 flavors of short-term extensions

3    that various objectors have proposed.  I'll try to capture

4    them all, Your Honor, but I think they range from a mere

5    continuance of this hearing through 6/25, which is

6    essentially a two-day bridge order extension of exclusivity,

7    an extension through the July 9th standing hearing, an

8    extension through the July 20th disclosure statement

9    hearing, which corresponds to the slated initial end of the

10    mediation process, and then extension to two months rather

11    than four months.  I think that's the full spectrum that

12    we've encountered.

13            And, Your Honor, it's our very strong view that

14    those proposals fundamentally misapprehend the value of

15    exclusivity, which is a meaningful opportunity for parties

16    to focus and negotiate around the debtors' plan without the

17    ability to simply wait out the next exclusivity slice and

18    gives the debtor freedom from having to start thinking about

19    and drafting its next exclusivity motion while arguments

20    over the last one are still ringing in peoples' ears.

21            And I think the T committee to a certain extent

22    acknowledged this point when they suggested that an

23    extension that would end before July 20th was a bad idea

24    because that would distract folks from fully engaging in the

25    mediation process.  And we think that point is true, but

1    doesn't go far enough.  We think in the absence of the full

2    exclusivity extension people will be disengaged and

3    distracted from fully focusing on the debtors' plan.

4              And of course it's crucial to remember, Your

5    Honor, that in a large case such as this nothing is

6    perfectly linear or even remotely linear it seems.  If every

7    set back or temporary impasse or business or legal

8    disagreement becomes a factoid in a constant series of

9    battles about short exclusivity extensions, the statutory

10   time remaining will not be used to maximum effect, and in

11   fact will be largely subverted by again this chronic

12   battling over what remains of exclusivity.

13             And of course, Your Honor, one last point, we're

14   asking for the balance of exclusivity.  Come the end of

15   October and the end of December exclusivity will lapse no

16   matter how far we advance our process, and there is nothing

17   the debtor nor respectfully that the Court can do about

18   that, and that makes this extension all the more important

19   in our view, and we think it's abundantly clear that these

20   estates have and these debtors have clearly earned the last

21   full measure of exclusivity.

22             And finally, Your Honor, I want to wrap up by

23   speaking just a bit about some of the particular arguments

24   that were made at least in a couple of the objections that

25   question whether in fact we've actually demonstrated cause.

1     And let me start with the unsecured ad hoc group.

2              They've suggested that the debtors are using

3     exclusivity to force their plan on creditors without giving

4     alternatives an opportunity to blossom.  I won't repeat what

5     I said, but our conduct suggests otherwise.  We in fact have

6     been fully engaged with the unsecured ad hocs about their

7     plan alternative, I won't repeat all the diligence we've

8     engaged in, all the meetings we've facilitated.  I would

9     note the TCH committee acknowledges the debtors' cooperative

10    efforts to date on exploring the REIT option, and again,

11    even the ad hoc committee acknowledges that to their face

12    and from all facial appearances we are fully cooperating,

13    only we may have some secret agenda with other parties on

14    the back end to denigrate the process.  It's simply not so.

15    And there are other objections that they've made along those

16    lines.

17              I want to just stop for one second on the argument

18    that they make about our insistence on the toggle, you've

19    heard much about that.  I don't think it's fair to

20    characterize a position a debtor has taken that there needs

21    to be a fall back plan if this high risk, high reward plan

22    is pursued, that there be something that doesn't leave the

23    debtor 12 or 15 months from now exactly where it is in terms

24    of unresolved litigation and the like.

25              We've been steadfast on that point from the very

1    start, I don't think that means we're trying to kill their

2    plan, we actually want it to be workable.  I certainly don't

3    think it translates into any basis to not afford additional

4    exclusivity as we have requested.

5         With regard to the EFH committee, Your Honor, and

6    it was a little difficult to follow some of their

7    objections, but they've said a few things.

8         One, that they can't evaluate how their

9    constituencies will fair under our plan without access to

10   Oncor bid information or participation in the T side plan

11   mediation.  And, Your Honor, those asks having asked and

12   answered.  They've in a number of context requested that

13   their principals be allowed into the sale process, and Your

14   Honor you've I think suggested that that would be dangerous

15   and we agree.  Also with respect to expanding the mediation

16   at this point to include the EFH committee that was also

17   requested and again ultimately that will be up to the

18   mediator, but for now I think you've said, and we agree, it

19   makes sense to have to focus be on the T side.  In any event

20   I don't think any of that really bears on exclusivity.

21        They said a couple of other things, Your Honor.

22   First they've said that all E side creditor constituency

23   agree that a rapid sale of Oncor is in the best interest of

24   the E side estates, and I don't actually think a rapid sale,

25   I mean everyone wants to move quickly, but I don't think our

1   plan as constituted actually is antithetical to that,

2   moreover what Fidelity and the second liens have said is

3   they're not in any rush for there to be a sale of Oncor to a

4   third-party purchaser in any event, so I think that

5   undercuts the suggestion of unanimity on the E side along

6   those lines.

7           Finally they've said the debtors are moving to

8   jointly reorganize the E and the T sides on the basis of

9   flawed premises.  The existence of intercompany claims being

10  one and tax consequences of deconsolidation being the other.

11          The only thing I can say on those, Your Honor, is

12  obviously the disinterested directors and their advisors are

13  keenly aware of all of those issues, they have obviously

14  negotiated the settlement they negotiated, which doesn't

15  suggest the T side claims are worthless, moreover, they are

16  fully cognizant of the tax issues, and I'll just say we

17  think there's significant tax risk in what the E side

18  suggests and the disinterested directors, advisors,

19  Proskauer, among them, I think have seen what we filed and

20  had they agree with what we have filed.  So, I just don't

21  think that holds any water.

22          And so, Your Honor, the only other objection I'll

23  just touch on is really a statement was from the first liens

24  who only want the back end date extended, the solicitation

25  date rather than the filing date.  And our view on that is

1    we don't want to be caught in a situation where our plan is

2    significantly amended as it may well be through negotiations

3    and someone argues that that's a new plan and therefore

4    we've blown our date.  In Caesars just a few days ago that

5    was dealt with by extending both dates to avoid that

6    argument, and we think that's appropriate here.

7              Finally, Your Honor, the last thing I want to say,

8    because it's an important point, is that these short

9    extensions of exclusivity we think have significant risk of

10   endangering our sale process, our bidders have been quite

11   patient, they've been dealing with us than the debtor,

12   because they view us as more or less in control of the case,

13   at least for the period that we can be fully in control of

14   the case, and I think these deli thin slices of exclusivity

15   are going to underscore or undercut their confidence in our

16   ability to deliver what we would hope to deliver.

17             So, Your Honor, for all those reasons we would ask

18   that the objections be overruled and that our relief as

19   requested be granted.

20             Your Honor, at this time I did want to offer

21   Mr. Keglevic's declaration into evidence, and again, he's

22   available should anyone want to cross-examine him.

23             THE COURT:  Is there any objection to the

24   admission of the declaration?

25             UNIDENTIFIED SPEAKER:  No, Your Honor.

1              THE COURT:  Okay.  The --

2              MR KIESELSTEIN:  Would you like it handed up, Your

3     Honor?

4              THE COURT:  Yes.  This is what was in the binder,

5     correct?

6              MR KIESELSTEIN:  Yes.

7              THE COURT:  All right.  It's admitted without

8     objection.

9         (Debtors' Exhibit was admitted)

10             MR. BRODY:  Good morning, Your Honor, Josh Brody

11    from Kramer Levin on behalf of the EFIH second lien

12    indenture trustee.

13             I think it makes sense that given we support the

14    motion to go now before the objectors did.

15             THE COURT:  Okay.

16             MR. BRODY:  So as Your Honor -- as Mr. Kieselstein

17    mentioned, as I hope Your Honor has seen, we filed a

18    statement in support of the debtors' request --

19             THE COURT:  Yes.

20             MR. BRODY:  -- to extend exclusivity to the end of

21    the statutory period, and I think, you know, pretty

22    straightforward the reason we filed the statement of support

23    is we agree with the debtors that -- and frankly I think we

24    agree with everybody in the courtroom -- that the cases

25    right now are at a pretty critical juncture, and so with

1     that in mind we think it makes sense to give the debtors the

2     fuller extension to the end of the statutory period instead

3     of having shorter ones along the way.

4          And I think all -- you know, you need nothing more

5     than to see what happened last week with this -- with these

6     requests for depositions that were filed and the requirement

7     that there was a status conference in front of Your Honor on

8     it.  If that keeps happening then shorter extensions I think

9     we pretty much know with certainty that will continue to

10    happen and that will cause further distraction from any

11    actual process on a plan.

12         Now, I do want to point out that my standing up

13    here right now shouldn't be misconstrued as broad support

14    for everything the debtors are doing and how they've handled

15    the cases to date.  We've had our issues with them and it

16    would not shock me that we're going to have further issues

17    with them down the road, but on the particular issue of

18    what's in front of Your Honor today, which is what should --

19    the debtors have requested an extension of exclusivity to

20    the end of the statutory period and the question -- should

21    they get that extension or something different as requested

22    by a number of the objectors, and that we think the clear

23    answer is it makes sense to give them until the end of the

24    statutory period.

25         You know, there's this narrative that's evolved in

1    that case over the last number of months that the Court is

2    basically faced with a binary choice, either the debtors'

3    plan that everyone hates or the REIT plan that's going to be

4    brought by the T side of unsecured creditors, and I think

5    that that narrative really is wrong, and what actually is

6    happening is that the debtors are engaged in negotiations

7    with the second liens -- with the EFIH second liens and with

8    Fidelity on a plan that would modify the debtors' current

9    plan, and there are other options in front of the Court, in

10   front of the debtor and not just this sort of binary and

11   take something that everyone hates in litigation or the REIT

12   plan, which by the way as Mr. Kieselstein mentioned, the

13   REIT plan, which sounds great every time people get up here

14   and talk about it, is not without significant execution

15   risk.

16           The transaction and the plan amendments that we're

17   talking about with Fidelity and with the debtors wouldn't

18   require reconversion during Chapter 11 and therefore one of

19   the major execution risks wouldn't be a factor in our plan.

20           Now as Mr. Kieselstein noted of course these

21   negotiations are ongoing and I don't know that we're going

22   to get there, I'm hopeful we are, but we're moving towards

23   it.  And so at this stage given everything that's going on,

24   and again, the critical juncture that this case has reached,

25   to have the debtors get shortened extensions of exclusivity

1   such as there are constantly skirmishes over whether or not

2   there should be a further extension really just doesn't make

3   any sense to us and therefore we support the debtors'

4   request and think that the Court should enter the order as

5   requested.

6          Thank you.

7          THE COURT:  Thank you.

8   MR. KAPLAN:  Thank you.  Good morning, Your Honor.  Gary

9   Kaplan from Fried Frank on behalf of Fidelity Management and

10  Research Company.

11         Your Honor, we, too, filed a statement in support

12  of exclusivity.  I'm not going to rehash the argument that

13  the debtor made and that Mr. Brody made.  Just a couple of

14  key points.

15         Your know, the first one is just to reiterate the

16  point.  We're not standing here supporting exclusivity

17  because we're there on a deal with the debtor.  We're

18  supporting exclusivity because the case is at a critical

19  juncture and the debtors have a lot of balls up in the air.

20  And people are all positioning because, you know, they want

21  to advance their plan.  They want one plan to go or another

22  plan.  But we have a Chapter 11 case that seems to be moving

23  in the right direction which is there are a whole host of

24  different ideas out there.  The debtors are negotiating with

25  a number of different parties.  Parties are mediating and it

1    seems to be moving.  And there does seem to actually be

2    momentum in this case right now towards a Chapter 11 plan

3    being on file that is hopefully supported by a number of

4    different constituencies.  And at this critical time in the

5    case, piecemeal extensions and coming back and filling up

6    the courtroom and spending huge amounts of lawyer time

7    distracting everybody from the real goal in this case which

8    is to emerge from Chapter 11, we think would just be a

9    really bad result here.  There seems to be some momentum

10   towards some plan.  Whatever it looks like, who knows?

11   Maybe it'll be the plan that we're endorsing; maybe it will

12   be some other plan.  But at least we're finally moving in

13   that direction.  And where we can schedule meetings for

14   negotiation and not have to work around everybody's court

15   scheduling and days that everybody needs to prepare for

16   exclusivity.  And if we have short-term extensions of

17   exclusivity, it's just going to take that much time for the

18   debtors, lawyers and principals.  Instead of doing the real

19   job of negotiating a Chapter 11 plan, they're going to end

20   up having to keep spending time on little skirmishes for

21   exclusivity.  So we'd urge the Court to grant the debtors'

22   request of extension.  Thank you, Your Honor.

23             THE COURT:  Thank you.  Mr. Miller?

24             MR. MILLER:  Good morning, Your Honor.  Brett

25   Miller, Morrison & Foerster, on behalf of the T-side

1   committee.  And I guess I'll start the objectors' side of

2   the agenda.

3           Yes, there are different variations on the same

4   theme.  And we don't all agree in how long an extension

5   would be appropriate here.  But I pretty much think we're

6   unified that we're not looking at piecemeal extensions here.

7   We're not looking at slicing up the remaining four months.

8   What we're looking at is a very busy summer.  Right now, the

9   case is at a critical point where we have the REIT plan and

10  the negotiations going on with regard to that.  We now have

11  the Fidelity second lien plan.  We've got the debtors' plan.

12  We've got a mediation.  We've got an Oncor sale process.

13  We've got standing motions coming up.  And we've got

14  discovery regarding the confirmation hearing and the

15  disclosure statement hearing.

16          But the key date here, the flag is planted on July

17  20th at the disclosure statement hearing.  Right now you

18  have a plan on file that no one seems to support.  Yes,

19  there's some momentum, some positive things going on, some

20  negative things going on.  But we, the T-side committee, and

21  I think all the T-side and E-side objectors, don't see this

22  as we're asking for a short period now and then another

23  short and another short and another short.  We're basically

24  saying get us through the July 20th disclosure hearing.  Get

25  us through the picking of a plan or a stalking horse or

1    something that leads to progress.  And then either we're

2    going to all be in -- uniformly together on that plan or

3    we'll have a confirmation fight on our hands about which

4    plan is the right plan to confirm.

5            Mr. Kieselstein said progress, momentum, focus and

6    engagement.  Well, if we extend exclusivity for two or so

7    months, we still think we keep all that.  We just keep it on

8    a short leash.

9            There needs to be balance in this case.  And there

10   has been to date.  But at this critical juncture, there's

11   got to be a balance between the debtors using exclusivity as

12   a sword or shield to protect its plan or decide between the

13   other plans that are out there and whose will become the

14   main focus of the plan in the disclosure statement.  And the

15   T-side committee certainly believes that a two-month or so

16   extension of exclusivity does not tip the balance.  It keeps

17   the balance.  It keeps the parties honest and it keeps this

18   case moving in the right direction because rather than what

19   would really be an ugly situation of going out with

20   exclusivity through the rest of the case and having a fight

21   over breaking exclusivity in two months from now if some

22   people think the wrong plan is picked as the main plan in

23   the case.  We strongly believe the shorter extension is the

24   right extension and it does keep this case moving forward at

25   the right speed with all the parties involved and very

1    seriously engaged.  Thank you.

2              THE COURT:  Thank you.

3              MR. GLUECKSTEIN:  Good morning, Your Honor.  Brian

4    Glueckstein, Sullivan & Cromwell, on behalf of the EFH

5    official unsecured creditors' committee.

6              The EFH committee submits, Your Honor, that the

7    60-day extension of exclusivity is appropriate at this time.

8    The EFH committee concluded that a shorter extension as

9    opposed to the full request of the statutory limit the

10   debtors are requesting is appropriate.  After careful

11   consideration of the debtors' arguments with respect to

12   cause, and did so as the only party-in-interest with a

13   fiduciary duty to all E-side creditors, the only E-side

14   creditors.  In contrast, many individual creditors have

15   competing economic interests and disputed claims elsewhere

16   in the capital structure and are, of course, permissibly

17   acting in their individual best interest.  That makes the

18   EFH committee's efforts on behalf of all creditors including

19   EFH's smaller unsecured creditors that much more important.

20             There certainly seems to be agreement, as

21   recognized by Your Honor, when we were last before you in

22   May, that there are a number of important milestones in

23   these cases that will occur in the near term and certainly

24   will occur in the next 60 days of which we are advocating or

25   agreeing that the debtors should have exclusivity.  And

1    among the many important issues that we've heard about --

2    Mr. Miller just went through a list but certainly the

3    ongoing negotiations with respect to the T-side and other

4    plan negotiations the debtors are currently -- have

5    underway, progression with the Oncor sale process, T-side

6    mediation, and the hearing that Your Honor has scheduled for

7    July 20th with respect to the disclosure statement on the

8    debtors' current plan that, as we stand here today, still

9    has no creditor support.

10            With that in mind, the EFH committee recognizes

11   that the debtors should have additional runway to see if

12   consensus can be forged and the momentum that we're hearing

13   about can continue to progress so that we can see tangible

14   progress in these cases with respect to the plan.  The

15   debtors' recent disclosure we've heard this morning of

16   direct discussions with certain E-side creditor groups is

17   certainly welcome by the E-side committee.

18            Based on the timelines laid out, however, Your

19   Honor, stakeholders and the Court will have visibility into

20   each of these important subjects in the next 60 days.  As we

21   stand here today, neither the EFH committee or the Court

22   have the facts necessary to determine whether a longer

23   extension of exclusivity is appropriate.  The debtors argue

24   instead that the result of these milestones should not

25   dictate whether they are entitled to continue the

1   exclusivity.  And that might be right.  But it's certainly

2   not necessarily true because the results of these important

3   events, as well as the process of how we get there over the

4   next few months, is certainly important as to whether

5   exclusivity should be further extended.  To be clear, the

6   EFH committee today does not have a position as to a further

7   extension beyond August but requires additional facts that

8   today are unknown.  And that is exactly the point.

9   Stakeholders and the Court should be able to consider

10  anything more than a 60-day extension with tangible facts as

11  to whether progress is actually being made in these cases or

12  not.

13          The EFH committee had repeatedly been told by the

14  debtors and various stakeholders there's no prejudice to us

15  constituents because the value of the EFH estates today is

16  sufficient to pay undisputed claims in full.  That seems to

17  be the premise of a card plan efforts that's certainly the

18  plan efforts that have been discussed before the Court.

19          We obviously would welcome such a plan and support

20  the efforts to negotiate a consensual plan that actually

21  does satisfy undisputed EFH creditor claims in full.  But

22  the committee today has no information to verify that any of

23  the alternative plans being discussed are bona fide,

24  confirmable or will, in fact, result in EFH creditors being

25  paid in full.  And so the EFH committee remains concerned.

1   They see no economic evidence that its constituents will be

2   paid, are not privy to the Oncor bid information and neither

3   the committee nor its professionals have seen a single piece

4   of paper concerning the alternative plans that the Court is

5   hearing so much about.

6          If a confirmable joint plan of reorganization does

7   not soon emerge, creditors -- EFH creditors could be

8   prejudiced by a further extension of exclusivity.  And the

9   committee cannot stand by and permit the debtors to

10  potentially render the EFH estate insolvent through endless

11  delay of the Oncor sale process while the junior T-side

12  creditors and others who are pursuing delay -- who have

13  pursued delay in many forms from the outset of these cases.

14  It is undisputed that Oncor is property of the EFIH debtors'

15  estate and we submit, Your Honor, that the time for that

16  process to move forward is now.  We heard from Mr.

17  Kieselstein that the debtors intend to move forward with

18  that process promptly and we certainly welcome that

19  development but believe that that, along with all of the

20  creditor plan negotiations, need to proceed.  And we've

21  heard nothing today so far, Your Honor, that indicates that

22  we won't have significantly more information two months from

23  now than we have today on all of these important events.

24         We submit, Your Honor, that it is appropriate to

25  be required to establish cause for a further extension on a

1    full record including the facts related to these important

2    milestones that will occur in the coming months.

3            Your Honor, the debtors maintain that the result

4    of these milestones are not relevant necessarily to their

5    request because they could simply pursue the plan that's

6    currently on file.  And besides having no creditor support

7    if EFH creditors are not paid in full, then we submit that

8    the plan is not progress supporting a longer extension as we

9    believe the plan would violate the absolute priority rule.

10   Obviously, that is an issue for another day.  But as we

11   currently stand here, the plan on file purports to impair

12   unsecured creditors of EFH.  At least so raises that

13   possibility in the papers that were filed.

14           That problem is compounded in our view until EFH

15   creditors are paid in full that the debtors' efforts to

16   pursue the joint plan for the benefit of the T-side

17   creditors and recipients of releases using E-side creditor

18   money is an actual conflict matter that must be treated as

19   such.  The EFH committee reserves all of its rights with

20   respect to the debtors' increasingly troublesome conflicts

21   of interest.

22           But notwithstanding all of that, the issue for

23   today is exclusivity.  And we submit, Your Honor, that based

24   on the current record and, importantly, the materiality of

25   additional information that will be available to all

1    stakeholders and the Court in the next 60 days, the EFH

2    committee respectfully requests that the debtors today be

3    limited to a 60-day extension of exclusivity.  We disagree,

4    Your Honor, that granting that period of time causes any of

5    the skirmish or concerns that were raised by the supporters

6    of the exclusivity motion.  In fact, we believe it strikes

7    the right balance with respect to the tenets that MR.

8    Kieselstein set out earlier:  progress, momentum, focus and

9    engagement.  I think all of those things are critically

10   important and we would submit, Your Honor, that we'll be in

11   a position to know in August whether at that time the

12   debtors have made sufficient progress or whether there is a

13   real question about whether or not the cases need to go in a

14   different direction.  Thank you.

15           THE COURT:  Thank you.

16           MR. PEDONE:  Good morning, Your Honor.  Richard

17   Pedone with Nixon Peabody on behalf of American Stock

18   Transfers, indenture trustee at the EFH corporate level, the

19   holding company.

20           Your Honor, I wish to point out two fallacies in

21   the debtors' narrative of these cases.  First, the debtors

22   state that there is a settlement in support of a plan.  They

23   come before you today saying there's a settlement and a plan

24   and that is progress in support of an extension of the

25   exclusivity period.  And that settlement was entered into by

1    disinterested directors.

2            Your Honor, that settlement is not in any way

3    final.  If you dig into the plan and you search for

4    documents memorializing some settlement, there is no such

5    settlement.  That settlement could have been filed by

6    Kirkland & Ellis together with the debtors among themselves

7    on the first day of these cases.  Instead, we have a

8    settlement allegedly put forward by people now called

9    disinterested directors.  Those directors are not

10   disinterested as that term is used in the Code.  You could

11   have prefaced the word "director" with any term.  Those

12   directors negotiated presumably a settlement that's not

13   binding among themselves to obtain releases for themselves.

14           While progress of filing a plan may be viewed as

15   progress, the substance of this plan is not progress.  It

16   leaves the creditors at EFH, as Mr. Glueckstein just

17   described, who are left out of an understanding of what the

18   sale process is, are left out of the mediation process and

19   excluded from it, holding the bag impaired with no prospect

20   moving forward of resolving it other than litigation through

21   the plan process.

22           These cases are complex.  And that complexity may,

23   in fact, be grounds for giving the debtors an extension of

24   exclusivity.  But we submit that should be limited to two

25   months in light of the fact that when you look under the

1    hood of this alleged plan, it isn't there.  It's missing.

2    And while we're happy that people are now engaged in

3    discussions, we don't believe that these debtors, in light

4    of the fact that they haven't reached a real resolution in

5    terms of the settlement, should be given the maximum

6    extension under the Code.

7              Thank you.  We ask that it be limited to 60 days.

8              MR. SHORE:  Good morning, Your Honor.  Chris Shore

9    from White & Case on behalf of the ad hoc group of TCH

10   unsecured creditors.

11             I'd like to focus on two factors from the debtors'

12   papers.  One, are the debtors making progress negotiating

13   with creditors towards a viable plan; and two, is the

14   extension being used to pressure creditors into a bad plan.

15   And I'd like to use the opportunity in discussing both to

16   kind of apprise the Court of where we are in the case which

17   seems fundamentally the purpose of having exclusivity

18   hearings.

19             Let me start here.  When we were last before the

20   Court, the issue at bar was whether and to what extent it

21   was necessary for the debtors to confirm a plan within their

22   exclusive periods.  And that was the primary reason

23   expressed by the Court -- or expressed by the debtors for

24   setting forth the confirmation schedule that they have put

25   forward.  And at that hearing, the Court clearly articulated

1    that exclusivity was not the be-all-end-all of the process

2    but rather it was getting to a consensual plan that was

3    confirmable, a viable plan.  That's why we spent the last

4    hearing establishing a runway for the pursuit of a viable

5    plan, not the debtors' plan, not our plan, but a viable

6    plan.

7           It's not clear from where we are today in the

8    presentation that was made that the debtors heard the

9    message.  Reading the papers and hearing the argument, it

10   seems that authorial pride is -- in filing and prosecuting a

11   plan still has a meaningful influence on what the debtors

12   are doing.  In this case, we believe we're long past the

13   time for pride.  What should matter and matter alone is the

14   creation of a viable plan that maximizes the debtors'

15   distributable value in a structure that meets with Section

16   11.29 of the Code.  That should be it.  If we can get there

17   and a plan signed by the debtors, that's fantastic.  If we

18   can't, we can't.  It's not that big a deal that the debtors

19   are the signatories of the plan or somebody else is the

20   signatory of the plan.  We certainly have no authorial pride

21   in pushing forward a plan.  If we can sponsor a plan and the

22   debtors want to sign it, that's great.

23          The problem is right now that the debtors' grip on

24   the pen and the desire to sign a plan is making it

25   demonstratively harder to get to the viable plan.  It hasn't

1    even advanced to one folk in favor of its plan in the last

2    six weeks.  To that end, we've asked for a short extension;

3    I think we're on the short end.  We're asking through July

4    9th which, again, is not slicing this into tiny slices.

5    We're just all asking for one more hearing, a stop, look and

6    listen over the summer before exclusivity expires.

7            Let me turn to the first factor and let's be frank

8    here.  The debtors are nowhere on their plan.  They filed

9    the plan six weeks ago.  Every one within the capital

10   structure is against the plan.  Even the parties in support

11   of extending exclusivity have made it very clear:  they are

12   not in support of the plan.

13           That plan and that structure are what are causing

14   the problems.  It does nothing on the T-side essentially

15   pitting the unsecureds against the secureds and having them

16   fight it out.  It impairs and gives votes to the make-whole

17   litigants on the E-side.  And it gives the upside and the

18   value of Oncor to a third party bidder.  It promises a

19   litigation between the T-side and the E-side over that

20   independent director settlement.  And at best, it's a

21   structure that has way too many moving pieces for anybody to

22   negotiate around it over the next six months.  In the end,

23   everyone whose vote that matters, and I'll come back to

24   that, in this case is up in arms.  It's hard to think of a

25   large case in which, with an extension of exclusivity out to

1    the statutory maximum, so many creditors would show up and

2    give a vote of no confidence to the debtors because that's

3    what you're hearing in all the objections.  People have

4    fundamentally come to the view, people who had supported

5    previous extensions, like our group, have come to the view

6    that the debtors just can't do this right and are asking the

7    Court to keep them on a much shorter leash than they are

8    asking for.  And that point of showing up for a vote of no

9    confidence, we don't think was lost on the debtors.

10             As of 11:57, I think, on Friday, they had nobody

11   supporting their extension of exclusivity.  Then the EFIH

12   second lien trustee and Fidelity filed short statements in

13   support, two two-page redundant support saying we'll agree

14   to the full extension.  I think the debtors knew that they

15   couldn't come to the hearing with an array of objections and

16   no support.  And the second liens, for their part, hate the

17   current plan which cashes them out at 10 cents on the make-

18   whole.  And there was a deal that was cut.  The second liens

19   were in the process of preparing a counteroffer which

20   increases their payout.  According to the debtors by

21   allowing them to be paid with Oncor equity at an unspecified

22   plan value.  In other words, their counteroffer to a 10 cent

23   cashout was we'll take a cashout but with a currency that we

24   like at a value that we like.

25             Now one might think that the debtors would have

1    shot that down.  They are engaged in litigation with the

2    second lien trustee advancing the point that the second lien

3    trustee has no make-whole claim, is not entitled to anything

4    more than the payment of their principal, and nobody in this

5    case is talking about the second liens not receiving payment

6    in full of their principal in cash on the effective date of

7    the plan.

8           But blow, we get the announcement that the debtors

9    are now considering the counteroffer and the litigation to

10   paying them with the Oncor upside.  And we get the two page

11   responses.

12          They also got a follow on from FIDO.  Now FIDO

13   hasn't said anything about its holdings.  We went back to

14   the PIK papers.  FIDO, at the time of the PIK litigation,

15   was holding a billion dollars of first lien and second lien

16   paper and probably are the single largest creditor to be

17   affected by the ruling on the make-wholes as far as whether

18   they get any recovery on those principal claims in respect

19   of the make-wholes.

20          So one critical view or one critical and cynical

21   view is that in exchange for two-page tepid supports of

22   exclusivity, the debtors went out and said we will publish

23   in a reply a statement that we are considering that.  The

24   debtors, in doing that, have started in exactly the wrong

25   place and I think they know it.  In fact, if we look at

1    paragraph 1 of the EFIH second lien papers, they talk about

2    the very problem.  You shouldn't extend exclusivity because

3    "certain creditor groups may seek to inappropriately

4    manipulate the process by using the threat of objecting to

5    further extensions of exclusivity as leveraging plan

6    negotiations (indeed, that already seems to be the case)."

7    In fact, it does seem to be the case that extensions of

8    exclusivity may be used by people either in support or

9    objections to advance or take plan processes backwards.

10            Now let me turn to the second factor 'cause I

11   don't think that the leverage that's talked about in the

12   exclusivity cases is that.  The second liens say the

13   leverage is that parties will object and then therefore you

14   shouldn't have extensions of exclusivity.  But that's

15   already handled in the Code.  The Code requires extensions

16   of exclusivity for cause, allows creditors to appear and be

17   heard, allows creditors to object.  That's not -- that

18   doesn't harm the process.  That's exactly the process that

19   Congress has set up.  The leverage that they talk about in

20   the cases is more fundamentally related to the very purpose

21   and the balance that was struck by Congress in exclusivity

22   was the concern that debtors would use the leverage of

23   having the exclusivity pen to force parties to accept the

24   terms of their plan or have to wait out the exclusive

25   periods before they could chart their own course.

1           The question at bar then is not whether creditors

2    can leverage the debtors into plan negotiations but rather

3    whether the debtors will leverage creditors into their own

4    plan.  And we think that's what's going on here and why

5    we're asking for a shorter extension of exclusivity.  I have

6    no interest in getting into a he-said-she-said or he-said-

7    he-said fight in front of the Court.  We heard you loud and

8    clear on Friday -- or Thursday about that.  The debtors

9    promise that they are not denigrating anybody.  We take them

10   at their word.  They promise that they are actively

11   supporting plans and are not trying in back channels to

12   undercut them.  We take them at their word.  If we find out

13   that's not true, we'll bring it to the Court's attention.

14   But they are being very frank about how they see the

15   negotiation process going forward while they have

16   exclusivity.

17           In paragraph 17 of their reply, they state as

18   follows:  "The Debtors have insisted from the very outset of

19   discussions around the REIT structure and continue to insist

20   that any deal with the TCH unsecured ad hoc group regarding

21   a REIT structure must include a clear and unambiguous

22   toggle."  That's their statement of how they are going to

23   use exclusivity.

24           Let me digress on what a toggle means because

25   you're going to hear it a lot and I think there's a

1    misunderstanding that everybody needs to be clear on before

2    we start.  The architect of the toggle concept -- or the

3    architects are here and Mr. Kieselstein and Mr. Luria from

4    the Visteon case.  As the Court may recall from that case,

5    White & Case was representing an ad hoc group of unsecured

6    creditors seeking to fund a rights offering that would

7    maximize value and increase unsecured recoveries.  Kirkland

8    & Ellis was representing Visteon which had a fully

9    negotiated plan on file.  The only party who was outside of

10   it was the unsecured group.  In that case, the debtors

11   insisted that the backstop parties address concerns that the

12   group simply wouldn't fund at exit.  In other words, if the

13   debtors were going to forego what they thought was a live

14   bird in hand, the backstop parties had to put teeth in their

15   commitment so that we didn't get to a position where there

16   was a non-funding and a non-consummation at the fault of the

17   backstop parties.  Given the case and the volatility in the

18   markets at the time, specific performance wasn't an option

19   for the backstop.  Liquidated damages weren't an option for

20   the backstop.  The toggle became a remedy.  A remedy to fix

21   one concern about parties' failure to allow a condition to

22   occur because of their own acts.

23          The toggle that the debtors are talking about in

24   their papers is not a remedy.  It is a confirmation gaiting

25   item and a precondition to any negotiations.  What's the

1    problem with that?  There are five as I have laid out here.

2              First, it's forcing the parties to start

3    negotiating an agreement at the remedy section.  No

4    negotiation goes well when the parties start out talking

5    what's going to happen when you fail to perform and until

6    you assuage my concerns about your performance, I'm not

7    going to talk to you at all.  Second, because there is no

8    agreed plan on file -- quite to the contrary, there's a plan

9    on file that, if voted upon now, would get resounding nos

10   across the room -- it's empowering the wrong people in the

11   negotiations.  The elegance of a REIT plan is that it pays

12   or gives the full legal entitlements to the whole E-side

13   creditor stack all the way up to EFH Legacy equity.  And

14   insisting on toggle as a precondition, the debtors are

15   requiring a negotiation of an impaired treatment for all of

16   those creditors.  In other words, in order to get a shot at

17   maximizing value, one that would pay everybody in full, you

18   have to give votes to the people who would paid in full.

19   And you have to, before you can solicit a plan such as that,

20   negotiate the terms under which they will accept an impaired

21   treatment.  You give a yes or no vote to the people, the

22   very people who got up now and said we are interested in

23   taking the Oncor equity.  So even if we get paid in full

24   under the plan, as long as we vote no, we get the Oncor

25   upside.  It doesn't work in the context of a plan which

1    doesn't yet have support.

2            Third, it's -- they insisted on a toggle, and this

3    is the delicate situation which is why I paused, it's

4    getting in the way of key negotiations.  We're moving

5    forward and hope to get in front of the Court on that June-

6    July time frame to come in with a fully-negotiated plan.

7    The insistence on a toggle though in setting forth the

8    complete backstop for what happens if we don't get to the

9    value maximization is forcing all parties, not just the

10   creditors in the case but all participating parties, to

11   continue to negotiate the terms under which they will accept

12   a fall-back treatment and it's, again, adding more

13   complexity to an already extremely complex situation.

14           Fourth, insisting on a fail safe of a debtor plan

15   forces creditors to bear disproportionate risks.  Again,

16   we're not talking about a failure to fund, unlike this

17   (indiscernible), I don't think there's any question here as

18   to the wherewithal of backstop parties who are known to the

19   debtors, who are in NDA's with the debtors, who are locked

20   up in these cases that they have the checks that are large

21   enough to fulfill the backstop agreement that's being talked

22   about.

23           What the debtors are talking about on the toggle

24   is the failure to get to the structure which creates value;

25   that is, the insistence that all of the risk with respect to

1      a REIT transaction be borne by the backstop parties and the

2      TCEH unsecured creditors.

3             If we can get there, great, it maximizes

4      distributable value, nobody's disputing that, but insisting

5      on a toggle the debtors are conditioning this -- the

6      prospect of value in piece on the negotiation of the terms

7      of surrender.  There are, in fact, other fixes than a

8      toggle.  The debtors going on the record repeatedly saying

9      the only fix we will agree to is the toggle, is an

10     inappropriate use of exclusivity.  They need to engage on

11     other ways of fixing it.

12            There is a current proposal for a de-link plan

13     which would, if we got to the case in which the T side got

14     all their work done and the E side was not done, you could

15     allow a spin and allow it to happen such that the entire

16     plan structure isn't dependent upon a REIT approval, and

17     we're working on that, right?  But the debtors are -- have

18     dug in and unapologetically so in saying there will be no

19     structure that does not get us out in 15 months, and that

20     leads me to my fifth point.

21            The insistence on an acceptance of the toggle

22     concept upends Congress's view with respect to who

23     ultimately gets to choose what level of execution risk

24     occurs.  Creditors with votes get to choose their risks of

25     emergence bounded only by feasibility.  If creditors vote

1    for a plan and choose a high-risk, high-reward strategy, as

2    long as that plan is feasible, it should be confirmed.

3            What's happening here is the debtors are imposing

4    not a feasibility reasonably likely but absolutely certain

5    standard before they say they will solicit any plan.  The

6    votes are not, as the debtors denigrate them, parochial

7    concerns of creditors.  It is the right granted to creditors

8    by the code when debtors lend -- or borrow $45 billion.

9    They have to deal with the votes.  Creditors who have votes

10   get to dictate the level of risk they are willing to accept

11   here, not management.  Clearly, management would like to get

12   out of bankruptcy.  I've never met management who wanted to

13   stay in bankruptcy a day longer than they had to.  But the

14   fact is is the process is complex.  It may be that the

15   debtors have to proceed because their creditors tell them to

16   with a plan that maximizes value but has execution risk

17   associated with it.

18           So, in sum, we're caught right now between an

19   elegant solution -- and there may be many elegant solutions

20   that reduce the complexity in the case -- and the debtors'

21   insistence that we keep all the complexity there, that we

22   negotiate every possibility and every permutation before

23   they are willing to give up the pen.

24           We think exclusivity should be carried through the

25   July 9th conference because that, quite frankly, is the

1    first issue of exclusivity, which is who holds the pen on

2    the first lien settlement.

3            We're going to continue over the ensuing weeks to

4    try to convince the debtors that what they should be doing

5    is move forward as quickly and as diligently as possible

6    with getting to a solution and we can address the concerns

7    with the executability of that at a later date.

8            But the process is too fragile and the debtors'

9    motivations right now too skewed to give up the opportunity

10   to come back once over the summer and address where we are

11   and what's happening and, hopefully, we come back at that

12   hearing with no fight, that we get to the point where what

13   we've done is we've addressed the debtors' concerns, that

14   they have a plan that they're willing to execute that has

15   more -- not only more than one vote but the billions of

16   votes that are necessary to have a viable plan and support a

17   further extension of exclusivity.

18           Thank you, Your Honor.

19           THE COURT:  You're welcome.

20           MR. JONAS:  Morning, Your Honor.  Jack Jonas from

21   Brown, Rudnick for Wilmington Savings Fund Society, the T

22   side second lien indenture trustee.

23           Your Honor, as set forth in our limited objection,

24   we suggest that exclusivity be extended through the

25   June 25th status conference when the Court can consider a

1    further extension after being updated on the progress of

2    plan negotiations, the alternative restructure, mediation

3    and related matters.

4           We also would support an extension for July 9th as

5    suggested by the TCEH unsecured noteholders for the same

6    reasons, Your Honor.

7           Your Honor, the Court's decision on extending

8    exclusivity is guided by assessing whether doing so would

9    facilitate moving the case forward.  In other words, how can

10   the Court's decision today on exclusivity best help push

11   this case towards a value maximizing conclusion?

12          We believe a limited extension with the debtors'

13   exclusivity will do that because it will help level the

14   playing field and require the debtors to work with all

15   parties towards that end.

16          Interestingly, Your Honor, nowhere in

17   Mr. Keglevic's declaration does he provide testimony

18   supporting A four-month versus a shorter exclusivity

19   extension.  Rather, he testifies as to the need for some

20   extension, which I think every party here today has

21   supported, particularly, Your Honor, if you look at

22   paragraph 3, it talks about maintaining exclusivity as

23   essential.  Paragraph 4, his concern regarding possible

24   competing plans, which concern will be addressed as long as

25   some extension is granted.  Paragraph 10, he talks about the

1    importance of exclusivity during the mediation process,

2    which also will be addressed by a shorter extension.

3            Accordingly, Your Honor, we question whether

4    debtors have met their burden for a four-month extension as

5    opposed to some shorter period.

6            Thank you, Your Honor.

7            THE COURT:  Thank you.  Give me just a moment,

8    please.

9        (Pause)

10           THE COURT:  Go ahead.

11           MR. KORNBERG:  Good morning, Your Honor.  Alan

12   Kornberg of Paul, Weiss, Rifkin, Wharton and Garrison for

13   the ad hoc committee of TCEH first lien debt holders.

14           Your Honor, as you've heard, all of the T side

15   creditor groups believe that the requested extension is too

16   long or that consideration of the debtors' motion should be

17   deferred until certain critical aspects of these cases play

18   themselves out.

19           We've heard various proposals from the T side

20   creditor groups to defer this matter to as soon as June 25

21   or as late as August 23.  Our clients, the first lien debt

22   holders, believe that this would be more properly considered

23   on July 20, which is the date of the hearing scheduled on

24   the debtors' disclosure statement.  So we don't believe

25   there has to be another hearing date.  That is an

1    appropriate date for a variety of reasons.

2           So, in sum, no T side creditor group has supported

3    the debtors' request as made and, Your Honor, it is a rare

4    moment when we have such consensus on the T side silo, and I

5    would urge Your Honor to take note of that.

6           Mr. Kieselstein doesn't want to see deli thin

7    slices, but that doesn't mean he has to get the whole

8    salami.  July 20th we think is an appropriate time in which

9    to consider this matter for several reasons.

10           First of all, that is the date by which the T side

11    mediation is supposed to be concluded.  The Oncor stalking

12    horse selection process will have concluded with a hearing

13    schedule for July 13th on a related motion.  As has been

14    mentioned the T side standing motions are scheduled for

15    hearing on July 9 and, importantly, all parties will have a

16    better read on the viability of alternative plan approaches,

17    whether it's the lawyer group's REIT-based plan or the

18    Fidelity effort that has been recently disclosed and, again,

19    the debtors will be here on July 20th on their disclosure

20    statement.

21           So the question, I think, for Your Honor is

22    whether granting the full statutory period today will hinder

23    or help the reorganization process.  We believe very

24    strongly -- and I think others have said it in different

25    ways -- that all parties' feet, including those of the

1   debtor, should be held close to the fire.  More pressure

2   rather than less is required here.

3          There is no question that the current process has

4   been very value disruptive.  Virtually all of the parties in

5   their pleadings have remarked on the astronomical cost of

6   these cases.  According to the debtors they cost

7   approximately a million dollars a day, and that sum, I

8   think, will escalate as we approach confirmation if it's not

9   a consensual process.

10          But we shouldn't lose sight of what these cases

11   are doing to the company's business on the T side.  These

12   are uncertain and precarious times for independent power

13   generators like Luminant.  They're facing not only depressed

14   market conditions but evolving regulatory and environmental

15   regulations.  Many independent power companies, the

16   competition, have focused on diversifying their asset base

17   and expanding their geographic reach and, quite frankly, the

18   TCEH debtors are at a disadvantage.  They can't, in our

19   view, sufficiently focus on the strategic and operational

20   matters while they're in this process of Chapter 11.

21          Your Honor, you don't have to take my word for it,

22   the results, according to the debtor, are very, very

23   striking.  In their recent disclosure statement, they

24   highlight that the TCEH junior creditors are more than

25   $10 billion out of the money, and since the filing date, the

1    debtors have projected a $1 billion downward adjustment to

2    their estimated EBIDTA for the period from 2015 through

3    2018.  That is stunning.

4           I don't mean to be critical of the debtors, they

5    are working very hard, in our opinion, to arrive at a plan

6    that will garner credit support but, given the dynamics I've

7    just described, the best way, in our view, to achieve the

8    level playing field envisioned by Congress in enacting

9    Section 1121 is not to give the debtors carte blanche

10   through the end of December.  Rather, the pressure should be

11   on all parties to make significant progress over the coming

12   weeks, and we believe that giving the debtor the full

13   statutory extension would result in less pressure rather

14   than more and that will result in less focus and less

15   progress.

16          As we suggest in our papers, Your Honor, there is

17   a -- I think a -- an easy way to resolve this.  Your Honor

18   entered the second order extending the debtors' exclusive

19   periods, which is docket number 3504, and that order

20   provides that if the debtors file the plan on or before

21   June 23, which, as we all know, they did on April 14, their

22   exclusive solicitation period was extended through

23   August 23.  Therefore, the debtors already have exclusivity

24   through the end of August and we don't believe they need any

25   relief today.

1          Indeed, by granting the present motion, what the

2    Court would effectively be doing is placing the burden on

3    creditors if they believe that exclusivity should be

4    terminated after August 23 rather than leaving the debtor

5    with the burden of showing that it is entitled to an

6    extension beyond that date, and we don't think that would be

7    helpful or appropriate in this case.

8          The recent Caesars ruling cited by the debtors in

9    footnote 4 is easily distinguishable.  No one before the

10   Court today, unlike Caesars, is asking that exclusivity be

11   terminated.  The status of the Caesars case bears no

12   resemblance to this one and we have a prior order in this

13   case which expressly gives the debtor until August 23 to

14   garner acceptances of their plan.

15         And, Your Honor, if the debtor is being overly

16   conservative, as Mr. Kieselstein, suggested, that by filing

17   a modified plan, they'd somehow lose exclusivity, we have a

18   very, very simple solution.  You can always enter a bridge

19   order as of June 23 when plan exclusivity terminates under

20   the prior order.

21         So, Your Honor, for all these reasons, we believe

22   that the motion by -- before the Court is premature, that a

23   further extension of exclusivity is best considered on

24   July 20 when we'll all be here together again and we will

25   all be in a better position to assess whether such an

1    extension would be helpful to the reorganization process or

2    harmful.  Deferring this matter, in our view, would not

3    deprive the debtors of the meaningful opportunity they seek

4    to devise a confirmable plan with creditor support.

5            Thank you very much, Your Honor.

6            MR. LOWENTHAL:  Good afternoon, Daniel Lowenthal,

7    Patterson, Belknap for Law Debenture.

8            We're the indenture trustee, Your Honor, on the T

9    side unsecured bonds, we filed a joinder with our holders as

10   well as the T side unsecured committee and, just following

11   Mr. Kornberg's remarks, I thought I'd just get up for a

12   moment just to round out the unanimity on the T side to say

13   that we also oppose the relief sought by the debtors.  We

14   think the amount of time they're seeking is too much, and

15   whether it's July 9th or July 20th or August 23rd, somewhere

16   in that time frame would be the right amount for the

17   extension.

18           Thank you.

19           MR. KIESELSTEIN:  Very briefly, Your Honor, I want

20   to try to avoid rehashing what I took up a bunch of your

21   time with earlier on, but there are a few points that I

22   think are worth making.

23           I think it was noted by T committee counsel that

24   we have a very busy summer ahead of us and, indeed, that is

25   the case, and I think, again, for all the reasons we've

1    stated, adding to that burden, if you think about July 9th

2    or July 23rd, we'll be starting on our next exclusivity

3    extension motion and all the litigation attendant to that

4    literally within a matter of a couple weeks.

5              Your Honor, I don't think that actually is helpful

6    to the process when you have a lot of other substantive work

7    going on.

8              Second, Your Honor, I think someone said we'll

9    have more information as we go along and that's obviously

10   always true.  We always have more information the following

11   day than we had the day before.  And, again, there are going

12   to be developments in this case.  There'll be daily and

13   weekly developments in this case.  They're not all pegged to

14   court hearings but they are part of the dialogue that we

15   have back and forth with creditors and in the view of any of

16   them they may be momentous enough to call further

17   exclusivity into question.  So it becomes a never ending

18   cycle of exclusivity litigation when we candidly all have

19   more important items to attend to.

20             And that leads to my next point which is that the

21   behavior of parties is affected by the length of the

22   exclusivity extension.  So there actually is an interactive

23   dynamic.  So if we have a very short term extension, then

24   people are going to have a very short term mindset whether

25   we're talking about the mediation process, whether we're

1    talking about the plan negotiation process or whatever it

2    is.

3           And, again, I won't go back through what four

4    months of relative quiet in the case has allowed the debtor

5    to accomplish in this case.  Some have said it's not as much

6    as we advertised.  We think it's actually a see change from

7    where we were before February 10, acknowledging, again,

8    there's obviously a lot of work to do.  But we think, you

9    know, history has its lessons and the lesson here was that

10   that four month extension was put to very good use.

11          Your Honor, a couple of other points to what Mr.

12   Shore had to say.  First, I'd say only the talented

13   Mr. Shore could twist our statements in support that we got

14   from Fidelity and second lienholders into a nefarious plot.

15   I think he said himself, a cynical view, and it's hard to

16   argue with that part of his statement.  In any event, I can

17   certainly represent to the Court that we didn't suddenly

18   wake up on Wednesday or Thursday and decide, let's see if we

19   can't manufacture a deal with Fidelity and the second liens

20   or the illusion of a deal with them so we can then maneuver

21   them into filing statements of support.  It's more that they

22   come to strong arm us into filing statements of support and

23   extract concessions from us on substantive issues like make

24   whole and the like.  They're sort of the furthest thing from

25   the truth although I give Mr. Shore points for creativity.

1          Your Honor, with respect to the toggle issue, I

2     don't think it lends itself to an extended discussion in

3     open Court.  But let me say a couple of things about it.

4     First, I guess I'll take credit for being one of the

5     architects of the toggle.  I'm not sure I want that carved

6     on my tombstone but I'll take it for now.

7          The relevant lesson from this beyond where the

8     rights are freeing was about one-fifth the size of what we

9     are talking about here and I'm talking about equity capital

10    was that there is no ability to make other people call me up

11    if one of their compatriots or more don't show up with the

12    money.  That could very easily happen here and it's not

13    because there's anything shady about any of Mr. Shore's

14    clients.  They weren't shady in Visteon either.  But they

15    were economic actors and for whatever reason it was no

16    longer in their interest to step up to the plate when the

17    time came some 12 or 15 months from now.

18          We needed protection.  Call it a toggle.  Call it

19    a backup plan.  Call it a ham sandwich.  It doesn't really

20    matter.  All we have said is that we need to have a

21    mechanism and toggle is shorthand Mr. Lurie (ph) and I are

22    well familiar with.  We have to have a mechanism to make

23    sure we are not back late in 2016 litigating things like

24    inter-company claims and the 2007 LBL.  That was a better

25    position that we've taken.  It's one that they were on board

1    for until very recently.  But nobody said it was going to be

2    easy and nobody said it wasn't going to involve talking to

3    other stakeholders in our capital structure who might be the

4    only logical candidates to play that role and which people

5    generally play backup roles for some sort of price.

6              No one said it would be easy.  No one said it

7    would be free.  But we all agreed at the outset it would be

8    important.

9              And there's another layer of risk associated here

10   that wasn't present in Visteon and that, of course, is the

11   regulatory risk which the ad hoc group has said they will

12   not take the risk.  They will not fund if they don't get the

13   regulatory rulings they need.  No, there's no moral

14   component to that.  Perfectly understandable.  The question

15   is, okay, well, what then?  And the answer is, we need

16   backup plan, toggle, ham sandwich, whatever you want to call

17   it to make sure that we haven't wasted a year of our lives.

18   And when I say "we", I don't mean the debtor, I mean all the

19   stakeholders and a great deal of money only to find us back

20   where we were.

21             So I don't think there's an irrational or

22   unreasonable insistence on that feature.  It's sort of an

23   inherent feature of this type of high risk transaction.  And

24   I don't think it's appropriate for the debtor to abdicate

25   its role in suggesting that that's -- so that problem needs

1    to have a solution.  We haven't placed a stop on any of the

2    other economic negotiations going around.  We've said, go

3    ahead.  And there are principals who've happily signed MDAs

4    and we're engaging with them as we speak and that's a good

5    thing and we fully encourage that.

6            But the toggle issue isn't sort of going away.  We

7    would like to grapple with it in the hearing now.  We think

8    that makes sense. Particularly people who are trying to hold

9    our feet to the fire in very short time lengths, then let's

10   talk about that later.  It's like it's not going to go away.

11   We have to talk about it and we ought to talk about it in

12   the here and now.  That's really all that amounts to.

13           So, Your Honor, to summarize again, we think the

14   four months that we are looking for identical to the four

15   months we got before based on what we accomplished during

16   those four months is, frankly, completely appropriate.

17   And holding us to July 9th, July 20th, July 13th, when the

18   stalking horse hearing, those intermediate dates all they do

19   is allow people to take their eyes off the prize.  And I

20   just that was a -- that's a bad dynamic and it's a damaging

21   dynamic.  If people want to be unloosed from exclusivity, I

22   mean, that's going to happen at some point regardless.  This

23   is our last best hope in terms of exclusivity and we ought

24   to utilize it in the most rational and efficient way.

25           Thank you, Your Honor.

1          (Pause)

2               THE COURT:  Just a moment.

3               MR. KIESELSTEIN:  One other point Mr. Sassower

4    reminded me of, Your Honor, that I should have mentioned

5    which is to, again, suggest that I think there was sort of

6    an implication that but for this issue we have on the toggle

7    mechanism, we are, you know, all the way there with the TDM

8    secured ad hoc group and that's simply not so.

9               We've received some preliminary documents from

10   them.  There are lots of issues around those.  That's to be

11   expected.  There are other documents we haven't yet received

12   at all and I didn't want to -- for you to have the

13   impression that that plan is sort of a glittering prize

14   that's just within our grasp but for this one issue.

15   There's more work to be done than that.

16               THE COURT:  Any further statements?  All right.

17   I'll do my best to stay organized with my notes.

18               Let me start by saying I don't think this is even

19   a remotely close question.  There's no question exclusivity

20   should be extended and the issue is simply the length of

21   that exclusivity.

22               Not granting the motion here and not giving the

23   debtors the full statutory exclusivity is simply an

24   invitation for further lengthy, time-consuming and expensive

25   objections and hearings that would ultimately result in a

1   further extension of exclusivity anyway.

2           I think the record is clear that, and not simply

3   through the declaration, but through my experience of being

4   involved in the case since it outset, that the debtors have

5   accomplished a great deal.  A great deal of it despite

6   adverse rulings from the Court.  As Mr. Miller said, I think

7   this case has been balanced.  The debtors have certainly not

8   had everything go their way but they've continued to make

9   progress.  Included in that progress, to just name a few

10  points, has been the development and filing of a plan and

11  disclosure statement; the ongoing efforts to market and

12  perhaps sell the Oncor business; the creation of a mechanism

13  to reach a T side, E side settlement through the independent

14  directors' mechanism.  Just to name a few things that have

15  occurred.  Oh, and the ongoing make whole litigation which

16  is a billions of dollar delta in distributable value for

17  creditors in this case depending on how it turns out.

18          There have been other important things that have

19  occurred.  We can't forget the fact that the debtors came in

20  with a RSA and a structure for dealing with the case.  That

21  RSA was ultimately abandoned as a direct result, I think, of

22  adverse rulings or at least indications that there would

23  possibly be adverse rulings by the Court in connection with

24  the RSA which required the debtors to start over in many

25  ways in figuring out how to exit.  Notwithstanding

1    Mr. Schwartz's point that the plan is nothing but RSA 2.0

2    which has been put in front of the Court, I think that's

3    both fair and unfair criticism and statement.  But, in any

4    event, there's been a tremendous amount of progress in the

5    case.

6              The disputes that are in front of me by the

7    creditors really aren't disputes.  They're arguments in

8    negotiation.  They are statements that they disagree with

9    the debtors' proposals and they would prefer a different

10   proposal.  But there's nothing to indicate that the debtors

11   are acting in contravention of the legal standards in

12   exclusivity in coming up with those proposals.

13             There is nothing to indicate that the debtors are

14   somehow browbeating creditors with this plan of

15   reorganization.  In fact, the record is just the opposite.

16             There's no question that the debtors continue to

17   push forward with trying to get a disclosure statement

18   approved in connection with that plan and go to confirmation

19   in connection with that plan.  But the record also

20   indicates, and like Mr. Shore, to a certain extent I'm

21   holding the debtors to their word, and while they might be a

22   little loose with that word with Mr. Shore, they better not

23   be loose with it with me and I don't think they are being

24   loose with it to either party.

25             Progress is being made.  Certainly the debtors

1    aren't there.  From the statements that I heard in Court,

2    they still don't have a significant creditor constituency in

3    support of the plan that they are pursuing.  But they are

4    engaged in negotiations and ultimately will make a judgment

5    in the exercise of their fiduciary duties whether to push

6    forward with a plan that is confirmable or not.

7         I certainly don't believe we're going to be

8    spending 20 days of confirmation hearings on a plan where no

9    class has voted yes.  It'll be a very short hearing.

10   (Laughter)

11        THE COURT:  And maybe the only short hearing in

12   the case.  So we'll see how it plays out.

13        You know, there are a couple comments sort of

14   comments here and there I'd like to address.  I'm not going

15   to get into the -- to addressing every issue that was made.

16        One of the things that was sort of repeatedly said

17   is the debtors need to continue to have their feet held to

18   the fire and they need to stay under pressure and I

19   shouldn't extend exclusivity to the statutory limit because

20   that'll slowdown that pressure and allow them to sort of sit

21   back and continue to gather their resources to pursue this

22   plan.

23        I think the debtors are under plenty of pressure

24   and that granting this request isn't giving them a break, an

25   unfair advantage or a vacation.  They have a lot to do.  And

1    what it will do is allow, at least in one isolated instance

2    in connection with exclusivity, to stop litigation, to stop

3    the expense, time and distraction of a series of litigations

4    over whether exclusivity should continue to be granted and

5    allow the parties to focus on what really matters which is

6    hopefully reaching a consensual plan of reorganization, if

7    not among all creditors, among a significant number of those

8    creditors.

9            And let me focus on that for just a moment.  I

10   have to say that I find this hearing extremely frustrating,

11   unnecessarily expensive and counterproductive to the case as

12   a whole.  There's no question that this case is complicated

13   by, among other things, the economic disparity between the E

14   side and the T side, the complications of a tax-free or tax

15   not free spin, the potential of significant litigation.

16           But, at some point, the parties need to focus on

17   things that matter in a case.  Not every proposed action by

18   the debtors justifies eight objections and a contested

19   hearing.

20           I have heard some meritorious arguments against

21   exclusivity that aren't simply, we disagree with the other

22   side's negotiation position.  Primarily among those, I

23   think, is Mr. Shore's argument about this concept of a

24   toggle.  Ultimately though that is at heart a negotiation

25   position and there's only so much I can do in connection

1    with it on an incomplete record other than to state that the

2    debtors have fiduciary duties and I expect that they will

3    follow those fiduciary duties.

4          But a dispute about a mechanism, a dispute about

5    the toggle as a negotiation point, giving all the other

6    facts going on in this case are not a reason to only give a

7    shortened extension of exclusivity.  Those points are out

8    there.  They will continue to be developed and at the end of

9    the day, the debtors will have to justify their actions, one

10   way or the other.  And I think they're well aware of that.

11         I am supportive of negotiation.  I've made rulings

12   in connection with the case to promote negotiation, to

13   provide, I think it was Mr. Lurie's initial concept, but

14   it's been discussed before, to provide run way in the case

15   to allow those negotiations to occur.  Among other things, I

16   did not approve the confirmation schedule suggested or

17   asserted by -- advocated, excuse me, by the debtors.  I was

18   happy to approve mediation.  I've pushed back on other

19   scheduling issues to provide for what will both a busy

20   summer in Court but also hopefully a busy, or even busier

21   summer in conference rooms in Chicago and elsewhere.

22         I understand that posturing is part of

23   negotiation.  I understand that posturing is part of

24   litigation.  But at the end of the day this hearing isn't

25   about posturing with each other over your negotiation

1    positions.  It's about coming in, addressing the issues on

2    the merits in front of the Court to get us to the point

3    where I can make an informed decision about the specific

4    issues in front of me.  I think that in some hearings in

5    this case, and I think this primarily, although not

6    exclusively, is one, I could have been over here in chambers

7    and all of this would have happened and we would have

8    accomplished the same thing.  You weren't litigating for me

9    today is my feeling.  You were litigating amongst each other

10   to improve your positions in connection with negotiation.

11   That's not constructive.  I may be wrong.  I can only tell

12   you my feelings based on what I've heard and what my

13   position is.

14          So enough of that.  At least on this one point

15   which is extension of exclusivity, I'm going to shut down

16   any further disputes about whether it should be extended or

17   not and any future contested hearings, whether it be in June

18   or July or August and grant the relief requested by the

19   debtors and overrule all of the objections on the merits.

20   I'll sign your order.

21          MR.  KIESELSTEIN:  May I approach?

22          THE COURT:  Yes.

23      (Pause)

24          THE COURT:  Okay.  I've signed the order.

25   Anything else?

1           MR. KIESELSTEIN:   That's all we've got, Your

2    Honor.

3           THE COURT:  All right.  Thank you.  We're

4    adjourned.

5        (A chorus of thank you)

6        (Whereupon the Court recessed at 12:23 p.m.)

7

8                              *  *  *  *  *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 73

1                      I N D E X

2                    E X H I B I T S

3       PARTY      NO   DESCRIPTION              ID.        EVID.

4                       Declaration of Mr.

5                       Keglevic                --           26

6

7                          RULINGS

8                                                          PAGE

9    Third Motion of Energy Future Holdings Corp., et al.,

10   for Entry of an Order Extending the Debtors' Exclusive

11   Periods to File a Chapter 11 Plan and Solicit

12   Acceptances Thereof Pursuant to Section 1121 of the

13   Bankruptcy Code [D.I. 4441; filed May 11, 2015]          71

14

15

16

17

18

19

20

21

22

23

24

25

Page 74

1              C E R T I F I C A T I O N

2

3    We, Dawn South, Lisa Beck, Linda Foley, and Pamela A. Skaw,

4    certify that the foregoing transcript is a true and accurate

5    record of the proceedings.

6    Dawn South
     Digitally signed by Dawn South
     DN: cn=Dawn South, o=Veritext, ou,
     email=digital@veritext.com, c=US
7    Date: 2015.06.02 14:45:05 -04'00'
     _____

8    Dawn South

9    AAERT Certified Electronic Transcriber CET**D-408

10   Lisa Beck
     Digitally signed by Lisa Beck
     DN: cn=Lisa Beck, o=Veritext, ou,
     email=digital@veritext.com, c=US
11   Date: 2015.06.02 14:45:38 -04'00'
     _____

12   Lisa Beck

13   AAERT Certified Electronic Transcriber (CET**D 486)

14   Pamela A. Skaw
     Digitally signed by Pamela A. Skaw
     DN: cn=Pamela A. Skaw, o=Veritext,
     ou, email=digital@veritext.com, c=US
15   Date: 2015.06.02 14:46:07 -04'00'
     _____

16   Pamela A. Skaw

17   Linda S. Foley
     Digitally signed by Linda S. Foley
     DN: cn=Linda S. Foley, o=Veritext, ou,
     email=digital@veritext.com, c=US
18   Date: 2015.06.02 14:46:55 -04'00'
     _____

19   Linda S. Foley

20

21

22   Date:  June 1, 2015

23   Veritext Legal Solutions

24   330 Old Country Road, Suite 300

25   Mineola, NY 11501