**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Hearing Date: August 11, 2015 at 9:30 a.m.** |
| | ) | **Objection Deadline: August 4, 2015 at 4:00 p.m.** |

**MOTION OF ENERGY FUTURE HOLDINGS CORP.,**
***ET AL.*, FOR ENTRY OF AN ORDER AUTHORIZING**
**CERTAIN DEBTORS TO ENTER INTO LIMITED**
**NON-PROPRIETARY HEDGING AND TRADING ARRANGEMENTS**
**SUBJECT TO THE DEBTORS' RISK MANAGEMENT GUIDELINES**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file

this motion (this "Motion") seeking entry of an order, substantially in the form attached hereto

as **Exhibit A** (the "Order"):  (a) waiving the tenor limitations set forth in the *Order Authorizing*

*Certain Debtors to Enter Into Non-Proprietary Hedging and Trading Arrangements With a*

*Tenor Beyond December 31, 2015 and Subject to Hedge and Tenor Limitations Consistent with*

*Historical Practice* (the "2016 Non-Proprietary Order")[2] solely with respect to (x) wholesale

Non-Proprietary Hedging and Trading Arrangements entered into between Luminant Energy

Company LLC, Luminant ET Services Company, and Luminant Generation Company LLC

---

[1]  The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810.  The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201.  Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

[2]  *See also Motion of Energy Future Holdings Corp.*, et al., *Clarifying Certain Relief Granted in the Non-Proprietary Trading Order and Seeking Entry of an Order Authorizing Certain Debtors to Enter Into Non-Proprietary Hedging and Trading Arrangements With a Tenor Beyond December 31, 2015 and Subject to Hedge and Tenor Limitations Consistent with Historical Practice* [D.I. 2710] (the "2016 Non-Proprietary Trading Motion").

(collectively the "Hedging and Trading Entities") on the one hand and municipally-owned utilities and cooperatives that operate as load serving entities within the ERCOT market (such entities, as described herein, the "Muni-LSEs"); and (y) in some instances, wholesale Non-Proprietary Hedging and Trading Arrangements entered into by the Hedging and Trading Entities to hedge generation obligations to the Muni-LSEs (collectively, the "Non-Proprietary LSE Arrangements"); and (b) authorizing, but not directing, the Hedging and Trading Entities to enter into Non-Proprietary LSE Arrangements, at all times subject to guidelines approved by the audit committee for the board of directors for Energy Future Holdings Corp. ("EFH") (the "Audit Committee") with respect to such Non-Proprietary LSE Arrangements and the Debtors' Risk Management Guidelines each as described herein. In support of this Motion, the Debtors submit the *Declaration of Joseph Ho., Senior Vice President of Enterprise Risk Management for EFH Corp., in Support of the Motion of Energy Future Holdings Corp., et al., for Entry of an Order Authorizing Certain Debtors to Enter Into Limited Non-Proprietary Hedging and Trading Arrangements Subject to the Debtors' Risk Management Guidelines* (the "Ho Declaration") and respectfully state as follows.

## Jurisdiction and Venue

1.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors consent pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent

consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The bases for the relief requested in this Motion are section 363 title 11 of the United States Code (the "Bankruptcy Code") and rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## Relief Requested

4.      Pursuant to the 2016 Non-Proprietary Order, the Debtors are permitted to enter into Non-Proprietary Hedging and Trading Arrangements with a tenor beyond December 31, 2015 without further order of the Court, subject to certain limits established by the Audit Committee.   In connection with discussions with various constituencies regarding the 2016 Non-Proprietary Order, the Debtors agreed to refrain from entering into Non-Proprietary Hedging and Trading Arrangements with a tenor that extended further than 27 calendar months past a particular Reference Date (as defined herein) without further relief from the Court.

5.      In light of the Muni-LSEs' increasing confidence in the Debtors' creditworthiness, and as described below, the Hedging and Trading Entities believe they now have an opportunity to capture significant value by entering into Non-Proprietary LSE Arrangements with a tenor beyond 27 calendar months from a particular Reference Date.  For that reason, by this Motion, the Debtors seek entry of the Order waiving the tenor limitations established in connection with the 2016 Non-Proprietary Order solely with respect to the Non-Proprietary LSE Arrangements, and authorizing the Hedging and Trading Entities to enter into the Non-Proprietary LSE Arrangements without imposing tenor limitations, at all times subject to the Debtors' Risk Management Guidelines and the governance procedures established by the Audit Committee.

**Background**

6.      On April 29, 2014, each of the Debtors filed a voluntary petition with the Court under the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Court has entered a final order for joint administration of these chapter 11 cases [D.I. 849].  The Court has not appointed a trustee.  The Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") formed an official committee of unsecured creditors of Energy Future Competitive Holdings Company LLC ("EFCH"), Texas Competitive Electric Holdings Company LLC ("TCEH"), the direct and indirect Debtor subsidiaries of EFCH and TCEH, and EFH Corporate Services Company (the "TCEH Creditors' Committee") on May 13, 2014 [D.I. 420] and an official committee of unsecured creditors of Energy Future Holdings Corp., Energy Future Intermediate Holding Company, LLC, EFIH Finance, Inc., and EECI, Inc. (the "EFH Creditors' Committee") on October 27, 2014 [D.I. 2570].  Further information regarding the Debtors' business operations and capital structure is set forth in the declaration of Paul Keglevic in support of the Debtors' first day motions [D.I. 98].

I.      **Overview of Hedging and Trading Arrangements**.

7.      As described in the First Hedging and Trading Motion, the power generation, retail electricity businesses, and hedging activities of Texas Competitive Electric Holdings Company LLC and its direct and indirect subsidiaries (collectively, the "TCEH Debtors") are highly integrated.  In short, the TCEH Debtors' hedging activities allow the TCEH Debtors to utilize (a) physical commodity transactions to hedge price and delivery risk related to fuel inputs (including natural gas, coal, uranium, and fuel oil) to the TCEH Debtors' power generation and mining operations, (b) physical transactions for electricity and related services produced or procured in their generation and retail operations, and (c) financial derivatives that

hedge price risk for both fuels and electricity. These transactions are memorialized in hedging and trading contracts (such contracts, the "Non-Proprietary Hedging and Trading Arrangements").

8.    As a complement to the Non-Proprietary Hedging and Trading Arrangements, the TCEH Debtors, in a limited and highly controlled environment, also enter into and perform under trading contracts for the purpose of generating profits ("Proprietary Trades," the related contracts, the "Proprietary Trading Arrangements," and, together with the Non-Proprietary Hedging and Trading Arrangements, the "Hedging and Trading Arrangements").[3]  By this Motion, the Debtors do not seek any relief with respect to the Proprietary Trades or the Proprietary Trading Arrangements.

## II.    Scope of Existing Relief Regarding Non-Proprietary Hedging and Trading Arrangements.

9.    The Debtors seek through this Motion to modify certain of the relief granted in connection with the Non-Proprietary Hedging and Trading Arrangements. As described below, as of the date hereof, the Debtors have obtained two final Court orders governing Non-Proprietary Hedging and Trading Arrangements.

10.    *2015 Non-Proprietary Hedging and Trading Arrangements Relief*.  On June 6, 2014, the Court entered a final order, granting the Debtors' authority to (a) continue performing under Non-Proprietary Hedging and Trading Arrangements and honoring related prepetition obligations (including collateral obligations) and (b) enter into new Non-Proprietary Hedging

---

[3]    Proprietary Trades may also be contracts entered into for the purpose of limiting losses or locking in profits from existing Proprietary Trades.

Nothing in this Motion, the Ho Declaration, or the Order shall affect the Proprietary Trading Arrangements, which shall be governed solely by the *Final Order (Re: Proprietary Trading Transactions That Do Not Involve the Debtors' Power Generation and Retail Operations) Authorizing the Debtors to (A) Continue Performing Under Prepetition Hedging and Trading Arrangements, (B) Pledge Collateral and Honor Obligations Thereunder, and (C) Enter Into and Perform Under Proprietary Trading Transactions Subject to Internal Risk Management Guidelines* [D.I. 1309] (the "Proprietary Trading Order").

and Trading Arrangements in the ordinary course of business [D.I. 860], *provided*, *however*, that the Debtors were prohibited from entering into wholesale Hedging and Trading Arrangements with a tenor beyond December 31, 2015.[4]

11.     ***2016 Non-Proprietary Hedging and Trading Arrangements Relief***. On November 20, 2014, the Court entered the 2016 Non-Proprietary Order, clarifying certain relief granted in the 2015 Non-Proprietary Order and, under paragraph two of the order, providing that "the Hedging and Trading Entities are authorized, but not directed, to enter into Non-Proprietary Hedging and Trading Arrangements with a tenor beyond December 31, 2015 subject to the Approved Limits and in a manner consistent with the Risk Management Guidelines." 2016 Non-Proprietary Order, ¶ 2.

12.     Based on (a) discussions the Debtors had with various constituencies regarding the 2016 Non-Proprietary Order and (b) the limits established by the Audit Committee in place as of the filing of the 2016 Non-Proprietary Hedging Motion (defined therein as the "Approved Limits"), which permitted the Debtors to hedge up to 100% for forward months 4-15, with a target of 50% for forward months 16-27, in each case subject to a particular Reference Date, the Debtors agreed to seek additional relief from the Court before entering into Non-Proprietary Hedging and Trading Arrangements with a tenor beyond 27 months from a particular Reference

---

[4]     *See Final Order (Re: Non-Proprietary Trading and Hedging Transactions Involving the Debtors' Power Generation and Retail Operations) Authorizing the Debtors to (A) Continue Performing Under Prepetition Hedging and Trading Arrangements, (B) Pledge Collateral and Honor Obligations Thereunder, and (C) Enter Into and Perform Under Trading Continuation Agreements and New Postpetition Hedging and Trading Arrangements* [D.I. 860]; *see also Motion of Energy Future Holdings Corp.,* et al., *for Entry of Interim and Final Orders Authorizing the Debtors to (A) Continue Performing Under Prepetition Hedging and Trading Arrangements, (B) Pledge Collateral and Honor Obligations Thereunder, and (C) Enter Into and Perform Under Trading Continuation Agreements and New Postpetition Hedging and Trading Arrangements* [D.I. 41] (the "First Hedging and Trading Motion").

Date.[5]

III.     **The Non-Proprietary LSE Arrangements Have the Potential to Unlock Significant Value for the Debtors' Estates**.

   A.     **The Non-Proprietary LSE Arrangements Have the Potential to Unlock a Significant Portion of the ERCOT Market**.

13.     The Non-Proprietary LSE Arrangements are one type of Non-Proprietary Hedging and Trading Arrangement that are subject to the 2015 Non-Proprietary Order and 2016 Non-Proprietary Order.  LSEs obtain electricity from generators and power marketers, like the Hedging and Trading Entities, and then sell such electricity to end-users.  While there are many types of LSEs, the relief requested herein is solely with respect to LSEs that are municipally-owned utilities or co-operatives ("Muni-LSEs").

14.     Muni-LSEs may own generation capacity but may obtain electricity on a wholesale basis from third-party generators and power marketers (like the Hedging and Trading Entities) if, for example, their existing generation is insufficient to cover demand or if it is more economical to purchase electricity from third parties as opposed to operating existing plants.  These third-party agreements typically take one of three forms:  (a) through bilateral contracts with power generators and power marketers, like the Non-Proprietary LSE Arrangements, whereby the Hedging and Trading entities agree to supply electricity to a Muni-LSE based upon an agreed price structure for a certain period of time (i.e., a certain tenor); (b) through the ERCOT day-ahead market (i.e., a Muni-LSE will estimate how much electricity it believes it will need for the next day and may purchase that electricity from entities like the Hedging and Trading Entities in the ERCOT day-ahead market); and (c) in certain limited circumstances, in

---

[5]     Hedge limits are generally determined on a rolling-forward basis from a particular date from which an assessment regarding exposure is made and such particular dates are known as "Reference Dates."  2016 Non-Proprietary Hedging Motion, ¶ 9.

ERCOT's real-time market (i.e., to bridge any gaps in a Muni-LSE's actual electric needs not otherwise met by the day-ahead market or bilateral contracts). Importantly, municipalities and cooperatives in the ERCOT market account for approximately 25% of the ERCOT load.

15.     In addition, the Muni-LSEs are historically low-risk counterparties with strong credit ratings. Franchised utilities, like the Muni-LSEs, can recover their costs through their rate structure (i.e., Muni-LSEs charge rates to their end-use customers and through those rates, recover their costs of incurring electricity from power generators like the Hedging and Trading Entities). Consequently, Muni-LSEs are universally considered to be strong transaction counterparties with limited default risk. In addition, and in part because of their strength as transaction counterparties, Muni-LSEs traditionally transact for longer-term contracts in order to ensure a secure and stable source of power. In many circumstances, Muni-LSEs are required by their internal risk management guidelines to enter into longer-term contracts to ensure minimal disruption to their power supply. Based on initial calculations, the Hedging and Trading Entities anticipate that the total margin available to the market based on the potential need of Muni-LSEs over the next five years may be in excess of $25 million.

**B.     The Muni-LSEs Have Demonstrated Renewed Interest in Transacting with the Hedging and Trading Entities**.

16.     In 2007, the Debtors engaged in a series of transactions that significantly increased the Debtors' funded indebtedness at the Debtor TCEH (which is the direct parent of the Hedging and Trading Entities), at the Debtor EFCH and at the Debtor EFH Corp. (each of which is the indirect parent of the Hedging and Trading Entities).[6]

17.     Over the last several years, and based on concerns regarding the Debtors' credit

---

[6]     For additional information regarding the 2007 transaction, *see Disclosure Statement for the Joint Plan of Reorganization of Energy Future Holdings Corp.*, et al., *Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 4143].

worthiness, as well as a perception that the Debtors would not be able to perform under the Non-Proprietary LSE Arrangements, the Muni-LSEs have been reluctant to engage with Hedging and Trading Entities regarding executing new Non-Proprietary LSE Arrangements.

18.     In recent months, however, the Muni-LSEs have begun re-engaging with the Hedging and Trading Entities regarding opportunities to enter into new Non-Proprietary LSE Arrangements.  These discussions are encouraging as they reflect the Muni-LSEs belief that the Debtors' financial condition and credit worthiness have improved and are likely to stay on a positive trajectory in the near-term.  The Debtors' current Non-Proprietary Hedging and Trading Arrangements do not allow them to capitalize on the value that may be unlocked through longer-term wholesale agreements with the Muni-LSEs.  Specifically, these new Non-Proprietary LSE Arrangements provide the Hedging and Trading Entities with the potential to serve the 25% of the ERCOT market that has remained virtually inaccessible over the last several years.

19.     In order to stay competitive with their peers and actively pursue opportunities with Muni-LSEs, the Hedging and Trading Entities require the ability to enter into Non-Proprietary LSE Hedging Arrangements with a tenor that extends beyond 27 months from a particular Reference Date. Thus, by this Motion, the Debtors seek authority to capitalize on new interest from Muni-LSEs to enter into profitable, long-term wholesale Non-Proprietary LSE Hedging Arrangements and, specifically, authority to enter into Non-Proprietary LSE Arrangements with a tenor that extends beyond 27 months from a particular Reference Date.

**IV.     The Non-Proprietary LSE Arrangements are Subject to the Approval Limit, Internal Hedging Policy, and Risk Management Guidelines**.

20.     The Non-Proprietary LSE Arrangements are, and will continue to be, subject to a number of related risk reduction policies, including (a) the Debtors' rigorous Risk Management

Guidelines; (b) the Approved Limits; and (c) the Internal Hedging Policy (each as defined and described below). As described in the First Hedging and Trading Motion, the Debtors utilize risk management guidelines, which focus on governance and operational accountabilities surrounding transactions undertaken under the Non-Proprietary Hedging and Trading Arrangements, to ultimately ensure that hedging and trading transactions are closely monitored and in the best interests of all of the Debtors' stakeholders (the "Risk Management Guidelines").[7]

21.    In addition to the Risk Management Guidelines, the Debtors utilize an internal hedging policy, which is reviewed annually by the Audit Committee and which restricts the Hedging and Trading Entities' ability to enter into Non-Proprietary Hedging and Trading Arrangements that would result in the Hedging and Trading Entities hedging more than 100% (in the aggregate) of the Debtors' projected exposure to certain commodities for a particular calendar year (the "Internal Hedging Policy"). The Internal Hedging Policy applies to certain commodities (including natural gas and power, both of which are contracted for under the Non-Proprietary LSE Arrangements) and imposes hedge limits with respect to those commodities (i.e., the percent up to which the Hedging and Trading Entities can hedge the Debtors' exposure with respect to such commodities) for specific periods (the "Approved Limits"). In addition, the Approved Limits and the Risk Management Guidelines require the Hedging and Trading Entities to follow certain transaction procedures (and obtain certain internal approvals) before entering into the Non-Proprietary LSE Arrangements. In short, the Non-Proprietary LSE Arrangements, like all of the Debtors' Non-Proprietary Hedging and Trading Arrangements, are subject to various risk protocols, but ultimately present minimal risk to the Debtors' exposure

---

[7]    For additional detail regarding the Risk Management Guidelines, *see* the 2016 Non-Proprietary Hedging and Trading Motion and the First Hedging and Trading Motion.

given the strength of Muni-LSEs as contract counterparties.

22.    Without the ability to enter into Non-Proprietary LSE Arrangements with a tenor beyond 27 months from a particular Reference Date, the Debtors are at risk of losing a significant opportunity to capitalize on new business in the hypercompetitive Texas electricity market.  The Debtors will be at a competitive disadvantage with respect to other companies in the energy industry if the Debtors cannot engage with the Muni-LSEs regarding long-term wholesale agreements and, given the projected tenor of such new arrangements, once lost, such a transaction opportunity may not arise again.  For these reasons, the Debtors seek a waiver from the tenor limitations established in connection with the 2016 Non-Proprietary Order, authorizing, but not directing, the Hedging and Trading Entities to enter into Non-Proprietary LSE Arrangements with a tenor that extends beyond 27 months from a particular Reference Date, subject to the Risk Management Guidelines.

**Basis for Relief**

I.    **Section 363(c) of the Bankruptcy Code Authorizes the Debtors to Enter Into  Non-Proprietary LSE Arrangements with a Tenor Beyond 27 Months from a Reference Date.**

23.    Section 363(c) of the Bankruptcy Code provides, in relevant part, that a debtor in possession "may enter into transactions . . . in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing."  11 U.S.C. § 363(c)(l).  To maximize the value of the Debtors' estates, the Hedging and Trading Entities should be permitted to enter into Hedging and Trading Arrangements with a tenor beyond 27 months from a particular Reference Date and utilize the Approved Limits.

24.    Section 363(c)(1)'s ordinary course of business standard was intended to allow a debtor in possession the flexibility to run its business. *Moore v. Brewer (In re HMH Motor*

*Servs., Inc.)*, 259 B.R. 440, 448–49 (Bankr. S.D. Ga. 2000).    A debtor in possession may therefore use, sell, or lease property of the estate without the need for prior court approval if the transaction is in the ordinary course of business.    *See Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (holding that ordinary course of business use of estate property does not require a prior hearing); *James A. Phillips*, 29 B.R. at 394 (holding that where a debtor in possession is merely exercising the privileges of its status, there is no general right to notice and a hearing concerning particular transactions conducted in the ordinary course of business).

25.    The Bankruptcy Code does not define the "ordinary course of business." *In re Commercial Mortg. & Fin. Co.*, 414 B.R. 389, 393 (Bankr. N.D. Ill. 2009).    The two tests ordinarily applied by the courts to determine the ordinary course of business are the "horizontal" test and the "vertical" test.    *Denton Cnty. Elec. Co-Op., Inc. v. Eldorado Ranch (In re Denton Cnty. Elec. Coop., Inc.)*, 281 B.R. 876, 882 and n.12 (Bankr. N.D. Tex. 2002). "The 'horizontal test' focuses on the way businesses operate within a given industry. The 'vertical test' focuses on the expectations of creditors."    *Denton Cnty. Elec. Co-Op.*, 281 B.R. at 882 n.12.

26.    Under both the horizontal test and the vertical test, a waiver of tenor limitations solely with respect to Non-Proprietary LSE Arrangements is in the Debtors' ordinary course. *See Med. Malpractice Ins. Assoc. v. Hirsch (In re Lavigne)*, 114 F.3d 379, 384 (2d Cir. 1997) (finding that "ordinary course of business" is meant "to embrace the reasonable expectations of interested parties of the nature of transactions that the debtor would likely enter in the course of its normal, daily business") (quoting *In re Watford*, 159 B.R. 597, 599 (M.D. Ga. 1993)); *In re Roth American, Inc.*, 975 F.2d 949, 952 (3rd Cir. 1992) (stating that section 363 of the

Bankruptcy Code is designed to allow a debtor in possession "flexibility to engage in ordinary transactions without unnecessary…oversight"); *In re Coordinated Apparel, Inc.*, 179 B.R. 40, 43 (Bankr. S.D.N.Y. 1995).

27.    Under the horizontal test, companies in the Debtors' industry routinely enter into hedging and trading transactions similar to those contemplated by the Non-Proprietary Hedging and Trading Arrangements.  *See*, *e.g.*, *In re Patriot Coal Corp.*, No. 12-12900 (Bankr. S.D.N.Y. July 10, 2012) (granting authority to enter into and perform under coal sales contracts); *In re Dynegy Holdings, LLC*, No. 11-38111 (Bankr. S.D.N.Y. Nov. 9, 2011) (granting authority to enter into and perform under derivative contracts); *In re Boston Generating, LLC*, No. 10-14419 (Bankr. S.D.N.Y. Sept. 23, 2010) (granting authority to enter into and perform under its hedging and purchase and sale contracts); *In re Calpine Corp.*, No. 05-60200 (Bankr. S.D.N.Y. Dec. 21, 2005) (granting authority to enter into and perform under its derivative contracts, including forward, futures, and options contracts); *In re Mirant Corp.*, No. 03-46590 (Bankr. N.D. Tex. Aug. 28, 2003) (same); *In re NRG Energy, Inc.*, No. 03-13024 (Bankr. S.D.N.Y. June 30, 2003) (same).[8]  Indeed, this Court granted the Debtors authority to continue the Hedging and Trading Entities' activities under Non-Proprietary Hedging and Trading Arrangements under the 2015 Non-Proprietary Order and the 2016 Non-Proprietary Order, including with respect to the Non-Proprietary LSE Arrangements.  The Non-Proprietary LSE Arrangements with a tenor beyond 27 months from a particular Reference Date are similar to the Non-Proprietary LSE Arrangements entered into by other energy companies, and are further regulated by a number of risk reduction protocols.

28.    Under the vertical test, creditors' reasonable expectations of a debtor's "ordinary

---

[8]    Because of the voluminous nature of the orders cited herein, such orders are not attached to this Motion. Copies of these orders are available upon request of the Debtors' counsel.

course of business" are based on the debtor's specific prepetition business practices and norms, and the expectation that the debtor will conform to those practices and norms while operating as a debtor in possession. *In re Garofalo's Finer Foods, Inc.,* 185 B.R. 414, 425 (N.D. Ill. 1995). Thus, a fundamental characteristic of an "ordinary" postpetition business transaction is its similarity to a prepetition business practice. *Marshack v. Orange Commercial Credit (In re Nat'l Lumber & Supply, Inc)*, 184 B.R. 74, 79 (9th Cir. B.A.P. 1995); *James A. Phillips*, 29 B.R. at 394. The size, nature and type of business, and the size and nature of the transactions in question, are all relevant to determining whether the transactions at issue are ordinary. *U.S. ex rel. Harrison v. Estate of Deutscher*, 115 B.R. 592, 598 (M.D. Tenn. 1990); *Johns-Manville Corp.*, 60 B.R. at 617. "Accordingly, a postpetition transaction undertaken by the debtor that is similar in size and nature to prepetition transactions undertaken by the debtor would be within the ordinary course of business." *Garofalo's*, 186 B.R. at 426.

29.     Here, the Debtors' creditors are likely aware that the Debtors' hedging and trading operations represent a significant source of value to the Debtors' enterprise and expect the Debtors to stay competitive with their peers by continuing to capitalize on hedging and trading opportunities as they arise in the ERCOT market. In addition, the Debtors' creditors are aware that Muni-LSEs are an ideal counterparty giving the strength of their credit rating and their ability to efficiently recover their costs through their rate structure.

30.     Accordingly, and under the authority provided by section 363(c)(1) of the Bankruptcy Code, the Debtors submit that a limited waiver of the tenor limitations set forth in the 2016 Non-Proprietary Order solely with respect to the Non-Proprietary LSE Arrangements, authorizing the Debtors to enter into Non-Proprietary LSE Arrangements with a tenor that extends beyond 27 calendar months from a particular Reference Date is in the best interests of

their estates and all parties in interest in these chapter 11 cases.

**II.    The Debtors' Have a Sound Business Purpose for Seeking a Limited Waiver of the Tenor Limitations Set Forth in the 2016 Non-Proprietary Order, Solely With Respect to the Non-Proprietary LSE Arrangements**

31.    To the extent the relief sought herein is not within the Debtors' ordinary course of business, section 363(b) of the Bankruptcy Code provides, in relevant part, that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  In the Third Circuit, courts have authorized transactions outside the ordinary course of business when the transaction has a sound business purpose and is proposed in good faith.  See *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991); *In re Exaeris, Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008).

32.    Here, a limited waiver of the tenor limitations in the 2016 Non-Proprietary Order, permitting the Debtors to enter into Non-Proprietary LSE Arrangements with a tenor beyond 27 calendar months from a particular Reference Date will allow the Debtors to stay competitive and capitalize on a limited opportunity to engage with Muni-LSEs on wholesale agreements that have the capacity to return significant value to the Debtors' estates.

33.    Accordingly, the Debtors seek entry of the Order waiving the tenor limitations established in connection with the 2016 Non-Proprietary Order solely with respect to the Non-Proprietary LSE Arrangements, and authorizing the Hedging and Trading Entities to enter into the Non-Proprietary LSE Arrangements without imposing tenor limitations, at all times subject to the Debtors' Risk Management Guidelines and the governance procedures established by the Audit Committee.

**Waiver of Bankruptcy Rules 6004(a) and 6004(h)**

34.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

**Notice**

35.     The Debtors shall provide notice of this Motion on the date hereof via first class mail to:  (a) the U.S. Trustee; (b) counsel to the TCEH Creditors' Committee; (c) counsel to the EFH Creditors' Committee; (d) Wilmington Trust, N.A., in its capacity as administrative agent under the TCEH first lien credit agreement and collateral agent under the TCEH intercreditor agreements and counsel thereto; (e) Bank of New York Mellon Trust Company, N.A., in its capacity as indenture trustee under:  (i) the TCEH unsecured pollution control revenue bonds; and (ii) the EFCH 2037 Notes due 2037, and counsel thereto; (f) American Stock Transfer & Trust Company, LLC, in its capacity as indenture trustee under:  (i) the 9.75% EFH senior unsecured notes due 2019; (ii) the 10.0% EFH senior unsecured notes due 2020; (iii) the 10.875% EFH LBO senior unsecured notes due 2017; (iv) the 11.25%/12.0% EFH LBO toggle notes due 2017; (v) the 5.55% EFH legacy notes (series P) due 2014; (vi) the 6.50% EFH legacy notes (series Q) due 2024; and (vii) the 6.55% EFH legacy notes (series R) due 2034, and counsel thereto;  (g) Computershare Trust Company, N.A. and Computershare Trust Company of Canada, in their capacities as indenture trustee under:  (i) the 11.0% EFIH senior secured second lien notes due 2021; and (ii) the 11.75% EFIH senior secured second lien notes due 2022, and counsel thereto; (h) UMB Bank, N.A. in its capacity as indenture trustee under: (i) the 9.75% EFIH senior unsecured notes due 2019; and (ii) the 11.25%/12.25% EFIH senior toggle notes due 2018, and counsel thereto; (i) Delaware Trust Company of Delaware in its capacity as indenture trustee under:  (i) the 6.875% EFIH senior secured notes due 2017; (ii) the

10.0% EFIH senior secured notes due 2020; and (iii), the 11.50% TCEH senior secured notes due 2020, and counsel thereto; (j) Law Debenture Trust Company of New York in its capacity as indenture trustee under:  (i) the 10.25% TCEH senior unsecured notes due 2015; and (ii) the 10.50%/11.25% TCEH senior toggle notes due 2016, and counsel thereto; (k) Wilmington Savings Fund Society, FSB in its capacity as indenture trustee under the 15.0% TCEH senior secured second lien notes due 2021, and counsel thereto; (l) counsel to certain holders of claims against the Debtors regarding each of the foregoing described in clauses (c) through (j); (m) the agent for the TCEH debtor-in-possession financing facility and counsel thereto; (n) the agent for the EFIH debtor-in-possession financing facility and counsel thereto; (o) counsel to certain holders of equity in Texas Energy Future Holdings Limited Partnership; (p) counsel to the Ad Hoc Committee of TCEH Unsecured Noteholders; (q) counsel to the Ad Hoc Committee of TCEH Second Lien Noteholders; (r) Oncor Electric Delivery Holdings Company LLC and counsel thereto; (s) Oncor Electric Delivery Company LLC and counsel thereto; (t) the Securities and Exchange Commission; (u) the Internal Revenue Service; (v) the Office of the United States Attorney for the District of Delaware; (w) the Office of the Texas Attorney General on behalf of the Public Utility Commission of Texas; (x) counsel to the Electric Reliability Council of Texas; and (y) those parties that have requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**Prior Request**

36.     As described herein, the relief sought in this Motion and the Order seeks a limited modification of the relief granted by the Court pursuant to the 2016 Non-Proprietary Order.

[*Remainder of page intentionally left blank.*]

WHEREFORE, the Debtors respectfully request that the Court enter the Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances.

Dated:  July 21, 2015
        Wilmington, Delaware

*/s/ Jason M. Madron*

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
920 North King Street
Wilmington, Delaware 19801
Telephone:      (302) 651-7700
Facsimile:       (302) 651-7701
Email:            collins@rlf.com
                      defranceschi@rlf.com
                      madron@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:      (212) 446-4800
Facsimile:       (212) 446-4900
Email:            edward.sassower@kirkland.com
                      stephen.hessler@kirkland.com
                      brian.schartz@kirkland.com

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Chad J. Husnick (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:       (312) 862-2200
Email:            james.sprayregen@kirkland.com
                      marc.kieselstein@kirkland.com
                      chad.husnick@kirkland.com
                      steven.serajeddini@kirkland.com

Co-Counsel to the Debtors and Debtors in Possession