**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) ) ) | Case No. 14-10979 (CSS) |
| Debtors. | ) ) | (Jointly Administered) |
| | ) ) | **Re: D.I. 5065** |
| | ) | |

**DECLARATION OF JOSEPH HO, SENIOR VICE PRESIDENT OF
ENTERPRISE RISK MANAGEMENT FOR ENERGY FUTURE HOLDINGS CORP.
IN SUPPORT OF THE MOTION OF ENERGY FUTURE HOLDINGS CORP., *ET AL.*,
FOR ENTRY OF AN ORDER AUTHORIZING CERTAIN DEBTORS TO ENTER INTO
LIMITED NON-PROPRIETARY HEDGING AND TRADING ARRANGEMENTS
SUBJECT TO THE DEBTORS' RISK MANAGEMENT GUIDELINES**

Pursuant to 28 U.S.C. § 1746, I, Joseph Ho, declare as follows:

1.     I am over the age of 18 and duly authorized to execute this declaration (the "Declaration") on behalf of the Debtors in support of, the *Motion of Energy Future Holdings Corp.*, et al., *for Entry of an Order Authorizing Certain Debtors to Enter into Limited Non-Proprietary Hedging and Trading Arrangements Subject to the Debtors' Risk Management Guidelines* [D.I. 5065] (the "Motion"),[2] filed contemporaneously herewith.

2.     I am the Senior Vice President of Enterprise Risk Management for EFH Corporate Services Company.  I have served in various roles for the Debtors for the past seven years. Through these roles, I have been, and continue to be, responsible for managing enterprise-wide

---

[1]     The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810.  The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201.  Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the debtors' proposed claims and noticing agent at http://www.efhcaseinfo.com.

[2]     All capitalized terms used herein have the meaning given to them in the Motion.

risk assessment and management efforts, including managing market, credit, and operational risks for the Debtors' trading and marketing operations. I have been employed in various finance and risk management positions in the wholesale energy marketing and trading industry for over 20 years, with the predominant amount of that time spent with firms engaged in wholesale electricity and natural gas marketing and trading activities.

4. The facts in this Declaration are based on my personal knowledge and review of information and my experience with the Debtors' operations and transactions relating to hedging and trading activities.  If called to testify, I would testify to the facts set forth herein.

## I.   The Non-Proprietary LSE Arrangements Have the Potential to Unlock Significant Value for the Debtors' Estates.

### A.   The Non-Proprietary LSE Arrangements Have the Potential to Unlock a Significant Portion of the ERCOT Market.

4. The Non-Proprietary LSE Arrangements are one type of Non-Proprietary Hedging and Trading Arrangement that are subject to the 2015 Non-Proprietary Order and 2016 Non-Proprietary Order.  LSEs obtain electricity from generators and power marketers, like the Hedging and Trading Entities, and then sell such electricity to end-users.  While there are many types of LSEs, the relief requested herein is solely with respect to the Muni-LSEs.

Muni-LSEs may own generation capacity but may obtain electricity on a wholesale basis from third-party generators and power marketers (like the Hedging and Trading Entities) if, for example, their existing generation is insufficient to cover demand or if it is more economical to purchase electricity from third parties as opposed to operating existing plants.  These third-party agreements typically take one of three forms:  (a) through bilateral contracts with power generators and power marketers, like the Non-Proprietary LSE Arrangements, whereby the Hedging and Trading entities agree to supply electricity to a Muni-LSE based upon an agreed

price structure for a certain period of time (*i.e.,* a certain tenor); (b) through the ERCOT day-ahead market (*i.e.,* a Muni-LSE will estimate how much electricity it believes it will need for the next day and may purchase that electricity from entities like the Hedging and Trading Entities in the ERCOT day-ahead market); and (c) in certain limited circumstances, in ERCOT's real-time market (*i.e.,* to bridge any gaps in a Muni-LSE's actual electric needs not otherwise met by the day-ahead market or bilateral contracts). Importantly, municipalities and cooperatives in the ERCOT market account for approximately 25% of the ERCOT load.

5.      In addition, the Muni-LSEs are historically low-risk counterparties with strong credit ratings. Franchised utilities, like the Muni-LSEs, can recover their costs through their rate structure (*i.e.,* Muni-LSEs charge rates to their end-use customers and through those rates, recover their costs of incurring electricity from power generators like the Hedging and Trading Entities). Consequently, I believe Muni-LSEs are universally considered to be strong transaction counterparties with limited default risk. In addition, and in part because of their strength as transaction counterparties, Muni-LSEs traditionally transact for longer-term contracts in order to ensure a secure and stable source of power. In many circumstances, I understand that Muni-LSEs are required by their internal risk management guidelines to enter into longer-term contracts to ensure minimal disruption to their power supply.

B.      **The Muni-LSEs Have Demonstrated Renewed Interest in Transacting with the Hedging and Trading Entities**.

6.      In 2007, the Debtors engaged in a series of transactions that significantly increased the Debtors' funded indebtedness at the Debtor TCEH (which is the direct parent of

the Hedging and Trading Entities), at the Debtor EFCH and at the Debtor EFH Corp. (each of which is the indirect parent of the Hedging and Trading Entities).[3]

7.      Over the last several years, and based on concerns regarding the Debtors' credit worthiness, as well as a perception that the Debtors would not be able to perform under the Non-Proprietary LSE Arrangements, the Muni-LSEs have been reluctant to engage with Hedging and Trading Entities regarding executing new Non-Proprietary LSE Arrangements.

8.      In recent months, however, the Muni-LSEs have begun re-engaging with the Hedging and Trading Entities regarding opportunities to enter into new Non-Proprietary LSE Arrangements.  These discussions are encouraging and I believe they reflect the Muni-LSEs belief that the Debtors' financial condition and credit worthiness have improved and are likely to stay on a positive trajectory in the near-term.  The Debtors' current Non-Proprietary Hedging and Trading Arrangements do not allow them to capitalize on the value that may be unlocked through longer-term wholesale agreements with the Muni-LSEs.  Specifically, these new Non-Proprietary LSE Arrangements provide the Hedging and Trading Entities with the potential to serve the 25% of the ERCOT market that has remained virtually inaccessible over the last several years.

9.      In order to stay competitive with their peers and actively pursue opportunities with Muni-LSEs, I believe the Hedging and Trading Entities require the ability to enter into Non-Proprietary LSE Hedging Arrangements with a tenor that extends beyond 27 months from a particular Reference Date.

---

[3]    For additional information regarding the 2007 transaction, *see Disclosure Statement for the Joint Plan of Reorganization of Energy Future Holdings Corp.*, et al., *Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 4143].

4

**II.    The Non-Proprietary LSE Arrangements are Subject to the Approval Limit, Internal Hedging Policy, and Risk Management Guidelines**.

10.    The Non-Proprietary LSE Arrangements are, and will continue to be, subject to a number of related risk reduction policies, including (a) the Debtors' rigorous Risk Management Guidelines; (b) the Approved Limits; and (c) the Internal Hedging Policy (each as defined and described below).  As described in the First Hedging and Trading Motion, the Debtors utilize Risk Management Guidelines which focus on governance and operational accountabilities surrounding transactions undertaken under the Non-Proprietary Hedging and Trading Arrangements, to ultimately ensure that hedging and trading transactions are closely monitored and in the best interests of all of the Debtors' stakeholders.[4]

11.    In addition to the Risk Management Guidelines, the Debtors utilize an Internal Hedging Policy, which is reviewed annually by the Audit Committee and which restricts the Hedging and Trading Entities' ability to enter into Non-Proprietary Hedging and Trading Arrangements that would result in the Hedging and Trading Entities hedging more than 100% (in the aggregate) of the Debtors' projected exposure to certain commodities for a particular calendar year.  The Internal Hedging Policy applies to certain commodities (including natural gas and power, both of which are contracted for under the Non-Proprietary LSE Arrangements) and imposes Approved Limits with respect to those commodities (*i.e.,* the percent up to which the Hedging and Trading Entities can hedge the Debtors' exposure with respect to such commodities) for specific periods.  In addition, the Approved Limits and the Risk Management Guidelines require the Hedging and Trading Entities to follow certain transaction procedures (and obtain certain internal approvals) before entering into the Non-Proprietary LSE

---

[4]    For additional detail regarding the Risk Management Guidelines, *see* the 2016 Non-Proprietary Hedging and Trading Motion and the First Hedging and Trading Motion.

Arrangements. In short, the Non-Proprietary LSE Arrangements, like all of the Debtors' Non-Proprietary Hedging and Trading Arrangements, are subject to various risk protocols, but ultimately present minimal risk to the Debtors' exposure given the strength of Muni-LSEs as contract counterparties.

12.     I believe that without the ability to enter into Non-Proprietary LSE Arrangements with a tenor beyond 27 months from a particular Reference Date, the Debtors are at risk of losing a significant opportunity to capitalize on new business in the hypercompetitive Texas electricity market.  I also believe that the Debtors will be at a competitive disadvantage with respect to other companies in the energy industry if the Debtors cannot engage with the Muni-LSEs regarding long-term wholesale agreements and, given the projected tenor of such new arrangements, once lost, such a transaction opportunity may not arise again.

13.     In conclusion, I believe a limited waiver of the tenor limitations in the 2016 Non Proprietary Order, permitting the Debtors to enter into Non-Proprietary LSE Arrangements with a tenor beyond 27 calendar months from a particular Reference Date will allow the Debtors to stay competitive and capitalize on a limited opportunity to engage with Muni-LSEs on wholesale agreements that have the capacity to return significant value to the Debtors' estates.

[*Remainder of page intentionally left blank.*]

RLF1 12583907v.1

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct to the best of my knowledge and belief.


Dated:  July 21, 2015
       Dallas, Texas                               */s/ Joseph Ho*
                                                 Joseph Ho
                                                 Senior Vice President, Enterprise Risk Management
                                                 EFH Corporate Services Company

RLF1 12583907v.1