## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) |
| ENERGY FUTURE HOLDINGS CORP., *et al.*, | )    Chapter 11 |
| *Debtors.* | )    Case No. 14-10979 (CSS) |
| | )    (Jointly Administered) |
| DELAWARE TRUST COMPANY, as | ) |
| INDENTURE TRUSTEE, | ) |
| *Plaintiff,* | ) |
| v. | )    Adversary Proceeding |
| ENERGY FUTURE INTERMEDIATE HOLDING | )    No. 14-50363 (CSS) |
| COMPANY LLC and EFIH FINANCE INC. | ) |
| *Defendants.* | ) |
| | ) |

### AMENDED NOTICE OF APPEAL[1]

Plaintiff Delaware Trust Company ("Plaintiff"), indenture trustee for first lien notes

("Notes") issued by Energy Future Intermediate Holding Company LLC and EFIH Finance Inc.,

and the specified holders of the Notes (the "Noteholders"; together with Plaintiff, "Appellants"),[2]

appeal under 28 U.S.C. § 158 from all of the following orders, judgments and decrees issued by

the U.S. Bankruptcy Court for the District of Delaware (Sontchi, J.) in the above-captioned

chapter 11 case and/or adversary proceeding:

- Order dated July 8, 2015 [No. 14-10979, Dkt. 4940; No. 14-50363, Dkt. 305]

- Findings of Fact and Conclusions of Law dated July 8, 2015 [No. 14-10979, Dkt. 4939; No. 14-50363, Dkt. 304]

---

[1] This Amended Notice of Appeal amends the Notice of Appeal filed on July 17, 2015 [No. 14-10979, Dkt. 5035; No. 14-50363, Dkt. 308] to attach the following: (1) Order dated July 8, 2015 [No. 14-10979, Dkt. 4940; No. 14-50363, Dkt. 305]; (2) Findings of Fact and Conclusions of Law dated July 8, 2015 [No. 14-10979, Dkt. 4939; No. 14-50363, Dkt. 304]; (3) Order dated March 26, 2015 [No. 14-10979, Dkt. 3985; No. 14-50363, Dkt. 246]; and (4) Findings of Facts and Conclusions of Law Regarding Cross-Motions for Summary Judgment dated March 26, 2015 [No. 14-10979, Dkt. 3984; No. 14-50363, Dkt. 245].

[2] The Noteholders consist of (or are funds or accounts managed or advised by): BlueMountain Capital Management, LLC; Cyrus Capital Partners L.P.; Halcyon Asset Management LLC; LLSM II L.P.; Luxor Capital Group, LP; Southpaw Credit Opportunity Master Fund LP; VR Advisory Services Ltd; Waveny Capital Management, LP; and Whitebox Advisors LLC.

- Order dated March 26, 2015 [No. 14-10979, Dkt. 3985; No. 14-50363, Dkt. 246]

- Findings of Facts and Conclusions of Law Regarding Cross-Motions for Summary Judgment dated March 26, 2015 [No. 14-10979, Dkt. 3984; No. 14-50363, Dkt. 245]

- Any and all orders, opinions, findings of fact, conclusions of law, rulings, or other decisions that merged in the foregoing Orders, Findings of Fact and Conclusions of Law

The names of all parties to the order and the names, addresses and telephone numbers of their respective attorneys are as follows:

| PARTY | COUNSEL |
|---|---|
| **Plaintiff / Appellants** | Norman L. Pernick<br>J. Kate Stickles<br>COLE SCHOTZ P.C.<br>500 Delaware Avenue, Suite 1410<br>Wilmington, DE  19801<br>Telephone: 302-652-3131<br>Facsimile:  302-652-3117<br>npernick@coleschotz.com<br>kstickles@coleschotz.com<br><br>Warren A. Usatine<br>COLE SCHOTZ P.C.<br>Court Plaza North<br>25 Main Street<br>Hackensack, NJ 07602<br>Telephone: 201-489-3000<br>Facsimile:  201-489-1536<br>wusatine@coleschotz.com<br><br>Philip D. Anker<br>Charles C. Platt<br>WILMER CUTLER PICKERING HALE AND DORR LLP<br>7 World Trade Center<br>250 Greenwich Street<br>New York, NY 10007<br>Telephone: 212-230-8800<br>Facsimile:  212-230-8888<br>Philip.Anker@wilmerhale.com |

| | |
|---|---|
| | Charles.Platt@wilmerhale.com<br><br>Dennis L. Jenkins<br>WILMER CUTLER PICKERING HALE AND<br>DORR LLP<br>60 State Street<br>Boston, MA 02109<br>Telephone:  617-526-6000<br>Facsimile: 617-526-5000<br>Dennis.Jenkins@wilmerhale.com<br><br>James H. Millar<br>DRINKER BIDDLE & REATH LLP<br>1177 Avenue of the Americas<br>41st Floor<br>New York, NY 10036-2714<br>Telephone:  212-248-3264<br>Facsimile:  212-248-3141<br>James.Millar@dbr.com<br><br>Todd C. Schiltz<br>DRINKER BIDDLE & REATH LLP<br>222 Delaware Ave, Suite 1410<br>Wilmington, DE  19801-1612<br>Telephone:  302-467-4200<br>Facsimile:  302-467-4201<br>todd.schiltz@dbr.com |
| **Defendants Energy Future**<br>**Intermediate Holding Company LLC**<br>**and EFIH Finance Inc. and**<br>**and the other Debtors and Debtors in**<br>**Possession / Appellees** | RICHARDS, LAYTON & FINGER, P.A.<br>Mark D. Collins<br>Daniel J. DeFranceschi<br>Jason M. Madron<br>920 North King Street<br>Wilmington, Delaware 19801<br>Telephone: (302) 651-7700<br>Facsimile: (302) 651-7701<br>collins@rlf.com<br>defranceschi@rlf.com<br>madron@rlf.com<br><br>Richard M. Cieri<br>Edward O. Sassower, P.C.<br>Brian E. Schartz<br>KIRKLAND & ELLIS LLP<br>KIRKLAND & ELLIS INTERNATIONAL LLP<br>601 Lexington Avenue |

| | |
|---|---|
| | New York, New York 10022-4611<br>Telephone: (212) 446-4800<br>Facsimile: (212) 446-4900<br>edward.sassower@kirkland.com<br>richard.cieri@kirkland<br>stephen.hessler@kirkland.com<br>brian.schartz@kirkland.com<br><br>James H.M. Sprayregen, P.C.<br>Marc Kieselstein, P.C.<br>Chad J. Husnick<br>Andrew R. McGaan<br>Steven N. Serajeddini<br>KIRKLAND & ELLIS LLP<br>KIRKLAND & ELLIS INTERNATIONAL LLP<br>300 North LaSalle<br>Chicago, Illinois 60654<br>Telephone: (312) 862-2000<br>Facsimile: (312) 862-2200<br>james.sprayregen@kirkland.com<br>marc.kieselstein@kirkland.com<br>chad.husnick@kirkland.com<br>andrew.mcgaan@kirkland.com<br>steven.serajeddini@kirkland.com |
| **Intervenors certain funds and accounts advised or sub-advised by Fidelity Management & Research Company or its affiliates** | Michael J. Joyce<br>CROSS & SIMON, LLC<br>1105 N. Market Street<br>Suite 901<br>Wilmington, Delaware 19899-1380<br>Telephone: (302) 777-4200<br>Facsimile: (302) 777-4224<br>mjoyce@crosslaw.com<br><br>Brad Eric Scheler<br>Gary L. Kaplan<br>Matthew M. Roose<br>FRIED, FRANK, HARRIS, SHRIVER &<br>JACOBSON LLP<br>One New York Plaza<br>New York, New York 10004<br>Telephone: (212) 859-8000<br>Facsimile: (212) 859-4000<br>brad.eric.scheler@friedfrank.com<br>gary.kaplan@friedfrank.com<br>matthew.roose@friedfrank.com |

| | |
|---|---|
| **Intervenor Pacific Investment Management Company LLC** | Jamie L. Edmonson<br>VENABLE LLP<br>1201 North Market Street<br>Suite 1400<br>Wilmington, DE 19801<br>Telephone: (302) 298-3535<br>Facsimile: (302) 298-3550<br>jledmonson@Venable.com<br><br>Jeffrey S. Sabin<br>VENABLE LLP<br>Rockefeller Center<br>1270 Avenue of the Americas<br>Twenty-Fifth Floor<br>New York, NY 10020<br>Telephone: (212) 307-5500<br>Facsimile: (212) 307-5598<br>jssabin@Venable.com<br><br>Julia Frost-Davies<br>Patrick Strawbridge<br>MORGAN, LEWIS & BOCKIUS LLP<br>One Federal Street<br>Boston, MA  02110-1726<br>Telephone: (617) 341-7700<br>Facsimile: (617) 341-7701<br>julia.frost-davies@morganlewis.com<br>patrick.strawbridge@morganlewis.com |
| **Intervenor the Ad Hoc Group of EFH Legacy Noteholders** | Garvan F. McDaniel<br>HOGAN MCDANIEL<br>1311 Delaware Avenue<br>Wilmington, Delaware 19806<br>Telephone: (302) 656-7540<br>Facsimile: (302) 656-7599<br>gfmcdaniel@dkhogan.com<br><br>David S. Rosner<br>Andrew K. Glenn<br>Daniel A. Fliman<br>KASOWITZ, BENSON, TORRES<br>& FRIEDMAN LLP<br>1633 Broadway<br>New York, New York 10019<br>Telephone: (212) 506-1700<br>Facsimile: (212) 506-1800 |

| | DRosner@kasowitz.com<br>AGlenn@kasowitz.com<br>DFliman@kasowitz.com |
|---|---|
| **Intervenor Computershare Trust Company, N.A. and Computershare Trust Company of Canada as Trustee** | Laura Davis Jones<br>Robert J. Feinstein<br>PACHULSKI STANG ZIEHL & JONES LLP<br>919 N. Market Street, 17th Floor<br>P.O. Box 8705<br>Wilmington, DE 19899-8705 (Courier 19801)<br>Telephone: (302) 652-4100<br>Facsimile: (302) 652-4400<br>ljones@pszjlaw.com<br>rfeinstein@pszjlaw.com<br><br>Thomas Moers Mayer<br>Gregory A. Horowitz<br>Joshua K. Brody<br>KRAMER LEVIN NAFTALIS & FRANKEL LLP<br>1177 Avenue of the Americas<br>New York, New York 10036<br>Telephone: (212) 715-9100<br>Facsimile: (212) 715-8000<br>tmayer@kramerlevin.com<br>ghorowitz@kramerlevin.com<br>jbrody@kramerlevin.com<br><br>Stephanie Wickouski<br>BRYAN CAVE LLP<br>1290 Avenue of the Americas<br>New York, New York 10104-3300<br>Telephone: 212-541-1114<br>Facsimile: 212-904-0514<br>stephanie.wickouski@bryancave.com |
| **Intervenor the Official Committee of TCEH Unsecured Creditors** | James M. Peck<br>Brett H. Miller<br>Lorenzo Marinuzzi<br>Todd M. Goren<br>MORRISON & FOERSTER LLP<br>250 West 55th Street<br>New York, New York 10019-9601<br>Telephone: (212) 468-8000<br>Facsimile: (212) 468-7900<br>jpeck@mofo.com<br>brettmiller@mofo.com<br>lmarinuzzi@mofo.com |

| | |
|---|---|
| | tgoren@mofo.com<br><br>Christopher A. Ward<br>Justin K. Edelson<br>Shanti M. Katona<br>Jarrett Vine<br>POLSINELLI PC<br>222 Delaware Avenue, Suite 1101<br>Wilmington, Delaware 19801<br>Telephone: (302) 252-0920<br>Facsimile: (302) 252-0921<br>cward@polsinelli.com<br>jedelson@polsinelli.com<br>skatona@polsinelli.com<br>jvine@polsinelli.com |
| **Intervenor the Official Committee of Unsecured Creditors of Energy Future Holdings Corp., Energy Future Intermediate Holding Company, LLC; EFIH Finance, Inc.; and EECL Inc.** | Natalie D. Ramsey<br>Davis Lee Wright<br>Mark A. Fink<br>MONTGOMERY McCRACKEN WALKER & RHOADS, LLP<br>1105 North Market Street, 15th Floor<br>Wilmington, DE 19801<br>Telephone: (302) 504-7800<br>Facsimile: (302) 504 -7820<br>nramsey@mmwr.com<br>dwright@mmwr.com<br>mfink@mmwr.com<br><br>Andrew G. Dietderich<br>Brian D. Glueckstein<br>Michael H. Torkin<br>SULLIVAN & CROMWELL LLP<br>125 Broad Street<br>New York, New York 10004<br>Telephone: (212) 558-4000<br>Facsimile: (212) 558-3588<br>dietdericha@sullcrom.com<br>gluecksteinb@sullcrom.com<br>torkinm@sullcrom.com |

Dated:  July 22, 2015

*/s/  Norman L. Pernick*
_____

COLE SCHOTZ P.C.
Norman L. Pernick (Bar No. 2290)
J. Kate Stickles (Bar No. 2917)
500 Delaware Avenue, Suite 1410
Wilmington, DE  19801
Telephone: 302-652-3131
Facsimile:  302-652-3117
npernick@coleschotz.com
kstickles@coleschotz.com

Warren A. Usatine
Court Plaza North
25 Main Street
Hackensack, NJ 07602
Telephone: 201-489-3000
Facsimile:  201-489-1536
wusatine@coleschotz.com

WILMER CUTLER PICKERING HALE AND DORR LLP
Philip D. Anker
Charles C. Platt
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: 212-230-8800
Facsimile:  212-230-8888
Philip.Anker@wilmerhale.com
Charles.Platt@wilmerhale.com

Dennis L. Jenkins
60 State Street
Boston, MA 02109
Telephone:  617-526-6000
Facsimile: 617-526-5000
Dennis.Jenkins@wilmerhale.com

DRINKER BIDDLE & REATH LLP
James H. Millar
1177 Avenue of the Americas
41st Floor
New York, NY 10036-2714
Telephone:  212-248-3264
Facsimile:  212-248-3141
James.Millar@dbr.com

Todd C. Schiltz
222 Delaware Ave, Suite 1410
Wilmington, DE  19801-1612
Telephone:  302-467-4200
Facsimile:  302-467-4201
todd.schiltz@dbr.com

**(1)**

**Order dated July 8, 2015**
**[No. 14-10979, Dkt. 4940; No. 14- 50363, Dkt. 305]**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re )<br><br>ENERGY FUTURE HOLDINGS CORP., )<br>*et al.*, )<br><br>*Debtors.* )<br><hr>DELAWARE TRUST COMPANY )<br>as INDENTURE TRUSTEE, )<br>)<br>*Plaintiff,* )<br>)<br>v. )<br>)<br>ENERGY FUTURE INTERMEDIATE )<br>HOLDING COMPANY LLC and )<br>EFIH FINANCE INC. )<br>)<br>*Defendants.* ) | Chapter 11<br>Bankruptcy Case No. 14-10979 (CSS)<br>(Jointly Administered)<br>Docket No. 473<br><br><br><br><br>Adversary Proceeding<br>No. 14-50363 (CSS)<br>Adv. Doc. Nos. 175, 254 |

## **ORDER**

For the reasons set forth in the Court's Findings of Fact and Conclusions of Law

dated July 8, 2015, the Court hereby ORDERS as follows:

1. The Stay-Applicability Motion[1] [D.I. 473] filed on May 15, 2015 is DENIED as to the issue of whether cause exists to lift the automatic stay.[2]

2. Summary judgment is granted with prejudice for EFIH Debtors on Count I of the Complaint.[3]

---

[1] Undefined terms used herein have the meaning set forth in the Court's Findings of Fact and Conclusions of Law.

[2] The Court previously entered summary judgment, in part, in favor of the EFIH Debtors on the Stay-Applicability Motion. Summary judgment was not entered on the Stay-Applicability Motion solely to the fact issue of whether cause exists to lift the automatic stay.

[3] The Court previously entered summary judgment in Debtors' favor without prejudice on Count I and with prejudice on Counts II, III, and IV of the Complaint.

3. Summary judgment is granted for EFIH Debtors on the Contested Matter.[4]

4. The Motion to Alter or Amend Judgment to Clarify that the Order dated March 26, 2015 is Not a Final Judgment [Adv. D.I. 254] is DENIED as moot.

5. Phase Two of the proceedings is unnecessary and shall not occur.[5]

6. All issues before the Court with regard to the Complaint, Contested Matter and Stay-Applicability Motion are resolved and judgment in these matters is final.

_____
Christopher S. Sontchi
United States Bankruptcy Judge

Dated:  July 8, 2015

---

[4] Although the Court intended previously to enter summary judgment in EFIH Debtors' favor on the Contested Matter, the Court inadvertently failed to reference the Contested Matter in the Summary Judgment Decision and related Order.

[5] *See* Adv. D.I. 128.

**(2)**

**Findings of Fact and Conclusions of Law dated July 8, 2015
[No. 14-10979, Dkt. 4939; No. 14-50363, Dkt. 304]**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | ) | |
| | ) | Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., | ) | Bankruptcy Case No. 14-10979 (CSS) |
| *et al.*, | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |
| DELAWARE TRUST COMPANY | ) | |
| as INDENTURE TRUSTEE, | ) | Adversary Proceeding |
| Plaintiff, | ) | No. 14-50363 (CSS) |
| | ) | |
| v. | ) | |
| | ) | |
| ENERGY FUTURE INTERMEDIATE | ) | |
| HOLDING COMPANY LLC and | ) | |
| EFIH FINANCE INC. | ) | |
| Defendants. | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]

### I.    INTRODUCTION & PROCEDURAL HISTORY[2]

1.    This adversary proceeding and motion relates to a series of 10% First Lien

Notes issued by Energy Future Intermediate Holding Company, LLC and EFIH Finance,

Inc., with original maturity of 2020, pursuant to an Indenture dated August 17, 2010.  The

Indenture was supplemented as of January 29, 2013.

---

[1] The Court hereby makes the following findings of fact and conclusions of law pursuant to Fed. R. Bank. P. 7052, which is applicable to this matter by virtue of Fed. R. Bankr. P. 9014. To the extent any findings of fact constitute conclusions of law, they are adopted as such. To the extent any conclusions or law constitute findings of fact, they are adopted as such.

[2] Capitalized terms in the Introduction and Procedural History section not otherwise defined in this section are defined below.

2.      On April 29, 2014, the EFIH Debtors filed petitions for relief under chapter 11 of the Bankruptcy Code.  The EFIH Debtors sought and obtained approval of debtor-in-possession financing, in part, to repay all of the outstanding Notes and settle certain Noteholders' claims (the "<u>DIP Motion</u>"), simultaneously commencing a contested matter seeking a determination that any Noteholders who did not agree to the treatment set forth in the DIP Motion were not entitled to any make-whole payment or related claim (the "<u>Contested Matter</u>").  (PX 94; PX 101; No. 14-10979, D.I. 858.)  The non-settling Noteholders are represented by the Trustee, the movant in the Stay-Applicability Motion and the Plaintiff in this adversary proceeding.

3.      On May 13, 2014, the Trustee objected to the DIP Motion, arguing that the Noteholders were entitled to a secured claim for an amount described in the Indenture as the "Applicable Premium" because: (i) an Optional Redemption would occur when the Notes were repaid; (ii) the EFIH Debtors intentionally defaulted by filing bankruptcy to avoid paying the Applicable Premium, and (iii) the repayment would be a breach of the Noteholders' purported right to rescind the Notes' acceleration.  (No. 14-10979, D.I. 421.)

4.      On May 15, 2014, the Trustee initiated an adversary proceeding.  (No. 14-10979, D.I. 470; No. 14-50363, D.I. 1.)  Its Complaint contained the claims from the May 13 objection, plus (a) a claim for breach of a purported "no-call" covenant in the Indenture; and (b) three unsecured claims, one for each of the three counts raised in its May 13 objection.  (*Id.* ¶ 76.)

5.      The Trustee also simultaneously filed a motion seeking a declaration that it could decelerate the Notes without violating the automatic stay, or alternatively for relief

2

from the automatic stay.  (No. 14-10979, D.I. 473 ("Stay-Applicability Motion").)  On June 4, 2014, a majority in dollar amount of the Noteholders delivered a letter to the Trustee—copied to EFIH—stating that the Noteholders:  (a) waive each and every Default that would otherwise constitute a Default pursuant to either section 6.01(a)(6) or section 6.01(a)(7) of the Indenture (each such Default, individually, a 'Bankruptcy Default') and its consequences, with the effect that no such Default shall be deemed to have occurred; and (b) rescind any acceleration with respect to the Notes and its consequences that would otherwise result from any Bankruptcy Default, including, without limitation, any such acceleration pursuant to the second paragraph of section 6.02 of the Indenture and paragraph 12 of the back of the Notes, with the effect that no such acceleration shall be deemed to have occurred.  (PX 100)  The letter further stated that in the event that "the automatic stay pursuant to Section 362 of the Bankruptcy Code applie[d] to stay the delivery and/or effectiveness" of the notice, "(i) [the notice was] conditioned upon entry of an order by a court of competent jurisdiction lifting the automatic stay to permit the delivery and/or effectiveness of [the notice] (a 'Lift Stay Order'); and (ii) upon entry of a Lift Stay Order, the waiver and rescission set forth above shall be effective as of the date of [the notice]."  (*Id.*)

6.     On June 6, 2014, the Court approved the DIP financing, the EFIH Debtors' use of the DIP financing to pay the outstanding EFIH First Lien Noteholders, and the settlement resolving certain Noteholders' claims for the Applicable Premium.  (No. 14-10979, D.I. 858 (Order Approving EFIH First Lien Settlement); PX 101 (Order approving use of DIP financing).)  The order approved the repayment of the principal balance of and accrued interest on the Notes, but it specified that "the rights of all parties are preserved with respect

to the EFIH First Lien Makewhole Claims." (No. 14-10979, D.I. 859 ¶ 12) The order further provided that:

> Nothing in this Final Order (including, without limitation, any factual findings herein) or the transactions contemplated hereby (including, without limitation, the closing of the EFIH First Lien Repayment) shall have any precedential, evidentiary, law of the case, or preclusive effect with respect to any present or future dispute concerning the amount (if any) of EFIH First Lien Makewhole Claims or any other claims for damages of the EFIH First Lien Notes Trustee or the Prepetition EFIH Lien Creditors due or that may become due as a result of, or in connection with, the EFIH First Lien Repayment, whether in connection with the [Adversary Proceeding], the [Stay-Applicability Motion], or any other claims objection or other proceeding, including, without limitation, whether (i) any acceleration of the EFIH First Lien Notes is subject to rescission by majority holders thereof pursuant to the terms of the EFIH First Lien Indentures or (ii) whether the EFIH First Lien Notes could have been reinstated before the EFIH First Lien Repayment.

> (*Id.*)

7.     On June 19, 2014, in accordance with the Order, the EFIH Debtors repaid all Noteholders their full principal and accrued interest (other than disputed amounts of interest and any make-whole payments) and paid the settling Noteholders an agreed upon amount to settle any remaining claims under the Notes. The non-settling Noteholders are pursuing claims for the Applicable Premium through this motion and adversary proceeding.

8.     On September 12, 2014, the Court bifurcated the proceedings. (No. 14-50363, D.I. 128.) This is Phase One of the litigation in which the Court will determine: (1) whether EFIH is "liable under applicable non-bankruptcy law for . . . a Redemption Claim," including the "make-whole" or other "damages . . . under any 'no-call' covenant, 'right to de-accelerate,'" or applicable law; and (2) "whether the Debtors intentionally defaulted in

order to avoid paying an alleged make-whole premium or other damages." (*Id*. at 2-3.)  The

Court ruled that, except with respect to the Trustee's claim that EFIH intentionally defaulted

to evade payment of the make-whole,[3] "the Court will assume solely for the purposes of

Phase One that the EFIH Debtors are solvent and able to pay all allowed claims of their

creditors in full."  (No. 14-50363, D.I. 128 at 3.)   If the Court finds EFIH liable for a

Redemption Claim, and if EFIH contests that it is, in fact, solvent, Phase Two will determine

"(a) whether the EFIH Debtors are insolvent, and, if so, whether that insolvency gives rise

to any defenses arising under the Bankruptcy Code in favor of the EFIH Debtors that bar or

limit the amount of the Redemption Claim, and (b) the dollar amount of . . . any allowed

Redemption Claim." (*Id*.)

9.      The parties conducted full discovery on the Phase One issues, including the

production of documents, multiple fact witness depositions, production of expert reports,

and multiple expert witness depositions.   Thereafter, the EFIH Debtors and the Trustee

submitted cross-motions for summary judgment, seeking to resolve all of the claims raised

in the Contested Matter, the adversary complaint, and the Stay-Applicability Motion.  (No.

14-50363, D.I. 175, 176, 178, 179.)

10.     On March 26, 2015, the Court issued Findings of Fact and Conclusions of Law

Regarding Cross-Motions for Summary Judgment (No. 14-10979, D.I. 3984; No. 14-50363,

D.I. 245) (the "<u>Summary Judgment Decision</u>") and related order (No. 14-10979, D.I. 3985;

No. 14-50363, D.I. 246) (the "<u>Summary Judgment Order</u>").   In the Summary Judgment

---

[3] The Court has granted summary judgment in favor of the EFIH Debtors on this claim. (Summary Judgment Decision ¶¶ 8(b), 58-61, 91 (No. 14-50363, D.I. 246).)

Decision, the Court held that the Trustee's motion for summary judgment should be denied in its entirety and summary judgment entered in favor of the EFIH Debtors on Counts I-IV of the Complaint (provided, however, that entry of summary judgment on Count I of the Complaint was without prejudice) and summary judgment should be granted, in part, in favor of the EFIH Debtors on the Stay-Applicability Motion.  (*Id*. at ¶ 95.)  The Court further held that summary judgment should not be entered on the Stay-Applicability Motion solely to the issue of whether, as a factual matter, cause exists to lift the automatic stay.  (*Id*.)  Accordingly, the Summary Judgment Order denied the Trustee's motion for summary judgment in its entirety and entered summary judgment in favor of the EFIH Debtors on Counts I-IV of the Complaint (provided, however, that entry of summary judgment on Count I of the Complaint was without prejudice) and entered summary judgment, in part, in favor of the EFIH Debtors on the Stay-Applicability Motion.  (No. 14-50363, D.I. 247.)[4] Summary judgment was not entered on the Stay-Applicability Motion solely to the fact issue of whether cause exists to lift the automatic stay.  (*Id*.)[5]

11.    As part of the Summary Judgment Decision, the Court found that "[a] genuine issue of material fact exists that requires a trial on the merits as to whether the Trustee can establish cause to lift the automatic stay, *nunc pro tunc* to a date on or before

---

[4] Although the Court intended to enter summary judgment in Debtors' favor on the Contested Matter, the Court inadvertently failed to reference the Contested Matter in the Summary Judgment Decision and related Order.  For the avoidance of doubt, the Court will enter judgment in Debtors' favor on the Contested Matter.

[5] The Trustee has filed a Motion to Alter or Amend Judgment to Clarify that the Order Dated March 26, 2015 Is Not a Final Judgment.  (No. 14-50363, D.I. 254)  These Findings of Fact and Conclusions of Law along with the Court's forthcoming order dispense with any need to address that motion and, accordingly, it will be denied as moot.

June 19, 2014, to allow the Trustee to waive the default and decelerate the Notes."
(Summary Judgment Decision ¶ 8(f).)

12.     The Court conducted a trial from April 20 through April 22, 2015, on the
merits of whether cause exists to lift the automatic stay.

13.     As set forth below, the Court finds that, notwithstanding that the EFIH
Debtors are deemed solvent for Phase One, cause does not exist to lift the automatic stay to
allow the Trustee to waive the default and decelerate the Notes.  As a result, the Court will
grant judgment in favor of the EFIH Debtors in this matter and deny the Trustee's motion
to lift the automatic stay.  More specifically, the Court holds as follows:

> **i.**     Notwithstanding that the EFIH Debtors are presumed solvent for
> Phase One, based upon the totality of the circumstances, cause does
> not exist to lift the automatic stay to allow the Trustee to waive the
> default and decelerate the Notes.

> **ii.**    Great prejudice to either the EFIH Debtors' estate or the EFIH
> Debtors, in the form of the loss of hundreds of millions of dollars,
> will result from a lifting of the automatic stay.

> **iii.**   The hardship to the Noteholders by maintenance of the automatic
> stay is, at most, equal to the hardship to the EFIH Debtors from
> lifting the automatic stay and therefore does not considerably
> outweigh the hardship to the EFIH Debtors.

      **iv.**      The Court has previously held that, under the Indenture, the "Trustee … had the right to waive [EFIH's bankruptcy] default and decelerate the Notes," and that "[w]ere the Court … to lift the automatic stay … to allow the Trustee's rescission notice to take effect then the automatic default would be waived, the Notes would no longer be immediately due and the refinancing would require payment of the Applicable Premium." (Summary Judgment Decision ¶ 69) Thus, the Trustee has demonstrated a likelihood of success on the merits.

## II.    FINDINGS OF FACT

14.    An Indenture dated August 17, 2010 (the "<u>Indenture</u>") governs the EFIH 10.000% Senior Secured Notes Due 2020. (PX 33.) That Indenture was supplemented as of January 29, 2013, but the parties agree that the provisions of that supplement are not relevant here. EFIH also issued certain 6.875% Senior Secured Notes Due 2012 pursuant to a separate 2012 indenture. That 2012 indenture is substantially identical in all relevant aspects to the Indenture.

### A.    The Parties

15.    Plaintiff is the indenture trustee (the "<u>Trustee</u>") for the EFIH 10.000% Senior Secured Notes due 2020 ("<u>Notes</u>"), representing Noteholders who did not accept a settlement offer in connection with the repayment of the Notes at the outset of these chapter 11 cases. (*See* No. 14-10979, D.I. 74.) Defendants are Energy Future Intermediate Holding

Company, LLC and EFIH Finance, Inc. (collectively "EFIH," the "EFIH Debtors," or

"Defendants").

### B.    Negotiation of the Notes

16.    In the summer of 2010, EFIH negotiated and ultimately executed a debt

exchange that involved the issuance of $2.18 billion of Notes.  (4/20/15 Trial Tr. 68:16-19

(Kearns Test.), 235:14-17 (Horton Test.).)  EFIH and the "Dealer Manager" investment banks

were the principal negotiators of the offering and execution documents, including the

Indenture that is at the center of this dispute.  (11/20/14 Moldovan Dep. 40:22-41:13.)

Counsel to the original Trustee of the Notes was also involved in negotiations of the

transaction, including the Indenture.  (4/21/15 Trial Tr. 171:7-23 (Moldovan Test.).)

17.    Many terms and conditions of the Indenture were modeled on other

indentures governing previous debt issuances by EFIH and EFH Corp. in 2009 and 2007,

respectively.  (Moldovan Dep. 143:11-20.)  Like the Indenture, these previous agreements

included an "Optional Redemption" provision providing for the payment of an "Applicable

Premium" under certain limited circumstances expressly specified in those agreements.

(PX 33 at § 3.07.)

### C.    The August 2010 EFIH Debt Exchange

18.    The "August 2010 Exchange" called for exchanging outstanding

11.250%/12.000% Senior Toggle Notes due 2017 and 10.875% Senior Notes due 2017 issued

by EFH Corp. and guaranteed by EFIH (the "Old Notes") for up to $2.18 billion aggregate

principal amount of 10% Notes, as well as an aggregate of $500 million in cash.  (4/20/15

Trial Tr. 235:14-17 (Horton Test.); 4/21/15 Trial Tr. 20:17-19 (Horton Test.).)

19.     The August 2010 Exchange was an arms' length transaction between EFIH, EFH, and the Noteholders.  One of the Trustee's experts described the exchange as a "balanced trade."  (4/20/15 Trial Tr. 165:20-23 (McCarty Test.).)  At the time of the August 2010 Exchange, the Old Notes were trading at approximately seventy cents on the dollar. (4/20/15 Trial Tr. 165:6-11 (McCarty Test.); 4/21/15 Trial Tr. 20:7-9 (Horton Test.).)  In the August 2010 Exchange, the Noteholders received the Notes, which granted additional security (first lien versus unsecured), and $500 million in cash. (4/20/15 Trial Tr. 164:9-25 (McCarty Test.); 4/21/15 Trial Tr. 19:16-20:6 (Horton Test.).)  The exchange ratio in the August 2010 Exchange effectively gave the Noteholders a five point increase in terms of fair market value on the Old Notes.  (4/20/15 Trial Tr. 165:12:17 (McCarty Test.); 4/21/15 Trial Tr. 18:22-19:6 (Horton Test.).)

20.     The Notes are governed by an Indenture.  (PX 33.)  The Indenture is governed by New York law.  (*Id.* at § 13.08.)  The Indenture constitutes the bargain between the EFIH Debtors, the Noteholders, and the Trustee.  (4/20/15 Trial Tr. 170:1-12 (McCarty Test.).)

21.     The call protection provisions were generally the same in the Indenture as in the indenture governing the Old Notes.  (*E.g.*, PX 9; 4/20/15 Trial Tr. 172:4-13 (McCarty Test.); 4/21/15 Trial Tr. 22:4-10 (Horton Test.).)  EFIH's Treasurer, Anthony Horton, testified that neither the Noteholders nor their representatives (including the Trustee) ever brought up during negotiations that they wanted or expected a make-whole payment following a bankruptcy acceleration.  (4/21/15 Trial Tr. 19:20-21:7, 21:17-22:2 (Horton Test.).)

22.     At the closing of the August 2010 Exchange, as is customary in issuances of securities, several written legal opinions were given by counsel to EFIH. (4/21/15 Trial Tr. 166:13-23 (Moldovan Test.).)  Simpson Thacher & Bartlett LLP, counsel to EFIH, negotiated the contents of its opinion with the dealer managers and the Trustee (including their respective counsel).  (*Id*. at 171:7-23.)  Among other things, Simpson Thacher opined that certain provisions of the Indenture were enforceable, but stated expressly that it was not opining on their enforceability in the event of a bankruptcy or insolvency.  (*Id*. at 172:5-173:1; DX 1 at 7)  In the registration statement for the issuance of the Notes filed with the Securities & Exchange Commission, Simpson Thacher also provided an "Exhibit 5" opinion that contained similar opinions and qualifications regarding the enforceability of the Notes.  (DX 2 at 2; 4/21/15 Trial Tr. 176:19-177:9 (Moldovan Test.).)

### D.     Investors in the Notes

23.     Although the Notes were originally issued in the August 2010 Exchange, they continued to be freely traded from the time of the Exchange through trial.  At trial, the Court heard from two Noteholders: Ethan Auerbach from Blue Mountain Capital Management and John Greene from Halcyon Asset Management.

24.     Blue Mountain Capital Management ("<u>Blue Mountain</u>") is an investment manager with $20 billion in assets under management.  (4/21/15 Trial Tr. 87:10-11, 87:17-19 (Auerbach Test.).)  As of the repayment date of the Notes, June 19, 2014, Blue Mountain owned $561 million in face value of the Notes and, at the time of trial, owned roughly $650 million in face value of the Notes.  (*Id*. at 94:1-7, 110:9-12.)  Blue Mountain first purchased Notes in the fall of 2011.  (*Id*. at 111:16-19.)  Blue Mountain subsequently made hundreds of

different purchases and sales of the Notes between its first purchase in 2011 and repayment of the Notes in 2014.  (*Id*. at 117:1-4.)  Blue Mountain performed significant diligence on the transaction, and Mr. Auerbach testified that it was important to read the Indenture to understand the bargain.  (*Id*. at 116:14-16.)  Blue Mountain also read a Form 8-K filed by EFIH with the SEC on November 1, 2013, that noted that the EFIH Debtors did not intend to pay any make-whole premiums on the Notes, and Blue Mountain understood that restructuring proposals proposed by EFIH and by certain creditors included not paying a make-whole premium.  (*Id*. at 118:18-119:18.)

25.    After November 1, 2013, Blue Mountain understood that a bankruptcy filing for EFIH was reasonably likely and that the EFIH Debtors, the Debtors' creditors, or both would fight the make-whole.  (*Id*. at 119:19-120:5.)  Blue Mountain continued to buy the Notes (or claims related thereto) after November 1, 2013, up until days before the lift-stay trial.  (*Id*. at 121:5-10, 121:22-23.)  The amount that Blue Mountain believes it would recover in the form of a make-whole payment should the automatic stay be lifted is slightly more than $100 million.  (*Id*. at 110:22-25.)  That amount, $100 million, represents approximately 0.5% of Blue Mountain's approximately $20 billion assets under management.  (*Id*. at 109:25-110:2.)  Blue Mountain could have invested in the EFIH First Lien DIP but chose not to do so.  (*Id*. at 114:12-19.)

26.    Halcyon Asset Management ("Halcyon") has roughly $11 billion in assets under management.  (*Id*. at 152:18-20 (Greene Test.).)  Mr. Greene is a partner who manages portfolios in the hedge fund section of Halcyon.  (*Id*. at 152:15-17, 153:1-7.)  As of the repayment date, June 19, 2014, Halcyon owned roughly $175 million in face value of the

Notes and, at the time of trial, owned closer to $150 million in face value of the Notes.  (*Id.* at 151:21-152:2.)

27.    Halcyon first purchased Notes in early April, 2014.  (*Id.* at 148:11-13.)  At the time of this initial purchase, Mr. Greene was aware that EFIH was going to challenge paying the make-whole premium in bankruptcy.  (*Id.* at 148:14-18.)  Mr. Greene and other members of his team read the Indenture, the Notes, the Offering Memorandum, and EFIH's SEC filings.  (*Id.* at 157:13-24.)  Halcyon made dozens of purchases and sales of Notes (or claims relating thereto) between its initial purchase and the lift-stay trial in this case.  (*Id.* at 148:19-149:14.)  Mr. Greene testified that he was familiar with the automatic stay at the time Halcyon first invested in the Notes.  (*Id.* at 155:24-156:2.)  Mr. Green calculated the amount that Halcyon believes it would recover in the form of a make-whole payment, should the automatic stay be lifted, to be $28 million.  (*Id.* at 154:16-22.)  That amount, $28 million, would represent around 0.25% of the total assets under management at Halcyon.  (*Id.* at 154:24-155:3.)  Halcyon could have invested in the first lien DIP but chose not to do so.  (*Id.* at 158:9-14.)

### E.    The High-Yield Bond Market

28.    Nearly all high-yield bonds—including the Notes—have two fundamental characteristics.  First, the interest rate is fixed until maturity—that is, it does not float or otherwise change as interest rates move up or down in the market.  (4/20/15 Trial Tr. 129:14-17 (McCarty Test.), 61:20-62:2 (Kearns Test.).)  Second, the debt does not amortize—that is, 100% of the principal balance is due at maturity.  (Id. at 130:9-16 (McCarty Test.), 69:11-17 (Kearns Test.).)

13

29.     An investor in high-yield debt contracts to receive a fixed payment of interest whenever interest is payable (typically, semi-annually) for the life of the bond.  (Id. at 130:3-8 (McCarty Test.).)  Those expected interest payments, when added together, constitute the investor's expected return on investment, or, in the industry parlance, the "yield."

30.     Because high-yield bonds offer a fixed income stream over a period of time, they are attractive to institutional investors like pension funds and insurance companies that must "match" their future income with their future obligations.  (Id. at 127:12-18, 127:19-128:2 (McCarty Test.).)  If these investors did not receive their expected cash flow, they would be unable to meet the obligations that they had incurred to retirees and policyholders, among others.  (Id. at 128:22-129:1, 155:1-6 (McCarty Test.).)

31.     Investment in high-yield debt involves an allocation of interest-rate risk: if rates in the market rise, the issuer benefits; if market rates fall, the noteholders benefit.  Specifically, if rates in the market rise, investors will receive a lower-than-market return, and the value of their debt will begin to trade on the open market below face value (known as "par").  (Id. at 131:22-132:4 (McCarty Test.), 64:23-65:3 (Kearns Test.).)  The investors assume that risk, and typically cannot "put" the bonds to the issuer and reinvest its capital at the now higher interest rates prevailing in the market.  (Id. at 132:16-133:1 (McCarty Test.).)

32.     Conversely, if interest rates drop (or the issuer's credit improves), the debt is likely to trade on the open market above par.  (Id. at 134:13-19, 144:10-15 (McCarty Test.).)

### F.      Call Protection

33.      Were high-yield bonds freely "callable" by the issuer whenever market rates of interest declined, the investor would be forced to bear the disproportionate risk of both increases and decreases in interest rates.  (Id. at 134:13-19 (McCarty Test.); 4/21/15 Trial Tr. 65:3-66:7 (Cacioppo Test.).)  The investor would not only lose its guaranteed income stream until maturity, but would also face "reinvestment risk," — the risk that the investor would be unable to find in the market a bond of comparable credit quality and duration that would generate a comparable return.  (4/20/15 Trial Tr. 136:6-13 (McCarty Test.), 65:4-17 (Kearns Test.).)

34.      To protect against these significant financial harms, high-yield debt is almost never freely callable by the issuer.  (Id. at 134:8-12 (McCarty Test.), 65:18-67:3 (Kearns Test.).)  Instead, virtually all high-yield bonds contain some form of "call protection" provision.  (Id. at 56:22-57:10 (Kearns Test.); 4/21/15 Trial Tr. 65:3-66:7 (Cacioppo Test.), 93:6-21 (Auerbach Test.), 132:20-134:4, 134:8-17 (Greene Test.).)

35.      Historically, call protection took the form of an absolute "no call."  That is, the issuer could not redeem the bond at all for at least several years.  (4/20/15 Trial Tr. 137:24-138:24 (McCarty Test.), 57:11-23 (Kearns Test.).)

36.      Over time, however, issuers have bargained for the flexibility to redeem bonds early.  Today, most high-yield bonds have call protection provisions that permit the issuer to call the bonds, subject to certain conditions such as if the issuer pays the investor a make-whole or other sum that ensures investors will receive their promised yield for a

specified period.  (4/20/15 Trial Tr. 137:24-138:6 (McCarty Test.), 73:20-75:4 (Kearns Test.);

4/21/15 Trial Tr. 63:11-17, 65:3-66:7 (Cacioppo Test.).)

### G.     Make-Whole Payments

37.     As its name suggests, a make-whole payment "literally [] make[s] the investor

whole" for what they had contracted to receive when they lent their money in the first place.

(4/20/15 Trial Tr. 136:1-5 (McCarty Test.).)  Make-whole payments are typically calculated

pursuant to a standard formula consisting of a lump sum payment equal to the present

value of the total of the remaining interest payments until a specified date, plus a

"premium" above the face amount of the notes that would be payable by the issuer upon

its redemption of the Notes on that First Call Date.  This formula approximates what the

investor had contracted to receive from the issuer, and would have received but for the early

repayment of the Notes, discounted to present value.  (4/20/15 Trial Tr. 135:17-25, 137:8-12

(McCarty Test.), 77:4-79:6 (Kearns Test.).)

38.     Make-whole provisions not only protect investors, but also benefit issuers.

This is because for an issuer, the alternative to a make-whole provision is either an absolute

no-call provision, (Id. at 138:13-24 (McCarty Test.).), or paying a higher rate of interest on

the notes.  (Id. at 73:20-75:4 (Kearns Test.).)  Freely callable bonds would require higher

interest rates than bonds that are non-callable, or that are callable subject to a make-whole.

(*See, e.g.*, id. at 134:20-135:4, 141:12-142:1 (McCarty Test.), 234:11-17 (Horton Test.); 4/21/15

Trial Tr. 45:18-46:5 (Horton Test.), 65:3-66:7 (Cacioppo Test.).

39.     All of the bonds issued by the Debtors from 2007 to 2013, including the Notes, were high-yield and exhibited the typical characteristics of high-yield bonds discussed above.

**H.     Repayment of the Notes**

40.     On April 29, 2014, the EFIH Debtors filed petitions for relief under chapter 11 of the Bankruptcy Code.   The EFIH Debtors sought approval of debtor-in-possession financing, in part, to repay all of the outstanding Notes and settle certain Noteholders' claims.

41.     On June 4, 2014, the Trustee sent a purported notice of rescission to the EFIH Debtors.  (PX 100.)  The Court previously held that sending a notice of rescission is an act to "collect, assess or recover" on a claim, especially when the Noteholders have already been paid their full principal and accrued interest.  (Summary Judgment Decision ¶ 67.)  Thus, the Trustee's notice of rescission was void *ab initio* as a result of the automatic stay.  (*Id*. at ¶ 69.)

42.     On June 6, 2014, the Court entered an order approving the EFIH First Lien DIP. (PX 101.)  In that Order, the Trustee reserved certain rights as of June 6, 2014, including the right to argue that "any acceleration of the EFIH First Lien Notes is subject to rescission by majority holders thereof pursuant to the terms of the EFIH First Lien Indentures."  (*Id*. at ¶ 40(b).)

43.     On June 19, 2014, EFIH paid all outstanding principal and accrued interest (other than disputed amounts of interest and any make-whole payments) on the First Lien Notes.  (4/20/15 Trial Tr. 70:5-20 (Horton Test.).)

44.     The Court previously held that when the EFIH Debtors filed for bankruptcy, the Notes automatically accelerated and became due and payable immediately.  (Summary Judgment Decision ¶ 56.)   Thus, the June 19, 2014 repayment was not an Optional Redemption under the Indenture and the Trustee was not entitled to the Applicable Premium under the express terms of the Indenture.  (*Id*. at ¶¶ 51, 57.)

45.     The Court also determined that a genuine issue of material fact existed as to whether the Trustee can establish cause to lift the automatic stay, *nunc pro tunc* to a date on or before June 19, 2014, to allow the Trustee to decelerate the Notes.  (*Id*. at ¶ 71.)

## I.     Economic Impact of Lifting or Maintaining the Automatic Stay

46.     One of the Trustee's experts, Christopher Kearns, calculated the make-whole amount as $431 million.  (4/20/15 Trial Tr. 112:18-20 (Kearns Test.).)  Mr. Kearns testified that the make-whole calculation was the liquidated damages amount for the make-whole under the contract.  (*Id*. at 96:4-21, 112:14-17.)   The make-whole amount, or "Applicable Premium," is calculated pursuant to specific requirements in the Indenture.  (*Id*. at 76:23-77:16.)

47.     Mr. Kearns also testified about a variety of reinvestment scenarios, assuming different rates of return from reinvesting the principal and interest paid to the Noteholders on June 19, 2014.  (*Id*. at 114:7-13.)  These scenarios resulted in a range of net loss from $333.7 million up to $428 million.  (*Id*.)  In addition to the reinvestment scenarios presented by Mr. Kearns, each of the Noteholders had the opportunity to participate in the DIP.  (4/21/15 Trial Tr. 26:21-27:6 (Horton Test.).)  EFIH's Treasurer, Anthony Horton, calculated that the Noteholders would have earned $140 million in interest with the DIP interest rate.  (*Id*. at

27:12-17.)   In addition, in June 2014, the non-settling Noteholders could have obtained approximately a $110 million settlement payment for their make-whole claims.  (*Id.* at 27:18-28:6.)

48.     EFIH's Treasurer also testified that the Debtors' current proposed plan of reorganization proposes to pay nothing towards the make-whole amount.  (4/21/15 Trial Tr. 31:23-32:1 (Horton Test.).)  Mr. Horton further stated that the loss to EFIH of $431 million would be "quite significant" and would "further complicate[] a very complex case in getting to a consensual case given that EFH, the parent of EFIH, now had [$]431 million less of distributable value and the implications of getting EFH and EFIH through bankruptcy made it more troublesome."  (*Id.* at 38:15-39:9.)  $431 million is a "big number" or "a lot of money" for any company, particularly one like EFIH that is attempting to restructure through Chapter 11.  (*See* 4/20/15 Trial Tr. 201:10-13, 206:2-22 (Horton Test.).)

49.     The EFIH Debtors received interest savings by virtue of repaying the Notes on June 19, 2014.  EFIH's Treasurer calculated those interest savings to be roughly $150 million from the repayment date through the first call date of December 1, 2015.  (4/20/15 Trial Tr. 224:12-17 (Horton Test.); 4/21/15 Trial Tr. 23:23-24:5 (Horton Test.).)  EFIH will receive those interest savings regardless of whether a make-whole is paid.  (4/21/15 Trial Tr. 24:25-25:18 (Horton Test.).)  And EFIH will receive those interest savings regardless of whether the automatic stay is lifted.  (*Id.*)

50.     Should the automatic stay also be lifted to allow for deceleration of the EFIH second lien and PIK notes, the EFIH Second Lien Noteholders would assert a make-whole

claim of $350-400 million and the PIK Noteholders would almost inevitably assert their own make-whole claim of $113 million.  (*Id*. at 33:4-19.)

## III.   CONCLUSIONS OF LAW

### A.   Jurisdiction and Venue

51.     The Debtors commenced these chapter 11 cases on April 29, 2014 (the "Petition Date").  Venue in the United States Bankruptcy Court for the District of Delaware was proper as of the Petition Date pursuant to 28 U.S.C. §§ 1408 and 1409 and continues to be so in the context of this adversary proceeding and motion.  This Court has subject matter jurisdiction over this adversary proceeding and motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 11 U.S.C. § 157(b).

### B.   Governing Standard

52.     The Bankruptcy Code authorizes bankruptcy courts to grant relief from the automatic stay for "cause."  11 U.S.C. § 362(d)(1).  Courts are to determine "cause" based on the totality of the circumstances in each particular case.  *In re Wilson*, 116 F.3d 87, 90 (3d Cir. 1997).  The factors courts generally use in determining whether cause exists are: (1) whether any great prejudice to either the bankrupt estate or the debtor will result from a lifting of the automatic stay; (2) whether the hardship to the non-bankrupt party by maintenance of the automatic stay considerably outweighs the hardship to the debtor; and (3) the probability of the creditor prevailing on the merits.  *In re Downey Fin. Corp.*, 428 B.R. 595, 609 (Bankr. D. Del. 2010).

53.     While the Trustee has again argued that, as a matter of law, cause exists to lift the automatic stay because (at this stage of the proceedings) the EFIH Debtors are presumed

to be solvent, the Trustee has failed to cite any cases standing for that proposition. While a debtor's solvency may, in certain cases, be a relevant consideration in determining whether cause exists to lift the automatic stay, it is not the sole factor to be considered by the Court. (Summary Judgment Decision ¶ 74.)

54.    The EFIH Debtors have the burden of proof, 11 U.S.C. § 362(g)(2), but only after the Trustee makes a *prima facie* case that it is entitled to relief. *In re RNI Wind Down Corp.*, 348 B.R. 286, 299 (Bankr. D. Del. 2006) *aff'd*, 359 F. App'x 352 (3d Cir. 2010). "A *prima facie* case requires a showing by the movant of 'a factual and legal right to the relief that it seeks.'" *RNI*, 348 B.R. at 299 (quoting *In re Elmira Litho, Inc.*, 174 B.R. 892, 902 (Bankr. S.D.N.Y. 1994)). Failure to prove a *prima facie* case requires denial of the requested relief. *RNI*, 348 B.R. at 299. To apply section 362(g)(2) differently "would force the debtor to prove a negative, that no cause exists." *In re Rexene Products Co.*, 141 B.R. 574, 577 (Bankr. D. Del. 1992).

55.    The Court previously held that the issue before it is whether to lift the automatic stay *nunc pro tunc* to a date on or before June 19, 2014, the date EFIH repaid the Notes. (Summary Judgment Decision ¶¶ 8(e), 8(f), 41, 68-71, 90.) Thus, under the terms of the Court's previous decision, the standard for retroactive automatic stay relief is applicable.[6]

---

[6] The standard for such relief in the Third Circuit is: "(1) whether the creditor was aware of the filing or encouraged violation of the automatic stay; (2) whether the debtor engaged in inequitable, unreasonable, or dishonest behavior; and (3) whether the creditor would be prejudiced." *See In re Myers*, 491 F.3d 120, 129 (3d Cir. 2007).

56.     The Trustee argues that the Court should not apply the *nunc pro tunc* standard because its reservation of rights in the June 6, 2014, EFIH First Lien DIP Order, (PX 101 ¶ 40(b).), preserved a right to not have to meet any additional showing required by the *nunc pro tunc* standard. This is incorrect. The Trustee violated the automatic stay on June 4, 2014, when it sent the rescission notice to the EFIH Debtors. (Summary Judgment Decision ¶ 67, 68.) The June 6, 2014, reservation of rights in the EFIH First Lien DIP Order reserved the Trustee's rights as of June 6, two days after the Trustee's automatic stay violation. Even if the Court had decided the Trustee's lift-stay motion on June 6, 2014, the Court would still have needed to apply the *nunc pro tunc* standard to determine whether to lift the automatic stay retroactively to annul the Trustee's prior automatic stay violation. Accordingly, that standard applies here.

57.     Nonetheless, it doesn't matter. Under the customary lift-stay factors, no cause exists to lift the automatic stay. Thus, the Court need not and will not apply the *nunc pro tunc* standard.

**C.     Great Prejudice Would Occur To The EFIH Debtors' Estate Or The EFIH Debtors Upon A Lifting Of The Automatic Stay**

58.     Courts consider harm to the estate when assessing whether cause exists to lift the automatic stay. *Downey*, 428 B.R. at 609. The estate is defined broadly, 11 U.S.C. § 541, and is created "for the benefit of all creditors and equity holders of the debtor," *In re Johns-Manville Corp.*, 36 B.R. 727, 735 (Bankr. S.D.N.Y. 1984). Accordingly, harm to EFIH's equity holder, EFH, is just as relevant as harm to other stakeholders (including EFIH's creditors) and should be considered as part of the Court's lift-stay analysis. While equity lies at the

bottom of the waterfall of priorities under the Bankruptcy Code, its interests cannot and should not be ignored.  Equity may be structurally subordinate to the creditors but it is not a second class citizen in a debtor's capital structure.  In fact, the EFIH Debtors have "a fiduciary duty to act in the best interest of the estate as a whole, including its creditors, equity interest holders and other parties in interest." *LaSalle Nat. Bank v. Perelman*, 82 F. Supp. 2d 279, 292 (D. Del. 2000); *In re Gen. Growth Props., Inc.*, 409 B.R. 43, 64 (Bankr. S.D.N.Y. 2009) ("Delaware law . . . provides that the directors of a solvent corporation are authorized—indeed, required—to consider the interests of the shareholders in exercising their fiduciary duties.").  The fact that a solvent corporation has commenced a chapter 11 case does not alter these well-settled principles.  *See LaSalle Nat. Bank*, 82 F. Supp. 2d at 292 ("The fiduciary duties that a debtor owes the estate are comparable to the duties that the officers and directors of a solvent corporation owe their shareholders outside bankruptcy.").

59.     The Trustee has argued that, if EFIH is solvent and can pay its creditors' claims, there is no relevant harm to its estate.  But the Trustee has cited to no authority suggesting that solvency alone provides "cause" to lift an automatic stay, and the Court does not agree that a solvent debtor's estate cannot suffer harm.  (Summary Judgment Decision ¶ 75.)  To do so would effectively remove equity holders from the "bankrupt estate."

60.     Therefore, the Court must consider whether great prejudice would result to either the EFIH Debtors or the EFIH Debtors' estate (including equity) as a result of lifting the automatic stay.  It is clear that, should the automatic stay be lifted, the Notes decelerated, and the Trustee's requested make-whole claim be paid, that such payment would

substantially reduce the value of other EFIH stakeholder recoveries, including recoveries to equity (i.e. EFH). The Trustee's expert, Mr. Kearns, calculated the make-whole amount at $431 million. (4/20/15 Trial Tr. 112:18-20 (Kearns Test.).) EFIH's Treasurer testified that the current proposed plan of reorganization proposes to pay nothing towards the make-whole amount. (4/21/15 Trial Tr. 31:23-32:1 (Horton Test.).) Lifting the automatic stay would, thus, cause nearly half a billion dollars to leave the estate. This was echoed in Mr. Horton's testimony as he explained that the impact on the issuer would be $431 million should the automatic stay be lifted. (*Id*. at 26:3-6.) Regardless of whether those amounts are going to creditors, equity, or creditors of equity (or creditors of other Debtors in these Chapter 11 cases), there can be no dispute that hundreds of millions of dollars is a substantial amount of distributable value and the EFIH Debtors' estate will be greatly prejudiced by the loss of that amount.

61. The Trustee argues that, as a legal matter, honoring state law obligations to permit the Noteholders to rescind contractual acceleration cannot constitute harm for the lift-stay analysis. This is incorrect. The automatic stay prohibits creditors from exercising their state law contract rights against the estate. *See* 11 U.S.C. § 362(a). By the Trustee's reasoning, the estate would never be harmed when creditors exercise their state law contract rights, and the automatic stay should therefore always be lifted. If true, this would nullify the automatic stay and therefore the Trustee cannot be correct.

62. In addition, Mr. Horton testified that, should the automatic stay also be lifted to allow for deceleration of the EFIH second lien and PIK notes, the EFIH Second Lien Noteholders will likely assert an additional make-whole claim of approximately $350-400

million and the PIK Noteholders a make-whole claim of approximately $113 million. (*Id*. at 33:4-19.)  Thus, the EFIH estate could confront a total loss of over approximately $900 million in distributable value if the Court were to lift the automatic stay in each of those instances.  The Court need not decide the likelihood of such events, however, as $431 million is already a material sum, the loss of which would greatly prejudice the EFIH Debtors' estate.  Mr. Horton, who serves as Treasurer for both EFIH and EFH, testified that this prejudice would be felt by both entities.  (*Id*. at 39:20-23.)

**D.    The Harm To The Noteholders From Maintaining The Automatic Stay Does Not "Considerably Outweigh" The Harm To The EFIH Debtors From Lifting The Automatic Stay**

63.    The second prong of the cause analysis assesses "whether the hardship to the non-bankruptcy party by maintenance of the stay *considerably outweighs* the hardship to the debtor."  *Downey*, 428 B.R. at 609 (emphasis added).  The Court has considered both economic harm to the parties as well as harm to the parties' expectations.

*i. Economic Harm*

64.    If the Court declines to lift the automatic stay, the harm to the Noteholders is straightforward—it is, at most, the value of the Applicable Premium, or $431 million.  If the Court lifts the automatic stay, the harm to the EFIH Debtor's estate, at the least, is the exact same approximately $431 million dollars.  Thus, the harms resulting from lifting or maintaining the automatic stay are, in the best case for the Trustee, in equipoise and the EFIH Debtors have demonstrated that the harm to the moving party (here the Noteholders) does not "considerably outweigh" the harm to the EFIH Debtors.

65.     Though unnecessary to reach this conclusion, the Court notes that the harm to the EFIH Debtors from lifting the automatic stay could eventually be much greater.  The EFIH Second Lien Trustee has already stated that it will be filing "shortly" its own motion to lift the automatic stay to rescind acceleration, (4/13/15 Ltr. G. Horowitz to Court, at 3 (No. 14-50363, D.I. 260); 4/22/15 Trial Tr. 63:1-8 (Closing).), and the Trustee for the EFIH Unsecured "PIK" Noteholders will likely seek to do the same to rescind the acceleration of the PIK Notes.  As noted above, this could expose the EFIH Debtors to the loss of upwards of approximately $900 million from its estate.  Moreover, the Court notes the obvious fact that exposing the EFIH Debtors to approximately $900 million or more in expanded claims will have a major effect on the Debtors' (including the EFIH Debtors') reorganization process and will benefit a few creditors at the expense of other stakeholders.  The Trustee argues that the effect of this loss of distributable value, however large, to EFIH's equity holder should be irrelevant or, at best, of little moment in this analysis.  The Court disagrees. EFIH is wholly-owned by EFH, another major debtor in these cases.  The loss of distributable value to EFIH's equity holder significantly complicates and prejudices EFH's proposed jointly administered restructuring, which, in turn, makes EFIH's own restructuring more difficult.  The Court need not ignore the reality that every restructuring proposal made in these cases to date has needed to grapple with the interdependent restructurings of EFH and its two major subsidiaries, EFIH and TCEH.  Thus, if the Trustee were permitted to lift the automatic stay and expand its own claim by $431 million, it would cause great prejudice not only to the EFIH Debtors, but also to their equity holder, EFH, which, in turn would significantly complicate efforts to successfully restructure the Debtors

(including the EFIH Debtors).  To the extent that lifting the automatic stay here leads to follow on make-whole claims from other EFIH creditors, the loss to the EFIH estate and its other stakeholders would approach $1 billion and only compound the harm to the EFIH estate.

66.     Thus, while the applicable standard requires the harm to the Noteholders to considerably outweigh the harm to the EFIH Debtors in order to lift the automatic stay, the facts here demonstrate that the harm to the EFIH Debtors outweighs the harm to the Noteholders.

67.     Faced with the argument that the harms are, at best for the Noteholders, equal here, the Trustee has put forward multiple creative but unpersuasive arguments:

68.     First, the Trustee argues that the harm to the EFIH Debtors is actually less than the harm to the Noteholders on a percentage basis.  This argument fails for multiple reasons.  As an initial matter, the Trustee has pointed to no authority supporting this alternative approach to calculating harm.  Additionally, it is an improper apples-to-oranges calculation to look at the make-whole amount as a percentage of the EFIH Debtors' total debt vis-à-vis a percentage of the Noteholders' claim.  Taking such an approach would necessarily show that almost any claim is less important to a debtor (as a percentage of its overall debt) than to a creditor who has a claim for only a portion of that debt.  Finally, as the EFIH Debtors demonstrated at trial, $431 million would actually be a much larger percentage of the EFIH Debtors' total debt than make-whole recoveries would be to

investors like Blue Mountain and Halcyon as a percentage of their overall invested assets.[7]
The concept that $431 million is not meaningful to a debtor with billions in debt is belied by
the testimony of Mr. Greene at Halcyon who agreed that the $28 million (the amount he
calculates as Halcyon's portion of the make-whole) was material to Halcyon even though it
is one quarter of one percent of its assets under management.  (4/21/15 Trial Tr. 154:16-
155:16 (Greene Test.).)

69.     Second, the Trustee argues that EFIH will receive the benefit of a net operating
loss ("NOL") to offset the loss from the Applicable Premium.  (1L Pre-Trial Br. 36; 4/20/15
Trial Tr. 211:18-212:14 (Horton Test.); PX 141.)   The Trustee has not presented sufficient
evidence to demonstrate which entity might receive this tax benefit—EFIH or its parent
EFH.  More importantly, for an NOL to have value, there must be income tax liability against
which to use any NOLs.  The Trustee has not shown that EFIH or EFH are generating
sufficient income such that any additional NOLs would provide any additional benefit to
EFIH or its estate.

70.     Third, the Trustee argues that the EFIH Debtors' harm upon lifting the
automatic stay would actually be less than $431 million because the EFIH Debtors have
achieved significant interest savings by repaying the Notes.  This argument ignores the
governing standard, which makes clear that the relevant inquiry is the harm that results
from *lifting or from maintaining the automatic stay*; not what harm may or may not have

---

[7] Blue Mountain stands to gain roughly $100 million should the automatic stay be lifted– an amount equal
to approximately 0.5% of its assets under management.  Halcyon stands to gain $28 million should the
automatic stay be lifted– an amount equal to approximately 0.25% of its assets under management.

resulted from the EFIH Debtors repaying the Notes on June 19, 2014.  *See Downey*, 428 B.R.

at 609 (factors include: "(1) [w]hether any great prejudice to either the bankrupt estate or

the debtor *will result from a lifting of the stay*; (2) [w]hether the hardship to the non-bankrupt

party *by maintenance of the stay* considerably outweighs the hardship to the debtor…."

(emphasis added).

71.     The Court need not consider either the EFIH Debtors' interest savings or the

Noteholders' ability to reinvest their principal and interest repaid on June 19, 2014.  Neither

of those issues relate to the harm associated with lifting the automatic stay.  Instead, they

focus on the harm to the parties associated with repaying the Notes before the first call date.

EFIH will receive the same interest savings regardless of whether the automatic stay is lifted,

just as the contractually provided make-whole calculation does not change based on the

investment returns the Noteholders receive through reinvestment.  (4/21/15 Trial Tr. 24:25-

25:18 (Horton Test.).)

72.     Even if the Court were to consider interest savings to the EFIH Debtors on

one hand and reinvestment benefits to the Noteholders on the other, the harm would

remain similar to each.  EFIH's Treasurer testified that the EFIH Debtors will receive

approximately $150 million in interest savings for the period from the repayment date to

the first call date.  (4/20/15 Trial Tr. 224:12-17 (Horton Test.); 4/21/15 Trial Tr. at 23:23-24:5

(Horton Test.).)  The Trustee's higher calculation is flawed: first, the Trustee improperly

calculated interest savings from repaying *both* the settling and non-settling Noteholders;

and second, the Trustee includes interest savings going beyond the first call date, while the

Trustee's expert agrees that a rational borrower would have called the notes upon the first call date. (4/20/15 Trial Tr. 80:7-25 (Kearns Test.).)

73.     In terms of the reinvestment opportunities for the Noteholders, multiple witnesses testified that the non-settling Noteholders would have had an opportunity to invest in the first lien DIP. (4/21/15 Trial Tr. 26:20-27:6 (Horton Test.); 4/21/15 Trial Tr. 107:4-7, 108:3-9 (Auerbach Test.); 4/21/15 Trial Tr. 145:9-19 (Greene Test.).) The first lien DIP was offered at an interest rate of 4.25%. (4/21/15 Trial Tr. 28:13-18 (Horton Test.); 4/20/15 Trial Tr. 93:8-13 (Kearns Test.).) The non-settling Noteholders, as was their right, elected not to invest the money they were repaid in the DIP because they determined a 4.25% yield was not attractive enough to them.[8] (4/21/15 Trial Tr. 114:12-19 (Auerbach Test.); 4/21/15 Trial Tr. 158:9-14 (Greene Test.).) An investment at 4.25% would have earned the Noteholders $140 million between the repayment date and the first call date. (4/21/15 Trial Tr. 27:12-17 (Horton Test.).) In addition, the non-settling Noteholders could have obtained approximately a $110 million settlement payment for their make-whole claim in June of 2014. (*Id.* at 27:18-28:6.)

74.     To be sure, there is some debate over exactly what reinvestment options the Noteholders could have utilized as well as the exact interest savings the EFIH Debtors received from repayment of the Notes. The evidence above suggests that the Noteholders could have mitigated their harm at least as effectively, if not more so, than the EFIH Debtors,

---

[8] Instead, representatives from both Blue Mountain and Halcyon testified that they reinvested capital in other investments that have returned less than the first lien DIP. (4/21/15 Trial Tr. 105:8-106:24 (Auerbach Test.); *see* 4/21/15 Trial Tr. 144:19-24 (Greene Test.).) That they made alternative, and apparently riskier, investment decisions does not alter the mitigation opportunity they had in the form of the first lien DIP.

and that the Noteholders could have earned more through reinvestment than the EFIH Debtors saved through interest savings. However, for reasons stated above, such an inquiry is unnecessary when evaluating the economic harm associated with lifting the automatic stay. Instead, the harm to the EFIH Debtors associated with lifting the automatic stay is at least the amount of the Applicable Premium. So, too, the harm to the Noteholders from maintaining the automatic stay is at most the amount of the Applicable Premium.

75.    The Trustee has failed to produce any evidence that the economic harm to the Noteholders from maintaining the automatic stay exceeds the $431 million make-whole calculation. Instead, all of the Trustee's witnesses admitted that $431 million is a cap on the Noteholders' damage. One of the Trustee's experts, Christopher Kearns, ran four harm scenarios based on reinvestment alternatives; each resulted in harm under $431 million. (4/20/15 Trial Tr. 114:7-22 (Kearns Test.).) Mr. Kearns admitted that he views the Applicable Premium as liquidated damages and testified that his make-whole calculation is his calculation of the harm to the Noteholders. (*Id.* at 112:8-111:2.) The Trustee's expert Michiel McCarty similarly testified that a make-whole payment would "literally . . . make the investor whole on a calculated basis for what they had originally committed to when they put out their money." (*Id.* at 136:1-5 (McCarty Test.).) Mr. McCarty explained that "cash is the whole issue" and the "central point" of the transaction and pointed to no losses beyond cash to the Noteholders. (*Id.* at 153:16-21.) Additionally, Ethan Auerbach from Blue Mountain admitted that the failure to allow Blue Mountain to rescind acceleration of the debt does not cause Blue Mountain any harm other than its portion of the make-whole payment. (4/21/15 Trial Tr. 113:19-23 (Auerbach Test.).)

76.     Perhaps most directly on point, the Trustee's expert James Cacioppo wrote in his report and confirmed at trial that "EFIH, the issuer, elected to refinance the notes in bankruptcy without paying a make whole.  As a result, it was able to obtain the very same economic benefits for itself and caused the very same economic harm to the holders of the notes that the call protections were designed to protect."  (4/21/15 Trial Tr. 84:16-85:2 (Cacioppo Test.).)

77.     In summary, the economic harm to the EFIH Debtors' estate from lifting the automatic stay would be at least as great as the economic harm to the Noteholders from maintaining the automatic stay, and the EFIH Debtors have met their burden to show that the harm to the Noteholders does not "considerably outweigh" the harm to the EFIH Debtors.  *Downey*, 428 B.R. at 609.

     ii.     <u>Harm to Investor Expectations</u>

78.     In addition to the evidence on economic harm, the Court also considered evidence regarding the alleged harm to the Noteholders' expectations.  The Court finds insufficient harm to the Noteholders' expectations (if indeed, there was any) to change the previous analysis.

79.     The Trustee spent considerable time on various risk factors (included and not included) in the 2010 Offering Memorandum associated with the August 2010 Exchange. (PX 30.)  The Court does not find the omission of a risk factor relating to the ability of a Noteholder to decelerate the Notes after a bankruptcy acceleration to be probative. (*See In re MPM Silicones, LLC*, No. 14-22503-RDD, 2014 WL 4436335, at *18 (Bankr. S.D.N.Y. Sept. 9, 2014).)  Instead, the only evidence presented from parties actually involved in negotiating

the Indenture was that the issue of whether or not a make-whole premium would be paid following a bankruptcy acceleration was never raised by the Noteholders.  (4/21/15 Trial Tr. 19:20-22:3 (Horton Test.).)

80.     Through expert testimony and argument, the Trustee suggested Noteholder expectations were dashed because the 2010 Offering Memorandum did not include among its enumerated risk factors a risk factor stating that a Noteholder would not receive a make-whole payment following a bankruptcy-caused acceleration.   Yet anyone reading the customary legal opinions provided in connection with the August 2010 Exchange would have seen that outside counsel refused to opine that the terms of the Indenture, including the make-whole provisions, would be enforceable in the event of a bankruptcy.  (DX 1 at 5, 7, 8, 10; DX 2 at 2.)  And the actual investors that testified, who owned an aggregate of over $800 million in face value of the Notes at the time of trial, were sophisticated investors who did not purchase Notes until well after the August 2010 Exchange.  They testified that they performed extensive diligence on the Indenture, the Notes, and all of EFIH's public filings. They purchased the Notes fully aware of both the implications of the automatic stay and of the EFIH Debtors' intent not to pay a make-whole premium in bankruptcy.  It cannot be said that these investors, hedge funds engaged in litigation arbitrage, suffered any added "expectation harm."   The Trustee did not present any other evidence of the alleged expectations of non-testifying investors, nor did the Trustee's experts make any effort to

speak to such Noteholders.  (4/20/15 Trial Tr. 166:3-21 (McCarty Test.); 4/20/15 Trial Tr. 109:16-111:15 (Kearns Test.).)[9]

81.    The Trustee also relies on broad arguments that the Noteholders would not have purchased the Notes if the Notes did not provide for "standard and customary" call protection.  (*See e.g.* 4/20/15 Trial Tr. 58:12-60:24 (Kearns Test.); 157:12-22 (McCarty Test.).)  To be sure, the Indenture *does* provide for call protection, just not when the Notes are accelerated after a bankruptcy filing.  (Summary Judgment Decision ¶¶ 8(a), 51, 57.)  The Trustee nonetheless argues that automatic acceleration makes the bonds "freely callable" and therefore not market standard.  (4/20/15 Trial Tr. 134:13-25 (McCarty Test.); 4/21/15 Trial Tr. 96:13-24 (Auerbach Test.).)  But none of the Trustee's three experts reviewed the actual text of the rescission or acceleration provisions of any other indentures to determine whether failing to provide a make-whole premium after bankruptcy-caused automatic acceleration was market standard.  (4/20/15 Trial Tr. 107:25-108:4, 108:21-25 (Kearns Test.), *id.* ¶ 168:20-169:1 (McCarty Test.); 4/21/15 Trial Tr. 85:6-15 (Cacioppo Test.).)  Additionally, the Trustee's expert, Mr. Cacioppo, testified that the acceleration and rescission language in the Indenture is "the standard form indenture," and that this language has been used in "a ton . . . a lot of deals."  (4/21/15 Trial Tr. 80:1-11 (Cacioppo Test.).)  This evidence is consistent with the body of case law construing similar and identical "standard form

---

[9] The Trustee also suggests that the absence of a "no make-whole in bankruptcy" risk factor indicates that the Debtors believed that a make-whole payment would be made following a bankruptcy acceleration.  (*See* 4/22/2015 Trial Tr. 46:13-19 (Closing).)  There is no evidence in the record supporting this position.  To the contrary, EFIH's Assistant Treasurer testified that he "never thought that in a bankruptcy that lenders could rescind an acceleration and therefore effectively, in my mind, reinstate debt."  (4/21/15 Trial Tr. 189:15-21 (Moldovan Test.).)

indentures" and finding, like this Court did, that while they may contain some call protections, they do not entitle noteholders to make-whole payments upon bankruptcy-caused acceleration. *See, e.g.*, *HSBC Bank USA, N.A. v. Calpine Corp.*, No. 07-3088, 2010 WL 3835200, at *4-*5 (S.D.N.Y. Sept. 15, 2010) (*Calpine II*); *MPM*, 2014 WL 4436335, at *14; *In re Premier Entm't Biloxi LLC*, 445 B.R. 582, 626-632 (Bankr. S.D. Miss. 2010).

82.     The Court agrees that the best evidence of the bargain between the parties, and therefore the parties' expectations, is the governing contract—in this case, the Indenture. (4/20/15 Trial Tr. 170:1-12 (McCarty Test.).)  As the Court previously found, the bargain struck does not contemplate for the payment of the Applicable Premium after a bankruptcy-caused acceleration. (Summary Judgment Decision ¶ 51.)[10]  In other words, the Trustee and the Noteholders bargained for the automatic acceleration of debt in the event of a bankruptcy default and must live with the consequences of their bargain.  They did not bargain for a make-whole premium in the event of an automatic acceleration following an event of default as a result of a bankruptcy filing by the EFIH Debtors, but they could have. True, the Noteholders also bargained for the right to rescind acceleration, but that right was blocked by the automatic stay. (*Id*. at ¶ 67.)

83.     In a recent ruling by Judge Briccetti in the Southern District of New York, in an appeal from the bankruptcy court's ruling in *In re MPM Silicones* ("Momentive"), the court addressed the identical issue now before this Court.  In *Momentive*, the trustee and

---

[10] On multiple occasions the Trustee elicited evidence about whether various witnesses had ever seen an Indenture without call protection. Such questions miss the mark.  There is no dispute here as to whether or not the Indenture contained make-whole call protection.  It did.  The Indenture did not, however, provide for a make-whole payment in the particular circumstance of repayment following an automatic acceleration following a default brought on by a bankruptcy filing.

noteholders also attempted to rescind a Code-mandated acceleration and also attempted to lift the automatic stay.  The court affirmed the bankruptcy court's refusal to lift the automatic stay, stating "[i]t matters not that the Senior Lien Noteholders' right to rescind the acceleration of the debt was canceled by the application of the automatic stay pursuant to section 362 of the Bankruptcy Code.  The Debtors correctly point out that all contracts signed among the parties operate against the backdrop of the relevant Bankruptcy Code provisions.  The potential for an automatic stay and the effect of the Code's automatic acceleration of the Notes upon the filing of a bankruptcy case is a part of the bargain to which the parties agreed."  (Memorandum Decision, *In re MPM Silicones, LLC*, No. 7:14-cv-07492-VB at 26, n.12 (S.D.N.Y. May 4, 2015) (Dkt. No. 31).)

84.     That observation applies equally here.  The Trustee and Noteholders here also negotiated contract terms that expressly contemplated that a bankruptcy filing by the Issuer (EFIH) was one of many possibilities.  The Trustee and Noteholders cannot now argue that the application of the automatic stay, a prominent Code provision that applies in all chapter 11 cases, was unexpected.  Nor did the court in *Momentive* reference the debtor's insolvency as a rationale for its refusal to lift the automatic stay.  It focused instead on the terms of the parties' written agreement.  The Court agrees with the reasoning in *Momentive* regarding the lack of any justification for lifting the automatic stay here.  As such, it would cause harm to the *EFIH Debtors'* expectations to now lift the automatic stay to allow the Noteholders to increase their claim by hundreds of millions of dollars.  Because the evidence demonstrates that the harm to the Noteholders is, at most, equal to the harm to the EFIH Debtors, the

second factor of the *Downey* test weighs heavily against finding cause to lift the automatic stay.

**E.      The Trustee Has Demonstrated a Likelihood Of Success On the Merits.**

85.      The Court has previously held that, under the Indenture, the "Trustee … had the right to waive [EFIH's bankruptcy] default and decelerate the Notes," and that "[w]ere the Court … to lift the automatic stay … to allow the Trustee's rescission notice to take effect then the automatic default would be waived, the Notes would no longer be immediately due and the refinancing would require payment of the Applicable Premium."  (Summary Judgment Decision ¶ 69)  Thus, the Trustee has demonstrated that it is likely the Trustee would succeed on the merits.

86.      The Debtors disagree, arguing that even if the Court were to lift the automatic stay, the Trustee's attempt to decelerate the Notes would not be permitted due to the automatic acceleration of the Notes by operation of the Bankruptcy Code.  As the Court finds that, under the totality of the circumstances, cause does not exist to lift the automatic stay even if it is likely the Trustee would succeed on the merits, the Court need not address the Debtor's argument.

**IV.    CONCLUSION**

87.      The Court is cognizant that its ruling makes it extremely unlikely that a creditor operating under a contract with provisions substantially similar to section 6.02 of the Indenture will be able to obtain relief from the automatic stay to waive a default arising from an issuer's bankruptcy filing and to rescind acceleration.  That is a result of the fact that the harm to the debtor's estate and its stakeholders, including equity if the debtor is

solvent, from lifting the stay is, by definition, the same as the harm to the creditor seeking the make-whole payment from maintenance of the stay – in this case, $431 million.  As the debtor's estate and its stakeholders would be greatly prejudiced by lifting the automatic stay and the harm to the creditor cannot substantially outweigh the harm to the debtor's estate, under the totality of the circumstances, relief from the automatic stay is almost certainly unavailable, regardless of the creditor's likelihood of success on the merits.

88.     That is not to say that a creditor can never successfully pursue a make-whole claim.  For example, unlike in this case, an indenture might provide for payment of a make-whole claim in a manner that does not implicate the automatic stay.  Whether such a claim would be successful is an issue for another day.  Under the facts of this case, however, the Trustee must obtain relief from the automatic stay for the Applicable Premium to be due and owing to the non-settling Noteholders and there is insufficient cause for the Court to lift the stay.

89.     Thus, the Court will deny the Stay-Applicability Motion, rule in Debtors' favor in the Contested Matter, and enter judgment with prejudice in Debtors' favor on Count I of the Complaint.[11]

90.     A separate order will be issued.

---

[11] The Court previously entered summary judgment in Debtors' favor without prejudice on Count I and with prejudice on Counts II, III, and IV of the Complaint.  In addition, the Court previously granted in part and denied in part the Debtors' motion for summary judgment on the Stay-Applicability Motion.  This opinion finally resolves all issues with regard to the Complaint, Contested Matter and Stay-Applicability Motion.

BY THE COURT:

_____
Christopher S. Sontchi
United States Bankruptcy Court

DATED: JULY 8, 2015

**(3)**

# Order dated March 26, 2015
# [No. 14-10979, Dkt. 3985; No. 14-50363, Dkt. 246]

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., | ) | Bankruptcy Case No. 14-10979 (CSS) |
| *et al.*, | ) | (Jointly Administered) |
| | ) | |
| *Debtors.* | ) | Docket No.: 473 |
| DELAWARE TRUST COMPANY | ) | |
| as INDENTURE TRUSTEE, | ) | |
| *Plaintiff,* | ) | Adversary Proceeding |
| | ) | No. 14-50363 (CSS) |
| v. | ) | |
| ENERGY FUTURE INTERMEDIATE | ) | |
| HOLDING COMPANY LLC and | ) | Adv. Doc. No.: 175, 178 |
| EFIH FINANCE INC. | ) | |
| *Defendants.* | ) | |

### ORDER

For the reasons set forth in the Court's Findings of Fact and Conclusions of Law Regarding Cross-Motions for Summary Judgment dated March 26, 2015, Plaintiff - Trustee's Motion for Summary Judgment [Adv. Docket No. 178] filed on February 13, 2015 is denied in its entirety; and EFIH Debtors' Cross-Motion for Summary Judgment [Adv. Docket No. 175] filed on February 13, 2015 is granted, in part, and denied, in part as follows:

1. Summary judgment is granted for EFIH Debtors on Counts I-IV of the Complaint, provided, however that entry of summary judgment on Count I of the Complaint is without prejudice.

2. Summary judgment is granted, in part, for EFIH Debtors on the Joint Motion of CSC Trust Company of Delaware, as Indenture Trustee, and Certain EFIH 10% First Lien Noteholders, for Confirmation that the Automatic Stay Does Not Apply or, Alternatively, for Limited Relief from the Automatic Stay, Solely Regarding

Rescission of Accelration (the "Stay-Applicability Motion") filed on May 15, 2015;

and not granted on the Stay-Applicability Motion solely to the issue of whether cause

exists to lift the automatic stay.

_____
Christopher S. Sontchi
United States Bankruptcy Judge

Dated:  March 26, 2015

**(4)**

**Findings of Facts and Conclusions of Law Regarding Cross Motions for Summary Judgment dated March 26, 2015 [No. 14-10979, Dkt. 3984; No. 14-50363, Dkt. 245]**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | ) |
| | ) |
| ENERGY FUTURE HOLDINGS CORP., | ) |
| *et al.*, | ) |
| | ) |
| *Debtors.* | ) |

Chapter 11
Bankruptcy Case No. 14-10979 (CSS)
(Jointly Administered)

| | |
|---|---|
| DELAWARE TRUST COMPANY | ) |
| as INDENTURE TRUSTEE, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) |
| | ) |
| ENERGY FUTURE INTERMEDIATE | ) |
| HOLDING COMPANY LLC and | ) |
| EFIH FINANCE INC. | ) |
| | ) |
| *Defendants.* | ) |

Adversary Proceeding
No. 14-50363 (CSS)

**FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT[1]**

### I.    INTRODUCTION & PROCEDURAL HISTORY[2]

1.      This adversary proceeding relates to a series of 10% First Lien Notes issued by Energy

Future Intermediate Holding Company LLC and EFIH Finance Inc., with original maturity of 2020,

pursuant to an Indenture dated August 17, 2010.  The original indenture was supplemented as of

January 29, 2013.

2.      On April 29, 2014, the EFIH Debtors filed petitions for relief under chapter 11 of the

Bankruptcy Code.  The EFIH Debtors sought approval of debtor-in-possession financing, in part, to

repay all of the outstanding Notes and settle certain Noteholders' claims (the "DIP Motion").  (No.

14-10979, D.I. 74, 858, 859.)  The non-settling Noteholders are represented by the Trustee, the

---

[1] The Court hereby makes the following findings of fact and conclusions of law pursuant to Fed. R. Bank. P.
7052, which is applicable to this matter by virtue of Fed. R. Bankr. P. 9014.  To the extent any findings of fact
constitute conclusions of law, they are adopted as such.  To the extent any conclusions or law constitute findings of
fact, they are adopted as such.

[2] Capitalized terms in the Introduction and Procedural History section not otherwise defined in this section are defined
below.

1

Plaintiff in this adversary proceeding.

3.     On May 13, 2014, the Trustee objected to the DIP Motion, arguing that the Noteholders were entitled to a secured claim for an amount described in the Indenture as the "Applicable Premium" because: (i) an Optional Redemption would occur when the Notes were repaid; (ii) the EFIH Debtors intentionally defaulted by filing bankruptcy to avoid paying the Applicable Premium, and (iii) the repayment would be a breach of the Noteholders' purported right to rescind the Notes' acceleration.  (No. 14-10979, D.I. 421.)

4.     On May 15, 2014, the Trustee initiated this adversary proceeding.  (No. 14-10979, D.I. 470; No. 14-50363, D.I. 1.)  The Complaint contained the claims from the May 13 objection, plus (a) an unsecured claim for breach of a purported "no-call" covenant in the Indenture; and (b) three unsecured claims, one for each of the three counts raised in its May 13 objection.  (Compl. ¶ 76.) The Trustee also simultaneously filed a motion seeking a declaration that it could decelerate the Notes without violating the automatic stay.  (No. 14-10979, D.I. 473 ("Stay-Applicability Motion").)  On June 4, 2014, the Trustee sent a purported notice of deceleration to the EFIH Debtors.

5.     On June 6, 2014, the Court approved the DIP financing, the EFIH Debtors' use of the DIP financing to pay the outstanding EFIH First Lien Noteholders, and the settlement resolving certain Noteholders' claims for the Applicable Premium.  (No. 14-10979, D.I. 858 (Order Approving EFIH First Lien Settlement),[3] 859 (Order approving use of DIP financing).)  The Noteholders who chose not to accept the settlement are pursuing claims for an Applicable Premium in this adversary proceeding.  (No. 14-50363, D.I. 9, 10.)  These Noteholders have been paid their full principal and accrued interest using DIP financing, which was funded on June 19, 2014.

---

[3] The non-settling Noteholders appealed the Court's Order approving the EFIH First Lien Settlement.  The district court, in an order dated February 19, 2015, affirmed this Court's Order and dismissed the non-settling Noteholders' appeal.  (No. 14-00723, D.I. 50 (D. Del. 2015).)

6.      On September 12, 2014, the Court bifurcated this adversary proceeding. (D.I. 128)[4] This is Phase One of the litigation in which the Court will determine (1) whether EFIH is "liable under applicable non-bankruptcy law for … a Redemption Claim," including the "make-whole" or other "damages … under any 'no-call' covenant, 'right to de-accelerate,'" or applicable law, and (2) "whether the Debtors intentionally defaulted in order to avoid paying an alleged make-whole premium or other damages."  (Id. at 2-3.)  Except with respect to the Trustee's claim that EFIH intentionally defaulted to evade payment of the make-whole, "the Court will assume solely for the purposes of Phase One that the EFIH Debtors are solvent and able to pay all allowed claims of their creditors in full." (*Id.*)  If the Court finds EFIH liable for a Redemption Claim, and if EFIH contests that it is, in fact, solvent, Phase Two will determine "(a) whether the EFIH Debtors are insolvent, and, if so, whether that insolvency gives rise to any defenses arising under the Bankruptcy Code in favor of the EFIH Debtors that bar or limit the amount of the Redemption Claim, and (b) the dollar amount of … any Redemption Claim." (*Id.*)

7.      The parties conducted full discovery on the Phase One issues, including the production of documents, multiple fact witness depositions, production of expert reports, and multiple expert witness depositions.  Thereafter, the EFIH Debtors and the Trustee submitted cross-motions for summary judgment, seeking to resolve all of the claims raised in the contested matter, the adversary complaint, and the Stay-Applicability Motion.  (D.I. 175, 176, 178, 179.)

---

[4] References in this opinion to "D.I.," without further description, shall refer to docket entries in this adversary proceeding, No. 14-50363.

3

8.      As set forth below, the Court will grant, in part, and deny, in part, the EFIH Debtors'
motion for summary judgment, and deny in its entirety the Trustee's motion for summary judgment.
More specifically, the Court holds as follows:

a.      The plain language of the Indenture does not require payment of an
Applicable Premium upon a repayment of the Notes, following an
acceleration under section 6.02 of the Indenture, arising from a
default for the commencement of "proceeding to be adjudicated
bankrupt or insolvent" under section 6.01(a)(6)(i) of the Indenture.

b.      The EFIH Debtors' filing of bankruptcy, which gave rise to the
default at issue, was not an intentional default under the Indenture.

c.      The Trustee's right under Section 6.02 of the Indenture to waive the
automatic default arising from the EFIH Debtors' bankruptcy filing
and rescind the acceleration of the Notes is not barred by the
language in the Indenture extinguishing that right if rescission
would "conflict with any judgment of a court of competent
jurisdiction" because the automatic stay under section 362 of the
Bankruptcy Code is not a "judgment of a court."

d.      The Trustee's attempt to waive the default and decelerate the Notes
by sending notice of same on June 4, 2014, was barred by the
automatic stay under section 362(a)(3) and (6) of the Bankruptcy
Code.

e.      If the Court were to lift the automatic stay, *nunc pro tunc* to a date

4

on or before the repayment of the Notes on June 19, 2014, to allow the Trustee to waive the default and decelerate the Notes than EFIH's refinancing would be an Optional Redemption under section 3.07 of the Indenture and the Applicable Premium (also referred to as Redemption Claim) would be due and owing to the non-settling Noteholders.

f.  A genuine issue of material fact exists that requires a trial on the merits as to whether the Trustee can establish cause to lift the automatic stay, *nunc pro tunc* to a date on or before June 19, 2014, to allow the Trustee to waive the default and decelerate the Notes.

g.  The Trustee has no claim for (i) breach of the "no-call" provision of section 3.07(c) of the Indenture; (ii) violation of the "perfect tender" rule under New York law; nor (iii) breach of the right to waive the default and decelerate the Notes.

## II.  FINDINGS OF FACT

9.  The parties' cross-motions for summary judgment implicate various provisions in the Indenture dated August 17, 2010 governing the EFIH 10.000% Senior Secured Notes Due 2020 ("Indenture").  (March 2, 2015 Romanowicz Am. Decl. in Support of Defs.' Mot. for SJ (D.I. 197) ("Romanowicz Am. Decl."), Ex. 1) (execution version of Indenture).)  That Indenture was supplemented, as of January 29, 2013, but the parties agree that the provisions of that supplement are not relevant here.  Additionally, EFIH issued certain 6.875% Senior Secured Notes Due 2012,

5

pursuant to a separate 2012 indenture. That 2012 indenture is substantially identical in all relevant aspects to the Indenture.

### A. The Parties

10.     Plaintiff is the indenture trustee (the "Trustee" or "Indenture Trustee") for the 10.000% Senior Secured Notes due 2020 ("Notes"), representing Noteholders who did not accept a settlement offer in connection with the repayment of the Notes at the outset of these chapter 11 cases. (*See* No. 14-10979, D.I. 74.) Defendants are Energy Future Intermediate Holding Company, LLC and EFIH Finance, Inc. (collectively "EFIH," the "EFIH Debtors," or "Defendants").

11.     In addition, the following parties are intervenors in this adversary proceeding: UMB, N.A., as indenture trustee for certain senior unsecured notes issued by EFIH (D.I. 13); Fidelity Management & Research Company (D.I. 14); the ad hoc committee of holders of certain unsecured EFIH toggle notes (D.I. 15); Pacific Investment Management Company LLC, investment manager for certain holders of the Notes (D.I. 16); Computershare Trust Company, N.A., and Computershare Trust Company of Canada, the indenture trustee for certain EFIH senior secured second lien notes (D.I. 19); the ad hoc group of holders of the so-called "Legacy Notes" issued by EFH Corp. (D.I. 18); the Official Committee of Unsecured Creditors of EFH Corp. and EFIH (D.I. 207); and the Official Committee of Unsecured Creditors of Energy Future Competitive Holdings Company LLC, Texas Competitive Electric Holdings Company LLC and their direct and indirect subsidiaries, and EFH Corporate Services Company (D.I. 227).

### B. Negotiation of the EFIH Notes

12.     In the summer of 2010, EFIH negotiated and ultimately executed a debt exchange that involved the issuance of $2.18 billion of Notes. EFIH and the so-called "Dealer Manager" investment banks, who represented the interests of the lenders who would be accepting the new Notes, were the principal negotiators of the offering and execution documents, including the governing Indenture that

6

is at the center of the parties' cross-motions for summary judgment. (Moldovan Tr. 40:22-41:20, 47:17-21.)[5] The Indenture Trustee for the Notes was involved in this process as well; the lead negotiating parties sent the Trustee (and its counsel) drafts of key issuing documents, such as the description of the Notes and the actual global note certificate representing the 10% Note, and solicited (and accepted many of) the Trustee's proposed changes. (Moldovan Tr. 41:16-20; March 2, 2015 Madron Decl. in Support of Defs.' Memo. in Opposition to Pl.'s Mot. for SJ (D.I. 205) ("Madron Decl."), Exs. 19-21 (email communications transmitting draft documents to Indenture Trustee).)

13.     Many terms and conditions of the Indenture were modeled on other indentures governing previous debt issuances by EFIH and EFH Corp. in 2009 and 2007, respectively. (Moldovan Tr. 143:11-20.) Like the Indenture, these previous agreements included an "Optional Redemption" provision providing for the payment of an "Applicable Premium" under certain circumstances upon an early, voluntary repayment of the Notes. (Indenture § 3.07.) Such "call protections" are common features in the indentures governing the type of high-yield debt issued by the EFH corporate family.

   **C.     The August 2010 EFIH Debt Exchange**

14.     The "August 2010 Exchange" called for exchanging outstanding 11.250%/12.000% Senior Toggle Notes due 2017 and 10.875% Senior Notes due 2017 issued by EFH Corp. in 2007 and guaranteed by EFIH (the "Old Notes") for up to $2.18 billion aggregate principal amount of Notes, as well as an aggregate of $500 million in cash. (Press Release (July 30, 2010), http://www.sec.gov/Archives/edgar/data/1023291/000119312510171555/dex992.htm.) The EFIH Debtors also announced plans to amend the indenture governing any Old Notes that would remain outstanding after the August 2010 Exchange was executed. These amendments called for eliminating

---

[5] Deposition transcripts referenced herein are cited as "Deponent Tr. Page:line"

substantially all of the restrictive covenants contained in the existing indenture and the Old Notes,

eliminating certain events of default, and modifying covenants regarding mergers and consolidations,

in addition to other changes.  (*Id.*)  99.51% of the Old Notes agreed to participate in the exchange,

and the requisite number of holders also agreed to the proposed amendments.  (*Id.*)

15.     Therefore, the EFIH Debtors issued the new EFIH Notes pursuant to the Indenture

dated August 17, 2010 between EFIH and the Bank of New York Mellon Trust Company, N.A., as

trustee.   (Press    Release    (August    18,    2010),    http://www.sec.gov/Archives/edgar/

data/1023291/000119312510191917/d8k.htm.)   The Indenture is governed by New York Law.

(Indenture § 13.08.)  Plaintiff later succeeded Bank of New York Mellon Trust Company, N.A., as

the indenture trustee.

### D.     Key Provisions of the Notes Indenture

16.     These cross motions for summary judgment call for the Court to interpret the meaning

of the Indenture, including section 3.07 ("Optional Redemption"), section 6.01 ("Events of Default"),

section  6.02  ("Acceleration"),  and  the  definition  of  "Applicable  Premium"  in  section  1.01

("Definitions").  Each is discussed below:

17.     In section 3.07, the Indenture specifies what constitutes an Optional Redemption.

Section 3.07(a) states:

> At any time prior to December 1, 2015, the Issuer may redeem all or a part of the
> Notes at a redemption price equal to 100% of the principal amount of the Notes
> redeemed plus the Applicable Premium as of, and accrued and unpaid interest to, the
> date of redemption (the "Redemption Date") . . . .

(Indenture § 3.07(a).)

18.     The Applicable Premium referenced in section 3.07(a) is defined in section 1.01:

> "Applicable Premium" means, with respect to any Note on any Redemption Date, the
> greater of: (1) 1.0% of the principal amount of such Note; and (2) the excess, if any,
> of (a) the present value at such Redemption Date of (i) the redemption price of such
> Note at December 1, 2015 (such redemption price as set forth in the table appearing

under Section 3.07(d) hereof), plus (ii) all required interest payments due on such Note through December 1, 2015 (excluding accrued but unpaid interest to the Redemption Date), computed using a discount rate equal to the Treasury Rate as of such Redemption Date plus 50 basis points; over (b) the principal amount of such Note.

(*Id.* § 1.01.)

19.    The Indenture also specifies certain Events of Default as well as the consequences of such Events of Default.  Section 6.01 defines the various Events of Default and, relevant here, sections 6.01(a)(6) and (a)(7) specify Events of Default related to bankruptcy.   In particular, section 6.01(a)(6)(i) states that an Event of Default occurs when EFIH "commences proceedings to be adjudicated bankrupt or insolvent."  (*Id.* § 6.01(a)(6)(i).)

20.    The acceleration clause in section 6.02  explains the consequences of this bankruptcy-caused Event of Default:

> [I]n the case of an Event of Default arising under clause (6) or (7) of Section 6.01(a) hereof [including EFIH's bankruptcy filing], all outstanding Notes shall be due and payable immediately without further action or notice.

(*Id.* § 6.02, ¶ 2.)

21.    By contrast, for an Event of Default unrelated to a bankruptcy filing, the Indenture provides an option to accelerate the Notes.  (*Id.* § 6.02, ¶ 1.)  Specifically, for non-bankruptcy defaults, the Trustee or holders of at least 30% of the Notes "may declare the principal, premium, if any, interest and any other monetary obligations on all the then outstanding Notes to be due and payable immediately."  (*Id.*)  This optional right to accelerate the Notes, however, does not apply to a bankruptcy default; instead, acceleration upon a bankruptcy default is automatic.  (*Id.*)

22.    Finally, in the event of an acceleration of the Notes, the Trustee possesses a qualified right effectively to decelerate the Notes through the act of rescission:

> The Holders of at least a majority in aggregate principal amount of the Notes by written notice to the Trustee may on behalf of all the Holders waive any existing Default and its consequences under the Indenture except a continuing Default in the

payment of interest on, premium, if any, or the principal of any Note (held by a non
consenting Holder) and rescind any acceleration with respect to the Notes and its
consequences (so long as such rescission would not conflict with any judgment of a
court of competent jurisdiction).

(*Id.* § 6.02, ¶ 3.)

### E.  EFIH's Decision to File for Chapter 11 Protection

23.     One of the issues before the Court is whether the Debtors intentionally defaulted in
order to avoid paying an alleged make-whole premium or other damages.  Both sides assert that there
is no genuine issue of material fact as to why EFIH filed bankruptcy, which gave rise to the default.
As discussed below, the Court agrees; thus, this issue is appropriate for summary judgment.

### i.   The EFIH Debtors' Position

24.     The EFIH Debtors argue that there is no genuine issue of material fact as to why EFIH
filed for bankruptcy – they were running out of cash.  For many months before EFIH ultimately filed
for chapter 11 protection, the EFH corporate family pursued restructuring strategies that would
involve seeking bankruptcy protection for TCEH but keeping EFIH out of bankruptcy. (*See, e.g.*, Pl.
App'x, A-112 (May 29, 2013 EFIH Unsecured Creditors Advisor Presentation calling for
recapitalizing EFIH "out-of-court"); Horton Tr. 94:17-24.)   This strategy, known as "Project
Olympus," was an effort to obtain the consent of key creditor constituencies to a consensual,
prepackaged transaction that would minimize the amount of time spent in a restructuring, avoid
potentially significant tax impacts, and maintain the EFH corporate family in one consolidated group.
(8-K Filing of EFH (October 15, 2013).)  This effort was ultimately unsuccessful, and all of the
Debtors, including the EFIH Debtors, filed a bankruptcy petition on April 29, 2014.

25.     After the company's attempts to pursue Project Olympus failed on November 1, 2013,
it was clear that EFIH would have to join the rest of the EFH corporate family in filing for bankruptcy.
As the company's Treasurer stated at his deposition, "We're going to have to file EFIH now regardless

of what . . . anyone else is saying because we're running out of cash. . . .  Project Olympus isn't happening, . . . EFIH is going to have to file. . . ." (Horton Tr. 190:19-191:2.)  EFIH's Executive Vice President and CFO further explained that by April 28, 2014, the day before EFIH filed for bankruptcy, the company had run out of cash to satisfy its interest obligations coming due on June 1 of that year. (Keglevic Tr. 52:25-53:14.)  Mr. Keglevic also testified at the June 5, 2014 hearing that the DIP was needed, in part, to provide liquidity to fund operations.  (Hr'g Tr. 96:14-20, 100:12-101:3 (June 5, 2014))  The EFIH Debtors did not see "any ability to issue debt or get equity to increase the amount of cash" needed to meet those interest obligations.  (*Id.* 172:14-173:4.)

### ii.   The Trustee's Position

26.    The Trustee counters at length that there is no genuine issue of material fact as to why the EFIH Debtors filed bankruptcy - it was to avoid having to pay the Applicable Premium.  First, the Trustee asserts that foregoing liability on the Applicable Premium was a reason for the bankruptcy filing.  Second, the Trustee counters EFIH's position that liquidity issues ultimately required EFIH to file for bankruptcy.  The Trustee asserts that EFIH avoided the most obvious potential source of liquidity for EFIH outside of bankruptcy, a sale of EFIH's equity stake in its principal assets, including its interest in Oncor Holdings.

27.    As discussed above, from late 2012 until November 2013, the Debtors pursued a plan known as "Project Olympus." (Horton Tr. 124:8-20.)  The goal was to put TCEH into bankruptcy and convert its first-lien debt into EFH equity, but to "keep EFH and EFIH out of bankruptcy." (Horton Tr. 94:6-95:3, 122:9-124:7; Keglevic Tr. 39:10-14.)  EFIH's senior executives believed this approach made sense because they were convinced that EFIH was solvent. (Horton Tr. 125:4-13; Keglevic Affidavit at 26-28.)

28.    In stage 1 of Project Olympus, EFH would raise $2 billion of equity and use it to

11

refinance EFIH first lien, second lien and unsecured notes (the so-called "<u>PIK Notes</u>") while TCEH was in bankruptcy. (Horton Tr. 166:14-22; Horton Ex. 14 at -2605, -2606; Horton Ex. 15 at 5648.) In stage 2, after TCEH emerged from bankruptcy, all remaining EFIH first-lien and second-lien debt would be refinanced. (Horton Tr. 166:23-167:11; Horton Ex. 15 at 5648.) In both stages, EFIH would use the optional redemption provisions of the Indenture for the Notes and pay the required make-whole. (Horton Tr. 153:19-154:3, 162:25-163:22; Horton Ex. 14 at 2605, 2606; Horton Ex. 15 at 5648; Keglevic Tr. 84:22-86:25 ("To the extent we called it, we would of course follow the indenture which said a call premium was due.").) During this period, the Debtors "were continuously looking for opportunities" to "refinance the first lien debt" through an optional redemption that EFIH admits would have triggered the make-whole. (Horton Tr. 70:18-71:23, 122:12-20; Horton Ex. 9; Horton Ex. 10.) But, in the Debtors' view, any restructuring "require[d]" the "agreement" of two creditor groups: the "TCEH 1st lien creditors" and the "EFIH/EFH unsecured creditors," i.e., the holders of the PIK Notes. (Horton Ex. 16 at 2696.)

29.     In March 2013, the TCEH first-lien noteholders presented the Debtors with proposals that would put EFIH into bankruptcy. (Keglevic Tr. 87:9-88:25.) They proposed an "alternative refinancing case," in which "significant value could be unlocked" if EFIH did not pay the make-whole after it filed for bankruptcy. (Keglevic Ex. 6 at 0825); *see also* (Millstein & Co., Project Olympus Preliminary Discussion Materials May 2013, SP_MW_000000741 ("If EFIH and EFH file for bankruptcy, thereby accelerating the maturity of the EFIH debt, the Company may be able to refinance EFIH without paying make-whole premiums, resulting in substantial savings compared to the Company's forecast.").) In the view of these creditors, there was "more value through potentially going into bankruptcy and either negotiating or winning make-wholes than a settlement outside of bankruptcy." (Keglevic Tr. 90:7-17.)

30.     In addition, the Debtors had proposed that the PIK noteholders convert their debt to equity.  (Horton Tr. 186:9-187:25.)  Those PIK noteholders evidently viewed that equity as valuable.  (Ying Tr. (6/23) 120:24-123:18; Horton Tr. 188:4-189:22.)   Because that equity would be more valuable if EFIH could refinance its debt without paying a make-whole, they too pushed the Debtors to contest the Noteholders' right to a make-whole.  (Horton Tr. 189:11-22.)

31.     On October 15, 2013, EFIH filed an 8-K with the SEC disclosing a restructuring proposal from the TCEH first-lien noteholders, in which, among other things, EFIH would file for bankruptcy and "refinance" the EFIH Notes without paying "any make-whole amount." (Horton Ex. 19 at 2-3 & Ex. 99.2; *id.* Ex. 99.2 at 1 (proposing that TCEH first-lien noteholders receive 100% of EFH equity); Horton Tr. 206:3-208:17.)

32.     On October 24, 2013, the EFIH PIK noteholders sent the Debtors a restructuring proposal that likewise provided, among other things, for EFIH to file bankruptcy, refinance the Notes and "disallow … any make-whole fee."  (Horton Ex. 17 at 6084, 6088; *id.* at 6086, 6088 (proposing that PIK noteholders receive up to 94.9% of EFIH equity); Horton Tr. 191:20-197:25.)

33.     The Debtors agreed that "[t]here [was] value in not paying the [make-whole]" on the EFIH First Lien Notes.  (Horton Tr. 96:12-22; *see id.* 97:21-98:2.)  On November 1, 2013, the Debtors filed an 8-K with the SEC disclosing their own proposal whereby, among other things, EFIH would file for bankruptcy and refinance the Notes without paying "any make-whole amount."  (Horton Ex. 20 (EFIH 8-K) at 4, Ex. 99.1 at 2; Horton Tr. 184:9-23, 213:13-219:13.)  This was the first time EFIH had publicly suggested that it would, or could, refinance the Notes in bankruptcy without paying a make-whole.  The Debtors ultimately memorialized this plan in a Restructuring Support Agreement (the "RSA") with certain creditors, including the PIK noteholders, who were to receive most of the EFH equity.  (Keglevic Affidavit at 71-72, 75-76; No. 14-10979, D.I. 98 (RSA term sheet) at 2-4.)

34.     In the October 2012 and December 2012 dealer manager agreements for the EFIH 6.875% Notes and in the January 2013 exchange for the Notes, EFIH's executives represented to the Dealer Managers that EFIH was "solvent."[6]  At no point did the Debtors conclude that EFIH's assets were worth less than its liabilities.  (Horton Tr. 270:9-271:24; Keglevic Tr. 158:4-15, 169:24-170:11.) EFIH had not missed any payment on the Notes or otherwise defaulted.  (Horton Tr. 80:23-81:16; Keglevic Tr. 52:17-53:14, 189:15-190:2.)

35.     Before filing for bankruptcy, EFIH solicited, negotiated, and obtained commitments for, and obligated itself to pay commitment and other fees on, $5.4 billion in DIP financing.  (No.14-50363, D.I. 27 ¶¶ 3, 15, 31-34.)  On the Petition Date, EFIH filed and served the EFIH First Lien DIP Motion seeking authority for the DIP financing.  Ultimately, EFIH obtained $5.4 billion in DIP financing, most of which it used to pay off the outstanding principal and interest (other than disputed interest) on the Notes.

36.     EFIH sought authority to, and did, redeem the Notes because it had "the opportunity to pay [them] off and … replac[e] [them] with DIP financing, … lower[ing] the interest costs." (Keglevic Tr. 182:22-183:23.)  The DIP financing bore an interest rate of 4.25% (Horton Tr. 37:18-20; Keglevic Tr. 184:15-20), substantially less than the interest rate that EFIH was paying on the Notes (10% for most of the Notes; 6.875% for the rest).  (Horton Tr. 37:21-25; Keglevic Tr. 184:21-25).  Mr. Keglevic testified that "by paying it sooner we could replace it with cheaper cost of money." (Keglevic Tr. 186:10-187:1.)  The refinancing's purpose, as EFIH explained, was "to take advantage of highly favorable debt market conditions to refinance the EFIH First Lien Notes," "saving an

---

[6] *See* Horton Tr. 129:12-135:23, 151:23-152:22, 162:15-24, 176:12-177:15, 181:6-17; Keglevic Tr. 153:3-8, 162:23-163:18, 174:22-175:6, 207:13-208:1; Horton Ex. 13 (Oct. 18, 2012 dealer manager agreement) at 0018, 0030 (EFIH representation that it is solvent); Keglevic Ex. 9 (EFIH Dec. 21, 2012 dealer manager agreement) at 9706 (EFIH representation that it is solvent); Horton Ex. 14 (Feb. 2013 presentation) at 2554 (referring to a "solvent" EFIH); Horton Ex. 15 (March 2013 presentation) at 5602 (same).

estimated $13 million in interest per month." (No. 14-10979, D.I. 74 at 4 ¶ 4; Horton Tr. 40:9-41:13, 44:15-20, 89:11-24; Horton Ex. 5 (Goldstein Decl.) at 5 ¶ 9.)

37.     On June 19, 2014, EFIH paid all outstanding principal and accrued interest (other than disputed amounts of interest and any make-whole or comparable damages) on the First Lien Notes, and the Notes were then cancelled.[7]

38.     Prior to filing bankruptcy, EFIH did not market its assets to avoid bankruptcy. (Horton Tr. 226:13-228:1; Keglevic Tr. 54:16-55:21, 57:2-58:5, 60:8-61:12.)  EFIH did not pursue a possible sale of its interest in Oncor because it wanted to limit the tax liabilities of a separate entity, its parent EFH.  *See, e.g.*, Omnibus Tax Memorandum (No. 14-10979, D.I. 2296 at 12 ("The principal goal of all the Debtors . . . was to keep EFH, TCEH, and EFIH together as a single consolidated group for federal income tax purposes and to *avoid* a taxable separation . . . [that] would trigger a tax liability of potentially $7 *billion* or more for EFH.")); Ruling on Bid Procedures, Nov. 3, 2014 Tr. at 13:1-6 ("There can be no question that the debtors' proposed tax structure that calls for a complicated tax-free deconsolidation of the E side and T side of the balance sheet was the fundamental element of the RSA, and is the debtors' preferred structure for the sale of the Oncor business. . . .".)

## III.   CONCLUSIONS OF LAW

### A.     Jurisdiction and Venue

39.     The Debtors commenced these chapter 11 cases on April 29, 2014 (the "Petition Date").  Venue in the United States Bankruptcy Court for the District of Delaware was proper as of the Petition Date pursuant to 28 U.S.C. §§ 1408 and 1409 and continues to be so in the context of this adversary proceeding.  This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 11 U.S.C. § 157(b).

---

[7] No. 14-10979, D.I. 859 (DIP Financing Order) ¶ 12 (directing Trustee to reduce Notes in customary manner following payment).

**B.**     **Standard for Summary Judgment**

40.     Federal Rule of Civil Procedure 56, made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7056, directs that summary judgment should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits "show that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also In re Delta Mills, Inc.*, 404 B.R. 95, 103 (Bankr. D. Del. 2009).  Summary judgment is designed "to avoid trial or extensive discovery if facts are settled and the dispute turns on an issue of law."  *Delta Mills*, 404 B.R. at 104.

41.     Here, the parties agree that there are no material facts in dispute, and that the questions necessary to resolve this proceeding are purely legal in nature.  The Court mostly agrees.  As discussed below, however, there is a genuine issue of material fact as to whether cause exists to lift the automatic stay, *nunc pro tu*nc to a date on or before June 19, 2014, to allow the Trustee to decelerate the Notes.  Otherwise, summary judgment is appropriate at this stage.  *Niagara Frontier Transit Metro Sys., Inc. v. Cnty. of Erie*, 212 A.D.2d 1027 (1995) (citing *W.W.W. Assoc., Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990) ("Where the contract is unambiguous on its face, it should be construed as a matter of law and summary judgment is appropriate.")); *Green Mach. Corp. v. Zurich Am. Ins. Grp.*, No. CIV. A. 99-3048, 2001 WL 1003217, at *6 (E.D. Pa. Aug. 24, 2001) ("Whether a contract provision is ambiguous is a question of law for the court."), *aff'd sub nom. Green Mach. Corp. v. Zurich-Am. Ins. Grp.*, 313 F.3d 837 (3d Cir. 2002).

**C.**     **Contract Interpretation Under New York Law**

42.     Under New York law, which governs the Indenture, the Court need not look "outside the four corners" of a complete document to determine what the parties intended.  *W.W.W.*, 566 N.E.2d at 642; *see also R/S Assocs. v. N.Y. Job Dev. Auth.*, 771 N.E.2d 240, 242 (N.Y. 2002) (applying same principle).  Here, neither party has alleged that the Indenture is an incomplete document, so it is

16

not necessary to resort to extrinsic evidence to interpret it. Moreover, neither party contends that any term in the Indenture is ambiguous—instead, each party relies on its own "plain reading" of the indenture in reaching competing results. A contract is not ambiguous merely because the parties offer different constructions of the same term. *Sayers v. Rochester Tel. Corp. Supp. Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993). The Court finds that the Indenture is not ambiguous.

43.     Having reached the conclusion that the Indenture is unambiguous, the Court relies on long-recognized canons of interpretation to determine its meaning. First, "[t]he best evidence of what parties to a written agreement intend is what they say in their writing." *Schron v. Troutman Sanders LLP*, 986 N.E.2d 430, 433 (N.Y. 2013) (internal quotation marks and citation omitted). Second, should there be an inconsistency between a specific and general provision of a contract, the specific controls. *Muzak Corp. v. Hotel Taft Corp.*, 133 N.E.2d 688, 690 (N.Y. 1956); *Waldman v. New Phone Dimensions, Inc.*, 487 N.Y.S.2d 29, 31 (N.Y. App. Div. 1985). Third, "[a] reading of the contract should not render any portion meaningless." *See Beal Sav. Bank v. Sommer*, 865 N.E. 2d 1210, 1213 (N.Y. 2007) (quotation marks and citations omitted); *Barrow v. Lawrence United Corp.*, 538 N.Y.S.2d 363, 365 (N.Y. App. Div. 1989) ("Contracts are also to be interpreted to avoid inconsistencies and to give meaning to all of its terms.").

**D.     The Plain Language Of The Indenture Does Not Require Payment Of The Applicable Premium**

44.     The Trustee seeks a declaratory judgment that EFIH's refinancing of the Notes constituted a redemption requiring payment of the Applicable Premium as a secured claim. (Compl. ¶¶ 51-57, 74-76.)[8]

45.     The Court begins its analysis with the most relevant provision, the acceleration

---

[8] A secured claim is allowable only if, in the first instance, it is "provided for under the agreement . . . under which such claim arose." 11 U.S.C. § 506(b); *see id.* § 502(b); *HSBC Bank USA, N.A. v. Calpine Corp.*, No. 07-3088, 2010 WL 3835200, at *5 (S.D.N.Y. Sept. 15, 2010) (citing *Travelers Cas. & Sur. Co. of Am.*, 549 U.S. 443, 450 (2007)).

provision of section 6.02 of the Indenture.  Under section 6.02, "in the case of an Event of Default arising under clause (6) or (7) of Section 6.01(a) hereof, all outstanding Notes shall be due and payable immediately without further action or notice."  Here, EFIH's filing for bankruptcy was an Event of Default arising under clause (6) of Section 6.01(a).  Thus, the Notes were automatically accelerated on the Petition Date and became due and payable immediately without further action or notice of the Trustee or any Noteholder. (Indenture § 6.02, ¶ 2.)

46.     There is no reference in Section 6.02 to the payment of the "Applicable Premium" upon an automatic acceleration, nor is section 3.07 incorporated into section 6.02.  The parties included the concept of an Applicable Premium in only one instance (an optional redemption under section 3.07).  It is not mentioned in section 6.02 or anywhere else in the Indenture.

47.     Under New York law, an indenture must contain express language requiring payment of a prepayment premium upon acceleration; otherwise, it is not owed.  *See Northwestern Mut. Life Ins. Co. v. Uniondale Realty Assocs.*, 816 N.Y.S.2d 831, 836 (N.Y. Sup. Ct. 2006) ("A prepayment premium will not be enforced under default circumstances in the absence of a clause which so states."); *In re South Side House, LLC*, 451 B.R. 248, 268 (Bankr. E.D.N.Y. 2011) ("[A] lender is not entitled to prepayment consideration after a default unless the parties' agreement expressly requires it."), *aff'd U.S. Bank Nat'l Ass'n v. South Side House, LLC*, No. 11-4135, 2012 WL 273119 (E.D.N.Y. Jan. 30, 2012); *In re Premier Entm't Biloxi LLC*, 445 B.R. 582, 626; Hr'g Tr. 36:9-14, *In MPM Silicones, LLC, et al.*, No. 14-22503, 2014 WL 4436335, at *13-14 (Bankr. S.D.N.Y. Sept. 9, 2014) ("*Momentive*").

48.     The parties certainly could have bargained for such a provision.  In many other cases—including cases decided before August of 2010, when this Indenture was negotiated—clauses specifically requiring post-acceleration payment of a make-whole, prepayment premium, or certain

costs were upheld. *See, e.g.*, *United Merchs. & Mfgrs., Inc. v. Equitable Life Assurance Soc'y of the United States (In re United Merchs. & Mfrs., Inc.)*, 674 F.2d 134, 141-43 (2d Cir. 1982); *Parker Plaza W. Partners v. Unum Pension & Ins. Co.*, 941 F.2d 349, 355-56 (5th Cir. 1991); *Teachers Ins. & Annuity Ass'n of Am. v. Butler*, 626 F. Supp. 1229, 1230 (S.D.N.Y. 1986); *In re AE Hotel Venture*, 321 B.R. 209, 217-20 (Bankr. N.D. Ill. 2005); *In re Vanderveer Estates Holdings, Inc.*, 283 B.R. 122, 126-27 (Bankr. E.D.N.Y. 2002); *In re Fin. Ctr. Assocs. of E. Meadow L.P.*, 140 B.R. 829, 834-35 (Bankr. E.D.N.Y. 1992); *In re Schaumburg Hotel Owner*, 97 B.R. 943, 952-54 (Bankr. N.D. Ill. 1989). The Indenture here was negotiated at arm's length between sophisticated parties who were represented by counsel. The Court is unwilling to "read[] into agreements between sophisticated parties provisions that are not there." *In re Solutia*, 379 B.R. 473, 485 n.7 (Bankr. S.D.N.Y. 2007).[9]

49.     The EFIH Debtors' reading is also correct based on well-accepted canons of contract interpretation. Under established principles of New York law, "a specific provision . . . governs the circumstance to which it is directed, even in the face of a more general provision." *In re AMR Corp.*, 730 F.3d 88, 99 (2d Cir. 2013) (citation omitted), *cert denied*, 134 S.Ct. 1888 (2014); *Muzak Corp.*, 133 N.E.2d at 690 ("Even if there was an inconsistency between a specific provision and a general provision of a contract (we find none), the specific provision controls."). As the Second Circuit has reasoned, "[i]n analyzing whether a Make-Whole Amount is due, the Court turns first to the provision of the Indentures that most specifically addresses the circumstances before the Court. That provision is Section 4.01(g), which provides that the filing of a voluntary bankruptcy constitutes an event of default." *In re AMR Corp.*, 485 B.R. 279, 289 (Bankr. S.D.N.Y. 2013), *aff'd* 730 F.3d 88 (2d Cir. 2013). Here, that specific provision is section 6.02. Nowhere in section 6.02 is there a reference to

---

[9] Because this Court does not find that an ambiguity exists, it is not necessary to consider the question whether the Indenture need to be construed against the EFIH Debtors. *Wallace v. 600 Partners Co.*, 658 N.E.2d 715, 717 (N.Y. 1995) ("The rules governing the construction of ambiguous contracts are not triggered unless the court first finds an ambiguity.").

Applicable Premium, to Optional Redemption, section 3.07, or anything that would support the

Trustee's position that the Applicable Premium is owed upon a bankruptcy event of default and

acceleration.

50.    Comparing the relevant language in the governing Indenture with language from other

cases compels the conclusion that the Indenture does not provide for a make-whole premium

following a bankruptcy acceleration.

- *Calpine*: "In the case of an Event of Default specified in clause (10) or (11) of Section 6.01 [which includes a bankruptcy filing], *all outstanding Notes will become due and payable immediately without further action or notice*." (Romanowicz Decl., Ex. 2 § 6.02 ¶ 1, *In re Calpine Corp.*, No. 05-60200 (Bankr. S.D.N.Y. 2007) (Dkt. No. 3481-4), *overruled by HSBC Bank USA, N.A. v. Calpine Corp.*, No. 07-3088, 2010 WL 3835200 (S.D.N.Y. Sept. 15, 2010) (emphasis added)); *HSBC Bank USA, N.A. v. Calpine Corp.*, No. 07-3088, 2010 WL 3835200, at *4-*5 (S.D.N.Y. Sept. 15, 2010) ("*Calpine II*").

- *Premier*: "In the case of an Event of Default specified in clause (j) [commencement of a voluntary bankruptcy case] . . . of § 6.01 hereof, with respect to Premier . . . *all outstanding Notes will become due and payable* immediately *without further action or notice*." (Romanowicz Decl., Ex. 3, at 73 (§ 6.02 ¶ 2), *In re Premier Entm't Biloxi LLC*, No. 07-05043 (Bankr. S.D. Miss.) (Dkt. No. 6-1 to -3) (emphasis added)); *In re Premier Entm't Biloxi LLC*, 445 B.R. at 626-632.

- *Momentive*: "If an Event of Default specified in Section 6.01(f) or (g) [which includes a bankruptcy filing] with respect to the Company occurs, *the principal of, premium, if any, and interest on all the Notes shall ipso facto become and be immediately due and payable without any declaration or other act* on the part of the Trustee or any Holders." (Romanowicz Decl., Ex. 5, at 92, *In re MPM Silicones, LLC, et al.*, No. 14- 22503 (Bankr. S.D.N.Y. June 18, 2014) (Dkt. No. 464-1) (emphasis added)); *Momentive*, 2014 WL 4436355, at *13-14.

- *Solutia*: "If an Event of default specified in 6.01(7) occurs with respect to the Company or any Subsidiary Guarantor [which includes filing a bankruptcy petition] *the principal of and premium, if any, and accrued interest, if any, on the Notes then outstanding shall become and be immediately due and payable without any declaration or other act* on the part of the Trustee or any Holder.'" (Romanowicz Decl., Ex. 4, at 11/70 (§ 6.02 ¶ 1), *In re Solutia*, No. 03-17949 (Bankr. S.D.N.Y. 2007) (Dkt. No. 4211-1 to -2) (emphasis added)); *In re Solutia Inc.*, 379 B.R. at 488.

51.    In each of these cases, the court found no make-whole obligation was created by

acceleration provisions substantially similar to the language before the Court.  The Court agrees with the holdings in these cases and finds that the acceleration provision in the Indenture does not include clear and unambiguous language that a make-whole premium (here the "Applicable Premium") is due upon the repayment of the Notes following a bankruptcy acceleration.  Because the Indenture does not specify that the Applicable Premium is owed after automatic acceleration, the Applicable Premium is not owed.

52.     In contrast, the Trustee's reading of the Indenture does not give meaning to each provision.  Both parties have argued that the Indenture must be read as a whole giving meaning to each provision.  The Court agrees.  *See Beal Sav. Bank v. Sommer*, 865 N.E. 2d 1210, 1213 (N.Y. 2007) (A reading of the contract should not render any portion meaningless.") (citations omitted); *Barrow v. Lawrence United Corp.*, 538 N.Y.S.2d 363, 365 (N.Y. App. Div. 1989) ("Contracts are also to be interpreted to avoid inconsistencies and to give meaning to all its terms.").  A review of section 3.07, one of the sections upon which the Trustee heavily relies, does not change the Court's reading of section 6.02.  The Trustee argues that section 3.07, the "Optional Redemption" provision, is a wholesale bar to any repayment before December 1, 2015.  This reading is strained for a number of reasons.

53.     As an initial matter, the Trustee looks to Article 3, "Redemption," instead of Article 6, "Defaults and Remedies," to determine the Debtors' obligations and the Trustee's remedies upon a default.  This defies the canons of contract interpretation.  Further, the Trustee asks this Court to conclude, contrary to New York law, that because section 3.07 does not include language expressly disclaiming the effect of section 6.02, section 3.07 must control.[10]  This argument fails on the same

---

[10] The Trustee cites to *NML Capital v. Republic of Argentina*, 952 N.E.2d 482, 492 (N.Y. 2011) for the proposition that absent specific language indicating that the parties intended for 3.07(c) to terminate upon acceleration, section 3.07(c) still applies after acceleration.  This is not the law.  In *NML Capital*, the Second Circuit stated that Argentina had not pointed to any language indicating that the biannual interest payment terminated upon acceleration of the debt.

21

grounds.

54.     "Optional Redemption" under section 3.07 is an act separate and apart from automatic acceleration.  This is evident in part from the noticing scheme outlined in Article 3, "Redemption." (*See* Indenture §§ 3.01-3.06 (requiring written notice prior to redemption and outlining procedures for same).)  This noticing scheme specifies a detailed process for advance notice of redemption, including the "Redemption Date," the Notes to be redeemed, and more.  No part of this notice process is required to be followed when the Notes become "due and payable immediately without further action or notice" under section 6.02.

55.     In other words, under the Indenture, redemption and acceleration are not the same thing.  The Indenture in various places distinguishes between the two concepts:

- "(a) An 'Event of Default' . . . means . . . (1) default in payment when due and payable, upon *redemption*, *acceleration* or otherwise, of principal, or premium, if any, on the Notes . . . ." (Indenture § 6.01(a)(1) (emphasis added).)

- "The due and punctual payment of the principal, premium, if any, and interest on the Notes when and as the same shall be due and payable, whether on an Interest Payment Date, at maturity, by *acceleration*, repurchase, *redemption* or otherwise . . . ." (*Id.* § 10.04 (emphasis added).)

- "[T]he principal, premium, if any, and interest on the Notes shall be promptly paid in full when due, whether at maturity, by *acceleration*, *redemption* or otherwise . . . ." (*Id.* § 11.01 (emphasis added).)

56.     When the EFIH Debtors filed for bankruptcy, the Notes automatically accelerated and became due and payable immediately.   Under New York law, "a borrower's repayment after acceleration is not considered voluntary."  *South Side*, 451 B.R. at 268; *see also AMR*, 730 F.3d at 103 (rejecting the claim that an accelerated repayment was a "voluntary redemption").  This is because

---

*Id.* at 263.  It did not state that there must be specific language indicating that the parties intended for a provision to terminate upon acceleration.

"[a]cceleration moves the maturity date from the original maturity date to the acceleration date and that date becomes the new maturity date." *Solutia*, 379 B.R. at 484.

57.     "Prepayment can only occur prior to the maturity date," *Id.* at 488 (emphasis omitted), and "acceleration, by definition, advances the maturity date of the debt so that payment thereafter is not prepayment but instead is payment made after maturity." *In re LHD* Realty *Corp.*, 726 F.2d 327, 330-31 (7th Cir. 1984).  "Once the maturity date is accelerated to the present, it is no longer possible to prepay the debt before maturity." *Northwestern Mutual*, 816 N.Y.S.2d at 834 (quoting *Rodgers v. Rainier Nat'l Bank*, 757 P.2d 976 (Wash. 1988)); *see also Solutia*, 379 B.R. at 488 ("Because the 2009 Notes were automatically accelerated, any payment at this time would not be a prepayment."). Acceleration therefore "does not trigger the [Trustee's] right to prepayment consideration" under the Optional Redemption provision. *South Side*, 451 B.R. at 268.  Thus, the Trustee's claim that the EFIH Debtors' repayment was an optional redemption must fail.  For these reasons, the Trustee is not entitled to an Applicable Premium.

### E.     The EFIH Debtors' Bankruptcy Filing Was Not An Intentional Default Under The Indenture

58.     The Trustee also seeks judgment for an allowed secured claim arguing that EFIH's default was done with intent to deny the Trustee the Applicable Premium.  (Compl. ¶¶ 58-65, 74-76.) The Court disagrees with the Trustee that it would be entitled to any relief.

59.     First, unlike in some cases, the Indenture does not contain a provision stating that a premium will be owed if EFIH intentionally causes an event of default to avoid paying the Applicable Premium.  *Compare with Premier*, 445 B.R. at 591 ("If an Event of Default occurs . . . by reason of any willful action . . . with the intention of avoiding the prohibition on redemption of the Notes . . . an additional premium shall also become due."); and *South Side*, 451 B.R. at 269-70 ("[P]arties may agree that a borrower's repayment of the debt after acceleration . . . will be deemed an evasion of the

parties' prepayment agreement.")

60.     Second, the Trustee has the burden of supplying "sufficient evidence (not mere allegations)" for a reasonable factfinder to conclude that the EFIH Debtors intentionally defaulted. *United States v. Jamas Day Care Ctr. Corp.*, 152 Fed. Appx. 171, 173 (3d Cir. 2005) (quoting *Olsen v. GE Astrospace*, 101 F.3d 947, 950 (3d Cir. 1996)).   A material fact is one that could "alter the outcome of the case."  *Argus Mgmt. Group v. GAB Robins, Inc. (In re CVEO Corp.)*, 327 B.R. 210, 214 (Bankr. D. Del 2005) (quoting *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995)).   It is genuine when it is "triable," that is, when reasonable minds could disagree on the result.  *Id.* at 210 (quoting *Matsushita Elec. Indus Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

61.     Viewing all factual inferences in a light most favorable to the Trustee, its argument is nonetheless insufficient to create a genuine issue of material fact as to why the EFIH Debtors filed bankruptcy.  While it is certainly the case that the EFIH Debtors planned pre-petition and followed through after filing bankruptcy to use the default created by that filing to refinance the Notes without having to pay the Applicable Premium, that is not enough to counter the overwhelming evidence that the Debtors filed bankruptcy because they were facing a severe liquidity crisis.  The collapse of Project Olympus doomed a T-side only bankruptcy and to suggest that the Debtors refused to market and sell Oncor, which may be worth $18 billion, to avoid having to pay a $400 million make-whole premium stretches the bounds of credulity.  The EFIH Debtors are no different than any other debtor that is forced into bankruptcy because of financial reasons but decides to use the tools provided by that bankruptcy, such as the power to reject unprofitable leases, for business reasons.  The Trustee has presented insufficient evidence to rebut that put forth by the EFIH Debtors.  There is no genuine issue of material fact – the EFIH Debtors did not file bankruptcy in an intentional effort to default

under the Indenture so that the Applicable Premium would not be due.

### F.      The Trustee's Right To Rescind Acceleration

62.      The Trustee asserts that the Noteholders had an "absolute right" to rescind the automatic acceleration of the Notes.  Based on this theory, the Trustee also seeks a declaratory judgment that it is entitled to an allowed secured claim in the amount of the Applicable Premium, for breach of the alleged right to rescind.  (Compl. ¶¶ 69, 73.)  The Trustee's qualified right of rescission raises a number of issues.

#### i.      The Trustee's right to rescind the acceleration of the Notes is not barred because the automatic stay under section 362 of the Bankruptcy Code is not a "judgment of a court."

63.      First, while the Trustee has the right under Section 6.02 of the Indenture to waive the automatic default arising from the EFIH Debtors' bankruptcy filing and rescind the acceleration of the Notes, that right is not absolute.  Section 6.02 of the Indenture, the relevant provision, reads:

> The Holders of at least a majority in aggregate principal amount of the Notes by written notice to the Trustee may on behalf of all the Holders waive any existing Default and its consequences under the Indenture except a continuing Default in the payment of interest on, premium, if any, or the principal of any Note (held by a non consenting Holder) and rescind any acceleration with respect to the Notes and its consequences (*so long as such rescission would not conflict with any judgment of a court of competent jurisdiction*).

(Indenture § 6.02, ¶ 3 (emphasis added).)

64.      Thus, the Trustee may not rescind acceleration of the Notes if so doing would "conflict with any judgment of a court of competent jurisdiction."  The EFIH Debtors argue that the right to rescind incorporates and is expressly limited by judicial orders, including the automatic stay. *In re Gruntz*, 202 F.3d 1074, 1082 (9th Cir. 2000) ("The automatic stay is an injunction issuing from the authority of the bankruptcy court, and bankruptcy court orders are not subject to collateral attack in other courts."); *In re San Angelo Pro Hockey Club, Inc.*, 292 B.R. 118, 124 (Bankr. N.D. Tex. 2003) ("The automatic stay is self-executing injunction, and therefore, for contempt purposes,

25

constitutes an order issuing from the bankruptcy court.").

65.     The Court disagrees.  The automatic stay is not a "judgment of a court of competent jurisdiction."  It is prescribed by statute, not by any court, and applies in every bankruptcy case automatically without any court order.  *See* 11 U.S.C. § 362(a); *In re James*, 257 B.R. 673, 678 (B.A.P. 8th Cir. 2001) ("[T]he stay is a statutory provision and not a court order[.]"); *In re Alberts*, 381 B.R. 171, 176 (Bankr. W.D. Pa. 2008) ("The 'automatic stay' is a statutory injunction … that … arises without … court order.").  Nor is the automatic stay a "judgment" under New York law, which provides that a judgment is "the determination of the rights of the parties in an action or special proceeding," NY CPLR § 5011, and is appealable as of right.[11]  NY CPLR § 5701(a)(1).  The fact that a bankruptcy filing gives rise to an automatic stay, by contrast, cannot be appealed.

66.     Thus, the Trustee's right to rescission is not barred by section 6.02 of the Indenture as a result of the imposition of the automatic stay.[12]

### ii.     The automatic stay bars the Trustee's rescission notice.

67.     Second, the automatic stay bars the Trustee's rescission notice of June 4, 2014.  Upon filing its voluntary chapter 11 petition, EFIH's assets, including its rights under the Indenture, became subject to the automatic stay.  11 U.S.C. § 362(a).  Sending a notice of rescission is an act to "collect, assess or recover" on a claim, especially when the Noteholders have already been paid their full principal and accrued interest.  *Id.* § 362(a)(6); *see also Momentive*, 2014 WL 4436335, at *19 ("[T]he automatic stay does, in fact, apply to the sending of a rescission notice."); *AMR Corp.*, 485 B.R. at

---

[11] *See also* Fed. R. Civ. P. 54(a) ("Definition; Form. 'Judgment' as used in these rules includes a decree and any order from which an appeal lies."); Black's Law Dictionary 970 (10th ed. 2014) ("judgment" means "[a] court's final determination of the rights and obligations of the parties in a case.  The term judgment includes an equitable decree and any order from which an appeal lies.").

[12] Moreover, even were the automatic stay a judgment under section 6.02 of the Indenture, the automatic stay can always be lifted.  In that case, rescission would no longer conflict with a judgment of the Court because the stay/judgment would simply cease to exist.

294 ("Any deceleration of these notes, however, is barred by the automatic stay imposed by the filing of this bankruptcy."), *aff'd* 730 F.3d 88 (2d Cir. 2013); *Solutia*, 379 B.R. at 485 ("[W]here the indenture provides for an automatic acceleration any attempt at deceleration would violate the automatic stay.").

### iii. If the Court were to lift the automatic stay the Applicable Premium would be due.

68.     Third, if the Court were to lift the automatic stay, *nunc pro tunc* to a date on or before the repayment of the Notes on June 19, 2014, to allow the Trustee to waive the default and decelerate the Notes than EFIH's refinancing would be an Optional Redemption under section 3.07 of the Indenture and the Applicable Premium would be due and owing to the non-settling Noteholders.

69.     Had EFIH refinanced the debt on the same day (June 19, 2014), on the same terms, outside of bankruptcy, on which it redeemed the Notes in bankruptcy, it would have owed the Applicable Premium.  The only thing that stands in the way of owing the Applicable Premium is that the bankruptcy caused an automatic default that accelerated the debt.  The Trustee, however, had the right to waive that default and decelerate the Notes, which it attempted to do by sending a rescission notice on June 4, 2014.  That notice, however, was void *ab initio* as a result of the automatic stay. Were the Court, however, to lift the automatic stay, *nunc pro tunc* to a date on or before June 19, 2014, to allow the Trustee's rescission notice to take effect then the automatic default would be waived, the Notes would no longer be immediately due and the refinancing would require payment of the Applicable Premium.

70.     Were the Court, however, either not lift the stay or do so, but not *nunc pro tunc* to a date on or before June 19, 2014, the date the Notes were paid, then the Applicable Premium would not have been owed at the time the Notes were paid in full.  At most, the Trustee and the Noteholders would have a damages claim for denial of the rescission right.  Whether such a claim exists is

discussed below.

> **iv.   A genuine issue of material fact exists as to whether the Trustee can establish cause to lift the automatic stay.**

71.    Fourth, a genuine issue of material fact exists as to whether the Trustee can establish cause to lift the automatic stay, *nunc pro tunc* to a date on or before June 19, 2014, to allow the Trustee to waive the default and decelerate the Notes, i.e., to give effect to the June 4, 2014 notice.

72.    The Stay-Applicability Motion requests a determination that the automatic stay would not bar the Noteholders from rescinding acceleration or, in the alternative, that the stay should be lifted.  The Court has already held that the automatic stay applies to the June 4 rescission notice.  There is a genuine issue of material fact precluding summary judgment as to whether cause exists to lift the automatic stay.

73.    The Bankruptcy Code authorizes bankruptcy courts to grant relief from the stay for "cause."  11 U.S.C. § 362(d)(1).  Courts are to determine "cause" based on the totality of the circumstances in each particular case.  *In re Wilson*, 116 F.3d 87, 90 (3d Cir. 1997).  The factors courts generally use in determining whether cause exists are (1) whether any great prejudice to either the bankrupt estate or the debtor will result from a lifting of the stay; (2) whether the hardship to the non-bankrupt party by maintenance of the stay considerably outweighs the hardship to the debtor; and (3) the probability of the creditor prevailing on the merits.  *In re Downey Fin. Corp.*, 428 B.R. 595, 609 (Bankr. D. Del. 2010).

74.    The Trustee argues that, as a matter of law, cause exists to lift the automatic stay because at this stage of the proceedings the EFIH Debtors are presumed to be solvent.  The Trustee cites to a number of cases in support of its argument.  *See, e.g., Claughton v. Mixson,* 33 F.3d 4 (4th Cir. 1994); and *In re Texaco, Inc.*, 81 B.R. 804 (Bankr. S.D.N.Y. 1988).  These cases do not stand for the proposition that a debtor's solvency is, as a matter of law, cause to lift the automatic stay.  While

28

a debtor's solvency may, in certain cases, be a relevant consideration in determining whether cause

exists to lift the automatic stay it is not the sole factor to be considered by the Court.

75.     The Trustee further argues that lifting the automatic stay would not prejudice either

the bankruptcy estate or the debtor because doing so would simply hold the EFIH Debtors to their

bargain and there can be no harm to a solvent estate.  The Court disagrees.  Several courts have held

that lifting the automatic stay to trigger liability under a make-whole claim may harm a debtor or its

estate and that analysis does not depend solely on whether that estate is insolvent.  *See, e.g.*, *In re*

*AMR Corp.*, 485 B.R. 279, 295 (Bankr. S.D.N.Y. 2013); *In re AMR Corp.*, 730 F.3d 88, 112 (2d Cir.

2013), and *Momentive*, 2014 WL 4436335, at \*23.   Moreover, "denial" of the Noteholders'

contractual right to rescission does not, in and of itself, establish cause to lift the aoutomatic stay.

76.     While the Trustee cannot meet its burden on summary judgment that cause exists to

lift the stay, the Court cannot hold on summary judgment, as urged by the EFIH Debtors, that cause

does not exist.  In short, there is a genuine dispute of material fact as to whether cause exists to lift the

automatic stay.

> **G.     The Trustee has no claim for (i) breach of the 'no-call" provision of section 3.07(c) of the Indenture; (ii) violation of the "perfect tender" rule under New York law; nor (iii) breach of the right to waive the default and decelerate the Notes.**

77.     The Trustee asserts claims for various breaches of the Indenture.  No such claims exist.

> **i.     Breach of no-call provision**

78.     The Trustee argues it should be entitled to a claim for damages arising from the

Debtors' breach of section 3.07(c) of the Indenture's No-Call Provision.  (Compl. ¶¶ 74-76.)  The

Court disagrees.

79.     As an initial matter, the Trustee appears to concede that section 3.07(c) is *not* a "no-

call" provision prohibiting repayment.  (Pl.'s Memo. in Support of Mot. for SJ 66. ("Pl. Br.").)  The

Trustee characterizes 3.07(c) as requiring payment of a make-whole premium if the Notes are repaid (under any circumstances) before December 1, 2015. But Section 3.07(c) provides only that redemptions at the EFIH Debtors' option, as defined by that section, require paying the Applicable Premium.

80.     The court in *Momentive* analyzed a nearly identical provision. The indenture there provided: "the Note shall not be redeemable at the option of MPM prior to October 15, 2015," which language, the court found, was "no more than an introduction or framing device for the notes' elective redemption provisions." *Momentive*, 2014 WL 4436335, at *16. The same is true here.

81.     Because the Notes were not optionally redeemed, section 3.07(c) does not apply, and the Court finds that the Trustee is not entitled to damages based on a breach of "no-call" theory.

### ii.      "Perfect Tender" claim

82.     The Trustee also asserts that repayment pursuant to section 6.02 of the Indenture breached New York's common-law "perfect tender" rule. (Pl. Br. 66-67.) The Court disagrees.

83.     Under the perfect tender" rule, "a [borrower] has no right to pay off his obligation prior to its stated maturity date in the absence of a prepayment clause." *Arthur v. Burkich*, 131 A.D.2d 105, 106 (N.Y. App. Div. 1987). The Trustee claims that section 6.10 of the Indenture ("Rights and Remedies Cumulative"), which states that "every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy," requires this Court to find the EFIH Debtors liable for damages under the rule of perfect tender.

84.     In a subsequent opinion, the *Momentive* court explained that the perfect tender rule does not apply if, as was the case there, the indenture modified the common-law rule. Bench Ruling Tr. 16:19-17:9, *In re MPM Silicones, LLC, et al.*, No. 14-08247 (Bankr. S.D.N.Y. Oct. 14, 2014) (Dkt. No. 60).) The Court agrees. Section 6.02 of the Indenture makes payment of the Notes automatic and mandatory before the Notes' stated maturity. This provision directly modifies the

30

common-law "perfect tender" rule, and the Trustee therefore is not entitled to damages.

### iii.        Claim for denial of right of rescission

85.        The Trustee also argues that it is entitled to a claim for the denial of the right to rescind acceleration, which constituted a breach of the Indenture giving rise to damages in the amount of the make-whole that the Noteholders would have been entitled to receive if their contractual right to rescind had been honored.  The Court disagrees.

86.        Oversecured creditors have allowed claims for "reasonable fees, costs, or charges" when those amounts are "provided for under the agreement . . . under which such claim arose." *See* 11 U.S.C. § 506(b).   The Indenture here does not provide for any fee, cost, or charge for breach of the purported right to rescind.  The Trustee merely asserts a vague claim for damages arising out of its inability to decelerate the Notes.

87.        As several courts have explained, secured claims are not allowed for breach of contract damages unless those damages are specifically provided for in the Indenture.  For example, in *Continental Securities* the lender sought damages for the alleged breach of a no-call provision. *Cont'l Secs. Corp. v. Shenandoah Nursing Home P'ship*, 188 B.R. 205, 215 (W.D. Va 1995), *aff'd*, 104 F. 3d 359 (4th Cir. 1996) (per curiam).  The court denied the secured claim, however, because the note there did not include any penalty provision for breach of the no-call provision.  *Id.*  Similarly, in *Vest Associates* a lender acknowledged that the note at issue did not provide for a make-whole premium upon post-acceleration repayment, but the lender nonetheless asserted a secured claim for the adverse tax consequences allegedly caused by the prepayment.  *In re Vest Assocs.*, 217 B.R. 696, 699 (Bankr. S.D.N.Y. 1998).  The court denied the claim because the damages sought were not provided for in the loan agreement.  *Id.*  Here, as in *Continental* and in *Vest*, the damages sought for the asserted breach of the alleged right to rescind are not set forth in the Indenture, and they cannot therefore be allowed as a secured claim.

88.     The cases the Trustee cites are inapposite.  *See In re Rodriguez*, 629 F.3d 136, 141-42 (3d Cir. 2010) (finding that underlying agreement provided for an enforceable state law claim); *In re Chemtura Corp.*, 439 B.R. 561, 603 (Bankr. S.D.N.Y 2010) (noting first the requirement that a claim must be valid under applicable non-bankruptcy law).

### H.     Counts I-IV of the Complaint

89.     Before the Court are cross motions for summary judgment on the Complaint filed by the Trustee.  Having addressed the relevant factual and legal issues raised by the parties, the Court now turns to the Complaint.

### i.     Count I

90.     Count I of the Complaint seeks a declaratory judgment that the EFIH Debtors' refinancing of the Notes constitutes a redemption under section 3.07 of the Indenture requiring payment of the Applicable Premium as an allowed secured claim. (Compl. ¶¶ 51-57.)  The Court has held that where, as here, the Notes were paid following an acceleration under section 6.02 of the Indenture arising from a default for the commencement of "proceeding to be adjudicated bankrupt or insolvent" under section 6.01(a)(6)(i) of the Indenture, the plain language of the Indenture does not require payment of an Applicable Premium.  The Court has also held that if it were to lift the automatic stay, *nunc pro tunc* to a date on or before the repayment of the Notes on June 19, 2014, to allow the Trustee to waive the default and decelerate the Notes than EFIH's refinancing would be an Optional Redemption under section 3.07 of the Indenture and the Applicable Premium would be due and owing to the non-settling Noteholders.  As a result, were the Court to grant relief from the automatic stay as outlined above, it could enter judgment in favor of the Trustee on Count I.  Thus, the Court will grant summary judgment in favor of the EFIH Debtors on Count I of the Complaint without prejudice to the Court's right to reinstate Count I and enter judgment in favor of the Trustee if, and only if, the Court deems it appropriate upon entry of an order lifting the automatic stay, *nunc pro tunc* to a date

on or before the repayment of the Notes on June 19, 2014, to allow the Trustee to waive the default and decelerate the Notes.

### ii.      Count II

91.      Count II of the Complaint seeks a declaratory judgment that the EFIH Debtors' default under the Notes with an intent to deny payment of the Applicable Premium requires payment of the Applicable Premium as an allowed secured claim. (Compl. ¶¶ 58-65.) The Court has held that the EFIH Debtors did not file bankruptcy in an intentional effort to default under the Indenture so that the Applicable Premium would not be due.  Thus, the Court will enter summary judgment in favor of the EFIH Debtors on Count II of the Complaint.

### iii.      Count III

92.      Count III of the Complaint seeks a declaratory judgment that the EFIH's Debtors' denial of the Noteholders' right to rescind acceleration of the Notes under section 6.02 of the Indenture gives rise to an allowed secured claim. (Compl. ¶¶ 66-73.)   The Court has held that while the Noteholders have a right of rescission under section 6.02 of the Indenture their attempt to exercise that right was a violation of the automatic stay.  As such, there can be no claim for breach of contract arising from operation of the automatic stay.  Moreover, secured claims are not allowed for breach of contract damages unless those damages are specifically provided for in the Indenture, which is not the case here.  Thus, the Court will enter summary judgment in favor of the EFIH Debtors on Count III of the Complaint

### iv.      Count IV

93.      Count IV of the Complaint seeks a declaratory judgment that EFIH's refinancing gives rise to an unsecured claim for the same reasons set forth in Counts I-III as well as for breach of section 3.07(c) of the Indenture's "no-call" provision, violation of New York's "perfect tender rule" and denial of the right to rescission.  (Compl. ¶¶ 74-76.)  The Court has ruled that the EFIH Debtors'

33

are entitled to summary judgment on Counts I-III (although without prejudice as to Count I) and there is no claim for breach of section 3.07(c) of the Indenture's "no-call" provision, violation of New York's "perfect tender rule" and denial of the right to rescission.  The sole avenue for relief in connection with the denial of the right to rescission is to seek relief from the automatic stay, which, if granted, might give rise to a claim under Count I.  Thus, the Court will grant summary judgment in favor of the EFIH Debtors on Count IV of the Complaint.

## I.        The Stay-Applicability Motion

94.        The parties have also sought summary judgment on the Stay-Applicability Motion, which requests a determination that the automatic stay would not bar the Noteholders from rescinding acceleration or, in the alternative, that the stay should be lifted to give effect of the rescission.  The Court has held that the right of rescission is not barred by the automatic stay but the issuance of the notice of rescission was a stay violation and void *ab initio*.  The Court has further held that if it were to lift the automatic stay, *nunc pro tunc* to a date on or before the repayment of the Notes on June 19, 2014, to allow the Trustee to waive the default and decelerate the Notes than EFIH's refinancing would be an Optional Redemption under section 3.07 of the Indenture and the Applicable Premium would be due and owing to the non-settling Noteholders.  In that instance, the Court could reinstate Count I of the Complaint, which is why summary judgment on Count I is being granted in favor of the EFIH Debtors without prejudice.  Finally, the Court has held that a genuine issue of material fact exists as to whether the Trustee can establish cause to lift the automatic stay.  Thus, the Court will grant summary judgment, in part, in favor of the EFIH Debtors on the Stay-Applicability Motion in that the automatic stay is applicable and the issuance of the notice of rescission was a stay violation. The Court will not grant summary judgment in favor of either party on the Stay-Applicability Motion on the issue of whether the Trustee can establish cause exists to lift the automatic stay.

## IV.    CONCLUSION

95.    For the reasons and to the extent set forth above, the EFIH Debtors' motion for summary judgment is granted, in part, and denied, in part, and the Trustee's motion for summary judgment is denied in its entirety.  Summary judgment is entered in favor of the EFIH Debtors on Counts I-IV of the Complaint, provided, however, that entry of summary judgment on Count I of the Complaint is without prejudice, summary judgment is entered, in part, in favor of the EFIH Debtors on the Stay-Applicability Motion, and summary judgment is not entered on the Stay-Applicability Motion solely to the issue of whether cause exists to lift the automatic stay.

96.    An order will be issued.

Dated: March 26, 2015

Sontchi, J._____