**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) ) ) | Case No.: 14-10979 (CSS) |
| | ) | Jointly Administered |
| Debtors. | ) ) | |
| | ) | **Re: Docket Nos. 5072 & 5115** |
| | ) | |

**JOINDER OF SHIRLEY FENICLE, AS SUCCESSOR-IN-INTEREST TO THE
ESTATE OF GEORGE FENICLE, AND DAVID WILLIAM FAHY
TO THE MOTION OF CHARLOTTE AND
CURTIS LIBERDA TO APPOINT LEGAL REPRESENTATIVE**

Shirley Fenicle, as successor-in-interest to the Estate of George Fenicle, and David William Fahy (respectively "Fenicle" and "Fahy"), both members of the EFH Official Committee of Unsecured Creditors ("Committee") hereby exercise their right to dissent from Committee decisions and submit this Memorandum in support of the motion of Charlotte and Curtis Liberda ("Liberda Motion"), [Docket No. 5072], seeking appointment of a legal representative for all future claimants including the current unmanifested asbestos claimants and those who will in the future develop relationships giving rise to such claims, in these jointly administered cases.

---

[1] The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810. The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201. Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http;://www.efhcaseinfo.com. The debtors are referred to collectively and individually herein as the "Debtors."

1397496.1                                                              1

I.

BACKGROUND

1.  On July 22, 2015, Charlotte and Curtis Liberda (the "Liberdas") filed the Liberda Motion requesting the appointment of a legal representative to represent unmanifested asbestos claimants on all issues before this Court.

2.  On July 27, 2015, the Liberdas filed a motion requesting an order shortening the notice of the Liberda Motion to allow the hearing to convene on August 11, 2015, at 9:30 a.m. (ET) ("Motion to Shorten") [Docket No. 5115]. The order shortening notice of hearing was granted on July 30, 2015 [Docket No. 5170].

II.

ARGUMENT

3.  The Committee previously called the Court's attention to the irreconcilable conflict of interest presented to the Committee by the Court's January 7, 2015, Opinion denying standing to plaintiffs' law firms,[2] which concluded that unmanifested future asbestos claimants

---

[2] The Court's standing decision was made without a record and without inviting argument. In fact, plaintiffs' law firms representing current asbestos claimants already represent vast members of potential unmanifested future claimants, at least those who have some connection to Debtors and know about that connection. Plaintiffs' law firms have standing to protect the interests of their clients (*Griswold v. Connecticut*, 381 U.S. 479 (1965)). For example, Mrs. Fenicle, appointed to the Committee in a representative capacity only, is herself a potential unmanifested future claimant since she lived with her husband during his Ebasco exposure and was exposed to asbestos on a take-home basis, as was her son. They are both at risk of developing asbestos-related disease, and should they do so in the future, would have exactly the kind of claim that Debtors now seek to preclude.

In addition, should Mrs. Fenicle herself become sick and suffer a terminal illness, her son as well as her daughter would themselves have cognizable claims for her wrongful death, and thus they too are potential future unmanifested claimants. This is the typical context in which asbestos cases are brought. Were this bankruptcy proceeding one which truly involved an assumption of asbestos liabilities by credit-worthy buyers along with adequate levels of insurance coverage, then there would be no conflict between present and future asbestos claimants, who could then

had current claims in this bankruptcy, and as creditors, would therefore fall within the scope of the existing creditors' committees on both the E and T Sides.  Last month, the United States Trustee was asked to appoint a Future Claims Representative or Guardian ad Litem for unmanifested asbestos claimants and invited comment from our Committee.  On June 29, 2015, the Committee indicated that it had no opposition.  The U.S. Trustee declined the request as beyond his powers, in effect inviting the pending Liberda Motion.

4. Fenicle and Fahy now therefore strongly support the Liberda Motion and urge the Court to grant that motion promptly.  We recognize and understand the Court's discussion in the January 2015 Opinion and the implications of Debtor exclusivity, and thus the Court's belief that at this point it cannot require the Debtor to propose a plan of reorganization utilizing § 524(g), requiring the appointment of a Future Claims Representative and the creation of an asbestos trust fund.  However, we respectfully suggest that no confirmable plan is possible here without § 524(g).

5. This is not one giant bankruptcy involving dozens of companies merged into one parent and as a result having lost their independent identities.  Rather, it is a large group of separately filed bankruptcies which the Court for very logical reasons has decided warrant joint administration.  Nonetheless, among this large group is the separate bankruptcy of EECI, Inc. (Case No. 14-10992) and as several other affiliated or related companies such as Ebasco Canada (Case No. 14-10987). There can be no legitimate question that these are purely asbestos companies, and the law in the Third Circuit is crystal clear that compliance with § 524(g) is mandatory. _In re Combustion Engineering, Inc._, 391 F.3rd 190 (Third Circuit, 2004).  In the

---

reasonably work together on a separate Asbestos Creditors Committee. However, as will be discussed below, the reinstatement/pass-through of asbestos claims that the Debtor has talked about is at best illusory, and the conflict is thus very real.

interim, during however long it takes Debtors to face these realities, the Court should at a minimum appoint a Guardian to protect the interests of these unrepresented and unmanifested future asbestos victims.

6. Ebasco went into business 100 years ago, and by the 1930s was a major user of asbestos insulation and related products in its international power plant design, construction, maintenance, and repair business which continued under a series of different ownerships through the 1980s. In its wake, Ebasco has thus left a worldwide legacy of deadly asbestos in place and, to the extent not already removed, the asbestos remains a potential source of future disease for decades to come. Given the long latency period of asbestos disease, even pre-1980 exposures can be expected to produce a significant volume of fatal asbestos cancers for at least another 30 years.

7. At the Debtors' urging, this Court has repeatedly considered actions that have profound potential impact on the rights of these thousands of people who have had no one to speak for them in the decisions that will affect them and their families for decades. If due process means anything, it has to mean that the Court should have heard from them already.[3] This deprivation of due process taints any relief granted Debtors in this case. In future decades, those who become sick can only claim that they had not received notice of the draconian bar date order requirements, imposed upon them ex parte at the Debtors' instance; hardly an adequate substitute for the constitutional right to due process.

8. To make matters worse, EECI is a company that has been a non-operating shell for approximately 20 years. In pre-petition litigation, EECI provided testimony and evidence that its net worth was around $300 million, EECI's assets were invested in the intercompany

---

[3] See *In re Amatex Corporation*, 755 F.2d 1034, 1042-43 (3rd Cir. 1985); 11 U.S.C. § 1109(b).

1397496.1                                                    4

cash pool and made available to other members of the corporate family, and that EECI was essentially acting as a conduit to forward claims to insurance carriers. (Deposition of Gaylene McMahon taken September 7, 2006 in *Margaret Slanina, et al. v. General Electric Co., et al.*, District Court of Harris County, Texas, 11th Judicial District (transferred from 125th Judicial District), Cause No. 2003-63363.)  To date, there has been no disclosure in this matter of the financial records of EECI, the extent to which it has intercompany claims for unpaid interest on the money it has made available to affiliated companies, or the nature and extent of its insurance coverage. Despite our requests, Debtors have only been willing to make insurance information available to our Committee's counsel on a "professionals' eyes only" basis.  As a result, although our lawyers (as our agents) presumably know something about the insurance assets, they have not been permitted to tell us anything.  EECI may well have other good and valid claims against current and previously affiliated companies.  Obviously, in a consensual bankruptcy, all of this might be wrapped up in one deal, but there cannot be a deal involving EECI outside of § 524(g) and without full disclosure.

III.

THE JOINT PLAN

A.

The E Side

9.     The Amended Joint Plan of Reorganization, filed July 23, 2015, [Docket No. 5078], recognizes that there are legacy unsecured claims against the EFH Debtors (p. 18, ¶ 184) as well as against the T Side Debtors (p. 18, ¶ 185).

10.    The EFH asbestos claimants are placed in Class A3 and described as "unimpaired." The treatment of these claims is set out in Article III, Section B.3 on page 42,

which provides that these Debtors will receive either payment in full in cash (3(b)(i)) or reinstatement (3(b)(ii)). "Reinstatement" is meaningless without clear explication of where these claims go and what assets are made available to secure their ultimate payment. Similarly, "payment in full in cash" is fraught with difficulty. The Debtor and claimants' counsel can settle cases one by one, as asbestos litigants have been doing for decades. But potential problems arise when the sides do not agree. It would appear the Debtor intends to invoke Article VII, starting at page 73, in such circumstances and presumably would turn to paragraph C – *Estimation of Claims* – which allows them to ask the Court to estimate disputed contingent claims and further provides, "in the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan …." While this may be an appropriate procedure for some types of claims, it is clearly both inappropriate and unconstitutional with respect to asbestos personal injury claims. Indeed, each asbestos claimant is entitled to a jury trial to liquidate the value of his or her claim (*Northern Pipeline Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982); 28 U.S.C. 157(b)(2)(B) and (b)(5)).

11.  Debtors' proposed Article VII(C) plan construct seeks not to lead the Court onto a slippery slope, but rather, to push it over a cliff. The Debtor's plan will lead inexorably to total gridlock and paralysis in the United States District Court for the District of Delaware.

12.  A bar date on presently diagnosed claimants can be appropriate and even useful. Once that bar date passes (December 2015), the inventory of claims will be known and the Debtor could *in theory* sit down with lawyers all over the country and try to resolve them. Doing so, however, will be no easy task, and, in all likelihood, dozens, if not hundreds, of claimants will demand their right to jury trial to liquidate the value of their claims. This is especially true if

the plan guarantees them payment in full, as it does here. The United States District Court for the District of Delaware will likely be overwhelmed by these trial demands. In the year ending March 31, 2015, a total of 1,600 civil cases, including only 21 personal injury/product liability cases, were filed in the United States District Court for the District of Delaware, however, the District Court "completed" only 88 trials of all kinds in the last year. The median time from civil case filing to trial is now almost three years. (see pp. 1 and 14 at http://www.uscourts.gov/statistics/table/na/federal-court-management-statistics/2015/03/31-2). How can the Delaware District Court possibly handle these cases on top of its already over-full docket?

13.     Over the years that this trial tsunami will require, large sums will have to be retained to secure that "payment in full," thus limiting what can be distributed to other creditors in the interim. The obvious logical alternative is to proceed under § 524(g) which does permit the Court to estimate the total value of asbestos liabilities and leave to a Trust the task of liquidating and paying those claims over time.

B.

The T Side

14.     The problems presented on the T Side of this case are even worse. The asbestos creditors with claims against the T Side companies are in Class C5 (p. 41, ¶ 3) and are defined as impaired. Their treatment is set out at page 53 in paragraph 31, which provides that each Claim Holder shall receive its pro rata share of either the right to purchase new EFH common stock in the merger scenario or in the "stand alone scenario," from what is described as the TCEH Unsecured Settlement Distribution, but can only get cash "to the extent consistent with the

1397496.1                                                                 7

Intended Tax-Free Treatment" (¶ 31(b)). This treatment is hardly useful for someone dying of cancer whose primary concern is to secure the financial future of his family

15.     The Debtor has acknowledged that there are asbestos liabilities on the T Side but has attempted to downplay them. But these asbestos liabilities are substantial, intertwined, and complex. Nine separate Debtors are Luminant companies. Other entities among the T Side Debtors also own power plants. Many of their T Side employees have claims against EECI and the E Side Debtors since Ebasco/EECI has performed considerable work at Luminant power plants over the years. Thus, Luminant employees, performing their own jobs, were likely exposed to asbestos by Ebasco/EECI employees and would have claims against EECI. Conversely, the Ebasco/EECI employees, when they get sick, will have potential claims against the Luminant companies if the Ebasco workers were exposed to asbestos dust created by the work of Luminant employees or employees of other contractors on those sites.

16.     Attempting to unravel the interrelationships between the Luminant power plant exposure liabilities and the EECI responsibilities for asbestos disease among Luminant employees will be a difficult and monumental task. For two years now, the Debtor has sought to trivialize the asbestos issue in these jointly administered cases. Those efforts, not surprisingly, have been well received by all the other creditors who clearly understand that every dollar that goes to an asbestos victim is a dollar they cannot divide amongst themselves.[4]

---

[4] To our knowledge, no one has made any effort to accurately estimate or assess the full extent of potential asbestos liabilities here. When you consider that Ebasco/EECI did major work at over 500 U.S. power plants over a 40 year period and that much of that asbestos is still in place, and that mesothelioma cases tend to average somewhere between $3 million and $5 million apiece in total value, if not more, and that anybody looking for basic insurance today would want at least $1 million per year coverage per insured site, and most states follow a triple trigger concept so that liability accrues for each year the asbestos is in place, a reasonable and conservative estimate done on a back-of-an-envelope basis would be that the asbestos liability in this case at a minimum is somewhere between $3 billion and $5 billion.

17. After the issuance of this Court's January opinion, the ad hoc plaintiffs committee demanded that the T Side Creditors Committee undertake the active representation of T Side asbestos claimants. That demand was ignored. The E Side Committee has two EECI creditor representatives along with one EFH pension beneficiary representative and two EFIH bondholder representatives. All committee members have acted appropriately in recognition of their fiduciary duties to the entire constituency, but it is only natural that we all come at this from different perspectives.

18. We had early on sought the appointment of an Asbestos Creditors Committee in this case but the U.S. Trustee instead chose the E Side combined committee format that we currently have. Such was within his discretion.

19. We have done the best we can, given these limitations, for the present asbestos claimants, and have tried to do more in recognition of our Committee's responsibility to the future unmanifested claimants, even though that responsibility puts our entire Committee in the very conflict situation which we have already called to the Court's attention. Fenicle and Fahy now urge the Court to grant the Liberda Motion and appoint a Guardian who can act with unconflicted devotion to protect the constitutional rights of thousands upon thousands of as yet unmanifested asbestos claimants.

| | |
|---|---|
| Dated: July 31, 2015 | By:  /s/ *Daniel K. Hogan* |

Daniel K. Hogan (DE Bar # 2814)
**HOGAN♦McDANIEL**
1311 Delaware Avenue
Wilmington, Delaware  19806
Telephone:  (302) 656-7540
Facsimile: (302) 656-7599
dkhogan@dkhogan.com

-and-

Frances Gecker (ARDC #6198450)
Joseph D. Frank (ARDC #6216085)
**FrankGecker LLP**
325 North LaSalle Street, Suite 625
Chicago, IL 60654
(312) 276-1400
(312) 276-0035 (fax)

*Counsel for Shirley Fenicle, as successor-in-interest to the Estate of George Fenicle, and David William Fahy*