# EXHIBIT C

**MASTER AGREEMENT FOR COMMERCIAL PRINT AND COPY SERVICES**

**BY AND BETWEEN**

**MASTERCRAFT PRINTED PRODUCTS AND SERVICES, INC.**

**AND**

**EFH CORPORATE SERVICES COMPANY**

**DATED September 1, 2011**

**NO. # C 0711331 C**

*Confidential*

No. # C 0711331 C

# MASTER AGREEMENT FOR COMMERCIAL PRINT AND COPY SERVICES

## 1. EFFECTIVE DATE

The effective date of this agreement is September 01, 2011.

## 2. PARTIES

COMPANY

> EFH Corporate Services, a Texas company

PROFESSIONAL

> Mastercraft Printed Products and Services, Inc. a Texas corporation

## 3. PURPOSE

The purpose of this Agreement is to authorize PROFESSIONAL to perform the Services described in the Scope of Service and Deliverables provision below and to establish the complete terms and conditions for performing the Services.

## 4. DEFINITIONS

COMPANY Group

> The term "COMPANY Group" means COMPANY, its parent corporation, Energy Future Holdings Corp., and all subsidiaries and affiliates of Energy Future Holdings Corp., and all officers, directors, shareholders, associates, related firms and entities, employees, servants and agents of both COMPANY and each such subsidiary or affiliate.

PROFESSIONAL Group

> The term "PROFESSIONAL Group" means PROFESSIONAL, all subcontractors of any tier employed by PROFESSIONAL, and all affiliated or related firms and entities, officers, directors, partners, limited partners, shareholders, associates, employees, servants and agents of each.

Contract Coordinator

> The term "Contract Coordinator" means a representative of each party named in this Agreement to act in matters related to performance of this Agreement as it is written. Actions of the Contract Coordinators regarding the day-to-day interaction between the operations of the parties, the issuance and approval of invoices, the issuance and approval of procedures, drawings, schedules and documents of any type, and other decisions made in managing this Agreement will not operate as a waiver or compromise of any provision of this Agreement.

Contract Administrator

> The term "Contract Administrator" means a representative of both parties named in this Agreement to act in matters relating to the revision of contract language, the adjustment of compensation or time and the resolution of issues regarding the meaning of contract language.

Deliverable

> Except to the extent otherwise expressly provided for this Agreement, the term "Deliverable" means any tangible items, products or deliverables to be developed or prepared by

1

# MASTER AGREEMENT FOR COMMERCIAL PRINT AND COPY SERVICES

PROFESSIONAL for COMPANY as part of the services.

**Employee(s)**

The term "Employee(s)" means any individual authorized by COMPANY to order copy/print reprographic Services as outlined in this Agreement.

**Schedule A**

The term "Schedule A" and all future Schedule A's mean a written document issued pursuant to this Agreement by PROFESSIONAL to COMPANY that identifies and authorizes Services to be performed. A Schedule A may, however, contain Work instructions, specifications, pricing and specific billing advise. As used herein, the term "Schedule A" shall have the same meaning as the term "Statement of Work" and the same shall be interchangeable.

**Standard Services Item(s)**

The term "Standard Services Item(s)" means flat non bound copy/reprographic Services.

**Services**

The term "Services" or "Work" means all labor, materials, equipment, transportation and facilities necessary to perform the Scope of Services and Deliverables described in this Agreement.

## 5. SCOPE OF SERVICES AND DELIVERABLES

PROFESSIONAL will be responsible for the supply of any and all materials, equipment, supervision and labor required to perform commercial print, copy reprographic and forms management services for COMPANY. Scope of services and deliverables include but are not limited to the following:

**DIRECT MAIL AND SPECIAL PROJECTS**

COMPANY may, from time to time, identify Services which COMPANY desires to be performed by PROFESSIONAL for Direct Mail and Special Projects. COMPANY will order services for direct mail and special projects in strict accordance with Schedule A(s) as outlined in Attachment 1 to this Agreement entitled "Sample Schedule A". The Schedule A will be documented and issued by PROFESSIONAL to COMPANY for execution once all the requirements have been identified and agreed to by the parties. Schedule A(s) issued shall reference this Agreement by number and shall be deemed a part of this Agreement. PROFESSIONAL and COMPANY agree that the nature and characteristics involving the final product may change course and direction during the design phase of any particular printed material. For Direct Mail and Special projects PROFESSIONAL will work with COMPANY or COMPANY's authorized third party to drive print design efficiencies and cost savings.

Nothing in this Agreement shall be deemed to authorize any Work, or constitute a commitment of either party to accept or execute any particular Schedule A, and neither COMPANY nor PROFESSIONAL will have any rights or obligations for or with respect to any particular Services except Services as identified in a Schedule A executed by both parities. At COMPANY's sole discretion, Services may be authorized verbally and confirmed by a written Schedule A.

Direct Mail and Special Projects may include but are not limited to:
- Direct Mail projects with or without fulfillment requirements
- Employee Benefits Letters

2

No. # C 0711331 C

# MASTER AGREEMENT FOR COMMERCIAL PRINT AND COPY SERVICES

## STATIONARY PRINTING, COPYING AND FULFILLMENT

PROFESSIONAL will generally review COMPANY's business forms for design improvements, consolidation and/or elimination and develop any other ideas and products that will enhance the quality and cost competiveness of each operation. COMPANY is under no obligation to accept or implement any such design improvements, consolidations, elimination or ideas or provide additional compensation to PROFESIONAL for providing same.

PROFESSIONAL will provide to COMPANY a current numeric forms catalog applicable to each affiliate. This catalog will be updated as the need arises or as requested by COMPANY. PROFESSIONAL will maintain current specifications on its system that can be selectively retrieved for grouping forms by size, product type and business entity.

The printed materials listed herein generally represent COMPANY's type, characteristics and fulfillment requirements (hereinafter referred to as "Stationary Printing, Copying and Fulfillment"). As mutually agreed on by both parties, Stationary Printing, Copying and Fulfillment may be warehoused at PROFESSIONAL's location for fulfillment requirements. PROFESSIONAL agrees to create, manage and update secure website containing COMPANY's Stationary Printing, Copying and Fulfillment Catalog for processing online Stationary Printing, Copying and Fulfillment requirements. Furthermore, PROFESSIONAL understands and agrees the Stationary Printing, Copying and Fulfillment may change based on COMPANY requirements.

Stationary Printing, Copying and Fulfillment may include, but is not limited to, the following:
- Brochures
- Forms
- Letterhead
- Letterhead Envelopes
- Bill Inserts
- Financial Print
- Other Printed Materials

## DIGITAL SOLUTIONS

PROFESSIONAL will perform copy / print reprographic and overall digital solution services for COMPANY that includes but is not limited to the following Scope of Services:

- Large format black and white and color copies
- Black and white copies single and duplex
- Color copies single and duplex
- File creation and manipulation services
- Fulfillment
- Digital color printing
- Typesetting and graphic design
- File transfer / conversion, online ordering and proofing services
- Large format printing and services
- Litigation copy services
- Scanning services
- Bindery services
- Project management
- Consulting services
- Delivery services

Hours of Operation

3

# MASTER AGREEMENT FOR COMMERCIAL PRINT AND COPY SERVICES

- Normal hours of operation will be 7:00AM – 6:00PM Monday through Friday.
- After hours rush / emergency services will be available 6:00PM to 7:00AM Monday through Friday and all day Saturday and Sunday.

Ordering Process – Standard Hours of Operation

- COMPANY Employee(s) will order print and copy / reprographic Services via email to a dedicated e-mail address provided by PROFESSIONAL or through PROFESSIONAL's secured website once COMPANY employees have been properly trained using the secured website.
- PROFESSIONAL receives the order and will contact the COMPANY Employee within twenty four (24) hours following receipt of order if required to discuss or clarify any questions or issues. PROFESSIONAL will make available a print consultant to either meet in person or via conference call during normal business hours at the request of COMPANY Employee pursuant to a print order.
- PROFESSIONAL will email the COMPANY Employee(s) within twenty four (24) hours following receipt of order attaching a PDF proof copy of the printed or copied material, associated pricing and delivery information.
- Once the COMPANY Employee approves the order, PROFESSIONAL will put order into production within twenty four (24) hours following receipt of approval.
- PROFESSIONAL will deliver next business day on all Standard Services Items.
- PROFESSIONAL will immediately contact COMPANY Employee should PROFESSIONAL fail to meet the delivery requirement.

Ordering Process – After Hours / On Call Service

- COMPANY Employee requiring after hours or emergency services will order via email through the dedicated email address provided by PROFESSIONAL and will concurrently contact PROFESSIONAL via phone to discuss the requirements of the Services.
- PROFESSIONAL will email the COMPANY Employee(s) within twenty four (24) hours following receipt of order attaching a PDF proof copy of the printed or copied material, associated pricing and delivery information.
- Once the COMPANY Employee approves the order, PROFESSIONAL will put order into production within twenty four (24) hours following receipt of approval.
- Once the order is complete PROFESSIONAL will deliver directly to the COMPANY Employee's location.
- After Hours / On Call Service Charge as outlined on Attachment # 3 may apply.

Ordering Process – Rush / Emergency

- COMPANY Employee requiring rush or emergency services will order via email through the dedicated email address provided by PROFESSIONAL and will concurrently contact PROFESSIONAL via phone to discuss the requirements of the Services.
- PROFESSIONAL will email the COMPANY Employee(s) within twelve (12) hours following receipt of order attaching a PDF proof copy of the printed or copied material, associated pricing and delivery information.
- Once the COMPANY Employee approves the order, PROFESSIONAL will put order into production within twelve (12) hours following receipt of approval.
- Once the order is complete PROFESSIONAL will deliver directly to the COMPANY Employee's location.
- Rush / Emergency Charge as outlined on Attachment # 3 may apply.

Print / Copy Production Turnaround Times and Delivery

- Orders received by PROFESSIONAL during Normal Hours of Operation for Standard Service Items for COMPANY Employees located at Lincoln Plaza, Energy Plaza and Sierra Building will be delivered the next business day based on the following delivery schedule:
  - Energy Plaza and Lincoln Plaza no later than 10:00AM

4

No. # C 0711331 C

# MASTER AGREEMENT FOR COMMERCIAL PRINT AND COPY SERVICES

- o   Sierra Building no later than 2:00PM
- Standard items for all other COMPANY locations will be delivered within two (2) to three (3) business days.
- Turnaround time for more complex print/copy orders will be agreed upon by the parties.
- Turnaround time for after hours or emergency orders will be agreed to by the parties and delivered directly to the COMPANY Employee's location.

Standard Delivery
PROFESSIONAL will deliver all Standard Services Items to the following:

| | |
|---|---|
| Energy Plaza | 5th Floor Print Services |
| Lincoln Plaza | 11th Floor Mail Services area |
| Sierra Building | Mail Center at the Dock |
| All other COMPANY locations | Ship via FedEx Express |

## GENERAL REQUIREMENTS:

Delivery
PROFESSIONAL is required at a minimum to provide printed materials and any fulfillment within standard delivery times specified above  for all Special Projects, Printed Materials or Copy Solutions orders.

Technology
PROFESSIONAL's staff will be competent in various software packages including, but not limited to, the following:

- Coral Draw 12
- Microsoft Office Extended Office Suite
  - o   Visio
  - o   Power Point
  - o   Excel
  - o   Outlook
  - o   Info Path
  - o   Access
- Adobe Photo Shop CS
- Adobe Illustrator CS
- Adobe Acrobat Version 7.0
- Adobe Indesign
- Quark Express
- Fiery Command Services Station 4.0
- PitStop Professional PDF Files

Security / Confidentiality
Safety and security of electronic and hard copy data are critical issues to COMPANY.  In addition to the requirements set forth in Article 16, PROFESSIONAL will at a minimum adhere to the following:

- PROFESSIONAL staff members will sign a Confidentiality Agreement in the form attached to this Agreement.
- PROFESSIONAL systems will be supported by redundant backup data systems and ensure that COMPANY data is kept secure and may only be accessed by employees of PROFESIONAL who have executed a Confidentiality Agreement.
- Password-protected methods or secure network encryption technology will be used during file uploading.
- PROFESSIONAL will maintain a secured firewall to ensure security of electronically transferred data and its digital output from COMPANY.

5

No. # C 0711331 C

## MASTER AGREEMENT FOR COMMERCIAL PRINT AND COPY SERVICES

- PROFESSIONAL will control all document spoilage and secure destruction of spoilage. PROFESSIONAL will provide evidence of destruction upon request by COMPANY.
- PROFESSIONAL will contact COMPANY"s Contract Coordinator for any compliance issues related to COMPANY's brand identity.

Reporting
PROFESSIONAL will provide to COMPANY quarterly performance reports no later than the fifteenth day of the month following the end of each calendar quarter (i.e., April 15, July 15, October 15 and January 15). These quarterly reports will contain all information as reasonably required by COMPANY in order for COMPANY to monitor PROFESSIONAL's performance, adherence to delivery requirements and overall quality of service, and effectively control and monitor COMPANY's ordering process and cost.
Quarterly Usage/Spend Reports (see attached Sample EFH Report)
- Quarterly Savings Report (see attached TXU Comparative Pricing Template)
- Other reports as may be required by COMPANY
- All Reports will include a breakdown of information as follows:
  - By Project / Schedule A
  - By COMPANY entity (i.e., parent, subsidiary, affiliate)
  - By COMPANY employee
  - By services category (Direct Mail, Special  Project, Stationary Printing, Copying, Fulfillment, Digital Solutions, Website)

### 6.   NON-EXCLUSIVE

COMPANY reserves the right to obtain the types of services provided by PROFESSIONAL from other sources without obligation or liability to PROFESSIONAL and nothing herein shall be deemed to limit or prohibit PROFESSIONAL from performing similar services for other clients.

### 7.   TERM OF AGREEMENT

This Agreement will be in full force and effect from its Effective Date and, unless terminated earlier, shall terminate on December 30, 2015; provided, however, that the provisions contained in the Confidentiality of Data, Rights to Data, Warranty, Intellectual Property and Indemnification clauses will survive completion or termination.

### 8.   COMPENSATION

Subject to the requirements of this section, compensation of the satisfactory performance by PROFESSIONAL of the Work shall be in accordance with the following:

**DIRECT MAIL AND SPECIAL PROJECTS**

Compensation structure under direct mail and special projects will be agreed upon mutually by both parties under Schedule A(s).   PROFESSIONAL will provide COMPANY with verification that costs associated with similar direct mail and special projects reflect a decrease in cost totaling 15% per year based on 2010 historical costs, excluding postage and post office fees.  If a 15% decrease is not realized, COMPANY may request that PROFESSIONAL offset any difference in cost to obtain 15% savings on Direct Mail and Special Projects.

**STATIONARY PRINTING, COPYING AND FULFILLMENT**

PROFESSIONAL's compensation for Stationary, Printing, Copying and Fulfillment services will be in accordance with the pricing as outlined in the Attachment #3 entitled "Baseline Pricing Matrix of Stationary Printing, Copying and Fulfillment".   PROFESSIONAL understands and agrees that PROFESSIONAL's compensation will be calculated by starting with the baseline pricing in conjunction with the applicable specification and the tiered quantity pricing.  Should COMPANY request a type of

No. # C 0711331 C

# MASTER AGREEMENT FOR COMMERCIAL PRINT AND COPY SERVICES

Stationary Printing, Copying and Fulfillment service not included in Attachment No 3, the parties will use the item on Attachment 3 that is most similar to the requested Stationary Printing, Copying and Fulfillment as the baseline price and make an equitable adjustment to the price, if necessary. Should COMPANY request Stationary Printing, Copying and Fulfillment on Attachment 3 in a quantity not provided on Attachment 3, the parties will agree on equitable adjustment either upward or downward based on the sliding scale to the baseline pricing pursuant to quantity tiers that have been established in Attachment No 3. PROFESSIONAL's rates under Attachment #3 reflect a 15% decrease in comparison to 2010 historical rates.

## DIGITAL SOLUTIONS

Digital Solutions will be billed in accordance with Attachment #4 entitled "Digital Solutions Pricing Matrix". All rates included in Attachment #4 reflect a 15% decrease in comparison to 2010 historical rates.

If during the term of this Agreement, prices for paper used for ongoing projects for EFH have increased a cumulative 10% or greater from the prices below , PROFESSIONAL will be allowed to submit a request for a price increase, not to exceed the market increase, to COMPANY for review, the increase shall be documented and validated by PROFESSIONAL providing written proof from the paper mill(s). Subsequently, any proposed change in the rates must be submitted in writing to COMPANY's Contract Administrator no less than thirty (30) days prior to the proposed effective date. No change will be authorized unless agreed to in writing and approved in advance by COMPANY's Contract Administrator.

Roll Stock
60# and 70# opaque text  $56.10/CWT
80# matte and gloss book  $57.00/CWT

Flat Sheet
60# and 70# offset text  $59.09/CWT
60# and 70# opaque text  $71.92/CWT
80# matte and gloss book  $56.25/CWT

## 9.  SALES TAX

COMPANY will provide PROESSIONAL with a Direct Payment Exemption Certificate which will negate the necessity of PROFESSIONAL's collection of State of Texas Sales and Use Tax from COMPANY. Properly authorized Direct Payment Exemption Certificate No's 1-75-0835281-6 is attached and made a part of this Agreement.

## 10. INVOICES AND PAYMENT

Invoices will be submitted at the end of each calendar month in which Work is performed. Such invoices will include a detailed description of the Work actually performed. Invoices will be accompanied by such documentation as COMPANY may require for verifying the propriety of any amounts billed. COMPANY may refuse to process any invoice that does not conform to the requirements of this Agreement, including without limitation, the requirements of Section 7 Compensation.

COMPANY will endeavor to promptly notify PROFESSIONAL of any non-conforming invoice that must be resubmitted before payment.

Each invoice issued in connection with Work will reference this Agreement's contract number. Detailed billing instructions will be set forth in the Schedule A.

PROFESSIONAL's invoices, if in compliance with this Agreement, will be paid within sixty (60) days of COMPANY's receipt thereof; provided, however, that should COMPANY dispute any portion of an invoice, COMPANY may pay only the undisputed portion of the invoice within the time stated above and at the same time, advise PROFESSIONAL in writing of its reasons for withholding the disputed portion.

7

No. # C 0711331 C

# MASTER AGREEMENT FOR COMMERCIAL PRINT AND COPY SERVICES

COMPANY will thereafter pay such amounts to PROFESSIONAL, upon the resolution of such discrepancy or conflict to the parties' mutual satisfaction.

## 11. TAXES

PROFESSIONAL will comply with all federal, state, or municipal laws, rules and regulations regarding taxes and the payment of taxes, until the Services have been completed, including, without limitation, social security, state unemployment insurance, gross receipts taxes, withholding taxes, and income tax. PROFESSIONAL will furnish, upon request by COMPANY, satisfactory evidence of its compliance.

## 12. INDEPENDENT CONTRACTOR RELATIONSHIP

PROFESSIONAL will act as and be deemed to be an independent contractor. Neither PROFESSIONAL nor any of its employees will act as, nor be deemed to be, an agent or employee of COMPANY. PROFESSIONAL will have the sole right to control and directly supervise the method, manner and details of the Services.

## 13. STANDARD AND CODES

Whenever reference is made in this Agreement to standards or codes in accordance with which Work is to be performed or tested, the edition or revision of the standards of codes current on the Effective Date will apply, unless otherwise expressly stated. In case of conflict between any referenced standards and codes and any documents attached to and incorporated into this Agreement, the Agreement documents will govern.

## 14. CHANGES IN SERVICES

COMPANY may by written notice, make changes in, additions to, or deletions from the Services. If any change significantly increases the time required to perform the Services, an equitable adjustment will be made in the schedule for the performance and completion of the Services. If the Services are being performed on a fixed price basis, and if any change significantly increases or decreases the cost to PROFESSIONAL of performing the Services, then an equitable adjustment will be made in the price. The compensation rates for the Services will not be changed.

In order to receive an equitable adjustment in price or schedule, PROFESSIONAL must provide a written request for that adjustment within five (5) working days after receiving COMPANY's notice of a change in the Services. PROFESSIONAL will continue to perform the changed Services prior to or pending Agreement on an equitable adjustment and will not halt or delay performance of the Service because of any failure to reach an Agreement on an adjustment.

To the extent necessary to achieve COMPANY's objectives with respect to a particular Services engagement, PROFESSIONAL may, to the extent expressly authorized by COMPANY, make changes in, additions to, or deletions from the Services. Such changes, additions or deletions will be specified in an amendment to be executed by the parties. If any change significantly increases the item required to be performed the Services, a mutually agreed-upon, equitable adjustment will be made in the Schedule A for the performance and completion of the Services. If the Services is being performed on a fixed price basis, and if any change significantly increases or decreases the cost to PRFESSIONAL of performing the Services, then a mutually agreed-upon, equitable adjustment will be made in the price. The compensation or rates for the Services will not be changed.

## 15. FORCE MAJEURE

If either party becomes unable, either wholly or in part, by an event of Force Majeure, to fulfill its obligations under this Agreement, the obligations affected by the event of Force Majeure will be suspended only during the continuance of that inability. The party so affected will give written notice of

8

No. # C 0711331 C

# MASTER AGREEMENT FOR COMMERCIAL PRINT AND COPY SERVICES

the existence, extent and nature of the Force Majeure to the other party within forty-eight (48) hours after the occurrence of the event. The party so affected will remedy its inability as soon as possible. Failure to give notice will result in the continuance of the affected party's obligation regardless of the extent of any existing Force Majeure.

The term "Force Majeure" as used in this Agreement means acts of God (except as excluded herein), strikes, lockouts, or other industrial disturbances, acts of public enemies, wars, blockades, insurrections, riots, epidemics, earthquakes, fires, priority allocations of pipe or other materials or orders, restraints or prohibitions by any court, board, department, commission or agency of the United States or of any States, any arrests and restraints, civil disturbances, explosions and inability despite reasonable diligence to obtain materials essential to the Work. Rain, snow, ice or other adverse weather conditions will not be considered events of Force Majeure.

## 16. CONFIDENTIAL AND PROPRIETARY INFORMATION

For purposes of this Section and except as provided below, the term "Confidential Information" means this Agreement, as well as any information: (1) disclosed to or known by PROFESSIONAL as a consequence of or through performing the Services; (2) not generally known outside COMPANY; and (3) relates to any aspect of COMPANY Group's business, operations, financial condition, projection, research development, and/or assets (including historical information), documents, and electronic data that PROFESSIONAL obtains in any manner from COMPANY. PROFESSIONAL agrees not to disclose any Confidential Information to any person or entity (including, but not limited to, the media, any governmental representative, authority or tribunal, and any corporation, partnership, group, individual or other entity) at any time or authorize anyone else to during the term of this Agreement or any time thereafter except as set forth in this section. PROFESSIONAL will treat all Confidential Information as confidential, whether oral, written, or electronic, and whether prepared by COMPANY, PROFESSIONAL, its representatives, or otherwise, which has been or in the future is furnished to or acquired by PROFESSIONAL or its representatives. PROFESSIONAL hereby agrees that PROFESSIONAL and its Representatives shall use the Confidential Information solely for the purposes set forth in this Agreement, that the Confidential Information will be kept confidential, that PROFESSIONAL and its representatives will not disclose to any person any of the Confidential Information, and the Confidential Information will not be used in any way detrimental to COMPANY, including without limitation, to gain a competitive advantage with the businesses of COMPANY. In addition, PROFESSIONAL agrees that, without COMPANY's prior written consent, PROFESSIONAL and its representatives will not disclose to any person or entity the fact that the Confidential Information has been made available to them.

Notwithstanding anything to the contrary herein, PROFESSIONAL and any of its representatives who have acquired Confidential Information may only disclose the Confidential Information to PROFESSIONAL's representatives (including employees) who (1) need to know such information in order to perform the Services and (2) have executed a Confidentiality Agreement on the same terms as incorporate in this Section. PROFESSIONAL and any of its representatives who have acquired Confidential Information may only disclose Confidential Information to persons outside those listed in this Section or on terms other than those listed in this Section with the written consent of COMPANY. PROFESSIONAL agrees to provide COMPANY a list of every person or entity that has been provided Confidential Information by PROFESSIONAL or its representatives and the signed Confidentiality Agreement signed by each of those persons or entities. PROFESSIONAL further agrees to inform its representatives of the confidential nature of the Confidential Information and to indemnify COMPANY for any of its representatives' acts or omissions with respect to this Confidential Information.

In the event that PROFESSIONAL or any of its representatives are required (by oral questions, interrogatories, requests for information or documents in legal proceedings, or by the Securities and Exchange Commission, subpoena, civil investigative demand or other similar process) to disclose any Confidential Information, PROFESSIONAL shall provide COMPANY with prompt written notice of any such request or requirements so that COMPANY may seek a protective order or other appropriate order or other remedy and/or waiver compliance with the provisions of this Section. If, in the absence of a

9

# MASTER AGREEMENT FOR COMMERCIAL PRINT AND COPY SERVICES

protective order or other remedy or the receipt of a waiver by COMPANY, PROFESSIONAL or any of its representatives are nonetheless legally compelled to make any such disclosure of Confidential Information or else stand liability for contempt, PROESSIONAL and its representatives may without liability hereunder, disclose to such person only that portion of the Confidential Information that on the advise of counsel is legally required to be disclosed, provided that PROFESSIONAL will use reasonable efforts to assist COMPANY in obtaining an appropriate protective order or other reliable assurance that confidential treatment will be accorded the Confidential Information.

At COMPANY's written request, PROFESSIONAL will promptly deliver to COMPANY all written or electronic Confidential Information that has been provided to or acquired by PROFESSIONAL or its representatives ( or, on agreement by COMPANY, PROFESSIONAL may destroy all such Confidential Information, and confirm such destruction in writing to COMPANY by the sworn statement of an authorized officer supervising such destruction) and neither PROFESSIONAL nor its representatives shall retain any copies, extracts, other reproductions in whole or in part of such Confidential Information, expressly including any electronic, audio, digital, or other back-up copies of the materials, and no copy thereof shall be retained and such destruction shall be confirmed in writing to COMPANY by the sworn statement of an authorized officer supervising such destruction. Notwithstanding anything to the contrary, PROFESSIONAL may retain an archival copy of any document for its permanent records to the extent required by applicable law or regulation.   However, if any such documents containing Confidential Information are so retained, PROFESSIONAL agrees to notify COMPANY in writing of the specific item(s) retained and the specific laws or regulations that require their retention.  Notwithstanding the return, retention or destruction of the Confidential Information, PROFESSIONAL and its representatives will continue to be bound by the confidentiality obligations under this Agreement.

PROFESSIONAL acknowledges that neither COMPANY nor any of its representatives makes any representation or warranty, express or implied, as to the accuracy or completeness of the information provided to PROFESSIONAL by COMPANY.  PROFESSIONAL agrees that neither COMPANY nor any of its representatives shall have any liability to PROFESSIONAL or to any of its representatives relating to or resulting from the use of the information provided to PROFESSIONAL by COMPANY.
PROFESSIONAL recognizes and acknowledges the competitive and confidential nature of the Confidential Information and that irreparable damage will result to COMPANY if Confidential Information is disclosed to any third party except as herein permitted. It is further understood and agreed that money damages may not be sufficient remedy for any breach of this Section.  Accordingly, it is agreed by PROFESSIONAL that COMPANY shall be entitled to an injunction or injunctions (without the posting of any bond and without proof of actual damages) to prevent breaches or threatened breaches of this Section and/or to specific performance of this Section, and that neither PROFESSIONAL, nor its representatives will oppose the granting of such relief. Furthermore, PROFESSIONAL agrees to promptly notify COMPANY if PROFESSIONAL becomes aware of any unauthorized disclosure of any Confidential Information except as herein permitted (including any such disclosure of Confidential Information by any of its representatives), PROFESSIONAL will cooperate fully in any attempt by COMPANY to obtain any remedy or relief relative thereto.

## 17. RIGHTS TO DATA

All designs, drawings, calculations, computer codes, plans, specifications, data and any and all other information developed, created or produced (including partially completed work) by PROFESSIONAL Group pursuant to or relating, directly or indirectly, to the Services, will become the property of COMPANY when so developed, created, or produced, and notwithstanding any property designations contained therein, COMPANY will have the right to use or sell that information without limitation.  At COMPANY's request, those designs, drawings, calculations, computer codes, plans, specifications, data, and any and all other information, will be delivered to COMPANY.

## 18. RECORDS AND RIGHTS TO AUDIT

COMPANY will have the right to examine and audit the books and records of PROFESSIONAL, at any

No. # C 0711331 C

# MASTER AGREEMENT FOR COMMERCIAL PRINT AND COPY SERVICES

reasonable time, to the extent COMPANY deems necessary to verify the accuracy and reasonableness of invoices. The books and records will be maintained in accordance with generally accepted accounting principles. This right to audit will continue for three (3) years following payment of the final invoice. COMPANY will bear the expenses incurred by it in supporting any such inspection or audit; provided, however, that should any audit or investigation produce evidence that PROFESSIONAL has knowingly overstated charges or units of measure upon which charges are based, or provided gifts, gratuities or other benefits to employees of COMPANY in violation of the Business Ethics provisions of this Agreement, PROFESSIONAL will be liable to COMPANY for actual damages, including cost of audit and investigation.

## 19. BUSINESS ETHICS

PROFESSIONAL represents and warrants that neither it nor any person or entity associated in any manner with PROFESSIONAL will:

1)  Provide or offer any compensation or benefit of any type, including any gift or gratuity, other than advertising mementos of nominal value or reasonable business meals and business entertainment, to any COMPANY employee;

2)  To the best of PROFESSIONAL's knowledge, maintain or establish any undisclosed business affiliation that could constitute or give the appearance of a conflict with the interests of the TXU System; or

3)  Except to the extent expressly provided for in this Agreement, attempt to act on behalf of or, in any manner, seek to represent COMPANY.

If, during the term of this Agreement, PROFESSIONAL knows or becomes aware of any facts or circumstances contrary to the representations and the warranties above, PROFESSIONAL will immediately notify COMPANY and provide sufficient information for COMPANY to take appropriate protective or corrective actions. PROFESSIONAL further agrees to cooperate fully in any investigation undertaken by COMPANY.

PROFESSIONAL, if requested by COMPANY, agrees to require its employees to execute an ethics/nondisclosure agreement at any time.

## 20. ASSIGNMENT

PROFESSIONAL will not assign any of the rights or responsibilities arising from this Agreement to any individual or entity without first having obtained the written approval of COMPANY.

## 21. SUBCONTRACTING

PROFESSIONAL will not subcontract for any of the Services without the prior written approval of COMPANY and only then upon terms and conditions as COMPANY may require.

## 22. WARRANTY

PROFESSIONAL agrees and warrants that its employees, agents and subcontractors will perform the Services in accordance with high professional standards, and with a level of care, skill, knowledge and judgment required or reasonably expected of firms or persons performing comparable services, and in strict accordance with this Agreement.

PROFESSIONAL warrants further that its employees, agents and subcontractors assigned to perform any part of the Services possess the education, experience and skills required for the satisfactory and professional performance of the Services.

11

No. # C 0711331 C

# MASTER AGREEMENT FOR COMMERCIAL PRINT AND COPY SERVICES

## 23. DEDICATION OF KEY PERSONNEL

PROFESSIONAL agrees that the individuals listed on Schedule A(s) issued against this Agreement will be assigned to perform the Services to be provided by PROFESSIONAL pursuant to this Agreement. There will be no addition, deletion or substitution of individuals by PROFESSIONAL without the prior written approval of COMPANY's Contract Coordinator.

## 24. INDEMNIFICATION

PROFESSIONAL agrees to and will defend, protect, indemnify and hold harmless COMPANY Group from and against all claims, losses, expenses, attorneys= fees, damages, demands, judgments, causes of action, suits, and liability in tort, contract, or any other basis and of every kind and character whatsoever (hereinafter in this and the following paragraphs collectively referred to as "CLAIMS"), for personal injury, death, or property damage of any member of PROFESSIONAL Group, arising out of or incident to or related in any way to, directly or indirectly, this Agreement, or the Work, services, or materials to be performed or supplied thereunder, or to any activities of any member of PROFESSIONAL Group while on any premises actually or allegedly owned, controlled, or operated by COMPANY, including, but not limited to, CLAIMS arising out of or resulting from (1) any condition of the premises, (2) separate operations being conducted on the premises, or (3) the imperfection or defective condition, whether latent or patent, of any material or equipment sold, supplied, or furnished by COMPANY; and further, **IT IS THE EXPRESS INTENT OF THE PARTIES THAT, FOR THE PURPOSES OF THIS PARAGRAPH, CLAIMS, AND PROFESSIONAL'S OBLIGATIONS TO DEFEND, PROTECT, INDEMNIFY, AND HOLD HARMLESS, WILL INCLUDE, BUT NOT BE LIMITED TO, CLAIMS ARISING OUT OF OR RESULTING FROM COMPANY GROUP'S SOLE OR CONCURRENT (1) NEGLIGENCE, (2) STRICT LIABILITY, OR (3) OTHER FAULT OF ANY NATURE.**

For all CLAIMS except those for personal injury, death, or property damage of any member of PROFESSIONAL Group within the scope of the preceding paragraph, PROFESSIONAL agrees to and will defend, protect, indemnify, and hold harmless COMPANY Group from and against any and all CLAIMS arising out of or incident to or related in any way to, directly or indirectly, this Agreement, or the Work, services, or materials to be performed or supplied thereunder, or to any activities of any member of PROFESSIONAL Group while on any premises actually or allegedly owned, controlled, or operated by COMPANY, including, but not limited to, CLAIMS arising out of or resulting from (1) any condition of the premises, or (2) separate operations being conducted on the premises, or (3) the imperfection or defective condition, whether latent or patent, of any material or equipment sold, supplied, or furnished by COMPANY; and further, **IT IS THE EXPRESS INTENT OF THE PARTIES THAT, FOR THE PURPOSES OF THIS PARAGRAPH, CLAIMS, AND PROFESSIONAL'S OBLIGATIONS TO DEFEND, PROTECT, INDEMNIFY, AND HOLD HARMLESS, WILL INCLUDE, BUT NOT BE LIMITED TO, CLAIMS ARISING OUT OF OR RESULTING FROM COMPANY GROUP'S CONCURRENT (1) NEGLIGENCE, (2) STRICT LIABILITY, OR (3) OTHER FAULT OF ANY NATURE.**

To the extent necessary to permit COMPANY to enforce any term, clause, or condition of this Agreement, PROFESSIONAL agrees that with respect to any CLAIMS brought against COMPANY Group, PROFESSIONAL will and does hereby waive as to COMPANY Group any defense it may have by virtue of the workers compensation laws of any state.

## 25. TERMINATION

COMPANY may terminate this Agreement at any time upon giving a written sixty (60) days notice to PROFESSIONAL. The notice of termination will specify the effective date of any termination and the Services or any part of the Services to be terminated, or alternatively, that this Agreement is terminated in its entirety.

PROFESSIONAL will have the right to terminate this Agreement only after ninety (90) days written notice

No. # C 0711331 C

# MASTER AGREEMENT FOR COMMERCIAL PRINT AND COPY SERVICES

to COMPANY.

In the event of early termination, all property, including, but not limited to, documents, workpapers, letters, memorandums, notes, reports, analyses and publications in any format prepared or acquired by PROFESSIONAL in the course of fulfilling the requirements of this Agreement will be delivered promptly to COMPANY.

## 26. INTELLECTUAL PROPERTY

PROFESSIONAL will obtain permission to use any and all intellectual property that may be required in order for PROFESSIONAL to perform the Services.  This permission will include all necessary licenses and governmental approvals.

PROFESSIONAL will hold harmless and indemnify COMPANY Group and, at COMPANY's option, defend COMPANY Group from and against any and all fines, penalties, losses, liabilities, damages, claims, and costs (including reasonable attorneys' fees and court costs), arising out of or incurred as a result, directly or indirectly, of any alleged or actual infringement or violation of any right, or alleged right, relating to intellectual property, to include any patent, copyright or trade secret.

In addition, if any claim is brought alleging infringement or the violation of any intellectual property right, PROFESSIONAL will avoid any further possible infringement of the intellectual property right in question.  PROFESSIONAL will seek to resolve the claim in consultation with COMPANY, either by means of alternative arrangements for the Services, or by obtaining permission to use the intellectual property in question.

## 27. GOVERNING LAW

THIS AGREEMENT IS GOVERNED BY AND WILL BE CONSTRUED IN ACCORDANCE WITH LAWS OF THE STATE OF TEXAS WITHOUT GIVING EFFECT TO ANY CHOICE OR CONFLICT OF LAW PROVISION OR RULE (WHETHER OF THE STATE OF TEXAS OR ANY OTHER JURISDICTION) THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN THE STATE OF TEXAS.  THE PARTIES MUTUALLY CONSENT TO THE EXCLUSIVE JURISDICTION OF THE FEDERAL AND STATE COURTS IN DALLAS COUNTY, TEXAS AND AGREE THAT ANY ACTION, SUIT OR PROCEEDING CONCERNING, RELATED TO OR ARISING OUT OF THIS AGREEMENT AND THE NEGOTIATION OF THIS AGREEMENT WILL BE BROUGHT ONLY IN A FEDERAL OR STATE COURT IN DALLAS COUNTY, TEXAS AND THE PARTIES AGREE THAT THEY WILL NOT RAISE ANY DEFENSE OR OBJECTION OR FILE ANY MOTION BASED ON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE, INCONVENIENCE OF THE FORUM OR THE LIKE IN ANY CASE FILED IN A FEDERAL OR STATE COURT IN DALLAS COUNTY, TEXAS.  THE PARTIES MUTUALLY AGREE THAT THIS AGREEMENT IS A "MAJOR TRANSACTION" WITHIN THE MEANING OF THE TEXAS CIVIL PRACTICE AND REMEDIES CODE § 15.020 AND AS SUCH AGREE THAT ANY ACTION OR SUIT ARISING FROM THIS AGREEMENT WILL BE BROUGHT IN DALLAS COUNTY, TEXAS, AND VENUE WILL BE IN DALLAS COUNTY, DALLAS, TEXAS.

## 28. NON-WAIVER OF RIGHTS

A waiver by either party of any breach of this Agreement or the failure of either party to enforce any provisions of this Agreement will not in any way affect, limit or waive that party's right to enforce and compel strict compliance as to future activities.

## 29. SEVERABILITY

In the event any provision of this Agreement is held to be void, unlawful or otherwise unenforceable, that provision will be severed from the remainder of the Agreement and replaced automatically by a provision containing terms as nearly like the void, unlawful or unenforceable provision as possible, and the

# MASTER AGREEMENT FOR COMMERCIAL PRINT AND COPY SERVICES

Agreement, as so modified, will continue to be in full force and effect.

### 30. PUBLICITY

No information relating to this Agreement will be released for publication, advertising or any other purpose without the prior written approval of COMPANY. PROFESSIONAL is expressly prohibited from using COMPANY's name in any publication, advertising or promotion.

### 31. BINDING ON SUCCESSORS AND ASSIGNS

This Agreement will inure to the benefit of and be binding upon the undersigned parties and entities and their respective legal representatives, successors, and assigns.

### 32. WORK SITE SAFETY, SECURITY, ALCOHOL, DRUGS AND WEAPONS

The specific Work Site Safety, Security and other related rules and procedures, if any, applicable to the particular job or Work Site are included in the Agreement in Attachment #6. Those specific rules and procedures are incorporated fully into this Agreement by this reference.

### 33. INSURANCE

PROFESSIONAL will, at its sole expense, purchase and maintain, and require its subcontractors to purchase and maintain, during the term of this Agreement, insurance policies with substantial and sound insurers, having coverage of the types and in the amounts specified in the Attachment #7 to this Agreement titled "Contractor's Insurance Requirements" will be submitted by PROFESSIONAL prior to the execution of this Agreement.

### 34. NOTICES

All notices from one party to the other will be deemed to have been delivered if hand delivered or sent by regular United States mail, postage prepaid, as follows:

If to PROFESSIONAL:

Mastercraft Printed Products, Inc.
2150 Century Circle
Irving, Texas 75062
Attention:      Brandon Eoff

If to COMPANY:

EFH Corporate Services Company
1601 Bryan Street,
Dallas, TX  75201-3411
Attention:      Wendy Allen

PROFESSIONAL's Contract Administrator and Contract Coordinator is Brandon Eoff, phone (214) 441-9084.

COMPANY's Contract Administrator is Wendy Allen, (214) 812-4540.

No. # C 0711331 C

# MASTER AGREEMENT FOR COMMERCIAL PRINT AND COPY SERVICES

## 35. ATTACHMENTS

The following attachments are incorporated into this Agreement:

1. Example of Schedule A
2. Confidentiality Agreement
3. Baseline Pricing Matrix of Stationary Printing, Copying and Fulfillment
4. Digital Solutions Pricing Form
5. Direct Payment Exemption Certificate
6. Work Site Safety, Security, Alcohol Drugs and Weapons
7. Contractor's Insurance Requirements
8. Sample EFH Report
9. TXU Comparative Pricing Template.

## 36. AMENDMENTS

Except as otherwise provided in this Agreement, no changes, modifications, amendments, supplements or any other provisions will be valid unless agreed to in writing and signed by both parties.

## 37. ENTIRETY OF AGREEMENT

This Agreement, together with any and all attachments or documents incorporated into it, constitutes the entire Agreement between the parties, and all prior negotiations, undertakings, understanding and agreements between the parties relating to the Services are merged into this Agreement.

The parties have signed this Agreement acknowledging their agreement to its provisions as of the Effective Date.

*PROFESSIONAL*

By: _Suzanne Eoff_
    Signature

Name: _SUZANNE EOFF_

Title: _PRESIDENT_

Date: _8/22/2011_

*COMPANY*

By: _Ben L. Ezzell II_
    Signature

Name: _Ben L. Ezzell II_

Title: _Director Supply Chain_

Date: _8-29-2011_

15

No. # C 0711331 C

**ATTACHMENT #1**
**SAMPLE SCHEDULE A**

**Statement of Work**
**SCHEDULE** _____
Dated: _____
Company Name:  TXU Energy / EFH Corporate Services Company
Project Name: _____

This Statement of Work is issued pursuant to, and is governed by, the terms of the Master Services Agreement for Commercial Print Services dated _____ #C 0711331 C between EFH Corporate Services Company ("Company") and Mastercraft Printed Products and Services, Inc. ("Professional") ("the Agreement"). Capitalized terms not otherwise defined in this Statement of Work ("SOW") have the meanings assigned in the Agreement.

1.  Project Description

2.  Project Services


3.  Project Fee (Compensation/Resources)


**Key Personnel**
Professional agrees that the individuals listed below will be assigned to perform the Work authorized by this Statement of Work. Professional will employ all reasonable commercial efforts to ensure that such individuals remain so assigned until such Work is accepted by Company; provided, however, that in the event that any such individuals are reassigned by Professional or otherwise become unavailable to perform such Work, Professional will provide, by way of replacement, individuals with reasonably equivalent experience and expertise.

| Name | Title | Telephone | E-mail |
|------|-------|-----------|--------|
|      |       |           |        |
|      |       |           |        |
|      |       |           |        |
|      |       |           |        |

**Fees and Payment Terms:**
Additional costs (if required) over and above what is included in this Statement of Work will be provided to COMPANY for its approval prior to being incurred.

The Project Fee will be billed and paid as set forth in the INVOICES AND PAYMENT Section of the Agreement.

Production costs include, but are not limited to, list procurement, printing of materials, letter shop resources, trucking, mechanical developments, technology set-up, and paper purchases. Production costs will be billed as incurred.  Studio time and resources will also be estimated on a per project basis.

4.  Project Contacts
5.  Professional
6.  Company

1

No. # C 0711331 C

## ATTACHMENT #1
## SAMPLE SCHEDULE A

<u>7.    All invoices shall be sent to:</u>

The parties agree to be bound by the terms and conditions of this Statement of Work.

**Mastercraft Printed Products and
Services, Inc.**

By: _Suzanne Eoff_

Name: _SUZANNE EOFF_

Title: _PRESIDENT_

Date: _8/22/2011_

"PROFESSIONAL"

**EFH Corporate Services Company**

By: _Ben C. Ezzell II_

Name: _Ben C. Ezzell II_

Title: _Director Supply Chain_

Date: _8-29-2011_

"COMPANY"

2

No. # C 0711331 C

## ATTACHMENT #2
## CONFIDENTIALITY AGREEMENT

## <u>CONFIDENTIALITY AGREEMENT</u>

**[Date]**

**[Consultant]**

Attn:

Ladies and Gentlemen:

In connection with **[Consultant's]** consideration of a possible transaction or transactions ("***Business Transaction***") with EFH **[appropriate company name]**, or its, affiliates, subsidiaries, parent companies, partners, and/or related companies (collectively, the "***Company***"), **[Consultant]** has requested and the Company is prepared to make available to **[Consultant]** certain proprietary and/or non-public information concerning its business, operations, financial condition, projections, and/or assets (including historical information) (the "***Confidential Information***"). As a condition to such Confidential Information being furnished to **[Consultant]** and/or its directors, officers, employees, affiliates, agents, attorneys, accountants, financial advisors, subcontractors, and/or anyone acting on **[Consultant's]** behalf or at **[Consultant's]** direction (collectively, "***Representatives***"), **[Consultant]** agrees not to disclose any Confidential Information to any person or entity (including, but not limited to, the media, any governmental representative, authority or tribunal, and any corporation, partnership, group, individual or other entity) except as set forth in this letter agreement and to treat any Confidential Information as confidential , whether oral, written, or electronic, and whether prepared by the Company, **[Consultant]**, its Representatives, or otherwise, which has been or in the future is furnished to or acquired by **[Consultant]** or its Representatives.

**[Consultant]** hereby agrees that **[Consultant]** and its Representatives shall use the Confidential Information solely for the purpose of evaluating, negotiating, financing, consummating and implementing a possible Business Transaction, that the Confidential Information will be kept confidential, that **[Consultant]** and its Representatives will not disclose to any person any of the Confidential Information, and the Confidential Information will not be used in any way detrimental to the Company or its stockholders, including, without limitation, to gain a competitive advantage with the businesses of the Company. In addition, **[Consultant]** agrees that, without the Company's prior written consent, **[Consultant]** and its Representatives will not disclose to any person or entity the fact that the Confidential Information has been made available to them, that discussions or negotiations are taking place concerning a possible Business Transaction or any of the terms, conditions, or other facts with respect thereto (including the status thereof).

Notwithstanding anything to the contrary herein, **[Consultant]** and any of its Representatives who have acquired Confidential Information may <u>only</u> disclose the Confidential Information to **[Consultant's]** Representatives (including employees) who (1) need to know such information for the purpose of evaluating, negotiating, financing, consummating or implementing a possible Business Transaction, and (2) have executed a Confidentiality Agreement on the same terms as incorporated in this letter agreement. **[Consultant]** and any of its Representatives who have acquired Confidential Information may only disclose Confidential Information to persons outside those listed in this paragraph or on terms other than those set forth in this paragraph with the written consent of the Company. Upon request, **[Consultant]** agrees to provide Company a list of every person or entity that has been provided Confidential Information by **[Consultant]** or its Representatives and the signed Confidentiality Agreement

1

# ATTACHMENT #2
## CONFIDENTIALITY AGREEMENT

signed by each of those persons or entities. **[Consultant]** further agrees to inform its Representatives of the confidential nature of the Confidential Information and to indemnify to the Company for any of its Representative's acts or omissions with respect to the Confidential Information.

In the event that you or any of your Representatives are requested or required (by oral questions, interrogatories, requests for information or documents in legal proceedings, or by the Securities and Exchange Commission, subpoena, civil investigative demand or other similar process) to disclose any Confidential Information, you shall provide the Company with prompt written notice of any such request or requirement so that the Company may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this letter agreement. If, in the absence of a protective order or other remedy or the receipt of a waiver by the Company, you or any of your Representatives are nonetheless legally compelled to make any such disclosure of Confidential Information or else stand liable for contempt, you or your Representative may, without liability hereunder, disclose to such person only that portion of the Confidential Information that on the advice of your counsel is legally required to be disclosed, provided that you will use your reasonable efforts to assist the Company in obtaining an appropriate protective order or other reliable assurance that confidential treatment will be accorded the Confidential Information.

If you decide that you do not wish to proceed with a Business Transaction, you will promptly inform the Company of that decision. In that case, you will promptly deliver to the Company all written or electronic Confidential Information that has been provided to or acquired by you or your Representatives (or, on agreement by the Company, you may destroy all such Confidential Information, and confirm such destruction in writing to the Company by the sworn statement of an authorized officer supervising such destruction) and neither you nor your Representatives shall retain any copies, extracts, other reproductions in whole or in part of such Confidential Information, expressly including any electronic, audio, digital, or other back-up copies of the Confidential Information. Any and all documents, memoranda, notes and other writings or electronic documents whatsoever prepared by you or your Representatives based on Confidential Information shall be destroyed, expressly including any electronic, audio, digital, or other back-up copies of the materials, and no copy thereof shall be retained and such destruction shall, be confirmed in writing to the Company by the sworn statement of an authorized officer supervising such destruction. Notwithstanding anything to the contrary, you may retain an archival copy of any document for your permanent records to the extent required by applicable law or regulation. However, if any such documents containing Confidential Information are so retained, you agree to notify Company in writing of the specific item(s) retained and the specific laws or regulations that require their retention. Notwithstanding the return, retention or destruction of the Confidential Information, you and your Representatives will continue to be bound by your obligations of confidentiality and other obligations under this letter agreement.

You acknowledge that neither the Company nor any of its Representatives makes any representation or warranty, express or implied, as to the accuracy or completeness of the information provided to you by the Company. You agree that neither the Company nor any of its Representatives shall have any liability to you or to any of your Representatives relating to or resulting from the use of the information provided to you by the Company. Only those representations or warranties which are made in the final definitive agreement regarding any Business Transaction, when, as and if executed and subject to such limitations and restrictions as may be specified therein, will have any legal effect.

You agree that unless and until a definitive written agreement regarding a Business Transaction between the Company and you has been executed, neither the Company nor you will be under any legal obligation of any kind whatsoever with respect to such a transaction by virtue of this letter agreement except for the matters specifically agreed to in this letter agreement. For the purposes of this paragraph, the term "definitive agreement" shall not include an executed letter of intent or any other preliminary written agreement, nor does it include any written or verbal acceptance by the Company of any offer or bid on your part except for the matters specifically agreed to in this letter agreement. You further acknowledge that the Company reserves the right, in its sole discretion, to reject any and all proposals

No. # C 0711331 C

# ATTACHMENT #2
## CONFIDENTIALITY AGREEMENT

made by you or any of your Representatives with regard to a Business Transaction between the Company and you, and to terminate discussions and negotiations with you at any time.

You agree that for a period of three years from the date hereof, you will not, directly or indirectly through any of your affiliates, solicit for employment any of the employees of the Company with whom you engage in discussions or otherwise become acquainted with during your due diligence efforts in evaluation a possible Business Transaction; provided, however, that this letter agreement shall not prohibit any general advertisement or general solicitation that is not specifically targeted at such persons.

You recognize and acknowledge the competitive and confidential nature of the Confidential Information and that irreparable damage will result to the Company if Confidential Information is disclosed to any third party except as herein permitted or is used for any purpose other than the evaluation of a possible Business Transaction. It is further understood and agreed that money damages may not be a sufficient remedy for any breach of this letter agreement. Accordingly, it is agreed by you that the Company shall be entitled to an injunction or injunctions (without the posting of any bond and without proof of actual damages) to prevent breaches or threatened breaches of this letter agreement and/or to specific performance of this letter agreement, and that neither you, nor your Representatives will oppose the granting of such relief. In the event of litigation relating to this letter agreement, the non-prevailing party in such litigation shall reimburse the prevailing party's costs and expenses (including reasonable attorney's fees) incurred in connection with such litigation. Such remedies shall not be deemed to be the exclusive remedies for a breach by you or your Representatives of this letter agreement but shall be in addition to all other remedies available at law or equity to you or the Company. Furthermore, you agree that you will notify the Company if you become aware of any unauthorized disclosure of any Confidential Information and, in the event of any disclosure of Confidential Information except as herein permitted (including any such disclosure of Confidential Information by any of your Representatives) you will cooperate fully in any attempt by the Company to obtain any remedy or relief relative thereto.

THIS LETTER AGREEMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH LAWS OF THE STATE OF TEXAS WITHOUT GIVING EFFECT TO ANY CHOICE OR CONFLICT OF LAW PROVISION OR RULE (WHETHER OF THE STATE OF TEXAS OR ANY OTHER JURISDICTION) THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN THE STATE OF TEXAS. THE PARTIES MUTUALLY CONSENT TO THE JURISDICTION OF THE FEDERAL AND STATE COURTS IN DALLAS COUNTY, TEXAS AND AGREE THAT ANY ACTION, SUIT OR PROCEEDING CONCERNING, RELATED TO OR ARISING OUT OF THIS LETTER AGREEMENT AND THE NEGOTIATION OF THIS LETTER AGREEMENT WILL BE BROUGHT ONLY IN A FEDERAL OR STATE COURT IN DALLAS COUNTY, TEXAS AND THE PARTIES AGREE THAT THEY WILL NOT RAISE ANY DEFENSE OR OBJECTION OR FILE ANY MOTION BASED ON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE, INCONVENIENCE OF THE FORUM OR THE LIKE IN ANY CASE FILED IN A FEDERAL OR STATE COURT IN DALLAS COUNTY, TEXAS. THE PARTIES MUTUALLY AGREE THAT THIS LETTER AGREEMENT IS A "MAJOR TRANSACTION" WITHIN THE MEANING OF THE TEXAS CIVIL PRACTICE AND REMEDIES CODE § 15.020 AND AS SUCH AGREE THAT ANY ACTION OR SUIT ARISING FROM THIS LETTER AGREEMENT SHALL BE BROUGHT IN DALLAS COUNTY, TEXAS, AND VENUE SHALL BE IN DALLAS COUNTY, DALLAS, TEXAS.

It is understood and agreed that any failure or delay by the Company in exercising any right, power or privilege hereunder shall not operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any right, power or privilege hereunder.

The Company reserves the right to assign all of its rights, powers and privileges under this letter agreement, including without limitation the right to enforce all of the terms of this letter agreement, to successors or affiliates of the Company or any person who acquires a majority of the outstanding stock or all or substantially all of the assets of the Company. Except as expressly permitted above, the Company

No. # C 0711331 C

## ATTACHMENT #2
## CONFIDENTIALITY AGREEMENT

shall not have the right to assign this letter agreement or its rights or obligations under this letter agreement without your prior written consent. You acknowledge and agree that you may not assign or otherwise delegate your obligations or duties under this letter agreement to any other person or entity. Any assignment in violation of this letter agreement shall be null and void *ab initio.*

You are aware, and you will advise your Representatives, that United States securities laws prohibit any person who has material non-public information concerning a publicly traded company or entity (including EFH Corp.) from purchasing or selling securities of such company or entity, or from communicating such information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities.

No amendment or modification of this letter agreement shall be binding unless made by written instrument signed by both parties hereto. This letter agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which, taken together, shall constitute one and the same agreement.

Please confirm your agreement with the foregoing by signing and returning one copy of this letter to the undersigned, whereupon this letter agreement shall become a binding agreement between you and the Company.

Very truly yours,

{appropriate company name}

By: *Ben L. Ezzell II*

Name: *Ben L. Ezzell II*

Title: *Director Supply Chain*

Accepted and agreed as of the
date first written above:

**[CONSULTANT]**

By: *Suzanne Eoff*

Name: *SUZANNE EOFF*

Title: *PRESIDENT*

4

No. # C 0711331 C

**ATTACHMENT #2**
**CONFIDENTIALITY AGREEMENT**

No. # C 0711331 C

## ATTACHMENT #3
## BASELINE PRICING MATRIX OF STATIONARY PRINTING, COPYING AND FULFILLMENT

**Baseline Price Matrix of Stationary Printing, Copying and Fulfillment**

Rush Projects: 24 Hour Request = $30.00 Lot

Standard Lead Time for general copy requests is 48 hours.

|  | UNIT OF MEASURE | PRICE | |
|---|---|---|---|
| 20# Bond | Impression | $ 0.026 | |
| 24# bond | Impression | $ 0.026 | |
| 28# Laser Bond | Impression | $ 0.043 | |
|  |  | $ 0.102 | RUSH |
| White, 11 x 17 | Impression | $ 0.05 | |
|  |  | $ 0.23 | RUSH |
| 67# Cover (Card) Stock |  |  | |
| White & Color, 8-1/2 x 11 | Impression | $ 0.08 | |
| 80# Cougar, 8-1/2 x 11 | Impression | $ 0.30 | |
| White & Color, 11 x 17 | Impression | $ 0.59 | |

| TABS | UNIT OF MEASURE |  | |
|---|---|---|---|
| Alpha or Numeric / | Impression | $ 0.25 | |
| Printed with Specific Text |  | $ 0.68 | RUSH |
| White, 9 x 11 |  |  | |
| Typesetting of tabs |  | $ 25.50 | |
| Tabs without Mylar |  | $ 0.25 | |
| Tabs with Mylar |  | $ 0.25 | |
| Tab Insertion into book |  | $ 0.08 | |

| COLOR COPIES | UNIT OF MEASURE | PRICE | |
|---|---|---|---|
| 28# Bond |  |  | |
| White, 8-1/2 x 11 | Impression | $ 0.30 | |
| Double sided | Impression | $ 0.30 | |
|  |  | $ 0.43 | RUSH |

No. # C 0711331 C

## ATTACHMENT #3
## BASELINE PRICING MATRIX OF STATIONARY PRINTING, COPYING AND FULFILLMENT

| | | | |
|---|---|---|---|
| 80# Gloss Text | Impression | $ 0.31 | |
| Double sided | Impression | $ 0.31 | |
| | | *$ 0.43* | *RUSH* |
| White, 8-1/2 x 14 | Impression | $ 0.30 | |
| White, 11 x 17 | Impression | $ 0.60 | |
| | | *$ 1.06* | *RUSH* |
| **80# Cover** | | | |
| White, 8-1/2 x 11 | Impression | $ 0.42 | |
| | | *$ 0.50* | *RUSH* |
| 80# Cover 10.25 x 11 | | $ 0.82 | |
| White, 11 x 17 | Impression | $ 0.85 | |
| | | *$ 1.06* | *RUSH* |
| **80# Gloss Cover** | | | |
| White, 8-1/2 x 11 | Impression | $ 0.46 | |
| | | *$ 0.50* | *RUSH* |
| 100# Gloss Text - no bleed | Impression | $ 0.39 | |
| | | $ 0.43 | *RUSH* |
| with bleed | | $ 0.65 | |
| | | $ 0.85 | *RUSH* |
| **OVERSIZE B & W** | Per Square Foot | $ 0.72 | |
| 24" x 24" = 576 / 144 = 4 sq feet | | | |
| **OVERSIZE COLOR** | Per Square Foot | $ 5.10 | |
| OVERSIZE COLOR on 7mm photo paper | | $ 6.80 | |
| Color Oversize Scanning | Per Square Foot | $ 3.74 | |
| **Yellow Flags** | | $ 0.07 | |

## BINDING AND COVERS

7

No. # C 0711331 C

## ATTACHMENT #3
## BASELINE PRICING MATRIX OF STATIONARY PRINTING, COPYING AND FULFILLMENT

| 3-Ring Binders, White, Clear pockets for Cover and Spine | | | |
|---|---|---|---|
| 1/2" (75 sheet capacity) | Each | $ | 2.03 | |
| 1" (175 sheet capacity) | Each | $ | 2.12 | |
| | | $ | 4.68 | RUSH |
| 1-1/2" (280 sheet capacity) | Each | $ | 2.54 | |
| | | $ | 2.98 | RUSH |
| 2" (375 sheet capacity) | Each | $ | 3.31 | |
| 3" (480 sheet capacity) Angle D | Each | $ | 4.22 | |
| 4" Angle D | Each | $ | 10.07 | |
| GBC Binding | Each | $ | 1.22 | |
| | | $ | 1.70 | RUSH |
| Plastic - Coil | | $ | 1.70 | |
| Wiro Binding | Each | $ | 1.43 | |
| | | $ | 1.83 | RUSH |
| Tape Bound | Each | $ | 0.47 | |
| | | $ | 2.13 | RUSH |
| Depo Binding | Each | $ | 1.70 | |
| Redweld | Each | $ | 2.13 | |
| Custom Redweld Labels | Each | $ | 1.70 | |
| Report Cover (Clear Front/Black Back) | Set | $ | 1.28 | |
| **FINISHING AND PACKAGING** | | $ | 21.25 | Per Hour |
| LAMINATION | | | | |
| 8.5 X 11 | | $ | 1.83 | |
| 11 x 17 | | $ | 2.55 | |
| **DESKTOP PUBLISHING / ARTWORK SERVICES** | | $ | 46.75 | Per Hour |
| Tab art = min $8.50 | | | | |

8

No. # C 0711331 C

## ATTACHMENT #3
## BASELINE PRICING MATRIX OF STATIONARY PRINTING, COPYING AND FULFILLMENT

| ON-CALL SERVICE / MINIMUM 3 HOURS | | $    106.25 | Per Hour | |
|---|---|---|---|---|
| Redwell Expandable Folder | | | $     2.76 | |
| - type and affix labels | | | $     0.24 | |
| Scan, glasswork | | | $     0.13 | |
| Scan, glasswork 11 x 17 | | | $     0.26 | |
| Autofeed | | | $     0.06 | |
| Over-Sized scanning | | | $     0.64 | Per Sq Ft. |
| Master CD | | | $    29.75 | |
| Master DVD | | | $    29.75 | |
| File Renaming | | | $     0.26 | |

| Name Plate - Desk and Wall | | PRICE |
|---|---|---|
| TXU = 2" x 10" | | $     14.88 |
| White Plate, Blue letters | | |
| With Logo | | $     14.03 |
| Without logo | | $     12.75 |
| | | |
| Oncor = 2" x 10" | | $     14.88 |
| White Plate, Black letters | | |
| With Logo | | $     14.03 |
| Without logo | | $ 12,075.00 |
| | | |
| Gold or Silver Desk Holder | | $      6.80 |
| Gold or Silver Wall Mount | | $      5.10 |
| | | |
| 6-1/4" x 3" Grey Plate w/White letters | | |
| | | $     11.86 |
| Magnetic Name Badge | | |
| 1-1/2" x 3" | | |
| TXU logo and black letters | | |
| | | |
| Non-Magnetic Name Badge | | $      8.50 |
| 1-1/2" x 3" | | |
| TXU logo and black letters | | |

9

No. # C 0711331 C

## ATTACHMENT #4
## DIGITAL SOLUTIONS PRICING MATRIX

| ITEM CODE | ITEM DESCRPTION | SELL PRICE PER PK |
|-----------|-----------------|-------------------|
| #10 666565 | #10 REGULAR ENVELOPE PO BOX 666565 | $ 17.85 |
| 10X13 SIER | TXU ENERGY 10 X 13 CATALO ENVELOPE | $ 57.02 |
| 116243 | CLEARANCE RECORD BOOKS | $ 13.21 |
| 121449 | TOOL LOAN RECORD | $ 31.28 |
| 127730 | PLANT OPERATORS LOG | $ 8.88 |
| 138719 | BOILER SLAG PATTERN | $ 4.39 |
| 138719 | BOILER SLAG PATTERN | $ 4.39 |
| 148989 | MATERIAL NOTIFICATION | $ 10.63 |
| 148989 | MATERIAL NOTIFICATION | $ 10.63 |
| 148989 | MATERIAL NOTIFICATION | $ 10.63 |
| 148999 | RETURN TO WAREHOUSE | $ 8.66 |
| 149002 | WAREHOUSE ISSUE REQST | $ 23.46 |
| 164693 | INTERLOCK DEFEATED RCD | $ 14.45 |
| 1887 | TXU PROPERTY DAMAGE | $ 4.24 |
| 1894 | VARIABLE RATE TRACKING FORM | $ 2.98 |
| 1895 | METERS ON VEHICLES | $ 5.76 |
| 1896 | RESIDENTIAL MAGNET | $ 15.24 |
| 1897 | MAGNETIC FIELD DATA SHEET | $ 15.24 |
| 1903 | EQUIPMENT FAILURE LABEL | $ 4.11 |
| 1903 | EQUIPMENT FAILURE LABEL | $ 4.11 |
| 1916 | 1916 TAMPERING EVIDENCE 9 X 12 | $ 127.50 |
| 1917 | 1917 TAMPERING EVIDENCE 6 X 9 | $ 114.75 |
| 1918 PRBD | 1918 PRE-BID JOB BRIEF FORM (496046) | $ 21.25 |
| 1918 PRBD | 1918 PRE-BID JOB BRIEF FORM (496046) | $ 18.70 |
| 2220 | OVERHEARD ELECTRICAL CONSTRUCTION | $ 13.83 |
| 2221 | UNDERGROUND ELECTRICAL CONSTRUCTION | $ 10.43 |
| 2223 | CONTRACTOR PERF. WORKSHEET/EVALUATION | $ 4.70 |
| 259452 | DAILY REPORT COVER | $ 95.03 |
| 301957 | DAILY CREW TIME REPORT | $ 16.64 |
| 302722 | CLEARANCE/HOLD ORDER | $ 15.00 |
| 310207 | SERVICE CALL REQ-2 PT | $ 109.64 |
| 310327 | CLEARANCE REPORT | $ 5.89 |
| 310328 | CUTTING WELDING PERMIT | $ 6.77 |
| 310328 | CUTTING WELDING PERMIT | $ 6.77 |
| 310329 | EXCAVATION PERMIT | $ 22.10 |
| 310330 | CONFINED SPACE ENTRY | $ 27.73 |
| 310331 | NOTICE OF CLEARANCE | $ 12.84 |
| 310331 | NOTICE OF CLEARANCE | $ 12.84 |

10

No. # C 0711331 C

## ATTACHMENT #4
## DIGITAL SOLUTIONS PRICING MATRIX

| | | | |
|---|---|---|---|
| 314775 | ENV-PO FILE JACKET | $ | 67.75 |
| 317153 | COUNTER ISSUE TICKET | $ | 6.09 |
| 317549 | ONCOR SPILL REPORT | $ | 50.05 |
| 318106 | EMPLOYEE INJURY/ILLNSS | $ | 1.70 |
| 318107 | MOTOR VEHICLE ACCIDENT | $ | 3.41 |
| 318116 | STRAIGHT B/L HAZ MATERIALS | $ | 21.52 |
| 318133 | POLE YARD TICKET | $ | 7.10 |
| 319062 | CIRCUIT BREAKER | $ | 2.03 |
| 319133 | METER VERIFICATION RPT | $ | 8.14 |
| 329623 | SHIPPING ORDER-NUMBERD | $ | 20.74 |
| 329624 | SHIPPING ORD CONT. | $ | 36.11 |
| 329934 | STICKER-HARD HAT PROD | $ | 11.31 |
| 388258 | PRIORITY WORK ORDER | $ | 8.86 |
| 388261 | WORK SUPPLEMENT | $ | 2.73 |
| 393022 | OPERATIONS DLY EQUIP | $ | 2.75 |
| 393022 | OPERATIONS DLY EQUIP | $ | 2.75 |
| 397838 | PRE-OPERATIONAL INSPECTION SAFETY | $ | 1.45 |
| 398201 | HANDBK,SPAN-SAFETY PRO | $ | 83.30 |
| 398202 | HANDBK,ENG-SAFETY PROD | $ | 66.51 |
| 407900 | CLEARANCE"MASTER TAG" LUM LOGO | $ | 16.01 |
| 408600 | CLEARANCE "MASTER TAG" (5x7) | $ | 13.40 |
| 449552 | INTERLOCK DEFEATED OR | $ | 15.83 |
| 449553 | FORM 504 CLEARANCE RCD | $ | 9.38 |
| 460284 | TRANSMISSION WORKSCOPE | $ | 2.51 |
| 460285 | EQUIP VERIFICATION SHT | $ | 2.25 |
| 478690 | PUMP INSPECTION LIST | $ | 2.17 |
| 492052 | VINYL SAMPLE TAG | $ | 7.53 |
| 493217 | PRE-SHIFT SCAFFOLD INSPECTION TAG | $ | 6.42 |
| 495805 | CONTRACTORS TRUCK INSPECTION | $ | 61.88 |
| 6073 | LARGE CAP METER & INST | $ | 25.60 |
| 617215 | CLEARANCE REPORT | $ | 7.17 |
| 617219 | SWITCHING &TAGGING ORD | $ | 56.10 |
| 617219 | SWITCHING &TAGGING ORD | $ | 56.10 |
| 632776 | SWITCHING AND TAGGING | $ | 30.60 |
| 663878 | DAILY EXCAVATION RPT | $ | 1.48 |
| 663878 | DAILY EXCAVATION RPT | $ | 2.80 |
| 665515 | MINE EMPL CONTRACTORS | $ | 8.98 |
| 665515 | MINE EMPL CONTRACTORS | $ | 8.98 |
| 690908 | TAG- REPAIRABLE ITEM | $ | 7.83 |
| 691656 | DANGER TAG | $ | 14.23 |
| 691657 | TAG - OUT OF SERVICE | $ | 4.37 |
| 692374 | PARTS REQUEST | $ | 8.63 |

No. # C 0711331 C

## ATTACHMENT #4
## DIGITAL SOLUTIONS PRICING MATRIX

| | | |
|---|---|---|
| 692376 | TUMCO CONTRACTOR WK OR | $ 30.18 |
| 695127 | TUMCO PARTS REQ CONT | $ 7.25 |
| 80921 | TXU ENERGY BUS SERV SPEC WIN | $ 94.40 |
| 80921 | TXU ENERGY BUS SERV SPEC WIN | $ 47.20 |
| 8111 | DRIVER MED. EXEMPT CRD | $ 1.45 |
| 9X12 COF | 9x12 COF CATALOG PEEL & STICK ENVELOPE | $ 56.17 |
| 9X12 COF | 9x12 COF CATALOG PEEL & STICK ENVELOPE | $ 56.17 |
| 9X12 HSTN | 9 X 12 HOUSTON BOOKLET ENVELOPE | $ 56.17 |
| ASTN AVRY | AUSTIN AVERY LABEL | $ 87.43 |
| ASTN ENV | TXU ENERGY #10 REGULAR ENVELOPE - AUSTIN | $ 61.23 |
| AUSTIN ENV | TXU ENERGY #10 REGULAR ENVELOPE - AUSTIN | $ 61.23 |
| AUSTIN ENV | TXU ENERGY #10 REGULAR ENVELOPE - AUSTIN | $ 36.74 |
| AUSTIN MLB | TXU ENERGY MAILING LABEL - AUSTIN | $ 14.88 |
| AUSTIN NCE | AUSTIN NOTECARDS WITH ENVELOPES | $ 105.91 |
| AUSTIN SLH | TXU ENERGY STANDARD LETTERHEAD - AUSTIN | $ 35.36 |
| COF AVRY | COF AVERY LABEL | $ 87.43 |
| COF ENV | TXU ENERGY #10 REGULAR ENVELOPE - COF | $ 61.23 |
| COF MLB | TXU ENERGY - MAILING LABEL - IRVING COF | $ 14.88 |
| COF NCE | COF NOTECARDS WITH ENVELOPES | $ 105.91 |
| COF SLH | TXU ENERGY STANDARD LETTERHEAD - COF | $ 35.36 |
| COR MLB | TXU ENERGY - MAILING LABEL - CORPUS | $ 14.88 |
| FTW ENV | TXU ENERGY #10 REG ENVELOPE - FT. WORTH | $ 61.23 |
| FTW MLB | TXU ENERGY - MAILING LABEL - FORT WORTH | $ 14.88 |
| FTW SLH | TXU ENERGY - STANDARD LH - FORT WORTH | $ 35.36 |
| HSTN AVRY | HOUSTON AVERY LABEL | $ 87.43 |
| HSTN ELH | TXU ENERGY EXECUTIVE LTTERHEAD - HOUSTON | $ 25.91 |
| HSTN ENV | TXU ENERGY -#10 REG ENVELOPE - HOUSTON | $ 61.23 |
| HSTN ENV | TXU ENERGY -#10 REG ENVELOPE - HOUSTON | $ 12.25 |
| HSTN MLB | TXU ENERGY MAILING LABEL - HOUSTON | $ 14.88 |
| HSTN NCE | HOUSTON NOTECARDS WITH ENVELOPES | $ 105.91 |
| HSTN SLH | TXU ENERGY STANDARD LETTERHEAD - HOUSTON | $ 35.36 |
| MCA MLB | TXU ENERGY - MAILING LABEL - MCALLEN | $ 14.88 |
| S WIN ENV | TXU ENERGY - #10 REG WINDOW ENV-SIERRA | $ 43.38 |
| SIERRA ELH | TXU ENERGY EXECUTIVE LETTERHEAD - SIERRA | $ 25.91 |
| SIERRA ELH | TXU ENERGY EXECUTIVE LETTERHEAD - SIERRA | $ 25.91 |
| SIERRA ENV | TXU ENERGY #10 REGULAR ENVELOPE - SIERRA | $ 61.23 |
| SIERRA MLB | TXU ENERGY MAILING LABEL - SIERRA | $ 14.88 |
| SIERRA NCE | SIERRA NOTECARDS WITH ENVELOPES | $ 105.91 |
| SIERRA SLH | TXU ENERGY STANDARD LETTERHEAD - SIERRA | $ 35.36 |
| SRRA AVRY | SIERRA AVERY LABEL | $ 87.43 |
| TXU 2ND SH | TXU ENERGY 2ND SHEETS | $ 14.45 |

No. # C 0711331 C

## ATTACHMENT #4
## DIGITAL SOLUTIONS PRICING MATRIX

| WIN SEC EN | TXU - REG WIN W/ SECURITY SCREEN -PO BOX | $ | 43.38 |

No. # C 0711331 C

## ATTACHMENT #5
## DIRECT PAYMENT EXEMPTION CERTIFICATE
### State of Texas
### Direct Payment Exemption Certificate
### Limited Sales, Excise, and Use Tax

Direct payment authorization number:   1-75-0835281-6  EFH Corporate Services Company

EFH Corporate Services Company hereby claim exemption from the payment of state, city, county, SPD, MTA and/or CTD sales and/or use taxes upon its purchase of taxable items and/or services from:

CONTRACTOR:        Mastercraft Printed Products, Inc.
Address:                2150 Century Circle
City, State, Zip:       Irving, Texas 75062

Description of items and/or services purchased under Contract No. C 0711331 C:

Master Agreement for Commercial Print Services

This certificate will remain in effect until the expiration date of the above contract.

This certificate does not cover:

A.    Purchase of taxable items and/or services to be resold.
B.    Sales or rental to any purchaser other than the permit holder.
C.    Sales or rental of motor vehicles subject to the motor vehicle sales and use tax (Chapter 152) and interstate motor carrier sales and use tax (Chapter 157).
D.    Nontaxable services or materials/supplies used or consumed by a provider of a nontaxable service.
E.    Lump-sum new construction projects to improve real property.

CONTRACTOR agrees not to permit others (including its contractors and repairmen) to use this direct payment authorization to purchase material tax free.

COMPANY agrees to accrue and pay the tax to the Comptroller of Public Accounts as required by statute.

Permit holder:   EFH Corporate Services Company


Authorized Signature/Date:  _____
                                    **Wendy Allen**

14

No. # C 0711331 C

## ATTACHMENT #6
## WORK SITE SAFETY, SECURITY, ALCOHOL, DRUGS AND WEAPONS

**A.    SAFETY**

1.    CONTRACTOR agrees that any safety-related assistance or initiatives undertaken by COMPANY will not relieve CONTRACTOR from responsibility for the implementation of, and compliance with, safe working practices, as developed from their own experience, or as imposed by law or regulation, and will not in any way, affect the responsibilities resting with CONTRACTOR under the provisions of any agreement to which these policies are attached and to meet all safety requirements as specified by the Occupational Safety & Health Administration (OSHA), the Mine Safety Health Administration (MSHA), the Department of Transportation (DOT) and any other applicable state or federal safety and health laws or regulations.

2.    In the event that a material safety data sheet (hereinafter **"MSDS"**), warning label, or other documentation concerning the use of hazardous chemicals at the Work Site or any other property owned or controlled by COMPANY or any of its affiliates (collectively, together with the Work Site, **"COMPANY Properties"**), applies to any materials or equipment provided by CONTRACTOR as an aspect of the Work, such documentation will be provided by CONTRACTOR to COMPANY prior to the commencement of any such Work.

3.    CONTRACTOR will provide information to COMPANY regarding hazardous chemicals and/or consumable products that contain constituents listed in 40 CFR 372.65 used at any COMPANY Property. CONTRACTOR will report the amount of such material carried on and off the site, the amount actually used and the manner of use. CONTRACTOR will provide the maximum quantity of the material stored on site at any one time and if a waste material was collected, where it was disposed of (location name and address). CONTRACTOR will provide information on the amount of material used for the previous calendar year by the first of February.

4.    CONTRACTOR will provide for the duration of the term of any agreement to which these policies are attached, at its sole expense, adequate first-aid facilities for members of CONTRACTOR Group.

5.    CONTRACTOR acknowledges and agrees that all members of CONTRACTOR Group performing Work at any COMPANY Property are required to view COMPANY's "CONTRACTOR/Visitor Safety Orientation" video, when applicable, and to read and adhere to COMPANY's "CONTRACTOR/Visitor Safety Booklet" prior to performing any Work any COMPANY Property.

6.    CONTRACTOR acknowledges and agrees that, except as otherwise expressly authorized in writing by COMPANY's designated safety representative, appropriate protective equipment will be worn by any member of CONTRACTOR Group while on any COMPANY Property. In addition, when any member of CONTRACTOR Group is performing Work which may expose that person to potential hazards, CONTRACTOR acknowledges and agrees that such person will wear appropriate clothing specific to and adequate for that exposure.

7.    CONTRACTOR will take all reasonable precautions to prevent any accident in connection with the performance of Work, including, but not limited to, putting up and maintaining sufficient barriers and lights.

8.    CONTRACTOR will report to COMPANY all accidents involving personal injuries (including death) and damage to property occurring directly or indirectly as a result of the Work performed by CONTRACTOR hereunder immediately, but in no event, no later than 24 hours after the occurrence of any such accident. Any accident or incident occurring directly or indirectly as a result of the Work which CONTRACTOR must report to a regulatory agency (e.g. OSHA, MSHA, TCEQ) must also be reported to COMPANY immediately following notification to the regulatory agency.

**B.    SECURITY**

1.    COMPANY may supply such site security as it deems necessary and may specify to CONTRACTOR such additional security precautions and procedures at any COMPANY Property

No. # C 0711331 C

# ATTACHMENT #6
# WORK SITE SAFETY, SECURITY, ALCOHOL, DRUGS AND WEAPONS

as, in COMPANY's opinion, are reasonably necessary for the safety and security of COMPANY's personnel and property.

2.  Security by COMPANY at COMPANY Properties, if any, will not provide personal policing of the materials, tools and equipment of CONTRACTOR Group. CONTRACTOR will assume sole responsibility for safeguarding such materials, tools and equipment.

3.  It will be the affirmative duty of CONTRACTOR to ensure that CONTRACTOR Group assists in carrying out all security measures, to include reporting all information or knowledge of matters adversely affecting security to COMPANY's designated security personnel.

4.  COMPANY reserves the right to exclude any of CONTRACTOR's employees from any COMPANY Property by denial of access, suspension or revocation of access authorization, preemptory expulsion, or by any other means, without notice or cause. Former COMPANY employees, and any of CONTRACTOR's employees who previously have been excluded from any COMPANY Property, may be brought onto COMPANY property or facilities only if prior approval from COMPANY is obtained.

5.  COMPANY measures may also include investigations, whether by COMPANY or law enforcement officials. CONTRACTOR agrees to cooperate in such investigations and understands that COMPANY reserves the right to require anyone in CONTRACTOR Group to authorize appropriate agencies to release his or her criminal records to CONTRACTOR as a condition of either initial or continued permission for access to any COMPANY Property. Investigations may include searches of CONTRACTOR Group. Such searches may include searches of facilities assigned to CONTRACTOR Group, search of all COMPANY Property areas and property at such COMPANY Property areas, searches of including, but not limited to, offices, lockers, desks, lunch boxes, packages and motor vehicles (regardless of ownership). Without limiting the foregoing, CONTRACTOR acknowledges and agrees that all members of CONTRACTOR Group, to the extent that COMPANY reasonably determines that such members require security badge access prior to entering onto any COMPANY Property, shall be required to comply with COMPANY's standard security badge requirements, including without limitation a background check to be performed by COMPANY.

6.  CONTRACTOR agrees to instruct its employees in the details of COMPANY's work site security policies and measures, both as specified herein and as hereinafter provided by COMPANY to CONTRACTOR.

## C.    ALCOHOLIC BEVERAGES, DRUGS AND WEAPONS

CONTRACTOR will inform all members of CONTRACTOR Group, who may be involved in the performance of any Work, of the following COMPANY rules, relating to alcoholic beverages, drugs and weapons, with which all employees are expected to comply:

1.  Bringing, attempting to bring, possessing, using or being under the influence of intoxicants, drugs, or narcotics while on any COMPANY Property, including, but not limited to parking areas, is prohibited. Possessing alcoholic beverages in sealed containers is permitted, however, in designated parking areas owned or controlled by Oncor Electric Delivery Company LLC, Luminant Generation Company LLC, Oak Grove Management Company LLC, Generation Development Company LLC, Sandow Power Company LLC and EFH Corporate Services Company, but not parking areas owned or controlled by Luminant Mining Company LLC, Luminant Big Brown Mining Company LLC and Oak Grove Mining Company LLC.

2.  Drugs prescribed by a licensed physician, for an individual working on any COMPANY Property, which could affect the employee's job performance, or non-prescription drugs which could affect the employee's job performance, are allowed on any COMPANY Property only if they have been previously cleared by the employee's supervisor. Any employee taking such medication must inform his or her supervisor of the medication and dosage being taken.

16

No. # C 0711331 C

## ATTACHMENT #6
## WORK SITE SAFETY, SECURITY, ALCOHOL, DRUGS AND WEAPONS

3.    Bringing, attempting to bring, possessing or using firearms, whether classified as legal or illegal, while on any COMPANY Property, including but not limited to buildings, parking areas, recreation facilities, equipment and vehicles, is prohibited.   Use or possession of firearms for specific situations is permitted if approved by function or higher level management of COMPANY.

4.    Off-the-job involvement with intoxicants, drugs, or narcotics, which adversely affects COMPANY's business, to include impairing the employee's ability to perform his job, or the public trust in the safe operation of COMPANY is prohibited.

5.    Any conduct on any COMPANY Property which is in violation of any state or federal law or regulation is considered a violation of these rules and a breach of any agreement to which these policies are attached.

6.    CONTRACTOR is responsible for the compliance of CONTRACTOR Group with the above specified rules.

7.    In order to enforce these rules, all individuals with access to any COMPANY Property as well as the vehicles, offices, lockers and any personal belongings of such individuals on any COMPANY Property are subject to search by COMPANY and its agents, to include security representatives appointed or employed by COMPANY.  Individuals may be required to take a blood, urinalysis or Breathalyzer test, or submit to other recognized investigatory tests or procedures as are deemed appropriate or necessary by COMPANY in the investigation of a violation of these rules.

8.    The refusal, on the part of any of CONTRACTOR Group, to submit immediately to a search of his or her person and/or property, or to be tested, whether by blood test, urinalysis, Breathalyzer or other recognized investigatory test or procedure, after being requested to do so, will be considered a violation of COMPANY rules.

9.    Violations of these rules may be cause for denial of access to any COMPANY Property.

No. # C 0711331 C

## ATTACHMENT #7
## CONTRACTOR'S INSURANCE REQUIREMENTS

CONTRACTOR will, at its own expense, maintain in force throughout the period of this document or agreement, or as otherwise specified, and until released by COMPANY the following minimum insurance coverages, with insurers acceptable to COMPANY.

1) <u>Workers' Compensation and Employers' Liability Insurance</u>, providing statutory benefits in accordance with the laws and regulations of the State of Texas or state of jurisdiction as applicable. The minimum limits for the employers' liability insurance will be five hundred thousand dollars ($500,000) bodily injury each accident, five hundred thousand dollars ($500,000) each employee bodily injury by disease, five hundred thousand dollars ($500,000) policy limit bodily injury by disease.

2) <u>Commercial General Liability Insurance</u>, including bodily injury and property damage, personal and advertising injury, contractual liability, and including products and completed operations coverage continuing for two (2) years after Final Acceptance, or completion of the Work, whichever is later, with minimum limits of one million dollars ($1,000,000) per occurrence for bodily injury, including death and property damage.

3) <u>Automobile Liability Insurance</u> for coverage of owned, non-owned and hired autos, trailers or semi-trailers with a minimum combined single limit of one million dollars ($1,000,000) per accident for bodily injury, including death, and property damage.

4) <u>Excess Liability Insurance</u> over and above the employers' liability, commercial general liability and automobile liability insurance coverage, with a minimum limit of two million dollars ($2,000,000) per occurrence. Coverage must replace exhausted aggregate limits under the coverages referenced in #1 (employers' liability), and #2 above. Coverage must continue for two (2) years after Final Acceptance, or completion of the Work, whichever is later.

5) <u>Professional Liability Insurance</u> with a minimum limit of three million dollars ($3,000,000) per claim or occurrence.

ADDITIONAL PROVISIONS:

A) The required limits of insurance can be satisfied by any combination of primary and excess coverage.

B) The commercial general liability insurance, automobile liability insurance and excess liability insurance policies will contain provisions that specify that the policies are primary as respects to COMPANY and will apply without consideration for other policies separately carried By COMPANY. The policies shall also include standard severability provisions that state each insured is provided coverage as though a separate policy had been issued to each, except with respects to limits of insurance, and that only one deductible (if applicable) will apply per occurrence regardless of the number of insureds involved in the occurrence. CONTRACTOR will be responsible for any deductibles or retentions.

C) The commercial general liability insurance, automobile liability insurance and excess liability insurance policies, if written on a claims-made basis, will be maintained in full force and effect for two (2) years after Final Acceptance or completion of the Work, whichever is later.

D) All policies must be issued by carriers having an *A.M. Best's* rating of "A-" or better, and an *A.M. Best's* financial size category of "VIII" or better, or *Standard & Poor Insurance Solvency Review* of "A-" or better. If requested in writing by COMPANY, CONTRACTOR will make available to COMPANY a certified copy of any or all insurance policies or endorsements required of CONTRACTOR.

E) Prior to commencement of Work, CONTRACTOR will provide to COMPANY certificates of insurance evidencing the coverage required herein. COMPANY's review of certificates or policies will not be construed as accepting any deficiencies in CONTRACTOR's insurance or relieve CONTRACTOR of any obligations set forth herein. In addition, CONTRACTOR will require each of its subcontractors to provide adequate insurance. Any deficiencies in the insurance to be provided by subcontractors will be the responsibility of CONTRACTOR.

F) **Certificates of insurance must show Energy Future Holdings Corp. and its direct and indirect subsidiaries as the certificate holder, and as an additional insured (including completed operations) as respects all of the required coverages except workers' compensation. Workers' compensation shall include Energy Future Holdings Corp. and its direct and indirect subsidiaries as an alternate employer. All of the required coverages must provide a waiver of subrogation in favor of the certificate holder.**

No. # C 0711331 C

## ATTACHMENT #7
## CONTRACTOR'S INSURANCE REQUIREMENTS

G)   CONTRACTOR agrees to report to the manager of the claims department of the COMPANY in writing as soon as practical all instances of damage to the Work and all accidents or occurrences which may result in injuries to any person, including death, and any property damage, arising out of the performance of the Work.

H)   If the insurance obligations required in this Agreement exceed the maximum limits permitted by law or do not otherwise conform with any applicable law, then this Agreement will be deemed amended so as to only require CONTRACTOR to provide insurance to the maximum extent allowed by law.

I)   The requirements contained herein as to the types and limits of all insurance to be maintained by CONTRACTOR are not intended to and will not, in any manner, limit or qualify the liabilities and obligations assumed by CONTRACTOR under this Agreement.

**ATTACHMENT #8**
**SAMPLE EFH REPORT**

No. # C 0711331 C

| DM Project | Titled Month | Qty | Invoice # | Print cost | Per piece | Comments | New contract pricing | Specification changes proposed |
|---|---|---|---|---|---|---|---|---|
| *Retention* | | | | | | | | |
| Renewal | | | | | | | | |
| Thank You | | | | | | | | |
| Early Bird P/C | | | | | | | | |
| Last Chance P/C | | | | | | | | |
| NTC | | | | | | | | |
| *DSM* | | | | | | | | |
| TOU | | | | | | | | |
| *Acquisition* | | | | | | | | |
| #9 Tip-on | | | | | | | | |
| #9 Tip-on | | | | | | | | |
| *SMB Mailings* | | | | | | | | |
| BAS Renewal | | | | | | | | |
| BAS SWAP | | | | | | | | |
| Non-BAS Renewal | | | | | | | | |
| Acquisition | | | | | | | | |

20

No. # C 0711331 C

## ATTACHMENT #9
## TXU COMPARATIVE PRICING TEMPLATE

| Project Name | Previous Project | Current Project | Comparison |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
| Cost | $ | $ | $ difference |

21

**AMENDMENT NO. 03**

**DATED JUNE 27, 2014**

**TO**

**CONTRACT FOR RECORD MANAGEMENT SERVICES**

**S0335427C**

**BY AND BETWEEN**

**MASTERCRAFT BUSINESS PRODUCTS AND SERVICES, INC.**

**AND**

**EFH CORPORATE SERVICES COMPANY**

**DATED DECEMBER 1, 2000**

Contract No. S0335427C

## AMENDMENT NO. 03

**EFFECTIVE DATE**

The Effective Date of this Amendment is June 27, 2014.

**PURPOSE**

This Amendment modifies, alters or changes specific terms and conditions of Contract No. S0335427C ("Agreement") that exists between EFH Corporate Services Company ("COMPANY") and Mastercraft Business Products and Services, Inc. ("MASTERCRAFT").  Except as modified in this Amendment or previous amendments, the Agreement will remain in full force and effect.

**MODIFICATIONS**

The Agreement is modified as follows:

### DEFINITIONS

COMPANY Group is revised as follows:

The term "COMPANY Group" means COMPANY, its parent corporation, Energy Future Holdings Corp., and all subsidiaries and affiliates of Energy Future Holdings Corp., and all officers, directors, shareholders, associates, related firms and entities, employees, servants and agents of both COMPANY and each such subsidiary or affiliate.

### TERM OF AGREEMENT

The contract expiration date is extended to June 30, 2019.

### COMPENSATION

As full compensation for the satisfactory performance by MASTERCRAFT of this Agreement, COMPANY will compensate MASTERCRAFT in accordance with the following revised pricing:

|  | June 30, 2014 – June 30, 2016 | July 1, 2016 – contract expiration |
|---|---|---|
| Storage fees (per box per month) | $0.145 | $0.18125 |
| Storage fees (climate controlled) (per box per month) | $1.00 | $1.25 |
| Retrieval fees (per box) | $1.50 | $1.87 |
| Re file fees (per box) | $1.50 | $1.87 |
| New transfers (per box) | $1.50 | $1.87 |
| **Pick Up/Delivery fees:** | | |
| • Same day service (if call is made by11:00am. Next morning services for calls after 11:00am) | no charge | no charge |
| • Rush (2 hours or less), fixed fee | $75.00 | $93.75 |
| • Emergency (1 hour rush), fixed fee | $100.00 | $125.00 |
| • Holiday/After hours, fixed fee | $150.00 | $187.50 |
| Special project charge, per hour | $25.00 | $31.25 |
| Certified destruction, per pound | $0.20 | $0.20 |

Contract No. S0335427C

All compensation paid to MASTERCRAFT excludes applicable State Sales and Use Tax.

**INVOICES AND PAYMENT**

The first sentence of the second paragraph is deleted and replaced with the following:

Payment will be made within sixty (60) days of receipt and approval of each invoice.

**COMPLIANCE WITH LAWS**

The third paragraph is deleted and replaced with the following:

Further, MASTERCRAFT, with regard to its employees, assumes and retains sole and complete responsibility and liability for compliance with any federal, state, or local statutes relating to compensation or wage and hour considerations, including, but not limited to, the Federal Fair Labor Standards Act, and the Texas Minimum Wage Act of 1970, and the Texas Pay Act, as well as any and all other federal statutes impacting, directly or indirectly, MASTERCRAFT's employees.

MASTERCRAFT expressly agrees that it will comply with the Equal Employment Opportunity and Affirmative Action obligations of Executive Order 11246, as amended, the Rehabilitation Act of 1973, as amended, and the Vietnam Era Veterans' Readjustment Assistance Act of 1974, as amended, where applicable. In particular:

    i.    41 CFR 60-300.5(a). COMPANY and MASTERCRAFT shall abide by the requirements of 41 CFR 60-300.5(a). This regulation prohibits discrimination against qualified protected veterans, and requires affirmative action by covered prime contractors and subcontractors to advance in employment qualified protected veterans.

    ii.    41 CFR 60-300.5(a). COMPANY and MASTERCRAFT shall abide by the requirements of 41 CFR 60-300.5(a). This regulation prohibits discrimination against qualified protected veterans, and requires affirmative action by covered prime contractors and subcontractors to employ and advance in employment qualified protected veterans.

**SMALL BUSINESS CONCERNS**

The provision is deleted and replaced in its entirety with the following:

If the total value of the Work exceeds $100,000 and MASTERCRAFT will subcontract any portion of its performance hereunder, CONTRACTOR will comply with the clause set forth at Title 15 U.S.C §637(d)(3), as amended by Public Law 106-50

If the total value of the Work exceeds $500,000 and MASTERCRAFT will subcontract any portion of its performance hereunder, MASTERCRAFT (except Small Business Concerns) will adopt a subcontracting plan in accordance with the requirements set forth in 15 U.S.C 637(d)(6), as amended by Public Law 106-50.

Contract No. S0335427C

**NOTICES**

COMPANY notices is revised as follows:

If to COMPANY:

EFH Corporate Services Company
1601 Bryan Street
Dallas, Texas 75201-3411
Attn: Maryann Sanchez

**REPRESENTATIVES**

COMPANY's Contract Administrator is revised to the following:

COMPANY's Contract Administrator is Maryann Sanchez, phone (972) 868-2812.

**Reservation of Rights**

Nothing in this Amendment shall constitute or be deemed (a) an allowance or disallowance of any claim, including administrative expense claims under section 503(b) of the Bankruptcy Code, (b) an assumption or rejection of the Agreement or any other executory contract or unexpired lease under section 365 of the Bankruptcy Code, (c) a waiver of any of the rights of the COMPANY to dispute claims asserted against the COMPANY in the chapter 11 cases commenced by the COMPANY, or (d) change of any priority levels existing in the absence of this Amendment.

The parties have signed this Amendment acknowledging their agreement to its provisions as of the Effective Date.

Mastercraft Business Products and Services, Inc.

By: _____
    Signature

Name: *SUZANNE EOFF*

Title: *PRESIDENT*

Date: *7/1/2014*

EFH Corporate Services Company

By: _____
    Signature

Name: *Sherry Hair*

Title: *Sourcing Manager*

Date: *7/2/2014*