## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) Case No. 14-10979 (CSS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Hearing Date:  September 17, 2015 at 9:30 a.m.** |
| | ) **Objection Deadline:  August 24, 2015 at 4:00 p.m.** |

## MOTION OF ENERGY FUTURE HOLDINGS CORP., *ET AL.*, TO AUTHORIZE THE DEBTORS TO ENTER INTO AND PERFORM UNDER THE PLAN SUPPORT AGREEMENT

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this motion (the "Motion") seeking entry of an order, substantially in the form attached hereto as **Exhibit A** (the "PSA Order"), approving and authorizing the Debtors to enter into and perform under the Plan Support Agreement, attached hereto as **Exhibit 1** to **Exhibit A** (the "PSA"), with the other parties thereto (the "PSA Parties").[2]  In support of this Motion, the Debtors respectfully submit as follows.

### Preliminary Statement

1.      For more than a year and a half, the Debtors have been hard at work building consensus for a value-maximizing reorganization plan.  As the Debtors made clear from the outset, they would consider all reasonable restructuring options.  Over the past several months, the Debtors engaged in intensive negotiations with TCEH creditors.  These negotiations have

---

[1]     The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810.  The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201.  Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

[2]     Capitalized terms that are used and not defined herein shall have the same meanings as set forth in the Settlement Agreement and the PSA, as applicable.

now culminated in a comprehensive agreement with creditors from **_all levels_** of the TCEH capital structure that includes a consensual third amended plan of reorganization, (the "<u>Plan</u>").   In addition to enjoying broad support among T-side creditors, the Plan contemplates payment in full of all allowed E-side claims.

2.      A fundamental premise of the Plan is that TCEH will spin off from EFH on a tax-free basis.   The spin-off avoids potentially material deconsolidation taxes and facilitates the merger transaction while still using the Debtors' net operating losses to deliver a substantial "step-up" in the tax basis of TCEH's assets.   The Plan also provides for an injection of approximately $7.1 billion of equity capital and approximately $5.1 billion of debt to finance a tax-free merger of reorganized EFH Corp. ("<u>Reorganized EFH</u>").   The new capital would be used to pay off all allowed E-side claims in full in cash.   In connection with consummation of the merger, Oncor would be restructured to permit the surviving company to convert to a REIT.[3]

3.      Consummation and funding of the merger is subject to certain conditions associated with, among other things, REIT-related approvals and rulings, the satisfaction of which is not entirely certain.   From the outset of Plan negotiations, the Debtors sought to either substantially reduce this conditionality or develop an alternative construct to mitigate it. Ultimately, the parties reached an agreement that effectively eliminates the most significant downside of conditionality, namely, the risk that failure to achieve the Plan's conditions will lead to a morass of inter-Debtor and inter-creditor litigation.   This agreement is embodied in a Settlement Agreement[4] and in PSA that settles a broad collection of litigation claims.   Under the Settlement Agreement and PSA, if, despite the parties' efforts, the merger is not consummated,

---

[3]    A real estate investment trust, or REIT, is a hybrid tax entity that, although treated as a corporation for federal income tax purposes, is able to eliminate the corporate level income tax by distributing its taxable income to shareholders.

[4]    The Debtors have filed a motion to approve the Settlement Agreement contemporaneously with this Motion.

2

the Debtors can focus on an alternative path to exit these chapter 11 cases, free from the overhanging litigation that has long plagued these cases.  The Debtors determined that in light of these provisions, together with the opportunity for the repayment in full in cash of all allowed claims against EFH Corp. and EFIH, the conditionality associated with the merger is acceptable.

4.      The Settlement Agreement and PSA are thus key elements of this negotiated solution.  *First*, under the Settlement Agreement, each of the Settlement Parties agrees to settle and release nearly all claims against: (a) the Debtors, (b) the TCEH First Lien Creditors, and (c) the Sponsors, and (d) the Debtors' directors and officers.  Critically, the Settlement Agreement will take effect, and most of the claims will be released, immediately upon approval by the Court, regardless of the success or failure of the transactions contemplated by the Plan, thus preserving the peace negotiated by, and avoiding litigation among, the Settlement Parties even if an alternative restructuring must be pursued, as described below.

5.      *Second*, the PSA requires the PSA Parties to support the Plan and to refrain from acting in any way that would impede its success, while also maintaining flexibility to pivot to an alternative restructuring should the transactions contemplated by the Plan prove unsuccessful.  Specifically, the PSA allows the PSA Parties, subject to certain restrictions, to continue negotiations around alternative restructuring structures, and generally requires the TCEH unsecured creditors not to object or interfere with such an alternative restructuring should the transactions contemplated by the Plan fail to close, so long as the alternative restructuring affords the TCEH creditors certain minimum treatment as set forth in the Settlement Agreement.  The PSA also includes a robust fiduciary out for the Debtors.

6.      These agreements were the result of hard-fought negotiations and should provide a clear path to plan confirmation in a matter of months, eliminating the prospect of a costly and

3

time-consuming detour though complex and uncertain litigation.  The Settlement Agreement and

PSA are also a critical demonstration of support by TCEH creditors for the proposed

restructuring embodied in the Plan.

7.    If approved, upon effectiveness, the PSA and Settlement Agreement together

would:

- ensure the support of creditors holding more than half by amount of TCEH first and second lien notes and two-thirds by amount of TCEH unsecured notes for the Debtors' restructuring;

- transform some of the Debtors' largest dissenting creditors into Plan supporters;

- guarantee resolution of contentious litigation;

- provide an opportunity for payment in full in cash of all EFH and EFIH creditors; and

- preserve the optionality necessary for the Debtors to maximize the value of their estates in the event of materially changed circumstances.

8.    Thus, the Debtors respectfully submit that the Court should approve the PSA as

an exercise of the Debtors' reasonable business judgment under section 363(b) of the Bankruptcy

Code.

## **Jurisdiction and Venue**

9.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334 and the Amended Standing Order of Reference from the United States District Court for

the District of Delaware, dated February 29, 2012.  This matter is a core proceeding within the

meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to rule

9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States

Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules") to the entry of a

final order by the Court in connection with this Motion to the extent that it is later determined

that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

10.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

11.     The bases for the relief requested in this Motion are sections 105 and 363(b) of title 11 of the United States Code (the "Bankruptcy Code").

## Relief Requested

12.     By this Motion, the Debtors respectfully request that the Court enter an order, substantially in the form of the PSA Order attached as **Exhibit A**, authorizing the Debtors to enter into and perform under the PSA.

## Background[5]

13.     On April 29, 2014 (the "Petition Date"), each of the Debtors filed a voluntary petition with the Court under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Court has entered a final order for joint administration of these chapter 11 cases.  The Office of the United States Trustee for the District of Delaware formed the Official Committee of Unsecured Creditors of Energy Future Competitive Holdings Company LLC ("EFCH"), EFCH's direct subsidiary, Texas Competitive Electric Holdings Company LLC ("TCEH") and their direct and indirect subsidiaries, and EFH Corporate Services Company on May 13, 2015, (D.I. 420) (the "TCEH Committee") and the Official Committee of Unsecured Creditors of EFH Corp., EFIH, EFIH Finance, Inc., and EECI, Inc. on October 27, 2014, (the "EFH Committee").  (D.I. 2570)

---

[5]    The Background section contained in this Motion is identical to the section contained in the Debtors' motion to approve the Settlement Agreement, filed contemporaneously with this Motion.

I.      **Overview of Plan Negotiations.**

        A.      **RSA and the Contemplated EFIH Second Lien DIP.**

14.     Before the Petition Date, the Debtors entered into the Restructuring Support and Lock-Up Agreement (the "<u>RSA</u>") with certain stakeholders.  (D.I. 98, Ex. D.)  The RSA contemplated a tax-free spinoff of reorganized TCEH and a new-money investment in Reorganized EFH in the form of an EFIH second lien DIP facility that would have mandatorily converted into 60% of the Reorganized EFH equity.

15.     After the Petition Date, during the summer of 2014, a bidding war broke out for the opportunity to fund the second lien DIP facility.  The interest in Reorganized EFH was not limited to creditors; the Debtors also received interest from third-party strategic and financial bidders.  The degree of interest in Reorganized EFH made clear that terminating the RSA was in the best interests of the estates, and the Debtors did so on July 24, 2014 (D.I. 1697), to embark on a marketing process for their economic interests in Oncor Electric Delivery Company LLC ("<u>Oncor</u>")[6] (as discussed further below).

        B.      **Retention of the Disinterested Director Advisors.**

16.     In November 2014, the Debtors, at the direction of their disinterested directors and managers (the "<u>Disinterested Directors</u>"), retained the following legal counsel and other professionals (collectively, the "<u>Disinterested Director Advisors</u>") to represent the respective estates' interests with respect to any matters on which there is an actual conflict of interest between one or more Debtors and another Debtor (the "<u>Conflicts Matters</u>"):

- Proskauer Rose LLP and SOLIC Capital Advisors on behalf of EFH Corp.;

- Cravath, Swaine & Moore LLP (and, subsequently, Jenner and Block LLP) and Goldin Associates, LLC on behalf of EFIH; and

---

[6]    EFIH's primary asset is its 100% ownership of Oncor Electric Delivery Holdings Company LLC, which, in turn, owns approximately 80% of Oncor.  EFIH is a direct subsidiary of EFH Corp.

- Munger, Tolles & Olson LLP and Greenhill & Co. LLC on behalf of EFCH, TCEH, and their Debtor subsidiaries.

17.    On December 9, 2014, the boards voted to adopt resolutions delegating to their respective Disinterested Directors the full authority to identify Conflicts Matters and to review and act upon them, including by directing the applicable Debtor to implement the Disinterested Directors' decisions.  The Debtors designed this procedure, in consultation with Kirkland & Ellis LLP (the Debtors' primary legal counsel) and each Debtor's Disinterested Director Advisors, to ensure a strong corporate governance process.

**C.    Oncor Bidding Process and Parallel Plan Negotiations.**

18.    In mid-January 2015, following the Court's approval of the Debtors' proposed bidding procedures (D.I. 3295), the Debtors began a renewed effort to market their economic interest in Oncor.  Although ultimately the Debtors did not select a transaction through the bidding process, that process spurred interest and activity among their creditors.

19.    The proposals for Reorganized EFH in the bidding process revolved around two alternative transaction structures that offered greater potential value to creditors than a potential sale of Oncor to a third-party buyer.  First, a group of EFH and EFIH creditors (the "EFH-EFIH Creditor Group") proposed a structure that would equitize the claims of the EFH and EFIH creditors together with a new-money investment in Reorganized EFH.  Second, Hunt Power Holdings, L.L.C. ("Hunt") and a consortium of other equity investors (collectively, the "Hunt-Investors") joined with certain other stakeholders and members of the ad hoc group of TCEH unsecured noteholders (the "TCEH Unsecured Group," and together with Hunt and the Hunt-Investors the "Hunt/TCEH Unsecured Group") to propose a transaction premised on a merger with EFH Corp. and converting the surviving company into a REIT, coupled with a multi-billion dollar new-money investment.

7

20.     The Debtors negotiated both potential transactions in parallel.  As part of those negotiations, the Debtors independently assessed the prospect of a potential REIT conversion while also facilitating creditor due diligence.  To that end, the Debtors met with Oncor management and advisors on multiple occasions to discuss the proposed structure of a REIT, and communicated to Oncor their intent to further analyze a REIT conversion in connection with the plan and marketing processes.

21.     On April 14, 2015, the Debtors filed an initial plan of reorganization and related documents (the "Initial Plan").  (D.I. 4142.)  The Initial Plan provided for a tax-free spinoff of reorganized TCEH coupled with a third-party merger, creditor investment, or standalone plan transaction at Reorganized EFH.  From May through July, 2015, the Debtors exchanged markups of a possible plan support agreement and associated investment agreement with the EFH-EFIH Creditor Group.  Meanwhile, the Debtors continued negotiations with the Hunt/TCEH Unsecured Group, developing drafts of a plan and associated definitive documentation for a possible REIT conversion.

22.     Ultimately, as the July hearing for the stalking horse bid approached, the Debtors determined that the bidding process had not yielded a sufficiently attractive bid to justify selecting a stalking horse bidder.  Accordingly, the Debtors declined to do so and instead shifted their focus to the ongoing negotiations.

### D.     Confirmation Scheduling and the Debtors' Exclusivity Periods.

23.     As it became evident to the Debtors and the TCEH creditors in late May and early June 2015 that achieving consensus around a plan was a realistic possibility, the parties were able to negotiate a schedule for plan confirmation.  The parties' agreement is embodied in the *Stipulation and Agreed Order Regarding Certain Confirmation Scheduling Matters* entered by the Court on July 2, 2015, (the "TCEH Scheduling Stipulation").  (D.I. 4918.)  The TCEH

Scheduling Stipulation provides for confirmation proceedings on October 5-8, 2015, if the Debtors' plan of reorganization:  (i) pays in cash, in full, the allowed claims of the EFH and EFIH Debtors' creditors; and (ii) has the support of the parties to the TCEH Scheduling Stipulation.  If either of these conditions is not satisfied, the confirmation hearing will instead begin on January 20, 2016.

24.    Additionally, the TCEH Scheduling Stipulation provides that if the Debtors' exclusive plan filing and solicitation periods have not been terminated by December 29, 2015, by order of the Court, the TCEH Second Lien Indenture Trustee, the TCEH Unsecured Group, and the TCEH Unsecured Indenture Trustee will not file, cause to be filed, or support the filing of a chapter 11 plan of reorganization or disclosure statement with respect to any Debtor until the Court issues a final ruling regarding whether to confirm the plan.

25.    The Debtors will soon file a motion to approve an amended confirmation schedule that includes a confirmation hearing starting on October 28, 2015 (subject to the Court's approval).  Additionally, the Debtors and certain TCEH creditors are filing an amended scheduling stipulation.  Among other things, the amended scheduling stipulation provides that, in the event that the transactions contemplated in the Plan are not consummated, such that an alternative restructuring must be pursued, the confirmation hearing shall be held within 90 days of any alternative plan of reorganization.

**E.    Consensus On the Plan.**

26.    Over the weekend of July 11, 2015, the TCEH Unsecured Group and the TCEH First Lien Creditors made substantial progress in their negotiations regarding the Hunt/TCEH Unsecured Group's plan proposal.  In the context of those negotiations, the parties discussed the potential settlement of litigation claims, including the pending Standing Motions (defined and discussed below).  Early the following week, the two groups submitted a term sheet to the

Debtors reflecting a preliminary agreement in principle between them.  Upon receiving the term sheet, the Debtors intensified negotiations with the TCEH Unsecured Group and the TCEH First Lien Ad Hoc Committee regarding a potential global settlement and plan structure.  Those negotiations would ultimately form the basis of the Settlement Agreement and the PSA.

27.    By July 23, 2015, the deadline for the Debtors to file an amended plan of reorganization under the operative scheduling order, the Debtors had not yet reached a definitive deal on either the Hunt/TCEH Unsecured Group proposal or the EFH-EFIH Creditor Group proposal.  Accordingly, the Debtors filed an amended plan of reorganization (the "First Amended Plan"), which preserved the Debtors' option to move forward with either the Hunt/TCEH Unsecured Group proposal or a standalone equitization transaction at EFH Corp. and EFIH.  (D.I. 5078, 5080.)  After filing the First Amended Plan, the Debtors continued to negotiate both potential transactions.

28.    Ultimately, on August 9, 2015, the Debtors, the Hunt/TCEH Unsecured Group, the Settlement Parties, and the PSA Parties reached agreement.  The Debtors concluded that the Hunt/TCEH Unsecured Group's proposal, coupled with the Settlement Agreement and the PSA, constitute the highest and otherwise best available restructuring alternative available at this time.

29.    As a result, simultaneously with this Motion, the Debtors have filed the Plan, which contemplates the tax-free spinoff of TCEH coupled with the merger of EFH Corp. into a Hunt/TCEH Unsecured Group acquisition vehicle with the goal of converting into a REIT, while providing the Debtors with downside protection in the event that the transactions contemplated in the Plan are unsuccessful.  The Settlement Agreement (as a condition precedent to confirmation of the Plan) and the PSA are both critical to the Debtors obtaining confirmation of the Plan.

10

## II.    Overview of Legacy Litigation Claims.

### A.    Legacy Discovery.

30.    Since the Petition Date, various creditors have alleged that certain pre-petition transactions give rise to viable litigation claims (the "Legacy Claims"), including fraudulent transfer and breach of fiduciary duty claims, owned by certain Debtors throughout the capital structure, and have announced their intention to litigate those claims on behalf of the Debtors.[7] As outlined below, the Legacy Claims include inter-Debtor claims, claims against certain creditors, and claims against the Sponsors and the Debtors' directors and officers.[8]

31.    On August 13, 2014, after negotiations between the Debtors and their creditor constituencies, this Court entered a consensual order authorizing discovery related to the Legacy Claims. (D.I. 1832.)  The order permitted creditors to pursue discovery on a broad set of topics concerning various pre-petition transactions and issues that could potentially give rise to Legacy Claims (the "Legacy Discovery").  (*Id.*)

32.    Creditors made full use of this opportunity, serving the Debtors with 212 document requests on a wide range of topics, reaching back more than 15 years prepetition.  In response to these requests, the Debtors produced over 800,000 documents, totaling more than 5.6 million pages, in less than eight months.  The Sponsors and other parties-in-interest were served with extremely broad document requests and made very substantial document productions in response to those requests, which included production of documents going back to before the

---

[7]    *See* Standing Motions and Litigation Letters, described below.

[8]    While the Settlement Parties support the relief requested in the Motion and entry of the Settlement Order, the Settlement Parties have divergent views on the Legacy Claims asserted herein and the strengths and weaknesses of the various arguments.  The summary and evaluation of the Legacy Claims herein was drafted by the Debtors' advisors, not the Settlement Parties.  The Settlement Parties independently analyzed the Legacy Claims and reached their own conclusions regarding litigation risks and values.  However, the Settlement Parties agree with the conclusion of the Debtors that approval of the Settlement Agreement is in the best interests of the Debtors' estates.

2007 LBO. In addition, the Debtors provided voluminous informal diligence, including informal interviews of personnel, related to Legacy Discovery requests.

**B.      Creditor Identification of Claims Against the TCEH First Lien Creditors.**

33.      In the Cash Collateral Order entered on June 6, 2014, the Debtors stipulated to, among other things, the validity of the obligations and liens related to the TCEH First Lien Debt. (D.I. 855.) Under the Cash Collateral Order, all other parties-in-interest would be bound by the Debtors' stipulations unless such parties obtained standing to challenge them by March 13, 2015 (as subsequently extended, the "Challenge Deadline").

34.      On February 19 and 20, 2015, the TCEH Committee, the EFH Committee, and the TCEH Unsecured Group each filed motions seeking standing to prosecute certain claims against the TCEH First Lien Creditors (in this context, the "Defendants"), and the exclusive authority to settle those claims (the "Standing Motions").[9] The Standing Motions and proposed complaints attached thereto identify numerous alleged causes of action, including actual and constructive fraudulent transfers, avoidance of preferences, equitable subordination, and declaratory judgments, seeking:

- avoidance of over $24 billion of liens, security interests, and obligations granted under the TCEH Credit Agreement, the TCEH First Lien Notes, and the Incremental Amendment Agreement;

- avoidance and recovery of over $2 billion of fees paid in connection with the 2011 Amend and Extend Transactions and the 2013 Revolver Extension, including incremental interest expense paid thereafter as a result of such transactions;

---

[9]      Motion of the Official Committee of Unsecured Creditors for Entry of an Order Granting Exclusive Standing and Authority to Commence, Prosecute, and Settle Certain Claims for Declaratory Judgment, Avoidance and Recovery of Liens, Security Interests, Obligations, Fees, and Interest Payments, and Disallowance of Claims, (D.I. 3593); Motion of The Ad Hoc Group of TCEH Unsecured Creditors for Entry of an Order Granting Standing and Authority to Commence, Prosecute, and Settle Certain Claims for Declaratory Judgment, Avoidance and Recovery of Liens, Security Interests, Obligations, Fees, and Interest Payments, and Disallowance of Claims, (D.I. 3603); Motion of the EFH Official Committee for Entry of an Order Granting Derivative Standing and Authority to Prosecute and Settle on Behalf of the Luminant Debtors' Estates, (D.I. 3605).

12

- entry of an order equitably subordinating over $24 billion of Defendants' claims against the TCEH Debtors' estates;

- recharacterization of adequate protection payments of over $100 million per month made by the TCEH Debtors to Defendants during these chapter 11 cases as payments of principal on the TCEH First Lien Debt, to the extent the Court determines at any time that Defendants are unsecured creditors;

- avoidance of approximately $216 million of preferential transfers;

- entry of an order disallowing over $24 billion of Defendants' claims against the TCEH Debtors' estates pending final resolution of the adversary proceeding, and a determination of the amount of Defendants' allowed claims;

- entry of an order disallowing approximately $8 million of Defendants' claims against the TCEH Debtors' estates to the extent such claims include unmatured interest;

- to the extent Defendants' claims are not avoided, entry of an order limiting the amount of Defendants' allowed claims based on section 2(b) of the guarantees under the TCEH Credit Agreement;

- declaratory judgments that certain deposit accounts, rabbi trust accounts, avoidance actions, commercial tort claims, and tax attributes are unencumbered;

- avoidance of Defendants' unperfected liens on or security interests in certain property;

- declaratory judgments that there has been no diminution in the value of Defendants' collateral after the Petition Date, and that the Debtors' use of cash collateral for the limited purposes set forth in the Cash Collateral Order will not result in a diminution in value of Defendants' collateral;

- declaratory judgments that (i) Defendants are not entitled to any postpetition interest and fees unless the Court determines that Defendants are oversecured creditors, (ii) in the event Defendants are determined by the Court to be oversecured creditors, postpetition interest and fees shall be allowed solely to the extent of the excess value of the collateral, and (iii) any award of postpetition interest should be at the contractual, non-default rate of interest;

- declaratory judgment that the TCEH Debtors' stipulations do not expand the scope of Defendants' liens; and

- avoidance and recovery of transfers to or for the benefit of Defendants directly or indirectly from Luminant Generation Company LLC and its debtor subsidiaries that are subsidiary guarantors.

13

(D.I. 3593, Ex. C; D.I. 3605.)

35.    On March 3, 2015, certain parties filed objections to the Standing Motions, including the Debtors, the TCEH First Lien Agent, and certain holders of TCEH First Lien Claims, individually and as members of the ad hoc group of TCEH First Lien Creditors.[10]  By agreement of the parties, the Challenge Deadline was subsequently extended several times and is now September 10, 2015.[11]  The parties have agreed to indefinitely adjourn the Standing Motions pursuant to the Plan Support Agreement.  (*See* PSA § 6.1(c).)

36.    In connection with these extensions, the parties further committed to begin a mediation regarding the Debtors' plan of reorganization.  (D.I. 4140.)  On May 18, 2015, the Court entered an order authorizing the mediation of "issues regarding the terms of the Plan related to, or arising in connection with, the restructuring of the TCEH Debtors' estates and the treatment of claims held by the Mediation Parties against the TCEH Debtors' estates under the Plan." (D.I. 4497.)

37.    On or about July 11, 2015, the TCEH First Lien Creditors and the TCEH Unsecured Group reached a preliminary agreement to settle all claims against the TCEH First Lien Creditors, including those raised in the Standing Motions.

---

[10]   Response and Limited Objection of Wilmington Savings Fund Society, FSB to Certain Motions for Standing (D.I. 3725); Debtors' Omnibus Objection to Standing Motions (D.I. 3726); Omnibus Objection of CCP Credit Acquisition Holdings, L.L.C., Centerbridge Special Credit Partners, L.P., and Centerbridge Special Credit Partners, II, L.P. to the Standing Motions (D.I. 3729); Omnibus Objection of Wilmington Trust, N.A., as Successor TCEH First Lien Administrative Agent and Successor TCEH First Lien Collateral Agent, to the Motions for Derivative Standing (D.I. 3731); Omnibus Objection of the Ad Hoc Committee of TCEH First Lien Creditors to Standing Motions (D.I. 3732); Objection of the Ad Hoc Group of TCEH Unsecured Noteholders to the Motion of the EFH Official Committee for Entry of an Order Granting Derivative Standing and Authority to Prosecute and Settle Claims on Behalf of the Luminant Debtors' Estates (D.I. 3734); Objection of Law Debenture Trust Company of New York, as Indenture Trustee, to the Motion of the EFH Official Committee for Entry of an Order Granting Derivative Standing and Authority to Prosecute and Settle Claims on Behalf of the Luminant Debtors' Estates (D.I. 3741).

[11]   *See* Stipulations dated August 8, 2014 (D.I. 1771), September 19, 2014 (D.I. 2083), November 5, 2014 (D.I. 2704), December 2, 2014 (D.I. 2916), January 27, 2015 (D.I. 3380), March 10, 2015 (D.I. 3857), April 17, 2015 (D.I. 4210), and July 9, 2015 (D.I. 4958).

**C.       Creditor Identification of Other Legacy Claims.**

38.       On September 16, 2014, the Court entered a protocol, (D.I. 2051), amended on November 13, 2014, (D.I. 2760), and July 21, 2015, (D.I. 5057) (as amended, the "Case Matters Protocol"), which imposes a process to govern the investigation and filing by parties in interest of motions seeking standing to commence Legacy Claims other than those subject to the Challenge Deadline.  The Case Matters Protocol requires each TCEH Creditor Representative (as defined in the Case Matters Protocol) to: (a) disclose in writing to the Debtors any material claims and causes of action for which it intends to request standing by April 30, 2015; and (b) file its standing motion by the later of (i) September 30, 2015, (ii) fifteen days after approval of a disclosure statement, or (iii) a mutually agreed date.

39.       In accordance with the Case Matters Protocol, on March 31, 2015 and April 30, 2015, the TCEH Committee sent letters to the Debtors identifying alleged claims and causes of action belonging to the TCEH Debtors' estates that the TCEH Committee may seek standing to pursue, including inter-Debtor claims, claims against the Sponsors, and claims against the Debtors' directors and officers (the "TCEH Committee Litigation Letters").   The claims identified in the TCEH Committee Litigation Letters include claims and causes of action for fraudulent transfers under state law and sections 544 and 548 of the Bankruptcy Code, preferential transfers under section 547 of the Bankruptcy Code, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of contract, and/or unjust enrichment.

40.       Also, in accordance with the Case Matters Protocol, on April 30, 2015, the TCEH Unsecured Group sent a letter to counsel to the Debtors identifying alleged inter-Debtor and other claims and causes of action belonging to the TCEH Debtors' estates that the TCEH Unsecured Group may seek to pursue, including inter-Debtor claims, claims against the Sponsors, and claims against the Debtors' directors and officers (the "TCEH Unsecured Group

15

Litigation Letter," and together with the TCEH Committee Litigation Letters, the "Litigation Letters").  The claims identified in the TCEH Unsecured Group Litigation Letter include claims and causes of action for fraudulent transfers under state law and sections 544 and 548 of the Bankruptcy Code, preferential transfers under section 547 of the Bankruptcy Code, breaches of fiduciary duty, aiding and abetting breaches of fiduciary duty, breaches of contract, and unjust enrichment.  There is a very substantial overlap of claims identified in the TCEH Committee Litigation Letter and the TCEH Unsecured Group Litigation Letter.

**D.    The Disinterested Director Settlement of Inter-Debtor Claims.**

41.    Beginning almost immediately after their retention in mid-November 2014, the Disinterested Director Advisors, at the direction of the Disinterested Directors, conducted extensive diligence on inter-Debtor transactions and relationships.  This diligence, which was facilitated by the Debtors and their counsel, included searching and reviewing thousands of documents, reviewing prior work product prepared by the Debtors' advisors, and conducting multiple interviews of the Debtors' personnel with knowledge of the facts relating to potential claims.  The Disinterested Director Advisors regularly consulted with their respective Disinterested Directors on their diligence and analysis, supplementing each Disinterested Director's own knowledge and experience, including knowledge and experience gained from serving on the board of his or her respective Debtor.

42.    As a result of this extensive diligence, the Disinterested Director Advisors were able to identify the following inter-Debtor claims to be resolved, either through settlement or, if necessary, through litigation:

- Claims by TCEH against other Debtors relating to:

  - intercompany tax sharing, including unpaid tax sharing obligations for TCEH-generated NOLs, audit statements, and avoidable transfers;

16

- allocation of shared services and related transfers, including letters of credit, use of unencumbered cash, allocation of restructuring fees, allocations of pension and OPEB obligations, and rabbi trust funds held in an account at EFH;

- Sponsor fees and other payments to Sponsors;

- underpayment of interest by EFH on TCEH Intercompany Notes;

- entry into the TCEH Credit Agreement and amendments and extensions of that agreement;

- the 2007 LBO, including claims related to the use and transfer of TCEH borrowings;

- TCEH-issued debt held by EFH and EFIH, including subordination and recharacterization, and avoidance of interest payments;

- allocation of value resulting from a tax-free spinoff of TCEH and reduced step-up in tax basis of TCEH assets;

- transfer of EFCH's ownership interest in dividend of shares of Oncor to EFH;

- transfers related to the Reimbursement (Make-whole) Agreements between Luminant and Oncor;

- payments by TCEH retail businesses to Oncor for transmission and delivery services; and

- TCEH's repayment of the joint credit facility with Oncor in 2007.

- Claims by EFH and EFIH against TCEH relating to:

  - debt issued by TCEH and the potential setoff of those holdings against claims asserted by TCEH;

  - dividends from EFIH to EFH that EFH used to repay the TCEH Intercompany Notes in February 2012 and January 2013; and

  - intercompany tax sharing.

- Claims by EFIH against EFH relating to:

  - dividends from EFIH to EFH that EFH used to repay the TCEH Intercompany Notes in February 2012 and January 2013;

17

- dividends of EFH Notes from EFIH to EFH in December 2012 and January 2013; and

- EFIH's holdings of EFH Legacy Notes.

(*See* D.I. 4145; D.I. 4146; D.I. 4147.)

43.      Beginning in mid-February and continuing through the end of March 2015, the Disinterested Directors and Disinterested Director Advisors conducted both in-person and telephonic negotiations concerning a potential settlement of the inter-Debtor claims.   Certain negotiations were conducted directly among the Disinterested Directors, while others were conducted among the Disinterested Director Advisors, under the direction and supervision of the Disinterested Directors.   In the course of these negotiations, the Disinterested Directors exchanged presentations advocating each Debtor's view on the strengths and weaknesses of the various inter-Debtor claims.   Throughout the process, the Disinterested Directors frequently conferred with their respective Disinterested Director Advisors on the terms and conditions of a reasonable settlement of inter-Debtor claims.

44.      These exhaustive, arm's-length negotiations culminated in a comprehensive settlement of all prepetition inter-Debtor claims (the "Disinterested Director Settlement").   Under the terms of the Disinterested Director Settlement, EFH, EFIH, and the TCEH Debtors agreed to release inter-Debtor claims in exchange for an allowed $700 million general unsecured claim by TCEH against EFH and certain additional potential recoveries by TCEH against EFH.   The Disinterested Directors further agreed that after full satisfaction of all allowed administrative, priority, and secured claims against EFH, the next $1.41 billion of distributable value of the EFH estate would be distributed as follows:   (a) EFH would retain 49.645% for distribution on account of allowed unsecured claims and interests (other than the TCEH claim); (b) TCEH would receive 49.645% on account of its claim; and (c) the Sponsor group would receive

18

0.709%.  Distributable value from the EFH estate in excess of $1.41 billion would be distributed as follows:  (a) TCEH would receive 50%, until TCEH received an additional $105 million, for a total distribution to TCEH of $805 million; and (b) EFH would retain 50% for distribution on account of allowed unsecured claims and interests (other than the TCEH claim).  On March 31 and April 1, 2015, each of the Disinterested Directors agreed that the proposed settlement was in the best interest of their respective estates, and the terms of the Disinterested Director Settlement were included as part of the Initial Plan.  (*See* D.I. 4145; D.I. 4146; D.I. 4147.)

**III.    The Settlement Agreement.**[12]

45.    The claims raised in the Standing Motions and Litigation Letters could give rise to lengthy, complex, and contentious litigation.  Recognizing that this cloud of potential litigation must be removed before the parties could possibly see their way to a consensual plan, the Debtors and certain key creditor constituencies have negotiated an agreement to settle these issues once and for all, regardless of the ultimate form of the Plan.

46.    On August 9, 2015, the Debtors entered into the Settlement Agreement (subject to this Court's approval) with the Settlement Parties, including significant creditors at all levels of the TCEH capital structure, and the TCEH  Committee.[13]  (Settlement Agreement ("SA") preliminary statement.)  The Debtors anticipate that additional creditors will sign onto the Settlement Agreement in advance of the hearing on this Motion.

47.    The Settlement Agreement resolves three broad categories of prepetition claims:

- inter-Debtor claims (SA § 2.1);

---

[12]    The summaries of the underlying PSA and Settlement Agreement contained in this Motion are included for descriptive purposes only and, to the extent of any inconsistency between the Motion and the agreements, the agreements control.

[13]    There are minority holders of TCEH first lien claims, TCEH second lien notes, and TCEH unsecured notes that will not be party to the Settlement Agreement.  The Settlement Order will not release the "direct claims" of these holders (i.e., claims held by creditors themselves, rather than the Debtors).

- claims against the TCEH First Lien Creditors (SA § 2.2); and

- claims against the Sponsors and against the Debtors' directors and officers (SA §§ 2.3, 2.4).

48.    The Settlement Parties' resolution of claims under the Settlement Agreement is in consideration of, among other things, the mutual releases of claims under the Settlement Agreement and the opportunity to receive the economic benefits of the transactions contemplated by the Plan or an Alternative Restructuring under the PSA, as discussed further below.

### A.    Categories of Claims Settled Under the Settlement Agreement.

#### 1.    Inter-Debtor Claims.

49.    The first category of claims settled in the Settlement Agreement is inter-Debtor claims (the "Inter-Debtor Claims," and the settlement of such claims, the "Inter-Debtor Settlement." (SA § 2.1.) The transactions and conduct underlying these Inter-Debtor Claims have been the subject of extensive investigation and diligence by the Debtors (including their Disinterested Directors) and their advisors (including the Disinterested Director Advisors), the Creditors' Committees, and various ad hoc creditor groups.

50.    With one narrow exception, the Settlement Agreement resolves *all* Inter-Debtor Claims relating to the Debtors and other specified matters,[14] "from the beginning of the world through the Settlement Effective Date." (SA § 2.1(a).) The released claims include, among others, all claims identified, claimed, or released in the Litigation Letters or the Disinterested Director Settlement with respect to the released parties. (*Id.*)

51.    The terms of the Inter-Debtor Settlement in the Settlement Agreement, described in more detail below, largely track the terms of the Disinterested Director Settlement, which, as

---

[14]    The Settlement Agreement does not release claims among the Debtors arising after the Petition Date under the Cash Management Order, (D.I. 801). (SA § 2.1(a).)

described in detail above, was separately negotiated at arm's-length among the Disinterested Directors in consultation with their Disinterested Director Advisors.[15]

### 2.    Claims Against TCEH First Lien Creditors.

52.    The second category of claims settled in the Settlement Agreement is claims against the TCEH First Lien Creditors (the "First Lien Claims," and the settlement of such claims, the "First Lien Settlement").  (SA § 2.2.)  Similar to the Inter-Debtor Settlement, the First Lien Settlement relinquishes *all* claims against the TCEH First Lien Creditors relating to the Debtors and other specified matters, "from the beginning of the world through the Settlement Effective Date."  (*Id.*)  These released claims include, among others, all claims identified, claimed, or released in the Standing Motions or the Disinterested Director Settlement.  (*Id.*)

### 3.    Claims Against the Sponsors and the Debtors' Directors and Officers.

53.    The third category of claims settled in the Settlement Agreement is claims against the Sponsors and the Debtors' directors and officers (the "S/D/O Claims"), and the settlement of such claims, the "S/D/O Settlement").  (SA §§ 2.3, 2.4.)  Similar to the Inter-Debtor Settlement and the First Lien Settlement, the S/D/O Settlement relinquishes *all* claims against the Sponsors and the Debtors' directors and officers relating to the Debtors and other specified matters, "from the beginning of the world through the Settlement Effective Date."  (*Id.*)  These released claims include, among others, all claims identified, claimed, or released in the Litigation Letters, or the Disinterested Director Settlement. (*Id.*)

---

[15]  Both the Disinterested Director Settlement and the Settlement Agreement provide TCEH with an allowed $700 million claim against EFH.  As discussed above, the Disinterested Director Settlement also guaranteed TCEH 49.65% of the distributable value from the EFH estate and guaranteed the Sponsor Group with 0.709% of the first $1.41 billion of distributable value from the EFH estate, and TCEH with the right to receive 50% of the distributable value from the EFH estate in excess of $1.41 billion, up to a total distribution to TCEH of $805 million.  These terms are not part of the Settlement Agreement.

**B.    Other Provisions of the Settlement Agreement.**

54.    The Settlement Agreement's resolution of litigation claims is not contingent upon the success of the Plan:

> [T]he Parties have resolved to enter into this Settlement Agreement. . ., which upon entry of the Settlement Order, shall remain binding on all Parties regardless of whether the Plan is confirmed or consummated.

(SA Recitals).

55.    Instead, assuming Court approval, the Settlement Agreement can be terminated at will only by *mutual* written agreement of the following parties, as defined in the Settlement Agreement: "(i) the Debtors; (ii) the Settling Interest Holders; (iii) the Required TCEH Creditor Parties; and (iv) the TCEH Official Committee," and may be terminated in certain other limited circumstances also requiring multi-party consent.  (SA § 3.5(a)-(c).)  There can be no *unilateral* termination by any one Settlement Party as a result of changing plan dynamics or any other event.

**C.    Economic Benefits of the Settlement Agreement.**

56.    The Settlement Parties agreed to the releases of claims in the Settlement Agreement in consideration of the mutual releases and the opportunity to benefit from the transactions contemplated by the PSA, including under the Plan or an Alternative Restructuring.

57.    Each of the Debtors, in particular, will receive substantial benefits from, and in exchange for, the releases.  The settlement and releases eliminate the potential for protracted litigation, which has the potential to materially delay or impede the Debtors' ability to successfully restructure.  Moreover, the releases are an integral part of the agreement of the Settlement Parties to:  (a) support the transactions under the Plan, including the potential multi-billion dollar cash contribution toward the repayment of all allowed claims against EFH Corp.

22

and EFIH in full, and; (b) if the merger is not consummated, support an Alternative Restructuring.

58.     The Plan contemplates that the Hunt/TCEH Unsecured Group will make and/or backstop an aggregate equity investment of approximately $7.1 billion plus approximately $5.5 billion in committed term debt financing to:  (a) repay all of the allowed claims against EFH and EFIH in full in cash;[16] (b) acquire Reorganized EFH through a merger; and (c) acquire the Oncor minority interest.  In connection with the equity investment, the Hunt/TCEH Unsecured Group will backstop approximately $5 billion of a rights offering to TCEH junior creditors.  In exchange for the cash contribution toward the repayment of EFH and EFIH claims, EFH Corp. would merge with and into an acquisition entity established by the Hunt/TCEH Unsecured Group.  The merger contemplates that the surviving company will elect to be treated as a REIT under federal tax law.

59.     Under the Plan, TCEH assets will be transferred to a newly-created subsidiary of reorganized TCEH, and the preferred stock of this newly-created subsidiary will be sold to third-party investors, which will result in a significant step-up in the basis of certain of TCEH's assets. Following that transaction, the TCEH First Lien Creditors will receive 100% of the reorganized TCEH equity through a tax-free spinoff which, as was true for the RSA, is also a fundamental element of the PSA.  The tax-free spinoff will occur immediately before the merger.  In addition to the participation rights offered to TCEH junior creditors, an incremental $700 million of participation rights will be offered to TCEH First Lien Creditors, any proceeds of which will reduce the merger's term debt financing or fund other cash uses in the transaction.

---

[16] Excluding any claims derived from or based upon make-whole, applicable premium, redemption premium or other similar payment provision, or any other alleged premiums, fees, or claims relating to the repayment of claims, which will be disallowed under the Plan.

60.     If the transactions contemplated by the Plan are not consummated, the PSA provides that PSA Parties who hold claims agree that they will support an Alternative Restructuring.  (*See* PSA § 5.1.)  In that event, the PSA provides for an agreed-upon treatment of TCEH junior creditors that "shall be materially consistent" with the Settlement Agreement.  (PSA § 5.6.)

61.     Moreover, if the Plan is not consummated, the TCEH First Lien Creditors will no longer have $700 million of participation rights in the merger.  Instead, the Settlement Agreement provides that the TCEH First Lien Creditors will receive the entirety of the TCEH Settlement Claim, which is an allowed, non-priority, unsecured claim against EFH Corp. in the amount of $700 million.  (SA § 2.1(b).)  Likewise, the TCEH junior creditors also will no longer receive the opportunity to participate in the acquisition of Reorganized EFH.  Instead, the holders of Allowed TCEH First Lien Deficiency Claims (subject to section 2.2(b) of the Settlement Agreement), Allowed TCEH Unsecured Note Claims, Allowed TCEH Second Lien Note Claims, Allowed PCRB Claims, and Allowed General Unsecured Claims Against the TCEH Debtors Other Than EFCH (each as defined in the Plan) will receive the $550 million TCEH Cash Payment, paid from the TCEH Debtors' estates, or as a carve out of the TCEH First Lien Creditors' Prepetition Collateral, and subordinate to the RCT Reclamation Support Carve Out, the Carve Out, and the Permitted Liens (each as defined in the Cash Collateral Order, D.I. 855).  (SA § 2.2(a).)

62.     Consummation and funding of the merger is subject to certain conditions associated with regulatory approvals, IRS rulings, and other terms, the satisfaction of which is uncertain.  The Debtors agreed to this conditionality in exchange for the releases in the Settlement Agreement and contractual obligations under the PSA and Settlement Agreement

that, in each case, survive a failure to consummate the merger.  The Debtors determined that these provisions for peace, together with the opportunity for the repayment in full in cash of all allowed claims against EFH and EFIH, make acceptable the conditionality associated with the merger.  This multifaceted package of consideration is the result of extensive negotiation and due diligence by all parties to the Settlement Agreement and represents a critical turning point in the chapter 11 cases.

## IV.   The Plan Support Agreement.

### A.   Overview.

63.     The Debtors and the PSA Parties[17] executed the PSA on August 9, 2015. Fundamentally, the PSA requires the PSA Parties to support the Plan.

64.     The Plan is currently the highest and otherwise best actionable transaction, warranting the considerable support it will receive under the PSA.  As noted, the Plan is premised on the successor to Reorganized EFH being converted into a REIT, which many parties believe will create significant value for the benefit of the Debtors' creditors.  The Debtors have received, evaluated, and actively negotiated numerous potential transactions, including transactions proposed by at least five distinct bidders or stakeholder groups.  But this Plan has garnered the most extensive support from creditors in all levels of the TCEH capital structure and will permit the Debtors to avoid costly and protracted litigation.  Thus, the Debtors have determined to lock up with the Hunt/TCEH Unsecured Group's proposal pursuant to the PSA—subject, however, to a backup plan and a robust fiduciary out (as discussed below).

65.     The PSA is a significant positive step toward the Debtors' goal of achieving consensus around the Plan.  Namely, the PSA:  (a) contains the commitments needed to

---

[17]   The PSA Parties include the Settlement Agreement Parties plus the Hunt-Investor Parties.

effectuate the Hunt/TCEH Unsecured Group's proposal embodied in the Plan; (b) represents significant T-side creditor support; and (c) maintains the Settlement Agreement's obligations regardless of the ultimate form of the Debtors' restructuring.

### B.    Plan Support Commitments.

66.    The PSA requires certain commitments of the Investor Parties, Consenting Interest Holders,[18] and Consenting TCEH Creditor Parties.[19]  (*See* PSA § 4.1.)  These parties agree:  (a) subject to receipt of an approved Disclosure Statement, to vote in favor of the Plan and, as applicable, elect not to opt out of Plan releases (PSA § 4.1(a)); and (b) to assist the Debtors in effectuating and consummating the Plan (PSA § 4.1(b)).  Not only must the parties provide their cooperation and assistance, but they cannot act to object, impede, or delay those efforts.  (PSA § 4.1(c).)  This includes agreeing to refrain from supporting any litigation requests for standing that may be brought by the EFH Committee (PSA § 4.1(e)), or the allowance or any payment of any EFH or EFIH make-whole claims (PSA § 4.1(f)).  Most importantly, section 4.1(c) of the PSA incorporates these parties' commitments to adhere to the terms of the Settlement Agreement while supporting the Plan, which are integral to the Debtors' restructuring efforts.  (*Id.*)  The PSA also provides for the TCEH Committee to make similar commitments, including the adjournment and ultimate withdrawal of all Standing Motions.  (*See* PSA § 4.2.)

67.    Recognizing that the Plan requires certain regulatory approvals, including from the Public Utility Commission of Texas (the "PUCT") and the IRS, the PSA similarly imposes

---

18   Consenting Interest Holders are: Kohlberg Kravis Roberts & Co., LP, TPG Capital Management, L.P, and Goldman, Sachs, & Co., as well as associated funds that hold equity interests in Texas Holdings (collectively the "Sponsors"); Texas Energy Future Holdings Limited Partnership ("Texas Holdings"); and Texas Energy Future Holdings LLC ("TEF").  (PSA preamble.)

19   Consenting TCEH Creditor Parties are: the Consenting TCEH Second Lien Notes Trustee, the Consenting TCEH Unsecured Notes Trustee, the Consenting TCEH Second Lien Noteholders, the Consenting TCEH Unsecured Noteholders, the Consenting TCEH First Lien Noteholders, and the Consenting TCEH First Lien Trustee.  (PSA preamble.)

an obligation that the parties use commercially reasonable efforts to assist the Debtors in obtaining consummation of the Plan and that they refrain from taking actions to the contrary with respect to the PUCT or otherwise.  (PSA §§ 4.1(b)-(c), 4.2(a)-(b).)  The PSA also provides for a consultation process by which the Debtors will allow parties to participate in substantive communications with the IRS, share materials concerning IRS and PUCT regulatory approvals, and incorporate the parties' reasonably requested comments therein.  (PSA §§ 10(a), 10(b).)

### C.    Primary Support Period.

68.    While the PSA requires that the PSA parties support the Plan, it also provides the Debtors with protections in the event the Plan cannot be consummated because of an inability to obtain necessary regulatory approvals or reach PSA milestones.[20]  While all parties must cooperate to confirm the Plan, during the Plan Support period, the PSA permits the PSA Parties simultaneously to negotiate and exchange documentation concerning an Alternative Restructuring.  (PSA § 4.1(c), 4.2(b).)  This carefully negotiated right for a "backup plan" protects the Debtors from losing precious time—if months down the road a REIT conversion fails, for instance, the Debtors can be ready immediately to prosecute an alternative plan.  The PSA permits the Debtors to pursue Court approval of such an Alternative Restructuring without having to start from square one.  Moreover, should an Alternative Restructuring become necessary due to the failure of the Plan, the PSA generally requires the PSA Parties to support and/or not interfere with that option so long as it contains certain required terms.  (*See* PSA §§ 5.1(a), 5.2, 5.3.)

---

[20]  The PSA parties' commitments under section 4 of the PSA terminate in the event certain milestones are not achieved.  (PSA § 10.)  The milestones are:  (1) entry of a Disclosure Statement Order by (or before) November 15, 2015, (2) entry of a Confirmation Order by (or before) January 15, 2016; and (c) the Effective Date of the Plan by (or before) April 30, 2016, all of which are subject to limited extensions under certain circumstances.

69.     To safeguard the tremendous benefits of the Settlement Agreement, the PSA requires that any Alternative Restructuring be materially consistent with the Settlement Agreement, the Settlement Order, and other terms.  (*See* PSA § 6.1.)  The PSA therefore ensures that the settlement of litigation claims will be preserved.

70.     As discussed above, if the Plan is not consummated, claims against the TCEH First Lien Creditors are still released under the Settlement Agreement in exchange for the $550 million TCEH Cash Payment to the TCEH unsecured creditors, paid from the TCEH Debtors' estates, or as a carveout from the TCEH First Lien Creditors' Prepetition Collateral.  The PSA further requires the TCEH unsecured creditors to vote in favor of an Alternative Restructuring filed or supported by the TCEH First Lien Creditors that contains the required terms.  This backup plan "drag" essentially forecloses confirmation objections from these stakeholders.

## D.     Fiduciary Out.

71.     A critical component of the PSA[21]—one which the Debtors required—is the "fiduciary out."  (*See* PSA § 12.6(h).)  It provides that a Debtor may terminate the PSA if:

> the board of directors, board of managers, or such similar governing body of any Debtor determines in good faith after consultation with its outside financial advisors and outside legal counsel, and based on the advice of such counsel, that proceeding with the Plan and Restructuring Transactions or the Alternative Restructuring would be inconsistent with its applicable fiduciary duties.

72.     This robust fiduciary out belies any concern that the Debtors and their management might somehow "contract away" their ability to maximize the value of these chapter 11 estates consistent with their fiduciary duties.  To the contrary, under the PSA, the Debtors are permitted to take any action "reasonably required" to comply with that fiduciary

---

[21]   The Merger Agreement also provides for a fiduciary out.  (Merger Agreement § 8.3(e)-(f).)

28

duty, including terminating their obligations under the PSA (which the Debtors are expressly permitted to do).  (*See* PSA § 4.3(c).)

## V.    Effectiveness of Releases in PSA and Settlement Agreement.

73.    The PSA contains contractual provisions that bind the PSA Parties to support and consent to releases, under the Plan or an Alternative Restructuring, of inter-Debtor and legacy claims that are substantially coextensive with those provided by the Settlement Agreement.  The PSA may be terminated by the applicable creditor PSA Parties if, among other things:  (a) the PSA Order is not entered by September 30, 2015; (b) the PSA is not executed, by August 31, 2015, by the beneficial holders of at least 50.1% of the TCEH second lien note claims, 66.7% of the TCEH unsecured note claims, and 50.1% of the TCEH first lien claims; and (c) the PSA is not executed, by August 31, 2015, by the TCEH first lien administrative and collateral agent.  (PSA §§ 12.1(a), 12.1(g), 12.2(a), 12.2(g), 12.6(a)-(c).)  Absent termination of the PSA, the PSA Parties' contractual obligations under the PSA will remain effective whether or not the Court enters the Settlement Order or confirms the Plan.

<u>Argument</u>

## I.    Entering Into the Plan Support Agreement Is an Exercise of the Debtors' Sound Business Judgment.

### A.    Legal Standard.

74.    Section 363(b) of the Bankruptcy Code provides, in relevant part, that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  In the Third Circuit, courts have authorized a debtor's use of property of the estate outside the ordinary course of business when such use has a "sound business purpose" and is proposed in good faith.  *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D.

29

Del. 1991); *see In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996). Courts authorize a debtor to use property of the estate outside the ordinary course of business if the debtor can show that: (a) a sound business reason or emergency justifies the proposed use; (b) adequate and reasonable notice was provided to all interested parties; (c) the proposed use was requested in good faith; and (d) fair and reasonable consideration is provided in exchange for the use of estate assets. *See In re Exaeris, Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008); *In re Decora Indus., Inc.*, No. 00-4459, 2002 WL 32332749, at *7-8 (D. Del. May 20, 2002); *Hudson*, 124 B.R. at 176.

75.     Once a debtor articulates a valid business justification under section 363, a presumption arises that the debtor's decision was made on an informed basis, in good faith, and in the honest belief the action was in the best interest of the company. *See In re Integrated Res., Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *see also In re Bridgeport Holdings, Inc.*, 388 B.R. 548, 567 (Bankr. D. Del. 2008). Further, once "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants v. Johns Manville Corp., (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). The business judgment rule has vitality in chapter 11 cases and shields a debtor's management from judicial second-guessing. *See Integrated Res.*, 147 B.R. at 656; *Johns-Manville*, 60 B.R. at 615–16 ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions"). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code.

76.     Additionally, under section 105(a) of the Bankruptcy Code, "[t]he court may issue any order . . . that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  Courts in this and other districts have relied on both sections 105(a) and 363(b) when approving a plan support agreement, finding that such relief is entirely consistent with the applicable provisions of the Bankruptcy Code.  *See, e.g.*, *In re Exide Techs,* Case No. 13-11482 (KJC) (Bankr. D. Del Feb. 4, 2015) (Dkt. No 3087) (order authorizing debtors to implement terms of a postpetition plan support agreement); *In re Nebraska Book Co.*, Inc., Case No. 11-12005 (PJW) (Bankr. D. Del Mar. 26, 2012) (Dkt. No. 1039) (same); *In re Overseas Shipholding Grp., Inc.,* Case No. 12-20000 (PJW) (Bankr. D. Del. Apr. 7, 2014) (Dkt. No. 2878) (same); *In re Visteon Corp.*, Case No. 09-11786 (CSS) (Bankr. D. Del. June 17, 2010) (Dkt. No. 3427) (same); *In re Intermet Corp.*, Case No. 08-11859 (KG) (Bankr. D. Del. June 5, 2009) (same); *see also In re Tronox Inc.*, Case No. 09-10156 (Bankr. S.D.N.Y. Dec. 23, 2009) (Dkt. No. 1030) (same); *In re Bally Total Fitness of Greater New York*, Case No. 08-14818 (Bankr. S.D.N.Y. July 9, 2009) (Dkt. No. 1231) (same); *In re Movie Gallery, Inc.*, Case No. 07-33849 (Bankr. E.D. Va. Feb. 6, 2008) (Dkt. No. 1430) (same).[22]

**B.     The Plan Support Agreement Provides the Debtors with a Viable Path to Plan Confirmation.**

77.     The Debtors submit that entering into the PSA is a sound exercise of their business judgment and is justified under the circumstances.  To start, the benefits of the PSA are numerous.  ***First***, it is finalized and actionable right now (subject to Court approval).  Unlike any of the other proposals the Debtors have received, the PSA builds the most consensus among creditors to achieve a pathway to plan confirmation.  Failure to obtain approval of the PSA likely

---

[22]  Because of the voluminous nature of the orders cited herein, such orders are not attached to the motion.  Copies of these orders are available upon request of the Debtors' counsel.

would mean further uncertainty, delay, and administrative costs, all of which the Debtors and their estates would do well to avoid.

78.    *Second*, the Plan offers the best overall value of any proposal the Debtors have received, making the PSA even more attractive.  In particular, repayment in full in cash of all allowed claims against the EFH Debtors and the EFIH Debtors is among the best results the Debtors could have hoped to receive.  Because of its attractiveness, the Debtors would be remiss if they were not able to "lock-up" the support of these creditor groups to move forward with the Plan, while preserving the right to simultaneously pursue an Alternative Restructuring in the event the Debtors are unable to consummate the Plan.

79.    *Third*, this proposal not only lays the groundwork for the *terms* of the Plan, it also gives the Debtors the *votes* of a significant group of creditors (subject to their receipt of an approved Disclosure Statement), on which they can build the necessary consensus to achieve confirmation.  Starting the solicitation and confirmation process with support in-hand is a value that should not be overlooked, particularly in chapter 11 cases as large and complex, and contentious, as these.  In effect, the Debtors will have the TCEH First Lien Creditors, TCEH Unsecured Group, and TCEH Committee as valuable advocates working with them to build consensus, and the presence of that large block of "yes" votes may likely help others coalesce around them in support of the Plan.

80.    *Fourth*, even after entering into the PSA, the Debtors will continue to retain authority to terminate their obligations under the PSA and go a different direction, if doing so is necessary to comply with their fiduciary duties in these chapter 11 estates.  Thus, even if the highest and otherwise best proposal right now—the Plan—cannot be consummated, the Debtors

32

will have the flexibility to entertain and pursue an Alternative Restructuring.  The risks to the Debtors and their stakeholders are reduced substantially by this flexibility.

81.    In sum, entering into the PSA marks a crucial next step for the Debtors toward maximizing the value of these estates, emerging from chapter 11, and allowing the Debtors to move forward, potentially sooner than otherwise anticipated.  Accordingly, the Debtors submit that doing so is in keeping with the sound exercise of their business judgment and request that the Court enter the PSA Order.

## II.    The Plan Support Agreement Complies With Section 1125 of the Bankruptcy Code.

82.    Entering into the PSA does not constitute a "solicitation" of the PSA Parties' votes in favor of the Plan under section 1125 of the Bankruptcy Code.  Section 1125(b) provides that "[a]n acceptance or rejection of a plan may not be solicited after the commencement of the case under this title . . . unless, at the time of or before such solicitation, there is transmitted . . . a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information."   11 U.S.C. § 1125(b).   Courts considering both prepetition and postpetition plan support agreements have held that such agreements are not "solicitations" if they permit a party to the agreement to later vote to reject a plan if there are any material deviations from the representations made at the time of signing the plan support agreement.  *See, e.g.*, *In re Neb. Book Co.*, No. 11-12005 (Bankr. D. Del. Sep. 7, 2011) (Dkt. No. 557) (approving a postpetition plan support agreement pursuant to which creditor agreed to vote in favor of plan provided there were no material modifications to the agreed upon plan); *In re Internet Corp.*, Case No. 08-11859 (KG) (Bankr. D. Del. June 5, 2009) (Dkt. No. 1066) (same); *In re Owens Corning*, Case No. 00-03837 (KG) (Bankr. D. Del. June 29, 2006) (Dkt. No. 18208) (same); *In re Heritage Org., L.L.C.*, 376 B.R. 783, 789-95 (Bankr. N.D. Tex. 2007) (finding that an agreement to vote for a plan in a term sheet does not constitute a solicitation for an official vote);

*In re Kellogg Square P'ship*, 160 B.R. 336 (Bankr. D. Minn. 1993) (holding that secured creditors' agreement to vote for plan prior to approval of disclosure statement did not violate statutory restrictions on solicitation); *Transworld Airlines, Inc. v. Texaco, Inc. (In re Texaco, Inc.)*, 81 B.R. 813 (Bankr. S.D.N.Y. 1988) (holding that parties' agreement to use best efforts to obtain confirmation of chapter 11 plan did not violate statutory restrictions on solicitation of votes for the plan).

83.     Bankruptcy courts have roundly rejected a broad reading of "solicitation." *See Century Glove, Inc. v. First Am. Bank of New York*, 860 F.2d 94, 101 (3d Cir. 1988) ("'[S]olicitation' must be read narrowly.").   Certain courts in this district, however, have declined to approve postpetition plan support agreements with specific enforcement provisions based on the rationale that these agreements improperly bind parties to a single reorganization structure in violation section 1125(b) of the Bankruptcy Code. *See In re Stations Holdings Co. Inc.*, No. 02-10882, 2002 WL 31947022 (Bankr. D. Del. 2002); *In re NII Holdings Inc.*, 288 B.R. 356 (Bankr. D. Del. 2002).

84.     Later decisions in this district, however, have approved postpetition plan support agreements as compliant with section 1125 of the Bankruptcy Code. *See In re Indianapolis Downs, LLC*, 486 B.R. 286 (Bankr. D. Del. 2013) ("[A] narrow construction of 'solicitation' affords [the] parties the opportunity to memorialize their agreements in a way that allows a Chapter 11 case to move forward."); *In re Neb. Book Co.*, No. 11-12005 (PJW) (Bankr. D. Del. Sep. 7, 2011) (Dkt. No. 557) (approving postpetition plan support agreement).   Moreover, and as the *Indianapolis Downs* court noted, the *Stations* and *NII Holdings* decisions were "two-page orders [that did] not contain any legal analysis and, consistent with this Court's practice, are of only the most limited (if any) precedential value." *See Indianapolis Downs*, 486 B.R. at 295.

34

85.     Accordingly, the Debtors' and the other PSA Parties' negotiation and execution of the PSA do not constitute improper solicitation under section 1125(b) of the Bankruptcy Code, and the Debtors submit that they should be permitted to enter into the PSA.

### Waiver of Bankruptcy Rules 6004(a) and 6004(h)

86.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

### Notice

87.     The Debtors shall provide notice of this Motion on the date hereof via first class mail to:  (a) the U.S. Trustee; (b) counsel to the TCEH Creditors' Committee; (c) counsel to the EFH Creditors' Committee; (d) Wilmington Trust, N.A., in its capacity as administrative agent under the TCEH first lien credit agreement and collateral agent under the TCEH intercreditor agreements and counsel thereto; (e) Bank of New York Mellon Trust Company, N.A., in its capacity as indenture trustee under:  (i) the TCEH unsecured pollution control revenue bonds; and (ii) the EFCH 2037 Notes due 2037, and counsel thereto; (f) American Stock Transfer & Trust Company, LLC, in its capacity as indenture trustee under:  (i) the 9.75% EFH senior unsecured notes due 2019; (ii) the 10.0% EFH senior unsecured notes due 2020; (iii) the 10.875% EFH LBO senior unsecured notes due 2017; (iv) the 11.25%/12.0% EFH LBO toggle notes due 2017; (v) the 5.55% EFH legacy notes (series P) due 2014; (vi) the 6.50% EFH legacy notes (series Q) due 2024; and (vii) the 6.55% EFH legacy notes (series R) due 2034, and counsel thereto; (g) Computershare Trust Company, N.A. and Computershare Trust Company of Canada, in their capacities as indenture trustee under:  (i) the 11.0% EFIH senior secured second lien notes due 2021; and (ii) the 11.75% EFIH senior secured second lien notes due 2022, and

35

counsel thereto; (h) UMB Bank, N.A. in its capacity as indenture trustee under: (i) the 9.75% EFIH senior unsecured notes due 2019; and (ii) the 11.25%/12.25% EFIH senior toggle notes due 2018, and counsel thereto; (i) Delaware Trust Company of Delaware in its capacity as indenture trustee under: (i) the 6.875% EFIH senior secured notes due 2017; (ii) the 10.0% EFIH senior secured notes due 2020; and (iii), the 11.50% TCEH senior secured notes due 2020, and counsel thereto; (j) Law Debenture Trust Company of New York in its capacity as indenture trustee under: (i) the 10.25% TCEH senior unsecured notes due 2015; and (ii) the 10.50%/11.25% TCEH senior toggle notes due 2016, and counsel thereto; (k) Wilmington Savings Fund Society, FSB in its capacity as indenture trustee under the 15.0% TCEH senior secured second lien notes due 2021, and counsel thereto; (l) counsel to certain holders of claims against the Debtors regarding each of the foregoing described in clauses (c) through (j); (m) the agent for the TCEH debtor-in-possession financing facility and counsel thereto; (n) the agent for the EFIH debtor-in-possession financing facility and counsel thereto; (o) counsel to certain holders of equity in Texas Energy Future Holdings Limited Partnership; (p) counsel to the Ad Hoc Committee of TCEH Unsecured Noteholders; (q) counsel to the Ad Hoc Committee of TCEH Second Lien Noteholders; (r) Oncor Electric Delivery Holdings Company LLC and counsel thereto; (s) Oncor Electric Delivery Company LLC and counsel thereto; (t) the Securities and Exchange Commission; (u) the Internal Revenue Service; (v) the Office of the United States Attorney for the District of Delaware; (w) the Office of the Texas Attorney General on behalf of the Public Utility Commission of Texas; (x) counsel to the Electric Reliability Council of Texas; and (y) those parties that have requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**No Prior Request**

88.     No prior request for the relief sought in this Motion has been made to this or any other court.

**Conclusion**

89.     The Debtors respectfully request that the Court enter an order, substantially in the form of the PSA Order attached as **Exhibit A** approving the PSA and authorizing the Debtors to enter into and perform under the PSA.

[*Remainder of page intentionally left blank.*]

37

Dated: August 10, 2015
      Wilmington, Delaware

*/s/ Jason M. Madron*

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
920 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 651-7700
Facsimile:    (302) 651-7701
Email:    collins@rlf.com
    defranceschi@rlf.com
    madron@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:    edward.sassower@kirkland.com
    stephen.hessler@kirkland.com
    brian.schartz@kirkland.com

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Chad J. Husnick (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:    james.sprayregen@kirkland.com
    marc.kieselstein@kirkland.com
    chad.husnick@kirkland.com
    steven.serajeddini@kirkland.com

Co-Counsel to the Debtors and Debtors in Possession

Dated:  August 10, 2015
      Wilmington, Delaware

*/s/ Mark K. Thomas*

**O'KELLY ERNST & BIELLI, LLC**
David M. Klauder (No. 5769)
Shannon J. Dougherty (No. 5740)
901 N. Market Street, Suite 1000
Wilmington, DE 19801
Telephone:      (302) 778-4000
Facsimile:      (302) 295-2873
Email:            dklauder@oeblegal.com
                      sdougherty@oeblegal.com

-and-

**PROSKAUER ROSE LLP**
Jeff J. Marwil (admitted *pro hac vice*)
Mark K. Thomas (admitted *pro hac vice*)
Peter J. Young (admitted *pro hac vice*)
Three First National Plaza
70 W. Madison Street, Suite 3800
Chicago, IL 60602
Telephone:      (312) 962-3550
Facsimile:      (312) 962-3551
Email:            jmarwil@proskauer.com
                      mthomas@proskauer.com
                      pyoung@proskauer.com

Co-Counsel to the Debtor Energy Future Holdings Corp.

Dated:  August 10, 2015
   Wilmington, Delaware    */s/ Richard Levin*
                **STEVENS & LEE, P.C.**
                Joseph H. Huston, Jr. (No. 4035)
                1105 North Market Street, Suite 700
                Wilmington, Delaware 19801
                Telephone:  (302) 425-3310
                Facsimile:  (610) 371-7927
                Email:   jhh@stevenslee.com

                -and-

                **CRAVATH, SWAINE AND MOORE LLP**
                Michael A. Paskin, Esq.
                Trevor M. Broad, Esq.
                Worldwide Plaza
                825 Eighth Avenue
                New York, NY 10019-7475
                Telephone:  (212) 474-1760
                Facsimile:  (212) 474-3700
                Email:   mpaskin@cravath.com
                      tbroad@cravath.com

                -and-

                **JENNER & BLOCK**
                Richard Levin
                919 Third Avenue
                New York, NY 10022-3908
                Telephone: (212) 891-1601
                Facsimile: (212) 891-1699
                Email:   rlevin@jenner.com

                Co-Counsel to Energy Future Intermediate Holding Company
                LLC

Dated:  August 10, 2015
       Wilmington, Delaware

*/s/ Thomas B. Walper*

**MCELROY, DEUTSCH, MULVANEY
& CARPENTER, LLP**
David P. Primack (No. 4449)
300 Delaware Avenue, Suite 770
Wilmington, DE  19801
Telephone:    (302) 300-4515
Facsimile:    (302) 654-4031
Email:        dprimack@mdmc-law.com

-and-

**MUNGER, TOLLES & OLSON LLP**
Thomas B. Walper
Seth Goldman
355 South Grand Avenue, 35th Floor
Los Angeles, CA 90071
Telephone:    (213) 683-9100
Facsimile:    (213) 683-4022
Email:        Thomas.Walper@mto.com
              Seth.Goldman@mto.com

Co-Counsel to the TCEH Debtors