GSO CHURCHILL PARTNERS LP,
GSO COASTLINE CREDIT PARTNERS LP,
GSO CREDIT-A PARTNERS LP,
GSO CREDIT ALPHA FUND LP,
GSO PALMETTO OPPORTUNISTIC INVESTMENT PARTNERS LP, and
STEAMBOAT CREDIT OPPORTUNITIES MASTER FUND LP

By: GSO Capital Partners LP, its Investment Manager


By:_____
Name: Marisa Beeney
Title:  Authorized Person



345 Park Avenue
31st Floor
New York, NY 10154
Attention: Patrick Fleury
          Marisa Beeney
Email:    Patrick.Fleury@gsocap.com
          Marisa.Beeney@gsocap.com

*[Signature Page to Backstop Agreement]*

GSO SPECIAL SITUATIONS MASTER FUND LP

By: GSO Capital Partners LP, its Investment Advisor


By:_____
Name: Marisa Beeney
Title:  Authorized Person



345 Park Avenue
31st Floor
New York, NY 10154
Attention: Patrick Fleury
            Marisa Beeney
Email:    Patrick.Fleury@gsocap.com
            Marisa.Beeney@gsocap.com

GSO AIGUILLE DES GRANDS MONTETS FUND I LP,
GSO AIGUILLE DES GRANDS MONTETS FUND II LP and
GSO AIGUILLE DES GRANDS MONTETS FUND III LP

By: GSO Capital Partners LP, its attorney-in-fact

By:_____
Name: Marisa Beeney
Title:  Authorized Person


345 Park Avenue
31st Floor
New York, NY 10154
Attention: Patrick Fleury
            Marisa Beeney
Email:    Patrick.Fleury@gsocap.com
            Marisa.Beeney@gsocap.com

GSO CACTUS CREDIT OPPORTUNITIES FUND LP

By: GSO Cactus Credit Opportunities Associates LLC,
its general partner

By:_____
Name: Marisa Beeney
Title: Authorized Person


345 Park Avenue
31st Floor
New York, NY 10154
Attention: Patrick Fleury
            Marisa Beeney
Email:    Patrick.Fleury@gsocap.com
          Marisa.Beeney@gsocap.com

**ANCHORAGE CAPITAL MASTER OFFSHORE, LTD.**

By: Anchorage Capital Group, L.L.C.,
    its Investment Manager

By: _____
Name:
Title:
       Daniel Allen
    Senior Portfolio Manager

Anchorage Capital Master Offshore, Ltd.
c/o Anchorage Capital Group, L.L.C.
610 Broadway, 6th Floor
New York, NY 10012
Attn: General Counsel
Fax: +1-212-432-4651
Email: legal@anchoragecap.com

**PCI FUND LLC**

By: Anchorage Capital Group, L.L.C.,
    its Investment Manager

By: _____
Name:
Title:        **Daniel Allen**
        **Senior Portfolio Manager**


PCI Fund LLC
c/o Anchorage Capital Group, L.L.C.
610 Broadway, 6th Floor
New York, NY 10012
Attn: General Counsel
Fax: +1-212-432-4651
Email: legal@anchoragecap.com

*[Signature Page to Backstop Agreement]*

**TACONIC OPPORTUNITY MASTER FUND L.P.**

By: Taconic Capital Advisors L.P.,
     its Investment Manager

By: _____
Name: Marc Schwartz
Title: Principal




Taconic Opportunity Master Fund L.P.
280 Park Avenue
5th Floor
New York, NY 10017
Attention: Marc Schwartz
Email:     maschwartz@taconiccap.com

*[Signature Page to Backstop Agreement]*

**TACONIC MASTER FUND 1.5 L.P.**

By: Taconic Capital Advisors L.P.,
    its Investment Manager

By: _____
Name: Marc Schwartz
Title: Principal

Taconic Master Fund 1.5 L.P.
280 Park Avenue
5th Floor
New York, NY 10017
Attention: Marc Schwartz
Email:      maschwartz@taconiccap.com

*[Signature Page to Backstop Agreement]*

**ARROWGRASS MASTER FUND LTD.**

By:

Name: Sean Flynn

Title:  Director

Arrowgrass Master Fund Ltd.
c/o Arrowgrass Capital Partners (US) LP
1330 Avenue of the Americas
32nd Floor
New York, NY 10019
Attention: Josh Hertz & David Dunn
Email:      Joshua.hertz@arrowgrass.com; David.dunn@arrowgrass.com


and


Arrowgrass Capital Partners LLP
3rd Floor
10 Portman Square
London, England
W1H 6AZ
Attention: General Counsel
Email:      legal@arrowgrass.com

[*Signature Page to Backstop Agreement*]

**ARROWGRASS DISTRESSED OPPORTUNITIES FUND
LIMITED**

By:
Name:  Sean Flynn
Title:  Director


Arrowgrass Distressed Opportunities Fund Limited
c/o Arrowgrass Capital Partners (US) LP
1330 Avenue of the Americas
32nd Floor
New York, NY 10019
Attention: Josh Hertz & David Dunn
Email:     Joshua.hertz@arrowgrass.com; David.dunn@arrowgrass.com


and


Arrowgrass Capital Partners LLP
3rd Floor
10 Portman Square
London, England
W1H 6AZ
Attention: General Counsel
Email:     legal@arrowgrass.com

*[Signature Page to Backstop Agreement]*

**BLACKROCK CORE BOND TRUST**

By: BlackRock Financial Management, Inc.,
     its Sub-Advisor

By: _____
Name:
Title:
    AnnMarie Smith
    Authorized Signatory


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:    David.trucano@blackrock.com

*[Signature Page to Backstop Agreement]*

**BLACKROCK MULTI-SECTOR INCOME TRUST**

By: BlackRock Advisors, LLC,
    its Investment Advisor

By:
Name:
Title:
    **AnnMarie Smith**
    **Authorized Signatory**


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:       David.trucano@blackrock.com

[*Signature Page to Backstop Agreement*]

**BLACKROCK DIVERSIFIED DISTRIBUTION FUND**

By: BlackRock Financial Management, Inc.
    its Sub-Advisor

By:
Name:      AnnMarie Smith
Title:      Authorized Signatory


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:    David.trucano@blackrock.com

*[Signature Page to Backstop Agreement]*

**BLACKROCK LIMITED DURATION INCOME TRUST**

By: BlackRock Financial Management, Inc.,
    its Sub-Advisor

By:
Name:   AnnMarie Smith
Title:    Authorized Signatory

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:    David.trucano@blackrock.com

*[Signature Page to Backstop Agreement]*

**BLACKROCK FUNDS II, BLACKROCK HIGH YIELD
BOND PORTFOLIO**

By: BlackRock Financial Management, Inc.,
    its Sub-Advisor

By: _____

Name:

Title:

    AnnMarie Smith
    Authorized Signatory

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:     David.trucano@blackrock.com

**BLACKROCK SECURED CREDIT PORTFOLIO OF
BLACKROCK FUNDS II**

By: BlackRock Financial Management, Inc.,
     its Sub-Advisor

By: _____
Name:
Title:
          AnnMarie Smith
          Authorized Signatory


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:      David.trucano@blackrock.com

*[Signature Page to Backstop Agreement]*

**BLACKROCK CREDIT ALLOCATION INCOME TRUST IV**

By: BlackRock Financial Management, Inc.,
    its Sub-Advisor

By: _____
Name:
Title:     AnnMarie Smith
       Authorized Signatory



BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:    David.trucano@blackrock.com

*[Signature Page to Backstop Agreement]*

**BLACKROCK HIGH YIELD PORTFOLIO OF THE
BLACKROCK SERIES FUND, INC.**

By: BlackRock Financial Management, Inc.,
    its Sub-Advisor

By: _____
Name:
Title:        AnnMarie Smith
              Authorized Signatory


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:      David.trucano@blackrock.com

*[Signature Page to Backstop Agreement]*

**BLACKROCK HIGH YIELD V.I. FUND OF**
**BLACKROCK VARIABLE SERIES FUNDS, INC.**

By: BlackRock Financial Management, Inc.,
    its Sub-Advisor

By: _____
Name:
Title:

AnnMarie Smith
Authorized Signatory

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:       David.trucano@blackrock.com

*[Signature Page to Backstop Agreement]*

**BGF GLOBAL HIGH YIELD BOND FUND**

By: BlackRock Financial Management, Inc.,
    its Sub-Advisor

By: _____
Name:
Title:

AnnMarie Smith
Authorized Signatory

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:    David.trucano@blackrock.com

*[Signature Page to Backstop Agreement]*

**BLACKROCK GLOBAL INVESTMENT SERIES:**
**INCOME STRATEGIES PORTFOLIO**

By: BlackRock Financial Management, Inc.,
    its Sub-Advisor

By: _____
Name:
Title:

AnnMarie Smith
Authorized Signatory

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:      David.trucano@blackrock.com

**BLACKROCK CORPORATE HIGH YIELD FUND, INC.**

By: BlackRock Advisors, LLC,
     its Investment Advisor

By: _____
Name:
Title:
          **AnnMarie Smith**
          **Authorized Signatory**

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:      David.trucano@blackrock.com

**MET INVESTORS SERIES TRUST - BLACKROCK
HIGH YIELD PORTFOLIO**

By: BlackRock Financial Management, Inc.,
    its Investment Advisor

By: _____
Name:
Title:

AnnMarie Smith
Authorized Signatory


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:    David.trucano@blackrock.com

**BGF US DOLLAR HIGH YIELD BOND FUND**

By: BlackRock Financial Management, Inc.,
    its Sub-Advisor

By:
Name:
Title:

AnnMarie Smith
Authorized Signatory

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:     David.trucano@blackrock.com

*[Signature Page to Backstop Agreement]*

**THE OBSIDIAN MASTER FUND**

By: BlackRock Financial Management, Inc.,
    its Investment Advisor

By:
Name:
Title:
    AnnMarie Smith
    Authorized Signatory


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:    David.trucano@blackrock.com

**CA 534 OFFSHORE FUND, LTD**

By: BlackRock Financial Management, Inc.,
    its Investment Advisor

By: _____
Name:
Title:

AnnMarie Smith
Authorized Signatory

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:      David.trucano@blackrock.com

[*Signature Page to Backstop Agreement*]

**BLACKROCK CREDIT ALPHA MASTER FUND L.P.**

By: BlackRock Financial Management, Inc.,
    its Investment Advisor

By:
Name:
Title:

    **AnnMarie Smith**
    **Authorized Signatory**


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:    David.trucano@blackrock.com

*[Signature Page to Backstop Agreement]*

**JNL/BLACKROCK GLOBAL LONG SHORT CREDIT
FUND**

By: BlackRock Financial Management, Inc.,
    its Sub-Advisor

By: _____
Name:
Title:      **AnnMarie Smith
Authorized Signatory**

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:    David.trucano@blackrock.com

*[Signature Page to Backstop Agreement]*

**BLACKROCK GLOBAL LONG/SHORT CREDIT FUND
OF BLACKROCK FUNDS**

By: BlackRock Financial Management, Inc.,
    its Sub-Advisor

By: _____

Name:

Title:
           Smith

          **Authorized Signatory**


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:     David.trucano@blackrock.com

**BLACKROCK MULTI-STRATEGY MASTER FUND LIMITED**

By: BlackRock Institutional Trust Company, N.A.,
     its Investment Manager

By: _____

Name: _____

Title: _____

        **AnnMarie Smith**
        **Authorized Signatory**


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:     David.trucano@blackrock.com

**ARCH REINSURANCE LTD.**

By: BlackRock Financial Management, Inc.,
    its Investment Advisor

By: _____
Name:
Title:


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:      David.trucano@blackrock.com

*[Signature Page to Backstop Agreement]*

**STRATEGIC INCOME OPPORTUNITIES BOND FUND**

By: BlackRock Institutional Trust Company, N.A.,
    not in its individual capacity but as Trustee of the Strategic
    Opportunities Bond Fund

By: _____
Name: _____
Title: _____

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:    David.trucano@blackrock.com

*[Signature Page to Backstop Agreement]*

**BLACKROCK FUNDS II, BLACKROCK STRATEGIC**
**INCOME OPPORTUNITIES PORTFOLIO**

By: BlackRock Financial Management, Inc.,
　　its Registered Sub-Advisor

By:
Name:
Title:

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:　　David.trucano@blackrock.com

*[Signature Page to Backstop Agreement]*

**BLACKROCK DYNAMIC HIGH INCOME PORTFOLIO
OF BLACKROCK FUNDS II**

By: BlackRock Advisors, LLC,
    its Investment Advisor

By: _____
Name: ALEX SHINGVEN
Title: MANAGING DIRECTOR


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:    David.trucano@blackrock.com

*[Signature Page to Backstop Agreement]*

**BLACKROCK MULTI-ASSET INCOME PORTFOLIO OF BLACKROCK FUNDS II**

By: BlackRock Advisors, LLC,
    its Investment Advisor

By: _____
Name: ALEX SHINGLER
Title: MANAGING DIRECTOR


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:      David.trucano@blackrock.com

[*Signature Page to Backstop Agreement*]

**BGF GLOBAL MULTI-ASSET INCOME FUND, A SUB-FUND OF BLACKROCK GLOBAL FUNDS**

By: BlackRock Financial Management, Inc.,
     its Advisor

By: _____
Name: ALEX SHINGLER
Title: MANAGING DIRECTOR

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:    David.trucano@blackrock.com

*[Signature Page to Backstop Agreement]*

**AVENUE CAPITAL MANAGEMENT II, L.P.**
*on behalf of certain funds it advises*

By: Avenue Capital Management II GenPar, LLC,
    its General Partner

By: _____
Name: Sonia Gardner
Title:  Managing Member

Avenue Capital Management II, L.P.
399 Park Avenue, 6th Floor
New York, NY 10022
Attention:  Sonia Gardner
           Todd Greenbarg
Email:      sgardner@avenuecapital.com
           tgreenbarg@avenuecapital.com

*[Signature Page to Backstop Agreement]*

## Schedule 1

| Investor | Backstop Commitment | Pro Rata Share | Percentage of Backstop Premium |
|---|---|---|---|
| Anchorage Capital Master Offshore, Ltd. | $ 1,689,722,318.50 | 33.21% | 32.59% |
| PCI Fund LLC | 10,277,681.50 | 0.20% | 0.20% |
| **Anchorage Total** | **$ 1,700,000,000.00** | **33.42%** | **32.79%** |
| | | | |
| Arrowgrass Master Fund LTD | 303,450,000.00 | 5.96% | 5.85% |
| Arrowgrass Distressed Opportunities Fund Limited | 31,450,000.00 | 0.62% | 0.61% |
| **Arrowgrass Total** | **$ 334,900,000.00** | **6.58%** | **6.46%** |
| | | | |
| Avenue Capital Management II, L.P. | 212,500,000.00 | 4.18% | 4.10% |
| **Avenue Total** | **$ 212,500,000.00** | **4.18%** | **4.10%** |
| | | | |
| Arch Reinsurance Ltd. | 1,912,361.11 | 0.04% | 0.04% |
| BlackRock Credit Alpha Master Fund L.P. | 22,066,305.55 | 0.43% | 0.46% |
| BlackRock Core Bond Trust | 1,405,000.00 | 0.03% | 0.03% |
| BlackRock Multi-Sector Income Trust | 2,419,722.22 | 0.05% | 0.05% |
| BlackRock Diversified Distribution Fund | 8,750,027.78 | 0.17% | 0.18% |
| BlackRock Limited Duration Income Trust | 4,371,111.11 | 0.09% | 0.09% |
| BlackRock Dynamic High Income Portfolio of BlackRock Funds II | 702,500.00 | 0.01% | 0.01% |
| BlackRock Global Long/Short Credit Fund Of BlackRock Funds | 43,359,861.11 | 0.85% | 0.91% |
| BlackRock Funds II, BlackRock High Yield Bond Portfolio | 423,919,722.22 | 8.33% | 8.90% |
| BlackRock Multi-Asset Income Portfolio of BlackRock Funds II | 35,437,222.22 | 0.70% | 0.74% |
| BlackRock Secured Credit Portfolio of BlackRock Funds II | 2,560,222.22 | 0.05% | 0.05% |
| BlackRock Funds II, BlackRock Strategic Income Opportunities Portfolio | 74,824,055.55 | 1.47% | 1.57% |
| Strategic Income Opportunities Bond Fund | 1,319,138.89 | 0.03% | 0.03% |
| BlackRock Credit Allocation Income Trust IV | 12,734,763.89 | 0.25% | 0.27% |
| BlackRock High Yield Portfolio of the BlackRock Series Fund, Inc. | 843,000.00 | 0.02% | 0.02% |
| BlackRock High Yield V.I. Fund of BlackRock Variable Series Funds, Inc. | 5,178,986.11 | 0.10% | 0.11% |
| CA 534 Offshore Fund, Ltd | 7,883,611.11 | 0.15% | 0.17% |
| BGF Global High Yield Bond Fund | 57,523,041.67 | 1.13% | 1.21% |
| BlackRock Global Investment Series: Income Strategies Portfolio | 4,624,791.67 | 0.09% | 0.10% |
| BGF Global Multi-Asset Income Fund, a sub-fund of BlackRock Global Funds | 10,615,555.56 | 0.21% | 0.22% |
| BlackRock Corporate High Yield Fund, Inc. | 52,531,388.89 | 1.03% | 1.10% |
| BlackRock Multi-Strategy Master Fund Limited | 4,687,236.11 | 0.09% | 0.10% |
| MET Investors Series Trust - BlackRock High Yield Portfolio | 17,570,305.56 | 0.35% | 0.37% |
| The Obsidian Master Fund | 29,602,569.45 | 0.58% | 0.62% |
| JNL/BlackRock Global Long Short Credit Fund | 3,473,472.22 | 0.07% | 0.07% |
| BGF US Dollar High Yield Bond Fund | 125,084,027.78 | 2.46% | 2.63% |
| **BlackRock Total** | **$ 955,400,000.00** | **18.78%** | **20.07%** |
| | | | |
| Atlas Enhanced Master Fund, Ltd | 117,300,000.00 | 2.31% | 2.26% |
| Atlas Master Fund, Ltd. | 108,800,000.00 | 2.14% | 2.10% |
| BAM Zie Master Fund, Ltd. | 60,350,000.00 | 1.19% | 1.16% |
| **Balyasny Total** | **$ 286,450,000.00** | **5.63%** | **5.52%** |
| | | | |
| BHR Capital LLC, as nominee for BHCO Master, Ltd., BHR Master Fund, Ltd. and BHR OC Master Fund, Ltd. | 119,850,000.00 | 2.36% | 2.31% |
| **BHR Total** | **$ 119,850,000.00** | **2.36%** | **2.31%** |
| | | | |
| Centerbridge Special Credit Partners II, LP | 86,040,187.50 | 1.69% | 1.66% |
| Centerbridge Credit Partners Master, L.P. | 163,687,687.50 | 3.22% | 3.16% |
| Centerbridge Credit Partners LP | 86,872,125.00 | 1.71% | 1.68% |
| **Centerbridge Total** | **$ 336,600,000.00** | **6.62%** | **6.49%** |
| | | | |
| Cyrus Opportunities Master Fund II, Ltd. | 113,411,482.00 | 2.23% | 2.33% |
| CRS Master Fund, L.P. | 31,167,010.92 | 0.61% | 0.64% |
| Crescent 1, L.P. | 34,810,753.54 | 0.68% | 0.72% |
| Cyrus Select Opportunities Master Fund, Ltd. | 11,860,753.54 | 0.23% | 0.24% |
| **Cyrus Total** | **$ 191,250,000.00** | **3.76%** | **3.93%** |
| | | | |
| Deutsche Bank Securities Inc. | 286,450,000.00 | 5.63% | 5.52% |
| **Deutsche Bank Total** | **$ 286,450,000.00** | **5.63%** | **5.52%** |
| | | | |
| GSO Special Situations Master Fund LP | 193,704,800.00 | 3.81% | 3.74% |
| GSO Credit-A Partners LP | 35,705,100.00 | 0.70% | 0.69% |
| GSO Palmetto Opportunistic Investment Partners LP | 34,404,600.00 | 0.68% | 0.66% |
| Steamboat Credit Opportunities Master Fund LP | 8,641,100.00 | 0.17% | 0.17% |
| GSO Coastline Credit Partners LP | 10,441,400.00 | 0.21% | 0.20% |
| GSO Cactus Credit Opportunities Fund LP | 22,515,650.00 | 0.44% | 0.43% |
| GSO Aiguille des Grands Montets Fund I LP | 18,932,900.00 | 0.37% | 0.37% |
| GSO Aiguille des Grands Montets Fund II LP | 14,382,000.00 | 0.28% | 0.28% |
| GSO Aiguille des Grands Montets Fund III LP | 8,760,100.00 | 0.17% | 0.17% |
| GSO Churchill Partners LP | 17,000,000.00 | 0.33% | 0.33% |
| GSO Credit Alpha Fund LP | 60,512,350.00 | 1.19% | 1.17% |
| **GSO Total** | **$ 425,000,000.00** | **8.35%** | **8.20%** |
| | | | |
| Taconic Opportunity Master Fund L.P. | 214,965,000.00 | 4.23% | 4.15% |
| Taconic Master Fund 1.5 L.P. | 23,885,000.00 | 0.47% | 0.46% |
| **Taconic Total** | **$ 238,850,000.00** | **4.70%** | **4.61%** |
| | | | |
| **Total Investors** | **$ 5,087,250,000.00** | **100.00%** | **100.00%** |

**Exhibit A**

**Commitment Joinder Agreement**

_____, 201__

Ovation Acquisition I, L.L.C.
1900 North Akard Street
Dallas, Texas  75201
Attention: Management Committee

Energy Future Holdings Corp.
Energy Future Intermediate Holding Company LLC
Energy Plaza
1601 Bryan Street
Dallas, Texas  75201
Attention: Boards of Directors

Ladies and Gentlemen:

Reference is made to that certain Backstop Agreement, dated as of August 9, 2015 (the "Backstop Agreement"), among Ovation Acquisition I, L.L.C., Energy Future Holdings Corp. and Energy Future Intermediate Holding Company LLC and the Investors (as defined in the Backstop Agreement). Capitalized terms used but not defined herein have the meanings ascribed to them in the Backstop Agreement.

The undersigned hereby (i) acknowledges that it has received and reviewed a copy of the Backstop Agreement, and (ii) represents and warrants that, from and after the Certification Date, it will hold at least $1,000,000 in aggregate principal amount of Rights Offering Allowed Claims and (iii) agrees to assume and be bound by the obligations of [_____] in respect of the Transferred Backstop Commitment set forth on the signature page hereof, and to observe and comply with, all of the terms and provisions of the Backstop Agreement that are applicable with respect to such Transferred Backstop Commitment as if an original party hereto.

The undersigned also represents and warrants that, without limiting the generality of any representations and warranties made by the undersigned in any subscription agreement executed by it as a condition to its admission to the Company, the undersigned is a qualified institutional "accredited investor" as defined in Rule 501(a)(1), (2), (3) and (7) of Regulation D under the Securities Act of 1933, as amended, or a qualified "accredited investor" as defined in Rule 501(a)(8) of Regulation D, but only to the extent all of the equity owners thereof are investors which are qualified institutional "accredited investors" as defined in Rule 501(a)(1), (2), (3) and (7) of Regulation D.

*[Signature page follows]*

IN WITNESS WHEREOF, the undersigned has caused this Joinder to be executed as of the date first written above.

[_____]

By: _____

Name:_____

Title: _____

Transferred Commitment:

| Investor | Backstop Commitment | Pro Rata Share | Percentage of Backstop Premium |
|---|---|---|---|
| [●] | $[●] | [●]% | [●]% |

## Exhibit B

**Guarantee**

(See attached.)

**EXECUTION VERSION**

**GUARANTEE**

GUARANTEE, dated as of August 9, 2015 (this "Guarantee"), by each of the parties listed on the signature pages hereto (each, a "Guarantor"), in favor of Energy Future Holdings Corp., a Texas corporation (the "Company"), and Energy Future Intermediate Holding Company LLC, a Delaware limited liability company ("EFIH"). Capitalized terms used but not defined herein shall have the meanings given to such terms in either: (i) the Purchase Agreement and Agreement and Plan of Merger, dated as of the date hereof (as amended or modified in accordance with the terms thereof, the "Merger Agreement"), by and among Ovation Acquisition I, L.L.C., a Delaware limited liability company ("Parent"), Ovation Acquisition II, L.L.C., a Delaware limited liability company ("OV2" and, together with Parent, the "Purchasers"), the Company and EFIH, (ii) that certain letter agreement, dated as of the date hereof, by and among the Company, EFIH, the Purchasers and each Guarantor (the "Equity Commitment Letter") providing for certain commitments by the Guarantors to invest in the Purchasers, as applicable, or (iii) that certain Backstop Agreement, dated as of the date hereof, by and among the Company, EFIH, Parent and certain Guarantors (the "Backstop Agreement") providing for, among other things, certain commitments by the Guarantors that are party thereto to backstop the Rights Offering.

1.      Guarantee.  To induce the Company and EFIH to enter into the Merger Agreement, each Guarantor, intending to be legally bound, hereby absolutely, irrevocably and unconditionally guarantees to the Company and EFIH, severally and not jointly, upon the terms and subject to the conditions set forth in this Guarantee, the due and punctual payment and discharge of its Pro Rata Share (as defined below) of the obligation of the Purchasers to pay all fees, costs and expenses  (including the payment of indemnities) payable by either Purchaser under the Merger Agreement or the Plan of Reorganization, not to exceed $35 million in the aggregate (the "Guaranteed Obligations"); *provided*, that in no event shall any Guarantor's several and not joint liability in respect of the Guaranteed Obligations exceed such Guarantor's Pro Rata Share of the Guaranteed Obligations as set forth opposite the name of such Guarantor on Annex 1 hereto, as such amount is adjusted to reflect any increase or decrease in the amount of any Guarantor's (i) Investment Commitment in accordance with Section 1, Section 3 or Section 4 of the Equity Commitment Letter and/or (ii) Backstop Commitment in accordance with Section 2.1, Section 2.2(i), Section 3.2(c), Section 3.3(a) or Section 3.5(a) of the Backstop Agreement (each such Guarantor's Pro Rata Share of the Guaranteed Obligations being referred to as the "Cap"). This Guarantee may not be enforced against any Guarantor without giving effect to the Cap (and to the provisions of Sections 6, 7 and 8 hereof).  This Guarantee may be enforced only for the payment of money by Guarantor up to the Cap.  All payments hereunder shall be made in lawful money of the United States, in immediately available funds. If any Purchaser fails to discharge any portion of the Guaranteed Obligations when due, each Guarantor's liability to the Company and EFIH hereunder in respect of its Pro Rata Share of the Guaranteed Obligations (up to the Cap) shall become immediately due and payable, and the Company and EFIH may at any time and from time to time, at the Company's and EFIH's option, and so long as any Purchaser has failed to discharge any portion of the Guaranteed Obligations, take any and all actions available hereunder or otherwise at law or in equity to

collect each Guarantor's Pro Rata Share of the Guaranteed Obligations (subject to the Cap). As used in this letter agreement, "Pro Rata Share" means, with respect to a Guarantor, the ratio of the aggregate Investment Commitment and, if applicable, Backstop Commitment of such Guarantor to the aggregate Investment Commitments and Backstop Commitments of all of the Guarantors, in each case as set forth on Annex 1 hereto, as such amount is adjusted to reflect any increase or decrease in the amount of any Guarantor's Investment Commitment in accordance with Section 1, Section 3 or Section 4 of the Equity Commitment Letter and/or Backstop Commitment in accordance with Section 2.1, Section 2.2(i), Section 3.2(c), Section 3.3(a) or Section 3.5(a) of the Backstop Agreement; *provided, however*, that whenever such term is used in a provision that refers to a Guarantor as a member of a group that represents a subset of all Guarantors, such ratio shall be calculated on the basis of the aggregate Investment Commitments and, if applicable, Backstop Commitments of all of the Guarantors who are members of such group (rather than all of the Guarantors).

In furtherance of the foregoing, each Guarantor acknowledges that this Guarantee is one of payment, not collection, and if any Purchaser fails to discharge any portion of the Guaranteed Obligations when due, the Company and EFIH may, in their sole discretion, bring and prosecute a separate action or actions against each Guarantor for the full amount of such Guarantor's Pro Rata Share of the Guaranteed Obligations (subject to the Cap), regardless of whether any such action is brought against any Purchaser or whether any Purchaser is joined in any such action or actions.

2.    Nature of Guarantee; Changes in Obligations; Certain Waivers.

(a)    Except as otherwise provided herein, the liability of each Guarantor in respect of the Guaranteed Obligations shall, to the fullest extent permitted under applicable Law, be absolute, irrevocable and unconditional irrespective of:

    i.    the value, genuineness, regularity, illegality or enforceability of the Merger Agreement, the Backstop Agreement, or any other Transaction Agreement, other than in the case of (A) fraud, (B) defenses to the payment of the Guaranteed Obligations that are available to the Purchasers under the Merger Agreement (including with respect to the value, genuineness, regularity, illegality or enforceability of the Merger Agreement), or (C) any attempt by the Company and/or EFIH or any Person acting on its behalf to seek to impose liability upon the Guarantors in violation of the provisions set forth in Section 6 or Section 7;

    ii.    any change in the corporate existence, structure or ownership of Parent or OV2, or any insolvency, bankruptcy, reorganization or other similar proceeding affecting Parent or OV2 or any of their respective assets;

    iii.    any waiver, amendment or modification of the Merger Agreement in accordance with its terms, or change in the time, manner, place or terms

- 2 -

of payment or performance, or any change or extension of the time of payment or performance of, renewal or alteration of, any Guaranteed Obligation, any liability incurred directly or indirectly in respect thereof, or any agreement entered into by the Company and/or EFIH, on the one hand, and Purchasers, on the other hand, in connection therewith (so long as any such changes do not have the effect of increasing the Cap or changing the several nature of this Guarantee);

iv.     the existence of any claim, set-off or other right that the Guarantor may have at any time against Parent, OV2, the Company or EFIH, whether in connection with any Guaranteed Obligation or otherwise;

v.     the failure or delay on the part of the Company and/or EFIH to assert any claim or demand or to enforce any right or remedy against Parent, OV2 or any other Guarantor;

vi.     the adequacy of any other means the Company and/or EFIH may have of obtaining payment related to the Guaranteed Obligations; or

vii.     any other act or omission that may or might in any manner or to any extent vary the risk of the Guarantor or otherwise operate as a discharge of the Guarantor as a matter of law or equity, other than payment of the Guaranteed Obligations or any claim, defense or other matter referred to in clauses (A) through (C) of Section 2(a)(i) and in Section 2(f).

(b)     Each Guarantor waives promptness, diligence, notice of the acceptance of this Guarantee and of the Guaranteed Obligations, presentment, demand for payment, notice of non-performance, default, dishonor and protest, notice of any Guaranteed Obligation incurred and all other notices of any kind (other than notices to Parent, with a copy to its counsel, with respect to the Guaranteed Obligations pursuant to the Merger Agreement), all defenses which may be available by virtue of any stay, moratorium or other similar Law now or hereafter in effect or any right to require the marshaling of assets of Parent, OV2 or any other Person now or hereafter liable with respect to the Guaranteed Obligations.

(c)     To the fullest extent permitted by applicable Law, each Guarantor hereby waives any and all notice of the creation, renewal, extension or accrual of any of the Guaranteed Obligations (subject to the Cap) and notice of or proof of reliance by the Company and/or EFIH in respect of this Guarantee. The Guaranteed Obligations shall conclusively be deemed to have been created, contracted or incurred in reliance upon this Guarantee, and all other arrangements between Parent, OV2 or the Guarantors, on the one hand, and the Company and/or EFIH, on the other, provided for in the Merger Agreement shall likewise be conclusively presumed to have been had or consummated in reliance upon this Guarantee. When pursuing its rights and remedies hereunder against any Guarantor, the Company and EFIH shall be under no obligation to pursue such rights and remedies it may have against Parent or OV2 or any other Person for the Guaranteed Obligations or any right of offset with respect thereto, and any failure by the

Company or EFIH to pursue such other rights or remedies, or to collect any payments from Parent or OV2 or any such other Person or to realize upon or to exercise any such right of offset, shall not relieve any Guarantor of any liability hereunder, and shall not impair the rights and remedies, whether express, implied or available as a matter of Law, of the Guarantors.

(d)    Neither the Company nor EFIH shall be obligated to file any claim relating to the Guaranteed Obligations if Parent or OV2 becomes subject to a bankruptcy, reorganization or similar proceeding, and the failure of the Company or EFIH to so file shall not affect the Guarantors' obligations hereunder (subject to the Cap).  If any payment made by a Guarantor to the Company and EFIH or in respect of the Guaranteed Obligations is rescinded or must otherwise be returned for any reason whatsoever, such Guarantor shall remain liable hereunder with respect to the Guaranteed Obligations as if such payment had not been made (subject to the Cap).

(e)    The Guarantors will not exercise any rights of subrogation or contribution against Parent or OV2, whether arising by contract or operation of Law (including, without limitation, any such right arising under bankruptcy or insolvency Laws) or otherwise, by reason of any payment by any of them pursuant to the provisions of this Guarantee unless and until the Guaranteed Obligations have been paid in full.

(f)    Notwithstanding anything to the contrary contained in this Guarantee or otherwise, the Company and EFIH each hereby agrees that each Guarantor shall have all defenses to the payment of its obligations under this Guarantee that would be available to Purchasers in respect of the Merger Agreement with respect to the Guaranteed Obligations.

(g)    Unless and until the Guaranteed Obligations have been paid in full, no Guarantor shall exercise against Parent, OV2 or any other Person now or hereafter liable with respect to the Guaranteed Obligations (including any other Guarantor) any rights of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of the Company or EFIH against Parent, OV2 or any other Person now or hereafter liable with respect to the Guaranteed Obligations (including any other Guarantor), whether arising by contract or operation of Law (including, without limitation, any such right arising under bankruptcy or insolvency Laws) or otherwise, including the right to take or receive from Parent, OV2 or any other Person now or hereafter liable with respect to the Guaranteed Obligations (including any other Guarantor), directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security on account of such claim, remedy or right, by reason of any payment by it pursuant to the provisions of Section 1 hereof. If any amount shall be paid to any Guarantor in violation of the immediately preceding sentence at any time prior to the payment in full in immediately available funds of all amounts payable under this Guarantee, such amount shall be received and held in trust for the benefit of the Company and EFIH, shall be segregated from other property and funds of such Guarantor and shall forthwith be promptly paid or delivered to the Company and EFIH in the same form as so received (with any necessary endorsement or assignment) to be credited and applied to all amounts payable by such Guarantor under this Guarantee.

3.      Representations and Warranties.

(a)      Each Guarantor hereby represents and warrants, severally as to itself only and not jointly, to the Purchasers, the other Guarantors, the Company and EFIH that (a) it has all requisite corporate, limited liability company or partnership (as the case may be) power and authority to execute, deliver and perform this Guarantee, (b) the execution, delivery and performance of this Guarantee by such Guarantor has been duly and validly authorized and approved by all necessary organizational action by it, (c) this Guarantee has been duly and validly executed and delivered by it and constitutes a legal, valid and binding obligation of such Guarantor, enforceable against such Guarantor in accordance with its terms, subject to (i) the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other similar laws affecting creditors' rights generally, and (ii) general equitable principles (whether considered in a proceeding in equity or at law) and (d) such Guarantor has the financial capacity to pay and perform its obligations under this Guarantee, and all funds necessary for such Guarantor to fulfill its obligations under this Guarantee shall be available to such Guarantor for so long as this Guarantee shall remain in effect in accordance with the provisions herein.

(b)      Each Purchaser hereby represents and warrants, severally as to itself only and not jointly, to the Guarantors, the Company and EFIH that (a) it has all requisite limited liability company power and authority to execute, deliver and perform this Guarantee, (b) the execution, delivery and performance of this Guarantee by such Purchaser has been duly and validly authorized and approved by all necessary organizational action by it and (c) this Guarantee has been duly and validly executed and delivered by it and constitutes a legal, valid and binding obligation of such Purchaser, enforceable against such Purchaser in accordance with its terms, subject to (i) the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other similar laws affecting creditors' rights generally, and (ii) general equitable principles (whether considered in a proceeding in equity or at law).

(c)      The Company and EFIH hereby jointly and severally represent and warrant to the Purchasers and the Guarantors that (a) each of the Company and EFIH has all requisite corporate or limited liability company (as the case may be) power and authority to execute, deliver and perform this Guarantee, (b) the execution, delivery and performance of this Guarantee by the Company and EFIH has been duly and validly authorized and approved by all necessary organizational action by each of the Company and EFIH (other than the requisite votes for approval of the Plan of Reorganization under the Bankruptcy Code) and (c) this Guarantee has been duly and validly executed and delivered by the Company and EFIH and, subject to the approval of the Bankruptcy Court, constitutes a legal, valid and binding obligation of the Company and EFIH, enforceable against each of the Company and EFIH in accordance with its terms, subject to (i) the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other similar laws affecting creditors' rights generally, and (ii) general equitable principles (whether considered in a proceeding in equity or at law).

4.    <u>No Assignment</u>.  The Company and EFIH may not assign, transfer or delegate their rights, interests or obligations under or in connection with this Guarantee, in whole or in part, to any other Person (except by operation of Law) without the prior written consent of each of the Guarantors, and any purported assignment, transfer or delegation without such consent shall be null and void.  No Guarantor may assign, transfer or delegate all or part of its rights, interests and obligations hereunder, without the prior written consent of the Company, EFIH and Parent, except to any other Person to which it may transfer all or a portion of its Investment Commitment in accordance with <u>Section 3</u> of the Equity Commitment Letter or its Backstop Commitment in accordance with <u>Section 3.5</u> of the Backstop Agreement without such consent, and subject to the execution of a joinder to this Guarantee in the form attached hereto as <u>Exhibit A</u> confirming its agreement to assume and be bound by the obligations of the applicable Guarantor; *provided,* that no such transfer will eliminate or modify in any manner the transferring Guarantor's obligations under this Guarantee (such that both the transferring Guarantor and the transferee of the Guarantee remain liable for the Guaranteed Obligations), unless otherwise consented to in writing by the Company, EFIH and Parent (in each case, such consent not to be unreasonably withheld, conditioned or delayed).  Notwithstanding the foregoing, following the Funding Date, the consent of the Company, EFIH and Parent shall not be required for a Guarantor to assign, transfer or delegate all or part of its rights, interests and obligations hereunder if such transferring Guarantor has fully funded its Investment Commitment in accordance with <u>Section 3</u> of the Equity Commitment Letter or its Backstop Commitment in accordance with <u>Section 3.5</u> of the Backstop Agreement and provides prior written notice of such transfer to each of the Company, EFIH and Parent; *provided,* that no such transfer will eliminate or modify in any manner the transferring Guarantor's obligations under this Guarantee (such that both the transferring Guarantor and the transferee of the Guarantee remain liable for the Guaranteed Obligations), unless otherwise consented to in writing by the Company, EFIH and Parent (in each case, such consent not to be unreasonably withheld, conditioned or delayed).  If a Guarantor transfers all or any portion of its rights, interests and obligations hereunder with the prior written consent of the Company, EFIH and Parent (such consent not to be unreasonably withheld, conditioned or delayed) in accordance with this <u>Section 4</u>, then upon such transfer, the transferring Guarantor shall have no further obligations hereunder in respect of such transferred rights, interests and obligations.  Following any assignment or transfer in accordance with this Guarantee, <u>Annex 1</u> hereto shall be revised and updated to reflect any changes in the identity of the Guarantors and their Pro Rata Shares and related Caps.

5.    <u>Notices</u>.  Any notice, request, instruction or other document to be given hereunder by any party to the others shall be in writing and delivered personally or sent by registered or certified mail, postage prepaid, by email or overnight courier:

<u>If to a Guarantor</u>:

To the notice information
set forth on such Guarantor's
signature page hereto.

with copies (which shall not constitute notice) to:

Baker Botts L.L.P.
2001 Ross Ave., Suite 600
Dallas, Texas 75201
Attention:      Geoffrey L. Newton
                Luckey McDowell
                Preston Bernhisel
Email:          geoffrey.newton@bakerbotts.com
                luckey.mcdowell@bakerbotts.com
                preston.bernhisel@bakerbotts.com

and

White & Case LLP
Wachovia Financial Center
200 South Biscayne Boulevard
Suite 4900
Miami, Florida 33131
Attention:      Thomas E. Lauria
Email: tlauria@whitecase.com

and

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036
Attention:      Gregory Pryor
Email: gpryor@whitecase.com

If to the Company and/or EFIH:

Energy Future Holdings Corp., et al.
Energy Plaza
1601 Bryan Street
Dallas, Texas 75201
Attention:      General Counsel
Email:          stacey.dore@energyfutureholdings.com; and
                awright@energyfutureholdings.com

with copies (which shall not constitute notice) to:

Kirkland & Ellis LLP
600 Travis St., Suite 3300

Houston, Texas 77002
Attention:      Andrew Calder
              Amber Meek
Email:         andrew.calder@kirkland.com
              amber.meek@kirkland.com

And

Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
Attention:      James Sprayregen
              Marc Kieselstein
              Chad Husnick
              Steven Serajeddini
Email:         jsprayregen@kirkland.com
              mkieselstein@kirkland.com
              chusnick@kirkland.com
              steven.serajedinni@kirkland.com

And

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attention:      Edward Sassower
              Stephen Hessler
              Brian Schartz
Email:         edward.sassower@kirkland.com
              stephen.hessler@kirkland.com
              bschartz@kirkland.com

     6.     <u>Termination</u>.  This Guarantee shall terminate in its entirety and each Guarantor shall have no further obligations or liabilities under or in connection with this Guarantee upon the earliest to occur of: (a) the First Closing, if the First Closing occurs, (b) the date which is forty-five (45) Business Days following the termination of the Merger Agreement if, on such date, neither the Company nor EFIH shall have made any valid claim for payment hereunder and (c) the date on which payment of the Guaranteed Obligations has been fully resolved pursuant to an agreement in writing executed by the Company and EFIH or indefeasibly paid in full if the Company or EFIH shall have made a valid claim for payment under this Guarantee within the time period specified in clause (b).

     7.     <u>No Recourse</u>.  Notwithstanding anything to the contrary contained in this Guarantee, each of the Company and EFIH, by its acceptance of the benefits of this Guarantee,

hereby covenants, acknowledges and agrees, that no Person other than the Guarantors and their permitted assignees shall have any obligation under this Guarantee, and that, notwithstanding that the Guarantors (or any of their permitted assignees) may be a partnership or limited liability company, no recourse or right of recovery (whether at law, in equity, in contract, in tort or otherwise) under this Guarantee, shall be had against any Related Party of the Guarantors based upon the relationship of such Related Party to any Guarantors or, whether by or through attempted piercing of the corporate (or limited liability company or limited liability partnership) veil, or by invoking any alter ego theory, by or through any claim against or on behalf of the Purchasers, whether by the enforcement of any assessment or by or through any legal or equitable proceeding, or by virtue of any applicable Law, or otherwise, it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on or otherwise be incurred by any such Related Party, as such, for any obligations of the Guarantors under this Guarantee, or for any claim based on, in respect of, or by reason of such obligation.  Notwithstanding the foregoing or anything else in this Guarantee to the contrary, nothing in this Guarantee shall limit the obligations of any Related Party of the Guarantors, any Purchaser or any other Person under any other Transaction Agreement to which it is a party for the benefit of the other parties thereto in accordance with the terms and subject to the limitations set forth therein and nothing in this Section 7 shall limit the obligations of any Guarantor under this Guarantee (including any Guarantor that is a Related Party of another Guarantor, but only in its capacity as a Guarantor).  "Related Party" means, with respect to any Person, (i) any former, current or future equity holder, controlling person, director, officer, employee, agent, advisor, representative, Affiliate, member, manager, general or limited partner of such Person and (ii) any former, current or future equity holder, controlling person, director, officer, employee, agent, advisor, representative, Affiliate, member, manager, general or limited partner of the foregoing; *provided*, that for the avoidance of doubt the Purchasers shall not be considered Related Parties of any Guarantor.

8.    Remedies.  The Company and EFIH agree that (A) none of the Guarantors are a party to the Merger Agreement, and nothing herein shall cause any of the Guarantors to become, or be deemed to have become, party to the Merger Agreement, and (B) the Company and EFIH shall in no event seek to recover any amount pursuant to this Guarantee from any Guarantor under this Guarantee in excess of the amount expressly payable by such Guarantor under this Guarantee.

9.    Governing Law; Jurisdiction.

(a)    THIS GUARANTEE, TOGETHER WITH ANY CLAIM, DISPUTE, REMEDY OR LEGAL PROCEEDING ARISING FROM OR RELATING TO THIS GUARANTEE OR THE TRANSACTIONS CONTEMPLATED HEREBY OR ANY RELIEF OR REMEDIES SOUGHT BY ANY PARTY HERETO, AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER, SHALL BE CONSTRUED, PERFORMED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT GIVING EFFECT TO ITS PRINCIPLES OR RULES OF CONFLICT OF LAWS TO THE EXTENT SUCH PRINCIPLES OR RULES WOULD

REQUIRE OR PERMIT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.  Each of the parties hereto (i) submits to the exclusive jurisdiction of the Bankruptcy Court (or, if the Bankruptcy Court declines to accept jurisdiction over a particular matter, then the Chancery Court of the State of Delaware, and if the Chancery Court of the State of Delaware declines jurisdiction, then any state or federal court sitting in Delaware) in any action or proceeding arising out of or relating to this Guarantee, (ii) agrees that all claims in respect of such action or proceeding may be heard and determined in any such court and (iii) agrees not to bring any action or proceeding arising out of or relating to this Guarantee (whether on the basis of a claim sounding in contract, equity, tort or otherwise) in any other court.  Each of the parties hereto agrees that a final judgment (subject to any appeals therefrom) in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.  Each of the parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Guarantee or the transactions contemplated hereby in the Bankruptcy Court or any Delaware or federal court in accordance with the provisions of this Section 9. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.  Each of the parties hereto hereby irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 5. Nothing in this Guarantee will affect the right of any party to this Guarantee to serve process in any other manner permitted by Law.

(b) EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS GUARANTEE IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS GUARANTEE, OR THE TRANSACTIONS CONTEMPLATED BY THIS GUARANTEE. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (W) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (X) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (Y) EACH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (Z) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS GUARANTEE BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.

10.    Counterparts.  This Guarantee may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement.  Execution copies of this Guarantee may be delivered by facsimile, electronic mail or otherwise, each of which shall be deemed to be an original for the purposes of this paragraph.

11.     <u>Third Party Beneficiaries</u>.  Subject to <u>Section 7</u>, this Guarantee is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any Person other than the parties hereto; except that as a material aspect of this Guarantee, the parties intend that all Related Parties shall be, and such Related Parties are, intended third party beneficiaries of this Guarantee who may rely on and enforce the provisions of this Guarantee that bar the liability, or otherwise protect the interests, of such Related Parties.

12.     <u>Confidentiality</u>.  This Guarantee shall be treated by the parties hereto as strictly confidential and is being provided to the parties hereto solely in connection with the Merger Agreement and the transactions contemplated thereby.  This Guarantee may not be used, circulated, quoted or otherwise referred to in any document (other than the Merger Agreement), except with the written consent of each of the parties hereto; *provided*, that the parties hereto may disclose such information to the extent necessary to comply with and prevent violation of applicable Law, the applicable rules of any national securities exchange or in connection with any U.S. Securities and Exchange Commission filings relating to the transactions contemplated by the Merger Agreement.  Notwithstanding the foregoing, this Guarantee may be provided by the parties hereto to their respective Affiliates, partners, directors, officers, employees, investors or potential investors, agents and legal, financial, accounting or other advisors or representatives who have been directed to treat this Guarantee as confidential, with the understanding that such Affiliates, partners, directors, officers, employees, investors or potential investors, agents, advisors and representatives shall be informed of the confidential nature of this Guarantee and their need to so treat this Guarantee as confidential, and each party shall be liable for any breach by such Affiliates, agents, advisors and representatives of the provisions of this Section 12.

13.     <u>Specific Performance</u>.   The parties hereto acknowledge and agree that irreparable damage would occur in the event that any provision of this Guarantee is not performed by a party hereto in accordance with its specific terms or is otherwise breached by a party hereto and the parties would not have an adequate remedy at law in the form of money damages.  Accordingly, the parties acknowledge and agree that the parties hereto shall be entitled, prior to the termination of this Guarantee in accordance with its terms, to enforce specifically the terms and provisions, and subject to the conditions and limitations (including the Cap), of this Guarantee and to obtain an injunction, injunctions or any form of equitable relief to prevent breaches of this Guarantee, in addition to any other remedy to enforce this Guarantee to which they are entitled at Law or in equity.  In addition, each Guarantor hereby covenants and agrees that it shall not directly or indirectly institute any proceeding asserting or assert as a defense in any proceeding, and shall cause its respective Affiliates not to directly or indirectly institute any proceeding asserting or assert as a defense in any proceeding, (i) that (x) the Company has an adequate remedy at law or (y) an award of specific performance is not an appropriate remedy for any reason at law or equity or (ii) the illegality, invalidity or unenforceability in accordance with its terms of this Guarantee.  Each Guarantor agrees to pay on demand all reasonable out-of-pocket expenses (including reasonable fees of counsel)

incurred by the Company in connection with the enforcement of its rights hereunder if the Company prevails in such litigation or proceeding.

14.    <u>Miscellaneous</u>.

(a)    This Guarantee, together with the provisions of and definitions contained in the Merger Agreement and the other Transaction Agreements, constitutes the entire understanding among the parties hereto with respect to the subject matter hereof and replaces and supersedes all prior agreements and understandings, both written and oral, among the parties hereto with respect to the subject matter hereof.

(b)    No single or partial exercise by the Company of any right, remedy or power hereunder shall preclude any other or future exercise of any right, remedy or power hereunder. Each and every right, remedy and power hereby granted to the Company or allowed it by Law or other agreement shall be cumulative and not exclusive of any other, and may be exercised by the Company at any time or from time to time.

(c)    This Guarantee may not be amended or waived except in a writing signed by each of the parties hereto.

(d)    The provisions of this Guarantee shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.  If any provision of this Guarantee, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (i) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (ii) the remainder of this Guarantee and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction. Notwithstanding the foregoing, this Guarantee may not be enforced without giving effect to the limitation of the amount payable by each Guarantor hereunder to the Cap and to the provisions of <u>Sections 6</u>, <u>7</u> or <u>8</u> hereof.  Each party hereto covenants and agrees that it shall not assert, and shall cause its respective Affiliates and representatives not to assert, that this Guarantee or any provisions hereof (including any limitations on any Guarantor's liability herein) are invalid, illegal or unenforceable.

(e)    The descriptive headings herein are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Guarantee.

(f)    All parties acknowledge that each party and its counsel have reviewed this Guarantee and that any rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Guarantee.

(g)    Notwithstanding anything contained herein, each party acknowledged that its decision to enter into this Guarantee has been made by such party independent of any other party.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, each of the Guarantors and the Guarantee parties have caused this Guarantee to be executed and delivered as of the date first written above by its officer or representative thereunto duly authorized.

**ENERGY FUTURE HOLDINGS CORP.**

By: _____
Name: Anthony Horton
Title:  Senior Vice President & Treasurer

**ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC**

By: _____
Name: Anthony Horton
Title: Senior Vice President & Treasurer

*[Signature Page to the Guarantee]*

**HUNT POWER HOLDINGS, L.L.C.**

By: _____

Name: Hunter L. Hunt
Title:   President

Hunt Power Holdings, L.L.C.
1900 N. Akard Street
Dallas, Texas 75201
Attention: David Hernandez
Email: DHernandez@huntconsolidated.com

*[Signature Page to Guarantee]*

**ATLAS MASTER FUND, LTD.**

By: _____
Name:
Title:    **Adam Finger**
          Authorized Signatory


Atlas Master Fund, Ltd.
c/o Balyasny Asset Management
181 West Madison Street
Chicago, IL 60602
Attention: Taylor O'Malley & Scott Schroeder
Email:    Tomalley@bamfunds.com; Sschroeder@bamfunds.com

*[Signature Page to Guarantee]*

**ATLAS ENHANCED MASTER FUND, LTD.**

By: _____
Name:    **Adam Finger**
Title:    **Authorized Signatory**


Atlas Enhanced Master Fund, Ltd.
c/o Balyasny Asset Management
181 West Madison Street
Chicago, IL 60602
Attention: Taylor O'Malley & Scott Schroeder
Email:    Tomalley@bamfunds.com; Sschroeder@bamfunds.com

*[Signature Page to Guarantee]*

**BAM ZIE MASTER FUND, LTD.**

By: _____

Name:

Title:   **Adam Finger**
     Authorized Signator


BAM Zie Master Fund, Ltd.
c/o Balyasny Asset Management
181 West Madison Street
Chicago, IL 60602
Attention: Taylor O'Malley & Scott Schroeder
Email:    Tomalley@bamfunds.com; Sschroeder@bamfunds.com

*[Signature Page to Guarantee]*

**BHR CAPITAL LLC as nominee for:**
**BHCO Master, Ltd.**
**BHR Master Fund, Ltd.**
**BHR OC Master Fund, Ltd., which funds shall be jointly**
**and severally liable for their obligations hereunder**

By: _____
Name:  William Brown
Title:  Partner, President & COO

BHR Capital LLC
545 Madison Avenue
10th Floor
New York, NY 10022
Attention: Michael N. Thompson
           William J. Brown
           Stephen Harris
Email:     Mthompson@bhrcap.com
           Wbrown@bhrcap.com
           Sharris@bhrcap.com

**CENTERBRIDGE CREDIT PARTNERS, L.P.**

By: _____
Name:        Susanne V. Clark
Title:        Authorized Signatory


Centerbridge Credit Partners, L.P.
375 Park Avenue
12th Floor
New York, NY 10152
Attention: The Office of the General Counsel
Email:      legalnotices@centerbridge.com

*[Signature Page to Guarantee]*

**CENTERBRIDGE CREDIT PARTNERS MASTER, L.P.**

By: _____
Name:        Susanne V. Clark
Title:        **Authorized Signatory**


Centerbridge Credit Partners Master, L.P.
375 Park Avenue
12th Floor
New York, NY 10152
Attention: The Office of the General Counsel
Email:        legalnotices@centerbridge.com

*[Signature Page to Guarantee]*

**CENTERBRIDGE SPECIAL CREDIT PARTNERS II, L.P.**

By: _Susanne V. Clark_____
Name:
Title:        Susanne V. Clark
            Authorized Signatory

Centerbridge Special Credit Partners II, L.P.
375 Park Avenue
12th Floor
New York, NY 10152
Attention: The Office of the General Counsel
Email:        legalnotices@centerbridge.com

[*Signature Page to Guarantee*]

**CYRUS OPPORTUNITIES MASTER FUND II, LTD.**

By: Cyrus Capital Partners, L.P.,
    its Investment Manager

By: _____
Name: Thomas Stamatelos
Title:   Authorized Signatory


Cyrus Opportunities Master Fund II, Ltd.
c/o Cyrus Capital Partners, L.P.
399 Park Avenue
39th Floor
New York, NY 10022
Attention: Sumaer Grewal
Email:        sgrewal@cyruscapital.com


With copies to:


Cyrus Capital Operations Department
Email:        ops@cyruscapital.com


*[Signature Page to Guarantee]*

**CYRUS SELECT OPPORTUNITIES MASTER FUND, LTD.**

By: Cyrus Capital Partners, L.P.,
   its Investment Manager

By: _____
Name: Thomas Stamatelos
Title:   Authorized Signatory




Cyrus Select Opportunities Master Fund, Ltd.
c/o Cyrus Capital Partners, L.P.
399 Park Avenue
39th Floor
New York, NY 10022
Attention: Sumaer Grewal
Email:      sgrewal@cyruscapital.com


With copies to:


Cyrus Capital Operations Department
Email:      ops@cyruscapital.com


*[Signature Page to Guarantee]*

**CRS MASTER FUND, L.P.**

By: Cyrus Capital Partners, L.P.,
    its Investment Manager

By: _____
Name: Thomas Stamatelos
Title:   Authorized Signatory




CRS Master Fund, L.P.
c/o Cyrus Capital Partners, L.P.
399 Park Avenue
39th Floor
New York, NY 10022
Attention: Sumaer Grewal
Email:     sgrewal@cyruscapital.com


With copies to:


Cyrus Capital Operations Department
Email:     ops@cyruscapital.com

*[Signature Page to Guarantee]*

**CRESCENT 1, L.P.**

By: Cyrus Capital Partners, L.P.,
    its Investment Manager

By: _____
Name: Thomas Stamatelos
Title:　Authorized Signatory




Crescent 1, L.P.
c/o Cyrus Capital Partners, L.P.
399 Park Avenue
39th Floor
New York, NY 10022
Attention: Sumaer Grewal
Email:　　sgrewal@cyruscapital.com


With copies to:


Cyrus Capital Operations Department
Email:　　ops@cyruscapital.com


*[Signature Page to Guarantee]*

**DEUTSCHE BANK SECURITIES INC.,**
**solely with respect to the Distressed Products Group**

By:

Name: Mike Curreri
Title:

By:

Name: Shawn Faurot
Title:

Deutsche Bank Securities Inc.
60 Wall Street
3rd Floor
New York, NY 10005
Attention: Mike Curreri & Shawn Faurot
Email:     Mikel.curreri@db.com; Shawn.faurot@db.com

*[Signature Page to Guarantee]*

GSO CHURCHILL PARTNERS LP,
GSO COASTLINE CREDIT PARTNERS LP,
GSO CREDIT-A PARTNERS LP,
GSO CREDIT ALPHA FUND LP,
GSO PALMETTO OPPORTUNISTIC INVESTMENT PARTNERS LP, and
STEAMBOAT CREDIT OPPORTUNITIES MASTER FUND LP

By: GSO Capital Partners LP, its Investment Manager

By:_____
Name: Marisa Beeney
Title:  Authorized Person

345 Park Avenue
31st Floor
New York, NY 10154
Attention: Patrick Fleury
          Marisa Beeney
Email:    Patrick.Fleury@gsocap.com
          Marisa.Beeney@gsocap.com

*[Signature Page to Guarantee]*

GSO SPECIAL SITUATIONS MASTER FUND LP

By: GSO Capital Partners LP, its Investment Advisor

By:_____
Name: Marisa Beeney
Title:  Authorized Person


345 Park Avenue
31st Floor
New York, NY 10154
Attention: Patrick Fleury
            Marisa Beeney
Email:    Patrick.Fleury@gsocap.com
          Marisa.Beeney@gsocap.com

GSO AIGUILLE DES GRANDS MONTETS FUND I LP,
GSO AIGUILLE DES GRANDS MONTETS FUND II LP and
GSO AIGUILLE DES GRANDS MONTETS FUND III LP

By: GSO Capital Partners LP, its attorney-in-fact

By:_____
Name: Marisa Beeney
Title:  Authorized Person


345 Park Avenue
31st Floor
New York, NY 10154
Attention: Patrick Fleury
        Marisa Beeney
Email:    Patrick.Fleury@gsocap.com
        Marisa.Beeney@gsocap.com

*[Signature Page to Guarantee]*

GSO CACTUS CREDIT OPPORTUNITIES FUND LP

By: GSO Cactus Credit Opportunities Associates LLC,
its general partner

By:_____
Name: Marisa Beeney
Title:  Authorized Person


345 Park Avenue
31st Floor
New York, NY 10154
Attention: Patrick Fleury
            Marisa Beeney
Email:     Patrick.Fleury@gsocap.com
            Marisa.Beeney@gsocap.com

*[Signature Page to Guarantee]*

**ANCHORAGE CAPITAL MASTER OFFSHORE, LTD.**

By: Anchorage Capital Group, L.L.C.,
      its Investment Manager

By: _____
Name:        **Daniel Allen**
Title:     **Senior Portfolio Manager**

Anchorage Capital Master Offshore, Ltd.
c/o Anchorage Capital Group, L.L.C.
610 Broadway, 6th Floor
New York, NY 10012
Attn: General Counsel
Fax: +1-212-432-4651
Email: legal@anchoragecap.com

*[Signature Page to Guarantee]*

**PCI FUND LLC**

By: Anchorage Capital Group, L.L.C.,
    its Investment Manager

By: _____
Name:
Title:      Daniel Allen
      Senior Portfolio Manager

PCI Fund LLC
c/o Anchorage Capital Group, L.L.C.
610 Broadway, 6th Floor
New York, NY 10012
Attn: General Counsel
Fax: +1-212-432-4651
Email: legal@anchoragecap.com

**TACONIC OPPORTUNITY MASTER FUND L.P.**

By: Taconic Capital Advisors L.P.,
    its Investment Manager

By: _____
Name: Marc Schwartz
Title: Principal

Taconic Opportunity Master Fund L.P.
280 Park Avenue
5th Floor
New York, NY 10017
Attention: Marc Schwartz
Email:    maschwartz@taconiccap.com

*[Signature Page to Guarantee]*

**TACONIC MASTER FUND 1.5 L.P.**

By: Taconic Capital Advisors L.P.,
    its Investment Manager

By: _____
Name: Marc Schwartz
Title: Principal

Taconic Master Fund 1.5 L.P.
280 Park Avenue
5th Floor
New York, NY 10017
Attention: Marc Schwartz
Email:     maschwartz@taconiccap.com

*[Signature Page to Guarantee]*

**ARROWGRASS MASTER FUND LTD.**

By:
Name:   Sean Flynn
Title:   Director


Arrowgrass Master Fund Ltd.
c/o Arrowgrass Capital Partners (US) LP
1330 Avenue of the Americas
32nd Floor
New York, NY 10019
Attention: Josh Hertz & David Dunn
Email:      Joshua.hertz@arrowgrass.com; David.dunn@arrowgrass.com


and


Arrowgrass Capital Partners LLP
3rd Floor
10 Portman Square
London, England
W1H 6AZ
Attention: General Counsel
Email:      legal@arrowgrass.com


*[Signature Page to Guarantee]*

**ARROWGRASS DISTRESSED OPPORTUNITIES FUND LIMITED**

By:

Name:

Title:   Director

Arrowgrass Distressed Opportunities Fund Limited
c/o Arrowgrass Capital Partners (US) LP
1330 Avenue of the Americas
32nd Floor
New York, NY 10019
Attention: Josh Hertz & David Dunn
Email:      Joshua.hertz@arrowgrass.com; David.dunn@arrowgrass.com


and


Arrowgrass Capital Partners LLP
3rd Floor
10 Portman Square
London, England
W1H 6AZ
Attention: General Counsel
Email:      legal@arrowgrass.com

[*Signature Page to Guarantee*]

**BLACKROCK CORE BOND TRUST**

By: BlackRock Financial Management, Inc.,
    its Sub-Advisor

By: _____
Name:   AnnMarie Smith
Title:   Authorized Signatory

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:     David.trucano@blackrock.com

*[Signature Page to Guarantee]*

**BLACKROCK MULTI-SECTOR INCOME TRUST**

By: BlackRock Advisors, LLC,
    its Investment Advisor

By: _____
Name:
Title: AnnMarie Smith
       Authorized Signatory

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:      David.trucano@blackrock.com

*[Signature Page to Guarantee]*

**BLACKROCK DIVERSIFIED DISTRIBUTION FUND**

By: BlackRock Financial Management, Inc.
      its Sub-Advisor

By: _____
Name:      AnnMarie Smith
Title:      Authorized Signatory



BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:      David.trucano@blackrock.com

*[Signature Page to Guarantee]*

**BLACKROCK LIMITED DURATION INCOME TRUST**

By: BlackRock Financial Management, Inc.,
     its Sub-Advisor

By:
Name:
Title:
        AnnMarie Smith
        Authorized Signatory


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:     David.trucano@blackrock.com

*[Signature Page to Guarantee]*

**BLACKROCK FUNDS II, BLACKROCK HIGH YIELD
BOND PORTFOLIO**

By: BlackRock Financial Management, Inc.,
    its Sub-Advisor

By:
Name:
Title:
    AnnMarie Smith
    Authorized Signatory

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:    David.trucano@blackrock.com

*[Signature Page to Guarantee]*

**BLACKROCK SECURED CREDIT PORTFOLIO OF
BLACKROCK FUNDS II**

By: BlackRock Financial Management, Inc.,
    its Sub-Advisor

By: _____
Name:
Title:

          AnnMarie Smith
          **Authorized Signatory**

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:     David.trucano@blackrock.com

*[Signature Page to Guarantee]*

**BLACKROCK CREDIT ALLOCATION INCOME
TRUST IV**

By: BlackRock Financial Management, Inc.,
    its Sub-Advisor

By: _____
Name:
Title:

      **AnnMarie Smith**
      **Authorized Signatory**

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:     David.trucano@blackrock.com

*[Signature Page to Guarantee]*

**BLACKROCK HIGH YIELD PORTFOLIO OF THE
BLACKROCK SERIES FUND, INC.**

By: BlackRock Financial Management, Inc.,
    its Sub-Advisor

By: _____
Name:
Title(    AnnMarie **Smith**
       **Authorized Signatory**

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:    David.trucano@blackrock.com

*[Signature Page to Guarantee]*

**BLACKROCK HIGH YIELD V.I. FUND OF
BLACKROCK VARIABLE SERIES FUNDS, INC.**

By: BlackRock Financial Management, Inc.,
    its Sub-Advisor

By:
Name:
Title:
      AnnMarie Smith
      Authorized Signatory


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:      David.trucano@blackrock.com

*[Signature Page to Guarantee]*

**BGF GLOBAL HIGH YIELD BOND FUND**

By: BlackRock Financial Management, Inc.,
    its Sub-Advisor

By:
Name:    AnnMarie Smith
Title:    Authorized Signatory


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:    David.trucano@blackrock.com

*[Signature Page to Guarantee]*

**BLACKROCK GLOBAL INVESTMENT SERIES:**
**INCOME STRATEGIES PORTFOLIO**

By: BlackRock Financial Management, Inc.,
   its Sub-Advisor

By: _____
Name:    **AnnMarie Smith**
Title:    **Authorized Signatory**

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:    David.trucano@blackrock.com

*[Signature Page to Guarantee]*

**BLACKROCK CORPORATE HIGH YIELD FUND, INC.**

By: BlackRock Advisors, LLC,
    its Investment Advisor

By: _____
Name:   AnnMarie Smith
Title:   Authorized Signatory


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:     David.trucano@blackrock.com

[*Signature Page to Guarantee*]

**MET INVESTORS SERIES TRUST - BLACKROCK
HIGH YIELD PORTFOLIO**

By: BlackRock Financial Management, Inc.,
    its Investment Advisor

By:    _____
Name:
Title:    AnnMarie Smith
       Authorized Signatory


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:    David.trucano@blackrock.com

*[Signature Page to Guarantee]*

**BGF US DOLLAR HIGH YIELD BOND FUND**

By: BlackRock Financial Management, Inc.,
    its Sub-Advisor

By: _____
Name:
Title:
      **AnnMarie Smith**
      **Authorized Signatory**


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:     David.trucano@blackrock.com

[*Signature Page to Guarantee*]

**THE OBSIDIAN MASTER FUND**

By: BlackRock Financial Management, Inc.,
    its Investment Advisor

By: _____
Name:
Title:

       AnnMarie **Smith**
     **Authorized Signatory**

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:    David.trucano@blackrock.com

*[Signature Page to Guarantee]*

**CA 534 OFFSHORE FUND, LTD**

By: BlackRock Financial Management, Inc.,
   its Investment Advisor

By: _____
Name:    AnnMarie Smith
Title:    Authorized Signatory


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:    David.trucano@blackrock.com

*[Signature Page to Guarantee]*

**BLACKROCK CREDIT ALPHA MASTER FUND L.P.**

By: BlackRock Financial Management, Inc.,
    its Investment Advisor

By: _____
Name:
Title: AnnMarie Smith
     Authorized Signatory


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:     David.trucano@blackrock.com

*[Signature Page to Guarantee]*

**JNL/BLACKROCK GLOBAL LONG SHORT CREDIT FUND**

By: BlackRock Financial Management, Inc.,
    its Sub-Advisor

By: _____
Name:
Title:    AnnMarie Smith
       Authorized Signatory


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:    David.trucano@blackrock.com

**BLACKROCK GLOBAL LONG/SHORT CREDIT FUND
OF BLACKROCK FUNDS**

By: BlackRock Financial Management, Inc.,
    its Sub-Advisor

By: _____
Name:
Title:

AnnMarie Smith
Authorized Signatory


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:      David.trucano@blackrock.com

*[Signature Page to Guarantee]*

**BLACKROCK MULTI-STRATEGY MASTER FUND LIMITED**

By: BlackRock Institutional Trust Company, N.A.,
    its Investment Manager

By: _____
Name:
Title:             arie Smith
             Authorized Signatory

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:     David.trucano@blackrock.com

**ARCH REINSURANCE LTD.**

By: BlackRock Financial Management, Inc.,
    its Investment Advisor

By: _____
Name:
Title:


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:      David.trucano@blackrock.com

*[Signature Page to Guarantee]*

**BLACKROCK FUNDS II, BLACKROCK STRATEGIC
INCOME OPPORTUNITIES PORTFOLIO**

By: BlackRock Financial Management, Inc.,
    its Registered Sub-Advisor

By: _____
Name:
Title:

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:    David.trucano@blackrock.com

*[Signature Page to Guarantee]*

**STRATEGIC INCOME OPPORTUNITIES BOND FUND**

By: BlackRock Institutional Trust Company, N.A.,
    not in its individual capacity but as Trustee of the Strategic
    Opportunities Bond Fund

By:
Name:
Title:

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:    David.trucano@blackrock.com

*[Signature Page to Guarantee]*

**BLACKROCK DYNAMIC HIGH INCOME PORTFOLIO OF BLACKROCK FUNDS II**

By: BlackRock Advisors, LLC,
    its Investment Advisor

By: _____
Name: ALEX SHINGLER
Title: MANAGING DIRECTOR



BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:    David.trucano@blackrock.com

[*Signature Page to Guarantee*]

**BLACKROCK MULTI-ASSET INCOME PORTFOLIO OF BLACKROCK FUNDS II**

By: BlackRock Advisors, LLC,
   its Investment Advisor

By: _____

Name: ALEX SHINGLER

Title: MANAGING DIRECTOR

BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:      David.trucano@blackrock.com

[*Signature Page to Guarantee*]

**BGF GLOBAL MULTI-ASSET INCOME FUND, A SUB-FUND OF BLACKROCK GLOBAL FUNDS**

By: BlackRock Financial Management, Inc.,
    its Advisor

By: _____
Name: ALEX SHINGLER
Title: MANAGING DIRECTOR


BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attention: David Trucano
Email:     David.trucano@blackrock.com

**AVENUE CAPITAL MANAGEMENT II, L.P.**
*on behalf of certain funds it advises*

By:  Avenue Capital Management II GenPar, LLC,
     its General Partner

By:  _____
Name: Sonia Gardner
Title:  Managing Member

Avenue Capital Management II, L.P.
399 Park Avenue, 6th Floor
New York, NY 10022
Attention:  Sonia Gardner
            Todd Greenbarg
Email:      sgardner@avenuecapital.com
            tgreenbarg@avenuecapital.com

[*Signature Page to Guarantee*]

**AVENUE CAPITAL MANAGEMENT II, L.P.**
*on behalf of certain funds it advises*

By: Avenue Capital Management II GenPar, LLC,
      its General Partner

By: _____
Name: Sonia Gardner
Title:   Managing Member


Avenue Capital Management II, L.P.
399 Park Avenue, 6th Floor
New York, NY 10022
Attention:  Sonia Gardner
                  Todd Greenbarg
Email:        sgardner@avenuecapital.com
                  tgreenbarg@avenuecapital.com

*[Signature Page to Backstop Agreement]*

**PECOS PARTNERS, L.P.**

By:  Pecos Strategic Partners, LLC,
        its General Partner

By:  GL Pecos Strategic Partners, LLC,
        its sole member

By:  _____
Name: Sonia Gardner
Title:  Member


Pecos Partners, L.P.
399 Park Avenue, 6th Floor
New York, NY 10022
Attention:  Sonia Gardner
                Todd Greenbarg
Email:        sgardner@avenuecapital.com
                tgreenbarg@avenuecapital.com

[*Signature Page to Guarantee*]

**FLOURISH INVESTMENT CORPORATION**

By: _____
Name: Keping Li
Title:   President and Executive Director


Flourish Investment Corporation
c/o China Investment Corporation
25/F New Poly Plaza, No.1 Chaoyangmen Beidajie Dongcheng District, Beijing, China. 100010
Attention: Yuan Tian
            Haipeng Liang
            Jia Chen
            Jie Yuan
Email:    tianyuan@china-inv.cn
            lianghp@china-inv.cn
            chenjia@china-inv.cn
            yuanjie@china-inv.cn

*[Signature Page to Guarantee]*

# Annex 1

# Pro Rata Share

| Guarantor | Pro Rata Share |
|---|---|
| Anchorage Capital Master Offshore, Ltd. | 28.00% |
| PCI Fund LLC | 0.17% |
| **Anchorage Total** | **28.17%** |
| | |
| Arrowgrass Master Fund LTD | 5.03% |
| Arrowgrass Distressed Opportunities Fund Limited | 0.52% |
| **Arrowgrass Total** | **5.55%** |
| | |
| Avenue Capital Management II, L.P. | 7.04% |
| **Avenue Total** | **7.04%** |
| | |
| Arch Reinsurance Ltd. | 0.03% |
| BlackRock Credit Alpha Master Fund L.P. | 0.40% |
| BlackRock Core Bond Trust | 0.03% |
| BlackRock Multi-Sector Income Trust | 0.04% |
| BlackRock Diversified Distribution Fund | 0.16% |
| BlackRock Limited Duration Income Trust | 0.08% |
| BlackRock Dynamic High Income Portfolio of BlackRock Funds II | 0.01% |
| BlackRock Global Long/Short Credit Fund Of BlackRock Funds | 0.78% |
| BlackRock Funds II, BlackRock High Yield Bond Portfolio | 7.65% |
| BlackRock Multi-Asset Income Portfolio of BlackRock Funds II | 0.64% |
| BlackRock Secured Credit Portfolio of BlackRock Funds II | 0.05% |
| BlackRock Funds II, BlackRock Strategic Income Opportunities Portfolio | 1.35% |
| Strategic Income Opportunities Bond Fund | 0.02% |
| BlackRock Credit Allocation Income Trust IV | 0.23% |
| BlackRock High Yield Portfolio of the BlackRock Series Fund, Inc. | 0.02% |
| BlackRock High Yield V.I. Fund of BlackRock Variable Series Funds, Inc. | 0.09% |
| CA 534 Offshore Fund, Ltd | 0.14% |
| BGF Global High Yield Bond Fund | 1.04% |
| BlackRock Global Investment Series: Income Strategies Portfolio | 0.08% |
| BGF Global Multi-Asset Income Fund, a sub-fund of BlackRock Global Funds | 0.19% |
| BlackRock Corporate High Yield Fund, Inc. | 0.95% |
| BlackRock Multi-Strategy Master Fund Limited | 0.08% |
| MET Investors Series Trust - BlackRock High Yield Portfolio | 0.32% |
| The Obsidian Master Fund | 0.53% |
| JNL/BlackRock Global Long Short Credit Fund | 0.06% |
| BGF US Dollar High Yield Bond Fund | 2.26% |
| **BlackRock Total** | **17.24%** |
| | |
| Atlas Enhanced Master Fund, Ltd | 1.94% |
| Atlas Master Fund, Ltd. | 1.80% |
| BAM Zie Master Fund, Ltd. | 1.00% |
| **Balyasny Total** | **4.75%** |
| | |
| BHR Capital LLC, as nominee for BHCO Master, Ltd., BHR Master Fund, Ltd. and BHR OC Master Fund, Ltd. | 1.99% |
| **BHR Total** | **1.99%** |
| | |
| Centerbridge Special Credit Partners II, LP | 1.43% |
| Centerbridge Credit Partners Master, L.P. | 2.71% |
| Centerbridge Credit Partners LP | 1.44% |
| **Centerbridge Total** | **5.58%** |
| | |
| Cyrus Opportunities Master Fund II, Ltd. | 2.00% |
| CRS Master Fund, L.P. | 0.55% |
| Crescent 1, L.P. | 0.62% |
| Cyrus Select Opportunities Master Fund, Ltd. | 0.21% |
| **Cyrus Total** | **3.38%** |
| | |
| Deutsche Bank Securities Inc. | 4.75% |
| **Deutsche Bank Total** | **4.75%** |
| | |
| GSO Special Situations Master Fund LP | 3.21% |
| GSO Credit-A Partners LP | 0.59% |
| GSO Palmetto Opportunistic Investment Partners LP | 0.57% |
| Steamboat Credit Opportunities Master Fund LP | 0.14% |
| GSO Coastline Credit Partners LP | 0.17% |
| GSO Cactus Credit Opportunities Fund LP | 0.37% |
| GSO Aiguille des Grands Montets Fund I LP | 0.31% |
| GSO Aiguille des Grands Montets Fund II LP | 0.24% |
| GSO Aiguille des Grands Montets Fund III LP | 0.15% |
| GSO Churchill Partners LP | 0.28% |
| GSO Credit Alpha Fund LP | 1.00% |
| **GSO Total** | **7.04%** |
| | |
| Taconic Opportunity Master Fund L.P. | 3.56% |
| Taconic Master Fund 1.5 L.P. | 0.40% |
| **Taconic Total** | **3.96%** |
| | |
| Hunt Power Holdings, LLC. | 3.52% |
| **Hunt Power Holdings Total** | **3.52%** |
| | |
| Pecos Partners, L.P. | 3.52% |
| **Pecos Partners Total** | **3.52%** |
| | |
| Flourish Investment Corporation | 3.52% |
| **Flourish Investment Total** | **3.52%** |
| | |
| **Total Investors** | **100.00%** |

**Exhibit A**

**Joinder to Guarantee**

_____, 201__

Energy Future Holdings Corp.
Energy Future Intermediate Holding Company LLC
Energy Plaza
1601 Bryan Street
Dallas, Texas  75201
Attention: Boards of Directors

Ladies and Gentlemen:

Reference is made to the Guarantee, dated as of August 9, 2015 (the "Guarantee"), among the Guarantors (as defined in the Guarantee), Energy Future Holdings Corp. and Energy Future Intermediate Holding Company LLC.  Capitalized terms used but not defined herein have the meanings ascribed to them in the Guarantee.

The undersigned hereby (i) acknowledges that it has received and reviewed a copy of the Guarantee and (ii) agrees to assume and be bound by the obligations of [_____] in respect of the portion of the Guaranteed Obligations transferred to the undersigned, as reflected on the updated Annex 1 to the Guarantee, and to observe and comply with all of the terms and provisions of the Guarantee that are applicable to the Guarantors as if an original party hereto.

_[Signature page follows]_

IN WITNESS WHEREOF, the undersigned has caused this Joinder to be executed as of the date first written above.

[_____]

By: _____
Name: _____
Title: _____

## EXHIBIT E

**FORM OF TAX MATTERS AGREEMENT**

FORM OF

TAX MATTERS AGREEMENT

BY AND AMONG

ENERGY FUTURE HOLDINGS CORP.,

ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC

AND

[REORGANIZED TCEH]

DATED AS OF [THE EFFECTIVE DATE]

Table of Contents

ARTICLE I Definitions ...................................................................................................... 3

    Section 1.01   General ................................................................................ 3
    Section 1.02   Construction....................................................................... 10
    Section 1.03   References to Time ............................................................ 11

ARTICLE II Preparation, Filing, and Payment of Taxes Shown Due on Tax Returns................ 11

    Section 2.01   Tax Returns........................................................................ 11
    Section 2.02   Tax Return Procedures....................................................... 11
    Section 2.03   Straddle Period Tax Allocation........................................... 13
    Section 2.04   Allocation of Taxes ........................................................... 13
    Section 2.05   Allocation of Separation-Related Taxes. ............................. 15
    Section 2.06   Audits/Redeterminations.................................................... 15
    Section 2.07   Expenses ........................................................................... 15
    Section 2.08   Timing of Payments .......................................................... 16

ARTICLE III Indemnification ........................................................................................... 16

    Section 3.01   Indemnification by the EFH Parties.................................... 16
    Section 3.02   Indemnification by Reorganized TCEH ............................. 16
    Section 3.03   Characterization of and Adjustments to Payments ............. 16
    Section 3.04   Timing of Indemnification Payments .................................. 16
    Section 3.05   Exclusive Remedy ............................................................. 17
    Section 3.06   No Duplicative Payment .................................................... 17

ARTICLE IV Refunds, Timing Differences, and Tax Attributes................................................ 17

    Section 4.01   Refunds ............................................................................. 17
    Section 4.02   Timing Differences ........................................................... 17

ARTICLE V Tax Proceedings ........................................................................................... 18

    Section 5.01   Notification of Tax Proceedings ......................................... 18
    Section 5.02   Tax Proceeding Procedures................................................ 18

ARTICLE VI Intended Tax Treatment................................................................................. 19

    Section 6.01   Restrictions Relating to the Distribution.............................. 19

ARTICLE VII Cooperation ............................................................................................... 20

    Section 7.01   General Cooperation .......................................................... 20
    Section 7.02   Retention of Records.......................................................... 21
    Section 7.03   Failure to Perform ............................................................. 21

ARTICLE VIII Miscellaneous............................................................................................ 21

Section 8.01    Governing law.................................................................................... 21
Section 8.02    Dispute Resolution.............................................................................. 22
Section 8.03    Tax Sharing Agreements..................................................................... 22
Section 8.04    Interest on Late Payments................................................................... 22
Section 8.05    Survival of Covenants......................................................................... 22
Section 8.06    Severability ........................................................................................ 22
Section 8.07    Entire Agreement................................................................................ 23
Section 8.08    Assignment ......................................................................................... 23
Section 8.09    No Third Party Beneficiaries .............................................................. 23
Section 8.10    Affiliates ............................................................................................ 23
Section 8.11    Amendments; Waivers........................................................................ 23
Section 8.12    Interpretation...................................................................................... 23
Section 8.13    Counterparts........................................................................................ 24
Section 8.14    Confidentiality.................................................................................... 24
Section 8.15    Waiver of Jury Trial............................................................................ 24
Section 8.16    Jurisdiction; Service of Process ......................................................... 24
Section 8.17    Notices ............................................................................................... 25
Section 8.18    Headings ............................................................................................ 28
Section 8.19    Effectiveness ...................................................................................... 28
Section 8.20    Further Assurances.............................................................................. 28

FORM OF
**TAX MATTERS AGREEMENT**

This **TAX MATTERS AGREEMENT** (this "Agreement"), dated as of [the Effective Date] (the "Effective Date"), is entered into by and among Energy Future Holdings Corp., a Texas Corporation ("EFH"), Energy Future Intermediate Holding Company LLC, a Delaware Limited Liability Company ("EFIH" and, together with EFH and each other Person that executes a joinder pursuant to Section 8.20, the "EFH Parties") and [Reorganized TCEH], a Delaware limited liability company and an indirect wholly owned Subsidiary of EFH ("Reorganized TCEH" and, together with the EFH Parties, the "Parties").

RECITALS[1]

**WHEREAS**, on April 29, 2014 EFH and certain entities in which it holds an equity interest (collectively, the "Debtors") commenced chapter 11 cases in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), which chapter 11 cases are being jointly administered and are captioned In re Energy Future Holdings Corp., et al., Case No. 14-10979 (CSS) (the "Chapter 11 Cases");

**WHEREAS**, the Bankruptcy Court has approved the restructuring of the Debtors pursuant to a confirmed Chapter 11 plan of reorganization (the "Plan");

**WHEREAS**, pursuant to the Plan, Texas Competitive Electric Holdings Company LLC ("TCEH"), a Delaware limited liability company and a wholly owned, indirect subsidiary of EFH, (a) has formed Reorganized TCEH as a new subsidiary of TCEH on or before the Effective Date and (b) incorporated [the Preferred Stock Entity], a Delaware corporation (the "Preferred Stock Entity") as a new subsidiary of TCEH immediately after the Contribution (as defined below);

**WHEREAS**, pursuant to the Plan, on the Effective Date, except for liabilities assumed by Reorganized TCEH pursuant to the Plan, all other Claims (as defined in the Plan) against the TCEH Debtors (as defined in the Plan) will be canceled, and each Holder (as defined in the Plan) of an Allowed Claim (as defined in the Plan) against a TCEH Debtor will have the right to receive its recovery in accordance with the terms of the Plan, and TCEH shall assume the obligations of its subsidiaries that are TCEH Debtors to make distributions pursuant to and in accordance with the Plan that are to be made after the Effective Date;

**WHEREAS**, pursuant to the Plan, immediately following such cancelation, pursuant to the Separation Agreement (as defined in the Plan), (a) TCEH will transfer all of TCEH's interests in its subsidiaries (excluding the stock of TCEH Finance, Inc. ("TCEH Finance")) to Reorganized TCEH; and (b) the EFH Debtors will transfer (i) the equity interests in the Reorganized EFH Shared Services Debtors (or with the consent of TCEH and the TCEH

---

[1]    Note to Draft: Recitals and other descriptive provisions to be appropriately revised/conformed to reflect the Plan, as amended.

Supporting First Lien Creditors (as defined in the Plan), the assets and liabilities of the Reorganized EFH Shared Services Debtors related to the TCEH Debtors' operations) and (ii) with the consent of TCEH and the TCEH Supporting First Lien Creditors, certain other assets, liabilities, and equity interests related to the TCEH Debtors' operations (including the equity interests of non-Debtor EFH Properties Company or the lease for the Debtors' corporate headquarters at "Energy Plaza" held by EFH Properties Company (but not including any cash on hand at EFH Properties Company, which shall be transferred to Reorganized EFH)), in exchange for which TCEH shall receive (i) 100% of the Reorganized TCEH membership interests and (ii) the net Cash proceeds of the Reorganized TCEH Debt (as defined in the Plan), subject to preserving the Intended Tax Treatment (as defined below) (together, the "Contribution");

WHEREAS, pursuant to the Plan, immediately following the Contribution but before the Reorganized TCEH Conversion (as defined below), and consistent with the procedures in Exhibit G of the Plan Support Agreement: (a) Reorganized TCEH will contribute the equity in the Contributed TCEH Debtors (as defined in the Plan), or, potentially, certain assets or joint interests in certain assets, to the Preferred Stock Entity (such contribution to the Preferred Stock Entity of such equity and, potentially such assets, in an amount that is expected to result in the Basis Step-Up (as defined in the Plan)) in exchange for (i) the Preferred Stock Entity's common stock and (ii) the Reorganized TCEH Sub Preferred Stock (as defined in the Plan); (b) immediately thereafter, and pursuant to a prearranged and binding agreement, Reorganized TCEH will sell all of the Reorganized TCEH Sub Preferred Stock to one or more third party investors in exchange for Cash (as defined in the Plan), *provided, however*, that Holders of TCEH First Lien Claims (as defined in the Plan) shall not be permitted to purchase the Reorganized TCEH Sub Preferred Stock; and (c) Reorganized TCEH will distribute such Cash to TCEH to fund recoveries under the Plan (together, the "Preferred Stock Sale")

WHEREAS, pursuant to the Plan, immediately following the Preferred Stock Sale, Reorganized TCEH shall convert from a Delaware limited liability company into a Delaware corporation (the "Reorganized TCEH Conversion");

WHEREAS, pursuant to the Plan, immediately following the Reorganized TCEH Conversion, TCEH will make a Pro Rata (as defined in the Plan) distribution of the Reorganized TCEH Common Stock and the net Cash proceeds of the New Reorganized TCEH Debt and the Preferred Stock Sale, if any, received in the Contribution to Holders of Allowed TCEH First Lien Claims (the "Distribution");

WHEREAS, each of EFCH, TCEH, TCEH Finance, and the Subsidiaries of EFH identified in Annex 1 of the Agreement and Plan of Merger, dated as of [•], by and among Hunt Ovation I, L.L.C. ("Parent"), Hunt Ovation II, L.L.C., EFIH, and EFH (the "Merger Agreement") other than the Spin-Off Entities (as defined in the Merger Agreement, will be dissolved and liquidated in accordance with the Plan and applicable law and EFH's direct and indirect equity interests in each of its other Subsidiaries (other than EFIH and the Oncor Entities) will be either (as mutually agreed by EFH and Parent, each acting reasonably) (a) cancelled or abandoned pursuant to the Plan or (b) acquired by Parent with such Subsidiaries being discharged and released, to the fullest extent permitted under applicable law, pursuant to the Plan;

**WHEREAS**, pursuant to the Plan and the Merger Agreement, EFH will merge with and into Parent following the Distribution (and other interim transactions) (the "Merger"), with Parent surviving;

**WHEREAS**, it is intended that, for U.S. federal income tax purposes, (a) the Contribution, the Reorganized TCEH Conversion and the Distribution will qualify as a "reorganization" within the meaning of Sections 368(a)(1)(G), 355, and 356 of the Code, (b) the contribution described in clause (a) of the definition of the Preferred Stock Sale will be treated as a taxable sale of the assets of the Preferred Stock Entity pursuant to Section 1001 of the Code resulting in the Basis Step-Up (together with clause (a), the "Intended Tax Treatment"), and (c) the Merger will qualify as a reorganization under the provisions of Section 368(a) of the Code;

**WHEREAS**, the Parties wish to (a) provide for the payment of Tax liabilities and entitlement to refunds thereof, allocate responsibility for, and cooperation in, the filing and defense of Tax Returns, and provide for certain other matters relating to Taxes and (b) set forth certain covenants and indemnities relating to the preservation of the Intended Tax Treatment; and

**WHEREAS**, this Agreement has been approved by the Bankruptcy Court and will be effective upon the Distribution.  In the event of any conflict between this Agreement and the Plan, the Plan shall govern.

**NOW, THEREFORE**, in consideration of these premises, and of the representations, warranties, covenants, and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

ARTICLE I

Definitions

Section 1.01    General.  As used in this Agreement, the following terms shall have the following meanings.

"Accounting Firm" has the meaning set forth in Section 8.02.

"Additional Preferred Stock Sale Tax" means an amount (but not less than zero) equal to the regular Income Tax liability (and any corollary state and local Tax liability) (excluding any alternative minimum Tax) of the EFH Group in its taxable year in which the Preferred Stock Sale is consummated and attributable to the Preferred Stock Sale, calculated by determining the excess of (i) the EFH Group tax liability (determined, for the avoidance of doubt, by taking into account the gain on the Preferred Stock Sale as Finally Determined) over (ii) the EFH Group tax liability assuming the Preferred Stock Sale did not occur; provided, that for purposes of such calculation, it shall be assumed that (a) the "consolidated year" (within the meaning of Section 1503(e)(2)(B) of the Code) ended on the Effective Date, (b) the EFH Group recognized no income, gain, loss or deduction as a result of transactions occurring outside the ordinary course of business on the Effective Date after the Preferred Stock Sale (other than Deferred Intercompany and ELA Items (if any) and items directly resulting from other transactions

expressly contemplated by the Plan), and (c) the Agreed Tax Attributes shall be as reported on the EFH Group's Tax Returns as originally filed, but adjusted to take into account (i) all Finally Determined adjustments to items of income, loss, credit or other Tax-related attribute attributable to or arising from any business contributed to, or otherwise held on the Effective Date by, any Reorganized TCEH Entity (other than EFH Properties Company) (including, for the avoidance of doubt, any adjustments to (x) any interest expense and discharge of indebtedness income with respect to indebtedness of any such entity, TCEH or any Subsidiary of TCEH (other than TCEH Finance), (y) Deferred Intercompany and ELA Items (if any) and (z) that portion of any Section 108(i) Items which relates to the indebtedness of TCEH or any Subsidiary of TCEH (other than TCEH Finance)) and (ii) all Finally Determined adjustments to items of income, loss, credit or other Tax-related attribute attributable to any business retained by any Reorganized EFH Entity or EFH Properties Company (including, for the avoidance of doubt, any adjustments to (x) any interest expense and discharge of indebtedness income with respect to indebtedness of any such entity and (y) that portion of any Section 108(i) Items which does not relate to the indebtedness of TCEH or any Subsidiary of TCEH (other than TCEH Finance)) (but, in the case of this clause (c)(ii), only to the extent that the aggregate (net) of all adjustments described in this clause (c)(ii) results in an increase to the Agreed Tax Attributes).

"Affiliate" means, with respect to any Person, any other Person, directly or indirectly, controlling, controlled by, or under common control with, such Person; *provided that*, notwithstanding the foregoing, Affiliates of EFH shall be deemed to exclude the Reorganized TCEH Entities following the Distribution.

"Agreed Tax Attributes" means 100% of the aggregate amount of net losses, net operating losses, and net capital losses (but only to the extent such net capital losses are deductible under applicable tax law against gain recognized on the Preferred Stock Sale) (in each case, including carryovers), available to the EFH Group as of the Effective Date (determined (a) as if the "consolidated year" (within the meaning of Section 1503(e)(2)(B) of the Code) of the EFH Group ended on the Effective Date and (b) without regard to any income, gain, loss or deduction generated as a result of the Preferred Stock Sale or transactions occurring outside the ordinary course of business on the Effective Date after the Preferred Stock Sale (other than any Deferred Intercompany and ELA Items (if any) and other transactions expressly contemplated by the Plan and the other Definitive Restructuring Documents (as defined in the Plan Support Agreement)), such amount to be determined in accordance with Exhibit G of the Plan Support Agreement .

"Agreement" has the meaning set forth in the Preamble.

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Basis Step-Up" means the increase in the U.S. federal income tax basis in the assets transferred or deemed transferred to the Preferred Stock Entity pursuant to the Preferred Stock Sale.

"Chapter 11 Cases" has the meaning set forth in the Recitals.

"Code" means the Internal Revenue Code of 1986, as amended.

"Contribution" has the meaning set forth in the Recitals.

"Covered Transaction" means the Contribution and Distribution, the Preferred Stock Sale, and any other transaction contemplated by the Plan or the Transaction Agreements.

"Debtors" has the meaning set forth in the Recitals.

"Deferred Intercompany and ELA Items" means intercompany items (as such term is defined in Treasury Regulations Section 1.1502-13(b)(2)) and excess loss account (as such term is defined in Treasury Regulations Section 1.1502-19(a)), in each case, of any Subsidiary of TCEH (other than TCEH Finance) that are accelerated into income as a result of the Distribution pursuant to Treasury Regulations Section 1.1502-13(d) or Section 1.1502-19.

"Distribution" has the meaning set forth in the Recitals.

"Due Date" means (a) with respect to a Tax Return, the date (taking into account all valid extensions) on which such Tax Return is required to be filed under applicable law and (b) with respect to a payment of Taxes, the date on which such payment is required to be made to avoid the incurrence of interest, penalties, and/or additions to Tax.

"Effective Date" has the meaning set forth in the Recitals.

"EFH" has the meaning set forth in the Preamble and, for the avoidance of doubt, all references to EFH shall include Parent following the Merger.

"EFH Breach" means a breach of one or more covenants in Article VI by any Reorganized EFH Entity or any of its Affiliates.

"EFH Group" has the meaning set forth in the Plan.

"EFH Parties" has the meaning set forth in the Preamble.

"EFH Shared Services Debtors" means, collectively:   (a) EFH Corporate Services Company; (b) Dallas Power and Light Company, Inc.; (c) EFH CG Holdings Company LP; (d) EFH CG Management Company LLC; (e) Lone Star Energy Company, Inc.; (f) Lone Star Pipeline Company, Inc.; (g) Southwestern Electric Service Company, Inc.; (h) Texas Electric Service Company, Inc.; (i) Texas Energy Industries Company, Inc.; (j) Texas Power and Light Company, Inc.; (k) Texas Utilities Company, Inc.; (l) Texas Utilities Electric Company, Inc.; and (m) TXU Electric Company, Inc.

"EFH Taxes" means (a) any Taxes of the EFH Group for periods (and portion of a Straddle Period) ending on or before the Effective Date that are not specifically included within the definition of Reorganized TCEH Taxes, including, without duplication, (i) any Taxes attributable to or arising from the ownership or operation of any business retained by any Reorganized EFH Entity or EFH Properties Company (including, for the avoidance of doubt, Taxes arising from any adjustment to interest expense and discharge of indebtedness income

with respect to indebtedness of any such entity), in each case, as determined pursuant to Sections 2.03 and 2.04, (ii) Taxes of the EFH Group other than Reorganized TCEH Taxes, (iii) Income Taxes imposed on a Reorganized TCEH Entity attributable to a Tax-Free Transaction Failure and allocated to the EFH Parties pursuant to Sections 2.05(a) or (b), (iv) Taxes attributable to the Preferred Stock Sale other than TCEH Preferred Stock Sale Tax, (v) Transfer Taxes allocated to the EFH Parties pursuant to Section 2.04(d)(i), and (vi) Taxes resulting from any action by any Reorganized EFH Entity outside of the ordinary course of business on the Effective Date after the Distribution, except as a result of any action that is expressly contemplated by the Plan or the Transaction Agreements and (b) any Taxes imposed on any Reorganized EFH Entity for periods (or portion of a Straddle Period) beginning after the Effective Date.

"EFIH" has the meaning set forth in the Preamble.

"Final Determination" means the final resolution of liability for any Tax for any taxable period, by or as a result of (a) a final decision, judgment, decree or other order by any court of competent jurisdiction that can no longer be appealed, (b) a final settlement with the IRS, a closing agreement or accepted offer in compromise under Sections 7121 or 7122 of the Code, or a comparable agreement under the laws of other jurisdictions, (c) any allowance of a Refund in respect of an overpayment of Tax, but only after the expiration of all periods during which such Refund may be recovered by the jurisdiction imposing the Tax or (d) any other final resolution, including by reason of the expiration of the applicable statute of limitations.

"Income Taxes" means any Taxes in whole or in part based upon, measured by, or calculated with respect to net income or profits, net worth or net receipts (including any alternative minimum Tax and the Texas Margin Tax).  For the avoidance of doubt, Income Taxes do not include sales, use, real or personal property, or transfer or similar Taxes.

"Indemnified Party" means, with respect to a matter, a Person that is entitled to seek indemnification under this Agreement with respect to such matter.

"Indemnifying Party" means, with respect to a matter, a Person that is obligated to provide indemnification under this Agreement with respect to such matter.

"Intended Tax Treatment" has the meaning set forth in the Recitals.

"IRS" means the U.S. Internal Revenue Service or any successor thereto, including its agents, representatives, and attorneys acting in their official capacity.

"IRS Submissions" means all submissions to the IRS in connection with requests for the Private Letter Ruling.

"Merger" has the meaning set forth in the Recitals.

"Merger Agreement" has the meaning set forth in the Recitals.

"Non-Income Taxes" means any Taxes other than Income Taxes.

"Notified Action" has the meaning set forth in Section 6.01(c).

"<u>Opinion</u>" means an opinion (including an Unqualified Tax Opinion) received by a Party with respect to certain Tax aspects of the Covered Transactions.

"<u>Parent</u>" has the meaning set forth in the Recitals.

"<u>Parties</u>" has the meaning set forth in the Preamble.

"<u>Person</u>" or "<u>person</u>" means a natural person, corporation, company, joint venture, individual business trust, trust association, partnership, limited partnership, limited liability company, association, unincorporated organization or other entity, including a governmental authority.

"<u>Plan</u>" has the meaning set forth in the Recitals.

"<u>Plan Support Agreement</u>" means that certain Plan Support Agreement, dated as of August 9, 2015, by and among the Debtors and the other parties thereto.

"<u>Post-Distribution Period</u>" means any taxable period (or portion thereof) beginning after the Effective Date, including for the avoidance of doubt, the portion of any Straddle Period beginning after the Effective Date.

"<u>Preferred Stock</u>" has the meaning set forth in the Recitals.

"<u>Preferred Stock Entity</u>" has the meaning set forth in the Recitals.

"<u>Preferred Stock Sale</u>" has the meaning set forth in the Recitals.

"<u>Private Letter Ruling</u>" means a private letter ruling issued by the IRS addressing the qualification of the Contribution, the Reorganized TCEH Conversion, and the Distribution as a "reorganization" within the meaning of Sections 368(a)(1)(G), 355 and 356 of the Internal Revenue Code and certain other matters, together with any amendments or supplements thereto (including any supplemental ruling obtained by a Party pursuant to <u>Section 6.01(c)</u>).

"<u>Refund</u>" means any refund (or credit in lieu thereof) of Taxes (including any overpayment of Taxes that can be refunded or, alternatively, applied to other Taxes payable), including any interest paid on or with respect to such refund of Taxes.

"<u>Reorganized EFH Entity</u>" means the EFH Parties and any entity that is a Subsidiary of EFH immediately after the Distribution (including, for the avoidance of doubt, EFCH, TCEH and TCEH Finance).

"<u>Reorganized EFH Shared Services Debtors</u>" means the EFH Shared Services Debtors as reorganized pursuant to and under the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

"<u>Reorganized TCEH</u>" has the meaning set forth in the Preamble and, for the avoidance of doubt, all references to Reorganized TCEH shall include Reorganized TCEH following the Contribution.

"Reorganized TCEH Breach" means a breach of one or more covenants in Article VI by any Reorganized TCEH Entity or any of its Affiliates.

"Reorganized TCEH Debt" has the meaning set forth in Section 8.05.

"Reorganized TCEH Entity" means Reorganized TCEH or any entity that is a Subsidiary of Reorganized TCEH immediately after the Distribution (which shall include, for the avoidance of doubt, the Reorganized EFH Shared Services Debtors and EFH Properties Company, to the extent the equity interests in such entities are transferred pursuant to the Contribution).

"Reorganized TCEH Taxes" means any (a) Income Taxes imposed on EFH and its Subsidiaries attributable to a Tax-Free Transaction Failure and allocated to Reorganized TCEH pursuant to Section 2.05(c), (b) any Taxes for periods (and the portion of any Straddle Period) ending on or before the Effective Date attributable to or arising from the ownership or operation of any business contributed to, or otherwise held on the Effective Date by, any Reorganized TCEH Entity (other than EFH Properties Company) (including, for the avoidance of doubt, any Taxes resulting from any adjustments to interest expense and discharge of indebtedness income with respect to indebtedness of any such entity, TCEH or any Subsidiary of TCEH (other than TCEH Finance)), as determined pursuant to Sections 2.03 and 2.04, in each case, other than any Taxes resulting from (i) a Tax-Free Transaction Failure, (ii) the Preferred Stock Sale or (iii) any Specified Tax Items, (c) Taxes imposed on any Reorganized TCEH Entity for periods (or portion of a Straddle Period) beginning after the Effective Date, (d) Transfer Taxes allocated to Reorganized TCEH pursuant to Section 2.04(d)(i), (e) TCEH Preferred Stock Sale Tax, and (f) Taxes resulting from any action by any Reorganized TCEH Entity outside of the ordinary course of business on the Effective Date after the Distribution, except as a result of any action that is expressly contemplated by the Plan or the Transaction Agreements.

"Restriction Period" has the meaning set forth in Section 6.01(b).

"Section 108(i) Items" means items of income or gain or other Tax items resulting from the acceleration (pursuant to the Plan Support Agreement) of all discharge of indebtedness income of the EFH Group that was previously deferred under Section 108(i) of the Code.

"Specified Tax Items" means Section 108(i) Items and Deferred Intercompany and ELA Items (if any).

"Straddle Period" means any taxable period that begins on or before and ends after the Effective Date.

"Subsidiary" means, with respect to any Person, any other Person of which at least a majority of the securities or other ownership interests having by their terms ordinary voting power to elect a majority of the board of directors or other persons performing similar functions is directly or indirectly owned or controlled by such Person and/or by one or more of its Subsidiaries; provided, that notwithstanding the foregoing, the Subsidiaries of EFH shall be deemed to exclude Reorganized TCEH and all Subsidiaries thereof.

"Tax" or "Taxes" means any and all U.S. federal, state or local, or foreign, income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall

profits, environmental, customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever (including any assessment, duty, fee or other charge in the nature of or in lieu of any such tax) and any interest, penalty, or addition thereto, whether disputed or not.

"Tax Attributes" means net operating losses, capital losses, alternative minimum tax credits, investment tax credit carryovers, earnings and profits, foreign tax credit carryovers, overall foreign losses, previously taxed income, separate limitation losses, and any other losses, deductions, credits or other comparable items that could reduce a Tax liability for a past or future taxable period.

"Tax Benefit" means any decrease in Tax payments actually required to be made to a Taxing Authority (or any increase in any Refund otherwise receivable from any Taxing Authority) including any decrease in Tax payments (or increase in any Refund) that actually results from an increase in Tax Attributes (computed on a "with" or "without" basis).

"Tax Cost" means any increase in Tax payments actually required to be made to a Taxing Authority (or any reduction in any Refund otherwise receivable from any Taxing Authority), including any increase in Tax payments (or reduction in any Refund) that actually results from a reduction in Tax Attributes (computed on a "with or without" basis).

"Tax-Free Transaction Failure" means (a) the failure of the Contribution and Distribution to qualify for clause (a) of the definition of the Intended Tax Treatment, and (b) the imposition of any Income Taxes on EFH under Section 355(d) or Section 355(e) of the Code with respect to the Distribution.

"Tax Item" means any item of income, gain, loss, deduction, credit, recapture of credit or any other item which increases, decreases or otherwise impacts Taxes paid or payable.

"Tax Materials" means (a) the Private Letter Ruling, (b) any Opinion, (c) the IRS Submissions, (d) any representation letter from a Party or any Affiliate thereof supporting an Opinion, and (e) any other materials delivered or deliverable by a Party or any Affiliate thereof in connection with the rendering of an Opinion or the issuance by the IRS of the Private Letter Ruling.

"Tax Matter" has the meaning set forth in Section 7.01.

"Tax Proceeding" means any audit, assessment of Taxes, pre-filing agreement, other examination by any Taxing Authority, proceeding, appeal of a proceeding or litigation relating to Taxes, whether administrative or judicial, including proceedings relating to competent authority determinations.

"Tax Return" means any return, report, certificate, form or similar statement or document (including any related or supporting information or schedule attached thereto and any information return or declaration of estimated Tax) supplied to, filed with or required to be supplied to or filed with a Taxing Authority in connection with the payment, determination,

assessment or collection of any Tax or the administration of any laws relating to any Tax, and any amended Tax return or claim for Refund.

"Taxing Authority" means any governmental authority or any subdivision, agency, commission or entity thereof or any quasi-governmental or private body having jurisdiction over the assessment, determination, collection or imposition of any Tax (including the IRS and the Office of the Texas Comptroller of Public Accounts).

"TCEH" has the meaning set forth in the Recitals.

"TCEH Finance" has the meaning set forth in the Recitals.

"TCEH Preferred Stock Sale Tax" means (i) 50% of the alternative minimum Tax (and any corollary state and local Taxes) that results from the limitation on the utilization of the Agreed Tax Attributes to offset the gain attributable to the Preferred Stock Sale under Section 56(d)(1)(A) of the Code and (ii) the Additional Preferred Stock Sale Tax (if any); provided, that in the event of a Tax-Free Transaction Failure (other than as a result of a Reorganized TCEH Breach), the TCEH Preferred Stock Sale Tax shall be zero.

"Texas Margin Tax" means any tax payable pursuant to Section 171.001 et seq. of the Texas Tax Code, as amended.

"Transaction Agreements" has the meaning set forth in the Plan.

"Transfer Taxes" means any transfer, stamp, documentary, sale, use, registration, value-added or other similar Taxes imposed with respect to the Contribution, the Reorganized TCEH Conversion, the Distribution, the Preferred Stock Sale, the Merger or any other transaction contemplated by the Plan.

"Treasury Regulations" means the proposed, final, and temporary income Tax regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

"Unqualified Tax Opinion" means a "will" opinion, without substantive qualifications, of a nationally recognized law or accounting firm, which firm is reasonably acceptable to the EFH Parties and Reorganized TCEH, to the effect that a transaction or action will not (i) affect the Intended Tax Treatment and (ii) negate any of the other rulings provided in the Private Letter Ruling. Each of the EFH Parties and Reorganized TCEH acknowledges that Paul, Weiss, Rifkind, Wharton & Garrison LLP, Kirkland & Ellis LLP, Thompson & Knight LLP, and Baker Botts L.L.P. are reasonably acceptable to such entity.

Section 1.02    Construction.  When a reference is made in this Agreement to an Article, a Section, an Exhibit, the Preamble or the Recitals, such reference shall be to an Article, a Section, an Exhibit, the Preamble or the Recitals of this Agreement, respectively, unless otherwise indicated.  Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."  The words "hereof," "herein," and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  The term

"or" is not exclusive.  Capitalized terms not defined herein have the meaning assigned to them in the Merger Agreement. All terms defined in this Agreement shall have the defined meanings when used in any certificate or other document made or delivered pursuant hereto unless otherwise defined herein.  The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such terms.  Unless otherwise specified, any agreement, instrument or statute defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes, and including all attachments thereto and instruments incorporated therein.  References to a person are also to its permitted successors and assigns.

Section 1.03   <u>References to Time</u>.  All references in this Agreement to times of the day shall be to New York City time.

ARTICLE II

<u>Preparation, Filing, and Payment of Taxes Shown Due on Tax Returns</u>

Section 2.01   <u>Tax Returns</u>.

(a)   *Tax Returns Required to be Filed by EFH*.  Consistent with Exhibit H to the Plan Support Agreement, EFH shall prepare and file (or cause to be prepared and filed) each Tax Return required to be filed by a Reorganized EFH Entity (including, for the avoidance of doubt, the U.S. federal income Tax Return of the EFH Group and all state income and franchise Tax Returns including members of the EFH Group for all periods ending on or before the Effective Date) and shall pay, or cause such Reorganized EFH Entity to pay, all Taxes shown to be due and payable on each such Tax Return; *provided that* Reorganized TCEH shall reimburse EFH for any such Taxes that are Reorganized TCEH Taxes.

(b)   *Reorganized TCEH Entity Tax Returns*.  Reorganized TCEH shall prepare and file (or cause to be prepared and filed) each Tax Return required to be filed by a Reorganized TCEH Entity after the Effective Date and shall pay, or cause be paid, all Taxes shown to be due and payable on such Tax Return; *provided that*, the EFH Parties shall jointly and severally reimburse Reorganized TCEH for any such Taxes that are EFH Taxes.

Section 2.02   <u>Tax Return Procedures</u>.

(a)   *Manner of Tax Return Preparation*.  Unless otherwise required by a Taxing Authority or by applicable law, the Parties shall prepare and file all Tax Returns, and take all other actions, in a manner consistent with this Agreement, the Tax Materials, and past practice.  All Tax Returns shall be filed on a timely basis (taking into account applicable extensions) by the Party responsible for filing such Tax Returns under this Agreement.

(b)   *Right to Review Certain Returns Prepared by EFH*.  In the case of any Tax Return described in <u>Section 2.01(a)</u>, (i) the portion (if any) of such Tax Return that relates to Reorganized TCEH Taxes or would reasonably be expected to adversely affect the Tax position

11

of any Reorganized TCEH Entity shall (to the extent permitted by law) be prepared in a manner consistent with past practice and the Tax Materials and (ii) EFH shall provide a draft of such Tax Return to Reorganized TCEH for its review and comment at least thirty (30) days prior to the Due Date for such Tax Return or, in the case of any such Tax Return filed on a monthly basis or property Tax Return, ten (10) days.  EFH shall consider in good faith any reasonable comment received from Reorganized TCEH at least three (3) days prior to the Due Date for such Tax Return.  In the event that neither past practice nor the Tax Materials are applicable to a particular item or matter, EFH shall determine the reporting of such item or matter in good faith in consultation with Reorganized TCEH.  The Parties shall negotiate in good faith to resolve all disputed issues.  Any disputes that the Parties are unable to resolve shall be resolved by the Accounting Firm pursuant to Section 8.02.  In the event that any dispute is not resolved (whether pursuant to good faith negotiations among the Parties or by the Accounting Firm) prior to the Due Date for the filing of any Tax Return, such Tax Return shall be timely filed as prepared by EFH and such Tax Return shall be amended as necessary to reflect the resolution of such dispute in a manner consistent with such resolution. For the avoidance of doubt, the EFH Parties shall be jointly and severally responsible for any interest, penalties or additions to Tax resulting from the late filing of any Tax Return described in Section 2.01(a), except to the extent that such late filing is primarily caused by the failure of any Reorganized TCEH Entity to provide relevant information necessary for the preparation and filing of such Tax Return.

(c)      *Right to Review Certain Returns Prepared by Reorganized TCEH*.  In the case of any Tax Return described in Section 2.01(b) that would reasonably be expected to adversely affect the Tax position of any Reorganized EFH Entity, (i) such Tax Return shall (to the extent permitted by law) be prepared in a manner consistent with past practice and the Tax Materials and (ii) Reorganized TCEH shall provide a draft of such Tax Return to EFH for its review and comment at least thirty (30) days prior to the Due Date for such Tax Return, or in the case of any such Tax Return filed on a monthly basis or property Tax Return, ten (10) days. Reorganized TCEH shall consider in good faith any reasonable comment received from EFH at least three (3) days prior to the Due Date for such Tax Return.  In the event that neither past practice nor the Tax Materials are applicable to a particular item or matter, Reorganized TCEH shall determine the reporting of such item or matter in good faith in consultation with EFH.  The Parties shall negotiate in good faith to resolve all disputed issues. Any disputes that the Parties are unable to resolve shall be resolved by the Accounting Firm pursuant to Section 8.02.  In the event that any dispute is not resolved (whether pursuant to good faith negotiations among the Parties or by the Accounting Firm) prior to the Due Date for the filing of any Tax Return, such Tax Return shall be timely filed as prepared by Reorganized TCEH and such Tax Return shall be amended as necessary to reflect the resolution of such dispute in a manner consistent with such resolution. For the avoidance of doubt, Reorganized TCEH shall be responsible for any interest, penalties or additions to Tax resulting from the late filing of any Tax Return described in Section 2.01(b) except to the extent that such late filing is primarily caused by the failure of any Reorganized EFH Entity to provide relevant information necessary for the preparation and filing of such Tax Return.

(d)      *Tax Reporting*. Unless otherwise required by law, the EFH Parties and Reorganized TCEH, as applicable, shall file the appropriate information and statements, as required by Treasury Regulations Sections 1.355-5(a) and 1.368-3, with the IRS, and shall retain

12

the appropriate information relating to the Contribution and the Distribution as described in Treasury Regulations Sections 1.355-5(d) and 1.368-3(d).

(e)     *Amendments*. Any amendment of any Tax Return described in <u>Section 2.01</u> of any Reorganized TCEH Entity shall be subject to the same procedures required for the preparation of such type of Tax Return of such Reorganized TCEH Entity pursuant to this <u>Section 2.02</u>. Any amendment of any Tax Return described in <u>Section 2.01</u> of any Reorganized EFH Entity shall be subject to the same procedures required for the preparation of such type of Tax Return of such Reorganized EFH Entity pursuant to this <u>Section 2.02</u>.

Section 2.03     <u>Straddle Period Tax Allocation</u>. To the extent permitted by law, the EFH Parties and Reorganized TCEH shall elect to close the taxable year of each Reorganized TCEH Entity as of the close of the Effective Date. In the case of any Straddle Period, the amount of any Income Taxes attributable to the portion of the Straddle Period ending on, or beginning after, the Effective Date shall be made by means of a closing of the books and records of such Reorganized TCEH Entity as of the close of the Effective Date; *provided that* in the case of Non-Income Taxes that are periodic Taxes (e.g., property Taxes) and exemptions, allowances, and deductions that are calculated on an annual basis (such as depreciation deductions), such Taxes, exemptions, allowances, and deductions shall be allocated between the portion of the Straddle Period ending at the end of the Effective Date and the portion beginning after the Effective Date based upon the ratio of (a) the number of days in the relevant portion of the Straddle Period to (b) the number of days in the entire Straddle Period; *provided, however*, that in allocating any such exemptions, allowances, or deductions (or increase in such amounts) between the two periods that comprise a Straddle Period, any such items that relate to an asset or property that was sold, acquired or improved during the Straddle Period shall be allocated on a daily basis solely among the days in the Straddle Period during which such asset was owned or such improvement existed; *provided further*, that Taxes that are properly allocable (based on, among other relevant factors, factors set forth in Treasury Regulations Section 1.1502-76(b)(1)(ii)(B)) to the portion of the Effective Date after the Distribution, shall be allocable to the portion of the Straddle Period beginning after the Effective Date.

Section 2.04     <u>Allocation of Taxes</u>.

(a)     *Income Taxes*. Subject to Section 2.04(b), Income Taxes (other than Taxes resulting from (x) a Tax-Free Transaction Failure, (y) the Preferred Stock Sale or (z) except in cases where there has been a Tax-Free Transaction Failure, any Specified Tax Items) shall be allocated in accordance with past practices and as follows:

(i)     In the case of U.S. federal regular Income Taxes, in proportion to the separate taxable income (calculated in accordance with Treasury Regulations Section 1.1552-1(a)(1) and determined without regard to any gain attributable to the Preferred Stock Sale) attributable to any business retained by any Reorganized EFH Entity or EFH Properties Company (including, for the avoidance of doubt, any interest expense and discharge of indebtedness income with respect to indebtedness of any such entity), on the one hand, and any business contributed to (or otherwise held on the Effective Date by) any Reorganized TCEH Entity (other than EFH Properties Company) (including, for the avoidance of doubt, any interest expense and discharge of indebtedness income with

13

respect to indebtedness of any such entity, TCEH or any Subsidiary of TCEH (other than TCEH Finance)), on the other hand; and

(ii)      In the case of Texas Margin Tax, in proportion to the separate taxable margins (calculated in a manner consistent with Treasury Regulations Section 1.1552-1(a)(1) and determined without regard to any gain attributable to the Preferred Stock Sale) attributable to any business retained by, any Reorganized EFH Entity or EFH Properties Company (including, for the avoidance of doubt, any interest expense and discharge of indebtedness income with respect to indebtedness of any such entity), on the one hand, and any business contributed to (or otherwise held on the Effective Date by) any Reorganized TCEH Entity (other than EFH Properties Company) (including, for the avoidance of doubt, any interest expense and discharge of indebtedness income with respect to indebtedness of any such entity, TCEH or any Subsidiary of TCEH (other than TCEH Finance)), on the other hand.

(b)      *Alternative Minimum Taxes*. Alternative minimum Taxes (other than Taxes resulting from (x) a Tax-Free Transaction Failure, (y) the Preferred Stock Sale or (z) except in cases where there has been a Tax-Free Transaction Failure, any Specified Tax Items) shall be allocated between the EFH Parties, on the one hand, and Reorganized TCEH, on the other hand, in proportion to the respective separate amounts of alternative minimum tax each of the Reorganized EFH Entities and EFH Properties Company, on the one hand, and the Reorganized TCEH Entities (other than EFH Properties Company), on the other hand, would have if each such group separately determined its alternative minimum tax based on items attributable to any business retained by any Reorganized EFH Entity or EFH Properties Company, on the one hand, and any business contributed to (or otherwise held on the Effective Date by) any Reorganized TCEH Entity (other than EFH Properties Company), on the other hand.

(c)      *Non-Income Taxes*. Non-Income Taxes shall be allocated between the EFH Parties, on the one hand, and Reorganized TCEH, on the other hand, based on the applicable items attributable to or arising from any business retained by any Reorganized EFH Entity or EFH Properties Company, on the one hand, and any business contributed to (or otherwise held on the Effective Date by) any Reorganized TCEH Entity (other than EFH Properties Company), on the other hand, that contribute to such Taxes (e.g., sales Taxes and value added Taxes shall be allocated to the EFH Parties to the extent arising from taxable sales made by any business retained by any Reorganized EFH Entity or EFH Properties Company). In the event that any Non-Income Tax is not attributable to (and does not arise from) any items relating to any business (e.g., capital Taxes imposed based on the authorized stock), such Non-Income Taxes shall be allocated between the EFH Parties, on the one hand, and Reorganized TCEH, on the other hand, in proportion to the net taxable income of any business retained by any Reorganized EFH Entity or EFH Properties Company, on the one hand, and any business contributed to (or otherwise held on the Effective Date by) any Reorganized TCEH Entity (other than EFH Properties Company), on the other hand.

(d)      *Other Taxes*.

14

(i)    Transfer Taxes, if any, shall be allocated fifty percent (50%) to the EFH Parties and fifty percent (50%) to Reorganized TCEH.

(ii)    Income Taxes attributable to a Tax-Free Transaction Failure shall be allocated as set forth in Section 2.05.

(iii)    TCEH Preferred Stock Sale Tax shall be allocated to Reorganized TCEH.

(iv)    Except in cases where there has been a Tax-Free Transaction Failure, Taxes resulting from any Specified Tax Items shall be allocated to the EFH Parties.

(e)    *Allocation of Tax Attributes*. Tax Attributes, if any, remaining after the Distribution (other than net operating losses) shall be allocated in accordance with the Private Letter Ruling or, if not addressed in the Private Letter Ruling, between the Reorganized EFH Entities, on the one hand, and the Reorganized TCEH Entities, on the other hand, in accordance with the Code and Treasury Regulations, including Treasury Regulations Section 1.1502-76 (and any applicable state, local and foreign Laws). The allocation of such Tax Attributes shall be determined by treating the Reorganized TCEH Entities as one consolidated group and the Reorganized EFH Entities as a separate and distinct consolidated group. Any disputes shall be resolved by the Accounting Firm in accordance with Section 8.02. The EFH Parties and Reorganized TCEH hereby agree to compute all Taxes consistently with the determination of the allocation of Tax Attributes pursuant to this Section 2.04(e) unless otherwise required by a Final Determination.

Section 2.05    Allocation of Separation-Related Taxes.

(a)    *No-Fault*. Income Taxes attributable to a Tax-Free Transaction Failure, to the extent not allocated pursuant to Sections 2.05(b) or (c), shall be allocated to the EFH Parties.

(b)    *EFH Breach*. Income Taxes attributable solely to a Tax-Free Transaction Failure as a result of an EFH Breach shall be allocated to the EFH Parties.

(c)    *Reorganized TCEH Breach*. Incomes Taxes attributable solely to a Tax-Free Transaction Failure as a result of Reorganized TCEH Breach shall be allocated to Reorganized TCEH.

Section 2.06    Audits/Redeterminations.    Any redetermined Taxes or Tax Attributes resulting from an audit shall be allocated between the EFH Parties, on the one hand, and Reorganized TCEH, on the other hand, in the same manner as they would have been allocated had the redetermined amounts been known at the time the original Tax liability was computed.

Section 2.07    Expenses.    Except as provided in Section 8.02 in respect of the Accounting Firm, each Party shall bear its own expenses incurred in connection with this Article II.

Section 2.08    Timing of Payments.  Any reimbursement of Taxes under Section 2.01 shall be made upon the later of (a) two (2) business days before the Due Date of such payment of such Taxes and (b) ten (10) business days after the party required to make such reimbursement has received notice from the party entitled to such reimbursement. For the avoidance of doubt, a party may provide notice of reimbursement of Taxes prior to the time such Taxes were paid, and such notice may represent a reasonable estimate (provided that the amount of reimbursement shall be based on the actual Tax liability and not on such reasonable estimate).

ARTICLE III

Indemnification

Section 3.01    Indemnification by the EFH Parties.  The EFH Parties, on a joint and several basis, shall pay (or cause to be paid), and shall indemnify and hold each Reorganized TCEH Entity harmless from and against, without duplication, all EFH Taxes and all losses or damages arising out of, resulting from or relating to any breach by any Reorganized EFH Entity of any EFH Party representation, warranty, covenant or agreement in this Agreement.

Section 3.02    Indemnification by Reorganized TCEH.  Reorganized TCEH shall pay (or cause to be paid), and shall indemnify and hold each Reorganized EFH Entity harmless from and against, without duplication, all Reorganized TCEH Taxes and all losses or damages arising out of, resulting from or relating to any breach by any Reorganized TCEH Entity of any Reorganized TCEH representation, warranty, covenant or agreement in this Agreement.

Section 3.03    Characterization of and Adjustments to Payments.

(a)    In the absence of a Final Determination to the contrary, for all Tax purposes, the EFH Parties and Reorganized TCEH shall treat or cause to be treated any payment required by this Agreement (other than any payment treated for Tax purposes as interest) as either a contribution by EFH to Reorganized TCEH or a distribution by Reorganized TCEH to EFH, as the case may be, occurring immediately prior to the Effective Date.

(b)    Any indemnity payment pursuant to this Agreement shall be (A) increased to include (i) all reasonable accounting, legal, and other professional fees and court costs and damages incurred by the Indemnified Party in connection with such indemnity payment and (ii) any Tax Cost resulting from the receipt of (or entitlement to) such indemnity payment and (B) decreased to account for any Tax Benefit that the Indemnified Party actually realizes by way of a Refund or a decrease in Taxes reported on a filed Tax Return (in or with respect to a taxable year that ends on or before December 31, 2021) in connection with the incurrence or the payment by the Indemnified Party of such fees or costs or indemnifiable amounts determined using a "with and without" methodology (treating any deductions attributable to such fees or costs or indemnifiable amounts as the last items claimed for any taxable year, including after the utilization of any available net operating loss carryovers).

Section 3.04    Timing of Indemnification Payments.  Indemnification payments in respect of any liabilities for which an Indemnified Party is entitled to indemnification pursuant to this Article III shall be paid by the Indemnifying Party to the Indemnified Party within ten (10)

days after written notification thereof by the Indemnified Party, including reasonably satisfactory documentation setting forth the basis for, and calculation of, the amount of such indemnification payment.

Section 3.05    <u>Exclusive Remedy</u>.    Anything to the contrary in this Agreement notwithstanding, the EFH Parties and Reorganized TCEH hereby agree that the sole and exclusive monetary remedy of a party for any breach or inaccuracy of any representation, warranty, covenant or agreement contained in <u>Section 6.01</u> shall be the indemnification rights set forth in this <u>Article III</u>.

Section 3.06    <u>No Duplicative Payment</u>.  Notwithstanding anything to the contrary in this Agreement, it is intended that the provisions of this Agreement will not result in a duplicative payment of any amount required to be paid under any other Transaction Agreement, and this Agreement shall be construed accordingly.

ARTICLE IV

<u>Refunds, Timing Differences, and Tax Attributes</u>

Section 4.01    <u>Refunds</u>.

(a)    Except as provided in <u>Section 4.02</u>, the EFH Parties shall be entitled to all Refunds of Taxes for which an EFH Party is responsible pursuant to <u>Article III</u>, and Reorganized TCEH shall be entitled to all Refunds of Taxes for which Reorganized TCEH is responsible pursuant to <u>Article III</u>.  A Party receiving a Refund to which the other Party is entitled pursuant to this Agreement shall pay the amount to which such other Party is entitled (less any Tax or other reasonable out-of-pocket costs incurred by the first Party in receiving such Refund) within ten (10) days after the receipt of the Refund.

(b)    To the extent that the amount of any Refund under this <u>Section 4.01</u> is later reduced by a Taxing Authority or in a Tax Proceeding, such reduction shall be allocated to the Party to which such Refund was allocated pursuant to this <u>Section 4.01</u> and an appropriate adjusting payment shall be made.

Section 4.02    <u>Timing Differences</u>.  If pursuant to a Final Determination any Tax Attribute (including those allocated pursuant to <u>Section 2.04(e)</u>) is made allowable to a Reorganized TCEH Entity as a result of an adjustment to any Taxes for which an EFH Party is responsible hereunder (other than Taxes attributable to a Tax-Free Transaction Failure) and such Tax Attribute would not have arisen or been allowable but for such adjustment, or if pursuant to a Final Determination any Tax Attribute is made allowable to a Reorganized EFH Entity as a result of an adjustment to any Taxes for which Reorganized TCEH is responsible hereunder and such Tax Attribute would not have arisen or been allowable but for such adjustment, Reorganized TCEH or the EFH Parties (on a joint a several basis), as the case may be, shall make a payment to either the applicable EFH Party or Reorganized TCEH, as appropriate, within thirty (30) days after such Party (or its Affiliates) actually realizes a Tax benefit by way of a Refund or a decrease in Taxes reported on a filed Tax Return (in or with respect to a taxable year that ends on or before December 31, 2021) that is attributable to such Tax Attribute, determined

17

using a "with and without" methodology (treating any deductions or amortization attributable to such Tax Attributes as the last items claimed for any taxable year, including after the utilization of any available net operating loss carryovers), *provided that* no payment shall be made under this Section unless Reorganized TCEH or the applicable EFH Party, as the case may be, has previously paid the Tax adjustment or indemnified the other Party for such Tax adjustment.  In the event of any overlap between Section 3.03 and this Section 4.02, this Section 4.02 shall apply and Section 3.03 shall not apply.

ARTICLE V

Tax Proceedings

Section 5.01    Notification of Tax Proceedings.    Within ten (10) days after an Indemnified Party becomes aware of the commencement of a Tax Proceeding that may give rise to an indemnity payment pursuant to Article III, such Indemnified Party shall notify the Indemnifying Party in writing of such Tax Proceeding, and thereafter shall promptly forward or make available to the Indemnifying Party copies of notices and communications relating to such Tax Proceeding.  The failure of the Indemnified Party to notify the Indemnifying Party in writing of the commencement of any such Tax Proceeding within such ten (10) day period or promptly forward any further notices or communications shall not relieve the Indemnifying Party of any obligation which it may have to the Indemnified Party under this Agreement except to the extent (and only to the extent) that the Indemnifying Party is actually materially prejudiced by such failure.

Section 5.02    Tax Proceeding Procedures.

(a)    EFH.    EFH shall be entitled to contest, compromise, and settle any adjustment that is proposed, asserted or assessed pursuant to any Tax Proceeding with respect to any Tax Return it is responsible for preparing pursuant to Article II; *provided that* to the extent that such Tax Proceeding relates to Reorganized TCEH Taxes or would reasonably be expected to materially adversely affect the Tax position of any Reorganized TCEH Entity for any Post-Distribution Period, EFH shall (i) keep Reorganized TCEH informed in a timely manner of the material actions proposed to be taken by EFH with respect to such Tax Proceeding, (ii) permit Reorganized TCEH at its own expense to participate in the aspects of such Tax Proceeding that relate to Reorganized TCEH Taxes, and (iii) not settle any aspect of such Tax Proceeding that relates to Reorganized TCEH Taxes without the prior written consent of Reorganized TCEH, which shall not be unreasonably withheld, delayed or conditioned. Notwithstanding the foregoing, Reorganized TCEH shall have the right to control any Tax Proceeding that relates primarily to Taxes for which Reorganized TCEH has an indemnification obligation pursuant to Section 3.02.

(b)    Reorganized TCEH.    Except as otherwise provided in Section 5.02(a), Reorganized TCEH shall be entitled to contest, compromise, and settle any adjustment that is proposed, asserted or assessed pursuant to any Tax Proceeding with respect to any Tax Return it is responsible for preparing pursuant to Article II; *provided that* to the extent that such Tax Proceeding relates to EFH Taxes or would reasonably be expected to materially adversely affect the Tax position of any Reorganized EFH Entity, Reorganized TCEH shall (i) keep EFH

18

informed in a timely manner of the material actions proposed to be taken by Reorganized TCEH with respect to such Tax Proceeding, (ii) permit EFH at its own expense to participate in the aspects of such Tax Proceeding that relate to EFH Taxes, and (iii) not settle any aspect of such Tax Proceeding that relates to EFH Taxes without the prior written consent of EFH, which shall not be unreasonably withheld, delayed or conditioned. Notwithstanding the foregoing, EFH shall have the right to control any Tax Proceeding that relates primarily to Taxes for which EFH has an indemnification obligation pursuant to Section 3.01.

ARTICLE VI

Intended Tax Treatment

Section 6.01    Restrictions Relating to the Distribution.

(a)    *General*.  Following the Distribution, (i) the EFH Parties will not (and will cause each other Reorganized EFH Entity not to) take any action (or refrain from taking any action) which is inconsistent with the facts presented and the representations made prior to the Effective Date in the Tax Materials and (ii) Reorganized TCEH will not (and will cause each other Reorganized TCEH Entity not to) take any action (or refrain from taking any action) which is inconsistent with the facts presented and the representations made prior to the Effective Date in the Tax Materials. Each of the EFH Parties and Reorganized TCEH covenants and agrees that it will not take, and will cause its respective Affiliates to refrain from taking, any position on any Tax Return that is inconsistent with the Intended Tax Treatment, except as required by a Final Determination.

(b)    *Restrictions*.  Without derogating from the generality of Section 6.01(a), following the Distribution and prior to the first day following the second anniversary of the Effective Date (the "Restriction Period"), each EFH Party and Reorganized TCEH shall, and except with respect to clause (iii) of this Section 6.01(b), shall cause each of its respective Subsidiaries set forth on Exhibit A to:

(i)    continue the active conduct of each trade or business (for purposes of Section 355(b) of the Code and the Treasury Regulations thereunder) (A) that it was engaged in immediately prior to the Distribution (taking into account Section 355(b)(3) of the Code), (B) that was being relied upon for purposes of satisfying the requirements of Section 355(b) of the Code and the Treasury Regulations thereunder and (C) the substantial assets of which are identified on Exhibit B;

(ii)    continue to hold certain assets identified on Exhibit B and held at the time of the Distribution;

(iii)    not dissolve or liquidate or take any action that is a liquidation for U.S. federal income tax purposes;

(iv)    not merge or consolidate with any other Person with such other Person surviving the merger or consolidation in a transaction that does not qualify as a reorganization under Section 368(a) of the Code;

(v)     not redeem or otherwise repurchase (directly or indirectly through an Affiliate) any of its equity other than pursuant to open market stock repurchase programs meeting the requirements of Section 4.05(1)(b) of Rev. Proc. 96-30, 1996-1 C.B. 696; and

(vi)     not directly or indirectly acquire any of the Preferred Stock.

(c)     *Certain Exceptions*.  Notwithstanding the restrictions imposed by Section 6.01(b), during the Restriction Period, the EFH Parties and Reorganized TCEH may proceed with any of the actions or transactions described therein, if:

(i)     such action or transaction is described in (or is otherwise consistent with) the facts in the Private Letter Ruling;

(ii)     a supplemental private letter ruling is received from the IRS in form and substance reasonably satisfactory to EFH and Reorganized TCEH to the effect that such action or transaction will not affect the Intended Tax Treatment of any applicable transaction;

(iii)     EFH or Reorganized TCEH, as the case may be, obtains an Unqualified Tax Opinion with respect to such action or transaction at least thirty (30) days prior to effecting such action or transaction;

(iv)     such action is the issuing of stock or options to employees under a compensation plan adopted after the Distribution; or

(v)     such action by the EFH Parties and/or their Affiliates is approved in writing by Reorganized TCEH and such action by Reorganized TCEH and/or its Affiliates is approved in writing by EFH.

If the EFH Parties, on the one hand, or Reorganized TCEH, on the other, notifies the other Party that it desires to take one of the actions described in Section 6.01(b) (a "Notified Action"), the EFH Parties and Reorganized TCEH shall cooperate in obtaining a supplemental private letter ruling from the IRS or an Unqualified Tax Opinion for the purpose of permitting the EFH Parties or Reorganized TCEH to take the Notified Action.

ARTICLE VII

Cooperation

Section 7.01     General Cooperation.  The Parties shall each cooperate fully (and each shall cause its respective Subsidiaries to cooperate fully) with all reasonable requests in writing or via e-mail from another Party, or from an agent, representative or advisor to such Party, in connection with the preparation and filing of Tax Returns, claims for Refunds, Tax Proceedings, Tax ruling requests, and calculations of amounts required to be paid pursuant to this Agreement, in each case, related or attributable to or arising in connection with Taxes of any of the Parties or their respective Subsidiaries covered by this Agreement and the establishment of any reserve required in connection with any financial reporting (a "Tax Matter").  Such cooperation shall

include the provision of any information reasonably necessary or helpful in connection with a Tax Matter and shall include at each Party's own cost:

> (i)    the provision, in hard copy and electronic forms, of any Tax Returns of the Parties and their respective Subsidiaries, books, records (including information regarding ownership and Tax basis of property), documentation, and other information relating to such Tax Returns, including accompanying schedules, related work papers, and documents relating to rulings or other determinations by Taxing Authorities;

> (ii)    the execution of any document (including any power of attorney) reasonably requested by another Party in connection with any Tax Proceedings of any of the Parties or their respective Subsidiaries, or the filing of a Tax Return or a Refund claim of the Parties or any of their respective Subsidiaries; and

> (iii)    the use of the Party's reasonable best efforts to obtain any documentation in connection with a Tax Matter.

Each Party shall make its employees, advisors, and facilities available, without charge, on a reasonable and mutually convenient basis in connection with the foregoing matters in a manner that does not interfere with the ordinary business operations of such Party.

Section 7.02    Retention of Records.    The EFH Parties and Reorganized TCEH shall retain or cause to be retained all Tax Returns, schedules, and work papers, and all material records or other documents relating thereto in their possession, including all such electronic records, and shall maintain all hardware necessary to retrieve such electronic records, in all cases until sixty (60) days after the expiration of the applicable statute of limitations (including any waivers or extensions thereof) of the taxable periods to which such Tax Returns and other documents relate or until the expiration of any additional period that any Party reasonably requests, in writing, with respect to specific material records and documents.    A Party intending to destroy any material records or documents shall provide the other Party with reasonable advance notice and the opportunity to copy or take possession of such records and documents. The Parties will notify each other in writing of any waivers or extensions of the applicable statute of limitations that may affect the period for which the foregoing records or other documents must be retained.

Section 7.03    Failure to Perform.    If a Party materially fails to comply with any of its obligations set forth in Section 7.01 or Section 7.02 upon reasonable request and notice by the other Party, and such failure results in the imposition of additional Taxes, the non-performing Party shall be liable in full for such additional Taxes notwithstanding anything to the contrary in this Agreement.

ARTICLE VIII

Miscellaneous

Section 8.01    Governing law.    This Agreement and all issues and questions concerning the construction, validity, enforcement, and interpretation of this Agreement (and all Schedules

and Exhibits) shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.  In furtherance of the foregoing, the internal laws of the State of Delaware shall control the interpretation and construction of this Agreement (and all Schedules and Exhibits), even though under that jurisdiction's choice of law or conflict of law analysis, the substantive law of some other jurisdiction would ordinarily apply.

Section 8.02    Dispute Resolution.  In the event of any dispute among the Parties as to any matter covered by Section 2.02 and Section 2.04, the Parties shall appoint a nationally recognized independent public accounting firm (the "Accounting Firm") to resolve such dispute. In this regard, the Accounting Firm shall make determinations with respect to the disputed items based solely on representations made by the EFH Parties and Reorganized TCEH and their respective representatives, and not by independent review, and shall function only as an expert and not as an arbitrator and shall be required to make a determination in favor of one Party only. The Parties shall require the Accounting Firm to resolve all disputes no later than thirty (30) days after the submission of such dispute to the Accounting Firm and agree that all decisions by the Accounting Firm with respect thereto shall be final and conclusive and binding on the Parties. The Accounting Firm shall resolve all disputes in a manner consistent with this Agreement. The Parties shall require the Accounting Firm to render all determinations in writing and to set forth, in reasonable detail, the basis for such determination.  The fees and expenses of the Accounting Firm shall be borne equally by the Parties.  For the avoidance of doubt, any dispute among the Parties as to any matter not covered by Section 2.02 or Section 2.04 shall be governed by the provisions set forth in Section 8.16.

Section 8.03    Tax Sharing Agreements.  All Tax sharing, indemnification, and similar agreements, written or unwritten, as between a Reorganized EFH Entity, on the one hand, and a Reorganized TCEH Entity, on the other (other than this Agreement and any other agreement for which Taxes is not the principal subject matter), shall be or shall have been terminated (and, to the extent provided under the Plan, settled) no later than the Effective Date and, after the Effective Date, no Reorganized EFH Entity or Reorganized TCEH Entity shall have any further rights or obligations under any such Tax sharing, indemnification or similar agreement, except as provided in the Plan.

Section 8.04    Interest on Late Payments.  With respect to any payment among the Parties pursuant to this Agreement not made by the due date set forth in this Agreement for such payment, the outstanding amount will accrue interest at a rate per annum equal to the rate in effect for underpayments under Section 6621 of the Code from such due date to and including the payment date.

Section 8.05    Survival of Covenants.  Except as otherwise contemplated by this Agreement, the covenants and agreements contained herein to be performed following the Distribution shall survive the Distribution in accordance with their respective terms.

Section 8.06    Severability.  If any provision of this Agreement or the application of any such provision to any Person or circumstance shall be declared judicially to be invalid, unenforceable or void, such decision shall not have the effect of invalidating or voiding the

remainder of this Agreement, it being the intent and agreement of the Parties that this Agreement shall be deemed amended by modifying such provision to the extent necessary to render it valid, legal, and enforceable to the maximum extent permitted while preserving its intent or, if such modification is not possible, by substituting therefor another provision that is valid, legal, and enforceable and that achieves the original intent of the Parties.

Section 8.07    Entire Agreement.    This Agreement, the Exhibits, the other Transaction Agreements, the Plan and the other documents referred to herein shall constitute the entire agreement among the Parties with respect to the subject matter hereof and shall supersede all previous negotiations, commitments, and writings with respect to such subject matter.  Except as otherwise expressly provided herein, in the case of any conflict between the terms of this Agreement and the terms of any other agreement, the terms of this Agreement shall control.

Section 8.08    Assignment.    Neither this Agreement nor any of the rights, benefits or obligations hereunder may be assigned by any of the Parties (whether by operation of law or otherwise) without the prior written consent of the other Parties, and any purported assignment without such consent shall be null and void.  Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of, and be enforceable by the Parties and their respective successors and permitted assigns.

Section 8.09    No Third Party Beneficiaries.    Nothing in this Agreement, express or implied, is intended to or shall confer upon any Person (other than the Parties and their respective successors and permitted assigns) any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement, and, except as provided in Article III relating to certain indemnitees, no Person shall be deemed a third party beneficiary under or by reason of this Agreement.

Section 8.10    Affiliates.    Each EFH Party shall cause to be performed, and hereby guarantees the performance of, all actions, agreements, and obligations set forth herein to be performed by an Affiliate of such EFH Party, and Reorganized TCEH shall cause to be performed, and hereby guarantees the performance of, all actions, agreements, and obligations set forth herein to be performed by an Affiliate of Reorganized TCEH.

Section 8.11    Amendments; Waivers.    This Agreement may not be amended except by an instrument in writing signed by each of the Parties.  No failure or delay by any Party in exercising any right hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right hereunder.  Any agreement on the part of any Party to any such waiver shall be valid only if set forth in an instrument in writing signed on behalf of such Party.

Section 8.12    Interpretation.    The Parties have participated jointly in the negotiation and drafting of this Agreement, and in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provisions of this Agreement.

Section 8.13   <u>Counterparts</u>.   This Agreement may be executed in one or more counterparts each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile or portable document format (PDF) shall be as effective as delivery of a manually executed counterpart of any such Agreement.

Section 8.14   <u>Confidentiality</u>.   Each Party shall hold and cause its directors, officers, employees, advisors, and consultants to hold in strict confidence, unless compelled to disclose by judicial or administrative process or, in the opinion of its counsel, by other requirements of law, all information (other than any such information relating solely to the business or affairs of such party) concerning the other Party furnished it by such other Party or its representatives pursuant to this Agreement (except to the extent that such information can be shown to have been (a) in the public domain through no fault of such Party or (b) later lawfully acquired from other sources not under a duty of confidentiality by the party to which it was furnished), and no Party shall release or disclose such information to any other Person, except its directors, officers, employees, auditors, attorneys, financial advisors, bankers or other consultants who shall be advised of and agree to be bound by the provisions of this <u>Section 8.14</u>.  Each Party shall be deemed to have satisfied its obligation to hold confidential information concerning or supplied by the other Party if it exercises the same care as it takes to preserve confidentiality for its own similar information.  Except as required by law or with the prior written consent of the other Party, all Tax Returns, documents, schedules, work papers and similar items and all information contained therein, and any other information that is obtained by a Party or any of its Affiliates pursuant to this Agreement, shall be kept confidential by such Party and its Affiliates and representatives, shall not be disclosed to any other Person, and shall be used only for the purposes provided herein.  If a Party or any of its Affiliates is required by law to disclose any such information, such Party shall give written notice to the other Party prior to making such disclosure.

Section 8.15   <u>Waiver of Jury Trial</u>.   AS A SPECIFICALLY BARGAINED INDUCEMENT FOR EACH PARTY TO ENTER INTO THIS AGREEMENT (WITH EACH PARTY HAVING HAD OPPORTUNITY TO CONSULT COUNSEL), EACH PARTY EXPRESSLY AND IRREVOCABLY WAIVES THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING UNDER THIS AGREEMENT OR ANY ACTION OR PROCEEDING ARISING OUT OF THE TRANSACTIONS CONTEMPLATED HEREBY OR ANY OTHER TRANSACTION AGREEMENT, REGARDLESS OF WHICH PARTY INITIATES SUCH ACTION OR PROCEEDING, AND ANY ACTION OR PROCEEDING UNDER THIS AGREEMENT OR ANY ACTION OR PROCEEDING ARISING OUT OF THE TRANSACTIONS CONTEMPLATED HEREBY OR ANY OTHER TRANSACTION AGREEMENT SHALL BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.

Section 8.16   <u>Jurisdiction; Service of Process</u>.   Any action with respect to this Agreement and the rights and obligations arising hereunder, or for recognition and enforcement of any judgment in respect of this Agreement and the rights and obligations arising hereunder brought by a Party or its successors or assigns, in each case, shall be brought and determined exclusively in the Bankruptcy Court (or, if the Bankruptcy Court declines to accept jurisdiction over a particular matter, then the Chancery Court of the State of Delaware, and if the Chancery

Court of the State of Delaware declines jurisdiction, then any state or federal court sitting in Delaware).  Each Party hereby irrevocably waives, and agrees not to assert, by way of motion, as a defense, counterclaim or otherwise, in any Action with respect to this Agreement (a) any claim that is not personally subject to the jurisdiction of the above named courts for any reason other than the failure to serve in accordance with this <u>Section 8.16</u>, (b) any claim that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise), and (c) to the fullest extent permitted by applicable law, any claim that (i) the Action in such court is brought in an inconvenient forum, (ii) the venue of such Action is improper or (iii) this Agreement, or the subject matter hereof, may not be enforced in or by such courts.  Each Party further agrees that no Party to this Agreement shall be required to obtain, furnish or post any bond or similar instrument in connection with or as a condition to obtaining any remedy referred to in this <u>Section 8.16</u> and each Party waives any objection to the imposition of such relief or any right it may have to require the obtaining, furnishing or posting of any such bond or similar instrument. The Parties hereby agree that mailing of process or other papers in connection with any such action or proceeding in the manner provided in <u>Section 8.17</u>, or in such other manner as may be permitted by law, shall be valid and sufficient service thereof and hereby waive any objections to service accomplished in the manner herein provided.  NOTWITHSTANDING THIS <u>Section 8.16</u>, ANY DISPUTE REGARDING <u>SECTION 2.02</u> OR <u>SECTION 2.04</u> SHALL BE RESOLVED IN ACCORDANCE WITH <u>SECTION 8.02</u>; PROVIDED THAT THE TERMS OF <u>SECTION 8.02</u> MAY BE ENFORCED BY EITHER PARTY IN ACCORDANCE WITH THE TERMS OF THIS <u>SECTION 8.16</u>.

Section 8.17  <u>Notices</u>.    All notices, requests, claims, demands, and other communications to be given or delivered under or by the provisions of this Agreement shall be in writing and shall be deemed given only (a) when delivered personally to the recipient, (b) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid), *provided that* confirmation of delivery is received, (c) upon machine-generated acknowledgment of receipt after transmittal by facsimile or (d) five (5) days after being mailed to the recipient by certified or registered mail (return receipt requested and postage prepaid).  Such notices, demands, and other communications shall be sent to the Parties at the following addresses (or at such address for a Party as will be specified by like notice):

<u>If to any EFH Party</u>:

Energy Future Holdings Corp., et al.
Energy Plaza
1601 Bryan Street
Dallas, Texas 75201
Attention:     General Counsel
E-mail:         stacey.dore@energyfutureholdings.com
                    awright@energyfutureholdings.com

<u>with a copy (which shall not constitute notice) to, until the Merger becomes effective</u>:

Kirkland & Ellis LLP
600 Travis St., Suite 3300
Houston, Texas 77002
Attention:      Andrew Calder
               Amber Meek
E-mail:         andrew.calder@kirkland.com
               amber.meek@kirkland.com

and

Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
Attention:      James Sprayregen
               Marc Kieselstein
               Chad Husnick
               Steven Serajeddini
E-mail:         jsprayregen@kirkland.com
               mkieselstein@kirkland.com
               chusnick@kirkland.com
               steven.serajedinni@kirkland.com

and

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attention:      Edward Sassower
               Stephen Hessler
               Brian Schartz
E-mail:         edward.sassower@kirkland.com
               stephen.hessler@kirkland.com
               bschartz@kirkland.com

<u>with a copy (which shall not constitute notice) to, when and after the Merger
becomes effective</u>:

Hunt Consolidated, Inc.
1900 North Akard Street
Dallas, Texas 75201
Attention:      David Hernandez
E-mail:         DHernandez@huntconsolidated.com

and

Baker Botts L.L.P.
2001 Ross Avenue, Suite 600

Dallas, Texas 75201
Attention:    Geoffrey L. Newton
              Luckey McDowell
              Preston Bernheisel
E-mail:       geoffrey.newton@bakerbotts.com
              luckey.mcdowell@bakerbotts.com
              preston.bernhisel@bakerbotts.com

and

White & Case LLP
Wachovia Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Attention:    Thomas E. Lauria
E-mail:       tlauria@whitecase.com

and

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036
Attention:    Gregory Pryor
E-mail:       gpryor@whitecase.com

If to Reorganized TCEH, after the Distribution:

[Reorganized TCEH]
[Energy Plaza
1601 Bryan Street
Dallas, Texas 75201]

with a copy (which shall not constitute notice) to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
Attention:    Alan W. Kornberg
              Brian S. Hermann
              Jacob A. Adlerstein
E-mail:       akornberg@paulweiss.com
              bhermann@paulweiss.com
              jadlerstein@paulweiss.com

Any Party to this Agreement may notify any other Party of any changes to the address or any of the other details specified in this paragraph; *provided that* such notification shall only be effective on the date specified in such notice or five (5) Business Days after the notice is given,

whichever is later. Rejection or other refusal to accept or the inability to deliver because of changed address of which no notice was given shall be deemed to be receipt of the notice as of the date of such rejection, refusal or inability to deliver. Any notice to any EFH Party will be deemed notice to all the Reorganized EFH Entities, and any notice to Reorganized TCEH will be deemed notice to all the Reorganized TCEH Entities.

Section 8.18    <u>Headings</u>.    The headings and captions of the Articles and Sections used in this Agreement and the table of contents to this Agreement are for reference and convenience purposes of the Parties only, and will be given no substantive or interpretive effect whatsoever.

Section 8.19    <u>Effectiveness</u>.    This Agreement shall become effective upon the Distribution.

Section 8.20    <u>Further Assurances</u>.    The EFH Parties shall cause each other Person that is or becomes a Subsidiary of EFH that is not "ring-fenced" to execute a joinder to this Agreement (a) to become an EFH Party (effective as of the date such Person becomes a Subsidiary of EFH or ceases to be "ring-fenced") and (b) to be bound by the obligations of the EFH Parties under this Agreement on a joint and several basis.

*[The remainder of this page is intentionally left blank.]*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed as of the day and year first above written.

ENERGY FUTURE HOLDINGS CORP.

By:_____

ENERGY FUTURE INTERMEDIATE
HOLDING COMPANY LLC

By:_____

[REORGANIZED TCEH]

By:_____

## EXHIBIT F

## FORM OF JOINDER AGREEMENT

This Joinder Agreement to the Plan Support Agreement, dated as of [_____], 2015 (as amended, supplemented, or otherwise modified from time to time, the "**Agreement**"), by and among the Parties is executed and delivered by _____ (the "**Joining Party**") as of _____, 2015.   Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

1. <u>Agreement To Be Bound</u>.  The Joining Party hereby agrees to be bound by (a) all of the terms of the Agreement, a copy of which is attached to this Joinder Agreement as <u>Annex I</u> (as the same has been or may be hereafter amended, restated, or otherwise modified from time to time in accordance with the provisions thereof), and (b) the vote with respect to the Plan or an Alternative Restructuring, as applicable, of the transferor of the Debtor Claims/Interests to be acquired in connection with the execution of this Joinder Agreement, if such vote was cast before the effectiveness of the transfer of such Debtor Claims/Interests.   The Joining Party shall hereafter be deemed to be a "Party" for all purposes under the Agreement and with respect to any and all Debtor Claims/Interests held by such Joining Party.

2. <u>Representations and Warranties</u>.  The Joining Party hereby makes the representations and warranties of the Investor Parties, Consenting Interest Holders and Consenting TCEH Creditor Parties set forth in the Agreement to each other Party to the Agreement.

3. <u>Governing Law</u>.  This Joinder Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Delaware, without regard to any conflict of laws provisions which would require the application of the law of any other jurisdiction.

*        *        *

IN WITNESS WHEREOF, the Joining Party has caused this Joinder Agreement to be executed as of the date first written above.

[JOINING PARTY]


By:_____
    Name:
    Title:

Notice information:

_____
_____
_____


Owned Debtor Claims/Interests:

_____
_____
_____

## EXHIBIT G

## MECHANICS RELATING TO THE PREFERRED STOCK SALE

Identification of Potential Preferred Stock Sale Assets. As promptly as is reasonably practicable after the Agreement Effective Date,[1] the Consenting TCEH First Lien Creditors, the Investor Parties, and the Debtors shall attempt to identify assets that could potentially be contributed in the Preferred Stock Sale and shall appoint a mutually acceptable valuation expert to provide a valuation report for each such identified asset. Such Parties shall attempt to obtain updated valuation reports for each asset that is proposed to be included in the Preferred Stock Sale no more than thirty (30) days prior to the Effective Date. Furthermore, the Debtors shall provide to the Consenting TCEH First Lien Creditors and the Investor Parties for their review an estimate of the tax basis of each such asset and a projection of such tax basis on the Effective Date, which projection shall be periodically updated.

Estimated Tax Attributes. At least one hundred and twenty (120) days prior to the Effective Date, the Debtors shall provide to the Consenting TCEH First Lien Creditors and the Investor Parties for their review an estimate of the Agreed Tax Attributes (as defined below), as well as all documents (including all schedules and worksheets) used by the Debtors to determine such estimate. The Consenting TCEH First Lien Creditors, the Investor Parties, and EFH shall negotiate in good faith to determine a reasonable estimate of the Agreed Tax Attributes (the "**Agreed Estimated Tax Attributes**"). If such Parties cannot agree, any disputes shall be resolved by the Accounting Firm pursuant to the Dispute Resolution provisions described below.

Determination of Expected Gain and Selection of Assets for Preferred Stock Sale. As promptly as is reasonably practicable after the date when the Consenting TCEH First Lien Creditors, the Investor Parties, and the Debtors determine the Agreed Estimated Tax Attributes, the Consenting TCEH First Lien Creditors shall determine the amount of gain that is intended to be recognized, which amount shall not be greater than the excess of (i) the Agreed Estimated Tax Attributes over (ii) $500,000,000 (such excess, the "**Maximum Gain**"). Following such determination by the Consenting TCEH First Lien Creditors, the Debtors shall provide the Consenting TCEH First Lien Creditors and the Investor Parties for their review a proposed list of assets to include in the Preferred Stock Sale, such list to be comprised only of assets for which a valuation was obtained as described above. The Consenting TCEH First Lien Creditors and the Investor Parties shall select the assets to be included in the Preferred Stock Sale from the assets on the list, to be selected so as to not generate gain in excess of the Maximum Gain (based on the valuation and tax basis figures with respect to such assets determined in accordance with this Exhibit G).

Formula Clause Approach. The Debtors, the Investor Parties, and the Consenting TCEH First Lien Creditors shall, in good faith, discuss the implementation of a formula-based approach to setting the amount of taxable gain realized in connection with the Preferred Stock Sale (the "Formula Clause Approach"). Under such an approach, the Debtors would propose that the precise percentage of certain assets to be transferred in connection with the Preferred Stock Sale

---

[1] Capitalized terms used but not otherwise defined in this Exhibit G have the meaning ascribed to such terms in (a) the Plan, which is attached to the Plan Support Agreement as Exhibit A, or (b) if not defined in the Plan, then the Plan Support Agreement to which this Exhibit G is attached.

would be based on a formula. Such formula would be designed to ensure that the aggregate fair market value of all of the assets transferred equals the sum of the tax basis of such assets plus the Agreed Tax Attributes (adjusted for the Maximum Gain), all as further agreed upon with the IRS as part of a pre-filing agreement or determined by the bankruptcy court or the IRS under the prompt determination of taxes procedure; *provided, however*, that if no agreement with the IRS is reached pursuant to such procedures and the bankruptcy court does not make a determination, the assets transferred in connection with the Preferred Stock Sale would be adjusted at such future time as ultimately determined pursuant to IRS audit and review procedures. For the avoidance of doubt, the Formula Clause Approach will be utilized only upon the agreement of the Debtors, the Investor Parties, and the Consenting TCEH First Lien Creditors.

Dispute Resolution. In the event of any dispute between the Debtors, the Investor Parties, and the Consenting TCEH First Lien Creditors as to any matter covered by the foregoing provisions of this Exhibit G, except for the Formula Clause Approach as discussed above (if applicable), the Consenting TCEH First Lien Creditors, the Investor Parties, and the Debtors shall appoint a nationally recognized independent public accounting firm (the "**Accounting Firm**") to resolve such dispute. In this regard, the Accounting Firm shall make determinations with respect to the disputed items based solely on representations made by such Parties and their respective representatives, and not by independent review, and shall function only as an expert and not as an arbitrator and shall be required to make a determination in favor of one Party only. Such Parties shall require the Accounting Firm to resolve all disputes no later than thirty (30) days after the submission of such dispute to the Accounting Firm and agree that all decisions by the Accounting Firm with respect thereto shall be final and conclusive and binding on the Parties. The Accounting Firm shall resolve all disputes in a manner consistent with this Agreement. Such Parties shall require the Accounting Firm to render all determinations in writing and to set forth, in reasonable detail, the basis for such determination. The fees and expenses of the Accounting Firm shall be borne equally by TCEH, on the one hand, and EFH, on the other hand.

Certain Definitions. For purposes of this Exhibit G,

(a) "**Agreed Tax Attributes**" means 100% of the aggregate amount of net losses, net operating losses, and net capital losses (but only to the extent such net capital losses are deductible under applicable tax law against gain recognized on the Preferred Stock Sale) (in each case, including carryovers), available to the EFH Group as of the Effective Date (determined (a) as if the "consolidated year" (within the meaning of Section 1503(e)(2)(B) of the Code) of the EFH Group ended on the Effective Date and (b) without regard to any income, gain, loss or deduction generated as a result of the Preferred Stock Sale or transactions occurring outside the ordinary course of business on the Effective Date after the Preferred Stock Sale (other than any Deferred Intercompany and ELA Items (if any) and other transactions expressly contemplated by the Plan and the other Definitive Restructuring Documents)), such amount to be mutually agreed on by EFH, the Investor Parties, and the Consenting TCEH First Lien Creditors; and

(b) "**Deferred Intercompany and ELA Items**" means intercompany items (as such term is defined in Treasury Regulations Section 1.1502-13(b)(2)) and excess loss accounts (as such term is defined in Treasury Regulations Section 1.1502-19(a)), in each case, of any subsidiary of TCEH (other than TCEH Finance) that are accelerated into income as a

result of the Distribution pursuant to Treasury Regulations Section 1.1502-13(d) or Section 1.1502-19.