## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ENERGY FUTURE HOLDINGS CORP., *et al.*,[1] | ) | Case No. 14-10979 (CSS) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | **Hearing Date:  September 17, 2015 at 9:30 a.m.** |
|  | ) | **Objection Deadline:  August 24, 2015 at 4:00 p.m.** |

## MOTION OF ENERGY FUTURE HOLDINGS CORP., *ET AL.*, TO APPROVE A SETTLEMENT OF LITIGATION CLAIMS AND AUTHORIZE THE DEBTORS TO ENTER INTO AND PERFORM UNDER THE SETTLEMENT AGREEMENT

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this motion (the "Motion") seeking entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Settlement Order"), (i) approving the settlement of litigation on the terms outlined in the Settlement Agreement, attached as **Exhibit 1** to **Exhibit A** (the "Settlement Agreement"), by and among the Debtors and the other parties thereto (such parties, the "Settlement Parties"), and (ii) authorizing the Debtors to enter into and perform under the Settlement Agreement.[2]  In support of this Motion, the Debtors respectfully submit as follows.

### Preliminary Statement

1.      For more than a year and a half, the Debtors have been hard at work building consensus for a value-maximizing reorganization plan.  As the Debtors made clear from the

---

[1]  The last four digits of Energy Future Holdings Corp.'s tax identification number are 8810.  The location of the debtors' service address is 1601 Bryan Street, Dallas, Texas 75201.  Due to the large number of debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://www.efhcaseinfo.com.

[2]  Capitalized terms that are used and not defined herein shall have the same meanings as set forth in the Settlement Agreement and the PSA, as applicable.

outset, they would consider all reasonable restructuring options.  Over the past several months, the Debtors engaged in intensive negotiations with TCEH creditors.  These negotiations have now culminated in a comprehensive agreement with creditors from ***all levels*** of the TCEH capital structure that includes a consensual third amended plan of reorganization, (the "Plan").  In addition to enjoying broad support among T-side creditors, the Plan contemplates payment in full of all allowed E-side claims.

2.      A fundamental premise of the Plan is that TCEH will spin off from EFH on a tax-free basis.  The spin-off avoids potentially material deconsolidation taxes and facilitates the merger transaction while still using the Debtors' net operating losses to deliver a substantial "step-up" in the tax basis of TCEH's assets.  The Plan also provides for an injection of approximately $7.1 billion of equity capital and approximately $5.1 billion of debt to finance a tax-free merger of reorganized EFH Corp. ("Reorganized EFH").  The new capital would be used to pay off all allowed E-side claims in full in cash.  In connection with consummation of the merger, Oncor would be restructured to permit the surviving company to convert to a REIT.[3]

3.      Consummation and funding of the merger is subject to certain conditions associated with, among other things, REIT-related approvals and rulings, the satisfaction of which is not entirely certain.  From the outset of Plan negotiations, the Debtors sought to either substantially reduce this conditionality or develop an alternative construct to mitigate it.  Ultimately, the parties reached an agreement that effectively eliminates the most significant downside of conditionality, namely, the risk that failure to achieve the Plan's conditions will lead to a morass of inter-Debtor and inter-creditor litigation.  This agreement is embodied in a

---

[3]   A real estate investment trust, or REIT, is a hybrid tax entity that, although treated as a corporation for federal income tax purposes, is able to eliminate the corporate level income tax by distributing its taxable income to shareholders.

Settlement Agreement[4] and in the PSA that settles a broad collection of litigation claims.  Under the Settlement Agreement and PSA, if, despite the parties' efforts, the merger is not consummated, the Debtors can focus on an alternative path to exit these chapter 11 cases, free from the overhanging litigation that has long plagued these cases.  The Debtors determined that in light of these provisions, together with the opportunity for the repayment in full in cash of all allowed claims against EFH Corp. and EFIH, the conditionality associated with the merger is acceptable.

4.      The Settlement Agreement and PSA are thus key elements of this negotiated solution.  *First*, under the Settlement Agreement, each of the Settlement Parties agrees to settle and release nearly all claims against: (a) the Debtors, (b) the TCEH First Lien Creditors, (c) the Sponsors, and (d) the Debtors' directors and officers.  Critically, the Settlement Agreement will take effect, and most of the claims will be released, immediately upon approval by the Court, regardless of the success or failure of the transactions contemplated by the Plan, thus preserving the peace negotiated by, and avoiding litigation among, the Settlement Parties even if an alternative restructuring must be pursued, as described below.

5.      *Second*, the PSA requires the PSA Parties to support the Plan and to refrain from acting in any way that would impede its success, while also maintaining flexibility to pivot to an alternative restructuring should the transactions contemplated by the Plan prove unsuccessful.  Specifically, the PSA allows the PSA Parties, subject to certain restrictions, to continue negotiations around alternative restructuring structures, and generally requires the TCEH unsecured creditors not to object or interfere with such an alternative restructuring should the transactions contemplated by the Plan fail to close, so long as the alternative restructuring affords

---

[4]      The Debtors have filed a motion to approve the PSA contemporaneously with this Motion.

the TCEH creditors certain minimum treatment as set forth in the Settlement Agreement.  The

PSA also includes a robust fiduciary out for the Debtors.

6.      These agreements were the result of hard-fought negotiations and should provide

a clear path to plan confirmation in a matter of months, eliminating the prospect of a costly and

time-consuming detour though complex and uncertain litigation.  The Settlement Agreement and

PSA are also a critical demonstration of support by TCEH creditors for the proposed

restructuring embodied in the Plan.

7.      If approved, upon effectiveness, the PSA and Settlement Agreement together

would:

- ensure the support of creditors holding more than half by amount of TCEH first and second lien notes and two-thirds by amount of TCEH unsecured notes for the Debtors' restructuring;

- transform some of the Debtors' largest dissenting creditors into Plan supporters;

- guarantee resolution of contentious litigation;

- provide an opportunity for payment in full in cash of all EFH and EFIH creditors; and

- preserve the optionality necessary for the Debtors to maximize the value of their estates in the event of materially changed circumstances.

8.      Thus, the Debtors respectfully submit that the Court should approve the

Settlement Agreement as in the best interest of the Debtors' estates and a reasonable compromise

under Bankruptcy Rule 9019.

### Jurisdiction and Venue

9.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334 and the Amended Standing Order of Reference from the United States District Court for

the District of Delaware, dated February 29, 2012.  This matter is a core proceeding within the

4

meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

10.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

11.     The bases for the relief requested in this Motion are sections 105 and 363(b) of title 11 of the United States Code (the "Bankruptcy Code") and rule 9019 of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules").

## Relief Requested

12.     By this Motion, the Debtors respectfully request that the Court enter an order, substantially in the form of the Settlement Order attached as **Exhibit A**, (i) approving the settlement embodied in the Settlement Agreement and (ii) authorizing the Debtors to enter into and perform under the Settlement Agreement.

## Background[5]

13.     On April 29, 2014 (the "Petition Date"), each of the Debtors filed a voluntary petition with the Court under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Court has entered a final order for joint administration of these chapter 11 cases.  The Office of the United States Trustee for the District of Delaware formed the Official Committee of Unsecured Creditors of Energy Future

---

[5]     The Background section contained in this Motion is identical to the section contained in the Debtors' motion to approve the PSA, filed contemporaneously with this Motion.

Competitive Holdings Company LLC ("EFCH"), EFCH's direct subsidiary, Texas Competitive

Electric Holdings Company LLC ("TCEH") and their direct and indirect subsidiaries, and EFH

Corporate Services Company on May 13, 2015, (D.I. 420) (the "TCEH Committee") and the

Official Committee of Unsecured Creditors of EFH Corp., EFIH, EFIH Finance, Inc., and EECI,

Inc. on October 27, 2014, (the "EFH Committee").  (D.I. 2570)

## I.    Overview of Plan Negotiations.

### A.    RSA and the Contemplated EFIH Second Lien DIP.

14.    Before the Petition Date, the Debtors entered into the Restructuring Support and

Lock-Up Agreement (the "RSA") with certain stakeholders.  (D.I. 98, Ex. D.)  The RSA

contemplated a tax-free spinoff of reorganized TCEH and a new-money investment in

Reorganized EFH in the form of an EFIH second lien DIP facility that would have mandatorily

converted into 60% of the Reorganized EFH equity.

15.    After the Petition Date, during the summer of 2014, a bidding war broke out for

the opportunity to fund the second lien DIP facility.  The interest in Reorganized EFH was not

limited to creditors; the Debtors also received interest from third-party strategic and financial

bidders.  The degree of interest in Reorganized EFH made clear that terminating the RSA was in

the best interests of the estates, and the Debtors did so on July 24, 2014 (D.I. 1697), to embark

on a marketing process for their economic interests in Oncor Electric Delivery Company LLC

("Oncor")[6] (as discussed further below).

### B.    Retention of the Disinterested Director Advisors.

16.    In November 2014, the Debtors, at the direction of their disinterested directors

and managers (the "Disinterested Directors"), retained the following legal counsel and other

---

[6]    EFIH's primary asset is its 100% ownership of Oncor Electric Delivery Holdings Company LLC, which, in turn, owns approximately 80% of Oncor.  EFIH is a direct subsidiary of EFH Corp.

professionals (collectively, the "Disinterested Director Advisors") to represent the respective estates' interests with respect to any matters on which there is an actual conflict of interest between one or more Debtors and another Debtor (the "Conflicts Matters"):

- Proskauer Rose LLP and SOLIC Capital Advisors on behalf of EFH Corp.;

- Cravath, Swaine & Moore LLP (and, subsequently, Jenner and Block LLP) and Goldin Associates, LLC on behalf of EFIH; and

- Munger, Tolles & Olson LLP and Greenhill & Co. LLC on behalf of EFCH, TCEH, and their Debtor subsidiaries.

17.    On December 9, 2014, the boards voted to adopt resolutions delegating to their respective Disinterested Directors the full authority to identify Conflicts Matters and to review and act upon them, including by directing the applicable Debtor to implement the Disinterested Directors' decisions.  The Debtors designed this procedure, in consultation with Kirkland & Ellis LLP (the Debtors' primary legal counsel) and each Debtor's Disinterested Director Advisors, to ensure a strong corporate governance process.

### C.    Oncor Bidding Process and Parallel Plan Negotiations.

18.    In mid-January 2015, following the Court's approval of the Debtors' proposed bidding procedures (D.I. 3295), the Debtors began a renewed effort to market their economic interest in Oncor.  Although ultimately the Debtors did not select a transaction through the bidding process, that process spurred interest and activity among their creditors.

19.    The proposals for Reorganized EFH in the bidding process revolved around two alternative transaction structures that offered greater potential value to creditors than a potential sale of Oncor to a third-party buyer.  First, a group of EFH and EFIH creditors (the "EFH-EFIH Creditor Group") proposed a structure that would equitize the claims of the EFH and EFIH creditors together with a new-money investment in Reorganized EFH.  Second, Hunt Power Holdings, L.L.C. ("Hunt") and a consortium of other equity investors (collectively, the "Hunt-

Investors") joined with certain other stakeholders and members of the ad hoc group of TCEH unsecured noteholders (the "TCEH Unsecured Group," and together with Hunt and the Hunt-Investors the "Hunt/TCEH Unsecured Group") to propose a transaction premised on a merger with EFH Corp. and converting the surviving company into a REIT, coupled with a multi-billion dollar new-money investment.

20.     The Debtors negotiated both potential transactions in parallel.  As part of those negotiations, the Debtors independently assessed the prospect of a potential REIT conversion while also facilitating creditor due diligence.  To that end, the Debtors met with Oncor management and advisors on multiple occasions to discuss the proposed structure of a REIT, and communicated to Oncor their intent to further analyze a REIT conversion in connection with the plan and marketing processes.

21.     On April 14, 2015, the Debtors filed an initial plan of reorganization and related documents (the "Initial Plan").  (D.I. 4142.)  The Initial Plan provided for a tax-free spinoff of reorganized TCEH coupled with a third-party merger, creditor investment, or standalone plan transaction at Reorganized EFH.  From May through July, 2015, the Debtors exchanged markups of a possible plan support agreement and associated investment agreement with the EFH-EFIH Creditor Group.  Meanwhile, the Debtors continued negotiations with the Hunt/TCEH Unsecured Group, developing drafts of a plan and associated definitive documentation for a possible REIT conversion.

22.     Ultimately, as the July hearing for the stalking horse bid approached, the Debtors determined that the bidding process had not yielded a sufficiently attractive bid to justify selecting a stalking horse bidder.  Accordingly, the Debtors declined to do so and instead shifted their focus to the ongoing negotiations.

**D.    Confirmation Scheduling and the Debtors' Exclusivity Periods.**

23.    As it became evident to the Debtors and the TCEH creditors in late May and early June 2015 that achieving consensus around a plan was a realistic possibility, the parties were able to negotiate a schedule for plan confirmation.  The parties' agreement is embodied in the *Stipulation and Agreed Order Regarding Certain Confirmation Scheduling Matters* entered by the Court on July 2, 2015, (the "TCEH Scheduling Stipulation").  (D.I. 4918.)  The TCEH Scheduling Stipulation provides for confirmation proceedings on October 5-8, 2015, if the Debtors' plan of reorganization:  (i) pays in cash, in full, the allowed claims of the EFH and EFIH Debtors' creditors; and (ii) has the support of the parties to the TCEH Scheduling Stipulation.  If either of these conditions is not satisfied, the confirmation hearing will instead begin on January 20, 2016.

24.    Additionally, the TCEH Scheduling Stipulation provides that if the Debtors' exclusive plan filing and solicitation periods have not been terminated by December 29, 2015, by order of the Court, the TCEH Second Lien Indenture Trustee, the TCEH Unsecured Group, and the TCEH Unsecured Indenture Trustee will not file, cause to be filed, or support the filing of a chapter 11 plan of reorganization or disclosure statement with respect to any Debtor until the Court issues a final ruling regarding whether to confirm the plan.

25.    The Debtors will soon file a motion to approve an amended confirmation schedule that includes a confirmation hearing starting on October 28, 2015 (subject to the Court's approval).  Additionally, the Debtors and certain TCEH creditors are filing an amended scheduling stipulation.  Among other things, the amended scheduling stipulation provides that, in the event that the transactions contemplated in the Plan are not consummated, such that an alternative restructuring must be pursued, the confirmation hearing shall be held within 90 days of any alternative plan of reorganization.

E.      **Consensus On the Plan.**

26.      Over the weekend of July 11, 2015, the TCEH Unsecured Group and the TCEH First Lien Creditors made substantial progress in their negotiations regarding the Hunt/TCEH Unsecured Group's plan proposal.  In the context of those negotiations, the parties discussed the potential settlement of litigation claims, including the pending Standing Motions (defined and discussed below).  Early the following week, the two groups submitted a term sheet to the Debtors reflecting a preliminary agreement in principle between them.  Upon receiving the term sheet, the Debtors intensified negotiations with the TCEH Unsecured Group and the TCEH First Lien Ad Hoc Committee regarding a potential global settlement and plan structure.  Those negotiations would ultimately form the basis of the Settlement Agreement and the PSA.

27.      By July 23, 2015, the deadline for the Debtors to file an amended plan of reorganization under the operative scheduling order, the Debtors had not yet reached a definitive deal on either the Hunt/TCEH Unsecured Group proposal or the EFH-EFIH Creditor Group proposal.  Accordingly, the Debtors filed an amended plan of reorganization (the "First Amended Plan"), which preserved the Debtors' option to move forward with either the Hunt/TCEH Unsecured Group proposal or a standalone equitization transaction at EFH Corp. and EFIH.  (D.I. 5078, 5080.)  After filing the First Amended Plan, the Debtors continued to negotiate both potential transactions.

28.      Ultimately, on August 9, 2015, the Debtors, the Hunt/TCEH Unsecured Group, the Settlement Parties, and the PSA Parties reached agreement.  The Debtors concluded that the Hunt/TCEH Unsecured Group's proposal, coupled with the Settlement Agreement and the PSA, constitute the highest and otherwise best available restructuring alternative available at this time.

29.      As a result, simultaneously with this Motion, the Debtors have filed the Plan, which contemplates the tax-free spinoff of TCEH coupled with the merger of EFH Corp. into a

RLF1 12774131v.1

Hunt/TCEH Unsecured Group acquisition vehicle with the goal of converting into a REIT, while providing the Debtors with downside protection in the event that the transactions contemplated in the Plan are unsuccessful.    The Settlement Agreement (as a condition precedent to confirmation of the Plan) and the PSA are both critical to the Debtors obtaining confirmation of the Plan.

## II.    Overview of Legacy Litigation Claims.

### A.    Legacy Discovery.

30.    Since the Petition Date, various creditors have alleged that certain pre-petition transactions give rise to viable litigation claims (the "Legacy Claims"), including fraudulent transfer and breach of fiduciary duty claims, owned by certain Debtors throughout the capital structure, and have announced their intention to litigate those claims on behalf of the Debtors.[7] As outlined below, the Legacy Claims include inter-Debtor claims, claims against certain creditors, and claims against the Sponsors and the Debtors' directors and officers.[8]

31.    On August 13, 2014, after negotiations between the Debtors and their creditor constituencies, this Court entered a consensual order authorizing discovery related to the Legacy Claims.  (D.I. 1832.)  The order permitted creditors to pursue discovery on a broad set of topics concerning various pre-petition transactions and issues that could potentially give rise to Legacy Claims (the "Legacy Discovery").  (*Id.*)

---

[7]    *See* Standing Motions and Litigation Letters, described below.

[8]    While the Settlement Parties support the relief requested in the Motion and entry of the Settlement Order, the Settlement Parties have divergent views on the Legacy Claims asserted herein and the strengths and weaknesses of the various arguments.  The summary and evaluation of the Legacy Claims herein was drafted by the Debtors' advisors, not the Settlement Parties.  The Settlement Parties independently analyzed the Legacy Claims and reached their own conclusions regarding litigation risks and values.  However, the Settlement Parties agree with the conclusion of the Debtors that approval of the Settlement Agreement is in the best interests of the Debtors' estates.

11

32.      Creditors made full use of this opportunity, serving the Debtors with 212 document requests on a wide range of topics, reaching back more than 15 years prepetition.  In response to these requests, the Debtors produced over 800,000 documents, totaling more than 5.6 million pages, in less than eight months.  The Sponsors and other parties-in-interest were served with extremely broad document requests and made very substantial document productions in response to those requests, which included production of documents going back to before the 2007 LBO.  In addition, the Debtors provided voluminous informal diligence, including informal interviews of personnel, related to Legacy Discovery requests.

**B.      Creditor Identification of Claims Against the TCEH First Lien Creditors.**

33.      In the Cash Collateral Order entered on June 6, 2014, the Debtors stipulated to, among other things, the validity of the obligations and liens related to the TCEH First Lien Debt. (D.I. 855.)  Under the Cash Collateral Order, all other parties-in-interest would be bound by the Debtors' stipulations unless such parties obtained standing to challenge them by March 13, 2015 (as subsequently extended, the "Challenge Deadline").

34.      On February 19 and 20, 2015, the TCEH Committee, the EFH Committee, and the TCEH Unsecured Group each filed motions seeking standing to prosecute certain claims against the TCEH First Lien Creditors (in this context, the "Defendants"), and the exclusive authority to settle those claims (the "Standing Motions").[9]  The Standing Motions and proposed complaints attached thereto identify numerous alleged causes of action, including actual and

---

[9]  *Motion of the Official Committee of Unsecured Creditors for Entry of an Order Granting Exclusive Standing and Authority to Commence, Prosecute, and Settle Certain Claims for Declaratory Judgment, Avoidance and Recovery of Liens, Security Interests, Obligations, Fees, and Interest Payments, and Disallowance of Claims,* (D.I. 3593); *Motion of The Ad Hoc Group of TCEH Unsecured Creditors for Entry of an Order Granting Standing and Authority to Commence, Prosecute, and Settle Certain Claims for Declaratory Judgment, Avoidance and Recovery of Claims,* (D.I. 3603); *Motion of the EFH Official Committee for Entry of an Order Granting Derivative Standing and Authority to Prosecute and Settle on Behalf of the Luminant Debtors' Estates,* (D.I. 3605).

constructive fraudulent transfers, avoidance of preferences, equitable subordination, and declaratory judgments, seeking:

- avoidance of over $24 billion of liens, security interests, and obligations granted under the TCEH Credit Agreement, the TCEH First Lien Notes, and the Incremental Amendment Agreement;

- avoidance and recovery of over $2 billion of fees paid in connection with the 2011 Amend and Extend Transactions and the 2013 Revolver Extension, including incremental interest expense paid thereafter as a result of such transactions;

- entry of an order equitably subordinating over $24 billion of Defendants' claims against the TCEH Debtors' estates;

- recharacterization of adequate protection payments of over $100 million per month made by the TCEH Debtors to Defendants during these chapter 11 cases as payments of principal on the TCEH First Lien Debt, to the extent the Court determines at any time that Defendants are unsecured creditors;

- avoidance of approximately $216 million of preferential transfers;

- entry of an order disallowing over $24 billion of Defendants' claims against the TCEH Debtors' estates pending final resolution of the adversary proceeding, and a determination of the amount of Defendants' allowed claims;

- entry of an order disallowing approximately $8 million of Defendants' claims against the TCEH Debtors' estates to the extent such claims include unmatured interest;

- to the extent Defendants' claims are not avoided, entry of an order limiting the amount of Defendants' allowed claims based on section 2(b) of the guarantees under the TCEH Credit Agreement;

- declaratory judgments that certain deposit accounts, rabbi trust accounts, avoidance actions, commercial tort claims, and tax attributes are unencumbered;

- avoidance of Defendants' unperfected liens on or security interests in certain property;

- declaratory judgments that there has been no diminution in the value of Defendants' collateral after the Petition Date, and that the Debtors' use of cash collateral for the limited purposes set forth in the Cash Collateral Order will not result in a diminution in value of Defendants' collateral;

- declaratory judgments that (i) Defendants are not entitled to any postpetition interest and fees unless the Court determines that Defendants are oversecured creditors, (ii) in the event Defendants are determined by the Court to be oversecured creditors, postpetition interest and fees shall be allowed solely to the extent of the excess value of the collateral, and (iii) any award of postpetition interest should be at the contractual, non-default rate of interest;

- declaratory judgment that the TCEH Debtors' stipulations do not expand the scope of Defendants' liens; and

- avoidance and recovery of transfers to or for the benefit of Defendants directly or indirectly from Luminant Generation Company LLC and its debtor subsidiaries that are subsidiary guarantors.

(D.I. 3593, Ex. C; D.I. 3605.)

35.    On March 3, 2015, certain parties filed objections to the Standing Motions, including the Debtors, the TCEH First Lien Agent, and certain holders of TCEH First Lien Claims, individually and as members of the ad hoc group of TCEH First Lien Creditors.[10]  By agreement of the parties, the Challenge Deadline was subsequently extended several times and is now September 10, 2015.[11]  The parties have agreed to indefinitely adjourn the Standing Motions pursuant to the Plan Support Agreement.  (*See* PSA § 6.1(c).)

36.    In connection with these extensions, the parties further committed to begin a mediation regarding the Debtors' plan of reorganization.  (D.I. 4140.)  On May 18, 2015, the

---

[10] *Response and Limited Objection of Wilmington Savings Fund Society, FSB to Certain Motions for Standing* (D.I. 3725); *Debtors' Omnibus Objection to Standing Motions* (D.I. 3726); *Omnibus Objection of CCP Credit Acquisition Holdings, L.L.C., Centerbridge Special Credit Partners, L.P., and Centerbridge Special Credit Partners, II, L.P. to the Standing Motions* (D.I. 3729); *Omnibus Objection of Wilmington Trust, N.A., as Successor TCEH First Lien Administrative Agent and Successor TCEH First Lien Collateral Agent, to the Motions for Derivative Standing* (D.I. 3731); *Omnibus Objection of the Ad Hoc Committee of TCEH First Lien Creditors to Standing Motions* (D.I. 3732); *Objection of the Ad Hoc Group of TCEH Unsecured Noteholders to the Motion of the EFH Official Committee for Entry of an Order Granting Derivative Standing and Authority to Prosecute and Settle Claims on Behalf of the Luminant Debtors' Estates* (D.I. 3734); *Objection of Law Debenture Trust Company of New York, as Indenture Trustee, to the Motion of the EFH Official Committee for Entry of an Order Granting Derivative Standing and Authority to Prosecute and Settle Claims on Behalf of the Luminant Debtors' Estates* (D.I. 3741).

[11] *See* Stipulations dated August 8, 2014 (D.I. 1771), September 19, 2014 (D.I. 2083), November 5, 2014 (D.I. 2704), December 2, 2014 (D.I. 2916), January 27, 2015 (D.I. 3380), March 10, 2015 (D.I. 3857), April 17, 2015 (D.I. 4210), and July 9, 2015 (D.I. 4958).

Court entered an order authorizing the mediation of "issues regarding the terms of the Plan related to, or arising in connection with, the restructuring of the TCEH Debtors' estates and the treatment of claims held by the Mediation Parties against the TCEH Debtors' estates under the Plan." (D.I. 4497.)

37.     On or about July 11, 2015, the TCEH First Lien Creditors and the TCEH Unsecured Group reached a preliminary agreement to settle all claims against the TCEH First Lien Creditors, including those raised in the Standing Motions.

**C.     Creditor Identification of Other Legacy Claims.**

38.     On September 16, 2014, the Court entered a protocol, (D.I. 2051), amended on November 13, 2014, (D.I. 2760), and July 21, 2015, (D.I. 5057) (as amended, the "<u>Case Matters Protocol</u>"), which imposes a process to govern the investigation and filing by parties in interest of motions seeking standing to commence Legacy Claims other than those subject to the Challenge Deadline.  The Case Matters Protocol requires each TCEH Creditor Representative (as defined in the Case Matters Protocol) to: (a) disclose in writing to the Debtors any material claims and causes of action for which it intends to request standing by April 30, 2015; and (b) file its standing motion by the later of (i) September 30, 2015, (ii) fifteen days after approval of a disclosure statement, or (iii) a mutually agreed date.

39.     In accordance with the Case Matters Protocol, on March 31, 2015 and April 30, 2015, the TCEH Committee sent letters to the Debtors identifying alleged claims and causes of action belonging to the TCEH Debtors' estates that the TCEH Committee may seek standing to pursue, including inter-Debtor claims, claims against the Sponsors, and claims against the Debtors' directors and officers (the "<u>TCEH Committee Litigation Letters</u>").   The claims identified in the TCEH Committee Litigation Letters include claims and causes of action for fraudulent transfers under state law and sections 544 and 548 of the Bankruptcy Code,

preferential transfers under section 547 of the Bankruptcy Code, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of contract, and/or unjust enrichment.

40.      Also, in accordance with the Case Matters Protocol, on April 30, 2015, the TCEH Unsecured Group sent a letter to counsel to the Debtors identifying alleged inter-Debtor and other claims and causes of action belonging to the TCEH Debtors' estates that the TCEH Unsecured Group may seek to pursue, including inter-Debtor claims, claims against the Sponsors, and claims against the Debtors' directors and officers (the "TCEH Unsecured Group Litigation Letter," and together with the TCEH Committee Litigation Letters, the "Litigation Letters").  The claims identified in the TCEH Unsecured Group Litigation Letter include claims and causes of action for fraudulent transfers under state law and sections 544 and 548 of the Bankruptcy Code, preferential transfers under section 547 of the Bankruptcy Code, breaches of fiduciary duty, aiding and abetting breaches of fiduciary duty, breaches of contract, and unjust enrichment.  There is a very substantial overlap of claims identified in the TCEH Committee Litigation Letter and the TCEH Unsecured Group Litigation Letter.

**D.      The Disinterested Director Settlement of Inter-Debtor Claims.**

41.      Beginning almost immediately after their retention in mid-November 2014, the Disinterested Director Advisors, at the direction of the Disinterested Directors, conducted extensive diligence on inter-Debtor transactions and relationships.  This diligence, which was facilitated by the Debtors and their counsel, included searching and reviewing thousands of documents, reviewing prior work product prepared by the Debtors' advisors, and conducting multiple interviews of the Debtors' personnel with knowledge of the facts relating to potential claims.   The Disinterested Director Advisors regularly consulted with their respective Disinterested Directors on their diligence and analysis, supplementing each Disinterested

Director's own knowledge and experience, including knowledge and experience gained from serving on the board of his or her respective Debtor.

42.     As a result of this extensive diligence, the Disinterested Director Advisors were able to identify the following inter-Debtor claims to be resolved, either through settlement or, if necessary, through litigation:

- Claims by TCEH against other Debtors relating to:

  - intercompany tax sharing, including unpaid tax sharing obligations for TCEH-generated NOLs, audit statements, and avoidable transfers;

  - allocation of shared services and related transfers, including letters of credit, use of unencumbered cash, allocation of restructuring fees, allocations of pension and OPEB obligations, and rabbi trust funds held in an account at EFH;

  - Sponsor fees and other payments to Sponsors;

  - underpayment of interest by EFH on TCEH Intercompany Notes;

  - entry into the TCEH Credit Agreement and amendments and extensions of that agreement;

  - the 2007 LBO, including claims related to the use and transfer of TCEH borrowings;

  - TCEH-issued debt held by EFH and EFIH, including subordination and recharacterization, and avoidance of interest payments;

  - allocation of value resulting from a tax-free spinoff of TCEH and reduced step-up in tax basis of TCEH assets;

  - transfer of EFCH's ownership interest in dividend of shares of Oncor to EFH;

  - transfers related to the Reimbursement (Make-whole) Agreements between Luminant and Oncor;

  - payments by TCEH retail businesses to Oncor for transmission and delivery services; and

  - TCEH's repayment of the joint credit facility with Oncor in 2007.

- <u>Claims by EFH and EFIH against TCEH relating to:</u>

  - debt issued by TCEH and the potential setoff of those holdings against claims asserted by TCEH;

  - dividends from EFIH to EFH that EFH used to repay the TCEH Intercompany Notes in February 2012 and January 2013; and

  - intercompany tax sharing.

- <u>Claims by EFIH against EFH relating to</u>:

  - dividends from EFIH to EFH that EFH used to repay the TCEH Intercompany Notes in February 2012 and January 2013;

  - dividends of EFH Notes from EFIH to EFH in December 2012 and January 2013; and

  - EFIH's holdings of EFH Legacy Notes.

(*See* D.I. 4145; D.I. 4146; D.I. 4147.)

43.      Beginning in mid-February and continuing through the end of March 2015, the Disinterested Directors and Disinterested Director Advisors conducted both in-person and telephonic negotiations concerning a potential settlement of the inter-Debtor claims.  Certain negotiations were conducted directly among the Disinterested Directors, while others were conducted among the Disinterested Director Advisors, under the direction and supervision of the Disinterested Directors.   In the course of these negotiations, the Disinterested Directors exchanged presentations advocating each Debtor's view on the strengths and weaknesses of the various inter-Debtor claims.  Throughout the process, the Disinterested Directors frequently conferred with their respective Disinterested Director Advisors on the terms and conditions of a reasonable settlement of inter-Debtor claims.

44.      These exhaustive, arm's-length negotiations culminated in a comprehensive settlement of all prepetition inter-Debtor claims (the "<u>Disinterested Director Settlement</u>").  Under the terms of the Disinterested Director Settlement, EFH, EFIH, and the TCEH Debtors agreed to

release inter-Debtor claims in exchange for an allowed $700 million general unsecured claim by TCEH against EFH and certain additional potential recoveries by TCEH against EFH. The Disinterested Directors further agreed that after full satisfaction of all allowed administrative, priority, and secured claims against EFH, the next $1.41 billion of distributable value of the EFH estate would be distributed as follows: (a) EFH would retain 49.645% for distribution on account of allowed unsecured claims and interests (other than the TCEH claim); (b) TCEH would receive 49.645% on account of its claim; and (c) the Sponsor group would receive 0.709%. Distributable value from the EFH estate in excess of $1.41 billion would be distributed as follows: (a) TCEH would receive 50%, until TCEH received an additional $105 million, for a total distribution to TCEH of $805 million; and (b) EFH would retain 50% for distribution on account of allowed unsecured claims and interests (other than the TCEH claim). On March 31 and April 1, 2015, each of the Disinterested Directors agreed that the proposed settlement was in the best interest of their respective estates, and the terms of the Disinterested Director Settlement were included as part of the Initial Plan. (*See* D.I. 4145; D.I. 4146; D.I. 4147.)

### III.   The Settlement Agreement.[12]

45.     The claims raised in the Standing Motions and Litigation Letters could give rise to lengthy, complex, and contentious litigation. Recognizing that this cloud of potential litigation must be removed before the parties could possibly see their way to a consensual plan, the Debtors and certain key creditor constituencies have negotiated an agreement to settle these issues once and for all, regardless of the ultimate form of the Plan.

46.     On August 9, 2015, the Debtors entered into the Settlement Agreement (subject to this Court's approval) with the Settlement Parties, including significant creditors at all levels

---

[12]   The summaries of the underlying PSA and Settlement Agreement contained in this Motion are included for descriptive purposes only and, to the extent of any inconsistency between the Motion and the agreements, the agreements control.

of the TCEH capital structure, and the TCEH Committee.[13]    (Settlement Agreement ("SA")

preliminary statement.)    The Debtors anticipate that additional creditors will sign onto the

Settlement Agreement in advance of the hearing on this Motion.

47.    The Settlement Agreement resolves three broad categories of prepetition claims:

- inter-Debtor claims (SA § 2.1);

- claims against the TCEH First Lien Creditors (SA § 2.2); and

- claims against the Sponsors and against the Debtors' directors and officers (SA §§ 2.3, 2.4).

48.    The Settlement Parties' resolution of claims under the Settlement Agreement is in

consideration of, among other things, the mutual releases of claims under the Settlement

Agreement and the opportunity to receive the economic benefits of the transactions contemplated

by the Plan or an Alternative Restructuring under the PSA, as discussed further below.

## A.    Categories of Claims Settled Under the Settlement Agreement.

### 1.    Inter-Debtor Claims.

49.    The first category of claims settled in the Settlement Agreement is inter-Debtor

claims (the "Inter-Debtor Claims," and the settlement of such claims, the "Inter-Debtor

Settlement." (SA § 2.1.)  The transactions and conduct underlying these Inter-Debtor Claims

have been the subject of extensive investigation and diligence by the Debtors (including their

Disinterested Directors) and their advisors (including the Disinterested Director Advisors), the

Creditors' Committees, and various ad hoc creditor groups.

50.    With one narrow exception, the Settlement Agreement resolves *all* Inter-Debtor

Claims relating to the Debtors and other specified matters,[14] "from the beginning of the world

---

13    There are minority holders of TCEH first lien claims, TCEH second lien notes, and TCEH unsecured notes that will not be party to the Settlement Agreement.  The Settlement Order will not release the "direct claims" of these holders (i.e., claims held by creditors themselves, rather than the Debtors).

through the Settlement Effective Date." (SA § 2.1(a).) The released claims include, among others, all claims identified, claimed, or released in the Litigation Letters or the Disinterested Director Settlement with respect to the released parties. (*Id.*)

51. The terms of the Inter-Debtor Settlement in the Settlement Agreement, described in more detail below, largely track the terms of the Disinterested Director Settlement, which, as described in detail above, was separately negotiated at arm's-length among the Disinterested Directors in consultation with their Disinterested Director Advisors.[15]

## 2. Claims Against TCEH First Lien Creditors.

52. The second category of claims settled in the Settlement Agreement is claims against the TCEH First Lien Creditors (the "First Lien Claims," and the settlement of such claims, the "First Lien Settlement"). (SA § 2.2.) Similar to the Inter-Debtor Settlement, the First Lien Settlement relinquishes *all* claims against the TCEH First Lien Creditors relating to the Debtors and other specified matters, "from the beginning of the world through the Settlement Effective Date." (*Id.*) These released claims include, among others, all claims identified, claimed, or released in the Standing Motions or the Disinterested Director Settlement. (*Id.*)

## 3. Claims Against the Sponsors and the Debtors' Directors and Officers.

53. The third category of claims settled in the Settlement Agreement is claims against the Sponsors and the Debtors' directors and officers (the "S/D/O Claims"), and the settlement of such claims, the "S/D/O Settlement"). (SA §§ 2.3, 2.4.) Similar to the Inter-Debtor Settlement

---

[14]  The Settlement Agreement does not release claims among the Debtors arising after the Petition Date under the Cash Management Order, (D.I. 801). (SA § 2.1(a).)

[15]  Both the Disinterested Director Settlement and the Settlement Agreement provide TCEH with an allowed $700 million claim against EFH. As discussed above, the Disinterested Director Settlement also guaranteed TCEH 49.65% of the distributable value from the EFH estate and guaranteed the Sponsor Group with 0.709% of the first $1.41 billion of distributable value from the EFH estate, and TCEH with the right to receive 50% of the distributable value from the EFH estate in excess of $1.41 billion, up to a total distribution to TCEH of $805 million. These terms are not part of the Settlement Agreement.

and the First Lien Settlement, the S/D/O Settlement relinquishes *all* claims against the Sponsors and the Debtors' directors and officers relating to the Debtors and other specified matters, "from the beginning of the world through the Settlement Effective Date." (*Id.*)  These released claims include, among others, all claims identified, claimed, or released in the Litigation Letters, or the Disinterested Director Settlement. (*Id.*)

### B.    Other Provisions of the Settlement Agreement.

54.    The Settlement Agreement's resolution of litigation claims is not contingent upon the success of the Plan:

> [T]he Parties have resolved to enter into this Settlement Agreement. . ., which upon entry of the Settlement Order, shall remain binding on all Parties regardless of whether the Plan is confirmed or consummated.

(SA Recitals).

55.    Instead, assuming Court approval, the Settlement Agreement can be terminated at will only by *mutual* written agreement of the following parties, as defined in the Settlement Agreement: "(i) the Debtors; (ii) the Settling Interest Holders; (iii) the Required TCEH Creditor Parties; and (iv) the TCEH Official Committee," and may be terminated in certain other limited circumstances also requiring multi-party consent.  (SA § 3.5(a)-(c).)  There can be no *unilateral* termination by any one Settlement Party as a result of changing plan dynamics or any other event.

### C.    Economic Benefits of the Settlement Agreement.

56.    The Settlement Parties agreed to the releases of claims in the Settlement Agreement in consideration of the mutual releases and the opportunity to benefit from the transactions contemplated by the PSA, including under the Plan or an Alternative Restructuring.

57.     Each of the Debtors, in particular, will receive substantial benefits from, and in exchange for, the releases.  The settlement and releases eliminate the potential for protracted litigation, which has the potential to materially delay or impede the Debtors' ability to successfully restructure.  Moreover, the releases are an integral part of the agreement of the Settlement Parties to:  (a) support the transactions under the Plan, including the potential multi-billion dollar cash contribution toward the repayment of all allowed claims against EFH Corp. and EFIH in full, and; (b) if the merger is not consummated, support an Alternative Restructuring.

58.     The Plan contemplates that the Hunt/TCEH Unsecured Group will make and/or backstop an aggregate equity investment of approximately $7.1 billion plus approximately $5.5 billion in committed term debt financing to:  (a) repay all of the allowed claims against EFH and EFIH in full in cash;[16] (b) acquire Reorganized EFH through a merger; and (c) acquire the Oncor minority interest.  In connection with the equity investment, the Hunt/TCEH Unsecured Group will backstop approximately $5 billion of a rights offering to TCEH junior creditors.  In exchange for the cash contribution toward the repayment of EFH and EFIH claims, EFH Corp. would merge with and into an acquisition entity established by the Hunt/TCEH Unsecured Group.  The merger contemplates that the surviving company will elect to be treated as a REIT under federal tax law.

59.     Under the Plan, TCEH assets will be transferred to a newly-created subsidiary of reorganized TCEH, and the preferred stock of this newly-created subsidiary will be sold to third-party investors, which will result in a significant step-up in the basis of certain of TCEH's assets.

---

[16] Excluding any claims derived from or based upon make-whole, applicable premium, redemption premium or other similar payment provision, or any other alleged premiums, fees, or claims relating to the repayment of claims, which will be disallowed under the Plan.

Following that transaction, the TCEH First Lien Creditors will receive 100% of the reorganized TCEH equity through a tax-free spinoff which, as was true for the RSA, is also a fundamental element of the PSA.  The tax-free spinoff will occur immediately before the merger.  In addition to the participation rights offered to TCEH junior creditors, an incremental $700 million of participation rights will be offered to TCEH First Lien Creditors, any proceeds of which will reduce the merger's term debt financing or fund other cash uses in the transaction.

60.    If the transactions contemplated by the Plan are not consummated, the PSA provides that PSA Parties who hold claims agree that they will support an Alternative Restructuring.  (*See* PSA § 5.1.)  In that event, the PSA provides for an agreed-upon treatment of TCEH junior creditors that "shall be materially consistent" with the Settlement Agreement. (PSA § 5.6.)

61.    Moreover, if the Plan is not consummated, the TCEH First Lien Creditors will no longer have $700 million of participation rights in the merger.  Instead, the Settlement Agreement provides that the TCEH First Lien Creditors will receive the entirety of the TCEH Settlement Claim, which is an allowed, non-priority, unsecured claim against EFH Corp. in the amount of $700 million.  (SA § 2.1(b).)  Likewise, the TCEH junior creditors also will no longer receive the opportunity to participate in the acquisition of Reorganized EFH.  Instead, the holders of Allowed TCEH First Lien Deficiency Claims (subject to section 2.2(b) of the Settlement Agreement), Allowed TCEH Unsecured Note Claims, Allowed TCEH Second Lien Note Claims, Allowed PCRB Claims, and Allowed General Unsecured Claims Against the TCEH Debtors Other Than EFCH (each as defined in the Plan) will receive the $550 million TCEH Cash Payment, paid from the TCEH Debtors' estates, or as a carve out of the TCEH First Lien Creditors' Prepetition Collateral, and subordinate to the RCT Reclamation Support Carve

Out, the Carve Out, and the Permitted Liens (each as defined in the Cash Collateral Order, D.I. 855).  (SA § 2.2(a).)

62.    Consummation and funding of the merger is subject to certain conditions associated with regulatory approvals, IRS rulings, and other terms, the satisfaction of which is uncertain.  The Debtors agreed to this conditionality in exchange for the releases in the Settlement Agreement and contractual obligations under the PSA and Settlement Agreement that, in each case, survive a failure to consummate the merger.  The Debtors determined that these provisions for peace, together with the opportunity for the repayment in full in cash of all allowed claims against EFH and EFIH, make acceptable the conditionality associated with the merger.  This multifaceted package of consideration is the result of extensive negotiation and due diligence by all parties to the Settlement Agreement and represents a critical turning point in the chapter 11 cases.

## IV.    The Plan Support Agreement.

### A.    Overview.

63.    The Debtors and the PSA Parties[17] executed the PSA on August 9, 2015. Fundamentally, the PSA requires the PSA Parties to support the Plan.

64.    The Plan is currently the highest and otherwise best actionable transaction, warranting the considerable support it will receive under the PSA.  As noted, the Plan is premised on the successor to Reorganized EFH being converted into a REIT, which many parties believe will create significant value for the benefit of the Debtors' creditors.  The Debtors have received, evaluated, and actively negotiated numerous potential transactions, including transactions proposed by at least five distinct bidders or stakeholder groups.  But this Plan has

---

[17]   The PSA Parties include the Settlement Agreement Parties plus the Hunt-Investor Parties.

garnered the most extensive support from creditors in all levels of the TCEH capital structure and will permit the Debtors to avoid costly and protracted litigation.  Thus, the Debtors have determined to lock up with the Hunt/TCEH Unsecured Group's proposal pursuant to the PSA—subject, however, to a backup plan and a robust fiduciary out (as discussed below).

65.    The PSA is a significant positive step toward the Debtors' goal of achieving consensus around the Plan.  Namely, the PSA:  (a) contains the commitments needed to effectuate the Hunt/TCEH Unsecured Group's proposal embodied in the Plan; (b) represents significant T-side creditor support; and (c) maintains the Settlement Agreement's obligations regardless of the ultimate form of the Debtors' restructuring.

### B.    Plan Support Commitments.

66.    The PSA requires certain commitments of the Investor Parties, Consenting Interest Holders,[18] and Consenting TCEH Creditor Parties.[19]  (*See* PSA § 4.1.)  These parties agree:  (a) subject to receipt of an approved Disclosure Statement, to vote in favor of the Plan and, as applicable, elect not to opt out of Plan releases (PSA § 4.1(a)); and (b) to assist the Debtors in effectuating and consummating the Plan (PSA § 4.1(b)).  Not only must the parties provide their cooperation and assistance, but they cannot act to object, impede, or delay those efforts.  (PSA § 4.1(c).)  This includes agreeing to refrain from supporting any litigation requests for standing that may be brought by the EFH Committee (PSA § 4.1(e)), or the allowance or any payment of any EFH or EFIH make-whole claims (PSA § 4.1(f)).  Most importantly,

---

[18]  Consenting Interest Holders are: Kohlberg Kravis Roberts & Co., LP, TPG Capital Management, L.P, and Goldman, Sachs, & Co., as well as associated funds that hold equity interests in Texas Holdings (collectively the "Sponsors"); Texas Energy Future Holdings Limited Partnership ("Texas Holdings"); and Texas Energy Future Holdings LLC ("TEF").  (PSA preamble.)

[19]  Consenting TCEH Creditor Parties are: the Consenting TCEH Second Lien Notes Trustee, the Consenting TCEH Unsecured Notes Trustee, the Consenting TCEH Second Lien Noteholders, the Consenting TCEH Unsecured Noteholders, the Consenting TCEH First Lien Noteholders, and the Consenting TCEH First Lien Trustee.  (PSA preamble.)

section 4.1(c) of the PSA incorporates these parties' commitments to adhere to the terms of the Settlement Agreement while supporting the Plan, which are integral to the Debtors' restructuring efforts.  (*Id.*)  The PSA also provides for the TCEH Committee to make similar commitments, including the adjournment and ultimate withdrawal of all Standing Motions.  (*See* PSA § 4.2.)

67.     Recognizing that the Plan requires certain regulatory approvals, including from the Public Utility Commission of Texas (the "PUCT") and the IRS, the PSA similarly imposes an obligation that the parties use commercially reasonable efforts to assist the Debtors in obtaining consummation of the Plan and that they refrain from taking actions to the contrary with respect to the PUCT or otherwise.  (PSA §§ 4.1(b)-(c), 4.2(a)-(b).)  The PSA also provides for a consultation process by which the Debtors will allow parties to participate in substantive communications with the IRS, share materials concerning IRS and PUCT regulatory approvals, and incorporate the parties' reasonably requested comments therein.  (PSA §§ 10(a), 10(b).)

### C.     Primary Support Period.

68.     While the PSA requires that the PSA parties support the Plan, it also provides the Debtors with protections in the event the Plan cannot be consummated because of an inability to obtain necessary regulatory approvals or reach PSA milestones.[20]   While all parties must cooperate to confirm the Plan, during the Plan Support period, the PSA permits the PSA Parties simultaneously to negotiate and exchange documentation concerning an Alternative Restructuring.  (PSA § 4.1(c), 4.2(b).)  This carefully negotiated right for a "backup plan" protects the Debtors from losing precious time—if months down the road a REIT conversion fails, for instance, the Debtors can be ready immediately to prosecute an alternative plan.  The

---

[20]  The PSA parties' commitments under section 4 of the PSA terminate in the event certain milestones are not achieved.  (PSA § 10.)  The milestones are:  (1) entry of a Disclosure Statement Order by (or before) November 15, 2015, (2) entry of a Confirmation Order by (or before) January 15, 2016; and (c) the Effective Date of the Plan by (or before) April 30, 2016, all of which are subject to limited extensions under certain circumstances.

PSA permits the Debtors to pursue Court approval of such an Alternative Restructuring without having to start from square one.  Moreover, should an Alternative Restructuring become necessary due to the failure of the Plan, the PSA generally requires the PSA Parties to support and/or not interfere with that option so long as it contains certain required terms.  (*See* PSA §§ 5.1(a), 5.2, 5.3.)

69.    To safeguard the tremendous benefits of the Settlement Agreement, the PSA requires that any Alternative Restructuring be materially consistent with the Settlement Agreement, the Settlement Order, and other terms.  (*See* PSA § 6.1.)  The PSA therefore ensures that the settlement of litigation claims will be preserved.

70.    As discussed above, if the Plan is not consummated, claims against the TCEH First Lien Creditors are still released under the Settlement Agreement in exchange for the $550 million TCEH Cash Payment to the TCEH unsecured creditors, paid from the TCEH Debtors' estates, or as a carveout from the TCEH First Lien Creditors' Prepetition Collateral.  The PSA further requires the TCEH unsecured creditors to vote in favor of an Alternative Restructuring filed or supported by the TCEH First Lien Creditors that contains the required terms.  This backup plan "drag" essentially forecloses confirmation objections from these stakeholders.

**D.    Fiduciary Out.**

71.    A critical component of the PSA[21]—one which the Debtors required—is the "fiduciary out."  (*See* PSA § 12.6(h).)  It provides that a Debtor may terminate the PSA if:

> the board of directors, board of managers, or such similar governing body of any Debtor determines in good faith after consultation with its outside financial advisors and outside legal counsel, and based on the advice of such counsel, that proceeding with the Plan and Restructuring Transactions or the Alternative

---

21    The Merger Agreement also provides for a fiduciary out.  (Merger Agreement § 8.3(e)-(f).)

Restructuring would be inconsistent with its applicable fiduciary duties.

72.     This robust fiduciary out belies any concern that the Debtors and their management might somehow "contract away" their ability to maximize the value of these chapter 11 estates consistent with their fiduciary duties.  To the contrary, under the PSA, the Debtors are permitted to take any action "reasonably required" to comply with that fiduciary duty, including terminating their obligations under the PSA (which the Debtors are expressly permitted to do).  (*See* PSA § 4.3(c).)

## V.     Effectiveness of Releases in PSA and Settlement Agreement.

73.     The PSA contains contractual provisions that bind the PSA Parties to support and consent to releases, under the Plan or an Alternative Restructuring, of inter-Debtor and legacy claims that are substantially coextensive with those provided by the Settlement Agreement.  The PSA may be terminated by the applicable creditor PSA Parties if, among other things:  (a) the PSA Order is not entered by September 30, 2015; (b) the PSA is not executed, by August 31, 2015, by the beneficial holders of at least 50.1% of the TCEH second lien note claims, 66.7% of the TCEH unsecured note claims, and 50.1% of the TCEH first lien claims; and (c) the PSA is not executed, by August 31, 2015, by the TCEH first lien administrative and collateral agent.  (PSA §§ 12.1(a), 12.1(g), 12.2(a), 12.2(g), 12.6(a)-(c).)  Absent termination of the PSA, the PSA Parties' contractual obligations under the PSA will remain effective whether or not the Court enters the Settlement Order or confirms the Plan.

## Argument

**I.      The Settlement Agreement Is Reasonable and In the Best Interest of the Debtors' Estate.**

**A.      Legal Standard.**

74.      Pursuant to Bankruptcy Rule 9019, a court may approve a proposed compromise or settlement after notice and a hearing.  Fed. R. Bankr. P. 9019(a).  Additionally, section 105(a) of the Bankruptcy Code allows a court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

75.      "[C]ompromises are favored in bankruptcy."  *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996) (citation omitted).  This Court may approve a settlement that is "fair and equitable."  *In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 514 (Bankr. D. Del. 2010) (Sontchi, J.).  To determine fairness and equity, the Court "need not decide the numerous questions of law or fact raised by litigation, but rather should canvas the issues to determine whether the settlement falls above the lowest point in the range of reasonableness."  *Id.* at 515. Ultimately, "the court does not have to be convinced that the settlement is the best possible compromise."  *In re World Health Alternatives, Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006) (citations omitted).

76.      In considering whether to approve a settlement, the Court must "balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal."  *In re GHR Cos., Inc.*, 50 B.R. 925 (Bankr. D. Mass. 1985).  In assessing this balance, the Court should consider: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors."  *In re Martin*, 91 F.3d at 393; *see also In re Capmark Fin. Grp.*, 438 B.R. at 476.

77.     It is not necessary for the Court to conduct a "mini trial" of the facts or the merits of the underlying disputes to be settled. *In re Capmark Fin. Grp.*, 438 B.R. at 515 ("[T]he Court is not required to conduct a full evidentiary hearing as a prerequisite to approving a compromise."). Rather, the Court need only consider those facts which are necessary to enable it to evaluate the settlement and to make an informed and independent judgment about the settlement. *In re Penn. Cent. Transp. Co.*, 596 F.2d 1102, 1114 (3d Cir. 1979) (citation omitted); *see also In re Adelphia Commc'ns. Corp.*, 368 B.R. 140, 241 (Bankr. S.D.N.Y. 2007) ("[A] bankruptcy court need not be aware of or decide the particulars of each individual claim resolved by the settlement agreement or assess the minutia of each and every claim; rather, the court need only canvass the issues and decide whether the settlement falls below the lowest point in the range or reasonableness.").

78.     Ultimately, while the "approval of a settlement rests in the Court's sound discretion, the debtor's business judgment should not be ignored." *In re Charter Commc'ns*, 419 B.R. 221, 252 (Bankr. S.D.N.Y. 2009) (citation omitted); *see also In re Key3Media Grp., Inc.*, 336 B.R. 87, 93 (Bankr. D. Del. 2005); June 6, 2014 Hr'g Tr. at 259:17-25 (approving first lien settlement under Rule 9019 as a "reasonable exercise of the debtors' business judgment.")

### B.     Overview of Claims Resolved in the Settlement Agreement.

79.     Although the Settlement Agreement resolves several distinct categories of claims—including Inter-Debtor Claims, First Lien Claims, and S/D/O Claims—the transactions at issue in each category overlap substantially. To avoid repetitive discussion of the transactions underlying the claims in each category, the Debtors, including the Disinterested Director Advisors, have summarized the key factual and legal issues for each transaction below, and

where appropriate, included additional factors considered by the Disinterested Directors and their advisors.[22]

### a.    The 2005 Oncor Transfer

80.    The Settlement Agreement resolves potential claims arising out of the transfer of the equity interests in Oncor from EFCH to EFH.  By way of background, Oncor was formerly a wholly-owned subsidiary of EFCH.  In 2005, EFH (then known as TXU Corporation) executed an internal restructuring of Oncor (then known as TXU Electric Delivery Company LLC).  The equity of Oncor was dividended from its parent EFCH (formerly known as TXU US Holdings Company) to its ultimate parent TXU Corp., at which point TXU Electric Delivery Company operated as a separate wholly-owned subsidiary of EFH.  This internal restructuring (the "Oncor Transfer") was the first step in a plan to spinoff Oncor from TXU's power, wholesale, and retail energy business.  That plan, known at the time as "Project Jewel," was ultimately abandoned.

81.    Shortly after the Petition Date, the TCEH Unsecured Group suggested that the Oncor Transfer occurred in 2007, rather than in 2005.  As support for this theory, the TCEH Unsecured Group cited a schedule to EFCH's Form 10-K for the fiscal year ended December 31, 2006, which appears to reflect Oncor as a direct subsidiary of EFCH.  The TCEH Unsecured Group further suggested that, if the Oncor Transfer indeed occurred in 2007, then EFCH might have a claim to avoid the Oncor Transfer as a constructive fraudulent transfer because:  (a) EFCH did not receive any consideration in exchange for the transfer; and (b) EFCH may have been rendered insolvent by the 2007 LBO.

---

[22]    The Debtors do not endorse the strengths of any of the potential arguments against them, or any of their directors or offices, with respect to these various potential claims, but merely acknowledge the existence of issues that would require litigation.  *See In re Washington Mut. Inc.*, 442 B.R. at 330 ("[I]t is sufficient to present the Court with the legal positions asserted by each side and the facts relevant to those issues.  The Court itself can then evaluate the likelihood of the parties' prevailing in that litigation to determine whether the settlement is reasonable.").

82.     As this discussion suggests, the strength of a claim to avoid the Oncor Transfer would depend substantially on *when* the transfer took effect.  If EFCH transferred its equity in Oncor in 2005, as opposed to in 2007, it would be significantly more difficult to avoid the transfer as constructively fraudulent.  That is because it is extremely unlikely that a court would find that EFCH was insolvent in December 2005, even without accounting for the value of any equity interest in Oncor.

83.     For this reason, under the direction of the TCEH Disinterested Director, the TCEH Disinterested Director Advisors conducted extensive diligence on the facts underlying the Oncor Transfer, including searching for and reviewing contemporaneous transaction documents and interviewing key company personnel.  Based on that diligence, the TCEH Disinterested Director Advisors concluded that there is overwhelming evidence that the Oncor Transfer was effected in December of 2005, and the indication in the schedule to EFCH's 10-K for fiscal year 2006 that Oncor was a subsidiary of EFCH resulted from a typographical error.  Evidence supporting this conclusion includes: (a) contemporaneous board resolutions authorizing the Oncor Transfer; (b) contemporaneous transactional documents; (c) organizational charts; and (d) statements in SEC filings.

84.     The TCEH Debtors also considered whether there was a viable argument for collapsing the December 2005 Oncor Transfer with the 2007 LBO.  Whether a transaction is collapsed depends on whether the component transaction was part of one integrated transaction, based on factors including:  (i) whether the defendants knew about the multiple transactions; (ii) whether each transaction would have occurred on its own; and (iii) whether each transaction depended upon the occurrence of the additional steps in order to fulfill the parties' intent.  *See, e.g.*, *Mervyn's, LLC v. Lubert-Adler Group IV, LLC* (*In re Mervyn's Holdings, LLC*), 426 B.R.

488, 497 (Bankr. D. Del. 2010). The TCEH Debtors found little to no factual support for this theory based on their investigation to date.[23]

85.    EFH's investigation of similar matters, with the assistance of EFH's Disinterested Director Advisors, yielded similar conclusions.

### b.    The 2007 LBO

86.    On October 10, 2007, an investor group led by Kohlberg Kravis Roberts & Co., L.P., TPG Capital, L.P. acquired TXU Energy Co. ("TXU") in a leveraged buyout which valued TXU at approximately $45 billion. As a result of the LBO, TXU became a private corporation and was renamed EFH. The 2007 LBO was financed, in part, by $26.1 billion in senior secured loan facilities, including the $24.5 billion TCEH senior secured facilities (the "TCEH Credit Agreement").

87.    The granting of first priority liens and security interests under the TCEH Credit Agreement has been challenged as a constructive fraudulent transfer. In addition, the transfer of approximately $21 billion of those loan proceeds from TCEH to EFH for the purpose of acquiring EFH equity in the 2007 LBO could be challenged as a constructive fraudulent transfer and has been alleged to show that the TCEH Debtors did not receive reasonably equivalent value in exchange for the first priority liens and security interests they granted under the TCEH Credit Agreement. *See* 11 U.S.C. § 544(b)(1); Del. Code Ann. tit. 6 § 1304. There are significant disputed issues related to these claims.

88.    *Statute of Limitations.* The timeliness of any LBO claims would be a heavily contested issue. The statute of limitations for a federal avoidance action is two years before the petition date. *See* 11 U.S.C. § 548(a)(1). State law statutes of limitations—which a debtor may

---

23    The TCEH Unsecured Group contends there would likely be a dispute as to whether there is sufficient evidence to support collapsing the 2005 Oncor Transfer with the 2007 LBO.

assert under section 544(b) of the Bankruptcy Code by "stepping into the shoes" of a "triggering" or "golden" creditor—generally range from four to six years. Thus, under these statutes of limitations, a claim to avoid any LBO transfer or obligation would likely be time-barred. *See In re Trinsum Group, Inc.*, 460 B.R. 379, 390 (Bankr. S.D.N.Y. 2011) (statute of limitations on a fraudulent transfer claim is six years under New York Law and four years under Delaware law); *Zenner v. Lone Star Striping & Paving LLC*, 371 S.W.3d 311, 315 (statute of limitations on a fraudulent transfer claim is four years under Texas law).

89.    The TCEH Committee, the TCEH Unsecured Group, and the TCEH Debtors, however, contend that there is a strong argument that a debtor may use the IRS as a triggering creditor under section 544 and thereby invoke cases that purport to hold that the IRS may bring fraudulent transfer actions under state law without regard to state law statutes of limitations. While there is no controlling authority on point, a majority of courts in other jurisdictions to consider the issue have held that a debtor may use the IRS as a triggering creditor under section 544 and thus avoid state law statutes of limitations on fraudulent transfer claims. *In re Kaiser*, 525 B.R. 697, 703-704 (Bankr. N.D. Ill. Dec. 31, 2014); *In re Polichuk*, 506 B.R. 405, 420 (Bankr. E.D. Pa. 2014); *In re Greater Se. Cmty. Hosp. Corp. I*, 365 B.R. 293, 301-306 (Bankr. D.D.C. 2006). There is, however, contrary authority. *See In re Vaughan*, 498 B.R. 297 (Bankr. D. N.M. 2013). The TCEH Debtors contend that the majority view that allows a debtor to use the IRS as a triggering creditor is better-reasoned and more consistent with the plain language of section 544 of the Bankruptcy Code.

90.    The TCEH First Lien Creditors, EFH, and the Sponsors disagree with this position. They contend that the TCEH Unsecured Creditors cannot invoke a ten-year statute of limitations period allegedly available to the IRS for the collection of assessed taxes under section

6502 of the Internal Revenue Code.  To that end, they contend that the better-reasoned view is espoused in *In re Vaughan*, which held that the IRS is permitted to use its immunity to state law statutes of limitation only to perform a government function, and thus it may not be used for the benefit of creditors generally.  *See, e.g.*, *In re Vaughan*, 498 B.R. 297.  As the *Vaughan* court held, section 544 does not permit a private litigant to invoke IRS's unique rights and privileges as a sovereign tax collector, and to hold otherwise would eviscerate the far shorter statutes of limitation of virtually all 50 states in most bankruptcy cases, work a "dramatic change" in the law, and create transactional instability.  *Vaughan*, 498 B.R. at 306-06; *see also In re Alpha Protective Servs., Inc.*, 531 B.R. 889, 907-808 (Bankr. M.D. Ga. 2015).

91.     Even if in principle a court concluded that section 544 allows a debtor to assert the IRS's immunity to state law statutes of limitations, a claimant still would need to show that the IRS held an allowed claim against the relevant TCEH Debtor such that the IRS could serve as a triggering creditor.  *See Kaiser*, 525 B.R. at 714 ("In order for the IRS to be the golden creditor in this case, it must hold 'an unsecured claim that is allowable under section 502'" of the Bankruptcy Code.).  The TCEH First Lien Creditors, EFH, and the Sponsors contend that the IRS is not a viable triggering creditor because many of the TCEH Debtors, including TCEH, are "disregarded" entities for federal income tax purposes, or otherwise are not recognized as taxpayers.  Under certain IRS guidance, such entities cannot be held liable for certain kinds of tax obligations unless certain state-law theories (such as veil-piercing and alter-ego-type claims) apply.  These entities "are essentially ignored for federal income tax purposes" and are not liable to the IRS for the federal incomes taxes incurred by the members of a consolidated tax group. *See* 26 C.F.R. §§ 301.7701-2(a), 301.7701-3(a).  Because section 544(b)(1) allows the trustee to succeed only to the rights of an actual creditor with an allowable claim as of the commencement

of a case, the IRS might not be a creditor with respect to certain TCEH Debtor entities.  This too likely would be an issue of significant dispute in any litigation.  A plaintiff might counter that certain Debtor entities are liable for tax claims as a result of historic merger activity, or on other theories, and that as a result, the IRS is a valid triggering creditor.  Whether the IRS's immunity to state law statutes of limitations is available for any avoidance action will depend on answers to these and related complex questions.[24]

92.     *Solvency.*  Solvency would also be a contested issue.  The TCEH First Lien Creditors have argued, and EFH and the Sponsors likely would argue, that the 2007 LBO was funded with approximately $8.3 billion in new equity financing from sophisticated investors and the incurrence of approximately $27 billion of new debt at TCEH.  In addition, Duff & Phelps Securities, LLC ("Duff & Phelps"), as well as two other financial advisory firms, provided fairness and/or solvency opinion in connection with the 2007 LBO, which demonstrated that TCEH was not rendered insolvent.  Other market based evidence, such as the trading value of the TCEH's public debt (which traded at or about par for nearly a year after the LBO), the price of natural gas (which surged immediately after the LBO), and the TCEH Debtors' significant natural gas hedge positions, support solvency as well.  *See, e.g., In re Hechinger Inv. Co. of Del.*, 327 B.R. 537, 548 (D. Del. 2005) *aff'd sub nom. In re Hechinger Inv. Co. of Delaware, Inc.*, 278 F. App'x 125 (3d Cir. 2008) ("[B]ecause valuation is, to a great extent, a subjective exercise dependent upon the input of both facts and assumptions, the court will give deference to 'prevailing marketplace values'. . . rather than to values created with the benefit of hindsight for the purpose of litigation."); *Peltz v. Hatten,* 279 B.R. 710, 738 (D. Del. 2002) ("When

---

[24]   Even if a TCEH Debtor could not use the IRS as a triggering creditor (because the IRS does not have an allowable claim against that debtor), it might be able to use other governmental creditors, which are also immune to state law statutes of limitations, as a triggering creditor.  *See e.g.*, *Thomas v. State*, 226 S.W.3d 697, 710 n.55 (Tex. App. 2007) ("[T]he State in its sovereign capacity, unlike ordinary litigants, is not subject to the defenses of limitations, laches, or estoppel.").

sophisticated parties make reasoned judgments about the value of assets that are supported by then prevailing marketplace values and by the reasonable perceptions about growth, risks, and the market at the time, it is not the place of fraudulent transfer law to reevaluate or question those transactions with the benefit of hindsight."). Additionally, that the TCEH Debtors operated in the ordinary course for nearly seven years after the 2007 LBO arguably further demonstrates that they were solvent at the time of the transaction. *See e.g.*, *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 943 (S.D.N.Y. 1995) (concluding that company's ability to remain viable as a going concern for approximately two years following LBO supported finding of adequacy of capital.)

93.    On the other hand, the TCEH Committee and TCEH Unsecured Group, as well as the TCEH Debtors contend that the 2007 LBO rendered TCEH insolvent. Evidence supporting this position includes (a) certain EFH executives viewed the Sponsors' LBO projections as aggressive; (b) certain EFH executives characterized LBO-levels of debt as creating a "significant insolvency risk"; and (c) at the time of the LBO, the 25-year average of natural gas prices was $3.50, arguably well below the price required for the TCEH Debtors to manage their LBO debt. In addition, the Duff & Phelps' LBO solvency opinion is arguably flawed for the reasons explained in the Standing Motions. The disputes concerning solvency are complex, fact intensive, and would consume enormous amounts of company financial and management resources.

94.    *Safe Harbor Defense.*  Parties would also dispute whether elements of the 2007 LBO are protected by the safe harbor of section 546(e) of the Bankruptcy Code.[25]  For instance,

---

[25]    While section 546(e) does not apply to intentional fraudulent transfers under section 548(a), the look-back period for federal fraudulent transfer claims is two years and this limitations period cannot be "extended" by stepping into the shoes of the IRS.

TCEH First Lien Creditors have asserted that section 546(e) precludes avoidance of the liens and obligations incurred by TCEH in connection with the 2007 LBO because these transactions involved financial participants and were executed in connection with a securities contract, namely, the Merger Agreement. *See In re Resorts Int'l, Inc.*, 181 F.3d 505 (3d Cir. 1999) (LBO payouts to former shareholders constitute "the transfer of cash or securities made to complete a securities transaction"); *In re Plassein Int'l Corp. v. B.A. Capital Co.*, 366 B.R. 318 (Bankr. D. Del. 2007) (dismissing LBO-related fraudulent transfer claim on section 546(e) grounds; *but see Geltzer v. Mooney (In re MacMenamin's Grill, Ltd.)*, 450 B.R. 414, 429 (Bankr. S.D.N.Y. 2011) (holding that because section 546(e) does not mention "obligations," only transfers, obligations are not within the safe harbor); *U.S. Bank Nat'l Ass'n v. Verizon Commc'ns Inc.*, 892 F. Supp. 2d 805, 826 (N.D. Tex. 2012) (same).

95.     Similarly, the parties would dispute the extent to which section 546(e) protects avoidance of the transfer of $21 billion of merger consideration from TCEH to EFH, which was used to fund the purchase of shares of EFH's shareholders.[26]  Some T-side creditors have argued that this specific transfer was, in substance, a dividend and therefore does not constitute a "settlement payment" within the meaning of section 546(e). *In re Tronox Inc.*, 503 B.R. 239, 341 (Bankr. S.D.N.Y. 2013) (noting that "a 'one-way payment' is not a settlement payment'") (quoting *In re Appleseed's Intermediate Holdings, Inc.*, 470 B.R. 289, 302 (D. Del. 2012)).  EFH and any other defendant, however, could cite authority rejecting the argument that the application of section 546(e) can be avoided by isolating a single transfer that is part of a complex, interrelated transaction that includes a settlement payment. *See Crescent Res. Litig. Trust ex rel. Bensimon v. Duke Energy Corp.*, 500 B.R. 464, 473 (W.D. Tex. 2013).  Further,

---

[26]  Technically, the transfer was from TCEH to EFH Merger Sub.

even if the transfer of $21 billion of merger consideration from TCEH to EFH did not constitute a settlement payment, there is a strong argument that it was a transfer in connection with a securities contract (namely, the Merger Agreement) and thus falls within section 546(e)'s safe harbor.

96.      In addition to the transfer of merger consideration, the TCEH Debtors contend that TCEH has a claim against EFH arising from TCEH's transfer to EFH of approximately $123 million of proceeds of TCEH borrowing, which EFH did not transfer to its shareholders.  While a claim to avoid this transfer would be subject to the statute of limitations and solvency issues discussed above, the TCEH Debtors could argue that it would not be subject to the section 546(e) defense because it constituted a pure dividend.  EFH would assert several defenses to any claim arising from TCEH's residual transfer, including the statute of limitations, solvency, and the section 546(e) safe harbor.

97.      The TCEH Debtors also considered potential claims arising from TCEH's use of the TCEH Credit Agreement proceeds to retire debt owed under joint TCEH/Oncor credit facilities.  In particular, under the direction of the TCEH Disinterested Director, the TCEH Disinterested Director Advisors investigated whether TCEH might have a claim against Oncor on the theory that it repaid Oncor's liabilities under the joint credit facilities.  However, the TCEH Debtors have found little to no evidence in their investigation to date that supports this theory.[27]  Moreover, Oncor could dispute several elements of, and assert several defenses to, any claim arising from the repayment of the joint credit facilities, including statutes of limitations and solvency.

---

[27] The TCEH Unsecured Group contends there would likely be a dispute as to the sufficiency of evidence to support such claims.

98.     Finally, the Debtors have considered potential claims that the Debtors' directors, officers, and advisors breached their fiduciary duties in connection with the 2007 LBO and related transactions, transfers, and payments, including the transactions discussed in the preceding paragraphs, as well as payments of LBO-related fees to the Sponsors, discussed further below.   A proponent of such claim would have to clear significant legal hurdles, including establishing the existence of duties owed to specific parties and overcoming the discretion afforded to directors under the business judgment rule.   In response, the fiduciaries could argue, among other things, that these claims are time-barred under the three-year Delaware statute of limitations.  *See* Del. Code Ann. Tit. 10, § 8106(a).

99.     Despite significant defenses to any claim regarding the 2007 LBO, litigation of such claims would likely be costly.  *Cf. In re Tribune Co.*, 464 B.R. 126, 175 (Bankr. D. Del. 2011)   ("Fraudulent   transfer   litigation   regarding   LBOs   are   notoriously   lengthy   and complex.").  The expense and delay associated with litigating these claims, as well as resulting transactional instability, are relevant considerations that weigh in favor of settlement.

### c.     The 2007 Management Agreement

100.    EFH executed a management agreement with Sponsors KKR, TPG, and Goldman, Sachs & Co. on October 10, 2007, under which all of EFH's subsidiaries are obligors (the "Management Agreement").  Pursuant to the Management Agreement, the Sponsors agreed to provide management, consulting, financial, and other advisory services to EFH Corp.  The Management Agreement requires EFH to pay to the Sponsors annual advisory fees of $35 million, increasing by 2% each year, in equal quarterly installments.   The Management Agreement also required EFH Corp. to make a one-time payment of $300 million to the

Sponsors (including approximately $6 million to non-Sponsor Lehman Brothers Inc.) on account of services provided in connection with the 2007 LBO and related transactions.[28]

101.    An October 10, 2007 indemnification agreement (the "Indemnification Agreement") was executed concurrently with the Management Agreement.  Among other things, the Indemnification Agreement gives the Sponsors a right to be indemnified for any and all claims, obligations, liabilities, causes of action, judgments, attorney's fees and costs incurred by the Sponsors in connection with certain acts, failures to act, and events.  A dispute could exist regarding the implication of the Indemnification Agreement and whether the Sponsor Group could argue any claim or recovery against them for management or transaction-related fees described herein could result in a further claim against EFH.

102.    The management advisory fees were $36 million, $35 million, and $8 million for the years ending December 31, 2009 and 2008 and the period from October 11, 2007 to December 31, 2007, respectively.  The fees are reported in EFH's financial statements as "SG&A" expense in "Corporate" and "Other" activities.  In 2010, 2011, and 2012, EFH Corporate Services paid Sponsors approximately $36.9 million, $37.5 million, and $38.4 million, respectively.  Beginning with the quarterly management fee due December 31, 2013, the Sponsors, while reserving the right to demand and receive the fees, directed EFH Corp. to suspend payment of the management fees.

103.    Before 2010, EFH and/or EFH Corporate Services paid 100% of the Sponsors' advisory fees, and none of those fees were allocated to TCEH.  For the years 2010, 2011, and

---

[28]  At one point, TCEH representatives suggested that TCEH may have paid the $300 million transaction fee at the time of the 2007 LBO.  However, there is no evidence that TCEH actually paid the $300 million transaction fee.  By contrast, numerous documents reflect that the $300 million transaction fee was paid by EFH.  These documents include paragraph 3 of the Management Agreement, the spreadsheet from the Funds Transfer memo, dated October 10, 2007 (with specific line item reference to EFH), and the Funds Flow Memorandum, which reflects that EFH, through its bridge financing, had funds available and transferred funds to Merger Sub to make this payment.  Any challenge by TCEH to this transaction would be subject to strong defenses.

2012, EFH Corporate Services paid 100% of the advisory fees, but was reimbursed by the TCEH subsidiaries in full for those amounts.

104.    The $300 million transaction fee and the advisory fees could potentially be challenged as constructive fraudulent conveyances.  The Sponsors (or any intermediate recipients of the payments) likely would assert several defenses to such claims including, among others that:  (a) the transferors were solvent at the time the payments were made; (b) the avoidance of these payments is barred by the statute of limitations; (c) EFH and TCEH received reasonably equivalent value in return for the transaction and advisory fees; (d) the Sponsors received the transfers in good faith and for value; and (e) the payments were not transfers of TCEH's property, and certain of the payments were not transfers of EFH's property.[29]

105.    EFH contends that the Management Agreement is not avoidable and the payment of the transaction fee and advisory fees were not fraudulent conveyances.  In addition to the defenses that likely would be asserted by the Sponsors, EFH would argue that:  (a) the Management Agreement was executed with TXU's knowledge and consent of the lenders and investors; and (b) the Management Agreement remained operative without objection until the commencement of these chapter 11 cases.  However, notwithstanding EFH's contention that the Sponsors would prevail in a challenge to the Management Agreement, there is a possibility that the Sponsors, were it to face such a challenge, could recover attorneys' fees and costs from EFH pursuant to the parties' Indemnification Agreement.

106.    The allocation of advisory fees to TCEH subsidiaries from 2010 forward could be challenged on the theory that some or all of those fees should have been allocated to

---

[29]  In addition, to the extent any claimant were to allege that the Sponsors or their affiliates can be held liable for LBO-related transfers beyond the transaction fee, the Sponsors and affiliates likely would argue, among other things, that they were neither the recipients nor the beneficiaries of such transfers, and that the transfers are protected by the section 546(e) safe harbors.

EFH/EFIH.  Whether the fees should be re-allocated among the Debtors is likely to be a disputed issue.

107.    The TCEH Debtors contend that they have claims for constructive fraudulent transfers against both EFH and EFIH (as immediate transferees or beneficiaries) based on the allocation of advisory fees from 2010 forward.  In particular, the TCEH Debtors contend that: (a) during this period, TCEH likely was insolvent; and (b) TCEH did not receive reasonably equivalent value in exchange for the advisory fees.  With respect to reasonably equivalent value, the TCEH Debtors would argue that, even assuming that the Sponsors provided *some* value to TCEH in exchange for the advisory fees, there was not a reasonable basis for allocating all of the fees to TCEH.

108.    The TCEH Debtors would argue that evidence supporting this position includes the fact that, in 2009, a consultant retained by EFH to advise on the allocation of shared services costs recommended that EFH *not* allocate the advisory fees to subsidiaries unless the fees were "in the nature of an investment return rather than for actual services rendered."  The TCEH Debtors maintain that they would have a strong argument that the advisory fees were in the nature of an investment return.

109.    EFH would assert numerous defenses to any claim by the TCEH Debtors for constructive fraudulent transfer with respect to the allocation of advisory fees from 2010 forward.  EFH contends that Sponsor fees were properly allocated to the TCEH Debtors pursuant to the "necessity and benefit" test for corporate costs and allocating qualifying costs to business units recommended in the referenced 2009 consultant report.  EFH believes that current officers and directors would confirm that the "necessity and benefit" test was applied annually after the receipt of the consultant report and fees were allocated appropriately.  TCEH received significant

benefits and fair value from the Sponsors' ongoing provision of financial and analytical services in many areas, including:    (a) capital structure and financing, retail strategy, liquidity, preservation and hedging strategies; (b) regulatory strategy and lobbying; (c) ongoing board services and related efforts; and (d) post-recession and post-natural gas price decline analyses of counterparty issues.    EFH contends that Sponsor fees for post-LBO advisory services are a normal component of LBO transactions, the fees charged by the Sponsors were discounted and, according to available and well-respected studies, well within the norm for a transaction of the 2007 LBO's size and scale.    EFH would also assert as an offset to any claim by the TCEH Debtors that a portion of the advisory fees paid by EFH in 2008 and 2009 should be allocated to the TCEH Debtors, thereby reducing any claim by the TCEH Debtors to a negligible amount.

110.    EFIH would argue that it has no responsibility for paying any portion of the Sponsor Fees.  EFIH was not involved in the LBO debt financing, and to the extent EFIH issued debt for which the Sponsors may have been involved, EFIH issued that debt for the benefit of EFH and TCEH.  As a result, EFIH would argue that EFH and TCEH are the appropriate entities to have borne the Sponsor fees.

### d.    Upstream Guarantee and Dividends by Luminant Generation

111.    The EFH Committee has asserted that Luminant Generation has claims against the TCEH Debtors and the TCEH First Lien Creditors to (a) challenge the scope and validity of Luminant's guarantees of TCEH's First Lien Debt and (b) to avoid dividends that Luminant allegedly issues to TCEH to service that debt.

112.    *Challenge to Luminant Guarantees.*    In connection with the 2007 LBO, Luminant Generation Company LLC ("Luminant Generation") guaranteed TCEH First Lien Debt incurred by TCEH.  The upstream guarantee was subject to a "savings clause," which limited the amount of the guarantee to the maximum amount that would not render Luminant

Generation insolvent.  The EFH Committee has argued that because the 2007 LBO rendered Luminant Generation insolvent, the savings clause should be enforced to limit the upstream guarantee.  The enforceability of the savings clause will likely be disputed.  The only court directly addressing the issue ruled that this kind of savings clause is unenforceable in bankruptcy.  *In re TOUSA, Inc.*, 422 B.R. 783, 863-65 (Bankr. S.D. Fla. 2009).

113.    Even if enforceable, however, the savings clause will not limit the upstream guarantee unless Luminant Generation was rendered insolvent at the time of the 2007 LBO.  The solvency of Luminant Generation will be disputed.  The EFH Committee argues that the 2007 Duff & Phelps solvency analysis was incorrect because it failed to account for built-in tax resulting from a potential taxable sale.  The EFH Committee further argues the built-in tax liability, if included, would have rendered TCEH, including Luminant Generation, insolvent.  Case law suggests, however, that similar built-in taxes are properly excluded from solvency calculations where a sale had not occurred at the time of the solvency event.  *See In re Heileg-Myers Company*, 319 B.R. 447, 468 (Bankr. E.D. Va. 2004).  Similarly, the TCEH First Lien Creditors have argued that the savings clause does not limit the upstream guarantee because the 2007 LBO did not render Luminant Generation insolvent.

114.    *Alleged Luminant Dividends.*    The EFH Committee has also asserted, on information and belief, that Luminant Generation made dividends to TCEH or payments to service TCEH debt.  The EFH Committee has sought standing to avoid any such dividends or payments as constructive fraudulent transfers to the extent they were made on a liability (derivative of the upstream guarantee) that did not exist at the time because Luminant Generation was insolvent.

115.    The factual basis for any such claim would be disputed.  In particular, while the Debtors understand that from 2009 to 2012, Luminant Generation paid Luminant Holdings yearly dividends ranging from one to two billion dollars in settlement of intercompany advances, there is no evidence that the dividends were subsequently paid by Luminant Holdings to TCEH or used to service TCEH debt.  Instead, Luminant Generation and Luminant Holdings accounted for their relative cash balances by making adjustments through the TCEH "money pool."  No other "dividends" were made by Luminant Generation.  Whether such accounting transactions are "transfers" subject to avoidance will likely be controversial.  Assuming that such transactions were transfers, and further assuming that TCEH was a recipient or beneficiary of the transfers, TCEH would argue that it gave fair value for any such transactions, and that Luminant Generation was not insolvent when they were effected.  The solvency of Luminant Generation at the time any dividends or payments were effected, however, also will be a disputed issue.

### e.    The Liability Management Program

116.    EFH and its subsidiaries (other than Oncor) initiated a Liability Management Program ("LMP") in 2009.  This program was designed to reduce outstanding debt, extend debt maturities, and reduce interest expense.  The LMP transactions primarily involved the creation and exchange of debt at EFH and EFIH.  Some or all of these transactions could be challenged as constructive fraudulent transfers, including:

- through seven transactions between November 2009 and January 2013, EFIH exchanged newly issued EFIH debt for existing EFH debt.  Some, but not all of, the EFH debt acquired by EFIH in the exchanges had been guaranteed by EFIH at the time of issuance;

- through three sets of dividends (in November 2009, October 2011, and December 2012/January 2013), EFIH dividended to EFH notes acquired in the debt exchanges.  EFIH had guaranteed the EFH notes at the time of issuance. EFH canceled and retired all of the EFH notes, eliminating EFIH's exposure on the guarantees;

47

- through two debt issuances in February and August 2012, EFIH issued new secured debt to raise $2 billion in the aggregate ($1.15 billion in February and $850 million in August). Following each debt issuance, EFIH issued dividends to EFH ($950 million in February, following the February issuance, and $680 million in January 2013, following the August 2012 issuance);

- after receiving the dividends from EFIH (in February 2012 and January 2013, as described above), EFH repaid $1.65 billion in the aggregate to TCEH. These payments satisfied EFH's obligations under the TCEH Intercompany Notes, both of which had been guaranteed by EFIH. (*See*, *infra* section I.B.k);

- in January 2010, EFH issued new debt, guaranteed by EFIH on a secured basis, to raise $500 million in cash. EFH used some of the proceeds to purchase old EFH debt in a series of five purchase transactions between March 2010 and December 2011; and

- in a series of six transactions between November 2009 and October 2011, EFH exchanged new debt, guaranteed by EFIH, for old EFH and TCEH debt. EFH canceled and retired the old EFH debt tendered in the exchanges. Some of the old EFH notes had been guaranteed by EFIH at the time of issuance.

117.    For example, the TCEH Committee and TCEH Unsecured Group have asserted that certain Defendants demanded, as part of the 2011 Amend and Extend Transactions (defined and discussed below), that EFIH issued $406 million of 11% senior secured second lien notes due October 2021 in exchange for $428 million of EFH 5.55% unsecured notes due November 2014, in an effort to improve their recoveries in the event of a subsequent bankruptcy filing.

118.    The TCEH Committee and TCEH Unsecured Group cite to this argument in support of their claims to equitably subordinate the TCEH First Lien Claims. To support a claim for equitable subordination, the TCEH Committee and TCEH Unsecured Group must allege that: (1) the TCEH First Lien Creditors engaged in some type of inequitable conduct; (2) the misconduct resulted in injury or harm to other creditors or conferred an unfair advantage on the TCEH First Lien Creditors; and (3) equitable subordination of the TCEH First Lien Creditors' claims is not inconsistent with the provisions of the Bankruptcy Code. *See, e.g.*, *Bank of New York Mellon Trust Co., N.A. v. Miller (In re Franklin Bank Corp.)*, 526 B.R. 527, 533-34 (D. Del. 2014). In response, the TCEH First Lien Creditors have argued that equitable subordination

is an "extraordinary remedy which is applied sparingly," and is unwarranted here. *See Bank of N.Y. v. Epic Resorts—Palm Springs Marquis Villas, LLC (In re Epic Capital Corp.)*, 307 B.R. 767, 773 (D. Del. 2004) (citations omitted).

119.    An argument to collapse the April 2011 EFIH debt exchange with the 2011 Amend and Extend Transactions would require substantial discovery and development of facts in support.  Even if the transactions were not collapsed, it may be argued that EFIH did not receive reasonably equivalent value in the exchange.  Assuming EFIH did not receive reasonably equivalent value for its guarantee, recovery, if any, would be limited to the extent EFIH paid noteholders under the guarantee — itself a fact that would be disputed and the subject of enormously intricate and complex fact discovery.  Moreover, in response to these claims, Defendants could argue that EFIH was solvent at the time of the issuance, the claim is time-barred, and the section 546(e) safe harbor applies.  For a discussion of relevant legal standards see, *supra*, I.B.1.b.

### f.    The 2011 Amend and Extend Transactions

120.    In April 2011, TCEH engaged in six related transactions (the "2011 Amend and Extend Transactions") that addressed certain debt covenants and impending debt maturities.  The 2011 Amend and Extend Transactions did so in two principal ways:  first the TCEH Credit Agreement was amended, including by substantially relaxing a maintenance covenant; and second, the maturity dates of $17.78 billion in outstanding TCEH First Lien Debt were extended by three years, from 2013 and 2014 to 2016 and 2017.  In furtherance of the maturity extension, TCEH issued approximately $1.75 billion in TCEH First Lien Notes, which it used to repay approximately $1.6 billion of TCEH First Lien Debt.

121.    The TCEH Committee and TCEH Unsecured Group have sought standing to challenge these transactions as constructive fraudulent transfers and to avoid nearly $2.1 billion

in fees, incremental interest, and prepayment benefits allegedly transferred by TCEH to the TCEH First Lien Creditors.  *See* 11 U.S.C. § 544(b)(1); Del. Code Ann. Tit. 6, §§ 1304(a)(2), 1305(a).  The TCEH Committee and TCEH Unsecured Group also sought standing to avoid the liens, security interests, and obligations arising out of the $1.75 billion in TCEH First Lien Notes.

122.    Whether TCEH received reasonably equivalent value in exchange for the transfers it made to the TCEH First Lien Creditors in connection with the 2011 Amend and Extend Transactions is disputed.  First, the TCEH Committee and TCEH Unsecured Group assert that TCEH transferred nearly $2.1 billion in value to the TCEH First Lien Creditors in the form of:  (a) over $800 million of fees and costs; (b) over $530 million in incremental interest on the extended debt; (c) approximately $420 million in incremental interest on the $1.75 billion in TCEH First Lien Notes; and (d) approximately $330 million in prepayment benefits on the approximately $1.6 billion of repaid debt.  Second, the TCEH Committee and TCEH Unsecured Group assert that these transfers provided little benefit to TCEH given that even after the transactions, approximately 20% of the TCEH First Lien Debt (approximately $4.5 billion) was left unextended and remained set to mature in 2013 and 2014.  The TCEH Committee and TCEH Unsecured Group argue that this non-extended debt was more than TCEH could reasonably hope to pay without further refinancing or maturity extensions, thus rendering the 80% debt extension worthless.

123.    The TCEH First Lien Creditors have responded that TCEH received reasonably equivalent value in the 2011 Amend and Extend Transactions.  First, they argue that the TCEH Committee and TCEH Unsecured Group overstate the value transferred by TCEH by at least $750 million, because the alleged $420 million in incremental interest on TCEH First Lien Notes

(new debt) and $330 million in prepayment benefits on repaid debt are irrelevant for fraudulent transfer purposes. Second, the TCEH First Lien Creditors argue that the 2011 Amend and Extend Transactions delivered significant value to TCEH (which by the TCEH Committee's own calculations, equated to an approximately 192 basis point all-in cost) by providing critical capacity for TCEH that substantially outweighed their costs to sustain a continued market downturn through extended maturity dates and a loosening of the maintenance covenant, ensuring continued access to liquidity, and saving billions of dollars in fees and expenses that would have been incurred had the TCEH First Lien Debt been refinanced rather than extended. The TCEH First Lien Creditors would further argue that market-based evidence supports the reasonableness of the value exchanged in connection with the 2011 Amend and Extend Transactions, as the price of the TCEH Debtors' junior-most securities surged following announcement of the transaction.

124. The solvency of TCEH at the time of the 2011 Amend and Extend Transactions might also be disputed. The TCEH Committee and TCEH Unsecured Group have argued that TCEH was insolvent as of the 2007 LBO, and identified EFH's 2010 Annual Report, filed March 2011, as the Debtors' first public disclosure that the TCEH Debtors' liabilities exceeded their assets. TCEH First Lien Creditors might dispute that assertion based on other measures of solvency. *See EBC I, Inc.*, 380 B.R. 348, 356-361 (Bankr. D. Del. 2008) (recognizing that accepted methods of determining solvency in the context of a constructive fraudulent transfer claim include the "balance sheet," "cash flow," and "capital adequacy" tests).

125. Additionally, the TCEH First Lien Creditors have argued that the $1.75 billion in TCEH First Lien Notes and the associated liens granted, and the prepayment of approximately $1.6 billion under the Credit Agreement are each protected from avoidance by the safe harbor

provision of section 546(e) of the Bankruptcy Code as transfers made "in connection with a securities contract."

126.     Finally, absent the Inter-Debtor Settlement, there likely would be claims asserted on behalf of TCEH against EFH for breach of fiduciary duty or aiding and abetting a breach of fiduciary duty arising from the 2011 Amend and Extend Transactions.  As support for that claim, a claimant likely would argue that, by 2011, TCEH was balance-sheet insolvent and, given that the "shale revolution" was already underway, it was unreasonable to expect natural gas prices to rebound significantly in the foreseeable future.  A claimant could argue that, under those circumstances, in the proper exercise of their fiduciary duties, the TCEH board (and EFH board) should have, but did not, consider bankruptcy as an alternative to a transaction that arguably imposed significant costs on TCEH for the sake of preserving the optionality of equity.  In addition, although the TCEH Debtors have not identified any evidence to support this assertion, a claimant might attempt to allege that the boards of EFH and TCEH pursued the 2011 Amend and Extend Transactions in order to delay a bankruptcy filing that would result in claims challenging the 2007 LBO.

127.     As damages for such a claim, a claimant could allege that the 2011 Amend and Extend Transactions imposed nearly $2 billion of incremental fees and interest expense to TCEH.  In exchange, TCEH received only a partial and limited maturity extension of its first lien debt.

128.     A claimant might argue, moreover, that the entire fairness standard, rather than the business judgment rule, would apply to the 2011 Amend and Extend Transactions.  That is because the Sponsors held portions of TCEH's First Lien Debt and therefore had a financial interest in the transactions.  Sponsor-affiliated directors formed the majority of both the EFCH

and TCEH boards at the time.  Although the Sponsor-affiliated directors abstained from voting on the 2011 Amend and Extend Transactions, there is authority under Delaware law that the entire fairness standard would nonetheless apply when only a minority of disinterested directors approve a transaction.  *See, e.g.*, *Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 637 (Del. Ch. 2013) (explaining that "[t]o overcome the presumption of loyalty, . . . a plaintiff must allege facts supporting a reasonable inference that there were not enough independent and disinterested individuals among the directors making the decision *to comprise a board majority*") (emphasis added); *In re Encore Computer Corp. Shareholders Litig.*, No. 16044, 2000 WL 823373, at *6 (Del. Ch. June 16, 2000) (holding that the business judgment rule applies to transaction approved by a 2-0 vote of disinterested directors on a four-person board, with two interested directors abstaining).  Further, a claimant might question the independence of those directors not formally affiliated with the Sponsors.

129.    EFH has responded that there is no colorable claim for breach of a fiduciary duty because a parent does not owe a fiduciary duty to a solvent, wholly-owned subsidiary.  *See Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 191 (Del. Ch. 2006) *aff'd sub nom., Trenwick Am. Litig. Trust v. Billet*, 931 A.2d 438 (Del. 2007) ("[A] parent does not owe fiduciary duties to its wholly-owned subsidiaries or their creditors.").  Assuming TCEH's insolvency, which is in dispute, there is no uniform view concerning whether a parent company owes a duty to a wholly-owned, insolvent subsidiary.  Further, courts have established that a board of directors may pursue a strategy to increase a corporation's overall value even if the decision involves the incurrence of additional debt, without breaching any fiduciary duties.  *Id.* at 205 ("If the board of an insolvent corporation, acting with due diligence and good faith, pursues a business strategy that it believes will increase the corporation's value, but that also involves the

incurrence of additional debt, it does not become a guarantor of that strategy's success."). Indeed, "[t]hat the strategy results in continued insolvency and an even more insolvent entity does not in itself give rise to a cause of action. Rather, in such a scenario the directors are protected by the business judgment rule. To conclude otherwise would fundamentally transform Delaware law." *Id.* EFH would argue that its board pursued such a strategy through the 2011 Amend and Extend Transactions, which improved TCEH's financial flexibility and, through the extension of its debt maturities, reduced TCEH's default risk and increased trading values across its capital structure.

130.    EFH asserts that the business judgment rule, which is the default standard of review, should apply to the 2011 Amend and Extend Transactions. The mere presence of dual fiduciaries in a transaction is insufficient to rebut the business judgment rule and invoke the application of the entire fairness standard. *See Quadrant Structured Products Co. v. Vertin*, 102 A.3d 155, 192 (Del. Ch. 2014) (holding that plaintiff failed to "rebut the business judgment rule" by alleging the board pursued a more risky business strategy even though the "[c]ompany is insolvent, and although the directors are dual-fiduciaries"). Rather, decisions by a board that affect the entity as a whole are subject to the business judgment rule. *Id.* at 187-88 (applying the business judgment rule and rejecting the entire fairness standard "when directors make decisions that appear rationally designed to increase the value of the firm as a whole"). Furthermore, the entire fairness standard should not apply because EFH did not stand on both sides of the transaction, which was conditioned on an affirmative vote of a majority interest of TCEH's creditors. *See In re Encore Computer Corp.*, 2000 WL 823373, at *6 (applying the business judgment rule, in part, because the transaction required the "affirmative vote" of the holders of the majority of stock present and voting at the meeting). In addition and as the TCEH Debtors

noted, the Sponsor-affiliated directors abstained from the vote, which was approved by the disinterested directors.  EFH would contend that the business judgment rule applies where the disinterested directors constitute the majority of the *voting* board and approve the transaction.  The cases cited by the TCEH Debtors do not hold otherwise.  *Compare Carsanaro*, 65 A.3d at 639-40 (declining to apply the business judgment rule where the majority of directors were interested and did not abstain but in fact voted on the transactions in question) *with In re Encore Computer Corp.*, 2000 WL 823373, at *6 (applying the business judgment rule where, as here, the interested directors abstained and the disinterested directors comprising the majority of the voting board approved the transaction).

131.    The 2011 Amend and Extend Transactions implicate issues that are both factually complex and legally uncertain, including:  (a) the appropriate measure of insolvency and whether TCEH was insolvent applying one or more of those measures; (b) assuming insolvency, whether a parent owes a duty to an insolvent, indirect subsidiary; (c) whether TCEH received reasonably equivalent value in light of the direct and indirect benefits it achieved; (d) what standard would apply to any breach of fiduciary duty claim; and (e) whether the Debtors would be obligated to indemnify its directors, managers and Sponsors if a breach of duty claim were successful.  These uncertainties were considered and balanced against other factors in reaching the Disinterested Director Settlement.

### g.    The 2013 Revolver Extension

132.    In late 2012, the Debtors learned that they might receive a "going concern" qualified audit opinion in March 2013, which would trigger defaults under the TCEH Credit Agreement and a series of cross-defaults across the corporate structure.  In light of the potential going concern opinion, in January 2013, the TCEH Debtors extended the maturity of approximately $645 million in 2013 revolver commitments from October 2013 to October 2016

(the "2013 Revolver Extension").   In return, TCEH issued to extending TCEH First Lien

Creditors a $340 million fee, structured as incremental first lien term loans (with a market value

of approximately $228 million) due in October 2017.

133.    The TCEH Committee and TCEH Unsecured Group have sought standing to

challenge the 2013 Revolver Extension as an actual and constructive fraudulent transfer.   They

seek to avoid any amounts paid on the $340 million fee note and to avoid any liens, security

interests, or obligations granted in connection with the $340 million fee note.   *See* 11 U.S.C. §§

548(a)(1)(A), 548 (a)(1)(B); Del. Code Ann. Tit. 6, §§ 1304(a)(1), 1304(a)(2).

134.    Whether the TCEH Debtors received reasonably equivalent value in exchange

for the transfers it made to the TCEH First Lien Creditors in connection with the 2013 Revolver

Extension will likely be disputed.   The TCEH Committee and TCEH Unsecured Group have

alleged that TCEH did not receive reasonably equivalent value for these fees because:  (a) TCEH

entered into the revolver extension solely to buy time to negotiate a consensual restructuring at a

time when the company was insolvent and on the brink of bankruptcy; and (b) TCEH knew that

2013 Revolver Extension would leave more than $4 billion of first lien debt with 2013 and 2014

maturities, making a bankruptcy filing prior to expiration of these maturities inevitable and

rendering illusory the three-year extension of $645 million in 2013 revolver commitments.

135.    The TCEH First Lien Creditors could argue that the TCEH Committee and

TCEH Unsecured Group have overstated the consideration paid by TCEH for the 2013 Revolver

Extension by focusing on the $340 million face value of the incremental first lien term loans

rather than their $228 million market value, and by ignoring the lower market value of the $645

million in revolver commitments after their three-year maturity extension.  The TCEH First Lien

Creditors could further argue that the TCEH Committee and TCEH Unsecured Group understate

the value received by TCEH in the 2013 Revolver Extension by ignoring intangible and/or indirect benefits. Wilmington Trust, for instance, has argued that the 2013 Revolver Extension delivered reasonably equivalent value to TCEH by providing breathing room for TCEH to prevent a free-fall bankruptcy and to benefit from any potential market improvements. *See In re Fruehauf Trailer Corp.*, 444 F.3d 203, 214 (3d Cir. 2006) (recognizing that courts may consider "potential, intangible benefits" when determining reasonably equivalent value).

136. Likewise, whether TCEH executed the 2013 Revolver Extension with the intent to hinder, delay, or defraud creditors would be disputed. The TCEH Committee and TCEH Unsecured Group have argued, for instance, that at the time of the transaction TCEH knew that a bankruptcy filing was inevitable and that it would be unable to pay its debts as they became due. Wilmington Trust has responded that the TCEH Committee and the TCEH Unsecured Group have failed to identify any evidence of fraudulent intent.

### h.    The Debtors' Use of Unencumbered Cash

137. In October 2013, TXU Receivables Company LLC ("TXU Receivables") wound down its accounts receivables program. Approximately $335 million of unencumbered funds held by TXU Receivables were transferred to TCEH and placed into a segregated, unencumbered JP Morgan account. On February 10, 2014, TCEH transferred approximately $126 million from this segregated, unencumbered account into an account identified by the Debtors as encumbered (the "TCEH Main Account"). The same day, TCEH made an interest payment of approximately $216 million to the TCEH First Lien Creditors (the "February 2014 Interest Payment"). Over the next four days, TCEH transferred approximately $62 million in funds from the segregated account into the TCEH Main Account, resulting in an aggregate amount of nearly $188 million being transferred from the Debtors' unencumbered account into its encumbered TCEH Main Account in February 2014 (the "February 2014 Account Transfers"). In March 2014, the

remaining balance of approximately $150 million in the unencumbered account was transferred to an unencumbered account with Union Bank.

138.    The TCEH Committee and TCEH Unsecured Group have argued that the $188 million February 2014 Account Transfers and/or the $216 million February 2014 Interest Payment are preferential transfers pursuant to section 547(b) of the Bankruptcy Code.  The TCEH Committee and TCEH Unsecured Group contend that the February 2014 Account Transfers improved the TCEH First Lien' collateral position, and that the February 2014 Interest Payment was likewise a preferential payment on account of an antecedent debt.  These claims might overlap, as a portion of the $188 million February 2014 Account Transfers might have been applied to the $216 million February 2014 Interest Payment.

139.    Whether the February 2014 Account Transfers are preferences is disputed.  The TCEH First Lien Creditors have argued, for instance, that they do not have possession or control over the TCEH Main Account, such that the February 2014 Account Transfers did not improve their collateral position.

140.    Whether the February 2014 Interest Payment was a preference is likewise disputed.  The TCEH First Lien Creditors assert, for instance, that the payment was an ordinary course payment subject to the protections of section 547(c)(2).  They contend that the payment of interest on prepetition funded debt falls squarely within section 547(c)(2)'s "ordinary course of business" defense and, thus, is not avoidable.  *See, e.g., Harman v. First Am. Bank of Md. (In re Jeffrey Bigelow Design Grp., Inc.)*, 956 F.2d 479, 487-88 (4th Cir. 1992) (holding that payment of interest on line of credit within preference period was not avoidable where loan was incurred in the ordinary course as part of the debtor's workout efforts and debtor had made regular interest payments over the life of the loan).

### i. Avoidance of Unperfected Liens and Security Interests

141.    Certain security interests in TCEH's assets, such as real property and natural resources, could be challenged.  For example, the TCEH Committee and TCEH Unsecured Group have sought standing to bring claims alleging that certain of these liens and security interests are unperfected, including "as-extracted" minerals and collateral, real property, vehicles, deposit accounts, commercial tort claims, and other unperfected collateral. Specifically, the TCEH Committee and TCEH Unsecured Group argue that certain Debtor entities hold fuel stock, nuclear fuel, and/or natural gas valued at approximately $500 million, and that security interests in some portion of these reserves have not been perfected.  Likewise, the TCEH Committee and TCEH Unsecured Group allege that there is real property with unperfected liens or security interests, a vehicle fleet with unperfected liens or security interests with a net book value of over $11 million, as well as unperfected liens or security interests in deposit accounts, commercial tort claims and other unperfected collateral.

142.    Whether there are identifiable unperfected liens and security interests on TCEH property is disputed.  Wilmington Trust, for instance, has argued that the TCEH Committee and TCEH Unsecured Group have failed to identify specific liens or security interests that are unperfected.

### j. Disallowance of OID and Unmatured Interest

143.    Claims against the Debtors' estates that include unmatured interest could be challenged.  For instance, the TCEH Committee and TCEH Unsecured Group have sought standing to prosecute claims to disallow an alleged $8 million of unaccreted original issue discount ("OID") associated with the $1.75 billion in TCEH First Lien Notes issued by TCEH in connection with the 2011 Amend and Extend Transactions.  Whether unaccreted OID should be disallowed might be disputed.

### k.    The TCEH Intercompany Notes

144.    Between October 2007 and January 2013, TCEH made intercompany loans to EFH pursuant to two promissory notes, which were amended and restated over time.  EFH repaid the loans in full in January of 2013, including interest.  TCEH's intercompany loans to EFH could be challenged on the theory that they were made at below-market interest rates and that EFH therefore failed to adequately compensate TCEH for its credit exposure to EFH.  EFH's repayment of the intercompany loans in 2012 and 2013 could also be challenged as constructive fraudulent transfers.  (*See supra*, section I.B.e.)

### i.    Background

145.    On the same day that the 2007 LBO closed, EFH issued two promissory notes to TCEH.  One note allowed EFH to borrow funds from TCEH to cover SG&A expenses (the "SG&A Note"); the other note allowed EFH to borrow funds from TCEH to pay principal and interest expenses on EFH debt (the "P&I Note" and, together with the SG&A Note, the "TCEH Intercompany Notes").  The TCEH Intercompany Notes were payable-on-demand and accrued interest at a rate of LIBOR plus 500 basis points (bps).

146.    EFH regularly borrowed under the TCEH Intercompany Notes, and at times the balance on the TCEH Intercompany Notes reached amounts in excess of $1 billion.  EFH also made periodic payments on the TCEH Intercompany Notes.[30]  While the TCEH Intercompany Notes were later restated to add EFIH as a guarantor,[31] they were not re-priced and remained payable-on-demand to TCEH.  Although the TCEH board regularly evaluated (at least in 2012)

---

[30]  EFH repaid the P&I Note in full on November 6, 2008, using proceeds from the sale of its minority interest in Oncor.

[31]  On May 1, 2009, EFH and TCEH entered into a new P&I Note, with identical terms to the original P&I Note, except that EFIH was added as a guarantor.  EFIH was added as a guarantor of the SG&A Note as of April 11, 2011 in connection with the 2011 Amend and Extend Transactions.

whether to exercise TCEH's rights under the TCEH Intercompany Notes and demand repayment, TCEH never exercised the demand feature of the TCEH Intercompany Notes.

147.    In early 2011, Aurelius Capital Master Ltd. and ACP Master Ltd. (collectively, "Aurelius"), which owned TCEH senior debt, alleged that TCEH was in default under the TCEH Credit Agreement because the TCEH Intercompany Notes were not made on an "arm's-length" basis, as required by the TCEH Credit Agreement.[32]

148.    In response to Aurelius' allegation that the TCEH Intercompany Notes violated a covenant in the TCEH Credit Agreement, as part of the 2011 Amend and Extend Transactions, TCEH negotiated an amendment to the TCEH Credit Agreement under which senior lenders (including Aurelius) acknowledged the "arm's-length" nature of the TCEH Intercompany Notes. The parties also amended the Credit Agreement to prohibit further borrowing under the SG&A Note, and to cap the amount of borrowings outstanding under the P&I Note at $2 billion. Furthermore, in connection with the amendment to the TCEH Credit Agreement, EFH repaid $770 million of borrowings under the SG&A Note, and EFIH and EFCH guaranteed EFH's remaining obligations to TCEH under the SG&A Note (consistent with the existing EFIH and EFCH guarantees of the P&I Note).

149.    Aurelius subsequently filed a creditor derivative suit in Texas against EFCH and its directors.  Complaint, *Aurelius Capital Master, Ltd. v. Acosta*, No. 3:13 Civ. 01173 (N.D. Tex. Mar. 19, 2013).  Aurelius sought approximately $725 million in lost interest expenses on the theory that the interest rates on the TCEH Intercompany Notes were below-market and TCEH/EFCH were insolvent during the term of the TCEH Intercompany Notes.  Aurelius thus argued that: (a) the loans constituted fraudulent transfers of EFCH; and (b) the directors thus

---

[32]  Specifically, Aurelius sent a notice of default to the TCEH Credit Agreement's administrative agent.  The administrative agent rejected Aurelius's claim.

breached their fiduciary duty in allowing the fraudulent transfers.  *Id*. at 7.  The Texas court dismissed the Aurelius complaint for lack of standing under Texas law.  Order, *Aurelius*, No. 3:13 Civ. 01173 (N.D. Tex. Jan. 28, 2014) (granting defendants' motion to dismiss).  The plaintiff appealed, and the case is currently stayed on appeal.

150.    As discussed above (*see*, *supra*, section I.B.1.d), in February and August 2012, EFIH issued new secured debt to raise $2 billion in the aggregate—$1.15 billion in February and $850 million in August 2012.  Following each debt issuance, EFIH issued dividends to EFH— $950 million in February 2012 and $680 million in January 2013.  In February 2012 and January 2013, EFH repaid $1.65 billion in the aggregate to TCEH.  These payments satisfied EFH's principal and contractual interest obligations under the TCEH Intercompany Notes.

### ii.    Claims Relating to the TCEH Intercompany Notes

151.    The TCEH Debtors contend that TCEH has a strong claim against EFH for constructive fraudulent transfer based on the TCEH Intercompany Notes.  In support of this claim, the TCEH Debtors would argue that every advance under the TCEH Intercompany Notes constituted a separate "transfer" for purposes of fraudulent transfer law.  The solvency of TCEH would be disputed—the TCEH Debtors would argue that TCEH was insolvent no later than the fourth quarter of 2008, and that at least during the period in which TCEH was insolvent, TCEH was entitled to receive reasonably equivalent value in exchange for its advances to EFH in the form of an interest rate that adequately compensated TCEH for the risk of lending to EFH.  *See, e.g.*, *In re Carrozzela & Richardson*, 286 B.R. 480, 489 (D. Conn. 2002) (noting the "universally accepted fundamental commercial princip[le] that, when you loan an entity money for a period of time in good faith, you have given value and you are entitled to a reasonable return") (citation omitted); *In re Bayou Grp*., LLC, 439 B.R. 284, 337 (S.D.N.Y. 2010) (same).

152.    Here, the TCEH Debtors would argue that the interest rate on the TCEH Intercompany Notes fell short of adequately compensating TCEH for its credit exposure to EFH. As noted, the interest rate on the notes was set at LIBOR plus 500 bps.  The TCEH Debtors would argue that, given the inherent volatility of LIBOR, it was foreseeable that this rate would depart dramatically from EFH's market cost of borrowing—and, in fact, that is precisely what happened.  The TCEH Disinterested Director Advisors have calculated that, by early 2009, the difference between the yield on EFH's senior notes—an objective measure of EFH's credit risk—and the TCEH Intercompany Notes had reached more than 10% (using EFH's 2017 senior notes as a benchmark),[33] and that, during the four-year period before the Petition Date, the difference between the interest paid on the TCEH Intercompany Notes and a market rate of interest on EFH borrowings was approximately $425 million.  According to the TCEH Disinterested Director Advisors' calculations, over the six years before the Petition Date, this "delta" increases to approximately $580 million, and over the term of the Intercompany Notes, the delta is approximately $605 million.[34]

153.    The TCEH Debtors also reject the suggestion that the "demand" feature of the TCEH Intercompany Notes justified a below-market interest rate.  The TCEH Debtors would argue that the demand feature was illusory, and that there was no realistic prospect that EFH, which controlled TCEH, would effectively demand repayment from itself.  The TCEH Debtors would further contend that if TCEH had demanded repayment, EFH would have been forced to

---

[33]  The TCEH Disinterested Director Advisors contend that another potential benchmark interest rate is the rate that EFH paid on its borrowings from the EFH "money pool," which was 10.875%.

[34]  In preparing these calculations, the TCEH Disinterested Director Advisors estimated the market rate of interest is estimated by applying the yield to maturity of unsecured, unguaranteed EFH public debt (5.55% Series P Senior Notes due November 2013) to the P&I Note and SG&A Note borrowings during the period that each note was not guaranteed; and the yield to maturity of unsecured, guaranteed EFH public debt (10.875% Senior Notes due November 2017) to borrowing during periods when the notes were guaranteed.

borrow from higher-cost sources and, in fact, the evidence suggests that the TCEH did not consider demanding repayment from EFH before 2012.  Finally, TCEH disputes that creditor ratification or estoppel would preclude a TCEH estate representative from asserting a claim for fraudulent transfer based on the TCEH Intercompany Notes.  TCEH would argue that, while TCEH's senior lenders may have ratified (in exchange for a fee) the TCEH Intercompany Notes as part of the 2011 Amend and Extend Transactions, other TCEH creditors—including creditors with claims pre-dating the 2007 LBO—have never expressly or implicitly consented to EFH borrowing from TCEH at below-market rates.

154.    As an initial matter, EFH would dispute TCEH's claims regarding TCEH's insolvency over the applicable time period.  EFH would also respond that:  (a) the Intercompany Notes were priced in 2007 after contemplation of several factors, including marketing considerations and rates on both EFH and TCEH debt; (b) EFH did not breach the TCEH Intercompany Notes; and (c) senior lenders ratified the terms of the TCEH Intercompany Notes in 2011, agreeing that the loan terms were for reasonably equivalent value.  Indeed, other than Aurelius, no existing creditor at the time of the 2011 Amend and Extend Transactions sought a judicial determination that the loans were not for reasonably equivalent value.  EFH would further argue that unsecured creditors knew, or should have known, of (a): the TCEH Intercompany Notes, which were issued in conjunction with the well-publicized 2007 LBO; and (b) the interest rates and outstanding balances, which were routinely disclosed by TCEH in public filings.  EFH would contend that in these circumstances, a trustee does not have standing to bring a state law fraudulent transfer claim.  *U.S. Bank Nat. Ass'n v. Verizon Comm'n Inc.*, 479 B.R. 405 (Bankr. N.D. Tex. 2012) (trustee has no standing if creditor has voluntarily assented to or ratified the transaction).

155.     Furthermore, EFH would likely argue that TCEH's board regularly evaluated the option to demand repayment, but decided against doing so for justifiable business reasons. Among other things, TCEH needed to manage its cash levels with respect to various "cash flow sweep" obligations set forth in certain of its lending relationships, which if triggered, would have permanently reduced liquidity at TCEH.  Thus, EFH would contend that TCEH, for legitimate business reasons, seemingly preferred to avoid any repayment by EFH of the outstanding loans, despite EFH's ability to repay—as demonstrated by EFH's successful repayment in early 2013.

156.     The EFH Disinterested Directors also considered the fact that litigation of the TCEH Intercompany Notes would impose a significant expense for a claim with a wide range of potential economic impacts.  In the first instance, EFH is unaware of any law, and TCEH has not identified any, supporting a claim against EFH for having paid a contractually-agreed upon interest rate that was "too low," notwithstanding the cases referenced by TCEH above.  EFH contends that those cases—*In re Carrozezella & Richardson*, 286 B.R. 480, and *In re Bayou Grp., LLC*, 439 B.R. 284—concern whether an innocent investor in a debtor's Ponzi scheme who received reasonable contractual interest payments should be entitled to retain those payments, or whether such payments should be returned to the debtor's estate for distribution to investors who did not receive a return of their investments.  As such, EFH would argue that the cases are inapposite and simply do not stand for the proposition that TCEH should have received a higher interest rate than that to which it agreed.

157.     If such a claim could be pursued, however, EFH contends that significant factual disputes would exist concerning what the appropriate comparator rate of interest should be, *e.g.*, whether EFH market debt yields, the EFH money pool rate, or some other comparator is the correct one; and once selected, what the comparator rate was at the time the loans were extended,

which spans the course of more than five years.  EFH would argue that although TCEH alleged a claim of between $400 million and $900 million in unpaid nominal and accrued interest, the range of potential comparator interest rates makes EFH's potential exposure, even assuming such a claim were successful, difficult to ascertain.  In any event, and despite formidable defenses, exposure on this claim would come close to the entirety of the allowed TCEH claim.

158.   Finally, EFH would further contend that other issues likely to be disputed—including whether TCEH exercised its business judgment in not demanding repayment under the notes, whether TCEH creditors had constructive knowledge of or ratified the terms of the loans made pursuant to the notes, and whether the parties received reasonably equivalent value—contribute to the complexity of litigation and raise significant questions concerning the likelihood of success.

159.   The TCEH Debtors could also challenge EFH's repayment of the TCEH Intercompany Notes in January 2013 as a fraudulent transfer.  Although this transfer repaid an antecedent debt, some states recognize a cause of action to recover a payment to an "insider" on account of an antecedent debt where the transferor was insolvent and the insider had reasonable cause to believe the transferor was insolvent.[35]   Whether the elements of such a claim are satisfied would be disputed.

160.   It could also be argued that EFIH's debt issuances, cash dividends to EFH, and EFH's payments to TCEH should be collapsed, because EFIH, EFH, and TCEH each had knowledge of the other transactions, and the note repayments in February 2012 and January 2013 could not have occurred without EFIH's debt issuances and cash dividends.  *See In re Mervyn's Holdings, LLC*, 426 B.R. 488, 497 (Bankr. D. Del. 2010); *see also In re Syntax-Brillian Corp.*,

---

[35]   *See, e.g.*, Del. Code Ann. tit. 6, § 1305(b); Tex. Bus. & Com. Code Ann. § 24.006(b).

No. 08-11407 (BLS), 2011 WL 3101809, at *12 (Bankr. D. Del. July 25, 2011).   If the transactions are collapsed, it could be argued that EFIH did not receive reasonably equivalent value because, among other reasons, EFIH received little to no direct consideration for its contributions to the transaction.

161.    The TCEH Debtors dispute that EFIH has a valid claim against TCEH based on the repayment of the TCEH Intercompany Notes.  As an initial matter, the TCEH Debtors would argue that EFIH was solvent at the time of both dividends and therefore cannot satisfy this element of a constructive fraudulent transfer claim.  Evidence supporting this argument includes the trading prices of EFIH's public debt; contemporaneous solvency calculations by EFIH management; and the fact that EFIH received a "clean" audit opinion from its auditor during this period.  The TCEH Debtors would further argue that EFIH received reasonably equivalent value from the repayment of the TCEH Intercompany Notes, because those repayments discharged its guarantee obligations.  *See, e.g.*, *In re Walters*, 163 B.R. 575, 581 (Bankr. C.D. Cal. 1994).

162.    EFIH in response would argue that it may not have been solvent at the time of the dividends.  In February 2012, EFIH had almost $3.9 billion of its own debt, had guaranteed more than $1.8 billion of EFH's debt, and had guaranteed the TCEH Intercompany Notes under which more than $640 million was outstanding.  By January 2013, EFIH had more than $7.7 billion of its own debt, had guaranteed $54 million of EFH debt, and at the time of the dividend had guaranteed the TCEH Intercompany Notes under which approximately $700 million remained outstanding.

163.    With respect to reasonably equivalent value, EFIH would argue that the TCEH Debtors' argument only works if EFIH's dividends to EFH and EFH's payments to TCEH are collapsed.  The collapsing doctrine is an equitable doctrine to protect general creditors, not to

preserve otherwise voidable transactions. *See generally Chase Manhattan Mortgage Corp. v. Shapiro (In re Lee)*, 530 F.3d 458 (6th Cir. 2008) (refusing to collapse separate transfers to permit assertion of earmarking defense). A court looking at these transactions may treat the dividends simply as dividends. Furthermore, EFIH would argue that because the transfers were structured as dividends rather than direct payments by EFIH to TCEH, EFIH lost its contribution claim against EFH as the principal obligor of the Notes. EFIH would contend that it did not receive anything for the loss of its contribution claim against EFH and thus did not receive reasonably equivalent value.

### l.    EFH and EFIH Holdings of TCEH Debt

164.    Both EFH and EFIH hold TCEH debt. EFH holds approximately $19 million of TCEH First Lien Debt and approximately $284 million of TCEH unsecured 10.25% senior notes. EFIH holds approximately $79 million of TCEH unsecured 10.25% senior notes. In litigation over the Inter-Debtor Claims, the parties would dispute whether EFH and/or EFIH can use their respective holdings of TCEH debt to set off their liabilities, if any, on TCEH's claims against them.

165.    The TCEH Debtors would dispute that EFH or EFIH has a right to setoff their holdings of TCEH debt against any liability on TCEH's claims for several reasons. *First*, the law is clear that a party cannot assert setoff to fraudulent transfer liability because mutuality (a prerequisite for setoff) is lacking. *See In re Singh*, 434 B.R. 298, 308 (Bankr. E.D.N.Y. 2010). Further, section 502(d) of the Bankruptcy Code precludes a creditor that received an avoidable transfer from receiving a distribution on a claim unless the creditor returns the transfer to the debtor's estate. *See* 11 U.S.C. § 502(d). Thus, neither EFH nor EFIH can setoff their holdings of TCEH debt against liability on TCEH's avoidance actions. *Second*, the TCEH Debtors would

68

argue that the "no-action" clause in the TCEH unsecured notes indenture bars setoff.[36]  While the Credit Agreement permits setoff for TCEH secured debt, it also requires that a lender share the benefit of any setoff ratably with other secured lenders.[37]  ***Third***, the TCEH Debtors would argue that setoff is inequitable under these circumstances.  *See In re Bevill, Bresler & Shulman Asset Mgmt. Corp.*, 896 F.2d 54, 59 (3d Cir. 1990).  In particular, the TCEH Debtors would argue that, to the extent EFH acquired TCEH debt with borrowings under the TCEH Intercompany Notes at below market interest rates, it would be inequitable to allow EFH to use that debt to reduce its liability to TCEH.

166.    EFH would argue that setoff is available under section 553(a) because the debts are mutual and EFH's claim arose pre-petition.  *See Durham v. SMI Indus. Corp.*, 882 F.2d 881, 883 (4th Cir. 1989) ("Section 502(d), therefore, does not preclude a defendant in an adversary proceeding from asserting the affirmative defense of pre-petition setoff merely because the trustee has asserted that the defendant has failed to disgorge an unrelated preference.").  EFIH's avoidable transfer claims against TCEH bar TCEH's claims against EFIH until TCEH returns the value of the dividends.  The First Lien Credit Agreement permits exercise of setoff rights, although EFH could arguably recover only an amount *in pari passu* with all other first lien lenders.  With respect to the TCEH unsecured notes, EFH would argue it may pursue setoff because the indenture expressly provides that an individual noteholder may bring suit to enforce a note once it becomes due and payable, which occurred when TCEH filed for bankruptcy and caused the notes to be accelerated.

---

36    *See* section 6.06 of the Indenture to the TCEH Senior Notes due 2015.

37    *See* TCEH Credit Agreement § 13.8(a).

167.    EFH strongly disputes that there is any evidence of inequitable conduct arising from its acquisition of the TCEH notes at a discount that would serve as a defense to setoff or provide a basis for TCEH to assert that EFH's claim should be equitably subordinated.  *See In re Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 896 F.2d 54 (3d Cir. 1990) (setoff permitted where no inequitable conduct found); *see also Citicorp Venture Capital, Ltd. v. UCC*, 160 F.3d 982, 987 (3d Cir. 1998) (expressly declining to adopt a rule that an insider's purchase of a debtor's debt at a discount in bankruptcy is "per se" improper, even where the insider is a fiduciary).

168.    In response to the TCEH Debtor's second argument that payments of interest on EFH's first lien debt positions are avoidable as either insider preferences or fraudulent transfers, EFH contends that the payments were made in the ordinary course of business, and were a bona fide, antecedent debt obligation and thus were made for reasonably equivalent value.

169.    EFH recognizes, however, that the outcome of these claims and defenses are uncertain because of the fact-dependent, subjective nature of certain issues and the absence of clear legal precedent. Litigation of these claims would be costly and time-consuming, particularly relative to the maximum potential setoff that would be achieved if EFH were successful.

170.    EFIH, like EFH, disagrees with the TCEH Debtors' position regarding the right to setoff holdings of TCEH debt against any liability on TCEH's claims.  In response to the TCEH Debtors' first argument, EFIH would point out that it too has an argument under section 502(d).

### m.    The Luminant "Make-whole" Payments

171.    The Inter-Debtor Settlement also resolves potential claims arising out of transfers relating to reimbursement, or "make-whole," agreements between Luminant and Oncor.

172.    By way of background, pursuant to a settlement plan that became final in January 2003, the PUCT authorized Oncor to issue $1.3 billion of transition bonds to securitize and recover generation-related regulatory assets and other qualified costs that had been transferred to Oncor in connection with the deregulation of the Texas utility industry.   In accordance with the parties' 2001 Master Separation Agreement,[38] Luminant agreed to reimburse Oncor for certain interest and tax expenses associated with the transition bonds and related regulatory assets.

173.    Specifically, under a tax reimbursement agreement dated January 1, 2002, Luminant agreed to reimburse Oncor's incremental taxes related to the transition surcharges it collected.[39]  Under an interest reimbursement agreement dated January 1, 2004 (together with the tax reimbursement agreement, the "Reimbursement Agreements"), Luminant agreed to reimburse Oncor for interest expenses associated with the generation-related regulatory assets.[40]

174.    In early 2012, Oncor initiated discussions with Luminant regarding settling Luminant's obligations under the Reimbursement Agreements in order to reduce its overall exposure to TCEH.  Oncor agreed to accept a one-time payment of approximately $159 million in settlement of Luminant's obligations to Oncor, through 2016, but requested that EFIH act as an intermediary in the proposed settlement.  In August 2012, EFIH purchased those obligations from Oncor for approximately $159 million (the "August 2012 Make-whole Payment").  In

---

[38]  See Master Separation Agreement by and among TXU Electric Delivery Company, TXU Generation Holdings Company LLC, TXU Merger Energy Trading Company LP, TXU Sesco Company, TXU Sesco Energy Services Company, TXU Energy Retail Company LP, and TXU Electric Company dated December 14, 2001. Under the 2001 Master Separation Agreement, the parties cross-indemnified one another so that each accepted the future liabilities and costs associated with their pre-unbundling activities.

[39]  Luminant agreed to pay Oncor approximately $437 million, which was the amount of federal income taxes associated with the $1.247 billion of generation-related regulatory assets that were transferred to Oncor under the 2001 Master Separation Agreement.

[40]  Under the 2004 Interest reimbursement agreement, the amount of the make-whole payments equaled the difference between the present value and book value of the generation-related regulatory assets.

September 2012, Luminant paid EFIH the same amount—approximately $159 million—in full satisfaction of its obligations under the Reimbursement Agreements (the "September 2012 Make-whole Payment").    At the time, Luminant's remaining obligations under the Reimbursement Agreements totaled $212 million.

175.    Absent the Inter-Debtor Settlement, it is likely that there would be litigation over one or both of the above transactions and, potentially, other transfers made in connection with the Reimbursement Agreements.    Specifically, claims could be asserted on behalf of EFIH against Oncor, and claims could be asserted on behalf of Luminant against Oncor and/or EFIH.

### i.    Claims by EFIH Against Oncor

176.    The EFIH Debtors could challenge the August 2012 Make-whole Payment to Oncor as a fraudulent transfer.    If the August 2012 Make-whole Payment were challenged, EFIH's solvency at the time of the transfer would likely be disputed.    It could be argued that EFIH was insolvent at that time because, among other things, its liquidity generally depended on intercompany cash flows from EFH, Oncor, and TCEH.    Oncor, however, could point to contemporaneous evidence that EFIH was solvent, including EFIH's issuance in August 2012 of $600 million Senior Secured Second Lien Notes.

177.    Whether EFIH received reasonably equivalent value for the August 2012 Make-whole Payment would also likely be disputed.    It could be argued that EFIH should have paid Oncor less than Luminant would pay EFIH, because EFIH accepted litigation risk without a potential benefit.    Oncor would likely respond by emphasizing the benefits EFIH received from Luminant's early settlement.    For instance, Oncor could argue that EFIH benefitted because without the settlement, Oncor might have withheld dividends to EFIH to compensate for its exposure to Luminant's credit risk—exacerbating EFIH's liquidity situation.

## ii. Claims by Luminant Against EFIH or Oncor[41]

178.   The TCEH Debtors contend that Luminant could assert a claim to avoid the September 2012 Make-whole Payment as a constructive fraudulent transfer.   There are three theories under which such a claim could be asserted.

179.   *Actual or intentional fraudulent transfer.*   To assert a claim for actual fraudulent transfer, Luminant would need to show that it made the transfer with the actual intent to hinder, delay, or defraud its creditors.   11 U.S.C. § 548(a)(1)(A); 6 Del. Code Ann. § 1304(a)(1).   The TCEH Debtors are not aware of any direct evidence that Luminant made the September 2012 Make-whole Payment with actual fraudulent intent.   However, the TCEH Debtors would argue that certain statutory and non-statutory "badges of fraud" are present, including:  (a) the transfer was made to an insider; (b) Luminant was insolvent at the time of the transfer; (c) EFIH and Oncor were aware of Luminant's financial condition at the time of the transfer, and Oncor arguably structured the transaction that anticipated a potential claim from Luminant's bankruptcy estate; and (d) the transfer allowed Oncor to receive more from the settlement than it would have received on a claim against Luminant's bankruptcy estate.   However, EFIH would argue that courts often dismiss claims that are based on only a few badges of fraud, particularly where, as here, many other badges point in the opposite direction.   *See ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 374 (S.D. Tex. 2008); *In re Gulf Fleet Holdings, Inc.*, 491 B.R. 747, 767-68 (Bankr. W.D. La. 2013); *In re Midway Games Inc.*, 428 B.R. 303, 325 (Bankr. Del. 2010). EFIH would further argue that the statute is clear that the court may consider the presence or absence of all badges.   Del. Code Ann. tit. 6 § 1306(b).

---

[41]   Although not a party to the Settlement Agreement, Oncor is both a released and releasing party under the Plan.

180.    *Constructive fraudulent transfer*.    In order to state a claim for constructive fraudulent transfer, Luminant would need to show that it: (a) was insolvent at the time of the September 2012 Make-whole Payment; and (b) did not receive reasonably equivalent value for the September 2012 Make-whole Payment.  *See* 11 U.S.C. § 548(a)(1)(B).

181.    As to the first element, the TCEH Debtors contend that there is a strong argument that Luminant was insolvent at the time of the transfer.  The TCEH Debtors claim that Oncor sought a settlement of the Reimbursement Agreements in order to reduce its credit exposure to TCEH, including Luminant.  EFIH and Oncor would counter that Luminant has the burden of proof to show that EFIH and Oncor had reasonable cause to believe Luminant was insolvent at the time, despite the fact that Luminant received a clean audit opinion from Deloitte for that year.

182.    As to the second element, the TCEH Debtors recognize that EFIH or Oncor could argue that, because that payment satisfied an antecedent debt (*i.e*., Luminant's obligations under the Reimbursement Agreements), Luminant received reasonably equivalent value in exchange for the transfer.  *See, e.g*., 11 U.S.C. § 548(d)(2)(A) (defining "value" to mean "satisfaction or securing of a present or antecedent debt"); *In re Crucible Materials Corp.*, No. 09-11582 (MFW), 2012 WL 5360945, at *8 (Bankr. D. Del. Oct. 31, 2012) ("When the transfer to a creditor is in dollar-for-dollar satisfaction of an antecedent debt, there can be no claim for constructive fraudulent transfer.  This is because the goal of fraudulent transfer law is the preservation of the estate against diminution and a payment which reduces a debt dollar-for-dollar does not diminish the estate.") (citations omitted).

183.    However, the TCEH Debtors contend that a claimant could argue that it did not receive reasonably equivalent value because, while Luminant paid the "face value" of its obligations to EFIH (and indirectly, to Oncor), in the event that Luminant filed for bankruptcy,

Oncor likely would have recovered a much smaller percentage of its claim under the Reimbursement Agreements—which would have been treated like an unsecured claim. The TCEH Debtors recognize that it is uncertain whether a court would accept this interpretation of "reasonably equivalent value." *See, e.g.*, *In re Wilkinson*, 196 F. App'x 337 (6th Cir. 2006) (rejecting the argument "that satisfying a third-party antecedent debt can never amount to reasonably equivalent value for a debtor who is deeply insolvent at the time of the transfer").

184.    Moreover, Luminant settled its obligations under the Reimbursement Agreements for an amount ($159 million) that represented a 20.5% present value discount from the $212 million in remaining undiscounted payments under such agreements. By virtue of this discount, the transaction was cash-flow neutral to Luminant by 2014. Thus, EFIH or Oncor could argue that Luminant received reasonably equivalent value from the September 2012 Make-whole Payment.

185.    *Insider Fraudulent Transfer*. The Uniform Fraudulent Transfer Act ("UFTA"), which has been adopted in Texas and Delaware, provides an exception to the "antecedent debt" rule for transfers made to statutorily defined "insiders." *See* 6 Del. Code Ann. § 1305(b); Tex. Bus. & Com. Code Ann. § 24.006(b). An insider fraudulent transfer claim requires proof that: (a) the transfer was from the debtor to an insider for an antecedent debt; (b) the debtor was insolvent at the time of the transfer; and (c) the insider had reasonable cause to believe that the debtor was insolvent. *Id*. The TCEH Debtors believe that Luminant could prove all of these elements with respect to the September 2012 Make-whole Payment.

186.    The TCEH Debtors contend that Luminant, for example, would have a strong argument that EFIH was an "insider" because EFIH was indirectly owned and controlled by the same entity that indirectly owned and controlled Luminant (namely, EFH). *See* 6 Del. Code

Ann. § 1301(1)(d) (defining "insider" as an "affiliate or an insider of an affiliate as if the affiliate were the debtor"); 6 Del. Code Ann. § 1301(1)(b) (defining affiliate to include "a corporation, 20 percent or more of whose outstanding securities are directly or indirectly owned, controlled or held with power to vote by . . . a person who directly or indirectly owns, controls or holds with power to vote 20 percent or more of the outstanding voting securities of the debtor").[42]

187.    An insider fraudulent transfer claim, however, would need to overcome a statute of limitations defense.  In particular, under the UFTA, an insider fraudulent transfer claim is "extinguished" one year after the transfer.  *See* 6 Del. Code Ann. § 1309(3); Tex. Bus. & Com. Code Ann. § 24.010(a)(3).  To overcome this defense, Luminant would need to successfully argue that it can step into the shoes of the IRS under section 544 and assert the IRS's immunity to the statute of limitations period on an insider fraudulent transfer claim.[43]  (*See supra*, section I.B.b.)  While there is case law that arguably supports this position, *see In re Porras* 312 B.R. 81, 97-98 (Bankr. W.D. Tex. 2004); *contra In re Vaughan Co.*, 498 B.R. 297, 305 (D.N.M. 2013), there is no controlling authority in the Third Circuit holding that a debtor may use the IRS as a triggering creditor for an insider fraudulent transfer claim.  (*See supra*, section I.B.b.)

188.    In addition, Luminant would have to show that EFIH had reasonable cause to believe Luminant was insolvent at the time of the transfer.  EFIH would maintain that it did not have reasonable cause to believe Luminant was insolvent, as Deloitte issued a clean audit opinion for that year.

---

[42]    While this section refers to corporations, the Delaware Court of Chancery has held that it applies to limited liability companies. *Quadrant Structured Products Co. v. Vertin*, 102 A.3d 155, 199 (Del. Ch. 2014).

[43]    Although the UFTA states that an untimely claim is "extinguished," rather than time-barred, courts have treated this provision as equivalent to a statute of limitations when assessing whether the extinguishment provision applies to the IRS. *See Bresson v. C.I.R.*, 213 F.3d 1173, 1178 (9th Cir. 2000).

189.    If Luminant could use the IRS as a triggering creditor, it could assert a claim to avoid all of the payments that it made to Oncor under the Reimbursement Agreements during the period in which Oncor knew or had reason to know that Luminant was insolvent.  Among other defenses to such a claim, though, Oncor could argue that such transfers were made in the ordinary course of business.  *See* 6 Del. Code Ann. § 1308(f)(2).[44]

### n.    Shared Services

190.    EFH Corporate Services Company provides shared services to TCEH and its subsidiaries (among other entities).  Costs of those services—including management advisory fees paid to the Sponsors—have historically been allocated among the entities that receive the services.  Before 2013, the companies' arrangements concerning shared services were not reflected in a written agreement.  In 2013, EFH and its subsidiaries entered into a shared services agreement to memorialize these practices.  Between 2007 and 2014, TCEH paid more than $1.3 billion for services provided through EFH Corporate Services Company.

191.    Payments made by TCEH for shared services could be challenged as constructive fraudulent transfers to or for the benefit of EFH or EFIH on the grounds that TCEH overpaid for its share of the services while EFH and EFIH received the benefits of those services without making payments.  EFH Corporate Services' primary defenses to such claims likely would be that:  (a) TCEH received reasonably equivalent value in the form of services rendered; (b) TCEH was solvent at the time it made a large portion of the payments; (c) EFH paid more than its proper share of shared services costs in 2008 and 2009 and would be entitled to a setoff; and (d) the avoidance of certain payments are barred by the statute of limitations.  EFH's and

---

[44]  EFIH would contend that any payments under the Reimbursement Agreements to Oncor that TCEH seeks to recover should be made against Oncor, not EFIH. EFIH would argue that it was purely an intermediary for the $159 million settlement of the Reimbursement Agreements and it did not otherwise receive payments under or pursuant to the Reimbursement Agreements.

EFIH's primary defenses to such claims likely would be the same; plus, they may argue that the allocations were fair based on actual usage of services.

192.    The TCEH Debtors contend that EFH over-allocated shared services costs to TCEH.  Among other things, TCEH would assert that, historically, EFH paid approximately 18% of shared services expenses.  Starting in fiscal year 2010, however, EFH began pushing down most of these costs to its business units—and in practice, this meant allocating costs to TCEH. Significantly, no shared services costs were allocated to EFIH before 2014, and costs allocated to Oncor declined substantially over the same period.  Moreover, the shared services allocated to TCEH included a number of corporate overhead items—such as corporate board and related expenses—that were likely unrelated to the underlying individual business unit operations.  The TCEH Debtors contend that EFIH should have been allocated at least a portion of these expenses.

193.    EFH would assert numerous defenses to any claim by the TCEH Debtors that payments made by TCEH for shared services were constructive fraudulent transfers to or for the benefit of EFH or EFIH.  Among other things, the 2009 consultant report referenced by the TCEH Debtors determined that the expenses for shared services allocated to EFH were too great, and recommended that the EFH allocation should be reduced from approximately 18% to a lower amount based upon a "necessity and benefit" test.  Current officers and directors have confirmed that, consistent with the consultant's recommendation, the "necessity and benefit" test for shared services expenses thereafter was applied annually and the approximately 18% allocation to EFH was reduced to an average of 5%.  Significantly, TCEH participated in the annual budgeting process through which services were negotiated and periodically adjusted.  The TCEH Debtors have not identified any specific expenses that were actually improperly allocated.  Nor could

they do so.  EFH has no independent operations or employees and required only minimal corporate services, and Oncor is ring-fenced.  The same is true for EFIH.  As with the Sponsor fees paid under the Management Agreement, to the extent that any claim by the TCEH Debtors would not be time barred, EFH would assert that a portion of the shared services expenses allocated to EFH in 2008 should be reallocated to the TCEH Debtors as an offset.  This dispute, if litigated, would involve an incredible consumption of time and resources, a de facto reengineering of cost and fee analyses, and extraordinary professional expenses for both the EFH and TCEH Debtors.

194.    Furthermore, EFIH would argue it is not clear that EFIH should be allocated any of what the TCEH Debtors describe as "corporate overhead items—such as corporate board and related expenses—that were likely unrelated to the underlying individual business unit operations."  Indeed, under the 2014 Service Level Agreements, which are based on re-evaluated methods of allocation and include allocations to EFIH, the allocation of these costs is again 100% to TCEH as it was previously.  Accordingly, EFIH would argue that TCEH provide no reasoned basis for reallocating historical shared service costs.

          **o.**      **Intercompany Tax Issues Related to Tax Sharing**

          **i.**      **Intercompany Tax Payables and Receivables Reflected in the Debtors' Statement of Financial Affairs and Schedules**

195.    As of the Petition Date, the Debtors' books and records reflected several intercompany tax payables and receivables.  These amounts were also included in the Debtors' Statement of Financial Affairs (the "SOFAs") and Schedules, and were initially not marked as contingent, unliquidated, or disputed.  Specifically, the Debtors' books and records, as well as the SOFAs and Schedules, included payables of approximately:

- $1.29 billion owed from Luminant Generation Company LLC ("Luminant Generation") to EFH;

- $754 million owed from EFH to TCEH;

- $2.9 million owed from TXU Energy Retail Company LLC ("TXU Energy Retail") to EFH;

- $1.4 million owed from Luminant Energy Company LLC ("Luminant Energy") to EFH; and

- $5.4 million owed from EFH to EFCH.

(*See* D.I. 1237.)

196.    These intercompany tax payables (the "Intercompany Tax Claims") primarily relate to the application of the Competitive Tax Allocation Agreement, executed May 14, 2012, by certain Debtors (the "TAA") to two tax settlements with the IRS:  (1) the settlement of certain issues related to the 1997-2002 taxable years (the "2002 Settlement"); and (2) the settlement of certain issues related to the 2003-2006 taxable years (the "2006 Settlement").  Although the 2006 Settlement was substantially agreed to with the IRS in 2013, it remains subject to finalization and, ultimately, the proof of claim process.[45]  Absent the Inter-Debtor Settlement, there likely would be significant, complex, and costly litigation between EFH and the TCEH Debtors regarding the Intercompany Tax Claims.  That litigation would revolve substantially around several interpretative issues relating to the TAA and complex questions of historical tax accounting practices.

197.    *The TAA's treatment of disregarded entities.*  Under the TAA, income and loss (and resulting tax sharing obligations and benefits) appear to be determined first at the "member" level (including income and loss of the member's disregarded subsidiaries) and then sub-

---

[45] As the Debtors continue to finalize calculations related to the tax years that were open on the Petition Date with the IRS, certain of these payables and receivables have been, and will continue to be, adjusted.  Such adjustments have been disclosed in the Debtors' SEC filings, to counsel for the Disinterested Directors, and to parties in interest.

allocated to disregarded entities owned by such "member," resulting in a "netting" among each "member" and its disregarded subsidiaries.  The TAA, however, does not define "member." There is a significant interpretative question over whether, for purposes of allocating EFH's consolidated income tax liability under the TAA, the term "member" is limited to entities that are treated as corporations for federal income tax purposes, or whether it also includes entities that are disregarded for federal income tax purposes, such as TCEH, or partnerships, such as TCEH prior to 2007.

198.     If "member" is limited to corporations, that would suggest that some or all of TCEH's claim against EFH should be netted against Luminant Generation's payable to EFH, resulting in a net payable to EFH of approximately $535 million.[46]  If "member" includes disregarded entities, on the other hand, it would be inappropriate to net these amounts.  TCEH would have a separate claim against, and Luminant Generation a separate payable to, EFH consistent with the schedules (although the amount of such claims would likely be independently subject to dispute even if this issue of contractual interpretation was resolved).

199.     TCEH contends that the text of the TAA is ambiguous as to the meaning of "member," and that extrinsic evidence makes clear that the TAA parties intended the term to refer to all signatories to the TAA, including disregarded entities, and more generally intended that the TAA allocation methodology result in separate claims between each signatory and EFH. That evidence includes:

- The transaction decision paper ("TDP")[47] prepared by EFH tax personnel regarding the TAA refers to all TAA signatories as "group members."

---

[46] For the sake of simplicity, this discussion focuses on the $1.29 billion payable recorded as owed by Luminant Generation to EFH and the $754 million payable recorded as owed by EFH to TCEH.

[47] When EFH enters into certain significant transactions or agreements, the company typically prepares a transaction decision paper to summarize the transaction or agreement.

- EFCH's SEC filings following the IRS settlements reflect the separate TCEH tax claim against EFH and EFH tax claim against Luminant Generation in the *consolidating* balance sheets (although, as mentioned in the description of EFH's argument below, when the balance sheets are combined to reflect assets and liabilities of EFCH, the *consolidated* balance sheet reflects the net claim).  *Compare* EFCH, Annual Report (Form 10-K), at 171 (Apr. 29, 2014) (consolidating balance sheet reflecting separate claims), *with id.* at 93 (consolidated balance sheets reflecting net claim).[48]

- The Debtors' SEC filings (and audited financial statements) state that the TAA provides for disregarded entities to make payments to EFH "in an amount calculated to approximate the amount of tax liability such entity would have owed if it filed a separate corporate return."  *See, e.g.,* EFH, Annual Report (Form 10-K), at 89 (Apr. 30, 2014).

- Historically, in the first step of the Debtors' tax sharing practices, tax sharing amounts have been calculated and booked on a standalone basis for every entity in the EFH group (without regard to whether such entities are corporations or disregarded entities), rather than through the "netting" allocation method described above.  Although there was aggregation of claims for payment purposes, that aggregation occurred via a "bottom-up" approach that did not rely on any distinction between corporations and disregarded entities.

- Documents arguably reflect that certain tax personnel at the Debtors interpreted the TAA as imposing separate tax-sharing obligations on each signatory.

- At least three disregarded entities signed joinders to the TAA after the TAA was executed and those joinders provide that each disregarded entity is a "new Member [that] has become a member of the Group."

- Before any dispute arose over the interpretation of the TAA, the Debtors scheduled the Intercompany Tax Claims as separate, valid, undisputed claims.

200.    TCEH also would argue that the TAA unambiguously provides that obligations between each "member" and EFH should not be netted with obligations between another "member" and EFH.  (*See* TAA, Art. 3.)  Because Luminant Generation and TCEH are both

---

[48] Language in the Form 10-K supports TCEH's argument that the *consolidating* balance sheets better reflect the actual obligations:

This annual report . . . occasionally make[s] references to EFCH, TCEH, TXU Energy or Luminant (or "we," "our," "us" or "the company") when describing actions, rights or obligations of their respective subsidiaries. These references reflect the fact that the subsidiaries are consolidated with, or otherwise reflected in, their respective parent company's financial statements for financial reporting purposes.  However, these references should not be interpreted to imply that the relevant parent company is actually undertaking the action or has the rights or obligations of the relevant subsidiary company or vice versa.

parties to the TAA, and therefore both "members," their respective payable and receivable should not be netted.

201.    EFH contends that the TAA should be read to exclude disregarded entities from the definition of "member."  Evidence in  support of this interpretation includes:

- Many provisions of the TAA clearly distinguish between "members" and "disregarded entities," and these distinctions would arguably be meaningless if "members" included "disregarded entities."

- SEC filings support a single claim by EFH against TCEH.  For example, beginning in at least 2008, SEC documents report a single net payable or net receivable between TCEH and EFH in the *consolidated* balance sheet.  *See, e.g.*, EFCH Quarterly Report (Form 10-Q), at 38 (Nov. 4, 2014) ("As of September 30, 2014, we had current income tax liabilities of $17 million and we had $535 million in noncurrent income tax liabilities payable to EFH Corp. as of the Petition Date reported as LSTC."); EFCH, Annual Report (Form 10-K) (Dec. 31, 2014).

- In contrast to the TAA, the Oncor Tax Sharing Agreement dated November 5, 2008, to which EFH also was a signatory, makes a specific point of calculating the separate tax liability of the entities as if they were separate corporations, even though a number of the signatories were partnerships and disregarded entities.

- It is undisputed that TCEH is a disregarded entity and, for many of the tax years at issue, was a partnership.  Thus, even assuming, for the sake of argument, that the TAA were deemed to be ambiguous, the TAA should be read consistent with the tax law and TCEH's "assets, liabilities, income items, and deduction items will be treated as owned, owed, received, and incurred directly by its owner" parent taxpayer, here EFH.  *See In re Conex Holdings, LLC*, 518 B.R. 792, 802 (Bankr. D. Del. 2014) (J. Sontchi) (granting the defendant-parent company's motion to dismiss the subsidiary's turnover claim, observing that "[a]ny tax benefits derived from the Defendant's use of the [subsidiary's] [net operating losses] inured solely to the benefit of the Defendant").

- Grant Thornton ("GT")[49] prepared a review of the tax sharing accounting methodology, based off the books and records, and they found that TCEH's subsidiaries calculated their own net tax liability by business unit, but then the net payables and receivables at the subgroup and group parent levels applied by the company over several years. Therefore, per GT's report, the actual tax calculations followed "netting" at the TCEH level. Grant Thornton's Report, at 72-76.

---

[49]  As a point of reference regarding the complexity of these claims, the Debtors hired a tax accounting expert, Grant Thornton, to do a preliminary and narrow review of the tax sharing accounting methodology applied by the company over several years.

- EFH believes that at least one current key officer of the Debtor entities, the CFO, who was a signatory to the TDP and who has the authority to determine any matters that are not expressly addressed by the TAA, (*see* TAA, Art. 2), would testify that the separate TCEH claim is not valid and a "net" of the payables between EFH and entities on the T-side is the proper result.

202.    EFH also contends that netting tax benefits and liabilities at the EFCH and TCEH level is consistent with the Debtors' historical tax practices, including the "pooling" mechanism that has historically been used by the Debtors to track and utilize tax attributes, and that these conclusions are supported by work conducted by independent experts retained by the Debtors.

203.    In addition, EFH would argue that if the TAA did not apply, Treasury regulation 1.1502-12 would lead to a single net liability owed by TCEH to EFH because that regulation only allocates amounts to a corporate consolidated group member.  If the TAA was found to be inapplicable for any reason, then there would arguably be no basis for TCEH to have any claims against EFH.  As discussed above, *Conex* provides that a disregarded entity has no claim against its parent for tax attributes (absent an enforceable tax sharing agreement).  *In re Conex Holdings, LLC*, 518 B.R. at 802.

204.    *Applicable years of the TAA*.  As noted above, the Intercompany Tax Claims largely arise out of the 2002 Settlement and 2006 Settlement.  These settlements include adjustments to tax years 1997 to 2012.[50]  There is an interpretative question as to whether the TAA, which was executed in 2012, governs the tax sharing implications of these settlements.

205.    Although the TAA was executed on May 15, 2012, it states that it is "effective as of January 1, 2010."  (TAA, at 1.)  The TAA further provides that, "[i]n order to reflect the

---

[50]  The payables and receivables reflected in the Debtors' schedules and statements relate to adjustments in 2003–2012.  Adjustments related to 1997–2002 were addressed by a prepetition payment from TCEH to EFH, which is discussed below.

parties' course of dealing since January 1, 2010, this Agreement shall be effective for all open taxable years beginning after December 21, 2009." (TAA, Art. 6.4.) This language could be construed to mean that the TAA only applies to open tax years starting in 2010 and not to adjustments to prior tax years, even if those adjustments occurred after 2010 or affect tax years after 2010. On the other hand, it could be argued that this provision conflicts with the TAA's statement that it "supersedes all previous tax allocation agreements . . . and other federal income tax allocation agreements or arrangements among the parties[.]" (TAA, Art. 6.1.) Additionally, the phase "open tax years" in the TAA is meaningless unless it includes years beginning before December 31, 2009, since all tax years after that year were open at the time the TAA was executed. Further, the Debtors' management—including its CFO, who is vested with authority under the TAA to determine any issue not expressly addressed in the agreement—interpreted the TAA to apply to pre-2010 tax years. (*See* TAA, Art. 2.) This interpretation also has the benefit of treating all open tax years consistently.

206.    The TAA has significant implications on the validity of the Intercompany Tax Claims. There is authority holding that, absent an enforceable tax sharing agreement, entities in consolidated groups, and especially disregarded entities, are neither entitled to payment for the tax attributes that they generate nor required to reimburse the parent entity. *See, e.g.*, *In re Conex Holdings, LLC*, 518 B.R. at 792; *In re Majestic Star Casino, LLC*, 716 F.3d 736 (3d Cir. 2013); *In re Marvel Ent. Grp., Inc.* 273 B.R. 58 (3d Cir. 2002); *Marvel Ent., LLC v. Comm'r*, 145 T.C. No. 2 (2015). Thus, if the TAA does not apply to tax years before December 31, 2009, the Intercompany Tax Claims arguably are unenforceable as to adjustments relating to tax years not covered by the TAA.

207.    *AMT Credits*.  A portion of TCEH's $754 million tax sharing claim against EFH is attributable to AMT credits used in tax year 2006 as part of the 2002 Settlement.  EFH and TCEH dispute:  (a) whether EFH is obligated under the TAA to reimburse parties for reduction of AMT credits; and (b) which entity holds the claim for the reduction of AMT credits.

208.    By way of background, under the 2002 Settlement, the EFH consolidated group agreed to recognize approximately $2.8 billion of cancellation of indebtedness income ("CODI") related to the discharge of worthless debt related to its investments in Europe.  This CODI was realized in the EFH group's 2006 tax year.  Under the Internal Revenue Code ("IRC"), the CODI was excluded from taxable income due to the obligor's insolvency, but the EFH group was required to reduce its tax attributes by the amount of the CODI.  As a result, all AMT credits in the EFH group were reduced, including AMT credits attributed to TCEH.  In the second quarter of 2013 (which is when the 2002 Settlement was largely finalized with the IRS), the company booked a payable of approximately $364 million from EFH to TCEH to compensate TCEH for the loss of its AMT credits.[51]  Upon subsequent evaluation, the company determined that it had miscalculated the amount of reimbursement due to TCEH with respect to the use of its AMT credits and, as a result, reduced the amount by approximately $111 million in late 2013.  Thus, based on investigation to date, it is believed that approximately $240 million of the $754 million TCEH claim is attributable to reimbursement for use of AMT credits.[52]

209.    First, EFH would argue that the TAA does not require EFH to compensate TCEH for the reduction of AMT credits attributed to TCEH because those credits were not used

---

[51]    The total payable booked in the second quarter of 2013 was approximately $395.4 million, which appears to have reflected the amount attributable to AMT reduction, as well as certain other positive and negative adjustments.

[52]    As is discussed below, investigation into the facts underlying the tax sharing claims has uncovered complicated and inconsistent tax accounting practices at the legal entity level and is hampered by lack of institutional memory regarding certain accounting decisions.

to offset another member's taxable income.  The CODI would have been excluded from taxable income whether or not the AMT credits were available for reduction, suggesting that the AMT credits were not used to offset the CODI taxable income.  Rather, the AMT credits attributed to TCEH were merely reduced as a "charge" under the IRC as a result of the CODI that would have been excluded from taxable income no matter the availability of AMT credits at TCEH (or any other entity).  The TAA, on the other hand, does not address attribute reduction at all, and only creates tax sharing obligations as a result of taxable income or the use of tax attributes of one "member" to reduce the tax liability of another "member."

210.    Second, EFH would argue that even if TCEH were entitled to compensation for the reduction of AMT credits attributed to it under the TAA, the AMT credits did not properly "belong" to TCEH.  TCEH historically has not generated AMT credits on a standalone basis. There is some evidence that AMT credits were moved from the books of TCEH subsidiaries, including Luminant Generation, to TCEH, in exchange for a reduction of such entities' tax sharing obligations.  EFH may argue that such movements were improper.  Additionally, it appears that certain of these movements of AMT credits to TCEH's books occurred after 2006, when the attribute reduction at issue occurred.  Consequently, EFH may argue that the AMT credits that were reduced as a result of the Europe CODI should not have been attributed to TCEH, and any payment required for their use should be made to the proper party with taxable income generating activities, not TCEH.  Importantly, such a payment obligation would likely lead, at least in part, to a claim by Luminant Generation against EFH, and such claim would likely be subject to setoff by EFH's claim against Luminant Generation (without regard to any "netting" considerations).

211.    TCEH, on the other hand, would argue that EFH properly recorded a payable to TCEH for the use of TCEH's AMT credits.  TCEH's books and records reflected the presence of AMT credits attributable to TCEH, negating any assertion that they are properly attributable to another party.  Moreover, to the extent the attributes were moved to TCEH's books and such movement reduced the tax sharing liability of another entity to TCEH, TCEH would argue that TCEH should receive compensation for the attributes now.  Further, the TAA is intended to compensate parties for use of their attributes when the use is attributable to another member.  TCEH would argue that this is what occurred with the 2002 Settlement—a subsidiary of EFH recorded CODI that "used" TCEH's tax attributes by causing those attributes to be reduced.  Consistent with this approach, EFH recorded a payable to TCEH.  To the extent there could be a dispute over this item, it was foreclosed when EFH's CFO, exercising the discretion afforded him in the TAA, approved the payable that reflected, in part, compensation for the reduction of AMT credit.  (*See* TAA, Art. 2.)

212.    Notwithstanding their divergent interpretations of the TAA, EFH and TCEH agree that the Inter-Debtor Settlement reflects a reasonable compromise of the Intercompany Tax Claims.  Litigation over these claims would involve, among other things, the interpretation of the arguably ambiguous TAA (including with respect to whether the TAA is applicable in the first place), SEC filings, past company practice, and availability and ownership of AMT credits and other tax attributes, as well as a detailed examination of complicated and inconsistent books and records, and extensive depositions of multiple individuals (many of whom are no longer with the Debtors) regarding actions taken many years ago.  As such, any litigation will be fact intensive, lengthy and very costly.

213.    Diligence conducted to date, moreover, suggests that the company's historical tax sharing practices were arguably inconsistent in certain ways during the relevant time period and were delegated to different departments within the company.  Even if extensive discovery were conducted, it would be very challenging to recreate all facts relating to the Intercompany Tax Claims given the lack of institutional knowledge, arguable inconsistencies in accounting at the legal-entity by legal-entity level within the company over many years, and the length of time since the accounting decisions.  *See, e.g., In re Adelphia Commc'ns Corp.*, 368 B.R. at 174 (finding intercompany accounting disputes would be difficult to litigate because they "largely relied on the interpretation of actions of former management, many of whom were no longer with the Debtors . . . [and] witnesses would have to testify as to journal and other accounting entries that occurred more than five years ago"); *In re WCI Cable, Inc.*, 282 B.R. 457, 476 (Bankr. D. Or. 2002) (citing difficulties reconstructing intercompany transactions in light of personnel changes and limited institutional memory).

214.    Finally, from EFH's perspective, even if EFH were to prevail in litigation over the Intercompany Tax Claims, its recovery is unlikely to be significant, as it would achieve an unsecured claim against the TCEH estate, that at best, could serve as offsets against other TCEH claims against EFH.

### ii.    2013 Tax Sharing Payment

215.    In addition to the Intercompany Tax Claims discussed above, in 2013, TCEH made a cash tax sharing payment of approximately $101.7 million to EFH for both federal and state taxes ($84.4 million of which related to federal taxes, with the rest relating to state taxes). This cash tax sharing payment relates to issues addressed by the 2002 Settlement that are not reflected in the payables discussed above.

216.     This payment could be challenged as an avoidable preference under section 547(b) Bankruptcy Code, or as a fraudulent transfer under section 544(b) and applicable state law, *see* Del. Code Ann. tit. 6, § 1304.  EFH would likely counter that there are defenses to a preference claim, including that the payment was made in the ordinary course of the Debtors' business, as evidenced by the prior course of dealing between the parties, the amount of the payment, the timing of the payment, the circumstances of the payment and the means of the payment, each of which reflects the consistency with which tax payments historically were made between and among the company entities.  *See* 11. U.S.C. § 547(c)(2).  EFH could also raise defenses to a fraudulent transfer claim, including that the payment was made in satisfaction of an antecedent debt, or that the transferor was solvent at the time of the transfer or would not become insolvent as a result of the transfer.  *See* Del. Code Ann. tit. 6, § 1304(a)(2); *In re Crucible Materials Corp.*, No. 09-11582, 2012 WL 5360945, at *8 (Bankr. D. Del. Oct. 31, 2012).  TCEH would dispute each of EFH's potential arguments, and would argue that the payment was not ordinary course because it related to the settlement of a multi-year IRS audit.

217.     Although potential exposure to EFH is not significant compared to other inter-Debtor claims, the outcome of the 2013 tax sharing payment claim is highly uncertain.

### iii.     Other Tax Sharing Claims

218.     In addition to the Intercompany Tax Claims, if there were to be litigation on tax sharing issues, the TCEH Debtors would likely also argue:  (a) that EFH breached the tax sharing agreement by setting off its tax sharing obligations to TCEH rather than paying them in cash; (b) inconsistencies in the company's tax sharing practices harmed TCEH; and (c) TCEH can avoid tax sharing payments made to EFH while it was insolvent.

219.     *First*, the TCEH Debtors could argue that the TAA requires that all tax sharing payments be made between EFH and each party to the TAA (a so-called hub-and-spoke payment

system).   The company, however, allowed parties on the T-side to "pay" and "receive" tax sharing obligations and benefits through inter-T-side adjustments to their money pool balances. This resulted in a single payment between the T-money-pool and E-money-pool with respect to tax sharing each quarter, and a true-up payment in connection with the filing of the tax return for a given taxable year.   EFH would likely respond that this three party setoff was permitted under the TAA and EFH was not required to pay each party to the TAA its tax sharing receivables in cash.

220.   **Second**, the TCEH Debtors could argue that inconsistencies in the company's tax sharing practices and accounting harmed TCEH.   As discussed above, this claim would require substantial discovery into inconsistent past company practices and expert accounting testimony. EFH would likely respond that there is no evidence that the inconsistencies harmed TCEH.

221.   **Third**, the TCEH Debtors could argue that tax sharing payments made from the TCEH Debtors to EFH should be avoided.[53]   This would include litigation of solvency issues described above and reasonably equivalent value. EFH could argue in response that TCEH actually owes additional amounts that were not recorded, particularly with respect to tax year 2011, because of certain historical tax sharing and accounting practices.

222.   Because the legal issues raised by the tax sharing claims between EFH and TCEH are complex and raise novel issues, it is impossible to predict the outcome of litigation of the claims (or even the probability of a certain outcome) with reliability.   One thing, however, is clear:  litigation of these tax sharing issues would be extremely costly and time consuming for all parties.  Indeed, such litigation would likely require what amounts to a complete reconstruction of the Debtors' entire tax sharing history, for a number of years that cannot be specifically

---

[53]   In the six years prior to the bankruptcy filing, TCEH made net cash tax sharing payments to EFH of less than $150 million.

identified but may go back to 1997 (and potentially even earlier)—a period of time that is not only lengthy, but also covers *multiple* restructurings of the company, which would further complicate the analysis.  Even if this incredible level of factual development were not necessary, the legal issues presented are extremely complex.  Thus, it was desirable for the parties to settle prior to full litigation that would have involved costly discovery and large downside risk.

### p.      EFIH Holdings of EFH Legacy Notes

223.     As of the Petition Date, EFIH held approximately $1.282 billion of EFH Legacy Notes.  As part of the Disinterested Director Settlement, EFIH waived any recovery on account of these holdings, to the benefit of all EFH creditors.

### q.      TCEH Release of Claims Against EFIH

224.     TCEH asserted various claims against EFIH, including certain claims related to shared services and the Luminant Make-whole Payments.  (*See supra*, I.B.m.)  In addition to the benefits achieved by avoiding the expense and delay that would be required to litigate these claims, the release by TCEH of any claims against EFIH provides value to EFH because those claims against EFIH, if successful, would be structurally superior and have a greater impact dollar for dollar to the EFH capital structure, than the claims by TCEH against EFIH directly.  In addition, under the Inter-Debtor Settlement, EFIH released its claims against TCEH to avoid as fraudulent transfers EFIH's dividends to EFH of $950 million in February 2012 and $680 million in August 2012, which funded EFH's repayment of the TCEH Intercompany Notes.  EFIH has alleged that it could recover these dividends from TCEH as the entity for whose benefit the transfers were made.  *See* 11 U.S.C. § 550(a)(1).

### C.   The Settlement of Certain Inter-Debtor Claims Is Reasonable and In the Best Interest of the Debtors' Estates.

225.     The Settlement Agreement resolves substantially all Inter-Debtor Claims and replaces them with the TCEH Settlement Claim, which is an allowed, non-priority, unsecured claim by TCEH against EFH in the amount of $700 million.  (SA § 2.1.)  The primary benefit of the Inter-Debtor Settlement to each Debtor is that it resolves a host of complex claims involving highly contested facts and legal principles that could otherwise generate extensive litigation at an extraordinary cost to the estates and delay in emergence.   The Inter-Debtor Settlement thus allows the Debtors and the other Settlement Parties to focus their efforts on capturing the economic benefits of the Plan, without facing the risk of value-destructive litigation.

226.     The terms of the Inter-Debtor Settlement were negotiated at arm's length and are manifestly reasonable.   The settlement is based upon the Disinterested Director Settlement, which the Disinterested Directors and Disinterested Director Advisors reached after more than a month of intense negotiations, supported by months of research and investigation by the Debtors, the Disinterested Directors, and their respective advisors.   The TCEH Settlement Claim represents the best judgment of the Disinterested Directors and the Disinterested Director Advisors as to the value of settling versus litigating the Inter-Debtor Claims in light of an assessment of the claims' merits if litigated, the cost and delay of litigating, the ability to collect on a judgment, and the impact on the Debtors' creditors and other stakeholders.   This result, achieved through a process that was fair to all Debtors, is substantively reasonable, fair and equitable, in the best interests of the Debtors' estates, and easily falls well above the lowest point in the range of reasonable recoveries for each Debtor.   This Court should approve the Inter-Debtor Settlement under the *Martin* balancing test.   *See, e.g., In re Washington Mut., Inc.*, 442

B.R. 314, 328 (Bankr. D. Del. 2011) (bankruptcy courts in this circuit balance the *Martin* factors

in determining whether to exercise their discretion to approve a settlement).

> **1.   The Complex Factual and Legal Issues Raised By the Inter-Debtor Claims Makes the Probability of Success Highly Uncertain.**

227.    The Inter-Debtor Settlement resolves a broad range of complex claims among

the Debtors.  Some of the settled claims raise a prospect for substantial (nine- or ten-figure)

recoveries, but all of them are subject to significant defenses and therefore substantial

uncertainty.  The most significant potential Inter-Debtor Claims and defenses arise from the

following transactions and issues: (a) the 2007 LBO, (b) the Liability Management Program,

(c) the TCEH Intercompany Notes, (d) EFH and EFIH holdings of TCEH debt, (e) EFIH

holdings of EFH debt, (f) the Luminant "Make-whole" payments, (g) the allocation of shared

services, (h) intercompany tax sharing obligations and related issues, and (i) EFIH holdings of

EFH Legacy Notes.  The strengths, weaknesses, and uncertainties surrounding these claims are

outlined above.

228.    Not surprisingly, in the course of negotiating the Disinterested Director

Settlement, the Disinterested Directors and Disinterested Director Advisors expressed

considerable disagreement as to the merits of the many Inter-Debtor Claims.  As the parties

tested their positions against one another, however, it became clear to the TCEH Debtors and

EFH that they generally agreed that TCEH's claims against EFH were more valuable than the

EFH claims against the TCEH Debtors.

229.    As for Inter-Debtor Claims between EFIH and EFH, most run in favor of

EFIH.  Any recovery by EFIH from EFH, however, would be either circular or uncertain.  If

EFH's holdings of EFIH membership interests have value (because EFIH is able to satisfy all

claims against it), then the recovery would be circular, because any additional value infused into

EFIH would accrue to the benefit of EFH as EFIH's owner.  If, on the other hand, the EFIH membership interests have no value (because EFIH is unable to satisfy all claims against it), then EFIH would have an unsecured claim against EFH that would be funded, if at all, from some portion of EFH's cash.  Recovery on such a claim would be uncertain, and unlikely to compensate for the litigation expense required to pursue the Inter-Debtor Claims.  Thus, the parties' negotiations narrowed to the question of just how much more valuable the TCEH Debtors' claims are, and what consideration EFH would contribute to the settlement to justify the TCEH Debtors' releases of those claims.

230.    The parties eventually arrived at a compromise that values the TCEH Debtors' Inter-Debtor Claims at roughly $700 million more than the EFH and EFIH Inter-Debtor Claims against the TCEH Debtors.  Although the Disinterested Directors did not attempt to mechanically allocate this figure among the various Inter-Debtor Claims, they concluded that the Inter-Debtor Settlement was reasonable in light of their assessment of each of the individual claims being released.  In agreeing to the settlement amount, moreover, the Disinterested Directors also took into account the significant benefits from a global resolution of all inter-Debtor litigation.  *See, e.g.*, *In re Tribune Co.*, 464 B.R. 125, 173-74 (Bankr. D. Del. 2011) (concluding that outcome of claims was uncertain but ultimately determining that settlement fell above the lowest point in the range of reasonableness); *In re Drexel Burnham Lambert Grp.*, 138 B.R. 723, 747 (Bankr. S.D.N.Y. 1992) (approving settlement that was "not derived from a precise mathematical formula" but "represent[ed] the product of the agreed resolution of a large number of uncertain issues in the context of a comprehensive settlement of issues regarding the treatment of all Claims against the Debtors").

**2.      Collection of a Large Judgment on an Inter-Debtor Claim Would Be Very Difficult.**

231.     As courts have recognized in assessing Rule 9019 settlements, a litigation claim is only as valuable as it is collectible.  *In re Washington Mut., Inc.*, 442 B.R. at 344 (discussing complexity and difficulties of collecting huge judgments, even against parties with substantial liquid assets—e.g., massive judgment against bank could result in bank collapse); *see also In re New Century TRS Holdings, Inc.*, 390 B.R. 140, 168 (Bankr. D. Del. 2008), *rev'd on other grounds*, 407 B.R. 576 (D. Del. 2009) ("[M]any of the issues and claims described above arise between and among the various Debtors and, while it is difficult to tell whether litigation would render such claim 'uncollectible,' the substantial expense would adversely impact even those creditors on the side of the victorious Debtor."); *In re Coram Healthcare*. 315 B.R. 321, 331 (Bankr. D. Del. 2004) (concluding that settlement was reasonable because of, among other factors, "enormous difficulty in collecting" against a party in its own bankruptcy proceeding).  Here, if any one of the Debtors were to obtain a large net judgment (accounting for setoff) on the Inter-Debtor Claims against another Debtor, it likely would face considerable difficulty in collecting on that judgment.  Any net judgment on account of the Inter-Debtor Claims would result in an unsecured claim by the prevailing Debtor against the defendant Debtor(s).  Depending on the overall valuation of the defendant Debtor at the time of emergence, even a large unsecured claim may have little to no value.

232.     The collectability problem is especially acute for Inter-Debtor Claims against the TCEH Debtors.  It is undisputed that the total value of TCEH and its subsidiaries is substantially less—by billions of dollars—than the total claims against them, and none of the approximately $7.655 billion of prepetition TCEH second lien and unsecured debt is above water.  Any additional unsecured claim on account of a net inter-Debtor judgment against TCEH or its

subsidiaries (including Luminant) would significantly dilute the massive unsecured claims pool, including the large deficiency claims of the TCEH First Lien Creditors, and would be unlikely to receive any meaningful recovery.

233.    There is also uncertainty with respect to collectability on the TCEH Debtors' claims against the EFH estate if they are ultimately determined to be meritorious.  EFH is a holding company with growing administrative claims for post-petition interest and bankruptcy expenses.  The cost of litigation of the Inter-Debtor Claims would further deplete the value available at EFH to satisfy any judgment.

234.    The limitations on the collectability of any judgment on Inter-Debtor Claims support the reasonableness of the settlement.  From the perspective of EFH or EFIH, for example, there is little potential "upside" to litigating their claims against the TCEH Debtors. Even if EFH or EFIH prevailed on such claims, they are very unlikely to obtain any substantial recovery for their respective estates.  From the perspective of the TCEH Debtors, litigation is also unlikely to result in a recovery materially greater than the settlement.  The T-Side inter-Debtor claims with the most potential value are those against EFH, but EFH's ability to satisfy a significant judgment is quite limited.  Given the cost and delay that would inevitably attend litigation against EFH, a $700 million claim against EFH is an eminently reasonable compromise.

**3.    The Complexity, Expense, and Delay of the Litigation Involved Support the Inter-Debtor Settlement.**

235.    Litigation of these claims would have an uncertain and potentially lengthy duration and would cost the estates tens, if not hundreds, of millions of dollars in attorneys' and other professional fees alone.  Litigation of the Inter-Debtors Claims would generate countless fact-intensive questions for judicial resolution related to dozens of transactions going back a

decade.  Complicated factual and legal questions concerning the timeliness of many of these claims would be litigated on motions to dismiss and summary judgment, adding significant expense and uncertainty before even getting to trial.  And even after trial, there is the possibility that losing parties would appeal the judgment and cause further delay and expense.  *See Adelphia*, 368 B.R. at 242-43; *accord In re Energy Future Holdings Corp.*, May 13, 2015 Hr'g Tr. (Sontchi, J.) ("I have every expectation with a claim of this size and the importance it may hold in connection with the capital structure and how this case might go forward that we wouldn't even have clarity were I to make a decision . . . because people would want to pursue their appellate rights.").  Extensive expert work would be required for most claims, ensuring that discovery would be protracted, complex, and costly.

236.    In addition to these direct litigation costs, the Debtors would incur substantial indirect costs from litigation of Inter-Debtor Claims.  Most concretely, litigation of Inter-Debtor Claims, for example, would materially delay the Debtors' emergence from bankruptcy, causing additional post-petition interest to accrue on claims against EFIH and EFH.  Other indirect costs are more difficult to quantify, but no less real.  For example, litigation of Inter-Debtor Claims would distract the Debtors' key management personnel from their primary responsibility—running those businesses—as they would be forced to respond to the many demands for their time and attention that litigation would inevitably entail.

237.    In short, it would be unnecessarily wasteful to pursue judicial resolution of each of these claims when a consensual resolution is possible, making this "the precise type of multi-faceted litigation that cries out for settlement."  *In re Washington Mut., Inc.*, 442 B.R. at 345.

### 4.    The Inter-Debtor Settlement is in the Paramount Interest of the Creditors.

238.    Settlement of all Inter-Debtor Claims is in the best interests of the creditors. Most significantly, the settlement avoids draining estate resources in massive litigation that could otherwise fund creditors' claims.  Given the breadth and complexity of the settled claims, litigation would likely remove millions of dollars from the Debtors' estates that could otherwise be used to satisfy creditor claims.  *See In re Kaiser Aluminum Corp.*, 339 B.R. 91, 96 (D. Del. 2006) (approving a settlement that "serves the best interest of the estate and the creditors by arranging for a global settlement which will facilitate a plan of reorganization that will ultimately benefit all creditors and reduce the fees, costs and expenses that the estate would have had to bear in order to litigate the extensive, complex and uncertain issues raised by [the] claim").

239.    Moreover, resolution of these claims provides some certainty to creditors and hastens the Debtors' emergence from bankruptcy.  The delay of Debtors' emergence would have an effect on customer retention, contracting with counterparties to hedge business risks, employee retention, investment in assets, and use of managerial time on litigation-related matters rather than for business operations.  *See In re Satcon Tech. Corp.*, No. 12-12869 KG, 2012 WL 6091160, at *5 (Bankr. D. Del. Dec. 7, 2012) (settlement was in the paramount interest of creditors because it was the "only way the Debtors can have confidence that the relationship" with their supplier "will remain stable in the future").

240.    Further, a delay in resolution of the Inter-Debtor Claims could have a material impact on the Debtors' value and could change the market environment for Oncor.  *See In re W.R. Grace & Co.*, 475 B.R. 34, 79 (D. Del. 2012) (settlement is in the paramount interest of creditors because it involved an "infusion of tangible and abstract value into Grace's bankruptcy estate" that "enlarges the pool of funds available to *all* creditors and ensures greater guaranteed

recovery."). All of these factors would affect the Debtors' ability to pay their creditors, making timely emergence (and hence the Inter-Debtor Settlement) in the paramount interest of creditors.

241.    Notably, the Inter-Debtor Settlement has the support of T-side creditors across the capital structure, and key T-side creditor constituencies are Settlement Parties. The Settlement Agreement also benefits E-side creditors, by facilitating the Plan, which would result in all allowed E-side creditor claims being paid in full in cash. *See In re Kaiser Aluminum Corp.*, 339 B.R. at 96 ("[P]roposed settlement serves the best interest of the estate and the creditors by arranging for a global settlement which will facilitate a plan of reorganization that will ultimately benefit all creditors[.]"). Even if the transactions in the Plan are not consummated, the Inter-Debtor Settlement benefits the E-side creditors by resolving their exposure to Inter-Debtor Claims, which are forever released under the Settlement Agreement regardless of the success of the Plan.

242.    For these reasons, the Inter-Debtor Settlement is reasonable and should be approved.

### D.    The Settlement of Claims Against TCEH First Lien Creditors is Reasonable and in the Best Interest of the Debtors' Estates.

243.    The Settlement Agreement resolves all First Lien Claims, including the claims asserted in the Standing Motions. (SA § 2.2) The terms of the First Lien Settlement derive from arm's-length and good faith negotiations between the TCEH First Lien Creditors and the other Settlement Parties. The negotiations produced a result that is in the best interest of the Debtors' estates and easily falls above the lowest point in the range of reasonableness: the TCEH Committee and the TCEH Unsecured Group will abandon their Standing Motions, and the TCEH First Lien Claims will be released in exchange for the TCEH First Lien Creditors' support for the

Plan.  In addition, in the event an alternative restructuring must be pursued, the TCEH junior creditors will receive the $550 million TCEH Cash Payment.

244.     As with the other aspects of the Settlement Agreement, the settlement of the First Lien Claims provides tangible benefits to the Debtors by resolving a variety of complex claims that could generate extensive litigation, drain estate resources, and delay their exit from chapter 11.  It further garners the support of the TCEH First Lien Creditors, the fulcrum creditors on the T-side of the capital structure, for a consensual plan of reorganization.  Meanwhile, the cost to the Debtors of the First Lien Settlement is minimal.  Even if successful, those claims would not enlarge the Debtors' estates, but would only adjust the relative recoveries of their creditors.  The First Lien Settlement is reasonable, in the best interests of the estate, and should be approved under Rule 9019(a) and the *Martin* balancing test.  *See, e.g., In re Washington Mut.*, 442 B.R. at 328.

### 1.    The Claims Against the TCEH First Lien Creditors Do Not Merit Expensive and Time-Consuming Litigation

245.     The Debtors have long maintained that expensive and time-consuming litigation in pursuit of the First Lien Claims would not be in the Debtors' best interests.  Indeed, the Debtors stipulated to the extent and validity of the TCEH First Lien Creditors' liens and claims in the Cash Collateral Order (D.I. 855) only after investigation and discussions with creditor groups in the months prior to filing.  The Debtors' assessment of the claims against the TCEH First Lien Creditors is represented in their objection to the Standing Motions (D.I. 3727), and is consistent with the substantive objections filed by various TCEH creditor groups.  (See D.I. 3725; D.I. 3726; D.I. 3729; D.I. 3731; D.I. 3732; D.I. 3734; D.I. 3741.)  The TCEH Committee and the TCEH Unsecured Group disagree with the Debtors' assessment of the claims and causes of action against the TCEH First Lien Creditors, but do agree that the likelihood of success is

uncertain and that settlement of such claims and causes of action as proposed in the Settlement Agreement is in the best interests of the Debtors' estates and their stakeholders.

246.    *First,* as discussed above, claims seeking to avoid liens, security interests, and obligations arising out of the 2007 LBO may be time-barred.  The assertion in the Standing Motions that these claims are timely because the TCEH Debtors can step into the shoes of the IRS and thereby enjoy the benefit of the IRS's immunity from state law statutes of limitations would be strongly contested.  In particular, the TCEH First Lien Creditors have argued that a private plaintiff should not be permitted to use a government agency's immunity from state law statutes of limitations to pursue private claims.  *See, e.g., In re Vaughan*, 498 B.R. 297 (Bankr. D.N.M. 2013).

247.    *Second,* if not time-barred, any fraudulent transfer claim based on the 2007 LBO may be challenged on the merits.  There are strong arguments that the Debtors were not rendered insolvent by the LBO, received reasonably equivalent value for the transaction.  In addition, there are strong arguments that the transaction would be protected by section 546(e)'s "safe harbor" for "settlement payment[s] . . . made by or to (or for the benefit of) a . . . financial institution" or as "transfer[s] made by or to (or for the benefit of) a . . . financial institution . . . in connection with a securities contract."

248.    *Third*, there are also arguments that the constructive fraudulent transfer claims concerning the 2011 Amend and Extend Transactions and 2013 Revolver Extension should fail because the Debtors received reasonably equivalent value for these transactions.  As discussed above, the TCEH First Lien Creditors would argue that (i) the 2011 Amend and Extend Transactions permitted TCEH to sustain a continued market downturn, ensuring continued access to liquidity, and saving billions of dollars in fees and expenses that would have been

incurred had the TCEH First Lien Debt been repaid rather than extended; and (ii) the 2013 Revolver Extension provided the Debtors with breathing room to benefit from potential market improvements and allowed them to avoid a freefall bankruptcy.

249.    **Fourth**, the facts necessary to support actual fraudulent transfer claims concerning the 2013 Revolver Extension would require affirmative evidence that the Debtors consummated the extension with fraudulent intent.  Despite the extensive discovery granted to creditors in Legacy Discovery, the Debtors have not been presented with any such evidence.

> **2.    The Remaining *Martin* Factors Support Approval of the Settlement of Claims Against the First Lien Creditors.**

250.    As with the Inter-Debtor Settlement, the outcome of the First Lien Claims would turn on complex factual and legal issues, which would be the subject of extensive discovery and expert testimony.  *See In re Key3Media Group, Inc.*, 336 B.R. 87, 97 (Bankr. D. Del. 2005) (finding that the complexity, expense, inconvenience, and delay of litigation weighed in favor of settling fraudulent transfer claims because the matter "would involve expert testimony, motion practice, and extensive discovery").  Further, the time necessary to obtain final judgments on the First Lien Claims is uncertain, would require expenditure of time and resources of *both* the Debtors and the TCEH creditors, and would delay any recovery by the Debtors and, ultimately, the TCEH unsecured creditors.  Accordingly, prompt settlement of First Lien Claims is in the estates' best interests, and should be approved.  *Id.*

251.    The First Lien Settlement is in the best interest of the creditors.  After all, the TCEH First Lien Creditors and the Settlement Parties negotiated and agreed to this aspect of the settlement after considering their interests and options.  They have opted for this settlement in lieu of protracted and expensive litigation, which may ultimately return little substantial benefit to the Debtors' estates or, ultimately, the creditors themselves. *See In re W.R. Grace & Co.*, 475

B.R. 34, 78 (approving a settlement, noting that it "obviates the need to further rehash these complex issues in costly and drawn-out litigation.  Moreover, the continuation of litigation . . . would inevitably create significant burdens and expenses . . . for both parties, and would only result in an unnecessary drain of estate resources.") (citations and internal quotations omitted).  In consideration for entering into the Settlement Agreement, the TCEH junior creditors receive support for the Plan and will receive the $550 million in cash in an alternative restructuring should the Plan fail.  For these reasons, the First Lien Settlement should be approved.

### E.    The Settlement of Claims Against the Sponsors and the Debtors' Directors and Officers is Reasonable and in the Best Interests of the Estate.

252.    The S/D/O Settlement and the releases of S/D/O Claims are a critical component of the Settlement Agreement and should be approved under Rule 9019(a).  In determining whether releases pass muster under Rule 9019(a), courts in this circuit are guided by the factors enumerated in *Master Mortgage*.  *See In re Washington Mut., Inc.*, 442 B.R. at 346-47 ("The Third Circuit has refused to articulate a test for when releases by Debtors are appropriate in the chapter 11 context.  However, the court continues to believe that the factors articulated in *Master Mortgage* form the foundation for such an analysis, with due consideration of other factors that may be relevant to this case.") (citation omitted).

253.    In *Master Mortgage*, the court considered: "(1) an identity of interest between the debtor and the non-debtor such that a suit against the non-debtor will deplete the estate's resources; (2) a substantial contribution to the plan by the non-debtor; (3) the necessity of the release to the reorganization; (4) the overwhelming acceptance of the plan and release by creditors and interest holders; and (5) the payment of all or substantially all of the claims of the creditors and interest holders under the plan."  *Id.* at 346 (citation omitted).

254.    These factors are "neither exclusive nor conjunctive requirements" but rather serve as guidance to courts in determining fairness of a debtor's releases. *Id.* Consideration of the *Master Mortgage* factors and other relevant considerations demonstrate that the Debtors' releases of the Sponsors and its directors and officers should be approved.

255.    *First*, an identity of interest exists between the Debtors and the Sponsors as well as the Debtors and the Debtors' directors and officers because the Debtors are required to indemnify each of the Sponsors and the directors and officers for any liability they incur as a result of any claims brought against the Sponsors. *Id.* (holding that an identity of interest existed between the directors/officers and the debtors where the debtors had to indemnify directors/officers for claims asserted against them); *In re Charter Commc'ns*, 419 B.R. 221, 259 (Bankr. S.D.N.Y. 2009) (holding that "the indemnification obligations between the Debtors and their directors, officers, agents, and professionals produce an identity of interest."); *In re Master Mortgage Inv. Fund, Inc.*, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994) (noting that the identity of interest is "usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor"). For example, certain indemnification agreements entitle the Sponsors to setoff claims against EFH in the event the Sponsors were found liable for fee claims. The proofs of claims filed by the Sponsors assert entitlement to indemnification. (*See* Claim Nos. 8703, 8704, 8733, 8916, 8917, 8946, 9342, 9343, 9372.)

256.    *Second*, the Sponsors and the directors and officers have made substantial contributions to the Plan. On the most basic level, by agreeing to forgo future recoveries on their equity and consenting to TCEH's $700 million claim against EFH in the event of an Alternative Plan, the Sponsors are agreeing to forgo a recovery from EFH to which they would be entitled. (*See* PSA § 6.1(b)(2).) Under the absolute priority rule, the Sponsors are entitled to all value of

EFH once creditors are paid in full, and would have a strong interest in minimizing claims against EFH and its subsidiaries.  The Sponsors, however, have instead agreed to forgo and assign recovery of excess value at EFH (and future "upside") and to accept the TCEH Settlement Claim.  These agreements are integral to the Plan.  Notably, even if the excess value at EFH is not ultimately realized, forgoing the *right* to this potential recovery is critical to enabling the Settlements that are integral to the Plan.  *See In re Blitz U.S.A., Inc.*, No. 11-13603, 2014 WL 2582976 at *4 (Bankr. D. Del. Jan. 30, 2014) (holding that consideration provided by Wal-Mart constitutes a substantial contribution where part of the consideration included agreement to relinquish valuable insurance rights).

257.    In addition, the Sponsors have filed proofs of claim against the Debtors for substantial amounts.  The proofs of claim assert a right to unpaid management fees and related expenses under the Management Agreement, which, as of today, total approximately $69 million.  The Sponsors additionally have broad reimbursement and indemnification rights against the Debtors, all of which have been asserted in the proofs of claim.   Under the Settlement Agreement, the Sponsors have agreed to waive these claims in exchange for the consideration being provided by the Debtors and consenting creditors.

258.    Further, Texas Energy Future Holdings Limited Partnership ("Texas Holdings")—the direct interest holder in EFH, which is owned by Sponsor-managed funds— has agreed that it will not take any "worthless stock deduction" with respect to its EFH equity prior to consummation of the Plan, if doing so would give rise to an ownership change for tax purposes.  Such action by Texas Holdings could limit the Debtors' ability to use a portion of their net operating loss deductions to offset taxable gain triggered to provide the partial basis

step-up contemplated by the Plan.  That partial basis step-up is a component of the Plan and provides economic benefit to the Debtors.

259.    Beyond all this, the Sponsors and the directors and officers have also made significant non-monetary contributions to the Settlement Agreement, the PSA, and the Plan. These contributions include massive investments of time and effort to, and continued support for, the Debtors' reorganization—including to encourage and facilitate a complex transaction involving the conversion of Reorganized EFH into a REIT.  The Directors' and Officers' unwavering commitment and effort has been commensurate with the cases' size and complexity. Indeed, for the past four years, the directors and officers have provided critical guidance to the Debtors, including through their participation in 75 joint board and committee meetings in 2015 alone, as well as their active governance and oversight of the Debtors' restructuring.  Without their substantial efforts, the Settlement Agreement, the PSA and the Plan would not have been possible.  *See In re Exide Techs.*, 303 B.R. 48, 74 at n.37 (Bankr. D. Del. 2003) (declining to hold that "the price of a release of officers, directors and others must always involve the contribution of tangible 'assets' or that efforts alone of officers and directors are never sufficient to warrant such a release.")

260.    ***Third***, the releases are essential to the Settlement Agreement, the PSA, and the Plan because they allow the Debtors to move forward with the restructuring without first tackling lengthy and complex litigation against the Sponsors or the Debtors' directors and officers. Investigation into any claims for breach of fiduciary duty or aiding and abetting breach of fiduciary duty would necessarily require a fact-intensive inquiry into the Debtors' historical transactions, the outcome of which will necessarily turn on complex solvency analyses at the time of the transactions at issue, which would be the subject of extensive discovery and expert

testimony.  *See In re Key3Media Group, Inc.*, 336 B.R. at 97 (Bankr. D. Del. 2005); *see In re Washington Mut., Inc.*, 442 B.R. at 348 (holding the releases were reasonable because in light "of the complex and interrelated claims that the Debtors, JPMC and the FDIC have to virtually every asset in the Debtors' estates, it is hard to imagine what plan the Debtors could propose without the resolution of those claims first").

261.    In addition, the Sponsor releases are essential to the Inter-Debtor Settlement, which, as discussed above, removes numerous substantial roadblocks to the Plan.  As consideration for their releases, the Sponsors have agreed to support the Inter-Debtor Settlement, which, as noted, inserts a $700 million claim by TCEH ahead of their own claim as creditors of EFH.  The Sponsors' support for the Inter-Debtor Settlement provides significant value to the Debtors and, standing alone, would support the Debtors' releases as a reasonable exercise of their business judgment.

262.    ***Fourth***, the Plan, Settlement and contemplated releases have substantial support of all T-side creditors and interest holders.  Indeed, the T-Side creditors were the only creditors to identify any potential claims against the Sponsors, directors, or officers, and each T-side creditor group fully supports the grant of releases contemplated by the Settlement Agreement.

263.    ***Fifth***, the Plan calls for payment of all allowed E-side creditor claims in full in cash.  This factor therefore weighs in favor of approving the releases.  *See In re Washington Mut., Inc.*, 442 B.R. at 348 (holding the releases were reasonable in part because "all creditors, except the lowest subordinated class, will receive payment in full plus post-petition interest from the proceeds of the assets released by the Global Settlement.").

264.    Thus, each of the *Master Mortgage* factors weighs in favor of approving the releases.  But the basis for Court approval does not end with these five factors.  To the extent

fraudulent-transfer claims might be pursued against the Sponsors in connection with the 2007 LBO, those claims would face substantial hurdles.  (*See supra*, section I.B.b.)  Claims to recover payments of fees to the Sponsors under the Management Agreement likewise would have to overcome numerous substantial defenses, as discussed above.  (*See supra*, section I.B.c.)

265.    To the extent the Debtors might pursue claims against their directors and officers, those claims also would be unlikely to succeed.  It is critical to note that the Debtors have *already* released potential claims for breach of fiduciary against their directors and officers in the LLC Agreements.  For example, the TCEH LLC Agreement eliminates the fiduciary duties of, among others, (a) any "member" of TCEH, an "Affiliate of any Member or their respective members, officers, directors . . . or partners"; (b) a "Manager, Officer, employee or agent" of TCEH; and (c) "a Person who serves on behalf of [TCEH] as a partner, manager, member, officer, director, employee, or agent of any other entity."  (TCEH LLC Agreement, at 3 (Definition of "Covered Person") [EFH05014263].)  The duties of such Covered Persons are eliminated "to the fullest extent allowed under Delaware law," (*id.* at § 2.06(f)), which permits an LLC to contractually eliminate all duties other than the duty of good faith and fair dealing, Del. Code Ann. tit. 6, § 17-1101(d).  TCEH's directors and officers clearly fall within this language, and thus cannot be liable for breach of their fiduciary duties unless a plaintiff could show that they acted in bad faith.  *Id.*  EFIH's LLC Agreement contains identical language preventing claims for breach of fiduciary duty against its directors and officers. (EFIH LLC Agreement, at § 2.3(c) [EFH05455688].)

266.    Setting aside this substantial hurdle to claims against those individuals, any significant claims against the directors and officers would be time-barred.  Because claims for breach of fiduciary duty against the Debtors' directors and officers would not fall under section

544, they could not benefit from an extension of the three-year or four-year statues of limitations under Delaware or Texas law.  *See* Del. Code Ann. Tit. 10, § 8106(a) (three-year statute of limitations for breach of fiduciary duty); Tex. Civ. Prac. & Rem. Code § 16.004(a)(5) (four-year statute of limitations for breach of fiduciary duty).

267.    There also do not appear to be grounds to toll the statute of limitations on any claim for breach of fiduciary duty.  Under Delaware law, for example, "there are three bases for tolling the statute of limitations:  (1) inherently unknowable injuries, (2) fraudulent concealment, and (3) equitable tolling following a breach of fiduciary duties."  *In re AMC Investors, LLC*, 524 B.R. 62, 80-81 (Bankr. D. Del. 2015) (internal citations omitted).  "However, [u]nder all three tolling doctrines, the statute begins to run upon the discovery of facts constituting the basis of the cause of action or the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery of such facts."  *Id.*  (internal quotation marks omitted and alteration in original).  Here, given the public nature of the transactions that likely would be the subject of a breach of fiduciary duty claim (*e.g.*, the 2007 LBO, the 2011 Amend and Extend Transactions, and the TCEH Intercompany Notes), it is unlikely that any of these doctrines would apply.

268.    Notably, Delaware does not recognize "adverse domination" as a basis for tolling the statute of limitations.  *Id.* at 81; *see In re Marvel Entm't Grp.*, 273 B.R. 58, 77 (D. Del. 2002).  While Texas law may recognize adverse domination as a tolling doctrine in limited circumstances, it requires a showing that the director-wrongdoers engaged in intentional wrongdoing—mere negligence or even gross negligence will not suffice.  *See Askanase v. Fatjo*, 130 F.3d 657, 666-67 (5th Cir. 1997); *Resolution Trust Corp. v. Acton*, 49 F.3d 1086, 1090-92 (5th Cir. 1995).  Other tolling doctrines under Texas law require a showing that a plaintiff's

injury was undiscoverable, or that the defendants fraudulently concealed its misconduct.  *See Shell Oil Co. v. Ross*, 356 S.W.3d 923, 929-30 (Tex. 2011); *Mitchell Energy Corp. v. Bartlett*, 958 S.W.2d 430, 4439 (Tex. App. 1997).  Those doctrines are unlikely to apply to the publicly-disclosed transactions at issue here.

269.     Finally, the S/D/O Settlement is in the best interests of the creditors.  The Debtors' releases of the S/D/O Claims avoid an unnecessary drain of estate resources that will be siphoned into litigation that has a low probability of success and is extremely unlikely to improve creditors' recovery.  All of these considerations demonstrate that the Debtors' releases of the S/D/O Claims are fair, reasonable, in the best interest of the estates, and should be approved.

## Waiver of Bankruptcy Rules 6004(a) and 6004(h)

270.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## Notice

271.     The Debtors shall provide notice of this Motion on the date hereof via first class mail to:  (a) the U.S. Trustee; (b) counsel to the TCEH Committee; (c) counsel to the EFH Committee; (d) Wilmington Trust, N.A., in its capacity as administrative agent under the TCEH first lien credit agreement and collateral agent under the TCEH intercreditor agreements and counsel thereto; (e) Bank of New York Mellon Trust Company, N.A., in its capacity as indenture trustee under:  (i) the TCEH unsecured pollution control revenue bonds; and (ii) the EFCH 2037 Notes due 2037, and counsel thereto; (f) American Stock Transfer & Trust Company, LLC, in its capacity as indenture trustee under:  (i) the 9.75% EFH senior unsecured notes due 2019; (ii) the

10.0% EFH senior unsecured notes due 2020; (iii) the 10.875% EFH LBO senior unsecured notes due 2017; (iv) the 11.25%/12.0% EFH LBO toggle notes due 2017; (v) the 5.55% EFH legacy notes (series P) due 2014; (vi) the 6.50% EFH legacy notes (series Q) due 2024; and (vii) the 6.55% EFH legacy notes (series R) due 2034, and counsel thereto; (g) Computershare Trust Company, N.A. and Computershare Trust Company of Canada, in their capacities as indenture trustee under:  (i) the 11.0% EFIH senior secured second lien notes due 2021; and (ii) the 11.75% EFIH senior secured second lien notes due 2022, and counsel thereto; (h) UMB Bank, N.A. in its capacity as indenture trustee under:  (i) the 9.75% EFIH senior unsecured notes due 2019; and (ii) the 11.25%/12.25% EFIH senior toggle notes due 2018, and counsel thereto; (i) Delaware Trust Company of Delaware in its capacity as indenture trustee under:  (i) the 6.875% EFIH senior secured notes due 2017; (ii) the 10.0% EFIH senior secured notes due 2020; and (iii), the 11.50% TCEH senior secured notes due 2020, and counsel thereto; (j) Law Debenture Trust Company of New York in its capacity as indenture trustee under:  (i) the 10.25% TCEH senior unsecured notes due 2015; and (ii) the 10.50%/11.25% TCEH senior toggle notes due 2016, and counsel thereto; (k) Wilmington Savings Fund Society, FSB in its capacity as indenture trustee under the 15.0% TCEH senior secured second lien notes due 2021, and counsel thereto; (l) counsel to certain holders of claims against the Debtors regarding each of the foregoing described in clauses (c) through (j); (m) the agent for the TCEH debtor-in-possession financing facility and counsel thereto; (n) the agent for the EFIH debtor-in-possession financing facility and counsel thereto; (o) counsel to certain holders of equity in Texas Energy Future Holdings Limited Partnership; (p) counsel to the Ad Hoc Committee of TCEH Unsecured Noteholders; (q) counsel to the Ad Hoc Committee of TCEH Second Lien Noteholders; (r) Oncor Electric Delivery Holdings Company LLC and counsel thereto; (s) Oncor Electric

Delivery Company LLC and counsel thereto; (t) the Securities and Exchange Commission; (u) the Internal Revenue Service; (v) the Office of the United States Attorney for the District of Delaware; (w) the Office of the Texas Attorney General on behalf of the Public Utility Commission of Texas; (x) counsel to the Electric Reliability Council of Texas; and (y) those parties that have requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### No Prior Request

272.    No prior request for the relief sought in this Motion has been made to this or any other court.

### Conclusion

273.    The Debtors respectfully request that the Court enter an order, substantially in the form of the Settlement Order attached as **Exhibit A** approving the Settlement Agreement and authorizing the Debtors to enter into and perform under the Settlement Agreement.

*[Remainder of page intentionally left blank.]*

Dated:  August 10, 2015
          Wilmington, Delaware

/s/ Jason M. Madron
**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
920 North King Street
Wilmington, Delaware 19801
Telephone:     (302) 651-7700
Facsimile:     (302) 651-7701
Email:         collins@rlf.com
               defranceschi@rlf.com
               madron@rlf.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Stephen E. Hessler (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:         edward.sassower@kirkland.com
               stephen.hessler@kirkland.com
               brian.schartz@kirkland.com

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Chad J. Husnick (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:         james.sprayregen@kirkland.com
               marc.kieselstein@kirkland.com
               chad.husnick@kirkland.com
               steven.serajeddini@kirkland.com

Co-Counsel to the Debtors and Debtors in Possession

Dated:  August 10, 2015
      Wilmington, Delaware

/s/ Mark K. Thomas
**O'KELLY ERNST & BIELLI, LLC**
David M. Klauder (No. 5769)
Shannon J. Dougherty (No. 5740)
901 N. Market Street, Suite 1000
Wilmington, DE 19801
Telephone:      (302) 778-4000
Facsimile:      (302) 295-2873
Email:          dklauder@oeblegal.com
                sdougherty@oeblegal.com

-and-

**PROSKAUER ROSE LLP**
Jeff J. Marwil (admitted *pro hac vice*)
Mark K. Thomas (admitted *pro hac vice*)
Peter J. Young (admitted *pro hac vice*)
Three First National Plaza
70 W. Madison Street, Suite 3800
Chicago, IL 60602
Telephone:      (312) 962-3550
Facsimile:      (312) 962-3551
Email:          jmarwil@proskauer.com
                mthomas@proskauer.com
                pyoung@proskauer.com

Co-Counsel to the Debtor Energy Future Holdings Corp.

Dated:  August 10, 2015
       Wilmington, Delaware       */s/ Richard Levin*

**STEVENS & LEE, P.C.**
Joseph H. Huston, Jr. (No. 4035)
1105 North Market Street, Suite 700
Wilmington, Delaware 19801
Telephone:    (302) 425-3310
Facsimile:    (610) 371-7927
Email:      jhh@stevenslee.com

-and-

**CRAVATH, SWAINE AND MOORE LLP**
Michael A. Paskin, Esq.
Trevor M. Broad, Esq.
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
Telephone:    (212) 474-1760
Facsimile:    (212) 474-3700
Email:      mpaskin@cravath.com
            tbroad@cravath.com

-and-

**JENNER & BLOCK**
Richard Levin
919 Third Avenue
New York, NY 10022-3908
Telephone:  (212) 891-1601
Facsimile:  (212) 891-1699
Email:     rlevin@jenner.com

Co-Counsel to Energy Future Intermediate Holding Company LLC

Dated:  August 10, 2015
        Wilmington, Delaware           */s/ Thomas B. Walper*
                                       **MCELROY, DEUTSCH, MULVANEY**
                                       **& CARPENTER, LLP**
                                       David P. Primack (No. 4449)
                                       300 Delaware Avenue, Suite 770
                                       Wilmington, DE  19801
                                       Telephone:    (302) 300-4515
                                       Facsimile:    (302) 654-4031
                                       Email:        dprimack@mdmc-law.com

                                       -and-

                                       **MUNGER, TOLLES & OLSON LLP**
                                       Thomas B. Walper
                                       Seth Goldman
                                       355 South Grand Avenue, 35th Floor
                                       Los Angeles, CA 90071
                                       Telephone:    (213) 683-9100
                                       Facsimile:    (213) 683-4022
                                       Email:        Thomas.Walper@mto.com
                                                     Seth.Goldman@mto.com

                                       Co-Counsel to the TCEH Debtors