Page 1

1    UNITED STATES BANKRUPTCY COURT

2    DISTRICT OF DELAWARE

3    In re:                          :

                                     :    Chapter 11

4    ENERGY FUTURE HOLDINGS          :

     CORP., et al.,                  :    Case No. 14-10979(CSS)

5                                    :

             debtors.                :    (Joint Administration

6    _____:    Requested)

7

8

9                                    United States Bankruptcy Court

10                                   824 North Market Street

11                                   Wilmington, Delaware

12

13                                   August 11, 2015

14                                   9:45 AM – 1:23 PM

15   B E F O R E :

16   HON CHRISTOPHER S. SONTCHI

17   U.S. BANKRUPTCY JUDGE

18

19

20

21

22

23

24

25   ECR OPERATOR:  DANA MOORE

1    HEARING re Motion of Energy Future Holdings Corp., et al.,

2    for Entry of an Order Authorizing Luminant Generation

3    Company LLC to Reject a Water Contract with Tarrant Regional

4    Water District, Effective Nunc Pro Tunc to the Petition Date

5    [D.I. 2662; filed October 30, 2014]

6

7    HEARING re debtors' First Omnibus (Non-Substantive)

8    Objection to (Amended and Superseded, Exact Duplicate, and

9    Insufficient Documentation) Claims Pursuant to Section

10   502(b) of the Bankruptcy Code, Bankruptcy Rules 3001, 3003,

11   and 3007, and Local Bankruptcy Rule 3007-1 [D.I. 2808; filed

12   November 18, 2014]

13

14   HEARING re debtors' Third Omnibus (Non-Substantive)

15   Objection to (No Supporting Documentation) Customer Claims

16   Pursuant to Section 502(b) of the Bankruptcy Code,

17   Bankruptcy Rules 3001, 3003, and 3007, and Local Bankruptcy

18   Rule 30071 [D.I. 2992; filed December 12, 2014]

19

20   HEARING re debtors' Fourth Omnibus (Substantive) Objection

21   to Certain Substantive Duplicate and No Liability Claims

22   Pursuant to Section 502(b) of the Bankruptcy Code,

23   Bankruptcy Rules 3001, 3003, and 3007, and Local Bankruptcy

24   Rule 30071 [D.I. 2994; filed December 12, 2014]

25

1    HEARING re debtors' Sixth Omnibus (Non-Substantive)

2    Objection to (Insufficient Documentation) Claims Pursuant to

3    Section 502(b) of the Bankruptcy Code, Bankruptcy Rules

4    3001, 3003, and 3007, and Local Bankruptcy Rule 3007-1 [D.I.

5    3212; filed January 9, 2015]

6

7    HEARING re debtors' Seventh Omnibus (Substantive) Objection

8    to Certain No Liability Claims Pursuant to Section 502(b) of

9    the Bankruptcy Code, Bankruptcy Rules 3001, 3003, and 3007,

10   and Local Bankruptcy Rule 3007-1 [D.I. 3218; filed January

11   9, 2015]

12

13   HEARING re debtors' Eighth Omnibus (Non-Substantive)

14   Objection to (Insufficient Documentation) Claims Pursuant to

15   Section 502(b) of the Bankruptcy Code, Bankruptcy Rules

16   3001, 3003, and 3007, and Local Bankruptcy Rule 3007-1 [D.I.

17   3381; filed January 27, 2015]

18

19   HEARING re debtors' Tenth Omnibus (Substantive) Objection to

20   (Certain No Liability) Claims Pursuant to Section 502(b) of

21   the Bankruptcy Code, Bankruptcy Rules 3001, 3003, and 3007,

22   and Local Bankruptcy Rule 3007-1 [D.I. 3473; filed February

23   6, 2015]

24

25

1   HEARING re Motion of the Official Committee of Unsecured

2   Creditors for Entry of an Order Granting Exclusive Standing

3   and Authority to Commence, Prosecute, and Settle Certain

4   Claims for Declaratory Judgment, Avoidance and Recovery of

5   Liens, Security Interests, Obligations, Fees, and Interest

6   Payments, and Disallowance of Claims (Redacted) [D.I. 3593;

7   filed February 19, 2015]

8

9   HEARING re Motion of the Ad Hoc Group of TCEH Unsecured

10   Noteholders for Entry of an Order Granting Standing and

11   Authority to Commence, Prosecute, and Settle Certain Claims

12   for Declaratory Judgment, Avoidance and Recovery of Liens,

13   Security Interests, Obligations, Fees, and Interest

14   Payments, and Disallowance of Claims (Sealed) [D.I. 3596;

15   filed February 19, 2015]

16

17   HEARING re Motion of the EFH Official Committee for Entry of

18   an Order Granting Derivative Standing and Authority to

19   Prosecute and Settle Claims on Behalf of the Luminant

20   debtors' Estates [D.I. 3605; filed February 19, 2015]

21

22

23

24

25

1   HEARING re debtors' Twelfth Omnibus (Non-Substantive)

2   Objection to (Insufficient Documentation) Claims Pursuant to

3   Section 502(b) of the Bankruptcy Code, Bankruptcy Rules

4   3001, 3003, and 3007, and Local Bankruptcy Rule 3007-1 [D.I.

5   3896; filed March 13, 2015]

6

7   HEARING re Motion of Energy Future Holdings Corp., et al.,

8   for Entry of an Order Authorizing Luminant Energy Company

9   LLC to Reject a Certain Executory Contract with Cloud Peak

10  Energy Resources LLC, Effective Nunc Pro Tunc to March 24,

11  2015 [D.I. 3961; filed March 24, 2015]

12

13  HEARING re debtors' Thirteenth Omnibus (Non-Substantive)

14  Objection to (Insufficient Documentation) Claims Pursuant to

15  Section 502(b) of the Bankruptcy Code, Bankruptcy Rules

16  3001, 3003, and 3007, and Local Bankruptcy Rule 3007-1 [D.I.

17  4003; filed March 27, 2015]

18

19  HEARING re debtors' Fourteenth Omnibus (Substantive)

20  Objection to (Certain Substantive Duplicate, No Liability,

21  and No Claim Asserted) Claims Pursuant to Section 502(b) of

22  the Bankruptcy Code, Bankruptcy Rules 3001, 3003, and 3007,

23  and Local Bankruptcy Rule 3007-1 [D.I. 4050; filed April 2,

24  2015]

25

1   HEARING re debtors' Fifteenth Omnibus (Non-Substantive)

2   Objection to (Insufficient Documentation) Claims Pursuant to

3   Section 502(b) of the Bankruptcy Code, Bankruptcy Rules

4   3001, 3003, and 3007, and Local Bankruptcy Rule 3007-1 [D.I.

5   4052; filed April 2, 2015]

6

7   HEARING re Motion of the EFH Official Committee for Entry of

8   an Order Directing Disclosure of Oncor Bid Information to

9   the EFH Official Committee [D.I. 4260; filed April 23, 2015]

10

11   HEARING re Motion for Order Authorizing Payment and

12   Reimbursement of Certain Fees and Expenses of UMB Bank,

13   N.A., as the EFIH Unsecured Indenture Trustee [D.I. 4438;

14   filed May 8, 2015]

15

16   HEARING re debtors' Sixteenth Omnibus (Non-Substantive)

17   Objection to (Insufficient Documentation, Amended, and Wrong

18   debtor) Claims Pursuant to Section 502(b) of the Bankruptcy

19   Code, Bankruptcy Rules 3001, 3003, and 3007, and Local

20   Bankruptcy Rule 3007-1 [D.I. 4782; filed June 16, 2015]

21

22

23

24

25

1    HEARING re debtors' Seventeenth Omnibus (Substantive)

2    Objection to (Substantive Duplicate, No Liability, and No

3    Claim Asserted) Claims Pursuant to Section 502(b) of the

4    Bankruptcy Code, Bankruptcy Rules 3001, 3003, and 3007, and

5    Local Bankruptcy Rule 3007-1 [D.I. 4784; filed June 16,

6    2015]

7

8    HEARING re debtors' Eighteenth Omnibus (Substantive)

9    Objection to Certain Improperly Asserted Claims Pursuant to

10   Section 502(b) of the Bankruptcy Code, Bankruptcy Rules

11   3001, 3003, and 3007, and Local Bankruptcy Rule 3007-1 [D.I.

12   4786; filed June 16, 2015]

13

14   HEARING re Motion Not to Reinstate Appeal filed by the

15   Tremble Parties [D.I. 4967; filed July 10, 2015]

16

17   HEARING re Motion of Energy Future Holdings Corp., et al.,

18   for Entry of an Order Authorizing Certain debtors to Enter

19   into Limited Non-Proprietary Hedging and Trading

20   Arrangements Subject to the debtors' Risk Management

21   Guidelines [D.I. 5065; filed July 21, 2015]

22

23

24

25

1    HEARING re Motion of Energy Future Holdings Corp., et al.,

2    for Entry of an Order Confirming that no Automatic Stay is

3    in Effect or, in the Alternative, Modifying the Automatic

4    Stay to the Extent Necessary to Permit Luminant Mining

5    Company LLC and Energy Future Holdings Corp. to Proceed with

6    Certain Litigation [D.I. 5067; filed July 21, 2015]

7

8    HEARING re debtors' Nineteenth Omnibus (Non-Substantive)

9    Objection to (Insufficient Documentation, Amended, and Wrong

10   debtor) Claims Pursuant to Section 502(b) of the Bankruptcy

11   Code, Bankruptcy Rules 3001, 3003, and 3007, and Local

12   Bankruptcy Rule 3007-1 [D.I. 4970; filed July 10, 2015]

13

14   HEARING re debtors' Twentieth Omnibus (Substantive)

15   Objection to (Substantive Duplicate and No Liability) Claims

16   Pursuant to Section 502(b) of the Bankruptcy Code,

17   Bankruptcy Rules 3001, 3003, and 3007, and Local Bankruptcy

18   Rule 3007-1 [D.I. 4972; filed July 10, 2015]

19

20   HEARING re debtors' Twenty-First Omnibus (Substantive)

21   Objection to (Certain Improperly Asserted) Claims Pursuant

22   to Section 502(b) of the Bankruptcy Code, Bankruptcy Rules

23   3001, 3003, and 3007, and Local Bankruptcy Rule 3007-1 [D.I.

24   4974; filed July 10, 2015]

25

1    HEARING re Twenty-Second Omnibus (Non-Substantive) Objection

2    to Claims (Wrong debtor) Pursuant to Section 502(b) of the

3    Bankruptcy Code, Bankruptcy Rules 3001, 3003, and 3007, and

4    Local Bankruptcy Rule 3007-1 [D.I. 4976; filed July 10,

5    2015]

6

7    HEARING re Twenty-Third Omnibus (Substantive) Objection to

8    (Certain Improperly Asserted) Claims Pursuant to Section

9    502(b) of the Bankruptcy Code, Bankruptcy Rules 3001, 3003,

10   and 3007, and Local Bankruptcy Rule 3007-1 [D.I. 4978; filed

11   July 10, 2015]

12

13   HEARING re EFIH debtors' Partial Objection to Proof of Claim

14   No. 6347 Filed by the Indenture Trustee for the EFIH

15   Unsecured Notes [D.I. 4964; filed July 9, 2015]

16

17   HEARING re Motion of Charlotte Liberda and Curtis Liberda to

18   Appoint Legal Representative [D.I. 5072; filed July 22,

19   2015]

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

1    A P P E A R A N C E S :

2

3    ABRAMS & BAYLISS LLP

4         Counsel to Goldman, Sachs & Co.

5

6    BY:  KEVIN G. ABRAMS, ESQ

7         JOHN M. SEAMAN, ESQ

8

9    BROWN RUDNICK LLP

10        Counsel to Wilmington Savings/WSFS

11

12   BY:  JONATHAN MARSHALL, ESQ

13

14   ASHBY & GEDDES, P.A.

15        Counsel to Wilmington Savings/WSFS

16

17   BY:  GREGORY TAYLOR, ESQ

18

19   COZEN O'CONNOR

20        Counsel to J. Aron & Company

21

22   BY:  SIMON FRASER, ESQ (TELEPHONICALLY)

23

24

25

1    CROSS & SIMON LLC

2         Counsel to American Stock Transfer & Trust Co

3

4    BY:  CHRISTOPHER SIMON, ESQ

5

6    HOGAN MCDANIEL

7         On behalf of movant | Charlotte Liberda and

8         Curtis Liberda

9

10   BY:  DANIEL HOGAN

11

12   KIRKLAND & ELLIS LLP

13        Counsel to EFHC debtors

14

15   BY:  RICHARD CIERI, ESQ

16        EDWARD SASSOWER PC, ESQ

17        CHAD HUSNICK, ESQ

18        ANDREW MCGANN, ESQ

19

20   KLEHR HARRISON HARVEY BRANZBURG LLP

21        Counsel to UMB Bank, N.A. Indenture Trustee)

22

23   BY:  RAYMOND H LEMISCH ESQ

24

25

1    MORRIS JAMES LLP

2        Counsel to Law Debenture Trust Company of NY

3

4    BY:  STEPHEN M MILLER, ESQ.

5

6    NIXON PEABODY

7        Counsel to American Stock Transfer & Trust Co.

8

9    BY:  CHRISTOPHER FONG, ESQ.

10

11   O'KELLY ERNST & BIELLI LLC

12       Counsel to Energy Future Holdings Corp

13

14   BY:  DAVID M KLAUDER, ESQ.

15

16   OFFICE OF THE UNITED STATES TRUSTEE

17

18   BY:  RICHARD L. SCHEPACARTER, ESQ.

19

20   PACHULSKI STANG ZIEHL & JONES LLP

21       Second Lien Indenture Trustee

22

23   BY:  COLIN ROBINSON, ESQ.

24

25

Page 13

1    PATTERSON BELKNAP WEBB & TYLER LLP

2         Counsel to Law Debenture Trust Company of NY

3

4    BY:  CRAIG W DENT, ESQ. (TELEPHONICALLY)

5

6    PROSKAUER ROSE LLP

7         Counsel to Energy Future Holdings Corp

8

9    BY:  PETER YOUNG, ESQ.

10        MARK K THOMAS, ESQ.

11

12   RICHARDS LAYTON & FINGER

13        Co-Counsel to EFHC debtors

14

15   BY:  JASON M MADRON ESQ

16        DANIEL DEFRANCESCHI, ESQ. (TELEPHONICALLY)

17

18   VENABLE

19        Attorney for PIMCO

20

21   BY:  JAMIE EDMONSON, ESQ.

22

23

24

25

1    POTTER ANDERSON & CORROON LLP

2         Attorney for Deutsche Bank

3

4    BY:  R. STEPHEN MCNEILL, ESQ.

5

6    PAUL, WEISS, RIFKIND, WHARTON & GARRISON

7         Attorneys for Ad Hoc Committee of TCEH First Lien

8         Creditors

9

10   BY:  BRIAN S. HERMANN, ESQ.

11        ALAN W. KORNBERG, ESQ.

12        ADAM DENHOFF, ESQ.

13

14   YOUNG CONAWAY STARGATT & TAYLOR, LLP

15        Attorneys for Ad Hoc Committee of TCEH First Lien

16        Creditors

17

18   BY:  PAULINE K. MORGAN, ESQ.

19

20   SULLIVAN & CROMWELL LLP

21        Attorney for E-side Committee

22

23   BY:  ANDREW DIETRICH, ESQ.

24        BRIAN D. GLUCKSTEIN, ESQ.

25

1    MONTGOMERY MCCRACKEN WALKER & RHOADS, LLP

2         Attorney for E-side Committee

3

4    BY:  NATALIE D. RAMSEY, ESQ.

5         MARK A. FINK, ESQ.

6

7    HOGAN MCDANIEL

8         Attorney for Citibank, NA, DIP agent

9

10   BY:  DANIEL K. HOGAN, ESQ.

11

12   COLE SCHOTZ MEISEL FORMAN & LEONARD, PA

13        Attorney for CSC Trust Company of Delaware

14

15   BY:  J. KATE STICKLES, ESQ.

16

17   DRINKER BIDDLE & REATH LLP

18        Attorney for Citibank, NA, DIP agent

19

20   BY:  HOWARD COHEN, ESQ.

21

22   FOX ROTHSCHILD LLP

23        Attorney for Ad Hoc Group of Unsecured TCEH Noteholders

24

25   BY:  JEFFREY M. SCHLERF, ESQ.

1    WHITE & CASE LLP

2        Attorney for Ad Hoc Group of TCEH Unsecured Noteholders

3

4    BY:  J. CHRISTOPHER SHORE, ESQ.

5        TOM LAURIA, ESQ.

6

7    KAZAN, MCCLAIN, SATTERLEY & GREENWOOD POLSINELLI

8        Attorneys for T-Side Committee

9

10   BY:  CHRIS WARD, ESQ.

11       JUSTIN K. EDELSON, ESQ.

12

13   MORRISON & FORRESTER

14       Attorneys for T-Side Committee

15

16   BY:  BRETT MILLER, ESQ.

17       TODD GOREN, ESQ.

18       DAN HARRIS, ESQ.

19

20

21

22

23

24

25

1   ALSO PRESENT TELEPHONICALLY:

2   GREGORY HOROWITZ

3   ALEXA J. KRANZLEY

4   JONATHAN D. MARSHALL

5   JEFF MARWIL

6   AME TIWANA

7   SCOTT L. ALBERINO

8   PHILE ANKER

9   THOMAS BERGHMAN

10  PEG A. BRICKLEY

11  MATTHEW BROD

12  PHILIP E. BROWN

13  STEPHEN BURNAZIAN (CLIENT)

14  MARK A. CODY

15  KENT COLLIER

16  ADAM M. DENHOFF

17  STACEY DORE

18  BRADLEY FEINGERTS

19  MICHAEL FIRESTEIN

20  MARK FLANNAGAN

21  PATRICK FLEURY (CLIENT)

22  JULIA FROST-DAVIES

23  RICHARD GITLIN (CLIENT)

24  SETH GOLDMAN

25  MARK F. HEBBEIN

1    ANGELA K. HERRING

2    NATASHA HWANGPO

3    MATTHEW KIMBLE

4    EMIL KLEINHAUS

5    SCOTT E. KOERNER

6    STUART KOVENSKY

7    MICHELE F. KYROUZ

8    MICHALE LEE

9    RICHARD G. MASON

10   HAL F. MORRIS

11   NAOMI MOSS

12   JASON NEW (CLIENT)

13   TUVIA PERETZ

14   MEREDITH PFISTER

15   ABID QUERESHI

16   ELIZABETH RASSKAZOVA

17   MARC B. ROITMAN

18   JEFF ROSENBAUM

19   MARK ROSENBERG

20   JEFFREY S. SABIN

21   NED S. SCHODEK

22   ANDREA B. SCHWARTZ

23   JENNIFER SHARRET

24   FREDRIC SOSNICK

25   JOHN W. SPIEGAL

1    KATHERIN STADLER

2    ANDREW M. THAU

3    CARL TULISON

4    MATTHEW UNDERWOOD

5    THOMAS WALPER

6    BRADY C. WILLIAMSON

7    AUSTIN WITT

8    APARNA YENAMANDRA

9    JOSEPH ZALEWSKI

10    JOHN BRINGARDNER

11    MICHAELLE DRYER

12    BENJAMIN D. FEDER

13    MOSHER FINK

14    MATTHEW R. GRAY

15    RICHARD PEDONE

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              THE COURT:  Good morning.

3              MR. SASSOWER:  Good morning, Your Honor.  For the

4    record, Edward Sassower with Kirkland & Ellis LLP, counsel

5    to the debtors.  Your Honor, before you move to today's

6    agenda, I'd like to provide an update on the status of the

7    debtor's cases.

8              Your Honor, it is my great honor and privilege to

9    apprise the Court the debtors have reached a deal with the

10   TCH first lien ad hoc group, the TCH unsecured ad hoc group,

11   the TCH official committee and the TCH second lien ad hoc

12   group.  That deal effectively provides for complete

13   consensus on the T-side and if the deal is consummated, it

14   will result in every creditor on the E-side being paid in

15   full in cash.  We fully expect that the deal will be

16   consummated.  But if it is not consummated for any reason,

17   then it will still provide a great deal of closure by

18   settling all significant causes of action that may exist in

19   this case.

20             It accomplishes that closure through two

21   mechanisms.  One is by adopting in large part the DBA

22   settlement and, second, is by paying the TCH unsecured

23   creditors $550 million in cash in that alternative scenario.

24   If the deal is not consummated, then we would need a new

25   plan of reorganization to reorganize both the E-side and the

1    T-side but that would be a far simpler task without the

2    presence of any significant remaining causes of action.

3    This is a watershed moment that has potentially set these

4    cases on the path towards global resolution.

5            The deal that the debtors have with the T-side

6    creditors is embodied in a variety of documents, all of

7    which we filed early yesterday morning.  The debtors filed a

8    third amended plan, which is Docket Entry 5244, and amended

9    disclosure statement for that plan, Docket Entry 5246, and

10   the motions to approve entry into a settlement agreement,

11   Docket Entry 5249, and a plan support agreement, Docket

12   Entry 5248.  The executed merger agreement, equity

13   commitment letter and backstop agreement are included as

14   exhibits to the executed plan support agreement and an

15   executed settlement agreement is attached to the settlement

16   motion.

17           With that overview, Your Honor, I'd like to

18   briefly summarize the merger transaction.  I'm going to give

19   you a preview of the hearing dates that we intend to request

20   at next week's hearing.  The plan provides an investor group

21   led by Hunt Consolidated Inc and the TCH unsecured group the

22   opportunity to acquire reorganized EFH through a merger and

23   then convert it into a REIT.  The merger would provide a

24   cash contribution sufficient to repay all allowed E-side

25   claims in full.

1          To fund this cash contribution, the investor group

2     has arranged for up to $5.5 billion in term debt financing

3     and $7.1 billion in equity financing.  Of that $7.1 billion,

4     approximately $5.1 billion will take the form of a backstop

5     rights offering to TCH unsecured creditors and the other

6     approximately $2 billion will take the form of direct equity

7     commitments by the investor group itself.

8          Regarding the T-side transaction, the plan

9     continues to contemplate the tax-free spinoff of reorganized

10    TCH to the TCH first lien creditors.  The merger agreement

11    and financing have a number of conditions, including

12    regulatory conditions, and we would not presume to predict

13    how the Public Utility Commission of Texas will view the

14    regulatory application.  We are confident, however, that

15    Oncor can put forward a compelling application.

16          As I just stated, we have every intention of

17    closing the merger transaction if the Court confirms the

18    plan.  But essential feature of this negotiated settlement

19    was resolving all significant causes of action should the

20    transaction not close for any reason, regulatory or

21    otherwise.  The parties refer to this feature of the

22    settlement as disarmament.  This disarmament is primarily

23    embodied in the settlement order as well as the PSA.

24          The settlement order would both approve the DBA

25    settlement with minor adjustments, which resolves all

1    intercompany claims as well as provide the TCH unsecureds

2    with $550 million in any alternative plan scenario in

3    exchange for their waiving all significant causes of action.

4    The settlement order should thus resolve all the T-side

5    legacy litigation of which so much time and resources has

6    already been expended.  Some 70% by amount of the TCH

7    unsecured note holders have essentially agreed to a

8    consensual resolution of this case come what may and that is

9    a huge breakthrough.

10              As Your Honor knows, the DBA settlement that the

11   deal incorporates was negotiated by the debtor's

12   disinterested directors with the assistance of the

13   independent advisors that were obtained with the court's

14   approval.  And we are confident that that settlement, as

15   embodied in the settlement agreement, can be fully defended

16   on its merits, to that end, the debtor's plan to request

17   entry of the settlement order in connection with the

18   confirmation.

19              The settlement order would remain in effect

20   whether or not the merger was consummated and whether or not

21   the plan goes effective thus providing much needed closure

22   in what has been, to this point, a highly contentious

23   restructuring.

24              Importantly, confirmation of the plan is

25   explicitly conditioned on entry of the settlement order.

1    One provision of the PSA that was important to the debtors

2    is that after confirmation we would still retain the ability

3    to negotiate an alternative plan with E-side stakeholders

4    and others as we have been and will continue to do so.  But

5    we will not file any such plan unless and until the merger

6    plan terminates.

7              As I mentioned a minute ago, we just filed the

8    third amended plan.  The second amended plan had provided

9    for what we called a dual path, either a merger transaction

10   or a standalone equitization of the E-side.  The debtors

11   filed this plan because he wanted to keep both options open

12   until approval of the disclosure statement or an agreement

13   on the deal.  Having reached that deal, the debtors agreed

14   to drop the standalone equitization on signing and that

15   revision is embodied in the third amended plan we filed

16   yesterday morning.

17             In exchange, the T-side stakeholders agree to

18   support a 90-day confirmation schedule for any alternative

19   plan should the merger not close.  This further strengthens

20   the ability of the debtors to pivot to an alternative plan

21   if necessary.  We are not, however, asking the Court to

22   approve this 90-day schedule at this time and we hope that

23   it will never be necessary because, as I said, we are

24   hopeful that the merger transaction will, in fact, close.

25             Your Honor, having provided that summary of the

1    deal, I'd like to highlight some of the next steps.  As you

2    know, the disclosure statement hearing was originally

3    scheduled for August 18th.  The objection deadline was

4    originally set for yesterday.  We filed a notice of

5    adjournment of the objection deadline yesterday and I'd like

6    to talk through the other disclosure statement related dates

7    now.

8              We would like to set the disclosure statement

9    objection deadline for August 17th and use August 18th has a

10   status conference and an opportunity to take stock of the

11   objections that were filed the day before.  The disclosure

12   statement does not include many changes because, as I

13   mentioned, the biggest change was that we amended the deal

14   path plan to drop the standalone equitization in favor of

15   the merger scenario.

16             We'd also like to use August 18th to seek entry of

17   a revised confirmation schedule and, towards that end, the

18   debtors plan to file a scheduling motion later today.

19   Through the scheduling motion, we intend to request a

20   confirmation and settlement hearing starting as soon as

21   practical in October.  We would like to formally adjourn the

22   disclosure statement hearing to September 17th and have the

23   disclosure statement and the PSA motion heard on that day.

24             So to recap, Your Honor, we'd like to have a

25   scheduling hearing on August 18th.  We also have a

1    preliminary discussion regarding the disclosure statement

2    objections received the day before, if any and I'd like to

3    have a disclosure statement and PSA hearing on September

4    17th.

5            Lastly, as I previously discussed, the settlement

6    motion will be heard in connection with confirmation and the

7    confirmation of the plan is contingent upon entry of the

8    settlement order.  All of these dates correspond to heavily

9    negotiated milestones in the newly executed PSA, which

10   emphasizes the critical importance in moving as swiftly as

11   possible through the confirmation process.

12           Specifically certain PSA termination events may be

13   triggered if the following milestones are not met: entry of

14   the PSA approval order by September 30th, a ruling approving

15   the disclosure statement by November 15th and a confirmation

16   ruling by January 15th.  And the disclosure statement and

17   confirmation milestones are subject to 30-day extensions

18   asserting resolving penalties.  But those milestones are

19   absolute backend dates.

20           We don't want to wait nearly that long.  To

21   achieve more certainty regarding the path forward and the

22   resolution of litigation is of the utmost important that we

23   move quickly towards confirmation of a plan.  Regarding the

24   letter that the EFH official committee filed yesterday, we

25   have every intention of working with the E-side

1   stakeholders, including the committee, to resolve any

2   scheduling issues and, to the extent those issues cannot be

3   resolved consensually, as I mentioned, we hope to come back

4   to the Court on August 18th to discuss that schedule.  Your

5   Honor, the case to date has been sometimes marked by intense

6   litigation but the parties have really come together in the

7   last month.

8           Today's result would not have been possible

9   without that collaborative spirit.  I'd like to thank the

10  mediator, Peter Borowitz, for helping to facilitate that

11  negotiating dynamic.  I'd also like to thank all the parties

12  that signed up to the deal, as well as their advisors,

13  including Mr. Kornberg, Mr. Hermann and their colleagues at

14  Paul Weiss, Mr. Lauria, Mr. Shore and their colleagues and

15  White & Case, Mr. McDowell and his colleagues at Baker Botz

16  who represent Hunt, Mr. Miller and Mr. Goren and their

17  colleagues at Morrison & Foerster, Mr. Weisfelner and Mr.

18  Jonas and their colleagues at Brown Rudnick and Mr. Mason

19  and his colleagues at Wachtell.

20          I'd also like to thank the many financial advisors

21  that were so involved in these negotiations and last, but

22  certainly not least, I'd like to thank the debtor's

23  disinterested directors and the DDAs as well as the rest of

24  the debtor's boards and management whose efforts were

25  mission critical to reaching a deal.

1           As a result of these efforts, all the parties and

2    their advisors, the deal has a broad-base support on the T-

3    side stakeholders and, of course, it's been approved by all

4    the debtor's boards, including each of the separately

5    advised disinterested directors on both the T-side and the

6    E-side.

7           Your Honor, we still have a ways to go on this

8    case.  There's a lot of work left to be done, but we've come

9    a long way from where we started.  And to that end, we hope

10   the E-side stakeholders will also be able to get behind this

11   deal.

12          The (indiscernible) transaction provides the

13   potential for the repayment in full, in cash of all of their

14   allowed claims and that PSA provides a path to an

15   alternative E-side restructuring should the merger not

16   close.

17          For these reasons, we believe this comprehensive

18   joint plan and the related settlement are in the best

19   interest of the estates of both the T-side and the E-side.

20   Your Honor, I know others want to comment on the events over

21   the past couple of days.  Before I yield the podium, I just

22   want to quickly tick through the agenda because we do have

23   some motions that are for today.

24          THE COURT:  Okay.

25          MR. SASSOWER:  Moving to the agenda, Your Honor,

1    there are two items up for today.  The first item is the

2    Liberda motion to appoint a representative for the interest

3    of certain asbestos claimants.  My partner Chad Husnick will

4    address that motion.  And the second item is a scheduling

5    issue related to the debtor's objection to the EFIH take

6    note holders post-petition interest claim.  My partner Andy

7    McGann is here to address that issue.  So with that, Your

8    Honor, unless you have any questions, I will yield the

9    podium.

10           THE COURT:  Just you mentioned three milestones.

11   First of all, really strange to see a lot of people on the

12   other side of the room, but certainly welcome and my nirvana

13   to have would be to have no one over at this table.  But

14   maybe we'll get there.  And I want to thank you for the

15   heads up through local counsel that there were developments,

16   which allowed me to be prepared to address those

17   developments or at least to understand them as best as

18   possible and I want to thank you for sending over the

19   materials yesterday morning.

20           I certainly didn't read two three-inch notebooks

21   last night but I did read both the PSA and settlement

22   motions which provided me with a lot of backdrop and

23   informed me as to what the current status is.  So I do

24   appreciate that.  You mentioned milestones and there is a

25   PSA disclosure stating the confirmation milestones.  Is

1    there a settlement agreement milestone as well or is that

2    identical to the confirmation?

3            MR. SASSOWER:  I don't believe there's a separate

4    settlement milestone but the confirmation is conditioned on

5    the settlement agreement.  So the settlement agreement has

6    to be approved on or before confirmation.

7            THE COURT:  Okay.  All right.  I would certainly -

8    - oh, and I did receive and read the letters that were

9    presented to the court.  I guess they were filed -- yeah,

10   they were written yesterday but I received them and read

11   them this morning, so I'm up to date on that.  Certainly

12   open the podium to anyone who wants to be heard in

13   connection with Mr. Sassower's update.

14           MR. SASSOWER:  Thank you, Your Honor.

15           THE COURT:  Mr. Lauria, good morning.

16           MR. LAURIA:  Good morning, Your Honor.  Tom Lauria

17   with White & Case.  We represent the ad hoc group of TCH

18   unsecured note holders.

19           The first thing I want to do is thank the Court

20   for making an expedited confirmation schedule available.

21   This deal is premised on ability to move quickly to

22   confirmation and without that schedule we never would have

23   gotten to the point we are at today.  And we will not get to

24   the finish line if we're not able to maintain that pace.

25           I think the speed and pace is really important to

1    the transaction that we've negotiated.  With that

2    opportunity at hand and with the able and steady assistance

3    of the Court appointed mediator of Mr. Peter Borowitz, we

4    have succeeded in building a broad consensus around a value

5    maximizing transaction that we believe will pave the way for

6    the debtors to exit Chapter 11 in the first half of 2016 if

7    all requisite approvals are obtained.  And that also

8    includes an insurance policy if we don't get there.

9         After over a year of contentious litigation -- and

10   I have to say it sure seems longer than that -- regarding

11   how the business of the EFH debtors would be reorganized and

12   how value would be allocated among the company's

13   approximately $42 billion of debt, we've forged an agreement

14   with the company and all of the other TCEH creditor groups

15   that have been active in the case regarding the terms of the

16   plan which was filed with the Court early yesterday morning.

17        The plan embraces three fundamental principles of

18   Chapter 11 reorganization: consensus, unimpairment and put

19   your money where your mouth is.  The merchant generation

20   business owned by TCEH will be transferred to its first lien

21   creditors in satisfaction of their approximately $25 billion

22   in debt.  This reflects near complete consensus of all T-

23   side stakeholder groups.

24        At the same time, all of the allowed claims

25   against EFH and EFIH will be paid in cash in full.  By

1   unimpairing them, we have taken the ballot out of their

2   hands in the hope of achieving a quick and efficient march

3   to confirmation.  This outcome is being sponsored by a group

4   of investors who, as promised, are providing $12.1 billion

5   of new debt and equity capital, $7.1 billion in equity and

6   $5.5 billion of debt availability.  We expect only to use $5

7   billion in connection with closing the transaction.

8          The group is comprised of members of the ad hoc

9   group including Anchorage, BlackRock, Arrowgrass, Balyasny,

10  Deutsche Bank, Cyrus and BHR.  TCEH unsecured notes

11  including Centerbridge, GSO and Taconic and Hunt

12  Consolidated and certain of its investors including Avenue

13  and the Texas Teachers' Pension.  These are the folks who

14  are putting their money where their mouth is.

15         We're not here to argue about valuation.  We're

16  here to pay the price to get out of jail.  To use my

17  partner, Mr. Shore's metaphor about the airplane with two

18  classes, one fighting over lobster and caviar and the other

19  hoping for chips, the folks in coach have gotten together

20  and agreed to buy the first class meal at full price.

21         The plan reflects a truly remarkable turn in these

22  cases.  When they were commenced the May 2014, it looked

23  like everyone would be impaired in some way and that

24  fighting between and within the two silos would be endless

25  and that billions of dollars of T-side unsecured claims were

1    at risk of a take-not in recovery.  Now we have a plan that

2    pays the E-side in full, gives the T-first their collateral

3    and provides a meaningful recovery to T-unsecureds.  To that

4    point, the T-unsecureds will receive outright 2% of the

5    equity and reorganized EFH and the rights to purchase

6    approximately $5.1 billion of new EFH common equity and the

7    rights are fully backstopped by members of the investor

8    group.  I think the Court knows -- I know sometimes people

9    say that and it isn't what the Court knows.

10             THE COURT:  Or what it remembers is more

11   difficult.

12             MR. LAURIA:  The road to this juncture has been

13   long and bumpy and anything but predictable.  We urged from

14   the beginning that the states mandated that no stone go

15   unturned.  And in truth, we never knew this particular stone

16   existed, much less what we would find under it.

17             In addition to speed, the deal is premised on the

18   ability to use the value that the parties believe will be

19   unlocked by converting EFH into a real estate investment

20   trust and transferring the T-side assets to TCH firsts in a

21   tax-free transaction.  These elements add materially to the

22   complexity of the exit but they also provide the currency

23   that makes the deal work.

24             Importantly, because of that complexity, the

25   parties have also negotiated a settlement agreement that

1   acts as an insurance policy, one that we all hope never to

2   use in the event that the deal doesn't consummate.

3           This was a tough, hard-fought deal made between

4   significantly impaired constituencies with conflicting

5   interests.  It was made and broken and remade multiple times

6   before bringing it to the court.  As we go forward, we need

7   to guard it from further breakage, particularly from those

8   stakeholders who this deal will pay in full.

9           We support completely the schedule that debtor's

10  counsel described on the record.  We think it's very

11  important to use the 18th as a checkpoint to see where we

12  are.  The 18th -- what we have before the court, the first

13  milestone is a disclosure statement hearing.  And just out

14  of curiosity, we had our office pull out of the new

15  disclosure statement all of the amended, new language, all

16  of the new language and it's 15 pages.  It's 15 pages that

17  are going to be reviewed and commented on and presumably

18  objected to by people who don't vote on a plan.

19          In fact, there's precedent for those people not

20  even getting a disclosure statement, just a summary.  But I

21  expect that when we get back to court on the 18th, the

22  objections that we're going to have are going to be

23  principally filed by those parties who already, from the

24  letter that was submitted, seemed dead set on doing nothing

25  but achieving delay, which will put them at risk more than

1    anybody else in this courtroom because at some point, at

2    some point if the peace isn't kept, if the deal isn't

3    maintained, you're going to have a foreclosure on the T-

4    side.

5         And when that happens, you have billions of

6    dollars of taxes being realized by those folks that will

7    diminish, if not eliminate, their potential recovery.  This

8    deal insulates them and protects them from that outcome.

9    Thank you, Your Honor.

10        THE COURT:  You're welcome.

11        MR. KORNBERG:  Good morning, Your Honor.  Alan

12   Kornberg of Paul Weiss, Rifkind Wharton & Garrison.  We're

13   the ad hoc committee of TCEH first lien creditors.  Your

14   Honor, it is a red letter day when you have significant

15   creditor support at all levels of the T-side capital

16   structure for a plan and related settlement and you have us

17   all, as the Court observes, sitting on the debtor's side of

18   the aisle.  If approved, the plan that's before the Court

19   will maximize creditor recoveries.

20        You've already heard how it will pay in full in

21   cash all allowed E-side claims and there is the related

22   settlement.  We described it as durable.  Mr. Sassower

23   described it as disarmament.  Mr. Laurie described it as an

24   insurance policy.  It is all of the above.  That settlement

25   would resolve for all time contentious, complicated issues

1    that would likely impede confirmation of not only the

2    proposed plan but any plan that might be proposed in these

3    cases.  Your Honor, we heard you loud and clear when several

4    hearings ago you admonished us all to posture in the

5    negotiating room and not in the courtroom.

6              With the able assistance of the mediator, Mr.

7    Borowitz, we got beyond posturing very quickly and focused

8    on putting together a very creative, complicated and

9    multifaceted deal.  It's a deal that our steering committee

10   believes is the value maximizing and most readily achievable

11   result in these very complex cases.  While it is tempting to

12   celebrate a milestone which we have today, at best this is

13   merely the beginning of the end.

14             From our perspective, we need to go out and garner

15   creditor support for this deal.  Many of the first lien

16   creditors only heard about the proposed plan and settlement

17   yesterday when they read it in the various bankruptcy news

18   services.  As you've heard, we have significant regulatory

19   and Internal Revenue Service processes that have to be

20   undertaken and successfully completed.  We have a myriad of

21   details to be worked out to implement the complicated

22   agreements that we've reached and, not the least, we have a

23   multifaceted bankruptcy process to complete.  One of the

24   reasons our steering committee fully supports this plan and

25   the related settlement is because we believe they can be

1    achieved relatively quickly.

2          Let me say that we are highly focused on having a

3    confirmation hearing as soon as possible.  I know we've been

4    a broken record with Your Honor on this point but, as we've

5    said many, many times, getting our collateral back sooner

6    rather than later is a principal goal of the TCEH first lien

7    creditors.  Therefore, we are fully supportive of the

8    proposed schedule that Mr. Sassower described and we urge

9    the Court to approve it and to overrule objections that

10   would delay or impede the path that has finally emerged to

11   resolve these cases.  Thank you, Your Honor.

12          THE COURT:  Thank you.  Mr. Miller.

13          MR. MILLER:  Thank you, Your Honor.  Brett Miller

14   of Morrison and Foerster on behalf of the T-side committee.

15   The T-side committee is comprised of a diverse group of

16   creditors with various types of claim at different debtor

17   entities.

18          On top of congratulating the debtors and the

19   mediator and the other T-side creditor groups who we've

20   worked with tirelessly over the last several weeks to get

21   this done, I really want to compliment the seven members of

22   the T-side committee who proudly display their fiduciary

23   duties over this period and during many emails and calls and

24   many versions of documents.  And not all their issues were

25   resolved in this merger plan.

1          We still actually have a way to go to get all of

2     them completely happy with the plan that's on file.  But

3     they worked together and they got to a point where they

4     agreed with all the other T-side entities and the

5     disinterested directors and supported this plan and really

6     want to push this forward to confirmation.  There's still a

7     ways to go and the T-side committee will endeavor to work

8     with the E-side committee and anyone else who's left on this

9     side of the room in the hope that at the confirmation

10    hearing we get everyone on one side of the room to have a

11    consensual confirmation hearing.  Thank you.

12          THE COURT:  Thank you.  Is anyone was questioning

13    or wish to be heard?

14          MR. DIETDERICH:  Good morning, Your Honor.  Andy

15    Dietderich.

16          THE COURT:  Oh, Mr. Dietderich.  I'm sorry.

17          MR. DIETDERICH:  For the EFH committee with my

18    partner, Brian Glueckstein.  Well, the good news is that no

19    fight proceeds at the opposition table.  But the Court

20    should not take any comfort in that today.  We're not

21    inclined to get angry at process points and a thick skin.

22    But today, we're angry.  Not a single page of the hundreds

23    of pages of documents filed overnight Sunday were shown to

24    the EFH committee prior to the public filing, not a one.  We

25    were not even told when they were coming.

1          The debtors and their new friends seek victory by

2     stealth and momentum.  This tactic is borne of the dogged

3     determination to throw EFH creditors under the bus in order

4     to release equity insiders from T-side predator threats at

5     all costs.  And it's borne of a disdain of the role of the

6     creditor's committee under the bankruptcy code.  Fear of

7     litigation with the T-side creditors have threatened those

8     insiders and an insistence on treating the committee as a

9     litigation adversary rather than a partner in the case.

10          And yet this giant secretly constructed deal is a

11     bid to buy Oncor, the primary property of the EFH and EFIH

12     estates.  It is the core of the EFH committee's fiduciary

13     mandate.  But it appears to be a complicated deal and raised

14     dozens if not hundreds of issues that we're only yesterday

15     discovering.

16          Our exclusion was not accidental.  It was

17     intentional.  This is not because we are paid in full.  This

18     T-side dream deal does not pay us in full.  It includes a

19     plan that is a free option for T-unsecured creditors coupled

20     with an attempt to jam through a settlement that is

21     disastrous for the EFH estate.  The EFH settlement has

22     nothing to do with this plan.

23          In fact, the EFH settlement only applies if the

24     plan fails.  A bona fide plan would need no settlement.  Yet

25     the debtors had conditioned the two in order to sweep the

1    settlement past the gates.

2            The plan is a Trojan horse and the settlement is

3    inside.  In taking this approach with the EFH state,

4    (indiscernible) creditors, the debtors have openly flouted

5    two orders of this Court: a bidding procedures order,

6    establishing rules for selling Oncor to the highest bidder,

7    and a scheduling order for litigating the debtor's proposal

8    to settle EFH inter-silo claims.  How did we get here?

9            The court rightly encouraged the debtor to resolve

10   his disputes with the T-side by negotiation, not litigation.

11   They have done so.  But the deal arranged did not involve

12   EFH creditors.  That much is obvious by its terms. The deal

13   is the T-side dream deal.  Is it what happens if you simply

14   suspend disbelief and pretend half the case doesn't exist?

15           In this plan, the T-juniors have the option to buy

16   Oncor.  This is a free option.  That is not my phrase.  It

17   is how debtor's counsel has described the deal to me,

18   debtor's counselor who negotiated it, a free option.  So far

19   in review of the papers, we agree.  We know what real M&A

20   commitments look like.  Our M&A guys would call this Swiss

21   cheese, the kind that has holes and stinks.  These are not

22   the conditions of bona fide seller.  The T-juniors can walk

23   away without any practical liability.

24           The EFH appears to have no enforceable rights to

25   the practical matter to hold into the deal and, worse, the

1  incentives are actually backwards.  The T-juniors get paid

2  if they decide to walk away.  Incredibly, the T-juniors get

3  paid $550 million in the settlement if they do not close on

4  the acquisition.  This isn't a break fee or a reverse break

5  fee.  It's a perverse break fee.  The incentives are

6  completely wrong and no seller bargaining for its own

7  account would ever agree to it.

8         For the first liens on the T-side, this deal is

9  great too.  They were at the table.  They get a free pass on

10  the avoidance of their names resulting in the world's

11  largest failed LBO.  They get this free pass if the deal

12  closes and also if it does not.  If the deal does not close,

13  the T-first liens must use $550 million of cash on hand at

14  TCH to pay T-juniors.  Okay.  But the T-first receive a full

15  release of all EFH claims regardless of the value of the

16  estates, a $700 million claim against EFH and all of EFH's

17  tax attributes.

18         Incredibly, the $550 million the T-first liens pay

19  to avoid the lien charge goes only to TCH junior creditors,

20  virtually all of who have claims arising out of the same

21  LBO.  And the largest non-LBO creditor at the moment, EFH,

22  gets nothing.  This could only be dreamed up in a deal where

23  EFH creditors were not involved.

24         So who would agree?  The board of EFH.  Why?

25  Incredibly, EFH equity holders were at the negotiating table

1   when EFH creditors were not.  If the T-juniors decide not to

2   close, EFH unsecured creditors are facing severe impairment

3   under this settlement.

4           But the sponsors, directors, officers are fat and

5   happy because they were at the secret negotiating table and

6   decisively bargained for free releases.  These releases

7   include pass claims that our Counsel Montgomery can describe

8   as well as future claims for future behavior.

9           This is preposterous to do in the middle of a

10  highly volatile and uncertain case.  It may be appropriate

11  at the end of the day if EFH creditors are paid in full but

12  it most certainly isn't appropriate if EFH creditors are

13  deeply impaired or even wiped out by this unfair strategy.

14  And it's also deeply disturbing that the board of EFH felt

15  it could actually condition, condition the sale of creditor

16  property on the receipt of advanced insider releases in the

17  first place or put the interest of equity owners ahead of

18  those of creditors.

19          Again, our pro counsel, Mrs.  Ramsey at

20  Montgomery's in the courtroom.  And ready to address the

21  claims against the directors, officers and equity insiders

22  in more detail.  Today is not really the time but she's here

23  if you have question.  But we're told it's disinterested

24  director, so it's all okay.

25          Your Honor, the disinterested directors were put

1    in place to solve an internal corporate government defect.

2    They are not creditors.  They are merely directors who sit

3    in a different conference room sometimes.  They do not alter

4    creditor rights under the code.

5            They do not change the standard for approval under

6    9019 or otherwise.  Directors in conference rooms talking

7    with each other after donning different color hats are not a

8    replacement for the adversary process in this Court.

9            Moreover, even as a matter of basic Delaware court

10   corporate law, the process EFH ran has been effective.  The

11   directors are personally interested in the settlement that

12   releases and exculpates themselves.

13           It was the EFH board that decided to make that

14   condition to the bid in the first place.  It releases the

15   disinterested directors, the interested directors, the

16   interested directors and the equity insiders.  Entire

17   fairness applies and at least to have some ratification by

18   the EFH fulcrum class and the burden has not been shifted.

19   Only EFH loses.

20           From our perspective, what does the plan do for

21   EFH?  EFH gives up the ability to sell property of its

22   estate, other than under certain narrow conditions.  Instead

23   it has to hope that the T-juniors like the value of Oncor in

24   the future and deiced to exercise this free option.  If the

25   value of EFH is high, the juniors close.  But EFH has gained

1    nothing in that circumstance because the value was high

2    anyway.  If the value of EFH is low, the juniors dump us.

3    Then the juniors are paid $550 million and EFH must share

4    its estate, whatever it is at the time with a $700 million

5    claim with the T-side.

6         EFH also gives up its tax attributes and all of

7    its own claims against the T-side.  This makes no sense.

8    Debtors do not spend the state resources to get buyers free

9    options, even in exchange for insider releases.  By

10   definition, there is no value to a contract where the

11   contract is not meaningfully enforceable by the debtor.  And

12   this one is not.

13        No estate fund should be spent pursuing it.  No

14   time wasted on it unless it is significantly approved.  And

15   the only way to make those improvements is EFH creditor

16   involvement.  But the debtor says situation's a situation.

17   This is the best bid for Oncor, so they have to proceed.

18        In fact, we have to proceed as quickly as

19   possible.  How did that happen?  This Court approved bidding

20   procedures for Oncor.  They were contested at a hearing in

21   which this Court chastised the debtor for trying to sell

22   Oncor without creditor committee involvement.  This Court

23   called the debtor's attempt to avoid creditor oversight

24   offensive.  We agree.  It happened again.

25        In the end, this Court at that time not only

1   required involvement of the TCH committee but put the

2   approval of the bidding procedures on hold to allow for the

3   formation of the EFH committee.  Involvement of the EFH

4   committee in the Oncor sales process was the reason for its

5   existence in the first place.  The Court instructed the

6   debtors to solicit EFH committee comments on the bidding

7   procedures and they did and we commented.

8           The result after many weeks of negotiation was an

9   agreement on a comprehensive set of procedures on how to

10  sell Oncor.  The EFH committee had important rights under

11  those procedures.  We were entitled to see all bids and

12  other documents, speak with the bidders, comment on draft

13  documents being negotiated, receive regular substantive

14  updates, consult on the selection of bidders and negotiation

15  of terms, have advanced notice and opportunity to comment on

16  court findings and consent to the approval rights on changes

17  of procedures and documents, et cetera.  We made those

18  comments.  They were taken and the Court entered the bidding

19  procedures.  The bids were confidential.

20          As committee professionals, we were not even

21  permitted to share the bids with our own clients.  What

22  happened?  I have to speak purely on the basis of publicly

23  available information but I will.  At least three

24  competitive bidders were reported by the press as being

25  involved: Nextera, the Hunt Group and the T-junior

1   creditors.

2          What happened?  The secret competitive auction was

3   cancelled.  Why?  We can't say.  But we do know that the T-

4   junior creditor bidders were given unfettered discretion to

5   talk to the two other competing bidders.  This is highly

6   irregular.  No debtor representative, no creditor committee

7   representative, no chaperone at all.

8          We have no idea what was said, but the result was

9   the cancellation of the competitive bid process at EFH and

10  EFIH.  And one of the bidders reported by the press as being

11  interested, the Hunt Group, ends up taking the business

12  opportunity to do the REIT, which developed on the E-side

13  and sponsoring the T-side plan for which they were

14  previously competing.

15         The result is the migration of that business

16  opportunity from the EFH estate to the T-consortium and now

17  whatever value was in the REIT alternative in the first

18  place, which, again, originated in the E-side as an

19  intellectual property of the E-side.  We believe this

20  requires investigation and we're discussing with our

21  financial advisor.

22         In any event, the EFH committee, despite the

23  protection from the bidding procedures ordered by this Court

24  had no involvement in the winning bid.  The fiction that

25  permitted this was that this T-side bid wasn't a bid at all

1      that required compliance with the bidding procedures.

2              It was a plan proposal that could be discussed

3      separately.  This is despite the fact that there's clearly a

4      bid to acquire Oncor and is sponsored by the Hunt Group who

5      qualified as a bidder under the bidding procedures.  All

6      this subterfuge to get around the bidding procedures.

7              Why?  Again, because the bidding procedures

8      require the involvement of EFH creditors and this bid, this

9      deal is not the kind that could be dreamed up except in the

10     absence of EFH creditor involvement, which brings us to the

11     settlement.

12             This is the most trouble element of all.  The

13     settlement is not really an intercompany settlement or even

14     my word, inter-silo settlement.  It's an inter-creditor

15     settlement.  All it does is move money from the fulcrum

16     creditors on side to the fulcrum creditors on the other.

17             It was long our view that once EFH creditors are

18     paid in full, the sponsors could spend their excess

19     distributions to pay the T-side.  We've been told repeatedly

20     in this case, up to this point, that EFH creditors can and

21     should be paid in full so that we should have less rights,

22     less involvement in the process.

23             Well, the settlement proposes to impair us

24     substantially.  There can be no more illusion about that.

25     It renders EFH unsecured creditors the fulcrum at EFH.  It

1    also makes it clear that EFH creditors must finally be fully

2    involved.  It is our money at risk in the settlement, not

3    the EFH equity owners and not the disinterested directors,

4    which is the perfect phrase to describe their view of what's

5    going on, disinterested.

6          We, the creditors, are interested in a good way.

7    The critical element for the test of the settlement is the

8    paramount interest of creditors.  The EFH committee is

9    composed of creditors.  Unlike all the constituencies

10   involved in this settlement and the judgments it involves,

11   the EFH committee, on behalf of the EFH creditors, has no

12   other axe to grind.  If this settlement is in the best

13   interest of EFH creditors, as Mr. Laurie submits, we will

14   support it.  If not, not.

15         So here's what EFH committee thinks of the

16   settlement, from EFH's perspective.  It's nuts.  If EFH

17   unsecured creditors are impaired, we're a long way from an

18   arrangement EFH could ever support simply on the merits

19   between EFH and T-side, leaving the equity owners out of it.

20   The balance on payments on intercompany claims flows from

21   the T-side to the E-side, not vice versa.  And the math of

22   this is simple.

23         First, let's undisputed it.  Luminant owes EFH at

24   least $950 million.  The T-side actually says it's $1.3

25   billion under the tax sharing agreement.

1          What happens to that undisputed claim in the

2     settlement?  It disappears.  But why would it disappear if

3     the T-firsts are paying $550 million to avoid a lien

4     challenge and then Luminant owns the collateral?  If EFH is

5     the largest non-ideal creditor of Luminant, the primary

6     operating companies, shouldn't EFH have a portion, if not

7     the lion's share of the $550 million?  Then EFH has a $363

8     million unsecured note claim and a $19 million secured note

9     claim against TCH.  What happens to that?  It disappears as

10    well.  There must be some recovery.  Where is it?

11          More substantially, EFH has sole, legal ownership

12    of its NOLs and sole ability to check the box to make the T-

13    side joint liens utterly liable for taxes.  That, those NOLs

14    are right now being used without any compensation to avoid

15    cash taxes and increase cash at TCH.  The NOLs are worth

16    hundreds of millions of dollars by themselves.

17          They can be used by a reorganized EFH just as

18    easily as they can be used by the T-side if not more easily.

19    And who's paying for their use?  So that's EFH against the

20    T-side.  What are the T-side claims against EFH?  We believe

21    nothing much.

22          The only material contractual claim is under the

23    tax sharing agreement.  That's a large headline number but

24    we believe it's a simple mistake as our substantive pleading

25    on point shows.  That pleading stood without response

1    including informally a negotiation involving records and the

2    debtor's overnight motion to approve the settlement.  We

3    will read and will respond to the note.  Any other material

4    claims are avoidance actions.  Most of them relate to the

5    LBI, which are barred by the statute of limitations

6    potentially and have to face the fact that an $8 billion

7    equity check.

8            In any event, if there were juice to the LBO

9    claims, they were being mitigated, the DFH's exposure is

10   being mitigated by the fact that EFH itself has avoidance

11   claims against the T-first liens because of the Luminant

12   claim and against the Equity owners in the LBO is

13   successfully put at issue.  All of this can be brief and

14   explained but none of it can be resolved definitively and

15   easily now.

16           So what to do.  How do we go forward?  Well, we

17   respectfully suggest four steps.  First, we need to read.

18   It's going to take a few days for us to be in a position of

19   a fully informed view of whether anything in this package

20   can be salvaged.  The debtors also need to disclose to us

21   the rest of the documents.  We need to know who's signed on

22   to the settlement agreement because the signature pages have

23   been redacted.  We need equity and debt commitment papers

24   and we're compiling a list of other missing information.

25   But this is a very complicated deal to be, you know, for us

1   to receive by surprise.

2           Second, the Court encouraged the debtors to

3   negotiate with the T-side.  Now the debtors and the T-side

4   can finally negotiate with us.  And this is a form of

5   progress.  We would like to meet to discuss a plan we can

6   all support.  The schedule set by this Court should allow us

7   time to do so and encourage consensual resolution.

8           We would like to have access to the mediator.  We

9   asked for this earlier and were told the mediation will be

10  limited to T-side issues but that if E-side issues were

11  included, the fulcrum creditors should be included in the

12  discussions.  Your Honor, so long as the settlement is on

13  the table, we are the fulcrum at EFH and we stand ready to

14  be involved in the work on a constructive resolution.

15          Third, this Court should exercise its discretion

16  to delay consideration of the inter-silo settlement thus and

17  until it is relevant for an actual plan of reorganization.

18  An inter-silo settlement without a plan is too heavy of a

19  lift.  It requires the Court to resolve many issues

20  unnecessarily.

21          There's also a list of resources if the plan is a

22  bona fide plan in the first place.  We do not, under any

23  circumstances, find credible the idea that this -- that at

24  least the cross-silo elements of the settlement and the E-

25  sponsor, director, officer elements of the settlement are

1    somehow necessary for the T to make a bid, even if there

2    were value in this bid, which we think there is not.

3          We believe those provisions were put in place by

4    the debtors as a condition and not by the buyers.  However,

5    if the Court does permit consideration of the settlement

6    outside of the context of a plan but as a condition to the

7    plan, it should be done on a schedule no shorter than that

8    already litigated and ordered by the court, a January

9    hearing with adequate discovery before the hearing.

10          Indeed, litigating without a settlement that

11   purports to be reasonable in any possible hypothetical plan

12   of reorganization strikes me as much more complicated than

13   litigating about a settlement that actually works on a plan

14   in a disclosure statement in front of parties in a court.

15   And the schedule for litigation of this hypothetical, all

16   purposes plan settlement should not be shortened from the

17   baseline already approved by the court.

18          Finally, EFH should have a process for making

19   cell-side decisions with respect to Oncor in consultation

20   with EFH creditors, including negotiating necessarily

21   amendments for the T-unsecured bid, if it's to be pursued,

22   and making decisions about how to pursue the available

23   alternatives in a competitive manner.  The T-juniors are

24   welcomed as bidders but must stand at arm's length and not

25   prevent the pursued of more certain and valuable offers.

1    And as long as a settlement is on the table and if EFH

2    unsecured creditors are impaired, EFH equity has to take a

3    backseat in the process and not condition the consideration

4    of better offers on insider releases.

5              We're reviewing the M&A papers, which, again,

6    we've only had 24 hours with and we'll have suggestions

7    along those lines for the debtors and, if necessary, the

8    Court.  I hope we continue to go through the papers and it's

9    only a preliminary position.

10             We all headed to work yesterday.  I was in Boston.

11   We were surprised by the timing.  We hope the debtors on the

12   T-side will now engage with us and we can get the other half

13   of this case resolved but we're not even close yet.  I'm

14   happy to answer questions from the court.

15             THE COURT:  Thank you.  Mr. Simon.

16             MR. SIMON:  Good morning, Your Honor.  I rise from

17   the wrong side of the courtroom this morning but I just rise

18   very quickly to address the court.  I'm here today on behalf

19   of American Stock Transfer.  Our lead counsel, Rick Pedone

20   is on the phone from Nixon Peabody.  American Stock Transfer

21   is the trustee for the EFH notes and we rise to support Mr.

22   Dietderich's comments.  We will address the settlement

23   formally at the appropriate time.  But I just wanted to rise

24   for the record and address the court.

25             THE COURT:  Thank you, Mr. Simon.

1          MR. SIMON:  Thank you, Your Honor.

2          MR. ABLERINO:  Good morning, Your Honor.  Scott

3   Alberino from Akin Gump on behalf of the UMB, the investor

4   trustee for the EFIH notes.

5          Your Honor, like a lot of -- like Mr. Dietderich

6   said, we had over 1000 pages of documents dumped on us

7   Monday morning and we spent the last 24 hours digesting, you

8   know, what appears to be a highly complex and intricate set

9   of transactions, commitments, agreements, you know, and

10  other elements that we've had no hand in crafting.

11         I think it's clear that we have not been involved

12  in any element of the T-side negotiations and we need time

13  to evaluate the plan as well as the restructuring.  There

14  are a number of documents that have yet to be filed by the

15  debtors and the plan sponsors.

16         We think it's prudent to delay things until we've

17  had an opportunity to review, you know, other documents they

18  intend to file.  We've not seen debt committed documents.

19  We've not seen the important Oncor letter agreement, which

20  will detail the level of cooperation Oncor intends to play

21  in this process.

22         We also think it's fair to say that, you know,

23  given the exclusion of all the E-side creditor groups from

24  these negotiations that a significant chunk of the risk, if

25  not all the risk, of a failed plan process in this case

1    falls on the shoulders of E-side creditors.  And that's not

2    something I'm saying for the first time.

3              I said that back in February when we were here on

4    exclusivity talking about the Oncor sales strategy, which

5    back in the day was how the debtors intended to ultimately

6    pay off the stack at EFIH.  And at that time we talked about

7    the cost associated with that process in terms of ongoing

8    EFI seconding interest accrual professional fees, market

9    risk.

10             The company pursued down a sale path, as we all

11   know.  It's been abandoned and replaced by the speed

12   process.

13             So although our -- those risks still remain, you

14   know, perhaps they've been exacerbated by the transaction

15   that, you know, the debtors have apparently agreed to with

16   the plan sponsors.

17             Your Honor, I mean, notwithstanding all the self-

18   serving kind of deadlines in the PSA, we think we need time

19   to fairly evaluate all these transactions just as you've

20   given time to the T-side creditors when they've raised

21   disputes with the Court, you know, concerning process points

22   and the ability to put on their case.  We want the ability

23   to put on our case as well.

24             Now, I know that I'm going to be subject to, you

25   know, the withering criticism from the debtors and all the

1   plan sponsors today on this side of the room concerning what

2   are you talking about?  Your clients are being paid in full

3   under our plan.

4          Your Honor, I guess that's kind of the kind of

5   bone of contention that, you know, we have in this case

6   because you can say you put your money where your mouth is

7   but you haven't put your money where your mouth is if under

8   your 1800 pages of deal documents you still have the ability

9   to walk from the deal at any point with no recourse.

10          And that's not my words, Judge.  I'm just quoting

11   from the disclosure statement that was filed yesterday by

12   the debtors in Section 8(b)9, "Whether or not the regulatory

13   conditions are satisfied, the equity investors or the

14   backstop purchasers may determine not to close the merger or

15   contribute the cash necessary to fund payments under the

16   plan.

17          In such case, the debtors will lack the ability to

18   pursue specific performance or damages with respect to the

19   failure of the merger or the debt or equity financing to

20   close."  That's interesting because I'm not used to reading

21   disclosure statements or being involved in cases where a

22   debtor in a highly complex, sophisticated Chapter 11 case

23   sets the case up on a 12-month journey to pursue a deal with

24   the equity investors if they had locked into the deal have

25   the ability to walk 12 to 15 months from now with no

1    recourse.

2           So, to use Mr. Laurie's example of, you know, the

3    airplane ticket, well, perhaps they're telling you that

4    they're buying a -- the coach passengers are buying a ticket

5    to take out the first class passengers, but I would say in

6    this case he's not buying a non-refundable ticket.  He's

7    buying a refundable ticket for us because he has the option

8    to purchase that ticket, closet in 15 months if he wants to

9    or they have the ability to walk from this deal with no

10   recourse.  And who's left holding the remains of this estate

11   after we've embarked on a 12 to 15-month process of a failed

12   REIT transaction?

13          I have a few observations that I want to share.

14   I'm not going to take the position that, you know, we want

15   to throw the entire transaction out the door.  There's a lot

16   of paper.  You know, there are elements of the set of

17   transactions that may be desirable.  There are other

18   elements of the transactions that may not be desirable.

19          But, you know, at its essence, I think there are

20   fair questions for us to debate and I think we need adequate

21   time to debate the substantive issues in front of Your Honor

22   and these questions include with respect to the transaction

23   in question, you know, what has been gained and for whom in

24   the negotiations leader to the deal, who bears the risk of a

25   fair transaction and have the debtors properly allocated

1    risk and reward amongst the various T-side and E-side

2    creditor groups, and whether this was actually the best deal

3    received by the debtors or whether this was the best deal

4    that they received given artificial deal constraints that

5    they imposed upon the negotiations for a standalone plan?

6           And then finally, as the committee counsel has

7    raised, why was the option process abandoned?  You know, we

8    spent nearly a year in this case after Your Honor had some

9    criticisms regarding the convertible second lien dip about a

10   need for a marketing process.  That marketing process

11   occurred.  Price discovery was obtained by the company yet

12   at the end of the day they decided to abandon that process.

13   So I think at some point, you know, as we evaluate risk,

14   reward and how the company has evaluated managing downside

15   risk for the E-side creditors while this plan option is

16   pursued, has that price discovery -- how did that priced

17   discovery and their potential views on what EFIH might be

18   worth, how does that factor into, you know, the risk that E-

19   side creditors have to bear?

20          There are a few substantive points also.  First,

21   let's just stop calling this a plan.  It's not a plan.  I

22   know they call it a plan.  I know they followed all the plan

23   documents.  It is not a plan.  It is a plan option.  If you

24   want to call it a plan, let's call it a plan option here.

25   The third circuit has stated that the feasibility

1   requirements that a plan provide a realistic and workable

2   framework.

3          Now, from the statement that I just read to you

4   from their disclosure statement, how can this plan possibly

5   provide a workable and realistic framework where the company

6   lacks the ability to hold $12 billion of debt and equity

7   financing to the deal?  That is not a plan.  That is a pure,

8   100% riskless option.

9          On the regulatory conditions, Your Honor, in Indy

10  Downs, you know, quoting Judge Carey in Tribune, Judge

11  Shannon made it clear that where a plan has important

12  regulatory approvals that the standard is that the plan

13  proponent bears the burden of demonstrating an achievement -

14  - I'm sorry, bears the burden of demonstrating that

15  achieving the necessary approvals is not subject to material

16  hurtles or readily anticipated significant obstacles.

17         Again, their disclosure statement kind of proves

18  the point.  The REIT obstacles, whether it's through the IRS

19  or the PUC, are going to be highly complex and highly

20  unconventional.  This is not your typical regulatory

21  approval sought and a gain in case or FCC case where there's

22  a process to go through.  These are requests that are being

23  proposed in front of the PUC and IRS, you know, that venture

24  into some uncharted territory.

25         There's never been a utility REIT of this scale

1    ever approved by the IRS or the PUC.  And the PUC is already

2    on record through their counsel indicating that they intend

3    to kind of highly scrutinize the transaction and that the

4    Sharyland transaction that if successfully completed by the

5    Hunts is not binding precedent on the PUC.

6              THE COURT:  Were you a signatory to the RSA?

7              MR. ALBERINO:  Which RSA, Your Honor?

8              THE COURT:  The first RSA.

9              MR. ALBERINO:  Yes.

10             THE COURT:  The one with the tax spinoff.

11             MR. ALBERINO:  Correct.

12             THE COURT:  Okay.  Go ahead.

13             MR. ALBERINO:  That's an interesting point you're

14   raising, Your Honor, because if where you're heading with

15   that is didn't you have certain IRS rulings with respect to

16   this bid?  I would say, yes, we did.

17             But I think if we at some point had the ability to

18   compare certain of the required rulings that were negotiated

19   a year ago compared to negotiated the required rulings that

20   are being required by this consortium over here, you'll see

21   that the rulings have significantly increased, you know,

22   both in amount as well as in complexity.  But that's for

23   another date.  No need for us to kind of get to that at this

24   point.  I'll probably trip over myself anyway.

25             Your Honor, another key element here, you know, is

1    the PUC.  This has been set up as a one-way option for, you

2    know, a lot of reasons and I don't presume to know every

3    reason.

4              But, you know, one of the reasons it's been set up

5    as a one-way free option for the plan sponsors is because

6    this is the beginning of a long process, a contentious

7    process potentially with the Public Utility Commission in

8    Texas, a process that involves not only the sponsors and

9    Oncor but also involves other constituents such as rate

10   payers, consumer groups, industrial groups that are going to

11   weigh in on the change of control application that we filed

12   in this case.

13             And the way the plan is set up, irrespective of

14   the fact that the sponsors could walk with no recourse, is

15   that they have the clear ability to walk if the PUC or the

16   IRS imposes -- if the PUC imposes what is called a Capital B

17   burdensome condition on the change of control application.

18   This is a term of our, and we're not going to get into it

19   today, but it's a term of ours that utilized in utility

20   deals because it is not uncommon during these change of

21   control procedures for change of controls to be conditioned

22   upon numerous economic and structural consensus.

23             Indeed, this was the case, you know, back in 2007

24   when the LBO was done.  Ultimately, you know, Oncor and the

25   LBO sponsors had to enter into no less than 52 commitments

1    spanning 19 pages of a PUC order in order to obtain their

2    approval.  The way this transaction is set up, arguably the

3    plan sponsors, you know, can look at numerous conditions

4    that they have not anticipated, or that they have

5    anticipated but have not agreed to accept today, and walk

6    from the deal.

7            And there are certain economic issues that are

8    floating out there and have been overhanging this process

9    for some time, you know, including whether the PUC, you

10   know, may restrict, you know, upstream dividend payments,

11   although the PUC may evaluate Oncor's ROE in this case to

12   factor in the tax savings from the REIT structure.  We don't

13   know where the process will end up because, like the

14   debtors, I'm not going to presume to say didn't tell you

15   what the PUC will or will not do.  But the process itself is

16   highly risky.

17           It's a process where some of the REIT savings and

18   REIT economics are potentially shifted from investors to

19   rate payers, you know, thus diminishing, you know, the

20   targeted rate of return on this investment for the plan

21   sponsors.  And, you know, one could argue that any money

22   investor pursuing a REIT here is going to have less margin

23   for error in front of the PUC, you know, than fulcrum

24   creditors advertising existing positions.

25           But the way this case is kind of set up, you know,

1    given the fact that this is a new -- these are new money

2    investments, that the investors have chosen to have maximum

3    flexibility on these conditions because ultimately they want

4    to put pressure on the PUC to provide the rate of return

5    that they want and they want the ability to walk, you know,

6    if the PUC does something that is adverse to their projected

7    returns on this investment.

8            Your Honor, the other kind of boogeyman here is

9    Oncor.  As you know, we're selling -- the company is selling

10   its economic interest in Oncor Electric.  Oncor Electric is

11   not a party to any of these agreements, although there is

12   purportedly an Oncor letter agreement to be negotiated that

13   may shed some light on whether Oncor's going to participate

14   in a supportive way in this process.

15           I think as you've heard previously, Oncor's a a

16   ring fenced entity and these structural protections were put

17   in place back in 2007.  They have independent directors and

18   those independent directors may need to approve certain

19   material amendments to the Oncor Electric charter docs yet

20   to facilitate the reorganization.

21           Now, in addition to that, there are minority

22   investors in the form of Texas Transmission who also have

23   representatives on the board, who also have special voting

24   rights and these interest holders are potentially the

25   subject, you know, the buyout, which may or may not be

1    consensual with them.

2           So I think one of the big issues in terms of

3    whether this transaction actually has lets is to shed some

4    light as to whether Oncor intends to fully cooperate through

5    this process or whether the company just intends to attempt

6    to control Oncor despite the fact that it has an independent

7    board, you know, by submitting, you know, directions and

8    other kind of board resolutions but from the parent company.

9    You know, it's unclear whether EFH or EFIH, you know, has

10   the ability to force, you know, the amendments that would be

11   necessary to facilitate the REIT reorganization on Oncor

12   Electric.

13          And finally, Your Honor, like you said earlier,

14   the most glaring criticism of this entire deal is the fact

15   that the debtors have no recourse against the Hunts or any

16   other plan sponsors if they fall down and breach this

17   agreement.

18          Under the terms of this deal, they have nine

19   months to get the REIT done.  They have the option of

20   extending by another six months or 180 days subject to

21   certain penalties in their deal with the T-side first liens.

22   But, you know, the debtors are, in essence, handing the keys

23   to this case to an unsecured creditor group on the other

24   side of the capital structure to basically level this case

25   potentially for the next 15 months and walk without recourse

1    or penalty if they choose to do so.  So it's no wonder why

2    Mr. Laurie and the others on the T-side have been so

3    supportive of this REIT deal.

4         They got the company to agree to a set of terms

5    and conditions that, you know, probably appeared highly

6    unlikely when they started these negotiations.  And they've

7    been able to turn nothing into something by co-opting the

8    sponsors, presumably in exchange for these pre-planned

9    estate releases, unprecedented, and the TCH first lien

10   lenders, you know, in exchange for them agreeing to settle

11   all their inter-creditor litigation for a $550 million

12   payout if they swing and miss because the investment is no

13   longer attracted to them and E-side unsecured creditors who,

14   again, not very sympathetic when we're poorly covered, you

15   know, by enterprise value right now but we bear 100% of this

16   risk of this failed process.  And we've been in this case

17   for 15 months, Judge, waiting to get out and being told

18   we're going to be paid off.  You know, a few more points and

19   I'll finish up, Your Honor.

20        We're very concerned that the debtors are

21   overstating the value of what the E-side is receiving under

22   the settlement agreement in exchange for the one-way option.

23   You know, in exchange for supporting broad, pre-planned

24   style estate releases to the LBO sponsors and the debtor's

25   directors and officers and supporting the disinterested

1    director settlement, the T-side creditors receive a riskless

2    15-month option to potentially capture the equity outside

3    from the reconversion.  They also get their $550 million

4    from the first liens if they walk from their deal.  What are

5    EFI -- what are the EFIH unsecured creditors receiving, you

6    know, in exchange for this process?

7          Number one, now, I heard that we're being paid in

8    full, we put our money where our mouth is and, actually, I

9    read the plan documents a little bit differently and maybe

10   I'll read them even more differently after I've gone through

11   the whole 1800 pages of them.  But what I see is that I'm

12   receiving a low-probability chance of being paid the full

13   allowed amount of my claims by end of 2016, if not 2017, if

14   the sponsors elect to fund the plan and consummate the

15   reconversion.

16          So am I being paid?  Am I receiving a guaranteed

17   shot at getting paid?  I'm not sure if the code actually

18   requires me to have a guaranteed shot, but I'm not sure if

19   the code allows the debtors to solicit a plan that gives me

20   a low-probability shot by getting paid in full if the plan

21   sponsors, after they have the benefit of seeing where the

22   IRS and the PUC end up, decide that, you know, we're going

23   to close this transaction.

24          You know, perhaps with no recourse they don't even

25   have to wait to see what the PUC or REIT does.  You know,

Page 67

1    perhaps they'd rather allocate their capital differently.

2    Perhaps interest rates rise.  Who knows?  But without

3    recourse, there's no way of holding anyone to the deal, so I

4    am perplexed as to how anybody on this side of the courtroom

5    can stand in front of Your Honor and tell me that my clients

6    are going to be paid in full under this plan.

7         Number two, we're receiving more litigation with

8    the company.  The plan sponsors have, you know, pursued, you

9    know, the PPI litigation, you know, for a long time now in

10   this case and it's not an insignificant amount of money,

11   Your Honor.  You know, our PPI claim as of June 30th of 2016

12   which appears to be kind of the earliest date upon which the

13   company can emerge under the REIT deal if everything goes

14   right, our PPI claim is $500 million, or a little bit over

15   $500 million.  Applying the federal judgment rate, it's

16   about $11 million.  You can see why there's a litigation

17   arbitrage kind of going on here and why the sponsors have

18   intentionally set up the plan, you know, to pay FJR, treat

19   us as being unimpaired but tell the Court that we'll pay if

20   you make us, Judge.

21        You know, so we are receiving, you know, continued

22   litigation over whenever our claims are unimpaired, you

23   know, and whether we should be entitled to be paid our full

24   contract rated interest, you know, in exchange for the

25   backstop parties and the plan sponsors, you know, purchasing

1    all of the REIT outside of our parent company.  And we'll

2    leave that for another day, Your Honor, but (indiscernible).

3            It's also clear that the plan sponsors were

4    prepared to invest under the deal and pay our full contract

5    rate but, you know, they're going to take advantage of their

6    ability to litigate and hopefully get Your Honor to kind of

7    rule in their favor because, to do so, will obviously

8    increase their potential return on their investment.

9            The last thing, Your Honor, is that, you know, in

10   the motion, the debtor's position is that the conditionality

11   of this deal -- I think they don't hide behind the

12   conditionality.  I think they're front and center about it.

13   It is a highly conditional, speculative deal.  But their

14   position is that the conditionality is justified because the

15   debtors have attained the TCH unsecured's consent to support

16   releases of all inter-debtor and inter-creditor litigation.

17   You know, that's what they hold up to Your Honor is we

18   understand this deal is highly contingent and very

19   conditional.  But we put all the litigation to good.

20           Well, then what was the whole point of the

21   disinterested director settlement?  Now TCH unsecured

22   creditor can say it was never necessary to approve that

23   settlement.  Would it have been litigated?  Potentially,

24   likely.  You know, we greed on scheduling order under which

25   that litigation would occur but obtaining TCH unsecured

1    creditor consent, you know, in exchange for us being locked

2    into a 15-month, you know, option.  I'm not sure if the

3    benefits are adding up there because it appears to us that

4    the debtors are handing over control of the cases to the

5    plan sponsors, you know, merely to avoid contested

6    litigation over the disinterested director settlement.

7            And on top of that, you know, if the settling

8    agreement is now going to be pushed to plan confirmation,

9    then what are we getting.  We're not getting any release of

10   the inter-debtor claims or inter-creditor litigation.  We

11   have to go through a contested confirmation process and even

12   then I'm not sure if anyone here can tell me today whether

13   there's a release that they're going to be approved at

14   confirmation or approved at the effective date.

15           I'm assuming there are people with different views

16   of that on both sides of the courtroom.  So for the debtors

17   to justify the conditionality of the deal on the delivery of

18   full disarmament, maybe they sense when they were going

19   forward with the settlement agreement on a pre-plan basis,

20   so people were locked into these issues prior to proceeding

21   down a solicitation path or confirmation path of the plan or

22   pushing out into the future that now I feel very disclosed

23   as an EFIH unsecured creditor because I'm not getting the

24   one benefit that the debtors told me they were getting, they

25   were relying upon, this justified conditionality, I'm not

1    getting it any more apparently.

2            Your Honor, lastly, we also believe that the

3    debtors are understanding the significant economic risk

4    they're exposing E-side creditors to in connection with this

5    process.  For example, what happens if a REIT is not

6    consummated?  The last multi-operative force suggested that

7    as professional be run rate for estate-paid professionals of

8    approximately $18 million per month.

9            On top of that, the merger requires EFH and EFIH,

10   you know, in an allocation to be determined, to pay the

11   transaction expenses of the Hunts as they pursue this

12   transaction.  Secondly, what about the EFI second interest

13   accrual, Your Honor?  That's not going away.  The interest

14   accrual is approximately $19 million per month and unlike

15   EFH who receives cash payments that bypass the EFIH box

16   under the Oncor (indiscernible) agreement, you know, our box

17   is subject to a shrinking pile of cash, you know, which is

18   gradually eroding as professional fees are sucked out and a

19   second lien interest accruals, you know, occur on top of us.

20           So there is a significant economic risk that we're

21   being exposed to, you know, while this option plays out.

22   You know, we've also are going to be in a position where

23   debtors have lost exclusivity.  We are now exposed to a

24   potential multimillion dollar tax deconsolidation scenario.

25   debtors have spent countless hours in front of this Court,

1   filed pleadings talking about the tax boogeyman.  The

2   cornerstone of this case was to avoid the multibillion

3   dollar tax liability.

4          Now, grant it, they're still pursuing that under

5   the deal but what if they fail?  They set up a deal.

6   They're signing up to a PSA with the T-side first liens,

7   allowing them to pursue an alternative transaction on an

8   expedited basis leaving their entire E-side creditor group

9   completely exposed to a taxable deconsolidation.  Sure the

10  debtor's going to oppose it.  But at that point, they've

11  lost exclusivity.  Where are my fiduciaries who are supposed

12  to protect the E-side creditors from that type of scenario

13  and why wasn't that negotiated as part of the PSA?  You

14  know, we'll have to find -- we'd like to find an answer to

15  that question.

16         Your Honor, we're also subject to market risk

17  given the rising interest rate environment.  It's no secret.

18  Interest rates are going to rise.  We all watch the Fed.  We

19  all watch the news reports.  We all know from early hearings

20  in this case that there is a negative correlation between

21  utility values and rising interest rates.

22         So while this option is playing out and interest

23  rates are potentially rising, you know, our asset is

24  potentially diminishing in value.  But, again, we're being

25  paid in full, Judge, so don't worry about it.  Those guys

1    should just sit down, shut up and not vote, not be involved

2    in this process.  Your Honor, also what happens to the value

3    of Oncor as a consequence of the PUC process?  The debtors

4    are giving the plan sponsors a free shot at the

5    reorganization.

6            We're not involved in that process.  We don't know

7    where that process ends up but we do know that if the

8    process ends up in a way that damages Oncor value, we're the

9    ones left holding the bag, Your Honor, not the plan

10   sponsors.  They walk away.  You know, they walk away for

11   free.

12           So I think the question we should ask ourselves

13   is, from EFI's perspective is under this transaction, is our

14   estate going to be left in the same or better position 12 to

15   15 months from now if the plan sponsors exercise their

16   option to walk without recourse?  You know, and have the

17   EFIH representatives at the board levels done enough to

18   protect our creditors, you know, should the plan option not

19   be exercised?

20           I think clearly the answer to that is that our

21   estate has not been protected and I think that's been a

22   function of the fact that our side, including EFH

23   representatives have intentionally been excluded from these

24   negotiations and we're left in the process where if company

25   continually pits one silo against the other inviting

1    litigation from the party who's outside the deal.

2            So maybe it's time as lead counsel suggested for

3    us to all get a room with the mediator.  They had success

4    with the mediator.  They were able to resolve, you know, the

5    inter-creditor issues amongst themselves and maybe it makes

6    sense for us to get a mediator involved in this case, you

7    know, to attempt to bridge differences because at the end of

8    the day, if the plan sponsors want to pursue a reconversion

9    and they think that's the pathway to maximize value, there

10   are tradeoffs that, you know, should be required.  There's

11   risk that needs to be fairly balanced and downside that

12   needs to be addressed.

13           And perhaps rather than us, you know, gearing up

14   for months and months of war, contested litigation, wasted

15   time, spinning our wheels all for us to get to the point

16   where we prove to you, Your Honor, that the estate plan

17   should not be approved and should not be solicited, wouldn't

18   we all be better off at this point trying to sit around a

19   conference table and work these issues out?  That's what --

20   so and it's my perspective, Your Honor.  If we have to

21   litigate, we'll litigate.

22           And as I said, we still need to review all the

23   documents in full.  We have to determine whether the breadth

24   of, you know, what the objections are but, you know, we have

25   some impressions from the documents as drafted that are

1    highly concerning to us and notwithstanding the fact that

2    this plan has been characterized as bearing the hallmarks of

3    consensus on impairment and put your money where your mouth

4    is.  There clearly is no consensus, you know, across the

5    debtor's capital structure.  Our claims are not unimpaired.

6    There are clear issues with respect to how they're altering

7    the legal rights of EFIH and EFIH unsecured creditors in an

8    attempt to deny us the ability to vote under the plan and to

9    have any say in this Court about whether this plan should

10   proceed.

11        And finally, on the remaining issue, put your

12   money where your mouth is, you can't say that, Judge, unless

13   you're actually prepared to fund.  And when you have an

14   unfettered walk away right without recourse, you have to put

15   your money where your mouth is.

16        So we're not sitting here today saying this deal

17   needs to be thrown out and completely rewritten.  But we do

18   think that with the court's help and guidance, we think a

19   more useful exercise for all the parties in this Courtroom

20   is to try to figure out how we improve upon, you know, the

21   transaction that's been proposed by the company and set it

22   up in a way so that, you know, E-side issues, you know, can

23   be, you know, properly, you know, addressed and balance, you

24   know, in the overall deal structure.

25        THE COURT:  Thank you.

1          MS. SARRET:  Your Honor, this is Jennifer Sarret

2     from Kramer Levin Naftalis & Frankel.  On behalf of

3     Computershare, the trustee for EFIH second lien notes making

4     sure (indiscernible) note Computershare is in the same place

5     as the other E-side creditors and trustees in that we do not

6     have any involvement in this deal.  We do share some initial

7     concerns already raised, in particular about conditionality

8     and whether this deal actually closed, but we are

9     undertaking a full review including (indiscernible)

10    documents and will address the substance at the appropriate

11    time.

12          THE COURT:  Thank you.

13          MS. LAWSON:  Making sure what time of day it still

14    is, Your Honor.  Good morning.  It's Kim Lawson from Reed

15    Smith.  I'm here for the only apparent T-side party that may

16    not be happy with this deal which is for Bank of NY Mellon

17    as the indentured trustee to what is referred to in the plan

18    everywhere else as pollution control revenue bonds or PCRBs.

19          We also are not pleased with the deal and we

20    believe that the timeframe that may be proposed, it's a

21    little unclear as to whether the motion will be filed and

22    anyone will chance to respond because it seems like it will

23    be filed and the deadlines will have already passed.  But we

24    also do not support an expedited plan process and we also

25    have concerns with how the current plan and the waivers and

1    cooperation agreements throughout the PSA and the settlement

2    agreement, which based upon representations from the debtors

3    today have already been executed by the parties, will

4    prohibit discovery by unsecured creditors on the T-side.

5              The original scheduling provided that unsecured

6    creditors had to go through the committees to do

7    consolidated discovery requests and those requests we were

8    limited to such things absent certain provisions in the

9    agreements.

10             So, in reliance on the consolidated request that

11   the R-side of the committees' discovery, it's unclear

12   underneath these agreements, these plans have now been

13   signed and are binding on the committee, whether those

14   discovery requests can even go forward and if that happens,

15   does that mean that the unsecured creditors who are working

16   through access to those documents in order to evaluate this

17   plan are now cut off from access because we don't have

18   individual discovery requests or how does that work.

19             And in that -- and in connection with that we

20   think that we're entitled to do discovery by some mechanism

21   to do these – evaluate these plan changes because on the T-

22   side we are one of the T-side constituents in the unsecured

23   group that everyone keeps referred to that is being treated

24   differently than everybody else and we don't think it's fair

25   and we deserve discovery on that.

1          So, to the extent that any of these discovery

2    rules seek to cut off our right to discovery or prohibit us

3    from discovery or to shorten the timeframe to not enable us

4    to do full and fair discovery, we would oppose the

5    shortening of any of the timeframes and we don't support the

6    plan as drafted.

7          We agree with a lot of the comments on the other

8    side.  You know, from our perspective a lot of this was not

9    public until yesterday.  You want to shorten a time frame.

10   We have bondholders that we have to notify through DTC.

11   That doesn't take 24 hours.  That takes a while and we don't

12   have any control over how long it takes to get to the

13   ultimate beneficiary and without the information that was

14   not available until yesterday, we were not able to notify

15   those bondholders in order to make them aware of what was

16   going on and to solicit their direction in terms of where

17   the trust should go.

18          So we would oppose any shortened timeframe and we

19   would want a full and fair opportunity to conduct discovery

20   and to evaluate and oppose any of the agreements, motions or

21   disclosure statement of plan.

22          THE COURT:  Anything else?

23          MR. SASSOWER:  For the record, Edward Sassower.

24   Your Honor, there's a lot of counters to what was said.

25   There will be plenty of time for that.  Now is not the time

1    or the place.

2          All we need from the Court right now is to discuss

3    a couple of scheduling matters.  We would like to move the

4    disclosure statement hearing from August 18th to September

5    17th and have the PSA motion heard also on September 17th.

6    We'd like to move the objection deadline from August 10th,

7    yesterday, to August 17th and then we'd like to use the

8    August 18th hearing, which was supposed to be the disclosure

9    statement hearing, to hear our scheduling motion to revise

10   the confirmation schedule and also as a status conference to

11   review any disclosure statement objections that are filed on

12   August 17th.

13         The disclosure statement was originally filed on

14   April 14th.  It was amended to reflect the dual path and the

15   merger transaction on July 23rd and then amended again to

16   add numbers on August 3rd so we don't think the schedule

17   imposes too much burden on the parties who've been dealing

18   with this same disclosure statement for a while.

19         We added some pages yesterday.  We added some

20   disclosure.  There's obviously a bunch of attachments.  But

21   they seem like they've done a bunch of studying already.

22   They've got some more studying to do.  We acknowledge that

23   and those are the dates that we're looking for.  The rest of

24   it we'll deal with at hearings on substantive motions with

25   the full record.

1          THE COURT:  Okay, thank you.

2          MR. SASSOWER:  Thank you.

3          THE COURT:  I appreciate everyone's comments.

4   It's obviously a moving case and it's – there have been

5   developments which the parties in interest, some parties in

6   interest, had no advanced notice.  I am certainly the last

7   person who needs notice.  I also received the documents

8   yesterday morning so I'm continuing to educate myself as

9   well, but I do appreciate people's comments to the Court as

10  to where they stand in connection with what they have been

11  able to review to date in connection with (indiscernible)

12  requests put before the Court.

13          The continuation of the disclosure statement to

14  September 17th?

15          MR. SASSOWER:  Yes.

16          THE COURT:  Is fine.  The movement of the

17  objection deadline to August 17th is fine.  I would

18  encourage people to make their disclosure statement

19  objections by that time.  If they're included in that

20  disclosure statement objection is, you know, more time is

21  needed to articulate a disclosure statement objection in a

22  meaningful way you can raise that.  I'm not saying which way

23  I'll rule on it one way or the other, but it certainly is

24  the case that you're talking about seven days between filing

25  revised documents and an objection deadline.  People want to

1    preserve their right to argue that that time has been

2    insufficient I'll consider it.

3            If at all possible I'd like you to raise your

4    substantive points, but I will open up that as a potential

5    objection on the 17th and we'll have a status conference on

6    disclosure on the 18th at which time I may rule as to when

7    an objection deadline might be extended for certain reasons,

8    etcetera.  We'll discuss that on the 18th.

9            I make no advanced ruling whatsoever on whether

10   I'll grant a motion to shorten, to have a revised - I assume

11   you're going to file a motion to revise the schedule?

12           MR. SASSOWER:  Right, we'll file that motion

13   today, Your Honor.

14           THE COURT:  Okay.  You can certainly request that

15   it be heard on the 18th and I'll decide a motion to shorten

16   when I receive it.  If there are objections to the motion to

17   shorten you're going to file that today.  I assume that

18   there will be objections to the motion to shorten.  What's

19   today, the 11th?  So, let me get any objections to the

20   motion to shorten filed by 4:00 pm on Thursday.  I'll make a

21   decision Friday whether to grant the motion to shorten or

22   not.  So I want people to have an opportunity to respond to

23   the timing you're requesting.

24           Is the anything else you actually needed out of

25   me?

1          MR. SASSOWER:  Just one point of clarification for

2    September 17th.  That's for the disclosure statement hearing

3    as well as the motion to approve the PSA.

4          THE COURT:  Yes.  It's certainly not a problem to

5    schedule the motion to approve the PSA for September 17th in

6    that you're not asking for any motion to shorten, it's an

7    omnibus state.  You provided 35 days' notice approximately,

8    37 days' notice.  People will object I'm sure.  Part of that

9    objection might be that it needs -- that people need

10   discovery, it needs to be heard at a different day,

11   whatever, I'll consider the merits of those objections at

12   the time.  So, but you can certainly schedule it for the

13   17th of September.

14         MR. SASSOWER:  Thank you, Your Honor.

15         THE COURT:  Anything else before we turn to the

16   items actually on the agenda?  All right, well before we do

17   that we're going to take a recess.  It's been two hours

18   almost on the bench so we'll take a short recess, allow

19   people to move around, go where they need to go and we'll

20   address the merits.

21         We're going to take -- we're going to take the --

22         MR. SASSOWER:  Liberda first.

23         THE COURT:  All right.

24         MR. SASSOWER:  Thank you, Your Honor.

25       (Recess at 11:16 a.m.)

1          MR. HUSNICK:  Chad Husnick with Kirkland and Ellis

2    on behalf of the debtors.  I think the next item up on the

3    agenda is the Motion to Appoint a Legal Representative for

4    Unmanifested Claimants.  That is the Motion for Liberda, so

5    I'll turn the turn the podium over to Liberda's counsel.

6          THE COURT:  Thank you.

7          MR. HOGAN:  Good morning, Your Honor, Daniel

8    Hogan, the Hogan, McDaniel Firm, on behalf of the Movant.

9    This is our Motion of Charlotte Liberda and Curtis Liberda

10   to appoint a legal representative.  With me today is Joseph

11   Frank of the Chicago Law Firm of FrankGecker.  He's been

12   admitted previously in this case, pro hac vice, and he will

13   be arguing the motion, Your Honor.

14         THE COURT:  All right.

15         MR. FRANK:  Good morning, Your Honor.

16         THE COURT:  Good morning.

17         MR. FRANK:  Joseph Frank -- I'm here on behalf of

18   Charlotte Liberda and Curtis Liberda.  The Liberdas are

19   brother and sister.  They're both in their fifties.  Ms.

20   Liberda lives in Houston.  Mr. Liberda lives in Dallas.  She

21   works in commercial real estate.  He's an architectural

22   lighting designer.  And their father worked for 47 years as

23   an electrician at an Alcoa plant in Point Comfort, Texas,

24   where he was exposed to asbestos, for which Ebasco or its

25   predecessor is liable.  He died two years ago.

1            And the Liberdas are unmanifested asbestos

2    claimants under the nomenclature of this case.  And the

3    reason I'm telling you about the Liberdas is because one

4    thing I urge on the Court, however you rule, is do not let

5    the unmanifested asbestos claimants become an abstraction.

6    Because they aren't an abstraction, Your Honor.

7            They're real people who, while not ill today, at

8    least some of them will become fatally ill in the future,

9    and at that time, may find out that compensation, which they

10   otherwise may have had a right to recover, was stripped from

11   them in this bankruptcy, that perhaps they knew nothing

12   about.  So they shouldn't be an abstraction.

13           However the Court rules, they're real people.

14   They will have real injuries and a real need for

15   compensation, and the way the Court rules today, should take

16   into account those real people, who are out there, all over

17   this country.

18           Your Honor, the debtors decided to use this

19   bankruptcy to address asbestos liability.  It didn't have to

20   do that, but it has done so.  And the Courts entered an

21   order setting a bar date for unmanifested asbestos claims.

22   We take account of that ruling and understand it.  And we

23   don't take issue with that today.

24           But I do think, by making that decision, the

25   debtor has put this case in a position where a

1    representative of unmanifested asbestos claimants is

2    virtually mandatory, Your Honor.  And while I'm not big on

3    quoting cases into the record, I do want to read briefly

4    from the Amatex decision by the third circuit.  It's at 755

5    F.2d 1034.  It's a 1985 decision, and I'm reading from pages

6    1042 through 1043.

7            And the Court said, "We conclude that future

8    claimants are sufficiently affected by the reorganization

9    proceedings to require some voice in them.  Moreover, none

10   of the parties currently involved in the reorganization

11   proceedings, had interests similar to those of future

12   claimants; and therefore, future claimants require their own

13   spokesperson."  That, Your Honor, I think makes the case for

14   our motion.  There really isn't that much more to say, given

15   the Third Circuit precedent, and the debtor's decision, to

16   try and use this bankruptcy to resolve, not only pending

17   asbestos liability, but the liability of the unmanifested

18   asbestos claimants.  One point I would add about Amatex,

19   Your Honor --

20           THE COURT:  Well, let's talk a little bit about

21   that.  Unmanifested claimants has been used in the process

22   of people who have been exposed, but have not currently

23   manifested an injury.

24           MR. FRANK:  I understand.

25           THE COURT:   Future claimants are people that have

1    not yet been exposed.  There's no bar date for people that

2    have not even been exposed.  And there's been no argument

3    that there's a request for a 524(g) injunction that would

4    funnel people that are going to be exposed in the future,

5    into some sort of process.

6              So I want to make sure I understand what you're

7    asking for.  Are you asking for a future right?  Or are you

8    asking for a representative on behalf of people that have

9    already been exposed, but have not yet manifested injury, or

10   both?

11             MR. FRANK:  Your Honor, I'm asking for a

12   representative, who I think would represent the interest of

13   both groups.  Neither group has any voice in this case.  And

14   I can get to that during my argument, or we can talk about

15   it now.

16             But neither group has any voice in this case.  And

17   I do think such a person can represent the interests of both

18   groups.  Amatex was not a 524(g) case.  UNR was not a 524(g)

19   case.  Manville was not a 524(g) case.  There is still a

20   need for a representative.  And Amatex even had an asbestos

21   committee, not a committee with no asbestos claimants or a

22   committee with a minority of asbestos claimants.  They had

23   an asbestos committee.  And the Third Circuit still found

24   that they needed their own representatives.

25             THE COURT:  Okay.

1              MR. FRANK:  So I think now, really the thing to

2    do, is just to address the arguments that have been made

3    against the Motion.  Because I've made the case for the

4    Motion, via Amatex, and via the realities of these real

5    people, who don't even know about this case, and whose

6    rights are being affected.

7              The first point that the debtors made in their

8    objection was that the movements have not shown that the

9    appointment of a representative is required.  And that's a

10   Strawman argument, Your Honor.

11             I don't have to show that it's required.  I mean

12   that's the 524(g) question.  I'm not saying this is a 524(g)

13   case.  I'm not saying, therefore, there has to be a

14   representative.

15             But what I have shown, and what I will demonstrate

16   during this argument, is that the Court should exercise its

17   discretion in this case, to look out for the interests of

18   these people.  So I don't have to prove that it's required.

19   I can't say it's required, unless at some point, this

20   becomes a 524(g) case.  But right now it is not required.

21   But it's a sound exercise of this Court's discretion.  At

22   the very least, consistent with, if not dictated by Third

23   Circuit precedent.

24             The next argument we hear is that the unmanifested

25   claimants are adequately represented, Your Honor.  It just

1    doesn't carry much weight.  The first group that's cited as

2    providing adequate representation is the group of personal

3    injury firms that came into this case and objected to

4    setting a bar date.  And Your Honor found that they don't

5    have standing.  So they certainly don't provide the adequate

6    representation for these people.

7           The second group that is cited by the debtor as

8    providing the adequate representation, is the people who

9    wrote a letter -- another group of personal injury firms

10   that wrote a letter.  And I can't say I know, Your Honor,

11   but my suspicion is, who they currently represent are once

12   again people with pending claims, and therefore people who

13   lack standing to appear on behalf of unmanifested claimants.

14   And, you know, let's just be blunt about the economic

15   realities of this, Your Honor.

16          These people have no certainty of any kind of

17   economic recovery.  They're all over the country.  Any

18   effort to organize them is stymied by the fact that they

19   aren't known.  And to the extent they are known, they

20   haven't been scheduled.  So if somebody wanted to try to

21   organize them and represent them, it can't be done.  And

22   there's no financial ability for them to pay to be in this

23   case.

24          I just learned this morning, that it runs off at

25   $18 million a month for professionals.  They have no ability

1      to appear in this nationwide case with large law firms to

2      represent themselves.  It's just a financial impossibility.

3      So the Court can decide that they are adequately

4      represented, but it shouldn't be on the basis that they can

5      somehow have the wherewithal to represent themselves.

6              And the fact that I'm here today, Your Honor,

7      doesn't mean that I can afford to be here tomorrow, and you

8      know, the hearings that keep coming up in this case,

9      throughout an entire, what appears to be a contested

10     confirmation proceeding.  It's just unrealistic.  So once

11     again, whatever the ruling, it shouldn't be based on the

12     fact that there's adequate representation for these unknown

13     people.

14             The next argument is that the Creditors'

15     Committees are performing the function adequately.  And,

16     Your Honor, there's one creditors' committee with no

17     asbestos claimants.  There's the east side committee that

18     does have two out of five asbestos afflicted people or

19     relatives on its committee.

20             I will point out first, that the committee that

21     has asbestos people on it, has filed a pleading in this case

22     that was really kind of surprising to me, where they

23     acknowledge a conflict.  Because I just haven't seen too

24     many committees, even when they have a conflict, acknowledge

25     a conflict in a pleading.  It was Docket number 4553.  We

1   cited the footnote in our motion.  But they've acknowledged

2   a conflict that makes them unable to represent the interests

3   of these unmanifested claimants.

4          The other committee, Your Honor, I just take issue

5   with the representation that they're adequately representing

6   the asbestos claimants.  And that certainly could be hashed

7   out at another time, provided they don't get the broad

8   releases that are provided for in the current plan.

9          But one thing I would point out, Your Honor, is

10  the current plan, particularly with respect to, I believe

11  it's class C5, clearly goes beyond this Court's

12  jurisdiction, under 28 USC 157b2B.  And we have not heard a

13  word from the T-side Committee, that said it adequately

14  represents these people with respect to the treatment of the

15  C5 creditors, which would include the unmanifested asbestos

16  claims.  It calls for estimation.  This Court lacks the

17  jurisdiction to estimate asbestos claims.

18          So I think the notion that the committees are

19  providing this representation, really doesn't carry the day,

20  and certainly hasn't been demonstrated in what's been filed

21  before the Court.

22          And the fourth issue, and I think this is the last

23  one, Your Honor, is that this is not an asbestos-driven

24  bankruptcy.  And I will stipulate that it's not an asbestos-

25  driven bankruptcy.

1           But I will also say that you can't hide an

2    asbestos-driven debtor in a financial restructuring, and

3    then say, there's no reason to take care of asbestos

4    claimants, because it's a financially-driven bankruptcy.

5    And I've made this argument in other cases successfully and

6    unsuccessfully.

7           But I will say, that to the asbestos claimants, it

8    doesn't really matter if it's a bond-driven bankruptcy or an

9    asbestos-driven bankruptcy.  Their claims are going to be

10   addressed in this bankruptcy, and they should have

11   representation here.  So to the extent saying it's not

12   asbestos-driven, is just a proxy for saying, it's not a

13   524(g) case.  It obviously isn't a 524(g) case.  We

14   understand that.

15          But that doesn't mean that these unknown people

16   don't get a voice in this case.  And the person who can give

17   them that voice, Your Honor, is the Court.  The U.S. Trustee

18   can't appoint a representative.  They were asked, but they

19   don't have that jurisdiction.  They have jurisdiction to

20   appoint committees.

21          And you can't form a committee of unknown

22   claimants, because nobody knows who they are.  So how do you

23   form that committee?  So the fact that the U.S.  Trustee

24   hasn't done it, leaves it to this Court.  And I would urge

25   the Court to do so.

1          In getting ready for this argument, it was good to

2    go back and read a lot of the cases, that I hadn't read in a

3    few years.  I was involved in combustion engineering and

4    even in Leslie, but it's been a few years, since I read the

5    cases.  And over and over, the cases that talk about dealing

6    with unmanifested claims in a bankruptcy, like Grossman's,

7    talk about the bedrock principle of fresh start.

8          In other words, we have to resolve pending

9    liability, even if it's contingent pending liability, so the

10   debtor can get a fresh start.  But I also went back to

11   combustion engineering.  And at the very end of combustion

12   engineering, they talk about the other bedrock principle of

13   Chapter 11, which is the quality of distribution.

14         And Your Honor, I don't think you can put all of

15   the weight in fresh start, without putting some of the

16   weight of inequality in distribution.  And I think when the

17   Court considers the quality of distribution, it becomes

18   eminently clear that in this case, there needs to be a

19   representative for these unmanifested claimants.  Your

20   Honor, I'd like an opportunity to reply as necessary, but

21   that's really what I wanted to say to the Court.

22         THE COURT:  All right, thank you, Mr. Frank.

23         MR. HOGAN:  Good morning again, Your Honor.

24   Daniel Hogan, Hogan McDaniel.  I rise to present to the

25   Court, Steven Kazan of the Kazan, McClain, Satterley, and

1    Greenwood Firm.  You filed a joinder to the motion that you

2    just heard, Your Honor.  I have prepared and filed a motion

3    to admit him Pro Hac Vice, which is on the docket, but has

4    not yet been entered.

5                THE COURT:  All right.

6                MR. HOGAN:  Thank you, Your Honor.

7                THE COURT:  You're welcome.  Welcome, sir.

8                MR. KAZAN:  Thank you, Your Honor, and good

9    morning.  I am personal counsel to Shirley Fenicle, who is a

10   member of the E-side Creditors' Committee, in her capacity

11   of executor of the estate of her husband.  She is an

12   asbestos widow, whose case was in Court and stayed as to

13   this debtor the ECI, by virtue of the injunction issued upon

14   the filing of this bankruptcy proceeding, along with Mr.

15   Early, who represents David Fahy, another member of our

16   committee.

17              We have jointly filed a joinder in the motion that

18   you have just heard.  I sat here for the two hours, where

19   Your Honor listened to discussions about what seems to be a

20   very complicated deal, involving a lot of people, with a lot

21   of money, and absolutely no mention made of anything

22   relating to asbestos issues.

23              And that's understandable because, while they

24   refer to this as a complicated case, in reality this is a

25   few (indiscernible) separate cases, consolidated for

1    administrative convenience for administrative purposes, but

2    not a substantive consolidation.

3            And therefore, I think it's appropriate to look at

4    the asbestos piece of this case.  There are at least three

5    identified asbestos companies in this bankruptcy.  They are

6    EECI, EEC Holding, and a company called LSGT Gas.  Between

7    them, they are worth, according to the financial statements

8    filed last year, somewhat in excess of a billion dollars.

9    That passes the Everett Dirksen threshold and constitutes

10   real money.

11           And these are real claims.  If it's only a billion

12   dollars, and I think it's more than that, by the time we get

13   through discovery, there's over a billion dollars in

14   asbestos assets, to say nothing of the insurance available

15   to protect these companies from asbestos claims.  We don't

16   know what those insurance policies are worth, because the

17   debtor has refused to permit committee counsel to disclose

18   that information to the committee members.

19           And I'm here today, wearing my separate hat, not

20   as a member of the committee.  The committee obviously has

21   its own counsel and speaks for itself.  And even if I knew

22   that on the committee I couldn't really use it separately

23   here.  But Your Honor has commented in the past, in the

24   January opinion on the bar date, about the role of 524(g),

25   and the debtors' right to exclusivity, and to try to do

1    anything it wants.

2            But it does not have an obligation to proceed

3    under 524(g), and we understand that to be the case.  Where

4    does the 524(g) case, Your Honor's comment about the

5    distinction between unmanifested cases and future cases,

6    contingent upon when the exposure took place, would not be

7    particularly relevant, because 524 draws a different line,

8    and puts both of those in the one hat of the future claims

9    representative's jurisdiction.

10            Mr. Frank cited the Amatex case to you.  I was on

11    the creditors' committee in that case, and served as one of

12    the two members on the Trustee Advisory Committee,

13    throughout the first 20 years of that bankruptcy.

14    Obviously, we were involved in the CE case as well.  Mr.

15    Frank and I were on opposite sides.

16            He was aligned with (indiscernible), and we were

17    off by ourselves.  But I had good company with Ms. Ramsey

18    and Elizabeth Magner, now the Bankruptcy Judge in New

19    Orleans.  And we're happy to discuss that case at any time

20    Your Honor might find it useful.

21            But putting aside the 524 issues, right now this

22    Court is dealing with the rights of a lot of people who are

23    not represented in this case.  Both the exposed, but not yet

24    sick, and those about to be exposed in the future.  Now that

25    latter group, I think is relatively small.

1           The idea that there is going to be a whole lot of

2    future exposure to asbestos at power plants is probably not

3    a major issue, if they're doing things appropriately under

4    current OSHA standards.  The group of people who were

5    exposed in the past, and not yet sick, is immense.

6           I don't know how many people the debtor has found,

7    to give actual notice to, but many of them are like Mrs.

8    Fenicle, whose husband worked at power plants during

9    construction, where (indiscernible) was involved, came home

10   with the dirty clothes, and exposed both her and their son

11   to that asbestos.  They are both at risk for the rest of

12   their lives of developing asbestos disease.  They could well

13   die of mesothelioma, as Mr. Fenicle did.

14          In addition, there are two other children, two

15   daughters who were born later, and therefore didn't have a

16   plausible take-home exposure case.  But should Mrs.  Fenicle

17   become sick and die, those two children, as well as the son,

18   would have rights themselves to bring wrongful death claims.

19   And so they are in a sense, the next generation removed of

20   exposed asbestos people.

21          There are a whole host of other kinds of people.

22   Somebody who worked and was exposed, and 20 years later gets

23   married, that wife would have a claim for wrongful death,

24   should he die.

25          There are people who conceivably could get married

1    after this case closes, and acquire new spouses, who would

2    never have known that they were going to marry somebody who

3    was exposed, and therefore, would never have filed anything

4    here.

5            The ripples on this pond extend potentially very

6    broadly.  And to expect many of all of these people to come

7    in now in response to a barely intelligible notice that's

8    full-page ads in the newspapers, and recognize that they

9    ought to do something and file a claim, is clearly designed

10   to minimize the number of potential future claims, which we

11   think is unfair.

12           And we think that it is appropriate, that there be

13   somebody appointed to speak for those people, and to protect

14   their interests.

15           Now the Court, in its January bar date opinion,

16   said that the Plaintiffs' law firms did not have standing.

17   And we accept that ruling.  At least it's not worth arguing

18   with you about at this point.

19           But the Court observed that it was surprised that

20   the creditors' committees had not appeared and participated.

21   Well the E-side Committee had been informed literally the

22   day before that hearing.  And we do have two members on that

23   committee.

24           THE COURT:  You're misremembering what happened.

25           MR. KAZAN:  Well, it was pretty close I think.

1          THE COURT:  The E-Committee was given ample

2     opportunity to appear.

3          MR. KAZAN:  All right, I stand corrected.  I think

4     that's right, and I don't want to reflect on my lack of

5     persuasiveness on internal committee matters.  But the fact

6     is, our committee has advised the Court that we feel that

7     we're in a conflict of interest position.

8          And that conflict is between present claimants and

9     the potential future or unmanifested asbestos claimants.

10    And so at least we've come forward and said, you know, we

11    really can't protect the interests of those people.  The T-

12    Side Committee in its response said -- well, first, there's

13    no evidence that there are any of these claims.

14          Well the debtor, in its own plan, defined in Class

15    C5 as impaired, Legacy Asbestos claims.  They know they have

16    them.  For the T-Side Committee to say, we don't believe

17    that they exist, seems inconsistent with their

18    responsibility to those people.  They say, well we have no

19    standing to raise this.

20          I don't think standing is required.  I think

21    anybody with an interest in the case is entitled to bring

22    these issues to the Court's attention.  And that's why we're

23    here in support of the Motion.  And they say that, in any

24    event, they fulfilled their fiduciary duties to these

25    people.

1          Well, I don't know how that's really possible.

2     They just participated in negotiating a plan that, from what

3     I understand, makes no change in any of the treatment of

4     asbestos claims, and certainly doesn't deal with the issue

5     of future claims, which we had been told by the debtor, was

6     something that all of these purchasers were demanding as

7     part of the deal.  (indiscernible) at the table, negotiating

8     this new global deal, that issue certainly would have been

9     raised.  But it doesn't appear to have been.

10          The T-Side Committee has exactly the same conflict

11    that the E-side Committee has, but for a different cohort of

12    claimants.  The employees at the power plants, which are on

13    the T-Side, all potentially have asbestos exposure.

14          There could certainly be claims coming out of that

15    group.  And they've done nothing that I can see to protect

16    them.  And in a way, it's even worse, because the T-Side

17    Committee has another conflict.  Its local counsel is an

18    asbestos defense litigation firm.  And the idea that they

19    could, without conflict, represent the interests and protect

20    the interests of asbestos claimants or potential asbestos

21    claimants, is a little difficult.

22          The debtors argue that they're talking, as Your

23    Honor mentioned, about unmanifested and future claimants.

24    And I get the distinction about the date of exposure.

25          But to ordinary people out in the world, who read

1    this notice plan, they will see that the debtor is telling

2    them the people who are exposed, but not yet ill, who have

3    not yet been diagnosed are unmanifested claimants, and they

4    have to file a claim now, in order to preserve their right

5    to file a claim in the future.

6            Now, an ordinary person would look at that and

7    say, well, I don't have a disease now.  But they say I might

8    have a future claim.  It seems to me, ordinary English,

9    makes those people future claimants.

10           The debtors' current plan, if it goes forward, as

11   we mentioned, will lead to, I think complete paralysis in

12   this District Court.  As Mr. Frank mentioned, you can't

13   estimate asbestos cases outside of a 524(g) plan.  You can't

14   liquidate them.  If you can't negotiate them individually,

15   you can't do anything to deprive those present claimants of

16   their right to a jury trial to determine the value of those

17   claims.  And that is not feasible.  That indeed is one of

18   the reasons why Congress turned to 524(g).

19           It seems to me that the end of the discussion here

20   -- I'd like to just add to what Mr. Frank said.  Like Mrs.

21   Fenicle, like Mr. Fahy, these are real people.  There are

22   hundreds, if not thousands of them, whose rights are going

23   to be affected in this case.

24           These are people who come to me and to my

25   colleagues at the Plaintiffs' bar, almost every day, looking

1    for help to protect their family's financial security.  And

2    if the Court is going to make decisions in this case, that

3    affect the rights of those people, it seems to me, it's only

4    fair to appoint somebody as a guardian for their interest in

5    this case, so that they don't continue to be overlooked as

6    the debtors here have done so far.

7            I think at the end of the day, the only

8    confirmable, workable plan here is going to have to involve

9    the 524(g) injunction and plan, at least for some of these

10   companies.  It may take some years before the debtor gets to

11   that realization.

12           And if we ever get there, that's a whole other

13   issue of who to appoint as the future claims'

14   representative.  But until we get there, I think it really

15   is critically important that this Court appoint somebody to

16   act as a guardian ad litem for the interests of these

17   people, who have nobody here to speak for them.  Thank you,

18   Your Honor.

19           THE COURT:  You're welcome.

20           MR. HUSNICK:  Good afternoon, Your Honor, Chad

21   Husnick with Kirkland and Ellis, appearing on behalf of the

22   debtors.  Your Honor, I'll be brief.  I think most of what I

23   want to say here, was already addressed in the papers.  And

24   most of what was raised by the Movants in their opening, was

25   raised in the papers, and I addressed in my response.  I

1    want to focus on a couple of things though.

2            The first is, that both the movant and the joinder

3    party continue to collapse the two terms.  And I think Your

4    Honor appropriately captured on the distinction between an

5    unmanifested claim and a future claimant.  We are not, as

6    you said, dealing with future claimants in this case.

7            Those claims, by definition, will be flowing

8    through the case, because we're not seeking in this plan,

9    excuse me, a 524(g) injunction.  Your Honor, what are we

10   seeking to do?  We set a bar date as you ruled in January,

11   is appropriate, and we are pursuing that bar date.  And

12   we've sent out notices that we negotiated with the E-side

13   Creditors' Committee.

14           Your Honor, it shocks me, as I stood here, to

15   listen to Mr. Kazan, who is a representative on the

16   committee, to hear that he has a complaint about the notice.

17   Because we took virtually every comment that we received

18   from the E-side Creditors' Committee, incorporating those

19   notices.  So we went out of our way to address the concerns

20   about due process for the unmanifested claimants.

21           And I do believe that the E-Committee has done a

22   superb job of representing those interests, in terms of

23   ensuring that they were given due process through the

24   notices.  Once claims are filed, Your Honor, the E-Committee

25   is the statutory representative, or fiduciary for all

1    unsecured claims, including the unliquidated and contingent

2    claims that are represented by the unmanifested claimants.

3    And it's critical here that we know that we're not going

4    that next step to touch future claims.  That I agree with

5    Mr. Kazan, would require a future claims' representative

6    under 524(g).

7             Your Honor, you mentioned in your opinion in

8    January --

9             THE COURT:  Just so we're clear, what are you

10   doing with unmanifested asbestos claimants to file claims.

11            MR. HUSNICK:  Sure.  It depends on the plan.  In

12   the E-side plan, as currently contemplated, all unmanifested

13   claimants would be reinstated under the plan.  So in effect,

14   if you file a claim and reserve your right, you will be

15   reinstated.  And your rights will be unaffected by the plan,

16   it says if the bankruptcy didn't happen.  On the T-Side,

17   it's a bit more difficult, because their unsecured

18   claimants, the claims that are pari passu or equal to in

19   terms of priority under the bankruptcy code are not

20   receiving payment in full.  So in those claims, we'll

21   actually have to make a determination in connection with the

22   other unsecured creditors, including their statutory

23   fiduciary, as to how we're going to allocate the

24   consideration, and in all likelihood, would need to

25   establish a reserve to the extent once the claims have come

1    in.  So that's the treatment that's embodied.  Clearly, the

2    debtor would prefer that all creditors be paid in full under

3    all categories of the plan, but that's just not feasible

4    under this plan, so we've negotiated as hard as we could to

5    get the plan sponsors and other purchasers that were

6    referenced earlier to assume those liabilities at the

7    Eastside debtors.  And you may remember, Your Honor, that

8    the vast majority of the potential asbestos exposure is on

9    the East Side.

10            THE COURT:  What about parties that don't file

11   claims?

12            MR. HUSNICK:  The party that does not file a claim

13   that received the actual notice would, of course, be barred.

14   A party that is an unknown creditor who received the due

15   process that we put forth in the notices and in the

16   publications would be barred, but their due process right --

17   they would have an ability to post hac to argue that they

18   didn't receive sufficient due process.

19            I emphasize that last point because as Mr. Kazan

20   was walking through the different examples of types of

21   unmanifested claimants, the further away you get from the

22   direct exposure, the more difficult admittedly it will be

23   for that person to have received sufficient notice.  So if

24   you're five steps removed, yet still had exposure and have a

25   cognizable claim, I would think that your due process

1    argument would be stronger for example, than the two

2    plaintiffs who are standing here today with unmanifested

3    claimants who quite clearly are involved in this case and

4    are represented by sophisticated counsel standing before

5    Your Honor.

6         Your Honor, just a couple things -- I mentioned

7    just the T-Side in terms of the standard here for what we're

8    talking.  We keep mentioning a representative for

9    unmanifested claims.  It's not a concept that exists in the

10   code.  The concept is the future claims' representative.

11   The Movants recite the Amatex case and the Manville case,

12   both of which predated 524(g).

13        So it's not surprising that they weren't 524(g)

14   cases.  But they are the cases that came up with the

15   construct that was ultimately codified in section 524(g).

16   And as Your Honor ruled in January, 524(g) is not the

17   exclusive means when dealing with asbestos claims.

18        Admittedly, the company does not get due process

19   safe harbors, if they do not pursue the 524(g) injunction.

20   But it doesn't mean it's the only way in which to attack

21   this.  In those two cases, therefore, in opposite to the

22   discussion that we're having here, about whether the

23   unmanifested claims need a separate and independent

24   representative from their statutory fiduciary in the forms

25   of the committees.

1          I just want to mention in terms of the T-Side in

2    particular, the T-Side Creditors' Committee will be

3    represented by (indiscernible).  I believe they have a

4    statement (indiscernible).  But what I wanted to mention

5    there, is they have not been derelict in their duties.  I've

6    had many discussions with them about the scope and nature of

7    the asbestos obligations.

8          We talked to them during the bar date process, and

9    ultimately the treatment in the plan is not discriminatory

10   against unmanifested claims or any asbestos claimants.  It's

11   the pari passu treatment that they're entitled to under the

12   bankruptcy code.  Your Honor, what I urge the Court to do is

13   treat this as a Motion to Appoint another Creditors'

14   Committee.

15         That request has been denied by the United States

16   Trustee, in the beginning of the case, when the United

17   States Trustee appointed the mixed committee of asbestos

18   plaintiffs and bondholders to represent the E-Side

19   interests.

20         That request was denied a second time for lack of

21   authority by the United States Trustee.  And we're here

22   today, Your Honor, and I submit that that request should be

23   denied a third time.  Your Honor already has two statutory

24   fiduciaries in front of Your Honor, that can ably, and have

25   been ably representing the interest of these claimants, and

1    will continue to do so through the end of the case.  Thank

2    you.

3            THE COURT:  You're welcome.

4            MR. HARRIS:  Good afternoon, Your Honor, Daniel

5    Harris from Morrison and Forester on behalf of the official

6    committee of TCEH unsecured creditors.  Your Honor, we filed

7    a limited objection to the motion raising some additional

8    points that are specific to our creditor group.

9            We agree with the debtors that the appointment of

10   a legal representative to represent unmanifested asbestos

11   claimants is unnecessary at this time.  And it is our

12   position that the movants lack standing to assert the

13   interest of unidentified T-Side creditors.  Your Honor,

14   Section 1109(b) is not without its limitations.

15           Movants have sought appointment of a legal

16   representative on the basis of potential unmanifested

17   asbestos injuries caused by EECI ,an E-Side debtor, but have

18   not identified a legally protected interest or any

19   connection whatsoever with respect to the T-Side Creditors.

20           Likewise, the joinder filed in support of the

21   motion, posits a theory upon which there could potentially

22   be claims against the Luminant debtors for unmanifested

23   asbestos claims.  That theory is not supported by any

24   evidence to substantiate the allegation.

25           In addition, the joinder fails to identify any

1    connection whatsoever with the T-Side debtors.  As a result,

2    the motion, as least with respect to the T-Side debtors,

3    seeks appointment of a legal representative on behalf of

4    unidentified third parties and consistent with your prior

5    ruling on the asbestos claims bar date where Your Honor

6    found that the PIA law firms lacked standing to assert the

7    rights of unidentified future asbestos claimants.  The

8    Movants lack standing to seek such relief here.

9              We also heard a couple times about the role of the

10   T-Side Committee during this process.  We recognize that we

11   have a duty to the entire class of creditors.  We, as

12   counsel and the members, have taken our role as fiduciaries

13   very seriously in balancing the interest of the entire --

14        (Break in sound)

15              MR. HARRIS:  -- that the Court deny the motion as

16   to the T-side debtors.  Thank you.

17              THE COURT:  Anyone else?  Mr. Frank?

18              MR. FRANK:  Thank you, Your Honor.  Joseph Frank,

19   again, and I will strictly reply, I won't retread.  And I'll

20   start with the statements made by counsel for the T-side

21   Committee and then go back to the things said by the debtor.

22              With respect to standing, I argue a lot more in

23   the Seventh Circuit, where 1109(d) is more narrowly

24   construed.  I think we cite case law and the case law is

25   clear that we have standing to request a representative for

1    unmanifested claimants across this case.

2            And I don't think there's any basis to say we

3    don't have standing to request one with respect to T-side

4    claimants and, quite frankly, if the Court's going to grant

5    this motion, the Court should appoint a representative to

6    represent all of these interests.

7            THE COURT:  Well I agree you have standing.

8            MR. FRANK:  Thank you.  Getting to what the debtor

9    said, it's great that the claims are going to be reinstated

10   with respect to E-side creditors, but the devil, of course,

11   is in the details, as we heard for a couple of hours this

12   morning, Your Honor.  Reinstated against what, Your Honor?

13           These claimants have specific claims against

14   specific debtor entities, not against EFH, the global EFH

15   that is administratively, but not substantively

16   consolidated.

17           And there needs to be a representative in this

18   case to make sure that the assets against which they have

19   claims before confirmation still exist to satisfy their

20   claims after confirmation if they're going to be reinstated

21   and don't disappear in some kind of global deal that takes

22   up 1,000 pages.

23           So while reinstatement is a great thing, we need

24   to have somebody make sure that they're reinstated with an

25   ability to collect.  And in addition to assets or one aspect

1     of those assets that are particularly important is

2     insurance, Your Honor, which in large part probably doesn't

3     exist to satisfy any other claimants, and I dare say, may

4     get lost in the shuffle and create arguments for insurers to

5     say, "We have no continuing liability."

6          Even if the debtor is well meaning and wants to

7     compensate these claimants, I think anyone who's been a

8     bankruptcy judge as long as Your Honor knows that insurers

9     will come in and make every argument they can to avoid

10    paying claims.

11         And then, with respect to the T-side Committee,

12    Your Honor, or rather the T-side treatment of claimants, I

13    would urge the Court to look at Creditor Class C5, where the

14    prescribed treatment, which it's true does cover all of the

15    C5 claimants, whether or not they're asbestos claimants,

16    provides for an estimation of the liability that then caps

17    the amount of recovery.

18         Your Honor, this Court cannot do that, you know,

19    which is the reason 524(g) was enacted; to address the

20    jurisdictional deficiencies of a bankruptcy court after the

21    Marathon decision and provide for that combined proceeding

22    between the district court and bankruptcy court.

23         Nonetheless, the last argument I want to respond

24    to that the debtor made is that Amatex is in opposite

25    because now we have 524(g).

1          To me, that's a circular argument.  In other

2     words, you can't argue a non-524(g) case in a court that's

3     going to be asked to treat asbestos liability in a

4     bankruptcy not involving 524(g) because now we have 524(g).

5          But by the same token, this Court can't require us

6     to utilize 524(g).  Then what's this Court to look to?

7     There has to be a body of case law that this Court can look

8     to for the resolution of asbestos liability in a case that

9     does not involve 524(g).  And I would posit that for this

10    Court in the Third Circuit, the most important case is

11    Amatex.  Thank you, Your Honor.

12          THE COURT:  Thank you.  Mr. Frank.-

13          MR. STONE:  Real briefly on this -- oh sorry.

14          MR. KAZAN:  Your Honor, here's one point, Steven

15    Kazan again.  The argument based upon the debtor's working

16    with the E-side Committee to improve and perfect the notice

17    plan proves exactly the opposite of what they contend.

18          In fact, the nub of the conflict that the E-side

19    Committee addressed to the Court was the conflict between

20    the interest of the unmanifested future claimants and the

21    current claimants.  And we point -- the Committee pointed

22    out in its brief, maybe too briefly, that the unmanifested

23    might take a different position.

24          Had there been a representative of these guardian

25    -- for these unmanifested people, it was in their -- it

1   would have been in their interest to have frankly the worst

2   possible notice plan out there.  Everything that the E-side

3   Committee did to help improve that notice takes away from

4   the potential rights of future claimants to bring a due

5   process challenge to the adequacy of the notice under

6   Mullaney and case law.

7            And so, that's the conflict.  Our committee noted

8   that we had a conflict.  We told the Court that we had no

9   alternative but to proceed on behalf of our apparent

10  constituency, but noted to the Court that we had been put in

11  this position of acting against the interests of people that

12  the Court has said we represent.

13           The T-side Committee appears to have basically

14  ignored that issue, but that's the heart of the issue here

15  and that's why it would have been good to have it very

16  earlier.  It's never too late to get somebody in here who

17  could act going forward to protect the interests of those

18  people so that our committee can be relieved of any

19  responsibility for them.

20           That's the whole concept between 524(g).  And by

21  analogy, it's something that this Court should look to here

22  to try and have un-conflicted current creditor committees

23  acting in this case doing the best they can so that you're

24  sure that you get the best possible input as this case goes

25  forward, to what I think is going to be a bitterly contested

1    confirmation hearing.  Thank you, Your Honor.

2         MR. GLUECKSTEIN:  Your Honor, if I may, I

3    understand we're on rebuttals, but Brian Glueckstein from

4    Sullivan and Cromwell on behalf of the E-side Committee, if

5    I may just very briefly be heard, Your Honor.

6         I just want to clarify for the record the E-side

7    Committee has exercised as acknowledged in the papers that

8    were filed in connection to this motion, has exercised its

9    fiduciary duties on behalf of all the creditors, unsecured

10   creditors on the E-side at every juncture, including, with

11   respect to the asbestos constituent of its -- a portion of

12   its constituents.

13        The E-side Committee did work, objected to and

14   worked with the debtors to resolve our objection with

15   respect to the notice plan and related documents, and that

16   is in the record.

17        I also just will refer to the Court to the

18   pleading that the E Committee filed on this issue of

19   potential or actual conflict, and the language that's in

20   there.  It's at docket 4553, identifying only the fact that

21   the committee acted as a state fiduciary, and in that role,

22   and not as an individual representative, and simply

23   highlighted that issue and nothing more.  Thank you.

24        THE COURT:  Thank you.

25        MR. HUSNICK:  Just one brief point of

1   clarification on the T-side treatment, Your Honor, you heard

2   twice about an estimation mechanism.  There is an express

3   carve out for claims that are capable of being estimated by

4   the bankruptcy court, so it's not contemplated that those

5   claims would be subject to that estimation mechanism in this

6   Court, recognizing that a limitation on personal or on

7   jurisdiction.

8           So and as for Amatex being circular, I don't think

9   it's circular at all.  I think Your Honor, Congress made a

10  decision about exactly what it was going to legislate, and

11  it did so, and I think Your Honor recognized that in the

12  January opinion, that 524(g) is not the only mechanism to

13  use for dealing with asbestos claims.  With that, Your

14  Honor, unless you have any questions, we'll rest.

15          THE COURT:  All right, we can take a recess.

16  Okay, I'm going to deny the motion for the motion for the

17  following reasons.

18          But first, let me say that it's a difficult

19  decision and one I don't take lightly.  I hope it goes

20  without saying, but I'm going to say it anyway, that I very

21  much understand, appreciate and take into account that the

22  generic legalistic term un-manifested asbestos claimants

23  means real people who are going to get really sick and some

24  of whom are going to die.  And I take that very seriously

25  and I take their claims very seriously.

1          And in fact, it's why when the debtors really

2     raise this issue and put the issue in play, one of the

3     reasons that I appointed or I didn't appoint -- one of the

4     reasons I directed that the trustee either appoint a

5     different committee, supplement the existing committee or

6     explain to the Court why it hadn't formed a committee.

7          Those were sort of the three choices, was to deal

8     in part with the fact that there were claimants on the E-

9     side which included asbestos claimants that were

10    unrepresented or arguably unrepresented at the time.

11         And I've found it significant, although I didn't

12    direct the makeup of the committee, but I think it is and

13    was significant that the Office of the US Trustee chose to

14    include two asbestos related claimants on the five member

15    committee that was appointed.  The two committees in this

16    case, the two official committees in this case have a

17    fiduciary duty and represent the interest of all general

18    unsecured creditors.

19         Court claimants, like claimants who have been

20    exposed to asbestos and who have an injury as a result of

21    that under operation of law and the bankruptcy code are

22    general unsecured creditors.  The unmanifested asbestos

23    claimants who are subject to the bar date that the Court

24    approved in January are current unsecured creditors of the

25    debtor's estates in that they have been exposed to what may

1    ultimately result in injury, exposed to asbestos.  Future

2    claimants are not in any way addressed by the plan nor could

3    they be absent the use of the 524(g) type injunction, which

4    is not common plated in this case or being sought in this

5    case.

6           As such, the unmanifested asbestos claimants have

7    a representative as do all unsecured creditors in the case

8    and those representatives are the two committees, both the

9    T-side and the E-side committee.  Although, obviously, those

10   committees' fiduciary duties are limited to the unsecured

11   creditors of the debtors identified for which they serve as

12   the representative.

13          The question to me becomes not should I appoint a

14   representative for unmanifested asbestos claimants.  They

15   already have a representative.  They have two official

16   committees in place.  The question to me becomes is there

17   something inadequate in the current representation of those

18   claimants and I find that there is not.

19          I have no basis to find that there is anything

20   inadequate in the representation of these creditors that's

21   specific to these creditors that would require an additional

22   representative to be appointed.

23          In fact, the evidence based on how the case has

24   proceeded is just the opposite.  There has been vigorous

25   representation of asbestos related creditors in this case by

1    the E-side committee.  There have also been individuals who

2    have stepped forward and taken up the fight on behalf of

3    these claimants, but I'm not focusing on them.  I'm focusing

4    on the official representative.

5            The E-side committee fought hard and long in

6    connection with the details of the notice that went out.

7    Frankly, I find the argument that that was somehow

8    inadequate because they did a good job as bizarre.  The

9    court had approved a bar date.  They did the best they could

10   to provide the notice that was going to be required under

11   the bar date.  I certainly wouldn't expect any court

12   appointed representative to do anything other than what was

13   done by the E-side committee in that instance.

14           The fight about the bar date is over.  It was over

15   in January.  No one appealed.  There was more than an

16   adequate opportunity for the E-side committed to participate

17   in that decision.  I moved it back as best I could several

18   times in order to allow that committee to be forward.  The

19   committee was formed prior to the Court making its decision.

20           I'm not going to hear it today, a complaint about

21   my January opinion.  I'm also not going to hear a complaint

22   about an agreed notice procedure that was put in place with

23   the approval of the E-side committee.  I haven't heard

24   anything today or in the case at all that would give me any

25   reason to doubt that an adequate job is being done on behalf

1    of all creditors including our manifested asbestos claimant

2    in this case.

3                I think it's very important to make it clear that

4    the future claimants aren't entitled to a representative nor

5    do they need one.  If the bar date Mr. Husnick has been

6    fighting for for months had never been established, there

7    still would be future claimants.  We'd still have a

8    reorganization and we'd still have issues, perhaps, in the

9    future, 10 years from now, as to the financial wherewithal

10   of the reorganized entity that might be liable for those

11   claimants.  There's nothing about this reorganization that's

12   changing what would've been the case in any event.

13               With regard to what the T-side of the plan says, I

14   can't estimate personal injury claims.  I don't have the

15   constitutional authority to do it and the plan can say what

16   it wants to say, but I'm not going to do it.

17               It sounds to me like it doesn't say that I'm

18   supposed to do it.  Whether or not estimation actually

19   occurs in connection with those claimants and whether it's

20   done at the district court or not is an issue for

21   confirmation and I think it's an issue that the existing

22   fiduciaries are more than adequately equipped to deal with.

23               I will deny the motion and the Court will enter an

24   order along those lines.

25               MAN 1:  Thank you, Your Honor.

1          THE COURT:  You're welcome.

2          All right.  I've read your letters.  We're talking

3     about when do I decide the interest rate, right?

4          MR. MCGANN:  Correct, Your Honor.  Andrew McGann

5     for the debtors, and that's exactly why we're here today.

6     We filed an objection to the claim that was filed by the PIK

7     trustee with respect to two issues.  One had to do with

8     their make-whole claim and their other with their claim to

9     post-petition interest.

10          We've been able to agree with counsel for the PIK

11     trustee on a briefing schedule to have, Your Honor, address

12     the make-whole claim and that was set out in our letter.  We

13     haven't been able to agree on a briefing schedule to address

14     the post-petition interest claim and that's what we're here

15     for today to ask Your Honor to set one.

16          With respect to the make-whole issue, the

17     agreement we have is that the PIK trustee will file its

18     opposition to our claim objection, again, with respect

19     solely to the make-whole issue at this point in time, on

20     August 28 and our reply, we propose would be due on

21     September 11.

22          We have some additional agreements around that

23     with respect to discovery counsel for the PIK trustee has

24     indicated that they don't need further document or expert

25     discovery here, but they are reviewing the documentary

1    evidence and the deposition testimony from the first lien

2    make-whole dispute.

3              They're going to give us word by this Friday

4    whether they need any depositions at all.  They would be

5    fact depositions.  There would be no more than two if they

6    need one at all is our understanding.

7              Finally, Your Honor, with respect to that issue,

8    we've agreed that if Your Honor sets oral argument on the

9    second lien make-whole dispute -- now, that's been scheduled

10   and it's by agreement and ordered by Your Honor and the

11   briefing on the second lien make-whole adversary closes on

12   September 10 --

13             THE COURT:  I was going to say that's still

14   pending, right?

15             MR. MCGANN:  It is.

16             THE COURT:  Yeah.

17             MR. MCGANN:  The briefing closes on September 10

18   at which point we would turn to Your Honor and see whether

19   you wanted to have oral argument and if so when.  The

20   agreement we've reached with counsel for the PIK trustee is

21   if indeed want to conduct oral argument, we jointly request

22   that this make-whole dispute be argued at the same time.

23             If that's acceptable to Your Honor, that

24   agreement, we would submit an order in that regard.  We

25   don't have one today because we've got another what we

1    regard as the other half of the scheduling that we'd like to

2    address today.

3              THE COURT:  Okay.

4              MR. MCGANN:  All right.

5              MS. SHARRET:  Mr. McGann, this is Jennifer

6    Sharrett from Kramer Levin for Computershare. If I can make

7    one comment on that point, on keeping the two make-whole

8    issues together.

9              We were consulted beforehand and we don't have an

10   issue if there is a short delay in there be a ruling of some

11   sort or oral argument on the make-whole but not a

12   significant delay including not one that's related to the

13   PIK post-petition interest issue which you are about to

14   hear.  We all know, and you'll see in our paper which will

15   be filed this week, we are seeking summary judgment on other

16   issues in our complaint, not related to the make-whole,

17   including interest and fees.

18             This is not -- although -- and not the only issue

19   with regard to second liens' open litigations.  There's also

20   the inter- creditor litigation between the EFIH first liens

21   and the EFIH second liens, which briefing has been completed

22   and is, you know, we're awaiting oral argument or decision

23   from Your Honor.

24             THE COURT:  Yeah.  Actually, let me just -- you're

25   going to be receiving -- on that last point, you're going to

1    be receiving a letter from me this week requesting some

2    additional briefing on an issue so that'll be coming,

3    hopefully, if I ever get off the bench, by the end of the

4    week.

5           It shouldn't delay things much, but it might

6    actually put all three prongs -- although, that's not

7    directly related to the two issues we're talking about, it

8    might basically put all three prongs on the same track of

9    briefing being completed in early to mid-September.

10           MS. SHARRET:  Okay.  Thank you.

11           THE COURT:  Okay.

12           MR. MCGANN:  Okay, Your Honor.  What we regard as

13   a narrow legal issue is the basis for our objection to the

14   post-petition interest claim and what it asks Your Honor to

15   rule is that the PIK trustee is not entitled under any

16   circumstances as a matter of law to any post-petition

17   interest in excess of the federal judgment rate.

18           We've tried to -- we proposed a schedule that

19   would have put this issue on the same schedule that we're

20   talking about with regard to the make-whole issue to get it

21   fully briefed by early to mid-September so Your Honor can

22   take a look at it and resolve it.

23           The PIK trustee, as they've laid out in their

24   letter, has argued that there's a sea of discovery,

25   confirmation like discovery and devalue and solvency and

Page 122

1    other circumstances going to equities in the case that Your

2    Honor is required somehow to consider before addressing the

3    legal question that is the basis for our claim objection.

4         We strongly disagree with that.  In fact, their

5    position presupposes that the law in the third circuit is

6    what the sixth circuit said the law should be in these

7    circumstances in the Dow Corning case and there's no such

8    law in the third circuit that requires Your Honor to survey

9    they equities before determining whether under the code as a

10   matter of federal law the PIK trustee is entitled to claim

11   any post-petition interest beyond the federal judgment rate.

12        They've really assumed the conclusion in arguing

13   how the procedure ought to go forward.  That this ought to

14   be kicked into confirmation litigation or post confirmation

15   before you even address the question whether as we argue

16   under the approach, for example, that Judge Walrath laid out

17   in the Washington Mutual case a few years ago.  They are not

18   entitled as a matter of federal law the full scope of the

19   post-petition interest, namely the contract rate that

20   they're claiming.

21        The view we're opposing here is the majority view.

22   It's been adopted in the -- pursued in the ninth circuit.

23        THE COURT:  What about this argument that there

24   are sort of two prongs to it.  One is the best interest of

25   creditors' tests, which is what Judge Walrath was rolling on

1    and the other is the fair and equitable test for cram down.

2         How do I decide the second part until I'm actually

3    at a plan?  I mean, I can theoretically decide the best

4    interest of creditors' part, I suppose, but their argument

5    is -- there's two issues that they might have in the

6    confirmation.  Until I know what the actual plan that's in

7    front of me at the time I make a decision says, I mean, I,

8    roughly, know what the third plan says, but, you know, it's

9    not in front of me yet.  How I can make that ruling?

10        MR. MCGANN:  Our position is that also as a matter

11   of law the absolute priority rule here does not create a new

12   claim or expand an existing claim.  In other words, when you

13   go to 1129(b), Your Honor's  not authorized by the code to

14   say, hey, because this test applies at this time I need to

15   see whether they have an added or additional claim.  It

16   talks about allowed claims.  To the extent the sixth circuit

17   in Dow Corning looked at it different, we simply disagree.

18        In the Washington Mutual case, Your Honor's

19   absolutely right.  Judge Walrath was speaking about the best

20   interest of creditors test, but it was a solvent debtor case

21   in which she held as a matter of federal law they are not

22   entitled to more than the federal judgment.

23        THE COURT:  And if they're truly unimpaired, and I

24   think we'll fight about that at a future date, perhaps,

25   1129(b) doesn't come into play because you can't -- you

1    don't cram down on an unimpaired class.  You only cram down

2    on an impaired class.

3              MR. MCGANN:  Right.

4              THE COURT: So, only the best interest of creditors

5    test would be at play at that point.

6              MR. MCGANN:  Correct.  And the argument we'd --

7    what'd we'd like to brief now that they've raised what they

8    call the alternative pathway is whether as a matter of law

9    that provision in the code, the absolute priority rule,

10   gives them a claim as a matter of federal law that they

11   don't otherwise have.

12             We say it doesn't.  We don't think the law is very

13   good on that.  Certainly, no decision in this circuit has

14   held that.  We think there's good reason like the ninth

15   circuit laid out in the Cardelucci case that that is not

16   what the code provides and you can't add to or expand their

17   claim simply because we're an 1129(b) at a confirmation

18   proceeding.  That's one of the legal issues that we would --

19   one of the gating issues that we would address in this

20   briefing.

21             Now, the only other point of opposition that

22   they've expressed is that this would be burdensome and

23   distracting to brief it.  I don't think the Court should

24   concern itself with that.  I don't think that's a serious

25   objection.

1           The universe of cases here have largely been

2    scared up and put in front of Your Honor.  These are many of

3    the same issues that were argued on the PIK trustees' motion

4    to dismiss the adversary complaint that Your Honor ruled on.

5           We've laid out, not all of them, but a number of

6    the important cases in the letters.  I think filing a brief

7    and permitting us that is requiring them to file an

8    opposition to our claim objection and giving us a chance to

9    reply, that can be done on the very same schedule and be

10   wrapped up by September 11th.

11          Then if Your Honor then reviews the briefs and if

12   you come to the conclusion that they're right, for example,

13   we don't think they are, but if you conclude they're right,

14   the 1129(b) requires you to look at all the facts and

15   circumstances and the equities of the cases they argue in

16   order to determine whether under that provision of the code

17   they suddenly have a post-petition interest claim that they

18   didn't otherwise have, why then you can very easily say,

19   well, then we'll take it up in connection with confirmation

20   at that time.  But, we'd like to address you on why we think

21   that's the wrong way to go.

22          THE COURT:  Okay.  Thank you.

23          MR. QURESHI:  Good afternoon, Your Honor.  For the

24   record, Abid Qureshi, Akin Gump Strauss Hauer & Feld, on

25   behalf of the PIK trustee.  Your Honor, in the debtors'

1    letter, they make two principle arguments as to why they

2    would like the PPI dispute, the legal issue as they tee it

3    up, heard now.  First, they try to characterize the issue as

4    a limited legal issue which might ovate the need for

5    discovery.

6            Second, they argue that the resolution of how they

7    frame the dispute now would somehow facilitate ongoing

8    negotiations.

9            With respect to the first of those arguments, Your

10   Honor, I would think that it's pretty clear based on what

11   Your Honor heard this morning from a multitude of

12   constituencies not the least of which is the E-side official

13   committee.  There are a host of confirmation issues that

14   will require discovery.  That discovery, Your Honor, I think

15   is going to overlap 100 percent with what we think we need

16   in connection with PPI.

17           Second, with respect to facilitating ongoing

18   negations, that one perplexes me, Your Honor.  I don't know

19   what negotiations they're talking about.  The T-side

20   negotiations are finished.  The E-side was never invited to

21   that table, so I frankly don't understand even what they're

22   getting at with that point.

23           But, let's be clear about what it is that they are

24   asking this Court to do, Your Honor, because I think it is

25   strikingly broad.  They are asking for a legal ruling from

1    this Court that is completely divorced from the facts of the

2    case and completely divorced from the equities of the case,

3    that in no circumstance is an unsecured creditor in a

4    solvent Chapter 11 case, in a reorganizing Chapter 11 case,

5    entitled ever to anything more than post-petition interest

6    at the federal judgment rate.  That is a very broad

7    proposition for which I don't think they have any case

8    support.

9            Of course, they point out the numbers half a

10   billion dollars versus roughly nine or 10.  It's a big

11   issue.  We understand why they don't want the equities of

12   the case exposed to the Court.  They'd prefer to have it

13   decided in a vacuum, but let's also make sure, Your Honor,

14   that we all understand the context in which this arises.  It

15   is not a condition precedent to the plan that is being

16   proposed that Your Honor cap post-petition interest at the

17   federal judgment rate.

18           A finding by the Court that the PIK note holders

19   are, in fact, entitled to post-petition interest at the

20   contract rate does not trigger a right under the plan for

21   the plan sponsors to walk away from the deal.  The plan, in

22   fact, contemplates a reserve for the full amount of contract

23   rate PPI.

24           What it really amounts to, Your Honor, is an

25   effort by the debtors to ask the Court to help its new

1    equity investors effectively increase the rate of their

2    return.

3           It is a proposition that I think will have

4    ramifications well beyond this case and that I think cannot

5    be done, Your Honor, as a matter of law, certainly,

6    shouldn't be done as a matter of equity, and I don't think

7    can be done under the code.

8           They will have their day in court, Your Honor, to

9    argue the merits of their position, the merits of their

10   legal argument, and that day should be at confirmation.

11          Now, I start with the code.  They argue that it is

12   appropriate to determine this issue now based on one

13   provision which is 726(a)(5) and the definition of what the

14   legal rate is.  But, Your Honor, 726(a)(5), it only comes

15   into play, if at all, in the context of the best interest of

16   creditors text, which arises under 1129(a)(7) in the context

17   of plan confirmation.  We start with section 103(b) of the

18   code and 103(b) expressly provides, Your Honor, that

19   subchapter 2 of Chapter Seven, which is where 726(a)(5) is,

20   applies only in Chapter Seven cases.

21          That section, the only one that they rely upon, is

22   not applicable in a Chapter 11 case except where the best

23   interest of creditors test is implicated under 1129 and the

24   context of plan confirmation.  They have no statutory

25   predicate to seek to deny the claim on the basis of that

1    code section outside of the context of a plan.

2            They have no case law, Your Honor, that suggests

3    otherwise.  That is simply a plain reading of the provisions

4    of the code.

5            They rely principally on Washington Mutual.

6    Washington Mutual, Your Honor, provides them with no

7    assistance.  It was, as Your Honor is well aware, a planned

8    confirmation decision.  Judge Walrath in that case made

9    clear that 726(a)(5) and the meaning of the legal rate in

10   that section was at play because it implicated the best

11   interest of creditors test under 1129(a)7.

12           So that alone is enough to make the Washington

13   Mutual decision unhelpful on the procedural issue that we

14   are here on today, which is when is the right time to hear

15   this dispute.

16           Now, in WAMU, the debtors proposed to pay

17   unsecured creditors at the contract rate and a group of

18   equity holders objected to the plan.  It does not stand for

19   the proposition that the debtors would like it to.  Now, on

20   the merits of the decision -- and, again, Your Honor, we're

21   here on a procedural question.  I'm only going into the

22   merits to the extent that it implicates the appropriateness

23   of considering the equities of the case.

24           Judge Walrath in an earlier decision denied

25   confirmation of a previous plan, declined to decide the PPI

1   question at that point because she said she needed to

2   consider the equities of the case.

3           When she then got to the plan confirmation ruling

4   that the debtors site, she found that she didn't need to

5   consider the equities, that she could decide the issue based

6   on a plain reading of 726(a)(5) and also went on to hold

7   that even had she considered the equities, she would get to

8   the same result.

9           The equitable arguments at play here, Your Honor,

10  I think are fundamentally different than what was at play in

11  the context of Washington Mutual.  There will be a lot of

12  issues before the court.  I'm not going to repeat them.

13  Your Honor heard a lot of from all of the parties here, but,

14  again, it's a reorganizing case.  This is not a case like in

15  WAMU where there is a limited pie that was generated by the

16  liquidation of the bank and various groups of creditors

17  fighting over how to divide up that pie.

18          I think the equitable considerations in this case

19  are very different because this case involves ownership of a

20  controlling equity stake in what is an ongoing enterprise.

21  The owners of that equity stake here are proposing to sell

22  their equity interests to the very side of the house that

23  has threatened all sorts of litigations in return for

24  releases.

25          The releases, as Your Honor as has heard, are not

1    contingent on the plan becoming effective.  There's all

2    sorts of conditionality associated with the plan.

3            Again, Your Honor heard hours on all of these

4    subjects this morning.  Just to highlight a few of them, the

5    regulatory risks.  They are complex.  They are significant.

6    The plan sponsors and their unfettered right to walk away

7    from this deal at any time without any recourse for EFH or

8    for EFIH.  There are all kinds of confirmation issues, Your

9    Honor, from disparate treatment of creditors, to impairment

10   issues, to good faith issues, to feasibility issues.

11           It's a plan that Your Honor has heard has a 15

12   month walk away right.  It's a free option as characterized

13   by the debtors.  They are saying that during all of that

14   time, we should be capped now before we ever know if that

15   plan is going to be confirmed at the federal judgment rate

16   in a context where, Your Honor, if for any reason the plan

17   is not confirmed or does not ultimately go effective because

18   they exercised their walk away right, there will be

19   significant harm to E-side creditors, professional fees at

20   $20 million a month, EFIH second lien debit continuing to

21   accrue interest at $19 million a month potential risk in the

22   decline of value as interest rates continue to rise.

23           All of the things that Your Honor heard about

24   today, these are significant, equitable considerations.  We

25   think and there is lots of case lot to support that these

1    types of equitable considerations ought to be considered by

2    the Court at the time of confirmation.  That is the

3    appropriate time for the PPI dispute to be determined.

4            Now, Your Honor heard about the settlement that we

5    reached with respect to make-whole, again, just dealing with

6    the procedural posture.  I want to highlight that because I

7    think it's important to distinguish between the two.

8            If the basis of the claim objection with respect

9    to PPI, Your Honor, was that our indenture did not provide

10   us with the right to receive post-petition interest at the

11   contract rate, if that were the argument, then I would

12   concede that it would be appropriate to hear that argument,

13   divorced from a plan, and that it would be appropriately

14   teed up as a claim objection.

15           That is the nature of their argument with respect

16   to make-whole.

17           They say, "Our indenture does not have the type of

18   language that is necessary to trigger a make-whole."  We

19   agree that that is the argument that they are marking, that

20   it is based on the contract.

21           And because we now have a plan that has a

22   presumptive value in it, we no longer oppose proceeding with

23   that issue.  But, with respect to PPI, Your Honor, the

24   argument is fundamentally different.  It is not based on our

25   contract.  It is based purely on a provision of the code

1    that is not applicable.

2            They have cited, Your Honor, with no authority to

3    suggest that it is applicable now preplan and they have

4    cited, Your Honor, with no case lot that says it is

5    applicable now.  They cite four cases in their letter, Your

6    Honor, WAMU, in RE 431 and In RE Cardelucci, are three of

7    those four.  All three of those involve the determination of

8    the appropriate rate of post-petition interest in the

9    context of plan confirmation.

10            The fourth case that they cite, in RE Fast, is a

11   Chapter Seven case.  They have absolutely no case authority,

12   Your Honor, and no statutory authority to get to the relief

13   that they would like.

14            Now, we make the argument that we are entitled

15   under the fair and equitable test under 1129(b)(2) to be

16   paid post-petition interest.

17            We're not assuming any conclusion, Your Honor.  We

18   think that as a matter of judicial efficiency even if we

19   were to presuppose that Your Honor had statutory of some

20   kind in the code to deal with this issue now divorced from a

21   plan based on the argument the debtor makes as to why we

22   should not receive contract rate interest, we don't think

23   that exists.

24            But, Your Honor, even if it did, the 1129(b)(2)

25   argument would not go away.  That is an argument that we're

1    entitled to make in the context of the plan.  I concede,

2    Your Honor, that what the debtors would have the Court

3    accept is that by denying us contract rate PPI, they can

4    deem us unimpaired and take away from us the right to vote,

5    take away from us the protections of the cram down

6    requirements of 1129.

7           Today's not the day to argue that, but Your Honor

8    can be certain that we will argue that they are wrong on

9    that front and they cannot simply unimpair us by proposing

10   to pay us federal judgment rate interest.  We think that we

11   clearly are impaired and that will be an issue before Your

12   Honor on another day.

13          But, either way, Your Honor, the 1129(b)(2) issue

14   does not go away.  The equitable argument will be made.  It

15   will be made at the appropriate time.

16          And, even if Your Honor were to without statutory

17   authority take up the debtors on their invitation to

18   determine the 726(a)(5) issue now, which, again, we don't

19   think that can be done, but even if Your Honor were to do it

20   and Your Honor were to find that the definition of legal

21   rate means federal judgment rate, we don't think even that

22   necessarily cuts off our right to post-petition interest at

23   the contract rate, again, because of the requirements of

24   1129(b)(2) and the fair and equitable requirement.

25          In sum, Your Honor, we rely principally on the

1    code itself.  I think that is a complete answer to the

2    question.  The one provision they rely on just does not get

3    them there.

4              THE COURT:  Thank you.

5              MR. QURESHI:  Thank you, Your Honor.

6              THE COURT:  Mr. Shore?

7              MR. SHORE:  Your Honor, briefly I rise for two

8    reasons; one to reclaim my metaphor.

9              THE COURT:  It's been beaten (indiscernible) --

10             MR. SHORE:  It's been bad luck.

11             THE COURT:  (Indiscernible) in the tickets.  We've

12   started the peanuts.  (Indiscernible) she had --

13             MR. SHORE:  The T-side unsecured creditors are

14   leaving the dream.  If anybody has ever been stuck in the

15   backseat of the plane on the tarmac for five hours, we're

16   buying the airline.  Okay.  As the buyers of the airline, we

17   have some very definite views as to the cash flows of where

18   all the money's going between now and confirmation.

19             We are going to be filing a supplemental objection

20   to the PIK claim, not to address the debtors' issues.  The

21   debtors have made a make-whole issue and they said that

22   they're only entitled to default interest.

23             In our view, the PIKs aren't entitled to any post-

24   petition interest at all.  That is not a solvent debtor.

25   The PIK trustee who just appeared filed an RSA which had an

1    impaired treatment.

2            The crown jewel which they say entitles them to

3    post-petition interest was marketed heavily and did not draw

4    a single bid.  The only reason they're getting unimpaired is

5    because we don't want to hear them talk anymore.  That does

6    not entitle them to post-petition interest.

7            In addition, the objection will contain objections

8    to OID which is unamortized as of the petition date.  They

9    are not entitled to that and that comes off as a principle

10   reduction of their claim.

11           We don't have a dog in the hunt right now as to

12   whether or not you should hear the issue of federal judgment

13   rate at this point, but at or around confirmation, we are

14   going to want to have the rest of the objection heard to

15   address those two additional issues.

16           THE COURT:  Thank you.

17           MR. GLUECKSTEIN:  Your Honor, just very briefly if

18   I may, Brian Glueckstein, Sullivan & Cromwell, for the E-

19   side committee, just in response to a few of the comments we

20   just heard here and certainly to the extent that Your Honor

21   determines you need to consider some of the issues that have

22   been raised that go to substantive points in connections

23   with the dispute that's currently in front of you at

24   whatever phase of the scheduling.

25           We certainly, as we heard this morning, believe

1    there are a number of issues, both with respect to discovery

2    and with respect to this plan as a whole that would require

3    that to be considered in the context of a plan and so --

4              THE COURT:  Let's all back up a minute.  This is a

5    claim objection.

6              MR. GLUECKSTEIN:  It is a claim objection, Your

7    Honor, but we're hearing now there's going to be

8    supplemental objections to claims and issues that would

9    potentially be determined with respect -- what I just heard

10   with respect to solvency and with respect to equities and

11   the like that certainly if we're going to go down that road

12   that should be heard at confirmation.

13             MR. MCGANN:  Andrew McGann, Your Honor, for the

14   debtors.  This notion that the debtors are doing the bidding

15   of the T unsecured or the plan sponsors doesn't make any

16   sense because we filed in adversary trying to extinguish the

17   post-petition interest claim of the PIK trustee in December

18   of last year.

19             We litigated that to a decision on jurisdiction

20   that Your Honor rendered this June.  In that decision Your

21   Honor pointed out something that is self-evident under the

22   code, you said that the debtors do not need to wait until

23   the claim is amended or confirmation of any plan to object

24   to a claim or liquidate claims.  Pretty basic statement of

25   how a claim objection works.

1          We took the invitation and in early July filed

2     this argument in the form of a claim objection, which the

3     code certainly permits if not urges Your Honor to decide.

4     I'm confused by Mr. Qureshi's argument that we don't have

5     code authority for what we're doing.  If we take a step back

6     here and we look at what the code says, they're the ones

7     without any code authority.

8          Where in the code does it say they're entitled to

9     post-petition interest at all?  It says in 502b2, as Your

10    Honor is well aware, they're not entitled to unmatured

11    interest.  All the cases that have looked at this with any

12    depth and said what does the code provide, it says -- if

13    you're a secured creditor and you're over collateralized,

14    506(b) says that you do get post-petition interest.  Then

15    the code, as a matter of federal law not contract, says the

16    federal law will look to the underlying agreement to

17    determine the rate.

18         There's no such provision that the unsecured

19    creditors get post-petition interest at all.  But, we're

20    standing in a district where Judge Walrath has issued an

21    opinion that cited and rejected the approach that they're

22    advocating based on the Dow Corning cased.  She cited Dow

23    Corning and said that is not the direction I'm going, so

24    they're argument has been rejected at least by one of your

25    colleagues.

1          She riled on, in that case and we do here as well,

2     the Cardelucci decision in the ninth circuit which also

3     rejected the Dow Corning approached, the 1129 alternate

4     route theory that the absolute propriety rule creates or

5     expands claims where none existed.  Cardelucci did it on the

6     same grounds with the same reason that Judge Walrath adopted

7     that is that the argument in favor of a single -- if

8     interest is -- if post-petition interest is to be awarded, a

9     single flat rate, in this case the federal judgment rate, is

10    appropriate in terms of fairness, equality, and

11    predictability.  That's one of the reasons the ninth circuit

12    stated and Judge Walrath adopted.

13          Secondly, the interest in applying federal law.

14    This is a code based federal law decision.  This has nothing

15    to do with what's in their contract.  In Cardelucci, the

16    court's analogized this type of claim to the interest on

17    judgments in the state courts.

18          In diversity cases in the federal courts,

19    prejudgment interest is determined by reference to state law

20    like prepetition interest would be here by reference to the

21    indenture of the notes.  After a judgment is rendered in a

22    diversity case in federal court, its federal law that

23    controls the post judgment rate.

24          Hereupon the filing of the petition, it cuts off

25    their entitlement under state law to interest as a matter of

1    federal law and that's the analogy the ninth circuit drew

2    and said that's why this question, are you entitled to post-

3    petition interest when you're an unsecured creditor in

4    bankruptcy and if so at what rate is it a matter purely of

5    federal law?  The federal law says they don't get any post-

6    petition interest.

7              There's be an exception based on the best interest

8    of creditors test that Your Honor was mentioning a few

9    moments ago that adopts the legal rate from 726(a)(5) and

10   the courts have uniformly said -- that have taken that

11   approach legally it means the federal judgment rate.

12             Lastly, Cardelucci relied on congressional intent,

13   very important here.  If congress intended for Your Honor to

14   refer to the contract in a post-petition interest setting,

15   it would've said so because when it intended to refer to an

16   underlying private agreement to determine the interest rate

17   in the post-petition setting in this Court, it did so very

18   explicitly in 506(b) and said refer to the agreement.  It

19   didn't say so here.

20             Mr. Qureshi, I think, has it absolutely backwards.

21   The code provides them no ground for arguing and there is no

22   -- we can find that there's not a court in this circuit

23   that's ever endorsed a free floating, solvent debtor

24   exception to interest.

25             All of this is to come back to say that this is

1    something that we believe we're entitled to brief and

2    address Your Honor on it and see whether we're right as a

3    matter of law they are limited to the federal judgment rate

4    at best here.  That's a legal decision.  Does it have no

5    consequences as Mr. Qureshi says?  Of course not.

6            Mr. Alberino said it's a half a billion dollar

7    claim.  Mr. Sasser in talking about the plan that was filed

8    yesterday talked about the opportunity to continue to

9    negotiate an alternate path with the E-side and those

10   negotiations are continuing.  This is material.  We may be

11   wrong.  We may be right, but we think we're entitled to put

12   it in a brief and address Your Honor.

13           THE COURT:  All right.  Thank you.  Briefly, Mr.

14   Qureshi.

15           MR. QURESHI:  Very briefly, Your Honor.  Two

16   points.  I don't know if what I heard from Mr. Shore is that

17   this date is, in fact, not solvent so I'm not sure about

18   that.  We'll wait until he files his papers, but briefly

19   with respect to what Your Honor heard from Mr. McGann.  He

20   strayed well into merits of the dispute.  We recognize that

21   there is a split in authority certainly within the third

22   circuit, Your Honor.

23           There's not binding authority one way or the other

24   on the merits.  I'm not going to get into the merits now.  I

25   mean, we go all the way back to consolidated rock in 1941

1   and the importance of respecting contract rights in a

2   solvent debtor case and we'll get to that, but I want to

3   emphasis, Your Honor, that what Your Honor did not hear from

4   Mr. McGann is an answer to the statutory questions.

5                Yes.  It's the case under Bankruptcy rule 3007; a

6   claim objection can be filed at any time.  Your Honor

7   pointed that out in the adversary proceeding ruling and, of

8   course, that is right, but Your Honor did not rule and the

9   bankruptcy rules and code do not layout the basis for a

10  claim objection.  Here, they have articulated one basis,

11  which is the definition of legal rate in 726(a)(5).

12               But, Bankruptcy Code section 10(3)(b) says that

13  that section is inapplicable except in Chapter Seven cases.

14  There is one recognized exception to that which is the best

15  interest of creditors' test which as Your Honor well knows

16  becomes relevant only in the context of plan confirmation.

17  Thank you.

18               THE COURT:  Thank you.  Well, again, focusing on

19  the procedure and it really comes down -- it certainly is

20  not a question that the Court's going to be required to make

21  a ruling in connection with the claim for post-petition

22  interest.

23               The issue becomes do I wait until confirmation or

24  after confirmation of the plan when I have a better

25  understanding of the various facts and circumstances

1    including whether or not the estate against which the claim

2    is being brought is solvent or not, what the equities in the

3    case might be, what the different statutory arguments can

4    be.

5            Do I wait or do I address now on this argument

6    that is in effect a summary judgment type of argument?

7    Decide now, Judge, because you don't need to go to trial

8    because as a matter of law they're not entitled to post-

9    petition interest and if they are, it is no more than the

10   federal judgment rate.

11           That analogy is why I think it better that it be

12   addressed now because I really do view it as, a, a claim

13   objection that can be brought at any time and, b, in effect,

14   a type of summary judgment argument that, look, Judge, as a

15   matter of law, you should grant our claim objection to the

16   following reasons.

17           Mr. Qureshi is going to argue, nobody has ever

18   done that and it would be an incredibly large blanket ruling

19   with huge consequences.  Those arguments can and should be

20   made in the brief.  It's the type of argument you would make

21   in a response to a summary judgment.  Your Honor, there are

22   material facts in dispute that need to be decided at trial

23   and you can't make this decision.

24           Or, you can make a narrow decision that make not -

25   - which would narrow the issues for trial but not eliminate

1    them in their entirety and that's really how I view what's

2    being kind of put in front of me here.

3            It may be that I buy the debtor's argument in

4    whole and make a very broad ruling.  It may be that I make

5    no ruling and it may be I make something in the middle.  I

6    really won't know until I get the briefs and I make a

7    decision as to where I'll come out, but I don't see a

8    requirement for judicial efficiency or other reasons to wait

9    completely until confirmation or even after confirmation to

10   make these rulings.

11           I think that the ability to narrow or eliminate

12   certain legal issues now as opposed to later it will be

13   beneficial.  I anticipate the confirmation will be

14   complicated and contested and as a result, narrowing issues

15   now as opposed to, if possible and appropriate, would be

16   more efficient.

17           If it turns out I get the briefs, I decide I have

18   to wait, I'll hear it all at confirmation, so be it.  But, I

19   don't think the time and effort and cost of that briefing is

20   so substantial that it wouldn't -- that it would forego even

21   giving an opportunity to decide the issue on a legal basis.

22           So, rather long winded for which I apologize, I

23   think it makes sense to have it heard now and brief now on a

24   legal basis and I don't see any reason that this rough

25   schedule that's been agreed to, to the make-whole wouldn't

1    work for this, but I'm not going to dictate the schedule.

2    But, I don't think it would require a bunch of additional

3    time in order to brief this up as a legal matter.

4              Now, if we're going to get into true questions of

5    fact that may change the basis on which I'm ruling and

6    require a more extensive discovery period and a briefing

7    period.  Then we'll probably get pushed back to

8    confirmation, but that's not what I was hearing.

9              I was hearing that the debtors want to bring a

10   legal argument on a filed proof of claim where a claim

11   objection has been filed, as can be done at any time and

12   need not await confirmation.  And I'll address Mr. Shore,

13   whenever you file what you file, we'll figure it out then.

14             MR. SHORE:  Right.  Just so I understand, I take

15   it that what you're doing is you're just making 7056

16   applicable under 9014 for the purpose of this and then we'll

17   work out the rest of it later as summary judgment was

18   denied?

19             THE COURT:  That's way more articulate than I did.

20   I was really doing by analogy and I think the point being

21   that -- in effect that you said, that -- well, not

22   necessarily technically a motion for summary judgment.

23   That's how I was thinking of it in terms of eliminating or

24   at least dealing with a legal issue that doesn't need to

25   await trial on the merits at confirmation.

1        MR. SHORE:  Right.  And why I was rising because

2    all our issues are going to be ones in which they're going

3    to be very hotly contested issues of fact so we wouldn't be

4    a part of that.

5        THE COURT:  Okay.  Mr. Qureshi?

6        MR. QURESHI:  Thank you, Your Honor.  I just

7    wanted to make sure I understand because I'm not sure that I

8    do but the scope of exactly what it is we're briefing.  So,

9    we're going to address only the legal entitlement under

10   726(a)(5), which is applicable because of the best interest

11   of creditors test, but we're not going to deal with 1129,

12   fair and equitable factors, or 1124 --

13       THE COURT:  No.  We're going to deal with whether

14   your claim as a matter of law to post-peti -- whether your

15   claim for post-petition interest as a matter of law can be

16   capped at the federal judgment rate.

17       MR. QURESHI:  Pursuant to 726(a)(5).

18       THE COURT:  No.  I didn't add the pursuant.  You

19   did.

20       MR. QURESHI:  Okay.  Well, their objection is

21   premised only on 726(a)(5), which is why I'm raising the

22   question.

23       THE COURT:  Well, then that's what they saw it.

24   Mr. McGann's shaking his head.  My point being you got up

25   and said, Judge, what they're asking you to do is make this

1    ruling that no matter what as a matter of law my claim can

2    be capped at the federal judgment rate.  What I'm saying is

3    that's the argument they're making.  That's the argument

4    making.  I'll hear that argument.

5              Your response will be multifaceted, I'm sure, and

6    one of those facets would be you can't do that.  This is a

7    legal question.  It's an equitable question.  You need

8    facts.  You can't decide as a matter of law that my claim

9    for post-petition interest is capped at most, no matter

10   what, at whatever the federal judgment rate is.  That's what

11   I was trying to articulate.

12             MR. QURESHI:  Okay.  All right.  To be clear then,

13   what we are going to respond to is the basis articulated in

14   the objection.  What we're not going to do is try to presume

15   what the fair and equitable factors will be.  We'll deal

16   with the narrow issue as they have teed it up.

17             THE COURT:  All right.

18             MR. MCGANN:  Your Honor, I'm concerned that this

19   muddies the water.  This is our position that the law does

20   not entitled them to post-petition interest in excess of the

21   federal judgment rate period.  If they're in the opposition

22   going to say I found a legal reason, it may be a new one

23   that they didn't articulate today and they put it in their

24   opposition and they say here's another one and here's a

25   fourth and a fifth one, we'll respond to all of them but

1    we're not narrowing this to one particular theory.

2              THE COURT:  And if their argument is that you

3    can't make that decision as a matter of law, you'll respond

4    to that.

5              MR. QURESHI:  Correct.

6              THE COURT:  Okay.  Hopefully, that's clear.  I

7    don't even want to ask.  Is there anything more?

8              MR. MCGANN:  No, Your Honor.

9              THE COURT:  All right.  Very good.  We're

10   adjourned for today.  Thank you.

11        (Whereupon these proceedings were concluded at

12   1:23p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 149

1                C E R T I F I C A T I O N

2

3    I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    Sonya

7    Ledanski Hyde

Digitally signed by Sonya Ledanski Hyde
DN: cn=Sonya Ledanski Hyde,
o=Veritext, ou,
email=digital@veritext.com, c=US
Date: 2015.08.12 10:30:19 -04'00'

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  August 12, 2015