UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>ENERGY FUTURE HOLDINGS CORP., *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 14-10979 (CSS)<br><br>(Jointly Administered)<br><br>Related D.I. No. 5247 |

**OBJECTIONS OF DELAWARE TRUST COMPANY, AS TCEH FIRST LIEN INDENTURE TRUSTEE, TO DEBTORS' AMENDED DISCLOSURE STATEMENT AND MOTION FOR SEPARATE STATUS CONFERENCE**

1. Delaware Trust Company, in its capacity as successor indenture trustee ("<u>Delaware Trust</u>" or "<u>First Lien Indenture Trustee</u>")[1] on behalf of the beneficial holders of 11.50% senior secured notes due October 1, 2020 (the "<u>First Lien Notes</u>") issued pursuant to an indenture dated as of April 19, 2011 (as amended, modified, or supplemented, the "<u>First Lien Notes Indenture</u>") by Texas Competitive Electric Holdings Company LLC and TCEH Finance, Inc. and guaranteed by certain of their affiliates and subsidiaries (collectively, the "<u>Obligors</u>"), hereby files this objection (this "<u>Objection</u>") to the approval of the *Disclosure Statement for the Third Amended Joint Plan of Reorganization of Energy Future Holdings Corp., et al.* [D.I. 5247] (the "<u>Disclosure Statement</u>").[2]

**PRELIMINARY STATEMENT**

2. The Disclosure Statement describes a Third Amended Joint Plan of Reorganization [D.I. 5244] (the "<u>Plan</u>") that is patently unconfirmable on its face. In particular,

---

[1] Delaware Trust became the First Lien Indenture Trustee, replacing BOKF, NA d/b/a Bank of Arizona, on July 17, 2014. Before that, BOKF, NA d/b/a Bank of Arizona had replaced the Bank of New York Mellon Trust Company, N.A. as the original First Lien Indenture Trustee.

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Disclosure Statement.

the Plan embodies an impermissible attempt by two groups of senior secured creditors to use the bankruptcy process to abrogate the rights and obligations created by an inter-creditor agreement—the Amended and Restated Collateral Agency and Intercreditor Agreement, dated as of October 10, 2007, and as amended and restated as of August 7, 2009 (the "<u>Intercreditor Agreement</u>" or "<u>ICA</u>")—at the expense of holders of $1.75 billion in first lien notes (the "<u>First Lien Noteholders</u>").  Under the unambiguous terms of the ICA, the First Lien Noteholders are contractually entitled to a far greater pro rata share of the first lien collateral distribution than is provided by the Plan.  Importantly, compliance with the terms of the ICA would <u>not</u> implicate the total amount of collateral distributions from the bankruptcy estate to these senior secured creditors (collectively, the "<u>First Lien Creditors</u>").  At issue is whether the proceeds of first lien collateral must be shared among the First Lien Creditors in accordance with the ICA to which all First Lien Creditors agreed to be bound—an issue this Court recognized more than a year ago "is not a debtor issue."[3]  Unfortunately, instead of simply providing in the Plan that the first lien collateral distributions will be allocated in accordance with the terms of the ICA, the first lien creditors who stand to benefit from non-application of the ICA at the expense of the First Lien Noteholders have chosen to attempt to take advantage of the bankruptcy process—not for any purpose relating to the rehabilitation of the Debtors—but rather to force a non-consensual amendment of the ICA onto the First Lien Noteholders for their own benefit.  On its face, such a Plan cannot be confirmed.

3.      Moreover, this purely intercreditor allocation dispute cannot be put aside at this stage as simply a confirmation objection.  The Plan's blatantly improper attempt to override the

---

[3]    *See* Declaration of Benjamin J.A. Sauter in Support of Objections of Delaware Trust Company To Debtors' Amended Disclosure Statement and Motion for Separate Status Conference ("<u>Sauter Declaration</u>") Ex. A (Transcript of June 5, 2014 Hearing before the Honorable Christopher S. Sontch) at 222:14.[3]  Subsequent references herein to and "Exhibit" or "Ex." Refer to the exhibits to the Sauter Declaration.

Intercreditor Agreement clouds the ability of all First Lien Creditors to make an informed judgment about whether to accept the legally deficient Plan.  The Disclosure Statement makes no mention of the imminent intercreditor dispute regarding the allocation of distributions under the Plan, nor would simply mentioning the dispute provide holders of the relevant claims with sufficient information to decide how to vote in compliance with section 1125 of the Bankruptcy Code.

4.  For these reasons, the proper allocation of collateral among the First Lien Creditors is an issue that can and should be expeditiously resolved <u>outside</u> of the Plan confirmation process.  Much distraction and uncertainty in the confirmation process can be avoided if this intercreditor allocation dispute is resolved separately. Notably, many of the allocation issues addressed in these Objections have already been the subject of litigation, both in this Court and in a separate New York State Court action, so there will be little or no prejudice to the parties from an expedited schedule.

5.  Accordingly, Delaware Trust respectfully requests that a status conference be scheduled for a date between September 8 – 11, 2015 to establish an appropriate briefing and hearing schedule to properly and expeditiously resolve this issue without delaying the current Plan confirmation schedule.

**RELEVANT BACKGROUND**

**A.  The Intercreditor Agreement**

6.  There are three groups of First Lien Creditors with secured rights in the Obligors' first lien collateral.  Those groups are: (1) the First Lien Noteholders; (2) holders of approximately $22.6 billion of first lien bank debt (the "<u>First Lien Bank Debt Holders</u>"); and (3) holders of approximately $1.255 billion of first lien hedges and swaps (the "<u>First Lien Swap</u>

Holders"). The debt held by the First Lien Noteholders, which was issued several years after the first lien bank and swap debt, accrues interest at a significantly higher rate than the debt held by the other two groups of First Lien Creditors.[4]

7.  The Intercreditor Agreement governs the respective rights and priorities of the three groups of First Lien Creditors and explicitly ensures that their bargained-for rights relative to one another continue to be protected and preserved regardless of any insolvency or liquidation proceedings.[5] *See* Ex. B (ICA). In recognition of the different rates of interest negotiated by the various First Lien Creditors, the Intercreditor Agreement requires, among other things, that distributions of first lien collateral and proceeds be allocated ratably based on the "Secured Obligations"—*which include accrued but unpaid interest*—outstanding with respect to each subset of First Lien Creditors at the time that each such distribution is made. This allocation method ensures that the First Lien Creditors who bargained for higher rates of interest receive, *vis-à-vis* the other First Lien Creditors, an increasingly greater share of the first lien collateral distributions in the event of a material time lapse between a default by the Obligors and a distribution of collateral for the benefit of First Lien Creditors. Moreover, by the plain terms of the ICA, all First Lien Creditors explicitly decided among themselves that this allocation method would continue to apply even after the Obligors become the subject of bankruptcy proceedings ***regardless*** of whether post-petition interest is allowed or allowable in those proceedings (this method is referred to as the "Post-Petition Allocation Method").

---

[4] The First Lien Notes accrue interest at a rate of 11.5% per annum. The debt held by the First Lien Bank Debt Holders accrued interest at a rate of LIBOR + 350 or 450 basis points per annum, depending on the tranche, prior to the commencement of bankruptcy; post-bankruptcy, the debt accrues interest at Prime Rate + 250 or 350 basis points, depending on the tranche, plus 2.00% of default interest. The First Lien Swaps accrue interest essentially at LIBOR.

[5] Pursuant to an Accession Agreement executed contemporaneously with the issuance of the First Lien Notes, the First Lien Indenture Trustee (now Delaware Trust) became a party to the Intercreditor Agreement as a "Secured Party" and "Secured Debt Representative" thereunder on behalf of the First Lien Noteholders.

8.  The Post-petition Allocation Method is established by Section 4.1 of the Intercreditor Agreement, which provides, in relevant part:

> 4.1 Application of Proceeds. **Regardless of any Insolvency or Liquidation Proceeding which has been commenced by or against [any Obligor]**, [First Lien] Collateral or any proceeds thereof received in connection with the sale or other disposition of, or collection on, such [First Lien] Collateral upon the exercise of remedies under the Security Documents by the [First Lien] Collateral Agent **shall be applied in the following order**
>
> [. . .]
>
> **third, on a pro rata basis,** to the payment of, without duplication, (a) all principal and other **amounts then due and payable in respect of the Secured Obligations** . . . .

Ex. B (ICA) § 4.1 (emphasis added).

9.  The term "Secured Obligations" means, among other things:

> **interest and fees that accrue after the commencement by or against any [Obligor] of any proceeding under any bankruptcy or insolvency law** naming such [Obligor] as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding [and] **whether or not allowed or allowable in an Insolvency or Liquidation Proceeding**. **"Secured Obligations" shall include, without limitation, interest accruing at the then applicable rate provided in the applicable Financing Document after the maturity date of the relevant Secured Obligations and any Post-Petition Interest**.

*Id.* § 1.1 (emphasis added).[6]

10. Section 4.1, together with the contractual definition of Secured Obligations, reflects the clear and unambiguous intention of the parties to the Intercreditor Agreement to have the allocation of any proceeds of first lien collateral among First Lien Creditors: (a) be determined based on the outstanding amount of all Secured Obligations, including accrued

---

[6] The term "Post-Petition Interest" is defined in the Intercreditor Agreement as "any interest or entitlement to fees or expenses or other charges that accrues after the commencement of any Insolvency or Liquidation Proceeding, **whether or not allowed or allowable in any such Insolvency or Liquidation Proceeding**." Ex. B. (ICA) § 1.1 (emphasis added).

{BAY:02756847v1}                                 5

unpaid interest thereon, due and payable as of the date such proceeds are paid; and (b) be exactly the same regardless of whether any of the Obligors is in bankruptcy.

11. Moreover, the allocation methodology employed by Section 4.1 of the ICA determines not only the contract rights of First Lien Creditors to a particular share in the distribution of first lien collateral, but also the extent of the property right that each First Lien Creditor maintains in the collateral itself. Specifically, Section 2.1 of the ICA provides:

> *Pari Passu*. As among the Secured Parties, all Liens on the Collateral shall rank *pari passu*, no Secured Party shall be entitled to any preferences or priority over any other Secured Party with respect to the Collateral (**except as otherwise provided in Section 4.1**) and the Secured Parties shall share in the Collateral and all Proceeds thereof in accordance with the terms of this Agreement.

Ex. B (ICA) § 2.1 (emphasis added). Thus, the Plan, by failing to distribute first lien collateral among First Lien Creditors in accordance with the Post-Petition Allocation Method to the detriment of First Lien Noteholders, is an impermissible denial of First Lien Noteholders' property rights in such collateral, and renders the Plan unconfirmable.

12. It is beyond dispute that the Bankruptcy Code prohibits the non-consensual taking of the property rights of secured creditors. *See Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 601 (1935) (invalidating bankruptcy legislation as unconstitutional taking of property); *United States v. Security Indus. Bank*, 459 U.S. 70, 82 (1982) (construing Bankruptcy Code to avoid difficult and sensitive questions arising out of the guarantees of the Takings Clause). For this reason, the Intercreditor Agreement specifically *prohibits* collateral distributions being made after the commencement of a bankruptcy case by an Obligor in any way other than in accordance with Section 4.1. Section 4.2 provides, in relevant part:

> Limitations on Payment Post Default. After (a) the commencement of any Insolvency or Liquidation Proceeding in respect of any Loan Party [*i.e.* Obligor, including the TCEH

>     Debtors] . . . , **no payment of cash (or the equivalent of cash) shall be made from the proceeds of [First Lien] Collateral** by any [Obligor] to the [First Lien] Collateral Agent for the benefit of any Secured Party, **except as provided for in Section 4.1.**

Ex. B (ICA) § 4.2 (emphasis added).[7]  Thus, any proposed plan that attempts to do so is patently unconfirmable on its face.

### B. Intercreditor Litigation

13. The First Lien Bank Debt and Swap Holders have no interest in continuing to abide by the Post-Petition Allocation Method in the ICA because, under that method, they receive a relatively lower pro rata distribution than the First Lien Noteholders.  Instead, their incentive is to allocate first lien collateral according to a calculation of Secured Obligations based on a single date (i.e., the bankruptcy petition date) that fails to account for interest continuing to accrue post-petition to the relative benefit of the First Lien Noteholders.  Their favored method of allocation is referred to as the "Petition Date Allocation Method."  The First Lien Bank Debt and Swap Holders are now trying to misuse the bankruptcy process to abrogate the Post-Petition Allocation Method provided in Section 4.1 of the ICA and, in effect, replace it with the Petition Date Allocation Method.

14. This is not the first time a dispute has arisen over Section 4.1 of the ICA.  In May 2014, a related dispute arose in the context of a Motion for Adequate Protection and the allocation of monthly cash collateral among the First Lien Creditors.  [D.I. 71.]  This Court received briefing and argument as to the correct interpretation of Section 4.1 of the ICA, but a resolution on the merits was not reached.  Instead, this Court (a) attempted to temporarily preserve the status quo by ordering that the difference between the amounts that would be due

---

[7]  Emphasizing the point, Section 8.3 of the ICA explicitly states that the respective "rights, interests, agreements and obligations" of the Collateral Agent and the First Lien Creditors "shall remain in full force irrespective of [. . .] the commencement of any Insolvency or Liquidation Proceeding in respect of the Borrower [. . . .]"  Ex. B (ICA) § 8.3(d).

under the Post-Petition Allocation Method and the Petition Date Allocation Method (the "Holdback Amounts") be set aside in an escrow account pending further order;[8] and (b) suggested that the parties "[g]o to New York State Court" in accordance with the choice of law and submission to jurisdiction clauses of the ICA to resolve what the Court recognized "is not a debtor issue." Ex. A (June 5, 2014 Hr'g Tr.) at 222:14, 231:25; *see also Final Order (A) Authorizing Use of Cash Collateral for Texas Competitive Electric Holdings Company LLC and Certain of Its Debtor Affiliates, (B) Granting Adequate Protection, and (C) Modifying the Automatic Stay* [D.I. 855 ] (the 'Cash Collateral Order") at 32-36.

15.  On March 13, 2015, the Trustee for the First Lien Notes filed a complaint for declaratory judgment and specific performance in New York State Court (the "Intercreditor Action") against Wilmington Trust, N.A. ("Wilmington") as Collateral Agent under the Intercreditor Agreement and Bank of New York Mellon ("BNY") as escrow agent for the Holdback Amounts. Among other things, the Intercreditor Action seeks (a) a declaration that payments be allocated among the First Lien Creditors using the Post-Petition Interest Allocation Method and, as a result, all Holdback Amounts with respect to past and future distribution must be allocated for the benefit of the First Lien Noteholders; and (b) a judgment requiring BNY and Wilmington to release and allocate the Holdback Amounts to the First Lien Noteholders. Rather than permit resolution of the dispute to proceed in New York State Court as this Court had suggested, Wilmington removed the case to the United States District Court for the Southern District of New York, which transferred the case back to the District of Delaware on July 23, 2015. *See Delaware Trust Co. v. Wilmington Trust, N.A.*, No. 1:15-CV-2883 [D.I. 72] (S.D.N.Y. July 23, 2015).

---

[8] The status quo has not been preserved because the Holdback Amounts are not held in an interest bearing escrow account.

16. The Intercreditor Action is currently awaiting a reference back to this Court. *See Delaware Trust Co. v. Wilmington Trust, N.A.*, No. 1:15-CV-657 [Minute Entry on Aug 13, 2015] (D. Del.). While the Disclosure Statement briefly mentions the Intercreditor Action (*see* Disclosure Statement at 85), it does so in the limited context of adequate protection payments under the Cash Collateral Order and fails to disclose that similar issues imperil the Plan itself. Moreover, while the Disclosure Statement mentions that the Holdback Payments are being held in escrow "pending resolution" of the Intercreditor Action, it fails to mention that the Plan as proposed purports to resolve the dispute in favor of the other first lien creditors.

### C. The Recently Amended Plan Would Abrogate and Rewrite the ICA

17. The Obligors filed a Third Amended Plan and Disclosure Statement on August 10, 2015. The Plan now purports to eviscerate the Post-Petition Allocation Method required by Section 4.1 of the ICA and instead would allocate collateral pro rata based on a calculation as of the bankruptcy petition date. Indeed, the Plan could not be clearer in its improper purpose:

> all distributions under the Plan to Holders of Allowed TCEH First Lien Secured Claims shall be allocated Pro Rata among such Holders based upon the Allowed amounts of such Claims **as of the Petition Date** as set forth in the Plan. **For the avoidance of doubt, Holders of Allowed TCEH First Lien Secured Claims shall not be entitled to any benefit or recovery on account of postpetition interest** unless the Holders of TCEH First Lien Secured Claims are determined to be oversecured, and no Holder of TCEH First Lien Secured Claims shall have greater rights in any collateral or proceeds thereof than the rights provided to such Holder under the Plan.

Plan Art. III Section B.28(c)(C).

18. In tacit recognition that the ICA squarely prohibits the allocation method now contemplated by the Plan, the Plan further directs the Collateral Trustee under the ICA (Wilmington), upon approval of the Plan by a majority of self-interested First Lien Bank Debt

{BAY:02756847v1}                                            9

and Swap Holders, to amend the ICA and involuntarily extinguish any further rights held by the First Lien Noteholders *vis-à-vis* other secured creditors in the ICA:

> To the extent that an amendment to the TCEH First Lien Intercreditor Agreement is necessary to give effect to the foregoing, (i) acceptance of the Plan by Holders of Allowed TCEH First Lien Secured Claims shall constitute a direction to the TCEH First Lien Agent by the Required Secured Parties (as defined in the TCEH First Lien Intercreditor Agreement) to enter into and execute such amendment, (ii) upon the Effective Date, **the TCEH First Lien Intercreditor Agreement shall be deemed amended to reflect that Holders of TCEH First Lien Secured Claims shall have no existing and future rights, claims, or entitlements to receive** from the Debtors or **from other Holders of TCEH First Lien Secured Claims any recovery on account of such Claims other than the rights provided to such Holders under the Plan**, and (iii) the Debtors shall enter into and execute such amendment on terms reasonably acceptable to the Debtors.

*Id.*

19.     Thus, the Plan not only purports to excise the Post-Petition Allocation Method from the ICA, but also seeks to release the First Lien Noteholders' contractual claims under the ICA against other non-debtors.

20.     The Plan would also allocate pro rata to all First Lien Creditors the Holdback Amounts that have been collected in escrow since June 2014:

> Holders of TCEH First Lien Secured Claims will be entitled to keep all adequate protection payments received under the Cash Collateral Order, and **all funds held in escrow under the Cash Collateral Order shall be distributed Pro Rata to Holders of Allowed TCEH First Lien Secured Claims based upon the Allowed amounts of such Claims as set forth in the Plan**.

*Id.*

21.     In short, the First Lien Bank Debt and Swap Holders are blatantly using the confirmation process to resolve the intercreditor allocation dispute in their favor at the expense of the First Lien Noteholders.

## **OBJECTIONS**

### 1. The Allocation Dispute Should Be Resolved Outside Of The Confirmation Process

22.     The intercreditor allocation dispute described in these Objections can and should be decided separately from the Plan and Disclosure Statement confirmation process. The First Lien Bank Debt Holders are a critical class of creditors, representing a significant percent of all secured debt. Without the support of this group, the Plan likely could not succeed. Rather than defer resolution of the intercreditor allocation dispute until the Plan confirmation process has significantly progressed—and thus risk sending the Plan back to the drawing board at that late stage once a judicial determination is made that the Plan impermissibly abrogates the ICA—it would be far more efficient to resolve the intercreditor allocation dispute in a separate and earlier hearing. The intercreditor allocation dispute described in these Objections is capable of expeditious resolution, and such resolution would ultimately enhance the certainty and efficiency of the confirmation process for all parties involved.

23.     Accordingly, Delaware Trust respectfully requests that these Objections be briefed and decided on a separate track. To that end, Delaware Trust proposes that a status conference be set for a date between September 8 – 11, 2015 to establish an appropriate briefing and hearing schedule for the intercreditor allocation dispute to be resolved, leading to a final merits hearing on the intercreditor allocation dispute in late September or early October 2015. Delaware Trust further requests that the hearing on the Disclosure Statement objections currently set for September 17, 2015 be postponed until after the intercreditor allocation dispute is resolved. This schedule would ensure that the intercreditor allocation dispute is settled in advance of the current Plan confirmation hearing.

### 2. The Current Plan Cannot Be Confirmed on Its Face

24. The current Plan described by the Disclosure Statement is patently unconfirmable. *See In re Market Square Inn, Inc.*, 163 B.R. 64, 67-68 (Bankr. W.D. Pa. 1994) ("[W]e conclude that [the creditor] cannot be compelled to voluntarily release his claim" and since it is clear that the plan is not capable of confirmation, it is "appropriate to refuse approval of the disclosure statement"); *see also Unichem Corp.*, 72 F.R. 95 (Bankr. N.D. Ill. 1987) (recognizing court may refuse to approve disclosure statement when it is apparent that plan accompanying it is not confirmable).[9]

25. The following is a preview of the objections to the Plan that make it unconfirmable with respect to its treatment of the ICA.[10]

   *a. The Intercreditor Agreement Must Be Enforced*

26. There is no authority for the Plan to abrogate the property rights determined by Section 4.1 of the ICA. The allocation methodology employed by Section 4.1 of the ICA determines not only the contract rights of First Lien Creditors to a particular share in the distribution of first lien collateral, but also the extent of the property rights that each First Lien

---

[9] *See also In re Beyond.com*, 289 B.R. 138, 140 (Bankr. N.D. Cal. 2003) (approval of disclosure statement should be denied if plan is clearly unconfirmable); *In re Main Rd. Props. Inc.*, 144 B.R. 217, 219 (Bankr. D.R.I. 1992) (noting that it is proper to consider substantive plan issues prior to confirmation "where the proposed plan is arguably unconfirmable on its face"); *In re Batten*, 141 B.R. 899, 909 (Bankr. W.D. La. 1992) (where a proposed plan is clearly not capable of confirmation, disclosure statement should be disapproved); *In re 266 Washington Assocs.*, 141 B.R. 275, 288 (Bankr. E.D.N.Y. 1992) (denying approval of debtor's disclosure statement because "it describes a plan which is fatally flawed and thus incapable of confirmation"); *In re E. Maine Elec. Coop.*, Inc., 125 B.R. 329, 333 (Bankr. D. Me. 1991) (court should refuse to consider adequacy of disclosure statement that describes a "fatally flawed" plan "because undertaking the burden and expense of plan distribution and vote solicitation is unwise and inappropriate if the proposed plan could never legally be confirmed"); *In re Century Investment Fund VIII Ltd. Partnership*, 114 B.R. 1003, 1005 (Bankr. E.D. Wis. 1990) (where proposed plan is clearly not capable of confirmation, disclosure statement should be disapproved); *In re Dakota Rail, Inc.*, 104 B.R. 138, 145 (Bankr. D. Minn. 1989) (denying approval of "facially defective disclosure statement" describing plan that was not feasible); *In re Pecht*, 57 B.R. 137, 139 (Bankr. E.D. Va. 1986) (holding that if court determines plan "does not comply with section 1129 of the Bankruptcy Code, then it is incumbent upon the Court to decline approval of the disclosure statement to prevent diminution of the estate").

[10] In light of the recent accelerated deadline for submitting objections to the Disclosure Statement, Delaware Trust expressly reserves its right to submit additional arguments and/or objections with respect to the Plan and Disclosure Statement upon further review of those documents. *See* Ex. C (Aug. 11, 2015 Hr'g. Tr.) at 79:16-80:8.

Creditor maintains in the collateral itself. The Post-Petition Allocation Method inheres in the very definition of a "Secured Obligation." Ex. B (ICA) § 1.1. Section 2.1 of the ICA confirms that the rights of the respective First Lien Creditors in the First Lien are established "as otherwise provided in Section 4.1." *Id.* § 2.1. Thus, by failing to distribute first lien collateral among First Lien Creditors in accordance with the Post-Petition Allocation Method to the detriment of First Lien Noteholders, the Plan denies the First Lien Noteholders' property rights in such collateral. This is a result that the Bankruptcy Code and the Constitution do not allow. *See Radford*, 295 U.S. at 601 (1935) (invalidating bankruptcy legislation as unconstitutional taking of property); *Security Indus. Bank*, 459 U.S. at 82 (construing Bankruptcy Code to avoid difficult and sensitive questions arising out of the guarantees of the Takings Clause).

27.  Nor can the Plan refuse to enforce the contractual bargains reached in the ICA. Section 510(a) of the Bankruptcy Code provides that contractual subordination agreements, such as the ICA, are enforceable in bankruptcy to the same extent they are enforceable under applicable non-bankruptcy law. 11 U.S.C. § 510(a); *see also In re Bank of New England Corp.*, 364 F.3d 355, 361 (1st Cir. 2004) ("Subordination agreements are essentially inter-creditor arrangements"). There can be no cognizable dispute that the ICA is enforceable under applicable non-bankruptcy law, and therefore the negotiated allocation of collateral among the First Lien Creditors set forth in Section 4.1 of the ICA must be given effect under the Plan. *In re Ion Media Networks*, 419 B.R. 585, 595 (Bankr. S.D.N.Y. 2009) ("The [i]ntercreditor [a]greement is an enforceable contract under section 510(a), and the [c]ourt will not disturb the bargained-for-rights and restrictions governing the second lien debt . . . .creditor expectations should be appropriately fulfilled"); In re Kors, Inc., 819 F.2d 19, 24 (2d Cir. 1987) ("[S]ubordination agreements are uniformly upheld by the courts.").

28.     A finding by this Court that the intercreditor allocation rights under the ICA can be cancelled, released, amended, discharged or otherwise made ineffective—as is expressly contemplated by Article III § B.28 of the Plan—would effectively annul the ICA and therefore violate Section 510(a) of the Bankruptcy Code. *See In re Consul Restaurant Corp.*, 146 B.R. 979, 988-89 (Bankr. D. Minn. 1992) (rejecting cram-down of senior lenders in violation of intercreditor agreement because it shifted bargained-for risk of loss as between lenders).  A Plan that overrides or releases the unambiguous intercreditor allocation rights and obligations set forth in the ICA violates Section 510(a) of the Bankruptcy Code and cannot be confirmed.  11 U.S.C. § 1129(a)(1) (requiring that a plan may be confirmed only if it "complies with the applicable provisions of [the Bankruptcy Code]"); *In re Best Prods. Co.*, 168 B.R. 35, 62 (Bankr. S.D.N.Y. 1994) ("Pursuant to section 510(a) and 1129(a)(1) of the Bankruptcy Code, [debtor] was mandated to enforce the subordination agreements [. . . .]").

  b.  *The Plan Discriminates Among First Lien Creditors*

29.     The collateral allocation contemplated by the Plan impermissibly favors the First Lien Bank Debt and Swap Holders at the expense of the First Lien Noteholders.  As discussed above, Section 4.1 of the ICA establishes a Post-Petition Allocation Method to adequately protect the First Lien Creditors from a diminution in the relative value of their collateral.  In particular, it preserves the First Lien Creditors' respective shares of, and pro rata interests in, the first lien collateral.  The Petition Date Allocation Method contemplated by the Plan, however, turns these relative interests on their head.  By calculating the intercreditor allocation based on a single date instead of taking into account accrued and accruing post-petition interest and the corresponding increase in the First Lien Noteholders respective pro rata share, the Plan grants the

First Lien Bank Debt and Swap Holders a preference at the expense of the First Lien Noteholders.

30.     The Plan's preference for the First Lien Bank Debt and Swap Holders over the First Lien Noteholders violates Section 1123 of the Bankruptcy Code.  That Section requires that the Plan "provide the same treatment for each claim or interest of a particular class."  11 U.S.C. § 1123(a)(4); *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013) (recognizing that "equality of distribution among creditors is a central policy of the Bankruptcy Code . . . ."). Under the Plan, however, the First Lien Noteholders allocation rights would be eviscerated while the other First Lien Creditors' allocations rights would be enhanced.  Again, a Plan that violates a provision of the Bankruptcy code cannot be confirmed.  11 U.S.C. § 1129(a)(1).  Further, the Plan's differential treatment of First Lien Creditors is also a violation of the *pari passu* provision in the ICA and therefore of Section 510(a) of the Bankruptcy Code as well.  Section 2.1 of the ICA prohibits granting "preferences or priority" to a particular group of First Lien Creditors.  Ex B (ICA) § 2.1.  But that is precisely what the Plan seeks to give the First Lien Bank Debt and Swap Holders.

      c.     *The Amendments To The ICA Contemplated By The Plan Are Otherwise Ineffective*

31.     The amendments to the ICA contemplated by the Plan to achieve the improper intercreditor allocation cannot be legally effected under the relevant agreements.  The Plan contemplates amendments to the ICA whereby, in essence: (a) Plan approval would direct the Collateral Agent to execute an amendment extinguishing the First Lien Noteholders' intercreditor allocation rights; (b) the amendment will become effective shortly after Plan Confirmation; and (c) the Debtors will execute the amendment.  There are at least two flaws with

this mechanism: neither the Debtors nor the Collateral Agent has authority to do what is asked of them.

32.  Under the ICA, Debtor approval is indeed required to effect an amendment to the ICA. Ex. B (ICA) § 9.3(d). However, the Debtors are contractually prohibited by the First Lien Notes Indenture from amending the ICA without the consent of a majority of "Required Debt." Ex. D (First Lien Notes Indenture) § 9.02(c). Under the circumstances now present—where the amendment to the ICA contemplated by the Plan would uniquely and disproportionately affect the First Lien Noteholders *vis-à-vis* the other categories of First Lien Creditors—the "Required Debt" means the First Lien Noteholders "*voting as a single class without any other series of debt.*" *Id.* § 1.01, definition of "Required Debt," subparagraph (c) (emphasis added); *see also id.* subparagraph (b). In other words, the First Lien Noteholders are entitled to a *separate* vote on the purported amendments to the ICA, and the First Lien Bank Debt Holders cannot legally authorize the Debtors to effect those amendments. Accordingly, the amendment mechanism contemplated by the Plan is ineffective.

33.  The amendments to the ICA contemplated by the Plan cannot be effected for another reason: the Collateral Agent under the ICA must act "in accordance with" and comply with "the express conditions contained" in the First Lien Note Indenture. Ex. B (ICA) § 7.1(a). Thus, before the amendments contemplated by the Plan can become effective, the Collateral Agent must first obtain an Officer's Certificate or Opinion of Counsel that any amendment to the ICA would not adversely affect the interests of the First Lien Noteholders. *See* Ex. D (First Lien Note Indenture) § 11.08(d). No such Certificate or Opinion can legitimately be obtained because, as discussed above, the amendments to the ICA contemplated by the Plan would be uniquely prejudicial to the First Lien Noteholders.

*d. The Plan Contains Impermissible Third-Party Releases*

34. The Plan not only improperly tries to control intercreditor distributions after they are made by the estate, but it also seeks to prevent the First Lien Noteholders from separately vindicating their contractual rights against non-debtor counterparties. There is no provision in the Bankruptcy Code that would allow the Plan to nullify or release state-law intercreditor contract rights, such as those asserted in the Intercreditor Action or similar claims that may be asserted by the First Lien Notes Trustee in the future. *See In re Continental Airlines*, 203 F.3d 203, 211-2015 (3d Cir. 2000) (rejecting releases of non-debtors in bankruptcy plan).

*e. The Plan Would Exceed This Court's Jurisdiction*

35. This Court lacks jurisdiction to authorize an abrogation or release of intercreditor contract rights, such as those reflected in Section 4.1 of the ICA and asserted in the Intercreditor Action, that neither belong to the bankruptcy estate nor affect the res of the estate. A bankruptcy court "only has jurisdiction to enjoin third-party non-debtor claims that directly affect the res of the bankruptcy estate." *In re Johns-Manville Corp.*, 517 F.3d 52, 66 (2d Cir. 2008). Here, the intercreditor dispute has no such effect—it does not affect the "rights, liabilities, options, or freedom of action or the handling and administration of the bankrupt estate." *In re Guild & Gallery Plus, Inc.*, 72 F.3d 1171, 1182 (3d Cir. 1996). The bankruptcy court has no jurisdiction to enter a final judgment or approve a Plan that would extinguish state law intercreditor allocation rights under the ICA. *Stern v. Marshall*, 131 S. Ct. 2594, 2618 (2011) (finding bankruptcy court lacked constitutional jurisdiction to enter final judgment on a state law counterclaim).

### 3. The Disclosure Statement Lacks Adequate Information

36. A disclosure statement must provide creditors with adequate information necessary to facilitate informed voting on the plan and knowledgeable creditor participation in the confirmation process. *See* 11 U.S.C. § 1125(a)(1); *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp.*, 337 F.3d 314, 323 (3d Cir. 2003) ("The importance of full and honest disclosure cannot be overstated."); *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996) ("These disclosure requirements [under section 1125 of the Bankruptcy Code] are crucial to the effective functioning of the federal bankruptcy system [. . .] the importance of full and honest disclosure cannot be overstated."); *In re Beltrami Enters. Inc.*, 191 B.R. 303, 304 (Bankr. M.D. Pa. 1995) ("The purpose of the disclosure statement is to provide sufficient information [. . .] the information to be provided should be comprised of all those factors presently known to the plan proponent that bear upon the success or failure of the proposals contained in the plan."). Here, the failure of the Disclosure Statement to even address this intercreditor dispute and the resulting impact its resolution will have on the allocation of distributions to First Lien Creditors violates section 1125 of the Bankruptcy Code.

### CONCLUSION

37. For the reasons stated, Delaware Trust respectfully requests that the Court: (i) set a status conference for a date between September 8 – 11, 2015 to establish an appropriate briefing and hearing schedule for the intercreditor dispute to be resolved, leading to a final merits hearing on the intercreditor dispute in late September or early October 2015; and (ii) postpone the hearing on the Disclosure Statement objections currently set for September 17, 2015 until after the intercreditor dispute is resolved; and (iii) sustain the above Objections to the Disclosure Statement.

Dated: Wilmington, Delaware
       August 17, 2015

                                      **BAYARD, P.A.**

                                      */s/ GianClaudio Finizio*
Neil B. Glassman (No. 2087)
GianClaudio Finizio (No. 4253)
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19801
(302) 655-5000
nglassman@bayardlaw.com
gfinizio@bayardlaw.com

and

**KOBRE & KIM LLP**

*/s/ Michael S. Kim*
Michael S. Kim
Jeremy C. Hollembeak
Melanie L. Oxhorn
Benjamin J.A. Sauter
800 Third Avenue
New York, New York 10022
Tel:    +1 212 488 1200
Fax:   +1 212 488 1200

*Attorneys for Delaware Trust Company as TCEH First Lien Indenture Trustee*

{BAY:02756847v1}                19