## BUSINESS

**Our Company**

We are a Dallas-based energy company that manages a portfolio of competitive and regulated energy businesses in Texas. We are a holding company conducting our operations principally through our subsidiaries, TCEH, Oncor Electric Delivery and their respective subsidiaries. TCEH is a holding company for the Luminant and TXU Energy businesses, which are engaged in competitive electricity market activities largely in Texas. The Luminant businesses include Luminant Power, Luminant Energy and Luminant Development. Luminant Power, Luminant Energy, Luminant Development and TXU Energy conduct their operations through a number of separate legal entities that, in accordance with regulatory requirements, operate independently within the competitive Texas power market.

As of June 30, 2007, Luminant Power had 18,365 MW of generation capacity in Texas (which includes 585 MW representing nine combustion turbine units currently operated for an unaffiliated party's benefit). This amount includes 8,137 MW of low-cost baseload solid fuel generation capacity represented by 2,300 MW of nuclear generation capacity and 5,837 MW of lignite/coal-fueled generation capacity. Luminant Energy primarily optimizes the purchases and sales of energy for TXU Energy and Luminant Power and also provides related services to other market participants. Luminant Energy is the largest purchaser of wind-generated electricity in Texas and the fifth largest in the United States. Luminant Development is currently developing three new lignite coal-fueled generation facilities in Texas with expected generation capacity totaling approximately 2,200 MW.

TXU Energy provides competitive electricity and related services to more than 2.1 million electricity customers in Texas. As of June 30, 2007, TXU Energy's estimated share of total ERCOT retail residential and small electric customers was approximately 35% and 25%, respectively.

Oncor Electric Delivery is an electricity distribution and transmission business that provides electricity delivery services to retail electric providers, including TXU Energy, that sell electricity to electricity consumers. Oncor Electric Delivery operates the largest distribution and transmission system in Texas, providing power to more than three million homes and businesses and operating more than 115,000 miles of transmission and distribution lines in Texas. A significant portion of Oncor Electric Delivery's revenues represent fees for delivery services provided to TCEH. Distribution revenues from TCEH represented 47% of Oncor Electric Delivery's distribution revenues and 41% of Oncor Electric Delivery's total revenues for the six months ended June 30, 2007 and 52% of Oncor Electric Delivery's distribution revenues and 46% of Oncor Electric Delivery's total revenues for the year ended December 31, 2006.

On or before the consummation of the Merger, Texas Holdings and Oncor Electric Delivery will implement certain structural and operational measures based on principles articulated by rating agencies and commitments made by Texas Holdings and Oncor Electric Delivery to the PUCT and the FERC that are intended to further separate Oncor Electric Delivery from Texas Holdings and its other subsidiaries in order to mitigate Oncor Electric Delivery's credit exposure to those entities and to reduce the risk that the assets and liabilities of Oncor Electric Delivery would be substantively consolidated with the assets and liabilities of Texas Holdings or any of its other subsidiaries in the event of a bankruptcy of one or more of those entities. See "The Transactions—Ring-Fencing" for a description of the material terms of the ring-fencing measures.

For the twelve months ended June 30, 2007, on a pro forma basis, TXU Corp. had Adjusted EBITDA of $5,259 million on a consolidated basis, 24% of which was attributable to Oncor Electric Delivery. See "—Summary Historical and Unaudited Pro Forma Consolidated Financial and Other Data of TXU Corp. and its Subsidiaries" for a definition of Adjusted EBITDA and a reconciliation of net income to Adjusted EBITDA. Oncor Electric Delivery Holdings and its subsidiaries will be Unrestricted Subsidiaries as defined in the indenture governing the notes offered hereby and, accordingly, will not be subject to most of the restrictive covenants in the indenture. See the subsections titled "Regulated Delivery Segment" under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the financial statements of Oncor Electric Delivery included elsewhere in this offering memorandum for information regarding the results of operations of Oncor Electric Delivery.

148

                                                                                          EF|HMW00296630

**PX 001**
**Page 155 of 453**

**Our Market**

We operate primarily within the ERCOT region, which represents approximately 85% of electricity consumption in Texas. ERCOT is the regional reliability coordinating organization for member electricity systems in Texas and the system operation of the interconnected transmission system for those systems. ERCOT's membership consists of 236 members, including electric cooperatives, municipal power agencies, investor-owned independent generators, independent power marketers, transmission service providers and distribution services providers, independent REPs and consumers.

ERCOT represents approximately 75% of the geographical area of Texas, but excludes El Paso, a large part of the Texas Panhandle and two small areas in the eastern part of the state. From 1994 through 2005, peak hourly demand in the ERCOT market grew at a compound annual rate of 2.79%, compared to a compound annual rate of growth of 2.34% for the entire United States over the same period. For 2006, hourly demand ranged from a low of 21,309 MW to a high of 62,339 MW. ERCOT has limited interconnections to other markets outside of ERCOT in the United States, which is currently limited to 1,106 MW of generation capacity (or approximately 2% of peak demand in Texas), and wholesale transactions within the ERCOT market are not subject to regulation by the FERC.

The ERCOT market has experienced significant construction of new generation plants in recent years, with over 29,000 MW of mostly natural gas-fueled combined cycle generation capacity added to the market since 1996. As of May 31, 2007, aggregate net generation capacity of approximately 76,801 MW existed in the ERCOT market, of which 72% was natural gas-fueled. Approximately 21,444 MW, or 27.9%, was lower marginal cost generation capacity such as coal, lignite and nuclear plants. As of May 31, 2007, Luminant Power's lignite and nuclear baseload plants represented 8,137 MW, or 37.9%, of the total lower marginal cost generation capacity in the ERCOT market. ERCOT has established a target reserve margin level of approximately 12.5%; and the reserve margin at May 17, 2007, was 14.6%, forecast to drop to 12.6% by 2008 and 10.1% by 2009.

Natural gas-fueled generation is the predominant supply resource in the ERCOT region in terms of both the installed generation capacity and generation produced, accounting for approximately 72% of the installed generation capacity and 46% of the electricity produced in the ERCOT region. In the ERCOT market, buyers and sellers enter into bilateral wholesale capacity, power and ancillary services contracts or may participate in the centralized ancillary services market, including balancing energy, which ERCOT administers. An October 1, 2005 report titled "Report on Existing and Potential Electric System Constraints and Needs" found that natural gas-fueled power plants set the market price of power more than 90% of the time in the ERCOT market. As a result, natural gas-fueled plant operators are the marginal suppliers in ERCOT, and wholesale electricity prices are highly correlated to natural gas prices.

The ERCOT market is currently divided into four regions or congestion zones, namely: North, Houston, South and West, which reflect transmission constraints that are commercially significant and which have limits as to the amount of power that can flow across zones. Luminant Power's baseload generation facilities are located primarily in the North region.

The ERCOT market operates under the reliability standards set by the NERC. The PUCT has primary jurisdiction over the ERCOT market to ensure the adequacy and reliability of power supply across Texas's main interconnected power transmission grid. ERCOT is responsible for facilitating reliable operations of the bulk electric power supply system in the ERCOT market. The ERCOT independent system operator ("ERCOT ISO") is responsible for maintaining reliable operations of the bulk electric power supply system in the ERCOT market. Its responsibilities include ensuring that electricity production and delivery are accurately accounted for among the generation resources and wholesale buyers and sellers. Unlike certain other regional power markets, the ERCOT market is not a centrally dispatched power pool, and the ERCOT ISO does not procure energy on behalf of its members. Members who sell and purchase power are responsible for contracting sales and purchases of

149

EFIHMW00296631

power bilaterally. The ERCOT ISO also serves as agent for procuring ancillary services for those members who elect not to provide their own ancillary services.

Our electric distribution and transmission business, Oncor Electric Delivery, along with those of other owners of transmission facilities in Texas, supports the operation of the ERCOT ISO. The transmission business has planning, design, construction, operation and maintenance responsibility for the portion of the transmission grid and for the load-serving substations it owns, primarily within its certificated area. We participate with the ERCOT ISO and other ERCOT utilities to plan, design, obtain regulatory approval for and construct new transmission lines necessary to meet reliability needs, increase bulk power transfer capability to remove existing constraints and interconnect generation on the ERCOT transmission grid.

We believe that the ERCOT region presents an attractive competitive electric service market due to the following factors:

- market rules support fair and robust competition, while providing opportunities to optimize the generation fleet operations and purchased power requirements;

- peak demand is expected to grow at an average rate of over 2.1% per year over the period 2007 to 2017;

- it is a sizeable market with over 62 GW of peak demand and approximately 34 GW of average demand; and

- as projected by ERCOT, in the absence of generation additions, annual reserve margins are expected to fall below ERCOT's desired margin of 12.5% as early as 2009, thus providing opportunities for generation owners and developers. Reserve margin is defined as the percentage by which available capacity is expected to exceed forecasted peak demand.

**Our Strengths**

- *Scale and diversity of business.* TXU believes it has three strong, large-scale electricity businesses in an attractive electric market. Luminant has a large and diversified competitive power generation portfolio with approximately 18,365 MW of generation capacity as of June 30, 2007 (which includes 585 MW representing nine combustion turbine units currently operated for an unaffiliated party's benefit). Its diversified portfolio consists of approximately 8,137 MW of low-cost solid fuel baseload generation capacity (approximately 72% lignite/coal and 28% nuclear) in ERCOT, a market in which power prices are predominantly set by natural gas-fueled generation that is more costly at current commodity levels. In addition, as of June 30, 2007, Luminant owned or operated 10,228 MW of intermediate and peaking facilities, which provide the ability to meet ERCOT requirements at various levels of demand. Luminant's lignite/coal-fueled plants are adjacent to lignite reserves that are controlled by Luminant and supply approximately 67% of the fuel used to operate these plants, which reduces Luminant's reliance on third-party coal suppliers and railroad use. Luminant controls approximately 1.0 billion tons, or over 21 years of fuel (assuming current mine production levels), of proven lignite reserves and operates the nation's 13th largest mining company. Luminant is also developing and constructing three new lignite coal-fueled generation facilities in Texas with expected generation capacity totaling approximately 2,200 MW of additional installed low-cost baseload capacity. We expect two of these units, representing approximately 1,400 MW, to be operational in 2009 and the remaining unit, representing approximately 800 MW, to be operational in 2010.

TXU Energy is a large scale competitive retailer that provides competitive electricity and related services to more than 2.1 million electricity customers in Texas. As of June 30, 2007, TXU Energy held a 62% retail residential market share in its historical market area located in the Dallas-Fort Worth area. As of June 30, 2007, TXU Energy's estimated share of total ERCOT retail residential and small business electric customers was approximately 35% and 25%, respectively.

150

Oncor Electric Delivery operates the largest distribution and transmission system in Texas, providing power to more than three million homes and businesses and operating more than 115,000 miles of transmission and distribution lines in Texas. We believe that significant opportunities for investments in transmission and distribution exist in ERCOT, including maintenance, repair and upgrades of the transmission and distribution grid and connecting planned wind generation and other generation projects in ERCOT.

- *Favorable market dynamics.* Our subsidiaries operate primarily in ERCOT, which represents approximately 85% of the electricity consumed in Texas. The strong regional economic growth in Texas continues to support demand growth for electricity in ERCOT. According to NERC, peak demand in ERCOT is expected to grow at an average rate of over 2.1% per year over the period from 2007 to 2017. ERCOT expects reserve margins to continue to decline, which presents additional investment opportunities, while also positively impacting the value of our existing plants. Power prices are generally driven by natural gas prices in ERCOT, where natural gas-fueled plants set the market price approximately 90% of the time. Texas has one of the highest retail energy consumption profiles in the country with approximately 14 MWh of consumption per household. ERCOT has experienced over 2.1% annual retail growth over the period from 2002 to 2006, making it one of the fastest growing NERC regions.

  Transmission and distribution businesses in ERCOT benefit from favorable regulatory capital recovery mechanisms known as "capital trackers" that we believe enable adequate and timely recovery of transmission investments, advanced meter reading investments and certain other infrastructure investments.

- *Strong operating performance.* Luminant Power is an industry-leading operator of baseload solid fuel plants. Based on our benchmark analysis, we believe that compared with the U.S. merchant coal plant fleet, Luminant Power's lignite/coal plants achieved top decile capacity factors and top quartile costs per MWh in 2005 and 2006. Similarly, we believe that our nuclear units achieved top decile capacity factors and top quartile costs per MWh in 2006. Luminant Power's lignite/coal-fueled plants achieved a capacity factor of 89.1% for 2006 and Luminant Power's nuclear plants achieved a capacity factor of 98.8% for 2006. Luminant Power's ongoing operating system initiatives are focused on achieving industry-leading capacity factors while continuing to manage costs. The capacity factor of a power plant is generally the ratio of each actual output of such power plant over a period of time as compared to its potential output if the plant operated at full capacity during such period.

  TXU Energy is committed to providing its customers with industry-leading customer service along with greater savings, flexibility and price certainty. For the twelve months ended June 30, 2007, call answer times averaged under 15 seconds, which dropped from an average of over 100 seconds for the same period in 2004. Customer call satisfaction scores in North Texas improved 16 percent in the twelve months ended June 30, 2007, as compared to the twelve months ended June 30, 2006. Meanwhile, TXU Energy continues to offer the broadest set of customer products of any retailer in the ERCOT market.

  Oncor Electric Delivery continues to progress toward its goal to improve its top-quartile reliability performance, while maintaining top-quartile cost performance. In 2006, Oncor Electric Delivery invested $839 million in its network to construct, rebuild and upgrade transmission lines, to extend the distribution infrastructure, and to pursue certain initiatives in infrastructure maintenance, information technology systems and advanced meter reading. Oncor Electric Delivery continues to transform its network into the nation's first broadband-enabled smart grid, with 235,000 advanced meters installed at the end of 2006 and plans to install up to 600,000 advanced meters by the end of 2007. Oncor Electric Delivery also achieved market-leading electric delivery performance in five out of seven key PUCT market metrics in 2006. These metrics measure the success of transmission and distribution companies in facilitating customer transactions in the competitive Texas electricity market.

151

EFIHMW00296633

- *Ability to hedge future cash flows through long-term hedging program.* The strong historical correlation between natural gas prices and power prices in ERCOT combined with significant liquidity in certain natural gas markets currently provides an opportunity for management of our exposure to natural gas prices. As a result, we expect to hedge up to 80% of the equivalent natural gas price exposure of our expected baseload generation output on a rolling five-year basis, and we could hedge up to 90% (but not more than 93%) of such exposure on a rolling five-year basis. As of August 31, 2007, 2.2 billion MMBtu of natural gas (equivalent to the natural gas exposure of over 260,000 GWh at an assumed 8.5 market heat rate) have been effectively sold forward by our subsidiaries over the period from 2007 to 2013 at average annual prices ranging from $7 per MMBtu to $9 per MMBtu. For the rolling five-year period from 2008 to 2012, these transactions result in us having effectively hedged approximately 70% of our expected baseload generation natural gas price exposure for such period (on an average basis for such rolling five-year period).

  We believe this hedging program provides us with visibility and stability of future revenues and cash flows.

- *Strong leadership.* Luminant, TXU Energy and Oncor Electric Delivery will have separate leadership teams consistent with the separation of TXU's legacy businesses into three distinct operating entities. Each company will have its own chief executive officer who, together with the respective management teams, will focus on optimizing operations and maximizing performance for that specific business unit, independent of the other business units. The management teams for each business will be comprised of highly experienced professionals. In addition, four prominent Texans, Donald L. Evans, former U.S. Secretary of Commerce; James R. Huffines, Chairman of the University of Texas Board of Regents; Lyndon L. Olson Jr., former Texas State Representative and former U.S. Ambassador to Sweden; and Kneeland Youngblood, a former director of the U.S. Enrichment Corporation, will also join the Board of Directors. William Reilly, Chairman Emeritus of the World Wildlife Fund and former EPA Administrator, will also join the Board of Directors and will lead the adoption of corporate governance policies that tie our operations and goals to environmental stewardship. Finally, former U.S. Secretary of State James A. Baker III will serve as Advisory Chairman to the General Partner.

## Our Strategies

Each of our businesses focuses its operations on key drivers for that business, as described below:

- Luminant focuses on optimizing its existing generation fleet to provide safe, reliable and cost-competitive power, as well as developing additional power generation capacity to meet the growing demand for power in Texas;

- TXU Energy focuses on providing high quality customer service, including continually improving customer service and developing innovative energy products to meet customers' needs; and

- Oncor Electric Delivery focuses on achieving a high level of reliability, minimizing service interruption, maintaining safe operations, and investing to improve its transmission and distribution infrastructure.

Other elements of our strategy include:

- *Increase value from our existing businesses.* Our strategy focuses on striving for consistent top decile performance across our operations in terms of reliability, cost and customer service. We will continue to focus on upgrading four critical skill sets: operational excellence across each business segment; market leadership; a systematic risk/return mindset applied to all key decisions; and rigorous performance management targeting industry-leading performance standards for productivity, reliability and customer service. An example of how we implement these principles is a program called the "Luminant Operating System," which is a program to drive ongoing productivity improvements in Luminant Power's businesses through application of lean operating techniques and deployment of a high-performance industrial culture.

152

Confidential

EFIHMW00296634

- *Pursue growth opportunities across our business lines.* We believe building upon and leveraging our scale advantages enables us to sustainably create value by eliminating duplicative costs, efficiently managing supply costs, and building and standardizing distinctive process expertise. Scale also allows us to take part in large capital investments, such as new generation projects and investments in our transmission and distribution system, with a smaller fraction of overall capital at risk and with an enhanced ability to streamline costs. The growth initiatives for each business include:

  - *Luminant*: Construction of three new lignite coal-fueled generation facilities at existing sites with onsite lignite fuel supplies, as well as the development of wind generation projects in the near to medium term. Pursuit of new generation opportunities to meet ERCOT's growing generation needs over the longer term from a diverse range of alternatives such as nuclear, renewables and advanced coal technologies, such as Integrated Gasification Combined Cycle.

  - *TXU Energy*: Retain existing customers and increase the number of customers served both in TXU Energy's historic territory, as well as in other Texas markets such as Houston, through innovative products and superior customer service.

  - *Oncor Electric Delivery*: Investment in automatic meter reading as well as the construction of new transmission and distribution facilities to meet the needs of the growing Texas market.

- *Reduce the volatility of our cash flows through our established risk management strategy.* A key component of our risk management strategy is our plan to hedge up to 80% of the natural gas exposure of Luminant Power's baseload generation output on a rolling five-year basis. The strong historical correlation between natural gas prices and power prices in ERCOT combined with the significant liquidity in certain natural gas markets currently provides an opportunity for management of our exposure to natural gas prices. After the consummation of the Transactions, we expect that TCEH will have up to approximately $5.9 billion of available revolving credit and letter of credit borrowing capacity which should provide significant liquidity for its operations, including for TCEH's long-term hedging strategies, particularly regarding its commodity and market heat rate exposures. We also expect that TCEH will have incremental, dedicated credit facilities to support collateral posting for specifically identified commodity hedge transactions. In addition, we expect that certain existing and future hedging transactions will be secured with a first lien security interest in TCEH's assets, which will reduce the liquidity requirements of entering into commodity hedge transactions because no cash or letter of credit collateral will be required for these transactions. As of the consummation of the Merger, we expect that approximately 50% of Luminant's natural gas hedging transactions will be secured by this first lien security interest in TCEH's assets.

- *Environmental focus.* We are committed to operating in compliance with all environmental laws, rules and regulations and reducing our impact on the environment. Upon consummation of the Merger, TXU will put in place a Sustainable Energy Advisory Board that will focus on assisting TXU in pursuing technology development opportunities that utilize America's vast energy resources with technologies designed to reduce TXU's impact on the environment while balancing the need to address the energy requirements of Texas. TXU's Sustainable Energy Advisory Board will be comprised of individuals who represent the following interests, including: the environment, customers, Texas economic development and ERCOT reliability standards. In addition, we are focused on and are pursuing opportunities to reduce emissions from our existing and planned new lignite/coal-fueled generation units in ERCOT. As such and in connection with our plans to build three new lignite coal-fueled generation units, we have committed to reduce emissions of mercury, nitrogen oxide and sulfur dioxide from our existing baseload generation units by 20% from 2005 levels, through a combination of investment in new emission control equipment and fuel switching. We also expect such investments to provide economic benefit to us by reducing future costs associated with complying with environmental emissions standards.

153

EFIHMW00296635

**Our Operating Segments**

TXU Corp. has aligned and reports its business activities as two operating segments: Competitive Electric (primarily represented by TCEH) and Regulated Delivery (primarily represented by Oncor Electric Delivery).

**Competitive Electric Segment**

The Competitive Electric segment is managed as an integrated business; however, for purposes of operational accountability and performance management, the segment has been divided into Luminant Power, Luminant Energy, Luminant Development and TXU Energy.

### *Luminant Power*

Luminant Power's electricity generation fleet consists of 19 plants in Texas with total generating capacity as of June 30, 2007 as shown in the table below:

| Fuel Type | Capacity (MW) | Number of Plants | Number of Units[a] |
|---|---|---|---|
| Nuclear | 2,300 | 1 | 2 |
| Lignite/coal | 5,837 | 4 | 9 |
| Natural gas[b][c] | 10,228 | 14 | 45 |
| Total | 18,365 | 19 | 56 |

(a)   Leased units consist of six natural gas-fueled units totaling 390 MW of capacity. All other units are owned.

(b)   Includes 1,329 MW representing five units mothballed and not currently available for dispatch.

(c)   Includes 585 MW representing nine combustion turbine units currently operated for an unaffiliated third party's benefit.

The generation plants are located primarily on land owned in fee simple. Nuclear and lignite/coal-fueled (baseload) plants are generally scheduled to run at capacity except for periods of scheduled maintenance activities or, in the case of lignite/coal units, backdown due to low periods of demand. The natural gas-fueled generation units supplement the baseload generation capacity in meeting variable consumption as production from these units can more readily be ramped up or down as demand warrants.

### *Nuclear Generation Assets*

Luminant Power operates two nuclear generation units at the Comanche Peak plant, each of which is designed for a capacity of 1,150 MW. Comanche Peak's Unit 1 and Unit 2 went into commercial operation in 1990 and 1993, respectively, and are generally operated at full capacity to meet the load requirements in ERCOT. Refueling (nuclear fuel assembly replacement) outages for each unit are scheduled to occur every eighteen months during the spring or fall off-peak demand periods. Every three years, the refueling cycle results in the refueling of both units during the same year, with the next scheduled to occur in 2008. While one unit is undergoing a refueling outage, the remaining unit is intended to operate at full capacity. During a refueling outage, other maintenance, modification and testing activities are completed that cannot be accomplished when the unit is in operation. Over the last 3 years, the refueling outage period per unit has ranged from a high of 38 days in 2004 to a low of 18 days in 2006. The Comanche Peak plant operated at a capacity factor of 98.8% in 2006, which represents top decile performance of US nuclear generation facilities.

Luminant Power has contracts in place for nuclear fuel conversion services through 2008. In addition, Luminant Power has contracts for the acquisition of uranium through 2009 and for nuclear fuel enrichment services through 2008, as well as for nuclear fuel fabrication services through 2016.

154

Confidential

EFIHMW00296636

Contracts for the acquisition of raw uranium and nuclear fuel conversion services through 2012 and 2009, respectively, are being finalized. Additional contracts to ensure a portion of nuclear fuel enrichment services through 2020 are being finalized. Luminant Power does not anticipate any issues with finalizing these contracts and does not anticipate any significant difficulties in acquiring raw uranium and contracting for associated services in the foreseeable future.

Luminant Power's on-site used nuclear fuel storage capability is sufficient for five to ten years. The nuclear industry is continuing to review ways to enhance security of used-fuel storage with the US Nuclear Regulatory Commission (NRC) to fully utilize physical storage capacity.

The Comanche Peak nuclear generation units have an estimated useful life of 60 years from the date of commercial operation. Therefore, assuming that Luminant Power receives the requisite license extensions, plant decommissioning activities would be scheduled to begin in 2050 for Comanche Peak Unit 1 and 2053 for Unit 2 and common facilities. Decommissioning costs are fully recoverable from Oncor Electric Delivery's customers through an ongoing delivery surcharge.

### Lignite/Coal-Fueled Generation Assets

Luminant Power's lignite/coal-fueled generation fleet has a nameplate capacity of 5,837 MW and consists of the Big Brown (2 units), Monticello (3 units), Martin Lake (3 units) and Sandow (1 unit) plants. These plants are generally operated at full capacity to meet the load requirements in ERCOT. Maintenance outages are scheduled during off-peak demand periods. Over the last three years, the total annual scheduled and unscheduled outages per unit averaged 33 days. Luminant Power's lignite/coal-fueled generation fleet operated at a capacity factor of 89.1% in 2006, which represents top decile performance of US coal-fueled generation facilities.

Approximately 67% of the fuel used at Luminant Power's lignite/coal-fueled generation plants in 2006 was supplied from owned in fee or leased proven surface-minable lignite reserves dedicated to the Big Brown, Monticello and Martin Lake plants, which were constructed adjacent to the reserves. TCEH, through its subsidiaries, owns in fee or has under lease an estimated 858 million tons of proven reserves dedicated to its generation plants, and also owns in fee or has under lease in excess of 119 million tons of proven reserves not currently dedicated to specific generation plants. In 2006, over 22 million tons of lignite were recovered to fuel Luminant Power's plants. TCEH utilizes owned and/or leased equipment to remove the overburden and recover the lignite.

Lignite mining operations include extensive reclamation activities that return the land to productive uses such as wildlife habitats, commercial timberland and pasture land. In 2006 alone, regulatory authorities approved Luminant Power's release from further reclamation obligation approximately 8,000 acres of reclaimed land; Luminant Power planted more than 1.2 million trees as part of this reclamation.

Luminant Power supplements its lignite fuel at Big Brown, Monticello and Martin Lake with western coal from the Powder River Basin (PRB) in Wyoming. The coal is purchased from multiple suppliers under contracts of various lengths and is transported from the Powder River Basin to Luminant Power's generating plants by railcar. Based on its current usage, Luminant Power believes that it has sufficient lignite reserves for the foreseeable future and has contracted 72% of its western coal resources and 100% of the related transportation through 2009.

### Natural Gas-Fueled Generation Assets

Luminant Power also operates a fleet of natural gas-fueled generation units, which includes 45 units with a total 10,228 MW of currently available capacity. A significant number of the natural gas-fueled units have the ability to switch between natural gas and fuel oil. The gas units predominantly serve as peaking units that can be more readily ramped up or down as demand warrants.

155

Confidential

EFIHMW00296637

*Luminant Energy*

Luminant Energy plays a pivotal role in supporting Luminant Power and TXU Energy by optimizing the performance of the generation assets and sourcing the electricity requirements for TXU Energy's customers. Luminant Energy manages commodity price exposure across the complementary generation and retail businesses on a portfolio basis. Under this approach, Luminant Energy manages the risks of imbalances between generation supply and sales load, which primarily represent exposures to natural gas price movements and market heat rate changes (variations in the relationships between natural gas prices and wholesale electricity prices), through wholesale markets activities that include physical purchases and sales and transacting in financial instruments.

Luminant Energy manages the commodity exposure of the generation and retail portfolio through asset management and hedging activities. Luminant Energy provides TXU Energy with the electricity and related services to meet retail customer demand and the operating requirements of ERCOT. Luminant Energy also supports Luminant Power in selling forward generation and seeking to maximize the economic value of the fleet. In consideration of operational production and customer consumption levels that can be highly variable as well as opportunities for long-term purchases and sales with large wholesale electricity market participants, Luminant Energy buys and sells electricity in the spot and short-term market and executes longer-term forward electricity purchase and sales agreements.

In its hedging activities, Luminant Energy enters into contracts for the physical delivery of electricity and natural gas, exchange traded and "over-the-counter" financial contracts and bilateral contracts with producers, generators and end-use customers. In October 2005, TXU Corp. commenced a long-term hedging program designed to reduce exposure to changes in future electricity prices due to changes in the price of natural gas. As of August 31, 2007, 2.2 billion MMBtu of natural gas (equivalent to the natural gas exposure of over 260,000 GWh at an assumed 8.5 market heat rate) have effectively been sold forward by our subsidiaries over the period from 2007 to 2013, principally utilizing natural gas-related financial instruments.

Luminant Energy also dispatches the gas-fueled generation fleet owned and operated by Luminant Power. Luminant Energy's dispatching activities are performed through a centrally managed real-time operational staff that synthesizes operational activities across the fleet and interfaces with various wholesale market channels. Luminant Energy coordinates the overall commercial strategy for these plants working closely with Luminant Power. In addition, Luminant Energy manages the fuel procurement requirements for the natural gas-fueled generation plants.

Luminant Energy engages in commercial operations such as physical purchases, storage and sales of natural gas, electricity and natural gas trading and third-party asset management. Luminant Energy's natural gas operations include well-head production contracts, transportation agreements, storage leases and retail sales. Luminant Energy currently manages approximately 18 billion cubic feet of natural gas storage capacity and has a presence outside of Texas in both electricity and natural gas commodity trading.

Luminant Energy manages exposure to wholesale commodity and credit related risk within established transactional risk management policies and limits. Luminant Energy targets best practices in risk management and risk control by employing proven principles used by financial institutions. These controls have been structured so that they are practical in application and consistent with stated business objectives. Risk management processes include capturing transactions, performing and validating valuations and reporting exposures on a daily basis using commodity information systems designed to support a large transactional portfolio. A risk management forum meets regularly to ensure that business practices comply with approved transactional limits, commodities, instruments, exchanges and markets. Transactional risks are monitored and limits are enforced to comply with the established risk policy. Luminant Energy has a strict disciplinary program to address any violations of the risk management policies and periodically reviews these policies to ensure they are responsive to changing market and business conditions.

Luminant Energy is one of the largest purchasers of wind-generated electricity in Texas and the fifth largest in the United States.

156

Confidential

### Luminant Development

Luminant Development is developing three new lignite coal-fueled units in the state of Texas with total estimated capacity of approximately 2,200 MW. The three proposed units consist of one new generation unit at an existing Luminant Power lignite coal-fueled generation plant site recently acquired from Alcoa Inc. (Sandow) and two units at a site (Oak Grove) owned by Luminant Power that was originally slated for the construction of a generation plant a number of years ago. Aggregate capital expenditures for these three units are expected to total approximately $3.25 billion including all construction, site preparation and mining development costs.

The development program includes up to $450 million for investments in state-of-the-art emissions controls for the three proposed new units. As part of the development program, additional environmental control systems will be included at Luminant Power's existing generation facilities. The capital expenditures for these additional environmental control systems are expected to total up to approximately $1.0 billion.

Development and procurement activities for the three proposed units are essentially complete and site construction is well underway. Air permits have been obtained and engineering, procurement and construction ("EPC") agreements have been executed with Bechtel Power Corporation and Fluor Enterprises, Inc. The expected on-line dates of the units are as follows: Sandow in 2009 and Oak Grove's two units in 2009 and 2010.

### TXU Energy

TXU Energy serves more than 2.1 million retail electricity customers, of which 1.9 million are in its historical service territory, which was the territory, largely in north Texas, being served by TXU Corp.'s regulated electric utility subsidiary at the time of entering retail competition on January 1, 2002. This territory, which is located in the north-central, eastern and western parts of Texas, has an estimated population in excess of 7 million, about one-third of the population of Texas, and comprises 92 counties and 370 incorporated municipalities, including Dallas/Fort Worth and surrounding suburbs, as well as Waco, Wichita Falls, Odessa, Midland, Tyler and Killeen.

Texas is one of the fastest growing states in the nation with a diverse and resilient economy and, as a result, has attracted a number of competitors into the deregulated retail electricity market. As a result, competition is expected to continue to be robust. TXU Energy, as an active participant in this competitive market, provides retail electric service to the other areas of ERCOT now open to competition including the Houston, Corpus Christi, and lower Rio Grande Valley areas of Texas. TXU Energy continues to market its services in Texas to add new customers and to retain its existing customers. As of September 2007, there are more than 100 REPs certified to compete within the state of Texas.

As a result of the legislation that restructured the electric utility industry in Texas to provide for retail competition (1999 Restructuring Legislation), effective January 1, 2002, REPs affiliated with electricity delivery utilities were required to charge price-to-beat retail prices, established by the Public Utility Commission of Texas (the Commission), to residential and small business customers located in their historical service territories. The price-to-beat mechanism was intended to spur competition as the rates were set such that competing REPs could profitably offer lower rates. TXU Energy, as a REP affiliated with an electricity delivery utility, was required to charge the price-to-beat retail price, adjusted for fuel factor changes, to these classes of customers until the earlier of January 1, 2005 or the date on which 40% of the electricity consumed by customers in that class was supplied by competing REPs. TXU Energy met the 40% threshold target calculation for its small business customers in December 2003 and began offering rates other than the price-to-beat retail prices to this customer class. Since January 1, 2005, TXU Energy has offered rates different from the price-to-beat retail prices to all customer classes, but was required to make the price-to-beat retail prices available for residential and small business customers in its historical service territory until January 1, 2007. As of January 1, 2007, TXU Energy is no longer required to offer the price-to-beat retail price to any of its customer classes.

In connection with the Merger, TXU Energy announced a 15 percent price reduction for residential customers in its historical service territory who have not already switched to one of the many pricing plans other

157

than the basic month-to-month plan. Customers received a six percent reduction beginning in late March 2007 and an additional four percent reduction in June 2007 and will receive an additional five percent reduction at the closing of the Merger. In addition, TXU Energy announced that, upon closing of the Merger, it will provide price protection through December 2008, ensuring that these customers receive the benefits of these savings through two summer seasons of peak energy usage.

### Regulated Delivery Segment

The Regulated Delivery segment primarily consists of Oncor Electric Delivery. Oncor Electric Delivery provides the essential service of delivering electricity safely, reliably and economically to end-use consumers through its distribution systems, as well as providing transmission grid connections to merchant power plants and interconnections to other transmission grids in Texas. Operating assets of the segment are located principally in the north-central, eastern and western parts of Texas.

Oncor Electric Delivery is not a buyer or seller of power. It provides transmission services to other electricity distribution companies, cooperatives and municipalities. It provides distribution services to REPs, which sell power to retail customers. Most of Oncor Electric Delivery's power lines have been constructed over lands of others pursuant to easements or along public highways, streets and rights-of-way as permitted by law. Oncor Electric Delivery's transmission and distribution rates are regulated by the Commission.

*Electricity Transmission*

Oncor Electric Delivery's electric transmission business is responsible for the safe and reliable operations of its transmission network and substations. These responsibilities consist of the construction and maintenance of transmission facilities and substations and the monitoring, controlling and dispatching of high-voltage electricity over Oncor Electric Delivery's transmission facilities in coordination with ERCOT.

Oncor Electric Delivery is a member of ERCOT, and the transmission business actively supports the operations of ERCOT and market participants. The transmission business participates with ERCOT and other member utilities to plan, design, construct and operate new transmission lines, with regulatory approval, necessary to maintain reliability, interconnect to merchant power plants, increase bulk power transfer capability and minimize limitations and constraints on the ERCOT transmission grid. For a more complete description of ERCOT see "ERCOT Market Framework" below.

Transmission revenues are provided under tariffs approved by either the PUCT or, to a small degree, the FERC. Network transmission revenues compensate Oncor Electric Delivery for delivery of power over transmission facilities operating at 60 kilovolts (kV) and above. Transformation service revenues compensate Oncor Electric Delivery for substation facilities that transform power from high-voltage transmission to distribution voltages below 60 kV. Other services offered by the transmission business include, but are not limited to: system impact studies, facilities studies and maintenance of transformer equipment, substations and transmission lines owned by other nonretail parties.

Provisions of the 1999 Restructuring Legislation allow Oncor Electric Delivery to annually update its transmission rates to reflect changes in invested capital. These provisions encourage investment in the transmission system to help ensure reliability and efficiency by allowing for timely recovery of and return on new transmission investments.

Oncor Electric Delivery's transmission facilities include 4,680 circuit miles of 345-kV transmission lines and 9,684 circuit miles of 138- and 69-kV transmission lines. In 2006, 198 circuit miles of new 345-kV transmission lines were constructed. Forty-five generating plants totaling 32,699 MW are directly connected to Oncor Electric Delivery's transmission system, and 710 distribution substations are served from Oncor Electric Delivery's transmission system.

158

EFIHMW00296640

Oncor Electric Delivery's transmission facilities have the following connections to other transmission grids in Texas:

| | Number of Interconnected Lines | | |
| --- | --- | --- | --- |
| Grid Connections | 345 kV | 138 kV | 69 kV |
| Centerpoint Energy Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 8 | — | — |
| American Electric Power Company, Inc.(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4 | 7 | 12 |
| Lower Colorado River Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6 | 20 | 3 |
| Texas Municipal Power Agency . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 8 | 9 | — |
| Texas New Mexico Power . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2 | 9 | 11 |
| Brazos Electric Power Cooperative . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4 | 94 | 21 |
| Rayburn Country Electric Cooperative . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 27 | 7 |
| City of Georgetown . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 2 | — |
| Other small systems operating wholly within Texas . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 10 | 3 |

(a)  One of the 345-kV lines is on asynchronous high voltage current connection with the Southwest Power Pool.

*Electricity Distribution.*  Oncor Electric Delivery's electricity distribution business is responsible for the overall safe and efficient operation of distribution facilities, including power delivery, power quality and system reliability. The Oncor Electric Delivery distribution system includes over 3 million points of delivery. The electricity distribution business consists of the ownership, management, construction, maintenance and operation of the distribution system within Oncor Electric Delivery's certificated service area. Over the past five years, the number of Oncor Electric Delivery's distribution system points of delivery served has been growing an average of 2% per year, adding approximately 43,000 points of delivery in 2006.

Oncor Electric Delivery's distribution system receives electricity from the transmission system through substations and distributes electricity to end-users and wholesale customers through approximately 3,000 distribution feeders.

The Oncor Electric Delivery distribution system consists of 56,102 miles of overhead primary conductors, 21,879 miles of overhead secondary and street light conductors, 14,578 miles of underground primary conductors and 9,114 miles of underground secondary and street light conductors. The majority of the distribution system operates at 25-kV and 12.5-kV.

*Customers.*  Oncor Electric Delivery's transmission customers consist of municipalities, electric cooperatives and other distribution companies. Oncor Electric Delivery's distribution customers consist of approximately 60 REPs in Oncor Electric Delivery's certificated service area, including TXU Energy. For the year ended December 31, 2006, distribution revenues from TCEH represented 52% of Oncor Electric Delivery's distribution revenues and 46% of Oncor Electric Delivery's total revenues. The retail customers who purchase and consume electricity delivered by Oncor Electric Delivery are free to choose their electricity supplier from REPs who compete for their business.

## Legal Proceedings

*Litigation*—Two putative class and derivative lawsuits and one derivative lawsuit were filed in the United States District Court, Northern District of Texas, Dallas Division in March 2007 against the directors of TXU Corp., TXU Corp., as a nominal defendant, and the Sponsors. On April 27, 2007, the Plaintiffs filed Amended Complaints asserting only derivative claims against the same defendants. The lawsuits seek to challenge and

159

Confidential

EFIHMW00296641

enjoin the Merger Agreement. The cases allege that the directors abused their ability to control and influence TXU Corp., committed gross mismanagement and violated various fiduciary duties by approving the Merger Agreement and the Sponsors aided and abetted that alleged conduct. The Plaintiffs contend that the directors violated fiduciary duties owed to shareholders by failing to maximize the value of TXU Corp. and by breaching duties of loyalty and due care by not taking adequate measures to ensure that the interests of shareholders were properly protected. The Merger Agreement allowed TXU Corp. to solicit other proposals from third parties until April 16, 2007 and the transaction was subject to the approval of TXU Corp.'s shareholders, which was obtained at the annual meeting of shareholders on September 7, 2007. Accordingly, TXU Corp. and its directors filed Motions to Dismiss based on the Plaintiffs' failure to comply with the provisions of the Texas Business Organizations Code ("TBOC") applicable to filing and pursuing derivative proceedings. The Motions are pending before the Court.

In February and March 2007, three derivative lawsuits were filed in Dallas County state district courts arising out of the Merger Agreement. The suits, filed by putative shareholders, allege that TXU Corp.'s directors, named as defendants, breached fiduciary duties owed TXU Corp. by approving the Merger Agreement. The petitions, now consolidated into one action in the 44th District Court, Dallas County, Texas, include claims that the defendants failed to ensure that the transaction was in the best interest of TXU Corp.; that the directors participated in a transaction where their loyalties were divided and where they were to receive a personal financial benefit; that such alleged conduct constituted a breach of their duties of care, loyalty, good faith, candor and independence owed to TXU Corp.; and that the Sponsors aided and abetted the alleged breaches of fiduciary duties by the directors. TXU Corp. believes that the Plaintiffs failed to comply with provisions of the Texas Business Organizations Code applicable to filing and pursuing derivative proceedings and thus have filed a Motion to Dismiss that is pending before the Court. Additionally, TXU Corp. has filed a Written Statement with the Court advising that, pursuant to the Texas Business Organizations Code, a Derivative Demand Committee of independent and disinterested members of TXU Corp.'s board of directors has been formed and is engaged in the active review, in good faith, of the allegations in the consolidated derivative lawsuits. Consequently, TXU Corp. has requested that the Court enforce the automatic and mandatory stay of the proceedings as provided in the Texas Business Organizations Code until the Derivative Demand Committee has completed its review. On May 16, 2007, the parties agreed to stay the consolidated derivative proceeding pending the Derivative Demand Committee's review of Plaintiffs' claims in that proceeding. On May 18, 2007, the Court entered an order staying the action in accordance with Section 21.555 of the TBOC. On July 18, 2007, TXU Corp. filed a Written Statement pursuant to TBOC Section 21.555(c) and an Application for Additional Stay informing the District Court that the Derivative Demand Committee was continuing its active review, in good faith, of the allegations set forth in the derivative lawsuits and accordingly requested an extension of the order staying the action through August 31, 2007. The Court has not yet ruled upon the Written Statement and Application.

In February and March 2007 eight lawsuits were filed in state district court in Dallas County, Texas by putative shareholders against the directors of TXU Corp., TXU Corp., the Sponsors, and certain financial entities, asserting claims on behalf of owners of shares of TXU Corp. common stock as well as seeking to certify a class action on behalf of allegedly similarly situated shareholders. The lawsuits, which have been consolidated into one action in the 44th District Court, Dallas County, Texas, contend that the directors of TXU Corp. violated various fiduciary duties owed plaintiffs and other shareholders in connection with the execution of the Merger Agreement and that the Sponsors and certain financial entities aided and abetted the alleged breaches of fiduciary duties by the directors. Plaintiffs seek to enjoin defendants from consummating the Merger Agreement until such time as a procedure or process is adopted to obtain the highest possible price for shareholders, as well as a request that the Court direct the officers and directors of TXU Corp. to exercise their fiduciary duties in order to obtain a transaction in the best interest of TXU corp. shareholders. The consolidated suit includes claims that the directors failed to take steps to properly value or maximize the value of TXU Corp. and breached their duties of loyalty, good faith, candor and independence owed to TXU Corp. shareholders. The Merger Agreement allowed TXU Corp. to solicit other proposals from third parties until April 16, 2007 and was subject to the approval of TXU Corp.'s shareholders, which was obtained at the annual meeting of shareholders on September 7, 2007. The consolidated suit purports to assert claims by shareholders directly against the directors. TXU Corp. believes that

160

EFIHMW00296642

Texas law does not recognize such a cause of action. Consequently, TXU Corp. and its directors have filed a Motion to Dismiss. On May 25, 2007, the Court granted the Motion and dismissed the consolidated putative class action suit with prejudice. On May 31, 2007, Plaintiffs moved for reconsideration of the May 25 Order dismissing the action; however, Plaintiffs subsequently withdrew this motion.

On July 19, 2007, a putative class action lawsuit was filed in the United States District Court, Northern District of Texas, Dallas Division by a putative shareholder against TXU Corp. and its directors asserting a claim under Section 14(a) of the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder, asserting that the preliminary proxy statement of TXU Corp. filed June 14, 2007 fails to adequately describe the relevant facts and circumstances regarding the Merger as well as seeking to certify the litigation as a class action on behalf of allegedly similarly situated shareholders. TXU Corp. has not yet responded to this litigation and, as described below, on July 23, 2007, the Sponsors, joined by TXU Corp. for the limited purpose described below, have entered into a memorandum of understanding with plaintiffs that would result in the dismissal of this litigation if the settlement is approved by the courts. In the event that TXU Corp. is required to respond to this litigation, TXU Corp. will file a Motion to Dismiss based on the fact that this proxy statement clearly and accurately describes the information regarding the Merger and the information necessary for a shareholder to evaluate the proposal to approve the Merger Agreement. TXU believes the claims made in this litigation are without merit and, therefore, if necessary, TXU Corp. intends to vigorously defend this litigation.

On July 23, 2007, the Sponsors, joined by TXU Corp. for the limited purpose described below, executed a memorandum of understanding with the plaintiffs in certain of the lawsuits described above pursuant to which, if approved by the court in which the litigation is pending, to the extent required, all of the litigation related to the Merger will be dismissed with prejudice. Neither TXU Corp. nor any of its directors agreed to fund any payment or pay any other consideration under the settlement. TXU Corp. did agree to make certain revisions to the final proxy statement as part of the agreement between the Sponsors and the plaintiffs to settle the litigation and agreed that under certain circumstances the termination fee payable by TXU Corp. under the Merger Agreement would be $925 million rather than $1 billion. The settlement of the litigation, subject to court approval, will result in a dismissal of all claims against TXU Corp. and its officers and directors related to the Merger.

On December 1, 2006, a lawsuit was filed in the United States District Court for the Western District of Texas against TXU Generation Company, LP, Oak Grove Management Company LLC and TXU Corp. The complaint seeks declaratory and injunctive relief, as well as the assessment of civil penalties, with respect to the permit application for the construction and operation of the Oak Grove generation plant in Robertson County, Texas. The plaintiffs allege violations of the federal Clean Air Act, Texas Health and Safety Code and Texas Administrative Code and seek to temporarily and permanently enjoin the construction and operation of the Oak Grove generation plant. The complaint also asserts that the permit application was deficient in failing to comply with various modeling and analyses requirements relative to the impact of emissions on the environment. Plaintiffs further request that the court enter an order requiring the defendants to take other appropriate actions to remedy, mitigate and offset alleged harm to the public health and environment. TXU believes the Oak Grove air permit, granted by the TCEQ, is protective of the environment and that the application for and the processing of the air permit by Oak Grove Management Company LLC with the TCEQ has been in accordance with law. The plaintiffs' complaint was dismissed by the Federal District Court on May 21, 2007 in response to TXU Corp.'s Motion to Dismiss, and the matter is now on appeal to the Court of Appeals for the Fifth Circuit. TXU believes that the claims made in this complaint are without merit and, accordingly, intends to vigorously defend this appeal.

On September 6, 2005 a lawsuit was filed in the U.S. District Court for the Northern District of Texas, Dallas Division against TXU and C. John Wilder. The plaintiffs' amended complaint asserts claims on behalf of the plaintiffs and a putative class of owners of certain TXU Corp. securities who tendered such securities in connection with a tender offer conducted by TXU Corp. in 2004. The amended complaint alleges violations of the provisions of Sections 14(e), 10(b) and 20(a) of the Securities Exchange Act of 1934, as amended, and Rule 10b-5 thereunder. The allegations relate to a tender offer conducted in September and October 2004 for certain

161

equity-linked securities in which it was expressly disclosed that TXU management was evaluating whether it should recommend to the board of directors that the board reevaluate TXU Corp.'s dividend policy. After the tender offer was closed, and consistent with the disclosure, management did make a recommendation to the board to reevaluate the dividend policy and the board elected to increase the quarterly dividend. The plaintiffs contend that such disclosure in connection with the tender offer was inadequate. TXU maintains that the disclosure provided in connection with the tender offer regarding the evaluation of the dividend policy was complete and accurate at the time the tender offer was initiated as well as when it was closed. A Motion to Dismiss was filed by the defendants, and the District Court entered an order granting the Motion to Dismiss and dismissing this litigation with prejudice on August 30, 2006. The plaintiffs filed a timely notice of appeal and the matter is now before the U.S. Fifth Circuit Court of Appeals with briefing of the appeal and oral agreement completed. While TXU is unable to estimate any possible loss or predict the outcome of this litigation in the event the Fifth Circuit Court of Appeals reverses the District Court, TXU believes the claims made in this litigation are without merit and, accordingly, intends to vigorously defend this litigation, including the appeal of the District Court's order dismissing the complaint.

In November 2002, February 2003 and March 2003, three lawsuits were filed in the U.S. District Court for the Northern District of Texas, Dallas Division, asserting claims under the Employee Retirement Income Security Act ("ERISA") on behalf of a putative class of participants in and beneficiaries of various employee benefit plans of TXU Corp. These ERISA lawsuits were consolidated, and a consolidated complaint was filed in February 2004 against TXU Corp., the directors of TXU Corp. serving during the putative class period as well as certain officers of TXU who were the members of the TXU Thrift Plan Committee. The plaintiffs seek to represent a class of participants in such employee benefit plans during the period between April 26, 2001 and October 11, 2002. The plaintiffs filed an initial motion for class certification and, after class certification discovery was completed, the District Court denied plaintiffs' initial class certification motion without prejudice and granted plaintiffs' leave to amend their complaint. Plaintiffs' second class certification motion, filed on the basis of their amended complaint, was denied and the case was ordered dismissed without prejudice on September 29, 2005. The plaintiffs filed an appeal of the dismissal to the Fifth Circuit Court of Appeals. While on appeal, the matter was referred to the Fifth Circuit's alternative dispute resolution program and subsequently to mediation. While mediation was unsuccessful, further discussions led to an agreement in principle to settle this litigation on December 24, 2006 for $7.25 million, before attorney's fees, to be paid by TXU Corp. to the thrift plan pursuant a Court approved allocation. A Memorandum of Understanding confirming the agreement in principle was signed on January 24, 2007 and the settlement is in the process of being confirmed with final settlement documents after which the settlement will be submitted to the District Court for approval. TXU believes the claims are without merit and, in the event the settlement is not approved, intends to vigorously defend the lawsuit, including the appeal. TXU Corp. is, however, unable to estimate any possible loss or predict the outcome of this action in the event the District Circuit rejects the settlement, the Fifth Circuit reverses the dismissal and remands the case to the District Court or the suit is refiled by the plaintiffs or others seeking to assert similar claims.

In addition to the above, TXU Corp. and its subsidiaries is involved in various other legal and administrative proceedings in the normal course of business the ultimate resolution of which, in the opinion of management, should not have a material effect on its financial position, results of operations or cash flows.

*Regulatory Investigations*—In October 2006, Luminant Energy was notified that the PUCT had begun an informal investigation of its 2005 activities in the ERCOT wholesale electricity market as a result of observations noted in the 2005 State of the Market Report for the *ERCOT Wholesale Electricity Markets* performed by Potomac Economics, an economic consulting firm. The investigation was focused on activities involving bids to sell balancing energy and generation unit commitments. Balancing energy represents approximately five to ten percent of the total energy sold in the ERCOT wholesale market. Luminant Energy has cooperated fully with the PUCT in its informal investigation.

In March 2007, the PUCT issued a Notice of Violation ("NOV") stating that the PUCT staff is recommending an enforcement action, including the assessment of administrative penalties, against TXU and

Confidential

certain affiliates for alleged market power abuse by its power generation affiliates and Luminant Energy in ERCOT-administered balancing energy auctions during certain periods of the summer of 2005. The PUCT staff issued a revised NOV in September 2007, in which the proposed administrative penalty amount was reduced from $210 million to $171 million. The revised NOV was necessary, according to the PUCT staff, to correct calculation errors in the initial NOV. As revised, the NOV is premised upon the PUCT staff's allegation that TXU Portfolio Management's bidding behavior was not competitive and increased market participants' costs of balancing energy by approximately $57 million, including approximately $19 million in incremental revenues to TXU. A hearing requested by Luminant Energy to contest the alleged occurrence of a violation and the amount of the penalty in the NOV has been scheduled to start in April 2008. TXU believes Luminant Energy's conduct during the period in question was consistent with the PUCT's rules and policies, and no market power abuse was committed. TXU Corp. is vigorously contesting the NOV. TXU Corp. is unable to predict the outcome of this matter.

TXU and Luminant Energy have taken actions to reduce the risk of future similar allegations related to the balancing energy segment of the ERCOT wholesale market, including working with the PUCT staff and the PUCT's independent market monitor to develop a voluntary mitigation plan for approval by the PUCT. Luminant Energy has submitted a voluntary mitigation plan that was approved by the PUCT in July 2007.

The PUCT staff had been investigating TXU Energy with respect to the renewal process for certain small and medium business customers on term service plans. The investigation did not involve residential customers. In June 2007, TXU Energy reached a settlement agreement with the Staff of the PUCT that was approved by the PUCT in July 2007. While TXU Energy expressly denies any violations of rules, it has agreed to pay the PUCT a $5 million settlement as a compromise in this dispute.

In addition to the above, TXU is involved in various other regulatory investigations in the normal course of business the ultimate resolution of which, in the opinion of management, should not have a material effect on its financial position, results of operations or cash flows.

**Environmental Regulations and Related Considerations**

*Climate Change and Carbon Dioxide.* Luminant's baseload lignite coal-fueled power plants are significant sources of carbon dioxide ("$CO_2$") emissions. The three new lignite coal-fueled units being developed will generate additional $CO_2$ emissions. TXU participates in a voluntary electric utility industry sector climate change initiative in partnership with the U.S. Department of Energy. This initiative supports the Bush Administration's greenhouse gas emissions intensity reduction program, Climate VISION. In addition, TXU continues to participate in a voluntary greenhouse gas emission reduction program under the Energy Policy Act of 1992 and since 1995 has reported the results of its program annually to the U.S. Department of Energy.

In conjunction with the Merger agreement, TXU announced its commitment to reduce $CO_2$ emissions and intent to join the U.S. Climate Action Partnership ("USCAP"), which is a broad-based group of businesses and leading environmental groups organized to work with the President, the Congress and all other stakeholders to enact environmentally effective and economically sustainable climate change programs. $CO_2$ is the principal greenhouse gas that TXU emits. As part of its support of USCAP, TXU is also pledging to support a mandatory cap and trade program to reduce $CO_2$ emissions.

TXU's approach to addressing global climate change is based upon the following principles:

- Climate change is a global issue requiring a comprehensive solution addressing all greenhouse gases, sources and economic sectors in all countries;

- Development of U.S. energy and environmental policy should seek to ensure U.S. energy security and independence;

163

Confidential

EFIHMW00296645

- Solutions should encourage investment in a diverse supply of new generation to meet U.S. needs to maintain adequate reserve margins and support economic growth, as well as address customer's needs for affordable and reliable energy;

- Policies should encourage significant investments in research and development and deployment of a broad spectrum of solutions, including energy efficiency, renewable energy and coal, natural gas and nuclear-fueled generation technologies; and

- Any mandate to reduce greenhouse gas emissions should be developed under a market-based framework that is consistent with expected technology development timelines and supports the displacement of old, inefficient power generation technology with advanced, more efficient technology.

TXU's strategies for lowering greenhouse gas emissions include:

- Investing in technology—TXU expects to invest up to $2 billion over the next five to seven years for the development and commercialization of cleaner power plant technologies, including integrated gasification combined cycle, the next generation of more efficient ultra-supercritical coal and pulverized coal emissions technology to reduce $CO_2$ emission intensity. A number of actions, including research and development investments and partnerships, have already been initiated to advance next-generation technologies.

- Providing electricity from renewable sources—TXU intends to become a leader in providing electricity from renewable sources by more than doubling its purchases of wind power to more than 1,500 MW. TXU also intends to promote solar power through solar/photovoltaic rebates.

- Committing to demand side management initiatives—TXU intends to invest $400 million over the next five years in programs designed to encourage customer electricity demand efficiencies.

- Reducing $CO_2$ emissions by increasing production efficiency—TXU expects to increase production efficiency of its existing generation facilities by up to 2 percent.

- Developing a nuclear generation facility—TXU plans to develop an application to file with the NRC for combined construction and operating licenses for up to 3,400 MW of new nuclear generation capacity at its Comanche Peak nuclear generation plant. TXU expects to submit the application in 2008. Nuclear generation is the lowest emission source of baseload generation available.

Increasing public concern and political pressure from local, regional, national and international bodies, may result in the passage of new laws mandating limits on greenhouse gas emissions. A series of reports by the Intergovernmental Panel on Climate Change earlier this year attracted considerable public attention and concern. Several bills addressing climate change have been introduced in the U.S. Congress and, in April 2007, the U.S. Supreme Court issued a decision ruling the EPA improperly declined to address $CO_2$ impacts in a rulemaking related to new motor vehicle emissions. While this decision is not directly applicable to power plant emissions, the reasoning of the decision could affect other regulatory programs that are. Various proposals in the U.S. Congress could require us to purchase offsets or allowances for some or all of our $CO_2$ emissions, or otherwise affect us based on the amount of $CO_2$ we generate. The impact on TXU of any future greenhouse gas regulation will depend in large part on the details of the requirements and the timetable for mandatory compliance. TXU continues to assess the financial and operational risks posed by possible future legislative changes pertaining to greenhouse gas emissions, but because these proposals are in the formative stages, TXU is unable to predict any future impacts on its financial condition and operations.

*Sulfur Dioxide, Nitrogen Oxide and Mercury Air Emissions.* The federal Clean Air Act includes provisions which, among other things, place limits on the SO2, NOx and mercury emissions produced by certain generation plants. In addition to the new source performance standards applicable to SO2 (associated with acid rain) and NOx (associated with ozone formulation), the Clean Air Act requires that fossil-fueled plants have sufficient SO2

164

EFIHMW00296646

emission allowances and meet certain NOx emission standards. TXU's generation plants meet the SO2 allowance requirements and NOx emission rates.

In 2005, the EPA issued a final rule to further reduce SO2 and NOx emissions from power plants. The SO2 and NOx reductions required under the Clean Air Interstate Rule ("CAIR") are based on a cap and trade approach (market-based) in which a cap is put on the total quantity of emissions allowed in 28 eastern states (including Texas), emitters are required to have allowances for each ton emitted, and emitters are allowed to trade emissions under the cap. The CAIR reductions are proposed to be phased in between 2009 and 2015.

Also in 2005, the EPA published a final rule requiring reductions of mercury emissions from coal-fueled generation plants. The Clean Air Mercury Rule ("CAMR") is based on a cap and trade approach on a nationwide basis. The mercury reductions are proposed to be phased in between 2010 and 2018.

SO2 reductions required under the proposed regional haze/visibility rule (or so-called BART rule) only apply to units built between 1962 and 1977. The reductions would be required on a unit-by-unit basis. The EPA provides the option for states to use CAIR to satisfy the BART reductions for electric generating units and Texas has chosen this option.

TXU expects that upon completion of its plan to develop three new lignite coal-fueled generation units in Texas, emissions of NOx, SO2 and mercury from its entire lignite coal-fueled generation fleet, including both the new and existing units, will be reduced by 20% from 2005 levels. This reduction is expected to be accomplished through the installation of emissions control equipment in both the new and existing units and fuel blending at some existing units. These efforts, which will involve incremental equipment investments, including up to $400 million at existing generation facilities, as well as additional costs for facility operations and maintenance in the future, will be coordinated with the CAIR, CAMR and BART rules for the most cost-effective compliance plan options.

The Clean Air Act also requires each state to monitor air quality for compliance with federal health standards. The standards for ozone are not being achieved in several areas of Texas. The TCEQ proposed new State Implementation Plan rules in December 2006 to deal with 8-hour ozone standards. These rules, if adopted, would require further NOx emission reductions from certain TXU facilities in the Dallas-Fort Worth area.

*Water.* The TCEQ and the EPA have jurisdiction over water discharges (including storm water) from facilities in Texas. Facilities of TXU Corp. are presently in compliance with applicable state and federal requirements relating to discharge of pollutants into water. TXU Corp. holds all required waste water discharge permits from the TCEQ for facilities in operation and has applied for or obtained necessary permits for facilities under construction. TXU believes it can satisfy the requirements necessary to obtain any required permits or renewals. Recent changes to federal rules pertaining to Spill Prevention, Control and Countermeasure Plans ("SPCC") for oil-filled electrical equipment and bulk storage facilities for oil will require updating of certain plants and facilities. TXU has determined that SPCC plans will be required for certain substations, work centers and distribution systems by July 1, 2009. The company is currently compiling data for development of these plans. Clean Water Act Section 316(b) regulations pertaining to existing water intake structures were published by the EPA in 2004. As prescribed in the regulations, TXU Corp. is implementing a monitoring program to determine the future actions that might need to be taken to comply with these regulations. The results of this program will determine the impact on TXU Corp., which cannot be predicted at this time.

Diversion, impoundment and withdrawal of water for cooling and other purposes are subject to the jurisdiction of the TCEQ and the EPA. TXU Corp. possesses all necessary permits for these activities from the TCEQ for its present operations. In January 2007, a federal court ruled against the EPA in a lawsuit brought by environmental groups challenging regulations governing cooling water intake structures at existing large power plants and, in July 2007, the EPA announced that it was suspending the rules pending further rulemaking. While

165

TXU did not anticipate a significant impact on its operations under the suspended existing rules, it cannot predict the impact of any new regulations.

*Radioactive Waste.* Under the federal Low-Level Radioactive Waste Policy Act of 1980, as amended, the State of Texas is required to provide, either on its own or jointly with other states in a compact, for the disposal of all low-level radioactive waste generated within the state. The State of Texas has agreed to a compact for a disposal facility that would be located in Texas. That compact was ratified by Congress and signed by the President in 1998. In 2003, the State of Texas enacted legislation allowing a private entity to be licensed to accept low-level radioactive waste for disposal, and in 2004 the State received a license application from such an entity for review. TXU intends to continue to ship low-level waste material off-site for as long as an alternative disposal site is available. Should existing off-site disposal become unavailable, the low-level waste material will be stored on-site. TXU's on-site storage capacity at the Comanche Peak plant is expected to be adequate until other off-site facilities become available. (See discussion under "—TCEH Operating Segment—Luminant Power—Nuclear Generation Assets" above.)

*Solid Waste, including Fly Ash Associated with Lignite/Coal-Fueled Generation.* Treatment, storage and disposal of solid waste and hazardous waste are regulated at the state level under the Texas Solid Waste Disposal Act and at the federal level under the Resource Conservation and Recovery Act of 1976, as amended, and the Toxic Substances Control Act. The EPA has issued regulations under the Resource Conservation and Recovery Act of 1976 and the Toxic Substances Control Act, and the TCEQ has issued regulations under the Texas Solid Waste Disposal Act applicable to facilities of TXU. TXU is in compliance with all applicable solid waste rules and regulations. In addition, TXU has registered solid waste disposal sites and has obtained or applied for permits required by such regulations.

*Environmental Capital Expenditures.* Capital expenditures for TXU's environmental projects totaled $48 million in 2006 and are expected to total approximately $111 million in 2007, exclusive of emissions control equipment investment planned as part of the three-unit Texas generation development program, which is expected to total up to $450 million over the construction period.

Confidential

EFIHMW00296648

## REGULATION AND RATES

**General**

### 2007 Texas Legislative Session

The Texas Legislature convened in its regular biennial session on January 9, 2007 and adjourned on May 28, 2007. The session was not a "sunset" session for the PUCT, so there was no requirement that the Legislature consider any electric industry-related bills. However, various measures pertaining to the electric industry were considered. The primary measures that were under consideration and would have materially affected TXU's businesses and potentially the Merger were ultimately not enacted. New PURA provisions were enacted that ensure the PUCT shall have authority to enforce commitments made in a filing under PURA Section 14.101 (such as the filing made by Texas Holdings and Oncor Electric Delivery on April 25, 2007).

**Luminant**

Luminant Power is an exempt wholesale generator under the Energy Policy Act of 2005 and is subject to the jurisdiction of the NRC with respect to its nuclear generation plant. NRC regulations govern the granting of licenses for the construction and operation of nuclear generation plants and subject such plants to continuing review and regulation. Luminant Energy holds a power marketer license from the FERC.

### Wholesale Market Design

In August 2003, the PUCT adopted a rule that, when implemented, will alter the wholesale market design in ERCOT. The rule requires ERCOT:

- to use a stakeholder process to develop a new wholesale market model;
- to operate a voluntary day-ahead energy market;
- to directly assign all congestion rents to the resources that caused the congestion;
- to use nodal energy prices for resources;
- to provide information for energy trading hubs by aggregating nodes;
- to use zonal prices for loads; and
- to provide congestion revenue rights (but not physical rights).

ERCOT currently has a zonal wholesale market structure consisting of four geographic zones. The proposed location-based congestion-management market is referred to as a "nodal" market because wholesale pricing would differ across the various locational nodes on the transmission grid. The implementation of a nodal market is being done in conjunction with transmission improvements designed to reduce current congestion. In March 2006, the PUCT approved a set of Nodal Protocols, which was filed by ERCOT and describes the operation of a wholesale nodal market, and set an implementation date of no later than January 1, 2009. In August 2006, the PUCT adopted an interim order approving ERCOT's application for a surcharge imposed on all Qualified Scheduling Entities in ERCOT (including subsidiaries of TCEH) for the purpose of financing 38% of ERCOT's expected nodal implementation costs. The interim surcharge took effect on October 1, 2006. On May 23, 2007, the PUCT adopted an order approving ERCOT's request for a final nodal-market-implementation surcharge and set the effective date for that surcharge as June 1, 2007. TXU expects that the annual impact of the final surcharge will be approximately $7 million to $8 million in additional expense. Although TXU does not expect our competitive position in the ERCOT market to be materially adversely affected by the proposed nodal wholesale market design, TXU is unable to predict the ultimate impact of the proposed nodal wholesale market design on its operations or financial results.

### Nuclear Decommissioning

Luminant Power's nuclear plant decommissioning costs are fully recoverable from Oncor Electric Delivery's distribution customers. Through December 31, 2001, decommissioning costs were recovered from

167

EFIHMW00296649

consumers based upon a 1992 site-specific study through rates placed in effect under TXU's January 1993 rate increase request. Effective January 1, 2002, decommissioning costs are recovered through a tariff charged to REPs by Oncor Electric Delivery based upon a 2000 redetermination of the 1997 site-specific study, adjusted for trust fund assets, as a component of delivery fees effective under TXU's 2001 Unbundled Cost of Service filing. In 2005, an updated study of the cost to decommission TXU's nuclear generating facility was completed by management and was filed with the PUCT in June 2005. The accompanying testimony concluded that no change to the nuclear decommissioning tariff was warranted at that time. In July 2005, the PUCT's Policy Development Division issued an order approving the decommissioning cost study and closing the docket.

### Regulatory Investigations

Please refer to the subsection titled "Legal Proceedings" under the section titled "Business" included elsewhere in this offering memorandum for a description of certain regulatory investigations.

## TXU Energy

### REP Certification Rulemaking

On March 30, 2007, the PUCT publicly requested comments on proposed revisions to its substantive rules governing the certification of REPs that, if ultimately approved, would 1) expand the types of transactions that would be considered to constitute the transfer of a REP certificate and 2) subject a REP to additional or different financial requirements if it serves more than one million residential customers in Texas and does not have its own investment grade credit rating. Under the PUCT's substantive rules, transfers of REP certificates require pre-approval by the PUCT, although the Texas Public Utility Regulatory Act does not expressly require any such pre-approval. Based upon public discussions by the PUCT Commissioners in an Open Meeting on September 13, 2007, TXU believes that it is unlikely that the PUCT will ultimately approve revisions that would expand the types of transactions that would be considered to constitute the transfer of a REP certificate (to, for example, include a transaction such as the Merger), although the Commissioners also discussed that once the Merger had concluded, the entity with the REP certificate would be subject to review under the PUCT's REP certification rules and that an investigation could be initiated to review whether or not the REP met the PUCT's requirements. In the event that the PUCT determined that the new REP did not meet the requirements for certification, the PUCT could revoke the REP certification, such that the REP could no longer do business in ERCOT. However, it is possible that the PUCT will approve changes to the minimum financial requirements that would increase the cost of doing business for TXU Energy Retail Company LLC. The PUCT Staff has scheduled a workshop on September 24, 2007 to discuss with interested stakeholders potential revisions to the rule, and the PUCT is expected to vote on any revisions by mid-October 2007. TXU is unable to predict with certainty whether the PUCT will adopt any amendments to its currently effective rules or what form any additional amendments might ultimately take.

### Regulatory Investigations

Please refer to the subsection titled "Legal Proceedings" under the section titled "Business" included elsewhere in this offering memorandum for a description of certain regulatory investigations.

## Oncor Electric Delivery

### General

Because its operations are wholly within Texas, Oncor Electric Delivery believes that it is not a public utility as defined in the Federal Power Act and has been advised by counsel that it is not subject to general regulation under such act.

The PUCT has original jurisdiction over transmission and distribution rates and services in unincorporated areas and in those municipalities that have ceded original jurisdiction to the PUCT and has exclusive appellate jurisdiction to review the rate and service orders and ordinances of municipalities. Generally, the PURA prohibits the collection of any rates or charges by a public utility (as defined by PURA) that does not have the prior approval of the appropriate regulatory authority (the PUCT or municipality with original jurisdiction).

At the state level, PURA, as amended, requires owners or operators of transmission facilities to provide open-access wholesale transmission services to third parties at rates and terms that are nondiscriminatory and

Confidential

comparable to the rates and terms of the utility's own use of its system. The PUCT has adopted rules implementing the state open-access requirements for utilities that are subject to the PUCT's jurisdiction over transmission services, such as Oncor Electric Delivery.

### Report Filed with the PUCT Regarding Merger

In April 2007, Oncor Electric Delivery and Texas Holdings (together, the "Applicants") filed a Joint Report and Application ("Report") with the PUCT pursuant to Section 14.101(b) of PURA and PUCT SUBST. R.25.75. Immediately following the Merger, Texas Holdings will own all or substantially all of the outstanding shares of TXU, and Oncor Electric Delivery will remain a direct or indirect wholly-owned subsidiary of TXU. This report contained commitments that would take effect upon the closing of the Merger. Such commitments include: maintenance of specified Oncor Electric Delivery debt-to-equity ratios, minimum Oncor Electric Delivery capital expenditure levels, increased spending on demand-side management/energy efficiency programs over the amount in Oncor Electric Delivery's rates, minimum five year continued majority ownership by the Sponsors and that Oncor Electric Delivery will not incur any indebtedness and will not guarantee or use its assets to secure any affiliate indebtedness incurred to finance the Merger.

Section 14.101(b) of PURA requires that a transaction involving the sale of more than 50% of the stock of a public utility be reported to the PUCT within a reasonable time subsequent to consummation of the transaction and that the PUCT shall determine whether the transaction is consistent with the public interest standards set out therein. Although the Merger does not involve the direct sale of public utility stock, the Applicants filed the Report pursuant to Section 14.101(b) of PURA as it relates to Oncor Electric Delivery. A procedural schedule has been adopted, with the Hearing on the Merits currently scheduled for October 9-12, 2007. The PUCT does not have authority to approve or reject the transaction.

### PUCT Request for Oncor Electric Delivery Rate Filing

At the request of the PUCT, the PUCT Staff filed a petition in March 2007 requesting that the PUCT order Oncor Electric Delivery to file a rate case based on a test year ending December 31, 2006. PUCT Staff stated that it would be advantageous to review Oncor Electric Delivery's costs prior to major ownership and organizational changes that TXU Corp. has announced in order to establish a baseline from which to assess any cost changes resulting from the announced changes. In April 2007, the PUCT issued an order requiring Oncor Electric Delivery to file a rate case based on a test year ending December 31, 2006. On August 28, 2007, Oncor Electric Delivery made the required filing, and the filing supports a rate increase of approximately $85 million over current rates subject to the original jurisdiction of the PUCT. However, Oncor Electric Delivery requested that the PUCT enter an order abating the proceeding, except that the PUCT convene a technical conference to consider a final order in this Docket No. 34040 that would include the following provisions: (i) the PUCT will take "no action" on Oncor Electric Delivery's proposed rate filing package and will enter an order confirming that Oncor Electric Delivery's current rates will remain in effect until otherwise changed by a final order of the PUCT or other appropriate jurisdictional authority; (ii) Oncor Electric Delivery will be required to file a system-wide rate case with the PUCT no later than July 1, 2008, based on a test year ended December 31, 2007, consistent with the Settlement Agreement between Oncor Electric Delivery and certain cities in its service territory; (iii) Oncor Electric Delivery will be required to file an Earnings Monitor Report ("EMR") with the PUCT no later than March 15, 2008, for calendar year 2007, and no later than March 15, 2009, for calendar year 2008, notwithstanding the pendency at the PUCT of this or any other Oncor Electric Delivery rate case; and (iv) the PUCT will enter an accounting order, or similar directive, providing that if Oncor Electric Delivery's 2008 or 2009 EMR filings demonstrate that Oncor Electric Delivery earned more than a 10.75% return on equity ("ROE") during the relevant period covered by the EMR filing, on a weather normalized basis, Oncor Electric Delivery will record a credit to the underrecovery balance in its insurance reserve, such that the additional expense would result in Oncor Electric Delivery's ROE for the relevant period being no higher than 10.75%.

### Transmission Rates

In order to recover increased affiliate and third-party transmission costs from REPs, Oncor Electric Delivery is allowed to request an update twice a year to the transmission cost recovery factor ("TCRF") component of its

Confidential

EFIHMW00296651

retail delivery rate charged to REPs. In January 2007, an application was filed to increase the TCRF, which was administratively approved on February 22, 2007 and became effective March 1, 2007. This increase is expected to increase annualized revenues by $14 million. In July 2007, an application was filed to increase the TCRF, which was approved administratively on August 23, 2007 and became effective September 1, 2007. This increase is expected to increase annualized revenues by $26 million and includes the $15 million of the wholesale transmission rate increase which is recoverable from REPs as described below.

In February 2007, Oncor Electric Delivery filed an application for an interim update of its wholesale transmission rate. The application was approved by the PUCT in April 2007 and the new rate went into effect immediately. Annualized revenues are expected to increase by approximately $38 million. Approximately $23 million of this increase is recoverable through transmission rates charged to wholesale customers, and the remaining $15 million is recoverable from REPs through the TCRF component of Oncor Electric Delivery's delivery rates charged to REPs.

### Competitive Renewable Energy Zones

In the first quarter of 2007, the PUCT initiated a docket to identify the transmission facilities necessary to interconnect future renewable energy generating facilities. As part of the docket, the PUCT considered which zones would contain the best renewable energy sources. On July 20, 2007, the PUCT voted to designate zones with generation potential of over 20,000 MW.

The PUCT also opened a project to evaluate potential transmission service providers that are interested in constructing the designated transmission facilities. In connection with this project, Oncor Electric Delivery indicated to the PUCT its interest in constructing any designated transmission facilities, particularly those within its traditional service territory and those that interconnect with Oncor Electric Delivery's transmission facilities.

The PUCT has not yet determined the desired capacity for any of the designated zones, the designated transmission facilities, or the transmission service providers that will construct the facilities. As such, Oncor Electric Delivery cannot predict the amount of transmission facilities in competitive renewable energy zones, if any, that it will construct.

### 2006 Cities Rate Settlement

In January 2006 Oncor Electric Delivery agreed with a steering committee representing 108 cities in Texas (the "Cities") to defer the filing of a system-wide rate case with the PUCT to no later than June 30, 2008 (based on a test year ending December 31, 2007), unless the Cities and Oncor Electric Delivery mutually agree that such a filing is unnecessary. Oncor Electric Delivery has extended the benefits of the agreement to 292 nonlitigant cities. Based on the final agreements, including the participation of the nonlitigant cities, expected payments to the cities are estimated to total approximately $70 million, including incremental franchise taxes.

This amount is being recognized in earnings over the period from May 2006 through June 2008. Payments under the agreement are expected to be made until new tariffs are effective, which based upon an assumed June 2008 rate case filing, is projected to be mid-2009. Payments under the agreement totaled $18 million in 2006 and are expected to total $30 million in 2007, $16 million in 2008 and $6 million in 2009. See Note 9 to the 2006 year-end Financial Statements.

### Advanced Meter Rulemaking

In 2005, the Texas Legislature passed legislation that authorized utilities to impose a surcharge to recover costs incurred in deploying advanced metering and meter information networks. Benefits of the advanced metering installation include improved safety, on-demand meter reading, enhanced outage identification and restoration and system monitoring of voltages. At December 31, 2006, Oncor Electric Delivery had installed approximately 285,000 advanced meters in its service territory and anticipates the installation of up to 600,000

170

Confidential

additional advanced meters in 2007, which would represent approximately 25% of the meters on the distribution system. Pursuant to the 2005 legislation, the PUCT conducted two rulemakings related to advance metering, and final rules have been adopted that set forth the technical standards for advanced metering and a process for seeking cost recovery. Oncor Electric Delivery is developing its deployment plan for advanced metering infrastructure and intends to file a surcharge request to seek recovery of investment costs incurred.

### *Reallocation of Stranded Cost Recovery*

PURA requires that to the extent statewide stranded costs, including regulatory assets, exceed $5 billion, any stranded costs in excess of $5 billion should to be reallocated among retail customer rate classes. The PUCT earlier determined that Oncor Electric Delivery's share of the excess could not be reallocated because of the Settlement Plan and related financing order, which resolved all allocation issues. In February 2007, the PUCT reversed its decision, subjecting Oncor Electric Delivery's allocation to further review by the State Office of Administrative Hearings. Any reallocation would not impact the total revenues collected by Oncor Electric Delivery, but rather rate classes partially shift the transition charges billed to REPs related to the securitization bonds from industrial and commercial to the residential rate classes. Oncor Electric Delivery believes that the initial decision was correct and cannot determine the ultimate outcome of this proceeding.

Confidential

EFIHMW00296653

**PX 001**
**Page 178 of 453**

## MANAGEMENT

Set forth in the chart below are our expected board members and TXU Corp.'s current executive officers, other than its chief executive officer who has indicated his intention to resign effective upon the consummation of the Merger. Other executive officers listed below may also not continue with our company after the consummation of the Merger.

| Name | Age[1] | Position(s) |
|------|------|-------------|
| David Bonderman | 64 | Director |
| Donald L. Evans | 61 | Director |
| Frederick M. Goltz | 36 | Director |
| James R. Huffines | 56 | Director |
| Scott Lebovitz | 32 | Director |
| Jeffrey Liaw | 30 | Director |
| Marc S. Lipschultz | 38 | Director |
| Michael MacDougall | 36 | Director |
| Lyndon L. Olson | 60 | Director |
| Kenneth Pontarelli | 37 | Director |
| William K. Reilly | 67 | Director |
| Jonathan D. Smidt | 34 | Director |
| William Young | 43 | Director |
| Kneeland Youngblood | 52 | Director |
| James A. Burke | 38 | Chairman of the Board, President and Chief Executive of TXU Energy |
| David A. Campbell | 39 | Executive Vice President and Chief Financial Officer of TXU Corp. |
| M. Rizwan Chand | 44 | Senior Vice President of TXU Corp. |
| Michael P. Childers | 46 | President and Chief Executive of Luminant Development |
| Charles R. Enze | 54 | President and Chief Executive of Luminant Construction |
| Michael Greene | 61 | Chairman of the Board, President and Chief Executive of Luminant Power |
| Michael T. McCall | 50 | Chairman of the Board, President and Chief Executive of Luminant Energy |
| David P. Poole | 45 | Executive Vice President and General Counsel of TXU Corp. |
| Jonathan A. Siegler | 35 | Vice President of Strategy, Mergers and Acquisition of TXU Business Services Company |

_____

(1)  As of September 1, 2007.

*David Bonderman* is a founder of TPG. Before forming TPG in 1992, Mr. Bonderman was Chief Operating Officer of the Robert M. Bass Group in Fort Worth, Texas. He serves as a director of Burger King, CoStar Group, Gemalto N.V., and Ryanair Holdings, of which he is Chairman. He also serves on the boards of the Wilderness Society, the Grand Canyon Trust, the World Wildlife Fund, the University of Washington Foundation, and the American Himalayan Foundation.

*Donald L. Evans* has been the CEO of the Financial Services Forum since 2005, after serving as the 34th secretary of the U.S. Department of Commerce. As Secretary of Commerce, he oversaw a diverse cabinet agency with some 40,000 workers and a $5.8 billion budget focused on promoting American business. Before serving in

172

EFIHMW00296654

the cabinet, Secretary Evans was the former CEO of Tom Brown, Inc., a large independent energy company. He formerly served as a member and chairman of the Board of Regents of the University of Texas. Secretary Evans also has served as an officer or board member for a number of civic and philanthropic organizations. He attended the University of Texas at Austin, receiving a B.S. degree in mechanical engineering in 1969 and an M.B.A. in 1973.

*Frederick M. Goltz* has been with KKR for 10 years. Mr. Goltz is one of the heads of KKR's Energy and Natural Resources industry team and leads KKR's efforts in the natural resources sector. He is a director of Accuride. He received a B.A., B.S., Magna Cum Laude, from the University of Pennsylvania, and an M.B.A. from INSEAD, Fontainebleau, France.

*James R. Huffines* is chairman of the University of Texas System Board of Regents, on which he has served since 2003. He also is Chairman, Central and South Texas, of PlainsCapital Bank in Austin, Executive Vice President of PlainsCapital Corporation, and a director of Hester Capital Mgmt., PlainsCapital Bank, and PlainsCapital Corp. He previously held senior management positions at Hester Capital Management, L.L.C., and Morgan Keegan & Co. Chairman Huffines also is a former Commissioner of the State of Texas Alcoholic Beverage Commission. He also has served as an officer or board member for a number of civic and philanthropic organizations. He earned a BBA degree in finance from the University of Texas at Austin in 1973 and attended Southwestern Graduate School of Banking at Southern Methodist University.

*Scott Lebovitz* is a Vice President of Goldman, Sachs & Co. in its Principal Investment Area. He joined Goldman, Sachs & Co. as Financial Analyst in 1997. He was promoted to Vice President in 2003. Mr. Lebovitz serves on the boards of Coffeyville Acquisition LLC and Village Voice Media, LLC. He received a B.S. degree from the University of Virginia.

*Jeffrey Liaw* is active in TPG's Energy and Industrial investing practice areas. Before joining TPG, he worked for Bain Capital in their Industrials practice. Mr. Liaw is a Phi Beta Kappa graduate of the University of Texas at Austin and received his M.B.A. with High Distinction from Harvard Business School where he was a Baker Scholar and a Siebel Scholar.

*Marc S. Lipschultz* has been with KKR for 12 years. He is one of the heads of KKR's Energy and Natural Resources industry team and leads KKR's efforts in the power sector. Currently, he is a director of Accel-KKR Company. He received an A.B., Honors and Distinction, Phi Beta Kappa, from Stanford University and an M.B.A. with High Distinction, Baker Scholar, from Harvard Business School.

*Michael MacDougall* is a leader of TPG's Energy and Industrial investing practice areas. He is a director of Altivity Packaging, Kraton Polymers, Aleris International, and the New York Opportunity Network. Mr. MacDougall is a graduate of the University of Texas at Austin and received his M.B.A. from Harvard Business School.

*Lyndon L. Olson* has been a Senior Advisor with Citigroup Inc. since 2002, after serving as United States Ambassador to Sweden from 1998 to 2001. He previously was affiliated with Citigroup from 1990 to 1998, as President and CEO of Travelers Insurance Holdings and the Associated Madison Companies, predecessor companies. Before joining Citigroup, he had been President of the National Group Corporation and CEO of its National Group Insurance Company. Ambassador Olson also is a former Chairman and a Member of the Texas State Board of Insurance, former President of the National Association of Insurance Commissioners, and a former member of the Texas House of Representatives. He also has served as an officer or board member for a number of civic and philanthropic organizations. Ambassador Olson is a graduate of Baylor University and attended Baylor Law School.

*Kenneth Pontarelli* is a Managing Director of Goldman, Sachs & Co. in its Principal Investment Area. He joined Goldman, Sachs & Co. as a Financial Analyst in 1992. Subsequently, he worked for Bain & Company,

173

EFIHMW00296655

Inc. before rejoining Goldman, Sachs & Co.'s Energy & Power Group as an Associate in 1997. He transferred to the Principal Investment Area in 1999 and was promoted to Managing Director in 2004 and to Partner in 2006. Mr. Pontarelli serves on the boards of Coffeyville Acquisition LLC, Cobalt International Energy, L.P., Horizon Wind Energy, and NextMedia Investors, LLC. He received a B.S. degree from Syracuse University and an M.B.A. from Harvard University.

*William K. Reilly* is a Senior Advisor to TPG and a founding partner of Aqua International Partners, an investment group that invests in companies that serve the water and renewable energy sectors, having previously served as the seventh Administrator of the U.S. Environmental Protection Agency. Mr. Reilly is a director of DuPont, Eden Springs, Ltd. of Israel, ConocoPhillips and Royal Caribbean International. Before serving as EPA Administrator, he was President of World Wildlife Fund and President of The Conservation Foundation. He previously served as Executive Director of the Rockefeller Task Force on Land Use and Urban Growth, a senior staff member of the President's Council on Environmental Quality, and Associate Director of the Urban Policy Center and the National Urban Coalition. Reilly has written and lectured extensively on environmental issues and is Co-Chairman of the National Commission on Energy Policy. He served in the U.S. Army to the rank of Captain. He also has served as an officer or board member for a number of civic and philanthropic organizations. An alumnus of Yale University, Mr. Reilly holds a law degree from Harvard University and a master's degree in urban planning from Columbia University.

*Jonathan D. Smidt* has been with KKR since 2000. He is a member of both the Energy and Natural Resources and the Consumer Products industry teams. Currently, he is a director of Laureate Education Inc. He holds a B.B.S. and a Postgraduate Diploma in Accounting from the University of Cape Town (South Africa).

*William Young* is Co-Head of the Goldman Sachs Infrastructure Investment Group. Mr. Young joined Goldman Sachs in 2001 as a Managing Director and Co-Head of the European Structured and Principal Finance Group. In 2002, Mr. Young was promoted to a Partner in the Financing Group, which includes all debt, derivative and equity capital markets activities for the Firm. Mr. Young became Co-Head of the Corporate and Acquisition Finance Group, which included the structured and leveraged finance businesses. Prior to joining Goldman Sachs, Mr. Young was with Citibank for 16 years, working in the Leveraged Finance and Work-Out Group and most recently running its European Securitisation Group. Mr. Young received a B.S. from Purdue University in 1987.

*Kneeland Youngblood* is founding partner of Pharos Capital Group, a private equity firm that focuses on providing growth and expansion capital to businesses in technology, business services, and health care services. He served six years on the board of trustees of the Teacher Retirement System of Texas, a $100+ billion pension fund to which he was appointed by Governor Ann Richards and confirmed by Governor George W. Bush, from 1993-1999. Mr. Youngblood is chairman of the American Beacon Funds, a $30 billion mutual fund company, managed by American Beacon Advisors, a $65 billion investment affiliate of American Airlines. He is a director of Starwood Hotels and Lodging. He also serves on the board of directors of Gap Inc. and the Burger King Corporation. He is a former director of the U.S. Enrichment Corporation, a global energy services company taken public in 1998 in a $1.4 billion initial public offering in the largest U.S. government privatization since Conrail. He served as a Presidential appointee with Senate confirmation in his role on the Board. Mr. Youngblood is a member of the Council on Foreign Relations and graduated from Princeton University in 1978 with an A.B. in Politics/Science in Human Affairs and earned an M.D. degree from the University of Texas, Southwestern Medical School in 1982.

*James A. Burke* has been Chairman of the Board, President and Chief Executive of TXU Energy since August 2005 and Executive Vice President of TCEH since July 2006. From 2004 to 2005, Mr. Burke was Senior Vice President Consumer Markets of TXU Energy. Prior to that time, Mr. Burke was President and Chief Operating Officer of Gexa Energy. Before that, Mr. Burke was Senior Vice President, Reliant Resources Incorporated.

174

*David A. Campbell* is Executive Vice President, Planning, Strategy and Risk and Acting Chief Financial Officer of TXU Corp. He has held the positions of Executive Vice President, Planning, Strategy and Risk of TXU Corp. since May 2004, has acted as our Chief Financial Officer since March 2006 and Executive Vice President of TCEH since September 2006. Prior to joining TXU, Mr. Campbell was a Principal of McKinsey & Company, Inc.

*M. Rizwan Chand* is Senior Vice President of TXU Corp. He has held the positions of Senior Vice President of TXU Corp. since August 2005 and Senior Vice President of TCEH, Oncor Electric Delivery and Oncor Electric Delivery Transition Bond Company, LLC since July 2005. Prior to July 2005, Mr. Chand was Vice President of Human Resources and Corporate Relations for Kennametal, Inc.

*Michael P. Childers* is President and Chief Executive of Luminant Development. He has held the positions of President and Chief Executive of Generation Development of Luminant Development since August 2006 and Executive Vice President and Chief Executive of Generation Development of TCEH since March 2006. From May 2006 to August 2006, Mr. Childers was President and Chief Executive Officer of Luminant Development. From 2005 to 2006, he was Senior Vice President of TXU Business Services and Senior Vice President of TCEH. Prior to that time, Mr. Childers was President of the Engineering, Construction and Maintenance Division and Executive Vice President for The Shaw Group. Prior to that time, he was President of Entergy Asset Management. Prior to that time, he was Chief Operating Officer of Entergy Wholesale Management Operations.

*Charles R. Enze* is President and Chief Executive of Luminant Construction. He has held the positions of President and Chief Executive of Generation Construction of Luminant Development since August 2006 and Executive Vice President and Chief Executive of Generation Construction of TXU Energy Holdings since June 2006. Prior to that time, Mr. Enze was Vice President of Engineering and Projects for Shell International Exploration & Production.

*Michael Greene* is Chairman of the Board, President, and Chief Executive of Luminant Power. He joined TXU as an engineer in 1969 and has served in a variety of senior positions. Mr. Greene is a director of the Electric Power Research Institute and past chairman of ERCOT and the NERC Stakeholder's Committee. He is an appointed member of the Texas Railroad Commission's Natural Gas Reliability Council and is a registered professional engineer in the State of Texas. Mr. Greene graduated from the University of Texas at Arlington with a bachelor's degree in mechanical engineering.

*Michael T. McCall* is Chairman of the Board, President and Chief Executive of Luminant Energy. He has held the positions of Chairman of the Board, President and Chief Executive of Luminant Wholesale since August 2005 and Executive Vice President of TCEH since April 2006. From 2004 to 2005, Mr. McCall was Senior Vice President of Luminant Power. From 2003 to 2004, he was President of TXU Gas. From 1999 to 2003, he was Vice President of TXU Business Services Company.

*David P. Poole* is Executive Vice President and General Counsel of TXU Corp. He has held the positions of Executive Vice President and General Counsel of TXU Corp. since March 2006 and Executive Vice President of TCEH since September 2006. From January 2005 to September 2006, Mr. Poole was Senior Vice President and Chief Legal Officer of Luminant Power. From January 2005 to May 2005, he was Senior Vice President of TXU Corp. From July 2004 to March 2005, Mr. Poole was Senior Vice President of TXU Business Services Company. From May 2004 to July 2004, he was Vice President and Associate General Counsel of TXU Business Services Company. Prior to that time, Mr. Poole was Managing partner of the Dallas office of Hunton & Williams LLP.

*Jonathan A. Siegler* is Vice President of Strategy, Mergers and Acquisition of TXU Business Services Company. He has held the position of Vice President of Strategy, Mergers and Acquisition of TXU Business Services Company since August 2004. Prior to that time, Mr. Siegler was Engagement Manager for McKinsey & Company. Prior to that time, he was a Lieutenant in the U.S. Navy.

175

EFIHMW00296657

**Executive Compensation**

We expect that our Board will consider adopting executive compensation plans that will link compensation with performance. We will continually review our executive compensation programs to ensure that they are competitive.

**Employment Agreements**

In connection with the Merger, we may enter into new employment agreements and/or amend existing employment agreements with some of TXU Corp.'s existing executive officers on terms to be agreed between us and those persons.

176

Confidential

EFIHMW00296658

## PRINCIPAL STOCKHOLDERS

Following the consummation of the Merger, substantially all of the capital stock of TXU Corp. will be held indirectly by the Sponsors and the Investors. At such time, the Sponsors will own approximately         % of the partnership interests of Texas Holdings, the direct parent company of TXU Corp. Members of the board of directors of TXU Corp. or managers of Texas Holdings affiliated with each of the Sponsors may be deemed to beneficially own shares owned by such entities or their associated investment funds. Each such individual disclaims beneficial ownership of any such shares in which such individual does not have a pecuniary interest.

177

Confidential

EFIHMW00296659

**PX 001**
**Page 184 of 453**

## CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS

**Texas Holdings Limited Partnership Agreement**

Immediately prior to the closing of the Merger, the Sponsors and the Investors and/or their assignees will contribute equity to Texas Holdings in exchange for limited partnership interests in Texas Holdings and will enter into a limited partnership agreement with Texas Holdings. Certain other third party investors are expected contribute equity to Texas Holdings through intermediate investment vehicles, some of which will be controlled by the Sponsors. The limited partnership agreement will contain agreements among the parties with respect to restrictions on the issuance or transfer of interests, other special corporate governance provisions (including the right to approve various corporate actions) and registration rights (including customary indemnification provisions).

**Sponsor Management Agreement**

In connection with consummation of the Merger, we will enter into a management agreement with affiliates of the Sponsors pursuant to which such entities or their affiliates will provide management services to us. Pursuant to such agreement, we currently anticipate that we will pay an aggregate annual management fee of $35.0 million, which amount is expected to increase annually by 2.0% and will reimburse out-of-pocket expenses incurred in connection with the provision of services pursuant to the agreement. In addition, pursuant to such agreement, we will also pay an aggregate transaction fee of approximately $300.0 million in connection with services provided by such entities in connection with the Merger and fees of approximately 1.0% of the transaction value of any subsequent financing, acquisition, disposition or change of control transaction, as well as a termination fee based on the net present value of future payment obligations under the management agreement, in the event of an initial public offering or under certain other circumstances. The agreement also will include customary exculpation and indemnification provisions in favor of the Sponsors and their affiliates.

**Other Relationships**

Over the last fiscal year, there have been no reportable transactions with related persons.

178

EFIHMW00296660

## DESCRIPTION OF OTHER INDEBTEDNESS

**Financing in Connection with the Merger**

**TCEH Senior Secured Facilities**

*Overview*

In connection with the Merger, we will enter into the TCEH Senior Secured Facilities, which are expected to be comprised of (i) the TCEH Initial Term Loan Facility, (ii) the TCEH Delayed Draw Term Loan Facility, (iii) the TCEH Letter of Credit Facility, (iv) the TCEH Revolving Facility, of which up to an amount to be agreed will be available in the form of (A) letters of credit and (B) swingline loans, and (v) the TCEH Commodity Collateral Posting Facility. In addition, subject to the satisfaction of certain conditions, TCEH may add one or more incremental term loan facilities, incremental letter of credit facilities and/or increase the commitments under the TCEH Revolving Facility in an aggregate principal amount up to $2.5 billion and/or add one or more incremental cash posting facilities. The TCEH Initial Term Loan Facility will be used to finance the Merger, the Merger Funds and the Capex Uses. The TCEH Delayed Draw Term Loan Facility will be used by TCEH and its subsidiaries during the two year period commencing on the closing date to fund, together with the Luminant Development Closing Date Amount portion of the TCEH Initial Term Loan, the construction, engineering, design, improvement, testing, start-up, retesting, operation, repair, maintenance and development costs and other capital expenditures (including environmental capital expenditures), interest during construction and related fees and expenses in connection with Luminant's new build program. The letters of credit under the TCEH Letter of Credit Facility will be used by TCEH and its subsidiaries for general corporate purposes (including, providing collateral support in respect of commodity hedging arrangements and other commodity transactions, including, commodity hedging arrangements and other commodity transactions related to TCEH's and its subsidiaries' wholesale business operations and activities). The TCEH Revolving Facility will be used by TCEH and its subsidiaries for working capital and for other general corporate purposes (including, but not limited to, the financing of permitted acquisitions and the provision of collateral support in respect of commodity hedging arrangements and other commodity transactions, including for the avoidance of doubt, commodity hedging arrangements and other commodity transactions related to the TCEH's and its subsidiaries' wholesale business operations and activities). The proceeds of drawings under the TCEH Commodity Collateral Posting Facility will be used by TCEH or any of its subsidiaries for general corporate purposes or to provide collateral support in respect of any over-the-counter or exchange-cleared natural gas fixed-for-floating swap transactions settling against the closing price on the last trading day of the New York Exchange Natural Gas Henry Hub Futures Contract and New York Mercantile Exchange Natural Gas Henry Hub Futures Contract positions executed by TCEH and/or any of its subsidiaries and under which TCEH (or such subsidiary) shall be the "floating price" payor (or have an equivalent position).

The TCEH Senior Secured Facilities (other than the TXU Energy Commodity Collateral Posting Facility) will be entered into with Citigroup, CS Securities, JPMSI, GSCP, LBI and MSSF as joint lead arrangers and joint lead bookrunners, Citigroup as sole and exclusive administrative agent and collateral agent, JPMBC as syndication agent and CS Securities, GSCP, the Lehman Lenders and MSSF. as co-documentation agents. The TCEH Commodity Collateral Posting Facility will be entered into with GSCP (or an affiliate thereof) as sole lead arranger, sole bookrunner, Posting Entity and Calculation Agent.

*Interest Rates and Fees*

Loans under the TCEH Senior Secured Facilities (other than the TCEH Commodity Collateral Posting Facility) are expected to bear interest at per annum rates equal to, at our option, (i) Adjusted LIBOR plus 2.50% or (ii) a base rate (the higher of (1) the prime rate of Citigroup and (2) the federal funds effective rate plus 0.50%) plus 1.50%. There is a margin adjustment mechanism in relation to term loans, revolving loans and letters of credit commencing after delivery of the financial statements for the first full fiscal quarter ending after

179

EFIHMW00296661

the closing date, under which the applicable margins may be reduced based on leverage ratio targets to be determined.

Loans under the TCEH Commodity Collateral Posting Facility are expected to bear interest at rates per annum equal to Adjusted LIBOR plus the actual stated interest rate spread over Adjusted LIBOR for the TCEH Initial Term Loan Facility and TCEH Delayed Draw Term Loan Facility as of the closing date, less 0.50%.

A commitment fee is expected to be payable quarterly in arrears and upon termination at a rate per annum equal to 0.50% of the average daily unused portion of the TCEH Revolving Facility. The commitment fee will be subject to reduction, commencing after delivery of the financial statements for the first full fiscal quarter ending after the closing date, based on leverage ratio targets to be determined.

A commitment fee is expected to be payable quarterly in arrears and upon termination on the undrawn portion of the commitments in respect of the TCEH Delayed Draw Term Loan Facility at a rate per annum equal to, prior to the first anniversary of the closing date, 1.00% per annum, and thereafter, 1.25% per annum.

Letter of credit fees under the TCEH Revolving Facility are expected to be payable quarterly in arrears and upon termination at a rate per annum equal to the spread over Adjusted LIBOR under the TCEH Revolving Facility, less the issuing bank's fronting fee.

A maintenance fee is expected to be payable quarterly in arrears and upon termination in respect of the TCEH Commodity Collateral Posting Facility at a rate per annum equal 0.30% on $3.3 billion, regardless of whether any amounts under the TCEH Commodity Collateral Posting Facility are outstanding.

### Guarantees and Security

*Guarantee.* The TCEH Senior Secured Facilities are expected to be unconditionally guaranteed jointly and severally on a senior secured basis, by US Holdings, TCEH and each existing and subsequently acquired or organized direct or indirect wholly-owned U.S. restricted subsidiary of TCEH (other than certain immaterial subsidiaries and other subsidiaries to be agreed upon), subject to certain other exceptions.

*Security.* The TCEH Senior Secured Facilities, including the guarantees thereof and certain commodity and other hedging and trading transactions, are expected to be secured by (a) substantially all of the assets of US Holdings, TCEH and TCEH's subsidiaries who are guarantors of such facilities as described above, subject to certain other exceptions, and (b) a pledge of the capital stock of TCEH and a pledge of the capital stock of each material wholly-owned restricted subsidiary of TCEH directly owned by TCEH or any guarantor (limited in the case of pledges of capital stock of any foreign subsidiaries, to 65% of the capital stock of any first-tier material foreign subsidiary). The Arranger Group has agreed that certain other assets shall not be required for the purpose of securing such obligations.

### Covenants

The TCEH Senior Secured Facilities are not expected to contain any financial maintenance covenants and are expected to contain customary negative covenants, restricting, subject to certain exceptions, US Holdings, TCEH and TCEH's restricted subsidiaries from, among other things, (i) incurring additional debt; (ii) incurring additional liens, (iii) entering into mergers and consolidations, (iv) sales of assets, (v) dividends, redemptions or other distributions in respect of capital stock, (vi) acquisitions, investments, loans and advances and (vii) payments and modifications of certain subordinated and other material debt.

In addition, the TCEH Senior Secured Facilities are expected to require that US Holdings, TCEH and their restricted subsidiaries observe certain customary reporting requirements and other affirmative covenants.

180

EFIHMW00296662

*Maturity and Amortization*

The TCEH Initial Term Loan Facility is expected to be required to be repaid in equal quarterly installments in an aggregate annual amount equal to 1% of the original principal amount of such facility, with the balance payable on the date which is seven years following the closing date. The TCEH Delayed Draw Term Facility is expected to be required to be repaid in equal quarterly installments beginning on the last day of the first fiscal quarter to occur after the second anniversary of the closing date (the "First DD Amortization Payment Date") in an aggregate annual amount equal to 1% of the actual principal outstanding under the TCEH Delayed Draw Term Loan Facility as of the First DD Amortization Payment Date, with the balance payable on the date which is seven years following the closing date. Amounts borrowed under the TCEH Energy Revolving Facility may be reborrowed from time to time from and after the closing date until the date that is the sixth anniversary thereof. The TCEH Letter of Credit Facility is expected to mature on the seventh anniversary of the closing date. The TCEH Commodity Collateral Posting Facility is expected to mature on December 31, 2012.

*Events of Default*

The TCEH Senior Secured Facilities are expected to contain certain customary events of default for senior leveraged acquisition financings the occurrence of which would allow the lenders to accelerate all outstanding loans and terminate their commitments.

**TXU Receivables Facility**

The TXU Receivables Facility is expected to be a commercial paper-backed accounts receivables facility to be obtained by TXU Receivables, which is to be used to refinance, replace or amend TXU Receivables Company's existing accounts receivables facility.

**TCEH Notes**

Concurrently with the offering of the notes hereby, a wholly owned subsidiary of the Issuer is offering the TCEH Notes. Following the consummation of the Merger, such subsidiary will merge into TCEH and TCEH, as the surviving company, will thereby assume all the obligations under, and become the issuer of, the TCEH Notes.

The indenture governing the TCEH Notes will limit US Holdings' and its subsidiaries' ability to:

• incur additional indebtedness;

• pay dividends on or make other distributions on or make other distributions or repurchase its capital stock;

• make certain investments;

• enter into certain types of transactions with affiliates; and

• sell certain assets or merge with or into other companies.

Subject to certain exceptions, the indenture governing the notes will permit TCEH and our restricted subsidiaries to incur additional indebtedness.

181

Confidential

EFIHMW00296663

**Existing Secured Indebtedness**

Upon the closing of the Merger, TXU Corp.'s subsidiaries will have outstanding approximately $1,409 million of secured debt, consisting primarily of the following:

- *US Holdings*

  - $78 million aggregate principal amount of US Holdings 7.460% Fixed Secured Facility Bonds with amortizing payments to 2015. In 1987, US Holdings entered into an operating lease arrangement for certain combustion turbine generating facilities. In March 2006, US Holdings purchased the owner participant interest in the lease and assumed $91 million aggregate principal amount of these bonds, which were issued to refinance the initial series of secured facility bonds that were issued in conjunction with the lease.

  - In 1990, US Holdings repurchased an electric cooperative's minority interest in the Comanche Peak nuclear generation plant and assumed payment of $174 million of the electric cooperative's indebtedness to the U.S. government. Pursuant to the assumption agreement, US Holdings makes principal and interest payments to the cooperative in an amount sufficient to allow the cooperative to make the required payments to the U.S. government. The debt is secured by a mortgage on the minority interest that was transferred to US Holdings and outstanding as follows:

    - $62 million aggregate principal amount of US Holdings 9.580% Fixed Notes due in semi-annual installments to December 2019; and

    - $58 million aggregate principal amount of US Holdings 8.254% Fixed Notes due in quarterly installments to December 2021.

- *TCEH*

  - $85.5 million capital lease—In August 2005, TCEH entered into a lease for a rail spur at the Big Brown generation plant. The capital lease refinanced an existing operating lease on the rail spur. An obligation of $95 million was reported as long-term debt.

  - $5 million capital lease for office furniture that expires in December 2012.

  In September, 2007, TCEH entered into a $52 million capital lease with High Ridge Leasing to refinance an operating lease of rail cars. An obligation of $52 million will be reported as long-term debt.

  - *TXU Properties*

  - $93 million aggregate principal amount of TXU Corp. 8.820% Building Financing due semiannually to 2022. On February 14, 2002, TXU Corp. sold its interest in its headquarters building in Dallas, Texas for $145 million. Simultaneous with the sale of the property, a subsidiary of TXU Corp. entered into a 20-year lease for the property and TXU Corp. recorded the transaction as a financing and reported long-term debt of $145 million.

  - *Oncor Electric Delivery Transition Bond Company Senior Notes and Debentures*

  A regulatory financing order finalized in January 2003 authorized the issuance of transition bonds with a principal amount of $1.3 billion to recover regulatory asset stranded costs and other qualified costs. Oncor Electric Delivery Transition Bond Company, a bankruptcy-remote financing subsidiary of Oncor Electric Delivery, issued $500 million principal amount of transition bonds in August 2003 and the remaining $790 million in June 2004. Amounts to service the principal and interest on the bonds are recovered from REPs by Oncor Electric Delivery through a distribution fee surcharge.

182

Confidential

Upon the closing of the Merger, Oncor Electric Delivery Transition Bond Company will have outstanding $1,026 million aggregate principal amount of these transition bonds consisting of the following series:

a) $109 million aggregate principal amount of Oncor Electric Delivery Transition Bond Company LLC 4.030% Fixed Series 2003 Bonds due in 2010;

b) $130 million aggregate principal amount of Oncor Electric Delivery Transition Bond Company LLC 4.950% Fixed Series 2003 Bonds due in 2013;

c) $145 million aggregate principal amount of Oncor Electric Delivery Transition Bond Company LLC 5.420% Fixed Series 2003 Bonds due in 2015;

d) $131 million aggregate principal amount of Oncor Electric Delivery Transition Bond Company LLC 3.520% Fixed Series 2004 Bonds due in 2009;

e) $221 million aggregate principal amount of Oncor Electric Delivery Transition Bond Company LLC 4.810% Fixed Series 2004 Bonds due in 2012; and

f) $289 million aggregate principal amount of Oncor Electric Delivery Transition Bond Company LLC 5.290% Fixed Series 2004 Bonds due in 2016.

## Oncor Electric Delivery Revolving Facility

### Overview

In connection with the Merger, we expect Oncor Electric Delivery to enter into the Oncor Electric Delivery Revolving Facility. The Oncor Electric Delivery Revolving Facility is expected to be comprised of a senior revolving credit facility in an aggregate principal amount of up to $2.0 billion, of which up to an amount to be agreed will be available (a) in the form of letters of credit and (b) for borrowings on same-day notice, referred to as the swingline loans. In addition, subject to the satisfaction of certain conditions, Oncor Electric Delivery may increase the commitments under the Oncor Electric Delivery Revolving Facility in an amount up to $500 million. The letters of credit and proceeds of borrowings under the Oncor Electric Delivery Revolving Facility will be used by Oncor Electric Delivery and its subsidiaries for working capital and for other general corporate purposes, including the refinancing of certain existing indebtedness of Oncor Electric Delivery and its subsidiaries on the closing date.

The Oncor Electric Delivery Revolving Facility will be entered into with JPMSI, CS Securities, Citigroup, GSCP, LBI and MSSF as joint lead arrangers and joint lead bookrunners, JPMCB as sole and exclusive administrative agent, Citigroup as syndication agent and CS Securities, GSCP, the Lehman Lenders and MSSF as co-documentation agents.

### Interest Rates and Fees

Loans under the Oncor Electric Delivery Revolving Facility are expected to bear interest at per annum rates equal to, at our option, (i) the Eurodollar rate plus an applicable margin based on a ratings based grid or (ii) a base rate (the higher of (i) the prime rate of JPMCB and the federal funds effective rate plus 0.50%) plus a applicable margin based on a ratings based grid. A rating of BBB- or Baa3 is expected to result in a spread over the Adjusted LIBOR of 0.575%, subject to provisions regarding split ratings.

A facility fee is expected to be payable quarterly in arrears and at termination at a rate based on a ratings based grid on an amount equal to the size of the facility, regardless of whether any amounts under the Oncor Electric Delivery Revolving Facility are outstanding. A rating of BBB- or Baa3 is expected to result in a facility fee rate of 0.175%, subject to provisions regarding split ratings.

A utilization fee is expected to be payable quarterly in arrears and at termination at a rate per annum equal to 0.125% on the drawn portion of the commitments in respect of the Oncor Electric Delivery Revolving Facility.

Confidential

EFIHMW00296665

Letter of credit fees are expected to be payable quarterly in arrears and at termination at a rate per annum equal to the spread over Adjusted LIBOR under the facility less the issuing bank's fronting fee.

*Covenants*

The Oncor Electric Delivery Revolving Facility is expected to contain customary affirmative and negative covenants similar to those contained in Oncor Electric Delivery's existing credit facility so long as not more burdensome on it and its subsidiaries than the covenants contained in the TCEH Senior Secured Facilities. If the covenants in Oncor Electric Delivery's existing credit facility are more burdensome, then the corresponding provisions in the Oncor Electric Delivery Revolving Facility shall be similar to those contained in the TCEH Senior Secured Facilities.

*Financial Covenant*

The Oncor Electric Delivery Revolving Facility is expected to contain a maximum ratio of debt to capitalization to be agreed (to be defined in a manner similar to Oncor Electric Delivery's existing credit facility).

*Maturity and Amortization*

Amounts borrowed under the Oncor Electric Delivery Revolving Facility may be reborrowed from time to time from and after the closing date until the date that is the sixth anniversary thereof, and are expected to mature on such anniversary.

*Events of Default*

The Oncor Electric Delivery Revolving Facility is expected to contain certain customary events of default similar to those contained in Oncor Electric Delivery's existing credit facility so long as not more burdensome on it and its subsidiaries than the events of default contained in the TCEH Senior Secured Facilities. If the events of default in Oncor Electric Delivery's existing credit facility are more burdensome, then the corresponding provisions in the Oncor Electric Delivery Revolving Facility shall be similar to those contained in the TCEH Senior Secured Facilities.

## Debt Repayment

*Tender Offers and Consent Solicitations*

In connection with the Merger, we intend to tender for (1) $1.0 billion of TXN Corp.'s outstanding 4.800% Series O Senior Notes due 2009, (2) $250.0 million of TCEH's outstanding 6.125% Senior Notes due 2008 and (3) $1.0 billion of TCEH's outstanding 7.000% Senior Notes due 2013, which we refer to as the "Specified Notes". We commenced cash tender offers to purchase any and all of the Specified Notes on September   , 2007. In connection with the tender offers for the Specified Notes, we have also solicited consents from the holders of the Specified Notes to amend or waive certain terms of the indentures governing the Specified Notes, the officer's certificates governing the Specified Notes and the Specified Notes themselves. The proposed amendments and waivers for which consents have been solicited would, among other things, eliminate certain covenants contained in the indentures and the officer's certificates governing the Specified Notes and the Specified Notes, eliminate certain events of default, modify covenants regarding mergers and consolidations, and modify or eliminate certain other provisions, including certain provisions relating to satisfaction and discharge, contained in the indentures and the officer's certificates governing the Specified Notes and the Specified Notes.

*Other Debt Repayment*

Including the Specified Notes, in connection with the Merger, we intend to redeem or repay an aggregate of approximately $5.4 billion of existing indebtedness of TXU Corp. and its subsidiaries (excluding Oncor Electric Delivery), including debt that will become payable upon the consummation of the Merger. Included in the aggregate amount of the Debt Repayment is the repayment in full of outstanding amounts under the credit facility of TCEH and, in addition, to redeem all of the outstanding $1.0 billion aggregate principal amount of 5.860% Floating Rate Senior Notes due September 16, 2008 of TCEH.

184

EFIHMW00296666

**Existing Unsecured Senior Notes and Debentures**

Upon the closing of the Merger and the repayment of indebtedness as described under "—Debt Repayment," $8,243 million in aggregate principal amount of existing unsecured senior notes and debentures of TXU Corp. and its subsidiaries will remain outstanding:

- *TXU Corp. Senior Notes*

  a) $3,500 million aggregate principal amount of TXU Corp. Senior Notes, issued in November 2004, in the following series:

     - $1,000 million of its 4.80% Series O Senior Notes due November 15, 2009 (to the extent not tendered in the tender offers described under "—Debt Repayment—Tender Offers and Consent Solicitations" or otherwise defeased or redeemed);

     - $1,000 million of its 5.550% Series P Senior Notes due November 15, 2014;

     - $750 million of its 6.500% Series Q Senior Notes due November 15, 2024; and

     - $750 million of its 6.550% Series R Senior Notes due November 15, 2034.

  b) $200 million aggregate principal amount of TXU Corp. 6.375% Series C Senior Notes due 2008 issued in January 1998.

  c) $25 million aggregate principal amount of TXU Corp. Floating Rate Convertible Senior Notes due 2033:

     These notes bear regular interest at an annual floating rate equal to three-month LIBOR, determined quarterly, plus 150 basis points, and are payable in arrears quarterly commencing on October 15, 2003. The notes will bear additional contingent interest during periods after July 15, 2008 if the average trading price of the notes for a specified period exceeds 120% of the principal amount of the notes.

     The notes' conversion rate at September 7, 2007 is 61.7192 shares of TXU Corp. common stock per $1,000 principal amount of notes, which equates to 1,523,106 shares. Should the holders elect to convert the notes, TXU Corp. has the option to settle the conversion in cash, common stock or a combination of both.

- *US Holdings Debentures*

  a) $1 million aggregate principal amount of US Holdings Floating Rate Junior Subordinated Debentures, Series D due 2037, issued in January 1997 (initially issued in $100 million principal amount of which $98.7 million has been redeemed).

  b) $8 million aggregate principal amount of US Holdings 8.175% Fixed Junior Subordinated Debentures, Series E due 2037, issued in January 1997 (initially issued in $400 million principal amount, of which $391.553 million has been redeemed).

- *TCEH Senior Notes*

  $1,250 million aggregate principal amount of TECH Senior Notes, issued in March 2003 in the following series:

     - $250 million principal amount of 6.125% Senior Notes due 2008 (to the extent not tendered in the tender offers described under "—Debt Repayment—Tender Offers and Consent Solicitations" or otherwise defeased or redeemed); and

     - $1,000 million principal amount of 7.000% Senior Notes due 2013 (to the extent not tendered in the tender offers described under "—Debt Repayment—Tender Offers and Consent Solicitations" or otherwise defeased or redeemed).

185

EFIHMW00296667

- *TCEH Pollution Control Revenue Bonds*

  Upon the closing of the Merger, we will also have outstanding $1,534 million aggregate principal amount of TCEH tax-exempt pollution control revenue bonds consisting of the following series issued by the following river authorities:

  a)   Brazos River Authority:

  - $39.1 million aggregate principal amount of 5.400% Fixed Series 1994A due May 1, 2029;

  - $110.5 million aggregate principal amount of 7.700% Fixed Series 1999A due April 1, 2033;

  - $16 million aggregate principal amount of 6.750% Fixed Series 1999B due September 1, 2034, remarketing date April 1, 2013;

  - $50 million aggregate principal amount of 7.700% Fixed Series 1999C due March 1, 2032;

  - $70.7 million aggregate principal amount of Floating Rate Series 2001A due October 1, 2030;

  - $217 million aggregate principal amount of 5.750% Fixed Series 2001C due May 1, 2036, remarketing date November 1, 2011;

  - $268.3 million aggregate principal amount of Floating Rate Series 2001D due May 1, 2033;

  - $61.8 million aggregate principal amount of Floating Rate Taxable Series 2001I due December 1, 2036;

  - $44.6 million aggregate principal amount of Floating Rate Series 2002A due May 1, 2037;

  - $43.7 million aggregate principal amount of 6.750% Fixed Series 2003A due April 1, 2038, remarketing date April 1, 2013;

  - $39 million aggregate principal amount of 6.300% Fixed Series 2003B due July 1, 2032;

  - $51.8 million aggregate principal amount of 6.750% Fixed Series 2003C due October 1, 2038;

  - $30.8 million aggregate principal amount of 5.400% Fixed Series 2003D due October 1, 2029, remarketing date October 1, 2014; and

  - $100 million aggregate principal amount of 5.000% Fixed Series 2006 due March 1, 2041.

  b)   Sabine River Authority of Texas:

  - $51 million aggregate principal amount of 6.450% Fixed Series 2000A due June 1, 2021;

  - $91.5 million aggregate principal amount of 5.500% Fixed Series 2001A due May 1, 2022, remarketing date November 1, 2011;

  - $107 million aggregate principal amount of 5.750% Fixed Series 2001B due May 1, 2030, remarketing date November 1, 2011;

  - $70 million aggregate principal amount of 5.200% Fixed Series 2001C due May 1, 2028;

  - $12.4 million aggregate principal amount of 5.800% Fixed Series 2003A due July 1, 2022; and

  - $44.6 million aggregate principal amount of 6.150% Fixed Series 2003B due August 1, 2022.

  c)   Trinity River Authority of Texas:

  - $14.1 million aggregate principal amount of 6.250% Fixed Series 2000A due May 1, 2028.

- *Oncor Electric Delivery Senior Notes and Debentures*

  a)   $1,200 million aggregate principal amount of Oncor Electric Delivery Senior Notes, issued in May 2002 in the following series:

186

EFIHMW00296668

- $700 million aggregate principal amount of Oncor Electric Delivery 6.375% Fixed Senior Notes due 2012; and

- $500 million aggregate principal amount of Oncor Electric Delivery 7.000% Fixed Senior Notes due 2032.

b) $850 million aggregate principal amount of Oncor Electric Delivery Senior Notes, issued in December 2002 in the following series:

- $500 million aggregate principal amount of Oncor Electric Delivery 6.375% Fixed Senior Notes due 2015; and

- $350 million aggregate principal amount of Oncor Electric Delivery 7.250% Fixed Senior Notes due 2033.

c) $800 million aggregate principal amount of Oncor Electric Delivery 7.000% Fixed Debentures due 2022 issued in August 2002.

187

EFIHMW00296669

## DESCRIPTION OF THE NOTES

**General**

Certain terms used in this description are defined under the subheading "Certain Definitions." In this description, (i) the terms "*we*," "*our*" and "*us*" each refer to (a) prior to the consummation of the Merger, Texas Energy Future Merger Sub Corp and not any of its Affiliates and (b) from and after the consummation of the Merger, TXU Corp. and its consolidated Subsidiaries, assuming completion of the Transactions; and (ii) the term "*Issuer*" refers only to (a) prior to the consummation of the Merger, Texas Energy Future Merger Sub Corp and not any of its Affiliates and (b) from and after the Merger, TXU Corp. and not any of its Subsidiaries.

The Issuer will issue $       aggregate principal amount of       % senior notes due 2017 (the "*Cash Pay Notes*") and $       aggregate principal amount of    %/   % optional PIK interest senior notes due 2017 (the "*Toggle Notes*" and, together with the Cash Pay Notes, the "*Notes*") under an Indenture to be dated as of October    , 2007 (the "*Indenture*") among the Issuer, the Guarantors and          , as trustee (the "*Trustee*"). The Notes will be issued in a private transaction that is not subject to the registration requirements of the Securities Act. See "Notice to Investors." Except as set forth herein, the terms of the Notes will be substantially identical and include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act.

As more particularly described under "The Transactions—Ring-Fencing," on or before the consummation of the Merger, Oncor Electric Delivery will undertake certain ring-fencing measures to separate itself, its subsidiaries and its immediate parent, Oncor Electric Delivery Holdings, from TXU Corp. and TXU Corp.'s other subsidiaries. Those measures include Oncor Electric Delivery and its subsidiaries being treated as Unrestricted Subsidiaries with respect to the Notes. As Unrestricted Subsidiaries, the Oncor Subsidiaries will not be subject to most of the covenants described herein and will not guarantee the Notes.

The Holders of the Notes, by accepting the Notes, acknowledge (i) the legal separateness of the Issuer and the Guarantors from Oncor Holdings and the Oncor Subsidiaries, (ii) that the lenders under the Oncor Revolving Credit Agreement and the noteholders under Oncor's debt instruments have likely advanced funds thereunder in reliance upon the separateness of Oncor Holdings and the Oncor Subsidiaries from the Issuer and the Guarantors, (iii) that Oncor Holdings and the Oncor Subsidiaries have assets and liabilities that are separate from those of the Issuer and its other Subsidiaries, (iv) that the obligations owing under the Notes are obligations and liabilities of the Issuer and the Guarantors only, and are not the obligations or liabilities of Oncor Holdings or any of the Oncor Subsidiaries, (v) that the Holders of the Notes shall look solely to the Issuer and the Guarantors and their assets, and not to any assets, or to the pledge of any assets, owned by Oncor Holdings or any of the Oncor Subsidiaries, for the repayment of any amounts payable pursuant to the Notes and for satisfaction of any other obligations owing to the Holders under the Indenture, the Registration Rights Agreement and any related documents, and (vi) that none of Oncor Holdings or any of the Oncor Subsidiaries shall be personally liable to the Holders of the Notes for any amounts payable, or any other liability, under the Indenture, the Registration Rights Agreement and related documents.

The Holders of the Notes, by accepting the Notes, shall acknowledge and agree that the Holders of the Notes shall not (i) initiate any legal proceeding to procure the appointment of an administrative receiver, or (ii) institute any bankruptcy, reorganization, insolvency, winding up, liquidation, or any like proceeding under applicable law, against Oncor Holdings or any of the Oncor Subsidiaries, or against any of Oncor Holdings' of the Oncor Subsidiaries' assets. The Holders further acknowledge and agree that Oncor Holdings and each of the Oncor Subsidiaries is a third party beneficiary of the forgoing covenant and shall have the right to specifically enforce such covenant in any proceeding at law or in equity.

The following description is only a summary of the material provisions of the Indenture, does not purport to be complete and is qualified in its entirety by reference to the provisions of the Indenture, including the

188

definitions therein of certain terms used below. We urge you to read the Indenture because it, and not this description, will define your rights as Holders of the Notes. You may request copies of the Indenture at our address set forth under the heading "Summary."

**Brief Description of Notes**

The Notes:

- will be unsecured senior obligations of the Issuer;

- will be effectively subordinated to any secured Indebtedness of the Issuer to the extent of the value of the assets securing such Indebtedness;

- will be structurally subordinated to any existing and future indebtedness and liabilities of non-guarantor Subsidiaries, including the Oncor Subsidiaries, TCEH and the TCEH Subsidiaries, any of the Issuer's Foreign Subsidiaries and any Unrestricted Subsidiaries;

- will rank equally in right of payment with all existing and future unsecured Senior Indebtedness of the Issuer (including the applicable Existing Notes);

- will be senior in right of payment to any future Subordinated Indebtedness of the Issuer;

- will be initially unconditionally guaranteed on a joint and several and senior basis only by US Holdings and Transmission and Distribution Holdings; and

- will be subject to registration with the SEC pursuant to the Registration Rights Agreement.

**Guarantees**

The Guarantors, as primary obligors and not merely as sureties, will initially jointly and severally fully and unconditionally guarantee, on a senior basis, the performance and full and punctual payment when due, whether at maturity, by acceleration or otherwise, of all obligations of the Issuer under the Indenture and the Notes, whether for payment of principal of, premium, if any, or interest or Additional Interest in respect of the Notes, expenses, indemnification or otherwise, on the terms set forth in the Indenture by executing the Indenture.

Only US Holdings and Transmission and Distribution Holdings will initially guarantee the Notes. Each of the Guarantees of the Notes will be a general unsecured senior obligation of each Guarantor. The Guarantees will rank equally in right of payment with all existing and future Senior Indebtedness of the Guarantor and will be effectively subordinated to all Secured Indebtedness of such Guarantor to the extent of the value of the collateral securing such Indebtedness. The Guarantees will be senior in right of payment to all existing and future Subordinated Indebtedness of each Guarantor. The Notes will be structurally subordinated to Indebtedness and other liabilities of Subsidiaries of the Issuer that do not Guarantee the Notes.

Not all of the Issuer's Subsidiaries will Guarantee the Notes. In the event of a bankruptcy, liquidation or reorganization of any of these non-guarantor Subsidiaries, the non-guarantor Subsidiaries will pay the holders of their debt and their trade creditors before they will be able to distribute any of their assets to the Issuer. None of TCEH, the TCEH Subsidiaries, or the Oncor Subsidiaries will guarantee the Notes. For the year ended December 31, 2006 and the six-month period ended June 30, 2007, the non-guarantor Subsidiaries generated all of the Issuer's consolidated total revenue. In addition, as of June 30, 2007, the non-guarantor Subsidiaries held approximately 99% of the Issuer's consolidated total assets.

The obligations of each Guarantor under its Guarantee will be limited as necessary to prevent the Guarantee from constituting a fraudulent conveyance under applicable law.

Any entity that makes a payment under its Guarantee will be entitled upon payment in full of all guaranteed obligations under the Indenture to a contribution from each other Guarantor in an amount equal to such other

189

EFIHMW00296671

Guarantor's pro rata portion of such payment based on the respective net assets of all the Guarantors at the time of such payment determined in accordance with GAAP.

If a Guarantee were rendered voidable, it could be subordinated by a court to all other indebtedness (including guarantees and other contingent liabilities) of the Guarantor, and, depending on the amount of such indebtedness, a Guarantor's liability on its Guarantee could be reduced to zero. See "Risk Factors—Risks Relating to Our Indebtedness and the Notes—Federal and state statutes allow courts, under specific circumstances, to void any future guarantees and require note holders to return payments received from future guarantors, if any."

Each Guarantee by a Guarantor will provide by its terms that it will be automatically and unconditionally released and discharged upon:

(1)(a) any sale, exchange or transfer (by merger or otherwise) of the Capital Stock of such Guarantor (including any sale, exchange or transfer, after which the applicable Guarantor is no longer a Restricted Subsidiary) or sale of all or substantially all the assets of such Guarantor, which sale, exchange or transfer is made in compliance with the applicable provisions of the Indenture;

(b) the release or discharge of the guarantee by such Guarantor that resulted in the creation of such Guarantee, except a discharge or release by or as a result of payment under such guarantee;

(c) the designation of any Restricted Subsidiary that is a Guarantor as an Unrestricted Subsidiary in compliance with the applicable provisions of the Indenture; or

(d) the exercise by the Issuer of its legal defeasance option or covenant defeasance option as described under "Legal Defeasance and Covenant Defeasance" or the discharge of the Issuer's obligations under the Indenture in accordance with the terms of the Indenture; and

(2) such Guarantor delivering to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that all conditions precedent provided for in the Indenture relating to such transaction have been complied with.

**Holding Company Structure**

The Issuer is a holding company for its Subsidiaries, with no material operations of its own and only limited assets. Accordingly, the Issuer is dependent upon the distribution of the earnings of its Subsidiaries, whether in the form of dividends, advances or payments on account of intercompany obligations, to service its debt obligations.

**Paying Agent and Registrar for the Notes**

The Issuer will maintain one or more paying agents for the Notes in the Borough of Manhattan, City of New York. The initial paying agent for the Notes will be the Trustee.

The Issuer will also maintain a registrar with offices in the Borough of Manhattan, City of New York. The initial registrar will be the Trustee. The registrar will maintain a register reflecting ownership of the Notes outstanding from time to time and will make payments on and facilitate transfer of Notes on behalf of the Issuer.

The Issuer may change the paying agents or the registrars without prior notice to the Holders. The Issuer or any of its Subsidiaries may act as a paying agent or registrar.

**Transfer and Exchange**

A Holder may transfer or exchange Notes in accordance with the Indenture. The registrar and the Trustee may require a Holder to furnish appropriate endorsements and transfer documents in connection with a transfer

190

EFIHMW00296672

of Notes. Holders will be required to pay all taxes due on transfer. The Issuer will not be required to transfer or exchange any Note selected for redemption. Also, the Issuer will not be required to transfer or exchange any Note for a period of 15 days before a selection of Notes to be redeemed.

**Principal, Maturity and Interest**

The Issuer will issue $4,500,000,000 in aggregate principal amount of Notes in this offering, of which $      in aggregate principal amount will be Cash Pay Notes and $      in aggregate principal amount will be Toggle Notes. The Cash Pay Notes will mature on      , 2017 and the Toggle Notes will mature on      , 2017. Subject to compliance with the covenant described below under "Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock," the Issuer may issue additional Cash Pay Notes and/or Toggle Notes from time to time after this offering under the Indenture (any such Cash Pay Notes or Toggle Notes, "*Additional Notes*"). In addition, in connection with the payment of PIK Interest or Partial PIK Interest in respect of the Toggle Notes, the Issuer is entitled to, without the consent of the Holders, increase the outstanding principal amount of the Toggle Notes or issue additional Toggle Notes (the "*PIK Notes*") under the Indenture on the same terms and conditions as the Toggle Notes offered hereby (in each case, the "*PIK Payment*"). The Cash Pay Notes and the Toggle Notes are each separate series of Notes but will be treated as a single class of securities under the Indenture, except as otherwise stated herein. As a result, Holders of each series of Notes will not have separate rights to, among other things, give notice of Defaults or to direct the Trustee to exercise remedies during an Event of Default or otherwise. Except as described under "Amendment, Supplement and Waiver," the Notes offered by the Issuer, the PIK Notes and any Additional Notes subsequently issued under the Indenture will be treated as a single class for all purposes under the Indenture, including waivers, amendments, redemptions and offers to purchase. Unless the context requires otherwise, references to " Notes" for all purposes of the Indenture and this "Description of Notes" include any PIK Notes and Additional Notes that are actually issued, and references to "principal amount" of the Notes includes any increase in the principal amount of the outstanding Notes as a result of a PIK Payment.

*Cash Pay Notes*

Interest on the Cash Pay Notes will accrue at the rate of    % per annum and will be payable semi-annually in arrears on      and      , commencing on      , 2008, to the Holders of Cash Pay Notes of record on the immediately preceding      and      . Interest on the Cash Pay Notes will accrue from the most recent date to which interest has been paid or, if no interest has been paid, from and including the Issue Date. Interest on the Cash Pay Notes will be computed on the basis of a 360-day year comprised of twelve 30-day months.

*Toggle Notes*

Interest on the Toggle Notes will be payable semi-annually in arrears on      and      , commencing on      , 2008, to the Holders of Toggle Notes of record on the immediately preceding      and      . Interest on the Toggle Notes will accrue from the most recent date to which interest has been paid or, if no interest has been paid, from and including the Issue Date. Interest on the Toggle Notes will be computed on the basis of a 360-day year comprised of twelve 30-day months.

For any interest payment period after the initial interest payment period, the Issuer may, at its option, elect to pay interest on the Toggle Notes:

- entirely in cash ("*Cash Interest*");

- entirely by increasing the principal amount of the outstanding Toggle Notes or by issuing PIK Notes ("*PIK Interest*"); or

- on 50% of the outstanding principal amount of the Toggle Notes in cash and on 50% of the principal amount by increasing the principal amount of the outstanding Toggle Notes or by issuing PIK Notes ("*Partial PIK Interest*").

191

EFIHMW00296673

The Issuer must elect the form of interest payment with respect to each interest period by delivering a notice to the Trustee prior to the beginning of each interest period. The Trustee shall promptly deliver a corresponding notice to the Holders. In the absence of such an election for any interest period, interest on the Toggle Notes shall be payable according to the election for the previous interest period. Interest for the first interest period commencing on the Issue Date shall be payable entirely in cash. Notwithstanding anything to the contrary, the payment of accrued interest in connection with any redemption of Toggle Notes as described under "—Optional Redemption—Toggle Notes" or "Repurchase at the Option of Holders" shall be made solely in cash.

Cash Interest on the Toggle Notes will accrue at a rate of    % per annum and be payable in cash. PIK Interest on the Toggle Notes will accrue at a rate of    % per annum and be payable (x) with respect to Toggle Notes represented by one or more global notes registered in the name of, or held by, The Depository Trust Company ("*DTC*") or its nominee on the relevant record date, by increasing the principal amount of the outstanding global Toggle Note by an amount equal to the amount of PIK Interest for the applicable interest period (rounded up to the nearest $1,000) and (y) with respect to Toggle Notes represented by certificated notes, by issuing PIK Notes in certificated form in an aggregate principal amount equal to the amount of PIK Interest for the applicable period (rounded up to the nearest whole dollar), and the Trustee will, at the request of the Issuer, authenticate and deliver such PIK Notes in certificated form for original issuance to the Holders on the relevant record date, as shown by the records of the register of Holders. In the event that the Issuer elects to pay Partial PIK Interest for any interest period, each Holder will be entitled to receive Cash Interest in respect of 50% of the principal amount of the Toggle Notes held by such Holder on the relevant record date and PIK Interest in respect of 50% of the principal amount of the Toggle Notes held by such Holder on the relevant record date. Following an increase in the principal amount of the outstanding global Toggle Notes as a result of a PIK Payment, the global Toggle Notes will bear interest on such increased principal amount from and after the date of such PIK Payment. Any PIK Notes issued in certificated form will be dated as of the applicable interest payment date and will bear interest from and after such date. All Toggle Notes issued pursuant to a PIK Payment will be governed by, and subject to the terms, provisions and conditions of, the Indenture and shall have the same rights and benefits as the Toggle Notes issued on the Issue Date. Any certificated PIK Notes will be issued with the description PIK on the face of such PIK Note.

### *Additional Interest*

Additional Interest may accrue on the Notes in certain circumstances pursuant to the Registration Rights Agreement. Any Additional Interest on the Notes will be payable in the same form elected by the Issuer for payment of interest for the applicable interest payment period. All references in the Indenture, in any context, to any interest or other amount payable on or with respect to the Notes shall be deemed to include any Additional Interest pursuant to the Registration Rights Agreement. Principal of, premium, if any, and interest on the Notes will be payable at the office or agency of the Issuer maintained for such purpose within the City and State of New York or, at the option of the Issuer, payment of interest may be made by check mailed to the Holders of the Notes at their respective addresses set forth in the register of Holders; *provided* that all payments of principal, premium, if any, and interest with respect to the Notes represented by one or more global notes registered in the name of or held by DTC or its nominee will be made by wire transfer of immediately available funds to the accounts specified by the Holder or Holders thereof. Until otherwise designated by the Issuer, the Issuer's office or agency in New York will be the office of the Trustee maintained for such purpose.

## Mandatory Redemption; Offers to Purchase; Open Market Purchases

The Issuer will not be required to make any mandatory redemption or sinking fund payments with respect to the Notes. However, under certain circumstances, the Issuer may be required to offer to purchase Notes as described under the caption "Repurchase at the Option of Holders." The Issuer may at any time and from time to time purchase Notes in the open market or otherwise.

Confidential

EFIHMW00296674

**Optional Redemption**

*Cash Pay Notes*

Except as set forth below, the Issuer will not be entitled to redeem Cash Pay Notes at its option prior to
            , 2012.

At any time prior to            , 2012, the Issuer may redeem all or a part of the Cash Pay Notes, upon not less than 30 nor more than 60 days' prior notice mailed by first-class mail to the registered address of each Holder of Cash Pay Notes or otherwise in accordance with the procedures of DTC, at a redemption price equal to 100% of the principal amount of the Cash Pay Notes redeemed plus the Applicable Premium as of, and accrued and unpaid interest and Additional Interest, if any, to the date of redemption (the "*Redemption Date*"), subject to the rights of Holders of Cash Pay Notes on the relevant record date to receive interest due on the relevant interest payment date.

On and after            , 2012, the Issuer may redeem the Cash Pay Notes, in whole or in part, upon not less than 30 nor more than 60 days' prior notice mailed by first-class mail to the registered address of each Holder of Cash Pay Notes or otherwise in accordance with the procedures of DTC, at the redemption prices (expressed as percentages of principal amount of the Cash Pay Notes to be redeemed) set forth below, plus accrued and unpaid interest thereon and Additional Interest, if any, to the applicable Redemption Date, subject to the right of Holders of Cash Pay Notes of record on the relevant record date to receive interest due on the relevant interest payment date, if redeemed during the twelve-month period beginning on            of each of the years indicated below:

| Year | Percentage |
| --- | --- |
| 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | % |
| 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | % |
| 2014 and thereafter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 100.000% |

In addition, until            , 2010, the Issuer may, at its option, on one or more occasions redeem up to 35% of the aggregate principal amount of Cash Pay Notes at a redemption price equal to    % of the aggregate principal amount thereof, plus accrued and unpaid interest thereon and Additional Interest, if any, to the applicable Redemption Date, subject to the right of Holders of Cash Pay Notes of record on the relevant record date to receive interest due on the relevant interest payment date, with the net cash proceeds of one or more Equity Offerings; *provided* that at least 50% of the sum of the original aggregate principal amount of Cash Pay Notes issued under the Indenture and the original principal amount of any Additional Notes that are Cash Pay Notes issued under the Indenture after the Issue Date remains outstanding immediately after the occurrence of each such redemption; *provided further* that each such redemption occurs within 90 days of the date of closing of each such Equity Offering.

Any notice of any redemption may be given prior to the redemption thereof, and any such redemption or notice may, at the Issuer's discretion, be subject to one or more conditions precedent, including, but not limited to, completion of an Equity Offering or other corporate transaction.

If the Issuer redeems less than all of the outstanding Cash Pay Notes, the Trustee shall select the Cash Pay Notes to be redeemed in the manner described under "Repurchase at the Option of Holders—Selection and Notice."

*Toggle Notes*

Except as set forth below, the Issuer will not be entitled to redeem Toggle Notes at its option prior to
            , 2012.

Confidential

EFIHMW00296675

At any time prior to              , 2012, the Issuer may redeem all or a part of the Toggle Notes, upon not less than 30 nor more than 60 days' prior notice mailed by first-class mail to the registered address of each Holder of Toggle Notes or otherwise in accordance with the procedures of DTC, at a redemption price equal to 100% of the principal amount of the Toggle Notes redeemed plus the Applicable Premium as of, and accrued and unpaid interest and Additional Interest, if any, to the Redemption Date, subject to the rights of Holders of Toggle Notes on the relevant record date to receive interest due on the relevant interest payment date.

On and after              , 2012, the Issuer may redeem the Toggle Notes, in whole or in part, upon not less than 30 nor more than 60 days' prior notice mailed by first-class mail to the registered address of each Holder of Toggle Notes or otherwise in accordance with the procedures of DTC, at the redemption prices (expressed as percentages of principal amount of the Toggle Notes to be redeemed) set forth below, plus accrued and unpaid interest thereon and Additional Interest, if any, to the applicable Redemption Date, subject to the right of Holders of Toggle Notes of record on the relevant record date to receive interest due on the relevant interest payment date, if redeemed during the twelve-month period beginning on              of each of the years indicated below:

| Year | Percentage |
| --- | --- |
| 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | % |
| 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | % |
| 2014 and thereafter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 100.000% |

In addition, until              , 2010, the Issuer may, at its option, on one or more occasions redeem up to 35% of the aggregate principal amount of Toggle Notes at a redemption price equal to    % of the aggregate principal amount thereof, plus accrued and unpaid interest thereon and Additional Interest, if any, to the applicable Redemption Date, subject to the right of Holders of Toggle Notes of record on the relevant record date to receive interest due on the relevant interest payment date, with the net cash proceeds of one or more Equity Offerings; *provided* that at least 50% of the sum of the original aggregate principal amount of Toggle Notes issued under the Indenture and the original principal amount of any Additional Notes that are Toggle Notes issued under the Indenture after the Issue Date remains outstanding immediately after the occurrence of each such redemption; *provided further* that each such redemption occurs within 90 days of the date of closing of each such Equity Offering.

In addition, at the end of each accrual period ending after the fifth anniversary of the Toggle Notes' issuance (each, an "*Optional AHYDO redemption date*"), the Issuer may redeem for cash a portion of each Toggle Note then outstanding up to the Optional AHYDO Principal Redemption Amount (such redemption, an "*Optional AHYDO Principal Redemption*"). The redemption price for the portion of each Toggle Note redeemed pursuant to an Optional AHYDO Principal Redemption will be 100% of the principal amount of such portion plus any accrued interest thereon on the date of redemption. The "Optional AHYDO Principal Redemption Amount" means, as of each Optional AHYDO redemption date, the excess, if any, of (a) the aggregate amount of accrued and unpaid interest and all accrued and unpaid "original issue discount" (as defined in Section 1273(a)(1) of the Code) with respect to the Toggle Notes, over (b) an amount equal to the product of (i) the "issue price" (as defined in Sections 1273(b) and 1274(a) of the Code) of the Toggle Notes multiplied by (ii) the "yield to maturity" (as defined in the Treasury Regulation Section 1.1272-1(b)(1(i)) of the Toggle Notes.

Any notice of any redemption may be given prior to the redemption thereof, and any such redemption or notice may, at the Issuer's discretion, be subject to one or more conditions precedent, including, but not limited to, completion of an Equity Offering or other corporate transaction.

If the Issuer redeems less than all of the outstanding Toggle Notes, the Trustee shall select the Toggle Notes to be redeemed in the manner described under "Repurchase at the Option of Holders—Selection and Notice."

Confidential

EFIHMW00296676

**Repurchase at the Option of Holders**

*Change of Control*

The Notes will provide that if a Change of Control occurs, unless the Issuer has previously or concurrently mailed a redemption notice with respect to all the outstanding Notes as described under "Optional Redemption," the Issuer will make an offer to purchase all of the Notes pursuant to the offer described below (the "*Change of Control Offer*") at a price in cash (the "*Change of Control Payment*") equal to 101% of the aggregate principal amount thereof plus accrued and unpaid interest and Additional Interest, if any, to the date of purchase, subject to the right of Holders of the Notes of record on the relevant record date to receive interest due on the relevant interest payment date. Within 30 days following any Change of Control, the Issuer will send notice of such Change of Control Offer by first-class mail, with a copy to the Trustee, to each Holder of Notes to the address of such Holder appearing in the security register with a copy to the Trustee or otherwise in accordance with the procedures of DTC, with the following information:

(1) that a Change of Control Offer is being made pursuant to the covenant entitled "Change of Control" and that all Notes properly tendered pursuant to such Change of Control Offer will be accepted for payment by the Issuer;

(2) the purchase price and the purchase date, which will be no earlier than 30 days nor later than 60 days from the date such notice is mailed (the "*Change of Control Payment Date*");

(3) that any Note not properly tendered will remain outstanding and continue to accrue interest;

(4) that unless the Issuer defaults in the payment of the Change of Control Payment, all Notes accepted for payment pursuant to the Change of Control Offer will cease to accrue interest on the Change of Control Payment Date;

(5) that Holders electing to have any Notes purchased pursuant to a Change of Control Offer will be required to surrender such Notes, with the form entitled "Option of Holder to Elect Purchase" on the reverse of such Notes completed, to the paying agent specified in the notice at the address specified in the notice prior to the close of business on the third Business Day preceding the Change of Control Payment Date;

(6) that Holders will be entitled to withdraw their tendered Notes and their election to require the Issuer to purchase such Notes; *provided* that the paying agent receives, not later than the close of business on the 30th day following the date of the Change of Control notice, a telegram, facsimile transmission or letter setting forth the name of the Holder of the Notes, the principal amount of Notes tendered for purchase, and a statement that such Holder is withdrawing its tendered Notes and its election to have such Notes purchased;

(7) that if the Issuer is redeeming less than all of the Notes, the Holders of the remaining Notes will be issued new Notes and such new Notes will be equal in principal amount to the unpurchased portion of the Notes surrendered. The unpurchased portion of the Notes must be equal to $2,000 or an integral multiple of $1,000 in excess thereof; and

(8) the other instructions, as determined by us, consistent with the covenant described hereunder, that a Holder must follow.

The Issuer will comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder to the extent such laws or regulations are applicable in connection with the repurchase of Notes pursuant to a Change of Control Offer. To the extent that the provisions of any securities laws or regulations conflict with the provisions of the Indenture, the Issuer will comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations described in the Indenture by virtue thereof.

On the Change of Control Payment Date, the Issuer will, to the extent permitted by law,

(1) accept for payment all Notes issued by it or portions thereof properly tendered pursuant to the Change of Control Offer;

195

(2) deposit with the paying agent an amount equal to the aggregate Change of Control Payment in respect of all Notes or portions thereof so tendered; and

(3) deliver, or cause to be delivered, to the Trustee for cancellation the Notes so accepted together with an Officer's Certificate to the Trustee stating that such Notes or portions thereof have been tendered to and purchased by the Issuer.

The TCEH Senior Secured Facilities will, and future credit agreements or other agreements relating to Senior Indebtedness to which the Issuer becomes a party may, provide that certain change of control events with respect to the Issuer would constitute a default thereunder (including a Change of Control under the Indenture). If we experience a change of control that triggers a default under the TCEH Senior Secured Facilities, we could seek a waiver of such default or seek to refinance the TCEH Senior Secured Facilities. In the event we do not obtain such a waiver or refinance the TCEH Senior Secured Facilities, such default could result in amounts outstanding under the TCEH Senior Secured Facilities being declared due and payable and could cause a Receivables Facility to be wound down.

Our ability to pay cash to the Holders of Notes following the occurrence of a Change of Control may be limited by our then-existing financial resources. Therefore, sufficient funds may not be available when necessary to make any required repurchases.

The Change of Control purchase feature of the Notes may in certain circumstances make more difficult or discourage a sale or takeover of us and, thus, the removal of incumbent management. The Change of Control purchase feature is a result of negotiations between the Initial Purchasers and us. After the Issue Date, we have no present intention to engage in a transaction involving a Change of Control, although it is possible that we could decide to do so in the future. Subject to the limitations discussed below, we could, in the future, enter into certain transactions, including acquisitions, refinancing or other recapitalizations, that would not constitute a Change of Control under the Indenture, but that could increase the amount of indebtedness outstanding at such time or otherwise affect our capital structure or credit ratings. Restrictions on our ability to incur additional Indebtedness are contained in the covenants described under "Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" and "Certain Covenants—Liens." Such restrictions in the Indenture can be waived only with the consent of the Holders of a majority in principal amount of the Notes then outstanding. Except for the limitations contained in such covenants, however, the Indenture will not contain any covenants or provisions that may afford Holders of the Notes protection in the event of a highly leveraged transaction.

The Issuer will not be required to make a Change of Control Offer following a Change of Control if a third party makes the Change of Control Offer in the manner, at the times and otherwise in compliance with the requirements set forth in the Indenture applicable to a Change of Control Offer made by us and purchases all Notes validly tendered and not withdrawn under such Change of Control Offer. Notwithstanding anything to the contrary herein, a Change of Control Offer may be made in advance of a Change of Control, conditional upon such Change of Control, if a definitive agreement is in place for the Change of Control at the time of making of the Change of Control Offer.

The definition of "Change of Control" includes a disposition of all or substantially all of the assets of the Issuer to any Person. Although there is a limited body of case law interpreting the phrase "substantially all," there is no precise established definition of the phrase under applicable law. Accordingly, in certain circumstances there may be a degree of uncertainty as to whether a particular transaction would involve a disposition of "all or substantially all" of the assets of the Issuer. As a result, it may be unclear as to whether a Change of Control has occurred and whether a Holder of Notes may require the Issuer to make an offer to repurchase the Notes as described above.

The provisions under the Indenture relating to the Issuer's obligation to make an offer to repurchase the Notes as a result of a Change of Control may be waived or modified with the written consent of the Holders of a majority in principal amount of the Notes.

196

Confidential

EFIHMW00296678

*Asset Sales*

The Indenture will provide that the Issuer will not, and will not permit any of its Restricted Subsidiaries to consummate, directly or indirectly, an Asset Sale, unless:

(1) the Issuer or such Restricted Subsidiary, as the case may be, receives consideration at the time of such Asset Sale at least equal to the fair market value (as determined in good faith by the Issuer) of the assets sold or otherwise disposed of; and

(2) except in the case of a Permitted Asset Swap, at least 75% of the consideration therefor received by the Issuer or such Restricted Subsidiary, as the case may be, is in the form of cash or Cash Equivalents; *provided* that the amount of:

(a) any liabilities (as shown on the Issuer's or such Restricted Subsidiary's most recent balance sheet or in the footnotes thereto) of the Issuer or such Restricted Subsidiary, other than liabilities that are by their terms subordinated to the Notes, that are assumed by the transferee of any such assets and for which the Issuer and all of its Restricted Subsidiaries have been validly released by all applicable creditors in writing,

(b) any securities received by the Issuer or such Restricted Subsidiary from such transferee that are converted by the Issuer or such Restricted Subsidiary into cash (to the extent of the cash received) within 180 days following the closing of such Asset Sale, and

(c) any Designated Non-cash Consideration received by the Issuer or such Restricted Subsidiary in such Asset Sale having an aggregate fair market value, taken together with all other Designated Non-cash Consideration received pursuant to this clause (c) that is at that time outstanding, not to exceed 5% of Total Assets at the time of the receipt of such Designated Non-cash Consideration, with the fair market value of each item of Designated Non-cash Consideration being measured at the time received and without giving effect to subsequent changes in value,

shall be deemed to be cash for purposes of this provision and for no other purpose.

Within 450 days after the receipt of any Net Proceeds of any Asset Sale, the Issuer or such Restricted Subsidiary, at its option, may apply the Net Proceeds from such Asset Sale,

(1) to permanently reduce:

(a) Obligations under Senior Indebtedness which is Secured Indebtedness permitted by the Indenture, and to correspondingly reduce commitments with respect thereto;

(b) Obligations under other Senior Indebtedness (and to correspondingly reduce commitments with respect thereto); *provided* that the Issuer shall equally and ratably reduce Obligations under the Notes as provided under "Optional Redemption," through open-market purchases (to the extent such purchases are at or above 100% of the principal amount thereof) or otherwise by making an offer (in accordance with the procedures set forth below for an Asset Sale Offer) to all Holders to purchase their Notes at 100% of the principal amount thereof, plus the amount of accrued but unpaid interest, if any, on the amount of the Notes that would otherwise be prepaid;

(c) Obligations under the Existing Notes which have a final maturity date (as in effect on the Issue Date) on or prior to              , 2017, *provided* that, at the time of, and after giving effect to, such repurchase, redemption or defeasance, the aggregate amount of Net Proceeds used to repurchase, redeem or defease Existing Notes pursuant to this subclause (c) following the Issue Date shall not exceed 3.5% of the consolidated total assets of the Issuer and its subsidiaries at such time; or

(d) Indebtedness of a Restricted Subsidiary that is not a Guarantor, other than Indebtedness owed to the Issuer or another Restricted Subsidiary (or any affiliate thereof),

*provided* that, if an offer to purchase any Indebtedness of US Holdings or any of its Restricted Subsidiaries is made in accordance with the terms of such Indebtedness, the obligation to permanently reduce Indebtedness of

197

EFIHMW00296679

a Restricted Subsidiary will be deemed to be satisfied to the extent of the amount of the offer, whether or not accepted by the holders thereof, and no Net Proceeds in the amount of such offer will be deemed to exist following such offer;

(2) to make (a) an Investment in any one or more businesses, *provided* that such Investment in any business is in the form of the acquisition of Capital Stock and results in the Issuer or another of its Restricted Subsidiaries, as the case may be, owning an amount of the Capital Stock of such business such that it constitutes a Restricted Subsidiary, (b) capital expenditures or (c) acquisitions of other assets, in each of (a), (b) and (c), used or useful in a Similar Business; or

(3) to make an Investment in (a) any one or more businesses, *provided* that such Investment in any business is in the form of the acquisition of Capital Stock and results in the Issuer or another of its Restricted Subsidiaries, as the case may be, owning an amount of the Capital Stock of such business such that it constitutes a Restricted Subsidiary, (b) properties or (c) acquisitions of other assets, in each of (a), (b) and (c), replace the businesses, properties and/or assets that are the subject of such Asset Sale;

*provided* that, in the case of clauses (2) and (3) above, a binding commitment shall be treated as a permitted application of the Net Proceeds from the date of such commitment so long as the Issuer, or such other Restricted Subsidiary enters into such commitment with the good faith expectation that such Net Proceeds will be applied to satisfy such commitment within 180 days of such commitment (an "*Acceptable Commitment*") (and reinvest within the later of 450 days from the date of receipt of Net Proceeds and 180 days of receipt of such commitment), or in the case of a Casualty Event, either enter into an Acceptable Commitment or deliver to the trustee a Restoration Certification with respect to plans to repair, restore or replace (and reinvest, in the case of an Acceptable Commitment, or use the proceeds to repair, restore or replace, in the case of a Restoration Certification, within the later of 450 days from the date of receipt of Net Proceeds and 180 days of receipt of such Acceptable Commitment or delivery of such Restoration Certification) and, in the event any Acceptable Commitment is later cancelled or terminated for any reason before the Net Proceeds are applied in connection therewith, the Issuer or such Restricted Subsidiary enters into another Acceptable Commitment (a "*Second Commitment*") within the later of (a) 180 days of such cancellation or termination or (b) the initial 450-day period; *provided further*, that if any Second Commitment is later cancelled or terminated for any reason before such Net Proceeds are applied, then such Net Proceeds shall constitute Excess Proceeds.

Notwithstanding the preceding paragraph, in the event that regulatory approval is necessary for an asset or investment, or replacement, repair or restoration on any asset or investment has commenced, then the Issuer or any Restricted Subsidiary shall have an additional 365 days to apply the Net Proceeds from such Asset Sale in accordance with the preceding paragraph.

Any Net Proceeds from Asset Sales that are not invested or applied as provided and within the time period set forth in the first sentence of the second preceding paragraph will be deemed to constitute "*Excess Proceeds*." When the aggregate amount of Excess Proceeds exceeds $200.0 million, the Issuer shall make an offer to all Holders of the Notes and, if required or permitted by the terms of any Senior Indebtedness, to the holders of such Senior Indebtedness (an "*Asset Sale Offer*"), to purchase the maximum aggregate principal amount of the Notes and such Senior Indebtedness that is a minimum of $2,000 or an integral multiple of $1,000 in excess thereof that may be purchased out of the Excess Proceeds at an offer price in cash in an amount equal to 100% of the principal amount thereof, plus accrued and unpaid interest and Additional Interest, if any, to the date fixed for the closing of such offer, in accordance with the procedures set forth in the Indenture. The Issuer will commence an Asset Sale Offer with respect to Excess Proceeds within 10 Business Days after the date that Excess Proceeds exceed $200.0 million by mailing the notice required pursuant to the terms of the Indenture, with a copy to the Trustee.

To the extent that the aggregate amount of Notes and such Senior Indebtedness tendered pursuant to an Asset Sale Offer is less than the Excess Proceeds, the Issuer may use any remaining Excess Proceeds for general corporate purposes, subject to other covenants contained in the Indenture. If the aggregate principal amount of Notes or the Senior Indebtedness surrendered by such holders thereof exceeds the amount of Excess Proceeds, the Trustee shall select the Notes and such Senior Indebtedness to be purchased on a pro rata basis based on the

198

EFIHMW00296680

accreted value or principal amount of the Notes or such Senior Indebtedness tendered. Upon completion of any such Asset Sale Offer, the amount of Excess Proceeds shall be reset at zero. Additionally, the Issuer may, at its option, make an Asset Sale Offer using proceeds from any Asset Sale at any time after consummation of such Asset Sale; *provided* that such Asset Sale Offer shall be in an aggregate amount of not less than $50.0 million. Upon consummation of such Asset Sale Offer, any Net Proceeds not required to be used to purchase Notes shall not be deemed Excess Proceeds.

Pending the final application of any Net Proceeds pursuant to this covenant, the holder of such Net Proceeds may apply such Net Proceeds temporarily to reduce Indebtedness outstanding under a revolving credit facility or otherwise invest such Net Proceeds in any manner not prohibited by the Indenture.

The Issuer will comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder to the extent such laws or regulations are applicable in connection with the repurchase of the Notes pursuant to an Asset Sale Offer. To the extent that the provisions of any securities laws or regulations conflict with the provisions of the Indenture, the Issuer will comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations described in the Indenture by virtue thereof.

### *Selection and Notice*

If the Issuer is redeeming less than all of the Notes issued by it at any time, the Trustee will select the Notes to be redeemed (a) if the Notes are listed on any national securities exchange, in compliance with the requirements of the principal national securities exchange on which the Notes are listed, (b) on a pro rata basis to the extent practicable or (c) by lot or such other similar method in accordance with the procedures of DTC. No Notes of $2,000 or less can be redeemed in part.

Notices of purchase or redemption shall be mailed by first-class mail, postage prepaid, at least 30 but not more than 60 days before the purchase or Redemption Date to each Holder of Notes at such Holder's registered address or otherwise in accordance with the procedures of DTC, except that redemption notices may be mailed more than 60 days prior to a Redemption Date if the notice is issued in connection with a defeasance of the Notes or a satisfaction and discharge of the Indenture. If any Note is to be purchased or redeemed in part only, any notice of purchase or redemption that relates to such Note shall state the portion of the principal amount thereof that has been or is to be purchased or redeemed.

The Issuer will issue a new Note in a principal amount equal to the unredeemed portion of the original Note in the name of the Holder upon cancellation of the original Note. Notes called for redemption become due on the date fixed for redemption. On and after the Redemption Date, interest ceases to accrue on Notes or portions thereof called for redemption.

### Certain Covenants

Set forth below are summaries of certain covenants contained in the Indenture. If on any date following the Issue Date (i) the Notes have Investment Grade Ratings from both Rating Agencies and (ii) no Default has occurred and is continuing under the Indenture (the occurrence of the events described in the foregoing clauses (i) and (ii) being collectively referred to as a "*Covenant Suspension Event*"), the Issuer and the Restricted Subsidiaries will not be subject to the covenants described under the following captions (collectively, the "*Suspended Covenants*"):

(1)  "Repurchase at the Option of Holders";

(2)  "Limitation on Restricted Payments";

(3)  "Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock";

(4)  clause (4) of the first paragraph of "—Merger, Consolidation or Sale of All or Substantially All Assets";

199

EFIHMW00296681

(5) "Transactions with Affiliates"; and

(6) "Dividend and Other Payment Restrictions Affecting Restricted Subsidiaries."

In the event that the Issuer and the Restricted Subsidiaries are not subject to the Suspended Covenants under the Indenture for any period of time as a result of the foregoing, and on any subsequent date (the "*Reversion Date*") one or both of the Rating Agencies (a) withdraw their Investment Grade Rating or downgrade the rating assigned to the Notes below an Investment Grade Rating and/or (b) the Issuer or any of its Affiliates enter into an agreement to effect a transaction that would result in a Change of Control and one or more of the Rating Agencies indicate that if consummated, such transaction (alone or together with any related recapitalization or refinancing transactions) would cause such Rating Agency to withdraw its Investment Grade Rating or downgrade the ratings assigned to the Notes below an Investment Grade Rating, then the Issuer and the Restricted Subsidiaries will thereafter again be subject to the Suspended Covenants under the Indenture with respect to future events, including, without limitation, a proposed transaction described in clause (b) above.

The period of time between the Suspension Date and the Reversion Date is referred to in this description as the "*Suspension Period*." Additionally, upon the occurrence of a Covenant Suspension Event, the amount of Excess Proceeds from Net Proceeds shall be reset at zero. In the event of any such reinstatement, no action taken or omitted to be taken by the Issuer or any of its Restricted Subsidiaries prior to such reinstatement will give rise to a Default or Event of Default under the Indentures with respect to Notes; provided that (1) with respect to Restricted Payments made after any such reinstatement, the amount of Restricted Payments made will be calculated as though the covenant described under "—Limitation on Restricted Payments" had been in effect prior to, but not during the Suspension Period, provided that any Subsidiaries designated as Unrestricted Subsidiaries during the Suspension Period shall automatically become Restricted Subsidiaries on the Reversion Date (subject to the Issuer's right to subsequently designate them as Unrestricted Subsidiaries in compliance with the covenants set forth below) and (2) all Indebtedness incurred, or Disqualified Stock or Preferred Stock issued, during the Suspension Period will be classified to have been incurred or issued pursuant to clause (3) of the second paragraph of "—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock."

There can be no assurance that the Notes will ever achieve or maintain Investment Grade Ratings.

### *Limitation on Restricted Payments*

The Issuer will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly:

(I) declare or pay any dividend or make any payment or distribution on account of the Issuer's, or any of its Restricted Subsidiaries' Equity Interests, including any dividend or distribution payable in connection with any merger or consolidation other than:

(a) dividends or distributions by the Issuer payable solely in Equity Interests (other than Disqualified Stock) of the Issuer; or

(b) dividends or distributions by a Restricted Subsidiary so long as, in the case of any dividend or distribution payable on or in respect of any class or series of securities issued by a Restricted Subsidiary other than a Wholly-Owned Subsidiary, the Issuer or a Restricted Subsidiary receives at least its pro rata share of such dividend or distribution in accordance with its Equity Interests in such class or series of securities;

(II) purchase, redeem, defease or otherwise acquire or retire for value any Equity Interests of the Issuer or any direct or indirect parent of the Issuer, including in connection with any merger or consolidation;

(III) make any principal payment on, or redeem, repurchase, defease or otherwise acquire or retire for value in each case, prior to any scheduled repayment, sinking fund payment or maturity, any Subordinated Indebtedness, other than:

(a) Indebtedness permitted under clauses (7) and (8) of the covenant described under "—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock"; or

200

Confidential

EFIHMW00296682

(b) the purchase, repurchase or other acquisition of Subordinated Indebtedness purchased in anticipation of satisfying a sinking fund obligation, principal installment or final maturity, in each case due within one year of the date of purchase, repurchase or acquisition; or

(IV) make any Restricted Investment

(all such payments and other actions set forth in clauses (I) through (IV) above (other than any exception thereto) being collectively referred to as "*Restricted Payments*"), unless, at the time of such Restricted Payment:

(1) no Default shall have occurred and be continuing or would occur as a consequence thereof;

(2)(A) with respect to a Restricted Payment by the Issuer or any Restricted Subsidiary of the Issuer other than US Holdings and its Restricted Subsidiaries, immediately after giving effect to such transaction on a *pro forma* basis, the Issuer could incur $1.00 of additional Indebtedness under the provisions of clause (i) of the first paragraph of the covenant described under "—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" or (B) with respect to a Restricted Payment by US Holdings or any Restricted Subsidiary of US Holdings, immediately after giving effect to such transaction on a *pro forma* basis, US Holdings could incur at least $1.00 of additional Indebtedness under the provisions of clause (ii) of the first paragraph of the covenant described under "—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock;" and

(3) such Restricted Payment, together with the aggregate amount of all other Restricted Payments made by the Issuer and its Restricted Subsidiaries after the Issue Date (including Restricted Payments permitted by clauses (1), (2) (with respect to the payment of dividends on Refunding Capital Stock (as defined below) pursuant to clause (b) thereof only), (6)(c), (9) and (14) of the next succeeding paragraph, but excluding all other Restricted Payments permitted by the next succeeding paragraph), is less than the sum of (without duplication):

(a)(A) with respect to a Restricted Payment by the Issuer or any Restricted Subsidiary of the Issuer other than US Holdings and its Restricted Subsidiaries, 50% of the Consolidated Net Income of the Issuer for the period (taken as one accounting period) beginning October 1, 2007, to the end of the Issuer's most recently ended fiscal quarter for which internal financial statements are available at the time of such Restricted Payment, or, in the case such Consolidated Net Income for such period is a deficit, minus 100% of such deficit or (B) with respect to a Restricted Payment by US Holdings or any Restricted Subsidiary of US Holdings, 50% of the Consolidated Net Income of US Holdings for the period (taken as one accounting period) beginning October 1, 2007, to the end of US Holding's most recently ended fiscal quarter for which interim financial statements are available at the time of such Restricted Payment, or, in the case such Consolidated Net Income for such period is a deficit, minus 100% of such deficit; *plus*

(b) 100% of the aggregate net cash proceeds and the fair market value, as determined in good faith by the Issuer, of marketable securities or other property received by the Issuer or its Restricted Subsidiaries since immediately after the Issue Date (other than net cash proceeds to the extent such net cash proceeds have been used to incur Indebtedness, Disqualified Stock or Preferred Stock pursuant to clause (12)(a) of the second paragraph of "—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock") from the issue or sale of:

(i) (A) Equity Interests of the Issuer, including Treasury Capital Stock (as defined below), but excluding cash proceeds and the fair market value, as determined in good faith by the Issuer, of marketable securities or other property received from the sale of:

(x) Equity Interests to members of management, directors or consultants of the Issuer, any direct or indirect parent company of the Issuer and the Issuer's Subsidiaries after the Issue Date to the extent such amounts have been applied to Restricted Payments made in accordance with clause (4) of the next succeeding paragraph; and

(y) Designated Preferred Stock; and

201

EFIHMW00296683

(B) to the extent such net cash proceeds are actually contributed to the Issuer or its Restricted Subsidiaries, Equity Interests of the Issuer's direct or indirect parent companies (excluding contributions of the proceeds from the sale of Designated Preferred Stock of such companies or contributions to the extent such amounts have been applied to Restricted Payments made in accordance with clause (4) of the next succeeding paragraph); or

(ii) debt securities of the Issuer that have been converted into or exchanged for such Equity Interests of the Issuer;

*provided, however*, that this clause (b) shall not include the proceeds from (V) Refunding Capital Stock (as defined below), (W) Equity Interests or convertible debt securities of the Issuer sold to a Restricted Subsidiary, as the case may be, (X) Disqualified Stock or debt securities that have been converted into Disqualified Stock or (Y) Excluded Contributions; *plus*

(c) 100% of the aggregate amount of cash and the fair market value, as determined in good faith by the Issuer, of marketable securities or other property contributed to the capital of the Issuer or its Restricted Subsidiaries following the Issue Date (other than net cash proceeds to the extent such net cash proceeds (i) have been used to incur Indebtedness, Disqualified Stock or Preferred Stock pursuant to clause (12)(a) of the second paragraph of "—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock," (ii) are contributed by a Restricted Subsidiary or (iii) constitute Excluded Contributions); *plus*

(d) 100% of the aggregate amount received in cash and the fair market value, as determined in good faith by the Issuer, of marketable securities or other property received by means of:

(i) the sale or other disposition (other than to the Issuer or a Restricted Subsidiary) of Restricted Investments made by the Issuer or its Restricted Subsidiaries and repurchases and redemptions of such Restricted Investments from the Issuer or its Restricted Subsidiaries and repayments of loans or advances, and releases of guarantees, which constitute Restricted Investments by the Issuer or its Restricted Subsidiaries, in each case after the Issue Date; or

(ii) the sale (other than to the Issuer or a Restricted Subsidiary) of the stock of an Unrestricted Subsidiary (other than to the extent the Investment in such Unrestricted Subsidiary was made by the Issuer or a Restricted Subsidiary pursuant to clause (7) of the next succeeding paragraph or to the extent such Investment constituted a Permitted Investment) or a distribution or dividend from an Unrestricted Subsidiary (other than distributions or dividends re-invested pursuant to clause (7) of the next succeeding paragraph) after the Issue Date; *plus*

(e) in the case of the redesignation of an Unrestricted Subsidiary as a Restricted Subsidiary after the Issue Date, the fair market value of the Investment in such Unrestricted Subsidiary, as determined by the Issuer in good faith (or if such fair market value exceeds $200.0 million, in writing by an Independent Financial Advisor), at the time of the redesignation of such Unrestricted Subsidiary as a Restricted Subsidiary other than to the extent the Investment in such Unrestricted Subsidiary was made by the Issuer or a Restricted Subsidiary pursuant to clause (7) of the next succeeding paragraph or to the extent such Investment constituted a Permitted Investment.

The foregoing provisions will not prohibit:

(1) the payment of any dividend within 60 days after the date of declaration thereof, if at the date of declaration such payment would have complied with the provisions of the Indenture;

(2)(a) the redemption, repurchase, retirement or other acquisition of any Equity Interests ("*Treasury Capital Stock*") or Subordinated Indebtedness of the Issuer or any Equity Interests of any direct or indirect parent company of the Issuer, in exchange for, or out of the proceeds of the substantially concurrent sale (other than to a Restricted Subsidiary) of, Equity Interests of the Issuer or any direct or indirect parent company of the Issuer to the extent contributed to the Issuer (in each case, other than any Disqualified Stock) ("*Refunding Capital Stock*") and (b) if immediately prior to the retirement of Treasury Capital Stock, the declaration and payment of dividends thereon was permitted under clause (6) of this paragraph, the declaration and payment of dividends on the Refunding Capital Stock (other than Refunding Capital Stock the proceeds of which were used to redeem, repurchase, retire or otherwise acquire any Equity Interests of

Confidential

EFIHMW00296684

any direct or indirect parent company of the Issuer) in an aggregate amount per year no greater than the aggregate amount of dividends per annum that were declarable and payable on such Treasury Capital Stock immediately prior to such retirement;

(3) the redemption, repurchase or other acquisition or retirement of Subordinated Indebtedness of the Issuer or a Guarantor made in exchange for, or out of the proceeds of the substantially concurrent sale of, new Indebtedness of the Issuer or a Guarantor, as the case may be, which is incurred in compliance with the covenant described under "—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" so long as:

(a) the principal amount (or accreted value) of such new Indebtedness does not exceed the principal amount of (or accreted value, if applicable), plus any accrued and unpaid interest on, the Subordinated Indebtedness being so redeemed, repurchased, acquired or retired for value, plus the amount of any reasonable premium (including reasonable tender premiums), defeasance costs and any reasonable fees and expenses incurred in connection with the issuance of such new Indebtedness;

(b) such new Indebtedness is subordinated to the Notes or the applicable Guarantee at least to the same extent as such Subordinated Indebtedness so purchased, exchanged, redeemed, repurchased, acquired or retired for value;

(c) such new Indebtedness has a final scheduled maturity date equal to or later than the final scheduled maturity date of the Subordinated Indebtedness being so redeemed, repurchased, acquired or retired; and

(d) such new Indebtedness has a Weighted Average Life to Maturity equal to or greater than the remaining Weighted Average Life to Maturity of the Subordinated Indebtedness being so redeemed, repurchased, acquired or retired;

(4) a Restricted Payment to pay for the repurchase, retirement or other acquisition or retirement for value of Equity Interests (other than Disqualified Stock) of the Issuer or any of its direct or indirect parent companies held by any future, present or former employee, director or consultant of the Issuer, any of its Subsidiaries or any of its direct or indirect parent companies pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement, including any Equity Interests rolled over by management of the Issuer or any of its direct or indirect parent companies in connection with the Transactions; *provided, however*, that the aggregate Restricted Payments made under this clause (4) do not exceed in any calendar year $25.0 million (which shall increase to $50.0 million subsequent to the consummation of an underwritten public Equity Offering by the Issuer or any direct or indirect parent entity of the Issuer) (with unused amounts in any calendar year being carried over to succeeding calendar years subject to a maximum (without giving effect to the following proviso) of $75.0 million in any calendar year (which shall increase to $150.0 million subsequent to the consummation of an underwritten public Equity Offering by the Issuer or any direct or indirect parent corporation of the Issuer)); *provided further* that such amount in any calendar year may be increased by an amount not to exceed:

(a) the cash proceeds from the sale of Equity Interests (other than Disqualified Stock) of the Issuer and, to the extent contributed to the Issuer, Equity Interests of any of the Issuer's direct or indirect parent companies, in each case to members of management, directors or consultants of the Issuer, any of its Subsidiaries or any of its direct or indirect parent companies that occurs after the Issue Date, to the extent the cash proceeds from the sale of such Equity Interests have not otherwise been applied to the payment of Restricted Payments by virtue of clause (3) of the preceding paragraph; *plus*

(b) the cash proceeds of key man life insurance policies received by the Issuer or its Restricted Subsidiaries after the Issue Date; *less*

(c) the amount of any Restricted Payments previously made with the cash proceeds described in clauses (a) and (b) of this clause (4);

203

EFIHMW00296685

and *provided, further*, that cancellation of Indebtedness owing to the Issuer or any Restricted Subsidiary from members of management of the Issuer, any of the Issuer's direct or indirect parent companies or any of the Issuer's Restricted Subsidiaries in connection with a repurchase of Equity Interests of the Issuer or any of its direct or indirect parent companies will not be deemed to constitute a Restricted Payment for purposes of this covenant or any other provision of the Indenture;

(5) the declaration and payment of dividends to holders of any class or series of Disqualified Stock of the Issuer or any of its Restricted Subsidiaries or any class or series of Preferred Stock of any Restricted Subsidiary issued in accordance with the covenant described under "—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" to the extent such dividends are included in the definition of "Fixed Charges";

(6)(a) the declaration and payment of dividends to holders of any class or series of Designated Preferred Stock (other than Disqualified Stock) issued by the Issuer after the Issue Date;

(b) the declaration and payment of dividends to a direct or indirect parent company of the Issuer, the proceeds of which will be used to fund the payment of dividends to holders of any class or series of Designated Preferred Stock (other than Disqualified Stock) of such parent corporation issued after the Issue Date; *provided* that the amount of dividends paid pursuant to this clause (b) shall not exceed the aggregate amount of cash actually contributed to the Issuer from the sale of such Designated Preferred Stock; or

(c) the declaration and payment of dividends on Refunding Capital Stock that is Preferred Stock in excess of the dividends declarable and payable thereon pursuant to clause (2) of this paragraph;

*provided, however*, in the case of each of (a) and (c) of this clause (6), that for the most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date of issuance of such Designated Preferred Stock or the declaration of such dividends on Refunding Capital Stock that is Preferred Stock, after giving effect to such issuance or declaration on a *pro forma* basis, the Issuer and its Restricted Subsidiaries on a consolidated basis would have had a Fixed Charge Coverage Ratio of at least 2.00 to 1.00;

(7) Investments in Unrestricted Subsidiaries having an aggregate fair market value, taken together with all other Investments made pursuant to this clause (7) that are at the time outstanding, without giving effect to the sale of an Unrestricted Subsidiary to the extent the proceeds of such sale do not consist of cash or marketable securities, not to exceed the sum of (A) 2.0% of Total Assets at the time of such Investment (with the fair market value of each Investment being measured at the time made and without giving effect to subsequent changes in value) and (B) an amount equal to 50% of the amount of any dividends received from all Unrestricted Subsidiaries since the Issue Date, *provided* that such amount under this clause (B) shall only be reinvested in the Unrestricted Subsidiary that originally distributed such amount; *provided further* that to the extent such amount under this clause (B) shall be so re-invested, such amount shall be excluded from the calculation of the amount available for Restricted Payments under clause 3(a) and 3(d)(ii) of the first paragraph of "Certain Covenants—Limitation on Restricted Payments" and (C) any amounts required by regulation or law to be invested in any Unrestricted Subsidiary existing on the Issue Date to remain in compliance with regulatory requirements;

(8) repurchases of Equity Interests deemed to occur upon exercise of stock options, warrants or other convertible securities if such Equity Interests represent a portion of the exercise price of such options, warrants or other convertible securities;

(9) the declaration and payment of dividends on the Issuer's common stock (or the payment of dividends to any direct or indirect parent entity to fund a payment of dividends on such entity's common stock), following consummation of the first public offering of the Issuer's common stock or the common stock of any of its direct or indirect parent companies after the Issue Date, of up to 6% per annum of the net cash proceeds received by or contributed to the Issuer in or from any such public offering, other than public offerings with respect to the Issuer's common stock registered on Form S-4 or Form S-8 and other than any public sale constituting an Excluded Contribution;

204

EFIHMW00296686

(10) Restricted Payments that are made with Excluded Contributions;

(11) other Restricted Payments in an aggregate amount taken together with all other Restricted Payments made pursuant to this clause (11) not to exceed 2.0% of Total Assets at the time made;

(12) distributions or payments of Receivables Fees;

(13) any Restricted Payment made as part of or in connection with the Transactions and the fees and expenses related thereto or used to fund amounts owed to Affiliates (including dividends to any direct or indirect parent of the Issuer to permit payment by such parent of such amount), in each case to the extent permitted by the covenant described under "—Transactions with Affiliates";

(14) the repurchase, redemption or other acquisition or retirement for value of any Subordinated Indebtedness in accordance with the provisions similar to those described under the captions "Repurchase at the Option of Holders—Change of Control" and "Repurchase at the Option of Holders—Asset Sales"; *provided* that all Notes tendered by Holders in connection with a Change of Control Offer or Asset Sale Offer, as applicable, have been repurchased, redeemed or acquired for value; or

(15) the declaration and payment of dividends by the Issuer to, or the making of loans to, any direct or indirect parent in amounts required for any direct or indirect parent companies to pay, in each case without duplication,

(a) franchise and excise taxes and other fees, taxes and expenses required to maintain their corporate existence;

(b) foreign, federal, state and local income taxes, to the extent such income taxes are attributable to the income of the Issuer and its Subsidiaries; *provided* that in each case the amount of such payments in any fiscal year does not exceed the amount that the Issuer and its Subsidiaries would be required to pay in respect of foreign, federal, state and local taxes for such fiscal year were the Issuer and its Subsidiaries to pay such taxes separately from any such parent entity;

(c) customary salary, bonus and other benefits payable to officers and employees of any direct or indirect parent company of the Issuer to the extent such salaries, bonuses and other benefits are attributable to the ownership or operation of the Issuer and its Subsidiaries;

(d) general corporate operating and overhead costs and expenses of any direct or indirect parent company of the Issuer to the extent such costs and expenses are attributable to the ownership or operation of the Issuer and its Subsidiaries;

(e) fees and expenses other than to Affiliates of the Issuer related to any unsuccessful equity or debt offering of such parent entity;

*provided, however,* that at the time of, and after giving effect to, any Restricted Payment permitted under clause (11), no Default shall have occurred and be continuing or would occur as a consequence thereof.

As of the Issue Date, all of the Issuer's Subsidiaries other than the Oncor Subsidiaries will be Restricted Subsidiaries. The Issuer will not permit any Unrestricted Subsidiary to become a Restricted Subsidiary except pursuant to the last sentence of the definition of "Unrestricted Subsidiary." For purposes of designating any Restricted Subsidiary as an Unrestricted Subsidiary, all outstanding Investments by the Issuer and its Restricted Subsidiaries (except to the extent repaid) in the Subsidiary so designated will be deemed to be Restricted Payments in an amount determined as set forth in the last sentence of the definition of "Investment." Such designation will be permitted only if a Restricted Payment in such amount would be permitted at such time, whether pursuant to the first paragraph of this covenant or under clause (7), (10) or (11) of the second paragraph of this covenant, or pursuant to the definition of "Permitted Investments," and if such Subsidiary otherwise meets the definition of an Unrestricted Subsidiary. Unrestricted Subsidiaries will not be subject to any of the restrictive covenants set forth in the Indenture.

205

Confidential

EFIHMW00296687

PX 001
Page 212 of 453

*Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock*

The Issuer will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable, contingently or otherwise (collectively, "*incur*" and collectively, an "*incurrence*") with respect to any Indebtedness (including Acquired Indebtedness), and the Issuer will not issue any shares of Disqualified Stock and will not permit any Restricted Subsidiary to issue any shares of Disqualified Stock or Preferred Stock; *provided, however,* that (i) the Issuer may incur Indebtedness (including Acquired Indebtedness) or issue shares of Disqualified Stock, and any of its Restricted Subsidiaries other than US Holdings and its Restricted Subsidiaries may incur Indebtedness (including Acquired Indebtedness), issue shares of Disqualified Stock and issue shares of Preferred Stock, if the Fixed Charge Coverage Ratio on a consolidated basis for the Issuer and its Restricted Subsidiaries' most recently ended four fiscal quarters for which internal financial statements are available immediately preceding the date on which such additional Indebtedness is incurred or such Disqualified Stock or Preferred Stock is issued would have been at least 2.00 to 1.00 and (ii) US Holdings or any of its Restricted Subsidiaries may Incur Indebtedness (including Acquired Indebtedness), issue shares of Disqualified Stock and issue shares of Disqualified Stock and issue shares of Preferred Stock, if the Fixed Charge Coverage Ratio on a consolidated basis for US Holdings and its Restricted Subsidiaries most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date on which such additional Indebtedness is Incurred or such Disqualified Stock or Preferred Stock is issued would have been at least 2.00 to 1.00, in each case determined on a *pro forma* basis (including a *pro forma* application of the net proceeds therefrom), as if the additional Indebtedness had been incurred, or the Disqualified Stock or Preferred Stock had been issued, as the case may be, and the application of proceeds therefrom had occurred at the beginning of such four-quarter period.

The foregoing limitations will not apply to:

(1) the incurrence of Indebtedness under (x) Credit Facilities by the Issuer or any of its Restricted Subsidiaries and the issuance and creation of letters of credit and bankers' acceptances thereunder (with letters of credit and bankers' acceptances being deemed to have a principal amount equal to the face amount thereof), up to an aggregate principal amount of $26,600 million outstanding at any one time and (y) any Collateral Posting Facility;

(2) the incurrence by the Issuer and any Guarantor of Indebtedness represented by the Notes (including any PIK Notes and any Guarantee) (other than any Additional Notes and any Exchange Notes (including Guarantees thereof));

(3) Indebtedness of the Issuer and its Restricted Subsidiaries in existence on the Issue Date (other than Indebtedness described in clauses (1) and (2)), including the Existing Notes;

(4) Indebtedness consisting of Capitalized Lease Obligations and Purchase Money Obligations; so long as, except with respect to any such Indebtedness incurred in connection with any Environmental Capital Expenditures or Necessary Capital Expenditures, such Indebtedness exists at the date of such purchase, lease, construction, repair, restoration, replacement, expansion or improvement or is created within 270 days thereafter;

(5) Indebtedness incurred by the Issuer or any of its Restricted Subsidiaries constituting reimbursement obligations with respect to letters of credit issued in the ordinary course of business, including letters of credit in respect of workers' compensation or employee health claims, or other Indebtedness with respect to reimbursement-type obligations regarding workers' compensation or employee health claims; *provided, however,* that upon the drawing of such letters of credit or the incurrence of such Indebtedness, such obligations are reimbursed within 30 days following such drawing or incurrence;

(6) Indebtedness arising from agreements of the Issuer or its Restricted Subsidiaries providing for indemnification, adjustment of purchase price or similar obligations, in each case, incurred or assumed in connection with the disposition of any business, assets or a Subsidiary, other than guarantees of Indebtedness incurred by any Person acquiring all or any portion of such business, assets or a Subsidiary for the purpose of financing such acquisition; *provided, however,* that such Indebtedness is not reflected on the

206

EFIHMW00296688

balance sheet of the Issuer, or any of its Restricted Subsidiaries (contingent obligations referred to in a footnote to financial statements and not otherwise reflected on the balance sheet will not be deemed to be reflected on such balance sheet for purposes of this clause (6));

(7) Indebtedness of the Issuer to a Restricted Subsidiary; *provided* that any such Indebtedness owing to a Restricted Subsidiary that is not a Guarantor is expressly subordinated in right of payment to the Notes; *provided, further,* that any subsequent issuance or transfer of any Capital Stock or any other event which results in any Restricted Subsidiary ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such Indebtedness (except to the Issuer or another Restricted Subsidiary) shall be deemed, in each case, to be an incurrence of such Indebtedness;

(8) Indebtedness of a Restricted Subsidiary to the Issuer or another Restricted Subsidiary; *provided* that if a Guarantor incurs such Indebtedness to a Restricted Subsidiary that is not a Guarantor, such Indebtedness is expressly subordinated in right of payment to the Guarantee of the Notes of such Guarantor; *provided, further,* that any subsequent transfer of any such Indebtedness (except to the Issuer or another Restricted Subsidiary) shall be deemed, in each case, to be an incurrence of such Indebtedness not permitted by this clause;

(9) shares of Preferred Stock of a Restricted Subsidiary issued to the Issuer or another Restricted Subsidiary; *provided* that any subsequent issuance or transfer of any Capital Stock or any other event which results in any such Restricted Subsidiary ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such shares of Preferred Stock (except to the Issuer or another of its Restricted Subsidiaries) shall be deemed in each case to be an issuance of such shares of Preferred Stock not permitted by this clause;

(10) Hedging Obligations (excluding Hedging Obligations entered into for speculative purposes that are not made in the ordinary course of business or not consistent with prudent industry practice);

(11) obligations in respect of performance, bid, appeal and surety bonds and completion guarantees provided by the Issuer or any of its Restricted Subsidiaries in the ordinary course of business;

(12)(a) Indebtedness or Disqualified Stock of the Issuer and Indebtedness, Disqualified Stock or Preferred Stock of the Issuer or any Restricted Subsidiary equal to 100.0% of the net cash proceeds received by the Issuer since immediately after the Issue Date from the issue or sale of Equity Interests of the Issuer or cash contributed to the capital of the Issuer (in each case, other than Excluded Contributions or proceeds of Disqualified Stock or sales of Equity Interests to the Issuer or any of its Subsidiaries) as determined in accordance with clauses (3)(b) and (3)(c) of the first paragraph of "—Limitation on Restricted Payments" to the extent such net cash proceeds or cash have not been applied pursuant to such clauses to make Restricted Payments or to make other Investments, payments or exchanges pursuant to the second paragraph of "—Limitation on Restricted Payments" or to make Permitted Investments (other than Permitted Investments specified in clauses (1) and (3) of the definition thereof) and (b) Indebtedness or Disqualified Stock of Issuer and Indebtedness, Disqualified Stock or Preferred Stock of the Issuer or any Restricted Subsidiary not otherwise permitted hereunder in an aggregate principal amount or liquidation preference, which when aggregated with the principal amount and liquidation preference of all other Indebtedness, Disqualified Stock and Preferred Stock then outstanding and incurred pursuant to this clause (12)(b), does not at any one time outstanding exceed $2,000.0 million (it being understood that any Indebtedness, Disqualified Stock or Preferred Stock incurred pursuant to this clause (12)(b) shall cease to be deemed incurred or outstanding for purposes of this clause (12)(b) but shall be deemed incurred for the purposes of the first paragraph of this covenant from and after the first date on which the Issuer or such Restricted Subsidiary could have incurred such Indebtedness, Disqualified Stock or Preferred Stock under the first paragraph of this covenant without reliance on this clause (12)(b));

(13) the incurrence or issuance by the Issuer or any Restricted Subsidiary of Indebtedness, Disqualified Stock or Preferred Stock which serves to refund or refinance any Indebtedness, Disqualified Stock or Preferred Stock of the Issuer or any Restricted Subsidiary incurred as permitted under the first paragraph of this covenant and clauses (2), (3), (4) and (12)(a) above, this clause (13) and clause (14) below or any

207

EFIHMW00296689

Indebtedness, Disqualified Stock or Preferred Stock of the Issuer or any Restricted Subsidiary issued to so refund or refinance such Indebtedness, Disqualified Stock or Preferred Stock of the Issuer or any Restricted Subsidiary including additional Indebtedness, Disqualified Stock or Preferred Stock incurred to pay premiums (including reasonable tender premiums), defeasance costs and fees in connection therewith (the "*Refinancing Indebtedness*") prior to its respective maturity; *provided, however,* that such Refinancing Indebtedness:

(a) has a Weighted Average Life to Maturity at the time such Refinancing Indebtedness is incurred which is not less than the remaining Weighted Average Life to Maturity of the Indebtedness, Disqualified Stock or Preferred Stock being refunded or refinanced,

(b) to the extent such Refinancing Indebtedness refinances (i) Indebtedness subordinated or *pari passu* to the Notes or any Guarantee thereof, such Refinancing Indebtedness is subordinated or *pari passu* to the Notes or the Guarantee at least to the same extent as the Indebtedness being refinanced or refunded or (ii) Disqualified Stock or Preferred Stock, such Refinancing Indebtedness must be Disqualified Stock or Preferred Stock, respectively, and

(c) shall not include Indebtedness, Disqualified Stock or Preferred Stock of a Subsidiary of the Issuer that is not a Guarantor that refinances Indebtedness, Disqualified Stock or Preferred Stock of the Issuer or a Guarantor;

and, *provided, further,* that subclause (a) of this clause (13) will not apply to any refunding or refinancing of any Obligations secured by Permitted Liens;

(14) Indebtedness, Disqualified Stock or Preferred Stock of (x) the Issuer or a Restricted Subsidiary incurred to finance an acquisition or (y) Persons that are acquired by the Issuer or any Restricted Subsidiary or merged into the Issuer or a Restricted Subsidiary in accordance with the terms of the Indenture; *provided* that after giving effect to such acquisition or merger, either

(1) in the case of an acquisition by or merger with the Issuer or any of its Restricted Subsidiaries other than US Holdings and its Restricted Subsidiaries, either (a) the Issuer would be permitted to incur at least $1.00 of additional Indebtedness pursuant to clause (i) of the Fixed Charge Coverage Ratio test set forth in the first sentence of this covenant, or (b) such Fixed Charge Coverage Ratio of the Issuer and the Restricted Subsidiaries is greater than immediately prior to such acquisition or merger; or

(2) in the case of an acquisition by or merger with US Holdings or any of its Restricted Subsidiaries, either (a) US Holdings would be permitted to Incur at least $1.00 of additional Indebtedness pursuant to clause (ii) of the Fixed Charge Coverage Ratio test set forth in the first sentence of this covenant, or (b) such Fixed Charge Coverage Ratio of US Holdings and its Restricted Subsidiaries would be greater than immediately prior to such acquisition or merger;

(15) Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business; *provided* that such Indebtedness is extinguished within two Business Days of its incurrence;

(16) Indebtedness of the Issuer or any of its Restricted Subsidiaries supported by a letter of credit issued pursuant to any Credit Facilities, in a principal amount not in excess of the stated amount of such letter of credit;

(17)(a) any guarantee by the Issuer or a Restricted Subsidiary of Indebtedness or other obligations of any Restricted Subsidiary, so long as the incurrence of such Indebtedness incurred by such Restricted Subsidiary is permitted under the terms of the Indenture, or (b) any guarantee by a Restricted Subsidiary of Indebtedness of the Issuer; *provided* that such guarantee is incurred in accordance with the covenant described under "—Limitation on Guarantees of Indebtedness by Restricted Subsidiaries";

(18) Indebtedness of the Issuer or any of its Restricted Subsidiaries consisting of (i) the financing of insurance premiums or (ii) take-or-pay obligations contained in supply arrangements, in each case, incurred in the ordinary course of business; and

Confidential

EFIHMW00296690

(19) Indebtedness consisting of Indebtedness issued by the Issuer or any of its Restricted Subsidiaries to current or former officers, directors and employees thereof, their respective estates, spouses or former spouses, in each case to finance the purchase or redemption of Equity Interests of the Issuer or any direct or indirect parent company of the Issuer to the extent described in clause (4) of the second paragraph under the caption "—Limitation on Restricted Payments".

For purposes of determining compliance with this covenant:

(1) in the event that an item of Indebtedness, Disqualified Stock or Preferred Stock (or any portion thereof) meets the criteria of more than one of the categories of permitted Indebtedness, Disqualified Stock or Preferred Stock described in clauses (1) through (19) above or is entitled to be incurred pursuant to the first paragraph of this covenant, the Issuer, in its sole discretion, will classify or reclassify such item of Indebtedness, Disqualified Stock or Preferred Stock (or any portion thereof) and will only be required to include the amount and type of such Indebtedness, Disqualified Stock or Preferred Stock in one of the above clauses; *provided* that all Indebtedness outstanding under the Credit Facilities on the Issue Date will be treated as incurred on the Issue Date under clause (1) of the preceding paragraph; and

(2) at the time of incurrence, the Issuer will be entitled to divide and classify an item of Indebtedness in more than one of the types of Indebtedness described in the first and second paragraphs above.

Accrual of interest, the accretion of accreted value and the payment of interest in the form of additional Indebtedness, Disqualified Stock or Preferred Stock will not be deemed to be an incurrence of Indebtedness, Disqualified Stock or Preferred Stock for purposes of this covenant.

For purposes of determining compliance with any U.S. dollar-denominated restriction on the incurrence of Indebtedness, the U.S. dollar-equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was incurred, in the case of term debt, or first committed, in the case of revolving credit debt; *provided* that if such Indebtedness is incurred to refinance other Indebtedness denominated in a foreign currency, and such refinancing would cause the applicable U.S. dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such U.S. dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being refinanced.

The principal amount of any Indebtedness incurred to refinance other Indebtedness, if incurred in a different currency from the Indebtedness being refinanced, shall be calculated based on the currency exchange rate applicable to the currencies in which such respective Indebtedness is denominated that is in effect on the date of such refinancing.

The Indenture will provide that the Issuer will not, and will not permit any Guarantor to, directly or indirectly, incur any Indebtedness (including Acquired Indebtedness) that is subordinated or junior in right of payment to any Indebtedness of the Issuer or such Guarantor, as the case may be, unless such Indebtedness is expressly subordinated in right of payment to the Notes or such Guarantor's Guarantee to the extent and in the same manner as such Indebtedness is subordinated to other Indebtedness of the Issuer or such Guarantor, as the case may be.

The Indenture will not treat (1) unsecured Indebtedness as subordinated or junior to Secured Indebtedness merely because it is unsecured or (2) Senior Indebtedness as subordinated or junior to any other Senior Indebtedness merely because it has a junior priority with respect to the same collateral.

### Liens

The Issuer will not, and will not permit any Guarantor to, directly or indirectly, create, incur, assume or suffer to exist any Lien (except Permitted Liens) that secures obligations under any Indebtedness of the Issuer or

209

EFIHMW00296691

any related Guarantee by a Guarantor, on any asset or property of the Issuer or any Guarantor, or any income or profits therefrom, or assign or convey any right to receive income therefrom, unless:

    (1) in the case of Liens securing Subordinated Indebtedness, the Notes and related Guarantees are secured by a Lien on such property, assets or proceeds that is senior in priority to such Liens; or

    (2) in all other cases, the Notes or the Guarantees are equally and ratably secured or are secured by a Lien on such property, assets or proceeds that is senior in priority to such Liens;

except that the foregoing shall not apply to (a) Liens securing the Notes and the related Guarantees, (b) Liens securing Indebtedness permitted to be incurred under Credit Facilities, including any letter of credit relating thereto, that was permitted by the terms of the Indenture to be incurred pursuant to clause (1) of the second paragraph under "—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" and (c) Liens incurred to secure Obligations in respect of any Indebtedness permitted to be incurred pursuant to the covenant described above under "—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" *provided* that, with respect to Liens securing Obligations permitted under this subclause (c), at the time of incurrence and after giving *pro forma* effect thereto, the ratio of (1) the sum of (i) Indebtedness for borrowed money, Obligations in respect of Capitalized Lease Obligations and debt obligations evidenced by promissory notes and similar instruments of the Oncor Subsidiaries subject to a Lien plus (ii) the aggregate amount of Indebtedness for borrowed money, Obligations in respect of Capitalized Lease Obligations and debt obligations evidenced by promissory notes and similar instruments (and excluding, for the avoidance of doubt, loans under the Letter of Credit Facility portion of the Credit Facilities, all obligations relating to Receivables Facilities and obligations outstanding in respect of any commodity collateral posting facility portion of any Credit Facilities) subject to a Lien incurred pursuant to subclause (b) above, this subclause (c) and clause (6) of the definition of "Permitted Liens" (other than Liens securing Indebtedness incurred pursuant to clause (4) of the covenant described under "—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock"), net of all cash, cash equivalents and margin deposits related to commodity positions, in each case reflected as the balance sheet of the Issuer, to (2) the Issuer's EBITDA (including the Oncor Subsidiaries) for the most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date on which such event for which such calculation is being made shall occur, in each case with such *pro forma* adjustments to Indebtedness and EBITDA as are appropriate and consistent with the *pro forma* adjustment provisions set forth in the definition of Fixed Charge Coverage Ratio would be no greater than 5.0 to 1.0.

### *Merger, Consolidation or Sale of All or Substantially All Assets*

    The Issuer may not consolidate or merge with or into or wind up into (whether or not the Issuer is the surviving corporation), or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets, in one or more related transactions, to any Person unless:

    (1) the Issuer is the surviving corporation or the Person formed by or surviving any such consolidation or merger (if other than the Issuer) or to which such sale, assignment, transfer, lease, conveyance or other disposition will have been made is a corporation organized or existing under the laws of the jurisdiction of organization of the Issuer or the laws of the United States, any state thereof, the District of Columbia, or any territory thereof (such Person, as the case may be, being herein called the "*Successor Company*");

    (2) the Successor Company, if other than the Issuer, expressly assumes all the obligations of the Issuer under the Notes pursuant to supplemental indentures or other documents or instruments in form reasonably satisfactory to the Trustee;

    (3) immediately after such transaction, no Default exists;

    (4) immediately after giving *pro forma* effect to such transaction and any related financing transactions, as if such transactions had occurred at the beginning of the applicable four-quarter period,

        (a) the Successor Company would be permitted to incur at least $1.00 of additional Indebtedness pursuant to clause (i) of the Fixed Charge Coverage Ratio test set forth in the first sentence of the

210

EFIHMW00296692

covenant described under "—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock," or

(b) such Fixed Charge Coverage Ratio for the Successor Company, the Issuer and its Restricted Subsidiaries would be greater than such ratio for the Issuer and its Restricted Subsidiaries immediately prior to such transaction;

(5) each Guarantor, unless it is the other party to the transactions described above, in which case clause (b) of the second succeeding paragraph shall apply, shall have by supplemental indenture confirmed that its Guarantee shall apply to such Person's obligations under the Indenture, the Notes and the Registration Rights Agreement; and

(6) the Issuer shall have delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that such consolidation, merger or transfer and such supplemental indentures, if any, comply with the Indenture and, if a supplemental indenture is required in connection with such transaction, such supplement shall comply with the applicable provisions of the Indenture.

The Successor Company will succeed to, and be substituted for the Issuer, as the case may be, under the Indenture, the Guarantees and the Notes, as applicable. Notwithstanding the foregoing clauses (3) and (4),

(1) any Restricted Subsidiary may consolidate with or merge into or transfer all or part of its properties and assets to the Issuer, and

(2) the Issuer may merge with an Affiliate of the Issuer, as the case may be, solely for the purpose of reincorporating the Issuer in a State of the United States or any state thereof, the District of Columbia or any territory thereof so long as the amount of Indebtedness of the Issuer and its Restricted Subsidiaries is not increased thereby.

Subject to certain limitations described in the Indenture governing release of a Guarantee upon the sale, disposition or transfer of a Guarantor, no Guarantor will, and the Issuer will not permit any Guarantor to, consolidate or merge with or into or wind up into (whether or not the Issuer or Guarantor is the surviving corporation), or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets, in one or more related transactions, to any Person unless:

(1)(a) such Guarantor is the surviving corporation or the Person formed by or surviving any such consolidation or merger (if other than such Guarantor) or to which such sale, assignment, transfer, lease, conveyance or other disposition will have been made is a corporation, partnership, limited partnership, limited liability corporation or trust organized or existing under the laws of the jurisdiction of organization of such Guarantor, as the case may be, or the laws of the United States, any state thereof, the District of Columbia, or any territory thereof (such Guarantor or such Person, as the case may be, being herein called the "*Successor Person*");

(b) the Successor Person, if other than such Guarantor, expressly assumes all the obligations of such Guarantor under the Indenture and such Guarantor's related Guarantee pursuant to supplemental indentures or other documents or instruments in form reasonably satisfactory to the Trustee;

(c) immediately after such transaction, no Default exists; and

(d) the Issuer shall have delivered to the Trustee an Officer's Certificate, each stating that such consolidation, merger or transfer and such supplemental indentures, if any, comply with the Indenture; or

(2) the transaction is made in compliance with the covenant described under "Repurchase at the Option of Holders—Asset Sales."

Subject to certain limitations described in the Indenture, the Successor Person will succeed to, and be substituted for, such Guarantor under the Indenture and such Guarantor's Guarantee. Notwithstanding the foregoing, any Guarantor may (i) merge into or transfer all or part of its properties and assets to another

211

Confidential

EFIHMW00296693

Guarantor or the Issuer, (ii) merge with an Affiliate of the Issuer solely for the purpose of reincorporating the Guarantor in the United States, any state thereof, the District of Columbia or any territory thereof or (iii) convert into a corporation, partnership, limited partnership, limited liability corporation or trust organized or existing under the laws of the jurisdiction of organization of such Guarantor.

*Transactions with Affiliates*

The Issuer will not, and will not permit any of its Restricted Subsidiaries to, make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction, contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate of the Issuer (each of the foregoing, an "*Affiliate Transaction*") involving aggregate payments or consideration in excess of $25.0 million, unless:

(1) such Affiliate Transaction is on terms that are not materially less favorable to the Issuer or its relevant Restricted Subsidiary than those that would have been obtained in a comparable transaction by the Issuer or such Restricted Subsidiary with an unrelated Person on an arm's-length basis; and

(2) the Issuer delivers to the Trustee with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate payments or consideration in excess of $50.0 million, a resolution adopted by the majority of the board of directors of the Issuer approving such Affiliate Transaction and set forth in an Officer's Certificate certifying that such Affiliate Transaction complies with clause (1) above.

The foregoing provisions will not apply to the following:

(1) transactions between or among the Issuer or any of its Restricted Subsidiaries or between or among the Issuer, any of its Restricted Subsidiaries and the Oncor Subsidiaries;

(2) Restricted Payments permitted by the provisions of the Indenture described under the covenant "—Limitation on Restricted Payments" and the definition of "Permitted Investments";

(3) the payment of management, consulting, monitoring and advisory fees and related expenses to the Investors pursuant to the Sponsor Management Agreement (plus any unpaid management, consulting, monitoring and advisory fees and related expenses accrued in any prior year) and the termination fees pursuant to the Sponsor Management Agreement, in each case as in effect on the Issue Date, or any amendment thereto (so long as any such amendment is not disadvantageous in the good faith judgment of the board of directors of the Issuer to the Holders when taken as a whole as compared to the Sponsor Management Agreement in effect on the Issue Date);

(4) the payment of reasonable and customary fees paid to, and indemnities provided for the benefit of, officers, directors, employees or consultants of Issuer, any of its direct or indirect parent companies or any of its Restricted Subsidiaries;

(5) transactions in which the Issuer or any of its Restricted Subsidiaries, as the case may be, delivers to the Trustee a letter from an Independent Financial Advisor stating that such transaction is fair to the Issuer or such Restricted Subsidiary from a financial point of view or stating that the terms are not materially less favorable to the Issuer or its relevant Restricted Subsidiary than those that would have been obtained in a comparable transaction by the Issuer or such Restricted Subsidiary with an unrelated Person on an arm's-length basis;

(6) any agreement as in effect as of the Issue Date, or any amendment thereto (so long as any such amendment is not disadvantageous to the Holders when taken as a whole as compared to the applicable agreement as in effect on the Issue Date);

(7) the existence of, or the performance by the Issuer or any of its Restricted Subsidiaries of its obligations under the terms of, any stockholders agreement (including any registration rights agreement or

212

 EFIHMW00296694

purchase agreement related thereto) to which it is a party as of the Issue Date and any similar agreements which it may enter into thereafter; *provided, however,* that the existence of, or the performance by the Issuer or any of its Restricted Subsidiaries of obligations under any future amendment to any such existing agreement or under any similar agreement entered into after the Issue Date shall only be permitted by this clause (7) to the extent that the terms of any such amendment or new agreement are not otherwise disadvantageous to the Holders when taken as a whole;

(8) the Transactions and the payment of all fees and expenses related to the Transactions, in each case as disclosed in this offering memorandum;

(9) transactions with customers, clients, suppliers, or purchasers or sellers of goods or services, in each case in the ordinary course of business and otherwise in compliance with the terms of the Indenture which are fair to the Issuer and its Restricted Subsidiaries, in the reasonable determination of the board of directors of the Issuer or the senior management thereof, or are on terms at least as favorable as might reasonably have been obtained at such time from an unaffiliated party;

(10) the issuance of Equity Interests (other than Disqualified Stock) of the Issuer to any Permitted Holder or to any director, officer, employee or consultant;

(11) sales of accounts receivable, or participations therein, in connection with any Receivables Facility;

(12) payments by the Issuer or any of its Restricted Subsidiaries to any of the Investors made for any financial advisory, financing, underwriting or placement services or in respect of other investment banking activities, including, without limitation, in connection with acquisitions or divestitures, which payments are approved by a majority of the board of directors of the Issuer in good faith;

(13) payments or loans (or cancellation of loans) to employees or consultants of the Issuer, any of its direct or indirect parent companies or any of its Restricted Subsidiaries and employment agreements, stock option plans and other similar arrangements with such employees or consultants which, in each case, are approved by the Issuer in good faith;

(14) investments by the Investors in securities of the Issuer or any of its Restricted Subsidiaries so long as (i) the investment is being offered generally to other investors on the same or more favorable terms and (ii) the investment constitutes less than 5% of the proposed or outstanding issue amount of such class of securities; and

(15) payments by the Issuer (and any direct or indirect parent thereof) and its Subsidiaries pursuant to tax sharing agreements among the Issuer (and any such parent) and its Subsidiaries on customary terms to the extent attributable to the ownership or operation of the Issuer and its Subsidiaries; *provided* that in each case the amount of such payments in any fiscal year does not exceed the amount that the Issuer, its Restricted Subsidiaries and its Unrestricted Subsidiaries (to the extent of amounts received from Unrestricted Subsidiaries) would be required to pay in respect of foreign, federal, state and local taxes for such fiscal year were the Issuer and its Restricted Subsidiaries (to the extent described above) to pay such taxes separately from any such parent entity.

### *Dividend and Other Payment Restrictions Affecting Restricted Subsidiaries*

The Issuer will not, and will not permit any of its Restricted Subsidiaries that are not Guarantors to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or consensual restriction on the ability of any such Restricted Subsidiary to:

(1)(a) pay dividends or make any other distributions to the Issuer or any of its Restricted Subsidiaries on its Capital Stock or with respect to any other interest or participation in, or measured by, its profits, or

(b) pay any Indebtedness owed to the Issuer or any of its Restricted Subsidiaries;

(2) make loans or advances to the Issuer or any of its Restricted Subsidiaries; or

213

Confidential

EFIHMW00296695

**PX 001**
**Page 220 of 453**