S&S DRAFT 10-08-07

EXHIBIT [B]
TO TXU CORP. [SENIOR UNSECURED
INTERIM LOAN AGREEMENT]

---

**TXU CORP.**

**AND EACH OF THE GUARANTORS PARTY HERETO**

**SENIOR CASH PAY NOTES DUE 2017**

**SENIOR TOGGLE NOTES DUE 2017**

---

**SENIOR REFINANCING INDENTURE**

**DATED AS OF [    ], 2007**

---

**[NAME OF TRUSTEE]**

**TRUSTEE**

---

NYDOCS01/1147878.11

CROSS-REFERENCE TABLE[*]

| Trust Indenture Act Section | Indenture Section |
|---|---|
| 310(a)(1) | 7.10 |
| (a)(2) | 7.10 |
| (a)(3) | N.A. |
| (a)(4) | N.A. |
| (a)(5) | 7.10 |
| (b) | 7.10 |
| (c) | N.A. |
| 311(a) | 7.11 |
| (b) | 7.11 |
| (c) | N.A. |
| 312(a) | 2.05 |
| (b) | 12.03 |
| (c) | 12.03 |
| 313(a) | 7.06; 12.02 |
| (b)(1) | N.A. |
| (b)(2) | 7.06; 7.07 |
| (c) | 7.06; 12.02 |
| (d) | 7.06 |
| 314(a) | 4.03; 12.02; 12.05 |
| (b) | N.A. |
| (c)(1) | 12.04 |
| (c)(2) | 12.04 |
| (c)(3) | N.A. |
| (d) | N.A. |
| (e) | 12.05 |
| (f) | N.A. |
| 315(a) | 7.01 |
| (b) | 7.05; 12.02 |
| (c) | 7.01 |
| (d) | 7.01 |
| (e) | 6.14 |
| 316(a) (last sentence) | 2.09 |
| (a)(1)(A) | 6.05 |
| (a)(1)(B) | 6.04 |
| (a)(2) | N.A. |
| (b) | 6.07 |
| (c) | 1.05 |
| 317(a)(1) | 6.08 |
| (a)(2) | 6.12 |
| (b) | 2.04 |
| 318(a) | 12.01 |
| (b) | N.A. |
| (c) | 12.01 |

N.A. means not applicable.

---

[*] This Cross Reference Table is not part of the Indenture.

NYDOCS01/1147878.11

EFIHMW00293303

**PX 003B**
**Page 2 of 178**

TABLE OF CONTENTS

Page

ARTICLE 1 DEFINITIONS AND INCORPORATION BY REFERENCE .......................................... 1

    Section 1.01    Definitions ................................................................................................. 1
    Section 1.02    Other Definitions ..................................................................................... 42
    Section 1.03    Incorporation by Reference of Trust Indenture Act............................... 43
    Section 1.04    Rules of Construction .............................................................................. 44
    Section 1.05    Acts of Holders ........................................................................................ 44

ARTICLE 2 THE SENIOR NOTES.................................................................................................. 45

    Section 2.01    Form and Dating; Terms.......................................................................... 45
    Section 2.02    Execution and Authentication.................................................................. 47
    Section 2.03    Registrar, Paying Agent and Calculation Agent ..................................... 48
    Section 2.04    Paying Agent to Hold Money in Trust .................................................... 49
    Section 2.05    Holder Lists .............................................................................................. 49
    Section 2.06    Transfer and Exchange............................................................................. 49
    Section 2.07    Replacement Senior Notes ....................................................................... 61
    Section 2.08    Outstanding Senior Notes ........................................................................ 61
    Section 2.09    Treasury Notes ......................................................................................... 61
    Section 2.10    Temporary Senior Notes .......................................................................... 62
    Section 2.11    Cancellation .............................................................................................. 62
    Section 2.12    Defaulted Cash Interest............................................................................ 62
    Section 2.13    CUSIP and ISIN Numbers ....................................................................... 63

ARTICLE 3 REDEMPTION............................................................................................................. 63

    Section 3.01    Notices to Trustee .................................................................................... 63
    Section 3.02    Selection of Senior Notes to Be Redeemed or Purchased ...................... 63
    Section 3.03    Notice of Redemption .............................................................................. 64
    Section 3.04    Effect of Notice of Redemption ............................................................... 65
    Section 3.05    Deposit of Redemption or Purchase Price ............................................... 65
    Section 3.06    Senior Notes Redeemed or Purchased in Part.......................................... 65
    Section 3.07    Optional Redemption ............................................................................... 66
    Section 3.08    Mandatory Redemption ........................................................................... 67
    Section 3.09    Offers to Repurchase by Application of Excess Proceeds....................... 67

ARTICLE 4 COVENANTS .............................................................................................................. 69

    Section 4.01    Payment of Senior Notes ......................................................................... 69
    Section 4.02    Maintenance of Office or Agency............................................................ 70
    Section 4.03    Reports and Other Information................................................................. 70
    Section 4.04    Compliance Certificate ............................................................................ 72
    Section 4.05    Taxes......................................................................................................... 72
    Section 4.06    Stay, Extension and Usury Laws ............................................................. 72
    Section 4.07    Limitation on Restricted Payments.......................................................... 72
    Section 4.08    Dividend and Other Payment Restrictions Affecting Restricted
                     Subsidiaries.............................................................................................. 79
    Section 4.09    Limitation on Incurrence of Indebtedness and Issuance of Disqualified
                     Stock and Preferred Stock........................................................................ 81
    Section 4.10    Asset Sales ............................................................................................... 86
    Section 4.11    Transactions with Affiliates .................................................................... 89

Confidential                                                    EFIHMW00293304

Section 4.12    Liens ................................................................................................. 91
Section 4.13    Corporate Existence ......................................................................... 91
Section 4.14    Offer to Repurchase upon Change of Control ................................. 92
Section 4.15    Limitation on Guarantees of Indebtedness by Restricted Subsidiaries ............... 93

ARTICLE 5 SUCCESSORS ................................................................................................. 94

Section 5.01    Merger, Consolidation, or Sale of All or Substantially All Assets ................... 94
Section 5.02    Successor Corporation Substituted ................................................. 96

ARTICLE 6 DEFAULTS AND REMEDIES ........................................................................ 96

Section 6.01    Events of Default ............................................................................. 96
Section 6.02    Acceleration ..................................................................................... 98
Section 6.03    Other Remedies ................................................................................ 99
Section 6.04    Waiver of Past Defaults ................................................................... 99
Section 6.05    Control by Majority ......................................................................... 99
Section 6.06    Limitation on Suits .......................................................................... 99
Section 6.07    Rights of Holders of Senior Notes to Receive Payment ................. 100
Section 6.08    Collection Suit by Trustee ............................................................. 100
Section 6.09    Restoration of Rights and Remedies .............................................. 100
Section 6.10    Rights and Remedies Cumulative .................................................. 100
Section 6.11    Delay or Omission Not Waiver ...................................................... 101
Section 6.12    Trustee May File Proofs of Claim .................................................. 101
Section 6.13    Priorities ......................................................................................... 101
Section 6.14    Undertaking for Costs .................................................................... 102

ARTICLE 7 TRUSTEE ........................................................................................................ 102

Section 7.01    Duties of Trustee ............................................................................ 102
Section 7.02    Rights of Trustee ............................................................................ 103
Section 7.03    Individual Rights of Trustee ........................................................... 104
Section 7.04    Trustee's Disclaimer ...................................................................... 104
Section 7.05    Notice of Defaults .......................................................................... 104
Section 7.06    Reports by Trustee to Holders of the Senior Notes ........................ 104
Section 7.07    Compensation and Indemnity ......................................................... 105
Section 7.08    Replacement of Trustee .................................................................. 106
Section 7.09    Successor Trustee by Merger, etc .................................................. 106
Section 7.10    Eligibility; Disqualification ............................................................ 106
Section 7.11    Preferential Collection of Claims Against Issuer ........................... 107

ARTICLE 8 LEGAL DEFEASANCE AND COVENANT DEFEASANCE ......................... 107

Section 8.01    Option to Effect Legal Defeasance or Covenant Defeasance ......... 107
Section 8.02    Legal Defeasance and Discharge .................................................. 107
Section 8.03    Covenant Defeasance ..................................................................... 108
Section 8.04    Conditions to Legal or Covenant Defeasance ................................ 108
Section 8.05    Deposited Money and Government Securities to Be Held in Trust; Other Miscellaneous Provisions ............................................................ 109
Section 8.06    Repayment to Issuer ....................................................................... 110
Section 8.07    Reinstatement .................................................................................. 110

ARTICLE 9 AMENDMENT, SUPPLEMENT AND WAIVER ........................................... 110

Section 9.01    Without Consent of Holders of Senior Notes ................................. 110
Section 9.02    With Consent of Holders of Senior Notes ...................................... 112

Confidential

EFIHMW00293305

**PX 003B**
**Page 4 of 178**

Section 9.03    Compliance with Trust Indenture Act.................................................................113
Section 9.04    Revocation and Effect of Consents.....................................................................114
Section 9.05    Notation on or Exchange of Senior Notes...........................................................114
Section 9.06    Trustee to Sign Amendments, etc.......................................................................114
Section 9.07    Payment for Consent...........................................................................................114

ARTICLE 10 GUARANTEES .................................................................................................115

Section 10.01    Guarantee............................................................................................................115
Section 10.02    Limitation on Guarantor Liability.......................................................................116
Section 10.03    Execution and Delivery ......................................................................................117
Section 10.04    Subrogation.........................................................................................................117
Section 10.05    Benefits Acknowledged .....................................................................................117
Section 10.06    Release of Guarantees........................................................................................117

ARTICLE 11 SATISFACTION AND DISCHARGE ...............................................................118

Section 11.01    Satisfaction and Discharge .................................................................................118
Section 11.02    Application of Trust Money ................................................................................119

ARTICLE 12 MISCELLANEOUS ..........................................................................................119

Section 12.01    Trust Indenture Act Controls ..............................................................................119
Section 12.02    Notices.................................................................................................................119
Section 12.03    Communication by Holders of Senior Notes with Other Holders of
                 Senior Notes........................................................................................................121
Section 12.04    Certificate and Opinion as to Conditions Precedent ...........................................121
Section 12.05    Statements Required in Certificate or Opinion ...................................................121
Section 12.06    Rules by Trustee and Agents ..............................................................................121
Section 12.07    No Personal Liability of Directors, Officers, Employees and
                 Stockholders .......................................................................................................121
Section 12.08    Governing Law ...................................................................................................122
Section 12.09    Waiver of Jury Trial............................................................................................122
Section 12.10    Force Majeure .....................................................................................................122
Section 12.11    No Adverse Interpretation of Other Agreements .................................................122
Section 12.12    Successors ...........................................................................................................122
Section 12.13    Severability .........................................................................................................122
Section 12.14    Counterpart Originals .........................................................................................122
Section 12.15    Table of Contents, Headings, etc ........................................................................123
Section 12.16    Qualification of Indenture...................................................................................123
Section 12.17    Ring-Fencing of Oncor ......................................................................................123

EXHIBITS

Exhibit A-1        FORM OF SENIOR CASH PAY NOTE – FLOATING RATE
Exhibit A-2        FORM OF SENIOR TOGGLE NOTE – FLOATING RATE
Exhibit A-3        FORM OF SENIOR CASH PAY NOTE – FIXED RATE
Exhibit A-4        FORM OF SENIOR TOGGLE NOTE – FIXED RATE
Exhibit B          FORM OF CERTIFICATE OF TRANSFER
Exhibit C          FORM OF CERTIFICATE OF EXCHANGE
Exhibit D          FORM OF SUPPLEMENTAL INDENTURE
Exhibit E-1        FORM OF EXCHANGE NOTICE FOR SENIOR CASH PAY LOANS
Exhibit E-2        FORM OF EXCHANGE NOTICE FOR SENIOR TOGGLE LOANS

Confidential                                                                    EFIHMW00293306

INDENTURE dated as of [          ], 2007 among TXU Corp., a Texas corporation (the "Issuer"), the Guarantors (as defined herein) and [Name of Trustee], as Trustee.

## WITNESSETH

WHEREAS, the Issuer has duly authorized the creation of an issue of (i) Senior Cash Pay Notes due 2017 (the "Initial Senior Cash Pay Notes") and (ii) Senior Toggle Notes due 2017 (together with any increases in the aggregate principal amount thereof, or any Related PIK Notes (as defined herein) with respect thereto, in each case in connection with any PIK Payment (as defined herein) with respect thereto, the "Initial Senior Toggle Notes"), to be issued in exchange for (i) Senior Cash Pay Term Loans, in the case of Initial Senior Cash Pay Notes, and (ii) Senior Toggle Term Loans, in the case of Initial Senior Toggle Notes, in each case on or after the Interim Loan Conversion Date;

WHEREAS, each of the Issuer and each of the Guarantors has duly authorized the execution and delivery of this Indenture;

NOW, THEREFORE, the Issuer, the Guarantors and the Trustee agree as follows for the benefit of each other and for the equal and ratable benefit of the Holders of the Senior Notes.

## ARTICLE 1

## DEFINITIONS AND INCORPORATION BY REFERENCE

Section 1.01    Definitions.

"144A Global Note" means a Global Note substantially in the form of Exhibit A-1, Exhibit A-2, Exhibit A-3 or Exhibit A-4 hereto, as the case may be, bearing the Global Note Legend, the Private Placement Legend and the Tax Legend (if applicable) and deposited with or on behalf of, and registered in the name of, the Depositary or its nominee that will be issued in a denomination equal to the outstanding principal amount of the Senior Notes sold in reliance on Rule 144A.

"Acquired Indebtedness" means, with respect to any specified Person,

(1)    Indebtedness of any other Person existing at the time such other Person is merged with or into or became a Restricted Subsidiary of such specified Person, including Indebtedness incurred in connection with, or in contemplation of, such other Person merging with or into or becoming a Restricted Subsidiary of such specified Person, and

(2)    Indebtedness secured by a Lien encumbering any asset acquired by such specified Person.

"Additional Interest" means all additional interest then owing pursuant to the Registration Rights Agreement.

"Additional Senior Cash Pay Notes" means additional Senior Cash Pay Notes (other than Initial Senior Cash Pay Notes and Exchange Notes issued in exchange for such Initial Senior Cash Pay Notes) issued from time to time under this Indenture in accordance with Sections 2.02 and 4.09 hereof, as part of the same series as the Initial Senior Cash Pay Notes.

"Additional Senior Notes" means Additional Senior Cash Pay Notes and Additional Senior Toggle Notes.

SENIOR REFINANCING INDENTURE

Confidential

"Additional Senior Toggle Notes" means additional Senior Toggle Notes (other than the Initial Senior Toggle Notes, any PIK Notes issued as a result of a PIK Payment on such Initial Senior Notes and Exchange Notes issued in exchange for such Initial Senior Toggle Notes and such PIK Notes) issued from time to time under this Indenture in accordance with Sections 2.02 and 4.09 hereof, as part of the same series as the Initial Senior Toggle Notes.

"Administrative Agent" means Morgan Stanley Senior Funding, Inc., as administrative agent under the Senior Interim Loan Agreement, until a successor replaces it in accordance with the terms of the Senior Interim Loan Agreement and, thereafter, means such successor.

"Affiliate" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise.

"Agent" means any Registrar, co-registrar, Paying Agent, additional paying agent or Calculation Agent.

"Applicable Margin" means, for any day, a rate per annum equal to that set forth on the following table for the period commencing on the date specified below to but not including the subsequent date specified below:

| | Senior Cash Pay Notes | Senior Toggle Notes – Cash Interest | Senior Toggle Notes – PIK Interest |
|---|---|---|---|
| October 15, 2008 | 5.25% | 5.50% | 6.25% |
| January 15, 2009 | 5.50% | 5.75% | 6.50% |
| April 15, 2009 | 5.75% | 6.00% | 6.75% |
| July 15, 2009 | 6.00% | 6.25% | 7.00% |
| October 15, 2009 | 6.25% | 6.50% | 7.25% |
| January 15, 2010 | 6.50% | 6.75% | 7.50% |
| April 15, 2010 | 6.75% | 7.00% | 7.75% |
| July 15, 2010 | 7.00% | 7.25% | 8.00% |
| October 15, 2010 | 7.25% | 7.50% | 8.25% |
| January 15, 2011 | 7.50% | 7.75% | 8.50% |
| April 15, 2011 | 7.75% | 8.00% | 8.75% |
| July 15, 2011 | 8.00% | 8.25% | 9.00% |
| October 15, 2011 | 8.25% | 8.50% | 9.25% |
| January 15, 2012 | 8.50% | 8.75% | 9.50% |
| April 15, 2012 | 8.75% | 9.00% | 9.75% |
| July 15, 2012 | 9.00% | 9.25% | 10.00% |
| October 15, 2012 | 9.25% | 9.50% | 10.25% |
| January 15, 2013 | 9.50% | 9.75% | 10.50% |
| April 15, 2013 | 9.75% | 10.00% | 10.75% |
| July 15, 2013 | 10.00% | 10.25% | 11.00% |
| October 15, 2013 | 10.25% | 10.50% | 11.25% |
| January 15, 2014 | 10.50% | 10.75% | 11.50% |
| April 15, 2014 | 10.75% | 11.00% | 11.75% |
| July 15, 2014 | 11.00% | 11.25% | 12.00% |

Confidential

EFIHMW00293308

"Applicable Premium" means, with respect to any Senior Note on any Redemption Date, the greater of:

(1)    1.0% of the principal amount of such Senior Note; and

(2)    (A)  with respect to the Senior Toggle Notes, the excess, if any, of (a) the present value at such Redemption Date of (i) the redemption price of such Senior Toggle Note at October 15, 2012 (such redemption price determined as set forth in the definition of Specified Premium), plus (ii) all required interest payments (calculated based on the Cash Interest rate payable on the Senior Toggle Notes) due on such Senior Toggle Note through October 15, 2012 (excluding accrued but unpaid interest to the Redemption Date), computed using a discount rate equal to the Treasury Rate as of such Redemption Date plus 50 basis points; over (b) the principal amount of such Senior Toggle Note, or

(B)    with respect to the Senior Cash Pay Notes, the excess, if any, of (a) the present value at such Redemption Date of (i) the redemption price of such Senior Cash Pay Note at October 15, 2012 (such redemption price determined as set forth in the definition of Specified Premium), plus (ii) all required interest payments due on such Senior Cash Pay Note through October 15, 2012 (excluding accrued but unpaid interest to the Redemption Date), computed using a discount rate equal to the Treasury Rate as of such Redemption Date plus 50 basis points; over (b) the principal amount of such Senior Cash Pay Note.

"Applicable Procedures" means, with respect to any transfer or exchange of or for beneficial interests in any Global Note, the rules and procedures of the Depositary, Euroclear and/or Clearstream that apply to such transfer or exchange.

"Applicable Rate" means, with respect to any Senior Note, the per annum rate of interest (excluding any interest paid pursuant to Section 2.10 of the Senior Interim Loan Agreement) borne by the Senior Term Loan exchanged for such Senior Note on the Exchange Date; provided that the Applicable Rate shall be capped such that the Applicable Rate shall not exceed the Senior Cash Pay Cap.

"Asset Sale" means:

(1)    the sale, conveyance, transfer or other disposition, whether in a single transaction or a series of related transactions, of property or assets (including by way of a Sale and Lease-Back Transaction) of the Issuer or any of its Restricted Subsidiaries (each referred to in this definition as a "disposition"); or

(2)    the issuance or sale of Equity Interests of any Restricted Subsidiary, whether in a single transaction or a series of related transactions (other than Preferred Stock of Restricted Subsidiaries issued in compliance with Section 4.09 hereof);

in each case, other than:

(a)    any disposition of Cash Equivalents or Investment Grade Securities or obsolete or worn out equipment (including any such equipment that has been refurbished in contemplation of such disposition) in the ordinary course of business or any disposition of inventory or goods (or other assets) held for sale in the ordinary course of business;

(b)    the disposition of all or substantially all of the assets of the Issuer in a manner permitted pursuant to Section 5.01 hereof or any disposition that constitutes a Change of Control pursuant to this Indenture in compliance with Section 4.14 hereof;

Confidential

(c)      the making of any Restricted Payment or Permitted Investment that is permitted to be made, and is made, under Section 4.07 hereof;

(d)      any disposition of assets or issuance or sale of Equity Interests of any Restricted Subsidiary in any transaction or series of related transactions with an aggregate fair market value of less than $75.0 million;

(e)      any disposition of property or assets or issuance of securities by a Restricted Subsidiary of the Issuer to the Issuer or by the Issuer or a Restricted Subsidiary of the Issuer to another Restricted Subsidiary of the Issuer;

(f)      to the extent allowable under Section 1031 of the Code or any comparable or successor provision, any exchange of like property (excluding any boot thereon) for use in a Similar Business;

(g)      the lease, assignment or sub-lease of any real or personal property in the ordinary course of business;

(h)      any issuance or sale of Equity Interests in, or Indebtedness or other securities of, an Unrestricted Subsidiary (other than the sale of Equity Interests in, or Indebtedness or other securities of, any of the Oncor Subsidiaries to the extent the aggregate Net Proceeds for such sales do not exceed $1,250 million; provided that the Net Proceeds are used to reduce intercompany loans from TCEH outstanding at the time such Net Proceeds are received and required to be repaid therefrom);

(i)      foreclosures on assets;

(j)      sales of accounts receivable, or participations therein, in connection with any Receivables Facility for the benefit of the Issuer or any of its Restricted Subsidiaries;

(k)      any financing transaction with respect to property built or acquired by the Issuer or any Restricted Subsidiary after the Closing Date, including Sale and Lease-Back Transactions and asset securitizations permitted by this Indenture;

(l)      [Reserved];

(m)      sales, transfers and other dispositions (i) of Investments in joint ventures to the extent required by, or made pursuant to, customary buy/sell or put/call arrangements between the joint venture parties set forth in joint venture arrangements and similar binding arrangements or (ii) to joint ventures in connection with the dissolution termination of a joint venture to the extent required pursuant to joint venture and similar arrangements;

(n)      [Reserved];

(o)      [Reserved];

(p)      [Reserved];

(q)      any Casualty Event provided the net proceeds therefrom are deemed to be Net Proceeds and are applied in accordance with Section 4.10(b) hereof or the Issuer or such Restricted Subsidiary delivers to the Trustee a Restoration Certificate with respect to plans to invest (and reinvests within 450 days from the date of receipt of the Net Proceeds) and;

(r)      the execution of (or amendment to), settlement of or unwinding of any Hedging Obligation in the ordinary course of business;

(s)      any disposition of mineral rights (other than coal and lignite mineral rights); provided the net proceeds therefrom are deemed to be Net Proceeds and are applied in accordance with Section 4.10(b) hereof;

Confidential

EFIHMW00293310

PX 003B
Page 9 of 178

(t)    any sale, transfer or other disposal of any real property that is (i) primarily used or intended to be used for mining which has either been reclaimed, or has not been used for mining in a manner which requires reclamation, and in either case has been determined by TCEH not to be necessary for use for mining, (ii) used as buffer land, but no longer serves such purpose or its use is restricted such that it will continue to be buffer land, or (iii) was acquired in connection with power generation facilities, but has been determined by TCEH to no longer be commercially suitable for such purpose;

(u)    [Reserved];

(v)    dispositions of power, capacity, heat rate, renewable energy credits, waste by-products, energy, electricity, coal and lignite, oil and other petroleum based liquids, emissions and other environmental credits, ancillary services, fuel (including all forms of nuclear fuel and natural gas) and other related assets or products of services, including assets related to trading activities or the sale of inventory or contracts related to any of the foregoing, in each case in the ordinary course of business;

(w)    [Reserved];

(x)    any disposition of assets in connection with salvage activities; provided the net proceeds therefrom are deemed to be Net Proceeds and are applied in accordance with Section 4.10(b) hereof; and

(y)    any sale, transfer or other disposition of any assets required by any Government Authority, provided the net proceeds therefrom are deemed to be Net Proceeds and are applied in accordance with Section 4.10(b) hereof.

"Asset Sale Offer" has the meaning set forth in Section 4.10(b) hereof.

"Bankruptcy Code" means Title 11 of the United States Code, as amended.

"Bankruptcy Law" means the Bankruptcy Code and any similar federal, state or foreign law for the relief of debtors.

"Board of Directors" means:

(1)    with respect to a corporation, the board of directors of the corporation or any committee thereof duly authorized to act on behalf of such board;

(2)    with respect to a partnership, the Board of Directors of the general partner of the partnership;

(3)    with respect to a limited liability company, the managing member or members or any controlling committee of managing members thereof; and

(4)    with respect to any other Person, the board or committee of such Person serving a similar function.

"broker-dealer" has the meaning set forth in the Registration Rights Agreement.

"Business Day" means each day which is not a Legal Holiday, and if such day relates to determining LIBOR, or any fundings disbursements, settlements and payments in respect of Floating Rate

Confidential

Notes, such day shall be a day on which dealings on deposits in U.S. dollars are conducted by and between banks in the London Interbank Eurodollar Market."

"Capital Stock" means:

(1)        in the case of a corporation, corporate stock;

(2)        in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(3)        in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); and

(4)        any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person.

"Capitalized Lease Obligation" means, at the time any determination thereof is to be made, the amount of the liability in respect of a capital lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) in accordance with GAAP; provided that any obligations existing on the Closing Date (i) that were not included on the balance sheet of the Issuer as capital lease obligations and (ii) that are subsequently recharacterized as capital lease obligations due to a change in accounting treatment shall for all purposes not be treated as Capitalized Lease Obligations.

"Capitalized Software Expenditures" means, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities) by a Person and its Restricted Subsidiaries during such period in respect of purchased software or internally developed software and software enhancements that, in conformity with GAAP, are or are required to be reflected as capitalized costs on the consolidated balance sheet of a Person and its Restricted Subsidiaries.

"Cash Equivalents" means:

(1)        United States dollars;

(2)        euros or any national currency of any participating member state of the EMU or such local currencies held by the Issuer and its Restricted Subsidiaries from time to time in the ordinary course of business;

(3)        securities issued or directly and fully and unconditionally guaranteed or insured by the U.S. government (or any agency or instrumentality thereof the securities of which are unconditionally guaranteed as a full faith and credit obligation of the U.S. government) with maturities, unless such securities are deposited to defease Indebtedness, of 24 months or less from the date of acquisition;

(4)        certificates of deposit, time deposits and eurodollar time deposits with maturities of one year or less from the date of acquisition, bankers' acceptances with maturities not exceeding one year and overnight bank deposits, in each case with any commercial bank having capital and surplus of not less than $500.0 million in the case of U.S. banks and $100.0 million (or the U.S. dollar equivalent as of the date of determination) in the case of non-U.S. banks;

(5)        repurchase obligations for underlying securities of the types described in clauses (3) and (4) entered into with any financial institution meeting the qualifications specified in clause (4) above;

Confidential

EFIHMW00293312

**PX 003B
Page 11 of 178**

(6)      commercial paper rated at least P-1 by Moody's or at least A-1 by S&P and in each case maturing within 24 months after the date of creation thereof;

(7)      marketable short-term money market and similar securities having a rating of at least P-2 or A-2 from either Moody's or S&P, respectively (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another Rating Agency) and in each case maturing within 24 months after the date of creation thereof;

(8)      investment funds investing 95% of their assets in securities of the types described in clauses (1) through (7) above;

(9)      readily marketable direct obligations issued by any state, commonwealth or territory of the United States or any political subdivision or taxing authority thereof having an Investment Grade Rating from either Moody's or S&P with maturities of 24 months or less from the date of acquisition;

(10)     Indebtedness or Preferred Stock issued by Persons with a rating of A or higher from S&P or A2 or higher from Moody's with maturities of 24 months or less from the date of acquisition; and

(11)     Investments with average maturities of 24 months or less from the date of acquisition in money market funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's.

Notwithstanding the foregoing, Cash Equivalents shall include amounts denominated in currencies other than those set forth in clauses (1) and (2) above; provided that such amounts are converted into any currency listed in clauses (1) and (2) as promptly as practicable and in any event within ten Business Days following the receipt of such amounts.

"Cash Interest" has the meaning set forth in Exhibit A-2 or Exhibit A-4 hereto.

"Casualty Event" means any taking under power of eminent domain or similar proceeding and any insured loss; provided that any such taking or similar proceeding or insured loss that results in Net Proceeds of less than $75.0 million shall not be deemed a Casualty Event.

"Change of Control" means the occurrence of any of the following:

(1)      the sale, lease or transfer, in one or a series of related transactions, of all or substantially all of the assets of the Issuer and its Subsidiaries, taken as a whole, to any Person other than a Permitted Holder; or

(2)      the Issuer becomes aware (by way of a report or any other filing pursuant to Section 13(d) of the Exchange Act, proxy, vote, written notice or otherwise) of the acquisition by any Person or group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act or any successor provision), including any group acting for the purpose of acquiring, holding or disposing of securities (within the meaning of Rule 13d-5(b)(1) under the Exchange Act or any successor provision), other than the Permitted Holders, in a single transaction or in a related series of transactions, by way of merger, consolidation or other business combination or purchase of beneficial ownership (within the meaning of Rule 13d-3 under the Exchange Act, or any successor provision) of 50% or more of the total voting power of the Voting Stock of the Issuer or any of its direct or indirect parent companies.

"Clearstream" means Clearstream Banking, Société Anonyme, and its successors.

"Closing Date" means October [10], 2007.

Confidential

"Code" means the Internal Revenue Code of 1986, as amended, or any successor thereto.

"Collateral Posting Facility" means any senior cash posting credit facility, the size of which is capped by the mark-to-market loss, inclusive of any unpaid settlement amounts, of TCEH and its subsidiaries on a hypothetical portfolio of commodity swaps, forwards and futures transactions that correspond to or replicate all or a portion of actual transactions by TCEH and its subsidiaries that are outstanding on, or entered into from time to time on or after, the Closing Date.

"Consolidated" with respect to any Person refers to such Person on a consolidated basis in accordance with GAAP, but excluding from such consolidation any Unrestricted Subsidiary as if such Unrestricted Subsidiary were not an Affiliate of such Person.

"Consolidated Depreciation and Amortization Expense" means with respect to any Person for any period, the total amount of depreciation and amortization expense, including the amortization of deferred financing fees, nuclear fuel costs, depletion of coal or lignite reserves, debt issuance costs, commissions, fees and expenses and Capitalized Software Expenditures, of such Person and its Restricted Subsidiaries for such period on a consolidated basis and otherwise determined in accordance with GAAP.

"Consolidated Interest Expense" means, with respect to any Person for any period, without duplication, the sum of:

(1)    consolidated interest expense of such Person and its Restricted Subsidiaries for such period, to the extent such expense was deducted (and not added back) in computing Consolidated Net Income (including (a) amortization of original issue discount resulting from the issuance of Indebtedness at less than par, (b) all commissions, discounts and other fees and charges owed with respect to letters of credit, bankers' acceptances or any Collateral Posting Facility or similar facilities, (c) non-cash interest payments (but excluding any non-cash interest expense attributable to the movement in the mark to market valuation of Hedging Obligations or other derivative instruments pursuant to GAAP), (d) the interest component of Capitalized Lease Obligations, and (e) net payments, if any, pursuant to interest rate Hedging Obligations with respect to Indebtedness, and excluding, (u) accretion of asset retirement obligations and accretion or accrual of discounted liabilities not constituting Indebtedness, (v) any expense resulting from the discounting of the Existing Notes or other Indebtedness in connection with the application of recapitalization accounting or, if applicable, purchase accounting, (w) any Additional Interest and any comparable "additional interest" with respect to other securities, (x) amortization of reacquired Indebtedness, deferred financing fees, debt issuance costs, commissions, fees and expenses, (y) any expensing of bridge, commitment and other financing fees and (z) commissions, discounts, yield and other fees and charges (including any interest expense) related to any Receivables Facility); plus

(2)    consolidated capitalized interest of such Person and its Restricted Subsidiaries for such period, whether paid or accrued; less

(3)    interest income of such Person and its Restricted Subsidiaries for such period.

For purposes of this definition, interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by such Person to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP.

"Consolidated Leverage Ratio" as of any date of determination, means the ratio of (x) Consolidated Total Indebtedness of the Issuer computed as of the end of the most recent fiscal quarter for which internal financial statements are available immediately preceding the date on which such event for which such calculation is being made shall occur to (y) the aggregate amount of EBITDA of the Issuer

Confidential

for the period of the most recently ended four full consecutive fiscal quarters for which internal financial statements are available immediately preceding the date on which such event for which such calculation is being made shall occur, in each case with such pro forma adjustments to Consolidated Total Indebtedness and EBITDA as are appropriate and consistent with the pro forma adjustment provisions set forth in the definition of "Fixed Charge Coverage Ratio."

"Consolidated Net Income" means, with respect to any Person for any period, the aggregate of the Net Income of such Person for such period, on a consolidated basis, and otherwise determined in accordance with GAAP; provided, however, that, without duplication,

(1)    any after-tax effect of extraordinary, non-recurring or unusual gains or losses (less all fees and expenses relating thereto) or expenses (including relating to the Transactions to the extent incurred on or prior to December 31, 2008), severance, relocation costs, consolidation and closing costs, integration and facilities opening costs, business optimization costs, transition costs, restructuring costs, signing, retention or completion bonuses, and curtailments or modifications to pension and post-retirement employee benefit plans shall be excluded;

(2)    the cumulative effect of a change in accounting principles during such period shall be excluded;

(3)    any after-tax effect of income (loss) from disposed, abandoned or discontinued operations and any net after-tax gains or losses on disposal of disposed, abandoned, transferred, closed or discontinued operations shall be excluded;

(4)    any after-tax effect of gains or losses (less all fees and expenses relating thereto) attributable to asset dispositions or abandonments other than in the ordinary course of business, as determined in good faith by the Issuer, shall be excluded;

(5)    the Net Income for such period of any Person that (a) is not a Subsidiary, (b) is an Unrestricted Subsidiary or (c) is accounted for by the equity method of accounting, shall be excluded; provided that Consolidated Net Income of the Issuer shall be increased by the amount of dividends or distributions or other payments that are actually paid in cash (or to the extent converted into cash) to the referent Person or a Restricted Subsidiary thereof in respect of such period;

(6)    solely for the purpose of determining the amount available for Restricted Payments under Section 4.07(a)(3)(a) hereof, the Net Income for such period of any Restricted Subsidiary (other than any Guarantor) shall be excluded to the extent that the declaration or payment of dividends or similar distributions by that Restricted Subsidiary of its Net Income is not at the date of determination wholly permitted without any prior governmental approval (which has not been obtained) or, directly or indirectly, by the operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule, or governmental regulation applicable to that Restricted Subsidiary or its stockholders, unless such restriction with respect to the payment of dividends or similar distributions has been legally waived or is otherwise permitted by Section 4.08 hereof; provided that Consolidated Net Income of the Issuer will be increased by the amount of dividends or other distributions or other payments actually paid in cash (or to the extent converted into cash) or Cash Equivalents to the Issuer or a Restricted Subsidiary thereof in respect of such period, to the extent not already included therein;

(7)    effects of adjustments (including the effects of such adjustments pushed down to the Issuer and its Restricted Subsidiaries) in the property, equipment, inventory, software and other intangible assets, deferred revenue and debt line items in such Person's consolidated financial statements pursuant to GAAP resulting from the application of recapitalization accounting or, if applicable, purchase accounting in relation to the Transactions or any

9

SENIOR REFINANCING INDENTURE

Confidential

consummated acquisition or the amortization or write-off of any amounts thereof, net of taxes, shall be excluded;

(8)    any after-tax effect of income (loss) from the early extinguishment of Indebtedness (other than Hedging Obligations) shall be excluded;

(9)    [any impairment charge or asset write-off, including, without limitation, impairment charges or asset write-offs related to intangible assets, long-lived assets or investments in debt and equity securities, in each case, pursuant to GAAP and the amortization of intangibles arising pursuant to GAAP shall be excluded;

(10)    any non-cash compensation expense recorded from grants of stock appreciation or similar rights, stock options, restricted stock or other rights, and any cash charges associated with the rollover, acceleration or payout of Equity Interests by management of the Issuer or any of its direct or indirect parent companies in connection with the Transactions, shall be excluded;

(11)    any fees and expenses incurred during such period, or any amortization thereof for such period, in connection with any acquisition, Investment, Asset Sale, issuance or repayment of Indebtedness, issuance of Equity Interests, refinancing transaction or amendment or modification of any debt instrument (in each case, including any such transaction consummated prior to the Closing Date and any such transaction undertaken but not completed) and any charges or non-recurring merger costs incurred during such period as a result of any such transaction shall be excluded;

(12)    accruals and reserves that are established or adjusted within twelve months after the Closing Date that are so required to be established as a result of the Transactions in accordance with GAAP, or changes as a result of adoption or modification of accounting policies, shall be excluded;

(13)    to the extent covered by insurance and actually reimbursed, or, so long as the Issuer has made a determination that there exists reasonable evidence that such amount will in fact be reimbursed by the insurer and only to the extent that such amount is (a) not denied by the applicable carrier in writing within 180 days and (b) in fact reimbursed within 365 days of the date of such evidence (with a deduction for any amount so added back to the extent not so reimbursed within 365 days), expenses with respect to liability or casualty events or business interruption shall be excluded;

(14)    any non-cash gain or loss attributable to Mark-to-Market Adjustments in connection with Hedging Obligations shall be excluded; and

(15)    any benefit from any fair market value of any contract as recorded on the balance sheet at the time of the Transaction shall be excluded.

Notwithstanding the foregoing, for the purpose of Section 4.07 hereof only (other than clause (a)(3)(d) thereof), there shall be excluded from Consolidated Net Income any income arising from any sale or other disposition of Restricted Investments made by the Issuer and its Restricted Subsidiaries, any repurchases and redemptions of Restricted Investments from the Issuer and its Restricted Subsidiaries, any repayments of loans and advances which constitute Restricted Investments by the Issuer or any of its Restricted Subsidiaries, any sale of the stock of an Unrestricted Subsidiary or any distribution or dividend from an Unrestricted Subsidiary, in each case only to the extent such amounts increase the amount of Restricted Payments permitted under Section 4.07(a)(3)(d) hereof.

"Consolidated Secured Debt Ratio" means, as of any date of determination, the ratio of (x) Consolidated Secured Indebtedness computed as of the end of the most recent fiscal quarter for which internal financial statements are available immediately preceding the date on which such event for which such calculation is being made shall occur to (y) the aggregate amount of EBITDA of the Issuer for the

Confidential                                                                    EFIHMW00293316

period of the most recently ended four full consecutive fiscal quarters for which internal financial statements are available immediately preceding the date on which such event for which such calculation is being made shall occur, in each case with such pro forma adjustments to Consolidated Secured Indebtedness and EBITDA as are appropriate and consistent with the pro forma adjustment provisions set forth in the definition of "Fixed Charge Coverage Ratio."

"Consolidated Secured Indebtedness" means Consolidated Total Indebtedness secured by a Lien on any assets of the Issuer or any of its Restricted Subsidiaries.

"Consolidated Total Indebtedness" means, as at any date of determination, an amount equal to (1) the aggregate amount of all outstanding Indebtedness of the Issuer and its Restricted Subsidiaries on a consolidated basis consisting of Indebtedness for borrowed money, debt obligations evidenced by promissory notes and similar instruments, letters of credit (only to the extent of any unreimbursed drawings thereunder) and Obligations in respect of Capitalized Lease Obligations, plus (2) the aggregate amount of all outstanding Disqualified Stock of the Issuer and all Disqualified Stock and Preferred Stock of its Restricted Subsidiaries on a consolidated basis, with the amount of such Disqualified Stock and Preferred Stock equal to the greater of their respective voluntary or involuntary liquidation preferences and maximum fixed repurchase prices, in each case determined on a consolidated basis in accordance with GAAP, less (3) the aggregate amount of all Unrestricted Cash and less (4) all Deposit L/C Loans and Incremental Deposit L/C Loans outstanding on such date of determination. For purposes hereof, the "maximum fixed repurchase price" of any Disqualified Stock or Preferred Stock that does not have a fixed repurchase price shall be calculated in accordance with the terms of such Disqualified Stock or Preferred Stock as if such Disqualified Stock or Preferred Stock were purchased on any date on which Consolidated Total Indebtedness shall be required to be determined, and if such price is based upon, or measured by, the fair market value of such Disqualified Stock or Preferred Stock, such fair market value shall be determined reasonably and in good faith by the Issuer.

"Contingent Obligations" means, with respect to any Person, any obligation of such Person guaranteeing any leases, dividends or other obligations that do not constitute Indebtedness ("primary obligations") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent,

    (1)    to purchase any such primary obligation or any property constituting direct or indirect security therefor,

    (2)    to advance or supply funds

        (a)    for the purchase or payment of any such primary obligation, or

        (b)    to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, or

    (3)    to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation against loss in respect thereof.

"Corporate Trust Office of the Trustee" shall be at the address of the Trustee specified in Section 12.02 hereof or such other address as to which the Trustee may give notice to the Holders and the Issuer.

"Credit Facilities" means, with respect to the Issuer or any of its Restricted Subsidiaries, one or more debt facilities, including the TCEH Senior Secured Facilities or other financing arrangements

Confidential

(including, without limitation, commercial paper facilities or indentures) providing for revolving credit loans, term loans, letters of credit or other long-term indebtedness, including any notes, mortgages, guarantees, collateral documents, instruments and agreements executed in connection therewith, and any amendments, supplements, modifications, extensions, renewals, restatements or refundings thereof and any indentures or credit facilities or commercial paper facilities that replace, refund or refinance any part of the loans, notes, other credit facilities or commitments thereunder, including any such replacement, refunding or refinancing facility or indenture that increases the amount permitted to be borrowed thereunder or alters the maturity thereof (<u>provided</u> that such increase in borrowings is permitted under Section 4.09 hereof) or adds Restricted Subsidiaries as additional borrowers or guarantors thereunder and whether by the same or any other agent, lender or group of lenders.

"<u>Custodian</u>" means the Trustee, as custodian with respect to the Senior Notes in global form, or any successor entity thereto.

"<u>Default</u>" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default.

"<u>Definitive Note</u>" means a certificated Senior Note registered in the name of the Holder thereof and issued in accordance with Section 2.06 hereof, substantially in the form of <u>Exhibit A-1</u>, <u>Exhibit A-2</u>, <u>Exhibit A-3</u> or <u>Exhibit A-4</u> hereto, as the case may be, except that such Senior Note shall not bear the Global Note Legend and shall not have the "Schedule of Exchanges of Interests in the Global Note" attached thereto.

"<u>Depositary</u>" means, with respect to the Senior Notes issuable or issued in whole or in part in global form, the Person specified in Section 2.03 hereof as the Depositary with respect to the Senior Notes, and any and all successors thereto appointed as depositary hereunder and having become such pursuant to the applicable provision of this Indenture.

"<u>Deposit L/C Loan</u>" means Deposit L/C Loans under the TCEH Senior Secured Facilities.

"<u>Designated Non-cash Consideration</u>" means the fair market value of non-cash consideration received by the Issuer or a Restricted Subsidiary in connection with an Asset Sale that is so designated as Designated Non-cash Consideration pursuant to an Officer's Certificate, setting forth the basis of such valuation, executed by the principal financial officer of the Issuer, less the amount of cash or Cash Equivalents received in connection with a subsequent sale of or collection on such Designated Non-cash Consideration.

"<u>Designated Preferred Stock</u>" means Preferred Stock of the Issuer or any parent corporation thereof (in each case other than Disqualified Stock) that is issued for cash (other than to a Restricted Subsidiary or an employee stock ownership plan or trust established by the Issuer or any of its Subsidiaries) and is so designated as Designated Preferred Stock, pursuant to an Officer's Certificate executed by the principal financial officer of the Issuer or the applicable parent corporation thereof, as the case may be, on the issuance date thereof, the cash proceeds of which are excluded from the calculation set forth in clause (3) of Section 4.07(a) hereof.

"<u>Disqualified Stock</u>" means, with respect to any Person, any Capital Stock of such Person which, by its terms, or by the terms of any security into which it is convertible or for which it is putable or exchangeable, or upon the happening of any event, matures or is mandatorily redeemable (other than solely as a result of a change of control or asset sale) pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof (other than solely as a result of a change of control or asset sale), in whole or in part, in each case prior to the date 91 days after the earlier of the maturity date

Confidential                    EFIHMW00293318

of the Senior Notes or the date the Senior Notes are no longer outstanding; provided, however, that if such Capital Stock is issued to any plan for the benefit of employees of the Issuer or its Subsidiaries or by any such plan to such employees, such Capital Stock shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Issuer or its Subsidiaries in order to satisfy applicable statutory or regulatory obligations.

"EBITDA" means, with respect to any Person for any period, the Consolidated Net Income of such Person for such period

(1)    increased (without duplication) by:

(a)    provision for taxes based on income or profits or capital gains, including, without limitation, foreign, federal, state, franchise, excise, value-added and similar taxes and foreign withholding taxes (including penalties and interest related to such taxes or arising from tax examinations) of such Person paid or accrued during such period, deducted (and not added back) in computing Consolidated Net Income; plus

(b)    Fixed Charges of such Person for such period (including (x) net losses on Hedging Obligations or other derivative instruments entered into for the purpose of hedging interest rate risk and (y) costs of surety bonds in connection with financing activities, in each case, to the extent included in Fixed Charges), together with items excluded from the definition of "Consolidated Interest Expense" pursuant to clauses (1)(u), (v), (w), (x), (y) and (z) of the definition thereof, and, in each such case, to the extent the same were deducted (and not added back) in calculating such Consolidated Net Income; plus

(c)    Consolidated Depreciation and Amortization Expense of such Person for such period to the extent the same was deducted (and not added back) in computing Consolidated Net Income; plus

(d)    any fees, expenses or charges (other than depreciation or amortization expense) related to any Equity Offering, Permitted Investment, acquisition, disposition, recapitalization or the incurrence of Indebtedness permitted to be incurred by such Person and its Restricted Subsidiaries under this Indenture (including a refinancing transaction or amendment or other modification of any debt instrument), including (i) such fees, expenses or charges related to the offering of the Senior Notes, the offering of the TCEH Notes and any interim bridge facilities related thereto and the TCEH Senior Secured Facilities and any Receivables Facility, (ii) any amendment or other modification of the Senior Notes, the TCEH Notes and any interim bridge facilities related thereto, (iii) any such transaction consummated prior to the Closing Date and any such transaction undertaken but not completed and (iv) any charges or non-recurring merger costs as a result of any such transaction, in each case, deducted (and not added back) in computing Consolidated Net Income; plus

(e)    the amount of any restructuring charge or reserve deducted (and not added back) in such period in computing Consolidated Net Income, including any costs incurred in connection with acquisitions after the Closing Date, costs related to the closure and/or consolidation of facilities; plus

(f)    any other non-cash charges, including any write-offs or write-downs, reducing Consolidated Net Income for such period (provided that if any such non-cash charges represent an accrual or reserve for potential cash items in any future period, the

Confidential                                                    EFIHMW00293319

cash payment in respect thereof in such future period shall be subtracted from EBITDA to such extent, and excluding amortization of a prepaid cash item that was paid in a prior period); <u>plus</u>

(g)      the amount of any minority interest expense consisting of Subsidiary income attributable to minority equity interests of third parties in any non-Wholly Owned Subsidiary deducted (and not added back) in such period in calculating Consolidated Net Income; <u>plus</u>

(h)      the amount of management, monitoring, consulting and advisory fees and related indemnities and expenses paid in such period to the Investors to the extent otherwise permitted under Section 4.11 hereof and deducted (and not added back) in calculating Consolidated Net Income; <u>plus</u>

(i)      the amount of net cost savings projected by the Issuer in good faith to be realized as a result of specified actions taken or to be taken prior to or during such period (calculated on a <u>pro forma</u> basis as though such cost savings had been realized on the first day of such period and added to EBITDA until fully realized), net of the amount of actual benefits realized during such period from such actions; <u>provided</u> that (w) such cost savings are reasonably identifiable and factually supportable, (x) such actions have been taken or are to be taken within 12 months after the date of determination to take such action and some portion of the benefit is expected to be realized within 12 months of taking such action, (y) no cost savings shall be added pursuant to this clause (i) to the extent duplicative of any expenses or charges relating to such cost savings that are included in clause (e) above with respect to such period and (z) the aggregate amount of cost savings added pursuant to this clause (i) shall not exceed $150.0 million for any four consecutive quarter period (which adjustments may be incremental to <u>pro forma</u> adjustments made pursuant to the second paragraph of the definition of "Fixed Charge Coverage Ratio"); <u>plus</u>

(j)      the amount of loss on sales of receivables and related assets to the Receivables Subsidiary in connection with a Receivables Facility deducted (and not added back) in calculating Consolidated Net Income; <u>plus</u>

(k)      any costs or expense incurred by the Issuer or a Restricted Subsidiary pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement or any stock subscription or shareholder agreement, to the extent that such cost or expenses are funded with cash proceeds contributed to the capital of the Issuer or net cash proceeds of an issuance of Equity Interests (other than Disqualified Stock) of the Issuer (or any direct or indirect parent thereof) solely to the extent that such net cash proceeds are excluded from the calculation set forth in clause (3) of Section 4.07(a); <u>plus</u>

(l)      Expenses Relating to a Unit Outage; <u>provided</u> that the only Expenses Relating to a Unit Outage that may be included in EBITDA shall be, without duplication (i) up to $250.0 million per fiscal year of Expenses Relating to a Unit Outage incurred within the first 12 months after any planned or unplanned outage of any Unit by reason of any action by any regulatory body or other Government Authority or to comply with any applicable law and (ii) up to $100.0 million per fiscal year of Expenses Relating to a Unit Outage incurred within the first 12 months after any planned outage of any Unit for purposes of expanding or upgrading such Unit; plus

Confidential                    EFIHMW00293320

(m)      cash receipts (or any netting arrangements resulting in increased cash receipts) not added in arriving at EBITDA or Consolidated Net Income in any period to the extent the non-cash gains relating to such income were deducted in the calculation of EBITDA pursuant to paragraph (2) below for any previous period and not added; and

(2)      decreased by (without duplication) (a) non-cash gains increasing Consolidated Net Income of such Person for such period, excluding any non-cash gains to the extent they represent the reversal of an accrual or reserve for a potential cash item that reduced EBITDA in any prior period, (b) cash expenditures (or any netting arrangements resulting in increased cash expenditures) not deducted in arriving at EBITDA or Consolidated Net Income in any period to the extent non-cash losses relating to such expenditures were added in the calculation of EBITDA pursuant to paragraph (1) above for any previous period and not deducted, and (c) the amount of any minority interest income consisting of Subsidiary losses attributable to minority equity interests of third parties in any non-Wholly Owned Subsidiary to the extent such minority interest income is included in Consolidated Net Income.

"Environmental CapEx Debt" means Indebtedness of the Issuer or any of its Restricted Subsidiaries incurred for the purpose of financing Environmental Capital Expenditures.

"EMU" means the economic and monetary union as contemplated in the Treaty on European Union.

"Energy Future Holding Company" means Energy Future Intermediate Holding Company LLC.

"Environmental Capital Expenditures" means capital expenditures deemed necessary by the Issuer or its Restricted Subsidiaries to comply with, or in anticipation of having to comply with, Environmental Law or otherwise undertaken voluntarily by the Issuer or any of its Restricted Subsidiaries in connection with environmental matters.

"Environmental Law" means any applicable Federal, state, foreign or local statute, law, rule, regulation, ordinance, code and rule of common law now or hereafter in effect and in each case as amended, and any applicable judicial or administrative interpretation thereof, including any applicable judicial or administrative order, consent decree or judgment, relating to the environment, human health or safety or Hazardous Materials.

"Equity Interests" means Capital Stock and all warrants, options or other rights to acquire Capital Stock, but excluding any debt security that is convertible into, or exchangeable for, Capital Stock.

"Equity Offering" means any public or private sale of common stock or Preferred Stock of the Issuer or any of its direct or indirect parent companies (excluding Disqualified Stock), other than:

(1)      public offerings with respect to the Issuer's or any direct or indirect parent company's common stock registered on Form S-8;

(2)      issuances to any Subsidiary of the Issuer; and

(3)      any such public or private sale that constitutes an Excluded Contribution.

"ERCOT" means the Electric Reliability Council of Texas.

"euro" means the single currency of participating member states of the EMU.

"Euroclear" means Euroclear Bank S.A./N.V., as operator of the Euroclear system.

Confidential                                                                        EFIHMW00293321

"Event of Default" has the meaning set forth under Section 6.01 hereof.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Exchange Date" means, with respect to any Senior Notes, the date on which a Lender surrenders Senior Term Loans in exchange for such Senior Notes, and which Senior Notes are authenticated by the Trustee, all in accordance with the terms of the Senior Interim Loan Agreement, this Indenture and the applicable Exchange Notice.

"Exchange Notes" means any notes issued in exchange for the Notes pursuant to the Registration Rights Agreement or similar agreement.

"Exchange Notice" means the Exchange Notice substantially in the form of Exhibit E-1 (in the case of Senior Cash Pay Term Loans and Senior Cash Pay Notes) or Exhibit E-2 (in the case of Senior Toggle Term Loans and Senior Toggle Notes), as applicable, pursuant to which a Lender may notify the Issuer, the Administrative Agent and the Trustee of its election to convert its Senior Cash Pay Term Loans and/or Senior Toggle Term Loans, as applicable, into Senior Cash Pay Notes and/or Senior Toggle Notes, respectively.

"Exchange Offer" has the meaning set forth in any Registration Rights Agreement.

"Exchange Registration Statement" has the meaning set forth in the Registration Rights Agreement.

"Excluded Contribution" means net cash proceeds, marketable securities or Qualified Proceeds received by the Issuer after the Closing Date from

> (1)     contributions to its common equity capital, and

> (2)     the sale (other than to a Subsidiary of the Issuer or to any management equity plan or stock option plan or any other management or employee benefit plan or agreement of the Issuer) of Capital Stock (other than Disqualified Stock and Designated Preferred Stock) of the Issuer,

in each case designated as Excluded Contributions pursuant to an Officer's Certificate executed by the principal financial officer of the Issuer on the date such capital contributions are made or the date such Equity Interests are sold, as the case may be, which are excluded from the calculation set forth in Section 4.07(a)(3) hereof.

"Existing Notes" means

- TXU Corp. 5.55% Fixed Senior Notes Series P due 2014;
- TXU Corp. 6.50% Fixed Senior Notes Series Q due 2024;
- TXU Corp. 6.55% Fixed Senior Notes Series R due 2034;
- TXU Corp. 6.375% Series C Senior Notes due 2008;
- TXU Corp. Floating Convertible Senior Notes due 2033;
- US Holdings Floating Rate Junior Subordinated Debentures, Series D due 2037;
- US Holdings 8.175% Fixed Junior Subordinated Debentures, Series E due 2037;
- Portion of TXU Corp. 4.800% Series O Senior Notes due 2009 not tendered;
- Portion of TCEH 6.125% Senior Notes due 2008 not tendered;
- Portion of TCEH 7.000% Senior Notes due 2013 not tendered;

Confidential                                                                    EFIHMW00293322

- US Holdings 7.460% Fixed Secured Bonds with amortizing payments to 2015;
- US Holdings 9.580% Fixed Notes due in semi-annual installments to 2019;
- US Holdings 8.254% Fixed Notes due in quarterly installments to 2021;

Pollution Control Revenue Bonds—Brazos River Authority:

- 5.400% Fixed Series 1994A due May 1, 2029;
- 7.700% Fixed Series 1999A due April 1, 2033;
- 6.750% Fixed Series 1999B due September 1, 2034, remarketing date April 1, 2013;
- 7.700% Fixed Series 1999C due March 1, 2032;
- Floating Rate Series 2001A due October 1, 2030;
- 5.750% Fixed Series 2001C due May 1, 2036, remarketing date November 1, 2011;
- Floating Rate Series 2001D due May 1, 2033;
- Floating Rate Taxable Series 2001I due December 1, 2036;
- Floating Rate Series 2002A due May 1, 2037 ;
- 6.750% Fixed Series 2003A due April 1, 2038, remarketing date April 1, 2013;
- 6.300% Fixed Series 2003B due July 1, 2032;
- 6.750% Fixed Series 2003C due October 1, 2038;
- 5.400% Fixed Series 2003D due October 1, 2029, remarketing date October 1, 2014;
- 5.000% Fixed Series 2006 due March 1, 2041;

Pollution Control Revenue Bonds—Sabine River Authority of Texas:

- 6.450% Fixed Series 2000A due June 1, 2021;
- 5.500% Fixed Series 2001A due May 1, 2022, remarketing date November 1, 2011;
- 5.750% Fixed Series 2001B due May 1, 2030, remarketing date November 1, 2011;
- 5.200% Fixed Series 2001C due May 1, 2028;
- 5.800% Fixed Series 2003A due July 1, 2022;
- 6.150% Fixed Series 2003B due August 1, 2022;

Pollution Control Revenue Bonds—Trinity River Authority of Texas:

- 6.250% Fixed Series 2000A due May 1, 2028;

in each case to the extent outstanding on the Closing Date.

"Existing Notes Indentures" means each of the indentures or other documents containing the terms of the Existing Notes.

"Expenses Relating to a Unit Outage" means any expenses or other charges as a result of any outage or shut-down of any Unit, including any expenses or charges relating to (a) restarting any such Unit so that it may be placed back in service after such outage or shut-down, (b) purchases of power, natural gas or heat rate to meet commitments to sell, or offset a short position in, power, natural gas or heat rate that would otherwise have been met or offset from production generated by such Unit during the period of such outage or shut-down, net of the expenses not in fact incurred (including fuel and other

Confidential

operating expenses) that would have been incurred if such unit had not shut down and (c) starting up, operating, maintaining and shutting down any other Unit that would not otherwise have been operating absent such outage or shut-down, including the fuel and other operating expenses to the extent in excess of the expenses not in fact incurred (including fuel and other operating costs) that would have been incurred absent such outage or shut down, incurred to start-up, operate, maintain and shut-down such Unit and that are required during the period of time that the shut-down or outaged Unit is out of service in order to meet the commitments of such shut-down or outaged Unit to sell, or offset a short position in, power, natural gas or heat rate.

"Fixed Charge Coverage Ratio" means, with respect to any Person for any period, the ratio of EBITDA of such Person for such period to the Fixed Charges of such Person for such period. In the event that the Issuer or any Restricted Subsidiary incurs, assumes, guarantees, redeems, retires or extinguishes any Indebtedness (other than Indebtedness incurred under any revolving credit facility unless such Indebtedness has been permanently repaid and has not been replaced) or issues or redeems Disqualified Stock or Preferred Stock subsequent to the commencement of the period for which the Fixed Charge Coverage Ratio is being calculated but prior to or simultaneously with the event for which the calculation of the Fixed Charge Coverage Ratio is made (the "Fixed Charge Coverage Ratio Calculation Date"), then the Fixed Charge Coverage Ratio shall be calculated giving pro forma effect to such incurrence, assumption, guarantee, redemption, retirement or extinguishment of Indebtedness, or such issuance or redemption of Disqualified Stock or Preferred Stock, as if the same had occurred at the beginning of the applicable four-quarter period.

For purposes of making the computation referred to above, Investments, acquisitions, dispositions, mergers, consolidations and disposed operations (as determined in accordance with GAAP) that have been made by the Issuer or any of its Restricted Subsidiaries during the four-quarter reference period or subsequent to such reference period and on or prior to or simultaneously with the Fixed Charge Coverage Ratio Calculation Date shall be calculated on a pro forma basis assuming that all such Investments, acquisitions, dispositions, mergers, consolidations and disposed operations (and the change in any associated fixed charge obligations and the change in EBITDA resulting therefrom) had occurred on the first day of the four-quarter reference period. If, since the beginning of such period, any Person that subsequently became a Restricted Subsidiary or was merged with or into the Issuer or any of its Restricted Subsidiaries since the beginning of such period shall have made any Investment, acquisition, disposition, merger, consolidation or disposed operation that would have required adjustment pursuant to this definition, then the Fixed Charge Coverage Ratio shall be calculated giving pro forma effect thereto for such period as if such Investment, acquisition, disposition, merger, consolidation or disposed operation had occurred at the beginning of the applicable four-quarter period.

For purposes of this definition, whenever pro forma effect is to be given to a transaction, the pro forma calculations shall be made in good faith by a responsible financial or accounting officer of the Issuer. If any Indebtedness bears a floating rate of interest and is being given pro forma effect, the interest on such Indebtedness shall be calculated as if the rate in effect on the Fixed Charge Coverage Ratio Calculation Date had been the applicable rate for the entire period (taking into account any Hedging Obligations applicable to such Indebtedness). Interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by a responsible financial or accounting officer of the Issuer to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP. For purposes of making the computation referred to above, interest on any Indebtedness under a revolving credit facility computed on a pro forma basis shall be computed based upon the average daily balance of such Indebtedness during the applicable period except as set forth in the first paragraph of this definition. Interest on Indebtedness that may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a eurocurrency interbank offered rate or other rate shall be deemed to have been

Confidential                                                    EFIHMW00293324

**PX 003B**
**Page 23 of 178**

based upon the rate actually chosen, or, if none, then based upon such optional rate chosen as the Issuer may designate.

"Fixed Charges" means, with respect to any Person for any period, the sum of:

(1)     Consolidated Interest Expense of such Person for such period;

(2)     all cash dividends or other distributions paid (excluding items eliminated in consolidation) on any series of Preferred Stock during such period; and

(3)     all cash dividends or other distributions paid (excluding items eliminated in consolidation) on any series of Disqualified Stock during such period.

"Fixed Rate Notes" means any Senior Notes bearing interest at a fixed rate.

"Floating Rate Notes" means any Senior Notes bearing interest at LIBOR plus the Applicable Margin.

"Foreign Subsidiary" means, with respect to any Person, any Restricted Subsidiary of such Person that is not organized or existing under the laws of the United States, any state or territory thereof or the District of Columbia and any Restricted Subsidiary of such Foreign Subsidiary.

"GAAP" means generally accepted accounting principles in the United States which are in effect on the Closing Date.

"Global Note Legend" means the legend set forth in Section 2.06(g)(ii) hereof, which is required to be placed on all Global Notes issued under this Indenture.

"Global Notes" means, individually and collectively, each of the Restricted Global Notes and the Unrestricted Global Notes deposited with or on behalf of and registered in the name of the Depositary or its nominee, substantially in the form of Exhibit A-1, Exhibit A-2, Exhibit A-3 or Exhibit A-4 hereto, as the case may be, and that bears the Global Note Legend and that has the "Schedule of Exchanges of Interests in the Global Note" attached thereto, issued in accordance with Section 2.01, 2.06(b), 2.06(d) or 2.06(f) hereof.

"Government Authority" means any nation or government, any state, province, territory or other political subdivision thereof, and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including without limitation ERCOT.

"Government Securities" means securities that are:

(1)     direct obligations of the United States of America for the timely payment of which its full faith and credit is pledged; or

(2)     obligations of a Person controlled or supervised by and acting as an agency or instrumentality of the United States of America the timely payment of which is unconditionally guaranteed as a full faith and credit obligation by the United States of America,

which, in either case, are not callable or redeemable at the option of the issuers thereof, and shall also include a depository receipt issued by a bank (as defined in Section 3(a)(2) of the Securities Act), as custodian with respect to any such Government Securities or a specific payment of principal of or interest on any such Government Securities held by such custodian for the account of the holder of such depository receipt; provided that (except as required by law) such custodian is not authorized to make any

Confidential

deduction from the amount payable to the holder of such depository receipt from any amount received by the custodian in respect of the Government Securities or the specific payment of principal of or interest on the Government Securities evidenced by such depository receipt.

"guarantee" means a guarantee (other than by endorsement of negotiable instruments for collection in the ordinary course of business), direct or indirect, in any manner (including letters of credit and reimbursement agreements in respect thereof), of all or any part of any Indebtedness or other obligations.

"Guarantee" means the guarantee by any Guarantor of the Issuer's Obligations under this Indenture and the Senior Notes.

"Guarantor" means each Restricted Subsidiary that Guarantees the Senior Notes in accordance with the terms of this Indenture.

"Goldman Sachs" means Goldman, Sachs & Co.

"Hazardous Materials" means (a) any petroleum or petroleum products, radioactive materials, friable asbestos, urea formaldehyde foam insulation, transformers or other equipment that contain dielectric fluid containing regulated levels of polychlorinated biphenyls and radon gas; (b) any chemicals, materials or substances defined as or included in the definition of "hazardous substances," "toxic substances," "toxic pollutants," "contaminants," or "pollutants" or words of similar import, under any applicable Environmental Law; and (c) any other chemical, material or substance, which is prohibited, limited or regulated by any Environmental Law.

["Hedging Obligations" means with respect to any Person, the obligations of such Person under (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement and (c) physical or financial commodity contracts or agreements, power purchase or sale agreements, fuel purchase or sale agreements, environmental credit purchase or sale agreements, power transmission agreements, commodity transportation agreements, fuel storage agreements, netting agreements (including Netting Agreements), capacity agreement and commercial or trading agreements, each with respect to, or including the purchase, sale, exchange of (or the option to purchase, sell or exchange), transmission, transportation, storage, distribution, processing, sale, lease or hedge of, any energy, electricity, generation capacity, power, heat rate, congestion, natural gas, nuclear fuel (including enrichment and conversion), diesel fuel, fuel oil, other petroleum-based liquids, coal , lignite, weather, emissions and other environmental credits, waste by-products, renewable energy credit, or any other energy related commodity or service (including ancillary services and related risks (such as location basis)) price or price indices for any such commodities or services or any other similar derivative agreements, and any other similar agreements.] **[TBD – Open in Credit Agreement]**

Confidential

EFIHMW00293326

**PX 003B
Page 25 of 178**

"Holder" means the Person in whose name a Senior Note is registered on the registrar's books.

"Incremental Deposit L/C Loans" means Incremental Deposit L/C Loans under the TCEH Senior Secured Facilities.

"Indebtedness" means, with respect to any Person, without duplication:

(1)     any indebtedness (including principal and premium) of such Person, whether or not contingent:

(a)     in respect of borrowed money;

(b)     evidenced by bonds, notes, debentures or similar instruments or letters of credit or bankers' acceptances (or, without duplication, reimbursement agreements in respect thereof);

(c)     representing the balance deferred and unpaid of the purchase price of any property (including Capitalized Lease Obligations), except (i) any such balance that constitutes a trade payable or similar obligation to a trade creditor, in each case accrued in the ordinary course of business and (ii) any earn-out obligations until such obligation becomes a liability on the balance sheet of such Person in accordance with GAAP; or

(d)     representing any Hedging Obligations;

if and to the extent that any of the foregoing Indebtedness (other than letters of credit and Hedging Obligations) would appear as a liability upon a balance sheet (excluding the footnotes thereto) of such Person prepared in accordance with GAAP;

(2)     to the extent not otherwise included, any obligation by such Person to be liable for, or to pay, as obligor, guarantor or otherwise on, the obligations of the type referred to in clause (1) of a third Person (whether or not such items would appear upon the balance sheet of the such obligor or guarantor), other than by endorsement of negotiable instruments for collection in the ordinary course of business; and

(3)     to the extent not otherwise included, the obligations of the type referred to in clause (1) of a third Person secured by a Lien on any asset owned by such first Person, whether or not such Indebtedness is assumed by such first Person; provided that the amount of Indebtedness of such first Person for purposes of this clause (3) shall be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) the fair market value of the property encumbered thereby as determined by such first Person in good faith;

provided, however, that notwithstanding the foregoing, Indebtedness shall be deemed not to include (a) Contingent Obligations incurred in the ordinary course of business or (b) obligations under or in respect of Receivables Facilities or (c) amounts payable by and between the Issuer and its Subsidiaries in connection with retail clawback or other regulatory transition issues.

"Indenture" means this Senior Refinancing Indenture, as amended or supplemented from time to time.

"Independent Financial Advisor" means an accounting, appraisal, investment banking firm or consultant to Persons engaged in Similar Businesses of nationally recognized standing that is, in the good faith judgment of the Issuer, qualified to perform the task for which it has been engaged.

Confidential

"Indirect Participant" means a Person who holds a beneficial interest in a Global Note through a Participant.

"Initial Closing Date" means the first date on which any Senior Notes are issued pursuant to this Indenture.

"Initial Purchasers" means Morgan Stanley & Co. Incorporated, Goldman, Sachs & Co., Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, J.P. Morgan Securities Inc and Lehman Brothers Inc.

"Initial Senior Cash Pay Notes" has the meaning set forth in the recitals hereto.

"Initial Senior Notes" means the Initial Senior Cash Pay Notes and the Initial Senior Toggle Notes.

"Initial Senior Toggle Notes" has the meaning set forth in the recitals hereto.

"insolvency or liquidation proceeding" means:

[(1)    any case commenced by or against the Issuer or any Guarantor under any Bankruptcy Law for the relief of debtors, any other proceeding for the reorganization, recapitalization or adjustment or marshalling of the assets or liabilities of the Issuer or any Guarantor, any receivership or assignment for the benefit of creditors relating to the Issuer or any Guarantor or any similar case or proceeding relative to the Issuer or any Guarantor or its creditors, as such, in each case whether or not voluntary;

(2)    any liquidation, dissolution, marshalling of assets or liabilities or other winding up of or relating to the Issuer or any Guarantor, in each case whether or not voluntary and whether or not involving bankruptcy or insolvency; or

(3)    any other proceeding of any type or nature in which substantially all claims of creditors of the Issuer or any Guarantor are determined and any payment or distribution is or may be made on account of such claims.]

"Interest Payment Date" means (1) with respect to any Fixed Rate Notes, April 15 and October 15 of each year to Stated Maturity and (2) with respect to any Floating Rate Notes, January 15, April 15, July 15 and October 15 of each year to Stated Maturity.

"Interim Loan Conversion Date" shall mean [●], 2008 or, if such date is not a Business Day, the next succeeding Business Day.

"Investment Grade Rating" means a rating equal to or higher than Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P, or an equivalent rating by any other Rating Agency.

"Investment Grade Securities" means:

(1)    securities issued or directly and fully guaranteed or insured by the United States government or any agency or instrumentality thereof (other than Cash Equivalents);

(2)    debt securities or debt instruments with an Investment Grade Rating, but excluding any debt securities or instruments constituting loans or advances among the Issuer and its Subsidiaries;

Confidential

(3)     investments in any fund that invests exclusively in investments of the type described in clauses (1) and (2) which fund may also hold immaterial amounts of cash pending investment or distribution; and

(4)     corresponding instruments in countries other than the United States customarily utilized for high quality investments.

"Investments" means, with respect to any Person, all investments by such Person in other Persons (including Affiliates) in the form of loans (including guarantees), advances or capital contributions (excluding accounts receivable, trade credit, advances to customers, commissions, travel and similar advances to officers and employees, in each case made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities issued by any other Person and investments that are required by GAAP to be classified on the balance sheet (excluding the footnotes) of the Issuer in the same manner as the other investments included in this definition to the extent such transactions involve the transfer of cash or other property.  For purposes of the definition of "Unrestricted Subsidiary" and Section 4.07 hereof:

(1)     "Investments" shall include the portion (proportionate to the Issuer's equity interest in such Subsidiary) of the fair market value of the net assets of a Subsidiary of the Issuer at the time that such Subsidiary is designated an Unrestricted Subsidiary; provided, however, that upon a redesignation of such Subsidiary as a Restricted Subsidiary, the Issuer shall be deemed to continue to have a permanent "Investment" in an Unrestricted Subsidiary in an amount (if positive) equal to:

(a)     the Issuer's "Investment" in such Subsidiary at the time of such redesignation; less

(b)     the portion (proportionate to the Issuer equity interest in such Subsidiary) of the fair market value of the net assets of such Subsidiary at the time of such resignation; and

(2)     any property transferred to or from an Unrestricted Subsidiary shall be valued at its fair market value at the time of such transfer, in each case as determined in good faith by the Issuer.

"Investors" means Kohlberg Kravis Roberts & Co. L.P., TPG Capital, L.P., J.P. Morgan Ventures Corporation, Citigroup Global Markets Inc., Morgan Stanley & Co. Incorporated, Goldman, Sachs & Co. and LB I Group and each of their respective Affiliates but not including, however, any portfolio companies of any of the foregoing.

"Issuer" has the meaning set forth in the recitals hereto and its successors under Article 5; provided that when used in the context of determining the fair market value of an asset or liability under this Indenture, "Issuer" shall be deemed to mean the board of directors of the Issuer when the fair market value is equal to or in excess of $500.0 million (unless otherwise expressly stated).

"KKR" means Kohlberg Kravis Roberts & Co. L.P.

"Legal Holiday" means a Saturday, a Sunday or a day on which commercial banking institutions are not required to be open in the State of New York.

"Lender" means any Lender as defined in the Senior Interim Loan Agreement.

Confidential

EFIHMW00293329

PX 003B
Page 28 of 178

"Letter of Transmittal" means the letter of transmittal to be prepared by the Issuer and sent to all Holders of the Senior Notes for use by such Holders in connection with the Exchange Offer.

"LIBOR" means "the LIBOR Rate" as set forth in the Senior Interim Loan Agreement.

"Lien" means, with respect to any asset, any mortgage, lien (statutory or otherwise), pledge, hypothecation, charge, security interest, preference, priority or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a security interest in and any filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statutes) of any jurisdiction; provided that in no event shall an operating lease be deemed to constitute a Lien.

"Mark-to-Market Adjustments" means:

(1)    any non-cash loss attributable to the mark-to-market movement in the valuation of Hedging Obligations (to the extent the cash impact resulting from such loss has not been realized) or other derivative instruments pursuant to Financial Accounting Standards Board Statement No. 133, "Accounting for Derivative Instruments and Hedging Activities," plus

(x)    any loss relating to amounts paid in cash prior to the stated settlement date of any Hedging Obligation that has been reflected in Consolidated Net Income in the current period, plus

(y)    any gain relating to Hedging Obligations associated with transactions recorded in the current period that has been reflected in Consolidated Net Income in prior periods and excluded from EBITDA pursuant to clauses (2)(x) and (2)(y) below, less

(2)    any non-cash gain attributable to the mark-to-market movement in the valuation of Hedging Obligations (to the extent the cash impact resulting from such gain has not been realized) or other derivative instruments pursuant to Financial Accounting Standards Board Statement No. 133, "Accounting for Derivative Instruments and Hedging Activities," less

(x)    any gain relating to amount received in cash prior to the stated settlement date of any Hedging Obligation that has been reflected in Consolidated Net Income in the current period, less

(y)    any loss relating to the Hedging Obligations associated with transactions recorded in the current period that has been reflected in Consolidated Net Income in prior periods and excluded from EBITDA pursuant to clauses (1)(x) and (1)(y) above.

"Moody's" means Moody's Investors Service, Inc. and any successor to its rating agency business.

"Net Income" means, with respect to any Person, the net income (loss) of such Person, determined in accordance with GAAP and before any reduction in respect of Preferred Stock dividends.

"Net Proceeds" means the aggregate cash proceeds received by the Issuer or any of its Restricted Subsidiaries in respect of any Asset Sale (including a Casualty Event), including any cash received upon the sale or other disposition of any Designated Non-cash Consideration received in any Asset Sale (including a Casualty Event), net of the direct costs relating to such Asset Sale (including a Casualty

Confidential                                                                                                EFIHMW00293330
PX 003B
Page 29 of 178

Event) and the sale or disposition of such Designated Non-cash Consideration, including legal, accounting and investment banking fees, and brokerage and sales commissions, any relocation expenses incurred as a result thereof, taxes paid or payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements), amounts required to be applied to the repayment of principal, premium, if any, and interest on Senior Indebtedness required (other than required by clause (1) of Section 4.10(b) hereof) to be paid as a result of such transaction and any deduction of appropriate amounts to be provided by the Issuer or any of its Restricted Subsidiaries as a reserve in accordance with GAAP against any liabilities associated with the asset disposed of in such transaction and retained by the Issuer or any of its Restricted Subsidiaries after such sale or other disposition thereof, including pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction.

"Netting Agreement" shall mean a netting agreement, master netting agreement or other similar document having the same effect as a netting agreement or master netting agreement and, as applicable, any collateral annex, security agreement or other similar document related to any master netting agreement or Permitted Contract.

"Non-U.S. Person" means a Person who is not a U.S. Person.

"Obligations" means any principal, interest (including any interest accruing subsequent to the filing of a petition in bankruptcy, reorganization or similar proceeding at the rate provided for in the documentation with respect thereto, whether or not such interest is an allowed claim under applicable state, federal or foreign law), premium, penalties, fees, indemnifications, reimbursements (including reimbursement obligations with respect to letters of credit and bankers' acceptances), damages and other liabilities, and guarantees of payment of such principal, interest, penalties, fees, indemnifications, reimbursements, damages and other liabilities, payable under the documentation governing any Indebtedness.

"Officer" means the Chairman of the Board, the Chief Executive Officer, the President, any Executive Vice President, Senior Vice President or Vice President, the Treasurer or the Secretary of the Issuer.

"Officer's Certificate" means a certificate signed on behalf of the Issuer by an Officer of the Issuer, who must be the principal executive officer, the principal financial officer, the treasurer or the principal accounting officer of the Issuer that meets the requirements of Section 12.05 hereof.

"Oncor Electric Delivery Facility" means the revolving credit agreement to be entered into as of the Closing Date by and among Oncor Electric Delivery, as borrower, the lenders party thereto in their capacities as lenders thereunder and JPMorgan Chase Bank, N.A., as Administrative Agent, including any guarantees, collateral documents, instruments and agreements executed in connection therewith, and any amendments, supplements, modifications, extensions, renewals, restatements, refundings or refinancings thereof and any indentures or credit facilities or commercial paper facilities with banks or other institutional lenders or investors that replace, refund or refinance any part of the loans, notes, other credit facilities or commitments thereunder, including any such replacement, refunding or refinancing facility or indenture that increases the amount borrowable thereunder or alters the maturity thereof (provided that such increase in borrowings is permitted under Section 4.09 hereof).

"Oncor Holdings" means [Oncor Electric Delivery Holdings].

Confidential                                      EFIHMW00293331

**PX 003B**
**Page 30 of 178**

"Oncor Subsidiaries" means the Subsidiaries of Energy Future Holding Company, including Oncor Holdings and its subsidiaries, all of which shall be Unrestricted Subsidiaries existing on the Closing Date.

"Opinion of Counsel" means a written opinion from legal counsel who is acceptable to the Trustee. The counsel may be an employee of or counsel to the Issuer or the Trustee.

"Partial PIK Interest" has the meaning set forth in Exhibit A-2 or Exhibit A-4 hereto.

"Participant" means, with respect to the Depositary, Euroclear or Clearstream, a Person who has an account with the Depositary, Euroclear or Clearstream, respectively (and, with respect to DTC, shall include Euroclear and Clearstream).

"Permitted Asset Swap" means the concurrent purchase and sale or exchange of Related Business Assets or a combination of Related Business Assets and cash or Cash Equivalents between the Issuer or any of its Restricted Subsidiaries and another Person; provided, that any cash or Cash Equivalents received must be applied in accordance with Section 4.10 hereof.

"Permitted Holders" means each of the Investors, members of management (including directors) of the Issuer or any of its Subsidiaries who on the Closing Date are (or will be at any time prior to the first anniversary of the Closing Date) holders of Equity Interests of the Issuer (or any of its direct or indirect parent companies) and any group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act or any successor provision) of which any of the foregoing are members; provided that, in the case of such group and without giving effect to the existence of such group or any other group, such Investors and members of management, collectively, have beneficial ownership of more than 50% of the total voting power of the Voting Stock of the Issuer or any of its direct or indirect parent companies.

"Permitted Investments" means:

(1)    any Investment in the Issuer or any of its Restricted Subsidiaries;

(2)    any Investment in cash and Cash Equivalents or Investment Grade Securities;

(3)    any Investment by the Issuer or any of its Restricted Subsidiaries in a Person that is engaged in a Similar Business if as a result of such Investment:

(a)    such Person becomes a Restricted Subsidiary; or

(b)    such Person, in one transaction or a series of related transactions, is merged or consolidated with or into, or transfers or conveys substantially all of its assets to, or is liquidated into, the Issuer or a Restricted Subsidiary,

and, in each case, any Investment held by such Person; provided that such Investment was not acquired by such Person in contemplation of such acquisition, merger, consolidation or transfer;

(4)    any Investment in securities or other assets not constituting cash, Cash Equivalents or Investment Grade Securities and received in connection with an Asset Sale made pursuant to Section 4.10 hereof or any other disposition of assets not constituting an Asset Sale;

(5)    any Investment existing on the Closing Date;

Confidential

(6)     any Investment acquired by the Issuer or any of its Restricted Subsidiaries:

    (a)     in exchange for any other Investment or accounts receivable held by the Issuer or any such Restricted Subsidiary in connection with or as a result of a bankruptcy, workout, reorganization or recapitalization of the issuer of such other Investment or accounts receivable; or

    (b)     as a result of a foreclosure by the Issuer or any of its Restricted Subsidiaries with respect to any secured Investment or other transfer of title with respect to any secured Investment in default;

(7)     Hedging Obligations permitted under clause (10) of 4.09(b) hereof;

(8)     any Investment in a Similar Business having an aggregate fair market value, taken together with all other Investments made pursuant to this clause (8) that are at that time outstanding, not to exceed 3.5% of Total Assets at the time of such Investment (with the fair market value of each Investment being measured at the time made and without giving effect to subsequent changes in value);

(9)     Investments the payment for which consists of Equity Interests (exclusive of Disqualified Stock) of the Issuer or any of its direct or indirect parent companies; provided, however, that such Equity Interests will not increase the amount available for Restricted Payments under clause (3) of Section 4.07(a) hereof;

(10)     guarantees of Indebtedness of the Issuer or any of its Restricted Subsidiaries permitted under Section 4.09 hereof;

(11)     any transaction to the extent it constitutes an Investment that is permitted and made in accordance with the provisions of Section 4.11(b) hereof (except transactions described in clauses (2), (5) and (9) of Section 4.11(b) hereof);

(12)     Investments consisting of purchases and acquisitions of inventory, fuel (including all forms of nuclear fuel), supplies, material or equipment;

(13)     additional Investments having an aggregate fair market value, taken together with all other Investments made pursuant to this clause (13) that are at that time outstanding (without giving effect to the sale of an Investment to the extent the proceeds of such sale do not consist of cash or marketable securities), not to exceed 3.5% of Total Assets at the time of such Investment (with the fair market value of each Investment being measured at the time made and without giving effect to subsequent changes in value);

(14)     Investments relating to a Receivables Subsidiary that, in the good faith determination of the Issuer, are necessary or advisable to effect any Receivables Facility for the benefit of the Issuer or any of its Restricted Subsidiaries;

(15)     advances to, or guarantees of Indebtedness of, employees not in excess of $25.0 million outstanding at any one time, in the aggregate;

(16)     loans and advances to officers, directors and employees for business-related travel expenses, moving expenses and other similar expenses, in each case incurred in the ordinary course of business or consistent with past practices or to fund such Person's purchase of Equity Interests of the Issuer or any direct or indirect parent company thereof;

(17)     any Investment in any Subsidiary or any joint venture in connection with intercompany cash management arrangements or related activities arising in the ordinary course of business;

Confidential

(18)     any Investment in Shell Wind in an aggregate amount not to exceed $1,500 million.

"Permitted Liens" means, with respect to any Person:

(1)     pledges or deposits by such Person under workmen's compensation laws, unemployment insurance laws or similar legislation, or good faith deposits in connection with bids, tenders, contracts (other than for the payment of Indebtedness) or leases to which such Person is a party, or deposits to secure public or statutory obligations of such Person or deposits of cash or U.S. government bonds to secure surety or appeal bonds to which such Person is a party, or deposits as security for contested taxes or import duties or for the payment of rent, in each case incurred in the ordinary course of business or in connection with the construction or restoration of facilities for the generation, transmission or distribution of electricity and not securing Indebtedness;

(2)     Liens imposed by law, such as carriers', warehousemen's and mechanics' Liens, in each case for sums not yet overdue for a period of more than 30 days or being contested in good faith by appropriate proceedings or other Liens arising out of judgments or awards against such Person with respect to which such Person shall then be proceeding with an appeal or other proceedings for review if adequate reserves with respect thereto are maintained on the books of such Person in accordance with GAAP;

(3)     Liens for taxes, assessments or other governmental charges not yet overdue for a period of more than 30 days or payable or subject to penalties for nonpayment or which are being contested in good faith by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of such Person in accordance with GAAP;

(4)     Liens in favor of issuers of performance and surety bonds or bid bonds or with respect to other regulatory requirements or letters of credit issued pursuant to the request of and for the account of such Person in the ordinary course of its business;

(5)     minor survey or title exceptions or irregularities, minor encumbrances, easements or reservations of, or rights of others for, licenses, permits, conditions, covenants, rights-of-way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning or other restrictions as to the use of real properties or Liens incidental to the conduct of the business of such Person or to the ownership of its properties which were not incurred in connection with Indebtedness and which do not in the aggregate materially adversely affect the value of said properties or materially impair their use in the operation of the business of such Person;

(6)     Liens securing Indebtedness permitted to be incurred pursuant to clauses (4), (12) or (13) of Section 4.09(b) hereof; provided that (a) Liens securing Indebtedness, Disqualified Stock or Preferred Stock permitted to be incurred pursuant to Section 4.09(b)(13) hereof relate only to Refinancing Indebtedness that serves to refund or refinance Indebtedness, Disqualified Stock or Preferred Stock incurred under Section 4.09(b)(4) or (12) hereof, and (b) Liens securing Indebtedness, Disqualified Stock or Preferred Stock permitted to be incurred pursuant to Section 4.09(b)(4) hereof extend only to the assets so financed, purchased, constructed or improved;

(7)     Liens existing on the Closing Date (other than Liens in favor of the lenders under the TCEH Senior Secured Facilities);

(8)     Liens on property or shares of stock of a Person at the time such Person becomes a Subsidiary; provided, however, such Liens are not created or incurred in connection with, or in contemplation of, such other Person becoming such a Subsidiary; provided, further, however, that such Liens may not extend to any other property owned by the Issuer or any of its Restricted Subsidiaries;

Confidential                                                                    EFIHMW00293334

(9)     Liens on property at the time the Issuer or a Restricted Subsidiary acquired the property, including any acquisition by means of a merger or consolidation with or into the Issuer or any of its Restricted Subsidiaries; provided, however, that such Liens are not created or incurred in connection with, or in contemplation of, such acquisition; provided, further, however, that the Liens may not extend to any other property owned by the Issuer or any of its Restricted Subsidiaries;

(10)     Liens securing Indebtedness or other obligations of a Restricted Subsidiary owing to the Issuer or another Restricted Subsidiary permitted to be incurred in accordance with Section 4.09 hereof;

(11)     Liens securing Hedging Obligations, of the Issuer or its Restricted Subsidiaries incurred under Section 4.09(b)(10) hereof, provided that such Hedging Obligations were not entered into for speculative purposes;

(12)     Liens on specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(13)     leases, subleases, licenses or sublicenses granted to others in the ordinary course of business which do not materially interfere with the ordinary conduct of the business of the Issuer or any of its Restricted Subsidiaries and do not secure any Indebtedness;

(14)     Liens arising from Uniform Commercial Code financing statement filings regarding operating leases entered into by the Issuer and its Restricted Subsidiaries in the ordinary course of business;

(15)     Liens in favor of the Issuer or any Guarantor;

(16)     Liens on equipment of the Issuer or any of its Restricted Subsidiaries granted in the ordinary course of business to the Issuer's client at which such equipment is located;

(17)     Liens on accounts receivable, other Receivables Facility assets, or accounts into which collections or proceeds of Receivables Facility assets are deposited, in each case in connection with a Receivables Facility for the benefit of the Issuer or its Restricted Subsidiaries;

(18)     Liens to secure any refinancing, refunding, extension, renewal or replacement (or successive refinancing, refunding, extensions, renewals or replacements) as a whole, or in part, of any Indebtedness secured by any Lien referred to in the foregoing clauses (6), (7), (8) and (9); provided, however, that (a) such new Lien shall be limited to all or part of the same property that secured the original Lien (plus improvements on such property), and (b) the Indebtedness secured by such Lien at such time is not increased to any amount greater than the sum of (i) the outstanding principal amount or, if greater, committed amount of the Indebtedness described under clauses (6), (7), (8), and (9) at the time the original Lien became a Permitted Lien under this Indenture, and (ii) an amount necessary to pay any fees and expenses, including premiums, related to such refinancing, refunding, extension, renewal or replacement;

(19)     deposits made in the ordinary course of business to secure liability to insurance carriers;

(20)     other Liens securing obligations incurred in the ordinary course of business which obligations do not exceed $100.0 million at any one time outstanding;

(21)     Liens securing judgments for the payment of money not constituting an Event of Default under Section 6.01(a)(5) hereof so long as such Liens are adequately bonded and any appropriate legal proceedings that may have been duly initiated for the review of such judgment

Confidential                                                                 EFIHMW00293335
PX 003B
Page 34 of 178

have not been finally terminated or the period within which such proceedings may be initiated has not expired;

(22)    Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(23)    Liens (i) of a collection bank arising under Section 4-210 of the Uniform Commercial Code, or any comparable or successor provision, on items in the course of collection, and (ii) in favor of banking institutions arising as a matter of law encumbering deposits (including the right of set-off) and which are within the general parameters customary in the banking industry;

(24)    Liens deemed to exist in connection with Investments in repurchase agreements permitted under Section 4.09 hereof; provided that such Liens do not extend to any assets other than those that are the subject of such repurchase agreements;

(25)    ground leases or subleases, licenses or sublicenses in respect of real property on which facilities owned or leased by the Issuer or any of its Subsidiaries are located;

(26)    Liens that are contractual rights of set-off (i) relating to the establishment of depository relations with banks not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of the Issuer or any of its Restricted Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Issuer and its Restricted Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of the Issuer or any of its Restricted Subsidiaries in the ordinary course of business;

(27)    Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale or purchase of goods entered into by the Issuer or any Restricted Subsidiary in the ordinary course of business;

[(28)    rights reserved to or vested in others to take or receive any part of the power, gas, oil, coal, lignite or other minerals or timber generated, developed, manufactured or produced by, or grown on, or acquired with, any property of the Issuer or any of its Restricted Subsidiaries and Liens upon the production from property of power, gas, oil, coal, lignite or other minerals or timber, and the by-products and proceeds thereof, to secure the obligations to pay all or a part of the expenses of exploration, drilling, mining or development of such property only out of such production or proceeds;] **[TBD – Open in Credit Agreement – clause (w)]**

[(29)    Liens arising out of all presently existing and future division and transfer orders, advance payment agreements, processing contracts, gas processing plant agreements, operating agreements, gas balancing or deferred production agreements, pooling, unitization or communitization agreements, pipeline, gathering or transportation agreements, platform agreements, drilling contracts, injection or repressuring agreements, cycling agreements, construction agreements, salt water or other disposal agreements, leases or rental agreements, farm-out and farm-in agreements, exploration and development agreements, and any and all other contracts or agreements covering, arising out of, used or useful in connection with or pertaining to the exploration, development, operation, production, sale, use, purchase, exchange, storage, separation, dehydration, treatment, compression, gathering, transportation, processing, improvement, marketing, disposal or handling of any property of the Issuer or any of its Restricted Subsidiaries, provided that such agreements are entered into in the ordinary course of business;] **[TBD – Open in Credit Agreement – clause (x)]**

Confidential                                                                                    EFIHMW00293336

**PX 003B**
**Page 35 of 178**

(30)    any restrictions on any stock or stock equivalents or other joint venture interests of the Issuer or any of its Restricted Subsidiaries providing for a breach, termination or default under any owners, participation, shared facility, joint venture, stockholder, membership, limited liability company or partnership agreement between such Person and one or more other holders of such stock or stock equivalents or interest of such Person, if a security interest or other Lien is created on such stock or stock equivalents or interest  as a result thereof and other similar Liens;

(31)    [Reserved].

(32)    Liens and other exceptions to title, in either case on or in respect of any facilities of the Issuer or any of its Restricted Subsidiaries, arising as a result of any shared facility agreement entered into with respect to such facility, except to the extent that any such Liens or exceptions, individually or in the aggregate, materially adversely affect the value of the relevant property or materially impair the use of the relevant property in the operation of business of the Issuer or any of its Restricted Subsidiaries, taken as a whole; **[TBD – Open in Credit Agreement – clause (aa)]** and

(33)    [Liens on cash and Cash Equivalents (i) deposited by the Issuer or any of its Restricted Subsidiaries in margin accounts with or on behalf of brokers, credit clearing organizations, independent system operators, regional transmission organizations, pipelines, state agencies, federal agencies, futures contract brokers, customers, trading counterparties, or any other parties or issuers of surety bonds or (ii) pledged or deposited as collateral by the Issuer or any of its Restricted Subsidiaries with any of the entities described in clause (i) above to secure their respective obligations, in the case of each of clauses (i) and (ii) above, with respect to: (A) any contracts and transactions for the purchase, sale, exchange of, or the option (whether physical or financial) to purchase, sell or exchange (1) natural gas, (2) electricity, (3) coal and lignite, (4) petroleum-based liquids, (5) oil, (6) nuclear fuel (including enrichment and conversion), (7) emissions or other environmental credits, (8) waste byproducts, (9) weather, (10) power and other generation capacity, (11) heat rate, (12) congestion, (13) renewal energy credit, or (14) any other energy-related commodity or services or derivative (including ancillary services and related risk (such as location basis); (B) any contracts or transactions for the purchase, processing, transmission, transportation, distribution, sale, lease, hedge or storage of, or any other services related to any commodity or service identified in subparts (1)—(14) above, including any capacity agreement; (C) any financial derivative agreement (including but not limited to swaps, options or swaptions) related to any commodity identified in subparts (1)—(14) above, or to any interest rate or currency rate management activities; (D) any agreement for membership or participation in an organization that facilitates or permits the entering into or clearing of any netting agreement or any agreement described in this clause (33); (E) any agreement combining part or all of a netting agreement or part or all of any of the agreements described in this clause (33); (E) any document relating to any agreement described in this clause (33) that is filed with a Government Authority and any related service agreements; or (F) any commercial or trading agreements, each with respect to, or involving the purchase, transmission, distribution, sale, lease or hedge of, any energy, generation capacity or fuel, or any other energy related commodity or service, price or price indices for any such commodities or services or any other similar derivative agreements, and any other similar agreements (such agreements described in clauses (A) through (F) of this clause (33) being collectively, "Permitted Contracts"), Netting Agreements, Hedging Obligations and letters of credit supporting Permitted Contracts, Netting Agreements and Hedging Obligations;] **[TBD – Open in Credit Agreement – clause (bb)]**.

(34)    Liens arising under Section 9.343 of the Texas Uniform Commercial Code or similar statutes of states other than Texas;

Confidential

(35)    Liens created in the ordinary course of business in favor of banks and other financial institutions over credit balances of any bank accounts of the Issuer and its Subsidiaries held at such banks or financial institutions, as the case may be, to facilitate the operation of cash pooling and/or interest set-off arrangements in respect of such bank accounts in the ordinary course of business;

(36)    any zoning, land use, environmental or similar law or right reserved to or vested in any Government Authority to control or regulate the use of any real property that does not materially interfere with the ordinary conduct of the business of the Issuer or any of its Restricted Subsidiaries, taken as a whole;

(37)    any Lien arising by reason of deposits with or giving of any form of security to any Government Authority for any purpose at any time as required by law as a condition to the transaction of any business or the exercise of any privilege or license, or to enable the Issuer or any of its Restricted Subsidiaries to maintain self-insurance or to participate in any fund for liability on any insurance risks; **[TBD – Open in Credit Agreement – pl (q)]**;

(38)    Liens, restrictions, regulations, easements, exceptions or reservations of any Government Authority applying particularly to nuclear fuel;

(39)    rights reserved to or vested in any Government Authority by the terms of any rights, power, franchise, grant, license or permit, or by any provision of applicable law, to terminate such right, power, franchise, grant, license or permit or to purchase or recapture or to designate a purchaser of any of the property of such person;

(40)    Liens arising under any obligations or duties affecting any of the property of the Issuer or any of its Restricted Subsidiaries to any Government Authority with respect to any franchise, grant, license or permit which do not materially impair the use of such property for the purposes for which it is held;

(41)    rights reserved to or vested in any Government Authority to use, control or regulate any property of such person; and

(42)    any obligations or duties, affecting the property of the Issuer or any of its Restricted Subsidiaries, to any Government Authority with respect to any franchise, grant, license or permit;

(43)    a set-off or netting rights granted by the Issuer or any Subsidiary of the Issuer pursuant to any agreements related to Hedging Obligations, Netting Agreements or Permitted Contracts solely in respect of amounts owing under such agreements;

(44)    Liens (i) on cash advances in favor of the seller of any property to be acquired in an Investment described under the definition of "Permitted Investments" to be applied against the purchase price for such Investment and (ii) consisting of an agreement to sell, transfer, lease or otherwise dispose of any property in a transaction excluded from the definition described under "Asset Sale," in each case, solely to the extent such Investment or sale, disposition, transfer or lease, as the case may be, would have been permitted on the date of the creation of such Lien;

(45)    rights of first refusal and purchase options in favor of Aluminum Company of America ("Alcoa") to purchase Sandow Unit 4 and/or the real property related thereto, as described in (i) the Sandow Unit 4 Agreement dated August 13, 1976, as amended, between Alcoa and Texas Power & Light Company ("TPL") and (ii) Deeds dated March 14, 1978 and July 21, 1980, as amended, executed by Alcoa conveying to TPL the Sandow Four real property; and

(46)    any amounts held by a trustee in the funds and accounts under any indenture securing any revenue bonds issued for the benefit of the Issuer or any of its Restricted Subsidiaries.

Confidential

For purposes of this definition, the term "Indebtedness" shall be deemed to include interest on such Indebtedness.

"Person" means any individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

"PIK Interest" has the meaning set forth in Exhibit A-2 or Exhibit A-4 hereto.

"PIK Notes" means additional Senior Toggle Notes issued under this Indenture on the same terms and conditions as the Senior Toggle Notes in connection with a PIK Payment. For purposes of this Indenture, all references to "PIK Notes" shall include the Related PIK Notes.

"PIK Payment" means an interest payment with respect to the Senior Toggle Notes made by increasing the outstanding principal amount of the Senior Toggle Notes or issuing PIK Notes.

"Plan of Reorganization" means any plan of reorganization, plan of liquidation, agreement for composition, or other type of plan of arrangement proposed in or in connection with any insolvency or liquidation proceeding.

"Preferred Stock" means any Equity Interest with preferential rights of payment of dividends or upon liquidation, dissolution or winding up.

"Private Placement Legend" means the legend set forth in Section 2.06(g)(i) hereof to be placed on all Senior Notes issued under this Indenture except where otherwise permitted by the provisions of this Indenture.

"Purchase Money Obligations" means any Indebtedness incurred to finance or refinance the acquisition, leasing, construction, repair, restoration, replacement, expansion or improvement of property (real or personal) or assets (other than Capital Stock), and whether acquired through the direct acquisition of such property or assets, or otherwise, incurred in respect of capital expenditures.

"QIB" means a "qualified institutional buyer" as defined in Rule 144A.

"Qualified Proceeds" means assets that are used or useful in, or Capital Stock of any Person engaged in, a Similar Business; provided that the fair market value of any such assets or Capital Stock shall be determined by the Issuer in good faith.

"Rating Agencies" means Moody's and S&P or if Moody's or S&P or both shall not make a rating on the applicable Senior Notes or other investment publicly available, a nationally recognized statistical rating agency or agencies, as the case may be, selected by the Issuer which shall be substituted for Moody's or S&P or both, as the case may be.

"Receivables Facility" means any of one or more receivables financing facilities as amended, supplemented, modified, extended, renewed, restated or refunded from time to time, the Obligations of which are non-recourse (except for customary representations, warranties, covenants and indemnities made in connection with such facilities) to the Issuer or any of its Restricted Subsidiaries (other than a Receivables Subsidiary) pursuant to which the Issuer or any of its Restricted Subsidiaries purports to sell its accounts receivable to either (a) a Person that is not a Restricted Subsidiary or (b) a Receivables Subsidiary that in turn funds such purchase by purporting to sell its accounts receivable to a Person that is

Confidential

not a Restricted Subsidiary or by borrowing from such a Person or from another Receivables Subsidiary that in turn funds itself by borrowing from such a Person.

"Receivables Fees" means distributions or payments made directly or by means of discounts with respect to any accounts receivable or participation interest therein issued or sold in connection with, and other fees paid to a Person that is not a Restricted Subsidiary in connection with any Receivables Facility.

"Receivables Subsidiary" means any Subsidiary formed for the purpose of facilitating or entering into one or more Receivables Facilities, and in each case engages only in activities reasonably related or incidental thereto.

"Record Date" for the interest or Additional Interest, if any, payable on any applicable Interest Payment Date means (1) with respect to any Fixed Rate Notes, April 1 or October 1 (whether or not a Business Day) and (2) with respect to any Floating Rate Notes, January 1, April 1, July 1 or October 1 (whether or not a Business Day), in each case, next preceding such Interest Payment Date.

"Registration Rights Agreement" means (1) the Registration Rights Agreement related to the Senior Notes, dated as of the Closing Date, among the Issuer, the Guarantors and the Initial Purchasers and (2) with respect to any Additional Senior Notes, any registration rights agreement among the Issuer and the other parties thereto relating to the registration by the Issuer of such Additional Senior Notes under the Securities Act.

"Regulation S" means Regulation S promulgated under the Securities Act.

"Regulation S Global Note" means a Regulation S Temporary Global Note or Regulation S Permanent Global Note, as appropriate.

"Regulation S Permanent Global Note" means a permanent Global Note in the form of Exhibit A-1, Exhibit A-2, Exhibit A-3 or Exhibit A-4 hereto, as the case may be, bearing the Global Note Legend, the Private Placement Legend and the Tax Legend and deposited with or on behalf of and registered in the name of the Depositary or its nominee, issued in a denomination equal to the outstanding principal amount of the Regulation S Temporary Global Note of the applicable series upon expiration of the Restricted Period.

"Regulation S Temporary Global Note" means a temporary Global Note in the form of Exhibit A-1, Exhibit A-2, Exhibit A-3 or Exhibit A-4 hereto, as the case may be, bearing the Global Note Legend, the Private Placement Legend, the Regulation S Temporary Global Note Legend and the Tax Legend (if applicable) and deposited with or on behalf of and registered in the name of the Depositary or its nominee, issued in a denomination equal to the outstanding principal amount of the Senior Notes of the applicable series initially sold in reliance on Rule 903.

"Regulation S Temporary Global Note Legend" means the legend set forth in Section 2.06(g)(iii) hereof.

"Related Business Assets" means assets (other than cash or Cash Equivalents) used or useful in a Similar Business; provided that any assets received by the Issuer or a Restricted Subsidiary in exchange for assets transferred by the Issuer or a Restricted Subsidiary will not be deemed to be Related Business Assets if they consist of securities of a Person, unless upon receipt of the securities of such Person, such Person would become a Restricted Subsidiary.

Confidential                                                                        EFIHMW00293340

"Related PIK Notes" means, with respect to a Senior Toggle Note, (i) each PIK Note issued in connection with a PIK Payment on such Senior Toggle Note and (ii) each additional PIK Note issued in connection with a PIK Payment on a Related PIK Note with respect to such Senior Toggle Note.

"Representative" means, with respect to a person, any trustee, agent or representative (if any) for an issue of Senior Indebtedness of such Person.

"Required Holders" means a majority of the outstanding principal amount of the Senior Notes (including any PIK Notes) and Term Loans (excluding any Loans held by Defaulting Lenders, as defined in the Senior Interim Loan Agreement) at such date voting as a single class.

"Required Lenders" shall have the meaning set forth in the Senior Interim Loan Agreement.

"Responsible Officer" means, when used with respect to the Trustee, any officer within the [corporate trust department] of the Trustee (or any successor group of the Trustee) having direct responsibility for the administration of this Indenture, or any other officer to whom any corporate trust matter is referred because of such Person's knowledge of and familiarity with the particular subject.

"Restoration Certificate" shall mean, with respect to any Casualty Event, an Officer's Certificate provided to the Trustee prior to the 365th day after such Casualty Event has occurred certifying (a) that the Issuer or such Restricted Subsidiary intends to use the proceeds received in connection with such Casualty Event to repair, restore or replace the property or assets in respect of which such Casualty Event occurred, (b) the approximate costs of completion of such repair, restoration or replacement and (c) that such repair, restoration or replacement will be completed within the later of (x) 450 days after the date on which cash proceeds with respect to such Casualty Event were received and (y) 180 days after delivery of such Restoration Certificate.

"Restricted Definitive Note" means a Definitive Note bearing the Private Placement Legend.

"Restricted Global Note" means a Global Note bearing the Private Placement Legend.

"Restricted Investment" means an Investment other than a Permitted Investment.

"Restricted Payment Coverage Ratio" means (i) for Restricted Payments (other than payments of cash dividends or distributions on, or in respect of, the Issuer's Capital Stock, purchases for cash or other acquisitions for cash of any Capital Stock of the Issuer or any direct or indirect parent of the Issuer for the purpose of paying any such dividend or distribution to, or acquisitions of Capital Stock of any direct or indirect parent of the Issuer for cash from, the Investors, or guaranteeing any Indebtedness of any Affiliate of the Issuer for the purpose of paying such dividend, making such distribution or so acquiring such Capital Stock to or from the Investors, all such Restricted Payments being referred to as "Investor Payments"), the Fixed Charge Coverage Ratio of the Issuer and its Restricted Subsidiaries treating the Oncor Subsidiaries as Restricted Subsidiaries for purposes of such calculation and (ii) for Restricted Payments constituting Investor Payments, the Fixed Charge Coverage Ratio of the Issuer and its Restricted Subsidiaries.

"Restricted Period" means the 40-day distribution compliance period as defined in Regulation S.

"Restricted Subsidiary" means, at any time, any direct or indirect Subsidiary of the Issuer (including any Foreign Subsidiary) that is not then an Unrestricted Subsidiary; provided, however, that upon an Unrestricted Subsidiary's ceasing to be an Unrestricted Subsidiary, such Subsidiary shall be included in the definition of "Restricted Subsidiary."

Confidential

"Rule 144" means Rule 144 promulgated under the Securities Act.

"Rule 144A" means Rule 144A promulgated under the Securities Act.

"Rule 903" means Rule 903 promulgated under the Securities Act.

"Rule 904" means Rule 904 promulgated under the Securities Act.

"S&P" means Standard & Poor's, a division of The McGraw-Hill Companies, Inc., and any successor to its rating agency business.

"Sale and Lease-Back Transaction" means any arrangement providing for the leasing by the Issuer or any of its Restricted Subsidiaries of any real or tangible personal property, which property has been or is to be sold or transferred by the Issuer or such Restricted Subsidiary to a third Person in contemplation of such leasing.

"SEC" means the U.S. Securities and Exchange Commission.

"Secured Indebtedness" means any Indebtedness of the Issuer or any of its Restricted Subsidiaries secured by a Lien.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Senior Cash Pay Cap" means 11.00% per annum.

"Senior Cash Pay Notes" means the Initial Senior Cash Pay Notes and any Additional Senior Cash Pay Notes.

"Senior Cash Pay Term Loans" means the term loans outstanding under the Senior Interim Loan Agreement that bear interest entirely in cash.

"Senior Indebtedness" means:

(1)     all Indebtedness of the Issuer or any Guarantor outstanding under the TCEH Senior Secured Facilities, the TCEH Notes and related guarantees or the Senior Notes and related Guarantees (including interest accruing on or after the filing of any petition in bankruptcy or similar proceeding or for reorganization of the Issuer or any Guarantor (at the rate provided for in the documentation with respect thereto, regardless of whether or not a claim for post-filing interest is allowed in such proceedings)), and any and all other fees, expense reimbursement obligations, indemnification amounts, penalties, and other amounts (whether existing on the Closing Date or thereafter created or incurred) and all obligations of the Issuer or any Guarantor to reimburse any bank or other Person in respect of amounts paid under letters of credit, acceptances or other similar instruments;

(2)     all Hedging Obligations (and guarantees thereof) owing to a Lender (as defined in the TCEH Senior Credit Facilities) or any Affiliate of such Lender (or any Person that was a Lender or an Affiliate of such Lender at the time the applicable agreement giving rise to such Hedging Obligation was entered into); provided that such Hedging Obligations are permitted to be incurred under the terms of this Indenture;

Confidential                    EFIHMW00293342

> (3)      any other Indebtedness of the Issuer or any Guarantor permitted to be incurred under the terms of this Indenture, unless the instrument under which such Indebtedness is incurred expressly provides that it is subordinated in right of payment to the Senior Notes or any related Guarantee; and

> (4)      all Obligations with respect to the items listed in the preceding clauses (1), (2) and (3);

provided, however, that Senior Indebtedness shall not include:

> (a)      any obligation of such Person to the Issuer or any of its Subsidiaries;

> (b)      any liability for federal, state, local or other taxes owed or owing by such Person;

> (c)      any accounts payable or other liability to trade creditors arising in the ordinary course of business;

> (d)      any Indebtedness or other Obligation of such Person which is subordinate or junior in any respect to any other Indebtedness or other Obligation of such Person;

> (e)      that portion of any Indebtedness which at the time of incurrence is incurred in violation of this Indenture;

> (f)      US Holdings' Floating Rate Junior Subordinated Debentures, Series D due 2037; or

> (g)      US Holdings' 8.175% Fixed Junior Subordinated Debentures, Series E due 2037.

"Senior Interim Loan Agreement" means the Senior Unsecured Interim Loan Agreement, dated as of the Closing Date, among TXU Corp., as borrower, the lenders party thereto from time to time, Morgan Stanley Senior Funding, Inc., as administrative agent, Goldman Sachs Credit Partners, L.P., as syndication agent, Morgan Stanley Senior Funding, Inc., Goldman Sachs Credit Partners L.P., Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, J.P. Morgan Securities Inc. and Lehman Brothers Inc., as joint lead arrangers and bookrunners.

"Senior Interim Loans" means the $4,500,000,000 aggregate principal amount of term loans borrowed by the Issuer pursuant to the Senior Interim Loan Agreement.

"Senior Notes" means the Initial Senior Cash Pay Notes and the Initial Senior Toggle Notes (including, in each case, any Exchange Notes issued in exchange therefor), and more particularly means any Senior Note authenticated and delivered under this Indenture. For all purposes of this Indenture, the term "Senior Notes" shall also include any Additional Senior Cash Pay Notes and Additional Senior Toggle Notes that may be issued under this Indenture. The Senior Cash Pay Notes and the Senior Toggle Notes (including, in each case, any Exchange Notes issued in exchange therefor) are separate series of Senior Notes, but shall be treated as a single class for all purposes under this Indenture, except as set forth herein. For purposes of this Indenture, all references to Senior Notes to be issued or authenticated upon transfer, replacement or exchange shall be deemed to refer to Senior Notes of the applicable series.

"Senior Term Loans" means any Senior Cash Pay Term Loans or Senior Toggle Term Loans held by any Lender, which may be exchanged for Senior Notes under this Indenture in accordance with the terms of the Senior Interim Loan Agreement and this Indenture.

Confidential                                                                    EFIHMW00293343

"Senior Toggle Cash Cap" means 11.25% per annum.

"Senior Toggle Notes" means the Initial Senior Toggle Notes, any Additional Senior Toggle Notes and any Related PIK Notes issued in respect of any Senior Toggle Notes (and any increase in the principal amount of any of the foregoing) as a result of a PIK Payment. For purposes of this Indenture, all references to "principal amount" of the Senior Toggle Notes shall include any PIK Notes issued in respect thereof (and any increase in the principal amount thereof) as a result of a PIK Payment.

"Senior Toggle PIK Cap" means 12.00% per annum.

"Senior Toggle Term Loans" means the term loans outstanding under the Senior Interim Loan Agreement that bear interest, at the option of the Issuer, entirely in cash, entirely by increasing the principal amount of the outstanding Senior Toggle Term Loans or 50% as cash interest and 50% as an increase in principal amount.

"Shelf Registration Statement" means the Shelf Registration Statement as defined in the Registration Rights Agreement.

"Shell Wind" means a joint venture with Shell WindEnergy Inc. (or a similar entity) in which the Issuer and its Restricted Subsidiaries have up to a 50% ownership interest relating to the joint development of a 3,000 megawatt wind project in Texas and other renewable energy projects in Texas.

"Significant Subsidiary" means any Restricted Subsidiary that would be a "significant subsidiary" as defined in Article 1, Rule 1-02 of Regulation S-X, promulgated pursuant to the Securities Act, as such regulation is in effect on the Closing Date.

"Similar Business" means any business conducted or proposed to be conducted by the Issuer and its Subsidiaries on the Closing Date or any business that is similar, reasonably related, incidental or ancillary thereto.

"Specified Premium" means, with respect to each Senior Note that is a Fixed Rate Note,

    (1)    during the one-year period commencing on October 15, 2012, a percentage of the principal amount of such Senior Note equal to one-half of the Applicable Rate for such Senior Note (excluding Additional Interest);

    (2)    during the one-year period commencing on October 15, 2013, a percentage of the principal amount of such Senior Note equal to one-third of the Applicable Rate for such Senior Note (excluding Additional Interest);

    (3)    during the one-year period commencing on October 15, 2014, a percentage of the principal amount of such Senior Note equal to one-sixth of the Applicable Rate for such Senior Note (excluding Additional Interest); and

    (3)    at all times on or after October 15, 2015 and ending on the day prior to the Stated Maturity of the Senior Notes, zero.

For example, if the Applicable Rate for a given Senior Note was equal to [9.000]%, then the Specified Premium would equal (a) [4.500]% during the one-year period commencing on October 15, 2012 and ending on October 15, 2013; (b) [3.000]% during the one-year period commencing on October 15, 2013 and ending on October 15, 2014; (c) [1.500]% during the one-year period commencing on October 15,

Confidential

EFIHMW00293344

2014 and ending on October 15, 2015 (c) zero at all times on or after October 15, 2015 and ending on the day prior to the Stated Maturity of the Senior Notes.

"Sponsor Management Agreement" means the management agreement between certain of the management companies associated with the Investors and the Issuer.

"Stated Maturity" means, with respect to any installment of interest or principal on any series of Indebtedness, the date on which the payment of interest or principal was scheduled to be paid in the documentation governing such Indebtedness as of the date of this Indenture, and will not include any contingent obligations to repay, redeem or repurchase any such interest or principal prior to the date originally scheduled for the payment thereof.

"Subordinated Indebtedness" means,

(1)    any Indebtedness of the Issuer which is by its terms subordinated in right of payment to the Senior Notes, and

(2)    any Indebtedness of any Guarantor which is by its terms subordinated in right of payment to the Guarantee of such entity of the Senior Notes.

"Subsidiary" means, with respect to any Person:

(1)    any corporation, association, or other business entity (other than a partnership, joint venture, limited liability company or similar entity) of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time of determination owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof or is consolidated under GAAP with such Person at such time; and

(2)    any partnership, joint venture, limited liability company or similar entity of which

(x)    more than 50% of the capital accounts, distribution rights, total equity and voting interests or general or limited partnership interests, as applicable, are owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof whether in the form of membership, general, special or limited partnership or otherwise, and

(y)    such Person or any Restricted Subsidiary of such Person is a controlling general partner or otherwise controls such entity.

"Tax Legend" means the legend set forth in Section 2.06(g)(iv) hereof to be placed on all PIK Notes (if applicable) issued under this Indenture except where otherwise permitted by the provisions of this Indenture.

"TCEH" means, prior to the consummation of the Merger, TCEH Merger Sub LLC and, from and after the consummation of the Merger, Texas Competitive Electric Holdings Company LLC.

"TCEH Senior Interim Facilities" means the credit agreement, dated as of October [10], 2007, by and among the Parent Guarantor, as guarantor, TCEH, as borrower, the guarantors parties thereto, the lenders party thereto in their capacities as lenders thereunder and Morgan Stanley Senior Funding, Inc., as

Confidential                                                    EFIHMW00293345

Administrative Agent, including any guarantees, instruments and agreements executed in connection therewith, and any amendments, supplements, modifications or restatements thereof.

"TCEH Senior Secured Facilities" means the credit agreement dated as of October [ ], 2007 by and among the Issuer, as guarantor, TCEH, as borrower, the lenders party thereto in their capacities as lenders thereunder and Citibank, N.A., as Administrative Agent, including any guarantees, collateral documents, instruments and agreements executed in connection therewith, and any amendments, supplements, modifications, extensions, renewals, restatements, refundings or refinancings thereof and any indentures or credit facilities or commercial paper facilities with banks or other institutional lenders or investors that replace, refund or refinance any part of the loans, notes, other credit facilities or commitments thereunder, including any such replacement, refunding or refinancing facility or indenture that increases the amount borrowable thereunder or alters the maturity thereof (provided that such increase in borrowings is permitted under Section 4.09 hereof).

"TCEH Notes" means $6,750,000,000 aggregate principal amount of [ ]% Senior Notes due 2015 and the [ ]% [ ]% Senior Toggle Notes due 2016 issued by TCEH.

"Total Assets" means the total assets of the Issuer and its Restricted Subsidiaries on a consolidated basis, as shown on the most recent consolidated balance sheet of the Issuer or such other Person as may be expressly stated.

"TPG" means TPG Capital, L.P.

"Transactions" means the transactions contemplated by the Transaction Agreement, the issuance of the Senior Notes and TCEH Notes and borrowings on the Closing Date under the Senior Interim Loan Agreement, the TCEH Senior Interim Loan Agreement, the TCEH Senior Secured Facilities, the Oncor Electric Delivery Facility and any Receivables Facility as in effect on the Closing Date and any repayments of indebtedness of the Issuer and its Restricted Subsidiaries in connection therewith.

"Transaction Agreement" means the Agreement and Plan of Merger, dated as of February 25, 2007, between Merger Sub, Texas Holdings and TXU Corp, as the same may be amended prior to the Closing Date.

"Treasury Rate" means, as of any Redemption Date, the yield to maturity as of such Redemption Date of United States Treasury securities with a constant maturity (as compiled and published in the most recent Federal Reserve Statistical Release H.15 (519) that has become publicly available at least two Business Days prior to the Redemption Date (or, if such Statistical Release is no longer published, any publicly available source of similar market data)) most nearly equal to the period from the Redemption Date to October 15, 2012; provided, however, that if the period from the Redemption Date to October 15, 2012 is less than one year, the weekly average yield on actually traded United States Treasury securities adjusted to a constant maturity of one year will be used.

"Trust Indenture Act" or "TIA" means the Trust Indenture Act of 1939, as amended (15 U.S.C. §§ 77aaa-77bbbb).

"Trustee" means [Name of Trustee], as trustee, until a successor replaces it in accordance with the applicable provisions of this Indenture and, thereafter, means the successor serving hereunder.

"TXU Corp. Senior Interim Facilities" means the credit agreement, dated as of October [10], 2007, by and among the Issuer, as borrower, US Holdings and Energy Future Holding Company, as guarantors, the guarantors parties thereto, the lenders party thereto in their capacities as lenders

Confidential                                                                                EFIHMW00293346

thereunder and Morgan Stanley Senior Funding, Inc., as Administrative Agent, including any guarantees, instruments and agreements executed in connection therewith, and any amendments, supplements, modifications or restatements thereof.

"Unit" shall mean [          ].

"Unrestricted Cash" means, as of any date, without duplication, (a) all cash and Cash Equivalents (in each case, free and clear of all Liens, other than nonconsensual Liens permitted by Section 4.12 hereof and Liens permitted by clause (23), subclauses (i) and (ii) of clause (26) and clause (33) of the definition of Permitted Liens, included in the cash and cash equivalents accounts listed on the consolidated balance sheet of the Issuer and its Restricted Subsidiaries as of such date and (b) all unrestricted margin deposits related to commodity positions listed on the consolidated balance sheet of Issuer and the Restricted Subsidiaries.

"Unrestricted Definitive Note" means one or more Definitive Notes that do not bear and are not required to be the Private Placement Legend.

"Unrestricted Global Note" means a permanent Global Note, substantially in the form of Exhibit A-1, Exhibit A-2, Exhibit A-3, or Exhibit A-4 attached hereto, as the case may be, that bears the Global Note Legend and that has the "Schedule of Exchanges of Interests in the Global Note" attached thereto, and that is deposited with or on behalf of and registered in the name of the Depositary, representing one or more Global Notes that do not bear and are not required to bear the Private Placement Legend.

"Unrestricted Subsidiary" means:

    (1)    each of the Oncor Subsidiaries;

    (2)    any Subsidiary of the Issuer which at the time of determination is an Unrestricted Subsidiary (as designated by the Issuer, as provided below); and

    (3)    any Subsidiary of an Unrestricted Subsidiary.

The Issuer may designate any Subsidiary of the Issuer (including any existing Subsidiary and any newly acquired or newly formed Subsidiary) to be an Unrestricted Subsidiary unless such Subsidiary or any of its Subsidiaries owns any Equity Interests or Indebtedness of, or owns or holds any Lien on, any property of, the Issuer or any Subsidiary of the Issuer (other than solely any Subsidiary of the Subsidiary to be so designated); provided that

    (1)    any Unrestricted Subsidiary must be an entity of which the Equity Interests entitled to cast at least a majority of the votes that may be cast by all Equity Interests having ordinary voting power for the election of directors or Persons performing a similar function are owned, directly or indirectly, by the Issuer;

    (2)    such designation complies with Section 4.07 hereof; and

    (3)    each of:

        (a)    the Subsidiary to be so designated; and

        (b)    its Subsidiaries

Confidential        EFIHMW00293347

has not at the time of designation, and does not thereafter, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable with respect to any Indebtedness pursuant to which the lender has recourse to any of the assets of the Issuer or any Restricted Subsidiary.

The Issuer may designate any Unrestricted Subsidiary to be a Restricted Subsidiary; provided that, immediately after giving effect to such designation, no Default shall have occurred and be continuing and either:

    (1)    in the case of any Subsidiary of the Issuer other than TCEH and any of its Subsidiaries, (A) the Issuer could incur at least $1.00 of additional Indebtedness pursuant to clause (i) of the Fixed Charge Coverage Ratio test as set forth in Section 4.09(a) hereof; or (B) the Fixed Charge Coverage Ratio for the Issuer and its Restricted Subsidiaries would be greater than such ratio for the Issuer and its Restricted Subsidiaries immediately prior to such designation, in each case on a pro forma basis taking into account such designation; or

    (2) in the case of TCEH and any of its Subsidiaries, (A) TCEH could Incur at least $1.00 of additional Indebtedness pursuant to clause (ii) of such Fixed Charge Coverage Ratio test or (B) such Fixed Charge Coverage Ratio for TCEH and its Restricted Subsidiaries would be greater than such ratio for TCEH and its Restricted Subsidiaries immediately prior to such designation, in each case on a pro forma basis taking into account such designation.

Any such designation by the Issuer shall be notified by the Issuer to the Trustee by promptly filing with the Trustee a copy of the resolution of the board of directors of the Issuer or any committee thereof giving effect to such designation and an Officer's Certificate certifying that such designation complied with the foregoing provisions.

"US Holdings" means Energy Future Competitive Holdings Company.

"U.S. Person" means a U.S. person as defined in Rule 902(k) promulgated under the Securities Act.

"Voting Stock" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the board of directors of such Person.

"Weighted Average Life to Maturity" means, when applied to any Indebtedness, Disqualified Stock or Preferred Stock, as the case may be, at any date, the quotient obtained by dividing:

    (1)    the sum of the products of the number of years from the date of determination to the date of each successive scheduled principal payment of such Indebtedness or redemption or similar payment with respect to such Disqualified Stock or Preferred Stock multiplied by the amount of such payment; by

    (2)    the sum of all such payments.

"Wholly-Owned Subsidiary" of any Person means a Subsidiary of such Person, 100% of the outstanding Equity Interests of which (other than directors' qualifying shares) shall at the time be owned by such Person or by one or more Wholly-Owned Subsidiaries of such Person.

    Section 1.02    Other Definitions.

| **Term** | **Defined in** |
| --- | --- |

Confidential

EFIHMW00293348

**PX 003B
Page 47 of 178**

|  | **Section** |
|---|---|
| "Acceptable Commitment" | 4.10 |
| "Affiliate Transaction" | 4.11 |
| "Asset Sale Offer" | 4.10 |
| "Calculation Agent" | 2.03 |
| "Change of Control Offer" | 4.14 |
| "Change of Control Payment" | 4.14 |
| "Change of Control Payment Date" | 4.14 |
| "Issuer Authentication Order" | 2.02 |
| "Covenant Defeasance" | 8.03 |
| "DTC" | 2.03 |
| "Event of Default" | 6.01 |
| "Excess Proceeds" | 4.10 |
| "incur" | 4.09 |
| "Legal Defeasance" | 8.02 |
| "Note Register" | 2.03 |
| "Offer Amount" | 3.09 |
| "Offer Period" | 3.09 |
| "Paying Agent" | 2.03 |
| "Purchase Date" | 3.09 |
| "Redemption Date" | 3.07 |
| "Refinancing Indebtedness" | 4.09 |
| "Refunding Capital Stock" | 4.07 |
| "Registrar" | 2.03 |
| "Restricted Payments" | 4.07 |
| "Second Commitment" | 4.10 |
| "Treasury Capital Stock" | 4.07 |

Section 1.03    Incorporation by Reference of Trust Indenture Act.

Whenever this Indenture refers to a provision of the Trust Indenture Act, the provision is incorporated by reference in and made a part of this Indenture.

The following Trust Indenture Act terms used in this Indenture have the following meanings:

"indenture securities" means the Senior Notes;

"indenture security holder" means a Holder of a Senior Note;

"indenture to be qualified" means this Indenture;

"indenture trustee" or "institutional trustee" means the Trustee; and

"obligor" on the Senior Notes and the Guarantees means the Issuer and the Guarantors, respectively, and any successor obligor upon the Senior Notes and the Guarantees, respectively.

All other terms used in this Indenture that are defined by the Trust Indenture Act, defined by Trust Indenture Act reference to another statute or defined by SEC rule under the Trust Indenture Act have the meanings so assigned to them.

Confidential

EFIHMW00293349

**PX 003B**

**Page 48 of 178**

Section 1.04    Rules of Construction.

Unless the context otherwise requires:

(a)    a term has the meaning assigned to it;

(b)    an accounting term not otherwise defined has the meaning assigned to it in accordance with GAAP;

(c)    "or" is not exclusive;

(d)    words in the singular include the plural, and in the plural include the singular;

(e)    "will" shall be interpreted to express a command;

(f)    provisions apply to successive events and transactions;

(g)    references to sections of, or rules under, the Securities Act shall be deemed to include substitute, replacement or successor sections or rules adopted by the SEC from time to time;

(h)    unless the context otherwise requires, any reference to an "Article," "Section" or "clause" refers to an Article, Section or clause, as the case may be, of this Indenture; and

(i)    the words "herein," "hereof" and "hereunder" and other words of similar import refer to this Indenture as a whole and not any particular Article, Section, clause or other subdivision.

Section 1.05    Acts of Holders.

(a)    Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Holders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Holders in person or by an agent duly appointed in writing.  Except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments or record or both are delivered to the Trustee and, where it is hereby expressly required, to the Issuer.  Proof of execution of any such instrument or of a writing appointing any such agent, or the holding by any Person of a Senior Note, shall be sufficient for any purpose of this Indenture and (subject to Section 7.01) conclusive in favor of the Trustee and the Issuer, if made in the manner provided in this Section 1.05.

(b)    The fact and date of the execution by any Person of any such instrument or writing may be proved by the affidavit of a witness of such execution or by the certificate of any notary public or other officer authorized by law to take acknowledgments of deeds, certifying that the individual signing such instrument or writing acknowledged to him the execution thereof.  Where such execution is by or on behalf of any legal entity other than an individual, such certificate or affidavit shall also constitute proof of the authority of the Person executing the same.  The fact and date of the execution of any such instrument or writing, or the authority of the Person executing the same, may also be proved in any other manner that the Trustee deems sufficient.

(c)    The ownership of Senior Notes shall be proved by the Note Register.

(d)    Any request, demand, authorization, direction, notice, consent, waiver or other action by the Holder of any Senior Note shall bind every future Holder of the same Senior Note and the Holder of

Confidential                                    EFIHMW00293350

every Senior Note issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof, in respect of any action taken, suffered or omitted by the Trustee or the Issuer in reliance thereon, whether or not notation of such action is made upon such Senior Note.

(e)     The Issuer may, in the circumstances permitted by the Trust Indenture Act, set a record date for purposes of determining the identity of Holders entitled to give any request, demand, authorization, direction, notice, consent, waiver or take any other act, or to vote or consent to any action by vote or consent authorized or permitted to be given or taken by Holders. Unless otherwise specified, if not set by the Issuer prior to the first solicitation of a Holder made by any Person in respect of any such action, or in the case of any such vote, prior to such vote, any such record date shall be the later of 10 days prior to the first solicitation of such consent or the date of the most recent list of Holders furnished to the Trustee prior to such solicitation.

(f)     Without limiting the foregoing, a Holder entitled to take any action hereunder with regard to any particular Senior Note may do so with regard to all or any part of the principal amount of such Senior Note or by one or more duly appointed agents, each of which may do so pursuant to such appointment with regard to all or any part of such principal amount. Any notice given or action taken by a Holder or its agents with regard to different parts of such principal amount pursuant to this paragraph shall have the same effect as if given or taken by separate Holders of each such different part.

(g)     Without limiting the generality of the foregoing, a Holder, including DTC that is the Holder of a Global Note, may make, give or take, by a proxy or proxies duly appointed in writing, any request, demand, authorization, direction, notice, consent, waiver or other action provided in this Indenture to be made, given or taken by Holders, and DTC that is the Holder of a Global Note may provide its proxy or proxies to the beneficial owners of interests in any such Global Note through such depositary's standing instructions and customary practices.

(h)     The Issuer may fix a record date for the purpose of determining the Persons who are beneficial owners of interests in any Global Note held by DTC entitled under the procedures of such depositary to make, give or take, by a proxy or proxies duly appointed in writing, any request, demand, authorization, direction, notice, consent, waiver or other action provided in this Indenture to be made, given or taken by Holders. If such a record date is fixed, the Holders on such record date or their duly appointed proxy or proxies, and only such Persons, shall be entitled to make, give or take such request, demand, authorization, direction, notice, consent, waiver or other action, whether or not such Holders remain Holders after such record date. No such request, demand, authorization, direction, notice, consent, waiver or other action shall be valid or effective if made, given or taken more than 90 days after such record date.

ARTICLE 2

THE SENIOR NOTES

Section 2.01     Form and Dating; Terms.

(a)     General. The Senior Notes and the Trustee's certificate of authentication shall be substantially in the form of Exhibit A-1 (in the case of Senior Cash Pay Notes that are Floating Rate Notes), Exhibit A-2 (in the case of the Senior Toggle Notes that are Floating Rate Notes), Exhibit A-3 (in the case of Senior Cash Pay Notes that are Fixed Rate Notes) or Exhibit A-4 (in the case of the Senior Toggle Notes that are Fixed Rate Notes) hereto. The Senior Notes may have notations, legends or endorsements required by law, stock exchange rules or usage. Each Senior Note shall be dated the date of its authentication[, unless a different date shall be provided for in the applicable Exchange Notice]. The

Confidential

Senior Notes shall be minimum in denominations of $2,000 and integral multiples of $1,000 in excess thereof, subject to the issuance of certificated PIK Notes as set forth in <u>Exhibit A-2</u> and <u>Exhibit A-4</u>.

(b)    <u>Global Notes</u>.    Senior Notes issued in global form shall be substantially in the form of <u>Exhibit A-1</u> (in the case of Senior Cash Pay Notes that are Floating Rate Notes), <u>Exhibit A-2</u> (in the case of the Senior Toggle Notes that are Floating Rate Notes), <u>Exhibit A-3</u> (in the case of Senior Cash Pay Notes that are Fixed Rate Notes) or <u>Exhibit A-4</u> (in the case of the Senior Toggle Notes that are Fixed Rate Notes) hereto (including, in each case, the Global Note Legend thereon and the "Schedule of Exchanges of Interests in the Global Note" attached thereto).    Senior Notes issued in definitive form shall be substantially in the form of <u>Exhibit A-1</u> (in the case of Senior Cash Pay Notes that are Floating Rate Notes), <u>Exhibit A-2</u> (in the case of the Senior Toggle Notes that are Floating Rate Notes), <u>Exhibit A-3</u> (in the case of Senior Cash Pay Notes that are Fixed Rate Notes) or <u>Exhibit A-4</u> (in the case of the Senior Toggle Notes that are Fixed Rate Notes) attached hereto (but without, in each case, the Global Note Legend thereon and without the "Schedule of Exchanges of Interests in the Global Note" attached thereto).    Each Global Note shall represent such of the outstanding Senior Notes as shall be specified in the "Schedule of Exchanges of Interests in the Global Note" attached thereto and each shall provide that it shall represent up to the aggregate principal amount of Senior Notes from time to time endorsed thereon and that the aggregate principal amount of outstanding Senior Notes represented thereby may from time to time be reduced or increased, as applicable, to reflect exchanges and redemptions.    Any endorsement of a Global Note to reflect the amount of any increase or decrease in the aggregate principal amount of outstanding Senior Notes represented thereby shall be made by the Trustee or the Custodian, at the direction of the Trustee, in accordance with instructions given by the Holder thereof as required by Section 2.06 hereof.

(c)    <u>Temporary Global Notes</u>.    Senior Notes offered and sold in reliance on Regulation S shall be issued initially in the form of the Regulation S Temporary Global Note, which shall be deposited on behalf of the purchasers of the Senior Notes represented thereby with the Trustee, as custodian for the Depositary, and registered in the name of the Depositary or the nominee of the Depositary for the accounts of designated agents holding on behalf of Euroclear or Clearstream, duly executed by the Issuer and authenticated by the Trustee as hereinafter provided.    The Restricted Period shall be terminated upon the receipt by the Trustee of:

(i)    a written certificate from the Depositary, together with copies of certificates from Euroclear and Clearstream certifying that they have received certification of non-United States beneficial ownership of 100% of the aggregate principal amount of the Regulation S Temporary Global Note (except to the extent of any beneficial owners thereof who acquired an interest therein during the Restricted Period pursuant to another exemption from registration under the Securities Act and who shall take delivery of a beneficial ownership interest in a 144A Global Note bearing a Private Placement Legend, all as contemplated by Section 2.06(b) hereof); and

(ii)    an Officer's Certificate from the Issuer.

Following the termination of the Restricted Period, beneficial interests in each Regulation S Temporary Global Note shall be exchanged for beneficial interests in the Regulation S Permanent Global Note of the same series pursuant to the Applicable Procedures.    Simultaneously with the authentication of the corresponding Regulation S Permanent Global Note, the Trustee shall cancel the corresponding Regulation S Temporary Global Note.    The aggregate principal amount of a Regulation S Temporary Global Note and the Regulation S Permanent Global Note may from time to time be increased or decreased by adjustments made on the records of the Trustee and the Depositary or its nominee, as the case may be, in connection with transfers of interest as hereinafter provided.

Confidential                                                                                EFIHMW00293352

(d)    Terms.  The aggregate principal amount of Senior Notes that may be authenticated and delivered under this Indenture is unlimited.

The terms and provisions contained in the Senior Notes shall constitute, and are hereby expressly made, a part of this Indenture and the Issuer, the Guarantors and the Trustee, by their execution and delivery of this Indenture, expressly agree to such terms and provisions and to be bound thereby. However, to the extent any provision of any Senior Note conflicts with the express provisions of this Indenture, the provisions of this Indenture shall govern and be controlling.

The Senior Notes shall be subject to repurchase by the Issuer pursuant to an Asset Sale Offer as provided in Section 4.10 hereof or a Change of Control Offer as provided in Section 4.14 hereof.  The Senior Notes shall not be redeemable other than as provided in Article 3 hereof.

Additional Senior Notes ranking *pari passu* with the Initial Senior Notes may be created and issued from time to time by the Issuer without notice to or consent of the Holders and shall be consolidated with and form a single class with the Initial Senior Notes and shall have the same terms as to status, redemption or otherwise as the Initial Senior Notes; provided that the Issuer's ability to issue Additional Senior Notes shall be subject, among other things, to the Issuer's compliance with Section 4.09 hereof; provided further that in connection with the payment of PIK Interest, the Issuer may, without the consent of the Holders (and without regard to any restrictions or limitations set forth in Section 4.09 hereof), increase the outstanding principal amount of the Senior Toggle Notes or issue PIK Notes.  The Senior Cash Pay Notes and the Senior Toggle Notes are each a separate series of Senior Notes but will be treated as a single class of securities under this Indenture, except as otherwise stated herein.  As a result, Holders of each series of Senior Notes will not have separate rights to, among other things, give notice of Defaults or to direct the Trustee to exercise remedies during an Event of Default or otherwise.  Except as described under Article 9 hereof, the Senior Notes offered by the Issuer, the PIK Notes and any Additional Senior Notes subsequently issued under this Indenture will be treated as a single class for all purposes under this Indenture, including, among other things, waivers, amendments, redemptions and offers to purchase.  Unless the context requires otherwise, references to "Senior Notes" for all purposes under this Indenture include any PIK Notes and Additional Notes that are actually issued, and references to "principal amount" of the Senior Notes includes any increases in the principal amount of the outstanding Senior Notes as a result of a PIK Payment.  Any Additional Senior Notes shall be issued with the benefit of an indenture supplemental to this Indenture.

(e)    Euroclear and Clearstream Procedures Applicable.  The provisions of the "Operating Procedures of the Euroclear System" and "Terms and Conditions Governing Use of Euroclear" and the "General Terms and Conditions of Clearstream Banking" and "Customer Handbook" of Clearstream shall be applicable to transfers of beneficial interests in the Regulation S Temporary Global Note and the Regulation S Permanent Global Notes that are held by Participants through Euroclear or Clearstream.

Section 2.02    Execution and Authentication.

At least one Officer shall execute the Senior Notes on behalf of the Issuer by manual or facsimile signature.

If an Officer whose signature is on a Senior Note no longer holds that office at the time a Senior Note is authenticated, the Senior Note shall nevertheless be valid.

A Senior Note shall not be entitled to any benefit under this Indenture or be valid or obligatory for any purpose until authenticated substantially in the form of Exhibit A-1, Exhibit A-2, Exhibit A-3 or Exhibit A-4 attached hereto, as the case may be, by the manual or facsimile signature of the Trustee.  The

Confidential                                                                    EFIHMW00293353

signature shall be conclusive evidence that the Senior Note has been duly authenticated and delivered under this Indenture.

On the applicable Closing Date, the Trustee shall, upon receipt of a written order of the Issuer signed by an Officer (an "Issuer Authentication Order") based on the direction of a Lender as set forth in an Exchange Notice, authenticate and deliver (i) the Initial Senior Cash Pay Notes and (ii) the Initial Senior Toggle Notes specified in such Issuer Authentication Order. In addition, at any time, and from time to time, the Trustee shall, upon receipt of an Issuer Authentication Order, authenticate and deliver any Additional Senior Notes, Exchange Notes or PIK Notes (or increases in the principal amount of any Senior Toggle Notes) as a result of a PIK Payment, for an aggregate principal amount specified in such Issuer Authentication Order for such Additional Senior Notes, Exchange Notes or PIK Notes (or increases in the principal amount of such Senior Toggle Notes).

On any Interest Payment Date on which the Issuer pays PIK Interest with respect to a Global Note, the Trustee shall increase the principal amount of such Global Note by an amount equal to the interest payable, rounded up to the nearest $1,000, for the relevant interest period on the principal amount of such Global Note as of the relevant Record Date, for such Interest Payment Date, to the credit of the Holders on such Record Date, pro rata in accordance with their interests, and an adjustment shall be made on the books and records of the Trustee (if it is then the Custodian for such Global Note) with respect to such Global Note, by the Trustee or the Custodian, to reflect such increase. On any Interest Payment Date on which the Issuer pays PIK Interest by issuing definitive PIK Notes, the principal amount of any such PIK Notes issued to any Holder, for the relevant interest period as of the relevant Record Date for such Interest Payment Date, shall be rounded up to the nearest $1.00.

The Trustee may appoint an authenticating agent acceptable to the Issuer to authenticate Senior Notes. An authenticating agent may authenticate Senior Notes whenever the Trustee may do so. Each reference in this Indenture to authentication by the Trustee includes authentication by such agent. An authenticating agent has the same rights as an Agent to deal with Holders or an Affiliate of the Issuer.

Section 2.03    Registrar, Paying Agent and Calculation Agent.

The Issuer shall maintain an office or agency where Senior Notes may be presented for registration of transfer or for exchange ("Registrar") and an office or agency where Senior Notes may be presented for payment ("Paying Agent"). In addition, the Issuer shall appoint a Calculation Agent for purposes of the Floating Rate Notes (the "Calculation Agent"). The Registrar shall keep a register of the Senior Notes ("Note Register") and of their transfer and exchange. The Issuer may appoint one or more co-registrars and one or more additional paying agents. The term "Registrar" includes any co-registrar and the term "Paying Agent" includes any additional paying agent. The Issuer may change any Paying Agent or Registrar without prior notice to any Holder.

The Issuer shall notify the Trustee in writing of the name and address of any Agent not a party to this Indenture. If the Issuer fails to appoint or maintain another entity as Registrar, Paying Agent or Calculation Agent, the Trustee shall act as such Registrar, Paying Agent or Calculation Agent. The Issuer or any of its Subsidiaries may act as Registrar or Paying Agent.

The Issuer initially appoints The Depository Trust Company ("DTC") to act as Depositary with respect to the Global Notes.

The Issuer initially appoints the Trustee to act as the Registrar, Paying Agent and Calculation Agent for the Senior Notes and to act as Custodian with respect to the Global Notes.

Confidential

Section 2.04    Paying Agent to Hold Money in Trust.

The Issuer shall require each Paying Agent other than the Trustee to agree in writing that the Paying Agent shall hold in trust for the benefit of Holders or the Trustee all money held by the Paying Agent for the payment of principal, premium, Additional Interest if any, or Cash Interest on the Senior Notes, and will notify the Trustee of any default by the Issuer in making any such payment. While any such default continues, the Trustee may require a Paying Agent to pay all money held by it to the Trustee. The Issuer at any time may require a Paying Agent to pay all money held by it to the Trustee. Upon payment over to the Trustee, the Paying Agent (if other than the Issuer or a Subsidiary) shall have no further liability for the money. If the Issuer or a Subsidiary acts as Paying Agent, it shall segregate and hold in a separate trust fund for the benefit of the Holders all money held by it as Paying Agent. Upon any bankruptcy or reorganization proceedings relating to the Issuer, the Trustee shall serve as Paying Agent for the Senior Notes.

Section 2.05    Holder Lists.

The Trustee shall preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of all Holders and shall otherwise comply with Trust Indenture Act Section 312(a). If the Trustee is not the Registrar, the Issuer shall furnish to the Trustee at least two Business Days before each Interest Payment Date and at such other times as the Trustee may request in writing, a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of the Holders of Senior Notes and the Issuer shall otherwise comply with Trust Indenture Act Section 312(a).

Section 2.06    Transfer and Exchange.

(a)    Transfer and Exchange of Global Notes.    Except as otherwise set forth in this Section 2.06, a Global Note may be transferred, in whole and not in part, only to another nominee of the Depositary or to a successor Depositary or a nominee of such successor Depositary. A beneficial interest in a Global Note may not be exchanged for a Definitive Note unless (i) the Depositary (x) notifies the Issuer that it is unwilling or unable to continue as Depositary for such Global Note or (y) has ceased to be a clearing agency registered under the Exchange Act and, in either case, a successor Depositary is not appointed by the Issuer within 120 days or (ii) there shall have occurred and be continuing a Default with respect to the Senior Notes. Upon the occurrence of any of the preceding events in (i) or (ii) above, Definitive Notes delivered in exchange for any Global Note or beneficial interests therein will be registered in the names, and issued in any approved denominations, requested by or on behalf of the Depositary (in accordance with its customary procedures). Global Notes also may be exchanged or replaced, in whole or in part, as provided in Sections 2.07 and 2.10 hereof. Every Senior Note authenticated and delivered in exchange for, or in lieu of, a Global Note or any portion thereof, pursuant to this Section 2.06 or Section 2.07 or 2.10 hereof, shall be authenticated and delivered in the form of, and shall be, a Global Note, except for Definitive Notes issued subsequent to any of the preceding events in (i) or (ii) above and pursuant to Section 2.06(c) hereof. A Global Note may not be exchanged for another Senior Note other than as provided in this Section 2.06(a); provided, however, that beneficial interests in a Global Note may be transferred and exchanged as provided in Section 2.06(b), (c) or (f) hereof.

(b)    Transfer and Exchange of Beneficial Interests in the Global Notes.    The transfer and exchange of beneficial interests in the Global Notes shall be effected through the Depositary, in accordance with the provisions of this Indenture and the Applicable Procedures. Beneficial interests in the Restricted Global Notes shall be subject to restrictions on transfer comparable to those set forth herein to the extent required by the Securities Act. Transfers of beneficial interests in the Global Notes also

Confidential

shall require compliance with either subparagraph (i) or (ii) below, as applicable, as well as one or more of the other following subparagraphs, as applicable:

(i)     <u>Transfer of Beneficial Interests in the Same Global Note</u>.  Beneficial interests in any Restricted Global Note may be transferred to Persons who take delivery thereof in the form of a beneficial interest in the same Restricted Global Note in accordance with the transfer restrictions set forth in the Private Placement Legend; <u>provided</u>, <u>however</u>, that prior to the expiration of the Restricted Period, transfers of beneficial interests in the Regulation S Temporary Global Note may not be made to a U.S. Person or for the account or benefit of a U.S. Person. Beneficial interests in any Unrestricted Global Note may be transferred to Persons who take delivery thereof in the form of a beneficial interest in an Unrestricted Global Note.  No written orders or instructions shall be required to be delivered to the Registrar to effect the transfers described in this Section 2.06(b)(i).

(ii)     <u>All Other Transfers and Exchanges of Beneficial Interests in Global Notes</u>.  In connection with all transfers and exchanges of beneficial interests that are not subject to Section 2.06(b)(i) hereof, the transferor of such beneficial interest must deliver to the Registrar either (A) (1) a written order from a Participant or an Indirect Participant given to the Depositary in accordance with the Applicable Procedures directing the Depositary to credit or cause to be credited a beneficial interest in another Global Note in an amount equal to the beneficial interest to be transferred or exchanged and (2) instructions given in accordance with the Applicable Procedures containing information regarding the Participant account to be credited with such increase or (B) (1) a written order from a Participant or an Indirect Participant given to the Depositary in accordance with the Applicable Procedures directing the Depositary to cause to be issued a Definitive Note of the same series in an amount equal to the beneficial interest to be transferred or exchanged and (2) instructions given by the Depositary to the Registrar containing information regarding the Person in whose name such Definitive Note shall be registered to effect the transfer or exchange referred to in (1) above; <u>provided</u> that in no event shall Definitive Notes be issued upon the transfer or exchange of beneficial interests in the Regulation S Temporary Global Note prior to (A) the expiration of the Restricted Period and (B) the receipt by the Registrar of any certificates required pursuant to Rule 903. Upon consummation of an Exchange Offer by the Issuer in accordance with Section 2.06(f) hereof, the requirements of this Section 2.06(b)(ii) shall be deemed to have been satisfied upon receipt by the Registrar of the instructions contained in the Letter of Transmittal delivered by the Holder of such beneficial interests in the Restricted Global Notes.  Upon satisfaction of all of the requirements for transfer or exchange of beneficial interests in Global Notes contained in this Indenture and the Senior Notes or otherwise applicable under the Securities Act, the Trustee shall adjust the principal amount of the relevant Global Note(s) pursuant to Section 2.06(h) hereof.

(iii)     <u>Transfer of Beneficial Interests to Another Restricted Global Note</u>.  A beneficial interest in any Restricted Global Note may be transferred to a Person who takes delivery thereof in the form of a beneficial interest in another Restricted Global Note if the transfer complies with the requirements of Section 2.06(b)(ii) hereof and the Registrar receives the following:

(A)     if the transferee will take delivery in the form of a beneficial interest in a 144A Global Note, then the transferor must deliver a certificate in the form of <u>Exhibit B</u> hereto, including the certifications in item (1) thereof; or

(B)     if the transferee will take delivery in the form of a beneficial interest in a Regulation S Global Note, then the transferor must deliver a certificate in the form of <u>Exhibit B</u> hereto, including the certifications in item (2) thereof.

Confidential

EFIHMW00293356

**PX 003B**
**Page 55 of 178**

(iv)    Transfer and Exchange of Beneficial Interests in a Restricted Global Note for Beneficial Interests in an Unrestricted Global Note. A beneficial interest in any Restricted Global Note may be exchanged by any holder thereof for a beneficial interest in an Unrestricted Global Note or transferred to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note if the exchange or transfer complies with the requirements of Section 2.06(b)(ii) hereof and:

(A)    such exchange or transfer is effected pursuant to the Exchange Offer in accordance with the Registration Rights Agreement and the holder of the beneficial interest to be transferred, in the case of an exchange, or the transferee, in the case of a transfer, certifies in the applicable Letter of Transmittal that it is not (1) a broker-dealer, (2) a Person participating in the distribution of the Exchange Notes or (3) a Person who is an affiliate (as defined in Rule 144) of the Issuer;

(B)    such transfer is effected pursuant to the Shelf Registration Statement in accordance with the Registration Rights Agreement;

(C)    such transfer is effected by a broker-dealer pursuant to the Exchange Registration Statement in accordance with the Registration Rights Agreement; or

(D)    the Registrar receives the following:

(1)    if the holder of such beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a beneficial interest in an Unrestricted Global Note of the same series, a certificate from such Holder substantially in the form of Exhibit C hereto, including the certifications in item (1)(a) thereof; or

(2)    if the holder of such beneficial interest in a Restricted Global Note proposes to transfer such beneficial interest to a Person who shall take delivery thereof in the form of a beneficial interest in an Unrestricted Global Note of the same series, a certificate from such holder in the form of Exhibit B hereto, including the certifications in item (4) thereof;

and, in each such case set forth in this subparagraph (D), if the Registrar so requests or if the Applicable Procedures so require, an Opinion of Counsel in form reasonably acceptable to the Registrar to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

If any such transfer is effected pursuant to subsection (B) or (D) above at a time when an Unrestricted Global Note has not yet been issued, the Issuer shall issue and, upon receipt of a Issuer Authentication Order in accordance with Section 2.02 hereof, the Trustee shall authenticate one or more Unrestricted Global Notes in an aggregate principal amount equal to the aggregate principal amount of beneficial interests transferred pursuant to subparagraph (B) or (D) above.

Beneficial interests in an Unrestricted Global Note cannot be exchanged for, or transferred to Persons who take delivery thereof in the form of, a beneficial interest in a Restricted Global Note.

(c)    Transfer or Exchange of Beneficial Interests for Definitive Notes.

Confidential

   (i) <u>Beneficial Interests in Restricted Global Notes to Restricted Definitive Notes</u>. If any holder of a beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a Restricted Definitive Note or to transfer such beneficial interest to a Person who takes delivery thereof in the form of a Restricted Definitive Note, then, upon the occurrence of any of the events in paragraph (i) or (ii) of Section 2.06(a) hereof and receipt by the Registrar of the following documentation:

     (A) if the holder of such beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a Restricted Definitive Note, a certificate from such holder substantially in the form of <u>Exhibit C</u> hereto, including the certifications in item (2)(a) thereof;

     (B) if such beneficial interest is being transferred to a QIB in accordance with Rule 144A, a certificate substantially in the form of <u>Exhibit B</u> hereto, including the certifications in item (1) thereof;

     (C) if such beneficial interest is being transferred to a Non-U.S. Person in an offshore transaction in accordance with Rule 903 or Rule 904, a certificate substantially in the form of <u>Exhibit B</u> hereto, including the certifications in item (2) thereof;

     (D) if such beneficial interest is being transferred pursuant to an exemption from the registration requirements of the Securities Act in accordance with Rule 144, a certificate substantially in the form of <u>Exhibit B</u> hereto, including the certifications in item (3)(a) thereof;

     (E) if such beneficial interest is being transferred to the Issuer or any of its Restricted Subsidiaries, a certificate substantially in the form of <u>Exhibit B</u> hereto, including the certifications in item (3)(b) thereof; or

     (F) if such beneficial interest is being transferred pursuant to an effective registration statement under the Securities Act, a certificate substantially in the form of <u>Exhibit B</u> hereto, including the certifications in item (3)(c) thereof,

the Trustee shall cause the aggregate principal amount of the applicable Global Note to be reduced accordingly pursuant to Section 2.06(h) hereof, and the Issuer shall execute and the Trustee shall authenticate and mail to the Person designated in the instructions a Definitive Note in the applicable principal amount. Any Definitive Note issued in exchange for a beneficial interest in a Restricted Global Note pursuant to this Section 2.06(c)(i) shall be registered in such name or names and in such authorized denomination or denominations as the holder of such beneficial interest shall instruct the Registrar through instructions from the Depositary and the Participant or Indirect Participant. The Trustee shall mail such Definitive Notes to the Persons in whose names such Senior Notes are so registered. Any Definitive Note issued in exchange for a beneficial interest in a Restricted Global Note pursuant to this Section 2.06(c)(i) shall bear the Private Placement Legend and shall be subject to all restrictions on transfer contained therein.

   (ii) <u>Beneficial Interests in Regulation S Temporary Global Note to Definitive Notes</u>. Notwithstanding Sections 2.06(c)(i)(A) and (C) hereof, a beneficial interest in the Regulation S Temporary Global Note may not be exchanged for a Definitive Note or transferred to a Person who takes delivery thereof in the form of a Definitive Note prior to (A) the expiration of the Restricted Period and (B) the receipt by the Registrar of any certificates required pursuant to Rule

Confidential                      EFIHMW00293358

903(b)(3)(ii)(B) of the Securities Act, except in the case of a transfer pursuant to an exemption from the registration requirements of the Securities Act other than Rule 903 or Rule 904.

      (iii)    <u>Beneficial Interests in Restricted Global Notes to Unrestricted Definitive Notes</u>. A holder of a beneficial interest in a Restricted Global Note may exchange such beneficial interest for an Unrestricted Definitive Note or may transfer such beneficial interest to a Person who takes delivery thereof in the form of an Unrestricted Definitive Note only upon the occurrence of any of the events in subsection (i) or (ii) of Section 2.06(a) hereof and if:

      (A)    such exchange or transfer is effected pursuant to the Exchange Offer in accordance with the Registration Rights Agreement and the holder of such beneficial interest, in the case of an exchange, or the transferee, in the case of a transfer, certifies in the applicable Letter of Transmittal that it is not (1) a broker-dealer, (2) a Person participating in the distribution of the Exchange Notes or (3) a Person who is an affiliate (as defined in Rule 144) of the Issuer;

      (B)    such transfer is effected pursuant to the Shelf Registration Statement in accordance with the Registration Rights Agreement;

      (C)    such transfer is effected by a broker-dealer pursuant to the Exchange Registration Statement in accordance with the Registration Rights Agreement; or

      (D)    the Registrar receives the following:

      (1)    if the holder of such beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for an Unrestricted Definitive Note, a certificate from such holder substantially in the form of <u>Exhibit C</u> hereto, including the certifications in item (1)(b) thereof; or

      (2)    if the holder of such beneficial interest in a Restricted Global Note proposes to transfer such beneficial interest to a Person who shall take delivery thereof in the form of an Unrestricted Definitive Note, a certificate from such holder substantially in the form of <u>Exhibit B</u> hereto, including the certifications in item (4) thereof;

and, in each such case set forth in this subparagraph (D), if the Registrar so requests or if the Applicable Procedures so require, an Opinion of Counsel in form reasonably acceptable to the Registrar to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

      (iv)    <u>Beneficial Interests in Unrestricted Global Notes to Unrestricted Definitive Notes</u>. If any holder of a beneficial interest in an Unrestricted Global Note proposes to exchange such beneficial interest for a Definitive Note or to transfer such beneficial interest to a Person who takes delivery thereof in the form of a Definitive Note, then, upon the occurrence of any of the events in subsection (i) or (ii) of Section 2.06(a) hereof and satisfaction of the conditions set forth in Section 2.06(b)(ii) hereof, the Trustee shall cause the aggregate principal amount of the applicable Global Note to be reduced accordingly pursuant to Section 2.06(h) hereof, and the Issuer shall execute and the Trustee shall authenticate and mail to the Person designated in the instructions a Definitive Note in the applicable principal amount. Any Definitive Note issued in exchange for a beneficial interest pursuant to this Section 2.06(c)(iv) shall be registered in such

Confidential

EFIHMW00293359

name or names and in such authorized denomination or denominations as the holder of such beneficial interest shall instruct the Registrar through instructions from or through the Depositary and the Participant or Indirect Participant. The Trustee shall mail such Definitive Notes to the Persons in whose names such Senior Notes are so registered. Any Definitive Note issued in exchange for a beneficial interest pursuant to this Section 2.06(c)(iv) shall not bear the Private Placement Legend.

(d)    Transfer and Exchange of Definitive Notes for Beneficial Interests.

(i)    Restricted Definitive Notes to Beneficial Interests in Restricted Global Notes. If any Holder of a Restricted Definitive Note proposes to exchange such Senior Note for a beneficial interest in a Restricted Global Note or to transfer such Restricted Definitive Note to a Person who takes delivery thereof in the form of a beneficial interest in a Restricted Global Note, then, upon receipt by the Registrar of the following documentation:

(A)    if the Holder of such Restricted Definitive Note proposes to exchange such Senior Note for a beneficial interest in a Restricted Global Note, a certificate from such Holder substantially in the form of Exhibit C hereto, including the certifications in item (2)(b) thereof;

(B)    if such Restricted Definitive Note is being transferred to a QIB in accordance with Rule 144A, a certificate substantially in the form of Exhibit B hereto, including the certifications in item (1) thereof;

(C)    if such Restricted Definitive Note is being transferred to a Non-U.S. Person in an offshore transaction in accordance with Rule 903 or Rule 904, a certificate substantially in the form of Exhibit B hereto, including the certifications in item (2) thereof;

(D)    if such Restricted Definitive Note is being transferred pursuant to an exemption from the registration requirements of the Securities Act in accordance with Rule 144, a certificate substantially in the form of Exhibit B hereto, including the certifications in item (3)(a) thereof;

(E)    if such Restricted Definitive Note is being transferred to the Issuer or any of its Restricted Subsidiaries, a certificate substantially in the form of Exhibit B hereto, including the certifications in item (3)(b) thereof; or

(F)    if such Restricted Definitive Note is being transferred pursuant to an effective registration statement under the Securities Act, a certificate substantially in the form of Exhibit B hereto, including the certifications in item (3)(c) thereof,

the Trustee shall cancel the Restricted Definitive Note, increase or cause to be increased the aggregate principal amount of, in the case of clause (A) above, the applicable Restricted Global Note, in the case of clause (B) above, the applicable 144A Global Note, and in the case of clause (C) above, the applicable Regulation S Global Note.

(ii)    Restricted Definitive Notes to Beneficial Interests in Unrestricted Global Notes. A Holder of a Restricted Definitive Note may exchange such Senior Note for a beneficial interest in an Unrestricted Global Note or transfer such Restricted Definitive Note to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note only if:

Confidential

(A)      such exchange or transfer is effected pursuant to the Exchange Offer in accordance with the Registration Rights Agreement and the Holder, in the case of an exchange, or the transferee, in the case of a transfer, certifies in the applicable Letter of Transmittal that it is not (1) a broker-dealer, (2) a Person participating in the distribution of the Exchange Notes or (3) a Person who is an affiliate (as defined in Rule 144) of the Issuer;

(B)      such transfer is effected pursuant to the Shelf Registration Statement in accordance with the Registration Rights Agreement;

(C)      such transfer is effected by a broker-dealer pursuant to the Exchange Registration Statement in accordance with the Registration Rights Agreement; or

(D)      the Registrar receives the following:

(1)      if the Holder of such Definitive Notes proposes to exchange such Senior Notes for a beneficial interest in the Unrestricted Global Note, a certificate from such Holder substantially in the form of <u>Exhibit C</u> hereto, including the certifications in item (1)(c) thereof; or

(2)      if the Holder of such Definitive Notes proposes to transfer such Senior Notes to a Person who shall take delivery thereof in the form of a beneficial interest in the Unrestricted Global Note, a certificate from such Holder substantially in the form of <u>Exhibit B</u> hereto, including the certifications in item (4) thereof;

and, in each such case set forth in this subsection (D), if the Registrar so requests or if the Applicable Procedures so require, an Opinion of Counsel in form reasonably acceptable to the Registrar to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

Upon satisfaction of the conditions of any of the subparagraphs in this Section 2.06(d)(ii), the Trustee shall cancel the Definitive Notes and increase or cause to be increased the aggregate principal amount of the Unrestricted Global Note.

(iii)      <u>Unrestricted Definitive Notes to Beneficial Interests in Unrestricted Global Notes</u>.  A Holder of an Unrestricted Definitive Note may exchange such Senior Note for a beneficial interest in an Unrestricted Global Note or transfer such Definitive Notes to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note at any time.  Upon receipt of a request for such an exchange or transfer, the Trustee shall cancel the applicable Unrestricted Definitive Note and increase or cause to be increased the aggregate principal amount of one of the Unrestricted Global Notes.

If any such exchange or transfer from a Definitive Note to a beneficial interest is effected pursuant to subsection (ii)(B), (ii)(D) or (iii) above at a time when an Unrestricted Global Note has not yet been issued, the Issuer shall issue and, upon receipt of a Issuer Authentication Order in accordance with Section 2.02 hereof, the Trustee shall authenticate one or more Unrestricted Global Notes in an aggregate principal amount equal to the principal amount of Definitive Notes so transferred.

Confidential                                                                                    EFIHMW00293361

(e)    _Transfer and Exchange of Definitive Notes for Definitive Notes_.  Upon request by a Holder of Definitive Notes and such Holder's compliance with the provisions of this Section 2.06(e), the Registrar shall register the transfer or exchange of Definitive Notes.  Prior to such registration of transfer or exchange, the requesting Holder shall present or surrender to the Registrar the Definitive Notes duly endorsed or accompanied by a written instruction of transfer in form satisfactory to the Registrar duly executed by such Holder or by its attorney, duly authorized in writing.  In addition, the requesting Holder shall provide any additional certifications, documents and information, as applicable, required pursuant to the following provisions of this Section 2.06(e):

(i)    _Restricted Definitive Notes to Restricted Definitive Notes_.  Any Restricted Definitive Note may be transferred to and registered in the name of Persons who take delivery thereof in the form of a Restricted Definitive Note if the Registrar receives the following:

(A)    if the transfer will be made to a QIB in accordance with Rule 144A, then the transferor must deliver a certificate in the form of _Exhibit B_ hereto, including the certifications in item (1) thereof;

(B)    if the transfer will be made pursuant to Rule 903 or Rule 904, then the transferor must deliver a certificate in the form of _Exhibit B_ hereto, including the certifications in item (2) thereof; or

(C)    if the transfer will be made pursuant to any other exemption from the registration requirements of the Securities Act, then the transferor must deliver a certificate in the form of _Exhibit B_ hereto, including the certifications required by item (3) thereof, if applicable.

(ii)    _Restricted Definitive Notes to Unrestricted Definitive Notes_.  Any Restricted Definitive Note may be exchanged by the Holder thereof for an Unrestricted Definitive Note or transferred to a Person or Persons who take delivery thereof in the form of an Unrestricted Definitive Note if:

(A)    such exchange or transfer is effected pursuant to the Exchange Offer in accordance with the Registration Rights Agreement and the Holder, in the case of an exchange, or the transferee, in the case of a transfer, certifies in the applicable Letter of Transmittal that it is not (1) a broker-dealer, (2) a Person participating in the distribution of the Exchange Notes or (3) a Person who is an affiliate (as defined in Rule 144) of the Issuer;

(B)    any such transfer is effected pursuant to the Shelf Registration Statement in accordance with the Registration Rights Agreement;

(C)    any such transfer is effected by a broker-dealer pursuant to the Exchange Registration Statement in accordance with the Registration Rights Agreement; or

(D)    the Registrar receives the following:

(1)    if the Holder of such Restricted Definitive Notes proposes to exchange such Senior Notes for an Unrestricted Definitive Note, a certificate from such Holder substantially in the form of _Exhibit C_ hereto, including the certifications in item (1)(d) thereof; or

Confidential

(2)    if the Holder of such Restricted Definitive Notes proposes to transfer such Senior Notes to a Person who shall take delivery thereof in the form of an Unrestricted Definitive Note, a certificate from such Holder substantially in the form of Exhibit B hereto, including the certifications in item (4) thereof;

and, in each such case set forth in this subsection (D), if the Registrar so requests, an Opinion of Counsel in form reasonably acceptable to the Registrar to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

(iii)    Unrestricted Definitive Notes to Unrestricted Definitive Notes.  A Holder of Unrestricted Definitive Notes may transfer such Senior Notes to a Person who takes delivery thereof in the form of an Unrestricted Definitive Note.  Upon receipt of a request to register such a transfer, the Registrar shall register the Unrestricted Definitive Notes pursuant to the instructions from the Holder thereof.

(f)    Exchange Offer.  Upon the occurrence of the Exchange Offer in accordance with the Registration Rights Agreement, the Issuer shall issue and, upon receipt of a Issuer Authentication Order in accordance with Section 2.02 hereof, the Trustee shall authenticate:

(i)    one or more Unrestricted Global Notes in an aggregate principal amount equal to the principal amount of the beneficial interests in the Restricted Global Notes tendered for acceptance, and excepted, in the Exchange Offer by Persons that certify in the applicable Letters of Transmittal that (A) they are not broker-dealers, (B) they are not participating in a distribution of the Exchange Notes and (C) they are not affiliates (as defined in Rule 144) of the Issuer; and

(ii)    Unrestricted Definitive Notes in an aggregate principal amount equal to the principal amount of the Restricted Definitive Notes tendered for acceptance, in the Exchange Offer by Persons that certify in the applicable Letters of Transmittal that (A) they are not broker-dealers, (B) they are not participating in a distribution of the Exchange Notes and (C) they are not affiliates (as defined in Rule 144) of the Issuer.

Concurrently with the issuance of such Senior Notes, the Trustee shall cause the aggregate principal amount of the applicable Restricted Global Notes to be reduced accordingly, and the Issuer shall execute and the Trustee shall authenticate and deliver to the Persons designated by the Holders of Definitive Notes so accepted Unrestricted Definitive Notes in the appropriate principal amount.  Any Senior Notes that remain outstanding after the consummation of an Exchange Offer, and Exchange Notes issued in connection with an Exchange Offer, shall be treated as a single class of securities under this Indenture.

(g)    Legends.  The following legends shall appear on the face of all Global Notes and Definitive Notes issued under this Indenture unless specifically stated otherwise in the applicable provisions of this Indenture:

(i)    Private Placement Legend.

(A)    Except as permitted by subparagraph (B) below, each Global Note and each Definitive Note (and all Senior Notes issued in exchange therefor or substitution therefor) shall bear the legend in substantially the following form:

Confidential

"THE THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD WITHIN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, U.S. PERSONS EXCEPT AS SET FORTH BELOW. BY ITS ACQUISITION HEREOF, THE HOLDER (1) REPRESENTS THAT (A) IT IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) OR (B) IT IS NOT A U.S. PERSON AND IS ACQUIRING THIS SECURITY IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH REGULATION S UNDER THE SECURITIES ACT, (2) AGREES THAT IT WILL NOT WITHIN TWO YEARS AFTER THE ORIGINAL ISSUANCE OF THIS SECURITY RESELL OR OTHERWISE TRANSFER THIS SECURITY EXCEPT (A) TO THE ISSUER OR ANY SUBSIDIARY THEREOF, (B) INSIDE THE UNITED STATES TO A QUALIFIED INSTITUTIONAL BUYER IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT, (C) OUTSIDE THE UNITED STATES IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH RULE 904 UNDER THE SECURITIES ACT, (D) PURSUANT TO THE EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT (IF AVAILABLE), (E) IN ACCORDANCE WITH ANOTHER EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT (AND BASED UPON AN OPINION OF COUNSEL IF THE ISSUER SO REQUESTS), OR (F) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND (3) AGREES THAT IT WILL GIVE TO EACH PERSON TO WHOM THIS SECURITY IS TRANSFERRED A NOTICE SUBSTANTIALLY TO THE EFFECT OF THIS LEGEND. AS USED HEREIN, THE TERMS "OFFSHORE TRANSACTION," "UNITED STATES" AND "U.S. PERSON" HAVE THE MEANING GIVEN TO THEM BY REGULATIONS UNDER THE SECURITIES ACT."

(B)    Notwithstanding the foregoing, any Global Note or Definitive Note issued pursuant to subparagraph (b)(iv), (c)(iii), (c)(iv), (d)(ii), (d)(iii), (e)(ii), (e)(iii) or (f) of this Section 2.06 (and all Senior Notes issued in exchange therefor or substitution thereof) shall not bear the Private Placement Legend.

(ii)    Global Note Legend. Each Global Note shall bear a legend in substantially the following form:

"THIS GLOBAL NOTE IS HELD BY THE DEPOSITARY (AS DEFINED IN THE INDENTURE GOVERNING THIS SENIOR NOTE) OR ITS NOMINEE IN CUSTODY FOR THE BENEFIT OF THE BENEFICIAL OWNERS HEREOF, AND IS NOT TRANSFERABLE TO ANY PERSON UNDER ANY CIRCUMSTANCES EXCEPT THAT (I) THE TRUSTEE MAY MAKE SUCH NOTATIONS HEREON AS MAY BE REQUIRED PURSUANT TO SECTION 2.06(h) OF THE INDENTURE, (II) THIS GLOBAL NOTE MAY BE EXCHANGED IN WHOLE BUT NOT IN PART PURSUANT TO SECTION 2.06(a) OF THE INDENTURE, (III) THIS GLOBAL NOTE MAY BE DELIVERED TO THE TRUSTEE FOR CANCELLATION PURSUANT TO SECTION 2.11 OF THE INDENTURE AND (IV) THIS GLOBAL NOTE MAY BE TRANSFERRED TO A SUCCESSOR DEPOSITARY WITH THE PRIOR WRITTEN CONSENT OF THE ISSUER.

UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR SENIOR NOTES IN DEFINITIVE FORM, THIS SENIOR NOTE MAY NOT BE

Confidential                                                    EFIHMW00293364

**PX 003B**
**Page 63 of 178**

TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY.  UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY (55 WATER STREET, NEW YORK, NEW YORK) ("DTC") TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR SUCH OTHER ENTITY AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN."

(iii)    Regulation S Temporary Global Note Legend.   The Regulation S Temporary Global Note shall bear a legend in substantially the following form:

"BY ITS ACQUISITION HEREOF, THE HOLDER HEREOF REPRESENTS THAT IT IS NOT A U.S. PERSON, NOR IS IT PURCHASING FOR THE ACCOUNT OF A U.S. PERSON, AND IS ACQUIRING THIS SECURITY IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH REGULATION S UNDER THE SECURITIES ACT."

(iv)    Tax Legend.  The Global Note with respect to the Senior Toggle Notes and each Definitive Note with respect to the Senior Toggle Notes shall bear the legend in substantially the following form:

"THIS NOTE IS ISSUED WITH ORIGINAL ISSUE DISCOUNT FOR PURPOSES OF SECTION 1271 ET SEQ. OF THE INTERNAL REVENUE CODE. A HOLDER MAY OBTAIN THE ISSUE PRICE, AMOUNT OF ORIGINAL ISSUE DISCOUNT, CLOSING DATE AND YIELD TO MATURITY FOR SUCH NOTE BY SUBMITTING A REQUEST FOR SUCH INFORMATION TO THE ISSUER AT THE FOLLOWING ADDRESS: TXU CORP, 1601 ENERGY PLAZA, 1601 BYRAN STREET, DALLAS, TEXAS 75201-3411, ATTENTION: TREASURER."

(h)    Cancellation and/or Adjustment of Global Notes.  At such time as all beneficial interests in a particular Global Note have been exchanged for Definitive Notes or a particular Global Note has been redeemed, repurchased or canceled in whole and not in part, each such Global Note shall be returned to or retained and canceled by the Trustee in accordance with Section 2.11 hereof.  At any time prior to such cancellation, if any beneficial interest in a Global Note is exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note or for Definitive Notes, the principal amount of Senior Notes represented by such Global Note shall be reduced accordingly and an endorsement shall be made on such Global Note by the Trustee or by the Depositary at the direction of the Trustee to reflect such reduction; and if the beneficial interest is being exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note, such other Global Note shall be increased accordingly and an endorsement shall be made on such Global Note by the Trustee or by the Depositary at the direction of the Trustee to reflect such increase.

Confidential                                                        EFIHMW00293365

(i)    <u>General Provisions Relating to Transfers and Exchanges</u>.

(i)    To permit registrations of transfers and exchanges, the Issuer shall execute and the Trustee shall authenticate Global Notes and Definitive Notes upon receipt of a Issuer Authentication Order in accordance with Section 2.02 hereof or at the Registrar's request.

(ii)    No service charge shall be made to a holder of a beneficial interest in a Global Note or to a Holder of a Definitive Note for any registration of transfer or exchange, but the Issuer may require payment of a sum sufficient to cover any transfer tax or similar governmental charge payable in connection therewith (other than any such transfer taxes or similar governmental charge payable upon exchange or transfer pursuant to Sections 2.07, 2.10, 3.06, 3.09, 4.10, 4.14 and 9.05 hereof).

(iii)    Neither the Registrar nor the Issuer shall be required to register the transfer of or exchange any Senior Note selected for redemption in whole or in part, except the unredeemed portion of any Senior Note being redeemed in part.

(iv)    All Global Notes and Definitive Notes issued upon any registration of transfer or exchange of Global Notes or Definitive Notes shall be the valid obligations of the Issuer, evidencing the same debt, and entitled to the same benefits under this Indenture, as the Global Notes or Definitive Notes surrendered upon such registration of transfer or exchange.

(v)    The Issuer shall not be required (A) to issue, to register the transfer of or to exchange any Senior Notes during a period beginning at the opening of business 15 days before the day of any selection of Senior Notes for redemption under Section 3.02 hereof and ending at the close of business on the day of selection; (B) to register the transfer of or to exchange any Senior Note so selected for redemption in whole or in part, except the unredeemed portion of any Senior Note being redeemed in part; or (C) to register the transfer of or to exchange a Senior Note between a Record Date and the next succeeding Interest Payment Date.

(vi)    Prior to due presentment for the registration of a transfer of any Senior Note, the Trustee, any Agent and the Issuer may deem and treat the Person in whose name any Senior Note is registered as the absolute owner of such Senior Note for the purpose of receiving payment of principal of (and premium, if any) and interest (including Additional Interest, if any) on such Senior Notes and for all other purposes, and none of the Trustee, any Agent or the Issuer shall be affected by notice to the contrary.

(vii)    Upon surrender for registration of transfer of any Senior Note at the office or agency of the Issuer designated pursuant to Section 4.02 hereof, the Issuer shall execute, and the Trustee shall authenticate and mail, in the name of the designated transferee or transferees, one or more replacement Senior Notes of any authorized denomination or denominations of a like aggregate principal amount.

(viii)    At the option of the Holder, Senior Notes may be exchanged for other Senior Notes of any authorized denomination or denominations of a like aggregate principal amount upon surrender of the Senior Notes to be exchanged at such office or agency.  Whenever any Global Notes or Definitive Notes are so surrendered for exchange, the Issuer shall execute, and the Trustee shall authenticate and mail, the replacement Global Notes and Definitive Notes which the Holder making the exchange is entitled to in accordance with the provisions of Section 2.02 hereof.

Confidential                                             EFIHMW00293366

(ix)    All certifications, certificates and Opinions of Counsel required to be submitted to the Registrar pursuant to this Section 2.06 to effect a registration of transfer or exchange may be submitted by facsimile.

Section 2.07    <u>Replacement Senior Notes</u>.

If any mutilated Senior Note is surrendered to the Trustee, the Registrar or the Issuer and the Trustee receives evidence to its satisfaction of the ownership and destruction, loss or theft of any Senior Note, the Issuer shall issue and the Trustee, upon receipt of a Issuer Authentication Order, shall authenticate a replacement Senior Note if the Trustee's requirements are met.  If required by the Trustee or the Issuer, an indemnity bond must be supplied by the Holder that is sufficient in the judgment of the Trustee and the Issuer to protect the Issuer, the Trustee, any Agent and any authenticating agent from any loss that any of them may suffer if a Senior Note is replaced.  The Issuer may charge for its expenses in replacing a Senior Note.

Every replacement Senior Note is a contractual obligation of the Issuer and shall be entitled to all of the benefits of this Indenture equally and proportionately with all other Senior Notes duly issued hereunder.

Section 2.08    <u>Outstanding Senior Notes</u>.

The Senior Notes outstanding at any time are all the Senior Notes authenticated by the Trustee except for those canceled by it, those delivered to it for cancellation, those reductions in the interest in a Global Note effected by the Trustee in accordance with the provisions hereof, and those described in this Section 2.08 as not outstanding.  Except as set forth in Section 2.09 hereof, a Senior Note does not cease to be outstanding because the Issuer or an Affiliate of the Issuer holds the Senior Note.

If a Senior Note is replaced pursuant to Section 2.07 hereof, it ceases to be outstanding unless the Trustee receives proof satisfactory to it that the replaced Senior Note is held by a protected purchaser.

If the principal amount of any Senior Note is considered paid under Section 4.01 hereof, it ceases to be outstanding and interest on it ceases to accrue.

If the Paying Agent (other than the Issuer, a Subsidiary or an Affiliate of any thereof) holds, on a Redemption Date or maturity date, money sufficient to pay Senior Notes payable on that date, then on and after that date such Senior Notes shall be deemed to be no longer outstanding and shall cease to accrue interest.

Section 2.09    <u>Treasury Notes</u>.

In determining whether the Holders of the required principal amount of Senior Notes have concurred in any direction, waiver or consent, any Senior Notes owned by the Issuer or any Affiliate of the Issuer, shall be considered as though not outstanding, except that for the purposes of determining whether the Trustee shall be protected in relying on any such direction, waiver or consent, only Senior Notes that a Responsible Officer of the Trustee knows are so owned, shall be so disregarded.  Senior Notes so owned which have been pledged in good faith shall not be disregarded if the pledgee establishes to the satisfaction of the Trustee the pledgee's right to deliver any such direction, waiver or consent with respect to the Senior Notes and that the pledgee is not the Issuer or any obligor upon the Senior Notes or any Affiliate of the Issuer or of such other obligor.

Confidential

Section 2.10     Temporary Senior Notes.

Until certificates representing Senior Notes are ready for delivery, the Issuer may prepare and the Trustee, upon receipt of a Issuer Authentication Order, shall authenticate temporary Senior Notes. Temporary Senior Notes shall be substantially in the form of certificated Senior Notes but may have variations that the Issuer considers appropriate for temporary Senior Notes and as shall be reasonably acceptable to the Trustee. Without unreasonable delay, the Issuer shall prepare and the Trustee shall authenticate definitive Senior Notes in exchange for temporary Senior Notes.

Holders and beneficial holders, as the case may be, of temporary Senior Notes shall be entitled to all of the benefits accorded to Holders, or beneficial holders, respectively, of Senior Notes under this Indenture.

Section 2.11     Cancellation.

The Issuer at any time may deliver Senior Notes to the Trustee for cancellation. The Registrar and Paying Agent shall forward to the Trustee any Senior Notes surrendered to them for registration of transfer, exchange or payment. The Trustee or, at the direction of the Trustee, the Registrar or the Paying Agent and no one else shall cancel all Senior Notes surrendered for registration of transfer, exchange, payment, replacement or cancellation and shall destroy cancelled Senior Notes (subject to the record retention requirement of the Exchange Act). Certification of the destruction of all cancelled Senior Notes shall be delivered to the Issuer upon the Issuer's written request. The Issuer may not issue new Senior Notes to replace Senior Notes that it has paid or that have been delivered to the Trustee for cancellation.

Section 2.12     Defaulted Cash Interest.

If the Issuer defaults in a payment of Cash Interest on the Senior Notes, it shall pay the defaulted Cash Interest in any lawful manner plus, to the extent lawful, interest payable on the defaulted Cash Interest, to the Persons who are Holders on a subsequent special record date, in each case at the rate provided in the Senior Notes and in Section 4.01 hereof. The Issuer shall notify the Trustee in writing of the amount of defaulted Cash Interest proposed to be paid on each Senior Note and the date of the proposed payment and at the same time the Issuer shall deposit with the Trustee an amount of money equal to the aggregate amount proposed to be paid in respect of such defaulted Cash Interest or shall make arrangements satisfactory to the Trustee for such deposit prior to the date of the proposed payment, such money when deposited to be held in trust for the benefit of the Persons entitled to such defaulted Cash Interest as provided in this Section 2.12. The Trustee shall fix or cause to be fixed each such special record date and payment date; provided that no such special record date shall be less than 10 days prior to the related payment date for such defaulted Cash Interest. The Trustee shall promptly notify the Issuer of such special record date. At least 15 days before the special record date, the Issuer (or, upon the written request of the Issuer, the Trustee in the name and at the expense of the Issuer) shall mail or cause to be mailed, first-class postage prepaid, to each Holder a notice at his or her address as it appears in the Note Register that states the special record date, the related payment date and the amount of such interest to be paid.

Subject to the foregoing provisions of this Section 2.12 and for greater certainty, each Senior Note delivered under this Indenture upon registration of transfer of or in exchange for or in lieu of any other Senior Note shall carry the rights to interest accrued and unpaid, and to accrue, which were carried by such other Senior Note.

Confidential                                                    EF1HMW00293368