EXECUTION VERSION

# Energy Future Holdings Corp.

### $2,000,000,000 10.875% Senior Notes due 2017

### $2,500,000,000 11.250% / 12.000% Senior Toggle Notes due 2017

---

### *Placement Agreement* (the "**Agreement**")

October 24, 2007

Morgan Stanley & Co. Incorporated
1585 Broadway
New York, New York 10036

and

Goldman, Sachs & Co.
85 Broad Street
New York, New York 10004

As representatives of the several Placement Agents
named in Schedule I hereto,

Ladies and Gentlemen:

Energy Future Holdings Corp., a Texas corporation (the "**Issuer**"), proposes, subject to the terms and conditions stated herein, to issue and sell to the Placement Agents named in Schedule I hereto (each a "**Placement Agent**" and collectively, the "**Placement Agents**") for whom each of you are acting as representative (each, a "**Representative**" and collectively, the "**Representatives**") $2,000,000,000 in aggregate principal amount of its 10.875% Senior Notes due 2017 (the "**Senior Cash Pay Notes**") and $2,500,000,000 in aggregate principal amount of its 11.250% / 12.000% Senior Toggle Notes due 2017 (the "**Senior Toggle Notes**" and together with the Senior Cash Pay Notes, the "**Securities**"). The Securities are to be issued pursuant to an indenture to be dated as of October 31, 2007 among the Issuer, Energy Future Competitive Holdings Company and Energy Future Intermediate Holding Company LLC, as guarantors (each a "**Guarantor**," and collectively, the "**Guarantors**"), and The Bank of New York, as trustee (the "**Trustee**") (the "**Indenture**"). The Securities will be irrevocably and unconditionally guaranteed (the "**Guarantees**") as to payment of principal, premium, if any, interest and Additional Interest (as defined in the Indenture), if any, on an unsecured and unsubordinated basis, jointly and severally, by each of the Guarantors.

1.     The Issuer and the Guarantors, jointly and severally, represent and warrant to, and agree with, each of the Placement Agents that:

       (a)     A preliminary offering memorandum, dated October 17, 2007 (the "**Preliminary Offering Memorandum**"), and an offering memorandum, dated October 24, 2007 (the "**Offering Memorandum**"), have been prepared in connection with the offering of the Securities. The Preliminary Offering Memorandum, as amended and supplemented immediately

MOLDOVAN

PLAINTIFF'S EXHIBIT
Telteber
11/20/14   KRB

NYDOCS01/1142224.11

EFIHMW00303787

prior to the Applicable Time (as defined in Section 1(b)), including by the supplement to the Preliminary Offering Memorandum dated October 23, 2007 ("**Supplement No. 1**") and the supplement to the Preliminary Offering Memorandum dated October 24, 2007 ("**Supplement No. 2**" and together with Supplement No. 1, the "**Supplements**"), is hereinafter referred to as the "**Pricing Memorandum**". Any reference to the Preliminary Offering Memorandum, the Pricing Memorandum or the Offering Memorandum shall be deemed to refer to and include any Additional Issuer Information (as defined in Section 5(f)) furnished by the Issuer on or prior to the completion of the distribution of the Securities. The Preliminary Offering Memorandum or the Offering Memorandum and any amendments or supplements thereto did not and will not, as of their respective dates, contain an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; *provided, however,* that this representation and warranty shall not apply to any statements or omissions made in reliance upon and in conformity with information furnished in writing to the Issuer by a Placement Agent through the Representatives expressly for use therein;

(b)      For the purposes of this Agreement, the "**Applicable Time**" is 3:15 p.m. (Eastern time) on the date of this Agreement; the Pricing Memorandum, as supplemented by the information set forth in Schedule III hereto, taken together (collectively, the "**Pricing Disclosure Package**") as of the Applicable Time, did not include any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; and each Issuer Supplemental Disclosure Document (as defined in Section 6(a)(i)) listed on Schedule II(a) hereto does not conflict with the information contained in the Pricing Memorandum or the Offering Memorandum and each such Issuer Supplemental Disclosure Document, as supplemented by and taken together with the Pricing Disclosure Package as of the Applicable Time, did not include any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; *provided, however,* that this representation and warranty shall not apply to statements or omissions made in an Issuer Supplemental Disclosure Document in reliance upon and in conformity with information furnished in writing to the Issuer by a Placement Agent through the Representatives expressly for use therein;

(c)      None of the Issuer or any of the Issuer's subsidiaries has sustained since the date of the latest audited financial statements included in the Pricing Memorandum any material loss or interference with its business from fire, explosion, flood or other calamity, whether or not covered by insurance, or from any labor dispute or court or governmental action, order or decree, otherwise than as set forth or contemplated in the Pricing Memorandum; and, since the respective dates as of which information is given in the Pricing Memorandum, there has not been any change in the capital stock or long-term debt of the Issuer or any of the Issuer's subsidiaries, or any material adverse change, or any development involving a prospective material adverse change, in or affecting the general affairs, management, financial position, stockholders' equity or results of operations of the Issuer or the Issuer's subsidiaries, in each case otherwise than as set forth or contemplated in the Pricing Memorandum;

(d)      The Issuer and the Issuer's subsidiaries have good and marketable title in fee simple to all real property and good and marketable title to all personal property described in the Pricing Memorandum and the Offering Memorandum as owned by them, in each case free and clear of all liens, encumbrances and defects except (i) such as are described in the Pricing Memorandum and Offering Memorandum, (ii) liens granted on, or in

2

NYDOCS01/1142224.11

EFIHMW00303788

**PX 004**
**Page 2 of 37**

connection with the sale of, Transition Bonds or Transition Property (each as defined in the Texas Utility Code) or in connection with the issuance of, or to secure the payment of, transition bonds issued pursuant to the Texas Utility Code or pursuant to a financing order issued by the Texas Public Utility Commission, or (iii) such as do not materially affect the value of such property and do not materially interfere with the use made and proposed to be made of such property by the Issuer and the Issuer's subsidiaries; except as described in the Pricing Memorandum and the Offering Memorandum, any real property and buildings held under lease by the Issuer and the Issuer's subsidiaries are held by them under valid, subsisting and enforceable leases subject, as to enforcement, to bankruptcy, insolvency, reorganization and other laws of general applicability relating to or affecting creditors' rights and to general equity principles (whether considered in a proceeding at equity or at law), with such exceptions as are not material and do not materially interfere with the use made and proposed to be made of such property and buildings by the Issuer and the Issuer's subsidiaries;

(e)     The Issuer and each of the Guarantors has been duly incorporated or formed and is validly existing as a corporation or limited liability company, as applicable, in good standing under the laws of their respective jurisdictions of incorporation or organization, with power and authority (corporate and other) to own, lease and/or operate its properties and conduct its business as described in the Pricing Memorandum and the Offering Memorandum, and has been duly registered or qualified as a foreign corporation or limited liability company, as the case may be, for the transaction of business and is in good standing under the laws of each other jurisdiction in which it owns or leases properties or conducts any business so as to require such qualification, except where the failure to so qualify or to be in good standing could not reasonably be expected to result in a material adverse effect upon the business, properties, financial condition or earnings of the Issuer and the Issuer's subsidiaries taken as a whole (a "**Material Adverse Effect**"); and each subsidiary of the Issuer has been duly incorporated or formed and is validly existing as a corporation or limited liability company, as applicable, in good standing under the laws of its jurisdiction of incorporation or organization;

(f)     The Issuer has an authorized capitalization as set forth in the Pricing Memorandum and the Offering Memorandum, and all of the issued shares of capital stock of the Issuer have been duly and validly authorized and issued and are fully paid and non-assessable; and all of the issued shares of capital stock of each subsidiary of the Issuer have been duly and validly authorized and issued, are fully paid and non-assessable, and are owned directly or indirectly by the Issuer, free and clear of all liens and preemptive or similar rights, except for liens created pursuant to the TCEH Senior Secured Facilities (as defined in the Pricing Memorandum and the Offering Memorandum);

(g)     The Issuer has validly authorized, executed and delivered this Agreement;

(h)     At the Time of Delivery (as defined below), the Indenture will have been duly authorized, and, when executed and delivered by the Issuer, the Guarantors and, assuming due authorization, execution and delivery thereof by the Trustee, the Indenture will constitute a valid and legally binding instrument of the Issuer and the Guarantors, enforceable against the Issuer and the Guarantors in accordance with its terms, subject, as to enforcement, to bankruptcy, insolvency, reorganization and other laws of general applicability relating to or affecting creditors' rights and to general equity principles (whether considered in a proceeding in equity or at law); at the Time of Delivery, the Securities will have been duly authorized by the Issuer and, when executed and authenticated by the Trustee in accordance with the provisions of the Indenture and

3

NYDOCS01/1142224.11

EFIHMW00303789

delivered to and paid for by the Placement Agents pursuant to this Agreement, will have been duly executed, authenticated, issued and delivered by the Issuer and will constitute valid and legally binding obligations of the Issuer, entitled to the benefits provided by the Indenture, subject, as to enforcement, to bankruptcy, insolvency, reorganization and other laws of general applicability relating to or affecting creditors' rights and to general equity principles (whether considered in a proceeding in equity or at law); and the Securities and the Indenture will conform to the descriptions thereof in the Pricing Disclosure Package and the Offering Memorandum and will be in substantially the form previously delivered to you;

(i)      At the Time of Delivery, the Guarantees will have been duly authorized by each of the Guarantors and, upon execution of the Indenture by the Guarantors, when issued and delivered pursuant to the Indenture, will have been duly executed, authenticated, issued and delivered and will constitute valid and legally binding obligations of each of the Guarantors, entitled to the benefits provided by the Indenture subject, as to enforcement, to applicable bankruptcy, insolvency, reorganization and other laws of general applicability relating to or affecting creditors' rights and to general equity principles (whether considered in a proceeding in equity or at law); and the Guarantees will conform to the descriptions thereof in the Pricing Disclosure Package and the Offering Memorandum and will be in substantially the forms previously delivered to you;

(j)      At the Time of Delivery, the Registration Rights Agreement to be dated as of the Time of Delivery (the "**Registration Rights Agreement**"), which will be substantially in the form previously delivered to you, will have been duly authorized by the Issuer and each of the Guarantors and, as of the Time of Delivery, will have been duly executed and delivered by the Issuer and each of the Guarantors, and (assuming due authorization, execution and delivery thereof by the Placement Agents) will constitute a valid and legally binding instrument of the Issuer and the Guarantors enforceable against the Issuer and the Guarantors in accordance with its terms, subject, as to enforcement, to bankruptcy, insolvency, reorganization and other laws of general applicability relating to or affecting creditors' rights and to general equity principles (whether considered in a proceeding in equity or at law); and the Registration Rights Agreement will conform to the description thereof in the Pricing Disclosure Package and the Offering Memorandum;

(k)      At the Time of Delivery, the securities to be offered in exchange for the Senior Cash Pay Notes and the Senior Toggle Notes pursuant to the Registration Rights Agreement (collectively, the "**Exchange Securities**") will have been duly authorized by the Issuer, and, when issued and delivered pursuant to this Agreement, the Registration Rights Agreement and the Indenture, will have been duly executed, authenticated, issued and delivered and will constitute valid and legally binding obligations of the Issuer, entitled to the benefits provided by the Registration Rights Agreement and the Indenture, subject, as to enforcement, to applicable bankruptcy, insolvency, reorganization and other laws of general applicability relating to or affecting creditors' rights and to general equity principles (whether considered in a proceeding in equity or at law); and the Exchange Securities will conform to the descriptions thereof in the Pricing Disclosure Package and the Offering Memorandum;

(l)      At the Time of Delivery, the guarantees of the Exchange Securities by the Guarantors will have been duly authorized by each of the Guarantors and, when issued and delivered pursuant to the Registration Rights Agreement and the Indenture, will have been duly executed, authenticated, issued and delivered and will constitute valid and legally binding obligations of the Guarantors, entitled to the benefits provided by the Registration Rights Agreement and the Indenture subject, as to enforcement, to

4

NYDOCS01/1142224.11

applicable bankruptcy, insolvency, reorganization and other laws of general applicability relating to or affecting creditors' rights and to general equity principles (whether considered in a proceeding in equity or at law); and the guarantees of the Exchange Securities will conform to the descriptions thereof in the Pricing Disclosure Package and the Offering Memorandum;

(m)     None of the transactions contemplated by this Agreement (including, without limitation, the use of proceeds from the sale of the Securities as described in the Pricing Memorandum and the Offering Memorandum) will violate or result in a violation of Section 7 of the United States Securities Exchange Act of 1934, as amended (the "**Exchange Act**"), or any regulation promulgated thereunder, including, without limitation, Regulations T, U, and X of the Board of Governors of the Federal Reserve System;

(n)     Prior to the date hereof, neither the Issuer, the Guarantors nor any of their affiliates have taken any action which is designed to or which has constituted or which might have been expected to cause or result in stabilization or manipulation of the price of any security of the Issuer in connection with the offering of the Securities;

(o)     Except as set forth or contemplated in the Pricing Memorandum and the Offering Memorandum, the issue and sale of the Securities and the compliance by each of the Issuer and the Guarantors with all of the provisions of the Securities, the Guarantees, the Indenture, the Registration Rights Agreement and this Agreement, as applicable, and the consummation of the transactions herein and therein contemplated will not conflict with or result in a breach or violation of any of the terms or provisions of, or constitute a default under, any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Issuer or any of the Issuer's subsidiaries is a party or by which the Issuer or any of the Issuer's subsidiaries is bound or to which any of the property or assets of the Issuer or any of the Issuer's subsidiaries is subject, except for such conflicts, breaches, violations or defaults that could not reasonably be expected to, individually or in the aggregate, result in a Material Adverse Effect; nor will such action result in any violation of the provisions of the Certificate of Incorporation or By-laws or other organizational documents of the Issuer or any of the Issuer's subsidiaries; nor will such action result in any violation of any statute or any order, rule or regulation of any court or governmental agency or body having jurisdiction over the Issuer or any of the Issuer's subsidiaries or any of their respective properties, except where such violations could not reasonably be expected to, individually or in the aggregate, result in a Material Adverse Effect; and no consent, approval, authorization, order, registration or qualification of or with any such court or governmental agency or body (each, a "**Consent**") is required for the issue and sale of the Securities or the consummation by the Issuer or the Guarantors of the transactions contemplated by this Agreement, the Indenture or the Registration Rights Agreement, except for Consents as may have been obtained or may be required in connection with the registration of the Securities with the Securities and Exchange Commission (the "**Commission**") pursuant to the United States Securities Act of 1933, as amended (the "**Act**"), pursuant to the Registration Rights Agreement and for such Consents as may be required under state securities or Blue Sky laws in connection with the purchase and distribution of the Securities by the Placement Agents or the failure to obtain which would not reasonably be expected to, individually or in the aggregate, result in a Material Adverse Effect;

(p)     Neither the Issuer nor any of the Issuer's subsidiaries is (i) in violation of its Certificate of Incorporation or By-laws or other organizational documents or (ii) in default in the performance or observance of any material obligation, covenant or condition contained

5

Highly Confidential

EFIHMW00303791

in any indenture, mortgage, deed of trust, loan agreement, lease or other agreement or instrument to which it is a party or by which it or any of its properties may be bound, except in connection with clause (ii) as could not reasonably be expected to result in a Material Adverse Effect;

(q)    The statements set forth in the Pricing Memorandum and the Offering Memorandum under the caption "Description of the Notes", insofar as they purport to constitute a summary of the terms of the Securities, are accurate in all material respects;

(r)    The audited consolidated financial statements included in the Pricing Memorandum and the Offering Memorandum, together with the related notes, present fairly, in all material respects, the consolidated financial position of the Issuer and its subsidiaries as of the dates indicated and the consolidated results of operations and cash flows of the Issuer and its subsidiaries for the periods specified and have been prepared in all material respects in conformity with generally accepted accounting principles applied on a consistent basis during the periods presented (except as otherwise noted therein); the other financial and statistical data set forth in the Pricing Memorandum and the Offering Memorandum under the captions "Summary — Summary Historical and Unaudited Pro Forma Consolidated Financial and Other Data of Energy Future Holdings Corp. and its Subsidiaries" and "Energy Future Holdings Corp. Selected Historical Consolidated Financial Data," and in Supplement No. 1 under the caption "Preliminary Results for the Nine Months Ended September 30, 2007," are accurately presented in all material respects and where applicable, have been prepared on a basis consistent with the financial statements and books and records of the Issuer; there are no financial statements (historical or pro forma) that would be required to be included in a registration statement under the Securities Act if the Securities were being registered thereunder that are not included in the Pricing Memorandum and the Offering Memorandum. The pro forma financial statements of the Issuer and its subsidiaries and the related notes thereto included in the Pricing Memorandum and the Offering Memorandum present fairly in all material respects the information shown therein, have been prepared in accordance with the Commission's rules and guidelines with respect to pro forma financial statements and have been properly compiled on the bases described therein, and the assumptions used in the preparation thereof are reasonable and the adjustments used therein are appropriate to give effect to the transactions and circumstances referred to therein;

(s)    Other than as set forth in the Pricing Memorandum, there are no legal or governmental proceedings pending to which the Issuer or any of the Issuer's subsidiaries is a party or of which any property of the Issuer or any of the Issuer's subsidiaries is the subject that, if determined adversely to the Issuer or any of the Issuer's subsidiaries, would individually or in the aggregate reasonably be expected to result in a Material Adverse Effect; and to the Issuer's knowledge, no such proceedings are threatened;

(t)    The Issuer and each of the Issuer's subsidiaries maintains insurance covering its properties, operations, personnel and businesses as the Issuer deems adequate and customary for companies engaged in similar businesses and all such policies are in full force and effect in all material respects, except where a failure to maintain such insurance policies would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect;

(u)    The Issuer and each of the Issuer's subsidiaries own, possess or can acquire on reasonable terms, adequate rights to use all trademarks, trade names and other rights to inventions, know-how, patents, copyrights, confidential information and other intellectual

6

NYDOCS01/1142224.11

Highly Confidential

EFIHMW00303792

PX 004
Page 6 of 37

property (collectively, "**intellectual property rights**") described in the Offering Memorandum as being owned by it or necessary for the conduct of its business (except where a failure to own or possess such intellectual property rights could not reasonably be expected to, individually or in the aggregate, result in a Material Adverse Effect), and have not received any notice of infringement of or conflict with asserted rights of others with respect to any intellectual property rights, except where any such notice the result of which, individually or in the aggregate, if the subject of an unfavorable decision, ruling or finding, would reasonably result in a Material Adverse Effect;

(v)   Except for such matters that could not reasonably be expected to, individually or in the aggregate, result in a Material Adverse Effect, neither the Issuer nor any of the Issuer's subsidiaries is in violation of any statute, any rule, regulation, decision or order of any governmental agency or body or any court, domestic or foreign, relating to the use, disposal or release into the environment of hazardous or toxic substances or relating to the protection or restoration of the environment or human exposure to hazardous or toxic substances (collectively, the "**environmental laws**"), owns or operates any real property contaminated with any hazardous or toxic substance that is subject to any remedial obligation or other liabilities pursuant to any environmental laws, is liable for any off-site disposal or contamination pursuant to any environmental laws, or is subject to any claim arising pursuant to any environmental laws; and the Issuer is not aware of any pending investigation pursuant to any environmental laws which would reasonably be expected to, individually or in the aggregate, result in a Material Adverse Effect;

(w)   When the Securities are issued and delivered pursuant to this Agreement and the Indenture, the Securities will not be of the same class (within the meaning of Rule 144A(d)(3) under the Act) as any security of the Issuer which is listed on a national securities exchange registered under Section 6 of the Exchange Act or quoted in a U.S. automated inter-dealer quotation system;

(x)   None of the Issuer or any of the Guarantors is, and after giving effect to the offering and sale of the Securities and the application of the proceeds thereof as described in the Offering Memorandum, none of them will be an "investment company", as such term is defined in the United States Investment Company Act of 1940, as amended (the "**Investment Company Act**");

(y)   Neither the Issuer, the Guarantors nor any person acting on its or their behalf (provided that no representation is made as to the Placement Agents or any person acting on their behalf) has offered or sold the Securities by means of any general solicitation or general advertising within the meaning of Rule 502(c) under the Act or, with respect to Securities sold outside the United States to non-U.S. persons (as defined in Rule 902 under the Act), by means of any directed selling efforts within the meaning of Rule 902 under the Act, and the Issuer, any affiliate of the Issuer and any person acting on its or their behalf has complied with and will implement the "offering restrictions" within the meaning of such Rule 902;

(z)   Within the six months preceding the date hereof, neither the Issuer, the Guarantors nor any other person acting on their respective behalf has offered or sold to any person any Securities, or any securities of the same or a similar class as the Securities, other than Securities offered or sold to the Placement Agents hereunder. The Issuer will take reasonable precautions designed to ensure that any offer or sale, direct or indirect, in the United States or to any U.S. person (as defined in Rule 902 under the Act) of any Securities or any substantially similar security issued by the Issuer, within six months subsequent to the date on which the distribution of the Securities has been completed

7

Highly Confidential

EFIHMW00303793

**PX 004**
**Page 7 of 37**

(as notified to the Issuer by the Representatives), is made under restrictions and other circumstances reasonably designed not to affect the status of the offer and sale of the Securities in the United States and to U.S. persons contemplated by this Agreement as transactions exempt from the registration provisions of the Act;

(aa)    The Issuer and its subsidiaries, on a consolidated basis, maintain a system of internal control over financial reporting (as such term is defined in Rule 13a-15(f) of the Exchange Act) that complies with the requirements of the Exchange Act and has been designed by the Issuer's principal executive officer and principal financial officer, or under their supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. The Issuer's internal control over financial reporting is effective and the Issuer is not aware of any material weaknesses in its internal control over financial reporting;

(bb)    Since the date of the latest audited financial statements included in the Pricing Memorandum, there has been no change in the Issuer's internal control over financial reporting that has materially affected, or is reasonably likely to materially affect, the Issuer's internal control over financial reporting;

(cc)    The Issuer and its subsidiaries, on a consolidated basis, maintain disclosure controls and procedures (as such term is defined in Rule 13a-15(e) of the Exchange Act) that comply with the requirements of the Exchange Act; such disclosure controls and procedures have been designed to ensure that material information relating to the Issuer and its subsidiaries is made known to the Issuer's principal executive officer and principal financial officer by others within those entities; and such disclosure controls and procedures are effective; and

(dd)    Deloitte & Touche LLP, which has audited certain financial statements of the Issuer and its subsidiaries, is an independent registered public accounting firm as required by the Act and the rules and regulations of the Commission thereunder.

2.    Subject to the terms and conditions herein set forth, the Issuer agrees to issue and sell to each of the Placement Agents, and each of the Placement Agents agrees, severally and not jointly, to purchase from the Issuer, (i) at a purchase price of 98.00% of the principal amount thereof, the respective principal amount of the Senior Cash Pay Notes set forth opposite the name of such Placement Agent in Schedule I hereto; and (ii) at a purchase price of 98.00% of the principal amount thereof, the respective principal amount of the Senior Toggle Notes set forth opposite the name of such Placement Agent in Schedule I hereto.

3.    Upon the authorization by the Issuer of the release of the Securities, the several Placement Agents propose to offer the Securities for sale upon the terms and conditions set forth in this Agreement and the Offering Memorandum and each Placement Agent, severally and not jointly, hereby represents and warrants to, and agrees with the Issuer and the Guarantors that:

(a)    It will offer and sell the Securities only to (i) persons who it reasonably believes are "qualified institutional buyers" ("**QIBs**") within the meaning of Rule 144A under the Act in transactions meeting the requirements of Rule 144A or (ii) upon the terms and conditions set forth in Annex I to this Agreement;

(b)    It is an Institutional Accredited Investor; and

NYDOCS01/1142224.11

Highly Confidential

EFIHMW00303794

**PX 004
Page 8 of 37**

(c)     It will not offer or sell the Securities by any form of general solicitation or general advertising, including but not limited to the methods described in Rule 502(c) under the Act.

4.    (a)     The Securities to be purchased by each Placement Agent hereunder will be represented by one or more definitive global Securities in book-entry form which will be deposited by or on behalf of the Issuer with The Depository Trust Company ("DTC") or its designated custodian. The Issuer will deliver the Securities to Morgan Stanley & Co. Incorporated, for the account of each Placement Agent, against payment by or on behalf of such Placement Agent of the purchase price therefor by wire transfer in Federal (same day) funds, by causing DTC to credit the Securities to the account of Morgan Stanley & Co. Incorporated at DTC. The Issuer will cause the certificates representing the Securities to be made available to the Placement Agents for checking at least twenty-four hours prior to the Time of Delivery (as defined below) at the office of Simpson, Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York, 10017 (the "**Closing Location**"). The time and date of such delivery and payment shall be 9:30 a.m., New York City time, on October 31, 2007, or such other time and date as the Placement Agents and the Issuer may agree upon in writing. Such time and date are herein called the "**Time of Delivery**."

(a)     The documents to be delivered at the Time of Delivery by or on behalf of the parties hereto pursuant to Section 8 hereof, including the cross-receipt for the Securities and any additional documents requested by the Placement Agents pursuant to Section 8(i) hereof, will be delivered at such time and date at the Closing Location, and the Securities will be delivered at DTC (or its designated custodian), all at the Time of Delivery. A meeting will be held at the Closing Location at 4:00 p.m., New York City time, on the New York Business Day next preceding the Time of Delivery, at which meeting the final drafts of the documents to be delivered pursuant to the preceding sentence will be available for review by the parties hereto. For the purposes of this Section 4, "New York Business Day" shall mean each Monday, Tuesday, Wednesday, Thursday and Friday which is not a day on which banking institutions in New York are generally authorized or obligated by law or executive order to close.

5.     The Issuer and the Guarantors jointly and severally agree with each of the Placement Agents:

(a)     The Issuer will prepare the Offering Memorandum in a form approved by the Placement Agents and will furnish the Placement Agents with copies thereof; to make no amendment or any supplement to the Offering Memorandum which shall be disapproved by the Placement Agents promptly after reasonable notice thereof;

(b)     The Issuer will promptly from time to time take such action as the Placement Agents may reasonably request to qualify the Securities for offering and sale under the securities laws of such jurisdictions as they may request and to comply with such laws so as to permit the continuance of sales and dealings therein in such jurisdictions for as long as may be necessary to complete the distribution of the Securities, provided that in connection therewith none of the Issuer or the Guarantors shall be required to qualify as a foreign corporation, to file a general consent to service of process in any jurisdiction or to subject themselves to taxation in excess of a nominal amount in respect of doing business in any jurisdiction;

(c)     The Issuer will furnish the Placement Agents with written and electronic copies of the Offering Memorandum in such quantities as the Placement Agents may from time to time reasonably request, and if, at any time prior to the expiration of six months after the

NYDOCS01/1142224.11

9

EFIHMW00303795

**PX 004**
**Page 9 of 37**

date of the Offering Memorandum, any event shall have occurred as a result of which the Offering Memorandum as then amended or supplemented would include an untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made when such Offering Memorandum is delivered, not misleading, or, if for any other reason it shall be necessary or desirable during such same period to amend or supplement the Offering Memorandum, to notify the Placement Agents and upon the request of the Placement Agents to prepare and furnish without charge to each Placement Agent and to any dealer in securities as many written and electronic copies as they may from time to time reasonably request of an amended Offering Memorandum or a supplement to the Offering Memorandum which will correct such statement or omission or effect such compliance;

(d)    During the period beginning from the date hereof and continuing until the date that is six months after the Time of Delivery, the Issuer will not and, up to the Closing Date, the Issuer will use its commercially reasonable efforts to cause the Guarantors not to, offer, sell, contract to sell or otherwise dispose of, except as provided hereunder, any securities of the Issuer that are substantially similar to the Securities without the prior written consent of the Placement Agents;

(e)    Not to be or become, at any time prior to the expiration of two years after the Time of Delivery, an open-end investment company, unit investment trust, closed-end investment company or face-amount certificate company that is or is required to be registered under Section 8 of the Investment Company Act;

(f)    At any time when the Issuer is not subject to Section 13 or 15(d) of the Exchange Act, for the benefit of holders from time to time of Securities, to furnish at its expense, upon request, to holders of Securities and prospective purchasers of Securities information (the "**Additional Issuer Information**") satisfying the requirements of subsection (d)(4)(i) of Rule 144A under the Act;

(g)    If requested by the Placement Agents, the Issuer will use its best efforts to cooperate with the Placement Agents to cause the Securities to be eligible for the PORTAL trading system of the Financial Industry Regulatory Authority;

(h)    During the period of two years after the Time of Delivery, the Issuer will not, and will not permit any of its "affiliates" (as defined in Rule 144 under the Securities Act) to, resell any of the Securities which constitute "restricted securities" under Rule 144 that have been reacquired by any of them, except in a transaction registered under the Act;

(i)    To use the net proceeds received by the Issuer from the sale of the Securities pursuant to this Agreement in the manner specified in the Pricing Memorandum under the caption "Use of Proceeds."

NYDOCS01/1142224.11

Highly Confidential

EFIHMW00303796

6.    (a)    (i)    The Issuer represents and agrees that, without the prior consent of the Placement Agents, it has not made and will not make any offer relating to the Securities that, if the offering of the Securities contemplated by this Agreement were conducted as a public offering pursuant to a registration statement filed under the Act with the Commission, would constitute an "issuer free writing prospectus," as defined in Rule 433 under the Act (any such offer is hereinafter referred to as a "**Issuer Supplemental Disclosure Document**");

(i)    Each Placement Agent represents and agrees that, without the prior consent of the Issuer and the Representatives, other than one or more term sheets relating to the Securities containing customary information and conveyed to purchasers of securities, it has not made and will not make any offer relating to the Securities that, if the offering of the Securities contemplated by this Agreement were conducted as a public offering pursuant to a registration statement filed under the Act with the Commission, would constitute a "free writing prospectus," as defined in Rule 405 under the Act, required to be filed with the Commission or retained by the Company pursuant to Rule 433 under the Act (any such offer (other than any such term sheets), is hereinafter referred to as a "**Placement Agent Supplemental Disclosure Document**"); and

(ii)    Any Issuer Supplemental Disclosure Document or Placement Agent Supplemental Disclosure Document the use of which has been consented to by the Issuer and the Placement Agents is listed on Schedule II hereto.

7.    The Issuer and each of the Guarantors, jointly and severally, covenants and agrees with the several Placement Agents that the Issuer and each of the Guarantors will pay or cause to be paid the following: (i) the fees, disbursements and expenses of the Issuer's counsel and accountants in connection with the issue of the Securities and all other expenses in connection with the preparation, printing, reproduction and filing of the Preliminary Offering Memorandum and the Offering Memorandum and any amendments and supplements thereto, including the Supplements, and the mailing and delivering of copies thereof to the Placement Agents and dealers; (ii) the cost of printing or producing any Agreement among Placement Agents, this Agreement, the Indenture, the Registration Rights Agreement, the Blue Sky Memorandum, closing documents (including any compilations thereof) and any other documents in connection with the offering, purchase, sale and delivery of the Securities; (iii) all expenses in connection with the qualification of the Securities for offering and sale under state securities laws as provided in Section 5(b) hereof, including the fees and disbursements of counsel for the Placement Agents in connection with such qualification and in connection with the Blue Sky surveys; (iv) any fees charged by securities rating services for rating the Securities; (v) the cost of preparing the Securities; (vi) the fees and expenses of the Trustee and any agent of the Trustee and the fees and disbursements of counsel for the Trustee in connection with the Indenture and the Securities; (vii) any cost incurred in connection with the designation of the Securities for trading in PORTAL and (viii) all other costs and expenses incident to the performance of its obligations hereunder which are not otherwise specifically provided for in this Section. It is understood, however, that, except as provided in this Section, and Sections 9 and 12 hereof, (a) the Placement Agents will pay all of their own costs and expenses, including the fees of their counsel, transfer taxes on resale of any of the Securities by them, and any advertising expenses connected with any offers they may make, (b) the Issuer and the Placement Agents shall bear all of their respective travel expenses in connection with any "roadshow" presentations to investors, and (c) the Issuer, on the one hand, and the Placement Agents, on the other hand, shall each pay 50% of the cost of any chartered plane used in connection with such "roadshow" presentations.

11

NYDOCS01/1142224.11

Highly Confidential

EFIHMW00303797

8.  The obligations of the Placement Agents hereunder shall be subject, in their discretion, to the condition that all representations and warranties and other statements of the Issuer and the Guarantors herein are, at and as of the Time of Delivery, true and correct, the condition that the Issuer and the Guarantors shall have performed all of their respective obligations hereunder theretofore to be performed, and the following additional conditions:

(a)  Shearman & Sterling LLP, counsel for the Placement Agents, shall have furnished to the Placement Agents their written opinion and negative assurance letter, in each case, dated the Time of Delivery, with respect to such matters as the Placement Agents may reasonably request, and such counsel shall have received such papers and information as they may reasonably request to enable them to pass upon such matters;

(b)  (i)  Simpson Thacher & Bartlett LLP, counsel for the Issuer and the Guarantors, shall have furnished to you their written opinion and negative assurance letter, dated the Time of Delivery, substantially in the form of Exhibit A-1 hereto;

(i)  Vinson & Elkins LLP, Texas counsel for the Issuer and the Guarantors, shall have furnished to you their written opinion, dated the Time of Delivery, substantially in the form of Exhibit A-2 hereto;

(ii)  Covington & Burling LLP, Federal Energy Regulatory Commission and Nuclear Regulatory Commission counsel for the Issuer and the Guarantors, shall have furnished to you their written opinion, dated the Time of Delivery, substantially in the form of Exhibit A-3 hereto;

(iii)  Hunton & Williams LLP, Texas electric utility regulatory counsel for the Issuer and the Guarantors, shall have furnished to you their written opinion, dated as of the Time of Delivery, substantially in the form of Exhibit A-4 hereto; and

(iv)  David Poole, the General Counsel of the Issuer, shall have furnished to you his written opinion, dated the Time of Delivery, substantially in the form of Exhibit A-5 hereto;

(c)  On the date of the Offering Memorandum prior to the execution of this Agreement and also at the Time of Delivery, Deloitte & Touche LLP shall have furnished to the Placement Agents a letter or letters, dated the respective dates of delivery thereof, in form and substance satisfactory to the Placement Agents;

(d)  (i)  None of the Issuer or any of the Issuer's subsidiaries shall have sustained since the date of the latest audited financial statements included in the Pricing Memorandum any loss or interference with its business from fire, explosion, flood or other calamity, whether or not covered by insurance, or from any labor dispute or court or governmental action, order or decree, otherwise than as set forth or contemplated in the Pricing Memorandum, and (ii) since the respective dates as of which information is given in the Pricing Memorandum (exclusive of any amendments or supplements thereto subsequent to the date of this Agreement) there shall not have been any change in the capital stock or long-term debt of the Issuer or any of the Issuer's subsidiaries or any change, or any development involving a prospective change, in or affecting the general affairs, management, financial position, stockholders' equity or results of operations of the Issuer and the Issuer's subsidiaries taken as a whole, otherwise than as set forth or contemplated in the Pricing Memorandum, the effect of which, in any such case described in clause (i) or (ii), is in the collective judgment of the Placement Agents, so material and adverse as to make it impracticable or inadvisable to proceed with the

12

NYDOCS01/1142224.11

Highly Confidential

EFIHMW00303798

offering, sale or the delivery of the Senior Cash Pay Notes or the Senior Toggle Notes on the terms and in the manner contemplated in this Agreement and in the Offering Memorandum;

(e)     On or after the Applicable Time (i) no downgrading shall have occurred in the rating accorded the Issuer's debt securities by any "nationally recognized statistical rating organization", as that term is defined by the Commission for purposes of Rule 436(g)(2) under the Act, and (ii) no such organization shall have publicly announced that it has under surveillance or review, with possible negative implications, its rating of any of the Issuer's debt securities;

(f)     On or after the Applicable Time there shall not have occurred any of the following: (i) a suspension or material limitation in trading in securities generally on the New York Stock Exchange; (ii) a suspension or material limitation in trading of the Company's securities on any exchange or in any over-the-counter market; (iii) a general moratorium on commercial banking activities declared by either Federal or New York State authorities or a material disruption in commercial banking or securities settlement or clearance services in the United States; (iii) the outbreak or escalation of hostilities involving the United States or the declaration by the United States of a national emergency or war or (iv) the occurrence of any other calamity or crisis or any material and adverse change in financial, political or economic conditions in the United States or elsewhere, if the effect of any such event specified in clause (iii) or (iv) in the collective judgment of the Placement Agents makes it impracticable or inadvisable to proceed with the offering, sale or the delivery of the Senior Cash Pay Notes or the Senior Toggle Notes on the terms and in the manner contemplated in the Offering Memorandum;

(g)     The Securities have been designated for trading on PORTAL;

(h)     The Placement Agents shall have received a counterpart of the Registration Rights Agreement that shall have been executed and delivered by duly authorized officers of the Issuer and the Guarantors;

(i)     Each of the Issuer and the Guarantors shall have furnished or caused to be furnished to you at the Time of Delivery certificates of officers of the Issuer and each of the Guarantors satisfactory to you as to the accuracy of the representations and warranties of the Issuer and the Guarantors herein at and as of such Time of Delivery, as to the performance by the Issuer and the Guarantors of all of their respective obligations hereunder to be performed at or prior to such Time of Delivery, as to the matters set forth in subsection (d) of this Section and as to such other matters as you may reasonably request.

9.     (a)     The Issuer and each of the Guarantors, jointly and severally agree, to indemnify and hold harmless each Placement Agent against any losses, claims, damages or liabilities, joint or several, to which such Placement Agent may become subject, under the Act or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon an untrue statement or alleged untrue statement of a material fact contained in any Preliminary Offering Memorandum, the Pricing Memorandum, the Offering Memorandum, or any amendment or supplement thereto, any Issuer Supplemental Disclosure Document, or arise out of or are based upon the omission or alleged omission to state therein a material fact necessary to make the statements therein not misleading, and will reimburse each Placement Agent for any legal or other expenses reasonably incurred by such Placement Agent in connection with investigating or defending any such action or claim as such expenses are incurred;

NYDOCS01/1142224.11

Highly Confidential

EFIHMW00303799

*provided, however,* that the Issuer and the Guarantors shall not be liable in any such case to the extent that any such loss, claim, damage or liability arises out of or is based upon an untrue statement or alleged untrue statement or omission or alleged omission made in any Preliminary Offering Memorandum, the Pricing Memorandum, the Offering Memorandum or any such amendment or supplement, or any Issuer Supplemental Disclosure Document, in reliance upon and in conformity with written information furnished to the Issuer by any Placement Agent through the Representatives expressly for use therein.

(a)     Each Placement Agent, severally and not jointly, will indemnify and hold harmless the Issuer and each Guarantor against any losses, claims, damages or liabilities to which the Issuer or any Guarantor may become subject, under the Act or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon an untrue statement or alleged untrue statement of a material fact contained in any Preliminary Offering Memorandum, the Pricing Memorandum, the Offering Memorandum, or any amendment or supplement thereto, or any Issuer Supplemental Disclosure Document, or arise out of or are based upon the omission or alleged omission to state therein a material fact or necessary to make the statements therein not misleading, in each case to the extent, but only to the extent, that such untrue statement or alleged untrue statement or omission or alleged omission was made in any Preliminary Offering Memorandum, the Pricing Memorandum, the Offering Memorandum or any such amendment or supplement, or any Issuer Supplemental Disclosure Document in reliance upon and in conformity with written information furnished to the Issuer by such Placement Agent through the Representatives expressly for use therein; and will reimburse the Issuer and any Guarantor for any legal or other expenses reasonably incurred by the Issuer and any Guarantor in connection with investigating or defending any such action or claim as such expenses are incurred.

(b)     Promptly after receipt by an indemnified party under subsection (a) or (b) above of notice of the commencement of any action, such indemnified party shall, if a claim in respect thereof is to be made against the indemnifying party under such subsection, notify the indemnifying party in writing of the commencement thereof; but the omission so to notify the indemnifying party shall not relieve it from any liability which it may have to any indemnified party otherwise than under such subsection. In case any such action shall be brought against any indemnified party and it shall notify the indemnifying party of the commencement thereof, the indemnifying party shall be entitled to participate therein and, to the extent that it shall wish, jointly with any other indemnifying party similarly notified, to assume the defense thereof, with counsel satisfactory to such indemnified party (who shall not, except with the consent of the indemnified party, be counsel to the indemnifying party), and, after notice from the indemnifying party to such indemnified party of its election so to assume the defense thereof, the indemnifying party shall not be liable to such indemnified party under such subsection for any legal expenses of other counsel or any other expenses, in each case subsequently incurred by such indemnified party, in connection with the defense thereof other than reasonable costs of investigation. No indemnifying party shall, without the written consent of the indemnified party, effect the settlement or compromise of, or consent to the entry of any judgment with respect to, any pending or threatened action or claim in respect of which indemnification or contribution may be sought hereunder (whether or not the indemnified party is an actual or potential party to such action or claim) unless such settlement, compromise or judgment (i) includes an unconditional release of the indemnified party from all liability arising out of such action or claim and (ii) does not include a statement as to, or an admission of, fault, culpability or a failure to act, by or on behalf of any indemnified party.

NYDOCS01/1142224.11

EFIHMW00303800

(c)     If the indemnification provided for in this Section 9 is unavailable to or insufficient to hold harmless an indemnified party under subsection (a) or (b) above in respect of any losses, claims, damages or liabilities (or actions in respect thereof) referred to therein, then each indemnifying party shall contribute to the amount paid or payable by such indemnified party as a result of such losses, claims, damages or liabilities (or actions in respect thereof) in such proportion as is appropriate to reflect the relative benefits received by the Issuer and the Guarantors on the one hand and the Placement Agents on the other from the offering of the Securities. If, however, the allocation provided by the immediately preceding sentence is not permitted by applicable law or if the indemnified party failed to give the notice required under subsection (c) above, then each indemnifying party shall contribute to such amount paid or payable by such indemnified party in such proportion as is appropriate to reflect not only such relative benefits but also the relative fault of the Issuer and the Guarantors on the one hand and the Placement Agents on the other in connection with the statements or omissions which resulted in such losses, claims, damages or liabilities (or actions in respect thereof), as well as any other relevant equitable considerations. The relative benefits received by the Issuer and the Guarantors on the one hand and the Placement Agents on the other shall be deemed to be in the same proportion as the total net proceeds from the offering of the Senior Cash Pay Notes and the Senior Toggle Notes (before deducting expenses) received by the Issuer bear to the total discounts and commissions received by the Placement Agents, therefrom, in each case as set forth in the Offering Memorandum. The relative fault shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the Issuer or the Guarantors on the one hand or the Placement Agents on the other and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission. The Issuer, the Guarantors and the Placement Agents agree that it would not be just and equitable if contribution pursuant to this subsection (d) were determined by pro rata allocation (even if the Placement Agents were treated as one entity for such purpose) or by any other method of allocation which does not take account of the equitable considerations referred to above in this subsection (d). The amount paid or payable by an indemnified party as a result of the losses, claims, damages or liabilities (or actions in respect thereof) referred to above in this subsection (d) shall be deemed to include any legal or other expenses reasonably incurred by such indemnified party in connection with investigating or defending any such action or claim. Notwithstanding the provisions of this subsection (d), no Placement Agent shall be required to contribute any amount in excess of the amount by which the total price at which the Senior Cash Pay Notes or the Senior Toggle Notes, as applicable, purchased by it and distributed to investors were offered to investors exceeds the amount of any damages which such Placement Agent has otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged omission.  The Placement Agents' obligations in this subsection (d) to contribute are several in proportion to their respective purchase obligations in connection with the Senior Cash Pay Notes or the Senior Toggle Notes, as applicable, and not joint.

(d)     The obligations of the Issuer and the Guarantors under this Section 9 shall be in addition to any liability which the Issuer and the Guarantors may otherwise have and shall extend, upon the same terms and conditions, to any affiliate of each Placement Agent and each person, if any, who controls any Placement Agent within the meaning of the Act; and the obligations of the Placement Agents under this Section 9 shall be in addition to any liability which the respective Placement Agents may otherwise have and shall extend, upon the same terms and conditions, to each officer and director of the Issuer

15

NYDOCS01/1142224.11

and the Guarantors and to each person, if any, who controls the Issuer or the Guarantors within the meaning of the Act.

10.    (a)    If any Placement Agent shall default in its obligation to purchase the Senior Cash Pay Notes or the Senior Toggle Notes which it has agreed to purchase hereunder, the Placement Agents may in their discretion arrange for the Placement Agents or another party or other parties to purchase the Senior Cash Pay Notes or the Senior Toggle Notes, as applicable, on the terms contained herein. If within thirty-six hours after such default by any Placement Agent you do not arrange for the purchase of the Senior Cash Pay Notes or the Senior Toggle Notes, as applicable, then the Issuer shall be entitled to a further period of thirty-six hours within which to procure another party or other parties satisfactory to you to purchase such Senior Cash Pay Notes or such Senior Toggle Notes, as applicable, on such terms. In the event that, within the respective prescribed periods, the Placement Agents notify the Issuer that they have so arranged for the purchase of such Senior Cash Pay Notes or such Senior Toggle Notes, as applicable, or the Issuer notifies the Placement Agents that it has so arranged for the purchase of such Senior Cash Pay Notes or such Senior Toggle Notes, as applicable, the Placement Agents and the Issuer shall have the right to postpone the Time of Delivery for a period of not more than seven days, in order to effect whatever changes may thereby be made necessary in the Offering Memorandum, or in any other documents or arrangements, and the Issuer agrees to prepare promptly any amendments to the Offering Memorandum which in the opinion of the Placement Agents may thereby be made necessary. The term "Placement Agent" as used in this Agreement shall include any person substituted under this Section with like effect as if such person had originally been a party to this Agreement with respect to such Senior Cash Pay Notes or such Senior Toggle Notes, as applicable.

(a)    If, after giving effect to any arrangements for the purchase of the Senior Cash Pay Notes or the Senior Toggle Notes, as applicable, of a defaulting Placement Agent or Placement Agents by the Issuer as provided in subsection (a) above, the aggregate principal amount of such Senior Cash Pay Notes or such Senior Toggle Notes, which remains unpurchased does not exceed one-eleventh of the aggregate principal amount of all the Senior Cash Pay Notes or the Senior Toggle Notes, as applicable, then the Issuer shall have the right to require each non-defaulting Placement Agent to purchase the principal amount of Senior Cash Pay Notes or Senior Toggle Notes, as applicable, which such Placement Agent agreed to purchase hereunder and, in addition, to require each non-defaulting Placement Agent to purchase its pro rata share (based on the principal amount of the Senior Cash Pay Notes or the Senior Toggle Notes, as applicable, which such Placement Agent agreed to purchase hereunder) of the Senior Cash Pay Notes or the Senior Toggle Notes, as applicable, of such defaulting Placement Agent or Placement Agents for which such arrangements have not been made; but nothing herein shall relieve a defaulting Placement Agent from liability for its default.

(b)    If, after giving effect to any arrangements for the purchase of the Senior Cash Pay Notes or the Senior Toggle Notes, as applicable, of a defaulting Placement Agent or Placement Agents by the Issuer as provided in subsection (a) above, the aggregate principal amount of the Senior Cash Pay Notes or the Senior Toggle Notes, as applicable, which remains unpurchased exceeds one-eleventh of the aggregate principal amount of all the Securities, or if the Issuer shall not exercise the right described in subsection (b) above to require non-defaulting Placement Agents to purchase the Senior Cash Pay Notes or the Senior Toggle Notes, as applicable, of a defaulting Placement Agent or Placement Agents, then this Agreement shall thereupon terminate, without liability on the part of any non-defaulting Placement Agent or the Issuer, except for the expenses to be borne by

16

NYDOCS01/1142224.11

Highly Confidential

EFIHMW00303802

the Issuer and the Placement Agents as provided in Section 7 hereof and the indemnity and contribution agreements in Section 9 hereof; but nothing herein shall relieve a defaulting Placement Agent from liability for its default.

11.    The respective indemnities, agreements, representations, warranties and other statements of the Issuer, the Guarantors and the several Placement Agents, as set forth in this Agreement or made by or on behalf of them, respectively, pursuant to this Agreement, shall remain in full force and effect, regardless of any investigation (or any statement as to the results thereof) made by or on behalf of any Placement Agent or any controlling person of any Placement Agent, or the Issuer, the Guarantors, or any officer or director or controlling person of the Issuer or any Guarantor, and shall survive delivery of and payment for the Securities.

12.    If this Agreement shall be terminated pursuant to Section 8(f) or Section 10 hereof or as a result of any other default by any of the Placement Agents, the Issuer and the Guarantors shall not then be under any liability to any Placement Agent except as provided in Sections 7 and 9 hereof; but, if for any other reason, the Securities are not delivered by or on behalf of the Issuer as provided herein, the Issuer and the Guarantors will reimburse the Placement Agents on demand for all reasonable expenses (including the reasonable fees and disbursements Shearman & Sterling LLP) that shall have been incurred by them in connection with the proposed purchase and sale of the Securities, but the Issuer and the Guarantors shall then be under no further liability to any Placement Agent except as provided in Sections 7 and 9 hereof.

13.    All statements, requests, notices and agreements hereunder shall be in writing, and if to the Placement Agents shall be delivered or sent by mail, telex or facsimile transmission in care of Morgan Stanley & Co. Incorporated at 1585 Broadway, New York, New York 10036, Attention: Global Capital Markets Syndicate Desk, fax: 212-761-0538 and Goldman, Sachs & Co. at 85 Broad Street, New York, New York 10004, Attention: Registration Department; and if to the Issuer or the Guarantors shall be delivered or sent by mail, telex or facsimile transmission to the address of the Issuer set forth in the Offering Memorandum, Attention: General Counsel; *provided, however,* that any notice to a Placement Agent pursuant to Section 9(c) hereof shall be delivered or sent by mail, telex or facsimile transmission to such Placement Agent at its address set forth in its Placement Agents' Questionnaire, or telex constituting such Questionnaire, which address will be supplied to the Issuer by the Representatives upon request. Any such statements, requests, notices or agreements shall take effect upon receipt thereof.

14.    This Agreement shall be binding upon, and inure solely to the benefit of, the parties hereto and, to the extent provided in Sections 9 and 11 hereof, the officers and directors of the Issuer and the Guarantors and each person who controls the Issuer, the Guarantors or any Placement Agent, and their respective heirs, executors, administrators, successors and assigns, and no other person shall acquire or have any right under or by virtue of this Agreement. No purchaser of any of the Securities from any Placement Agent shall be deemed a successor or assign by reason merely of such purchase.

15.    Time shall be of the essence of this Agreement.

16.    Each of the Issuer and the Guarantors acknowledge and agree that (i) the purchase and sale of the Securities pursuant to this Agreement is an arm's-length commercial transaction between the Issuer and the Guarantors, on the one hand, and the several Placement Agents, on the other, (ii) in connection therewith and with the process leading to such transaction each Placement Agent is acting solely as a principal and not the agent or fiduciary of the Issuer or any of the Guarantors, (iii) no Placement Agent has assumed an advisory or fiduciary responsibility in favor of the Issuer or the Guarantors with respect to the offering contemplated

17

NYDOCS01/1142224.11

Highly Confidential                                                                                    EFIHMW00303803

hereby or the process leading thereto (irrespective of whether such Placement Agent has advised or is currently advising the Issuer or the Guarantors on other matters) or any other obligation to the Issuer or the Guarantors except the obligations expressly set forth in this Agreement and (iv) the Issuer and the Guarantors have consulted their own legal and financial advisors to the extent they have deemed appropriate. Each of the Issuer and the Guarantors agree that, it will not claim that the Placement Agent, or any of them, has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to any of the Issuer or the Guarantors, in connection with such transaction or the process leading thereto.

17.    This Agreement supersedes all prior agreements and understandings (whether written or oral) between the Issuer, the Guarantors and the Placement Agents, or any of them, with respect to the subject matter hereof.

18.    **This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.**

19.    Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, any and all right to trial by jury in any legal proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

20.    This Agreement may be executed by any one or more of the parties hereto in any number of counterparts, each of which shall be deemed to be an original, but all such respective counterparts shall together constitute one and the same instrument.

21.    Notwithstanding anything herein to the contrary, the Issuer (and the Issuer's employees, representatives, and other agents) is authorized to disclose to any and all persons, the tax treatment and tax structure of the potential transaction and all materials of any kind (including tax opinions and other tax analyses) provided to the Issuer relating to that treatment and structure, without the Placement Agents' imposing any limitation of any kind.  However, any information relating to the tax treatment and tax structure shall remain confidential (and the foregoing sentence shall not apply) to the extent necessary to enable any person to comply with securities laws. For this purpose, "tax treatment" means US federal and state income tax treatment, and "tax structure" is limited to any facts that may be relevant to that treatment.

NYDOCS01/1142224.11

Highly Confidential

EFIHMW00303804

If the foregoing is in accordance with your understanding, please sign and return to us counterparts hereof, and upon the acceptance hereof by you, on behalf of each of the Placement Agents, this letter and such acceptance hereof shall constitute a binding agreement between each of the Placement Agents, the Issuer and the Guarantors. It is understood that your acceptance of this letter on behalf of each of the Placement Agents is pursuant to the authority set forth in a form of Agreement among Placement Agents, the form of which shall be submitted to the Issuer for examination upon request, but without warranty on your part as to the authority of the signers thereof.

Very truly yours,

ENERGY FUTURE HOLDINGS CORP.

By: _____

Name:
Title:

[Signature Page to EFH Corp. Placement Agreement]

Highly Confidential

EFIHMW00303805

ENERGY FUTURE COMPETITIVE HOLDINGS
COMPANY, as Guarantor

By: _____

Name:
Title:

[Signature Page to EFH Corp. Placement Agreement]

NYDOCS01/1142224

Highly Confidential

EFIHMW00303806

ENERGY FUTURE INTERMEDIATE HOLDING
COMPANY LLC, as Guarantor

By: _____

    Name:
    Title:

[Signature Page to EFH Corp. Placement Agreement]

NYDOCS01/1142224

Highly Confidential

EFIHMW00303807

Accepted as of the date hereof:

Morgan Stanley & Co. Incorporated
Goldman, Sachs & Co.

For themselves and as
Representatives of the
Several Placement Agents
Named in Schedule I hereto

By:  Morgan Stanley & Co. Incorporated

By:  _____

      Name:
      Title:

By:  Goldman, Sachs & Co.

By:  _____

      (Goldman, Sachs & Co.)

[Signature Page to EFH Corp. Placement Agreement]

NYDOCS01/1142224

Highly Confidential

EFIHMW00303808

**PX 004**
**Page 22 of 37**

SCHEDULE I

| Placement Agents | Principal Amount of Senior Cash Pay Notes to be Purchased | Principal Amount of Senior Toggle Notes to be Purchased |
|---|---|---|
| Morgan Stanley & Co. Incorporated | $375,000,000 | $468,750,000 |
| Goldman, Sachs & Co. | $375,000,000 | $468,750,000 |
| Citigroup Global Markets Inc. | $375,000,000 | $468,750,000 |
| Credit Suisse Securities (USA) LLC | $250,000,000 | $312,500,000 |
| J.P. Morgan Securities Inc. | $375,000,000 | $468,750,000 |
| Lehman Brothers Inc. | $250,000,000 | $312,500,000 |
| Total | $2,000,000,000 | $2,500,000,000 |

Highly Confidential

EFIHMW00303809

**SCHEDULE II**

(a)      Approved Issuer Supplemental Disclosure Documents:

      electronic roadshow presentation relating to the offering of the Securities, dated on or after October 17, 2007.

(b)      Approved Placement Agent Supplemental Disclosure Documents:

Highly Confidential                                                                                    EFIHMW00303810

SCHEDULE III

# Energy Future Holdings Corp.

### $2,000,000,000 10.875% Senior Notes due 2017

### $2,500,000,000 11.250% / 12.000% Senior Toggle Notes due 2017

| | |
|---|---|
| Issuer: | Energy Future Holdings Corp. (formerly TXU Corp.) |
| Securities: | 10.875% Senior Notes due 2017 |
| | 11.250% / 12.000% Senior Toggle Notes due 2017 |
| Distribution: | 144A/Regulation S with registration rights |
| Maturity: | November 1, 2017 |
| Principal Amount: | Senior Notes: $2,000,000,000 |
| | Senior Toggle Notes: $2,500,000,000 |
| Gross Proceeds: | Senior Notes: $2,000,000,000 |
| | Senior Toggle Notes: $2,445,375,000 |
| Coupon: | Senior Notes: 10.875% per annum |
| | Senior Toggle Notes: 11.250% per annum / 12.000% per annum |
| Issue Price: | Senior Notes: 100.000% |
| | Senior Toggle Notes: 97.815% |
| Yield to Maturity: | Senior Notes: 10.875% |
| | Senior Toggle Notes: 11.625% |
| Settlement Date: | October 31, 2007 (T+5) |
| Accrued Interest: | Flat |
| Interest Payment Dates: | Senior Notes: May 1 and November 1, beginning May 1, 2008 |
| | Senior Toggle Notes: May 1 and November 1, beginning May 1, 2008 |
| Redemption: | On and after November 1, 2012, the Issuer may redeem each series of notes, in whole or in part, upon not less than 30 nor more than 60 days prior notice, at the redemption prices (expressed as percentages of principal amount of the notes to be redeemed) set forth below, plus accrued and unpaid |

NYDOCS01/1142224.11                                        III-1

interest thereon and additional interest, if any, to the applicable redemption date, if redeemed during the twelvemonth period beginning on November 1 of each of the years indicated below:

*Senior Notes:*

| Year | Price |
|------|-------|
| 2012 | 105.438% |
| 2013 | 103.625% |
| 2014 | 101.813% |
| 2015 and thereafter | 100.000% |

*Senior Toggle Notes*

| Year | Price |
|------|-------|
| 2012 | 105,625% |
| 2013 | 103.750% |
| 2014 | 101.875% |
| 2015 and thereafter | 100.000% |

At any time prior to November 1, 2012, the Issuer may redeem all or a part of each series of notes, upon not less than 30 nor more than 60 days' prior notice, at a redemption price equal to 100% of the principal amount of the notes redeemed plus an applicable make-whole premium as of, and accrued and unpaid interest and additional interest, if any, to the date of redemption.

Equity Clawback:

In addition, until November 1, 2010, the Issuer may, at its option, on one or more occasions redeem up to 35% of the aggregate principal amount of each series of notes at a redemption price equal to 110.875% of the aggregate principal amount of the Senior Notes or 111.250% of the aggregate principal amount of the Senior Toggle Notes, as the case may be, plus accrued and unpaid interest thereon and additional interest, if any, to the applicable redemption date, with the net cash proceeds of one or more equity offerings. However, the Issuer may only make such redemption if at least 50% of the aggregate principal amount of the Senior Notes or Senior Toggle Notes, as the case may be, issued under the Indenture remain outstanding immediately after the occurrence of such redemption, and if each such redemption occurs within 90 days of the date of closing of each such equity offering.

Joint Book-Running Managers:

Morgan Stanley & Co. Incorporated
Goldman, Sachs & Co.
Citigroup Global Markets Inc.
Credit Suisse Securities (USA) LLC
J.P. Morgan Securities Inc.

Highly Confidential

EFIHMW00303812

Lehman Brothers Inc.

CUSIP/ISIN:          Senior Notes:

*Rule 144A:* 292680 AA3 / US292680AA32
*Reg. S:* U29191 AA8 / USU29191AA82

Senior Toggle Notes:
*Rule 144A:* 292680 AB1 / US292680AB15
*Reg. S:* U29191 AB6 /USU29191AB65

Delivery of the notes is expected on or about October 31, 2007, which is the fifth business day following the date of pricing of the notes (such settlement cycle being referred to as "T+5"). Trades in the secondary market generally are required to settle in three business days, unless the parties to any such trade expressly agree otherwise. Accordingly, purchasers who wish to trade the notes on the date of the pricing or the next succeeding business day will be required to specify an alternate settlement cycle at the time of any such trade to prevent a failed settlement. Purchasers who wish to trade the notes on the pricing date or the next succeeding business day should consult their own advisors.

The notes have not been registered under the Securities Act. The notes may not be offered or sold in the United States or to U.S. persons, except to qualified institutional buyers in reliance on the exemption from registration provided by Rule 144A and to certain persons in offshore transactions in reliance on Regulation S. You are hereby notified that sellers of the notes may be relying on the exemption from the provisions of Section 5 of the Securities Act provided by Rule 144A.

The information in this term sheet supplements the Issuer's preliminary offering memorandum, dated October 17, 2007, as supplemented by the supplements to the preliminary offering memorandum dated October 23, 2007 and October 24, 2007 (the "Preliminary Offering Memorandum") and supersedes the information in the Preliminary Offering Memorandum to the extent inconsistent as so supplemented, with the information in the Preliminary Offering Memorandum. This term sheet is qualified in its entirety by reference to the Preliminary Offering Memorandum. You may obtain a copy of the Preliminary Offering Memorandum from Morgan Stanley & Co. Incorporated, 1585 Broadway, New York, NY 10036, ATTN: High Yield New Issue Group, from Goldman, Sachs & Co., Prospectus Department, by calling 212-902-1171, from Citigroup Global Markets Inc., from Credit Suisse Securities (USA) LLC, Peter Espy +1 212 325 5623, 11 Madison Avenue, New York, New York 10010, from J.P. Morgan Securities Inc. or from Lehman Brothers Inc. at 1-888-603-5847

Highly Confidential          EFIHMW00303813

**PX 004**
**Page 27 of 37**

ANNEX I

(1)    The Securities have not been and will not be registered under the Act and may not be offered or sold within the United States or to, or for the account or benefit of, U.S. persons except in accordance with Regulation S under the Act or pursuant to an exemption from the registration requirements of the Act.   Each Placement Agent, severally and not jointly, represents that it has offered and sold the Securities, and will offer and sell the Securities (i) as part of their distribution at any time and (ii) otherwise until 40 days after the later of the commencement of the offering and the Time of Delivery, only in accordance with Rule 903 of Regulation S or Rule 144A under the Act. Accordingly, each Placement Agent, severally and not jointly, agrees that neither it, its affiliates nor any persons acting on its or their behalf has engaged or will engage in any directed selling efforts with respect to the Securities, and it and they have complied and will comply with the offering restrictions requirement of Regulation S.  Each Placement Agent, severally and not jointly, agrees that, at or prior to confirmation of sale of Securities (other than a sale pursuant to Rule 144A), it will have sent to each distributor, dealer or person receiving a selling concession, fee or other remuneration that purchases Securities from it during the restricted period a confirmation or notice to substantially the following effect:

"The Securities covered hereby have not been registered under the U.S. Securities Act of 1933 (the "Securities Act") and may not be offered and sold within the United States or to, or for the account or benefit of, U.S. persons (i) as part of their distribution at any time or (ii) otherwise until 40 days after the later of the commencement of the offering and the closing date, except in either case in accordance with Regulation S (or Rule 144A if available) under the Securities Act.  Terms used above have the meaning given to them by Regulation S."

Terms used in this paragraph have the meanings given to them by Regulation S.

Each Placement Agent, severally and not jointly, further agrees that it has not entered and will not enter into any contractual arrangement with respect to the distribution or delivery of the Securities, except with its affiliates or with the prior written consent of the Issuer.

(2)    Notwithstanding the foregoing, Securities in registered form may be offered, sold and delivered by the Placement Agents in the United States and to U.S. persons pursuant to Section 3 of this Agreement without delivery of the written statement required by paragraph (1) above.

(3)    Each Placement Agent, severally and not jointly, agrees that it will not offer, sell or deliver any of the Securities in any jurisdiction outside the United States except under circumstances that will result in compliance with the applicable laws thereof, and that it will take at its own expense whatever action is required to permit its purchase and resale of the Securities in such jurisdictions.  Each Placement Agent understands that no action has been taken to permit a public offering in any jurisdiction outside the United States where action would be required for such purpose.  Each Placement Agent, severally and not jointly, agrees not to cause any advertisement of the Securities to be published in any newspaper or periodical or posted in any public place and not to issue any circular relating to the Securities, except in any such case with Morgan Stanley & Co. Incorporated's express written consent and then only at its own risk and expense.

Highly Confidential                                                                    EFIHMW00303814

**PX 004**<br>**Page 28 of 37**

Exhibit A-1

Opinion of Simpson Thacher & Bartlett LLP, Counsel for the Issuer and the Guarantors

1.    Intermediate Holding is validly existing and in good standing as a limited liability company under the law of the State of Delaware and has full power and authority to conduct its business as described in the Pricing Disclosure Package and the Offering Memorandum.

2.    The Indenture has been duly authorized, executed and delivered by Intermediate Holding and, assuming that the Indenture has been duly authorized, executed and delivered by the Company and Competitive Holdings and assuming, further, that the Indenture is the valid and legally binding obligation of the Trustee, the Indenture constitutes a valid and legally binding obligation of each of the Company and Guarantors, enforceable against the Company and the Guarantors in accordance with its terms.

3.    Assuming due authorization, execution and issuance of the Notes by the Company and assuming due authentication thereof by the Trustee and upon payment and delivery in accordance with the Placement Agreement, the Notes will constitute valid and legally binding obligations of the Company, enforceable against the Company in accordance with their terms and entitled to the benefits of the Indenture.

4.    The Guarantee has been duly authorized, executed and issued by Intermediate Holding and, assuming that the Guarantee has been duly authorized, executed and delivered by Competitive Holdings and assuming, further, due authentication of the Notes by the Trustee and upon payment for and delivery of the Notes in accordance with the Placement Agreement, the Guarantee will constitute valid and legally binding obligations of the Guarantors, enforceable against the Guarantors in accordance with their terms and entitled to the benefits of the Indenture.

5.    The Exchange Guarantee (as defined in the Placement Agreement) has been duly authorized by Intermediate Holding.

6.    The Registration Rights Agreement has been duly authorized, executed and delivered by Intermediate Holding and, assuming that the Registration Rights Agreement is the valid and legally binding obligation of the Placement Agents and has been duly authorized, executed and delivered by the Company and Competitive Holdings, constitutes a valid and legally binding obligation of the Company and the Guarantors, enforceable against the Company and the Guarantors in accordance with its terms.

7.    The statements made in each of the Pricing Disclosure Package and the Offering Memorandum under the caption "Description of Other Indebtedness," "Description of the Notes" and "Exchange Offer; Registration Rights," insofar as they purport to constitute summaries of certain terms of documents referred to therein, constitute accurate summaries of the terms of such documents in all material respects.

8.    The statements made in each of the Pricing Disclosure Package and the Offering Memorandum under the caption "Certain U.S. Federal Tax Consequences," insofar as they purport to constitute summaries of United States federal tax law and

Highly Confidential                                                    EFIHMW00303815

regulations or legal conclusions with respect thereto, constitute accurate summaries of the matters described therein in all material respects.

9.    The Placement Agreement has been duly authorized, executed and delivered by Intermediate Holding.

10. The issue and sale of the Notes by the Company, the issue of the Guarantees by the Guarantors, the execution, delivery and performance by the Company and the Guarantors of the Placement Agreement and the Registration Rights Agreement and the execution and delivery of the Indenture by the Company and the Guarantors will not breach or result in a default under any of the agreements or instruments identified on Schedule I hereto, nor will such actions violate the certificate of formation or limited liability company agreement of Intermediate Holding or any federal or New York statute or the Delaware Limited Liability Company Act or any rule or regulation that has been issued pursuant to any federal or New York statute or the Delaware Limited Liability Company Act or any order known to us issued pursuant to any federal or New York statute or the Delaware Limited Liability Company Act by any court or governmental agency or body having jurisdiction over Intermediate Holding or any of its properties, except that it is understood that no opinion is given in this paragraph 10 with respect to any federal or state securities law or any rule or regulation issued pursuant to any federal or state securities law.

11. No consent, approval, authorization, order, registration or qualification of or with any federal or New York governmental agency or body or any Delaware governmental agency or body acting pursuant to the Delaware Limited Liability Company Act or, to our knowledge, any federal or New York court or any Delaware court acting pursuant to the Delaware Limited Liability Company Act is required for the issue and sale of the Notes by the Company, the issuance of the Guarantees by the Guarantors and the compliance by the Company and the Guarantors with all of the provisions of the Placement Agreement, the Registration Rights Agreement and the Indenture, except that it is understood that no opinion is given in this paragraph 11 with respect to (A) any federal or state securities law or any rule or regulation issued pursuant to any federal or state securities law and (B) any matters subject to federal laws and regulations relating to the generation, storage, sale or transmission of electricity or the ownership or operation of generating facilities (including without limitation nuclear generating facilities) or transmission facilities (including without limitation the Atomic Energy Act of 1954, as amended, the Federal Power Act, the Energy Policy Act of 2005, the Interstate Commerce Act and the Public Utility Holding Company Act of 2005 and in each case the rules and regulations promulgated thereunder and such other rules, regulations and orders administered by the Federal Energy Regulatory Commission, the U.S. Nuclear Regulatory Commission and the U.S. Environmental Protection Agency).

12. No registration under the Securities Act of 1933, as amended, of the Notes or the Guarantees and no qualification of the Indenture under the Trust Indenture Act of 1939, as amended, is required for the offer and sale of the Notes and the Guarantees by the Company and the Guarantors to the Placement Agents or the reoffer and resale of the Notes by the Placement Agents to the initial purchasers therefrom solely in the manner contemplated by the Pricing Disclosure Package and the Offering Memorandum, the Placement Agreement and the Indenture.

Highly Confidential    EFIHMW00303816

**PX 004**
**Page 30 of 37**

13. Neither the Company nor any of the Guarantors is, and after giving effect to the offer and sale of the Notes and the Guarantees and the application of the net proceeds therefrom (as described in the Offering Memorandum) none of them will be, an "investment company" within the meaning of and subject to regulation under the Investment Company Act of 1940, as amended.

We have not independently verified the accuracy, completeness or fairness of the statements made or included in the Preliminary Offering Memorandum dated October 17, 2007 (the "Preliminary Offering Memorandum" and, together with the supplements to the Preliminary Offering Memorandum, dated October 23, 2007 and October 24, 2007, and the information set forth on Schedule III to the Placement Agreement, together, the "Pricing Disclosure Package") or the Offering Memorandum dated October 24, 2007 (the "Offering Memorandum") and we take no responsibility therefor, except as and to the extent set forth in numbered paragraphs 7 and 8 of our opinion letter to you dated the date hereof.

In connection with, and under the circumstances applicable to, the offering of the Securities, we participated in conferences with certain officers and employees of the Issuer and the Guarantors, representatives of Deloitte & Touche LLP, other counsel to the Issuer and the Guarantors, your representatives and your counsel in the course of the preparation by the Issuer and the Guarantors of the Preliminary Offering Circular, the Pricing Disclosure Package and the Offering Circular and also reviewed certain corporate and other records and documents furnished to us by the Issuer, as well as the documents delivered to you at the closing.

Based upon our review of the Preliminary Offering Circular, the Pricing Disclosure Package and the Offering Circular, our participation in the conferences referred to above, our review of the corporate and other records and documents as described above, as well as our understanding of the U.S. federal securities laws and the experience we have gained in our practice thereunder, nothing has come to our attention that causes us to believe that (a) the Pricing Disclosure Package, as of the Applicable Time, contained any untrue statement of a material fact or omitted to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, or (b) the Offering Circular, as of its date or as of the date hereof, contained or contains any untrue statement of a material fact or omitted or omits to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, except that we express no belief in either of clauses (a) or (b) above with respect to (1) the financial statements or other financial data, (2) to the extent covered by the opinion of Hunton & Williams LLP referenced below, Texas electric utility regulatory matters or (3) [to the extent covered by the opinion of Covington & Burling LLP referenced below, matters pertaining to the Federal Energy Regulatory Commission and the U.S. Nuclear Regulatory Commission], in each case contained in or omitted from the Pricing Disclosure Package and the Offering Circular.

We understand that with respect to (1) matters pertaining to Texas electric utility regulatory matters, you are receiving the opinion of Hunton & Williams LLP dated the date hereof and (2) matters pertaining to the Federal Energy Regulatory Commission and the U.S. Nuclear Regulatory Commission, you are receiving the opinion of Covington & Burling LLP dated the date hereof. We also understand that you are receiving the opinion of Vinson & Elkins LLP as to matters of Texas law.

Highly Confidential                                                                EFIHMW00303817

Exhibit A-2

Opinion of Vinson & Elkins LLP, Texas Counsel for the Issuer and the Guarantors

1.    Each of the Company and the Texas Guarantor is validly existing, and each of the Company and the Texas Guarantor is in good standing, under the laws of the State of Texas, and has full corporate power and authority to conduct its business as described in the General Disclosure Package and the Offering Memorandum.

2.    The Indenture has been duly authorized, executed and delivered by the Company and the Texas Guarantor.

3.    The Notes have been duly authorized, executed and delivered by the Company.

4.    The Guarantee has been duly authorized, executed and delivered by the Texas Guarantor.

5.    The Exchange Notes (as defined in the Placement Agreement) have been duly authorized by the Company;

6.    The Exchange Guarantee (as defined in the Placement Agreement) has been duly authorized by the Texas Guarantor.

7.    The Registration Rights Agreement has been duly authorized, executed and delivered by the Company and the Texas Guarantor.

8.    The Placement Agreement has been duly authorized, executed and delivered by the Company and the Texas Guarantor.

9.    The issuance and sale of the Notes by the Company, the issuance of the Guarantee by the Texas Guarantor, the execution, delivery and performance by the Company and the Texas Guarantor of the Placement Agreement and the Registration Rights Agreement, and the execution and delivery by the Company and the Texas Guarantor of the Indenture will not (a) violate the Company's or the Texas Guarantor's Organizational Documents, (b) result in any violation by the Company or the Texas Guarantor of any Applicable Law (as defined below), (c) breach or result in a default under any agreement or instrument listed in Part A of Schedule IV hereto ("Applicable Contracts"), (d) result in any violation by the Company or the Texas Guarantor of any order, writ, judgment or decree listed in Part B of Schedule IV hereto ("Applicable Orders"), (e) result in the creation or imposition of any lien on any properties of the Company or the Texas Guarantor pursuant to any Applicable Contract, other than as may be contemplated by the Transaction Documents, or (f) result in any violation by the Company or the Texas Guarantor of any commitments made to the PUCT pursuant to that certain Joint Report and Application of Oncor Electric Delivery Company and Texas Energy Future Holdings Limited Partnership Pursuant to Public Utility Regulatory Act Section 14.101 dated as of April 25, 2007, including without limitation the No Transaction-Related Debt at Oncor Commitment, and modified to include a 15% customer rate decrease, and the additional $25 credit to customers receiving service from TXU Energy Retail.

NYDOCS01/1142224.11                    EA-2-1

Highly Confidential                                                                    EFIHMW00303818

"Applicable Laws" means those laws, rules and regulations of the State of Texas and the rules and regulations adopted thereunder (including the ERCOT Protocols), that, in our experience, are normally applicable to transactions of the type contemplated by the Transaction Documents, including, without limitation, Title 2 of the Texas Utilities Code (the "Public Utility Regulatory Act") and the rules and regulations adopted thereunder (herein referred to collectively as the "Texas Electric Utilities Laws"). However, the term "Applicable Laws" does not include, and we express no opinion with regard to (i) any state laws, rules or regulations relating to:  (A) pollution or protection of the environment; (B) zoning, land use, building or construction; (C) occupational safety and health or other similar matters; (D) labor, employee rights and benefits; (E) the regulation of utilities, except as to the Texas Electric Utilities Laws; (F) antitrust and trade regulation; (G) tax; (H) securities, including, without limitation, Texas state securities laws, rules and regulations; (I) corrupt practices; and (J) copyrights, patents and trademarks, and (ii) any laws, rules or regulations of any county, municipality or similar political subdivision or any agency or instrumentality thereof.   For the avoidance of doubt, the term "Applicable Laws" does not include, and we express no opinion with regard to, the laws, rules and regulations of the federal government of the United States.

      10.    No Governmental Approval (as defined below) which has not been obtained or taken and is not in full force and effect, is required to be obtained or taken by the Company or the Texas Guarantor for the issuance and sale of the Notes by the Issuer, the issuance of the Guarantee by the Texas Guarantor or the compliance by the Issuer and the Texas Guarantor with all of the provisions of the Placement Agreement, the Registration Rights Agreement and the Indenture.

      "Governmental Approvals" means any consent, approval, license, permit, registration, certification, authorization or validation of, or filing, recording or registration with, any Governmental Authority pursuant to any Applicable Laws (as defined in paragraph 9 above).

      We have participated in conferences with representatives and officers of the Company, with representatives of the Company's independent accountants, and with representatives of, and counsel to, the Placement Agents, at which conferences the contents of the Preliminary Offering Memorandum, the Pricing Disclosure Package and the Offering Memorandum and related matters were discussed and, based on the participation described above, no facts have come to our attention that have caused us to believe that (a) the Pricing Disclosure Package, as of the Applicable Time (as defined in the Purchase Agreement), contained any untrue statement of a material fact or omitted to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, or (b) the Offering Memorandum, as of its date or as of the date hereof, contained or contains any untrue statement of a material fact or omitted or omits to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.  Notwithstanding the foregoing, we express no view, belief or comment with respect to the form, accuracy, completeness or fairness of the financial statements, including the related notes and schedules thereto and the auditors' reports thereon or other financial or accounting information contained or incorporated by reference therein or excluded therefrom.

Highly Confidential

EFIHMW00303819

Opinion of Covington & Burling LLP, Federal Energy Regulatory Commission and Nuclear
Regulatory Commission Counsel for the Issuer and the Guarantors

    1.    The issue and sale of the Securities by the Issuer; the issue of the
Guarantees by the Guarantors; the execution, delivery and performance by the Issuer
and the Guarantors of the Purchase Agreement and the Registration Rights Agreement;
and the execution and delivery of the Indenture by the Issuer and the Guarantors will not
violate the Public Utility Regulatory Act and the rules and regulations adopted by the
Public Utility Commission of Texas ("PUCT") thereunder (including ERCOT Protocols),
or the commitments made to the PUCT in the Joint Report and Application of Oncor
Electric Delivery Company and Texas Energy Future Holdings Limited Partnership
Pursuant to Public Utility Regulatory Act Section 14.101, dated April 25, 2007, and as
thereafter modified, including without limitation the No Transaction-Related Debt at
Oncor Commitment (collectively, "Applicable Texas Electric Utility Laws") or any order
known to us issued pursuant to Applicable Texas Electric Utility Law by any Texas court
or governmental agency or body having jurisdiction over the Issuer, the Guarantors or
any of their subsidiaries or any of their properties.

    2.    The statements made in each of the Preliminary Offering Memorandum
and the Offering Memorandum under the captions "Risk Factors — Risks Relating to
Our Indebtedness and the Notes — As a result of the ring-fencing measures undertaken
by our subsidiary, Oncor Electric Delivery, you should not rely on funds from Oncor
Electric Delivery to pay any amounts payable on the notes," "Risk Factors — Risks
Relating to Our Businesses — Our businesses are subject to ongoing complex
governmental regulations and legislation that have impacted, and may in the future
impact, our business and/or results of operations," "Risk Factors — Risks Relating to
Our Businesses — Litigation or legal proceedings could expose us to significant
liabilities, damage our reputation and have a material adverse effect on our results of
operations, and the litigation environment in which we operate poses a significant risk to
our businesses," "Risk Factors — Risks Relating to Our Businesses — The rates of
Oncor Electric Delivery's electric delivery business are subject to regulatory review,"
"The Transactions — Ring Fencing," "Energy Future Holdings Corp. Management's
Discussion and Analysis of Financial Condition and Results of Operations — Rate Case
and Proposed PUCT Settlement," "Business — Legal Proceedings — Regulatory
Investigations" and "Regulation and Rates" (collectively, the "Reviewed Sections")
insofar as they purport to constitute summaries of legal matters, documents or legal
proceedings or legal conclusions, fairly present and summarize, in all material respects,
the matters referred to therein.

    In acting as special Texas electric utility regulatory counsel to the Issuer and the
Guarantors in connection with the transactions described herein, we have participated in various
conferences at which the contents of the Reviewed Sections of the Preliminary Offering
Memorandum, the Pricing Disclosure Package and the Offering Memorandum were discussed
and revised. Because of the inherent limitations in the independent verification of factual
matters and the character of the determinations involved in the preparation of disclosure
documents, we are not passing upon or assuming responsibility for the accuracy, completeness
or fairness of the statements contained in the Reviewed Sections of the Preliminary Offering
Memorandum, the Pricing Disclosure Package or the Offering Memorandum and have made no
independent verification thereof (except as set forth in paragraph 2 above). However, subject to

Highly Confidential

and on the basis of our review of the Reviewed Sections of the Preliminary Offering Memorandum, the Pricing Disclosure Package and the Offering Memorandum, our participation in the conferences referred to above, and our review of the corporate and other records and documents as described above, we advise you that nothing has come to our attention that causes us to believe that (a) the Reviewed Sections of the Pricing Disclosure Package, as of the Applicable Time, contained any untrue statement of a material fact or omitted to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, or (b) the Reviewed Sections of the Offering Memorandum, as of its date or as of the date hereof, contained or contains any untrue statement of a material fact or omitted or omits to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, except that we express no belief in either of clauses (a) or (b) above with respect to the financial statements and schedules and notes thereto or other financial or accounting information contained in or omitted from the Reviewed Sections of the Preliminary Offering Memorandum, the Pricing Disclosure Package or the Offering Memorandum.

NYDOCS01/1142224.11                                    EA-3-2

Highly Confidential                                    EFIHMW00303821

**Exhibit A-4**

Opinion of Hunton & Williams LLP, Texas Electric Utility Regulatory Counsel for the Issuer and the Guarantors

       1.      No consent, approval, authorization or order of the FERC or NRC is required under the Electricity Laws or Nuclear Laws for the issue and sale of the Notes by the Company; the issue of the guarantees of the Notes by the Guarantors (the "Guarantees") pursuant to the Indenture; execution or delivery on or prior to the date hereof by the Company or the Guarantors of the Placement Agreement, the Registration Rights Agreement or the Indenture; or the consummation of the transactions contemplated thereby in accordance with the terms thereof; except, in each case, the FERC Order and the NRC Order.

       2.      The issue and sale of the Notes by the Company; the issue of the Guarantees by the Guarantors; the execution and delivery on the date hereof by the Company and the Guarantors of the Placement Agreement, the Registration Rights Agreement and the Indenture; and the consummation of the transactions contemplated thereby in accordance with the terms thereof, do not and will not violate any provisions of the Electricity Laws or Nuclear Laws known to us to which the Company or any Guarantor or any of their subsidiaries or any of their properties is subject or (ii) any order known to us issued pursuant to the Electricity Laws or Nuclear Laws by any court or governmental agency or body having jurisdiction over the Company or any Guarantor or any of their respective subsidiaries or any of their properties.

       3.      The statements in the Offering Memorandum and the Preliminary Offering Memorandum identified in Schedule II to such opinion letter, insofar as such statements constitute summaries of the laws, regulations, legal matters, or legal documents referred to therein, are accurate in all material respects and fairly summarize the matters referred to therein.

Highly Confidential

EFIHMW00303822

**Exhibit A-5**

Opinion of David Poole, General Counsel for the Issuer

1. To my knowledge, other than as disclosed in the Offering Memorandum, there is no action, suit or proceeding now pending before or by any court, arbitrator or governmental agency, body or official to which the Issuer or any Guarantor is a party or to which the business, assets or property of the Issuer or any Guarantor is subject, and, to my knowledge, no action, suit or proceeding is currently threatened to which the Issuer or any Guarantor would be a party or to which the business, assets or property of the Issuer or any Guarantor would be subject, that could reasonably be expected to result in a Material Adverse Effect.

Highly Confidential

EFIHMW00303823

**PX 004**
**Page 37 of 37**