Other income in 2004 included:

- $88 million in amortization of the gain on the 2002 sale of two generation plants, including $58 million of the remaining unamortized gain recognized as a result of the termination of a related power purchase and tolling agreement; and

- a $19 million gain on sale of undeveloped land.

Other deductions totaled $15 million in 2005 and $611 million in 2004. The 2005 amount includes:

- a $12 million charge related to nonperformance of a counterparty in connection with a trading coal contract;

- $12 million in transition costs associated with the Capgemini outsourcing agreement;

- $7 million in equity losses (representing depreciation expense) in the EFH Corp. entity holding the capitalized software licensed to Capgemini; and

- a $16 million net credit adjusting the impairment loss on the leased gas-fueled combustion turbines to reflect actual sub-lease proceeds under the terms of a third-party contract entered into in 2005.

The 2004 amount includes:

- $180 million in lease-related charges primarily related to generation and mining assets taken out of service;

- $107 million in software write-offs;

- $107 million for employee severance;

- $101 million in termination costs for an existing power purchase and tolling agreement; and

- $79 million for spare parts inventory writedowns.

Interest income increased $39 million to $70 million in 2005 reflecting higher interest on short-term investments and higher average advances to affiliates.

Interest expense and related charges increased $40 million, or 11%, to $393 million in 2005. The increase reflected $26 million due to higher average interest rates and $14 million due to higher average debt levels.

The effective income tax rate was 32.5% in 2005 and 28.4% in 2004. The increase reflects the effect of ongoing relatively fixed tax benefits of lignite depletion allowances and amortization of investment tax credits on a significantly higher 2005 income base. The 2005 effective income tax rate also reflects a $29 million credit for the reversal of previously established tax reserves due to current period events, partially offset by $10 million in additional tax expense related to settlement of the IRS audit for the 1994 to 1996 tax years.

Income from continuing operations increased $1.0 billion to $1.4 billion in 2005 driven by improved gross margin, the effect of restructuring-related charges in 2004 and lower SG&A expenses.

Highly Confidential

EFIHMW00250182

**Regulated Delivery Segment**
*Financial Results*

| | Year Ended December 31, | |
|---|---|---|
| | 2005 | 2004 |
| | (millions of dollars) | |
| Operating revenues: | | |
| Electricity distribution revenues(a) | | |
| Affiliated (TCEH)......................................................... | $1,276 | $1,418 |
| Nonaffiliated .............................................................. | 879 | 590 |
| Total distribution revenues...................................... | 2,155 | 2,008 |
| Third-party transmission revenues .......................................... | 213 | 192 |
| Other miscellaneous revenues ............................................. | 26 | 26 |
| Total operating revenues ........................................ | $2,394 | $2,226 |
| Costs and expenses: | | |
| Operating costs .......................................................... | 758 | 730 |
| Depreciation and amortization............................................. | 446 | 389 |
| Selling, general and administrative expenses ................................ | 201 | 219 |
| Franchise and revenue-based taxes ....................................... | 247 | 248 |
| Other income ............................................................. | (4) | (7) |
| Other deductions......................................................... | 11 | 52 |
| Interest income .......................................................... | (59) | (56) |
| Interest expense and related charges ...................................... | 269 | 280 |
| Total costs and expenses......................................... | 1,869 | 1,855 |
| Income before income taxes, extraordinary gain and cumulative effect of change in accounting principle ....................................................... | 525 | 371 |
| Income tax expense ....................................................... | 174 | 116 |
| Income before extraordinary gain and cumulative effect of change in accounting principle................................................................... | $ 351 | $ 255 |

(a)    Includes transition charges associated with the issuance of securitization bonds totaling $152 million and $106 million for the years ended December 31, 2005 and 2004, respectively. Also includes disconnect/reconnect fees and other discretionary revenues for services requested by REPs.

**Regulated Delivery Segment**
*2005 compared to 2004*

Operating revenues increased $168 million, or 8%, to $2.4 billion in 2005. This change reflected:

- $46 million in higher transition charges associated with the issuance of securitization bonds in June 2004 (offset in total by higher amortization of the related regulatory asset as discussed below);

- approximately $30 million related to warmer summer weather;

- $22 million from continued implementation of power factor billing (power factor billing is a tariff adjustment applied to nonresidential end-use consumers that utilize inefficient equipment);

- $21 million in base growth reflecting an increase in points of delivery;

- $21 million from increased distribution tariffs to recover higher transmission costs; and

- $21 million in increased transmission revenues due to rate increases approved in 2005 and 2004 and higher volumes.

111

EFIHMW00250183

**PX 006**
**Page 118 of 382**

*Gross Margin*

| | Year Ended December 31, | | | |
|---|---|---|---|---|
| | 2005 | % of Revenue | 2004 | % of Revenue |
| | (millions of dollars, except percentages) | | | |
| Operating revenues | $2,394 | 100% | $2,226 | 100% |
| Costs and expenses: | | | | |
| Transmission and distribution system operating costs | 758 | 32% | 730 | 33% |
| Depreciation and amortization | 446 | 18% | 386 | 17% |
| Gross margin | $1,190 | 50% | $1,110 | 50% |

Gross margin increased $80 million, or 7%, to $1.2 billion in 2005. The increase was driven by higher operating revenues.

Operating costs rose $28 million, or 4%, to $758 million. This increase reflected:

- $13 million in increased spending for system reliability initiatives;

- $7 million in higher property taxes primarily due to increased investments in property;

- $4 million in increased metering expenses due to increased labor costs to accommodate increased consumer requested activities;

- $3 million in increased third-party transmission costs due to increased rates; and

- $3 million in higher transportation expense due to an increase in fuel and lease costs,

partially offset by:

- $4 million in decreased employee benefits costs, reflecting lower health care costs due to plan changes; and

- $4 million in reduced pension and OPEB costs. This reduction reflects an amendment to PURA as discussed in Note 20 to the 2006 year-end Financial Statements.

Depreciation and amortization (consisting almost entirely of amounts shown in the gross margin table above) increased $57 million, or 15%, to $446 million in 2005. The increase reflected $46 million in higher amortization of regulatory assets associated with the issuance of transition bonds (offsetting the same amount of revenue increase) and $14 million in higher depreciation due to normal additions and replacements of property, plant, and equipment, partially offset by a $3 million decline reflecting the July 2004 transfer of information technology assets, principally capitalized software, to a EFH Corp. affiliate in connection with the Capgemini outsourcing transaction.

SG&A expense decreased $18 million, or 8%, to $201 million in 2005. The decline included:

- $16 million from cost reduction initiatives including the effects of the Capgemini agreement;

- $5 million in decreased employee benefits, reflecting lower health care costs due to plan changes; and

- $2 million in reduced pension and OPEB costs as a result of the amendment to PURA,

partially offset by $3 million in higher bad debt expense largely resulting from the establishment of an allowance for uncollectible accounts based on a credit-scoring methodology applied to outstanding REP accounts receivable.

112

Highly Confidential

EFIHMW00250184

**PX 006**
**Page 119 of 382**

Other deductions totaled $11 million in 2005 and $52 million in 2004.

The 2005 amount included:

- $3 million in costs associated with transitioning the outsourced activities to Capgemini;

- $3 million in equity losses (representing amortization expense) related to the ownership interest in the EFH Corp. subsidiary holding the capitalized software licensed to Capgemini, and

- $2 million of severance-related charges resulting from the 2004 restructuring actions.

The 2004 amount included:

- a $21 million charge for estimated settlement payments arising from the 2004 cities rate settlement;

- $20 million of severance-related charges in connection with the Capgemini outsourcing transaction and other EFH Corp. restructuring actions; and

- $8 million related to transitioning the outsourced activities to Capgemini, including asset write-downs and other unusual charges.

Interest expense decreased $11 million, or 4%, to $269 million in 2005. The decrease includes $9 million from the impact of lower average interest rates and $2 million due to an increase in allowance for funds used during construction (capitalized interest) on higher construction expenditures.

The effective income tax rate increased to 33.1% in 2005 from 31.3% in 2004. The increase is due primarily to the effect of ongoing relatively fixed amortization of tax benefits (statutory tax rate changes and investment tax credits) on a higher 2005 income base, partially offset by $4 million credit in 2005 arising from the settlement of the IRS audit for the 1994 through 1996 tax years.

Income before extraordinary gain and cumulative effect of a change in accounting principle (an after-tax measure) increased $96 million, or 38%, to $351 million. This increase was driven by higher operating revenues and the impact of unusual charges in 2004 reported in other deductions.

**Comprehensive Income—Continuing Operations**

Cash flow hedge activity reported in other comprehensive income from continuing operations included (all amounts after-tax):

| | Year Ended December 31, | | |
| | 2006 | 2005 | 2004 |
| | (millions of dollars) | | |
|---|---|---|---|
| Net increase (decrease) in fair value of cash flow hedges (all commodity) held at end of period | $476 | $(47) | $(75) |
| Derivative value of net losses (gains) reported in net income that relate to hedged transactions recognized in the period: | | | |
| Commodities | (23) | 64 | 21 |
| Financing—interest rate swaps(a) | 7 | 7 | 8 |
| | (16) | 71 | 29 |
| Total income (loss) effect of cash flow hedges reported in other comprehensive income from continuing operations | $460 | $ 24 | $(46) |

(a)    Represents recognition of net losses on settled swaps.

113

EFIHMW00250185

Energy Future Competitive Holdings has historically used, and expects to continue to use, derivative instruments that are effective in offsetting future cash flow variability in interest rates and energy commodity prices. The amounts included in accumulated other comprehensive income are expected to offset the impact of rate or price changes on forecasted transactions. Amounts in accumulated other comprehensive income include (i) the value of open cash flow hedges (for the effective portion), based on current market conditions and (ii) the value of dedesignated and terminated cash flow hedges at the time of such dedesignation, less amounts reclassified to earnings as the original hedged transaction are recognized, unless the hedged transactions become probable of not occurring. The effects of the hedge will be recorded in the statement of income as the hedged transactions are actually settled and affect earnings. Also see Note 18 to the 2006 year-end Financial Statements.

See discussion in Note 20 to the 2006 year-end Financial Statements regarding the minimum pension liability adjustments reported in other comprehensive income.

**Financial Condition — Historical/Pre-Merger**

*Liquidity and Capital Resources*

***Cash Flows —*** Cash flows used in operating activities for the six months ended June 30, 2007 totaled $632 million compared to cash flows provided by operating activities of $2.1 billion for the six months ended June 30, 2006. The unfavorable change of $2.8 billion reflected:

- lower operating earnings after taking into account noncash items such as deferred federal income taxes, unrealized mark-to-market valuations and charges related to impairment of gas-fueled generation plants in 2006;

- an unfavorable change in federal income taxes payable to EFH Corp. of $1.3 billion reflecting an $888 million tax payment in 2007 and a $236 million net tax refund in 2006;

- an unfavorable change of $959 million in net margin deposits due to the effect of higher forward natural gas prices on hedge positions;

- an unfavorable change in working capital (accounts receivable, accounts payable and inventories) balances of $233 million primarily due to the effects of lower natural gas prices, as cash flows in 2006 included the collection of higher wholesale natural gas and electricity receivables that resulted from higher prices in late 2005; and

- $102 million premium paid in 2007 related to a structured natural gas-related option transaction entered into as part of the long-term hedging program.

Cash flows provided by financing activities totaled $1.6 billion in 2007 compared to $331 million in 2006 as summarized below:

| | Six Months Ended June 30, | |
|---|---|---|
| | 2007 | 2006 |
| | (millions of dollars) | |
| Net issuances, repayments and repurchases of borrowings | $2,355 | $ 842 |
| Repayment of pollution control revenue bonds | (143) | (203) |
| Payments on income tax-related note payable to Oncor Electric Delivery | (15) | (22) |
| Distributions paid to parent | (567) | (286) |
| Total | $1,630 | $ 331 |

114

Highly Confidential

EFIHMW00250186

Cash flows used in investing activities decreased $1.9 billion as summarized below:

|  | Six Months Ended June 30, | |
|---|---|---|
|  | 2007 | 2006 |
|  | (millions of dollars) | |
| Increase in advances to affiliates | $(326) | $(2,039) |
| Capital expenditures, including nuclear fuel | (411) | (248) |
| Reduction of restricted cash related to the redemption of pollution control revenue bonds | 143 | — |
| Proceeds from pollution control revenue bonds deposited with trustee | — | (99) |
| Purchase of lease trust | — | (69) |
| Net investments in nuclear decommissioning trust fund securities | (7) | (7) |
| Other | — | (1) |
| Total | $(601) | $(2,463) |

Depreciation and amortization expense reported in the statement of cash flows exceeds the amount reported in the statement of income by $30 million for 2007. This difference represents amortization of nuclear fuel, which is reported as fuel, purchased power costs and delivery fees in the statement of income consistent with industry practice.

Cash flows provided by operating activities totaled $4.8 billion for the year ended December 31, 2006 compared to $2.6 billion for the year ended December 31, 2005. The $2.2 billion improvement reflected:

- a favorable change of $1.7 billion in income taxes due to/receivable from EFH Corp. due to the combined effect of an increase in the 2006 liability resulting from higher taxable earnings (approximately $500 million in accrued income taxes related to 2006 taxable earnings was paid in the first half of 2007) and a refund received in 2006 related to 2005 reflecting a mark-to-market tax deduction related to a power sales agreement;

- a favorable change of $503 million in net margin deposits, primarily reflecting amounts received from counterparties related to natural gas positions in the long-term hedging program; and

- a favorable change of $260 million in working capital (accounts receivable, accounts payable and inventories) driven by higher wholesale natural gas and electricity receivables in 2005 due to higher prices in the fourth quarter of 2005,

partially offset by lower operating earnings (after taking into account noncash items) driven by the absence of Oncor Electric Delivery's operating cash flows in 2005. Such noncash items included depreciation, deferred income tax expense, the generation plant impairment charge and the net effect of unrealized mark-to-market valuations.

Cash flows provided by operating activities for the year ended December 31, 2005 increased $742 million, or 40%, over the 2004 period. The improvement reflected higher earnings partially offset by higher income tax payments to EFH Corp. as well as unfavorable accounts payable changes due primarily to higher purchased power volumes on a weather-related increase in retail sales volumes in late 2004.

115

Highly Confidential

Cash flows used in financing activities totaled $1.3 billion in 2006, $61 million in 2005 and $772 million in 2004. The drivers of the $1.2 billion increase in cash used in financing activities from 2005 to 2006 and the $711 million decrease in cash used in financing activities from 2004 to 2005 are summarized in the table below:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2006 | 2005 | 2004 |
| | (millions of dollars) | | |
| Cash used in financing activities: | | | |
| Net effect of debt repayments, repurchases and issuances............. | $ (378) | $ 451 | $ 483 |
| Payments on income tax-related note payable to TXU Electric Delivery.................................................... | (40) | — | — |
| Distributions paid to parent........................................... | (858) | (525) | (775) |
| Net changes in advances to affiliate................................. | — | — | (478) |
| Preferred stock dividends paid ...................................... | — | (3) | (2) |
| Excess tax benefits on stock-based incentive compensation ........... | 11 | 16 | — |
| Total.......................................................... | $(1,265) | $ (61) | $(772) |

Cash flows used in investing activities totaled $3.5 billion in 2006, $2.6 billion in 2005 and $1.8 billion in 2004. The table below details the business activities impacting the investing cash flows:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2006 | 2005 | 2004 |
| | (millions of dollars) | | |
| Cash used in investing activities: | | | |
| Advances to affiliates ........................................... | $(2,470) | $(1,531) | $(1,277) |
| Capital expenditures, including nuclear fuel(a)...................... | (505) | (1,099) | (968) |
| Purchase of equipment on behalf of Luminant Construction......... | (208) | — | — |
| Proceeds from sale of assets and businesses ...................... | 17 | 70 | 530 |
| Purchase of lease trust.......................................... | (69) | — | — |
| Deposit of proceeds from pollution control revenue bonds with trustee ...................................................... | (240) | — | — |
| Net investments in nuclear decommissioning trust fund securities ... | (16) | (15) | (15) |
| Other.......................................................... | (3) | 3 | (46) |
| Total ......................................................... | $(3,494) | $(2,572) | $(1,776) |

(a)   The decline in capital expenditures in 2006 reflects the absence of Oncor Electric Delivery's capital expenditures, which totaled $733 million and $600 million in 2005 and 2004, respectively.

Depreciation and amortization expense reported in the statement of cash flows exceeds the amount reported in the statement of income by $66 million, $60 million and $65 million for 2006, 2005 and 2004, respectively. This difference represents amortization of nuclear fuel, which is reported as fuel, purchased power costs and delivery fees in the statement of income consistent with industry practice.

**Long-term Debt Activity**—Issuances totaled $1 billion principal amount in floating rate senior notes for the six months ended June 30, 2007. Principal payments totaled $157 million for the six months ended June 30, 2007, including $143 million in pollution control revenue bonds.

Issuances for the year ended December 31, 2006 totaled $243 million principal amount in pollution control revenue bonds. Scheduled payments in 2006 totaled $676 million principal amount, including $400 million in senior notes and $259 million in pollution control revenue bonds. Scheduled principal payments in 2007 total $178 million.

116

Highly Confidential

See Note 7 to the June 30, 2007 Financial Statements and Note 14 to the 2006 year-end Financial Statements for further detail of long-term debt and other financing arrangements.

*Capitalization*—The capitalization ratios of Energy Future Competitive Holdings at June 30, 2007, consisted of 33.7% long-term debt, less amounts due currently, and 66.3% shareholders' equity. The capitalization ratios of Energy Future Competitive Holdings at December 31, 2006, consisted of 28.2% long-term debt, less amounts due currently, and 71.8% shareholders' equity. Total debt to capitalization, including short-term debt, was 34.2% at December 31, 2006.

*Cash Distributions to Parent*—In both April and July 2007, Energy Future Competitive Holdings declared and paid cash dividends of $284 million to EFH Corp. In January 2007, Energy Future Competitive Holdings declared and paid a cash dividend of $284 million to EFH Corp. Energy Future Competitive Holdings paid cash dividends to EFH Corp. of $858 million in 2006, $525 million in 2005 and $775 million in 2004.

*Sale of Accounts Receivable*—Subsidiaries of Energy Future Competitive Holdings participate in an accounts receivable securitization program established by EFH Corp. for certain of its subsidiaries, the activity under which is accounted for as a sale of accounts receivable in accordance with SFAS 140. Under the program, subsidiaries of TCEH sell trade accounts receivable to TXU Receivables Company, a consolidated wholly-owned bankruptcy-remote direct subsidiary of EFH Corp., which sells undivided interests in the purchased accounts receivable for cash to special purpose entities established by financial institutions. All new trade receivables under the program generated by subsidiaries of Energy Future Competitive Holdings are continuously purchased by TXU Receivables Company with the proceeds from collections of receivables previously purchased. Funding to Energy Future Competitive Holdings under the program totaled $441 million and $541 million at June 30, 2007 and December 31, 2006, respectively. See Note 5 to the June 30, 2007 Financial Statements and Note 12 to the 2006 year-end Financial Statements for a more complete description of the program including the impact on the financial statements for the periods presented and the contingencies that could result upon the termination of the program. In connection into the closing of the Merger, this program was replaced with a new receivables program described under "Description of Other Indebtedness."

**Liquidity Effects of Risk Management and Trading Activities**—Risk management and trading transactions typically require collateral to support potential future payment obligations. In particular, commodity transactions typically require a counterparty to post collateral if the forward price of the underlying commodity moves such that the hedging or trading instrument is out-of-the-money to such counterparty. Energy Future Competitive Holdings typically uses cash and letters of credit to satisfy such collateral obligations. In addition, Energy Future Competitive Holdings, continuously explores the use of other forms of collateral to maximize liquidity. For example, given the scale of the long-term hedging program, prior to the Merger, EFH Corp.'s hedging transactions were supported with a first-lien security interest in two existing lignite/coal-fueled generation units at the Big Brown site (Big Brown Lien) as well as a guarantee from TCEH. The Big Brown Lien supported hedging transactions for up to an aggregate of 1.2 billion MMBtu of natural gas. As of October 10, 2007, approximately half of EFH Corp.'s long-term hedging program position was supported with cash and letter of credit collateral while the other half was supported by the Big Brown Lien. Upon the closing of the Merger, the transactions that were secured by the Big Brown Lien became pari passu with the TCEH Senior Secured Facilities and the TCEH guarantee was terminated.

As of September 30, 2007, Energy Future Competitive Holdings has received or posted cash and letters of credit for risk management and trading activities as follows:

- $31 million in cash has been posted as of September 30, 2007 related to daily margin settled transactions, principally associated with positions in the long-term hedging program, as compared to $672 million received as of December 31, 2006;

117

EFIHMW00250189

- $63 million in cash has been posted with over-the-counter and all other counterparties as collateral as of September 30, 2007, as compared to $2 million received as of December 31, 2006; and

- $603 million in letters of credit have been posted with all counterparties as collateral as of September 30, 2007, as compared to $455 million posted as of December 31, 2006.

With respect to exchange cleared transactions, these transactions typically require initial margin (i.e. the upfront cash and/or letter of credit posted to take into account the size and maturity of the positions and credit quality) in addition to variation margin (i.e. the daily cash margin posted to take into account changes in the value of the underlying commodity). The amount of initial margin required is generally defined by exchange rules. Clearing agents, however, typically have the right to request additional initial margin based on various factors including market depth, volatility and credit quality, which may be in the form of cash, letters of credit, a guaranty or other forms as negotiated with the clearing agent. With respect to cash collateral that is received, such cash collateral is used by Energy Future Competitive Holdings for working capital and other corporate purposes, including reducing short-term borrowings under credit facilities. Such counterparties generally have the right to substitute letters of credit for such cash collateral. In such event, the cash collateral previously posted would be returned to such counterparties thereby reducing Energy Future Competitive Holdings' liquidity.

As a result of the long-term hedging program, any increase in natural gas prices results in increased cash and letter of credit margin requirements for Energy Future Competitive Holdings and its subsidiaries. Significant increases in cash and letter of credit margin requirements, whether resulting from initial margin or variation margin requirements or otherwise, could have a material adverse impact on Energy Future Competitive Holdings' liquidity. As representative example, as of September 30, 2007, for each $1.00 per MMBtu increase in natural gas prices, Energy Future Competitive Holdings' liquidity could have been reduced by approximately $1.2 billion as a result of cash and letter of credit variation margin posting requirements associated with the long-term hedging program.

*Historical Long-term Contractual Obligations and Commitments*—The following table summarizes Energy Future Competitive Holdings' contractual cash obligations as of December 31, 2006 (see Notes 14 and 15 to the 2006 year-end Financial Statements for additional disclosures regarding these long-term debt and noncancelable purchase obligations).

**Contractual Cash Obligations**

|  | Less Than One Year | One to Three Years | Three to Five Years | More Than Five Years | Total |
|---|---|---|---|---|---|
|  | (millions of dollars) | | | | |
| Long-term debt—principal(a) | $ 167 | $ 287 | $ 44 | $2,655 | $ 3,153 |
| Long-term debt—interest(b) | 200 | 346 | 335 | 1,867 | 2,748 |
| Operating and capital leases(c) | 53 | 99 | 87 | 314 | 553 |
| Obligations under commodity purchase and services agreements(d) | 2,021 | 2,322 | 743 | 1,102 | 6,188 |
| Total contractual cash obligations(e) | $2,441 | $3,054 | $1,209 | $5,938 | $12,642 |

(a)   Excludes capital lease obligations and fair value adjustments related to interest rate swaps.
(b)   Includes net amounts payable under interest rate swaps. Variable interest payments and net amounts payable under interest rate swaps are calculated based on interest rates in effect at December 31, 2006.
(c)   Includes short-term noncancellable leases.

118

EFIHMW00250190

**PX 006**
**Page 125 of 382**

(d) Includes capacity payments, nuclear fuel and natural gas take-or-pay contracts, coal contracts, business services and nuclear-related outsourcing contracts and other purchase commitments. Amounts presented for variable priced contracts assumed the year-end 2006 price remained in effect for all periods except where contractual price adjustment or index-based prices were specified.

(e) Excludes scheduled contractual payments for the three proposed new generation units, which, as of December 31, 2006, were being developed by a subsidiary of EFH Corp. and not of Energy Future Competitive Holdings, totaling $2.2 billion of which $1.4 billion is expected to be paid in 2007 and $800 million in 2008 through 2009.

The following contractual obligations were excluded from the table above:

• contracts between affiliated entities and intercompany debt;

• individual contracts that have an annual cash requirement of less than $1 million (however, multiple contracts with one counterparty that are more than $1 million on an aggregated basis have been included);

• contracts that are cancelable without payment of a substantial cancellation penalty; and

• employment contracts with management.

***Guarantees***—See Note 8 to the June 30, 2007 Financial Statements and Note 15 to the 2006 year-end Financial Statements regarding guarantees.

### Off Balance Sheet Arrangements

EFH Corp. has established an accounts receivable securitization program in which subsidiaries of Energy Future Competitive Holdings participate. See discussion above under "—Sale of Accounts Receivable" and in Note 5 to the June 30, 2007 Financial Statements and Note 12 to the 2006 year-end Financial Statements.

Also see Note 8 to the June 30, 2007 Financial Statements and Note 15 to the 2006 year-end Financial Statements regarding guarantees.

### Commitments and Contingencies

See Note 8 to the June 30, 2007 Financial Statements and Note 15 to the 2006 year-end Financial Statements for discussion of commitments and contingencies.

### Changes in Accounting Standards

See Notes 1 and 2 to the June 30, 2007 Financial Statements and Notes 1 and 20 to the 2006 year-end Financial Statements for a discussion of changes in accounting standards.

### Quantitative and Qualitative Disclosures About Market Risk.

Market risk is the risk that Energy Future Competitive Holdings may experience a loss in value as a result of changes in market conditions affecting commodity prices and interest rates, which Energy Future Competitive Holdings is exposed to in the ordinary course of business. Energy Future Competitive Holdings' exposure to market risk is affected by a number of factors, including the size, duration and composition of its energy and financial portfolio, as well as the volatility and liquidity of markets. Energy Future Competitive Holdings enters into instruments such as interest rate swaps to manage interest rate risks related to its indebtedness, as well as exchange traded, over-the-counter contracts and other contractual commitments to manage commodity price risk as part of its wholesale activities.

119

EFIHMW00250191

### Risk Oversight

Energy Future Competitive Holdings' wholesale operation manages the commodity price, counterparty credit and operational risk related to the unregulated energy business within limitations established by senior management and in accordance with Energy Future Competitive Holdings' overall risk management policies. Interest rate risks are managed centrally by the corporate treasury function. Market risks are monitored daily by risk management groups that operate and report independently of the wholesale commercial operations, utilizing defined practices and analytical methodologies. These techniques measure the risk of change in value of the portfolio of contracts and the hypothetical effect on this value from changes in market conditions and include, but are not limited to, Value at Risk (VaR) methodologies. Key risk control activities include, but are not limited to, credit review and approval, operational and market risk measurement, validation of transaction capture, portfolio valuation and daily portfolio reporting, including mark-to-market valuation, VaR and other risk measurement metrics.

EFH Corp. has a corporate risk management organization that is headed by a Chief Risk Officer. The Chief Risk Officer, through his designees, enforces all applicable risk limits, including the respective policies and procedures to ensure compliance with such limits and evaluates the risks inherent in the various businesses of Energy Future Competitive Holdings and their associated transactions.

### Commodity Price Risk

Energy Future Competitive Holdings' businesses are subject to the inherent risks of market fluctuations in the price of electricity, natural gas and other energy-related products they market or purchase. Energy Future Competitive Holdings' businesses actively manage their portfolio of owned generation assets, fuel supply and retail sales load to mitigate the near-term impacts of these risks on results of operations. These businesses, similar to other participants in the market, cannot fully manage the long-term value impact of structural declines or increases in natural gas and power prices and spark spreads (differences between the market price of electricity and its cost of production).

In managing energy price risk, subsidiaries of Energy Future Competitive Holdings enter into a variety of market transactions including, but not limited to, short- and long-term contracts for physical delivery, exchange traded and over-the-counter financial contracts and bilateral contracts with customers. Activities in the wholesale operations include hedging, the structuring of long-term contractual arrangements and proprietary trading. The wholesale operation continuously monitors the valuation of identified risks and adjusts the portfolio based on current market conditions. Valuation adjustments or reserves are established in recognition that certain risks exist until full delivery and settlement of energy has occurred, counterparties have fulfilled their financial commitments and related contracts have either matured or are settled. Energy Future Competitive Holdings strives to use consistent assumptions regarding forward market price curves in evaluating and recording the effects of commodity price risk.

*Long-term Hedging Program*—See discussion above under "—Significant Developments" for an update of the program, including potential effects on reported results.

*VaR Methodology*—A VaR methodology is used to measure the amount of market risk that exists within the portfolio under a variety of market conditions. The resultant VaR produces an estimate of a portfolio's potential for loss given a specified confidence level and considers among other things, market movements utilizing standard statistical techniques given historical and projected market prices and volatilities.

A Monte Carlo simulation methodology is used to calculate VaR and is considered by management to be the most effective way to estimate changes in a portfolio's value based on assumed

120

market conditions for liquid markets. The use of this method requires a number of key assumptions, such as use of (i) an assumed confidence level; (ii) an assumed holding period (i.e. the time necessary for management action, such as to liquidate positions); and (iii) historical estimates of volatility and correlation data.

Energy Future Competitive Holdings regularly reviews its risk analysis metrics. In the course of a review in 2006, it was determined that the Cash Flow at Risk metric previously disclosed is not a meaningful measure of actionable commodity price risk. It was also determined that providing a Trading VaR would enhance disclosure. Trading VaR includes all natural gas and electricity-related contracts entered into for trading purposes. Energy Future Competitive Holdings may add or eliminate other metrics in the future in its disclosures of risks.

*Trading VaR*—This measurement estimates the potential loss in fair value, due to changes in market conditions, of all contracts entered into for trading purposes based on a 95% confidence level and an assumed holding period of five to 60 days.

|  | Six Months Ended June 30, 2007 | Year Ended December 31, 2006 |
|---|---|---|
|  | (millions of dollars) | |
| Month-end average Trading VaR: | $ 9 | $12 |
| Month-end high Trading VaR: | $11 | $30 |
| Month-end low Trading VaR: | $ 6 | $ 5 |

In a review performed in 2006 of the holding period for VaR calculations presented below, Energy Future Competitive Holdings determined that a holding period of five to 60 days, instead of the five-day holding period previously assumed, would be more reflective of the time it would take to liquidate the portfolio, considering the increase in longer-dated positions (principally related to the long-term hedging program) and the associated liquidity effects.

*VaR for Energy-Related Contracts Subject to Mark-to-Market (MtM) Accounting*—This measurement estimates the potential loss in fair value, due to changes in market conditions, of all contracts marked-to-market in net income (principally hedges not accounted for as cash flow hedges and trading positions), based on a 95% confidence level and an assumed holding period as presented below.

|  | Six Months Ended June 30, 2007 | Year Ended December 31, 2006 |
|---|---|---|
|  | Five to 60 day holding period | Five to 60 day holding period |
|  | (millions of dollars) | |
| Month-end average MtM VaR: | $417 | $ 89 |
| Month-end high MtM VaR: | $566 | $246 |
| Month-end low MtM VaR: | $253 | $ 5 |

|  | Year Ended December 31, 2006 | | Year Ended December 31, 2005 |
|---|---|---|---|
|  | Five to 60 day holding period | Five-day holding period | Five-day holding period |
|  | (millions of dollars) | | |
| Month-end average MtM VaR: | $ 89 | $32 | $19 |
| Month-end high MtM VaR: | $246 | $77 | $27 |
| Month-end low MtM VaR: | $ 5 | $ 5 | $12 |

*Earnings at Risk (EaR)*—This measurement estimates the potential reduction of fair value of expected pretax earnings for the years presented, due to changes in market conditions, of all energy-related contracts marked-to-market in net income and contracts not marked-to-market in net income

121

EFIHMW00250193

that are expected to be settled within the fiscal year (physical purchases and sales of commodities). For this purpose, cash flow hedges are also included with transactions that are not marked-to-market in net income. A 95% confidence level is assumed in determining EaR.

| | Six Months Ended June 30, 2007 | Year Ended December 31, 2006 |
|---|---|---|
| | Five to 60 day holding period | Five to 60 day holding period |
| | (millions of dollars) | |
| Month-end average EaR: | $405 | $ 99 |
| Month-end high EaR: | $546 | $241 |
| Month-end low EaR: | $249 | $ 21 |

| | Year Ended December 31, 2006 | | Year Ended December 31, 2005 |
|---|---|---|---|
| | Five to 60 day holding period | Five-day holding period | Five-day holding period |
| | (millions of dollars) | | |
| Month-end average EaR: | $ 99 | $41 | $23 |
| Month-end high EaR: | $241 | $72 | $41 |
| Month-end low EaR: | $ 21 | $21 | $ 3 |

The increases in the risk measures (MtM VaR and EaR) in 2007 are driven by the dedesignation of positions in the long-term hedging program as cash flow hedges for accounting purposes as well as the increase in number of positions in the program.

### Interest Rate Risk

The table below provides information concerning Energy Future Competitive Holdings' financial instruments as of December 31, 2006 and 2005 that are sensitive to changes in interest rates. The weighted average interest rate presented is based on the rate in effect at the reporting date. Capital leases and the effects of unamortized premiums and discounts are excluded from the table. See Note 14 to the 2006 year-end Financial Statements for a discussion of changes in debt obligations.

| | Expected Maturity Date | | | | | | 2006 Total Carrying Amount | 2006 Total Fair Value | 2005 Total Carrying Amount | 2005 Total Fair Value |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | There-After | | | | |
| | (million of dollars, except percentages) | | | | | | | | | |
| Long-term debt (including current maturities) | | | | | | | | | | |
| Fixed rate debt amount(a) | $ 24 | $ 268 | $ 19 | $ 21 | $ 23 | $2,208 | $2,563 | $2,672 | $2,734 | $2,881 |
| Average interest rate | 7.75% | 6.25% | 8.05% | 8.06% | 8.06% | 6.67% | 6.67% | — | 6.55% | — |
| Variable rate debt amount | 143 | — | — | — | — | 447 | 590 | 557 | 847 | 791 |
| Average interest rate | 4.11% | — | — | — | — | 4.17% | 4.16% | — | 4.28% | — |
| Total Debt | $ 167 | $ 268 | $ 19 | $ 21 | $ 23 | $2,655 | $3,153 | $3,229 | $3,581 | $3,672 |
| Debt swapped to variable: | | | | | | | | | | |
| Amount | $ — | $ 250 | $ — | $ — | $ — | $ — | $ 250 | | $ 250 | |
| Average pay rate | — | 8.06% | — | — | — | — | 8.06% | | 7.61% | |
| Average receive rate | — | 6.13% | — | — | — | — | 6.13% | | 6.13% | |

(a)  Reflects the maturity date and not the remarketing date for certain debt that is subject to mandatory tender for remarketing prior to maturity. See Note 14 to the 2006 year-end Financial Statements for details concerning long-term debt subject to mandatory tender for remarketing.

Highly Confidential

EFIHMW00250194

As of August 31, 2007, the potential reduction of annual pretax earnings due to a one-point increase in interest rates totaled approximately $13 million.

### Credit Risk

*Credit Risk*—Credit risk relates to the risk of loss associated with nonperformance by counterparties. Energy Future Competitive Holdings and its subsidiaries maintain credit risk policies with regard to their counterparties to minimize overall credit risk. These policies require an evaluation of a potential counterparty's financial condition, credit rating and other quantitative and qualitative credit criteria and specify authorized risk mitigation tools including, but not limited to, use of standardized master netting contracts and agreements that allow for netting of positive and negative exposures associated with a single counterparty. Energy Future Competitive Holdings has standardized documented processes for monitoring and managing credit exposure of its businesses including methodologies to analyze counterparties' financial strength, measurement of current and potential future credit exposures and standardized contract language that provides rights for netting and set-off. Credit enhancements such as parental guarantees, letters of credit, surety bonds and margin deposits are also utilized. Additionally, individual counterparties and credit portfolios are managed to preset limits and analyzed to assess potential credit exposure. This evaluation results in establishing credit limits or collateral requirements prior to entering into an agreement with a counterparty that creates credit exposure. Additionally, Energy Future Competitive Holdings has established controls to determine and monitor the appropriateness of these limits on an ongoing basis. Any prospective material adverse change in the payment history or financial condition of a counterparty or downgrade of its credit quality will result in the reassessment of the credit limit with that counterparty. This process can result in the subsequent reduction of the credit limit or a request for additional financial assurances.

*Credit Exposure*—Energy Future Competitive Holdings' gross exposure to credit risk associated with trade accounts receivable (retail and wholesale) and net asset positions arising from hedging and trading activities totaled $1.8 billion at both June 30, 2007 and December 31, 2006.

Gross assets subject to credit risk as of June 30, 2007 and December 31, 2006 include $532 million and $595 million, respectively, in accounts receivable from the retail sale of electricity to residential and small business customers. The risk of material loss (after consideration of bad debt allowances) from nonperformance by these customers is unlikely based upon historical experience. Allowances for uncollectible accounts receivable are established for the potential loss from nonpayment by these customers based on historical experience and market or operational conditions.

Most of the remaining credit exposure is with large business retail customers and wholesale counterparties. These counterparties include energy companies, financial institutions, electric utilities, independent power producers, oil and gas producers, local distribution companies and energy trading and marketing companies. As of June 30, 2007, the exposure to credit risk from these customers and counterparties totaled $1.3 billion taking into account standardized master netting contracts and agreements described above and $23 million in credit collateral (cash, letters of credit and other security interests) held by Energy Future Competitive Holdings subsidiaries. As of December 31, 2006, the exposure to credit risk from these customers and counterparties totaled $1.2 billion taking into account standardized master netting contracts and agreements described above and $56 million in credit collateral (cash, letters of credit and other security interests) held by Energy Future Competitive Holdings subsidiaries.

Of the $1.3 billion net exposure at June 30, 2007, 77% is with investment grade customers and counterparties, as determined using publicly available information including major rating agencies' published ratings and Energy Future Competitive Holdings' internal credit evaluation process. Of the $1.2 billion net exposure at December 31, 2006, 88% is with investment grade customers and

123

EFIHMW00250195

counterparties. Those customers and counterparties without an S&P rating of at least BBB- or similar rating from another major rating agency are rated using internal credit methodologies and credit scoring models to estimate an S&P equivalent rating. Energy Future Competitive Holdings routinely monitors and manages its credit exposure to these customers and counterparties on this basis.

The following tables presents the distribution of credit exposure as of June 30, 2007 and December 31, 2006, for retail trade accounts receivable from large business customers, wholesale trade accounts receivable as well as net asset positions arising from hedging and trading activities, by investment grade and noninvestment grade, credit quality and maturity.

| | June 30, 2007 | | | | | | |
|---|---|---|---|---|---|---|---|
| | Exposure before Credit Collateral | Credit Collateral | Net Exposure | Net Exposure by Maturity | | | |
| | | | | 2 years or less | Between 2-5 years | Greater than 5 years | Total |
| | (millions of dollars, except percentages) | | | | | | |
| Investment grade............ | $1,004 | $16 | $ 988 | $596 | $140 | $252 | $ 988 |
| Noninvestment grade........ | 301 | 7 | 294 | 168 | 72 | 54 | 294 |
| Totals.................. | $1,305 | $23 | $1,282 | $764 | $212 | $306 | $1,282 |
| Investment grade............ | 77% | 70% | 77% | | | | |
| Noninvestment grade........ | 23% | 30% | 23% | | | | |

| | December 31, 2006 | | | | | | |
|---|---|---|---|---|---|---|---|
| | Exposure before Credit Collateral | Credit Collateral | Net Exposure | Net Exposure by Maturity | | | |
| | | | | 2 years or less | Between 2-5 years | Greater than 5 years | Total |
| | (millions of dollars, except percentages) | | | | | | |
| Investment grade............ | $1,094 | $41 | $1,053 | $614 | $220 | $219 | $1,053 |
| Noninvestment grade........ | 164 | 15 | 149 | 111 | 13 | 25 | 149 |
| Totals.................. | $1,258 | $56 | $1,202 | $725 | $233 | $244 | $1,202 |
| Investment grade............ | 87% | 73% | 88% | | | | |
| Noninvestment grade........ | 13% | 27% | 12% | | | | |

Approximately 60% of the net $1.3 billion credit exposure at June 30, 2007 has a maturity date of two years or less. Energy Future Competitive Holdings does not anticipate any material adverse effect on its financial position or results of operations due to nonperformance by any customer or counterparty.

Energy Future Competitive Holdings had credit exposure to two counterparties each having an exposure greater than 10% of the net exposure of $1.3 billion at June 30, 2007. These two counterparties represented 16% and 13%, respectively, of the net exposure. Energy Future Competitive Holdings views its exposure with these two counterparties to be within an acceptable level of risk tolerance as they are rated investment grade.

Energy Future Competitive Holdings is exposed to credit risk related to its long-term hedging program. Of the transactions in the program at June 30, 2007, over 98% of the volumes are with counterparties with an A credit rating or better, and 99% are at least investment grade.

Additionally, under the long-term hedging program, Energy Future Competitive Holdings has potential credit risk exposure concentration related to a limited number of counterparties. The hedge transactions with these counterparties contain certain credit rating provisions that would require the

124

EFIHMW00250196

PX 006
Page 131 of 382

counterparties to post collateral in the event of significant declines in natural gas prices and a material downgrade in the credit rating of the counterparties. Energy Future Competitive Holdings views the potential concentration of risk with these counterparties to be within an acceptable risk tolerance due to the strong financial profile of the counterparties and their respective A or above credit rating.

Energy Future Competitive Holdings is also exposed to credit risk related to the Capgemini put option with a carrying value of $103 million at June 30, 2007. Subject to certain terms and conditions, Cap Gemini North America, Inc. and its parent, Cap Gemini S.A., have guaranteed the performance and payment obligations of Capgemini under the services agreement, as well as the payment in connection with a put option. S&P currently maintains a BB+ rating with a positive outlook for Cap Gemini S. A.

### Financial Condition—Post-Merger

#### *Liquidity and Capital Resources*

Following the consummation of the Transactions, we are highly leveraged. As of June 30, 2007, on a pro forma basis (excluding expected discount of $287 million related to the fair valuing of existing debt due to purchase accounting and $1.25 billion relating to the TCEH Letter of Credit Facility) after giving effect to the Transactions, we would have had outstanding $27.9 billion in aggregate indebtedness outstanding (excluding Energy Future Competitive Holdings' guarantee of the EFH Corp. Senior Interim Facility), with an additional approximately $5.9 billion of borrowing capacity available under the TCEH Senior Secured Facilities (excluding amounts available under the TCEH Commodity Collateral Posting Facility and outstanding letters of credit). Our liquidity requirements will be significant, primarily due to debt service requirements and financing costs incurred in connection with our new credit facilities. On a pro forma basis, after giving effect to the Transactions, our interest expense and related charges for the 12 months ended June 30, 2007 would have been $2,620 million.

Our parent, EFH Corp. is a holding company and substantially all of its consolidated assets are held by its subsidiaries. Upon consummation of the Transactions, EFH Corp. will be highly leveraged and its liquidity requirements will be significant. To meet these debt service requirements, EFH Corp. will rely on loans and dividends from its subsidiaries, including TCEH, which, together with its subsidiaries, represented 88% and 81% of EFH Corp.' consolidated revenues for the year ended December 31, 2006 and the six-month period ended June 30, 2007, respectively. The indenture governing the notes offered hereby is expected to contain significant flexibility for TCEH and Energy Future Competitive Holdings to loan or dividend funds up to EFH Corp. to make interest, principal and premium payments on its debt when due. See "Description of Notes."

Management expects our cash flows from operations, combined with availability under TCEH's new credit facilities, to provide sufficient liquidity to fund our current obligations, projected working capital requirements, restructuring obligations and capital spending for a period that includes the next twelve months. We expect to make approximately $2.1 billion in capital expenditures including capitalized interest over the twelve months ending December 31, 2008.

#### *Capital Expenditures*

We expect to incur the following capital expenditures and distributions in 2007:

- $2.2 billion for investments in generation activities, including $1.4 billion for construction of one generation unit at Sandow and two generation units at Oak Grove; and

- $430 million related to the suspended development of eight coal-fueled generation units.

125

EFIHMW00250197

**PX 006**
**Page 132 of 382**

### Indebtedness Incurred in Connection with the Merger

#### Credit Facilities

In connection with the Merger, TCEH entered into the TCEH Senior Secured Facilities. See "Description of Other Indebtedness" for additional information.

#### Collateral Posting Facility

The TCEH Commodity Collateral Posting Facility is a senior secured revolving credit facility, the aggregate principal amount of which is determined by the out-of-the-money mark-to-market exposure of TCEH (and/or its subsidiaries) on a portfolio of certain natural gas commodity swap transactions under which TCEH (and/or its subsidiaries) is the "floating price" payor as such portfolio may be amended from time to time (the "Deemed Transactions"). The Deemed Transactions generally correspond to hedging transactions of TCEH (and/or its subsidiaries). The TCEH Commodity Collateral Posting Facility is intended to fund the cash posting requirements due to trading counterparties for a significant portion of TCEH's long-term hedging program that is not otherwise secured by means of a first lien under the security arrangements entered into in connection with the TCEH Senior Secured Facilities. On a pro forma basis, as on June 30, 2007 (based on the forward natural gas curve as on such date), approximately $687 million would have been outstanding under the TCEH Commodity Collateral Posting Facility. The actual drawn amount on October 10, 2007 (based on the forward natural gas curve as of such date) was approximately $378 million.

#### Senior Interim Facilities

In connection with the Merger, EFH Corp. entered into the $4,500 million EFH Senior Interim Facility. EFH Corp. will use the proceeds from the concurrent offering of the EFH Corp. Notes, along with cash on hand, to repay in full the EFH Senior Interim Facility.

In connection with the Merger, TCEH entered into the $6,750 million TCEH Senior Interim Facility. We will use the proceeds from the offering of the notes hereby, along with cash on hand, to repay $3.0 billion in outstanding borrowings under the TCEH Senior Interim Facility. See "Description of Other Indebtedness—TCEH Senior Interim Facility" for additional information.

#### Notes Offered Hereby

The indenture governing the notes offered hereby will limit the Issuer's and its restricted subsidiaries' ability to among other things:

- incur additional indebtedness;
- pay dividends on or make other distributions or repurchase our capital stock;
- make certain investments;
- enter into certain types of transactions with affiliates; and
- sell certain assets or merge with or into other companies.

Subject to certain exceptions, the indenture governing the notes will permit us to incur additional indebtedness. See "Description of Notes." We will use the proceeds received from this offering of notes, along with cash on hand, to reduce the borrowings outstanding under the TCEH Senior Interim Facility.

#### EFH Corp. Notes

Concurrently with the offering of the notes hereby, EFH Corp., our parent, is offering the EFH Corp. Notes.

126

Highly Confidential

*Existing Senior Notes and Debentures*

After the consummation of the Transactions, we had outstanding an aggregate principal amount of approximately $1,844 million of existing senior notes and debentures. See "Description of Other Indebtedness" for additional information and a description of that indebtedness.

*Debt Repayment*

In connection with the Merger, we redeemed and repaid or expect to repay an aggregate of approximately $4.5 billion of our existing consolidated indebtedness, including debt that became payable upon the consummation of the Merger. See "Description of Other Indebtedness—Debt Repayment" for a description of the indebtedness that was repaid or redeemed in connection with the Merger.

**Material Credit Rating Covenants**

Certain transmission and distribution utilities in Texas have tariffs in place to assure adequate credit worthiness of any REP to support the REP's obligation to collect securitization bond-related (transition) charges on behalf of the utility. Under these tariffs, as a result of the downgrade of TCEH's credit rating to below investment grade, TCEH is required to post collateral support in an amount equal to estimated transition charges over specified time periods. The amount of collateral support required to be posted, as well as the time period of transition charges covered, varies by utility. Based on requests to post collateral support from utilities that have been received by TCEH and its subsidiaries as of September 30, 2007, TCEH has posted collateral support to the applicable utilities in an aggregate amount equal to $25 million, with $16 million of this amount posted for the benefit of Oncor Electric Delivery.

The PUCT has rules in place to assure adequate credit worthiness of any REP. Under these rules, as a result of the downgrade of TCEH's credit rating to below investment grade, TCEH has agreed to maintain at all times availability under its credit facilities an amount no less than the aggregate amount of customer deposits and any advanced payments received from customers. As of September 30, 2007, the amount of customer deposits received from customers held by TCEH's REP subsidiaries totaled approximately $125 million.

ERCOT also has rules in place to assure adequate credit worthiness of parties that schedule power on the ERCOT System. Under these rules, as a result of the downgrade of TCEH's credit rating to below investment grade, TCEH posted additional collateral support of $34 million on March 7, 2007 and $16 million on August 31, 2007, which is subject to periodic adjustments.

Other arrangements of Energy Future Competitive Holdings and its subsidiaries, including certain leases, contain terms pursuant to which the interest rates charged under the agreements may be adjusted depending on credit ratings.

**Material Cross Default Provisions**

Certain financing arrangements contain provisions that may result in an event of default if there were a failure under other financing arrangements to meet payment terms or to observe other covenants that may result in an acceleration of payments due. Such provisions are referred to as "cross default" provisions.

The indentures governing the notes offered hereby and the EFH Corp. Notes offered concurrently, as well as the TCEH Senior Secured Facilities and the TCEH Senior Interim Facility all contain cross-default or cross-acceleration provisions.

127

EFIHMW00250199

Energy Future Competitive Holdings and its subsidiaries enter into energy-related and financial contracts, the master forms of which contain provisions whereby an event of default or acceleration of settlement would occur if Energy Future Competitive Holdings or those subsidiaries were to default under an obligation in respect of borrowings in excess of thresholds, which vary, stated in the contracts. The entities whose default would trigger cross default vary depending on the contract.

Each of TCEH's commodity hedging agreements that are pari passu with the TCEH Senior Secured Facilities contains a cross default provision. In the event of a default by TCEH or its subsidiaries relating to certain obligations of TCEH or its subsidiaries in an amount equal to or greater than $250 million, the applicable hedge counterparties may terminate the applicable transactions covered by the applicable hedging agreements and require all outstanding obligations thereunder to be settled.

Also see Note 10 to the June 30, 2007 Financial Statements and Note 16 to the 2006 year-end Financial Statements for details of guarantees.

### Contractual Obligations and Commitments—Post Merger

*Pro Forma Long-term Contractual Obligations and Commitments*—The following table summarizes Energy Future Competitive Holding's contractual cash obligations as of December 31, 2006 giving pro forma effect to the Transactions and the Interim Facility Refinancing.

**Contractual Cash Obligations**

| | Less Than One Year | One to Three Years | Three to Five Years | More Than Five Years | Total |
|---|---|---|---|---|---|
| | (millions of dollars) | | | | |
| Long-term debt—principal(a) . . . . . . . . . . . . . . . . . . . . | $ 332 | $ 408 | $ 456 | $28,694 | $29,890 |
| Long-term debt—interest(b) . . . . . . . . . . . . . . . . . . . . . | 2,396 | 4,639 | 4,428 | 7,140 | 18,602 |
| Operating and capital leases(c) . . . . . . . . . . . . . . . . . . | 53 | 99 | 87 | 314 | 553 |
| Contracts related to generation facilities program . . . | 1,401 | 796 | — | — | 2,197 |
| Obligations under commodity purchase and services agreements(d) . . . . . . . . . . . . . . . . . . . . . . . . | 2,021 | 2,322 | 743 | 1,102 | 6,188 |
| Total contractual cash obligations. . . . . . . . . . . . | $6,203 | $8,264 | $5,714 | $37,250 | $57,430 |

(a)  Excludes capital lease obligations and fair value adjustments related to interest rate swaps.
(b)  Variable interest payments are calculated based on interest rates in effect at December 31, 2006.
(c)  Includes short-term noncancellable leases.
(d)  Includes capacity payments, nuclear fuel and natural gas take-or-pay contracts, coal contracts, business services and nuclear-related outsourcing contracts and other purchase commitments. Amounts presented for variable priced contracts assumed the year-end 2006 price remained in effect for all periods except where contractual price adjustment or index-based prices were specified.

The following contractual obligations were excluded from the table above:

• contracts between affiliated entities and intercompany debt;

• individual contracts that have an annual cash requirement of less than $1 million (however, multiple contracts with one counterparty that are more than $1 million on an aggregated basis have been included);

• contracts that are cancelable without payment of a substantial cancellation penalty; and

128

EFIHMW00250200

- income tax payments associated with uncertain tax positions that cannot be reasonably estimated;

- management fees that may be payable to affiliates of the Sponsors;

- employment contracts with management.

### Interest Rate Risk—Pro Forma

The table below provides information on a pro forma basis after giving effect to the Transactions concerning Energy Future Competitive Holdings' financial instruments as of December 31, 2006 that are sensitive to changes in interest rates. The weighted average interest rate presented is based on the rate in effect at the reporting date. Capital leases and the effects of unamortized premiums and discounts are excluded from the table. See Note 14 to the 2006 year-end Financial Statements for a discussion of changes in debt obligations.

| | Expected Maturity Date | | | | | | 2006 Total Carrying Amount | 2006 Total Fair Value |
|---|---|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | There-After | | |
| | (millions of dollars, except percentages) | | | | | | | |
| Long-term debt (including current maturities) | | | | | | | | |
| Fixed rate debt amount(a) | $ 24 | $ 18 | $ 19 | $ 21 | $ 23 | $ 8,645 | $ 8,750 | $ 8,801 |
| Average interest rate | 7.75% | 8.04% | 8.05% | 8.06% | 8.06% | 9.03% | 9.02% | — |
| Variable rate debt amount | $ 308 | $ 165 | $ 206 | $ 206 | $ 206 | $20,049 | $21,140 | $21,107 |
| Average interest rate | 6.44% | 8.25% | 8.54% | 8.66% | 8.80% | 8.82% | 8.78% | — |
| Total Debt | $ 332 | $ 183 | $ 225 | $ 227 | $ 229 | $28,694 | $29,890 | $29,908 |
| Debt swapped to variable: | | | | | | | | |
| Amount | $ — | $ — | $ — | $ — | $ — | $ — | $ — | — |
| Average pay rate | — | — | — | — | — | — | — | — |
| Average receive rate | — | — | — | — | — | — | — | — |

(a) Reflects the maturity date and not the remarketing date for certain debt that is subject to mandatory tender for remarketing prior to maturity. See Note 14 to the 2006 year-end Financial Statements for details concerning long-term debt subject to mandatory tender for remarketing.

### Hedging

We expect to continue to pursue additional hedging arrangements to continually manage our exposure to changes in natural gas prices. These arrangements typically take the form of forward natural gas sales in which TCEH commits to selling certain volumes of natural gas in the future at fixed prices; in effect, these arrangements reduce the exposure of our base load generation facilities to changes in future power prices that occur as a result of changes in natural gas prices (one of the primary drivers of power prices in the ERCOT markets). Under the terms of our indebtedness after the consummation of the Merger, TCEH will have the ability to secure future hedges on a first-lien basis, pari passu with the TCEH Senior Secured Facilities (as opposed to securing any such hedges with cash collateral or letters of credit).

129

EFIHMW00250201

**BUSINESS**

**Texas Competitive Electric Holdings Company LLC**

We are a direct subsidiary of Energy Future Competitive Holdings, which in turn is a direct subsidiary of EFH Corp., a Dallas-based energy company that manages a portfolio of competitive and regulated energy businesses in Texas. We are a holding company for EFH Corp.'s Luminant and TXU Energy businesses, which are engaged in competitive electricity market activities largely in Texas. The Luminant businesses include Luminant Power, Luminant Energy and Luminant Construction. Luminant Power, Luminant Energy, Luminant Construction and TXU Energy conduct their operations through a number of separate legal entities that, in accordance with regulatory requirements, operate independently within the competitive Texas power market.

As of June 30, 2007, Luminant Power had 18,365 MW of generation capacity in Texas (which includes 585 MW representing nine combustion turbine units currently operated for an unaffiliated party's benefit). This amount includes 8,137 MW of low-cost baseload solid fuel generation capacity represented by 2,300 MW of nuclear generation capacity and 5,837 MW of lignite/coal-fueled generation capacity. Luminant Energy supports Luminant Power and TXU Energy by optimizing the performance of the generation assets and sourcing the electricity requirements for TXU Energy customers as well as providing related services to other market participants. Luminant Energy is the largest purchaser of wind-generated electricity in Texas and the fifth largest in the United States. Luminant Construction is currently constructing three new lignite coal-fueled generation facilities in Texas with expected generation capacity totaling approximately 2,200 MW. The three facilities are permitted and are expected to come on-line in the 2009-2010 time frame. See also "—Our Operating Segments—Luminant Construction" for more information.

TXU Energy provides competitive electricity and related services to more than 2.1 million electricity customers in Texas. As of June 30, 2007, TXU Energy's estimated share of the total ERCOT market retail residential and small business electric customers was approximately 35% and 25%, respectively.

For the twelve months ended June 30, 2007, on a pro forma basis, we had Adjusted EBITDA of $4,061 million on a consolidated basis. See "—Summary Historical and Unaudited Pro Forma Condensed Consolidated Financial and Other Data of Energy Future Competitive Holdings and its Subsidiaries" for a definition of Adjusted EBITDA and a reconciliation of net income to Adjusted EBITDA.

**Our Market**

We operate primarily within the ERCOT market, which represents approximately 85% of electricity consumption in Texas. ERCOT is the regional reliability coordinating organization for member electricity systems in Texas and the system operation of the interconnected transmission system for those systems. ERCOT's membership consists of 236 members, including electric cooperatives, municipal power agencies, investor-owned independent generators, independent power marketers, transmission service providers and distribution services providers, independent REPs and consumers.

ERCOT represents approximately 75% of the geographical area of Texas, but excludes El Paso, a large part of the Texas Panhandle and two small areas in the eastern part of the state. From 1994 through 2005, peak hourly demand in the ERCOT market grew at a compound annual rate of 2.8%, compared to a compound annual rate of growth of 2.3% for the entire United States over the same period. For 2006, hourly demand ranged from a low of 21,309 MW to a high of 62,339 MW. ERCOT has limited interconnections to other markets outside of ERCOT in the United States, which currently limits potential imports into ERCOT and is currently limited to 1,106 MW of generation capacity (or

130

EFIHMW00250202

approximately 2% of peak demand in Texas). In addition, wholesale transactions within the ERCOT market are not subject to regulation by the FERC.

The ERCOT market has experienced significant construction of new generation plants in recent years, with over 29,000 MW of mostly natural gas-fueled combined cycle generation capacity added to the market since 1996. As of May 31, 2007, aggregate net generation capacity of approximately 76,801 MW existed in the ERCOT market, of which 72% was natural gas-fueled. Approximately 21,444 MW, or 27.9%, was lower marginal cost generation capacity such as coal, lignite and nuclear plants. As of May 31, 2007, Luminant Power's lignite and nuclear baseload plants represented 8,137 MW, or 37.9%, of the total lower marginal cost generation capacity in the ERCOT market. ERCOT has established a target reserve margin level of approximately 12.5%; and the reserve margin at May 17, 2007, was 14.6%, forecast to drop to 12.6% by 2008 and 10.1% by 2009.

Natural gas-fueled generation is the predominant supply resource in the ERCOT market in terms of both the installed generation capacity and generation produced, accounting for approximately 72% of the installed generation capacity and 46% of the electricity produced in the ERCOT market. In the ERCOT market, buyers and sellers enter into bilateral wholesale capacity, power and ancillary services contracts or may participate in the centralized ancillary services market, including balancing energy, which ERCOT administers. An October 1, 2005 report titled "Report on Existing and Potential Electric System Constraints and Needs" found that natural gas-fueled power plants set the market price of power more than 90% of the time in the ERCOT market. As a result, natural gas-fueled plant operators are the marginal suppliers in ERCOT, and wholesale electricity prices are highly correlated to natural gas prices.

The ERCOT market is currently divided into four regions or congestion zones, namely: North, Houston, South and West, which reflect transmission constraints that are commercially significant and which have limits as to the amount of power that can flow across zones. Luminant Power's baseload generation facilities are located primarily in the North region.

The ERCOT market operates under the reliability standards set by the NERC. The PUCT has primary jurisdiction over the ERCOT market to ensure the adequacy and reliability of power supply across Texas's main interconnected power transmission grid. ERCOT is responsible for facilitating reliable operations of the bulk electric power supply system in the ERCOT market. The ERCOT independent system operator (ERCOT ISO) is responsible for maintaining reliable operations of the bulk electric power supply system in the ERCOT market. Its responsibilities include ensuring that electricity production and delivery are accurately accounted for among the generation resources and wholesale buyers and sellers. Unlike certain other regional power markets, the ERCOT market is not a centrally dispatched power pool, and the ERCOT ISO does not procure energy on behalf of its members. Members who sell and purchase power are responsible for contracting sales and purchases of power bilaterally. The ERCOT ISO also serves as agent for procuring ancillary services for those members who elect not to provide their own ancillary services.

We believe that the ERCOT market presents an attractive competitive electric service market due to the following factors:

- market rules support fair and robust competition, while providing opportunities to optimize the generation fleet operations and purchased power requirements;

- peak demand is expected to grow at an average rate of over 2.1% per year over the period 2007 to 2017;

- it is a sizeable market with over 62 GW of peak demand and approximately 34 GW of average demand; and

- as projected by ERCOT, in the absence of additional generation capacity, annual reserve margins are expected to fall below ERCOT's targeted reserve margin of 12.5% as early as

131

EFIHMW00250203

2009, thus providing opportunities for generation owners and developers. Reserve margin is defined as the percentage by which available capacity is expected to exceed forecasted peak demand.

**Our Strengths**

- **Scale and diversity of business.**    TCEH believes it has two strong, large-scale electricity businesses in an attractive electric market. Luminant has a large and diversified competitive power generation portfolio with approximately 18,365 MW of generation capacity as of June 30, 2007 (which includes 585 MW representing nine combustion turbine units currently operated for an unaffiliated party's benefit). Its diversified portfolio consists of approximately 8,137 MW of low-cost solid fuel baseload generation capacity (approximately 72% lignite/coal and 28% nuclear) in ERCOT, a market in which power prices are predominantly set by natural gas-fueled generation that is more costly than the solid fuel that powers Luminant's baseload generation plants at current commodity levels. In addition, as of June 30, 2007, Luminant owned or operated 10,228 MW of intermediate and peaking facilities, which provide the ability to dispatch assets in periods of high demand and prices. Luminant's lignite/coal-fueled plants are near lignite reserves that are controlled by Luminant and supply approximately 67% of the fuel used to operate these plants, which reduces Luminant's reliance on third-party coal suppliers and railroad use. Luminant controls approximately 1.0 billion tons, or over 21 years of fuel (assuming current mine production levels), of proven lignite reserves and operates the nation's 13th largest mining company. Luminant is also developing and constructing three new lignite coal-fueled generation facilities in Texas with expected generation capacity totaling approximately 2,200 MW of additional installed low-cost baseload capacity. We expect two of these units, representing approximately 1,400 MW, to be operational in 2009 and the remaining unit, representing approximately 800 MW, to be operational in 2010.

  TXU Energy is a large scale competitive retailer that provides competitive electricity and related services to more than 2.1 million electricity customers in Texas. As of June 30, 2007, TXU Energy held approximately 62% of the retail residential market share in its historical market area located in the north-central, eastern and western parts of Texas, including the Dallas–Fort Worth area. As of June 30, 2007, TXU Energy's estimated share of the total ERCOT market retail residential and small business electric customers was approximately 35% and 25%, respectively.

- **Low-cost asset base.**    We are the largest provider of baseload generation power in Texas with approximately 8,137 MW of existing low-cost solid fuel baseload capacity (lignite/coal and nuclear) in a predominantly gas-on-the-margin market. Our baseload generation facilities operate at high utilization levels, incur comparatively low operations and maintenance costs and benefit from a number of long-term fuel contracts on attractive terms.

  Our low-cost position is supported by a number of factors, including our control of an estimated 858 million tons of dedicated proven lignite reserves, and in excess of 119 million tons of undedicated proven lignite reserves. Importantly, these lignite reserves, which are near a number of the lignite coal-fueled plants that we operate, provide a low cost source of fuel for certain of our plants, and reduce our exposure to rising coal and rail contract prices.

- **Favorable market dynamics.**    Our subsidiaries operate primarily in ERCOT, which represents approximately 85% of the electricity consumed in Texas. We believe that the strong regional economic growth in Texas continues to support demand growth for electricity in ERCOT. According to ERCOT, peak demand in ERCOT is expected to grow at an average rate of over 2.1% per year over the period from 2007 to 2017. ERCOT expects reserve margins to continue to decline, which presents additional investment opportunities, while also positively impacting the value of our existing plants. Power prices are generally driven by natural gas prices in ERCOT, where natural gas-fueled plants set the market price approximately 90% of

132

EFIHMW00250204

the time. Texas has one of the highest retail energy consumption profiles in the country with approximately 14 MWh per year of consumption per household. ERCOT has experienced over 2.1% annual retail growth over the period from 2002 to 2006, making it one of the fastest growing NERC regions.

Transmission and distribution businesses in ERCOT benefit from favorable regulatory capital recovery mechanisms known as "capital trackers" that we believe enable adequate and timely recovery of transmission investments, advanced meter reading investments and certain other infrastructure investments.

- **Strong operating performance.** Luminant Power is an industry-leading operator of baseload solid fuel plants. Based on our benchmark analysis, we believe that compared with the U.S. merchant coal plant fleet, Luminant Power's lignite/coal plants achieved top decile capacity factors and top quartile costs per MWh in 2005 and 2006. Similarly, we believe that our nuclear units achieved top decile capacity factors and top quartile costs per MWh in 2006. Luminant Power's lignite/coal-fueled plants achieved a capacity factor of 89.1% for 2006 and Luminant Power's nuclear plants achieved a capacity factor of 98.8% for 2006. Luminant Power's ongoing operating system initiatives are focused on achieving industry-leading capacity factors while continuing to manage costs. The capacity factor of a power plant is generally the ratio of the actual output of the power plant over a period of time as compared to its potential output if the plant operated at full capacity during such period.

TXU Energy is committed to providing its customers with industry-leading customer service and creating an innovative set of new products and services to meet customer needs. For the twelve months ended June 30, 2007, call answer times averaged under 15 seconds, which dropped from an average of over 100 seconds for the same period in 2004. Customer call satisfaction scores in North Texas improved 16 percent in the twelve months ended June 30, 2007, as compared to the twelve months ended June 30, 2006. TXU Energy continues to offer the broadest set of customer products of any retailer in the ERCOT market.

- **Attractive opportunities for capital investment.** We have a number of attractive opportunities for capital investment. Luminant Construction is building three, new low-cost lignite coal-fueled generation units in the state of Texas with total estimated capacity of approximately 2,200 MW. The three units consist of one new generation unit at a site owned by Alcoa Inc. that is adjacent to an existing TCEH lignite coal-fueled generation plant site (Sandow) and two units at a TCEH site that was slated for construction of a generation plant a number of years ago (Oak Grove). Aggregate capital expenditures to develop these three units are expected to total approximately $3.25 billion, including all construction, site preparation and mining development costs (not including the purchase of the Three Oaks mine assets).

We believe that these construction projects represent attractive investment opportunities and benefit from a number of strategic advantages, including:

- our incumbent position in the ERCOT market,

- our control of attractive brownfield development sites with access to low-cost lignite fuel,

- our first mover advantage in seeking, sitting and permitting approval and

- low-cost construction contracts with leading EPC firms.

- **Attractive cash flow generation.** For the twelve months ended June 30, 2007, on a pro forma basis, Energy Future Competitive Holdings would have generated Adjusted EBITDA of $4,061 million. Specific characteristics of our businesses that support our attractive cash flow generation are outlined in this offering circular. Our anticipated operating margins, low maintenance capital expenditures and modest going-forward working capital requirements are expected to be key drivers of our strong cash flow generation.

133

EFIHMW00250205

- **Ability to hedge future cash flows through long-term hedging program.** We believe that the strong historical correlation between natural gas prices and power prices in the ERCOT market combined with significant liquidity in certain natural gas markets currently provides an opportunity for management of our exposure to natural gas prices. As a result, TCEH expects to hedge up to 80% of the equivalent natural gas price exposure of our expected baseload generation output on a rolling five-year basis. As of October 10, 2007, approximately 2.6 billion MMBtu of natural gas (equivalent to the natural gas exposure of over 300,000 GWh at an assumed 8.5 MMBtu/MWh market heat rate) have been effectively sold forward by our subsidiaries over the period from 2008 to 2013 at average annual prices ranging from $7.25 per MMBtu to $8.15 per MMBtu. For the period from 2008 to 2012, and taking into consideration the estimated portfolio impacts of our retail electricity business, these transactions result in us having effectively hedged approximately 80% of our expected baseload generation natural gas price exposure for such period (on an average basis for such period). Demonstrating the ability to implement a long-term hedge program on a rolling basis, we have also hedged approximately 60% of our expected baseload generation natural gas price exposure in 2013 at prices above $7.25 per MMBtu. We believe this hedging program provides us with visibility and stability of future revenues and cash flows.
- **Strong leadership.**  Luminant and TXU Energy have separate leadership teams consistent with the separation of EFH's legacy businesses into distinct operating entities. Each company has its own chief executive officer who, together with the respective management teams, will focus on optimizing operations and maximizing performance for that specific business unit, independent of the other business units. The management teams for each business are comprised of highly experienced professionals. In addition, four prominent Texans, Donald L. Evans, former U.S. Secretary of Commerce; James R. Huffines, Chairman of the University of Texas Board of Regents; Lyndon L. Olson Jr., former Texas State Representative and former U.S. Ambassador to Sweden; and Kneeland Youngblood, a former director of the U.S. Enrichment Corporation, also joined the Board of Directors of EFH Corp., our parent. William Reilly, Chairman Emeritus of the World Wildlife Fund and former EPA Administrator, joined the Board of Directors of EFH Corp. and will lead the adoption of corporate governance policies that tie EFH Corp.'s operations and goals to environmental stewardship. Finally, former U.S. Secretary of State James A. Baker III serves as Advisory Chairman to the General Partner.

## Our Strategies

Each of our businesses focuses its operations on key drivers for that business, as described below:

- Luminant focuses on optimizing its existing generation fleet to provide safe, reliable and cost-competitive power, as well as developing and constructing additional power generation capacity to meet the growing demand for power in Texas; and
- TXU Energy focuses on providing high quality customer service, including continually improving customer service and developing innovative energy products to meet customers' needs.

Other elements of our strategy include:

- **Increase value from our existing businesses.**   Our strategy focuses on striving for consistent top decile performance across our operations in terms of reliability, cost and customer service. We will continue to focus on upgrading four critical skill sets: operational excellence across each business, market leadership, systematic risk/return mindset applied to all key decisions, and rigorous performance management targeting industry-leading performance standards for productivity, reliability and customer service. An example of how we implement these principles is a program called the "Luminant Operating System," which is a

134

EFIHMW00250206

program to drive ongoing productivity improvements in Luminant Power's businesses through application of lean operating techniques and deployment of a high-performance industrial culture.

- **Pursue growth opportunities across our business lines.**    We believe building upon and leveraging our scale advantages enables us to sustainably create value by eliminating duplicative costs, efficiently managing supply costs, and building and standardizing distinctive process expertise. Scale also allows us to take part in large capital investments, such as new generation projects, with a smaller fraction of overall capital at risk and with an enhanced ability to streamline costs. The growth initiatives for each business include:

    - *Luminant*: Construction of three new lignite coal-fueled generation facilities at existing sites with onsite lignite fuel supplies, as well as the development of wind generation projects in the near to medium term. Pursuit of new generation opportunities to meet ERCOT's growing generation needs over the longer term from a diverse range of alternatives such as nuclear, renewables and advanced coal technologies such as Integrated Gasification Combined Cycle.

    - *TXU Energy*: Retain existing customers and increase the number of customers served both in TXU Energy's historic territory, as well as in other Texas markets such as Houston, through innovative products and superior customer service.

- **Reduce the volatility of our cash flows through our established risk management strategy.**    A key component of our risk management strategy is our plan to hedge up to 80% of the natural gas exposure of Luminant Power's baseload generation output on a rolling five-year basis. The strong historical correlation between natural gas prices and power prices in ERCOT combined with the significant liquidity in certain natural gas markets currently provides an opportunity for management of our exposure to natural gas prices. TCEH has approximately $5.9 billion of available revolving credit and letter of credit borrowing capacity (excluding amounts under the TCEH Commodity Collateral Facility and outstanding letters of credit) which we believe will provide significant liquidity for its operations, including for TCEH's long-term hedging strategies, particularly regarding its commodity and market heat rate exposures. In addition, the TCEH Commodity Collateral Posting Facility will support the margin requirements for a significant portion of the natural gas swap transactions that are a part of the long-term hedging program not otherwise secured by a first lien on TCEH's assets. In addition, certain existing and future hedging transactions are secured with a first lien security interest in TCEH's assets, which will reduce the liquidity requirements of entering into commodity hedge transactions because no cash or letter of credit collateral will be required for these transactions. As of the consummation of the Merger, approximately 90% of Luminant's natural gas hedging transactions were secured by this first lien security interest in TCEH's assets (including transactions covered by the TCEH Commodity Collateral Posting Facility described under "The Transactions—Debt Financing").

- **Environmental focus.**    We are committed to continue to operate in compliance with all environmental laws, rules and regulations and to reduce our impact on the environment. EFH Corp. will put in place a Sustainable Energy Advisory Board that will focus on assisting EFH Corp. in pursuing technology development opportunities that utilize the United States' vast energy resources with technologies designed to reduce EFH Corp.'s impact on the environment while balancing the need to address the energy requirements of Texas. EFH Corp.'s Sustainable Energy Advisory Board will be comprised of individuals who represent the following interests, among others: the environment, customers, Texas economic development and ERCOT reliability standards. In addition, we are focused on and are pursuing opportunities to reduce emissions from our existing and planned new lignite/coal-fueled generation units in ERCOT. As such and in connection with our plans to build three new lignite coal-fueled

135

EFIHMW00250207

generation units, we have committed to reduce emissions of mercury, nitrogen oxide and sulfur dioxide from our existing units, so that the total of those emissions from both existing and new lignite coal-fueled units are 20% below 2005 levels. We expect to make these reductions through a combination of investment in new emission control equipment and possible fuel switching. We also expect such investments to provide economic benefit to us by reducing future costs associated with complying with environmental emissions standards.

**Our Operating Segments**

TCEH is managed as an integrated business; however, for purposes of operational accountability and performance management, the segment has been divided into Luminant Power, Luminant Energy, Luminant Construction and TXU Energy. Historical financial data and discussions of results of operations for historical periods included in this offering circular reflect the fact that Luminant Construction was not previously included within TCEH (as well as Energy Future Competitive Holdings) as the development activities have been conducted out side of TCEH (as well as Energy Future Competitive Holdings) by another subsidiary of EFH Corp. As part of the Merger, the activities of Luminant Construction will now be conducted within TCEH and therefore included in its (and Energy Future Competitive Holdings) future results of operations.

*Luminant Power*

Luminant Power's electricity generation fleet consists of 19 plants in Texas with total generating capacity as of June 30, 2007 as shown in the table below:

| Fuel Type | Capacity (MW) | Number of Plants | Number of Units(a) |
|---|---|---|---|
| Nuclear | 2,300 | 1 | 2 |
| Lignite/coal | 5,837 | 4 | 9 |
| Natural gas(b)(c) | 10,228 | 14 | 45 |
| Total | 18,365 | 19 | 56 |

(a)    Leased units consist of six natural gas-fueled units totaling 390 MW of capacity. All other units are owned.

(b)    Includes 1,329 MW representing five units mothballed and not currently available for dispatch.

(c)    Includes 585 MW representing nine combustion turbine units currently operated for an unaffiliated third party's benefit.

The generation plants are located primarily on land owned in fee simple. Nuclear and lignite/coal-fueled (baseload) plants are generally scheduled to run at capacity except for periods of scheduled maintenance activities or, in the case of lignite/coal units, backdown due to low periods of demand. The natural gas-fueled generation units supplement the baseload generation capacity in meeting variable consumption as production from these units can more readily be ramped up or down as demand warrants.

*Nuclear Generation Assets.*    Luminant Power operates two nuclear generation units at the Comanche Peak plant, each of which is designed for a capacity of 1,150 MW. Comanche Peak's Unit 1 and Unit 2 went into commercial operation in 1990 and 1993, respectively, and are generally operated at full capacity to meet the load requirements in ERCOT. Refueling (nuclear fuel assembly replacement) outages for each unit are scheduled to occur every eighteen months during the spring or fall off-peak demand periods. Every three years, the refueling cycle results in the refueling of both units during the same year, with the next scheduled to occur in 2008. While one unit is undergoing a refueling outage, the remaining unit is intended to operate at full capacity. During a refueling outage, other maintenance, modification and testing activities are completed that cannot be accomplished when the unit is in operation. Over the last 3 years, the refueling outage period per unit has ranged

136

from a high of 38 days in 2004 to a low of 18 days in 2006. The Comanche Peak plant operated at a capacity factor of 98.8% in 2006, which represents top decile performance of US nuclear generation facilities.

Luminant Power has contracts in place for nuclear fuel conversion services through 2008. In addition, Luminant Power has contracts for the acquisition of uranium through 2009 and for nuclear fuel enrichment services through 2008, as well as for nuclear fuel fabrication services through 2018.

Contracts for the acquisition of raw uranium and nuclear fuel conversion services through 2012 and 2009, respectively, are being negotiated. Additional contracts to ensure a portion of nuclear fuel enrichment services through 2020 are being negotiated. Luminant Power does not anticipate any issues with finalizing these contracts and does not anticipate any significant difficulties in acquiring raw uranium and contracting for associated services in the foreseeable future.

Luminant Power's on-site used nuclear fuel storage capability is sufficient for five to ten years. The nuclear industry is continuing to review ways to enhance security of used-fuel storage with the NRC to fully utilize physical storage capacity.

The Comanche Peak nuclear generation units have an estimated useful life of 60 years from the date of commercial operation. Therefore, assuming that Luminant Power receives the requisite license extensions, plant decommissioning activities would be scheduled to begin in 2050 for Comanche Peak Unit 1 and 2053 for Unit 2 and common facilities.

*Lignite/Coal-Fueled Generation Assets.*   Luminant Power's lignite/coal-fueled generation fleet has a nameplate capacity of 5,837 MW and consists of the Big Brown (2 units), Monticello (3 units), Martin Lake (3 units) and Sandow (1 unit) plants. These plants are generally operated at full capacity to meet the load requirements in ERCOT. Maintenance outages are scheduled during off-peak demand periods. Over the last three years, the total annual scheduled and unscheduled outages per unit averaged 33 days. Luminant Power's lignite/coal-fueled generation fleet operated at a capacity factor of 89.1% in 2006, which represents top decile performance of U.S. coal-fueled generation facilities.

Approximately 67% of the fuel used at Luminant Power's lignite/coal-fueled generation plants in 2006 was supplied from owned in fee or leased proven surface-minable lignite reserves dedicated to the Big Brown, Monticello and Martin Lake plants, which were constructed adjacent to the reserves. TCEH, through its subsidiaries, owns in fee or has under lease an estimated 858 million tons of proven reserves dedicated to its generation plants, and also owns in fee or has under lease in excess of 119 million tons of proven reserves not currently dedicated to specific generation plants. In 2006, over 22 million tons of lignite were recovered to fuel Luminant Power's plants. TCEH utilizes owned and/or leased equipment to remove the overburden and recover the lignite.

Lignite mining operations include extensive reclamation activities that return the land to productive uses such as wildlife habitats, commercial timberland and pasture land. In 2006 alone, regulatory authorities approved Luminant Power's release from further reclamation obligation approximately 8,000 acres of reclaimed land; Luminant Power planted more than 1.2 million trees as part of this reclamation.

Luminant Power supplements its lignite fuel at Big Brown, Monticello and Martin Lake with western coal from the Powder River Basin (PRB) in Wyoming. The coal is purchased from multiple suppliers under contracts of various lengths and is transported from the Powder River Basin to Luminant Power's generating plants by railcar. Based on its current usage, Luminant Power believes that it has sufficient lignite reserves for the foreseeable future and has contracted 72% of its western coal resources and 100% of the related transportation through 2009.

137

EFIHMW00250209

*Natural Gas-Fueled Generation Assets.*    Luminant Power also operates a fleet of natural gas-fueled generation units, which includes 45 units with a total 10,228 MW of currently available capacity. A significant number of the natural gas-fueled units have the ability to switch between natural gas and fuel oil. The gas units predominantly serve as peaking units that can be more readily ramped up or down as demand warrants.

### Luminant Energy

Luminant Energy plays a pivotal role in supporting Luminant Power and TXU Energy by optimizing the performance of the generation assets and sourcing the electricity requirements for TXU Energy's customers. Luminant Energy manages commodity price exposure across the complementary generation and retail businesses on a portfolio basis. Under this approach, Luminant Energy manages the risks of imbalances between generation supply and sales load, which primarily represent exposures to natural gas price movements and market heat rate changes (variations in the relationships between natural gas prices and wholesale electricity prices), through wholesale markets activities that include physical purchases and sales and transacting in financial instruments.

Luminant Energy manages the commodity exposure of the generation and retail portfolio through asset management and hedging activities. Luminant Energy provides TXU Energy with the electricity and related services to meet retail customer demand and the operating requirements of ERCOT. Luminant Energy also supports Luminant Power in selling forward generation and seeking to maximize the economic value of the fleet. In consideration of operational production and customer consumption levels that can be highly variable as well as opportunities for long-term purchases and sales with large wholesale electricity market participants, Luminant Energy buys and sells electricity in the spot and short-term market and executes longer-term forward electricity purchase and sales agreements.

In its hedging activities, Luminant Energy enters into contracts for the physical delivery of electricity and natural gas, exchange traded and "over-the-counter" financial contracts and bilateral contracts with producers, generators and end-use customers. In October 2005, EFH Corp. commenced a long-term hedging program designed to reduce exposure to changes in future electricity prices due to changes in the price of natural gas. As of October 10, 2007, 2.6 billion MMBtu of natural gas (equivalent to the natural gas exposure of over 300,000 GWh at an assumed 8.5 MMBtu/MWh market heat rate) have effectively been sold forward by our subsidiaries over the period from 2008 to 2013, principally utilizing natural gas-related financial instruments.

Luminant Energy also dispatches the gas-fueled generation fleet owned and operated by Luminant Power. Luminant Energy's dispatching activities are performed through a centrally managed real-time operational staff that synthesizes operational activities across the fleet and interfaces with various wholesale market channels. Luminant Energy coordinates the overall commercial strategy for these plants working closely with Luminant Power. In addition, Luminant Energy manages the fuel procurement requirements for the natural gas-fueled generation plants.

Luminant Energy engages in commercial operations such as physical purchases, storage and sales of natural gas, electricity and natural gas trading and third-party asset management. Luminant Energy's natural gas operations include well-head production contracts, transportation agreements, storage leases and retail sales. Luminant Energy currently manages approximately 18 billion cubic feet of natural gas storage capacity and has a presence outside of Texas in both electricity and natural gas commodity trading.

Luminant Energy manages exposure to wholesale commodity and credit related risk within established transactional risk management policies and limits. Luminant Energy targets best practices in risk management and risk control by employing proven principles used by financial institutions. These controls have been structured so that they are practical in application and consistent with stated business objectives. Risk management processes include capturing transactions, performing and

138

EFIHMW00250210

validating valuations and reporting exposures on a daily basis using commodity information systems designed to support a large transactional portfolio. A risk management forum meets regularly to ensure that business practices comply with approved transactional limits, commodities, instruments, exchanges and markets. Transactional risks are monitored and limits are enforced to comply with the established risk policy. Luminant Energy has a strict disciplinary program to address any violations of the risk management policies and periodically reviews these policies to ensure they are responsive to changing market and business conditions.

Luminant Energy is one of the largest purchasers of wind-generated electricity in Texas and the fifth largest in the United States.

### Luminant Construction

Luminant Construction is developing three new lignite coal-fueled units in the state of Texas with total estimated capacity of approximately 2,200 MW. The three proposed units consist of one new generation unit at an existing Luminant Power lignite coal-fueled generation plant site recently acquired from Alcoa Inc. (Sandow) and two units at a site (Oak Grove) owned by Luminant Power that was originally slated for the construction of a generation plant a number of years ago. Aggregate capital expenditures for these three units are expected to total approximately $3.25 billion, including all construction, site preparation and mining development costs (not including the purchase of the Three Oaks mine assets).

The development program includes up to $450 million for investments in state-of-the-art emissions controls for the three proposed new units. As part of the development program, additional environmental control systems will be installed at Luminant Power's existing generation facilities. Estimates for capital expenditures associated with the full potential scope of these additional environmental control systems are in the range of approximately $1 billion to $1.3 billion. Luminant Power has yet to undertake and complete detailed cost and engineering studies for the additional environmental systems. The cost estimates for capital expenditures at Luminant Power's existing facilities are subject to change, which change could be substantial as Luminant Power determines the details of and further evaluates the engineering and construction costs related to these investments.

Development and procurement activities for the three proposed units are essentially complete and site construction is well underway. Air permits have been obtained and EPC agreements have been executed with Bechtel Power Corporation and Fluor Enterprises, Inc. The expected on-line dates of the units are as follows: Sandow in 2009 and Oak Grove's two units in 2009 and 2010.

### TXU Energy

TXU Energy serves more than 2.1 million retail electricity customers, of which 1.9 million are in its historical service territory, which was the territory, largely in north Texas, being served by EFH Corp.'s regulated electric utility subsidiary at the time of entering retail competition on January 1, 2002. This territory, which is located in the north-central, eastern and western parts of Texas, has an estimated population in excess of 7 million, about one-third of the population of Texas, and comprises 92 counties and 370 incorporated municipalities, including Dallas/Fort Worth and surrounding suburbs, as well as Waco, Wichita Falls, Odessa, Midland, Tyler and Killeen.

Texas is one of the fastest growing states in the nation with a diverse and resilient economy and, as a result, has attracted a number of competitors into the deregulated retail electricity market. As a result, competition is expected to continue to be robust. TXU Energy, as an active participant in this competitive market, provides retail electric service to the other areas of ERCOT now open to competition including the Houston, Corpus Christi, and lower Rio Grande Valley areas of Texas. TXU Energy continues to market its services in Texas to add new customers and to retain its existing customers. As of September 2007, there are approximately more than 100 REPs certified to compete within the state of Texas.

139

As a result of the 1999 Restructuring Legislation, effective January 1, 2002, REPs affiliated with electricity delivery utilities were required to charge price-to-beat retail prices, established by the Commission, to residential and small business customers located in their historical service territories. The price-to-beat mechanism was intended to spur competition as the rates were set such that competing REPs could profitably offer lower rates. TXU Energy, as a REP affiliated with an electricity delivery utility, was required to charge the price-to-beat retail price, adjusted for fuel factor changes, to these classes of customers until the earlier of January 1, 2005 or the date on which 40% of the electricity consumed by customers in that class was supplied by competing REPs. TXU Energy met the 40% threshold target calculation for its small business customers in December 2003 and began offering rates other than the price-to-beat retail prices to this customer class. Since January 1, 2005, TXU Energy has offered rates different from the price-to-beat retail prices to all customer classes, but was required to make the price-to-beat retail prices available for residential and small business customers in its historical service territory until January 1, 2007. As of January 1, 2007, TXU Energy is no longer required to offer the price-to-beat retail price to any of its customer classes.

In connection with the Merger, TXU Energy announced a 15 percent price reduction for residential customers in its historical service territory who have not already switched to one of the many pricing plans other than the basic month-to-month plan. These customers received a six percent reduction beginning in late March 2007 and an additional four percent reduction in June 2007 and will receive an additional five percent reduction effective in late October 2007. In addition, TXU Energy will provide price protection to these customers through December 2008, ensuring that these customers receive the benefits of these savings through two summer seasons of peak energy usage.

**Legal Proceedings**

*Litigation*—Two putative class and derivative lawsuits and one derivative lawsuit were filed in the United States District Court, Northern District of Texas, Dallas Division in March 2007 against the directors of EFH Corp., EFH Corp., as a nominal defendant, and the Sponsors. On April 27, 2007, the Plaintiffs filed Amended Complaints asserting only derivative claims against the same defendants. The lawsuits seek to challenge and enjoin the Merger Agreement. The cases allege that the directors abused their ability to control and influence EFH Corp., committed gross mismanagement and violated various fiduciary duties by approving the Merger Agreement and the Sponsors aided and abetted that alleged conduct. The Plaintiffs contend that the directors violated fiduciary duties owed to shareholders by failing to maximize the value of EFH Corp. and by breaching duties of loyalty and due care by not taking adequate measures to ensure that the interests of shareholders were properly protected. The Merger Agreement allowed EFH Corp. to solicit other proposals from third parties until April 16, 2007 and the transaction was subject to the approval of EFH Corp.'s shareholders, which was obtained at the annual meeting of shareholders on September 7, 2007. Accordingly, EFH Corp. and its directors filed Motions to Dismiss based on the Plaintiffs' failure to comply with the provisions of the Texas Business Organizations Code ("TBOC") applicable to filing and pursuing derivative proceedings. The Motions are pending before the Court.

In February and March 2007, three derivative lawsuits were filed in Dallas County state district courts arising out of the Merger Agreement. The suits, filed by putative shareholders, allege that EFH Corp.'s directors, named as defendants, breached fiduciary duties owed EFH Corp. by approving the Merger Agreement. The petitions, now consolidated into one action in the 44th District Court, Dallas County, Texas, include claims that the defendants failed to ensure that the transaction was in the best interest of EFH Corp.; that the directors participated in a transaction where their loyalties were divided and where they were to receive a personal financial benefit; that such alleged conduct constituted a breach of their duties of care, loyalty, good faith, candor and independence owed to EFH Corp.; and that the Sponsors aided and abetted the alleged breaches of fiduciary duties by the directors. EFH

140

Corp. believes that the Plaintiffs failed to comply with provisions of the Texas Business Organizations Code applicable to filing and pursuing derivative proceedings and thus have filed a Motion to Dismiss that is pending before the Court. Additionally, EFH Corp. has filed a Written Statement with the Court advising that, pursuant to the Texas Business Organizations Code, a Derivative Demand Committee of independent and disinterested members of EFH Corp.'s board of directors has been formed and is engaged in the active review, in good faith, of the allegations in the consolidated derivative lawsuits. Consequently, EFH Corp. has requested that the Court enforce the automatic and mandatory stay of the proceedings as provided in the Texas Business Organizations Code until the Derivative Demand Committee has completed its review. On May 16, 2007, the parties agreed to stay the consolidated derivative proceeding pending the Derivative Demand Committee's review of Plaintiffs' claims in that proceeding. On May 18, 2007, the Court entered an order staying the action in accordance with Section 21.555 of the TBOC. On July 18, 2007, EFH Corp. filed a Written Statement pursuant to TBOC Section 21.555(c) and an Application for Additional Stay informing the District Court that the Derivative Demand Committee was continuing its active review, in good faith, of the allegations set forth in the derivative lawsuits and accordingly requested an extension of the order staying the action through August 31, 2007. The Court has not yet ruled upon the Written Statement and Application.

In February and March 2007 eight lawsuits were filed in state district court in Dallas County, Texas by putative shareholders against the directors of EFH Corp., EFH Corp., the Sponsors, and certain financial entities, asserting claims on behalf of owners of shares of EFH Corp. common stock as well as seeking to certify a class action on behalf of allegedly similarly situated shareholders. The lawsuits, which have been consolidated into one action in the 44th District Court, Dallas County, Texas, contend that the directors of EFH Corp. violated various fiduciary duties owed plaintiffs and other shareholders in connection with the execution of the Merger Agreement and that the Sponsors and certain financial entities aided and abetted the alleged breaches of fiduciary duties by the directors. Plaintiffs seek to enjoin defendants from consummating the Merger Agreement until such time as a procedure or process is adopted to obtain the highest possible price for shareholders, as well as a request that the Court direct the officers and directors of EFH Corp. to exercise their fiduciary duties in order to obtain a transaction in the best interest of EFH Corp. shareholders. The consolidated suit includes claims that the directors failed to take steps to properly value or maximize the value of EFH Corp. and breached their duties of loyalty, good faith, candor and independence owed to EFH Corp. shareholders. The Merger Agreement allowed EFH Corp. to solicit other proposals from third parties until April 16, 2007 and was subject to the approval of EFH Corp.'s shareholders, which was obtained at the annual meeting of shareholders on September 7, 2007. The consolidated suit purports to assert claims by shareholders directly against the directors. EFH Corp. believes that Texas law does not recognize such a cause of action. Consequently, EFH Corp. and its directors have filed a Motion to Dismiss. On May 25, 2007, the Court granted the Motion and dismissed the consolidated putative class action suit with prejudice. On May 31, 2007, Plaintiffs moved for reconsideration of the May 25 Order dismissing the action; however, Plaintiffs subsequently withdrew this motion.

On July 19, 2007, a putative class action lawsuit was filed in the United States District Court, Northern District of Texas, Dallas Division by a putative shareholder against EFH Corp. and its directors asserting a claim under Section 14(a) of the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder, asserting that the preliminary proxy statement of EFH Corp. filed June 14, 2007 fails to adequately describe the relevant facts and circumstances regarding the Merger as well as seeking to certify the litigation as a class action on behalf of allegedly similarly situated shareholders. EFH Corp. has not yet responded to this litigation and, as described below, on July 23, 2007, the Sponsors, joined by EFH Corp. for the limited purpose described below, have entered into a memorandum of understanding with plaintiffs that would result in the dismissal of this litigation if the settlement is approved by the courts. In the event that EFH Corp. is required to respond to this litigation, EFH Corp. will file a Motion to Dismiss based on the fact that this proxy statement clearly and accurately describes the information regarding the Merger and the information necessary

141

EFIHMW00250213

for a shareholder to evaluate the proposal to approve the Merger Agreement. EFH Corp. believes the claims made in this litigation are without merit and, therefore, if necessary, EFH Corp. intends to vigorously defend this litigation.

On July 23, 2007, the Sponsors, joined by EFH Corp. for the limited purpose described below, executed a memorandum of understanding with the plaintiffs in certain of the lawsuits described above pursuant to which, if approved by the court in which the litigation is pending, to the extent required, all of the litigation related to the Merger will be dismissed with prejudice. Neither EFH Corp. nor any of its directors agreed to fund any payment or pay any other consideration under the settlement. EFH Corp. did agree to make certain revisions to the final proxy statement as part of the agreement between the Sponsors and the plaintiffs to settle the litigation and agreed that under certain circumstances the termination fee payable by EFH Corp. under the Merger Agreement would be $925 million rather than $1 billion. The settlement of the litigation, subject to court approval, will result in a dismissal of all claims against EFH Corp. and its officers and directors related to the Merger.

On December 1, 2006, a lawsuit was filed in the United States District Court for the Western District of Texas against TXU Generation Company, LP, Oak Grove Management Company LLC and EFH Corp. The complaint seeks declaratory and injunctive relief, as well as the assessment of civil penalties, with respect to the permit application for the construction and operation of the Oak Grove generation plant in Robertson County, Texas. The plaintiffs allege violations of the federal Clean Air Act, Texas Health and Safety Code and Texas Administrative Code and seek to temporarily and permanently enjoin the construction and operation of the Oak Grove generation plant. The complaint also asserts that the permit application was deficient in failing to comply with various modeling and analyses requirements relative to the impact of emissions on the environment. Plaintiffs further request that the court enter an order requiring the defendants to take other appropriate actions to remedy, mitigate and offset alleged harm to the public health and environment. EFH Corp. believes the Oak Grove air permit, granted by the TCEQ, is protective of the environment and that the application for and the processing of the air permit by Oak Grove Management Company LLC with the TCEQ has been in accordance with law. The plaintiffs' complaint was dismissed by the Federal District Court on May 21, 2007 in response to EFH Corp.'s Motion to Dismiss, and the matter is now on appeal to the Court of Appeals for the Fifth Circuit. EFH Corp. believes that the claims made in this complaint are without merit and, accordingly, intends to vigorously defend this appeal.

On September 6, 2005 a lawsuit was filed in the U.S. District Court for the Northern District of Texas, Dallas Division against EFH Corp. and C. John Wilder. The plaintiffs' amended complaint asserts claims on behalf of the plaintiffs and a putative class of owners of certain EFH Corp. securities who tendered such securities in connection with a tender offer conducted by EFH Corp. in 2004. The amended complaint alleges violations of the provisions of Sections 14(e), 10(b) and 20(a) of the Securities Exchange Act of 1934, as amended, and Rule 10b-5 thereunder. The allegations relate to a tender offer conducted in September and October 2004 for certain equity-linked securities in which it was expressly disclosed that EFH Corp. management was evaluating whether it should recommend to the board of directors that the board reevaluate EFH Corp.'s dividend policy. After the tender offer was closed, and consistent with the disclosure, management did make a recommendation to the board to reevaluate the dividend policy and the board elected to increase the quarterly dividend. The plaintiffs contend that such disclosure in connection with the tender offer was inadequate. EFH Corp. maintains that the disclosure provided in connection with the tender offer regarding the evaluation of the dividend policy was complete and accurate at the time the tender offer was initiated as well as when it was closed. A Motion to Dismiss was filed by the defendants, and the District Court entered an order granting the Motion to Dismiss and dismissing this litigation with prejudice on August 30, 2006. The plaintiffs filed a timely notice of appeal and, on appeal, the U.S. Fifth Circuit Court of Appeals remanded the dismissal to the District Court in light of the decision in Tellabs, Inc., v. Makor Issues & Rights, Ltd. While EFH Corp. is unable to estimate any possible loss or predict the outcome of this litigation in the event the Fifth Circuit Court of Appeals reverses the District Court, EFH Corp. believes

Highly Confidential

EFIHMW00250214

the claims made in this litigation are without merit and, accordingly, intends to vigorously defend this litigation, including the appeal of the District Court's order dismissing the complaint.

In November 2002, February 2003 and March 2003, three lawsuits were filed in the U.S. District Court for the Northern District of Texas, Dallas Division, asserting claims under the Employee Retirement Income Security Act ("ERISA") on behalf of a putative class of participants in and beneficiaries of various employee benefit plans of EFH Corp. These ERISA lawsuits were consolidated, and a consolidated complaint was filed in February 2004 against EFH Corp., the directors of EFH Corp. serving during the putative class period as well as certain officers of EFH Corp. who were the members of the TXU Thrift Plan Committee. The plaintiffs seek to represent a class of participants in such employee benefit plans during the period between April 26, 2001 and October 11, 2002. The plaintiffs filed an initial motion for class certification and, after class certification discovery was completed, the District Court denied plaintiffs' initial class certification motion without prejudice and granted plaintiffs' leave to amend their complaint. Plaintiffs' second class certification motion, filed on the basis of their amended complaint, was denied and the case was ordered dismissed without prejudice on September 29, 2005. The plaintiffs filed an appeal of the dismissal to the Fifth Circuit Court of Appeals. While on appeal, the matter was referred to the Fifth Circuit's alternative dispute resolution program and subsequently to mediation. While mediation was unsuccessful, further discussions led to an agreement in principle to settle this litigation on December 24, 2006 for $7.25 million, before attorney's fees, to be paid by EFH Corp. to the thrift plan pursuant a Court approved allocation. A Memorandum of Understanding confirming the agreement in principle was signed on January 24, 2007 and the settlement is in the process of being confirmed with final settlement documents after which the settlement will be submitted to the District Court for approval. EFH Corp. believes the claims are without merit and, in the event the settlement is not approved, intends to vigorously defend the lawsuit, including the appeal. EFH Corp. is, however, unable to estimate any possible loss or predict the outcome of this action in the event the District Circuit rejects the settlement, the Fifth Circuit reverses the dismissal and remands the case to the District Court or the suit is refiled by the plaintiffs or others seeking to assert similar claims.

We are also involved in litigation concerning environmental permits for the three new lignite coal-fueled units that Luminant is developing at Oak Grove and Sandow. See "Energy Future Competitive Holdings Management's Discussion and Analysis of Financial Condition and Results of Operations—Significant Developments-Texas Generation Facilities Development."

In addition to the above, EFH Corp. and its subsidiaries are involved in various other legal and administrative proceedings in the normal course of business the ultimate resolution of which, in the opinion of management, should not have a material effect on its financial position, results of operations or cash flows.

*Regulatory Investigations*—In October 2006, Luminant Energy was notified that the PUCT had begun an informal investigation of its 2005 activities in the ERCOT wholesale electricity market as a result of observations noted in the 2005 State of the Market Report for the *ERCOT Wholesale Electricity Markets* performed by Potomac Economics, an economic consulting firm. The investigation was focused on activities involving bids to sell balancing energy and generation unit commitments. Balancing energy represents approximately five to ten percent of the total energy sold in the ERCOT wholesale market. Luminant Energy has cooperated fully with the PUCT in its informal investigation.

In March 2007, the PUCT issued a Notice of Violation ("NOV") stating that the PUCT staff is recommending an enforcement action, including the assessment of administrative penalties, against EFH Corp. and certain affiliates for alleged market power abuse by its power generation affiliates and Luminant Energy in ERCOT-administered balancing energy auctions during certain periods of the summer of 2005. The PUCT staff issued a revised NOV in September 2007, in which the proposed administrative penalty amount was reduced from $210 million to $171 million. The revised NOV was

143

EFIHMW00250215

necessary, according to the PUCT staff, to correct calculation errors in the initial NOV. As revised, the NOV is premised upon the PUCT staff's allegation that TXU Portfolio Management's bidding behavior was not competitive and increased market participants' costs of balancing energy by approximately $57 million, including approximately $19 million in incremental revenues to EFH Corp. A hearing requested by Luminant Energy to contest the alleged occurrence of a violation and the amount of the penalty in the NOV has been scheduled to start in April 2008. EFH Corp. believes Luminant Energy's conduct during the period in question was consistent with the PUCT's rules and policies, and no market power abuse was committed. EFH Corp. is vigorously contesting the NOV. EFH Corp. is unable to predict the outcome of this matter.

EFH Corp. and Luminant Energy have taken actions to reduce the risk of future similar allegations related to the balancing energy segment of the ERCOT wholesale market, including working with the PUCT staff and the PUCT's independent market monitor to develop a voluntary mitigation plan for approval by the PUCT. Luminant Energy has submitted a voluntary mitigation plan that was approved by the PUCT in July 2007. The PUCT's approval action has been challenged by some other market participants on procedural grounds and to the initial ruling of the Texas District Court has upheld that challenge. TCEH cannot predict whether the PUCT will appeal that ruling or be successful on such appeal.

The PUCT staff had been investigating TXU Energy with respect to the renewal process for certain small and medium business customers on term service plans. The investigation did not involve residential customers. In June 2007, TXU Energy reached a settlement agreement with the Staff of the PUCT that was approved by the PUCT in July 2007. While TXU Energy expressly denies any violations of rules, it has agreed to pay the PUCT a $5 million settlement as a compromise in this dispute.

In addition to the above, EFH Corp. is involved in various other regulatory investigations in the normal course of business the ultimate resolution of which, in the opinion of management, should not have a material effect on its financial position, results of operations or cash flows.

**Environmental Regulations and Related Considerations**

*Climate Change and Carbon Dioxide.*   Luminant's baseload lignite coal-fueled power plants are significant sources of carbon dioxide ("$CO_2$") emissions, generating the great majority of the average of 57 million tons of $CO_2$ that our monitoring indicates our generation plants have produced annually from 2004 to 2006. The three new lignite coal-fueled units being developed will generate substantial additional $CO_2$ emissions. EFH Corp. participates in a voluntary electric utility industry sector climate change initiative in partnership with the U.S. Department of Energy. This initiative supports the Bush Administration's greenhouse gas emissions intensity reduction program, Climate VISION. In addition, EFH Corp. continues to participate in a voluntary greenhouse gas emission reduction program under the Energy Policy Act of 1992 and since 1995 has reported the results of its program annually to the U.S. Department of Energy.

In conjunction with the Merger agreement, EFH Corp. announced its commitment to reduce carbon dioxide $CO_2$ emissions and intent to join the U.S. Climate Action Partnership ("USCAP"), which is a broad-based group of businesses and leading environmental groups organized to work with the President, the Congress and all other stakeholders to enact environmentally effective and economically sustainable climate change programs. $CO_2$ is the principal greenhouse gas that EFH Corp. emits. As part of our support of USCAP, EFH Corp. is also pledging to support a mandatory cap and trade program to reduce CO2 emissions.

EFH Corp.'s approach to addressing global climate change is based upon the following principles:

• Climate change is a global issue requiring a comprehensive solution addressing all greenhouse gases, sources and economic sectors in all countries;

144

EFIHMW00250216

- Development of U.S. energy and environmental policy should seek to ensure U.S. energy security and independence;

- Solutions should encourage investment in a diverse supply of new generation to meet U.S. needs to maintain adequate reserve margins and support economic growth, as well as address customer's needs for affordable and reliable energy;

- Policies should encourage significant investments in research and development and deployment of a broad spectrum of solutions, including energy efficiency, renewable energy and coal, natural gas and nuclear-fueled generation technologies; and

- Any mandate to reduce greenhouse gas emissions should be developed under a market-based framework that is consistent with expected technology development timelines and supports the displacement of old, inefficient power generation technology with advanced, more efficient technology.

EFH Corp.'s strategies for lowering greenhouse gas emissions include:

- Investing in technology—EFH Corp. expects to invest up to $2 billion over the next five to seven years for the development and commercialization of cleaner power plant technologies, including integrated gasification combined cycle, the next generation of more efficient ultra-supercritical coal and pulverized coal emissions technology to reduce CO2 emission intensity. A number of actions, including research and development investments and partnerships, have already been initiated to advance next-generation technologies.

- Providing electricity from renewable sources—EFH Corp. intends to become a leader in providing electricity from renewable sources by more than doubling its purchases of wind power to more than 1,500 MW. EFH Corp. also intends to promote solar power through solar/photovoltaic rebates.

- Committing to demand side management initiatives—EFH Corp. expects that its subsidiaries will invest $400 million over the next five years in programs designed to encourage customer electricity demand efficiencies.

- Reducing CO2 emissions by increasing production efficiency—EFH Corp. expects to increase production efficiency of its existing generation facilities by up to 2 percent.

- Evaluating the development of a nuclear generation facility—EFH Corp. plans to develop an application to file with the NRC for combined construction and operating licenses for up to 3,400 MW of new nuclear generation capacity at its Comanche Peak nuclear generation plant. EFH Corp. expects to submit the application in 2008. Nuclear generation is the lowest emission source of baseload generation available.

Increasing public concern and political pressure from local, regional, national and international bodies, may result in the passage of new laws mandating limits on greenhouse gas emissions. A series of reports by the Intergovernmental Panel on Climate Change earlier this year attracted considerable public attention and concern. Several bills addressing climate change have been introduced in the U.S. Congress and in April 2007, the U.S. Supreme Court issued a decision ruling the EPA improperly declined to address $CO_2$ impacts in a rulemaking related to new motor vehicle emissions. While this decision is not directly applicable to power plant emissions, the reasoning of the decision could affect other regulatory programs. Various proposals in the U.S. Congress could require us to purchase offsets or allowances for some or all of our $CO_2$ emissions, or otherwise affect us based on the amount of $CO_2$ we generate. The impact on EFH Corp. of any future greenhouse gas regulation will depend in large part on the details of the requirements and the timetable for mandatory compliance. EFH Corp. continues to assess the financial and operational risks posed by possible future legislative changes pertaining to greenhouse gas emissions, but because these proposals are in the formative stages, EFH Corp. is unable to predict any future impacts on our financial condition and operations.

Highly Confidential

EFIHMW00250217

*Sulfur Dioxide, Nitrogen Oxide and Mercury Air Emissions.*    The federal Clean Air Act includes provisions which, among other things, place limits on the SO2, NOx, and mercury emissions produced by certain generation plants. In addition to the new source performance standards applicable to SO2 (associated with acid rain) and NOx (associated with ozone formation), the Clean Air Act requires that fossil-fueled plants have sufficient SO2 emission allowances and meet certain NOx emission standards. EFH Corp.'s generation plants meet the current SO2 allowance requirements and NOx emission rates.

In 2005, the EPA issued a final rule to further reduce SO2 and NOx emissions from power plants. The SO2 and NOx reductions required under the Clean Air Interstate Rule ("CAIR") are based on a cap and trade approach (market-based) in which a cap is put on the total quantity of emissions allowed in 28 eastern states (including Texas), emitters are required to have allowances for each ton emitted, and emitters are allowed to trade emissions under the cap. The CAIR reductions are required to be phased in between 2009 and 2015.

Also in 2005, the EPA published a final rule requiring reductions of mercury emissions from coal-fueled generation plants. The Clean Air Mercury Rule ("CAMR") is based on a cap and trade approach on a nationwide basis. The mercury reductions are required to be phased in between 2010 and 2018.

SO2 reductions required under the proposed regional haze/visibility rule (or so-called BART rule) only apply to units built between 1962 and 1977. The reductions would be required on a unit-by-unit basis. The EPA provides the option for states to use CAIR to satisfy the BART reductions for electric generating units and Texas has chosen this option.

In connection with our plan to build three new lignite coal-fueled generation units in Texas, we have committed to reduce emissions of NOx, SO2 and mercury from our new and existing coal fueled units so that the total of these emissions is 20% below 2005 levels. This reduction is expected to be accomplished through the installation of emissions control equipment in both the new and existing units and possible fuel blending at some existing units. These efforts, which will involve incremental equipment investments, as well as additional costs for facility operations and maintenance in the future, will be coordinated with the CAIR, CAMR and BART rules for the most cost-effective compliance plan options. Estimates for capital expenditures associated with the full potential scope of these additional environmental control systems are in the range of approximately $1 billion to $1.3 billion. Luminant Power has yet to undertake and complete detailed cost and engineering studies for the additional environmental systems. The cost estimates for capital expenditures at Luminant Power's existing facilities are subject to change, which changes could be substantial, as Luminant Power determines the details of and further evaluates the engineering and construction costs related to these investments.

The Clean Air Act also requires each state to monitor air quality for compliance with federal health standards. The standards for ozone are not being achieved in several areas of Texas. The TCEQ adopted new State Implementation Plan rules in July 2007 to deal with 8-hour ozone standards. These rules require further NOx emission reductions from certain EFH Corp. facilities in the Dallas-Fort Worth area.

We believe that EFH Corp. holds all required material emissions permits for facilities in operation and has applied for or obtained the necessary permits for facilities under construction.

*Water.*    The TCEQ and the EPA have jurisdiction over water discharges (including storm water) from facilities in Texas. We believe facilities of EFH Corp. are presently in material compliance with applicable state and federal requirements relating to discharge of pollutants into water. EFH Corp. believes it holds all required material waste water discharge permits from the TCEQ for facilities in operation and has applied for or obtained necessary permits for facilities under construction. EFH

146

EFIHMW00250218

Corp. believes it can satisfy the requirements necessary to obtain any required permits or renewals. Recent changes to federal rules pertaining to Spill Prevention, Control and Countermeasure Plans ("SPCC") for oil-filled electrical equipment and bulk storage facilities for oil will require updating of certain plants and facilities. EFH Corp. has determined that SPCC plans will be required for certain substations, work centers and distribution systems by July 1, 2009. The company is currently compiling data for development of these plans.

Diversion, impoundment and withdrawal of water for cooling and other purposes are subject to the jurisdiction of the TCEQ and the EPA. EFH Corp. believes it possesses all material necessary permits for these activities from the TCEQ for its present operations. Clean Water Act Section 316(b) regulations pertaining to existing water intake structures at large power plants were published by the EPA in 2004. As prescribed in the regulations, we began implementing a monitoring program to determine the future actions that might need to be taken to comply with these regulations. In January 2007, a federal court ruled against the EPA in a lawsuit brought by environmental groups challenging aspects of these regulations, and, in July 2007, the EPA announced that it was suspending the regulations pending further rulemaking. We cannot predict the impact on our operations of the suspended existing regulations or impact of any new regulations that replace them.

*Radioactive Waste.*   Under the federal Low-Level Radioactive Waste Policy Act of 1980, as amended, the State of Texas is required to provide, either on its own or jointly with other states in a compact, for the disposal of all low-level radioactive waste generated within the state. The State of Texas has agreed to be a compact for a disposal facility that would be located in Texas. That compact was ratified by Congress and signed by the President in 1998. In 2003, the State of Texas enacted legislation allowing a private entity to be licensed to accept low-level radioactive waste for disposal, and in 2004 the State received a license application from such an entity for review. EFH Corp. intends to continue to ship low-level waste material off-site for as long as an alternative disposal site is available. Should existing off-site disposal become unavailable, the low-level waste material will be stored on-site. EFH Corp.'s on-site storage capacity at the Comanche Peak plant is expected to be adequate until other off-site facilities become available. (See discussion under "—Our Operating Segments—Luminant Power—Nuclear Generation Assets" above.)

*Solid Waste, including Fly Ash Associated with Lignite/Coal-Fueled Generation.*   Treatment, storage and disposal of solid waste and hazardous waste are regulated at the state level under the Texas Solid Waste Disposal Act and at the federal level under the Resource Conservation and Recovery Act of 1976, as amended, and the Toxic Substances Control Act. The EPA has issued regulations under the Resource Conservation and Recovery Act of 1976 and the Toxic Substances Control Act, and the TCEQ has issued regulations under the Texas Solid Waste Disposal Act applicable to facilities of EFH Corp. We believe we are in material compliance with all applicable solid waste rules and regulations. In addition, we have registered solid waste disposal sites and have obtained or applied for permits required by such regulations.

*Environmental Capital Expenditures.*   Capital expenditures for TCEH's environmental projects totaled $43 million in 2006 and are expected to total approximately $105 million in 2007, exclusive of emissions control equipment investment planned as part of the three-unit Texas generation development program, which is expected to total up to $450 million over the construction period. Estimates for capital expenditures associated with the full potential scope of these additional environmental control systems at Luminant Power's existing generation facilities are in the range of $1 billion to $1.3 billion. Luminant Power has yet to undertake and complete detailed cost and engineering studies for the additional environmental systems. The cost estimates for capital expenditures at Luminant Power's existing facilities are subject to change, which change could be substantial as Luminant Power determines the details of and further evaluates the engineering and construction costs related to these investments.

147

EFIHMW00250219

## REGULATION AND RATES

**General**

*2007 Texas Legislative Session*

The Texas Legislature convened in its regular biennial session on January 9, 2007 and adjourned on May 28, 2007. The session was not a "sunset" session for the PUCT, so there was no requirement that the Legislature consider any electric industry-related bills. However, various measures pertaining to the electric industry were considered. The primary measures that were under consideration and would have materially affected EFH Corp.'s businesses and potentially the Merger were ultimately not enacted. New PURA provisions were enacted that ensure the PUCT shall have authority to enforce commitments made in a filing under PURA Section 14.101 (such as the filing with the PUCT made by Texas Holdings and Oncor Electric Delivery on April 25, 2007). In addition, the Sponsors have publicly indicated their intention to:

- Spend more than $30 million per year over five years to provide relief for low-income residents and to pursue new demand-side management initiatives in conservation, energy efficiency and weatherization;

- In the current regulatory system, hold a majority of their ownership in EFH Corp. for more than five years after the closing of the Merger; and

- Invest significant resources in emerging energy technologies, such as integrated gasification combined cycle coal plants, including an increased commitment to renewable energy.

**Luminant**

Luminant Power is an exempt wholesale generator under the Energy Policy Act of 2005 and is subject to the jurisdiction of the NRC with respect to its nuclear generation plant. NRC regulations govern the granting of licenses for the construction and operation of nuclear generation plants and subject such plants to continuing review and regulation. Luminant Energy holds a power marketer authorization from the FERC.

*Wholesale Market Design*

In August 2003, the PUCT adopted a rule that, when implemented, will alter the wholesale market design in ERCOT. The rule requires ERCOT:

- to use a stakeholder process to develop a new wholesale market model;

- to operate a voluntary day-ahead energy market;

- to directly assign all congestion rents to the resources that caused the congestion;

- to use nodal energy prices for resources;

- to provide information for energy trading hubs by aggregating nodes;

- to use zonal prices for loads; and

- to provide congestion revenue rights (but not physical rights).

ERCOT currently has a zonal wholesale market structure consisting of four geographic zones. The proposed location-based congestion-management market is referred to as a "nodal" market because wholesale pricing would differ across the various locational nodes on the transmission grid. The implementation of a nodal market is being done in conjunction with transmission improvements designed to reduce current congestion. In March 2006, the PUCT approved a set of Nodal Protocols, which was filed by ERCOT and describes the operation of a wholesale nodal market, and set an implementation date of no later than January 1, 2009. In August 2006, the PUCT adopted an interim order approving ERCOT's application for a surcharge imposed on all Qualified Scheduling Entities in ERCOT (including subsidiaries of TCEH) for the purpose of financing 38% of ERCOT's expected nodal implementation costs. The interim surcharge took effect on October 1, 2006. On May 23, 2007, the PUCT adopted an order approving ERCOT's request for a final nodal-market-implementation surcharge and set the effective date for that surcharge as June 1, 2007. EFH Corp. expects that the

148

EFIHMW00250220

annual impact of the final surcharge will be approximately $7 million to $8 million in additional expense. Although EFH Corp. does not expect our competitive position in the ERCOT market to be materially adversely affected by the proposed nodal wholesale market design, EFH is unable to predict the ultimate impact of the proposed nodal wholesale market design on its operations or financial results.

### Nuclear Decommissioning

Luminant Power's nuclear plant decommissioning costs are fully recoverable from Oncor Electric Delivery's distribution customers. Through December 31, 2001, decommissioning costs were recovered from consumers based upon a 1992 site-specific study through rates placed in effect under EFH Corp.'s January 1993 rate increase request. Effective January 1, 2002, decommissioning costs are recovered through a tariff charged to REPs by Oncor Electric Delivery based upon a 2000 redetermination of the 1997 site-specific study, adjusted for trust fund assets, as a component of delivery fees effective under EFH Corp.'s 2001 Unbundled Cost of Service filing. In 2005, an updated study of the cost to decommission EFH Corp.'s nuclear generating facility was completed by management and was filed with the PUCT in June 2005. The accompanying testimony concluded that no change to the nuclear decommissioning tariff was warranted at that time. In July 2005, the PUCT's Policy Development Division issued an order approving the decommissioning cost study and closing the docket.

### Regulatory Investigations

Please refer to the subsection titled "Business—Legal Proceedings" elsewhere in this offering circular for a description of certain regulatory investigations.

## TXU Energy

### REP Certification Rulemaking

On March 30, 2007, the PUCT publicly requested comments on proposed revisions to its substantive rules governing the certification of REPs that, if ultimately approved, would have (1) expanded the types of transactions that would be considered to constitute the transfer of a REP certificate and (2) subjected a REP to unspecified additional or different financial requirements if it serves one million residential customers in Texas or more and does not have its own investment grade credit rating. The PUCT Staff conducted a workshop on September 24, 2007 to discuss with interested stakeholders potential revisions to the rule and the largest REPs, including TXU Energy, ultimately agreed with the PUCT Staff to compromise rule revision language specifying acceptable additional minimum financial requirements for REPs with at least one million Texas residential customers. In an Open Meeting on October 9, 2007, the PUCT voted to approve revisions to its REP certification rule. The PUCT Commissioners declined to make any revisions to expand the types of transactions that would be considered to constitute the transfer of a REP certificate. The PUCT Commissioners approved the compromise agreed to by the largest REPs and PUCT Staff. The approved revisions provide that REPs that serve one million Texas residential customers or more are subject to additional or different financial requirements as determined by the PUCT unless they meet one of the following specified additional financial requirements: (1) a heightened credit rating of "BBB" for S&P or "Baa2" for Moody's, or their financial equivalent (satisfied through the REP's own credit rating, a guaranty of a parent or controlling shareholder with the required credit rating, or a bond, guaranty or corporate commitment of another company with the required credit rating); (2) an increased amount of equity (defined as assets in excess of liabilities); or (3) an increased amount of unused cash resources. The additional financial requirements are not anticipated to significantly increase TCEH's cost of doing business.

### Regulatory Investigations

Please refer to the subsection titled "Legal Proceedings" under the section titled "Business" included elsewhere in this offering circular for a description of certain regulatory investigations.

Highly Confidential

## MANAGEMENT

Our directors are set forth in the chart below. The exact composition of TCEH's executive management following the Merger has not been finalized as of the date of this offering circular.

| Name | Age(1) | Position(s) |
|------|--------|-------------|
| Frederick M. Goltz . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 36 | Director |
| Scott Lebovitz . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 32 | Director |
| Michael MacDougall. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 36 | Director |

(1)   As of September 1, 2007.

*Frederick M. Goltz* has been with KKR for 10 years. Mr. Goltz is one of the heads of KKR's Energy and Natural Resources industry team and leads KKR's efforts in the natural resources sector. He received a B.A., B.S., Magna Cum Laude, from the University of Pennsylvania, and an M.B.A. from INSEAD, Fontainebleau, France.

*Scott Lebovitz* is a Vice President of Goldman, Sachs & Co. in its Principal Investment Area. He joined Goldman, Sachs & Co. in 1997. He was promoted to Vice President in 2003. Mr. Lebovitz serves on the boards of Coffeyville Acquisition LLC and Village Voice Media, LLC. He received a B.S. degree from the University of Virginia.

*Michael MacDougall* is a partner of TPG. Prior to joining TPG in 2002, Mr. MacDougall was a vice president in the Principal Investment Area of the Merchant Banking Division of Goldman, Sachs & Co., where he focused on private equity and mezzanine investments. Mr. MacDougall received his M.B.A., with distinction, from Harvard Business School. Prior to attending business school, Mr. MacDougall was an assistant brand manager in the Paper Division of Procter & Gamble. He received his B.B.A., with highest honors, from the University of Texas at Austin. Mr. MacDougall serves on the Board of Directors of Aleris International and Altivity Packaging LLC. Mr. MacDougall also serves on the Board of The Opportunity Network (a charitable organization that creates access for top-performing New York City public school students to influential networks, career opportunities and competitive colleges) and is the Co-Chair of The Dwight School's Annual Fund.

## Executive Compensation

We expect that our Board will consider adopting executive compensation plans that will link compensation with performance. We will continually review our executive compensation programs to ensure that they are competitive.

## Employment Agreements

In connection with the Merger, we may enter into new employment agreements and/or amend existing employment agreements with some of TCEH's executive officers on terms to be agreed between us and those persons.

150

EFIHMW00250222

## PRINCIPAL STOCKHOLDERS

As a result of the consummation of the Merger, substantially all of the capital stock of EFH Corp., our parent, is held indirectly by the Sponsors and the Investors. The Sponsors own approximately 62% of the partnership interests of Texas Holdings, the direct parent of EFH Corp. Members of the board of directors of EFH Corp. or managers of Texas Holdings affiliated with each of the Sponsors may be deemed to beneficially own shares owned by such entities or their associated investment funds. Each such individual disclaims beneficial ownership of any such shares in which such individual does not have a pecuniary interest.

Affiliates of certain of the initial purchasers in this offering have indirect ownership interests in EFH Corp. See "The Transactions—Equity Contributions."

Highly Confidential

EFIHMW00250223

**PX 006**
**Page 158 of 382**

## CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS

**Agreements Among and With Sponsors and Investors**

### *Texas Holdings Limited Partnership Agreement*

Immediately prior to the closing of the Merger, the Sponsors and the Investors and/or their assignees contributed equity to Texas Holdings in exchange for limited partnership interests in Texas Holdings and entered into a limited partnership agreement with Texas Holdings. Certain third party investors contributed equity to Texas Holdings through intermediate investment vehicles, some of which are controlled by the Sponsors. The limited partnership agreement contains agreements among the parties with respect to restrictions on the issuance or transfer of interests. The Sponsors and certain of the Investors are also party to the limited liability company agreement of the General Partner, which provides, among other things, that the Sponsors control Texas Holdings and have the right to nominate directors to the board of directors of EFH Corp.

### *Indemnification Agreement*

On October 10, 2007, Texas Holdings and EFH Corp. entered into an indemnification agreement with the Sponsors (the "Indemnification Agreement") to indemnify the Sponsors, their affiliates and related persons from claims against liabilities incurred by the Sponsors, their affiliates and related persons in connection with the Transactions or any future offerings of equity or debt securities by EFH Corp., its subsidiaries or affiliates. Under the Indemnification Agreement, the Sponsors, their affiliates and related persons are indemnified against claims for liabilities incurred for actions or omissions relating to the provision of financial advisory, monitoring and management consulting services to the General Partner, Texas Holdings, EFH Corp. and any of their subsidiaries and affiliates. The Indemnification Agreement also indemnifies the directors and officers of each of the General Partner, Texas Holdings, EFH Corp. and any of their subsidiaries and affiliates from claims against liabilities incurred while acting in such capacity.

### *Registration Rights Agreement*

On October 10, 2007, Texas Holdings and EFH Corp. entered into a registration rights agreement with certain shareholders of EFH Corp. pursuant to which such shareholders have certain registration and other rights with respect to shares of common stock they own in EFH Corp.

### *Sponsor Management Agreement*

On October 10, 2007, in connection with the Merger, the Sponsors and LBI entered into a management agreement with EFH Corp. (the "Management Agreement"), pursuant to which affiliates of the Sponsors will provide management, consulting, financial and other advisory services to EFH Corp. Pursuant to the Management Agreement, the Sponsors are entitled to receive an aggregate annual management fee of $35 million, which amount will increase 2% annually, and reimbursement of out-of-pocket expenses incurred in connection with the provision of services pursuant to the Management Agreement. The Management Agreement will continue in effect from year to year, unless terminated upon a change of control of EFH Corp. or in connection with an initial public offering of EFH Corp. or if the parties mutually agree to terminate the Management Agreement. Pursuant to the Management Agreement, the Sponsors and LBI received aggregate transaction fees of $300 million in connection with certain services provided in connection with the Merger and related transactions. In addition, the Management Agreement provides that the Sponsors will be entitled to receive a fee equal to a percentage of the gross transaction value in connection with certain subsequent financing,

152

EFIHMW00250224

acquisition, disposition, merger combination and change of control transactions, as well as a termination fee based on the net present value of future payment obligations under the Management Agreement in the event of an initial public offering or under certain other circumstances.

**Historical Related Party Transactions—Six Months Ended June 30, 2007 and 2006**

The following represents our significant historical related party transactions for the six months ended June 30, 2007 and 2006.

- TCEH incurs electricity delivery fees charged by Oncor Electric Delivery. These fees totaled $498 million and $554 million for the six months ended June 30, 2007 and 2006, respectively.

- Oncor Electric Delivery's bankruptcy-remote financing subsidiary has issued securitization bonds to recover generation-related regulatory assets through a transition surcharge to its customers. Oncor Electric Delivery's incremental income taxes related to the transition surcharges it collects are being reimbursed by TCEH. Therefore, Energy Future Competitive Holdings' financial statements reflect a noninterest bearing note payable to Oncor Electric Delivery of $340 million ($33 million reported as current liabilities) at June 30, 2007 and $356 million ($33 million reported as current liabilities) at December 31, 2006.

- TCEH reimburses Oncor Electric Delivery for interest expense on Oncor Electric Delivery's bankruptcy-remote financing subsidiary's securitization bonds. This interest expense totaled $25 million and $27 million for the six months ended June 30, 2007 and 2006, respectively.

- Current and noncurrent advances to Energy Future Competitive Holdings totaled $4.3 billion at June 30, 2007 (all reported as current) and $4.0 billion at December 31, 2006 ($700 million reported as noncurrent). The average daily balances of the advances to Energy Future Competitive Holdings totaled $4.0 billion and $2.1 billion during the six months ended June 30, 2007 and 2006, respectively. Interest income earned on the advances totaled $123 million and $55 million for the six months ended June 30, 2007 and 2006, respectively. The weighted average annual interest rates were 6.1% and 5.2% for the six months ended June 30, 2007 and 2006, respectively.

- In December 2005, a subsidiary of Energy Future Competitive Holdings received a $1.5 billion note receivable from EFH Corp. in partial settlement of outstanding advances to EFH Corp. The note carries interest at a rate based on the weighted average cost of Energy Future Competitive Holdings' short-term borrowings. Interest income related to this note totaled $46 million and $39 million for the six months ended June 30, 2007 and 2006, respectively.

- An EFH Corp. subsidiary charges subsidiaries of Energy Future Competitive Holdings for financial, accounting, environmental and other administrative services at cost. These costs, which are primarily reported in SG&A expenses, totaled $29 million and $35 million for the six months ended June 30, 2007 and 2006, respectively.

- Under Texas regulatory provisions, the trust fund for decommissioning the Comanche Peak nuclear generation facility, reported in investments on Energy Future Competitive Holdings' balance sheet, is funded by a delivery fee surcharge billed to REPs by Oncor Electric Delivery and remitted to TCEH, with the intent that the trust fund assets will be sufficient to fund the decommissioning liability, reported in noncurrent liabilities on Energy Future Competitive Holdings' balance sheet. Income and expenses associated with the trust fund and the decommissioning liability incurred by Energy Future Competitive Holdings are offset by a net change in the intercompany receivable/payable with Oncor Electric Delivery, which in turn results in a change in the net regulatory asset/liability. A regulatory liability totaling $26 million at June 30, 2007, reported on Oncor Electric Delivery's balance sheet represents the excess of the trust fund balance over the decommissioning liability.

153

EFIHMW00250225

- TCEH has a 53.1% limited partnership interest, with a carrying value of $11 million at June 30, 2007, in an EFH Corp. subsidiary holding Capgemini-related assets. Equity losses related to this interest totaled $3 million and $5 million for the six months ended June 30, 2007 and 2006, respectively. These losses primarily represent amortization of software assets held by the subsidiary. The equity losses are reported as other deductions.

- EFH Corp. files a consolidated federal income tax return, and federal income taxes are allocated to subsidiaries based on their respective taxable income or loss. As a result, Energy Future Competitive Holdings had an income tax payable to EFH Corp. of $24 million and $538 million as of June 30, 2007 and December 31, 2006, respectively.

- In the second quarter of 2006, TCEH began charging TXU DevCo for employee services related to the development of generation facilities in Texas. These charges totaled $1.4 million and $0.7 million for the six months ended June 30, 2007 and 2006, respectively. These charges are largely reflected as a reduction in Energy Future Competitive Holdings' SG&A expenses.

**Historical Related Party Transactions—Years Ended December 31, 2006, 2005 and 2004**

The following represent our significant historical related party transactions for the years ended December 31, 2006, 2005 and 2004:

- Oncor Electric Delivery provides distribution or transmission services to customers of TCEH and bills monthly in arrears for such services. These fees totaled $1.1 billion for the year ended December 31, 2006.

- In 2006, Luminant Construction effectively reimbursed TCEH for $208 million in construction expenditures related to Luminant Construction's program to develop new generation facilities in Texas. The transaction was settled through affiliate advance accounts.

- Oncor Electric Delivery's bankruptcy remote financing subsidiary has issued securitization bonds to recover generation-related regulatory assets through a transition surcharge to its customers. Oncor Electric Delivery has entered into a Reimbursement Agreement with TCEH to cover Oncor Electric Delivery's incremental income taxes related to the transition surcharges it collects. Under the agreement, TCEH agreed to pay an aggregate of $437 million in quarterly installments.

- TCEH reimburses Oncor Electric Delivery for interest expense on Oncor Electric Delivery's bankruptcy remote financing subsidiary's securitization bonds pursuant to a Reimbursement Agreement between Oncor Electric Delivery and Luminant Generation Company LLC. This interest expense totaled $52 million for the year ended December 31, 2006.

- Energy Future Competitive Holdings from time to time provides advances to EFH Corp. At December 31, 2006, these advances totaled $4.0 billion. The average daily balances of the advances to parent totaled $2.8 billion during the year ended December 31, 2006. Interest income earned on the advances totaled $154 million, for the years ended December 31, 2006. The weighted average annual interest rate was 5.4% for the year ended December 31, 2006, respectively. In December 2005, Energy Future Competitive Holdings received a $1.5 billion note receivable payable on demand from EFH Corp. in partial settlement of outstanding advances to parent. The note carries interest at the same rate applied to advances to affiliates as discussed above. Interest income related to this note totaled $82 million and $2 million for the years ended December 31, 2006 and 2005, respectively.

- A EFH Corp. subsidiary provides financial, accounting, environmental and other administrative services to subsidiaries of Energy Future Competitive Holdings. These services are charged at cost and totaled $65 million for the year ended December 31, 2006.

154

EFIHMW00250226

- In April 2004, EFH Corp. purchased TCEH's exchangeable preferred membership interests from an unaffiliated holder, and as a result TCEH paid distributions to EFH Corp. on these securities subsequent to the purchase. Interest expense and related charges associated with these securities, including amortization of the related discount, totaled $86 million and $57 million for the years 2005 and 2004, respectively. In December 2005, EFH Corp. assigned its interest in TCEH's exchangeable preferred membership interests to Energy Future Competitive Holdings, and effective September 30, 2006, these securities were recapitalized into common equity membership interests.

- Under Texas regulatory provisions, the trust fund for decommissioning the Comanche Peak nuclear generation facility, reported in investments on Energy Future Competitive Holdings' balance sheet, is funded by a delivery fee surcharge billed to REPs by Oncor Electric Delivery and remitted to TCEH, with the intent that the trust fund assets will be sufficient to fund the decommissioning liability, reported in noncurrent liabilities on Energy Future Competitive Holdings' balance sheet. Income and expenses associated with the trust fund and the estimated decommissioning liability recorded by Energy Future Competitive Holdings are offset by a net change in the intercompany receivable/payable with Oncor Electric Delivery, which in turn results in a change in the net regulatory asset/liability. A regulatory liability totaling $17 million at December 31, 2006 and reported on Oncor Electric Delivery's balance sheet represents the excess of the trust fund balance over the estimated decommissioning liability at that date. A regulatory asset totaling $8 million at December 31, 2005 and reported on Oncor Electric Delivery's balance sheet represents the excess of the decommissioning liability over the trust fund balance at that date.

- Energy Future Competitive Holdings has a 53.1% limited partnership interest, with a total carrying value of $14 million and $24 million at December 31, 2006 and 2005, respectively, in a EFH Corp. subsidiary holding Capgemini-related assets. Equity losses related to this interest totaled $10 million, $7 million and $7 million for the years ended December 31, 2006, 2005 and 2004, respectively. Oncor Electric Delivery had equity losses of $3 million for the year ended December 31, 2005 related to its 19.5% interest in the same limited partnership. These losses primarily represent amortization of software assets held by the subsidiary. The equity losses are reported as other deductions.

- Energy Future Competitive Holdings charges Luminant Construction for employee services related to the development of generation facilities in Texas. These charges totaled $4 million for the year ended December 31, 2006.

For additional information on Energy Future Competitive Holdings' related party transactions, see Note 23 to the 2006 year-end financial statements included elsewhere in this offering circular.

**Post-Merger Related Party Transactions**

Upon the consummation of the Merger, Texas Holdings and Oncor Electric Delivery, which is a subsidiary of EFH Corp., but not a subsidiary of ours, put in place several measures that are often referred to as "ring-fencing" by rating agencies and regulatory authorities. Such measures include the following:

- the transfer of EFH's ownership of Oncor Electric Delivery to Oncor Electric Delivery Holdings,

- a newly-formed special purpose, bankruptcy remote subsidiary, and immediately thereafter the transfer of EFH's ownership of Oncor Electric Delivery Holdings to a newly-formed, wholly owned subsidiary, Energy Future Intermediate Holding;

- the conversion of Oncor Electric Delivery from a Texas corporation to a Delaware limited liability company;

155

EFIHMW00250227

- the inclusion of covenants in Oncor Electric Delivery Holdings' and Oncor Electric Delivery's limited liability company agreements intended to separate Oncor Electric Delivery Holdings and its subsidiaries, including Oncor Electric Delivery, from Texas Holdings and its other subsidiaries, including Energy Future Intermediate Holding;

- the establishment of boards of directors for Oncor Electric Delivery Holdings and Oncor Electric Delivery with a majority of members who will meet the New York Stock Exchange requirements for independence in all material respects and whose unanimous consent will be required to take certain material actions, including (i) to consolidate or merge (A) with EFH Corp. or any of EFH's other subsidiaries or (B) with any other entity, if Oncor Electric Delivery Holdings or Oncor Electric Delivery, as applicable, would not be the surviving entity; (ii) to sell, transfer or dispose of all or substantially all of the assets of Oncor Electric Delivery Holdings or Oncor Electric Delivery, as applicable, without adequate provision for the payment of all of such entity's creditors; (iii) to institute, or consent to the institution of, bankruptcy or insolvency proceedings in respect of Oncor Electric Delivery Holdings or Oncor Electric Delivery, as applicable; or (iv) to the fullest extent permitted by law, to dissolve or liquidate Oncor Electric Delivery Holdings or Oncor Electric Delivery, as applicable, without adequate provision for the payment of all of such entity's creditors;

- the specific delegation to each of the board of directors and the independent directors of Oncor Electric Delivery, each acting by majority vote, of the right to prevent distributions, if it or they determine that it is in the best interests of Oncor Electric Delivery to retain such amounts to meet expected future requirements;

- after the appointment of the initial independent directors, the delegation of the ability to nominate, appoint, and fill vacancies in respect of the independent directors of Oncor Electric Delivery and Oncor Electric Delivery Holdings to a standing nominating committee of Oncor Electric Delivery Holdings' board, a majority of whose members are independent directors; and

- the incurrence of new indebtedness, evidenced by the Oncor Electric Delivery Revolving Facility, the lenders of which will be specifically relying on the separateness of Oncor Electric Delivery Holdings and Oncor Electric Delivery, and their assets, from Texas Holdings and its other subsidiaries.

These ring-fencing measures limit our ability to engage in transactions with Oncor Electric Delivery.

156

Highly Confidential

EFIHMW00250228

PX 006
Page 163 of 382

# DESCRIPTION OF OTHER INDEBTEDNESS

**Financing in Connection with the Merger**

**TCEH Senior Secured Facilities**

*Overview*

In connection with the Merger, we entered into the TCEH Senior Secured Facilities which are comprised of (i) the TCEH Initial Term Loan Facility, (ii) the TCEH Delayed Draw Term Loan Facility, (iii) the TCEH Letter of Credit Facility and (iv) the TCEH Revolving Facility, of which amounts are available in the form of (A) letters of credit and (B) swingline loans, as well as the TCEH Commodity Collateral Posting Facility. The TCEH Initial Term Loan Facility was used to finance the Merger, and for general corporate purposes. The TCEH Delayed Draw Term Loan Facility will be used by TCEH and its subsidiaries during the two year period commencing on the closing date to fund the construction, engineering, design, improvement, testing, start-up, retesting, operation, repair, maintenance and development costs and other capital expenditures (including environmental capital expenditures), interest during construction and related fees and expenses in connection with the construction of three lignite coal-fueled generation stations in ERCOT and environmental upgrades at its existing generation facilities (collectively, the "Capex Uses"). The letters of credit under the TCEH Letter of Credit Facility will be used by TCEH and its subsidiaries for general corporate purposes (including, providing collateral support in respect of commodity hedging arrangements and other commodity transactions, including, commodity hedging arrangements and other commodity transactions related to TCEH's and its subsidiaries' wholesale business operations and activities). The TCEH Revolving Facility will be used by TCEH and its subsidiaries for working capital and for other general corporate purposes (including, but not limited to, the financing of permitted acquisitions and the provision of collateral support in respect of commodity hedging arrangements and other commodity transactions, including for the avoidance of doubt, commodity hedging arrangements and other commodity transactions related to the TCEH's and its subsidiaries' wholesale business operations and activities). The TCEH Commodity Collateral Posting Facility is a senior secured revolving credit facility, the aggregate principal amount of which is determined by the out-of-the-money mark-to-market exposure of TCEH (and/or its subsidiaries) on a portfolio of certain natural gas commodity swap transactions under which TCEH (and/or its subsidiaries) is the "floating price" payor as such portfolio may be amended from time to time (the "Deemed Transactions"). The Deemed Transactions generally correspond to hedging transactions of TCEH (and/or its subsidiaries). The TCEH Commodity Collateral Posting Facility is intended to fund the cash posting requirements due to trading counterparties for significant portion of TCEH's long-term hedging program that is not otherwise secured by means of a first lien under the security arrangements entered into in connection with the TCEH Senior Secured Facilities.

Subject to the satisfaction of certain conditions, TCEH may add one or more incremental term loan facilities, incremental letter of credit facilities and/or increase the commitments under the TCEH Revolving Facility in an aggregate principal amount of up to $2 billion and/or add more incremental cash posting facilities.

The TCEH Senior Secured Facilities (other than the TCEH Commodity Collateral Posting Facility) were entered into with Citigroup Global Markets Inc., ("Citigroup"), Credit Suisse Securities (USA) LLC ("CS Securities" and, together with its respective affiliates and branches, "Credit Suisse"), J.P. Morgan Securities Inc. ("JPMorgan"), Goldman Sachs Credit Partners L.P. ("GSCP"), LBI and Morgan Stanley Senior Funding, Inc. ("MSSF") as joint lead arrangers and bookrunners, Citibank, N.A. ("Citibank") as administrative agent and collateral agent, JPMorgan Chase Bank, N.A. ("JPMCB") as syndication agent and Credit Suisse, GSCP, Lehman Commercial Paper Inc. ("LCPI"), GSCP and MSSF, as co-documentation agents. The TCEH Commodity Collateral Posting Facility was entered into with GSCP as lead arranger and sole bookrunner, Citibank, N.A. ("Citibank"), and J. Aron & Company ("J. Aron") as posting and calculation agent ("Calculation Agent").

157

EFIHMW00250229

*Interest Rates and Fees*

Loans under the TCEH Senior Secured Facilities (other than the TCEH Commodity Collateral Posting Facility) bear interest at per annum rates equal to, at our option, (i) Adjusted LIBOR plus 3.50% or (ii) a base rate (the higher of (1) the prime rate of Citibank and (2) the federal funds effective rate plus 0.50%) plus 2.50%. There is a margin adjustment mechanism in relation to loans term, loans revolving and letters of credit commencing after delivery of the financial statements for the first full fiscal quarter ending after October 10, 2007, under which the applicable margins may be reduced based on leverage ratio targets to be determined.

A commitment fee is payable quarterly in arrears and upon termination at a rate per annum equal to 0.50% of the average daily unused portion of the TCEH Revolving Facility. The commitment fee will be subject to reduction, commencing after delivery of the financial statements for the first full fiscal quarter ending after October 10, 2007, based on leverage ratio targets to be determined.

A commitment fee is payable quarterly in arrears and upon termination on the undrawn portion of the commitments in respect of the TCEH Delayed Draw Term Loan Facility at a rate per annum equal to, prior to the first anniversary of October 10, 2007, 1.25% per annum, and thereafter, 1.50% per annum.

Letter of credit fees under the TCEH Revolving Facility are payable quarterly in arrears and upon termination at a rate per annum equal to the spread over Adjusted LIBOR under the TCEH Revolving Facility, less the issuing bank's fronting fee.

TECH will pay a fixed quarterly maintenance fee through maturity for having procured the TCEH Commodity Collateral Posting Facility regardless of actual borrowings under the facility. In addition, TCEH will pay interest at LIBOR on actual borrowed amounts under the TCEH Commodity Collateral Posting Facility which will be offset by interest earned on collateral deposits to counterparties, thereby making the TCEH Commodity Collateral Posting Facility largely a fixed cost facility regardless of utilization.

*Guarantees and Security*

*Guarantee.*    The TCEH Senior Secured Facilities are unconditionally guaranteed jointly and severally on a senior secured basis, by Energy Future Competitive Holdings and each existing and subsequently acquired or organized direct or indirect wholly-owned U.S. restricted subsidiary of TCEH (other than certain immaterial subsidiaries and other subsidiaries to be agreed upon), subject to certain other exceptions.

*Security.*    The TCEH Senior Secured Facilities, including the guarantees thereof and certain commodity and other hedging and trading transactions, are secured by (a) all of the assets of TCEH and TCEH's subsidiaries who are guarantors of such facilities as described above, subject to certain other exceptions, and (b) a pledge of the capital stock of TCEH and a pledge of the capital stock of each material wholly-owned restricted subsidiary of TCEH directly owned by TCEH or any guarantor (limited in the case of pledges of capital stock of any foreign subsidiaries, to 65% of the capital stock of any first-tier material foreign subsidiary). The Arranger Group has agreed that certain other assets, shall not be required for the purpose of securing such obligations.

*Covenants*

The TCEH Senior Secured Facilities contain customary negative covenants, restricting, subject to certain exceptions, TCEH and TCEH's restricted subsidiaries from, among other things, (i) incurring additional debt, (ii) incurring additional liens, (iii) entering into mergers and consolidations, (iv) sales of assets, (v) dividends, redemptions or other distributions in respect of capital stock, (vi) acquisitions, investments, loans and advances and (vii) payments and modifications of certain subordinated and other material debt.

158

Highly Confidential

EFIHMW00250230

In addition, the TCEH Senior Secured Facilities require that TCEH and its restricted subsidiaries maintain a consolidated secured debt to consolidated EBITDA ratio (as defined in the TCEH Senior Secured Facilities) measured over a rolling four-quarter measurement period, which cannot exceed 7.25 to 1.00 for the first measurement period ending September 30, 2008. The maximum consolidated secured debt to consolidated EBITDA ratio will decline over time until it reaches 5.75 to 1.00 for measurement periods beginning on or after March 31, 2014. Additionally TCEH and its restricted subsidiaries are required to observe certain customary reporting requirements and other affirmative covenants.

### Maturity and Amortization

The TCEH Initial Term Loan Facility is required to be repaid in equal quarterly installments in an aggregate annual amount equal to 1% of the original principal amount of such facility, with the balance payable on the date which is seven years following the closing date. The TCEH Delayed Draw Term Facility is required to be repaid in equal quarterly installments beginning on the last day of the first fiscal quarter to occur after the second anniversary of the closing date (the "First DD Amortization Payment Date") in an aggregate annual amount equal to 1% of the actual principal outstanding under the TCEH Delayed Draw Term Loan Facility as of the First DD Amortization Payment Date, with the balance payable on the date which is seven years following October 10, 2007. Amounts borrowed under the TCEH Energy Revolving Facility may be reborrowed from time to time from and after October 10, 2007 until the date that is the sixth anniversary thereof. The TCEH Letter of Credit Facility will mature on the seventh anniversary of October 10, 2007. The TCEH Commodity Collateral Posting Facility will mature on December 31, 2012.

### Events of Default

The TCEH Senior Secured Facilities contain customary events of default for senior leveraged acquisition financings, including, without limitation, a failure to pay principal, interest, fees or other amounts when due, a representation or warranty fails to be true in all material respects when made or deemed made, a breach of a covenant, cross-default, the entry of a material judgment against TCEH or a restricted subsidiary, bankruptcy or insolvency events, certain ERISA violations, the invalidity of a guarantee or of the collateral securing the facility, or the occurrence of a "change of control" as defined in the TCEH Senior Secured Facilities, the occurrence of which would allow the lenders to accelerate all outstanding loans and terminate their commitments. These events of default may allow for certain grace periods and materiality limitations.

### TCEH Senior Interim Facility

### Overview

On October 10, 2007, in connection with the Merger and the repayment of certain existing indebtedness, Energy Future Competitive Holdings, TCEH and TCEH Finance, Inc., a wholly-owned subsidiary of TCEH ("TCEH Finance" and, together with TCEH, the "Co-Borrowers"), entered into the TCEH Senior Interim Facility with MSSF, as administrative agent, GSCP, as syndication agent, Citigroup, Credit Suisse, JPMCB and LCPI, as co-documentation agents, and GSCP, MSSF, Citigroup, Credit Suisse, JPMorgan and LBI, as joint lead arrangers and bookrunners.

The TCEH Senior Interim Facility provides senior unsecured financing of $6.75 billion, consisting of a:

- $5.0 billion senior unsecured cash pay term loan facility with an initial term of one year (the "TCEH Initial Cash Pay Loans"); and

- $1.75 billion senior unsecured toggle term loan facility with an initial term of one year (the "TCEH Initial Toggle Loans" and, together with the TCEH Initial Cash Pay Loans, the "TCEH Initial Loans").

159

EFIHMW00250231

The proceeds from this offering, along with cash on hand, will be used to repay $3.0 billion principal amount of the TCEH Initial Cash Pay Loans. If any borrowings under the TCEH Senior Interim Facility remain outstanding on the one-year anniversary (the "TCEH Initial Maturity Date") of the closing of the TCEH Senior Interim Facility, the lenders in respect of the TCEH Initial Cash Pay Loans and the lenders in respect of the TCEH Initial Toggle Loans will each have the option at any time or from time to time to exchange such TCEH Initial Loans for senior cash pay notes (the "TCEH Senior Cash Pay Exchange Notes") or such TCEH Initial Toggle Loans for senior toggle notes (the "TCEH Senior Toggle Exchange Notes" and, together with the TCEH Senior Cash Pay Exchange Notes, the "TCEH Senior Exchange Notes"), respectively, which the Co-Borrowers will issue under a senior indenture. On the TCEH Initial Maturity Date, the maturity date of any TCEH Initial Loans that have not been repaid will automatically be extended to the eighth anniversary, in the case of the TCEH Initial Cash Pay Loans (the "TCEH Cash Pay Final Maturity Date") and the ninth anniversary in the case of the TCEH Initial Toggle Loans (the "TCEH Toggle Final Maturity Date") of the closing of the TCEH Senior Interim Facility. The TCEH Senior Cash Pay Exchange Notes will also mature on the TCEH Cash Pay Final Maturity Date, and the TCEH Senior Toggle Exchange Notes will also mature on the TCEH Toggle Final Maturity Date. Holders of the TCEH Senior Exchange Notes will have registration rights.

*Interest Rate*

At the option of TCEH, borrowings under the TCEH Senior Interim Facility may take the form of ABR loans that bear interest at a base rate (equal to either the federal funds rate plus 50 basis points or the prime rate) plus an applicable margin, or as LIBOR loans that bear interest at LIBOR plus an applicable margin. The initial applicable margin on ABR loans is 300 basis points with respect to Company Initial Cash Pay Loans or 325 basis points with respect to Company Initial Toggle Loans. The initial applicable margin on LIBOR loans is 400 basis points with respect to Company Initial Cash Pay Loans or 425 basis points with respect to Company Initial Toggle Loans. On the six-month anniversary of the closing of the TCEH Senior Interim Facility, the applicable margin on any outstanding ABR loans and LIBOR loans will increase by an additional 50 basis points and will continue to increase by an additional 25 basis points every three months until the loans are repaid in full. The maximum interest rates payable on borrowings under the TCEH Senior Interim Facility is capped. Currently, all borrowings under the TCEH Senior Interim Facility are LIBOR loans. If issued, the interest rate on the TCEH Senior Exchange Notes will be the same as the interest rate borne by the TCEH Initial Loans; provided, that if any TCEH Senior Exchange Notes are transferred by the lender to a third-party purchaser, the interest rate on those notes will be fixed at the interest rate in effect on the transfer date.

*Prepayments and Redemptions*

Until the TCEH Initial Maturity Date, the Co-Borrowers will also be required to prepay outstanding TCEH Initial Loans with the net proceeds of any refinancing debt, including from the concurrent offering of TCEH Notes. The Co-Borrowers will be required to make an offer to repay loans under the TCEH Senior Interim Facility and, following the TCEH Initial Maturity Date, repurchase TCEH Senior Exchange Notes with net proceeds from specified asset sales. In addition, after any payments required to be made to repay the TCEH Senior Interim Facility, the Co-Borrowers will be required to offer to repay loans and, if issued, to repurchase the TCEH Senior Exchange Notes upon the occurrence of a change of control. The Co-Borrowers may voluntarily repay outstanding TCEH Initial Loans, in whole or in part, at their option at any time upon three business days' prior notice, at par plus accrued and unpaid interest and subject to, in the case of TCEH Initial Loans based on LIBOR, customary "breakage" costs with respect to such LIBOR loans, other than customary "breakage" costs with respect to LIBOR loans. The Co-Borrowers may optionally redeem the TCEH Senior Exchange Notes other than fixed-rate exchange notes, if issued, in whole or in part, at any time at par plus accrued and

Highly Confidential

EFIHMW00250232

unpaid interest to the redemption date, provided that it also optionally prepays any outstanding TCEH Initial Loans on a pro rata basis.

If any TCEH Senior Exchange Note is sold by a lender to a third-party purchaser, and the interest rate on such TCEH Senior Exchange Note becomes fixed, such TCEH Senior Exchange Note will be non-callable prior to October 15, 2011, in the case of the TCEH Senior Cash Pay Exchange Notes, and prior to October 15, 2012, in the case of the TCEH Senior Toggle Exchange Notes, subject to equity clawback and make-whole provisions consistent with those applicable to the notes offered hereby, and will be callable thereafter at a specified premium.

The premium will decline ratably on each yearly anniversary of October 15, 2011, in the case of the TCEH Senior Cash Pay Exchange Notes, or October 15, 2011, in the case of the TCEH Senior Toggle Exchange Notes, to zero on October 15, 2013, in the case of the TCEH Senior Cash Pay Exchange Notes, and October 15, 2015, in the case of the TCEH Senior Toggle Exchange Notes.

### Guarantee

All obligations under the TCEH Senior Interim Facility and, if the TCEH Senior Exchange Notes are issued, the senior indenture, are jointly and severally guaranteed on a senior basis by Energy Future Competitive Holdings and each of TCEH's domestic subsidiaries that guarantees obligations under the TCEH Senior Secured Facilities.

### Certain Covenants and Events of Default

The TCEH Senior Interim Facility and the senior indenture contain a number of covenants that, among other things, restrict, subject to certain exceptions, the Co-Borrowers' and their restricted subsidiaries' ability to:

- incur additional indebtedness;
- create liens;
- engage in mergers or consolidations;
- sell or transfer assets and subsidiary stock;
- pay dividends and distributions or repurchase their capital stock;
- make certain investments, loans or advances;
- prepay certain indebtedness;
- enter into agreements that restrict the payment of dividends by subsidiaries or the repayment of intercompany loans and advances; and
- engage in certain transactions with affiliates.

In addition, the TCEH Senior Interim Facility and the senior indenture impose certain requirements as to future subsidiary guarantors. The TCEH Senior Interim Facility and the senior indenture also contain certain customary affirmative covenants consistent with those in the TCEH Senior Secured Facilities, to the extent applicable, and certain customary events of default, including, without limitation, a failure to pay principal, interest or other amounts when due, a breach of a covenant, including the obligation to issue TCEH Senior Exchange Notes, cross-default, the entry of a material judgment against TCEH or a restricted subsidiary, bankruptcy or insolvency events or the invalidity of a guarantee. These events of default may allow for certain grace periods and materiality limitations.

161

Highly Confidential

**Indebtedness Guaranteed by Energy Future Competitive Holdings**

*EFH Senior Interim Facility*

On October 10, 2007, in connection with the Merger and the repayment of certain existing indebtedness, EFH Corp. entered into the EFH Senior Interim Facility with MSSF, as administrative agent, GSCP, as syndication agent, Citigroup, Credit Suisse, JPMCB and LCPI, as co-documentation agents, and GSCP, MSSF, Citigroup, Credit Suisse, JPMorgan and LBI, as joint lead arrangers and bookrunners. The EFH Senior Interim Facility provided senior unsecured financing of $4.5 billion, consisting of a:

- $2.0 billion senior unsecured cash pay term loan facility with an initial term of one year; and

- $2.5 billion senior unsecured toggle term loan facility with an initial term of one year.

The proceeds of the concurrent offering of EFH Corp. Notes, along with cash on hand, will be used to repay in full the EFH Senior Interim Facility.

**EFH Corp. Notes**

Concurrently with the offering of the notes hereby, EFH Corp., the indirect parent company of the Issuer, is offering the EFH Corp. Notes. The proceeds from the issuance of EFH Corp. Notes, along with cash on hand, will be used to repay in full the EFH Senior Interim Facility.

The indenture governing the EFH Corp. Notes will limit EFH Corp.'s and its restricted subsidiaries' ability, among other things, to:

- incur additional indebtedness;

- create liens;

- engage in mergers or consolidations;

- pay dividends on or make other distributions on or make other distributions or repurchase its capital stock;

- make certain investments;

- enter into certain types of transactions with affiliates; and

- sell certain assets or merge with or into other companies.

Subject to certain exceptions, the indenture governing the EFH Corp. Notes will permit EFH Corp. and its restricted subsidiaries to incur additional indebtedness.

**Existing Secured Indebtedness**

Upon the closing of the Merger, Energy Future Competitive Holdings had outstanding approximately $342 million of existing secured debt, consisting primarily of the following:

*Energy Future Competitive Holdings*

- $78 million aggregate principal amount of Energy Future Competitive Holdings 7.460% Fixed Secured Facility Bonds with amortizing payments to 2015. In 1987, Energy Future Competitive Holdings entered into an operating lease arrangement for certain combustion turbine generating facilities. In March 2006, Energy Future Competitive Holdings purchased the owner participant interest in the lease and assumed $91 million aggregate principal amount of these bonds, which were issued to refinance the initial series of secured facility bonds that were issued in conjunction with the lease.

162

EFIHMW00250234

- In 1990, Energy Future Competitive Holdings repurchased an electric cooperative's minority interest in the Comanche Peak nuclear generation plant and assumed payment of $174 million of the electric cooperative's indebtedness to the U.S. government. Pursuant to the assumption agreement, Energy Future Competitive Holdings makes principal and interest payments to the cooperative in an amount sufficient to allow the cooperative to make the required payments to the U.S. government. The debt is secured by a mortgage on the minority interest that was transferred to Energy Future Competitive Holdings and outstanding as follows:

  - $62 million aggregate principal amount of Energy Future Competitive Holdings 9.580% Fixed Notes due in semi-annual installments to December 2019; and

  - $58 million aggregate principal amount of Energy Future Competitive Holdings 8.254% Fixed Notes due in quarterly installments to December 2021.

### TCEH

- $87 million capital lease—In August 2005, TCEH entered into a lease for a rail spur at the Big Brown generation plant. The capital lease refinanced an existing operating lease on the rail spur. An obligation of $95 million was reported as long-term debt.

- $5 million capital lease for office furniture that expires in December 2012.

- $52 million capital lease associated with rail cars.

### Debt Repayment

*Tender Offers and Consent Solicitations*.    In connection with the Merger, EFH Corp. tendered for $250 million of TCEH's outstanding 6.125% Senior Notes due 2008 and $1.0 billion of TCEH's outstanding 7.000% Senior Notes due 2013, which we refer to as the "Specified Notes." On the closing date of the Merger, TCEH repaid an aggregate of $247 million of the TCEH 6.125% Senior Notes due 2008 and $995 million of the TCEH 7.000% Senior Notes due 2013. In connection with the tender offers for the Specified Notes, we solicited and obtained consents from the holders of the Specified Notes to amend or waive certain terms of the indentures governing the Specified Notes, the officer's certificates governing the Specified Notes and the Specified Notes themselves. The amendments and waivers for which consents were obtained would, among other things, eliminate certain covenants contained in the indentures and the officer's certificates governing the Specified Notes and the Specified Notes, eliminate certain events of default, modify covenants regarding mergers and consolidations, and modify or eliminate certain other provisions, including certain provisions relating to satisfaction and discharge, contained in the indentures and the officer's certificates governing the Specified Notes and the Specified Notes.

*Other Debt Repayment*.    Including the Specified Notes, in connection with the Merger, we redeemed or repaid or expect to repay an aggregate of approximately $4.5 billion of existing indebtedness of Energy Future Competitive Holdings and its subsidiaries, including debt that became payable upon the consummation of the Merger. Included in the aggregate amount of the Debt Repayment is the repayment in full of outstanding amounts under the credit facilities of TCEH and, in addition, to redeem all of the outstanding $1.0 billion aggregate principal amount of 5.860% Floating Rate Senior Notes due September 16, 2008 of TCEH.

### Existing Unsecured Senior Notes and Debentures

Upon the closing of the Merger and the repayment of indebtedness as described under "—Debt Repayment", an aggregate principal amount of $4,270 million of existing unsecured senior notes and

163

debentures of EFH Corp. and its subsidiaries (other than Oncor Electric Delivery) remained outstanding:

- **_EFH Corp. Senior Notes_**

  a) $2,500 million aggregate principal amount of EFH Corp. Senior Notes, issued in November 2004, in the following series:

    - $1,000 million of its 5.55% Series P Senior Notes due November 15, 2014;

    - $750 million of its 6.50% Series Q Senior Notes due November 15, 2024; and

    - $750 million of its 6.55% Series R Senior Notes due November 15, 2034.

  b) $200 million aggregate principal amount of EFH Corp. 6.375% Series C Senior Notes due 2008 issued in January 1998 (to the extent not tendered in the tenders offers described under "—Debt Repayment—Tenders Offers and Consent Solicitations" or otherwise defeased or redeemed).

  c) $25 million aggregate principal amount of EFH Corp. Floating Rate Convertible Senior Notes due 2033:

    These notes bear regular interest at an annual floating rate equal to three-month LIBOR, determined quarterly, plus 150 basis points, and are payable in arrears quarterly commencing on October 15, 2003. The notes will bear additional contingent interest during periods after July 15, 2008 if the average trading price of the notes for a specified period exceeds 120% of the principal amount of the notes.

    As of October 10, 2007, the notes are convertible only into cash. The amount of cash payable upon conversion per $1,000 principal amount of notes is $4,274.05 which notes are payable upon notice from the holders.

  EFH Corp. will require funds from its subsidiaries, including TCEH, to fund the interest and principal payments on this indebtedness.

**_Energy Future Competitive Holdings Debentures_**

  a) $1 million aggregate principal amount of Energy Future Competitive Holdings Floating Rate Junior Subordinated Debentures, Series D due 2037, issued in January 1997 (initially issued in $100 million principal amount of which $98.7 million has been redeemed).

  b) $8 million aggregate principal amount of Energy Future Competitive Holdings 8.175% Fixed Junior Subordinated Debentures, Series E due 2037, issued in January 1997 (initially issued in $400 million principal amount, of which $391.553 million has been redeemed).

**TCEH Pollution Control Revenue Bonds**

  Upon the closing of the Merger, TCEH also had outstanding $1,536 million aggregate principal amount of TCEH tax-exempt pollution control revenue bonds consisting of the following series issued by the following river authorities:

  a) Brazos River Authority:

    - $39 million aggregate principal amount of 5.400% Fixed Series 1994A due May 1, 2029;

    - $111 million aggregate principal amount of 7.700% Fixed Series 1999A due April 1, 2033;

    - $16 million aggregate principal amount of 6.750% Fixed Series 1999B due September 1, 2034, remarking date April 1, 2013;

164

EFIHMW00250236

- $50 million aggregate principal amount of 7.700% Fixed Series 1999C due March 1, 2032;

- $71 million aggregate principal amount of Floating Rate Series 2001A due October 1, 2030;

- $217 million aggregate principal amount of 5.750% Fixed Series 2001C due May 1, 2036, remarketing date November 1, 2011;

- $268 million aggregate principal amount of Floating Rate Series 2001D due May 1, 2033;

- $62 million aggregate principal amount of Floating Rate Taxable Series 2001I due December 1, 2036;

- $45 million aggregate principal amount of Floating Rate Series 2002A due May 1, 2037;

- $44 million aggregate principal amount of 6.750% Fixed Series 2003A due April 1, 2038, remarketing date April 1, 2013;

- $39 million aggregate principal amount of 6.300% Fixed Series 2003B due July 1, 2032;

- $52 million aggregate principal amount of 6.750% Fixed Series 2003C due October 1, 2038;

- $31 million aggregate principal amount of 5.400% Fixed Series 2003D due October 1, 2029, remarketing date October 1, 2014; and

- $100 million aggregate principal amount of 5.000% Fixed Series 2006 due March 1, 2041.

b)    Sabine River Authority of Texas:

- $51 million aggregate principal amount of 6.450% Fixed Series 2000A due June 1, 2021;

- $92 million aggregate principal amount of 5.500% Fixed Series 2001A due May 1, 2022, remarketing date November 1, 2011;

- $107 million aggregate principal amount of 5.750% Fixed Series 2001B due May 1, 2030;

- $70 million aggregate principal amount of 5.200% Fixed Series 2001C due May 1, 2028, remarketing date November 1, 2011;

- $12 million aggregate principal amount of 5.800% Fixed Series 2003A due July 1, 2022; and

- $45 million aggregate principal amount of 6.150% Fixed Series 2003B due August 1, 2022.

c)    Trinity River Authority of Texas:

- $14 million aggregate principal amount of 6.250% Fixed Series 2000A due May 1, 2028.

Highly Confidential

EFIHMW00250237

**DESCRIPTION OF NOTES**

**General**

Certain terms used in this description are defined under the subheading "Certain Definitions." In this description, (i) the terms "*we*," "*our*" and "*us*" each refer to Energy Future Competitive Holdings and its consolidated Subsidiaries, (ii) the term "*Issuer*" refers only to collectively, Texas Competitive Electric Holdings Company LLC and TCEH Finance, Inc., a Delaware corporation and a direct, wholly-owned subsidiary of TCEH, and not any of their respective subsidiaries and (iii) the term "Parent Guarantor" refers only to Energy Future Competitive Holdings and not any of its subsidiaries.

The Issuer will issue $3,000,000,000 aggregate principal amount of 10.25% senior notes due 2015 (the "*Notes*") under an Indenture to be dated as of October 31, 2007 (the "*Indenture*") among the Issuer, the Guarantors and The Bank of New York, as trustee (the "*Trustee*"). The Notes will be issued in a private transaction that is not subject to the registration requirements of the Securities Act. See "Notice to Investors." Except as set forth herein, the terms of the Notes will be substantially identical and include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act.

The Holders of the Notes, by accepting the Notes, acknowledge (i) the legal separateness of the Parent Guarantor and its subsidiaries from Oncor Holdings and the other Oncor Subsidiaries, (ii) that the lenders under the Oncor Electric Delivery Facility and the holders of the existing Oncor notes and Oncor's transition bonds have likely advanced funds thereunder in reliance upon the separateness of Oncor Holdings and the other Oncor Subsidiaries from the Parent Guarantor and its subsidiaries, (iii) that Oncor Holdings and the other Oncor Subsidiaries have assets and liabilities that are separate from those of the Parent Guarantor and its subsidiaries, (iv) that the obligations owing under the Notes are obligations and liabilities of the Issuer, the Parent Guarantor and the other Guarantors only, and are not the obligations or liabilities of Oncor Holdings or any of the other Oncor Subsidiaries, (v) that the Holders of the Notes shall look solely to the Parent Guarantor and its subsidiaries and their assets, and not to any assets, or to the pledge of any assets, owned by Oncor Holdings or any of the other Oncor Subsidiaries, for the repayment of any amounts payable pursuant to the Notes and for satisfaction of any other obligations owing to the Holders under the Indenture, the Registration Rights Agreement and any related documents and (vi) that none of Oncor Holdings or any of the other Oncor Subsidiaries shall be personally liable to the Holders of the Notes for any amounts payable, or any other obligation, under the Indenture, the Registration Rights Agreement or any related documents.

The Holders of the Notes, by accepting the Notes, shall acknowledge and agree that the Holders of the Notes shall not (i) initiate any legal proceeding to procure the appointment of an administrative receiver or (ii) institute any bankruptcy, reorganization, insolvency, winding up, liquidation, or any like proceeding under applicable law, against Oncor Holdings or any of the other Oncor Subsidiaries, or against any of Oncor Holdings' of the other Oncor Subsidiaries' assets. The Holders further acknowledge and agree that Oncor Holdings and each of the other Oncor Subsidiaries is a third party beneficiary of the foregoing covenant and shall have the right to specifically enforce such covenant in any proceeding at law or in equity. The foregoing acknowledgements and agreements are contained in the indenture governing the notes.

The following description is only a summary of the material provisions of the Indenture, does not purport to be complete and is qualified in its entirety by reference to the provisions of the Indenture, including the definitions therein of certain terms used below. We urge you to read the Indenture because it, and not this description, will define your rights as Holders of the Notes. You may request copies of the Indenture at our address set forth under the heading "Summary."

166

EFIHMW00250238

**Brief Description of Notes**

The Notes:

- will be unsecured senior obligations of the Issuer;

- will be effectively subordinated to all secured Indebtedness of the Issuer, including the Issuer's obligations under the TCEH Senior Secured Facilities, to the extent of the value of the assets securing such Indebtedness;

- will be structurally subordinated to any existing and future indebtedness and liabilities of non-guarantor Subsidiaries, including any of the Issuer's Foreign Subsidiaries and any Unrestricted Subsidiaries;

- will rank equally in right of payment with all existing and future unsecured Senior Indebtedness of the Issuer (including any amounts that remain outstanding under the TCEH Senior Interim Facility and applicable Existing Notes);

- will be senior in right of payment to any future Subordinated Indebtedness of the Issuer;

- will be initially unconditionally guaranteed on a joint and several and senior basis by Energy Future Competitive Holdings Company (which we refer to herein as the "Parent Guarantor") and by each Restricted Subsidiary that guarantees the Issuer's obligations under the TCEH Senior Secured Facilities; and

- will be subject to registration with the SEC pursuant to the Registration Rights Agreement.

**Guarantees**

The Guarantors, as primary obligors and not merely as sureties, will initially jointly and severally fully and unconditionally guarantee, on a senior basis, the performance and full and punctual payment when due, whether at maturity, by acceleration or otherwise, of all obligations of the Issuer under the Indenture and the Notes, whether for payment of principal of, premium, if any, or interest or Additional Interest in respect of the Notes, expenses, indemnification or otherwise, on the terms set forth in the Indenture by executing the Indenture.

The Parent Guarantor and each Restricted Subsidiary that guarantees the Issuer's obligations under the TCEH Senior Secured Facilities will initially guarantee the Notes. Each of the Guarantees of the Notes will be a general unsecured senior obligation of each Guarantor. The Guarantees will rank equally in right of payment with all existing and future Senior Indebtedness of the Guarantor and will be effectively subordinated to all Secured Indebtedness of such Guarantor to the extent of the value of the collateral securing such Indebtedness. The Guarantees will be senior in right of payment to all existing and future Subordinated Indebtedness of each Guarantor. The Notes will be structurally subordinated to Indebtedness and other liabilities of Subsidiaries of the Issuer that do not Guarantee the Notes.

The obligations of each Guarantor under its Guarantee will be limited as necessary to prevent the Guarantee from constituting a fraudulent conveyance under applicable law.

Any entity that makes a payment under its Guarantee will be entitled upon payment in full of all guaranteed obligations under the Indenture to a contribution from each other Guarantor in an amount equal to such other Guarantor's pro rata portion of such payment based on the respective net assets of all the Guarantors at the time of such payment determined in accordance with GAAP.

If a Guarantee were rendered voidable, it could be subordinated by a court to all other indebtedness (including guarantees and other contingent liabilities) of the Guarantor, and, depending on the amount of such indebtedness, a Guarantor's liability on its Guarantee could be reduced to zero.

167

EFIHMW00250239

**PX 006**
**Page 174 of 382**

See "Risk Factors—Risks Relating to Our Indebtedness and the Notes—Federal and state statutes allow courts, under specific circumstances, to void guarantees, subordinate claims in respect of guarantees and require note holders to return payments received from future guarantors, if any."

Each Guarantee by a Guarantor (other than the Parent Guarantor) will provide by its terms that it will be automatically and unconditionally released and discharged upon:

(1)   (a) any sale, exchange or transfer (by merger or otherwise) of the Capital Stock of such Guarantor (including any sale, exchange or transfer), after which the applicable Guarantor is no longer a Restricted Subsidiary or sale of all or substantially all the assets of such Guarantor, which sale, exchange or transfer is made in compliance with the applicable provisions of the Indenture;

(b) the release or discharge of its guarantee under the TCEH Senior Secured Facilities or of the guarantee by such Guarantor that resulted in the creation of such Guarantee, except a discharge or release by or as a result of payment under such guarantee;

(c) the designation of any Restricted Subsidiary that is a Guarantor as an Unrestricted Subsidiary in compliance with the applicable provisions of the Indenture; or

(d) the exercise by the Issuer of its legal defeasance option or covenant defeasance option as described under "Legal Defeasance and Covenant Defeasance" or the discharge of the Issuer's obligations under the Indenture in accordance with the terms of the Indenture; and

(2) such Guarantor delivering to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that all conditions precedent provided for in the Indenture relating to such transaction have been complied with.

**Holding Company Structure**

Each of the Parent Guarantor and the Issuer is a holding company for its Subsidiaries, with no material operations of its own and only limited assets. Accordingly, each of the Parent Guarantor and the Issuer is dependent upon the distribution of the earnings of its Subsidiaries, whether in the form of dividends, advances or payments on account of intercompany obligations, to service its debt obligations.

**Paying Agent and Registrar for the Notes**

The Issuer will maintain one or more paying agents for the Notes in the Borough of Manhattan, City of New York. The initial paying agent for the Notes will be the Trustee.

The Issuer will also maintain a registrar with offices in the Borough of Manhattan, City of New York. The initial registrar will be the Trustee. The registrar will maintain a register reflecting ownership of the Notes outstanding from time to time and will make payments on and facilitate transfer of Notes on behalf of the Issuer.

The Issuer may change the paying agents or the registrars without prior notice to the Holders. The Issuer or any of its Subsidiaries may act as a paying agent or registrar.

**Transfer and Exchange**

A Holder may transfer or exchange Notes in accordance with the Indenture. The registrar and the Trustee may require a Holder to furnish appropriate endorsements and transfer documents in connection with a transfer of Notes. Holders will be required to pay all taxes due on transfer. The

Highly Confidential

Issuer will not be required to transfer or exchange any Note selected for redemption. Also, the Issuer will not be required to transfer or exchange any Note for a period of 15 days before a selection of Notes to be redeemed.

**Principal, Maturity and Interest**

The Issuer will issue $3,000,000,000 in aggregate principal amount of Notes in this offering. The Notes will mature on November 1, 2015. Subject to compliance with the covenant described below under "Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock," the Issuer may issue additional Notes from time to time after this offering under the Indenture (any such Notes, "*Additional Notes*"). The Notes offered by the Issuer and any Additional Notes subsequently issued under the Indenture will be treated as a single class for all purposes under the Indenture, including waivers, amendments, redemptions and offers to purchase. Unless the context requires otherwise, references to "Notes" for all purposes of the Indenture and this "Description of Notes" include any Additional Notes that are actually issued.

Interest on the Notes will accrue at the rate of 10.25% per annum and will be payable semi-annually in arrears on May 1 and November 1, commencing on May 1, 2008, to the Holders of Notes of record on the immediately preceding April 15 and October 15. Interest on the Notes will accrue from the most recent date to which interest has been paid or, if no interest has been paid, from and including the Issue Date. Interest on the Notes will be computed on the basis of a 360-day year comprised of twelve 30-day months.

*Additional Interest*

Additional Interest may accrue on the Notes in certain circumstances pursuant to the Registration Rights Agreement. All references in the Indenture, in any context, to any interest or other amount payable on or with respect to the Notes shall be deemed to include any Additional Interest pursuant to the Registration Rights Agreement. Principal of, premium, if any, and interest on the Notes will be payable at the office or agency of the Issuer maintained for such purpose within the City and State of New York or, at the option of the Issuer, payment of interest may be made by check mailed to the Holders of the Notes at their respective addresses set forth in the register of Holders; *provided* that all payments of principal, premium, if any, and interest with respect to the Notes represented by one or more global notes registered in the name of or held by The Depository Trust Company ("DTC") or its nominee will be made by wire transfer of immediately available funds to the accounts specified by the Holder or Holders thereof. Until otherwise designated by the Issuer, the Issuer's office or agency in New York will be the office of the Trustee maintained for such purpose.

**Mandatory Redemption; Offers to Purchase; Open Market Purchases**

The Issuer will not be required to make any mandatory redemption or sinking fund payments with respect to the Notes. However, under certain circumstances, the Issuer may be required to offer to purchase Notes as described under the caption "Repurchase at the Option of Holders." The Issuer may at any time and from time to time purchase Notes in the open market or otherwise.

**Optional Redemption**

Except as set forth below, the Issuer will not be entitled to redeem Notes at its option prior to November 1, 2011.

At any time prior to November 1, 2011, the Issuer may redeem all or a part of the Notes, upon not less than 30 nor more than 60 days' prior notice mailed by first-class mail to the registered address of

Highly Confidential

EFIHMW00250241

each Holder of Notes or otherwise in accordance with the procedures of DTC, at a redemption price equal to 100% of the principal amount of the Notes redeemed plus the Applicable Premium as of, and accrued and unpaid interest and Additional Interest, if any, to the date of redemption (the "*Redemption Date*"), subject to the rights of Holders of Notes on the relevant record date to receive interest due on the relevant interest payment date.

On and after November 1, 2011, the Issuer may redeem the Notes, in whole or in part, upon not less than 30 nor more than 60 days' prior notice mailed by first-class mail to the registered address of each Holder of Notes or otherwise in accordance with the procedures of DTC, at the redemption prices (expressed as percentages of principal amount of the Notes to be redeemed) set forth below, plus accrued and unpaid interest thereon and Additional Interest, if any, to the applicable Redemption Date, subject to the right of Holders of Notes of record on the relevant record date to receive interest due on the relevant interest payment date, if redeemed during the twelve-month period beginning on November 1 of each of the years indicated below:

| Year | Percentage |
| --- | --- |
| 2011 | 105.125% |
| 2012 | 102.563% |
| 2013 and thereafter | 100.000% |

In addition, until November 1, 2010, the Issuer may, at its option, on one or more occasions redeem up to 35% of the aggregate principal amount of Notes at a redemption price equal to 110.250% of the aggregate principal amount thereof, plus accrued and unpaid interest thereon and Additional Interest, if any, to the applicable Redemption Date, subject to the right of Holders of Notes of record on the relevant record date to receive interest due on the relevant interest payment date, with the net cash proceeds of one or more Equity Offerings; *provided* that at least 50% of the sum of the original aggregate principal amount of Notes issued under the Indenture and the original principal amount of any Additional Notes that are Notes issued under the Indenture after the Issue Date remains outstanding immediately after the occurrence of each such redemption; *provided further* that each such redemption occurs within 90 days of the date of closing of each such Equity Offering.

Any notice of any redemption may be given prior to the redemption thereof, and any such redemption or notice may, at the Issuer's discretion, be subject to one or more conditions precedent, including, but not limited to, completion of an Equity Offering or other corporate transaction.

If the Issuer redeems less than all of the outstanding Notes, the Trustee shall select the Notes to be redeemed in the manner described under "Repurchase at the Option of Holders—Selection and Notice."

**Repurchase at the Option of Holders**

*Change of Control*

The Notes will provide that if a Change of Control occurs, unless the Issuer has previously or concurrently mailed a redemption notice with respect to all the outstanding Notes as described under "Optional Redemption" and will redeem all of the outstanding Notes pursuant thereto, the Issuer will make an offer to purchase all of the Notes pursuant to the offer described below (the "*Change of Control Offer*") at a price in cash (the "*Change of Control Payment*") equal to 101% of the aggregate principal amount thereof plus accrued and unpaid interest and Additional Interest, if any, to the date of purchase, subject to the right of Holders of the Notes of record on the relevant record date to receive interest due on the relevant interest payment date. Within 30 days following any Change of Control, the Issuer will send notice of such Change of Control Offer by first-class mail, with a copy to the Trustee, to

170

EFIHMW00250242

**PX 006**
**Page 177 of 382**

each Holder of Notes to the address of such Holder appearing in the security register with a copy to the Trustee or otherwise in accordance with the procedures of DTC, with the following information:

(1) that a Change of Control Offer is being made pursuant to the covenant entitled "Change of Control" and that all Notes properly tendered pursuant to such Change of Control Offer will be accepted for payment by the Issuer;

(2) the purchase price and the purchase date, which will be no earlier than 30 days nor later than 60 days from the date such notice is mailed (the "*Change of Control Payment Date*");

(3) that any Note not properly tendered will remain outstanding and continue to accrue interest;

(4) that unless the Issuer defaults in the payment of the Change of Control Payment, all Notes accepted for payment pursuant to the Change of Control Offer will cease to accrue interest on the Change of Control Payment Date;

(5) that Holders electing to have any Notes purchased pursuant to a Change of Control Offer will be required to surrender such Notes, with the form entitled "Option of Holder to Elect Purchase" on the reverse of such Notes completed, to the paying agent specified in the notice at the address specified in the notice prior to the close of business on the third Business Day preceding the Change of Control Payment Date;

(6) that Holders will be entitled to withdraw their tendered Notes and their election to require the Issuer to purchase such Notes; *provided* that the paying agent receives, not later than the close of business on the expiration date of the Change of Control Offer, a telegram, facsimile transmission or letter setting forth the name of the Holder of the Notes, the principal amount of Notes tendered for purchase, and a statement that such Holder is withdrawing its tendered Notes and its election to have such Notes purchased;

(7) that the Holders whose Notes are being repurchased only in part will be issued new Notes and such new Notes will be equal in principal amount to the unpurchased portion of the Notes surrendered. The unpurchased portion of the Notes must be equal to $2,000 or an integral multiple of $1,000 in excess thereof; and

(8) the other instructions, as determined by TCEH, consistent with the covenant described hereunder, that a Holder must follow.

The Issuer will comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder to the extent such laws or regulations are applicable in connection with the repurchase of Notes pursuant to a Change of Control Offer. To the extent that the provisions of any securities laws or regulations conflict with the provisions of the Indenture, the Issuer will comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations described in the Indenture by virtue thereof.

On the Change of Control Payment Date, the Issuer will, to the extent permitted by law,

(1) accept for payment all Notes issued by it or portions thereof properly tendered pursuant to the Change of Control Offer;

(2) deposit with the paying agent an amount equal to the aggregate Change of Control Payment in respect of all Notes or portions thereof so tendered; and

(3) deliver, or cause to be delivered, to the Trustee for cancellation the Notes so accepted together with an Officer's Certificate to the Trustee stating that such Notes or portions thereof have been tendered to and purchased by the Issuer.

171

EFIHMW00250243

The TCEH Senior Secured Facilities, and future credit agreements or other agreements relating to Senior Indebtedness to which the Issuer becomes a party may, provide that certain change of control events with respect to the Issuer would constitute a default thereunder (including a Change of Control under the Indenture). If we experience a change of control that triggers a default under the TCEH Senior Secured Facilities, we could seek a waiver of such default or seek to refinance the TCEH Senior Secured Facilities. In the event we do not obtain such a waiver or refinance the TCEH Senior Secured Facilities, such default could result in amounts outstanding under the TCEH Senior Secured Facilities being declared due and payable and could cause a Receivables Facility to be wound down.

Our ability to pay cash to the Holders of Notes following the occurrence of a Change of Control may be limited by our then-existing financial resources. Therefore, sufficient funds may not be available when necessary to make any required repurchases.

The Change of Control purchase feature of the Notes may in certain circumstances make more difficult or discourage a sale or takeover of us and, thus, the removal of incumbent management. The Change of Control purchase feature is a result of negotiations between the Initial Purchasers and us. After the Issue Date, we have no present intention to engage in a transaction involving a Change of Control, although it is possible that we could decide to do so in the future. Subject to the limitations discussed below, we could, in the future, enter into certain transactions, including acquisitions, refinancings or other recapitalizations, that would not constitute a Change of Control under the Indenture, but that could increase the amount of indebtedness outstanding at such time or otherwise affect our capital structure or credit ratings. Restrictions on our ability to incur additional Indebtedness are contained in the covenants described under "Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" and "Certain Covenants—Liens." Such restrictions in the Indenture can be waived with the consent of the Required Holders of a majority in principal amount of the Required Debt. Except for the limitations contained in such covenants, however, the Indenture will not contain any covenants or provisions that may afford Holders of the Notes protection in the event of a highly leveraged transaction.

The Issuer will not be required to make a Change of Control Offer following a Change of Control if a third party makes the Change of Control Offer in the manner, at the times and otherwise in compliance with the requirements set forth in the Indenture applicable to a Change of Control Offer made by us and purchases all Notes validly tendered and not withdrawn under such Change of Control Offer. Notwithstanding anything to the contrary herein, a Change of Control Offer may be made in advance of a Change of Control, conditional upon such Change of Control, if a definitive agreement is in place for the Change of Control at the time of making of the Change of Control Offer.

The definition of "Change of Control" includes a disposition of all or substantially all of the assets of the Issuer to any Person. Although there is a limited body of case law interpreting the phrase "substantially all," there is no precise established definition of the phrase under applicable law. Accordingly, in certain circumstances there may be a degree of uncertainty as to whether a particular transaction would involve a disposition of "all or substantially all" of the assets of the Issuer. As a result, it may be unclear as to whether a Change of Control has occurred and whether a Holder of Notes may require the Issuer to make an offer to repurchase the Notes as described above.

The provisions under the Indenture relating to the Issuer's obligation to make an offer to repurchase the Notes as a result of a Change of Control may be waived or modified with the written consent of the Required Holders of a majority in principal amount of the Required Debt.

172

EFIHMW00250244

PX 006
Page 179 of 382

*Asset Sales*

The Indenture will provide that TCEH will not, and will not permit any of its Restricted Subsidiaries to consummate, directly or indirectly, an Asset Sale, unless:

(1) TCEH or such Restricted Subsidiary, as the case may be, receives consideration at the time of such Asset Sale at least equal to the fair market value (as determined in good faith by TCEH) of the assets sold or otherwise disposed of; and

(2) except in the case of a Permitted Asset Swap, at least 75% of the consideration therefor received by TCEH or such Restricted Subsidiary, as the case may be, is in the form of cash or Cash Equivalents; *provided* that the amount of:

(a) any liabilities (as shown on TCEH's or such Restricted Subsidiary's most recent balance sheet or in the footnotes thereto) of TCEH or such Restricted Subsidiary, other than liabilities that are by their terms subordinated to the Notes or that are owed to TCEH or an Affiliate of TCEH, that are assumed by the transferee of any such assets and for which TCEH and all of its Restricted Subsidiaries have been validly released by all applicable creditors in writing,

(b) any securities received by TCEH or such Restricted Subsidiary from such transferee that are converted by TCEH or such Restricted Subsidiary into cash (to the extent of the cash received) within 180 days following the closing of such Asset Sale, and

(c) any Designated Non-cash Consideration received by TCEH or such Restricted Subsidiary in such Asset Sale having an aggregate fair market value, taken together with all other Designated Non-cash Consideration received pursuant to this clause (c) that is at that time outstanding, not to exceed 5% of Total Assets at the time of the receipt of such Designated Non-cash Consideration, with the fair market value of each item of Designated Non-cash Consideration being measured at the time received and without giving effect to subsequent changes in value,

shall be deemed to be cash for purposes of this provision and for no other purpose.

Within 450 days after the receipt of any Net Proceeds of any Asset Sale, TCEH or such Restricted Subsidiary, at its option, may apply the Net Proceeds from such Asset Sale,

(1) to permanently reduce:

(a) Obligations under Senior Indebtedness which is Secured Indebtedness permitted by the Indenture, and to correspondingly reduce commitments with respect thereto;

(b) Obligations under other Senior Indebtedness (and to correspondingly reduce commitments with respect thereto); *provided* that the Issuer shall equally and ratably reduce Obligations under the Notes as provided under "Optional Redemption," through open-market purchases (to the extent such purchases are at or above 100% of the principal amount thereof) or otherwise by making an offer (in accordance with the procedures set forth below for an Asset Sale Offer) to all Holders to purchase their Notes at 100% of the principal amount thereof, plus the amount of accrued but unpaid interest, if any;

(c) Obligations under the Existing Notes which have a final maturity date (as in effect on the Closing Date) on or prior to October 15, 2016; *provided* that, at the time of, and after giving effect to, such repurchase, redemption or defeasance, the aggregate amount of Net Proceeds used to repurchase, redeem or defease Existing Notes pursuant to this subclause (c) following the Closing Date shall not exceed 3.5% of Total Assets at such time; or

173

EFIHMW00250245

(d) Indebtedness of a Restricted Subsidiary (other than TCEH Finance, Inc.) that is not a Guarantor, other than Indebtedness owed to TCEH or another Restricted Subsidiary (or any affiliate thereof);

(2) to make (a) an Investment in any one or more businesses, *provided* that such Investment in any business is in the form of the acquisition of Capital Stock and results in TCEH or another of its Restricted Subsidiaries, as the case may be, owning an amount of the Capital Stock of such business such that it constitutes a Restricted Subsidiary, (b) capital expenditures or (c) acquisitions of other assets, in each of (a), (b) and (c), used or useful in a Similar Business; or

(3) to make an Investment in (a) any one or more businesses, *provided* that such Investment in any business is in the form of the acquisition of Capital Stock and results in TCEH or another of its Restricted Subsidiaries, as the case may be, owning an amount of the Capital Stock of such business such that it constitutes a Restricted Subsidiary, (b) properties or (c) acquisitions of other assets that, in each of (a), (b) and (c), replace the businesses, properties and/or assets that are the subject of such Asset Sale;

*provided* that, in the case of clauses (2) and (3) above, a binding commitment shall be treated as a permitted application of the Net Proceeds from the date of such commitment so long as TCEH, or such other Restricted Subsidiary enters into such commitment with the good faith expectation that such Net Proceeds will be applied to satisfy such commitment within 180 days of such commitment (an "*Acceptable Commitment*") (and reinvest within the later of 450 days from the date of receipt of Net Proceeds and 180 days of receipt of such commitment) and, in the event any Acceptable Commitment is later cancelled or terminated for any reason before the Net Proceeds are applied in connection therewith, TCEH or such Restricted Subsidiary enters into another Acceptable Commitment (a "*Second Commitment*") within the later of (a) 180 days of such cancellation or termination or (b) the initial 450-day period; *provided further*, that if any Second Commitment is later cancelled or terminated for any reason before such Net Proceeds are applied, then such Net Proceeds shall constitute Excess Proceeds.

Notwithstanding the preceding paragraph, in the event that regulatory approval is necessary for an asset or investment, or replacement, repair or restoration on any asset or investment, then TCEH or any Restricted Subsidiary shall have an additional 365 days to apply the Net Proceeds from such Asset Sale in accordance with the preceding paragraph.

Any Net Proceeds from Asset Sales that are not invested or applied as provided and within the time period set forth in the first sentence of the second preceding paragraph will be deemed to constitute "*Excess Proceeds*." When the aggregate amount of Excess Proceeds exceeds $200.0 million, the Issuer shall make an offer to all Holders of the Notes and, if required or permitted by the terms of any Senior Indebtedness, to the holders of such Senior Indebtedness (an "*Asset Sale Offer*"), to purchase the maximum aggregate principal amount of the Notes and such Senior Indebtedness that is a minimum of $2,000 or an integral multiple of $1,000 in excess thereof that may be purchased out of the Excess Proceeds at an offer price in cash in an amount equal to 100% of the principal amount thereof, plus accrued and unpaid interest and Additional Interest, if any, to the date fixed for the closing of such offer, in accordance with the procedures set forth in the Indenture. The Issuer will commence an Asset Sale Offer with respect to Excess Proceeds within 10 Business Days after the date that Excess Proceeds exceed $200.0 million by mailing the notice required pursuant to the terms of the Indenture, with a copy to the Trustee.

To the extent that the aggregate amount of Notes and such Senior Indebtedness tendered pursuant to an Asset Sale Offer is less than the Excess Proceeds, TCEH may use any remaining Excess Proceeds for general corporate purposes, subject to other covenants contained in the Indenture. If the aggregate principal amount of Notes or the Senior Indebtedness surrendered by such

174

EFIHMW00250246

holders thereof exceeds the amount of Excess Proceeds, the Trustee shall select the Notes and such Senior Indebtedness to be purchased on a pro rata basis based on the accreted value or principal amount of the Notes or such Senior Indebtedness tendered. Additionally, the Issuer may, at its option, make an Asset Sale Offer using proceeds from any Asset Sale at any time after consummation of such Asset Sale; *provided* that such Asset Sale Offer shall be in an aggregate amount of not less than $25.0 million. Upon consummation of an Asset Sale Offer, any Net Proceeds not required to be used to purchase Notes shall not be deemed Excess Proceeds and any remaining amounts may be used to make Restricted Payments to the extent permitted by clause (16) of the second paragraph described under the caption "Limitation on Restricted Payments."

Pending the final application of any Net Proceeds pursuant to this covenant, the holder of such Net Proceeds may apply such Net Proceeds temporarily to reduce Indebtedness outstanding under a revolving credit facility or otherwise invest such Net Proceeds in any manner not prohibited by the Indenture.

The Issuer will comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder to the extent such laws or regulations are applicable in connection with the repurchase of the Notes pursuant to an Asset Sale Offer. To the extent that the provisions of any securities laws or regulations conflict with the provisions of the Indenture, the Issuer will comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations described in the Indenture by virtue thereof.

### Selection and Notice

If the Issuer is redeeming less than all of the Notes issued by it at any time, the Trustee will select the Notes to be redeemed (a) if the Notes are listed on any national securities exchange, in compliance with the requirements of the principal national securities exchange on which the Notes are listed, (b) on a pro rata basis to the extent practicable or (c) by lot or such other similar method in accordance with the procedures of DTC. No Notes of $2,000 or less can be redeemed in part.

Notices of purchase or redemption shall be mailed by first-class mail, postage prepaid, at least 30 but not more than 60 days before the purchase or Redemption Date to each Holder of Notes at such Holder's registered address or otherwise in accordance with the procedures of DTC, except that redemption notices may be mailed more than 60 days prior to a Redemption Date if the notice is issued in connection with a defeasance of the Notes or a satisfaction and discharge of the Indenture. If any Note is to be purchased or redeemed in part only, any notice of purchase or redemption that relates to such Note shall state the portion of the principal amount thereof that has been or is to be purchased or redeemed. The notice will also state any conditions applicable to a redemption.

The Issuer will issue a new Note in a principal amount equal to the unredeemed portion of the original Note in the name of the Holder upon cancellation of the original Note. Notes called for redemption become due on the date fixed for redemption, but such redemption may be subject to one or more conditions precedent. On and after the Redemption Date, interest ceases to accrue on Notes or portions thereof called for redemption.

175

EFIHMW00250247

**Certain Covenants**

*__Limitation on Restricted Payments__*

TCEH will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly:

(I) declare or pay any dividend or make any payment or distribution on account of TCEH's, or any of its Restricted Subsidiaries' Equity Interests, including any dividend or distribution payable in connection with any merger or consolidation other than:

(a) dividends or distributions by TCEH payable solely in Equity Interests (other than Disqualified Stock) of TCEH; or

(b) dividends or distributions by a Restricted Subsidiary so long as, in the case of any dividend or distribution payable on or in respect of any class or series of securities issued by a Restricted Subsidiary other than a Wholly-Owned Subsidiary, TCEH or a Restricted Subsidiary receives at least its pro rata share of such dividend or distribution in accordance with its Equity Interests in such class or series of securities;

(II) purchase, redeem, defease or otherwise acquire or retire for value any Equity Interests of TCEH or any direct or indirect parent of TCEH, including in connection with any merger or consolidation;

(III) make any principal payment on, or redeem, repurchase, defease or otherwise acquire or retire for value in each case, prior to any scheduled repayment, sinking fund payment or maturity, any Subordinated Indebtedness, other than:

(a) Indebtedness permitted under clauses (7) and (8) of the covenant described under "—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock"; or

(b) the purchase, repurchase or other acquisition of Subordinated Indebtedness purchased in anticipation of satisfying a sinking fund obligation, principal installment or final maturity, in each case due within one year of the date of purchase, repurchase or acquisition; or

(IV) make any Restricted Investment

(all such payments and other actions set forth in clauses (I) through (IV) above (other than any exception thereto) being collectively referred to as "*Restricted Payments*"), unless, at the time of such Restricted Payment:

(1) no Default shall have occurred and be continuing or would occur as a consequence thereof;

(2) immediately after giving effect to such transaction on a *pro forma* basis, TCEH could incur $1.00 of additional Indebtedness under the provisions of the first paragraph of the covenant described under "—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock;" and

(3) such Restricted Payment, together with the aggregate amount of all other Restricted Payments made by TCEH and its Restricted Subsidiaries after the Closing Date (including Restricted Payments permitted by clauses (1), (2) (with respect to the payment of dividends on Refunding Capital Stock (as defined below) pursuant to clause (b) thereof only), (6)(c), (9) and (14) of the next succeeding paragraph, but excluding all other Restricted Payments permitted by the next succeeding paragraph), is less than the sum of (without duplication):

(a) 50% of the Consolidated Net Income of TCEH for the period (taken as one accounting period) beginning October 1, 2007, to the end of TCEH's most recently ended

176

EFIHMW00250248

**PX 006
Page 183 of 382**

fiscal quarter for which internal financial statements are available at the time of such Restricted Payment, or, in the case such Consolidated Net Income for such period is a deficit, minus 100% of such deficit; *plus*

(b) 100% of the aggregate net cash proceeds and the fair market value, as determined in good faith by TCEH, of marketable securities or other property received by TCEH since immediately after the Closing Date (other than net cash proceeds to the extent such net cash proceeds have been used to incur Indebtedness, Disqualified Stock or Preferred Stock pursuant to clause (12)(a) of the second paragraph of "—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock") from the issue or sale of:

(i)(A) Equity Interests of TCEH, including Treasury Capital Stock (as defined below), but excluding cash proceeds and the fair market value, as determined in good faith by TCEH, of marketable securities or other property received from the sale of:

(x) Equity Interests to members of management, directors or consultants of TCEH, any direct or indirect parent company of TCEH and TCEH's Subsidiaries after the Closing Date to the extent such amounts have been applied to Restricted Payments made in accordance with clause (4) of the next succeeding paragraph; and

(y) Designated Preferred Stock; and

(B) to the extent such net cash proceeds are actually contributed to the capital of TCEH, Equity Interests of TCEH's direct or indirect parent companies (excluding contributions of the proceeds from the sale of Designated Preferred Stock of such companies or contributions to the extent such amounts have been applied to Restricted Payments made in accordance with clause (4) of the next succeeding paragraph); or

(ii) debt securities of TCEH that have been converted into or exchanged for such Equity Interests of TCEH;

*provided, however*, that this clause (b) shall not include the proceeds from (V) Refunding Capital Stock (as defined below), (W) Equity Interests or debt securities of TCEH sold to a Restricted Subsidiary, as the case may be, (X) Disqualified Stock or debt securities that have been converted into or exchanged for Disqualified Stock or (Y) Excluded Contributions; *plus*

(c) 100% of the aggregate amount of cash and the fair market value, as determined in good faith by TCEH, of marketable securities or other property contributed to the capital of TCEH following the Closing Date (other than net cash proceeds to the extent such net cash proceeds (i) have been used to incur Indebtedness, Disqualified Stock or Preferred Stock pursuant to clause (12)(a) of the second paragraph of "—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock," (ii) are contributed by a Restricted Subsidiary or (iii) constitute Excluded Contributions); *plus*

(d) 100% of the aggregate amount received in cash and the fair market value, as determined in good faith by TCEH, of marketable securities or other property received by means of:

(i) the sale or other disposition (other than to TCEH or a Restricted Subsidiary) of Restricted Investments made by TCEH or its Restricted Subsidiaries after the Closing Date and repurchases and redemptions of such Restricted Investments from TCEH or its Restricted Subsidiaries and repayments of loans or advances, and releases of guarantees, which constitute Restricted Investments by TCEH or its Restricted Subsidiaries, after the Closing Date; or

177

EFIHMW00250249

(ii) the sale (other than to TCEH or a Restricted Subsidiary) of the stock of an Unrestricted Subsidiary (other than to the extent the Investment in such Unrestricted Subsidiary was made by TCEH or a Restricted Subsidiary pursuant to clause (7) of the next succeeding paragraph or to the extent such Investment constituted a Permitted Investment) or a distribution or dividend from an Unrestricted Subsidiary after the Closing Date; *plus*

(e) in the case of the redesignation of an Unrestricted Subsidiary as a Restricted Subsidiary after the Closing Date, the fair market value of the Investment in such Unrestricted Subsidiary, as determined by TCEH in good faith (or if such fair market value exceeds $200.0 million, in writing by an Independent Financial Advisor), at the time of the redesignation of such Unrestricted Subsidiary as a Restricted Subsidiary other than to the extent the Investment in such Unrestricted Subsidiary was made by TCEH or a Restricted Subsidiary pursuant to clause (7) of the next succeeding paragraph or to the extent such Investment constituted a Permitted Investment.

The foregoing provisions will not prohibit:

(1) the payment of any dividend within 60 days after the date of declaration thereof, if at the date of declaration such payment would have complied with the provisions of the Indenture;

(2)(a) the redemption, repurchase, retirement or other acquisition of any Equity Interests ("*Treasury Capital Stock*") or Subordinated Indebtedness of the Issuer or a Guarantor or any Equity Interests of any direct or indirect parent company of TCEH, in exchange for, or out of the proceeds of the substantially concurrent sale (other than to a Restricted Subsidiary) of, Equity Interests of TCEH or any direct or indirect parent company of TCEH to the extent contributed to the capital of TCEH (in each case, other than any Disqualified Stock) ("*Refunding Capital Stock*") and (b) if immediately prior to the retirement of Treasury Capital Stock, the declaration and payment of dividends thereon was permitted under clause (6) of this paragraph, the declaration and payment of dividends on the Refunding Capital Stock (other than Refunding Capital Stock the proceeds of which were used to redeem, repurchase, retire or otherwise acquire any Equity Interests of any direct or indirect parent company of TCEH) in an aggregate amount per year no greater than the aggregate amount of dividends per annum that were declarable and payable on such Treasury Capital Stock immediately prior to such retirement;

(3) the redemption, repurchase or other acquisition or retirement of Subordinated Indebtedness of the Issuer or a Guarantor (other than the Parent Guarantor) made in exchange for, or out of the proceeds of the substantially concurrent sale of, new Indebtedness of the Issuer or a Guarantor, as the case may be, which is incurred in compliance with the covenant described under "—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" so long as:

(a) the principal amount (or accreted value) of such new Indebtedness does not exceed the principal amount of (or accreted value, if applicable), plus any accrued and unpaid interest on, the Subordinated Indebtedness being so redeemed, repurchased, acquired or retired for value, plus the amount of any reasonable premium (including reasonable tender premiums), defeasance costs and any reasonable fees and expenses incurred in connection with the issuance of such new Indebtedness;

(b) such new Indebtedness is subordinated to the Notes or the applicable Guarantee at least to the same extent as such Subordinated Indebtedness so purchased, exchanged, redeemed, repurchased, acquired or retired for value;

178

EFIHMW00250250

(c) such new Indebtedness has a final scheduled maturity date equal to or later than the final scheduled maturity date of the Subordinated Indebtedness being so redeemed, repurchased, acquired or retired; and

(d) such new Indebtedness has a Weighted Average Life to Maturity equal to or greater than the remaining Weighted Average Life to Maturity of the Subordinated Indebtedness being so redeemed, repurchased, acquired or retired;

(4) a Restricted Payment to pay for the repurchase, retirement or other acquisition or retirement for value of Equity Interests (other than Disqualified Stock) of TCEH or any of its direct or indirect parent companies held by any future, present or former employee, director or consultant of TCEH, any of its Subsidiaries or any of its direct or indirect parent companies pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement, including any Equity Interests rolled over by management of TCEH or any of its direct or indirect parent companies in connection with the Transactions; *provided*, *however*, that the aggregate Restricted Payments made under this clause (4) do not exceed in any calendar year $25.0 million (which shall increase to $50.0 million subsequent to the consummation of an underwritten public Equity Offering by TCEH or any direct or indirect parent entity of TCEH) (with unused amounts in any calendar year being carried over to succeeding calendar years subject to a maximum (without giving effect to the following proviso) of $75.0 million in any calendar year (which shall increase to $150.0 million subsequent to the consummation of an underwritten public Equity Offering by TCEH or any direct or indirect parent corporation of TCEH)); *provided further* that such amount in any calendar year may be increased by an amount not to exceed:

(a) the cash proceeds from the sale of Equity Interests (other than Disqualified Stock) of TCEH and, to the extent contributed to the capital of TCEH, Equity Interests of any of TCEH's direct or indirect parent companies, in each case to members of management, directors or consultants of the TCEH, any of its Subsidiaries or any of its direct or indirect parent companies that occurs after the Closing Date, to the extent the cash proceeds from the sale of such Equity Interests have not otherwise been applied to the payment of Restricted Payments by virtue of clause (3) of the preceding paragraph; *plus*

(b) the cash proceeds of key man life insurance policies received by TCEH or its Restricted Subsidiaries after the Closing Date; *less*

(c) the amount of any Restricted Payments previously made with the cash proceeds described in clauses (a) and (b) of this clause (4);

and *provided*, *further*, that cancellation of Indebtedness owing to TCEH or any Restricted Subsidiary from members of management of TCEH, any of TCEH's direct or indirect parent companies or any of TCEH's Restricted Subsidiaries in connection with a repurchase of Equity Interests of TCEH or any of its direct or indirect parent companies will not be deemed to constitute a Restricted Payment for purposes of this covenant or any other provision of the Indenture;

(5) the declaration and payment of dividends to holders of any class or series of Disqualified Stock of TCEH or any of its Restricted Subsidiaries or any class or series of Preferred Stock of any Restricted Subsidiary issued in accordance with the covenant described under "—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" to the extent such dividends are included in the definition of "Fixed Charges";

(6)(a) the declaration and payment of dividends to holders of any class or series of Designated Preferred Stock (other than Disqualified Stock) issued by TCEH after the Closing Date;

(b) the declaration and payment of dividends to a direct or indirect parent company of TCEH, the proceeds of which will be used to fund the payment of dividends to holders of

179

EFIHMW00250251

any class or series of Designated Preferred Stock (other than Disqualified Stock) of such parent corporation issued after the Closing Date; *provided* that the amount of dividends paid pursuant to this clause (b) shall not exceed the aggregate amount of cash actually contributed to the capital of TCEH from the sale of such Designated Preferred Stock; or

(c) the declaration and payment of dividends on Refunding Capital Stock that is Preferred Stock in excess of the dividends declarable and payable thereon pursuant to clause (2) of this paragraph;

*provided, however*, in the case of each of (a) and (c) of this clause (6), that for the most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date of issuance of such Designated Preferred Stock or the declaration of such dividends on Refunding Capital Stock that is Preferred Stock, after giving effect to such issuance or declaration on a *pro forma* basis, TCEH and its Restricted Subsidiaries on a consolidated basis would have had a Fixed Charge Coverage Ratio of at least 2.00 to 1.00;

(7) Investments in Unrestricted Subsidiaries having an aggregate fair market value, taken together with all other Investments made pursuant to this clause (7) that are at the time outstanding, without giving effect to the sale of an Unrestricted Subsidiary to the extent the proceeds of such sale do not consist of cash or marketable securities, not to exceed 1.0% of Total Assets at the time of such Investment (with the fair market value of each Investment being measured at the time made and without giving effect to subsequent changes in value);

(8) repurchases of Equity Interests deemed to occur upon exercise of stock options or warrants if such Equity Interests represent a portion of the exercise price of such options or warrants;

(9) the declaration and payment of dividends on TCEH's common stock (or the payment of dividends to any direct or indirect parent entity to fund a payment of dividends on such entity's common stock), following consummation of the first public offering of TCEH's common stock or the common stock of any of its direct or indirect parent companies after the Closing Date, of up to 6% per annum of the net cash proceeds received by or contributed to TCEH in or from any such public offering, other than public offerings with respect to TCEH's common stock registered on Form S-4 or Form S-8 and other than any public sale constituting an Excluded Contribution;

(10) Restricted Payments that are made with Excluded Contributions;

(11) (A) other Restricted Payments in an aggregate amount taken together with all other Restricted Payments made pursuant to this clause (A) not to exceed 2.0% of Total Assets at the time made; and (B) dividends to or, the making of loans to, EFH Corp. in an aggregate amount not to exceed $1,000.0 million, to the extent the proceeds of such loans or dividends are invested in any of the Oncor Subsidiaries; *provided* that no more than $500.0 million of payments under this clause (B) may be made other than by Intercompany Loans;

(12) distributions or payments of Receivables Fees;

(13) any Restricted Payment made as part of or in connection with the Transactions (including any payments made after the Closing Date in respect of the Issuer's and its Subsidiaries' long-term incentive plan or in respect of tax gross-ups and other deferred compensation) and the fees and expenses related thereto or used to fund amounts owed to Affiliates (including dividends to any direct or indirect parent of TCEH to permit payment by such parent of such amount), in each case to the extent permitted by the covenant described under "—Transactions with Affiliates";

(14) the repurchase, redemption or other acquisition or retirement for value of any Subordinated Indebtedness in accordance with the provisions similar to those described under the captions "Repurchase at the Option of Holders—Change of Control" and "Repurchase at the

180

EFIHMW00250252

Option of Holders—Asset Sales"; *provided* that all Notes tendered by Holders in connection with a Change of Control Offer or Asset Sale Offer, as applicable, have been repurchased, redeemed or acquired for value;

(15) the declaration and payment of dividends or distributions by TCEH to, or the making of loans to, any direct or indirect parent in amounts required for any direct or indirect parent companies to pay, in each case without duplication,

(a) franchise and excise taxes and other fees, taxes and expenses required to maintain their corporate existence;

(b) foreign, federal, state and local income taxes (including any amounts reimbursable to the Oncor Subsidiaries in respect of such taxes pursuant to a tax sharing agreement), to the extent such income taxes are attributable to the income of (i) EFH Corp. and its Subsidiaries (other than the Oncor Subsidiaries) and (ii) the Oncor Subsidiaries, to the extent the Oncor Subsidiaries have not reimbursed EFH Corp. or such direct or indirect parent of TCEH for such payments in amounts required to pay such taxes; *provided* that the amount of such payments in any fiscal year does not exceed the amount that EFH Corp. and its Subsidiaries, is required to pay in respect of foreign, federal, state and local income taxes for such fiscal year (including any amounts reimbursable to the Oncor Subsidiaries in respect of such taxes pursuant to a tax sharing agreement);

(c) customary salary, bonus and other benefits payable to officers and employees of EFH Corp. or any direct or indirect parent company of EFH Corp. that are paid in the ordinary course of business to the extent such salaries, bonuses and other benefits are attributable to (i) the ownership or operation of EFH Corp. and its Restricted Subsidiaries or (ii) the ownership and operation of the Oncor Subsidiaries, to the extent the Oncor Subsidiaries have not reimbursed EFH Corp. or such direct or indirect parent company of EFH Corp. for such payments;

(d) general corporate operating and overhead costs and expenses of EFH Corp. or any direct or indirect parent company of EFH Corp. that are incurred in the ordinary course of business to the extent such costs and expenses are attributable to (i) the ownership or operation of EFH Corp. and its Restricted Subsidiaries or (ii) the ownership and operation of the Oncor Subsidiaries, to the extent the Oncor Subsidiaries have not reimbursed EFH Corp. or such direct or indirect parent company of EFH Corp. for such payments;

(e) fees and expenses other than to Affiliates of TCEH related to any unsuccessful equity or debt offering of such parent entity;

(16) Restricted Payments that are made with Excess Proceeds remaining after the completion of any Asset Sale Offer in an amount not to exceed $200 million;

(17) the making of Intercompany Loans to EFH Corp. so long as TCEH is a Subsidiary of EFH Corp. (A) in amounts required for EFH Corp. to pay, in each case without duplication, principal, premium and interest when due on (x) the EFH Corp. Notes and any Indebtedness incurred to replace, refund or refinance such debt and (y) Indebtedness of EFH Corp. and Parent Guarantor in existence on the Closing Date, including the Existing EFH Corp. Notes and the Existing Parent Guarantor Notes, and any Indebtedness incurred to replace, refund or refinance such debt and (B) in amounts required for EFH Corp. and its Subsidiaries (other than the Issuer and its Subsidiaries) that guarantee debt of EFH Corp. to pay, without duplication, principal, premium and interest when due on any Indebtedness incurred after the Closing Date by EFH Corp. or such Subsidiaries after the Issue Date; *provided* that the aggregate amount of Intercompany Loans to EFH Corp. pursuant to this subclause (B) shall not exceed $600.0 million;

181

EFIHMW00250253

(18) any distributions of, or Investments in, accounts receivable for purposes of inclusion in any Receivables Facility for the benefit of TCEH or its Restricted Subsidiaries, in each case made in the ordinary course of business or consistent with past practices); or

(19) making of Intercompany Loans to EFH Corp. in an amount sufficient to permit EFH Corp. to make any Optional Interest Repayment (as defined in the EFH Corp. Notes), permitted by the terms of the EFH Corp. Notes or any similar payments on Indebtedness incurred to replace, refund or refinance such debt; *provided* that in connection with any such replacement, refunding or refinancing, the aggregate principal amount of such Indebtedness is not increased (except by an amount equal to accrued interest, fees and expenses payable in connection therewith);

*provided, however*, that at the time of, and after giving effect to (A) any Restricted Payment permitted under clause (7), (11) and (19), no Default shall have occurred and be continuing or would occur as a consequence thereof and (B) any Restricted Payment permitted under clause (17), no Default under clauses (1) or (2) under "Events of Default and Remedies" shall have occurred and be continuing or would occur as a consequence thereof or any payment default or bankruptcy event of default under the EFH Corp. Notes (or any Indebtedness incurred to replace, refund or refinance such debt) shall have occurred and be continuing.

As of the Issue Date, all of TCEH's Subsidiaries will be Restricted Subsidiaries. TCEH will not permit any Unrestricted Subsidiary to become a Restricted Subsidiary except pursuant to the last sentence of the definition of "Unrestricted Subsidiary." For purposes of designating any Restricted Subsidiary as an Unrestricted Subsidiary, all outstanding Investments by TCEH and its Restricted Subsidiaries (except to the extent repaid) in the Subsidiary so designated will be deemed to be Restricted Payments in an amount determined as set forth in the last sentence of the definition of "Investments." Such designation will be permitted only if a Restricted Payment in such amount would be permitted at such time, whether pursuant to the first paragraph of this covenant or under clause (7), (10) or (11) of the second paragraph of this covenant, or pursuant to the definition of "Permitted Investments," and if such Subsidiary otherwise meets the definition of an Unrestricted Subsidiary. Unrestricted Subsidiaries will not be subject to any of the restrictive covenants set forth in the Indenture.

### *Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock*

TCEH will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable, contingently or otherwise (collectively, "*incur*" and collectively, an "*incurrence*") with respect to any Indebtedness (including Acquired Indebtedness), and TCEH will not issue any shares of Disqualified Stock and will not permit any Restricted Subsidiary to issue any shares of Disqualified Stock or Preferred Stock; *provided, however*, that TCEH may incur Indebtedness (including Acquired Indebtedness) or issue shares of Disqualified Stock, and any of its Restricted Subsidiaries may incur Indebtedness (including Acquired Indebtedness), issue shares of Disqualified Stock and issue shares of Preferred Stock, if the Fixed Charge Coverage Ratio on a consolidated basis for TCEH and its Restricted Subsidiaries' most recently ended four fiscal quarters for which internal financial statements are available immediately preceding the date on which such additional Indebtedness is incurred or such Disqualified Stock or Preferred Stock is issued would have been at least 2.00 to 1.00 determined on a *pro forma* basis (including a *pro forma* application of the net proceeds therefrom), as if the additional Indebtedness had been incurred, or the Disqualified Stock or Preferred Stock had been issued, as the case may be, and the application of proceeds therefrom had occurred at the beginning of such four-quarter period; *provided, further*, that Restricted Subsidiaries that are not Guarantors may not incur Indebtedness or

182

EFIHMW00250254

issue Disqualified Stock or Preferred Stock if, after giving *pro forma* effect to such incurrence or issuance (including a *pro forma* application of the net proceeds therefrom), more than an aggregate of $1,250.0 million of Indebtedness or Disqualified Stock or Preferred Stock of Restricted Subsidiaries that are not Guarantors would be outstanding pursuant to this paragraph and clauses (12) and (14) below at such time.

The foregoing limitations will not apply to:

(1) the incurrence of Indebtedness under (x) Credit Facilities by TCEH or any of its Restricted Subsidiaries and the issuance and creation of letters of credit and bankers' acceptances thereunder (with letters of credit and bankers' acceptances being deemed to have a principal amount equal to the face amount thereof), up to an aggregate principal amount of $26,500.0 million outstanding at any one time and (y) any Collateral Posting Facility;

(2) the incurrence by the Issuer and any Guarantor of Indebtedness represented by the Notes (including any Guarantee thereof) (other than any Additional Notes or Guarantees thereof);

(3) Indebtedness of TCEH and its Restricted Subsidiaries in existence on the Closing Date (other than Indebtedness described in clauses (1) and (2)), including the Existing Notes and Indebtedness under the TCEH Senior Interim Facility (including any PIK Interest which may be paid with respect thereto);

(4) Indebtedness consisting of Capitalized Lease Obligations and Purchase Money Obligations, so long as such Indebtedness (except Environmental CapEx Debt) exists at the date of such purchase, lease or improvement, or is created within 270 days thereafter;

(5) Indebtedness incurred by TCEH or any of its Restricted Subsidiaries constituting reimbursement obligations with respect to letters of credit issued in the ordinary course of business, including letters of credit in respect of workers' compensation or employee health claims, or other Indebtedness with respect to reimbursement-type obligations regarding workers' compensation or employee health claims; *provided*, *however*, that upon the drawing of such letters of credit or the incurrence of such Indebtedness, such obligations are reimbursed within 30 days following such drawing or incurrence;

(6) Indebtedness arising from agreements of TCEH or its Restricted Subsidiaries providing for indemnification, adjustment of purchase price or similar obligations, in each case, incurred or assumed in connection with the disposition of any business, assets or a Subsidiary, other than guarantees of Indebtedness incurred by any Person acquiring all or any portion of such business, assets or a Subsidiary for the purpose of financing such acquisition; *provided*, *however*, that such Indebtedness is not reflected on the balance sheet of TCEH, or any of its Restricted Subsidiaries (contingent obligations referred to in a footnote to financial statements and not otherwise reflected on the balance sheet will not be deemed to be reflected on such balance sheet for purposes of this clause (6));

(7) Indebtedness of TCEH to a Restricted Subsidiary; *provided* that any such Indebtedness owing to a Restricted Subsidiary that is not the Issuer or a Guarantor is expressly subordinated in right of payment to the Notes; *provided*, *further*, that any subsequent issuance or transfer of any Capital Stock or any other event which results in any Restricted Subsidiary ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such Indebtedness (except to TCEH or another Restricted Subsidiary) shall be deemed, in each case, to be an incurrence of such Indebtedness not permitted by this clause (7);

(8) Indebtedness of a Restricted Subsidiary to TCEH or another Restricted Subsidiary; *provided* that if the Issuer or a Guarantor incurs such Indebtedness to a Restricted Subsidiary that is not the Issuer or a Guarantor, such Indebtedness is expressly subordinated in right of payment to the Guarantee of the Notes of such Guarantor; *provided*, *further*, that any subsequent

183

EFIHMW00250255

issuance or transfer of any Capital Stock or any other event which results in any Restricted Subsidiary ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such Indebtedness (except to the Issuer or another Restricted Subsidiary) shall be deemed, in each case, to be an incurrence of such Indebtedness not permitted by this clause (8);

(9) shares of Preferred Stock of a Restricted Subsidiary issued to TCEH or another Restricted Subsidiary; *provided* that any subsequent issuance or transfer of any Capital Stock or any other event which results in any such Restricted Subsidiary ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such shares of Preferred Stock (except to TCEH or another of its Restricted Subsidiaries) shall be deemed in each case to be an issuance of such shares of Preferred Stock not permitted by this clause (9);

(10) Hedging Obligations; *provided* that (i) other than in the case of commodity Hedging Obligations, such Hedging Obligations are not entered into for speculative purposes (as determined by TCEH in its reasonable discretion acting in good faith) and (ii) in the case of speculative commodity Hedging Obligations, such Hedging Obligations are entered into in the ordinary course of business and are consistent with past practice;

(11) obligations in respect of performance, bid, appeal and surety bonds and completion guarantees provided by TCEH or any of its Restricted Subsidiaries in the ordinary course of business;

(12)(a) Indebtedness or Disqualified Stock of TCEH and Indebtedness, Disqualified Stock or Preferred Stock of TCEH or any Restricted Subsidiary equal to 100.0% of the net cash proceeds received by TCEH since immediately after the Closing Date from the issue or sale of Equity Interests of TCEH or cash contributed to the capital of TCEH (in each case, other than Excluded Contributions or proceeds of Disqualified Stock or sales of Equity Interests to TCEH or any of its Subsidiaries) as determined in accordance with clauses (3)(b) and (3)(c) of the first paragraph of "—Limitation on Restricted Payments" to the extent such net cash proceeds or cash have not been applied pursuant to such clauses to make Restricted Payments or to make other Investments, payments or exchanges pursuant to the second paragraph of "—Limitation on Restricted Payments" or to make Permitted Investments (other than Permitted Investments specified in clauses (1) and (3) of the definition thereof) and (b) Indebtedness or Disqualified Stock of TCEH and Indebtedness, Disqualified Stock or Preferred Stock of TCEH or any Restricted Subsidiary not otherwise permitted hereunder in an aggregate principal amount or liquidation preference, which when aggregated with the principal amount and liquidation preference of all other Indebtedness, Disqualified Stock and Preferred Stock then outstanding and incurred pursuant to this clause (12)(b), does not at any one time outstanding exceed $1,750.0 million (it being understood that any Indebtedness, Disqualified Stock or Preferred Stock incurred pursuant to this clause (12)(b) shall cease to be deemed incurred or outstanding for purposes of this clause (12)(b) but shall be deemed incurred for the purposes of the first paragraph of this covenant from and after the first date on which TCEH or such Restricted Subsidiary could have incurred such Indebtedness, Disqualified Stock or Preferred Stock under the first paragraph of this covenant without reliance on this clause (12)(b)); provided, *however* that on a pro forma basis, together with any amounts incurred and outstanding by Restricted Subsidiaries that are not Guarantors pursuant to the first paragraph of this covenant and clause (14), no more than $1,250.0 million of Indebtedness, Disqualified Stock or Preferred Stock at any one time outstanding and incurred pursuant to this clause (12) shall be incurred by Restricted Subsidiaries that are not Guarantors;

(13) the incurrence or issuance by TCEH or any Restricted Subsidiary of Indebtedness, Disqualified Stock or Preferred Stock which serves to refund or refinance any Indebtedness, Disqualified Stock or Preferred Stock of TCEH or any Restricted Subsidiary incurred as permitted under the first paragraph of this covenant and clauses (2), (3), (4) and (12)(a) above, this

184

EFIHMW00250256

clause (13) and clause (14) below or any Indebtedness, Disqualified Stock or Preferred Stock of TCEH or any Restricted Subsidiary issued to so refund or refinance such Indebtedness, Disqualified Stock or Preferred Stock of TCEH or any Restricted Subsidiary including additional Indebtedness, Disqualified Stock or Preferred Stock incurred to pay premiums (including reasonable tender premiums), defeasance costs and fees in connection therewith (the "*Refinancing Indebtedness*") prior to its respective maturity; *provided*, *however*, that such Refinancing Indebtedness:

(a) has a Weighted Average Life to Maturity at the time such Refinancing Indebtedness is incurred which is not less than the remaining Weighted Average Life to Maturity of the Indebtedness, Disqualified Stock or Preferred Stock being refunded or refinanced,

(b) to the extent such Refinancing Indebtedness refinances (i) Indebtedness subordinated or *pari passu* to the Notes or any Guarantee thereof, such Refinancing Indebtedness is subordinated or *pari passu* to the Notes or the Guarantee at least to the same extent as the Indebtedness being refinanced or refunded or (ii) Disqualified Stock or Preferred Stock, such Refinancing Indebtedness must be Disqualified Stock or Preferred Stock, respectively, and

(c) shall not include Indebtedness, Disqualified Stock or Preferred Stock of a Subsidiary of TCEH that is not the Issuer or a Guarantor that refinances Indebtedness, Disqualified Stock or Preferred Stock of TCEH or a Guarantor;

and, *provided*, *further*, that subclause (a) of this clause (13) will not apply to any refunding or refinancing of any Obligations under Credit Facilities secured by Permitted Liens or the TCEH Senior Interim Facilities; *provided*, *further*, that with respect to any pollution control revenue bonds or similar instruments, the maturity of any series thereof shall be deemed to be the date set forth in any instrument governing such Indebtedness for the remarketing of such Indebtedness;

(14) Indebtedness, Disqualified Stock or Preferred Stock of (x) TCEH or a Restricted Subsidiary incurred to finance an acquisition or (y) Persons that are acquired by TCEH or any Restricted Subsidiary or merged into TCEH or a Restricted Subsidiary in accordance with the terms of the Indenture; *provided* that after giving effect to such acquisition or merger, either

(a) TCEH would be permitted to incur at least $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in the first sentence of this covenant, or

(b) such Fixed Charge Coverage Ratio of TCEH and the Restricted Subsidiaries is greater than immediately prior to such acquisition or merger;

*provided*, *however* that on a pro forma basis, together with any amounts incurred and outstanding by Restricted Subsidiaries that are not Guarantors pursuant to the first paragraph of this covenant and clause (12), no more than $1,250.0 million of Indebtedness, Disqualified Stock or Preferred Stock at any one time outstanding and incurred pursuant to this clause (14) shall be incurred by Restricted Subsidiaries that are not Guarantors;

(15) Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business; *provided* that such Indebtedness is extinguished within two Business Days of its incurrence;

(16) Indebtedness of TCEH or any of its Restricted Subsidiaries supported by a letter of credit issued pursuant to any Credit Facilities, in a principal amount not in excess of the stated amount of such letter of credit;

185

EFIHMW00250257

**PX 006**
**Page 192 of 382**

(17)(a) any guarantee by TCEH or a Restricted Subsidiary of Indebtedness or other obligations of any Restricted Subsidiary, so long as the incurrence of such Indebtedness incurred by such Restricted Subsidiary is permitted under the terms of the Indenture, or (b) any guarantee by a Restricted Subsidiary of Indebtedness of TCEH; *provided* that such guarantee is incurred in accordance with the covenant described under "—Limitation on Guarantees of Indebtedness by Restricted Subsidiaries";

(18) Indebtedness of TCEH or any of its Restricted Subsidiaries consisting of (i) the financing of insurance premiums or (ii) take-or-pay obligations contained in supply arrangements, in each case, incurred in the ordinary course of business;

(19) Indebtedness consisting of Indebtedness issued by TCEH or any of its Restricted Subsidiaries to current or former officers, directors and employees thereof, their respective estates, spouses or former spouses, in each case to finance the purchase or redemption of Equity Interests of TCEH or any direct or indirect parent company of TCEH to the extent described in clause (4) of the second paragraph under the caption "—Limitation on Restricted Payments"; and

(20) Indebtedness of TCEH or any Restricted Subsidiary to EFH Corp. or any of its Subsidiaries consistent with past practice in an aggregate amount not to exceed $25.0 million; *provided,* that at the time of incurring, and after giving effect to, such Indebtedness, no Default described in clauses (1) and (2) under the caption "—Events of Default and Remedies" shall have occurred and be continuing or would occur as a consequence thereof; *provided, further,* that any such Indebtedness owing to an entity that is not a Guarantor is expressly subordinated in right of payment to the Notes.

For purposes of determining compliance with this covenant:

(1) in the event that an item of Indebtedness, Disqualified Stock or Preferred Stock (or any portion thereof) meets the criteria of more than one of the categories of permitted Indebtedness, Disqualified Stock or Preferred Stock described in clauses (1) through (20) above or is entitled to be incurred pursuant to the first paragraph of this covenant, TCEH, in its sole discretion, will classify or reclassify such item of Indebtedness, Disqualified Stock or Preferred Stock (or any portion thereof) and will only be required to include the amount and type of such Indebtedness, Disqualified Stock or Preferred Stock in one of the above clauses; and

(2) at the time of incurrence, TCEH will be entitled to divide and classify an item of Indebtedness in more than one of the types of Indebtedness described in the first and second paragraphs above;

*provided* that all Indebtedness outstanding under the TCEH Senior Secured Facilities on the Closing Date will be treated as incurred on the Closing Date under clause (1) of the preceding paragraph.

Accrual of interest, the accretion of accreted value and the payment of interest in the form of additional Indebtedness, Disqualified Stock or Preferred Stock will not be deemed to be an incurrence of Indebtedness, Disqualified Stock or Preferred Stock for purposes of this covenant.

For purposes of determining compliance with any U.S. dollar-denominated restriction on the incurrence of Indebtedness, the U.S. dollar-equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was incurred, in the case of term debt, or first committed, in the case of revolving credit debt; *provided* that if such Indebtedness is incurred to refinance other Indebtedness denominated in a foreign currency, and such refinancing would cause the applicable U.S. dollar-

Highly Confidential

EFIHMW00250258

denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such U.S. dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being refinanced.

The principal amount of any Indebtedness incurred to refinance other Indebtedness, if incurred in a different currency from the Indebtedness being refinanced, shall be calculated based on the currency exchange rate applicable to the currencies in which such respective Indebtedness is denominated that is in effect on the date of such refinancing.

The Indenture will provide that TCEH will not, and will not permit TCEH Finance, Inc. or any Guarantor to, directly or indirectly, incur any Indebtedness (including Acquired Indebtedness) that is subordinated or junior in right of payment to any Indebtedness of TCEH, TCEH Finance, Inc. or such Guarantor, as the case may be, unless such Indebtedness is expressly subordinated in right of payment to the Notes or such Guarantor's Guarantee to the extent and in the same manner as such Indebtedness is subordinated to other Indebtedness of TCEH, TCEH Finance, Inc. or such Guarantor, as the case may be.

The Indenture will not treat (1) unsecured Indebtedness as subordinated or junior to Secured Indebtedness merely because it is unsecured or (2) Senior Indebtedness as subordinated or junior to any other Senior Indebtedness merely because it has a junior priority with respect to the same collateral.

### Liens

TCEH will not, and will not permit TCEH Finance, Inc. or any Guarantor to, directly or indirectly, create, incur, assume or suffer to exist any Lien (except Permitted Liens) that secures obligations under any Indebtedness or any related guarantee, on any asset or property of the Issuer or any Guarantor, or any income or profits therefrom, or assign or convey any right to receive income therefrom, unless:

(1) in the case of Liens securing Subordinated Indebtedness, the Notes and related Guarantees are secured by a Lien on such property, assets or proceeds that is senior in priority to such Liens; or

(2) in all other cases, the Notes or the Guarantees are equally and ratably secured or are secured by a Lien on such property, assets or proceeds that is senior in priority to such Liens;

except that the foregoing shall not apply to (a) Liens securing the Notes and the related Guarantees, (b) Liens securing Indebtedness permitted to be incurred under Credit Facilities, including any letter of credit relating thereto, that was permitted by the terms of the Indenture to be incurred pursuant to clause (1) of the second paragraph under "—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" and (c) Liens incurred to secure Obligations in respect of any Indebtedness permitted to be incurred pursuant to the covenant described above under "—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock;" provided that, with respect to Liens securing Obligations permitted under this subclause (c), at the time of incurrence and after giving pro forma effect thereto, the Consolidated Secured Debt Ratio for the most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date on which such event for which such calculation is being made shall occur, in each case with such pro forma adjustments to Indebtedness and EBITDA as are appropriate and consistent with the pro forma adjustment provisions set forth in the definition of Fixed Charge Coverage Ratio would be no greater than 5.0 to 1.0. Any Lien which is granted to secure the Notes under this covenant shall be discharged at the same time as the discharge of the Lien (other than through the exercise of remedies with respect thereto) that gave rise to the obligation to so secure the Notes.

187

Highly Confidential

EFIHMW00250259

### *Merger, Consolidation or Sale of All or Substantially All Assets*

Neither TCEH nor the Parent Guarantor may consolidate or merge with or into or wind up into (whether or not TCEH or the Parent Guarantor, as the case may be, is the surviving corporation), or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets, in one or more related transactions, to any Person unless:

(1) TCEH or the Parent Guarantor, as the case may be, is the surviving corporation or the Person formed by or surviving any such consolidation or merger (if other than TCEH or the Parent Guarantor, as the case may be) or to which such sale, assignment, transfer, lease, conveyance or other disposition will have been made is a corporation, partnership, limited liability corporation or trust organized or existing under the laws of the jurisdiction of organization of TCEH or the laws of the United States, any state thereof, the District of Columbia, or any territory thereof (such Person, as the case may be, being herein called the "*Successor Company*");

(2) the Successor Company, if other than TCEH or the Parent Guarantor, as the case may be, expressly assumes (i) all the obligations of TCEH or the Parent Guarantor, as the case may, be under the Notes and the Indenture pursuant to supplemental indentures or other documents or instruments in form reasonably satisfactory to the Trustee and (ii) the Registration Rights Agreement;

(3) immediately after such transaction, no Default exists;

(4) in the case of TCEH, immediately after giving *pro forma* effect to such transaction and any related financing transactions, as if such transactions had occurred at the beginning of the applicable four-quarter period,

(a) the Successor Company would be permitted to incur at least $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in the first sentence of the covenant described under "—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock," or

(b) such Fixed Charge Coverage Ratio for the Successor Company and its Restricted Subsidiaries would be greater than such ratio for TCEH and its Restricted Subsidiaries immediately prior to such transaction;

(5) each Guarantor, unless it is the other party to the transactions described above, in which case clause (b) of the second succeeding paragraph shall apply, shall have by supplemental indenture confirmed that its Guarantee shall apply to such Person's obligations under the Indenture, the Notes and the Registration Rights Agreement; and

(6) TCEH shall have delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that such consolidation, merger or transfer and such supplemental indentures, if any, comply with the Indenture and, if a supplemental indenture is required in connection with such transaction, such supplement shall comply with the applicable provisions of the Indenture.

The Successor Company will succeed to, and be substituted for TCEH or the Parent Guarantor, as the case may be, under the Indenture and the Notes, as applicable. Notwithstanding the foregoing clauses (3) and (4),

(1) any Restricted Subsidiary may consolidate with or merge into or transfer all or part of its properties and assets to TCEH, and

(2) TCEH may merge with an Affiliate of TCEH, solely for the purpose of reincorporating TCEH in a State of the United States, the District of Columbia or any territory thereof so long as the amount of Indebtedness of TCEH and its Restricted Subsidiaries is not increased thereby.

188

EFIHMW00250260

Subject to certain limitations described in the Indenture governing release of a Guarantee upon the sale, disposition or transfer of a Guarantor (other than the Parent Guarantor), no Guarantor will, and TCEH will not permit any Guarantor to, consolidate or merge with or into or wind up into (whether or not TCEH or the Guarantor is the surviving corporation), or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets, in one or more related transactions, to any Person unless:

(1)(a) such Guarantor is the surviving corporation or the Person formed by or surviving any such consolidation or merger (if other than such Guarantor) or to which such sale, assignment, transfer, lease, conveyance or other disposition will have been made is a corporation, partnership, limited partnership, limited liability corporation or trust organized or existing under the laws of the jurisdiction of organization of such Guarantor, as the case may be, or the laws of the United States, any state thereof, the District of Columbia, or any territory thereof (such Guarantor or such Person, as the case may be, being herein called the "*Successor Person*");

(b) the Successor Person, if other than such Guarantor, expressly assumes all the obligations of such Guarantor under the Indenture and such Guarantor's related Guarantee pursuant to supplemental indentures or other documents or instruments in form reasonably satisfactory to the Trustee;

(c) immediately after such transaction, no Default exists; and

(d) TCEH shall have delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that such consolidation, merger or transfer and such supplemental indentures, if any, comply with the Indenture; or

(2) the transaction is made in compliance with the covenant described under "Repurchase at the Option of Holders—Asset Sales."

Subject to certain limitations described in the Indenture, the Successor Person will succeed to, and be substituted for, such Guarantor under the Indenture and such Guarantor's Guarantee. Notwithstanding the foregoing, any Guarantor may (i) merge into or transfer all or part of its properties and assets to another Guarantor or TCEH, (ii) merge with an Affiliate of TCEH solely for the purpose of reincorporating the Guarantor in the United States, any state thereof, the District of Columbia or any territory thereof or (iii) convert into a corporation, partnership, limited partnership, limited liability corporation or trust organized or existing under the laws of the jurisdiction of organization of such Guarantor.

TCEH Finance, Inc. may not consolidate or merge with or into or wind up into (whether or not TCEH Finance, Inc. is the surviving corporation), or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of TECH Finance Inc.'s properties or assets, in one or more related transactions, to any Person unless:

(1)(a) concurrently therewith, a corporate Wholly-Owned Subsidiary of TCEH that is a Restricted Subsidiary organized or existing under the laws of the United States, any state thereof, the District of Columbia, or any territory thereof expressly assumes (i) all the obligations of TCEH Finance, Inc. under the Notes and the Indenture pursuant to a supplemental indenture or other documents or instruments in form reasonably satisfactory to the Trustee and (ii) the Registration Rights Agreement; or

(b) after giving effect thereto, at least one obligor on the Notes shall be a corporation organized or existing under the laws of the United States, any state thereof, the District of Columbia, or any territory thereof; and

189

Highly Confidential

EFIHMW00250261

(2) immediately after such transaction, no Default exists;

(3) TCEH Finance shall have delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that such consolidation, merger or transfer and such supplemental indenture, if any, comply with the Indenture and, if a supplemental indenture is required in connection with such transaction, such supplement shall comply with the applicable provisions of the Indenture.

### Transactions with Affiliates

TCEH will not, and will not permit any of its Restricted Subsidiaries to, make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction, contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate of TCEH (each of the foregoing, an "*Affiliate Transaction*") involving aggregate payments or consideration in excess of $25.0 million, unless:

(1) such Affiliate Transaction is on terms that are not materially less favorable to TCEH or its relevant Restricted Subsidiary than those that would have been obtained in a comparable transaction by TCEH or such Restricted Subsidiary with an unrelated Person on an arm's-length basis; and

(2) TCEH delivers to the Trustee with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate payments or consideration in excess of $50.0 million, a resolution adopted by the majority of the board of directors of TCEH approving such Affiliate Transaction and set forth in an Officer's Certificate certifying that such Affiliate Transaction complies with clause (1) above.

The foregoing provisions will not apply to the following:

(1) transactions between or among TCEH or any of its Restricted Subsidiaries or between or among TCEH, and its Restricted Subsidiaries and EFH Corp. and any of its Subsidiaries in the ordinary course of business;

(2) Restricted Payments permitted by the provisions of the Indenture described under the covenant "—Limitation on Restricted Payments" and "Permitted Investments";

(3) the payment of management, consulting, monitoring and advisory fees and related expenses to the Investors pursuant to the Sponsor Management Agreement (plus any unpaid management, consulting, monitoring and advisory fees and related expenses accrued in any prior year) and the termination fees pursuant to the Sponsor Management Agreement, in each case as in effect on the Closing Date, or any amendment thereto (so long as any such amendment is not disadvantageous in the good faith judgment of the board of directors of TCEH to the Holders when taken as a whole as compared to the Sponsor Management Agreement in effect on the Closing Date);

(4) the payment of reasonable and customary fees paid to, and indemnities provided for the benefit of, officers, directors, employees or consultants of TCEH, any of its direct or indirect parent companies or any of its Restricted Subsidiaries;

(5) transactions in which TCEH or any of its Restricted Subsidiaries, as the case may be, delivers to the Trustee a letter from an Independent Financial Advisor stating that such transaction is fair to TCEH or such Restricted Subsidiary from a financial point of view or stating

190

EFIHMW00250262

that the terms are not materially less favorable to TCEH or its relevant Restricted Subsidiary than those that would have been obtained in a comparable transaction by TCEH or such Restricted Subsidiary with an unrelated Person on an arm's-length basis;

(6) any agreement as in effect as of the Closing Date, or any amendment thereto (so long as any such amendment is not disadvantageous to the Holders when taken as a whole as compared to the applicable agreement as in effect on the Closing Date);

(7) the existence of, or the performance by TCEH or any of its Restricted Subsidiaries of its obligations under the terms of, any stockholders agreement (including any registration rights agreement or purchase agreement related thereto) to which it is a party as of the Closing Date and any similar agreements which it may enter into thereafter; *provided, however,* that the existence of, or the performance by TCEH or any of its Restricted Subsidiaries of obligations under any future amendment to any such existing agreement or under any similar agreement entered into after the Closing Date shall only be permitted by this clause (7) to the extent that the terms of any such amendment or new agreement are not otherwise disadvantageous to the Holders when taken as a whole;

(8) the Transactions (including any payments made after the Closing Date in respect of the Issuer's and its Subsidiaries' long-term incentive plan or in respect of tax gross-ups and other deferred compensation) and the payment of all fees and expenses related to the Transactions, in each case as disclosed in this offering circular;

(9) transactions with customers, clients, suppliers, or purchasers or sellers of goods or services, including EFH Corp. and its subsidiaries, in each case in the ordinary course of business and otherwise in compliance with the terms of the Indenture which are fair to TCEH and its Restricted Subsidiaries, in the reasonable determination of the board of directors of TCEH or the senior management thereof, or are on terms at least as favorable as might reasonably have been obtained at such time from an unaffiliated party;

(10) the issuance of Equity Interests (other than Disqualified Stock) of TCEH to any Permitted Holder or to any director, officer, employee or consultant;

(11) sales of accounts receivable, or participations therein, in connection with any Receivables Facility for the benefit of TCEH or any of its Restricted Subsidiaries;

(12) payments by TCEH or any of its Restricted Subsidiaries to any of the Investors made for any financial advisory, financing, underwriting or placement services or in respect of other investment banking activities, including, without limitation, in connection with acquisitions or divestitures, which payments are approved by a majority of the board of directors of TCEH in good faith;

(13) payments or loans (or cancellation of loans) to employees or consultants of TCEH, any of its direct or indirect parent companies or any of its Restricted Subsidiaries and employment agreements, stock option plans and other similar arrangements with such employees or consultants which, in each case, are approved by TCEH in good faith;

(14) investments by the Investors in securities of TCEH or any of its Restricted Subsidiaries so long as (i) the investment is being offered generally to other investors on the same or more favorable terms and (ii) the investment constitutes less than 5% of the proposed or outstanding issue amount of such class of securities; and

(15) payments by TCEH (and any direct or indirect parent thereof) and its Subsidiaries pursuant to tax sharing agreements among TCEH (and any such parent) and its Subsidiaries on customary terms to the extent attributable to the ownership or operation of TCEH and its Subsidiaries; *provided* that in each case the amount of such payments in any fiscal year does not

191

EFIHMW00250263

exceed the amount that TCEH, its Restricted Subsidiaries and its Unrestricted Subsidiaries (to the extent of amounts received from Unrestricted Subsidiaries) would be required to pay in respect of foreign, federal, state and local taxes for such fiscal year were TCEH and its Subsidiaries (to the extent described above) to pay such taxes separately from any such parent entity.

### *Dividend and Other Payment Restrictions Affecting Restricted Subsidiaries*

TCEH will not, and will not permit any of its Restricted Subsidiaries that are not Guarantors to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or consensual restriction on the ability of any such Restricted Subsidiary to:

(1)(a) pay dividends or make any other distributions to TCEH or any of its Restricted Subsidiaries on its Capital Stock or with respect to any other interest or participation in, or measured by, its profits, or

(b) pay any Indebtedness owed to TCEH or any of its Restricted Subsidiaries;

(2) make loans or advances to TCEH or any of its Restricted Subsidiaries; or

(3) sell, lease or transfer any of its properties or assets to TCEH or any of its Restricted Subsidiaries,

except (in each case) for such encumbrances or restrictions existing under or by reason of:

(a) contractual encumbrances or restrictions in effect on the Closing Date, including pursuant to the TCEH Senior Secured Facilities and the related documentation, the TCEH Senior Interim Facility and the related documentation and the Existing Notes Indentures and the related documentation;

(b) the Indenture and the Notes;

(c) purchase money obligations for property acquired in the ordinary course of business that impose restrictions of the nature discussed in clause (3) above on the property so acquired;

(d) applicable law or any applicable rule, regulation or order;

(e) any agreement or other instrument of a Person acquired by TCEH or any Restricted Subsidiary in existence at the time of such acquisition (but not created in contemplation thereof), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person and its Subsidiaries, or the property or assets of the Person and its Subsidiaries, so acquired;

(f) contracts for the sale of assets, including customary restrictions with respect to a Subsidiary of TCEH pursuant to an agreement that has been entered into for the sale or disposition of all or substantially all of the Capital Stock or assets of such Subsidiary;

(g) Secured Indebtedness that limits the right of the debtor to dispose of the assets securing such Indebtedness that is otherwise permitted to be incurred pursuant to the covenants described under "—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" and "—Liens";

(h) restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business;

(i) other Indebtedness, Disqualified Stock or Preferred Stock of Foreign Subsidiaries permitted to be incurred subsequent to the Closing Date pursuant to the provisions of the

EFIHMW00250264

covenant described under "—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock";

(j) customary provisions in joint venture agreements and other agreements or arrangements relating solely to such joint venture;

(k) customary provisions contained in leases or licenses of intellectual property and other agreements, in each case entered into in the ordinary course of business;

(l) any encumbrances or restrictions of the type referred to in clauses (1), (2) and (3) above imposed by any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancing of the contracts, instruments or obligations referred to in clauses (a) through (k) above; *provided* that such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings are, in the good faith judgment of TCEH, no more restrictive with respect to such encumbrance and other restrictions taken as a whole than those prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing;

(m) restrictions created in connection with any Receivables Facility for the benefit of TCEH or any of its Restricted Subsidiaries that, in the good faith determination of TCEH, are necessary or advisable to effect the transactions contemplated under such Receivables Facility; and

(n) restrictions or conditions contained in any trading, netting, operating, construction, service, supply, purchase, sale, hedging or similar agreement to which TCEH or any Restricted Subsidiary of TCEH is a party entered into in the ordinary course of business; *provided*, that such agreement prohibits the encumbrance solely to the property or assets of TCEH or such Restricted Subsidiary that are the subject of such agreement, the payment rights arising thereunder and/or the proceeds thereof and does not extend to any other asset or property of TCEH or such Restricted Subsidiary or the assets or property of any other Restricted Subsidiary.

### Limitation on Guarantees of Indebtedness by Restricted Subsidiaries

TCEH will not permit any of its Wholly-Owned Subsidiaries that are Restricted Subsidiaries (and non-Wholly-Owned Subsidiaries if such non-Wholly-Owned Subsidiaries guarantee other capital markets debt securities of TCEH, TCEH Finance, Inc. or any Guarantor), other than TCEH Finance, Inc., a Guarantor, a Foreign Subsidiary or a Receivables Subsidiary, to guarantee the payment of any Indebtedness of TCEH, TCEH Finance, Inc. or any Guarantor unless:

(1) such Restricted Subsidiary within 30 days executes and delivers a supplemental indenture to the Indenture providing for a Guarantee by such Restricted Subsidiary, except that with respect to a guarantee of Indebtedness of the Issuer or any Guarantor:

(a) if the Notes or such Guarantor's Guarantee is subordinated in right of payment to such Indebtedness, the Guarantee under the supplemental indenture shall be subordinated to such Restricted Subsidiary's guarantee with respect to such Indebtedness substantially to the same extent as the Notes are subordinated to such Indebtedness; and

(b) if such Indebtedness is by its express terms subordinated in right of payment to the Notes or such Guarantor's Guarantee, any such guarantee by such Restricted Subsidiary with respect to such Indebtedness shall be subordinated in right of payment to such Guarantee substantially to the same extent as such Indebtedness is subordinated to the Notes or such Guarantor's Guarantee; and

(2) such Restricted Subsidiary waives, and will not in any manner whatsoever claim or take the benefit or advantage of, any rights of reimbursement, indemnity or subrogation or any other

193

Highly Confidential

rights against TCEH or any other Restricted Subsidiary as a result of any payment by such
Restricted Subsidiary under its Guarantee;

*provided* that this covenant shall not be applicable to any guarantee of any Restricted Subsidiary that
existed at the time such Person became a Restricted Subsidiary and was not incurred in connection
with, or in contemplation of, such Person becoming a Restricted Subsidiary.

### Limitations on Business Activities of TCEH Finance, Inc.

TCEH Finance, Inc. may not hold assets, become liable for any obligations or engage in any
business activities; *provided* that it may be a co-obligor with respect to the Notes or any other
Indebtedness issued by TCEH, and may engage in any activities directly related thereto or necessary
in connection therewith. TCEH Finance, Inc. shall be a Wholly-Owned Subsidiary of TCEH at all times.

### Reports and Other Information

Notwithstanding that TCEH may not be subject to the reporting requirements of Section 13 or
15(d) of the Exchange Act or otherwise report on an annual and quarterly basis on forms provided for
such annual and quarterly reporting pursuant to rules and regulations promulgated by the SEC, the
Indenture will require TCEH to file with the SEC (and make available to the Trustee and Holders of the
Notes (without exhibits), without cost to any Holder, within 15 days after it files them with the SEC)
from and after the Issue Date,

(1) within 90 days (or any other time period then in effect under the rules and regulations of
the Exchange Act with respect to the filing of a Form 10-K by a non-accelerated filer) after the
end of each fiscal year, annual reports on Form 10-K, or any successor or comparable form,
containing the information required to be contained therein, or required in such successor or
comparable form;

(2) within 45 days after the end of each of the first three fiscal quarters of each fiscal year,
reports on Form 10-Q containing all quarterly information that would be required to be contained
in Form 10-Q, or any successor or comparable form;

(3) promptly from time to time after the occurrence of an event required to be therein
reported, such other reports on Form 8-K, or any successor or comparable form; and

(4) any other information, documents and other reports which TCEH would be required to
file with the SEC if it were subject to Section 13 or 15(d) of the Exchange Act;

in each case in a manner that complies in all material respects with the requirements specified in such
form; *provided* that TCEH shall not be so obligated to file such reports with the SEC if the SEC does
not permit such filing, in which event TCEH will make available such information to prospective
purchasers of Notes, in addition to providing such information to the Trustee and the Holders of the
Notes, in each case within 15 days after the time TCEH would be required to file such information with
the SEC if it were subject to Section 13 or 15(d) of the Exchange Act. In addition, to the extent not
satisfied by the foregoing, each of the Parent Guarantor and the Issuer will agree that, for so long as
any Notes are outstanding, it will furnish to Holders and to securities analysts and prospective
investors, upon their request, the information required to be delivered pursuant to Rule 144A(d)(4)
under the Securities Act.

In the event that any direct or indirect parent company of TCEH is or becomes a Guarantor of the
Notes (including the Parent Guarantor), the Indenture will permit TCEH to satisfy its obligations in this
covenant with respect to financial information relating to TCEH by furnishing financial information
relating to such parent; *provided* that the same is accompanied by consolidating information that

194

EFIHMW00250266

explains in reasonable detail the differences between the information relating to such parent, on the one hand, and the information relating to TCEH and its Restricted Subsidiaries on a standalone basis, on the other hand.

Notwithstanding the foregoing, such requirements shall be deemed satisfied prior to the commencement of the exchange offer or the effectiveness of the shelf registration statement described in the Registration Rights Agreement (1) by the filing with the SEC of the exchange offer registration statement or shelf registration statement (or any other similar registration statement), and any amendments thereto, with such financial information that satisfies Regulation S-X, subject to exceptions consistent with the presentation of financial information in this offering circular, to the extent filed within the times specified above, or (2) by posting reports that would be required to be filed substantially in the form required by the SEC on the Issuer's website (or that of any of its parent companies) or providing such reports to the Trustee within 15 days after the time TCEH would be required to file such information with the SEC if it were subject to Section 13 or 15(d) of the Exchange Act, containing the financial information (including a "Management's Discussion and Analysis of Financial Condition and Results of Operations" section) that would be required to be included in such reports, subject to exceptions consistent with the presentation of financial information in this offering circular, to the extent filed within the times specified above.

Notwithstanding anything herein to the contrary, TCEH will not be deemed to have failed to comply with any of its obligations hereunder for purposes of clause (3) under "Events of Default and Remedies" until 60 days after the date any report hereunder is due.

**Events of Default and Remedies**

The Indenture will provide that each of the following is an "*Event of Default*":

(1) default in payment when due and payable, upon redemption, acceleration or otherwise, of principal of, or premium, if any, on the Notes;

(2) default for 30 days or more in the payment when due of interest or Additional Interest on or with respect to the Notes;

(3) failure by the Issuer or any Restricted Subsidiary for 60 days after receipt of written notice given by the Trustee or the Required Holders of not less than 30% in principal amount of the Required Debt to comply with any of its obligations, covenants or agreements (other than a default referred to in clauses (1) and (2) above) contained in the Indenture or the Notes;

(4) default under any mortgage, indenture or instrument under which there is issued or by which there is secured or evidenced any Indebtedness for money borrowed by TCEH or any of its Restricted Subsidiaries or the payment of which is guaranteed by TCEH or any of its Restricted Subsidiaries, other than Indebtedness owed to TCEH or a Restricted Subsidiary, whether such Indebtedness or guarantee now exists or is created after the issuance of the Notes, if both:

(a) such default either results from the failure to pay any principal of such Indebtedness at its stated final maturity (after giving effect to any applicable grace periods) or relates to an obligation other than the obligation to pay principal of any such Indebtedness at its stated final maturity and results in the holder or holders of such Indebtedness causing such Indebtedness to become due prior to its stated maturity; and

(b) the principal amount of such Indebtedness, together with the principal amount of any other such Indebtedness in default for failure to pay principal at stated final maturity (after giving effect to any applicable grace periods), or the maturity of which has been so accelerated, aggregate $250.0 million or more at any one time outstanding;

(5) failure by the Issuer or any Significant Subsidiary (or any group of Restricted Subsidiaries that together would constitute a Significant Subsidiary) to pay final judgments

Highly Confidential

aggregating in excess of $250.0 million, which final judgments remain unpaid, undischarged and unstayed for a period of more than 60 days after such judgment becomes final, and in the event such judgment is covered by insurance, an enforcement proceeding has been commenced by any creditor upon such judgment or decree which is not promptly stayed;

(6) certain events of bankruptcy or insolvency with respect to the Issuer or any Significant Subsidiary (or any group of Restricted Subsidiaries that together would constitute a Significant Subsidiary); or

(7) the Guarantee of the Parent Guarantor or any Significant Subsidiary (or any group of Restricted Subsidiaries that together would constitute a Significant Subsidiary) shall for any reason cease to be in full force and effect or be declared null and void or any responsible officer of any Guarantor that is a Significant Subsidiary (or any group of Restricted Subsidiaries that together would constitute a Significant Subsidiary), as the case may be, denies that it has any further liability under its Guarantee or gives notice to such effect, other than by reason of the termination of the Indenture or the release of any such Guarantee in accordance with the Indenture.

If any Event of Default (other than of a type specified in clause (6) above) occurs and is continuing under the Indenture, the Trustee or the Required Holders of at least 30% in principal amount of the Required Debt may declare the principal, premium, if any, interest and any other monetary obligations on all the then outstanding Notes to be due and payable immediately.

Upon the effectiveness of such declaration, such principal and interest will be due and payable immediately. Notwithstanding the foregoing, in the case of an Event of Default arising under clause (6) of the first paragraph of this section, all outstanding Notes will become due and payable without further action or notice. The Indenture will provide that the Trustee may withhold from the Holders notice of any continuing Default, except a Default relating to the payment of principal, premium, if any, or interest, if it determines that withholding notice is in their interest. In addition, the Trustee shall have no obligation to accelerate the Notes if in the best judgment of the Trustee acceleration is not in the best interest of the Holders of the Notes.

The Indenture provides that the Required Holders of a majority in aggregate principal amount of the Required Debt by notice to the Trustee may on behalf of the Holders of all of the Notes waive any existing Default and its consequences under the Indenture except a continuing Default in the payment of interest on, premium, if any, or the principal of any Note held by a non-consenting Holder. In the event of any Event of Default specified in clause (4) above, such Event of Default and all consequences thereof (excluding any resulting payment default, other than as a result of acceleration of the Notes) shall be annulled, waived and rescinded, automatically and without any action by the Trustee or the Holders, if within 20 days after such Event of Default arose:

(1) the Indebtedness or guarantee that is the basis for such Event of Default has been discharged; or

(2) holders thereof have rescinded or waived the acceleration, notice or action (as the case may be) giving rise to such Event of Default; or

(3) the default that is the basis for such Event of Default has been cured.

Subject to the provisions of the Indenture relating to the duties of the Trustee thereunder, in case an Event of Default occurs and is continuing, the Trustee will be under no obligation to exercise any of the rights or powers under the Indenture at the request or direction of any of the Holders of the Notes unless the Holders have offered to the Trustee reasonable indemnity or security against any loss,

Highly Confidential

EFIHMW00250268

liability or expense. Except to enforce the right to receive payment of principal, premium, if any, or interest when due, no Holder of a Note may pursue any remedy with respect to the Indenture or the Notes unless:

(1) such Holder has previously given the Trustee notice that an Event of Default is continuing;

(2) Required Holders of at least 30% in principal amount of the Required Debt have requested the Trustee to pursue the remedy;

(3) Holders of the Notes have offered the Trustee reasonable security or indemnity against any loss, liability or expense;

(4) the Trustee has not complied with such request within 60 days after the receipt thereof and the offer of security or indemnity; and

(5) Required Holders of a majority in principal amount of the Required Debt have not given the Trustee a direction inconsistent with such request within such 60-day period.

Subject to certain restrictions, under the Indenture the Required Holders of a majority in principal amount of the Required Debt are given the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or of exercising any trust or power conferred on the Trustee. The Trustee, however, may refuse to follow any direction that conflicts with law or the Indenture or that the Trustee determines is unduly prejudicial to the rights of any other Holder of a Note or that would involve the Trustee in personal liability.

The Indenture will provide that TCEH is required to deliver to the Trustee annually a statement regarding compliance with the Indenture, and TCEH is required, within five Business Days, upon becoming aware of any Default, to deliver to the Trustee a statement specifying such Default.

**No Personal Liability of Directors, Officers, Employees and Stockholders**

No director, officer, employee, incorporator or stockholder of the Issuer, the Parent Guarantor or any other Guarantor or any of their parent companies (other than the Issuer and the Guarantors) shall have any liability for any obligations of the Issuer, the Parent Guarantor or the other Guarantors under the Notes, the Guarantees or the Indenture or for any claim based on, in respect of, or by reason of such obligations or their creation. Each Holder by accepting the Notes waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Notes. Such waiver may not be effective to waive liabilities under the federal securities laws, and it is the view of the SEC that such a waiver is against public policy.

**Legal Defeasance and Covenant Defeasance**

The obligations of the Issuer and the Guarantors under the Indenture will terminate (other than certain obligations) and will be released upon payment in full of all of the Notes. The Issuer may, at its option and at any time, elect to have all of its obligations discharged with respect to the Notes and have the Issuer's and each Guarantor's obligation discharged with respect to its Guarantee ("*Legal Defeasance*") and cure all then existing Events of Default except for:

(1) the rights of Holders of Notes to receive payments in respect of the principal of, premium, if any, and interest on the Notes when such payments are due solely out of the trust created pursuant to the Indenture;

197

EFIHMW00250269

(2) the Issuer's obligations with respect to Notes concerning issuing temporary notes, registration of such Notes, mutilated, destroyed, lost or stolen Notes and the maintenance of an office or agency for payment and money for security payments held in trust;

(3) the rights, powers, trusts, duties and immunities of the Trustee, and the Issuer's obligations in connection therewith; and

(4) the Legal Defeasance provisions of the Indenture.

In addition, the Issuer may, at its option and at any time, elect to have its obligations and those of each Guarantor released with respect to certain covenants that are described in the Indenture ("*Covenant Defeasance*") and thereafter any omission to comply with such obligations shall not constitute a Default with respect to the Notes. In the event Covenant Defeasance occurs, certain events (not including bankruptcy, receivership, rehabilitation and insolvency events pertaining to the Issuer) described under "Events of Default and Remedies" will no longer constitute an Event of Default with respect to the Notes.

In order to exercise either Legal Defeasance or Covenant Defeasance with respect to the Notes:

(1) the Issuer must irrevocably deposit with the Trustee, in trust, for the benefit of the Holders of the Notes, cash in U.S. dollars, Government Securities, or a combination thereof, in such amounts as will be sufficient, in the opinion of a nationally recognized firm of independent public accountants, to pay the principal of, premium, if any, and interest due on the Notes on the stated maturity date or on the redemption date, as the case may be, of such principal, premium, if any, or interest on such Notes, and the Issuer must specify whether such Notes are being defeased to maturity or to a particular redemption date;

(2) in the case of Legal Defeasance, the Issuer shall have delivered to the Trustee an Opinion of Counsel reasonably acceptable to the Trustee confirming that, subject to customary assumptions and exclusions,

(a) the Issuer has received from, or there has been published by, the United States Internal Revenue Service a ruling, or

(b) since the issuance of the Notes, there has been a change in the applicable U.S. federal income tax law,

in either case to the effect that, and based thereon such Opinion of Counsel shall confirm that, subject to customary assumptions and exclusions, the Holders of the Notes will not recognize income, gain or loss for U.S. federal income tax purposes, as applicable, as a result of such Legal Defeasance and will be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Legal Defeasance had not occurred;

(3) in the case of Covenant Defeasance, the Issuer shall have delivered to the Trustee an Opinion of Counsel reasonably acceptable to the Trustee confirming that, subject to customary assumptions and exclusions, the Holders of the Notes will not recognize income, gain or loss for U.S. federal income tax purposes as a result of such Covenant Defeasance and will be subject to such tax on the same amounts, in the same manner and at the same times as would have been the case if such Covenant Defeasance had not occurred;

(4) no Default (other than that resulting from borrowing funds to be applied to make such deposit and any similar and simultaneous deposit relating to other Indebtedness and, in each case, the granting of Liens in connection therewith) shall have occurred and be continuing on the date of such deposit;

(5) such Legal Defeasance or Covenant Defeasance shall not result in a breach or violation of, or constitute a default under the TCEH Senior Secured Facilities or any other material

Highly Confidential

agreement or instrument (other than the Indenture) to which the Issuer or any Guarantor is a party or by which the Issuer or any Guarantor is bound (other than that resulting from borrowing funds to be applied to make such deposit and any similar and simultaneous deposit relating to other Indebtedness and, in each case, the granting of Liens in connection therewith);

(6) the Issuer shall have delivered to the Trustee an Opinion of Counsel to the effect that, as of the date of such opinion and subject to customary assumptions and exclusions following the deposit, the trust funds will not be subject to the effect of Section 547 of Title 11 of the United States Code;

(7) the Issuer shall have delivered to the Trustee an Officer's Certificate stating that the deposit was not made by the Issuer with the intent of defeating, hindering, delaying or defrauding any creditors of the Issuer or any Guarantor or others; and

(8) the Issuer shall have delivered to the Trustee an Officer's Certificate and an Opinion of Counsel (which Opinion of Counsel may be subject to customary assumptions and exclusions) each stating that all conditions precedent provided for or relating to the Legal Defeasance or the Covenant Defeasance, as the case may be, have been complied with.

## Satisfaction and Discharge

The Indenture will be discharged and will cease to be of further effect as to all Notes, when either:

(1) all Notes theretofore authenticated and delivered, except lost, stolen or destroyed Notes which have been replaced or paid and Notes for whose payment money has theretofore been deposited in trust, have been delivered to the Trustee for cancellation; or

(2)(a) all Notes not theretofore delivered to the Trustee for cancellation have become due and payable by reason of the making of a notice of redemption or otherwise, will become due and payable within one year or may be called for redemption within one year under arrangements satisfactory to the Trustee for the giving of notice of redemption by the Trustee in the name, and at the expense, of the Issuer, and the Issuer or any Guarantor has irrevocably deposited or caused to be deposited with the Trustee as trust funds in trust solely for the benefit of the Holders of the Notes, cash in U.S. dollars, Government Securities, or a combination thereof, in such amounts as will be sufficient without consideration of any reinvestment of interest to pay and discharge the entire indebtedness on the Notes not theretofore delivered to the Trustee for cancellation for principal, premium, if any, and accrued interest to the date of maturity or redemption;

(b) no Default (other than that resulting from borrowing funds to be applied to make such deposit and any similar and simultaneous deposit relating to other Indebtedness and, in each case, the granting of Liens in connection therewith) with respect to the Indenture or the Notes shall have occurred and be continuing on the date of such deposit or shall occur as a result of such deposit, and such deposit will not result in a breach or violation of, or constitute a default under, the TCEH Senior Secured Facilities or any other material agreement or instrument (other than the Indenture) to which the Issuer or any Guarantor is a party or by which the Issuer or any Guarantor is bound (other than that resulting from borrowing funds to be applied to make such deposit and any similar and simultaneous deposit relating to other Indebtedness and, in each case, the granting of Liens in connection therewith);

(c) the Issuer has paid or caused to be paid all sums payable by it under the Indenture; and

(d) the Issuer has delivered irrevocable instructions to the Trustee to apply the deposited money toward the payment of the Notes at maturity or the redemption date, as the case may be.

199

EFIHMW00250271

**PX 006**
**Page 206 of 382**

In addition, the Issuer must deliver an Officer's Certificate and an Opinion of Counsel to the Trustee stating that all conditions precedent to satisfaction and discharge have been satisfied.

**Amendment, Supplement and Waiver**

Except as provided in the next two succeeding paragraphs, the Indenture, any Guarantee and the Notes may be amended or supplemented with the consent of the Required Holders of at least a majority in principal amount of the Required Debt, including consents obtained in connection with a purchase of, or tender offer or exchange offer for, the Required Debt, and any existing Default or compliance with any provision of the Indenture, the Notes issued thereunder or any Guarantee may be waived with the consent of the Required Holders of a majority in principal amount of the Required Debt, other than Required Debt beneficially owned by the Issuer or its Affiliates (including consents obtained in connection with a purchase of or tender offer or exchange offer for the Required Debt).

The Indenture will provide that, without the consent of each affected Holder of Notes, an amendment or waiver may not, with respect to any Notes held by a non-consenting Holder:

(1) reduce the principal amount of such Notes whose Holders must consent to an amendment, supplement or waiver;

(2) reduce the principal of or change the fixed final maturity of any such Note or alter or waive the provisions with respect to the redemption of such Notes (other than provisions relating to the covenants described under the caption "Repurchase at the Option of Holders");

(3) reduce the rate of or change the time for payment of interest on any Note;

(4) waive a Default in the payment of principal of or premium, if any, or interest on the Notes, except a rescission of acceleration of the Notes by the Required Holders of at least a majority in aggregate principal amount of the Required Debt and a waiver of the payment default that resulted from such acceleration, or in respect of a covenant or provision contained in the Indenture or any Guarantee which cannot be amended or modified without the consent of all Holders;

(5) make any Note payable in money other than that stated therein;

(6) make any change in the provisions of the Indenture relating to waivers of past Defaults or the rights of Holders to receive payments of principal of or premium, if any, or interest on the Notes;

(7) make any change in these amendment and waiver provisions;

(8) impair the right of any Holder to receive payment of principal of, or interest on such Holder's Notes on or after the due dates therefor or to institute suit for the enforcement of any payment on or with respect to such Holder's Notes;

(9) make any change to or modify the ranking of the Notes that would adversely affect the Holders; or

(10) except as expressly permitted by the Indenture, modify the Guarantees of any Significant Subsidiary in any manner adverse to the Holders of the Notes.

Notwithstanding the foregoing, the Issuer, any Guarantor (with respect to a Guarantee or the Indenture to which it is a party) and the Trustee may amend or supplement the Indenture and any Guarantee or Notes without the consent of any Holder;

(1) to cure any ambiguity, omission, mistake, defect or inconsistency;

(2) to provide for uncertificated Notes of such series in addition to or in place of certificated notes;

200

EFIHMW00250272

(3) to comply with the covenant relating to mergers, consolidations and sales of assets;

(4) to provide for the assumption of the Issuer's or any Guarantor's obligations to the Holders;

(5) to make any change that would provide any additional rights or benefits to the Holders or that does not adversely affect the legal rights under the Indenture of any such Holder;

(6) to add covenants for the benefit of the Holders or to surrender any right or power conferred upon the Issuer or any Guarantor;

(7) to comply with requirements of the SEC in order to effect or maintain the qualification of the Indenture under the Trust Indenture Act;

(8) to evidence and provide for the acceptance and appointment under the Indenture of a successor Trustee thereunder pursuant to the requirements thereof;

(9) to provide for the issuance of Exchange Notes or private exchange notes, which are identical to Exchange Notes except that they are not freely transferable;

(10) to add a Guarantor under the Indenture;

(11) to conform the text of the Indenture, Guarantees or the Notes to any provision of this "Description of Notes" to the extent that such provision in this "Description of Notes" was intended to be a verbatim recitation of a provision of the Indenture, Guarantee or Notes;

(12) to make any amendment to the provisions of the Indenture relating to the transfer and legending of Notes as permitted by the Indenture, including, without limitation, to facilitate the issuance and administration of the Notes; *provided*, *however*, that (i) compliance with the Indenture as so amended would not result in Notes being transferred in violation of the Securities Act or any applicable securities law and (ii) such amendment does not materially and adversely affect the rights of Holders to transfer Notes; or

(13) to mortgage, pledge, hypothecate or grant any other Lien in favor of the Trustee for the benefit of the Holders of the Notes, as security for the payment and performance of all or any portion of the Obligations, in any property or assets.

The consent of the Holders is not necessary under the Indenture to approve the particular form of any proposed amendment. It is sufficient if such consent approves the substance of the proposed amendment.

**Notices**

Notices given by publication will be deemed given on the first date on which publication is made and notices given by first-class mail, postage prepaid, will be deemed given five calendar days after mailing.

**Concerning the Trustee**

The Indenture will contain certain limitations on the rights of the Trustee thereunder, should it become a creditor of the Issuer, to obtain payment of claims in certain cases, or to realize on certain property received in respect of any such claim as security or otherwise. The Trustee will be permitted to engage in other transactions; however, if it acquires any conflicting interest it must eliminate such conflict within 90 days, apply to the SEC for permission to continue or resign.

The Indenture will provide that the Required Holders of a majority in principal amount of the Required Debt will have the right to direct the time, method and place of conducting any proceeding for

201

Highly Confidential

exercising any remedy available to the Trustee, subject to certain exceptions. The Indenture will provide that in case an Event of Default shall occur (which shall not be cured), the Trustee will be required, in the exercise of its power, to use the degree of care of a prudent person in the conduct of his own affairs. Subject to such provisions, the Trustee will be under no obligation to exercise any of its rights or powers under the Indenture at the request of any Holder of the Notes, unless such Holder shall have offered to the Trustee security and indemnity satisfactory to it against any loss, liability or expense.

**Governing Law**

The Indenture, the Notes and any Guarantee will be governed by and construed in accordance with the laws of the State of New York.

**Certain Definitions**

Set forth below are certain defined terms used in the Indenture. For purposes of the Indenture, unless otherwise specifically indicated, the term "*consolidated*" with respect to any Person refers to such Person on a consolidated basis in accordance with GAAP, but excluding from such consolidation any Unrestricted Subsidiary as if such Unrestricted Subsidiary were not an Affiliate of such Person.

"*Acquired Indebtedness*" means, with respect to any specified Person,

(1) Indebtedness of any other Person existing at the time such other Person is merged with or into or became a Restricted Subsidiary of such specified Person, including Indebtedness incurred in connection with, or in contemplation of, such other Person merging with or into or becoming a Restricted Subsidiary of such specified Person, and

(2) Indebtedness secured by a Lien encumbering any asset acquired by such specified Person.

"*Additional Interest*" means all additional interest then owing pursuant to the Registration Rights Agreement.

"*Affiliate*" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise.

"*Applicable Premium*" means, with respect to any Note on any Redemption Date, the greater of:

(1) 1.0% of the principal amount of such Note; and

(2) the excess, if any, of (a) the present value at such Redemption Date of (i) the redemption price of such Note at November 1, 2011 (such redemption price being set forth in the tables appearing under the caption "Optional Redemption"), plus (ii) all required interest payments due on such Note through November 1, 2011 (excluding accrued but unpaid interest to the Redemption Date), computed using a discount rate equal to the Treasury Rate as of such Redemption Date plus 50 basis points; over (b) the principal amount of such Note.

"*Asset Sale*" means:

(1) the sale, conveyance, transfer or other disposition, whether in a single transaction or a series of related transactions, of property or assets (including by way of a Sale and Lease-Back

202

Transaction) of TCEH or any of its Restricted Subsidiaries (each referred to in this definition as a "disposition"); or

(2) the issuance or sale of Equity Interests of any Restricted Subsidiary, whether in a single transaction or a series of related transactions (other than Preferred Stock of Restricted Subsidiaries issued in compliance with the covenant described under "Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock");

in each case, other than:

(a) any disposition of Cash Equivalents or Investment Grade Securities or obsolete or worn out equipment (including any such equipment that has been refurbished in contemplation of such disposition) in the ordinary course of business or any disposition of inventory or goods (or other assets) held for sale in the ordinary course of business;

(b) the disposition of all or substantially all of the assets of TCEH in a manner permitted pursuant to the provisions described under "Certain Covenants—Merger, Consolidation or Sale of All or Substantially All Assets" or any disposition that constitutes a Change of Control pursuant to the Indenture;

(c) the making of any Restricted Payment or Permitted Investment that is permitted to be made, and is made, under the covenant described under "Certain Covenants—Limitation on Restricted Payments";

(d) any disposition of assets or issuance or sale of Equity Interests of any Restricted Subsidiary in any transaction or series of related transactions with an aggregate fair market value of less than $75.0 million;

(e) any disposition of property or assets or issuance of securities by a Restricted Subsidiary of TCEH to TCEH or by TCEH or a Restricted Subsidiary of TCEH to another Restricted Subsidiary of TCEH;

(f) to the extent allowable under Section 1031 of the Code or any comparable or successor provision, any exchange of like property (excluding any boot thereon) for use in a Similar Business;

(g) the lease, assignment or sub-lease of any real or personal property in the ordinary course of business;

(h) any issuance or sale of Equity Interests in, or Indebtedness or other securities of, an Unrestricted Subsidiary;

(i) foreclosures on assets;

(j) sales of accounts receivable, or participations therein, in connection with any Receivables Facility for the benefit of TCEH or any of its Restricted Subsidiaries;

(k) any financing transaction with respect to property built or acquired by TCEH or any Restricted Subsidiary after the Closing Date, including Sale and Lease-Back Transactions and asset securitizations permitted by the Indenture;

(l) [Intentionally omitted];

(m) sales, transfers and other dispositions (i) of Investments in joint ventures to the extent required by, or made pursuant to, customary buy/sell or put/call arrangements between the joint venture parties set forth in joint venture arrangements and similar binding arrangements or (ii) to joint ventures in connection with the dissolution or termination of a joint venture to the extent required pursuant to joint venture and similar arrangements;

203

Highly Confidential

(n) [Intentionally omitted];

(o) [Intentionally omitted];

(p) [Intentionally omitted];

(q) any Casualty Event *provided* the net proceeds therefrom are deemed to be Net Proceeds and are applied in accordance with the second paragraph under "Repurchase at the Option of Holders—Asset Sales" or TCEH or such Restricted Subsidiary delivers to the Trustee a Restoration Certificate with respect to plans to invest (and reinvests within 450 days from the date of receipt of the Net Proceeds);

(r) the execution of (or amendment to), settlement of or unwinding of any Hedging Obligation in the ordinary course of business;

(s) any disposition of mineral rights (other than coal and lignite mineral rights), *provided* the net proceeds therefrom are deemed to be Net Proceeds and are applied in accordance with the second paragraph under "Repurchase at the Option of Holders—Asset Sales";

(t) any sale, transfer or other disposal of any real property that is (i) primarily used or intended to be used for mining which has either been reclaimed, or has not been used for mining in a manner which requires reclamation, and in either case has been determined by TCEH not to be necessary for use for mining, (ii) used as buffer land, but no longer serves such purpose or its use is restricted such that it will continue to be buffer land, or (iii) was acquired in connection with power generation facilities, but has been determined by TCEH to no longer be commercially suitable for such purpose;

(u) [Intentionally omitted];

(v) dispositions of power, capacity, heat rate, renewable energy credits, waste by-products, energy, electricity, coal and lignite, oil and other petroleum based liquids, emissions and other environmental credits, ancillary services, fuel (including all forms of nuclear fuel and natural gas) and other related assets or products of services, including assets related to trading activities or the sale of inventory or contracts related to any of the foregoing, in each case in the ordinary course of business;

(w) [Intentionally omitted];

(x) any disposition of assets in connection with salvage activities, *provided* the net proceeds therefrom are deemed to be Net Proceeds and are applied in accordance with the second paragraph under "Repurchase at the Option of Holders—Asset Sales"; and

(y) any sale, transfer or other disposition of any assets required by any Government Authority; *provided* the net proceeds therefrom are deemed to be Net Proceeds and are applied in accordance with the second paragraph under "Repurchase at the Option of Holders—Asset Sales."

"*Asset Sale Offer*" has the meaning set forth in the fourth paragraph under "Repurchase at the Option of Holders—Asset Sales."

"*Bankruptcy Code*" means Title 11 of the United States Code, as amended.

"*Bankruptcy Law*" means the Bankruptcy Code and any similar federal, state or foreign law for the relief of debtors.

"*Business Day*" means each day which is not a Legal Holiday.

204

EFIHMW00250276

"*Capital Stock*" means:

(1) in the case of a corporation, corporate stock;

(2) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(3) in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); and

(4) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person.

"*Capitalized Lease Obligation*" means, at the time any determination thereof is to be made, the amount of the liability in respect of a capital lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) in accordance with GAAP; *provided* that any obligations existing on the Closing Date (i) that were not included on the balance sheet of TCEH as capital lease obligations and (ii) that are subsequently recharacterized as capital lease obligations due to a change in accounting treatment shall for all purposes not be treated as Capitalized Lease Obligations.

"*Capitalized Software Expenditures*" means, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities) by a Person and its Restricted Subsidiaries during such period in respect of purchased software or internally developed software and software enhancements that, in conformity with GAAP, are or are required to be reflected as capitalized costs on the consolidated balance sheet of a Person and its Restricted Subsidiaries.

"*Cash Equivalents*" means:

(1) United States dollars;

(2) euros or any national currency of any participating member state of the EMU or such local currencies held by TCEH and its Restricted Subsidiaries from time to time in the ordinary course of business;

(3) securities issued or directly and fully and unconditionally guaranteed or insured by the U.S. government (or any agency or instrumentality thereof the securities of which are unconditionally guaranteed as a full faith and credit obligation of the U.S. government) with maturities, unless such securities are deposited to defease Indebtedness, of 24 months or less from the date of acquisition;

(4) certificates of deposit, time deposits and eurodollar time deposits with maturities of one year or less from the date of acquisition, bankers' acceptances with maturities not exceeding one year and overnight bank deposits, in each case with any commercial bank having capital and surplus of not less than $500.0 million in the case of U.S. banks and $100.0 million (or the U.S. dollar equivalent as of the date of determination) in the case of non-U.S. banks;

(5) repurchase obligations for underlying securities of the types described in clauses (3) and (4) entered into with any financial institution meeting the qualifications specified in clause (4) above;

(6) commercial paper rated at least P-1 by Moody's or at least A-1 by S&P and in each case maturing within 24 months after the date of creation thereof;

(7) marketable short-term money market and similar securities having a rating of at least P-2 or A-2 from either Moody's or S&P, respectively (or, if at any time neither Moody's nor S&P

205

EFIHMW00250277

shall be rating such obligations, an equivalent rating from another Rating Agency) and in each case maturing within 24 months after the date of creation thereof;

(8) investment funds investing 95% of their assets in securities of the types described in clauses (1) through (7) above;

(9) readily marketable direct obligations issued by any state, commonwealth or territory of the United States or any political subdivision or taxing authority thereof having an Investment Grade Rating from either Moody's or S&P with maturities of 24 months or less from the date of acquisition;

(10) Indebtedness or Preferred Stock issued by Persons with a rating of A or higher from S&P or A2 or higher from Moody's with maturities of 24 months or less from the date of acquisition; and

(11) Investments with average maturities of 24 months or less from the date of acquisition in money market funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's.

Notwithstanding the foregoing, Cash Equivalents shall include amounts denominated in currencies other than those set forth in clauses (1) and (2) above; *provided* that such amounts are converted into any currency listed in clauses (1) and (2) as promptly as practicable and in any event within ten Business Days following the receipt of such amounts.

"*Casualty Event*" means any taking under power of eminent domain or similar proceeding and any insured loss; *provided* that any such taking or similar proceeding or insured loss that results in Net Proceeds of less than $75.0 million shall not be deemed a Casualty Event.

"*Change of Control*" means the occurrence of any of the following:

(1) the sale, lease or transfer, in one or a series of related transactions, of all or substantially all of the assets of the Parent Guarantor or TCEH and its Subsidiaries, taken as a whole, to any Person other than a Permitted Holder;

(2) TCEH becomes aware (by way of a report or any other filing pursuant to Section 13(d) of the Exchange Act, proxy, vote, written notice or otherwise) of the acquisition by any Person or group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act or any successor provision), including any group acting for the purpose of acquiring, holding or disposing of securities (within the meaning of Rule 13d-5(b)(1) under the Exchange Act or any successor provision), other than the Permitted Holders, in a single transaction or in a related series of transactions, by way of merger, consolidation or other business combination or purchase of beneficial ownership (within the meaning of Rule 13d-3 under the Exchange Act, or any successor provision) of 50% or more of the total voting power of the Voting Stock of TCEH or any of its direct or indirect parent companies; or

(3) at any time, EFH Corp. shall cease to own directly or indirectly beneficially and of record at least a majority of the total voting power of the voting stock of TCEH.

"*Closing Date*" means October 10, 2007.

"*Code*" means the Internal Revenue Code of 1986, as amended, or any successor thereto.

"*Collateral Posting Facility*" means any senior cash posting credit facility, the size of which is capped by the mark-to-market loss, inclusive of any unpaid settlement amounts, of TCEH and its subsidiaries on a hypothetical portfolio of commodity swaps, forwards and futures transactions that

Highly Confidential

EFIHMW00250278

correspond to or replicate all or a portion of actual transactions by TCEH and its subsidiaries that are outstanding on, or entered into from time to time on or after, the Closing Date.

"*Consolidated Depreciation and Amortization Expense*" means with respect to any Person for any period, the total amount of depreciation and amortization expense, including the amortization of deferred financing fees, nuclear fuel costs, depletion of coal or lignite reserves, debt issuance costs, commissions, fees and expenses and Capitalized Software Expenditures, of such Person and its Restricted Subsidiaries for such period on a consolidated basis and otherwise determined in accordance with GAAP.

"*Consolidated Interest Expense*" means, with respect to any Person for any period, without duplication, the sum of:

(1) consolidated interest expense of such Person and its Restricted Subsidiaries for such period, to the extent such expense was deducted (and not added back) in computing Consolidated Net Income (including (a) amortization of original issue discount resulting from the issuance of Indebtedness at less than par, (b) all commissions, discounts and other fees and charges owed with respect to letters of credit, bankers' acceptances or any Collateral Posting Facility or similar facilities, (c) non-cash interest payments (but excluding any non-cash interest expense attributable to the movement in the mark to market valuation of Hedging Obligations or other derivative instruments pursuant to GAAP), (d) the interest component of Capitalized Lease Obligations, and (e) net payments, if any, pursuant to interest rate Hedging Obligations with respect to Indebtedness, and excluding, (u) accretion of asset retirement obligations and accretion or accrual of discounted liabilities not constituting Indebtedness, (v) any expense resulting from the discounting of the Existing Notes or other Indebtedness in connection with the application of purchase accounting, (w) any Additional Interest and any comparable "additional interest" with respect to other securities, (x) amortization of reacquired Indebtedness, deferred financing fees, debt issuance costs, commissions, fees and expenses, (y) any expensing of bridge, commitment and other financing fees and (z) commissions, discounts, yield and other fees and charges (including any interest expense) related to any Receivables Facility); *plus*

(2) consolidated capitalized interest of such Person and its Restricted Subsidiaries for such period, whether paid or accrued; less

(3) interest income of such Person and its Restricted Subsidiaries for such period.

For purposes of this definition, interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by such Person to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP.

"*Consolidated Net Income*" means, with respect to any Person for any period, the aggregate of the Net Income of such Person for such period, on a consolidated basis, and otherwise determined in accordance with GAAP; *provided*, *however*, that, without duplication,

(1) any after-tax effect of extraordinary, non-recurring or unusual gains or losses (less all fees and expenses relating thereto) or expenses (including Transaction fees and expenses to the extent incurred on or prior to December 31, 2008), severance, relocation costs, consolidation and closing costs, integration and facilities opening costs, business optimization costs, transition costs, restructuring costs, signing, retention or completion bonuses, and curtailments or modifications to pension and post-retirement employee benefit plans shall be excluded;

(2) the cumulative effect of a change in accounting principles during such period shall be excluded;

207

EFIHMW00250279

(3) any after-tax effect of income (loss) from disposed, abandoned or discontinued operations and any net after-tax gains or losses on disposal of disposed, abandoned, transferred, closed or discontinued operations shall be excluded;

(4) any after-tax effect of gains or losses (less all fees and expenses relating thereto) attributable to asset dispositions or abandonments other than in the ordinary course of business, as determined in good faith by TCEH, shall be excluded;

(5) the Net Income for such period of any Person that (a) is not a Subsidiary, (b) is an Unrestricted Subsidiary or (c) is accounted for by the equity method of accounting, shall be excluded; *provided* that Consolidated Net Income of TCEH shall be increased by the amount of dividends or distributions or other payments that are actually paid in cash (or to the extent converted into cash) to the referent Person or a Restricted Subsidiary thereof in respect of such period;

(6) solely for the purpose of determining the amount available for Restricted Payments under clause (3)(a) of the first paragraph of "Certain Covenants—Limitation on Restricted Payments," the Net Income for such period of any Restricted Subsidiary (other than a Guarantor) shall be excluded to the extent that the declaration or payment of dividends or similar distributions by that Restricted Subsidiary of its Net Income is not at the date of determination wholly permitted without any prior governmental approval (which has not been obtained) or, directly or indirectly, by the operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule, or governmental regulation applicable to that Restricted Subsidiary or its stockholders, unless such restriction with respect to the payment of dividends or similar distributions has been legally waived; *provided* that Consolidated Net Income of TCEH will be increased by the amount of dividends or other distributions or other payments actually paid in cash (or to the extent converted into cash) or Cash Equivalents to TCEH or a Restricted Subsidiary thereof in respect of such period, to the extent not already included therein;

(7) effects of all adjustments (including the effects of such adjustments pushed down to TCEH and its Restricted Subsidiaries) in such Person's consolidated financial statements pursuant to GAAP resulting from the application of purchase accounting in relation to the Transactions or any consummated acquisition or the amortization or write-off of any amounts thereof, net of taxes, shall be excluded;

(8) any net after-tax effect of income (loss) attributable to the early extinguishment of Indebtedness (other than Hedging Obligations) shall be excluded;

(9) any impairment charge or asset write-off, including, without limitation, impairment charges or asset write-offs related to intangible assets, long-lived assets or investments in debt and equity securities, in each case, pursuant to GAAP and the amortization of intangibles arising pursuant to GAAP shall be excluded;

(10) any non-cash compensation expense recorded from grants of stock appreciation or similar rights, stock options, restricted stock or other rights, and any cash charges associated with the rollover, acceleration or payout of Equity Interests by management of TCEH or any of its direct or indirect parent companies in connection with the Transactions, shall be excluded;

(11) any fees and expenses incurred during such period, or any amortization thereof for such period, in connection with any acquisition, Investment, Asset Sale, issuance or repayment of Indebtedness, issuance of Equity Interests, refinancing transaction or amendment or modification of any debt instrument (in each case, including any such transaction consummated prior to the Closing Date and any such transaction undertaken but not completed) and any charges or non-recurring merger costs incurred during such period as a result of any such transaction shall be excluded;

208

EFIHMW00250280

(12) accruals and reserves that are established or adjusted within twelve months after the Closing Date that are so required to be established as a result of the Transactions in accordance with GAAP, or changes as a result of adoption or modification of accounting policies, shall be excluded;

(13) to the extent covered by insurance and actually reimbursed, or, so long as TCEH has made a determination that there exists reasonable evidence that such amount will in fact be reimbursed by the insurer and only to the extent that such amount is (a) not denied by the applicable carrier in writing within 180 days and (b) in fact reimbursed within 365 days of the date of such evidence (with a deduction for any amount so added back to the extent not so reimbursed within 365 days), expenses with respect to liability or casualty events or business interruption shall be excluded;

(14) any net after-tax effect of unrealized income (loss) attributable to Hedging Obligations or other derivative instruments shall be excluded; and

(15) any benefit from any fair market value of any contract as recorded on the balance sheet at the time of the Transactions shall be excluded.

Notwithstanding the foregoing, for the purpose of the covenant described under "Certain Covenants—Limitation on Restricted Payments" only (other than clause (3)(d) thereof), there shall be excluded from Consolidated Net Income any income arising from any sale or other disposition of Restricted Investments made by TCEH and its Restricted Subsidiaries, any repurchases and redemptions of Restricted Investments from TCEH and its Restricted Subsidiaries, any repayments of loans and advances which constitute Restricted Investments by TCEH or any of its Restricted Subsidiaries, any sale of the stock of an Unrestricted Subsidiary or any distribution or dividend from an Unrestricted Subsidiary, in each case only to the extent such amounts increase the amount of Restricted Payments permitted under such covenant pursuant to clause (3)(d) thereof.

"*Consolidated Secured Debt Ratio*" means, as of any date of determination, the ratio of (x) Consolidated Secured Indebtedness computed as of the end of the most recent fiscal quarter for which internal financial statements are available immediately preceding the date on which such event for which such calculation is being made shall occur to (y) the aggregate amount of EBITDA of TCEH for the period of the most recently ended four full consecutive fiscal quarters for which internal financial statements are available immediately preceding the date on which such event for which such calculation is being made shall occur, in each case with such pro forma adjustments to Consolidated Secured Indebtedness and EBITDA as are appropriate and consistent with the pro forma adjustment provisions set forth in the definition of "Fixed Charge Coverage Ratio."

"*Consolidated Secured Indebtedness*" means Consolidated Total Indebtedness secured by a Lien on any assets of TCEH or any of its Restricted Subsidiaries.

"*Consolidated Total Indebtedness*" means, as at any date of determination, an amount equal to (1) the aggregate amount of all outstanding Indebtedness of TCEH and its Restricted Subsidiaries on a consolidated basis consisting of Indebtedness for borrowed money, debt obligations evidenced by promissory notes and similar instruments, letters of credit (only to the extent of any unreimbursed drawings thereunder) and Obligations in respect of Capitalized Lease Obligations, plus (2) the aggregate amount of all outstanding Disqualified Stock of TCEH and all Disqualified Stock and Preferred Stock of its Restricted Subsidiaries on a consolidated basis, with the amount of such Disqualified Stock and Preferred Stock equal to the greater of their respective voluntary or involuntary liquidation preferences and maximum fixed repurchase prices, in each case determined on a consolidated basis in accordance with GAAP, less (3) the aggregate amount of all Unrestricted Cash and less (4) all Deposit L/C Loans and Incremental Deposit L/C Loans outstanding on such date of

209

EFIHMW00250281