determination. For purposes hereof, the "maximum fixed repurchase price" of any Disqualified Stock or Preferred Stock that does not have a fixed repurchase price shall be calculated in accordance with the terms of such Disqualified Stock or Preferred Stock as if such Disqualified Stock or Preferred Stock were purchased on any date on which Consolidated Total Indebtedness shall be required to be determined, and if such price is based upon, or measured by, the fair market value of such Disqualified Stock or Preferred Stock, such fair market value shall be determined reasonably and in good faith by TCEH.

"*Contingent Obligations*" means, with respect to any Person, any obligation of such Person guaranteeing any leases, dividends or other obligations that do not constitute Indebtedness ("*primary obligations*") of any other Person (the "*primary obligor*") in any manner, whether directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent,

(1) to purchase any such primary obligation or any property constituting direct or indirect security therefor,

(2) to advance or supply funds

(a) for the purchase or payment of any such primary obligation, or

(b) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, or

(3) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation against loss in respect thereof.

"*Covered Commodity*" means any energy, electricity, generation capacity, power, heat rate, congestion, natural gas, nuclear fuel (including enrichment and conversion), diesel fuel, fuel oil, other petroleum-based liquids, coal, lignite, weather, emissions and other environmental credits, waste by-products, renewable energy credit, or any other energy related commodity or service (including ancillary services and related risks (such as location basis)).

"*Credit Facilities*" means, with respect to TCEH or any of its Restricted Subsidiaries, one or more debt facilities, including the TCEH Senior Secured Facilities or other financing arrangements (including, without limitation, commercial paper facilities or indentures) providing for revolving credit loans, term loans, letters of credit or other long-term indebtedness, including any notes, mortgages, guarantees, collateral documents, instruments and agreements executed in connection therewith, and any amendments, supplements, modifications, extensions, renewals, restatements or refundings thereof and any indentures or credit facilities or commercial paper facilities that replace, refund or refinance any part of the loans, notes, other credit facilities or commitments thereunder, including any such replacement, refunding or refinancing facility or indenture that increases the amount permitted to be borrowed thereunder or alters the maturity thereof (*provided* that such increase in borrowings is permitted by the covenant described under "Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock") or adds Restricted Subsidiaries as additional borrowers or guarantors thereunder and whether by the same or any other agent, lender or group of lenders.

"*Default*" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default.

"*Deposit L/C Loan*" means Deposit L/C Loans under, and as defined in, the TCEH Senior Secured Facilities.

"*Designated Non-cash Consideration*" means the fair market value of non-cash consideration received by TCEH or a Restricted Subsidiary in connection with an Asset Sale that is so designated as

Highly Confidential

EFIHMW00250282

Designated Non-cash Consideration pursuant to an Officer's Certificate, setting forth the basis of such valuation, executed by the principal financial officer of TCEH, less the amount of cash or Cash Equivalents received in connection with a subsequent sale of or collection on such Designated Non-cash Consideration.

"*Designated Preferred Stock*" means Preferred Stock of TCEH or any parent corporation thereof (in each case other than Disqualified Stock) that is issued for cash (other than to a Restricted Subsidiary or an employee stock ownership plan or trust established by TCEH or any of its Subsidiaries) and is so designated as Designated Preferred Stock, pursuant to an Officer's Certificate executed by the principal financial officer of TCEH or the applicable parent corporation thereof, as the case may be, on the issuance date thereof, the cash proceeds of which are excluded from the calculation set forth in clause (3) of the first paragraph under "Certain Covenants—Limitation on Restricted Payments."

"*Disqualified Stock*" means, with respect to any Person, any Capital Stock of such Person which, by its terms, or by the terms of any security into which it is convertible or for which it is putable or exchangeable, or upon the happening of any event, matures or is mandatorily redeemable (other than solely as a result of a change of control or asset sale) pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof (other than solely as a result of a change of control or asset sale), in whole or in part, in each case prior to the date 91 days after the earlier of the maturity date of the Notes or the date the Notes are no longer outstanding; *provided, however*, that if such Capital Stock is issued to any plan for the benefit of employees of TCEH or its Subsidiaries or by any such plan to such employees, such Capital Stock shall not constitute Disqualified Stock solely because it may be required to be repurchased by TCEH or its Subsidiaries in order to satisfy applicable statutory or regulatory obligations.

"*EBITDA*" means, with respect to any Person for any period, the Consolidated Net Income of such Person for such period.

(1) increased (without duplication) by:

(a) provision for taxes based on income or profits or capital gains, including, without limitation, foreign, federal, state, franchise, excise, value-added and similar taxes and foreign withholding taxes (including penalties and interest related to such taxes or arising from tax examinations) of such Person paid or accrued during such period, deducted (and not added back) in computing Consolidated Net Income; *plus*

(b) Fixed Charges of such Person for such period (including (x) net losses on Hedging Obligations or other derivative instruments entered into for the purpose of hedging interest rate risk and (y) costs of surety bonds in connection with financing activities, in each case, to the extent included in Fixed Charges), together with items excluded from the definition of "Consolidated Interest Expense" pursuant to clauses (1) (u), (v), (w), (x), (y) and (z) of the definition thereof, and, in each such case, to the extent the same were deducted (and not added back) in calculating such Consolidated Net Income; *plus*

(c) Consolidated Depreciation and Amortization Expense of such Person for such period to the extent the same was deducted (and not added back) in computing Consolidated Net Income; *plus*

(d) any fees, expenses or charges (other than depreciation or amortization expense) related to any Equity Offering, Permitted Investment, acquisition, disposition, recapitalization or the incurrence of Indebtedness permitted to be incurred by such Person and its Restricted Subsidiaries, by the Indenture (including a refinancing transaction or amendment or other modification of any debt instrument) (whether or not successful), including (i) such

Highly Confidential

EFIHMW00250283

fees, expenses or charges related to the offering of the Notes, the TCEH Senior Secured Facilities, the TCEH Senior Interim Facilities and any Receivables Facility, (ii) any amendment or other modification of the Notes, (iii) any such transaction consummated prior to the Closing Date and any such transaction undertaken but not completed, and (iv) any charges or non-recurring merger costs as a result of any such transaction, in each case, deducted (and not added back) in computing Consolidated Net Income; *plus*

(e) the amount of any restructuring charge or reserve deducted (and not added back) in such period in computing Consolidated Net Income, including any costs incurred in connection with acquisitions after the Closing Date, costs related to the closure and/or consolidation of facilities; *plus*

(f) any other non-cash charges, including any write-offs or write-downs, reducing Consolidated Net Income for such period (*provided* that if any such non-cash charges represent an accrual or reserve for potential cash items in any future period, the cash payment in respect thereof in such future period shall be subtracted from EBITDA to such extent, and excluding amortization of a prepaid cash item that was paid in a prior period); *plus*

(g) the amount of any minority interest expense consisting of Subsidiary income attributable to minority equity interests of third parties in any non-Wholly Owned Subsidiary deducted (and not added back) in such period in calculating Consolidated Net Income; *plus*

(h) the amount of management, monitoring, consulting and advisory fees and related indemnities and expenses paid in such period to the Investors to the extent otherwise permitted under "Certain Covenants—Transactions with Affiliates" and deducted (and not added back) in calculating Consolidated Net Income; *plus*

(i) the amount of net cost savings projected by TCEH in good faith to be realized as a result of specified actions taken or to be taken prior to or during such period (calculated on a *pro forma* basis as though such cost savings had been realized on the first day of such period and added to EBITDA until fully realized), net of the amount of actual benefits realized during such period from such actions; *provided* that (w) such cost savings are reasonably identifiable and factually supportable, (x) such actions have been taken or are to be taken within 12 months after the date of determination to take such action and some portion of the benefit is expected to be realized within 12 months of taking such action, (y) no cost savings shall be added pursuant to this clause (i) to the extent duplicative of any expenses or charges relating to such cost savings that are included in clause (e) above with respect to such period and (z) the aggregate amount of cost savings added pursuant to this clause (i) shall not exceed $150.0 million for any four consecutive quarter period (which adjustments may be incremental to *pro forma* adjustments made pursuant to the second paragraph of the definition of "Fixed Charge Coverage Ratio"); *plus*

(j) the amount of loss on sales of receivables and related assets to the Receivables Subsidiary in connection with a Receivables Facility deducted (and not added back) in calculating Consolidated Net Income; *plus*

(k) any costs or expense incurred by TCEH or a Restricted Subsidiary pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement or any stock subscription or shareholder agreement, to the extent that such cost or expenses are funded with cash proceeds contributed to the capital of TCEH or net cash proceeds of an issuance of Equity Interests (other than Disqualified Stock) of TCEH (or any direct or indirect parent thereof) solely to the extent that such net cash proceeds are excluded from the calculation set forth in clause (3) of the first paragraph under "Certain Covenants—Limitation on Restricted Payments"; *plus*

212

EFIHMW00250284

(l) Expenses Relating to a Unit Outage; *provided* that the only Expenses Relating to a Unit Outage that may be included in EBITDA shall be, without duplication, (i) up to $250.0 million per fiscal year of Expenses Relating to a Unit Outage incurred within the first 12 months after any planned or unplanned outage of any Unit by reason of any action by any regulatory body or other Government Authority or to comply with any applicable law, and (ii) up to $100.0 million per fiscal year of Expenses Relating to a Unit Outage incurred within the first 12 months after any planned outage of any Unit for purposes of expanding or upgrading such Unit;

(m) cash receipts (or any netting arrangements resulting in increased cash receipts) not added in arriving at EBITDA or Consolidated Net Income in any period to the extent the non-cash gains relating to such receipts were deducted in the calculation of EBITDA pursuant to paragraph (2) below for any previous period and not added; and

(2) decreased by (without duplication) (a) non-cash gains increasing Consolidated Net Income of such Person for such period, excluding any non-cash gains to the extent they represent the reversal of an accrual or reserve for a potential cash item that reduced EBITDA in any prior period, (b) cash expenditures (or any netting arrangements resulting in increased cash expenditures) not deducted in arriving at EBITDA or Consolidated Net Income in any period to the extent non-cash losses relating to such expenditures were added in the calculation of EBITDA pursuant to paragraph (1) above for any previous period and not deducted, and (c) the amount of any minority interest income consisting of Subsidiary losses attributable to minority equity interests of third parties in a non-Wholly Owned Subsidiary to the extent such minority interest income is included in Consolidated Net Income.

"*EFH Corp.*" means Energy Future Holdings Corp.

"*EFH Corp. Notes*" means the $2,000,000,000 aggregate principal amount of 10.875% Senior Notes due 2017 and the $2,500,000,000 aggregate principal amount of 11.250%/12.000% Senior Toggle Notes due 2017 issued by EFH Corp. and any PIK notes issued (or increase in principal amount) as payment of interest thereon.

"*EFH Senior Interim Facility*" means the senior interim loan agreement dated as of the Closing Date by and among EFH Corp., as borrower, the lenders party thereto in their capacities as lenders thereunder and Morgan Stanley Senior Funding, Inc., as Administrative Agent, including any guarantee instruments and agreements executed in connection therewith and any amendments, supplements, modifications or restatements thereof.

"*Energy Future Competitive Holdings*" means Energy Future Competitive Holdings Company.

"*Energy Future Intermediate Holding Company*" means Energy Future Intermediate Holding Company LLC.

"*Environmental CapEx Debt*" means Indebtedness of TCEH or any of its Restricted Subsidiaries incurred for the purpose of financing Environmental Capital Expenditures.

"*EMU*" means the economic and monetary union as contemplated in the Treaty on European Union.

"*Environmental Capital Expenditures*" means capital expenditures deemed necessary by TCEH or its Restricted Subsidiaries to comply with, or in anticipation of having to comply with, Environmental Law or otherwise undertaken voluntarily by TCEH or any of its Restricted Subsidiaries in connection with environmental matters.

"*Environmental Law*" means any applicable Federal, state, foreign or local statute, law, rule, regulation, ordinance, code and rule of common law now or hereafter in effect and in each case as

213

EFIHMW00250285

amended, and any applicable judicial or administrative interpretation thereof, including any applicable judicial or administrative order, consent decree or judgment, relating to the environment, human health or safety or Hazardous Materials.

"*Equity Interests*" means Capital Stock and all warrants, options or other rights to acquire Capital Stock, but excluding any debt security that is convertible into, or exchangeable for, Capital Stock.

"*Equity Offering*" means any public or private sale of common stock or Preferred Stock of TCEH or any of its direct or indirect parent companies (excluding Disqualified Stock), other than:

> (1) public offerings with respect to TCEH's or any direct or indirect parent company's common stock registered on Form S-8;

> (2) issuances to any Subsidiary of TCEH; and

> (3) any such public or private sale that constitutes an Excluded Contribution.

"*ERCOT*" means the Electric Reliability Council of Texas.

"*euro*" means the single currency of participating member states of the EMU.

"*Event of Default*" has the meaning set forth under "Events of Default and Remedies."

"*Excess Proceeds*" has the meaning set forth in the fourth paragraph under "Repurchase at the Option of Holders—Asset Sales."

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"*Exchange Notes*" means any notes issued in exchange for the Notes pursuant to the Registration Rights Agreement or similar agreement.

"*Excluded Contribution*" means net cash proceeds, marketable securities or Qualified Proceeds received by TCEH after the Closing Date from

> (1) contributions to its common equity capital, and

> (2) the sale (other than to a Subsidiary of TCEH or to any management equity plan or stock option plan or any other management or employee benefit plan or agreement of the Issuer or TCEH) of Capital Stock (other than Disqualified Stock and Designated Preferred Stock) of TCEH.

in each case designated as Excluded Contributions pursuant to an Officer's Certificate executed by the principal financial officer of TCEH on the date such capital contributions are made or the date such Equity Interests are sold, as the case may be, which are excluded from the calculation set forth in clause (3) of the first paragraph under "Certain Covenants—Limitation on Restricted Payments."

"*Existing Notes*" means

- Parent Guarantor's Floating Rate Junior Subordinated Debentures, Series D due 2037;

- Parent Guarantor's 8.175% Fixed Junior Subordinated Debentures, Series E due 2037;

- TCEH's 6.125% Senior Notes due 2008;

- TCEH's 7.000% Senior Notes due 2013;

- Parent Guarantor's 7.460% Fixed Secured Bonds with amortizing payments to 2015;

214

EFIHMW00250286

- Parent Guarantor's 7.480% Fixed Secured Bonds;
- Parent Guarantor's 9.580% Fixed Notes due in semi-annual installments to 2019;
- Parent Guarantor's 8.254% Fixed Notes due in quarterly installments to 2021;

Pollution Control Revenue Bonds—Brazos River Authority:

- 5.400% Fixed Series 1994A due May 1, 2029;
- 7.700% Fixed Series 1999A due April 1, 2033;
- 6.750% Fixed Series 1999B due September 1, 2034;
- 7.700% Fixed Series 1999C due March 1, 2032;
- Floating Rate Series 2001A due October 1, 2030;
- 5.750% Fixed Series 2001C due May 1, 2036;
- Floating Rate Series 2001D due May 1, 2033;
- Floating Rate Taxable Series 2001I due December 1, 2036;
- Floating Rate Series 2002A due May 1, 2037 ;
- 6.750% Fixed Series 2003A due April 1, 2038;
- 6.300% Fixed Series 2003B due July 1, 2032;
- 6.750% Fixed Series 2003C due October 1, 2038;
- 5.400% Fixed Series 2003D due October 1, 2029, remarketing date October 1, 2014;
- 5.000% Fixed Series 2006 due March 1, 2041;

Pollution Control Revenue Bonds—Sabine River Authority of Texas:

- 6.450% Fixed Series 2000A due June 1, 2021;
- 5.500% Fixed Series 2001A due May 1, 2022, remarketing date November 1, 2011;
- 5.750% Fixed Series 2001B due May 1, 2030, remarketing date November 1, 2011;
- 5.200% Fixed Series 2001C due May 1, 2028;
- 5.800% Fixed Series 2003A due July 1, 2022;
- 6.150% Fixed Series 2003B due August 1, 2022;

Pollution Control Revenue Bonds—Trinity River Authority of Texas:

- 6.250% Fixed Series 2000A due May 1, 2028;

in each case to the extent outstanding on the Closing Date.

   "*Existing Notes Indentures*" means each of the indentures or other documents containing the terms of the Existing Notes.

   "*Existing Parent Guarantor Notes*" means

- Parent Guarantor's Floating Rate Junior Subordinated Debentures, Series D due 2037;
- Parent Guarantor's 8.175% Fixed Junior Subordinated Debentures, Series E due 2037;

215

Highly Confidential

- Parent Guarantor's 7.460% Fixed Secured Bonds with amortizing payments to 2015;

- Parent Guarantor's 7.480% Fixed Secured Bonds;

- Parent Guarantor's 9.580% Fixed Notes due in semi-annual installments to 2019;

- Parent Guarantor's 8.254% Fixed Notes due in quarterly installments to 2021;

in each case to the extent outstanding on the Closing Date.

"*Existing EFH Corp. Notes*" means

- EFH Corp. 5.550% Fixed Senior Notes Series P due 2014;

- EFH Corp. 6.500% Fixed Senior Notes Series Q due 2024;

- EFH Corp. 6.550% Fixed Senior Notes Series R due 2034;

- EFH Corp. Floating Convertible Senior Notes due 2033;

- EFH Corp. 6.375% Series C Senior Notes due 2008;

- EFH Corp. 4.800% Series O Senior Notes due 2009;

in each case to the extent outstanding on the Closing Date.

"*Expenses Relating to a Unit Outage*" means any expenses or other charges as a result of any outage or shut-down of any Unit, including any expenses or charges relating to (a) restarting any such Unit so that it may be placed back in service after such outage or shut-down, (b) purchases of power, natural gas or heat rate to meet commitments to sell, or offset a short position in, power, natural gas or heat rate that would otherwise have been met or offset from production generated by such Unit during the period of such outage or shut-down, net of the expenses not in fact incurred (including fuel and other operating expenses) that would have been incurred absent such outage or shut down and (c) starting up, operating, maintaining and shutting down any other Unit that would not otherwise have been operating absent such outage or shut-down, including the fuel and other operating expenses to the extent in excess of the expenses not in fact incurred (including fuel and other operating costs) that would have been incurred absent such outage or shut down, incurred to start-up, operate, maintain and shut-down such Unit and that are required during the period of time that the shut-down or outaged Unit is out of service in order to meet the commitments of such shut-down or outaged Unit to sell, or offset a short position in, power, natural gas or heat rate.

"*Fixed Charge Coverage Ratio*" means, with respect to any Person for any period, the ratio of EBITDA of such Person for such period to the Fixed Charges of such Person for such period. In the event that TCEH or any Restricted Subsidiary incurs, assumes, guarantees, redeems, retires or extinguishes any Indebtedness (other than Indebtedness incurred under any revolving credit facility unless such Indebtedness has been permanently repaid and has not been replaced) or issues or redeems Disqualified Stock or Preferred Stock subsequent to the commencement of the period for which the Fixed Charge Coverage Ratio is being calculated but prior to or simultaneously with the event for which the calculation of the Fixed Charge Coverage Ratio is made (the "*Fixed Charge Coverage Ratio Calculation Date*"), then the Fixed Charge Coverage Ratio shall be calculated giving *pro forma* effect to such incurrence, assumption, guarantee, redemption, retirement or extinguishment of Indebtedness, or such issuance or redemption of Disqualified Stock or Preferred Stock, as if the same had occurred at the beginning of the applicable four-quarter period.

For purposes of making the computation referred to above, Investments, acquisitions, dispositions, mergers, consolidations and disposed operations (as determined in accordance with

216

EFIHMW00250288

GAAP) that have been made by TCEH or any of its Restricted Subsidiaries during the four-quarter reference period or subsequent to such reference period and on or prior to or simultaneously with the Fixed Charge Coverage Ratio Calculation Date shall be calculated on a *pro forma* basis assuming that all such Investments, acquisitions, dispositions, mergers, consolidations and disposed operations (and the change in any associated fixed charge obligations and the change in EBITDA resulting therefrom) had occurred on the first day of the four-quarter reference period. If, since the beginning of such period, any Person that subsequently became a Restricted Subsidiary or was merged with or into TCEH or any of its Restricted Subsidiaries since the beginning of such period shall have made any Investment, acquisition, disposition, merger, consolidation or disposed operation that would have required adjustment pursuant to this definition, then the Fixed Charge Coverage Ratio shall be calculated giving *pro forma* effect thereto for such period as if such Investment, acquisition, disposition, merger, consolidation or disposed operation had occurred at the beginning of the applicable four-quarter period.

For purposes of this definition, whenever *pro forma* effect is to be given to a transaction, the *pro forma* calculations shall be made in good faith by a responsible financial or accounting officer of TCEH. If any Indebtedness bears a floating rate of interest and is being given *pro forma* effect, the interest on such Indebtedness shall be calculated as if the rate in effect on the Fixed Charge Coverage Ratio Calculation Date had been the applicable rate for the entire period (taking into account any Hedging Obligations applicable to such Indebtedness). Interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by a responsible financial or accounting officer of TCEH to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP. For purposes of making the computation referred to above, interest on any Indebtedness under a revolving credit facility computed on a *pro forma* basis shall be computed based upon the average daily balance of such Indebtedness during the applicable period except as set forth in the first paragraph of this definition. Interest on Indebtedness that may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a eurocurrency interbank offered rate or other rate shall be deemed to have been based upon the rate actually chosen, or, if none, then based upon such optional rate chosen as TCEH may designate.

"*Fixed Charges*" means, with respect to any Person for any period, the sum of:

(1) Consolidated Interest Expense of such Person for such period;

(2) all cash dividends or other distributions paid (excluding items eliminated in consolidation) on any series of Preferred Stock during such period; and

(3) all cash dividends or other distributions paid (excluding items eliminated in consolidation) on any series of Disqualified Stock during such period.

"*Foreign Subsidiary*" means, with respect to any Person, any Restricted Subsidiary of such Person that is not organized or existing under the laws of the United States, any state or territory thereof or the District of Columbia and any Restricted Subsidiary of such Foreign Subsidiary.

"*GAAP*" means generally accepted accounting principles in the United States which are in effect on the Closing Date.

"*Government Authority*" means any nation or government, any state, province, territory or other political subdivision thereof, and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including without limitation ERCOT.

"*Government Securities*" means securities that are:

(1) direct obligations of the United States of America for the timely payment of which its full faith and credit is pledged; or

217

EFIHMW00250289

(2) obligations of a Person controlled or supervised by and acting as an agency or instrumentality of the United States of America the timely payment of which is unconditionally guaranteed as a full faith and credit obligation by the United States of America,

which, in either case, are not callable or redeemable at the option of the issuers thereof, and shall also include a depository receipt issued by a bank (as defined in Section 3(a)(2) of the Securities Act), as custodian with respect to any such Government Securities or a specific payment of principal of or interest on any such Government Securities held by such custodian for the account of the holder of such depository receipt; *provided* that (except as required by law) such custodian is not authorized to make any deduction from the amount payable to the holder of such depository receipt from any amount received by the custodian in respect of the Government Securities or the specific payment of principal of or interest on the Government Securities evidenced by such depository receipt.

"*guarantee*" means a guarantee (other than by endorsement of negotiable instruments for collection in the ordinary course of business), direct or indirect, in any manner (including letters of credit and reimbursement agreements in respect thereof), of all or any part of any Indebtedness or other obligations.

"*Guarantee*" means the guarantee by any Guarantor of the Issuer's Obligations under the Indenture.

"*Guarantor*" means the Parent Guarantor and each Restricted Subsidiary that Guarantees the Notes in accordance with the terms of the Indenture.

"*Hazardous Materials*" means (a) any petroleum or petroleum products, radioactive materials, friable asbestos, urea formaldehyde foam insulation, transformers or other equipment that contain dielectric fluid containing regulated levels of polychlorinated biphenyls and radon gas; (b) any chemicals, materials or substances defined as or included in the definition of "hazardous substances," "toxic substances," "toxic pollutants," "contaminants," or "pollutants" or words of similar import, under any applicable Environmental Law; and (c) any other chemical, material or substance, which is prohibited, limited or regulated by any Environmental Law.

"*Hedging Obligations*" means with respect to any Person, the obligations of such Person under (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement and (c) physical or financial commodity contracts or agreements, power purchase or sale agreements, fuel purchase or sale agreements, environmental credit purchase or sale agreements, power transmission agreements, commodity transportation agreements, fuel storage agreements, netting agreements (including Netting Agreements), capacity agreement and commercial or trading agreements, each with respect to the purchase, sale, exchange of (or the option to purchase, sell or exchange), transmission, transportation, storage, distribution, processing, sale, lease or hedge of, any Covered Commodity price or price

218

Highly Confidential

indices for any such Covered Commodity or services or any other similar derivative agreements, and any other similar agreements.

"Holder" means the Person in whose name a Note is registered on the registrar's books.

"*Incremental Deposit L/C Loans*" means Incremental Deposit L/C Loans under, and as defined in, the TCEH Senior Secured Facilities.

"*Indebtedness*" means, with respect to any Person, without duplication:

(1) any indebtedness (including principal and premium) of such Person, whether or not contingent:

(a) in respect of borrowed money;

(b) evidenced by bonds, notes, debentures or similar instruments or letters of credit or bankers' acceptances (or, without duplication, reimbursement agreements in respect thereof);

(c) representing the balance deferred and unpaid of the purchase price of any property (including Capitalized Lease Obligations), except (i) any such balance that constitutes a trade payable or similar obligation to a trade creditor, in each case accrued in the ordinary course of business and (ii) any earn-out obligations until such obligation becomes a liability on the balance sheet of such Person in accordance with GAAP; or

(d) representing any Hedging Obligations;

if and to the extent that any of the foregoing Indebtedness (other than letters of credit and Hedging Obligations) would appear as a liability upon a balance sheet (excluding the footnotes thereto) of such Person prepared in accordance with GAAP;

(2) to the extent not otherwise included, any obligation by such Person to be liable for, or to pay, as obligor, guarantor or otherwise on, the obligations of the type referred to in clause (1) of a third Person (whether or not such items would appear upon the balance sheet of the such obligor or guarantor), other than by endorsement of negotiable instruments for collection in the ordinary course of business; and

(3) to the extent not otherwise included, the obligations of the type referred to in clause (1) of a third Person secured by a Lien on any asset owned by such first Person, whether or not such Indebtedness is assumed by such first Person *provided* that the amount of Indebtedness of such first Person for purposes of this clause (3) shall be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) the fair market value of the property encumbered thereby as determined by such first Person in good faith;

*provided, however*, that notwithstanding the foregoing, Indebtedness shall be deemed not to include (a) Contingent Obligations incurred in the ordinary course of business or (b) obligations under or in respect of Receivables Facilities or (c) amounts payable by TCEH and any Restricted Subsidiary in connection with retail clawback or other regulatory transition issues.

"*Independent Financial Advisor*" means an accounting, appraisal, investment banking firm or consultant to Persons engaged in Similar Businesses of nationally recognized standing that is, in the good faith judgment of TCEH, qualified to perform the task for which it has been engaged.

"*Initial Purchasers*" means Goldman, Sachs & Co., Morgan Stanley & Co. Incorporated, Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, J.P. Morgan Securities Inc. and Lehman Brothers Inc.

"*Intercompany Loan*" means a senior, unsubordinated loan by TCEH or any of its Restricted Subsidiaries to EFH Corp., with an interest rate commensurate with an arm's length relationship,

Highly Confidential

EFIHMW00250291

guaranteed by any Subsidiary of EFH Corp. that has guaranteed any Indebtedness of EFH Corp. and (if outstanding at the time any such proceeds are received) requiring repayment with up to $1,250.0 million of proceeds received by EFH Corp. or any of its Subsidiaries (other than the Oncor Subsidiaries) from the sale of Equity Interests in, Indebtedness of, or all or substantially all of the assets (in one transaction or a series of related transactions) of any of the Oncor Subsidiaries or any direct or indirect parent of the Oncor Subsidiaries.

"*Investment Grade Rating*" means a rating equal to or higher than Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P, or an equivalent rating by any other Rating Agency.

"*Investment Grade Securities*" means:

(1) securities issued or directly and fully guaranteed or insured by the United States government or any agency or instrumentality thereof (other than Cash Equivalents);

(2) debt securities or debt instruments with an Investment Grade Rating, but excluding any debt securities or instruments constituting loans or advances among TCEH (or any of its direct or indirect parent companies) and its (or their) Subsidiaries;

(3) investments in any fund that invests exclusively in investments of the type described in clauses (1) and (2) which fund may also hold immaterial amounts of cash pending investment or distribution; and

(4) corresponding instruments in countries other than the United States customarily utilized for high quality investments.

"*Investments*" means, with respect to any Person, all investments by such Person in other Persons (including Affiliates) in the form of loans (including guarantees), advances or capital contributions (excluding accounts receivable, trade credit, advances to customers, commissions, travel and similar advances to officers and employees, in each case made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities issued by any other Person and investments that are required by GAAP to be classified on the balance sheet (excluding the footnotes) of TCEH in the same manner as the other investments included in this definition to the extent such transactions involve the transfer of cash or other property. For purposes of the definition of "Unrestricted Subsidiary" and the covenant described under "Certain Covenants—Limitation on Restricted Payments":

(1) "Investments" shall include the portion (proportionate to TCEH's equity interest in such Subsidiary) of the fair market value of the net assets of a Subsidiary of TCEH at the time that such Subsidiary is designated an Unrestricted Subsidiary; *provided, however*, that upon a redesignation of such Subsidiary as a Restricted Subsidiary, TCEH shall be deemed to continue to have a permanent "Investment" in an Unrestricted Subsidiary in an amount (if positive) equal to:

(a) TCEH's "Investment" in such Subsidiary at the time of such redesignation; *less*

(b) the portion (proportionate to TCEH's equity interest in such Subsidiary) of the fair market value of the net assets of such Subsidiary at the time of such redesignation; and

(2) any property transferred to or from an Unrestricted Subsidiary shall be valued at its fair market value at the time of such transfer, in each case as determined in good faith by TCEH.

"*Investors*" means Kohlberg Kravis Roberts & Co. L.P., TPG Capital, L.P., J.P. Morgan Ventures Corporation, Citigroup Global Markets Inc., Morgan Stanley & Co. Incorporated, Goldman, Sachs & Co. and LB I Group and each of their respective Affiliates but not including, however, any portfolio companies of any of the foregoing.

220

Highly Confidential

EFIHMW00250292

"*Issue Date*" means the first date on which any Notes are issued pursuant to the Indenture.

"*Issuer*" has the meaning set forth in the first paragraph under "General"; *provided* that when used in the context of determining the fair market value of an asset or liability under the Indenture, "Issuer" shall be deemed to mean the board of directors of the Issuer when the fair market value is equal to or in excess of $500.0 million (unless otherwise expressly stated).

"*Legal Holiday*" means a Saturday, a Sunday or a day on which commercial banking institutions are not required to be open in the State of New York.

"*Lien*" means, with respect to any asset, any mortgage, lien (statutory or otherwise), pledge, hypothecation, charge, security interest, preference, priority or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a security interest in and any filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statutes) of any jurisdiction; *provided* that in no event shall an operating lease be deemed to constitute a Lien.

"*Moody's*" means Moody's Investors Service, Inc. and any successor to its rating agency business.

"*Necessary CapEx Debt*" means Indebtedness of the Issuer or any of its Restricted Subsidiaries incurred for the purpose of financing Necessary Capital Expenditures.

"*Necessary Capital Expenditures*" means capital expenditures by the Issuer and its Restricted Subsidiaries that are required by applicable law (other than Environmental Law) or otherwise undertaken voluntarily for health and safety reasons (other than as required by Environmental Law). The term "Necessary Capital Expenditures" does not include any capital expenditure undertaken primarily to increase the efficiency of, expand or re-power any power generation facility.

"*Net Income*" means, with respect to any Person, the net income (loss) of such Person, determined in accordance with GAAP and before any reduction in respect of Preferred Stock dividends.

"*Net Proceeds*" means the aggregate cash proceeds received by TCEH or any of its Restricted Subsidiaries in respect of any Asset Sale (including a Casualty Event), including any cash received upon the sale or other disposition of any Designated Non-cash Consideration received in any Asset Sale (including a Casualty Event), net of the direct costs relating to such Asset Sale (including a Casualty Event) and the sale or disposition of such Designated Non-cash Consideration, including legal, accounting and investment banking fees, and brokerage and sales commissions, any relocation expenses incurred as a result thereof, taxes paid or payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements), amounts required to be applied to the repayment of principal, premium, if any, and interest on Senior Indebtedness required (other than required by clause (1) of the second paragraph of "Repurchase at the Option of Holders—Asset Sales") to be paid as a result of such transaction and any deduction of appropriate amounts to be provided by TCEH or any of its Restricted Subsidiaries as a reserve in accordance with GAAP against any liabilities associated with the asset disposed of in such transaction and retained by TCEH or any of its Restricted Subsidiaries after such sale or other disposition thereof, including pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction.

"*Netting Agreement*" shall mean a netting agreement, master netting agreement or other similar document having the same effect as a netting agreement or master netting agreement and, as

221

EFIHMW00250293

**PX 006**
**Page 228 of 382**

applicable, any collateral annex, security agreement or other similar document related to any master netting agreement or Permitted Contract.

"*Obligations*" means any principal, interest (including any interest accruing subsequent to the filing of a petition in bankruptcy, reorganization or similar proceeding at the rate provided for in the documentation with respect thereto, whether or not such interest is an allowed claim under applicable state, federal or foreign law), premium, penalties, fees, indemnifications, reimbursements (including reimbursement obligations with respect to letters of credit and bankers' acceptances), damages and other liabilities, and guarantees of payment of such principal, interest, penalties, fees, indemnifications, reimbursements, damages and other liabilities, payable under the documentation governing any Indebtedness.

"*Officer*" means the Chairman of the Board, the Chief Executive Officer, the President, any Executive Vice President, Senior Vice President or Vice President, the Treasurer or the Secretary of the Issuer.

"*Officer's Certificate*" means a certificate signed on behalf of the Issuer by an Officer of the Issuer, who must be the principal executive officer, the principal financial officer, the treasurer or the principal accounting officer of the Issuer that meets the requirements set forth in the Indenture.

"*Oncor Electric Delivery Facility*" means the revolving credit agreement to be entered into as of the Closing Date by and among Oncor Electric Delivery, as borrower, the lenders party thereto in their capacities as lenders thereunder and JPMorgan Chase Bank, N.A., as Administrative Agent, including any guarantees, collateral documents, instruments and agreements executed in connection therewith, and any amendments, supplements, modifications, extensions, renewals, restatements, refundings or refinancings thereof and any indentures or credit facilities or commercial paper facilities with banks or other institutional lenders or investors that replace, refund or refinance any part of the loans, notes, other credit facilities or commitments thereunder, including any such replacement, refunding or refinancing facility or indenture that increases the amount borrowable thereunder or alters the maturity thereof.

"*Oncor Holdings*" means Oncor Electric Delivery Holdings LLC.

"*Oncor Subsidiaries*" means the Subsidiaries of Energy Future Intermediate Holding Company, including Oncor Holdings and its subsidiaries.

"*Opinion of Counsel*" means a written opinion from legal counsel who is acceptable to the Trustee. The counsel may be an employee of or counsel to the Issuer or the Trustee.

"*Permitted Asset Swap*" means the concurrent purchase and sale or exchange of Related Business Assets or a combination of Related Business Assets and cash or Cash Equivalents between TCEH or any of its Restricted Subsidiaries and another Person; *provided*, that any cash or Cash Equivalents received must be applied in accordance with the covenant described under "Repurchase at the Option of Holders—Asset Sales."

"*Permitted Holders*" means each of the Investors, members of management (including directors) of EFH Corp. or its Subsidiaries who on the Closing Date are (or will be at any time prior to the first anniversary of the Closing Date) holders of Equity Interests of TCEH (or any of its direct or indirect parent companies) and any group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the

222

EFIHMW00250294

PX 006
Page 229 of 382

Exchange Act or any successor provision) of which any of the foregoing are members; provided that, in the case of such group and without giving effect to the existence of such group or any other group, such Investors and members of management collectively, have beneficial ownership of more than 50% of the total voting power of the Voting Stock of TCEH or any of its direct or indirect parent companies.

"*Permitted Investments*" means:

(1) any Investment in TCEH or any of its Restricted Subsidiaries;

(2) any Investment in cash and Cash Equivalents or Investment Grade Securities;

(3) any Investment by TCEH or any of its Restricted Subsidiaries in a Person that is engaged in a Similar Business if as a result of such Investment:

(a) such Person becomes a Restricted Subsidiary; or

(b) such Person, in one transaction or a series of related transactions, is merged or consolidated with or into, or transfers or conveys substantially all of its assets to, or is liquidated into, TCEH or a Restricted Subsidiary,

and, in each case, any Investment held by such Person; *provided* that such Investment was not acquired by such Person in contemplation of such acquisition, merger, consolidation or transfer;

(4) any Investment in securities or other assets not constituting cash, Cash Equivalents or Investment Grade Securities and received in connection with an Asset Sale made pursuant to the provisions described under "Repurchase at the Option of Holders—Asset Sales" or any other disposition of assets not constituting an Asset Sale;

(5) any Investment existing on the Closing Date;

(6) any Investment acquired by TCEH or any of its Restricted Subsidiaries:

(a) in exchange for any other Investment or accounts receivable held by TCEH or any such Restricted Subsidiary in connection with or as a result of a bankruptcy, workout, reorganization or recapitalization of the issuer of such other Investment or accounts receivable; or

(b) as a result of a foreclosure by TCEH or any of its Restricted Subsidiaries with respect to any secured Investment or other transfer of title with respect to any secured Investment in default;

(7) Hedging Obligations permitted under clause (10) of the second paragraph of the covenant described in "Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock";

(8) any Investment in a Similar Business having an aggregate fair market value, taken together with all other Investments made pursuant to this clause (8) that are at that time outstanding, not to exceed 3.5% of Total Assets at the time of such Investment (with the fair market value of each Investment being measured at the time made and without giving effect to subsequent changes in value);

(9) Investments the payment for which consists of Equity Interests (exclusive of Disqualified Stock) of TCEH or any of its direct or indirect parent companies; *provided*, *however*, that such Equity Interests will not increase the amount available for Restricted Payments under clause (3) of the first paragraph under the covenant described in "Certain Covenants—Limitations on Restricted Payments";

223

Highly Confidential

EFIHMW00250295

(10) guarantees of Indebtedness of TCEH or any of its Restricted Subsidiaries permitted under the covenant described under "Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock";

(11) any transaction to the extent it constitutes an Investment that is permitted and made in accordance with the provisions of the second paragraph of the covenant described under "Certain Covenants—Transactions with Affiliates" (except transactions described in clauses (2), (5) and (9) of such paragraph);

(12) Investments consisting of purchases and acquisitions of inventory, fuel (including all forms of nuclear fuel), supplies, material or equipment;

(13) additional Investments having an aggregate fair market value, taken together with all other Investments made pursuant to this clause (13) that are at that time outstanding (without giving effect to the sale of an Investment to the extent the proceeds of such sale do not consist of cash or marketable securities), not to exceed 3.5% of Total Assets at the time of such Investment (with the fair market value of each Investment being measured at the time made and without giving effect to subsequent changes in value);

(14) Investments relating to a Receivables Subsidiary that, in the good faith determination of TCEH, are necessary or advisable to effect any Receivables Facility for the benefit of TCEH or any of its Restricted Subsidiaries;

(15) advances to, or guarantees of Indebtedness of, employees not in excess of $25.0 million outstanding at any one time, in the aggregate;

(16) loans and advances to officers, directors and employees for business-related travel expenses, moving expenses and other similar expenses, in each case incurred in the ordinary course of business or consistent with past practices or to fund such Person's purchase of Equity Interests of the Issuer or any direct or indirect parent company thereof;

(17) any Investment in any Subsidiary or any joint venture in connection with intercompany cash management arrangements or related activities arising in the ordinary course of business;

(18) any loans to, letters of credit issued on behalf of, EFH Corp. or any of its Restricted Subsidiaries under the EFH Corp. Notes, and any refinancings thereof, for working capital purposes, in each case made in the ordinary course of business and consistent with past practices;

(19) any Investment in Shell Wind in an aggregate amount not to exceed $1,500.0 million; and

(20) one or more letters of credit in an aggregate amount not to exceed $170.0 million posted by a Restricted Subsidiary in favor of an Oncor Subsidiary to secure that Restricted Subsidiary's contractual obligations to that Subsidiary.

"*Permitted Liens*" means, with respect to any Person:

(1) pledges or deposits by such Person under workmen's compensation laws, unemployment insurance laws or similar legislation, or good faith deposits in connection with bids, tenders, contracts (other than for the payment of Indebtedness) or leases to which such Person is a party, or deposits to secure public or statutory obligations of such Person or deposits of cash or U.S. government bonds to secure surety or appeal bonds to which such Person is a party, or deposits as security for contested taxes or import duties or for the payment of rent, in each case incurred in the ordinary course of business (including in connection with the construction or restoration of facilities for the generation, transmission or distribution of electricity) or otherwise constituting Permitted Investments;

224

Highly Confidential

EFIHMW00250296

(2) Liens imposed by law, such as carriers', warehousemen's and mechanics' Liens, in each case for sums not yet overdue for a period of more than 30 days or being contested in good faith by appropriate proceedings or other Liens arising out of judgments or awards against such Person with respect to which such Person shall then be proceeding with an appeal or other proceedings for review if adequate reserves with respect thereto are maintained on the books of such Person in accordance with GAAP;

(3) Liens for taxes, assessments or other governmental charges not yet overdue for a period of more than 30 days or payable or subject to penalties for nonpayment or which are being contested in good faith by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of such Person in accordance with GAAP;

(4) Liens in favor of issuers of performance and surety bonds or bid bonds or with respect to other regulatory requirements or letters of credit issued pursuant to the request of and for the account of such Person in the ordinary course of its business;

(5) minor survey or title exceptions or irregularities, minor encumbrances, easements or reservations of, or rights of others for, licenses, permits, conditions, covenants, rights-of-way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning or other restrictions as to the use of real properties or Liens incidental to the conduct of the business of such Person or to the ownership of its properties which were not incurred in connection with Indebtedness and which do not in the aggregate materially adversely affect the value of said properties or materially impair their use in the operation of the business of such Person;

(6) Liens securing Indebtedness permitted to be incurred pursuant to clause (4), (12) or (13) of the second paragraph under "Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock"; provided that (a) Liens securing Indebtedness, Disqualified Stock or Preferred Stock permitted to be incurred pursuant to clause (13) relate only to Refinancing Indebtedness that serves to refund or refinance Indebtedness, Disqualified Stock or Preferred Stock incurred under clause (4) or (12) of the second paragraph under "Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock," and (b) Liens securing Indebtedness, Disqualified Stock or Preferred Stock permitted to be incurred pursuant to clause (4) of the second paragraph under "Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" extend only to the assets so financed, purchased, constructed or improved;

(7) Liens existing on the Closing Date (other than Liens in favor of the lenders under the TCEH Senior Secured Facilities);

(8) Liens on property or shares of stock of a Person at the time such Person becomes a Subsidiary; provided, however, such Liens are not created or incurred in connection with, or in contemplation of, such other Person becoming such a Subsidiary; provided, further, however, that such Liens may not extend to any other property owned by TCEH or any of its Restricted Subsidiaries;

(9) Liens on property at the time TCEH or a Restricted Subsidiary acquired the property, including any acquisition by means of a merger or consolidation with or into TCEH or any of its Restricted Subsidiaries; provided, however, that such Liens are not created or incurred in connection with, or in contemplation of, such acquisition; provided, further, however, that the Liens may not extend to any other property owned by TCEH or any of its Restricted Subsidiaries;

(10) Liens securing Indebtedness or other obligations of a Restricted Subsidiary owing to TCEH or another Restricted Subsidiary permitted to be incurred in accordance with the covenant described under "Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock";

225

Highly Confidential

(11) Liens securing Hedging Obligations of TCEH or its Restricted Subsidiaries incurred under clause (10) of the second paragraph under "Certain—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock"; *provided* that such agreements were entered into in the ordinary course of business and not for speculative purposes (as determined by TCEH in its reasonable discretion acting in good faith) and, in the case of any commodity Hedging Obligations or any Hedging Obligation of the type described in clause (c) of the definition of "Hedging Obligations," entered into in order to hedge against or manage fluctuations in the price or availability of any Covered Commodity);

(12) Liens on specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(13) leases, subleases, licenses or sublicenses granted to others in the ordinary course of business which do not materially interfere with the ordinary conduct of the business of TCEH or any of its Restricted Subsidiaries;

(14) Liens arising from Uniform Commercial Code financing statement filings regarding operating leases entered into by TCEH and its Restricted Subsidiaries in the ordinary course of business;

(15) Liens in favor of TCEH or any Restricted Subsidiary that is a Guarantor;

(16) [Intentionally omitted];

(17) Liens on accounts receivable, other Receivables Facility assets, or accounts into which collections or proceeds of Receivables Facility assets are deposited, in each case in connection with a Receivables Facility for the benefit of TCEH or its Restricted Subsidiaries;

(18) Liens to secure any refinancing, refunding, extension, renewal or replacement (or successive refinancing, refunding, extensions, renewals or replacements) as a whole, or in part, of any Indebtedness secured by any Lien referred to in the foregoing clauses (6), (7), (8) and (9); *provided, however,* that (a) such new Lien shall be limited to all or part of the same property that secured the original Lien (plus improvements on such property), and (b) the Indebtedness secured by such Lien at such time is not increased to any amount greater than the sum of (i) the outstanding principal amount or, if greater, committed amount of the Indebtedness described under clauses (6), (7), (8), and (9) at the time the original Lien became a Permitted Lien under the Indenture, and (ii) an amount necessary to pay any fees and expenses, including premiums, related to such refinancing, refunding, extension, renewal or replacement;

(19) deposits made in the ordinary course of business to secure liability to insurance carriers;

(20) other Liens securing obligations incurred in the ordinary course of business which obligations do not exceed $100.0 million at any one time outstanding;

(21) Liens securing judgments for the payment of money not constituting an Event of Default under clause (5) under the caption "Events of Default and Remedies" so long as such Liens are adequately bonded and any appropriate legal proceedings that may have been duly initiated for the review of such judgment have not been finally terminated or the period within which such proceedings may be initiated has not expired;

(22) Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(23) Liens (i) of a collection bank arising under Section 4-210 of the Uniform Commercial Code, or any comparable or successor provision, on items in the course of collection, and (ii) in

226

EFIHMW00250298

favor of banking institutions arising as a matter of law encumbering deposits (including the right of set-off) and which are within the general parameters customary in the banking industry;

(24) Liens deemed to exist in connection with Investments in repurchase agreements permitted by the covenant described under "Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock"; *provided* that such Liens do not extend to any assets other than those that are the subject of such repurchase agreements;

(25) ground leases or subleases, licenses or sublicenses in respect of real property on which facilities owned or leased by TCEH or any of its Subsidiaries are located;

(26) Liens that are contractual rights of set-off (i) relating to the establishment of depository relations with banks not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of TCEH or any of its Restricted Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of TCEH and its Restricted Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of TCEH or any of its Restricted Subsidiaries in the ordinary course of business;

(27) Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale or purchase of goods entered into by TCEH or any Restricted Subsidiary in the ordinary course of business;

(28) rights reserved to or vested in others to take or receive any part of, or royalties related to, the power, gas, oil, coal, lignite or other minerals or timber generated, developed, manufactured or produced by, or grown on, or acquired with, any property of TCEH or any of its Restricted Subsidiaries and Liens upon the production from property of power, gas, oil, coal, lignite or other minerals or timber, and the by-products and proceeds thereof, to secure the obligations to pay all or a part of the expenses of exploration, drilling, mining or development of such property only out of such production or proceeds;

(29) Liens arising out of all presently existing and future division and transfer orders, advance payment agreements, processing contracts, gas processing plant agreements, operating agreements, gas balancing or deferred production agreements, pooling, unitization or communitization agreements, pipeline, gathering or transportation agreements, platform agreements, drilling contracts, injection or repressuring agreements, cycling agreements, construction agreements, salt water or other disposal agreements, leases or rental agreements, farm-out and farm-in agreements, exploration and development agreements, and any and all other contracts or agreements covering, arising out of, used or useful in connection with or pertaining to the exploration, development, operation, production, sale, use, purchase, exchange, storage, separation, dehydration, treatment, compression, gathering, transportation, processing, improvement, marketing, disposal or handling of any property of TCEH or any of its Restricted Subsidiaries, *provided* that such agreements are entered into in the ordinary course of business (including in respect of construction and restoration activities);

(30) any restrictions on any stock or stock equivalents or other joint venture interests of TCEH or any of its Restricted Subsidiaries providing for a breach, termination or default under any owners, participation, shared facility, joint venture, stockholder, membership, limited liability company or partnership agreement between such Person and one or more other holders of such stock or stock equivalents or interest of such Person, if a security interest or other Lien is created on such stock or stock equivalents or interest as a result thereof and other similar Liens;

(31) [Intentionally omitted];

(32) Liens and other exceptions to title, in either case on or in respect of any facilities of TCEH or any of its Restricted Subsidiaries, arising as a result of any shared facility agreement

227

EFIHMW00250299

entered into with respect to such facility, except to the extent that any such Liens or exceptions, individually or in the aggregate, materially adversely affect the value of the relevant property or materially impair the use of the relevant property in the operation of business of TCEH or any of its Restricted Subsidiaries, taken as a whole; and

(33) Liens on cash and Cash Equivalents (i) deposited by TCEH or any of its Restricted Subsidiaries in margin accounts with or on behalf of brokers, credit clearing organizations, independent system operators, regional transmission organizations, pipelines, state agencies, federal agencies, futures contract brokers, customers, trading counterparties, or any other parties or issuers of surety bonds or (ii) pledged or deposited as collateral by TCEH or any of its Restricted Subsidiaries with any of the entities described in clause (i) above to secure their respective obligations, in the case of each of clauses (i) and (ii) above, with respect to: (A) any contracts and transactions for the purchase, sale, exchange of, or the option (whether physical or financial) to purchase, sell or exchange (1) natural gas, (2) electricity, (3) coal and lignite, (4) petroleum¬based liquids, (5) oil, (6) nuclear fuel (including enrichment and conversion),(7) emissions or other environmental credits, (8) waste byproducts, (9) weather, (10) power and other generation capacity, (11) heat rate, (12) congestion, (13) renewal energy credit, or (14) any other energy-related commodity or services or derivative (including ancillary services and related risk (such as location basis); (B) any contracts or transactions for the purchase, processing, transmission, transportation, distribution, sale, lease, hedge or storage of, or any other services related to any commodity or service identified in subparts (1)—(14) above, including any capacity agreement; (C) any financial derivative agreement (including but not limited to swaps, options or swaptions) related to any commodity identified in subparts (1)—(14) above, or to any interest rate or currency rate management activities; (D) any agreement for membership or participation in an organization that facilitates or permits the entering into or clearing of any netting agreement or any agreement described in this clause (33); (E) any agreement combining part or all of a netting agreement or part or all of any of the agreements described in this clause (33); (E) any document relating to any agreement described in this clause (33) that is filed with a Government Authority and any related service agreements; or (F) any commercial or trading agreements, each with respect to, or involving the purchase, transmission, distribution, sale, lease or hedge of, any energy, generation capacity or fuel, or any other energy related commodity or service, price or price indices for any such commodities or services or any other similar derivative agreements, and any other similar agreements (such agreements described in *clauses (A)* through *(F)* of this clause (33) being collectively, "*Permitted Contracts*"), Netting Agreements, Hedging Obligations and letters of credit supporting Permitted Contracts, Netting Agreements and Hedging Obligations;

(34) Liens arising under Section 9.343 of the Texas Uniform Commercial Code or similar statutes of states other than Texas;

(35) Liens created in the ordinary course of business in favor of banks and other financial institutions over credit balances of any bank accounts of TCEH and its Subsidiaries held at such banks or financial institutions, as the case may be, to facilitate the operation of cash pooling and/or interest set-off arrangements in respect of such bank accounts in the ordinary course of business;

(36) any zoning land use, environmental or similar law or right reserved to or vested in any Government Authority to control or regulate the use of any real property that does not materially interfere with the ordinary conduct of the business of TCEH or any of its Restricted Subsidiaries, taken as a whole;

(37) any Liens arising by reason of deposits with or giving of any form of security to any Government Authority for any purpose at any time as required by applicable law as a condition to the transaction of any business or the exercise of any privilege or license, or to enable the Issuer

228

EFIHMW00250300

or any of its Restricted Subsidiaries to maintain self-insurance or participate in any fund for liability on any insurance risks;

(38) Liens, restrictions, regulations, easements, exceptions or reservations of any Government Authority applying particularly to nuclear fuel;

(39) rights reserved to or vested in any Government Authority by the terms of any right, power, franchise, grant, license or permit, or by any provision of applicable law, to terminate or modify such right, power, franchise, grant, license or permit or to purchase or recapture or to designate a purchaser of any of the property of such person;

(40) Liens arising under any obligations or duties affecting any of the property of TCEH or any of its Restricted Subsidiaries to any Government Authority with respect to any franchise, grant, license or permit which do not materially impair the use of such property for the purposes for which it is held;

(41) rights reserved to or vested in any Government Authority to use, control or regulate any property of such person;

(42) any obligations or duties, affecting the property of TCEH or any of its Restricted Subsidiaries, to any Government Authority with respect to any franchise, grant, license or permit;

(43) a set-off or netting rights granted by TCEH or any Subsidiary of TCEH pursuant to any agreements related to Hedging Obligations, Netting Agreements or Permitted Contracts solely in respect of amounts owing under such agreements;

(44) Liens (i) on cash advances in favor of the seller of any property to be acquired in an Investment described under "Permitted Investments" to be applied against the purchase price for such Investment and (ii) consisting of an agreement to sell, transfer, lease or otherwise dispose of any property in a transaction excluded from the definition described under "Asset Sale," in each case, solely to the extent such Investment or sale, disposition, transfer or lease, as the case may be, would have been permitted on the date of the creation of such Lien;

(45) rights of first refusal and purchase options in favor of Aluminum Company of America ("*Alcoa*") to purchase Sandow Unit 4 and/or the real property related thereto, as described in (i) the Sandow Unit 4 Agreement dated August 13, 1976, as amended, between Alcoa and Texas Power & Light Company ("*TPL*") and (ii) Deeds dated March 14, 1978 and July 21, 1980, as amended, executed by Alcoa conveying to TPL the Sandow Four real property; and

(46) any amounts held by a trustee in the funds and accounts under any indenture securing any revenue bonds issued for the benefit of TCEH or any of its Restricted Subsidiaries.

For purposes of this definition, the term "Indebtedness" shall be deemed to include interest on such Indebtedness.

"*Person*" means any individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

"*Preferred Stock*" means any Equity Interest with preferential rights of payment of dividends or upon liquidation, dissolution or winding up.

"*Purchase Money Obligations*" means any Indebtedness incurred to finance or refinance the acquisition, leasing, construction, repair, restoration, replacement, expansion or improvement of property (real or personal) or assets (other than Capital Stock), and whether acquired through the

229

EFIHMW00250301

**PX 006**
**Page 236 of 382**

direct acquisition of such property or assets, or otherwise, incurred in respect of capital expenditures (including Environmental CapEx Debt and Necessary CapEx Debt).

"*Qualified Proceeds*" means assets that are used or useful in, or Capital Stock of any Person engaged in, a Similar Business; *provided* that the fair market value of any such assets or Capital Stock shall be determined by TCEH in good faith.

"*Rating Agencies*" means Moody's and S&P or if Moody's or S&P or both shall not make a rating on the applicable Notes or other investment publicly available, a nationally recognized statistical rating agency or agencies, as the case may be, selected by TCEH which shall be substituted for Moody's or S&P or both, as the case may be.

"*Receivables Facility*" means any of one or more receivables financing facilities as amended, supplemented, modified, extended, renewed, restated or refunded from time to time, the Obligations of which are non-recourse (except for customary representations, warranties, covenants and indemnities made in connection with such facilities) to TCEH or any of its Restricted Subsidiaries (other than a Receivables Subsidiary) pursuant to which TCEH or any of its Restricted Subsidiaries purports to sell its accounts receivable to either (a) a Person that is not a Restricted Subsidiary or (b) a Receivables Subsidiary that in turn funds such purchase by purporting to sell its accounts receivable to a Person that is not a Restricted Subsidiary or by borrowing from such a Person or from another Receivables Subsidiary that in turn funds itself by borrowing from such a Person.

"*Receivables Fees*" means distributions or payments made directly or by means of discounts with respect to any accounts receivable or participation interest therein issued or sold in connection with, and other fees paid to a Person that is not a Restricted Subsidiary in connection with any Receivables Facility.

"*Receivables Subsidiary*" means any Subsidiary formed for the purpose of facilitating or entering into one or more Receivables Facilities, and in each case engages only in activities reasonably related or incidental thereto.

"*Redemption Date*" has the meaning set forth under "Optional Redemption."

"*Registration Rights Agreement*" means (1) the Registration Rights Agreement related to the Notes, dated as of the Issue Date, among the Issuer, the Guarantors and the Initial Purchasers, and (2) with respect to any Additional Notes, any registration rights agreement among the Issuer and the other parties thereto relating to the registration by the Issuer of such Additional Notes under the Securities Act.

"*Related Business Assets*" means assets (other than cash or Cash Equivalents) used or useful in a Similar Business; *provided* that any assets received by TCEH or a Restricted Subsidiary in exchange for assets transferred by TCEH or a Restricted Subsidiary will not be deemed to be Related Business Assets if they consist of securities of a Person, unless upon receipt of the securities of such Person, such Person would become a Restricted Subsidiary.

"*Required Debt*" means, with respect to any action, on any date, the outstanding principal amount of:

(1)    the Notes (including any Additional Notes),

(2)    the Senior Term Loans under the TCEH Senior Interim Facility (excluding any Senior Term Loans held by Defaulting Lenders (as defined in the TCEH Senior Interim Facility),

230

EFIHMW00250302

(3)    the Senior Notes (as defined in the TCEH Senior Interim Facility), and

(4)    any other senior unsecured securities issued by the Issuer to refinance or replace any of the items described in clauses (2) and (3) of this definition (including any additional securities of the same series)

at such date, other than, in each case, any such debt beneficially owned by the Issuer or its Affiliates, voting as a single class, except to the extent prohibited by law; *provided* that (a) Required Debt shall only include debt described in clauses (2) through (4) of this definition, to the extent such debt would require the consent of the holders of the debt described in this definition voting as a single class to take such action, except to the extent described below in clause (b) and (c) below; (b) if any amendment, waiver or other action would disproportionately affect the holders of the Notes, Required Debt shall mean the Notes voting as a single class and the debt described in clauses (1) through (4) voting as a single class, and (c) if any amendment, waiver or other action would only affect the Notes, Required Debt shall mean the Notes voting as a single class without the debt described in clauses (2) through (4).

"*Required Holders*" means Persons holding the Required Debt.

"*Restoration Certificate*" shall mean, with respect to any Casualty Event, an Officer's Certificate provided to the Trustee prior to the 365th day after such Casualty Event has occurred certifying (a) that TCEH or such Restricted Subsidiary intends to use the proceeds received in connection with such Casualty Event to repair, restore or replace the property or assets in respect of which such Casualty Event occurred, (b) the approximate costs of completion of such repair, restoration or replacement and (c) that such repair, restoration or replacement will be completed within the later of (x) 450 days after the date on which cash proceeds with respect to such Casualty Event were received and (y) 180 days after delivery of such Restoration Certificate.

"*Restricted Investment*" means an Investment other than a Permitted Investment.

"*Restricted Subsidiary*" means, at any time, any direct or indirect Subsidiary of TCEH (including any Foreign Subsidiary) that is not then an Unrestricted Subsidiary; *provided*, *however*, that upon an Unrestricted Subsidiary's ceasing to be an Unrestricted Subsidiary, such Subsidiary shall be included in the definition of "Restricted Subsidiary."

"*S&P*" means Standard & Poor's, a division of The McGraw-Hill Companies, Inc., and any successor to its rating agency business.

"*Sale and Lease-Back Transaction*" means any arrangement providing for the leasing by TCEH or any of its Restricted Subsidiaries of any real or tangible personal property, which property has been or is to be sold or transferred by TCEH or such Restricted Subsidiary to a third Person in contemplation of such leasing.

"*SEC*" means the U.S. Securities and Exchange Commission.

"*Secured Indebtedness*" means any Indebtedness of TCEH or any of its Restricted Subsidiaries secured by a Lien.

"*Securities Act*" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"*Senior Indebtedness*" means:

(1) all Indebtedness of the Issuer or any Guarantor (other than the Parent Guarantor) outstanding under the TCEH Senior Secured Facilities, the TCEH Senior Interim Facility or the Notes and related

231

EFIHMW00250303

Guarantees (including interest accruing on or after the filing of any petition in bankruptcy or similar proceeding or for reorganization of the Issuer or any such Guarantor (at the rate provided for in the documentation with respect thereto, regardless of whether or not a claim for post-filing interest is allowed in such proceedings)), and any and all other fees, expense reimbursement obligations, indemnification amounts, penalties, and other amounts (whether existing on the Closing Date or thereafter created or incurred) and all obligations of the Issuer or any such Guarantor to reimburse any bank or other Person in respect of amounts paid under letters of credit, acceptances or other similar instruments;

(2) all Hedging Obligations (and guarantees thereof) of the Issuer or any Guarantor (other than the Parent Guarantor) owing to a Lender (as defined in the TCEH Senior Secured Facilities) or any Affiliate of such Lender (or any Person that was a Lender or an Affiliate of such Lender at the time the applicable agreement giving rise to such Hedging Obligation was entered into); *provided* that such Hedging Obligations are permitted to be incurred under the terms of the Indenture;

(3) any other Indebtedness of the Issuer or any Guarantor (other than the Parent Guarantor) permitted to be incurred under the terms of the Indenture, unless the instrument under which such Indebtedness is incurred expressly provides that it is subordinated in right of payment to the Notes or any related Guarantee; and

(4) all Obligations with respect to the items listed in the preceding clauses (1), (2) and (3);

*provided*, *however*, that Senior Indebtedness shall not include:

(a) any obligation of such Person to TCEH or any of its Subsidiaries;

(b) any liability for federal, state, local or other taxes owed or owing by such Person;

(c) any accounts payable or other liability to trade creditors arising in the ordinary course of business;

(d) any Indebtedness or other Obligation of such Person which is subordinate or junior in any respect to any other Indebtedness or other Obligation of such Person; or

(e) that portion of any Indebtedness which at the time of incurrence is incurred in violation of the Indenture.

"*Shell Wind*" means a joint venture with Shell WindEnergy Inc. (or a similar entity) in which TCEH and its Restricted Subsidiaries have up to a 50% ownership interest relating to the joint development of a 3,000 megawatt wind project in Texas and other renewable energy projects in Texas.

"*Significant Subsidiary*" means any Restricted Subsidiary that would be a "significant subsidiary" as defined in Article 1, Rule 1-02 of Regulation S-X, promulgated pursuant to the Securities Act, as such regulation is in effect on the Closing Date.

"*Similar Business*" means any business conducted or proposed to be conducted by TCEH and its Subsidiaries on the Closing Date or any business that is similar, reasonably related, incidental or ancillary thereto.

"*Sponsor Management Agreement*" means the management agreement between certain of the management companies associated with the Investors and EFH Corp.

"*Subordinated Indebtedness*" means,

(1) any Indebtedness of the Issuer which is by its terms subordinated in right of payment to the Notes, and

232

EFIHMW00250304

(2) any Indebtedness of any Guarantor which is by its terms subordinated in right of payment to the Guarantee of such entity of the Notes.

"*Subsidiary*" means, with respect to any Person:

(1) any corporation, association, or other business entity (other than a partnership, joint venture, limited liability company or similar entity) of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time of determination owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof; and

(2) any partnership, joint venture, limited liability company or similar entity of which

(x) more than 50% of the capital accounts, distribution rights, total equity and voting interests or general or limited partnership interests, as applicable, are owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof whether in the form of membership, general, special or limited partnership or otherwise, and

(y) such Person or any Restricted Subsidiary of such Person is a controlling general partner or otherwise controls such entity.

"*TCEH*" means Texas Competitive Electric Holdings Company LLC.

"*TCEH Senior Interim Facility*" means the interim loan agreement dated as of the Closing Date, by and among the Parent Guarantor, as guarantor, TCEH, as borrower, the guarantors party thereto, the lenders party thereto in their capacities as lenders thereunder and Morgan Stanley Senior Funding, Inc., as Administrative Agent, including any guarantees, instruments and agreements executed in connection therewith, and any amendments, supplements, modifications or restatements thereof.

"*TCEH Senior Secured Facilities*" means the credit agreement dated as of the Closing Date by and among the Parent Guarantor, as guarantor, TCEH, as borrower, the other guarantors party thereto the lenders party thereto in their capacities as lenders thereunder and Citibank N.A., as Administrative Agent, including any guarantees, collateral documents, instruments and agreements executed in connection therewith, and any amendments, supplements, modifications, extensions, renewals, restatements, refundings or refinancings thereof and any indentures or credit facilities or commercial paper facilities with banks or other institutional lenders or investors that replace, refund or refinance any part of the loans, notes, other credit facilities or commitments thereunder, including any such replacement, refunding or refinancing facility or indenture that increases the amount borrowable thereunder or alters the maturity thereof (*provided* that such increase in borrowings is permitted under "Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" above).

"*Total Assets*" means the total assets of TCEH and its Restricted Subsidiaries on a consolidated basis, as shown on the most recent consolidated balance sheet of TCEH or such other Person as may be expressly stated.

"*Transactions*" means the transactions contemplated by the Transaction Agreement, the TCEH Senior Interim Facility, the EFH Senior Interim Facility, borrowings under the TCEH Senior Secured Facilities, the Oncor Electric Delivery Facility and any Receivables Facility as in effect on the Closing Date and any repayments of indebtedness in connection therewith.

"*Transaction Agreement*" means the Agreement and Plan of Merger, dated as of February 25, 2007, among Merger Sub, Texas Holdings and EFH Corp.

233

EFIHMW00250305

"*Treasury Rate*" means, as of any Redemption Date, the yield to maturity as of such Redemption Date of United States Treasury securities with a constant maturity (as compiled and published in the most recent Federal Reserve Statistical Release H.15 (519) that has become publicly available at least two Business Days prior to the Redemption Date (or, if such Statistical Release is no longer published, any publicly available source of similar market data)) most nearly equal to the period from the Redemption Date to November 1, 2011; provided, however, that if the period from the Redemption Date to November 1, 2011 is less than one year, the weekly average yield on actually traded United States Treasury securities adjusted to a constant maturity of one year will be used.

"*Trust Indenture Act*" means the Trust Indenture Act of 1939, as amended (15 U.S.C. §§ 77aaa-77bbbb).

"*Unit*" means an individual power plant generation system comprised of all necessary physically connected generators, reactors, boilers, combustion turbines and other prime movers operated together to independently generate electricity.

"*Unrestricted Cash*" means, as of any date, without duplication, (a) all cash and Cash Equivalents (in each case, free and clear of all Liens, other than nonconsensual Liens permitted by the covenant described under "Certain Covenants—Liens" and Liens permitted by clause (23), subclauses (i) and (ii) of clause (26) and clause (33) of the definition of Permitted Liens, included in the cash and cash equivalents accounts listed on the consolidated balance sheet of TCEH and its Restricted Subsidiaries as of such date and (b) all unrestricted margin deposits related to commodity positions listed on the consolidated balance sheet of Issuer and the Restricted Subsidiaries.

"*Unrestricted Subsidiary*" means:

(1) any Subsidiary of TCEH (other than TCEH Finance, Inc.) which at the time of determination is an Unrestricted Subsidiary (as designated by TCEH, as provided below); and

(2) any Subsidiary of an Unrestricted Subsidiary.

TCEH may designate any Subsidiary of TCEH (including any existing Subsidiary and any newly acquired or newly formed Subsidiary but excluding TCEH Finance, Inc.) to be an Unrestricted Subsidiary unless such Subsidiary or any of its Subsidiaries owns any Equity Interests or Indebtedness of, or owns or holds any Lien on, any property of, TCEH or any Subsidiary of TCEH (other than solely any Subsidiary of the Subsidiary to be so designated); *provided* that

(1) any Unrestricted Subsidiary must be an entity of which the Equity Interests entitled to cast at least a majority of the votes that may be cast by all Equity Interests having ordinary voting power for the election of directors or Persons performing a similar function are owned, directly or indirectly, by TCEH;

(2) such designation complies with the covenants described under "Certain Covenants—Limitation on Restricted Payments"; and

(3) each of:

(a) the Subsidiary to be so designated; and

(b) its Subsidiaries

has not at the time of designation, and does not thereafter, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable with respect to any Indebtedness pursuant to which the lender has recourse to any of the assets of TCEH or any Restricted Subsidiary.

234

EFIHMW00250306

TCEH may designate any Unrestricted Subsidiary to be a Restricted Subsidiary; *provided* that, immediately after giving effect to such designation, no Default shall have occurred and be continuing and either:

(1) TCEH could incur at least $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test described in the first paragraph under "Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock"; or

(2) the Fixed Charge Coverage Ratio for TCEH and its Restricted Subsidiaries would be greater than such ratio for TCEH and its Restricted Subsidiaries immediately prior to such designation, in each case on a *pro forma* basis taking into account such designation.

Any such designation by TCEH shall be notified by TCEH to the Trustee by promptly filing with the Trustee a copy of the resolution of the board of directors of TCEH or any committee thereof giving effect to such designation and an Officer's Certificate certifying that such designation complied with the foregoing provisions.

"*Voting Stock*" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the board of directors of such Person.

"*Weighted Average Life to Maturity*" means, when applied to any Indebtedness, Disqualified Stock or Preferred Stock, as the case may be, at any date, the quotient obtained by dividing:

(1) the sum of the products of the number of years from the date of determination to the date of each successive scheduled principal payment of such Indebtedness or redemption or similar payment with respect to such Disqualified Stock or Preferred Stock multiplied by the amount of such payment; by

(2) the sum of all such payments.

"*Wholly-Owned Subsidiary*" of any Person means a Subsidiary of such Person, 100% of the outstanding Equity Interests of which (other than directors' qualifying shares) shall at the time be owned by such Person or by one or more Wholly-Owned Subsidiaries of such Person.

235

EFIHMW00250307

**PX 006**
**Page 242 of 382**

## EXCHANGE OFFER; REGISTRATION RIGHTS

The Parent Guarantor, the Issuer, and the other guarantors of the notes offered hereby and the initial purchasers will enter into the registration rights agreement on the original issue date of the notes. In the registration rights agreement, each of the Parent Guarantor, the Issuer and the other guarantors will agree that they will, at their expense, for the benefit of the holders of the notes, (1) file a registration statement on an appropriate registration form (each, an "exchange offer registration statement") with respect to a registered offer (each, an "exchange offer") to exchange the notes for new notes guaranteed by the Parent Guarantor and the guarantors on a senior unsecured basis, with terms substantially identical in all material respects to the notes (the notes so exchanged, the "exchange notes") (except that the exchange notes will not contain terms with respect to transfer restrictions) and (2) use their commercially reasonable efforts to cause the exchange offer registration statement to be declared effective under the Securities Act no later than 360 days after the original issue date of the notes. Upon the exchange offer registration statement being declared effective, we will offer the exchange notes (and the related guarantees) in exchange for surrender of the notes. We will keep each exchange offer open for not less than 20 business days (or longer if required by applicable law) after the date notice of the exchange offer is mailed to the holders. For each note surrendered to us pursuant to the exchange offer, the holder who surrendered such note will receive an exchange note having a principal amount equal to that of the surrendered note. Interest on each exchange note will accrue (A) from the later of (1) the last interest payment date on which interest was paid on the note surrendered in exchange therefor or (2) if the note is surrendered for exchange on a date in a period that includes the record date for an interest payment date to occur on or after the date of such exchange and as to which interest will be paid, the date of such interest payment date or (B) if no interest has been paid on such note, from the original issue date of the notes.

Under existing interpretations of the SEC contained in several no-action letters to third parties, the exchange notes and the related guarantees will be freely transferable by holders thereof (other than our affiliates) after the applicable exchange offer without further registration under the Securities Act; provided, however, that each holder that wishes to exchange its notes for exchange notes will be required to represent (1) that any exchange notes to be received by it will be acquired in the ordinary course of its business, (2) that, at the time of the commencement of the applicable exchange offer, it has no arrangement or understanding with any person to participate in the distribution (within the meaning of Securities Act) of the applicable exchange notes in violation of the Securities Act, (3) that it is not an "affiliate" (as defined in Rule 405 under the Securities Act) of ours, (4) if such holder is not a broker-dealer, that it is not engaged in, and does not intend to engage in, the distribution of applicable exchange notes and (5) if such holder is a broker-dealer (a "participating broker-dealer") that will receive exchange notes for its own account in exchange for notes that were acquired as a result of market-making or other trading activities, that it will deliver a prospectus in connection with any resale of such exchange notes. We will agree to make available, during the period required by the Securities Act, a prospectus meeting the requirements of the Securities Act for use by participating broker-dealers and other persons, if any, with similar prospectus delivery requirements for use in connection with any resale of exchange notes.

If (1) because of any change in law or in currently prevailing interpretations of the Staff of the SEC, we are not permitted to effect an exchange offer, (2) an exchange offer is not consummated within 360 days of the original issue date of the notes, (3) in certain circumstances, certain holders of unregistered exchange notes so request, or (4) in the case of any holder that participates in an exchange offer, such holder does not receive exchange notes on the date of the exchange that may be sold without restriction under state and federal securities laws (other than due solely to the status of such holder as an affiliate of ours within the meaning of the Securities Act), then, in each case, we will (x) promptly deliver to the holders through the trustee written notice thereof and (y) at our sole expense, (a) promptly file a shelf registration statement covering resales of the notes within 90 days

236

EFIHMW00250308

**PX 006**
**Page 243 of 382**

after the obligation to file a shelf registration statement arises (but no earlier than 360 days after the original issue date of the notes) and (b) use our commercially reasonable efforts to keep effective such shelf registration statement until the earliest of (i) two years after the original issue date of the notes or (ii) such time as all of the applicable notes have been sold thereunder or (iii) the date upon which all notes covered by such shelf registration statement become eligible for resale, without regard to volume, manner of sale or other restrictions contained in Rule 144 (the "shelf registration period"). We will, in the event that a shelf registration statement is filed, provide to each holder whose notes are registered under such shelf registration statement copies of the prospectus that is a part of such shelf registration statement, notify each such holder when such shelf registration statement has become effective and take certain other actions as are required to permit unrestricted resales of the notes. A holder that sells notes pursuant to a shelf registration statement will be required to be named as a selling security holder in the related prospectus and to deliver a prospectus to purchasers, will be subject to certain of the civil liability provisions under Securities Act in connection with such sales and will be bound by the provisions of the applicable registration rights agreement that are applicable to such a holder (including certain indemnification rights and obligations).

The registration rights agreement permit us to prohibit offers and sales of registrable securities under the shelf registration statement for a period not to exceed an aggregate of 90 days in any 12-month period, if our Board of Directors determines that there is a valid business purpose for such prohibition. We refer to any such period during which we may prohibit offers and sales as a "suspension period."

If (1) we have not filed the exchange offer registration statement or shelf registration statement by the deadlines discussed above, (2) the exchange offer registration statement or shelf registration statement has not become or been declared effective by the deadline discussed above or (3) if a registration statement relating to the notes has been declared effective and such registration statement ceases to be effective at any time during the shelf registration period (subject to certain exceptions) (each of (1), (2) or (3) above, a "registration default"), then additional interest shall accrue on the principal amount of the notes at a rate of 0.25% per annum for the first 90-day period during which a registration default continues, and thereafter the interest rate on the notes will increase by 0.50% per annum over the interest rate shown on the cover of this offering circular for the remaining period during which a registration default continues. If we cure all registration defaults, the interest rate on the notes will revert to the original level.

Any amounts of additional interest due will be payable on the same original interest payment dates as interest on the notes is payable.

The exchange notes will be accepted for clearance through DTC.

This summary of the provisions of the registration rights agreement does not purport to be complete and is subject to, and is qualified in its entirety by reference to, all the provisions of the registration rights agreement, copies of which will be available from us upon request.

237

EFIHMW00250309

PX 006
Page 244 of 382

## BOOK ENTRY; DELIVERY AND FORM

The notes are being offered and sold to qualified institutional buyers in reliance on Rule 144A ("Rule 144A Notes"). The notes also may be offered and sold in offshore transactions in reliance on Regulation S ("Regulation S Notes"). Except as set forth below, the notes will be issued in registered, global form in minimum denominations of $2,000 and integral multiples of $1,000 in excess of $2,000. Notes will be issued at the closing of this offering only against payment in immediately available funds.

Rule 144A Notes initially will be represented by one or more global notes in registered form without interest coupons (collectively, the "Rule 144A Global Notes"). Regulation S Notes initially will be represented by one or more temporary global notes in registered form without interest coupons (collectively, the "Regulation S Temporary Global Notes"). The Rule 144A Global Notes and the Regulation S Temporary Global Notes will be deposited upon issuance with the applicable trustee as custodian for DTC in New York, New York, and registered in the name of DTC or its nominee, in each case, for credit to an account of a direct or indirect participant in DTC as described below. Through and including the 40th day after the later of the commencement of this offering and the closing of this offering (such period through and including such 40th day, the "Restricted Period"), beneficial interests in the Regulation S Temporary Global Notes may be held only through Euroclear Bank S.A./N.V., as operator of the Euroclear System ("Euroclear"), and Clearstream Banking, Société Anonyme ("Clearstream, Luxembourg") (as indirect participants in DTC), unless transferred to a person that takes delivery through a Rule 144A Global Note in accordance with the certification requirements described under "—Exchanges Between Regulation S Notes and Rule 144A Notes" below. Within a reasonable time period after the expiration of the Restricted Period, the Regulation S Temporary Global Notes will be exchanged for one or more permanent notes in registered, global form without interest coupons (collectively, the "Regulation S Permanent Global Notes" and, together with the Regulation S Temporary Global Notes, the "Regulation S Global Notes"; the Regulation S Global Notes and the Rule 144A Global Notes collectively being the "Global Notes") upon delivery to DTC of certification of compliance with the transfer restrictions applicable to the notes and pursuant to Regulation S as provided in the indenture. Beneficial interests in the Rule 144A Global Notes may not be exchanged for beneficial interests in the Regulation S Global Notes at any time except in the limited circumstances described under "—Exchanges Between Regulation S Notes and Rule 144A Notes" below.

Except as set forth below, the Global Notes may be transferred, in whole and not in part, only to another nominee of DTC or to a successor of DTC or its nominee. Beneficial interests in the Global Notes may not be exchanged for definitive notes in registered certificated form ("Certificated Notes") except in the limited circumstances described below. See "—Exchange of Global Notes for Certificated Notes." Except in the limited circumstances described below, owners of beneficial interests in the Global Notes will not be entitled to receive physical delivery of notes in certificated form.

Rule 144A Notes (including beneficial interests in the Rule 144A Global Notes) will be subject to certain restrictions on transfer and will bear a restrictive legend as described under "Notice to Investors." Regulation S Notes will also be subject to certain restrictions on transfer and will also bear the legend as described under "Notice to Investors." In addition, transfers of beneficial interests in the Global Notes will be subject to the applicable rules and procedures of DTC and its direct or indirect participants (including, if applicable, those of Euroclear and Clearstream, Luxembourg), which may change from time to time.

### Depository Procedures

The following description of the operations and procedures of DTC, Euroclear and Clearstream, Luxembourg is provided solely as a matter of convenience. These operations and procedures are

238

EFIHMW00250310

solely within the control of the respective settlement systems and are subject to changes by them. We take no responsibility for these operations and procedures and urge investors to contact the system or their participants directly to discuss these matters.

DTC has advised us that DTC is a limited-purpose trust company organized under the laws of the State of New York, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code and a "clearing agency" registered pursuant to the provisions of Section 17A of the Exchange Act. DTC was created to hold securities for its participating organizations (collectively, the "Participants") and to facilitate the clearance and settlement of transactions in those securities between the Participants through electronic book-entry changes in accounts of its Participants. The Participants include securities brokers and dealers (including the initial purchasers), banks, trust companies, clearing corporations and certain other organizations. Access to DTC's system is also available to other entities such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a Participant, either directly or indirectly (collectively, the "Indirect Participants"). Persons who are not Participants may beneficially own securities held by or on behalf of DTC only through the Participants or the Indirect Participants. The ownership interests in, and transfers of ownership interests in, each security held by or on behalf of DTC are recorded on the records of the Participants and Indirect Participants.

DTC has also advised us that, pursuant to procedures established by it:

- upon deposit of the Global Notes, DTC will credit the accounts of the Participants designated by the initial purchasers with portions of the principal amount of the Global Notes; and

- ownership of these interests in the Global Notes will be shown on, and the transfer of ownership of these interests will be effected only through, records maintained by DTC (with respect to the Participants) or by the Participants and the Indirect Participants (with respect to other owners of beneficial interests in the Global Notes).

Investors in the Rule 144A Global Notes who are Participants may hold their interests therein directly through DTC. Investors in the Rule 144A Global Notes who are not Participants may hold their interests therein indirectly through organizations (including Euroclear and Clearstream, Luxembourg) that are Participants. Investors in the Regulation S Global Notes must initially hold their interests therein through Euroclear or Clearstream, if they are participants in such systems, or indirectly through organizations that are participants. After the expiration of the Restricted Period (but not earlier), investors may also hold interests in the Regulation S Global Notes through Participants in DTC other than Euroclear and Clearstream, Luxembourg. Euroclear and Clearstream, Luxembourg will hold interests in the Regulation S Global Notes on behalf of their participants through customers' securities accounts in their respective names on the books of their respective depositories, which in turn hold such interests in customers' securities accounts in the depositaries' names on the books of DTC. Citibank, N.A. acts as depositary for Clearstream, Luxembourg, and JPMorgan Chase Bank acts as depositary for Euroclear. All interests in a Global Note, including those held through Euroclear or Clearstream, Luxembourg, may be subject to the procedures and requirements of DTC. Those interests held through Euroclear or Clearstream, Luxembourg may also be subject to the procedures and requirements of such systems. The laws of some states require that certain persons take physical delivery in definitive form of securities that they own. Consequently, the ability to transfer beneficial interests in a Global Note to such persons will be limited to that extent. Because DTC can act only on behalf of Participants, which in turn act on behalf of Indirect Participants, the ability of a person having beneficial interests in a Global Note to pledge such interests to persons that do not participate in the DTC system, or otherwise take actions in respect of such interests, may be affected by the lack of a physical certificate evidencing such interests.

239

EFIHMW00250311

**Except as described below, owners of interests in the Global Notes will not have notes registered in their names, will not receive physical delivery of notes in certificated form and will not be considered the registered owners or "holders" thereof under the indenture for any purpose.**

Payments in respect of the principal of, and interest and premium, if any, and Additional Interest, if any, on a Global Note registered in the name of DTC or its nominee will be payable to DTC in its capacity as the registered holder under the indenture. Under the terms of the indenture, we and the trustee will treat the persons in whose names the notes, including the Global Notes, are registered as the owners of the notes for the purpose of receiving payments and for all other purposes. Consequently, neither we, the trustees nor any agent of ours or either trustee has or will have any responsibility or liability for:

- any aspect of DTC's records or any Participant's or Indirect Participant's records relating to, or payments made on account of, beneficial ownership interests in the Global Notes or for maintaining, supervising or reviewing any of DTC's records or any Participant's or Indirect Participant's records relating to the beneficial ownership interests in the Global Notes; or

- any other matter relating to the actions and practices of DTC or any of its Participants or Indirect Participants.

DTC has advised us that its current practice, upon receipt of any payment in respect of securities such as the notes (including principal and interest), is to credit the accounts of the relevant Participants with the payment on the payment date unless DTC has reason to believe that it will not receive payment on such payment date. Each relevant Participant is credited with an amount proportionate to its beneficial ownership of an interest in the principal amount of the relevant security as shown on the records of DTC. Payments by the Participants and the Indirect Participants to the beneficial owners of notes will be governed by standing instructions and customary practices and will be the responsibility of the Participants or the Indirect Participants and will not be our responsibility or the responsibility of DTC or either trustee. Neither we nor the trustee will be liable for any delay by DTC or any of the Participants or the Indirect Participants in identifying the beneficial owners of the notes, and we and the trustee may conclusively rely on and will be protected in relying on instructions from DTC or its nominee for all purposes.

Subject to the transfer restrictions set forth under "Notice to Investors," transfers between the Participants will be effected in accordance with DTC's procedures and will be settled in same-day funds, and transfers between participants in Euroclear and Clearstream, Luxembourg will be effected in accordance with their respective rules and operating procedures.

Subject to compliance with the transfer restrictions applicable to the notes described herein, cross-market transfers between the Participants, on the one hand, and Euroclear or Clearstream, Luxembourg participants, on the other hand, will be effected through DTC in accordance with DTC's rules on behalf of Euroclear or Clearstream, Luxembourg, as the case may be, by its respective depositary. However, such cross-market transactions will require delivery of instructions to Euroclear or Clearstream, Luxembourg, as the case may be, by the counterparty in such system in accordance with the rules and procedures and within the established deadlines (Brussels time) of such system. Euroclear or Clearstream, Luxembourg, as the case may be, will, if the transaction meets its settlement requirements, deliver instructions to its respective depositary to take action to effect final settlement on its behalf by delivering or receiving interests in the relevant Global Note from DTC, and making or receiving payment in accordance with normal procedures for same-day funds settlement applicable to DTC. Euroclear participants and Clearstream, Luxembourg participants may not deliver instructions directly to the depositories for Euroclear or Clearstream, Luxembourg.

240

Highly Confidential

DTC has advised us that it will take any action permitted to be taken by a holder of notes only at the direction of one or more Participants to whose account DTC has credited the interests in the Global Notes and only in respect of such portion of the aggregate principal amount of the notes as to which such Participant or Participants has or have given such direction. However, if there is an event of default under the notes, DTC reserves the right to exchange the Global Notes for legended notes in certificated form and to distribute such notes to its Participants.

Although DTC, Euroclear and Clearstream, Luxembourg have agreed to the foregoing procedures to facilitate transfers of interests in the Rule 144A Global Notes and the Regulation S Global Notes among participants in DTC, Euroclear and Clearstream, Luxembourg, they are under no obligation to perform or to continue to perform such procedures, and may discontinue such procedures at any time. Neither we nor the trustee nor any of our or its agents will have any responsibility for the performance by DTC, Euroclear or Clearstream, Luxembourg or their respective participants or indirect participants of their respective obligations under the rules and procedures governing their operations.

**Exchange of Global Notes for Certificated Notes**

A Global Note is exchangeable for Certificated Notes if:

- DTC (1) notifies us that it is unwilling or unable to continue as depositary for the Global Notes or (2) has ceased to be a clearing agency registered under the Exchange Act and, in either case, we fail to appoint a successor depositary; or

- there has occurred and is continuing an event of default with respect to the notes.

In addition, beneficial interests in a Global Note may be exchanged for Certificated Notes upon prior written notice given to the trustee by or on behalf of DTC in accordance with the indenture. In all cases, Certificated Notes delivered in exchange for any Global Note or beneficial interests in Global Notes will be registered in the names, and issued in any approved denominations, requested by or on behalf of the depositary (in accordance with its customary procedures) and will bear the applicable restrictive legend referred to in "Notice to Investors," unless that legend is not required by applicable law.

**Exchange of Certificated Notes for Global Notes**

Certificated notes may not be exchanged for beneficial interests in any Global Note unless the transferor first delivers to the trustee a written certificate (in the form provided in the indenture) to the effect that such transfer will comply with the appropriate transfer restrictions applicable to such notes. See "Notice to Investors."

**Exchanges Between Regulation S Notes and Rule 144A Notes**

Prior to the expiration of the Restricted Period, beneficial interests in the Regulation S Global Notes may be exchanged for beneficial interests in the Rule 144A Global Notes only if:

- such exchange occurs in connection with a transfer of the notes pursuant to Rule 144A; and

- the transferor first delivers to the trustee a written certificate (in the form provided in the indenture) to the effect that the notes are being transferred to a person:

  - who the transferor reasonably believes to be a QIB within the meaning of Rule 144A;

241

Highly Confidential

EFIHMW00250313

**PX 006**
**Page 248 of 382**

- purchasing for its own account or the account of a QIB in a transaction meeting the requirements of Rule 144A; and

- in accordance with all applicable securities laws of the states of the United States and other jurisdictions.

Beneficial interests in a Rule 144A Global Note may be transferred to a person who takes delivery in the form of an interest in the Regulation S Global Notes, whether before or after the expiration of the Restricted Period, only if the transferor first delivers to the trustee a written certificate (in the form provided in the indenture) to the effect that such transfer is being made in accordance with Rule 903 or 904 of Regulation S or Rule 144 (if available) and that, if such transfer occurs prior to the expiration of the Restricted Period, the interest transferred will be held immediately thereafter through Euroclear or Clearstream, Luxembourg.

Transfers involving exchanges of beneficial interests between the Regulation S Global Notes and the Rule 144A Global Notes will be effected by DTC by means of an instruction originated by the trustee through the DTC Deposit/Withdraw at Custodian system. Accordingly, in connection with any such transfer, appropriate adjustments will be made to reflect a decrease in the principal amount of the Regulation S Global Notes and a corresponding increase in the principal amount of the Rule 144A Global Notes or vice versa, as applicable. Any beneficial interest in one of the Global Notes that is transferred to a person who takes delivery in the form of an interest in the other Global Note will, upon transfer, cease to be an interest in such Global Note and will become an interest in the other Global Note and, accordingly, will thereafter be subject to all transfer restrictions and other procedures applicable to beneficial interests in such other Global Note for so long as it remains such an interest. The policies and practices of DTC may prohibit transfers of beneficial interests in the Regulation S Global Notes prior to the expiration of the Restricted Period.

**Certifications by Holders of the Regulation S Temporary Global Notes**

A holder of a beneficial interest in the Regulation S Temporary Global Notes must provide Euroclear or Clearstream, Luxembourg, as the case may be, with a certificate in the form required by the indenture certifying that the beneficial owner of the interest in the Regulation S Temporary Global Notes is either a non-U.S. person or a U.S. person that has purchased such interest in a transaction that is exempt from the registration requirements under the Securities Act and Euroclear or Clearstream, Luxembourg, as the case may be, must deliver to the trustee (or the paying agent if other than such trustee) a certificate in the form required by the indenture, prior to any exchange of such beneficial interest for a beneficial interest in the Regulation S Permanent Global Notes.

**Same Day Settlement and Payment**

We will make payments in respect of the notes represented by the Global Notes (including principal, premium, if any, interest and Additional Interest, if any) by wire transfer of immediately available funds to the accounts specified by DTC or its nominee. We will make all payments of principal, interest and premium, if any, and Additional Interest, if any, with respect to Certificated Notes by wire transfer of immediately available funds to the accounts specified by the holders of the Certificated Notes or, if no such account is specified, by mailing a check to each such holder's registered address. The notes represented by the Global Notes are expected to be eligible to trade in The PORTAL^SM Market and to trade in DTC's Same-Day Funds Settlement System, and any permitted secondary market trading activity in such notes will, therefore, be required by DTC to be settled in immediately available funds. We expect that secondary trading in any Certificated Notes will also be settled in immediately available funds.

Highly Confidential

EFIHMW00250314

Because of time-zone differences, credits of interests in the Global Notes received in Clearstream, Luxembourg or Euroclear as a result of a transaction with a DTC Participant will be made during subsequent securities settlement processing and dated the business day following the DTC settlement date. Such credits or any transactions involving interests in such Global Notes settled during such processing will be reported to the relevant Clearstream, Luxembourg or Euroclear participants on such business day. Cash received in Clearstream, Luxembourg or Euroclear as a result of sales of interests in the Global Notes by or through a Clearstream, Luxembourg participant or a Euroclear Participant to a DTC Participant will be received with value on the DTC settlement date but will be available in the relevant Clearstream, Luxembourg or Euroclear cash account only as of the business day following settlement in DTC.

243

EFIHMW00250315

## CERTAIN U.S. FEDERAL TAX CONSEQUENCES

**To ensure compliance with Internal Revenue Service Circular 230, you are hereby notified that any discussion of tax matters set forth in this offering circular was written in connection with the promotion or marketing of the transactions or matters addressed herein and was not intended or written to be used, and cannot be used by any prospective investor, for the purpose of avoiding tax-related penalties under U.S. federal, state or local tax law. Each prospective investor should seek advice based on its particular circumstances from an independent tax advisor.**

The following is a summary of certain U.S. federal income and, in the case of non-U.S. holders (as defined below), estate tax consequences of the purchase, ownership and disposition of the notes as of the date of this offering circular. Unless otherwise stated, this summary deals only with notes held as capital assets (generally, property held for investment) by persons who purchase the notes for cash upon original issuance at their initial offering price.

As used herein, a "U.S. holder" means a beneficial owner of the notes that is for U.S. federal income tax purposes any of the following:

- an individual citizen or resident of the United States;

- a corporation (or any other entity treated as a corporation for U.S. federal income tax purposes) created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust if it (1) is subject to the primary supervision of a court within the United States and one or more United States persons have the authority to control all substantial decisions of the trust or (2) has a valid election in effect under applicable United States Treasury regulations to be treated as a United States person.

The term "non-U.S. holder" means a beneficial owner of the notes (other than a partnership or any other entity treated as a partnership for U.S. federal income tax purposes) that is not a U.S. holder.

This summary does not represent a detailed description of the U.S. federal income tax consequences applicable to you if you are a person subject to special tax treatment under the U.S. federal income tax laws, including, without limitation:

- a dealer in securities or currencies;

- a financial institution;

- a regulated investment company;

- a real estate investment trust;

- a tax-exempt organization;

- an insurance company;

- a person holding the notes as part of a hedging, integrated, conversion or constructive sale transaction or a straddle;

- a trader in securities that has elected the mark-to-market method of accounting for your securities;

- a person liable for alternative minimum tax;

244

Highly Confidential

EFIHMW00250316

- a partnership or other pass-through entity for U.S. federal income tax purposes;

- a person whose "functional currency" is not the U.S. dollar;

- a "controlled foreign corporation";

- a "passive foreign investment company"; or

- a United States expatriate.

This summary is based on the Internal Revenue Code of 1986, as amended (the "Code"), United States Treasury regulations, rulings and judicial decisions as of the date hereof. Those authorities may be changed, possibly on a retroactive basis, so as to result in United States federal income and estate tax consequences different from those summarized below.

If a partnership (including any entity classified as a partnership for U.S. federal income tax purposes) holds notes, the tax treatment of a partner will generally depend upon the status of the partner and the activities of the partnership. If you are a partnership or a partner in a partnership holding notes, you should consult your own tax advisors regarding the tax consequences of an investment in the notes.

This summary does not represent a detailed description of the United States federal income and estate tax consequences that may be applicable to you in light of your particular circumstances and does not address the effects of any state, local or non-United States tax laws. It is not intended to be, and should not be construed to be, legal or tax advice to any particular purchaser of notes. **If you are considering the purchase of notes, you should consult your own tax advisors concerning the particular United States federal income and estate tax consequences to you of the ownership of the notes, as well as the consequences to you arising under the laws of any other taxing jurisdiction.**

**Certain Tax Consequences to U.S. Holders**

The following is a summary of certain U.S. federal income tax consequences that will apply to U.S. holders of the notes.

*Payments of Interest on Notes*.    Interest on a note will generally be taxable to you as ordinary income at the time it is paid or accrued in accordance with your method of accounting for U.S. federal income tax purposes.

*Sale, Exchange, Retirement, or Other Taxable Disposition of Notes*.    Upon the sale, exchange, retirement, or other taxable disposition of a note, you generally will recognize gain or loss equal to the difference between the amount realized upon the sale, exchange, retirement or other taxable disposition (less an amount equal to any accrued interest, which will be taxable as interest income) and the adjusted tax basis of the note. Your adjusted tax basis in a note will, in general, be your cost for that note. Any gain or loss will be capital gain or loss. Capital gains of individuals derived in respect of capital assets held for more than one year are eligible for reduced rates of taxation. The deductibility of capital losses is subject to limitations.

**Certain Tax Consequences to Non-U.S. Holders**

The following is a summary of certain U.S. federal income and estate tax consequences that will apply to non-U.S. holders of the notes.

245

EFIHMW00250317

***U.S. Federal Withholding Tax***.    The 30% United States federal withholding tax will not apply to any payment of interest on the notes under the "portfolio interest rule," provided that:

- interest paid on the notes is not effectively connected with your conduct of a trade or business in the United States;

- you do not actually (or constructively) own 10% or more of the total combined voting power of all classes of our voting stock within the meaning of the Code and applicable United States Treasury regulations;

- you are not a controlled foreign corporation that is related to us through stock ownership;

- you are not a bank whose receipt of interest on the notes is described in Section 881(c)(3)(A) of the Code; and

- either (a) you provide your name and address on an Internal Revenue Service ("IRS") Form W-8BEN (or other applicable form), and certify, under penalties of perjury, that you are not a United States person as defined under the Code or (b) you hold your notes through certain foreign intermediaries and satisfy the certification requirements of applicable United States Treasury regulations. Special certification rules apply to non-U.S. holders that are pass-through entities rather than corporations or individuals.

If you cannot satisfy the requirements described above, payments of interest made to you will be subject to the 30% U.S. federal withholding tax, unless you provide us with a properly executed:

- IRS Form W-8BEN (or other applicable form) certifying an exemption from or reduction in withholding under the benefit of an applicable income tax treaty; or

- IRS Form W-8ECI (or other applicable form) certifying that interest paid on the notes is not subject to withholding tax because it is effectively connected with your conduct of a trade or business in the United States (as discussed below under "—U.S. Federal Income Tax").

The 30% U.S. federal withholding tax generally will not apply to any payment of principal or gain that you realize on the sale, exchange, retirement or other taxable disposition of a note.

***U.S. Federal Income Tax***.    If you are engaged in a trade or business in the United States and interest on the notes is effectively connected with the conduct of that trade or business (and, if required by an applicable income tax treaty, is attributable to a United States permanent establishment), then you will be subject to U.S. federal income tax on that interest on a net income basis (although you will be exempt from the 30% U.S. federal withholding tax, provided the certification requirements discussed above in "—U.S. Federal Withholding Tax" are satisfied) in generally the same manner as if you were a United States person as defined under the Code. In addition, if you are a foreign corporation, you may be subject to a branch profits tax equal to 30% (or lower applicable income tax treaty rate) of such interest, subject to adjustments.

Any gain realized on the disposition of a note generally will not be subject to U.S. federal income tax unless:

- the gain is effectively connected with your conduct of a trade or business in the United States (and, if required by an applicable income tax treaty, is attributable to a United States permanent establishment); or

- you are an individual who is present in the United States for 183 days or more in the taxable year of that disposition, and certain other conditions are met.

If a non-U.S. holder of notes is described in the first bullet point above, any gain realized upon a sale, exchange, retirement, or other taxable disposition of the notes will be subject to U.S. federal

246

Highly Confidential

EFIHMW00250318

income tax on a net income basis. If a non-U.S. holder of notes is described in the second bullet point above, any gain realized upon a sale, exchange, retirement, or other taxable disposition of the notes will be subject to U.S. federal income tax at a statutory rate of 30%, which gain may be offset by certain losses.

*U.S. Federal Estate Tax*.   Your estate will not be subject to U.S. federal estate tax on notes beneficially owned by you at the time of your death, provided that any payment to you on the notes would be eligible for exemption from the 30% U.S. federal withholding tax under the "portfolio interest rule" described above under "—U.S. Federal Withholding Tax" without regard to the statement requirement described in the fifth bullet point of that section.

### Information Reporting and Backup Withholding

#### U.S. Holders

In general, information reporting requirements will apply to certain payments of principal and interest paid on the notes and to the proceeds of sale or other taxable disposition of a note paid to you (unless you are an exempt recipient such as a corporation). Backup withholding may apply to such payments if you fail to provide a taxpayer identification number or a certification that you are not subject to backup withholding.

Backup withholding is not an additional tax and any amounts withheld under the backup withholding rules may be allowed as a refund or a credit against your U.S. federal income tax liability provided the required information is timely furnished to the IRS.

#### Non-U.S. Holders

Generally, we must report to the IRS and to you the amount of interest paid to you and the amount of tax, if any, withheld with respect to those payments. Copies of the information returns reporting such interest payments and any withholding may also be made available to the tax authorities in the country in which you reside under the provisions of an applicable income tax treaty.

In general, you will not be subject to backup withholding with respect to payments of interest on the notes that we make to you provided that we do not have actual knowledge or reason to know that you are a United States person as defined under the Code and we have received from you the required certification that you are a non-U.S. Holder described above in the fifth bullet point under "—Certain Tax Consequences to Non-U.S. Holders—U.S. Federal Withholding Tax."

Information reporting and, depending on the circumstances, backup withholding will apply to the proceeds of a sale or other taxable disposition (including a redemption) of notes within the United States or conducted through certain United States-related financial intermediaries, unless you certify to the payor under penalties of perjury that you are a non-U.S. holder (and the payor does not have actual knowledge or reason to know that you are a United States person as defined under the Code), or you otherwise establish an exemption.

Backup withholding is not an additional tax and any amounts withheld under the backup withholding rules may be allowed as a refund or a credit against your U.S. federal income tax liability provided the required information is timely furnished to the IRS.

Highly Confidential

EFIHMW00250319

## ERISA CONSIDERATIONS

**To ensure compliance with Internal Revenue Service Circular 230, you are hereby notified that any discussion of tax matters set forth in this offering circular was written in connection with the promotion or marketing of the transactions or matters addressed herein and was not intended or written to be used, and cannot be used by any prospective investor, for the purpose of avoiding tax-related penalties under U.S. federal, state or local tax law. Each prospective investor should seek advice based on its particular circumstances from an independent tax advisor.**

The following is a summary of certain considerations associated with the purchase of the notes and exchange notes by employee benefit plans that are subject to ERISA, plans, individual retirement accounts and other arrangements that are subject to Section 4975 of the Code or provisions under any federal, state, local, non-U.S. or other laws, rules or regulations that are similar to such provisions of ERISA or the Code (collectively, "Similar Laws"), and entities whose underlying assets are considered to include "plan assets" of such employee benefit plans, plans, accounts or arrangements (each, a "Plan").

### General Fiduciary Matters

ERISA and the Code impose certain duties on persons who are fiduciaries of a Plan subject to Title I of ERISA or Section 4975 of the Code (an "ERISA Plan") and prohibit certain transactions involving the assets of an ERISA Plan and its fiduciaries or other interested parties.

In considering an investment in the notes of a portion of the assets of any Plan, a fiduciary should determine whether the investment is in accordance with the documents and instruments governing the Plan and the applicable provisions of ERISA, the Code or any Similar Law relating to a fiduciary's duties to the Plan including, without limitation, the prudence, diversification, delegation of control and prohibited transaction provisions of ERISA, the Code and any other applicable Similar Laws.

### Prohibited Transaction Issues

Section 406 of ERISA and Section 4975 of the Code prohibit ERISA Plans from engaging in specified transactions involving plan assets with persons or entities who are "parties in interest," within the meaning of ERISA, or "disqualified persons," within the meaning of Section 4975 of the Code, unless an exemption is available. A party in interest or disqualified person who engages in a nonexempt prohibited transaction may be subject to excise taxes and other penalties and liabilities under ERISA and the Code. The acquisition and/or holding of notes by an ERISA Plan with respect to which we or the initial purchasers are considered a party in interest or disqualified person may constitute or result in a direct or indirect prohibited transaction under Section 406 of ERISA and/or Section 4975 of the Code, unless the investment is acquired and is held in accordance with an applicable statutory, class or individual prohibited transaction exemption. Included among the exemptions that may apply to the acquisition and holding of the notes are Section 408(b)(17) of ERISA and the United States Department of Labor prohibited transaction class exemptions ("PTCE") 84-14 respecting transactions determined by independent qualified professional asset managers, PTCE 90-1, respecting insurance company pooled separate accounts, PTCE 91-38, respecting bank collective investment funds, PTCE 95-60, respecting life insurance company general accounts and PTCE 96-23, respecting transactions determined by in-house asset managers, although there can be no assurance that all of the conditions of any such exemptions will be satisfied. Because of the foregoing, the notes should not be purchased or held by any person investing "plan assets" of any Plan, unless such purchase and holding (and the exchange of notes for exchange notes) will not constitute a non-exempt prohibited transaction under ERISA and the Code or similar violation of any applicable Similar Laws.

248

EFIHMW00250320

**Representation**

Accordingly, by acceptance of a note or an exchange note, each purchaser and subsequent transferee will be deemed to have represented and warranted that either (i) no portion of the assets used by such purchaser or transferee to acquire and hold the notes or any interest therein constitutes assets of any Plan or (ii) the acquisition and holding of the notes or any interest therein (and the exchange of notes for exchange notes) by such purchaser or transferee will not constitute a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code or similar violation under any applicable Similar Laws.

The foregoing discussion is general in nature and is not intended to be all-inclusive. Due to the complexity of these rules and the penalties that may be imposed upon persons involved in non-exempt prohibited transactions, it is particularly important that fiduciaries or other persons considering purchasing the notes (and holding the notes or exchange notes) on behalf of, or with the assets of, any Plan, consult with their counsel regarding the potential applicability of ERISA, Section 4975 of the Code and any Similar Laws to such transactions and whether an exemption would be applicable to the purchase and holding of the notes.

249

Highly Confidential

## PLAN OF DISTRIBUTION

We and the initial purchasers named below have entered into a purchase agreement with respect to the notes. Subject to certain conditions, each initial purchaser has severally agreed to purchase the principal amount of notes indicated in the following table.

| Initial Purchasers | Principal Amount of Notes |
|---|---|
| Goldman, Sachs & Co. | $ 562,500,000 |
| Morgan Stanley & Co. Incorporated | $ 562,500,000 |
| Citigroup Global Markets Inc. | $ 562,500,000 |
| Credit Suisse Securities (USA) LLC | $ 375,000,000 |
| J.P. Morgan Securities Inc. | $ 562,500,000 |
| Lehman Brothers Inc. | $ 375,000,000 |
| Total | $3,000,000,000 |

The initial purchasers are committed to take and pay for all of the notes being offered, if any are taken. The initial offering price for the notes is set forth on the cover page of this offering circular. After the notes are released for sale, the initial purchasers may change the offering price and other selling terms.

The notes have not been registered under the Securities Act. The initial purchasers have agreed that they will only offer or sell the notes (A) in the United States to qualified institutional buyers in reliance on Rule 144A under the Securities Act, and (B) outside the United States to non-U.S. persons in offshore transactions in reliance on Regulation S under the Securities Act. Terms used above have the meanings given to them by Rule 144A and Regulation S under the Securities Act.

We expect that the delivery of the notes will be made against payment therefore on or about the fifth New York business day following the date of pricing the notes (such settlement being referred to as "T + 5"). Under Rule 15c6-1 of the Securities Exchange Act of 1934, trades in the secondary market generally are required to settle in three business days unless the parties to any such trade expressly agree otherwise. Accordingly, purchasers who wish to trade such notes prior to the delivery of the notes hereunder will be required, by virtue of the fact that such notes will initially settle in the T + 5 to specify an alternative settlement cycle at the time of any such trade to prevent a failed settlement. Purchasers of notes who wish to trade notes prior to their delivery hereunder should consult their own advisors.

In connection with sales outside the United States, the initial purchasers have agreed that they will not offer, sell or deliver the notes to, or for the account or benefit of, U.S. persons (i) as part of the initial purchasers' distribution at any time or (ii) otherwise until 40 days after the later of the commencement of the offering or the date the notes are originally issued. The initial purchasers will send to each dealer to whom they sell such notes during such 40-day period a confirmation or other notice setting forth the restrictions on offers and sales of the notes within the United States or to, or for the account or benefit of, U.S. person.

In addition, with respect to notes initially sold pursuant to Regulation S, until 40 days after the commencement of this offering, an offering or sale of such notes within the United States by a dealer that is not participating in the offering may violate the registration requirements of the Securities Act.

The notes will be new securities for which there is currently no market. As a result, we cannot assure you that the initial prices at which the notes will sell in the market after this offering will not be lower than the initial offering price or that an active trading market for the notes will develop and continue after completion of this offering. The initial purchasers have advised us that they currently intend to make a market in the notes. However, they are not obligated to do so, and they may

Highly Confidential

EFIHMW00250322

PX 006
Page 257 of 382

discontinue any market-making activities with respect to the notes at any time without notice. In connection with the offering, the initial purchasers may purchase and sell notes in the open market. These transactions may include short sales, stabilizing transactions and purchases to cover positions created by short sales. Short sales involve the sale by the initial purchasers of a greater number of notes than they are required to purchase in the offering. Stabilizing transactions consist of certain bids or purchases made for the purpose of preventing or retarding a decline in the market price of the notes while the offering is in progress. These activities by the initial purchasers may stabilize, maintain or otherwise affect the market price of the notes. As a result, the price of the notes may be higher than the price that otherwise might exist in the open market. If these activities are commenced, they may be discontinued by the initial purchasers at any time. These transactions may be effected in the over-the-counter market or otherwise. As certain of the initial purchasers have made Equity Contributions, these initial purchasers may be required to deliver a "market-making prospectus" when effecting offers and sales of notes. For so long as the market-making prospectus is required to be delivered, the ability of these initial purchasers to make a market in the notes may, in part, be dependent on our ability to maintain a current market-making prospectus. See "Transactions—Equity Contributions."

In relation to each Member State of the European Economic Area which has implemented the Prospectus Directive (each, a Relevant Member State), each Initial Purchaser has represented and agreed that with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State (the Relevant Implementation Date) it has not made and will not make an offer of notes to the public in that Relevant Member State prior to the publication of a prospectus in relation to the notes which has been approved by the competent authority in that Relevant Member State or, where appropriate, approved in another Relevant Member State and notified to the competent authority in that Relevant Member State, all in accordance with the Prospectus Directive, except that it may, with effect from and including the Relevant Implementation Date, make an offer of notes to the public in that Relevant Member State at any time:

    (a)    to legal entities which are authorized or regulated to operate in the financial markets or, if not so authorized or regulated, whose corporate purpose is solely to invest in securities;

    (b)    to any legal entity which has two or more of (1) an average of at least 250 employees during the last financial year, (2) a total balance sheet of more than €43,000,000 and (3) an annual net turnover of more than €50,000,000, as shown in its last annual or consolidated accounts;

    (c)    to fewer than 100 natural or legal persons (other than qualified investors as defined in the Prospectus Directive) subject to obtaining the prior consent of the representatives for any such offer; or

    (d)    in any other circumstances which do not require the publication by the Issuer of a prospectus pursuant to Article 3 of the Prospectus Directive.

For the purposes of this provision, the expression an "offer of notes to the public" in relation to any notes in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the notes to be offered so as to enable an investor to decide to purchase or subscribe the notes, as the same may be varied in that Member State by any measure implementing the Prospectus Directive in that Member State and the expression Prospectus Directive means Directive 2003/71/EC and includes any relevant implementing measure in each Relevant Member State.

Each Initial Purchaser has represented and agreed that:

    (a)    it has only communicated or caused to be communicated and will only communicate or cause to be communicated an invitation or inducement to engage in investment activity (within the meaning of Section 21 of the FSMA) received by it in connection with the issue or

251

EFIHMW00250323

PX 006
Page 258 of 382

sale of the notes in circumstances in which Section 21(1) of the FSMA does not apply to the Issuer or the Guarantors; and

(b)     it has complied and will comply with all applicable provisions of the FSMA with respect to anything done by it in relation to the notes in, from or otherwise involving the United Kingdom.

The notes may not be offered or sold by means of any document other than (i) in circumstances which do not constitute an offer to the public within the meaning of the Companies Ordinance (Cap.32, Laws of Hong Kong), or (ii) to "professional investors" within the meaning of the Securities and Futures Ordinance (Cap.571, Laws of Hong Kong) and any rules made thereunder, or (iii) in other circumstances which do not result in the document being a "prospectus" within the meaning of the Companies Ordinance (Cap.32, Laws of Hong Kong), and no advertisement, invitation or document relating to the notes may be issued or may be in the possession of any person for the purpose of issue (in each case whether in Hong Kong or elsewhere), which is directed at, or the contents of which are likely to be accessed or read by, the public in Hong Kong (except if permitted to do so under the laws of Hong Kong) other than with respect to notes which are or are intended to be disposed of only to persons outside Hong Kong or only to "professional investors" within the meaning of the Securities and Futures Ordinance (Cap. 571, Laws of Hong Kong) and any rules made thereunder.

This offering circular has not been registered as a prospectus with the Monetary Authority of Singapore. Accordingly, this offering circular and any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of the notes may not be circulated or distributed, nor may the notes be offered or sold, or be made the subject of an invitation for subscription or purchase, whether directly or indirectly, to persons in Singapore other than (i) to an institutional investor under Section 274 of the Securities and Futures Act, Chapter 289 of Singapore (the "SFA"), (ii) to a relevant person, or any person pursuant to Section 275(1A), and in accordance with the conditions, specified in Section 275 of the SFA or (iii) otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA.

Where the notes are subscribed or purchased under Section 275 by a relevant person which is: (a) a corporation (which is not an accredited investor) the sole business of which is to hold investments and the entire share capital of which is owned by one or more individuals, each of whom is an accredited investor; or (b) a trust (where the trustee is not an accredited investor) whose sole purpose is to hold investments and each beneficiary is an accredited investor, shares, debentures and units of shares and debentures of that corporation or the beneficiaries' rights and interest in that trust shall not be transferable for 6 months after that corporation or that trust has acquired the notes under Section 275 except: (1) to an institutional investor under Section 274 of the SFA or to a relevant person, or any person pursuant to Section 275(1A), and in accordance with the conditions, specified in Section 275 of the SFA; (2) where no consideration is given for the transfer; or (3) by operation of law.

The securities have not been and will not be registered under the Securities and Exchange Law of Japan (the Securities and Exchange Law) and each Initial Purchaser has agreed that it will not offer or sell any securities, directly or indirectly, in Japan or to, or for the benefit of, any resident of Japan (which term as used herein means any person resident in Japan, including any corporation or other entity organized under the laws of Japan), or to others for re-offering or resale, directly or indirectly, in Japan or to a resident of Japan, except pursuant to an exemption from the registration requirements of, and otherwise in compliance with, the Securities and Exchange Law and any other applicable laws, regulations and ministerial guidelines of Japan.

We have agreed to indemnify the initial purchasers against certain liabilities, including liabilities under the Securities Act.

252

EFIHMW00250324

From time to time, the initial purchasers and their affiliates have provided, and may in the future provide from time to time, investment banking and commercial banking services and financial advisory services to us for which they have in the past received, and may in the future receive, customary fees. Goldman, Sachs & Co., Morgan Stanley & Co. Incorporated, Citigroup Global Markets Inc., J.P. Morgan Securities Inc., Lehman Brothers Inc. and Credit Suisse Securities (USA) LLC and certain of their affiliates provide, or may in the future provide, certain commercial banking, financial advisory and investment banking services for the Issuer and certain of its affiliates and for the Sponsors and certain of their affiliates, for which they receive, or will receive, customary fees.

Affiliates of certain of the initial purchasers have ownership interests in EFH Corp. See "The Transactions—Equity Contributions."

Michael MacDougall, one of our directors, is a director of Kraton Polymers Inc. which may be deemed to be an affiliate of J.P. Morgan Securities Inc. Scott Lebovitz, a member of our board of directors, is an employee of Goldman, Sachs & Co.

An affiliate of Morgan Stanley & Co. Incorporated is the administrative agent, an affiliate of Goldman Sachs & Co. is the syndication agent, affiliates of Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, J.P. Morgan Securities Inc. and Lehman Brothers Inc. are co-documentation agents and each of the initial purchasers or their affiliates are joint lead arrangers and bookrunners under each of the EFH Senior Interim Facility and the TCEH Senior Interim Facility and affiliates of each of the initial purchasers are lenders under the EFH Senior Interim Facility and the TCEH Senior Interim Facility. The net proceeds from the offering of notes will be used to repay borrowings under the TCEH Senior Interim Facility and will be received by the initial purchasers or their affiliates.

In connection with the Merger, an affiliate of Credit Suisse Securities (USA) LLC provided financial advisory services to, and will receive fees from, EFH Corp., including fees received upon the completion of the Merger and affiliates of the other initial purchasers provided financial advisory services to the sponsors in connection with the merger for which they received fees from the Sponsors upon the completion of the merger. In addition, an affiliate of Citigroup Global Markets Inc. is the administrative agent and collateral agent, an affiliate of J.P. Morgan Securities Inc. is the syndication agent, affiliates of Credit Suisse Securities (USA) LLC, Goldman, Sachs & Co., Lehman Brothers Inc. and Morgan Stanley & Co. Incorporated are co-documentation agents and the initial purchasers or their affiliates are joint lead arrangers and joint lead bookrunners for the TCEH Senior Secured Facilities and affiliates of each of the initial purchasers are lenders under the TCEH Senior Secured Facilities. An affiliate of Goldman, Sachs & Co. is sole lead arranger, sole bookrunner and posting agent for the TCEH Commodity Collateral Posting Facility. An affiliate of J.P. Morgan Securities Inc. is administrative agent, an affiliate of Citigroup Global Markets Inc. is syndication agent, affiliates of Credit Suisse Securities (USA) LLC, Goldman, Sachs & Co., Lehman Brothers Inc. and Morgan Stanley & Co. are co-documentation agents and the initial purchasers or their affiliates are joint lead arrangers and joint lead bookrunners for the Oncor Electric Delivery Revolving Facility and affiliates of each of the initial purchasers are lenders under the Oncor Electric Delivery Revolving Facilities. Each of the initial purchasers is an initial purchaser in the concurrent offering EFH Corp. Notes. Goldman, Sachs & Co. acted as dealer manager for the offers to purchase and consent solicitations with respect to the Specified Notes. See "The Transactions—Debt Repayment."

253

EFIHMW00250325

PX 006
Page 260 of 382

## LEGAL MATTERS

Certain legal matters in connection with the offering will be passed upon for us by Simpson Thacher & Bartlett LLP, New York, New York, and Vinson & Elkins L.L.P., Houston, Texas, FERC and NRC regulatory matters will be passed on for us by Covington & Burling LLP and certain Texas electric utility regulatory matters will be passed on for us by Hunton & Williams LLP. Certain legal matters in connection with the offering will be passed upon for the initial purchasers by Shearman & Sterling LLP, New York, New York, and certain regulatory matters will be passed upon for the initial purchasers by Haynes and Boone, LLP. An investment vehicle comprised of several partners of Simpson Thacher & Bartlett LLP, members of their families, related persons and others own interests representing less than 1% of the capital commitments of the KKR Millennium Fund, L.P. and KKR 2006 Fund, L.P.

## INDEPENDENT AUDITORS

The financial statements of Energy Future Competitive Holdings Company (formerly TXU US Holdings Company) and subsidiaries as of December 31, 2006 and 2005 and for each of the three years in the period ended December 31, 2006, included in this offering circular have been audited by Deloitte & Touche LLP, independent auditors, as stated in their report included in this offering circular (which report on the financial statements expresses an unqualified opinion and includes an explanatory paragraph related to the change in method of accounting for stock based compensation with the election to early adopt Statement of Financial Accounting Standards No. 123 (revised 2004) Share-Based Payment).

## AVAILABLE INFORMATION

We have historically filed annual, quarterly and current reports, proxy statements and other information with the SEC. You may read and copy any document we have filed or will file with the SEC at the SEC's public website *(www.sec.gov)* or at the Public Reference Room of the SEC located at 100 F Street, N.E., Washington, D.C. 20549. Copies of such materials can be obtained from the Public Reference Room of the SEC at prescribed rates. You can call the SEC at 1-800-SEC-0330 to obtain information on the operation of the Public Reference Room.

You should rely only upon the information provided in this offering circular. TCEH has not authorized anyone to provide you with different information. You should not assume that the information in this offering circular is accurate as of any date other than the date of this offering circular.

This offering circular contains summaries of certain agreements that we have entered into or will enter into in connection with the Transactions and the Interim Facility Refinancing, such as the indenture governing the notes offered hereby and the registration rights agreement relating to the notes offered hereby, the TCEH Senior Secured Credit Facilities, the TCEH Senior Interim Facility, the indenture governing the EFH Corp. Notes and certain agreements described under "The Transactions," "Management," "Certain Relationships and Related Party Transactions" and "Description of Other Indebtedness," The descriptions contained in this offering circular of these agreements do not purport to be complete and are subject to, or qualified in their entirety by reference to, the definitive agreements. Copies of the definitive agreements, when available, will be made available without charge to you in response to a written or oral request to us.

254

Highly Confidential

## GLOSSARY

Other than under the caption "Description of Notes" where a different meaning for a term or abbreviation listed below is provided, when the following terms and abbreviations appear in the text of this offering circular, they have the meanings indicated below.

**1999 Restructuring Legislation** . . . .    legislation that restructured the electric utility industry in Texas to provide for retail competition

**2004 Form 10-K** . . . . . . . . . . . . . . . . .    Energy Future Competitive Holdings' Annual Report on Form 10-K for the year ended December 31, 2004

**2006 year-end Financial**
   **Statements** . . . . . . . . . . . . . . . . . . . .    These audited financial statements include the consolidated balance sheets of Energy Future Competitive Holdings and subsidiaries as of December 31, 2006 and 2005 and the related statements of consolidated income, comprehensive income, cash flows and shareholders' equity for each of the three years in the period ended December 31, 2006 and the related notes to the financial statements.

**APB 25** . . . . . . . . . . . . . . . . . . . . . . . . . .    Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees"

**Capgemini** . . . . . . . . . . . . . . . . . . . . . . .    Capgemini Energy LP, a subsidiary of Cap Gemini North America Inc. that provides business process support services to EFH Corp. and its subsidiaries

**Competitive Electric** . . . . . . . . . . . . . .    Refers to the EFH Corp. business segment, formerly referred to as TXU Energy Holdings, which included the activities of TCEH.

**EFH** . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    Refers to EFH Corp. and its consolidated subsidiaries, which were acquired in the Merger

**EFH Corp.** . . . . . . . . . . . . . . . . . . . . . . . .    Refers to Energy Future Holdings Corp., a holding company, and/or its subsidiaries, depending on context. This document occasionally makes references to Energy Future Holdings Corp., TCEH or Oncor Electric Delivery when describing actions, rights or obligations of their respective subsidiaries. These references reflect the fact that the subsidiaries are consolidated with their respective parent companies for financial reporting purposes. However, these references should not be interpreted to imply that the parent company is actually undertaking the action or has the rights or obligations of the relevant subsidiary company or that the subsidiary company is undertaking an action or has the rights or obligations of its parent company or of any other affiliate.

**EITF 02-03** . . . . . . . . . . . . . . . . . . . . . . .    Emerging Issues Task Force Issue No. 02-3, "Issues Involved in Accounting for Derivative Contracts Held for Trading Purposes and Contracts Involved in Energy Trading and Risk Management Activities"

255

Highly Confidential

EFIHMW00250327

**Energy Future Competitive
Holding** . . . . . . . . . . . . . . . . . . . . . .    Refers to Energy Future Competitive Holdings Company (formerly TXU US Holdings Company), a subsidiary of EFH Corp., a holding company, and/or its subsidiaries, depending on context. This document occasionally makes references to Energy Future Competitive Holdings, TCEH or Oncor Electric Delivery when describing actions, rights or obligations of their respective subsidiaries. These references reflect the fact that the subsidiaries are consolidated with their respective parent companies for financial reporting purposes. However, these references should not be interpreted to imply that the parent company is actually undertaking the action or has the rights or obligations of the relevant subsidiary company or that the subsidiary company is undertaking an action or has the rights or obligations of its parent company or of any other affiliate.

**Energy Future Intermediate
Holding** . . . . . . . . . . . . . . . . . . . . . .    Energy Future Intermediate Holdings LLC, a Delaware limited liability company and subsidiary of EFH Corp.

**EPA** . . . . . . . . . . . . . . . . . . . . . . . . . . .    U.S. Environmental Protection Agency

**EPC** . . . . . . . . . . . . . . . . . . . . . . . . . . .    engineering, procurement and construction

**ERCOT** . . . . . . . . . . . . . . . . . . . . . . . . .    Electric Reliability Council of Texas, the Independent System Operator and the regional coordinator of various electricity systems within Texas

**ERISA** . . . . . . . . . . . . . . . . . . . . . . . . .    Employee Retirement Income Security Act

**FASB** . . . . . . . . . . . . . . . . . . . . . . . . .    Financial Accounting Standards Board, the designated organization in the private sector for establishing standards for financial accounting and reporting

**FERC** . . . . . . . . . . . . . . . . . . . . . . . . .    U.S. Federal Energy Regulatory Commission

**FIN** . . . . . . . . . . . . . . . . . . . . . . . . . . .    Financial Accounting Standards Board Interpretation

**FIN 45** . . . . . . . . . . . . . . . . . . . . . . . . .    FIN No. 45, "Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others—An Interpretation of FASB Statements No. 5, 57, and 107 and Recission of FASB Interpretation No. 34"

**FIN 46R** . . . . . . . . . . . . . . . . . . . . . . . .    FIN No. 46R (Revised 2003), "Consolidation of Variable Interest Entities"

**FIN 47** . . . . . . . . . . . . . . . . . . . . . . . . .    FIN No. 47, "Accounting for Conditional Asset Retirement Obligations—An Interpretation of FASB Statement No. 143"

**FIN 48** . . . . . . . . . . . . . . . . . . . . . . . . .    FIN No. 48, "Accounting for Uncertainty in Income Taxes"

**FSP** . . . . . . . . . . . . . . . . . . . . . . . . . . .    FASB Staff Position

256

Highly Confidential

| | |
|---|---|
| **GAAP** . . . . . . . . . . . . . . . . . . . . . . . . . . . | generally accepted accounting principles |
| **GW** . . . . . . . . . . . . . . . . . . . . . . . . . . . | gigawatts |
| **GWh** . . . . . . . . . . . . . . . . . . . . . . . . . . | gigawatt-hours |
| **historical service territory** . . . . . . . . | the territory, largely in north Texas, being served by EFH Corp.'s regulated electric utility subsidiary at the time of entering retail competition on January 1, 2002 |
| **IRS**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . | U.S. Internal Revenue Service |
| **June 30, 2007 Financial Statements** . . . . . . . . . . . . . . . . . . . . | These unaudited financial statements include the consolidated balance sheet of Energy Future Competitive Holdings Company and subsidiaries as of June 30, 2007, and the related condensed statements of consolidated income and comprehensive income for the three-month and six-month periods ended June 30, 2007 and 2006, and of cash flows for the six-month periods ended June 30, 2007 and 2006 and the related notes to the financial statements. |
| **kV**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . | kilovolts |
| **kWh**. . . . . . . . . . . . . . . . . . . . . . . . . . . . | kilowatt-hours |
| **Luminant Construction or TXU DevCo** . . . . . . . . . . . . . . . . . . . . . . . . | Refers to wholly owned subsidiaries of EFH Corp. that have been established for the purpose of developing and constructing new generation facilities. |
| **Luminant Energy or TXU Portfolio Management** . . . . . . . . . . . . . . . . . . . | Luminant Energy Company LLC (formerly TXU Portfolio Management Company LP), a subsidiary of TCEH |
| **market heat rate** . . . . . . . . . . . . . . . . . | Heat rate is a measure of the efficiency of converting a fuel source to electricity. The market heat rate is based on the price offer of the marginal supplier in Texas (generally natural gas plants) in generating electricity and is calculated by dividing the wholesale market price of electricity by the market price of natural gas. |
| **Merger Agreement**. . . . . . . . . . . . . . . . | Agreement and Plan of Merger, dated February 25, 2007, under which an investor group led by KKR and TPG acquired EFH Corp. |
| **Merger Sub**. . . . . . . . . . . . . . . . . . . . . . | Texas Energy Future Merger Sub Corp, a Texas corporation and a wholly-owned subsidiary of Texas Holdings. |
| **Merger Sub Parent**. . . . . . . . . . . . . . . | Texas Energy Future Holdings Limited Partnership, a Delaware limited partnership. |

Highly Confidential

EFIHMW00250329

**PX 006**
**Page 264 of 382**

| | |
|---|---|
| **MMBtu** . . . . . . . . . . . . . . . . . . . . . . . . | million British thermal units |
| **Moody's** . . . . . . . . . . . . . . . . . . . . . . . | Moody's Investors Services, Inc. (a credit rating agency) |
| **MW** . . . . . . . . . . . . . . . . . . . . . . . . . . . | megawatts |
| **MWh** . . . . . . . . . . . . . . . . . . . . . . . . . . | megawatt-hours |
| **NRC** . . . . . . . . . . . . . . . . . . . . . . . . . . . | U.S. Nuclear Regulatory Commission |
| **Oncor Electric Delivery** . . . . . . . . . . | Refers to Oncor Electric Delivery Company, a subsidiary of EFH Corp., and/or its consolidated bankruptcy remote financing subsidiary, Oncor Electric Delivery Transition Bond Company LLC, depending on context. This document occasionally makes references to EFH Corp., TCEH or Oncor Electric Delivery when describing actions, rights or obligations of their respective subsidiaries. These references reflect the fact that the subsidiaries are consolidated with their respective parent companies for financial reporting purposes. |
| **PRB** . . . . . . . . . . . . . . . . . . . . . . . . . . . | Powder River Basin—a coal mining region that covers southeast Montana and northeast Wyoming. EFH Corp. purchases coal from this region from multiple suppliers, which is currently blended with lignite to fuel the Big Brown, Monticello and Martin Lake generating plants. |
| **price-to-beat rate** . . . . . . . . . . . . . . . . | residential and small business customer electricity rates established by the PUCT that (i) were required to be charged in a REP's historical service territories until the earlier of January 1, 2005 or the date when 40% of the electricity consumed by such customer classes was supplied by competing REPs, adjusted periodically for changes in fuel costs, and (ii) were required to be made available to those customers until January 1, 2007 |
| **PUCT or Commission** . . . . . . . . . . . . . | Public Utility Commission of Texas |
| **PURA** . . . . . . . . . . . . . . . . . . . . . . . . . . | Texas Public Utility Regulatory Act |
| **REP** . . . . . . . . . . . . . . . . . . . . . . . . . . . | retail electric provider |
| **S&P** . . . . . . . . . . . . . . . . . . . . . . . . . . . | Standard & Poor's Ratings Services, a division of the McGraw Hill Companies Inc. (a credit rating agency) |
| **SEC** . . . . . . . . . . . . . . . . . . . . . . . . . . . | U.S. Securities and Exchange Commission |
| **Settlement Plan** . . . . . . . . . . . . . . . . . | regulatory settlement plan that received final approval by the PUCT in January 2003 |
| **SFAS** . . . . . . . . . . . . . . . . . . . . . . . . . . | Statement of Financial Accounting Standards issued by the FASB |
| **SFAS 5** . . . . . . . . . . . . . . . . . . . . . . . . . | SFAS No. 5, "Accounting for Contingencies" |

258

Highly Confidential

| | |
|---|---|
| **SFAS 34**........................ | SFAS No. 34, "Capitalization of Interest Cost" |
| **SFAS 71**........................ | SFAS No. 71, "Accounting for the Effect of Certain Types of Regulation" |
| **SFAS 87**........................ | SFAS No. 87, "Employers' Accounting for Pensions" |
| **SFAS 106** ....................... | SFAS No. 106, "Employers' Accounting for Postretirement Benefits Other Than Pensions" |
| **SFAS 109** ....................... | SFAS No. 109, "Accounting for Income Taxes" |
| **SFAS 115** ....................... | SFAS No. 115, "Accounting for Certain Investments in Debt and Equity Securities" |
| **SFAS 123R** ...................... | SFAS No. 123 (revised 2004), "Share-Based Payment" |
| **SFAS 133** ....................... | SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities" as amended and interpreted |
| **SFAS 140** ....................... | SFAS No. 140, "Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities, a replacement of FASB Statement 125" |
| **SFAS 142** ....................... | SFAS No. 142, "Goodwill and Other Intangible Assets" |
| **SFAS 143** ....................... | SFAS No. 143, "Accounting for Asset Retirement Obligations" |
| **SFAS 144** ....................... | SFAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets" |
| **SFAS 146** ....................... | SFAS No. 146, "Accounting for Costs Associated with Exit or Disposal Activities" |
| **SFAS 157** ....................... | SFAS No. 157, "Fair Value Measurements" |
| **SFAS 158** ....................... | SFAS No 158, "Employer's Accounting for Defined Benefits Pension and Other Postretirement Plans" |
| **SFAS 159** ....................... | SFAS No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities—Including an Amendment of FASB Statement No. 115" |
| **SG&A** ........................... | selling, general and administrative |
| **Short-cut method**................ | refers to the short-cut method under SFAS 133 that allows entities to assume no hedge ineffectiveness in a hedging relationship of interest rate risk if certain conditions are met |
| **Sponsors** ....................... | The private investment group, consisting of entities advised by or affiliated with KKR and TPG and Goldman, Sachs, that directly and indirectly own or will own Texas Holdings and Merger Sub. |

259

Highly Confidential

EFIHMW00250331

**PX 006**
**Page 266 of 382**

| | |
|---|---|
| **TCEQ** . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Texas Commission on Environmental Quality |
| **Texas Competitive Holdings or TCEH** . . . . . . . . . . . . . . . . . . . . . . . . | Refers to Texas Competitive Electric Holdings Company LLC (formerly TXU Energy Company LLC), a subsidiary of Energy Future Competitive Holdings, and/or its consolidated subsidiaries, depending on context, engaged in electricity generation and wholesale and retail energy markets activities. This document and the SEC filings of Texas Competitive Holdings occasionally make references to Texas Competitive Holdings when describing actions, rights or obligations of its subsidiaries. These references reflect the fact that the subsidiaries are consolidated with Texas Competitive Holdings for financial reporting purposes. |
| **Texas Holdings** . . . . . . . . . . . . . . . . . . | Texas Energy Future Holdings Limited Partnership, a Delaware limited partnership. |
| **TXU Australia** . . . . . . . . . . . . . . . . . . . . | Refers to TXU Australia Group Pty Ltd, a former subsidiary of EFH Corp., and its subsidiaries |
| **TXU Big Brown** . . . . . . . . . . . . . . . . . . . | Big Brown Power Company LLC (formerly TXU Big Brown Company LP), a Texas limited liability company and subsidiary of TXU Energy Company, which owns two lignite/coal-fueled generation units in Texas |
| **TXU Energy or TXU Energy Retail** . . . . . . . . . . . . . . . . . . . . . . . . | Refers to TXU Energy Retail Company LLC (formerly TXU Energy Retail Company LP), a subsidiary of TCEH engaged in the retail sale of power to residential and business customers |
| **TXU Europe** . . . . . . . . . . . . . . . . . . . . . . | TXU Europe Limited, a former subsidiary of EFH Corp. |
| **TXU Fuel** . . . . . . . . . . . . . . . . . . . . . . . | TXU Fuel Company, a former subsidiary of TXU Energy Company |
| **TXU Gas** . . . . . . . . . . . . . . . . . . . . . . . | TXU Gas Company, a former subsidiary of EFH Corp. |
| **United States or U.S.** . . . . . . . . . . . . | United States of America |

Highly Confidential

EFIHMW00250332

**PX 006**
**Page 267 of 382**

## INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

Page

**Energy Future Competitive Holdings Company and Subsidiaries Unaudited Financial Statements for the Three Month and Six Month Periods ended June 30, 2007 and 2006**

Condensed Statements of Consolidated Income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    F-2

Condensed Statements of Consolidated Comprehensive Income . . . . . . . . . . . . . . . . . . . . . . . . . . .    F-3

Condensed Statements of Consolidated Cash Flows . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    F-4

Condensed Consolidated Balance Sheets—June 30, 2007 and December 31, 2006 . . . . . . . . . .    F-5

Notes to Condensed Consolidated Financial Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    F-6

**Energy Future Competitive Holdings Company and Subsidiaries Audited Financial Statements**

Independent Auditors' Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    F-43

Statements of Consolidated Income for each of the three years in the period ended December 31, 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    F-44

Statements of Consolidated Comprehensive Income for each of the three years in the period ended December 31, 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    F-45

Statements of Consolidated Cash Flows for each of the three years in the period ended December 31, 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    F-46

Consolidated Balance Sheets, December 31, 2006 and 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    F-48

Statements of Consolidated Shareholders' Equity for each of the three years in the period ended December 31, 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    F-49

Notes to Financial Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    F-51

Highly Confidential

EFIHMW00250333

**PX 006
Page 268 of 382**

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

### Condensed Statements of Consolidated Income
### (Unaudited)

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| | (millions of dollars) | | | |
| **Operating revenues** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $1,890 | $2,468 | $3,414 | $4,478 |
| Costs and expenses: | | | | |
| Fuel, purchased power costs and delivery fees . . . . . . . . . . . . | 971 | 943 | 1,902 | 1,733 |
| Operating costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 164 | 149 | 313 | 300 |
| Depreciation and amortization . . . . . . . . . . . . . . . . . . . . . . . . . | 81 | 85 | 161 | 170 |
| Selling, general and administrative expenses. . . . . . . . . . . . . | 148 | 121 | 286 | 243 |
| Franchise and revenue-based taxes. . . . . . . . . . . . . . . . . . . . . | 28 | 28 | 54 | 55 |
| Other income (Note 4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (13) | (15) | (34) | (28) |
| Other deductions (Note 4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 9 | 205 | 14 | 201 |
| Interest income. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (99) | (57) | (189) | (100) |
| Interest expense and related charges (Note 13) . . . . . . . . . . | 112 | 84 | 198 | 167 |
| Total costs and expenses . . . . . . . . . . . . . . . . . . . . . . . . . | 1,401 | 1,543 | 2,705 | 2,741 |
| Income before income taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 489 | 925 | 709 | 1,737 |
| Income tax expense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 135 | 356 | 199 | 622 |
| **Net income** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 354 | $ 569 | $ 510 | $1,115 |

See Notes to Financial Statements.

F-2

EFIHMW00250334

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

**Condensed Statements of Consolidated Comprehensive Income**
**(Unaudited)**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| | (millions of dollars) | | | |
| Net income | $354 | $569 | $ 510 | $1,115 |
| Other comprehensive income (loss): | | | | |
| Cash flow hedges: | | | | |
| Net increase (decrease) in fair value of derivatives held at end of period (net of tax (expense) benefit of $(19), $39, $95 and $(21)) | 35 | (74) | (177) | 39 |
| Derivative value net (gains) losses related to hedged transactions settled during the period and reported in net income (net of tax (expense) benefit of $(9), $6, $(49) and $5) | (18) | 12 | (91) | 10 |
| Total effect of cash flow hedges | 17 | (62) | (268) | 49 |
| Comprehensive income | $371 | $507 | $ 242 | $1,164 |

See Notes to Financial Statements.

F-3

Highly Confidential

EFIHMW00250335

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

**Condensed Statements of Consolidated Cash Flows**
**(Unaudited)**

|  | Six Months Ended June 30, | |
|---|---|---|
|  | 2007 | 2006 |
|  | (millions of dollars) | |
| **Cash flows—operating activities:** | | |
| Net income | $   510 | $ 1,115 |
| Adjustments to reconcile net income to cash provided by operating activities: | | |
| Depreciation and amortization | 191 | 203 |
| Deferred income tax expense (benefit)—net | (214) | 92 |
| Net effect of unrealized mark-to-market valuations—losses (gains) | 751 | (148) |
| Bad debt expense | 24 | 29 |
| Net gain on sale of assets | (24) | (23) |
| Net equity loss from unconsolidated affiliate | 3 | 5 |
| Stock-based incentive compensation expense | 4 | 4 |
| Impairment of natural gas-fueled generation plants | — | 198 |
| Inventory write-off related to natural gas-fueled generation plants | — | 3 |
| Credit related to impaired leases | — | 2 |
| Other, net | 14 | 8 |
| Changes in operating assets and liabilities | (1,891) | 637 |
| Cash (used in) provided by operating activities | (632) | 2,125 |
| **Cash flows—financing activities:** | | |
| Issuances of long-term debt | 1,000 | 100 |
| Retirements of debt: | | |
| Pollution control revenue bonds | (143) | (203) |
| Other long-term debt | (14) | (409) |
| Change in short-term borrowings: | | |
| Commercial paper | (623) | 365 |
| Bank borrowings | 2,000 | 800 |
| Decrease in income tax-related note payable to Oncor Electric Delivery | (15) | (22) |
| Distributions paid to parent | (567) | (286) |
| Debt premium, discount, financing and reacquisition expenses—net | (8) | (14) |
| Cash provided by financing activities | 1,630 | 331 |
| **Cash flows—investing activities:** | | |
| Net advances to affiliates | (326) | (2,039) |
| Capital expenditures | (381) | (218) |
| Nuclear fuel | (30) | (30) |
| Reduction of restricted cash related to the redemption of pollution control revenue bonds | 143 | — |
| Proceeds from sales of nuclear decommissioning trust fund securities | 104 | 144 |
| Investments in nuclear decommissioning trust fund securities | (111) | (151) |
| Proceeds from pollution control revenue bonds deposited with trustee | — | (99) |
| Purchase of lease trust | — | (69) |
| Other | — | (1) |
| Cash used in investing activities | (601) | (2,463) |
| Net change in cash and cash equivalents | 397 | (7) |
| Cash and cash equivalents—beginning balance | 7 | 12 |
| Cash and cash equivalents—ending balance | $   404 | $    5 |

See Notes to Financial Statements.

F-4

Highly Confidential

EFIHMW00250336

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

**Condensed Consolidated Balance Sheets**
**(Unaudited)**

| | June 30, 2007 | December 31, 2006 |
|---|---|---|
| | (millions of dollars) | |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 404 | $ 7 |
| Restricted cash | 1 | 3 |
| Trade accounts receivable—net (Note 5) | 833 | 806 |
| Advances to parent | 4,339 | 3,308 |
| Note receivable from parent | 1,500 | 1,500 |
| Inventories | 357 | 306 |
| Commodity and other derivative contractual assets (Note 10) | 287 | 948 |
| Accumulated deferred income taxes (Note 2) | 601 | 198 |
| Margin deposits related to commodity positions | 448 | 7 |
| Other current assets | 88 | 88 |
| Total current assets | 8,858 | 7,171 |
| Restricted cash | 102 | 241 |
| Investments | 571 | 546 |
| Advances to parent | — | 700 |
| Property, plant and equipment—net | 10,168 | 9,924 |
| Goodwill | 517 | 517 |
| Commodity and other derivative contractual assets (Note 10) | 151 | 251 |
| Other noncurrent assets | 276 | 280 |
| Total assets | $20,643 | $19,630 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Short-term borrowings (Note 6) | $ 2,195 | $ 818 |
| Long-term debt due currently (Note 7) | 285 | 178 |
| Trade accounts payable—nonaffiliates | 733 | 803 |
| Trade accounts and other payables to affiliates | 187 | 164 |
| Commodity and other derivative contractual liabilities (Note 10) | 405 | 272 |
| Margin deposits related to commodity positions | 35 | 681 |
| Accrued income taxes payable to parent | 36 | 538 |
| Accrued taxes other than income | 54 | 52 |
| Other current liabilities | 336 | 350 |
| Total current liabilities | 4,266 | 3,856 |
| Accumulated deferred income taxes (Note 2) | 2,371 | 2,697 |
| Investment tax credits | 304 | 311 |
| Commodity and other derivative contractual liabilities (Note 10) | 258 | 127 |
| Notes or other liabilities due affiliates | 307 | 323 |
| Long-term debt, less amounts due currently (Note 7) | 3,824 | 3,088 |
| Other noncurrent liabilities and deferred credits | 1,780 | 1,361 |
| Total liabilities | 13,110 | 11,763 |
| Commitments and contingencies (Note 8) | | |
| Shareholders' equity (Note 9) | 7,533 | 7,867 |
| Total liabilities and shareholders' equity | $20,643 | $19,630 |

See Notes to Financial Statements.

F-5

EFIHMW00250337

## ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES

### Notes to Condensed Consolidated Financial Statements
### (Unaudited)

### *1. SIGNIFICANT ACCOUNTING POLICIES AND BUSINESS*

**Description of Business.**    Energy Future Competitive Holdings Company (Energy Future Competitive Holdings) is a wholly-owned subsidiary of EFH Corp. and is a holding company that conducts its operations principally through its Texas Competitive Electric Holdings Company LLC (Texas Competitive Holdings) subsidiary. Texas Competitive Holdings is a holding company whose subsidiaries are engaged in competitive market activities consisting of electricity generation, retail electricity sales to residential and business customers, wholesale energy sales and purchases as well as commodity risk management and trading activities, all largely in Texas. Energy Future Competitive Holdings is managed as an integrated business; therefore, there are no reportable business segments.

On February 25, 2007, EFH Corp. entered into the Merger Agreement with Merger Sub Parent and Merger Sub, whereby EFH Corp. would merge with Merger Sub and EFH Corp. would become a wholly-owned subsidiary of Merger Sub Parent. Merger Sub Parent and Merger Sub are entities directly and indirectly owned by a private investment group consisting of entities advised by or affiliated with Kohlberg Kravis Roberts & Co. and Texas Pacific Group (Sponsors). See Note 14.

**Basis of Presentation.**    The condensed consolidated financial statements of Energy Future Competitive Holdings have been prepared in accordance with US GAAP and on the same basis as the audited financial statements for the three-year period ended December 31, 2006 with the exception of the adoption of FIN 48. All adjustments (consisting of normal recurring accruals) necessary for a fair presentation of the results of operations and financial position have been included therein. All intercompany items and transactions have been eliminated in consolidation. Certain information and footnote disclosures normally included in annual consolidated financial statements prepared in accordance with US GAAP have been omitted pursuant to the rules and regulations of the SEC. Because the condensed consolidated interim financial statements do not include all of the information and footnotes required by US GAAP, they should be read in conjunction with the audited financial statements and related notes for the three-year period ended December 31, 2006. The results of operations for an interim period may not give a true indication of results for a full year. All dollar amounts in the financial statements and tables in the notes are stated in millions of US dollars unless otherwise indicated.

Prior period commodity contract assets and liabilities and cash flow hedge and other derivative assets and liabilities have been combined to conform with the current period presentation (see Note 10).

**Use of Estimates.**    Preparation of Energy Future Competitive Holdings' financial statements requires management to make estimates and assumptions about future events that affect the reporting of assets and liabilities at the balance sheet dates and the reported amounts of revenue and expense, including mark-to-market valuations. In the event estimates and/or assumptions prove to be different from actual amounts, adjustments are made in subsequent periods to reflect more current information. No material adjustments, other than those disclosed elsewhere herein, were made to previous estimates or assumptions during the current year.

**Changes in Accounting Standards.**    Effective January 1, 2007, Energy Future Competitive Holdings adopted FIN 48 as required. FIN 48 provides clarification of SFAS 109 with respect to the recognition of income tax benefits of uncertain tax positions in the financial statements. See Note 2 for the impacts of adopting FIN 48 and required disclosures.

F-6

EFIHMW00250338

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

**Notes to Condensed Consolidated Financial Statements—(Continued)**

In April 2007, the FASB issued FASB Staff Position (FSP) FIN 39-1, "Amendment of FASB Interpretation No. 39". This FSP provides additional guidance regarding the offsetting in the balance sheet of cash collateral and contractual fair value amounts and related disclosures. This FSP is effective for fiscal years beginning after November 15, 2007. Energy Future Competitive Holdings is evaluating the impact of this standard on its balance sheet.

## 2. ADOPTION OF NEW INCOME TAX ACCOUNTING RULES (FIN 48)

FIN 48 requires that each tax position be reviewed and assessed with recognition and measurement of the tax benefit based on a "more-likely-than-not" standard with respect to the ultimate outcome, regardless of whether this assessment is favorable or unfavorable. Energy Future Competitive Holdings has completed its review and assessment of uncertain tax positions and in the quarter ended March 31, 2007 recorded a net charge to shareholders' equity and an increase to noncurrent liabilities of $41 million in accordance with the new accounting rule.

EFH Corp. and its subsidiaries file income tax returns in US federal, state and foreign jurisdictions and are subject to examinations by the IRS and other taxing authorities. Examinations of income tax returns filed by EFH Corp. and any of its subsidiaries for the years ending prior to January 1, 1997, with few exceptions, are complete. Texas franchise tax returns for the years 2002 to 2006 have not been examined.

As expected, the IRS has completed examining EFH Corp.'s US income tax returns for the years 1997 through 2002, and proposed adjustments were received in July 2007. EFH Corp. plans to appeal the proposed adjustments in the third quarter of 2007. The proposed adjustments received from the IRS with respect to the 1997-2002 income tax returns do not materially affect Energy Future Competitive Holdings' assessment of uncertain tax positions as reflected in the amounts recorded upon adoption of FIN 48.

For Energy Future Competitive Holdings, the total amount of benefits taken on income tax returns that do not qualify for financial statement recognition under FIN 48 totaled $654 million as of June 30, 2007, the substantial majority of which represents amounts that have been accounted for as noncurrent liabilities instead of deferred income tax liabilities; of this amount, $41 million would increase earnings if recognized. The balance sheet at June 30, 2007 reflects a reclassification of $378 million from accumulated deferred income tax liabilities to other noncurrent liabilities recorded in the first quarter of 2007.

Energy Future Competitive Holdings classifies interest and penalties related to unrecognized tax benefits as income tax expense. As of June 30, 2007, noncurrent liabilities included a total of $45 million in accrued interest. The amount of interest included in income tax expense for the three and six months ended June 30, 2007 totaled $7 million and $12 million after-tax, respectively.

Energy Future Competitive Holdings does not expect that the total amount of unrecognized tax benefits for the positions assessed as of the date of the adoption will significantly increase or decrease within the next 12 months.

## 3. TEXAS MARGIN TAX

In May 2006, the Texas legislature enacted a new law that reformed the Texas franchise tax system and replaced it with a new tax system, referred to as the Texas margin tax. The Texas margin

F-7

EFIHMW00250339

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

**Notes to Condensed Consolidated Financial Statements—(Continued)**

tax has been determined to be an income tax for accounting purposes. In accordance with the provisions of SFAS 109, which require that deferred tax assets and liabilities be adjusted for the effects of new income tax legislation in the period of enactment, Energy Future Competitive Holdings estimated and recorded a deferred tax expense of $44 million in the second quarter of 2006.

In June 2007, an amendment to this law was enacted that included clarifications and technical changes to the provisions of the tax calculation. In the second quarter of 2007, Energy Future Competitive Holdings recorded a deferred tax benefit of $30 million, essentially all of which related to changes in the rate at which a tax credit is calculated as specified in the new law. This estimated benefit is based on the Texas margin tax law in its current form and the current guidance issued by the Texas Comptroller of Public Accounts.

The effective date of the Texas margin tax for Energy Future Competitive Holdings is January 1, 2008. The computation of tax liability will be based on 2007 revenues as reduced by certain deductions and is being accrued in the current year.

### 4. OTHER INCOME AND DEDUCTIONS

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| Other income: | | | | |
| Amortization of gain on sale of TXU Fuel | $11 | $ 11 | $23 | $ 23 |
| Settlement penalty for coal tonnage delivery deficiency | — | — | 3 | — |
| Royalty income from lignite and natural gas leases | 1 | — | 5 | — |
| Other | 1 | 4 | 3 | 5 |
| Total other income | $13 | $ 15 | $34 | $ 28 |
| Other deductions: | | | | |
| Charge for impairment of natural gas-fueled generation plants | $ — | $198 | $ — | $198 |
| Inventory write-off related to natural gas-fueled generation plants | — | 3 | — | 3 |
| Credit related to coal contract counterparty claim(a) | — | — | — | (12) |
| Charge for settlement of retail matter with the Commission | 5 | — | 5 | — |
| Equity losses of entity holding investment in Capgemini | 2 | 2 | 3 | 5 |
| Accretion expense | 1 | 1 | 2 | 2 |
| Other | 1 | 1 | 4 | 5 |
| Total other deductions | $ 9 | $205 | $14 | $201 |

_____

(a)  In the first quarter of 2006, Texas Competitive Holdings recorded income of $12 million upon the settlement of a claim against a counterparty for nonperformance under a coal contract. A charge in the same amount was recorded in the first quarter of 2005 for losses due to the nonperformance.

F-8

EFIHMW00250340

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

**Notes to Condensed Consolidated Financial Statements—(Continued)**

### 5. TRADE ACCOUNTS RECEIVABLE AND SALE OF RECEIVABLES PROGRAM

*Sale of Receivables*.    Subsidiaries of Energy Future Competitive Holdings participate in an accounts receivable securitization program established by EFH Corp. for certain of its subsidiaries, the activity under which is accounted for as a sale of accounts receivable in accordance with SFAS 140. Under the program, subsidiaries of Energy Future Competitive Holdings sell trade accounts receivable to TXU Receivables Company, a consolidated wholly-owned bankruptcy-remote direct subsidiary of EFH Corp., which sells undivided interests in the purchased accounts receivable for cash to special purpose entities established by financial institutions (the funding entities). The current program is subject to renewal in June 2008.

The maximum amount currently available under the program to all EFH Corp. subsidiary participants (originators) is $700 million, and the program funding was $527 million as of June 30, 2007. The program funding to Energy Future Competitive Holdings totaled $441 million as of June 30, 2007. Under certain circumstances, the amount of customer deposits held by the originators can reduce the amount of undivided interests that can be sold, thus reducing funding available under the program. Funding availability for all originators is reduced by 100% of the originators' customer deposits if Texas Competitive Holdings' fixed charge coverage ratio is less than 2.5 times; 50% if Texas Competitive Holdings' coverage ratio is less than 3.25 times, but at least 2.5 times; and zero % if Texas Competitive Holdings' coverage ratio is 3.25 times or more. The originators' customer deposits, which totaled $119 million, did not affect funding availability at that date as Texas Competitive Holdings' coverage ratio was in excess of 3.25 times.

All new trade receivables under the program generated by subsidiaries of Energy Future Competitive Holdings are continuously purchased by TXU Receivables Company with the proceeds from collections of receivables previously purchased. Changes in the amount of funding under the program, through changes in the amount of undivided interests sold by TXU Receivables Company, reflect seasonal variations in the level of accounts receivable, changes in collection trends as well as other factors such as changes in sales prices and volumes. TXU Receivables Company has issued subordinated notes payable to subsidiaries of Energy Future Competitive Holdings for the difference between the face amount of the uncollected accounts receivable purchased, less a discount, and cash paid to subsidiaries of Energy Future Competitive Holdings that was funded by the sale of the undivided interests. The balance of the subordinated notes issued to subsidiaries of Energy Future Competitive Holdings, which is reported in trade accounts receivable, was $255 million and $159 million at June 30, 2007 and December 31, 2006, respectively.

The discount from face amount on the purchase of receivables principally funds program fees paid by TXU Receivables Company to the funding entities. The discount also funds a servicing fee paid by TXU Receivables Company to TXU Business Services Company, a direct subsidiary of EFH Corp. The program fees, also referred to as losses on sale of the receivables under SFAS 140, consist primarily of interest costs on the underlying financing and totaled $16 million and $15 million for the first six months of 2007 and 2006, respectively, and averaged 6.4% and 5.4% (on an annualized basis) of the funding under the program for the six months of 2007 and 2006, respectively. The servicing fee, which totaled approximately $2 million for the first six months of both 2007 and 2006, compensates TXU Business Services Company for its services as collection agent, including maintaining the detailed accounts receivable collection records. The program and servicing fees represent essentially all the net incremental costs of the program to Energy Future Competitive Holdings and are reported in SG&A expenses.

F-9

EFIHMW00250341

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

**Notes to Condensed Consolidated Financial Statements—(Continued)**

The accounts receivable balance reported in the June 30, 2007 condensed consolidated balance sheet has been reduced by $696 million face amount of trade accounts receivable sold to TXU Receivables Company, partially offset by the inclusion of $255 million of subordinated notes receivable from TXU Receivables Company. Funding under the program decreased $100 million to $441 million for the six month period ending June 30, 2007 and increased $26 million to $608 million for the six month period ending June 30, 2006. Funding increases or decreases under the program are reflected as operating cash flow activity in the statement of cash flows. The carrying amount of the retained interests in the accounts receivable balance approximated fair value due to the short-term nature of the collection period.

Activities of TXU Receivables Company related to Energy Future Competitive Holdings were as follows:

| | Six Months Ended June 30, | |
| --- | --- | --- |
| | **2007** | **2006** |
| Cash collections on accounts receivable | $ 3,262 | $ 3,138 |
| Face amount of new receivables purchased | (3,258) | (3,184) |
| Discount from face amount of purchased receivables | 18 | 17 |
| Program fees paid | (16) | (15) |
| Servicing fees paid | (2) | (2) |
| Increase in subordinated notes payable | 96 | 20 |
| Operating cash flows used by (provided to) Energy Future Competitive Holdings under the program | $ 100 | $ (26) |

Upon termination of the program, cash flows would be delayed as collections of sold receivables would be used by TXU Receivables Company to repurchase the undivided interests from the funding entities instead of purchasing new receivables. The level of cash flows would normalize in approximately 16 to 30 days.

***Contingencies Related to Sale of Receivables Program.*** Although TXU Receivables Company expects to be able to pay its subordinated notes from the collections of purchased receivables, these notes are subordinated to the undivided interests of the financial institutions in those receivables, and collections might not be sufficient to pay the subordinated notes. The program may be terminated if either of the following events occurs:

1) all of the originators cease to maintain their required fixed charge coverage ratio and debt to capital (leverage) ratio; or

2) the delinquency ratio (delinquent for 31 days) for the sold receivables, the default ratio (delinquent for 91 days or deemed uncollectible), the dilution ratio (reductions for discounts, disputes and other allowances) or the days collection outstanding ratio exceed stated thresholds and the financial institutions do not waive such event of termination. The thresholds apply to the entire portfolio of sold receivables, not separately to the receivables of each originator.

Highly Confidential

EFIHMW00250342

**PX 006**

**Page 277 of 382**

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

**Notes to Condensed Consolidated Financial Statements—(Continued)**

*Trade Accounts Receivable*

|  | June 30, 2007 | December 31, 2006 |
|---|---|---|
| Gross trade accounts receivable | $1,282 | $1,355 |
| Undivided interests in accounts receivable sold by TXU Receivables Company | (696) | (700) |
| Subordinated notes receivable from TXU Receivables Company | 255 | 159 |
| Allowance for uncollectible accounts related to undivided interests in receivables retained | (8) | (8) |
| Trade accounts receivable—reported in balance sheet | $ 833 | $ 806 |

Gross trade accounts receivable at June 30, 2007 and December 31, 2006 included unbilled revenues of $458 million and $406 million, respectively.

*Allowance for Uncollectible Accounts Receivable*

|  | 2007 | 2006 |
|---|---|---|
| Allowance for uncollectible accounts receivable as of January 1 | $ 8 | $ 31 |
| Increase for bad debt expense | 24 | 29 |
| Decrease for account write-offs | (33) | (41) |
| Changes related to receivables sold | 9 | 13 |
| Other(a) | — | (16) |
| Allowance for uncollectible accounts receivable as of June 30 | $ 8 | $ 16 |

_____

(a)  Represents an allowance established in 2005 for a coal contract dispute that was reversed upon settlement in 2006. See Note 4.

Allowances related to undivided interests in receivables sold are reported in current liabilities and totaled $16 million and $25 million at June 30, 2007 and December 31, 2006, respectively.

### 6. SHORT-TERM FINANCING

*Short-term Borrowings.*  At June 30, 2007 and December 31, 2006, the outstanding short-term borrowings of Energy Future Competitive Holdings consisted of the following:

|  | At June 30, 2007 | | At December 31, 2006 | |
|---|---|---|---|---|
|  | Outstanding Amount | Interest Rate(a) | Outstanding Amount | Interest Rate(a) |
| Bank borrowings | $2,195 | 6.22% | $195 | 5.97% |
| Commercial paper | — | — | 623 | 5.52% |
| Total | $2,195 | | $818 | |

_____

(a)  Weighted average interest rate at the end of the period.

Under the commercial paper program, subsidiaries of Energy Future Competitive Holdings may issue up to $2.4 billion of these securities. At June 30, 2007, Texas Competitive Holdings and Oncor

F-11

EFIHMW00250343

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

**Notes to Condensed Consolidated Financial Statements—(Continued)**

Electric Delivery had no commercial paper outstanding. The program is effectively supported by existing credit facilities although there is no contractual obligation under the program to maintain equivalent availability under existing credit facilities.

*Credit Facilities.*   At June 30, 2007, Energy Future Competitive Holdings had access to credit facilities with the following terms:

| Authorized Borrowers | Maturity Date | At June 30, 2007 | | | |
|---|---|---|---|---|---|
| | | Facility Limit | Letters of Credit | Cash Borrowings | Availability |
| Texas Competitive Holdings . . . . . . . . . . . | February 2008 | $1,500 | $   — | $   — | $1,500 |
| Texas Competitive Holdings, Oncor Electric Delivery . . . . . . . . . . . . . . . . . . . | June 2008 | 1,400 | 512 | 765 | 123 |
| Texas Competitive Holdings, Oncor Electric Delivery . . . . . . . . . . . . . . . . . . . | August 2008 | 1,000 | — | 495 | 505 |
| Texas Competitive Holdings, Oncor Electric Delivery . . . . . . . . . . . . . . . . . . . | March 2010 | 1,600 | 248 | 815 | 537 |
| Texas Competitive Holdings, Oncor Electric Delivery . . . . . . . . . . . . . . . . . . . | June 2010 | 500 | 5 | 230 | 265 |
| Texas Competitive Holdings . . . . . . . . . . . | December 2009 | 500 | 455 | 45 | — |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . | | $6,500 | $1,220 | $2,350 | $2,930 |

The maximum amount Texas Competitive Holdings and Oncor Electric Delivery can directly access under the facilities is $6.5 billion and $3.6 billion, respectively. These facilities may be used for working capital and general corporate purposes, including providing support for issuances of commercial paper and for issuing letters of credit. All letters of credit under the credit facilities as of June 30, 2007 are the obligations of Texas Competitive Holdings. At June 30, 2007, Texas Competitive Holdings and Oncor Electric Delivery had $2.195 billion and $155 million in outstanding cash borrowings, respectively.

Availability under these facilities as of June 30, 2007 declined $2.4 billion from December 31, 2006.

On March 1, 2007, a $1.5 billion Texas Competitive Holdings facility maturing in May 2007 was terminated and replaced with a new 364-day facility with terms comparable to the existing facilities. The new credit facility may only be drawn upon if the $1.0 billion credit facility maturing in August 2008 is fully drawn. The facility matures in February 2008 but will terminate earlier on any date Texas Competitive Holdings issues any debt (excluding pollution control revenue bonds and commercial paper) or preferred equity securities or enters into any credit facilities.

Pursuant to Commission rules, availability under the credit facilities is further reduced by $125 million to provide liquidity to permit TXU Energy Retail to return retail customer deposits, if necessary.

F-12

EFIHMW00250344

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

**Notes to Condensed Consolidated Financial Statements—(Continued)**

### 7. LONG-TERM DEBT

**Long-term debt.**    At June 30, 2007 and December 31, 2006, the long-term debt of Energy Future Competitive Holdings consisted of the following:

| | June 30, 2007 | December 31, 2006 |
|---|---|---|
| **Texas Competitive Holdings** | | |
| Pollution Control Revenue Bonds: | | |
| Brazos River Authority: | | |
| 5.400% Fixed Series 1994A due May 1, 2029 | $    39 | $    39 |
| 7.700% Fixed Series 1999A due April 1, 2033 | 111 | 111 |
| 6.750% Fixed Series 1999B due September 1, 2034, remarking date April 1, 2013(a) | 16 | 16 |
| 7.700% Fixed Series 1999C due March 1, 2032 | 50 | 50 |
| 3.830% Floating Series 2001A due October 1, 2030(b) | 71 | 71 |
| 5.750% Fixed Series 2001C due May 1, 2036, remarking date November 1, 2011(a) | 217 | 217 |
| 3.780% Floating Series 2001D due May 1, 2033(b) | 268 | 268 |
| 5.380% Floating Taxable Series 2001I due December 1, 2036(b) | 62 | 62 |
| 3.830% Floating Series 2002A due May 1, 2037(b) | 45 | 45 |
| 6.750% Fixed Series 2003A due April 1, 2038, remarking date April 1, 2013(a) | 44 | 44 |
| 6.300% Fixed Series 2003B due July 1, 2032 | 39 | 39 |
| 6.750% Fixed Series 2003C due October 1, 2038 | 52 | 52 |
| 5.400% Fixed Series 2003D due October 1, 2029, remarking date October 1, 2014(a) | 31 | 31 |
| 5.000% Fixed Series 2006 due March 1, 2041 | 100 | 100 |
| | | |
| Sabine River Authority of Texas: | | |
| 6.450% Fixed Series 2000A due June 1, 2021 | 51 | 51 |
| 5.500% Fixed Series 2001A due May 1, 2022, remarking date November 1, 2011(a) | 91 | 91 |
| 5.750% Fixed Series 2001B due May 1, 2030, remarking date November 1, 2011(a) | 107 | 107 |
| 5.200% Fixed Series 2001C due May 1, 2028 | 70 | 70 |
| 5.800% Fixed Series 2003A due July 1, 2022 | 12 | 12 |
| 6.150% Fixed Series 2003B due August 1, 2022 | 45 | 45 |
| 3.850% Floating Series 2006A due November 1, 2041, (interest rate in effect at March 31, 2007)(c) | — | 47 |
| 3.850% Floating Series 2006B due November 1, 2041, (interest rate in effect at March 31, 2007)(c) | — | 46 |
| | | |
| Trinity River Authority of Texas: | | |
| 6.250% Fixed Series 2000A due May 1, 2028 | 14 | 14 |
| 3.850% Floating Series 2006 due November 1, 2041, (interest rate in effect at March 31, 2007)(c) | — | 50 |
| Other: | | |
| 6.125% Fixed Senior Notes due March 15, 2008(d) | 250 | 250 |
| 7.000% Fixed Senior Notes due March 15, 2013 | 1,000 | 1,000 |

F-13

EFIHMW00250345

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

**Notes to Condensed Consolidated Financial Statements—(Continued)**

| | June 30, 2007 | December 31, 2006 |
|---|---|---|
| 5.860% Floating Senior Notes due September 16, 2008(e) | 1,000 | — |
| Capital lease obligations | 92 | 98 |
| Fair value adjustments related to interest rate swaps | 11 | 10 |
| Total Texas Competitive Holdings | 3,888 | 3,036 |
| **Energy Future Competitive Holdings** | | |
| 7.170% Fixed Senior Debentures due August 1, 2007 | 10 | 10 |
| 7.460% Fixed Secured Facility Bonds with amortizing payments through January 2015 | 78 | 85 |
| 9.580% Fixed Notes due in semiannual installments through December 4, 2019 | 62 | 62 |
| 8.254% Fixed Notes due in quarterly installments through December 31, 2021 | 58 | 59 |
| 6.156% Floating Rate Junior Subordinated Debentures, Series D due January 30, 2037(e) | 1 | 1 |
| 8.175% Fixed Junior Subordinated Debentures, Series E due January 30, 2037 | 8 | 8 |
| Unamortized premium | 4 | 5 |
| Total Energy Future Competitive Holdings | 221 | 230 |
| Total Energy Future Competitive Holdings consolidated | 4,109 | 3,266 |
| Less amount due currently | (285) | (178) |
| Total long-term debt | $3,824 | $3,088 |

(a)  These series are in the multiannual interest rate mode and are subject to mandatory tender prior to maturity on the mandatory remarketing date. On such date, the interest rate and interest rate period will be reset for the bonds.

(b)  Interest rates in effect at June 30, 2007. These series are in a weekly interest rate mode and are classified as long-term as they are supported by long-term irrevocable letters of credit.

(c)  These series were redeemed on May 8, 2007 as a result of the suspension of development of eight coal-fueled generation facilities.

(d)  Interest rate swapped to variable on entire principal amount at June 30, 2007.

(e)  Interest rates in effect at June 30, 2007.

**_Debt-related Activity in 2007._**   In May 2007, Texas Competitive Holdings redeemed at par the Sabine River Authority of Texas Series 2006A and 2006B pollution control revenue bonds with aggregate principal amounts of $47 million and $46 million, respectively, and the Trinity River Authority of Texas Series 2006 pollution control revenue bonds with an aggregate principal amount of $50 million. All three bond series were issued in conjunction with the development of eight coal-fueled generation plants, which has been suspended. Restricted cash retained upon issuance of the bonds was used to fund substantially all of the redemption amount.

In March 2007, Texas Competitive Holdings issued floating rate senior notes with an aggregate principal amount of $1.0 billion. The floating rate is based on LIBOR plus 50 basis points (subject to an increase of 25 basis points in the event of a further downgrade in Texas Competitive Holdings' credit rating). The notes mature in September 2008, but are subject to mandatory redemption upon a change in control of EFH Corp., including consummation of the Proposed Merger, and are subject to optional redemption on or after September 16, 2007.

F-14

EFIHMW00250346

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

**Notes to Condensed Consolidated Financial Statements—(Continued)**

*Fair Value Hedge.*   Energy Future Competitive Holdings uses fair value hedging strategies to manage its exposure to fixed interest rates on long-term debt. At June 30, 2007, $250 million of fixed rate debt had been effectively converted to variable rates through an interest rate swap transaction expiring in 2008. The swap qualified for and has been designated as a fair value hedge in accordance with SFAS 133 (under the short-cut method as the conditions for assuming no ineffectiveness are met).

*Long-term debt fair value adjustments*

|  | Six Months Ended June 30, 2007 |
|---|---|
| Long-term debt fair value adjustments related to interest rate swap at beginning of period—increase in debt carrying value | $10 |
| Fair value adjustments during the period | 2 |
| Recognition of net gains on settled fair value hedges(a) | (1) |
| Long-term debt fair value adjustments at end of period—increase in debt carrying value (net in-the-money value of swap) | $11 |

_____

(a)   Net value of settled in-the-money fixed-to-variable swaps recognized in net income when the hedged transactions are recognized. Amount is pretax.

Any changes in unsettled swap fair values of active positions reported as fair value adjustments to debt amounts are offset by changes in derivative assets and liabilities.

## 8. COMMITMENTS AND CONTINGENCIES

### Generation Development

*Generation Development Program.*   TXU DevCo is developing three lignite/coal-fueled generation units in Texas (two units at Oak Grove and one unit at Sandow). Energy Future Competitive Holdings or its subsidiaries have executed engineering, procurement and construction (EPC) agreements for the development of these units and orders for critical long lead-time equipment, including boilers, turbine generators and air quality control systems have been placed. Air permits for the three units have been obtained, and construction has commenced. See discussion below under "Litigation" regarding the Oak Grove permit.

Capital expenditures under these arrangements totaled approximately $1.0 billion as of June 30, 2007. If the agreements had been canceled as of that date, an additional estimated obligation of up to $340 million would have arisen. This estimated gross cancellation exposure of approximately $1.4 billion at June 30, 2007 excluded any recovery values related to the assets acquired and for owned assets that are intended to be utilized in the program. Construction work-in-process expenditures under these agreements are assets of TXU DevCo.

### Litigation

On December 1, 2006, a lawsuit was filed in the United States District Court for the Western District of Texas against TXU Generation Company LP, Oak Grove Management Company, LLC and EFH Corp. The complaint sought declaratory and injunctive relief, as well as the assessment of civil penalties, with respect to the permit application for the construction and operation of the Oak Grove

F-15

EFIHMW00250347

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

**Notes to Condensed Consolidated Financial Statements—(Continued)**

Steam Electric Station in Robertson County, Texas. The plaintiffs allege violations of the Federal Clean Air Act, Texas Health and Safety Code and Texas Administrative Code and sought to temporarily and permanently enjoin the construction and operation of the Oak Grove generation plant. The complaint also asserted that the permit application was deficient in failing to comply with various modeling and analyses requirements relative to the impact of emissions from the Oak Grove plant. Plaintiffs further requested that the District Court enter an order requiring the defendants to take other appropriate actions to remedy, mitigate and offset alleged harm to the public health and environment. EFH Corp. believes the Oak Grove air permit granted by the TCEQ on June 13, 2007 is protective of the environment and that the application for and the processing of the air permit by Oak Grove Management Company LLC with the TCEQ has been in accordance with applicable law. EFH Corp. and the other defendants filed a Motion to Dismiss the litigation, which was granted by the District Court on May 21, 2007. The Plaintiffs have appealed the District Court's dismissal of the case to the Fifth Circuit Court of Appeals. EFH Corp. believes the District Court properly granted the Motion to Dismiss and while EFH Corp. is unable to estimate any possible loss or predict the outcome of this litigation in the event the Fifth Circuit Court of Appeals reverses the District Court, EFH Corp. maintains that the claims made in the complaint are without merit. Accordingly, EFH Corp. intends to vigorously defend the appeal and this litigation in the event the Fifth Circuit reverses the District Court.

### Regulatory Investigations

In March 2007, the Commission issued a Notice of Violation (NOV) stating that the Commission Staff is recommending an enforcement action, including the assessment of administrative penalties, against EFH Corp. and certain affiliates for alleged market power abuse by its power generation affiliates and TXU Portfolio Management in ERCOT-administered balancing energy auctions during certain periods of the summer of 2005. The NOV is premised upon the Commission Staff's allegation that TXU Portfolio Management's bidding behavior was not competitive and increased market participants' costs of balancing energy by approximately $70 million, including approximately $20 million in incremental revenues to EFH Corp. The Commission Staff has recommended that TXU Portfolio Management and its affiliates be required to pay administrative penalties in the amount of $140 million and pay the $70 million in incremental costs purportedly incurred by market participants. A hearing requested by TXU Portfolio Management to contest the alleged occurrence of a violation and the amount of the penalty in the NOV has been scheduled to start in April 2008. EFH Corp. believes TXU Portfolio Management's conduct during the period in question was consistent with the Commission's rules and policies, and no market power abuse was committed. EFH Corp. is vigorously contesting the NOV. EFH Corp. is unable to predict the outcome of this matter.

EFH Corp. and TXU Portfolio Management have taken actions to reduce the risk of future similar allegations related to the balancing energy segment of the ERCOT wholesale market, including working with the Commission Staff and the Commission's independent market monitor to develop a voluntary mitigation plan for approval by the Commission. TXU Portfolio Management has submitted a voluntary mitigation plan that was approved by the Commission in July 2007.

As previously disclosed, the Commission Staff had been investigating TXU Energy Retail with respect to the renewal process for certain small and medium business customers on term service plans. The investigation did not involve residential customers. In June 2007, TXU Energy Retail reached a settlement agreement with the Staff of the Commission that was approved by the Commission in July 2007. While TXU Energy Retail expressly denies any violations of rules, it has agreed to pay the Commission a $5 million settlement as a compromise in this dispute.

Highly Confidential

EFIHMW00250348

**PX 006**

**Page 283 of 382**

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

**Notes to Condensed Consolidated Financial Statements—(Continued)**

### Other Proceedings

In addition to the above, Energy Future Competitive Holdings and its subsidiaries are involved in various other legal and administrative proceedings in the normal course of business the ultimate resolution of which, in the opinion of management, should not have a material effect on its financial position, results of operations or cash flows.

### Guarantees

**Overview.**   Energy Future Competitive Holdings has entered into contracts that contain guarantees to outside parties that could require performance or payment under certain conditions. Guarantees issued or modified after December 31, 2002 are subject to the recognition and initial measurement provisions of FIN 45, which requires a guarantor to recognize, at the inception of a guarantee, a liability for the fair value of the obligation undertaken in issuing the guarantee.

**Residual value guarantees in operating leases.**   Texas Competitive Holdings is the lessee under various operating leases that guarantee the residual values of the leased assets. At June 30, 2007, both the aggregate maximum amount of residual values guaranteed and the estimated residual recoveries totaled approximately $174 million. These leased assets consist primarily of mining equipment and rail cars. The average life of the lease portfolio is approximately four years.

### Letters of Credit

At June 30, 2007, Texas Competitive Holdings had outstanding letters of credit under its revolving credit facilities in the amount of $499 million to support risk management and trading margin requirements in the normal course of business, including over-the-counter hedging transactions, and $46 million for miscellaneous credit support requirements.

Texas Competitive Holdings has outstanding letters of credit under its revolving credit facilities totaling $455 million at June 30, 2007 to support existing floating rate pollution control revenue bond debt of $446 million principal amount. The letters of credit are available to fund the payment of such debt obligations and expire in 2009.

As of June 30, 2007, Texas Competitive Holdings had outstanding letters of credit under its revolving credit facilities totaling $77 million to support mining reclamation activities and certain collection agent activities performed for REPs in EFH Corp.'s historical service territory.

EFH Corp. and Texas Competitive Holdings have previously guaranteed the obligations under the lease agreement for EFH Corp.'s current headquarters building. These obligations include future undiscounted base rent payments. As a result of the March 2007 downgrade by S&P of Texas Competitive Holdings' credit rating to below investment grade, Texas Competitive Holdings has provided a $144 million letter of credit to replace EFH Corp.'s and its guarantees of these obligations.

### Security Interest

A first-lien security interest has been placed on the two lignite/coal-fueled generation units at Texas Competitive Holdings' Big Brown plant to support commodity hedging transactions entered into by TXU DevCo. The lien can be used to secure obligations related to current and future hedging transactions of TXU DevCo or its affiliates for up to an aggregate of 1.2 billion MMBtu of natural gas.

F-17

Highly Confidential

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

**Notes to Condensed Consolidated Financial Statements—(Continued)**

### 9. SHAREHOLDERS' EQUITY

**Common and Preferred Stock.**    No shares of Energy Future Competitive Holdings' common stock are held by or for its own account, nor are any shares of such capital stock reserved for its officers and employees or for options, warrants, conversions or other rights in connection therewith. The common stock amount included in shareholders' equity totaled $128 million and $101 million at June 30, 2007 and December 31, 2006, respectively. The preferred stock amount totaled $51 thousand at the end of both periods.

**Noncash contributions.**    Under SFAS 123R, expense related to EFH Corp.'s stock-based incentive compensation awards granted to Energy Future Competitive Holdings' employees is accounted for as a noncash capital contribution from EFH Corp. Accordingly, Energy Future Competitive Holdings recorded a credit of $3 million and $4 million to its common stock account for the six months ended June 30, 2007 and 2006, respectively.

The increase in the common stock amount in 2007 also reflects the excess tax benefit of $25 million arising from the distribution date value of the stock-based incentive awards exceeding the reported compensation expense.

**Dividends.**    During 2007, Energy Future Competitive Holdings declared and paid the following dividends to EFH Corp.:

| Declaration Date | Payment Date | Dividend Amount |
|---|---|---|
| July 1, 2007 | July 2, 2007 | $284 |
| April 1, 2007 | April 2, 2007 | $284 |
| January 1, 2007 | January 2, 2007 | $283 |

**Shareholders' Equity.**    The following table presents the changes in shareholders' equity for the six months ended June 30, 2007:

|  | Capital Accounts | Accumulated Other Comprehensive Income (Loss) | Total Shareholders' Equity |
|---|---|---|---|
| Balance at December 31, 2006 | $7,463 | $ 404 | $7,867 |
| Net income | 510 | — | 510 |
| Effect of adoption of FIN 48 | (41) | — | (41) |
| Distributions paid to parent | (567) | — | (567) |
| Effects of stock-based incentive compensation plans | 29 | — | 29 |
| Distribution of mineral interest companies from EFH Corp. | 3 | — | 3 |
| Net effects of cash flow hedges (net of tax) | — | (268) | (268) |
| Balance at June 30, 2007 | $7,397 | $ 136 | $7,533 |

F-18

Highly Confidential

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

**Notes to Condensed Consolidated Financial Statements—(Continued)**

### 10. COMMODITY AND OTHER DERIVATIVE CONTRACTUAL ASSETS AND LIABILITIES

The following table breaks down commodity and other derivative contractual assets and liabilities as presented in the balance sheet into the two major components:

| | June 30, 2007 | | | |
| --- | --- | --- | --- | --- |
| | Commodity contracts | Cash flow hedges and other derivatives | Netting adjustments(a) | Total |
| Assets: | | | | |
| Current assets | $ 243 | $347 | $(303) | $ 287 |
| Noncurrent assets | 121 | 58 | (28) | 151 |
| Total | $ 364 | $405 | $(331) | $ 438 |
| Liabilities: | | | | |
| Current liabilities | $ 694 | $ 14 | $(303) | $ 405 |
| Noncurrent liabilities | 277 | 9 | (28) | 258 |
| Total | $ 971 | $ 23 | $(331) | $ 663 |
| Net assets (liabilities) | $(607) | $382 | $ — | $(225) |

| | December 31, 2006 | | | |
| --- | --- | --- | --- | --- |
| | Commodity contracts | Cash flow hedges and other derivatives | Netting adjustments(a) | Total |
| Assets: | | | | |
| Current assets | $276 | $696 | $(24) | $ 948 |
| Noncurrent assets | 163 | 94 | (6) | 251 |
| Total | $439 | $790 | $(30) | $1,199 |
| Liabilities: | | | | |
| Current liabilities | $278 | $ 18 | $(24) | $ 272 |
| Noncurrent liabilities | 124 | 9 | (6) | 127 |
| Total | $402 | $ 27 | $(30) | $ 399 |
| Net assets (liabilities) | $ 37 | $763 | $ — | $ 800 |

_____
(a)    Represents the effects of netting assets and liabilities at the counterparty agreement level.

**Commodity Contract Assets and Liabilities.**    Commodity contract assets and liabilities primarily represent mark-to-market values of natural gas and electricity derivative instruments that have not been designated as cash flow hedges or "normal" purchases or sales under SFAS 133.

Current and noncurrent commodity contract assets are stated net of applicable credit (collection) and performance reserves totaling $10 million and $9 million at June 30, 2007 and December 31, 2006, respectively. Performance reserves are provided for direct, incremental costs to settle the contracts.

Commodity contract assets/liabilities at June 30, 2007 include "day one" losses of $30 million associated with contracts entered into in the first six months of 2007 at below market prices. Of this amount, $26 million is related to a natural gas-related option agreement entered into in the first quarter

F-19

EFIHMW00250351

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

**Notes to Condensed Consolidated Financial Statements—(Continued)**

of 2007 and intended to economically hedge exposure to future changes in electricity prices. The losses were recorded as a reduction of revenues, consistent with other mark-to-market gains and losses.

Commodity contract assets/liabilities at June 30, 2007 include a "day one" gain of $30 million associated with a long-term power purchase agreement entered into in the second quarter of 2007. The gain was recorded as an increase to revenues, consistent with other mark-to-market gains and losses.

**Cash Flow Hedge and Other Derivative Assets and Liabilities.** Cash flow hedge and other derivative assets and liabilities primarily represent mark-to-market values of commodity contracts that have been designated as cash flow hedges as well as interest rate swap agreements. The change in fair value of derivative assets and liabilities related to cash flow hedges are recorded as other comprehensive income or loss to the extent the hedges are effective; the ineffective portion of the change in fair value is included in net income. A portion of the interest rate swaps have been designated as fair value hedges and the change in fair value of such hedges are recorded as an increase or decrease in the carrying value of the debt (see Note 7); changes in fair value of other interest rate swaps are included in net income.

As previously disclosed, a significant portion of natural gas financial instruments entered into to hedge future changes in electricity prices had been designated and accounted for as cash flow hedges. In March 2007, these instruments were dedesignated as cash flow hedges as allowed under SFAS 133. Subsequent changes in the fair value of these instruments are being marked-to-market in net income.

A summary of cash flow hedge and other derivative assets and liabilities follows:

|  | June 30, 2007 | December 31, 2006 |
|---|---|---|
| Current and noncurrent assets: | | |
| Commodity-related cash flow hedges | $405 | $790 |
| Current and noncurrent liabilities: | | |
| Commodity-related cash flow hedges | $ 20 | $ 22 |
| Debt-related interest rate swap | 3 | 5 |
| Total | $ 23 | $ 27 |

**Other Cash Flow Hedge Information.** Energy Future Competitive Holdings experienced cash flow hedge ineffectiveness of $1 million in net losses and $57 million in net gains for the three and six month periods ended June 30, 2007, respectively. For the corresponding periods of 2006, the amounts were $147 million and $134 million in net gains, respectively. These amounts are pretax and are reported in revenues.

The net effect of recording unrealized mark-to-market gains and losses arising from hedge ineffectiveness (versus recording gains and losses upon settlement) includes the above amounts as well as the effect of reversing unrealized ineffectiveness gains and losses recorded in previous periods to offset realized gains and losses in the current period. Such net unrealized effect totaled $5 million in net losses and $37 million in net gains for the three and six month periods ended June 30, 2007, respectively, and $151 million and $150 million in net gains for the three and six month periods ended June 30, 2006, respectively.

F-20

Highly Confidential

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

**Notes to Condensed Consolidated Financial Statements—(Continued)**

As of June 30, 2007, commodity positions accounted for as cash flow hedges, which represent a small portion of economic hedge positions, reduce exposure to variability of future cash flows from future revenues or purchases through 2010.

Cash flow hedge amounts reported in the Condensed Statements of Consolidated Comprehensive Income exclude period net gains and losses associated with cash flow hedges settled within the periods presented. These amounts totaled $5 million and $16 million in after-tax net losses for the three and six month periods ended June 30, 2007, respectively, and $14 million and $18 million in after-tax net gains for the three and six month periods ended June 30, 2006, respectively.

Energy Future Competitive Holdings expects that $46 million of after-tax net gains related to cash flow hedges included in accumulated other comprehensive income will be reclassified into net income during the next twelve months as the related hedged transactions are settled and affect net income. Of this amount, $50 million in gains relate to commodity hedges and $4 million in losses relate to debt-related hedges.

### 11. PENSION AND OTHER POSTRETIREMENT EMPLOYEE BENEFITS (OPEB) COSTS

Subsidiaries of Energy Future Competitive Holdings are participating employers in the pension plan sponsored by EFH Corp. Subsidiaries of Energy Future Competitive Holdings' also participate with EFH Corp. and other subsidiaries of EFH Corp. to offer health care and life insurance benefits to eligible employees and their eligible dependents upon the retirement of such employees. The net allocated pension and OPEB costs applicable to Energy Future Competitive Holdings totaled $3 million and $4 million for the three months ended June 30, 2007 and 2006, respectively, and $10 million and $9 million for the six months ended June 30, 2007 and 2006, respectively.

The discount rate reflected in net pension and OPEB costs in 2007 is 5.90%. The expected rate of return on plan assets reflected in the 2007 cost amounts is 8.75% for the pension plan and 8.67% for the OPEB plan.

### 12. RELATED–PARTY TRANSACTIONS

The following represent the significant related-party transactions of Energy Future Competitive Holdings:

- Texas Competitive Holdings incurs electricity delivery fees charged by Oncor Electric Delivery. These fees totaled $232 million and $285 million for the three months ended June 30, 2007 and 2006, respectively, and $498 million and $554 million for the six months ended June 30, 2007 and 2006, respectively.

- Oncor Electric Delivery's bankruptcy-remote financing subsidiary has issued securitization bonds to recover generation-related regulatory assets through a transition surcharge to its customers. Oncor Electric Delivery's incremental income taxes related to the transition surcharges it collects are being reimbursed by Texas Competitive Holdings. Therefore, Energy Future Competitive Holdings' financial statements reflect a noninterest bearing note payable to Oncor Electric Delivery of $340 million ($33 million reported as current liabilities) at June 30, 2007 and $356 million ($33 million reported as current liabilities) at December 31, 2006.

- Texas Competitive Holdings reimburses Oncor Electric Delivery for interest expense on Oncor Electric Delivery's bankruptcy-remote financing subsidiary's securitization bonds. This interest

F-21

EFIHMW00250353

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

**Notes to Condensed Consolidated Financial Statements—(Continued)**

expense totaled $12 million and $13 million for the three months ended June 30, 2007 and 2006, respectively, and $25 million and $27 million for the six months ended June 30, 2007 and 2006, respectively.

- Current and noncurrent advances to parent totaled $4.3 billion at June 30, 2007 (all reported as current) and $4.0 billion at December 31, 2006 ($700 million reported as noncurrent). The average daily balances of the advances to parent totaled $4.1 billion and $2.5 billion during the three months ended June 30, 2007 and 2006, respectively. Interest income earned on the advances totaled $65 million and $33 million for the three months ended June 30, 2007 and 2006, respectively. The weighted average annual interest rates were 6.4% and 5.3% for the three months ended June 30, 2007 and 2006, respectively. The average daily balances of the advances to parent totaled $4.0 billion and $2.1 billion during the six months ended June 30, 2007 and 2006, respectively. Interest income earned on the advances totaled $123 million and $55 million for the six months ended June 30, 2007 and 2006, respectively. The weighted average annual interest rates were 6.1% and 5.2% for the six months ended June 30, 2007 and 2006, respectively.

- In December 2005, a subsidiary of Energy Future Competitive Holdings received a $1.5 billion note receivable from EFH Corp. in partial settlement of outstanding advances to parent. The note carries interest at a rate based on the weighted average cost of Energy Future Competitive Holdings' short-term borrowings. Interest income related to this note totaled $24 million and $19 million for the three months ended June 30, 2007 and 2006, respectively, and $46 million and $39 million for the six months ended June 30, 2007 and 2006, respectively.

- A EFH Corp. subsidiary charges subsidiaries of Energy Future Competitive Holdings for financial, accounting, environmental and other administrative services at cost. These costs, which are primarily reported in SG&A expenses, totaled $16 million and $15 million for the three months ended June 30, 2007 and 2006, respectively, and $29 million and $35 million for the six months ended June 30, 2007 and 2006, respectively.

- Under Texas regulatory provisions, the trust fund for decommissioning the Comanche Peak nuclear generation facility, reported in investments on Energy Future Competitive Holdings' balance sheet, is funded by a delivery fee surcharge billed to REPs by Oncor Electric Delivery and remitted to Texas Competitive Holdings, with the intent that the trust fund assets will be sufficient to fund the decommissioning liability, reported in noncurrent liabilities on Energy Future Competitive Holdings' balance sheet. Income and expenses associated with the trust fund and the decommissioning liability incurred by Energy Future Competitive Holdings are offset by a net change in the intercompany receivable/payable with Oncor Electric Delivery, which in turn results in a change in the net regulatory asset/liability. A regulatory liability totaling $26 million and $17 million at June 30, 2007 and December 31, 2006, respectively, reported on Oncor Electric Delivery's balance sheet represents the excess of the trust fund balance over the decommissioning liability.

- Texas Competitive Holdings has a 53.1% limited partnership interest, with a carrying value of $11 million and $14 million at June 30, 2007 and December 31, 2006, respectively, in a EFH Corp. subsidiary holding Capgemini-related assets. Equity losses related to this interest totaled $2 million for both the three months ended June 30, 2007 and 2006 and $3 million and $5 million for the six months ended June 30, 2007 and 2006, respectively. These losses primarily represent amortization of software assets held by the subsidiary. The equity losses are reported as other deductions.

F-22

EFIHMW00250354

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

**Notes to Condensed Consolidated Financial Statements—(Continued)**

- EFH Corp. files a consolidated federal income tax return, and federal income taxes are allocated to subsidiaries based on their respective taxable income or loss. As a result, Energy Future Competitive Holdings had an income tax payable to EFH Corp. of $24 million and $538 million as of June 30, 2007 and December 31, 2006, respectively.

- In the second quarter of 2006, Texas Competitive Holdings began charging TXU DevCo for employee services related to the development of generation facilities in Texas. These charges totaled $0.6 million and $0.7 million for the three months ended June 30, 2007 and 2006, respectively, and $1.4 million and $0.7 million for the six months ended June 30, 2007 and 2006, respectively. These charges are largely reflected as a reduction in Energy Future Competitive Holdings' SG&A expenses.

See Note 5 for information regarding the accounts receivable securitization program and related subordinated notes receivable from TXU Receivables Company and Note 9 for cash dividends paid to EFH Corp.

### 13. SUPPLEMENTARY FINANCIAL INFORMATION

#### Interest Expense and Related Charges

|  | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
|  | 2007 | 2006 | 2007 | 2006 |
| Interest | $115 | $90 | $208 | $176 |
| Amortization of discount and debt issuance costs | 4 | 2 | 6 | 3 |
| Interest capitalized in accordance with SFAS 34 | (7) | (8) | (16) | (12) |
| Total interest expense and related charges | $112 | $84 | $198 | $167 |

#### Restricted Cash

|  | Balance Sheet Classification | | | |
|---|---|---|---|---|
|  | At June 30, 2007 | | At December 31, 2006 | |
|  | Current Assets | Noncurrent Assets | Current Assets | Noncurrent Assets |
| Pollution control revenue bond funds held by trustee | $ 1 | $102 | $— | $241 |
| All other | — | — | 3 | — |
| Total restricted cash | $ 1 | $102 | $ 3 | $241 |

#### Inventories by Major Category

|  | June 30, 2007 | December 31, 2006 |
|---|---|---|
| Materials and supplies | $115 | $112 |
| Fuel stock | 97 | 94 |
| Natural gas in storage | 110 | 75 |
| Environmental energy credits and emission allowances | 35 | 25 |
| Total inventories | $357 | $306 |

F-23

EFIHMW00250355

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

**Notes to Condensed Consolidated Financial Statements—(Continued)**

*Investments*

| | June 30, 2007 | December 31, 2006 |
|---|---|---|
| Nuclear decommissioning trust | $474 | $447 |
| Assets related to employee benefit plans, principally employee savings programs | 51 | 51 |
| Land | 33 | 33 |
| Investment in affiliate holding Capgemini-related assets | 11 | 14 |
| Miscellaneous other | 2 | 1 |
| Total investments | $571 | $546 |

*Property, Plant and Equipment.*   As of June 30, 2007 and December 31, 2006, property, plant and equipment of $10.2 billion and $9.9 billion, respectively, is stated net of accumulated depreciation and amortization of $8.4 billion and $8.2 billion, respectively.

*Asset Retirement Obligations.*   These liabilities primarily relate to nuclear generation plant decommissioning, land reclamation related to lignite mining, removal of lignite/coal-fueled plant ash treatment facilities and generation plant asbestos removal and disposal costs. There is no earnings impact with respect to the recognition of the asset retirement costs for nuclear decommissioning, as all costs are recoverable through the regulatory process as part of Oncor Electric Delivery's rate setting.

The following table summarizes the changes to the asset retirement liability, reported in other noncurrent liabilities and deferred credits in the consolidated balance sheet, during the six months ended June 30, 2007:

| | |
|---|---|
| Asset retirement liability at December 31, 2006 | $585 |
| Additions: | |
| Accretion | 19 |
| Reductions: | |
| Mining reclamation cost adjustments | (2) |
| Mining reclamation payments | (13) |
| Asset retirement liability at June 30, 2007 | $589 |

*Intangible Assets.*   Intangible assets other than goodwill are comprised of the following:

| | As of June 30, 2007 | | | As of December 31, 2006 | | |
|---|---|---|---|---|---|---|
| | Gross Carrying Amount | Accumulated Amortization | Net | Gross Carrying Amount | Accumulated Amortization | Net |
| Intangible assets subject to amortization included in property, plant and equipment: | | | | | | |
| Capitalized software placed in service | $25 | $7 | $18 | $14 | $5 | $ 9 |
| Land easements | 2 | 1 | 1 | 2 | 1 | 1 |
| Total | $27 | $8 | $19 | $16 | $6 | $10 |

F-24

EFIHMW00250356

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

**Notes to Condensed Consolidated Financial Statements—(Continued)**

Aggregate amortization expense for intangible assets totaled $1 million and $0.7 million for the three months ended June 30, 2007 and 2006, respectively. Aggregate amortization expense for intangible assets totaled $2 million and $1 million for the six months ended June 30, 2007 and 2006, respectively. At June 30, 2007, the weighted average remaining useful lives of capitalized software and land easements were 6 years and 54 years, respectively. The estimated aggregate amortization expense for each of the five succeeding fiscal years from December 31, 2006 is as follows:

| Year | Amortization Expense |
|------|---------------------|
| 2007 | $6 |
| 2008 | 4 |
| 2009 | 2 |
| 2010 | 1 |
| 2011 | 1 |

Goodwill (net of accumulated amortization) as of June 30, 2007 and December 31, 2006 totaled $517 million.

### Supplemental Cash Flow Information

| | Six Months Ended June 30, | |
|---|---|---|
| | 2007 | 2006 |
| Cash payments (receipts) related to continuing operations: | | |
| Interest (net of amounts capitalized) | $182 | $ 172 |
| Income taxes | $888 | $(236) |
| Noncash investing and financing activities: | | |
| Noncash construction expenditures[a] | $ 28 | $  26 |
| Net transfer of property from TXU DevCo | $  7 | $  — |
| Noncash contribution of pension-related assets | $  — | $  (8) |
| Noncash contribution related to EFH Corp. stock-based compensation | $  4 | $  4 |

(a)   Represents end of period accruals.

### 14. MERGER RELATED TRANSACTIONS

*Overview*

On October 10, 2007, Energy Future Holdings Corp., a Texas corporation formerly known as TXU Corp., completed its Merger with Merger Sub, a wholly-owned subsidiary of Texas Energy Future Holdings Limited Partnership (Parent). As a result of the Merger, Energy Future Holdings Corp. became a wholly-owned subsidiary of Parent. Parent is controlled by investment funds affiliated with Kohlberg Kravis Roberts & Co. L.P., TPG Capital, L.P. and GS Capital Partners (collectively, the Sponsor Group).

The aggregate purchase price paid for all of the equity securities of TXU Corp. (on a fully-diluted basis) was approximately $32.4 billion, which purchase price was funded by the equity financing from the Sponsor Group and certain other investors and by the new credit facilities described below. These

F-25

EFIHMW00250357

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

**Notes to Condensed Consolidated Financial Statements—(Continued)**

new credit facilities also funded the repayment of existing credit facilities as discussed below. The purchase amount is exclusive of costs directly associated with the Merger, including legal, consulting and other professional service fees.

The Merger is being accounted for under the purchase method of accounting whereby the total cost of the transaction is being allocated to Energy Future Holdings Corp.'s identifiable tangible and intangible assets acquired and liabilities assumed based on their fair values, and the excess of the purchase price over the fair value of net assets acquired is recorded as goodwill. The allocation of the purchase price to the net assets of Energy Future Holdings Corp. and the resulting goodwill determination are not yet final. The allocation is expected to result in a significant amount of goodwill, an increase in the carrying value of property, plant and equipment and deferred income tax liabilities as well as new identifiable intangible assets and liabilities. Reported earnings in the future will reflect increases in interest, depreciation and amortization expenses.

### TCEH Senior Secured Facilities

*Overview*—In connection with the Merger, TCEH, as borrower, and Energy Future Competitive Holdings, have entered into a credit agreement, and related security and other agreements, with a group of lenders led by Citibank, N.A. that provides senior secured financing of up to $24.5 billion plus the amount of the TCEH Commodity Collateral Posting Facility (as defined below) (the TCEH Senior Secured Facilities), consisting of:

- a senior secured initial term loan facility (the TCEH Initial Term Loan Facility) in an aggregate principal amount of up to $16.45 billion (reduced by all amounts drawn under the TCEH Delayed Draw Facility discussed below);

- a senior secured delayed draw term loan facility in an aggregate principal amount of up to $4.1 billion (the TCEH Delayed Draw Term Loan Facility) of which $2.15 billion was drawn at the closing of the Merger;

- a senior secured letter of credit facility in an aggregate principal amount of up to $1.25 billion (the TCEH Letter of Credit Facility);

- a senior secured revolving credit facility in an aggregate principal amount of up to $2.7 billion (the TCEH Revolving Facility), which includes borrowing capacity available for letters of credit and for borrowings on same-day notice; and

- a senior secured cash posting credit facility (the TCEH Commodity Collateral Posting Facility) that is expected to fund the cash posting requirements for a significant portion of TCEH's long-term hedging program that is not otherwise secured by means of a first lien under the security arrangements described below. Such posting requirement totaled $378 million as of October 10, 2007.

*Interest Rates and Fees*—Loans under the TCEH Senior Secured Facilities (other than the TCEH Commodity Collateral Posting Facility) bear interest at per annum rates equal to, at TCEH's option, (i) adjusted LIBOR plus 3.50% or (ii) a base rate (the higher of (1) the prime rate of Citibank, N.A. and (2) the federal funds effective rate plus 0.50%) plus 2.50%. There is a margin adjustment mechanism in relation to term loans, revolving loans and letters of credit commencing after delivery of the financial statements for the first full fiscal quarter ending after October 10, 2007, under which the applicable margins may be reduced based on leverage ratio targets to be determined.

F-26

EFIHMW00250358

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

Notes to Condensed Consolidated Financial Statements—(Continued)

A commitment fee is payable quarterly in arrears and upon termination at a rate per annum equal to 0.50% of the average daily unused portion of the TCEH Revolving Facility. The commitment fee will be subject to reduction, commencing after delivery of the financial statements for the first full fiscal quarter ending after October 10, 2007, based on leverage ratio targets to be determined.

A commitment fee is payable quarterly in arrears and upon termination on the undrawn portion of the commitments in respect of the TCEH Delayed Draw Term Loan Facility at a rate per annum equal to, prior to the first anniversary of October 10, 2007, 1.25% per annum, and thereafter, 1.50% per annum.

Letter of credit fees under the TCEH Revolving Facility are payable quarterly in arrears and upon termination at a rate per annum equal to the spread over adjusted LIBOR under the TCEH Revolving Facility, less the issuing bank's fronting fee.

TCEH will pay a fixed quarterly maintenance fee through maturity for having procured the TCEH Commodity Collateral Posting Facility regardless of actual borrowings under the facility. In addition, TCEH will pay interest at LIBOR on actual borrowed amounts under the TCEH Commodity Collateral Posting Facility which will be offset by interest earned on collateral deposits to counterparties, thereby making this facility largely a fixed cost facility regardless of utilization.

**Guarantees and Security**—*Guarantee.* The TCEH Senior Secured Facilities are unconditionally guaranteed jointly and severally on a senior secured basis, by Energy Future Competitive Holdings, TCEH and each existing and subsequently acquired or organized direct or indirect wholly-owned U.S. restricted subsidiary of TCEH (other than certain immaterial subsidiaries and other subsidiaries to be agreed upon), subject to certain other exceptions.

*Security.* The TCEH Senior Secured Facilities, including the guarantees thereof and certain commodity and other hedging and trading transactions, are secured by (a) substantially all of the assets of Energy Future Competitive Holdings, TCEH and TCEH's subsidiaries who are guarantors of such facilities as described above, and (b) pledges of the capital stock of TCEH and each material wholly-owned restricted subsidiary of TCEH directly owned by TCEH or any guarantor (limited in the case of pledges of capital stock of any foreign subsidiaries, to 65% of the capital stock of any first-tier material foreign subsidiary).

**Covenants**—The TCEH Senior Secured Facilities contain customary negative covenants, restricting, subject to certain exceptions, Energy Future Competitive Holdings, TCEH and TCEH's restricted subsidiaries from, among other things:

- incurring additional debt;
- incurring additional liens;
- entering into mergers and consolidations;
- sales of assets;
- dividends, redemptions or other distributions in respect of capital stock;
- acquisitions, investments, loans and advances; and
- payments and modifications of certain subordinated and other material debt.

In addition, the TCEH Senior Secured Facilities require that Energy Future Competitive Holdings, TCEH and their restricted subsidiaries maintain a maximum secured leverage ratio beginning on September 30, 2008 of 7.25 to 1.00 and observe certain customary reporting requirements and other affirmative covenants.

F-27

EFIHMW00250359

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

Notes to Condensed Consolidated Financial Statements—(Continued)

*Maturity and Amortization*—The TCEH Initial Term Loan Facility is required to be repaid in equal quarterly installments beginning December 31, 2007 in an aggregate annual amount equal to 1% of the original principal amount of such facility, with the balance payable on October 10, 2014. The TCEH Delayed Draw Term Facility is required to be repaid in equal quarterly installments beginning on the last day of the first fiscal quarter to occur after October 10, 2009 in an aggregate annual amount equal to 1% of the actual principal outstanding under the TCEH Delayed Draw Term Loan Facility as of such date, with the balance payable on October 10, 2014. Amounts borrowed under the TCEH Revolving Facility may be reborrowed from time to time from and after the closing date until October 10, 2013. The TCEH Letter of Credit Facility will mature on October 10, 2014. The TCEH Commodity Collateral Posting Facility will mature on December 31, 2012.

*Events of Default*—The TCEH Senior Secured Facilities contain certain customary events of default for senior leveraged acquisition financings the occurrence of which would allow the lenders to accelerate all outstanding loans and terminate their commitments.

### Senior Unsecured Bridge Facility – TCEH

*Overview*—On October 10, 2007, Energy Future Competitive Holdings, TCEH and TCEH Finance, Inc, a Delaware corporation and wholly-owned subsidiary of TCEH (TCEH Finance and, together with TCEH, the Co-Borrowers), entered into senior unsecured credit facilities (TCEH Unsecured Bridge Facilities).

The TCEH Unsecured Bridge Facilities provide senior unsecured financing of $6.75 billion, consisting of a:

- $5.0 billion senior unsecured cash-pay term loan facility with a term of eight years (the TCEH Initial Cash-Pay Loans); and

- $1.75 billion senior unsecured toggle term loan facility with a term of nine years (the TCEH Initial Toggle Loans and, together with the TCEH Initial Cash-Pay Loans, the TCEH Initial Loans).

If any borrowings under the TCEH Unsecured Bridge Facilities remain outstanding on October 10, 2008, the lenders will have the option to exchange such TCEH Initial Loans for senior cash-pay notes (the TCEH Senior Cash-Pay Exchange Notes) or senior toggle notes (the TCEH Senior Toggle Exchange Notes and, together with the TCEH Senior Cash-Pay Exchange Notes, the TCEH Senior Exchange Notes), respectively, which the Co-Borrowers will issue under a senior indenture. The maturity date of any TCEH Initial Loans that are not exchanged for TCEH Senior Exchange Notes will automatically be extended to the October 10, 2015, in the case of the TCEH Initial Cash-Pay Loans and October 10, 2016 in the case of the TCEH Initial Toggle Loans. The TCEH Senior Cash-Pay Exchange Notes will mature on October 10, 2015, and the TCEH Senior Toggle Exchange Notes will mature on October 10, 2016. Holders of the TCEH Senior Exchange Notes will have registration rights.

*Interest Rate*—Subject to specified caps, borrowings under the TCEH Unsecured Bridge Facilities for the first six-month period from the closing of the TCEH Unsecured Bridge Facilities will bear interest at a rate equal to LIBOR plus (i) 325 basis points, in the case of the TCEH Initial Cash-Pay Loans and (ii) 350 basis points, in the case of the TCEH Initial Toggle Loans (in each case, the TCEH Initial Margin). Interest for the three-month period commencing at the end of the initial six-month period, subject to specified caps, shall be payable at prevailing LIBOR for the interest period

F-28

EFIHMW00250360

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

**Notes to Condensed Consolidated Financial Statements—(Continued)**

plus the TCEH Initial Margin plus 50 basis points. Thereafter, subject to specified caps, interest will be increased by an additional 25 basis points at the beginning of each three-month period subsequent to the initial nine-month period, for so long as the TCEH Initial Loans are outstanding. If issued, the interest rate on the TCEH Senior Exchange Notes will be the same as the interest rate borne by the TCEH Initial Loans; provided, that if any TCEH Senior Exchange Notes are transferred by the lender to a third-party purchaser, the interest rate on those notes will be fixed at the interest rate in effect on the transfer date.

*Prepayments and Redemptions*—The Co-Borrowers will be required to make an offer to repay loans under the TCEH Unsecured Bridge Facilities and, following October 10, 2008, repurchase TCEH Senior Exchange Notes with net proceeds from specified asset sales. In addition, after any payments required to be made to repay the TCEH Unsecured Bridge Facilities, the Co-Borrowers will be required to offer to repay loans and, if issued, to repurchase the TCEH Senior Exchange Notes upon the occurrence of a change of control. Until October 10, 2008, the Co-Borrowers will also be required to prepay outstanding TCEH Initial Loans with the net proceeds of any refinancing debt.

The Co-Borrowers may voluntarily repay outstanding TCEH Initial Loans, in whole or in part, at their option at any time upon three business days' prior notice, at par plus accrued and unpaid interest and subject to, in the case of TCEH Initial Loans based on LIBOR, customary "breakage" costs with respect to such LIBOR loans, other than customary "breakage" costs with respect to LIBOR loans. The Co-Borrowers may optionally redeem the TCEH Senior Exchange Notes other than fixed-rate exchange notes, if issued, in whole or in part, at any time at par plus accrued and unpaid interest to the redemption date, provided that it also optionally prepays any outstanding TCEH Initial Loans on a pro rata basis.

If any TCEH Senior Exchange Note is sold by a lender to a third-party purchaser, and the interest rate on such TCEH Senior Exchange Note becomes fixed, such TCEH Senior Exchange Note will be non-callable until October 10, 2011, in the case of the TCEH Senior Cash-Pay Exchange Notes, and until October 10, 2012, in the case of the TCEH Senior Toggle Exchange Notes, subject to equity clawback and make-whole provisions consistent with those applicable to the notes offered hereby, and will be callable thereafter at a specified premium. The premium will decline ratably on each yearly anniversary of the date of such sale to zero two years prior to the final maturity date, in the case of the TCEH Senior Cash-Pay Exchange Notes, and one year, in the case of the TCEH Senior Toggle Exchange Notes.

*Guarantee*—All obligations under the TCEH Unsecured Bridge Facilities and, if the TCEH Senior Exchange Notes are issued, the senior indenture, are jointly and severally guaranteed on a senior basis by Energy Future Competitive Holdings and each of TCEH's domestic subsidiaries that guarantees obligations under the TCEH Senior Secured Facilities.

*Certain Covenants and Events of Default*—The TCEH Unsecured Bridge Facilities and the senior indenture contain a number of covenants that, among other things, restrict, subject to certain exceptions, the Co-Borrowers' ability to:

- incur additional indebtedness;

- create liens;

- engage in mergers or consolidations;

F-29

EFIHMW00250361

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

Notes to Condensed Consolidated Financial Statements—(Continued)

- sell or transfer assets and subsidiary stock;

- pay dividends and distributions or repurchase their capital stock;

- make certain investments, loans or advances;

- prepay certain indebtedness;

- enter into agreements that restrict the payment of dividends by subsidiaries or the repayment of intercompany loans and advances; and

- engage in certain transactions with affiliates.

In addition, the TCEH Unsecured Bridge Facilities and the senior indenture impose certain requirements as to future subsidiary guarantors. The TCEH Unsecured Bridge Facilities and the senior indenture also contain certain customary affirmative covenants consistent with those in the TCEH Senior Secured Facilities, to the extent applicable, and certain customary events of default.

### Senior Unsecured Bridge Facility – Energy Future Holdings Corp.

**Overview**—On October 10, 2007, in connection with the Merger and the repayment of certain existing indebtedness, Energy Future Holdings Corp. entered into senior unsecured credit facilities (Energy Future Holdings Corp. Unsecured Bridge Facilities).

Energy Future Holdings Corp.'s Unsecured Bridge Facilities provide senior unsecured financing of $4.5 billion, consisting of a:

- $2.0 billion senior unsecured cash-pay term loan facility with a term of ten years (Energy Future Holdings Corp. Initial Cash-Pay Loans); and

- $2.5 billion senior unsecured toggle term loan facility with a term of ten years (Energy Future Holdings Corp. Initial Toggle Loans and, together with Energy Future Holdings Corp. Initial Cash-Pay Loans, Energy Future Holdings Corp. Initial Loans).

If any borrowings under Energy Future Holdings Corp. Unsecured Bridge Facilities remain outstanding on October 10, 2008, the lenders will have the option at any time or from time to time to exchange such Energy Future Holdings Corp. Initial Loans for senior cash-pay notes (Energy Future Holdings Corp. Senior Cash-Pay Exchange Notes) or senior toggle notes (Energy Future Holdings Corp. Senior Toggle Exchange Notes and, together with Energy Future Holdings Corp. Senior Cash-Pay Exchange Notes, Energy Future Holdings Corp. Senior Exchange Notes) that Energy Future Holdings Corp. will issue under a senior indenture. The maturity date of any Energy Future Holdings Corp. Initial Loans that are not exchanged for Energy Future Holdings Corp. Senior Exchange Notes will automatically be extended to October 10, 2017. Energy Future Holdings Corp. Senior Exchange Notes will also mature on October 10, 2017. Holders of Energy Future Holdings Corp. Senior Exchange Notes will have registration rights.

**Interest Rate**—Subject to specified caps, borrowings under Energy Future Holdings Corp. Unsecured Bridge Facilities for the first six-month period from the closing of the TCEH Senior Secured Facilities will bear interest at a rate equal to LIBOR plus (i) 400 basis points, in the case of Energy Future Holdings Corp. Initial Cash-Pay Loans and (ii) 425 basis points, in the case of Energy Future Holdings Corp. Initial Toggle Loans (in each case, Energy Future Holdings Corp. Initial Margin). Interest for the three-month period commencing at the end of the initial six-month period, subject to

F-30

EFIHMW00250362

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

**Notes to Condensed Consolidated Financial Statements—(Continued)**

specified caps, shall be payable at prevailing LIBOR for the interest period plus (A) Energy Future Holdings Corp. Initial Margin plus (B) 50 basis points. Thereafter, subject to specified caps, interest will be increased by an additional 25 basis points at the beginning of each three-month period subsequent to the initial nine-month period, for so long as Energy Future Holdings Corp. Initial Loans are outstanding. If issued, the interest rate on Energy Future Holdings Corp. Senior Exchange Notes will be the same as the interest rate borne by Energy Future Holdings Corp. Initial Loans; provided, that if any Energy Future Holdings Corp. Senior Exchange Notes are transferred by the lender to a third-party purchaser, the interest rate on those notes will be fixed at the interest rate in effect on the transfer date.

*Prepayments and Redemptions*—Energy Future Holdings Corp. will be required to make an offer to repay loans under Energy Future Holdings Corp. Unsecured Bridge Facilities and, following October 10, 2008, repurchase Energy Future Holdings Corp. Senior Exchange Notes with net proceeds from specified asset sales. In addition, after any payments required to be made to repay the TCEH Senior Secured Facilities, Energy Future Holdings Corp. will be required to offer to repay loans and, if issued, to repurchase Energy Future Holdings Corp. Senior Exchange Notes upon the occurrence of a change of control. Until October 10, 2008, Energy Future Holdings Corp. will also be required to prepay outstanding Energy Future Holdings Corp. Initial Loans with the net proceeds of any refinancing debt.

Energy Future Holdings Corp. may voluntarily repay outstanding Energy Future Holdings Corp. Initial Loans, in whole or in part, at its option at any time upon three business days' prior notice, at par plus accrued and unpaid interest and subject to, in the case of Energy Future Holdings Corp. Initial Loans based on LIBOR, customary "breakage" costs with respect to such LIBOR loans, other than customary "breakage" costs with respect to LIBOR loans. Energy Future Holdings Corp. may optionally redeem Energy Future Holdings Corp. Senior Exchange Notes other than fixed-rate exchange notes, if issued, in whole or in part, at any time at par plus accrued and unpaid interest to the redemption date, provided that it also optionally prepays any outstanding Energy Future Holdings Corp. Initial Loans on a pro rata basis.

If any Energy Future Holdings Corp. Senior Exchange Note is sold by a lender to a third-party purchaser, and the interest rate on such Energy Future Holdings Corp. Senior Exchange Note becomes fixed, such Energy Future Holdings Corp. Senior Exchange Note will be non-callable for the first four years from October 10, 2008, subject to equity clawback and make-whole provisions consistent with those applicable to the notes offered hereby, and will be callable thereafter at a specified premium. The premium will decline ratably on each yearly anniversary of the date of such sale to zero on October 10, 2015.

*Guarantee*—All obligations under Energy Future Holdings Corp. Unsecured Bridge Facilities and, if Energy Future Holdings Corp. Senior Exchange Notes are issued, the senior indenture are jointly and severally guaranteed on a senior unsecured basis by Intermediate Holding and Energy Future Competitive Holdings.

*Certain Covenants and Events of Default*—Energy Future Holdings Corp. Unsecured Bridge Facilities and the senior indenture contain a number of covenants that, among other things, restrict, subject to certain exceptions, Energy Future Holdings Corp.'s ability to:

- incur additional indebtedness;
- create liens;

F-31

EFIHMW00250363

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

**Notes to Condensed Consolidated Financial Statements—(Continued)**

- engage in mergers or consolidations;
- sell or transfer assets and subsidiary stock;
- pay dividends and distributions or repurchase its capital stock;
- make certain investments, loans or advances;
- prepay certain indebtedness;
- enter into agreements that restrict the payment of dividends by subsidiaries or the repayment of intercompany loans and advances; and
- engage in certain transactions with affiliates.

In addition, Energy Future Holdings Corp. Unsecured Bridge Facilities and the senior indenture impose certain requirements as to future subsidiary guarantors. Energy Future Holdings Corp. Unsecured Bridge Facilities and the senior indenture also contain certain customary affirmative covenants consistent with those in TCEH Senior Secured Facilities, to the extent applicable.

### Intercreditor Agreement

On October 10, 2007, in connection with the Merger, TCEH, Energy Future Competitive Holdings and the subsidiary guarantors under the TCEH Senior Secured Facilities entered into a Collateral Agency and Intercreditor Agreement (the Intercreditor Agreement) with Citibank, N.A., and four secured commodity hedge counterparties (Secured Commodity Hedge Counterparties).

The Intercreditor Agreement provides that the lien granted to the Secured Commodity Hedge Counterparties should rank pari passu with the lien granted to the secured parties under the TCEH Senior Secured Facilities on the collateral under the TCEH Senior Secured Facilities and the Secured Commodity Hedge Counterparties will be entitled to share, on a pro rata basis, in the proceeds of any liquidation of such collateral in connection with a foreclosure on such collateral in an amount provided in the TCEH Credit Agreement. The Intercreditor Agreement also provides that the Secured Commodity Hedge Counterparties will have voting rights with respect to any amendment or waiver of any provision of the Intercreditor Agreement that changes the priority of the Secured Commodity Hedge Counterparties' lien on such collateral relative to the priority of lien granted to the secured parties under the TCEH Senior Secured Facilities or the priority of payments to the Secured Commodity Hedge Counterparties upon a foreclosure and liquidation of such collateral relative to the priority of the lien granted to the secured parties under the TCEH Senior Secured Facilities.

### TXU Receivables Program

Also in connection with the Merger, the accounts receivable securitization program was amended. Concurrently, the financial institutions required that Oncor Electric Delivery repurchase all of the receivables it had previously sold to TXU Receivables Company totaling $113 million, which amount was refinanced by the Oncor Electric Delivery Revolving Facility.

### Contribution of Certain Assets and Liabilities of Luminant Development

In connection with the Merger, certain assets and liabilities of Luminant Development consisting primarily of Sandow 5 and Oak Grove and the hedging transactions related to the long term hedging program were contributed by Energy Future Holdings Corp. to a subsidiary of TCEH. Such contribution will be accounted for in a manner similar to a pooling of interests.

F-32

EFIHMW00250364

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

**Notes to Condensed Consolidated Financial Statements—(Continued)**

### Repayment of Existing Credit Facilities

On October 10, 2007, in connection with the Merger, TCEH and Oncor repaid in full all outstanding loans totaling $2.4 billion, together with interest and all other amounts due in connection with such repayment under the $6.5 billion of existing credit facilities. TCEH and Oncor also repaid floating rate senior notes with an aggregate principal amount of $1.0 billion and $800 million, respectively. (See Note 8).

### Management Agreement

On October 10, 2007, in connection with the Merger, Kohlberg Kravis Roberts & Co. L.P., TPG Capital, L.P., Goldman, Sachs & Co. and Lehman Brothers Inc. entered into a management agreement with Energy Future Holdings Corp. (the Management Agreement), pursuant to which affiliates of the investors will provide management, consulting, financial and other advisory services to Energy Future Holdings Corp. Pursuant to the Management Agreement, the Sponsor Group is entitled to receive an aggregate annual management fee of $35.0 million, which amount will increase 2% annually, and reimbursement of out-of-pocket expenses incurred in connection with the provision of services pursuant to the Management Agreement. The Management Agreement will continue in effect from year to year, unless terminated upon a change of control of Energy Future Holdings Corp. or in connection with an initial public offering of Energy Future Holdings Corp. or if the parties mutually agree to terminate the Management Agreement. Pursuant to the Management Agreement, the Sponsor Group is also entitled to receive aggregate transaction fees of $300 million in connection with certain services provided in connection with the Merger and related transactions. In addition, the Management Agreement provides that the Sponsor Group will be entitled to receive a fee equal to a percentage of the gross transaction value in connection with certain subsequent financing, acquisition, disposition, merger combination and change of control transactions, as well as a termination fee based on the net present value of future payment obligations under the Management Agreement in the event of an initial public offering or under certain other circumstances.

### Tender Offers and Consent Solicitations

On September 25, 2007, Energy Future Holdings Corp. commenced offers to purchase and consent solicitations with respect to $1.0 billion in aggregate principal amount of Energy Future Holdings Corp.'s outstanding 4.80 % Series O Senior Notes due 2009, $250.0 million in aggregate principal amount of TCEH's outstanding 6.125% Senior Notes due 2008 and $1.0 billion in aggregate principal amount of TCEH's outstanding 7.000% Senior Notes due 2013. On the closing date of the Merger, Energy Future Holdings Corp. purchased an aggregate of $995.7 million, $246.9 million and $994.9 million of these notes, respectively.

### 15. SUPPLEMENTAL GUARANTOR CONDENSED FINANCIAL INFORMATION

On October 10, 2007, Energy Future Holdings Corp., a Texas corporation formerly known as TXU Corp., completed its Merger with Merger Sub, a wholly-owned subsidiary of Texas Energy Future Holdings Limited Partnership (Parent). As a result of the Merger, Energy Future Holdings Corp. became a wholly-owned subsidiary of Parent.

The Merger is being accounted for under the purchase method of accounting whereby the total cost of the transaction is being allocated to Energy Future Holdings Corp.'s identifiable tangible and intangible assets acquired and liabilities assumed based on their fair values, and the excess of the purchase price over the fair value of net assets acquired is recorded as goodwill.

F-33

EFIHMW00250365

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

**Notes to Condensed Consolidated Financial Statements—(Continued)**

In connection with the Merger, Texas Competitive Holdings obtained approximately $24.5 billion of senior secured credit facilities. Also in connection with the Merger, Texas Competitive Holdings and Texas Competitive Holdings Finance Inc. (a 100% owned subsidiary of Texas Competitive Holdings) expect to co-issue $2.5 billion aggregate principal amount of senior unsecured Texas Competitive Holdings' cash pay notes due 2015 (the "Notes") to refinance a portion of Texas Competitive Holdings' Senior Unsecured Interim Facility obtained to finance the Merger. The senior secured credit facilities will be unconditionally guaranteed by substantially all of the 100% owned subsidiaries of Texas Competitive Holdings and by its parent company, Energy Future Competitive Holdings, (collectively the "Other Guarantors") on a secured basis. The Notes will be unconditionally guaranteed by the Guarantors on an unsecured basis. The guarantees issued by the Guarantors will be full and unconditional, joint and several guarantees of the senior secured credit facilities and the Notes. The secured guarantee will be senior to the Notes and the guarantee of the Notes. All other subsidiaries of Energy Future Competitive Holdings, either direct or indirect, will not guarantee the senior secured credit facilities or the Notes (collectively the "Non-Guarantors"). The debt agreements will restrict Energy Future Competitive Holdings' ability to pay dividends or make investments.

The following tables present the condensed consolidating statements of income of Energy Future Competitive Holdings (Parent), Texas Competitive Holdings (Issuer), the Guarantors and the Non-Guarantors for the three-month and six-month periods ended June 30, 2007 and 2006, the condensed consolidating statements of cash flows of Energy Future Competitive Holdings (Parent Guarantor), Texas Competitive Holdings (Issuer), the Guarantors and all the Non-Guarantors for the six-month periods ended June 30, 2007 and 2006 and the condensed consolidating balance sheets as of June 30, 2007 and December 31, 2006 of Energy Future Competitive Holdings (Parent Guarantor), Texas Competitive Holdings (Issuer), the Guarantors and the Non-Guarantors.

F-34

Highly Confidential

EFIHMW00250366

PX 006
Page 301 of 382

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

Notes to Condensed Consolidated Financial Statements—(Continued)

Condensed Consolidating Statements of Income
Three Months Ended June 30, 2007

| | Parent Guarantor | Issuer | Other Guarantors | Non-Guarantors | Eliminations | Consolidated |
|---|---|---|---|---|---|---|
| | Millions of Dollars | | | | | |
| Operating revenues................. | $ — | $1,889 | $120 | $ — | $(119) | $1,890 |
| Costs and expenses: | | | | | | |
| Fuel, purchased power costs and delivery fees.............. | — | 970 | 34 | — | (33) | 971 |
| Operating costs................. | — | 168 | 53 | — | (57) | 164 |
| Depreciation and amortization .... | — | 81 | — | — | — | 81 |
| Selling, general and administrative expenses..................... | — | 147 | 31 | — | (30) | 148 |
| Franchise and revenue-based taxes........................... | — | 27 | — | 1 | — | 28 |
| Other income ................... | — | — | (1) | (12) | — | (13) |
| Other deductions................ | — | 10 | — | — | (1) | 9 |
| Interest income................. | (65) | (85) | (1) | (6) | 58 | (99) |
| Interest expense and related charges ..................... | 60 | 108 | 2 | — | (58) | 112 |
| Total costs and expenses .... | (5) | 1,426 | 118 | (17) | (121) | 1,401 |
| Income before income taxes and equity in earnings of subsidiaries.......... | 5 | 463 | 2 | 17 | 2 | 489 |
| Income tax expense ................ | 2 | 124 | 1 | 7 | 1 | 135 |
| Equity in earnings of subsidiaries ..... | 351 | — | 1 | 4 | (356) | — |
| Net income ........................ | $354 | $ 339 | $ 2 | $ 14 | $(355) | $ 354 |

F-35

EFIHMW00250367

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

Notes to Condensed Consolidated Financial Statements—(Continued)

Condensed Consolidating Statements of Income
Three Months Ended June 30, 2006

| | Millions of Dollars | | | | | |
|---|---|---|---|---|---|---|
| | Parent Guarantor | Issuer | Other Guarantors | Non-Guarantors | Eliminations | Consolidated |
| Operating revenues.................. | $ — | $2,468 | $ 2 | $ — | $ (2) | $2,468 |
| Costs and expenses: | | | | | | |
| Fuel, purchased power costs and delivery fees.................. | — | 943 | — | — | — | 943 |
| Operating costs.................. | — | 152 | — | — | (3) | 149 |
| Depreciation and amortization .... | — | 84 | — | — | 1 | 85 |
| Selling, general and administrative expenses...................... | — | 121 | — | — | — | 121 |
| Franchise and revenue-based taxes........................... | — | 27 | — | 1 | — | 28 |
| Other income.................... | — | (1) | (2) | (12) | — | (15) |
| Other deductions................. | — | 205 | — | — | — | 205 |
| Interest income.................. | (51) | (45) | — | (5) | 44 | (57) |
| Interest expense and related charges ...................... | 29 | 102 | 2 | — | (49) | 84 |
| Total costs and expenses .... | (22) | 1,588 | — | (16) | (7) | 1,543 |
| Income before income taxes and equity in earnings of subsidiaries ......... | 22 | 880 | 2 | 16 | 5 | 925 |
| Income tax expense ................. | 6 | 337 | 1 | 13 | (1) | 356 |
| Equity in earnings of subsidiaries ..... | 553 | — | — | 6 | (559) | — |
| Net income ........................ | $569 | $ 543 | $ 1 | $ 9 | $(553) | $ 569 |

F-36

Highly Confidential

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

Notes to Condensed Consolidated Financial Statements—(Continued)

Condensed Consolidating Statements of Income
Six Months Ended June 30, 2007

| | Parent Guarantor | Issuer | Other Guarantors | Non-Guarantors | Eliminations | Consolidated |
|---|---|---|---|---|---|---|
| | | | Millions of Dollars | | | |
| Operating revenues. . . . . . . . . . . . . . . . . . | $  — | $3,411 | $270 | $  — | $(267) | $3,414 |
| Costs and expenses: | | | | | | |
| Fuel, purchased power costs and delivery fees . . . . . . . . . . . . . . . . . . . | — | 1,900 | 76 | — | (74) | $1,902 |
| Operating costs . . . . . . . . . . . . . . . . . . | — | 319 | 123 | — | (129) | $   313 |
| Depreciation and amortization . . . . . | — | 160 | 1 | — | — | $   161 |
| Selling, general and administrative expenses. . . . . . . . . . . . . . . . . . . . . . | — | 285 | 68 | — | (67) | $   286 |
| Franchise and revenue-based taxes. . . . . . . . . . . . . . . . . . . . . . . . . | — | 53 | — | 1 | — | $     54 |
| Other income . . . . . . . . . . . . . . . . . . . . | — | (9) | (1) | (24) | — | $    (34) |
| Other deductions . . . . . . . . . . . . . . . . . | — | 15 | (1) | — | — | $     14 |
| Interest income. . . . . . . . . . . . . . . . . . . | (125) | (162) | (2) | (11) | 111 | $  (189) |
| Interest expense and related charges . . . . . . . . . . . . . . . . . . . . . . . | 114 | 190 | 4 | — | (110) | $   198 |
| Total costs and expenses . . . . . | (11) | 2,751 | 268 | (34) | (269) | 2,705 |
| Income before income taxes and equity in earnings of subsidiaries  . . . . . . . . . | 11 | 660 | 2 | 34 | 2 | 709 |
| Income tax expense . . . . . . . . . . . . . . . . | 4 | 180 | 1 | 13 | 1 | $   199 |
| Equity in earnings of subsidiaries . . . . . . | 503 | — | 1 | 5 | (509) | $     — |
| Net income  . . . . . . . . . . . . . . . . . . . . . . . | $ 510 | $  480 | $   2 | $ 26 | $(508) | $   510 |

F-37

EFIHMW00250369

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

Notes to Condensed Consolidated Financial Statements—(Continued)

**Condensed Consolidating Statements of Income**
**Six Months Ended June 30, 2006**

| | Parent Guarantor | Issuer | Other Guarantors | Non-Guarantors | Eliminations | Consolidated |
|---|---|---|---|---|---|---|
| | | | Millions of Dollars | | | |
| Operating revenues................... | $ — | $4,478 | $ 5 | $ — | $ (5) | $4,478 |
| Costs and expenses: | | | | | | |
| Fuel, purchased power costs and delivery fees................... | — | 1,733 | — | — | — | 1,733 |
| Operating costs .................. | — | 307 | — | — | (7) | 300 |
| Depreciation and amortization ..... | — | 169 | 1 | — | — | 170 |
| Selling, general and administrative expenses...................... | — | 242 | — | — | 1 | 243 |
| Franchise and revenue-based taxes.......................... | — | 54 | — | — | 1 | 55 |
| Other income .................... | — | (1) | (4) | (23) | — | (28) |
| Other deductions ................. | — | 195 | 6 | — | — | 201 |
| Interest income................... | (89) | (76) | — | (9) | 74 | (100) |
| Interest expense and related charges ........................ | 47 | 202 | 3 | — | (85) | 167 |
| Total costs and expenses ..... | (42) | 2,825 | 6 | (32) | (16) | 2,741 |
| Income (loss) before income taxes and equity in earnings of subsidiaries..... | 42 | 1,653 | (1) | 32 | 11 | 1,737 |
| Income tax expense ................. | 13 | 590 | — | 19 | — | 622 |
| Equity in earnings of subsidiaries ...... | 1,086 | — | — | 11 | (1,097) | — |
| Net income (loss) ................... | $1,115 | $1,063 | $(1) | $ 24 | $(1,086) | $1,115 |

F-38

Highly Confidential

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

Notes to Condensed Consolidated Financial Statements—(Continued)

### Condensed Consolidating Statements of Cash Flows
### Six Months Ended June 30, 2007

| | Parent Guarantor | Issuer | Other Guarantors | Non-Guarantors | Eliminations | Consolidated |
|---|---|---|---|---|---|---|
| | | | Millions of Dollars | | | |
| Cash flows—operating activities: | | | | | | |
| Net income | $ 510 | $ 480 | $ 2 | $ 26 | $(508) | $ 510 |
| Adjustments to reconcile net income to cash provided by (used in) operating activities: | | | | | | |
| Equity in earnings of subsidiaries | (503) | — | (1) | (5) | 509 | — |
| Depreciation and amortization | — | 191 | — | — | — | 191 |
| Deferred income tax expense (benefit)—net | — | (219) | (3) | 8 | — | (214) |
| Net losses from unrealized mark-to-market valuations | — | 750 | — | — | 1 | 751 |
| Other, net | — | 43 | 3 | (24) | (1) | 21 |
| Net changes in operating assets and liabilities | 547 | (1,923) | 44 | 4 | (563) | (1,891) |
| Cash provided by (used in) operating activities | 554 | (678) | 45 | 9 | (562) | (632) |
| Cash flows—financing activities: | | | | | | |
| Issuances of long-term debt | — | 1,000 | — | — | — | 1,000 |
| Retirements/repurchases of long-term debt | (1) | (148) | (7) | — | (1) | (157) |
| Change in short term borrowings: | — | 1,377 | — | — | — | 1,377 |
| Cash dividends paid: | (567) | (567) | — | — | 567 | (567) |
| Change in advances—affiliates | — | — | (39) | — | 39 | — |
| Other, net | — | (24) | — | — | 1 | (23) |
| Cash provided by (used in) financing activities | (568) | 1,638 | (46) | — | 606 | 1,630 |
| Cash flows—investing activities: | | | | | | |
| Capital expenditures and nuclear fuel | — | (411) | — | — | — | (411) |
| Proceeds from sales of nuclear decommissioning trust fund securities | — | 104 | — | — | — | 104 |
| Investments in nuclear decommissioning trust fund securities | — | (111) | — | — | — | (111) |
| Change in advances—affiliates | 14 | (288) | — | (9) | (43) | (326) |
| Other, net | — | 143 | 1 | — | (1) | 143 |
| Cash provided by (used in) investing activities | 14 | (563) | 1 | (9) | (44) | (601) |
| Net change in cash and cash equivalents | — | 397 | — | — | — | 397 |
| Cash and cash equivalents—beginning balance | — | 7 | — | — | — | 7 |
| Cash and cash equivalents—ending balance | $ — | $ 404 | $ — | $ — | $ — | $ 404 |

F-39

Highly Confidential

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

Notes to Condensed Consolidated Financial Statements—(Continued)

**Condensed Consolidating Statements of Cash Flows**
**Six Months Ended June 30, 2006**

| | Parent Guarantor | Issuer | Other Guarantors | Non-Guarantors | Eliminations | Consolidated |
|---|---|---|---|---|---|---|
| | | | Millions of Dollars | | | |
| Cash flows—operating activities: | | | | | | |
| Net income (loss) | $ 1,115 | $ 1,063 | $  (1) | $ 24 | $(1,086) | $ 1,115 |
| Adjustments to reconcile net income (loss) to cash provided by (used in) operating activities: | | | | | | |
| Equity in earnings of subsidiaries | (1,086) | — | — | (11) | 1,097 | — |
| Depreciation and amortization | — | 202 | 1 | — | — | 203 |
| Deferred income tax expense—net | — | 74 | — | 9 | 9 | 92 |
| Impairments and other asset writedown charges | — | 201 | — | — | — | 201 |
| Net gains from unrealized mark-to-market valuations | — | (148) | — | — | — | (148) |
| Other, net | — | 43 | — | (23) | 5 | 25 |
| Net changes in operating assets and liabilities | 618 | 659 | (47) | 12 | (605) | 637 |
| Cash provided by (used in) operating activities | 647 | 2,094 | (47) | 11 | (580) | 2,125 |
| Cash flows—financing activities: | | | | | | |
| Issuances of long-term debt | — | 100 | — | — | — | 100 |
| Retirements/repurchases of long-term debt | (2) | (603) | (7) | — | — | (612) |
| Change in short term borrowings | — | 1,165 | — | — | — | 1,165 |
| Cash dividends paid | (286) | (572) | — | — | 572 | (286) |
| Change in advances—affiliates | — | — | 50 | — | (50) | — |
| Other, net | — | (36) | — | — | — | (36) |
| Cash provided by (used in) financing activities | (288) | 54 | 43 | — | 522 | 331 |
| Cash flows—investing activities: | | | | | | |
| Capital expenditures and nuclear fuel | — | (248) | — | — | — | (248) |
| Proceeds from sales of nuclear decommissioning trust fund securities | — | 144 | — | — | — | 144 |
| Investments in nuclear decommissioning trust fund securities | — | (151) | — | — | — | (151) |
| Change in advances—affiliates | (290) | (1,803) | 7 | (11) | 58 | (2,039) |
| Other, including transaction costs | (69) | (97) | (3) | — | — | (169) |
| Cash provided by (used in) investing activities | (359) | (2,155) | 4 | (11) | 58 | (2,463) |
| Net change in cash and cash equivalents | — | (7) | — | — | — | (7) |
| Cash and cash equivalents—beginning balance | — | 12 | — | — | — | 12 |
| Cash and cash equivalents—ending balance | $  — | $  5 | $  — | $  — | $  — | $  5 |

F-40

EFIHMW00250372

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

Notes to Condensed Consolidated Financial Statements—(Continued)

Condensed Consolidating Balance Sheets as of June 30, 2007

| | | | | Millions of Dollars | | |
|---|---|---|---|---|---|---|
| | Parent Guarantor | Issuer | Other Guarantors | Non-Guarantors | Eliminations | Consolidated |
| **ASSETS** | | | | | | |
| Current assets: | | | | | | |
| Cash and cash equivalents . . . . . . . . . . . . . . | $ — | $ 404 | $ — | $ — | $ — | $ 404 |
| Restricted cash . . . . . . . . . . . . . . . . . . . . . . . | — | 1 | — | — | — | 1 |
| Advances to parent . . . . . . . . . . . . . . . . . . . . | 570 | 3,406 | — | 370 | (7) | 4,339 |
| Trade accounts receivable—net . . . . . . . . . . | 1 | 831 | 1 | — | — | 833 |
| Income taxes receivable . . . . . . . . . . . . . . . . | — | — | 15 | — | (15) | — |
| Accounts receivable from affiliates . . . . . . . . | 146 | — | 43 | — | (189) | — |
| Notes receivable from parent . . . . . . . . . . . . | — | 1,500 | — | — | — | 1,500 |
| Inventories . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 357 | — | — | — | 357 |
| Commodity and other derivative contractual assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 287 | — | — | — | 287 |
| Accumulated deferred income taxes . . . . . . . | — | 599 | 2 | 1 | (1) | 601 |
| Margin deposits related to commodity positions . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 448 | — | — | — | 448 |
| Other current assets . . . . . . . . . . . . . . . . . . . | — | 83 | 2 | 3 | — | 88 |
| Total current assets . . . . . . . . . . . . . . . . | 717 | 7,916 | 63 | 374 | (212) | 8,858 |
| Restricted cash . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 102 | — | — | — | 102 |
| Investments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6,565 | 519 | 77 | 160 | (6,750) | 571 |
| Property, plant and equipment—net . . . . . . . . . . . | — | 10,133 | 35 | — | — | 10,168 |
| Notes receivable from affiliates . . . . . . . . . . . . . . | — | — | 38 | — | (38) | — |
| Goodwill . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 517 | — | — | — | 517 |
| Commodity and other derivative contractual assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 151 | — | — | — | 151 |
| Accumulated deferred income taxes . . . . . . . . . . | 390 | — | 53 | 118 | (561) | — |
| Other noncurrent assets . . . . . . . . . . . . . . . . . . . . | 8 | 159 | 4 | — | 105 | 276 |
| Total assets . . . . . . . . . . . . . . . . . . . . . . . | $7,680 | $19,497 | $270 | $652 | $(7,456) | $20,643 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | | | | | |
| Current liabilities: | | | | | | |
| Short-term borrowings . . . . . . . . . . . . . . . . . . | $ — | $ 2,195 | $ — | $ — | $ — | $ 2,195 |
| Advances from affiliates . . . . . . . . . . . . . . . . . | — | — | 7 | — | (7) | — |
| Long-term debt due currently . . . . . . . . . . . . | 17 | 257 | 11 | — | — | 285 |
| Trade accounts payable—nonaffiliates . . . . | — | 732 | 1 | — | — | 733 |
| Accounts payable to affiliates . . . . . . . . . . . | — | 341 | — | 2 | (190) | 153 |
| Notes payable to affiliates . . . . . . . . . . . . . . | — | 33 | — | — | 1 | 34 |
| Commodity and other derivative contractual liabilities . . . . . . . . . . . . . . . . . . . . . . . . . | — | 405 | — | — | — | 405 |
| Margin deposits related to commodity positions . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 35 | — | — | — | 35 |
| Accumulated deferred income taxes . . . . . . . | 6 | 100 | — | — | (16) | 90 |
| Other current liabilities . . . . . . . . . . . . . . . . . | 2 | 254 | 33 | 47 | — | 336 |
| Total current liabilities . . . . . . . . . . . . . . | 25 | 4,352 | 52 | 49 | (212) | 4,266 |
| Accumulated deferred income taxes . . . . . . . . . . | — | 2,932 | — | — | (561) | 2,371 |
| Investment tax credits . . . . . . . . . . . . . . . . . . . . . | — | 304 | — | — | — | 304 |
| Commodity and other derivative contractual liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 258 | — | — | — | 258 |
| Notes or other liabilities due affiliates . . . . . . . . . | — | 345 | — | — | (38) | 307 |
| Long-term debt, less amounts due currently . . . . | 122 | 3,631 | 71 | — | — | 3,824 |
| Other noncurrent liabilities and deferred credits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 1,414 | 39 | 223 | 104 | 1,780 |
| Total liabilities . . . . . . . . . . . . . . . . . . . . . | 147 | 13,236 | 162 | 272 | (707) | 13,110 |
| Shareholders' equity . . . . . . . . . . . . . . . . . | 7,533 | 6,261 | 108 | 380 | (6,749) | 7,533 |
| Total liabilities and shareholders' equity . . . . . . . . . . . . . . . . . . . . . . . . . . | $7,680 | $19,497 | $270 | $652 | $(7,456) | $20,643 |

F-41

Highly Confidential

EFIHMW00250373

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

Notes to Condensed Consolidated Financial Statements—(Continued)

Condensed Consolidating Balance Sheets as of December 31, 2006

Millions of Dollars

| | Parent Guarantor | Issuer | Other Guarantors | Non-Guarantors | Eliminations | Consolidated |
|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | |
| Current assets: | | | | | | |
| Cash and cash equivalents | $ — | $ 7 | $ — | $ — | $ — | $ 7 |
| Restricted cash | — | 3 | — | — | — | 3 |
| Advances to parent | 584 | 2,418 | — | 362 | (56) | 3,308 |
| Trade accounts receivable—net | 1 | 804 | 2 | — | (1) | 806 |
| Income taxes receivable | — | — | 11 | 2 | (13) | — |
| Accounts receivable from affiliates | 146 | — | 72 | — | (218) | — |
| Notes receivable from affiliates | — | 1,500 | — | — | — | 1,500 |
| Inventories | — | 306 | — | — | — | 306 |
| Commodity and other derivative contractual assets | — | 948 | — | — | — | 948 |
| Accumulated deferred income taxes | 5 | 189 | 2 | 1 | 1 | 198 |
| Margin deposits related to commodity positions | — | 7 | — | — | — | 7 |
| Other current assets | — | 84 | 2 | 2 | — | 88 |
| Total current assets | 736 | 6,266 | 89 | 367 | (287) | 7,171 |
| Restricted cash | — | 241 | — | — | — | 241 |
| Investments | 6,902 | 496 | 67 | 131 | (7,050) | 546 |
| Property, plant and equipment—net | — | 9,888 | 36 | — | — | 9,924 |
| Notes receivable from affiliates | 700 | 700 | 36 | — | (736) | 700 |
| Goodwill | — | 517 | — | — | — | 517 |
| Commodity and other derivative contractual assets | — | 251 | — | — | — | 251 |
| Accumulated deferred income taxes | 391 | — | 50 | 99 | (540) | — |
| Other noncurrent assets | — | 157 | 6 | — | 117 | 280 |
| Total assets | $8,729 | $18,516 | $284 | $597 | $(8,496) | $19,630 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | | | | | |
| Current liabilities: | | | | | | |
| Short-term borrowings | $ — | $ 818 | $ — | $ — | $ — | $ 818 |
| Advances from affiliates | — | — | 52 | — | (52) | — |
| Long-term debt due currently | 17 | 154 | 7 | — | — | 178 |
| Trade accounts payable—nonaffiliates | — | 802 | 1 | — | — | 803 |
| Accounts payable to affiliates | — | 346 | — | 6 | (221) | 131 |
| Notes payable to affiliates | — | 33 | — | — | — | 33 |
| Commodity and other derivative contractual liabilities | — | 272 | — | — | — | 272 |
| Margin deposits related to commodity positions | — | 681 | — | — | — | 681 |
| Accumulated deferred income taxes | 19 | 584 | 1 | — | (14) | 590 |
| Other current liabilities | 2 | 255 | 45 | 47 | 1 | 350 |
| Total current liabilities | 38 | 3,945 | 106 | 53 | (286) | 3,856 |
| Accumulated deferred income taxes | — | 3,237 | — | — | (540) | 2,697 |
| Investment tax credits | — | 311 | — | — | — | 311 |
| Commodity and other derivative contractual liabilities | — | 127 | — | — | — | 127 |
| Notes or other liabilities due affiliates | 700 | 359 | — | — | (736) | 323 |
| Long-term debt, less amounts due currently | 124 | 2,882 | 82 | — | — | 3,088 |
| Other noncurrent liabilities and deferred credits | — | 1,002 | 31 | 211 | 117 | 1,361 |
| Total liabilities | 862 | 11,863 | 219 | 264 | (1,445) | 11,763 |
| Shareholders' equity | 7,867 | 6,653 | 65 | 333 | (7,051) | 7,867 |
| Total liabilities and shareholders' equity | $8,729 | $18,516 | $284 | $597 | $(8,496) | $19,630 |

F-42

EFIHMW00250374

PX 006
Page 309 of 382

### INDEPENDENT AUDITORS' REPORT

To the Board of Directors and Shareholders of Energy Future Competitive Holdings Company:

We have audited the accompanying consolidated balance sheets of Energy Future Competitive Holdings Company (formerly TXU US Holdings Company) and subsidiaries (the "Company") as of December 31, 2006 and 2005, and the related statements of consolidated income, comprehensive income, cash flows and shareholders' equity for each of the three years in the period ended December 31, 2006. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards as established by the Auditing Standards Board (United States) and in accordance with the auditing standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of Energy Future Competitive Holdings Company and subsidiaries at December 31, 2006 and 2005, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2006, in conformity with accounting principles generally accepted in the United States of America.

As discussed in Note 21 to the Notes to Financial Statements, the Company changed its method of accounting for stock based compensation with the election to early adopt Statement of Financial Accounting Standards No. 123 (revised 2004) *Share-Based Payment,* effective October 1, 2004.

/s/ Deloitte & Touche LLP

Dallas, Texas
September 12, 2007

(October 16, 2007 as to Note 26)

F-43

EFIHMW00250375

PX 006
Page 310 of 382

### ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES
#### Statements of Consolidated Income

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2006 | 2005 | 2004 |
| | (millions of dollars) | | |
| Operating revenues | $9,607 | $10,660 | $9,201 |
| Costs and expenses: | | | |
| Fuel, purchased power costs and delivery fees | 3,929 | 4,261 | 3,743 |
| Operating costs | 604 | 1,424 | 1,433 |
| Depreciation and amortization | 334 | 759 | 739 |
| Selling, general and administrative expenses | 533 | 723 | 886 |
| Franchise and revenue-based taxes | 127 | 363 | 366 |
| Other income | (72) | (115) | (142) |
| Other deductions | 210 | 26 | 665 |
| Interest income | (252) | (95) | (38) |
| Interest expense and related charges | 335 | 616 | 595 |
| Total costs and expenses | 5,748 | 7,962 | 8,247 |
| Income from continuing operations before income taxes, extraordinary items and cumulative effect of changes in accounting principles | 3,859 | 2,698 | 954 |
| Income tax expense | 1,323 | 882 | 282 |
| Income from continuing operations before extraordinary items and cumulative effect of changes in accounting principles | 2,536 | 1,816 | 672 |
| Loss from discontinued operations, net of tax effect (Note 3) | — | (8) | (34) |
| Extraordinary gain (loss), net of tax effect (Note 4) | — | (50) | 16 |
| Cumulative effect of changes in accounting principles, net of tax effect (Note 5) | — | (8) | 6 |
| Net income | 2,536 | 1,750 | 660 |
| Preferred stock dividends | — | 3 | 2 |
| Net income available for common stock | $2,536 | $ 1,747 | $ 658 |

See Notes to Financial Statements.

F-44

Highly Confidential

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

**Statements of Consolidated Comprehensive Income**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2006 | 2005 | 2004 |
| | (millions of dollars) | | |
| Components related to continuing operations: | | | |
| Income from continuing operations before extraordinary items and cumulative effect of changes in accounting principles | $2,536 | $1,816 | $672 |
| Other comprehensive income (loss), net of tax effects | | | |
| Minimum pension liability adjustments (net of tax expense of $—, $7 and $2) | — | 12 | 3 |
| Cash flow hedges: | | | |
| Net change in fair value of derivatives held at end of period (net of tax (expense) benefit of $(256), $24 and $40) | 476 | (47) | (75) |
| Derivatives value net (gains) losses reported in net income that relate to hedged transactions recognized in the period (net of tax (expense) benefit of $(9), $38 and $15) | (16) | 71 | 29 |
| Total effect of cash flow hedges | 460 | 24 | (46) |
| Total adjustments to net income from continuing operations | 460 | 36 | (43) |
| Comprehensive income from continuing operations | 2,996 | 1,852 | 629 |
| Comprehensive loss from discontinued operations | — | (8) | (34) |
| Extraordinary gain (loss), net of tax effect | — | (50) | 16 |
| Cumulative effect of changes in accounting principles, net of tax effect | — | (8) | 6 |
| Comprehensive income | $2,996 | $1,786 | $617 |

See Notes to Financial Statements.

F-45

Highly Confidential

EFIHMW00250377

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

**Statements of Consolidated Cash Flows**

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 2006 | 2005 | 2004 |
|  | (millions of dollars) | | |
| Cash flows—operating activities: | | | |
| Net income | $2,536 | $1,750 | $ 660 |
| Loss from discontinued operations, net of tax effect | — | 8 | 34 |
| Extraordinary (gain) loss, net of tax effect | — | 50 | (16) |
| Cumulative effect of changes in accounting principles, net of tax effect | — | 8 | (6) |
| Income from continuing operations before extraordinary items and cumulative effect of changes in accounting principles | 2,536 | 1,816 | 672 |
| Adjustments to reconcile income from continuing operations to cash provided by operating activities: | | | |
| Depreciation and amortization | 400 | 819 | 804 |
| Deferred income taxes and investment tax credits—net | 161 | 643 | (127) |
| Net effect of unrealized mark-to-market valuations—(gains) losses | (330) | 18 | 109 |
| Impairment of natural gas-fired generation plants | 198 | — | — |
| Customer appreciation bonus charge (net of amounts credited to customers in 2006) | 122 | — | — |
| Bad debt expense | 67 | 56 | 90 |
| Net gain on sale of assets | (67) | (90) | (135) |
| Recognition of losses on dedesignated cash flow hedges | 10 | 11 | 11 |
| Net equity loss from unconsolidated affiliates | 10 | 10 | 7 |
| Stock-based incentive compensation expense | 9 | 19 | 33 |
| Charge related to coal contract counterparty claim | — | 12 | — |
| Charge (credit) related to impaired leases | (2) | (16) | 180 |
| Inventory write-off related to natural gas-fueled generation plants | 3 | — | — |
| Asset writedown charges | — | 11 | 193 |
| Change in regulatory-related liabilities | — | (81) | (70) |
| Changes in operating assets and liabilities: | | | |
| Affiliate accounts receivable/payable—net | (43) | 14 | (22) |
| Accounts receivable—trade | 348 | (329) | (227) |
| Impact of sale of accounts receivable program | (41) | 197 | (73) |
| Inventories | 1 | (56) | 16 |
| Accounts payable—trade | (213) | (34) | 220 |
| Margin deposits—net | 564 | 61 | 34 |
| Commodity contract assets and liabilities—net | — | 76 | (5) |
| Other—net assets | (152) | (499) | 7 |
| Other—net liabilities | 1,173 | (78) | 121 |
| Cash provided by operating activities of continuing operations | 4,754 | 2,580 | 1,838 |

F-46

Highly Confidential

EFIHMW00250378

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

**Statements of Consolidated Cash Flows (Continued)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2006 | 2005 | 2004 |
| | (millions of dollars) | | |
| Cash flows—financing activities: | | | |
| Issuances of long-term debt | 243 | 180 | 1,590 |
| Retirements/repurchases of securities: | | | |
| Long-term debt | (676) | (258) | (1,280) |
| Preferred stock | — | (38) | — |
| Change in short-term borrowings: | | | |
| Commercial paper | 317 | 358 | — |
| Banks | (245) | 230 | 210 |
| Decrease in income tax-related note payable to Oncor Electric Delivery | (40) | — | — |
| Net changes in advances to affiliate | — | — | (478) |
| Distributions paid to parent | (858) | (525) | (775) |
| Preferred stock dividends paid | — | (3) | (2) |
| Excess tax benefit on stock-based incentive compensation | 11 | 16 | — |
| Debt premium, discount, financing and reacquisition expenses | (17) | (21) | (37) |
| Cash used in financing activities of continuing operations | (1,265) | (61) | (772) |
| | | | |
| Cash flows—investing activities: | | | |
| Advances to affiliates | (2,470) | (1,531) | (1,277) |
| Capital expenditures | (388) | (1,042) | (881) |
| Nuclear fuel | (117) | (57) | (87) |
| Equipment purchases on behalf of TXU DevCo | (208) | — | — |
| Proceeds from sale of assets and businesses | 17 | 70 | 530 |
| Purchase of lease trust | (69) | — | — |
| Proceeds from pollution control revenue bonds deposited with trustee | (240) | — | — |
| Proceeds from sales of nuclear decommissioning trust fund securities | 207 | 191 | 88 |
| Investments in nuclear decommissioning trust fund securities | (223) | (206) | (103) |
| Costs to remove retired property | — | (44) | (40) |
| Other | (3) | 47 | (6) |
| Cash used in investing activities of continuing operations | (3,494) | (2,572) | (1,776) |
| | | | |
| Discontinued operations: | | | |
| Cash used in operating activities | — | (5) | (28) |
| Cash used in financing activities | — | — | — |
| Cash provided by investing activities | — | — | 2 |
| Cash used in discontinued operations | — | (5) | (26) |
| Net change in cash and cash equivalents | (5) | (58) | (736) |
| Cash and cash equivalents—beginning balance | 12 | 70 | 806 |
| Cash and cash equivalents—ending balance | $ 7 | $ 12 | $ 70 |

See Notes to Financial Statements.

F-47

Highly Confidential

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

**Consolidated Balance Sheets**

| | December 31, | |
|---|---|---|
| | 2006 | 2005 |
| | (millions of dollars) | |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 7 | $ 12 |
| Restricted cash | 3 | 8 |
| Trade accounts receivable—net (Note 12) | 806 | 1,179 |
| Advances to affiliates | 3,308 | 1,330 |
| Note receivable from parent | 1,500 | 1,500 |
| Income taxes receivable from parent | — | 348 |
| Inventories | 306 | 309 |
| Commodity contract assets (Note 17) | 276 | 1,603 |
| Cash flow hedge and other derivative assets (Note 18) | 696 | 63 |
| Accumulated deferred income taxes (Note 10) | 197 | 174 |
| Margin deposits related to commodity positions | 7 | 247 |
| Other current assets | 89 | 78 |
| Total current assets | 7,195 | 6,851 |
| Restricted cash | 241 | — |
| Investments | 546 | 502 |
| Advances to parent | 700 | — |
| Property, plant and equipment—net | 9,924 | 9,994 |
| Goodwill | 517 | 517 |
| Commodity contract assets (Note 17) | 163 | 338 |
| Cash flow hedge and other derivative assets (Note 18) | 94 | 68 |
| Other noncurrent assets | 280 | 181 |
| Total assets | $19,660 | $18,451 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Short-term borrowings (Note 13) | $ 818 | $ 746 |
| Long-term debt due currently (Note 14) | 178 | 414 |
| Trade accounts payable—nonaffiliates | 803 | 879 |
| Trade accounts and other payables to affiliates | 164 | 213 |
| Commodity contract liabilities (Note 17) | 278 | 1,481 |
| Cash flow hedge and other derivative liabilities (Note 18) | 18 | 260 |
| Margin deposits related to commodity positions | 681 | 357 |
| Accrued income taxes payable to parent | 538 | — |
| Accrued taxes other than income | 52 | 49 |
| Other current liabilities | 350 | 541 |
| Total current liabilities | 3,880 | 4,940 |
| Accumulated deferred income taxes (Note 10) | 2,697 | 2,247 |
| Investment tax credits | 311 | 326 |
| Commodity contract liabilities (Note 17) | 124 | 516 |
| Cash flow hedge and other derivative liabilities (Note 18) | 9 | 44 |
| Notes or other liabilities due affiliates | 323 | 362 |
| Other noncurrent liabilities and deferred credits | 1,361 | 1,092 |
| Long-term debt, less amounts due currently (Note 14) | 3,088 | 3,284 |
| Total liabilities | 11,793 | 12,811 |
| Commitments and contingencies (Note 15) | | |
| Shareholders' equity (Note 16) | 7,867 | 5,640 |
| Total liabilities and membership interests | $19,660 | $18,451 |

See Notes to Financial Statements.

F-48

EFIHMW00250380

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

**Statements of Consolidated Shareholders' Equity**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2006 | 2005 | 2004 |
| | (millions of dollars) | | |
| Preferred stock—not subject to mandatory redemption: | | | |
| Balance at beginning of year | $   — | $   38 | $   38 |
| Preferred stock repurchased and retired | — | (38) | — |
| Balance at end of year (2006 and 2005—788 shares and 2004—379,231 shares) | — | — | 38 |
| Class A common stock without par value—authorized shares—9,000,000 | | | |
| Balance at beginning of year | 4 | 140 | 102 |
| Distribution of assets and liabilities of Oncor Electric Delivery Company to EFH Corp. | — | (148) | — |
| Capital contribution from EFH Corp. related to exchangeable preferred membership interests of Texas Competitive Holdings | — | 45 | — |
| Capital contribution from EFH Corp. related to property assets | — | 1 | — |
| Effects of stock-based incentive compensation plans | 1 | 2 | 38 |
| Effects of allocation of SFAS 158 transition adjustment | 3 | — | — |
| Transfer of equity to Class B common stock | — | (36) | — |
| Balance at end of year (shares outstanding 2006, 2005 and 2004—2,062,768) | 8 | 4 | 140 |
| Class B common stock without par value—authorized shares—171,000,000 | | | |
| Balance at beginning of year | 73 | 1,949 | 1,949 |
| Distribution of assets and liabilities of Oncor Electric Delivery Company to EFH Corp. | — | (2,807) | — |
| Capital contribution from EFH Corp. related to exchangeable preferred membership interests of Texas Competitive Holdings | — | 843 | — |
| Capital contribution from EFH Corp. related to property assets | — | 18 | — |
| Effects of stock-based incentive compensation plans | 20 | 34 | — |
| Effects of allocation of SFAS 158 transition adjustment | 62 | — | — |
| Transfer of accumulated deferred income taxes | 2 | — | — |
| TXU Fuel Co LLC equity adjustment | 1 | — | — |
| Transfer of equity from Class A common stock | — | 36 | — |
| Balance at end of year (shares outstanding 2006, 2005 and 2004—39,192,594) | 158 | 73 | 1,949 |
| Retained earnings: | | | |
| Balance at beginning of year | 5,684 | 4,462 | 4,366 |
| Net income | 2,536 | 1,750 | 660 |
| Dividends declared on common stock | (858) | (525) | (562) |
| Dividends declared on preferred stock | — | (3) | (2) |
| Balance at end of year | 7,362 | 5,684 | 4,462 |

F-49

EFIHMW00250381

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

**Statements of Consolidated Shareholders' Equity (Continued)**

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 2006 | 2005 | 2004 |
|  | (millions of dollars) | | |
| Accumulated other comprehensive gain (loss), net of tax effects: | | | |
| Pension and other postretirement employee benefit liability adjustments: | | | |
| Balance at beginning of year....................................... | — | (12) | (15) |
| Change during the year....................................... | — | 12 | 3 |
| Balance at end of year .......................................... | — | — | (12) |
| Amounts related to cash flow hedges: | | | |
| Balance at beginning of year....................................... | (121) | (166) | (120) |
| Change during the year....................................... | 460 | 25 | (46) |
| Distribution of assets and liabilities of Oncor Electric Delivery Company to EFH Corp. ...................................... | — | 20 | — |
| Balance at end of year .......................................... | 339 | (121) | (166) |
| Total accumulated other comprehensive gain (loss) at end of year......... | 339 | (121) | (178) |
| Total common stock equity ......................................... | 7,867 | 5,640 | 6,373 |
| Shareholders' equity ................................................. | $7,867 | $5,640 | $6,411 |

See Notes to Financial Statements.

F-50

EFIHMW00250382

PX 006
Page 317 of 382

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

**Notes to Financial Statements**

## 1. SIGNIFICANT ACCOUNTING POLICIES

*Description of Business.*   Energy Future Competitive Holdings Company (Energy Future Competitive Holdings) is a wholly-owned subsidiary of EFH Corp. and is a holding company that as of January 1, 2006 conducts its operations principally through its Texas Competitive Electric Holdings Company LLC (Texas Competitive Holdings) subsidiary. Texas Competitive Holdings is a holding company whose subsidiaries are engaged in competitive market activities consisting of electricity generation, retail electricity sales to residential and business customers, wholesale energy sales and purchases as well as commodity risk management and trading activities, all largely in Texas. Energy Future Competitive Holdings is managed as an integrated business; therefore, there are no reportable business segments for the 2006 reporting period.

In December 2005, Energy Future Competitive Holdings distributed the assets and liabilities of its Oncor Electric Delivery subsidiary, which is engaged in regulated electricity transmission and distribution operations, to EFH Corp. in the form of a dividend of capital (see Note 2). For the 2005 and 2004 reporting periods, Energy Future Competitive Holdings had two reportable business segments, Texas Competitive Holdings and Oncor Electric Delivery. (See Note 24 for further information concerning reportable business segments.)

On February 25, 2007, EFH Corp. entered into the Merger Agreement with Merger Sub Parent and Merger Sub, whereby EFH Corp. would merge with Merger Sub and EFH Corp. would become a wholly-owned subsidiary of Merger Sub Parent. Merger Sub Parent and Merger Sub are entities directly and indirectly owned by a private investment group consisting of entities advised by or affiliated with Kohlberg Kravis Roberts & Co. and Texas Pacific Group (Sponsors). See Note 26.

*Basis of Presentation.*   The consolidated financial statements of Energy Future Competitive Holdings have been prepared in accordance with accounting principles generally accepted in the US and except for the effect of the Oncor Electric Delivery transaction discussed above and the reporting of wholesale electricity trading activities and ERCOT electricity balancing transactions as discussed below under "Revenue Recognition", on the same basis as the audited financial statements included in the 2004 Form 10-K. As discussed below, certain reclassifications have been made to conform prior period data to current period presentation. All intercompany items and transactions have been eliminated in consolidation. All dollar amounts in the financial statements and tables in the notes are stated in millions of US dollars unless otherwise indicated.

Commodity contract and derivative assets and liabilities and margin deposits reported in the consolidated balance sheet each reflect counterparty netting in accordance with legal right of offset agreements.

*Discontinued Businesses.*   Note 3 presents detailed information regarding the effects of discontinued businesses, the results of which have been classified as discontinued operations.

*Use of Estimates.*   Preparation of Energy Future Competitive Holdings' financial statements requires management to make estimates and assumptions about future events that affect the reporting of assets and liabilities at the balance sheet dates and the reported amounts of revenue and expense, including mark-to-market valuation adjustments. In the event estimates and/or assumptions prove to be different from actual amounts, adjustments are made in subsequent periods to reflect more current information. No material adjustments, other than those disclosed elsewhere herein, were made to previous estimates or assumptions during the current year.

F-51

EFIHMW00250383

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

Notes to Financial Statements—(Continued)

***Derivative Instruments and Mark-to-Market Accounting.***   Energy Future Competitive Holdings enters into contracts for the purchase and sale of electricity, natural gas and other commodities and also enters into other derivative instruments such as options, swaps, futures and forwards primarily to manage commodity price risks. Subsidiaries of Energy Future Competitive Holdings also enter into financial instruments to manage interest rate risks. If the instrument meets the definition of a derivative under SFAS 133, changes in the fair value of the derivative are recognized in net income as unrealized gains and losses, unless the criteria for certain exceptions are met, and an offsetting derivative asset or liability is recorded in the balance sheet. This recognition is referred to as "mark-to-market" accounting. The fair values of unsettled commodity-related derivative instruments under mark-to-market accounting are reported in the balance sheet as commodity contract assets or liabilities. When derivative instruments are settled and realized gains and losses are recorded, the previously recorded unrealized gains and losses and derivative assets and liabilities are reversed. Under the exception criteria of SFAS 133, "normal" purchase and sale exemptions may be elected; further, derivatives may be designated as a cash flow or fair value hedge. A derivative contract may be designated as a "normal" purchase or sale if the intent is to physically receive or deliver the product for use or sale in the normal course of business. If designated as normal, the derivative contract is accounted for under the accrual method of accounting (not marked-to-market).

Because derivative instruments are frequently used as economic hedges, SFAS 133 allows the designation of these hedges as cash flow or fair value hedges provided certain conditions are met. A cash flow hedge mitigates the risk associated with variable future cash flows (e.g., a forecasted sale of electricity in the future at market prices), while a fair value hedge mitigates risk associated with fixed future cash flows (e.g., debt with fixed interest rate payments). In accounting for changes in value of cash flow hedges, derivative assets and liabilities are recorded on the balance sheet with an offset to other comprehensive income or loss to the extent the hedges are effective and the hedged transaction remains probable of occurring. If the hedged transaction is no longer probable of occurring, hedge accounting is discontinued. Amounts recorded in other comprehensive income are reclassified into net income as the related hedged transactions settle and affect earnings. If the hedged transaction becomes probable of not occurring, the amount recorded in other comprehensive income is immediately reclassified to net income. Changes in value of fair value hedges are recorded as derivative assets or liabilities with an offset to net income, and the carrying value of the related asset or liability (hedged item) is adjusted for the change in fair value with an offset to net income. If the fair value hedge is settled prior to the maturity of the hedged item, the cumulative fair value gain or loss is amortized into income over the remaining life of the hedged item. In the statement of cash flows, the effects of settlements of derivative instruments are classified consistent with the related hedged transactions.

To qualify for hedge accounting, a hedge must be considered highly effective in offsetting changes in fair value of the hedged item. Assessment of the hedge's effectiveness is tested at least quarterly throughout its term to continue to qualify for hedge accounting. Changes in fair value that represent hedge ineffectiveness, even if the hedge continues to be assessed as effective, are immediately recognized in net income. Ineffectiveness is generally measured as the cumulative excess, if any, of the change in value of the hedging instrument over the change in value of the hedged item. The "short-cut" method under SFAS 133 allows entities to assume no hedge ineffectiveness in a hedging relationship of interest rate risk if certain conditions are met. If all short-cut conditions are met, then the hedge results in no ineffectiveness gains and losses, as the hedge is considered 100% effective, and no future effectiveness testing is required. See Notes 14, 17 and 18 for additional details concerning hedging activity.

F-52

EFIHMW00250384

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

Notes to Financial Statements—(Continued)

**Revenue Recognition.**    Energy Future Competitive Holdings records revenue from electricity sales under the accrual method of accounting. Revenues are recognized when electricity is provided to customers on the basis of periodic cycle meter readings and include an estimated accrual for the revenues earned from the meter reading date to the end of the period (unbilled revenue).

Under a realignment of Energy Future Competitive Holdings' wholesale energy operations effective January 1, 2006, management of wholesale purchases and sales of electricity for purposes of balancing electricity supply and demand was segregated from the buying and selling of electricity for trading purposes. Previously, all wholesale electricity purchases and sales were managed in aggregate under a "portfolio management" structure, as the primary activity was energy balancing, and all wholesale activity utilized (and continues to utilize) contracts for physical delivery. Financial derivative instruments, as are common in natural gas markets, are not as readily available in the Texas electricity market. The realignment reflects an expectation of a growing market for electricity trading in Texas. Under the previous structure, all purchases and sales scheduled with ERCOT for delivery were reported gross in the income statement, and "booked-out" sales and purchases (agreement with the counterparty to net settle before scheduling for delivery) were reported net. Effective with the January 1, 2006 realignment, those contracts that are separately managed as a trading book and scheduled for physical delivery are reported net upon settlement in accordance with existing accounting rules (EITF 02-03). All transactions reported net, including booked-out contracts, are reported as a component of revenues. Gross revenues from electricity trading activities totaled $1.3 billion in 2006.

In addition, Energy Future Competitive Holdings revised its reporting of ERCOT electricity balancing transactions effective with 2006 reporting. These transactions represent wholesale purchases and sales of electricity for real-time balancing purposes as measured in 15-minute intervals. As is industry practice, these purchases and sales with ERCOT, as the balancing energy clearinghouse agent, are reported net. Energy Future Competitive Holdings had historically reported the net amount as a component of purchased power cost as the activity consistently represented a net purchase of electricity prior to 2005 due in part to Energy Future Competitive Holdings' retail load exceeding generation volumes. More recently, the balancing activity has frequently resulted in net revenues due in part to generation volumes increasingly exceeding retail load. Energy Future Competitive Holdings believes that presentation of this activity as a component of revenues more appropriately reflects its market position. Accordingly, net electricity balancing transactions are reported in revenues and the prior years' amounts have been reclassified. The amount reported in revenues totaled $31 million in net purchases in 2006, $225 million in net sales in 2005 and $92 million in net purchases in 2004.

Realized and unrealized gains and losses from transacting in energy-related derivative instruments are reported as a component of revenues. See discussion above under "Derivative Instruments and Mark-to-Market Accounting."

**Impairment of Long-Lived Assets.**    Subsidiaries of Energy Future Competitive Holdings evaluate long-lived assets for impairment whenever indications of impairment exist, in accordance with SFAS 144. The determination of the existence of indications of impairment involves judgments that are subjective in nature and may require the use of estimates in forecasting future results and cash flows related to an asset or group of assets. See Note 6 for details of the impairment of the natural gas-fueled generation plants recorded in the second quarter of 2006.

F-53

EFIHMW00250385

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

Notes to Financial Statements—(Continued)

*Amortization of Nuclear Fuel.*    Amortization of nuclear fuel is calculated on the units-of-production method and is reported as fuel costs.

*Major Maintenance.*    Major maintenance costs incurred during generation plant outages, as well as the costs of other maintenance activities, are charged to expense as incurred. This accounting is consistent with guidance issued by the FASB as discussed below under "Changes in Accounting Standards".

*Defined Benefit Pension Plans and Other Postretirement Employee Benefit Plans.*    Subsidiaries of Energy Future Competitive Holdings bear a portion of the costs of the EFH Corp. sponsored pension plan, offering pension benefits through either a defined benefit pension plan or cash balance plan, and the EFH Corp. plan offering certain health care and life insurance benefits to employees of subsidiaries of Energy Future Competitive Holdings' and their eligible dependents upon the retirement of such employees. Costs of pension and other postretirement employee benefit (OPEB) plans are determined in accordance with SFAS 87 and SFAS 106 and are dependent upon numerous factors, assumptions and estimates. See Note 20 for other information regarding pension and OPEB costs.

*Stock-Based Incentive Compensation*.    EFH Corp. has provided discretionary awards to qualified managerial employees of subsidiaries of Energy Future Competitive Holdings that are payable in common stock under EFH Corp.'s shareholder-approved long-term incentive plans. Energy Future Competitive Holdings recognizes expense for these awards based on the provisions of SFAS 123R which provides for the recognition of stock-based compensation expense over the vesting period based on the grant-date fair value of those awards. See Note 21 for information regarding stock-based incentive compensation.

*Sales and Excise Taxes*.    Sales and excise taxes are accounted for as a "pass through" item on the balance sheet; i.e., the tax is billed to customers and recorded as trade accounts receivable with an offsetting amount recorded as a liability to the taxing jurisdiction.

*Franchise and Revenue-Based Taxes*.    Franchise and gross receipt taxes are not a "pass through" item such as sales and excise taxes. These taxes are assessed to subsidiaries of Energy Future Competitive Holdings by state and local government bodies, based on revenues or kWh delivered, as a cost of doing business and are recorded as an expense. Rates charged to customers by subsidiaries of Energy Future Competitive Holdings are intended to recover the taxes, but the subsidiaries are not acting as agents to collect the taxes from customers.

*Income Taxes*.    EFH Corp. files a consolidated federal income tax return, and federal income taxes are allocated to subsidiaries based upon their respective taxable income or loss. Investment tax credits are amortized to income over the estimated service lives of properties. Deferred income taxes are provided for temporary differences between the book and tax basis of assets and liabilities.

EFH Corp. has generally accounted for uncertainty related to positions taken on tax returns based on the probable liability approach consistent with SFAS 5. FIN No. 48, as discussed below under "Changes in Accounting Standards", provides clarification of the accounting for uncertain income tax positions.

*Accounting for Contingencies*.    The financial results of Energy Future Competitive Holdings may be affected by judgments and estimates related to loss contingencies. Accruals for loss

F-54

EFIHMW00250386

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

**Notes to Financial Statements—(Continued)**

contingencies are recorded when management determines that it is probable that an asset has been impaired or a liability has been incurred and that such economic loss can be reasonably estimated. Such determinations are subject to interpretations of current facts and circumstances, forecasts of future events and estimates of the financial impacts of such events. See Note 15 for a discussion of contingencies.

*Cash Equivalents*.   For purposes of reporting cash and cash equivalents, temporary cash investments purchased with a remaining maturity of three months or less are considered to be cash equivalents.

*Property, Plant and Equipment*.   Properties are stated at original cost. The cost of property additions includes materials and both direct and indirect labor and applicable overhead, including payroll-related costs.

Depreciation of property, plant and equipment is calculated on a straight-line basis over the estimated service lives of the properties. As is common in the industry, subsidiaries of Energy Future Competitive Holdings record depreciation expense using composite depreciation rates that reflect blended estimates of the lives of major asset components as compared to depreciation expense calculated on an asset-by-asset basis. Estimated depreciable lives are based on management's estimates of the assets' economic useful life. Depreciation also includes the effect of asset retirement obligations as prescribed by SFAS 143 and the impacts of FIN 47 (see Note 5), which was adopted by Energy Future Competitive Holdings in 2005.

Effective January 1, 2005, the estimated depreciable lives of lignite/coal-fueled generation facilities were extended from fifty years to sixty years to better reflect their useful lives, resulting in a reduction of depreciation expense for the year ended December 31, 2005 of $13 million ($8 million after-tax) as compared to the 2004 year.

*Inventories*.   Inventories, including environmental energy credits and emission allowances, are carried at weighted average cost. All inventories are reported at the lower of cost or market unless expected to be used in the generation of electricity.

*Investments*.   Deposits in a nuclear decommissioning trust fund are carried at fair value in the balance sheet. Investments in unconsolidated business entities over which Energy Future Competitive Holdings has significant influence but does not maintain effective control, generally representing ownership of at least 20% and not more than 50% of common equity, are accounted for under the equity method. Assets related to employee benefit plans represent investments held to satisfy deferred compensation liabilities and are recorded at market value. See Note 19 for details of investments.

*Changes in Accounting Standards*.   In February 2007, the FASB issued SFAS 159, which permits an entity to choose to measure certain financial assets and liabilities at fair value. SFAS 159 also revises provisions of SFAS 115 that apply to available-for-sale and trading securities. This statement is effective for fiscal years beginning after November 15, 2007. Energy Future Competitive Holdings continues to evaluate the potential impact of this standard.

In September 2006, the FASB issued SFAS 158, which was adopted by Energy Future Competitive Holdings effective December 31, 2006. See Note 20 for details related to the adoption of SFAS 158.

F-55

Highly Confidential

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

**Notes to Financial Statements—(Continued)**

Also, in September 2006, the FASB issued SFAS 157, which establishes a framework for measuring fair value. This statement is effective for fiscal years beginning after November 15, 2007. Energy Future Competitive Holdings expects that the adoption of the statement will impact mark-to-market valuations of certain commodity contracts.

The FASB issued guidance in September 2006 regarding accounting for major maintenance activities (referred to as FASB Staff Position AUG AIR-1, "Accounting for Planned Major Maintenance Activities"). This guidance prohibits the use of the accrue-in-advance method of accounting. Subsidiaries of Energy Future Competitive Holdings expense major maintenance costs as incurred.

In June 2006, the FASB issued FIN 48, which provides clarification of SFAS 109 with respect to the recognition of income tax benefits of uncertain tax positions in the financial statements. FIN 48 requires uncertain tax positions be reviewed and assessed with recognition and measurement of the tax benefit based on a "more-likely-than-not" standard. Benefits of positions taken on income tax returns that do not qualify for financial statement recognition are required to be disclosed in the financial statements. This interpretation was adopted by Energy Future Competitive Holdings effective January 1, 2007, as required and resulted in a net charge to retained earnings and an increase to noncurrent liabilities of $41 million in the first quarter of 2007.

### 2. ONCOR ELECTRIC DELIVERY DISTRIBUTION

On December 29, 2005, Energy Future Competitive Holdings distributed its ownership of Oncor Electric Delivery to EFH Corp. as a dividend. A summary of the assets and liabilities, which were distributed at book value, is provided in the table below. In accordance with the requirements of SFAS 144, Oncor Electric Delivery's results of operations are not reported as discontinued operations in Energy Future Competitive Holdings' consolidated operating results because a significant component of Oncor Electric Delivery's cash flows have not been eliminated from the ongoing operations of Energy Future Competitive Holdings as a result of Oncor Electric Delivery's delivery fee charges to Texas Competitive Holdings related to the sale of electricity to retail customers (and effective recovery of those charges) by Texas Competitive Holdings.

| | |
|---|---:|
| Current assets | $ 455 |
| Investments | 463 |
| Property, plant and equipment—net | 7,067 |
| Other noncurrent assets | 1,926 |
| Total assets | $9,911 |
| Current liabilities | $ 786 |
| Noncurrent liabilities | 2,083 |
| Long-term debt | 4,107 |
| Total liabilities | $6,976 |
| Net assets distributed | $2,935 |

F-56

Highly Confidential

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

**Notes to Financial Statements—(Continued)**

### 3. DISCONTINUED OPERATIONS

The table below reflects the results of the businesses reported as discontinued operations in 2005 and 2004:

| | Strategic Retail Services | Pedricktown | Total |
|---|---|---|---|
| **2005** | | | |
| Operating revenues | $ — | $ 12 | $ 12 |
| Operating costs and expenses | — | 14 | 14 |
| Other deductions—net | 3 | — | 3 |
| Operating loss before income taxes | (3) | (2) | (5) |
| Income tax benefit | (1) | — | (1) |
| Charges related to exit (after-tax) | — | (4) | (4) |
| Loss from discontinued operations | $ (2) | $ (6) | $ (8) |
| **2004** | | | |
| Operating revenues | $ 17 | $ 32 | $ 49 |
| Operating costs and expenses | 20 | 37 | 57 |
| Other deductions—net | 10 | — | 10 |
| Interest income | (1) | — | (1) |
| Operating loss before income taxes | (12) | (5) | (17) |
| Income tax benefit | (4) | (2) | (6) |
| Charges related to exit (after-tax) | (6) | (17) | (23) |
| Loss from discontinued operations | $(14) | $(20) | $(34) |

*Strategic Retail Services.*   In December 2003, Texas Competitive Holdings finalized a formal plan to sell its strategic retail services business, which was engaged principally in providing energy management services. Results in 2004 include a $6 million after-tax charge to settle a contract dispute related to the business. Results in 2005 reflect an after-tax charge of $2 million related to a litigation settlement.

*Pedricktown.*   In the second quarter of 2004, Texas Competitive Holdings initiated a plan to sell the Pedricktown, New Jersey 122 MW electricity generation business and exit the related power supply and gas transportation agreements resulting in a $17 million after-tax impairment charge in 2004. The business was sold in July, 2005 for $8.7 million in cash. A $4 million after-tax charge in 2005 represents an estimated working capital adjustment related to the sale transaction.

### 4. EXTRAORDINARY ITEMS

*Purchase of Lease Trust Interest.*   In the fourth quarter of 2005, Energy Future Competitive Holdings recorded an extraordinary loss of $50 million (net of tax benefit of $28 million) related to a December 2005 agreement to purchase, for $69 million in cash, the owner participant interest in a trust established to lease combustion turbines to Texas Competitive Holdings. The transaction was closed on March 31, 2006. The trust's assets consist primarily of nine combustion turbines and its liabilities consist primarily of $91 million principal amount of 7.46% debt with amortizing payments through 2015.

F-57

EFIHMW00250389

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

Notes to Financial Statements—(Continued)

The owner participant in the trust was an unrelated party. The trust is a variable interest entity and the agreement has been accounted for in accordance with FIN 46R, resulting in consolidation of the trust's assets and liabilities in Energy Future Competitive Holdings' financial statements. The combustion turbine assets and debt were recorded at estimated fair market values of $35 million and $96 million, respectively. The net loss reflects the excess of the purchase price over the fair value of the trusts' net assets, net of the reversal of a previously established liability of $59 million related to the combustion turbine lease.

*Securitization Bonds.*   The Settlement Plan addressed the issuance of securitization bonds to recover regulatory asset stranded costs and other qualified costs. A financing order finalized in January 2003 authorized the issuance of securitization bonds with a principal amount of $1.3 billion, and the second and final tranche of the securitization bonds was issued in June of 2004. An extraordinary gain of $16 million (net of tax of $9 million) recorded in the second quarter of 2004 represents an increase in the carrying value of the regulatory asset subject to securitization. The increase in the related regulatory asset is due to the effect of higher interest rates than previously estimated on the bonds and therefore increased amounts to be recovered from REPs through revenues as a transition charge to service the principal and interest of the bonds.

## 5. CUMULATIVE EFFECT OF CHANGES IN ACCOUNTING PRINCIPLES

FIN 47 was effective with reporting for the fourth quarter of 2005. This interpretation clarifies the term "conditional asset retirement" under SFAS 143 and requires entities to record the fair value of legally binding asset retirement obligations, the timing or method of settlement of which is conditional on a future event. For Energy Future Competitive Holdings, such liability relates to generation assets asbestos removal and disposal costs. As the new accounting rule required retrospective application to the inception of the liability, the effects of the adoption reflect the accretion and depreciation from the liability inception date through December 31, 2005. The liability is accreted each period, representing the time value of money, and the capitalized cost is depreciated over the remaining useful life of the related asset.

The following table details the $8 million net charge in December 2005 arising from the adoption of FIN 47:

| | |
|---|---:|
| Increase in property, plant and equipment—net | $  5 |
| Increase in other noncurrent liabilities and deferred credits | (17) |
| Increase in accumulated deferred income taxes | 4 |
| Cumulative effect of change in accounting principle | $ (8) |

SFAS 123R, which addresses accounting for stock-based compensation costs, was issued in December 2004. Energy Future Competitive Holdings early adopted SFAS 123R effective October 1, 2004 and recorded a cumulative effect of change in accounting principle of $6 million after-tax (representing a net credit). See Note 21 for additional information.

## 6. IMPAIRMENT OF NATURAL GAS-FUELED GENERATION PLANTS

In the second quarter of 2006, Energy Future Competitive Holdings performed an evaluation of its natural gas-fueled generation plants for impairment in accordance with the requirements of SFAS 144, which provides that long-lived assets should be tested for recovery whenever events or changes in

F-58

EFIHMW00250390

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

**Notes to Financial Statements—(Continued)**

circumstances indicate that the carrying amount may not be recoverable. In consideration of the new lignite/coal-fueled generation plant development program, among other factors, Energy Future Competitive Holdings determined that it was more likely than not that its natural gas-fueled generation plants, which have generally been operated to meet peak demands for electricity, would be sold or otherwise disposed of before the end of their previously estimated useful lives and should be tested for impairment as an asset group. As a result, it was determined that an impairment existed, and a charge of $198 million ($129 million after-tax) was recorded in 2006 to write down the assets to fair value, which was determined based on discounted estimated future cash flows. Future cash flow expectations are subject to considerable estimation, including forecasts of future natural gas prices and market heat rates. Further, the form and timing of usage and ultimate disposition of the plants is uncertain. Because of the highly judgmental nature of key assumptions and potential volatility of market conditions, the adjusted carrying value of the plants does not necessarily represent the amount of proceeds from any transaction to sell the plants and future additional impairment is possible. The impairment was reported in other deductions in the Statements of Consolidated Income.

### 7. CUSTOMER APPRECIATION BONUS

In the fourth quarter of 2006, Texas Competitive Holdings announced a special customer appreciation bonus program. Under the program, a $100 bonus will be provided to residential customers receiving service as of October 29, 2006 and living in areas where Texas Competitive Holdings offered its price-to-beat rate, which expired January 1, 2007 in accordance with the Texas deregulation provisions. Eligible customers are not required to continue to receive service from Texas Competitive Holdings to receive the bonus. The bonus was paid out in the form of credits on customer bills, with approximately $40 million paid out in the fourth quarter of 2006 and the balance settled in 2007. The bonus program resulted in a pretax charge of $162 million ($105 million after-tax) in the fourth quarter of 2006. The charge was recorded as a reduction to revenue.

### 8. RESTRUCTURING ACTIONS IN 2004

During 2004, senior management reviewed EFH Corp.'s operations and implemented a restructuring plan to restore financial strength, drive performance improvement with a competitive industrial company perspective and allocate capital in a disciplined and efficient manner.

The restructuring actions included dispositions of businesses, repurchases of debt and other securities, rationalization of generation assets, termination of uneconomic contractual arrangements, headcount reductions, outsourcing of support activities and resolution of litigation, income tax and other contingencies.

F-59

Highly Confidential

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

**Notes to Financial Statements—(Continued)**

The restructuring activities resulted in unusual charges and credits impacting Energy Future Competitive Holdings' 2004 income from continuing operations, summarized as follows and discussed below in more detail:

| | Income Statement Classification | Charge/(Credit) to Earnings | |
| --- | --- | --- | --- |
| | | Pretax | After-tax |
| Competitive Electric segment: | | | |
| Charges related to leased equipment | Other deductions | $180 | $117 |
| Software write-off | Other deductions | 107 | 70 |
| Employee severance costs | Other deductions | 107 | 69 |
| Power purchase contract termination charge | Other deductions | 101 | 66 |
| Spare parts inventory write-down | Other deductions | 79 | 51 |
| Outsourcing transition costs | Other deductions | 10 | 6 |
| Other asset impairments | Other deductions | 6 | 4 |
| Other charges | Operating costs/SG&A | 8 | 6 |
| Recognition of deferred gain on plant sales | Other income | (58) | (38) |
| Gain on sale of undeveloped properties | Other income | (19) | (12) |
| Regulated Delivery segment: | | | |
| Employee severance costs | Other deductions | 20 | 13 |
| Cities rate settlement charge | Other deductions | 21 | 14 |
| Outsourcing transition costs | Other deductions | 4 | 3 |
| Software write-off and asset impairment | Other deductions | 4 | 2 |
| Other charges | Operating costs/SG&A | 2 | 1 |
| Total | | $572 | $372 |

In addition, income from discontinued operations in 2004 included recognition of a $17 million after-tax charge related to the disposition of the Pedricktown, New Jersey generation business. See Note 3 for a discussion of this item.

Following is a discussion of major actions associated with the restructuring plan affecting income from continuing operations:

***Sale of TXU Fuel.***   In April 2004, Texas Competitive Holdings distributed the assets and liabilities of TXU Fuel, its intrastate gas transportation subsidiary, to Energy Future Competitive Holdings at book value, including $16 million of allocated goodwill. In June 2004, Energy Future Competitive Holdings completed the sale of the assets of TXU Fuel for $500 million in cash. As part of the transaction, Texas Competitive Holdings entered into a transportation agreement, intended to be market-price based, with the new owner to transport natural gas to Texas Competitive Holdings' generation plants. Because of the continuing involvement in the business through the transportation agreement, the pretax gain related to the sale of $375 million will be recognized over the eight-year life of the transportation agreement, and the business has not been accounted for as a discontinued operation.

F-60

Highly Confidential

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

Notes to Financial Statements—(Continued)

*Capgemini Outsourcing Agreement*.   In May 2004, under an arrangement negotiated by EFH Corp., Texas Competitive Holdings and Oncor Electric Delivery entered into services agreements with Capgemini Energy LP (Capgemini). Under the ten-year arrangement, over 2,500 employees (including approximately 1,100 from Texas Competitive Holdings and 200 from Oncor Electric Delivery) transferred from subsidiaries of EFH Corp. to Capgemini effective July 1, 2004. Outsourced base support services performed by Capgemini for a fixed fee, subject to adjustment for volumes or other factors, include information technology, customer call center, billing, human resources, supply chain and certain accounting activities.

EFH Corp. agreed to indemnify Capgemini for severance costs incurred by Capgemini for former EFH Corp. employees terminated within 21 months of their transfer to Capgemini. Accordingly, in the second quarter of 2004, Energy Future Competitive Holdings recorded a $38 million ($25 million after-tax) charge for its share of accrued severance expense. (See Note 25 for further details regarding severance liabilities.) In addition, EFH Corp. committed to pay up to $25 million for costs associated with transitioning the outsourced activities to Capgemini. Accordingly, on an as incurred basis, Energy Future Competitive Holdings recorded its share of transition expenses of $14 million ($9 million after-tax) in 2004 and the remaining $11 million ($7 million after-tax) in 2005.

As part of the agreement, Capgemini was provided a royalty-free right, under an asset license arrangement, to use EFH Corp.'s information technology assets, consisting primarily of computer software. A portion of the software was in development and had not yet been placed in service. As a result of outsourcing its information technology activities, EFH Corp. no longer intended to develop the majority of these projects and from EFH Corp.'s perspective the software was abandoned. The agreements with Capgemini do not require that any software in development be completed and placed in service. Consequently, the carrying value of Energy Future Competitive Holdings' software projects was written off, resulting in a charge of $109 million ($71 million after-tax). The remaining assets were transferred to a subsidiary of EFH Corp. at book value in exchange for an interest in that subsidiary. Such interest is accounted for on the equity method.

EFH Corp. obtained a 2.9% limited partnership interest in Capgemini in exchange for the asset license described immediately above. See Note 19 for additional discussion of EFH Corp.'s investment in Capgemini and related terms of the agreement.

*Actions Related to Generation Operations*.   In December 2004, Energy Future Competitive Holdings executed an agreement to terminate, for a payment of $172 million, a power purchase and tolling agreement expiring in 2006. The agreement had been entered into in connection with the sale of two generation plants to the counterparty in 2001. As a result of the transaction, Energy Future Competitive Holdings recorded a charge of $101 million ($66 million after-tax). The charge represents the payment amount less the remaining out-of-the-money liability related to the agreement originally recorded at its inception. Energy Future Competitive Holdings also recorded a gain of $58 million ($38 million after-tax), representing the remaining deferred gain from the sale of the two plants.

Also in December 2004, Energy Future Competitive Holdings committed to immediately cease operating for its own benefit nine leased gas-fired combustion turbines, and recorded a charge of $157 million ($102 million after-tax). The charge represented the present value of the future lease payments related to the turbines, net of estimated sublease proceeds. Net credits of $11 million and $16 million were recorded in 2006 and 2005, respectively, to adjust the liability recorded in 2004 for changes in estimated sublease proceeds.

F-61

EFIHMW00250393

**PX 006**
**Page 328 of 382**

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

**Notes to Financial Statements—(Continued)**

Effective November 1, 2004, Energy Future Competitive Holdings entered into an agreement to terminate the operating lease for certain mining equipment for approximately $28 million in cash. The lease termination resulted in a charge of $21 million ($14 million after-tax).

As part of a review of its generation asset portfolio in the second quarter of 2004, Energy Future Competitive Holdings completed a review of its spare parts and equipment inventory to determine the appropriate level of such inventory. As a result of this review, Energy Future Competitive Holdings recorded a charge of $79 million ($51 million after-tax), to reflect excess inventory on hand and to write down carrying values to scrap values.

Energy Future Competitive Holdings recorded charges totaling $15 million ($10 million after-tax) in 2004 for employee severance costs and impairments related to the closures of a number of gas-fired generation units.

***Organizational Realignment and Headcount Reductions***.    During 2004, management completed a comprehensive organizational review, including an analysis of staffing requirements. As a result, a self-nomination severance program and other involuntary severance actions were completed. Energy Future Competitive Holdings recorded severance charges totaling $74 million ($47 million after-tax). These amounts include $33 million in allocated EFH Corp. severance charges. Additionally, Oncor Electric Delivery recorded $11 million of employee severance costs as a regulatory asset in accordance with SFAS 71.

***Cities Rate Settlement***.    In the fourth quarter of 2004, Energy Future Competitive Holdings recorded a $21 million ($14 million after-tax) charge for estimated payments under a settlement, which was finalized in February 2005, with a number of municipalities initiating an inquiry regarding distribution rates charged by Oncor Electric Delivery.

### 9. TEXAS MARGIN TAX

In May 2006, the Texas Legislature enacted reforms of the Texas franchise tax system and replaced it with a new tax system, referred to as the Texas margin tax. The Texas margin tax is a significant change in Texas tax law because it generally makes all legal entities subject to tax, including general and limited partnerships, while the current franchise tax system applies only to corporations and limited liability companies. Subsidiaries of Energy Future Competitive Holdings conduct significant operations through Texas limited partnerships that will become subject to the new Texas margin tax. The effective date of the Texas margin tax, which has been interpreted to be an income tax for accounting purposes, is January 1, 2008 for calendar year-end companies, and the tax liability is being accrued in 2007 based on 2007 revenues as reduced by certain deductions.

In accordance with the provisions of SFAS 109, which require that deferred tax assets and liabilities be adjusted for the effects of new tax legislation in the period of enactment, Energy Future Competitive Holdings estimated and recorded a net charge to deferred tax expense of $44 million in 2006. The total estimate recorded in 2006 was based on the Texas margin tax law in its then current form and the guidance issued by the Texas Comptroller of Public Accounts (Comptroller).

F-62

Highly Confidential

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

**Notes to Financial Statements—(Continued)**

**10. INCOME TAXES**

The components of Energy Future Competitive Holdings' income tax expense applicable to continuing operations are as follows:

| | Year Ended December 31, | | |
| | 2006 | 2005 | 2004 |
|---|---|---|---|
| Current: | | | |
| US Federal | $1,160 | $233 | $ 384 |
| State | — | 5 | 25 |
| Foreign | 2 | — | — |
| Total | 1,162 | 238 | 409 |
| Deferred: | | | |
| US Federal | 99 | 663 | (86) |
| State | 78 | 2 | (18) |
| Foreign | (1) | — | — |
| Total | 176 | 665 | (104) |
| Amortization of investment tax credits | (15) | (21) | (23) |
| Total | $1,323 | $882 | $ 282 |

Reconciliation of income taxes computed at the US federal statutory rate to income tax expense:

| | Year Ended December 31, | | |
| | 2006 | 2005 | 2004 |
|---|---|---|---|
| Income from continuing operations before income taxes, extraordinary items and cumulative effect of changes in accounting principles | $3,859 | $2,698 | $ 954 |
| Income taxes at the federal statutory rate of 35% | $1,351 | $ 944 | $ 334 |
| Lignite depletion allowance | (51) | (33) | (25) |
| Production activities deduction | (14) | — | — |
| Amortization of investment tax credits | (15) | (21) | (23) |
| State income taxes, net of federal tax benefit | 1 | 4 | 5 |
| Texas margin tax, net of federal tax benefit | 44 | — | — |
| Other, including audit settlements | 7 | (12) | (9) |
| Income tax expense | $1,323 | $ 882 | $ 282 |
| Effective tax rate | 34.3% | 32.7% | 29.6% |

F-63

Highly Confidential

### ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES
#### Notes to Financial Statements—(Continued)

Deferred income taxes provided for temporary differences based on tax laws in effect at December 31, 2006 and 2005, balance sheet dates are as follows:

| | December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2006 | | | 2005 | | |
| | Total | Current | Noncurrent | Total | Current | Noncurrent |
| **Deferred Income Tax Assets** | | | | | | |
| Alternative minimum tax credit carryforwards . . . . . . . . . . . . . . . . . . . . | $ 307 | $ 173 | $ 134 | $ 309 | $ — | $ 309 |
| Net operating loss (NOL) carryforwards . . . . . . . . . . . . . . . . . . . . | 12 | — | 12 | 123 | 123 | — |
| Unamortized investment tax credits. . . | 109 | — | 109 | 114 | — | 114 |
| Employee benefit obligations . . . . . . . . | 40 | 10 | 30 | 79 | 19 | 60 |
| Other. . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 242 | 20 | 222 | 288 | 38 | 250 |
| Total deferred tax assets . . . . . . . . | 710 | 203 | 507 | 913 | 180 | 733 |
| **Deferred Income Tax Liabilities** | | | | | | |
| Book/tax depreciation differences . . . . | 2,206 | — | 2,206 | 2,166 | — | 2,166 |
| Mark-to-market net deductions. . . . . . . | 929 | 4 | 925 | 761 | 4 | 757 |
| Software development costs . . . . . . . . . | 43 | — | 43 | 41 | — | 41 |
| Other. . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 32 | 2 | 30 | 18 | 2 | 16 |
| Total deferred tax liabilities . . . . . . | 3,210 | 6 | 3,204 | 2,986 | 6 | 2,980 |
| **Net Deferred Income Tax (Asset) Liability** . . . . . . . . . . . . . . . . . . . . . . . . . | $2,500 | $(197) | $2,697 | $2,073 | $(174) | $2,247 |

At December 31, 2006, Energy Future Competitive Holdings had $307 million of alternative minimum tax credit carryforwards (AMT) available to offset future tax payments. These AMT credit carryforwards have no expiration date. At December 31, 2006, Energy Future Competitive Holdings had net operating loss (NOL) carryforwards for federal income tax purposes of $12 million that expire between 2022 and 2026. The NOL carryforwards can be used to offset future taxable income. Energy Future Competitive Holdings fully expects to utilize all of its NOL carryforwards prior to their expiration dates.

As expected, the IRS has completed examining EFH Corp.'s US income tax returns for the years 1997 through 2002 and proposed adjustments were received in July 2007. EFH Corp. plans to appeal the proposed adjustments in the third quarter of 2007. In management's opinion, an adequate provision has been made for any future taxes that may be owed.

See Note 1 for discussion regarding the implementation of FIN 48, which addresses accounting for uncertain tax positions.

Highly Confidential

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

**Notes to Financial Statements—(Continued)**

*11. OTHER INCOME AND DEDUCTIONS*

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2006** | **2005** | **2004** |
| Other income: | | | |
| Amortization of gain on sale of TXU Fuel | $ 47 | $ 47 | $ 27 |
| Net gain on sale of assets(a) | 20 | 36 | 107 |
| Sales tax refunds | 3 | 4 | — |
| Insurance recoveries related to generation assets | 2 | 8 | — |
| Gain on sale of out-of-state electricity transmission project | — | 7 | — |
| Electricity sale agreement termination fee | — | 4 | — |
| Equity portion of allowance for funds used during construction | — | 2 | 4 |
| Other | — | 7 | 4 |
| Total other income | $ 72 | $115 | $142 |
| Other deductions: | | | |
| Charge for impairment of natural gas-fueled generation plants (Note 6) | $198 | $ — | $ — |
| Asset writedown and generation-related lease termination charge (credits) (Note 8) | (1) | (16) | 375 |
| Equity losses of affiliate holding investment in Capgemini | 10 | 10 | 7 |
| Litigation-related charges | 6 | — | — |
| Inventory write-off related to natural gas-fired generation plants | 3 | — | — |
| Employee severance charges (See Note 8 regarding 2004 charges) | — | 1 | 127 |
| Termination of electricity purchase contract (Note 8) | — | — | 101 |
| Capgemini outsourcing transition costs (Note 8) | — | 12 | 14 |
| Expenses related to canceled construction projects | — | 3 | 6 |
| Cities rate case settlement (Note 8) | — | 1 | 21 |
| Charge (credit) related to coal contract counterparty claim(b) | (12) | 12 | — |
| Other | 6 | 3 | 14 |
| Total other deductions | $210 | $ 26 | $665 |

_____

(a)  Includes gains on land sales of $11 million in 2006, $33 million in 2005 and $19 million in 2004. The 2006 period also includes an $8 million gain related to the sale of mineral interests. The 2005 period also includes a $2 million gain on the sale of surplus equipment. The 2004 period also includes $30 million in amortization of a deferred gain related to the sale of generation plants in 2002. The remaining $58 million in 2004 represents the recognition of the remaining previously deferred gain. See Note 8.

(b)  In the first quarter of 2006, Energy Future Competitive Holdings recorded a credit of $12 million upon the settlement of a claim against a counterparty for nonperformance under a coal contract. A charge in the same amount was recorded in the first quarter of 2005 for losses due to the nonperformance.

F-65

Highly Confidential

EFIHMW00250397

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

Notes to Financial Statements—(Continued)

### 12. TRADE ACCOUNTS RECEIVABLE AND SALE OF RECEIVABLES PROGRAM

*Sale of Receivables*.    Subsidiaries of Energy Future Competitive Holdings participate in an accounts receivable securitization program established by EFH Corp. for certain of its subsidiaries, the activity under which is accounted for as a sale of accounts receivable in accordance with SFAS 140. Under the program, subsidiaries of Energy Future Competitive Holdings sell trade accounts receivable to TXU Receivables Company, a consolidated wholly-owned bankruptcy-remote direct subsidiary of EFH Corp., which sells undivided interests in the purchased accounts receivable for cash to special purpose entities established by financial institutions (the funding entities). The current program is subject to renewal in June 2008.

The maximum amount currently available under the program to all EFH Corp. subsidiary participants (originators) is $700 million, and the program funding was $627 million as of December 31, 2006. The program funding to Energy Future Competitive Holdings totaled $541 million as of December 31, 2006. Under certain circumstances, the amount of customer deposits held by the originators can reduce the amount of undivided interests that can be sold, thus reducing funding available under the program. Funding availability for all originators is reduced by 100% of the originators' customer deposits if Texas Competitive Holdings' fixed charge coverage ratio is less than 2.5 times; 50% if Texas Competitive Holdings' coverage ratio is less than 3.25 times, but at least 2.5 times; and zero % if Texas Competitive Holdings' coverage ratio is 3.25 times or more. The originators' customer deposits, which totaled $116 million, did not affect funding availability at that date as Texas Competitive Holdings' coverage ratio was in excess of 3.25 times.

All new trade receivables under the program generated by Energy Future Competitive Holdings are continuously purchased by TXU Receivables Company with the proceeds from collections of receivables previously purchased. Changes in the amount of funding under the program, through changes in the amount of undivided interests sold by TXU Receivables Company, reflect seasonal variations in the level of accounts receivable, changes in collection trends as well as other factors such as changes in sales prices and volumes. TXU Receivables Company has issued subordinated notes payable to Energy Future Competitive Holdings for the difference between the face amount of the uncollected accounts receivable purchased, less a discount, and cash paid to Energy Future Competitive Holdings that was funded by the sale of the undivided interests. The balance of the subordinated notes issued to Energy Future Competitive Holdings, which is reported in trade accounts receivable, was $159 million and $154 million at December 31, 2006 and 2005, respectively.

The discount from face amount on the purchase of receivables principally funds program fees paid by TXU Receivables Company to the funding entities. The discount also funds a servicing fee paid by TXU Receivables Company to TXU Business Services Company, a direct subsidiary of EFH Corp. The program fees, also referred to as losses on sale of the receivables under SFAS 140, consist primarily of interest costs on the underlying financing and totaled $34 million, $23 million and $12 million in 2006, 2005 and 2004, respectively, and averaged 5.8%, 4.0% and 2.1% (on an annualized basis) of the funding under the program in 2006, 2005 and 2004, respectively. The servicing fee, which totaled approximately $4 million in both 2006 and 2005 and $6 million in 2004, compensates TXU Business Services Company for its services as collection agent, including maintaining the detailed accounts receivable collection records. The program and servicing fees represent essentially all the net incremental costs of the program to Energy Future Competitive Holdings and are reported in SG&A expenses.

F-66

EFIHMW00250398

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

**Notes to Financial Statements—(Continued)**

The accounts receivable balance reported in the December 31, 2006 consolidated balance sheet has been reduced by $700 million face amount of trade accounts receivable sold to TXU Receivables Company, partially offset by the inclusion of $159 million of subordinated notes receivable from TXU Receivables Company. Funding under the program decreased $41 million 2006, increased $197 million in 2005 and decreased $73 million in 2004. Funding increases or decreases under the program are reflected as operating cash flow activity in the statement of cash flows. The carrying amount of the retained interests in the accounts receivable balance approximated fair value due to the short-term nature of the collection period.

Activities of TXU Receivables Company related to Energy Future Competitive Holdings were as follows:

| | Year Ended December 31, | | |
| --- | ---: | ---: | ---: |
| | **2006** | **2005** | **2004** |
| Cash collections on accounts receivable | $ 7,274 | $ 7,450 | $ 7,420 |
| Face amount of new receivables purchased | (7,238) | (7,511) | (7,217) |
| Discount from face amount of purchased receivables | 38 | 27 | 17 |
| Program fees paid | (34) | (23) | (12) |
| Servicing fees paid | (4) | (4) | (5) |
| Increase in subordinated notes payable | 5 | (136) | (130) |
| Cash flows used by (provided to) Energy Future Competitive Holdings under the program | $    41 | $  (197) | $    73 |

Activities in 2006 reflect the absence of Oncor Electric Delivery from the consolidated accounts of Energy Future Competitive Holdings.

Upon termination of the program, cash flows would be delayed as collections of sold receivables would be used by TXU Receivables Company to repurchase the undivided interests from the funding entities instead of purchasing new receivables. The level of cash flows would normalize in approximately 16 to 30 days.

*Contingencies Related to Sale of Receivables Program.*    Although TXU Receivables Company expects to be able to pay its subordinated notes from the collections of purchased receivables, these notes are subordinated to the undivided interests of the financial institutions in those receivables, and collections might not be sufficient to pay the subordinated notes. The program may be terminated if either of the following events occurs:

1) all of the originators cease to maintain their required fixed charge coverage ratio and debt to capital (leverage) ratio; or

2) the delinquency ratio (delinquent for 31 days) for the sold receivables, the default ratio (delinquent for 91 days or deemed uncollectible), the dilution ratio (reductions for discounts, disputes and other allowances) or the days collection outstanding ratio exceed stated thresholds and the financial institutions do not waive such event of termination. The thresholds apply to the entire portfolio of sold receivables, not separately to the receivables of each originator.

F-67

Highly Confidential

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

**Notes to Financial Statements—(Continued)**

*Trade Accounts Receivable*

|  | December 31, | |
|---|---|---|
|  | 2006 | 2005 |
| Gross trade accounts receivable | $1,355 | $1,792 |
| Undivided interests in accounts receivable sold by TXU Receivables Company | (700) | (736) |
| Subordinated notes receivable from TXU Receivables Company | 159 | 154 |
| Allowance for uncollectible accounts related to undivided interests in receivables retained | (8) | (31) |
| Trade accounts receivable—reported in balance sheet | $ 806 | $1,179 |

Gross trade accounts receivable included unbilled revenues of $406 million and $443 million at December 31, 2006 and 2005, respectively.

*Allowance for Uncollectible Accounts*

|  | December 31, | | |
|---|---|---|---|
|  | 2006 | 2005 | 2004 |
| Allowance for uncollectible accounts receivable as of January 1 | $ 31 | $ 15 | $ 53 |
| Increase for bad debt expense | 67 | 56 | 90 |
| Decrease for account write-offs | (79) | (68) | (122) |
| Changes related to receivables sold | 4 | 16 | (6) |
| Distribution of Oncor Electric Delivery | — | (3) |  |
| Other[a] | (15) | 15 | — |
| Allowance for uncollectible accounts receivable as of December 31 | $ 8 | $ 31 | $ 15 |

_____

(a)   Reflects an allowance established in 2005 for a coal contract dispute that was reversed upon settlement in 2006. See Note 11.

Allowances related to receivables sold are reported in current liabilities and totaled $25 million and $29 million at December 31, 2006 and 2005, respectively.

**13. SHORT-TERM FINANCING**

*Short-term Borrowings.*   At December 31, 2006 and 2005, the outstanding short-term borrowings of Energy Future Competitive Holdings consisted of the following:

|  | At December 31, 2006 | | At December 31, 2005 | |
|---|---|---|---|---|
|  | Outstanding Amount | Interest Rate(a) | Outstanding Amount | Interest Rate(a) |
| Commercial paper | $623 | 5.52% | $306 | 4.48% |
| Bank borrowings | 195 | 5.97% | 440 | 4.86% |
| Total | $818 |  | $746 |  |

_____

(a)   Weighted average interest rate at the end of the period.

F-68

Highly Confidential

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY AND SUBSIDIARIES**

**Notes to Financial Statements—(Continued)**

Under the commercial paper program, subsidiaries of Energy Future Competitive Holdings may issue up to $2.4 billion of these securities. The program is supported by existing credit facilities.

*Credit Facilities.*    At December 31, 2006, Energy Future Competitive Holdings, through its subsidiaries, had access to credit facilities with the following terms:

| Authorized Borrowers | Maturity Date | Facility Limit | Letters of Credit | Cash Borrowings | Availability |
|---|---|---|---|---|---|
| | | At December 31, 2006 | | | |
| Texas Competitive Holdings . . . . . . . . . . . | May 2007 | $1,500 | $ — | $ — | $1,500 |
| Texas Competitive Holdings, Oncor Electric Delivery . . . . . . . . . . . . . . . . . . | June 2008 | 1,400 | 489 | — | 911 |
| Texas Competitive Holdings, Oncor Electric Delivery . . . . . . . . . . . . . . . . . . | August 2008 | 1,000 | — | 150 | 850 |
| Texas Competitive Holdings, Oncor Electric Delivery . . . . . . . . . . . . . . . . . . | March 2010 | 1,600 | 3 | — | 1,597 |
| Texas Competitive Holdings, Oncor Electric Delivery . . . . . . . . . . . . . . . . . . | June 2010 | 500 | — | — | 500 |
| Texas Competitive Holdings . . . . . . . . . . . | December 2009 | 500 | 455 | 45 | — |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . | | $6,500 | $947 | $195 | $5,358 |

The maximum amount Texas Competitive Holdings and Oncor Electric Delivery can directly access under the facilities is $6.5 billion and $3.6 billion, respectively. These facilities may be used for working capital and general corporate purposes, including providing support for issuances of commercial paper and for issuing letters of credit. Both Texas Competitive Holdings and Oncor Electric Delivery had outstanding commercial paper at December 31, 2006.

In addition, Texas Competitive Holdings and Oncor Electric Delivery have a $25 million joint uncommitted line of credit without an expiration date. The terms are generally consistent with existing credit facilities, except that funding remains at the discretion of the lender. As of December 31, 2006, there were no outstanding borrowings under this line of credit.

All letters of credit and cash borrowings under the credit facilities as of December 31, 2006 are the obligations of Texas Competitive Holdings. In addition, Oncor Electric Delivery has outstanding commercial paper supported by these facilities totaling $673 million.

F-69

EFIHMW00250401