# BUSINESS

## Our Company

We are a Dallas-based energy company that manages a portfolio of competitive and regulated energy businesses in Texas. We are a holding company conducting our operations principally through our subsidiaries, TCEH, Oncor Electric Delivery and their respective subsidiaries. TCEH is a holding company for the Luminant and TXU Energy businesses, which are engaged in competitive electricity market activities largely in Texas. The Luminant businesses include Luminant Power, Luminant Energy and Luminant Construction. Luminant Power, Luminant Energy, Luminant Construction and TXU Energy conduct their operations through a number of separate legal entities that, in accordance with regulatory requirements, operate independently within the competitive Texas power market.

As of June 30, 2007, Luminant Power had 18,365 MW of generation capacity in Texas (which includes 585 MW representing nine combustion turbine units currently operated for an unaffiliated party's benefit). This amount includes 8,137 MW of low-cost baseload solid fuel generation capacity represented by 2,300 MW of nuclear generation capacity and 5,837 MW of lignite/coal-fueled generation capacity. Luminant Energy supports Luminant Power and TXU Energy by optimizing the performance of the generation assets and sourcing the electricity requirements for TXU Energy's customers as well as providing related services to other market participants. Luminant Energy is the largest purchaser of wind-generated electricity in Texas and the fifth largest in the United States. Luminant Construction is currently constructing three new lignite coal-fueled generation facilities in Texas with expected generation capacity totaling approximately 2,200 MW. The three facilities are permitted and are expected to come on-line in the 2009-2010 timeframe. See "—Competitive Electric Segment—Luminant Construction" for more information.

TXU Energy provides competitive electricity and related services to more than 2.1 million electricity customers in Texas. As of June 30, 2007, TXU Energy's estimated share of the total ERCOT market retail residential and small business electric customers was approximately 35% and 25%, respectively.

Oncor Electric Delivery is an electricity distribution and transmission business that provides electricity delivery services to retail electric providers, including TXU Energy, that sell electricity to consumers. Oncor Electric Delivery operates the largest distribution and transmission system in Texas, providing power to more than three million homes and businesses and operating more than 115,000 miles of transmission and distribution lines in Texas. A significant portion of Oncor Electric Delivery's revenues represent fees for delivery services provided to TCEH. Distribution revenues from TCEH represented 47% of Oncor Electric Delivery's distribution revenues and 41% of Oncor Electric Delivery's total revenues for the six months ended June 30, 2007 and 52% of Oncor Electric Delivery's distribution revenues and 46% of Oncor Electric Delivery's total revenues for the year ended December 31, 2006.

Upon consummation of the Merger, we and Oncor Electric Delivery implemented certain structural and operational measures based on principles articulated by rating agencies and commitments made by Texas Holdings and Oncor Electric Delivery to the PUCT and the FERC that are intended to further separate Oncor Electric Delivery from Texas Holdings and its other subsidiaries in order to mitigate Oncor Electric Delivery's credit exposure to those entities and to reduce the risk that the assets and liabilities of Oncor Electric Delivery would be substantively consolidated with the assets and liabilities of Texas Holdings or any of its other subsidiaries in the event of a bankruptcy of one or more of those entities. See "The Transactions—Ring-Fencing" for a description of the material terms of the ring-fencing measures.

For the twelve months ended June 30, 2007, on a pro forma basis, Energy Future Holdings Corp. had Adjusted EBITDA of $5,235 million on a consolidated basis, 24% of which was attributable to Oncor Electric Delivery. See "—Summary Historical and Unaudited Pro Forma Consolidated Financial and Other Data of Energy Future Holdings Corp. and its Subsidiaries" for a definition of Adjusted EBITDA and a reconciliation of net income to Adjusted EBITDA. Oncor Electric Delivery Holdings and its subsidiaries will be Unrestricted Subsidiaries as defined in the indenture governing the notes offered hereby and, accordingly, will not be subject to most of the restrictive covenants in the indenture. See the subsections titled "Regulated Delivery Segment" under "Energy

156

EFIHMW00208286

Future Holdings Corp. Management's Discussion and Analysis of Financial Condition and Results of Operations" and the financial statements of Oncor Electric Delivery included elsewhere in this offering memorandum for information regarding the results of operations of Oncor Electric Delivery.

## Our Market

We operate primarily within the ERCOT market, which represents approximately 85% of electricity consumption in Texas. ERCOT is the regional reliability coordinating organization for member electricity systems in Texas and the system operation of the interconnected transmission system for those systems. ERCOT's membership consists of 236 members, including electric cooperatives, municipal power agencies, investor-owned independent generators, independent power marketers, transmission service providers and distribution services providers, independent REPs and consumers.

ERCOT represents approximately 75% of the geographical area of Texas, but excludes El Paso, a large part of the Texas Panhandle and two small areas in the eastern part of the state. From 1994 through 2005, peak hourly demand in the ERCOT market grew at a compound annual rate of 2.8%, compared to a compound annual rate of growth of 2.3% for the entire United States over the same period. For 2006, hourly demand ranged from a low of 21,309 MW to a high of 62,339 MW. ERCOT has limited interconnections to other markets outside of ERCOT in the United States, which currently limits potential imports into ERCOT and is currently limited to 1,106 MW of generation capacity (or approximately 2% of peak demand in Texas). In addition, wholesale transactions within the ERCOT market are not subject to regulation by the FERC.

The ERCOT market has experienced significant construction of new generation plants in recent years, with over 29,000 MW of mostly natural gas-fueled combined cycle generation capacity added to the market since 1996. As of May 31, 2007, aggregate net generation capacity of approximately 76,801 MW existed in the ERCOT market, of which 72% was natural gas-fueled. Approximately 21,444 MW, or 27.9%, was lower marginal cost generation capacity such as coal, lignite and nuclear plants. As of May 31, 2007, Luminant Power's lignite and nuclear baseload plants represented 8,137 MW, or 37.9%, of the total lower marginal cost generation capacity in the ERCOT market. ERCOT has established a target reserve margin level of approximately 12.5%; and the reserve margin at May 17, 2007, was 14.6%, forecast to drop to 12.6% by 2008 and 10.1% by 2009.

Natural gas-fueled generation is the predominant supply resource in the ERCOT market in terms of both the installed generation capacity and generation produced, accounting for approximately 72% of the installed generation capacity and 46% of the electricity produced in the ERCOT market. In the ERCOT market, buyers and sellers enter into bilateral wholesale capacity, power and ancillary services contracts or may participate in the centralized ancillary services market, including balancing energy, which ERCOT administers. An October 1, 2005 report titled "Report on Existing and Potential Electric System Constraints and Needs" found that natural gas-fueled power plants set the market price of power more than 90% of the time in the ERCOT market. As a result, natural gas-fueled plant operators are the marginal suppliers in ERCOT, and wholesale electricity prices are highly correlated to natural gas prices.

The ERCOT market is currently divided into four regions or congestion zones, namely: North, Houston, South and West, which reflect transmission constraints that are commercially significant and which have limits as to the amount of power that can flow across zones. Luminant Power's baseload generation facilities are located primarily in the North region.

The ERCOT market operates under the reliability standards set by the NERC. The PUCT has primary jurisdiction over the ERCOT market to ensure the adequacy and reliability of power supply across Texas's main interconnected power transmission grid. ERCOT is responsible for facilitating reliable operations of the bulk electric power supply system in the ERCOT market. The ERCOT independent system operator ("ERCOT ISO") is responsible for maintaining reliable operations of the bulk electric power supply system in the ERCOT market. Its responsibilities include ensuring that electricity production and delivery are accurately accounted for among

157

EFIHMW00208287

the generation resources and wholesale buyers and sellers. Unlike certain other regional power markets, the ERCOT market is not a centrally dispatched power pool, and the ERCOT ISO does not procure energy on behalf of its members. Members who sell and purchase power are responsible for contracting sales and purchases of power bilaterally. The ERCOT ISO also serves as agent for procuring ancillary services for those members who elect not to provide their own ancillary services.

Our electric distribution and transmission business, Oncor Electric Delivery, along with those of other owners of transmission facilities in Texas, supports the operation of the ERCOT ISO. The transmission business has planning, design, construction, operation and maintenance responsibility for the portion of the transmission grid and for the load-serving substations it owns, primarily within its certificated area. We participate with the ERCOT ISO and other ERCOT utilities to plan, design, obtain regulatory approval for and construct new transmission lines necessary to meet reliability needs, increase bulk power transfer capability to remove existing constraints and interconnect generation on the ERCOT transmission grid.

We believe that the ERCOT market presents an attractive competitive electric service market due to the following factors:

- market rules support fair and robust competition, while providing opportunities to optimize the generation fleet operations and purchased power requirements;

- peak demand is expected to grow at an average rate of over 2.1% per year over the period 2007 to 2017;

- it is a sizeable market with over 62 GW of peak demand and approximately 34 GW of average demand; and

- as projected by ERCOT, in the absence of additional generation capacity, annual reserve margins are expected to fall below ERCOT's targeted reserve margin of 12.5% as early as 2009, thus providing opportunities for generation owners and developers. Reserve margin is defined as the percentage by which available capacity is expected to exceed forecasted peak demand.

**Our Strengths**

- ***Scale and diversity of business.*** We believe we have three strong, large-scale electricity businesses in an attractive electric market. Luminant has a large and diversified competitive power generation portfolio with approximately 18,365 MW of generation capacity as of June 30, 2007 (which includes 585 MW representing nine combustion turbine units currently operated for an unaffiliated party's benefit). Its diversified portfolio consists of approximately 8,137 MW of low-cost solid fuel baseload generation capacity (approximately 72% lignite/coal and 28% nuclear) in ERCOT, a market in which power prices are predominantly set by natural gas-fueled generation that is more costly than the solid fuel that powers Luminant's baseload generation plants at current commodity levels. In addition, as of June 30, 2007, Luminant owned or operated 10,228 MW of intermediate and peaking facilities, which provide the ability to dispatch assets in periods of high demand and prices. Luminant's lignite/coal-fueled plants are near lignite reserves that are controlled by Luminant and supply approximately 67% of the fuel used to operate these plants, which reduces Luminant's reliance on third-party coal suppliers and railroad use. Luminant controls approximately 1.0 billion tons, or over 21 years of fuel (assuming current mine production levels), of proven lignite reserves and operates the nation's 13th largest mining company. Luminant is also developing and constructing three new lignite coal-fueled generation facilities in Texas with expected generation capacity totaling approximately 2,200 MW of additional installed low-cost baseload capacity. We expect two of these units, representing approximately 1,400 MW, to be operational in 2009 and the remaining unit, representing approximately 800 MW, to be operational in 2010.

TXU Energy is a large scale competitive retailer that provides competitive electricity and related services to more than 2.1 million electricity customers in Texas. As of June 30, 2007, TXU Energy

158

EFIHMW00208288

held approximately 62% of the retail residential market share in its historical market area located in the north-central, eastern and western parts of Texas, including the Dallas-Fort Worth area. As of June 30, 2007, TXU Energy's estimated share of the total ERCOT market retail residential and small business electric customers was approximately 35% and 25%, respectively.

Oncor Electric Delivery operates the largest distribution and transmission system in Texas, providing power to more than three million homes and businesses and operating more than 115,000 miles of transmission and distribution lines in Texas. We believe that significant opportunities for investments in transmission and distribution exist in ERCOT, including maintenance, repair and upgrades of the transmission and distribution grid and connecting planned wind generation and other generation projects in ERCOT.

- *Low-cost asset base.* We are the largest provider of baseload generation power in Texas with approximately 8,137 MW of existing low-cost solid fuel baseload capacity (lignite/coal and nuclear) in a predominantly gas-on-the-margin market. Our baseload generation facilities operate at high utilization levels, incur comparatively low operations and maintenance costs and benefit from a number of long-term fuel contracts on attractive terms.

  Our low-cost position is supported by a number of factors, including our control of an estimated 858 million tons of dedicated proven lignite reserves, and in excess of 119 million tons of undedicated proven lignite reserves. Importantly, these lignite reserves, which are near a number of the lignite coal-fueled plants that we operate, provide a low-cost source of fuel for certain of our plants, and reduce our exposure to rising coal and rail contract prices.

- *Favorable market dynamics.* Our subsidiaries operate primarily in ERCOT, which represents approximately 85% of the electricity consumed in Texas. We believe that the strong regional economic growth in Texas continues to support demand growth for electricity in ERCOT. According to ERCOT, peak demand in ERCOT is expected to grow at an average rate of over 2.1% per year over the period from 2007 to 2017. ERCOT expects reserve margins to continue to decline, which presents additional investment opportunities, while also positively impacting the value of our existing plants. Power prices are generally driven by natural gas prices in ERCOT, where natural gas-fueled plants set the market price approximately 90% of the time. Texas has one of the highest retail energy consumption profiles in the country with approximately 14 MWh per year of consumption per household. ERCOT has experienced over 2.1% annual retail growth over the period from 2002 to 2006, making it one of the fastest growing NERC regions.

  Transmission and distribution businesses in ERCOT benefit from favorable regulatory capital recovery mechanisms known as "capital trackers" that we believe enable adequate and timely recovery of transmission investments, advanced meter reading investments and certain other infrastructure investments.

- *Strong operating performance.* Luminant Power is an industry-leading operator of baseload solid fuel plants. Based on our benchmark analysis, we believe that compared with the U.S. merchant coal plant fleet, Luminant Power's lignite/coal plants achieved top decile capacity factors and top quartile costs per MWh in 2005 and 2006. Similarly, we believe that our nuclear units achieved top decile capacity factors and top quartile costs per MWh in 2006. Luminant Power's lignite/coal-fueled plants achieved a capacity factor of 89.1% for 2006 and Luminant Power's nuclear plants achieved a capacity factor of 98.8% for 2006. Luminant Power's ongoing operating system initiatives are focused on achieving industry-leading capacity factors while continuing to manage costs. The capacity factor of a power plant is generally the ratio of the actual output of the power plant over a period of time as compared to its potential output if the plant operated at full capacity during such period.

TXU Energy is committed to providing its customers with industry-leading customer service and creating an innovative set of new products and services to meet customer needs. For the twelve months ended June 30, 2007, call answer times averaged under 15 seconds, which dropped from an average of

Confidential

EFIHMW00208289

over 100 seconds for the same period in 2004. Customer call satisfaction scores in North Texas improved 16 percent in the twelve months ended June 30, 2007, as compared to the twelve months ended June 30, 2006. TXU Energy continues to offer the broadest set of customer products of any retailer in the ERCOT market.

Oncor Electric Delivery continues to progress toward its goal of improving its top-quartile reliability performance, while maintaining top-quartile cost performance. In 2006, Oncor Electric Delivery invested approximately $840 million in its network to construct, rebuild and upgrade transmission lines, to extend the distribution infrastructure, and to pursue certain initiatives in infrastructure maintenance, information technology systems and advanced meter reading. Oncor Electric Delivery continues to transform its network into the nation's first broadband-enabled smart grid, with approximately 285,000 advanced meters installed at the end of 2006, and it plans to install up to 600,000 advanced meters by the end of 2007. Oncor Electric Delivery also achieved market-leading electric delivery performance in five out of seven key PUCT market metrics in 2006. These metrics measure the success of transmission and distribution companies in facilitating customer transactions in the competitive Texas electricity market.

- *Attractive opportunities for capital investment.* We have a number of attractive opportunities for capital investment. Luminant Construction is building three, new low-cost lignite coal-fueled generation units in the state of Texas with total estimated capacity of approximately 2,200 MW. The three units consist of one new generation unit at a site owned by Alcoa Inc. that is adjacent to an existing TCEH lignite coal-fueled generation plant site (Sandow) and two units at a TCEH site that was slated for construction of a generation plant a number of years ago (Oak Grove). Aggregate capital expenditures to develop these three units are expected to total approximately $3.25 billion, including all construction, site preparation and mining development costs (not including the purchase of the Three Oaks mine assets).

We believe that these construction projects represent attractive investment opportunities and benefit from a number of strategic advantages, including:

- our incumbent position in the ERCOT market;

- our control of attractive brownfield development sites with access to low-cost lignite fuel;

- our first mover advantage in seeking, siting and permitting approval; and

- our low-cost construction contracts with leading EPC firms.

- *Attractive cash flow generation.* For the twelve months ended June 30, 2007, on a pro forma basis, we generated Adjusted EBITDA of $5,235 million. Specific characteristics of our businesses that support our attractive cash flow generation are outlined in this offering memorandum. Our anticipated operating margins, low maintenance capital expenditures and modest working capital requirements are expected to be key drivers of our strong cash flow generation.

- *Ability to hedge future cash flows through long-term hedging program.* We believe that the strong historical correlation between natural gas prices and power prices in the ERCOT market combined with significant liquidity in certain natural gas markets currently provides an opportunity for management of our exposure to natural gas prices. As a result, we expect to hedge up to 80% of the equivalent natural gas price exposure of our expected baseload generation output on a rolling five-year basis. As of October 10, 2007, approximately 2.6 billion MMBtu of natural gas (equivalent to the natural gas exposure of over 300,000 GWh at an assumed 8.5 MMBtu/MWh market heat rate) have been effectively sold forward by our subsidiaries over the period from 2008 to 2013 at average annual prices ranging from $7.25 per MMBtu to $8.15 per MMBtu. For the period from 2008 to 2012, and taking into consideration the estimated portfolio impacts of our retail electricity business, these transactions result in us having effectively hedged approximately 80% of our expected baseload generation natural gas price exposure for such period (on an average basis for such period). Demonstrating the ability to

160

Confidential

implement a long-term hedging program on a rolling basis, we have also hedged approximately 60% of our expected baseload generation natural gas price exposure in 2013 at prices above $7.25 per MMBtu.

We believe this hedging program provides us with visibility and stability of future cash flows.

- **Strong leadership.** Luminant, TXU Energy and Oncor Electric Delivery have separate leadership teams consistent with the separation of our legacy businesses into three distinct operating entities. Each company has its own chief executive officer who, together with the respective management teams, will focus on optimizing operations and maximizing performance for that specific business unit, independent of the other business units. The management teams for each business are comprised of highly experienced professionals. In addition, four prominent Texans, Donald L. Evans, former U.S. Secretary of Commerce; James R. Huffines, Chairman of the University of Texas Board of Regents; Lyndon L. Olson Jr., former Texas State Representative and former U.S. Ambassador to Sweden; and Kneeland Youngblood, a former director of the U.S. Enrichment Corporation, have joined our Board of Directors. William Reilly, Chairman Emeritus of the World Wildlife Fund and former EPA Administrator, has also joined our Board of Directors and will lead the adoption of corporate governance policies that tie our operations and goals to environmental stewardship. Finally, former U.S. Secretary of State James A. Baker III serves as Advisory Chairman to the General Partner.

## Our Strategies

Each of our businesses focuses its operations on key drivers for that business, as described below:

- Luminant focuses on optimizing its existing generation fleet to provide safe, reliable and cost-competitive power, as well as developing and constructing additional power generation capacity to meet the growing demand for power in Texas;

- TXU Energy focuses on providing high quality customer service, including continually improving customer service and developing innovative energy products to meet customers' needs; and

- Oncor Electric Delivery focuses on achieving a high level of reliability, minimizing service interruption, maintaining safe operations, and investing to improve its transmission and distribution infrastructure.

Other elements of our strategy include:

- **Increase value from our existing businesses.** Our strategy focuses on striving for consistent top decile performance across our operations in terms of reliability, cost and customer service. We will continue to focus on upgrading four critical skill sets: operational excellence across each business; market leadership; a systematic risk/return mindset applied to all key decisions; and rigorous performance management targeting industry-leading performance standards for productivity, reliability and customer service. An example of how we implement these principles is a program called the "Luminant Operating System," which is a program to drive ongoing productivity improvements in Luminant Power's businesses through application of lean operating techniques and deployment of a high-performance industrial culture.

- **Pursue growth opportunities across our business lines.** We believe building upon and leveraging our scale advantages enables us to sustainably create value by eliminating duplicative costs, efficiently managing supply costs, and building and standardizing distinctive process expertise. Scale also allows us to take part in large capital investments, such as new generation projects and investments in our transmission and distribution system, with a smaller fraction of overall capital at risk and with an enhanced ability to streamline costs. The growth initiatives for each business include:

  - *Luminant*: Construction of three new lignite coal-fueled generation facilities at existing sites with onsite lignite fuel supplies, as well as the development of wind generation projects in the near to

161

EFIHMW00208291

medium term. Pursuit of new generation opportunities to meet ERCOT's growing generation needs over the longer term from a diverse range of alternatives such as nuclear, renewables and advanced coal technologies, such as Integrated Gasification Combined Cycle.

- *TXU Energy*: Retain existing customers and increase the number of customers served both in TXU Energy's historic territory, as well as in other Texas markets such as Houston, through innovative products and superior customer service.

- *Oncor Electric Delivery*: Investment in automatic meter reading as well as the construction of new transmission and distribution facilities to meet the needs of the growing Texas market.

- **Reduce the volatility of our cash flows through our established risk management strategy.** A key component of our risk management strategy is our plan to hedge up to 80% of the natural gas exposure of Luminant Power's baseload generation output on a rolling five-year basis. The strong historical correlation between natural gas prices and power prices in ERCOT combined with the significant liquidity in certain natural gas markets currently provides an opportunity for management of our exposure to natural gas prices. TCEH has approximately $5.9 billion of available revolving credit and letter of credit borrowing capacity (excluding amounts available under the TCEH Commodity Collateral Posting Facility and outstanding letters of credit) which we believe will provide significant liquidity for its operations, including for TCEH's long-term hedging strategies, particularly regarding its commodity and market heat rate exposures. In addition, the TCEH Commodity Collateral Posting Facility will support the margin requirements for a significant portion of the natural gas swaps that are a part of the long-term hedging program not otherwise secured by a first lien on TCEH's assets. In addition, certain existing and future hedging transactions are secured with a first lien security interest in TCEH's assets, which will reduce the liquidity requirements of entering into commodity hedge transactions because no cash or letter of credit collateral will be required for these transactions. As of the consummation of the Merger, approximately 90% of Luminant's natural gas hedging transactions were secured by this first lien security interest in TCEH's assets (including transactions covered by the TCEH Commodity Collateral Posting Facility described under "The Transactions—Debt Financing").

- **Environmental focus.** We are committed to continue to operate in compliance with all environmental laws, rules and regulations and to reduce our impact on the environment. We will put in place a Sustainable Energy Advisory Board that will focus on assisting us in pursuing technology development opportunities that utilize the United States' vast energy resources with technologies designed to reduce our impact on the environment while balancing the need to address the energy requirements of Texas. Our Sustainable Energy Advisory Board will be comprised of individuals who represent the following interests, among others: the environment, customers, Texas economic development and ERCOT reliability standards. In addition, we are focused on and are pursuing opportunities to reduce emissions from our existing and planned new lignite/coal-fueled generation units in ERCOT. As such and in connection with our plans to build three new lignite coal-fueled generation units, we have committed to reduce emissions of mercury, nitrogen oxide and sulfur dioxide at our existing units, so that the total of those emissions from both existing and new lignite coal-fueled units is 20% below 2005 levels. We expect to make these reductions through a combination of investment in new emission control equipment and possible fuel switching. We also expect such investments to provide economic benefits to us by reducing future costs associated with complying with environmental emissions standards.

## Our Operating Segments

Energy Future Holdings Corp. has aligned and reports its business activities as two operating segments: Competitive Electric (primarily represented by TCEH) and Regulated Delivery (primarily represented by Oncor Electric Delivery).

162

Confidential

**Competitive Electric Segment**

The Competitive Electric segment is managed as an integrated business; however, for purposes of operational accountability and performance management, the segment has been divided into Luminant Power, Luminant Energy, Luminant Construction and TXU Energy.

*Luminant Power*

Luminant Power's electricity generation fleet consists of 19 plants in Texas with total generating capacity as of June 30, 2007 as shown in the table below:

| Fuel Type | Capacity (MW) | Number of Plants | Number of Units[a] |
|---|---|---|---|
| Nuclear | 2,300 | 1 | 2 |
| Lignite/coal | 5,837 | 4 | 9 |
| Natural gas[b][c] | 10,228 | 14 | 45 |
| Total | 18,365 | 19 | 56 |

(a)  Leased units consist of six natural gas-fueled units totaling 390 MW of capacity. All other units are owned.

(b)  Includes 1,329 MW representing five units mothballed and not currently available for dispatch.

(c)  Includes 585 MW representing nine combustion turbine units currently operated for an unaffiliated third party's benefit.

The generation plants are located primarily on land owned in fee simple. Nuclear and lignite/coal-fueled (baseload) plants are generally scheduled to run at capacity except for periods of scheduled maintenance activities or, in the case of lignite/coal units, backdown due to low periods of demand. The natural gas-fueled generation units supplement the baseload generation capacity in meeting variable consumption, as production from these units can more readily be ramped up or down as demand warrants.

*Nuclear Generation Assets*

Luminant Power operates two nuclear generation units at the Comanche Peak plant, each of which is designed for a capacity of 1,150 MW. Comanche Peak's Unit 1 and Unit 2 went into commercial operation in 1990 and 1993, respectively, and are generally operated at full capacity to meet the load requirements in ERCOT. Refueling (nuclear fuel assembly replacement) outages for each unit are scheduled to occur every eighteen months during the spring or fall off-peak demand periods. Every three years, the refueling cycle results in the refueling of both units during the same year, with the next scheduled to occur in 2008. While one unit is undergoing a refueling outage, the remaining unit is intended to operate at full capacity. During a refueling outage, other maintenance, modification and testing activities are completed that cannot be accomplished when the unit is in operation. Over the last 3 years, the refueling outage period per unit has ranged from a high of 38 days in 2004 to a low of 18 days in 2006. The Comanche Peak plant operated at a capacity factor of 98.8% in 2006, which represents top decile performance of US nuclear generation facilities.

Luminant Power has contracts in place for nuclear fuel conversion services through 2008. In addition, Luminant Power has contracts for the acquisition of uranium through 2009 and for nuclear fuel enrichment services through 2008, as well as for nuclear fuel fabrication services through 2018.

Contracts for the acquisition of raw uranium and nuclear fuel conversion services through 2012 and 2009, respectively, are being negotiated. Additional contracts to ensure a portion of nuclear fuel enrichment services through 2020 are being negotiated. Luminant Power does not anticipate any issues with finalizing these contracts and does not anticipate any significant difficulties in acquiring raw uranium and contracting for associated services in the foreseeable future.

163

Confidential

EFIHMW00208293

Luminant Power's on-site used nuclear fuel storage capability is sufficient for five to ten years. The nuclear industry is continuing to review ways to enhance security of used-fuel storage with the NRC to fully utilize physical storage capacity.

The Comanche Peak nuclear generation units have an estimated useful life of 60 years from the date of commercial operation. Therefore, assuming that Luminant Power receives the requisite license extensions, plant decommissioning activities would be scheduled to begin in 2050 for Comanche Peak Unit 1 and 2053 for Unit 2 and common facilities. Decommissioning costs are fully recoverable from Oncor Electric Delivery's customers through an ongoing delivery surcharge.

*Lignite/Coal-Fueled Generation Assets*

Luminant Power's lignite/coal-fueled generation fleet has a nameplate capacity of 5,837 MW and consists of the Big Brown (2 units), Monticello (3 units), Martin Lake (3 units) and Sandow (1 unit) plants. These plants are generally operated at full capacity to meet the load requirements in ERCOT. Maintenance outages are scheduled during off-peak demand periods. Over the last three years, the total annual scheduled and unscheduled outages per unit averaged 33 days. Luminant Power's lignite/coal-fueled generation fleet operated at a capacity factor of 89.1% in 2006, which represents top decile performance of U.S. coal-fueled generation facilities.

Approximately 67% of the fuel used at Luminant Power's lignite/coal-fueled generation plants in 2006 was supplied from owned in fee or leased proven surface-minable lignite reserves dedicated to the Big Brown, Monticello and Martin Lake plants, which were constructed adjacent to the reserves. TCEH, through its subsidiaries, owns in fee or has under lease an estimated 858 million tons of proven reserves dedicated to its generation plants, and also owns in fee or has under lease in excess of 119 million tons of proven reserves not currently dedicated to specific generation plants. In 2006, over 22 million tons of lignite were recovered to fuel Luminant Power's plants. TCEH utilizes owned and/or leased equipment to remove the overburden and recover the lignite.

Lignite mining operations include extensive reclamation activities that return the land to productive uses such as wildlife habitats, commercial timberland and pasture land. In 2006 alone, regulatory authorities approved Luminant Power's release from further reclamation obligation approximately 8,000 acres of reclaimed land; Luminant Power planted more than 1.2 million trees as part of this reclamation.

Luminant Power supplements its lignite fuel at Big Brown, Monticello and Martin Lake with western coal from the Powder River Basin (PRB) in Wyoming. The coal is purchased from multiple suppliers under contracts of various lengths and is transported from the Powder River Basin to Luminant Power's generating plants by railcar. Based on its current usage, Luminant Power believes that it has sufficient lignite reserves for the foreseeable future and has contracted 72% of its western coal resources and 100% of the related transportation through 2009.

*Natural Gas-Fueled Generation Assets*

Luminant Power also operates a fleet of natural gas-fueled generation units, which includes 45 units with a total 10,228 MW of currently available capacity. A significant number of the natural gas-fueled units have the ability to switch between natural gas and fuel oil. The gas units predominantly serve as peaking units that can be more readily ramped up or down as demand warrants.

**Luminant Energy**

Luminant Energy plays a pivotal role in supporting Luminant Power and TXU Energy by optimizing the performance of the generation assets and sourcing the electricity requirements for TXU Energy's customers. Luminant Energy manages commodity price exposure across the complementary generation and retail businesses

164

Confidential

on a portfolio basis. Under this approach, Luminant Energy manages the risks of imbalances between generation supply and sales load, which primarily represent exposures to natural gas price movements and market heat rate changes (variations in the relationships between natural gas prices and wholesale electricity prices), through wholesale markets activities that include physical purchases and sales and transacting in financial instruments.

Luminant Energy manages the commodity exposure of the generation and retail portfolio through asset management and hedging activities. Luminant Energy provides TXU Energy with the electricity and related services to meet retail customer demand and the operating requirements of ERCOT. Luminant Energy also supports Luminant Power in selling forward generation and seeking to maximize the economic value of the fleet. In consideration of operational production and customer consumption levels that can be highly variable as well as opportunities for long-term purchases and sales with large wholesale electricity market participants, Luminant Energy buys and sells electricity in the spot and short-term market and executes longer-term forward electricity purchase and sales agreements.

In its hedging activities, Luminant Energy enters into contracts for the physical delivery of electricity and natural gas, exchange traded and "over-the-counter" financial contracts and bilateral contracts with producers, generators and end-use customers. In October 2005, Energy Future Holdings Corp. commenced a long-term hedging program designed to reduce exposure to changes in future electricity prices due to changes in the price of natural gas. As of October 10, 2007, 2.6 billion MMBtu of natural gas (equivalent to the natural gas exposure of over 300,000 GWh at an assumed 8.5 MMBtu/MWh market heat rate) have effectively been sold forward by our subsidiaries over the period from 2008 to 2013, principally utilizing natural gas-related financial instruments.

Luminant Energy also dispatches the gas-fueled generation fleet owned and operated by Luminant Power. Luminant Energy's dispatching activities are performed through a centrally managed real-time operational staff that synthesizes operational activities across the fleet and interfaces with various wholesale market channels. Luminant Energy coordinates the overall commercial strategy for these plants working closely with Luminant Power. In addition, Luminant Energy manages the fuel procurement requirements for the natural gas-fueled generation plants.

Luminant Energy engages in commercial operations such as physical purchases, storage and sales of natural gas, electricity and natural gas trading and third-party asset management. Luminant Energy's natural gas operations include well-head production contracts, transportation agreements, storage leases and retail sales. Luminant Energy currently manages approximately 18 billion cubic feet of natural gas storage capacity and has a presence outside of Texas in both electricity and natural gas commodity trading.

Luminant Energy manages exposure to wholesale commodity and credit related risk within established transactional risk management policies and limits. Luminant Energy targets best practices in risk management and risk control by employing proven principles used by financial institutions. These controls have been structured so that they are practical in application and consistent with stated business objectives. Risk management processes include capturing transactions, performing and validating valuations and reporting exposures on a daily basis using commodity information systems designed to support a large transactional portfolio. A risk management forum meets regularly to ensure that business practices comply with approved transactional limits, commodities, instruments, exchanges and markets. Transactional risks are monitored and limits are enforced to comply with the established risk policy. Luminant Energy has a strict disciplinary program to address any violations of the risk management policies and periodically reviews these policies to ensure they are responsive to changing market and business conditions.

Luminant Energy is one of the largest purchasers of wind-generated electricity in Texas and the fifth largest in the United States.

### Luminant Construction

Luminant Construction is developing three new lignite coal-fueled units in the state of Texas with total estimated capacity of approximately 2,200 MW. The three proposed units consist of one new generation unit at

165

Confidential

an existing Luminant Power lignite coal-fueled generation plant site recently acquired from Alcoa Inc. (Sandow) and two units at a site (Oak Grove) owned by Luminant Power that was originally slated for the construction of a generation plant a number of years ago. Aggregate capital expenditures for these three units are expected to total approximately $3.25 billion including all construction, site preparation and mining development costs (not including the purchase of the Three Oaks mine assets).

The development program includes up to $450 million for investments in state-of-the-art emissions controls for the three proposed new units. As part of the development program, additional environmental control systems will be included at Luminant Power's existing generation facilities. Estimates for capital expenditures associated with the full potential scope of these additional environmental control systems are in the range of approximately $1 billion to $1.3 billion. Luminant Power has yet to undertake and complete detailed cost and engineering studies for the additional environmental systems. The cost estimates for capital expenditures at Luminant Power's existing facilities are subject to change, which change could be substantial as Luminant Power determines the details of and further evaluates the engineering and construction costs related to these investments.

Development and procurement activities for the three proposed units are essentially complete and site construction is well underway. Air permits have been obtained and EPC agreements have been executed with Bechtel Power Corporation and Fluor Enterprises, Inc. The expected on-line dates of the units are as follows: Sandow in 2009 and Oak Grove's two units in 2009 and 2010.

### TXU Energy

TXU Energy serves more than 2.1 million retail electricity customers, of which 1.9 million are in its historical service territory, which was the territory, largely in north Texas, being served by Energy Future Holdings Corp.'s regulated electric utility subsidiary at the time of entering retail competition on January 1, 2002. This territory, which is located in the north-central, eastern and western parts of Texas, has an estimated population in excess of 7 million, about one-third of the population of Texas, and comprises 92 counties and 370 incorporated municipalities, including Dallas/Fort Worth and surrounding suburbs, as well as Waco, Wichita Falls, Odessa, Midland, Tyler and Killeen.

Texas is one of the fastest growing states in the nation with a diverse and resilient economy and, as a result, has attracted a number of competitors into the deregulated retail electricity market. As a result, competition is expected to continue to be robust. TXU Energy, as an active participant in this competitive market, provides retail electric service to the other areas of ERCOT now open to competition including the Houston, Corpus Christi, and lower Rio Grande Valley areas of Texas. TXU Energy continues to market its services in Texas to add new customers and to retain its existing customers. As of September 2007, there are more than 100 REPs certified to compete within the state of Texas.

As a result of the legislation that restructured the electric utility industry in Texas to provide for retail competition (1999 Restructuring Legislation), effective January 1, 2002, REPs affiliated with electricity delivery utilities were required to charge price-to-beat retail prices, established by the Public Utility Commission of Texas (the Commission), to residential and small business customers located in their historical service territories. The price-to-beat mechanism was intended to spur competition as the rates were set such that competing REPs could profitably offer lower rates. TXU Energy, as a REP affiliated with an electricity delivery utility, was required to charge the price-to-beat retail price, adjusted for fuel factor changes, to these classes of customers until the earlier of January 1, 2005 or the date on which 40% of the electricity consumed by customers in that class was supplied by competing REPs. TXU Energy met the 40% threshold target calculation for its small business customers in December 2003 and began offering rates other than the price-to-beat retail prices to this customer class. Since January 1, 2005, TXU Energy has offered rates different from the price-to-beat retail prices to all customer classes, but was required to make the price-to-beat retail prices available for residential and small business customers in its historical service territory until January 1, 2007. As of January 1, 2007, TXU Energy is no longer required to offer the price-to-beat retail price to any of its customer classes.

166

EFIHMW00208296

In connection with the Merger, TXU Energy announced a 15 percent price reduction for residential customers in its historical service territory who have not already switched to one of the many pricing plans other than the basic month-to-month plan. These customers received a six percent reduction beginning in late March 2007 and an additional four percent reduction in June 2007 and will receive an additional five percent reduction effective in late October 2007. In addition, TXU Energy will provide price protection to these customers through December 2008, ensuring that these customers receive the benefits of these savings through two summer seasons of peak energy usage.

### Regulated Delivery Segment

The Regulated Delivery segment primarily consists of Oncor Electric Delivery. Oncor Electric Delivery provides the essential service of delivering electricity safely, reliably and economically to end-use consumers through its distribution systems, as well as providing transmission grid connections to merchant power plants and interconnections to other transmission grids in Texas. Operating assets of the segment are located principally in the north-central, eastern and western parts of Texas.

Oncor Electric Delivery is not a buyer or seller of power. It provides transmission services to other electricity distribution companies, cooperatives and municipalities. It provides distribution services to REPs, which sell power to retail customers. Most of Oncor Electric Delivery's power lines have been constructed over lands of others pursuant to easements or along public highways, streets and rights-of-way as permitted by law. Oncor Electric Delivery's transmission and distribution rates are regulated by the PUCT.

*Electricity Transmission*

Oncor Electric Delivery's electric transmission business is responsible for the safe and reliable operations of its transmission network and substations. These responsibilities consist of the construction and maintenance of transmission facilities and substations and the monitoring, controlling and dispatching of high-voltage electricity over Oncor Electric Delivery's transmission facilities in coordination with ERCOT.

Oncor Electric Delivery is a member of ERCOT, and the transmission business actively supports the operations of ERCOT and market participants. The transmission business participates with ERCOT and other member utilities to plan, design, construct and operate new transmission lines, with regulatory approval, necessary to maintain reliability, interconnect to merchant power plants, increase bulk power transfer capability and minimize limitations and constraints on the ERCOT transmission grid. For a more complete description of ERCOT see "ERCOT Market Framework" below.

Transmission revenues are provided under tariffs approved by either the PUCT or, to a small degree, the FERC. Network transmission revenues compensate Oncor Electric Delivery for delivery of power over transmission facilities operating at 60 kilovolts (kV) and above. Transformation service revenues compensate Oncor Electric Delivery for substation facilities that transform power from high-voltage transmission to distribution voltages below 60 kV. Other services offered by the transmission business include, but are not limited to: system impact studies, facilities studies and maintenance of transformer equipment, substations and transmission lines owned by other nonretail parties.

Provisions of the 1999 Restructuring Legislation allow Oncor Electric Delivery to annually update its transmission rates to reflect changes in invested capital. These provisions encourage investment in the transmission system to help ensure reliability and efficiency by allowing for timely recovery of and return on new transmission investments.

Oncor Electric Delivery's transmission facilities include 4,680 circuit miles of 345-kV transmission lines and 9,684 circuit miles of 138- and 69-kV transmission lines. In 2006, 198 circuit miles of new 345-kV transmission lines were constructed. Forty-five generating plants totaling 32,699 MW are directly connected to Oncor Electric Delivery's transmission system, and 710 distribution substations are served from Oncor Electric Delivery's transmission system.

Confidential

EFIHMW00208297

Oncor Electric Delivery's transmission facilities have the following connections to other transmission grids in Texas:

| Grid Connections | Number of Interconnected Lines | | |
|---|---|---|---|
| | 345 kV | 138 kV | 69 kV |
| Centerpoint Energy Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 8 | — | — |
| American Electric Power Company, Inc.(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4 | 7 | 12 |
| Lower Colorado River Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6 | 20 | 3 |
| Texas Municipal Power Agency . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 8 | 9 | — |
| Texas New Mexico Power . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2 | 9 | 11 |
| Brazos Electric Power Cooperative . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4 | 94 | 21 |
| Rayburn Country Electric Cooperative . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 27 | 7 |
| City of Georgetown . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 2 | — |
| Other small systems operating wholly within Texas . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 10 | 3 |

(a)  One of the 345-kV lines is on asynchronous high voltage current connection with the Southwest Power Pool.

*Electricity Distribution.*  Oncor Electric Delivery's electricity distribution business is responsible for the overall safe and efficient operation of distribution facilities, including power delivery, power quality and system reliability. The Oncor Electric Delivery distribution system includes over 3 million points of delivery. The electricity distribution business consists of the ownership, management, construction, maintenance and operation of the distribution system within Oncor Electric Delivery's certificated service area. Over the past five years, the number of Oncor Electric Delivery's distribution system points of delivery served has been growing an average of 2% per year, adding approximately 43,000 points of delivery in 2006.

Oncor Electric Delivery's distribution system receives electricity from the transmission system through substations and distributes electricity to end-users and wholesale customers through approximately 3,000 distribution feeders.

The Oncor Electric Delivery distribution system consists of 56,102 miles of overhead primary conductors, 21,879 miles of overhead secondary and street light conductors, 14,578 miles of underground primary conductors and 9,114 miles of underground secondary and street light conductors. The majority of the distribution system operates at 25-kV and 12.5-kV.

*Customers.*  Oncor Electric Delivery's transmission customers consist of municipalities, electric cooperatives and other distribution companies. Oncor Electric Delivery's distribution customers consist of approximately 60 REPs in Oncor Electric Delivery's certificated service area, including TXU Energy. For the year ended December 31, 2006, distribution revenues from TCEH represented 52% of Oncor Electric Delivery's distribution revenues and 46% of Oncor Electric Delivery's total revenues. The retail customers who purchase and consume electricity delivered by Oncor Electric Delivery are free to choose their electricity supplier from REPs who compete for their business.

**Legal Proceedings**

*Litigation*—Two putative class and derivative lawsuits and one derivative lawsuit were filed in the United States District Court, Northern District of Texas, Dallas Division in March 2007 against the directors of Energy Future Holdings Corp., Energy Future Holdings Corp., as a nominal defendant, and the Sponsors. On April 27, 2007, the Plaintiffs filed Amended Complaints asserting only derivative claims against the same defendants. The

Confidential

EFIHMW00208298

lawsuits seek to challenge and enjoin the Merger Agreement. The cases allege that the directors abused their ability to control and influence Energy Future Holdings Corp.. committed gross mismanagement and violated various fiduciary duties by approving the Merger Agreement and the Sponsors aided and abetted that alleged conduct. The Plaintiffs contend that the directors violated fiduciary duties owed to shareholders by failing to maximize the value of Energy Future Holdings Corp. and by breaching duties of loyalty and due care by not taking adequate measures to ensure that the interests of shareholders were properly protected. The Merger Agreement allowed Energy Future Holdings Corp. to solicit other proposals from third parties until April 16, 2007 and the transaction was subject to the approval of Energy Future Holdings Corp.'s shareholders. which was obtained at the annual meeting of shareholders on September 7, 2007. Accordingly, Energy Future Holdings Corp. and its directors filed Motions to Dismiss based on the Plaintiffs' failure to comply with the provisions of the Texas Business Organizations Code ("TBOC") applicable to filing and pursuing derivative proceedings. The Motions are pending before the Court.

In February and March 2007, three derivative lawsuits were filed in Dallas County state district courts arising out of the Merger Agreement. The suits, filed by putative shareholders, allege that Energy Future Holdings Corp.'s directors, named as defendants, breached fiduciary duties owed Energy Future Holdings Corp. by approving the Merger Agreement. The petitions, now consolidated into one action in the 44th District Court, Dallas County, Texas, include claims that the defendants failed to ensure that the transaction was in the best interest of Energy Future Holdings Corp.; that the directors participated in a transaction where their loyalties were divided and where they were to receive a personal financial benefit; that such alleged conduct constituted a breach of their duties of care, loyalty, good faith, candor and independence owed to Energy Future Holdings Corp.; and that the Sponsors aided and abetted the alleged breaches of fiduciary duties by the directors. Energy Future Holdings Corp. believes that the Plaintiffs failed to comply with provisions of the Texas Business Organizations Code applicable to filing and pursuing derivative proceedings and thus have filed a Motion to Dismiss that is pending before the Court. Additionally, Energy Future Holdings Corp. has filed a Written Statement with the Court advising that, pursuant to the Texas Business Organizations Code, a Derivative Demand Committee of independent and disinterested members of Energy Future Holdings Corp.'s board of directors has been formed and is engaged in the active review, in good faith, of the allegations in the consolidated derivative lawsuits. Consequently, Energy Future Holdings Corp. has requested that the Court enforce the automatic and mandatory stay of the proceedings as provided in the Texas Business Organizations Code until the Derivative Demand Committee has completed its review. On May 16, 2007, the parties agreed to stay the consolidated derivative proceeding pending the Derivative Demand Committee's review of Plaintiffs' claims in that proceeding. On May 18, 2007, the Court entered an order staying the action in accordance with Section 21.555 of the TBOC. On July 18, 2007, Energy Future Holdings Corp. filed a Written Statement pursuant to TBOC Section 21.555(c) and an Application for Additional Stay informing the District Court that the Derivative Demand Committee was continuing its active review, in good faith, of the allegations set forth in the derivative lawsuits and accordingly requested an extension of the order staying the action through August 31, 2007. The Court has not yet ruled upon the Written Statement and Application.

In February and March 2007 eight lawsuits were filed in state district court in Dallas County, Texas by putative shareholders against the directors of Energy Future Holdings Corp., Energy Future Holdings Corp., the Sponsors, and certain financial entities, asserting claims on behalf of owners of shares of Energy Future Holdings Corp. common stock as well as seeking to certify a class action on behalf of allegedly similarly situated shareholders. The lawsuits, which have been consolidated into one action in the 44th District Court, Dallas County, Texas, contend that the directors of Energy Future Holdings Corp. violated various fiduciary duties owed plaintiffs and other shareholders in connection with the execution of the Merger Agreement and that the Sponsors and certain financial entities aided and abetted the alleged breaches of fiduciary duties by the directors. Plaintiffs seek to enjoin defendants from consummating the Merger Agreement until such time as a procedure or process is adopted to obtain the highest possible price for shareholders. as well as a request that the Court direct the officers and directors of Energy Future Holdings Corp. to exercise their fiduciary duties in order to obtain a transaction in the best interest of Energy Future Holdings Corp. shareholders. The consolidated suit includes

Confidential

EFIHMW00208299

claims that the directors failed to take steps to properly value or maximize the value of Energy Future Holdings Corp. and breached their duties of loyalty, good faith, candor and independence owed to Energy Future Holdings Corp. shareholders. The Merger Agreement allowed Energy Future Holdings Corp. to solicit other proposals from third parties until April 16, 2007 and was subject to the approval of Energy Future Holdings Corp.'s shareholders, which was obtained at the annual meeting of shareholders on September 7, 2007. The consolidated suit purports to assert claims by shareholders directly against the directors. Energy Future Holdings Corp. believes that Texas law does not recognize such a cause of action. Consequently, Energy Future Holdings Corp. and its directors have filed a Motion to Dismiss. On May 25, 2007, the Court granted the Motion and dismissed the consolidated putative class action suit with prejudice. On May 31, 2007, Plaintiffs moved for reconsideration of the May 25 Order dismissing the action; however, Plaintiffs subsequently withdrew this motion.

On July 19, 2007, a putative class action lawsuit was filed in the United States District Court, Northern District of Texas, Dallas Division by a putative shareholder against Energy Future Holdings Corp. and its directors asserting a claim under Section 14(a) of the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder, asserting that the preliminary proxy statement of Energy Future Holdings Corp. filed June 14, 2007 fails to adequately describe the relevant facts and circumstances regarding the Merger as well as seeking to certify the litigation as a class action on behalf of allegedly similarly situated shareholders. Energy Future Holdings Corp. has not yet responded to this litigation and, as described below, on July 23, 2007, the Sponsors, joined by Energy Future Holdings Corp. for the limited purpose described below, have entered into a memorandum of understanding with plaintiffs that would result in the dismissal of this litigation if the settlement is approved by the courts. In the event that Energy Future Holdings Corp. is required to respond to this litigation, Energy Future Holdings Corp. will file a Motion to Dismiss based on the fact that this proxy statement clearly and accurately describes the information regarding the Merger and the information necessary for a shareholder to evaluate the proposal to approve the Merger Agreement. We believe the claims made in this litigation are without merit and, therefore, if necessary, we intend to vigorously defend this litigation.

On July 23, 2007, the Sponsors, joined by Energy Future Holdings Corp. for the limited purpose described below, executed a memorandum of understanding with the plaintiffs in certain of the lawsuits described above pursuant to which, if approved by the court in which the litigation is pending, to the extent required, all of the litigation related to the Merger will be dismissed with prejudice. Neither Energy Future Holdings Corp. nor any of its directors agreed to fund any payment or pay any other consideration under the settlement. Energy Future Holdings Corp. did agree to make certain revisions to the final proxy statement as part of the agreement between the Sponsors and the plaintiffs to settle the litigation and agreed that under certain circumstances the termination fee payable by Energy Future Holdings Corp. under the Merger Agreement would be $925 million rather than $1 billion. The settlement of the litigation, subject to court approval, will result in a dismissal of all claims against Energy Future Holdings Corp. and its officers and directors related to the Merger.

On December 1, 2006, a lawsuit was filed in the United States District Court for the Western District of Texas against TXU Generation Company, LP, Oak Grove Management Company LLC and Energy Future Holdings Corp. The complaint seeks declaratory and injunctive relief, as well as the assessment of civil penalties, with respect to the permit application for the construction and operation of the Oak Grove generation plant in Robertson County, Texas. The plaintiffs allege violations of the federal Clean Air Act, Texas Health and Safety Code and Texas Administrative Code and seek to temporarily and permanently enjoin the construction and operation of the Oak Grove generation plant. The complaint also asserts that the permit application was deficient in failing to comply with various modeling and analyses requirements relative to the impact of emissions on the environment. Plaintiffs further request that the court enter an order requiring the defendants to take other appropriate actions to remedy, mitigate and offset alleged harm to the public health and environment. We believe the Oak Grove air permit, granted by the TCEQ, is protective of the environment and that the application for and the processing of the air permit by Oak Grove Management Company LLC with the TCEQ has been in accordance with law. The plaintiffs' complaint was dismissed by the Federal District Court on May 21, 2007 in response to Energy Future Holdings Corp.'s Motion to Dismiss, and the matter is now on appeal to the Court of

170

Confidential

Appeals for the Fifth Circuit. We believe that the claims made in this complaint are without merit and, accordingly, intend to vigorously defend this appeal.

On September 6, 2005 a lawsuit was filed in the U.S. District Court for the Northern District of Texas, Dallas Division against Energy Future Holdings Corp. and C. John Wilder. The plaintiffs' amended complaint asserts claims on behalf of the plaintiffs and a putative class of owners of certain Energy Future Holdings Corp. securities who tendered such securities in connection with a tender offer conducted by Energy Future Holdings Corp. in 2004. The amended complaint alleges violations of the provisions of Sections 14(e), 10(b) and 20(a) of the Securities Exchange Act of 1934, as amended, and Rule 10b-5 thereunder. The allegations relate to a tender offer conducted in September and October 2004 for certain equity-linked securities in which it was expressly disclosed that Energy Future Holdings Corp. management was evaluating whether it should recommend to the board of directors that the board reevaluate Energy Future Holdings Corp.'s dividend policy. After the tender offer was closed, and consistent with the disclosure, management did make a recommendation to the board to reevaluate the dividend policy and the board elected to increase the quarterly dividend. The plaintiffs contend that such disclosure in connection with the tender offer was inadequate. We maintain that the disclosure provided in connection with the tender offer regarding the evaluation of the dividend policy was complete and accurate at the time the tender offer was initiated as well as when it was closed. A Motion to Dismiss was filed by the defendants, and the District Court entered an order granting the Motion to Dismiss and dismissing this litigation with prejudice on August 30, 2006. The plaintiffs filed a timely notice of appeal and, on appeal, the U.S. Fifth Circuit Court of Appeals remanded the dismissal to the District Court in light of the decisions in Tellabs, Inc. v. Makor Issues & Rights, Ltd. While we are unable to estimate any possible loss or predict the outcome of this litigation, we believe the claims made in this litigation are without merit and, accordingly, intend to vigorously defend this litigation, including the appeal of the District Court's order dismissing the complaint.

In November 2002, February 2003 and March 2003, three lawsuits were filed in the U.S. District Court for the Northern District of Texas, Dallas Division, asserting claims under the Employee Retirement Income Security Act ("ERISA") on behalf of a putative class of participants in and beneficiaries of various employee benefit plans of Energy Future Holdings Corp. These ERISA lawsuits were consolidated, and a consolidated complaint was filed in February 2004 against Energy Future Holdings Corp., the directors of Energy Future Holdings Corp. serving during the putative class period as well as certain officers of Energy Future Holdings Corp. who were the members of the TXU Thrift Plan Committee. The plaintiffs seek to represent a class of participants in such employee benefit plans during the period between April 26, 2001 and October 11, 2002. The plaintiffs filed an initial motion for class certification and, after class certification discovery was completed, the District Court denied plaintiffs' initial class certification motion without prejudice and granted plaintiffs' leave to amend their complaint. Plaintiffs' second class certification motion, filed on the basis of their amended complaint, was denied and the case was ordered dismissed without prejudice on September 29, 2005. The plaintiffs filed an appeal of the dismissal to the Fifth Circuit Court of Appeals. While on appeal, the matter was referred to the Fifth Circuit's alternative dispute resolution program and subsequently to mediation. While mediation was unsuccessful, further discussions led to an agreement in principle to settle this litigation on December 24, 2006 for $7.25 million, before attorney's fees, to be paid by Energy Future Holdings Corp. to the thrift plan pursuant a Court approved allocation. A Memorandum of Understanding confirming the agreement in principle was signed on January 24, 2007 and the settlement is in the process of being confirmed with final settlement documents after which the settlement will be submitted to the District Court for approval. We believe the claims are without merit and, in the event the settlement is not approved, intends to vigorously defend the lawsuit, including the appeal. Energy Future Holdings Corp. is, however, unable to estimate any possible loss or predict the outcome of this action in the event the District Circuit rejects the settlement, the Fifth Circuit reverses the dismissal and remands the case to the District Court or the suit is refiled by the plaintiffs or others seeking to assert similar claims.

We are also involved in litigation concerning environmental permits for the three new lignite coal-fueled units that Luminant is developing at Oak Grove and Sandow. See "Energy Future Holding Corp. Management's Discussion and Analysis of Financial Condition and Results of Operations—Significant Developments—Texas Generation Facilities Development."

Confidential

EFIHMW00208301

In addition to the above, Energy Future Holdings Corp. and its subsidiaries is involved in various other legal and administrative proceedings in the normal course of business the ultimate resolution of which, in the opinion of management, should not have a material effect on its financial position, results of operations or cash flows.

*Regulatory Investigations*—In October 2006, Luminant Energy was notified that the PUCT had begun an informal investigation of its 2005 activities in the ERCOT wholesale electricity market as a result of observations noted in the 2005 State of the Market Report for the *ERCOT Wholesale Electricity Markets* performed by Potomac Economics, an economic consulting firm. The investigation was focused on activities involving bids to sell balancing energy and generation unit commitments. Balancing energy represents approximately five to ten percent of the total energy sold in the ERCOT wholesale market. Luminant Energy has cooperated fully with the PUCT in its informal investigation.

In March 2007, the PUCT issued a Notice of Violation ("NOV") stating that the PUCT staff is recommending an enforcement action, including the assessment of administrative penalties, against us and certain affiliates for alleged market power abuse by its power generation affiliates and Luminant Energy in ERCOT-administered balancing energy auctions during certain periods of the summer of 2005. The PUCT staff issued a revised NOV in September 2007, in which the proposed administrative penalty amount was reduced from $210 million to $171 million. The revised NOV was necessary, according to the PUCT staff, to correct calculation errors in the initial NOV. As revised, the NOV is premised upon the PUCT staff's allegation that TXU Portfolio Management's bidding behavior was not competitive and increased market participants' costs of balancing energy by approximately $57 million, including approximately $19 million in incremental revenues to Energy Future Holdings Corp. A hearing requested by Luminant Energy to contest the alleged occurrence of a violation and the amount of the penalty in the NOV has been scheduled to start in April 2008. We believe Luminant Energy's conduct during the period in question was consistent with the PUCT's rules and policies, and no market power abuse was committed. Energy Future Holdings Corp. is vigorously contesting the NOV. Energy Future Holdings Corp. is unable to predict the outcome of this matter.

Energy Future Holdings Corp. and Luminant Energy have taken actions to reduce the risk of future similar allegations related to the balancing energy segment of the ERCOT wholesale market, including working with the PUCT staff and the PUCT's independent market monitor to develop a voluntary mitigation plan for approval by the PUCT. Luminant Energy has submitted a voluntary mitigation plan that was approved by the PUCT in July 2007. The PUCT's approval action has been challenged by some other market participants on procedural grounds and the initial ruling of the Texas District Court has upheld that challenge. TCEH cannot predict whether the PUCT will appeal that ruling or be successful in any such appeal.

The PUCT staff had been investigating TXU Energy with respect to the renewal process for certain small and medium business customers on term service plans. The investigation did not involve residential customers. In June 2007, TXU Energy reached a settlement agreement with the Staff of the PUCT that was approved by the PUCT in July 2007. While TXU Energy expressly denies any violations of rules, it has agreed to pay the PUCT a $5 million settlement as a compromise in this dispute.

In addition to the above, we are involved in various other regulatory investigations in the normal course of business the ultimate resolution of which, in the opinion of management, should not have a material effect on our financial position, results of operations or cash flows.

**Environmental Regulations and Related Considerations**

*Climate Change and Carbon Dioxide.* Luminant's baseload lignite coal-fueled power plants are significant sources of carbon dioxide ("$CO_2$") emissions, generating the great majority of the average of 57 million tons of $CO_2$ that our monitoring indicates our generation plants have produced annually from 2004 to 2006. The three new lignite coal-fueled units being developed will generate substantial additional $CO_2$ emissions. We participate in a voluntary electric utility industry sector climate change initiative in partnership with the U.S. Department of Energy. This initiative supports the Bush Administration's greenhouse gas emissions intensity reduction program, Climate VISION. In addition, we continue to participate in a voluntary greenhouse gas emission

172

EFIHMW00208302

reduction program under the Energy Policy Act of 1992 and since 1995 has reported the results of its program annually to the U.S. Department of Energy.

In conjunction with the Merger agreement, we announced our commitment to reduce $CO_2$ emissions and intent to join the U.S. Climate Action Partnership ("USCAP"), which is a broad-based group of businesses and leading environmental groups organized to work with the President, the Congress and all other stakeholders to enact environmentally effective and economically sustainable climate change programs. $CO_2$ is the principal greenhouse gas that we emit. As part of our support of USCAP, we are also pledging to support a mandatory cap and trade program to reduce $CO_2$ emissions.

Our approach to addressing global climate change is based upon the following principles:

- Climate change is a global issue requiring a comprehensive solution addressing all greenhouse gases, sources and economic sectors in all countries;

- Development of U.S. energy and environmental policy should seek to ensure U.S. energy security and independence;

- Solutions should encourage investment in a diverse supply of new generation to meet U.S. needs to maintain adequate reserve margins and support economic growth, as well as address customer's needs for affordable and reliable energy;

- Policies should encourage significant investments in research and development and deployment of a broad spectrum of solutions, including energy efficiency, renewable energy and coal, natural gas and nuclear-fueled generation technologies; and

- Any mandate to reduce greenhouse gas emissions should be developed under a market-based framework that is consistent with expected technology development timelines and supports the displacement of old, inefficient power generation technology with advanced, more efficient technology.

Our strategies for lowering greenhouse gas emissions include:

- Investing in technology—We expect to invest up to $2 billion over the next five to seven years for the development and commercialization of cleaner power plant technologies, including integrated gasification combined cycle, the next generation of more efficient ultra-supercritical coal and pulverized coal emissions technology to reduce $CO_2$ emission intensity. A number of actions, including research and development investments and partnerships, have already been initiated to advance next-generation technologies.

- Providing electricity from renewable sources—We intend to become a leader in providing electricity from renewable sources by more than doubling our purchases of wind power to more than 1,500 MW. We also intend to promote solar power through solar/photovoltaic rebates.

- Committing to demand side management initiatives—We expect that our subsidiaries will invest $400 million over the next five years in programs designed to encourage customer electricity demand efficiencies.

- Reducing $CO_2$ emissions by increasing production efficiency—We expect to increase production efficiency of its existing generation facilities by up to 2 percent.

- Evaluating the development of a nuclear generation facility—We plan to develop an application to file with the NRC for combined construction and operating licenses for up to 3,400 MW of new nuclear generation capacity at its Comanche Peak nuclear generation plant. We expect to submit the application in 2008. Nuclear generation is the lowest emission source of baseload generation available.

Increasing public concern and political pressure from local, regional, national and international bodies, may result in the passage of new laws mandating limits on greenhouse gas emissions. A series of reports by the

173

Confidential

EFIHMW00208303

Intergovernmental Panel on Climate Change earlier this year attracted considerable public attention and concern. Several bills addressing climate change have been introduced in the U.S. Congress and, in April 2007, the U.S. Supreme Court issued a decision ruling the EPA improperly declined to address $CO_2$ impacts in a rulemaking related to new motor vehicle emissions. While this decision is not directly applicable to power plant emissions, the reasoning of the decision could affect other regulatory programs. Various proposals in the U.S. Congress could require us to purchase offsets or allowances for some or all of our $CO_2$ emissions, or otherwise affect us based on the amount of $CO_2$ we generate. The impact on us of any future greenhouse gas regulation will depend in large part on the details of the requirements and the timetable for mandatory compliance. We continue to assess the financial and operational risks posed by possible future legislative changes pertaining to greenhouse gas emissions, but because these proposals are in the formative stages, we are unable to predict any future impacts on our financial condition and operations.

*Sulfur Dioxide, Nitrogen Oxide and Mercury Air Emissions.* The federal Clean Air Act includes provisions which, among other things, place limits on the SO2, NOx and mercury emissions produced by certain generation plants. In addition to the new source performance standards applicable to SO2 (associated with acid rain) and NOx (associated with ozone formation), the Clean Air Act requires that fossil-fueled plants have sufficient SO2 emission allowances and meet certain NOx emission standards. Our generation plants meet the current SO2 allowance requirements and NOx emission rates.

In 2005, the EPA issued a final rule to further reduce SO2 and NOx emissions from power plants. The SO2 and NOx reductions required under the Clean Air Interstate Rule ("CAIR") are based on a cap and trade approach (market-based) in which a cap is put on the total quantity of emissions allowed in 28 eastern states (including Texas), emitters are required to have allowances for each ton emitted, and emitters are allowed to trade emissions under the cap. The CAIR reductions are required to be phased in between 2009 and 2015.

Also in 2005, the EPA published a final rule requiring reductions of mercury emissions from coal-fueled generation plants. The Clean Air Mercury Rule ("CAMR") is based on a cap and trade approach on a nationwide basis. The mercury reductions are required to be phased in between 2010 and 2018.

SO2 reductions required under the proposed regional haze/visibility rule (or so-called BART rule) only apply to units built between 1962 and 1977. The reductions would be required on a unit-by-unit basis. The EPA provides the option for states to use CAIR to satisfy the BART reductions for electric generating units and Texas has chosen this option.

In connection with our plan to build three new lignite coal-fueled generation units in Texas, we have committed to reduce emissions of NOx, SO2 and mercury at our existing coal-fueled units so that the total of those emissions from both existing and new lignite/coal-fueled units are 20% below 2005 levels. This reduction is expected to be accomplished through the installation of emissions control equipment in both the new and existing units and possible fuel blending at some existing units. These efforts, which will involve incremental equipment investments, as well as additional costs for facility operations and maintenance in the future, will be coordinated with the CAIR, CAMR and BART rules for the most cost-effective compliance plan options. Estimates for capital expenditures associated with the full potential scope of these additional environmental control systems are in the range of approximately $1 billion to $1.3 billion. Luminant Power has yet to undertake and complete detailed cost and engineering studies for the additional environmental systems. The cost estimates for capital expenditures at Luminant Power's existing facilities are subject to change, which change could be substantial as Luminant Power determines the details of and further evaluates the engineering and construction costs related to these investments.

The Clean Air Act also requires each state to monitor air quality for compliance with federal health standards. The standards for ozone are not being achieved in several areas of Texas. The TCEQ adopted new State Implementation Plan rules in July 2007 to deal with 8-hour ozone standards. These rules require further NOx emission reductions from certain of our facilities in the Dallas-Fort Worth area.

We believe that Energy Future Holdings Corp. holds all required material emissions permits for facilities in operation and has applied for or obtained the necessary permits for facilities under construction.

174

EFIHMW00208304

*Water.* The TCEQ and the EPA have jurisdiction over water discharges (including storm water) from facilities in Texas. We believe facilities of Energy Future Holdings Corp. are presently in material compliance with applicable state and federal requirements relating to discharge of pollutants into water. Energy Future Holdings Corp. believes it holds all required material waste water discharge permits from the TCEQ for facilities in operation and has applied for or obtained necessary permits for facilities under construction. We believe we can satisfy the requirements necessary to obtain any required permits or renewals. Recent changes to federal rules pertaining to Spill Prevention, Control and Countermeasure Plans ("SPCC") for oil-filled electrical equipment and bulk storage facilities for oil will require updating of certain plants and facilities. We have determined that SPCC plans will be required for certain substations, work centers and distribution systems by July 1, 2009. We are currently compiling data for development of these plans.

Diversion, impoundment and withdrawal of water for cooling and other purposes are subject to the jurisdiction of the TCEQ and the EPA. Energy Future Holdings Corp. believes it possesses all material necessary permits for these activities from the TCEQ for its present operations. Clean Water Act Section 316(b) regulations pertaining to existing water intake structures at large power plants were published by the EPA in 2004. As prescribed in the regulations, we began implementing a monitoring program to determine the future actions that might need to be taken to comply with these regulations. In January 2007, a federal court ruled against the EPA in a lawsuit brought by environmental groups challenging aspects of these regulations, and in July 2007, the EPA announced that it was suspending the regulations pending further rulemaking. We cannot predict the impact on our operations of the suspended existing regulations or of any new regulations that replace them.

*Radioactive Waste.* Under the federal Low-Level Radioactive Waste Policy Act of 1980, as amended, the State of Texas is required to provide, either on its own or jointly with other states in a compact, for the disposal of all low-level radioactive waste generated within the state. The State of Texas has agreed to a compact for a disposal facility that would be located in Texas. That compact was ratified by Congress and signed by the President in 1998. In 2003, the State of Texas enacted legislation allowing a private entity to be licensed to accept low-level radioactive waste for disposal, and in 2004 the State received a license application from such an entity for review. We intend to continue to ship low-level waste material off-site for as long as an alternative disposal site is available. Should existing off-site disposal become unavailable, the low-level waste material will be stored on-site. Our on-site storage capacity at the Comanche Peak plant is expected to be adequate until other off-site facilities become available. (See discussion under "—TCEH Operating Segment—Luminant Power—Nuclear Generation Assets" above.)

*Solid Waste, including Fly Ash Associated with Lignite/Coal-Fueled Generation.* Treatment, storage and disposal of solid waste and hazardous waste are regulated at the state level under the Texas Solid Waste Disposal Act and at the federal level under the Resource Conservation and Recovery Act of 1976, as amended, and the Toxic Substances Control Act. The EPA has issued regulations under the Resource Conservation and Recovery Act of 1976 and the Toxic Substances Control Act, and the TCEQ has issued regulations under the Texas Solid Waste Disposal Act applicable to our facilities. We believe we are in material compliance with all applicable solid waste rules and regulations. In addition, we have registered solid waste disposal sites and have obtained or applied for permits required by such regulations.

*Environmental Capital Expenditures.* Capital expenditures for our environmental projects totaled $48 million in 2006 and are expected to total approximately $111 million in 2007, exclusive of emissions control equipment investment planned as part of the three-unit Texas generation development program, which is expected to total up to $450 million over the construction period. Estimates for capital expenditures associated with the full potential scope of these additional environmental control systems at Luminant Power's existing generation facilities are in the range of approximately $1 billion to $1.3 billion. Luminant Power has yet to undertake and compete detailed cost and engineering studies for the additional environmental systems. The cost estimates for capital expenditures at Luminant Power's existing facilities are subject to change, which change could be substantial as Luminant Power determines the details of and further evaluates the engineering and construction costs related to these investments.

175

Confidential

## REGULATION AND RATES

### General

#### 2007 Texas Legislative Session

The Texas Legislature convened in its regular biennial session on January 9, 2007 and adjourned on May 28, 2007. The session was not a "sunset" session for the PUCT, so there was no requirement that the Legislature consider any electric industry-related bills. However, various measures pertaining to the electric industry were considered. The primary measures that were under consideration and would have materially affected our businesses and potentially the Merger were ultimately not enacted. New PURA provisions were enacted that ensure the PUCT shall have authority to enforce commitments made in a filing under PURA Section 14.101 (such as the filing with the PUCT made by Texas Holdings and Oncor Electric Delivery on April 25, 2007). In addition, the Sponsors have publicly indicated their intention to:

- Spend more than $30 million per year over five years to provide relief for low-income residents and to pursue new demand side management initiatives in conservation, energy efficiency and weatherization;

- In the current regulatory system, hold a majority of their ownership in Energy Future Holdings Corp. for more than five years after closing of the Merger; and

- Invest significant resources in emerging energy technologies, such as integrated gasification combined cycle coal plants, including an increased commitment to renewable energy.

### Luminant

Luminant Power is an exempt wholesale generator under the Energy Policy Act of 2005 and is subject to the jurisdiction of the NRC with respect to its nuclear generation plant. NRC regulations govern the granting of licenses for the construction and operation of nuclear generation plants and subject such plants to continuing review and regulation. Luminant Energy holds a power marketer license from the FERC.

#### Wholesale Market Design

In August 2003, the PUCT adopted a rule that, when implemented, will alter the wholesale market design in ERCOT. The rule requires ERCOT:

- to use a stakeholder process to develop a new wholesale market model;

- to operate a voluntary day-ahead energy market;

- to directly assign all congestion rents to the resources that caused the congestion;

- to use nodal energy prices for resources;

- to provide information for energy trading hubs by aggregating nodes;

- to use zonal prices for loads; and

- to provide congestion revenue rights (but not physical rights).

ERCOT currently has a zonal wholesale market structure consisting of four geographic zones. The proposed location-based congestion-management market is referred to as a "nodal" market because wholesale pricing would differ across the various locational nodes on the transmission grid. The implementation of a nodal market is being done in conjunction with transmission improvements designed to reduce current congestion. In March 2006, the PUCT approved a set of Nodal Protocols, which was filed by ERCOT and describes the operation of a wholesale nodal market, and set an implementation date of no later than January 1, 2009. In August 2006, the PUCT adopted an interim order approving ERCOT's application for a surcharge imposed on all Qualified Scheduling Entities in ERCOT (including subsidiaries of TCEH) for the purpose of financing 38% of ERCOT's expected nodal implementation costs. The interim surcharge took effect on October 1, 2006. On May 23, 2007,

176

EFIHMW00208306

the PUCT adopted an order approving ERCOT's request for a final nodal-market-implementation surcharge and set the effective date for that surcharge as June 1, 2007. We expect that the annual impact of the final surcharge will be approximately $7 million to $8 million in additional expense. Although we do not expect our competitive position in the ERCOT market to be materially adversely affected by the proposed nodal wholesale market design, we are unable to predict the ultimate impact of the proposed nodal wholesale market design on our operations or financial results.

### Nuclear Decommissioning

Luminant Power's nuclear plant decommissioning costs are fully recoverable from Oncor Electric Delivery's distribution customers. Through December 31, 2001, decommissioning costs were recovered from consumers based upon a 1992 site-specific study through rates placed in effect under our January 1993 rate increase request. Effective January 1, 2002, decommissioning costs are recovered through a tariff charged to REPs by Oncor Electric Delivery based upon a 2000 redetermination of the 1997 site-specific study, adjusted for trust fund assets, as a component of delivery fees effective under our 2001 Unbundled Cost of Service filing. In 2005, an updated study of the cost to decommission our nuclear generating facility was completed by management and was filed with the PUCT in June 2005. The accompanying testimony concluded that no change to the nuclear decommissioning tariff was warranted at that time. In July 2005, the PUCT's Policy Development Division issued an order approving the decommissioning cost study and closing the docket.

### Regulatory Investigations

Please refer to "Business—Legal Proceedings" elsewhere in this offering memorandum for a description of certain regulatory investigations.

## TXU Energy

### REP Certification Rulemaking

On March 30, 2007, the PUCT publicly requested comments on proposed revisions to its substantive rules governing the certification of REPs that, if ultimately approved, would have (1) expanded the types of transactions that would be considered to constitute the transfer of a REP certificate and (2) subjected a REP to unspecified additional or different financial requirements if it serves one million residential customers in Texas or more and does not have its own investment grade credit rating. The PUCT Staff conducted a workshop on September 24, 2007 to discuss with interested stakeholders potential revisions to the rule and the largest REPs, including TXU Energy, ultimately agreed with the PUCT Staff to compromise rule revision language specifying acceptable additional minimum financial requirements for REPs with at least one million Texas residential customers. In an Open Meeting on October 9, 2007, the PUCT voted to approve revisions to its REP certification rule. The PUCT Commissioners declined to make any revisions to expand the types of transactions that would be considered to constitute the transfer of a REP certificate. The PUCT Commissioners approved the compromise agreed to by the largest REPs and PUCT Staff. The approved revisions provide that REPs that serve one million Texas residential customers or more are subject to additional or different financial requirements as determined by the PUCT unless they meet one of the following specified additional financial requirements: (1) a heightened credit rating of "BBB" for S&P or "Baa2" for Moody's, or their financial equivalent (satisfied through the REP's own credit rating, a guaranty of a parent or controlling shareholder with the required credit rating, or a bond, guaranty or corporate commitment of another company with the required credit rating); (2) an increased amount of equity (defined as assets in excess of liabilities); or (3) an increased amount of unused cash resources. The additional financial requirements are not anticipated to significantly increase TCEH's cost of doing business.

### Regulatory Investigations

Please refer to "Business—Legal Proceedings" elsewhere in this offering memorandum for a description of certain regulatory investigations.

177

EFIHMW00208307

**Oncor Electric Delivery**

*General*

Because its operations are wholly within Texas, Oncor Electric Delivery believes that it is not a public utility as defined in the Federal Power Act and has been advised by counsel that it is not subject to general regulation under such act.

The PUCT has original jurisdiction over transmission and distribution rates and services in unincorporated areas and in those municipalities that have ceded original jurisdiction to the PUCT and has exclusive appellate jurisdiction to review the rate and service orders and ordinances of municipalities. Generally, the PURA prohibits the collection of any rates or charges by a public utility (as defined by PURA) that does not have the prior approval of the appropriate regulatory authority (the PUCT or municipality with original jurisdiction).

At the state level, PURA, as amended, requires owners or operators of transmission facilities to provide open-access wholesale transmission services to third parties at rates and terms that are nondiscriminatory and comparable to the rates and terms of the utility's own use of its system. The PUCT has adopted rules implementing the state open-access requirements for utilities that are subject to the PUCT's jurisdiction over transmission services, such as Oncor Electric Delivery.

*Report Filed with the PUCT Regarding Merger*

In April 2007, Oncor Electric Delivery and Texas Holdings (together, the "Applicants") filed a Joint Report and Application ("Report") with the PUCT pursuant to Section 14.101(b) of PURA and PUCT SUBST. R.25.75. As a result of the consummation of the Merger, Texas Holdings owns all or substantially all of the outstanding shares of Energy Future Holdings Corp., and Oncor Electric Delivery remains a direct or indirect wholly-owned subsidiary of Energy Future Holdings Corp. This report contained commitments that took effect upon the closing of the Merger. Such commitments include: maintenance of specified Oncor Electric Delivery debt-to-equity ratios, minimum Oncor Electric Delivery capital expenditure levels, increased spending on demand-side management/energy efficiency programs over the amount in Oncor Electric Delivery's rates, minimum five year continued majority ownership by the Sponsors and that Oncor Electric Delivery will not incur any indebtedness and will not guarantee or use its assets to secure any affiliate indebtedness incurred to finance the Merger.

Section 14.101(b) of PURA requires that a transaction involving the sale of more than 50% of the stock of a public utility be reported to the PUCT within a reasonable time subsequent to consummation of the transaction and that the PUCT shall determine whether the transaction is consistent with the public interest standards set out therein. Although the Merger does not involve the direct sale of public utility stock, the Applicants filed the Report pursuant to Section 14.101(b) of PURA as it relates to Oncor Electric Delivery. Many of the parties to this proceeding, including Oncor Electric Delivery and the PUCT staff, have agreed on the terms of a settlement of this proceeding. A procedural schedule has been adopted for the consideration of a non-unanimous settlement, with the Hearing on the Merits currently scheduled for December 12-13, 2007. The PUCT does not have authority to approve or reject the transaction.

*PUCT Request for Oncor Electric Delivery Rate Filing*

At the request of the PUCT, the PUCT Staff filed a petition in March 2007 requesting that the PUCT order Oncor Electric Delivery to file a rate case based on a test year ending December 31, 2006. PUCT Staff stated that it would be advantageous to review Oncor Electric Delivery's costs prior to major ownership and organizational changes that Energy Future Holdings Corp. has announced in order to establish a baseline from which to assess any cost changes resulting from the announced changes. In April 2007, the PUCT issued an order requiring Oncor Electric Delivery to file a rate case based on a test year ending December 31, 2006. On August 28, 2007, Oncor Electric Delivery made the required filing, and the filing supports a rate increase of approximately $85 million over current rates subject to the original jurisdiction of the PUCT. However, Oncor Electric Delivery

178

Confidential

requested that the PUCT enter an order abating the proceeding, except that the PUCT convene a technical conference to consider a final order in this Docket No. 34040 that would include the following provisions: (i) the PUCT will take "no action" on Oncor Electric Delivery's proposed rate filing package and will enter an order confirming that Oncor Electric Delivery's current rates will remain in effect until otherwise changed by a final order of the PUCT or other appropriate jurisdictional authority; (ii) Oncor Electric Delivery will be required to file a system-wide rate case with the PUCT no later than July 1, 2008, based on a test year ended December 31, 2007, consistent with the Settlement Agreement between Oncor Electric Delivery and certain cities in its service territory; (iii) Oncor Electric Delivery will be required to file an Earnings Monitor Report ("EMR") with the PUCT no later than March 15, 2008, for calendar year 2007, and no later than March 15, 2009, for calendar year 2008, notwithstanding the pendency at the PUCT of this or any other Oncor Electric Delivery rate case; and (iv) the PUCT will enter an accounting order, or similar directive, providing that if Oncor Electric Delivery's 2008 or 2009 EMR filings demonstrate that Oncor Electric Delivery earned more than a 10.75% return on equity ("ROE") during the relevant period covered by the EMR filing, on a weather normalized basis, Oncor Electric Delivery will record a credit to the underrecovery balance in its insurance reserve, such that the additional expense would result in Oncor Electric Delivery's ROE for the relevant period being no higher than 10.75%.

Many of the parties to this case have agreed to abate this case as part of the non-unanimous settlement described above related to the Report filed with the PUCT pursuant to PURA Section 14.101(b). That non-unanimous settlement, which is subject to approval by the PUCT, includes a one-time rate credit to all retail customers of $72 million.

### Transmission Rates

In order to recover increased affiliate and third-party transmission costs from REPs, Oncor Electric Delivery is allowed to request an update twice a year to the transmission cost recovery factor ("TCRF") component of its retail delivery rate charged to REPs. In January 2007, an application was filed to increase the TCRF, which was administratively approved on February 22, 2007 and became effective March 1, 2007. This increase is expected to increase annualized revenues by $14 million. In July 2007, an application was filed to increase the TCRF, which was approved administratively on August 23, 2007 and became effective September 1, 2007. This increase is expected to increase annualized revenues by $26 million and includes the $15 million of the wholesale transmission rate increase which is recoverable from REPs as described below.

In February 2007, Oncor Electric Delivery filed an application for an interim update of its wholesale transmission rate. The application was approved by the PUCT in April 2007 and the new rate went into effect immediately. Annualized revenues are expected to increase by approximately $38 million. Approximately $23 million of this increase is recoverable through transmission rates charged to wholesale customers, and the remaining $15 million is recoverable from REPs through the TCRF component of Oncor Electric Delivery's delivery rates charged to REPs.

### Competitive Renewable Energy Zones

In the first quarter of 2007, the PUCT initiated a docket to identify the transmission facilities necessary to interconnect future renewable energy generating facilities. As part of the docket, the PUCT considered which zones would contain the best renewable energy sources. On July 20, 2007, the PUCT voted to designate zones with generation potential of over 20,000 MW.

The PUCT also opened a project to evaluate potential transmission service providers that are interested in constructing the designated transmission facilities. In connection with this project, Oncor Electric Delivery indicated to the PUCT its interest in constructing any designated transmission facilities, particularly those within its traditional service territory and those that interconnect with Oncor Electric Delivery's transmission facilities.

The PUCT has not yet determined with specificity the desired capacity for any of the designated zones, and has not yet designated transmission facilities, or the transmission service providers that will construct the

179

EFIHMW00208309

facilities. As such, Oncor Electric Delivery cannot predict the amount of transmission facilities in competitive renewable energy zones, if any, that it will construct.

### 2006 Cities Rate Settlement

In January 2006 Oncor Electric Delivery agreed with a steering committee representing 108 cities in Texas (the "Cities") to defer the filing of a system-wide rate case with the PUCT to no later than June 30, 2008 (based on a test year ending December 31, 2007), unless the Cities and Oncor Electric Delivery mutually agree that such a filing is unnecessary. Oncor Electric Delivery has extended the benefits of the agreement to 292 nonlitigant cities. Based on the final agreements, including the participation of the nonlitigant cities, expected payments to the cities are estimated to total approximately $70 million, including incremental franchise taxes.

This amount is being recognized in earnings over the period from May 2006 through June 2008. Payments under the agreement are expected to be made until new tariffs are effective, which based upon an assumed June 2008 rate case filing, is projected to be mid-2009. Payments under the agreement totaled $18 million in 2006 and are expected to total $30 million in 2007, $16 million in 2008 and $6 million in 2009. See Note 9 to the 2006 year-end Financial Statements.

### Advanced Meter Rulemaking

In 2005, the Texas Legislature passed legislation that authorized utilities to impose a surcharge to recover costs incurred in deploying advanced metering and meter information networks. Benefits of the advanced metering installation include improved safety, on-demand meter reading, enhanced outage identification and restoration and system monitoring of voltages. At December 31, 2006, Oncor Electric Delivery had installed approximately 285,000 advanced meters in its service territory and anticipates the installation of up to 600,000 additional advanced meters in 2007, which would represent approximately 25% of the meters on the distribution system. Pursuant to the 2005 legislation, the PUCT conducted two rulemakings related to advance metering, and final rules have been adopted that set forth the technical standards for advanced metering and a process for seeking cost recovery. Oncor Electric Delivery is developing its deployment plan for advanced metering infrastructure and intends to file a surcharge request to seek recovery of investment costs incurred.

### Reallocation of Stranded Cost Recovery

PURA requires that to the extent statewide stranded costs, including regulatory assets, exceed $5 billion, any stranded costs in excess of $5 billion should be reallocated among retail customer rate classes. The PUCT earlier determined that Oncor Electric Delivery's share of the excess could not be reallocated because of the Settlement Plan and related financing order, which resolved all allocation issues. In February 2007, the PUCT reversed its decision, subjecting Oncor Electric Delivery's allocation to further review by the State Office of Administrative Hearings. Any reallocation would not impact the total revenues collected by Oncor Electric Delivery, but rather the rate classes, partially shifting the transition charges billed to REPs related to the securitization bonds from industrial and commercial to the residential rate classes. Oncor Electric Delivery believes that the initial decision was correct and cannot determine the ultimate outcome of this proceeding.

Confidential

EFIHMW00208310

**PX 008**
**Page 189 of 501**

## MANAGEMENT

Set forth in the chart below are our board members and executive officers, other than our chief executive officer who resigned from our company following the consummation of the Merger. We have initiated a search for a new chief executive officer.

| Name | Age[1] | Position(s) |
| --- | --- | --- |
| David Bonderman | 64 | Director |
| Donald L. Evans | 61 | Director |
| Frederick M. Goltz | 36 | Director |
| James R. Huffines | 56 | Director |
| Scott Lebovitz | 32 | Director |
| Jeffrey Liaw | 30 | Director |
| Marc S. Lipschultz | 38 | Director |
| Michael MacDougall | 36 | Director |
| Lyndon L. Olson | 60 | Director |
| Kenneth Pontarelli | 37 | Director |
| William K. Reilly | 67 | Director |
| Jonathan D. Smidt | 34 | Director |
| William Young | 43 | Director |
| Kneeland Youngblood | 52 | Director |
| James A. Burke | 38 | Chairman of the Board, President and Chief Executive of TXU Energy |
| David A. Campbell | 39 | Executive Vice President and Chief Financial Officer of Energy Future Holdings Corp. |
| M. Rizwan Chand | 44 | Senior Vice President of Energy Future Holdings Corp. |
| Michael P. Childers | 46 | President and Chief Executive of Luminant Construction |
| Charles R. Enze | 54 | President and Chief Executive of Luminant Construction |
| Michael Greene | 61 | Chairman of the Board, President and Chief Executive of Luminant Power |
| Michael T. McCall | 50 | Chairman of the Board, President and Chief Executive of Luminant Energy |
| David P. Poole | 45 | Executive Vice President and General Counsel of Energy Future Holdings Corp. |
| Jonathan A. Siegler | 35 | Senior Vice President of Strategy, Mergers and Acquisition of TXU Business Services Company |

_____

(1) As of September 1, 2007.

_David Bonderman_ is a Founding Partner of TPG. TPG invests primarily in restructurings, recapitalizations and buyouts in the United States, Canada, Europe and Asia. Mr. Bonderman serves on the Board of Directors of the following public companies: Burger King Holdings, Inc.; CoStar Group, Inc.; Gemalto N.V.; and Ryanair Holdings, plc. He is also Chairman of the Board of Ryanair Holdings, plc. He also serves on the Board of Directors of The Wilderness Society, The Grand Canyon Trust, The World Wildlife Fund, The University of Washington Foundation and The American Himalayan Foundation. Prior to forming TPG in 1992, Mr. Bonderman was Chief Operating Officer of the Robert M. Bass Group, Inc. (now doing business as Keystone, Inc.) in Fort Worth, Texas. Prior to joining RMBG in 1983, Mr. Bonderman was a partner in the law firm of Arnold & Porter in Washington, D.C., where he specialized in corporate, securities, bankruptcy and

181

Confidential

EFIHMW00208311

antitrust litigation. From 1969 to 1970, Mr. Bonderman was a Fellow in Foreign and Comparative Law in conjunction with Harvard University and from 1968 to 1969, he was Special Assistant to the U.S. Attorney General in the Civil Rights Division. From 1967 to 1968, Mr. Bonderman was Assistant Professor at Tulane University School of Law in New Orleans. Mr. Bonderman was a member of Phi Beta Kappa at the University of Washington where he graduated cum laude, and a member of the Harvard Law Review.

*Donald L. Evans* has been the CEO of the Financial Services Forum since 2005, after serving as the 34th secretary of the U.S. Department of Commerce. As Secretary of Commerce, he oversaw a diverse cabinet agency with some 40,000 workers and a $5.8 billion budget focused on promoting American business. Before serving in the cabinet, Secretary Evans was the former CEO of Tom Brown, Inc., a large independent energy company. He formerly served as a member and chairman of the Board of Regents of the University of Texas. Secretary Evans also has served as an officer or board member for a number of civic and philanthropic organizations. He attended the University of Texas at Austin, receiving a B.S. degree in mechanical engineering in 1969 and an M.B.A. in 1973.

*Frederick M. Goltz* has been with KKR for 10 years. Mr. Goltz is one of the heads of KKR's Energy and Natural Resources industry team and leads KKR's efforts in the natural resources sector. He received a B.A., B.S., Magna Cum Laude, from the University of Pennsylvania, and an M.B.A. from INSEAD, Fontainebleau, France.

*James R. Huffines* is chairman of the University of Texas System Board of Regents, on which he has served since 2003. He also is Chairman, Central and South Texas, of PlainsCapital Bank in Austin, Executive Vice President of PlainsCapital Corporation, and a director of Hester Capital Mgmt., PlainsCapital Bank, and PlainsCapital Corp. He previously held senior management positions at Hester Capital Management, L.L.C., and Morgan Keegan & Co. Chairman Huffines also is a former Commissioner of the State of Texas Alcoholic Beverage Commission. He also has served as an officer or board member for a number of civic and philanthropic organizations. He earned a BBA degree in finance from the University of Texas at Austin in 1973 and attended Southwestern Graduate School of Banking at Southern Methodist University.

*Scott Lebovitz* is a Vice President of Goldman, Sachs & Co. in its Principal Investment Area. He joined Goldman, Sachs & Co. in 1997. He was promoted to Vice President in 2003. Mr. Lebovitz serves on the boards of Coffeyville Acquisition LLC and Village Voice Media, LLC. He received a B.S. degree from the University of Virginia.

*Jeffrey Liaw* is Vice President of TPG, which he joined in 2005, and is active in TPG's Energy and Industrial investing practice areas. From 2001 through 2003, he was an associate with Bain Capital in their Industrials practice. Mr. Liaw is a Phi Beta Kappa graduate of the University of Texas at Austin and received his M.B.A. with High Distinction from Harvard Business School where he was a Baker Scholar and a Siebel Scholar.

*Marc S. Lipschultz* has been with KKR for 12 years. He is one of the heads of KKR's Energy and Natural Resources industry team and leads KKR's efforts in the power sector. Currently, he is a director of Accel-KKR Company. He received an A.B., Honors and Distinction, Phi Beta Kappa, from Stanford University and an M.B.A. with High Distinction, Baker Scholar, from Harvard Business School.

*Michael MacDougall* is a partner of TPG. Prior to joining TPG in 2002, Mr. MacDougall was a vice president in the Principal Investment Area of the Merchant Banking Division of Goldman, Sachs & Co., where he focused on private equity and mezzanine investments. Mr. MacDougall received his M.B.A., with distinction, from Harvard Business School. Prior to attending business school, Mr. MacDougall was an assistant brand manager in the Paper Division of Procter & Gamble. He received his B.B.A., with highest honors, from the University of Texas at Austin. Mr. MacDougall serves on the Board of Directors of Aleris International and Kraton Polymers LLC. Mr. MacDougall also serves on the Board of The Opportunity Network (a charitable

182

Confidential

organization that creates access for top-performing New York City public school students to influential networks, career opportunities and competitive colleges) and is the Co-Chair of The Dwight School's Annual Fund.

*Lyndon L. Olson* has been a Senior Advisor with Citigroup Inc. since 2002, after serving as United States Ambassador to Sweden from 1998 to 2001. He previously was affiliated with Citigroup from 1990 to 1998, as President and CEO of Travelers Insurance Holdings and the Associated Madison Companies, predecessor companies. Before joining Citigroup, he had been President of the National Group Corporation and CEO of its National Group Insurance Company. Ambassador Olson also is a former Chairman and a Member of the Texas State Board of Insurance, former President of the National Association of Insurance Commissioners, and a former member of the Texas House of Representatives. He also has served as an officer or board member for a number of civic and philanthropic organizations. Ambassador Olson is a graduate of Baylor University and attended Baylor Law School.

*Kenneth Pontarelli* is a Managing Director of Goldman, Sachs & Co. in its Principal Investment Area. He transferred to the Principal Investment Area in 1999 and was promoted to Managing Director in 2004 and to Partner in 2006. Mr. Pontarelli serves on the boards of Coffeyville Acquisition LLC, Cobalt International Energy, L.P., Knight Inc. and NextMedia Investors, LLC. He received a B.S. degree from Syracuse University and an M.B.A. from Harvard University.

*William K. Reilly* is a Senior Advisor to TPG and a founding partner of Aqua International Partners, an investment group that invests in companies that serve the water and renewable energy sectors, having previously served as the seventh Administrator of the U.S. Environmental Protection Agency. Mr. Reilly is a director of DuPont, Eden Springs, Ltd. of Israel, ConocoPhillips and Royal Caribbean International. Before serving as EPA Administrator, he was President of World Wildlife Fund and President of The Conservation Foundation. He is Chairman Emeritus of the Board of the World Wildlife Fund. Mr. Reilly previously served as Executive Director of the Rockefeller Task Force on Land Use and Urban Growth, a senior staff member of the President's Council on Environmental Quality, and Associate Director of the Urban Policy Center and the National Urban Coalition. Mr. Reilly is Co-Chairman of the National Commission on Energy Policy. He served as board member of Northeast Utilities. An alumnus of Yale University, Mr. Reilly holds a law degree from Harvard University and a master's degree in urban planning from Columbia University.

*Jonathan D. Smidt* has been with KKR since 2000. He is a member of both the Energy and Natural Resources and the Consumer Products industry teams. Currently, he is a director of Laureate Education Inc. He holds a B.B.S. and a Postgraduate Diploma in Accounting from the University of Cape Town, South Africa.

*William Young* is Co-Head of the Goldman Sachs Infrastructure Investment Group. Mr. Young joined Goldman Sachs in 2001 as a Managing Director and Co-Head of the European Structured and Principal Finance Group. In 2002, Mr. Young was promoted to a Partner in the Financing Group, which includes all debt, derivative and equity capital markets activities for the Firm. Mr. Young became Co-Head of the Corporate and Acquisition Finance Group, which included the structured and leveraged finance businesses. Prior to joining Goldman Sachs, Mr. Young was with Citibank for 16 years, working in the Leveraged Finance and Work-Out Group and most recently running its European Securitisation Group. Mr. Young received a B.S. from Purdue University in 1987.

*Kneeland Youngblood* is founding partner of Pharos Capital Group, a private equity firm that focuses on providing growth and expansion capital to businesses in technology, business services, and health care services. Mr. Youngblood is chairman of the American Beacon Funds, a $30 billion mutual fund company, managed by American Beacon Advisors, a $65 billion investment affiliate of American Airlines. He is a director of Starwood Hotels and Lodging. He also serves on the board of directors of Gap Inc. and the Burger King Corporation. He is a former director of the U.S. Enrichment Corporation, a global energy services company privatized in 1998. He served as a Presidential appointee with Senate confirmation in his role on the Board. Mr. Youngblood is a member of the Council on Foreign Relations and graduated from Princeton University in 1978 with an A.B. in Politics/Science in Human Affairs and earned an M.D. degree from the University of Texas, Southwestern Medical School in 1982.

183

EFIHMW00208313

*James A. Burke* has been Chairman of the Board, President and Chief Executive of TXU Energy since August 2005 and Executive Vice President of TCEH since July 2006. From 2004 to 2005, Mr. Burke was Senior Vice President Consumer Markets of TXU Energy. Prior to that time, Mr. Burke was President and Chief Operating Officer of Gexa Energy. Before that, Mr. Burke was Senior Vice President, Reliant Resources Incorporated.

*David A. Campbell* is Executive Vice President and Chief Financial Officer of Energy Future Holdings Corp. He has held the positions of Executive Vice President, Planning, Strategy and Risk of Energy Future Holdings Corp. since May 2004, has been Chief Financial Officer since March 2006 and Executive Vice President of TCEH since September 2006. Prior to joining our company, Mr. Campbell was a Principal of McKinsey & Company, Inc.

*M. Rizwan Chand* is Senior Vice President of Energy Future Holdings Corp. He has held the positions of Senior Vice President of Energy Future Holdings Corp. since August 2005 and Senior Vice President of TCEH, Oncor Electric Delivery and Oncor Electric Delivery Transition Bond Company, LLC since July 2005. Prior to July 2005, Mr. Chand was Vice President of Human Resources and Corporate Relations for Kennametal, Inc.

*Michael P. Childers* is President and Chief Executive of Luminant Construction. He has held the positions of President and Chief Executive of Generation Development of Luminant Construction since August 2006 and Executive Vice President and Chief Executive of Generation Development of TCEH since March 2006. From May 2006 to August 2006, Mr. Childers was President and Chief Executive Officer of Luminant Construction. From 2005 to 2006, he was Senior Vice President of TXU Business Services and Senior Vice President of TCEH. Prior to that time, Mr. Childers was President of the Engineering, Construction and Maintenance Division and Executive Vice President for The Shaw Group. Prior to that time, he was President of Entergy Asset Management. Prior to that time, he was Chief Operating Officer of Entergy Wholesale Management Operations.

*Charles R. Enze* is President and Chief Executive of Luminant Construction. He has held the positions of President and Chief Executive of Generation Construction of Luminant Construction since August 2006 and Executive Vice President and Chief Executive of Generation Construction of TXU Energy Holdings since June 2006. Prior to that time, Mr. Enze was Vice President of Engineering and Projects for Shell International Exploration & Production.

*Michael Greene* is Chairman of the Board, President, and Chief Executive of Luminant Power. He joined our company as an engineer in 1969 and has served in a variety of senior positions. Mr. Greene is a director of the Electric Power Research Institute and past chairman of ERCOT and the NERC Stakeholder's Committee. He is an appointed member of the Texas Railroad Commission's Natural Gas Reliability Council and is a registered professional engineer in the State of Texas. Mr. Greene graduated from the University of Texas at Arlington with a bachelor's degree in mechanical engineering.

*Michael T. McCall* is Chairman of the Board, President and Chief Executive of Luminant Energy. He has held the positions of Chairman of the Board, President and Chief Executive of Luminant Wholesale since August 2005 and Executive Vice President of TCEH since April 2006. From 2004 to 2005, Mr. McCall was Senior Vice President of Luminant Power. From 2003 to 2004, he was President of TXU Gas. From 1999 to 2003, he was Vice President of TXU Business Services Company.

*David P. Poole* is Executive Vice President and General Counsel of Energy Future Holdings Corp. He has held the positions of Executive Vice President and General Counsel of Energy Future Holdings Corp. since March 2006 and Executive Vice President of TCEH since September 2006. From January 2005 to September 2006, Mr. Poole was Senior Vice President and Chief Legal Officer of Luminant Power. From January 2005 to May 2005, he was Senior Vice President of Energy Future Holdings Corp. From July 2004 to March 2005, Mr. Poole was Senior Vice President of TXU Business Services Company. From May 2004 to July 2004, he was Vice President and Associate General Counsel of TXU Business Services Company. Prior to that time, Mr. Poole was Managing partner of the Dallas office of Hunton & Williams LLP.

Confidential

EFIHMW00208314

*Jonathan A. Siegler* is Senior Vice President of Strategy, Mergers and Acquisition of TXU Business Services Company. He has held the position of Vice President of Strategy, Mergers and Acquisition of TXU Business Services Company since August 2004. Prior to that time, Mr. Siegler was Engagement Manager for McKinsey & Company. Prior to that time, he was a Lieutenant in the U.S. Navy.

**Executive Compensation**

We expect that our Board will consider adopting executive compensation plans that will link compensation with performance. We will continually review our executive compensation programs to ensure that they are competitive.

**Employment Agreements**

In connection with the Merger, we may enter into new employment agreements and/or amend existing employment agreements with some of Energy Future Holdings Corp.'s existing executive officers on terms to be agreed between us and those persons.

185

Confidential

EFIHMW00208315

## PRINCIPAL STOCKHOLDERS

As a result of the consummation of the Merger, substantially all of the capital stock of Energy Future Holdings Corp. is held indirectly by the Sponsors and the Investors. The Sponsors own approximately 62% of the partnership interests of Texas Holdings, the direct parent company of Energy Future Holdings Corp. Members of the board of directors of Energy Future Holdings Corp. or managers of Texas Holdings affiliated with each of the Sponsors may be deemed to beneficially own shares owned by such entities or their associated investment funds. Each such individual disclaims beneficial ownership of any such shares in which such individual does not have a pecuniary interest.

Affiliates of certain of the placement agents in this offering have indirect ownership interests in Energy Future Holdings Corp. See "Transactions—Equity Contributions."

186

Confidential

EFIHMW00208316

## CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS

**Texas Holdings Limited Partnership Agreement**

Immediately prior to the closing of the Merger, the Sponsors and the Investors and/or their assignees contributed equity to Texas Holdings in exchange for limited partnership interests in Texas Holdings and entered into a limited partnership agreement with Texas Holdings. Certain third party investors contributed equity to Texas Holdings through intermediate investment vehicles, some of which are controlled by the Sponsors. The limited partnership agreement contains agreements among the parties with respect to the issuance or transfer of interests. The Sponsors and certain of the Investors are also party to the limited liability company agreement of the General Partner, which provides, among other things, that the Sponsors control Texas Holdings and have the right to nominate directors to the board of directors of Energy Future Holdings Corp.

**Indemnification Agreement**

On October 10, 2007, Texas Holdings and Energy Future Holdings Corp. entered into an indemnification agreement with the Sponsors (the "Indemnification Agreement") to indemnify the Sponsors, their affiliates and related persons from claims against liabilities incurred by the Sponsors, their affiliates and related persons in connection with the Transactions or any future offerings of equity or debt securities by Energy Future Holdings Corp., its subsidiaries or affiliates. Under the Indemnification Agreement the Sponsors, their affiliates and related persons are indemnified against claims for liabilities incurred for actions or omissions relating to the provision of financial advisory, monitoring and management consulting services to the General Partner, Texas Holdings, Energy Future Holdings Corp. and any of their subsidiaries and affiliates. The Indemnification Agreement also indemnifies the directors and officers of each of the General Partner, Texas Holdings, Energy Future Holdings Corp. and any of their subsidiaries and affiliates from claims against liabilities incurred while acting in such capacity.

**Registration Rights Agreement**

On October 10, 2007, Texas Holdings and Energy Future Holdings Corp. entered into a registration rights agreement with certain shareholders of Energy Future Holdings Corp. pursuant to which such shareholders have certain registration and other rights with respect to shares of common stock they own in Energy Future Holdings Corp.

**Sponsor Management Agreement**

On October 10, 2007, in connection with the Merger, the Sponsors and LBI entered into a management agreement with Energy Future Holdings Corp. (the "Management Agreement"), pursuant to which affiliates of the Sponsors will provide management, consulting, financial and other advisory services to Energy Future Holdings Corp. Pursuant to the Management Agreement, the Sponsors are entitled to receive an aggregate annual management fee of $35 million, which amount will increase 2% annually, and reimbursement of out-of-pocket expenses incurred in connection with the provision of services pursuant to the Management Agreement. The Management Agreement will continue in effect from year to year, unless terminated upon a change of control of Energy Future Holdings Corp. or in connection with an initial public offering of Energy Future Holdings Corp. or if the parties mutually agree to terminate the Management Agreement. Pursuant to the Management Agreement, the Sponsors and LBI are also entitled to receive aggregate transaction fees of $300 million in connection with certain services provided in connection with the Merger and related transactions. In addition, the Management Agreement provides that the Sponsors will be entitled to receive a fee equal to a percentage of the gross transaction value in connection with certain subsequent financing, acquisition, disposition, merger combination and change of control transactions, as well as a termination fee based on the net present value of future payment obligations under the Management Agreement in the event of an initial public offering or under certain other circumstances.

**Other Relationships**

Over the last fiscal year, there have been no reportable transactions with related persons.

187

EFIHMW00208317

## DESCRIPTION OF OTHER INDEBTEDNESS

**Financing in Connection with the Merger**

**TCEH Senior Secured Facilities**

*Overview*

In connection with the Merger, TCEH entered into the TCEH Senior Secured Facilities, which are comprised of (i) the TCEH Initial Term Loan Facility, (ii) the TCEH Delayed Draw Term Loan Facility, (iii) the TCEH Letter of Credit Facility and (iv) the TCEH Revolving Facility, of which amounts are available in the form of (A) letters of credit and (B) swingline loans, as well as the TCEH Commodity Collateral Posting Facility. The TCEH Initial Term Loan Facility was used to finance the Merger and for general corporate purposes. The TCEH Delayed Draw Term Loan Facility will be used by TCEH and its subsidiaries during the two year period commencing on the closing date to fund the construction, engineering, design, improvement, testing, start-up, retesting, operation, repair, maintenance and development costs and other capital expenditures (including environmental capital expenditures), interest during construction and related fees and expenses in connection with the construction of three lignite coal-fueled generation stations in ERCOT and environmental upgrades at its existing generation facilities (collectively, the "Capex Uses"). The letters of credit under the TCEH Letter of Credit Facility will be used by TCEH and its subsidiaries for general corporate purposes (including, providing collateral support in respect of commodity hedging arrangements and other commodity transactions, including, commodity hedging arrangements and other commodity transactions related to TCEH's and its subsidiaries' wholesale business operations and activities). The TCEH Revolving Facility will be used by TCEH and its subsidiaries for working capital and for other general corporate purposes (including, but not limited to, the financing of permitted acquisitions and the provision of collateral support in respect of commodity hedging arrangements and other commodity transactions, including for the avoidance of doubt, commodity hedging arrangements and other commodity transactions related to the TCEH's and its subsidiaries' wholesale business operations and activities). The TCEH Commodity Collateral Posting Facility is a senior secured revolving credit facility, the aggregate principal amount of which is determined by the out-of-the-money mark-to-market exposure of TCEH (and/or its subsidiaries) on a portfolio of certain natural gas commodity swap transactions under which TCEH (and/or its subsidiaries) is the "floating price" payor as such portfolio may be amended from time to time (the "Deemed Transactions"). The Deemed Transactions generally correspond to hedging transactions of TCEH (and/or its subsidiaries). The TCEH Commodity Collateral Posting Facility is intended to fund the cash posting requirements due to trading counterparties for a significant portion of TCEH's long-term hedging program that is not otherwise secured by means of a first lien under the security arrangements entered into in connection with the TCEH Senior Secured Facilities.

Subject to the satisfaction of certain conditions, TCEH may add one or more incremental term loan facilities, incremental letter of credit facilities and/or increase the commitments under the TCEH Revolving Facility in an aggregate principal amount up to $2.0 billion and/or add more incremental cash posting facilities.

The TCEH Senior Secured Facilities (other than the TCEH Commodity Collateral Posting Facility) were entered into with Citigroup Global Markets Inc. ("Citigroup"), Credit Suisse Securities (USA) LLC ("CS Securities" and, together with its respective affiliates and branches, "Credit Suisse"), J.P. Morgan Securities Inc. ("JPMorgan"), Goldman Sachs Credit Partners L.P. ("GSCP"), LBI and Morgan Stanley Senior Funding, Inc. ("MSSF") as joint lead arrangers and bookrunners, Citibank, N.A. ("Citibank") as administrative agent and collateral agent, JPMorgan Chase Bank, N.A. ("JPMCB") as syndication agent and Credit Suisse, GSCP, Lehman Commercial Paper Inc. ("LCPI"), GSCP and MSSF, as co-documentation agents. The TCEH Commodity Collateral Posting Facility was entered into with GSCP as lead arranger and sole bookrunner, Citibank, N.A. ("Citibank"), and J. Aron & Company ("J. Aron") as posting and calculation agent ("Calculation Agent").

188

*Interest Rates and Fees*

Loans under the TCEH Senior Secured Facilities (other than the TCEH Commodity Collateral Posting Facility) bear interest at per annum rates equal to, at our option, (i) Adjusted LIBOR plus 3.50% or (ii) a base rate (the higher of (1) the prime rate of Citibank and (2) the federal funds effective rate plus 0.50%) plus 2.50%. There is a margin adjustment mechanism in relation to term loans, revolving loans and letters of credit commencing after delivery of the financial statements for the first full fiscal quarter ending after October 10, 2007, under which the applicable margins may be reduced based on leverage ratio targets to be determined.

A commitment fee is payable quarterly in arrears and upon termination at a rate per annum equal to 0.50% of the average daily unused portion of the TCEH Revolving Facility. The commitment fee is subject to reduction, commencing after delivery of the financial statements for the first full fiscal quarter ending after October 10, 2007, based on leverage ratio targets to be determined.

A commitment fee is payable quarterly in arrears and upon termination on the undrawn portion of the commitments in respect of the TCEH Delayed Draw Term Loan Facility at a rate per annum equal to, prior to the first anniversary of October 10, 2007, 1.25% per annum, and thereafter, 1.50% per annum.

Letter of credit fees under the TCEH Revolving Facility are payable quarterly in arrears and upon termination at a rate per annum equal to the spread over Adjusted LIBOR under the TCEH Revolving Facility, less the issuing bank's fronting fee.

TCEH will pay a fixed quarterly maintenance fee through maturity for having procured the TCEH Commodity Collateral Posting Facility regardless of actual borrowings under the facility. In addition, TCEH will pay interest at LIBOR on actual borrowed amounts under the TCEH Commodity Collateral Posting Facility which will be offset by interest earned on collateral deposits to counterparties, thereby making the TCEH Commodity Collateral Posting Facility largely a fixed cost facility regardless of utilization.

*Guarantees and Security*

*Guarantee.* The TCEH Senior Secured Facilities are unconditionally guaranteed jointly and severally on a senior secured basis, by Energy Future Competitive Holdings and each existing and subsequently acquired or organized direct or indirect wholly-owned U.S. restricted subsidiary of TCEH (other than certain immaterial subsidiaries and other subsidiaries to be agreed upon), subject to certain other exceptions.

*Security.* The TCEH Senior Secured Facilities, including the guarantees thereof and certain commodity and other hedging and trading transactions, are secured by (a) all of the assets of TCEH and TCEH's subsidiaries who are guarantors of such facilities as described above, subject to certain other exceptions, and (b) a pledge of the capital stock of TCEH and a pledge of the capital stock of each material wholly-owned restricted subsidiary of TCEH directly owned by TCEH or any guarantor (limited in the case of pledges of capital stock of any foreign subsidiaries, to 65% of the capital stock of any first-tier material foreign subsidiary). The Arranger Group has agreed that certain other assets shall not be required for the purpose of securing such obligations.

*Covenants*

The TCEH Senior Secured Facilities contain customary negative covenants, restricting, subject to certain exceptions, TCEH and TCEH's restricted subsidiaries from, among other things, (i) incurring additional debt; (ii) incurring additional liens, (iii) entering into mergers and consolidations, (iv) sales of assets, (v) dividends, redemptions or other distributions in respect of capital stock, (vi) acquisitions, investments, loans and advances and (vii) payments and modifications of certain subordinated and other material debt.

In addition, the TCEH Senior Secured Facilities require that TCEH and its restricted subsidiaries maintain a consolidated secured debt to consolidated EBITDA ratio (as defined in the TCEH Senior Secured Facilities)

189

EFIHMW00208319

measured over a rolling four-quarter measurement period, which cannot exceed 7.25 to 1.00 for the first measurement period ending September 30, 2008. The maximum consolidated secured debt to consolidated EBITDA ratio will decline over time until it reaches 5.75 to 1.00 for measurement periods beginning on or after March 31, 2014. Additionally, TCEH and its restricted subsidiaries are required to observe certain customary reporting requirements and other affirmative covenants.

### Maturity and Amortization

The TCEH Initial Term Loan Facility is required to be repaid in equal quarterly installments in an aggregate annual amount equal to 1% of the original principal amount of such facility, with the balance payable on the date which is seven years following the closing date. The TCEH Delayed Draw Term Facility is required to be repaid in equal quarterly installments beginning on the last day of the first fiscal quarter to occur after the second anniversary of the closing date (the "First DD Amortization Payment Date") in an aggregate annual amount equal to 1% of the actual principal outstanding under the TCEH Delayed Draw Term Loan Facility as of the First DD Amortization Payment Date, with the balance payable on the date which is seven years following October 10, 2007. Amounts borrowed under the TCEH Energy Revolving Facility may be reborrowed from time to time from and after October 10, 2007 until the date that is the sixth anniversary thereof. The TCEH Letter of Credit Facility will mature on the seventh anniversary of October 10, 2007. The TCEH Commodity Collateral Posting Facility will mature on December 31, 2012.

### Events of Default

The TCEH Senior Secured Facilities contain customary events of default for senior leveraged acquisition financings, including, without limitation, a failure to pay principal, interest, fees or other amounts when due, a representation or warranty fails to be true in all material respects when made or deemed made, a breach of a covenant, cross-default, the entry of a material judgment against TCEH or a restricted subsidiary, bankruptcy or insolvency events, certain ERISA violations, the invalidity of a guarantee or of the collateral securing the facility, or the occurrence of a "change of control" as defined in the TCEH Senior Secured Facilities, the occurrence of which would allow the lenders to accelerate all outstanding loans and terminate their commitments. These events of default may allow for certain grace periods and materiality limitations.

## EFH Senior Interim Facility

On October 10, 2007, in connection with the Merger and the repayment of certain existing indebtedness, Energy Future Holdings Corp. entered into the EFH Senior Interim Facility with MSSF, as administrative agent, GSCP, as syndication agent, Citigroup, Credit Suisse, JPMCB and LCPI, as co-documentation agents, and GSCP, MSSF, Citigroup, Credit Suisse, JPMorgan and Lehman Brothers Inc., as joint lead arrangers and bookrunners. The EFH Senior Interim Facility provided senior unsecured financing of $4.5 billion, consisting of a:

- $2.0 billion senior unsecured cash pay term loan facility with an initial term of one year; and
- $2.5 billion senior unsecured toggle term loan facility with an initial term of one year.

The proceeds from this offering, along with cash on hand, will be used to repay in full the EFH Senior Interim Facility.

## TCEH Senior Interim Facility

### Overview

On October 10, 2007, in connection with the Merger and the repayment of certain existing indebtedness, Energy Future Competitive Holdings, TCEH and TCEH Finance, Inc., a wholly-owned subsidiary of TCEH ("TCEH Finance" and, together with TCEH, the "Co-Borrowers"), entered into the TCEH Senior Interim Facility with MSSF, as administrative agent, GSCP, as syndication agent, Citigroup, Credit Suisse, JPMCB and LCPI, as co-documentation agents, and GSCP, MSSF, Citigroup, Credit Suisse, JPMorgan and LBI, as joint lead arrangers and bookrunners.

190

Confidential

EFIHMW00208320

The TCEH Senior Interim Facility provides senior unsecured financing of $6.75 billion, consisting of a:

- $5.0 billion senior unsecured cash-pay term loan facility with an initial term of one year (the "TCEH Initial Cash-Pay Loans"); and

- $1.75 billion senior unsecured senior toggle term loan facility with an initial term of one year (the "TCEH Initial Toggle Loans" and, together with the TCEH Initial Cash-Pay Loans, the "TCEH Initial Loans").

The proceeds of the concurrent offering of TCEH Notes will be used to repay a portion of the TCEH Initial Cash-Pay Loans.

If any borrowings under the TCEH Bridge Loan remain outstanding on the one-year anniversary (the "TCEH Initial Maturity Date") of the closing of the TCEH Senior Interim Facility, the lenders in respect of the TCEH Initial Cash-Pay Loans and the lenders in respect of the TCEH Initial Toggle Loans will each have the option at any time or from time to time to exchange such TCEH Initial Loans for senior cash-pay notes (the "TCEH Senior Cash-Pay Exchange Notes") or such TCEH Initial Toggle Loans for senior toggle notes (the "TCEH Senior Toggle Exchange Notes" and, together with the TCEH Senior Cash-Pay Exchange Notes, the "TCEH Senior Exchange Notes"), respectively, which the Co-Borrowers will issue under a senior indenture. On the TCEH Initial Maturity Date, the maturity date of any TCEH Initial Loans that have not been repaid will automatically be extended to the eighth anniversary, in the case of the TCEH Initial Cash-Pay Loans (the "TCEH Cash-Pay Final Maturity Date") and the ninth anniversary in the case of the TCEH Initial Toggle Loans (the "TCEH Toggle Final Maturity Date") of the closing of the TCEH Senior Interim Facility. The TCEH Senior Cash-Pay Exchange Notes will also mature on the TCEH Cash-Pay Final Maturity Date, and the TCEH Senior Toggle Exchange Notes will also mature on the TCEH Toggle Final Maturity Date. Holders of the TCEH Senior Exchange Notes will have registration rights.

### *Interest Rate*

At the option of the Co-Borrowers, borrowings under the TCEH Senior Interim Facility may take the form of ABR loans that bear interest at a base rate (equal to either the federal funds rate plus 50 basis points or the prime rate) plus an applicable margin, or as LIBOR loans that bear interest at LIBOR plus an applicable margin. The initial applicable margin on ABR loans is 225 basis points with respect to Company Initial Cash-Pay Loans or 250 basis points with respect to Company Initial Toggle Loans. The initial applicable margin on LIBOR loans is 325 basis points with respect to Company Initial Cash-Pay Loans or 350 basis points with respect to Company Initial Toggle Loans. On the six-month anniversary of the closing of the TCEH Senior Interim Facility, the applicable margin on any outstanding ABR loans and LIBOR loans will increase by an additional 50 basis points and will continue to increase by an additional 25 basis points every three months until the loans are repaid in full. The maximum interest rates payable on borrowings under the TCEH Senior Interim Facility is capped. Currently all borrowings under the TCEH Senior Interim Facility are LIBOR loans. If issued, the interest rate on the TCEH Senior Exchange Notes will be the same as the interest rate borne by the TCEH Initial Loans; provided, that if any TCEH Senior Exchange Notes are transferred by the lender to a third-party purchaser, the interest rate on those notes will be fixed at the interest rate in effect on the transfer date.

### *Prepayments and Redemptions*

Until the TCEH Initial Maturity Date, the Co-Borrowers will also be required to prepay outstanding TCEH Initial Loans with the net proceeds of any refinancing debt, including from the concurrent offering of TCEH Notes. The Co-Borrowers will be required to make an offer to repay loans under the TCEH Senior Interim Facility and, following the TCEH Initial Maturity Date, repurchase TCEH Senior Exchange Notes with net proceeds from specified asset sales. In addition, after any payments required to be made to repay the TCEH Senior Interim Facility, the Co-Borrowers will be required to offer to repay loans and, if issued, to repurchase the TCEH Senior Exchange Notes upon the occurrence of a change of control. The Co-Borrowers may voluntarily repay outstanding TCEH Initial Loans, in whole or in part, at their option at any time upon three business days' prior notice, at par

191

EFIHMW00208321

plus accrued and unpaid interest and subject to, in the case of TCEH Initial Loans based on LIBOR, customary "breakage" costs with respect to such LIBOR loans, other than customary "breakage" costs with respect to LIBOR loans. The Co-Borrowers may optionally redeem the TCEH Senior Exchange Notes other than fixed-rate exchange notes, if issued, in whole or in part, at any time at par plus accrued and unpaid interest to the redemption date, provided that it also optionally prepays any outstanding TCEH Initial Loans on a pro rata basis.

If any TCEH Senior Exchange Note is sold by a lender to a third-party purchaser, and the interest rate on such TCEH Senior Exchange Note becomes fixed, such TCEH Senior Exchange Note will be non-callable prior to October 15, 2011 in the case of the TCEH Senior Cash-Pay Exchange Notes, and prior to October 15, 2012, in the case of the TCEH Senior Toggle Exchange Notes, subject to equity clawback and make-whole provisions consistent with those applicable to the notes offered hereby, and will be callable thereafter at a specified premium.

The premium will decline ratably on each yearly anniversary of October 15, 2011, in the case of the TCEH Senior Cash-Pay Exchange Notes, or October 15, 2011, in the case of the TCEH Senior Toggle Exchange Notes, to zero on October 15, 2013, in the case of the TCEH Senior Cash-Pay Exchange Notes, and October 15, 2015, in the case of the TCEH Senior Toggle Exchange Notes.

### Guarantee

All obligations under the TCEH Senior Interim Facility and, if the TCEH Senior Exchange Notes are issued, the senior indenture, are jointly and severally guaranteed on a senior basis by Energy Future Competitive Holdings and each of TCEH's domestic subsidiaries that guarantees obligations under the TCEH Senior Secured Facilities.

### Certain Covenants and Events of Default

The TCEH Senior Interim Facility and the senior indenture contain a number of covenants that, among other things, restrict, subject to certain exceptions, the Co-Borrowers and their restricted subsidiaries' ability to, among other things:

- incur additional indebtedness;
- create liens;
- engage in mergers or consolidations;
- sell or transfer assets and subsidiary stock;
- pay dividends and distributions or repurchase their capital stock;
- make certain investments, loans or advances;
- prepay certain indebtedness;
- enter into agreements that restrict the payment of dividends by subsidiaries or the repayment of intercompany loans and advances; and
- engage in certain transactions with affiliates.

In addition, the TCEH Senior Interim Facility and the senior indenture impose certain requirements as to future subsidiary guarantors. The TCEH Senior Interim Facility and the senior indenture also contain certain customary affirmative covenants and certain customary events of default, including, without limitation, a failure to pay principal, interest or other amounts when due, a breach of a covenant, including the obligation to issue TCEH Senior Exchange Notes, cross-acceleration, the entry of a material judgment against TCEH or a restricted subsidiary, bankruptcy or insolvency events or the invalidity of a guarantee. These events of default may allow for certain grace periods and materiality limitations.

192

Confidential

EFIHMW00208322

**TCEH Notes**

Concurrently with the offering of the notes hereby, a wholly owned subsidiary of the Issuer is offering the TCEH Notes.

The indenture governing the TCEH Notes will limit TCEH's and its restricted subsidiaries' ability to, among other things:

- incur additional indebtedness;

- create liens;

- engage in mergers or consolidations;

- pay dividends on or make other distributions on or make other distributions or repurchase its capital stock;

- make certain investments;

- enter into certain types of transactions with affiliates; and

- sell certain assets or merge with or into other companies.

Subject to certain exceptions, the indenture governing the notes will permit TCEH and its restricted subsidiaries to incur additional indebtedness.

**Existing Secured Indebtedness**

Upon the closing of the Merger, Energy Future Holdings Corp.'s subsidiaries had outstanding approximately $1,461 million of secured debt, consisting primarily of the following:

- *Energy Future Competitive Holdings*

  - $78 million aggregate principal amount of Energy Future Competitive Holdings 7.460% Fixed Secured Facility Bonds with amortizing payments to 2015. In 1987, Energy Future Competitive Holdings entered into an operating lease arrangement for certain combustion turbine generating facilities. In March 2006, Energy Future Competitive Holdings purchased the owner participant interest in the lease and assumed $91 million aggregate principal amount of these bonds, which were issued to refinance the initial series of secured facility bonds that were issued in conjunction with the lease.

  - In 1990, Energy Future Competitive Holdings repurchased an electric cooperative's minority interest in the Comanche Peak nuclear generation plant and assumed payment of $174 million of the electric cooperative's indebtedness to the U.S. government. Pursuant to the assumption agreement, Energy Future Competitive Holdings makes principal and interest payments to the cooperative in an amount sufficient to allow the cooperative to make the required payments to the U.S. government. The debt is secured by a mortgage on the minority interest that was transferred to Energy Future Competitive Holdings and outstanding as follows:

    - $62 million aggregate principal amount of Energy Future Competitive Holdings 9.580% Fixed Notes due in semi-annual installments to December 2019; and

    - $58 million aggregate principal amount of Energy Future Competitive Holdings 8.254% Fixed Notes due in quarterly installments to December 2021.

- *TCEH*

  - $87 million capital lease—In August 2005, TCEH entered into a lease for a rail spur at the Big Brown generation plant. The capital lease refinanced an existing operating lease on the rail spur. An obligation of $95 million was reported as long-term debt.

Confidential

EFIHMW00208323

- $5 million capital lease for office furniture that expires in December 2012.

- $52 million capital lease associated with rail cars.

- **TXU Properties Company**
  - $93 million aggregate principal amount of Energy Future Holdings Corp. 8.820% Building Financing due semiannually to 2022. On February 14, 2002, Energy Future Holdings Corp. sold its interest in its headquarters building in Dallas, Texas for $145 million. Simultaneous with the sale of the property, a subsidiary of Energy Future Holdings Corp. entered into a 20-year lease for the property and Energy Future Holdings Corp. recorded the transaction as a financing and reported long-term debt of $145 million.

  - **Oncor Electric Delivery Transition Bond Company Senior Notes and Debentures**

    A regulatory financing order finalized in January 2003 authorized the issuance of transition bonds with a principal amount of $1.3 billion to recover regulatory asset stranded costs and other qualified costs. Oncor Electric Delivery Transition Bond Company, a bankruptcy-remote financing subsidiary of Oncor Electric Delivery, issued $500 million principal amount of transition bonds in August 2003 and the remaining $790 million in June 2004. Amounts to service the principal and interest on the bonds are recovered from REPs by Oncor Electric Delivery through a distribution fee surcharge.

    Upon the closing of the Merger, Oncor Electric Delivery Transition Bond Company had outstanding $1,026 million aggregate principal amount of these transition bonds consisting of the following series:

    a) $109 million aggregate principal amount of Oncor Electric Delivery Transition Bond Company LLC 4.030% Fixed Series 2003 Bonds due in 2010;

    b) $130 million aggregate principal amount of Oncor Electric Delivery Transition Bond Company LLC 4.950% Fixed Series 2003 Bonds due in 2013;

    c) $145 million aggregate principal amount of Oncor Electric Delivery Transition Bond Company LLC 5.420% Fixed Series 2003 Bonds due in 2015;

    d) $131 million aggregate principal amount of Oncor Electric Delivery Transition Bond Company LLC 3.520% Fixed Series 2004 Bonds due in 2009;

    e) $221 million aggregate principal amount of Oncor Electric Delivery Transition Bond Company LLC 4.810% Fixed Series 2004 Bonds due in 2012; and

    f) $290 million aggregate principal amount of Oncor Electric Delivery Transition Bond Company LLC 5.290% Fixed Series 2004 Bonds due in 2016.

### Oncor Electric Delivery Revolving Facility

*Overview*

In connection with the Merger, Oncor Electric Delivery entered into the Oncor Electric Delivery Revolving Facility. The Oncor Electric Delivery Revolving Facility is comprised of a senior revolving credit facility in an aggregate principal amount of $2.0 billion, of which amounts are available (a) in the form of letters of credit and (b) for borrowings on same-day notice, referred to as the swingline loans. In addition, subject to the satisfaction of certain conditions, Oncor Electric Delivery may increase the commitments under the Oncor Electric Delivery Revolving Facility in an amount up to $500 million. The letters of credit and proceeds of borrowings under the Oncor Electric Delivery Revolving Facility will be used by Oncor Electric Delivery and its subsidiaries for the repayment of certain existing indebtedness of Oncor Electric Delivery or its subsidiaries and for working capital and other general corporate purposes.

194

Confidential

The Oncor Electric Delivery Revolving Facility was entered into by Oncor Electric Delivery with JPMorgan, CS Securities, Citigroup, GSCP, LBI and MSSF as joint lead arrangers and bookrunners, JPMCB as administrative agent, Citibank as syndication agent and CS Securities, GSCP, LCPI and MSSF as co-documentation agents.

### Interest Rates and Fees

Loans under the Oncor Electric Delivery Revolving Facility bear interest at per annum rates equal to, at Oncor Electric Delivery's option, (i) LIBOR plus a spread of 0.275% to 0.800% (which spread shall depend on the credit rating assigned to Oncor Electric Delivery's senior secured long-term debt) or (ii) a base rate (the higher of (1) the prime rate of JPMCB and (2) the federal funds effective rate plus 0.50%). Currently, borrowings under the Oncor Electric Delivery Revolving Facility are LIBOR-based, and, based on Oncor Electric Delivery's current credit ratings, bear interest at LIBOR plus 0.575%.

A facility fee is payable quarterly in arrears and upon a termination or commitment reduction at a rate per annum equal to 0.100% to 0.200% (such spread will depend on the credit rating assigned to Oncor Electric Delivery's senior secured debt) of the commitments under the Oncor Electric Delivery Revolving Credit Facility. Based on Oncor Electric Delivery's current credit ratings, its facility fee rate will be 0.175%.

A utilization fee is payable quarterly in arrears and upon a termination or commitment reduction on the average daily amount outstanding (to the extent of borrowings in excess of 50% of the commitments) under the Oncor Electric Delivery Revolving Credit Facility at a rate equal to 0.125% per annum.

Letter of credit fees under the Oncor Electric Delivery Revolving Credit Facility are payable quarterly in arrears and upon termination at a rate per annum equal to the spread over LIBOR under the Oncor Electric Delivery Revolving Credit Facility, less the issuing bank's fronting fee.

### Security

The Oncor Electric Delivery Revolving Credit Facility, including hedging transactions, will be secured on a post-closing basis, by certain of Oncor Electric Delivery's assets used in connection with its the transmission and distribution business.

### Covenants

The Oncor Electric Delivery Revolving Credit Facility contains customary covenants for facilities of this type, restricting, subject to certain exceptions, Oncor Electric Delivery and its subsidiaries from, among other things:

- incurring additional liens;
- entering into mergers and consolidations;
- sales of substantial assets; and
- acquisitions and investments in subsidiaries.

In addition, the Oncor Electric Delivery Revolving Credit Facility requires that Oncor Electric Delivery maintain a maximum consolidated senior debt to capitalization ratio of 0.65 to 1.00 and observe certain customary reporting requirements and other affirmative covenants.

### Maturity

The Oncor Electric Delivery Revolving Credit Facility matures on October 10, 2013. Prior to the maturity date, funds under the Oncor Electric Delivery Revolving Credit Facility may be borrowed, repaid or reborrowed without premium or penalty.

195

Confidential

*Events of Default*

The Oncor Electric Delivery Revolving Credit Facility contains certain customary events of default for facilities of this type, including, without limitation, a failure to pay principal, interest, fees or other amounts when due under the Oncor Electric Delivery Revolving Credit Facility, a representation or warranty fails to be true in all material respects when made or deemed made, a breach of a covenant, cross-default, the entry, under certain circumstances, of a material judgment against Oncor Electric Delivery or a subsidiary, bankruptcy or insolvency events, certain ERISA violations, the invalidity of a guarantee or of the collateral securing the facility, the amendment, waiver, modification or violation of certain provisions of Oncor Electric Holdings' or Oncor Electric Delivery's respective limited liability company agreements, or the occurrence of a "change of control" as defined in the Oncor Electric Delivery Revolving Credit Facility, the occurrence of which would allow the lenders to accelerate all outstanding loans and terminate their commitments. These events of default may allow for certain grace periods and materiality limitations.

## Debt Repayment

*Tender Offers and Consent Solicitations*

In connection with the Merger, we commenced cash tender offers to purchase any and all of the Specified Notes on September 25, 2007. On the closing date of the Merger, we repaid an aggregate of $996 million of the Energy Future Holdings Corp. 4.80% Series O Senior Notes due 2009, $247 million of the TCEH 6.125% Senior Notes due 2008 and $995 million of the TCEH 7.000% Senior Notes due 2013. In connection with the tender offers for the Specified Notes, we also solicited and obtained consents from the holders of the Specified Notes to amend or waive certain terms of the indentures governing the Specified Notes, the officer's certificates governing the Specified Notes and the Specified Notes themselves. The amendments and waivers for which consents were obtained, among other things, eliminate certain covenants contained in the indentures and the officer's certificates governing the Specified Notes and the Specified Notes, eliminate certain events of default, modify covenants regarding mergers and consolidations, and modify or eliminate certain other provisions, including certain provisions relating to satisfaction and discharge, contained in the indentures and the officer's certificates governing the Specified Notes and the Specified Notes.

*Other Debt Repayment*

Including the Specified Notes, in connection with the Merger, we redeemed or repaid or expect to repay an aggregate of approximately $5.5 billion of existing indebtedness of Energy Future Holdings Corp. and its subsidiaries (excluding Oncor Electric Delivery), including debt that became payable upon the consummation of the Merger. Included in the aggregate amount of the Debt Repayment is the repayment in full of outstanding amounts under the credit facility of TCEH and, in addition, to redeem all of the outstanding $1.0 billion aggregate principal amount of 5.860% Floating Rate Senior Notes due September 16, 2008 of TCEH.

## Existing Unsecured Senior Notes and Debentures

Upon the closing of the Merger and the repayment of indebtedness as described under "—Debt Repayment," $7,120 million in aggregate principal amount of existing unsecured senior notes and debentures of Energy Future Holdings Corp. and its subsidiaries remained outstanding:

- *Energy Future Holdings Corp. Senior Notes*

   a)  $2,500 million aggregate principal amount of Energy Future Holdings Corp. Senior Notes, issued in November 2004, in the following series:

   - $1,000 million of its 5.55% Series P Senior Notes due November 15, 2014;

   - $750 million of its 6.50% Series Q Senior Notes due November 15, 2024; and

   - $750 million of its 6.55% Series R Senior Notes due November 15, 2034.

196

EFIHMW00208326

**PX 008**
**Page 205 of 501**

b)  $200 million aggregate principal amount of Energy Future Holdings Corp. 6.375% Series C Senior Notes due 2008 issued in January 1998.

c)  $25 million aggregate principal amount of Energy Future Holdings Corp. Floating Rate Convertible Senior Notes due 2033:

These notes bear regular interest at an annual floating rate equal to three-month LIBOR, determined quarterly, plus 150 basis points, and are payable in arrears quarterly commencing on October 15, 2003. The notes will bear additional contingent interest during periods after July 15, 2008 if the average trading price of the notes for a specified period exceeds 120% of the principal amount of the notes.

As of October 10, 2007, the notes are convertible only into cash. The amount of cash payable upon conversion per $1.000 principal amount of notes is $4,274.05 which are payable upon notice from the holders.

- *Energy Future Competitive Holdings Debentures*

a)  $1 million aggregate principal amount of Energy Future Competitive Holdings Floating Rate Junior Subordinated Debentures, Series D due 2037, issued in January 1997 (initially issued in $100 million principal amount of which $98.7 million has been redeemed).

b)  $8 million aggregate principal amount of Energy Future Competitive Holdings 8.175% Fixed Junior Subordinated Debentures, Series E due 2037, issued in January 1997 (initially issued in $400 million principal amount, of which $391.553 million has been redeemed).

- *TCEH Pollution Control Revenue Bonds*

Upon the closing of the Merger, TCEH also had outstanding $1,536 million aggregate principal amount of TCEH tax-exempt pollution control revenue bonds consisting of the following series issued by the following river authorities:

a)  Brazos River Authority:

- $39 million aggregate principal amount of 5.400% Fixed Series 1994A due May 1, 2029;

- $111 million aggregate principal amount of 7.700% Fixed Series 1999A due April 1, 2033;

- $16 million aggregate principal amount of 6.750% Fixed Series 1999B due September 1, 2034, remarking date April 1, 2013;

- $50 million aggregate principal amount of 7.700% Fixed Series 1999C due March 1, 2032;

- $71 million aggregate principal amount of Floating Rate Series 2001A due October 1, 2030;

- $217 million aggregate principal amount of 5.750% Fixed Series 2001C due May 1, 2036, remarking date November 1, 2011;

- $268 million aggregate principal amount of Floating Rate Series 2001D due May 1, 2033;

- $62 million aggregate principal amount of Floating Rate Taxable Series 2001I due December 1, 2036;

- $45 million aggregate principal amount of Floating Rate Series 2002A due May 1, 2037;

- $44 million aggregate principal amount of 6.750% Fixed Series 2003A due April 1, 2038, remarking date April 1, 2013;

- $39 million aggregate principal amount of 6.300% Fixed Series 2003B due July 1, 2032;

- $52 million aggregate principal amount of 6.750% Fixed Series 2003C due October 1, 2038;

197

Confidential

- $31 million aggregate principal amount of 5.400% Fixed Series 2003D due October 1, 2029, remarketing date October 1, 2014; and

- $100 million aggregate principal amount of 5.000% Fixed Series 2006 due March 1, 2041.

b)  Sabine River Authority of Texas:

- $51 million aggregate principal amount of 6.450% Fixed Series 2000A due June 1, 2021;

- $92 million aggregate principal amount of 5.500% Fixed Series 2001A due May 1, 2022, remarketing date November 1, 2011;

- $107 million aggregate principal amount of 5.750% Fixed Series 2001B due May 1, 2030, remarketing date November 1, 2011;

- $70 million aggregate principal amount of 5.200% Fixed Series 2001C due May 1, 2028;

- $12 million aggregate principal amount of 5.800% Fixed Series 2003A due July 1, 2022; and

- $45 million aggregate principal amount of 6.150% Fixed Series 2003B due August 1, 2022.

c)  Trinity River Authority of Texas:

- $14 million aggregate principal amount of 6.250% Fixed Series 2000A due May 1, 2028.

- *Oncor Electric Delivery Senior Notes and Debentures*

   In addition, upon the closing of the Merger, Oncor Electric Delivery had the following debt outstanding:

a)  $1,200 million aggregate principal amount of Oncor Electric Delivery Senior Notes, issued in May 2002 in the following series:

- $700 million aggregate principal amount of Oncor Electric Delivery 6.375% Fixed Senior Notes due 2012; and

- $500 million aggregate principal amount of Oncor Electric Delivery 7.000% Fixed Senior Notes due 2032.

b)  $850 million aggregate principal amount of Oncor Electric Delivery Senior Notes, issued in December 2002 in the following series:

- $500 million aggregate principal amount of Oncor Electric Delivery 6.375% Fixed Senior Notes due 2015; and

- $350 million aggregate principal amount of Oncor Electric Delivery 7.250% Fixed Senior Notes due 2033.

c)  $800 million aggregate principal amount of Oncor Electric Delivery 7.000% Fixed Debentures due 2022 issued in August 2002.

Confidential

EFIHMW00208328

## DESCRIPTION OF THE NOTES

**General**

Certain terms used in this description are defined under the subheading "Certain Definitions." In this description, (i) the terms "*we*," "*our*" and "*us*" each refer to Energy Future Holdings Corp. (formerly known as TXU Corp.) and its consolidated Subsidiaries; and (ii) the term "*Issuer*" refers only to Energy Future Holdings Corp. and not any of its Subsidiaries.

The Issuer will issue $2,000,000,000 aggregate principal amount of 10.875% senior notes due 2017 (the "*Cash Pay Notes*") and $2,500,000,000 aggregate principal amount of 11.250%/12.000% optional PIK interest senior notes due 2017 (the "*Toggle Notes*" and, together with the Cash Pay Notes, the "*Notes*") under an Indenture to be dated as of October 31, 2007 (the "*Indenture*") among the Issuer, the Guarantors and The Bank of New York, as trustee (the "*Trustee*"). The Notes will be issued in a private transaction that is not subject to the registration requirements of the Securities Act. See "Notice to Investors." Except as set forth herein, the terms of the Notes will be substantially identical and include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act.

As more particularly described under "The Transactions—Ring-Fencing," upon the consummation of the Merger, Oncor Electric Delivery undertook certain ring-fencing measures to separate itself, its subsidiaries and its immediate parent, Oncor Electric Delivery Holdings, from the Issuer and the Issuer's other Subsidiaries. Those measures include Oncor Electric Delivery and its Subsidiaries being treated as Unrestricted Subsidiaries with respect to the Notes. As Unrestricted Subsidiaries, the Oncor Subsidiaries will not be subject to most of the covenants described herein and will not guarantee the Notes.

The Holders of the Notes, by accepting the Notes, acknowledge (i) the legal separateness of the Issuer and the Guarantors from Oncor Holdings and the other Oncor Subsidiaries, (ii) that the lenders under the Oncor Electric Delivery Facility and the noteholders under Oncor's existing debt instruments have likely advanced funds thereunder in reliance upon the separateness of Oncor Holdings and the other Oncor Subsidiaries from the Issuer and the Guarantors, (iii) that Oncor Holdings and the other Oncor Subsidiaries have assets and liabilities that are separate from those of the Issuer and its other Subsidiaries, (iv) that the obligations owing under the Notes are obligations and liabilities of the Issuer and the Guarantors only, and are not the obligations or liabilities of Oncor Holdings or any of the other Oncor Subsidiaries, (v) that the Holders of the Notes shall look solely to the Issuer and the Guarantors and their assets, and not to any assets, or to the pledge of any assets, owned by Oncor Holdings or any of the other Oncor Subsidiaries, for the repayment of any amounts payable pursuant to the Notes and for satisfaction of any other obligations owing to the Holders under the Indenture, the Registration Rights Agreement and any related documents and (vi) that none of Oncor Holdings or any of the other Oncor Subsidiaries shall be personally liable to the Holders of the Notes for any amounts payable, or any other obligation, under the Indenture, the Registration Rights Agreement or any related documents.

The Holders of the Notes, by accepting the Notes, shall acknowledge and agree that the Holders of the Notes shall not (i) initiate any legal proceeding to procure the appointment of an administrative receiver or (ii) institute any bankruptcy, reorganization, insolvency, winding up, liquidation, or any like proceeding under applicable law, against Oncor Holdings or any of the other Oncor Subsidiaries, or against any of Oncor Holdings' of the other Oncor Subsidiaries' assets. The Holders further acknowledge and agree that Oncor Holdings and each of the other Oncor Subsidiaries is a third party beneficiary of the forgoing covenant and shall have the right to specifically enforce such covenant in any proceeding at law or in equity. The foregoing acknowledgements and agreements are contained in the indenture governing the notes.

The following description is only a summary of the material provisions of the Indenture, does not purport to be complete and is qualified in its entirety by reference to the provisions of the Indenture, including the definitions therein of certain terms used below. We urge you to read the Indenture because it, and not this description, will define your rights as Holders of the Notes. You may request copies of the Indenture at our address set forth under the heading "Summary."

199

Confidential

**Brief Description of Notes**

The Notes:

- will be unsecured senior obligations of the Issuer;

- will be effectively subordinated to any secured Indebtedness of the Issuer to the extent of the value of the assets securing such Indebtedness;

- will be structurally subordinated to any existing and future indebtedness and liabilities of non-guarantor Subsidiaries, including the Oncor Subsidiaries, TCEH and the TCEH Subsidiaries, any of the Issuer's Foreign Subsidiaries and any Unrestricted Subsidiaries;

- will rank equally in right of payment with all existing and future unsecured Senior Indebtedness of the Issuer (including the applicable Existing Notes);

- will be senior in right of payment to any future Subordinated Indebtedness of the Issuer;

- will be initially unconditionally guaranteed on a joint and several and senior basis only by Energy Future Competitive Holdings and Energy Future Intermediate Holding; and

- will be subject to registration with the SEC pursuant to the Registration Rights Agreement.

**Guarantees**

The Guarantors, as primary obligors and not merely as sureties, will initially jointly and severally fully and unconditionally guarantee, on a senior basis, the performance and full and punctual payment when due, whether at maturity, by acceleration or otherwise, of all obligations of the Issuer under the Indenture and the Notes, whether for payment of principal of, premium, if any, or interest or Additional Interest in respect of the Notes, expenses, indemnification or otherwise, on the terms set forth in the Indenture by executing the Indenture.

Only Energy Future Competitive Holdings and Energy Future Intermediate Holding will initially guarantee the Notes. Each of the Guarantees of the Notes will be a general unsecured senior obligation of each Guarantor. The Guarantees will rank equally in right of payment with all existing and future Senior Indebtedness of the Guarantor and will be effectively subordinated to all Secured Indebtedness of such Guarantor to the extent of the value of the collateral securing such Indebtedness. The Guarantees will be senior in right of payment to all existing and future Subordinated Indebtedness of each Guarantor. The Notes will be structurally subordinated to Indebtedness and other liabilities of Subsidiaries of the Issuer that do not Guarantee the Notes.

Not all of the Issuer's Subsidiaries will Guarantee the Notes. In the event of a bankruptcy, liquidation or reorganization of any of these non-guarantor Subsidiaries, the non-guarantor Subsidiaries will pay the holders of their debt and their trade creditors before they will be able to distribute any of their assets to the Issuer. None of TCEH, the TCEH Subsidiaries, or the Oncor Subsidiaries will guarantee the Notes. For the year ended December 31, 2006 and the six months ended June 30, 2007, the non-guarantor Subsidiaries generated all of the Issuer's consolidated total revenue. In addition, as of June 30, 2007, the non-guarantor Subsidiaries held approximately 99% of the Issuer's consolidated total assets.

The obligations of each Guarantor under its Guarantee will be limited as necessary to prevent the Guarantee from constituting a fraudulent conveyance under applicable law.

Any entity that makes a payment under its Guarantee will be entitled upon payment in full of all guaranteed obligations under the Indenture to a contribution from each other Guarantor in an amount equal to such other Guarantor's pro rata portion of such payment based on the respective net assets of all the Guarantors at the time of such payment determined in accordance with GAAP.

200

Confidential