- 5.500% Fixed Series 2001A due May 1, 2022, remarketing date November 1, 2011;

- 5.750% Fixed Series 2001B due May 1, 2030, remarketing date November 1, 2011;

- 5.200% Fixed Series 2001C due May 1, 2028;

- 5.800% Fixed Series 2003A due July 1, 2022;

- 6.150% Fixed Series 2003B due August 1, 2022;

Pollution Control Revenue Bonds—Trinity River Authority of Texas:

- 6.250% Fixed Series 2000A due May 1, 2028;

in each case to the extent outstanding on the Closing Date.

"*Existing Notes Indentures*" means each of the indentures or other documents containing the terms of the Existing Notes.

"*Expenses Relating to a Unit Outage*" means any expenses or other charges as a result of any outage or shut-down of any Unit, including any expenses or charges relating to (a) restarting any such Unit so that it may be placed back in service after such outage or shut-down, (b) purchases of power, natural gas or heat rate to meet commitments to sell, or offset a short position in, power, natural gas or heat rate that would otherwise have been met or offset from production generated by such Unit during the period of such outage or shut-down, net of the expenses not in fact incurred (including fuel and other operating expenses) that would have been incurred absent such an outage or shut down and (c) starting up, operating, maintaining and shutting down any other Unit that would not otherwise have been operating absent such outage or shut-down, including the fuel and other operating expenses to the extent in excess of the expenses not in fact incurred (including fuel and other operating costs) that would have been incurred absent such outage or shut down, incurred to start-up, operate, maintain and shut-down such Unit and that are required during the period of time that the shut-down or outaged Unit is out of service in order to meet the commitments of such shut-down or outaged Unit to sell, or offset a short position in, power, natural gas or heat rate.

"*Fixed Charge Coverage Ratio*" means, with respect to any Person for any period, the ratio of EBITDA of such Person for such period to the Fixed Charges of such Person for such period. In the event that the Issuer or any Restricted Subsidiary incurs, assumes, guarantees, redeems, retires or extinguishes any Indebtedness (other than Indebtedness incurred under any revolving credit facility unless such Indebtedness has been permanently repaid and has not been replaced) or issues or redeems Disqualified Stock or Preferred Stock subsequent to the commencement of the period for which the Fixed Charge Coverage Ratio is being calculated but prior to or simultaneously with the event for which the calculation of the Fixed Charge Coverage Ratio is made (the "*Fixed Charge Coverage Ratio Calculation Date*"), then the Fixed Charge Coverage Ratio shall be calculated giving *pro forma* effect to such incurrence, assumption, guarantee, redemption, retirement or extinguishment of Indebtedness, or such issuance or redemption of Disqualified Stock or Preferred Stock, as if the same had occurred at the beginning of the applicable four-quarter period.

For purposes of making the computation referred to above, Investments, acquisitions, dispositions, mergers, consolidations and disposed operations (as determined in accordance with GAAP) that have been made by the Issuer or any of its Restricted Subsidiaries during the four-quarter reference period or subsequent to such reference period and on or prior to or simultaneously with the Fixed Charge Coverage Ratio Calculation Date shall be calculated on a *pro forma* basis assuming that all such Investments, acquisitions, dispositions, mergers, consolidations and disposed operations (and the change in any associated fixed charge obligations and the change in EBITDA resulting therefrom) had occurred on the first day of the four-quarter reference period. If, since the beginning of such period, any Person that subsequently became a Restricted Subsidiary or was merged with or into the Issuer or any of its Restricted Subsidiaries since the beginning of such period shall have made any Investment, acquisition, disposition, merger, consolidation or disposed operation that would have required

247

Confidential

EFIHMW00208377

adjustment pursuant to this definition, then the Fixed Charge Coverage Ratio shall be calculated giving *pro forma* effect thereto for such period as if such Investment, acquisition, disposition, merger, consolidation or disposed operation had occurred at the beginning of the applicable four-quarter period.

For purposes of this definition, whenever *pro forma* effect is to be given to a transaction, the *pro forma* calculations shall be made in good faith by a responsible financial or accounting officer of the Issuer. If any Indebtedness bears a floating rate of interest and is being given *pro forma* effect, the interest on such Indebtedness shall be calculated as if the rate in effect on the Fixed Charge Coverage Ratio Calculation Date had been the applicable rate for the entire period (taking into account any Hedging Obligations applicable to such Indebtedness). Interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by a responsible financial or accounting officer of the Issuer to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP. For purposes of making the computation referred to above, interest on any Indebtedness under a revolving credit facility computed on a *pro forma* basis shall be computed based upon the average daily balance of such Indebtedness during the applicable period except as set forth in the first paragraph of this definition. Interest on Indebtedness that may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a eurocurrency interbank offered rate or other rate shall be deemed to have been based upon the rate actually chosen, or, if none, then based upon such optional rate chosen as the Issuer may designate.

"*Fixed Charges*" means, with respect to any Person for any period, the sum of:

(1) Consolidated Interest Expense of such Person for such period;

(2) all cash dividends or other distributions paid (excluding items eliminated in consolidation) on any series of Preferred Stock during such period; and

(3) all cash dividends or other distributions paid (excluding items eliminated in consolidation) on any series of Disqualified Stock during such period.

"*Foreign Subsidiary*" means, with respect to any Person, any Restricted Subsidiary of such Person that is not organized or existing under the laws of the United States, any state or territory thereof or the District of Columbia and any Restricted Subsidiary of such Foreign Subsidiary.

"*GAAP*" means generally accepted accounting principles in the United States which are in effect on the Closing Date.

"*Government Authority*" means any nation or government, any state, province, territory or other political subdivision thereof, and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including without limitation ERCOT.

"*Government Securities*" means securities that are:

(1) direct obligations of the United States of America for the timely payment of which its full faith and credit is pledged; or

(2) obligations of a Person controlled or supervised by and acting as an agency or instrumentality of the United States of America the timely payment of which is unconditionally guaranteed as a full faith and credit obligation by the United States of America,

which, in either case, are not callable or redeemable at the option of the issuers thereof, and shall also include a depository receipt issued by a bank (as defined in Section 3(a)(2) of the Securities Act), as custodian with respect to any such Government Securities or a specific payment of principal of or interest on any such Government Securities held by such custodian for the account of the holder of such depository receipt; *provided* that (except as required by law) such custodian is not authorized to make any deduction from the amount payable to the

248

Confidential

holder of such depository receipt from any amount received by the custodian in respect of the Government Securities or the specific payment of principal of or interest on the Government Securities evidenced by such depository receipt.

"*guarantee*" means a guarantee (other than by endorsement of negotiable instruments for collection in the ordinary course of business), direct or indirect, in any manner (including letters of credit and reimbursement agreements in respect thereof), of all or any part of any Indebtedness or other obligations.

"*Guarantee*" means the guarantee by any Guarantor of the Issuer's Obligations under the Indenture.

"*Guarantor*" means each Restricted Subsidiary that Guarantees the Notes in accordance with the terms of the Indenture.

"*Hazardous Materials*" means (a) any petroleum or petroleum products, radioactive materials, friable asbestos, urea formaldehyde foam insulation, transformers or other equipment that contain dielectric fluid containing regulated levels of polychlorinated biphenyls and radon gas; (b) any chemicals, materials or substances defined as or included in the definition of "hazardous substances," "toxic substances," "toxic pollutants," "contaminants," or "pollutants" or words of similar import, under any applicable Environmental Law; and (c) any other chemical, material or substance, which is prohibited, limited or regulated by any Environmental Law.

"*Hedging Obligations*" means with respect to any Person, the obligations of such Person under (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement and (c) physical or financial commodity contracts or agreements, power purchase or sale agreements, fuel purchase or sale agreements, environmental credit purchase or sale agreements, power transmission agreements, commodity transportation agreements, fuel storage agreements, netting agreements (including Netting Agreements), capacity agreement and commercial or trading agreements, each with respect to, or including the purchase, sale, exchange of (or the option to purchase, sell or exchange), transmission, transportation, storage, distribution, processing, sale, lease or hedge of, any Covered Commodity price or price indices for any such Covered Commodity or services or any other similar derivative agreements, and any other similar agreements.

"*Holder*" means the Person in whose name a Note is registered on the registrar's books.

"*Incremental Deposit L/C Loans*" means Incremental Deposit L/C Loans under, and as defined in, the TCEH Senior Secured Facilities.

"*Indebtedness*" means, with respect to any Person, without duplication:

    (1) any indebtedness (including principal and premium) of such Person, whether or not contingent:

        (a) in respect of borrowed money;

249

Confidential

(b) evidenced by bonds, notes, debentures or similar instruments or letters of credit or bankers' acceptances (or, without duplication, reimbursement agreements in respect thereof);

(c) representing the balance deferred and unpaid of the purchase price of any property (including Capitalized Lease Obligations), except (i) any such balance that constitutes a trade payable or similar obligation to a trade creditor, in each case accrued in the ordinary course of business and (ii) any earn-out obligations until such obligation becomes a liability on the balance sheet of such Person in accordance with GAAP; or

(d) representing any Hedging Obligations;

if and to the extent that any of the foregoing Indebtedness (other than letters of credit and Hedging Obligations) would appear as a liability upon a balance sheet (excluding the footnotes thereto) of such Person prepared in accordance with GAAP;

(2) to the extent not otherwise included, any obligation by such Person to be liable for, or to pay, as obligor, guarantor or otherwise on, the obligations of the type referred to in clause (1) of a third Person (whether or not such items would appear upon the balance sheet of the such obligor or guarantor), other than by endorsement of negotiable instruments for collection in the ordinary course of business; and

(3) to the extent not otherwise included, the obligations of the type referred to in clause (1) of a third Person secured by a Lien on any asset owned by such first Person, whether or not such Indebtedness is assumed by such first Person; *provided* that the amount of Indebtedness of such first Person for purposes of this clause (3) shall be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) the fair market value of the property encumbered thereby as determined by such first Person in good faith;

*provided, however,* that notwithstanding the foregoing, Indebtedness shall be deemed not to include (a) Contingent Obligations incurred in the ordinary course of business or (b) obligations under or in respect of Receivables Facilities or (c) amounts payable by and between the Issuer and its Subsidiaries in connection with retail clawback or other regulatory transition issues.

"*Independent Financial Advisor*" means an accounting, appraisal, investment banking firm or consultant to Persons engaged in Similar Businesses of nationally recognized standing that is, in the good faith judgment of the Issuer, qualified to perform the task for which it has been engaged.

"*Initial Purchasers*" means Morgan Stanley & Co. Incorporated, Goldman, Sachs & Co., Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, J.P. Morgan Securities Inc. and Lehman Brothers Inc.

"*Investment Grade Rating*" means a rating equal to or higher than Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P, or an equivalent rating by any other Rating Agency.

"*Investment Grade Securities*" means:

(1) securities issued or directly and fully guaranteed or insured by the United States government or any agency or instrumentality thereof (other than Cash Equivalents);

(2) debt securities or debt instruments with an Investment Grade Rating, but excluding any debt securities or instruments constituting loans or advances among the Issuer and its Subsidiaries;

(3) investments in any fund that invests exclusively in investments of the type described in clauses (1) and (2) which fund may also hold immaterial amounts of cash pending investment or distribution; and

(4) corresponding instruments in countries other than the United States customarily utilized for high quality investments.

"*Investments*" means, with respect to any Person, all investments by such Person in other Persons (including Affiliates) in the form of loans (including guarantees), advances or capital contributions (excluding accounts

250

EFIHMW00208380

receivable, trade credit, advances to customers, commissions, travel and similar advances to officers and employees, in each case made in the ordinary course of business). purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities issued by any other Person and investments that are required by GAAP to be classified on the balance sheet (excluding the footnotes) of the Issuer in the same manner as the other investments included in this definition to the extent such transactions involve the transfer of cash or other property.

For purposes of the definition of "Unrestricted Subsidiary" and the covenant described under "Certain Covenants—Limitation on Restricted Payments":

(1) "Investments" shall include the portion (proportionate to the Issuer's equity interest in such Subsidiary) of the fair market value of the net assets of a Subsidiary of the Issuer at the time that such Subsidiary is designated an Unrestricted Subsidiary; *provided, however*, that upon a redesignation of such Subsidiary as a Restricted Subsidiary, the Issuer shall be deemed to continue to have a permanent "Investment" in an Unrestricted Subsidiary in an amount (if positive) equal to:

(a) the Issuer's "Investment" in such Subsidiary at the time of such redesignation; *less*

(b) the portion (proportionate to the Issuer equity interest in such Subsidiary) of the fair market value of the net assets of such Subsidiary at the time of such redesignation; and

(2) any property transferred to or from an Unrestricted Subsidiary shall be valued at its fair market value at the time of such transfer, in each case as determined in good faith by the Issuer.

"*Investors*" means Kohlberg Kravis Roberts & Co. L.P., TPG Capital, L.P., J.P. Morgan Ventures Corporation, Citigroup Global Markets Inc., Morgan Stanley & Co. Incorporated, Goldman, Sachs & Co. and LB I Group and each of their respective Affiliates but not including, however, any portfolio companies of any of the foregoing.

"*Issue Date*" means the first date on which any Notes are issued pursuant to the Indenture.

"*Issuer*" has the meaning set forth in the first paragraph under "General"; *provided* that when used in the context of determining the fair market value of an asset or liability under the Indenture, "Issuer" shall be deemed to mean the board of directors of the Issuer when the fair market value is equal to or in excess of $500.0 million (unless otherwise expressly stated).

"*Legal Holiday*" means a Saturday, a Sunday or a day on which commercial banking institutions are not required to be open in the State of New York.

"*Lien*" means, with respect to any asset, any mortgage, lien (statutory or otherwise), pledge, hypothecation, charge, security interest, preference, priority or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a security interest in and any filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statutes) of any jurisdiction; *provided* that in no event shall an operating lease be deemed to constitute a Lien.

"*Moody's*" means Moody's Investors Service, Inc. and any successor to its rating agency business.

"*Necessary CapEx Debt*" means Indebtedness of the Issuer or any of its Restricted Subsidiaries incurred for the purpose of financing Necessary Capital Expenditures.

"*Necessary Capital Expenditures*" means capital expenditures by the Issuer and its Restricted Subsidiaries that are required by applicable law (other than Environmental Law) or otherwise undertaken voluntarily for health and safety reasons (other than as required by Environmental Law). The term "Necessary Capital

251

EFIHMW00208381

Expenditures" does not include any capital expenditure undertaken primarily to increase the efficiency of, expand or re-power any power generation facility.

"*Net Income*" means, with respect to any Person, the net income (loss) of such Person, determined in accordance with GAAP and before any reduction in respect of Preferred Stock dividends.

"*Net Proceeds*" means the aggregate cash proceeds received by the Issuer or any of its Restricted Subsidiaries in respect of any Asset Sale (including a Casualty Event), including any cash received upon the sale or other disposition of any Designated Non-cash Consideration received in any Asset Sale (including a Casualty Event), net of the direct costs relating to such Asset Sale (including a Casualty Event) and the sale or disposition of such Designated Non-cash Consideration, including legal, accounting and investment banking fees, and brokerage and sales commissions, any relocation expenses incurred as a result thereof, taxes paid or payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements), amounts required to be applied to the repayment of principal, premium, if any, and interest on Senior Indebtedness required (other than required by clause (1) of the second paragraph of "Repurchase at the Option of Holders—Asset Sales") to be paid as a result of such transaction and any deduction of appropriate amounts to be provided by the Issuer or any of its Restricted Subsidiaries as a reserve in accordance with GAAP against any liabilities associated with the asset disposed of in such transaction and retained by the Issuer or any of its Restricted Subsidiaries after such sale or other disposition thereof, including pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction.

"*Netting Agreement*" shall mean a netting agreement, master netting agreement or other similar document having the same effect as a netting agreement or master netting agreement and, as applicable, any collateral annex, security agreement or other similar document related to any master netting agreement or Permitted Contract.

"*Obligations*" means any principal, interest (including any interest accruing subsequent to the filing of a petition in bankruptcy, reorganization or similar proceeding at the rate provided for in the documentation with respect thereto, whether or not such interest is an allowed claim under applicable state, federal or foreign law), premium, penalties, fees, indemnifications, reimbursements (including reimbursement obligations with respect to letters of credit and bankers' acceptances), damages and other liabilities, and guarantees of payment of such principal, interest, penalties, fees, indemnifications, reimbursements, damages and other liabilities, payable under the documentation governing any Indebtedness.

"*Officer*" means the Chairman of the Board, the Chief Executive Officer, the President, any Executive Vice President, Senior Vice President or Vice President, the Treasurer or the Secretary of the Issuer.

"*Officer's Certificate*" means a certificate signed on behalf of the Issuer by an Officer of the Issuer, who must be the principal executive officer, the principal financial officer, the treasurer or the principal accounting officer of the Issuer that meets the requirements set forth in the Indenture.

"*Oncor Electric Delivery Facility*" means the revolving credit agreement to be entered into as of the Closing Date by and among Oncor Electric Delivery, as borrower, the lenders party thereto in their capacities as lenders thereunder and JPMorgan Chase Bank, N.A., as Administrative Agent, including any guarantees, collateral documents, instruments and agreements executed in connection therewith, and any amendments, supplements, modifications, extensions, renewals, restatements, refundings or refinancings thereof and any indentures or credit facilities or commercial paper facilities with banks or other institutional lenders or investors that replace, refund or refinance any part of the loans, notes, other credit facilities or commitments thereunder, including any such replacement, refunding or refinancing facility or indenture that increases the amount borrowable thereunder or alters the maturity thereof.

252

EFIHMW00208382

*"Oncor Holdings"* means Oncor Electric Delivery Holdings LLC.

*"Oncor Subsidiaries"* means the Subsidiaries of Energy Future Intermediate Holding, including Oncor Holdings and its Subsidiaries, all of which shall be Unrestricted Subsidiaries existing on the Issue Date.

*"Opinion of Counsel"* means a written opinion from legal counsel who is acceptable to the Trustee. The counsel may be an employee of or counsel to the Issuer or the Trustee.

*"Partial PIK Interest"* has the meaning set forth under "Principal, Maturity and Interest—Toggle Notes."

*"Permitted Asset Swap"* means the concurrent purchase and sale or exchange of Related Business Assets or a combination of Related Business Assets and cash or Cash Equivalents between the Issuer or any of its Restricted Subsidiaries and another Person; *provided*, that any cash or Cash Equivalents received must be applied in accordance with the covenant described under "Repurchase at the Option of Holders—Asset Sales."

*"Permitted Holders"* means each of the Investors, members of management (including directors) of the Issuer or any of its Subsidiaries who on the Closing Date are (or will be at any time prior to the first anniversary of the Closing Date) holders of Equity Interests of the Issuer (or any of its direct or indirect parent companies) and any group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act or any successor provision) of which any of the foregoing are members; *provided* that, in the case of such group and without giving effect to the existence of such group or any other group, such Investors and members of management, collectively, have beneficial ownership of more than 50% of the total voting power of the Voting Stock of the Issuer or any of its direct or indirect parent companies.

*"Permitted Investments"* means:

(1) any Investment in the Issuer or any of its Restricted Subsidiaries;

(2) any Investment in cash and Cash Equivalents or Investment Grade Securities;

(3) any Investment by the Issuer or any of its Restricted Subsidiaries in a Person that is engaged in a Similar Business if as a result of such Investment:

(a) such Person becomes a Restricted Subsidiary; or

(b) such Person, in one transaction or a series of related transactions, is merged or consolidated with or into, or transfers or conveys substantially all of its assets to, or is liquidated into, the Issuer or a Restricted Subsidiary,

and, in each case, any Investment held by such Person; *provided* that such Investment was not acquired by such Person in contemplation of such acquisition, merger, consolidation or transfer;

(4) any Investment in securities or other assets not constituting cash, Cash Equivalents or Investment Grade Securities and received in connection with an Asset Sale made pursuant to the provisions described under "Repurchase at the Option of Holders—Asset Sales" or any other disposition of assets not constituting an Asset Sale;

(5) any Investment existing on the Closing Date;

(6) any Investment acquired by the Issuer or any of its Restricted Subsidiaries:

(a) in exchange for any other Investment or accounts receivable held by the Issuer or any such Restricted Subsidiary in connection with or as a result of a bankruptcy, workout, reorganization or recapitalization of the issuer of such other Investment or accounts receivable; or

(b) as a result of a foreclosure by the Issuer or any of its Restricted Subsidiaries with respect to any secured Investment or other transfer of title with respect to any secured Investment in default;

253

Confidential

(7) Hedging Obligations permitted under clause (10) of the second paragraph of the covenant described in "Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock";

(8) any Investment in a Similar Business having an aggregate fair market value, taken together with all other Investments made pursuant to this clause (8) that are at that time outstanding, not to exceed 3.5% of Total Assets at the time of such Investment (with the fair market value of each Investment being measured at the time made and without giving effect to subsequent changes in value);

(9) Investments the payment for which consists of Equity Interests (exclusive of Disqualified Stock) of the Issuer or any of its direct or indirect parent companies; *provided, however*, that such Equity Interests will not increase the amount available for Restricted Payments under clause (3) of the first paragraph under the covenant described in "Certain Covenants—Limitations on Restricted Payments";

(10) guarantees of Indebtedness of the Issuer or any of its Restricted Subsidiaries permitted under the covenant described under "Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock";

(11) any transaction to the extent it constitutes an Investment that is permitted and made in accordance with the provisions of the second paragraph of the covenant described under "Certain Covenants— Transactions with Affiliates" (except transactions described in clauses (2), (5) and (9) of such paragraph);

(12) Investments consisting of purchases and acquisitions of inventory, fuel (including all forms of nuclear fuel), supplies, material or equipment;

(13) additional Investments having an aggregate fair market value, taken together with all other Investments made pursuant to this clause (13) that are at that time outstanding (without giving effect to the sale of an Investment to the extent the proceeds of such sale do not consist of cash or marketable securities), not to exceed 3.5% of Total Assets at the time of such Investment (with the fair market value of each Investment being measured at the time made and without giving effect to subsequent changes in value);

(14) Investments relating to a Receivables Subsidiary that, in the good faith determination of the Issuer, are necessary or advisable to effect any Receivables Facility for the benefit of the Issuer or any of its Restricted Subsidiaries;

(15) advances to, or guarantees of Indebtedness of, employees not in excess of $25.0 million outstanding at any one time, in the aggregate;

(16) loans and advances to officers, directors and employees for business-related travel expenses, moving expenses and other similar expenses, in each case incurred in the ordinary course of business or consistent with past practices or to fund such Person's purchase of Equity Interests of the Issuer or any direct or indirect parent company thereof;

(17) any Investment in any Subsidiary or any joint venture in connection with intercompany cash management arrangements or related activities arising in the ordinary course of business;

(18) any Investment in Shell Wind in an aggregate amount not to exceed $1,500.0 million; and

(19) one or more letters of credit in an aggregate amount not to exceed $170.0 million posted by a Restricted Subsidiary in favor of an Oncor Subsidiary to secure that Restricted Subsidiary's contractual obligations to that Oncor Subsidiary.

"*Permitted Liens*" means, with respect to any Person:

(1) pledges or deposits by such Person under workmen's compensation laws, unemployment insurance laws or similar legislation, or good faith deposits in connection with bids, tenders, contracts (other than for the payment of Indebtedness) or leases to which such Person is a party, or deposits to secure public or statutory obligations of such Person or deposits of cash or U.S. government bonds to secure surety or appeal

254

EFIHMW00208384

bonds to which such Person is a party, or deposits as security for contested taxes or import duties or for the payment of rent, in each case incurred in the ordinary course of business (including in connection with the construction or restoration of facilities for the generation, transmission or distribution of electricity) or otherwise constituting Permitted Investments;

(2) Liens imposed by law, such as carriers', warehousemen's and mechanics' Liens, in each case for sums not yet overdue for a period of more than 30 days or being contested in good faith by appropriate proceedings or other Liens arising out of judgments or awards against such Person with respect to which such Person shall then be proceeding with an appeal or other proceedings for review if adequate reserves with respect thereto are maintained on the books of such Person in accordance with GAAP;

(3) Liens for taxes, assessments or other governmental charges not yet overdue for a period of more than 30 days or payable or subject to penalties for nonpayment or which are being contested in good faith by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of such Person in accordance with GAAP;

(4) Liens in favor of issuers of performance and surety bonds or bid bonds or with respect to other regulatory requirements or letters of credit issued pursuant to the request of and for the account of such Person in the ordinary course of its business;

(5) minor survey or title exceptions or irregularities, minor encumbrances, easements or reservations of, or rights of others for, licenses, permits, conditions, covenants, rights-of-way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning or other restrictions as to the use of real properties or Liens incidental to the conduct of the business of such Person or to the ownership of its properties which were not incurred in connection with Indebtedness and which do not in the aggregate materially adversely affect the value of said properties or materially impair their use in the operation of the business of such Person;

(6) Liens securing Indebtedness permitted to be incurred pursuant to clause (4), (12) or (13) of the second paragraph under "Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock"; *provided* that (a) Liens securing Indebtedness, Disqualified Stock or Preferred Stock permitted to be incurred pursuant to clause (13) relate only to Refinancing Indebtedness that serves to refund or refinance Indebtedness, Disqualified Stock or Preferred Stock incurred under clause (4) or (12) of the second paragraph under "Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock," and (b) Liens securing Indebtedness, Disqualified Stock or Preferred Stock permitted to be incurred pursuant to clause (4) of the second paragraph under "Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" extend only to the assets so financed, purchased, constructed or improved;

(7) Liens existing on the Closing Date (other than Liens in favor of the lenders under the TCEH Senior Secured Facilities);

(8) Liens on property or shares of stock of a Person at the time such Person becomes a Subsidiary; *provided, however,* such Liens are not created or incurred in connection with, or in contemplation of, such other Person becoming such a Subsidiary; *provided, further, however,* that such Liens may not extend to any other property owned by the Issuer or any of its Restricted Subsidiaries;

(9) Liens on property at the time the Issuer or a Restricted Subsidiary acquired the property, including any acquisition by means of a merger or consolidation with or into the Issuer or any of its Restricted Subsidiaries; *provided, however,* that such Liens are not created or incurred in connection with, or in contemplation of, such acquisition; *provided, further, however,* that the Liens may not extend to any other property owned by the Issuer or any of its Restricted Subsidiaries;

(10) Liens securing Indebtedness or other obligations of a Restricted Subsidiary owing to the Issuer or another Restricted Subsidiary permitted to be incurred in accordance with the covenant described under

255

Confidential

"Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock";

(11) Liens securing Hedging Obligations, of the Issuer or its Restricted Subsidiaries incurred under clause (10) of the second paragraph under "Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock"; *provided* that such agreements were entered into in the ordinary course of business and not for speculative purposes (as determined by the Issuer in its reasonable discretion acting in good faith) and, in the case of any commodity Hedging Obligations or any Hedging Obligation of the type described in clause (c) of the definition of "Hedging Obligations," entered into in order to hedge against or manage fluctuations in the price or availability of any Covered Commodity;

(12) Liens on specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(13) leases, subleases, licenses or sublicenses granted to others in the ordinary course of business which do not materially interfere with the ordinary conduct of the business of the Issuer or any of its Restricted Subsidiaries;

(14) Liens arising from Uniform Commercial Code financing statement filings regarding operating leases entered into by the Issuer and its Restricted Subsidiaries in the ordinary course of business;

(15) Liens in favor of the Issuer or any Guarantor;

(16) [Intentionally omitted];

(17) Liens on accounts receivable, other Receivables Facility assets, or accounts into which collections or proceeds of Receivables Facility assets are deposited, in each case in connection with a Receivables Facility for the benefit of the Issuer or its Restricted Subsidiaries;

(18) Liens to secure any refinancing, refunding, extension, renewal or replacement (or successive refinancing, refunding, extensions, renewals or replacements) as a whole, or in part, of any Indebtedness secured by any Lien referred to in the foregoing clauses (6), (7), (8) and (9); *provided, however*, that (a) such new Lien shall be limited to all or part of the same property that secured the original Lien (plus improvements on such property), and (b) the Indebtedness secured by such Lien at such time is not increased to any amount greater than the sum of (i) the outstanding principal amount or, if greater, committed amount of the Indebtedness described under clauses (6), (7), (8), and (9) at the time the original Lien became a Permitted Lien under the Indenture, and (ii) an amount necessary to pay any fees and expenses, including premiums, related to such refinancing, refunding, extension, renewal or replacement;

(19) deposits made in the ordinary course of business to secure liability to insurance carriers;

(20) other Liens securing obligations incurred in the ordinary course of business which obligations do not exceed $100.0 million at any one time outstanding;

(21) Liens securing judgments for the payment of money not constituting an Event of Default under clause (5) under the caption "Events of Default and Remedies" so long as such Liens are adequately bonded and any appropriate legal proceedings that may have been duly initiated for the review of such judgment have not been finally terminated or the period within which such proceedings may be initiated has not expired;

(22) Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(23) Liens (i) of a collection bank arising under Section 4-210 of the Uniform Commercial Code, or any comparable or successor provision, on items in the course of collection, and (ii) in favor of banking institutions arising as a matter of law encumbering deposits (including the right of set-off) and which are within the general parameters customary in the banking industry;

256

EFIHMW00208386

(24) Liens deemed to exist in connection with Investments in repurchase agreements permitted by the covenant described under "Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock"; *provided* that such Liens do not extend to any assets other than those that are the subject of such repurchase agreements;

(25) ground leases or subleases, licenses or sublicenses in respect of real property on which facilities owned or leased by the Issuer or any of its Subsidiaries are located;

(26) Liens that are contractual rights of set-off (i) relating to the establishment of depository relations with banks not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of the Issuer or any of its Restricted Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Issuer and its Restricted Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of the Issuer or any of its Restricted Subsidiaries in the ordinary course of business;

(27) Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale or purchase of goods entered into by the Issuer or any Restricted Subsidiary in the ordinary course of business;

(28) rights reserved to or vested in others to take or receive any part of, or royalties related to, the power, gas, oil, coal, lignite or other minerals or timber generated, developed, manufactured or produced by, or grown on, or acquired with, any property of the Issuer or any of its Restricted Subsidiaries and Liens upon the production from property of power, gas, oil, coal, lignite or other minerals or timber, and the by-products and proceeds thereof, to secure the obligations to pay all or a part of the expenses of exploration, drilling, mining or development of such property only out of such production or proceeds;

(29) Liens arising out of all presently existing and future division and transfer orders, advance payment agreements, processing contracts, gas processing plant agreements, operating agreements, gas balancing or deferred production agreements, pooling, unitization or communitization agreements, pipeline, gathering or transportation agreements, platform agreements, drilling contracts, injection or repressuring agreements, cycling agreements, construction agreements, salt water or other disposal agreements, leases or rental agreements, farm-out and farm-in agreements, exploration and development agreements, and any and all other contracts or agreements covering, arising out of, used or useful in connection with or pertaining to the exploration, development, operation, production, sale, use, purchase, exchange, storage, separation, dehydration, treatment, compression, gathering, transportation, processing, improvement, marketing, disposal or handling of any property of the Issuer or any of its Restricted Subsidiaries, *provided* that such agreements are entered into in the ordinary course of business (including in respect of construction and restoration activities);

(30) any restrictions on any stock or stock equivalents or other joint venture interests of the Issuer or any of its Restricted Subsidiaries providing for a breach, termination or default under any owners, participation, shared facility, joint venture, stockholder, membership, limited liability company or partnership agreement between such Person and one or more other holders of such stock or stock equivalents or interest of such Person, if a security interest or other Lien is created on such stock or stock equivalents or interest as a result thereof and other similar Liens;

(31) [Intentionally omitted];

(32) Liens and other exceptions to title, in either case on or in respect of any facilities of the Issuer or any of its Restricted Subsidiaries, arising as a result of any shared facility agreement entered into with respect to such facility, except to the extent that any such Liens or exceptions, individually or in the aggregate, materially adversely affect the value of the relevant property or materially impair the use of the relevant property in the operation of business of the Issuer or any of its Restricted Subsidiaries, taken as a whole;

(33) Liens on cash and Cash Equivalents (i) deposited by the Issuer or any of its Restricted Subsidiaries in margin accounts with or on behalf of brokers, credit clearing organizations, independent system

257

EFIHMW00208387

operators, regional transmission organizations, pipelines, state agencies, federal agencies, futures contract brokers, customers, trading counterparties, or any other parties or issuers of surety bonds or (ii) pledged or deposited as collateral by the Issuer or any of its Restricted Subsidiaries with any of the entities described in clause (i) above to secure their respective obligations, in the case of each of clauses (i) and (ii) above, with respect to: (A) any contracts and transactions for the purchase, sale, exchange of, or the option (whether physical or financial) to purchase, sell or exchange (1) natural gas, (2) electricity, (3) coal and lignite, (4) petroleum-based liquids, (5) oil, (6) nuclear fuel (including enrichment and conversion), (7) emissions or other environmental credits, (8) waste byproducts, (9) weather, (10) power and other generation capacity, (11) heat rate, (12) congestion, (13) renewal energy credit, or (14) any other energy-related commodity or services or derivative (including ancillary services and related risk (such as location basis); (B) any contracts or transactions for the purchase, processing, transmission, transportation, distribution, sale, lease, hedge or storage of, or any other services related to any commodity or service identified in subparts (1)—(14) above, including any capacity agreement; (C) any financial derivative agreement (including but not limited to swaps, options or swaptions) related to any commodity identified in subparts (1)—(14) above, or to any interest rate or currency rate management activities; (D) any agreement for membership or participation in an organization that facilitates or permits the entering into or clearing of any netting agreement or any agreement described in this clause (33); (E) any agreement combining part or all of a netting agreement or part or all of any of the agreements described in this clause (33); (E) any document relating to any agreement described in this clause (33) that is filed with a Government Authority and any related service agreements; or (F) any commercial or trading agreements, each with respect to, or involving the purchase, transmission, distribution, sale, lease or hedge of, any energy, generation capacity or fuel, or any other energy related commodity or service, price or price indices for any such commodities or services or any other similar derivative agreements, and any other similar agreements (such agreements described in *clauses (A)* through *(F)* of this clause (33) being collectively, "*Permitted Contracts*"), Netting Agreements, Hedging Obligations and letters of credit supporting Permitted Contracts, Netting Agreements and Hedging Obligations;

(34) Liens arising under Section 9.343 of the Texas Uniform Commercial Code or similar statutes of states other than Texas;

(35) Liens created in the ordinary course of business in favor of banks and other financial institutions over credit balances of any bank accounts of the Issuer and its Subsidiaries held at such banks or financial institutions, as the case may be, to facilitate the operation of cash pooling and/or interest set-off arrangements in respect of such bank accounts in the ordinary course of business;

(36) any zoning, land use, environmental or similar law or right reserved to or vested in any Government Authority to control or regulate the use of any real property that does not materially interfere with the ordinary conduct of the business of the Issuer or any of its Restricted Subsidiaries, taken as a whole;

(37) any Lien arising by reason of deposits with or giving of any form of security to any Government Authority for any purpose at any time as required by applicable law as a condition to the transaction of any business or the exercise of any privilege or license, or to enable the Issuer or any of its Restricted Subsidiaries to maintain self-insurance or to participate in any fund for liability on any insurance risks;

(38) Liens, restrictions, regulations, easements, exceptions or reservations of any Government Authority applying particularly to nuclear fuel;

(39) rights reserved to or vested in any Government Authority by the terms of any right, power, franchise, grant, license or permit, or by any provision of applicable law, to terminate or modify such right, power, franchise, grant, license or permit or to purchase or recapture or to designate a purchaser of any of the property of such person;

(40) Liens arising under any obligations or duties affecting any of the property of the Issuer or any of its Restricted Subsidiaries to any Government Authority with respect to any franchise, grant, license or permit which do not materially impair the use of such property for the purposes for which it is held;

258

EFIHMW00208388

(41) rights reserved to or vested in any Government Authority to use, control or regulate any property of such person;

(42) any obligations or duties, affecting the property of the Issuer or any of its Restricted Subsidiaries, to any Government Authority with respect to any franchise, grant, license or permit;

(43) a set-off or netting rights granted by the Issuer or any Subsidiary of the Issuer pursuant to any agreements related to Hedging Obligations, Netting Agreements or Permitted Contracts solely in respect of amounts owing under such agreements;

(44) Liens (i) on cash advances in favor of the seller of any property to be acquired in an Investment described under the definition of "Permitted Investments" to be applied against the purchase price for such Investment and (ii) consisting of an agreement to sell, transfer, lease or otherwise dispose of any property in a transaction excluded from the definition described under "Asset Sale," in each case, solely to the extent such Investment or sale, disposition, transfer or lease, as the case may be, would have been permitted on the date of the creation of such Lien;

(45) rights of first refusal and purchase options in favor of Aluminum Company of America ("Alcoa") to purchase Sandow Unit 4 and/or the real property related thereto, as described in (i) the Sandow Unit 4 Agreement dated August 13, 1976, as amended, between Alcoa and Texas Power & Light Company ("TPL") and (ii) Deeds dated March 14, 1978 and July 21, 1980, as amended, executed by Alcoa conveying to TPL the Sandow Four real property; and

(46) any amounts held by a trustee in the funds and accounts under any indenture securing any revenue bonds issued for the benefit of the Issuer or any of its Restricted Subsidiaries.

For purposes of this definition, the term "Indebtedness" shall be deemed to include interest on such Indebtedness.

"*Person*" means any individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

"*PIK Interest*" has the meaning set forth under "Principal, Maturity and Interest—Toggle Notes."

"*PIK Notes*" has the meaning set forth under "Principal, Maturity and Interest—Toggle Notes."

"*PIK Payment*" has the meaning set forth under "Principal, Maturity and Interest—Toggle Notes."

"*Preferred Stock*" means any Equity Interest with preferential rights of payment of dividends or upon liquidation, dissolution or winding up.

"*Purchase Money Obligations*" means any Indebtedness incurred to finance or refinance the acquisition, leasing, construction, repair, restoration, replacement, expansion or improvement of property (real or personal) or assets (other than Capital Stock), and whether acquired through the direct acquisition of such property or assets, or otherwise, incurred in respect of capital expenditures, including Environmental CapEx Debt and Necessary CapEx Debt.

"*Qualified Proceeds*" means assets that are used or useful in, or Capital Stock of any Person engaged in, a Similar Business; *provided* that the fair market value of any such assets or Capital Stock shall be determined by the Issuer in good faith.

"*Rating Agencies*" means Moody's and S&P or if Moody's or S&P or both shall not make a rating on the applicable Notes or other investment publicly available, a nationally recognized statistical rating agency or agencies, as the case may be, selected by the Issuer which shall be substituted for Moody's or S&P or both, as the case may be.

259

Confidential

"*Receivables Facility*" means any of one or more receivables financing facilities or programs as amended, supplemented, modified, extended, renewed, restated or refunded from time to time, the Obligations of which are non-recourse (except for customary representations, warranties, covenants and indemnities made in connection with such facilities) to the Issuer or any of its Restricted Subsidiaries (other than a Receivables Subsidiary) pursuant to which the Issuer or any of its Restricted Subsidiaries purports to sell its accounts receivable to either (a) a Person that is not a Restricted Subsidiary or (b) a Receivables Subsidiary that in turn funds such purchase by purporting to sell its accounts receivable to a Person that is not a Restricted Subsidiary or by borrowing from such a Person or from another Receivables Subsidiary that in turn funds itself by borrowing from such a Person.

"*Receivables Fees*" means distributions or payments made directly or by means of discounts with respect to any accounts receivable or participation interest therein issued or sold in connection with, and other fees paid to a Person that is not a Restricted Subsidiary in connection with any Receivables Facility.

"*Receivables Subsidiary*" means any Subsidiary formed for the purpose of facilitating or entering into one or more Receivables Facilities, and in each case engages only in activities reasonably related or incidental thereto.

"*Redemption Date*" has the meaning set forth under "Optional Redemption."

"*Registration Rights Agreement*" means (1) the Registration Rights Agreement related to the Notes, dated as of the Issue Date, among the Issuer, the Guarantors and the Initial Purchasers, and (2) with respect to any Additional Notes, any registration rights agreement among the Issuer and the other parties thereto relating to the registration by the Issuer of such Additional Notes under the Securities Act.

"*Related Business Assets*" means assets (other than cash or Cash Equivalents) used or useful in a Similar Business; *provided* that any assets received by the Issuer or a Restricted Subsidiary in exchange for assets transferred by the Issuer or a Restricted Subsidiary will not be deemed to be Related Business Assets if they consist of securities of a Person, unless upon receipt of the securities of such Person, such Person would become a Restricted Subsidiary.

"*Restoration Certificate*" " shall mean, with respect to any Casualty Event, an Officer's Certificate provided to the Trustee prior to the 365th day after such Casualty Event has occurred certifying (a) that the Issuer or such Restricted Subsidiary intends to use the proceeds received in connection with such Casualty Event to repair, restore or replace the property or assets in respect of which such Casualty Event occurred, (b) the approximate costs of completion of such repair, restoration or replacement and (c) that such repair, restoration or replacement will be completed within the later of (x) 450 days after the date on which cash proceeds with respect to such Casualty Event were received and (y) 180 days after delivery of such Restoration Certificate.

"*Restricted Investment*" means an Investment other than a Permitted Investment.

"*Restricted Payment Coverage Ratio*" means (i) for Restricted Payments (other than payments of cash dividends or distributions on, or in respect of, the Issuer's Capital Stock, purchases for cash or other acquisitions for cash of any Capital Stock of the Issuer or any direct or indirect parent of the Issuer for the purpose of paying any such dividend or distribution to, or acquisitions of Capital Stock of any direct or indirect parent of the Issuer for cash from, the Investors, or guaranteeing any Indebtedness of any Affiliate of the Issuer for the purpose of paying such dividend, making such distribution or so acquiring such Capital Stock to or from the Investors, all such Restricted Payments being referred to as "*Investor Payments*"), the Fixed Charge Coverage Ratio of the Issuer and its Restricted Subsidiaries treating the Oncor Subsidiaries as Restricted Subsidiaries for purposes of such calculation and (ii) for Restricted Payments constituting Investor Payments, the Fixed Charge Coverage Ratio of the Issuer and its Restricted Subsidiaries.

"*Restricted Subsidiary*" means, at any time, any direct or indirect Subsidiary of the Issuer (including any Foreign Subsidiary) that is not then an Unrestricted Subsidiary; *provided, however*, that upon an Unrestricted

260

EFIHMW00208390

Subsidiary's ceasing to be an Unrestricted Subsidiary, such Subsidiary shall be included in the definition of "Restricted Subsidiary."

"*S&P*" means Standard & Poor's, a division of The McGraw-Hill Companies, Inc., and any successor to its rating agency business.

"*Sale and Lease-Back Transaction*" means any arrangement providing for the leasing by the Issuer or any of its Restricted Subsidiaries of any real or tangible personal property, which property has been or is to be sold or transferred by the Issuer or such Restricted Subsidiary to a third Person in contemplation of such leasing.

"*SEC*" means the U.S. Securities and Exchange Commission.

"*Secured Indebtedness*" means any Indebtedness of the Issuer or any of its Restricted Subsidiaries secured by a Lien.

"*Securities Act*" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"*Senior Indebtedness*" means:

(1) all Indebtedness of the Issuer or any Guarantor outstanding under the TCEH Senior Secured Facilities, the TCEH Notes and related guarantees, the TCEH Senior Interim Facility and related guarantees or the Notes and related Guarantees (including interest accruing on or after the filing of any petition in bankruptcy or similar proceeding or for reorganization of the Issuer or any Guarantor (at the rate provided for in the documentation with respect thereto, regardless of whether or not a claim for post-filing interest is allowed in such proceedings)), and any and all other fees, expense reimbursement obligations, indemnification amounts, penalties, and other amounts (whether existing on the Closing Date or thereafter created or incurred) and all obligations of the Issuer or any Guarantor to reimburse any bank or other Person in respect of amounts paid under letters of credit, acceptances or other similar instruments;

(2) all Hedging Obligations (and guarantees thereof) owing to a Lender (as defined in the TCEH Senior Secured Facilities) or any Affiliate of such Lender (or any Person that was a Lender or an Affiliate of such Lender at the time the applicable agreement giving rise to such Hedging Obligation was entered into); *provided* that such Hedging Obligations are permitted to be incurred under the terms of the Indenture;

(3) any other Indebtedness of the Issuer or any Guarantor permitted to be incurred under the terms of the Indenture, unless the instrument under which such Indebtedness is incurred expressly provides that it is subordinated in right of payment to the Notes or any related Guarantee; and

(4) all Obligations with respect to the items listed in the preceding clauses (1), (2) and (3);

*provided, however*, that Senior Indebtedness shall not include:

(a) any obligation of such Person to the Issuer or any of its Subsidiaries;

(b) any liability for federal, state, local or other taxes owed or owing by such Person;

(c) any accounts payable or other liability to trade creditors arising in the ordinary course of business;

(d) any Indebtedness or other Obligation of such Person which is subordinate or junior in any respect to any other Indebtedness or other Obligation of such Person;

(e) that portion of any Indebtedness which at the time of incurrence is incurred in violation of the Indenture;

(f) Energy Future Competitive Holdings Floating Rate Junior Subordinated Debentures, Series D due 2037; or

261

Confidential

EFIHMW00208391

**PX 008**
**Page 270 of 501**

(g) Energy Future Competitive Holdings 8.175% Fixed Junior Subordinated Debentures, Series E due 2037.

"*Shell Wind*" means a joint venture with Shell WindEnergy Inc. (or a similar entity) in which the Issuer and its Restricted Subsidiaries have up to a 50% ownership interest relating to the joint development of a 3,000 megawatt wind project in Texas and other renewable energy projects in Texas.

"*Significant Subsidiary*" means any Restricted Subsidiary that would be a "significant subsidiary" as defined in Article 1, Rule 1-02 of Regulation S-X, promulgated pursuant to the Securities Act, as such regulation is in effect on the Closing Date.

"*Similar Business*" means any business conducted or proposed to be conducted by the Issuer and its Subsidiaries on the Closing Date or any business that is similar, reasonably related, incidental or ancillary thereto.

"*Sponsor Management Agreement*" means the management agreement between certain of the management companies associated with the Investors and the Issuer.

"*Subordinated Indebtedness*" means,

(1) any Indebtedness of the Issuer which is by its terms subordinated in right of payment to the Notes, and

(2) any Indebtedness of any Guarantor which is by its terms subordinated in right of payment to the Guarantee of such entity of the Notes.

"*Subsidiary*" means, with respect to any Person:

(1) any corporation, association, or other business entity (other than a partnership, joint venture, limited liability company or similar entity) of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time of determination owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof; and

(2) any partnership, joint venture, limited liability company or similar entity of which

(x) more than 50% of the capital accounts, distribution rights, total equity and voting interests or general or limited partnership interests, as applicable, are owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof whether in the form of membership, general, special or limited partnership or otherwise, and

(y) such Person or any Restricted Subsidiary of such Person is a controlling general partner or otherwise controls such entity.

"*TCEH*" means Texas Competitive Electric Holdings Company LLC.

"*TCEH Senior Interim Facility*" means the interim loan agreement, dated as of the Closing Date by and among Energy Future Competitive Holdings, as guarantor, TCEH, as borrower, the other guarantors parties thereto, the lenders party thereto in their capacities as lenders thereunder and Morgan Stanley Senior Funding, Inc., as Administrative Agent, including any guarantees, instruments and agreements executed in connection therewith, and any amendments, supplements, modifications or restatements thereof.

"*TCEH Senior Secured Facilities*" means the credit agreement dated as of the Closing Date by and among Energy Future Competitive Holdings, as guarantor, TCEH, as borrower, the lenders party thereto in their capacities as lenders thereunder and Citibank, N.A., as Administrative Agent, including any guarantees, collateral documents, instruments and agreements executed in connection therewith, and any amendments, supplements,

262

Confidential

modifications, extensions, renewals, restatements, refundings or refinancings thereof and any indentures or credit facilities or commercial paper facilities with banks or other institutional lenders or investors that replace, refund or refinance any part of the loans, notes, other credit facilities or commitments thereunder, including any such replacement, refunding or refinancing facility or indenture that increases the amount borrowable thereunder or alters the maturity thereof (*provided* that such increase in borrowings is permitted under "Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" above).

"*TCEH Notes*" means the notes to be issued by TCEH to refinance outstanding indebtedness under the TCEH Senior Interim Facility.

"*Total Assets*" means the total assets of the Issuer and its Restricted Subsidiaries on a consolidated basis, as shown on the most recent consolidated balance sheet of the Issuer or such other Person as may be expressly stated.

"*Transactions*" means the transactions contemplated by the Transaction Agreement, borrowings under the TCEH Senior Secured Facilities, the EFH Senior Interim Facility, the TCEH Senior Interim Facility, the Oncor Electric Delivery Facility and any Receivables Facility as in effect on the Closing Date and any repayments of indebtedness of the Issuer and its Restricted Subsidiaries in connection therewith.

"*Transaction Agreement*" means the Agreement and Plan of Merger, dated as of February 25, 2007, among Merger Sub, Texas Energy Future Holdings Limited Partnership and TXU Corp.

"*Treasury Rate*" means, as of any Redemption Date, the yield to maturity as of such Redemption Date of United States Treasury securities with a constant maturity (as compiled and published in the most recent Federal Reserve Statistical Release H.15 (519) that has become publicly available at least two Business Days prior to the Redemption Date (or, if such Statistical Release is no longer published, any publicly available source of similar market data)) most nearly equal to the period from the Redemption Date to November 1, 2012; *provided*, *however*, that if the period from the Redemption Date to November 1, 2012 is less than one year, the weekly average yield on actually traded United States Treasury securities adjusted to a constant maturity of one year will be used.

"*Trust Indenture Act*" means the Trust Indenture Act of 1939, as amended (15 U.S.C. §§ 77aaa-77bbbb).

"*Unit*" shall mean an individual power plant generation system comprised of all necessary physically connected generators, reactors, boilers, combustion turbines and other prime movers operated together to independently generate electricity.

"*Unrestricted Cash*" means, as of any date, without duplication, (a) all cash and Cash Equivalents (in each case, free and clear of all Liens, other than nonconsensual Liens permitted by the covenant described under "Certain Covenants—Liens" and Liens permitted by clause (23), subclauses (i) and (ii) of clause (26) and clause (33) of the definition of Permitted Liens, included in the cash and cash equivalents accounts listed on the consolidated balance sheet of the Issuer and its Restricted Subsidiaries as of such date and (b) all unrestricted margin deposits related to commodity positions listed on the consolidated balance sheet of Issuer and the Restricted Subsidiaries.

"*Unrestricted Subsidiary*" means:

(1) each of the Oncor Subsidiaries;

(2) any Subsidiary of the Issuer which at the time of determination is an Unrestricted Subsidiary (as designated by the Issuer, as provided below); and

(3) any Subsidiary of an Unrestricted Subsidiary.

The Issuer may designate any Subsidiary of the Issuer (including any existing Subsidiary and any newly acquired or newly formed Subsidiary) to be an Unrestricted Subsidiary unless such Subsidiary or any of its

263

EFIHMW00208393

Subsidiaries owns any Equity Interests or Indebtedness of, or owns or holds any Lien on, any property of, the Issuer or any Subsidiary of the Issuer (other than solely any Subsidiary of the Subsidiary to be so designated); *provided* that

(1) any Unrestricted Subsidiary must be an entity of which the Equity Interests entitled to cast at least a majority of the votes that may be cast by all Equity Interests having ordinary voting power for the election of directors or Persons performing a similar function are owned, directly or indirectly, by the Issuer;

(2) such designation complies with the covenants described under "Certain Covenants—Limitation on Restricted Payments"; and

(3) each of:

(a) the Subsidiary to be so designated; and

(b) its Subsidiaries

has not at the time of designation, and does not thereafter, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable with respect to any Indebtedness pursuant to which the lender has recourse to any of the assets of the Issuer or any Restricted Subsidiary.

The Issuer may designate any Unrestricted Subsidiary to be a Restricted Subsidiary; *provided* that, immediately after giving effect to such designation, no Default shall have occurred and be continuing and either:

(1) in the case of any Subsidiary of the Issuer other than TCEH and any of its Subsidiaries, (A) the Issuer could incur at least $1.00 of additional Indebtedness pursuant to clause (i) of the Fixed Charge Coverage Ratio test described in the first paragraph under "Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock"; or (B) the Fixed Charge Coverage Ratio for the Issuer and its Restricted Subsidiaries would be greater than such ratio for the Issuer and its Restricted Subsidiaries immediately prior to such designation, in each case on a *pro forma* basis taking into account such designation; or

(2) in the case of TCEH and any of its Subsidiaries, (A) TCEH could incur at least $1.00 of additional Indebtedness pursuant to clause (ii) of such Fixed Charge Coverage Ratio test or (B) such Fixed Charge Coverage Ratio for TCEH and its Restricted Subsidiaries would be greater than such ratio for TCEH and its Restricted Subsidiaries immediately prior to such designation, in each case on a pro forma basis taking into account such designation.

Any such designation by the Issuer shall be notified by the Issuer to the Trustee by promptly filing with the Trustee a copy of the resolution of the board of directors of the Issuer or any committee thereof giving effect to such designation and an Officer's Certificate certifying that such designation complied with the foregoing provisions.

"*Voting Stock*" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the board of directors of such Person.

"*Weighted Average Life to Maturity*" means, when applied to any Indebtedness, Disqualified Stock or Preferred Stock, as the case may be, at any date, the quotient obtained by dividing:

(1) the sum of the products of the number of years from the date of determination to the date of each successive scheduled principal payment of such Indebtedness or redemption or similar payment with respect to such Disqualified Stock or Preferred Stock multiplied by the amount of such payment; by

(2) the sum of all such payments.

"*Wholly-Owned Subsidiary*" of any Person means a Subsidiary of such Person, 100% of the outstanding Equity Interests of which (other than directors' qualifying shares) shall at the time be owned by such Person or by one or more Wholly-Owned Subsidiaries of such Person.

264

EFIHMW00208394

**Exchange Offer; Registration Rights**

The Issuer, the Guarantors and the placement agents will enter into the registration rights agreement on the original issue date of the notes. In the registration rights agreement, each of the Issuer and the guarantors will agree that they will, at their expense, for the benefit of the holders of the notes, (1) file a registration statement on an appropriate registration form (each, an "exchange offer registration statement") with respect to a registered offer (each, an "exchange offer") to exchange the notes for new notes guaranteed by the guarantors on a senior unsecured basis. with terms substantially identical in all material respects to the notes (the notes so exchanged, the "exchange notes") (except that the exchange notes will not contain terms with respect to transfer restrictions) and (2) use their commercially reasonable efforts to cause the exchange offer registration statement to be declared effective under the Securities Act no later than 360 days after the original issue date of the notes. Upon the exchange offer registration statement being declared effective, we will offer the exchange notes (and the related guarantees) in exchange for surrender of the notes. We will keep each exchange offer open for not less than 20 business days (or longer if required by applicable law) after the date notice of the exchange offer is mailed to the holders. For each note surrendered to us pursuant to the exchange offer, the holder who surrendered such note will receive an exchange note having a principal amount equal to that of the surrendered note. Interest on each exchange note will accrue (A) from the later of (1) the last interest payment date on which interest was paid on the note surrendered in exchange therefor or (2) if the note is surrendered for exchange on a date in a period that includes the record date for an interest payment date to occur on or after the date of such exchange and as to which interest will be paid, the date of such interest payment date or (B) if no interest has been paid on such note, from the original issue date of the notes.

Under existing interpretations of the SEC contained in several no-action letters to third parties, the exchange notes and the related guarantees will be freely transferable by holders thereof (other than our affiliates) after the applicable exchange offer without further registration under the Securities Act; provided, however, that each holder that wishes to exchange its notes for exchange notes will be required to represent (1) that any exchange notes to be received by it will be acquired in the ordinary course of its business, (2) that, at the time of the commencement of the applicable exchange offer, it has no arrangement or understanding with any person to participate in the distribution (within the meaning of Securities Act) of the applicable exchange notes in violation of the Securities Act, (3) that it is not an "affiliate" (as defined in Rule 405 under the Securities Act) of ours, (4) if such holder is not a broker-dealer. that it is not engaged in, and does not intend to engage in, the distribution of applicable exchange notes and (5) if such holder is a broker-dealer (a "participating broker-dealer") that will receive exchange notes for its own account in exchange for notes that were acquired as a result of market-making or other trading activities. that it will deliver a prospectus in connection with any resale of such exchange notes. We will agree to make available, during the period required by the Securities Act, a prospectus meeting the requirements of the Securities Act for use by participating broker-dealers and other persons, if any, with similar prospectus delivery requirements for use in connection with any resale of exchange notes.

If (1) because of any change in law or in currently prevailing interpretations of the Staff of the SEC, we are not permitted to effect an exchange offer, (2) an exchange offer is not consummated within 360 days of the original issue date of the notes, (3) in certain circumstances. certain holders of unregistered exchange notes so request. or (4) in the case of any holder that participates in an exchange offer, such holder does not receive exchange notes on the date of the exchange that may be sold without restriction under state and federal securities laws (other than due solely to the status of such holder as an affiliate of ours within the meaning of the Securities Act), then, in each case, we will (x) promptly deliver to the holders through the trustee written notice thereof and (y) at our sole expense, (a) promptly file a shelf registration statement covering resales of the notes within 90 days after the obligation to file a shelf registration statement arises (but no earlier than 360 days after the original issue date of the note) and (b) use our commercially reasonable efforts to keep effective such shelf registration statement until the earliest of (i) two years after the original issue date of the notes or (ii) such time as all of the applicable notes have been sold thereunder or (iii) the date upon which all notes covered by such shelf registration statement become eligible for resale, without regard to volume, manner of sale or other restrictions contained in Rule 144 (the "shelf registration period"). We will, in the event that a shelf registration statement is

265

Confidential

filed, provide to each holder whose notes are registered under such shelf registration statement copies of the prospectus that is a part of such shelf registration statement, notify each such holder when such shelf registration statement has become effective and take certain other actions as are required to permit unrestricted resales of the notes. A holder that sells notes pursuant to a shelf registration statement will be required to be named as a selling security holder in the related prospectus and to deliver a prospectus to purchasers, will be subject to certain of the civil liability provisions under Securities Act in connection with such sales and will be bound by the provisions of the applicable registration rights agreement that are applicable to such a holder (including certain indemnification rights and obligations).

The registration rights agreement permits us to prohibit offers and sales of registrable securities under the shelf registration statement for a period not to exceed an aggregate of 90 days in any 12-month period, if our Board of Directors determines that there is a valid business purpose for such prohibition. We refer to any such period during which we may prohibit offers and sales as a "suspension period."

If (1) we have not filed the exchange offer registration statement or shelf registration statement by the deadlines discussed above, (2) the exchange offer registration statement or shelf registration statement has not become or been declared effective by the deadlines discussed above, or (3) a registration statement relating to the notes has been declared effective and such registration statement ceases to be effective at any time during the shelf registration period (subject to certain exceptions) (each of (1), (2) or (3) above, a "registration default"), then additional interest shall accrue on the principal amount of the notes at a rate of 0.25% per annum for the first 90-day period during which a registration default continues, and thereafter the interest rate on the notes will increase by 0.50% per annum over the interest rate shown on the cover of this offering memorandum for the remaining period during which a registration default continues. If we cure all registration defaults, the interest rate on the notes will revert to the original level.

Any amounts of additional interest due will be payable on the same original interest payment dates as interest on the notes is payable.

The exchange notes will be accepted for clearance through DTC.

This summary of the provisions of the registration rights agreement does not purport to be complete and is subject to, and is qualified in its entirety by reference to, all the provisions of the registration rights agreement, copies of which will be available from us upon request.

Confidential

EFIHMW00208396

## NOTICE TO INVESTORS

Because the following restrictions will apply to the notes unless we complete an exchange offer for such notes or otherwise cause a registration statement with respect to the resale of such notes to be declared effective under the Securities Act, purchasers are advised to consult legal counsel prior to making any offer, resale, pledge or transfer of any of the notes. See "Description of the Notes."

The notes have not been registered under the Securities Act and may not be offered or sold in the United States or to, or for the account or benefit of, U.S. persons except in transactions exempt from, or not subject to, the registration requirements of the Securities Act. Accordingly, the notes are being offered and sold only (1) to "qualified institutional buyers" under Rule 144A under the Securities Act and (2) outside the United States to non-U.S. persons in reliance upon Regulation S under the Securities Act.

Each purchaser of notes, by its acceptance thereof, will be deemed to have acknowledged, represented to and agreed with us and the placement agents as follows:

1. It is not an "affiliate" (as defined in Rule 144 under the Securities Act) and is not acting on our behalf, and it is either a:

- "qualified institutional buyer" within the meaning of Rule 144A promulgated under the Securities Act and is aware that any sale of notes to it will be made in reliance on Rule 144A, and such acquisition will be for its own account or for the account of another qualified institutional buyer; or

- person that, at the time the buy order for the notes was originated, was outside the United States and was not a U.S. person (and was not purchasing for the account or benefit of a U.S. person) within the meaning of Regulation S under the Securities Act.

2. The notes are being offered for resale in a transaction not involving any public offering in the United States within the meaning of the Securities Act. The notes have not been registered under the Securities Act or any U.S. securities laws, and they are being offered for resale in transactions not requiring registration under the Securities Act. The notes may not be reoffered, resold, pledged or otherwise transferred except:

- to a person whom the purchaser reasonably believes is a qualified institutional buyer in a transaction meeting the requirements of Rule 144A;

- in an offshore transaction complying with Rule 903 or Rule 904 of Regulation S;

- pursuant to the exemption from registration under the Securities Act provided by Rule 144 thereunder (if available);

- to an institutional "accredited investor" (as defined in Rule 501(a)(1), (2), (3) or (7) of Regulation D under the Securities Act) that, prior to such transfer, furnishes the trustee a signed letter containing certain representations and agreements relating to the transfer of the notes and, if such transfer is in respect of an aggregate principal amount of notes less than $250,000, an opinion of counsel acceptable to us, if we so request, that the transfer is in compliance with the Securities Act;

- in accordance with another exemption from the registration requirements of the Securities Act (and based upon an opinion of counsel acceptable to us, if we so request);

- to us; or

- pursuant to an effective registration statement under the Securities Act and, in each case, in accordance with all applicable U.S. state securities laws.

The purchaser will, and each subsequent holder is required to, notify any subsequent purchaser from it of the resale restrictions set forth in the preceding sentence. No representation is being made as to the availability of the exemption provided by Rule 144 for resales of the notes.

267

Confidential

**PX 008**
**Page 276 of 501**

3. It is relying on the information contained in this offering memorandum in making its investment decision with respect to the notes. It acknowledges that no representation or warranty is made by the placement agents as to the accuracy or completeness of such materials. It further acknowledges that neither the Issuer nor the placement agents, nor any person representing any such party has made any representation to it with respect to the Issuer or the offering or sale of any notes other than the information contained in this offering memorandum. It has had access to such financial and other information concerning the Issuer and the notes as it has deemed necessary in connection with its decision to purchase any of the notes, including any opportunity to ask questions of and request information from the Issuer and the placement agents.

4. It acknowledges that prior to any proposed transfer of notes in certificated form or of beneficial interests in a note in global form (a "Global Note") (in each case other than pursuant to an effective registration statement), the holder of notes or the holder of beneficial interests in a Global Note, as the case may be, may be required to provide certifications and other documentation relating to the manner of such transfer and submit such certifications and other documentation as provided in the indenture.

5. It understands that all of the notes will bear a legend substantially to the following effect unless otherwise agreed by us and the holder thereof:

THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD WITHIN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, U.S. PERSONS EXCEPT AS SET FORTH BELOW. BY ITS ACQUISITION HEREOF, THE HOLDER (1) REPRESENTS THAT (A) IT IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) OR (B) IT IS NOT A U.S. PERSON AND IS ACQUIRING THIS SECURITY IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH REGULATION S UNDER THE SECURITIES ACT, (2) AGREES THAT IT WILL NOT WITHIN TWO YEARS AFTER THE ORIGINAL ISSUANCE OF THIS SECURITY RESELL OR OTHERWISE TRANSFER THIS SECURITY EXCEPT (A) TO THE ISSUER OR ANY SUBSIDIARY THEREOF, (B) INSIDE THE UNITED STATES TO A QUALIFIED INSTITUTIONAL BUYER IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT, (C) OUTSIDE THE UNITED STATES IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH RULE 904 UNDER THE SECURITIES ACT, (D) PURSUANT TO THE EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT (IF AVAILABLE), (E) IN ACCORDANCE WITH ANOTHER EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT (AND BASED UPON AN OPINION OF COUNSEL IF THE ISSUER SO REQUESTS), OR (F) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND (3) AGREES THAT IT WILL GIVE TO EACH PERSON TO WHOM THIS SECURITY IS TRANSFERRED A NOTICE SUBSTANTIALLY TO THE EFFECT OF THIS LEGEND. AS USED HEREIN, THE TERMS "OFFSHORE TRANSACTION," "UNITED STATES" AND "U.S. PERSON" HAVE THE MEANING GIVEN TO THEM BY REGULATION S UNDER THE SECURITIES ACT.

In the case of the notes sold pursuant to Regulation S, the notes will bear an additional legend substantially to the following effect unless otherwise agreed by us and the holder thereof:

BY ITS ACQUISITION HEREOF, THE HOLDER HEREOF REPRESENTS THAT IT IS NOT A U.S. PERSON, NOR IS IT PURCHASING FOR THE ACCOUNT OF A U.S. PERSON, AND IS ACQUIRING THIS SECURITY IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH REGULATION S UNDER THE SECURITIES ACT.

6. Either (A) part of the assets to be used by such purchaser to acquire and hold the notes or any interest therein constitutes assets of any (1) employee benefit plan (as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")) that is subject to Title I of ERISA, (2) plan, individual retirement accounts or other arrangements that are subject to Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code") or provisions under federal, state, local non-United States or other laws, rules or regulations that are similar to such provisions of ERISA or the

268

EFIHMW00208398

Code (collectively, "Similar Laws"), or (3) other entity deemed to be investing "plan assets" (within the meaning of 29 C.F.R. Section 2510.3-101 or otherwise under ERISA) of any such employee benefit plan or plan, account or arrangement, or (B) the acquisition and holding of the notes or any interest therein (and the exchange of notes for exchange notes) by such purchaser will not constitute a non-exempt prohibited transaction within the meaning of Sections 406 and 407 of ERISA or Section 4975 of the Code or similar violation under any applicable Similar Laws.

7. It acknowledges that the trustee will not be required to accept for registration of transfer any notes acquired by it, except upon presentation of evidence satisfactory to us and the trustee that the restrictions set forth herein have been complied with.

8. It acknowledges that we, the placement agents and others will rely upon the truth and accuracy of the foregoing acknowledgments, representations and agreements and agrees that if any of the acknowledgments, representations or agreements deemed to have been made by its purchase of the notes are no longer accurate, it shall promptly notify us and the placement agents. If it is acquiring the notes as a fiduciary or agent for one or more investor accounts, it represents that it has sole investment discretion with respect to each such account and it has full power to make the foregoing acknowledgments, representations, and agreements on behalf of each account.

269

Confidential

## BOOK ENTRY; DELIVERY AND FORM

The notes are being offered and sold to qualified institutional buyers in reliance on Rule 144A ("Rule 144A Notes"). The notes also may be offered and sold in offshore transactions in reliance on Regulation S ("Regulation S Notes"). Except as set forth below, the notes will be issued in registered, global form in minimum denominations of $2,000 and integral multiples of $1,000 in excess of $2,000. Notes will be issued at the closing of this offering only against payment in immediately available funds.

Rule 144A Notes initially will be represented by one or more global notes in registered form without interest coupons (collectively, the "Rule 144A Global Notes"). Regulation S Notes initially will be represented by one or more temporary global notes in registered form without interest coupons (collectively, the "Regulation S Temporary Global Notes"). The Rule 144A Global Notes and the Regulation S Temporary Global Notes will be deposited upon issuance with the applicable trustee as custodian for DTC in New York, New York, and registered in the name of DTC or its nominee, in each case, for credit to an account of a direct or indirect participant in DTC as described below. Through and including the 40th day after the later of the commencement of this offering and the closing of this offering (such period through and including such 40th day, the "Restricted Period"), beneficial interests in the Regulation S Temporary Global Notes may be held only through Euroclear Bank S.A./N.V., as operator of the Euroclear System ("Euroclear"), and Clearstream Banking, Société Anonyme ("Clearstream, Luxembourg") (as indirect participants in DTC), unless transferred to a person that takes delivery through a Rule 144A Global Note in accordance with the certification requirements described under "—Exchanges Between Regulation S Notes and Rule 144A Notes" below. Within a reasonable time period after the expiration of the Restricted Period, the Regulation S Temporary Global Notes will be exchanged for one or more permanent notes in registered, global form without interest coupons (collectively, the "Regulation S Permanent Global Notes" and, together with the Regulation S Temporary Global Notes, the "Regulation S Global Notes"; the Regulation S Global Notes and the Rule 144A Global Notes collectively being the "Global Notes") upon delivery to DTC of certification of compliance with the transfer restrictions applicable to the notes and pursuant to Regulation S as provided in the indenture. Beneficial interests in the Rule 144A Global Notes may not be exchanged for beneficial interests in the Regulation S Global Notes at any time except in the limited circumstances described under "—Exchanges Between Regulation S Notes and Rule 144A Notes" below.

Except as set forth below, the Global Notes may be transferred, in whole and not in part, only to another nominee of DTC or to a successor of DTC or its nominee. Beneficial interests in the Global Notes may not be exchanged for definitive notes in registered certificated form ("Certificated Notes") except in the limited circumstances described below. See "—Exchange of Global Notes for Certificated Notes." Except in the limited circumstances described below, owners of beneficial interests in the Global Notes will not be entitled to receive physical delivery of notes in certificated form.

Rule 144A Notes (including beneficial interests in the Rule 144A Global Notes) will be subject to certain restrictions on transfer and will bear a restrictive legend as described under "Notice to Investors." Regulation S Notes will also be subject to certain restrictions on transfer and will also bear the legend as described under "Notice to Investors." In addition, transfers of beneficial interests in the Global Notes will be subject to the applicable rules and procedures of DTC and its direct or indirect participants (including, if applicable, those of Euroclear and Clearstream, Luxembourg), which may change from time to time.

### Depository Procedures

The following description of the operations and procedures of DTC, Euroclear and Clearstream, Luxembourg is provided solely as a matter of convenience. These operations and procedures are solely within the control of the respective settlement systems and are subject to changes by them. We take no responsibility for these operations and procedures and urge investors to contact the system or their participants directly to discuss these matters.

270

EFIHMW00208400

DTC has advised us that DTC is a limited-purpose trust company organized under the laws of the State of New York, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code and a "clearing agency" registered pursuant to the provisions of Section 17A of the Exchange Act. DTC was created to hold securities for its participating organizations (collectively, the "Participants") and to facilitate the clearance and settlement of transactions in those securities between the Participants through electronic book-entry changes in accounts of its Participants. The Participants include securities brokers and dealers (including the placement agents), banks, trust companies, clearing corporations and certain other organizations. Access to DTC's system is also available to other entities such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a Participant, either directly or indirectly (collectively, the "Indirect Participants"). Persons who are not Participants may beneficially own securities held by or on behalf of DTC only through the Participants or the Indirect Participants. The ownership interests in, and transfers of ownership interests in, each security held by or on behalf of DTC are recorded on the records of the Participants and Indirect Participants.

DTC has also advised us that, pursuant to procedures established by it:

* upon deposit of the Global Notes, DTC will credit the accounts of the Participants designated by the placement agents with portions of the principal amount of the Global Notes; and

* ownership of these interests in the Global Notes will be shown on, and the transfer of ownership of these interests will be effected only through, records maintained by DTC (with respect to the Participants) or by the Participants and the Indirect Participants (with respect to other owners of beneficial interests in the Global Notes).

Investors in the Rule 144A Global Notes who are Participants may hold their interests therein directly through DTC. Investors in the Rule 144A Global Notes who are not Participants may hold their interests therein indirectly through organizations (including Euroclear and Clearstream, Luxembourg) that are Participants. Investors in the Regulation S Global Notes must initially hold their interests therein through Euroclear or Clearstream, if they are participants in such systems, or indirectly through organizations that are participants. After the expiration of the Restricted Period (but not earlier), investors may also hold interests in the Regulation S Global Notes through Participants in DTC other than Euroclear and Clearstream, Luxembourg. Euroclear and Clearstream, Luxembourg will hold interests in the Regulation S Global Notes on behalf of their participants through customers' securities accounts in their respective names on the books of their respective depositaries, which in turn hold such interests in customers' securities accounts in the depositaries' names on the books of DTC. Citibank, N.A. acts as depositary for Clearstream, Luxembourg, and JPMorgan Chase Bank acts as depositary for Euroclear. All interests in a Global Note, including those held through Euroclear or Clearstream, Luxembourg, may be subject to the procedures and requirements of DTC. Those interests held through Euroclear or Clearstream, Luxembourg may also be subject to the procedures and requirements of such systems. The laws of some states require that certain persons take physical delivery in definitive form of securities that they own. Consequently, the ability to transfer beneficial interests in a Global Note to such persons will be limited to that extent. Because DTC can act only on behalf of Participants, which in turn act on behalf of Indirect Participants, the ability of a person having beneficial interests in a Global Note to pledge such interests to persons that do not participate in the DTC system, or otherwise take actions in respect of such interests, may be affected by the lack of a physical certificate evidencing such interests.

**Except as described below, owners of interests in the Global Notes will not have notes registered in their names, will not receive physical delivery of notes in certificated form and will not be considered the registered owners or "holders" thereof under the indenture for any purpose.**

Payments in respect of the principal of, and interest and premium, if any, and Additional Interest, if any, on a Global Note registered in the name of DTC or its nominee will be payable to DTC in its capacity as the registered holder under the indenture. Under the terms of the indenture, we and the trustee will treat the persons

271

Confidential

EFIHMW00208401

in whose names the notes, including the Global Notes, are registered as the owners of the notes for the purpose of receiving payments and for all other purposes. Consequently, neither we, the trustees nor any agent of ours or either trustee has or will have any responsibility or liability for:

- any aspect of DTC's records or any Participant's or Indirect Participant's records relating to, or payments made on account of, beneficial ownership interests in the Global Notes or for maintaining, supervising or reviewing any of DTC's records or any Participant's or Indirect Participant's records relating to the beneficial ownership interests in the Global Notes; or

- any other matter relating to the actions and practices of DTC or any of its Participants or Indirect Participants.

DTC has advised us that its current practice, upon receipt of any payment in respect of securities such as the notes (including principal and interest), is to credit the accounts of the relevant Participants with the payment on the payment date unless DTC has reason to believe that it will not receive payment on such payment date. Each relevant Participant is credited with an amount proportionate to its beneficial ownership of an interest in the principal amount of the relevant security as shown on the records of DTC. Payments by the Participants and the Indirect Participants to the beneficial owners of notes will be governed by standing instructions and customary practices and will be the responsibility of the Participants or the Indirect Participants and will not be our responsibility or the responsibility of DTC or either trustee. Neither we nor the trustee will be liable for any delay by DTC or any of the Participants or the Indirect Participants in identifying the beneficial owners of the notes, and we and the trustee may conclusively rely on and will be protected in relying on instructions from DTC or its nominee for all purposes.

Subject to the transfer restrictions set forth under "Notice to Investors," transfers between the Participants will be effected in accordance with DTC's procedures and will be settled in same-day funds, and transfers between participants in Euroclear and Clearstream, Luxembourg will be effected in accordance with their respective rules and operating procedures.

Subject to compliance with the transfer restrictions applicable to the notes described herein, cross-market transfers between the Participants, on the one hand, and Euroclear or Clearstream, Luxembourg participants, on the other hand, will be effected through DTC in accordance with DTC's rules on behalf of Euroclear or Clearstream, Luxembourg, as the case may be, by its respective depositary. However, such cross-market transactions will require delivery of instructions to Euroclear or Clearstream, Luxembourg, as the case may be, by the counterparty in such system in accordance with the rules and procedures and within the established deadlines (Brussels time) of such system. Euroclear or Clearstream, Luxembourg, as the case may be, will, if the transaction meets its settlement requirements, deliver instructions to its respective depositary to take action to effect final settlement on its behalf by delivering or receiving interests in the relevant Global Note from DTC, and making or receiving payment in accordance with normal procedures for same-day funds settlement applicable to DTC. Euroclear participants and Clearstream, Luxembourg participants may not deliver instructions directly to the depositories for Euroclear or Clearstream, Luxembourg.

DTC has advised us that it will take any action permitted to be taken by a holder of notes only at the direction of one or more Participants to whose account DTC has credited the interests in the Global Notes and only in respect of such portion of the aggregate principal amount of the notes as to which such Participant or Participants has or have given such direction. However, if there is an event of default under the notes, DTC reserves the right to exchange the Global Notes for legended notes in certificated form and to distribute such notes to its Participants.

Although DTC, Euroclear and Clearstream, Luxembourg have agreed to the foregoing procedures to facilitate transfers of interests in the Rule 144A Global Notes and the Regulation S Global Notes among participants in DTC, Euroclear and Clearstream, Luxembourg, they are under no obligation to perform or to continue to perform such procedures, and may discontinue such procedures at any time. Neither we nor the

272

EFIHMW00208402

trustee nor any of our or its agents will have any responsibility for the performance by DTC, Euroclear or Clearstream, Luxembourg or their respective participants or indirect participants of their respective obligations under the rules and procedures governing their operations.

**Exchange of Global Notes for Certificated Notes**

A Global Note is exchangeable for Certificated Notes if:

- DTC (1) notifies us that it is unwilling or unable to continue as depositary for the Global Notes or (2) has ceased to be a clearing agency registered under the Exchange Act and, in either case, we fail to appoint a successor depositary; or

- there has occurred and is continuing an event of default with respect to the notes.

In addition, beneficial interests in a Global Note may be exchanged for Certificated Notes upon prior written notice given to the trustee by or on behalf of DTC in accordance with the indenture. In all cases, Certificated Notes delivered in exchange for any Global Note or beneficial interests in Global Notes will be registered in the names, and issued in any approved denominations, requested by or on behalf of the depositary (in accordance with its customary procedures) and will bear the applicable restrictive legend referred to in "Notice to Investors," unless that legend is not required by applicable law.

**Exchange of Certificated Notes for Global Notes**

Certificated notes may not be exchanged for beneficial interests in any Global Note unless the transferor first delivers to the trustee a written certificate (in the form provided in the indenture) to the effect that such transfer will comply with the appropriate transfer restrictions applicable to such notes. See "Notice to Investors."

**Exchanges Between Regulation S Notes and Rule 144A Notes**

Prior to the expiration of the Restricted Period, beneficial interests in the Regulation S Global Notes may be exchanged for beneficial interests in the Rule 144A Global Notes only if:

- such exchange occurs in connection with a transfer of the notes pursuant to Rule 144A; and

- the transferor first delivers to the trustee a written certificate (in the form provided in the indenture) to the effect that the notes are being transferred to a person:

  - who the transferor reasonably believes to be a QIB within the meaning of Rule 144A;

  - purchasing for its own account or the account of a QIB in a transaction meeting the requirements of Rule 144A; and

  - in accordance with all applicable securities laws of the states of the United States and other jurisdictions.

Beneficial interests in a Rule 144A Global Note may be transferred to a person who takes delivery in the form of an interest in the Regulation S Global Notes, whether before or after the expiration of the Restricted Period, only if the transferor first delivers to the trustee a written certificate (in the form provided in the indenture) to the effect that such transfer is being made in accordance with Rule 903 or 904 of Regulation S or Rule 144 (if available) and that, if such transfer occurs prior to the expiration of the Restricted Period, the interest transferred will be held immediately thereafter through Euroclear or Clearstream, Luxembourg.

Transfers involving exchanges of beneficial interests between the Regulation S Global Notes and the Rule 144A Global Notes will be effected by DTC by means of an instruction originated by the trustee through the

273

Confidential

DTC Deposit/Withdraw at Custodian system. Accordingly, in connection with any such transfer, appropriate adjustments will be made to reflect a decrease in the principal amount of the Regulation S Global Notes and a corresponding increase in the principal amount of the Rule 144A Global Notes or vice versa, as applicable. Any beneficial interest in one of the Global Notes that is transferred to a person who takes delivery in the form of an interest in the other Global Note will, upon transfer, cease to be an interest in such Global Note and will become an interest in the other Global Note and, accordingly, will thereafter be subject to all transfer restrictions and other procedures applicable to beneficial interests in such other Global Note for so long as it remains such an interest. The policies and practices of DTC may prohibit transfers of beneficial interests in the Regulation S Global Notes prior to the expiration of the Restricted Period.

**Certifications by Holders of the Regulation S Temporary Global Notes**

A holder of a beneficial interest in the Regulation S Temporary Global Notes must provide Euroclear or Clearstream, Luxembourg, as the case may be, with a certificate in the form required by the indenture certifying that the beneficial owner of the interest in the Regulation S Temporary Global Notes is either a non-U.S. person or a U.S. person that has purchased such interest in a transaction that is exempt from the registration requirements under the Securities Act and Euroclear or Clearstream, Luxembourg, as the case may be, must deliver to the trustee (or the paying agent if other than such trustee) a certificate in the form required by the indenture, prior to any exchange of such beneficial interest for a beneficial interest in the Regulation S Permanent Global Notes.

**Same Day Settlement and Payment**

We will make payments in respect of the notes represented by the Global Notes (including principal, premium, if any, interest and Additional Interest, if any) by wire transfer of immediately available funds to the accounts specified by DTC or its nominee. We will make all payments of principal, interest and premium, if any, and Additional Interest, if any, with respect to Certificated Notes by wire transfer of immediately available funds to the accounts specified by the holders of the Certificated Notes or, if no such account is specified, by mailing a check to each such holder's registered address. The notes represented by the Global Notes are expected to be eligible to trade in The PORTAL[SM] Market and to trade in DTC's Same-Day Funds Settlement System, and any permitted secondary market trading activity in such notes will, therefore, be required by DTC to be settled in immediately available funds. We expect that secondary trading in any Certificated Notes will also be settled in immediately available funds.

Because of time-zone differences, credits of interests in the Global Notes received in Clearstream, Luxembourg or Euroclear as a result of a transaction with a DTC Participant will be made during subsequent securities settlement processing and dated the business day following the DTC settlement date. Such credits or any transactions involving interests in such Global Notes settled during such processing will be reported to the relevant Clearstream, Luxembourg or Euroclear participants on such business day. Cash received in Clearstream, Luxembourg or Euroclear as a result of sales of interests in the Global Notes by or through a Clearstream, Luxembourg participant or a Euroclear Participant to a DTC Participant will be received with value on the DTC settlement date but will be available in the relevant Clearstream, Luxembourg or Euroclear cash account only as of the business day following settlement in DTC.

Confidential

EFIHMW00208404

## CERTAIN U.S. FEDERAL TAX CONSEQUENCES

**To ensure compliance with Internal Revenue Service Circular 230, you are hereby notified that any discussion of tax matters set forth in this offering memorandum was written in connection with the promotion or marketing of the transactions or matters addressed herein and was not intended or written to be used, and cannot be used by any prospective investor, for the purpose of avoiding tax-related penalties under U.S. federal, state or local tax law. Each prospective investor should seek advice based on its particular circumstances from an independent tax advisor.**

The following is a summary of certain U.S. federal income and, in the case of non-U.S. holders (as defined below), estate tax consequences of the purchase, ownership and disposition of the notes as of the date of this offering memorandum. Unless otherwise stated, this summary deals only with notes held as capital assets (generally, property held for investment) by persons who purchase the notes for cash upon original issuance at their initial offering price.

As used herein, a "U.S. holder" means a beneficial owner of the notes that is for U.S. federal income tax purposes any of the following:

- an individual citizen or resident of the United States;

- a corporation (or any other entity treated as a corporation for U.S. federal income tax purposes) created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust if it (1) is subject to the primary supervision of a court within the United States and one or more United States persons have the authority to control all substantial decisions of the trust or (2) has a valid election in effect under applicable United States Treasury regulations to be treated as a United States person.

The term "non-U.S. holder" means a beneficial owner of the notes (other than a partnership or any other entity treated as a partnership for U.S. federal income tax purposes) that is not a U.S. holder.

This summary does not represent a detailed description of the U.S. federal income tax consequences applicable to you if you are a person subject to special tax treatment under the U.S. federal income tax laws, including, without limitation:

- a dealer in securities or currencies;

- a financial institution;

- a regulated investment company;

- a real estate investment trust;

- a tax-exempt organization;

- an insurance company;

- a person holding the notes as part of a hedging, integrated, conversion or constructive sale transaction or a straddle;

- a trader in securities that has elected the mark-to-market method of accounting for your securities;

- a person liable for alternative minimum tax;

- a partnership or other pass-through entity for U.S. federal income tax purposes;

- a person whose "functional currency" is not the U.S. dollar;

275

Confidential

EFIHMW00208405

- a "controlled foreign corporation";

- a "passive foreign investment company"; or

- a United States expatriate.

This summary is based on the Internal Revenue Code of 1986, as amended (the "Code"), United States Treasury regulations, rulings and judicial decisions as of the date hereof. Those authorities may be changed, possibly on a retroactive basis, so as to result in United States federal income and estate tax consequences different from those summarized below.

If a partnership (including any entity classified as a partnership for U.S. federal income tax purposes) holds notes, the tax treatment of a partner will generally depend upon the status of the partner and the activities of the partnership. If you are a partnership or a partner in a partnership holding notes, you should consult your own tax advisors regarding the tax consequences of an investment in the notes.

This summary does not represent a detailed description of the United States federal income and estate tax consequences that may be applicable to you in light of your particular circumstances and does not address the effects of any state, local or non-United States tax laws. It is not intended to be, and should not be construed to be, legal or tax advice to any particular purchaser of notes. **If you are considering the purchase of notes, you should consult your own tax advisors concerning the particular United States federal income and estate tax consequences to you of the ownership of the notes, as well as the consequences to you arising under the laws of any other taxing jurisdiction.**

### Certain Tax Consequences to the Company

Because (i) the yield-to-maturity on the toggle notes equals or exceeds the sum of (x) the "applicable federal rate" (as determined under Section 1274(d) of the Code) in effect for the calendar month in which the toggle notes are issued (the "AFR") and (y) 5 percentage points, (ii) the maturity date of the toggle notes is more than five years from the date of issue and (iii) the toggle notes have "significant" original issue discount ("OID"), the toggle notes will be considered "applicable high yield discount obligations". Therefore we will not be allowed to take a deduction for interest (including OID) accrued on the toggle notes for United States federal income tax purposes until such time as we actually pay such interest (including OID) in cash or in other property (other than stock or debt issued by us or by a person deemed to be related to us under Section 453(f)(1) of the Code).

Moreover, because the yield-to-maturity on the toggle notes exceeds the sum of (x) the AFR and (y) 6 percentage points (such excess shall be referred to hereinafter as the "Disqualified Yield"), the deduction for interest (including OID) accrued on the toggle notes will be permanently disallowed (regardless of whether we actually pay such interest or OID in cash or in other property) for United States federal income tax purposes to the extent such interest or OID is attributable to the Disqualified Yield on the toggle notes ("Dividend-Equivalent Interest").

### Certain Tax Consequences to U.S. Holders

The following is a summary of certain U.S. federal income tax consequences that will apply to U.S. holders of the notes.

#### Cash-Pay Notes

***Payments of Interest on Cash-Pay Notes.*** Interest on a cash-pay note will generally be taxable to you as ordinary income at the time it is paid or accrued in accordance with your method of accounting for U.S. federal income tax purposes.

276

Confidential

EFIHMW00208406

*Sale, Exchange, Retirement, or Other Taxable Disposition of Cash-Pay Notes*. Upon the sale, exchange, retirement, or other taxable disposition of a cash-pay note, you generally will recognize gain or loss equal to the difference between the amount realized upon the sale, exchange, retirement or other taxable disposition (less an amount equal to any accrued interest, which will be taxable as interest income) and the adjusted tax basis of the cash-pay note. Your adjusted tax basis in a cash-pay note will, in general, be your cost for that cash-pay note. Any gain or loss will be capital gain or loss. Capital gains of individuals derived in respect of capital assets held for more than one year are eligible for reduced rates of taxation. The deductibility of capital losses is subject to limitations.

### Toggle Notes

*Original Issue Discount*. Because the toggle notes provide us with the option to pay PIK interest in lieu of paying cash interest in any interest payment period after the initial interest payment, and because the issue price of the toggle notes is actually less than their stated redemption price at maturity, we will treat the toggle notes as issued with OID, as described below. The issuance of PIK Notes generally is not treated as a payment of interest. Instead, the toggle note and any PIK Notes issued in respect of PIK interest thereon are treated as a single debt instrument under the OID rules.

The toggle notes will be treated as issued with OID in an amount equal to the difference between their "stated redemption price at maturity" (the sum of all payments to be made on the toggle notes other than "qualified stated interest") and their "issue price." You generally must include OID in gross income in advance of the receipt of cash attributable to that income.

The "issue price" of each toggle note will be the first price at which a substantial amount of the toggle notes are sold (other than to an underwriter, placement agent or wholesaler). The term "qualified stated interest" means stated interest that is unconditionally payable in cash or in property (other than debt instruments of the issuer) at least annually at a single fixed rate or, subject to certain conditions, based on one or more interest indices. Because we have the option in any interest payment period after the initial interest payment and through 2017 to make interest payments in PIK interest instead of paying cash, the stated interest payments on the toggle notes are not qualified stated interest.

The amount of OID that you must include in income if you are the initial holder of a toggle note will generally equal the sum of the "daily portions" of OID with respect to the toggle note for each day during the taxable year or portion of the taxable year in which you held such toggle note ("accrued OID"). The daily portion is determined by allocating to each day in any "accrual period" a pro rata portion of the OID allocable to that accrual period. The "accrual period" for a toggle note may be of any length and may vary in length over the term of the toggle note, provided that each accrual period is no longer than one year and each scheduled payment of principal or interest occurs on the first day or the final day of an accrual period. The amount of OID allocable to any accrual period other than the final accrual period is an amount equal to the product of the toggle note's adjusted issue price at the beginning of such accrual period and its yield to maturity (determined on the basis of compounding at the close of each accrual period and properly adjusted for the length of the accrual period). OID allocable to a final accrual period is the difference between the amount payable at maturity and the adjusted issue price at the beginning of the final accrual period. The yield to maturity of the toggle note is the discount rate that causes the present value of all payments on the note as of its original issue date to equal the issue price of such note. For purposes of determining the yield to maturity, the assumption is that we will pay interest in cash and not exercise the option to pay PIK interest, except in respect of any period in which we actually elect to pay PIK interest.

The "adjusted issue price" of a toggle note at the beginning of any accrual period is equal to its issue price increased by the accrued OID for each prior accrual period and reduced by any cash payments made on such toggle note on or before the first day of the accrual period. We are required to provide information returns stating the amount of OID accrued on toggle notes held by persons of record other than corporations and other holders exempt from information reporting.

277

Confidential

EFIHMW00208407

If we in fact pay interest in cash on the toggle notes, you will not be required to adjust your OID inclusions. Each payment made in cash under a toggle note will be treated first as a payment of any accrued OID that has not been allocated to prior payments and second as a payment of principal. You generally will not be required to include separately in income cash payments received on the toggle notes to the extent such payments constitute payments of previously accrued original issue discount or payments of principal.

If, for any interest payment period, we exercise our option to pay interest in the form of PIK interest, your OID calculation for future periods will be adjusted by treating the toggle note as if it had been retired and then reissued for an amount equal to its adjusted issue price on the date preceding the first date of such interest payment period, and re-calculating the yield to maturity of the reissued note by treating the amount of PIK interest (and of any prior PIK interest) as a payment that will be made on the maturity date of such note.

The rules regarding OID are complex and the rules described above may not apply in all cases. Accordingly, you should consult your own tax advisors regarding their application.

### *Applicable High Yield Discount Obligations*

For purposes of the dividends-received deduction, the Dividend-Equivalent Interest, as defined above under "Certain Tax Consequences to the Company", will be treated as a dividend to the extent it is deemed to have been paid out of our current or accumulated earnings and profits. Accordingly, if you are a corporation, you may be entitled, subject to applicable limitations, to take a dividends-received deduction with respect to any Dividend-Equivalent Interest received by you on such toggle note.

***Sale, Exchange, Retirement, or Other Taxable Disposition of Toggle Notes***. Upon the sale, exchange, retirement, or other taxable disposition of a toggle note (or a PIK Note), you generally will recognize gain or loss equal to the difference between the amount realized upon the sale, exchange, retirement, or other taxable disposition and the adjusted tax basis of the toggle note (or the PIK Note). Your adjusted tax basis in a toggle note will, in general, be your cost for the toggle note, increased by OID previously included in income, and reduced by any cash payments on the toggle note. Although not free from doubt, your adjusted tax basis in the toggle note should be allocated between the original toggle note and any PIK Notes received in respect of PIK interest thereon in proportion to their relative principal amounts. Your holding period in any PIK Note received in respect of PIK interest would likely be identical to your holding period for the original toggle note with respect to which the PIK Note was received. Any gain or loss will be capital gain or loss. Capital gains of individuals derived in respect of capital assets held for more than one year are eligible for reduced rates of taxation. The deductibility of capital losses is subject to limitations.

### Certain Tax Consequences to Non-U.S. Holders

The following is a summary of certain U.S. federal income and estate tax consequences that will apply to non-U.S. holders of the notes.

***U.S. Federal Withholding Tax***. The 30% United States federal withholding tax will not apply to any payment of interest (which for these purposes includes OID) on the notes under the "portfolio interest rule," provided that:

- interest paid on the notes (including OID) is not effectively connected with your conduct of a trade or business in the United States;

- you do not actually (or constructively) own 10% or more of the total combined voting power of all classes of our voting stock within the meaning of the Code and applicable United States Treasury regulations;

- you are not a controlled foreign corporation that is related to us through stock ownership;

278

Confidential

- you are not a bank whose receipt of interest (including OID) on the notes is described in Section 881(c)(3)(A) of the Code; and
- either (a) you provide your name and address on an Internal Revenue Service ("IRS") Form W-8BEN (or other applicable form), and certify, under penalties of perjury, that you are not a United States person as defined under the Code or (b) you hold your notes through certain foreign intermediaries and satisfy the certification requirements of applicable United States Treasury regulations. Special certification rules apply to non-U.S. holders that are pass-through entities rather than corporations or individuals.

If you cannot satisfy the requirements described above, payments of interest (including OID) made to you will be subject to the 30% U.S. federal withholding tax, unless you provide us with a properly executed:

- IRS Form W-8BEN (or other applicable form) certifying an exemption from or reduction in withholding under the benefit of an applicable income tax treaty; or
- IRS Form W-8ECI (or other applicable form) certifying that interest (including OID) paid on the notes is not subject to withholding tax because it is effectively connected with your conduct of a trade or business in the United States (as discussed below under "—U.S. Federal Income Tax").

The 30% U.S. federal withholding tax generally will not apply to any payment of principal or gain that you realize on the sale, exchange, retirement or other taxable disposition of a note.

*U.S. Federal Income Tax*. If you are engaged in a trade or business in the United States and interest (including OID) on the notes is effectively connected with the conduct of that trade or business (and, if required by an applicable income tax treaty, is attributable to a United States permanent establishment), then you will be subject to U.S. federal income tax on that interest (including OID) on a net income basis (although you will be exempt from the 30% U.S. federal withholding tax, provided the certification requirements discussed above in "—U.S. Federal Withholding Tax" are satisfied) in generally the same manner as if you were a United States person as defined under the Code. In addition, if you are a foreign corporation, you may be subject to a branch profits tax equal to 30% (or lower applicable income tax treaty rate) of such interest (including OID), subject to adjustments.

Any gain realized on the disposition of a note generally will not be subject to U.S. federal income tax unless:

- the gain is effectively connected with your conduct of a trade or business in the United States (and, if required by an applicable income tax treaty, is attributable to a United States permanent establishment); or
- you are an individual who is present in the United States for 183 days or more in the taxable year of that disposition, and certain other conditions are met.

If a non-U.S. holder of notes is described in the first bullet point above, any gain realized upon a sale, exchange, retirement, or other taxable disposition of the notes will be subject to U.S. federal income tax on a net income basis. If a non-U.S. holder of notes is described in the second bullet point above, any gain realized upon a sale, exchange, retirement, or other taxable disposition of the notes will be subject to U.S. federal income tax at a statutory rate of 30%, which gain may be offset by certain losses.

*U.S. Federal Estate Tax*. Your estate will not be subject to U.S. federal estate tax on notes beneficially owned by you at the time of your death, provided that any payment to you on the notes would be eligible for exemption from the 30% U.S. federal withholding tax under the "portfolio interest rule" described above under "—U.S. Federal Withholding Tax" without regard to the statement requirement described in the fifth bullet point of that section.

279

Confidential

**Information Reporting and Backup Withholding**

*U.S. Holders*

In general, information reporting requirements will apply to certain payments of principal and interest paid on the notes and to the proceeds of sale or other taxable disposition of a note paid to you (unless you are an exempt recipient such as a corporation). Backup withholding may apply to such payments if you fail to provide a taxpayer identification number or a certification that you are not subject to backup withholding.

Backup withholding is not an additional tax and any amounts withheld under the backup withholding rules may be allowed as a refund or a credit against your U.S. federal income tax liability provided the required information is timely furnished to the IRS.

*Non-U.S. Holders*

Generally, we must report to the IRS and to you the amount of interest (including OID) paid to you and the amount of tax, if any, withheld with respect to those payments. Copies of the information returns reporting such interest payments and any withholding may also be made available to the tax authorities in the country in which you reside under the provisions of an applicable income tax treaty.

In general, you will not be subject to backup withholding with respect to payments of interest (including OID) on the notes that we make to you provided that we do not have actual knowledge or reason to know that you are a United States person as defined under the Code and we have received from you the required certification that you are a non-U.S. Holder described above in the fifth bullet point under "—Certain Tax Consequences to Non-U.S. Holders—U.S. Federal Withholding Tax."

Information reporting and, depending on the circumstances, backup withholding will apply to the proceeds of a sale or other taxable disposition (including a redemption) of notes within the United States or conducted through certain United States-related financial intermediaries, unless you certify to the payor under penalties of perjury that you are a non-U.S. holder (and the payor does not have actual knowledge or reason to know that you are a United States person as defined under the Code), or you otherwise establish an exemption.

Backup withholding is not an additional tax and any amounts withheld under the backup withholding rules may be allowed as a refund or a credit against your U.S. federal income tax liability provided the required information is timely furnished to the IRS.

280

Confidential

# ERISA CONSIDERATIONS

**To ensure compliance with Internal Revenue Service Circular 230, you are hereby notified that any discussion of tax matters set forth in this offering memorandum was written in connection with the promotion or marketing of the transactions or matters addressed herein and was not intended or written to be used, and cannot be used by any prospective investor, for the purpose of avoiding tax-related penalties under U.S. federal, state or local tax law. Each prospective investor should seek advice based on its particular circumstances from an independent tax advisor.**

The following is a summary of certain considerations associated with the purchase of the notes and exchange notes by employee benefit plans that are subject to ERISA, plans, individual retirement accounts and other arrangements that are subject to Section 4975 of the Code or provisions under any federal, state, local, non-U.S. or other laws, rules or regulations that are similar to such provisions of ERISA or the Code (collectively, "Similar Laws"), and entities whose underlying assets are considered to include "plan assets" of such employee benefit plans, plans, accounts or arrangements (each, a "Plan").

## General Fiduciary Matters

ERISA and the Code impose certain duties on persons who are fiduciaries of a Plan subject to Title I of ERISA or Section 4975 of the Code (an "ERISA Plan") and prohibit certain transactions involving the assets of an ERISA Plan and its fiduciaries or other interested parties.

In considering an investment in the notes or a portion of the assets of any Plan, a fiduciary should determine whether the investment is in accordance with the documents and instruments governing the Plan and the applicable provisions of ERISA, the Code or any Similar Law relating to a fiduciary's duties to the Plan including, without limitation, the prudence, diversification, delegation of control and prohibited transaction provisions of ERISA, the Code and any other applicable Similar Laws.

## Prohibited Transaction Issues

Section 406 of ERISA and Section 4975 of the Code prohibit ERISA Plans from engaging in specified transactions involving plan assets with persons or entities who are "parties in interest," within the meaning of ERISA, or "disqualified persons," within the meaning of Section 4975 of the Code, unless an exemption is available. A party in interest or disqualified person who engages in a nonexempt prohibited transaction may be subject to excise taxes and other penalties and liabilities under ERISA and the Code. The acquisition and/or holding of notes by an ERISA Plan with respect to which we or the placement agents are considered a party in interest or disqualified person may constitute or result in a direct or indirect prohibited transaction under Section 406 of ERISA and/or Section 4975 of the Code, unless the investment is acquired and is held in accordance with an applicable statutory, class or individual prohibited transaction exemption. Included among the exemptions that may apply to the acquisition and holding of the notes are Section 408(b)(17) of ERISA and the United States Department of Labor prohibited transaction class exemption ("PTCE") 84-14 respecting transactions determined by independent qualified professional asset managers, PTCE 90-1, respecting insurance company pooled separate accounts, PTCE 91-38, respecting bank collective investment funds, PTCE 95-60, respecting life insurance company general accounts and PTCE 96-23, respecting transactions determined by in-house asset managers, although there can be no assurance that all of the conditions of any such exemptions will be satisfied. Because of the foregoing, the notes should not be purchased or held by any person investing "plan assets" of any Plan, unless such purchase and holding (and the exchange of notes for exchange notes) will not constitute a non-exempt prohibited transaction under ERISA and the Code or similar violation of any applicable Similar Laws.

## Representation

Accordingly, by acceptance of a note or an exchange note, each purchaser and subsequent transferee will be deemed to have represented and warranted that either (i) no portion of the assets used by such purchaser or

281

EFIHMW00208411

transferee to acquire and hold the notes or any interest therein constitutes assets of any Plan or (ii) the acquisition and holding of the notes or any interest therein (and the exchange of notes for exchange notes) by such purchaser or transferee will not constitute a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code or similar violation under any applicable Similar Laws.

The foregoing discussion is general in nature and is not intended to be all-inclusive. Due to the complexity of these rules and the penalties that may be imposed upon persons involved in non-exempt prohibited transactions, it is particularly important that fiduciaries or other persons considering purchasing the notes (and holding the notes or exchange notes) on behalf of, or with the assets of, any Plan, consult with their counsel regarding the potential applicability of ERISA, Section 4975 of the Code and any Similar Laws to such transactions and whether an exemption would be applicable to the purchase and holding of the notes.

282

Confidential

## PRIVATE PLACEMENT

Subject to the terms and conditions contained in the Placement Agreement (the "Placement Agreement"), dated the date hereof among us, Energy Future Competitive Holdings and Energy Future Intermediate Holding and the placement agents, we have agreed to sell, and the placement agents have severally agreed to purchase, all of the notes offered hereby.

We have been advised that the placement agents propose to resell the notes at the offering price set forth on the cover page of this offering memorandum. See "Notice to Investors." After the initial offering of the notes offered hereby, the offering price and other selling terms may from time to time be varied by the placement agents. The Placement Agreement provides that the obligations of the placement agents to pay for and accept delivery of the notes are subject to, among other conditions, the delivery of certain legal opinions by our counsel.

The Placement Agreement provides that we and the Guarantors, on one hand, and the placement agents, on the other hand, will indemnify each other against certain liabilities, including liabilities under the Securities Act, and will contribute to payments the other may be required to make in respect thereof.

The notes offered hereby are expected to be eligible for trading in the PORTAL market.

In order to facilitate the offering of the notes, the placement agents may engage in transactions that stabilize, maintain or otherwise affect the price of the notes. Specifically, the placement agents may overallot in connection with this offering, creating a short position in the notes for its own account. In addition, to cover overallotments or to stabilize the price of the notes, the placement agents may bid for, and purchase, notes in the open market. Finally, the placement agents may reclaim selling concessions allowed to an agent or dealer for distributing the notes in this offering if the placement agents repurchase previously distributed notes in transactions to cover short portions, in stabilization transactions or otherwise. Any of these activities may stabilize or maintain the market price of the notes above independent market levels. The placement agents are not required to engage in these activities, and may end any of these activities at any time. No assurance can be given that an active public market or other market will develop for the notes or as to the liquidity of the trading market for the notes.

In connection with sales outside the United States, the placement agents have agreed that they will not offer, sell or deliver the notes to, or for the account or benefit of, United States persons (1) as part of their distribution at any time or (2) otherwise prior to 40 days after the closing of the offering. Each placement agent will send to any dealer to whom it sells notes during such period a confirmation or other notice setting forth the restrictions on offers and sales of the notes within the United States or to, or for the account or benefit of, United States persons.

The notes will be new securities for which there is currently no market. As a result, we cannot assure you that the initial prices at which the notes will sell in the market after this offering will not be lower than the initial offering price or that an active trading market for the notes will develop and continue after completion of this offering. The placement agents have advised us that they currently intend to make a market in the notes. However, they are not obligated to do so, and they may discontinue any market-making activities with respect to the notes at any time without notice. As certain of the placement agents have made Equity Contributions, these placement agents may be required to deliver a "market-making prospectus" when effecting offers and sales of notes. For so long as the market-making prospectus is required to be delivered, the ability of these placement agents to make a market in the notes may, in part, be dependent on our ability to maintain a current market-making prospectus. See "The Transactions—Equity Contributions." In addition, market-making activities will be subject to the limits imposed by the Exchange Act and may be limited. Accordingly, we cannot assure you as to the liquidity of, or trading market for, the notes.

It is expected that delivery of the notes will be made against payment therefore on or about the dates specified in the last paragraph of the cover page of this offering memorandum, which will be the fifth business day following the date of pricing of the notes or T + 5. Under Rule 15c6-1 of the Exchange Act, trades in the

283

EFIHMW00208413

secondary market generally are required to settle in three business days unless the parties to any such trade expressly agree otherwise. Accordingly, purchasers who wish to trade such notes prior to the delivery of the notes hereunder will be required, by virtue of the fact that such notes will initially settle in the T + 5 to specify an alternative settlement cycle at the time of any such trade to prevent a failed settlement. Purchasers of notes who wish to trade notes prior to their delivery hereunder should consult their own advisors.

The placement agents have only communicated or caused to be communicated and will only communicate or cause to be communicated any invitation or inducement to engage in investment activity (within the meaning of section 21 of FSMA) received by it in connection with the issue or sale of the notes in circumstances in which section 21(1) of FSMA does not apply to us. The placement agents agree and acknowledge that they have complied and will comply with all applicable provisions of FSMA with respect to anything done by them in relation to the notes in, from or otherwise involving the United Kingdom.

In relation to each Member State of the European Economic Area which has implemented the Prospectus Directive (each, a Relevant Member State), each Placement Agent has represented and agreed that with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State (the Relevant Implementation Date) it has not made and will not make an offer of notes to the public in that Relevant Member State prior to the publication of a prospectus in relation to the notes which has been approved by the competent authority in that Relevant Member State or, where appropriate, approved in another Relevant Member State and notified to the competent authority in that Relevant Member State, all in accordance with the Prospectus Directive, except that it may, with effect from and including the Relevant Implementation Date, make an offer of notes to the public in that Relevant Member State at any time:

> (a) to legal entities which are authorized or regulated to operate in the financial markets or, if not so authorized or regulated, whose corporate purpose is solely to invest in securities;

> (b) to any legal entity which has two or more of (1) an average of at least 250 employees during the last financial year; (2) a total balance sheet of more than €43,000,000 and (3) an annual net turnover of more than €50,000,000, as shown in its last annual or consolidated accounts;

> (c) to fewer than 100 natural or legal persons (other than qualified investors as defined in the Prospectus Directive) subject to obtaining the prior consent of the representatives for any such offer; or

> (d) in any other circumstances which do not require the publication by the Issuer of a prospectus pursuant to Article 3 of the Prospectus Directive.

For the purposes of this provision, the expression an "offer of notes to the public" in relation to any notes in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the notes to be offered so as to enable an investor to decide to purchase or subscribe the notes, as the same may be varied in that Member State by any measure implementing the Prospectus Directive in that Member State and the expression Prospectus Directive means Directive 2003/71/EC and includes any relevant implementing measure in each Relevant Member State.

The notes may not be offered or sold by means of any document other than (i) in circumstances which do not constitute an offer to the public within the meaning of the Companies Ordinance (Cap.32, Laws of Hong Kong), or (ii) to "professional investors" within the meaning of the Securities and Futures Ordinance (Cap.571, Laws of Hong Kong) and any rules made thereunder, or (iii) in other circumstances which do not result in the document being a "prospectus" within the meaning of the Companies Ordinance (Cap.32, Laws of Hong Kong), and no advertisement, invitation or document relating to the notes may be issued or may be in the possession of any person for the purpose of issue (in each case whether in Hong Kong or elsewhere), which is directed at, or the contents of which are likely to be accessed or read by, the public in Hong Kong (except if permitted to do so under the laws of Hong Kong) other than with respect to notes which are or are intended to be disposed of only to persons outside Hong Kong or only to "professional investors" within the meaning of the Securities and Futures Ordinance (Cap. 571, Laws of Hong Kong) and any rules made thereunder.

284

EFIHMW00208414

This offering memorandum has not been registered as a prospectus with the Monetary Authority of Singapore. Accordingly, this offering memorandum and any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of the notes may not be circulated or distributed, nor may the notes be offered or sold, or be made the subject of an invitation for subscription or purchase, whether directly or indirectly, to persons in Singapore other than (i) to an institutional investor under Section 274 of the Securities and Futures Act, Chapter 289 of Singapore (the "SFA"), (ii) to a relevant person, or any person pursuant to Section 275(1A), and in accordance with the conditions, specified in Section 275 of the SFA or (iii) otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA.

Where the notes are subscribed or purchased under Section 275 by a relevant person which is: (a) a corporation (which is not an accredited investor) the sole business of which is to hold investments and the entire share capital of which is owned by one or more individuals, each of whom is an accredited investor; or (b) a trust (where the trustee is not an accredited investor) whose sole purpose is to hold investments and each beneficiary is an accredited investor, shares, debentures and units of shares and debentures of that corporation or the beneficiaries' rights and interest in that trust shall not be transferable for 6 months after that corporation or that trust has acquired the notes under Section 275 except: (1) to an institutional investor under Section 274 of the SFA or to a relevant person, or any person pursuant to Section 275(1A), and in accordance with the conditions, specified in Section 275 of the SFA; (2) where no consideration is given for the transfer; or (3) by operation of law.

The securities have not been and will not be registered under the Securities and Exchange Law of Japan (the Securities and Exchange Law) and each Placement Agent has agreed that it will not offer or sell any securities, directly or indirectly, in Japan or to, or for the benefit of, any resident of Japan (which term as used herein means any person resident in Japan, including any corporation or other entity organized under the laws of Japan), or to others for re-offering or resale, directly or indirectly, in Japan or to a resident of Japan, except pursuant to an exemption from the registration requirements of, and otherwise in compliance with, the Securities and Exchange Law and any other applicable laws, regulations and ministerial guidelines of Japan.

From time to time, the placement agents and their affiliates have provided, and may in the future provide from time to time, investment banking and commercial banking services and financial advisory services to us for which they have in the past received, and may in the future receive, customary fees. Morgan Stanley & Co. Incorporated, Goldman, Sachs & Co., Citigroup Global Markets Inc., J.P. Morgan Securities Inc., Lehman Brothers Inc. and Credit Suisse Securities (USA) LLC and certain of their affiliates provide, or may in the future provide, certain commercial banking, financial advisory and investment banking services for the Issuer, TCEH, Oncor Electric Delivery and certain of their affiliates and for the Sponsors and certain of their affiliates, for which they receive, or will receive, customary fees.

Affiliates of certain of the placement agents have ownership interest in Energy Future Holdings Corp. See "The Transactions—Equity Contributions."

Michael MacDougall, one of our directors, is a director of Kraton Polymers Inc. which may be deemed to be an affiliate of J.P. Morgan Securities Inc. Each of Scott Lebovitz, Kenneth Pontarelli and William Young, who are members of our board of directors, are employees of Goldman, Sachs & Co. or its affiliates. Lyndon Olson, a member of our board of directors, is a Senior Advisor with Citigroup Inc., an affiliate of Citigroup Global Markets Inc.

An affiliate of Morgan Stanley & Co. Incorporated is the administrative agent, an affiliate of Goldman, Sachs & Co. is the syndication agent, affiliates of Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, J.P. Morgan Securities Inc. and Lehman Brothers Inc. are co-documentation agents, and each of the placement agents or their affiliates are joint lead arrangers and bookrunners under each of the EFH Senior Interim Facility and the TCEH Senior Interim Facility and affiliates of each of the placement agents are lenders under the EFH Senior Interim Facility. The net proceeds from the offering of notes will be used to repay borrowings under the EFH Senior Interim Facility and will be received by the placement agents or their affiliates.

285

Confidential

In connection with the Merger, an affiliate of Credit Suisse Securities (USA) LLC provided financial advisory services to, and will receive fees from, Energy Future Holdings Corp., including fees received upon the completion of the Merger and affiliates of the other placement agents provided financial advisory services to the Sponsors in connection with the Merger for which they received fees from the Sponsors upon the completion of the Merger. In addition, an affiliate of Citigroup Global Markets Inc. is the administrative agent and collateral agent, an affiliate of J.P. Morgan Securities Inc. is the syndication agent, affiliates of Credit Suisse Securities (USA) LLC, Goldman, Sachs & Co., Lehman Brothers Inc. and Morgan Stanley & Co. Incorporated are co-documentation agents and the placement agents or their affiliates are joint lead arrangers and joint lead bookrunners for the TCEH Senior Secured Facilities and affiliates of each of the placement agents are lenders under the TCEH Senior Secured Facilities. An affiliate of Goldman, Sachs & Co. is sole lead arranger, sole bookrunner and posting agent for the TCEH Commodity Collateral Posting Facility. An affiliate of J.P. Morgan Securities Inc. is administrative agent, an affiliate of Citigroup Global Markets Inc. is syndication agent, affiliates of Credit Suisse Securities (USA) LLC, Goldman, Sachs & Co., Lehman Brothers Inc. and Morgan Stanley & Co. are co-documentation agents and the placement agents or their affiliates are joint lead arrangers and joint lead bookrunners for the Oncor Electric Delivery Revolving Facility and affiliates of each of the placement agents are lenders under the Oncor Electric Revolving Facility. Each of the placement agents will act as initial purchasers in the concurrent offering of TCEH Notes. Goldman, Sachs & Co. acted as dealer manager for the offers to purchase and consent solicitations with respect to the Specified Notes. See "The Transactions—Debt Repayment."

Confidential

EFIHMW00208416

## LEGAL MATTERS

Certain legal matters in connection with the offering will be passed upon for us by Simpson Thacher & Bartlett LLP, New York, New York, and Vinson & Elkins L.L.P., Houston, Texas, FERC and NRC regulatory matters will be passed on for us by Covington & Burling LLP and certain Texas electric utility regulatory matters will be passed on for us by Hunton & Williams LLP. Certain legal matters in connection with the offering will be passed upon for the placement agents by Shearman & Sterling LLP, New York, New York, and certain regulatory matters will be passed on for the placement agents by Haynes and Boone, LLP. An investment vehicle comprised of several partners of Simpson Thacher & Bartlett LLP, members of their families, related persons and others own interests representing less than 1% of the capital commitments of the KKR Millennium Fund, L.P. and KKR 2006 Fund, L.P.

## INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

The consolidated financial statements of Energy Future Holdings Corp. and subsidiaries as of December 31, 2006 and 2005 and for each of the three years in the period ended December 31, 2006, included in this offering memorandum have been audited by Deloitte & Touche LLP, an independent registered public accounting firm, as stated in their report included in this offering memorandum (which report expresses an unqualified opinion and includes an explanatory paragraph related to Energy Future Holdings Corp.'s change in method of accounting for stock based compensation with the election to early adopt Statement of Financial Accounting Standards No. 123 (revised 2004) *Share-Based Payment*).

The consolidated financial statements of Oncor Electric Delivery Company (formerly TXU Electric Delivery Company) and subsidiary as of December 31, 2006 and 2005 and for each of the three years in the period ended December 31, 2006, included in this offering memorandum have been audited by Deloitte & Touche LLP, an independent registered public accounting firm, as stated in their report included in this offering memorandum (which report expresses an unqualified opinion and includes an explanatory paragraph related to Energy Future Holdings Corp.'s change in method of accounting for stock based compensation with the election to early adopt Statement of Financial Accounting Standards No. 123 (revised 2004) *Share-Based Payment*).

With respect to the unaudited interim financial information for Energy Future Holdings Corp. and Oncor Electric Delivery Company (formerly TXU Electric Delivery Company) for the periods ended June 30, 2007 and 2006 which is included in this offering memorandum, Deloitte & Touche LLP, an independent registered public accounting firm, have applied limited procedures in accordance with the standards of the Public Company Accounting Oversight Board (United States) for a review of such information. However, as stated in their reports included in the offering memorandum as of June 30, 2007 and for the three months and six months ended June 30, 2007, they did not audit and they do not express an opinion on that interim financial information. Accordingly, the degree of reliance on their reports on such information should be restricted in light of the limited nature of the review procedures applied.

## AVAILABLE INFORMATION

We have historically filed annual, quarterly and current reports, proxy statements and other information with the SEC. You may read and copy any document we have filed or will file with the SEC at the SEC's public website (*www.sec.gov*) or at the Public Reference Room of the SEC located at 100 F Street, N.E., Washington, D.C. 20549. Copies of such materials can be obtained from the Public Reference Room of the SEC at prescribed rates. You can call the SEC at 1-800-SEC-0330 to obtain information on the operation of the Public Reference Room.

You should rely only upon the information provided in this offering memorandum. The Issuer has not authorized anyone to provide you with different information. You should not assume that the information in this offering memorandum is accurate as of any date other than the date of this offering memorandum.

Confidential

EFIHMW00208417

This offering memorandum contains summaries of certain agreements that we have entered into or will enter into in connection with the Transactions and the Interim Facility Refinancing, such as the indenture governing the notes offered hereby and the registration rights agreement relating to the notes offered hereby, the TCEH Senior Secured Facilities, the TCEH Senior Interim Facility, the indenture governing the TCEH Notes and the registration rights agreement relating to the TCEH Notes and certain agreements described under "The Transactions," "Management," "Certain Relationships and Related Party Transactions" and "Description of Other Indebtedness." The descriptions contained in this offering memorandum of these agreements do not purport to be complete and are subject to, or qualified in their entirety by reference to, the definitive agreements. Copies of the definitive agreements, when available, will be made available without charge to you in response to a written or oral request to us.

Confidential

EFIHMW00208418

## GLOSSARY

Other than under the caption "Description of the Notes," where a different meaning for a term or abbreviation listed below is provided, when the following terms and abbreviations appear in the text of this offering memorandum, they have the meanings indicated below.

| | |
|---|---|
| **1999 Restructuring Legislation** | legislation that restructured the electric utility industry in Texas to provide for retail competition |
| **2006 Form 10-K** | Energy Future Holdings Corp.'s Annual Report on Form 10-K for the year ended December 31, 2006 |
| **2006 year-end Financial Statements** | These audited financial statements include the consolidated balance sheets of Energy Future Holdings Corp. and subsidiaries as of December 31, 2006 and 2005 and the related statements of consolidated income, comprehensive income, cash flows and shareholders' equity for each of the three years in the period ended December 31, 2006 and the related notes to the financial statements. |
| **APB 25** | Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" |
| **Capgemini** | Capgemini Energy LP, a subsidiary of Cap Gemini North America Inc. that provides business process support services to Energy Future Holdings Corp. and its subsidiaries |
| **Competitive Electric** | Refers to the Energy Future Holdings Corp. business segment, formerly referred to as TXU Energy Holdings, which included the activities of TCEH. |
| **Energy Future Intermediate Holding** | Energy Future Intermediate Holding Company LLC, a Delaware limited liability company and subsidiary and Energy Future Holdings Corp. |
| **Energy Future Holdings Corp.** | Refers to Energy Future Holdings Corp., a holding company, and/or its subsidiaries, depending on context. This document occasionally makes references to Energy Future Holdings Corp., TCEH or Oncor Electric Delivery when describing actions, rights or obligations of their respective subsidiaries. These references reflect the fact that the subsidiaries are consolidated with their respective parent companies for financial reporting purposes. However, these references should not be interpreted to imply that the parent company is actually undertaking the action or has the rights or obligations of the relevant subsidiary company or that the subsidiary company is undertaking an action or has the rights or obligations of its parent company or of any other affiliate. |
| **EPA** | U.S. Environmental Protection Agency |
| **EPC** | engineering, procurement and construction |
| **ERCOT** | Electric Reliability Council of Texas, the Independent System Operator and the regional coordinator of various electricity systems within Texas |
| **ERISA** | Employee Retirement Income Security Act |

289

Confidential

| | |
|---|---|
| **FASB** | Financial Accounting Standards Board, the designated organization in the private sector for establishing standards for financial accounting and reporting |
| **FERC** | U.S. Federal Energy Regulatory Commission |
| **FIN 46R** | FIN No. 46R (Revised 2003), "Consolidation of Variable Interest Entities" |
| **FIN 47** | FIN No. 47, "Accounting for Conditional Asset Retirement Obligations—An Interpretation of FASB Statement No. 143" |
| **FIN 48** | FIN No. 48, "Accounting for Uncertainty in Income Taxes" |
| **FSP** | FASB Staff Position |
| **GAAP** | generally accepted accounting principles |
| **GW** | gigawatts |
| **GWh** | gigawatt-hours |
| **historical service territory** | the territory, largely in north Texas, being served by TXU Corp.'s regulated electric utility subsidiary at the time of entering retail competition on January 1, 2002 |
| **IRS** | U.S. Internal Revenue Service |
| **June 30, 2007 Financial Statements** | These unaudited financial statements include the consolidated balance sheet of Energy Future Holdings Corp. and subsidiaries as of June 30, 2007, and the related condensed statements of consolidated income and comprehensive income for the three-month and six-month periods ended June 30, 2007 and 2006, and of cash flows for the six-month periods ended June 30, 2007 and 2006 and the related notes to the financial statements. |
| **kV** | kilovolts |
| **kWh** | kilowatt-hours |
| **Luminant Construction or TXU DevCo** | Refers to wholly owned subsidiaries of Energy Future Holdings Corp. that have been established for the purpose of developing and constructing new generation facilities. |
| **Luminant Energy or TXU Portfolio Management** | Luminant Energy Company LLC (formerly TXU Portfolio Management Company LP), a subsidiary of TCEH |
| **market heat rate** | Heat rate is a measure of the efficiency of converting a fuel source to electricity. The market heat rate is based on the price offer of the marginal supplier in Texas (generally natural gas plants) in generating electricity and is calculated by dividing the wholesale market price of electricity by the market price of natural gas. |
| **Merger Agreement** | Agreement and Plan of Merger, dated February 25, 2007, under which Texas Holdings agreed to acquire Energy Future Holdings Corp. |

290

Confidential

EFIHMW00208420

**PX 008**
**Page 299 of 501**

| | |
|---|---|
| **Merger Sub** | Texas Energy Future Merger Sub Corp, a Texas corporation and a wholly-owned subsidiary of Texas Holdings. |
| **MMBtu** | million British thermal units |
| **Moody's** | Moody's Investors Services, Inc. (a credit rating agency) |
| **MW** | megawatts |
| **MWh** | megawatt-hours |
| **NRC** | U.S. Nuclear Regulatory Commission |
| **Oncor Electric Delivery** | Refers to Oncor Electric Delivery Company, a subsidiary of Energy Future Holdings Corp., and/or its consolidated bankruptcy remote financing subsidiary, Oncor Electric Delivery Transition Bond Company LLC, depending on context. This document occasionally makes references to Energy Future Holdings Corp., TCEH or Oncor Electric Delivery when describing actions, rights or obligations of their respective subsidiaries. These references reflect the fact that the subsidiaries are consolidated with their respective parent companies for financial reporting purposes. However, these references should not be interpreted to imply that the parent company is actually undertaking the action or has the rights or obligations of the relevant subsidiary company or that the subsidiary company is undertaking an action or has the rights or obligations of its parents company or of any other affiliate. |
| **PRB** | Powder River Basin—a coal mining region that covers southeast Montana and northeast Wyoming. Energy Future Holdings Corp. purchases coal from this region from multiple suppliers, which is currently blended with lignite to fuel the Big Brown, Monticello and Martin Lake generating plants. |
| **price-to-beat rate** | residential and small business customer electricity rates established by the PUCT that (i) were required to be charged in a REP's historical service territories until the earlier of January 1, 2005 or the date when 40% of the electricity consumed by such customer classes was supplied by competing REPs, adjusted periodically for changes in fuel costs, and (ii) were required to be made available to those customers until January 1, 2007 |
| **PUCT or Commission** | Public Utility Commission of Texas |
| **PURA** | Texas Public Utility Regulatory Act |
| **REP** | retail electric provider |
| **S&P** | Standard & Poor's Ratings Services, a division of the McGraw Hill Companies Inc. (a credit rating agency) |
| **SEC** | U.S. Securities and Exchange Commission |

291

Confidential

| | |
|---|---|
| **Settlement Plan** | regulatory settlement plan that received final approval by the PUCT in January 2003 |
| **SFAS** | Statement of Financial Accounting Standards issued by the FASB |
| **SFAS 5** | SFAS No. 5, "Contingencies" |
| **SFAS 34** | SFAS No. 34, "Capitalization of Interest" |
| **SFAS 71** | SFAS No. 71, "Accounting for the Effect of Certain Types of Regulation" |
| **SFAS 87** | SFAS No. 87, "Employers' Accounting for Pensions" |
| **SFAS 106** | SFAS No. 106, "Employers' Accounting for Postretirement Benefits Other Than Pensions" |
| **SFAS 109** | SFAS No. 109, "Accounting for Income Taxes" |
| **SFAS 115** | SFAS No. 115, "Accounting for Certain Investments in Debt and Equity Securities" |
| **SFAS 123R** | SFAS No. 123 (revised 2004), "Share-Based Payment" |
| **SFAS 133** | SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities" as amended and interpreted |
| **SFAS 140** | SFAS No. 140, "Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities, a replacement of FASB Statement 125" |
| **SFAS 142** | SFAS No. 142, "Goodwill and Other Intangible Assets" |
| **SFAS 143** | SFAS No. 143, "Accounting for Asset Retirement Obligations" |
| **SFAS 144** | SFAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets" |
| **SFAS 146** | SFAS No. 146, "Accounting for Costs Associated with Exit or Disposal Activities" |
| **SFAS 157** | SFAS No. 157, "Fair Value Measurement" |
| **SFAS 158** | SFAS No. 158, "Employer's Accounting for Defined Benefit Pension and Other Postretirement Plans" |
| **SFAS 159** | SFAS No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities—Including an Amendment of FASB Statement No. 115" |
| **SG&A** | selling, general and administrative |
| **Short-cut Method** | refers to the short-cut method under SFAS 133 that allows entities to assume no hedge ineffectiveness in a hedging relationship of interest rate risk if certain conditions are met |

292

Confidential

| | |
|---|---|
| **Sponsors** | The private investment group, consisting of entities advised by or affiliated with KKR, TPG and Goldman Sachs, that directly and indirectly own or will own Texas Holdings and Merger Sub. |
| **TCEQ** | Texas Commission on Environmental Quality |
| **Texas Competitive Holdings or TCEH** | Refers to Texas Competitive Electric Holdings Company LLC (formerly TXU Energy Company LLC), a subsidiary of Energy Future Competitive Holdings, and/or its consolidated subsidiaries, depending on context, engaged in electricity generation and wholesale and retail energy markets activities. This document and the SEC filings of Texas Competitive Holdings occasionally make references to Texas Competitive Holdings when describing actions, rights or obligations of its subsidiaries. These references reflect the fact that the subsidiaries are consolidated with Texas Competitive Holdings for financial reporting purposes. However, these references should not be interpreted to imply that Texas Competitive Holdings is actually undertaking the action or has the rights or obligations of the relevant subsidiary company or that the subsidiary company is undertaking an action or has the rights or obligations of Texas Competitive Holdings or of any other affiliate. |
| **Texas Holdings or Merger Sub Parent** | Texas Energy Future Holdings Limited Partnership, a Delaware limited partnership. |
| **TXU Australia** | Refers to TXU Australia Group Pty Ltd, a former subsidiary of Energy Future Holdings Corp., and its subsidiaries |
| **TXU Big Brown** | Big Brown Power Company LLC (formerly TXU Big Brown Company LP), a Texas limited liability company and subsidiary of TCEH, which owns two lignite/coal-fueled generation units in Texas |
| **TXU Energy or TXU Energy Retail** | Refers to TXU Energy Retail Company LLC (formerly TXU Energy Retail Company LP), a subsidiary of TCEH engaged in the retail sale of power to residential and business customers |
| **TXU Europe** | TXU Europe Limited, a former subsidiary of Energy Future Holdings Corp. |
| **TXU Fuel** | TXU Fuel Company, a former subsidiary of TCEH |
| **TXU Gas** | TXU Gas Company, a former subsidiary of Energy Future Holdings Corp. |
| **United States or U.S.** | United States of America |
| **US Holdings or Energy Future Competitive Holdings** | Energy Future Competitive Holdings Company (formerly TXU US Holdings Company), a subsidiary of Energy Future Holdings Corp. |
| **VEBA** | Refers to voluntary employees' beneficiary association |

293

Confidential

EFIHMW00208423

**PX 008**
**Page 302 of 501**

[THIS PAGE INTENTIONALLY LEFT BLANK]

Confidential

EFIHMW00208424

# INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

## ENERGY FUTURE HOLDINGS CORP.

**Unaudited Financial Statements for the Quarterly Period Ended June 30, 2007**

Report of Independent Registered Public Accounting Firm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-2

Condensed Statements of Consolidated Income—Three and Six Months Ended June 30, 2007 and 2006 . . . . F-3

Condensed Statements of Consolidated Comprehensive Income—Three and Six Months Ended June 30, 2007 and 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-4

Condensed Statements of Consolidated Cash Flows—Six Months Ended June 30, 2007 and 2006 . . . . . . . . F-5

Condensed Consolidated Balance Sheets—June 30, 2007 and December 31, 2006 . . . . . . . . . . . . . . . . . . . . F-7

Notes to Condensed Consolidated Financial Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-8

**Audited Financial Statements for the Fiscal Year Ended December 31, 2006**

Report of Independent Registered Public Accounting Firm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-53

Statements of Consolidated Income for each of the three years in the period ended December 31, 2006 . . . . . F-54

Statements of Consolidated Comprehensive Income for each of the three years in the period ended December 31, 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-55

Statements of Consolidated Cash Flows for each of the three years in the period ended December 31, 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-56

Consolidated Balance sheets, December 31, 2006 and 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-58

Statements of Consolidated Shareholders' Equity for each of the three years in the period ended December 31, 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-59

Notes to Financial Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-61

## ONCOR ELECTRIC DELIVERY

**Unaudited Financial Statements for the Quarterly Period Ended June 30, 2007**

Report of Independent Registered Public Accounting Firm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-140

Condensed Statements of Consolidated Income—Three and Six Months Ended June 30, 2007 and 2006 . . . F-141

Condensed Statements of Consolidated Comprehensive Income—Three and Six Months Ended June 30, 2007 and 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-142

Condensed Statements of Consolidated Cash Flows—Six Months Ended June 30, 2007 and 2006 . . . . . . . . F-143

Condensed Consolidated Balance Sheets—June 30, 2007 and December 31, 2006 . . . . . . . . . . . . . . . . . . . . F-144

Notes to Condensed Consolidated Financial Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-145

**Audited Financial Statements of TXU Electric Delivery Company (Now known as Oncor Electric Delivery Company) for the year ended December 31, 2006**

Report of Independent Registered Public Accounting Firm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-161

Statements of Consolidated Income for each of the three years in the period ended December 31, 2006 . . . . F-162

Statements of Consolidated Comprehensive Income for each of the three years in the period ended December 31, 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-163

Statements of Consolidated Cash Flows for each of the three years in the period ended December 31, 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-164

Consolidated Balance sheets, December 31, 2006 and 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-165

Statements of Consolidated Shareholder's Equity for each of the three years in the period ended December 31, 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-166

Notes to Financial Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-167

F-1

EFIHMW00208425

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Shareholder of Energy Future Holdings Corp.:

We have reviewed the accompanying condensed consolidated balance sheet of Energy Future Holdings Corp. (formerly known as TXU Corp.) and subsidiaries ("the Company") as of June 30, 2007, and the related condensed statements of consolidated income and comprehensive income for the three-month and six-month periods ended June 30, 2007 and 2006, and of cash flows for the six-month periods ended June 30, 2007 and 2006. These interim financial statements are the responsibility of the Company's management.

We conducted our reviews in accordance with the standards of the Public Company Accounting Oversight Board (United States). A review of interim financial information consists principally of applying analytical procedures and making inquiries of persons responsible for financial and accounting matters. It is substantially less in scope than an audit conducted in accordance with the standards of the Public Company Accounting Oversight Board (United States), the objective of which is the expression of an opinion regarding the financial statements taken as a whole. Accordingly, we do not express such an opinion.

Based on our reviews, we are not aware of any material modifications that should be made to such condensed consolidated interim financial statements for them to be in conformity with accounting principles generally accepted in the United States of America.

We have previously audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheet of Energy Future Holdings Corp. and subsidiaries as of December 31, 2006, and the related statements of consolidated income, comprehensive income, cash flows, and shareholders' equity for the year then ended (not presented herein); and in our report dated March 1, 2007 (October 16, 2007 as to Note 26), we expressed an unqualified opinion on those consolidated financial statements. In our opinion, the information set forth in the accompanying condensed consolidated balance sheet as of December 31, 2006 is fairly stated, in all material respects, in relation to the consolidated balance sheet from which it has been derived.

/s/ Deloitte & Touche LLP

Dallas, Texas
August 9, 2007
(October 16, 2007 as to Notes 16 and 17)

F-2

EFIHMW00208426

**ENERGY FUTURE HOLDINGS CORP. AND SUBSIDIARIES**

**CONDENSED STATEMENTS OF CONSOLIDATED INCOME**
(Unaudited)

| | Three Months Ended June 30, | | Six Months Ended June 30. | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| | (millions of dollars, except per share amounts) | | | |
| Operating revenues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $2,022 | $2,667 | $3,691 | $4,971 |
| Costs and expenses: | | | | |
|     Fuel, purchased power costs and delivery fees . . . . . . . . . . . . . . . | 739 | 658 | 1,404 | 1,179 |
|     Operating costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 368 | 341 | 714 | 684 |
|     Depreciation and amortization . . . . . . . . . . . . . . . . . . . . . . . . . . . | 200 | 207 | 403 | 413 |
|     Selling, general and administrative expenses . . . . . . . . . . . . . . . | 227 | 181 | 447 | 370 |
|     Franchise and revenue-based taxes . . . . . . . . . . . . . . . . . . . . . . . | 89 | 87 | 176 | 174 |
|     Other income (Note 6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (16) | (42) | (45) | (55) |
|     Other deductions (Note 6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 122 | 221 | 891 | 221 |
|     Interest income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (17) | (11) | (35) | (20) |
|     Interest expense and related charges (Note 15) . . . . . . . . . . . . . | 221 | 218 | 418 | 431 |
|        Total costs and expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,933 | 1,860 | 4,373 | 3,397 |
| Income (loss) from continuing operations before income taxes . . . . . . . | 89 | 807 | (682) | 1,574 |
| Income tax expense (benefit) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (21) | 310 | (294) | 561 |
| **Income (loss) from continuing operations** . . . . . . . . . . . . . . . . . . . . . | 110 | 497 | (388) | 1,013 |
| Income from discontinued operations, net of tax effect . . . . . . . . . . . . . | 11 | — | 11 | 60 |
| **Net income (loss)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 121 | $ 497 | $ (377) | $1,073 |
| Average shares of common stock outstanding (millions): | | | | |
|     Basic . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 459 | 458 | 458 | 461 |
|     Diluted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 464 | 465 | 458 | 470 |
| Per share of common stock—Basic: | | | | |
|     Net income (loss) from continuing operations . . . . . . . . . . . . . | $ 0.24 | $ 1.08 | $(0.85) | $ 2.20 |
|     Income from discontinued operations, net of tax effect . . . . . | 0.02 | — | 0.03 | 0.13 |
|     Net income (loss) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 0.26 | $ 1.08 | $(0.82) | $ 2.33 |
| Per share of common stock—Diluted: | | | | |
|     Net income (loss) from continuing operations . . . . . . . . . . . . . | $ 0.24 | $ 1.07 | $(0.85) | $ 2.16 |
|     Income from discontinued operations, net of tax effect . . . . . | 0.02 | — | 0.03 | 0.13 |
|     Net income (loss) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 0.26 | $ 1.07 | $(0.82) | $ 2.29 |
| Dividends declared . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $0.433 | $0.413 | $0.865 | $0.826 |

See Notes to Financial Statements.

F-3

Confidential

**ENERGY FUTURE HOLDINGS CORP. AND SUBSIDIARIES**

**CONDENSED STATEMENTS OF CONSOLIDATED COMPREHENSIVE INCOME**
**(Unaudited)**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| | (millions of dollars) | | | |
| Components related to continuing operations: | | | | |
| Income (loss) from continuing operations ........................ | $110 | $497 | $(388) | $1,013 |
| Other comprehensive income (loss): | | | | |
| Reclassification of pension and other retirement benefit costs (net of tax expense of $—, —, $3 and —) (Note 13) ................ | 1 | — | 5 | — |
| Cash flow hedges: | | | | |
| Net increase (decrease) in fair value of derivatives held at end of period (net of tax (expense) benefit of $(19), $44, $151 and $(16)) ..................................... | 35 | (83) | (281) | 30 |
| Derivative value net (gains) losses related to hedged transactions settled during the period and reported in net income (net of tax (expense) benefit of $(9), $6, $(49) and $6) ......................................... | (17) | 12 | (91) | 11 |
| Total effect of cash flow hedges ..................... | 18 | (71) | (372) | 41 |
| Total adjustments to net income (loss) from continuing operations .......................................... | 19 | (71) | (367) | 41 |
| Comprehensive income (loss) from continuing operations ........... | 129 | 426 | (755) | 1,054 |
| Comprehensive income from discontinued operations ............... | 11 | — | 11 | 60 |
| Comprehensive income (loss) ................................. | $140 | $426 | $(744) | $1,114 |

See Notes to Financial Statements.

F-4

Confidential

EFIHMW00208428

**ENERGY FUTURE HOLDINGS CORP. AND SUBSIDIARIES**

**CONDENSED STATEMENTS OF CONSOLIDATED CASH FLOWS**
(Unaudited)

| | Six Months Ended June 30, | |
|---|---|---|
| | 2007 | 2006 |
| | (millions of dollars) | |
| Cash flows—operating activities: | | |
| Net income (loss) | $ (377) | $ 1,073 |
| Income from discontinued operations, net of tax effect | (11) | (60) |
| Income (loss) from continuing operations | (388) | 1,013 |
| Adjustments to reconcile income (loss) from continuing operations to cash provided by (used in) operating activities: | | |
| Depreciation and amortization | 433 | 444 |
| Deferred income tax expense (benefit)—net | (613) | 319 |
| Impairment of natural gas-fueled generation plants | — | 198 |
| Inventory write-off related to natural gas-fueled generation plants | — | 3 |
| Charges related to suspended development of generation facilities (Note 2) | 716 | — |
| Write-off of deferred transaction costs (Note 6) | 38 | — |
| Net gains on sale of assets | (27) | (24) |
| Net effect of unrealized mark-to-market valuations—losses (gains) | 1,182 | (29) |
| Gain on contract settlement | — | (26) |
| Bad debt expense | 25 | 30 |
| Stock-based incentive compensation expense | 15 | 9 |
| Other, net | 19 | 16 |
| Changes in operating assets and liabilities | (1,455) | (49) |
| Cash provided by (used in) operating activities from continuing operations | (55) | 1,904 |
| Cash flows—financing activities: | | |
| Issuances of securities: | | |
| Long-term debt | 1,800 | 100 |
| Common stock | 1 | 180 |
| Retirements/repurchases of securities: | | |
| Equity-linked debt | — | (179) |
| Pollution control revenue bonds | (143) | (203) |
| Other long-term debt | (68) | (1,143) |
| Common stock | (10) | (809) |
| Change in short-term borrowings: | | |
| Commercial paper | (1,296) | 905 |
| Bank borrowings | 2,155 | 800 |
| Common stock dividends paid | (397) | (384) |
| Settlements of minimum withholding tax liabilities under stock-based compensation plans | (93) | (56) |
| Debt premium, discount, financing and reacquisition expenses—net | (15) | (17) |
| Cash provided by (used in) financing activities from continuing operations | 1,934 | (806) |
| Cash flows—investing activities: | | |
| Capital expenditures | (1,611) | (825) |
| Nuclear fuel | (30) | (30) |
| Proceeds from sale of assets | 4 | — |
| Purchase of lease trust | — | (69) |

F-5

Confidential

**PX 008**
**Page 308 of 501**

**ENERGY FUTURE HOLDINGS CORP. AND SUBSIDIARIES**

**CONDENSED STATEMENTS OF CONSOLIDATED CASH FLOWS (cont.)**

**(Unaudited)**

| | Six Months Ended June 30, | |
| --- | --- | --- |
| | 2007 | 2006 |
| | (millions of dollars) | |
| Reduction of restricted cash related to the redemption of pollution control revenue bonds | 143 | — |
| Proceeds from sales of nuclear decommissioning trust fund securities | 104 | 144 |
| Investments in nuclear decommissioning trust fund securities | (111) | (151) |
| Proceeds from pollution control revenue bonds deposited with trustee | — | (99) |
| Cost to remove retired property | (16) | (22) |
| Investment in unconsolidated affiliate | — | (15) |
| Other | 11 | 5 |
| Cash used in investing activities from continuing operations | (1,506) | (1,062) |
| Discontinued operations: | | |
| Cash provided by (used in) operating activities | 24 | (1) |
| Cash used in financing activities | — | — |
| Cash used in investing activities | — | — |
| Cash provided by (used in) discontinued operations | 24 | (1) |
| Net change in cash and cash equivalents | 397 | 35 |
| Cash and cash equivalents—beginning balance | 25 | 37 |
| Cash and cash equivalents—ending balance | $ 422 | $ 72 |

See Notes to Financial Statements.

F-6

Confidential

EFIHMW00208430

## ENERGY FUTURE HOLDINGS CORP. AND SUBSIDIARIES
### CONDENSED CONSOLIDATED BALANCE SHEETS
#### (Unaudited)

| | June 30, 2007 | December 31, 2006 |
|---|---|---|
| | (millions of dollars) | |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 422 | $ 25 |
| Restricted cash | 54 | 58 |
| Trade accounts receivable—net (Note 7) | 1,016 | 959 |
| Inventories | 428 | 383 |
| Commodity and other derivative contractual assets (Note 12) | 299 | 950 |
| Accumulated deferred income taxes (Note 3) | 829 | 253 |
| Margin deposits related to commodity positions | 448 | 7 |
| Other current assets | 189 | 177 |
| Total current assets | 3,685 | 2,812 |
| Restricted cash | 119 | 258 |
| Investments | 742 | 712 |
| Property, plant and equipment—net | 19,387 | 18,756 |
| Goodwill | 542 | 542 |
| Regulatory assets—net | 1,935 | 2,028 |
| Commodity and other derivative contractual assets (Note 12) | 216 | 345 |
| Other noncurrent assets | 362 | 380 |
| Total assets | $26,988 | $25,833 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Short-term borrowings (Note 8) | $ 2,350 | $ 1,491 |
| Long-term debt due currently (Note 9) | 792 | 485 |
| Trade accounts payable | 1,014 | 1,093 |
| Commodity and other derivative contractual liabilities (Note 12) | 429 | 293 |
| Margin deposits related to commodity positions | 35 | 681 |
| Other current liabilities | 993 | 1,040 |
| Total current liabilities | 5,613 | 5,083 |
| Accumulated deferred income taxes (Note 3) | 3,121 | 4,238 |
| Investment tax credits | 353 | 363 |
| Commodity and other derivative contractual liabilities (Note 12) | 876 | 191 |
| Long-term debt, less amounts due currently (Note 9) | 11,917 | 10,631 |
| Other noncurrent liabilities and deferred credits | 4,063 | 3,187 |
| Total liabilities | 25,943 | 23,693 |
| Commitments and Contingencies (Note 10) | | |
| Shareholders' equity (Note 11): | | |
| Common stock without par value: Authorized shares: 1,000,000,000 | | |
| Outstanding shares: 461,196,630 and 459,244,523 | 5 | 5 |
| Additional paid-in capital | 1,115 | 1,104 |
| Retained earnings (deficit) | (117) | 622 |
| Accumulated other comprehensive income | 42 | 409 |
| Total shareholders' equity | 1,045 | 2,140 |
| Total liabilities and shareholders' equity | $26,988 | $25,833 |

See Notes to Financial Statements.

F-7

Confidential

EFIHMW00208431

**ENERGY FUTURE HOLDINGS CORP. AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(Unaudited)**

## 1. SIGNIFICANT ACCOUNTING POLICIES AND BUSINESS

*Description of Business*—Energy Future Holdings Corp. (formerly named TXU Corp.) is a holding company conducting its operations principally through its Texas Competitive Holdings, Oncor Electric Delivery and TXU DevCo subsidiaries and their subsidiaries. Each of these subsidiaries is a separate legal entity with its own assets and liabilities. Texas Competitive Holdings is a holding company whose subsidiaries are engaged in competitive market activities consisting of electricity generation, retail electricity sales to residential and business customers, wholesale energy sales and purchases as well as commodity risk management and trading activities, all largely in Texas. Oncor Electric Delivery is engaged in regulated electricity transmission and distribution operations in Texas. TXU DevCo and its subsidiaries are engaged in the development of new generation facilities in Texas.

On February 25, 2007, Energy Future Holdings Corp. entered into a Merger Agreement under which an investor group led by Kohlberg Kravis Roberts & Co. and Texas Pacific Group (Sponsors) is expected to acquire Energy Future Holdings Corp. if the relevant conditions to closing are satisfied (Proposed Merger).

Energy Future Holdings Corp. has two reportable segments: the Competitive Electric segment (formerly the TXU Energy Holdings segment), which includes the activities of Texas Competitive Holdings, TXU DevCo and a lease trust holding certain combustion turbines, and the Regulated Delivery segment (formerly the Oncor Electric Delivery segment), which includes the activities of Oncor Electric Delivery, its wholly owned bankruptcy-remote financing subsidiary and certain revenues and costs associated with broadband-over-powerlines equipment installation. (See Note 14 for further information concerning reportable business segments.)

*Basis of Presentation*—The condensed consolidated financial statements of Energy Future Holdings Corp. have been prepared in accordance with US GAAP and on the same basis as the audited financial statements included in its 2006 Form 10-K with the exception of the adoption of FIN 48. All adjustments (consisting of normal recurring accruals) necessary for a fair presentation of the results of operations and financial position have been included therein. All intercompany items and transactions have been eliminated in consolidation. Certain information and footnote disclosures normally included in annual consolidated financial statements prepared in accordance with US GAAP have been omitted pursuant to the rules and regulations of the SEC. Because the condensed consolidated interim financial statements do not include all of the information and footnotes required by US GAAP, they should be read in conjunction with the audited financial statements and related notes included in the 2006 Form 10-K. The results of operations for an interim period may not give a true indication of results for a full year. All dollar amounts in the financial statements and tables in the notes are stated in millions of US dollars unless otherwise indicated.

Prior period commodity contract assets and liabilities and cash flow hedge and other derivative assets and liabilities have been combined to conform with the current period presentation (see Note 12).

*Discontinued Businesses*—Income from discontinued operations in the six months ended June 30, 2007 consisted primarily of insurance settlements related to TXU Europe litigation. Income from discontinued operations in the six months ended June 30, 2006 consisted primarily of a reversal of a TXU Gas income tax reserve due to a favorable resolution of an IRS audit matter. The TXU Gas business was disposed of in October 2004.

*Use of Estimates*—Preparation of Energy Future Holdings Corp.'s financial statements requires management to make estimates and assumptions about future events that affect the reporting of assets and liabilities at the balance sheet dates and the reported amounts of revenue and expense, including mark-to-market valuations. In the event estimates and/or assumptions prove to be different from actual amounts, adjustments are

F-8