*TXU Australia*—In July 2004, Energy Future Holdings Corp. completed the sale of TXU Australia to Singapore Power Ltd. for $1.9 billion in cash and $1.7 billion of assumed debt. TXU Australia's operations consisted of a portfolio of competitive and regulated energy businesses, principally in Victoria and South Australia. The $10 million credit recorded in 2005 primarily represented an adjustment to the estimated income tax effect of the sale.

*Strategic Retail Services*—In December 2003, Texas Competitive Holdings finalized a formal plan to sell its strategic retail services business, which was engaged principally in providing energy management services. Results in 2004 include a $6 million after-tax charge to settle a contract dispute related to the business. Results in 2005 reflect an after-tax charge of $2 million related to a litigation settlement.

*Pedricktown*—In the second quarter of 2004, Texas Competitive Holdings initiated a plan to sell the Pedricktown, New Jersey 122 MW electricity generation business and exit the related power supply and gas transportation agreements resulting in a $17 million after-tax impairment charge in 2004. The business was sold in July 2005 for $8.7 million in cash. A $4 million after-tax charge in 2005 represents a working capital adjustment related to the sale transaction.

*Mexico*—In January 2004, Energy Future Holdings Corp. completed the sale of its majority-owned gas distribution operations in Mexico for $11 million in notes receivable which were settled for cash in January 2006.

*TXU Europe*—In January 2005, Energy Future Holdings Corp. executed a comprehensive settlement agreement resolving potential claims relating to TXU Europe. Results from discontinued operations in 2004 include an after-tax charge of $143 million for the expected payment under the terms of the agreement. The $222 million settlement was paid in full in October 2005. As discussed above, credits representing insurance recoveries related to the settlement were recorded in 2006.

*Telecommunications*—In April 2004, Energy Future Holdings Corp. sold its telecommunications business for $524 million in cash and $3 million of assumed debt. The business was formerly a joint venture and was consolidated from March 1, 2003 through the sale date.

*Income tax benefits*—Discontinued operations results in 2004 also reflected the recognition of $680 million in tax benefits associated with the 2002 write-off of the investment in TXU Europe. The tax benefit was based on a preliminary notice received from the IRS in June 2004 and primarily reflected the utilization of the worthlessness deduction against capital gains arising from the dispositions of TXU Australia, TXU Gas and the communications business as well as transactions completed in prior years. Also see Notes 11 and 16 for a discussion of TXU Europe income tax matters.

## 4. EXTRAORDINARY ITEMS

*Purchase of Lease Trust Interest*—In December 2005 a subsidiary of Energy Future Holdings Corp. entered into an agreement to purchase, for $69 million in cash, the owner participant interest in a trust established to lease combustion turbines to another subsidiary of Energy Future Holdings Corp. The trust is a variable interest entity, and in accordance with FIN 46R, the trust was consolidated at December 31, 2005, with the trust's combustion turbine assets and related debt recorded at estimated fair values of $35 million and $96 million, respectively. The transaction was closed in March 2006. In the fourth quarter of 2005, Energy Future Holdings Corp. recorded an extraordinary loss of $50 million (net of a $28 million tax benefit) for the excess of the purchase price over the fair value of the trust's net assets, net of the reversal of a previously established liability of $59 million related to the combustion turbine lease. Classification of the loss as extraordinary is in accordance with the provisions of FIN 46R.

*Securitization (Transition) Bonds*—A regulatory financing order finalized in January 2003 authorized the issuance of transition bonds with a principal amount of $1.3 billion to recover regulatory asset stranded costs and

F-68

other qualified costs. A bankruptcy-remote financing subsidiary of Oncor Electric Delivery issued $500 million principal amount of transition bonds in August 2003 and the remaining $790 million in June 2004. An extraordinary gain of $16 million (net of tax of $9 million) recorded in the second quarter of 2004 represents an increase in the carrying value of the regulatory asset subject to securitization. The increase in the related regulatory asset is due to the effect of higher interest rates than previously estimated on the bonds and therefore increased amounts to be recovered from REPs through revenues as a transition charge to service the principal and interest of the bonds. Classification of the gain as extraordinary is reflective of the regulatory financing order having arisen from legislation to transition the Texas electricity market to competition.

## 5. CUMULATIVE EFFECT OF CHANGES IN ACCOUNTING PRINCIPLES

FIN 47 was effective with reporting for the fourth quarter of 2005. This interpretation clarifies the term "conditional asset retirement" under SFAS 143 and requires entities to record the fair value of legally binding asset retirement obligations, the timing or method of settlement of which is conditional on a future event. For Energy Future Holdings Corp., such liability relates to generation assets asbestos removal and disposal costs. As the new accounting rule required retrospective application to the inception of the liability, the effects of the adoption reflect the accretion and depreciation from the liability inception date through December 31, 2005. The liability is accreted each period, representing the time value of money, and the capitalized cost is depreciated over the remaining useful life of the related asset.

The following table details the $8 million net charge in December 2005 arising from the adoption of FIN 47:

| | |
|---|---:|
| Increase in property, plant and equipment—net | $ 5 |
| Increase in other noncurrent liabilities and deferred credits | (17) |
| Increase in accumulated deferred income taxes | 4 |
| Cumulative effect of change in accounting principle | $ (8) |

SFAS 123R, which addresses accounting for stock-based compensation costs, was issued in December 2004. Energy Future Holdings Corp. early adopted SFAS 123R effective October 1, 2004 and recorded a cumulative effect of change in accounting principle of $10 million after-tax (representing a net credit). See Note 22 for additional information.

## 6. IMPAIRMENT OF NATURAL GAS-FUELED GENERATION PLANTS

In the second quarter of 2006, Energy Future Holdings Corp. performed an evaluation of its natural gas-fueled generation plants for impairment in accordance with the requirements of SFAS 144, which provides that long-lived assets should be tested for recovery whenever events or changes in circumstances indicate that the carrying amount may not be recoverable. In consideration of the new lignite/coal-fueled generation plant development program, among other factors, Energy Future Holdings Corp. determined that it was more likely than not that its gas-fueled generation plants, which have generally been operated to meet peak demands for electricity, would be sold or otherwise disposed of before the end of their previously estimated useful lives and should be tested for impairment as an asset group. As a result, it was determined that an impairment existed, and a charge of $198 million ($129 million after-tax) was recorded in the second quarter of 2006 to write down the assets to fair value, which was determined based on discounted estimated future cash flows. Future cash flow expectations are subject to considerable estimation, including forecasts of future natural gas prices and market heat rates. Further, the form and timing of usage and ultimate disposition of the plants is uncertain. Because of the highly judgmental nature of key assumptions and potential volatility of market conditions, the adjusted carrying value of the plants does not necessarily represent the amount of proceeds from any transaction to sell the plants and future additional impairment is possible. The impairment was reported in other deductions in the Statements of Consolidated Income and included in the results of the Competitive Electric segment.

F-69

Confidential

## 7. CUSTOMER APPRECIATION BONUS

In the fourth quarter of 2006, Energy Future Holdings Corp. announced a special customer appreciation bonus program. Under the program, a $100 bonus will be provided to residential customers receiving service as of October 29, 2006 and living in areas where Energy Future Holdings Corp. offered its price-to-beat rate, which expired January 1, 2007 in accordance with the Texas deregulation provisions. Eligible customers are not required to continue to receive service from Energy Future Holdings Corp. to receive the bonus. The bonus is expected to be paid out in the form of credits on customer bills, with approximately $40 million paid out in the fourth quarter of 2006 and the balance expected to be fully settled in 2007. The bonus program resulted in a pretax charge of $162 million ($105 million after-tax) in the fourth quarter of 2006. The charge was recorded as a reduction to revenue in the Competitive Electric segment.

## 8. RESTRUCTURING ACTIONS IN 2004

During 2004, senior management reviewed Energy Future Holdings Corp.'s operations and implemented a restructuring plan to restore financial strength, drive performance improvement with a competitive industrial company perspective and allocate capital in a disciplined and efficient manner.

The restructuring actions included dispositions of businesses, repurchases of debt and other securities, rationalization of generation assets, termination of uneconomic contractual arrangements, headcount reductions, outsourcing of support activities and resolution of litigation, income tax and other contingencies.

The restructuring activities resulted in unusual charges and credits impacting 2004 income from continuing operations, summarized as follows and discussed below in more detail:

| | Income Statement Classification | Charge/(Credit) to Earnings | |
| --- | --- | --- | --- |
| | | Pretax | After-tax |
| **Competitive Electric segment:** | | | |
| Charges related to leased equipment | Other deductions | $   180 | $117 |
| Software write-off | Other deductions | 107 | 70 |
| Employee severance costs | Other deductions | 107 | 69 |
| Power purchase contract termination charge | Other deductions | 101 | 66 |
| Spare parts inventory write-down | Other deductions | 79 | 51 |
| Outsourcing transition costs | Other deductions | 10 | 6 |
| Other asset impairments | Other deductions | 6 | 4 |
| Other charges | Operating costs/SG&A | 8 | 6 |
| Recognition of deferred gain on plant sales | Other income | (58) | (38) |
| Gain on sale of undeveloped properties | Other income | (19) | (12) |
| **Regulated Delivery segment:** | | | |
| Employee severance costs | Other deductions | 20 | 13 |
| Cities rate settlement charge | Other deductions | 21 | 14 |
| Outsourcing transition costs | Other deductions | 4 | 3 |
| Software write-off and asset impairment | Other deductions | 4 | 2 |
| Other charges | Operating costs/SG&A | 2 | 1 |
| **Corporate and other:** | | | |
| Debt extinguishment losses | Other deductions | 416 | 382 |
| Litigation accrual | Other deductions | 86 | 56 |
| Executive compensation | SG&A | 52 | 52 |
| Consulting and professional fees | SG&A | 54 | 35 |
| Employee severance costs | Other deductions | 5 | 3 |
| Transaction related fees | Other deductions | 5 | 3 |
| Recognition of income tax benefit | Income taxes | — | (75) |
| Total | | $1,190 | $828 |

F-70

Confidential

EFIHMW00208494

In addition, income from discontinued operations in 2004 included recognition of $680 million in tax benefits related to the write-off of the investment in TXU Europe, a net charge of $193 million after-tax on the disposition of TXU Gas, a net charge of $143 million after-tax related to the settlement of potential claims related to TXU Europe, a net credit of $129 million after-tax related to the sale of TXU Australia and a net charge of $17 million after-tax related to the disposition of the Pedricktown, New Jersey generation business. See Note 3 for a discussion of these items.

Following is a discussion of major actions associated with the restructuring plan affecting income from continuing operations:

*Sale of TXU Fuel*—In June 2004, Energy Future Holdings Corp. completed the sale of the assets of TXU Fuel, the former intrastate gas transportation subsidiary of Texas Competitive Holdings, for $500 million in cash. As part of the transaction, Texas Competitive Holdings entered into a transportation agreement with the new owner, intended to be market-price based, to transport natural gas to Texas Competitive Holdings' generation plants. Because of the continuing involvement in the business through the transportation agreement, the pretax gain related to the sale of $375 million is being recognized over the eight-year life of the transportation agreement, and the business was not accounted for as a discontinued operation. The sale of TXU Fuel assets resulted in a capital gain and allowed for recognition of a $75 million income tax benefit for utilization of a portion of the capital loss deduction arising from the write-off of the investment in TXU Europe.

*Capgemini Outsourcing Agreement*—In May 2004, Energy Future Holdings Corp. entered into a services agreement with Capgemini Energy LP (Capgemini). Under the ten-year agreement, over 2,500 employees transferred from subsidiaries of Energy Future Holdings Corp. to Capgemini effective July 1, 2004. Outsourced base support services performed by Capgemini for a fixed fee, subject to adjustment for volumes or other factors, include information technology, customer call center, billing, human resources, supply chain and certain accounting activities.

Energy Future Holdings Corp. agreed to indemnify Capgemini for severance costs incurred by Capgemini for former Energy Future Holdings Corp. employees terminated within 21 months of their transfer to Capgemini. Accordingly, Energy Future Holdings Corp. recorded a $40 million ($26 million after-tax) charge for severance expense in the second quarter of 2004. (See Note 25 for further details regarding severance liabilities.) In addition, Energy Future Holdings Corp. committed to pay up to $25 million for costs associated with transitioning the outsourced activities to Capgemini. Transition expenses of $14 million ($9 million after-tax) were recorded by Energy Future Holdings Corp. during 2004, and the remainder was expensed as incurred in 2005.

As part of the agreement, Capgemini was provided a royalty-free right, under an asset license arrangement, to use Energy Future Holdings Corp.'s information technology assets, consisting primarily of computer software. A portion of the software was in development and had not yet been placed in service. As a result of outsourcing its information technology activities, Energy Future Holdings Corp. no longer intended to develop the majority of these projects and from Energy Future Holdings Corp.'s perspective the software was abandoned. The agreements with Capgemini do not require that any software in development be completed and placed in service. Consequently, the carrying value of these software projects was written off, resulting in a charge of $109 million ($71 million after-tax).

Energy Future Holdings Corp. obtained a 2.9% limited partnership interest in Capgemini in exchange for the asset license described immediately above. See Note 20 for additional discussion of Energy Future Holdings Corp.'s investment in Capgemini and related terms of the agreement.

*Actions Related to Generation Operations*—In December 2004, Energy Future Holdings Corp. executed an agreement to terminate, for a payment of $172 million, a power purchase and tolling agreement expiring in 2006. The agreement had been entered into in connection with the sale of two generation plants to the counterparty in

Confidential

EFIHMW00208495

2001. As a result of the transaction, Energy Future Holdings Corp. recorded a charge of $101 million ($66 million after-tax). The charge represents the payment amount less the remaining out-of-the-money liability related to the agreement originally recorded at its inception. Energy Future Holdings Corp. also recorded a gain of $58 million ($38 million after-tax), representing the remaining deferred gain from the sale of the two plants.

Also in December 2004, Energy Future Holdings Corp. committed to immediately cease operating for its own benefit nine leased gas-fueled combustion turbines, and recorded a charge of $157 million ($102 million after-tax). The charge represented the present value of the future lease payments related to the turbines, net of estimated sublease proceeds. A $16 million credit was recorded in 2005 to adjust the liability recorded in 2004 for changes in estimated sublease proceeds.

Effective November 1, 2004, Energy Future Holdings Corp. entered into an agreement to terminate the operating lease for certain mining equipment for approximately $28 million in cash. The lease termination resulted in a charge of $21 million ($14 million after-tax).

As part of a review of its generation asset portfolio in the second quarter of 2004, Energy Future Holdings Corp. completed a review of its spare parts and equipment inventory to determine the appropriate level of such inventory. As a result of this review, Energy Future Holdings Corp. recorded a charge of $79 million ($51 million after-tax), to reflect excess inventory on hand and to write down carrying values to scrap values.

Energy Future Holdings Corp. recorded charges totaling $15 million ($10 million after-tax) in 2004 for employee severance costs and impairments ($1 million pretax) arising from a decision to take a number of gas-fueled generation units out of service.

*Organization Realignment and Headcount Reductions*—During 2004, management completed a comprehensive organizational review, including an analysis of staffing requirements. As a result, Energy Future Holdings Corp. completed a self-nomination severance program and certain involuntary severance actions and recorded severance charges totaling $77 million ($49 million after-tax).

*Liability and Capital Management*—Energy Future Holdings Corp. utilized cash proceeds from the sale of TXU Australia, TXU Gas and TXU Fuel and other assets sales as well as cash provided from operations and lower-cost debt issuances in 2004 to increase value and reduce risks through an ongoing liability management initiative. Largely under this initiative, in 2004 Energy Future Holdings Corp. repurchased or legally defeased $3.6 billion of debt securities (including equity-linked debt securities and debt held by subsidiary trusts). Debt extinguishment losses in 2004 totaled $416 million ($382 million after-tax). See Note 17 for a discussion of the repurchase of preferred membership interests.

*Cities Rate Settlement*—In the fourth quarter of 2004, Energy Future Holdings Corp. recorded a $21 million ($14 million after-tax) charge for estimated payments under a settlement, which was finalized in February 2005, with a number of municipalities initiating an inquiry regarding distribution rates charged by Oncor Electric Delivery.

*Litigation*—In the fourth quarter of 2004, management assessed the progress and status of matters in litigation, and in anticipation of resolution, recorded a charge of $86 million ($56 million after-tax) net of estimated insurance recoveries. This net charge relates almost entirely to the shareholders' litigation settlement initially filed in October 2002. Energy Future Holdings Corp. reached a comprehensive settlement of the lawsuit in January 2005. The agreement included a one-time payment to the class members of $150 million, of which insurance carriers reimbursed Energy Future Holdings Corp. $101 million in 2005 and $15 million in 2006.

## 9. CITIES RATE SETTLEMENT IN 2006

In January 2006, Oncor Electric Delivery agreed with a steering committee representing 108 cities in Texas (Cities) to defer the filing of a system-wide rate case with the Commission to no later than June 30, 2008 (based

F-72

Confidential

EFIHMW00208496

on a test year ending December 31, 2007), unless the Cities and Oncor Electric Delivery mutually agree that such a filing is unnecessary. Oncor Electric Delivery has extended the benefits of the agreement to 292 nonlitigant cities. Based on the final agreements, including the participation of the nonlitigant cities, payments to the cities are estimated to total approximately $70 million, including incremental franchise taxes.

This amount is being recognized in earnings of the Regulated Delivery segment over the period from May 2006 through June 2008. Amounts recognized in 2006 totaled $18 million and have been reported in the other deductions (see Note 12) and franchise and revenue-based taxes in the Statements of Consolidated Income.

## 10. TEXAS MARGIN TAX

In May 2006, the Texas Legislature enacted reforms of the Texas franchise tax system and replaced it with a new tax system, referred to as the Texas margin tax. The Texas margin tax is a significant change in Texas tax law because it generally makes all legal entities subject to tax, including general and limited partnerships, while the current franchise tax system applies only to corporations and limited liability companies. Energy Future Holdings Corp. conducts significant operations through Texas limited partnerships that will become subject to the new Texas margin tax. The effective date of the Texas margin tax, which has been interpreted to be an income tax for accounting purposes, is January 1, 2008 for calendar year-end companies, and the computation of tax liability is expected to be based on 2007 revenues as reduced by certain deductions.

In accordance with the provisions of SFAS 109, which require that deferred tax assets and liabilities be adjusted for the effects of new income tax legislation in the period of enactment, Energy Future Holdings Corp. estimated and recorded a net charge to deferred tax expense of $41 million in the second quarter of 2006. An additional adjustment of $3 million was recorded in the fourth quarter of 2006. Essentially all of the effect of the Texas margin tax was reported in the Competitive Electric segment. The total estimate recorded in 2006 was based on the Texas margin tax law in its current form and the guidance issued by the Texas Comptroller of Public Accounts (Comptroller). Energy Future Holdings Corp. expects the law to be amended in the 2007 Texas legislative session and for the Comptroller to issue further guidance.

## 11. INCOME TAXES

The components of Energy Future Holdings Corp.'s income tax expense applicable to continuing operations are as follows:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2006 | 2005 | 2004 |
| Current: | | | |
| US Federal | $ 500 | $145 | $ 25 |
| State | 5 | 6 | 26 |
| Non-US | 1 | — | 2 |
| Total | 506 | 151 | 53 |
| Deferred: | | | |
| US Federal | 715 | 498 | 31 |
| State | 63 | 4 | (19) |
| Total | 778 | 502 | 12 |
| Amortization of investment tax credits | (21) | (21) | (23) |
| Total | $1,263 | $632 | $ 42 |

F-73

Confidential

EFIHMW00208497

Reconciliation of income taxes computed at the US federal statutory rate to income tax expense:

| | Year Ended December 31, | | |
|---|---:|---:|---:|
| | 2006 | 2005 | 2004 |
| Income from continuing operations before income taxes, extraordinary gain (loss) and cumulative effect of changes in accounting principles: | | | |
| Domestic | $3,728 | $2,408 | $ 123 |
| Non-US | — | (1) | — |
| Total | $3,728 | $2,407 | $ 123 |
| Income taxes at the US federal statutory rate of 35% | $1,305 | $ 842 | $ 43 |
| Losses on extinguishment of debt | — | — | 107 |
| Lignite depletion allowance | (51) | (33) | (25) |
| Production activities deduction | (14) | — | — |
| Recognition of benefits related to TXU Europe | — | (138) | (75) |
| Amortization of investment tax credits—net of deferred income tax effect | (15) | (15) | (17) |
| Amortization (under regulatory accounting) of statutory rate changes | (7) | (7) | (8) |
| Medicare subsidy—other postretirement employee benefits | (8) | (9) | (11) |
| Nondeductible compensation expense | — | (5) | 18 |
| State income taxes, net of federal tax benefit | 6 | 7 | 5 |
| Texas margin tax | 44 | — | — |
| Other, including audit settlements | 3 | (10) | 5 |
| Income tax expense | $1,263 | $ 632 | $ 42 |
| Effective tax rate | 33.9% | 26.3% | 34.1% |

***TXU Europe***—In the first quarter of 2005, Energy Future Holdings Corp. recognized a $138 million tax benefit related to the 2002 TXU Europe worthlessness deduction. The recognition of the tax benefit was based on the identification of tax planning strategies Energy Future Holdings Corp. would implement to ensure utilization of capital losses associated with the write-off of the investment in TXU Europe. Classification of this benefit in continuing operations is in accordance with SFAS 109.

In 2004, Energy Future Holdings Corp. recognized tax benefits related to TXU Europe totaling $755 million, of which $680 million was classified as discontinued operations. The recognition of benefits was based on a preliminary notice of proposed adjustment issued by the IRS in June 2004. The notice proposes, among other things, that the worthlessness deduction for the write-off of the investment in TXU Europe claimed on the 2002 tax return as an ordinary loss be instead treated as a capital loss (deductible only against capital gains). Energy Future Holdings Corp. had previously not recognized in net income any benefit related to the TXU Europe write-off due to a number of uncertainties regarding the income tax effects.

The benefit recognized includes the effect of the expected utilization of the TXU Europe worthlessness deduction against the capital gains arising from the dispositions of TXU Australia, TXU Gas, TXU Fuel and other 2004 and prior year transactions.

Benefits arising from the resolution of uncertainty regarding utilization of deductions in the year the TXU Europe investment was written-off or in a prior year have been reported in discontinued operations. Additional such benefits arising from subsequent sales of businesses classified as discontinued operations have also been reported in discontinued operations. The $75 million of tax benefit recognized in 2004 continuing operations relates to the capital gain arising from the sale of TXU Fuel, the operations of which have been classified as continuing operations.

F-74

Confidential

EFIHMW00208498

*Deferred Income Tax Balances*—Deferred income taxes provided for temporary differences based on tax laws in effect at December 31, 2006 and 2005, balance sheet dates are as follows:

| | December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | **2006** | | | **2005** | | |
| | **Total** | **Current** | **Noncurrent** | **Total** | **Current** | **Noncurrent** |
| **Deferred Income Tax Assets** | | | | | | |
| Net operating loss (NOL) carryforwards .... | $ 12 | $ — | $ 12 | $ 666 | $ 666 | $ — |
| Alternative minimum tax credit carryforwards ......................... | 768 | 209 | 559 | 651 | — | 651 |
| Employee benefit liabilities .............. | 496 | 7 | 489 | 410 | 15 | 395 |
| Unamortized investment tax credits ........ | 137 | — | 137 | 145 | — | 145 |
| Capital loss carryforward ................ | 31 | 31 | — | 138 | — | 138 |
| Deferred gain on sale of assets ........... | 121 | — | 121 | 136 | — | 136 |
| Other ................................... | 242 | 12 | 230 | 356 | 43 | 313 |
| Total ......................... | 1,807 | 259 | 1,548 | 2,502 | 724 | 1,778 |
| **Deferred Income Tax Liabilities** | | | | | | |
| Book/tax depreciation differences ......... | 3,523 | — | 3,523 | 3,400 | — | 3,400 |
| Mark-to-market net deductions ............ | 966 | 4 | 962 | 761 | 4 | 757 |
| Deductions related to TXU Europe ........ | 465 | — | 465 | 592 | — | 592 |
| Effects of amounts recorded as regulatory assets ................................ | 484 | — | 484 | 538 | — | 538 |
| Other .................................. | 354 | 2 | 352 | 191 | 3 | 188 |
| Total ......................... | 5,792 | 6 | 5,786 | 5,482 | 7 | 5,475 |
| **Net Deferred Income Tax (Asset) Liability** ......................... | $3,985 | $(253) | $4,238 | $2,980 | $(717) | $3,697 |

At December 31, 2006, Energy Future Holdings Corp. had $768 million of alternative minimum tax credit carryforwards (AMT) available to offset future tax payments. The AMT credit carryforwards have no expiration date. At December 31, 2006, Energy Future Holdings Corp. had net operating loss (NOL) carryforwards for federal income tax purposes of $12 million that expire between 2022 and 2026. The NOL carryforwards can be used to offset future taxable income. Energy Future Holdings Corp. fully expects to utilize all of its NOL carryforwards prior to their expiration dates.

The income tax effects of the components included in accumulated other comprehensive income for the year ended December 31, 2006 total a net deferred tax liability of $321 million.

See Note 16 under "Income Tax Contingencies" for discussion of tax matters related to TXU Europe and the status of IRS audits.

See Note 1 for discussion regarding the implementation of FIN 48, which addresses accounting for uncertain tax positions.

Confidential

EFIHMW00208499

## 12. OTHER INCOME AND DEDUCTIONS

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2006 | 2005 | 2004 |
| Other income: | | | |
| Gain on contract settlement[a] | $ 26 | $ — | $ — |
| Amortization of gain on sale of TXU Fuel (Note 8) | 47 | 47 | 27 |
| Net gain on sale of other properties and investments[b] | 22 | 42 | 107 |
| Insurance recovery of litigation settlement[c] | 15 | 35 | — |
| Insurance recoveries related to generation assets | 2 | 8 | — |
| Electricity sale agreement termination fee | — | 4 | — |
| Equity portion of allowance for funds used during construction | — | 3 | 4 |
| Other | 9 | 12 | 10 |
| Total other income | $121 | $151 | $ 148 |
| Other deductions: | | | |
| Charge for impairment of natural gas-fueled generation plants (Note 6) | $198 | $ — | $ — |
| Asset writedown and generation-related lease termination charges (credit) (see Note 8 for 2005 and 2004 items) | 4 | (16) | 376 |
| Equity losses of an unconsolidated affiliate engaged in broadband-over-powerline activities | 14 | — | — |
| Debt extinguishment losses (See Note 8 regarding 2004 charges) | 1 | — | 416 |
| Litigation settlements (See Note 8 regarding 2004 charges) | 9 | 7 | 86 |
| Employee severance charges (See Note 8 regarding 2004 charges) | — | 1 | 132 |
| Termination of electricity purchase contract (See Note 8 regarding 2004 charges) | — | — | 101 |
| Costs related to cities rate settlements (Notes 8 and 9) | 13 | 1 | 21 |
| Capgemini outsourcing transition costs (Note 8 regarding 2004 charges) | — | 11 | 14 |
| Restructuring transaction-related fees | — | — | 5 |
| Expenses related to canceled construction projects | — | — | 6 |
| Transition costs related to InfrastruX Energy Services joint venture | 7 | — | — |
| Employee retirement benefit costs related to discontinued business | 23 | 15 | — |
| Charge (credit) related to coal contract counterparty claim[d] | (12) | 12 | — |
| Other | 12 | 14 | 15 |
| Total other deductions | $269 | $ 45 | $1,172 |

---

(a)  Represents a gain recorded in the second quarter of 2006 upon the settlement of a contract dispute related to antenna site rentals by a telecommunications company (reported in Corporate and Other nonsegment operations).

(b)  Includes gains on land sales of $12 million in 2006, $33 million in 2005 and $19 million in 2004. (All reported in the Competitive Electric segment except $1 million in 2006 reported in the Regulated Delivery segment.) The 2006 period also includes a $10 million gain related to the sale of mineral interests (reported in Corporate and Other nonsegment operations). The 2005 period also includes a $7 million gain on the sale of an out-of-state electricity transmission project (reported in the Competitive Electric segment). The 2004 period also includes $30 million in amortization of a deferred gain related to the sale of generation plants in 2002. The remaining $58 million in 2004 represents the recognition of the remaining previously deferred gain (reported in the Competitive Electric segment). See Note 8.

(c)  Represents additional insurance recoveries recorded in the third quarter of 2006 and second quarter of 2005 related to the 2005 settlement of the shareholders' litigation (reported in Corporate and Other nonsegment operations).

F-76

Confidential

EFIHMW00208500

PX 008
Page 379 of 501

(d) In the first quarter of 2006, Energy Future Holdings Corp. recorded a credit of $12 million upon settlement of a claim against a counterparty for nonperformance under a coal contract. A charge in the same amount was recorded in the first quarter of 2005 for losses due to the nonperformance (reported in the Competitive Electric segment).

## 13. TRADE ACCOUNTS RECEIVABLE AND SALE OF RECEIVABLES PROGRAM

*Sale of Receivables*—Subsidiaries of Energy Future Holdings Corp. participate in an accounts receivable securitization program, the activity under which is accounted for as a sale of accounts receivable in accordance with SFAS 140. Under the program, subsidiaries of Energy Future Holdings Corp. (originators) sell trade accounts receivable to TXU Receivables Company, a consolidated wholly-owned bankruptcy-remote direct subsidiary of Energy Future Holdings Corp., which sells undivided interests in the purchased accounts receivable for cash to special purpose entities established by financial institutions (the funding entities). The current program is subject to renewal in June 2008.

The maximum amount currently available under the program is $700 million, and the program funding was $627 million as of December 31, 2006. Under certain circumstances, the amount of customer deposits held by the originators can reduce the amount of undivided interests that can be sold, thus reducing funding available under the program. Funding availability for all originators is reduced by 100% of the originators' customer deposits if Texas Competitive Holdings' fixed charge coverage ratio is less than 2.5 times; 50% if Texas Competitive Holdings' coverage ratio is less than 3.25 times, but at least 2.5 times; and zero % if Texas Competitive Holdings' coverage ratio is 3.25 times or more. The originators' customer deposits, which totaled $116 million, did not affect funding availability at that date as Texas Competitive Holdings' coverage ratio was in excess of 3.25 times.

All new trade receivables under the program generated by the originators are continuously purchased by TXU Receivables Company with the proceeds from collections of receivables previously purchased. Changes in the amount of funding under the program, through changes in the amount of undivided interests sold by TXU Receivables Company, reflect seasonal variations in the level of accounts receivable, changes in collection trends as well as other factors such as changes in sales prices and volumes. TXU Receivables Company has issued subordinated notes payable to the originators for the difference between the face amount of the uncollected accounts receivable purchased, less a discount, and cash paid to the originators that was funded by the sale of the undivided interests. The balance of the subordinated notes payable, which is eliminated in consolidation, totaled $211 million and $201 million at December 31, 2006 and 2005, respectively.

The discount from face amount on the purchase of receivables principally funds program fees paid by TXU Receivables Company to the funding entities. The discount also funds a servicing fee paid by TXU Receivables Company to TXU Business Services Company, a direct subsidiary of Energy Future Holdings Corp. The program fees, also referred to as losses on sale of the receivables under SFAS 140, consist primarily of interest costs on the underlying financing and totaled $40 million, $23 million and $12 million in 2006, 2005 and 2004, respectively, and averaged 5.8%, 4.0% and 2.1% (on an annualized basis) of the funding under the program in 2006, 2005 and 2004, respectively. The servicing fee, which totaled approximately $4 million in both 2006 and 2005 and $7 million in 2004, compensates TXU Business Services Company for its services as collection agent, including maintaining the detailed accounts receivable collection records. The program fees represent essentially all the net incremental costs of the program on a consolidated basis and are reported in SG&A expenses.

The accounts receivable balance reported in the December 31, 2006 consolidated balance sheet includes $838 million face amount of trade accounts receivable of Texas Competitive Holdings and Oncor Electric Delivery sold to TXU Receivables Company, such amount having been reduced by $627 million of undivided interests sold by TXU Receivables Company. Funding under the program related to continuing operations decreased $44 million in 2006, increased $197 million in 2005 and decreased $73 million in 2004. Funding increases or decreases under the program are reflected as operating cash flow activity in the statement of cash

Confidential

EFIHMW00208501

flows. The carrying amount of the retained interests in the accounts receivable balance approximated fair value due to the short-term nature of the collection period.

Activities of TXU Receivables Company were as follows:

| | Year Ended December 31, | | |
| | 2006 | 2005 | 2004 |
|---|---|---|---|
| Cash collections on accounts receivable | $ 8,503 | $ 7,450 | $ 8,449 |
| Face amount of new receivables purchased | (8,469) | (7,511) | (8,149) |
| Discount from face amount of purchased receivables | 44 | 27 | 19 |
| Program fees paid | (40) | (23) | (12) |
| Servicing fees paid | (4) | (4) | (7) |
| Increase in subordinated notes payable | 10 | (136) | (174) |
| Operating cash flows used by (provided to) Energy Future Holdings Corp. under the program | $ 44 | $ (197) | $ 126 |
| Cash flow related to disposed TXU Gas business | — | — | (53) |
| Cash flows used by (provided to) continuing operations | $ 44 | $ (197) | $ 73 |

Upon termination of the program, cash flows would be delayed as collections of sold receivables would be used by TXU Receivables Company to repurchase the undivided interests from the funding entities instead of purchasing new receivables. The level of cash flows would normalize in approximately 16 to 30 days.

***Contingencies Related to Sale of Receivables Program***—Although TXU Receivables Company expects to be able to pay its subordinated notes from the collections of purchased receivables, these notes are subordinated to the undivided interests of the financial institutions in those receivables, and collections might not be sufficient to pay the subordinated notes. The program may be terminated if either of the following events occurs:

1) all of the originators cease to maintain their required fixed charge coverage ratio and debt to capital (leverage) ratio; or

2) the delinquency ratio (delinquent for 31 days) for the sold receivables, the default ratio (delinquent for 91 days or deemed uncollectible), the dilution ratio (reductions for discounts, disputes and other allowances) or the days collection outstanding ratio exceed stated thresholds and the financial institutions do not waive such event of termination. The thresholds apply to the entire portfolio of sold receivables, not separately to the receivables of each originator.

***Trade Accounts Receivable***—

| | December 31, | |
| | 2006 | 2005 |
|---|---|---|
| Gross trade accounts receivable | $1,599 | $2,035 |
| Undivided interests in accounts receivable sold by TXU Receivables Company | (627) | (671) |
| Allowance for uncollectible accounts related to undivided interests in receivables retained | (13) | (36) |
| Trade accounts receivable—reported in balance sheet | $ 959 | $1,328 |

Gross trade accounts receivable at December 31, 2006 and 2005 included unbilled revenues of $466 million and $494 million, respectively.

F-78

Confidential

EFIHMW00208502

*Allowance for Uncollectible Accounts Receivable—*

|  | 2006 | 2005 | 2004 |
|---|---|---|---|
| Allowance for uncollectible accounts receivable as of January 1 | $ 36 | $ 16 | $ 54 |
| Increase for bad debt expense | 68 | 56 | 90 |
| Decrease for account write-offs | (80) | (68) | (121) |
| Changes related to receivables sold | 4 | 17 | (7) |
| Other[a] | (15) | 15 | — |
| Allowance for uncollectible accounts receivable as of December 31 | $ 13 | $ 36 | $ 16 |

_____

(a) Reflects an allowance established in 2005 for a coal contract dispute that was reversed upon settlement in 2006. See Note 12.

Allowances related to undivided interests in receivables sold are reported in current liabilities and totaled $26 million and $30 million at December 31, 2006 and December 31, 2005, respectively.

## 14. SHORT-TERM FINANCING

*Short-term Borrowings*—At December 31, 2006 and 2005, the outstanding short-term borrowings of Energy Future Holdings Corp. and its subsidiaries consisted of the following:

|  | At December 31, 2006 | | At December 31, 2005 | |
|---|---|---|---|---|
|  | Outstanding Amount | Interest Rate[a] | Outstanding Amount | Interest Rate[a] |
| Commercial paper | $1,296 | 5.53% | $358 | 4.49% |
| Bank borrowings | 195 | 5.97% | 440 | 4.86% |
| Total | $1,491 | | $798 | |

_____

(a) Weighted average interest rate at the end of the period.

Under the commercial paper programs, Texas Competitive Holdings and Oncor Electric Delivery may issue up to $2.4 billion and $1.0 billion, respectively, of these securities. These programs are supported by existing credit facilities.

*Credit Facilities*—At December 31, 2006, subsidiaries of Energy Future Holdings Corp. had access to credit facilities with the following terms:

|  |  | At December 31, 2006 | | | |
|---|---|---|---|---|---|
| Authorized Borrowers | Maturity Date | Facility Limit | Letters of Credit | Cash Borrowings | Availability |
| Texas Competitive Holdings | May 2007 | $1,500 | $ — | $ — | $1,500 |
| Texas Competitive Holdings, Oncor Electric Delivery | June 2008 | 1,400 | 489 | — | 911 |
| Texas Competitive Holdings, Oncor Electric Delivery | August 2008 | 1,000 | — | 150 | 850 |
| Texas Competitive Holdings, Oncor Electric Delivery | March 2010 | 1,600 | 3 | — | 1,597 |
| Texas Competitive Holdings, Oncor Electric Delivery | June 2010 | 500 | — | — | 500 |
| Texas Competitive Holdings | December 2009 | 500 | 455 | 45 | — |
| Total | | $6,500 | $947 | $195 | $5,358 |

Confidential

EFIHMW00208503

The $1.5 billion facility in the above table with a May 2007 maturity date was entered into by Texas Competitive Holdings in May 2006 on terms comparable to its existing facilities.

The maximum amount Texas Competitive Holdings and Oncor Electric Delivery can directly access under the facilities is $6.5 billion and $3.6 billion, respectively. These facilities may be used for working capital and general corporate purposes, including providing support for issuances of commercial paper and for issuing letters of credit.

In addition, Texas Competitive Holdings and Oncor Electric Delivery have a $25 million joint uncommitted line of credit without an expiration date. The terms are generally consistent with existing credit facilities, except that funding remains at the discretion of the lender. As of December 31, 2006, there were no outstanding borrowings under this line of credit.

All letters of credit and cash borrowings under the credit facilities as of December 31, 2006 are the obligations of Texas Competitive Holdings. Outstanding commercial paper, which totaled $623 million for Texas Competitive Holdings and $673 million for Oncor Electric Delivery as of December 31, 2006, is supported by these facilities but does not limit the availability.

## 15. LONG-TERM DEBT

*Long-term debt*—At December 31, 2006 and 2005, the long-term debt of Energy Future Holdings Corp. consisted of the following:

| | December 31, | |
| --- | --- | --- |
| | 2006 | 2005 |
| Texas Competitive Holdings | | |
| Pollution Control Revenue Bonds: | | |
| Brazos River Authority: | | |
| 5.400% Fixed Series 1994A due May 1, 2029 .................................... | $ 39 | $ 39 |
| 5.400% Fixed Series 1994B due May 1, 2029, remarketing date May 1, 2006[a)(b)] .......... | — | 39 |
| 5.400% Fixed Series 1995A due April 1, 2030, remarketing date May 1, 2006[a)(b)] ......... | — | 50 |
| 5.050% Fixed Series 1995B due June 1, 2030, remarketing date June 19, 2006[a)(c)] ......... | — | 114 |
| 7.700% Fixed Series 1999A due April 1, 2033 ..................................... | 111 | 111 |
| 6.750% Fixed Series 1999B due September 1, 2034, remarketing date April 1, 2013[a)] ...... | 16 | 16 |
| 7.700% Fixed Series 1999C due March 1, 2032 ................................... | 50 | 50 |
| 4.000% Floating Series 2001A due October 1, 2030[e)] ............................... | 71 | 71 |
| 4.750% Fixed Series 2001B due May 1, 2029, remarketing date November 1, 2006[a)(d)] ..... | — | 19 |
| 5.750% Fixed Series 2001C due May 1, 2036, remarketing date November 1, 2011[a)] ....... | 217 | 217 |
| 3.960% Floating Series 2001D due May 1, 2033[e)] .................................. | 268 | 268 |
| 5.370% Floating Taxable Series 2001I due December 1, 2036[e)] ........................ | 62 | 62 |
| 4.000% Floating Series 2002A due May 1, 2037[e)] .................................. | 45 | 45 |
| 6.750% Fixed Series 2003A due April 1, 2038, remarketing date April 1, 2013[a)] .......... | 44 | 44 |
| 6.300% Fixed Series 2003B due July 1, 2032 ..................................... | 39 | 39 |
| 6.750% Fixed Series 2003C due October 1, 2038 ................................. | 52 | 52 |
| 5.400% Fixed Series 2003D due October 1, 2029, remarketing date October 1, 2014[a)] ...... | 31 | 31 |
| 5.000% Fixed Series 2006 due March 1, 2041 .................................... | 100 | — |
| Sabine River Authority of Texas: | | |
| 6.450% Fixed Series 2000A due June 1, 2021 .................................... | 51 | 51 |
| 5.500% Fixed Series 2001A due May 1, 2022, remarketing date November 1, 2011[a)] ....... | 91 | 91 |
| 6.750% Fixed Series 2001B due May 1, 2030, remarketing date November 1, 2011[a)] ....... | 107 | 107 |
| 5.200% Fixed Series 2001C due May 1, 2028 .................................... | 70 | 70 |

F-80

Confidential

| | December 31, | |
|---|---|---|
| | **2006** | **2005** |
| 5.800% Fixed Series 2003A due July 1, 2022 . . . . . . . . . . . . . . . . . . . . . . . . . . | 12 | 12 |
| 6.150% Fixed Series 2003B due August 1, 2022 . . . . . . . . . . . . . . . . . . . . . . . . | 45 | 45 |
| 4.110% Floating Series 2006A due November 1, 2041, remarking date May 9, 2007(g)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 47 | — |
| 4.110% Floating Series 2006B due November 1, 2041, remarking date May 9, 2007(g)(j) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 46 | — |
| Trinity River Authority of Texas: | | |
| 6.250% Fixed Series 2000A due May 1, 2028 . . . . . . . . . . . . . . . . . . . . . . . . . . | 14 | 14 |
| 5.000% Fixed Series 2001A due May 1, 2027, remarketing date November 1, 2006(a)(d) . . | — | 37 |
| 4.110% Floating Series 2006 due November 1, 2041, remarking date May 9, 2007(g)(j) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 50 | — |
| Other: | | |
| 6.125% Fixed Senior Notes due March 15, 2008 (swapped to variable)(f) . . . . . . . . . . . . . | 250 | 250 |
| 7.000% Fixed Senior Notes due March 15, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . | 1,000 | 1,000 |
| 4.920% Floating Rate Senior Notes due January 17, 2006 (interest rate in effect at December 31, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 400 |
| Capital lease obligations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 98 | 103 |
| Fair value adjustments related to interest rate swaps . . . . . . . . . . . . . . . . . . . . . . | 10 | 9 |
| Total Texas Competitive Holdings | $3,036 | $3,456 |
| Oncor Electric Delivery | | |
| 6.375% Fixed Senior Notes due May 1, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 700 | $ 700 |
| 7.000% Fixed Senior Notes due May 1, 2032 . . . . . . . . . . . . . . . . . . . . . . . . . . . | 500 | 500 |
| 6.375% Fixed Senior Notes due January 15, 2015 (swapped to variable)(f) . . . . . . . . . . . . | 500 | 500 |
| 7.250% Fixed Senior Notes due January 15, 2033 . . . . . . . . . . . . . . . . . . . . . . . . | 350 | 350 |
| 5.000% Fixed Debentures due September 1, 2007 (swapped to variable)(f) . . . . . . . . . . . . | 200 | 200 |
| 7.000% Fixed Debentures due September 1, 2022 . . . . . . . . . . . . . . . . . . . . . . . . | 800 | 800 |
| Unamortized discount . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (16) | (17) |
| Sub-total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,034 | 3,033 |
| Oncor Electric Delivery Transition Bond Company LLC(h) | | |
| 2.260% Fixed Series 2003 Bonds due in semiannual installments through February 15, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 8 | 44 |
| 4.030% Fixed Series 2003 Bonds due in semiannual installments through February 15, 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 122 | 122 |
| 4.950% Fixed Series 2003 Bonds due in semiannual installments through February 15, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 130 | 130 |
| 5.420% Fixed Series 2003 Bonds due in semiannual installments through August 15, 2015 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 145 | 145 |
| 3.520% Fixed Series 2004 Bonds due in semiannual installments through November 15, 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 158 | 215 |
| 4.810% Fixed Series 2004 Bonds due in semiannual installments through November 15, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 221 | 221 |
| 5.290% Fixed Series 2004 Bonds due in semiannual installments through May 15, 2016 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 290 | 290 |
| Total Oncor Electric Delivery Transition Bond Company LLC . . . . . . . . . . . . . . . . | 1,074 | 1,167 |
| Total Oncor Electric Delivery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4,108 | 4,200 |

Confidential

EFIHMW00208505

**PX 008**
**Page 384 of 501**

|  | December 31, | |
|---|---|---|
|  | **2006** | **2005** |
| **Energy Future Competitive Holdings Company** | | |
| 7.170% Fixed Senior Debentures due August 1, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . | 10 | 10 |
| 7.460% Fixed Secured Facility Bonds with amortizing payments through January 2015 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 85 | 91 |
| 9.580% Fixed Notes due in semiannual installments through December 4, 2019 . . . . . . | 62 | 65 |
| 8.254% Fixed Notes due in quarterly installments through December 31, 2021 . . . . . . . | 59 | 62 |
| 6.171% Floating Rate Junior Subordinated Debentures, Series D due January 30, 2037[g] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 | 1 |
| 8.175% Fixed Junior Subordinated Debentures, Series E due January 30, 2037 . . . . . . . | 8 | 8 |
| Unamortized premium . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5 | 5 |
| Total Energy Future Competitive Holdings Company . . . . . . . . . . . . . . . . . . . . . . | 230 | 242 |
| **Energy Future Holdings Corp.** | | |
| 6.375% Fixed Senior Notes Series C due January 1, 2008 (swapped to variable)[f] . . . . . | 200 | 200 |
| 6.375% Fixed Senior Notes Series J due June 15, 2006 . . . . . . . . . . . . . . . . . . . . . . . . | — | 683 |
| 4.446% Fixed Senior Notes Series K due November 16, 2006 . . . . . . . . . . . . . . . . . . . | — | 50 |
| 5.800% Fixed Senior Notes Series M due May 16, 2008[i] . . . . . . . . . . . . . . . . . . . . . . | — | 179 |
| 4.800% Fixed Senior Notes Series O due November 15, 2009 ($450 swapped to variable)[f] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,000 | 1,000 |
| 5.550% Fixed Senior Notes Series P due November 15, 2014 ($500 swapped to variable)[f] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,000 | 1,000 |
| 6.500% Fixed Senior Notes Series Q due November 15, 2024 ($400 swapped to variable)[f] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 750 | 750 |
| 6.550% Fixed Senior Notes Series R due November 15, 2034 . . . . . . . . . . . . . . . . . . . | 750 | 750 |
| 8.820% Building Financing due semiannually through February 11, 2022 . . . . . . . . . . | 99 | 109 |
| 6.874% Floating Convertible Senior Notes due July 15, 2033[g] . . . . . . . . . . . . . . . . . . | 25 | 25 |
| Fair value adjustments related to interest rate swaps . . . . . . . . . . . . . . . . . . . . . . . . . . | (73) | (53) |
| Unamortized discount . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (9) | (9) |
| Total Energy Future Holdings Corp. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,742 | 4,684 |
| Total Energy Future Holdings Corp. consolidated . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 11,116 | 12,582 |
| Less amount due currently . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (485) | (1,250) |
| Total long-term debt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $10,631 | $11,332 |

---

(a) These series are in the multiannual interest rate mode and are subject to mandatory tender prior to maturity on the mandatory remarketing date. On such date, the interest rate and interest rate period will be reset for the bonds.

(b) Repurchased on May 1, 2006 for remarketing at a later date.

(c) Repurchased on June 19, 2006 for remarketing at a later date.

(d) Repurchased on November 1, 2006 for remarketing at a later date.

(e) Interest rates in effect at December 31, 2006. These series are in a weekly interest rate mode and are classified as long-term as they are supported by long-term irrevocable letters of credit.

(f) Interest rates swapped to variable on a net $2.5 billion of $3.9 billion aggregate principal amount at December 31, 2006.

(g) Interest rates in effect at December 31, 2006.

(h) These bonds are nonrecourse to Oncor Electric Delivery and were issued to recover a regulatory asset.

(i) Equity-linked.

(j) These series are in a weekly interest rate mode and are subject to mandatory tender prior to maturity on the mandatory remarketing date. On such date, the interest rate period will be reset for the bonds.

F-82

EFIHMW00208506

***Debt-related Activity in 2006***—In November 2006, Texas Competitive Holdings issued the Sabine River Authority of Texas Series 2006A and 2006B pollution control revenue bonds with aggregate principal amounts of $47 million and $46 million, respectively. Also in November 2006, Texas Competitive Holdings issued the Trinity River Authority of Texas Series 2006 pollution control revenue bonds with an aggregate principal amount of $50 million. All three bond series were issued in conjunction with the generation facility development program and have weekly reset floating interest rates, mature in November 2041 and are expected to be repurchased by May 9, 2007. All three bond series are classified as long-term debt due currently. Net proceeds of $141 million ($143 million principal amount less issuance expenses) from the issuance are held in a trust and, along with related earned interest, are classified as restricted cash. Such proceeds will be released to Texas Competitive Holdings by the trust at such time documentation of qualified expenditures are presented and approved by the trustee.

In November 2006, upon the scheduled mandatory tender date, Texas Competitive Holdings repurchased all of the Trinity River Authority of Texas Series 2001A and Brazos River Authority Series 2001B pollution control revenue bonds with aggregate principal amounts of $37 million and $19 million, respectively, at a price of 100% of the principal amount thereof. Texas Competitive Holdings currently plans to remarket these bonds.

In June 2006, upon the scheduled mandatory tender date, Texas Competitive Holdings repurchased all of the Brazos River Authority Pollution Control Revenue (Refunding) Bonds Series 1995B with an aggregate principal amount of $114 million at a price of 100% of the principal amount thereof. Texas Competitive Holdings currently plans to remarket these bonds.

In May 2006, upon the scheduled mandatory tender date, Texas Competitive Holdings repurchased all of the Brazos River Authority Pollution Control Revenue (Refunding) Bonds Series 1994B and 1995A with aggregate principal amounts of $39 million and $50 million, respectively, at a price of 100% of the principal amounts thereof. Texas Competitive Holdings currently plans to remarket these bonds.

In May 2006, the equity-linked Series M Senior Notes with an aggregate principal amount of $179 million were remarketed to fund the settlement of the associated common stock purchase contracts. Energy Future Holdings Corp. participated in the remarketing and purchased all of the outstanding Series M Senior Notes at a price of 100.5% of par and immediately retired the notes resulting in a loss on retirement of $1 million.

In March 2006, Texas Competitive Holdings issued the Brazos River Authority Series 2006 Pollution Control Revenue Bonds with an aggregate principal amount of $100 million. The bonds have a fixed interest rate of 5.0% and mature in March 2041. Net proceeds of $100 million (principal amount less issuance expenses) from the issuance are held in a trust and, along with related earned interest, are classified as restricted cash. Such proceeds will be released to Texas Competitive Holdings by the trust at such time as documentation of qualified expenditures are presented and approved by the trustee.

Other retirements of long-term debt in 2006 totaling $1.3 billion represented payments at scheduled maturity dates and included $733 million of Energy Future Holdings Corp. senior notes and $400 million of Texas Competitive Holdings senior notes.

***Debt-related Activity in 2005***—In December 2005, in connection with the consolidation of the combustion turbine lease trust, Energy Future Holdings Corp. assumed $91 million principal amount of 7.460% fixed secured bonds with amortizing principal payments through 2015. See Note 4 for additional discussion.

In November 2005, Texas Competitive Holdings remarketed the Sabine River Authority Series 2001C and the Brazos River Authority Series 1994A pollution control revenue bonds with aggregate principal amounts of $70 million and $39 million, respectively. The bonds were purchased upon mandatory tender in November 2003 and May 2005, respectively.

In July 2005, the remaining publicly outstanding $92 million principal amount of Oncor Electric Delivery's Fixed First Mortgage Bonds matured and was paid. In a related action, in October 2005 Oncor Electric Delivery

Confidential

EFIHMW00208507

released the liens associated with its 2002 Secured Indenture resulting in its Senior Secured Notes becoming unsecured obligations of Oncor Electric Delivery ranking equally with all of its other unsecured obligations. Because the First Mortgage Bonds that served as collateral for the 2002 Secured Indenture were returned to Oncor Electric Delivery in connection with that release and Oncor Electric Delivery no longer had any publicly outstanding First Mortgage Bonds, Oncor Electric Delivery discharged its 1983 Mortgage in October 2005. As a result of these actions, Oncor Electric Delivery no longer has any secured debt outstanding.

In January 2005, Texas Competitive Holdings remarketed and converted to floating rate mode the Brazos River Authority Series 2001A pollution control revenue bonds with an aggregate principal amount of $71 million. The bonds were purchased upon mandatory tender in April 2004.

Other retirements of long-term debt in 2005 totaling $138 million represent payments at scheduled maturity dates.

*Fair Value Hedges*—Energy Future Holdings Corp. uses fair value hedging strategies to manage its exposure to fixed interest rates on long-term debt. At December 31, 2006, $2.5 billion of fixed rate debt had been effectively converted to variable rates through interest rate swap transactions, expiring through 2024. These swaps qualified for and were designated as fair value hedges in accordance with SFAS 133 (under the short-cut method as the conditions for assuming no ineffectiveness are met). In December 2006, interest rate swaps related to $300 million principal amount of debt were dedesignated as fair value hedges. Offsetting swap positions were entered into and both the original swaps and offsetting positions are subsequently being marked-to-market in net income.

*Long-term debt fair value adjustments*—

| | At December 31, | |
| --- | --- | --- |
| | 2006 | 2005 |
| Long-term debt fair value adjustments related to interest rate swaps at beginning of period—net (reduction) increase in debt carrying value | $(44) | $ 15 |
| Fair value adjustments during the period | (13) | (49) |
| Recognition of net gains on settled fair value hedges[a] | (6) | (10) |
| Long-term debt fair value adjustments at end of period—net reduction in debt carrying value (net out-of-the-money value of swaps) | $(63) | $(44) |

_____

(a) Net value of settled in-the-money fixed-to-variable swaps recognized in net income when the hedged transactions are recognized. Amounts are pretax.

Any changes in unsettled swap fair values reported as fair value adjustments to debt amounts are offset by changes in derivative assets and liabilities.

*Securitization (Transition) Bonds*—Under a regulatory financing order authorizing the issuance of $1.3 billion principal amount of transition bonds to recover regulatory assets, a bankruptcy-remote financing subsidiary of Oncor Electric Delivery issued $500 million principal amount of transition bonds in August 2003 and the remaining $790 million principal amount in June 2004. Amounts to service the principal and interest on the bonds are recovered from REPs by Oncor Electric Delivery through a distribution fee surcharge. Also see Note 4.

*Convertible Senior Notes*—At December 31, 2006 and 2005, Energy Future Holdings Corp. had $25 million principal amount outstanding of its Floating Rate Convertible Senior Notes due 2033. The notes bear regular interest at an annual floating rate equal to 3-month LIBOR, determined quarterly, plus 150 basis points, and are payable in arrears quarterly commencing October 15, 2003. The notes will bear additional contingent interest during periods after July 15, 2008 if the average trading price of the notes for a specified period exceeds 120% of the principal amount of

Confidential

EFIHMW00208508

the notes. The notes conversion rate at December 31, 2006 is 60.2958 shares of Energy Future Holdings Corp. common stock per $1,000 principal amount of notes, which equates to 1,523,916 shares. Should the holders elect to convert the notes, Energy Future Holdings Corp. has the option to settle the conversion in cash, common stock or a combination of both. At December 31, 2006, Energy Future Holdings Corp. intended to settle any future conversion of the remaining $25 million principal amount of outstanding notes in common stock.

*Maturities*—Transition bond sinking fund requirements and other long-term debt maturities at December 31, 2006, were as follows:

| Year | |
|---|---|
| 2007 | $ 474 |
| 2008 | 576 |
| 2009 | 1,129 |
| 2010 | 135 |
| 2011 | 143 |
| Thereafter | 8,644 |
| Unamortized premium and discount and fair value adjustments | (83) |
| Capital lease obligations | 98 |
| Total | $11,116 |

## 16. COMMITMENTS AND CONTINGENCIES

### Commitments

*Generation Development Program*—In April 2006, Energy Future Holdings Corp. announced a plan to develop and construct up to 11 lignite/coal-fueled generation facilities in Texas, the development of eight of which were suspended in February 2007. Subsidiaries of Energy Future Holdings Corp. have executed engineering, procurement and construction (EPC) agreements for the three units now expected to be completed. Energy Future Holdings Corp. or the EPC contractors had placed orders for critical long lead-time equipment, including boilers, turbine generators and air quality control systems for all 11 units. Capital expenditures under these arrangements totaled $1.0 billion as of December 31, 2006. If the agreements had been canceled as of that date, an additional estimated obligation of up to $430 million would have arisen. This estimated gross cancellation exposure of $1.4 billion at December 31, 2006 excluded any recovery values related to the assets acquired and for owned assets that are intended to be utilized in the program.

*Other Contractual Commitments*—At December 31, 2006, Energy Future Holdings Corp. had noncancelable commitments under energy-related contracts, leases and other agreements as follows:

| | Coal purchase agreements and coal transportation agreements | Pipeline transportation and storage reservation fees | Capacity payments under power purchase agreements[a] | Nuclear Fuel Contracts | Water Rights Contracts |
|---|---|---|---|---|---|
| 2007 | $151 | $ 62 | $107 | $ 82 | $ 6 |
| 2008 | 98 | 42 | 54 | 134 | 7 |
| 2009 | 102 | 38 | — | 111 | 7 |
| 2010 | — | 37 | — | 36 | 7 |
| 2011 | — | 38 | — | 26 | 7 |
| Thereafter | — | 16 | — | 121 | 53 |
| Total | $351 | $233 | $161 | $510 | $87 |

(a) On the basis of Energy Future Holdings Corp.'s current expectations of demand from its electricity customers as compared with its capacity and take-or-pay payments, management does not consider it likely that any material payments will become due for electricity not taken beyond capacity payments.

Confidential

EFIHMW00208509

Future minimum lease payments under both capital leases and operating leases are as follows:

| | Capital Leases | Operating Leases(a) |
|---|---|---|
| 2007 | $ 17 | $ 52 |
| 2008 | 16 | 47 |
| 2009 | 15 | 47 |
| 2010 | 14 | 45 |
| 2011 | 10 | 41 |
| Thereafter | 47 | 285 |
| Total future minimum lease payments | 119 | $517 |
| Less amounts representing interest | 21 | |
| Present value of future minimum lease payments | 98 | |
| Less current portion | 11 | |
| Long-term capital lease obligation | $ 87 | |

---

(a)  Includes operating leases with initial or remaining noncancelable lease terms in excess of one year. Excludes Texas Competitive Holdings' future minimum lease payments for combustion turbines owned by a lease trust of $17 million in 2007, $17 million in 2008, $17 million in 2009, $17 million in 2010, $17 million in 2011 and $51 million in periods thereafter.

Texas Competitive Holdings has commitments in place to replace the four steam generators and reactor vessel head in Unit 1 of the Comanche Peak nuclear plant in order to maintain the operating efficiency of the unit. An agreement for the manufacture and delivery of the equipment was completed in October 2003 and equipment delivery occurred in late 2006. Estimated future project capital spending to complete the installation, expected in 2007, totals $87 million.

### Contingencies

*Litigation*—On February 28, 2007, a lawsuit was filed in the 160th District Court, Dallas County, Texas seeking compensatory damages and injunctive relief arising out of the Merger Agreement. The suit, filed by putative Energy Future Holdings Corp. shareholder, International Brotherhood of Electrical Workers Local 98 Pension Fund, individually, and as a class action for similarly situated shareholders, alleges that directors of Energy Future Holdings Corp. breached fiduciary duties owed Energy Future Holdings Corp. shareholders by approving the Merger Agreement. Named as defendants are Energy Future Holdings Corp. and directors of its Board, as well as private equity firms and investors involved in the transaction. Energy Future Holdings Corp. believes the claims made in this litigation are without merit and, therefore, intends to vigorously defend this litigation, including demonstrating to the court that the Merger Agreement contains a "go-shop" provision pursuant to which Energy Future Holdings Corp. has the right to solicit and engage in discussions and negotiations with respect to competing proposals through April 16, 2007 and that the transaction is subject to the approval of Energy Future Holdings Corp.'s shareholders. Further, the suit purports to assert claims by shareholders directly against the Board of Directors when Energy Future Holdings Corp. believes that Texas law does not recognize such a cause of action.

On February 27, 2007, a lawsuit was filed in the 68th District Court, Dallas County, Texas arising out of the Merger Agreement. The suit, filed by putative Energy Future Holdings Corp. shareholders Gary and Lon Grady, alleges that directors of Energy Future Holdings Corp., named as defendants, breached fiduciary duties owed Energy Future Holdings Corp. by approving the Merger Agreement. The petition includes claims that directors and/or officers failed to ensure that the transaction was in the best interest of Energy Future Holdings Corp.; that the directors participated in a transaction where their loyalties were divided and where they were to receive a personal financial benefit; and that such alleged conduct constituted a breach of their duties of care, loyalty, good faith, candor and independence owed to Energy Future Holdings Corp. Energy Future Holdings Corp. believes

F-86

Confidential

EFIHMW00208510

the claims made in this litigation are without merit and, therefore, intends to vigorously defend this litigation, including demonstrating to the court that the Merger Agreement allows Energy Future Holdings Corp. to solicit other proposals from third parties through April 16, 2007 and that the transaction is subject to the approval of Energy Future Holdings Corp.'s shareholders. Further, Energy Future Holdings Corp. believes that the plaintiffs failed to comply with provisions of the Texas Business Organizations Code applicable to filing a derivative proceeding.

On February 27, 2007, a lawsuit was filed in the 162nd District Court, Dallas County, Texas by putative Energy Future Holdings Corp. common stock shareholder, J&B Charitable Remainder Trust, asserting claims individually and as a class action on behalf of allegedly similarly situated shareholders. The suit named the directors of Energy Future Holdings Corp. as defendants as well as two private equity firms. The lawsuit contends that the directors violated various fiduciary duties in connection with the February 25, 2007 execution of the Merger Agreement. Plaintiff seeks to enjoin defendants from consummating the Merger Agreement until such time as a procedure or process is adopted to obtain the highest possible price for Energy Future Holdings Corp. shareholders, as well as a request that the court order the directors of Energy Future Holdings Corp. to exercise their fiduciary duties in order to obtain a transaction in the best interest of Energy Future Holdings Corp. shareholders. The Merger Agreement allows Energy Future Holdings Corp. to solicit other proposals from third parties through April 16, 2007 and is subject to the approval of Energy Future Holdings Corp.'s shareholders. Further, the suit purports to assert claims by shareholders directly against the Board of Directors when Energy Future Holdings Corp. believes that Texas law does not recognize such a cause of action. Energy Future Holdings Corp. believes the claims made in this litigation are without merit and, therefore, intends to vigorously defend this litigation.

On February 26, 2007, a lawsuit was filed in the 101st District Court, Dallas County, Texas by putative Energy Future Holdings Corp. shareholder, Samuel T. Cohen, asserting claims individually and as a class action on behalf of allegedly similarly situated shareholders. The suit named the directors of Energy Future Holdings Corp. as defendants as well as two private equity firms. The lawsuit contends that the directors violated various fiduciary duties in connection with the February 25, 2007 execution of the Merger Agreement. Plaintiff seeks to enjoin defendants from consummating the transactions contemplated by the Merger Agreement until such time as a procedure or process is adopted to obtain the highest possible price for Energy Future Holdings Corp. shareholders, as well as a request that the court direct the officers and directors of Energy Future Holdings Corp. to exercise their fiduciary duties in order to obtain a transaction in the best interest of Energy Future Holdings Corp. shareholders. The Merger Agreement allows Energy Future Holdings Corp. to solicit other proposals from third parties through April 16, 2007 and is subject to the approval of Energy Future Holdings Corp.'s shareholders. Further, the suit purports to assert claims by shareholders directly against the Board of Directors when Energy Future Holdings Corp. believes that Texas law does not recognize such a cause of action. Energy Future Holdings Corp. believes the claims made in this litigation are without merit and, therefore, intends to vigorously defend this litigation.

On February 26, 2007, a lawsuit was filed in the 192nd District Court, Dallas County, Texas seeking temporary and permanent injunctive relief arising out of the Merger Agreement. The suit, filed by putative Energy Future Holdings Corp. shareholder Brian Gottlieb, individually, and as a class action for similarly situated shareholders, alleges that directors of Energy Future Holdings Corp., named as defendants, breached fiduciary duties owed Energy Future Holdings Corp. shareholders by approving the Merger Agreement. The petition includes claims that directors failed to take steps to properly value or maximize the value of the company and breached their duties of loyalty, good faith, candor and independence owed to Energy Future Holdings Corp. shareholders. Energy Future Holdings Corp. believes the claims made in this litigation are without merit and, therefore, intends to vigorously defend this litigation, including demonstrating to the court that the Merger Agreement allows Energy Future Holdings Corp. to solicit other proposals from third parties through April 16, 2007 and that the transaction is subject to the approval of Energy Future Holdings Corp.'s shareholders. Further, the suit purports to assert claims by shareholders directly against the Energy Future Holdings Corp. Board of Directors when Energy Future Holdings Corp. believes that Texas law does not recognize such a cause of action.

F-87

Confidential

**PX 008**
**Page 390 of 501**

On February 26, 2007, a lawsuit was filed in the 192nd District Court, Dallas County, Texas seeking compensatory damages and injunctive relief arising out of the Merger Agreement. The suit, filed by Energy Future Holdings Corp. shareholder Henry Schipper, individually, and as a class action for similarly situated shareholders, alleges that directors of Energy Future Holdings Corp., named as defendants, breached their fiduciary duty owed Energy Future Holdings Corp. shareholders by approving the Merger Agreement and failing to take all reasonable steps to assure maximization of shareholder value. The petition further claims that directors failed to fully inform themselves about whether greater value could be achieved through the sale of the company to a third party. Energy Future Holdings Corp. believes the claims made in this litigation are without merit and, therefore, intends to vigorously defend this litigation, including demonstrating to the court that the Merger Agreement allows Energy Future Holdings Corp. to solicit other proposals from third parties through April 16, 2007 and that the transaction is subject to the approval of Energy Future Holdings Corp.'s shareholders. Further, the suit purports to assert claims directly against directors when Energy Future Holdings Corp. believes that Texas law does not recognize such a cause of action.

On February 25, 2007, a lawsuit was filed in District Court, Dallas County, Texas by a pension fund against the directors of Energy Future Holdings Corp., asserting claims on behalf of an owner of shares of Energy Future Holdings Corp. common stock as well as seeking to certify a class action on behalf of allegedly similarly situated shareholders. The lawsuit contends that directors of Energy Future Holdings Corp. violated various fiduciary duties owed plaintiff and other shareholders in connection with the February 25, 2007 execution of the Merger Agreement. Plaintiff seeks to enjoin defendants from consummating the Merger Agreement until such time as a procedure or process is adopted to obtain the highest possible price for shareholders, as well as a request that the court direct the officers and directors of Energy Future Holdings Corp. to exercise their fiduciary duties in order to obtain a transaction in the best interest of Energy Future Holdings Corp. shareholders. The Merger Agreement allows Energy Future Holdings Corp. to solicit other proposals from third parties through April 16, 2007 and is subject to the approval of Energy Future Holdings Corp.'s shareholders. Further, the suit purports to assert claims directly against directors when Energy Future Holdings Corp. believes that Texas law does not recognize such a cause of action. Accordingly, Energy Future Holdings Corp. believes the claims made in this litigation are without merit and, therefore, intends to vigorously defend this litigation.

On December 1, 2006, a lawsuit was filed in the United States District Court for the Western District of Texas against TXU Generation Company, LP, Oak Grove Management Company LLC, and Energy Future Holdings Corp. The complaint seeks declaratory and injunctive relief, as well as the assessment of civil penalties, with respect to the permit application for the construction and operation of the Oak Grove generation plant in Robertson County, Texas. The plaintiffs allege violations of the Federal Clean Air Act, Texas Health and Safety Code and Texas Administrative Code and seek to temporarily and permanently enjoin the construction and operation of the Oak Grove generation plant. The complaint also asserts that the permit application was deficient in failing to comply with various modeling and analyses requirements relative to the impact of emissions on the environment. Plaintiffs further request that the District Court enter an order requiring the defendants to take other appropriate actions to remedy, mitigate and offset alleged harm to the public health and environment. Energy Future Holdings Corp. believes the Oak Grove air permit, if granted by the TCEQ, will be protective of the environment and that the application for and the processing of the air permit by Oak Grove Management Company LLC with the TCEQ has been in accordance with law. Energy Future Holdings Corp. further believes that the plaintiffs' complaint should be dismissed in response to the Motion to Dismiss, which has been filed in the litigation, and that the claims made in this litigation are without merit and, accordingly, intends to vigorously defend this litigation.

On September 6, 2005 a lawsuit was filed in the US District Court for the Northern District of Texas, Dallas Division against Energy Future Holdings Corp. and C. John Wilder. The plaintiffs' amended complaint asserts claims on behalf of the plaintiffs and a putative class of owners of certain Energy Future Holdings Corp. securities who tendered such securities in connection with a tender offer conducted by Energy Future Holdings Corp. in 2004. The amended complaint alleges violations of the provisions of Sections 14(e), 10(b) and 20(a) of

Confidential                                                                EFIHMW00208512

the Securities Exchange Act of 1934, as amended, and Rule 10b-5 thereunder. The allegations relate to a tender offer conducted in September and October 2004 for certain equity-linked securities in which it was expressly disclosed that Energy Future Holdings Corp. management was evaluating whether it should recommend to the board of directors that the board reevaluate Energy Future Holdings Corp.'s dividend policy. After the tender offer was closed, and consistent with the disclosure, management did make a recommendation to the board to reevaluate the dividend policy and the board elected to increase the quarterly dividend. The plaintiffs contend that such disclosure in connection with the tender offer was inadequate. Energy Future Holdings Corp. maintains that the disclosure provided in connection with the tender offer regarding the evaluation of the dividend policy was complete and accurate at the time the tender offer was initiated as well as when it was closed. A Motion to Dismiss was filed by the defendants, and the District Court entered an order granting the Motion to Dismiss and dismissing this litigation with prejudice on August 30, 2006. The plaintiff filed a timely notice of appeal and the matter is now before the Fifth Circuit Court of Appeals with briefing of the appeal completed. While Energy Future Holdings Corp. is unable to estimate any possible loss or predict the outcome of this litigation in the event the Fifth Circuit Court of Appeals reverses the District Court, Energy Future Holdings Corp. believes the claims made in this litigation are without merit and, accordingly, intends to vigorously defend this litigation, including the appeal of the District Court's order dismissing the complaint.

Between October 19, 2004 and October 31, 2005, twelve lawsuits were filed in various California Superior Courts by purported customers against Energy Future Holdings Corp., TXU Energy Trading Company and TXU Energy Services and other marketers, traders, transporters and sellers of natural gas in California. Plaintiffs alleged that beginning at least by the summer of 2000, defendants manipulated and fixed at artificially high levels natural gas prices in California in violation of the Cartwright Act and other California state laws. These lawsuits were coordinated in the San Diego Superior Court with numerous other natural gas actions as "In re Natural Gas Anti-Trust Cases I, II, III, IV and V." On December 28, 2006, an agreement in principle to settle this matter was reached between the Energy Future Holdings Corp. and TXU defendants and the plaintiffs in the twelve pending lawsuits. Formal settlement documents were signed in February 2007. Notices of Dismissal were filed in the San Diego Superior Court and the case was dismissed with prejudice on February 14, 2007.

In November 2002, February 2003 and March 2003, three lawsuits were filed in the US District Court for the Northern District of Texas, Dallas Division, asserting claims under ERISA on behalf of a putative class of participants in and beneficiaries of various employee benefit plans of Energy Future Holdings Corp. These ERISA lawsuits were consolidated, and a consolidated complaint was filed in February 2004 against Energy Future Holdings Corp., the directors of Energy Future Holdings Corp. serving during the putative class period as well as certain officers of Energy Future Holdings Corp. who were the members of the TXU Thrift Plan Committee. The plaintiffs seek to represent a class of participants in such employee benefit plans during the period between April 26, 2001 and October 11, 2002. The plaintiffs filed an initial motion for class certification and, after class certification discovery was completed, the District Court denied plaintiffs' initial class certification motion without prejudice and granted plaintiffs' leave to amend their complaint. Plaintiffs' second class certification motion, filed on the basis of their amended complaint, was denied and the case was ordered dismissed without prejudice on September 29, 2005. The plaintiffs filed an appeal of the dismissal to the Fifth Circuit Court of Appeals. While on appeal, the matter was referred to the Fifth Circuit's alternative dispute resolution program and subsequently to mediation. While mediation was unsuccessful, further discussions led to an agreement in principle to settle this litigation on December 24, 2006 for $7.25 million, before attorney's fees, to be paid by Energy Future Holdings Corp. to the thrift plan pursuant a Court approved allocation. A Memorandum of Understanding confirming the agreement in principle was signed on January 24, 2007 and the settlement is in the process of being confirmed with final settlement documents after which the settlement will be submitted to the District Court for approval. Energy Future Holdings Corp. believes the claims are without merit and, in the event the settlement is not approved, intends to vigorously defend the lawsuit, including the appeal. Energy Future Holdings Corp. is, however, unable to estimate any possible loss or predict the outcome of this action in the event the District Circuit rejects the settlement. the Fifth Circuit reverses the dismissal and remands the case to the District Court or the suit is refiled by the plaintiffs or others seeking to assert similar claims.

F-89

Confidential

EFIHMW00208513

In October, November and December 2002 and January 2003, a number of lawsuits were filed in, removed to or transferred to the US District Court for the Northern District of Texas, Dallas Division, against Energy Future Holdings Corp. and certain of its officers and directors. These lawsuits were consolidated and lead plaintiffs were appointed by the Court. The consolidated complaint alleged violations of the Securities Exchange Act of 1934, as amended. Rule 10b-5 thereunder and the Securities Act of 1933, as amended. On January 20, 2005, Energy Future Holdings Corp. executed a memorandum of understanding settling this litigation for $150 million. After preliminary certification of a settlement class and notice to such class, the District Court conducted a hearing and thereafter on November 8, 2005 granted final approval of the settlement. Certain members of the settlement class who objected to the plan of allocation, the plaintiffs' attorneys' fees and other matters related to the approval of the settlement have appealed the orders approving the settlement to the Fifth Circuit Court of Appeals and the appeal remains pending. Energy Future Holdings Corp. believes that the issues raised on appeal are without merit but cannot predict whether the appeal might result in a remand to the District Court for reconsideration of the notice to the settlement class, the plaintiffs' attorneys' fees or other matters, and while Energy Future Holdings Corp. cannot predict the effect of the appeal being sustained, it does not believe that the appeal will result in reversal of the approval of the settlement.

In addition to the above, Energy Future Holdings Corp. is involved in various other legal and administrative proceedings in the normal course of business the ultimate resolution of which, in the opinion of management, should not have a material effect on its financial position, results of operations or cash flows.

*Regulatory Investigations*—In October 2006, TXU Portfolio Management Company (TXU Portfolio Management) was notified that the Commission had begun an investigation of its 2005 activities in the ERCOT wholesale electricity market as a result of observations noted in the *2005 State of the Market Report for the ERCOT Wholesale Electricity Markets* performed by Potomac Economics, an economic consulting firm. TXU Portfolio Management believes that the investigation will focus on activities involving bids to sell balancing energy and generation unit commitments. Balancing energy represents approximately five to ten percent of the total energy sold in the ERCOT wholesale market. TXU Portfolio Management is cooperating fully with the Commission in its informal investigation.

On March 18, 2005, Energy Future Holdings Corp. received a subpoena from the SEC. The subpoena required Energy Future Holdings Corp. to produce documents and other information for the period from January 1, 2001 to March 31, 2003 relating to, among other things, the financial distress at TXU Europe during 2002 and the resulting financial condition of Energy Future Holdings Corp. including reduction of Energy Future Holdings Corp.'s quarterly dividend in October 2002. Energy Future Holdings Corp. cooperated with the SEC and completed the production of the documents requested by the subpoena as well as other information requested by the SEC. Energy Future Holdings Corp. received a letter dated February 15, 2007 which stated that the investigation had been terminated and that no enforcement action had been recommended to the Commission. Accordingly, Energy Future Holdings Corp. does not expect any action by the SEC against the company related to the matters which were the subject of the investigation.

*Income Tax Contingencies*—Energy Future Holdings Corp. and certain of its subsidiaries are currently under audit by the IRS with respect to tax returns for various tax periods as discussed below, and are subject to audit by other taxing authorities and by the IRS for subsequent tax periods. The amount and timing of any tax assessments resulting from these audits are uncertain, and could have a material effect on Energy Future Holdings Corp.'s liquidity and results of operations. Certain audit matters as to which management believes there is a reasonable possibility of a material future tax assessment are discussed below.

*Energy Future Holdings Corp. 1997-2002 Audit*—The IRS is currently examining Energy Future Holdings Corp.'s federal income tax returns for 1997-2002. A tax basis step-up of assets that occurred at ENSERCH Corporation prior to its 1997 acquisition by Energy Future Holdings Corp. resulted in a Energy Future Holdings Corp. audit issue as a result of the 2000 sale of the assets. The issue was resolved with the IRS in the first quarter of 2006, and a reserve of $62 million was released (see Note 3). In addition to proposed adjustments with respect

F-90

Confidential

**PX 008**
**Page 393 of 501**



to the worthlessness of Energy Future Holdings Corp.'s investment in TXU Europe (discussed separately below), the IRS has issued notices of proposed adjustment with respect to several other items. The IRS is expected to complete its examination in the second quarter of 2007. Energy Future Holdings Corp. expects to protest a number of adjustments and further expects that the protested issues will not be resolved until after 2007. Management believes that tax reserves recorded for potential adjustments to Energy Future Holdings Corp.'s 1997-2002 tax returns are adequate to provide for the expected outcome of the IRS's proposed adjustments.

*Energy Future Holdings Corp. 2003-2005 Audit*—Energy Future Holdings Corp. expects that the IRS will commence an examination of its 2003 through 2005 tax returns during 2007. Consistent with its experience in prior audits, Energy Future Holdings Corp. expects that the IRS will propose adjustments to the tax returns and that Energy Future Holdings Corp. will incur some liability to resolve those proposed adjustments with the IRS. The precise nature and amount of any such proposed adjustments is uncertain but the likelihood of occurrence is probable. Energy Future Holdings Corp. has recorded reserves related to potential audit adjustments, representing the estimated tax expense to be incurred as a result of such audit adjustments.

*TXU Gas (formerly ENSERCH Corporation) Audits*—The IRS audits of the 1993 and 1994-1997 ENSERCH tax returns were closed in 2005. As part of the close of the audit, the IRS filed a notice of deficiency for tax. Although Energy Future Holdings Corp. does not believe that the notice of deficiency is supportable under existing facts and law, Energy Future Holdings Corp. paid this tax and related interest totaling $30 million in 2005. but in 2006 filed a refund claim for these and additional amounts. The IRS and Energy Future Holdings Corp. have extended the time to file suit for refund so the government may review the claim.

*TXU Europe*—On its US federal income tax return for calendar year 2002, Energy Future Holdings Corp. claimed an ordinary loss deduction related to the worthlessness of Energy Future Holdings Corp.'s investment in TXU Europe, the tax benefit of which is estimated to be $983 million (assuming the deduction is sustained on audit). Due to a number of uncertainties regarding the proper tax treatment of the worthlessness loss, no portion of the tax benefit related to Energy Future Holdings Corp.'s 2002 write-off of its investment in TXU Europe was recognized in income prior to the second quarter of 2004.

In June 2004, the IRS issued a preliminary notice of proposed adjustment (subsequently amended in September 2004) proposing to disallow the 2002 worthlessness deduction and treat the worthlessness as a capital loss (deductible only against capital gains). In addition, in 2004 Energy Future Holdings Corp. revised the estimates of capital losses and ordinary deductions expected from the worthlessness deduction utilization. Accordingly, in 2004 Energy Future Holdings Corp. recorded a tax benefit of $755 million ($680 million classified as discontinued operations) related to the TXU Europe worthlessness deduction, which reflects expected utilization of the capital loss deduction against capital gains realized in 2004 and prior periods. The benefit recognized also included $220 million for deductions related to the write-off of the investment in TXU Europe expected to be sustained as ordinary as a result of the preliminary notice.

The tax benefits recognized are based on the notice of proposed adjustment, adjusted to exclude the effects of elements of the IRS notice that Energy Future Holdings Corp. believes are without merit and unlikely to be sustained. While the notice of proposed adjustment is not binding on the IRS and therefore it is uncertain what positions the IRS might ultimately assert or what, if any, tax liability might result, Energy Future Holdings Corp. believes that the possibility of the IRS adopting a more adverse position is remote.

If Energy Future Holdings Corp.'s ordinary loss deduction claimed on the 2002 tax return is not sustained, Energy Future Holdings Corp. would be required to repay approximately $665 million in tax refunds previously received, inclusive of related interest, based on the assumptions used to determine the tax benefits recognized after receipt of the notice of proposed adjustments, and before taking into account other potential IRS adjustments to Energy Future Holdings Corp.'s 1997-2002 tax returns. These amounts are reported as noncurrent liabilities on the December 31, 2006 balance sheet. No material earnings charge is expected with respect to any such repayment. Energy Future Holdings Corp. is unable to predict the timing of any such repayment.

F-91

Confidential

EFIHMW00208515

PX 008
Page 394 of 501

Energy Future Holdings Corp. believes that its original tax reporting of the worthlessness of its investment in TXU Europe as an ordinary deduction was proper and intends to protest the IRS's proposed adjustments. If Energy Future Holdings Corp.'s position is sustained, a credit of approximately $79 million would be recognized in earnings.

*Labor Contracts*—Certain personnel engaged in Texas Competitive Holdings and Oncor Electric Delivery activities are represented by labor unions and covered by collective bargaining agreements with varying expiration dates. New one-year labor agreements were reached in 2006 covering bargaining unit personnel engaged in Texas Competitive Holdings' lignite mining and nuclear generation operations. In January 2007, new one-year labor agreements were reached covering bargaining unit personnel engaged in the natural gas-fueled generation operations. Negotiations are currently underway with respect to the collective bargaining agreement covering bargaining unit personnel engaged in Texas Competitive Holdings' lignite/coal-fueled generation operations. The existing Oncor Electric Delivery bargaining agreement will expire in 2007 and wages and benefits are currently being negotiated. A new bargaining unit, representing approximately 500 employees, was certified in Oncor Electric Delivery in December 2006, and negotiations will begin on an initial labor agreement in early 2007. Management expects that any changes in collective bargaining agreements will not have a material effect on Energy Future Holdings Corp.'s financial position, results of operations or cash flows; however, Energy Future Holdings Corp. is unable to predict the ultimate outcome of these labor negotiations.

*Environmental Contingencies*—The federal Clean Air Act, as amended (Clean Air Act) includes provisions which, among other things, place limits on sulfur dioxide and nitrogen oxide emissions produced by electricity generation plants. The capital requirements of Energy Future Holdings Corp. and its subsidiaries have not been significantly affected by the requirements of the Clean Air Act. In addition, all air pollution control provisions of the 1999 Restructuring Legislation have been satisfied.

Energy Future Holdings Corp. and its subsidiaries must comply with environmental laws and regulations applicable to the handling and disposal of hazardous waste. Energy Future Holdings Corp. and its subsidiaries are in compliance with all current laws and regulations; however, the impact, if any, of changes to existing regulations or the implementation of new regulation is not determinable.

The costs to comply with environmental regulations can be significantly affected by the following external events or conditions:

- enactment of state or federal regulations regarding $CO_2$ emissions;

- other changes to existing state or federal regulation regarding air quality, water quality, control of toxic substances and hazardous and solid wastes, and other environmental matters; and

- the identification of sites requiring clean-up or the filing of other complaints in which Energy Future Holdings Corp. or its subsidiaries may be asserted to be potential responsible parties.

*Guarantees*—As discussed below, Energy Future Holdings Corp. and its subsidiaries have entered into contracts that contain guarantees to outside parties that could require performance or payment under certain conditions. Guarantees issued or modified after December 31, 2002 are subject to the recognition and initial measurement provisions of FIN 45, which requires a guarantor to recognize, at the inception of a guarantee, a liability for the fair value of the obligation undertaken in issuing the guarantee.

*Disposed TXU Gas operations*—In connection with the TXU Gas transaction in October 2004, Energy Future Holdings Corp. agreed, for a period of three years from the disposition date, to indemnify Atmos Energy Corporation for certain qualified environmental claims that may arise in relation to the assets acquired by Atmos Energy Corporation. Energy Future Holdings Corp. is not required to indemnify Atmos Energy Corporation until the aggregate of all such qualified claims exceeds $10 million, and Energy Future Holdings Corp. is only required to indemnify Atmos Energy Corporation for 50% of qualified claims between $10 million and $20 million. The maximum amount that Energy Future Holdings Corp. would be required to pay Atmos Energy

F-92

Confidential

EFIHMW00208516

Corporation pursuant to this environmental indemnity is $192.5 million. In addition, Energy Future Holdings Corp. agreed to indemnify Atmos Energy Corporation for up to $500 million for any liability related to assets retained by TXU Gas, including certain inactive gas plant sites not acquired by Atmos Energy Corporation, and up to $1.4 billion for contingent liabilities associated with preclosing tax and employee related matters. In each case, Energy Future Holdings Corp.'s indemnification is limited to 10 years from the disposition date. The maximum aggregate amount that Energy Future Holdings Corp. may be required to pay is $1.9 billion. The estimated fair value of the indemnification recorded upon completion of the TXU Gas transaction was $2.5 million. To date, Energy Future Holdings Corp. has not been required to make any payments to Atmos Energy Corporation under this indemnity obligation, and no such payments are currently anticipated.

In 1992, a discontinued engineering and construction business of TXU Gas completed construction of a plant, the performance of which is guaranteed by TXU Gas through 2008. The maximum contingent liability under the guarantee is approximately $114 million. No claims have been asserted under the guarantee and none are currently anticipated. Energy Future Holdings Corp. retains this contingent liability under the terms of the TXU Gas transaction agreement.

*Residual value guarantees in operating leases*—Energy Future Holdings Corp. or a subsidiary is the lessee under various operating leases that guarantee the residual values of the leased facilities. At December 31, 2006, the aggregate maximum amount of residual values guaranteed was approximately $128 million with an estimated residual recovery of approximately $125 million. These leased assets consist primarily of mining equipment, rail cars and vehicles. The average life of the lease portfolio is approximately six years. A significant portion of the maximum guarantee amount relates to leases entered into prior to December 31, 2002.

*Indebtedness guarantee*—In 1990, Energy Future Competitive Holdings Company repurchased an electric co-op's minority ownership interest in the Comanche Peak nuclear generation plant and assumed the co-op's indebtedness to the US government for the facilities. The indebtedness is included in long-term debt reported in the consolidated balance sheet. Energy Future Competitive Holdings Company is making principal and interest payments to the co-op in an amount sufficient for the co-op to make payments on its indebtedness. Energy Future Competitive Holdings Company guaranteed the co-op's payments, and in the event that the co-op fails to make its payments on the indebtedness, the US government would assume the co-op's rights under the agreement, and such payments would then be owed directly by Energy Future Competitive Holdings Company. At December 31, 2006, the balance of the indebtedness was $121 million with maturities of principal and interest extending to December 2021. The indebtedness is secured by a lien on the purchased facilities.

*Letters of Credit*—At December 31, 2006, Texas Competitive Holdings had outstanding letters of credit under its revolving credit facilities in the amount of $455 million to support risk management and trading margin requirements in the normal course of business, including over-the-counter hedging transactions, and for miscellaneous credit support requirements. As of December 31, 2006, approximately 28% of the obligations supported by these letters of credit mature within one year, and substantially all of the remainder mature in the next four years.

Further, Texas Competitive Holdings has outstanding letters of credit under its revolving credit facilities totaling $455 million at December 31, 2006 to support existing floating rate pollution control revenue bond debt of $446 million principal amount. The letters of credit are available to fund the payment of such debt obligations and expire in 2009.

*Security Interest*—A first-lien security interest has been placed on the two lignite/coal-fueled generation units at Texas Competitive Holdings' Big Brown plant to support commodity hedging transactions.

*Nuclear Insurance*—Nuclear insurance includes liability coverage, property damage, decontamination and premature decommissioning coverage and accidental outage and/or extra expense coverage. The liability coverage is governed by the Price-Anderson Act (Act), while the property damage, decontamination and

Confidential

EFIHMW00208517

premature decommissioning coverage is promulgated by the rules and regulations of the NRC. Energy Future Holdings Corp. intends to maintain insurance against nuclear risks as long as such insurance is available. Energy Future Holdings Corp. is self-insured to the extent that losses (i) are within the policy deductibles, (ii) are not covered per policy exclusions, terms and limitations, (iii) exceed the amount of insurance maintained, or (iv) are not covered due to lack of insurance availability. Such losses could have a material adverse effect on Energy Future Holdings Corp.'s financial condition and its results of operations and cash flows.

With regard to liability coverage, the Act provides financial protection for the public in the event of a significant nuclear generation plant incident. The Act sets the statutory limit of public liability for a single nuclear incident at $10.8 billion and requires nuclear generation plant operators to provide financial protection for this amount. The US Congress could impose revenue-raising measures on the nuclear industry to pay claims exceeding the $10.8 billion limit for a single incident mandated by the Act. As required, Energy Future Holdings Corp. provides this financial protection for a nuclear incident at Comanche Peak resulting in public bodily injury and property damage through a combination of private insurance and industry-wide retrospective payment plans. As the first layer of financial protection, Energy Future Holdings Corp. has $300 million of liability insurance from American Nuclear Insurers (ANI), which provides such insurance on behalf of a major stock insurance company pool, Nuclear Energy Liability Insurance Association. The second layer of financial protection is provided under an industry-wide retrospective payment program called Secondary Financial Protection (SFP).

Under the SFP, in the event of an incident at any nuclear generation plant in the US, each operating licensed reactor in the US is subject to an assessment of up to $100.6 million plus a 3% insurance premium tax, subject to increases for inflation every five years. Assessments are limited to $15 million per operating licensed reactor per year per incident. Energy Future Holdings Corp.'s maximum potential assessment under the industry retrospective plan would be $201.2 million (excluding taxes) per incident but no more than $30 million in any one year for each incident. The potential assessment is triggered by a nuclear liability loss in excess of $300 million per accident at any nuclear facility. The SFP and liability coverage are not subject to any deductibles.

With respect to nuclear decontamination and property damage insurance, the NRC requires that nuclear generation plant license-holders maintain at least $1.1 billion of such insurance and require the proceeds thereof to be used to place a plant in a safe and stable condition, to decontaminate it pursuant to a plan submitted to and approved by the NRC before the proceeds can be used for plant repair or restoration or to provide for premature decommissioning. Energy Future Holdings Corp. maintains nuclear decontamination and property damage insurance for Comanche Peak in the amount of $3.5 billion (subject to $1 million deductible per accident), above which Energy Future Holdings Corp. is self-insured. The $3.5 billion consists of a primary layer of coverage of $500 million provided by Nuclear Electric Insurance Limited (NEIL), a nuclear electric utility industry mutual insurance company, $2.25 billion of premature decommissioning coverage provided by NEIL and $737 million of other property damage coverage from other insurance markets and foreign nuclear insurance pools.

Energy Future Holdings Corp. maintains Accidental Outage Insurance through NEIL to cover the additional costs of obtaining replacement electricity from another source if one or both of the units at Comanche Peak are out of service for more than twelve weeks as a result of covered direct physical damage. The coverage provides for weekly payments of $3.5 million for the first fifty-two weeks and $2.8 million for the next 110 weeks for each outage, respectively, after the initial twelve-week waiting period. The total maximum coverage is $490 million per unit. The coverage amounts applicable to each unit will be reduced to 80% if both units are out of service at the same time as a result of the same accident.

If NEIL's losses exceeded its reserves for the applicable coverages, potential assessments total $14.5 million for primary property, $14.1 million for excess property and $8.3 million for accidental outage.

Also, under the NEIL policies, if there were multiple terrorism losses occurring within a one-year time frame, NEIL would make available one industry aggregate limit of $3.2 billion plus any amounts it recovers from other sources up to the limits for each claimant. If terrorism losses occurred beyond the one-year period, a new

F-94

Confidential

set of limits and resources would apply. Under the ANI liability policy, the liability arising out of terrorist acts will be subject to one industry aggregate limit of $300 million that could be reinstated at ANI's option depending on prevailing risk circumstances and the balance in the Industry Credit Rating Plan reserve fund. Under the US Terrorism Risk Insurance Extension Act of 2005, the US government provides reinsurance with respect to acts of terrorism in the US for losses caused by an individual or individuals acting on behalf of foreign parties. In such circumstances, the NEIL and ANI terrorism aggregates would not apply.

## 17. SHAREHOLDERS' EQUITY

*Declaration of Dividend*—At its February 2007 meeting, the Board of Directors of Energy Future Holdings Corp. declared a quarterly dividend of $0.4325 a share, payable April 2, 2007 to shareholders of record on March 2, 2007.

*Stock Split*—In 2005, Energy Future Holdings Corp.'s board of directors declared a two-for-one stock split effected in the form of a 100 percent stock dividend. The stock split entitled each shareholder of record at the close of business on November 18, 2005, to receive one additional share for every outstanding share of common stock they held on that date. The additional shares resulting from the stock split were distributed on December 8, 2005.

*Common Stock Repurchase*—In November 2005, the Energy Future Holdings Corp. board of directors authorized the repurchase of up to 34 million shares of common stock through the end of 2006. This authorization has been extended to year end 2007. Additionally, in November 2006, the Energy Future Holdings Corp. board of directors authorized the repurchase of an additional 20 million shares of common stock through year end 2007. Under these authorities, Energy Future Holdings Corp. has repurchased and retired approximately 31 million shares, including 12 million shares in November 2005 and 19 million shares during the twelve months ended December 31, 2006 at an average price of $49.51 and $51.77 per share, respectively, (including related fees and expenses).

*Common Stock Issuance*—In May 2006, Energy Future Holdings Corp. settled the purchase contracts associated with its remaining equity-linked debt securities. In connection with the settlement, Energy Future Holdings Corp. issued 5.7 million shares of common stock, resulting in an increase in additional paid-in capital of $180 million.

*Accelerated Share Repurchase Program*—In November 2004, Energy Future Holdings Corp. entered into an agreement with a broker-dealer counterparty under which Energy Future Holdings Corp. repurchased and retired 105 million shares of its outstanding common stock at an initial price of $32.29 per share for a total of $3.4 billion. Under the agreement, the counterparty immediately borrowed shares that were sold to and canceled by Energy Future Holdings Corp. and in turn purchased shares in the open market over a subsequent time period; the agreement was subject to a future contingent purchase price adjustment based on the actual price of the shares purchased by the counterparty. In May 2005, Energy Future Holdings Corp. paid $523 million (including related fees and expenses) in cash to the counterparty in full settlement of the transaction. The counterparty had repurchased the shares under the agreement at an average price per share of $36.91.

*Thrift Plan*—The Thrift Plan is an employee savings plan under which Energy Future Holdings Corp. matches a portion of employees' contributions of their earnings with a contribution in shares of common stock. Contributions to the Thrift Plan are held by an unconsolidated trust. At December 31, 2006, the Thrift Plan had an obligation of $210 million outstanding in the form of a note payable to Energy Future Holdings Corp. (LESOP note). Proceeds from the issuance of the note, which Energy Future Holdings Corp. purchased from a third-party lender in 1990, were used by the Thrift Plan trustee to purchase Energy Future Holdings Corp. common stock on the open market for the purpose of satisfying future matching requirements. These shares (LESOP shares) are held by the Thrift Plan trustee under the leveraged employee stock ownership provision of the Thrift Plan. The note receivable has been classified as a reduction of common stock equity, and the principal and related interest is being amortized as a component of LESOP-related expense.

F-95

Confidential

At December 31, 2006, the Thrift Plan trustee held 6,177,171 shares of Energy Future Holdings Corp. common stock. The Thrift Plan uses dividends received on the LESOP shares held and contributions from Energy Future Holdings Corp., if required, to repay interest and principal on the LESOP note; such contributions totaled $17 million in 2006 and $19 million in 2005. The net expense associated with the Thrift Plan totaled $24 million in 2004, which included $14 million representing the cost of additional matching contributions; the amounts in 2006 and 2005 were not significant.

*Direct Stock Purchase and Dividend Reinvestment Plan*—Issuances of new shares to satisfy purchases by participants in this plan (including reinvestment of dividends) increased common stock by $4 million in 2004. Since April 2004, share purchases by participants have been satisfied through purchases in the open market by Energy Future Holdings Corp.

At December 31, 2006, authorized but unissued common shares of Energy Future Holdings Corp. were registered with the SEC for new issuance pursuant to provisions of the following:

|  | Number of Shares |
|---|---|
| DRIP Plan | 3,710,195 |
| Thrift Plan | 8,849,200 |
| Long-Term Incentive Compensation Plan | 5,426,007 |
| Omnibus Incentive Compensation Plan | 17,976,140 |
| Convertible senior notes | 1,523,916 |
| Other | 1,345,494 |
| Total | 38,830,952 |

*Energy Future Holdings Corp. Preference Stock*—In June 2005, Energy Future Holdings Corp. redeemed for cash all 3,000 shares of its Series B preference stock outstanding (liquidation preference of $100,000 per share) at the aggregate principal amount of $300 million. The preference stock had a dividend rate of 7.24%.

*Energy Future Competitive Holding Company's Preferred Stock*—In August 2005, Energy Future Competitive Holdings Company redeemed all 379,231 shares of its outstanding preferred stock with a stated value of $38 million for approximately $40 million in cash, including principal, premium and accrued dividends. The preferred stock had dividend rates ranging from $4.00 to $5.08 per share. In December 2005, Energy Future Competitive Holdings Company reissued 788 shares of its $4.56 Series preferred stock in private placement transactions.

*Exchangeable Preferred Membership Interests of Texas Competitive Holdings*—In April 2004, Energy Future Holdings Corp. repurchased Texas Competitive Holdings' exchangeable preferred membership interests with a liquidation amount of $750 million for $1.85 billion (including transaction costs). The excess of the purchase price over the carrying value of the securities, net of $384 million in income tax benefits recorded as a deferred tax asset, was recorded as a charge to additional paid-in capital in the amount of $849 million. The carrying value of the securities was $617 million, which is the liquidation amount of $750 million net of $102 million in unamortized discount and $31 million in unamortized debt issuance costs, both recorded at the time of issuance of the securities in November 2002. The charge to additional paid-in capital was accounted for in a manner similar to Energy Future Holdings Corp.'s preference share dividends, resulting in a reduction in net income available to common shareholders.

F-96

Confidential

EFIHMW00208520

*Dividend Restrictions*—At December 31, 2006, there were no restrictions on the payment of common stock dividends or redemption of outstanding shares of Energy Future Holdings Corp. common stock.

The table below reflects the changes in the number of Energy Future Holdings Corp. common stock shares outstanding:

|  | 2006 | 2005 | 2004 |
|---|---|---|---|
| Balance at beginning of year | 470,845,978 | 479,705,760 | 647,766,184 |
| Issuances under equity-linked debt securities | 5,683,791 | 2,708,250 | 3,634,742 |
| Issuances under Direct Stock Purchase and Dividend Reinvestment Plan | — | — | 220,028 |
| Issuances under stock-based incentive compensation plans (Note 22) | 2,200,766 | 1,093,480 | 1,187,028 |
| Issued on conversion of convertible senior notes | — | 9,716 | — |
| Repurchases | (18,165,403) | (12,476,228) | (168,514,888) |
| Forfeitures and cancellations under stock-based incentive compensation plan | (1,320,609) | (195,000) | (4,587,334) |
| Balance at end of year | 459,244,523 | 470,845,978 | 479,705,760 |

## 18. COMMODITY CONTRACT ASSETS AND LIABILITIES

Commodity contract assets and liabilities primarily represent mark-to-market values of natural gas and electricity derivative instruments that have not been designated as cash flow hedges or "normal" purchases or sales under SFAS 133.

Current and noncurrent commodity contract assets totaling $438 million and $1.9 billion at December 31, 2006 and 2005, respectively, are stated net of applicable credit (collection) and performance reserves totaling $9 million and $12 million, respectively. Performance reserves are provided for direct, incremental costs to settle the contracts.

Current and noncurrent commodity contract liabilities totaled $461 million and $2.0 billion at December 31, 2006 and 2005, respectively. The balance at December 31, 2006 includes a $109 million "day one" loss recorded in the second quarter of 2006 associated with a related series of hedging contracts entered into at below market prices. The contracts, the value of which are based on natural gas prices, are intended to hedge exposure to future changes in electricity prices. The loss was recorded as a reduction of revenues, consistent with other mark-to-market gains and losses, and is included in the results of the Competitive Electric segment. Future changes in fair value of the contracts, to the extent effective, are expected to be largely reflected in other comprehensive income due to designation as cash flow hedges.

## 19. CASH FLOW HEDGE AND OTHER DERIVATIVE ASSETS AND LIABILITIES

Cash flow hedge and other derivative assets and liabilities represent mark-to-market values of derivative contracts, the substantial majority of which have been designated as cash flow or fair value hedges under SFAS 133. Cash flow hedges consist primarily of natural gas derivative financial instruments. The change in fair value of these derivative assets and liabilities are recorded as other comprehensive income or loss to the extent the hedges are effective; the ineffective portion of the change in fair value is included in net income. (See Note 1 under "Derivative Instruments and Mark-to-Market Accounting"). Fair value hedges consist of fixed-to-variable interest rate swaps, and the change in fair value of the derivative assets and liabilities are recorded as an increase or decrease in the carrying value of the debt.

Confidential

EFIHMW00208521

**PX 008**
**Page 400 of 501**

A summary of cash flow hedge and other derivative assets and liabilities follows:

| | December 31, 2006 | December 31, 2005 |
|---|---|---|
| Current and noncurrent assets: | | |
| Commodity-related cash flow hedges | $933 | $131 |
| Debt-related fair value hedges | 4 | — |
| Other | 9 | 9 |
| Total | $946 | $140 |
| Current and noncurrent liabilities: | | |
| Commodity-related cash flow hedges | $ 23 | $295 |
| Debt-related fair value hedges | 89 | 71 |
| Total | $112 | $366 |

***Other Cash Flow Hedge Information***

Energy Future Holdings Corp. experienced cash flow hedge ineffectiveness related to positions held at the end of the period of $218 million in net gains in 2006, $38 million in net losses in 2005 and $21 million in net losses in 2004. These amounts are pretax and are reported in revenues.

The net effect of recording unrealized mark-to-market gains and losses arising from hedge ineffectiveness (versus recording gains and losses upon settlement) includes the above amounts as well as the effect of reversing unrealized ineffectiveness gains and losses recorded in previous periods to offset realized gains and losses in the current period. Such net unrealized effect totaled $239 million in net gains in 2006, $27 million in net losses in 2005 and $19 million in net losses in 2004.

As of December 31, 2006, commodity positions accounted for as cash flow hedges reduce exposure to variability of future cash flows from future revenues or purchases through 2011.

Cash flow hedge amounts reported in accumulated other comprehensive income will be recognized in earnings as the related forecasted transactions are settled or become probable of not occurring. No amounts were reclassified into earnings in 2006, 2005 or 2004 as a result of the discontinuance of cash flow hedge accounting because a hedged forecasted transaction became probable of not occurring.

Cash flow hedge amounts reported in the Statements of Consolidated Comprehensive Income exclude net gains and losses associated with cash flow hedges entered into and settled within the periods presented. These amounts totaled $31 million in after-tax net gains in 2006, $53 million in after-tax net losses in 2005 and $1 million in after-tax net gains in 2004.

Energy Future Holdings Corp. expects that $132 million of after-tax net gains related to cash flow hedges included in accumulated other comprehensive income will be reclassified into net income during the next twelve months as the related hedged transactions are settled and affect net income. Of this amount, $139 million in gains relate to commodity hedges and $7 million in losses relate to debt-related hedges. The following table summarizes after-tax balances currently recognized in accumulated other comprehensive income:

| | Accumulated Other Comprehensive Income at December 31, 2006 Gain (Loss) | | |
|---|---|---|---|
| | Commodity-related | Debt-Related | Total |
| Dedesignated hedges—amounts fixed | $131 | $(57) | $ 74 |
| Hedges subject to fair value adjustments | 337 | — | 337 |
| Total | $468 | $(57) | $411 |

## 20. INVESTMENTS

The balance of investments consists of the following:

|  | December 31, | |
|---|---|---|
|  | 2006 | 2005 |
| Nuclear decommissioning trust | $447 | $389 |
| Assets related to employee benefit plans | 197 | 187 |
| Land | 36 | 35 |
| Note receivable from Capgemini | 25 | 25 |
| Investment in unconsolidated affiliates | 3 | 3 |
| Miscellaneous other | 4 | 4 |
| Total investments | $712 | $643 |

*Nuclear Decommissioning Trust*—Deposits in a trust fund for costs to decommission the Comanche Peak nuclear generation plant are carried at fair value. Decommissioning costs are being recovered from Oncor Electric Delivery's customers as a delivery fee surcharge over the life of the plant and deposited in the trust fund. Net gains and losses on investments in the trust fund are offset by a corresponding adjustment to a regulatory asset/liability. A summary of investments in the fund follows:

|  | December 31, 2006 | | | |
|---|---|---|---|---|
|  | Cost(a) | Unrealized gain | Unrealized loss | Fair market value |
| Debt securities | $169 | $ 5 | $ (1) | $173 |
| Equity securities | 162 | 117 | (5) | 274 |
| Total | $331 | $122 | $ (6) | $447 |

|  | December 31, 2005 | | | |
|---|---|---|---|---|
|  | Cost(a) | Unrealized gain | Unrealized loss | Fair market value |
| Debt securities | $151 | $ 5 | $ (1) | $155 |
| Equity securities | 156 | 90 | (12) | 234 |
| Total | $307 | $ 95 | $(13) | $389 |

(a)   Includes realized gains and losses of securities sold.

Debt securities held at December 31, 2006 mature as follows: $54 million in one to five years, $60 million in five to ten years and $59 million after ten years.

*Assets Related to Employee Benefit Plans*—The majority of these assets represent cash surrender values of life insurance policies that are purchased to fund liabilities under deferred compensation plans. Energy Future Holdings Corp. pays the premiums and is the beneficiary of these life insurance policies. As of December 31, 2006 and 2005, the face amount of these policies totaled $501 million and $521 million, and the net cash surrender values totaled $167 million and $151 million, respectively. Changes in cash surrender value are netted against premiums paid. Other investment assets held to satisfy deferred compensation liabilities are recorded at market value.

*Capgemini Agreement*—In May 2004, Energy Future Holdings Corp. entered into a services agreement with Capgemini to outsource certain support activities. As part of the agreement, Capgemini was provided a royalty-free right, under an asset license arrangement, to use Energy Future Holdings Corp.'s information technology assets, consisting primarily of computer software. Energy Future Holdings Corp. obtained a 2.9% limited partnership interest in Capgemini in exchange for the asset license. Energy Future Holdings Corp. has the right to sell (the put option) its interest and the licensed software to Cap Gemini North America Inc. for $200

F-99

Confidential

million, plus its share of Capgemini's undistributed earnings, upon expiration of the services agreement or earlier upon the occurrence of certain unexpected events. Cap Gemini North America Inc. has the right to purchase these interests under the same terms and conditions. The partnership interest has been recorded at an initial value of $2.9 million and is being accounted for on the cost method.

Energy Future Holdings Corp. recorded the estimated fair value of the put option of $177 million in 2004, reported in the balance sheet in other noncurrent assets. Of this amount, $169 million was recorded as a reduction to the carrying value of the licensed software, and the balance, which represents the fair value of the assumed cash distributions and gains while holding the partnership interest, was recorded as a noncurrent deferred credit. This accounting is in accordance with AICPA Statement of Position 98-1, "Accounting for the Costs of Computer Software Developed or Obtained for Internal Use."

In July 2004, Energy Future Holdings Corp. loaned Capgemini $25 million for working capital purposes pursuant to a promissory note that bears interest at an annual rate of 4% and matures in July 2019.

Subject to certain terms and conditions, Cap Gemini North America, Inc. and its parent, Cap Gemini S.A., have guaranteed the performance and payment obligations of Capgemini under the services agreement, as well as payments under the put option.

## 21. PENSION AND OTHER POSTRETIREMENT EMPLOYEE BENEFITS

*Adoption of SFAS 158*—In September 2006, the FASB issued SFAS 158, which was adopted by Energy Future Holdings Corp. effective December 31, 2006, as required. SFAS 158 requires reporting in the balance sheet of the funded status of defined benefit pension and other postretirement employee benefit (OPEB) plans. Periodic pension and OPEB costs continue to be determined in accordance with SFAS 87 and SFAS 106. Under these standards, the accrued benefit obligation recognized in the balance sheet represented the cumulative difference between the net periodic benefit costs and cash funding of the plans. SFAS 87 also required the recording of a minimum pension liability representing the excess of the accumulated benefit obligation over the fair value of the plans' assets and the accrued benefit obligation already recorded under SFAS 87. The recording of the minimum pension liability resulted in adjustments to other comprehensive income or balance sheet accounts, principally regulatory assets.

SFAS 158 requires that both the pension and OPEB accrued benefit obligation reported in the balance sheet represent the funded status of the plans based on the projected benefit obligation, which for the pension plan takes into account future compensation increases. For Energy Future Holdings Corp., the initial recognition of the funded status on the financial statements is largely reflected as an increase in the accrued benefit obligation and an increase in regulatory assets. The recording of a regulatory asset, instead of a reduction in the accumulated other comprehensive income component of shareholders' equity as set forth in SFAS 158, is based on the regulatory recovery of retirement benefits under the June 2005 amendment to PURA. See discussion below under "Regulatory Recovery of Pension and Other Postretirement Employee Benefit Costs".

Confidential

EFIHMW00208524

The following summarizes the impact on the consolidated balance sheet of adopting SFAS 158:

| | December 31, 2006 | | |
| --- | --- | --- | --- |
| | Balances Prior to Application of SFAS 158 | Increase (Decrease) to Balances | Balances After Application of SFAS 158 |
| Pension assets | $ 16 | $ (7) | $ 9 |
| Noncurrent assets: | | | |
| Accumulated deferred income taxes | $176 | $ 14 | $ 190 |
| Regulatory assets | $ 61 | $343 | $ 404 |
| Current liabilities: | | | |
| Defined benefit pension and OPEB obligations | $ — | $ 2 | $ 2 |
| Noncurrent liabilities: | | | |
| Defined benefit pension and OPEB obligations | $708 | $361 | $1,069 |
| Shareholders' equity: | | | |
| Accumulated other comprehensive income—net | $ 11 | $(13) | $ (2) |

The amounts recorded in the fourth quarter of 2006 upon adoption of SFAS 158 were based on the measurements of Energy Future Holdings Corp.'s pension and OPEB plans at the December 31, 2006 year-end date, which has been Energy Future Holdings Corp.'s practice but is now required under SFAS 158.

The recording of the total liability did not affect any financial covenants in credit agreements.

*Pension Plan*—Energy Future Holdings Corp. is the plan sponsor of the TXU Retirement Plan (Retirement Plan), which provides benefits to eligible employees of consolidated subsidiaries (participating employers) based on years of service and average earnings. The Retirement Plan is a defined benefit pension plan intended to qualify under Section 401(a) of the Internal Revenue Code of 1986, as amended (Code) and is subject to the provisions of the Employee Retirement Income Security Act of 1974, as amended (ERISA). Employees are eligible to participate in the Retirement Plan upon their completion of one year of service and the attainment of age 21. The Retirement Plan provides benefits to participants under one of two formulas: (i) a cash balance formula under which participants earn monthly contribution credits based on their compensation and a combination of their age and years of service, plus monthly interest credits, or (ii) a traditional defined benefit formula based on years of service and the average earnings of the three years of highest earnings. The cash balance interest component of the cash balance plan is variable and is determined using the yield on 30-year Treasury bonds.

All eligible employees hired after January 1, 2001 participate under the cash balance formula. Certain employees who, prior to January 1, 2002, participated under the traditional defined benefit formula, continue their participation under that formula. Under the cash balance formula, future increases in earnings will not apply to prior service costs. It is Energy Future Holdings Corp.'s policy to fund the plans on a current basis to the extent deductible under existing federal tax regulations.

Energy Future Holdings Corp. also has supplemental unfunded retirement plans for management employees, the information for which is included in the data below.

*Minimum Pension Liability Adjustment Prior to SFAS 158*—As discussed above, Energy Future Holdings Corp. recorded a minimum pension liability prior to the adoption of SFAS 158. The minimum pension liability recorded for the year ended December 31, 2005 totaled $112 million after-tax, of which a loss of $46 million after-tax was recorded as a charge to other comprehensive income and $66 million, net of deferred tax liability, was recorded as a regulatory asset. The minimum pension liability recorded for the year ended December 31, 2004 totaled $24 million after-tax and was recorded as a charge to other comprehensive income.

F-101

Confidential

EFIHMW00208525

**PX 008**
**Page 404 of 501**



*Detailed Information Regarding Pension Benefits*—The following information is based on December 31 measurement dates:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2006 | 2005 | 2004 |
| *Assumptions Used to Determine Net Periodic Pension Cost:* | | | |
| Discount rate | 5.75% | 6.00% | 6.00% - 6.50% |
| Expected return on plan assets | 8.75% | 8.75% | 8.50% |
| Rate of compensation increase | 3.32% | 3.31% | 3.57% |
| *Components of Net Pension Cost:* | | | |
| Service cost | $    42 | $    37 | $        46 |
| Interest cost | 136 | 130 | 130 |
| Expected return on assets | (147) | (145) | (142) |
| Amortization of prior service cost | 3 | 3 | 4 |
| Amortization of net loss | 32 | 20 | 13 |
| Recognized curtailment loss | — | 1 | 7 |
| Net periodic pension cost | $    66 | $    46 | $        58 |
| *Assumptions used to determine benefit obligations at December 31:* | | | |
| Discount rate | 5.90% | 5.75% | 6.00% |
| Rate of compensation increase | 3.44% | 3.32% | 3.57% |
| *Change in Pension Obligation:* | | | |
| Projected benefit obligation at beginning of year | $ 2,440 | $ 2,218 | |
| Service cost | 42 | 37 | |
| Interest cost | 136 | 130 | |
| Plan amendments | 2 | — | |
| Actuarial (gain) loss | (47) | 195 | |
| Benefits paid | (116) | (128) | |
| Settlements | — | (12) | |
| Projected benefit obligation at end of year | $ 2,457 | $ 2,440 | |
| Accumulated benefit obligation at end of year | $ 2,297 | $ 2,277 | |
| *Change in Plan Assets:* | | | |
| Fair value of assets at beginning of year | $ 1,982 | $ 1,995 | |
| Actual return on assets | 220 | 121 | |
| Employer contributions | 4 | 3 | |
| Benefits paid | (116) | (128) | |
| Settlements | — | (9) | |
| Fair value of assets at end of year | $ 2,090 | $ 1,982 | |
| *Funded Status:* | | | |
| Projected pension benefit obligation | $(2,457) | $(2,440) | |
| Fair value of assets | 2,090 | 1,982 | |
| Funded status at end of year | $  (367) | $  (458) | |
| Unrecognized prior service cost | — | 8 | |
| Unrecognized net loss | — | 357 | |
| Accrued pension cost | $  (367) | $    (93) | |

F-102

Confidential

EFIHMW00208526

| Amounts Recognized in the Balance Sheet Consist of: | December 31, 2006 | December 31, 2005 |
|---|---|---|
| Other noncurrent assets[a] | | |
| Intangible asset | $ 9 | $ 8 |
| Regulatory asset | — | 9 |
| Other current liabilities | — | 66 |
| Other noncurrent liabilities | (2) | — |
| Accumulated other comprehensive income | (374) | (304) |
| Accumulated deferred income tax assets | — | 60 |
| Net amount recognized | — | 68 |
|  | $(367) | $ (93) |

*Amounts Recognized in Other Comprehensive Income and Accumulated Other Comprehensive Income under SFAS 158 Consist of:*

| | |
|---|---|
| Net loss | |
| Prior service cost | $ 2 |
|  | 5 |
| Net amount recognized | $ 7 |

*Amounts Recognized as Regulatory Assets under SFAS 158 Consist of:*

| | |
|---|---|
| Net loss | |
| Prior service cost | $ 203 |
|  | 3 |
| Net amount recognized | $ 206 |

_____

(a)  Amounts represent overfunded plans.

The following table provides information regarding pension plans with projected benefit obligation (PBO) and accumulated benefit obligation (ABO) in excess of the fair value of plan assets.

| Pension Plans with PBO and ABO in Excess of Plan Assets: | Year Ended December 31, 2006 | Year Ended December 31, 2005 |
|---|---|---|
| Projected benefit obligation | $2,452 | $2,435 |
| Accumulated benefit obligation | 2,291 | 2,271 |
| Plan assets | 2,076 | 1,967 |

*Asset Allocations*—The weighted-average asset allocations of pension plans by asset category are as follows:

| Asset Type | Allocation of Plan Assets 2006 | Allocation of Plan Assets 2005 | Target Allocation Ranges | Expected Long-term Returns |
|---|---|---|---|---|
| US equities | 46.1% | 49.9% | 30% - 65% | 9.5% |
| International equities | 18.6% | 16.0% | 5% - 20% | 10.0% |
| Fixed income | 31.9% | 29.4% | 15% - 50% | 6.8% |
| Real estate | 3.4% | 4.7% | 0% - 10% | 8.2% |
|  | 100.0% | 100.0% | | 8.75% |

*Expected Long-Term Rate of Return on Assets Assumption*—Energy Future Holdings Corp. considered both historical returns and future expectations for returns of various asset classes in its determination of the expected long-term rate of return assumption. A key expectation is that current interest rates will move towards an equilibrium interest rate that produces a 6% yield on intermediate government bonds. Expected returns for other asset classes are based on incremental returns over such expected government bond yield. The expected return for each asset class is then weighted based on the target asset allocation to develop the expected long-term rate of return assumption for the portfolio.

F-103

Confidential