In the event of a foreclosure, liquidation, bankruptcy or similar proceeding, the proceeds from any sale of the membership interests of Oncor Holdings and other Collateral may not be sufficient to pay the obligations due under the New Senior Secured Notes.

To the extent that the claims of the holders of the New Senior Secured Notes exceed the value of the membership interests of Oncor Holdings and other Collateral, those claims will rank equally with the claims of the holders of EFH Corp.'s then outstanding Old Notes and other debt. As a result, if the value of the membership interests of Oncor Holdings and other Collateral is less than the value of the claims of the holders of the New Senior Secured Notes, those claims may not be satisfied in full.

The security interest granted in favor of the collateral trustee is subject to practical problems generally associated with the realization of security interests in collateral. For example, the collateral trustee may need to obtain the consent of a third party to obtain or enforce a security interest in a contract, and we cannot assure you that the collateral trustee will be able to obtain any such consent. The consents of any third parties may not be given when required to facilitate a foreclosure on any particular assets. Accordingly, the collateral trustee may not have the ability to foreclose upon such assets, and the value of the Collateral may significantly decrease.

Regulatory approvals may be required in order to enforce the security interests against the Collateral and to dispose of an interest in, or operational control of, the Collateral that secures the New EFIH Senior Secured Notes and EFIH's guarantee of the New EFH Senior Secured Notes.

The Collateral securing the New EFIH Senior Secured Notes and EFIH's guarantee of the New EFH Senior Secured Notes will include all of the membership interests of Oncor Holdings, which are held by EFIH. Pursuant to the Public Utility Regulatory Act ("PURA"), Texas Utilities Code §§39.262(l) and 39.915, an electric utility must obtain prior PUCT approval of any change in majority ownership, controlling ownership or operational control of Oncor. As a result, prior to any foreclosure on the membership interests of Oncor Holdings, approval of the PUCT may be required for a change in ownership or control of Oncor Holdings. Pursuant to PURA §§39.262(m) and 39.915(b), the PUCT will approve such a transfer if it finds that the transaction is in the public interest. In making its determination, these sections of PURA provide that the PUCT will consider whether the transaction will adversely affect the reliability of service, availability of service or cost of service of Oncor. Therefore, in connection with any action taken to enforce the security against the Collateral, such approval may not be granted and, if it were to be granted, it is not known how long such approval would take to obtain. Even if the approval were granted to foreclose on the Collateral, then additional prior PUCT approval may also be required for any subsequent change in majority ownership, controlling ownership or operational control in the membership interests of Oncor Holdings.

In addition, pursuant to the terms of an investor rights agreement among EFH Corp., Oncor Holdings, Oncor and Texas Transmission, the noncontrolling investor in Oncor, any transfer of the equity interests in Oncor Holdings to a third party, including as a result of any enforcement of the lien on the Collateral securing the New EFIH Senior Secured Notes and EFIH's guarantee of the New EFH Senior Secured Notes, may be limited and give rise to a tag-along right of Texas Transmission to participate in that transfer on a pro rata basis, which may hinder the enforcement of the lien on the Collateral in a timely manner, if at all. See "The Transactions—Sale of Noncontrolling Interest in Oncor" for a description of the investor rights agreement.

***In the event of any Offeror's bankruptcy, the ability of the holders of New Senior Secured Notes to realize upon the Collateral securing the New EFIH Senior Secured Notes or EFIH's guarantee of the New EFH Senior Secured Notes will be subject to certain bankruptcy law limitations.***

The right of the trustees for the New Senior Secured Notes to repossess and dispose of the Collateral which is securing the New EFIH Senior Secured Notes and EFIH's guarantee of the New EFH Senior Secured Notes upon acceleration is likely to be significantly impaired by federal bankruptcy law if bankruptcy proceedings are commenced by or against any Offeror. This could be true even if bankruptcy proceedings are commenced after

52

EFIHMW00245780

**PX 014**
**Page 62 of 1116**

the trustees for the New Senior Secured Notes have repossessed and disposed of the Collateral. Under bankruptcy law, a secured creditor, such as the trustees for the New Senior Secured Notes, is prohibited from repossessing collateral from a debtor in a bankruptcy case, or from disposing of collateral repossessed from a debtor, without bankruptcy court approval. Moreover, bankruptcy law permits the debtor to continue to retain and to use any such collateral, and the proceeds, products, rents or profits of such collateral, even though the debtor is in default under the applicable debt instruments, provided that the secured creditor is given "adequate protection." The meaning of the term "adequate protection" varies according to circumstances, but in general the doctrine of "adequate protection" requires a debtor to protect the value of a secured creditor's interest in the collateral, through cash payments, the granting of an additional security interest or otherwise. It is impossible to predict whether or when payments in respect of the New Senior Secured Notes might be made following commencement of a bankruptcy case, whether or when the trustee would repossess or dispose of the Collateral, or whether or to what extent holders of the New Senior Secured Notes would be compensated for any delay in payment or loss of value of the Collateral through the requirements of "adequate protection." Furthermore, in the event the bankruptcy court determines that the value of the Collateral is not sufficient to repay all amounts due on the New Senior Secured Notes, the holders of the New Senior Secured Notes would have unsecured "deficiency claims" as to the difference. Federal bankruptcy laws do not generally permit the payment of interest, costs, or attorneys' fees for unsecured claims during the debtor's bankruptcy case.

***Under the indentures governing the New Senior Secured Notes, holders of the New Senior Secured Notes agree to not file a bankruptcy proceeding against Oncor Holdings or any of its subsidiaries.***

In connection with the exchange offers and consent solicitations, holders that receive the New EFH Senior Secured Notes and the New EFIH Senior Secured Notes will, as part of participation in the exchange offers and consent solicitations, acknowledge and agree that they will not (i) initiate any legal proceeding to procure the appointment of an administrative receiver or (ii) institute any bankruptcy, reorganization, insolvency, winding up, liquidation, or any like proceeding under applicable law, against Oncor Holdings, Oncor or any of their subsidiaries, or against any of the assets of Oncor Holdings, Oncor or any of their subsidiaries. Such holders will further acknowledge and agree that each of Oncor Holdings, Oncor and any of their subsidiaries is a third party beneficiary of the foregoing covenant and have the right to specifically enforce such covenant in any proceeding at law or in equity.

***In the event that EFIH becomes the subject of a bankruptcy proceeding, holders of the New EFIH Senior Secured Notes will only have a claim for repayment of their New EFIH Senior Secured Notes against EFIH's assets, including the membership interests of Oncor Holdings and any other Collateral.***

Holders of the New EFIH Senior Secured Notes will not benefit from a guarantee of any of EFH Corp.'s other subsidiaries. Therefore, in the event that EFIH becomes the subject of a bankruptcy proceeding, holders of New EFIH Senior Secured Notes will only have a claim against EFIH's assets, including the membership interests of Oncor Holdings and any other Collateral, to satisfy any outstanding principal, premium and interest on the New EFIH Senior Secured Notes, and will have no claim against the assets of EFH Corp. or any of its subsidiaries (other than EFIH), including EFCH and TCEH. Therefore, a holder of TCEH Notes that receives New EFIH Senior Secured Notes in the exchange offers will no longer have a claim against the assets of TCEH and EFCH.

***The value of the Collateral may be diluted if we issue additional debt that is secured equally and ratably by the same Collateral securing the New EFIH Senior Secured Notes and the guarantee by EFIH of the New EFH Senior Secured Notes or if the Collateral is sold.***

The indentures governing the New Senior Secured Notes will provide that EFH Corp. and EFIH may incur up to an aggregate of $4.0 billion of debt, including the New Senior Secured Notes to be issued on the Settlement Date, which is secured on a parity lien basis by the Collateral. Therefore, because less than $4.0 billion of New EFIH Senior Secured Notes and New EFH Senior Secured Notes will be issued in the exchange offers, EFH

53

EFIHMW00245781

Corp. and EFIH may subsequently incur additional debt secured on a parity lien basis by the Collateral up to the $4.0 billion limit, subject to restrictions on their ability to incur debt and liens under the indentures governing the New Senior Secured Notes and under other documents governing their indebtedness. To the extent that any of this additional debt is incurred in the future, the interests of holders of the New Senior Secured Notes in the Collateral will be diluted. Additionally, EFH Corp. and EFIH are not restricted from issuing additional debt that is secured by a junior lien on the Collateral, subject to restrictions on their ability to incur debt and liens under the indentures governing the New Senior Secured Notes and under other documents governing their indebtedness.

The collateral trust agreement governing the pledge of Collateral will generally provide that the holders of a majority of the debt secured by a first priority lien on the Collateral, including the New Senior Secured Notes and other future debt incurred by EFH Corp. or EFIH secured by the Collateral equally and ratably, will have, subject to certain limited exceptions, the exclusive right to manage, perform and enforce the terms of the security documents securing the rights of secured debtholders in the Collateral, and to exercise and enforce all privileges, rights and remedies thereunder. To the extent that we incur additional secured debt in the future that is secured equally and ratably with the New Senior Secured Notes, and the amount of this additional secured debt exceeds the amount of outstanding New Senior Secured Notes, the holders of the new secured debt may be able to exercise control under the collateral trust agreement and other security documents.

We will in most cases have control over the Collateral securing the New EFIH Senior Secured Notes and EFIH's guarantee of the New EFH Senior Secured Notes, and to the extent permitted, its sale by us would eliminate the collateral securing such notes and guarantee. The documents governing the pledge of the Collateral permit EFIH to remain in possession of, retain exclusive control over, freely operate and collect, invest and dispose of, any income from, the Collateral, such as cash dividends. In addition, in certain limited circumstances EFIH will have the right to sell the Collateral free and clear of the security interest underlying the New Senior Secured Notes.

> ### Rights of holders of the New Senior Secured Notes in the Collateral may be adversely affected by the failure to perfect security interests in certain Collateral acquired in the future.

EFIH may acquire assets or investments in the future that would be required to be pledged as Collateral securing the New Senior Secured Notes. There can be no assurance that the trustee or the collateral trustee will monitor, or that we will inform the trustee or the collateral trustee of, the future acquisition of assets or investments that would be required to be pledged as Collateral, and that the necessary action will be taken to properly perfect the security interest in such after-acquired Collateral. Neither the trustee nor the collateral trustee for the New Senior Secured Notes has an obligation to monitor the acquisition of additional assets or investments that are required to be pledged as Collateral or the perfection of any security interest in such Collateral. Such failure may result in the loss of the security interest in the Collateral or the priority of the security interest in favor of the New Senior Secured Notes against third parties.

> ### We may transfer or dispose of our interests in EFIH or Oncor Holdings to a third party in a manner that would result in EFIH or such third party becoming the obligor under the New EFH Senior Secured Notes, or such third party becoming the obligor under the New EFIH Senior Secured Notes, without EFH Corp. or EFIH, as the case may be, being required to offer to repurchase the New Senior Secured Notes. The risks of an investment in the New Senior Secured Notes may increase further following such a transaction.

The indenture governing the New EFH Senior Secured Notes will provide that EFH Corp. may engage in a "Permitted Asset Transfer" with respect to EFH Corp.'s ownership of EFIH or EFIH's ownership of Oncor Holdings that would result in the obligations under the New EFH Senior Secured Notes being assumed by EFIH or by a third party to which the investments in Oncor Holdings and its subsidiaries are transferred in any such Permitted Asset Transfer (referred to as a "third party transferee"). Additionally, the disposition of all of EFIH's equity interests and other investments in Oncor Holdings and its subsidiaries (collectively, the "Oncor

54

EFIHMW00245782

Subsidiaries") could result in the New EFIH Senior Secured Notes no longer being obligations of EFIH. A Permitted Asset Transfer includes:

- the direct or indirect sale, assignment, transfer, conveyance or other disposition (including by way of merger, wind-up or consolidation) or spin-off of the equity of EFIH such that it is no longer a subsidiary of EFH Corp., and

- the sale, assignment, transfer, conveyance or other disposition (other than by way of merger, wind-up or consolidation) of all of EFIH's equity interests and other investments in the Oncor Subsidiaries or successor Oncor business and all other Collateral held by EFIH.

If a valid Permitted Asset Transfer occurs, the New EFH Senior Secured Notes would become obligations of EFIH or the third party transferee of the investments in the Oncor Subsidiaries, which would result in the guarantee of EFCH being released and EFH Corp. no longer being liable on the New EFH Senior Secured Notes unless EFH Corp. is the transferee. Currently, and for some period of time following the completion of the exchange offers, it is expected that EFH Corp. will rely on the cash flows from TCEH and its subsidiaries to service its debt obligations, including the New EFH Senior Secured Notes and the New EFIH Senior Secured Notes. Following the completion of a Permitted Asset Transfer other than a merger of EFIH into EFH Corp., the cash flows from EFH Corp. and its other subsidiaries, including TCEH and its subsidiaries, would no longer be available to EFIH to pay interest and principal on the New EFH Senior Secured Notes that would have become EFIH's obligation in connection with the Permitted Asset Transfer, and holders of the transferred New EFH Senior Secured Notes would not be able to look to the assets of EFH Corp. and its subsidiaries in the case of a bankruptcy, liquidation or insolvency with respect to EFIH. As of September 30, 2009, the assets of EFIH and its subsidiaries (including the Oncor Subsidiaries) represented 26% of the total consolidated assets of EFH Corp. and its subsidiaries. In connection with a Permitted Asset Transfer to a third party transferee, such third party transferee would not be a subsidiary of EFH Corp. and would not have the access to such cash flows to service its debt obligations, which would include the transferred New EFH Senior Secured Notes and the New EFIH Senior Secured Notes, nor would such third party transferee be able to look to the assets of EFH Corp. and its subsidiaries in the case of a bankruptcy, liquidation or insolvency. In addition, such third party transferee, as the successor obligor, may not have sufficient sources of capital to service its debt and the obligations under the New Senior Secured Notes, and distributions from the Oncor Subsidiaries may not be available or sufficient to service the obligations under the New Senior Secured Notes. No Oncor Subsidiary will become obligated on the New Senior Secured Notes as a result of a Permitted Asset Transfer.

Additionally, if a Permitted Asset Transfer occurs in accordance with the terms of the indentures governing the New Senior Secured Notes, the Offerors will not be required to make a change of control offer to repurchase the New Senior Secured Notes under either indenture even if a change of control may otherwise have occurred.

If a merger of EFIH into EFH Corp. occurs, the covenants, events of default and other terms of the New EFIH Senior Secured Notes will be amended to be substantially similar to those of the New EFH Senior Secured Notes. The amended provisions may be less restrictive than the original terms of the New EFIH Senior Secured Notes, in particular with respect to the ability to incur debt or make restricted payments.

The indentures governing the New Senior Secured Notes will provide that a Permitted Asset Transfer may only occur if certain conditions are met, including a requirement that the ratings of the New Senior Secured Notes are not lowered by two or more rating agencies (or the only rating agency then rating such New Senior Secured Notes) during a specified period before or after the proposed Permitted Asset Transfer has been publicly announced. However, these conditions may not protect holders against actions that EFIH or the permitted transferee could take that may negatively impact the credit risk of the New Senior Secured Notes following a Permitted Asset Transfer, such as removing assets and cash from EFIH or the Oncor Subsidiaries or increasing debt at EFIH before the Permitted Asset Transfer. In addition, because EFIH is a Restricted Subsidiary under the indenture governing the New EFH Senior Secured Notes, assets of EFIH, including any TCEH Notes and Legacy Notes received and retained by EFIH in connection with the exchange offers, other than the Collateral, could be

Confidential

transferred to EFH Corp. prior to a Permitted Asset Transfer and would in that case not be assets of EFIH or a third party transferee that has become the obligor of the New EFH Senior Secured Notes.

The third party transferee that becomes the obligor on the New EFH Senior Secured Notes may itself engage in a subsequent Permitted Asset Transfer, in which case the risks described above would continue to apply with respect to the subsequent Permitted Asset Transfer and the subsequent third party transferee.

There will be no event of default under the indentures governing the New Senior Secured Notes if the Oncor Subsidiaries take actions or enter into transactions that would impair their ability to dividend funds to EFIH, which could impair EFIH's ability to service the New Senior Secured Notes, or that would negatively affect the value of the assets that are pledged as Collateral, such as incurring debt, selling or transferring all or a portion of the assets of Oncor, entering into joint ventures, dividending out assets or engaging in speculative investments.

Any of the above actions on the part of EFIH, the third party transferee or subsequent third party transferee or the Oncor Subsidiaries following the completion of a Permitted Asset Transfer may further increase the credit risk of the New Senior Secured Notes, may result in the rating agencies taking negative action with respect to the New Senior Secured Notes and may reduce the market price of the New Senior Secured Notes.

See "Description of the EFH Corp. Notes—Certain Covenants—Restrictions on Permitted Asset Transfers," and "—Restrictions on TCEH Transfers" and the definitions of "Change of Control" and "Permitted Asset Transfer" contained in "Description of the EFH Corp. Notes" and "Description of the EFIH Notes" for more information.

### *We may transfer or dispose of our interests in or the assets of TCEH to a third party without such third party becoming the obligor under the New EFH Senior Secured Notes and without being required to offer to repurchase the New EFH Senior Secured Notes.*

The indenture governing the New EFH Senior Secured Notes will provide that, subject to certain conditions, certain transactions with respect to TCEH, referred to in this Prospectus as a "TCEH Transfer," which include a disposition or spin-off of all of the equity interests of an entity that owns all or substantially all of the assets of TCEH (including EFCH), or the sale of all or substantially all of the assets of TCEH, will not result in the acquirer of the TCEH equity interests or assets becoming the obligor under the New EFH Senior Secured Notes.

If a TCEH Transfer occurs, EFH Corp. will remain the obligor of the New EFH Senior Secured Notes, even though substantially all of the assets of EFH Corp. and its subsidiaries may have been transferred to a third party, and therefore EFH Corp. could be a more highly-leveraged company. Additionally, if a TCEH Transfer occurs, EFH Corp. will not be required to make a change of control offer to repurchase the New EFH Senior Secured Notes, even if the assets of TCEH transferred accounted for substantially all of the assets of EFH Corp. and its subsidiaries. As of September 30, 2009, EFCH and its subsidiaries, including TCEH and its subsidiaries, accounted for 71% of the consolidated assets of EFH Corp. The indenture governing the New EFH Senior Secured Notes does not restrict EFH Corp.'s ability to transfer assets, other than Collateral, to any of its restricted subsidiaries, including EFCH and TCEH. EFH Corp. could take actions that may negatively impact the credit risk of the New EFH Senior Secured Notes, including transferring assets to TCEH before a TCEH Transfer.

Currently, and for some period of time following the completion of the exchange offers, it is expected that EFH Corp. will rely on the cash flows from TCEH and its subsidiaries to service its debt obligations, including the New EFH Senior Secured Notes. Following the completion of a TCEH Transfer, the cash flows from TCEH and its subsidiaries would no longer be available to pay interest and principal on the New EFH Senior Secured Notes. Additionally, the holders of the New EFH Senior Secured Notes would not be able to look to the assets of TCEH and its subsidiaries in the case of a bankruptcy, liquidation or insolvency with respect to EFH Corp. In addition, EFH Corp. may transfer its interest in TCEH and its subsidiaries without any consideration if the

56

EFIHMW00245784

**PX 014**
**Page 66 of 1116**

transaction would not violate the "Limitation on Restricted Payments" covenant in the indenture governing the New EFH Senior Secured Notes.

Additionally, following a TCEH Transfer, the only operating subsidiaries of EFH Corp. could be the Oncor Subsidiaries, which are "Unrestricted Subsidiaries" under the indentures for the New Senior Secured Notes. Unrestricted Subsidiaries will not be subject to the restrictive covenants contained in the indentures governing the New Senior Secured Notes. The indentures governing the New Senior Secured Notes will not limit or restrict the ability of Unrestricted Subsidiaries, including the Oncor Subsidiaries, to take actions or enter into transactions that would impair their ability to dividend funds to EFH Corp. to service the New EFH Senior Secured Notes, or that would negatively affect the value of the Oncor Subsidiaries and therefore the equity value of the investments that are pledged as Collateral, such as incurring debt, selling or transferring all or a portion of the assets of the Oncor Subsidiaries, entering into joint ventures, dividending out assets or engaging in speculative investments.

The occurrence of a TCEH Transfer may further increase the credit risk of the New EFH Senior Secured Notes, may result in the credit rating agencies taking negative action with respect to the New EFH Senior Secured Notes and may reduce the market price of the New EFH Senior Secured Notes.

See "Description of the EFH Corp. Notes—Certain Covenants—Restrictions on TCEH Transfers" and the definitions of "Change of Control" and "TCEH Transfer" contained in "Description of the EFH Corp. Notes" for more information.

***The indentures governing the New Senior Secured Notes may not protect holders from all actions that EFH Corp., EFIH or the Oncor Subsidiaries may take that would reduce your interest in the Collateral or that may reduce the value of the Collateral, including sales or exchanges of the Collateral or the assets of the Oncor Subsidiaries for other assets or investments.***

Under the indentures that will govern the New Senior Secured Notes, EFIH may dispose of all or a portion of the Collateral for fair market value consideration (including consideration other than cash) that may consist of assets or equity interests in joint ventures. Additionally, there will be no event of default under indentures if the Oncor subsidiaries sell, transfer or otherwise dispose of their assets or equity interests for any form of consideration.

If EFIH or the Oncor Subsidiaries effect any of these transactions, holders' interest in the Collateral or the value of the Collateral may be materially reduced.

The indentures governing the New Senior Secured Notes will allow EFIH to transfer any of the Collateral in exchange for an equivalent fair market value of assets other than cash or for investments in businesses that are similar to the businesses of Oncor, including interests in joint ventures in businesses that are not controlled by EFH Corp. or EFIH. The assets received as consideration and pledged as substitute Collateral may prove to be less valuable than the value of the investments in Oncor that were disposed of in such transfer or exchange. Additionally, if interests in a new business were received in exchange for the Collateral, such new business may, in the future, engage in businesses activities that are different from the business that Oncor presently is in or such new business may not prove to be as creditworthy or valuable as Oncor, and the Offerors may not have any control over such business' activities if a minority interest in the joint venture interests was received in such transfer or exchange. Therefore, such new collateral may negatively alter the risk profile of EFIH or the value of such new collateral may decline relative to the value of the disposed investments in Oncor.

There will be no event of default under the indentures governing the New Senior Secured Notes if any of the Oncor Subsidiaries sells, transfers or disposes of the assets of Oncor Holdings or investments in or assets of Oncor. The consideration received in exchange for such assets or investments may decline in value as compared to the assets or investments that were so disposed, and, therefore, the value of the Collateral may be less than if such assets and investments had been retained. The Oncor Subsidiaries may transfer their assets and investments

Confidential

EFIHMW00245785

in exchange for interests in other businesses or assets, minority interests or interests in joint ventures, in which case the value of the Collateral may be at risk of declining due to the factors described above.

In any joint venture that EFIH or an Oncor Subsidiary has an interest, EFIH or the Oncor Subsidiary may not have the right or power to direct the management and policies of such joint ventures and other participants may take action contrary to the instructions or requests of EFIH or such Oncor Subsidiary or against its policies and objectives, and any such actions taken by such joint ventures may not be in the best interests of holders of New Senior Secured Notes. In addition, the other participants to any such joint venture may become bankrupt or have economic or other business interests or goals that are inconsistent with the goals of EFIH or such Oncor Subsidiary and/or the holders of the New Senior Secured Notes.

Additionally, the TCEH Senior Secured Facilities do not allow EFH Corp. to prepay the New EFH Senior Secured Notes using proceeds received from a disposition of any investments of EFH Corp. and EFIH in the Oncor Subsidiaries (including the Collateral) or from a sale of all or substantially all of the assets of any of the Oncor Subsidiaries, so long as certain intercompany loans from TCEH to EFH Corp. are at the time outstanding. As of September 30, 2009, $1.112 billion of such intercompany loans from TCEH to EFH Corp. were outstanding.

The completion of any of the above events may result in the credit risk of the New Senior Secured Notes increasing, the credit rating agencies taking negative action with respect to the New Senior Secured Notes or the market price of the New Senior Secured Notes declining. Additionally, in the event of any foreclosure on the Collateral, holders of the New Senior Secured Notes may recover less than if the Collateral still consisted of investments in the Oncor Subsidiaries.

### *You may be required to recognize taxable gain or loss in connection with a Permitted Asset Transfer.*

In connection with a Permitted Asset Transfer, EFH Corp.'s obligations under the New EFH Senior Secured Notes would be transferred to, and assumed by, EFIH or a third party transferee and EFIH's obligations under the New EFIH Senior Secured Note may be transferred to, and assumed by, a third party transferee or may be considered, for U.S. federal income tax purposes, to undergo a substitution of obligors even if not transferred to, or assumed by, a third party transferee. Upon any such transfer or deemed substitution of obligors, you may be deemed to have exchanged the New EFH Senior Secured Notes and/or the New EFIH Senior Secured Notes, as the case may be, for new notes for U.S. federal income tax purposes. Upon such deemed exchange, a holder, under U.S. federal income tax law, may be required to recognize gain or loss equal to the difference between the amount deemed to be realized in connection with the deemed exchange and such holder's adjusted tax basis in the New EFH Senior Secured Notes or the New EFIH Senior Secured Notes, as the case may be, on the date of the deemed exchange. For more information, please see "Material U.S. Federal Income Tax Considerations— Ownership of New Senior Secured Notes—Sale, Exchange or Retirement of New Senior Secured Notes."

### *The issuance by EFH Corp. of the New EFH Senior Secured Notes or by EFIH of New EFIH Senior Secured Notes or the issuance by EFIH or EFCH of the guarantees of the New EFH Senior Secured Notes or the grant of the pledge of Collateral by EFIH to secure the New Senior Secured Notes could be wholly or partially voided as a preferential transfer.*

If EFH Corp., EFIH or EFCH becomes the subject of a bankruptcy proceeding within 90 days after the exchange offers are completed (or, with respect to any insiders specified in bankruptcy law who are holders of New Senior Secured Notes, within one year after completion of the exchange offers), and a court in connection with a bankruptcy proceeding determines that any of EFH Corp., EFIH or EFCH was insolvent at the time of the exchange offers, then the court could find that the issuance of the New Senior Secured Notes by either EFH Corp. or EFIH or the issuance of the related guarantee by EFIH or EFCH or the pledge of the Collateral by EFIH to secure the New Senior Secured Notes involved a preferential transfer to the holders of Old Notes that are accepted for exchange in the exchange offers. All or a portion of the exchange offers could be an avoidable preference if, among other things, it is determined in a bankruptcy proceeding for EFH Corp., EFIH or EFCH

58

EFIHMW00245786

that, at the time of the exchange offers, EFH Corp., EFIH or EFCH were insolvent, and the exchange offers allowed an exchanging holder of Old Notes to recover more from EFH Corp., EFIH or EFCH than such holder would have received had the exchanges not been made and EFH Corp., EFIH or EFCH, as the case may be, was liquidated in a bankruptcy proceeding. As described below we cannot assure you that EFH Corp., EFIH or EFCH would satisfy the solvency tests set forth below or what standard a court would apply in determining whether the Offerors or a guarantor would be considered to be insolvent.

Because holders of Old Notes would now become secured creditors when Old Notes are exchanged for New Senior Secured Notes, such holders could be entitled to receive a greater recovery in bankruptcy proceeding liquidation than the same holders would have been entitled to receive if those holders had not participated in the exchange offers. Additionally, because holders of Legacy Notes will receive New Senior Secured Notes that include a guarantee from both EFIH and EFCH, such holders could also be entitled to receive a greater recovery in bankruptcy proceeding liquidation than the same holders would have been entitled to receive if those holders had not participated in the exchange offers. If the court determined that the issuance of a guarantee by EFIH or EFCH or a pledge of the Collateral by EFIH as security for the New Senior Secured Notes was a preferential transfer that did not qualify for any defense under bankruptcy law, then holders of the affected New Senior Secured Notes could have all or a portion of the value transferred to such holders in the exchange offers voided or such holders could be treated as unsecured creditors with claims that rank *pari passu* with all other unsubordinated unsecured creditors of the applicable obligor, including trade creditors. In addition, under such circumstances, the value of any consideration holders received with respect to the New Senior Secured Notes, including upon foreclosure of the Collateral, could also be subject to recovery from such holders and possibly from subsequent transferees, or holders might be returned to the same position they held as holders of the Old Notes.

Because all of the New EFH Senior Secured Notes to be issued in the exchange offers are fungible with each other and all of the New EFIH Senior Secured Notes to be issued in the exchange offers are also fungible with each other, a determination by a court that the issuance of New EFH Senior Secured Notes, the New EFIH Senior Secured Notes or any related guarantee or the pledge of Collateral in connection with the exchange for any issue of Old Notes constituted a preferential transfer may impact the holders who received New EFH Senior Secured Notes and/or the New EFIH Senior Secured Notes for another issue of Old Notes whether or not there was a preferential transfer in connection with any such the exchange.

***The liabilities of each of EFH Corp. and EFCH currently exceed its assets as shown on its most recent balance sheet, and after giving effect to the exchange offers, the liabilities of EFIH may exceed its assets as shown on its most recent balance sheet. If a court were to find that EFH Corp., EFCH or EFIH were insolvent before or after giving effect to the exchange offers and did not receive reasonably equivalent value or fair consideration in the exchange offers, the court may void all or a portion of the obligations represented by the New EFH Senior Secured Notes, the New EFIH Senior Secured Notes or the guarantees of the New EFH Senior Secured Notes by EFIH or EFCH or the pledge of the Collateral granted by EFIH for such notes as a fraudulent conveyance.***

In a bankruptcy proceeding, a trustee, debtor in possession or another person acting on behalf of the bankruptcy estate may seek to recover all or a portion of transfers made or void obligations incurred prior to the bankruptcy proceeding on the basis that such transfers and obligations constituted fraudulent conveyances. Under certain circumstances, creditors may recover transfers or void obligations under state fraudulent conveyance laws even if the debtor is not in bankruptcy.

Fraudulent conveyances are generally defined to include transfers made or obligations incurred for inadequate consideration when a debtor was insolvent, inadequately capitalized or in similar financial distress, or transfers made or obligations incurred with the intent of hindering, delaying or defrauding current or future creditors. A trustee, debtor in possession or another person acting on behalf of a bankruptcy estate may be able to recover such transfers under the fraudulent conveyance provisions of the bankruptcy law and/or state fraudulent

Confidential

conveyance laws. The fraudulent conveyance provisions of the bankruptcy law allows the trustee, debtor in possession, or other person acting on behalf of a bankruptcy estate to void a fraudulent conveyance made within two years prior to the commencement of a bankruptcy proceeding. Under state fraudulent conveyance laws, transfers made more than two years prior to the commencement of a fraudulent conveyance lawsuit may be subject to avoidance.

If a court were to find that the Offerors issued the New Senior Secured Notes, EFIH or EFCH issued their respective guarantees, or EFIH granted its pledge of the Collateral under circumstances constituting a fraudulent conveyance, then a court could void all or a portion of the obligations under the New Senior Secured Notes, the guarantees or the pledge of Collateral. In addition, under such circumstances, the value of any consideration holders received with respect to the New Senior Secured Notes, the guarantees and the Collateral, including upon foreclosure of the Collateral, could also be subject to recovery from such holders and, possibly, from subsequent transferees of the New Senior Secured Notes. If the pledge of Collateral was voided and the issuance of New Senior Secured Notes and/or the related guarantees were not voided, then holders of New Senior Secured Notes would become unsecured creditors.

The New Senior Secured Notes, the related guarantee incurred by EFIH and EFCH or pledge of Collateral by EFIH could be voided as a fraudulent conveyance, or claims in respect of the notes, guarantee or pledge could be subordinated to all other debts of the Offerors or the applicable guarantor, if the Offerors or the applicable guarantor, at the time they incurred the indebtedness evidenced by the New Senior Secured Notes or the guarantee or granted the pledge received less than reasonably equivalent value or fair consideration for the issuance of the New Senior Secured Notes or the incurrence of the guarantee or the grant of the pledge of Collateral and:

- were insolvent or rendered insolvent by reason of such issuance or incurrence or grant;

- were engaged in a business or transaction for which the Offerors' or the applicable guarantor's remaining assets constituted unreasonably small capital; or

- intended to incur, or believed that they would incur, debts beyond their ability to pay those debts as they mature.

The measures of insolvency for purposes of these fraudulent transfer laws will vary depending upon the law applied in any proceeding to determine whether a fraudulent transfer has occurred. Generally, however, a debtor would be considered insolvent if:

- the sum of its debts, including contingent liabilities, was greater than the fair saleable value of all of its assets;

- the present fair saleable value of its assets was less than the amount that would be required to pay its probable liability on its existing debts, including contingent liabilities, as they become absolute and mature; or

- it could not pay its debts as they become due.

The liabilities of each of EFH Corp. and EFCH currently exceed its assets as shown on its respective balance sheet prepared in accordance with U.S. generally accepted accounting principles as of September 30, 2009. Following completion of the exchange offers, EFH Corp.'s liabilities likely will continue to exceed its assets as shown on its balance sheet, and EFCH's liabilities likely will continue to exceed its assets as shown on its balance sheet. While EFIH's assets currently exceed its liabilities as shown on its balance sheet prepared in accordance with U.S. generally accepted accounting principles as of September 30, 2009, after giving effect to the exchange offers, EFIH's liabilities may exceed its assets as shown on its balance sheet depending on the amounts and issues of Old Notes that are exchanged in the exchange offers and the value of the Legacy Notes or TCEH Notes that are retained by EFIH in connection with the exchange offers. See "Use of Proceeds" for more

60

EFIHMW00245788

information on the Legacy Notes and TCEH Notes that EFIH may retain following completion of the exchange offers. The balance sheets showing the assets and liabilities of EFH Corp., EFIH and EFCH have been prepared in accordance with U.S. generally accepted accounting principles; however, the values assigned to assets and liabilities in these balance sheets are not necessarily indicative of the values that a court would assign to such assets and liabilities in making a solvency determination. We have not obtained or prepared an appraisal of the fair saleable value of the assets of EFH Corp., EFCH or EFIH. As a result, we cannot assure you that EFH, EFIH or EFCH would satisfy the solvency tests set forth in the bullet points immediately prior to this paragraph or what standard a court would apply in determining whether the Offerors or a guarantor would be considered to be insolvent.

In addition, we cannot assure you that a court would determine that reasonably equivalent value or fair consideration was received by each of EFH Corp., EFIH and EFCH in connection with the exchange offers. In the exchange offers, EFIH's liabilities will be increased by its guarantee of the New EFIH Senior Secured Notes and its issuance of the New EFIH Senior Secured Notes and will be reduced by the principal amount of 2017 Notes surrendered in the exchange offers and cancelled, since it is a guarantor of the 2017 Notes, and the fair saleable value of its assets will be increased by the fair saleable value of the Legacy Notes and TCEH Notes received in the Exchange Offers that remain outstanding and are retained by EFIH. The amount and the fair saleable value of TCEH Notes and Legacy Notes that will be received by EFIH in the exchange offers cannot be determined until after the completion of the exchange offers. In the exchange offers, EFH Corp.'s liabilities will be increased by the principal amount of the New EFH Senior Secured Notes issued and reduced by the principal amount of 2017 Notes and Legacy Notes that are surrendered in the exchange offers, cancelled and do not remain outstanding. In the exchange offers, EFCH's liabilities will be increased by its guarantee of the New EFH Senior Secured Notes to be issued in exchange for the 2017 Notes, the Legacy Notes and the TCEH Notes but its liabilities will only be reduced by the principal amount of 2017 Notes surrendered in the exchange offers and cancelled, since it is a guarantor of the 2017 Notes. EFCH is not an obligor of the Legacy Notes and, although it is a guarantor of the TCEH Notes, the TCEH Notes may remain outstanding following the exchange offers.

Each guarantee of the New EFH Senior Secured Notes contains a provision intended to limit the guarantor's liability to the maximum amount that it could incur without causing the incurrence of obligations under its guarantee to be a fraudulent conveyance. This provision may not be effective to protect the guarantee from being voided under fraudulent conveyance law, or may reduce or eliminate the guarantor's obligation to an amount that effectively makes the guarantee worthless.

The Offerors are offering New EFH Senior Secured Notes and the New EFIH Senior Secured Notes in exchange for each of the Legacy Notes, 2017 Notes and TCEH Notes. All of the New EFH Senior Secured Notes to be issued in the exchange offers are fungible with each other and all of the New EFIH Senior Secured Notes to be issued in the exchange offers are fungible with each other. As a result, a determination by a court that the issuance of New EFH Senior Secured Notes, the New EFIH Senior Secured Notes or any related guarantee or pledge in connection with the exchange for any issue of Old Notes constituted a fraudulent conveyance may impact the holders who received New EFH Senior Secured Notes and/or the New EFIH Senior Secured Notes for another issue of Old Notes.

### Unlike the New EFH Senior Secured Notes, the New EFIH Senior Secured Notes will not be guaranteed by EFCH or any other guarantor.

EFCH will guarantee the New EFH Senior Secured Notes on a senior unsecured basis but will not guarantee the New EFIH Senior Secured Notes. To the extent that the value of the Collateral is insufficient to satisfy the claims of all holders of the New Senior Secured Notes, holders of the New EFH Senior Secured Notes can also look to the unsecured guarantee from EFCH. However, holders of the New EFIH Senior Secured Notes cannot rely on a guarantee by EFCH or any other subsidiary of EFH Corp. for the satisfaction of any claims.

61

EFIHMW00245789

***The Offerors may not be able to repurchase the New Senior Secured Notes upon a change of control.***

Upon the occurrence of specific kinds of change of control events, the Offerors will be required to offer to repurchase all of their respective New Senior Secured Notes at 101% of their respective principal amount plus accrued and unpaid interest. The source of funds for any purchase of the New Senior Secured Notes will be the applicable Offeror's available cash or cash generated from the applicable Offeror's subsidiaries' operations or other sources, including borrowings, sales of assets or sales of equity. The Offerors may not be able to repurchase the New Senior Secured Notes upon a change of control because the Offerors may not have sufficient financial resources to purchase all of the New Senior Secured Notes that are tendered upon a change of control. Further, EFH Corp. and EFIH may be restricted under the terms of debt agreements of TCEH and Oncor, respectively, from receiving funds from TCEH and Oncor, respectively, sufficient to repurchase all of the New Senior Secured Notes tendered by holders upon a change of control. Accordingly, the Offerors may not be able to satisfy their obligations to purchase the New Senior Secured Notes unless the Offerors are able to refinance or obtain waivers under the instruments governing their indebtedness. An Offeror's failure to repurchase the New Senior Secured Notes upon a change of control would cause a default under the applicable indenture and a cross-default under certain of such Offeror's other debt agreements. The instruments governing the TCEH Senior Secured Facilities also provide that a change of control will be a default that permits the lenders thereunder to accelerate the maturity of borrowings thereunder. Any of the Offerors' future debt agreements may contain similar provisions.

***An active trading market may not develop for the New Senior Secured Notes.***

The New EFH Senior Secured Notes and the New EFIH Senior Secured Notes are new issues of securities and will not be fungible with the Old Notes. There is no established public trading market for the New Senior Secured Notes, and an active trading market may not develop. Although EFH Corp. and EFIH have applied for the New EFH Senior Secured Notes and the New EFIH Senior Secured Notes to be issued in the exchange offers to be listed on the New York Stock Exchange, there may, nonetheless, be limited liquidity in the trading market for the New Senior Secured Notes. In addition, the liquidity of the trading market in the New Senior Secured Notes and the market prices quoted for the New Senior Secured Notes may be adversely affected by changes in the overall market for these types of securities and by changes in the Offerors' financial performance or prospects or in the prospects for companies in the Offerors' industry generally. As a consequence, an active trading market may not develop for the New Senior Secured Notes, holders of New Senior Secured Notes may not be able to sell their New Senior Secured Notes, or, even if they can sell their New Senior Secured Notes, they may not be able to sell them at a favorable price.

It is possible that only a small aggregate principal amount of New EFH Senior Secured Notes and New EFIH Senior Secured Notes may be issued upon completion of the exchange offers, which may adversely affect the liquidity of the New EFH Senior Secured Notes and New EFIH Senior Secured Notes. A series of securities with a small float generally commands a lower price than does a comparable series of securities with a greater float. A reduced float may also make the trading prices of the New EFH Senior Secured Notes and New EFIH Senior Secured Notes more volatile. If a small aggregate principal amount of New EFH Senior Secured Notes and New EFIH Senior Secured Notes is outstanding following the completion of the exchange offers, holders of a small principal amount of the New EFH Senior Secured Notes and New EFIH Senior Secured Notes may control decisions with respect to the New EFH Senior Secured Notes and New EFIH Senior Secured Notes, respectively, including with respect to amendments, waivers and requests to accelerate upon an event of default, among others.

***EFH Corp. may incur an income tax liability as a result of the exchange offers.***

As a result of the exchange offers, EFH Corp. will realize cancellation of indebtedness income for U.S. federal income tax purposes ("COD income"). Under recently enacted legislation, EFH Corp. may elect to postpone the recognition of COD income in certain circumstances. If the election is made, the recognition of COD income incurred as a result of the exchange offers will be deferred until the fifth taxable-year following the closing of the exchange offers and then be recognized ratably over the ensuing five taxable-year period from

62

EFIHMW00245790

**PX 014**
**Page 72 of 1116**

2014 to 2018. The amount of COD income incurred by EFH Corp. will depend upon, among other things, the fair market value of the consideration offered in exchange for the Old Notes. As such, EFH Corp. will not be able to calculate the aggregate amount of COD income attributable to the Old Notes accepted for exchange until after the Expiration Date. See "Material U.S. Federal Income Tax Considerations—Tax Consequences to EFH Corp."

### *The New Senior Secured Notes may be issued with original issue discount for U.S. federal income tax purposes.*

The New Senior Secured Notes will be treated as issued with original issue discount ("OID") for U.S. federal income tax purposes to the extent that their stated principal amount exceeds their issue price by more than a de minimis amount. A U.S. Holder (as defined in "Material U.S. Federal Income Tax Considerations") of the New Senior Secured Notes will be required to accrue such OID on a current basis before receiving cash attributable to that income regardless of the U.S. Holder's method of tax accounting. For further discussion of the computation and reporting of OID, see "Material U.S. Federal Income Tax Considerations." Additionally, a bankruptcy court may not allow a claim for all or a portion of any unamortized amount of the OID on the New Senior Secured Notes.

If EFH Corp. chooses to make the election to defer the recognition of COD income described above, EFH Corp. will not be permitted to deduct any OID on the New Senior Secured Notes to the extent that such OID (i) accrues before 2014 and (ii) does not exceed COD income realized in the exchange offers. EFH Corp. will, however, be allowed to take these disallowed OID deductions ratably over the five-year period from 2014 through 2018.

### *If a bankruptcy petition were filed by or against any of the Offerors or EFCH, holders of the New Senior Secured Notes issued in consideration for the Old Notes may have their claims allowed in a lesser amount than the face amount of their claims under the indentures governing the New Senior Secured Notes.*

If a bankruptcy petition were filed by or against any of the Offerors or EFCH under the U.S. Bankruptcy Code after the completion of the exchange offers, the allowed claim of any holder of the New Senior Secured Notes issued as consideration for the Old Notes for the principal amount of the New Senior Secured Notes may be limited to an amount equal to the sum of:

* the original issue price for the New Senior Secured Notes; and
* that portion of the OID that does not constitute "unmatured interest" for purposes of the U.S. Bankruptcy Code.

Bankruptcy courts have not developed a uniform method for determining the original issue price of new notes where the consideration for such new notes is not cash. Rather, the facts and circumstances of the particular issuance appear to dictate how the original issue price of such new notes is determined. Measures of the original issue price of new notes where the consideration for such new notes is not cash have included the fair market value of the consideration for such new notes at the time of the issuance of such new notes and the selling price of such new notes on their first day of trading.

Any OID that was not amortized as of the date of the bankruptcy filing would constitute unmatured interest. Accordingly, holders of the New Senior Secured Notes under these circumstances may have their claims allowed in a lesser amount than the face amount of their claims would be under the terms of the indentures governing the New Senior Secured Notes, even if sufficient funds are available to pay such holders the unamortized portion of any OID as of the bankruptcy filing.

### *The interests of the Sponsor Group may differ from the interests of the holders of the New Senior Secured Notes.*

The Sponsor Group indirectly owns approximately 60% of EFH Corp.'s capital stock on a fully diluted basis through their investment in Texas Holdings. As a result of this ownership and the Sponsor Group's ownership in

63

EFIHMW00245791

interests of the general partner of Texas Holdings, the Sponsor Group has control over decisions regarding our operations, plans, strategies, finances and structure, including whether to enter into any corporate transaction, and will have the ability to prevent any transaction that requires the approval of EFH Corp.'s shareholders.

The interests of these persons may differ from your interests in material respects. For example, if we encounter financial difficulties or are unable to pay our debts as they mature, the interests of the Sponsor Group, as equity holders, might conflict with your interests as a noteholder. The Sponsor Group may also have an interest in pursuing acquisitions, divestitures, financings or other transactions that, in their judgment, could enhance their equity investments, even though such transactions might involve risks to you as a noteholder. Additionally, the indentures governing the New Senior Secured Notes permits us to pay advisory fees, dividends or make other restricted payments under certain circumstances, and the Sponsor Group may have an interest in our doing so.

### Risks Related to Our Substantial Indebtedness and Debt Agreements

***Our substantial leverage could adversely affect our ability to raise additional capital to fund our operations, limit our ability to react to changes in the economy or our industry, expose us to interest rate risk to the extent of our variable rate debt and prevent us from meeting obligations under the various debt agreements governing our indebtedness.***

We are highly leveraged. As of September 30, 2009, our consolidated principal amount of debt (short-term borrowings and long-term debt, including amounts due currently) totaled $43.996 billion (see Note 15 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus and Note 4 to EFH Corp.'s historical condensed consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus). Our substantial leverage could have important consequences, including:

- making it more difficult for us to make payments on our indebtedness;

- requiring a substantial portion of cash flow from operations to be dedicated to the payment of principal and interest on indebtedness, therefore reducing our ability to use our cash flow to fund operations, capital expenditures and future business opportunities and execute our strategy;

- increasing our vulnerability to adverse economic, industry or competitive developments;

- exposing us to the risk of increased interest rates because, as of September 30, 2009, taking into consideration interest swap transactions, 7% of our long-term borrowings were at variable rates of interest;

- limiting our ability to make strategic acquisitions or causing us to make non-strategic divestitures;

- limiting our ability to obtain additional financing for working capital, capital expenditures, product development, debt service requirements, acquisitions and general corporate or other purposes, or to refinance existing debt; and

- limiting our ability to adjust to changing market conditions and placing us at a competitive disadvantage compared to competitors who are less highly leveraged and who, therefore, may be able to take advantage of opportunities that we cannot due to our substantial leverage.

***Despite our current high indebtedness level, we may still be able to incur substantially more indebtedness. This could further exacerbate the risks associated with our substantial indebtedness.***

We may be able to incur additional indebtedness in the future. Although our debt agreements contain restrictions on the incurrence of additional indebtedness, these restrictions are subject to a number of significant qualifications and exceptions, and under certain circumstances, the amount of indebtedness that could be incurred in compliance with these restrictions could be substantial. The indentures for the New Senior Secured Notes will allow EFH Corp. and EFIH to incur up to an aggregate of $4.0 billion of debt, including the New Senior Secured Notes, secured by a first-priority security interest in the Collateral, and a substantial amount of additional

64

EFIHMW00245792

indebtedness, which additional indebtedness may be secured by a junior-priority security interest in the Collateral or by assets of EFH Corp. or EFIH other than the Collateral. If new debt is added to our existing debt levels, the related risks that we now face would intensify. See "Description of the EFH Corp. Notes" and "Description of the EFIH Notes."

*Increases in interest rates may negatively impact our operating results and financial condition.*

Certain of our borrowings, to the extent the interest rate is not fixed by interest rate swaps, are at variable rates of interest. An increase in interest rates would have a negative impact on our results of operations by causing an increase in interest expense.

At September 30, 2009, we had $3.1 billion aggregate principal amount of variable rate long-term indebtedness (excluding $1.135 billion of long-term borrowings associated with the senior secured letter of credit facility of TCEH that are invested at a variable rate), taking into account interest rate swaps that fix the interest rate on $17.55 billion in notional amount of variable rate indebtedness. As a result, as of September 30, 2009, the impact of a 100 basis point increase in interest rates would increase our annual interest expense by approximately $31 million. See discussion of interest rate swap transactions in Note 4 to EFH Corp.'s historical condensed consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus.

Our interest expense for the nine months ended September 30, 2009 was $2.136 billion.

*EFH Corp.'s and its subsidiaries' debt agreements contain restrictions that limit flexibility in operating its businesses.*

EFH Corp.'s and its subsidiaries' debt agreements contain various covenants and other restrictions that limit the ability of EFH Corp. and/or its restricted subsidiaries to engage in specified types of transactions and may adversely affect the ability to operate its businesses. These covenants and other restrictions limit EFH Corp.'s and/or its restricted subsidiaries' ability to, among other things:

- incur additional indebtedness or issue preferred shares;
- pay dividends on, repurchase or make distributions in respect of capital stock or make other restricted payments;
- make investments;
- sell or transfer assets;
- create liens;
- consolidate, merge, sell or otherwise dispose of all or substantially all of its or their assets;
- enter into transactions with its or their affiliates; and
- repaying, repurchasing or modifying certain subordinated and other material debt.

There are a number of important limitations and exceptions to these covenants and other restrictions. See Note 15 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus, "Description of the EFH Corp. Notes" and "Description of the EFIH Notes" for a description of these covenants and other restrictions.

Under the TCEH Senior Secured Facilities, TCEH is required to maintain a leverage ratio below specified levels. TCEH's ability to maintain its leverage ratio below such levels can be affected by events beyond its control, and there can be no assurance that it will meet any such ratio.

A breach of any of these covenants or restrictions could result in an event of default under one or more of EFH Corp.'s and its subsidiaries' debt agreements, including as a result of cross default provisions. Upon the occurrence of an event of default under one of the debt agreements, the lenders could elect to declare all amounts outstanding under that debt agreement to be immediately due and payable and/or terminate all commitments to extend further credit. Such actions by those lenders could cause cross defaults under EFH Corp.'s and its

65

EFIHMW00245793

**PX 014**
**Page 75 of 1116**

subsidiaries' other indebtedness. If EFH Corp. or one of its subsidiaries was unable to repay those amounts, the lenders could proceed against any collateral granted to them to secure such indebtedness. If lenders accelerate the repayment of borrowings, EFH Corp. or such subsidiary may not have sufficient assets and funds to repay those borrowings.

In addition, as described in "The Transactions—Ring-Fencing," EFH Corp. and Oncor have implemented a number of "ring-fencing" measures to further separate Oncor, its immediate parent, Oncor Holdings, and Oncor Holdings' other subsidiaries, from Texas Holdings and its other subsidiaries. Those measures include, among other things:

- Oncor being treated as an unrestricted subsidiary with respect to certain EFH Corp. indebtedness;
- Oncor not being restricted from incurring its own indebtedness;
- Oncor not guaranteeing or pledging any of its assets to secure the indebtedness of Texas Holdings and its other subsidiaries; and
- restrictions on dividends, and the right of the independent members of Oncor's board of directors and the minority member of Oncor to block the payment of dividends.

***Under the terms of TCEH's debt agreements, TCEH is restricted from making certain payments to EFH Corp.***

EFH Corp. is a holding company and substantially all of its consolidated assets are held by its subsidiaries. As of and for the nine months ended September 30, 2009, TCEH and its subsidiaries held approximately 71% of EFH Corp.'s consolidated assets and represented approximately 83% of EFH Corp.'s consolidated revenues, respectively. Accordingly, EFH Corp. depends upon TCEH for a significant amount of its cash flows and ability to pay its obligations. However, under the terms of TCEH's debt agreements, TCEH is restricted from making certain payments, including dividends and loans, to EFH Corp., except in limited circumstances.

## Risks Related to Structure

***EFH Corp. and EFIH are holding companies and their obligations are structurally subordinated to existing and future liabilities and preferred stock of their respective subsidiaries.***

EFH Corp. and EFIH's cash flows and ability to meet their obligations are largely dependent upon the earnings of their respective subsidiaries and the payment of such earnings to EFH Corp. and EFIH, respectively, in the form of dividends, distributions, loans or otherwise, and repayment of loans or advances from EFH Corp. and EFIH, respectively. These subsidiaries are separate and distinct legal entities and have no obligation to provide EFH Corp. or EFIH with funds for their payment obligations. Any decision by a subsidiary to provide EFH Corp. or EFIH with funds for their payment obligations, whether by dividends, distributions, loans or otherwise, will depend on, among other things, the subsidiary's results of operations, financial condition, cash requirements, contractual restrictions and other factors. In addition, a subsidiary's ability to pay dividends may be limited by covenants in its existing and future debt agreements or applicable law. Further, the distributions that may be paid by Oncor are limited through December 31, 2012, to an amount not to exceed Oncor's net income (determined in accordance with U.S. generally accepted accounting principles, subject to certain defined adjustments, including goodwill impairments), and are further limited by an agreement that Oncor's regulatory capital structure will be at or below the assumed debt-to-equity ratio established periodically by the PUCT for ratemaking purposes, which is currently set at 60% debt to 40% equity. Also, the independent members of Oncor's board of directors and the noncontrolling member of Oncor can block the payment of dividends.

Because EFH Corp. and EFIH are holding companies, their obligations to their respective creditors are structurally subordinated to all existing and future liabilities and existing and future preferred stock of their respective subsidiaries that do not guarantee such obligations. Therefore, with respect to subsidiaries that do not guarantee EFH Corp. or EFIH's obligations, EFH Corp. or EFIH's rights and the rights of their creditors to participate in the assets of any subsidiary in the event that such a subsidiary is liquidated or reorganized are subject to the prior claims of such subsidiary's creditors and holders of such subsidiary's preferred stock. To the

66

EFIHMW00245794

extent that EFH Corp. or EFIH may be a creditor with recognized claims against any such subsidiary, EFH Corp. or EFIH's claims would still be subject to the prior claims of such subsidiary's creditors to the extent that they are secured or senior to those held by EFH Corp. or EFIH. Subject to restrictions contained in financing arrangements, EFH Corp. or EFIH's subsidiaries may incur additional indebtedness and other liabilities.

### *Oncor may or may not make any distributions to the Offerors.*

Upon the consummation of the Merger, EFH Corp. and Oncor implemented certain structural and operational "ring-fencing" measures based on principles articulated by rating agencies and commitments made by Texas Holdings and Oncor to the PUCT and the FERC to further separate Oncor from the Texas Holdings Group. These measures were put into place to mitigate Oncor's credit exposure to those entities and to reduce the risk that the assets and liabilities of Oncor would be substantially consolidated with the assets and liabilities of the Texas Holdings Group in the event of a bankruptcy of one or more of those entities.

As part of the ring-fencing measures implemented by EFH Corp. and Oncor, a majority of the members of the board of directors of Oncor are required to be, and are, independent from EFH Corp. Any new independent directors are required to be appointed by the nominating committee of Oncor Holdings. The organizational documents of Oncor give these independent directors, acting by majority vote, and, during certain periods, any director designated by Texas Transmission, the express right to prevent distributions from Oncor if they determine that it is in the best interests of Oncor to retain such amounts to meet expected future requirements. Accordingly, there can be no assurance that Oncor will make any distributions to the Offerors.

In addition, Oncor's organizational documents limit Oncor's distributions to the Offerors through 2012 to Oncor's net income and prohibit Oncor from making any distribution to the Offerors so long as and to the extent that such distribution would cause Oncor's debt-to-equity ratio for regulatory purposes to be above the debt-to-equity ratio established from time to time by the PUCT for ratemaking purposes, which is currently set at 60% debt to 40% equity.

In March 2009, the PUCT awarded Oncor the right to construct approximately $1.3 billion of transmission lines and facilities associated with its Competitive Renewable Energy Zones (CREZ) Transmission Plan (see discussion in "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Nine Months Ended September 30, 2009—Regulation and Rates" included in Annex B to this Prospectus). With the award, it is likely Oncor will incur additional debt. In addition, Oncor may incur additional debt in connection with other investments in infrastructure or technology. Accordingly, while Oncor is required to maintain a debt to equity ratio of 60% debt to 40% equity, there can be no assurance that Oncor's equity balance will be sufficient to maintain the required debt-to-equity ratio established from time to time by the PUCT for ratemaking purposes, thereby restricting Oncor from making any distributions to the Offerors.

### Risks Related to Our Businesses

EFH Corp. is a holding company conducting its operations principally through its subsidiaries, TCEH (which is indirectly wholly-owned by EFH Corp.) and Oncor (in which EFH Corp. indirectly holds an approximate 80% indirect ownership interest). As such, the risks described below will apply to holders of New Senior Secured Notes issued in the exchange offers. There are additional risks relating to investing in the New Senior Secured Notes that you should review before deciding to tender your Old Notes. Such additional risks are described elsewhere in this "Risk Factors" section under the headings "—Risks Related to the Exchange Offers and the New Senior Secured Notes," "—Risks Related to Our Substantial Indebtedness and Debt Agreements," "—Risks Related to Structure" and "Risks Related to the EFIH Business."

### *Our businesses are subject to ongoing complex governmental regulations and legislation that have impacted, and may in the future impact, our businesses and/or results of operations.*

Our businesses operate in changing market environments influenced by various state and federal legislative and regulatory initiatives regarding the restructuring of the energy industry, including competition in the

67

EFIHMW00245795

**PX 014**
**Page 77 of 1116**

generation and sale of electricity. We will need to continually adapt to these changes. For example, the Texas retail electricity market became competitive in January 2002, and the introduction of competition has resulted in, and may continue to result in, declines in customer counts and sales volumes.

Our businesses are subject to changes in state and federal laws (including PURA, the Federal Power Act, the Atomic Energy Act, the Public Utility Regulatory Policies Act of 1978, the Clean Air Act and the Energy Policy Act of 2005), changing governmental policy and regulatory actions (including those of the PUCT, the Electric Reliability Organization, the Texas Regional Entity, the Railroad Commission of Texas, the Texas Commission on Environmental Quality, the FERC, the U.S. Environmental Protection Agency and the NRC) and the rules, guidelines and protocols of ERCOT with respect to matters including, but not limited to, market structure and design, operation of nuclear generation facilities, construction and operation of other generation facilities, construction and operation of transmission facilities, acquisition, disposal, depreciation and amortization of regulated assets and facilities, recovery of costs and investments, decommissioning costs, return on invested capital for regulated businesses, market behavior rules, present or prospective wholesale and retail competition and environmental matters. TCEH, along with other market participants, is subject to electricity pricing constraints and market behavior and other competition-related rules and regulations under PURA that are administered by the PUCT and ERCOT, and, with respect to any wholesale power sales outside the ERCOT market, is subject to market behavior and other competition-related rules and regulations under the Federal Power Act that are administered by the FERC. Changes in, revisions to, or reinterpretations of existing laws and regulations (for example, with respect to prices at which TCEH may sell electricity, the required permits for the three lignite-fueled generation units currently under construction or the cost of emitting greenhouse gases) may have an adverse effect on our businesses.

The Texas Legislature meets every two years and from time to time bills are introduced and considered that could materially affect our business. Although the 2009 Texas Legislative Session closed without passage of legislation that significantly negatively impacted our business, there can be no assurance that future action of the Texas Legislature will not result in legislation that could have a material adverse effect on us and our financial prospects.

### *Litigation, legal proceedings, regulatory investigations or other administrative proceedings could expose us to significant liabilities and reputation damage and have a material adverse effect on our results of operations, and the litigation environment in which we operate poses a significant risk to our businesses.*

We are involved in the ordinary course of business in a number of lawsuits involving employment, commercial, environmental and injuries and damages issues, among other matters, such as challenges (to which we may or may not be a direct party) to the permits that have been issued or may be issued for the new lignite-fueled generation units currently under construction. We evaluate litigation claims and legal proceedings to assess the likelihood of unfavorable outcomes and to estimate, if possible, the amount of potential losses. Based on these assessments and estimates, we establish reserves and disclose the relevant litigation claims or legal proceedings, as appropriate. These assessments and estimates are based on the information available to management at the time and involve a significant amount of judgment. Actual outcomes or losses may differ materially from current assessments and estimates. The settlement or resolution of such claims or proceedings may have a material adverse effect on our results of operations. In addition, judges and juries in the State of Texas have demonstrated a willingness to grant large verdicts, including punitive damages, to plaintiffs in personal injury, property damage and business tort cases. We use legal and appropriate means to contest litigation threatened or filed against us, but the litigation environment in the State of Texas poses a significant business risk.

We are also involved in the ordinary course of business in regulatory investigations and other administrative proceedings, and we are exposed to the risk that we may become the subject of additional regulatory investigations or administrative proceedings. See Note 5 to EFH Corp.'s historical condensed consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus. While we cannot predict the outcome of any regulatory investigation or administrative proceeding, any such regulatory

Confidential

investigation or administrative proceeding could result in us incurring material penalties and/or other costs and have a material adverse effect on our results of operations.

***TXU Energy Retail Company LLC may lose a significant number of retail customers due to competitive marketing activity by other retail electric providers.***

TXU Energy Retail Company LLC ("TXU Energy") faces competition for customers. Competitors may offer lower prices and other incentives, which, despite TXU Energy's long-standing relationship with customers, may attract customers away from TXU Energy.

In some retail electric markets, TXU Energy's principal competitor may be the incumbent retail electric provider. The incumbent retail electric provider has the advantage of long-standing relationships with its customers, including well-known brand recognition.

In addition to competition from the incumbent retail electric provider, TXU Energy may face competition from a number of other energy service providers, other energy industry participants, or nationally branded providers of consumer products and services who may develop businesses that will compete with TXU Energy. Some of these competitors or potential competitors may be larger or better capitalized than TXU Energy. If there is inadequate potential margin in these retail electric markets, it may not be profitable for TXU Energy to compete in these markets.

***TCEH's revenues and results of operations may be negatively impacted by decreases in market prices for power, decreases in natural gas prices, and/or decreases in market heat rates.***

TCEH, our largest business, is not guaranteed any rate of return on capital investments in its competitive businesses. We market and trade electricity and natural gas, including electricity from our own generation facilities and generation contracted from third parties, as part of our wholesale markets operation. TCEH's results of operations depend in large part upon market prices for electricity, natural gas, uranium, coal and transportation in its regional market and other competitive markets and upon prevailing retail electricity rates, which may be impacted by actions of regulatory authorities. Market prices may fluctuate substantially over relatively short periods of time. Demand for electricity can fluctuate dramatically, creating periods of substantial under- or over-supply. During periods of over-supply, prices might be depressed. Also, at times there may be political pressure, or pressure from regulatory authorities with jurisdiction over wholesale and retail energy commodity and transportation rates, to impose price limitations, bidding rules and other mechanisms to address volatility and other issues in these markets.

Some of the fuel for our generation facilities is purchased under short-term contracts. Prices of fuel, including diesel, natural gas, coal and nuclear fuel, may also be volatile, and the price we can obtain for electricity sales may not change at the same rate as changes in fuel costs. In addition, we purchase and sell natural gas and other energy related commodities, and volatility in these markets may affect costs incurred in meeting obligations.

Volatility in market prices for fuel and electricity may result from the following:

- volatility in natural gas prices;

- volatility in market heat rates;

- severe or unexpected weather conditions;

- seasonality;

- changes in electricity and fuel usage;

- illiquidity in the wholesale power or other markets;

- transmission or transportation constraints, inoperability or inefficiencies;

- availability of competitively-priced alternative energy sources;

69

EFIHMW00245797

- changes in supply and demand for energy commodities, including nuclear fuel and related enrichment and conversion services;

- changes in generation efficiency;

- outages at our generation facilities or those of competitors;

- changes in the credit risk or payment practices of market participants;

- changes in production and storage levels of natural gas, lignite, coal, crude oil and other refined products;

- natural disasters, wars, sabotage, terrorist acts, embargoes and other catastrophic events; and

- federal, state and local energy, environmental and other regulation and legislation.

All of our generation facilities are located in the ERCOT market, a market with limited interconnections to other markets. Wholesale electricity prices in the ERCOT market generally correlate with the price of natural gas because marginal electricity demand is generally supplied by natural gas-fueled generation plants.

Wholesale electricity prices also correlate with market heat rates (a measure of efficiency of the marginal price-setting generator of electricity), which could fall if demand for electricity were to decrease or if additional generation facilities are built in ERCOT. Accordingly, the contribution to earnings and the value of our baseload (lignite/coal-fueled and nuclear) generation assets, which provided a substantial portion of our supply volumes in 2008 and the first nine months of 2009, are dependent in significant part upon the price of natural gas and market heat rates. As a result, our baseload generation assets could significantly decrease in profitability and value if natural gas prices or market heat rates fall.

***Our assets or positions cannot be fully hedged against changes in commodity prices and market heat rates, and hedging transactions may not work as planned or hedge counterparties may default on their obligations.***

We cannot fully hedge the risk associated with changes in commodity prices, most notably natural gas prices, or market heat rates because of the expected useful life of our generation assets and the size of our position relative to market liquidity. To the extent we have unhedged positions, fluctuating commodity prices and/or market heat rates can materially impact our results of operations and financial position, either favorably or unfavorably.

To manage our financial exposure related to commodity price fluctuations, we routinely enter into contracts to hedge portions of purchase and sale commitments, weather positions, fuel requirements and inventories of natural gas, lignite, coal, crude oil, diesel fuel and refined products, and other commodities, within established risk management guidelines. As part of this strategy, we routinely utilize fixed-price forward physical purchase and sale contracts, futures, financial swaps and option contracts traded in over-the-counter markets or on exchanges. Although we devote a considerable amount of time and effort to the establishment of risk management procedures, as well as the ongoing review of the implementation of these procedures, the procedures in place may not always function as planned and cannot eliminate all the risks associated with these activities. For example, we hedge the expected needs of our wholesale and retail customers, but unexpected changes due to weather, natural disasters (such as Hurricane Ike), market constraints or other factors could cause us to purchase power to meet unexpected demand in periods of high wholesale market prices or resell excess power into the wholesale market in periods of low prices. As a result of these and other factors, we cannot precisely predict the impact that risk management decisions may have on our businesses, results of operations or financial position.

With the tightening of credit markets, there has been some decline in the number of market participants in the energy commodities markets, resulting in less liquidity, particularly in the ERCOT wholesale electricity market. Participation by financial institutions and other intermediaries (including investment banks) has

70

EFIHMW00245798

particularly declined. Extended declines in market liquidity could materially affect our ability to hedge our financial exposure to desired levels.

To the extent we engage in hedging and risk management activities, we are exposed to the risk that counterparties that owe us money, energy or other commodities as a result of market transactions will not perform their obligations. Should the counterparties to these arrangements fail to perform, we might be forced to enter into alternative hedging arrangements or honor the underlying commitment at then-current market prices. In such event, we might incur losses in addition to amounts, if any, already paid to the counterparties. ERCOT market participants are also exposed to risks that another ERCOT market participant may default on its obligations to pay ERCOT for power taken, in which case such costs, to the extent not offset by posted security and other protections available to ERCOT, may be allocated to various non-defaulting ERCOT market participants, including us.

### *Our use of assets as collateral for hedging arrangements could be materially impacted if certain proposed legislation regarding the regulation of over-the-counter financial derivatives were to be enacted and be applicable to us.*

The Obama administration has proposed financial market reforms with respect to the currently unregulated Over-the-Counter (OTC) financial derivatives market. As a result, there are currently competing bills in the US House of Representatives that propose to regulate OTC derivatives. Certain of the proposals require entities to clear OTC derivatives that are currently traded on the bilateral market through exchanges, which require that all collateral be in the form of cash. We have entered into a significant number of asset-backed OTC derivatives to hedge risks associated with commodity and interest rate exposure. If this legislation were to be passed and be applicable to us so that we were required to clear our OTC derivatives through exchanges, we would likely be precluded from using our noncash assets as collateral for hedging arrangements. This preclusion could have a material impact on our liquidity, particularly if the final legislation does not provide for the grandfathering of existing OTC derivatives. As a result, if applied to our OTC derivatives transactions, this legislation could significantly increase our costs of entering into OTC derivatives and/or could significantly limit our ability to enter into OTC derivatives and hedge our commodity and interest rate risks. The most recent legislative developments in the US House of Representatives indicate a willingness to grandfather existing OTC derivatives and to exclude from the new clearing requirements swaps used for hedging purposes by end users. However, the proposed legislation is in the early stages of consideration, and we cannot predict whether or when the legislation will be enacted or whether these exemptions will be included in the final legislation.

### *We may suffer material losses, costs and liabilities due to ownership and operation of the Comanche Peak nuclear generation plant.*

The ownership and operation of a nuclear generation plant involves certain risks. These risks include:

- unscheduled outages or unexpected costs due to equipment, mechanical, structural or other problems;

- inadequacy or lapses in maintenance protocols;

- the impairment of reactor operation and safety systems due to human error;

- the costs of storage, handling and disposal of nuclear materials;

- the costs of procuring nuclear fuel;

- the costs of securing the plant against possible terrorist attacks;

- limitations on the amounts and types of insurance coverage commercially available; and

- uncertainties with respect to the technological and financial aspects of decommissioning nuclear facilities at the end of their useful lives.

Confidential

EFIHMW00245799

The prolonged unavailability of Comanche Peak could materially affect our financial condition and results of operations. The following are among the more significant of these risks:

- Operational Risk—Operations at any nuclear generation plant could degrade to the point where the plant would have to be shut down. If such degradations were to occur, the process of identifying and correcting the causes of the operational downgrade to return the plant to operation could require significant time and expense, resulting in both lost revenue and increased fuel and purchased power expense to meet supply commitments. Furthermore, a shut-down or failure at any other nuclear generation plant could cause regulators to require a shut-down or reduced availability at Comanche Peak.

- Regulatory Risk—The NRC may modify, suspend or revoke licenses and impose civil penalties for failure to comply with the Atomic Energy Act, the regulations under it or the terms of the licenses of nuclear generation facilities. Unless extended, the NRC operating licenses for Comanche Peak Unit 1 and Unit 2 will expire in 2030 and 2033, respectively. Changes in regulations by the NRC could require a substantial increase in capital expenditures or result in increased operating or decommissioning costs.

- Nuclear Accident Risk—Although the safety record of Comanche Peak and other nuclear generation plants generally has been very good, accidents and other unforeseen problems have occurred both in the U.S. and elsewhere. The consequences of an accident can be severe and include loss of life, injury, lasting negative health impact and property damage. Any accident, or perceived accident, could result in significant liabilities and damage our reputation. Any such resulting liability from a nuclear accident could exceed our resources, including insurance coverage.

***The operation and maintenance of electricity generation and delivery facilities involves significant risks that could adversely affect our results of operations and financial condition.***

The operation and maintenance of electricity generation and delivery facilities involves many risks, including, as applicable, start-up risks, breakdown or failure of facilities, lack of sufficient capital to maintain the facilities, the dependence on a specific fuel source or the impact of unusual or adverse weather conditions or other natural events, as well as the risk of performance below expected levels of output, efficiency or reliability, the occurrence of any of which could result in lost revenues and/or increased expenses. A significant number of our facilities were constructed many years ago. In particular, older generating equipment and transmission and distribution equipment, even if maintained in accordance with good engineering practices, may require significant capital expenditures to keep operating at peak efficiency or reliability. The risk of increased maintenance and capital expenditures arises from (a) increased starting and stopping of generation equipment due to the volatility of the competitive generation market, (b) any unexpected failure to generate electricity, including failure caused by breakdown or forced outage and (c) damage to facilities due to storms, natural disasters, wars, terrorist acts and other catastrophic events. Further, our ability to successfully and timely complete capital improvements to existing facilities or other capital projects is contingent upon many variables and subject to substantial risks. Should any such efforts be unsuccessful, we could be subject to additional costs and/or the write-off of our investment in the project or improvement.

Insurance, warranties or performance guarantees may not cover all or any of the lost revenues or increased expenses, including the cost of replacement power. Likewise, the ability to obtain insurance, and the cost of and coverage provided by such insurance, could be affected by events outside our control.

***Our cost of compliance with environmental laws and regulations and our commitments, and the cost of compliance with new environmental laws, regulations or commitments could materially adversely affect our results of operations and financial condition.***

We are subject to extensive environmental regulation by governmental authorities. In operating our facilities, we are required to comply with numerous environmental laws and regulations and to obtain numerous governmental permits. We may incur significant additional costs beyond those currently contemplated to comply

72

EFIHMW00245800

with these requirements. If we fail to comply with these requirements, we could be subject to civil or criminal liabilities and fines. Existing environmental regulations could be revised or reinterpreted, new laws and regulations could be adopted or become applicable to us or our facilities, and future changes in environmental laws and regulations could occur, including potential regulatory and enforcement developments related to air emissions, all of which could result in significant additional costs beyond those currently contemplated to comply with existing requirements.

In conjunction with the building of three new generation units, we have committed to reduce emissions of mercury, NOx and SO2 associated with our baseload generation units so that the total of these emissions from both existing and new lignite/coal-fueled units are 20% below 2005 levels. We may incur significantly greater costs than those contemplated in order to achieve this commitment.

We have formed a Sustainable Energy Advisory Board that advises us in our pursuit of technology development opportunities that, among other things, are designed to reduce our impact on the environment. Any adoption of Sustainable Energy Advisory Board recommendations may cause us to incur significant costs in addition to the costs referenced above.

We may not be able to obtain or maintain all required environmental regulatory approvals. If there is a delay in obtaining any required environmental regulatory approvals or if we fail to obtain, maintain or comply with any such approval, the operation and/or construction of our facilities could be stopped, curtailed or modified or become subject to additional costs.

In addition, we may be responsible for any on-site liabilities associated with the environmental condition of facilities that we have acquired, leased or developed, regardless of when the liabilities arose and whether they are known or unknown. In connection with certain acquisitions and sales of assets, we may obtain, or be required to provide, indemnification against certain environmental liabilities. Another party could, depending on the circumstances, assert an environmental claim against us or fail to meet its indemnification obligations to us.

### *Our financial condition and results of operations may be materially adversely affected if new federal and/or state legislation or regulations are adopted to address global climate change.*

In recent years, a growing concern has emerged nationally and internationally about global climate change and how greenhouse gas (GHG) emissions, such as CO2, contribute to global climate change. Several bills addressing climate change have been introduced in the U.S. Congress or discussed by the Obama Administration that are intended to address climate change using different approaches, including a cap on carbon emissions with emitters allowed to trade unused emission allowances (cap-and-trade), a tax on carbon emissions (carbon-tax), incentives for the development of low-carbon technology and federal renewable portfolio standards. In addition, in April 2007, the U.S. Supreme Court issued its decision in Massachusetts v. U.S. Environmental Protection Agency holding that CO2 and other GHG emissions are pollutants subject to regulation under the new motor vehicle provisions of the Clean Air Act. Some commentators believe that the possible outcome from the decision include regulation of GHG emissions not only from motor vehicles but also from industrial sectors, including electricity generation, transmission and distribution facilities. We produce GHG emissions from the combustion of fossil fuels at our generation plants. We estimate that our generation plants produced an average of 57 million tons of CO2 annually from 2005 to 2008. The three new lignite-fueled units currently under construction, that we estimate will come on-line in 2009 and 2010, will generate additional CO2 emissions. Because a substantial portion of our generation portfolio consists of lignite/coal-fueled generation plants, our financial condition and results of operations could be materially and adversely affected by the enactment of any legislation or regulation that mandates a reduction in GHG emissions or that imposes financial penalties, costs or taxes upon those that produce GHG emissions. For example, to the extent a cap-and-trade program is adopted, we may be required to incur material costs to reduce our GHG emissions or to procure emission allowances or credits to comply with such program. To the extent a carbon-tax is adopted, we could be subject to a material tax liability under such a program and could incur material costs to reduce our GHG emissions in order to reduce such tax liability.

73

EFIHMW00245801

*Our financial condition and results of operations may be materially adversely affected by the effects of extreme weather conditions.*

We could be subject to the effects of extreme weather. Extreme weather conditions could stress our transmission and distribution system or our generation facilities resulting in increased maintenance and capital expenditures. Extreme weather events, including hurricanes or storms or other natural disasters, could be destructive and result in casualty losses that are not ultimately offset by insurance proceeds or in increased capital expenditures or costs, including supply chain costs.

Moreover, an extreme weather event could cause disruption in service to customers due to downed wires and poles or damage to other operating equipment, which could result in us foregoing sales of electricity and lost revenue. Similarly, an extreme weather event might affect the availability of generation and transmission capacity, limiting our ability to source or deliver electricity to where it is needed. These conditions, which cannot be reliably predicted, could have an adverse consequence by requiring us to seek additional sources of electricity when wholesale markets are tight or to seek to sell excess electricity when those markets are weak.

*The rates of Oncor's electric delivery business are subject to regulatory review, and may be reduced below current levels, which could adversely impact Oncor's financial condition and results of operation.*

The rates charged by Oncor are regulated by the PUCT and certain cities and are subject to cost-of-service regulation and annual earnings oversight. This regulatory treatment does not provide any assurance as to achievement of earnings levels. Oncor's rates are regulated based on an analysis of Oncor's costs and capital structure, as reviewed and approved in a regulatory proceeding. While rate regulation is premised on the full recovery of prudently incurred costs and a reasonable rate of return on invested capital, there can be no assurance that the PUCT will judge all of Oncor's costs to have been prudently incurred, that the PUCT will not reduce the amount of invested capital included in the capital structure that Oncor's rates are based upon, or that the regulatory process in which rates are determined will always result in rates that will produce full recovery of Oncor's costs, including regulatory assets reported in the balance sheet, and the return on invested capital allowed by the PUCT.

In addition, in connection with the Merger, Oncor has made several commitments to the PUCT regarding its rates. For example, Oncor committed that it will, in rate cases after its 2008 general rate case through proceedings initiated prior to December 31, 2012, support a cost of debt that will be no greater than the then-current cost of debt of electric utilities with investment grade credit ratings equal to Oncor's ratings as of October 1, 2007. As a result, Oncor may not be able to recover debt costs above its cost of debt prior to the Merger.

*Our growth strategy, including investment in three new lignite-fueled generation units and Oncor's capital program, may not be executed as planned, which could adversely impact our financial condition and results of operations.*

There can be no guarantee that the execution of our growth strategy will be successful. As discussed below, our growth strategy is dependent upon many factors. Changes in laws, regulations, markets, costs, the outcome of ongoing litigation or other factors could negatively impact the execution of our growth strategy, including causing us to change the strategy. Even if we are able to execute our growth strategy, it may take longer than expected and costs may be higher than expected.

There can be no guarantee that the execution of the lignite-fueled generation development program will be successful. While we have experience in operating lignite-fueled generation facilities, we have limited recent experience in constructing, commissioning and starting-up such facilities. To the extent construction is not managed efficiently and to a timely conclusion, cost overruns may occur, resulting in the overall program costing significantly more than anticipated. This may also result in delays in the expected online dates for the facilities resulting in less overall income than projected. While we believe we can acquire the resources needed to

74

EFIHMW00245802

effectively execute this program, we are exposed to the risk that we may not be able to attract and retain skilled labor, at projected rates, for constructing, commissioning and starting-up these new facilities.

Our lignite-fueled generation development program is subject to changes in laws, regulations and policies that are beyond our control. Changes in law, regulation or policy regarding commodity prices, power prices, electricity competition or solid-fuel generation facilities or other related matters could adversely impact this program. In recent years, global warming has received significant media attention, which has resulted in legislators focusing on environmental laws, regulations and policies. Changes in environmental law, regulation or policy, such as regulations of emissions of carbon dioxide, could adversely impact this program. Although we have received permits to construct and operate the new units that are a part of the lignite-fueled generation development program, some of these permits are subject to ongoing litigation. See Note 5 to EFH Corp.'s historical condensed consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus for further detail regarding such ongoing litigation. An adverse ruling on these matters could materially and adversely effect the implementation of this program.

Our lignite-fueled generation development program is subject to changes in the electricity market, primarily ERCOT, that are beyond our control. If demand growth is less than expected or if other generation companies build a significant amount of new generation assets in ERCOT, market prices of power could fall such that the new generation capacity becomes uneconomical. In addition, any unanticipated reduction in wholesale electricity prices, market heat rates and natural gas prices, which could occur for a variety of reasons, could adversely impact this program. Even if we enter into hedges to reduce such exposures, we would still be subject to the credit risk of our counterparties.

Our lignite-fueled generation development program is subject to other risks that are beyond our control. For example, we are exposed to the risk that a change in technology for electricity generation facilities and/or emissions control technologies may make other generation facilities less costly and more attractive than our new generation facilities. We are subject to risks relating to transmission capabilities and constraints. We are also exposed to the risk that our contractors may default on their obligations and compensation for damages received, if any, will not cover our losses.

There can be no guarantee that the execution of Oncor's capital deployment program for its electricity delivery facilities will be successful, and there can be no assurance that the capital investments Oncor intends to make in connection with its electricity delivery business will produce the desired reductions in cost and improvements to service and reliability. Furthermore, there can be no guarantee that Oncor's capital investments, including the investment of approximately $1.3 billion (based on ERCOT cost estimates for CREZ construction projects) to construct CREZ-related transmission lines and facilities, will ultimately be recoverable through rates or, if recovered, that they will be recovered on a timely basis.

***Ongoing performance improvement initiatives may not achieve desired cost reductions and may instead result in significant additional costs if unsuccessful. In addition, we may incur significant transition costs and/or experience significant operational disruptions in connection with the termination of our outsourcing arrangement with Capgemini Energy LP.***

The implementation of performance improvement initiatives identified by management may not produce the desired reduction in costs and if unsuccessful, may instead result in significant additional costs as well as significant disruptions in our operations due to employee displacement and the rapid pace of changes to organizational structure and operating practices and processes. Such additional costs or operational disruptions could have an adverse effect on our business and financial prospects. For example, we are in the process of upgrading or replacing certain of our software systems, most notably the recent transition of our retail customer care and revenue management software systems to a new SAP software platform. Such transition could result in material disruptions to our operations. Disruptions in retail customer care operations could result in decreased revenue should the number of customers decline due to customer dissatisfaction. Disruptions in retail revenue

75

EFIHMW00245803

management operations could result in decreased revenue or delayed or lost cash flows to the extent such disruptions result in billing errors or the inability to bill or collect payments for an extended period of time.

In addition, we may incur significant transition costs or experience significant operational disruptions in connection with the termination of our outsourcing arrangement with Capgemini Energy LP as we transition the business support services back to us or to other vendors. Such additional costs and/or operational difficulties could have an adverse effect on our business and financial prospects. Moreover, we are subject to the risk that any new outsourcing arrangements for such business support services may not produce the desired cost savings or operational improvements.

***TXU Energy's retail business is subject to the risk that sensitive customer data may be compromised, which could result in an adverse impact to its reputation and/or the results of operations of the retail business.***

TXU Energy's retail business requires access to sensitive customer data in the ordinary course of business. Examples of sensitive customer data are names, addresses, account information, historical electricity usage, expected patterns of use, payment history, credit bureau data, credit and debit card account numbers, drivers license numbers, social security numbers and bank account information. TXU Energy's retail business may need to provide sensitive customer data to vendors and service providers who require access to this information in order to provide services, such as call center operations, to the retail business. If a significant breach occurred, the reputation of TXU Energy's retail business may be adversely affected, customer confidence may be diminished, or TXU Energy's retail business may be subject to legal claims, any of which may contribute to the loss of customers and have a negative impact on the business and/or results of operations.

***TXU Energy relies on the infrastructure of local utilities or independent transmission system operators to provide electricity to, and to obtain information about, its customers. Any infrastructure failure could negatively impact customer satisfaction and could have a material negative impact on its business and results of operations.***

TXU Energy depends on transmission and distribution facilities owned and operated by unaffiliated utilities, as well as Oncor's facilities, to deliver the electricity it sells to its customers. If transmission capacity is inadequate, TXU Energy's ability to sell and deliver electricity may be hindered, it may have to forgo sales or it may have to buy more expensive wholesale electricity than is available in the capacity-constrained area. For example, during some periods, transmission access is constrained in some areas of the Dallas-Fort Worth metroplex, where TXU Energy has a significant number of customers. The cost to provide service to these customers may exceed the cost to provide service to other customers, resulting in lower profits. In addition, any infrastructure failure that interrupts or impairs delivery of electricity to TXU Energy's customers could negatively impact the satisfaction of its customers with its service.

***TXU Energy offers bundled services to its retail customers, with some bundled services offered at fixed prices and for fixed terms. If TXU Energy's costs for these bundled services exceed the prices paid by its customers, its results of operations could be materially adversely affected.***

TXU Energy offers its customers a bundle of services that include, at a minimum, electricity plus transmission, distribution and related services. The prices TXU Energy charges for its bundle of services or for the various components of the bundle, any of which may be fixed by contract with the customer for a period of time, could fall below TXU Energy's underlying cost to provide the components of such services.

***TXU Energy's retail business is subject to the risk that it will not be able to profitably serve its customers given its price protection promise to certain customers, which could result in an adverse impact to its reputation and/or results of operations.***

TXU Energy committed in 2006 to not increase prices above then current levels through 2009 for qualifying residential customers who remain on certain plans with rates that were then equal to the formerly regulated rate.

76

EFIHMW00245804

The prices TXU Energy charges during this period could fall below TXU Energy's underlying cost to provide electricity.

### *TXU Energy's retail electric provider certification is subject to PUCT review.*

The PUCT may at any time initiate an investigation into whether TXU Energy is compliant with PUCT Substantive Rules and whether it has met all of the requirements for retail electric provider certification, including financial requirements. Any removal or revocation of a retail electric provider certification would mean that TXU Energy would no longer be allowed to provide electricity service to retail customers. Such decertification would have an adverse effect on TXU Energy and its financial prospects. See "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Nine Months Ended September 30, 2009—Regulations and Rates" included in Annex B to this Prospectus for a discussion of the new rules regarding retail electric provider certification.

### *Changes in technology may reduce the value of our generation plants and/or Oncor's electricity delivery facilities and may significantly impact our businesses in other ways as well.*

Research and development activities are ongoing to improve existing and alternative technologies to produce electricity, including gas turbines, fuel cells, microturbines, photovoltaic (solar) cells and concentrated solar thermal devices. It is possible that advances in these or other technologies will reduce the costs of electricity production from these technologies to a level that will enable these technologies to compete effectively with our traditional generation plants. While demand for electric energy services is generally increasing throughout the U.S., the rate of construction and development of new, more efficient generation facilities may exceed increases in demand in some regional electric markets. Consequently, where we have facilities, the profitability and market value of our generation assets could be significantly reduced. Also, electricity demand could be reduced by increased conservation efforts and advances in technology, which could likewise significantly reduce the value of our generation assets and electricity delivery facilities. Changes in technology could also alter the channels through which retail customers buy electricity. To the extent self-generation facilities become a more cost-effective option for certain customers, our revenues could be reduced.

### *Our revenues and results of operations may be adversely impacted by decreases in market prices of power due to the development of wind generation power sources.*

A significant amount of investment in wind generation in the ERCOT market over the past few years has increased overall wind power generation capacity. Generally, the increased capacity has led to lower wholesale electricity prices (driven by lower market heat rates) in the zones at or near wind generation development, especially in, but not exclusive to, the ERCOT West zone where most of the new wind power generation is located. As a result, the profitability of our generation facilities and power purchase contracts, including certain wind generation power purchase contracts, has been impacted and could be further impacted by the effects of the wind power generation, and the value could significantly decrease if wind power generation has a material sustained effect on market heat rates.

### *Our revenues and results of operations may be adversely impacted as ERCOT transitions the current zonal market structure to a nodal wholesale market.*

Substantially all of our competitive businesses are located in the ERCOT market, which is currently in the process of transitioning from a zonal market structure with four congestion management zones to a nodal market structure that will directly manage congestion on a localized basis. In a nodal market, the prices received and paid for power will be based on pricing determined at specific interconnection points on the transmission grid (i.e., Locational Marginal Pricing), which could result in lower revenues or higher costs for our competitive businesses. This market structure change could have a significant impact on the profitability and value of our

Confidential

EFIHMW00245805

competitive businesses depending on how the Locational Marginal Pricing develops. See "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Nine Months Ended September 30, 2009—Regulation and Rates—Wholesale Market Design" included in Annex B to this Prospectus.

***Our future results of operations may be negatively impacted by settlement adjustments determined by ERCOT related to prior periods.***

ERCOT is the independent system operator that is responsible for maintaining reliable operation of the bulk electric power supply system in the ERCOT market. Its responsibilities include the clearing and settlement of electricity volumes and related ancillary services among the various participants in the deregulated Texas market. Settlement information is due from ERCOT within two months after the operating day, and true-up settlements are due from ERCOT within six months after the operating day. Likewise, ERCOT has the ability to resettle any operating day at any time after the six month settlement period, usually the result of a lingering dispute, an alternative dispute resolution process or litigated event. As a result, we are subject to settlement adjustments from ERCOT related to prior periods, which may result in charges or credits impacting our future reported results of operations.

***Our results of operations and financial condition could be negatively impacted by any development or event beyond our control that causes economic weakness in the ERCOT market.***

We derive substantially all of our revenues from operations in the ERCOT market, which covers approximately 75% of the geographical area in the State of Texas. As a result, regardless of the state of the economy in areas outside the ERCOT market, economic weakness in the ERCOT market could lead to reduced demand for electricity in the ERCOT market. Such a reduction could have a material negative impact on our results of operations and financial condition.

***EFH Corp.'s (or any applicable subsidiary's) credit ratings could negatively affect EFH Corp.'s (or the pertinent subsidiary's) ability to access capital and could require EFH Corp. or its subsidiaries to post collateral or repay certain indebtedness.***

Downgrades in EFH Corp.'s or any of its applicable subsidiaries' long-term debt ratings generally cause borrowing costs to increase and the potential pool of investors and funding sources to decrease and might trigger liquidity demands pursuant to the terms of new commodity contracts, leases or other agreements. In August 2009, S&P placed the ratings for EFH Corp. on "negative outlook," citing its expectation that EFH Corp. and TCEH will exercise the payment-in-kind option on their respective toggle notes a third time, which will increase refinancing risk. In October 2009, both S&P and Moody's announced rating actions related to their view that the exchange offers represented a "distressed exchange." As a result, S&P downgraded the corporate issuer ratings of each of EFH Corp., EFCH and TCEH by four notches to CC from B- and affirmed their negative outlook. S&P also completed multi-notch downgrades of its ratings on the issues of Old Notes subject to the exchange offers to CC. Moody's affirmed its Caa1 corporate family ratings and negative outlook for EFH Corp. and TCEH but downgraded its probability of default rating for EFH Corp. and TCEH three notches to Ca from Caa1. Additionally, Moody's downgraded its ratings on certain of the issues of Old Notes subject to the exchange offers and placed the ratings of the Priority 2 Notes on review for possible downgrade.

Most of EFH Corp.'s large customers, suppliers and counterparties require an expected level of creditworthiness in order for them to enter into transactions. If EFH Corp.'s (or an applicable subsidiary's) credit ratings decline, the costs to operate its businesses would likely increase because counterparties could require the posting of collateral in the form of cash-related instruments, or counterparties could decline to do business with EFH Corp. (or its applicable subsidiary).

78

Confidential

*The global financial crisis has caused unprecedented market volatility and may have impacts on our business and financial condition that we currently cannot predict.*

Because our operations are capital intensive, we expect to rely over the long-term upon access to financial markets (particularly the attainment of liquidity facilities) as a significant source of liquidity for capital requirements not satisfied by cash-on-hand, operating cash flows or our revolving credit facilities. The capital and credit markets have been experiencing extreme volatility and disruption. As a result, the continued credit crisis and related turmoil in the global financial system may have an impact on our business and financial condition. Our ability to access the capital or credit markets may be severely restricted at a time when we would like, or need, to access those markets, which could have an impact on our flexibility to react to changing economic and business conditions. In addition, the cost of debt financing may be materially adversely impacted by these market conditions. As such, there can be no assurance that the capital and credit markets will continue to be a reliable or acceptable source of short-term or long-term financing for us. If current levels of market disruption and volatility continue or worsen, we may be forced to meet our liquidity needs, such as our anticipated capital expenditures, through our cash flows. Additionally, the crisis could have a broader impact on business in general in ways that could lead to reduced electricity usage, which could have a negative impact on our revenues, and the credit crisis could have an impact on our customers, counterparties and/or lenders, causing them to fail to meet their obligations to us.

*Our liquidity needs could be difficult to satisfy, particularly during times of uncertainty in the financial markets and/or during times when there are significant changes in commodity prices. The inability to access liquidity, particularly on favorable terms, could materially adversely affect results of operations and/or financial condition.*

Our businesses are capital intensive. We rely on access to financial markets and liquidity facilities as a significant source of liquidity for capital requirements not satisfied by cash-on-hand or operating cash flows. The inability to raise capital on favorable terms or access liquidity facilities, particularly during times of uncertainty similar to that which is currently being experienced in the financial markets, could impact our ability to sustain and grow our businesses and would likely increase capital costs. Our access to the financial markets and liquidity facilities could be adversely impacted by various factors, such as:

- changes in financial markets that reduce available credit or the ability to obtain or renew liquidity facilities on acceptable terms;

- economic weakness in the ERCOT or general U.S. market;

- changes in interest rates;

- a deterioration of our credit or the credit of our subsidiaries or a reduction in our or our applicable subsidiaries' credit ratings;

- a deterioration of the credit or bankruptcy of one or more lenders or counterparties under our or our applicable subsidiaries' liquidity facilities that affects the ability of such lender(s) to make loans to us or our subsidiaries;

- volatility in commodity prices that increases margin or credit requirements;

- a material breakdown in our risk management procedures; and

- the occurrence of changes in our businesses that restrict our ability to access liquidity facilities.

Although we expect to actively manage the liquidity exposure of existing and future hedging arrangements, given the size of the long-term hedging program, any significant increase in the price of natural gas could result in us being required to provide cash or letter of credit collateral in substantial amounts. While these potential posting obligations are primarily supported by the liquidity facilities, for certain transactions there is a potential for the timing of postings on the commodity contract obligations to vary from the timing of borrowings from the senior secured cash posting credit facility of TCEH. Any perceived reduction in our credit quality could result in clearing agents or other counterparties requesting additional collateral. We have potential credit concentration

79

EFIHMW00245807

risk related to the limited number of lenders that provide us liquidity to support our hedging program. A deterioration of the credit quality of such lenders could materially affect our ability to continue such program on acceptable terms. An event of default by one or more of our hedge counterparties could subsequently result in termination-related settlement payments that reduce available liquidity if we owe amounts related to our commodity contracts or delays in receipts of expected settlements if the hedge counterparties owe amounts to us.

In the event that the governmental agencies that regulate the activities of our businesses determine that the creditworthiness of any such business is inadequate to support our activities, such agencies could require us to provide additional cash or letter of credit collateral in substantial amounts to qualify to do business.

In the event our liquidity facilities are being used largely to support the long-term hedging program as a result of a significant increase in the price of natural gas or significant reduction in credit quality, we may have to forego certain capital expenditures or other investments in our competitive businesses or other business opportunities.

Further, a lack of available liquidity could adversely impact the evaluation of our creditworthiness by counterparties and rating agencies. In particular, such concerns by existing and potential counterparties could significantly limit TCEH's wholesale markets activities, including its long-term hedging program.

***The costs of providing pension and OPEB and related funding requirements are subject to changes in pension fund values, changing demographics and fluctuating actuarial assumptions and may have a material adverse effect on our results of operations and financial condition.***

We provide pension benefits based on either a traditional defined benefit formula or a cash balance formula and also provide certain health care and life insurance benefits to eligible employees and their eligible dependents upon these employees' retirement from us. Our costs of providing such benefits and related funding requirements are dependent upon numerous factors, assumptions and estimates and are subject to changes in such factors, assumptions and estimates, including the market value of the assets funding our pension plan and our OPEB plans. Fluctuations in financial market returns as well as changes in general interest rates may result in increased or decreased benefit costs in future periods.

The recent substantial dislocation in the financial markets has caused the value of the investments that fund our pension and OPEB plans to significantly differ from, and may alter the values and actuarial assumptions we use to calculate, our projected future pension plan expense and OPEB costs. A continuation or further decline in the value of these investments could increase the expenses of our pension plan and the costs of our OPEB plans and related funding requirements in the future. Our costs of providing such benefits and related funding requirements are also subject to changing employee demographics (including but not limited to age, compensation levels and years of accredited service), the level of contributions made to retiree plans, expected and actual earnings on plan assets and the discount rates used in determining the projected benefit obligation. Changes made to the provisions of the plans may also impact current and future benefit costs. Fluctuations in financial market returns as well as changes in general interest rates may result in increased or decreased benefit costs in future periods.

***As was the case in the fourth quarter 2008 (as discussed in Notes 1 and 3 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus), goodwill and/or other intangible assets not subject to amortization that we have recorded in connection with the Merger are subject to at least annual impairment evaluations and as a result, we could be required to write off some or all of this goodwill and other intangible assets, which may reflect adverse impacts on our financial condition and results of operations.***

In accordance with Statement of Financial Accounting Standards No. 142, "Goodwill and Other Intangible Assets," goodwill and certain other indefinite-lived intangible assets that are not subject to amortization are reviewed annually or more frequently for impairment, if certain conditions exist, and may be impaired. Any

80

EFIHMW00245808

reduction in or impairment of the value of goodwill or other intangible assets will result in a charge against earnings, which could cause a material adverse impact on our reported results of operations and financial position.

### *The loss of the services of our key management and personnel could adversely affect our ability to operate our businesses.*

Our future success will depend on our ability to continue to attract and retain highly qualified personnel. We compete for such personnel with many other companies, in and outside our industry, government entities and other organizations. We may not be successful in retaining current personnel or in hiring or retaining qualified personnel in the future. Our failure to attract new personnel or retain existing personnel could have a material adverse effect on our businesses.

### *The Sponsor Group controls and may have conflicts of interest with us in the future.*

The Sponsor Group indirectly owns approximately 60% of EFH Corp.'s capital stock on a fully-diluted basis through its investment in Texas Holdings. As a result of this ownership and the Sponsor Group's ownership in interests of the general partner of Texas Holdings, the Sponsor Group has control over decisions regarding our operations, plans, strategies, finances and structure, including whether to enter into any corporate transaction, and will have the ability to prevent any transaction that requires the approval of EFH Corp.'s shareholders.

Additionally, each member of the Sponsor Group is in the business of making investments in companies and may from time to time acquire and hold interests in businesses that compete directly or indirectly with us. Members of the Sponsor Group may also pursue acquisition opportunities that may be complementary to our businesses and, as a result, those acquisition opportunities may not be available to us. So long as the members of the Sponsor Group, or other funds controlled by or associated with the members of the Sponsor Group, continue to indirectly own a significant amount of the outstanding shares of EFH Corp.'s common stock, even if such amount is less than 50%, the Sponsor Group will continue to be able to strongly influence or effectively control our decisions.

### Risks Related to the EFIH Businesses

EFIH is a holding company conducting its operations principally through its subsidiary Oncor (in which EFIH indirectly holds an approximate 80% ownership interest). As such, the risks described below relating to Oncor's businesses will apply to holders of New EFIH Senior Secured Notes issued in the exchange offers. In addition, EFIH is a wholly-owned subsidiary of EFH Corp. Accordingly, these risks will also apply to holders of New EFH Senior Secured Notes issued in the exchange offers. There are additional risks relating to investing in the New Senior Secured Notes that you should review before deciding to tender your Old Notes. Such additional risks are described elsewhere in this "Risk Factors" section under the headings "—Risks Related to the Exchange Offers and the New Senior Secured Notes" and "—Risks Related to Structure."

### *Oncor's businesses are subject to ongoing complex governmental regulations and legislation that have impacted, and may in the future impact, its business and/or results of operations.*

Oncor's businesses operate in changing market environments influenced by various state and federal legislative and regulatory initiatives regarding the restructuring of the energy industry. Oncor will need to continually adapt to these changes.

Oncor's businesses are subject to changes in state and federal laws (including PURA, the Federal Power Act, the Public Utility Regulatory Policies Act of 1978 and the Energy Policy Act of 2005), changing governmental policy and regulatory actions (including those of the PUCT, the Electric Reliability Organization, the Texas Regional Entity, the Texas Commission on Environmental Quality, the FERC and the U.S. Environmental Protection Agency) and the rules, guidelines and protocols of ERCOT with respect to matters

81

EFIHMW00245809

including, but not limited to, market structure and design, construction and operation of transmission facilities, acquisition, disposal, depreciation and amortization of regulated assets and facilities, recovery of costs and investments, return on invested capital and environmental matters. Changes in, revisions to, or reinterpretations of existing laws and regulations may have an adverse effect on Oncor's businesses.

Although the 2009 Texas Legislative Session closed without passage of legislation that significantly negatively impacted Oncor's businesses, there can be no assurance that future action of the Texas Legislature will not result in legislation that could have a material adverse effect on Oncor and its financial prospects.

### *The litigation environment in which Oncor operates poses a significant risk to its businesses.*

Oncor is involved in the ordinary course of business in a number of lawsuits involving employment, commercial, environmental and injuries and damages issues, among other matters. Judges and juries in the State of Texas have demonstrated a willingness to grant large verdicts, including punitive damages, to plaintiffs in personal injury, property damage and business tort cases. Oncor uses legal and appropriate means to contest litigation threatened or filed against it, but the litigation environment in the State of Texas poses a significant business risk.

### *Oncor's revenues are concentrated in a small number of customers, and any delay or default in payment could adversely affect its cash flows, financial condition and results of operations.*

Oncor's revenues from the distribution of electricity are collected from more than 65 retail electric providers, including TXU Energy, that sell the electricity Oncor distributes to their customers. Adverse economic conditions, structural problems in the market served by ERCOT or financial difficulties of one or more retail electric providers could impair the ability of these retail providers to pay for Oncor's services or could cause them to delay such payments. Oncor depends on these retail electric providers to timely remit these revenues to Oncor. Oncor could experience delays or defaults in payment from these retail electric providers, which could adversely affect Oncor's cash flows, financial condition and results of operations.

### *Disruptions at power generation facilities owned by third parties could interrupt Oncor's sales of transmission and distribution services.*

The electricity Oncor transmits and distributes to customers of retail electric providers is obtained by the retail electric providers from electricity generation facilities. Oncor does not own or operate any generation facilities. If generation is disrupted or if generation capacity is inadequate, Oncor's sales of transmission and distribution services may be diminished or interrupted, and its results of operations, financial condition and cash flows may be adversely affected.

### *Oncor's revenues and results of operations are seasonal.*

A significant portion of Oncor's revenues is derived from rates that Oncor collects from each retail electric provider based on the amount of electricity Oncor distributes on behalf of such retail electric provider. Sales of electricity to residential and commercial customers are influenced by temperature fluctuations. Thus, Oncor's revenues and results of operations are subject to seasonality, weather conditions and other changes in electricity usage, with revenues being higher during the warmer months.

### *The operation and maintenance of electricity delivery facilities involves significant risks that could adversely affect Oncor's results of operations and financial condition.*

The operation and maintenance of delivery facilities involves many risks, including breakdown or failure of facilities, lack of sufficient capital to maintain the facilities, impact of unusual or adverse weather conditions or other natural events, as well as the risk of performance below expected levels of efficiency or reliability, the occurrence of any of which could result in lost revenues and/or increased expenses that may not be recoverable

82

EFIHMW00245810

**PX 014**
**Page 92 of 1116**

through rates. A significant number of Oncor's facilities were constructed many years ago. In particular, older transmission and distribution equipment, even if maintained in accordance with good engineering practices, may require significant capital expenditures to keep operating at peak efficiency or reliability. The risk of increased maintenance and capital expenditures arises from damage to facilities due to storms, natural disasters, wars, terrorist acts and other catastrophic events. Further, Oncor's ability to successfully and timely complete capital improvements to existing facilities or other capital projects is contingent upon many variables and subject to substantial risks. Should any such efforts be unsuccessful, Oncor could be subject to additional costs that may not be recoverable through rates and/or the write-off of its investment in the project or improvement.

Insurance, warranties or performance guarantees may not cover all or any of the lost revenues or increased expenses. Likewise, Oncor's ability to obtain insurance, and the cost of and coverage provided by such insurance, could be affected by events outside Oncor's control.

### *The rates of Oncor's electric delivery business are subject to regulatory review, and may be reduced below current levels, which could adversely impact Oncor's financial condition and results of operations.*

The rates charged by Oncor are regulated by the PUCT and certain cities and are subject to cost-of-service regulation and annual earnings oversight. This regulatory treatment does not provide any assurance as to achievement of earnings levels. Oncor's rates are regulated based on an analysis of Oncor's costs and capital structure, as reviewed and approved in a regulatory proceeding. While rate regulation is premised on the full recovery of prudently incurred costs and a reasonable rate of return on invested capital, there can be no assurance that the PUCT will judge all of Oncor's costs to have been prudently incurred, that the PUCT will not reduce the amount of invested capital included in the capital structure that Oncor's rates are based upon, or that the regulatory process in which rates are determined will always result in rates that will produce full recovery of Oncor's costs, including regulatory assets reported in the balance sheet, and the return on invested capital allowed by the PUCT.

In addition, in connection with the Merger, Oncor has made several commitments to the PUCT regarding its rates. For example, Oncor committed that it will, in rate cases after its 2008 general rate case through proceedings initiated prior to December 31, 2012, support a cost of debt that will be no greater than the then-current cost of debt of electric utilities with investment grade credit ratings equal to Oncor's ratings as of October 1, 2007. As a result, Oncor may not be able to recover debt costs above its cost of debt prior to the Merger.

Any adverse regulatory ruling, including reductions in rates, could have an adverse effect on Oncor's business and results of operations.

### *Oncor's capital deployment program may not be executed as planned, which could adversely impact its financial condition and results of operations.*

There can be no guarantee that the execution of Oncor's capital deployment program for its electricity delivery facilities will be successful and there can be no assurance that the capital investments Oncor intends to make in connection with its electricity delivery business will produce the desired reductions in cost and improvements to service and reliability. Furthermore, there can be no guarantee that Oncor's capital investments, including the investment of approximately $1.3 billion (based on ERCOT cost estimates for CREZ construction projects) to construct CREZ-related transmission lines and facilities, will ultimately be recoverable through rates or, if recovered, that they will be recovered on a timely basis. With the award, it is likely Oncor will incur additional debt. In addition, Oncor may incur additional debt in connection with other investments in infrastructure or technology. For more information regarding the limitation on recovering the value of investments using rates, see "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Year Ended December 31, 2008—Key Risks and Challenges" included in Annex C to this Prospectus and EFIH and its subsidiaries' historical consolidated financial statements for the year ended December 31, 2008 and related notes that are included elsewhere in this Prospectus.

Confidential

EFIHMW00245811

***Ongoing performance improvement initiatives may not achieve desired cost reductions and may instead result in significant additional costs if unsuccessful. In addition, Oncor may incur significant transition costs and/or experience significant operational disruptions in connection with the termination of its outsourcing arrangement with Capgemini Energy LP.***

The implementation of performance improvement initiatives identified by management may not produce the desired reduction in costs and, if unsuccessful, may instead result in significant additional costs as well as significant disruptions in Oncor's operations due to employee displacements and the rapid pace of changes to organizational structure and operating practices and processes. Such additional costs or operational disruptions could have an adverse effect on Oncor's business and financial prospects and may not be recoverable through rates.

In addition, Oncor may incur significant transition costs or experience significant operational disruptions in connection with the termination of its outsourcing arrangement with Capgemini Energy LP as it transitions the business support services back to Oncor or to other vendors. Such additional costs and/or operational difficulties could have an adverse effect on Oncor's business and financial prospects. Moreover, Oncor is subject to the risk that any new outsourcing arrangements for such business support services may cost more.

***Changes in technology may reduce the value of Oncor's electricity delivery facilities and may significantly impact Oncor's businesses in other ways as well.***

Research and development activities are ongoing to improve existing and alternative technologies to produce electricity, including gas turbines, fuel cells, microturbines and photovoltaic (solar) cells. It is possible that advances in these or other technologies will reduce the costs of electricity production from these technologies to a level that will enable these technologies to compete effectively with traditional generation plants. Also, electricity demand could be reduced by increased conservation efforts and advances in technology, which could likewise significantly reduce the value of Oncor's electricity delivery facilities. Changes in technology could also alter the channels through which retail customers buy electricity. To the extent self-generation facilities become a more cost-effective option for certain customers, Oncor's revenues could be reduced.

***Oncor's results of operations and financial condition could be negatively impacted by any development or event beyond Oncor's control that causes economic weakness in the ERCOT market.***

Oncor derives substantially all of its revenues from operations in the ERCOT market, which covers approximately 75% of the geographical area in the State of Texas. As a result, regardless of the state of the economy in areas outside the ERCOT market, economic weakness in the ERCOT market could lead to reduced demand for electricity in the ERCOT market. Such a reduction could have a material negative impact on Oncor's results of operations and financial condition.

***Oncor's credit ratings could negatively affect Oncor's ability to access capital.***

Downgrades in Oncor's credit ratings generally cause borrowing costs to increase and the potential pool of investors and funding sources to decrease. In the event any downgrade occurs and causes Oncor's borrowing costs to increase, Oncor may not be able to recover such increased costs if they exceed Oncor's approved cost of debt determined in its 2008 general rate case or subsequent rate cases.

Most of Oncor's large customers, suppliers and counterparties require an expected level of creditworthiness in order for them to enter into transactions. If Oncor's credit ratings decline, the costs to operate Oncor's businesses would likely increase because counterparties could require the posting of collateral in the form of cash-related instruments, or counterparties could decline to do business with Oncor.

84

EFIHMW00245812

*The loss of the services of Oncor's key management and personnel could adversely affect Oncor's ability to operate its businesses.*

Oncor's future success will depend on its ability to continue to attract and retain highly qualified personnel. Oncor competes for such personnel with many other companies, in and outside Oncor's industry, government entities and other organizations. Oncor may not be successful in retaining its current personnel or in hiring or retaining qualified personnel in the future. Oncor's failure to attract new personnel or retain its existing personnel could have a material adverse effect on Oncor's businesses.

*The global financial crisis has caused unprecedented market volatility and may have impacts on Oncor's business and financial condition that Oncor currently cannot predict.*

Because its operations are capital intensive, Oncor expects to rely over the long term upon access to financial markets as a significant source of liquidity for capital requirements not satisfied by cash-on-hand, operating cash flows or its revolving credit facility. The capital and credit markets have been experiencing extreme volatility and disruption. As a result, the continued credit crisis and related turmoil in the global financial system may have an impact on Oncor's business and financial condition. Oncor's ability to access the capital or credit markets may be severely restricted at a time when Oncor would like, or needs, to access those markets, which could have an impact on Oncor's flexibility to react to changing economic and business conditions. In addition, the cost of debt financing may be materially adversely impacted by these market conditions. Even if Oncor is able to obtain debt financing, it may be unable to recover in rates some or all of the costs of such debt financing as a result of its agreement with the PUCT that it will, in rate cases after its 2008 general rate case through proceedings initiated prior to December 31, 2012, support a cost of debt that will be based on the then-current cost of debt of electric utilities with investment grade credit ratings equal to Oncor's ratings as of October 1, 2007. As such, there can be no assurance that the capital and credit markets will continue to be a reliable or acceptable source of short-term or long-term financing for Oncor. If current levels of market disruption and volatility continue or worsen, Oncor may be forced to meet its liquidity needs, such as its anticipated capital expenditures, through its cash flows. Additionally, the crisis could have a broader impact on business in general in ways that could lead to reduced electricity usage, which could have a negative impact on Oncor's revenues, and the credit crisis could have an impact on Oncor's customers, causing them to fail to meet their obligations to Oncor.

*In the future, Oncor could have liquidity needs that could be difficult to satisfy under some circumstances, especially in uncertain financial market conditions.*

Oncor's operations are capital intensive. Oncor relies on access to financial markets and its liquidity facility as a significant source of liquidity for capital requirements not satisfied by cash-on-hand or operating cash flows. The inability to raise capital on favorable terms or access liquidity facilities, particularly during times of uncertainty similar to that which is currently being experienced in the financial markets, could adversely impact Oncor's ability to sustain and grow its businesses and would likely increase capital costs that may not be recoverable through rates. Oncor's access to the financial markets and its liquidity facility, and the pricing and terms Oncor receives in the financial markets, could be adversely impacted by various factors, such as:

- changes in financial markets that reduce available credit or the ability to obtain or renew liquidity facilities on acceptable terms;

- economic weakness in the ERCOT market;

- changes in interest rates;

- a deterioration of Oncor's credit or a reduction in Oncor's credit ratings;

- a deterioration of the credit of EFH Corp. or EFH Corp.'s other subsidiaries or a reduction in the credit ratings of EFH Corp. or EFH Corp.'s other subsidiaries that is perceived to potentially have an adverse impact on Oncor despite the ring-fencing of Oncor Holdings and its direct and indirect subsidiaries (the "Oncor Ring-Fenced Entities") from the Texas Holdings Group;

85

EFIHMW00245813

- a material breakdown in Oncor's risk management procedures; and
- the occurrence of material adverse changes in Oncor's businesses that restrict its ability to access its liquidity facilities.

Oncor's primary source of liquidity aside from operating cash flows is its ability to borrow under its revolving credit facility. The facility contains a debt-to-capital ratio covenant that effectively limits Oncor's ability to incur indebtedness in the future. As of September 30, 2009, Oncor was in compliance with such covenant. The credit facility and the senior notes issued by Oncor are secured by a deed of trust which permits Oncor to secure other indebtedness with the lien of the deed of trust up to the amount of the available bond credits. As of September 30, 2009, the available bond credits were $2.2 billion. In connection with the Merger, Oncor also committed to the PUCT that it would maintain a regulatory capital structure at or below the assumed debt-to-equity ratio established periodically by the PUCT for ratemaking purposes, which is currently set at 60% debt to 40% equity.

> ***The allocated costs of providing pension and OPEB and related funding requirements are subject to changes in pension fund values, changing demographics and fluctuating actuarial assumptions and may have a material adverse effect on Oncor's results of operations and financial condition.***

Oncor is a participating employer in the pension plan sponsored by EFH Corp. and offers pension benefits based on either a traditional defined benefit formula or a cash balance formula. Oncor also participates in health care and life insurance benefit plans offered by EFH Corp. to eligible employees and their eligible dependents upon these employees' retirement from Oncor. Oncor's allocated costs of providing such benefits and related funding requirements are dependent upon numerous factors, assumptions and estimates and are subject to changes in such factors, assumptions and estimates, including the market value of the assets funding EFH Corp.'s pension plan and OPEB plans. Fluctuations in actual market returns as well as changes in general interest rates may result in increased or decreased benefit costs in future periods.

The recent substantial dislocation in the financial markets has caused the value of the investments that fund EFH Corp.'s pension and OPEB plans to significantly differ from, and may alter the values and actuarial assumptions EFH Corp. uses to calculate, projected future pension plan expense and OPEB costs allocated to Oncor. A continuation or further decline in the value of these investments could increase the expenses of EFH Corp.'s pension plan and the costs of its OPEB plans allocated to Oncor and related funding requirements in the future. Benefits costs and related funding requirements are also subject to changing employee demographics (including but not limited to age, compensation levels and years of accredited service), the level of contributions made to retiree plans, expected and actual earnings on plan assets and the discount rates used in determining the projected benefit obligation. Changes made to the provisions of the plans may also impact current and future benefit costs. Fluctuations in actual market returns as well as changes in general interest rates may result in increased or decreased benefit costs in future periods.

> ***As was the case in the fourth quarter 2008 (as discussed in Notes 1 and 3 to EFIH and its subsidiaries' historical consolidated financial statements for the year ended December 31, 2008 that are included elsewhere in this Prospectus), goodwill that Oncor has recorded in connection with the Merger is subject to at least annual impairment evaluations and as a result, Oncor could be required to write off some or all of this goodwill, which may reflect adverse impacts on Oncor's financial condition and results of operations.***

In accordance with Statement of Financial Accounting Standards No. 142, "Goodwill and Other Intangible Assets," goodwill recorded in connection with the Merger is not amortized but is reviewed annually or more frequently for impairment, if certain conditions exist, and may be impaired. Any reduction in or impairment of the value of goodwill will result in a charge against earnings, which could reflect material adverse impacts on Oncor's reported results of operations and financial position.

86

Confidential

*Oncor's ring-fencing measures may not work as planned.*

As discussed above, to enhance the separateness between the Oncor Ring-Fenced Entities and the Texas Holdings Group, various legal, financial and contractual provisions were implemented. These enhancements are intended to minimize the risk that a court would order any of the Oncor Ring-Fenced Entities' assets and liabilities to be substantively consolidated with those of any member of the Texas Holdings Group in the event that a member of the Texas Holdings Group were to become a debtor in a bankruptcy case. Nevertheless, bankruptcy courts have broad equitable powers and, as a result, outcomes in bankruptcy proceedings are inherently difficult to predict. Accordingly, if any member of the Texas Holdings Group were to become a debtor in a bankruptcy case, there can be no assurance that a court would not order an Oncor Ring-Fenced Entity's assets and liabilities to be substantively consolidated with those of such member of the Texas Holdings Group. See Note 1 to EFIH and its subsidiaries' historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus.

Confidential

EFIHMW00245815

**PX 014**
**Page 97 of 1116**

## USE OF PROCEEDS

The Offerors will not receive any cash proceeds from the exchange offers or the consent solicitations. Any Legacy Notes and TCEH Notes accepted for exchange in the exchange offers may remain outstanding and be held by EFH Corp., EFCH and/or EFIH. Any 2017 Notes accepted for exchange in the exchange offers are expected to be retired and cancelled.

The Offerors intend to fund all cash payable to holders pursuant to the exchange offers and the consent solicitations, represented by an amount equal to accrued and unpaid cash interest from the last applicable interest payment date to, but not including, the Settlement Date on any Old Notes (other than Old Toggle Notes) accepted in the exchange offers and any consent payments payable to consenting holders of Consent Notes, with cash on hand.

Each member of the Sponsor Group has advised us that it, and the affiliates that it controls, in the aggregate, own an insignificant amount of Old Notes, and it and/or such affiliates may participate in the exchange offers and consent solicitations. Such participation, if any, will be on the same terms and subject to the same conditions set forth in this Prospectus applicable to other holders of the respective Old Notes held by the Sponsor Group and such affiliates. Consent Notes held by the Sponsor Group and such affiliates will not be considered outstanding for the purposes of determining whether the holders of the required outstanding principal amount of any issue of Consent Notes have delivered Consents necessary to adopt the Proposed Amendments with respect to such issue of Consent Notes.

In connection with the exchange offers, the Offerors will pay TPG, a member of the Sponsor Group, an advisory fee of up to $3.25 million for advising the management of the Offerors regarding the terms and structure of the exchange offers and consent solicitations. Affiliates of each of Goldman Sachs and KKR, members of the Sponsor Group, are acting as Dealer Managers and will receive compensation for acting as such as described under "Exchange Agent; Information Agent; Dealer Managers and Solicitation Agents; Other Advisors—Dealer Managers and Solicitation Agents."

Confidential

EFIHMW00245816

PX 014
Page 98 of 1116

# CAPITALIZATION

**EFH Corp.**

The following table sets forth as of September 30, 2009, EFH Corp.'s cash and cash equivalents and capitalization of EFH Corp. and certain of its subsidiaries:

(1) on an actual basis; and

(2) on an adjusted basis to give effect to the completion of the exchange offers and the issuance of approximately $115.5 million principal amount of New EFH Senior Secured Notes and $141.1 million principal amount of New EFIH Senior Secured Notes on November 16, 2009, the expected Settlement Date.

| | As of September 30, 2009 | |
| --- | --- | --- |
| | Actual | As Adjusted (a) |
| | (millions of dollars) | |
| Cash and cash equivalents | $ 1,725 | $ 1,718 |
| **Debt:** | | |
| EFH Corp.: | | |
| 4.80% Series O Senior Notes due 2009 | 3 | 3 |
| 5.55% Series P Senior Notes due 2014 | 1,000 | 983 |
| 6.50% Series Q Senior Notes due 2024 | 750 | 740 |
| 6.55% Series R Senior Notes due 2034 | 750 | 744 |
| 10.875% Senior Notes due 2017 | 2,000 | 1,831 |
| 11.250%/12.000% Senior Toggle Notes due 2017 | 2,650 | 2,797 |
| 9.75% Senior Secured Notes due 2019 | — | 116 |
| Unamortized fair value discount | (619) | (612) |
| Unamortized discount on New Senior Secured Notes | — | (1) |
| Total EFH Corp. debt | 6,534 | 6,601 |
| EFIH (b): | | |
| 9.75% Senior Secured Notes due 2019 | — | 141 |
| Unamortized discount on New Senior Secured Notes | — | (1) |
| Total EFIH debt | — | 140 |
| EFCH (c): | | |
| Secured debt | 94 | 94 |
| Unsecured debt | 9 | 9 |
| Total EFCH debt | 103 | 103 |
| TCEH: | | |
| TCEH Senior Secured Facilities | 22,356 | 22,356 |
| TCEH Notes | 5,000 | 4,857 |
| TCEH Toggle Notes | 1,848 | 1,848 |
| Other secured debt | 208 | 208 |
| Other unsecured debt | 1,390 | 1,390 |
| Total TCEH debt | 30,802 | 30,659 |
| Oncor: | | |
| Secured debt | 5,674 | 5,674 |
| Total Oncor debt | 5,674 | 5,674 |
| Debt of Other Subsidiaries: | | |
| Secured debt (d) | 92 | 92 |
| Total consolidated debt | 43,205 | 43,269 |
| Total shareholders' equity | (3,234) | (3,173) |
| Noncontrolling interest in subsidiaries | 1,420 | 1,420 |
| Total capitalization | $41,391 | $41,516 |

Confidential

EFIHMW00245817

(a)   The adjustment to cash and cash equivalents reflects estimated issuance costs related to the exchange offers. Debt amounts exclude an aggregate principal amount of up to $176 million and unamortized fair value discount of up to $11 million related to exchanged Legacy Notes and TCEH Notes that may remain outstanding and be held by EFH Corp. (parent), EFCH and/or EFIH; such notes would be eliminated in the EFH Corp. consolidated financial statements. The Old Toggle Notes as adjusted amount includes $159 million in additional principal reflecting the payment-in-kind interest payment on November 1, 2009. Total shareholders' equity reflects an approximate $62 million after tax gain on the transaction. Amounts do not include accrued and unpaid interest paid on the Old Notes exchanged on which cash interest is paid, which we expect to be approximately $1 million.

(b)   Excludes EFIH's guarantees of the 2017 Notes and the New EFH Senior Secured Notes.

(c)   Excludes EFCH's guarantee of the 2017 Notes, the TCEH Senior Secured Facilities, the TCEH Notes and the New EFH Senior Secured Notes.

(d)   Consists of a building finance lease.

Confidential

EFIHMW00245818

**PX 014**
**Page 100 of 1116**

**EFIH**

The following table sets forth as of September 30, 2009, EFIH's cash and cash equivalents and capitalization of EFIH and certain of its subsidiaries:

(1) on an actual basis; and

(2) on an adjusted basis to give effect to the completion of the exchange offers and the issuance of approximately $115.5 million principal amount of New EFH Senior Secured Notes and $141.1 million principal amount of New EFIH Senior Secured Notes on November 16, 2009, the expected Settlement Date.

| | As of September 30, 2009 | |
| --- | --- | --- |
| | Actual | As Adjusted |
| | (millions of dollars) | |
| Cash and cash equivalents .......................................... | $    23 | $    23 |
| Debt: | | |
| EFIH: | | |
| 10.875% EFH Corp. Senior Notes due 2017 (a) ........................... | 1,000 | 915 |
| 11.250%/12.000% EFH Corp. Senior Toggle Notes due 2017 (a) ............ | 1,325 | 1,399 |
| 9.75% EFH Corp. Senior Secured Notes due 2019 (a) ..................... | — | 58 |
| 9.75% Senior Secured Notes due 2019 ................................. | — | 141 |
| Unamortized discount on 9.75% Senior Secured Notes due 2019 (b) ......... | — | (2) |
| Total EFIH debt ............................................... | 2,325 | 2,511 |
| Oncor: | | |
| Secured debt .................................................. | 5,674 | 5,674 |
| Total Oncor debt ............................................. | 5,674 | 5,674 |
| Total consolidated debt ....................................... | 7,999 | 8,185 |
| Total EFIH membership interest (c) ........................... | 3,207 | 3,231 |
| Total noncontrolling interests in subsidiaries ..................... | 1,378 | 1,378 |
| Total capitalization ..................................... | $12,584 | $12,794 |

(a) Represents 50% of the principal amount of the 2017 Notes guaranteed by EFIH (pushed-down debt), as discussed in Note 4 to EFIH and its subsidiaries' historical condensed consolidated financial statements for the quarter ended September 30, 2009 included elsewhere in this Prospectus, and 50% of the New EFH Senior Secured Notes guaranteed by EFIH (pushed-down debt).

(b) Includes $1 million related to the push down of 50% of the 9.75% EFH Corp. Senior Notes due 2019, which will be guaranteed by EFIH.

(c) As Adjusted amount includes push down effects (arising from the EFIH guarantee) of the retirement of the 2017 Notes and the issuance of the New EFH Senior Secured Notes.

Confidential

EFIHMW00245819

# THE TRANSACTIONS

## The Merger

On October 10, 2007, the Merger occurred. Upon the effectiveness of the Merger, each share of EFH Corp. common stock outstanding immediately prior to the Merger (other than shares held by EFH Corp. or any of its subsidiaries or Texas Holdings or any of its subsidiaries, including Merger Sub, in each case not held on behalf of third parties, or shares held by holders who properly exercised their rights of dissent and appraisal under Texas law) was cancelled and converted into the right to receive $69.25 in cash, without interest and less any applicable withholding taxes.

## Equity Contributions

At the closing of the Merger, Texas Holdings received an aggregate equity investment of approximately $8.3 billion. Investment funds affiliated with the Sponsor Group, or their respective assignees, contributed approximately $5.1 billion to Texas Holdings. The Sponsor Group consists of investment funds associated with or designated by KKR, TPG and Goldman Sachs who, along with certain other co-investors, own EFH Corp. through Texas Holdings, with the Sponsor Group controlling Texas Holdings' general partner, Texas Energy Future Capital Holdings LLC. In addition, Citigroup Global Markets Inc., a Dealer Manager with respect to the exchange offers and a solicitation agent with respect to the consent solicitations, and Morgan Stanley & Co. Incorporated, or their respective affiliates, each made equity investments of approximately $250 million in Texas Holdings. The Sponsor Group obtained approximately $2.3 billion in equity investments from other existing investors in KKR's and TPG's private equity funds and other third party investors. Following the closing of the Merger and as of the date of this Prospectus, the Sponsor Group owned approximately 62% of the limited partnership units issued by Texas Holdings in connection with the Merger.

The equity contributions by the Sponsor Group and the Investors are referred to in this Prospectus as the "Equity Contributions."

## Debt Financing

In connection with the Merger, in addition to the Equity Contributions described above, we entered into the following debt financing arrangements, in each case, arranged by a consortium of arrangers and bookrunners:

- The TCEH Senior Secured Facilities, which are guaranteed by EFCH and subsidiaries of TCEH;

- a $6.75 billion senior unsecured interim loan facility of TCEH (the "TCEH Senior Interim Facility"), which was used to fund the Merger and related transactions; and

- a $4.5 billion senior unsecured interim loan facility of EFH Corp. (the "EFH Senior Interim Facility"), which was used to fund the Merger and related transactions.

In October and December 2007, TCEH and TCEH Finance, Inc. issued $6.75 billion aggregate principal amount of the TCEH Notes in two private offerings. The proceeds from the offerings of the TCEH Notes, along with cash on hand, were used by TCEH to repay in full the TCEH Senior Interim Facility.

In October 2007, EFH Corp. issued the 2017 Notes in a private offering. The proceeds from the offering of the 2017 Notes, along with cash on hand, were used by EFH Corp. to repay in full the EFH Senior Interim Facility.

We refer to the above, collectively, as the "Debt Financing."

Concurrently with the transactions described above, Oncor entered into a $2.0 billion senior revolving credit facility (the "Oncor Revolving Credit Facility"), which may be increased by up to $500 million, subject to certain conditions, which is being used by Oncor for working capital and for other general corporate purposes. No portion of the Oncor Revolving Credit Facility was used to finance the Merger or the debt repayment that occurred in connection with the Merger.

92

EFIHMW00245820

We refer to the transactions listed above, including the Merger and the application of the proceeds of the Equity Contributions and the Debt Financing, as the "Transactions."

**Ring-Fencing**

Upon the consummation of the Merger, EFH Corp. and Oncor implemented several measures that are referred to as "ring-fencing." Such measures included, among others, the following:

- the conversion of Oncor from a Texas corporation to a Delaware limited liability company;

- the inclusion of covenants in Oncor Holdings' and Oncor's limited liability company agreements intended to enhance the separation of Oncor Holdings and its subsidiaries, including Oncor, from Texas Holdings and its other subsidiaries, including EFIH;

- the establishment of boards of directors for Oncor Holdings and Oncor with a majority of members who meet the New York Stock Exchange requirements for independence in all material respects and whose unanimous consent is required to take certain material actions, including (i) to consolidate or merge (A) with EFH Corp. or any of EFH Corp.'s other subsidiaries or (B) with any other entity, if Oncor Holdings or Oncor, as applicable, would not be the surviving entity; (ii) to sell, transfer or dispose of all or substantially all of the assets of Oncor Holdings or Oncor, as applicable, without adequate provision for the payment of all of such entity's creditors; (iii) to institute, or consent to the institution of, bankruptcy or similar proceedings in respect of Oncor Holdings or Oncor, as applicable; or (iv) to the fullest extent permitted by law, to dissolve or liquidate Oncor Holdings or Oncor, as applicable, without adequate provision for the payment of all of such entity's creditors;

- the specific delegation to each of the board of directors and the independent directors of Oncor, each acting by majority vote, of the right to prevent distributions, if it or they determine that it is in the best interests of Oncor to retain such amounts to meet expected future requirements;

- after the appointment of the initial independent directors, the delegation of the ability to nominate, appoint and fill vacancies in respect of the independent directors of Oncor Holdings and Oncor to a standing nominating committee of Oncor Holdings' board of directors, a majority of whose members are independent directors; and

- the incurrence of new indebtedness, evidenced by the Oncor Revolving Credit Facility, the lenders of which will be specifically relying on the separateness of Oncor Holdings and Oncor, and their assets, from Texas Holdings and its other subsidiaries.

The ring-fencing measures were based on certain principles articulated by rating agencies and certain commitments made by Texas Holdings and Oncor to the PUCT and the FERC intended to further separate Oncor from Texas Holdings and its subsidiaries and to mitigate Oncor's credit exposure to those entities and to reduce the risk that the assets and liabilities of Oncor Holdings or of any of its subsidiaries would be substantively consolidated with the assets and liabilities of Texas Holdings or of any of its other subsidiaries in the event of a bankruptcy of one or more of those entities. A number of ring-fencing measures put in place were incorporated into a PUCT order that is legally binding on Oncor.

None of the ring-fenced entities guarantees or otherwise holds out its credit as being available to support the obligations of EFH Corp. or any of its subsidiaries (other than the ring-fenced entities), including with respect to the New Senior Secured Notes offered hereby. In addition, lenders under the TCEH Senior Secured Facilities and the holders of the 2017 Notes and the TCEH senior notes have acknowledged, and the future holders of such notes will acknowledge, by acceptance of such notes, the legal separateness of Oncor and its subsidiaries from the borrowers and guarantors under such financing documents. Lenders under the TCEH Senior Secured Facilities and the holders of the 2017 Notes and the TCEH senior notes also agreed, and the future holders of such notes will agree, by acceptance of such notes, that they will not initiate any bankruptcy or similar proceeding against Oncor Holdings or its subsidiaries and that Oncor Holdings and its subsidiaries are entitled to enforce this non-petition covenant. In addition, holders of New Senior Secured Notes, by acceptance of such

93

EFIHMW00245821

notes, will acknowledge the legal separateness of Oncor and its subsidiaries from the Offerors and EFCH (if applicable) under such financing documents. Holders of New Senior Secured Notes, by acceptance of such notes, will also agree that they will not initiate any bankruptcy or similar proceeding against Oncor Holdings or its subsidiaries and that Oncor Holdings and its subsidiaries are entitled to enforce this non-petition covenant.

**Sale of Noncontrolling Interests in Oncor**

In November 2008, Oncor issued and sold additional equity interests to Texas Transmission for $1.254 billion in cash. At the closing of the sale, Oncor also offered and sold additional equity interests to Oncor Management Investment LLC, an entity owned by certain members of Oncor's management, for the same price per unit of equity interest paid by Texas Transmission. Accordingly, the equity issuances resulted in EFH Corp. indirectly owning 80.04% of Oncor, certain members of Oncor management indirectly owning 0.21% of Oncor and Texas Transmission owning 19.75% of Oncor.

The investor rights agreement dated as of November 5, 2008, by and among Oncor, Oncor Holdings, Texas Transmission, EFH Corp. and any other persons that subsequently become a party thereto (the "Investor Rights Agreement") governs certain rights of certain members of Oncor and EFH Corp. arising out of their direct or indirect ownership of Oncor membership interests, including, without limitation, transfers of Oncor membership interests and restrictions thereon. Among other transfer restrictions, the Investor Rights Agreement provides that, prior to the earlier of the completion of a qualified initial public offering or seven years from the date of the Investor Rights Agreement, Texas Transmission may transfer its Oncor membership interests only to certain permitted transferees or with the prior approval of Oncor Holdings. Following such time period, Texas Transmission may transfer its Oncor membership interests under a registration statement or pursuant to applicable securities laws. The Investor Rights Agreement also grants Texas Transmission certain "tag-along" rights in relation to certain sales, transfers or pledges of Oncor membership interests by Oncor Holdings or indirectly by EFH Corp. or its subsidiaries. Subject to certain conditions, these "tag-along" rights allow Texas Transmission to transfer a pro-rata portion of its Oncor membership interests in the event of a transfer of Oncor membership interests by Oncor Holdings or indirectly by EFH Corp. or its subsidiaries on the same terms as Oncor Holdings, EFH Corp. or a subsidiary of EFH Corp. would receive for the Oncor membership interests. The agreement further provides that under certain offerings of equity securities occurring before an initial public offering of Oncor, Texas Transmission and Oncor Holdings will receive preemptive rights to purchase their pro-rata share of the equity securities to be sold pursuant to such offerings. The Investor Rights Agreement also provides EFH Corp. with a right of first refusal to purchase any Oncor membership interests to be sold in a permitted sale by Texas Transmission or its permitted transferees.

Additionally, Texas Holdings, EFH Corp., certain of EFH Corp.'s subsidiaries and Oncor Holdings have certain "drag-along" rights in relation to offers from third-parties to purchase their directly or indirectly owned membership interests in Oncor, where the resulting sale would constitute a change of control of Oncor. These "drag-along" rights compel Texas Transmission and all other members of Oncor to sell or otherwise transfer their membership interests in Oncor on substantially the same terms as Texas Holdings, EFH Corp., the EFH Corp. subsidiary or Oncor Holdings (as applicable). Pursuant to the Investor Rights Agreement, all members of Oncor that have entered into such agreement must cooperate with Oncor in connection with an initial public offering of Oncor.

94

Confidential

## SELECTED HISTORICAL CONSOLIDATED FINANCIAL DATA FOR
## EFH CORP. AND ITS SUBSIDIARIES

The following table sets forth our selected historical consolidated financial data as of and for the periods indicated. The selected historical financial data as of December 31, 2008 and 2007 (Successor) and for the year ended December 31, 2008 (Successor), the period from October 11, 2007 through December 31, 2007 (Successor), the period from January 1, 2007 through October 10, 2007 (Predecessor) and for the year ended December 31, 2006 (Predecessor) have been derived from our audited historical consolidated financial statements and related notes included elsewhere in this Prospectus. The historical financial data as of December 31, 2006, 2005 and 2004 (Predecessor) and for the years ended December 31, 2005 and 2004 (Predecessor) have been derived from our audited historical consolidated financial statements that are not included in this Prospectus. The "Predecessor" period reflects the period prior to the Merger, which occurred on October 10, 2007. The historical financial data as of September 30, 2009 and for the nine months ended September 30, 2009 and 2008 have been derived from our unaudited historical interim condensed consolidated financial statements and related notes included elsewhere in this Prospectus. In EFH Corp.'s opinion, such unaudited interim financial data reflects all adjustments, consisting of normal recurring accruals, necessary for the fair presentation of the results for those periods. The results of operations for the interim periods, for seasonal and other factors, are not necessarily indicative of the results to be expected for the full year or any future period.

The selected historical consolidated financial data should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Year Ended December 31, 2008" and "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Nine Months Ended September 30, 2009," each included in Annex B to this Prospectus, and our historical consolidated financial statements and related notes that are included elsewhere in this Prospectus.

| | Successor | | Predecessor | | | |
|---|---|---|---|---|---|---|
| | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, | | |
| | | | | 2006 | 2005 | 2004 |
| | (millions of dollars, except ratios) | | | | | |
| Operating revenues (a) | $11,364 | $ 1,994 | $8,044 | $10,703 | $10,826 | $9,319 |
| Income (loss) from continuing operations before extraordinary gain (loss) and cumulative effect of changes in accounting principles | (9,998) | (1,361) | 699 | 2,465 | 1,775 | 81 |
| Income from discontinued operations, net of tax effect | — | 1 | 24 | 87 | 5 | 378 |
| Extraordinary gain (loss), net of tax effect | — | — | — | — | (50) | 16 |
| Cumulative effect of changes in accounting principles, net of tax effect | — | — | — | — | (8) | 10 |
| Exchangeable preferred membership interest buyback premium | — | — | — | — | — | 849 |
| Preference stock dividends | — | — | — | — | 10 | 22 |
| Net income (loss) | (9,998) | (1,360) | 723 | 2,552 | 1,712 | (386) |
| Net loss attributable to noncontrolling interests | 160 | — | — | — | — | — |
| Net income (loss) attributable to EFH Corp. | $(9,838) | $(1,360) | $ 723 | $ 2,552 | $ 1,712 | $ (386) |
| Ratio of earnings to fixed charges (b) | — | — | 2.30 | 5.11 | 3.80 | 1.16 |
| Ratio of earnings to combined fixed charges and preference dividends (b) | — | — | 2.30 | 5.11 | 3.74 | 1.11 |
| Embedded interest cost on long-term debt—end of period (c) | 9.2% | 9.5% | 6.5% | 6.6% | 6.3% | 6.0% |
| Embedded dividend cost on preferred stock of subsidiaries—end of period (d) | — % | — % | — % | — % | — % | 4.4% |
| Capital expenditures, including nuclear fuel | $ 2,978 | $ 707 | $2,395 | $ 2,297 | $ 1,104 | $ 999 |

95

Confidential

EFIHMW00245823

| | Successor | | Predecessor | | |
| | December 31, | | December 31, | | |
| | 2008 | 2007 | 2006 | 2005 | 2004 |
| | (millions of dollars, except ratios) | | | | |
| Total assets—end of year (e) | $59,263 | $64,804 | $27,216 | $27,978 | $24,059 |
| Property, plant & equipment—net—end of year | $29,522 | $28,650 | $18,569 | $17,006 | $16,495 |
| Goodwill and intangible assets—end of year | $17,379 | $27,319 | $ 729 | $ 728 | $ 723 |
| Capitalization—end of year | | | | | |
| Equity-linked debt securities | $ — | $ — | $ — | $ 179 | $ 285 |
| All other long-term debt, less amounts due currently | 40,838 | 38,603 | 10,631 | 11,153 | 12,127 |
| Preferred stock of subsidiaries (not subject to mandatory redemption) (f) | — | — | — | — | 38 |
| Preference stock | — | — | — | — | 300 |
| EFH Corp. common stock equity | (3,532) | 6,685 | 2,140 | 475 | 339 |
| Noncontrolling interests in subsidiaries | 1,355 | | | | |
| Total | $38,661 | $45,288 | $12,771 | $11,807 | $13,089 |
| Capitalization ratios—end of year | | | | | |
| Equity-linked debt securities | — % | — % | — % | 1.5% | 2.2% |
| All other long-term debt, less amounts due currently | 105.6 | 85.2 | 83.2 | 94.5 | 92.6 |
| Preferred stock of subsidiaries (f) | — | — | — | — | 0.3 |
| Preference stock | — | — | — | — | 2.3 |
| EFH Corp. common stock equity | (9.1) | 14.8 | 16.8 | 4.0 | 2.6 |
| Noncontrolling interests in subsidiaries | 3.5 | — | | | |
| Total | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Short-term borrowings—end of year | $ 1,237 | $ 1,718 | $ 1,491 | $ 798 | $ 210 |
| Long-term debt due currently—end of year | $ 385 | $ 513 | $ 485 | $ 1,250 | $ 229 |

(a)  The operating revenues shown above reflect the change in classification for commodity hedging and trading activities discussed in Note 1 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus that resulted in an increase in operating revenues of $1.492 billion and $554 million for the Successor period from October 11 through December 31, 2007 and the Predecessor period from January 1 through October 10, 2007, respectively, a decrease of $153 million for the year ended December 31, 2006, and an increase of $164 million and $103 million for the years ended December 31, 2005 and 2004, respectively.

(b)  Fixed charges and combined fixed charges and preference dividends exceeded "earnings" (net loss) by $10.469 billion and $2.034 billion for the year ended December 31, 2008 and for the period from October 11, 2007 through December 31, 2007, respectively.

(c)  Represents the annual interest using year-end rates for variable rate debt and reflecting the effects of interest rate swaps (excluding unrealized mark-to-market gains or losses) and amortization of any discounts, premiums, issuance costs and any deferred gains/losses on reacquisitions divided by the carrying value of the debt plus or minus the unamortized balance of any discounts, premiums, issuance costs and gains/losses on reacquisitions at the end of the year.

(d)  Includes the unamortized balance of the loss on reacquired preferred stock and associated amortization.

(e)  The total assets shown above reflect the change in presentation related to EFH Corp.'s adoption of FSP FIN 39-1 as discussed in Note 1 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus. Such change in presentation resulted in an increase of $1.020 billion, $1.383 billion, $2.439 billion and $870 million in EFH Corp.'s total assets and total liabilities as of December 31, 2007, 2006, 2005 and 2004, respectively, as compared to amounts reported in EFH Corp.'s Annual Report on Form 10-K for the year ended December 31, 2007.

(f)  Preferred stock outstanding at the end of 2008, 2007, 2006 and 2005 has a stated amount of $51 thousand.

Although EFH Corp. continued as the same legal entity after the Merger, its "Selected Historical Consolidated Financial Data" for periods preceding the Merger and for the periods succeeding the Merger are presented as the consolidated financial statements of the "Predecessor" and the "Successor," respectively. The consolidated financial statements of the Predecessor have been prepared on the same basis as EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2007, which are not included in this Prospectus, with the exception of a change in presentation related to EFH Corp.'s adoption of FSP FIN 39-1 and a change in classification to report the results of commodity

96

EFIHMW00245824

hedging and trading activities on a separate line in the statement of consolidated income (loss) instead of within operating revenues. (See "Basis of Presentation" in Note 1 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus) The consolidated financial statements of the Successor also reflect the application of "purchase accounting" and the adoption of SFAS 160.

Results for 2008 were significantly impacted by impairment charges related to goodwill, trade name and emission allowances intangible assets and natural gas-fueled generation fleet. Results for 2004 are significantly impacted by charges related to EFH Corp.'s comprehensive restructuring plan.

| | Successor | |
|---|---|---|
| | Nine Months Ended September 30, 2009 | Nine Months Ended September 30, 2008 |
| | (millions of dollars, except ratios) | |
| Operating revenues | $7,366 | $9,001 |
| Net income (loss) | $ 261 | $ (983) |
| Net income attributable to noncontrolling interests | $ (54) | $ — |
| Net income (loss) attributable to EFH Corp. | $ 207 | $ (983) |
| Ratio of earnings to fixed charges (a) | 1.21 | ——— |
| Ratio of earnings to combined fixed charges and preference dividends (a) | 1.21 | ——— |
| Capital expenditures, including nuclear fuel | $2,004 | $2,179 |

(a)   Fixed charges and combined fixed charges and preference dividends exceeded "earnings" by $1.445 billion for the nine months ended September 30, 2008.

| | Successor |
|---|---|
| | September 30, 2009 |
| | (millions of dollars, except ratios) |
| Total assets | $59,651 |
| Property, plant & equipment—net | $30,019 |
| Goodwill and intangible assets | $17,223 |
| Capitalization | |
| Long-term debt, less amounts due currently | $41,442 |
| EFH Corp. shareholders' equity | (3,234) |
| Noncontrolling interests in subsidiaries | 1,420 |
| Total | $39,628 |
| Capitalization ratios | |
| Long-term debt, less amounts due currently | 104.6% |
| EFH Corp. shareholders' equity | (8.2) |
| Noncontrolling interests in subsidiaries | 3.6 |
| Total | 100.0% |
| Short-term borrowings | $ 1,437 |
| Long-term debt due currently | $ 326 |
| Embedded interest cost on long-term debt—end of period (a) | 7.8% |

(a)   Represents the annual interest using end of period rates for variable rate debt and reflecting the effects of interest rate swaps (excluding unrealized mark-to-market gains or losses) and amortization of any discounts, premiums, issuance costs and any deferred gains/losses on reacquisitions divided by the carrying value of the debt plus or minus the unamortized balance of any discounts, premiums, issuance costs and gains/losses on reacquisitions at the end of the period.

97

Confidential

EFIHMW00245825

**Quarterly Information**

Results of operations by quarter are summarized below. In the opinion of EFH Corp., all adjustments (consisting of normal recurring accruals) necessary for a fair statement of such amounts have been made. Quarterly results are not necessarily indicative of a full year's operations because of seasonal and other factors. All amounts are in millions of dollars.

| | Successor | | |
|---|---|---|---|
| | First Quarter | Second Quarter | Third Quarter |
| **2009:** | | | |
| Operating revenues | $2,139 | $2,342 | $2,885 |
| Net income (loss) | 454 | (139) | (54) |
| Net loss attributable to noncontrolling interests | 12 | 16 | (26) |
| Net income (loss) attributable to EFH Corp. | $ 442 | $ (155) | $ (80) |

| | Successor | | | |
|---|---|---|---|---|
| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
| **2008:** | | | | |
| Operating revenues | $ 2,354 | $ 2,951 | $3,695 | $ 2,364 |
| Net income (loss) | (1,269) | (3,331) | 3,617 | (9,015) |
| Net loss attributable to noncontrolling interests | — | — | — | 160 |
| Net income (loss) attributable to EFH Corp. | $(1,269) | $(3,331) | $3,617 | $(8,855) |

| | Predecessor (a) | | | Successor |
|---|---|---|---|---|
| | First Quarter | Second Quarter | Third Quarter | Period from October 11, 2007 through December 31, 2007 |
| **2007:** | | | | |
| Operating revenues | $2,355 | $2,405 | $2,983 | $ 1,994 |
| Income (loss) from continuing operations | (497) | 110 | 979 | (1,361) |
| Income from discontinued operations, net of tax effect | — | 11 | 13 | 1 |
| Net income (loss) | $ (497) | $ 121 | $ 992 | $(1,360) |

_____

(a)  The 10-day period ended October 10, 2007 has not been presented as it is deemed to be immaterial.

*Reconciliation of Previously Reported Quarterly Information*—The following tables present changes to previously reported quarterly results. The first quarter 2008 reflects the change in classification to report the results of commodity hedging and trading activities on a separate line item in the income statement instead of within operating revenues and the fourth quarter 2008 reflects the effects of the retrospective adoption of SFAS 160. Income (loss) from continuing operations, income from discontinued operations, net income (loss) and net income (loss) attributable to EFH Corp. in the first quarter 2008 were not affected by the change in classification. The adoption of SFAS 160 only affected the fourth quarter 2008, since that is when Oncor sold noncontrolling interests, and it did not affect operating revenues. (See Note 1 to EFH Corp's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus for additional information).

Confidential

|  | Successor First Quarter |
|---|---|
| **2008:** | |
| Previously reported operating revenues | $ 787 |
| Change in classification | 1,567 |
| Operating revenues | $2,354 |

|  | Successor Fourth Quarter |
|---|---|
| **2008:** | |
| Previously reported net income (loss) | $(8,855) |
| Change due to adoption of SFAS 160 | (160) |
| Net income (loss) | $(9,015) |
| Net loss attributable to noncontrolling interests (a) | 160 |
| Net income (loss) attributable to EFH Corp. (a) | $(8,855) |

(a)   New lines/presentation pursuant to SFAS 160.

|  | Predecessor | | | Successor |
|---|---|---|---|---|
|  | First Quarter | Second Quarter | Third Quarter | Period from October 11, 2007 through December 31, 2007 |
| **2007:** | | | | |
| Previously reported operating revenues | $1,669 | $2,022 | $3,445 | $ 502 |
| Change in classification | 686 | 383 | (462) | 1,492 |
| Operating revenues | $2,355 | $2,405 | $2,983 | $1,994 |

99

Confidential

EFIHMW00245827

## SELECTED HISTORICAL CONSOLIDATED FINANCIAL DATA FOR
## EFIH AND ITS SUBSIDIARIES

The following table sets forth EFIH and its subsidiaries' selected historical consolidated financial data as of and for the periods indicated. The selected historical financial data as of December 31, 2008 and 2007 (Successor) and for the year ended December 31, 2008 (Successor), the period from October 11, 2007 through December 31, 2007 (Successor), the period from January 1, 2007 through October 10, 2007 (Predecessor) and for the year ended December 31, 2006 (Predecessor) have been derived from EFIH and its subsidiaries' audited historical consolidated financial statements and related notes included elsewhere in this Prospectus. The historical financial data as of December 31, 2006, 2005 and 2004 (Predecessor) and for the years ended December 31, 2005 and 2004 (Predecessor) have been derived from an EFIH subsidiary's (Oncor's) audited historical consolidated financial statements that are not included in this Prospectus. EFIH was formed at the time of the Merger, and its predecessor is Oncor. The historical financial data as of September 30, 2009 and for the nine months ended September 30, 2009 and 2008 have been derived from EFIH and its subsidiaries' unaudited historical interim condensed consolidated financial statements and related notes included elsewhere in this Prospectus. In EFIH's opinion, such unaudited interim financial data reflects all adjustments, consisting of normal recurring accruals, necessary for the fair presentation of the results for those periods. The results of operations for the interim periods, for seasonal and other factors, are not necessarily indicative of the results to be expected for the full year or any future period.

The selected historical consolidated financial data should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Year Ended December 31, 2008" and "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Nine Months Ended September 30, 2009," each included in Annex C to this Prospectus, and our historical consolidated financial statements and related notes that are included elsewhere in this Prospectus.

| | Successor (a) | | Predecessor (a) | | | |
|---|---|---|---|---|---|---|
| | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, | | |
| | | | | 2006 | 2005 | 2004 |
| | (millions of dollars, except ratios) | | | | | |
| Operating revenues . . . . . . . . . . . . | $2,580 | $ 533 | $1,967 | $2,449 | $2,394 | $2,226 |
| Net income (loss) (b) . . . . . . . . . . . | (655) | 19 | 263 | 344 | 351 | 273 |
| Net loss attributable to noncontrolling interests . . . . . . . | 160 | —— | —— | —— | —— | —— |
| Net income (loss) attributable to EFIH . . . . . . . . . . . . . . . . . . . | (495) | 19 | 263 | 344 | 351 | 273 |
| Capital expenditures . . . . . . . . . . . | $ 882 | $ 153 | $ 555 | $ 840 | $ 733 | $ 600 |
| Ratio of earnings to fixed charges (c) . . . . . . . . . . . . . . . . . . . . . . . . | —— | 1.19 | 2.68 | 2.74 | 2.87 | 2.29 |
| Embedded interest cost on long-term debt—end of period (d) . . . | 8.2% | 8.5% | 6.6% | 6.5% | 6.5% | 6.4% |

(a)   The Predecessor is Oncor; EFIH was formed at the time of the Merger. The consolidated financial statements of the Successor reflect the application of purchase accounting.

(b)   Amount in 2008 includes an $860 million goodwill impairment charge (see Note 3 to EFIH and its subsidiaries' historical consolidated financial statements for the year ended December 31, 2008 that are included elsewhere in this Prospectus). Amount in 2004 includes an extraordinary gain of $16 million after-tax related to a regulatory asset adjustment and a credit of $2 million after-tax representing a cumulative effect of change in accounting principle.

100

EFIHMW00245828

(c)  Fixed charges exceeded "earnings" (net loss) by $526 million for the year ended December 31, 2008.
(d)  Represents the annual interest and amortization of any discounts, premiums, issuance costs and any deferred gains/losses on reacquisitions divided by the carrying value of the debt plus or minus the unamortized balance of any discounts, premiums, issuance costs and gains/losses on reacquisitions at the end of the year and excludes advances from affiliates.

| | Successor (a) | | Predecessor (a) | | |
| | December 31, | | December 31, | | |
| | 2008 | 2007 | 2006 | 2005 | 2004 |
| | (millions of dollars, except ratios) | | | | |
| Total assets—end of year | $15,821 | $15,548 | $10,709 | $9,911 | $9,493 |
| Property, plant & equipment—net—end of year | 8,606 | 8,069 | 7,608 | 7,067 | 6,609 |
| Goodwill—end of year | 4,064 | 4,894 | 25 | 25 | 25 |
| Capitalization—end of year | | | | | |
| Long-term debt, less amounts due currently | $ 7,351 | $ 5,952 | $ 3,811 | $4,107 | $4,199 |
| Shareholder's equity | — | — | 2,975 | 2,935 | 2,687 |
| EFIH membership interest | 3,210 | 5,439 | — | — | — |
| Noncontrolling interests in subsidiary | 1,355 | — | — | — | — |
| Total | $11,916 | $11,391 | $ 6,786 | $7,042 | $6,886 |
| Capitalization ratios—end of year | | | | | |
| Long-term debt, less amounts due currently | 61.7% | 52.3% | 56.2% | 58.3% | 61.0% |
| Shareholder's equity | — | — | 43.8 | 41.7 | 39.0 |
| EFIH membership interest | 26.9 | 47.7 | — | — | — |
| Noncontrolling interests in subsidiary | 11.4 | — | — | — | — |
| Total | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

(a)  The Predecessor is Oncor; EFIH was formed at the time of the Merger. The consolidated financial statements of the Successor reflect the application of purchase accounting.

| | Successor | |
| | Nine Months Ended September 30, 2009 | Nine Months Ended September 30, 2008 |
| | (millions of dollars, except ratios) | |
| Operating revenues | $2,037 | $1,969 |
| Net income | $ 134 | $ 179 |
| Net income attributable to noncontrolling interests | $ 54 | $ — |
| Net income attributable to EFIH | $ 80 | $ 179 |
| Ratio of earnings to fixed charges | 1.43 | 1.68 |
| Capital expenditures | $ 728 | $ 654 |

Confidential

EFIHMW00245829

|  | Successor |
|---|---|
|  | **September 30, 2009** |
|  | (millions of dollars, except ratios) |
| Total assets | $16,022 |
| Property, plant & equipment—net | $ 9,058 |
| Goodwill | $ 4,064 |
| Capitalization |  |
|     Long-term debt, less amounts due currently | $ 7,356 |
|     EFIH membership interest | 3,207 |
|     Noncontrolling interests in subsidiaries | 1,378 |
|         Total | $11,941 |
| Capitalization ratios |  |
|     Long-term debt, less amounts due currently | 61.6% |
|     EFIH membership interest | 26.9 |
|     Noncontrolling interests in subsidiaries | 11.5 |
|         Total | 100.0% |
| Short-term borrowings | $ 537 |
| Long-term debt due currently | $ 106 |
| Embedded interest cost on long-term debt—end of period (a) | 8.3% |

(a) Represents the annual interest using end of period rates for variable rate debt and reflecting the effects of amortization of any discounts, premiums, issuance costs and any deferred gains/losses on reacquisitions divided by the carrying value of the debt plus or minus the unamortized balance of any discounts, premiums, issuance costs and gains/losses on reacquisitions at the end of the period.

**Quarterly Information (unaudited)**

Results of operations by quarter are summarized below. In the opinion of EFIH, all adjustments (consisting of normal recurring accruals) necessary for a fair statement of such amounts have been made. Quarterly results are not necessarily indicative of a full year's operations because of seasonal and other factors. All amounts are in millions of dollars.

|  | Successor | | |
|---|---|---|---|
|  | **First Quarter** | **Second Quarter** | **Third Quarter** |
| **2009:** |  |  |  |
| Operating revenues | $614 | $653 | $770 |
| Operating income | 143 | 167 | 205 |
| Net income | 13 | 36 | 85 |
| Net income attributable to noncontrolling interests | 12 | 16 | 26 |
| Net income attributable to EFIH | 1 | 20 | 59 |

|  | Successor | | | |
|---|---|---|---|---|
|  | **First Quarter** | **Second Quarter** | **Third Quarter** | **Fourth Quarter** |
| **2008:** |  |  |  |  |
| Operating revenues | $614 | $626 | $728 | $ 612 |
| Operating income | 151 | 150 | 206 | 147 |
| Net income (loss) | 41 | 41 | 96 | (833) |
| Net loss attributable to noncontrolling interests | — | — | — | 160 |
| Net income (loss) attributable to EFIH | 41 | 41 | 96 | (673) |

102

Confidential

| | Predecessor (a) | | | Successor (b) |
| | First Quarter | Second Quarter | Third Quarter | Period from October 11, 2007 through December 31, 2007 |
|---|---|---|---|---|
| **2007:** | | | | |
| Operating revenues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $613 | $582 | $705 | $533 |
| Operating income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 157 | 129 | 199 | 125 |
| Net income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 85 | 54 | 124 | 19 |

(a)   The Predecessor is Oncor; EFIH and Oncor Holdings were formed at the time of the Merger.
(b)   The 10-day period ended October 10, 2007 has not been presented as it is deemed immaterial.

Confidential

EFIHMW00245831

# SELECTED HISTORICAL CONSOLIDATED FINANCIAL DATA FOR EFCH AND ITS SUBSIDIARIES

The following tables set forth EFCH and its subsidiaries' selected historical consolidated financial data as of and for the periods indicated. The selected historical financial data as of December 31, 2008 (Successor) and 2007 (Successor) and for the year ended December 31, 2008 (Successor), the period from October 11, 2007 through December 31, 2007 (Successor), the period from January 1, 2007 through October 10, 2007 (Predecessor) and for the year ended December 31, 2006 (Predecessor) have been derived from EFCH and its subsidiaries' audited historical consolidated financial statements and related notes included elsewhere in this Prospectus. The historical financial data as of December 31, 2006, 2005 and 2004 (Predecessor) and for the years ended December 31, 2005 and 2004 (Predecessor) have been derived from EFCH and its subsidiaries' historical consolidated financial statements that are not included in this Prospectus. The historical financial data as of September 30, 2009 (Successor) and for the nine months ended September 30, 2009 and September 30, 2008 (Successor) have been derived from EFCH and its subsidiaries' unaudited historical condensed consolidated financial statements included elsewhere in this Prospectus. In EFCH's opinion, such unaudited financial data reflects all adjustments, consisting of normal recurring accruals, necessary for a fair presentation of the results for those periods. The results of operations for the interim periods are not necessarily indicative of the results to be expected for the full year or any future period.

The selected historical consolidated financial data set forth below should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Year Ended December 31, 2008" and "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Nine Months Ended September 30, 2009," each included in Annex D to this Prospectus, and EFCH and its subsidiaries' historical consolidated financial statements and related notes that are included elsewhere in this Prospectus.

| | Successor | | Predecessor | | | |
| | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, | | |
| | | | | 2006 | 2005 | 2004 |
| | (millions of dollars, except ratios and per share amounts) | | | | | |
| **Statement of Income Data:** | | | | | | |
| Operating revenues | $ 9,787 | $ 1,671 | $ 6,884 | $ 9,396 | $10,824 | $ 9,304 |
| Income (loss) from continuing operations before extraordinary gain (loss) and cumulative effect of changes in accounting principles | (9,039) | (1,266) | 1,306 | 2,501 | 1,816 | 672 |
| Loss from discontinued operations, net of tax effect | — | — | — | — | (8) | (34) |
| Extraordinary gain (loss), net of tax effect | — | — | — | — | (50) | 16 |
| Cumulative effect of changes in accounting principles, net of tax effect | — | — | — | — | (8) | 6 |
| Preferred stock dividends | — | — | — | — | 3 | 2 |
| Net income (loss) available for common stock | $(9,039) | $(1,266) | $ 1,306 | $ 2,501 | $ 1,747 | $ 658 |
| Ratio of earnings to fixed charges (a) | — | — | 5.88 | 10.84 | 5.04 | 2.47 |
| Ratio of earnings to combined fixed charges and preference dividends (a) | — | — | 5.88 | 10.84 | 5.01 | 2.45 |
| **Statement of Cash Flows Data:** | | | | | | |
| Cash flows provided by (used in) operating activities from continuing operations | $ 1,657 | $ (248) | $ 1,231 | $ 4,757 | $ 2,580 | $ 1,838 |
| Cash flows provided by (used in) financing activities from continuing operations | 1,289 | 1,488 | 895 | (1,265) | (61) | (772) |
| Cash flows used in investing activities from continuing operations | (2,682) | (1,881) | (1,277) | (3,497) | (2,572) | (1,776) |
| **Other Financial Data:** | | | | | | |
| Capital expenditures, including nuclear fuel | $ 2,074 | $ 519 | $ 1,585 | $ 908 | $ 1,099 | $ 968 |

104

| | Successor | | Predecessor | | |
| | December 31, | | December 31, | | |
| | 2008 | 2007 | 2006 | 2005 | 2004 |
| | | (millions of dollars) | | | |
| **Balance Sheet Data:** | | | | | |
| Total assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $43,000 | $49,152 | $21,149 | $20,890 | $24,833 |
| Property, plant & equipment—net . . . . . . . . . . . . . . . . . . . . . | $20,902 | $20,545 | $10,344 | $ 9,994 | $16,529 |
| Goodwill and intangible assets . . . . . . . . . . . . . . . . . . . . | $13,096 | $22,197 | $ 526 | $ 522 | $ 687 |
| Capitalization | | | | | |
|   Long-term debt, less amounts due currently . . . . . . . . . . . . . . | $31,556 | $30,762 | $ 3,088 | $ 3,284 | $ 7,571 |
|   Exchangeable preferred membership interests of TCEH (b) . . . . | — | — | — | — | 511 |
|   Preferred stock of subsidiaries (not subject to mandatory | | | | | |
|     redemption) (c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | — | — | 38 |
|   Shareholders' equity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (5,002) | 4,003 | 7,943 | 5,640 | 6,373 |
|     Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $26,554 | $34,765 | $11,031 | $ 8,924 | $14,493 |
| Capitalization ratios | | | | | |
|   Long-term debt, less amounts due currently . . . . . . . . . . . . . . | 118.8% | 88.5% | 28.0% | 36.8% | 52.2% |
|   Exchangeable preferred membership interests of TCEH (b) . . . . | — | — | — | — | 3.5 |
|   Preferred stock of subsidiaries (not subject to mandatory | | | | | |
|     redemption) (c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | — | — | 0.3 |
|   Shareholders' equity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (18.8) | 11.5 | 72.0 | 63.2 | 44.0 |
|     Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Short-term borrowings . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 900 | $ 438 | $ 818 | $ 746 | $ 210 |
| Long-term debt due currently . . . . . . . . . . . . . . . . . . . . . . . . | $ 269 | $ 202 | $ 178 | $ 414 | $ 218 |
| Embedded interest cost on long-term debt—end of period (d) . . . . . . | 9.0% | 9.6% | 7.2% | 7.0% | 6.1% |
|   Embedded dividend cost on preferred stock of subsidiaries— | | | | | |
|     end of period (e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — % | — % | — % | 14.0% | 14.0% |

(a) Fixed charges and combined fixed charges and preference dividends exceeded "earnings" (net loss) by $9.543 billion for the year ended December 31, 2008 and $1.941 billion for the period from October 11, 2007 through December 31, 2007, respectively.

(b) Amount is net of discount. In April 2004, EFH Corp. repurchased TCEH's exchangeable preferred membership interests. Such membership interests were contributed to EFCH in 2005.

(c) Preferred stock outstanding has a stated value of less than $1 million at the end of 2004 through 2008.

(d) Represents the annual interest using year-end rates for variable rate debt and reflecting the effects of interest rate swaps (excluding unrealized mark-to-market gains or losses) and amortization of any discounts, premiums, issuance costs and any deferred gains/losses on reacquisitions divided by the carrying value of the debt plus or minus the unamortized balance of any discounts, premiums, issuance costs and gains/losses on reacquisitions at the end of the year.

(e) Includes the unamortized balance of the loss on reacquired preferred stock and associated amortization.

| | Successor | |
| | Nine Months Ended September 30, 2009 | Nine Months Ended September 30, 2008 |
| | (millions of dollars, except ratios) | |
| **Statement of Income Data:** | | |
| Operating revenues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $6,144 | $7,809 |
| Net income (loss) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 347 | $ (943) |
| Net income (loss) attributable to noncontrolling interests . . . . . . . . . . . . . . | $ — | $ — |
| Net income (loss) attributable to EFCH . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 347 | $ (943) |
| Ratio of earnings to fixed charges (a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1.33 | —— |
| Ratio of earnings to combined fixed charges and preference | | |
|   dividends (a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1.33 | —— |

105

EFIHMW00245833

**PX 014**
**Page 115 of 1116**

|  | Successor | |
|---|---|---|
|  | Nine Months Ended September 30, 2009 | Nine Months Ended September 30, 2008 |
|  | (millions of dollars) | |
| **Statement of Cash Flows Data:** | | |
| Cash flows provided by operating activities . . . . . . . . . . . . . . . . . . . . . . . . | $ 1,471 | $   865 |
| Cash flows provided by financing activities . . . . . . . . . . . . . . . . . . . . . . . | $   287 | $ 2,914 |
| Cash flows used in investing activities . . . . . . . . . . . . . . . . . . . . . . . . . . . | $(1,483) | $(2,122) |
| **Other Financial Data:** | | |
| Capital expenditures, including nuclear fuel . . . . . . . . . . . . . . . . . . . . . . . | $ 1,263 | $ 1,514 |

|  | Successor |
|---|---|
|  | September 30, 2009 |
|  | (millions of dollars) |
| **Balance Sheet Data:** | |
| Total assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $43,329 |
| Property, plant & equipment—net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $20,980 |
| Goodwill and intangible assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $12,910 |
| Capitalization | |
|     Long-term debt, less amounts due currently . . . . . . . . . . . . . . . . . . . . . . . | $32,123 |
|     EFCH shareholders' equity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (4,559) |
|     Noncontrolling interests in subsidiaries . . . . . . . . . . . . . . . . . . . . . . . . . . . | 42 |
|         Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $27,606 |
| Capitalization ratios | |
|     Long-term debt, less amounts due currently . . . . . . . . . . . . . . . . . . . . . . . | 116.4% |
|     EFCH shareholders' equity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (16.5) |
|     Noncontrolling interests in subsidiaries . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.1 |
|         Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 100.0% |
| Short-term borrowings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $   900 |
| Long-term debt due currently . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $   207 |
| Embedded interest cost on long-term debt—end of period (b) . . . . . . . . . . . . . . . . . . . . | 7.2% |

(a)  Fixed charges and combined fixed charges and preference dividends exceeded "earnings" by $1.436 billion for the nine months ended September 30, 2008.

(b)  Represents the annual interest using period-end rates for variable rate debt and reflecting the effects of interest rate swaps (excluding unrealized mark-to-market gains or losses) and amortization of any discounts, premiums, issuance costs and any deferred gains/losses on reacquisitions divided by the carrying value of the debt plus or minus the unamortized balance of any discounts, premiums, issuance costs and gains/losses on reacquisitions at the end of the period.

Confidential

EFIHMW00245834

**PX 014**
**Page 116 of 1116**

**Quarterly Information**

Results of operations by quarter are summarized below. In the opinion of EFCH, all adjustments (consisting of normal recurring accruals) necessary for a fair statement of such amounts have been made. Quarterly results are not necessarily indicative of a full year's operations because of seasonal and other factors. All amounts are in millions of dollars.

|  | Successor | | |
|---|---|---|---|
|  | First Quarter | Second Quarter | Third Quarter |
| **2009:** | | | |
| Operating revenues | $1,766 | $1,945 | $2,433 |
| Net income (loss) | 526 | (107) | (72) |
| Net income (loss) attributable to noncontrolling interests | —— | —— | —— |
| Net income (loss) attributable to EFCH | 526 | (107) | (72) |

|  | Successor | | | |
|---|---|---|---|---|
|  | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
| **2008:** | | | | |
| Operating revenues | $ 1,983 | $ 2,567 | $3,258 | $ 1,979 |
| Net income (loss) | $(1,239) | $(3,289) | $3,586 | $(8,097) |

|  | Predecessor (a) | | | Successor |
|---|---|---|---|---|
|  | First Quarter | Second Quarter | Third Quarter | Period from October 11, 2007 through December 31, 2007 |
| **2007:** | | | | |
| Operating revenues | $2,003 | $2,049 | $2,572 | $ 1,671 |
| Net income (loss) | $    22 | $   210 | $1,000 | $(1,266) |

(a)  The 10-day period ended October 10, 2007 has not been presented as it is deemed to be immaterial.

107

EFIHMW00245835

## GENERAL TERMS OF THE EXCHANGE OFFERS AND CONSENT SOLICITATIONS

### Purpose of the Exchange Offers and Consent Solicitations

The purpose of the exchange offers is to reduce the outstanding principal amount and extend the weighted average maturity of the long-term debt of EFH Corp. and its subsidiaries. The purpose of the consent solicitations is to adopt the Proposed Amendments which will provide EFH Corp. and its subsidiaries additional financial and operational flexibility.

### General

Upon the terms and subject to the conditions set forth in this Prospectus and the Consent and Letter of Transmittal, including the Acceptance Priority Levels, the Maximum Exchange Amount and the possible prorations resulting therefrom, the Offerors are offering to exchange outstanding Old Notes validly tendered and not validly withdrawn for up to $3.0 billion aggregate principal amount of New Senior Secured Notes, payable 45% in New EFH Senior Secured Notes and 55% New EFIH Senior Secured Notes.

The maximum aggregate principal amount of New Senior Secured Notes issuable in the exchange offers will not exceed $3.0 billion. The maximum aggregate principal amount of New Senior Secured Notes issuable in the exchange offers, including the principal amount of any New Senior Secured Notes to be issued in lieu of accrued and unpaid payment-in-kind interest on Old Toggle Notes accepted for exchange, is referred to in this Prospectus as the "Maximum Exchange Amount." In addition, the aggregate principal amount of New Senior Secured Notes issuable in exchange for Priority 2 Notes will not exceed the Priority Level 2 Cap and will be less than such amount to the extent necessary for the total principal amount of New Senior Secured Notes issued in the exchange offers not to exceed the Maximum Exchange Amount. The maximum principal amount of each issue of Old Notes that will be accepted for exchange is the outstanding principal amount of such issue, as limited by the Acceptance Priority Levels, the Maximum Exchange Amount (and, in the case of the Priority 2 Notes, the Priority Level 2 Cap) and the possible prorations resulting therefrom. The exchange offers are not conditioned on a minimum principal amount of any issue of Old Notes being validly tendered and not validly withdrawn. Subject to applicable law, the Offerors reserve the right, but are not obligated, to increase or decrease the Maximum Exchange Amount and/or the Priority Level 2 Cap and/or to change Acceptance Priority Levels. If a change is made to the amount of securities offered to be exchanged pursuant to any exchange offer, including any change to the Maximum Exchange Amount, the Priority Level 2 Cap and/or the Acceptance Priority Levels, as applicable, such exchange offer will remain open for at least ten business days following the announcement of such change. For more information regarding the acceptance priorities for Old Notes validly tendered pursuant to the exchange offers in the event that the Maximum Exchange Amount and/or Priority Level 2 Cap is exceeded, please see "—Acceptance; Priority Proration."

Holders of Old Notes (other than Old Toggle Notes) accepted by the Offerors in the exchange offers will be entitled to receive an amount equal to accrued and unpaid interest, if any, in cash from the last applicable interest payment date to, but not including, the Settlement Date, in addition to the Total Consideration that such holder would receive in the exchange offers. All participating holders of Old Toggle Notes will also receive in the exchange offers, with respect to any of their Old Toggle Notes accepted for exchange, in lieu of accrued and unpaid payment-in-kind interest with respect to such Old Toggle Notes, if any, from the last applicable interest payment date to, but not including, the Settlement Date, additional New Senior Secured Notes paid in accordance with the applicable consideration listed on page ii of this Prospectus. See also "Acceptance of Old Notes; Accrual of Interest—Accrued Interest."

In addition, EFH Corp. is soliciting Consents in the consent solicitations to amend the Consent Notes Indentures for each issue of Consent Notes. The purpose of the consent solicitations is to obtain the Consents

108

EFIHMW00245836

required to adopt the Proposed Amendments, which would, among other things, eliminate substantially all of the restrictive covenants contained in the Consent Notes Indentures and the Consent Notes, eliminate certain events of default, modify covenants regarding mergers and consolidations, and modify or eliminate certain other provisions, including the limitation on the incurrence of secured indebtedness in the Legacy Notes Indentures and the limitations on the incurrence of indebtedness and liens in the 2017 Notes Indentures, such that an unlimited amount of secured debt could be issued by EFH Corp. under the terms of the Consent Notes Indentures, and certain provisions relating to defeasance contained in the 2017 Notes Indenture and 2017 Notes which would otherwise prevent a defeasance without, among other things, delivery of an opinion of counsel confirming such defeasance does not constitute a taxable event.

Execution and delivery of the Consent and Letter of Transmittal will constitute an express waiver by a consenting holder of the Consent Notes with respect to all claims against the Offerors and the Sponsor Group of any breach, default or event of default that may have arisen under the Consent Notes Indentures.

In order to be adopted with respect to a particular issue of Consent Notes, the applicable Proposed Amendments must be consented to by the holders of at least a majority of the outstanding aggregate principal amount of such issue of Consent Notes, voting as a separate class; provided, however, that the holders of both issues of the 2017 Notes vote together as a single class and, accordingly, the Proposed Amendments to the 2017 Notes Indenture must be consented to by the holders of at least a majority of the outstanding aggregate principal amount of all the 2017 Notes voting together as a single class. The Proposed Amendments to each issue of Consent Notes will be set forth in corresponding Supplemental Indentures to each of the Consent Notes Indentures. It is expected but not required that the Supplemental Indenture for each issue of Consent Notes will be executed promptly following the Consent Date assuming receipt of the requisite Consents for the Proposed Amendments. The Supplemental Indentures relating to the Proposed Amendments will become effective immediately upon their execution and delivery by the parties thereto; however, the Proposed Amendments contained therein will not become operative until immediately prior to the acceptance for exchange of Old Notes upon the terms and subject to the conditions set forth in this Prospectus. See "Proposed Amendments."

The Proposed Amendments with respect to each of the Legacy Notes Indentures constitute a single proposal for the related consent solicitation, and a consenting holder must consent to the Proposed Amendments applicable to all Legacy Notes tendered by that holder as an entirety and may not consent selectively with respect to certain of the Proposed Amendments. The Proposed Amendments with respect to the 2017 Notes Indenture constitute a single proposal for the related consent solicitation, and a consenting holder must consent to the Proposed Amendments applicable to all 2017 Notes tendered by that holder as an entirety and may not consent selectively with respect to certain of the Proposed Amendments.

Consent Notes validly tendered pursuant to the exchange offers (and not validly withdrawn) at or prior to the Consent Date will be deemed to include Consents to the Proposed Amendments. The completion, execution and delivery of a Consent and Letter of Transmittal, or transmission of an Agent's Message, in connection with a valid tender of Consent Notes pursuant to the applicable exchange offer at or prior to the Consent Date will constitute the delivery of Consents with respect to such Consent Notes. Holders may not validly tender Consent Notes in the exchange offers at or prior to the Consent Date without delivering the related Consents. Holders may not deliver Consents in the consent solicitations without validly tendering their Consent Notes in the exchange offers at or prior to the Consent Date and may only validly revoke Consents by validly withdrawing the previously tendered related Consent Notes at or prior to the Consent Date or by revoking Consents after the Consent Date and prior to the execution of the Supplemental Indenture to which such Consents relate. Because it is expected that the Supplemental Indentures will be executed promptly following the Consent Date assuming receipt of the requisite Consents for the Proposed Amendments, holders should not expect that they will be able to revoke their Consents after the Consent Date. If the Expiration Date is extended but the Consent Date is not extended, holders may tender Consent Notes after the Consent Date and at or prior to the Expiration Date as it may have been extended without delivering Consents but holders tendering Consent Notes after the Consent Date will not be eligible to receive the cash consent payment.

If the requisite Consents with respect to a given Consent Notes Indenture are received and the Supplemental Indenture for such Consent Notes is executed, EFH Corp. will pay to each holder that validly delivers and does

Confidential