HOLDER. YOU ARE URGED TO CONSULT YOUR OWN TAX ADVISOR WITH REGARD TO THE APPLICATION OF THE U.S. FEDERAL INCOME TAX LAWS, AS WELL AS THE APPLICATION OF NON-INCOME TAX LAWS AND THE LAWS OF ANY STATE, LOCAL OR FOREIGN TAXING JURISDICTION, TO YOUR PARTICULAR SITUATION.

**Tax Consequences to Participating U.S. Holders**

### *The Exchange of Old Notes Pursuant to the Exchange Offers*

*Recapitalization Treatment.* A U.S. Holder participating in the exchange offers will recognize gain or loss in full upon the exchange of the Old Notes for New Senior Secured Notes (as described under the subheading "Fully-Taxable Exchange" below) unless such exchange qualifies as a recapitalization.

In order for such exchange to qualify as a recapitalization, the Old Notes and the New Senior Secured Notes must both be treated as "securities" under the relevant provisions of the Code. Neither the Code nor the Regulations define the term "security." Whether a debt instrument is a security is based on all of the facts and circumstances. Factors evaluated include whether the holder of such debt instrument is subject to a material level of entrepreneurial risk. Most authorities have held that the term to maturity of the debt instrument is one of the most significant factors. In this regard, debt instruments with a term of ten years or more generally have qualified as securities, whereas debt instruments with a term of less than five years generally have not qualified as securities.

Additionally, for an exchange to qualify as a recapitalization, the exchanged securities and the newly issued securities must be issued by the same obligor. Because the TCEH Notes and the New Senior Secured Notes are issued by different obligors, the exchange of the TCEH Notes for New Senior Secured Notes cannot qualify as a recapitalization. For U.S. federal income tax purposes, EFIH is classified as an entity whose existence is disregarded as separate from EFH Corp. Accordingly, for U.S. federal income tax purposes, EFIH is generally treated as a division of EFH Corp., and New EFIH Senior Secured Notes will generally be treated as issued by EFH Corp. However, there is no direct authority regarding whether the exchange of Old Notes issued by EFH Corp. ("Old EFH Notes") for New EFIH Senior Secured Notes can qualify as a recapitalization, since EFIH and EFH Corp. are different issuers for non-tax purposes. The Offerors intend to take the position that the exchange of Old EFH Notes for New EFIH Senior Secured Notes will qualify as a recapitalization. However, there can be no assurance that the IRS will not take a contrary position.

All of the Old EFH Notes had a term of ten years or more at the time of issuance (other than the 5.55% Series P Senior Notes due 2014, which had a term of approximately nine years and eleven months), and it is expected that the New Senior Secured Notes will have a term of approximately ten years. Because some of the Old EFH Notes will have a remaining term of more than five years but less than ten years at the time of exchange, it is not entirely clear whether they will qualify as securities. The Offerors intend to take the position that each series of the Old EFH Notes and the New Senior Secured Notes will be treated as securities, and, thus, that the exchange of each issue of Old EFH Notes for New Senior Secured Notes will be treated as a recapitalization. Under such characterization, subject to the discussions under the headings "—Accrued Interest" and "—Consent Consideration" below, a U.S. Holder that receives New Senior Secured Notes in exchange for Old EFH Notes as a result of participation in the exchange offers will not recognize gain or loss on the exchange. A U.S. Holder's tax basis in the New Senior Secured Notes received in the exchange will be equal to the tax basis in the Old EFH Notes exchanged therefor, and the holding period for such New Senior Secured Notes will include the period during which the Old EFH Notes surrendered in the exchange were held.

*Fully-Taxable Exchange.* In an exchange of TCEH Notes for New Senior Secured Notes, and in an exchange of an issue of Old EFH Notes for New Senior Secured Notes not treated as a recapitalization, a U.S. Holder of such issue of Old Notes will recognize gain or loss equal to the difference between the amount realized on the exchange and the U.S. Holder's adjusted tax basis in the Old Notes on the date of the exchange. The

339

EFIHMW00246067

amount realized on the exchange will equal the "issue price" (determined as described below under "—Issue Price of New Senior Secured Notes") of any New Senior Secured Notes received in the exchange, subject to the discussions under the heading "—Consent Consideration" below. A U.S. Holder's adjusted tax basis in the Old Notes exchanged will generally be equal to the amount paid therefor, increased by any accrued OID previously included in such holder's income and any market discount previously taken into income and reduced by any amortizable bond premium previously taken into account and any cash payments other than qualified stated interest (i.e., stated interest unconditionally payable in cash at least annually). The New Senior Secured Notes will have an adjusted tax basis equal to their issue price (as determined as described below under "—Issue Price of New Senior Secured Notes") and a new holding period commencing on the day after the exchange. Any gain or loss recognized will generally be capital gain or loss (except to the extent of any accrued market discount not previously included in income as described below under "—Market Discount") and will be long-term capital gain or loss if the Old Notes have been held for more than one year. Long-term capital gain recognized by non-corporate U.S. Holders is generally eligible for a reduced rate of taxation and the deduction of capital losses is subject to significant limitations.

*Issue Price of New Senior Secured Notes.* Because the effectiveness of the exchange offers is conditioned upon the listing of the New Senior Secured Notes on the New York Stock Exchange, the New Senior Secured Notes will be "publicly traded" for U.S. federal income tax purposes. Accordingly, the "issue price" of the New Senior Secured Notes will be equal to their fair market value on the date of the exchange.

*Market Discount.* If a U.S. Holder acquired Old Notes with market discount, any gain recognized on the exchange of Old Notes for New Senior Secured Notes pursuant to the exchange offers will be treated as ordinary income to the extent of the market discount accrued during his, her or its period of ownership, unless such holder previously elected to include market discount in income as it accrued for U.S. federal income tax purposes. For these purposes, market discount is generally the excess, if any, of the stated principal amount or the adjusted issue price (where the Old Note was issued with OID) of an Old Note over such holder's initial tax basis in the Old Note, if such excess exceeds a de minimis amount. In an exchange of Old Notes with market discount for New Senior Secured Notes that qualifies as a recapitalization, New Senior Secured Notes that a U.S. Holder receives in exchange for such Old Notes will be treated as acquired at a market discount if the issue price of such New Senior Secured Notes exceeds the U.S. Holder's initial tax basis for such New Senior Secured Notes by more than a de minimis amount, and any accrued market discount with respect to such Old Notes not previously included in income will carry over to such New Senior Secured Notes. U.S. Holders who acquired their Old Notes other than at original issuance should consult their tax advisors regarding the possible application of the market discount rules of the Code to an exchange of the Old Notes for New Senior Secured Notes pursuant to the exchange offers.

*Accrued Interest.* To the extent that any amount received by a U.S. Holder pursuant to the exchange offers is attributable to accrued and unpaid qualified stated interest on an Old Note, such amount will be includible in gross income as ordinary interest income if such accrued interest has not been included previously in gross income for U.S. federal income tax purposes.

*Consent Consideration.* A U.S. Holder that validly delivers and does not validly revoke a consent with respect to a Consent Note for which requisite Consents are received will receive a cash consent payment (the "Cash Consent Consideration") in addition to the Total Consideration payable to such Holder. Further it is possible that the IRS could take the position that, in addition to the Cash Consent Consideration, all or a portion of the Total Consideration paid to a holder of Consent Notes constitutes additional consideration for the holder's Consent to the Proposed Amendments ("Deemed Consent Consideration").

The U.S. federal income tax treatment of any Cash Consent Consideration or Deemed Consent Consideration (collectively, the "Consent Consideration") is subject to uncertainty because there are no authorities directly on point. The receipt of Consent Consideration by a U.S. Holder might be treated, for U.S. federal income tax purposes, as (a) part of the consideration received by a U.S. Holder exchanging Old Notes in

340

EFIHMW00246068

exchange for New Senior Secured Notes, in which case such amount would be taken into account in determining the amount of gain or loss on the exchange in the manner described above, or (b) separate consideration for consenting to the Proposed Amendments in which case such amount would likely constitute current ordinary income to the U.S. Holder (unless such amount could be properly treated as a return of principal).

The Offerors intend to take the position that any Cash Consent Consideration payable for Consents is treated as separate consideration received in exchange for consenting to the Proposed Amendments and that there is no Deemed Consent Consideration. Under such treatment, any Cash Consent Consideration paid to a U.S. Holder would likely constitute ordinary income to such U.S. Holder rather than exchange consideration. If, instead, the Cash Consent Consideration were treated as additional exchange consideration to a U.S. Holder, such amount would be treated as additional amount realized in the exchange in determining the amount of gain or loss to such U.S. Holder on the exchange. Furthermore, a U.S. Holder that receives Cash Consent Consideration in an exchange qualifying as a recapitalization would generally recognize gain, if any, to the extent of the amount of cash received that is treated as additional exchange consideration. If any Deemed Consent Consideration were to be treated as separate consideration for consenting to the Proposed Amendments, then such payment would likely constitute current ordinary income to the U.S. Holder rather than sale proceeds.

U.S. Holders are encouraged to consult their tax advisors regarding the U.S. federal income tax treatment of any Consent Consideration.

### Ownership of New Senior Secured Notes

*Payments of Stated Interest.* The stated interest payments on the New Senior Secured Notes will generally be taxed to a U.S. Holder as ordinary income at the time paid or accrued in accordance with such holder's method of accounting for U.S. federal income tax purposes.

*Original Issue Discount.* If the issue price of the New Senior Secured Notes (as described above under the heading "—Issue Price of New Senior Secured Notes") is less than their stated principal amount by more than a specified de minimis amount, the New Senior Secured Notes will be treated as issued with OID in an amount equal to such difference. If the New Senior Secured Notes are issued with OID, a U.S. Holder must generally include such OID in gross income as it accrues over the term of the New Senior Secured Notes at a constant yield without regard to its regular method of accounting for U.S. federal income tax purposes and in advance of the receipt of cash payments attributable to that income.

The amount of OID that a U.S. Holder must include in income will generally equal the sum of the "daily portions" of OID with respect to the New Senior Secured Note for each day during the taxable year or portion of the taxable year in which such New Senior Secured Note was held ("accrued OID"). The daily portion is determined by allocating to each day in any "accrual period" a pro rata portion of the OID allocable to that accrual period. The "accrual period" for a New Senior Secured Note may be of any length and may vary in length over the term of the New Senior Secured Note, provided that each accrual period is no longer than one year and each scheduled payment of principal or interest occurs on the first day or the final day of an accrual period. The amount of OID allocable to any accrual period other than the final accrual period is an amount equal to the excess, if any, of (i) the product of the New Senior Secured Note's adjusted issue price at the beginning of such accrual period and its yield to maturity (determined on the basis of compounding at the close of each accrual period and properly adjusted for the length of the accrual period) over (ii) the aggregate of all stated interest allocable to the accrual period. OID allocable to a final accrual period is the difference between the amount payable at maturity (other than a payment of stated interest) and the adjusted issue price of the New Senior Secured Note at the beginning of the final accrual period. The "adjusted issue price" of a New Senior Secured Note at the beginning of any accrual period is equal to its issue price increased by the accrued OID for each prior accrual period (determined without regard to the amortization of any acquisition premium or amortizable bond premium, as discussed below under the subheading "—Acquisition Premium or Amortizable Bond Premium on New Senior Secured Notes").

341

Confidential

If the New Senior Secured Notes are issued with OID, then a U.S. Holder may elect to treat all interest on a New Senior Secured Note as OID and calculate the amount includible in gross income under the constant yield method described above. The election is to be made for the taxable year in which the New Senior Secured Note was acquired, and may not be revoked without the consent of the IRS. U.S. Holders should consult their own tax advisors about this election.

*Certain Additional Payments.* In certain circumstances (see "Description of the EFH Corp. Notes—Optional Redemption," "Description of the EFH Corp. Notes—Repurchase at the Option of Holders—Change of Control," "Description of the EFIH Notes—Optional Redemption," and "Description of the EFIH Notes—Repurchase at the Option of Holders—Change of Control"), the Offerors may be obligated to pay amounts on the New Senior Secured Notes that are in excess of stated interest or principal on the New Senior Secured Notes. The Offerors do not intend to treat the possibility of paying such additional amounts as affecting the determination of the yield to maturity of the New Senior Secured Notes or giving rise to any additional accrual of OID or recognition of ordinary income upon sale, exchange or retirement of the New Senior Secured Notes. However, additional income will be recognized if any such additional payment is made. It is possible, however, that the IRS may take a different position, in which case the timing, character, and amount of income may be different.

*Market Discount.* If the exchange of Old Notes for New Senior Secured Notes qualifies as a recapitalization, a U.S. Holder may acquire a New Senior Secured Note at a market discount as described above under "—The Exchange of Old Notes Pursuant to the Exchange Offers—Market Discount." Under the market discount rules, a U.S. Holder will be required to treat any principal payment on, or any gain on the sale, exchange or retirement of, a New Senior Secured Note as ordinary income to the extent of the market discount that such U.S. Holder has not previously included in income and is treated as having accrued on the New Senior Secured Note at the time of the payment or disposition.

In addition, a U.S. Holder may be required to defer, until the maturity of the New Senior Secured Note or its earlier disposition in a taxable transaction, the deduction of all or a portion of the interest expense on any indebtedness attributable to the New Senior Secured Note. Under certain circumstances, a U.S. Holder may elect, on a note-by-note basis, to deduct the deferred interest expense in a tax year prior to the year of disposition. A U.S. Holder should consult its own tax advisors before making this election.

Any market discount will be considered to accrue ratably during the period from the date of acquisition to the maturity date of the New Senior Secured Note unless a U.S. Holder elects to accrue on a constant interest method. A U.S. Holder may elect to include market discount in income currently as it accrues, on either a ratable or constant interest method, in which case the rule described above regarding deferral of interest deductions will not apply.

*Acquisition Premium or Amortizable Bond Premium on New Senior Secured Notes.* If the exchange of Old Notes for New Senior Secured Notes qualifies as a recapitalization, a U.S. Holder of the New Senior Secured Notes may have "acquisition premium" to the extent its initial tax basis in the New Senior Secured Notes is greater than the issue price of the New Senior Secured Notes and less than or equal to their stated principal amount. Under the acquisition premium rules, the amount of OID that must be included in gross income with respect to the New Senior Secured Notes for any taxable year will be reduced by the portion of the acquisition premium properly allocable to that year.

If the exchange of Old Notes for New Senior Secured Notes qualifies as a recapitalization and the initial tax basis in the New Senior Secured Notes to a U.S. Holder exceeds their stated principal amount, the U.S. Holder will be considered to have acquired the New Senior Secured Notes with "amortizable bond premium" and will not be required to include any OID in income. A U.S. Holder may generally elect to amortize the premium over the remaining term of the New Senior Secured Notes on a constant yield method as an offset to stated interest when includible in income under such holder's regular accounting method. If a U.S. Holder does not elect to amortize the premium, that premium will decrease the gain or increase the loss otherwise recognized on disposition of the New Senior Secured Notes.

342

EFIHMW00246070

*Sale, Exchange or Retirement of New Senior Secured Notes.* A U.S. Holder will generally recognize taxable gain or loss upon a sale, exchange or retirement of a New Senior Secured Note (including potentially upon a Permitted Asset Transfer) in an amount equal to the difference between (i) the amount of cash and the fair market value of any property received (less an amount attributable to any accrued and unpaid stated interest, which will be taxed in the manner described above under the subheading "—Payments of Stated Interest") and (ii) such holder's adjusted tax basis in the New Senior Secured Note. A U.S. Holder's adjusted tax basis in a New Senior Secured Note will generally be its initial tax basis in the New Senior Secured Note, increased by any OID or market discount previously included in income, and reduced by any amortized bond premium.

Any gain or loss on the sale, exchange or retirement of a New Senior Secured Note will likely be capital gain or loss (although if the exchange of Old Notes for New Senior Secured Notes qualifies as a recapitalization, any gain recognized on the sale, exchange, retirement or other taxable disposition of a New Senior Secured Note by a U.S. Holder will be recharacterized as ordinary income to the extent attributable to market discount accrued during the periods that the U.S. Holder held the Old Notes and the New Senior Secured Notes, as discussed above under the heading "—Market Discount") and will be long-term capital gain or loss if the U.S. Holder has a holding period of more than one year at the time of the sale, exchange or retirement. Long-term capital gain recognized by non-corporate U.S. Holders is generally eligible for a reduced rate of taxation and the deduction of capital losses is subject to significant limitations.

**Tax Consequences to Non-Participating U.S. Holders**

There are no tax consequences to a U.S. Holder of Old Notes, other than Consent Notes with respect to which Proposed Amendments become operative, that does not participate in the exchange offers. The tax treatment of a U.S. Holder of Consent Notes, with respect to which Proposed Amendments become operative, that does not participate in the exchange offers (a "Non-Participating U.S. Holder") will depend upon whether the adoption of such Proposed Amendments constitutes a modification to the Consent Notes that would result in a "deemed" exchange of such Consent Notes for U.S. federal income tax purposes. Generally, the modification of a debt instrument will be treated as a "deemed" exchange of an "old" debt instrument for a "new" debt instrument if such modification is "significant" within the meaning of the Regulations. Under the Regulations, the modification of a debt instrument is a "significant" modification if, based on all the facts and circumstances and taking into account all modifications of the debt instrument collectively, the legal rights or obligations that are altered and the degree to which they are altered are "economically significant." The Regulations further provide that a modification of a debt instrument that adds, deletes or alters customary accounting or financial covenants is not a significant modification. The Regulations do not, however, define "customary accounting or financial covenants." Whether the adoption of the Proposed Amendments would be considered a significant modification under the foregoing rules is not entirely clear.

If the Proposed Amendments adopted with respect to an issue of Consent Notes (a) were treated as mere deletions or alterations of customary accounting or financial covenants or (b) were not so treated, but the legal rights and obligations that are altered by such Proposed Amendments and the degree to which they are altered were not viewed as "economically significant," then there would be no tax consequences to the Non-Participating U.S. Holders of such Consent Notes.

EFH Corp. intends to take the position that adoption of the Proposed Amendments would not cause a "significant modification" of the Consent Notes under the Regulations, and therefore would not result in a deemed exchange of the Consent Notes for U.S. federal income tax purposes. It is possible, however, that if the Proposed Amendments become operative with respect to certain Consent Notes, the IRS could treat the adoption of the Proposed Amendments as a significant modification of such Consent Notes, resulting in a deemed exchange of such Consent Notes held by a U.S. Holder for "new" Consent Notes for U.S. federal income tax purposes. If such a position were taken and sustained, the deemed exchange would be fully taxable unless it qualified as a recapitalization for U.S. federal income tax purposes (for which qualification is not entirely clear). In addition, the Non-Participating U.S. Holder could be treated as acquiring the "new" Consent Note with OID,

343

EFIHMW00246071

which, regardless of such holder's regular method of tax accounting, would be included in income as it accrued, regardless of when any related cash was actually received, and a Non-Participating U.S. Holder could recognize ordinary interest income to the extent that any portion of the "new" Consent Notes is attributable to accrued but unpaid qualified stated interest not previously taken into income. U.S. Holders are encouraged to consult their tax advisors regarding the potential tax consequences of not tendering their Consent Notes pursuant to the exchange offers and consent solicitations.

A U.S. Holder of Consent Notes that validly delivers and does not validly revoke a Consent with respect to such notes and who does not exchange such notes pursuant to an exchange offer because of the operation of the proration provisions of the exchange offers, will likely recognize ordinary income in the amount of any Cash Consent Consideration received with respect to such notes as described above under the heading "The Exchange of Old Notes Pursuant to the Exchange Offers—Consent Consideration."

### Tax Consequences to Participating Non-U.S. Holders

#### *The Exchange of Old Notes Pursuant to the Exchange Offers*

Subject to the discussion below under the subheading "—Consent Consideration," a Non-U.S. Holder generally will not be subject to taxation on any gain that a U.S. Holder would be required to recognize on the exchange of Old Notes for New Senior Secured Notes as discussed above under "—Tax Consequences to Participating U.S. Holders—The Exchange of Old Notes Pursuant to the Exchange Offers" unless:

- the gain is effectively connected with his, her or its conduct of a trade or business in the United States (and, if required by an applicable income tax treaty, is attributable to a U.S. permanent establishment that such Non-U.S. Holder maintains), in which case the gain will be subject to tax in the same manner as effectively connected interest income as described below under the heading "—Ownership of New Senior Secured Notes—Payments of Interest"; or

- such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of the exchange, and certain other conditions are met, in which case the gain will generally be subject to 30% tax subject to the reduction of such gain by such Non-U.S. Holder's capital losses from U.S. sources.

Any amount received by a Non-U.S. Holder that is attributable to accrued and unpaid interest (including OID) on an Old Note generally will be taxable in the same manner as described below under "—Ownership of New Senior Secured Notes—Payments of Interest."

*Consent Consideration.* As discussed above under "—Tax Consequences to Participating U.S. Holders— The Exchange of Old Notes Pursuant to the Exchange Offers—Consent Consideration," under current U.S. federal income tax law, there is uncertainty regarding whether the Cash Consent Consideration or any Deemed Consent Consideration constitutes a separate fee or instead constitutes part of the consideration received for the Old Notes.

The Offerors intend to take the position that any Cash Consent Consideration payable to a Non-U.S. Holder constitutes a separate fee paid for consenting to the Proposed Amendments and there is no Deemed Consent Consideration. Accordingly, absent further guidance from the IRS, the Offerors intend to withhold from any Cash Consent Consideration paid to a Non-U.S. Holder, U.S. federal income tax at a rate of 30% of such payment, unless (i) the Non-U.S. Holder is engaged in the conduct of a trade or business in the U.S. to which the receipt of the Cash Consent Consideration is effectively connected and provides a properly executed Form W-8ECI, or (ii) a U.S. tax treaty either eliminates or reduces such withholding tax with respect to the Cash Consent Consideration payable to the Non-U.S. Holder and the Non-U.S. Holder provides a properly executed Form W-8BEN. If such withholding results in an overpayment of taxes (because, for example, the Cash Consent Consideration may be treated as interest or as additional consideration received in the exchange), a refund or

Confidential

credit may be obtainable, provided that the required information is timely furnished to the IRS. In addition, the Offerors will report any Cash Consent Consideration paid under applicable U.S. information reporting rules. If any Deemed Consent Consideration were to be treated as separate consideration for consenting to the Proposed Amendments, then such a payment could result in a U.S. federal income tax liability to certain Non-U.S. Holders.

Non-U.S. Holders are encouraged to consult their tax advisors with respect to the treatment of any Consent Consideration.

### Ownership of New Senior Secured Notes

*Payments of Interest.* A Non-U.S. Holder will not be subject to tax on any payment of interest (which for purposes of this discussion includes OID) on the New Senior Secured Notes under the "portfolio interest rule," provided that (i) such interest is not effectively connected with the conduct of a trade or business of the Non-U.S. Holder in the United States (or, if required by an applicable income tax treaty, is not attributable to a U.S. permanent establishment of the Non-U.S. Holder); (ii) the Non-U.S. Holder does not actually or constructively own 10% or more of EFH Corp.'s voting stock within the meaning of the Code and the Regulations; (iii) the Non-U.S. Holder is not a controlled foreign corporation that is related to the Offerors actually or constructively through stock ownership; (iv) the Non-U.S. Holder is not a bank receiving interest on a loan agreement entered into in the ordinary course of its trade or business; and (v) the Non-U.S. Holder has provided a validly completed IRS Form W-8BEN (or other applicable form) establishing such Non-U.S. Holder status (or certain documentary evidence requirements for establishing such Non-U.S. Holder status).

If a Non-U.S. Holder cannot satisfy the requirements described above, payments of interest on the New Senior Secured Notes (including OID) made to such Non-U.S. Holder will be subject to a 30% U.S. federal withholding tax, unless such Non-U.S. Holder provides EFH Corp. (or its paying agent) with a properly executed (i) IRS Form W-8BEN (or other applicable form) claiming an exemption from or reduction in withholding under the benefit of an applicable income tax treaty; or (ii) IRS Form W-8ECI (or other applicable form) certifying that interest paid on the New Senior Secured Notes is not subject to withholding tax because it is effectively connected with the conduct of a trade or business in the United States.

If a Non-U.S. Holder is engaged in a trade or business in the United States and interest (including OID) on the New Senior Secured Notes is effectively connected with the conduct of that trade or business (and, if required by an applicable income tax treaty is attributable to a U.S. permanent establishment that such Non-U.S. Holder maintains), then such Non-U.S. Holder will be subject to U.S. federal income tax on that interest (including OID) on a net income basis generally in the same manner as if he, she or it were a U.S. Holder unless an applicable income tax treaty provides otherwise (although the Non-U.S. Holder will be exempt from the 30% U.S. federal withholding tax, provided the certification requirements discussed above are satisfied). In addition, if the Non-U.S. Holder is a corporate Non-U.S. Holder, it may be subject to a branch profits tax equal to 30% (or lower applicable income tax treaty rate) of such interest (including OID), subject to adjustments.

*Sale, Exchange or Retirement of New Senior Secured Notes.* Any gain realized upon the sale, exchange or retirement of a New Senior Secured Note generally will not be subject to U.S. federal income tax unless certain exceptions apply, as described above under the heading "—The Exchange of Old Notes Pursuant to the Exchange Offers."

## Tax Consequences to Non-Participating Non-U.S. Holders

Non-U.S. Holders that do not validly tender their Consent Notes pursuant to the exchange offers and consent solicitations generally will not be subject to U.S. federal income tax as a result of the adoption of the Proposed Amendments if, as the Offerors believe, the adoption of the Proposed Amendments would not give rise to a deemed exchange of Consent Notes for "new" Consent Notes. Moreover, even if there were a deemed

345

EFIHMW00246073

exchange, such exchange generally would result in tax only if it were not considered a recapitalization and such Non-U.S. Holders were in one of the two categories described in the heading "—Tax Consequences to Participating Non-U.S. Holders—The Exchange of Old Notes Pursuant to the Exchange Offers."

A Non-U.S. Holder of Consent Notes that validly delivers and does not validly revoke a consent with respect to such notes and who does not exchange such notes pursuant to an exchange offer because of the operation of the proration provisions of the exchange offers will be subject to a 30% U.S. federal income withholding tax except in the circumstances described in the heading "—Tax Consequences to Participating Non-U.S. Holders—The Exchange of Old Notes Pursuant to the Exchange Offers—Consent Consideration."

**Backup Withholding and Information Reporting**

*U.S. Holders*

In general, information reporting requirements may apply to the exchange of Old Notes for New Senior Secured Notes, and such requirements will apply to certain payments of interest (and accruals of OID) on, or proceeds from a disposition (including a retirement or redemption) of, New Senior Secured Notes (unless, in each case, the holder is an exempt recipient such as a corporation).

Backup withholding may apply to the exchange of Old Notes for New Senior Secured Notes and payments of interest (and accruals of OID) on or proceeds from disposition (including a retirement or redemption) of New Senior Secured Notes if the holder fails to provide a taxpayer identification number or a certification that he, she or it is not subject to backup withholding. Backup withholding is not an additional tax and any amounts withheld under the backup withholding rules may be allowed as a refund or a credit against the holder's U.S. federal income tax liability, provided the required information is timely furnished to the IRS.

*Non-U.S. Holders*

Generally, the Offerors must report to the IRS and to each Non-U.S. Holder the amount of interest (including OID) paid to such Non-U.S. Holder with respect to the Old Notes or New Senior Secured Notes, and the amount of tax, if any, withheld with respect to such payments. Copies of the information returns reporting such interest payments and any withholding may also be made available to the tax authorities in the country in which such Non-U.S. Holder resides under the provisions of an applicable income tax treaty.

In general, a Non-U.S. Holder will not be subject to backup withholding with respect to the exchange of Old Notes for New Senior Secured Notes or interest (including OID) that the applicable Offeror pays to such Non-U.S. Holder on the Old Notes or New Senior Secured Notes, provided that such Offeror does not have actual knowledge or reason to know that such Non-U.S. Holder is a United States person as defined under the Code, and such Non-U.S. Holder has provided a validly completed IRS Form W-8BEN (or other applicable form) establishing that he, she or it is a Non-U.S. Holder (or such Non-U.S. Holder satisfies certain documentary evidence requirements for establishing that he, she or it is a Non-U.S. Holder).

Information reporting and, depending on the circumstances, backup withholding will apply to the proceeds of a sale or other disposition (including a retirement or redemption) of Old Notes or New Senior Secured Notes made within the United States or conducted through certain U.S.-related financial intermediaries, unless the Non-U.S. Holder certifies to the payor under penalties of perjury that he, she or it is a Non-U.S. Holder (and the payor does not have actual knowledge or reason to know that such Non-U.S. Holder is a United States person as defined under the Code), or he, she or it otherwise establishes an exemption.

Backup withholding is not an additional tax and any amounts withheld under the backup withholding rules may be allowed as a refund or a credit against the Non-U.S. Holder's U.S. federal income tax liability, provided the required information is timely furnished to the IRS.

346

EFIHMW00246074

**Tax Consequences to EFH Corp.**

*Cancellation of Indebtedness Income*

To the extent that the issue price of the New Senior Secured Notes is less than the adjusted issue price of the Old Notes, the consolidated group of which EFH Corp. is the common parent will realize cancellation of indebtedness income for U.S. federal income tax purposes ("COD income"). For transactions occurring before 2009, COD income was generally required to be included in gross income in the year of the transaction for U.S. federal income tax purposes. Under the American Recovery and Reinvestment Act of 2009 (the "2009 Law"), EFH Corp. may make an election to defer the recognition of COD income incurred as a result of the exchange offers until the fifth taxable year following the closing of the exchange offers. The COD income will then be recognized ratably over the ensuing five taxable years. At the time of recognition, COD income may be offset in whole or in part by net operating losses ("NOL") and other tax attributes available at such time, although there is no assurance that EFH Corp. will have such attributes at such time. However, even if a corporation might be able to offset all of its taxable income, including COD income, for regular tax purposes by available NOL carryovers, only 90% of a corporation's taxable income for alternative minimum tax ("AMT") purposes may be offset by available NOL carryovers or carrybacks, and therefore the corporation may incur an AMT liability with respect to COD income at the time of the deferred recognition. Pursuant to the 2009 Law, if a corporation elects to defer the recognition of COD income and is subsequently liquidated or sells substantially all of its assets, or similarly undergoes a cessation of business, then any deferred income will be accelerated into the taxable year in which such event occurs.

*Deferral of Deduction for OID*

A corporation is generally allowed to take a deduction for OID as it accrues. However, if EFH Corp. elects to postpone the recognition of COD income, EFH Corp. will be required to defer any deduction for OID that would otherwise accrue before the fifth taxable year following the exchange. In the fifth taxable year following the exchange, deductions for the aggregate amount of the deferred OID will be allowed to be taken ratably over the ensuing period of five taxable years. If the amount of OID that would normally accrue during the deferral period exceeds the amount of deferred COD income, deductions would be allowed for any such excess amount at the time such OID normally would accrue.

Confidential

## CERTAIN ERISA CONSIDERATIONS

This disclosure was written in connection with the promotion and marketing of the New Senior Secured Notes by the Offerors and the Dealer Managers, and it cannot be used by any holder for the purpose of avoiding penalties that may be asserted against the holder under the Code. Prospective purchasers of the New Senior Secured Notes should consult their own tax advisors with respect to the application of the U.S. federal income tax laws to their particular situations.

The following is a summary of certain considerations associated with the exchange of the Old Notes resulting in the acquisition or holding of the New Senior Secured Notes by employee benefit plans that are subject to Title I of the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA"), individual retirement accounts and other plans and arrangements that are subject to Section 4975 of the Code or provisions under any federal, state, local, non-U.S. or other laws or regulations that are similar to such provisions of ERISA or the Code (collectively, "Similar Laws"), and entities whose underlying assets are considered to include "plan assets" of any such plan, account or arrangement (each, a "Plan").

This summary is based on the provisions of ERISA and the Code (and related regulations and administrative and judicial interpretations) as of the date of this Prospectus. This summary does not purport to be complete and future legislation, court decisions, administrative regulations, rulings or administrative pronouncements could significantly modify the requirements summarized below. Any of these changes may be retroactive and may thereby apply to transactions entered into prior to the date of their enactment or release.

### General Fiduciary Matters

ERISA imposes certain duties on persons who are fiduciaries of a Plan subject to Title I of ERISA or of a Plan subject to Section 4975 of the Code (each a "Benefit Plan") and both ERISA and the Code prohibit certain transactions involving the assets of a Plan and its fiduciaries or other interested parties. Under ERISA and the Code, any person who exercises any discretionary authority or control over the administration of such a Plan or the management or disposition of the assets of such Plan, or who renders investment advice for a fee or other compensation to such a Plan, is generally considered to be a fiduciary of the Plan.

In considering the exchange of the Old Notes resulting in the acquisition of New Senior Secured Notes with a portion of the assets of any Plan, a fiduciary should determine whether the investment is in accordance with the documents and instruments governing the Plan and the applicable provisions of ERISA, the Code or any Similar Law. In addition, a fiduciary of a Plan should determine if the exchange offers satisfy the fiduciary's duties to the Plan including, without limitation, the prudence, diversification, delegation of control and prohibited transaction provisions of ERISA, the Code and any other applicable Similar Laws.

### Prohibited Transaction Issues

Section 406 of ERISA and Section 4975 of the Code prohibit Benefit Plans from engaging in specified transactions involving plan assets with persons or entities who are "parties in interest," within the meaning of ERISA, or "disqualified persons," within the meaning of Section 4975 of the Code, unless an exemption is available. A party in interest or disqualified person who engaged in a non-exempt prohibited transaction may be subject to excise taxes and other penalties and liabilities under ERISA and the Code. In addition, the fiduciary of such a Benefit Plan that engaged in such a non-exempt prohibited transaction may be subject to penalties and liabilities under ERISA and the Code.

The exchange of Old Notes and the acquisition and/or holding of New Senior Secured Notes by a Benefit Plan with respect to which the Offerors, TCEH, the Sponsor Group, the Dealer Managers, the Information Agent, the Exchange Agent or a Guarantor is considered a party in interest or a disqualified person may constitute or result in a direct or indirect prohibited transaction under Section 406 of ERISA and/or Section 4975 of the Code,

348

EFIHMW00246076

unless the investment is acquired and is held in accordance with an applicable statutory, class or individual prohibited transaction exemption. In this regard, the U.S. Department of Labor has issued prohibited transaction class exemptions ("PTCE") that may apply to the exchange of the Old Notes and the acquisition and/or holding of New Senior Secured Notes. These class exemptions include, without limitation, PTCE 84-14 respecting transactions determined by independent qualified professional asset managers, PTCE 90-1 respecting insurance company pooled separate accounts, PTCE 91-38 respecting bank collective investment funds, PTCE 95-60 respecting life insurance company general accounts and PTCE 96-23 respecting transactions determined by in-house asset managers.

Plans that previously acquired or held Old Notes in reliance on PTCE 84-14 should note that the exchange offers may constitute a renewal under Part V(i) of PTCE 84-14 and any such Plan should consult its counsel to evaluate whether PTCE 84-14 remains applicable.

Each of these PTCEs contains conditions and limitations on its application. Fiduciaries of Plans that consider exchanging Old Notes and acquiring and/or holding New Senior Secured Notes in reliance on any of these or any other PTCEs should carefully review the PTCE to assure it is applicable. There can be no assurance that all of the conditions of any such exemptions will be satisfied.

Because of the foregoing, the New Senior Secured Notes should not be acquired or held by any person investing "plan assets" of any Plan, unless such acquisition and holding will not constitute a non-exempt prohibited transaction under ERISA or Section 4975 of the Code or a violation of any applicable Similar Laws.

**Representation**

Accordingly, by acceptance of a New Senior Secured Note, each purchaser and holder will be deemed to have represented and warranted that either (i) no portion of the assets used to acquire or hold the New Senior Secured Notes constitutes assets of any Plan or (ii) the acquisition and holding of the New Senior Secured Notes (including the exchange of Old Notes for New Senior Secured Notes) are entitled to exemptive relief from the prohibited transaction provisions of Section 406 of ERISA and Section 4975 of the Code and are otherwise permissible under all applicable Similar Laws.

The foregoing discussion is general in nature and is not intended to be all inclusive. Due to the complexity of these rules and the penalties that may be imposed upon persons involved in non-exempt prohibited transactions, it is particularly important that fiduciaries, or other persons considering acquiring the New Senior Secured Notes (or exchanging Old Notes for New Senior Secured Notes) on behalf of, or with the assets of, any Plan, consult with their counsel regarding the potential applicability of ERISA, Section 4975 of the Code and any Similar Laws to such investment and whether an exemption would be applicable to the purchase and holding of the New Senior Secured Notes.

## LEGAL MATTERS

Certain legal matters with respect to the New Senior Secured Notes offered in the exchange offers will be passed upon for the Offerors by Vinson & Elkins L.L.P., Dallas, Texas, and Simpson Thacher & Bartlett LLP, New York, New York, and NRC regulatory matters will be passed upon for the Offerors by Morgan, Lewis & Bockius LLP. Certain legal matters with respect to the New Senior Secured Notes offered in the exchange offers will be passed upon for the Dealer Managers by Shearman & Sterling LLP, New York, New York. An investment vehicle comprised of several partners of Simpson Thacher & Bartlett LLP, members of their families, related persons and others own interests representing less than 1% of the capital commitments of the KKR Millennium Fund, L.P. and KKR 2006 Fund, L.P.

349

EFIHMW00246077

**PX 014**

**Page 359 of 1116**

## EXPERTS

The financial statements as of December 31, 2008 and 2007 (successor), and for the year ended December 31, 2008 (successor), the period from October 11, 2007 through December 31, 2007 (successor), the period from January 1, 2007 through October 10, 2007 (predecessor) and the year ended December 31, 2006 (predecessor) of EFH Corp. included in this Prospectus have been audited by Deloitte & Touche LLP, an independent registered public accounting firm, as stated in their report appearing herein, (which report expresses an unqualified opinion and includes an explanatory paragraph referring to the completion of EFH Corp.'s merger with Merger Sub and becoming a subsidiary of Texas Holdings on October 10, 2007, as well as, the adoption of the provisions of FASB Staff Position No. FIN 39-1, the reclassification of the results of its commodity hedging and trading activities on a retrospective basis, and the adoption of the provisions of SFAS 160 on a retrospective basis). The financial statements as of December 31, 2008 and 2007 (successor), and for the year ended December 31, 2008 (successor), the period from October 11, 2007 through December 31, 2007 (successor), the period from January 1, 2007 through October 10, 2007 (predecessor) and the year ended December 31, 2006 (predecessor) of EFCH included in this Prospectus, have been audited by Deloitte & Touche LLP, an independent registered public accounting firm, as stated in their report appearing herein (which report expresses an unqualified opinion and includes an explanatory paragraph referring to EFCH as a wholly-owned subsidiary of EFH Corp., which was merged with Merger Sub on October 10, 2007). The financial statements and the related financial statement schedule included elsewhere in the registration statement as of December 31, 2008 and 2007 (successor balance sheets), and for the year ended December 31, 2008 (successor operations) and the period from October 11, 2007 through December 31, 2007 (successor operations) of EFIH and the financial statements for the period from January 1, 2007 through October 10, 2007 (predecessor operations) and the year ended December 31, 2006 (predecessor operations) of Oncor (as EFIH's predecessor) included in this Prospectus, have been audited by Deloitte & Touche LLP, an independent registered public accounting firm, as stated in their report appearing herein and elsewhere in the registration statement (which report expresses an unqualified opinion on the financial statements and includes an explanatory paragraph referring to EFIH as a wholly-owned subsidiary of EFH Corp., which was merged with Merger Sub on October 10, 2007, as well as, the adoption of the provisions of SFAS 160, on a retrospective basis). The financial statements as of December 31, 2008 and 2007 (successor balance sheets), and for the year ended December 31, 2008 (successor operations), the period from October 11, 2007 through December 31, 2007 (successor operations) of Oncor Holdings and the financial statements for the period from January 1, 2007 through October 10, 2007 (predecessor operations) and the year ended December 31, 2006 (predecessor operations) of Oncor (as Oncor Holdings' predecessor) included in this Prospectus, have been audited by Deloitte & Touche LLP, an independent registered public accounting firm, as stated in their report appearing herein (which report expresses an unqualified opinion and includes an explanatory paragraph referring to Oncor Holdings as an indirect subsidiary of EFH Corp., which was merged with Merger Sub on October 10, 2007, as well as, the adoption of the provisions of SFAS 160, on a retrospective basis). Such financial statements and financial statement schedule have been so included in reliance upon the reports of such firm given upon their authority as experts in accounting and auditing.

With respect to the unaudited interim financial information for the periods ended September 30, 2009 and 2008 which is included in this Prospectus for EFH Corp., EFCH, EFIH and Oncor Holdings, Deloitte & Touche LLP, an independent registered public accounting firm, have applied limited procedures in accordance with the standards of the Public Company Accounting Oversight Board (United States) for a review of such information. However, as stated in their reports included herein for EFH Corp., EFCH, EFIH and Oncor Holdings, they did not audit and they do not express an opinion on that interim financial information. Accordingly, the degree of reliance on their reports on such information should be restricted in light of the limited nature of the review procedures applied. Deloitte & Touche LLP are not subject to the liability provisions of Section 11 of the Securities Act for their reports on the unaudited interim financial information because those reports are not "reports" or a "part" of the Registration Statement prepared or certified by an accountant within the meaning of Sections 7 and 11 of the Securities Act.

Confidential

## INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

|  | Page |
|---|---|
| **Audited Consolidated Financial Statements of Energy Future Holdings Corp.** | |
| Glossary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | F-4 |
| Report of Independent Registered Public Accounting Firm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | F-10 |
| Statements of Consolidated Income (Loss) for the year ended December 31, 2008 (Successor), the period from October 11, 2007 through December 31, 2007 (Successor), the period from January 1, 2007 through October 10, 2007 (Predecessor) and the year ended December 31, 2006 (Predecessor) . . . . . . . | F-11 |
| Statements of Consolidated Comprehensive Income (Loss) for the year ended December 31, 2008 (Successor), the period from October 11, 2007 through December 31, 2007 (Successor), the period from January 1, 2007 through October 10, 2007 (Predecessor) and the year ended December 31, 2006 (Predecessor) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | F-12 |
| Statements of Consolidated Cash Flows for the year ended December 31, 2008 (Successor), the period from October 11, 2007 through December 31, 2007 (Successor), the period from January 1, 2007 through October 10, 2007 (Predecessor) and the year ended December 31, 2006 (Predecessor) . . . . . . | F-13 |
| Consolidated Balance Sheets as of December 31, 2008 (Successor) and December 31, 2007 (Successor) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | F-16 |
| Statements of Consolidated Equity for the year ended December 31, 2008 (Successor), the period from October 11, 2007 through December 31, 2007 (Successor), the period from January 1, 2007 through October 10, 2007 (Predecessor) and the year ended December 31, 2006 (Predecessor) . . . . . . . . . . . . . | F-17 |
| Notes to Consolidated Financial Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | F-18 |
| **Unaudited Condensed Consolidated Financial Statements of Energy Future Holdings Corp.** | |
| Glossary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | F-109 |
| Condensed Statements of Consolidated Income (Loss) for the three-month and nine-month periods ended September 30, 2009 and 2008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | F-113 |
| Condensed Statements of Consolidated Comprehensive Income (Loss) for the three-month and nine-month periods ended September 30, 2009 and 2008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | F-114 |
| Condensed Statements of Consolidated Cash Flows for the nine-month periods ended September 30, 2009 and 2008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | F-115 |
| Condensed Consolidated Balance Sheets as of September 30, 2009 and December 31, 2008 . . . . . . . . . . | F-116 |
| Notes to Condensed Consolidated Financial Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | F-117 |
| Report of Independent Registered Public Accounting Firm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | F-161 |
| **Audited Consolidated Financial Statements of Energy Future Intermediate Holding Company LLC (Successor) and Oncor Electric Delivery Company LLC (Predecessor)** | |
| Glossary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | F-162 |
| Report of Independent Registered Public Accounting Firm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | F-167 |
| Statements of Consolidated Income (Loss) for the year ended December 31, 2008 (Successor), the period from October 11, 2007 through December 31, 2007 (Successor), the period from January 1, 2007 through October 10, 2007 (Predecessor) and the year ended December 31, 2006 (Predecessor) . . . . . . . | F-168 |
| Statements of Consolidated Comprehensive Income (Loss) for the year ended December 31, 2008 (Successor), the period from October 11, 2007 through December 31, 2007 (Successor), the period from January 1, 2007 through October 10, 2007 (Predecessor) and the year ended December 31, 2006 (Predecessor) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | F-169 |

Confidential

EFIHMW00246079

|  | Page |
|---|---|
| Statements of Consolidated Cash Flows for the year ended December 31, 2008 (Successor), the period from October 11, 2007 through December 31, 2007 (Successor), the period from January 1, 2007 through October 10, 2007 (Predecessor) and the year ended December 31, 2006 (Predecessor) | F-170 |
| Consolidated Balance Sheets as of December 31, 2008 (Successor) and December 31, 2007 (Successor) | F-171 |
| Statements of Consolidated Membership Interests for the year ended December 31, 2008 (Successor) and the period from October 11, 2007 through December 31, 2007 (Successor) | F-172 |
| Statements of Consolidated Shareholder's Equity for the period from January 1, 2007 through October 10, 2007 (Predecessor) and the year ended December 31, 2006 (Predecessor) | F-173 |
| Notes to Consolidated Financial Statements | F-174 |

**Unaudited Condensed Consolidated Financial Statements of Energy Future Intermediate Holding Company LLC**

| Glossary | F-206 |
|---|---|
| Condensed Statements of Consolidated Income for the three-month and nine-month periods ended September 30, 2009 and 2008 | F-209 |
| Condensed Statements of Consolidated Comprehensive Income for the three-month and nine-month periods ended September 30, 2009 and 2008 | F-210 |
| Condensed Statements of Consolidated Cash Flows for the nine-month periods ended September 30, 2009 and 2008 | F-211 |
| Condensed Consolidated Balance Sheets as of September 30, 2009 and December 31, 2008 | F-212 |
| Notes to Condensed Consolidated Financial Statements | F-213 |
| Report of Independent Registered Public Accounting Firm | F-227 |

**Audited Consolidated Financial Statements of Energy Future Competitive Holdings Company**

| Glossary | F-228 |
|---|---|
| Report of Independent Registered Public Accounting Firm | F-234 |
| Statements of Consolidated Income (Loss) for the year ended December 31, 2008 (Successor), the period from October 11, 2007 through December 31, 2007 (Successor), the period from January 1, 2007 through October 10, 2007 (Predecessor) and the year ended December 31, 2006 (Predecessor) | F-235 |
| Statements of Consolidated Comprehensive Income (Loss) for the year ended December 31, 2008 (Successor), the period from October 11, 2007 through December 31, 2007 (Successor), the period from January 1, 2007 through October 10, 2007 (Predecessor) and the year ended December 31, 2006 (Predecessor) | F-236 |
| Statements of Consolidated Cash Flows for the year ended December 31, 2008 (Successor), the period from October 11, 2007 through December 31, 2007 (Successor), the period from January 1, 2007 through October 10, 2007 (Predecessor) and the year ended December 31, 2006 (Predecessor) | F-237 |
| Consolidated Balance Sheets as of December 31, 2008 (Successor) and December 31, 2007 (Successor) | F-239 |
| Statements of Consolidated Shareholders' Equity for the year ended December 31, 2008 (Successor), the period from October 11, 2007 through December 31, 2007 (Successor), the period from January 1, 2007 through October 10, 2007 (Predecessor) and the year ended December 31, 2006 (Predecessor) | F-240 |
| Notes to Consolidated Financial Statements | F-242 |

**Unaudited Condensed Consolidated Financial Statements of Energy Future Competitive Holdings Company**

| Glossary | F-307 |
|---|---|

Confidential

EFIHMW00246080

|  | Page |
|---|---|
| Condensed Statements of Consolidated Income (Loss) for the three-month and nine-month periods ended September 30, 2009 and 2008 | F-310 |
| Condensed Statements of Consolidated Comprehensive Income (Loss) for the three-month and nine-month periods ended September 30, 2009 and 2008 | F-311 |
| Condensed Statements of Consolidated Cash Flows for the nine-month periods ended September 30, 2009 and 2008 | F-312 |
| Condensed Consolidated Balance Sheets as of September 30, 2009 and December 31, 2008 | F-313 |
| Notes to Condensed Consolidated Financial Statements | F-314 |
| Report of Independent Registered Public Accounting Firm | F-352 |

**Audited Consolidated Financial Statements of Oncor Electric Delivery Holdings Company LLC (Successor) and Oncor Electric Delivery Company LLC (Predecessor)**

| | |
|---|---|
| Glossary | F-353 |
| Report of Independent Registered Public Accounting Firm | F-357 |
| Statements of Consolidated Income (Loss) for the year ended December 31, 2008 (Successor), the period from October 11, 2007 through December 31, 2007 (Successor), the period from January 1, 2007 through October 10, 2007 (Predecessor) and the year ended December 31, 2006 (Predecessor) | F-358 |
| Statements of Consolidated Comprehensive Income (Loss) for the year ended December 31, 2008 (Successor), the period from October 11, 2007 through December 31, 2007 (Successor), the period from January 1, 2007 through October 10, 2007 (Predecessor) and the year ended December 31, 2006 (Predecessor) | F-359 |
| Statements of Consolidated Cash Flows for the year ended December 31, 2008 (Successor), the period from October 11, 2007 through December 31, 2007 (Successor), the period from January 1, 2007 through October 10, 2007 (Predecessor) and the year ended December 31, 2006 (Predecessor) | F-360 |
| Consolidated Balance Sheets as of December 31, 2008 (Successor) and December 31, 2007 (Successor) | F-361 |
| Statements of Consolidated Membership Interests for the year ended December 31, 2008 (Successor) and the period from October 11, 2007 through December 31, 2007 (Successor) | F-362 |
| Statements of Consolidated Shareholder's Equity for the period from January 1, 2007 through October 10, 2007 (Predecessor) and the year ended December 31, 2006 (Predecessor) | F-363 |
| Notes to Consolidated Financial Statements | F-364 |

**Unaudited Condensed Consolidated Financial Statements of Oncor Electric Delivery Holdings Company LLC**

| | |
|---|---|
| Glossary | F-394 |
| Report of Independent Registered Public Accounting Firm | F-396 |
| Condensed Statements of Consolidated Income for the three-month and nine-month periods ended September 30, 2009 and 2008 | F-397 |
| Condensed Statements of Consolidated Comprehensive Income for the three-month and nine-month periods ended September 30, 2009 and 2008 | F-398 |
| Condensed Statements of Consolidated Cash Flows for the nine-month periods ended September 30, 2009 and 2008 | F-399 |
| Condensed Consolidated Balance Sheets as of September 30, 2009 and December 31, 2008 | F-400 |
| Notes to Condensed Consolidated Financial Statements | F-401 |

F-3

EFIHMW00246081

## GLOSSARY

When the following terms and abbreviations appear in the text of this report, they have the meanings indicated below.

**1999 Restructuring Legislation** . . . Texas Electric Choice Plan, the legislation that restructured the electric utility industry in Texas to provide for retail competition

**2007 Form 10-K** . . . . . . . . . . . . . . EFH Corp.'s Annual Report on Form 10-K for the year ended December 31, 2007

**2008 Form 10-K** . . . . . . . . . . . . . . EFH Corp.'s Annual Report on Form 10-K for the year ended December 31, 2008

**Adjusted EBITDA** . . . . . . . . . . . . . Adjusted EBITDA means EBITDA adjusted to exclude non-cash items, unusual items and other adjustments allowable under certain debt arrangements of EFH Corp. and its subsidiaries. See the definition of EBITDA below. Adjusted EBITDA and EBITDA are not recognized terms under GAAP and, thus, are non-GAAP financial measures. EFH Corp. is providing Adjusted EBITDA in this annual report (see reconciliation in Exhibits 99(a) and 99(c) (in the 2008 Form 10-K)) solely because of the important role that Adjusted EBITDA plays in respect of the certain covenants contained in EFH Corp.'s debt arrangements. EFH Corp. does not intend for Adjusted EBITDA (or EBITDA) to be an alternative to net income as a measure of operating performance or an alternative to cash flows from operating activities as a measure of liquidity or an alternative to any other measure of financial performance presented in accordance with GAAP. Additionally, EFH Corp. does not intend for Adjusted EBITDA (or EBITDA) to be used as a measure of free cash flow available for management's discretionary use, as the measure excludes certain cash requirements such as interest payments, tax payments and other debt service requirements. Because not all companies use identical calculations, EFH Corp.'s presentation of Adjusted EBITDA (and EBITDA) may not be comparable to similarly titled measures of other companies.

**Ancillary services** . . . . . . . . . . . . . Refers to services necessary to support the transmission of energy and maintain reliable operations for the entire transmission system.

**CAIR** . . . . . . . . . . . . . . . . . . . . . . . Clean Air Interstate Rule

**Capgemini** . . . . . . . . . . . . . . . . . . . Capgemini Energy LP, a subsidiary of Cap Gemini North America Inc. that provides business support services to EFH Corp. and its subsidiaries

**$CO_2$** . . . . . . . . . . . . . . . . . . . . . . . . carbon dioxide

**Competitive Electric segment** . . . . Refers to the EFH Corp. business segment that includes TCEH and equipment salvage and resale activities related to eight cancelled coal-fueled generation units.

**CREZ** . . . . . . . . . . . . . . . . . . . . . . . Competitive Renewable Energy Zones

**DOE** . . . . . . . . . . . . . . . . . . . . . . . . US Department of Energy

F-4

EFIHMW00246082

**EBITDA** . . . . . . . . . . . . . . . . . . . . .    Refers to earnings (net income) before interest expense, income taxes, depreciation and amortization. See the definition of Adjusted EBITDA above.

**EFC Holdings** . . . . . . . . . . . . . . .    Refers to Energy Future Competitive Holdings Company, a direct, wholly-owned subsidiary of EFH Corp. and the direct parent of TCEH.

**EFH Corp.** . . . . . . . . . . . . . . . . . .    Refers to Energy Future Holdings Corp., a holding company, and/or its subsidiaries, depending on context. Its major subsidiaries include TCEH and Oncor.

**EPA** . . . . . . . . . . . . . . . . . . . . . . . .    US Environmental Protection Agency

**EPC** . . . . . . . . . . . . . . . . . . . . . . . .    engineering, procurement and construction

**ERCOT** . . . . . . . . . . . . . . . . . . . .    Electric Reliability Council of Texas, the independent system operator and the regional coordinator of various electricity systems within Texas

**ERISA** . . . . . . . . . . . . . . . . . . . . .    Employee Retirement Income Security Act of 1974, as amended

**FASB** . . . . . . . . . . . . . . . . . . . . . .    Financial Accounting Standards Board, the designated organization in the private sector for establishing standards for financial accounting and reporting

**FERC** . . . . . . . . . . . . . . . . . . . . . .    US Federal Energy Regulatory Commission

**FIN** . . . . . . . . . . . . . . . . . . . . . . . .    Financial Accounting Standards Board Interpretation

**FIN 39** . . . . . . . . . . . . . . . . . . . . .    FIN No. 39, "Offsetting of Amounts Related to Certain Contracts—an Interpretation of APB Opinion No. 10 and FASB Statement No. 105"

**FIN 46R** . . . . . . . . . . . . . . . . . . . .    FIN No. 46R (Revised 2003), "Consolidation of Variable Interest Entities"

**FIN 47** . . . . . . . . . . . . . . . . . . . . .    FIN No. 47, "Accounting for Conditional Asset Retirement Obligations—An Interpretation of FASB Statement No. 143"

**FIN 48** . . . . . . . . . . . . . . . . . . . . .    FIN No. 48 (As Amended), "Accounting for Uncertainty in Income Taxes"

**Fitch** . . . . . . . . . . . . . . . . . . . . . . .    Fitch Ratings, Ltd. (a credit rating agency)

**FSP** . . . . . . . . . . . . . . . . . . . . . . . .    FASB Staff Position

**FSP FIN 39-1** . . . . . . . . . . . . . . . .    FSP FIN No. 39-1, "Amendment of FASB Interpretation No. 39"

**FSP FIN 48-1** . . . . . . . . . . . . . . . .    FSP FIN No. 48-1, "Definition of Settlement in FASB Interpretation No. 48"

**FSP SFAS 132(R)-1** . . . . . . . . . . . .    FSP SFAS No. 132(R)-1, "Employers' Disclosures about Postretirement Benefit Plan Assets"

F-5

Confidential

**FSP SFAS 140-4 and FIN 46(R)-8** . . . . . . . . . . . . . . . . . . . .  FSP SFAS No. 140-4 and FIN 46(R)-8, "Disclosures by Public Entities (Enterprises) about Transfers of Financial Assets and Interest in Variable Interest Entities"

**FSP SFAS 157-3** . . . . . . . . . . . . . .  FSP SFAS No. 157-3, "Determining the Fair Value of a Financial Asset When the Market for That Asset Is Not Active"

**GAAP** . . . . . . . . . . . . . . . . . . . . . . .  generally accepted accounting principles

**GWh** . . . . . . . . . . . . . . . . . . . . . . . .  gigawatt-hours

**historical service territory** . . . . . . .  the territory, largely in north Texas, being served by EFH Corp.'s regulated electric utility subsidiary at the time of entering retail competition on January 1, 2002

**Intermediate Holding** . . . . . . . . . .  Refers to Energy Future Intermediate Holding Company LLC, a direct, wholly-owned subsidiary of EFH Corp. and the direct parent of Oncor Holdings.

**IRS** . . . . . . . . . . . . . . . . . . . . . . . . .  US Internal Revenue Service

**kV** . . . . . . . . . . . . . . . . . . . . . . . . . .  kilovolts

**kWh** . . . . . . . . . . . . . . . . . . . . . . . .  kilowatt-hours

**LIBOR** . . . . . . . . . . . . . . . . . . . . . .  London Interbank Offered Rate. An interest rate at which banks can borrow funds, in marketable size, from other banks in the London interbank market.

**Luminant** . . . . . . . . . . . . . . . . . . . .  Refers to wholly-owned subsidiaries of TCEH engaged in competitive market activities consisting of electricity generation, development and construction of new generation facilities, wholesale energy sales and purchases as well as commodity risk management and trading activities, all largely in Texas.

**Luminant Construction** . . . . . . . . .  Refers to the operations of TCEH established for the purpose of developing and constructing new generation facilities.

**Luminant Energy** . . . . . . . . . . . . . .  Luminant Energy Company LLC, an indirect, wholly-owned subsidiary of TCEH that engages in certain wholesale markets activities

**Luminant Power** . . . . . . . . . . . . . . .  Refers to subsidiaries of TCEH engaged in electricity generation activities.

**market heat rate** . . . . . . . . . . . . . .  Heat rate is a measure of the efficiency of converting a fuel source to electricity. The market heat rate is based on the price offer of the marginal supplier in Texas (generally natural gas plants) in generating electricity and is calculated by dividing the wholesale market price of electricity by the market price of natural gas.

**Merger** . . . . . . . . . . . . . . . . . . . . . .  The transaction referred to in "Merger Agreement" (defined immediately below) that was completed on October 10, 2007.

F-6

Confidential

EFIHMW00246084

| | |
|---|---|
| **Merger Agreement** ............. | Agreement and Plan of Merger, dated February 25, 2007, under which Texas Holdings agreed to acquire EFH Corp. |
| **Merger Sub** ................. | Texas Energy Future Merger Sub Corp, a Texas corporation and a wholly-owned subsidiary of Texas Holdings that was merged into EFH Corp. on October 10, 2007 |
| **MMBtu** ...................... | million British thermal units |
| **Moody's** ..................... | Moody's Investors Services, Inc. (a credit rating agency) |
| **MW** ......................... | megawatts |
| **MWh** ........................ | megawatt-hours |
| **NERC** ....................... | North American Electric Reliability Corporation |
| **NO$_x$** ........................ | nitrogen oxide |
| **NRC** ........................ | US Nuclear Regulatory Commission |
| **Oncor** ...................... | Refers to Oncor Electric Delivery Company LLC, a direct majority-owned subsidiary of Oncor Holdings and an indirect subsidiary of EFH Corp., and/or its consolidated bankruptcy-remote financing subsidiary, Oncor Electric Delivery Transition Bond Company LLC, depending on context, that is engaged in regulated electricity transmission and distribution activities. |
| **Oncor Holdings** ............... | Refers to Oncor Electric Delivery Holdings Company LLC, a direct wholly-owned subsidiary, consolidated as a variable interest entity under FIN 46R, of Intermediate Holding and the direct majority owner of Oncor. |
| **Oncor Ring-Fenced Entities** ...... | Refers to Oncor Holdings and its direct and indirect subsidiaries, including Oncor. |
| **OPEB** ....................... | other postretirement employee benefits |
| **PUCT** ....................... | Public Utility Commission of Texas |
| **PURA** ....................... | Texas Public Utility Regulatory Act |
| **Purchase accounting** ........... | The purchase method of accounting for a business combination as prescribed by SFAS 141 whereby the cost or "purchase price" of a business combination, including the amount paid for the equity and direct transaction costs are allocated to identifiable assets and liabilities (including intangible assets) based upon their fair values. The excess of the purchase price over the fair values of assets and liabilities is recorded as goodwill. |
| **Regulated Delivery segment** ...... | Refers to the EFH Corp. business segment, the substantial majority of which consists of the activities of Oncor. |

F-7

Confidential

| | |
|---|---|
| **REP** . . . . . . . . . . . . . . . . . . . . . . . . . | retail electric provider |
| **RRC** . . . . . . . . . . . . . . . . . . . . . . | Railroad Commission of Texas, which has oversight of lignite mining activity |
| **S&P** . . . . . . . . . . . . . . . . . . . . . . . . | Standard & Poor's Ratings Services, a division of the McGraw-Hill Companies Inc. (a credit rating agency) |
| **SARs** . . . . . . . . . . . . . . . . . . . . . . . | Stock Appreciation Rights |
| **SARs Plan** . . . . . . . . . . . . . . . . . . | Refers to the Oncor Electric Delivery Company Stock Appreciation Rights Plan |
| **SEC** . . . . . . . . . . . . . . . . . . . . . . . . . | US Securities and Exchange Commission |
| **Securities Act** . . . . . . . . . . . . . . . . | Securities Act of 1933, as amended |
| **SFAS** . . . . . . . . . . . . . . . . . . . . . . . . | Statement of Financial Accounting Standards issued by the FASB |
| **SFAS 5** . . . . . . . . . . . . . . . . . . . . . . | SFAS No. 5, "Accounting for Contingencies" |
| **SFAS 34** . . . . . . . . . . . . . . . . . . . . . | SFAS No. 34, "Capitalization of Interest Cost" |
| **SFAS 71** . . . . . . . . . . . . . . . . . . . . . | SFAS No. 71, "Accounting for the Effect of Certain Types of Regulation" |
| **SFAS 87** . . . . . . . . . . . . . . . . . . . . . | SFAS No. 87, "Employers' Accounting for Pensions" |
| **SFAS 106** . . . . . . . . . . . . . . . . . . . . | SFAS No. 106, "Employers' Accounting for Postretirement Benefits Other Than Pensions" |
| **SFAS 109** . . . . . . . . . . . . . . . . . . . . | SFAS No. 109, "Accounting for Income Taxes" |
| **SFAS 123 (R)** . . . . . . . . . . . . . . . . . | SFAS No. 123 (revised 2004), "Share-Based Payment" |
| **SFAS 132 (R)** . . . . . . . . . . . . . . . . . | SFAS No. 132 (revised 2003), "Employers' Disclosures About Pensions and Other Postretirement Benefits" |
| **SFAS 133** . . . . . . . . . . . . . . . . . . . . | SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities" as amended and interpreted |
| **SFAS 140** . . . . . . . . . . . . . . . . . . . . | SFAS No. 140, "Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities, a replacement of FASB Statement No. 125" |
| **SFAS 141** . . . . . . . . . . . . . . . . . . . . | SFAS No. 141, "Business Combinations" |
| **SFAS 142** . . . . . . . . . . . . . . . . . . . . | SFAS No. 142, "Goodwill and Other Intangible Assets" |
| **SFAS 144** . . . . . . . . . . . . . . . . . . . . | SFAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets" |
| **SFAS 146** . . . . . . . . . . . . . . . . . . . . | SFAS No. 146, "Accounting for Costs Associated with Exit or Disposal Activities" |

F-8

EFIHMW00246086

| | |
|---|---|
| **SFAS 157** . . . . . . . . . . . . . . . . . . . . | SFAS No. 157, "Fair Value Measurements" |
| **SFAS 158** . . . . . . . . . . . . . . . . . . . . | SFAS No. 158, "Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans" |
| **SFAS 160** . . . . . . . . . . . . . . . . . . . . | SFAS No. 160, "Noncontrolling Interests in Consolidated Financial Statements—an amendment of ARB No. 51" |
| **SFAS 161** . . . . . . . . . . . . . . . . . . . . | SFAS No. 161, "Disclosures about Derivative Instruments and Hedging Activities—an amendment of FASB Statement No. 133" |
| **SG&A** . . . . . . . . . . . . . . . . . . . . . . . | selling, general and administrative |
| **SO₂** . . . . . . . . . . . . . . . . . . . . . . . . . | sulfur dioxide |
| **Sponsor Group** . . . . . . . . . . . . . . . | Collectively, the investment funds affiliated with Kohlberg Kravis Roberts & Co. L.P., TPG Capital, L.P. and GS Capital Partners, an affiliate of Goldman Sachs & Co. (See Texas Holdings below.) |
| **TCEH** . . . . . . . . . . . . . . . . . . . . . . . | Refers to Texas Competitive Electric Holdings Company LLC, a direct, wholly-owned subsidiary of EFC Holdings and an indirect, wholly-owned subsidiary of EFH Corp., and/or its subsidiaries, depending on context, that are engaged in electricity generation, wholesale and retail energy markets and development and construction activities. Its major subsidiaries include Luminant and TXU Energy. |
| **TCEH Finance** . . . . . . . . . . . . . . . . | Refers to TCEH Finance, Inc., a direct, wholly-owned subsidiary of TCEH, formed for the sole purpose of serving as co-issuer with TCEH of certain debt securities. |
| **TCEH Senior Secured Facilities** . . | Refers collectively to the TCEH Initial Term Loan Facility, TCEH Delayed Draw Term Loan Facility, TCEH Revolving Credit Facility, TCEH Letter of Credit Facility and TCEH Commodity Collateral Posting Facility. See Note 15 to the Financial Statements for details of these facilities. |
| **TCEQ** . . . . . . . . . . . . . . . . . . . . . . . | Texas Commission on Environmental Quality |
| **Texas Holdings** . . . . . . . . . . . . . . . | Refers to Texas Energy Future Holdings Limited Partnership, a Delaware limited partnership controlled by the Sponsor Group that owns substantially all of the common stock of EFH Corp. |
| **Texas Holdings Group** . . . . . . . . . | Refers to Texas Holdings and its direct and indirect subsidiaries other than the Oncor Ring-Fenced Entities. |
| **Texas Transmission** . . . . . . . . . . . | Refers to Texas Transmission Investment LLC, a Delaware limited liability company that purchased a 19.75% equity interest in Oncor in November 2008. |
| **TXU Energy** . . . . . . . . . . . . . . . . . . | Refers to TXU Energy Retail Company LLC, a direct, wholly-owned subsidiary of TCEH engaged in the retail sale of electricity to residential and business customers. TXU Energy is a REP in competitive areas of ERCOT. |
| **TXU Europe** . . . . . . . . . . . . . . . . . . | TXU Europe Limited, a subsidiary of EFH Corp. that is in administration (similar to bankruptcy) in the United Kingdom |
| **TXU Fuel** . . . . . . . . . . . . . . . . . . . . | TXU Fuel Company, a former subsidiary of TCEH |
| **TXU Gas** . . . . . . . . . . . . . . . . . . . . | TXU Gas Company, a former subsidiary of EFH Corp. |
| **US** . . . . . . . . . . . . . . . . . . . . . . . . . | United States of America |

F-9

EFIHMW00246087

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors and Shareholders of Energy Future Holdings Corp.:

We have audited the accompanying consolidated balance sheets of Energy Future Holdings Corp. and subsidiaries ("EFH Corp.") as of December 31, 2008 and 2007 (successor), and the related statements of consolidated income (loss), comprehensive income (loss), cash flows and shareholders' equity for the year ended December 31, 2008 (successor), the period from October 11, 2007 through December 31, 2007 (successor), the period from January 1, 2007 through October 10, 2007 (predecessor) and the year ended December 31, 2006 (predecessor). These financial statements are the responsibility of EFH Corp.'s management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of Energy Future Holdings Corp. and subsidiaries at December 31, 2008 and 2007 (successor), and the results of their operations and their cash flows for the year ended December 31, 2008 (successor), the period from October 11, 2007 through December 31, 2007 (successor), the period from January 1, 2007 through October 10, 2007 (predecessor) and the year ended December 31, 2006 (predecessor), in conformity with accounting principles generally accepted in the United States of America.

As discussed in Note 1 to the consolidated financial statements, EFH Corp. completed its merger with Texas Energy Future Merger Sub Corp and became a subsidiary of Texas Energy Future Holdings Limited Partnership on October 10, 2007. In addition, during the year ended December 31, 2008 EFH Corp. adopted the provisions of FASB Staff Position No. FIN 39-1 and reclassified the results of its commodity hedging and trading activities on a retrospective basis. As also discussed in Note 1 to the consolidated financial statements, EFH Corp. adopted SFAS 160 effective January 1, 2009, on a retrospective basis.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the Company's internal control over financial reporting as of December 31, 2008, based on the criteria established in *Internal Control—Integrated Framework* issued by the Committee Sponsoring Organizations of the Treadway Commission and our report dated March 2, 2009 expressed an unqualified opinion on the Company's internal control over financial reporting.

/s/ Deloitte & Touche LLP

Dallas, Texas
March 2, 2009
(May 20, 2009 as to the effects of the retrospective adoption of SFAS 160 as described in Note 1)

F-10

EFIHMW00246088

## ENERGY FUTURE HOLDINGS CORP. AND SUBSIDIARIES

### STATEMENTS OF CONSOLIDATED INCOME (LOSS)
#### (Millions of Dollars)

| | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
| | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, 2006 |
| Operating revenues | $ 11,364 | $ 1,994 | $ 8,044 | $10,703 |
| Fuel, purchased power costs and delivery fees | (4,595) | (644) | (2,381) | (2,784) |
| Net gain (loss) from commodity hedging and trading activities | 2,184 | (1,492) | (554) | 153 |
| Operating costs | (1,503) | (306) | (1,107) | (1,373) |
| Depreciation and amortization | (1,610) | (415) | (634) | (830) |
| Selling, general and administrative expenses | (957) | (216) | (691) | (819) |
| Franchise and revenue-based taxes | (363) | (93) | (282) | (390) |
| Impairment of goodwill (Note 3) | (8,860) | — | — | — |
| Other income (Note 13) | 80 | 14 | 69 | 121 |
| Other deductions (Note 13) | (1,301) | (61) | (841) | (269) |
| Interest income | 27 | 24 | 56 | 46 |
| Interest expense and related charges (Note 28) | (4,935) | (839) | (671) | (830) |
| Income (loss) from continuing operations before income taxes | (10,469) | (2,034) | 1,008 | 3,728 |
| Income tax (expense) benefit | 471 | 673 | (309) | (1,263) |
| Income (loss) from continuing operations | (9,998) | (1,361) | 699 | 2,465 |
| Income from discontinued operations, net of tax effect (Note 4) | — | 1 | 24 | 87 |
| Net income (loss) | (9,998) | (1,360) | 723 | 2,552 |
| Net loss attributable to noncontrolling interests | 160 | — | — | — |
| Net income (loss) attributable to EFH Corp. | $ (9,838) | $(1,360) | $ 723 | $ 2,552 |

See Notes to Financial Statements.

F-11

**ENERGY FUTURE HOLDINGS CORP. AND SUBSIDIARIES**

**STATEMENTS OF CONSOLIDATED COMPREHENSIVE INCOME (LOSS)**
**(Millions of Dollars)**

| | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
| | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, 2006 |
| Net income (loss) . . . . . . . . . . . . . . . . . . . . . | $ (9,998) | $(1,360) | $ 723 | $2,552 |
| Other comprehensive income (loss), net of tax effects: | | | | |
| Reclassification of pension and other retirement benefit costs (net of tax (expense) benefit of $69, $5, $(19) and $—) (Note 22) . . . . . . . . . . . . . . . . . . | (84) | (57) | 49 | — |
| Minimum pension liability adjustments (net of tax (expense) benefit of $—, $—, $— and $(38)) . . . . . . . . . . . . . . . . . . . . | — | — | — | 71 |
| Cash flow hedges: | | | | |
| Net increase (decrease) in fair value of derivatives (net of tax (expense) benefit of $99, $97, $154 and $(321)) . . . . . . . . . . . . . . . . . . . . . | (183) | (177) | (288) | 598 |
| Derivative value net (gains) losses related to hedged transactions recognized during the period and reported in net income (net of tax (expense) benefit of $66, $—, $(48) and $(25)) . . . . . . . . . . . . . . . . . | 122 | — | (89) | (45) |
| Total effect of cash flow hedges . . . . . | (61) | (177) | (377) | 553 |
| Total adjustments to net income (loss) . . . . . . . . | (145) | (234) | (328) | 624 |
| Comprehensive income (loss) . . . . . . . . . . . . . . . . . . | (10,143) | (1,594) | 395 | 3,176 |
| Comprehensive loss attributable to noncontrolling interests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 160 | — | — | — |
| Comprehensive loss attributable to EFH Corp. . . . . . | $ (9,983) | $(1,594) | $ 395 | $3,176 |

See Notes to Financial Statements.

F-12

Confidential

**ENERGY FUTURE HOLDINGS CORP. AND SUBSIDIARIES**

**STATEMENTS OF CONSOLIDATED CASH FLOWS**
**(Millions of Dollars)**

| | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
| | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, 2006 |
| Cash flows—operating activities | | | | |
| Net income (loss) | $(9,998) | $(1,360) | $ 723 | $2,552 |
| Income from discontinued operations, net of tax effect | — | (1) | (24) | (87) |
| Income (loss) from continuing operations | (9,998) | (1,361) | 699 | 2,465 |
| Adjustments to reconcile income from continuing operations to cash provided by operating activities: | | | | |
| Depreciation and amortization | 2,070 | 568 | 684 | 893 |
| Deferred income tax expense (benefit)—net | (477) | (736) | (111) | 756 |
| Impairment of goodwill (Note 3) | 8,860 | — | — | — |
| Impairment of trade name intangible asset (Note 3) | 481 | — | — | — |
| Impairment of emission allowances intangible assets (Note 3) | 501 | — | — | — |
| Impairment of natural gas-fueled generation fleet (Note 6) | 229 | — | — | 198 |
| Charge related to Lehman bankruptcy (Note 13) | 26 | — | — | — |
| Unrealized net losses (gains) from mark-to-market valuations of commodity positions | (2,329) | 1,556 | 722 | (272) |
| Unrealized net losses from mark-to-market valuations of interest rate swaps | 1,477 | — | — | — |
| Bad debt expense | 81 | 12 | 46 | 68 |
| Stock-based incentive compensation expense | 30 | — | 27 | 27 |
| Recognition of losses on dedesignated cash flow hedges | 66 | — | 10 | 12 |
| Customer appreciation bonus charge (net of amounts credited to customers in 2006) (Note 7) | — | — | — | 122 |
| Net charges related to cancelled development of generation facilities (Note 5) | — | 2 | 676 | — |
| Write-off of deferred transaction costs (Note 13) | — | — | 38 | — |
| Credit related to impaired leases (Note 13) | — | — | (48) | (2) |
| Net gains on sale of assets, including amortization of deferred gains | (1) | (1) | (40) | (69) |
| Other, net | (20) | 5 | 19 | 16 |
| Changes in operating assets and liabilities: | | | | |
| Accounts receivable—trade | (505) | 309 | (200) | 337 |
| Impact of accounts receivable sales program (Note 14) | 53 | (336) | 72 | (44) |
| Inventories | (21) | (5) | (7) | (21) |
| Accounts payable—trade | 385 | (264) | 81 | (219) |
| Commodity and other derivative contractual assets and liabilities | (28) | 18 | (185) | — |
| Margin deposits—net | 595 | (614) | (569) | 564 |
| Other—net assets | 440 | 284 | (89) | (92) |
| Other—net liabilities | (410) | 113 | 440 | 215 |
| Cash provided by (used in) operating activities from continuing operations | $ 1,505 | $ (450) | $2,265 | $4,954 |

See Notes to Financial Statements.

F-13

ENERGY FUTURE HOLDINGS CORP. AND SUBSIDIARIES

STATEMENTS OF CONSOLIDATED CASH FLOWS (CONT.)

(Millions of Dollars)

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, 2006 |
| Cash flows—financing activities | | | | |
| Issuances of securities/long-term borrowings (Note 15): | | | | |
| Equity financing from Sponsor Group and other investors | $    — | $  8,236 | $    — | $    — |
| Merger-related debt financing | — | 42,732 | 1,800 | — |
| Pollution control revenue bonds | 242 | — | — | 243 |
| Oncor long-term debt | 1,500 | — | — | — |
| Other long-term debt | 1,443 | — | — | — |
| Common stock | 34 | — | 1 | 180 |
| Retirements/repurchases of securities/long-term borrowings (Note 15): | | | | |
| Equity-linked debt | — | — | — | (179) |
| Pollution control revenue bonds | (242) | — | (143) | (259) |
| Merger-related debt repurchases | — | (15,314) | — | — |
| Other long-term debt | (925) | (81) | (302) | (1,253) |
| Common stock | (3) | — | (13) | (960) |
| Increase (decrease) in short-term borrowings (Note 15): | | | | |
| Banks | (481) | (722) | 2,245 | (245) |
| Commercial paper | — | — | (1,296) | 939 |
| Proceeds from sale of noncontrolling interests, net of transaction costs (Note 18) | 1,253 | — | — | — |
| Common stock dividends paid | — | — | (788) | (764) |
| Settlements of minimum withholding tax liabilities under stock-based compensation plans | — | — | (93) | (52) |
| Excess tax benefit on stock-based incentive compensation | — | — | — | 41 |
| Debt discount, financing and reacquisition expenses | (21) | (986) | (17) | (23) |
| Other | 37 | — | — | — |
| Cash provided by (used in) financing activities from continuing operations | $ 2,837 | $ 33,865 | $ 1,394 | $(2,332) |
| Cash flows—investing activities | | | | |
| Acquisition of EFH Corp. | — | (32,694) | — | — |
| Capital expenditures | (2,812) | (684) | (2,341) | (2,180) |
| Nuclear fuel purchases | (166) | (23) | (54) | (117) |
| Investment held in money market fund (Note 1) | (142) | — | — | — |
| Purchase of mining-related assets | — | — | (122) | — |
| Proceeds from sale of assets | 80 | 86 | 71 | 20 |
| Proceeds from sale of environmental allowances and credits | 39 | — | — | — |
| Purchases of environmental allowances and credits | (34) | — | — | — |
| Purchase of lease trust | — | — | — | (69) |
| Proceeds from letter of credit facility deposited with trustee (restricted cash) (Note 15) | — | (1,250) | — | — |
| Proceeds from pollution control revenue bonds (deposited) withdrawn from trustee (restricted cash) | 29 | 13 | 202 | (240) |
| Other changes in restricted cash | 1 | 14 | (16) | — |
| Cash settlements related to outsourcing contract termination (Note 21) | 70 | — | — | — |
| Proceeds from sales of nuclear decommissioning trust fund securities | 1,623 | 831 | 602 | 207 |
| Investments in nuclear decommissioning trust fund securities | (1,639) | (835) | (614) | (223) |
| Costs to remove retired property | (37) | (9) | (25) | (40) |
| Settlement of loan (Note 21) | 25 | — | — | — |
| Other | 29 | (12) | 14 | (22) |
| Cash used in investing activities from continuing operations | $(2,934) | $(34,563) | $(2,283) | $(2,664) |

F-14

EFIHMW00246092

## ENERGY FUTURE HOLDINGS CORP. AND SUBSIDIARIES

## STATEMENTS OF CONSOLIDATED CASH FLOWS (CONT.)
### (Millions of Dollars)

| | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
| | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, 2006 |
| Discontinued operations: | | | | |
| Cash provided by (used in) operating activities . . . . . . . . . | — | (7) | 35 | 30 |
| Cash used in financing activities . . . . . . . . . . . . . . . . . . . | — | — | — | — |
| Cash provided by (used in) investing activities . . . . . . . . . | — | — | — | — |
| Cash provided by (used in) discontinued operations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | (7) | 35 | 30 |
| Net change in cash and cash equivalents . . . . . . . . . . . . . . . . . | 1,408 | (1,155) | 1,411 | (12) |
| Cash and cash equivalents—beginning balance . . . . . . . . . . . . . | 281 | 1,436 | 25 | 37 |
| Cash and cash equivalents—ending balance . . . . . . . . . . . . . . | $1,689 | $   281 | $1,436 | $ 25 |

See Notes to Financial Statements.

F-15

EFIHMW00246093

**ENERGY FUTURE HOLDINGS CORP. AND SUBSIDIARIES**

**CONSOLIDATED BALANCE SHEETS**

**(Millions of Dollars)**

| | Successor | |
|---|---|---|
| | December 31, 2008 | December 31, 2007 |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents ................................................ | $ 1,689 | $   281 |
| Investments held in money market fund (Note 1) ........................... | 142 | —— |
| Restricted cash (Note 28) ................................................ | 55 | 56 |
| Trade accounts receivable—net (Note 14) ................................. | 1,219 | 1,099 |
| Income taxes receivable—net ............................................. | 42 | 101 |
| Inventories (Note 28) .................................................... | 426 | 405 |
| Commodity and other derivative contractual assets (Note 19) ................. | 2,534 | 1,129 |
| Accumulated deferred income taxes (Note 12) .............................. | 44 | 9 |
| Margin deposits related to commodity positions ........................... | 439 | 513 |
| Other current assets .................................................... | 165 | 376 |
| Total current assets ................................................ | 6,755 | 3,969 |
| Restricted cash (Note 28) ................................................ | 1,267 | 1,296 |
| Investments (Note 20) ................................................... | 645 | 868 |
| Property, plant and equipment—net (Note 28) ............................. | 29,522 | 28,650 |
| Goodwill (Note 3) ....................................................... | 14,386 | 22,954 |
| Intangible assets—net (Note 3) .......................................... | 2,993 | 4,365 |
| Regulatory assets—net (Note 28) ......................................... | 1,892 | 1,305 |
| Commodity and other derivative contractual assets (Note 19) ................. | 962 | 244 |
| Other noncurrent assets, principally unamortized debt issuance costs ........... | 841 | 1,130 |
| Assets held for sale ..................................................... | —— | 23 |
| Total assets ....................................................... | $59,263 | $64,804 |
| **LIABILITIES AND EQUITY** | | |
| Current liabilities: | | |
| Short-term borrowings (Note 15) ......................................... | $ 1,237 | $ 1,718 |
| Long-term debt due currently (Note 15) .................................... | 385 | 513 |
| Trade accounts payable .................................................. | 1,143 | 904 |
| Commodity and other derivative contractual liabilities (Note 19) ............. | 2,908 | 1,146 |
| Margin deposits related to commodity positions ........................... | 525 | 5 |
| Accrued interest ......................................................... | 524 | 537 |
| Other current liabilities ................................................. | 612 | 879 |
| Total current liabilities .............................................. | 7,334 | 5,702 |
| Accumulated deferred income taxes (Note 12) .............................. | 5,926 | 6,664 |
| Investment tax credits ................................................... | 42 | 47 |
| Commodity and other derivative contractual liabilities (Note 19) ............. | 2,095 | 2,453 |
| Long-term debt, less amounts due currently (Note 15) ...................... | 40,838 | 38,603 |
| Other noncurrent liabilities and deferred credits (Note 28) .................. | 5,205 | 4,650 |
| Total liabilities .................................................... | 61,440 | 58,119 |
| Commitments and Contingencies (Note 16) | | |
| Equity (Note 17): | | |
| EFH Corp. shareholders' equity ....................................... | (3,532) | 6,685 |
| Noncontrolling interests in subsidiaries ................................ | 1,355 | —— |
| Total equity ............................................................ | (2,177) | 6,685 |
| Total liabilities and equity ........................................... | $59,263 | $64,804 |

See Notes to Financial Statements.

F-16

EFIHMW00246094

## ENERGY FUTURE HOLDINGS CORP. AND SUBSIDIARIES

### STATEMENTS OF CONSOLIDATED EQUITY
#### (Millions of Dollars)

| | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
| | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, 2006 |
| Common stock without par value (number of authorized shares — Successor—2,000,000,000; Predecessor—1,000,000,000): | | | | |
| Balance at beginning of period | $ — | $ — | $ 5 | $ 5 |
| Balance at end of period (number of shares outstanding: Successor: 2008—1,667,149,663; 2007—1,664,345,953; Predecessor: October 10, 2007—461,152,009; 2006—459,244,523) | — | — | 5 | 5 |
| Additional paid-in capital: | | | | |
| Balance at beginning of period | 8,279 | — | 1,104 | 1,840 |
| Investment by Sponsor Group and other investors | — | 8,279 | — | — |
| Effects of stock-based incentive compensation plans | 29 | — | (66) | 27 |
| Effect of sale of noncontrolling interests (Note 18) | (265) | — | — | — |
| Common stock repurchases | — | — | (13) | (1,012) |
| Excess tax benefit on stock-based compensation | — | — | 82 | 41 |
| Issuance of shares under equity-linked debt securities | — | — | — | 180 |
| Cost of Thrift Plan shares released by LESOP trustee (Note 22) | — | — | 210 | 2 |
| Effects of executive deferred compensation plan | — | — | 11 | 13 |
| Other | 2 | — | (2) | 13 |
| Balance at end of period | 8,045 | 8,279 | 1,326 | 1,104 |
| Retained earnings (deficit): | | | | |
| Balance at beginning of period | (1,360) | — | 622 | (1,168) |
| Net income (loss) | (9,838) | (1,360) | 723 | 2,552 |
| Dividends declared on common stock ($-, $-, $1.30 and $1.67 per share) | — | — | (596) | (768) |
| Effect of adoption of FIN 48 (Note 10) | — | — | 33 | — |
| LESOP dividend deduction tax benefit and other | — | — | 3 | 6 |
| Balance at end of period | (11,198) | (1,360) | 785 | 622 |
| Accumulated other comprehensive gain (loss), net of tax effects: | | | | |
| Pension and other postretirement employee benefit liability adjustments: | | | | |
| Balance at beginning of period | (57) | — | (2) | (60) |
| Change in unrecognized gains (losses) related to pension and other retirement benefit costs | (84) | (57) | 49 | — |
| Change in minimum pension liability | — | — | — | 71 |
| SFAS 158 transition adjustment | — | — | — | (13) |
| Balance at end of period | (141) | (57) | 47 | (2) |
| Amounts related to cash flow hedges: | | | | |
| Balance at beginning of period | (177) | — | 411 | (142) |
| Change during the period | (61) | (177) | (377) | 553 |
| Balance at end of period | (238) | (177) | 34 | 411 |
| Total accumulated other comprehensive gain (loss) at end of period | (379) | (234) | 81 | 409 |
| EFH Corp. shareholders' equity at end of period (Note 17) | (3,532) | 6,685 | 2,197 | 2,140 |
| Noncontrolling interests in subsidiaries (Note 18): | | | | |
| Balance at beginning of period | — | — | — | — |
| Net loss | (160) | — | — | — |
| Investment | 1,253 | — | — | — |
| Effect of sale of noncontrolling interests (Note 18) | 265 | — | — | — |
| Distributions to noncontrolling interests | (2) | — | — | — |
| Other | (1) | — | — | — |
| Noncontrolling interests in subsidiaries at end of period | 1,355 | — | — | — |
| Total equity at end of period | $ (2,177) | $ 6,685 | $2,197 | $ 2,140 |

See Notes to Financial Statements.

F-17

Confidential

ENERGY FUTURE HOLDINGS CORP. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

1.    BUSINESS AND SIGNIFICANT ACCOUNTING POLICIES

*Description of Business*

EFH Corp., a Texas corporation, is a Dallas-based holding company conducting its operations principally through its TCEH and Oncor subsidiaries. TCEH is a holding company for subsidiaries engaged in competitive electricity market activities largely in Texas including electricity generation, development and construction of new generation facilities, wholesale energy sales and purchases, commodity risk management and trading activities, and retail electricity sales. Oncor is engaged in regulated electricity transmission and distribution operations in Texas.

On October 10, 2007, EFH Corp. completed its Merger with Merger Sub. As a result of the Merger, EFH Corp. became a subsidiary of Texas Holdings, which is controlled by the Sponsor Group.

Various "ring-fencing" measures have been taken, in connection with the Merger, to enhance the credit quality of Oncor. Such measures include, among other things: the formation of a new special purpose holding company for Oncor, Oncor Holdings, as one of the Oncor Ring-Fenced Entities; the conversion of Oncor from a corporation to a limited liability company; maintenance of separate books and records for the Oncor Ring-Fenced Entities; changes to Oncor's corporate governance provisions; appointment of a majority of independent directors to Oncor's board of directors, and prohibitions on the Oncor Ring-Fenced Entities providing credit support to, or receiving credit support from, any member of the Texas Holdings Group. The assets and liabilities of the Oncor Ring-Fenced Entities are separate and distinct from those of the Texas Holdings Group and none of the assets of the Oncor Ring-Fenced Entities are available to satisfy the debt or other obligations of any member of the Texas Holdings Group. Moreover, the cash flows of the Oncor Ring-Fenced Entities and their results of operations are separate from those of the Texas Holdings Group. Oncor Holdings is consolidated with EFH Corp. as a variable interest entity under FIN 46R.

See Note 18 for discussion of noncontrolling interests sold by Oncor in November 2008.

EFH Corp. has two reportable segments: the Competitive Electric segment, which includes the activities of TCEH as well as equipment salvage and resale activities related to the 2007 cancelled development of new generation facilities, and the Regulated Delivery segment, which includes the activities of Oncor, its wholly-owned bankruptcy-remote financing subsidiary and, in 2007, certain revenues and costs associated with installation of equipment that will facilitate Oncor's technology initiatives. See Note 27 for further information concerning reportable business segments.

*Basis of Presentation*

The consolidated financial statements of EFH Corp. have been prepared in accordance with US GAAP. The accompanying consolidated statements of income (loss), comprehensive income (loss) and cash flows present results of operations and cash flows of EFH Corp. for "Successor" and "Predecessor" periods, which relate to periods succeeding and preceding the Merger, respectively. The consolidated financial statements have been prepared on the same basis as the audited financial statements included in EFH Corp.'s 2007 Form 10-K, with the exception of a change to discontinue the netting of derivative assets and liabilities under master netting agreements as allowed under FSP FIN 39-1, a change in classification to report the results of commodity hedging and trading activities on a separate line item in the income statement instead of within operating revenues, as discussed immediately below, a change in the presentation of amounts attributable to noncontrolling interests in the financials statements pursuant to adoption of SFAS 160 as discussed in "Changes in Accounting Standards" below, and certain reclassifications in the statements of consolidated comprehensive income (loss) to conform to current period presentation. The consolidated financial statements of the Successor reflect the application of

F-18

EFIHMW00246096

purchase accounting in accordance with the provisions of SFAS 141, include the activities of Merger Sub, all of which related to the acquisition of EFH Corp., and reflect the adoption of SFAS 157. All intercompany items and transactions have been eliminated in consolidation. All dollar amounts in the financial statements and tables in the notes are stated in millions of US dollars unless otherwise indicated.

*Change in Classification of Results from Commodity Hedging and Trading Activities*—Effective April 1, 2008, EFH Corp. changed its classification of realized and unrealized net gains and losses from commodity hedging and trading activities such that the results from these activities are reported as a separate line on the income statement. Prior to April 1, 2008, such amounts were included within operating revenues. EFH Corp. believes this change in classification provides users of the financial statements better transparency of underlying revenue trends. Results from commodity hedging and trading activities are volatile as a substantial majority of the activity involves natural gas financial instruments, which are used to economically hedge future cash flows from electricity sales and are marked-to-market in net income. Comparative financial statements of prior periods reflect this reclassification. The following table presents EFH Corp.'s operating revenues as reported in the 2007 Form 10-K and reflects the change in classification. There is no effect on reported earnings, the balance sheet or the statement of cash flows as a result of this change in presentation.

| | Successor | | Predecessor | | | |
|---|---|---|---|---|---|---|
| | As Originally Reported | As Reclassified | As Originally Reported | As Reclassified | As Originally Reported | As Reclassified |
| | Period from October 11, 2007 through December 31, 2007 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, 2006 | Year Ended December 31, 2006 |
| Operating revenues . . . . | $   502 | $ 1,994 | $7,490 | $8,044 | $10,856 | $10,703 |
| Net gain (loss) from commodity hedging and trading activities . . . . . . . . . | n/a | (1,492) | n/a | (554) | n/a | 153 |
| Income (loss) from continuing operations . . . . . . . . | (1,361) | (1,361) | 699 | 699 | 2,465 | 2,465 |

## Discontinued Businesses

Note 4 presents detailed information regarding the effects of discontinued businesses, the results of which have been classified as discontinued operations.

## Use of Estimates

Preparation of EFH Corp.'s financial statements requires management to make estimates and assumptions about future events that affect the reporting of assets and liabilities at the balance sheet dates and the reported amounts of revenue and expense, including fair value measurements. In the event estimates and/or assumptions prove to be different from actual amounts, adjustments are made in subsequent periods to reflect more current information. No material adjustments, other than those disclosed elsewhere herein, were made to previous estimates or assumptions during the current year.

## Purchase Accounting

The Merger has been accounted for under purchase accounting, whereby the total purchase price of the transaction was allocated to EFH Corp.'s identifiable tangible and intangible assets acquired and liabilities assumed based on their fair values, and the excess of the purchase price over the fair value of net assets acquired was recorded as goodwill. The allocation resulted in a significant amount of goodwill, an increase in the carrying value of property, plant and equipment and deferred income tax liabilities as well as new identifiable intangible assets and liabilities. Reported earnings in periods subsequent to the Merger reflect increases in interest, depreciation and amortization expense. See Note 2 for details regarding the effect of purchase accounting.

F-19

Confidential

*Derivative Instruments and Mark-to-Market Accounting*

EFH Corp. enters into contracts for the purchase and sale of electricity, natural gas and other commodities and also enters into other derivative instruments such as options, swaps, futures and forwards primarily to manage commodity price and interest rate risks. If the instrument meets the definition of a derivative under SFAS 133, changes in the fair value of the derivative are recognized in net income as unrealized gains and losses, unless the criteria for certain exceptions are met, and an offsetting derivative asset or liability is recorded in the balance sheet. This recognition is referred to as "mark-to-market" accounting. The fair values of EFH Corp.'s unsettled derivative instruments under mark-to-market accounting are reported in the balance sheet as commodity and other derivative contractual assets or liabilities. When derivative instruments are settled and realized gains and losses are recorded, the previously recorded unrealized gains and losses and derivative assets and liabilities are reversed. See Note 19 and 24 for additional information regarding commodity and other derivative contractual assets and liabilities and fair value measurement. Under the election criteria of SFAS 133, EFH Corp. may elect the "normal" purchase and sale exemption. A commodity-related derivative contract may be designated as a "normal" purchase or sale if the commodity is to be physically received or delivered for use or sale in the normal course of business. If designated as normal, the derivative contract is accounted for under the accrual method of accounting (not marked-to-market) with no balance sheet or income statement recognition of the contract until settlement.

Because derivative instruments are frequently used as economic hedges, SFAS 133 allows the designation of such instruments as cash flow or fair value hedges provided certain conditions are met. A cash flow hedge mitigates the risk associated with the variability of the future cash flows related to an asset or liability (e.g., a forecasted sale of electricity in the future at market prices or the payment of interest related to variable rate debt), while a fair value hedge mitigates risk associated with fixed future cash flows (e.g., debt with fixed interest rate payments). In accounting for changes in the fair value of cash flow hedges, derivative assets and liabilities are recorded on the balance sheet with an offset to other comprehensive income or loss to the extent the hedges are effective and the hedged transaction remains probable of occurring. If the hedged transaction becomes probable of not occurring, hedge accounting is discontinued and the amount recorded in other comprehensive income is immediately reclassified into net income. If the relationship between the hedge and the hedged transaction ceases to exist or is dedesignated, hedge accounting is discontinued, and the amounts recorded in other comprehensive income are recognized as the previously hedged transaction impacts earnings. Changes in value of fair value hedges are recorded as derivative assets or liabilities with an offset to net income, and the carrying value of the related asset or liability (hedged item) is adjusted for changes in fair value with an offset to net income. If the fair value hedge is settled prior to the maturity of the hedged item, the cumulative fair value gain or loss associated with the hedge is amortized into income over the remaining life of the hedged item. In the statement of cash flow, the effects of settlements of derivative instruments are classified consistent with the related hedged transactions.

To qualify for hedge accounting, a hedge must be considered highly effective in offsetting changes in fair value of the hedged item. Assessment of the hedge's effectiveness is tested at least quarterly throughout its term to continue to qualify for hedge accounting. Changes in fair value that represent hedge ineffectiveness, even if the hedge continues to be assessed as effective, are immediately recognized in net income. Ineffectiveness is generally measured as the cumulative excess, if any, of the change in value of the hedging instrument over the change in value of the hedged item. See Notes 15 and 19 for additional information concerning hedging activity.

Realized and unrealized gains and losses from transacting in energy-related derivative instruments are primarily reported in the income statement in net gain (loss) from commodity hedging and trading activities. In accordance with accounting rules, realized gains and losses associated with physically settled sales and purchase derivative instruments are reported in revenues and fuel, purchased power costs and delivery fees.

*Revenue Recognition*

EFH Corp. records revenue from electricity sales and delivery service under the accrual method of accounting. Revenues are recognized when electricity or delivery services are provided to customers on the basis of periodic cycle meter readings and include an estimated accrual for the revenues earned from the meter reading date to the end of the period (unbilled revenue).

Confidential

EFH Corp.'s reported revenues include, on a net basis, ERCOT electricity balancing transactions, which represent wholesale purchases and sales of electricity for real-time balancing purposes as measured in 15-minute intervals. As is industry practice, these purchases and sales with ERCOT, as the balancing energy clearinghouse agent, are reported net in the income statement. Although difficult to predict, it is expected that the balancing activity will frequently result in net revenues due in part to generation volumes exceeding retail load. EFH Corp. believes that presentation of this activity as a component of revenues more appropriately reflects EFH Corp.'s market position.

### Impairment of Long-Lived Assets

EFH Corp. evaluates long-lived assets (including intangible assets with finite lives) for impairment whenever indications of impairment exist in accordance with the requirements of SFAS 144. The carrying value of such assets is deemed to be impaired if the projected undiscounted cash flows are less than the carrying value. If there is such impairment, a loss would be recognized based on the amount by which the carrying value exceeds the fair value. Fair value is determined primarily by discounted cash flows, supported by available market valuations, if applicable. See Note 6 for details of the impairment of the natural gas-fueled generation fleet recorded in 2008 and 2006.

Finite-lived intangibles identified as a result of purchase accounting are amortized over their estimated useful lives based on the expected realization of economic effects. See Note 3 to Financial Statements for additional information.

### Goodwill and Intangible Assets with Indefinite Lives

EFH Corp. evaluates goodwill and intangible assets with indefinite lives for impairment at least annually (as of October 1) in accordance with SFAS 142, "Goodwill and Other Intangible Assets." The impairment tests performed are based on discounted cash flow analyses. See Note 3 for details of goodwill and intangible assets with indefinite lives, including discussion of goodwill and trade name intangible assets impairments recorded in 2008.

### Amortization of Nuclear Fuel

Amortization of nuclear fuel is calculated on the units-of-production method and is reported as fuel costs.

### Major Maintenance

Major maintenance costs incurred during generation plant outages and the costs of other maintenance activities are charged to expense as incurred. This accounting is consistent with FASB Staff Position AUG AIR-1, "Accounting for Planned Major Maintenance Activities."

### Defined Benefit Pension Plans and Other Postretirement Employee Benefit Plans

EFH Corp. offers pension benefits based on either a traditional defined benefit formula or a cash balance formula and also offers certain health care and life insurance benefits to eligible employees and their eligible dependents upon the retirement of such employees from EFH Corp. Costs of pension and OPEB plans are determined in accordance with SFAS 87 and SFAS 106 and are dependent upon numerous factors, assumptions and estimates. Effective December 31, 2006, EFH Corp. adopted SFAS 158. See Note 22 for additional information regarding pension and OPEB plans.

### Stock-Based Incentive Compensation

Prior to the Merger, EFH Corp. provided discretionary awards payable in its common stock to qualified managerial employees under its shareholder-approved long-term incentive plans. These awards were accounted for based on the provisions of SFAS 123R, which provides for the recognition of stock-based compensation expense over the vesting period based on the grant-date fair value of those awards. In December 2007, EFH Corp.'s board of directors established its 2007 Stock Incentive Plan, which authorizes discretionary grants to

F-21

EFIHMW00246099

directors, officers and qualified managerial employees of EFH Corp. or its affiliates of non-qualified stock options, stock appreciation rights, restricted shares, shares of common stock, the opportunity to purchase shares of common stock and other stock-based awards. Stock options and stock appreciation rights granted are being accounted for based upon the provisions of SFAS 123R. See Note 23 for information regarding stock-based incentive compensation.

### Sales and Excise Taxes

Sales and excise taxes are accounted for as a "pass through" item on the balance sheet; i.e., the tax is billed to customers and recorded as trade accounts receivable with an offsetting amount recorded as a liability to the taxing jurisdiction.

### Franchise and Revenue-Based Taxes

Unlike sales and excise taxes, franchise and gross receipt taxes are not a "pass through" item. These taxes are assessed to EFH Corp. by state and local government bodies, based on revenues or kWh delivered, as a cost of doing business and are recorded as an expense. Rates charged to customers by EFH Corp. are intended to recover the taxes, but EFH Corp. is not acting as an agent to collect the taxes from customers.

### Income Taxes

EFH Corp. files a consolidated federal income tax return, and federal income taxes are allocated substantially as if the entities were stand-alone corporations. Deferred income taxes are provided for temporary differences between the book and tax basis of assets and liabilities. Effective with the sale of noncontrolling interests in Oncor (see Note 18), Oncor became a partnership for US federal income tax purposes, and EFH Corp. provides deferred income taxes on the difference between the book and tax basis of its investment in Oncor. Previously earned investment tax credits were deferred and amortized as a reduction of income tax expense over the estimated lives of the related properties. In connection with purchase accounting, the remaining unamortized investment tax credit amount related to unregulated businesses of $300 million was eliminated. Investment tax credits related to Oncor's regulated operations will continue to be amortized over the lives of the related properties. Certain provisions of SFAS 109 provide that regulated enterprises are permitted to recognize deferred taxes as regulatory tax assets or tax liabilities if it is probable that such amounts will be recovered from, or returned to, customers in future rates.

Prior to 2007, EFH Corp. generally accounted for uncertainty related to positions taken on tax returns based on the probable liability approach consistent with SFAS 5. Effective January 1, 2007, the company adopted FIN 48 as discussed in Note 10.

### Accounting for Contingencies

The financial results of EFH Corp. may be affected by judgments and estimates related to loss contingencies. Accruals for loss contingencies are recorded when management determines that it is probable that an asset has been impaired or a liability has been incurred and that such economic loss can be reasonably estimated. Such determinations are subject to interpretations of current facts and circumstances, forecasts of future events and estimates of the financial impacts of such events. See Note 16 for a discussion of contingencies.

### Cash and Cash Equivalents

For purposes of reporting cash and cash equivalents, temporary cash investments purchased with a remaining maturity of three months or less are considered to be cash equivalents.

EFH Corp. held an interest in The Reserve's US Government Fund, which began liquidation proceedings in September 2008 due to the credit crisis and withdrawal demands. In September 2008, EFH Corp. attempted to redeem its interest, totaling $242 million, in the US Government Fund, but due to the liquidation process, the

Confidential

EFIHMW00246100

funds were not immediately made available; accordingly, such amount was reclassified from cash and cash equivalents to investment held in money market fund. EFH Corp. received $100 million of the funds in November 2008 and the remaining $142 million in January 2009.

*Restricted Cash*

The terms of certain agreements require the restriction of cash for specific purposes. At December 31, 2008, $1.250 billion of cash is restricted to support letters of credit. See Note 15 and 28 for more details regarding this and other restricted cash.

*Property, Plant and Equipment*

As a result of purchase accounting, carrying amounts of property, plant and equipment related to unregulated businesses at October 10, 2007 were adjusted to estimated fair values. Subsequent additions are recorded at cost. Regulated properties at Oncor continue to be reported at original cost, which is considered to be fair value due to the cost-based regulated returns associated with those assets. The cost of self-constructed property additions includes materials and both direct and indirect labor and applicable overhead, including payroll-related costs.

Depreciation of EFH Corp's property, plant and equipment is calculated on a straight-line basis over the estimated service lives of the properties. As is common in the industry, the Predecessor historically recorded depreciation expense using composite depreciation rates that reflect blended estimates of the lives of major asset components as compared to depreciation expense calculated on an asset-by-asset basis. Effective with the Merger, depreciation expense for unregulated properties is calculated on an asset-by-asset basis. Estimated depreciable lives are based on management's estimates of the assets' economic useful lives.

*Capitalized Interest and Allowance for Funds Used During Construction (AFUDC)*

Interest related to qualifying construction projects and qualifying software projects are capitalized in accordance with SFAS 34. Oncor capitalizes AFUDC as a cost component of projects involving construction periods lasting greater than thirty days. AFUDC is a regulatory cost accounting procedure whereby both interest charges on borrowed funds and a return on equity capital used to finance construction are included in the recorded cost of utility plant and equipment being constructed. The equity portion of capitalized AFUDC is accounted for as other income; there was no equity AFUDC for the years presented. See Note 28.

*Inventories*

All inventories are reported at the lower of cost (on a weighted average basis) or market unless expected to be used in the generation of electricity. In connection with purchase accounting, inventory amounts at October 10, 2007 were recorded at fair value. Also see discussion immediately below regarding environmental allowances and credits.

*Environmental Allowances and Credits*

Effective with the Merger, EFH Corp. began accounting for all environmental allowances and credits as identifiable intangible assets with finite lives that are subject to amortization. The recorded values of these intangible assets were originally established reflecting fair value determinations as of the date of the Merger under purchase accounting. Amortization expense associated with these intangible assets is recognized on a unit of production basis as the allowances or credits are consumed in generation operations. In accordance with SFAS 144, the environmental allowances and credits are assessed for impairment when conditions or events occur that could affect the carrying value of the assets. See Note 3 for details of impairment amounts recorded in 2008. EFH Corp. previously accounted for environmental allowances and credits as inventory. Both accounting methods are acceptable under GAAP.

F-23

EFIHMW00246101

*Regulatory Assets and Liabilities*

The financial statements of EFH Corp.'s regulated electricity delivery operations reflect regulatory assets and liabilities under cost-based rate regulation in accordance with SFAS 71. The assumptions and judgments used by regulatory authorities continue to have an impact on the recovery of costs, the rate earned on invested capital and the timing and amount of assets to be recovered by rates. See Note 28 for details of the regulatory assets and liabilities.

*Investments*

Investments in a nuclear decommissioning trust fund are carried at market value in the balance sheet. Investments in unconsolidated business entities over which EFH Corp. has significant influence but does not maintain effective control, generally representing ownership of at least 20% and not more than 50% of common equity, are accounted for under the equity method. Assets related to employee benefit plans represent investments held to satisfy deferred compensation liabilities and are recorded at market value. See Note 20 for details of investments.

*Sale of Noncontrolling Interests*

See Note 18 for discussion of accounting for the sale of noncontrolling interests by Oncor.

*Changes in Accounting Standards*

In December 2007, the FASB issued SFAS 160, "Noncontrolling Interests in Consolidated Financial Statements—an amendment of ARB No. 51." SFAS 160 was effective for fiscal years beginning on or after December 15, 2008 and required noncontrolling interests (previously called minority interests) in subsidiaries initially to be measured at fair value and classified as a separate component of equity. In accordance with the retrospective reporting requirements of SFAS 160, the financial statements present the noncontrolling interests created as a result of Oncor's November 2008 sale of equity interests (see Note 18) as a separate component of equity in the consolidated balance sheet (totaling $1.355 billion as of December 31, 2008), consolidated net loss for the year ended December 31, 2008 reflects the net loss attributable to the noncontrolling interests as a line item below net loss (totaling $160 million) as compared to the previous presentation as a line item above net loss and the net proceeds received from Oncor's sale of the noncontrolling interests are reflected in the statement of consolidated cash flows as a financing activity as compared to previous presentation as an investing activity.

Effective January 1, 2008, EFH Corp. adopted FSP FIN 39-1, "Amendment of FASB Interpretation No. 39." This FSP provides additional guidance regarding the offsetting in the balance sheet of cash collateral and derivative fair value asset and liability amounts. As provided for by this rule, for balance sheet presentation, EFH Corp. elected to not adopt netting of cash collateral, and further to discontinue netting of derivative assets and liabilities under master netting agreements. Accordingly, as required by the rule, prior period amounts in the financial statements reflect the change in presentation, resulting in an increase of $849 million and $171 million in both commodity and other derivative contractual current and noncurrent assets and liabilities, respectively, at December 31, 2007 compared to amounts reported in the 2007 Form 10-K.

In March 2008, the FASB issued SFAS 161, "Disclosures about Derivative Instruments and Hedging Activities—an Amendment of FASB Statement 133." SFAS 161 enhances required disclosures regarding derivatives and hedging activities to enable investors to better understand their effects on an entity's financial position, financial performance and cash flows. This statement is effective for fiscal years and interim periods beginning after November 15, 2008, with early application encouraged. As SFAS 161 provides only disclosure requirements, the adoption of this standard will not have any effect on EFH Corp.'s reported results of operations or financial condition. EFH Corp. will provide the enhanced disclosures in its Form 10-Q for the three months ended March 31, 2009.

Confidential

In October 2008, the FASB issued FSP SFAS 157-3, "Determining the Fair Value of a Financial Asset When the Market for That Asset is Not Active." The FSP clarifies the application of SFAS 157 in a market that is not active and provides an example to illustrate key considerations in determining the fair value of a financial asset when the market for that financial asset is not active. The FSP does not change the fair value measurement principles in SFAS 157. The FSP was effective upon issuance, including prior periods for which financial statements had not been issued. EFH Corp. has determined this FSP does not change its approach for measuring fair value of financial assets.

Effective December 31, 2008, EFH Corp. adopted FSP SFAS 140-4 and FIN 46(R)-8, "Disclosures by Public Entities (Enterprises) about Transfers of Financial Assets and Interests in Variable Interest Entities." This FSP amends SFAS 140, "Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities" to require additional disclosures about transfers of financial assets. It also amends FIN 46R, "Consolidation of Variable Interest Entities," to require additional disclosures about an entity's involvement with variable interest entities. The disclosures required by this FSP are intended to provide greater transparency about a transferor's continuing involvement with transferred financial assets and an entity's involvement with variable interest entities and qualifying special purpose entities (SPEs). As the FSP provides only disclosure requirements, the adoption of this FSP did not have any effect on EFH Corp.'s reported results of operations, financial condition or cash flows. See Note 14 for related disclosures.

In December 2008, the FASB issued FSP SFAS 132(R)-1, "Employers' Disclosures about Postretirement Benefit Plan Assets." This FSP amends SFAS 132(R) to provide enhanced disclosures regarding how investment allocation decisions are made and certain aspects of fair value measurements on plan assets. The disclosures required by this FSP are intended to provide transparency related to the types of assets and associated risks in an employer's defined benefit pension or other postretirement employee benefits plan and events in the economy and markets that could have a significant effect on the value of plan assets. This FSP is effective for fiscal years ending after December 15, 2009. As the FSP provides only disclosure requirements, the adoption of this FSP will not have any effect on EFH Corp.'s reported results of operations, financial condition or cash flows. EFH Corp. is evaluating the impact of this FSP on its financial statement disclosures.

## 2.  FINANCIAL STATEMENT EFFECTS OF THE MERGER

As discussed in Note 1, the Merger was completed on October 10, 2007. The aggregate purchase price paid for the equity securities of EFH Corp. was $31.9 billion, which was financed by a combination of equity invested by the Sponsor Group and certain other investors and by borrowings under a senior secured credit facility and senior unsecured interim facilities. These facilities also funded the repayment and redemption of certain existing credit facilities and debt upon completion of the Merger. See Note 15 for a discussion of EFH Corp.'s debt.

The statements of consolidated income (loss) and cash flows for 2007 present Predecessor results from January 1 through October 10 and Successor results from October 11 through December 31.

### *Sources and Uses*

The sources and uses of the funds for the Merger are summarized in the table below.

| Sources of funds: | | Uses of funds: | |
|---|---|---|---|
| (billions of dollars) | | | |
| Cash and other sources . . . . . . . . . . . . . . . . . . . | $ 0.3 | Equity purchase price (b) . . . . . . . . . . . . . . . . | $31.9 |
| TCEH credit facilities (Note 15) . . . . . . . . . . . . | 27.0 | Transaction costs (c) . . . . . . . . . . . . . . . . . . . . | 0.8 |
| EFH Corp. senior unsecured interim facility | | Repayment of existing debt (Note 15) . . . . . . | 5.3 |
| (Note 15) . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4.5 | | |
| Equity contributions (a) . . . . . . . . . . . . . . . . . . | 8.3 | Restricted cash . . . . . . . . . . . . . . . . . . . . . . . . | 1.2 |
| | | Financing fees related to new facilities . . . . . . | 0.9 |
| Total source of funds . . . . . . . . . . . . . . . . . | $40.1 | Total uses of funds . . . . . . . . . . . . . . . . . | $40.1 |

Confidential

EFIHMW00246103

(a)  Consists of equity contributions by the Sponsor Group and certain other investors.
(b)  Represents 461.2 million outstanding shares of EFH Corp. common stock multiplied by $69.25 per share.
(c)  Represents professional fees incurred by the Sponsor Group that were directly associated with the Merger and accounted for as part of the purchase price.

*Purchase Price Allocation*

EFH Corp. accounted for the Merger under purchase accounting in accordance with the provisions of SFAS 141, whereby the total purchase price of the transaction was allocated to EFH Corp.'s identifiable tangible and intangible assets acquired and liabilities assumed based on their fair values as of October 10, 2007 as summarized in the table below. The fair values were determined based upon assumptions related to future cash flows, discount rates, and asset lives as well as factors more unique to EFH Corp., its industry and the competitive wholesale power market that include forward natural gas price curves and market heat rates, retail customer attrition rates, generation plant operating and construction costs, and the effect on generation facility values of lignite fuel reserves and mining capabilities using currently available information. As a result of cost-based regulatory rate-setting processes, the book value of the majority of Oncor's assets and liabilities effectively represent fair value, and no adjustments to those regulated assets or liabilities were recorded. The excess of the purchase price over the fair value of net assets acquired was recorded as goodwill.

The goodwill amount recorded upon finalization of purchase accounting in 2008 totaled $23.2 billion. Management believes the drivers of the goodwill amount include the incremental value of the future cash flow potential of the baseload generation facilities, including facilities under construction, over the values assigned to those assets under purchase accounting rules, considering the market-pricing mechanisms and growth potential in the ERCOT market, as well as the value derived from the scale of the retail business. Management also believes that the goodwill reflects the value of the relatively stable, long-lived cash flows of the regulated business, considering the constructive regulatory environment and market growth potential. See Note 3 for disclosures related to goodwill, including an impairment recorded in the fourth quarter of 2008.

The following table summarizes the components of the final purchase price allocation:

|  |  |  |
|---|---:|---:|
| Equity purchase price | | $31,935 |
| Transaction costs | | 759 |
| Total purchase price. | | 32,694 |
| Property, plant and equipment | 28,088 | |
| Intangible assets (Note 3) | 4,454 | |
| Regulatory assets and deferred debits | 1,445 | |
| Other assets | 5,187 | |
| Total assets acquired | 39,174 | |
| Short-term borrowings and long-term debt | 14,183 | |
| Deferred tax liabilities | 7,706 | |
| Other liabilities | 7,837 | |
| Total liabilities assumed | 29,726 | |
| Net identifiable assets acquired | | 9,448 |
| Goodwill. | | $23,246 |

Confidential

EFIHMW00246104

**PX 014**
**Page 386 of 1116**

The following table summarizes the change in the total amount of goodwill during 2008 as a result of purchase accounting:

| | | |
|---|---:|---:|
| Goodwill at December 31, 2007 ................................ | | $22,954 |
| Property, plant and equipment ................................ | 311 | |
| Intangible assets ........................................... | 30 | |
| Regulatory assets—net ...................................... | 2 | |
| Other assets ............................................... | 174 | |
| Total assets acquired .................................... | 517 | |
| Deferred income tax liabilities ............................... | (263) | |
| Other liabilities ........................................... | 38 | |
| Total liabilities assumed ................................. | (225) | |
| Net identifiable assets acquired ........................... | | 292 |
| Goodwill at completion of purchase accounting ............ | | $23,246 |

The above changes relate largely to finalization of fair values of natural gas-fueled generation plants and amounts related to the Capgemini outsourcing agreement, as well as the effects on related deferred income tax balances.

Exit liabilities originally recorded as part of the purchase price allocation totaled approximately $60 million, which consisted primarily of estimated amounts related to the cancellation of the development of coal-fueled generation facilities discussed in Note 5 and the exit of certain administrative activities. Such cancellation liabilities have been negotiated to a lesser amount and taking into consideration payments made, the exit liabilities have all been extinguished as of December 31, 2008. During 2008, additional exit liabilities totaling $66 million were recorded largely in connection with the termination of outsourcing arrangements with Capgemini under change of control provisions of such arrangements (also see Note 21). This amount is expected to be settled no later than June 30, 2011, the targeted date of completion of transition of outsourced activities back to EFH Corp. or to service providers.

***Unaudited Pro Forma Financial Information***

The following unaudited pro forma financial position and results of operations assume that the Merger-related transactions occurred on January 1, 2007 and 2006, respectively. The unaudited pro forma information is provided for informational purposes only and is not necessarily indicative of what EFH Corp.'s results of operations would have been if the Merger-related transactions had occurred on that date, or what EFH Corp.'s results of operations will be for any future periods.

For the year ended December 31, 2007, unaudited pro forma revenues and net loss were $10.0 billion and $2.3 billion, respectively. Pro forma adjustments for the year ended December 31, 2007 consist of adjustments for the Predecessor period and consist of $473 million in depreciation and amortization expense (including amounts recognized in revenues or fuel and purchased power costs), $2.1 billion in interest expense and a $895 million income tax benefit.

For the year ended December 31, 2006, unaudited pro forma revenues and net income were $10.7 billion and $378 million, respectively. Pro forma adjustments for the year ended December 31, 2006 consist of adjustments for the Predecessor period and consist of $606 million in depreciation and amortization expense (including amounts recognized in revenues or fuel and purchased power costs), $2.8 billion in interest expense and a $1.2 billion income tax benefit.

F-27

Confidential

### 3.    GOODWILL AND IDENTIFIABLE INTANGIBLE ASSETS

*Goodwill*

Reported goodwill as of December 31, 2008 totaled $14.4 billion, with $10.3 billion assigned to the Competitive Electric segment and $4.1 billion to the Regulated Delivery segment. As of December 31, 2007, reported goodwill totaled $23.0 billion with $18.1 billion assigned to the Competitive Electric segment and $4.9 billion to the Regulated Delivery segment. None of this goodwill balance is being deducted for tax purposes.

As discussed in Note 2, EFH Corp. accounted for the Merger under purchase accounting. The total goodwill amount recorded as a result of purchase accounting totaled $23.2 billion, representing the excess of the purchase price over the fair value of the tangible and identifiable intangible net assets acquired in the Merger; subsequently, an impairment charge was recorded in the fourth quarter of 2008 (discussed immediately below). SFAS 142 requires that goodwill be assigned to "reporting units," which management has determined to be the Competitive Electric segment and the Regulated Delivery segment, which is largely comprised of TCEH and Oncor, respectively. The goodwill amounts assigned to the Competitive Electric segment of $18.3 billion and the Regulated Delivery segment of $4.9 billion were based on the enterprise values of those businesses at the closing date of the Merger and the completion of purchase accounting.

*Goodwill and Trade Name Intangible Asset Impairments*

In the fourth quarter of 2008, EFH Corp. recorded a goodwill impairment charge totaling $8.9 billion, which is not deductible for income tax purposes. This amount represents EFH Corp.'s best estimate of impairment pending finalization of the fair value calculations, which is expected in the first quarter of 2009. The total charge consists of an impairment of $8.0 billion related to the Competitive Electric segment and $860 million related to the Regulated Delivery segment. The impairment primarily arises from the dislocation in the capital markets that has increased interest rate spreads and the resulting discount rates used in estimating fair values and the effect of recent declines in market values of debt and equity securities of comparable companies.

Also in the fourth quarter of 2008, EFH Corp. recorded a trade name intangible asset impairment charge totaling $481 million ($310 million after-tax). The impairment primarily arises from the increase in the discount rate used in estimating fair value.

Although the annual goodwill and intangible assets with indefinite lives impairment test date set by management is October 1, management determined that in consideration of the continuing deterioration of securities values during the fourth quarter of 2008, an impairment testing trigger occurred subsequent to that test date; consequently, the impairment charges were based on estimated fair values at December 31, 2008.

The impairment determination involves significant assumptions and judgments in estimating enterprise values of the Competitive Electric and Regulated Delivery segments and the fair values of their assets and liabilities.

F-28

EFHMW00246106

*Identifiable Intangible Assets*

Identifiable intangible assets reported in the balance sheet are comprised of the following:

| | Successor | | | | | |
| | As of December 31, 2008 | | | As of December 31, 2007 | | |
| | Gross Carrying Amount | Accumulated Amortization | Net | Gross Carrying Amount | Accumulated Amortization | Net |
|---|---|---|---|---|---|---|
| Retail customer relationship .............. | $ 463 | $130 | $ 333 | $ 463 | $ 79 | $ 384 |
| Favorable purchase and sales contracts ...... | 700 | 249 | 451 | 702 | 68 | 634 |
| Capitalized in-service software ........... | 255 | 116 | 139 | 225 | 71 | 154 |
| Environmental allowances and credits ...... | 994 | 121 | 873 | 1,525 | 19 | 1,506 |
| Land easements and other ................ | 203 | 71 | 132 | 179 | 67 | 112 |
| Total intangible assets subject to amortization ..................... | $2,615 | $687 | 1,928 | $3,094 | $304 | 2,790 |
| Trade name (not subject to amortization) .... | | | 955 | | | 1,436 |
| Mineral interests (not currently subject to amortization) ......................... | | | 110 | | | 139 |
| Total intangible assets ............... | | | $2,993 | | | $4,365 |

Amortization expense related to intangible assets consisted of:

| | Successor | | | Predecessor | |
| | Useful lives at December 31, 2008 (weighted average in years) | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, 2006 |
|---|---|---|---|---|---|
| Retail customer relationship ....... | 4 | $ 51 | $ 79 | $— | $— |
| Favorable purchase and sales contracts ..................... | 10 | 168 | 72 | — | — |
| Capitalized in-service software ..... | 8 | 44 | 8 | 23 | 35 |
| Environmental allowances and credits ........................ | 29 | 102 | 20 | — | — |
| Land easements and other ......... | 69 | 4 | — | 2 | 2 |
| Total amortization expense .... | | $369 | $179 | $ 25 | $ 37 |

Separately identifiable and previously unrecognized intangible assets acquired and recorded as part of purchase accounting for the Merger are described as follows:

- *Retail Customer Relationship*—Retail customer relationship intangible asset represents the estimated fair value of the non-contracted customer base and is being amortized using an accelerated method based on customer attrition rates and reflecting the pattern in which economic benefits are realized over their estimated useful life. Amortization expense related to the retail customer relationship intangible asset is reported as part of depreciation and amortization expense in the income statement (reported in the Competitive Electric segment).

- *Favorable Purchase and Sales Contracts*—Favorable purchase and sales contracts intangible asset primarily represents the above market value, based on observable prices or estimates, of commodity contracts for which: 1) EFH Corp. has made the "normal" purchase or sale election allowed by SFAS 133 or 2) the contracts that did not meet the definition of a derivative. The amortization periods of

F-29

EFIHMW00246107

these intangible assets are based on the terms of the contracts, and the expense is reported as part of revenues or fuel and purchased power costs in the income statement as appropriate (reported in the Competitive Electric segment). Unfavorable purchase and sales contracts are recorded as other noncurrent liabilities and deferred credits (see Note 28).

- *Trade name*—The trade name intangible asset represents the estimated fair value of the TXU Energy trade name, and was determined to be an indefinite-lived asset not subject to amortization. This intangible asset will be evaluated for impairment at least annually (as of October 1) in accordance with SFAS 142, "Goodwill and Other Intangible Assets." See above for discussion of an impairment charge recorded in 2008.

- *Environmental Allowances and Credits*—This intangible asset represents the fair value, based on observable prices or estimates, of environmental credits held by EFH Corp., substantially all of which were expected to be used in its power generation activity. These credits will be amortized to fuel and purchase power costs utilizing a units-of-production method (reported in the Competitive Electric segment).

### *Impairment of Environmental Allowances and Credits Intangible Assets*

In March 2005, the EPA issued regulations called the Clean Air Interstate Rule (CAIR) for 28 states, including Texas, where EFH Corp.'s generation facilities are located. CAIR requires reductions of $SO_2$ and $NO_x$ emissions from power generation facilities in such states. The $SO_2$ reductions were beyond the reductions required under the Clean Air Act's existing acid rain cap-and-trade program (the Acid Rain Program). CAIR also established a new regional cap-and-trade program for $NO_x$ emissions reductions.

In July 2008, the US Court of Appeals for the D.C. Circuit (the D.C. Circuit Court) invalidated CAIR. The D.C. Circuit Court did not overturn the existing cap-and-trade program for $SO_2$ reductions under the Acid Rain Program.

In the second quarter of 2008, EFH Corp. determined that certain of its $SO_2$ allowances had decreased materially in value, likely driven by litigation that resulted in the July 2008 decision from the D.C. Circuit Court invalidating CAIR. Accordingly, EFH Corp. recorded a $2 million (before deferred income tax benefit) impairment of certain $SO_2$ allowances.

Based on the D.C. Circuit Court's ruling, EFH Corp. recorded a non-cash impairment charge to earnings in the third quarter of 2008. EFH Corp. impaired $NO_x$ allowances in the amount of $401 million (before deferred income tax benefit). As a result of the D.C. Circuit Court's July 2008 decision, $NO_x$ allowances would no longer be needed, and thus there would not be an actively traded market for such allowances. Consequently, the $NO_x$ allowances held by EFH Corp. would likely have very little value absent reversal of the D.C. Circuit Court's decision or promulgation of new rules by the EPA. In addition, EFH Corp. impaired $SO_2$ allowances in the amount of $98 million (before deferred income tax benefit). While the D.C. Circuit Court did not invalidate the Acid Rain Program, EFH Corp. would have more $SO_2$ allowances than it would need to comply with the Acid Rain Program. While there continued to be a market for $SO_2$ allowances, the D.C. Circuit Court's decision resulted in a material decrease in the market price of $SO_2$ allowances.

The impairment amounts recorded in the second and third quarters of 2008 were reported in other deductions and are reflected in the results of the Competitive Electric segment.

In December 2008, in response to an EPA petition, the D.C. Circuit Court reversed, in part, its previous ruling. Such reversal confirmed CAIR is not valid, but allowed it to remain in place while the EPA revises CAIR to correct the previously identified shortcomings. Since the D.C. Circuit Court did not prescribe a deadline for this revision, at this time, EFH Corp. cannot predict how or when the EPA may revise CAIR.

F-30

EFIHMW00246108

*Estimated Amortization of Intangible Assets*—The estimated aggregate amortization expense of intangible assets for each of the five succeeding fiscal years from December 31, 2008 is as follows:

| Year | Successor |
|------|-----------|
| 2009 | $360 |
| 2010 | 225 |
| 2011 | 179 |
| 2012 | 137 |
| 2013 | 114 |

## 4.   DISCONTINUED OPERATIONS

Results from discontinued operations during the period October 11, 2007 to December 31, 2007 totaled $1 million in net income and during the period from January 1, 2007 to October 10, 2007 totaled $24 million in net income and consisted primarily of insurance proceeds related to the 2005 TXU Europe litigation settlement agreement in both periods.

Results from discontinued operations in 2006 totaled $87 million in net income. This amount included a $62 million credit representing reversal of a TXU Gas income tax reserve, due to favorable resolution of an IRS audit matter relating to a business sold in 2000, and a total of $27 million ($42 million pretax) in credits representing insurance recoveries associated with the TXU Europe settlement agreement.

## 5.   CHARGES RELATED TO CANCELLED DEVELOPMENT OF COAL-FUELED GENERATION FACILITIES

In 2007, EFH Corp. recorded a net charge totaling $757 million ($492 million after-tax), substantially all of which was in the Predecessor period, in connection with the February 2007 suspension of the development of eight coal-fueled generation units. This decision and subsequent terminations of equipment orders required an evaluation of the recoverability of recorded assets associated with the development program. The net charge included $705 million for the impairment of construction work-in-process asset balances (primarily pre-construction development costs), $79 million for costs arising from terminations of equipment orders, $29 million for the write-off of deferred financing costs and a $57 million gain on sale (in early October 2007) of two in-process boilers. In determining the net charges recorded, EFH Corp. applied accounting rules for impairment of long-lived assets under SFAS 144 and for exit activities under SFAS 146. Additional charges totaling $12 million ($8 million after-tax) were recorded in 2008, which primarily represented costs for transportation and storage of materials.

The construction work-in-process asset balances totaled $871 million prior to the writedown and included progress payments made and accruals for amounts due to equipment suppliers, based on percentage of completion estimates, engineering and design services costs, site preparation expenditures, internal salary and related overhead costs for personnel engaged directly in construction management activities and capitalized interest. The construction work-in-process balance at December 31, 2008 totaled $81 million and consisted of estimated recovery amounts, using a probability-weighted methodology, from equipment salvage and potential resale activities. Cumulative net cash proceeds through December 31, 2008 from the sale of the impaired assets total $169 million.

Subsidiaries of EFH Corp. have terminated all of the equipment orders, with the exception of one purchase order for a boiler that is expected to be resold, and the air permit applications related to the eight units were formally withdrawn from the TCEQ in October 2007 after the close of the Merger. The net charges arising from cancellation of this development program have been classified in other deductions and are reported in the results of the Competitive Electric segment.

F-31

6.  **IMPAIRMENT OF NATURAL GAS-FUELED GENERATION FLEET**

In the fourth quarter of 2008, EFH Corp. performed an evaluation of its natural gas-fueled generation fleet for impairment in accordance with the requirements of SFAS 144, which provides that long-lived assets should be tested for recoverability whenever events or changes in circumstances indicate that the carrying amount may not be recoverable. The impairment test was triggered by a determination that it was more likely than not that certain generation units would be retired or mothballed (idled) earlier than previously expected. The natural gas-fueled generation units are generally operated to meet peak demands for electricity and the fleet is tested for impairment as an asset group. As a result of the evaluation, it was determined that an impairment existed, and a charge of $229 million ($147 million after-tax) was recorded to write down the assets to fair value of approximately $28 million, which was determined based on discounted estimated future cash flows.

In 2006, EFH Corp. also performed an evaluation of its natural gas-fueled generation fleet for impairment in accordance with the requirements of SFAS 144. In consideration of the lignite/coal-fueled generation plant development program then underway, among other factors, EFH Corp. determined at that time that it was more likely than not that its natural gas-fueled generation units would be sold or otherwise disposed of before the end of their previously estimated useful lives and should be tested for impairment. As a result, it was determined that an impairment existed, and a charge of $198 million ($129 million after-tax) was recorded in 2006 to write down the assets to fair value, which was determined based on discounted estimated future cash flows.

The impairments in both years were reported in other deductions in the Competitive Electric segment.

7.  **CUSTOMER APPRECIATION BONUS**

In 2006, EFH Corp. announced a special customer appreciation bonus program. Under the program, a $100 bonus was provided to residential customers receiving service as of October 29, 2006 and living in areas where EFH Corp. offered its then-regulated rate, which expired January 1, 2007 in accordance with applicable law. Eligible customers were not required to continue to receive service from EFH Corp. to receive the bonus. The bonus was paid out in the form of credits on customer bills, with approximately $40 million paid out in 2006 and the balance fully settled in 2007. The bonus program resulted in a charge of $162 million ($105 million after-tax) in 2006. The charge was recorded as a reduction to revenue in the Competitive Electric segment.

8.  **STIPULATION APPROVED BY THE PUCT**

Oncor and Texas Holdings agreed to the terms of a stipulation, which was conditional upon completion of the Merger, with major interested parties to resolve all outstanding issues in the PUCT review related to the Merger. In February 2008, the PUCT entered an order approving the stipulation. The PUCT issued a final order on rehearing in April 2008 that has been appealed to District Court.

In addition to commitments Oncor made in its filings in the PUCT review, the stipulation included the following provisions, among others:

- Oncor provided a one-time $72 million refund to its REP customers in the September 2008 billing cycle. The refund was in the form of a credit on distribution fee billings. The liability for the refund was recorded as part of purchase accounting.

- Consistent with the 2006 cities rate settlement (see Note 9), Oncor filed a system-wide rate case in June 2008 based on a test-year ended December 31, 2007.

- Oncor agreed not to request recovery of approximately $56 million of regulatory assets related to self-insurance reserve costs and 2002 restructuring expenses. These regulatory assets were eliminated as part of purchase accounting.

- The dividends paid by Oncor will be limited through December 31, 2012, to an amount not to exceed Oncor's net income (determined in accordance with GAAP, subject to certain defined adjustments) for

F-32

EFIHMW00246110

**PX 014
Page 392 of 1116**

the period beginning October 11, 2007 and ending December 31, 2012 and are further limited by an agreement that Oncor's regulatory capital structure, as determined by the PUCT, will be at or below the assumed debt-to-equity ratio established periodically by the PUCT for ratemaking purposes, which is currently set at 60% debt to 40% equity.

• Oncor committed to minimum capital spending of $3.6 billion over the five-year period ending December 31, 2012, subject to certain defined conditions.

• Oncor committed to an additional $100 million in spending over the five-year period ending December 31, 2012 on demand-side management or other energy efficiency initiatives. These additional expenditures will not be recoverable in rates, and this amount was recorded as a regulatory liability as part of purchase accounting and consistent with SFAS 71.

• If Oncor's credit rating is below investment grade with two or more rating agencies, TCEH will post a letter of credit in an amount of $170 million to secure TXU Energy's payment obligations to Oncor.

• Oncor agreed not to request recovery of the $4.9 billion of goodwill resulting from purchase accounting or any future impairment of the goodwill in its rates.

## 9.   CITIES RATE SETTLEMENT IN 2006

In January 2006, Oncor agreed with a steering committee representing 108 cities in Texas (Cities) to defer the filing of a system-wide rate case with the PUCT to no later than July 1, 2008 (based on a test year ending December 31, 2007). Oncor filed the rate case with the PUCT in June 2008. Oncor extended the benefits of the agreement to 292 nonlitigant cities. The agreements provided that Oncor would make payments to participating cities totaling approximately $70 million, including incremental franchise taxes.

This amount was recognized in earnings of the Regulated Delivery segment over the period from May 2006 through June 2008. Amounts recognized totaled $23 million in 2008, $8 million for the period October 11, 2007 through December 31, 2007, $25 million for the period January 1, 2007 through October 10, 2007, and $18 million in 2006, of which $13 million, $6 million, $20 million and $13 million, respectively, are reported in other deductions (see Note 13) and franchise and revenue-based taxes.

## 10.   ACCOUNTING FOR UNCERTAINTY IN INCOME TAXES (FIN 48)

Effective January 1, 2007, EFH Corp. adopted FIN 48. FIN 48 requires that all tax positions subject to uncertainty be reviewed and assessed with recognition and measurement of the tax benefit based on a "more-likely-than-not" standard with respect to the ultimate outcome, regardless of whether this assessment is favorable or unfavorable. EFH Corp. applied FSP FIN 48-1 to determine if each tax position was effectively settled for the purpose of recognizing previously uncertain tax positions. EFH Corp. completed its review and assessment of uncertain tax positions and in the 2007 Predecessor period recorded a net benefit to retained earnings and a decrease to noncurrent liabilities of $33 million in accordance with the new accounting rule.

EFH Corp. and its subsidiaries file income tax returns in US federal, state and foreign jurisdictions and are subject to examinations by the IRS and other taxing authorities. Examinations of income tax returns filed by EFH Corp. and any of its subsidiaries for the years ending prior to January 1, 2003 are complete. In the fourth quarter 2008, EFH Corp. was notified of the commencement of the IRS audit of tax years 2003 to 2006. The audit is expected to require two years to complete. Texas franchise tax return periods under examination or still open for examination range from 2003 to 2007.

During the third quarter of 2008, EFH Corp. participated in negotiations with the IRS regarding the 2002 worthlessness loss associated with its discontinued Europe business and has reduced the liability for uncertain tax positions to reflect the most likely settlement of the issue. The reduction in the liability of approximately $375 million was largely offset by a reduction of deferred tax assets related to alternative minimum tax. The conclusion of issues contested from the 1997-2002 audit, including Europe, is not expected to occur prior to 2010.

F-33

EFH Corp. classifies interest and penalties related to uncertain tax positions as income tax expense. The amount of interest and penalties included in income tax expense totaled $88 million in 2008, $12 million for the period October 11, 2007 through December 31, 2007 and $43 million for the period January 1, 2007 through October 10, 2007. Noncurrent liabilities included a total of $198 million and $105 million in accrued interest at December 31, 2008 and 2007, respectively. All interest amounts are after-tax.

The following table summarizes the changes to the uncertain tax positions, reported in other noncurrent liabilities in the consolidated balance sheet, during the years ended December 31, 2008 and 2007:

|  | 2008 | 2007 |
|---|---|---|
| Balance at January 1, excluding interest and penalties | $1,834 | $1,770 |
| Additions based on tax positions related to prior years | 124 | 97 |
| Reductions based on tax positions related to prior years | (451) | (124) |
| Additions based on tax positions related to the current year | 33 | 101 |
| Settlements with taxing authorities | 43 | (10) |
| Reductions related to the lapse of the tax statute of limitations | — | — |
| Balance at December 31, excluding interest and penalties | $1,583 | $1,834 |

Of the balance at December 31, 2008, $1.411 billion represents tax positions for which the uncertainty relates to the timing of recognition in tax returns. The disallowance of such positions would not affect the effective tax rate, but would accelerate the payment of cash to the taxing authority to an earlier period.

With respect to tax positions for which the ultimate deductibility is uncertain (permanent items), should EFH Corp. sustain such positions on income tax returns previously filed, liabilities recorded would be reduced by $138 million, resulting in increased income from continuing operations and a favorable impact on the effective tax rate.

EFH Corp. filed a claim in 2006 for refund of income taxes and related interest paid in 2005 associated with IRS audits of 1993 and 1994 tax returns of a discontinued operation. The expected refund was recognized in the adoption of FIN 48. The carrying amount related to the claim, which is classified as a current income tax receivable as of December 31, 2008, consists of $43 million of tax and approximately $51 million of interest. The refund was received in February 2009 in an amount substantially as expected.

EFH Corp. does not expect the total amount of liabilities recorded related to uncertain tax positions will significantly increase or decrease within the next 12 months.

## 11. TEXAS MARGIN TAX

In May 2006, the Texas legislature enacted a new law that reformed the Texas franchise tax system and replaced it with a new tax system, referred to as the Texas margin tax. The Texas margin tax has been determined to be an income tax for accounting purposes. In accordance with the provisions of SFAS 109, which require that deferred tax assets and liabilities be adjusted for the effects of new income tax legislation in the period of enactment, EFH Corp. estimated and recorded a net deferred tax charge of $44 million in 2006.

In June 2007, an amendment to this law was enacted that included clarifications and technical changes to the provisions of the tax calculation. In the 2007 Predecessor period, EFH Corp. recorded a deferred tax benefit of $70 million, essentially all of which related to changes in the rate at which a tax credit is calculated as specified in the new law. This estimated benefit is based on the Texas margin tax law in its current form and the current guidance issued by the Texas Comptroller of Public Accounts.

The Texas margin tax was effective for returns filed on or after January 1, 2008. EFH Corp.'s return filed during 2008 was based upon the taxable margin earned in 2007. Beginning January 1, 2007, margin tax has been accrued based on revenues reduced by deductions provided in the amended law.

F-34

EFIHMW00246112

**PX 014**

**Page 394 of 1116**

Of the total 2006 net deferred tax charge, $43 million was recognized as a deferred tax charge in the Competitive Electric segment results and $1 million was recognized as a deferred tax charge in the Corporate and Other nonsegment results. Of the total 2007 deferred tax benefit, $32 million was recognized in the Competitive Electric segment results and $38 million was recognized in the Corporate and Other nonsegment results.

## 12. INCOME TAXES

The components of EFH Corp.'s income tax expense (benefit) applicable to continuing operations are as follows:

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, 2006 |
| Current: | | | | |
| US Federal | $ (46) | $ 52 | $ 400 | $ 500 |
| State | 52 | 10 | 20 | 5 |
| Non-US | — | — | — | 1 |
| Total | 6 | 62 | 420 | 506 |
| Deferred: | | | | |
| US Federal | (482) | (722) | 12 | 715 |
| State | 10 | (12) | (108) | 63 |
| Total | (472) | (734) | (96) | 778 |
| Amortization of investment tax credits | (5) | (1) | (15) | (21) |
| Total | $(471) | $(673) | $ 309 | $1,263 |

Reconciliation of income taxes computed at the US federal statutory rate to income tax expense:

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, 2006 |
| Income from continuing operations before income taxes | $(10,469) | $(2,034) | $1,008 | $3,728 |
| Income taxes at the US federal statutory rate of 35% | $ (3,664) | $ (712) | $ 353 | $1,305 |
| Nondeductible goodwill impairment | 3,101 | | | |
| Lignite depletion allowance | (29) | (5) | (30) | (51) |
| Production activities deduction | — | 10 | (10) | (14) |
| Amortization of investment tax credits—net of deferred income tax effect | (5) | (1) | (12) | (15) |
| Amortization (under regulatory accounting) of statutory rate changes | 2 | — | 2 | (7) |
| Medicare subsidy—other postretirement employee benefits | (6) | (2) | (6) | (8) |
| Nondeductible interest expense | 11 | 1 | — | — |
| Nondeductible losses (earnings) on benefit plans | 9 | (1) | (6) | (4) |
| State income taxes, net of federal tax benefit | 39 | (3) | 16 | 6 |
| Texas margin tax—deferred tax adjustments (Note 11) | — | — | (70) | 44 |
| Nondeductible merger transaction costs | — | 23 | — | — |
| Deferred tax adjustments | — | — | 25 | — |
| Accrual of interest | 59 | 12 | 43 | 9 |
| Other, including audit settlements | 12 | 5 | 4 | (2) |
| Income tax expense (benefit) | $ (471) | $ (673) | $ 309 | $1,263 |
| Effective tax rate | 4.5% | 33.1% | 30.7% | 33.9% |

Confidential

*Deferred Income Tax Balances*

Deferred income taxes provided for temporary differences based on tax laws in effect at December 31, 2008 and 2007 balance sheet dates are as follows:

| | Successor | | | | | |
|---|---|---|---|---|---|---|
| | December 31, 2008 | | | December 31, 2007 | | |
| | Total | Current | Noncurrent | Total | Current | Noncurrent |
| **Deferred Income Tax Assets** | | | | | | |
| Alternative minimum tax credit carryforwards . . . . . . . . . . . . . . . | $ 447 | $—— | $ 447 | $ 789 | $—— | $ 789 |
| Employee benefit liabilities . . . . . . . | 173 | 33 | 140 | 456 | 29 | 427 |
| Net operating loss (NOL) carryforwards . . . . . . . . . . . . . . . | 523 | —— | 523 | 194 | —— | 194 |
| Regulatory liabilities . . . . . . . . . . . | — | — | — | 111 | — | 111 |
| Unfavorable purchase and sales contracts . . . . . . . . . . . . . . . . . . . . | 259 | — | 259 | 269 | — | 269 |
| Other . . . . . . . . . . . . . . . . . . . . . . . | 260 | 44 | 216 | 133 | 11 | 122 |
| Total . . . . . . . . . . . . . . . . . . . . | 1,662 | 77 | 1,585 | 1,952 | 40 | 1,912 |
| **Deferred Income Tax Liabilities** | | | | | | |
| Property, plant and equipment . . . . . | 4,375 | —— | 4,375 | 5,787 | —— | 5,787 |
| Basis difference in Oncor partnership . . . . . . . . . . . . . . . . . | 1,192 | —— | 1,192 | — | —— | —— |
| Commodity contracts and interest rate swaps . . . . . . . . . . . . . . . . . . | 645 | 31 | 614 | 224 | 31 | 193 |
| Regulatory assets . . . . . . . . . . . . . . | —— | —— | —— | 680 | —— | 680 |
| Identifiable intangible assets . . . . . . | 1,049 | —— | 1,049 | 1,580 | —— | 1,580 |
| Debt fair value discounts . . . . . . . . . | 257 | —— | 257 | 301 | —— | 301 |
| Other . . . . . . . . . . . . . . . . . . . . . . . | 26 | 2 | 24 | 35 | —— | 35 |
| Total . . . . . . . . . . . . . . . . . . . . | 7,544 | 33 | 7,511 | 8,607 | 31 | 8,576 |
| **Net Deferred Income Tax (Asset) Liability** . . . . . . . . . . . . . . . . . . | $5,882 | $ (44) | $5,926 | $6,655 | $ (9) | $6,664 |

At December 31, 2008 EFH Corp. had $447 million of alternative minimum tax credit carryforwards (AMT) available to offset future tax payments. The AMT credit carryforwards have no expiration date. At December 31, 2008, EFH Corp. had net operating loss (NOL) carryforwards for federal income tax purposes of $1.493 billion that expire between 2023 and 2028. The NOL carryforwards can be used to offset future taxable income. EFH Corp. fully expects to utilize all of its NOL carryforwards prior to their expiration dates.

The component of deferred income tax liabilities referred to as "basis difference in Oncor partnership" arose as a result of the noncontrolling interests sale (see Note 18) at which time Oncor became a partnership for US federal income tax purposes. The amount of this basis difference at the date of the transaction represented EFH Corp.'s interest (approximately 80%) in the net deferred tax liabilities related to Oncor's individual operating assets and liabilities. The remaining net deferred tax liabilities associated with Oncor ($299 million at December 31, 2008) that are attributable to the noncontrolling interests have been reclassified as other noncurrent liabilities (see Note 28).

The income tax effects of the components included in accumulated other comprehensive income at December 31, 2008 and 2007 totaled a net deferred tax asset of $207 and $91 million, respectively.

See Note 10 for discussion regarding accounting for uncertain tax positions (FIN 48).

Confidential

EFIHMW00246114

### 13. OTHER INCOME AND DEDUCTIONS

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, 2006 |
| Other income: | | | | |
| Gain on contract settlement (a) | $ — | $— | $— | $ 26 |
| Amortization of gain on sale of TXU Fuel (b) | — | — | 36 | 47 |
| Accretion of adjustment (discount) of regulatory assets resulting from purchase accounting (Note 2) | 44 | 10 | — | — |
| Insurance recoveries (c) | 21 | — | — | 17 |
| Net gain on sale of other properties and investments (d) | 4 | 1 | 4 | 22 |
| Reduction of insurance reserves related to discontinued operations | — | 1 | 7 | — |
| Penalty received for nonperformance under a coal transportation agreement | — | — | 6 | — |
| Mineral rights royalty income | 4 | 1 | 8 | — |
| Other | 7 | 1 | 8 | 9 |
| Total other income | $ 80 | $ 14 | $ 69 | $121 |
| Other deductions: | | | | |
| Impairment of trade name intangible asset (Note 3) | $ 481 | $— | $— | $— |
| Impairment of emission allowances intangible assets (Note 3) | 501 | — | — | — |
| Charge for impairment of natural gas-fueled generation fleet (Note 6) | 229 | — | — | 198 |
| Charge related to Lehman bankruptcy (e) | 26 | — | — | — |
| Professional fees incurred related to the Merger (f) | 14 | 51 | 39 | — |
| Net charges related to cancelled development of generation facilities (Note 5) | 12 | 2 | 755 | — |
| Charge related to termination of rail car lease (g) | — | — | 10 | — |
| Other asset writeoffs (h) | 2 | — | 34 | 4 |
| Credit related to impaired leases (i) | — | — | (48) | — |
| Equity losses—unconsolidated affiliates | — | — | 1 | 14 |
| Costs related to 2006 cities rate settlement (Note 9) | 13 | 6 | 20 | 13 |
| Litigation/regulatory settlements | 10 | — | 5 | 9 |
| Expenses related to cancelled joint venture at Oncor | — | — | 12 | 7 |
| Ongoing pension and other postretirement benefit costs related to discontinued businesses | 2 | (2) | 7 | 23 |
| Other | 11 | 4 | 6 | 1 |
| Total other deductions | $1,301 | $ 61 | $841 | $269 |

(a)  In 2006, EFH Corp. recorded income of $26 million upon settlement of a contract dispute related to antenna site rentals by a telecommunication company (reported in Corporate and Other activities).

(b)  As part of the 2004 sale of the assets of TXU Fuel, TCEH entered into a transportation agreement with the new owner, intended to be market-price based, to transport natural gas to TCEH's generation plants. Because of the continuing involvement in the business through the transportation agreement, the pretax gain of $375 million related to the sale was deferred and being recognized over the eight-year life of the transportation agreement, and the business was not accounted for as a discontinued operation. The remaining $218 million deferred gain was eliminated as part of purchase accounting related to the Merger (reported in Corporate and Other activities).

Confidential

(c)  2008 amount represents insurance recovery for damage to mining equipment (reported in Competitive Electric segment). 2006 amount primarily represents additional insurance recoveries recorded related to the 2005 settlement of the shareholders' litigation (reported in Corporate and Other activities).

(d)  The 2006 period includes $12 million in gains on land sales (substantially all reported in the Competitive Electric segment) and a $10 million gain related to the sale of mineral interests (reported in Corporate and Other activities).

(e)  Represents reserve established against amounts due (excluding termination related costs) from subsidiaries of Lehman Brothers Holdings Inc. arising from commodity hedging and trading activities. There are no open positions with these subsidiaries. (Reported in Competitive Electric segment.)

(f)  Includes post-Merger consulting expenses related to optimizing business performance (reported in Corporate and Other activities).

(g)  Represents costs associated with termination and refinancing of a rail car lease (reported in the Competitive Electric segment).

(h)  Predecessor period of 2007 includes $30 million of previously deferred costs, consisting primarily of professional fees for tax, legal and other advisory services, in connection with certain previously anticipated strategic transactions (including expected financings) that were no longer expected to be consummated as a result of the Merger (reported in Corporate and Other activities).

(i)  In 2004, EFH Corp. recorded a charge of $157 million for leases of certain natural gas-fueled combustion turbines, net of estimated sublease revenues, that were no longer operated for its own benefit. In the third quarter of 2007, a $48 million reduction in the related liability was recorded to reflect new subleases entered into in October 2007 (reported in the Competitive Electric segment results). The remaining $59 million liability was eliminated as part of purchase accounting as EFH Corp. intends to operate these assets for its own benefit.

## 14.  TRADE ACCOUNTS RECEIVABLE AND SALE OF RECEIVABLES PROGRAM

*Sale of Receivables*

Subsidiaries of EFH Corp. engaged in retail sales of electricity participate in an accounts receivable securitization program, the activity under which is accounted for as a sale of accounts receivable in accordance with SFAS 140. Under the program, such subsidiaries (originators) sell trade accounts receivable to TXU Receivables Company, which is a special purpose entity created for the purpose of purchasing receivables from the originators and is a consolidated wholly-owned bankruptcy-remote direct subsidiary of EFH Corp. TXU Receivables Company sells undivided interests in the purchased accounts receivable for cash to special purpose entities established by financial institutions (the funding entities).

The maximum amount currently available under the accounts receivable securitization program is $700 million, and the program funding was $416 million at December 31, 2008. The amount of customer deposits held by the originators can reduce the amount of undivided interests that can be sold, thus reducing funding available under the program, during periods in which TCEH's long-term senior unsecured debt rating is lower than investment grade. Funding availability for all originators can be reduced by 100% of the originators' customer deposits if TCEH's credit rating is lower than Ba3/BB-; 50% if TCEH's credit rating is between Ba3/BB- and Ba1/BB+; and zero % if TCEH's credit rating is at least Baa3/BBB-. The originators' customer deposits, which totaled $108 million, reduced funding availability as of December 31, 2008 because TCEH's credit ratings were lower than Ba3/BB-.

All new trade receivables under the program generated by the originators are continuously purchased by TXU Receivables Company with the proceeds from collections of receivables previously purchased. Changes in the amount of funding under the program, through changes in the amount of undivided interests sold by TXU Receivables Company, reflect seasonal variations in the level of accounts receivable, changes in collection trends and other factors such as changes in sales prices and volumes. TXU Receivables Company has issued subordinated notes payable to the originators for the difference between the face amount of the uncollected accounts receivable purchased, less a discount, and cash paid to the originators that was funded by the sale of the undivided interests. The balance of the subordinated notes payable, which is eliminated in consolidation, totaled $268 million and $296 million at December 31, 2008 and 2007, respectively.

F-38

The discount from face amount on the purchase of receivables from the originators principally funds program fees paid to the funding entities. The program fees, which are also referred to as losses on sale of the receivables under SFAS 140, consist primarily of interest costs on the underlying financing. The discount also funds a servicing fee paid by TXU Receivables Company to EFH Corporate Services Company, a direct wholly-owned subsidiary of EFH Corp., which serves as the collection agent of the receivables. EFH Corp. maintains collection responsibilities through EFH Corporate Services Company in order to efficiently service and maintain the integrity of the receivables portfolio. The servicing fee compensates EFH Corporate Services Company for serving as the collection agent of the receivables. Responsibilities of the collection agent include, but are not limited to, maintaining detailed accounts receivable collection records and interfacing with customers regarding payment options and terms of current and past-due accounts. In the event EFH Corporate Services Company is relieved of its duties as collection agent because of default under the program, the funding entities assume responsibility as the collection agent.

The program fees represent essentially all the net incremental costs of the program on a consolidated basis and are reported in SG&A expenses. Fee amounts were as follows:

|  | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
|  | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, 2006 |
| Program fees . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 25 | $ 9 | $ 32 | $ 40 |
| Program fees as a percentage of average funding (annualized) . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5.2% | 9.5% | 6.4% | 5.8% |
| Servicing fees . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 4 | $ 1 | $ 3 | $ 4 |

The accounts receivable balance reported in the December 31, 2008 consolidated balance sheet includes $684 million face amount of trade accounts receivable of TCEH subsidiaries, in which undivided interests totaling $416 million have been sold by TXU Receivables Company. Funding under the program increased $53 million in 2008, decreased $264 million in 2007 and decreased $44 million in 2006. Funding increases or decreases under the program are reflected as operating cash flow activity in the statement of cash flows. The carrying amount of the retained interests in the accounts receivable balance approximated fair value due to the short-term nature of the collection period.

Activities of TXU Receivables Company were as follows:

|  | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
|  | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, 2006 |
| Cash collections on accounts receivable . . . . . . . . | $ 6,393 | $ 1,538 | $ 6,251 | $ 8,503 |
| Face amount of new receivables purchased . . . . . | (6,418) | (1,194) | (6,628) | (8,469) |
| Discount from face amount of purchased receivables . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 29 | 9 | 35 | 44 |
| Program fees paid . . . . . . . . . . . . . . . . . . . . . . . . | (25) | (9) | (32) | (40) |
| Servicing fees paid . . . . . . . . . . . . . . . . . . . . . . . | (4) | (1) | (3) | (4) |
| Increase (decrease) in subordinated notes payable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (28) | (120) | 305 | 10 |
| Oncor's repurchase of receivables previously sold . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 113 | — | — |
| Operating cash flows used by (provided to) EFH Corp. under the program . . . . . . . . . . . . . . . . . | $ (53) | $ 336 | $ (72) | $ 44 |

F-39

In connection with the Merger, the accounts receivable securitization program was amended. Concurrently with the amendment, the financial institutions required that Oncor repurchase all of the receivables it had previously sold to TXU Receivables Company, which totaled $254 million. Oncor funded such repurchases through borrowings under its credit facility of $113 million, and a related subordinated note receivable from TXU Receivables Company in the amount of $141 million was canceled. Amounts related to Oncor's trade accounts receivable for the period from January 1, 2007 through October 11, 2007 totaled $6 million in program fees and $27 million in operating cash flows provided, exclusive of the $113 million used by Oncor to repurchase its receivables at the time of the Merger. Subsequent to the Merger, only subsidiaries of TCEH participate in the accounts receivable securitization program.

The program may be terminated upon the occurrence of a number of specified events, including if the delinquency ratio (delinquent for 31 days) for the sold receivables, the default ratio (delinquent for 91 days or deemed uncollectible), the dilution ratio (reductions for discounts, disputes and other allowances) or the days collection outstanding ratio exceed stated thresholds, and the financial institutions do not waive such event of termination. The thresholds apply to the entire portfolio of sold receivables, not separately to the receivables of each originator. In addition, the program may be terminated if TXU Receivables Company or EFH Corporate Services Company, as collection agent, shall default in any payment with respect to debt in excess of $50,000 in the aggregate for TXU Receivables Company and EFH Corporate Services Company, or if TCEH, any affiliate of TCEH acting as collection agent under the program other than EFH Corporate Services Company, any parent guarantor of an originator or any originator shall default in any payment with respect to debt (other than hedging obligations) in excess of $200 million in the aggregate for such entities.

Upon termination of the program, cash flows would be delayed as collections of sold receivables would be used by TXU Receivables Company to repurchase the undivided interests from the funding entities instead of purchasing new receivables. The level of cash flows would normalize in approximately 16 to 30 days.

The subordinated notes issued by TXU Receivables Company are subordinated to the undivided interests of the financial institutions in the purchased receivables.

*Trade Accounts Receivable*

|  | Successor | |
|---|---|---|
|  | December 31, | |
|  | **2008** | **2007** |
| Gross wholesale and retail trade accounts receivable . . . . . . . . . . . . . . . | $1,705 | $1,494 |
| Undivided interests in retail accounts receivable sold by TXU | | |
| Receivables Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (416) | (363) |
| Allowance for uncollectible accounts . . . . . . . . . . . . . . . . . . . . . . . . . . . | (70) | (32) |
| Trade accounts receivable—reported in balance sheet . . . . . . . . . . . . . . | $1,219 | $1,099 |

Gross trade accounts receivable at December 31, 2008 and 2007 included unbilled revenues of $505 million and $477 million, respectively.

F-40

EFIHMW00246118

*Allowance for Uncollectible Accounts Receivable*

Predecessor:

| | |
|---|---:|
| Allowance for uncollectible accounts receivable as of December 31, 2005 . . . . . . . . . | $ 36 |
| Increase for bad debt expense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 68 |
| Decrease for account write-offs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (80) |
| Changes related to receivables sold . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4 |
| Other (a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (15) |
| Allowance for uncollectible accounts receivable as of December 31, 2006 . . . . . . . . . | 13 |
| Increase for bad debt expense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 46 |
| Decrease for account write-offs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (54) |
| Changes related to receivables sold . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 26 |
| Allowance for uncollectible accounts receivable as of October 10, 2007 . . . . . . . . . . | 31 |

Successor:

| | |
|---|---:|
| Allowance for uncollectible accounts receivable as of October 11, 2007 . . . . . . . . . . | 31 |
| Increase for bad debt expense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 13 |
| Decrease for account write-offs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (12) |
| Allowance for uncollectible accounts receivable as of December 31, 2007 . . . . . . . . . | 32 |
| Increase for bad debt expense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 81 |
| Decrease for account write-offs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (69) |
| Charge related to Lehman bankruptcy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 26 |
| Allowance for uncollectible accounts receivable as of December 31, 2008 . . . . . . . . . | $ 70 |

---

(a)    Reflects an allowance established in 2005 for a coal contract dispute that was reversed upon settlement in 2006. (Allowance and subsequent reversal are recorded in other deductions.)

## 15.    SHORT-TERM BORROWINGS AND LONG-TERM DEBT

*Short-Term Borrowings*

At December 31, 2008, EFH Corp. and its subsidiaries had outstanding short-term borrowings of $1.237 billion at a weighted average interest rate of 3.41%, excluding certain customary fees, at the end of the period. Short-term borrowings under credit facilities totaled $900 million for TCEH and $337 million for Oncor.

At December 31, 2007, EFH Corp. and its subsidiaries had outstanding short-term borrowings of $1.718 billion at a weighted average interest rate of 5.39%, excluding certain customary fees, at the end of the period. Borrowings under credit facilities totaled $1.280 billion for Oncor and $438 million for TCEH.

*Credit Facilities*

EFH Corp.'s credit facilities with cash borrowing and/or letter of credit availability at December 31, 2008 are presented below. The facilities are all senior secured facilities of the authorized borrower.

| | | At December 31, 2008 | | | |
|---|---|---|---|---|---|
| **Authorized Borrowers and Facility** | **Maturity Date** | **Facility Limit** | **Letters of Credit** | **Cash Borrowings** | **Availability** |
| TCEH Delayed Draw Term Loan Facility (a) . . . . | October 2014 | $    4,100 | $— | $3,562 | $      522 |
| TCEH Revolving Credit Facility (b) . . . . . . . . . . | October 2013 | 2,700 | 7 | 900 | 1,767 |
| TCEH Letter of Credit Facility (c) . . . . . . . . . . . | October 2014 | 1,250 | — | 1,250 | — |
| Subtotal TCEH (d) . . . . . . . . . . . . . . . . . . . . | | $    8,050 | $    7 | $5,712 | 2,289 |
| TCEH Commodity Collateral Posting Facility (e) . . . . . . . . . . . . . . . . . . . . . . . . . . . | December 2012 | Unlimited | $— | $    — | Unlimited |
| Oncor Revolving Credit Facility (f) . . . . . . . . . . | October 2013 | $    2,000 | $— | $    337 | $    1,508 |

F-41

EFIHMW00246119

(a)    Facility to be used during the two-year period commencing on October 10, 2007 to fund expenditures for constructing certain new generation facilities and environmental upgrades of existing generation facilities, including previously incurred expenditures not yet funded under this facility. Borrowings are classified as long-term debt. Availability amount excludes $9 million of undrawn commitments from a subsidiary of Lehman Brothers Holding Inc. (Lehman) that has filed for bankruptcy under Chapter 11 of the US Bankruptcy Code and $7 million of requested draws that have not been funded by the Lehman subsidiary.

(b)    Facility to be used for letters of credit and borrowings for general corporate purposes. Borrowings are classified as short-term borrowings. Availability amount includes $144 million of undrawn commitments from the Lehman subsidiary that is only available from the fronting banks in the form of letters of credit and excludes $26 million of requested draws that have not been funded by the Lehman subsidiary.

(c)    Facility to be used for issuing letters of credit for general corporate purposes, including, but not limited to, providing collateral support under hedging arrangements and other commodity transactions that are not eligible for funding under the TCEH Commodity Collateral Posting Facility. The borrowings, all of which were drawn at the closing of the Merger and are classified as long-term debt, have been retained as restricted cash. Letters of credit totaling $760 million issued as of December 31, 2008 are supported by the restricted cash, and the remaining letter of credit availability totals $490 million.

(d)    Pursuant to PUCT rules, TCEH is required to maintain available capacity under its credit facilities to assure adequate credit worthiness of TCEH's REP subsidiaries, including the ability to return retail customer deposits, if necessary. As a result, at December 31, 2008, the total availability under the TCEH credit facilities should be further reduced by $266 million.

(e)    Revolving facility to be used to fund cash collateral posting requirements for specified volumes of natural gas hedges. As of December 31, 2008, cash borrowings under the facility had been repaid. See "TCEH Senior Secured Facilities" below for additional information.

(f)    Facility to be used by Oncor for its general corporate purposes. Borrowings are classified as short-term borrowings. Availability amount excludes $142 million of undrawn commitments from the Lehman subsidiary and $13 million of requested draws that have not been funded by the Lehman subsidiary.

Confidential

EFIHMW00246120

PX 014
Page 402 of 1116

*Long-Term Debt*

At December 31, 2008 and 2007, the long-term debt of EFH Corp. consisted of the following:

| | Successor | |
|---|---|---|
| | December 31, 2008 | December 31, 2007 |
| **TCEH** | | |
| Pollution Control Revenue Bonds: | | |
| Brazos River Authority: | | |
| 5.400% Fixed Series 1994A due May 1, 2029 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 39 | $ 39 |
| 7.700% Fixed Series 1999A due April 1, 2033 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 111 | 111 |
| 6.750% Fixed Series 1999B due September 1, 2034, remarketing date April 1, 2013 (a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 16 | 16 |
| 7.700% Fixed Series 1999C due March 1, 2032 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 50 | 50 |
| 8.250% Fixed Series 2001A due October 1, 2030 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 71 | — |
| 2.300% Floating Series 2001A due October 1, 2030 (b) . . . . . . . . . . . . . . . . . . . . . . . . | — | 71 |
| 5.750% Fixed Series 2001C due May 1, 2036. remarketing date November 1, 2011 (a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 217 | 217 |
| 8.250% Fixed Series 2001D-1 due May 1, 2033 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 171 | — |
| 2.300% Floating Series 2001D-1 due May 1, 2033 (b) . . . . . . . . . . . . . . . . . . . . . . . . | — | 171 |
| 1.400% Floating Series 2001D-2 due May 1, 2033 (c) . . . . . . . . . . . . . . . . . . . . . . . . | 97 | 97 |
| 2.500% Floating Taxable Series 2001I due December 1, 2036 (d) . . . . . . . . . . . . . . . . | 62 | 62 |
| 1.400% Floating Series 2002A due May 1, 2037 (c) . . . . . . . . . . . . . . . . . . . . . . . . . . | 45 | 45 |
| 6.750% Fixed Series 2003A due April 1, 2038, remarketing date April 1, 2013 (a) . . . . . | 44 | 44 |
| 6.300% Fixed Series 2003B due July 1, 2032 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 39 | 39 |
| 6.750% Fixed Series 2003C due October 1, 2038 . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 52 | 52 |
| 5.400% Fixed Series 2003D due October 1, 2029, remarketing date October 1, 2014 (a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 31 | 31 |
| 5.000% Fixed Series 2006 due March 1, 2041 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 100 | 100 |
| Sabine River Authority of Texas: | | |
| 6.450% Fixed Series 2000A due June 1, 2021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 51 | 51 |
| 5.500% Fixed Series 2001A due May 1, 2022, remarketing date November 1, 2011 (a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 91 | 91 |
| 5.750% Fixed Series 2001B due May 1, 2030, remarketing date November 1, 2011 (a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 107 | 107 |
| 5.200% Fixed Series 2001C due May 1, 2028 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 70 | 70 |
| 5.800% Fixed Series 2003A due July 1, 2022 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 12 | 12 |
| 6.150% Fixed Series 2003B due August 1, 2022 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 45 | 45 |
| Trinity River Authority of Texas: | | |
| 6.250% Fixed Series 2000A due May 1, 2028 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14 | 14 |
| Unamortized fair value discount related to pollution control revenue bonds (e) . . . . . . . | (161) | (175) |
| Senior Secured Facilities: | | |
| 5.456% TCEH Initial Term Loan Facility maturing October 10, 2014 (f)(g) . . . . . . . . . . | 16,244 | 16,409 |
| 5.150% TCEH Delayed Draw Term Loan Facility maturing October 10, 2014 (f)(g) . . . . | 3,562 | 2,150 |
| 3.986% TCEH Letter of Credit Facility maturing October 10, 2014 (g) . . . . . . . . . . . . . | 1,250 | 1,250 |
| 0.449% TCEH Commodity Collateral Posting Facility maturing December 31, 2012 (h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 382 |
| Other: | | |
| 10.25% Fixed Senior Notes due November 1, 2015 (i) . . . . . . . . . . . . . . . . . . . . . . . . . | 3,000 | 3,000 |
| 10.25% Fixed Senior Notes Series B due November 1, 2015 (i) . . . . . . . . . . . . . . . . . . | 2,000 | 2,000 |
| 10.50 / 11.25% Senior Toggle Notes due November 1, 2016 (i) . . . . . . . . . . . . . . . . . . | 1,750 | 1,750 |
| 6.125% Fixed Senior Notes due March 15, 2008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 3 |
| 7.000% Fixed Senior Notes due March 15, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5 | 5 |
| 7.100% Promissory Note due January 5, 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 65 | 65 |
| 7.460% Fixed Secured Facility Bonds with amortizing payments through January 2015 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 67 | 78 |
| Capital lease obligations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 159 | 161 |
| Unamortized fair value discount (e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (6) | (9) |
| Total TCEH . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $29,470 | $28,604 |

F-43

EFIHMW00246121

|  | Successor | |
|---|---|---|
|  | December 31, 2008 | December 31, 2007 |
| **EFC Holdings** | | |
| 9.580% Fixed Notes due in semiannual installments through December 4, 2019 . . . . . . . . . . | $ 55 | $ 59 |
| 8.254% Fixed Notes due in quarterly installments through December 31, 2021 . . . . . . . . . . . | 53 | 56 |
| 3.993% Floating Rate Junior Subordinated Debentures, Series D due January 30, 2037 (g) . . | 1 | 1 |
| 8.175% Fixed Junior Subordinated Debentures, Series E due January 30, 2037 . . . . . . . . . . | 8 | 8 |
| Unamortized fair value discount (e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (12) | (14) |
| Total EFC Holdings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 105 | 110 |
| **EFH Corp. (parent entity)** | | |
| 10.875% Fixed Senior Notes due November 1, 2017 (i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,000 | 2,000 |
| 11.25 / 12.00% Senior Toggle Notes due November 1, 2017 (i) . . . . . . . . . . . . . . . . . . . . . . | 2,500 | 2,500 |
| 6.375% Fixed Senior Notes Series C due January 1, 2008 . . . . . . . . . . . . . . . . . . . . . . . . . | — | 200 |
| 4.800% Fixed Senior Notes Series O due November 15, 2009 . . . . . . . . . . . . . . . . . . . . . . . | 3 | 3 |
| 5.550% Fixed Senior Notes Series P due November 15, 2014 . . . . . . . . . . . . . . . . . . . . . . . | 1,000 | 1,000 |
| 6.500% Fixed Senior Notes Series Q due November 15, 2024 . . . . . . . . . . . . . . . . . . . . . . | 750 | 750 |
| 6.550% Fixed Senior Notes Series R due November 15, 2034 . . . . . . . . . . . . . . . . . . . . . . | 750 | 750 |
| 8.820% Building Financing due semiannually through February 11, 2022 (j) . . . . . . . . . . . | 80 | 88 |
| Unamortized fair value premium related to Building Financing (e) . . . . . . . . . . . . . . . . . . . | 22 | 24 |
| Unamortized fair value discount (e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (661) | (714) |
| Total EFH Corp. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6,444 | 6,601 |
| **Oncor (k)** | | |
| 6.375% Fixed Senior Notes due May 1, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 700 | 700 |
| 5.950% Fixed Senior Notes due September 1, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 650 | — |
| 6.375% Fixed Senior Notes due January 15, 2015 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 500 | 500 |
| 6.800% Fixed Senior Notes due September 1, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 550 | — |
| 7.000% Fixed Debentures due September 1, 2022 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 800 | 800 |
| 7.000% Fixed Senior Notes due May 1, 2032 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 500 | 500 |
| 7.250% Fixed Senior Notes due January 15, 2033 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 350 | 350 |
| 7.500% Fixed Senior Notes due September 1, 2038 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 300 | — |
| Unamortized discount . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (16) | (15) |
| Total Oncor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4,334 | 2,835 |
| Oncor Electric Delivery Transition Bond Company LLC (l) | | |
| 4.030% Fixed Series 2003 Bonds due in semiannual installments through February 15, 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 54 | 93 |
| 4.950% Fixed Series 2003 Bonds due in semiannual installments through February 15, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 130 | 130 |
| 5.420% Fixed Series 2003 Bonds due in semiannual installments through August 15, 2015 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 145 | 145 |
| 3.520% Fixed Series 2004 Bonds due in semiannual installments through November 15, 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 39 | 99 |
| 4.810% Fixed Series 2004 Bonds due in semiannual installments through November 15, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 221 | 221 |
| 5.290% Fixed Series 2004 Bonds due in semiannual installments through May 15, 2016 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 290 | 290 |
| Total Oncor Electric Delivery Transition Bond Company LLC . . . . . . . . . . . . . . . . | 879 | 978 |
| Unamortized fair value discount related to transition bonds (e) . . . . . . . . . . . . . . . . . | (9) | (12) |
| Total Oncor consolidated . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5,204 | 3,801 |
| Total EFH Corp. consolidated . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 41,223 | 39,116 |
| Less amount due currently (m) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (385) | (513) |
| Total long-term debt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $40,838 | $38,603 |

(a)   These series are in the multiannual interest rate mode and are subject to mandatory tender prior to maturity on the mandatory remarketing date. On such date, the interest rate and interest rate period will be reset for the bonds.

(b)   Interest rates in effect at March 31, 2008. These series were remarketed in June 2008, resulting in a fixed rate to maturity.

F-44

EFIHMW00246122

(c)  Interest rates in effect at December 31, 2008. These series are in a daily interest rate mode and are classified as long-term as they are supported by long-term irrevocable letters of credit.
(d)  Interest rate in effect at December 31, 2008. This series is in a weekly interest rate mode and is classified as long-term as it is supported by long-term irrevocable letters of credit.
(e)  Amount represents unamortized fair value adjustments recorded under purchase accounting.
(f)  Interest rate swapped to fixed on $17.55 billion principal amount.
(g)  Interest rates in effect at December 31, 2008.
(h)  Interest rates in effect at December 31, 2008, excluding quarterly maintenance fee discussed below. See "Credit Facilities" above for more information.
(i)  Additional Interest will be payable on these notes on May 1, 2009. See the discussion below under "TCEH Notes Issued Subsequent to the Merger" and "EFH Corp. Notes Issued Subsequent to the Merger."
(j)  This financing is secured with a $121 million letter of credit.
(k)  Secured with first priority lien as discussed under "Oncor Revolving Credit Facility" below.
(l)  These bonds are nonrecourse to Oncor and were issued to securitize a regulatory asset.
(m)  Includes $3 million and $200 million at December 31, 2008 and 2007, respectively, representing debt of the EFH Corp. parent entity.

***Debt-Related Activity in 2008***—Repayments of long-term debt in 2008 totaling $1.167 billion represented principal payments at scheduled maturity dates as well as the remarketing of $242 million principal amount of pollution control revenue bonds discussed below, repayment of $413 million of borrowings under the TCEH Commodity Collateral Posting Facility, which fully repaid borrowings under the facility, and other repayments totaling $48 million, principally related to leases. Payments at scheduled maturity dates included $200 million of EFH Corp. senior notes, $165 million repaid under the TCEH Initial Term Loan Facility, and $99 million of Oncor transition bond principal payments.

Increases in long-term debt during 2008 totaling $3.185 billion consisted of issuances of senior secured notes issued by Oncor with an aggregate principal amount of $1.500 billion (see discussion below under "Oncor Senior Secured Notes"), borrowings under the TCEH Delayed Draw Term Loan Facility of $1.412 billion to fund expenditures related to the development of new generation facilities and the environmental retrofit program for existing lignite/coal-fueled generation facilities, the remarketing of $242 million principal amount of pollution control revenue bonds discussed immediately below and $31 million of additional borrowings under the TCEH Commodity Collateral Posting Facility.

In June 2008, TCEH remarketed the Brazos River Authority Pollution Control Revenue Bonds Series 2001A due in October 2030 and Series 2001D-1 due in May 2033 with aggregate principal amounts of $71 million and $171 million, respectively. The bonds were previously in a floating rate mode that reset weekly and were backed by two letters of credit in an aggregate amount of $247 million. As a result of the remarketing, the bonds were fixed to maturity at an interest rate of 8.25%, and the two letters of credit were cancelled. The bonds are redeemable at par beginning July 1, 2018 and are redeemable with a make-whole premium prior to July 1, 2018. These bonds were remarketed with a covenant package similar to the notes discussed below under "TCEH Notes Issued Subsequent to the Merger."

EFH Corp. and TCEH have the option every six months until November 1, 2012, at their election, to use the payment-in-kind (PIK) feature of their respective toggle notes in lieu of making cash interest payments. The companies elected to do so for the May 1, 2009 interest payment date as an efficient and cost-effective method to further enhance liquidity, in light of the substantial dislocation in the financial markets. Moreover, the incremental liquidity obtained by using the PIK feature of the toggle notes for this specific payment period more than offsets the liquidity that was effectively lost as a result of the default by affiliates of Lehman under TCEH's Senior Secured Facilities.

EFH Corp. will make its May 2009 interest payment by using the PIK feature of the EFH Corp. Toggle Notes. The election will increase the interest rate on the toggle notes from 11.25% to 12.00% during the interest period covered by the PIK election and require EFH Corp. to issue an additional $150 million principal amount of EFH Corp. Toggle Notes on May 1, 2009. In addition, the election will increase liquidity by an amount equal to approximately $141 million, constituting the amount of cash interest that otherwise would have been payable

F-45

EFIHMW00246123

on May 1, 2009, and increase the expected annual cash interest expense by approximately $17 million, constituting the additional cash interest that would be payable with respect to the $150 million of additional toggle notes.

Similarly, TCEH will make its May 2009 interest payment by using the PIK feature of the TCEH Toggle Notes. The election will increase the interest rate on the TCEH Toggle Notes from 10.50% to 11.25% during the interest period covered by the PIK election and require TCEH to issue an additional approximately $98.5 million principal amount of TCEH Toggle Notes on May 1, 2009. In addition, the election will increase liquidity by an amount equal to approximately $92 million, constituting the amount of cash interest that otherwise would have been payable on May 1, 2009, and increase the expected annual cash interest expense by approximately $10 million, constituting the additional cash interest that would be payable with respect to the $98.5 million of additional toggle notes.

*Maturities*—Long-term debt maturities as of December 31, 2008 are as follows (includes Oncor's transition bond semi-annual payments):

| Year | |
|---|---:|
| 2009 (a) | $   371 |
| 2010 | 335 |
| 2011 | 759 |
| 2012 | 1,051 |
| 2013 | 1,066 |
| Thereafter (a) | 38,325 |
| Unamortized fair value premium | 22 |
| Unamortized fair value discount (b) | (849) |
| Unamortized discount | (16) |
| Capital lease obligations | 159 |
| Total | $41,223 |

(a)   Long-term debt maturities for EFH Corp. (parent entity) totals $3 million and $7.0 billion for 2009 and thereafter, respectively.
(b)   Unamortized fair value discount for EFH Corp. (parent entity) totals $(661) million.

F-46

EFIHMW00246124

*Long-Term Debt-Related Activity in 2007*—EFH Corp. and its subsidiaries issued, reacquired or made scheduled principal payments on long-term debt in 2007 as follows (all amounts presented are principal):

| | Successor | | | | Predecessor | |
| | Post-Merger | | Merger-Date | | | |
| | Issuances | Repayments / Repurchases | Issuances | Repayments / Repurchases | Issuances | Repayments / Repurchases |
|---|---|---|---|---|---|---|
| **TCEH:** | | | | | | |
| Senior secured facilities: | | | | | | |
| Initial term loan facility . . . . . . . . . . | $ — | $ (41) | $16,450 | $ — | $ — | $ — |
| Delayed draw term loan facility . . . . | — | — | 2,150 | — | — | — |
| Letter of credit facility . . . . . . . . . . . | — | — | 1,250 | — | — | — |
| Commodity collateral posting | | | | | | |
| facility . . . . . . . . . . . . . . . . . . . . . | — | — | 382 | — | — | — |
| Senior unsecured interim facilities: | | | | | | |
| Initial cash-pay loans . . . . . . . . . . . . | — | (5,000) | 5,000 | — | — | — |
| Initial toggle loans . . . . . . . . . . . . . . | — | (1,750) | 1,750 | — | — | — |
| Senior notes: | | | | | | |
| Senior cash-pay notes . . . . . . . . . . . | 5,000 | — | — | — | — | — |
| Senior toggle notes . . . . . . . . . . . . . | 1,750 | — | — | — | — | — |
| Floating rate senior notes (a) . . . . . . . . . | — | — | — | (1,000) | 1,000 | — |
| Fixed senior notes . . . . . . . . . . . . . . | — | — | — | (1,242) | — | — |
| Secured promissory note . . . . . . . . . . . . | — | — | — | — | 65 | — |
| Pollution control revenue bonds . . . . . . . | — | — | — | — | — | (143) |
| Capital lease obligations . . . . . . . . . . . . | 16 | (4) | — | — | 59 | (8) |
| Other long-term debt . . . . . . . . . . . . . . . | — | — | — | — | — | (7) |
| **EFC Holdings:** | | | | | | |
| Fixed senior debentures . . . . . . . . . . . . . | — | — | — | — | — | (10) |
| Other long-term debt . . . . . . . . . . . . . . . | — | (4) | — | — | — | (2) |
| **EFH Corp.:** | | | | | | |
| Senior unsecured interim facilities: | | | | | | |
| Initial cash-pay loans . . . . . . . . . . . . | — | (2,000) | 2,000 | — | — | — |
| Initial toggle loans . . . . . . . . . . . . . . | — | (2,500) | 2,500 | — | — | — |
| Senior notes: . . . . . . . . . . . . . . . . . . | | | | | | |
| Senior cash-pay notes . . . . . . . . . . . | 2,000 | — | — | — | — | — |
| Senior toggle notes . . . . . . . . . . . . . | 2,500 | — | — | — | — | — |
| Fixed senior notes . . . . . . . . . . . . . . . . | — | — | — | (997) | — | — |
| Floating convertible senior notes . . . . . . . | — | — | — | (25) | — | — |
| Other long-term debt . . . . . . . . . . . . . . . | — | — | — | — | — | (11) |
| **Oncor:** | | | | | | |
| Floating rate senior notes (a) . . . . . . . . . . | — | — | — | (800) | 800 | — |
| Fixed debentures . . . . . . . . . . . . . . . . . . | — | — | — | — | — | (200) |
| Transition bonds . . . . . . . . . . . . . . . . . . | — | (32) | — | — | — | (64) |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . | $11,266 | $(11,331) | $31,482 | $(4,064) | $1,924 | $(445) |

--------

(a)  Notes were subject to mandatory redemption upon closing of the Merger.

F-47

EFIHMW00246125

**PX 014**
**Page 407 of 1116**

*Convertible Senior Notes*—At December 31, 2006, EFH Corp. had $25 million principal amount outstanding of its Floating Rate Convertible Senior Notes due 2033. In conjunction with the Merger, a supplemental indenture was executed and provided that the previously outstanding EFH Corp. Floating Convertible Senior Notes became payable in cash at a fixed conversion rate of $4,274.05 per $1,000 principal amount of the Senior Notes. On October 25, 2007, substantially all of these notes (approximately $24.7 million) were converted and redeemed.

*Other Debt-Related Activity in 2007*—In September 2007, EFH Corp. commenced offers to purchase and consent solicitations with respect to $1.0 billion in aggregate principal amount of EFH Corp.'s outstanding 4.80% Series O Senior Notes due 2009, $250 million in aggregate principal amount of TCEH's outstanding 6.125% Senior Notes due 2008 and $1.0 billion in aggregate principal amount of TCEH's outstanding 7.000% Senior Notes due 2013. The offers were contingent upon the closing of the Merger. In October 2007, EFH Corp. purchased an aggregate of $997 million, $247 million and $995 million principal amounts of these notes, respectively, for $1.005 billion, $248 million and $1.097 billion, respectively, excluding unpaid interest. Interest rate swaps related to $700 million principal amount of these notes were settled for $13 million upon extinguishment of the debt.

In September 2007, subsidiaries of EFH Corp. acquired certain assets of Alcoa Inc. relating to the operation of a lignite mine near Sandow, including partial ownership of the lignite reserves in the mine, for a purchase price of $135 million, including cash of $70 million and a promissory note of $65 million that was paid at maturity on January 5, 2009 at a fixed interest rate of 7.100%, which is reported as a current liability as of December 31, 2008.

In September 2007, TCEH refinanced an existing lease of rail cars, which had been accounted for as an operating lease, with a lease with another party that has been accounted for as a capital lease, resulting in $52 million reported as long-term debt. In late 2007, TCEH also entered into leases related to mining equipment that have been accounted for as capital leases totaling $23 million reported as long-term debt.

In May 2007, TCEH redeemed at par the Sabine River Authority of Texas Series 2006A and 2006B pollution control revenue bonds with aggregate principal amounts of $47 million and $46 million, respectively, and the Trinity River Authority of Texas Series 2006 pollution control revenue bonds with an aggregate principal amount of $50 million. All three bond series were issued in November 2006 in conjunction with the development of eight coal-fueled generation units, which has been cancelled. Restricted cash retained upon issuance of the bonds was used to fund substantially all of the redemption amounts.

In March 2007, TCEH and Oncor issued floating rate senior notes with an aggregate principal amount of $1.0 billion and $800 million, respectively, with a floating rate based on LIBOR plus 50 basis points for TCEH and 37.5 basis points for Oncor. The notes were to mature in September 2008, but in accordance with their terms, were redeemed upon closing of the Merger.

*TCEH Senior Secured Facilities*—Borrowings under the TCEH Initial Term Loan Facility, the TCEH Delayed Draw Term Loan Facility, the TCEH Revolving Credit Facility and the TCEH Letter of Credit Facility, which totaled $21.956 billion at December 31, 2008, bear interest per annum rates equal to, at TCEH's option, (i) adjusted LIBOR plus 3.50% or (ii) a base rate (the higher of (1) the prime rate as announced from time to time by the administrative agent of the facilities and (2) the federal funds effective rate plus 0.50%) plus 2.50%. There is a margin adjustment mechanism in relation to term loans, revolving loans and letter of credit fees under which the applicable margins may be reduced based on the achievement of certain leverage ratio levels; there was no such reduction based upon December 31, 2008 levels. The applicable rate on each facility as of December 31, 2008 is provided in the long-term debt table above and reflects LIBOR-based borrowings.

A commitment fee is payable quarterly in arrears and upon termination of the TCEH Revolving Credit Facility at a rate per annum equal to 0.50% of the average daily unused portion of such facility. The commitment fee is subject to reduction, based on the achievement of certain leverage ratio levels; there was no such reduction based upon December 31, 2008 levels.

F-48

Confidential

With respect to the TCEH Delayed Draw Term Loan Facility, a commitment fee is payable quarterly in arrears and upon termination of the undrawn portion of the commitments of such facility at a rate per annum equal to, prior to October 10, 2008, 1.25% per annum, and thereafter, 1.50% per annum.

Letter of credit fees under the TCEH Revolving Facility are payable quarterly in arrears and upon termination at a rate per annum equal to the spread over adjusted LIBOR under the TCEH Revolving Facility, less the issuing bank's fronting fee. Letter of credit fees under the TCEH Letter of Credit Facility are equal to the difference between interest paid on each outstanding letter of credit at a rate of LIBOR plus 3.50% per annum and the interest earned on the total $1.25 billion TCEH Letter of Credit Facility restricted cash at a rate of LIBOR minus 0.12% per annum yielding a currently effective rate of 3.62% per annum on each outstanding letter of credit under that facility.

TCEH will pay a fixed quarterly maintenance fee of approximately $11 million through maturity for having procured the TCEH Commodity Collateral Posting Facility regardless of actual borrowings under the facility. In addition, TCEH will pay interest at LIBOR on actual borrowed amounts under the TCEH Commodity Collateral Posting Facility partially offset by interest earned on collateral deposits to counterparties.

The TCEH Senior Secured Facilities are unconditionally guaranteed jointly and severally on a senior secured basis, by EFC Holdings, and each existing and subsequently acquired or organized direct or indirect wholly-owned US restricted subsidiary of TCEH (other than certain subsidiaries as provided in the TCEH Senior Secured Facilities), subject to certain other exceptions.

The TCEH Senior Secured Facilities, including the guarantees thereof, certain commodity hedging transactions and the interest rate swaps described under "TCEH Interest Rate Hedges" below are secured by (a) substantially all of the current and future assets of TCEH and TCEH's subsidiaries who are guarantors of such facilities as described above, and (b) pledges of the capital stock of TCEH and each current and future material wholly-owned restricted subsidiary of TCEH directly owned by TCEH or any guarantor.

The TCEH Senior Secured Facilities contain customary negative covenants, restricting, subject to certain exceptions, TCEH and TCEH's restricted subsidiaries from, among other things:

- incurring additional debt;
- incurring additional liens;
- entering into mergers and consolidations;
- selling or otherwise disposing of assets;
- making dividends, redemptions or other distributions in respect of capital stock;
- making acquisitions, investments, loans and advances, and
- paying or modifying certain subordinated and other material debt.

In addition, the TCEH Senior Secured Facilities contain a maintenance covenant that prohibits TCEH and its restricted subsidiaries from exceeding a maximum consolidated secured leverage ratio and to observe certain customary reporting requirements and other affirmative covenants.

The TCEH Initial Term Loan Facility is required to be repaid in equal quarterly installments in an aggregate annual amount equal to 1% of the original principal amount of such facility ($41 million quarterly), with the balance payable on October 10, 2014. The TCEH Delayed Draw Term Loan Facility is required to be repaid in equal quarterly installments beginning on December 31, 2009 in an aggregate annual amount equal to 1% of the actual principal outstanding under the TCEH Delayed Draw Term Loan Facility as of such date, with the balance payable on October 10, 2014. Amounts borrowed under the TCEH Revolving Facility may be reborrowed from time to time from and after the closing date until October 10, 2013. The TCEH Letter of Credit Facility will mature on October 10, 2014. The TCEH Commodity Collateral Posting Facility will mature on December 31, 2012.

F-49

Confidential

The TCEH Senior Secured Facilities contain certain customary events of default for senior leveraged acquisition financings, the occurrence of which would allow the lenders to accelerate all outstanding loans and terminate their commitments.

**TCEH Notes Issued Subsequent to the Merger**—Pursuant to an indenture entered into in October 2007 (the TCEH Indenture), TCEH and TCEH Finance (the Co-Issuers) issued and sold $3.0 billion aggregate principal amount of 10.25% Senior Notes due November 1, 2015. In December 2007 under a supplemental indenture, the Co-Issuers issued and sold $2.0 billion aggregate principal amount of 10.25% Series B Senior Notes due November 1, 2015. Interest on these notes (referred to as the TCEH Cash-Pay Notes) is payable in cash semiannually in arrears on May 1 and November 1 of each year at a fixed rate of 10.25% per annum, and the first interest payment was made on May 1, 2008.

Pursuant to the supplemental indenture, the Co-Issuers also issued and sold $1.75 billion aggregate principal amount of 10.50%/11.25% Senior Toggle Notes due November 1, 2016. The initial interest payment on these notes (referred to as the TCEH Toggle Notes) was paid in cash. For any interest period thereafter until November 1, 2012, the Issuer may elect to pay interest on the notes, at the Issuer's option (i) entirely in cash; (ii) by increasing the principal amount of the notes or by issuing new TCEH Toggle Notes (Payment-in-Kind or PIK Interest); or (iii) 50% in cash and 50% in PIK Interest. Interest on the notes is payable semi-annually in arrears on May 1 and November 1 of each year at a fixed rate of 10.50% per annum for cash interest and at a fixed rate of 11.25% per annum for PIK Interest, and the first interest payment was made on May 1, 2008. See "Debt Related Activity in 2008" above for discussion of TCEH's election to use the PIK option for the May 1, 2009 payment.

The $6.75 billion principal amount of notes issued under the TCEH Indenture and its supplement (the TCEH Cash-Pay Notes and the TCEH Toggle Notes) are collectively referred to as the TCEH Notes.

The TCEH Notes are fully and unconditionally guaranteed by TCEH's direct parent, EFC Holdings (which owns 100% of TCEH and its subsidiary guarantors), and by each subsidiary that guarantees the TCEH Senior Secured Facilities (the TCEH Guarantors). The TCEH Notes are the Co-Issuers' senior unsecured debt and rank senior in right of payment to any future subordinated indebtedness of the Co-Issuers, equally in right of payment with all of the Co-Issuers' existing and future senior unsecured indebtedness, and structurally subordinated in right of payment to all existing and future indebtedness and other liabilities of the Co-Issuers' non-guarantor subsidiaries, including trade payables (other than indebtedness and liabilities owed to the Co-Issuers or the TCEH Guarantors). The TCEH Notes rank effectively junior in right of payment to all existing and future senior secured indebtedness of the Co-Issuers, including the TCEH Senior Secured Facilities to the extent of the value of the collateral securing such indebtedness.

The guarantees are joint and several guarantees of the TCEH Notes, are the TCEH Guarantors' senior unsecured obligations and rank equal in right of payment with all existing and future senior unsecured indebtedness of the relevant TCEH Guarantor and senior in right of payment to any existing or future subordinated indebtedness of the relevant TCEH Guarantor. The guarantees rank effectively junior to all secured indebtedness of the TCEH Guarantors to the extent of the assets securing that indebtedness. EFC Holdings' guarantee of the TCEH Notes ranks equally with its guarantee of the EFH Corp. Cash-Pay Notes and the EFH Corp. Toggle Notes (discussed below). The guarantees of the TCEH Notes are structurally junior to all indebtedness and other liabilities of the Co-Issuers' subsidiaries that do not guarantee the notes.

The TCEH Indenture contains a number of covenants that, among other things, restrict, subject to certain exceptions, the Co-Issuers' and their restricted subsidiaries' ability to:

- make restricted payments;

- incur debt and issue preferred stock;

- create liens;

F-50

EFIHMW00246128

- enter into mergers or consolidations;

- sell or otherwise dispose of certain assets;

- permit dividend and other payment restrictions on restricted subsidiaries, and

- engage in certain transactions with affiliates.

The TCEH Indenture also contains customary events of default, including failure to pay principal or interest on the TCEH Notes or the guarantees when due, among others. If an event of default occurs under the TCEH Indenture, the trustee or the holders of at least 30% in principal amount of the Required Debt (as such term is defined in the TCEH Indenture) may declare the principal amount on the TCEH Notes to be due and payable immediately.

The Co-Issuers may redeem the TCEH Cash-Pay Notes, in whole or in part, at any time on or after November 1, 2011, or the TCEH Toggle Notes, in whole or in part, at any time on or after November 1, 2012, at specified redemption prices, plus accrued and unpaid interest, if any. In addition, before November 1, 2010, the Co-Issuers may redeem with the cash proceeds of certain equity offerings up to 35% of the aggregate principal amount of TCEH Cash-Pay Notes from time to time at a redemption price of 110.250% of the aggregate principal amount of the TCEH Cash-Pay Notes, plus accrued and unpaid interest, if any, or 110.500% of the aggregate principal amount of the TCEH Toggle Notes, plus accrued and unpaid interest, if any. The Co-Issuers may also redeem the TCEH Cash-Pay Notes at any time prior to November 1, 2011 or the TCEH Toggle Notes at any time prior to November 1, 2012 at a price equal to 100% of their principal amount, plus accrued and unpaid interest and a "make-whole" premium. Upon the occurrence of a change in control of TCEH, the Co-Issuers must offer to repurchase the TCEH Notes at 101% of their principal amount, plus accrued and unpaid interest, if any.

The TCEH Notes were issued in a private placement with registration rights. Notes having substantially identical terms as the TCEH Notes were registered with the SEC by the Co-Issuers in December 2008 as part of an offer to exchange freely tradable exchange notes for the TCEH Notes. The exchange offer was completed in January 2009. Because the exchange offer was not completed within 360 days after the issue date of the TCEH Notes (a TCEH Registration Default), the annual interest rate on the TCEH Notes increased for the period during which the TCEH Registration Default continued (October 26, 2008 to January 30, 2009 for the Senior Notes and November 30, 2008 to January 30, 2009 for the Series B Senior Notes and Senior Toggle Notes), resulting in incremental interest of $3.7 million.

***EFH Corp. Notes Issued Subsequent to the Merger***—Pursuant to an indenture entered into in October 2007 (the EFH Corp. Indenture), EFH Corp. issued and sold $2.0 billion aggregate principal amount of 10.875% Senior Notes due November 1, 2017. Interest on the notes (referred to as the EFH Corp. Cash-Pay Notes) is payable in cash semi-annually in arrears on May 1 and November 1 of each year at a fixed rate of 10.875% per annum, and the first interest payment was made on May 1, 2008.

Pursuant to the EFH Corp. Indenture, EFH Corp. also issued and sold $2.5 billion aggregate principal amount of 11.250%/12.000% Senior Toggle Notes due November 1, 2017. The initial interest payment on the notes (referred to as the EFH Corp. Toggle Notes) was paid in cash. For any interest period thereafter until November 1, 2012, EFH Corp. may elect to pay interest on the notes, at EFH Corp.'s option (i) entirely in cash; (ii) by increasing the principal amount of the notes or by issuing new EFH Corp. Toggle Notes (PIK Interest); or (iii) 50% in cash and 50% in PIK Interest. Interest on the notes is payable semi-annually in arrears on May 1 and November 1 of each year at a fixed rate of 11.250% per annum for cash interest and at a fixed rate of 12.000% per annum for PIK Interest, and the first interest payment was made on May 1, 2008. See "Debt Related Activity in 2008" above for discussion of EFH Corp.'s election to use the PIK option for the May 1, 2009 payment.

The $4.5 billion principal amount of notes issued under the EFH Corp. Indenture (the EFH Corp. Cash-Pay Notes and the EFH Corp. Toggle Notes) are collectively referred to herein as the EFH Corp. Notes.

F-51

EFIHMW00246129

The EFH Corp. Notes are fully and unconditionally guaranteed by EFC Holdings and Intermediate Holding, 100% owned subsidiaries of EFH Corp. (the EFH Corp. Guarantors). The EFH Corp. Notes are EFH Corp.'s senior unsecured debt and rank senior in right of payment to any existing and future subordinated indebtedness of EFH Corp., equally in right of payment with all of EFH Corp.'s existing and future senior unsecured indebtedness and structurally subordinated in right of payment to all existing and future indebtedness, preferred stock and other liabilities of EFH Corp.'s non-guarantor subsidiaries, including trade payables (other than indebtedness and liabilities owed to EFH Corp. or the EFH Corp. Guarantors). The EFH Corp. Notes will rank effectively junior in right of payment to all future secured indebtedness of EFH Corp. to the extent of the assets securing that indebtedness.

The guarantees are joint and several guarantees of the EFH Corp. Notes, are the EFH Corp. Guarantors' unsecured senior obligations and rank equal in right of payment with all existing and future senior unsecured indebtedness of the relevant EFH Corp. Guarantor and senior in right of payment to any existing or future subordinated indebtedness of the relevant EFH Corp. Guarantor. The guarantees of the EFH Corp. Notes will be structurally junior to all indebtedness and other liabilities of the relevant EFH Corp. Guarantor's subsidiaries that are not guarantors.

The EFH Corp. Indenture contains a number of covenants that, among other things, restrict, subject to certain exceptions, EFH Corp.'s and its restricted subsidiaries' ability to:

- make restricted payments;

- incur debt and issue preferred stock;

- create liens;

- enter into mergers or consolidations;

- sell or otherwise dispose of certain assets;

- permit dividend and other payment restrictions on restricted subsidiaries, and

- engage in certain transactions with affiliates.

The EFH Corp. Indenture also contains customary events of default, including failure to pay principal or interest on the EFH Corp. Notes or the guarantees when due, among others. If an event of default occurs under the EFH Corp. Indenture, the trustee or the holders of at least 30% in principal amount outstanding of the EFH Corp. Notes may declare the principal amount on the EFH Corp. Notes to be due and payable immediately.

EFH Corp. may redeem the EFH Corp. Notes, in whole or in part, at any time on or after November 1, 2012, at specified redemption prices, plus accrued and unpaid interest, if any. In addition, before November 1, 2010, EFH Corp. may redeem, with the net cash proceeds of certain equity offerings, up to 35% of the aggregate principal amount of the EFH Corp. Notes from time to time at a redemption price of 110.875% of the aggregate principal amount of the EFH Corp. Cash Pay Notes, plus accrued and unpaid interest, if any, or 111.250% of the aggregate principal amount of the EFH Corp. Toggle Notes, plus accrued and unpaid interest, if any. EFH Corp. may also redeem the EFH Corp. Notes at any time prior to November 1, 2012 at a price equal to 100% of their principal amount, plus accrued and unpaid interest and a "make-whole" premium. Upon the occurrence of a change in control, EFH Corp. must offer to repurchase the EFH Corp. Notes at 101% of their principal amount, plus accrued and unpaid interest, if any.

The EFH Corp. Notes were issued in a private placement with registration rights. Notes having substantially identical terms as the EFH Corp. Notes were registered with the SEC by EFH Corp. in December 2008 as part of an offer to exchange freely tradable exchange notes for the EFH Corp. Notes. The exchange offer was completed in January 2009. Because the exchange offer was not completed within 360 days after the issue date of the EFH Corp. Notes (an EFH Corp. Registration Default), the annual interest rate on the EFH Corp. Notes increased for the period during which the EFH Corp. Registration Default continued (October 26, 2008 to January 30, 2009), resulting in incremental interest of $3.2 million.

F-52

EFIHMW00246130