the ability for TCEH to issue up to an additional $4 billion of secured notes or loans ranking junior to TCEH's first lien obligations, provided that:

- such notes or loans mature later than the latest maturity date of any of the initial term loans under the TCEH Senior Secured Facilities, and

- any net cash proceeds from any such issuances are used (i) in exchange for, or to refinance, repay, retire, refund or replace indebtedness of TCEH or (ii) to acquire, directly or indirectly, all or substantially all of the property and assets or business of another person or to finance the purchase price, cost of design, acquisition, construction, repair, restoration, replacement, expansion, installation or improvement of certain fixed or capital assets.

In addition, the amended Credit Agreement permits TCEH to, among other things:

- issue new secured notes or loans, which may include, in each case, indebtedness secured on a pari passu basis with the obligations under the TCEH Senior Secured Facilities, so long as, in each case, among other things, the net cash proceeds from any such issuance are used to prepay certain loans under the TCEH Senior Secured Facilities at par;

- agree with individual lenders to extend the maturity of their term loans or extend or refinance their revolving credit commitments under the TCEH Senior Secured Facilities, and pay increased interest rates or otherwise modify the terms of their loans or revolving commitments in connection with such an extension, and

- exclude from the financial maintenance covenant under the TCEH Senior Secured Facilities any new debt issued that ranks junior to TCEH's first lien obligations under the TCEH Senior Secured Facilities.

The TCEH Senior Secured Facilities are unconditionally guaranteed jointly and severally on a senior secured basis by EFC Holdings and subject to certain exceptions, each existing and future direct or indirect wholly-owned US restricted subsidiary of TCEH. The TCEH Senior Secured Facilities, including the guarantees thereof, certain commodity hedging transactions and the interest rate swaps described under "TCEH Interest Rate Hedges" below are secured by (a) substantially all of the current and future assets of TCEH and TCEH's subsidiaries who are guarantors of such facilities and (b) pledges of the capital stock of TCEH and certain current and future direct or indirect subsidiaries of TCEH.

The TCEH Initial Term Loan Facility is required to be repaid in equal quarterly installments in an aggregate annual amount equal to 1% of the original principal amount of such facility (approximately $41 million quarterly), with the balance payable in October 2014. The TCEH Delayed Draw Term Loan Facility is required to be repaid in equal quarterly installments beginning in December 2009 in an aggregate annual amount equal to 1% of the actual principal outstanding under such facility as of such date, with the balance payable in October 2014. Amounts borrowed under the TCEH Revolving Facility may be reborrowed from time to time until October 2013. The TCEH Letter of Credit Facility and TCEH Commodity Collateral Posting Facility will mature in October 2014 and December 2012, respectively.

*TCEH Senior Notes*—Borrowings under TCEH's and TCEH Finance's (collectively, the Co-Issuers) 10.25% Senior Notes due November 1, 2015 and 10.25% Senior Notes Series B due November 1, 2015 (collectively, TCEH Cash-Pay Notes) bear interest semiannually in arrears on May 1 and November 1 of each year at a fixed rate of 10.25% per annum. Borrowings under the TCEH Toggle Notes bear interest semiannually in arrears on May 1 and November 1 of each year at a fixed rate of 10.50% per annum for cash interest and at a fixed rate of 11.25% per annum for PIK Interest (as defined below). For any interest period until November 1, 2012, the Co-Issuers may elect to pay interest on the notes (i) entirely in cash; (ii) by increasing the principal amount of the notes or by issuing new TCEH Toggle Notes (Payment-in-Kind or PIK Interest); or (iii) 50% in cash and 50% in PIK Interest.

F-129

EFIHMW00246207

The TCEH Cash-Pay Notes and the TCEH Toggle Notes (collectively, the TCEH Senior Notes) are fully and unconditionally guaranteed on a joint and several basis by TCEH's direct parent, EFC Holdings (which owns 100% of TCEH and its subsidiary guarantors), and by each subsidiary that guarantees the TCEH Senior Secured Facilities.

The Co-Issuers may redeem the TCEH Cash-Pay Notes, in whole or in part, at any time on or after November 1, 2011, or the TCEH Toggle Notes, in whole or in part, at any time on or after November 1, 2012, at specified redemption prices, plus accrued and unpaid interest, if any. In addition, before November 1, 2010, the Co-Issuers may redeem with the cash proceeds of certain equity offerings up to 35% of the aggregate principal amount of TCEH Cash-Pay Notes and TCEH Toggle Notes from time to time at a redemption price of 110.250% and 110.500%, respectively, of their respective aggregate principal amount plus accrued and unpaid interest, if any. The Co-Issuers may also redeem the TCEH Cash-Pay Notes at any time prior to November 1, 2011 or the TCEH Toggle Notes at any time prior to November 1, 2012 at a price equal to 100% of their principal amount, plus accrued and unpaid interest and a "make-whole" premium. Upon the occurrence of a change in control of TCEH, the Co-Issuers must offer to repurchase the TCEH Senior Notes at 101% of their principal amount, plus accrued and unpaid interest, if any.

*EFH Corp. Senior Notes*—Borrowings under EFH Corp.'s 10.875% Senior Notes due November 1, 2017 (EFH Corp. Cash-Pay Notes) bear interest semiannually in arrears on May 1 and November 1 of each year at a fixed rate of 10.875% per annum. Borrowings under EFH Corp.'s 11.250%/12.000% Senior Toggle Notes due November 1, 2017 (EFH Corp. Toggle Notes and collectively with the EFH Corp. Cash-Pay Notes, the EFH Corp. Senior Notes) bear interest semiannually in arrears on May 1 and November 1 of each year at a fixed rate of 11.250% per annum for cash interest and at a fixed rate of 12.000% per annum for PIK Interest. For any interest period until November 1, 2012, EFH Corp. may elect to pay interest on the notes, at EFH Corp.'s option (i) entirely in cash; (ii) by increasing the principal amount of the notes or by issuing new EFH Corp. Toggle Notes; or (iii) 50% in cash and 50% in PIK Interest.

The EFH Corp. Senior Notes are fully and unconditionally guaranteed on a joint and several basis by EFC Holdings and Intermediate Holding.

EFH Corp. may redeem the EFH Corp. Senior Notes, in whole or in part, at any time on or after November 1, 2012, at specified redemption prices, plus accrued and unpaid interest, if any. In addition, before November 1, 2010, EFH Corp. may redeem, with the net cash proceeds of certain equity offerings, up to 35% of the aggregate principal amount of the EFH Corp. Toggle Notes from time to time at a redemption price of 110.875% of the aggregate principal amount of the EFH Corp. Cash-Pay Notes, plus accrued and unpaid interest, if any, or 111.250% of aggregate principal amount of the EFH Corp. Toggle Notes, plus accrued and unpaid interest, if any. EFH Corp. may also redeem the EFH Corp. Senior Notes at any time prior to November 1, 2012 at a price equal to 100% of their principal amount, plus accrued and unpaid interest and a "make-whole" premium. Upon the occurrence of a change in control of EFH Corp., EFH Corp. must offer to repurchase the EFH Corp. Senior Notes at 101% of their principal amount, plus accrued and unpaid interest, if any.

*TCEH Interest Rate Swap Transactions*—As of September 30, 2009, TCEH has entered into interest rate swap transactions pursuant to which payment of the floating interest rates on an aggregate of $17.55 billion of senior secured term loans of TCEH were exchanged for interest payments at fixed rates of between 7.3% and 8.3% on debt maturing from 2009 to 2014. Interest rate swaps on an aggregate of $15.05 billion were being accounted for as cash flow hedges related to variable interest rate cash flows until August 29, 2008, at which time these swaps were dedesignated as cash flow hedges as a result of the intent to change the variable interest rate terms of the hedged debt (from three-month LIBOR to one-month LIBOR) in connection with the planned execution of interest rate basis swaps (discussed immediately below) to further reduce the fixed borrowing costs. Based on the fair value of the positions, the cumulative unrealized mark-to-market net losses related to these interest rate swaps totaled $431 million (pre-tax) at the dedesignation date and was recorded in accumulated other comprehensive income. This balance will be reclassified into net income as interest on the hedged debt is reflected in net income. No ineffectiveness gains or losses were recorded.

F-130

EFIHMW00246208

As of September 30, 2009, TCEH has entered into interest rate basis swap transactions pursuant to which payments at floating interest rates of three-month LIBOR on an aggregate of $18.0 billion principal amount of senior secured term loans of TCEH were exchanged for floating interest rates of one-month LIBOR plus spreads ranging from 0.0625% to 0.353%. These transactions include swaps entered into in the nine months ended September 30, 2009 related to an aggregate $9.55 billion principal amount of senior secured term loans of TCEH and reflect the expiration of swaps in the nine months ended September 30, 2009 that related to an aggregate $4.595 billion principal amount of senior secured term loans of TCEH.

The interest rate swap counterparties are secured by the same collateral package granted to the lenders under the TCEH Senior Secured Facilities. Subsequent to the dedesignation in August 2008 discussed above, changes in the fair value of such swaps are being reported in the income statement in interest expense and related charges, and such unrealized mark-to-market value changes totaled $138 million in net losses and $36 million in net gains in the three months ended September 30, 2009 and 2008, respectively, and $527 million and $36 million in net gains in the nine months ended September 30, 2009 and 2008, respectively. The cumulative unrealized mark-to-market net liability related to the swaps totaled $1.4 billion at September 30, 2009, of which $238 million (pre-tax) was reported in accumulated other comprehensive income.

See Note 7 for discussion of collateral investments related to certain of these interest rate swaps.

***Oncor Secured Revolving Credit Facility***—Oncor has a $2.0 billion credit facility to be used for its working capital and general corporate purposes, including issuances of commercial paper and letters of credit. Oncor may request increases in the commitments under the facility in any amount up to $500 million, subject to the satisfaction of certain conditions. Amounts borrowed under the facility, once repaid, can be reborrowed by Oncor from time to time until October 10, 2013. Oncor secured this credit facility with a first priority lien on certain of its transmission and distribution assets. Oncor also secured all of its existing long-term debt securities (excluding the transition bonds) with the same lien in accordance with the terms of those securities. The lien contains customary provisions allowing Oncor to use the assets in its business, as well as to replace and/or release collateral as long as the market value of the aggregate collateral is at least 115% of the aggregate secured debt. The lien may be terminated at Oncor's option upon the termination of Oncor's credit facility. Borrowings under this credit facility totaled $537 million and $337 million at September 30, 2009 and December 31, 2008, respectively. The applicable rate on borrowings under this credit facility as of September 30, 2009 was 0.60% (see detail provided in the credit facilities table above).

## 5.  COMMITMENTS AND CONTINGENCIES

### Generation Development

Construction of three lignite-fueled generation units in Texas, two units at Oak Grove and one unit at Sandow, is nearing completion. The Sandow unit achieved substantial completion (as defined in the EPC Agreement for the unit) on September 30, 2009, and one Oak Grove unit is in the commissioning and start-up phase.

In connection with the acquisition of the development rights to the Sandow unit, a subsidiary of TCEH (Sandow Power Company LLC, or Sandow Power) became a party to a federal consent decree with, among others, the US Department of Justice in August 2007 (the Consent Decree). A 2007 federal court order that was merged into the Consent Decree requires that, among other things, the Sandow unit commence commercial operation (as defined in the Consent Decree) and achieve and maintain certain emission-related deadlines by August 31, 2009. The Sandow unit met the commercial operation deadline by synchronizing to the ERCOT grid in early July 2009. However, due to unforeseen weather events and equipment malfunctions experienced during commissioning and start-up activities, the Sandow unit was not able to meet the emission-related deadlines by August 31, 2009. Under the terms of the Consent Decree, Sandow Power may request an extension to these deadlines from the federal district court that presides over the Consent Decree for certain force majeure events

Confidential

(including such events as the weather events and equipment malfunctions described above). In September 2009, the federal district court granted Sandow Power's request for force majeure relief and gave Sandow Power an additional sixty-one days from August 31, 2009 to begin achieving compliance with the applicable Consent Decree deadlines.

TCEH has received the air permits for the Sandow and Oak Grove units. However, the issuances of the air permits have been challenged as discussed below under "Litigation Related to Generation Facilities."

Construction work-in-process asset balances for the Oak Grove units totaled approximately $3.3 billion as of September 30, 2009, which includes the effects of the fair value adjustments related to purchase accounting and capitalized interest. In the unexpected event the development of the Oak Grove units was cancelled due to air permit challenges, the cancellation exposure as of September 30, 2009 totaled $3.4 billion, which includes the carrying value of the project and up to approximately $100 million of termination obligations. This estimated exposure amount excludes any potential recovery values for assets acquired to date and for assets already owned prior to executing such agreements that are being utilized in these projects.

*Litigation Related to Generation Facilities*

In September 2007, an administrative appeal challenging the order of the TCEQ issuing the air permit for construction and operation of the Oak Grove generation facility in Robertson County, Texas was filed in the State District Court of Travis County, Texas. Plaintiffs asked that the District Court reverse the TCEQ's approval of the Oak Grove air permit and the TCEQ's adoption and approval of the TCEQ Executive Director's Response to Comments, and remand the matter back to TCEQ for further proceedings. In addition to this administrative appeal, two other petitions were filed in Travis County District Court by non-parties to the administrative hearing before the TCEQ and the State Office of Administrative Hearings (SOAH) seeking to challenge the TCEQ's issuance of the Oak Grove air permit and asking the District Court to remand the matter to the SOAH for further proceedings. Finally, the plaintiffs in these two additional lawsuits filed a third, joint petition claiming insufficiencies in the Oak Grove application, permit, and process and seeking party status and remand to the SOAH for further proceedings. One of the plaintiffs has asked the District Court to consolidate all these proceedings, and the Attorney General of Texas, on behalf of TCEQ, filed pleas to the jurisdiction seeking dismissal of all but the administrative appeal. In May 2009, the District Court dismissed the claims that contest the merits of the TCEQ's permitting decision, but declined to dismiss the claims that contest the process by which the TCEQ handled the permit application. Oak Grove Management Company LLC (a subsidiary of TCEH) has subsequently intervened in these proceedings and has filed its own pleas to the jurisdiction asking the court to dismiss the remaining collateral attack claims. In October 2009, one of the plaintiffs ended its legal challenge to the permit. We believe the Oak Grove air permit granted by the TCEQ was issued in accordance with applicable law. There can be no assurance that the outcome of these matters will not adversely impact the Oak Grove project.

In June and September 2008, administrative appeals were filed in the State District Court of Travis County, Texas to challenge the administrative action of the TCEQ Executive Director in issuing an air permit alteration for the previously-permitted construction and operation of the Sandow 5 generation facility in Milam County, Texas, and the failure of the TCEQ to overturn that administrative action. Plaintiffs asked that the District Court reverse the issuance of the permit alteration. The Attorney General of Texas, on behalf of TCEQ, is defending the issuance of the permit alteration. Sandow Power has intervened in support of the TCEQ. The plaintiff's brief was filed in late August 2009, and the Attorney General of Texas and Sandow Power have filed responsive briefs. We believe the Sandow 5 air permit alteration administratively issued by the Executive Director of the TCEQ was issued in accordance with applicable law. There can be no assurance that the outcome of these matters will not adversely impact the Sandow 5 project.

In July 2008, the Sierra Club announced that it may sue Luminant, after the expiration of a 60-day waiting period, for violating federal Clean Air Act provisions in connection with Luminant's Martin Lake generation

Confidential

facility. We cannot predict whether the Sierra Club will actually file suit relating to Martin Lake or the outcome of any such proceeding.

### Other Litigation

In September 2005, a lawsuit was filed in the US District Court for the Northern District of Texas, Dallas Division against EFH Corp. (then known as TXU Corp.) and C. John Wilder, EFH Corp.'s former Chief Executive Officer. The plaintiffs asserted claims on behalf of themselves and a putative class of owners of certain EFH Corp. securities who tendered such securities in connection with a tender offer conducted by EFH Corp. in 2004. The plaintiffs alleged violations of the provisions of Sections 14(e), 10(b) and 20(a) of the Securities Exchange Act of 1934, as amended, and Rule 10b-5 thereunder. In August 2006, the District Court dismissed this litigation with prejudice. In 2007, the US Court of Appeals for the Fifth Circuit remanded the dismissal to the District Court in light of the US Supreme Court's then-recent decision in Tellabs, Inc. v. Makor Issues & Rights, Ltd. On remand, in April 2008, the District Court again dismissed this litigation with prejudice. In April 2009, the US Court of Appeals for the Fifth Circuit affirmed the dismissal of all claims. In June 2009, the plaintiffs requested that the US Supreme Court review the merits of the case. In October 2009, the US Supreme Court denied the plaintiff's petition for review. Accordingly, this litigation has concluded.

In July 2008, Alcoa Inc. filed a lawsuit in Milam County, Texas district court against Luminant Generation and Luminant Mining (wholly-owned subsidiaries of TCEH), later adding EFH Corp., a number of its subsidiaries, Texas Holdings and Texas Energy Future Capital Holdings LLC as parties to the suit. The lawsuit makes various claims concerning the operation of the Sandow Unit 4 generation facility and the Three Oaks lignite mine, including claims for breach of contract, breach of fiduciary duty, fraud, tortious interference, civil conspiracy and conversion. The plaintiff requests money damages of no less than $500 million, declaratory judgment, rescission and other forms of equitable relief. An agreed scheduling order is currently in place setting trial for May 2010. While we are unable to estimate any possible loss or predict the outcome of this litigation, we believe the plaintiff's claims made in this litigation are without merit and, accordingly, intend to vigorously defend this litigation.

### Regulatory Investigations and Reviews

In June 2008, the EPA issued a request for information to TCEH under EPA's authority under Section 114 of the Clean Air Act. The stated purpose of the request is to obtain information necessary to determine compliance with the Clean Air Act, including New Source Review Standards and air permits issued by the TCEQ for the Big Brown, Monticello and Martin Lake generation facilities. The company is cooperating with the EPA and is responding in good faith to the EPA's request, but is unable to predict the outcome of this matter.

### Other Proceedings

In addition to the above, we are involved in various other legal and administrative proceedings in the normal course of business, the ultimate resolution of which, in the opinion of management, should not have a material effect on our financial position, results of operations or cash flows.

### Guarantees

We have entered into contracts that contain guarantees to outside parties that could require performance or payment under certain conditions. Material guarantees are discussed below.

*Disposed TXU Gas operations*—In connection with the TXU Gas transaction in October 2004, EFH Corp. agreed to indemnify Atmos Energy Corporation (Atmos), until October 1, 2014, for up to $500 million for any liability related to assets retained by TXU Gas, including certain inactive gas plant sites not acquired by Atmos, and up to $1.4 billion for contingent liabilities associated with preclosing tax and employee related matters.

F-133

Confidential

The maximum aggregate amount that we may be required to pay is $1.9 billion. To date, we have not been required to make any payments to Atmos under any of these indemnity obligations, and no such payments are currently anticipated.

*Residual value guarantees in operating leases*—We are the lessee under various operating leases that guarantee the residual values of the leased assets. At September 30, 2009, the aggregate maximum amount of residual values guaranteed was approximately $51 million with an estimated residual recovery of approximately $56 million. These leased assets consist primarily of mining equipment, rail cars and vehicles. The average life of the residual value guarantees under the lease portfolio is approximately four years.

See Note 4 above and Note 15 to Financial Statements in the 2008 Form 10-K for discussion of guarantees and security for certain of our indebtedness.

## Letters of Credit

At September 30, 2009, TCEH had outstanding letters of credit under its credit facilities totaling $714 million as follows:

- $360 million to support risk management and trading margin requirements in the normal course of business, including over-the-counter hedging transactions;

- $208 million to support floating rate pollution control revenue bond debt with an aggregate principal amount of $204 million (the letters of credit are available to fund the payment of such debt obligations and expire in 2014);

- $65 million for collateral funding transactions with counterparties to interest rate swap agreements related to TCEH debt (see Note 7), and

- $81 million for miscellaneous credit support requirements.

*Long-Term Contractual Obligations and Commitments*—In the nine months ended September 30, 2009, we entered into contractual obligations for fuel for our generation facilities totaling approximately $320 million to purchase nuclear fuel in periods between 2010 and 2020 and totaling approximately $153 million to purchase coal in periods between 2010 and 2012.

## 6.   EQUITY

### Dividend Restrictions

The indenture governing the EFH Corp. Senior Notes includes covenants that, among other things and subject to certain exceptions, restrict our ability to pay dividends or make other distributions in respect of our capital stock. Accordingly, essentially all of our net income is restricted from being used to make distributions on our common stock unless such distributions are expressly permitted under the indenture and/or after such distributions, on a pro forma basis, after giving effect to such payment, our consolidated leverage ratio is equal to or less than 7.0 to 1.0. Consolidated leverage ratio is generally defined as the ratio of consolidated total indebtedness (as defined in the indenture) to Adjusted EBITDA, in each case, on a consolidated basis, excluding Oncor Holdings and its subsidiaries.

The TCEH Senior Secured Facilities generally restrict TCEH from making any distribution to any of its parent companies for the ultimate purpose of making a distribution to Texas Holdings unless at the time, and after giving effect to such distribution, its consolidated total debt (as defined in the TCEH Senior Secured Facilities) to Adjusted EBITDA would be equal to or less than 6.5 to 1.0. In addition, the TCEH Senior Secured Facilities and Indenture generally restrict TCEH's ability to make distributions or loans to any of its parent companies, EFC Holdings and EFH Corp., unless such distributions or loans are expressly permitted under the

Confidential

EFIHMW00246212

TCEH Senior Secured Facilities and Indenture. Those agreements generally permit TCEH to make unlimited distributions or loans to its parent companies for corporate overhead costs, SG&A expenses, taxes and principal and interest payments. In addition, those agreements contain certain investment and dividend baskets that would allow TCEH to make additional distributions and/or loans to its parent companies up to the amount of such baskets. At September 30, 2009, EFH Corp. notes payable to TCEH totaled $1.112 billion.

In addition, under applicable law, we would be prohibited from paying any dividend to the extent that immediately following payment of such dividend, there would be no statutory surplus or we would be insolvent. See "Shareholder Actions" below.

EFH Corp. has not paid any cash dividends subsequent to the Merger.

### Shareholder Actions

In May 2009, the shareholders of EFH Corp. approved the reduction of the stated capital of EFH Corp.'s common stock, no par value per share, to an amount equal to $0.001 for each outstanding share of common stock, resulting in total stated value of outstanding common stock of $2 million. Also in May 2009, EFH Corp.'s board of directors approved a decrease in additional paid-in capital of the same amount and the allocation of $0.001 per share to stated value of common stock upon issuance of any authorized but unissued shares of common stock that may occur from time to time, with the remainder of any amounts received for such shares allocated to additional paid-in capital.

### Noncontrolling Interests

In November 2008, Oncor sold equity interests to Texas Transmission. Oncor also indirectly sold equity interests to certain members of its board of directors and its management team. Accordingly, after giving effect to all equity issuances, as of September 30, 2009, Oncor's ownership was as follows: 80.03% held indirectly by EFH Corp., 0.22% held indirectly by Oncor's management and board of directors and 19.75% held by Texas Transmission (see Note 1). Of the noncontrolling interests balance at September 30, 2009 in the table below, $1.378 billion related to Oncor's noncontrolling interests.

In connection with the filing of a combined operating license application with the NRC for two new nuclear generation units, in January 2009, TCEH and Mitsubishi Heavy Industries Ltd. (MHI) formed a joint venture, known as Comanche Peak Nuclear Power Company LLC, to further the development of the two new nuclear generation units using MHI's US–Advanced Pressurized Water Reactor technology. Under the terms of the joint venture agreement, a subsidiary of TCEH owns an 88% interest in the venture and a subsidiary of MHI owns a 12% interest. This joint venture is a variable interest entity, and a subsidiary of TCEH is considered the primary beneficiary under consolidations accounting standards.

F-135

Confidential

*Equity*

The following table presents the changes to equity during the nine months ended September 30, 2009.

| | EFH Corp. Shareholders' Equity | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Common Stock (a) | Additional Paid-in Capital | Retained Earnings (Deficit) | Accumulated Other Comprehensive Income (Loss) | Noncontrolling Interests (b) | Total Equity |
| Balance at December 31, 2008 . . . . . . | $ —— | $8,045 | $(11,198) | $(379) | $1,355 | $(2,177) |
| Net income . . . . . . . . . . . . . . . . . . | —— | —— | 207 | —— | 54 | 261 |
| Effects of shareholder actions related to stated value of common stock . . . . . . . . . . . . | 2 | (2) | — | — | —— | —— |
| Effects of EFH Corp. stock-based incentive compensation plans . . . . . . . . . . . . . . . . . . . . | —— | 12 | — | — | —— | 12 |
| Net effects of cash flow hedges . . . . . . . . . . . . . . . . . | —— | —— | — | 79 | —— | 79 |
| Distributions to noncontrolling interests . . . . . . . . . . . . . . . . | — | — | — | — | (32) | (32) |
| Investment by noncontrolling interests . . . . . . . . . . . . . . . . | —— | —— | — | — | 42 | 42 |
| Other . . . . . . . . . . . . . . . . . . . . . | —— | —— | — | — | 1 | 1 |
| Balance at September 30, 2009 . . . . . . | $ 2 | $8,055 | $(10,991) | $(300) | $1,420 | $(1,814) |

(a) Authorized shares totaled 2,000,000,000 ($0.001 stated value) as of September 30, 2009. Outstanding shares totaled 1,666,346,008 and 1,667,149,663 as of September 30, 2009 and December 31, 2008, respectively.

(b) See Note 1 for discussion of adoption of amended guidance for accounting for noncontrolling interests in consolidated financial statements.


## 7.   COMMODITY AND OTHER DERIVATIVE CONTRACTUAL ASSETS AND LIABILITIES

*Risk Management Hedging Strategy*

We enter into physical and financial derivative instruments, such as options, swaps, futures and forward contracts, primarily to manage commodity price risk and interest rate risk exposure. Our principal activities involving derivatives consist of a long-term hedging program and the hedging of interest costs on our long-term debt. See Note 8 for a discussion of the fair value of all derivatives.

*Long-Term Hedging Program*—TCEH has a long-term hedging program designed to reduce exposure to changes in future electricity prices due to changes in the price of natural gas, thereby hedging future revenues from electricity sales and related cash flows. In ERCOT, the wholesale price of electricity is correlated to the price of natural gas. Under the program, TCEH has entered into market transactions involving natural gas-related financial instruments and has sold forward natural gas over the next five years. These transactions are intended to hedge a majority of electricity price exposure related to expected baseload generation for this period. Changes in the fair value of the instruments under the long-term hedging program are reported in the income statement in net gain (loss) from commodity hedging and trading activities.

*Interest Rate Swap Transactions*—Interest rate swap agreements are used to reduce exposure to interest rate changes by converting floating-rate debt to a fixed basis, thereby hedging future interest costs and related cash flows. Interest rate basis swaps are used to reduce the hedged borrowing costs. Changes in the fair value of the swaps are recorded as unrealized gains and losses in interest expense and related charges. See Note 4 for additional information about these and other interest rate swap agreements.

F-136

EFIHMW00246214

**PX 014**

**Page 496 of 1116**

*Other Commodity Hedging and Trading Activity*—In addition to the long-term hedging program, TCEH enters into derivatives, including electricity, natural gas, fuel oil and coal instruments, generally for shorter-term hedging purposes. To a limited extent, TCEH also enters into derivative transactions for proprietary trading purposes, principally in natural gas and electricity markets.

As of September 30, 2009, commodity positions accounted for as cash flow hedges, which represent a small portion of economic hedge positions, reduce exposure to variability of future cash flows through 2009.

The following table provides detail of commodity and other derivative contractual assets and liabilities as presented in the balance sheet at September 30, 2009:

| | Derivatives not under hedge accounting | | | | Cash flow hedges | |
| | Derivative assets | | Derivative liabilities | | Derivative liabilities | |
| | Commodity contracts | Interest rate swaps | Commodity contracts | Interest rate swaps | Commodity contracts | Total |
|---|---|---|---|---|---|---|
| Current assets .......................... | $2,517 | $ 91 | $ 11 | $ — | $ — | $ 2,619 |
| Noncurrent assets .................... | 1,118 | 5 | 30 | — | — | 1,153 |
| Current liabilities ..................... | (28) | — | (1,910) | (709) | (2) | (2,649) |
| Noncurrent liabilities ................. | (19) | — | (524) | (800) | — | (1,343) |
| Net assets (liabilities) ............. | $3,588 | $ 96 | $(2,393) | $(1,509) | $ (2) | $ (220) |

Margin deposits that contractually offset these derivative instruments are reported separately in the balance sheet and totaled $396 million and $190 million in net liabilities at September 30, 2009 and December 31, 2008, respectively, which do not include the collateral investments related to certain interest rate swaps and commodity positions discussed immediately below. Amounts presented in the above table do not reflect netting of assets and liabilities with the same counterparties under existing netting arrangements. This presentation can result in significant volatility in derivative assets and liabilities because we may enter into offsetting positions with the same counterparties, resulting in both assets and liabilities, and the underlying commodity prices can change significantly from period to period.

In early 2009, we entered into collateral funding transactions with counterparties to certain interest rate swap agreements related to TCEH debt. Under the terms of these transactions, which we elected to enter into as a cash management measure, as of September 30, 2009 EFH Corp. (parent) has posted $400 million in cash and TCEH has posted $65 million in letters of credit to the counterparties, with the outstanding balance of such collateral earning interest. TCEH had also entered into commodity hedging transactions with one of these counterparties, and under an arrangement effective August 2009, both the interest rate swaps and certain of the commodity hedging transactions with the counterparty are under the same derivative agreement, which continues to be secured by a first-lien interest in the assets of TCEH. At September 30, 2009, the net mark-to-market liability under the derivative agreements exceeded the collateral posted under such agreements. In particular, the net commodity and interest rate swap mark-to-market liability related to the $400 million cash posting totaled $685 million at September 30, 2009. We are not required to post any additional collateral to these counterparties, regardless of the net mark-to-market liability under the applicable derivative agreement, and the applicable counterparty will return the cash collateral to the extent the mark-to-market liability under the applicable derivative agreement falls below the funded amount, subject to a $50 million minimum transfer amount. The counterparties are required to return any remaining collateral, along with accrued and unpaid interest, on March 31, 2010. The cash collateral was recorded as an investment and is presented in the balance sheet (including accrued interest) as a separate line item under current assets.

Confidential

The following table presents the pre-tax effect of derivatives not under hedge accounting on net income, including realized and unrealized effects, for the three and nine months ended September 30, 2009:

| Derivative (Income statement presentation) | Three Months Ended September 30, 2009 | Nine Months Ended September 30, 2009 |
|---|---|---|
| Commodity contracts (Net gain (loss) from commodity hedging and trading activities) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 136 | $1,026 |
| Interest rate swaps (Interest expense and related charges) . . . . . . . . . . . . | (317) | 16 |
| Net gain (loss) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $(181) | $1,042 |

Results for the three and nine months ended September 30, 2008 include net "day one" losses totaling $10 million and $68 million, respectively, primarily associated with commodity contracts entered into at below market prices. Substantially all of these amounts represent losses associated with related series of transactions involving natural gas financial instruments intended to hedge exposure to future changes in electricity prices. The losses are reported in the income statement in net gain (loss) from commodity hedging and trading activities, consistent with other mark-to-market hedging and trading gains and losses, and are included in the results of the Competitive Electric segment.

The following tables present the pre-tax effect of derivative instruments accounted for as cash flow hedges on net income (loss) and other comprehensive income (loss) (OCI) for the three and nine months ended September 30, 2009:

**Three Months Ended September 30, 2009**

| Derivative | Amount of (loss) recognized in OCI (effective portion) | Income statement presentation of gain (loss) reclassified from accumulated OCI into income (effective portion) | Amount |
|---|---|---|---|
| Interest rate swaps . . . . . . . . . . . . . . . . . . . | $ — | Interest expense and related charges | $ (56) |
| Commodity contracts . . . . . . . . . . . . . . . . . | (6) | Fuel, purchased power costs and delivery fees | (6) |
|  |  | Operating revenues | — |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ (6) |  | $ (62) |

**Nine Months Ended September 30, 2009**

| Derivative | Amount of (loss) recognized in OCI (effective portion) | Income statement presentation of gain (loss) reclassified from accumulated OCI into income (effective portion) | Amount |
|---|---|---|---|
| Interest rate swaps . . . . . . . . . . . . . . . . . . . | $ — | Interest expense and related charges | $(140) |
| Commodity contracts . . . . . . . . . . . . . . . . . | (31) | Fuel, purchased power costs and delivery fees | (10) |
|  |  | Operating revenues | (2) |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ (31) |  | $(152) |

There were no ineffectiveness net gains or losses related to transactions currently designated as cash flow hedges in the three and nine months ended September 30, 2009.

Accumulated other comprehensive income related to cash flow hedges at September 30, 2009 totaled $159 million in net losses (after-tax), substantially all of which relates to interest rate swaps. We expect that $82 million of net losses related to cash flow hedges included in accumulated other comprehensive income as of September 30, 2009 will be reclassified into net income during the next twelve months as the related hedged transactions affect net income.

F-138

EFIHMW00246216

**PX 014**
**Page 498 of 1116**

The following table presents the gross notional amounts of derivative volumes at September 30, 2009:

| Derivative type | Notional Volume | Unit of Measure |
|---|---|---|
| Interest rate swaps: | | |
|     Floating/fixed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 19,250 | Million US dollars |
|     Basis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 18,000 | Million US dollars |
| Natural gas: | | |
|     Long-term hedge forward sales and purchases (a) . . | 3,522 | Million MMBtu |
|     Locational basis swaps . . . . . . . . . . . . . . . . . . . . . . . | 909 | Million MMBtu |
|     All other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,366 | Million MMBtu |
| Electricity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 190,431 | GWh |
| Coal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7 | Million tons |
| Fuel oil . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 166 | Million gallons |

(a)  Represents gross notional forward sales, purchases and options of fixed and basis (price point) transactions in the long-term hedging program. The net amount of these transactions, excluding basis transactions, is 1.7 billion MMBtu.

### Credit Risk-Related Contingent Features

The agreements that govern our derivative instrument transactions may contain certain credit risk-related contingent features that could trigger liquidity requirements in the form of cash collateral, letters of credit or some other form of credit enhancement. Certain of those agreements require the posting of collateral if our credit rating is downgraded by one or more of the credit rating agencies; however, due to our below investment grade ratings, substantially all of such collateral posting requirements are already effective.

As of September 30, 2009, the fair value of liabilities related to derivative instruments under agreements with credit risk-related contingent features that were not fully cash collateralized totaled $850 million. The liquidity exposure associated with these liabilities was reduced by cash and letter of credit postings with the counterparties totaling $162 million as of September 30, 2009. If all the credit risk-related contingent features related to these derivatives had been triggered, including cross default provisions, as of September 30, 2009, the remaining related liquidity requirement would have totaled $28 million after reduction for net accounts receivable and derivative assets under netting arrangements.

In addition, certain derivative agreements that are collateralized primarily with asset liens include indebtedness cross-default provisions that could result in the settlement of such contracts if there were a failure under other financing arrangements to meet payment terms or to comply with other covenants that could result in the acceleration of such indebtedness. As of September 30, 2009, the fair value of derivative liabilities subject to such cross-default provisions, largely related to interest rate swaps, totaled $1.716 billion (before consideration of the amount of assets under the liens). The liquidity exposure associated with these liabilities was reduced by cash collateral and letters of credit posted with counterparties totaling $483 million as of September 30, 2009. If all the credit risk-related contingent features related to these derivatives, including amounts related to cross-default provisions, had been triggered as of September 30, 2009, the remaining related liquidity requirement would have totaled $810 million after reduction for derivative assets under netting arrangements (before consideration of the amount of assets under the liens). See Note 15 to the Financial Statements in the 2008 Form 10-K for a description of other obligations that are supported by asset liens.

As discussed immediately above, the aggregate fair values of liabilities under derivative agreements with credit risk-related contingent features, including cross-default provisions, totaled $2.566 billion at September 30, 2009. This amount is before consideration of cash and letter of credit collateral posted, net accounts receivable and derivative assets under netting arrangements and assets under related liens.

Confidential

Some commodity derivative contracts contain credit risk-related contingent features that do not provide for specific amounts to be posted if the features are triggered. These provisions include material adverse change, performance assurance, and other clauses that generally provide counterparties with the right to request additional credit enhancements. The amounts disclosed above exclude credit risk-related contingent features that do not provide for specific amounts or exposure calculations.

While the disclosures above address our derivative liabilities, we also manage our counterparty credit exposure with respect to derivative assets.

## 8. FAIR VALUE MEASUREMENTS

Accounting standards related to the determination of fair value define fair value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. We use a "mid-market" valuation convention (the mid-point price between bid and ask prices) as a practical expedient to measure fair value for the majority of our assets and liabilities subject to fair value measurement on a recurring basis. We primarily use the market approach for recurring fair value measurements and use valuation techniques to maximize the use of observable inputs and minimize the use of unobservable inputs.

We categorize our assets and liabilities recorded at fair value based upon the following fair value hierarchy:

- Level 1 valuations use quoted prices in active markets for identical assets or liabilities that are accessible at the measurement date. An active market is a market in which transactions for the asset or liability occur with sufficient frequency and volume to provide pricing information on an ongoing basis. Our Level 1 assets and liabilities include exchange traded commodity contracts. For example, a significant number of our derivatives are NYMEX futures and swaps transacted through clearing brokers for which prices are actively quoted.

- Level 2 valuations use inputs, in the absence of actively quoted market prices, that are observable for the asset or liability, either directly or indirectly. Level 2 inputs include: (a) quoted prices for similar assets or liabilities in active markets, (b) quoted prices for identical or similar assets or liabilities in markets that are not active, (c) inputs other than quoted prices that are observable for the asset or liability such as interest rates and yield curves observable at commonly quoted intervals and (d) inputs that are derived principally from or corroborated by observable market data by correlation or other means. Our Level 2 valuations utilize over-the-counter broker quotes, quoted prices for similar assets or liabilities that are corroborated by correlations or other mathematical means and other valuation inputs. For example, our Level 2 assets and liabilities include forward commodity positions at locations for which over-the-counter broker quotes are available.

- Level 3 valuations use unobservable inputs for the asset or liability. Unobservable inputs are used to the extent observable inputs are not available, thereby allowing for situations in which there is little, if any, market activity for the asset or liability at the measurement date. We use the most meaningful information available from the market combined with internally developed valuation methodologies to develop our best estimate of fair value. For example, our Level 3 assets and liabilities include certain derivatives whose values are derived from pricing models that utilize multiple inputs to the valuations, including inputs that are not observable or easily corroborated through other means.

We utilize several different valuation techniques to measure the fair value of assets and liabilities, relying primarily on the market approach of using prices and other market information for identical and/or comparable assets and liabilities for those items that are measured on a recurring basis. These methods include, among others, the use of broker quotes and statistical relationships between different price curves.

In utilizing broker quotes, we attempt to obtain multiple quotes from brokers that are active in the commodity markets in which we participate (and require at least one quote from two brokers to determine a pricing input as observable); however, not all pricing inputs are quoted by brokers. The number of broker quotes

F-140

EFIHMW00246218

**PX 014**

**Page 500 of 1116**

received for certain pricing inputs varies depending on the depth of the trading market, each individual broker's publication policy, recent trading volume trends and various other factors. In addition, for valuation of interest rate swaps, we use a combination of dealer provided market valuations (generally non-binding) and Bloomberg valuations based on month-end interest rate curves and standard rate swap valuation models.

Certain derivatives and financial instruments are valued utilizing option pricing models that take into consideration multiple inputs including commodity prices, volatility factors, discount rates and other inputs. Additionally, when there is not a sufficient amount of observable market data, valuation models are developed that incorporate proprietary views of market factors. Those valuation models are generally used in developing long-term forward price curves for certain commodities. We believe the development of such curves is consistent with industry practice; however, the fair value measurements resulting from such curves are classified as Level 3.

With respect to amounts presented in the following fair value hierarchy table, the fair value measurement of an asset or liability (e.g. a contract) is required to fall in its entirety in one level, based on the lowest level input that is significant to the fair value measurement. Certain assets and liabilities would be classified in Level 2 instead of Level 3 of the hierarchy except for the effects of credit reserves and non-performance risk adjustments, respectively. Assessing the significance of a particular input to the fair value measurement in its entirety requires judgment, considering factors specific to the asset or liability being measured.

At September 30, 2009, assets and liabilities measured at fair value on a recurring basis consisted of the following:

| | Level 1 | Level 2 | Level 3 (a) | Reclassification (b) | Total |
|---|---|---|---|---|---|
| **Assets:** | | | | | |
| Commodity contracts | $1,035 | $2,276 | $277 | $ 88 | $3,676 |
| Interest rate swaps | — | 96 | — | — | 96 |
| Nuclear decommissioning trust—equity securities (c) | 142 | 99 | — | — | 241 |
| Nuclear decommissioning trust—debt securities (c) | — | 216 | — | — | 216 |
| Total assets | $1,177 | $2,687 | $277 | $ 88 | $4,229 |
| | | | | | |
| **Liabilities:** | | | | | |
| Commodity contracts | $1,133 | $ 944 | $318 | $ 88 | $2,483 |
| Interest rate swaps | — | 1,509 | — | — | 1,509 |
| Total liabilities | $1,133 | $2,453 | $318 | $ 88 | $3,992 |

---

(a)  Level 3 assets and liabilities consist primarily of more complex long-term power purchase and sales agreements, including longer-term wind generation purchase contracts and certain natural gas positions (collars) in the long-term hedging program.

(b)  Represents the effects of reclassification of the assets and liabilities to conform to the balance sheet presentation of current and long-term assets and liabilities.

(c)  The nuclear decommissioning trust investment is included in the Investments line on the balance sheet. See Note 13.

Confidential

EFIHMW00246219

At December 31, 2008, assets and liabilities measured at fair value on a recurring basis consisted of the following:

|  | Level 1 | Level 2 | Level 3 (a) | Total |
|---|---|---|---|---|
| Assets: |  |  |  |  |
| Commodity contracts | $1,010 | $2,061 | $283 | $3,354 |
| Interest rate swaps | — | 142 | — | 142 |
| Nuclear decommissioning trust—equity securities (b) | 109 | 83 | — | 192 |
| Nuclear decommissioning trust—debt securities (b) | — | 193 | — | 193 |
| Total assets | $1,119 | $2,479 | $283 | $3,881 |
| Liabilities: |  |  |  |  |
| Commodity contracts | $1,288 | $1,274 | $355 | $2,917 |
| Interest rate swaps | — | 2,086 | | 2,086 |
| Total liabilities | $1,288 | $3,360 | $355 | $5,003 |

(a) Level 3 assets and liabilities consist primarily of more complex long-term power purchase and sales agreements, including longer-term wind generation purchase contracts and certain natural gas positions (collars) in the long-term hedging program.

(b) The nuclear decommissioning trust investment is included in the Investments line on the balance sheet.

Commodity contracts consist primarily of natural gas, electricity, fuel oil and coal derivative instruments entered into for hedging purposes and include physical contracts that have not been designated "normal" purchases or sales. See Note 7 for further discussion regarding the company's use of derivative instruments.

Interest rate swaps include variable-to-fixed rate swap instruments that are economic hedges of interest on long-term debt as well as interest rate basis swaps designed to effectively reduce the hedged borrowing costs. See Note 4 for discussion of interest rate swaps.

Nuclear decommissioning trust assets represent securities held for the purpose of funding the future retirement and decommissioning of the nuclear generation units. These investments include equity, debt and other fixed-income securities consistent with investment rules established by the NRC and the PUCT.

The following table presents the changes in fair value of the Level 3 assets and liabilities (all related to commodity contracts) for the three and nine months ended September 30, 2009 and 2008:

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
|  | 2009 | 2008 | 2009 | 2008 |
| Balance at beginning of period | $(72) | $(539) | $(72) | $(173) |
| Total realized and unrealized gains (losses) (a): |  |  |  |  |
| Included in net income (loss) | 42 | 297 | 57 | (48) |
| Included in other comprehensive income (loss) | (6) | (12) | (31) | 3 |
| Purchases, sales, issuances and settlements (net) (b) | (6) | (42) | (15) | (45) |
| Net transfers in and/or out of Level 3 (c) | 1 | 104 | 20 | 71 |
| Balance at end of period | $(41) | $(192) | $(41) | $(192) |
| Net change in unrealized gains (losses) included in net income relating to instruments held at end of period (d) | $ 44 | $ 213 | $ 61 | $ (33) |

(a) Substantially all changes in values of commodity contracts are reported in the income statement in net gain (loss) from commodity hedging and trading activities.

F-142

Confidential

EFIHMW00246220

(b)  Settlements represent reversals of unrealized mark-to-market valuations of these positions previously recognized in net income. Purchases and issuances reflect option premiums paid or received.

(c)  Includes transfers due to changes in the observability of significant inputs used in valuing derivatives. Transfers in are assumed to transfer in at the beginning of the quarter and transfers out at the end of the quarter, which is when the assessments are performed. Any changes in value during the period are reported as unrealized gains and losses in net gain (loss) from commodity hedging and trading activities.

(d)  Includes unrealized gains and losses of instruments held at the end of the period only related to the periods in which the instrument was classified as a Level 3 asset or liability.

## 9.  FAIR VALUE OF NONDERIVATIVE FINANCIAL INSTRUMENTS

The carrying amounts and related estimated fair values of significant nonderivative financial instruments were as follows:

| | September 30, 2009 | | December 31, 2008 | |
| | Carrying Amount | Fair Value (a) | Carrying Amount | Fair Value (a) |
|---|---|---|---|---|
| **On balance sheet assets (liabilities):** | | | | |
| Long-term debt (including current maturities) (b): | | | | |
| TCEH, EFH Corp., and other | $(36,473) | $(27,627) | $(35,860) | $(24,162) |
| Oncor | $ (5,137) | $ (5,862) | $ (5,204) | $ (4,990) |
| Total | $(41,610) | $(33,489) | $(41,064) | $(29,152) |
| **Off balance sheet assets (liabilities):** | | | | |
| Financial guarantees | $    — | $      (8) | $    — | $      (3) |

(a)  Fair value determined in accordance with accounting standards related to the determination of fair value.

(b)  Excludes capital leases.

See Notes 7 and 8 for discussion of accounting for financial instruments that are derivatives.

## 10.  PENSION AND OTHER POSTRETIREMENT EMPLOYEE BENEFITS (OPEB) COSTS

Net pension and OPEB costs for the three and nine months ended September 30, 2009 and 2008 are comprised of the following:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| | 2009 | 2008 | 2009 | 2008 |
|---|---|---|---|---|
| Components of net pension costs: | | | | |
| Service cost | $ 10 | $ 12 | $ 28 | $ 29 |
| Interest cost | 40 | 51 | 119 | 117 |
| Expected return on assets | (41) | (56) | (124) | (133) |
| Prior service cost | — | — | — | 1 |
| Net loss | 4 | — | 7 | — |
| Net pension costs | 13 | 7 | 30 | 14 |
| Components of net OPEB costs: | | | | |
| Service cost | 3 | 3 | 8 | 8 |
| Interest cost | 15 | 14 | 46 | 44 |
| Expected return on assets | (3) | (5) | (10) | (15) |
| Prior service cost | — | — | — | (1) |
| Net loss | 3 | 2 | 9 | 8 |
| Net OPEB costs | 18 | 14 | 53 | 44 |
| Net pension and OPEB costs | 31 | 21 | 83 | 58 |
| Less amounts deferred principally as a regulatory asset or property | (18) | (10) | (51) | (32) |
| Net amounts recognized as expense | $ 13 | $ 11 | $ 32 | $ 26 |

Confidential

The discount rates reflected in net pension and OPEB costs in 2009 are 6.90% and 6.85%, respectively. The expected rates of return on pension and OPEB plan assets reflected in the 2009 cost amounts are 8.25% and 7.64%, respectively.

We made cash contributions related to our pension and OPEB plans of $61 million and $16 million, respectively, in the first nine months of 2009, and we expect to make additional contributions of $18 million and $6 million, respectively, in the remainder of 2009.

## 11. RELATED PARTY TRANSACTIONS

We incur an annual management fee under terms of a management agreement with the Sponsor Group for which we accrued $9 million for both the three months ended September 30, 2009 and 2008, and $27 million and $26 million for the nine months ended September 30, 2009 and 2008, respectively. The fee is reported as SG&A expense in Corporate and Other activities.

At the closing of the Merger, TCEH entered into the TCEH Senior Secured Facilities and Oncor entered into a revolving credit facility, each with syndicates of financial institutions and other lenders. These syndicates included affiliates of GS Capital Partners, which is a member of the Sponsor Group. Affiliates of GS Capital Partners and Kohlberg Kravis Roberts & Co. L.P. (a member of the Sponsor Group) have from time to time engaged in commercial banking and financial advisory transactions with us in the normal course of business.

Affiliates of the Sponsor Group are participating in exchange offers announced in October 2009 by EFH Corp., Intermediate Holding and EFIH Finance to exchange new senior secured notes for the EFH Corp. Securities and the TCEH Cash-Pay Notes. Goldman, Sachs & Co. and KKR Capital Markets LLC are acting as dealer managers and TPG Capital, L.P. is serving as an advisor in the exchange offers. (See Note 4 for additional information). These affiliates will be compensated for their services in accordance with the terms of the exchange offer agreements.

Affiliates of Goldman Sachs & Co. are parties to certain commodity and interest rate hedging transactions with us in the normal course of business.

Affiliates of the Sponsor Group may sell or acquire debt or debt securities issued by us in open market transactions or through loan syndications.

## 12. SEGMENT INFORMATION

Our operations are aligned into two reportable business segments: Competitive Electric and Regulated Delivery. The segments are managed separately because they are strategic business units that offer different products or services and involve different risks.

The Competitive Electric segment is engaged in competitive market activities consisting of electricity generation, the development and construction of new generation facilities, wholesale energy sales and purchases, commodity risk management and trading activities, and retail electricity sales to residential and business customers, all largely in Texas. These activities are conducted by TCEH. The results of this segment also include equipment salvage and resale activities related to the 2007 cancellation of the development of eight new coal-fueled generation units; such activities were not material for the periods presented.

The Regulated Delivery segment is engaged in regulated electricity transmission and distribution operations in Texas. These activities are conducted by Oncor, including its wholly-owned bankruptcy-remote financing subsidiary.

Corporate and Other represents the remaining nonsegment operations consisting primarily of general corporate expenses and interest on EFH Corp. (parent entity) and EFC Holdings debt.

F-144

Confidential

The accounting policies of the business segments are the same as those described in the summary of significant accounting policies in Note 1 above and in Note 1 in the 2008 Form 10-K. We evaluate performance based on income from continuing operations. We record intersegment sales and transfers as if the sales or transfers were to third parties, that is, at current market prices.

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
|  | 2009 | 2008 | 2009 | 2008 |
| **Operating revenues:** | | | | |
| Competitive Electric | $2,433 | $3,258 | $6,144 | $7,809 |
| Regulated Delivery | 770 | 728 | 2,037 | 1,969 |
| Corporate and Other | 3 | 10 | 16 | 27 |
| Eliminations | (321) | (301) | (831) | (804) |
| Consolidated | $2,885 | $3,695 | $7,366 | $9,001 |
| **Affiliated revenues included in operating revenues:** | | | | |
| Competitive Electric | $ 2 | $ 2 | $ 5 | $ 5 |
| Regulated Delivery | 316 | 290 | 813 | 775 |
| Corporate and Other | 3 | 9 | 13 | 24 |
| Eliminations | (321) | (301) | (831) | (804) |
| Consolidated | $ — | $ — | $ — | $ — |
| **Net income (loss):** | | | | |
| Competitive Electric | $ (44) | $3,611 | $ 436 | $ (862) |
| Regulated Delivery | 132 | 139 | 272 | 309 |
| Corporate and Other | (142) | (133) | (447) | (430) |
| Consolidated | $ (54) | $3,617 | $ 261 | $ (983) |

## 13. SUPPLEMENTARY FINANCIAL INFORMATION

### Regulated Versus Unregulated Operations

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
|  | 2009 | 2008 | 2009 | 2008 |
| **Operating revenues** | | | | |
| Regulated | $ 770 | $ 728 | $ 2,037 | $ 1,969 |
| Unregulated | 2,436 | 3,268 | 6,160 | 7,836 |
| Intercompany sales eliminations—regulated | (316) | (290) | (813) | (775) |
| Intercompany sales eliminations—unregulated | (5) | (11) | (18) | (29) |
| Total operating revenues | 2,885 | 3,695 | 7,366 | 9,001 |
| Fuel, purchased power and delivery fees—unregulated (a) | (870) | (1,631) | (2,171) | (3,867) |
| Net gain (loss) from commodity hedging and trading activities—unregulated | 123 | 6,045 | 1,003 | (248) |
| Operating costs—regulated | (228) | (213) | (668) | (620) |
| Operating costs—unregulated | (160) | (157) | (503) | (500) |
| Depreciation and amortization—regulated | (147) | (128) | (405) | (370) |
| Depreciation and amortization—unregulated | (309) | (303) | (881) | (847) |
| Selling, general and administrative expenses—regulated | (50) | (42) | (139) | (126) |
| Selling, general and administrative expenses—unregulated | (227) | (207) | (653) | (586) |
| Franchise and revenue-based taxes—regulated | (67) | (67) | (185) | (186) |
| Franchise and revenue-based taxes—unregulated | (27) | (25) | (74) | (73) |
| Impairment of goodwill | — | — | (90) | — |
| Other income | 45 | 14 | 71 | 43 |
| Other deductions | (32) | (541) | (50) | (583) |
| Interest income | 18 | 9 | 30 | 22 |
| Interest expense and other charges | (1,039) | (831) | (2,136) | (2,505) |
| Income (loss) before income taxes | $ (85) | $ 5,618 | $ 515 | $(1,445) |

F-145

Confidential

EFIHMW00246223

(a)  Includes unregulated cost of fuel consumed of $360 million and $538 million for the three months ended September 30, 2009 and 2008, respectively, and $943 million and $1.320 billion for the nine months ended September 30, 2009 and 2008, respectively. The balance represents energy purchased for resale and delivery fees net of intercompany eliminations.

*Other Income and Deductions*

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2009 | 2008 | 2009 | 2008 |
| Other income: | | | | |
| Accretion of adjustment (discount) of regulatory assets resulting from purchase accounting | $ 10 | $ 11 | $ 30 | $ 33 |
| Reversal of reserve recorded in purchase accounting (a) | 23 | — | 23 | — |
| Fee received related to interest rate swap/commodity hedge derivative agreement (b) (Note 7) | 6 | — | 6 | — |
| Mineral rights royalty income | 1 | 1 | 3 | 3 |
| Other | 5 | 2 | 9 | 7 |
| Total other income | $ 45 | $ 14 | $ 71 | $ 43 |
| Other deductions: | | | | |
| Impairment of emission allowances intangible assets | $— | $499 | $— | $501 |
| Charge related to Lehman bankruptcy (c) | — | 26 | — | 26 |
| Write-off of regulatory assets (Note 13) | 25 | — | 25 | — |
| Transition and business optimization costs | — | 8 | — | 8 |
| Net charges related to cancelled development of generation facilities | 1 | 2 | 3 | 10 |
| Severance charges | — | — | 6 | — |
| Professional fees incurred related to the Merger | — | 1 | — | 4 |
| Costs related to 2006 cities rate settlement | 1 | — | 2 | 13 |
| Litigation/regulatory settlements | — | — | — | 6 |
| Other | 5 | 5 | 14 | 15 |
| Total other deductions | $ 32 | $541 | $ 50 | $583 |

(a)  Reversal of a use tax accrual, related to periods prior to the Merger, due to state ruling in the third quarter of 2009. (Reported in Competitive Electric segment.)

(b)  Reported in Competitive Electric segment.

(c)  Reserve established against amounts due (excluding termination related costs) from subsidiaries of Lehman Brothers Holdings Inc. arising from commodity hedging and trading activities. (Reported in Competitive Electric segment.)

F-146

EF|HMW00246224

*Interest Expense and Related Charges*

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2009 | 2008 | 2009 | 2008 |
| Interest (including net amounts settled/ accrued under interest rate swaps) | $ 874 | $860 | $2,619 | $2,583 |
| Unrealized mark-to-market net (gain) loss on interest rate swaps | 138 | (36) | (527) | (36) |
| Amortization of interest rate swap losses at dedesignation of hedge accounting | 56 | 17 | 140 | 17 |
| Amortization of fair value debt discounts resulting from purchase accounting | 17 | 18 | 56 | 55 |
| Amortization of debt issuance costs and discounts | 34 | 48 | 104 | 111 |
| Capitalized interest, primarily related to generation facility and regulated utility asset construction | (80) | (76) | (256) | (225) |
| Total interest expense and related charges | $1,039 | $831 | $2,136 | $2,505 |

*Restricted Cash*

| | At September 30, 2009 | | At December 31, 2008 | |
|---|---|---|---|---|
| | Current Assets | Noncurrent Assets | Current Assets | Noncurrent Assets |
| Amounts related to the TCEH Letter of Credit Facility (See Note 4) | $— | $1,135 | $— | $1,250 |
| Amounts related to margin deposits held | — | — | 4 | — |
| Amounts related to securitization (transition) bonds | 64 | 15 | 51 | 17 |
| Total restricted cash | $ 64 | $1,150 | $ 55 | $1,267 |

*Inventories by Major Category*

| | September 30, 2009 | December 31, 2008 |
|---|---|---|
| Materials and supplies | $234 | $199 |
| Fuel stock | 222 | 162 |
| Natural gas in storage | 28 | 65 |
| Total inventories | $484 | $426 |

*Investments*

| | September 30, 2009 | December 31, 2008 |
|---|---|---|
| Nuclear decommissioning trust | $457 | $385 |
| Assets related to employee benefit plans, including employee savings programs, net of distributions | 208 | 210 |
| Land | 44 | 44 |
| Investment in natural gas gathering pipeline business (a) | 31 | — |
| Miscellaneous other | 4 | 6 |
| Total investments | $744 | $645 |

(a)   A controlling interest in this previously consolidated subsidiary was sold in August 2009.

F-147

EFIHMW00246225

*Nuclear Decommissioning Trust*—Investments in a trust that will be used to fund the costs to decommission the Comanche Peak nuclear generation plant are carried at fair value. Decommissioning costs are being recovered from Oncor's customers as a delivery fee surcharge over the life of the plant and deposited in the trust fund. Net gains and losses on investments in the trust fund are offset by a corresponding adjustment to a regulatory asset/liability. A summary of investments in the fund follows:

| | September 30, 2009 | | | |
| | Cost (a) | Unrealized gain | Unrealized loss | Fair market value |
|---|---|---|---|---|
| Debt securities (b) | $210 | $ 9 | $ (3) | $216 |
| Equity securities (c) | 191 | 71 | (21) | 241 |
| Total | $401 | $80 | $(24) | $457 |

| | December 31, 2008 | | | |
| | Cost (a) | Unrealized gain | Unrealized loss | Fair market value |
|---|---|---|---|---|
| Debt securities (b) | $203 | $ 4 | $(14) | $193 |
| Equity securities (c) | 181 | 46 | (35) | 192 |
| Total | $384 | $50 | $(49) | $385 |

(a) Includes realized gains and losses of securities sold.
(b) The investment objective for debt securities is to invest in a diversified tax efficient portfolio with an overall portfolio rating of AA or above as graded by S&P or Aa2 by Moody's. The debt securities are heavily weighted with municipal bonds. The debt securities had an average coupon rate of 4.15% and 3.77% and an average maturity of 8.3 years and 8.0 years at September 30, 2009 and December 31, 2008, respectively.
(c) The investment objective for equity securities is to invest tax efficiently and to match the performance of the S&P 500 Index.

Debt securities held at September 30, 2009 mature as follows: $79 million in one to five years, $33 million in five to ten years and $104 million after ten years.

### Property, Plant and Equipment

As of September 30, 2009 and December 31, 2008, property, plant and equipment of $30.0 billion and $29.5 billion, respectively, is stated net of accumulated depreciation and amortization of $6.7 billion and $5.6 billion, respectively.

### Asset Retirement Obligations

These liabilities primarily relate to nuclear generation plant decommissioning, land reclamation related to lignite mining, removal of lignite/coal-fueled plant ash treatment facilities and generation plant asbestos removal and disposal costs. There is no earnings impact with respect to the recognition of the asset retirement costs for nuclear decommissioning, as all costs are recoverable through the regulatory process as part of Oncor's rates.

The following table summarizes the changes to the asset retirement liability, reported in other noncurrent liabilities and deferred credits in the balance sheet, during the nine months ended September 30, 2009:

| | |
|---|---|
| Asset retirement liability at January 1, 2009 | $859 |
| Additions: | |
| Accretion | 45 |
| Reductions: | |
| Payments, essentially all mining reclamation | (21) |
| Asset retirement liability at September 30, 2009 | $883 |

F-148

EFIHMW00246226

*Oncor's Regulatory Assets and Liabilities*

Recognition of regulatory assets and liabilities and the amortization periods over which they are expected to be recovered or refunded through rate regulation reflect the decisions of the PUCT. Components of the regulatory assets and liabilities are provided in the table below; amounts not earning a return through rate regulation are noted. On August 31, 2009, the PUCT issued a final order on Oncor's rate review filed in June 2008. The rate review included a determination of the recoverability of regulatory assets as of December 31, 2007, including the recoverability period of those assets deemed allowable by the PUCT. The PUCT's findings included denial of recovery of certain regulatory assets, primarily related to business restructuring costs and rate case expenses, which resulted in a $25 million charge ($16 million after-tax) in the third quarter 2009 reported in other deductions in the Regulated Delivery segment.

| | Remaining Rate Recovery/Amortization Period as of September 30, 2009 | Carrying Amount | |
| --- | --- | --- | --- |
| | | September 30, 2009 | December 31, 2008 |
| **Regulatory assets:** | | | |
| Generation-related regulatory assets securitized by transition bonds (a) | 7 years | $  787 | $  865 |
| Employee retirement costs | 5 years | 84 | — |
| Employee retirement costs to be reviewed (b)(c) | To be determined | 37 | 100 |
| Employee retirement liability (a)(c)(d) | To be determined | 542 | 559 |
| Self-insurance reserve (primarily storm recovery costs)—net | 7 years | 142 | — |
| Self-insurance reserve to be reviewed (b)(c) | To be determined | 109 | 214 |
| Nuclear decommissioning cost under-recovery (a)(c)(e) | Not applicable | 90 | 127 |
| Securities reacquisition costs (pre-industry restructure) | 8 years | 63 | 68 |
| Securities reacquisition costs (post-industry restructure) | Terms of related debt | 28 | 29 |
| Recoverable amounts for/in lieu of deferred income taxes—net | Life of related asset or liability | 76 | 77 |
| Rate case expenses (f) | Largely 3 years | 9 | 10 |
| Rate case expenses to be reviewed (b)(c) | To be determined | 2 | — |
| Advanced meter customer education costs | 10 years | 4 | 2 |
| Deferred conventional meter depreciation | 10 years | 2 | — |
| Business restructuring costs (g) | Not applicable | — | 20 |
| Total regulatory assets | | 1,975 | 2,071 |
| **Regulatory liabilities:** | | | |
| Committed spending for demand-side management initiatives (a) | 3 years | 87 | 96 |
| Deferred advanced metering system revenues | 10 years | 51 | — |
| Investment tax credit and protected excess deferred taxes | Various | 46 | 49 |
| Over-collection of securitization (transition) bond revenues (a) | 7 years | 32 | 28 |
| Other regulatory liabilities (a) | Various | 4 | 6 |
| Total regulatory liabilities | | 220 | 179 |
| Net regulatory asset | | $1,755 | $1,892 |

(a)  Not earning a return in the regulatory rate-setting process.
(b)  Costs incurred since the period covered under the last rate review.
(c)  Recovery is specifically authorized by statute, subject to reasonableness review by the PUCT.

F-149

Confidential

EFIHMW00246227

(d)   Represents unfunded liabilities recorded in accordance with pension and OPEB accounting standards.
(e)   Offset by an intercompany payable to TCEH.
(f)   Rate case expenses totaling $4 million were disallowed by the PUCT and written off in the third quarter of 2009.
(g)   All previously recorded business restructuring costs were disallowed by the PUCT and written off in the third quarter of 2009.

As part of purchase accounting, the carrying value of the generation-related regulatory assets was reduced by $213 million, and this amount is being accreted to other income over the approximate nine-year recovery period remaining as of the date of the Merger.

In September 2008, the PUCT approved a settlement for Oncor to recover its estimated future investment for advanced metering deployment. Oncor began billing the advanced metering surcharge in the January 2009 billing month cycle. The surcharge is expected to total $1.023 billion over the 11-year recovery period and includes a cost recovery factor of $2.19 per month per residential retail customer and $2.39 to $5.15 per month for non-residential retail customers. We account for the difference between the surcharge billings for advanced metering facilities and the allowed revenues under the surcharge provisions, which are based on expenditures and an allowed return, as a regulatory asset or liability; such differences arise principally as a result of timing of expenditures. As indicated in the table above, the regulatory liability at September 30, 2009 totaled $51 million.

### Exit Liabilities

As part of purchase accounting for the Merger, we accrued $54 million in costs expected to be incurred related to the termination and transition of outsourcing arrangements. We incurred $7 million and $17 million of the exit liabilities in the three and nine months ended September 30, 2009, respectively, and the remaining accrual is expected to be settled no later than June 30, 2010, the targeted date of completion of transition of outsourced activities back to us or to service providers.

### Other Noncurrent Liabilities and Deferred Credits

The balance of other noncurrent liabilities and deferred credits consists of the following:

|  | September 30, 2009 | December 31, 2008 |
|---|---|---|
| Uncertain tax positions (including accrued interest) | $1,924 | $1,780 |
| Retirement plan and other employee benefits | 1,446 | 1,451 |
| Asset retirement obligations | 883 | 859 |
| Unfavorable purchase and sales contracts | 707 | 727 |
| Liabilities related to subsidiary tax sharing agreement | 314 | 299 |
| Other | 101 | 89 |
| Total other noncurrent liabilities and deferred credits | $5,375 | $5,205 |

We do not expect the total amount of liabilities recorded related to uncertain tax positions to significantly increase or decrease within the next 12 months. As of September 30, 2009, the federal income tax benefit on the interest accrued on uncertain tax positions is recorded as accumulated deferred income taxes.

*Unfavorable Purchase and Sales Contracts*—The amortization of unfavorable purchase and sales contracts totaled $7 million and $6 million in the three months ended September 30, 2009 and 2008, respectively, and $21 million and $23 million in the nine months ended September 30, 2009 and 2008, respectively. Favorable purchase and sales contracts are recorded as intangible assets (see Note 2).

F-150

Confidential

The estimated amortization of unfavorable purchase and sales contracts for each of the five succeeding fiscal years from December 31, 2008 is as follows:

| Year | Amount |
|------|--------|
| 2009 | $27 |
| 2010 | 27 |
| 2011 | 27 |
| 2012 | 27 |
| 2013 | 26 |

*Liabilities Related to Subsidiary Tax Sharing Agreement*—Amount represents the noncontrolling interests' portion of the previously recorded net deferred tax liabilities of Oncor. Upon the sale of noncontrolling interests in Oncor (see Note 6), Oncor became a partnership for US federal income tax purposes, and the temporary differences which gave rise to the deferred taxes will, over time, become taxable to the noncontrolling interests. Under a tax sharing agreement among Oncor and its equity holders, Oncor reimburses its equity holders for federal income taxes as the partnership earnings become taxable to such holders. Accordingly, as the temporary differences become taxable, the equity holders will be reimbursed by Oncor. In the unlikely event such amounts are not reimbursed under the tax sharing agreement, it is probable they would be refunded to rate payers. The net changes in the liability for the nine months ended September 30, 2009 of $15 million reflected changes in temporary differences.

### Supplemental Cash Flow Information

| | Nine Months Ended September 30, | |
|---|---|---|
| | 2009 | 2008 |
| Cash payments (receipts) related to: | | |
| Interest paid (a) | $2,042 | $2,262 |
| Capitalized interest | (256) | (225) |
| Interest paid (net of capitalized interest) (a) | 1,786 | 2,307 |
| Income taxes | (38) | (61) |
| Noncash investing and financing activities: | | |
| Issuance of toggle notes in lieu of cash interest for EFH Corp. and TCEH | 248 | — |
| Noncash construction expenditures (b) | 132 | 180 |
| Capital leases | 15 | 13 |

(a)  Net of interest received on interest rate swaps.
(b)  Represents end-of-period accruals.

### 14. SUPPLEMENTAL GUARANTOR CONDENSED FINANCIAL INFORMATION

In 2007, EFH Corp. issued $2.0 billion 10.875% Senior Notes Due 2017 and $2.5 billion 11.25%/12.00% Senior Toggle Notes Due 2017 (collectively, the EFH Corp. Senior Notes). In May 2009, EFH Corp. issued an additional $150 million of the EFH Corp. Toggle Notes (see Note 4). The EFH Corp. Senior Notes are unconditionally guaranteed by EFC Holdings and Intermediate Holding, 100% owned subsidiaries of EFH Corp. (collectively, the Guarantors) on an unsecured basis. The guarantees issued by the Guarantors are full and unconditional, joint and several guarantees of the EFH Corp. Senior Notes. The guarantees rank equally with any senior unsecured indebtedness of the Guarantors and rank effectively junior to all of the secured indebtedness of the Guarantors to the extent of the assets securing that indebtedness. All other subsidiaries of EFH Corp., either direct or indirect, do not guarantee the EFH Corp. Senior Notes (collectively, the Non-Guarantors). The indenture governing the EFH Corp. Senior Notes contains certain restrictions, subject to certain exceptions, on EFH Corp.'s ability to pay dividends or make investments. See Note 6.

F-151

EFIHMW00246229

The following tables have been prepared in accordance with Regulation S-X Rule 3-10, "Financial Statements of Guarantors and Issuers of Guaranteed Securities Registered or Being Registered" in order to present the condensed consolidating statements of income of EFH Corp. (the Parent/Issuer), the Guarantors and the Non-Guarantors for the three-month and nine-month periods ended September 30, 2009 and 2008, the condensed consolidating statements of cash flows of the Parent/Issuer, the Guarantors and the Non-Guarantors for the nine-month periods ended September 30, 2009 and 2008 and the condensed consolidating balance sheets as of September 30, 2009 and December 31, 2008 of the Parent/Issuer, the Guarantors and the Non-Guarantors. Investments in consolidated subsidiaries are accounted for under the equity method. The presentations reflect the application of SEC Staff Accounting Bulletin Topic 5-J, Push Down Basis of Accounting Required in Certain Limited Circumstances, including the effects of the push down of the $4.65 billion and $4.5 billion EFH Corp. Senior Notes to the Guarantors as of September 30, 2009 and December 31, 2008, respectively (see Notes 4 and 5).

EFH Corp. (Parent) received dividends from its consolidated subsidiaries totaling $117 million and $213 million for the nine months ended September 30, 2009 and 2008, respectively.

F-152

Confidential

**ENERGY FUTURE HOLDINGS CORP. AND SUBSIDIARIES**

**Condensed Consolidating Statements of Income (Loss)**
**For the Three Months Ended September 30, 2009**
**(millions of dollars)**

| | Parent/ Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Operating revenues | $ — | $ — | $2,885 | $ — | $ 2,885 |
| Fuel, purchased power costs and delivery fees | — | — | (870) | — | (870) |
| Net gain from commodity hedging and trading activities | — | — | 123 | — | 123 |
| Operating costs | — | — | (388) | — | (388) |
| Depreciation and amortization | — | — | (456) | — | (456) |
| Selling, general and administrative expenses | (29) | — | (248) | — | (277) |
| Franchise and revenue-based taxes | — | — | (94) | — | (94) |
| Other income | — | — | 45 | — | 45 |
| Other deductions | — | — | (32) | — | (32) |
| Interest income | 62 | — | 46 | (90) | 18 |
| Interest expense and related charges | (250) | (142) | (876) | 229 | (1,039) |
| Income (loss) before income taxes and equity earnings of subsidiaries | (217) | (142) | 135 | 139 | (85) |
| Income tax (expense) benefit | 75 | 48 | (46) | (46) | 31 |
| Equity earnings of subsidiaries | 62 | 81 | — | (143) | — |
| Net income (loss) | (80) | (13) | 89 | (50) | (54) |
| Net income attributable to noncontrolling interests | — | — | (26) | — | (26) |
| Net income (loss) attributable to EFH Corp. | $ (80) | $ (13) | $ 63 | $ (50) | $ (80) |

F-153

Confidential

EFIHMW00246231

**ENERGY FUTURE HOLDINGS CORP. AND SUBSIDIARIES**

**Condensed Consolidating Statements of Income (Loss)**
**For the Three Months Ended September 30, 2008**
**(millions of dollars)**

| | Parent/ Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Operating revenues | $ — | $ — | $ 3,695 | $ — | $ 3,695 |
| Fuel, purchased power costs and delivery fees | — | — | (1,631) | — | (1,631) |
| Net gain from commodity hedging and trading activities | — | — | 6,045 | — | 6,045 |
| Operating costs | — | — | (372) | 2 | (370) |
| Depreciation and amortization | — | — | (431) | — | (431) |
| Selling, general and administrative expenses | (29) | — | (219) | (1) | (249) |
| Franchise and revenue-based taxes | — | — | (92) | — | (92) |
| Other income | — | — | 14 | — | 14 |
| Other deductions | (9) | — | (532) | — | (541) |
| Interest income | 43 | — | 44 | (78) | 9 |
| Interest expense and related charges | (229) | (131) | (677) | 206 | (831) |
| Income (loss) before income taxes and equity earnings of subsidiaries | (224) | (131) | 5,844 | 129 | 5,618 |
| Income tax (expense) benefit | 87 | 45 | (2,088) | (45) | (2,001) |
| Equity earnings of subsidiaries | 3,754 | 3,768 | — | (7,522) | — |
| Net income (loss) | $3,617 | $3,682 | $ 3,756 | $(7,438) | $ 3,617 |

F-154

Confidential

**ENERGY FUTURE HOLDINGS CORP. AND SUBSIDIARIES**

Condensed Consolidating Statements of Income (Loss)
For the Nine Months Ended September 30, 2009
(millions of dollars)

| | Parent/ Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Operating revenues | $ — | $ — | $ 7,366 | $ — | $ 7,366 |
| Fuel, purchased power costs and delivery fees | — | — | (2,171) | — | (2,171) |
| Net gain from commodity hedging and trading activities | — | — | 1,003 | — | 1,003 |
| Operating costs | — | — | (1,171) | — | (1,171) |
| Depreciation and amortization | — | — | (1,286) | — | (1,286) |
| Selling, general and administrative expenses | (92) | — | (700) | — | (792) |
| Franchise and revenue-based taxes | — | (1) | (258) | — | (259) |
| Impairment of goodwill | — | — | (90) | — | (90) |
| Other income | 2 | — | 69 | — | 71 |
| Other deductions | (3) | — | (47) | — | (50) |
| Interest income | 173 | — | 103 | (246) | 30 |
| Interest expense and related charges | (727) | (423) | (1,647) | 661 | (2,136) |
| Income (loss) before income taxes and equity earnings of subsidiaries | (647) | (424) | 1,171 | 415 | 515 |
| Income tax (expense) benefit | 213 | 141 | (468) | (140) | (254) |
| Equity earnings of subsidiaries | 641 | 710 | — | (1,351) | — |
| Net income | 207 | 427 | 703 | (1,076) | 261 |
| Net income attributable to noncontrolling interests | — | — | (54) | — | (54) |
| Net income attributable to EFH Corp. | $ 207 | $ 427 | $ 649 | $(1,076) | $ 207 |

F-155

Confidential

## ENERGY FUTURE HOLDINGS CORP. AND SUBSIDIARIES

### Condensed Consolidating Statements of Income (Loss)
### For the Nine Months Ended September 30, 2008
### (millions of dollars)

| | Parent/ Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Operating revenues | $ — | $ — | $ 9,001 | $ — | $ 9,001 |
| Fuel, purchased power costs and delivery fees | — | — | (3,867) | — | (3,867) |
| Net loss from commodity hedging and trading activities | — | — | (248) | — | (248) |
| Operating costs | — | — | (1,120) | — | (1,120) |
| Depreciation and amortization | — | — | (1,217) | — | (1,217) |
| Selling, general and administrative expenses | (84) | — | (628) | — | (712) |
| Franchise and revenue-based taxes | — | 1 | (260) | — | (259) |
| Other income | — | — | 43 | — | 43 |
| Other deductions | (17) | — | (566) | — | (583) |
| Interest income | 122 | 5 | 113 | (218) | 22 |
| Interest expense and related charges | (679) | (401) | (2,034) | 609 | (2,505) |
| Income (loss) before income taxes and equity earnings of subsidiaries | (658) | (395) | (783) | 391 | (1,445) |
| Income tax (expense) benefit | 217 | 134 | 242 | (131) | 462 |
| Equity earnings of subsidiaries | (542) | (502) | — | 1,044 | — |
| Net income (loss) | $(983) | $(763) | $ (541) | $1,304 | $ (983) |

F-156

Confidential

EFIHMW00246234

**ENERGY FUTURE HOLDINGS CORP. AND SUBSIDIARIES**

**Condensed Consolidating Statements of Cash Flows**
**For the Nine Months Ended September 30, 2009**
**(millions of dollars)**

| | Parent/ Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Cash provided by (used in) operating activities | $ (43) | $ 113 | $ 1,907 | $(234) | $ 1,743 |
| **Cash flows—financing activities:** | | | | | |
| Issuances of long-term borrowings | — | — | 522 | — | 522 |
| Retirements of long-term borrowings | — | (3) | (294) | — | (297) |
| Change in short-term borrowings | — | — | 200 | — | 200 |
| Contributions from noncontrolling interests | — | — | 42 | — | 42 |
| Distributions paid to noncontrolling interests | — | — | (32) | — | (32) |
| Cash dividends paid | — | (117) | (117) | 234 | — |
| Change in advances—affiliates | 289 | 7 | — | (296) | — |
| Other, net | 20 | — | (35) | — | (15) |
| Cash provided by (used in) financing activities | 309 | (113) | 286 | (62) | 420 |
| **Cash flows—investing activities:** | | | | | |
| Capital expenditures and nuclear fuel purchases | — | — | (2,004) | — | (2,004) |
| Money market fund redemptions | — | — | 142 | — | 142 |
| Investment posted with derivative counterparty | (400) | — | — | — | (400) |
| Net proceeds from sale of majority interest in natural gas gathering pipeline business | — | — | 40 | | 40 |
| Reduction of restricted cash related to letter of credit facility | — | — | 115 | — | 115 |
| Proceeds from sale of environmental allowances and credits | — | — | 22 | — | 22 |
| Purchases of environmental allowances and credits | — | — | (23) | — | (23) |
| Proceeds from sales of nuclear decommissioning trust fund securities | — | — | 2,972 | — | 2,972 |
| Investments in nuclear decommissioning trust fund securities | — | — | (2,983) | — | (2,983) |
| Change in advances—affiliates | — | — | (296) | 296 | — |
| Other, net | — | — | (8) | — | (8) |
| Cash provided by (used in) investing activities | (400) | — | (2,023) | 296 | (2,127) |
| Net change in cash and cash equivalents | (134) | — | 170 | — | 36 |
| Cash and cash equivalents—beginning balance | 1,075 | — | 614 | — | 1,689 |
| Cash and cash equivalents—ending balance | $ 941 | $ — | $ 784 | $ — | $ 1,725 |

F-157

Confidential

## ENERGY FUTURE HOLDINGS CORP. AND SUBSIDIARIES

### Condensed Consolidating Statements of Cash Flows
### For the Nine Months Ended September 30, 2008
### (millions of dollars)

| | Parent/ Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Cash provided by (used in) operating activities | $(136) | $ 292 | $ 1,227 | $(426) | $ 957 |
| Cash flows—financing activities: | | | | | |
| Issuances of securities: | | | | | |
| Long-term debt | — | — | 2,777 | — | 2,777 |
| Common stock | 34 | — | — | — | 34 |
| Retirements/repurchases of securities: | | | | | |
| Long-term debt | (200) | (2) | (472) | — | (674) |
| Common stock | (1) | — | — | — | (1) |
| Change in short-term borrowings | — | — | 902 | — | 902 |
| Cash dividends paid | — | (213) | (213) | 426 | — |
| Change in advances—affiliates | 269 | — | — | (269) | — |
| Other, net | — | — | 14 | — | 14 |
| Cash provided by (used in) financing activities | 102 | (215) | 3,008 | 157 | 3,052 |
| Cash flows—investing activities: | | | | | |
| Capital expenditures and nuclear fuel purchases | — | — | (2,179) | — | (2,179) |
| Investments held in money market fund | — | — | (242) | — | (242) |
| Proceeds from sale of environmental allowances and credits | — | — | 30 | — | 30 |
| Purchases of environmental allowances and credits | — | — | (18) | — | (18) |
| Proceeds from sales of nuclear decommissioning trust fund securities | — | — | 747 | — | 747 |
| Investments in nuclear decommissioning trust fund securities | — | — | (758) | — | (758) |
| Change in advances—affiliates | — | (77) | (192) | 269 | — |
| Other, net | 2 | — | 44 | — | 46 |
| Cash provided by (used in) investing activities | 2 | (77) | (2,568) | 269 | (2,374) |
| Net change in cash and cash equivalents | (32) | — | 1,667 | — | 1,635 |
| Cash and cash equivalents—beginning balance | 32 | — | 249 | — | 281 |
| Cash and cash equivalents—ending balance | $ — | $ — | $ 1,916 | $ — | $ 1,916 |

F-158

Confidential

# ENERGY FUTURE HOLDINGS CORP. AND SUBSIDIARIES

### Condensed Consolidating Balance Sheets
### at September 30, 2009
### (millions of dollars)

| | Parent/ Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Current assets: | | | | | |
| Cash and cash equivalents | $ 941 | $ — | $ 784 | $ — | $ 1,725 |
| Investment posted with counterparty | 417 | — | — | — | 417 |
| Restricted cash | — | — | 64 | — | 64 |
| Advances to affiliates | 413 | 4 | — | (417) | — |
| Trade accounts receivable—net | 9 | — | 1,005 | — | 1,014 |
| Income taxes receivable | 180 | 5 | — | (185) | — |
| Accounts receivable from affiliates | — | — | 12 | (12) | — |
| Notes receivable from affiliates | 112 | — | 1,166 | (1,278) | — |
| Inventories | — | — | 484 | — | 484 |
| Commodity and other derivative contractual assets | 82 | — | 2,537 | — | 2,619 |
| Accumulated deferred income taxes | 7 | 1 | 93 | — | 101 |
| Margin deposits related to commodity positions | — | — | 158 | — | 158 |
| Other current assets | 3 | — | 142 | — | 145 |
| Total current assets | 2,164 | 10 | 6,445 | (1,892) | 6,727 |
| Restricted cash | — | — | 1,150 | — | 1,150 |
| Investments | 4,510 | 3,469 | 677 | (7,912) | 744 |
| Property, plant and equipment—net | — | — | 30,019 | — | 30,019 |
| Notes receivable from affiliates | 13 | — | 2,245 | (2,258) | — |
| Goodwill | — | — | 14,316 | — | 14,316 |
| Intangible assets—net | — | — | 2,907 | — | 2,907 |
| Regulatory assets—net | — | — | 1,755 | — | 1,755 |
| Commodity and other derivative contractual assets | — | — | 1,153 | — | 1,153 |
| Accumulated deferred income taxes | 478 | 57 | — | (535) | — |
| Unamortized debt issuance costs and other noncurrent assets | 111 | 95 | 769 | (95) | 880 |
| Total assets | $ 7,276 | $ 3,631 | $61,436 | $(12,692) | $59,651 |
| **LIABILITIES AND EQUITY** | | | | | |
| Current liabilities: | | | | | |
| Short-term borrowings | $ — | $ — | $ 1,437 | $ — | $ 1,437 |
| Advances from affiliates | — | — | 417 | (417) | — |
| Long-term debt due currently | 4 | 7 | 315 | — | 326 |
| Trade accounts payable | 7 | — | 731 | — | 738 |
| Accounts payable to affiliates | 7 | 5 | — | (12) | — |
| Notes payable to affiliates | 1,112 | 18 | 148 | (1,278) | — |
| Commodity and other derivative contractual liabilities | 114 | — | 2,535 | — | 2,649 |
| Margin deposits related to commodity positions | — | — | 504 | — | 504 |
| Accumulated deferred income taxes | — | — | — | — | — |
| Accrued interest | 291 | 225 | 563 | (223) | 856 |
| Other current liabilities | 9 | 1 | 869 | (185) | 694 |
| Total current liabilities | 1,544 | 256 | 7,519 | (2,115) | 7,204 |
| Accumulated deferred income taxes | — | — | 6,546 | (483) | 6,063 |
| Investment tax credits | — | — | 38 | — | 38 |
| Commodity and other derivative contractual liabilities | — | — | 1,343 | — | 1,343 |
| Notes or other liabilities due affiliates | 2,019 | — | 239 | (2,258) | — |
| Long-term debt, less amounts due currently | 6,531 | 4,746 | 34,815 | (4,650) | 41,442 |
| Other noncurrent liabilities and deferred credits | 416 | 3 | 4,956 | — | 5,375 |
| Total liabilities | 10,510 | 5,005 | 55,456 | (9,506) | 61,465 |
| EFH Corp. shareholders' equity | (3,234) | (1,374) | 4,560 | (3,186) | (3,234) |
| Noncontrolling interests in subsidiaries | — | — | 1,420 | — | 1,420 |
| Total equity | (3,234) | (1,374) | 5,980 | (3,186) | (1,814) |
| Total liabilities and equity | $ 7,276 | $ 3,631 | $61,436 | $(12,692) | $59,651 |

Confidential

EFIHMW00246237

## ENERGY FUTURE HOLDINGS CORP. AND SUBSIDIARIES

### Condensed Consolidating Balance Sheets
### at December 31, 2008
### (millions of dollars)

| | Parent/ Issuer | Guarantors | Non-Guarantors | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Current assets: | | | | | |
| Cash and cash equivalents | $ 1,075 | $ — | $ 614 | $ — | $ 1,689 |
| Investments held in money market fund | — | — | 142 | — | 142 |
| Restricted cash | — | — | 55 | — | 55 |
| Advances to affiliates | 403 | 7 | — | (410) | — |
| Trade accounts receivable—net | 3 | — | 1,216 | — | 1,219 |
| Income taxes receivable | — | — | 128 | (86) | 42 |
| Accounts receivable from affiliates | — | — | 3 | (3) | — |
| Notes receivable from affiliates | — | — | 633 | (633) | — |
| Inventories | — | — | 426 | — | 426 |
| Commodity and other derivative contractual assets | 143 | — | 2,391 | — | 2,534 |
| Accumulated deferred income taxes | — | — | 80 | (36) | 44 |
| Margin deposits related to commodity positions | — | — | 439 | — | 439 |
| Other current assets | 6 | — | 159 | — | 165 |
| Total current assets | 1,630 | 7 | 6,286 | (1,168) | 6,755 |
| Restricted cash | — | — | 1,267 | — | 1,267 |
| Investments | 3,899 | 2,793 | 579 | (6,626) | 645 |
| Property, plant and equipment—net | — | — | 29,522 | — | 29,522 |
| Notes receivable from affiliates | 12 | — | 2,273 | (2,285) | — |
| Goodwill | — | — | 14,386 | — | 14,386 |
| Intangible assets—net | — | — | 2,993 | — | 2,993 |
| Regulatory assets—net | — | — | 1,892 | — | 1,892 |
| Commodity and other derivative contractual assets | — | — | 962 | — | 962 |
| Accumulated deferred income taxes | 575 | 6 | — | (581) | — |
| Unamortized debt issuance costs and other noncurrent assets | 130 | 111 | 711 | (111) | 841 |
| Total assets | $ 6,246 | $ 2,917 | $60,871 | $(10,771) | $59,263 |
| **LIABILITIES AND EQUITY** | | | | | |
| Current liabilities: | | | | | |
| Short-term borrowings | $ — | $ — | $ 1,237 | $ — | $ 1,237 |
| Advances from affiliates | — | — | 410 | (410) | — |
| Long-term debt due currently | 3 | 8 | 374 | — | 385 |
| Trade accounts payable | 8 | — | 1,135 | — | 1,143 |
| Accounts payable to affiliates | — | 3 | — | (3) | — |
| Notes payable to affiliates | 585 | 13 | 35 | (633) | — |
| Commodity and other derivative contractual liabilities | 178 | — | 2,730 | — | 2,908 |
| Margin deposits related to commodity positions | — | — | 525 | — | 525 |
| Accumulated deferred income taxes | 36 | — | — | (36) | — |
| Accrued interest | 110 | 87 | 413 | (86) | 524 |
| Other current liabilities | 111 | — | 587 | (86) | 612 |
| Total current liabilities | 1,031 | 111 | 7,446 | (1,254) | 7,334 |
| Accumulated deferred income taxes | — | — | 6,507 | (581) | 5,926 |
| Investment tax credits | — | — | 42 | — | 42 |
| Commodity and other derivative contractual liabilities | — | — | 2,095 | — | 2,095 |
| Notes or other liabilities due affiliates | 2,019 | — | 266 | (2,285) | — |
| Long-term debt, less amounts due currently | 6,340 | 4,597 | 34,401 | (4,500) | 40,838 |
| Other noncurrent liabilities and deferred credits | 388 | 1 | 4,817 | (1) | 5,205 |
| Total liabilities | 9,778 | 4,709 | 55,574 | (8,621) | 61,440 |
| EFH Corp. shareholders' equity | (3,532) | (1,792) | 3,942 | (2,150) | (3,532) |
| Noncontrolling interests in subsidiaries | — | — | 1,355 | — | 1,355 |
| Total equity | (3,532) | (1,792) | 5,297 | (2,150) | (2,177) |
| Total liabilities and equity | $ 6,246 | $ 2,917 | $60,871 | $(10,771) | $59,263 |

Confidential

EFIHMW00246238

**PX 014**
**Page 520 of 1116**

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors and Shareholders of Energy Future Holdings Corp.:

We have reviewed the accompanying condensed consolidated balance sheet of Energy Future Holdings Corp. and subsidiaries ("EFH Corp.") as of September 30, 2009, and the related condensed statements of consolidated income (loss) and comprehensive income (loss) for the three-month and nine-month periods ended September 30, 2009 and 2008, and of cash flows for the nine-month periods ended September 30, 2009 and 2008. These interim financial statements are the responsibility of EFH Corp.'s management.

We conducted our reviews in accordance with the standards of the Public Company Accounting Oversight Board (United States). A review of interim financial information consists principally of applying analytical procedures and making inquiries of persons responsible for financial and accounting matters. It is substantially less in scope than an audit conducted in accordance with the standards of the Public Company Accounting Oversight Board (United States), the objective of which is the expression of an opinion regarding the financial statements taken as a whole. Accordingly, we do not express such an opinion.

Based on our reviews, we are not aware of any material modifications that should be made to such condensed consolidated interim financial statements for them to be in conformity with accounting principles generally accepted in the United States of America.

We have previously audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheet of Energy Future Holdings Corp. and subsidiaries as of December 31, 2008, and the related statements of consolidated income (loss), comprehensive income (loss), cash flows, and shareholders' equity for the year then ended (not presented herein); and in our report dated March 2, 2009 (May 20, 2009 as to the effects of the retrospective adoption of new accounting guidance related to noncontrolling interests in consolidated financial statements) (which report includes an explanatory paragraph related to EFH Corp. completing its merger with Texas Energy Future Merger Sub Corp and becoming a subsidiary of Texas Energy Future Holdings Limited Partnership on October 10, 2007, EFH Corp.'s adoption of new accounting guidance related to noncontrolling interests in consolidated financial statements, the provisions of accounting guidance related to the presentation of assets and liabilities with the legal right of offset and reclassification of results of its commodity hedging and trading activities on a retrospective basis), we expressed an unqualified opinion on those consolidated financial statements. In our opinion, the information set forth in the accompanying condensed consolidated balance sheet as of December 31, 2008 is fairly stated, in all material respects, in relation to the consolidated balance sheet from which it has been derived.

/s/ Deloitte & Touche LLP

Dallas, Texas
October 29, 2009

F-161

EFIHMW00246239

**PX 014**
**Page 521 of 1116**

## GLOSSARY

When the following terms and abbreviations appear in the text of this report, they have the meanings indicated below.

**1999 Restructuring Legislation** . . . . . . Texas Electric Choice Plan, the legislation that restructured the electric utility industry in Texas to provide for retail competition

**Adjusted EBITDA** . . . . . . . . . . . . . . . Adjusted EBITDA means EBITDA adjusted to exclude non-cash items, unusual items and other adjustments allowable under certain debt arrangements of EFH Corp. Adjusted EBITDA and EBITDA are not recognized terms under GAAP and, thus, are non-GAAP financial measures. Intermediate Holding is providing EFH Corp.'s Adjusted EBITDA in this annual report (see reconciliation in Exhibit 99(a)) solely because of the important role that Adjusted EBITDA plays in respect of the certain covenants contained in the indenture for EFH Corp. debt pushed down to Intermediate Holding as discussed in Note 11 to Financial Statements. Intermediate Holding does not intend for Adjusted EBITDA (or EBITDA) to be an alternative to net income as a measure of operating performance or an alternative to cash flows from operating activities as a measure of liquidity or an alternative to any other measure of financial performance presented in accordance with GAAP. Additionally, Intermediate Holding does not intend for Adjusted EBITDA (or EBITDA) to be used as a measure of free cash flow available for management's discretionary use, as the measure excludes certain cash requirements such as interest payments, tax payments and other debt service requirements. Because not all companies use identical calculations, Intermediate Holding's presentation of Adjusted EBITDA (and EBITDA) may not be comparable to similarly titled measures of other companies.

**Capgemini** . . . . . . . . . . . . . . . . . . . . . Capgemini Energy LP, a subsidiary of Cap Gemini North America Inc. that provides business process support services to Oncor

**CREZ** . . . . . . . . . . . . . . . . . . . . . . . . . Competitive Renewable Energy Zones

**EBITDA** . . . . . . . . . . . . . . . . . . . . . . . Refers to earnings (net income) before interest expense, income taxes, depreciation and amortization. See the definition of Adjusted EBITDA above.

**EFC Holdings** . . . . . . . . . . . . . . . . . . Refers to Energy Future Competitive Holdings Company, a direct, wholly-owned subsidiary of EFH Corp. and the direct parent of TCEH.

**EFH Corp.** . . . . . . . . . . . . . . . . . . . . . Refers to Energy Future Holdings Corp., a holding company, and/or its subsidiaries, depending on context. Its major subsidiaries include Oncor and TCEH.

**EFH Corp. Notes** . . . . . . . . . . . . . . . Refers collectively to EFH Corp.'s 10.875% Senior Notes due November 1 2017 (Cash-Pay Notes) and EFH Corp.'s 11.250%/ 12.000% Senior Toggle Notes due November 1, 2017 (Toggle Notes).

F-162

Confidential

EFIHMW00246240

**PX 014**
**Page 522 of 1116**

| | |
|---|---|
| **EPA** | US Environmental Protection Agency |
| **ERCOT** | Electric Reliability Council of Texas, the independent system operator and the regional coordinator of the various electricity systems within Texas |
| **ERISA** | Employee Retirement Income Security Act of 1974, as amended |
| **FASB** | Financial Accounting Standards Board, the designated organization in the private sector for establishing standards for financial accounting and reporting |
| **FERC** | US Federal Energy Regulatory Commission |
| **FIN** | Financial Accounting Standards Board Interpretation |
| **FIN 48** | FIN No. 48 (As Amended), "Accounting for Uncertainty in Income Taxes" |
| **Fitch** | Fitch Ratings, Ltd. (a credit rating agency) |
| **FSP** | FASB Staff Position |
| **FSP FIN 48-1** | FASB Staff Position FIN 48-1, "Definition of Settlement in FASB Interpretation No. 48" |
| **FSP SFAS 132(R)** | FSP SFAS No. 132(R)-1, "Employers' Disclosures about Postretirement Benefit Plan Assets" |
| **GAAP** | generally accepted accounting principles |
| **GWh** | gigawatt-hours |
| **Intermediate Holding** | Refers to Energy Future Intermediate Holding Company LLC, a direct, wholly-owned subsidiary of EFH Corp. and the direct parent of Oncor Holdings. |
| **Investment LLC** | Refers to Oncor Management Investment LLC, a Delaware limited liability company and minority interest owner of Oncor, whose managing member is Oncor and whose Class B Interests are owned by officers, directors and key employees of Oncor. |
| **IRS** | US Internal Revenue Service |
| **kWh** | kilowatt-hours |
| **LIBOR** | London Interbank Offered Rate. An interest rate at which banks can borrow funds, in marketable size, from other banks in the London interbank market. |
| **Limited Liability Company Agreement** | The Second Amended and Restated Limited Liability Company Agreement of Oncor, dated as of November 5, 2008 by and among |

F-163

Confidential

EFIHMW00246241

Oncor Holdings, Texas Transmission and Investment LLC, as amended.

**Luminant** . . . . . . . . . . . . . . . . . . . . . . . Refers to wholly-owned subsidiaries of TCEH engaged in competitive market activities consisting of electricity generation, development and construction of new generation facilities, wholesale energy sales and purchases as well as commodity risk management and trading activities, all largely in Texas.

**Merger** . . . . . . . . . . . . . . . . . . . . . . . . . The transaction referred to in the Merger Agreement (defined immediately below) that was completed on October 10, 2007.

**Merger Agreement** . . . . . . . . . . . . . . . Agreement and Plan of Merger, dated February 25, 2007, under which Texas Holdings agreed to acquire EFH Corp.

**Moody's** . . . . . . . . . . . . . . . . . . . . . . . . Moody's Investors Services, Inc. (a credit rating agency)

**MW** . . . . . . . . . . . . . . . . . . . . . . . . . . . . megawatts

**Oncor** . . . . . . . . . . . . . . . . . . . . . . . . . . Refers to Oncor Electric Delivery Company LLC, a direct, majority-owned subsidiary of Oncor Holdings, and/or its wholly-owned consolidated bankruptcy-remote financing subsidiary, Oncor Electric Delivery Transition Bond Company LLC, depending on context.

**Oncor Holdings** . . . . . . . . . . . . . . . . . . Refers to Oncor Electric Delivery Holdings Company LLC, a direct, wholly-owned subsidiary of Intermediate Holding and the direct majority owner of Oncor.

**Oncor Ring-Fenced Entities** . . . . . . . . Refers to Oncor Holdings and its direct and indirect subsidiaries.

**OPEB** . . . . . . . . . . . . . . . . . . . . . . . . . . other postretirement employee benefit

**PUCT** . . . . . . . . . . . . . . . . . . . . . . . . . . Public Utility Commission of Texas

**PURA** . . . . . . . . . . . . . . . . . . . . . . . . . . Texas Public Utility Regulatory Act

**Purchase accounting** . . . . . . . . . . . . . . The purchase method of accounting for a business combination as prescribed by SFAS 141 whereby the cost or "purchase price" of a business combination, including the amount paid for the equity and direct transaction costs are allocated to identifiable assets and liabilities (including intangible assets) based upon their fair values. The excess of the purchase price over the fair values of assets and liabilities is recorded as goodwill.

**REP** . . . . . . . . . . . . . . . . . . . . . . . . . . . retail electric provider

**S&P** . . . . . . . . . . . . . . . . . . . . . . . . . . . Standard & Poor's Ratings Services, a division of the McGraw-Hill Companies. Inc. (a credit rating agency)

**SARs** . . . . . . . . . . . . . . . . . . . . . . . . . . Stock Appreciation Rights

**SARs Plan** . . . . . . . . . . . . . . . . . . . . . . Refers to the Oncor Electric Delivery Stock Appreciation Rights Plan

F-164

Confidential

| | |
|---|---|
| **SEC** | US Securities and Exchange Commission |
| **Securities Act** | Securities Act of 1933, as amended |
| **SFAS** | Statement of Financial Accounting Standards issued by the FASB |
| **SFAS 5** | SFAS No. 5, "Accounting for Contingencies" |
| **SFAS 71** | SFAS No. 71, "Accounting for the Effect of Certain Types of Regulation" |
| **SFAS 87** | SFAS No. 87, "Employers' Accounting for Pensions" |
| **SFAS 106** | SFAS No. 106, "Employers' Accounting for Postretirement Benefits Other Than Pensions" |
| **SFAS 109** | SFAS No. 109, "Accounting for Income Taxes" |
| **SFAS 123(R)** | SFAS No. 123 (revised 2004), "Share-Based Payment" |
| **SFAS 132(R)** | SFAS No. 132 (revised 2003), "Employers' Disclosures About Pensions and Other Postretirement Benefits" |
| **SFAS 133** | SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities" as amended and interpreted |
| **SFAS 140** | SFAS No. 140, "Accounting for Transfers and Servicing of Financial Assets and Extinguishment of Liabilities, a replacement of FASB Statement No. 125" |
| **SFAS 141** | SFAS No. 141, "Business Combinations" |
| **SFAS 142** | SFAS No. 142, "Goodwill and Other Intangible Assets" |
| **SFAS 144** | SFAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets" |
| **SFAS 157** | SFAS No. 157, "Fair Value Measurements" |
| **SFAS 158** | SFAS No. 158, "Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans" |
| **SFAS 160** | SFAS No. 160, "Noncontrolling Interests in Consolidated Financial Statements—an amendment of ARB No. 51" |
| **SFAS 165** | SFAS No. 165, "Subsequent Events" |
| **SFAS 168** | SFAS No. 168, "The *FASB Accounting Standards Codification*™ and the Hierarchy of Generally Accepted Accounting Principles" |
| **Sponsor Group** | Collectively, the investment funds affiliated with Kohlberg Kravis Roberts & Co. L.P., TPG Capital, L.P. and GS Capital Partners, an affiliate of Goldman Sachs & Co. (See Texas Holdings below.) |

F-165

EFIHMW00246243

**PX 014**
**Page 525 of 1116**

| | |
|---|---|
| **TCEH** . . . . . . . . . . . . . . . . . . . . . . . . . . | Refers to Texas Competitive Electric Holdings Company LLC, a direct, wholly-owned subsidiary of EFC Holdings and an indirect, wholly-owned subsidiary of EFH Corp., and/or its subsidiaries, depending on context. |
| **TCEQ** . . . . . . . . . . . . . . . . . . . . . . . . . . | Texas Commission on Environmental Quality |
| **Texas Holdings** . . . . . . . . . . . . . . . . . . | Refers to Texas Energy Future Holdings Limited Partnership, a Delaware limited partnership controlled by the Sponsor Group, that owns substantially all of the common stock of EFH Corp. |
| **Texas Holdings Group** . . . . . . . . . . . . | Refers to Texas Holdings and its direct and indirect subsidiaries other than the Oncor Ring-Fenced Entities. |
| **Texas Transmission** . . . . . . . . . . . . . . | Refers to Texas Transmission Investment LLC, a Delaware limited liability company that purchased a 19.75% equity interest in Oncor in November 2008. It is not affiliated with EFH Corp., any of EFH Corp.'s subsidiaries or any member of the Sponsor Group. |
| **TXU Energy** . . . . . . . . . . . . . . . . . . . . . | Refers to TXU Energy Retail Company LLC, a direct, wholly-owned subsidiary of TCEH engaged in the retail sale of electricity to residential and business customers. TXU Energy is a REP in competitive areas of ERCOT. |
| **US** . . . . . . . . . . . . . . . . . . . . . . . . . . . . | United States of America |

This Annual Report occasionally makes references to Intermediate Holding, Oncor Holdings or Oncor when describing actions, rights or obligations of their respective subsidiaries. These references reflect the fact that the subsidiaries are consolidated with their respective parent companies for financial reporting purposes. However, these references should not be interpreted to imply that the parent company is actually undertaking the action or has the rights or obligations of the relevant subsidiary company or that the subsidiary company is undertaking an action or has the rights or obligations of its parent company or any other affiliate.

Confidential

EFIHMW00246244

**PX 014
Page 526 of 1116**

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Member of
Energy Future Intermediate Holding Company LLC
Dallas, Texas

We have audited the accompanying consolidated balance sheets of Energy Future Intermediate Holding Company LLC and subsidiaries ("Intermediate Holding" or the "Successor") as of December 31, 2008 and 2007 (Successor balance sheets), and the related statements of consolidated income (loss), comprehensive income (loss), cash flows, and membership interests for the year ended December 31, 2008 and the period from October 11, 2007 through December 31, 2007 (Successor operations). We have also audited the accompanying statements of consolidated income (loss), comprehensive income (loss), cash flows, and shareholder's equity of Oncor Electric Delivery Company LLC (the "Predecessor") for the period from January 1, 2007 through October 10, 2007 and the year ended December 31, 2006 (Predecessor operations). These financial statements are the responsibility of Intermediate Holding's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the auditing standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. Intermediate Holding is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of Intermediate Holding's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the Successor's consolidated financial statements referred to above present fairly, in all material respects, the financial position of Energy Future Intermediate Holding Company LLC and subsidiaries as of December 31, 2008 and 2007, and the results of their operations and their cash flows for the year ended December 31, 2008 and the period from October 11, 2007 through December 31, 2007 in conformity with accounting principles generally accepted in the United States of America. Further, in our opinion, the Predecessor's consolidated financial statements referred to above present fairly, in all material respects, the results of operations and cash flows of Oncor Electric Delivery Company LLC for the period from January 1, 2007 through October 10, 2007 and the year ended December 31, 2006, in conformity with accounting principles generally accepted in the United States of America.

As discussed in Note 1 to the consolidated financial statements, Intermediate Holding is a wholly owned subsidiary of Energy Future Holdings Corp., which was merged with Texas Energy Future Merger Sub Corp on October 10, 2007. As also discussed in Note 1, Intermediate Holding adopted the provisions of FASB Statement No. 160, Noncontrolling Interests in Consolidated Financial Statements—an amendment of ARB No. 51 on a retrospective basis.

/s/ Deloitte & Touche LLP

Dallas, Texas
September 2, 2009

F-167

EFIHMW00246245
**PX 014**
**Page 527 of 1116**

**ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC (SUCCESSOR) AND
ONCOR ELECTRIC DELIVERY COMPANY LLC (PREDECESSOR)**

**STATEMENTS OF CONSOLIDATED INCOME (LOSS)**
**(millions of dollars)**

| | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
| | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, 2006 |
| Operating revenues: | | | | |
| Affiliated . . . . . . . . . . . . . . . . . . . . . . . . | $1,000 | $209 | $ 823 | $1,139 |
| Nonaffiliated . . . . . . . . . . . . . . . . . . . . . . | 1,580 | 324 | 1,144 | 1,310 |
| Total operating revenues . . . . . . . . . . . | 2,580 | 533 | 1,967 | 2,449 |
| Operating expenses: | | | | |
| Operation and maintenance . . . . . . . . . . . . . | 852 | 200 | 649 | 804 |
| Depreciation and amortization . . . . . . . . . . | 492 | 96 | 366 | 476 |
| Income taxes . . . . . . . . . . . . . . . . . . . . . . . | 191 | 25 | 150 | 156 |
| Taxes other than income taxes . . . . . . . . . . . | 391 | 87 | 305 | 402 |
| Total operating expenses . . . . . . . . . . | 1,926 | 408 | 1,470 | 1,838 |
| Operating income . . . . . . . . . . . . . . . . . . . . | 654 | 125 | 497 | 611 |
| Other income and deductions: | | | | |
| Impairment of goodwill (Note 3) . . . . . . . . | 860 | —— | —— | —— |
| Other income (Note 20) . . . . . . . . . . . . . . . | 45 | 11 | 3 | 2 |
| Other deductions (Note 20) . . . . . . . . . . . . . | 25 | 8 | 30 | 27 |
| Nonoperating income taxes . . . . . . . . . . . . . | (62) | (17) | 9 | 14 |
| Interest income . . . . . . . . . . . . . . . . . . . . . | 47 | 12 | 44 | 58 |
| Interest expense and related charges (Note 20) . . | 578 | 138 | 242 | 286 |
| Net income (loss) . . . . . . . . . . . . . . . . . . . . | (655) | 19 | 263 | 344 |
| Net loss attributable to noncontrolling interests . . . . . . . . . . . . . . . . . . . . . . . . . . | 160 | —— | —— | —— |
| Net income (loss) attributable to Intermediate Holding . . . . . . . . . . . . . . . . . . . . . . . . . . | $ (495) | $ 19 | $ 263 | $ 344 |

See Notes to Financial Statements.

F-168

Confidential

**ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC (SUCCESSOR) AND
ONCOR ELECTRIC DELIVERY COMPANY LLC (PREDECESSOR)**

**STATEMENTS OF CONSOLIDATED COMPREHENSIVE INCOME (LOSS)**
**(millions of dollars)**

| | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
| | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, 2006 |
| Net income (loss) . . . . . . . . . . . . . . . . . . . . . . . | $(655) | $ 19 | $263 | $344 |
| Other comprehensive income, net of tax effects: | | | | |
| Cash flow hedges: | | | | |
| Net decrease in fair value of derivatives (net of tax benefit of $1, —, — and —) . . . . . . . . . . . . . . . . . . . . . . | (2) | — | — | — |
| Cash flow hedges—derivative value net losses related to hedged transactions recognized during the period in net income (net of tax expense of $ — in all periods) . . . . . | — | — | 1 | 2 |
| Comprehensive income (loss) . . . . . . . . . . . . . . . | (657) | 19 | 264 | 346 |
| Comprehensive loss attributable to noncontrolling interests . . . . . . . . . . . . . . . . . . | 160 | — | — | — |
| Comprehensive income (loss) attributable to Intermediate Holding . . . . . . . . . . . . . . . . . . . . | $(497) | $ 19 | $264 | $346 |

See Notes to Financial Statements.

F-169

Confidential

EFIHMW00246247

**ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC (SUCCESSOR) AND
ONCOR ELECTRIC DELIVERY COMPANY LLC (PREDECESSOR)**

**STATEMENTS OF CONSOLIDATED CASH FLOWS**
(millions of dollars)

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, 2006 |
| Cash flows—operating activities: | | | | |
| Net income (loss) .................................. | $ (655) | $ 19 | $ 263 | $ 344 |
| Adjustments to reconcile net income to cash provided by operating activities: | | | | |
| Depreciation and amortization ..................... | 462 | 97 | 366 | 473 |
| Deferred income taxes expense (benefit)—net ........ | 160 | 71 | 21 | 27 |
| Amortization of investment tax credits .............. | (5) | (1) | (4) | (5) |
| Impairment of goodwill (Note 3) .................... | 860 | — | — | — |
| Net gains on sale of assets ........................ | (1) | (1) | (3) | — |
| Bad debt expense ................................. | 1 | (2) | 2 | 1 |
| Stock-based incentive compensation expense ......... | — | — | 3 | 4 |
| Recognition of losses on dedesignated cash flow hedges ......................................... | — | — | 2 | 2 |
| Effect of Parent's payment of interest on pushed-down debt ........................................... | 251 | 24 | — | — |
| Other, net ....................................... | 6 | 4 | 2 | 1 |
| Changes in operating assets and liabilities: | | | | |
| Accounts receivable—trade (including affiliates) .. | (1) | 39 | (47) | 3 |
| Impact of accounts receivable sales program (Note 9) ...................................... | — | (113) | 27 | (3) |
| Inventories ................................... | (12) | 6 | 19 | (22) |
| Accounts payable—trade (including affiliates) .... | 6 | (3) | 8 | (16) |
| Other—assets ................................. | (141) | (32) | (24) | (56) |
| Other—liabilities ............................. | (102) | (43) | 47 | (125) |
| Cash provided by operating activities .......... | 829 | 65 | 682 | 628 |
| Cash flows—financing activities: | | | | |
| Issuance of long-term debt .......................... | 1,500 | — | 800 | — |
| Repayments of long-term debt ....................... | (99) | (832) | (264) | (93) |
| Net increase (decrease) in short-term borrowings ..... | (943) | 895 | (288) | 622 |
| Proceeds from sale of noncontrolling interests, net of transaction costs .............................. | 1,253 | — | — | — |
| Distribution to parent of equity sale net proceeds ...... | (1,253) | — | — | — |
| Distributions/dividends ............................. | (330) | — | (326) | (340) |
| Net increase (decrease) in advances from parent ....... | — | — | (24) | 2 |
| Decrease in income tax-related note receivable from TCEH ......................................... | 34 | 9 | 24 | 39 |
| Excess tax benefit on stock-based incentive compensation ... | 10 | 15 | — | 14 |
| Debt discount, financing and reacquisition expenses—net ... | (18) | (1) | (10) | (4) |
| Cash provided by (used in) financing activities .. | 154 | 86 | (88) | 240 |
| Cash flows—investing activities: | | | | |
| Capital expenditures .............................. | (882) | (153) | (555) | (840) |
| Costs to remove retired property .................... | (37) | (9) | (25) | (40) |
| Cash settlements related to outsourcing contract termination (Note 16) ..................................... | 20 | — | — | — |
| Proceeds from sale of assets ........................ | 1 | 1 | 4 | — |
| Other ........................................... | 19 | 15 | (2) | (2) |
| Cash used in investing activities .............. | (879) | (146) | (578) | (882) |
| Net change in cash and cash equivalents ................... | 104 | 5 | 16 | (14) |
| Cash and cash equivalents—beginning balance ................ | 22 | 17 | 1 | 15 |
| Cash and cash equivalents—ending balance ................. | $ 126 | $ 22 | $ 17 | $ 1 |

See Notes to Financial Statements.

F-170

Confidential

# ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC (SUCCESSOR)

## CONSOLIDATED BALANCE SHEETS
### (millions of dollars)

| | Successor | |
|---|---|---|
| | December 31, 2008 | December 31, 2007 |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 126 | $ 22 |
| Restricted cash (Note 15) | 51 | 56 |
| Trade accounts receivable from nonaffiliates—net (Note 9) | 217 | 208 |
| Trade accounts and other receivables from affiliates | 182 | 181 |
| Advances to Parent | 3 | 25 |
| Income taxes receivable from parent | 22 | 52 |
| Materials and supplies inventories—at average cost | 63 | 51 |
| Accumulated deferred income taxes (Note 7) | 54 | 45 |
| Prepayments | 75 | 67 |
| Other current assets | 9 | 2 |
| Total current assets | 802 | 709 |
| Restricted cash (Note 15) | 16 | 17 |
| Investments and other property (Note 15) | 72 | 89 |
| Property, plant and equipment—net (Note 20) | 8,606 | 8,069 |
| Goodwill (Note 20) | 4,064 | 4,894 |
| Note receivable due from TCEH (Note 19) | 254 | 289 |
| Regulatory assets—net (Note 8) | 1,892 | 1,305 |
| Other noncurrent assets | 115 | 176 |
| Total assets | $15,821 | $15,548 |
| **LIABILITIES AND MEMBERSHIP INTERESTS** | | |
| Current liabilities: | | |
| Short-term borrowings (Note 10) | $ 337 | $ 1,280 |
| Long-term debt due currently (Note 11) | 103 | 99 |
| Trade accounts payable | 124 | 130 |
| Accrued taxes other than income taxes | 141 | 136 |
| Accrued interest | 146 | 115 |
| Other current liabilities | 99 | 98 |
| Total current liabilities | 950 | 1,858 |
| Accumulated deferred income taxes (Note 7) | 1,192 | 1,354 |
| Investment tax credits | 42 | 47 |
| Long-term debt, less amounts due currently (Note 11) | 7,351 | 5,952 |
| Other noncurrent liabilities and deferred credits | 1,721 | 898 |
| Total liabilities | 11,256 | 10,109 |
| Commitments and contingencies (Note 12) | | |
| Membership interests (Note 13): | | |
| Intermediate Holding membership interest | 3,210 | 5,439 |
| Noncontrolling interests in subsidiary | 1,355 | — |
| Total membership interests | 4,565 | 5,439 |
| Total liabilities and membership interests | $15,821 | $15,548 |

See Notes to Financial Statements.

Confidential

EFIHMW00246249

**ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC (SUCCESSOR)**

**STATEMENTS OF CONSOLIDATED MEMBERSHIP INTERESTS**
**(millions of dollars)**

|  | Successor | |
|---|---|---|
|  | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 |
| Capital account: | | |
| Balance at beginning of period (a) | $ 5,439 | $ 7,539 |
| Investment by Texas Holdings | — | 12 |
| Distribution of investment in Oncor Communications Holding Company LLC to parent | (24) | — |
| Settlement of incentive compensation plans | — | 28 |
| Effect of debt push-down from EFH Corp. (Note 11) | 140 | (2,158) |
| Effect of sale of noncontrolling interests (Note 14) | (265) | — |
| Distributions paid to parent | (1,583) | — |
| Net income (loss) | (495) | 19 |
| Other | — | (1) |
| Balance at end of period | 3,212 | 5,439 |
| Accumulated other comprehensive income (loss), net of tax effects: | | |
| Balance at beginning of period | — | — |
| Net effects of cash flow hedges | (2) | — |
| Balance at end of period | (2) | — |
| Intermediate Holding membership interest at end of period | 3,210 | — |
| Noncontrolling interests in subsidiary (Note 14) | | |
| Balance at beginning of period | — | — |
| Net loss | (160) | — |
| Investment | 1,253 | — |
| Effect of sale of noncontrolling interests (Note 14) | 265 | — |
| Distributions to noncontrolling interests | (2) | — |
| Other | (1) | — |
| Noncontrolling interests in subsidiary at end of period | 1,355 | — |
| Total membership interests at end of period | $ 4,565 | $ 5,439 |

(a)  The beginning equity balance for the period from October 11, 2007 through December 31, 2007 reflects the application of push-down accounting as a result of the Merger.

See Notes to Financial Statements.

F-172

EFIHMW00246250

**ONCOR ELECTRIC DELIVERY COMPANY LLC (PREDECESSOR)**

**STATEMENTS OF CONSOLIDATED SHAREHOLDER'S EQUITY**
**(millions of dollars)**

| | Predecessor | |
|---|---|---|
| | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, 2006 |
| Common stock without par value (number of authorized shares—100,000,000): | | |
| Balance at beginning of period | $1,986 | $1,952 |
| Effects of stock-based incentive compensation plans (Note 13) | 18 | 19 |
| Noncash contribution of pension-related assets (Note 13) | — | 15 |
| Balance at end of period (number of shares outstanding: October 10, 2007—0; 2006 and 2005—48,864,775) | 2,004 | 1,986 |
| Retained earnings: | | |
| Balance at beginning of period | 1,008 | 1,004 |
| Net income | 263 | 344 |
| Dividends to parent | (326) | (340) |
| Effect of adoption of FIN 48 | (9) | — |
| Other | 1 | — |
| Balance at end of period | 937 | 1,008 |
| Accumulated other comprehensive (loss), net of tax effects: | | |
| Balance at beginning of period | (19) | (21) |
| Net effects of cash flow hedges | 1 | 2 |
| Balance at end of period | (18) | (19) |
| Total shareholder's equity at end of period | $2,923 | $2,975 |

See Notes to Financial Statements.

F-173

Confidential

**ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC (SUCCESSOR) AND
ONCOR ELECTRIC DELIVERY COMPANY LLC (PREDECESSOR)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

## 1.    SIGNIFICANT ACCOUNTING POLICIES

*Description of Business*

Intermediate Holding is a Dallas, Texas-based holding company whose financial statements reflect almost entirely the operations of its indirect, majority (approximately 80%) owned subsidiary, Oncor. Oncor is a regulated electricity transmission and distribution company principally engaged in providing delivery services to REPs, including subsidiaries of TCEH, that sell power in the north-central, eastern and western parts of Texas. Distribution revenues from TCEH represented 39% of total revenues for the year ended December 31, 2008. Intermediate Holding is a direct, wholly-owned subsidiary of EFH Corp. With the closing of the Merger on October 10, 2007, EFH Corp. became a subsidiary of Texas Holdings, which is controlled by the Sponsor Group.

References in this report to Intermediate Holding are to Intermediate Holding and/or its direct or indirect subsidiaries as apparent in the context. See "Glossary" for definition of terms and abbreviations.

Intermediate Holding's consolidated financial statements include its indirect, bankruptcy-remote financing subsidiary, Oncor Electric Delivery Transition Bond Company LLC. This financing subsidiary was organized for the limited purpose of issuing specified transition bonds in 2003 and 2004. Oncor Electric Delivery Transition Bond Company LLC issued $1.3 billion principal amount of securitization (transition) bonds to recover generation-related regulatory asset stranded costs and other qualified costs under an order issued by the PUCT in 2002.

Various "ring-fencing" measures have been taken, in connection with the Merger, to enhance credit quality of Oncor Holdings and Oncor. Such measures include, among other things: Oncor Holdings' sale of a 19.75% equity interest in Oncor to Texas Transmission; TXU Electric Delivery Company's name change to Oncor Electric Delivery Company; the formation of a new special purpose holding company for Oncor, Oncor Holdings, as one of the Oncor Ring-Fenced Entities; the conversion of Oncor from a corporation to a limited liability company; maintenance of separate books and records for the Oncor Ring-Fenced Entities; changes to Oncor's corporate governance provisions; Oncor's board of directors being comprised of a majority of independent directors; physical separation of Oncor's headquarters from Luminant and TXU Energy; amendments to contracts between the Oncor Ring-Fenced Entities and the Texas Holdings Group, and prohibitions on the Oncor Ring-Fenced Entities' providing credit support to, or receiving credit support from, any member of the Texas Holdings Group. The assets and liabilities of the Oncor Ring-Fenced Entities are separate and distinct from those of the Texas Holdings Group, including TXU Energy and Luminant, and none of the assets of the Oncor Ring-Fenced Entities are available to satisfy the debt or other obligations of any member of the Texas Holdings Group. Furthermore, Oncor does not bear any liability for Intermediate Holding's obligations (including, but not limited to, debt obligations), and vice versa. Accordingly, Oncor's operations are conducted, and its cash flows managed, independently from the Texas Holdings Group.

Intermediate Holding's financial statements reflect almost entirely the operations of Oncor; consequently, there are no separate reportable business segments.

See Note 14 for discussion of noncontrolling interests sold by Oncor in November 2008.

*Basis of Presentation*

The consolidated financial statements of Intermediate Holding have been prepared in accordance with US GAAP. The accompanying consolidated statements of income (loss), comprehensive income (loss) and cash flows present results of operations and cash flows of Intermediate Holding for periods subsequent to the Merger

F-174

EFIHMW00246252

(Successor) and of Oncor for periods preceding the Merger (Predecessor), since Intermediate Holding did not exist prior to the Merger. The consolidated financial statements of the Successor reflect the application of purchase accounting in accordance with the provisions of SFAS 141 and the adoption of SFAS 160 as discussed in "Changes in Accounting Standards" below. Adoption of SFAS 160 did not affect the periods prior to 2008 as there were no noncontrolling interests in those periods. All intercompany items and transactions have been eliminated in consolidation. All dollar amounts in the financial statements and tables in the notes are stated in millions of US dollars unless otherwise indicated.

### Income Taxes

EFH Corp. files a consolidated federal income tax return, and federal income taxes were allocated to subsidiaries, including Intermediate Holding, Oncor Holdings and Oncor, based on their respective taxable income or loss. Effective with the sale of noncontrolling interests in Oncor (see Note 14), Oncor became a partnership for US federal income tax purposes, and subsequently EFH Corp.'s share of partnership income is included in its consolidated federal income tax return. In connection with the Merger, Oncor, Oncor Holdings and EFH Corp. entered into a tax sharing agreement (amended in November 2008 to include Texas Transmission and Investment LLC), that is retroactive to January 1, 2007. The tax sharing agreement provides for the allocation of tax liability to each of Oncor Holdings and Oncor substantially as if these entities filed their own income tax returns and requires tax payments to EFH Corp. and noncontrolling interest holders determined on that basis (without duplication for any income taxes paid by a subsidiary of Oncor Holdings). Deferred income taxes are provided for temporary differences between the book and tax bases of individual parent company assets and liabilities of Intermediate Holding and Oncor Holdings, which primarily relate to the difference between the book and tax basis of the investment in Oncor.

Amounts of deferred income tax assets and liabilities, as well as current and noncurrent accruals, are determined in accordance with the provisions of SFAS 109 and FIN 48. See Note 7 for additional detail.

Prior to 2007, Oncor generally accounted for uncertainty related to positions taken on tax returns based on the probable liability approach consistent with SFAS 5. Effective January 1, 2007, Intermediate Holding adopted FIN 48 as discussed in Note 6.

### Use of Estimates

Preparation of Intermediate Holding's financial statements requires management to make estimates and assumptions about future events that affect the reporting of assets and liabilities at the balance sheet dates and the reported amounts of revenue and expense, including fair value measurements. In the event estimates and/or assumptions prove to be different from actual amounts, adjustments are made in subsequent periods to reflect more current information. No material adjustments, other than those disclosed elsewhere herein, were made to previous estimates or assumptions during the current year.

### Purchase Accounting

The Merger has been accounted for under purchase accounting, whereby the total purchase price of the transaction was allocated to EFH Corp.'s identifiable tangible and intangible assets acquired and liabilities assumed based on their fair values, and the excess of the purchase price over the fair value of net assets acquired was recorded as goodwill. The allocation resulted in a significant amount of goodwill, a portion of which was assigned to Intermediate Holding. See Note 2 for details regarding the effect of purchase accounting.

### Derivative Instruments and Mark-to-Market Accounting

Oncor has from time-to-time entered into derivative instruments, referred to as interest rate swaps, to hedge interest rate risk. If the instrument meets the definition of a derivative under SFAS 133, the fair value of each

F-175

derivative is required to be recognized on the balance sheet as a derivative asset or liability and changes in the fair value recognized in net income, unless criteria for certain exceptions are met. This recognition is referred to as "mark-to-market" accounting. Under the exception criteria of SFAS 133, derivatives may be designated as cash flow or fair value hedges.

Because derivative instruments are frequently used as economic hedges, SFAS 133 allows the designation of such instruments as cash flow or fair value hedges provided certain conditions are met. A cash flow hedge mitigates the risk associated with the variability of the future cash flows related to an asset or liability (e.g., debt with variable interest rate payments), while a fair value hedge mitigates risk associated with fixed future cash flows (e.g., debt with fixed interest rate payments). In accounting for cash flow hedges, derivative assets and liabilities are recorded on the balance sheet at fair value with an offset to other comprehensive income to the extent the hedges are effective. Amounts remain in accumulated other comprehensive income, unless the underlying transactions become probable of not occurring, and are reclassified into net income as the related transactions (hedged items) settle and affect net income. Fair value hedges are recorded as derivative assets or liabilities with an offset to net income, and the carrying value of the related asset or liability (hedged item) is adjusted for changes in fair value with an offset to net income. If the fair value hedge is settled prior to the maturity of the hedged item, the cumulative fair value gain or loss associated with the hedge is amortized into income over the remaining life of the hedged item. To qualify for hedge accounting, a hedge must be considered highly effective in offsetting changes in fair value of the hedged item. Assessment of the hedge's effectiveness is tested at least quarterly throughout its term to continue to qualify for hedge accounting. Hedge ineffectiveness, even if the hedge continues to be assessed as effective, is immediately recognized in net income. Ineffectiveness is generally measured as the cumulative excess, if any, of the change in value of the hedging instrument over the change in value of the hedged item.

### Revenue Recognition

Revenues from delivery services are recorded under the accrual method of accounting. Revenues are recognized when delivery services are provided to customers on the basis of periodic cycle meter readings and include an estimate for revenues earned from the meter reading date to the end of the period with an adjustment for the impact of weather and other factors on unmetered deliveries (unbilled revenue).

### Impairment of Goodwill and Other Intangible Assets

Intermediate Holding evaluates goodwill for impairment at least annually (as of October 1) in accordance with SFAS 142. The impairment tests performed are based on determinations of enterprise value using discounted cash flow analyses, comparable company equity values and any relevant transactions indicative of enterprise values. See Note 20 for details of goodwill and other intangible assets and Note 3 for discussion of a goodwill impairment charge recorded in 2008.

### System of Accounts

The accounting records of Intermediate Holding have been maintained in accordance with the FERC Uniform System of Accounts as adopted by the PUCT.

### Defined Benefit Pension Plans and Other Postretirement Employee Benefit (OPEB) Plans

Subsidiaries of Intermediate Holding participate in an EFH Corp. pension plan that offers benefits based on either a traditional defined benefit formula or a cash balance formula and an OPEB plan that offers certain health care and life insurance benefits to eligible employees and their eligible dependents upon the retirement of such employees from subsidiaries of Intermediate Holding. Costs of pension and OPEB plans are determined in accordance with SFAS 87 and SFAS 106 and are dependent upon numerous factors, assumptions and estimates.

F-176

Confidential

Effective December 31, 2006, Oncor adopted SFAS 158. See Note 17 for additional information regarding pension and OPEB plans.

### Stock-Based Incentive Compensation

Prior to the Merger, EFH Corp. provided discretionary awards payable in its common stock to qualified managerial employees of Oncor under EFH Corp.'s shareholder-approved long-term incentive plans. Intermediate Holding recognized expense for these awards based on the provisions of SFAS 123(R), which provides for the recognition of stock-based compensation expense over the vesting period based on the grant-date fair value of those awards. In November 2008, Oncor implemented a SARs Plan for certain management that purchased equity interests in Oncor indirectly by investing in Investment LLC. SARs have been awarded under the plan and are being accounted for based upon the provisions of SFAS 123(R). See Note 18 for information regarding stock-based compensation.

### Fair Value of Nonderivative Financial Instruments

The carrying amounts for financial assets classified as current assets and the carrying amounts for financial liabilities classified as current liabilities approximate fair value due to the short maturity of such instruments. The fair values of other financial instruments, for which carrying amounts and fair values have not been presented, are not materially different than their related carrying amounts.

### Franchise Taxes

Franchise taxes are assessed to Oncor by local governmental bodies, based on kWh delivered and are the principal component of "taxes other than amounts related to income taxes" as reported in the income statement. Franchise taxes are not a "pass through" item. Rates charged to customers by Oncor are intended to recover the taxes, but Oncor is not acting as an agent to collect the taxes from customers.

### Cash and Cash Equivalents

For purposes of reporting cash and cash equivalents, temporary cash investments purchased with a remaining maturity of three months or less are considered to be cash equivalents. See Note 15 for details regarding restricted cash.

### Property, Plant and Equipment

Properties are stated at original cost. The cost of self-constructed property additions includes materials and both direct and indirect labor and applicable overhead and an allowance for funds used during construction.

Depreciation of property, plant and equipment is calculated on a straight-line basis over the estimated service lives of the properties based on depreciation rates approved by the PUCT. Depreciation rates include plant removal costs as a component of depreciation expense, consistent with regulatory treatment. As is common in the industry, depreciation expense is recorded using composite depreciation rates that reflect blended estimates of the lives of major asset components as compared to depreciation expense calculated on an asset-by-asset basis.

### Allowance For Funds Used During Construction (AFUDC)

AFUDC is a regulatory cost accounting procedure whereby both interest charges on borrowed funds and a return on equity capital used to finance construction are included in the recorded cost of utility plant and equipment being constructed. AFUDC is capitalized on all projects involving construction periods lasting greater than thirty days. The equity portion of capitalized AFUDC is accounted for as other income. See Note 20 for detail of amounts charged to interest expense; there was no equity AFUDC in the years presented.

F-177

EFIHMW00246255

*Regulatory Assets and Liabilities*

The financial statements of Intermediate Holding reflect regulatory assets and liabilities under cost-based rate regulation in accordance with SFAS 71. The assumptions and judgments used by regulatory authorities continue to have an impact on the recovery of costs, the rate earned on invested capital and the timing and amount of assets to be recovered by rates. See Note 8 for details of regulatory assets and liabilities.

*Sale of Noncontrolling Interests*

See Note 14 for discussion of accounting for the sale of noncontrolling interests by Oncor.

*Push-Down of EFH Corp. Debt*

In accordance with SEC Staff Accounting Bulletin (SAB) Topic 5-J, at December 31, 2008 and 2007, Intermediate Holding reflects $2.250 billion principal amount of certain EFH Corp. senior notes on its balance sheet and the related interest expense in its income statement as a result of Intermediate Holding's guarantee of the debt. The amount to be reflected on Intermediate Holding's balance sheet was calculated based upon the relative equity investment of EFC Holdings, which is also a guarantor of the debt, and Intermediate Holding in their respective operating subsidiaries at the time of the Merger. See Note 11 for discussion of the EFH Corp. debt pushed down to Intermediate Holding.

*Changes in Accounting Standards*

In December 2007, the FASB issued SFAS 160, "Noncontrolling Interests in Consolidated Financial Statements—an amendment of ARB No. 51." SFAS 160 was effective for fiscal years beginning on or after December 15, 2008 and requires noncontrolling interests in subsidiaries initially to be measured at fair value and classified as a separate component of equity. In accordance with the retrospective reporting requirements of SFAS 160, the financial statements present the noncontrolling interests created as a result of Oncor's November 2008 sale of equity interests (totaling $1.355 billion at December 31, 2008) as a separate component of equity in the balance sheet, consolidated net loss for the year ended December 31, 2008 reflects the net loss attributable to the noncontrolling interests (totaling $160 million) as a line item below net loss and the net proceeds received from Oncor's sale of the noncontrolling interests are reflected in the statement of consolidated cash flows as a financing activity.

In December 2008, the FASB issued FSP SFAS 132(R)-1, "Employers' Disclosures about Postretirement Benefit Plan Assets." This FSP amends SFAS 132(R) to provide enhanced disclosures regarding how investment allocation decisions are made and certain aspects of fair value measurements on plan assets. The disclosures required by this FSP are intended to provide transparency related to the types of assets and associated risks in an employer's defined benefit pension or other postretirement employee benefits plan and events in the economy and markets that could have a significant effect on the value of plan assets. This FSP is effective for fiscal years ending after December 15, 2009. As the FSP provides only disclosure requirements, the adoption of this FSP will not have any effect on Intermediate Holding's reported results of operations, financial condition or cash flows. Intermediate Holding is evaluating the impact of this FSP on its financial statement disclosures.

In May 2009, the FASB issued SFAS 165, "Subsequent Events," which requires disclosure of the date through which Intermediate Holding has evaluated subsequent events related to the financial statements being issued and the basis for that date (either the date the financial statements were issued or the date they were available to be issued). SFAS 165 is effective for interim and annual reporting periods ending after June 15, 2009. The adoption of this rule for the second quarter 2009 financial statements will not affect reported results of operations, financial condition or cash flows.

In June 2009, the FASB issued SFAS 168, "The *FASB Accounting Standards Codification™* and the Hierarchy of Generally Accepted Accounting Principles," which establishes the *FASB Accounting Standards*

F-178

EFIHMW00246256

*Codification*™ (Codification) as the source of authoritative US GAAP recognized by the FASB to be applied to nongovernmental entities. Rules and interpretive releases of the SEC under authority of federal securities laws are also included in the Codification as sources of authoritative US GAAP for SEC registrants. SFAS 168 and the Codification are effective for financial statements issued for interim and annual periods ending after September 15, 2009. The adoption of this rule will not affect reported results of operations, financial condition or cash flows. Intermediate Holding will implement SFAS 168 in the third quarter 2009 by updating the previous FASB references to the Codification.

## 2. FINANCIAL STATEMENT EFFECTS OF THE MERGER

EFH Corp. accounted for the Merger under purchase accounting in accordance with the provisions of SFAS 141, whereby the total purchase price of the transaction was allocated to EFH Corp.'s identifiable tangible and intangible assets acquired and liabilities assumed based on their fair values as of October 10, 2007. As a result of cost-based regulatory rate-setting processes, the book value of the majority of Oncor's assets and liabilities effectively represents fair value, and no adjustments to the carrying value of those regulated assets or liabilities were recorded. The excess of the purchase price over the fair value of net assets acquired was recorded as goodwill. The purchase price was allocated to TCEH and Oncor. The purchase price amount assigned to Intermediate Holding was based on the relative enterprise value of the business on the closing date of the Merger and resulted in an excess of purchase price over fair value of assets and liabilities of $4.9 billion, which was recorded as goodwill. See Note 20 for disclosures related to goodwill and Note 3 regarding an impairment charge recorded in the fourth quarter of 2008.

The following table summarizes the final purchase price allocation to the estimated fair values of the assets acquired and liabilities assumed (billions of dollars):

| | |
|---|---:|
| Purchase price assigned to Intermediate Holding | $7.6 |
| Property, plant and equipment | 7.9 |
| Regulatory assets—net | 1.3 |
| Other assets | 1.3 |
| Total assets acquired | 10.5 |
| Short-term borrowings and long-term debt | 5.1 |
| Deferred income tax liabilities | 1.3 |
| Other liabilities | 1.4 |
| Total liabilities assumed | 7.8 |
| Net identifiable assets acquired. | 2.7 |
| Goodwill. | $4.9 |

As part of purchase accounting, the carrying value of certain generation-related regulatory assets securitized by transition bonds, which have been reviewed and approved by the PUCT for recovery but without earning a rate of return, was reduced by $213 million. This amount will be accreted to other income over the recovery period remaining as of the closing date of the Merger (approximately nine years). The related securitization (transition) bonds were also fair valued and the resulting discount of $12 million will be amortized to interest expense over the life of the bonds remaining as of the closing date of the Merger (approximately nine years).

The final purchase price allocation includes $16 million in liabilities recorded in connection with the notice of termination of outsourcing arrangements with Capgemini under the change of control provisions of such arrangements (also see Note 16). This amount represents estimated incremental costs to exit and transition the services under the arrangements and is expected to be settled no later than June 30, 2010, the targeted date of completion of transition of outsourced activities back to Oncor or to service providers.

Confidential

*Unaudited Pro Forma Financial Information*

The following unaudited pro forma financial position and results of operations assume that the Merger-related transactions occurred on January 1, 2007 and 2006, respectively. The unaudited pro forma information is provided for informational purposes only and is not necessarily indicative of what Intermediate Holding's results of operations would have been if the Merger-related transactions had occurred on that date, or what Intermediate Holding's results of operations will be for any future periods.

For the year ended December 31, 2007, unaudited pro forma revenues and net income were $2.5 billion and $170 million, respectively. Pro forma adjustments for the year ended December 31, 2007 consist of adjustments for the Predecessor period and consist of $24 million in other income, $197 million in interest expense and a $61 million income tax benefit. For the year ended December 31, 2006, unaudited pro forma revenues and net income were $2.4 billion and $196 million, respectively. Pro forma adjustments for the year ended December 31, 2006 consist of adjustments for the Predecessor period and consist of $24 million in other income, $252 million in interest expense and a $80 million income tax benefit.

## 3.   GOODWILL IMPAIRMENT

In the fourth quarter of 2008, Intermediate Holding recorded a goodwill impairment charge totaling $860 million, which is not deductible for income tax-related purposes.

Although the annual goodwill impairment test date set by management is October 1, management determined that in consideration of the continuing deterioration of securities values during the fourth quarter of 2008, an impairment testing trigger occurred subsequent to that test date; consequently, the impairment charge is based on estimated fair values at December 31, 2008.

The impairment determination involves significant assumptions and judgments in estimating enterprise values and the fair values of assets and liabilities. The impairment primarily arises from the dislocation in the capital markets that has increased interest rate spreads and the resulting discount rates used in estimating fair values and the effect of recent declines in market values of debt and equity securities of comparable companies.

## 4.   STIPULATION APPROVED BY THE PUCT

Oncor and Texas Holdings agreed to the terms of a stipulation, which was conditional upon completion of the Merger, with major interested parties to resolve all outstanding issues in the PUCT review related to the Merger. In February 2008, the PUCT entered an order approving the stipulation. The PUCT issued a final order on rehearing in April 2008 that has been appealed to District Court.

In addition to commitments Oncor made in its filings in the PUCT review, the stipulation included the following provisions, among others:

- Oncor provided a one-time $72 million refund to its REP customers in the September 2008 billing cycle. The refund was in the form of a credit on distribution fee billings. The liability for the refund was recorded as part of purchase accounting.

- Consistent with the 2006 cities rate settlement (see Note 5), Oncor filed a system-wide rate case in June 2008 based on a test-year ended December 31, 2007.

- Oncor agreed not to request recovery of approximately $56 million of regulatory assets related to self-insurance reserve costs and 2002 restructuring expenses. These regulatory assets were eliminated as part of purchase accounting.

- The dividends paid by Oncor will be limited through December 31, 2012, to an amount not to exceed Oncor's net income (determined in accordance with GAAP, subject to certain defined adjustments) for

F-180

the period beginning October 11, 2007 and ending December 31, 2012 and are further limited by an agreement that Oncor's regulatory capital structure, as determined by the PUCT, will be at or below the assumed debt-to-equity ratio established periodically by the PUCT for ratemaking purposes, which is currently set at 60% debt to 40% equity.

- Oncor committed to minimum capital spending of $3.6 billion over the five-year period ending December 31, 2012, subject to certain defined conditions.

- Oncor committed to an additional $100 million in spending over the five-year period ending December 31, 2012 on demand-side management or other energy efficiency initiatives. These additional expenditures will not be recoverable in rates, and this amount was recorded as a regulatory liability as part of purchase accounting and consistent with SFAS 71.

- If Oncor's credit rating is below investment grade with two or more rating agencies, TCEH will post a letter of credit in an amount of $170 million to secure TXU Energy's payment obligations to Oncor.

- Oncor agreed not to request recovery of the $4.9 billion of goodwill resulting from purchase accounting or any future impairment of the goodwill in its rates.

## 5.    CITIES RATE SETTLEMENT IN 2006

In January 2006, Oncor agreed with a steering committee representing 108 cities in Texas (Cities) to defer the filing of a system-wide rate case with the PUCT to no later than July 1, 2008 (based on a test year ending December 31, 2007). Oncor filed the rate case with the PUCT in June 2008. Oncor extended the benefits of the agreement to 292 nonlitigant cities. The agreements provided that Oncor would make payments to participating cities totaling approximately $70 million, including incremental franchise taxes.

This amount was recognized in earnings over the period from May 2006 through June 2008. Amounts recognized totaled $23 million in 2008, $8 million for the period October 11, 2007 through December 31, 2007, $25 million for the period January 1, 2007 through October 10, 2007 and $18 million in 2006, of which $13 million, $6 million, $20 million and $13 million, respectively, is reported in other deductions (see Note 20), and the remainder as taxes other than income taxes.

## 6.    ACCOUNTING FOR UNCERTAINTY IN INCOME TAXES (FIN 48)

Effective January 1, 2007, EFH Corp. and its subsidiaries adopted FIN 48. FIN 48 requires that each tax position be reviewed and assessed with recognition and measurement of the tax benefit based on a "more-likely-than-not" standard with respect to the ultimate outcome, regardless of whether this assessment is favorable or unfavorable. Intermediate Holding applied FSP FIN 48-1 to determine if each tax position was effectively settled for the purpose of recognizing previously uncertain tax positions. Intermediate Holding completed its review and assessment of uncertain tax positions and in 2007 recorded a net charge to retained earnings and an increase to noncurrent liabilities of $9 million in accordance with the new accounting rule.

EFH Corp. and its subsidiaries file income tax returns in US federal, state and foreign jurisdictions and are subject to examinations by the IRS and other taxing authorities. Examinations of income tax returns filed by EFH Corp. and any of its subsidiaries for the years ending prior to January 1, 2003 are complete. In the fourth quarter 2008, EFH Corp. was notified of the commencement of the IRS audit of tax years 2003 to 2006. The audit is expected to require two years to complete. Texas franchise tax return periods under examination or still open for examination range from 2003 to 2007.

Intermediate Holding classifies interest and penalties expense related to uncertain tax positions as income tax expense. The amount of interest and penalties included in income tax expense totaled $6 million in 2008, $2 million for the period October 11, 2007 through December 31, 2007 and $3 million for the period January 1, 2007 through October 10, 2007. Noncurrent liabilities included a total of $22 million and $12 million in accrued interest at December 31, 2008 and 2007, respectively. These interest amounts are after-tax.

F-181

EFIHMW00246259

The following table summarizes the changes to the uncertain tax positions, reported in other noncurrent liabilities in the consolidated balance sheet, during the years ended December 31, 2008 and 2007:

|  | 2008 | 2007 |
|---|---|---|
| Balance at January 1, excluding interest and penalties . . . . . . . . . . . . . . . . . . | $111 | $ 80 |
| Additions based on tax positions related to prior years . . . . . . . . . . . . . . . . | 41 | 38 |
| Reductions based on tax positions related to prior years . . . . . . . . . . . . . . | (30) | (15) |
| Additions based on tax positions related to the current year . . . . . . . . . . . | — | 8 |
| Balance at December 31, excluding interest and penalties . . . . . . . . . . . . . . | $122 | $111 |

Of the balance at December 31, 2008, $100 million represents tax positions for which the uncertainty relates to the timing of recognition for tax purposes. The disallowance of such positions would not affect the effective tax rate, but would accelerate the payment of cash under the tax sharing agreement to an earlier period.

With respect to tax positions for which the ultimate deductibility is uncertain (permanent items), should EFH Corp. sustain such positions on income tax returns previously filed, Intermediate Holding's liabilities recorded would be reduced by $22 million, resulting in increased net income and a favorable impact on the effective tax rate.

Intermediate Holding does not expect that the total amount of liabilities recorded related to uncertain tax positions will significantly increase or decrease within the next 12 months.

## 7.  INCOME TAXES

The components of Intermediate Holding's income tax expense are as follows:

|  | Successor | | Predecessor | |
|---|---|---|---|---|
|  | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, 2006 |
| Reported in operating expenses | | | | |
| Current: | | | | |
| US federal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 37 | $(46) | $116 | $127 |
| State . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 17 | — | 12 | 6 |
| Deferred: | | | | |
| US federal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 142 | 74 | 26 | 28 |
| State . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | (2) | — | — |
| Amortization of investment tax credits . . . . . . . . . . . | (5) | (1) | (4) | (5) |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 191 | 25 | 150 | 156 |
| Reported in other income and deductions: | | | | |
| Current: | | | | |
| US federal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (81) | (17) | 8 | 18 |
| State . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 | — | 1 | (3) |
| Deferred federal . . . . . . . . . . . . . . . . . . . . . . . . . | 18 | — | — | (1) |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (62) | (17) | 9 | 14 |
| Total income tax expense . . . . . . . . . . . . . . . . . . . . . | $129 | $ 8 | $159 | $170 |

F-182

EFIHMW00246260

Reconciliation of income taxes computed at the US federal statutory rate to income tax expense:

| | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
| | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, 2006 |
| Income (loss) before income taxes | $(526) | $27 | $ 422 | $ 514 |
| Income taxes at the US federal statutory rate of 35% | $(184) | $ 9 | $ 148 | $ 180 |
| Goodwill impairment | 301 | — | — | — |
| Amortization of investment tax credits—net of deferred tax effect | (5) | (1) | (4) | (5) |
| Amortization (under regulatory accounting) of statutory tax rate changes | (3) | (1) | (3) | (7) |
| State income taxes, net of federal tax benefit | 11 | (1) | 8 | 4 |
| Medicare subsidy | (5) | (2) | (5) | (6) |
| Nondeductible losses (gains) on employee benefit plan investments | 4 | — | (2) | (2) |
| Disallowed interest on pushed down debt | 3 | 1 | — | — |
| Other, including audit settlements | 7 | 3 | 17 | 6 |
| Income tax expense | $ 129 | $ 8 | $ 159 | $ 170 |
| Effective rate | — | 29.6% | 37.7% | 33.1% |

Deferred income taxes provided for temporary differences based on tax laws in effect at the December 31, 2008 and 2007 balance sheet dates are as follows:

| | Successor | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | December 31, 2008 | | | December 31, 2007 | | |
| | Total | Current | Noncurrent | Total | Current | Noncurrent |
| **Deferred Income Tax Assets** | | | | | | |
| Alternative minimum tax credit carryforwards | $ 54 | $ 54 | $ — | $ 65 | $ 35 | $ 30 |
| Employee benefit liabilities | — | — | — | 328 | 7 | 321 |
| Regulatory liabilities | — | — | — | 111 | — | 111 |
| Other | — | — | — | 7 | 3 | 4 |
| Total | 54 | 54 | — | 511 | 45 | 466 |
| **Deferred Income Tax Liabilities** | | | | | | |
| Basis difference in Oncor partnership | 1,192 | — | 1,192 | — | — | — |
| Property, plant and equipment | — | — | — | 1,138 | — | 1,138 |
| Regulatory assets | — | — | — | 680 | — | 680 |
| Other | — | — | — | 2 | — | 2 |
| Total | 1,192 | — | 1,192 | 1,820 | — | 1,820 |
| **Net Deferred Income Tax (Asset) Liability** | $1,138 | $(54) | $1,192 | $1,309 | $(45) | $1,354 |

At December 31, 2008, Intermediate Holding had $54 million of alternative minimum tax (AMT) credit carryforwards available to offset future tax sharing payments. The AMT credit carryforwards have no expiration date.

Confidential

The component of deferred income tax liabilities referred to as "basis difference in Oncor partnership" arose as a result of the noncontrolling interests sale (see Note 14) at which time Oncor became a partnership for US federal income tax purposes. The amount of this basis difference at the date of the transaction represented Intermediate Holding's interest (approximately 80%) in the net deferred tax liabilities related to Oncor's individual operating assets and liabilities. The remaining net deferred tax liabilities associated with Oncor ($299 million at December 31, 2008) that are attributable to the noncontrolling interests have been reclassified as other noncurrent liabilities.

See Note 6 for discussion regarding accounting for uncertain tax positions (FIN 48).

## 8. REGULATORY ASSETS AND LIABILITIES

| | Successor | |
| --- | --- | --- |
| | December 31, | |
| | 2008 | 2007 |
| **Regulatory assets** | | |
| Generation-related regulatory assets securitized by transition bonds | $ 865 | $ 967 |
| Employee retirement costs | 659 | 265 |
| Self-insurance reserve (primarily storm recovery costs) | 214 | 149 |
| Nuclear decommissioning cost under-recovery | 127 | —— |
| Securities reacquisition costs | 97 | 105 |
| Recoverable deferred income taxes—net | 77 | 84 |
| Employee severance costs | 20 | 20 |
| Other | 12 | 3 |
| Total regulatory assets | 2,071 | 1,593 |
| **Regulatory liabilities** | | |
| Committed spending for demand-side management initiatives | 96 | 100 |
| Investment tax credit and protected excess deferred taxes | 49 | 55 |
| Over-collection of securitization (transition) bond revenues | 28 | 34 |
| Credit due REPs under PUCT stipulation | —— | 72 |
| Nuclear decommissioning cost over-recovery | —— | 13 |
| Other regulatory liabilities | 6 | 14 |
| Total regulatory liabilities | 179 | 288 |
| Net regulatory assets | $1,892 | $1,305 |

Regulatory assets that have been reviewed and approved by the PUCT and are not earning a return totaled $1.021 billion and $997 million at December 31, 2008 and 2007, respectively, including the generation-related regulatory assets securitized by transition bonds that have a remaining recovery period of approximately eight years. See Note 4 for discussion of effects on regulatory assets and liabilities of the stipulation approved by the PUCT.

As of December 31, 2008, regulatory assets totaling $913 million have not been reviewed by the PUCT but are deemed by management to be probable of recovery.

On August 13, 2009, the PUCT voted on Oncor's rate review filed in June 2008. A final order was signed August 31, 2009. The PUCT's findings included denial of recovery of $25 million of certain regulatory assets, which will result in a $16 million after-tax loss being recognized in the third quarter 2009.

See Note 19 for additional information regarding nuclear decommissioning cost recovery.

F-184

Confidential

### 9.    TRADE ACCOUNTS RECEIVABLE AND SALE OF RECEIVABLES PROGRAM

*Trade Accounts Receivable*

|  | Successor | |
|---|---|---|
|  | December 31, | |
|  | 2008 | 2007 |
| Gross trade accounts receivable .................................. | $ 359 | $ 361 |
| Trade accounts receivable from TCEH ........................... | (135) | (147) |
| Allowance for uncollectible accounts ........................... | (7) | (6) |
| Trade accounts receivable from nonaffiliates—net .................. | $ 217 | $ 208 |

Gross trade accounts receivable at December 31, 2008 and 2007 included unbilled revenues of $140 million and $137 million, respectively.

*Sale of Receivables*

Prior to the Merger, Oncor participated in an accounts receivable securitization program established by EFH Corp. for certain of its subsidiaries, the activity under which was accounted for as a sale of accounts receivable in accordance with SFAS 140. Under the program, Oncor sold trade accounts receivable to TXU Receivables Company, a consolidated wholly-owned bankruptcy-remote direct subsidiary of EFH Corp., which sold undivided interests in those purchased accounts receivable for cash to special purpose entities established by financial institutions (the funding entities). In connection with the Merger, the accounts receivable securitization program was amended. Concurrently, the financial institutions required that Oncor repurchase all of the receivables it had previously sold to TXU Receivables Company, which totaled $254 million. Oncor funded such repurchases through borrowings under its credit facility of $113 million, and the related subordinated note receivable from TXU Receivables Company in the amount of $141 million was canceled. Oncor is no longer a participant in the accounts receivable securitization program.

Under the program, new trade receivables generated by Oncor were continuously purchased by TXU Receivables Company with the proceeds from collections of receivables previously purchased. Changes in the amount of funding under the program, through changes in the amount of undivided interests sold by TXU Receivables Company, reflected seasonal variations in the level of accounts receivable, changes in collection trends as well as other factors such as changes in delivery fees and volumes. TXU Receivables Company issued subordinated notes payable to Oncor for the difference between the face amount of the uncollected accounts receivable purchased, less a discount, and cash paid to Oncor that was funded by the sale of the undivided interests.

The discount from face amount on the purchase of receivables principally funded program fees paid by TXU Receivables Company to the funding entities. The discount also funded a servicing fee paid by TXU Receivables Company to EFH Corporate Services Company, a direct subsidiary of EFH Corp., but the amounts were immaterial. The program fees, referred to as losses on sale of the receivables under SFAS 140, consisted primarily of interest costs on the underlying financing. These fees represented essentially all of the net incremental costs of the program to Oncor and were reported in operation and maintenance expenses. Fee amounts were as follows:

|  | Predecessor | |
|---|---|---|
|  | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, 2006 |
| Program fees ................................. | $ 6 | $ 6 |
| Program fees as a percentage of average funding (annualized) ................................... | 6.4% | 5.8% |

F-185

EFIHMW00246263

Funding under the program decreased $86 million to zero in 2007 with Oncor's exit from the program and decreased $3 million to $86 million in 2006. Funding increases or decreases under the program were reflected as operating cash flow activity in the statement of cash flows. The carrying amount of the retained interests in the accounts receivable balance approximated fair value due to the short-term nature of the collection period.

Activities of TXU Receivables Company related to Oncor in 2007 and 2006 were as follows:

| | Successor (a) | Predecessor | |
| --- | --- | --- | --- |
| | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, 2006 |
| Cash collections on accounts receivable . . . . . . . . . . . . . . . . . . . | $ — | $ 1,082 | $ 1,229 |
| Face amount of new receivables purchased . . . . . . . . . . . . . . . . | — | (1,156) | (1,231) |
| Discount from face amount of purchased receivables . . . . . . . . . | — | 5 | 6 |
| Program fees paid . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | (6) | (6) |
| Increase in subordinated notes payable . . . . . . . . . . . . . . . . . . . | — | 48 | 5 |
| Repurchase of receivables previously sold . . . . . . . . . . . . . . . . . | 113 | — | — |
| Operating cash flows used by (provided to) Oncor under the program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $113 | $ (27) | $ 3 |

(a)  Represents final activities related to Oncor's exit from the sale of receivables program.

## 10.  SHORT-TERM FINANCING

At December 31, 2008, Oncor had a $2.0 billion credit facility, expiring October 10, 2013, to be used for its working capital and general corporate purposes, including issuances of commercial paper and letters of credit. Oncor may request increases in the commitments under the facility in any amount up to $500 million, subject to the satisfaction of certain conditions. This facility is a revolving credit facility, which means that amounts borrowed under the facility, once repaid, can be borrowed again by Oncor from time to time. Borrowings are classified as short-term on the balance sheet. In May 2008, Oncor secured this credit facility with a first priority lien on certain of its transmission and distribution assets. Oncor also secured all of its existing long-term debt securities (excluding the transition bonds) with the same lien in accordance with the terms of those securities. The lien contains customary provisions allowing Oncor to use the assets in its business, as well as to replace and/ or release collateral as long as the market value of the aggregate collateral is at least 115% of the aggregate secured debt. The lien may be terminated at Oncor's option upon the termination of Oncor's current credit facility.

At December 31, 2008, Oncor had outstanding borrowings under its credit facility totaling $337 million ($350 million requested draws less $13 million of draws not funded) with an interest rate of 1.98% at the end of the period. At December 31, 2007, Oncor had outstanding borrowings under its credit facility totaling $1.280 billion with an interest rate of 5.70% at the end of the period. The decrease in borrowings was driven by use of the majority of the proceeds from the issuance in September 2008 of $1.5 billion of senior secured notes (as described in Note 11) to repay short-term borrowings, partially offset by funding of ongoing capital investments including the acquisition of BPL-based "Smart Grid" network assets. Availability under the credit facility as of December 31, 2008 was $1.508 billion, which excludes $155 million of undrawn commitments from a subsidiary of Lehman Brothers Holding Inc. (such subsidiary, Lehman) that has filed for bankruptcy under Chapter 11 of the US Bankruptcy Code. In April 2009, a portion of the Lehman commitment was purchased by another entity unrelated to Lehman, effectively increasing availability by $32 million.

Under the terms of Oncor's revolving credit facility, the commitments of the lenders to make loans to Oncor are several and not joint. Accordingly, if any lender fails to make loans to Oncor, Oncor's available liquidity could be reduced by an amount up to the aggregate amount of such lender's commitments under the facility.

F-186

Confidential

EFIHMW00246264

Borrowings under this credit facility bear interest at per annum rates equal to, at Oncor's option, (i) adjusted LIBOR plus a spread of 0.275% to 0.800% (depending on the rating assigned to Oncor's senior secured debt) or (ii) a base rate (the higher of (1) the prime rate of JPMorgan Chase Bank, N.A. and (2) the federal funds effective rate plus 0.50%). Under option (i) and based on Oncor's ratings as of December 31, 2008, its LIBOR-based borrowings, which apply to all outstanding borrowings at December 31, 2008, bear interest at LIBOR plus 0.425%.

A facility fee is payable at a rate per annum equal to 0.100% to 0.200% (depending on the rating assigned to Oncor's senior secured debt) of the commitments under the facility. Based on Oncor's ratings as of December 31, 2008, its facility fee is 0.150%. A utilization fee is payable on the average daily amount of borrowings in excess of 50% of the commitments under the facility at a rate per annum equal to 0.125% per annum. The interest rate and facility fee rate per annum declined in June 2009 to LIBOR plus 0.350% and 0.125%, respectively, due to a two notch upgrade in Oncor's credit ratings by Moody's.

The credit facility contains customary covenants for facilities of this type, restricting, subject to certain exceptions, Oncor and its subsidiary from, among other things:

- incurring additional liens;

- entering into mergers and consolidations;

- selling certain assets, and

- making acquisitions and investments in subsidiaries.

In addition, the credit facility requires that Oncor maintain a consolidated senior debt-to-capitalization ratio of no greater than 0.65 to 1.00 and observe certain customary reporting requirements and other affirmative covenants.

The credit facility contains certain customary events of default for facilities of this type, the occurrence of which would allow the lenders to accelerate all outstanding loans and terminate their commitments under the facility.

F-187

Confidential

## 11.  LONG-TERM DEBT

At December 31, 2008 and 2007, the long-term debt of Intermediate Holding consisted of the following:

|  | Successor December 31, | |
|---|---|---|
|  | 2008 | 2007 |
| Oncor (a): | | |
| 6.375% Fixed Senior Notes due May 1, 2012 | $  700 | $  700 |
| 5.950% Fixed Senior Notes due September 1, 2013 | 650 | — |
| 6.375% Fixed Senior Notes due January 15, 2015 | 500 | 500 |
| 6.800% Fixed Senior Notes due September 1, 2018 | 550 | — |
| 7.000% Fixed Debentures due September 1, 2022 | 800 | 800 |
| 7.000% Fixed Senior Notes due May 1, 2032 | 500 | 500 |
| 7.250% Fixed Senior Notes due January 15, 2033 | 350 | 350 |
| 7.500% Fixed Senior Notes due September 1, 2038 | 300 | — |
| Unamortized discount | (16) | (15) |
| Total Oncor | 4,334 | 2,835 |
| Oncor Electric Delivery Transition Bond Company LLC (b): | | |
| 4.030% Fixed Series 2003 Bonds due in semiannual installments through February 15, 2010 | 54 | 93 |
| 4.950% Fixed Series 2003 Bonds due in semiannual installments through February 15, 2013 | 130 | 130 |
| 5.420% Fixed Series 2003 Bonds due in semiannual installments through August 15, 2015 | 145 | 145 |
| 3.520% Fixed Series 2004 Bonds due in semiannual installments through November 15, 2009 | 39 | 99 |
| 4.810% Fixed Series 2004 Bonds due in semiannual installments through November 15, 2012 | 221 | 221 |
| 5.290% Fixed Series 2004 Bonds due in semiannual installments through May 15, 2016 | 290 | 290 |
| Total Oncor Electric Delivery Transition Bond Company LLC | 879 | 978 |
| Unamortized fair value discount related to transition bonds (c) | (9) | (12) |
| Intermediate Holding: | | |
| 10.875% EFH Corp. Fixed Senior Notes due November 1, 2017 (d) | 1,000 | 1,000 |
| 11.25/12.00% EFH Corp. Senior Toggle Notes due November 1, 2017 (d) | 1,250 | 1,250 |
| Total Intermediate Holding | 2,250 | 2,250 |
| Total consolidated | 7,454 | 6,051 |
| Less amount due currently | (103) | (99) |
| Total long-term debt | $7,351 | $5,952 |

(a)  Secured with first priority lien as discussed in Note 10.

(b)  The transition bonds are nonrecourse to Oncor and were issued to securitize a regulatory asset.

(c)  The transition bonds, which secured regulatory assets not earning a return, were fair valued as of October 10, 2007 as a result of purchase accounting.

(d)  Represents 50% of the principal amount of EFH Corp. debt guaranteed by Intermediate Holding (pushed-down debt) per the discussion below under "Push Down of EFH Corp. Notes Issued Subsequent to the Merger."

Oncor does not bear any liability for Intermediate Holding's debt obligations, including, but not limited to, the EFH Corp. Notes (as defined below), and vice versa.

F-188

Confidential

EFIHMW00246266

*Oncor Debt Related Activity in 2008*

In September 2008, Oncor issued and sold senior secured notes with an aggregate principal amount of $1.5 billion consisting of $650 million aggregate principal amount of 5.95% senior secured notes maturing in September 2013, $550 million aggregate principal amount of 6.80% senior secured notes maturing in September 2018 and $300 million aggregate principal amount of 7.50% senior secured notes maturing in September 2038. Oncor used the net proceeds of approximately $1.487 billion from the sale of the notes to repay most of its borrowings under its credit facility as well as for general corporate purposes. The notes are initially secured by the first priority lien described in Note 10. The notes are secured equally and ratably with all of Oncor's other secured indebtedness. If the lien is terminated, the notes will cease to be secured obligations of Oncor and will become senior unsecured general obligations of Oncor.

Interest on these notes is payable in cash semiannually in arrears on March 1 and September 1 of each year, and the first interest payment was in March 2009. Oncor may redeem the notes, in whole or in part, at any time, at a price equal to 100% of their principal amount, plus accrued and unpaid interest and a "make-whole" premium. The notes also contain customary events of default, including failure to pay principal or interest on the notes when due.

Repayments of long-term debt in 2008 totaled $99 million and represent transition bond principal payments at scheduled maturity dates.

*Oncor Debt-Related Activity in 2007*

In March 2007, Oncor issued floating rate senior notes with an aggregate principal amount of $800 million with a floating rate based on LIBOR plus 37.5 basis points. The notes were to mature in September 2008, but in accordance with their terms, were redeemed upon closing of the Merger.

Other repayments of debt in 2007 totaling $296 million represented payments at scheduled maturity dates and included $200 million of maturing fixed-rate debentures and $96 million of scheduled transition bond principal payments.

*Push Down of EFH Corp. Notes Issued Subsequent to the Merger*

Intermediate Holding is a guarantor of the EFH Corp. Notes described immediately below and consequently, in accordance with SEC Staff Accounting Bulletin (SAB) Topic 5-J, Intermediate Holding reflects $2.250 billion principal amount of the EFH Corp. Notes on its balance sheet and the related interest expense in its income statement. The amount reflected on Intermediate Holding's balance sheet, which represents 50% of the EFH Corp. debt guaranteed by Intermediate Holding, was calculated based upon the relative equity investment of EFC Holdings, which is also a guarantor of the debt, and Intermediate Holding in their respective operating subsidiaries at the time of the Merger. Because payment of principal and interest on the notes is the responsibility of EFH Corp., Intermediate Holding records the settlement of such amounts as noncash capital contributions from EFH Corp. The EFH Corp. senior notes and the guarantees are described immediately below.

Pursuant to an indenture entered into in October 2007 (the EFH Corp. Indenture), EFH Corp. issued and sold $2.0 billion aggregate principal amount of 10.875% Senior Notes due November 1, 2017. Interest on the notes (referred to as the Cash-Pay Notes) is payable in cash semi-annually in arrears on May 1 and November 1 of each year at a fixed rate of 10.875% per annum, and the first interest payment was made on May 1, 2008.

Pursuant to the EFH Corp. Indenture, EFH Corp. also issued and sold $2.5 billion aggregate principal amount of 11.250%/12.000% Senior Toggle Notes due November 1, 2017. The initial interest payment on the notes (referred to as the Toggle Notes) was paid in cash. For any interest period thereafter until November 1, 2012, EFH Corp. may elect to pay interest on the notes, at EFH Corp.'s option (i) entirely in cash; (ii) by increasing the principal amount of the notes or by issuing new Toggle Notes (PIK Interest); or (iii) 50% in cash

F-189

EFHMW00246267

and 50% in PIK Interest. Interest on the notes is payable semi-annually in arrears on May 1 and November 1 of each year at a fixed rate of 11.250% per annum for cash interest and at a fixed rate of 12.000% per annum for PIK Interest, and the first interest payment was made on May 1, 2008.

EFH Corp. made its May 2009 interest payment and will make its November 2009 interest payment by using the PIK feature of the Toggle Notes. During the applicable interest periods, the interest rate on the Toggle Notes is increased from 11.25% to 12.00%. In electing the PIK feature, EFH Corp. increased the aggregate principal amount of the Toggle Notes by $150 million on May 1, 2009 and will further increase the aggregate principal amount of the Toggle Notes by $159 million on November 1, 2009. The election will increase the expected annual cash interest expense by approximately $35 million (50% of which relates to Intermediate Holding due to push down), constituting the additional cash interest that will be payable with respect to the $309 million of additional Toggle Notes.

The $4.5 billion principal amount of notes issued under the EFH Corp. Indenture (the Cash-Pay Notes and the Toggle Notes) are collectively referred to herein as the EFH Corp. Notes.

The EFH Corp. Notes are fully and unconditionally guaranteed by EFC Holdings and Intermediate Holding, 100% owned subsidiaries of EFH Corp. (collectively, the EFH Corp. Guarantors). The EFH Corp. Notes are EFH Corp.'s senior unsecured debt and rank senior in right of payment to any existing and future subordinated indebtedness of EFH Corp., equally in right of payment with all of EFH Corp.'s existing and future senior unsecured indebtedness and structurally subordinated in right of payment to all existing and future indebtedness, preferred stock and other liabilities of EFH Corp.'s non-guarantor subsidiaries, including trade payables (other than indebtedness and liabilities owed to EFH Corp. or the EFH Corp. Guarantors). The EFH Corp. Notes will rank effectively junior in right of payment to all future secured indebtedness of EFH Corp. to the extent of the assets securing that indebtedness.

The guarantees are joint and several guarantees of the EFH Corp. Notes, are the EFH Corp. Guarantors' unsecured senior obligations and rank equal in right of payment with all existing and future senior unsecured indebtedness of the relevant EFH Corp. Guarantor and senior in right of payment to any existing or future subordinated indebtedness of the relevant EFH Corp. Guarantor. The guarantees of the EFH Corp. Notes will be structurally junior to all indebtedness and other liabilities of the relevant EFH Corp. Guarantor's subsidiaries that are not guarantors.

The EFH Corp. Indenture contains a number of covenants that, among other things, restrict, subject to certain exceptions, EFH Corp.'s and its restricted subsidiaries' ability to:

- make restricted payments;

- incur debt and issue preferred stock;

- create liens;

- engage in mergers or consolidations;

- permit dividend and other payment restrictions on restricted subsidiaries, and

- engage in certain transactions with affiliates.

The EFH Corp. Indenture also contains customary events of default, including failure to pay principal or interest on the EFH Corp. Notes or the guarantees when due, among others. If an event of default occurs under the EFH Corp. Indenture, the trustee or the holders of at least 30% in principal amount outstanding of the EFH Corp. Notes may declare the principal amount on the EFH Corp. Notes to be due and payable immediately.

EFH Corp. may redeem the EFH Corp. Notes, in whole or in part, at any time on or after November 1, 2012, at specified redemption prices, plus accrued and unpaid interest, if any. In addition, before November 1, 2010,

F-190

EFIHMW00246268

EFH Corp. may redeem, with the net cash proceeds of certain equity offerings, up to 35% of the aggregate principal amount of the EFH Corp. Notes from time to time at a redemption price of 110.875% of the aggregate principal amount of the Cash Pay Notes, plus accrued and unpaid interest, if any, or 111.250% of the aggregate principal amount of the Toggle Notes, plus accrued and unpaid interest, if any. EFH Corp. may also redeem the EFH Corp. Notes at any time prior to November 1, 2012 at a price equal to 100% of their principal amount, plus accrued and unpaid interest and a "make-whole" premium. Upon the occurrence of a change in control, EFH Corp. must offer to repurchase the EFH Corp. Notes at 101% of their principal amount, plus accrued and unpaid interest, if any.

The EFH Corp. Notes were issued in a private placement with registration rights. Notes having substantially identical terms as the EFH Corp. Notes were registered under the Securities Act by EFH Corp. in December 2008 as part of an offer to exchange freely tradable exchange notes for the EFH Corp. Notes. The exchange offer was completed in January 2009. Because the exchange offer was not completed within 360 days after the issue date of the EFH Corp. Notes, the annual interest rate on the EFH Corp. Notes increased for the period beginning on October 26, 2008 and ending on January 30, 2009, the date that the exchange offer was completed, resulting in incremental interest expense of $3.2 million (50% of which relates to Intermediate Holding due to debt push down).

### Fair Value of Long-Term Debt

The estimated fair value of long-term debt (including current maturities) totaled $6.287 billion and $6.207 billion at December 31, 2008 and 2007, respectively, and the carrying amount totaled $7.454 billion and $6.051 billion, respectively. The fair value is estimated at the lesser of either the call price or the market value as determined by quoted market prices.

### Interest Rate Hedges

In September 2008, Oncor entered into interest rate swap transactions hedging the variability of treasury bond rates used to determine the interest rates on an anticipated issuance of an aggregate of $1.0 billion of senior secured notes maturing from 2013 to 2018. The hedges were terminated the same day, and $2 million in after-tax losses were recorded as other comprehensive income. After-tax net losses of $0.4 million will be reclassified into net income during the next twelve months as the related hedged transactions affect net income.

### Maturities

Long-term debt and transition bonds maturities are as follows:

| Year | |
| --- | ---: |
| 2009 | $  103 |
| 2010 | 108 |
| 2011 | 113 |
| 2012 | 819 |
| 2013 | 775 |
| Thereafter | 5,561 |
| Unamortized fair value discount | (9) |
| Unamortized discount | (16) |
| Total | $7,454 |

F-191

EFIHMW00246269

## 12. COMMITMENTS AND CONTINGENCIES

*Leases*

As of December 31, 2008, future minimum lease payments under operating leases (with initial or remaining noncancelable lease terms in excess of one year) were as follows:

| Year | |
| --- | --- |
| 2009 | $ 8 |
| 2010 | 7 |
| 2011 | 7 |
| 2012 | 6 |
| 2013 | 3 |
| Thereafter | 11 |
| Total future minimum lease payments | $42 |

Rent charged to operation and maintenance expense totaled $10 million for the year ended December 31, 2008, $3 million for the period October 11, 2007 through December 31, 2007, $7 million for the period January 1, 2007 through October 10, 2007 and $13 million for the year ended December 31, 2006.

*Legal Proceedings*

Oncor is involved in various legal and administrative proceedings in the normal course of business the ultimate resolution of which, in the opinion of management, should not have a material effect upon its financial position, results of operations or cash flows.

*Capital Expenditures*

Oncor and Texas Holdings agreed to the terms of a stipulation with major interested parties to resolve all outstanding issues in the PUCT review related to the Merger. As one of the provisions of this stipulation, Oncor committed to minimum capital spending of $3.6 billion over the five-year period ending December 31, 2012, subject to certain defined conditions.

*Efficiency Spending*

Oncor expects to invest $300 million, which includes $100 million in excess of regulatory requirements, over the five years ending in 2012 on programs designed to improve customer electricity demand efficiencies.

*Labor Contracts*

Certain Oncor employees are represented by a labor union and covered by a collective bargaining agreement that expired in January 2008. A new three-year labor contract was ratified in February 2008. In April 2008, a group of approximately 50 employees elected to be represented by a labor union. The new labor contract and the representation of this group of additional employees will not have a material effect on Intermediate Holding's financial position, results of operations or cash flows.

*Environmental Contingencies*

Oncor must comply with environmental laws and regulations applicable to the handling and disposal of hazardous waste. Oncor is in compliance with all current laws and regulations; however, the impact, if any, of

F-192

EFIHMW00246270

changes to existing regulations or the implementation of new regulations is not determinable. The costs to comply with environmental regulations can be significantly affected by the following external events or conditions:

- changes to existing state or federal regulation by governmental authorities having jurisdiction over control of toxic substances and hazardous and solid wastes, and other environmental matters; and

- the identification of additional sites requiring clean-up or the filing of other complaints in which Intermediate Holding may be asserted to be a potential responsible party.

### *Guarantees*

Intermediate Holding and its subsidiaries have entered into contracts that contain guarantees to outside parties that could require performance or payment under certain conditions.

Oncor is the lessee under various operating leases that obligate it to guarantee the residual values of the leased assets. At December 31, 2008, both the aggregate maximum amount of residual values guaranteed and the estimated residual recoveries totaled approximately $13 million. These leased assets consist primarily of vehicles used in distribution activities. The average life of the residual value guarantees under the lease portfolio is approximately one year.

See Note 11 for discussion of Intermediate Holding's guarantee of certain EFH Corp. debt.

### 13. MEMBERSHIP INTERESTS

#### *Successor*

In connection with the Merger, Intermediate Holding was formed as a new holding company, indirectly owning approximately 80% of the membership interests of Oncor as of December 31, 2008. Intermediate Holding is a Delaware limited liability company with a single membership interest directly held by EFH Corp.

***Effect of Sale of Noncontrolling Interests***—Oncor's sale of noncontrolling interests discussed in Note 14 resulted in a $265 million reduction of Intermediate Holding's membership interest. This amount represents the excess of the carrying value of the interests sold over the proceeds from the transactions, which reflects the fact that Oncor's carrying value after purchase accounting is based on the Merger value, while the noncontrolling interests sale value does not include a control premium.

***Distributions***—The net proceeds of $1.253 billion from Oncor's sale of noncontrolling interests in November 2008 were distributed to EFH Corp.

During 2008, Intermediate Holding's board of directors declared and Intermediate Holding paid the following cash distributions to EFH Corp.:

| Declaration Date | Payment Date | Amount Paid |
| --- | --- | --- |
| November 13, 2008 | November 14, 2008 | $117 |
| August 20, 2008 | August 21, 2008 | $ 78 |
| May 14, 2008 | May 15, 2008 | $ 78 |
| February 20, 2008 | March 31, 2008 | $ 57 |

During 2009, Intermediate Holding's board of directors declared and Intermediate Holding paid the following cash distributions to EFH Corp.:

| Declaration Date | Payment Date | Amount Paid |
| --- | --- | --- |
| May 19, 2009 | May 20, 2009 | $40 |
| February 18, 2009 | March 3, 2009 | $18 |

F-193

Confidential

*Distribution Restrictions*—While there are no direct restrictions on Intermediate Holding's ability to distribute its net income that are currently material, substantially all of Intermediate Holding's net income is derived from Oncor. The boards of directors of each of Oncor and Oncor Holdings, which are composed of a majority of independent directors, can withhold distributions to the extent the boards determine that it is necessary to retain such amounts to meet expected future requirements of Oncor and/or Oncor Holdings. For the period beginning October 11, 2007 and ending December 31, 2012, distributions paid by Oncor (other than distributions of the proceeds of any issuance of limited liability company units) are limited by the Limited Liability Company Agreement to an amount not to exceed Oncor's net income determined in accordance with GAAP, subject to certain defined adjustments. Such adjustments include deducting the $72 million ($46 million after tax) one-time refund to customers in September 2008 and deducting funds spent as part of the $100 million commitment for additional demand side management or other energy efficiency initiatives (see Note 4), neither of which impacts net income due to purchase accounting, and removing the effect of the $860 million goodwill impairment charge from fourth quarter 2008 net income available for distribution. Distributions are further limited by Oncor's required regulatory capital structure, as determined by the PUCT, to be at or below the assumed debt-to-equity ratio established periodically by the PUCT for ratemaking purposes, which is currently set at 60% debt to 40% equity. At December 31, 2008, no material amount of Oncor's net income was restricted from being used to make distributions on its membership interests except for the one-time refund. The net proceeds of $1.253 billion received from the sale of the equity interests to Texas Transmission and certain members of Oncor's management were excluded from these distribution limitations.

*Equity Contributions*—As a result of the Merger, all outstanding unvested stock-based incentive compensation awards previously granted by EFH Corp. to Oncor employees vested and such employees became entitled to receive the $69.25 per share Merger consideration. The settlement of these awards totaled $24 million and was accounted for as an equity contribution from EFH Corp., as was the settlement of $4 million of cash incentive compensation awards. See Note 18 for further discussion of stock-based compensation, including a SARs Plan implemented in November 2008.

In connection with the Merger, Texas Holdings paid a $12 million fee related to Oncor's $2 billion revolving credit facility. Such payment was accounted for as an investment by Texas Holdings.

In May 2008, Intermediate Holding distributed its investment in an entity with telecommunications-related activities that are not part of Oncor's current operations totaling $24 million to EFH Corp.

See Notes 1 and 11 for discussion of noncash contributions from EFH Corp. related to debt pushed down to Intermediate Holding in accordance with SEC SAB Topic 5-J.

## Predecessor

No shares of Oncor's common stock were held by or for its own account, nor were any shares of such capital stock reserved for its officers and employees or for options, warrants, conversions and other rights in connection therewith.

Under SFAS 123(R), expense related to EFH Corp.'s stock-based incentive compensation awards granted to Oncor's employees was accounted for as a noncash capital contribution from EFH Corp. Accordingly, Oncor recorded a credit to its common stock account of $3 million in the period January 1, 2007 through October 10, 2007 and $5 million for the year ended December 31, 2006.

Oncor recorded a credit to common stock of $15 million in the period January 1, 2007 through October 10, 2007 and $14 million in the year 2006 arising from the excess tax benefit generated by the distribution date value of the stock-based incentive awards exceeding the reported compensation expense. The $15 million credit (benefit) in 2007 was realized in the Successor period in conjunction with a tax payment to EFH Corp.

Confidential

Effective January 1, 2005, Oncor and TCEH entered into an agreement whereby Oncor assumed responsibility for pension and OPEB costs for all applicable former employees of the regulated predecessor integrated electric utility that, in addition to its own employees consists largely of active and retired personnel engaged in TCEH's activities, related to service of those additional personnel prior to the deregulation and disaggregation of EFH Corp.'s business. (See Note 17 for additional information related to this agreement.) In connection with this agreement, Oncor recorded a $15 million credit to its common stock account in 2006 for the noncash contribution of pension-related assets and a $146 million charge to common stock in 2005 for the noncash assumption of the pension obligation.

In 2006, Oncor distributed its mineral interests in natural gas and oil to EFH Corp. in the form of a dividend. The dividend was recorded at the book value of the interests, which was zero. These mineral interests were acquired as part of land purchases over the years to support the expansion of the transmission and distribution system and not for the mineral development, and no value was attributed to the mineral interests at the time of acquisition.

## 14. NONCONTROLLING INTERESTS

On November 5, 2008, Oncor issued and sold additional equity interests to Texas Transmission. Texas Transmission is an entity indirectly owned by a private investment group led by OMERS Administration Corporation, acting through its infrastructure investment entity, Borealis Infrastructure Management Inc., and the Government of Singapore Investment Corporation, acting through its private equity and infrastructure arm, GIC Special Investments Pte Ltd.

Texas Transmission acquired the equity interests for $1.254 billion in cash. At the closing of the sale, Oncor also offered and sold additional equity interests to Investment LLC, an entity owned by certain members of Oncor's management team, for a total of $13 million in cash (the same price per unit paid by Texas Transmission). Accordingly, the equity issuances in 2008 resulted in Intermediate Holding (and EFH Corp.) indirectly owning 80.04% of Oncor, certain members of Oncor management indirectly owning 0.21% of Oncor and Texas Transmission owning 19.75% of Oncor.

The proceeds (net of closing costs) of $1.253 billion received by Oncor from Texas Transmission and the members of Oncor management upon completion of these transactions were distributed ultimately to EFH Corp.

Intermediate Holding recorded the $265 million excess of Intermediate Holding's carrying amount of the noncontrolling interests sold by Oncor over the net proceeds from the transactions as a reduction to additional paid in capital, consistent with the provisions of SAB Topic 5-H, "Accounting for Sales of Stock by a Subsidiary."

The noncontrolling interests balance of $1.355 billion reported in the December 31, 2008 consolidated balance sheet represented the proportional share of Oncor's net assets at the date of the transaction less $160 million representing the noncontrolling interests' share of Oncor's results for the period subsequent to the transaction (including the goodwill impairment charge), net of $2 million in cash distributions. See Note 13.

## 15. INVESTMENTS

The investments balance consists of the following:

|  | Successor December 31, | |
| --- | --- | --- |
|  | 2008 | 2007 |
| Assets related to employee benefit plans, including employee savings programs, net of distributions | $65 | $77 |
| Investment in unconsolidated affiliates | 5 | 10 |
| Land | 2 | 2 |
| Total investments | $72 | $89 |

F-195

EFIHMW00246273

*Assets Related to Employee Benefit Plans*

The majority of these assets represent cash surrender values of life insurance policies that are purchased to fund liabilities under deferred compensation plans. EFH Corp. pays the premiums and is the beneficiary of these life insurance policies. As of December 31, 2008 and 2007, the face amount of these policies totaled $151 million and $168 million, and the net cash surrender values totaled $53 million and $68 million, respectively. Changes in cash surrender value are netted against premiums paid. Other investment assets held to satisfy deferred compensation liabilities are recorded at market value.

*Restricted Cash*

|  | Successor | | | |
|  | At December 31, 2008 | | At December 31, 2007 | |
|  | Current Assets | Noncurrent Assets | Current Assets | Noncurrent Assets |
|---|---|---|---|---|
| Customer collections related to securitization (transition) bonds used only to service debt and pay expenses | $ 51 | $— | $ 56 | $— |
| Reserve for fees associated with transition bonds | — | 10 | — | 10 |
| Reserve for shortfalls of transition bond charges | — | 6 | — | 7 |
| Total restricted cash | $ 51 | $ 16 | $ 56 | $ 17 |

## 16.  NOTICE OF TERMINATION OF OUTSOURCING ARRANGEMENTS

In connection with the closing of the Merger, EFH Corp., Oncor and TCEH commenced a review, under the change of control provision, of certain outsourcing arrangements with Capgemini Energy LP (Capgemini), Capgemini America, Inc. and Capgemini North America, Inc. (collectively, CgE). During the fourth quarter of 2008, Oncor executed a Separation Agreement with CgE. Simultaneous with the execution of that Separation Agreement, EFH Corp. and TCEH entered into a substantially similar Separation Agreement with CgE. The Separation Agreements principally provide for (i) notice of termination of each of the Master Framework Agreements, dated as of May 17, 2004, each as amended, between Capgemini and each of Oncor and TCEH and the related service agreements under each of the Master Framework Agreements and (ii) termination of the joint venture arrangements between EFH Corp. (and its applicable subsidiaries) and CgE. Under the Master Framework Agreements and related services agreements, Capgemini provides to Oncor and EFH Corp. and its other subsidiaries outsourced support services, including information technology, customer care and billing, human resources, procurement and certain finance and accounting activities.

The Separation Agreement acts as a notice of termination under the Master Framework Agreement and the related services agreements. As a result of the "change of control" of EFH Corp. that occurred as a result of the Merger, Oncor had the contractual right to terminate, without penalty, its Master Framework Agreement. Oncor has elected to exercise such right. Consistent with the Master Framework Agreement, to provide for an orderly transition of the services, the Separation Agreement requires that Capgemini provide termination assistance services until the services are transitioned back to Oncor and/or to another service provider. The Separation Agreement provides that the services be transitioned by December 31, 2010 (June 30, 2011, in the case of the information technology services). The Master Framework Agreement will actually terminate when these termination assistance services are completed. Oncor previously provided a termination notice to Capgemini in respect of human resources services.

The Separation Agreements provide for the termination of the joint venture arrangement between EFH Corp. (and its applicable subsidiaries) and CgE. As a result, during the fourth quarter of 2008:

- EFH Corp. received approximately $70 million in cash in exchange for the termination of a purchase option agreement pursuant to which subsidiaries of EFH Corp. had the right to "put" to Capgemini (and

F-196

EFIHMW00246274

Capgemini had the right to "call" from a subsidiary of EFH Corp.) EFH Corp.'s 2.9% limited partnership interest in Capgemini and licensed assets, principally software, upon the expiration of the Master Framework Agreements in 2014 or, in some circumstances, earlier. Oncor received $20 million of such proceeds, reflecting its share of the put option value.

- The parties entered into a mutual release of all claims under the Master Framework Agreement and related services agreements, subject to certain defined exceptions, and Oncor received $4 million in cash in settlement of such claims.

The carrying value of Oncor's share of the put option value was $48 million prior to the application of purchase accounting (recorded as a noncurrent asset). The effects of the termination of the outsourcing arrangements, including the accrual of $16 million for incremental costs to exit and transition the services, were included in the final purchase price allocation (see Note 2).

## 17. PENSION AND OTHER POSTRETIREMENT EMPLOYEE BENEFITS

*Pension Plan*

Subsidiaries of Intermediate Holding are participating employers in the EFH Retirement Plan (Retirement Plan), a defined benefit pension plan sponsored by EFH Corp. The Retirement Plan is a qualified pension plan under Section 401(a) of the Internal Revenue Code of 1986, as amended (Code) and is subject to the provisions of the Employee Retirement Income Security Act of 1974, as amended (ERISA). Employees are eligible to participate in the Retirement Plan upon their completion of one year of service and the attainment of age 21. All benefits are funded by the participating employers. The Retirement Plan provides benefits to participants under one of two formulas: (i) a Cash Balance Formula under which participants earn monthly contribution credits based on their compensation and a combination of their age and years of service, plus monthly interest credits or (ii) a Traditional Retirement Plan Formula based on years of service and the average earnings of the three years of highest earnings. The interest component of the Cash Balance Formula is variable and is determined using the yield on 30-year Treasury bonds.

All eligible employees hired after January 1, 2001 participate under the Cash Balance Formula. Certain employees who, prior to January 1, 2002, participated under the Traditional Retirement Plan Formula, continue their participation under that formula. Under the Cash Balance Formula, future increases in earnings will not apply to prior service costs. It is EFH Corp.'s policy to fund the plans on a current basis to the extent deductible under existing federal tax regulations.

Subsidiaries of Intermediate Holding also participate in EFH Corp.'s supplemental retirement plans for certain employees, whose retirement benefits cannot be fully earned under the qualified Retirement Plan, the information for which is included below.

### Other Postretirement Employee Benefits (OPEB) Plan

Subsidiaries of Intermediate Holding participate with EFH Corp. and certain other affiliated subsidiaries of EFH Corp. to offer certain health care and life insurance benefits to eligible employees and their eligible dependents upon the retirement of such employees. For employees retiring on or after January 1, 2002, the retiree contributions required for such coverage vary based on a formula depending on the retiree's age and years of service.

F-197

EFIHMW00246275

*Pension and OPEB Costs Recognized as Expense*

The following details net pension and OPEB costs recognized as expense:

| | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
| | Year Ended December 31, 2008 | Period from October 11, 2007 to December 31, 2007 | Period from January 1, 2007 to October 10, 2007 | Year Ended December 31, 2006 |
| Pension costs under SFAS 87 | $ 15 | $3 | $ 21 | $ 41 |
| OPEB costs under SFAS 106 | 44 | 9 | 50 | 61 |
| Total benefit costs | 59 | 12 | 71 | 102 |
| Less amounts deferred principally as a regulatory asset or property | (42) | (8) | (43) | (84) |
| Net amounts recognized as expense | $ 17 | $4 | $ 28 | $ 18 |

Consistent with SFAS 87, EFH Corp. uses the calculated value method to determine the market-related value of the assets held in its trust. EFH Corp. includes the realized and unrealized gains or losses in the market-related value of assets over a rolling four-year period. Each year, 25% of such gains and losses for the current year and for each of the preceding three years is included in the market-related value. Each year, the market-related value of assets is increased for contributions to the plan, and investment income and is decreased for benefit payments and expenses for that year.

The pension and OPEB amounts provided represent allocations to Intermediate Holding of amounts related to EFH Corp.'s plans.

*Regulatory Recovery of Pension and OPEB Costs*

In June 2005, an amendment to PURA relating to EFH Corp.'s pension and OPEB costs was enacted by the Texas Legislature. This amendment, which was retroactively effective January 1, 2005, provides for the recovery by Oncor of pension and OPEB costs for all applicable former employees of the regulated predecessor integrated electric utility. In addition to Oncor's active and retired employees, these former employees largely include active and retired personnel engaged in TCEH's activities related to service of those additional personnel prior to the deregulation and disaggregation of EFH Corp.'s businesses effective January 1, 2002. Accordingly, Oncor and TCEH entered into an agreement whereby Oncor assumed responsibility for applicable pension and OPEB costs related to those personnel.

The amendment additionally authorizes Oncor to establish a regulatory asset or liability for the difference between the amounts of pension and OPEB costs approved in current billing rates and the actual amounts that would otherwise have been recorded as charges or credits to earnings. Accordingly, in the second quarter of 2005 Oncor began deferring (principally as a regulatory asset or property) additional pension and OPEB costs as permitted by the amendment. Amounts deferred are ultimately subject to regulatory approval. Amounts recorded as a regulatory asset totaled $15 million and $20 million in 2008 and 2007, respectively.

*Assumed Discount Rate*

The discount rates reflected in net pension and OPEB costs are 6.55% for the year ended December 31, 2008, 6.45% for the period October 11, 2007 through December 31, 2007, 5.90% for the period January 1, 2007 through October 10, 2007, and 5.75% for the year ended December 31, 2006. The expected rate of return on plan assets reflected in the 2008 cost amounts is 8.25% for the pension plan and 7.90% for OPEBs.

F-198

Confidential

*Pension and OPEB Plan Cash Contributions*

Contributions to the benefit plans were as follows:

|  | December 31, | | |
|---|---|---|---|
|  | 2008 | 2007 | 2006 |
| Pension plan contributions | $46 | $ 3 | $ 2 |
| OPEB plan contributions | 31 | 33 | 26 |
| Total contributions | $77 | $36 | $28 |

Estimated funding in 2009 of the pension plan and OPEB plan totals $61 million and $18 million, respectively.

*Thrift Plan*

Employees of subsidiaries of Intermediate Holding may participate in a qualified savings plan, the EFH Thrift Plan (Thrift Plan). This plan is a participant-directed defined contribution plan intended to qualify under Section 401(a) of the Code, and is subject to the provisions of ERISA. Under the terms of the Thrift Plan, employees who do not earn more than the IRS threshold compensation limit used to determine highly compensated employees may contribute, through pre-tax salary deferrals and/or after-tax applicable payroll deductions, the lesser of 75% of their regular salary or wages or the maximum amount permitted under law. Employees who earn more than such threshold may contribute from 1% to 16% of their regular salary or wages. Employer matching contributions are also made in an amount equal to 100% of the first 6% of employee contributions for employees who are covered under the Cash Balance Formula of the Retirement Plan, and 75% of the first 6% of employee contributions for employees who are covered under the Traditional Retirement Plan Formula of the Retirement Plan. As of October 10, 2007, employer matching contributions are made in cash and may be allocated by participants to any of the Thrift Plan's investment options.

## 18.  STOCK-BASED COMPENSATION

*Successor*

In 2008, Oncor established the Oncor Electric Delivery Company LLC Stock Appreciation Rights Plan (the SARs Plan) under which certain employees of Oncor may be granted stock appreciation rights (SARs) payable in cash, or in some circumstances, Oncor units. Two types of SARs may be granted under the SARs Plan. Time-based SARs (Time SARs) vest solely based upon continued employment ratably on an annual basis on each of the first five anniversaries of the grant date. Performance-based SARs (Performance SARs) vest based upon both continued employment and the achievement of a predetermined level of Oncor EBITDA over time, generally ratably over five years based upon annual Oncor EBITDA levels, with provisions for vesting if the annual levels are not achieved but cumulative two- or three-year total Oncor EBITDA levels are achieved. Time and Performance SARs may also vest in part or in full upon the occurrence of certain specified liquidity events and are exercisable only upon the occurrence of certain specified liquidity events. Since the exercisability of the Time and Performance SARs is conditioned upon the occurrence of a liquidity event, compensation expense will not be recorded until it is probable that a liquidity event will occur. Generally, awards under the SARs Plan terminate on the tenth anniversary of the grant, unless the participant's employment is terminated earlier under certain circumstances.

In February 2009, Oncor also established the Oncor Electric Delivery Company LLC Director Stock Appreciation Rights Plan (the Director SARs Plan) under which certain non-employee members of Oncor's board of directors and other persons having a relationship with Oncor may be granted SARs payable in cash, or in some circumstances, Oncor units. SARs granted under the Director Plan vest in eight equal quarterly installments over a two-year period and are exercisable only upon the occurrence of certain specified liquidity events. Since the exercisability of the Director SARs is conditioned upon the occurrence of a liquidity event, expense will not be recorded until it is probable a liquidity event will occur.

F-199

Confidential

SARs under the SARs Plan and the Director SARs Plan are generally payable in cash based on the fair market value of the SAR on the date of exercise. During 2008, Oncor granted 13.9 million SARs under the SARs Plan, of which 1.4 million Time SARS were vested at December 31, 2008. Pursuant to an amendment to the SARs Plan terms in February 2009, a total of 1.4 million Performance SARS related to the period ended December 31, 2008 were declared vested in recognition that the established 2008 EBITDA target was substantially achieved. There were no SARs eligible for exercise at December 31, 2008.

*Predecessor*

Prior to the Merger, Oncor bore the costs of the EFH Corp. shareholder-approved long-term incentive plans for applicable management personnel engaged in Oncor's business activities. EFH Corp. provided discretionary awards of performance units to qualified management employees that were payable in its common stock. The awards generally vested over a three-year period and the number of shares ultimately earned was based on the performance of EFH Corp.'s stock over the vesting period as compared to peer companies and established thresholds. EFH Corp. established restrictions that limited certain employees' opportunities to liquidate vested awards.

EFH Corp. determined the fair value of its stock-based compensation awards utilizing a valuation model that took into account three principal factors: expected volatility of the stock price of EFH Corp. and peer group companies, dividend rate of EFH Corp. and peer group companies and the restrictions limiting liquidation of vested stock awards. Based on the fair values determined under this model, Oncor's reported expense related to the awards totaled $3 million ($2 million after-tax) for the period January 1, 2007 through October 10, 2007 and $4 million ($3 million after-tax) in 2006. The number of awards granted, net of forfeitures, totaled zero and 8 thousand in 2007 and 2006, respectively.

With respect to awards to Oncor's employees, the fair value of awards that vested in the period January 1, 2007 through October 10, 2007 and the year ended December 31, 2006 totaled $84 million and $57 million, respectively, based on the vesting date share prices.

## 19.  RELATED-PARTY TRANSACTIONS

The following represent significant related-party transactions of Intermediate Holding:

- Oncor records revenue from TCEH, principally for electricity delivery fees, which totaled $1 billion for the year ended December 31, 2008, $209 million for the period October 11, 2007 through December 31, 2007, $823 million for the period January 1, 2007 through October 10, 2007 and $1.1 billion for the year ended December 31, 2006.

- Oncor records interest income from TCEH with respect to Oncor's generation-related regulatory assets, which have been securitized through the issuance of transition bonds by Oncor's bankruptcy-remote financing subsidiary. The interest income serves to offset Oncor's interest expense on the transition bonds. This interest income totaled $46 million for the year ended December 31, 2008, $11 million for the period October 11, 2007 through December 31, 2007, $38 million for the period January 1, 2007 through October 10, 2007 and $52 million for the year ended December 31, 2006.

- Incremental accrued income taxes incurred by Oncor as a result of delivery fee surcharges to its customers related to transition bonds are reimbursed by TCEH. Intermediate Holding's financial statements reflect a note receivable from TCEH to Oncor of $289 million ($35 million reported as current in trade accounts and other receivables from affiliates) at December 31, 2008 and $323 million ($34 million reported as current in trade accounts and other receivables from affiliates) at December 31, 2007 related to these income taxes.

- Short-term advances to parent totaled $3 million and $25 million at December 31, 2008 and 2007, respectively. Interest income on the advances totaled $2 million for the year ended December 31, 2008

F-200

EFIHMW00246278

at a weighted average interest rate of 10.9% during the period. The $25 million advance was settled in May 2008 as part of Intermediate Holding's distribution of its investment in an entity with telecommunications-related activities that are not part of Oncor's current operations to EFH Corp. as discussed in Note 13.

- Short-term advances from parent totaled $24 million at December 31, 2006. The average daily balances of short-term advances from parent totaled $42 million and $44 million for the period January 1, 2007 through October 10, 2007 and the year ended December 31, 2006, and the weighted average interest rate for the respective periods was 5.8% and 5.4%. Interest expense incurred on the advances totaled approximately $2 million for the period January 1, 2007 through October 10, 2007 and $2 million for the year ended December 31, 2006. As a result of actions taken at the time of the Merger to further ring-fence Oncor, advances from EFH Corp. to Oncor ceased and outstanding amounts were repaid.

- An EFH Corp. subsidiary charges Oncor for financial and certain other administrative services at cost. These costs, which are reported in operation and maintenance expenses, totaled $24 million for the year ended December 31, 2008, $6 million for the period October 11, 2007 through December 31, 2007, $20 million for the period January 1, 2007 through October 10, 2007 and $36 million for the year ended December 31, 2006.

- Under Texas regulatory provisions, the trust fund for decommissioning the Comanche Peak nuclear generation facility (reported on TCEH's balance sheet) is funded by a delivery fee surcharge collected from REPs by Oncor and remitted to TCEH. These trust fund assets are established with the intent to be sufficient to fund the estimated decommissioning liability (also reported on TCEH's balance sheet). Income and expenses associated with the trust fund and the decommissioning liability recorded by TCEH are offset by a net change in the Oncor and TCEH intercompany receivable/payable, which in turn results in a change in Oncor's reported net regulatory asset/liability. At December 31, 2008, the excess of the decommissioning liability over the trust fund balance resulted in a regulatory asset of $127 million. At December 31, 2007, the excess of the trust fund balance over the estimated net decommissioning liability resulted in a regulatory liability of $13 million.

- Oncor has a 19.5% limited partnership interest, with a carrying value of $5 million and $10 million at December 31, 2008 and 2007, respectively, in an EFH Corp. subsidiary holding principally software-related assets. Equity losses related to this interest are reported in other deductions and totaled $4 million for the year ended December 31, 2008, $1 million for the period October 11, 2007 through December 31, 2007, $2 million for the period January 1, 2007 through October 10, 2007 and $4 million for the year ended December 31, 2006. These losses primarily represent amortization of the assets held by the subsidiary.

- EFH Corp. files a consolidated federal income tax return and allocates income tax liabilities to Intermediate Holding substantially as if Intermediate Holding was filing its own income tax returns. See discussion in Note 1 under "Income Taxes." Intermediate Holding had amounts receivable from EFH Corp. related to income taxes, primarily due to timing of payments, totaling $22 million and $52 million at December 31, 2008 and 2007, respectively.

- Oncor held cash collateral of $15 million on both December 31, 2008 and 2007 from TCEH related to interconnection agreements for three generation units being developed by TCEH. The collateral is reported in the balance sheet in other current liabilities.

- Certain transmission and distribution utilities in Texas have tariffs in place to assure adequate credit worthiness of any REP to support the REP's obligation to collect securitization bond-related (transition) charges on behalf of the utility. Under these tariffs, as a result of TCEH's credit rating being below investment grade, TCEH is required to post collateral support in an amount equal to estimated transition charges over specified time periods. Accordingly, as of December 31, 2008 and 2007, TCEH had posted letters of credit in the amount of $13 million and $14 million, respectively, for the benefit of Oncor.

F-201

Confidential