- At the closing of the Merger, Oncor entered into a $2 billion revolving credit facility with a syndicate of financial institutions and other lenders. The syndicate includes affiliates of GS Capital Partners. Affiliates of GS Capital Partners (a member of the Sponsor Group) have from time-to-time engaged in commercial banking transactions with Intermediate Holding or its subsidiaries in the normal course of business.

- Affiliates of the Sponsor Group have, and may, acquire debt or debt securities issued by Intermediate Holding or its subsidiaries in open market transactions or through loan syndications. In addition, affiliates of the Sponsor Group acted as initial purchasers in Oncor's $1.5 billion senior secured notes offering in September 2008.

See Notes 7, 9, 11, 13 and 17 for information regarding the tax sharing agreement, the accounts receivable securitization program, guarantees and push-down of certain EFH Corp. debt, distributions to EFH Corp. and the allocation of EFH Corp.'s pension and OPEB costs to Intermediate Holding, respectively.

## 20.  SUPPLEMENTARY FINANCIAL INFORMATION

*Other Income and Deductions*

| | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
| | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, 2006 |
| Other income: | | | | |
| Net gain on sale of other properties and investment | $  1 | $  1 | $  3 | $  1 |
| Accretion of adjustment (discount) to regulatory assets due to purchase accounting (Note 2) | 44 | 10 | — | — |
| Other | — | — | — | 1 |
| Total other income | $ 45 | $11 | $  3 | $  2 |
| Other deductions: | | | | |
| Charges related to 2006 cities rate settlements (Note 5) | $ 13 | $  6 | $ 20 | $ 13 |
| Expenses related to canceled InfrastruX Energy Services joint venture (a) | — | — | 3 | 7 |
| Equity losses in an unconsolidated affiliate (Note 19) | 4 | 1 | 2 | 4 |
| Other | 8 | 1 | 5 | 3 |
| Total other deductions | $ 25 | $  8 | $ 30 | $ 27 |

(a)  Consists of previously deferred costs arising from operational activities to transition to the joint venture arrangement, which was canceled in connection with the Merger.

*Major Customers*

Amounts billed to TCEH represented 39% and amounts billed to one large nonaffiliated REP represented 16% of total operating revenues for the year ended December 31, 2008. No other customer represented 10% or more of total operating revenues.

Confidential

*Interest Expense and Related Charges*

| | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
| | **Year Ended December 31, 2008** | **Period from October 11, 2007 through December 31, 2007** | **Period from January 1, 2007 through October 10, 2007** | **Year Ended December 31, 2006** |
| Interest .................................. | $565 | $136 | $242 | $287 |
| Amortization of fair value debt discounts resulting from purchase accounting ......... | 3 | — | — | — |
| Amortization of debt issuance costs and discounts ............................... | 16 | 3 | 7 | 5 |
| Allowance for funds used during construction—capitalized interest portion ............... | (6) | (1) | (7) | (6) |
| Total interest expense and related charges .......................... | $578 | $138 | $242 | $286 |

*Property, Plant and Equipment*

| | Successor | |
| --- | --- | --- |
| | December 31, | |
| | **2008** | **2007** |
| Assets in service: | | |
| Distribution ...................................................... | $ 8,429 | $ 8,036 |
| Transmission ...................................................... | 3,626 | 3,388 |
| Other assets ...................................................... | 477 | 388 |
| Total ...................................................... | 12,532 | 11,812 |
| Less accumulated depreciation ......................................... | 4,158 | 3,932 |
| Net of accumulated depreciation ..................................... | 8,374 | 7,880 |
| Construction work in progress ........................................... | 213 | 170 |
| Held for future use ................................................. | 19 | 19 |
| Property, plant and equipment—net ..................................... | $ 8,606 | $ 8,069 |

Depreciation expense as a percent of average depreciable property approximated 2.8% for 2008, 2007 and 2006.

*Intangible Assets*

Intangible assets other than goodwill reported in the balance sheet are comprised of the following:

| | Successor | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | As of December 31, 2008 | | | As of December 31, 2007 | | |
| | **Gross Carrying Amount** | **Accumulated Amortization** | **Net** | **Gross Carrying Amount** | **Accumulated Amortization** | **Net** |
| Intangible assets subject to amortization included in property, plant and equipment: | | | | | | |
| Land easements ....................... | $184 | $ 69 | $115 | $179 | $ 67 | $112 |
| Capitalized software ................... | 145 | 80 | 65 | 122 | 63 | 59 |
| Total ........................... | $329 | $149 | $180 | $301 | $130 | $171 |

F-203

EFIHMW00246281

Aggregate amortization expense for intangible assets totaled $19 million for the year ended December 31, 2008, $3 million for the period October 11, 2007 through December 31, 2007, $11 million for the period January 1, 2007 through October 10, 2007, and $20 million for the year ended December 31, 2006. At December 31, 2008, the weighted average remaining useful lives of capitalized land easements and software were 69 years and 10 years, respectively. The estimated aggregate amortization expense for each of the five succeeding fiscal years from December 31, 2008 is as follows:

| Year | Amortization Expense |
| --- | --- |
| 2009 | $21 |
| 2010 | 15 |
| 2011 | 12 |
| 2012 | 10 |
| 2013 | 5 |

Goodwill of $4.9 billion was reported on the balance sheet as of December 31, 2007 and represented the portion of the goodwill arising from the Merger under purchase accounting that was assigned to the Regulated Delivery reporting unit of EFH Corp. The balance reported at December 31, 2008 is $4.1 billion. See Note 2 for discussion of financial statement effects of the Merger and Note 3 for discussion of the goodwill impairment. None of this goodwill is being deducted for tax purposes.

### Other Noncurrent Liabilities and Deferred Credits

The balance of other noncurrent liabilities and deferred credits consists of the following:

| | Successor | |
| --- | --- | --- |
| | December 31, 2008 | December 31, 2007 |
| Retirement plan and other employee benefits | $1,115 | $744 |
| Liabilities related to subsidiary tax sharing agreement | 299 | — |
| Uncertain tax positions (including accrued interest) (Note 6) | 144 | 134 |
| Nuclear decommissioning cost under-recovery (a) | 127 | — |
| Other | 36 | 20 |
| Total other noncurrent liabilities and deferred credits | $1,721 | $898 |

_____

(a)  Represents intercompany payable to TCEH offset in Oncor's net reported regulatory asset/liability. See Note 19.

*Liabilities Related to Subsidiary Tax Sharing Agreement*—Amount represents the noncontrolling interests' portion of the previously recorded net deferred tax liabilities of Oncor. Upon the sale of noncontrolling interests in Oncor (see Note 14), Oncor became a partnership for US federal income tax purposes, and the temporary differences which gave rise to the deferred taxes will, over time, become taxable to the noncontrolling interests. Under a tax sharing agreement among Oncor and its equity holders, Oncor reimburses the equity holders for income taxes as the partnership earnings become taxable to the equity holders. Accordingly, as the temporary differences become taxable, the equity holders will be reimbursed by Oncor. In the unlikely event such amounts are not reimbursed under the tax sharing agreement, it is probable they would be refunded to rate payers.

F-204

EFIHMW00246282

*Supplemental Cash Flow Information*

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, 2006 |
| Cash payments: | | | | |
| Interest paid . . . . . . . . . . . . . . . . . . . . . . . . | $284 | $72 | $240 | $287 |
| Capitalized interest . . . . . . . . . . . . . . . . . . | (6) | (1) | (7) | (6) |
| Interest (net of amounts capitalized) . . . | 278 | 71 | 233 | 281 |
| Income taxes . . . . . . . . . . . . . . . . . . . . . . . | 65 | 26 | 106 | 290 |
| Noncash investing and financing activities: | | | | |
| Noncash construction expenditures (a) . . . . . | 49 | 70 | 25 | 33 |
| Noncash distributions of investment to parent . . . . . . . . . . . . . . . . . . . . . . . . . . . | 24 | — | — | — |
| Noncash contribution from EFH Corp. related to the debt push-down . . . . . . . . . | — | (2,182) | — | — |
| Noncash contribution from EFH Corp. related to the payment of interest on pushed-down debt (b) . . . . . . . . . . . . . . | 140 | 24 | — | — |
| Noncash contribution related to incentive compensation plans . . . . . . . . . . . . . . . . . | — | 28 | — | 5 |
| Noncash capital contribution from Texas Holdings . . . . . . . . . . . . . . . . . . . . . . . . . | — | 12 | — | — |
| Noncash contribution for pension-related assets . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | — | 15 |

(a)  Represents end-of-period accruals.
(b)  Amount is net of tax.

* * * * *

F-205

Confidential

## GLOSSARY

When the following terms and abbreviations appear in the text of this report, they have the meanings indicated below.

| | |
|---|---|
| **2008 Audited Financial Statements** . . . . | Intermediate Holding's audited financial statements for the year ended December 31, 2008 |
| **Adjusted EBITDA** . . . . . . . . . . . . . . . . . | Adjusted EBITDA means EBITDA adjusted to exclude non-cash items, unusual items and other adjustments allowable under certain debt arrangements of EFH Corp. and its subsidiaries. See definition of EBITDA below. Adjusted EBITDA and EBITDA are not recognized terms under GAAP and, thus, are non-GAAP financial measures. Intermediate Holding is providing EFH Corp.'s Adjusted EBITDA in this quarterly report (see reconciliation in Exhibit 99(a)) solely because of the important role that Adjusted EBITDA plays in respect of the certain covenants contained in the indenture for EFH Corp. debt pushed down to Intermediate Holding as discussed in Note 4 to Financial Statements. Intermediate Holding does not intend for Adjusted EBITDA (or EBITDA) to be an alternative to net income as a measure of operating performance or an alternative to cash flows from operating activities as a measure of liquidity or an alternative to any other measure of financial performance presented in accordance with GAAP. Additionally, Intermediate Holding does not intend for Adjusted EBITDA (or EBITDA) to be used as a measure of free cash flow available for management's discretionary use, as the measure excludes certain cash requirements such as interest payments, tax payments and other debt service requirements. Because not all companies use identical calculations, Intermediate Holding's presentation of Adjusted EBITDA (and EBITDA) may not be comparable to similarly titled measures of other companies. |
| **CREZ** . . . . . . . . . . . . . . . . . . . . . . . . . | Competitive Renewable Energy Zone |
| **EBITDA** . . . . . . . . . . . . . . . . . . . . . . . | Refers to earnings (net income) before interest expense, income taxes, depreciation and amortization. See the definition of Adjusted EBITDA above. |
| **EFC Holdings** . . . . . . . . . . . . . . . . . . . | Refers to Energy Future Competitive Holdings Company, a direct subsidiary of EFH Corp. and the direct parent of TCEH. |
| **EFH Corp.** . . . . . . . . . . . . . . . . . . . . . . | Refers to Energy Future Holdings Corp., a holding company, and/or its subsidiaries, depending on context. Its major subsidiaries include Oncor and TCEH. |
| **EFH Corp. Notes** . . . . . . . . . . . . . . . . . | Refers collectively to EFH Corp.'s 10.875% Senior Notes due November 1, 2017 (Cash-Pay Notes) and EFH Corp.'s 11.250%/12.000% Senior Toggle Notes due November 1, 2017 (Toggle Notes). |
| **EPA** . . . . . . . . . . . . . . . . . . . . . . . . . . . | US Environmental Protection Agency |
| **ERCOT** . . . . . . . . . . . . . . . . . . . . . . . . | Electric Reliability Council of Texas, the independent system operator and the regional coordinator of the various electricity systems within Texas |

F-206

Confidential

| | |
|---|---|
| **FASB** . . . . . . . . . . . . . . . . . . . . . . . . . | Financial Accounting Standards Board, the designated organization in the private sector for establishing standards for financial accounting and reporting |
| **FERC** . . . . . . . . . . . . . . . . . . . . . . . . . | US Federal Energy Regulatory Commission |
| **Fitch** . . . . . . . . . . . . . . . . . . . . . . . . . | Fitch Ratings, Ltd. (a credit rating agency) |
| **GAAP** . . . . . . . . . . . . . . . . . . . . . . . . | generally accepted accounting principles |
| **GWh** . . . . . . . . . . . . . . . . . . . . . . . . . | gigawatt-hours |
| **Intermediate Holding** . . . . . . . . . . . . . | Refers to Energy Future Intermediate Holding Company LLC, a direct, wholly-owned subsidiary of EFH Corp. and the direct parent of Oncor Holdings. |
| **Investment LLC** . . . . . . . . . . . . . . . . . . | Refers to Oncor Management Investment LLC, a Delaware limited liability company and noncontrolling interest owner of Oncor, whose managing member is Oncor and whose Class B Interests are owned by officers, directors and key employees of Oncor. |
| **LIBOR** . . . . . . . . . . . . . . . . . . . . . . . . . | London Interbank Offered Rate. An interest rate at which banks can borrow funds, in marketable size, from other banks in the London interbank market. |
| **Limited Liability Company Agreement** . . . . . . . . . . . . . . . . . . . . . | The Second Amended and Restated Limited Liability Company Agreement of Oncor, dated as of November 5, 2008, by and among Oncor Holdings, Texas Transmission and Investment LLC, as amended. |
| **Merger** . . . . . . . . . . . . . . . . . . . . . . . . . | The transaction referred to in the Merger Agreement (defined immediately below) that was completed on October 10, 2007. |
| **Merger Agreement** . . . . . . . . . . . . . . . | Agreement and Plan of Merger, dated February 25, 2007, under which Texas Holdings agreed to acquire EFH Corp. |
| **Moody's** . . . . . . . . . . . . . . . . . . . . . . . . | Moody's Investors Services, Inc. (a credit rating agency) |
| **Oncor** . . . . . . . . . . . . . . . . . . . . . . . . . | Refers to Oncor Electric Delivery Company LLC, a direct, majority-owned subsidiary of Oncor Holdings, and/or its wholly-owned consolidated bankruptcy-remote financing subsidiary, Oncor Electric Delivery Transition Bond Company LLC, depending on context. |
| **Oncor Holdings** . . . . . . . . . . . . . . . . . . | Refers to Oncor Electric Delivery Holdings Company LLC, a direct, wholly-owned subsidiary of Intermediate Holding and the direct majority owner of Oncor. |
| **Oncor Ring-Fenced Entities** . . . . . . . . . | Refers to Oncor Holdings and its direct and indirect subsidiaries. |
| **OPEB** . . . . . . . . . . . . . . . . . . . . . . . . . | other postretirement employee benefits |
| **PUCT** . . . . . . . . . . . . . . . . . . . . . . . . . | Public Utility Commission of Texas |
| **PURA** . . . . . . . . . . . . . . . . . . . . . . . . . | Texas Public Utility Regulatory Act |
| **Purchase accounting** . . . . . . . . . . . . . . . | The purchase method of accounting for a business combination as prescribed by GAAP, whereby the cost or "purchase price" of a business combination, including the amount paid for the equity and direct transaction costs, are allocated to identifiable assets and liabilities (including intangible assets) based upon their fair values. The excess of the purchase price over the fair values of assets and liabilities is recorded as goodwill. |

F-207

Confidential

EFIHMW00246285

| | |
|---|---|
| **REP** . . . . . . . . . . . . . . . . . . . . . . . . . . . . | retail electric provider |
| **S&P** . . . . . . . . . . . . . . . . . . . . . . . . . . | Standard & Poor's Ratings Services, a division of the McGraw-Hill Companies, Inc. (a credit rating agency) |
| **SEC** . . . . . . . . . . . . . . . . . . . . . . . . . . . | US Securities and Exchange Commission |
| **Sponsor Group** . . . . . . . . . . . . . . . . . . . | Collectively, the investment funds affiliated with Kohlberg Kravis Roberts & Co. L.P. (KKR), TPG Capital, L.P. and GS Capital Partners, an affiliate of Goldman Sachs & Co. (See Texas Holdings below.) |
| **TCEH** . . . . . . . . . . . . . . . . . . . . . . . . . . | Refers to Texas Competitive Electric Holdings Company LLC, a direct, wholly-owned subsidiary of EFC Holdings and an indirect subsidiary of EFH Corp., and/or its subsidiaries, depending on context. |
| **TCEQ** . . . . . . . . . . . . . . . . . . . . . . . . . . | Texas Commission on Environmental Quality |
| **Texas Holdings** . . . . . . . . . . . . . . . . . . . | Refers to Texas Energy Future Holdings Limited Partnership, a limited partnership controlled by the Sponsor Group that owns substantially all of the common stock of EFH Corp. |
| **Texas Holdings Group** . . . . . . . . . . . . | Refers to Texas Holdings and its direct and indirect subsidiaries other than the Oncor Ring-Fenced Entities. |
| **Texas Transmission** . . . . . . . . . . . . . . . | Refers to Texas Transmission Investment LLC, a limited liability company that owns a 19.75% equity interest in Oncor. Texas Transmission is not affiliated with EFH Corp., any of EFH Corp.'s subsidiaries or any member of the Sponsor Group. |
| **US** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | United States of America |

This quarterly report occasionally makes references to Intermediate Holding, Oncor Holdings or Oncor when describing actions, rights or obligations of their respective subsidiaries. These references reflect the fact that the subsidiaries are consolidated with their respective parent companies for financial reporting purposes. However, these references should not be interpreted to imply that the parent company is actually undertaking the action or has the rights or obligations of the relevant subsidiary company or that the subsidiary company is undertaking an action or has the rights or obligations of its parent company or any other affiliate.

F-208

Confidential

**ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC**

**CONDENSED STATEMENTS OF CONSOLIDATED INCOME**
(Unaudited)

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2009 | 2008 | 2009 | 2008 |
| | (millions of dollars) | | | |
| Operating revenues: | | | | |
| Affiliated | $308 | $290 | $ 783 | $ 775 |
| Nonaffiliated | 462 | 438 | 1,254 | 1,194 |
| Total operating revenues | 770 | 728 | 2,037 | 1,969 |
| Operating expenses: | | | | |
| Operation and maintenance | 245 | 221 | 698 | 640 |
| Write off of regulatory assets (Note 2) | 25 | — | 25 | — |
| Depreciation and amortization | 147 | 128 | 405 | 370 |
| Income taxes | 49 | 73 | 122 | 162 |
| Taxes other than income taxes | 99 | 100 | 287 | 289 |
| Total operating expenses | 565 | 522 | 1,537 | 1,461 |
| Operating income | 205 | 206 | 500 | 508 |
| Other income and deductions: | | | | |
| Other income (Note 9) | 10 | 12 | 30 | 34 |
| Other deductions (Note 9) | 5 | 4 | 14 | 21 |
| Nonoperating income tax benefit (Note 4) | (17) | (14) | (51) | (48) |
| Interest income | 13 | 12 | 32 | 34 |
| Interest expense and related charges (Note 9) | 155 | 144 | 465 | 424 |
| Net income | 85 | 96 | 134 | 179 |
| Net income attributable to noncontrolling interests | 26 | — | 54 | — |
| Net income attributable to Intermediate Holding | $ 59 | $ 96 | $  80 | $ 179 |

See Notes to Financial Statements.

F-209

Confidential

**ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC**

**CONDENSED STATEMENTS OF CONSOLIDATED COMPREHENSIVE INCOME**
**(Unaudited)**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2009 | 2008 | 2009 | 2008 |
| | | (millions of dollars) | | |
| Net income | $ 85 | $ 96 | $134 | $179 |
| Other comprehensive income, net of tax effects: | | | | |
| Cash flow hedges: | | | | |
| Net decrease in fair value of derivatives (net of tax benefit of $—, $1, $— and $1) | — | (2) | — | (2) |
| Comprehensive income | 85 | 94 | 134 | 177 |
| Comprehensive income attributable to noncontrolling interests | 26 | — | 54 | — |
| Comprehensive income attributable to Intermediate Holding | $ 59 | $ 94 | $ 80 | $177 |

See Notes to Financial Statements.

F-210

Confidential

**ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC**

**CONDENSED STATEMENTS OF CONSOLIDATED CASH FLOWS**
**(Unaudited)**

| | Nine Months Ended September 30, | |
|---|---|---|
| | 2009 | 2008 |
| | (millions of dollars) | |
| Cash flows—operating activities: | | |
| Net income | $ 134 | $ 179 |
| Adjustments to reconcile net income to cash provided by operating activities: | | |
| Depreciation and amortization | 386 | 348 |
| Write off of regulatory assets (Note 2) | 25 | — |
| Deferred income taxes—net | 36 | 63 |
| Amortization of investment tax credits | (4) | (4) |
| Noncash interest expense related to pushed down debt of parent (Note 4) | 131 | 126 |
| Other—net | (2) | 4 |
| Changes in operating assets and liabilities: | | |
| Deferred advanced metering system revenues (Note 2) | 51 | — |
| Other operating assets and liabilities | (103) | (126) |
| Cash provided by operating activities | 654 | 590 |
| Cash flows—financing activities: | | |
| Issuance of long-term debt | — | 1,500 |
| Repayments of long-term debt | (70) | (67) |
| Net increase (decrease) in short-term borrowings | 200 | (1,130) |
| Distributions to parent | (117) | (213) |
| Distributions to noncontrolling interests | (32) | — |
| Decrease in income tax-related note receivable from TCEH | 27 | 24 |
| Debt discount, financing and reacquisition expenses—net | (3) | (15) |
| Cash provided by financing activities | 5 | 99 |
| Cash flows—investing activities: | | |
| Capital expenditures | (728) | (654) |
| Costs to remove retired property | (30) | (26) |
| Other | (4) | 1 |
| Cash used in investing activities | (762) | (679) |
| Net change in cash and cash equivalents | (103) | 10 |
| Cash and cash equivalents—beginning balance | 126 | 22 |
| Cash and cash equivalents—ending balance | $ 23 | $ 32 |

See Notes to Financial Statements.

F-211

EFIHMW00246289

## ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC

### CONDENSED CONSOLIDATED BALANCE SHEETS
#### (Unaudited)

|  | September 30, 2009 | December 31, 2008 |
|---|---|---|
|  | (millions of dollars) | |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 23 | $ 126 |
| Restricted cash (Note 9) | 64 | 51 |
| Trade accounts receivable from nonaffiliates—net (Note 9) | 253 | 217 |
| Trade accounts and other receivables from affiliates | 211 | 182 |
| Advances to parent | 3 | 3 |
| Income taxes receivable from parent (Note 8) | — | 22 |
| Materials and supplies inventories—at average cost | 79 | 63 |
| Accumulated deferred income taxes | 7 | 54 |
| Prepayments | 83 | 75 |
| Other current assets | 7 | 9 |
| Total current assets | 730 | 802 |
| Restricted cash (Note 9) | 15 | 16 |
| Investments and other property (Note 9) | 72 | 72 |
| Property, plant and equipment—net (Note 9) | 9,058 | 8,606 |
| Goodwill | 4,064 | 4,064 |
| Note receivable due from TCEH (Note 8) | 227 | 254 |
| Regulatory assets—net (Note 2) | 1,755 | 1,892 |
| Other noncurrent assets | 101 | 115 |
| Total assets | $16,022 | $15,821 |
| **LIABILITIES AND MEMBERSHIP INTERESTS** | | |
| Current liabilities: | | |
| Short-term borrowings (Note 3) | $ 537 | $ 337 |
| Long-term debt due currently (Note 4) | 106 | 103 |
| Trade accounts payable | 128 | 124 |
| Income taxes payable to parent (Note 8) | 3 | — |
| Accrued taxes other than income taxes | 116 | 141 |
| Accrued interest | 185 | 146 |
| Other current liabilities | 116 | 99 |
| Total current liabilities | 1,191 | 950 |
| Accumulated deferred income taxes | 1,199 | 1,192 |
| Investment tax credits | 38 | 42 |
| Long-term debt, less amounts due currently (Note 4) | 7,356 | 7,351 |
| Other noncurrent liabilities and deferred credits | 1,653 | 1,721 |
| Total liabilities | 11,437 | 11,256 |
| Commitments and Contingencies (Note 5) | | |
| Membership interests (Note 6): | | |
| Intermediate Holding membership interest | 3,207 | 3,210 |
| Noncontrolling interests in subsidiary | 1,378 | 1,355 |
| Total membership interests | 4,585 | 4,565 |
| Total liabilities and membership interests | $16,022 | $15,821 |

See Notes to Financial Statements.

F-212

Confidential

ENERGY FUTURE INTERMEDIATE HOLDING COMPANY LLC
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(Unaudited)

## 1. SIGNIFICANT ACCOUNTING POLICIES AND BUSINESS

*Description of Business*

Intermediate Holding is a Dallas, Texas-based holding company whose financial statements reflect almost entirely the operations of its indirect, majority (approximately 80%) owned subsidiary, Oncor. Oncor is a regulated electricity transmission and distribution company principally engaged in providing delivery services to REPs, including subsidiaries of TCEH, that sell power in the north-central, eastern and western parts of Texas. Distribution revenues from TCEH represented 38% and 39% of total revenues for the nine months ended September 30, 2009 and 2008, respectively. Intermediate Holding is a direct, wholly-owned subsidiary of EFH Corp. Intermediate Holding's financial statements reflect almost entirely the operations of Oncor; consequently, there are no separate reportable business segments.

References in this report to Intermediate Holding are to Intermediate Holding and/or its direct or indirect subsidiaries as apparent in the context. See "Glossary" for definition of terms and abbreviations.

Various "ring-fencing" measures have been taken to enhance the credit quality of Oncor Holdings and Oncor. Such measures include, among other things: Oncor Holdings' sale of a 19.75% equity interest in Oncor to Texas Transmission in November 2008; maintenance of separate books and records for the Oncor Ring-Fenced Entities; Oncor's board of directors being comprised of a majority of independent directors, and prohibitions on the Oncor Ring-Fenced Entities' providing credit support to, or receiving credit support from, any member of the Texas Holdings Group. The assets and liabilities of the Oncor Ring-Fenced Entities are separate and distinct from those of the Texas Holdings Group, and none of the assets of the Oncor Ring-Fenced Entities are available to satisfy the debt or other obligations of any member of the Texas Holdings Group. Furthermore, Oncor does not bear any liability for Intermediate Holding's obligations (including, but not limited to, debt obligations), and vice versa. Accordingly, Oncor's operations are conducted, and its cash flows managed, independently from the Texas Holdings Group.

*Basis of Presentation*

Intermediate Holding's condensed consolidated financial statements have been prepared in accordance with US GAAP and on the same basis as the audited financial statements included in the 2008 Audited Financial Statements. All adjustments (consisting of normal recurring accruals) necessary for a fair presentation of the results of operations and financial position have been included therein. All intercompany items and transactions have been eliminated in consolidation. Certain information and footnote disclosures normally included in annual consolidated financial statements prepared in accordance with US GAAP have been omitted pursuant to the rules and regulations of the SEC. Because the condensed consolidated interim financial statements do not include all of the information and footnotes required by US GAAP, they should be read in conjunction with the audited financial statements and related notes included in the 2008 Audited Financial Statements. The results of operations for an interim period may not give a true indication of results for a full year. All dollar amounts in the financial statements and tables in the notes are stated in millions of US dollars unless otherwise indicated. Subsequent events have been evaluated through October 29, 2009, the date these condensed consolidated financial statements were issued.

Effective with reporting for the third quarter 2009, income tax expense related to noncontrolling interests is included in operating income instead of other income and deductions. Such income tax amounts for the year-to-date period ended September 30, 2009 included $8 million related to each of the three months ended March 31 and June 30, 2009.

F-213

*Use of Estimates*

Preparation of the financial statements requires estimates and assumptions about future events that affect the reporting of assets and liabilities at the balance sheet dates and the reported amounts of revenue and expense, including fair value measurements. In the event estimates and/or assumptions prove to be different from actual amounts, adjustments are made in subsequent periods to reflect more current information. No material adjustments, other than those disclosed elsewhere herein, were made to previous estimates or assumptions during the current year.

*Property, Plant and Equipment*

Properties are stated at original cost. The cost of self-constructed property additions includes materials and both direct and indirect labor and applicable overhead and an allowance for funds used during construction.

Depreciation of property, plant and equipment is calculated on a straight-line basis over the estimated service lives of the properties based on depreciation rates approved by the PUCT. Depreciation rates include plant removal costs as a component of depreciation expense, consistent with regulatory treatment. As is common in the industry, depreciation expense is recorded using composite depreciation rates that reflect blended estimates of the lives of major asset components as compared to depreciation expense calculated on an asset-by-asset basis.

In accordance with the PUCT's August 2009 order in Oncor's rate review, the remaining net book value and anticipated removal cost of existing meters that are being replaced by advanced meters is being charged (amortized) to expense over an 11-year cost recovery period.

*Changes in Accounting Standards*

In June 2009, the FASB issued "The *FASB Accounting Standards Codification™* and the Hierarchy of Generally Accepted Accounting Principles," which establishes the *FASB Accounting Standards Codification™* (Codification) as the source of authoritative US GAAP recognized by the FASB to be applied to nongovernmental entities. The Codification was effective for financial statements issued for interim and annual periods ending after September 15, 2009. The adoption of the Codification did not affect reported results of operations, financial condition or cash flows. Intermediate Holding implemented the Codification in this quarterly report.

In May 2009, the FASB issued new guidance related to subsequent events that requires disclosure of the date through which Intermediate Holding has evaluated subsequent events related to the financial statements being issued and the basis for that date (either the date the financial statements were issued or the date they were available to be issued). This guidance was effective for interim and annual reporting periods ending after June 15, 2009. The adoption of this guidance as of April 1, 2009 did not affect reported results of operations, financial condition or cash flows, and the required disclosure is provided above in "Basis of Presentation."

In April 2009, the FASB issued new guidance requiring the disclosure of summarized financial information about the fair value of financial instruments for interim reporting. This new guidance is effective for interim reporting periods ending after June 15, 2009, and Intermediate Holding adopted it as of April 1, 2009. As this new guidance provides only disclosure requirements, the adoption did not have any effect on reported results of operations, financial condition or cash flows. The disclosures are provided in Note 4.

In December 2008, the FASB issued new guidance for employers' disclosures about postretirement benefit plan assets. This new guidance provides enhanced disclosures regarding how investment allocation decisions are made and certain aspects of fair value measurements on plan assets. The required disclosures are intended to provide transparency related to the types of assets and associated risks in an employer's defined benefit pension or other postretirement employee benefits plan and events in the economy and markets that could have a significant effect on the value of plan assets. These new disclosure requirements are effective for fiscal years ending after December 15, 2009. As this new guidance provides only disclosure requirements, the adoption will not have any effect on reported results of operations, financial condition or cash flows.

Confidential

In December 2007, the FASB issued amended guidance for accounting for noncontrolling interests in consolidated financial statements effective for fiscal years beginning on or after December 15, 2008. This amended guidance requires noncontrolling interests in subsidiaries initially to be measured at fair value and classified as a separate component of equity. Effective January 1, 2009, on a retrospective basis, Intermediate Holding classified the noncontrolling interests created as a result of Oncor's November 2008 sale of equity interests ($1.355 billion at December 31, 2008) as a separate component of membership interests in the balance sheet, and reported consolidated net income includes the net income attributable to noncontrolling interests.

## 2. REGULATORY ASSETS AND LIABILITIES

Recognition of regulatory assets and liabilities and the amortization periods over which they are expected to be recovered or refunded through rate regulation reflect the decisions of the PUCT. Components of the regulatory assets and liabilities are provided in the table below. Amounts not earning a return through rate regulation are noted. On August 31, 2009, the PUCT issued a final order on Oncor's rate review filed in June 2008. The rate review included a determination of the recoverability of regulatory assets as of December 31, 2007, including the recoverability period of those assets deemed allowable by the PUCT. The PUCT's findings included denial of recovery of certain regulatory assets primarily related to business restructuring costs and rate case expenses, which resulted in a $25 million charge ($16 million after-tax) in the third quarter 2009 reported as write off of regulatory assets.

| | Remaining Rate Recovery/Amortization Period as of September 30, 2009 | Carrying Amount | |
| --- | --- | --- | --- |
| | | September 30, 2009 | December 31, 2008 |
| Regulatory assets: | | | |
| Generation-related regulatory assets securitized by transition bonds (a) | 7 years | $ 787 | $ 865 |
| Employee retirement costs | 5 years | 84 | — |
| Employee retirement costs to be reviewed (b)(c) | To be determined | 37 | 100 |
| Employee retirement liability (a)(c)(d) | To be determined | 542 | 559 |
| Self-insurance reserve (primarily storm recovery costs)—net | 7 years | 142 | — |
| Self-insurance reserve to be reviewed (b)(c) | To be determined | 109 | 214 |
| Nuclear decommissioning cost under-recovery (a)(c)(e) | Not applicable | 90 | 127 |
| Securities reacquisition costs (pre-industry restructure) | 8 years | 63 | 68 |
| Securities reacquisition costs (post-industry restructure) | Terms of related debt | 28 | 29 |
| Recoverable amounts for/in lieu of deferred income taxes—net | Life of related asset or liability | 76 | 77 |
| Rate case expenses (f) | Largely 3 years | 9 | 10 |
| Rate case expenses to be reviewed (b)(c) | To be determined | 2 | — |
| Advanced meter customer education costs | 10 years | 4 | 2 |
| Deferred conventional meter depreciation | 10 years | 2 | — |
| Business restructuring costs (g) | Not applicable | — | 20 |
| Total regulatory assets | | 1,975 | 2,071 |
| Regulatory liabilities: | | | |
| Committed spending for demand-side management initiatives (a) | 3 years | 87 | 96 |
| Deferred advanced metering system revenues | 10 years | 51 | — |
| Investment tax credit and protected excess deferred taxes | Various | 46 | 49 |
| Over-collection of securitization (transition) bond revenues (a) | 7 years | 32 | 28 |
| Other regulatory liabilities (a) | Various | 4 | 6 |
| Total regulatory liabilities | | 220 | 179 |
| Net regulatory asset | | $1,755 | $1,892 |

F-215

---

(a)   Not earning a return in the regulatory rate-setting process.
(b)   Costs incurred since the period covered under the last rate review.
(c)   Recovery is specifically authorized by statute, subject to reasonableness review by the PUCT.
(d)   Represents unfunded liabilities recorded in accordance with pension and OPEB accounting standards.
(e)   Offset by an intercompany payable to TCEH. See Note 8.
(f)   Rate case expenses totaling $4 million were disallowed by the PUCT and written off in the third quarter of 2009.
(g)   All previously recorded business restructuring costs were disallowed by the PUCT and written off in the third quarter of 2009.

As part of purchase accounting, the carrying value of the generation-related regulatory assets was reduced by $213 million, and this amount is being accreted to other income over the approximate nine-year recovery period remaining as of the date of the Merger.

In September 2008, the PUCT approved a settlement for Oncor to recover its estimated future investment for advanced metering deployment. Oncor began billing the advanced metering surcharge in the January 2009 billing month cycle. The surcharge is expected to total $1.023 billion over the 11-year recovery period and includes a cost recovery factor of $2.19 per month per residential retail customer and $2.39 to $5.15 per month for non-residential retail customers. Intermediate Holding accounts for the difference between the surcharge billings for advanced metering facilities and the allowed revenues under the surcharge provisions, which are based on expenditures and an allowed return, as a regulatory asset or liability. Such differences arise principally as a result of timing of expenditures. As indicated in the table above, the regulatory liability at September 30, 2009 totaled $51 million.

See Note 8 for additional information regarding nuclear decommissioning cost recovery.

## 3. BORROWINGS UNDER CREDIT FACILITIES

At September 30, 2009, Oncor had a $2.0 billion secured revolving credit facility, expiring October 10, 2013, to be used for its working capital and general corporate purposes, including issuances of commercial paper and letters of credit. Increases in the commitments under the facility may be requested in any amount up to $500 million, subject to the satisfaction of certain conditions. Amounts borrowed under the facility, once repaid, can be borrowed again from time to time. Borrowings are classified as short-term on the balance sheet.

At September 30, 2009, Oncor had outstanding borrowings under the credit facility totaling $537 million with an interest rate of 0.60% at the end of the period. At December 31, 2008, outstanding borrowings under the credit facility totaled $337 million with an interest rate of 1.98% at the end of the period. All outstanding borrowings at September 30, 2009 bear interest at LIBOR plus 0.350%, and a facility fee is payable (currently at a rate per annum equal to 0.125%) on the commitments under the facility, each based on Oncor's current credit ratings. The interest rate and facility fee per annum declined in June 2009 from LIBOR plus 0.425% and 0.150%, respectively, due to a two notch upgrade in Oncor's credit ratings by Moody's.

Availability under the credit facility as of September 30, 2009 was $1.341 billion. This availability excludes $122 million of commitments from a subsidiary of Lehman Brothers Holding Inc. (such subsidiary, Lehman) that has filed for bankruptcy under Chapter 11 of the US Bankruptcy Code. Availability under the credit facility as of December 31, 2008 was $1.508 billion, which excluded $155 million of commitments from Lehman. See Note 10 to the 2008 Audited Financial Statements for additional information.

Confidential

EFIHMW00246294

**PX 014**
**Page 576 of 1116**

## 4. LONG-TERM DEBT

At September 30, 2009 and December 31, 2008, long-term debt consisted of the following:

| | September 30, 2009 | December 31, 2008 |
|---|---|---|
| Oncor (a): | | |
| 6.375% Fixed Senior Notes due May 1, 2012 | $ 700 | $ 700 |
| 5.950% Fixed Senior Notes due September 1, 2013 | 650 | 650 |
| 6.375% Fixed Senior Notes due January 15, 2015 | 500 | 500 |
| 6.800% Fixed Senior Notes due September 1, 2018 | 550 | 550 |
| 7.000% Fixed Debentures due September 1, 2022 | 800 | 800 |
| 7.000% Fixed Senior Notes due May 1, 2032 | 500 | 500 |
| 7.250% Fixed Senior Notes due January 15, 2033 | 350 | 350 |
| 7.500% Fixed Senior Notes due September 1, 2038 | 300 | 300 |
| Unamortized discount | (15) | (16) |
| Total Oncor | 4,335 | 4,334 |
| Oncor Electric Delivery Transition Bond Company LLC (b): | | |
| 4.030% Fixed Series 2003 Bonds due in semiannual installments through February 15, 2010 | 13 | 54 |
| 4.950% Fixed Series 2003 Bonds due in semiannual installments through February 15, 2013 | 130 | 130 |
| 5.420% Fixed Series 2003 Bonds due in semiannual installments through August 15, 2015 | 145 | 145 |
| 3.520% Fixed Series 2004 Bonds due in semiannual installments through November 15, 2009 | 10 | 39 |
| 4.810% Fixed Series 2004 Bonds due in semiannual installments through November 15, 2012 | 221 | 221 |
| 5.290% Fixed Series 2004 Bonds due in semiannual installments through May 15, 2016 | 290 | 290 |
| Total Oncor Electric Delivery Transition Bond Company LLC | 809 | 879 |
| Unamortized fair value discount related to transition bonds (c) | (7) | (9) |
| Intermediate Holding: | | |
| 10.875% EFH Corp. Fixed Senior Notes due November 1, 2017 (d) | 1,000 | 1,000 |
| 11.25/12.00% EFH Corp. Senior Toggle Notes due November 1, 2017 (d) | 1,325 | 1,250 |
| Total Intermediate Holding | 2,325 | 2,250 |
| Total consolidated | 7,462 | 7,454 |
| Less amount due currently | (106) | (103) |
| Total long-term debt | $7,356 | $7,351 |

(a) Secured with first priority lien on certain transmission and distribution assets equally and ratably with the credit facility. If the lien is terminated at Oncor's option upon the termination of the current credit facility, the notes will cease to be secured obligations and will become senior unsecured general obligations. See Note 11 to the 2008 Audited Financial Statements for additional information.

(b) The transition bonds are nonrecourse to Oncor and were issued to securitize a regulatory asset.

(c) The transition bonds, which secured regulatory assets not earning a return, were fair valued as of October 10, 2007 as a result of purchase accounting.

(d) Represents 50% of the principal amount of EFH Corp. debt guaranteed by Intermediate Holding (pushed-down debt) per the discussion below under "Push Down of EFH Corp. Notes."

Confidential

EFIHMW00246295

Oncor does not bear any liability for Intermediate Holding's debt obligations, including, but not limited to, the EFH Corp. Notes (as defined below), and vice versa.

***Oncor Debt Related Activity in 2009***

Repayments of long-term debt in 2009 totaled $70 million and represent transition bond principal payments at scheduled maturity dates.

***Push Down of EFH Corp. Notes***

The EFH Corp. Notes described immediately below are fully and unconditionally guaranteed on a joint and several basis by EFC Holdings and Intermediate Holding. In accordance with SEC Staff Accounting Bulletin (SAB) Topic 5-J, Intermediate Holding reflects $2.325 billion principal amount of the EFH Corp. Notes on its balance sheet and the related interest expense in its income statement. The amount reflected on Intermediate Holding's balance sheet, which represents 50% of the EFH Corp. debt guaranteed by Intermediate Holding, was calculated based upon the relative equity investment of EFC Holdings and Intermediate Holding in their respective operating subsidiaries at the time of the Merger. Because payment of principal and interest on the notes is the responsibility of EFH Corp., Intermediate Holding records the settlement of such amounts as noncash capital contributions from EFH Corp. The income tax benefit related to interest expense associated with the pushed-down debt is reported in nonoperating income tax benefit in the statement of consolidated income. See Note 11 to Financial Statements in the 2008 Audited Financial Statements for more information on the notes and guarantees.

Borrowings under EFH Corp.'s $2.0 billion principal amount 10.875% Senior Notes due November 1, 2017 (Cash-Pay Notes) bear interest semiannually in arrears on May 1 and November 1 of each year at a fixed rate of 10.875% per annum. Borrowings under EFH Corp.'s $2.65 billion principal amount 11.250%/12.000% Senior Toggle Notes due November 1, 2017 (Toggle Notes and collectively with the Cash-Pay Notes, the EFH Corp. Notes) bear interest semiannually in arrears on May 1 and November 1 of each year at a fixed rate of 11.250% per annum for cash interest and at a fixed rate of 12.000% per annum for payment-in-kind (PIK) interest. For any interest period until November 1, 2012, EFH Corp. may elect to pay interest on the Toggle Notes, at EFH Corp.'s option (i) entirely in cash; (ii) by increasing the principal amount of the notes or by issuing new Toggle Notes; or (iii) 50% in cash and 50% in PIK interest. Once EFH Corp. makes a PIK election, the election is valid for each succeeding interest payment period until EFH Corp. revokes the election.

EFH Corp. made its May 2009 interest payment and will make its November 2009 and May 2010 interest payments by using the PIK feature of the Toggle Notes. During the applicable interest periods, the interest rate on the Toggle Notes is increased from 11.25% to 12.00%. As a result of the PIK elections, EFH Corp. increased the aggregate principal amount of the Toggle Notes by $150 million on May 1, 2009 and will further increase the aggregate principal amount of the Toggle Notes by $159 million on November 1, 2009 and $169 million on May 1, 2010. The elections will increase the expected annual cash interest expense by approximately $54 million (50% of which relates to Intermediate Holding due to push down), constituting the additional cash interest that will be payable with respect to the $478 million of additional Toggle Notes. These amounts may be affected by the debt exchange offer discussed below.

EFH Corp. may redeem the EFH Corp. Notes, in whole or in part, at any time on or after November 1, 2012, at specified redemption prices, plus accrued and unpaid interest, if any. In addition, before November 1, 2010, EFH Corp. may redeem, with the net cash proceeds of certain equity offerings, up to 35% of the aggregate principal amount of the Toggle Notes from time to time at a redemption price of 110.875% of the aggregate principal amount of the Cash-Pay Notes, plus accrued and unpaid interest, if any, or 111.250% of aggregate principal amount of the Toggle Notes, plus accrued and unpaid interest, if any. EFH Corp. may also redeem the EFH Corp. Notes at any time prior to November 1, 2012 at a price equal to 100% of their principal amount, plus accrued and unpaid interest and a "make-whole" premium. Upon the occurrence of a change in control of EFH Corp., EFH Corp. must offer to repurchase the EFH Corp. Notes at 101% of their principal amount, plus accrued and unpaid interest, if any.

F-218

EFIHMW00246296

PX 014
Page 578 of 1116

*Debt Exchange Offers*

In October 2009, EFH Corp., Intermediate Holding and EFIH Finance, a wholly-owned subsidiary of Intermediate Holding, (collectively, the Offerors) commenced offers to exchange certain EFH Corp. outstanding debt securities, consisting of the EFH Corp. Notes and EFH Corp.'s Series P, Q and R notes (collectively, the EFH Corp. Securities), and the TCEH Cash-Pay Notes for up to $3.0 billion of new 9.75% senior secured notes due 2019 (new senior secured notes) to be issued by EFH Corp. ($1.35 billion) and Intermediate Holding and EFIH Finance ($1.65 billion), upon the terms and subject to certain conditions set forth in the prospectus relating to the exchange offers (Prospectus) and the related Consent and Letter of Transmittal. The purpose of the exchange offers is to reduce the outstanding principal amount and extend the weighted average maturity of the long-term debt of EFH Corp. and its subsidiaries. Under the terms of the exchange offers, the maximum principal amount of aggregate EFH Corp. Securities and TCEH Cash-Pay Notes that could be exchanged is approximately $4.9 billion.

Concurrent with the exchange offers, and upon the terms and subject to the conditions more fully described in the Prospectus and the related Consent and Letter of Transmittal, EFH Corp. is soliciting consents from holders of the EFH Corp. Securities to certain proposed amendments. The proposed amendments would eliminate substantially all of the restrictive covenants in the indentures governing the EFH Corp. Securities, eliminate certain events of default, modify covenants regarding mergers and consolidations, and modify or eliminate certain other provisions.

The exchange offers are not conditioned on any minimum principal amount of EFH Corp. Securities or TCEH Cash-Pay Notes being tendered or the issuance of a minimum principal amount of new senior secured notes or the receipt of requisite consents to adopt any of the proposed amendments to the indentures governing the EFH Corp. Securities. However, the exchange offers are subject to certain other conditions, including the conditions (which conditions cannot be waived) that the Registration Statement (as defined below), of which the Prospectus forms a part, has been declared effective by the SEC and that each series of the new senior secured notes to be issued in the exchange offers are approved for listing on the New York Stock Exchange, subject to notice of issuance, each as more fully described in the Prospectus. Subject to applicable law, the Offerors have the right to amend any of the exchange offers or the consent solicitations at any time and for any reason and to terminate or withdraw any of the exchange offers and consent solicitations if any of the conditions described in the Prospectus are not satisfied.

The Offerors filed a registration statement on Form S-4 (Registration Statement) relating to the exchange offers and the consent solicitations with the SEC on October 5, 2009 as amended on October 23, 2009. The Registration Statement has not yet become effective and the new senior secured notes may not be issued, nor may the exchange offers be completed, until such time as the Registration Statement has been declared effective by the SEC and is not subject to a stop order or any proceedings for that purpose. There is no assurance that the exchange offers and consent solicitations will be completed or that they will be completed on the terms and conditions described in the Prospectus.

The exchange offers may result in (i) a reduction of the amount of debt guaranteed by Intermediate Holding and the amount of debt pushed down to Intermediate Holding from EFH Corp. related to EFH Corp. Notes exchanged and (ii) an increase in the amount of debt guaranteed and the amount pushed down to Intermediate Holding from EFH Corp. related to any new senior secured notes issued by EFH Corp.

*Fair Value of Long-Term Debt*

The estimated fair value of long-term debt (including current maturities) totaled $7.477 billion at September 30, 2009 and $6.287 billion at December 31, 2008, and the carrying amount totaled $7.462 billion and $7.454 billion, respectively. The fair value is estimated at the lesser of either the call price or the market value as determined by quoted market prices.

F-219

EFIHMW00246297

## 5. COMMITMENTS AND CONTINGENCIES

### Legal Proceedings

Intermediate Holding is involved in various legal and administrative proceedings in the normal course of business, the ultimate resolution of which, in the opinion of management, should not have a material effect upon its financial position, results of operations or cash flows.

### Guarantees

Intermediate Holding and its subsidiaries have entered into contracts that contain guarantees to outside parties that could require performance or payment under certain conditions.

Oncor is the lessee under various operating leases that obligate it to guarantee the residual values of the leased assets. At September 30, 2009, both the aggregate maximum amount of residual values guaranteed and the estimated residual recoveries totaled approximately $10 million. These leased assets consist primarily of vehicles used in distribution activities. The average life of the residual value guarantees under the lease portfolio is approximately one year.

See Note 4 for discussion of Intermediate Holding's guarantee of certain EFH Corp. debt.

## 6. MEMBERSHIP INTERESTS

### Cash Distributions

During 2009, Intermediate Holding's board of directors declared and Intermediate Holding paid the following cash distributions to EFH Corp.:

| Declaration Date | Payment Date | Amount Paid |
|---|---|---|
| August 18, 2009 . . . . . . . . . . . . . . . . . . . . . . . . | August 19, 2009 | $59 |
| May 19, 2009 . . . . . . . . . . . . . . . . . . . . . . . . | May 20, 2009 | $40 |
| February 18, 2009 . . . . . . . . . . . . . . . . . . . . . . | March 3, 2009 | $18 |

While there are no direct restrictions on Intermediate Holding's ability to distribute its net income that are currently material, substantially all of Intermediate Holding's net income is derived from Oncor. The boards of directors of each of Oncor and Oncor Holdings, which are composed of a majority of independent directors, can withhold distributions to the extent the boards determine that it is necessary to retain such amounts to meet expected future requirements of Oncor and/or Oncor Holdings. For the period beginning October 11, 2007 and ending December 31, 2012, distributions paid by Oncor (other than distributions of the proceeds of any issuance of limited liability company units) are limited by the Limited Liability Company Agreement to an amount not to exceed Oncor's net cumulative income determined in accordance with GAAP, as adjusted by applicable orders of the PUCT. Such adjustments include deducting the $72 million ($46 million after tax) one-time refund to customers in September 2008 and deducting funds spent as part of the $100 million commitment for additional demand-side management or other energy efficiency initiatives (see Note 4 to the 2008 Audited Financial Statements) of which $13 million ($9 million after tax) has been spent through September 30, 2009, neither of which impacted net income due to purchase accounting, and removing the effect of the $860 million goodwill impairment charge from fourth quarter 2008 net income available for distribution. The refund and goodwill impairment charge are described in the 2008 Audited Financial Statements. Distributions are further limited by Oncor's required regulatory capital structure, as determined by the PUCT, to be at or below the assumed debt-to-equity ratio established periodically by the PUCT for ratemaking purposes, which is currently set at 60% debt to 40% equity. At September 30, 2009, no material amount of net income was restricted from being used to make distributions on membership interests.

F-220

EFIHMW00246298

*Noncontrolling Interests*

In November 2008, Oncor sold equity interests to Texas Transmission. Oncor also indirectly sold equity interests to certain members of its board of directors and its management team. Accordingly, after giving effect to all equity issuances, as of September 30, 2009, Oncor's ownership was as follows: 80.03% held indirectly by Intermediate Holding, 0.22% held indirectly by Oncor's management and board of directors and 19.75% held by Texas Transmission.

*Membership Interests*

The following table presents the changes to membership interests during the nine months ended September 30, 2009:

| | Capital Account | Accumulated Other Comprehensive Loss | Noncontrolling Interests | Total Membership Interests |
|---|---|---|---|---|
| Balance at December 31, 2008 ......................... | $3,212 | $ (2) | $1,355 | $4,565 |
| Net income ....................................... | 80 | — | 54 | 134 |
| Distributions ..................................... | (117) | — | — | (117) |
| Distributions to noncontrolling interests ............... | — | — | (32) | (32) |
| Effects of debt push-down from EFH Corp. (Note 4) ..... | 12 | — | — | 12 |
| Capital contributions (a) ........................... | 22 | — | — | 22 |
| Other ........................................... | — | — | 1 | 1 |
| Balance at September 30, 2009 ......................... | $3,209 | $ (2) | $1,378 | $4,585 |

(a)   Reflects noncash settlement of certain income taxes payable arising as a result of the sale of noncontrolling interests in Oncor.

## 7. PENSION AND OTHER POSTRETIREMENT EMPLOYEE BENEFITS (OPEB) COSTS

Subsidiaries of Intermediate Holding are participating employers in the EFH Retirement Plan, a defined benefit pension plan sponsored by EFH Corp., and also participate with EFH Corp. and certain other affiliated subsidiaries of EFH Corp. to offer certain health care and life insurance benefits to eligible employees and their eligible dependents upon the retirement of such employees. The net allocated pension and OPEB costs applicable to Intermediate Holding for the three and nine months ended September 30, 2009 and 2008 are comprised of the following:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2009 | 2008 | 2009 | 2008 |
| Amounts recognized as expense ................................... | $ 5 | $ 4 | $14 | $13 |
| Amounts deferred principally as a regulatory asset or property ............ | 18 | 10 | 51 | 32 |
| Net pension and OPEB costs ................................. | $23 | $14 | $65 | $45 |

The discount rates reflected in net pension and OPEB costs in 2009 are 6.90% and 6.85%, respectively. The expected rates of return on pension and OPEB plan assets reflected in the 2009 cost amounts are 8.25% and 7.64%, respectively.

Subsidiaries of Intermediate Holding made contributions to EFH Corp.'s pension and OPEB plans of $41 million and $13 million, respectively, during the nine months ended September 30, 2009, and expect to make additional contributions of $16 million and $4 million, respectively, in the remainder of 2009.

## 8. RELATED—PARTY TRANSACTIONS

The following represents Intermediate Holding's significant related-party transactions:

*   Oncor records revenue from TCEH, principally for electricity delivery fees, which totaled $308 million and $290 million for the three months ended September 30, 2009 and 2008, respectively, and $783 million and $775 million for the nine months ended September 30, 2009 and 2008, respectively.

F-221

EFIHMW00246299

- Oncor records interest income from TCEH with respect to generation-related regulatory assets, which have been securitized through the issuance of transition bonds by Oncor's bankruptcy-remote financing subsidiary. The interest income serves to offset interest expense on the transition bonds. This interest income totaled $10 million and $11 million for the three months ended September 30, 2009 and 2008, respectively, and $32 million and $35 million for the nine months ended September 30, 2009 and 2008, respectively.

- Incremental amounts payable related to income taxes as a result of delivery fee surcharges to customers related to transition bonds are reimbursed by TCEH. Intermediate Holding's financial statements reflect a note receivable from TCEH to Oncor of $263 million ($36 million reported as current in trade accounts and other receivables from affiliates) at September 30, 2009 and $289 million ($35 million reported as current in trade accounts and other receivables from affiliates) at December 31, 2008 related to these income taxes.

- An EFH Corp. subsidiary charges Oncor for financial and certain other administrative services at cost. These costs, which are reported in operation and maintenance expenses, totaled $6 million and $5 million for the three months ended September 30, 2009 and 2008, respectively, and $19 million and $17 million for the nine months ended September 30, 2009 and 2008, respectively.

- Under Texas regulatory provisions, the trust fund for decommissioning the Comanche Peak nuclear generation facility (reported on TCEH's balance sheet) is funded by a delivery fee surcharge collected from REPs by Oncor and remitted to TCEH. These trust fund assets are established with the intent to be sufficient to fund the estimated decommissioning liability (also reported on TCEH's balance sheet). Income and expenses associated with the trust fund and the decommissioning liability recorded by TCEH are offset by a net change in the Oncor and TCEH intercompany receivable/payable, which in turn results in a change in Oncor's reported net regulatory asset/liability. The regulatory asset of $90 million and $127 million at September 30, 2009 and December 31, 2008, respectively, represents the excess of the net decommissioning liability over the trust fund balance.

- Oncor has a 19.5% limited partnership interest, with carrying values of $4 million and $5 million at September 30, 2009 and December 31, 2008, respectively, in an EFH Corp. subsidiary holding principally software-related assets. Equity losses related to this interest are reported in other deductions and totaled $1 million for both the three months ended September 30, 2009 and 2008 and $1 million and $3 million for the nine months ended September 30, 2009 and 2008, respectively. These losses primarily represent amortization of software assets held by the subsidiary.

- EFH Corp. files a consolidated federal income tax return and allocates income tax liabilities to Intermediate Holding under a tax sharing agreement substantially as if Intermediate Holding was filing its own income tax returns. Intermediate Holding's results are included in the consolidated Texas state margin tax return filed by EFH Corp. Intermediate Holding's amount payable to EFH Corp. related to income taxes totaled $3 million at September 30, 2009, and amount receivable from EFH Corp. related to income taxes, primarily due to timing of payments, totaled $22 million at December 31, 2008. Income tax payments in the nine months ended September 30, 2009 totaled $19 million to EFH Corp., and Oncor made federal income tax-related payments totaling $9 million to noncontrolling interests.

- Oncor held cash collateral of $15 million on both September 30, 2009 and December 31, 2008 provided by TCEH related to interconnection agreements for three generation units being developed by TCEH. The collateral is reported in the balance sheet in other current liabilities.

- Certain transmission and distribution utilities in Texas have tariffs in place to assure adequate creditworthiness of any REP to support the REP's obligation to collect securitization bond-related (transition) charges on behalf of the utility. Under these tariffs, as a result of TCEH's credit rating being below investment grade, TCEH is required to post collateral support in an amount equal to estimated transition charges over specified time periods. Accordingly, as of September 30, 2009 and December 31, 2008, TCEH had posted letters of credit in the amounts of $16 million and $13 million, respectively, for Oncor's benefit.

F-222

- At the closing of the Merger, Oncor entered into its current $2 billion revolving credit facility with a syndicate of financial institutions and other lenders. The syndicate includes affiliates of GS Capital Partners. Affiliates of GS Capital Partners (a member of the Sponsor Group) have from time to time engaged in commercial banking transactions with Intermediate Holding or its subsidiaries in the normal course of business.

- Affiliates of the Sponsor Group are participating in exchange offers announced in October 2009 by EFH Corp., Intermediate Holding and EFIH Finance to exchange new senior secured notes for the EFH Corp. Securities and the TCEH Cash-Pay Notes. Goldman, Sachs & Co. and KKR Capital Markets LLC are acting as dealer managers and TPG Capital, L.P. is serving as an advisor in the exchange offers. (See Note 4 for additional information). These affiliates will be compensated for their services in accordance with the terms of the exchange offer agreements.

- Affiliates of the Sponsor Group have, and may, sell, acquire or participate in the offerings of debt or debt securities issued by Intermediate Holding or its subsidiaries in open market transactions or through loan syndications.

See Notes 4, 6 and 7 for information regarding guarantees and push-down of certain EFH Corp. debt, distributions to EFH Corp., capital contributions and the allocation of EFH Corp.'s pension and OPEB costs to Intermediate Holding, respectively.

## 9. SUPPLEMENTARY FINANCIAL INFORMATION

### *Other Income and Deductions*

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2009 | 2008 | 2009 | 2008 |
| Other income: | | | | |
| Accretion of adjustment (discount) of regulatory assets resulting from purchase accounting | $ 10 | $ 11 | $ 30 | $33 |
| Net gain on sale of other properties and investments | — | 1 | — | 1 |
| Total other income | $ 10 | $ 12 | $ 30 | $34 |
| Other deductions: | | | | |
| Professional fees | $ 2 | $ 1 | $ 7 | $ 4 |
| Costs related to 2006 cities rate settlement | 1 | — | 2 | 13 |
| Other | 2 | 3 | 5 | 4 |
| Total other deductions | $ 5 | $ 4 | $ 14 | $21 |

### *Major Customers*

Distribution revenues from TCEH represented 40% of total operating revenues for both the three months ended September 30, 2009 and 2008, and 38% and 39% for the nine months ended September 30, 2009 and 2008, respectively. Revenues from subsidiaries of one nonaffiliated REP collectively represented 13% and 14% of total operating revenues for the three months ended September 30, 2009 and 2008, respectively, and 14% and 15% for the nine months ended September 30, 2009 and 2008, respectively. No other customer represented 10% or more of total operating revenues.

F-223

Confidential

*Interest Expense and Related Charges*

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2009 | 2008 | 2009 | 2008 |
| Interest .......................................... | $152 | $141 | $454 | $413 |
| Amortization of fair value debt discounts resulting from purchase accounting .......................................... | — | 1 | 2 | 3 |
| Amortization of debt issuance costs and discounts .................. | 4 | 4 | 12 | 12 |
| Allowance for funds used during construction—capitalized interest portion .......................................... | (1) | (2) | (3) | (4) |
| Total interest expense and related charges ..................... | $155 | $144 | $465 | $424 |

*Restricted Cash*

All restricted cash amounts reported on the balance sheet relate to the securitization (transition) bonds.

*Trade Accounts Receivable*

| | September 30, 2009 | December 31, 2008 |
| --- | --- | --- |
| Gross trade accounts receivable ................................. | $ 427 | $ 359 |
| Trade accounts receivable from TCEH ........................... | (172) | (135) |
| Allowance for uncollectible accounts ............................ | (2) | (7) |
| Trade accounts receivable from nonaffiliates—net ............. | $ 253 | $ 217 |

Gross trade accounts receivable at September 30, 2009 and December 31, 2008 included unbilled revenues of $138 million and $140 million, respectively.

In April 2009, the PUCT finalized a new rule relating to the Certification of Retail Electric Providers. Under the new rule, write-offs of uncollectible amounts owed by nonaffiliated REPs are deferred as a regulatory asset. Accordingly, Intermediate Holding recognized a $3 million one-time reversal of bad debt expense in the three months ended June 30, 2009 representing bad debt reserves previously recognized for nonaffiliated REP accounts receivable.

*Investments*

| | September 30, 2009 | December 31, 2008 |
| --- | --- | --- |
| Assets related to employee benefit plans, including employee savings programs, net of distributions ................................. | $66 | $65 |
| Investments in unconsolidated affiliates ........................... | 4 | 5 |
| Land ........................................... | 2 | 2 |
| Total investments ........................................ | $72 | $72 |

*Property, Plant and Equipment*

At September 30, 2009 and December 31, 2008, property, plant and equipment of $9.1 billion and $8.6 billion, respectively, is stated net of accumulated depreciation and amortization of $4.3 and $4.2 billion, respectively.

F-224

Confidential

*Intangible Assets*

Intangible assets other than goodwill reported in the balance sheet are comprised of the following:

|  | As of September 30, 2009 | | | As of December 31, 2008 | | |
|---|---|---|---|---|---|---|
|  | Gross Carrying Amount | Accumulated Amortization | Net | Gross Carrying Amount | Accumulated Amortization | Net |
| Intangible assets subject to amortization included in property, plant and equipment: |  |  |  |  |  |  |
| Land easements .................... | $184 | $ 71 | $113 | $184 | $ 69 | $115 |
| Capitalized software .................. | 203 | 99 | 104 | 145 | 80 | 65 |
| Total ........................... | $387 | $170 | $217 | $329 | $149 | $180 |

Aggregate amortization expense for intangible assets totaled $9 million and $5 million for the three months ended September 30, 2009 and 2008, respectively, and $21 million and $14 million for the nine months ended September 30, 2009 and 2008, respectively. The estimated aggregate amortization expense for each of the five succeeding fiscal years from December 31, 2008 is as follows:

| Year | Amortization Expense |
|---|---|
| 2009 ......................................... | $29 |
| 2010 ......................................... | 25 |
| 2011 ......................................... | 22 |
| 2012 ......................................... | 19 |
| 2013 ......................................... | 13 |

At September 30, 2009 and December 31, 2008, goodwill of $4.1 billion was reported on the balance sheet. None of this goodwill balance is being deducted for tax purposes. This balance is net of the $860 million goodwill impairment charge recorded in the fourth quarter of 2008 (see Note 3 to the 2008 Audited Financial Statements), which is the only goodwill impairment recorded since the Merger.

*Exit Liabilities*

As part of purchase accounting, Oncor accrued $16 million in costs expected to be incurred related to the termination and transition of outsourcing arrangements. Oncor incurred $1 million of the exit liabilities in the nine months ended September 30, 2009, and the remaining accrual is expected to be settled no later than June 30, 2010, the targeted date of completion of transition of outsourced activities.

*Other Noncurrent Liabilities and Deferred Credits*

The balance of other noncurrent liabilities and deferred credits consists of the following:

|  | September 30, 2009 | December 31, 2008 |
|---|---|---|
| Retirement plan and other employee benefits ...................... | $1,118 | $1,115 |
| Liabilities related to subsidiary tax sharing agreement ............... | 314 | 299 |
| Uncertain tax positions (including accrued interest) ................ | 88 | 144 |
| Nuclear decommissioning cost under-recovery (a) ................. | 90 | 127 |
| Other ................................................. | 43 | 36 |
| Total other noncurrent liabilities and deferred credits ........... | $1,653 | $1,721 |

(a) Represents intercompany payable to TCEH offset in Oncor's net reported regulatory asset/liability. See Note 8.

F-225

EFIHMW00246303

PX 014
Page 585 of 1116

Intermediate Holding does not expect the total amount of liabilities recorded related to uncertain tax positions to significantly increase or decrease within the next 12 months. As of September 30, 2009, the federal income tax benefit on the interest accrued on uncertain tax positions is recorded as accumulated deferred income taxes.

*Liabilities Related to Subsidiary Tax Sharing Agreement*—Amount represents the noncontrolling interests' portion of the previously recorded net deferred tax liabilities of Oncor. Upon the sale of noncontrolling interests in Oncor (see Note 6), Oncor became a partnership for US federal income tax purposes, and the temporary differences which gave rise to the deferred taxes will, over time, become taxable to the noncontrolling interests. Under a tax sharing agreement among Oncor and its equity holders, Oncor reimburses its equity holders for federal income taxes as the partnership earnings become taxable to such holders. Accordingly, as the temporary differences become taxable, the equity holders will be reimbursed by Oncor. In the unlikely event such amounts are not reimbursed under the tax sharing agreement, it is probable they would be refunded to rate payers. The net increase in the liability for the nine months ended September 30, 2009 totaling $15 million reflected changes in temporary differences.

### Supplemental Cash Flow Information

|  | Nine Months Ended September 30, | |
| --- | --- | --- |
|  | 2009 | 2008 |
| Cash payments: | | |
|     Interest paid | $283 | $227 |
|     Capitalized interest | (3) | (4) |
|         Interest (net of amounts capitalized) | 280 | 223 |
|     Income taxes | 28 | 76 |
| Noncash investing and financing activities: | | |
|     Effect of Parent's payment of interest and issuance of toggle notes as consideration for cash interest, net of tax, on pushed-down debt | 87 | 126 |
|     Noncash construction expenditures (a) | 56 | 24 |
|     Noncash capital contribution related to settlement of certain income taxes payable (see Note 6) | 22 | —— |

(a)   Represents end-of-period accruals.

F-226

EFIHMW00246304

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors and Member of
Energy Future Intermediate Holding Company LLC
Dallas, Texas

We have reviewed the accompanying condensed consolidated balance sheet of Energy Future Intermediate Holding Company LLC and subsidiaries ("Intermediate Holding") as of September 30, 2009, and the related condensed statements of consolidated income and comprehensive income for the three-month and nine-month periods ended September 30, 2009 and 2008, and of cash flows for the nine-month periods ended September 30, 2009 and 2008. These interim financial statements are the responsibility of Intermediate Holding's management.

We conducted our reviews in accordance with the standards of the Public Company Accounting Oversight Board (United States). A review of interim financial information consists principally of applying analytical procedures and making inquiries of persons responsible for financial and accounting matters. It is substantially less in scope than an audit conducted in accordance with the standards of the Public Company Accounting Oversight Board (United States), the objective of which is the expression of an opinion regarding the financial statements taken as a whole. Accordingly, we do not express such an opinion.

Based on our reviews, we are not aware of any material modifications that should be made to such condensed consolidated interim financial statements for them to be in conformity with accounting principles generally accepted in the United States of America.

We have previously audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheet of Energy Future Intermediate Holding Company LLC and subsidiaries as of December 31, 2008, and the related statements of consolidated income (loss), comprehensive income (loss), cash flows, and membership interests for the year then ended (not presented herein); and in our report dated September 2, 2009 (which report includes an explanatory paragraph related to (1) Intermediate Holding being a wholly owned subsidiary of Energy Future Holdings Corp., which was merged with Texas Energy Future Merger Sub Corp on October 10, 2007 and (2) the retrospective adoption of the provisions of accounting guidance related to noncontrolling interests in consolidated financial statements), we expressed an unqualified opinion on those consolidated financial statements. In our opinion, the information set forth in the accompanying condensed consolidated balance sheet as of December 31, 2008 is fairly stated, in all material respects, in relation to the consolidated balance sheet from which it has been derived.

/s/ Deloitte & Touche LLP

Dallas, Texas
October 29, 2009

F-227

EFIHMW00246305

## GLOSSARY

When the following terms and abbreviations appear in the text of this report, they have the meanings indicated below.

| | |
|---|---|
| **1999 Restructuring Legislation** . . . | Texas Electric Choice Plan, the legislation that restructured the electric utility industry in Texas to provide for retail competition |
| **2007 Annual Report** . . . . . . . . . . . | EFC Holdings' Annual Financial Statements for the three years ended December 31, 2007, 2006 and 2005 included in the Registration Statement on Form S-4 (File Number 333-153700) |
| **Adjusted EBITDA** . . . . . . . . . . . . . | Adjusted EBITDA means EBITDA adjusted to exclude non-cash items, unusual items and other adjustments allowable under certain debt arrangements of TCEH and EFH Corp. Adjusted EBITDA and EBITDA are not recognized terms under GAAP and, thus, are non-GAAP financial measures. EFC Holdings is providing TCEH's and EFH Corp.'s Adjusted EBITDA in this Form 10-K (see reconciliation in Exhibit 99(b) and 99(c)) solely because of the important role that Adjusted EBITDA plays in respect of the certain covenants contained in the debt arrangements. EFC Holdings does not intend for Adjusted EBITDA (or EBITDA) to be an alternative to net income as a measure of operating performance or an alternative to cash flows from operating activities as a measure of liquidity or an alternative to any other measure of financial performance presented in accordance with GAAP. Additionally, EFC Holdings does not intend for Adjusted EBITDA (or EBITDA) to be used as a measure of free cash flow available for management's discretionary use, as the measure excludes certain cash requirements such as interest payments, tax payments and other debt service requirements. Because not all companies use identical calculations, EFC Holdings' presentation of Adjusted EBITDA (and EBITDA) may not be comparable to similarly titled measures of other companies. |
| **Ancillary services** . . . . . . . . . . . . . | Refers to services necessary to support the transmission of energy and maintain reliable operations for the entire transmission system. |
| **CAIR** . . . . . . . . . . . . . . . . . . . . . . | Clean Air Interstate Rule |
| **Capgemini** . . . . . . . . . . . . . . . . . . | Capgemini Energy LP, a subsidiary of Cap Gemini North America Inc. that provides business support services to EFC Holdings and its subsidiaries |
| **CO$_2$** . . . . . . . . . . . . . . . . . . . . . . . . | carbon dioxide |
| **DOE** . . . . . . . . . . . . . . . . . . . . . . . | US Department of Energy |
| **EBITDA** . . . . . . . . . . . . . . . . . . . . | Refers to earnings (net income) before interest expense, income taxes, depreciation and amortization. See the definition of Adjusted EBITDA above. |

F-228

EFIHMW00246306

| | |
|---|---|
| **EFC Holdings** . . . . . . . . . . . . . . . . . | Refers to Energy Future Competitive Holdings Company, a direct, wholly-owned subsidiary of EFH Corp. and the direct parent of TCEH, and/or its consolidated subsidiaries, depending on context. |
| **EFH Corp.** . . . . . . . . . . . . . . . . . . . . | Refers to Energy Future Holdings Corp., a holding company, and/or its subsidiaries, depending on context. Its major subsidiaries include TCEH and Oncor. |
| **EPA** . . . . . . . . . . . . . . . . . . . . . . . . . | US Environmental Protection Agency |
| **EPC** . . . . . . . . . . . . . . . . . . . . . . . . . | engineering, procurement and construction |
| **ERCOT** . . . . . . . . . . . . . . . . . . . . . . | Electric Reliability Council of Texas, the independent system operator and the regional coordinator of various electricity systems within Texas |
| **ERISA** . . . . . . . . . . . . . . . . . . . . . . . | Employee Retirement Income Security Act of 1974, as amended |
| **FASB** . . . . . . . . . . . . . . . . . . . . . . . | Financial Accounting Standards Board, the designated organization in the private sector for establishing standards for financial accounting and reporting |
| **FERC** . . . . . . . . . . . . . . . . . . . . . . . | US Federal Energy Regulatory Commission |
| **FIN** . . . . . . . . . . . . . . . . . . . . . . . . . | Financial Accounting Standards Board Interpretation |
| **FIN 39-1** . . . . . . . . . . . . . . . . . . . . . | FIN No. 39, "Offsetting of Amounts Related to Certain Contracts—an Interpretation of APB Opinion No. 10 and FASB Statement No. 105" |
| **FIN 46R** . . . . . . . . . . . . . . . . . . . . . | FIN No. 46R (Revised 2003), "Consolidation of Variable Interest Entities" |
| **FIN 48** . . . . . . . . . . . . . . . . . . . . . . . | FASB Interpretation No. 48 (As Amended), "Accounting for Uncertainty in Income Taxes" |
| **Fitch** . . . . . . . . . . . . . . . . . . . . . . . . | Fitch Ratings, Ltd. (a credit rating agency) |
| **FSP** . . . . . . . . . . . . . . . . . . . . . . . . . | FASB Staff Position |
| **FSP FIN 39-1** . . . . . . . . . . . . . . . . . | FSP FIN No. 39-1, "Amendment of FASB Interpretation No. 39" |
| **FSP FIN 48-1** . . . . . . . . . . . . . . . . . | FSP FIN No. 48-1, "Definition of Settlement in FASB Interpretation No. 48" |
| **FSP SFAS 132(R)-1** . . . . . . . . . . . . . | FSP SFAS No. 132(R)-1, "Employers' Disclosures about Postretirement Benefit Plan Assets" |
| **FSP SFAS 140-4 and FIN 46(R)-8** . . . | FSP SFAS No. 140-4 and FIN 46(R)-8, "Disclosures by Public Entities (Enterprises) about Transfers of Financial Assets and Interest in Variable Interest Entities" |
| **FSP SFAS 157-3** . . . . . . . . . . . . . . . | FSP SFAS No. 157-3, "Determining the Fair Value of a Financial Asset When the Market for That Asset Is Not Active" |

F-229

EFIHMW00246307

| | |
|---|---|
| **GAAP** . . . . . . . . . . . . . . . . . . . . . | generally accepted accounting principles |
| **GWh** . . . . . . . . . . . . . . . . . . . . . | gigawatt-hours |
| **historical service territory** . . . . . . . | the territory, largely in north Texas, being served by EFH Corp.'s regulated electric utility subsidiary at the time of entering retail competition on January 1, 2002 |
| **Intermediate Holding** . . . . . . . . . . | Refers to Energy Future Intermediate Holding Company LLC, a direct, wholly-owned subsidiary of EFH Corp. and the direct parent of Oncor Holdings. |
| **IRS** . . . . . . . . . . . . . . . . . . . . . . | US Internal Revenue Service |
| **kV** . . . . . . . . . . . . . . . . . . . . . . . | kilovolts |
| **kWh** . . . . . . . . . . . . . . . . . . . . . | kilowatt-hours |
| **LIBOR** . . . . . . . . . . . . . . . . . . . . | London Interbank Offered Rate. An interest rate at which banks can borrow funds, in marketable size, from other banks in the London interbank market. |
| **Luminant** . . . . . . . . . . . . . . . . . . | Refers to wholly-owned subsidiaries of TCEH engaged in competitive market activities consisting of electricity generation, development and construction of new generation facilities, wholesale energy sales and purchases as well as commodity risk management and trading activities, all largely in Texas. |
| **Luminant Construction** . . . . . . . . | Refers to the operations of TCEH established for the purpose of developing and constructing new generation facilities. |
| **Luminant Energy** . . . . . . . . . . . . . | Luminant Energy Company LLC, an indirect, wholly-owned subsidiary of TCEH that engages in certain wholesale markets activities |
| **Luminant Power** . . . . . . . . . . . . . . | Refers to subsidiaries of TCEH engaged in electricity generation activities. |
| **market heat rate** . . . . . . . . . . . . . . | Heat rate is a measure of the efficiency of converting a fuel source to electricity. The market heat rate is based on the price offer of the marginal supplier in Texas (generally natural gas plants) in generating electricity and is calculated by dividing the wholesale market price of electricity by the market price of natural gas. |
| **Merger** . . . . . . . . . . . . . . . . . . . . . | The transaction referred to in "Merger Agreement" (defined immediately below) that was completed on October 10, 2007. |
| **Merger Agreement** . . . . . . . . . . . . | Agreement and Plan of Merger, dated February 25, 2007, under which Texas Holdings agreed to acquire EFH Corp. |
| **Merger Sub** . . . . . . . . . . . . . . . . . | Texas Energy Future Merger Sub Corp, a Texas corporation and a wholly-owned subsidiary of Texas Holdings that was merged into EFH Corp. on October 10, 2007 |

F-230

Confidential

EFIHMW00246308

**MMBtu** . . . . . . . . . . . . . . . . . . . . . . million British thermal units

**Moody's** . . . . . . . . . . . . . . . . . . . . . Moody's Investors Services, Inc. (a credit rating agency)

**MW** . . . . . . . . . . . . . . . . . . . . . . . . megawatts

**MWh** . . . . . . . . . . . . . . . . . . . . . . . megawatt-hours

**NERC** . . . . . . . . . . . . . . . . . . . . . . North American Electric Reliability Corporation

**NO$_x$** . . . . . . . . . . . . . . . . . . . . . . . . nitrogen oxide

**NRC** . . . . . . . . . . . . . . . . . . . . . . . . US Nuclear Regulatory Commission

**Oncor** . . . . . . . . . . . . . . . . . . . . . . . Refers to Oncor Electric Delivery Company LLC, a direct majority-owned subsidiary of Oncor Holdings and an indirect subsidiary of EFH Corp., and/or its consolidated bankruptcy-remote financing subsidiary, Oncor Electric Delivery Transition Bond Company LLC, depending on context, that is engaged in regulated electricity transmission and distribution activities.

**Oncor Holdings** . . . . . . . . . . . . . . . Refers to Oncor Electric Delivery Holdings Company LLC, a direct wholly-owned subsidiary of Intermediate Holding and the direct majority owner of Oncor.

**Oncor Ring-Fenced Entities** . . . . . . Refers to Oncor Holdings and its direct and indirect subsidiaries, including Oncor.

**OPEB** . . . . . . . . . . . . . . . . . . . . . . . other postretirement employee benefits

**PUCT** . . . . . . . . . . . . . . . . . . . . . . . Public Utility Commission of Texas

**PURA** . . . . . . . . . . . . . . . . . . . . . . . Texas Public Utility Regulatory Act

**Purchase accounting** . . . . . . . . . . . The purchase method of accounting for a business combination as prescribed by SFAS 141 whereby the cost or "purchase price" of a business combination, including the amount paid for the equity and direct transaction costs are allocated to identifiable assets and liabilities (including intangible assets) based upon their fair values. The excess of the purchase price over the fair values of assets and liabilities is recorded as goodwill.

**REP** . . . . . . . . . . . . . . . . . . . . . . . . retail electric provider

**RRC** . . . . . . . . . . . . . . . . . . . . . . . . Railroad Commission of Texas, which has oversight of lignite mining activity

**S&P** . . . . . . . . . . . . . . . . . . . . . . . . Standard & Poor's Ratings Services, a division of the McGraw-Hill Companies Inc. (a credit rating agency)

**SEC** . . . . . . . . . . . . . . . . . . . . . . . . US Securities and Exchange Commission

F-231

Confidential

| | |
|---|---|
| **Securities Act** . . . . . . . . . . . . . . . . . | Securities Act of 1933, as amended |
| **SFAS** . . . . . . . . . . . . . . . . . . . . . . . | Statement of Financial Accounting Standards issued by the FASB |
| **SFAS 5** . . . . . . . . . . . . . . . . . . . . . | SFAS No. 5, "Accounting for Contingencies" |
| **SFAS 34** . . . . . . . . . . . . . . . . . . . . | SFAS No. 34, "Capitalization of Interest Cost" |
| **SFAS 87** . . . . . . . . . . . . . . . . . . . . | SFAS No. 87, "Employers' Accounting for Pensions" |
| **SFAS 106** . . . . . . . . . . . . . . . . . . . | SFAS No. 106, "Employers' Accounting for Postretirement Benefits Other Than Pensions" |
| **SFAS 109** . . . . . . . . . . . . . . . . . . . | SFAS No. 109, "Accounting for Income Taxes" |
| **SFAS 115** . . . . . . . . . . . . . . . . . . . | SFAS No. 115, "Accounting for Certain Investments in Debt and Equity Securities" |
| **SFAS 123(R)** . . . . . . . . . . . . . . . . . | SFAS No. 123 (revised 2004), "Share-Based Payment" |
| **SFAS 132(R)** . . . . . . . . . . . . . . . . . | SFAS No. 132 (revised 2003), "Employers' Disclosures About Pensions and Other Postretirement Benefits" |
| **SFAS 133** . . . . . . . . . . . . . . . . . . . | SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities" as amended and interpreted |
| **SFAS 140** . . . . . . . . . . . . . . . . . . . | SFAS No. 140, "Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities, a replacement of FASB Statement No. 125" |
| **SFAS 141** . . . . . . . . . . . . . . . . . . . | SFAS No. 141, "Business Combinations" |
| **SFAS 142** . . . . . . . . . . . . . . . . . . . | SFAS No. 142, "Goodwill and Other Intangible Assets" |
| **SFAS 144** . . . . . . . . . . . . . . . . . . . | SFAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets" |
| **SFAS 146** . . . . . . . . . . . . . . . . . . . | SFAS No. 146, "Accounting for Costs Associated with Exit or Disposal Activities" |
| **SFAS 157** . . . . . . . . . . . . . . . . . . . | SFAS No. 157, "Fair Value Measurements" |
| **SFAS 158** . . . . . . . . . . . . . . . . . . . | SFAS No. 158, "Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans" |
| **SFAS 159** . . . . . . . . . . . . . . . . . . . | SFAS No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities—Including an Amendment of FASB Statement No. 115" |
| **SFAS 161** . . . . . . . . . . . . . . . . . . . | SFAS No. 161, "Disclosures about Derivative Instruments and Hedging Activities—an amendment of FASB Statement No. 133" |

Confidential

| | |
|---|---|
| **SG&A** . . . . . . . . . . . . . . . . . . . . . . | selling, general and administrative |
| **SO$_2$** . . . . . . . . . . . . . . . . . . . . . . . | sulfur dioxide |
| **Sponsor Group** . . . . . . . . . . . . . . | Collectively, the investment funds affiliated with Kohlberg Kravis Roberts & Co. L.P., TPG Capital, L.P. and GS Capital Partners, an affiliate of Goldman Sachs & Co. (See Texas Holdings below.) |
| **TCEH** . . . . . . . . . . . . . . . . . . . . . . | Refers to Texas Competitive Electric Holdings Company LLC, a direct, wholly-owned subsidiary of EFC Holdings and an indirect, wholly-owned subsidiary of EFH Corp., and/or its subsidiaries, depending on context, that are engaged in electricity generation, wholesale and retail energy markets and development and construction activities. Its major subsidiaries include Luminant and TXU Energy. |
| **TCEH Finance** . . . . . . . . . . . . . . . . | Refers to TCEH Finance, Inc., a direct, wholly-owned subsidiary of TCEH, formed for the sole purpose of serving as co-issuer with TCEH of certain debt securities. |
| **TCEH Senior Secured Facilities** . . | Refers collectively to the TCEH Initial Term Loan Facility, TCEH Delayed Draw Term Loan Facility, TCEH Revolving Credit Facility, TCEH Letter of Credit Facility and TCEH Commodity Collateral Posting Facility. See Note 12 to Financial Statements for details of these facilities. |
| **TCEQ** . . . . . . . . . . . . . . . . . . . . . . | Texas Commission on Environmental Quality |
| **Texas Holdings** . . . . . . . . . . . . . . . | Refers to Texas Energy Future Holdings Limited Partnership, a Delaware limited partnership controlled by the Sponsor Group that owns substantially all of the common stock of EFH Corp. |
| **Texas Holdings Group** . . . . . . . . . | Refers to Texas Holdings and its direct and indirect subsidiaries other than the Oncor Ring-Fenced Entities. |
| **TXU Energy** . . . . . . . . . . . . . . . . . . | Refers to TXU Energy Retail Company LLC, a direct, wholly-owned subsidiary of TCEH engaged in the retail sale of electricity to residential and business customers. TXU Energy is a REP in competitive areas of ERCOT. |
| **TXU Fuel** . . . . . . . . . . . . . . . . . . . . | TXU Fuel Company, a former subsidiary of TCEH |
| **US** . . . . . . . . . . . . . . . . . . . . . . . . | United States of America |

F-233

Confidential

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors and Shareholders of Energy Future Competitive Holdings Company:

We have audited the accompanying consolidated balance sheets of Energy Future Competitive Holdings Company and subsidiaries ("EFC Holdings") as of December 31, 2008 and 2007 (successor), and the related statements of consolidated income (loss), comprehensive income (loss), cash flows and shareholders' equity for the year ended December 31, 2008 (successor), the period from October 11, 2007 through December 31, 2007 (successor), the period from January 1, 2007 through October 10, 2007 (predecessor) and the year ended December 31, 2006 (predecessor). These financial statements are the responsibility of EFC Holdings' management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. EFC Holdings is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of EFC Holdings' internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of Energy Future Competitive Holdings Company and subsidiaries at December 31, 2008 and 2007 (successor), and the results of their operations and their cash flows for the year ended December 31, 2008 (successor), the period from October 11, 2007 through December 31, 2007 (successor), the period from January 1, 2007 through October 10, 2007 (predecessor) and the year ended December 31, 2006 (predecessor), in conformity with accounting principles generally accepted in the United States of America.

As discussed in Note 1 to the consolidated financial statements, EFC Holdings is a wholly owned subsidiary of Energy Future Holdings Corp. ("EFH Corp."), which was merged with Texas Energy Future Merger Sub Corp on October 10, 2007.

/s/ Deloitte & Touche LLP

Dallas, Texas
March 2, 2009
(November 4, 2009 as to Note 24)

F-234

Confidential

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY**

**STATEMENTS OF CONSOLIDATED INCOME (LOSS)**
**(Millions of Dollars)**

| | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
| | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, 2006 |
| Operating revenues | $ 9,787 | $ 1,671 | $ 6,884 | $ 9,396 |
| Fuel, purchased power costs and delivery fees | (5,600) | (852) | (3,209) | (3,929) |
| Net gain (loss) from commodity hedging and trading activities | 2,184 | (1,492) | (554) | 153 |
| Operating costs | (677) | (124) | (471) | (605) |
| Depreciation and amortization | (1,092) | (315) | (253) | (334) |
| Selling, general and administrative expenses | (680) | (153) | (452) | (533) |
| Franchise and revenue-based taxes | (109) | (30) | (83) | (127) |
| Impairment of goodwill | (8,000) | — | —— | —— |
| Other income (Note 10) | 35 | 2 | 59 | 78 |
| Other deductions (Note 10) | (1,263) | (5) | 20 | (210) |
| Interest income | 59 | 9 | 312 | 252 |
| Interest expense and related charges (Note 23) | (4,187) | (652) | (329) | (334) |
| Income (loss) before income taxes | (9,543) | (1,941) | 1,924 | 3,807 |
| Income tax (expense) benefit | 504 | 675 | (618) | (1,306) |
| Net income (loss) | $(9,039) | $(1,266) | $ 1,306 | $ 2,501 |

See Notes to Financial Statements.

F-235

Confidential

EFIHMW00246313

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY**

**STATEMENTS OF CONSOLIDATED COMPREHENSIVE INCOME (LOSS)**
**(Millions of Dollars)**

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, 2006 |
| Net income (loss) .............................. | $(9,039) | $(1,266) | $1,306 | $2,501 |
| Other comprehensive income (loss), net of tax effects: | | | | |
| Cash flow hedges: | | | | |
| Net increase (decrease) in fair value of derivatives (net of tax (expense) benefit of $98, $97, $154 and $(321)) ............... | (181) | (177) | (288) | 598 |
| Derivative value net (gains) losses related to hedged transactions recognized during the period and reported in net income (net of tax (expense) benefit of $66, $—, $(48) and $(26)) ................................. | 122 | — | (89) | (47) |
| Total adjustments to net income (loss) ........ | (59) | (177) | (377) | 551 |
| Comprehensive income (loss) ...................... | $(9,098) | $(1,443) | $ 929 | $3,052 |

See Notes to Financial Statements.

F-236

Confidential

## ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY

### STATEMENTS OF CONSOLIDATED CASH FLOWS
### (Millions of Dollars)

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, 2006 |
| **Cash flows—operating activities** | | | | |
| Net income (loss) | $(9,039) | $ (1,266) | $ 1,306 | $ 2,501 |
| Adjustments to reconcile net income (loss) to cash provided by (used in) operating activities: | | | | |
| Depreciation and amortization | 1,549 | 444 | 306 | 400 |
| Deferred income tax expense (benefit)—net | (377) | (453) | (68) | 182 |
| Impairment of goodwill (Note 3) | 8,000 | — | — | — |
| Impairment of trade name intangible asset (Note 3) | 481 | — | — | — |
| Impairment of emission allowances intangible assets (Note 3) | 501 | — | — | — |
| Impairment of natural gas-fueled generation fleet (Note 5) | 229 | — | — | 198 |
| Charge related to Lehman bankruptcy (Note 10) | 26 | — | — | — |
| Net effect of unrealized mark-to-market valuations of commodity positions—losses (gains) | (2,329) | 1,556 | 722 | (272) |
| Unrealized net loss on mark-to-market valuations of interest rate swaps | 1,477 | — | — | — |
| Bad debt expense | 81 | 13 | 44 | 67 |
| Stock-based incentive compensation expense | 10 | — | 6 | 9 |
| Recognition of losses on desdesignated cash flow hedges | 66 | 1 | 8 | 10 |
| Customer appreciation bonus charge (net of amounts credited to customers in 2006) | — | — | — | 122 |
| Credit related to impaired leases (Note 10) | — | — | (48) | (2) |
| Net (gains) losses on sale of assets | — | 1 | (38) | (68) |
| Effect of Parent's payment of interest on pushed-down debt | 251 | 24 | — | — |
| Net equity loss from unconsolidated affiliate | 10 | 2 | 5 | 10 |
| Other, net | (24) | 2 | 5 | 8 |
| Changes in operating assets and liabilities: | | | | |
| Affiliate accounts receivable/payable—net | 44 | (91) | 100 | (43) |
| Accounts receivable—trade | (491) | (211) | 308 | 348 |
| Impact of accounts receivable sales program (Note 11) | 53 | (223) | 45 | (41) |
| Inventories | (12) | (14) | (33) | 1 |
| Accounts payable—trade | 366 | 260 | (444) | (212) |
| Commodity and other derivative contractual assets and liabilities | (28) | (10) | (167) | — |
| Margin deposits—net | 595 | (614) | (569) | 564 |
| Other—net assets | 374 | (223) | (5) | 176 |
| Other—net liabilities | (156) | 554 | (252) | 799 |
| Cash provided by (used in) operating activities | 1,657 | (248) | 1,231 | 4,757 |
| **Cash flows—financing activities** | | | | |
| Issuances of securities/long term borrowings (Note 12): | | | | |
| Merger-related debt financing | — | 33,732 | — | — |
| Pollution control revenue bonds | 242 | — | — | 243 |
| Other long-term debt | 1,443 | — | 1,000 | — |
| Retirements/repurchases of securities/long-term borrowings (Note 12): | | | | |
| Merger-related debt repurchases | — | (8,992) | — | — |
| Pollution control revenue bonds | (242) | — | (143) | (259) |
| Other long-term debt | (618) | (49) | (28) | (417) |
| Increase (decrease) in short-term borrowings (Note 12): | | | | |
| Bank | 462 | (1,617) | 1,860 | (245) |
| Commercial paper | — | — | (623) | 317 |
| Decrease in income tax-related note payable to Oncor | (34) | (9) | (24) | (40) |
| Distribution paid to parent | — | (21,000) | (1,135) | (858) |
| Excess tax benefit on stock-based incentive compensation | — | — | — | 11 |
| Debt discount, financing and reacquisition expenses—net | (1) | (577) | (12) | (17) |
| Other | 37 | — | — | — |
| Cash provided by (used in) financing activities continuing operations | $ 1,289 | $ 1,488 | $  895 | $(1,265) |

F-237

Confidential

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY**

**STATEMENTS OF CONSOLIDATED CASH FLOWS (CONT.)**
**(Millions of Dollars)**

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, 2006 |
| Cash flows—investing activities | | | | |
| Net loans (to) from affiliates. | $ (558) | $ (134) | $ 114 | $(2,278) |
| Capital expenditures | (1,908) | (496) | (1,409) | (791) |
| Nuclear fuel purchases | (166) | (23) | (54) | (117) |
| Investment held in money market fund (Note 1) | (142) | — | — | — |
| Purchase of mining-related assets | — | — | (122) | — |
| Purchase of lease trust | — | — | — | (69) |
| Proceeds from sale of assets | 29 | 14 | 2 | 17 |
| Proceeds from letter of credit facility posted with trustee (Note 23) | — | (1,250) | — | — |
| Proceeds from pollution control revenue bonds (deposited with) withdrawn from trustee—restricted cash | 29 | 13 | 202 | (240) |
| Other changes in restricted cash | (4) | 1 | (1) | — |
| Proceeds from sale of environmental allowances and credits | 39 | — | — | — |
| Purchases of environmental allowances and credits | (34) | — | — | — |
| Proceeds from sales of nuclear decommissioning trust fund securities | 1,623 | 831 | 602 | 207 |
| Investments in nuclear decommissioning trust fund securities | (1,639) | (835) | (614) | (223) |
| Cash settlements related to outsourcing contract termination | 41 | — | — | — |
| Other | 8 | (2) | 3 | (3) |
| Cash used in investing activities | (2,682) | (1,881) | (1,277) | (3,497) |
| Net change in cash and cash equivalents | 264 | (641) | 849 | (5) |
| Cash and cash equivalents—beginning balance | 215 | 856 | 7 | 12 |
| Cash and cash equivalents—ending balance | $ 479 | $ 215 | $ 856 | $ 7 |

See Notes to Financial Statements.

F-238

Confidential

## ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY

### CONSOLIDATED BALANCE SHEETS
### (Millions of Dollars)

| | Successor | |
|---|---|---|
| | December 31, 2008 | December 31, 2007 |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 479 | $ 215 |
| Investments held in money market fund (Note 1) | 142 | — |
| Restricted cash (Note 23) | 4 | — |
| Trade accounts receivable—net (Note 11) | 994 | 827 |
| Note receivable from parent (Note 22) | 584 | 25 |
| Income taxes receivable from parent (Note 22) | — | 211 |
| Inventories (Note 23) | 361 | 352 |
| Commodity and other derivative contractual assets (Note 15) | 2,391 | 1,126 |
| Accumulated deferred income taxes (Note 9) | 21 | 18 |
| Margin deposits related to commodity positions | 439 | 513 |
| Other current assets | 86 | 73 |
| Total current assets | 5,501 | 3,360 |
| Restricted cash (Note 23) | 1,250 | 1,279 |
| Investments (Note 16) | 484 | 613 |
| Property, plant and equipment—net (Note 23) | 20,902 | 20,545 |
| Goodwill (Note 3) | 10,322 | 18,060 |
| Intangible assets—net (Note 3) | 2,774 | 4,137 |
| Commodity and other derivative contractual assets (Note 15) | 962 | 244 |
| Other noncurrent assets, principally unamortized debt issuance costs | 805 | 914 |
| Total assets | $43,000 | $49,152 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Short-term borrowings (Note 12) | $ 900 | $ 438 |
| Long-term debt due currently (Note 12) | 269 | 202 |
| Trade accounts payable—nonaffiliates | 1,000 | 754 |
| Trade accounts and other payables to affiliates | 171 | 125 |
| Commodity and other derivative contractual liabilities (Note 15) | 2,730 | 1,108 |
| Margin deposits related to commodity positions | 525 | 5 |
| Accrued income taxes payable to parent (Note 22) | 33 | — |
| Accrued taxes other than income | 70 | 56 |
| Accrued interest | 354 | 393 |
| Other current liabilities | 275 | 241 |
| Total current liabilities | 6,327 | 3,322 |
| Accumulated deferred income taxes (Note 9) | 5,242 | 5,900 |
| Commodity and other derivative contractual liabilities (Note 15) | 2,095 | 2,452 |
| Notes or other liabilities due affiliates (Note 22) | 254 | 289 |
| Long-term debt, less amounts due currently (Note 12) | 31,556 | 30,762 |
| Other noncurrent liabilities and deferred credits (Note 23) | 2,528 | 2,424 |
| Total liabilities | 48,002 | 45,149 |
| Commitments and Contingencies (Note 13) | | |
| Shareholders' equity (Note 14) | (5,002) | 4,003 |
| Total liabilities and shareholders' equity | $43,000 | $49,152 |

See Notes to Financial Statements.

F-239

Confidential

## ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY

### STATEMENTS OF CONSOLIDATED SHAREHOLDERS' EQUITY
#### (Millions of Dollars)

| | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, 2006 |
|---|---|---|---|---|
| **Preferred stock—not subject to mandatory redemption:** | | | | |
| Balance at beginning of period .................... | $ — | $ — | $ — | $ — |
| Issuance of preferred stock .................... | 1 | — | ...... | ...... |
| Balance at end of period (number of shares outstanding: Successor: December 31, 2008 and 2007—4,788 shares; Predecessor: October 10, 2007 and December 31, 2006—788 shares) ................ | 1 | — | ...... | ...... |
| **Class A common stock without par value—authorized shares—9,000,000 (a):** | | | | |
| Balance at beginning of period .................... | 272 | — | 9 | 4 |
| Effects of purchase accounting push-down ........ | (2) | 1,415 | ...... | ...... |
| Dividend to parent to fund Merger ............... | — | (1,050) | ...... | ...... |
| Merger-related transactions .................... | — | 15 | ...... | ...... |
| Effects of debt push-down from EFH Corp. ........ | 7 | (108) | ...... | ...... |
| Effects of stock-based incentive compensation plans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | 1 | 1 |
| Acquired subsidiaries and net assets .............. | — | — | — | 1 |
| Effects of allocation of SFAS 158 transition adjustment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | — | 3 |
| Allocated pension assets ....................... | — | — | 1 | ...... |
| Balance at end of period (shares outstanding for all periods presented—2,062,768) .................... | 277 | 272 | 11 | 9 |
| **Class B common stock without par value—authorized shares—171,000,000 (a):** | | | | |
| Balance at beginning of period .................... | 5,174 | — | 177 | 73 |
| Effects of purchase accounting push-down ........ | (49) | 26,888 | ...... | ...... |
| Dividend to parent to fund Merger ............... | — | (19,950) | ...... | ...... |
| Merger-related transactions .................... | — | 286 | ...... | ...... |
| Effects of debt push-down from EFH Corp. (Note 12) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 133 | (2,050) | ...... | ...... |
| Effects of stock-based incentive compensation plans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3 | — | 30 | 20 |
| Acquired subsidiaries and net assets .............. | — | — | — | 19 |
| Effects of allocation of SFAS 158 transition adjustment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | — | 62 |
| Allocated pension assets ....................... | — | — | 7 | ...... |
| Transfer of accumulated deferred income taxes ..... | — | — | — | 2 |
| TXU Fuel Co LLC equity adjustment ............. | — | — | — | 1 |
| Balance at end of period (shares outstanding for all periods presented—39,192,594) ............... | 5,261 | 5,174 | 214 | 177 |

F-240

Confidential

**ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY**

**STATEMENTS OF CONSOLIDATED SHAREHOLDERS' EQUITY (CONT.)**
**(Millions of Dollars)**

| | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, 2006 |
|---|---|---|---|---|
| Retained earnings: | | | | |
| Balance at beginning of period ..................... | (1,266) | — | 7,327 | 5,684 |
| Net income (loss) .......................... | (9,039) | (1,266) | 1,306 | 2,501 |
| Intercompany payable/receivable settlements and contributions related to the Merger ............. | — | — | (4,832) | — |
| Dividends declared on common stock ............ | — | — | (1,135) | (858) |
| Effect of adoption of FIN 48 .................... | — | — | (42) | |
| Balance at end of period ......................... | (10,305) | (1,266) | 2,624 | 7,327 |
| | | | | |
| Accumulated other comprehensive income (loss), net of tax effects (b): | | | | |
| Balance at beginning of period ................. | (177) | — | 430 | (121) |
| Change during the period ................. | (59) | (177) | (377) | 551 |
| Balance at end of period ...................... | (236) | (177) | 53 | 430 |
| | | | | |
| Total shareholders' equity ........................... | $ (5,002) | $ 4,003 | $ 2,902 | $7,943 |

(a) The beginning equity balance for the Successor period reflects the application of push-down accounting as a result of the Merger.

(b) All amounts relate to cash flow hedges.

See Notes to Financial Statements.

F-241

ENERGY FUTURE COMPETITIVE HOLDINGS COMPANY
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## 1.    SIGNIFICANT ACCOUNTING POLICIES

*Description of Business*

EFC Holdings is a wholly-owned subsidiary of EFH Corp. and is a Dallas-based holding company that conducts its operations principally through its wholly-owned subsidiary, TCEH. TCEH is a Dallas-based holding company for subsidiaries engaged in competitive electricity market activities largely in Texas, including electricity generation, development and construction of new generation facilities, wholesale energy sales and purchases, commodity risk management and trading activities, and retail electricity sales. Commodity risk management and allocation of financial resources are performed at the consolidated level; therefore, there are no reportable business segments.

On October 10, 2007, EFH Corp. completed its Merger with Merger Sub. As a result of the Merger, EFH Corp. became a subsidiary of Texas Holdings, which is controlled by the Sponsor Group.

In connection with the Merger, certain wholly-owned subsidiaries of EFH Corp. established for the purpose of developing and constructing new generation facilities have become subsidiaries of TCEH, and certain assets and liabilities of other such subsidiaries were transferred to TCEH and its subsidiaries. Those subsidiaries holding impaired construction work-in-process assets related to eight canceled coal-fueled generation units have not become subsidiaries of TCEH. In addition, a wholly-owned subsidiary of EFC Holdings representing a lease trust holding certain combustion turbines has become a subsidiary of TCEH. Because these transactions were between entities under the common control of EFC Corp., EFC Holdings accounted for the transactions in a manner similar to a pooling of interests. As a result, historical operations, financial position and cash flows of EFC Holdings and the entities and other net assets contributed are presented on a combined basis for all periods presented. See Note 4 for further information.

*Basis of Presentation*

The consolidated financial statements of EFC Holdings have been prepared in accordance with US GAAP. The accompanying consolidated statements of income (loss), comprehensive income (loss) and cash flows present results of operations and cash flows of EFC Holdings for "Successor" and "Predecessor" periods, which relate to periods succeeding and preceding the Merger, respectively. The consolidated financial statements have been prepared on the same basis as the audited financial statements included in EFC Holdings' Registration Statement on Form S-4 (file number 333-153700), which included certain retrospective accounting changes. The consolidated financial statements of the Successor reflect the application of purchase accounting in accordance with the provisions of SFAS 141 and reflect the adoption of SFAS 157. All intercompany items and transactions have been eliminated in consolidation. All dollar amounts in the financial statements and tables in the notes are stated in millions of US dollars unless otherwise indicated.

*Use of Estimates*

Preparation of EFC Holdings' financial statements requires management to make estimates and assumptions about future events that affect the reporting of assets and liabilities at the balance sheet dates and the reported amounts of revenue and expense, including fair value measurements. In the event estimates and/or assumptions prove to be different from actual amounts, adjustments are made in subsequent periods to reflect more current information. No material adjustments, other than those disclosed elsewhere herein, were made to previous estimates or assumptions during the current year.

*Purchase Accounting*

The Merger has been accounted for under purchase accounting, whereby the total purchase price of the transaction was allocated to EFH Corp.'s identifiable tangible and intangible assets acquired and liabilities

F-242

EFIHMW00246320

assumed based on their fair values, and the excess of the purchase price over the fair value of net assets acquired was recorded as goodwill. The allocation resulted in a significant amount of goodwill, an increase in the carrying value of property, plant and equipment and deferred income tax liabilities as well as new identifiable intangible assets and liabilities. Purchase accounting impacts, including goodwill recognition, have been "pushed down", resulting in the assets and liabilities of EFC Holdings being recorded at their respective fair values as of October 10, 2007 and the recording of $18.3 billion of goodwill by EFC Holdings. Reported earnings in periods subsequent to the Merger reflect increases in interest, depreciation and amortization expense. See Note 2 for details regarding the effect of purchase accounting.

### Derivative Instruments and Mark-to-Market Accounting

EFC Holdings enters into contracts for the purchase and sale of electricity, natural gas and other commodities and also enters into other derivative instruments such as options, swaps, futures and forwards primarily to manage commodity price and interest rate risks. If the instrument meets the definition of a derivative under SFAS 133, changes in the fair value of the derivative are recognized in net income as unrealized gains and losses, unless the criteria for certain exceptions are met, and an offsetting derivative asset or liability is recorded in the balance sheet. This recognition is referred to as "mark-to-market" accounting. The fair values of EFC Holdings' unsettled derivative instruments under mark-to-market accounting are reported in the balance sheet as commodity and other derivative contractual assets or liabilities. When derivative instruments are settled and realized gains and losses are recorded, the previously recorded unrealized gains and losses and derivative assets and liabilities are reversed. See Note 15 and 20 for additional information regarding commodity and other derivative contractual assets and liabilities and fair value measurement. Under the election criteria of SFAS 133, EFC Holdings may elect the "normal" purchase and sale exemption. A commodity-related derivative contract may be designated as a "normal" purchase or sale if the commodity is to be physically received or delivered for use or sale in the normal course of business. If designated as normal, the derivative contract is accounted for under the accrual method of accounting (not marked-to-market) with no balance sheet or income statement recognition of the contract until settlement.

Because derivative instruments are frequently used as economic hedges, SFAS 133 allows the designation of such instruments as cash flow or fair value hedges provided certain conditions are met. A cash flow hedge mitigates the risk associated with the variability of the future cash flows related to an asset or liability (e.g., a forecasted sale of electricity in the future at market prices or the payment of interest related to variable rate debt), while a fair value hedge mitigates risk associated with fixed derivative fixed cash flows (e.g., debt with fixed interest rate payments). In accounting for changes in the fair value of cash flow hedges, derivative assets and liabilities are recorded on the balance sheet with an offset to other comprehensive income or loss to the extent the hedges are effective and the hedged transaction remains probable of occurring. If the hedged transaction becomes probable of not occurring, hedge accounting is discontinued and the amount recorded in other comprehensive income is immediately reclassified into net income. If the relationship between the hedge and the hedged transaction ceases to exist or is desdesignated, hedge accounting is discontinued, and the amounts recorded in other comprehensive income are recognized as the previously hedged transaction impacts earnings. Changes in value of fair value hedges are recorded as derivative assets or liabilities with an offset to net income, and the carrying value of the related asset or liability (hedged item) is adjusted for changes in fair value with an offset to net income. If the fair value hedge is settled prior to the maturity of the hedged item, the cumulative fair value gain or loss associated with the hedge is amortized into income over the remaining life of the hedged item. In the statement of cash flow, the effects of settlements of derivative instruments are classified consistent with the related hedged transactions.

To qualify for hedge accounting, a hedge must be considered highly effective in offsetting changes in fair value of the hedged item. Assessment of the hedge's effectiveness is tested at least quarterly throughout its term to continue to qualify for hedge accounting. Changes in fair value that represent hedge ineffectiveness, even if the hedge continues to be assessed as effective, are immediately recognized in net income. Ineffectiveness is generally measured as the cumulative excess, if any, of the change in value of the hedging instrument over the change in value of the hedged item. See Notes 12 and 15 for additional information concerning hedging activity.

F-243

Confidential

Realized and unrealized gains and losses from transacting in energy-related derivative instruments are primarily reported in the income statement in net gain (loss) from commodity hedging and trading activities. In accordance with accounting rules, realized gains and losses associated with physically settled sales and purchase derivative instruments are reported in revenues and fuel, purchased power costs and delivery fees.

### *Revenue Recognition*

EFC Holdings records revenue from electricity sales under the accrual method of accounting. Revenues are recognized when electricity is provided to customers on the basis of periodic cycle meter readings and include an estimated accrual for the revenues earned from the meter reading date to the end of the period (unbilled revenue).

EFC Holdings' reported revenues include, on a net basis, ERCOT electricity balancing transactions, which represent wholesale purchases and sales of electricity for real-time balancing purposes as measured in 15-minute intervals. As is industry practice, these purchases and sales with ERCOT, as the balancing energy clearinghouse agent, are reported net in the income statement. Although difficult to predict, it is expected that the balancing activity will frequently result in net revenues due in part to generation volumes exceeding retail load. EFC Holdings believes that presentation of this activity as a component of revenues more appropriately reflects EFC Holdings' market position.

### *Impairment of Long-Lived Assets*

EFC Holdings evaluates long-lived assets (including intangible assets with finite lives) for impairment whenever indications of impairment exist in accordance with the requirements of SFAS 144. The carrying value of such assets is deemed to be impaired if the projected undiscounted cash flows are less than the carrying value. If there is such impairment, a loss would be recognized based on the amount by which the carrying value exceeds the fair value. Fair value is determined primarily by discounted cash flows, supported by available market valuations, if applicable. See Note 5 for details of the impairment of the natural gas-fueled generation fleet recorded in 2008 and 2006.

Finite-lived intangibles identified as a result of purchase accounting are amortized over their estimated useful lives based on the expected realization of economic effects. See Note 3 to Financial Statements for additional information.

### *Goodwill and Intangible Assets with Indefinite Lives*

EFC Holdings evaluates goodwill and intangible assets with indefinite lives for impairment at least annually (as of October 1) in accordance with SFAS 142, "Goodwill and Other Intangible Assets". The impairment tests performed are based on discounted cash flow analyses. See Note 3 for details of goodwill and intangible assets with indefinite lives, including discussion of goodwill and trade name intangible asset impairments recorded in 2008.

### *Amortization of Nuclear Fuel*

Amortization of nuclear fuel is calculated on the units-of-production method and is reported as fuel costs.

### *Major Maintenance*

Major maintenance costs incurred during generation plant outages and the costs of other maintenance activities are charged to expense as incurred. This accounting is consistent with FASB Staff Position AUG AIR-1, "Accounting for Planned Major Maintenance Activities."

F-244

EFIHMW00246322

*Defined Benefit Pension Plans and Other Postretirement Employee Benefit Plans*

EFC Holdings bears a portion of the costs of the EFH Corp. sponsored pension plan offering pension benefits based on either a traditional defined benefit formula or a cash balance formula to eligible employees and also offers certain health care and life insurance benefits to eligible employees and their eligible dependents upon the retirement of such employees from EFC Holdings. Costs of pension and OPEB plans are determined in accordance with SFAS 87 and SFAS 106 and are dependent upon numerous factors, assumptions and estimates. Effective December 31, 2006, EFC Holdings adopted SFAS 158. See Note 18 for additional information regarding pension and OPEB plans.

*Stock-Based Incentive Compensation*

Prior to the Merger, EFH Corp. provided discretionary awards payable in its common stock to qualified managerial employees under its shareholder-approved long-term incentive plans. These awards were accounted for based on the provisions of SFAS 123(R), which provides for the recognition of stock-based compensation expense over the vesting period based on the grant-date fair value of those awards. In December 2007, EFH Corp.'s board of directors established its 2007 Stock Incentive Plan, which authorizes discretionary grants to directors, officers and qualified managerial employees of EFH Corp. and its affiliates (including EFC Holdings) of non-qualified stock options, stock appreciation rights, restricted shares, shares of common stock, the opportunity to purchase shares of common stock and other EFH Corp. stock-based awards. Stock options have been granted to employees of EFC Holdings under the plan and are being accounted for based upon the provisions of SFAS 123(R). See Note 19 for information regarding stock-based incentive compensation.

*Sales and Excise Taxes*

Sales and excise taxes are accounted for as a "pass through" item on the balance sheet; i.e., the tax is billed to customers and recorded as trade accounts receivable with an offsetting amount recorded as a liability to the taxing jurisdiction.

*Franchise and Revenue-Based Taxes*

Unlike sales and excise taxes, franchise and gross receipt taxes are not a "pass through" item. These taxes are assessed to EFC Holdings by state and local government bodies, based on revenues or kWh delivered, as a cost of doing business and are recorded as an expense. Rates charged to customers by EFC Holdings are intended to recover the taxes, but EFC Holdings is not acting as an agent to collect the taxes from customers.

*Income Taxes*

EFH Corp. files a consolidated federal income tax return; however, EFC Holdings' income tax expense and related balance sheet amounts are recorded as if the entity was a stand-alone corporation. Deferred income taxes are provided for temporary differences between the book and tax basis of assets and liabilities. Previously earned investment tax credits were deferred and amortized as a reduction of income tax expense over the estimated lives of the related properties. In connection with purchase accounting, the remaining unamortized investment tax credit amount of $300 million was eliminated.

Prior to 2007, EFC Holdings generally accounted for uncertainty related to positions taken on tax returns based on the probable liability approach consistent with SFAS 5. Effective January 1, 2007, the company adopted FIN 48 as discussed in Note 7.

*Accounting for Contingencies*

The financial results of EFC Holdings may be affected by judgments and estimates related to loss contingencies. Accruals for loss contingencies are recorded when management determines that it is probable that

Confidential

EFIHMW00246323

an asset has been impaired or a liability has been incurred and that such economic loss can be reasonably estimated. Such determinations are subject to interpretations of current facts and circumstances, forecasts of future events and estimates of the financial impacts of such events. See Note 13 for a discussion of contingencies.

### Cash and Cash Equivalents

For purposes of reporting cash and cash equivalents, temporary cash investments purchased with a remaining maturity of three months or less are considered to be cash equivalents.

EFC Holdings held an interest in The Reserve's US Government Fund, which began liquidation proceedings in September 2008 due to the credit crisis and withdrawal demands. In September 2008, EFC Holdings attempted to redeem its interest, totaling $242 million, in the US Government Fund, but due to the liquidation process, the funds were not immediately made available; accordingly, such amount was reclassified from cash and cash equivalents to investment held in money market fund. EFC Holdings received $100 million of the funds in November 2008 and the remaining $142 million in January 2009.

### Restricted Cash

The terms of certain agreements require the restriction of cash for specific purposes. At December 31, 2008, $1.250 billion of cash is restricted to support letters of credit. See Notes 12 and 23 for more details regarding this and other restricted cash.

### Property, Plant and Equipment

As a result of purchase accounting, carrying amounts of property, plant and equipment at October 10, 2007 were adjusted to estimated fair values. Subsequent additions are recorded at cost. The cost of self-constructed property additions includes materials and both direct and indirect labor and applicable overhead, including payroll-related costs.

Depreciation of EFC Holdings' property, plant and equipment is calculated on a straight-line basis over the estimated service lives of the properties. As is common in the industry, the Predecessor historically recorded depreciation expense using composite depreciation rates that reflect blended estimates of the lives of major asset components as compared to depreciation expense calculated on an asset-by-asset basis. Effective with the Merger, depreciation expense for EFC Holdings' properties is calculated on an asset-by-asset basis. Estimated depreciable lives are based on management's estimates of the assets' economic useful lives.

### Capitalized Interest

Interest related to qualifying construction projects and qualifying software projects is capitalized in accordance with SFAS 34. See Note 23 for details of amounts.

### Inventories

All inventories are reported at the lower of cost (on a weighted average basis) or market unless expected to be used in the generation of electricity. In connection with purchase accounting, inventory amounts at October 10, 2007 were recorded at fair value. Also see discussion immediately below regarding environmental allowances and credits.

### Environmental Allowances and Credits

Effective with the Merger, EFC Holdings began accounting for all environmental allowances and credits as identifiable intangible assets with finite lives that are subject to amortization. The recorded values of these intangible assets were originally established reflecting fair value determinations as of the date of the Merger

F-246

Confidential

under purchase accounting. Amortization expense associated with these intangible assets is recognized on a unit of production basis as the allowances or credits are consumed in generation operations. In accordance with SFAS 144, the environmental allowances and credits are assessed for impairment when conditions or events occur that could affect the carrying value of the assets. See Note 3 for details of impairment amounts recorded in 2008. EFC Holdings previously accounted for environmental allowances and credits as inventory. Both accounting methods are acceptable under GAAP.

*Investments*

Investments in a nuclear decommissioning trust fund are carried at market value in the balance sheet. Investments in unconsolidated business entities over which EFC Holdings has significant influence but does not maintain effective control, generally representing ownership of at least 20% and not more than 50% of common equity, are accounted for under the equity method. Assets related to employee benefit plans represent investments held to satisfy deferred compensation liabilities and are recorded at market value. See Note 16 for details of investments.

**Push-Down of EFH Corp. Debt**

In accordance with SEC Staff Accounting Bulletin (SAB) Topic 5-J, EFC Holdings reflects $2.250 billion principal amount of the EFH Corp. Notes on its balance sheet and the related interest expense in its income statement. The amount to be reflected on EFC Holdings' balance sheet was calculated based upon the relative equity investment of EFC Holdings and Intermediate Holding in their respective operating subsidiaries at the time of the Merger. EFC Holdings expects that a portion of the $150 million of additional EFH Corp. Toggle Notes to be issued in May 2009 as discussed in Note 12 will be pushed-down to EFC Holdings.

**Changes in Accounting Standards**

In March 2008, the FASB issued SFAS 161, "Disclosures about Derivative Instruments and Hedging Activities—an Amendment of FASB Statement 133." SFAS 161 enhances required disclosures regarding derivatives and hedging activities to enable investors to better understand their effects on an entity's financial position, financial performance and cash flows. This statement is effective for fiscal years and interim periods beginning after November 15, 2008, with early application encouraged. As SFAS 161 provides only disclosure requirements, the adoption of this standard will not have any effect on EFC Holdings' reported results of operations or financial condition. EFC Holdings will provide the enhanced disclosures in its Form 10-Q for the three months ended March 31, 2009.

In October 2008, the FASB issued FSP SFAS 157-3, "Determining the Fair Value of a Financial Asset When the Market for That Asset is Not Active." The FSP clarifies the application of SFAS 157 in a market that is not active and provides an example to illustrate key considerations in determining the fair value of a financial asset when the market for that financial asset is not active. The FSP does not change the fair value measurement principles in SFAS 157. The FSP was effective upon issuance, including prior periods for which financial statements had not been issued. EFC Holdings has determined this FSP does not change its approach for measuring fair value of financial assets.

Effective December 31, 2008, EFC Holdings adopted FSP SFAS 140-4 and FIN 46(R)-8, "Disclosures by Public Entities (Enterprises) about Transfers of Financial Assets and Interests in Variable Interest Entities." This FSP amends SFAS 140, "Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities" to require additional disclosures about transfers of financial assets. It also amends FIN 46R, "Consolidation of Variable Interest Entities," to require additional disclosures about an entity's involvement with variable interest entities. The disclosures required by this FSP are intended to provide greater transparency about a transferor's continuing involvement with transferred financial assets and an entity's involvement with variable interest entities and qualifying special purpose entities (SPEs). As the FSP provides only disclosure requirements, the adoption of this FSP did not have any effect on EFC Holdings' reported results of operations, financial condition or cash flows. See Note 11 for related disclosures.

F-247

EFIHMW00246325

In December 2008, the FASB issued FSP SFAS 132(R)-1, "Employers' Disclosures about Postretirement Benefit Plan Assets." This FSP amends SFAS 132(R) to provide enhanced disclosures regarding how investment allocation decisions are made and certain aspects of fair value measurements on plan assets. The disclosures required by this FSP are intended to provide transparency related to the types of assets and associated risks in an employer's defined benefit pension or other postretirement employee benefits plan and events in the economy and markets that could have a significant effect on the value of plan assets. This FSP is effective for fiscal years ending after December 15, 2009. As the FSP provides only disclosure requirements, the adoption of this FSP will not have any effect on EFC Holdings' reported results of operations, financial condition or cash flows. EFC Holdings is evaluating the impact of this FSP on its financial statement disclosures.

## 2.   FINANCIAL STATEMENT EFFECTS OF THE MERGER

EFH Corp. accounted for the Merger under purchase accounting in accordance with the provisions of SFAS 141, whereby the total purchase price of the transaction was allocated to EFH Corp.'s identifiable tangible and intangible assets acquired and liabilities assumed based on their fair values as of October 10, 2007. The fair values were determined based upon assumptions related to future cash flows, discount rates, and asset lives as well as factors more unique to EFH Corp., its industry and the competitive wholesale power market that include forward natural gas price curves and market heat rates, retail customer attrition rates, generation plant operating and construction costs, and the effect on generation facility values of lignite fuel reserves and mining capabilities using currently available information. The excess of the purchase price over the fair value of net assets acquired was recorded by EFH Corp. as goodwill, which upon finalization of purchase accounting in 2008 totaled $23.2 billion. See Note 3 for disclosures related to goodwill, including an impairment recorded in the fourth quarter of 2008.

Purchase accounting impacts, including goodwill recognition, have been "pushed down", resulting in assets and liabilities of EFC Holdings being recorded at their fair values as of October 10, 2007. The assignment of purchase price was based on the relative estimated enterprise value of EFC Holdings' operations as of the date of the Merger using discounted cash flow methodologies and resulted in EFC Holdings recording $18.3 billion of goodwill.

Management believes the drivers of the goodwill amount include the incremental value of the future cash flow potential of the baseload generation facilities, including facilities under construction, over the values assigned to those assets under purchase accounting rules, considering the market-pricing mechanisms and growth potential in the ERCOT market, as well as the value derived from the scale of the retail business.

The following table summarizes the components of the final purchase price allocation (billions of dollars):

| | | |
|---|---:|---:|
| Purchase price assigned to EFC Holdings | | $28.2 |
| Property, plant and equipment | 20.0 | |
| Intangible assets (Note 3) | 4.4 | |
| Other assets | 3.8 | |
| Total assets acquired | 28.2 | |
| Short-term borrowings and long-term debt | 6.1 | |
| Deferred tax liabilities | 6.4 | |
| Other liabilities | 5.8 | |
| Total liabilities assumed | 18.3 | |
| Net identifiable assets acquired. | | 9.9 |
| Goodwill. | | $18.3 |

F-248

EFIHMW00246326

The following table summarizes the change in the total amount of goodwill during 2008 as a result of purchase accounting (billions of dollars):

| | | |
|---|---:|---:|
| Goodwill at December 31, 2007 | | $18.1 |
| Purchase price allocation adjustments | | (0.1) |
| Property, plant and equipment | 0.3 | |
| Intangible assets | — | |
| Other assets | 0.1 | |
| Total assets acquired | 0.4 | |
| Deferred income tax liabilities | (0.2) | |
| Other liabilities | 0.1 | |
| Total liabilities assumed | (0.1) | |
| Net identifiable assets acquired. | | 0.3 |
| Goodwill at completion of purchase accounting | | $18.3 |

The above changes largely relate to finalization of fair values of natural gas-fueled generation plants and amounts related to the Capgemini outsourcing agreement, as well as the effects on related deferred income taxes.

During 2008, additional exit liabilities totaling $28 million were recorded largely in connection with the termination of outsourcing arrangements with Capgemini under change of control provisions of such arrangements (also see Note 17). This amount is expected to be settled no later than June 30, 2011, the targeted date of completion of transition of outsourced activities back to EFH Corp. or to service providers.

### Unaudited Pro Forma Financial Information

The following unaudited pro forma financial position and results of operations assume that the Merger-related transactions occurred on January 1, 2007 and 2006, respectively. The unaudited pro forma information is provided for informational purposes only and is not necessarily indicative of what EFC Holdings' results of operations would have been if the Merger-related transactions had occurred on that date, or what EFC Holdings' results of operations will be for any future periods.

For the year ended December 31, 2007, unaudited pro forma revenues and net losses were $8.6 billion and $1.4 billion, respectively. Pro forma adjustments for the year ended December 31, 2007 consist of adjustments for the Predecessor period and consist of $473 million in depreciation and amortization expense (including amounts recognized in revenues or fuel and purchased power costs), $1.8 billion in interest expense and a $790 million income tax benefit.

For the year ended December 31, 2006, unaudited pro forma revenues and net income were $9.4 billion and $582 million, respectively. Pro forma adjustments for the year ended December 31, 2007 consist of adjustments for the Predecessor period and consist of $606 million in depreciation and amortization expense (including amounts recognized in revenues or fuel and purchased power costs), $2.3 billion in interest expense and a $1.0 billion income tax benefit.

### 3.   GOODWILL AND IDENTIFIABLE INTANGIBLE ASSETS

### Goodwill

Reported goodwill as of December 31, 2008 and 2007 totaled $10.3 billion and $18.1 billion, respectively. None of this goodwill is being deducted for tax purposes.

Confidential

As discussed in Note 2, EFC Holdings accounted for the Merger under purchase accounting. The total goodwill amount recorded as a result of purchase accounting totaled $18.3 billion representing the excess of the purchase price over the fair value of the tangible and identifiable intangible net assets acquired in the Merger; subsequently, an impairment charge was recorded in the fourth quarter of 2008 (discussed immediately below). SFAS 142 requires that goodwill be assigned to "reporting units". Management has determined that TCEH represents the reporting unit for EFC Holdings, and all goodwill has been assigned to TCEH.

### Goodwill and Trade Name Intangible Asset Impairments

In the fourth quarter of 2008, EFC Holdings recorded a goodwill impairment charge totaling $8.0 billion, which is not deductible for income tax purposes. This amount represents EFC Holdings' best estimate of impairment pending finalization of the fair value calculations, which is expected in the first quarter of 2009. The impairment primarily arises from the dislocation in the capital markets that has increased interest rate spreads and the resulting discount rates used in estimating fair values and the effect of recent declines in market values of debt and equity securities of comparable companies.

Also in the fourth quarter of 2008, EFC Holdings recorded a trade name intangible asset impairment charge totaling $481 million ($310 million after-tax). The impairment primarily arises from the increase in the discount rate used in estimating fair value.

Although the annual goodwill and intangible assets with indefinite lives impairment test date set by management is October 1, management determined that in consideration of the continuing deterioration of securities values during the fourth quarter of 2008, an impairment testing trigger occurred subsequent to that test date; consequently, the impairment charges were based on estimated fair values at December 31, 2008.

The impairment determination involves significant assumptions and judgments in estimating the enterprise value of TCEH and the fair values of its assets and liabilities.

### Identifiable Intangible Assets

Identifiable intangible assets reported in the balance sheet are comprised of the following:

| | Successor | | | | | |
|---|---|---|---|---|---|---|
| | As of December 31, 2008 | | | As of December 31, 2007 | | |
| | Gross Carrying Amount | Accumulated Amortization | Net | Gross Carrying Amount | Accumulated Amortization | Net |
| Retail customer relationship .............. | $ 463 | $130 | $ 333 | $ 463 | $ 79 | $ 384 |
| Favorable purchase and sales contracts ...... | 700 | 249 | 451 | 702 | 68 | 634 |
| Capitalized in-service software ............ | 48 | 13 | 35 | 41 | 3 | 38 |
| Environmental allowances and credits ...... | 994 | 121 | 873 | 1,525 | 19 | 1,506 |
| Mining development costs ................ | 19 | 2 | 17 | — | — | — |
| Total intangible assets subject to amortization ..................... | $2,224 | $515 | 1,709 | $2,731 | $169 | 2,562 |
| Trade name (not subject to amortization) .... | | | 955 | | | 1,436 |
| Mineral interests (not currently subject to amortization) ......................... | | | 110 | | | 139 |
| Total intangible assets ............... | | | $2,774 | | | $4,137 |

F-250

EFIHMW00246328

**PX 014**
**Page 610 of 1116**

Amortization expense related to intangible assets consisted of:

| | | Successor | | Predecessor | |
|---|---|---|---|---|---|
| | Useful lives at December 31, 2008 (weighted average in years) | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, 2006 |
| Retail customer relationship . . . . . . . . | 4 | $ 51 | $ 79 | $— | $— |
| Favorable purchase and sales contracts . . . . . . . . . . . . . . . . . . . . . | 10 | 168 | 72 | —— | —— |
| Capitalized in-service software . . . . . . | 7 | 10 | 2 | 4 | 2 |
| Environmental allowances and credits . . . . . . . . . . . . . . . . . . . . . | 29 | 102 | 20 | —— | —— |
| Mining development costs . . . . . . . . . | 7 | 1 | — | —— | —— |
| Total amortization expense . . . . . | | $332 | $173 | $ 4 | $ 2 |

As discussed in Note 2, purchase accounting impacts were "pushed down", resulting in the assets and liabilities of EFC Holdings being recorded at their fair values as of October 10, 2007. As part of that process, EFC Holdings identified the following separately identifiable and previously unrecognized intangible assets acquired:

- *Retail Customer Relationship*—Retail customer relationship intangible asset represents the estimated fair value of the non-contracted customer base and is being amortized using an accelerated method based on customer attrition rates and reflecting the pattern in which economic benefits are realized over their estimated useful life. Amortization expense related to the retail customer relationship intangibles asset is reported as part of depreciation and amortization expense in the income statement.

- *Favorable Purchase and Sales Contracts*—Favorable purchase and sales contracts intangible asset primarily represents the above market value, based on observable prices or estimates, of commodity contracts for which: 1) EFC Holdings has made the "normal" purchase or sale election allowed by SFAS 133 or 2) the contracts that did not meet the definition of a derivative. The amortization periods of these intangible assets are based on the terms of the contracts, and the expense is reported as part of revenues or fuel and purchased power costs in the income statement as appropriate. Unfavorable purchase and sales contracts are recorded as other noncurrent liabilities and deferred credits (see Note 23).

- *Trade Name*—The trade name intangible asset represents the estimated fair value of the TXU Energy trade name, and was determined to be an indefinite-lived asset not subject to amortization. This intangible asset will be evaluated for impairment at least annually (as of October 1) in accordance with SFAS 142, "Goodwill and Other Intangible Assets". See above for discussion of an impairment charge recorded in 2008.

- *Environmental Allowances and Credits*—This intangible asset represents the fair value, based on observable prices or estimates, of environmental credits held by EFC Holdings, substantially all of which are expected to be used in its power generation activity. These credits will be amortized to fuel and purchase power costs utilizing a units-of-production method.

### Impairment of Environmental Allowances and Credits Intangible Assets

In March 2005, the EPA issued regulations called the Clean Air Interstate Rule (CAIR) for 28 states, including Texas, where EFC Holdings' generation facilities are located. CAIR requires reductions of $SO_2$ and NOx emissions from power generation facilities in such states. The $SO_2$ reductions were beyond the reductions required under the Clean Air Act's existing acid rain cap-and-trade program (the Acid Rain Program). CAIR also established a new regional cap-and-trade program for NOx emissions reductions.

Confidential

In July 2008, the US Court of Appeals for the D.C. Circuit (the D.C. Circuit Court) invalidated CAIR. The D.C. Circuit Court did not overturn the existing cap-and-trade program for $SO_2$ reductions under the Acid Rain Program.

In the second quarter of 2008, EFC Holdings determined that certain of its $SO_2$ allowances had decreased materially in value, likely driven by litigation that resulted in the July 2008 decision from the D.C. Circuit Court invalidating CAIR. Accordingly, EFC Holdings recorded a $2 million (before deferred income tax benefit) impairment of certain $SO_2$ allowances.

Based on the D.C. Circuit Court's ruling, EFC Holdings recorded a non-cash impairment charge to earnings in the third quarter of 2008. EFC Holdings impaired NOx allowances in the amount of $401 million (before deferred income tax benefit). As a result of the D.C. Circuit Court's July 2008 decision, NOx allowances would no longer be needed, and thus there would not be an actively traded market for such allowances. Consequently, the NOx allowances held by EFC Holdings would likely have very little value absent reversal of the D.C. Circuit Court's decision or promulgation of new rules by the EPA. In addition, EFC Holdings impaired $SO_2$ allowances in the amount of $98 million (before deferred income tax benefit). While the D.C. Circuit Court did not invalidate the Acid Rain Program, EFC Holdings would have more $SO_2$ allowances than it would need to comply with the Acid Rain Program. While there continued to be a market for $SO_2$ allowances, the D.C. Circuit Court's decision resulted in a material decrease in the market price of $SO_2$ allowances.

The impairment amounts recorded in the second and third quarters of 2008 were reported in other deductions.

In December 2008, in response to an EPA petition, the D.C. Circuit Court reversed, in part, its previous ruling. Such reversal confirmed CAIR is not valid, but allowed it to remain in place while the EPA revises CAIR to correct the previously identified shortcomings. Since the D.C. Circuit Court did not prescribe a deadline for this revision, at this time, EFC Holdings cannot predict how or when the EPA may revise CAIR.

*Estimated Amortization of Intangible Assets*—The estimated aggregate amortization expense of intangible assets for each of the five succeeding fiscal years from December 31, 2008 is as follows:

| Year | Successor |
|------|-----------|
| 2009 | $327 |
| 2010 | 199 |
| 2011 | 158 |
| 2012 | 124 |
| 2013 | 109 |

## 4.    CONTRIBUTIONS OF ENTITIES AND NET ASSETS TO EFC HOLDINGS

In connection with the Merger, EFH Corp. or EFC Holdings contributed all of the outstanding equity of certain subsidiaries to EFC Holdings. In addition, EFH Corp. subsidiaries contributed certain assets and liabilities to EFC Holdings. These contributions included assets and liabilities associated with the three new lignite/coal-fueled generation units currently under development and certain natural gas hedge positions. Because these transactions were between entities under the common control of EFH Corp., EFC Holdings accounted for the transactions in a manner similar to a pooling of interests. As a result, historical operations, financial position and cash flows of EFC Holdings and the entities and other net assets contributed are presented on a combined basis for all periods presented.

F-252

EFIHMW00246330

The following table presents the revenues, net gain (loss) from commodity hedging and trading activities and net income (loss) of the entities contributed and the combined amounts presented in EFC Holdings' consolidated income statements.

| | Predecessor | |
| | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, 2006 |
| --- | --- | --- |
| **Revenues:** | | |
| EFC Holdings | $6,884 | $9,396 |
| Contributed subsidiaries | — | — |
| Combined | $6,884 | $9,396 |
| **Net gain (loss) from commodity hedging and trading activities (a):** | | |
| EFC Holdings | $ (264) | $ 211 |
| Contributed subsidiaries | (290) | (58) |
| Combined | $ (554) | $ 153 |
| **Net income (loss):** | | |
| EFC Holdings | $1,436 | $2,536 |
| Contributed subsidiaries | (130) | (35) |
| Combined | $1,306 | $2,501 |

(a) Commodity hedging and trading activities were previously reported within revenues. See Note 1.

## 5. IMPAIRMENT OF NATURAL GAS-FUELED GENERATION FLEET

In the fourth quarter of 2008, EFC Holdings performed an evaluation of its natural gas-fueled generation fleet for impairment in accordance with the requirements of SFAS 144, which provides that long-lived assets should be tested for recoverability whenever events or changes in circumstances indicate that the carrying amount may not be recoverable. The impairment test was triggered by a determination that it was more likely than not that certain generation units would be retired or mothballed (idled) earlier than previously expected. The natural gas-fueled generation units are generally operated to meet peak demands for electricity and the fleet is tested for impairment as an asset group. As a result of the evaluation, it was determined that an impairment existed, and a charge of $229 million ($147 million after-tax) was recorded to write down the assets to fair value of approximately $28 million, which was determined based on discounted estimated future cash flows.

In 2006, EFC Holdings also performed an evaluation of its natural gas-fueled generation fleet for impairment in accordance with the requirements of SFAS 144. In consideration of the lignite/coal-fueled generation plant development program then underway, among other factors, EFC Holdings determined at that time that it was more likely than not that its natural gas-fueled generation units would be sold or otherwise disposed of before the end of their previously estimated useful lives and should be tested for impairment. As a result, it was determined that an impairment existed, and a charge of $198 million ($129 million after-tax) was recorded in 2006 to write down the assets to fair value, which was determined based on discounted estimated future cash flows.

The impairments in both years were reported in other deductions.

## 6. CUSTOMER APPRECIATION BONUS

In 2006, EFC Holdings announced a special customer appreciation bonus program. Under the program, a $100 bonus was provided to residential customers receiving service as of October 29, 2006 and living in areas

F-253

EFIHMW00246331

where EFC Holdings offered its then-regulated rate, which expired January 1, 2007 in accordance with applicable law. Eligible customers were not required to continue to receive service from EFC Holdings to receive the bonus. The bonus was paid out in the form of credits on customer bills, with approximately $40 million paid out in 2006 and the balance fully settled in 2007. The bonus program resulted in a charge of $162 million ($105 million after-tax) in 2006. The charge was recorded as a reduction to revenue.

## 7. ACCOUNTING FOR UNCERTAINTY IN INCOME TAXES (FIN 48)

Effective January 1, 2007, EFC Holdings adopted FIN 48. FIN 48 requires that all tax positions subject to uncertainty be reviewed and assessed with recognition and measurement of the tax benefit based on a "more-likely-than-not" standard with respect to the ultimate outcome, regardless of whether this assessment is favorable or unfavorable. EFC Holdings applied FSP FIN 48-1 to determine if each tax position was effectively settled for the purpose of recognizing previously uncertain tax positions. EFC Holdings completed its review and assessment of uncertain tax positions and in the 2007 Predecessor period recorded a net charge to retained earnings and an increase to noncurrent liabilities of $42 million in accordance with the new accounting rule.

EFH Corp. and its subsidiaries file income tax returns in US federal, state and foreign jurisdictions and are subject to examinations by the IRS and other taxing authorities. Examinations of income tax returns filed by EFH Corp. and any of its subsidiaries for the years ending prior to January 1, 2003 are complete. In the fourth quarter 2008, EFH Corp. was notified of the commencement of the IRS audit of tax years 2003 to 2006. The audit is expected to require two years to complete. Texas franchise tax return periods under examination or still open for examination range from 2003 to 2007.

EFC Holdings classifies interest and penalties related to uncertain tax positions as income tax expense. The amount of interest and penalties included in income tax expense totaled $22 million in 2008, $5 million for the period October 11, 2007 through December 31, 2007 and $12 million for the period January 1, 2007 through October 10, 2007. Noncurrent liabilities included a total of $74 million and $50 million in accrued interest at December 31, 2008 and 2007, respectively. All interest amounts are after-tax.

The following table summarizes the changes to the uncertain tax positions, reported in other noncurrent liabilities in the consolidated balance sheet, during the years ended December 31, 2008 and 2007:

|  | 2008 | 2007 |
|---|---|---|
| Balance at January 1 excluding interest and penalties | $748 | $676 |
| Additions based on tax positions related to prior years | 46 | 70 |
| Reductions based on tax positions related to prior years | (40) | (65) |
| Additions based on tax positions related to the current year | 33 | 72 |
| Settlements with taxing authorities | — | (5) |
| Balance at December 31 excluding interest and penalties | $787 | $748 |

Of the balance at December 31, 2008, $748 million represents tax positions for which the uncertainty relates to the timing of recognition in tax returns. The disallowance of such positions would not affect the effective tax rate, but would accelerate the payment of cash to the taxing authority to an earlier period.

With respect to tax positions for which the ultimate deductibility is uncertain (permanent items), should EFH Corp. sustain such positions on income tax returns previously filed, EFC Holdings' liabilities recorded would be reduced by $39 million, resulting in increased net income and a favorable impact on the effective tax rate.

EFC Holdings does not expect that the total amount of uncertain tax positions for the positions assessed as of the date of the adoption will significantly increase or decrease within the next 12 months.

F-254

Confidential

8.  **TEXAS MARGIN TAX**

In May 2006, the Texas legislature enacted a new law that reformed the Texas franchise tax system and replaced it with a new tax system, referred to as the Texas margin tax. The Texas margin tax has been determined to be an income tax for accounting purposes. In accordance with the provisions of SFAS 109, which require that deferred tax assets and liabilities be adjusted for the effects of new income tax legislation in the period of enactment, EFC Holdings estimated and recorded a deferred tax charge of $46 million in 2006.

In June 2007, an amendment to this law was enacted that included clarifications and technical changes to the provisions of the tax calculation. In the 2007 Predecessor period, EFC Holdings recorded a deferred tax benefit of $35 million, essentially all of which related to changes in the rate at which a tax credit is calculated as specified in the new law. This estimated benefit is based on the Texas margin tax law in its current form and the current guidance issued by the Texas Comptroller of Public Accounts.

The Texas margin tax was effective for returns filed on or after January 1, 2008. EFC Holdings' return filed during 2008 was based upon the taxable margin earned in 2007. Beginning January 1, 2007, margin tax has been accrued based on revenues reduced by deductions provided in the amended law.

9.  **INCOME TAXES**

The components of EFC Holdings' income tax expense (benefit) are as follows:

| | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
| | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, 2006 |
| Current: | | | | |
| US federal | (163) | $(232) | $678 | $1,122 |
| State | 36 | 10 | 8 | — |
| Non-US | — | — | — | 2 |
| Total | (127) | (222) | 686 | 1,124 |
| Deferred: | | | | |
| US federal | (389) | (440) | (5) | 120 |
| State | 12 | (13) | (52) | 78 |
| Non-US | — | — | — | (1) |
| Total | (377) | (453) | (57) | 197 |
| Amortization of investment tax credits | — | — | (11) | (15) |
| Total | $(504) | $(675) | $618 | $1,306 |

Confidential

Reconciliation of income taxes computed at the US federal statutory rate to income tax expense:

| | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
| | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, 2006 |
| Income (loss) before income taxes ............... | $(9,543) | $(1,941) | $1,924 | $3,807 |
| Income taxes at the US federal statutory rate of 35% ............................................. | (3,340) | (679) | 673 | $1,332 |
|    Lignite depletion allowance ................. | (29) | (5) | (30) | (51) |
|    Production activities deduction ............... | —— | 8 | (10) | (14) |
|    Nondeductible interest expense .............. | 8 | 1 | — | — |
|    Amortization of investment tax credits ......... | — | — | (11) | (15) |
|    Impairment of goodwill .................... | 2,800 | —— | —— | —— |
|    State income taxes, net of federal tax benefit .... | 29 | (5) | 9 | —— |
|    Texas margin tax—deferred tax adjustments (Note 8) ................................... | —— | —— | (35) | 46 |
|    Accrual of interest ......................... | 21 | 5 | 12 | 6 |
|    Other, including audit settlements ........... | 7 | —— | 10 | 2 |
| Income tax expense (benefit) ................. | (504) | (675) | 618 | $1,306 |
| Effective tax rate ............................. | 5.3% | 34.8% | 32.1% | 34.3% |

### Deferred Income Tax Balances

Deferred income taxes provided for temporary differences based on tax laws in effect at December 31, 2008 and 2007 balance sheet dates are as follows:

| | Successor | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | December 31, 2008 | | | December 31, 2007 | | |
| | Total | Current | Noncurrent | Total | Current | Noncurrent |
| **Deferred Income Tax Assets** | | | | | | |
|   Alternative minimum tax credit carryforwards ....................... | $ 389 | $— | $ 389 | $ 337 | $ 33 | $ 304 |
|   Net operating loss (NOL) carryforwards .... | 58 | — | 58 | 9 | —— | 9 |
|   Unfavorable purchase and sales contracts ... | 259 | — | 259 | 269 | —— | 269 |
|   Employee benefit obligations .............. | 58 | 26 | 32 | 40 | 15 | 25 |
|   Other ................................. | 198 | 29 | 169 | 137 | 8 | 129 |
|      Total ............................ | 962 | 55 | 907 | 792 | 56 | 736 |
| **Deferred Income Tax Liabilities** | | | | | | |
|   Property, plant and equipment ............ | 4,454 | —— | 4,454 | 4,770 | —— | 4,770 |
|   Commodity contracts and interest rate swaps ................................. | 643 | 32 | 611 | 257 | 32 | 225 |
|   Identifiable intangible assets .............. | 1,033 | —— | 1,033 | 1,564 | —— | 1,564 |
|   Debt fair value discounts ................. | 50 | —— | 50 | 77 | —— | 77 |
|   Other ................................. | 3 | 2 | 1 | 6 | 6 | —— |
|      Total ................................. | 6,183 | 34 | 6,149 | 6,674 | 38 | 6,636 |
| **Net Deferred Income Tax (Asset) Liability** .... | $5,221 | $(21) | $5,242 | $5,882 | $(18) | $5,900 |

Confidential

At December 31, 2008, EFC Holdings had $389 million of alternative minimum tax credit carryforwards (AMT) available to offset future tax payments. The AMT credit carryforwards have no expiration date. At December 31, 2008, EFC Holdings had net operating loss (NOL) carryforwards for federal income tax purposes of $166 million that expire between 2023 and 2028. The NOL carryforwards can be used to offset future taxable income. EFC Holdings expects to utilize all of its NOL carryforwards prior to their expiration dates.

The income tax effects of the components included in accumulated other comprehensive income at December 31, 2008 and 2007 totaled a net deferred tax asset of $131 million and a net deferred tax asset of $95 million, respectively.

See Note 7 for discussion regarding accounting for uncertain tax positions (FIN 48).

## 10.  OTHER INCOME AND DEDUCTIONS

| | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
| | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, 2006 |
| Other income: | | | | |
| Amortization of gain on sale of TXU Fuel (a) ........ | $ — | $— | $ 36 | $ 47 |
| Penalty received for nonperformance under a coal transportation agreement ....................... | — | — | 6 | — |
| Mineral rights royalty income ..................... | 4 | 1 | 9 | 4 |
| Net gain on sale of assets (b) .................... | 4 | — | 1 | 21 |
| Sales tax refunds ............................... | — | — | 3 | 3 |
| Insurance recoveries (c) ......................... | 21 | — | — | 2 |
| Other ......................................... | 6 | 1 | 4 | 1 |
| Total other income ...................... | $ 35 | $ 2 | $ 59 | $ 78 |
| Other deductions: | | | | |
| Impairment of trade name intangible asset (Note 3) .... | $ 481 | $— | $— | $— |
| Impairment of emission allowances intangible assets (Note 3) ..................................... | 501 | — | — | — |
| Charge for impairment of natural gas-fueled generation fleet (Note 5) ................................. | 229 | — | — | 198 |
| Charge related to Lehman bankruptcy (d) ........... | 26 | — | — | — |
| Charge related to termination of rail car lease (e) ...... | — | — | 10 | — |
| Credit related to impaired leases (f) ................ | — | — | (48) | (2) |
| Equity losses of affiliate holding investment in Capgemini .................................... | 10 | 2 | 5 | 10 |
| Litigation/regulatory settlements .................. | 7 | — | 5 | 6 |
| Inventory write-off related to natural gas-fueled generation plants .............................. | — | — | — | 3 |
| Other ......................................... | 9 | 3 | 8 | (5) |
| Total other deductions ...................... | $1,263 | $ 5 | $ (20) | $210 |

(a)  As part of the 2004 sale of the assets of TXU Fuel, TCEH entered into a transportation agreement with the new owner, intended to be market-price based, to transport natural gas to TCEH's generation plants. Because of the continuing involvement in the business through the transportation agreement, the pretax gain of $375 million related to the sale was deferred and being recognized over the eight-year life of the

Confidential

transportation agreement, and the business was not accounted for as a discontinued operation. The remaining $218 million deferred gain was eliminated as part of purchase accounting related to the Merger.
(b)  The 2006 period includes $11 million in gains on land sales and $10 million related to the sale of mineral interests.
(c)  2008 amount represents insurance recovery for damage to mining equipment.
(d)  Represents reserve established against amounts due (excluding termination related costs) from subsidiaries of Lehman Brothers Holdings Inc. arising from commodity hedging and trading activities. There are no open positions with these subsidiaries.
(e)  Represents costs associated with termination and refinancing of a rail car lease.
(f)  In 2004, EFC Holdings recorded a charge of $157 million for leases of certain natural gas-fueled combustion turbines, net of estimated sublease revenues, that were no longer operated for its own benefit. In the third quarter of 2007, a $48 million reduction in the related liability was recorded to reflect new subleases entered into in October 2007. The remaining $59 million liability was eliminated as part of purchase accounting as EFC Holdings intends to operate these assets for its own benefit.

## 11.  TRADE ACCOUNTS RECEIVABLE AND SALE OF RECEIVABLES PROGRAM

### *Sale of Receivables*

Subsidiaries of EFC Holdings engaged in retail sales of electricity participate in an accounts receivable securitization program established by EFH Corp. for certain of its subsidiaries, the activity under which is accounted for as a sale of accounts receivable in accordance with SFAS 140. Under the program, such subsidiaries (originators) sell trade accounts receivable to TXU Receivables Company, which is a special purpose entity created for the purpose of purchasing receivables from the originators and is a consolidated wholly-owned bankruptcy-remote direct subsidiary of EFH Corp. TXU Receivables Company sells undivided interests in the purchased accounts receivable for cash to special purpose entities established by financial institutions (the funding entities).

The maximum amount currently available under the accounts receivable securitization program is $700 million, and the program funding to the originators was $416 million at December 31, 2008. The amount of customer deposits held by the originators can reduce the amount of undivided interests that can be sold, thus reducing funding available under the program, during periods in which TCEH's long-term senior unsecured debt rating is lower than investment grade. Funding availability for all originators can be reduced by 100% of the originators' customer deposits if TCEH's credit rating is lower than Ba3/BB-; 50% if TCEH's credit rating is between Ba3/BB- and Ba1/BB+; and zero % if TCEH's credit rating is at least Baa3/BBB-. The originators' customer deposits, which totaled $108 million, reduced funding availability as of December 31, 2008 because TCEH's credit ratings were lower than Ba3/BB-.

All new trade receivables under the program generated by the originators are continuously purchased by TXU Receivables Company with the proceeds from collections of receivables previously purchased. Changes in the amount of funding under the program, through changes in the amount of undivided interests sold by TXU Receivables Company, reflect seasonal variations in the level of accounts receivable, changes in collection trends and other factors such as changes in sales prices and volumes. TXU Receivables Company has issued subordinated notes payable to the originators for the difference between the face amount of the uncollected accounts receivable purchased, less a discount, and cash paid to the originators that was funded by the sale of the undivided interests. The balance of the subordinated notes payable, which is reported in trade accounts receivable, totaled $268 million and $296 million at December 31, 2008 and 2007, respectively.

The discount from face amount on the purchase of receivables from the originators principally funds program fees paid to the funding entities. The program fees, which are also referred to as losses on sale of the receivables under SFAS 140, consist primarily of interest costs on the underlying financing. The discount also funds a servicing fee paid by TXU Receivables Company to EFH Corporate Services Company, a direct wholly-owned subsidiary of EFH Corp., which serves as the collection agent of the receivables. EFH Corp. maintains

F-258

collection responsibilities through EFH Corporate Services Company in order to efficiently service and maintain the integrity of the receivables portfolio. The servicing fee compensates EFH Corporate Services Company for serving as the collection agent of the receivables. Responsibilities of the collection agent include, but are not limited to, maintaining detailed accounts receivable collection records and interfacing with customers regarding payment options and terms of current and past-due accounts. In the event EFH Corporate Services Company is relieved of its duties as collection agent because of default under the program, the funding entities assume responsibility as the collection agent.

The program fees represent essentially all the net incremental costs of the program on a consolidated basis and are reported in SG&A expenses. Fee amounts were as follows:

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, 2006 |
| Program fees .................................. | $ 25 | $ 9 | $ 26 | $ 34 |
| Program fees as a percentage of average funding (annualized) .................................. | 5.2% | 9.5% | 6.4% | 5.8% |
| Servicing fees .................................. | 4 | 1 | 3 | 4 |

The accounts receivable balance reported in the December 31, 2008 consolidated balance sheet has been reduced by $684 million face amount of trade accounts receivable sold to TXU Receivables Company, partially offset by the inclusion of $268 million of subordinated notes receivable from TXU Receivables Company. Funding under the program increased $53 million in 2008 and decreased $178 million in 2007 and $41 million in 2006. Funding increases or decreases under the program are reflected as operating cash flow activity in the statement of cash flows. The carrying amount of the retained interests in the accounts receivable balance approximated fair value due to the short-term nature of the collection period.

Activities of TXU Receivables Company related to EFC Holdings were as follows:

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, 2006 |
| Cash collections on accounts receivable ............. | $ 6,393 | $ 1,538 | $ 5,169 | $ 7,274 |
| Face amount of new receivables purchased ......... | (6,418) | (1,194) | (5,472) | (7,238) |
| Discount from face amount of purchased receivables .................................. | 29 | 9 | 30 | 38 |
| Program fees paid .............................. | (25) | (9) | (26) | (34) |
| Servicing fees paid ............................. | (4) | (1) | (3) | (4) |
| Increase (decrease) in subordinated notes payable .... | (28) | (120) | 257 | 5 |
| Operating cash flows used by (provided to) EFC Holdings under the program .................. | $ (53) | $ 223 | $ (45) | $ 41 |

The program may be terminated upon the occurrence of a number of specified events, including if the delinquency ratio (delinquent for 31 days) for the sold receivables, the default ratio (delinquent for 91 days or deemed uncollectible), the dilution ratio (reductions for discounts, disputes and other allowances) or the days collection outstanding ratio exceed stated thresholds, and the financial institutions do not waive such event of termination. The thresholds apply to the entire portfolio of sold receivables, not separately to the receivables of each originator. In addition, the program may be terminated if TXU Receivables Company or EFH Corporate Services Company, as collection agent, shall default in any payment with respect to debt in excess of $50,000 in

F-259

Confidential

the aggregate for TXU Receivables Company and EFH Corporate Services Company, or if TCEH, any affiliate of TCEH acting as collection agent under the program other than EFH Corporate Services Company, any parent guarantor of an originator or any originator shall default in any payment with respect to debt (other than hedging obligations) in excess of $200 million in the aggregate for such entities.

Upon termination of the program, cash flows would be delayed as collections of sold receivables would be used by TXU Receivables Company to repurchase the undivided interests from the funding entities instead of purchasing new receivables. The level of cash flows would normalize in approximately 16 to 30 days.

The subordinated notes issued by TXU Receivables Company are subordinated to the undivided interests of the financial institutions in the purchased receivables.

### Trade Accounts Receivable

|  | Successor | |
|---|---|---|
|  | December 31, 2008 | December 31, 2007 |
| Gross wholesale and trade accounts receivable . . . . . . . . . . . . . . . . . . . . . . | $1,474 | $1,214 |
| Undivided interest in retail accounts receivable sold by TXU Receivables Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (684) | (659) |
| Subordinated notes receivable from TXU Receivables Company . . . . . . | 268 | 296 |
| Allowance for uncollectible accounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (64) | (24) |
| Trade accounts receivable—reported in balance sheet . . . . . . . . . . . . . . . | $  994 | $  827 |

Gross trade accounts receivable at December 31, 2008 and 2007 included unbilled revenues of $427 million and $404 million, respectively.

### Allowance for Uncollectible Accounts Receivable

| **Predecessor:** | |
|---|---|
| Allowance for uncollectible accounts receivable as of December 31, 2005 . . . . . . . . | $ 31 |
|     Increase for bad debt expense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 67 |
|     Decrease for account write-offs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (79) |
|     Changes related to receivables sold . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4 |
|     Other (a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (15) |
| Allowance for uncollectible accounts receivable as of December 31, 2006 . . . . . . . . | 8 |
|     Increase for bad debt expense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 44 |
|     Decrease for account write-offs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (54) |
|     Changes related to receivables sold . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 25 |
| Allowance for uncollectible accounts receivable as of October 10, 2007 . . . . . . . . . . | $ 23 |
| **Successor:** | |
| Allowance for uncollectible accounts receivable as of October 11, 2007 . . . . . . . . . . . | $ 23 |
|     Increase for bad debt expense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 13 |
|     Decrease for account write-offs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (12) |
| Allowance for uncollectible accounts receivable as of December 31, 2007 . . . . . . . . | 24 |
|     Increase for bad debt expense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 81 |
|     Decrease for account write-offs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (67) |
|     Charge related to Lehman bankruptcy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 26 |
| Allowance for uncollectible accounts receivable as of December 31, 2008 . . . . . . . . | $ 64 |

_____

(a)  Reflects an allowance established in 2005 for a coal contract dispute that was reversed upon settlement in 2006. (Allowance and subsequent reversal are recorded in other deductions.)

Confidential

EFIHMW00246338

## 12.  SHORT-TERM BORROWINGS AND LONG-TERM DEBT

### *Short-Term Borrowings*

At December 31, 2008, EFC Holdings and its subsidiaries had outstanding short-term borrowings of $900 million at a weighted average interest rate of 3.95%, excluding certain customary fees, at the end of the period. At December 31, 2007, EFC Holdings and its subsidiaries had outstanding short-term borrowings of $438 million at a weighted average interest rate of 4.47%, excluding certain customary fees, at the end of the period. All short-term borrowings were under TCEH credit facilities.

### *Credit Facilities*

EFC Holdings' (through TCEH) credit facilities with cash borrowing and/or letter of credit availability at December 31, 2008 are presented below. The facilities are all senior secured facilities.

| | | At December 31, 2008 | | | |
|---|---|---|---|---|---|
| Authorized Borrowers and Facility | Maturity Date | Facility Limit | Letters of Credit | Cash Borrowings | Availability |
| TCEH Delayed Draw Term Loan Facility (a) . . . . . | October 2014 | $4,100 | $— | $3,562 | $ 522 |
| TCEH Revolving Credit Facility (b) . . . . . . . . . . . . | October 2013 | 2,700 | 7 | 900 | 1,767 |
| TCEH Letter of Credit Facility (c) . . . . . . . . . . . . . | October 2014 | 1,250 | — | 1,250 | — |
| Subtotal TCEH (d) . . . . . . . . . . . . . . . . . . . . . | | $8,050 | $ 7 | $5,712 | $2,289 |
| TCEH Commodity Collateral Posting Facility (e) . . . . . . . . . . . . . . . . . . . . . . . . . . | December 2012 | Unlimited | $— | $ — | Unlimited |

(a)  Facility to be used during the two-year period commencing on October 10, 2007 to fund expenditures for constructing certain new generation facilities and environmental upgrades of existing generation facilities, including previously incurred expenditures not yet funded under this facility. Borrowings are classified as long-term debt. Availability amount excludes $9 million of undrawn commitments from a subsidiary of Lehman Brothers Holding Inc. (Lehman) that has filed for bankruptcy under Chapter 11 of the US Bankruptcy Code and $7 million of requested draws that have not been funded by the Lehman subsidiary.

(b)  Facility to be used for letters of credit and borrowings for general corporate purposes. Borrowings are classified as short-term borrowings. Availability amount includes $144 million of undrawn commitments from the Lehman subsidiary that is only available from the fronting banks in the form of letters of credit and excludes $26 million of requested draws that have not been funded by the Lehman subsidiary.

(c)  Facility to be used for issuing letters of credit for general corporate purposes, including, but not limited to, providing collateral support under hedging arrangements and other commodity transactions that are not eligible for funding under the TCEH Commodity Collateral Posting Facility. The borrowings, all of which were drawn at the closing of the Merger and are classified as long-term debt, have been retained as restricted cash. Letters of credit totaling $760 million issued as of December 31, 2008 are supported by the restricted cash, and the remaining letter of credit availability totals $490 million.

(d)  Pursuant to PUCT rules, TCEH is required to maintain available capacity under its credit facilities to assure adequate credit worthiness of TCEH's REP subsidiaries, including the ability to return retail customer deposits, if necessary. As a result, at December 31, 2008, the total availability under the TCEH credit facilities should be further reduced by $266 million.

(e)  Revolving facility to be used to fund cash collateral posting requirements for specified volumes of natural gas hedges. As of December 31, 2008, cash borrowings under the facility had been repaid. See "TCEH Senior Secured Facilities" below for additional information.

Confidential

EFIHMW00246339

*Long-Term Debt*

At December 31, 2008 and 2007, the long-term debt of EFC Holdings consisted of the following:

| | Successor | |
|---|---|---|
| | December 31, 2008 | December 31, 2007 |
| **TCEH** | | |
| Pollution Control Revenue Bonds: | | |
| Brazos River Authority: | | |
| 5.400% Fixed Series 1994A due May 1, 2029 ......................... | $  39 | $  39 |
| 7.700% Fixed Series 1999A due April 1, 2033 ......................... | 111 | 111 |
| 6.750% Fixed Series 1999B due September 1, 2034, remarketing date April 1, 2013 (a) ............................................. | 16 | 16 |
| 7.700% Fixed Series 1999C due March 1, 2032 ........................ | 50 | 50 |
| 8.250% Fixed Series 2001A due October 1, 2030 ...................... | 71 | — |
| 2.300% Floating Series 2001A due October 1, 2030 (b) ................. | — | 71 |
| 5.750% Fixed Series 2001C due May 1, 2036, remarketing date November 1, 2011 (a) ............................................. | 217 | 217 |
| 8.250% Fixed Series 2001D-1 due May 1, 2033 ........................ | 171 | — |
| 2.300% Floating Series 2001D-1 due May 1, 2033 (b) .................. | — | 171 |
| 1.400% Floating Series 2001D-2 due May 1, 2033 (c) .................. | 97 | 97 |
| 2.500% Floating Taxable Series 2001I due December 1, 2036 (d) ......... | 62 | 62 |
| 1.400% Floating Series 2002A due May 1, 2037 (c) .................... | 45 | 45 |
| 6.750% Fixed Series 2003A due April 1, 2038, remarketing date April 1, 2013 (a) ............................................. | 44 | 44 |
| 6.300% Fixed Series 2003B due July 1, 2032 .......................... | 39 | 39 |
| 6.750% Fixed Series 2003C due October 1, 2038 ....................... | 52 | 52 |
| 5.400% Fixed Series 2003D due October 1, 2029, remarketing date October 1, 2014 (a) ......................................... | 31 | 31 |
| 5.000% Fixed Series 2006 due March 1, 2041 .......................... | 100 | 100 |
| Sabine River Authority of Texas: | | |
| 6.450% Fixed Series 2000A due June 1, 2021 .......................... | 51 | 51 |
| 5.500% Fixed Series 2001A due May 1, 2022, remarketing date November 1, 2011 (a) ............................................. | 91 | 91 |
| 5.750% Fixed Series 2001B due May 1, 2030, remarketing date November 1, 2011 (a) ............................................. | 107 | 107 |
| 5.200% Fixed Series 2001C due May 1, 2028 .......................... | 70 | 70 |
| 5.800% Fixed Series 2003A due July 1, 2022 .......................... | 12 | 12 |
| 6.150% Fixed Series 2003B due August 1, 2022 ....................... | 45 | 45 |
| Trinity River Authority of Texas: | | |
| 6.250% Fixed Series 2000A due May 1, 2028 .......................... | 14 | 14 |
| Unamortized fair value discount related to pollution control revenue bonds (e) ............................................... | (161) | (175) |
| Senior Secured Facilities: | | |
| 5.456% TCEH Initial Term Loan Facility maturing October 10, 2014 (f)(g) ............................................... | 16,244 | 16,409 |
| 5.150% TCEH Delayed Draw Term Loan Facility maturing October 10, 2014 (f)(g) ............................................... | 3,562 | 2,150 |
| 3.986% TCEH Letter of Credit Facility maturing October 10, 2014 (g) ...... | 1,250 | 1,250 |
| 0.449% TCEH Commodity Collateral Posting Facility maturing December 31, 2012 (h) ......................................... | — | 382 |

F-262

EFIHMW00246340

|  | Successor | |
|---|---|---|
|  | December 31, 2008 | December 31, 2007 |
| **Other:** | | |
| 10.25% Fixed Senior Notes due November 1, 2015 | 3,000 | 3,000 |
| 10.25% Fixed Senior Notes Series B due November 1, 2015 | 2,000 | 2,000 |
| 10.50/11.25% Senior Toggle Notes due November 1, 2016 | 1,750 | 1,750 |
| 6.125% Fixed Senior Notes due March 15, 2008 | — | 3 |
| 7.000% Fixed Senior Notes due March 15, 2013 | 5 | 5 |
| 7.100% Promissory Note due January 5, 2009 | 65 | 65 |
| 7.460% Fixed Secured Facility Bonds with amortizing payments through January 2015 | 67 | 78 |
| Capital lease obligations | 159 | 161 |
| Unamortized fair value discount (e) | (6) | (9) |
| Total TCEH | $29,470 | $28,604 |
| **EFC Holdings (parent entity)** | | |
| 9.580% Fixed Notes due in semiannual installments through December 4, 2019 | $ 55 | $ 59 |
| 8.254% Fixed Notes due in quarterly installments through December 31, 2021 | 53 | 56 |
| 3.993% Floating Rate Junior Subordinated Debentures, Series D due January 30, 2037 (g) | 1 | 1 |
| 8.175% Fixed Junior Subordinated Debentures, Series E due January 30, 2037 | 8 | 8 |
| 10.875% EFH Corp. Fixed Senior Notes due November 1, 2017 (i) | 1,000 | 1,000 |
| 11.25/12.00% EFH Corp. Senior Toggle Notes due November 1, 2017 (i) | 1,250 | 1,250 |
| Unamortized fair value discount (e) | (12) | (14) |
| Total EFC Holdings | 2,355 | 2,360 |
| Total EFC Holdings consolidated | 31,825 | 30,964 |
| Less amount due currently | (269) | (202) |
| Total long-term debt | $31,556 | $30,762 |

---

(a)   These series are in the multiannual interest rate mode and are subject to mandatory tender prior to maturity on the mandatory remarketing date. On such date, the interest rate and interest rate period will be reset for the bonds.

(b)   Interest rates in effect at March 31, 2008. These series were remarketed in June 2008, resulting in a fixed rate to maturity.

(c)   Interest rates in effect at December 31, 2008. These series are in a daily interest rate mode and are classified as long-term as they are supported by long-term irrevocable letters of credit.

(d)   Interest rate in effect at December 31, 2008. This series is in a weekly interest rate mode and is classified as long-term as it is supported by long-term irrevocable letters of credit.

(e)   Amount represents unamortized fair value adjustments recorded under purchase accounting.

(f)   Interest rate swapped to fixed on $17.55 billion principal amount.

(g)   Interest rates in effect at December 31, 2008.

(h)   Interest rates in effect at December 31, 2008, excluding quarterly maintenance fee discussed below. See "Credit Facilities" above for more information.

(i)   Represents 50% of the principal amount of EFH Corp. debt guaranteed by EFC Holdings (pushed-down debt) per the discussion below under "EFH Corp. Notes Issued Subsequent to the Merger."

**Debt-Related Activity in 2008**—Repayments of long-term debt in 2008 totaling $860 million represented principal payments at scheduled maturity dates as well as the remarketing of $242 million principal amount of pollution control revenue bonds discussed below, repayment of $413 million of borrowings under the TCEH

Confidential

Commodity Collateral Posting Facility, which fully repaid borrowings under the facility, and other repayments totaling $40 million, principally related to leases. Payments at scheduled maturity dates included $165 million repaid under the TCEH Initial Term Loan Facility.

Increases in long-term debt during 2008 totaling $1.685 billion consisted of borrowings under the TCEH Delayed Draw Term Loan Facility of $1.412 billion to fund expenditures related to the development of new generation facilities and the environmental retrofit program for existing lignite/coal-fueled generation facilities, the remarketing of $242 million principal amount of pollution control revenue bonds discussed immediately below and $31 million of additional borrowings under the TCEH Commodity Collateral Posting Facility.

In June 2008, TCEH remarketed the Brazos River Authority Pollution Control Revenue Bonds Series 2001A due in October 2030 and Series 2001D-1 due in May 2033 with aggregate principal amounts of $71 million and $171 million, respectively. The bonds were previously in a floating rate mode that reset weekly and were backed by two letters of credit in an aggregate amount of $247 million. As a result of the remarketing, the bonds were fixed to maturity at an interest rate of 8.25%, and the two letters of credit were cancelled. The bonds are redeemable at par beginning July 1, 2018 and are redeemable with a make-whole premium prior to July 1, 2018. These bonds were remarketed with a covenant package similar to the notes discussed below under "TCEH Notes Issued Subsequent to the Merger."

EFH Corp. and TCEH have the option every six months until November 1, 2012, at their election, to use the payment-in-kind (PIK) feature of their respective toggle notes in lieu of making cash interest payments. The companies elected to do so for the May 1, 2009 interest payment date as an efficient and cost-effective method to further enhance liquidity, in light of the substantial dislocation in the financial markets. Moreover, the incremental liquidity obtained by using the PIK feature of the toggle notes for this specific payment period more than offsets the liquidity that was effectively lost as a result of the default by affiliates of Lehman under TCEH's Senior Secured Facilities.

EFH Corp. will make its May 2009 interest payment by using the PIK feature of the EFH Corp. Toggle Notes. The election will increase the interest rate on the toggle notes from 11.25% to 12.00% during the interest period covered by the PIK election and require EFH Corp. to issue an additional $150 million principal amount of EFH Corp. Toggle Notes on May 1, 2009. In addition, the election will increase liquidity by an amount equal to approximately $141 million, constituting the amount of cash interest that otherwise would have been payable on May 1, 2009, and increase the expected annual cash interest expense by approximately $17 million, constituting the additional cash interest that would be payable with respect to the $150 million of additional toggle notes.

Similarly, TCEH will make its May 2009 interest payment by using the PIK feature of the TCEH Toggle Notes. The election will increase the interest rate on the TCEH Toggle Notes from 10.50% to 11.25% during the interest period covered by the PIK election and require TCEH to issue an additional approximately $98.5 million principal amount of TCEH Toggle Notes on May 1, 2009. In addition, the election will increase liquidity by an amount equal to approximately $92 million, constituting the amount of cash interest that otherwise would have been payable on May 1, 2009, and increase the expected annual cash interest expense by approximately $10 million, constituting the additional cash interest that would be payable with respect to the $98.5 million of additional toggle notes.

F-264

Confidential

*Maturities*—Long-term debt maturities as of December 31, 2008 are as follows:

| Year | |
|---|---:|
| 2009 (a) | $    258 |
| 2010 | 221 |
| 2011 | 639 |
| 2012 | 225 |
| 2013 | 284 |
| Thereafter (a) | 30,218 |
| Unamortized fair value discount (b) | (179) |
| Capital lease obligations | 159 |
| Total | $31,825 |

_____

(a) Long-term debt maturities for EFC Holdings (parent entity) totals $7 million, $9 million, $9 million, $10 million, $11 million and $2.321 billion for 2009, 2010, 2011, 2012, 2013 and thereafter, respectively.

(b) Unamortized fair value discount for EFC Holdings (parent entity) totals $(12) million.

*Long-Term Debt-Related Activity in 2007*—EFC Holdings and its subsidiaries issued, reacquired or made scheduled principal payments on long-term debt in 2007 as follows (all amounts presented are principal):

| | Successor | | | | Predecessor | |
|---|---|---|---|---|---|---|
| | Post-Merger | | Merger-Date | | | |
| | Issuances | Repayments / Repurchases | Issuances | Repayments / Repurchases | Issuances | Repayments / Repurchases |
| **TCEH:** | | | | | | |
| Senior secured facilities: | | | | | | |
| Initial term loan facility . . . . | $ — | $   (41) | $16,450 | $  — | $  — | $  — |
| Delayed draw term loan facility . . . . . . . . . . . . . . . | — | — | 2,150 | — | — | — |
| Letter of credit facility . . . . . | — | — | 1,250 | — | — | — |
| Commodity collateral posting facility . . . . . . . . . | — | — | 382 | — | — | — |
| Senior unsecured interim facilities: . . . . . . . . . . . . . . . . | — | — | | | | |
| Initial cash-pay loans . . . . . . | — | (5,000) | 5,000 | — | — | — |
| Initial toggle loans . . . . . . . . | — | (1,750) | 1,750 | — | — | — |
| Senior notes: | | | | | | |
| Senior cash-pay notes . . . . . | 5,000 | — | — | — | — | — |
| Senior toggle notes . . . . . . . | 1,750 | — | — | — | — | — |
| Floating rate senior notes (a) . . . . | — | — | — | (1,000) | 1,000 | — |
| Fixed senior notes . . . . . . . . . . . | — | — | — | (1,242) | — | — |
| Secured promissory note . . . . . . . | — | — | — | — | 65 | — |
| Pollution control revenue bonds . . . . . . . . . . . . . . . . . . . | — | — | — | — | — | (143) |
| Capital lease obligations . . . . . . . | 16 | (4) | — | — | 59 | (8) |
| Other long-term debt . . . . . . . . . . | — | — | — | — | — | (7) |
| **EFC Holdings:** | | | | | | |
| Fixed senior debentures . . . . . . . . | — | — | — | — | — | (10) |
| Other long-term debt . . . . . . . . . | — | (4) | — | — | — | (2) |
| Total . . . . . . . . . . . . . . . . . . . . | $6,766 | $(6,799) | $26,982 | $(2,242) | $1,124 | $(170) |

F-265

EFIHMW00246343

---

(a)    Notes were subject to mandatory redemption upon closing of the Merger.

Note: Amounts above do not include EFC Holdings' allocated portion of EFH Corp. Notes issued subsequent to the Merger that are reflected on EFC Holdings' balance sheet. See discussion below under "EFH Corp. Notes Issued Subsequent to the Merger".

*Other Debt-Related Activity in 2007*—In September 2007, EFH Corp. commenced offers to purchase and consent solicitations with respect to $250 million in aggregate principal amount of TCEH's outstanding 6.125% Senior Notes due 2008 and $1.0 billion in aggregate principal amount of TCEH's outstanding 7.000% Senior Notes due 2013. The offers were contingent upon the closing of the Merger. In October 2007, TCEH purchased an aggregate of $247 million and $995 million principal amounts of these notes, respectively, for $248 million and $1.097 billion, respectively, excluding unpaid interest. An interest rate swap related to $250 million principal amount of these notes was settled for $2 million upon extinguishment of the debt.

In September 2007, subsidiaries of EFC Holdings acquired certain assets of Alcoa Inc. relating to the operation of a lignite mine near Sandow, including partial ownership of the lignite reserves in the mine, for a purchase price of $135 million, including cash of $70 million and a promissory note of $65 million that was paid at maturity on January 5, 2009 at a fixed interest rate of 7.100%, which is reported as a current liability as of December 31, 2008.

In September 2007, TCEH refinanced an existing lease of rail cars, which had been accounted for as an operating lease, with a lease with another party that has been accounted for as a capital lease, resulting in $52 million reported as long-term debt. In late 2007, TCEH also entered into leases related to mining equipment that have been accounted for as capital leases totaling $23 million reported as long-term debt.

In May 2007, TCEH redeemed at par the Sabine River Authority of Texas Series 2006A and 2006B pollution control revenue bonds with aggregate principal amounts of $47 million and $46 million, respectively, and the Trinity River Authority of Texas Series 2006 pollution control revenue bonds with an aggregate principal amount of $50 million. All three bond series were issued in November 2006 in conjunction with the development of eight coal-fueled generation units, which has been cancelled. Restricted cash retained upon issuance of the bonds was used to fund substantially all of the redemption amounts.

In March 2007, TCEH issued floating rate senior notes with an aggregate principal amount of $1.0 billion with a floating rate based on LIBOR plus 50 basis points. The notes were to mature in September 2008, but in accordance with their terms, were redeemed upon closing of the Merger.

*TCEH Senior Secured Facilities*—Borrowings under the TCEH Initial Term Loan Facility, the TCEH Delayed Draw Term Loan Facility, the TCEH Revolving Credit Facility and the TCEH Letter of Credit Facility, which totaled $21.956 billion at December 31, 2008, bear interest at per annum rates equal to, at TCEH's option, (i) adjusted LIBOR plus 3.50% or (ii) a base rate (the higher of (1) the prime rate as announced from time to time by the administrative agent of the facilities and (2) the federal funds effective rate plus 0.50%) plus 2.50%. There is a margin adjustment mechanism in relation to term loans, revolving loans and letter of credit fees under which the applicable margins may be reduced based on the achievement of certain leverage ratio levels; there was no such reduction based upon December 31, 2008 levels. The applicable rate on each facility as of December 31, 2008 is provided in the long-term debt table above and reflects LIBOR-based borrowings.

A commitment fee is payable quarterly in arrears and upon termination of the TCEH Revolving Credit Facility at a rate per annum equal to 0.50% of the average daily unused portion of such facility. The commitment fee is subject to reduction, based on the achievement of certain leverage ratio levels; there was no such reduction based upon December 31, 2008 levels.

F-266

EFIHMW00246344

With respect to the TCEH Delayed Draw Term Loan Facility, a commitment fee is payable quarterly in arrears and upon termination of the undrawn portion of the commitments of such facility at a rate per annum equal to, prior to October 10, 2008, 1.25% per annum, and thereafter, 1.50% per annum.

Letter of credit fees under the TCEH Revolving Facility are payable quarterly in arrears and upon termination at a rate per annum equal to the spread over adjusted LIBOR under the TCEH Revolving Facility, less the issuing bank's fronting fee. Letter of credit fees under the TCEH Letter of Credit Facility are equal to the difference between interest paid on each outstanding letter of credit at a rate of LIBOR plus 3.50% per annum and the interest earned on the total $1.25 billion TCEH Letter of Credit Facility restricted cash at a rate of LIBOR minus 0.12% per annum yielding a currently effective rate of 3.62% per annum on each outstanding letter of credit under that facility.

TCEH will pay a fixed quarterly maintenance fee of approximately $11 million through maturity for having procured the TCEH Commodity Collateral Posting Facility regardless of actual borrowings under the facility. In addition, TCEH will pay interest at LIBOR on actual borrowed amounts under the TCEH Commodity Collateral Posting Facility partially offset by interest earned on collateral deposits to counterparties.

The TCEH Senior Secured Facilities are unconditionally guaranteed jointly and severally on a senior secured basis, by EFC Holdings, and each existing and subsequently acquired or organized direct or indirect wholly-owned US restricted subsidiary of TCEH (other than certain subsidiaries as provided in the TCEH Senior Secured Facilities), subject to certain other exceptions.

The TCEH Senior Secured Facilities, including the guarantees thereof, certain commodity hedging transactions and the interest rate swaps described under "TCEH Interest Rate Hedges" below are secured by (a) substantially all of the current and future assets of TCEH and TCEH's subsidiaries who are guarantors of such facilities as described above, and (b) pledges of the capital stock of TCEH and each current and future material wholly-owned restricted subsidiary of TCEH directly owned by TCEH or any guarantor.

The TCEH Senior Secured Facilities contain customary negative covenants, restricting, subject to certain exceptions, TCEH and TCEH's restricted subsidiaries from, among other things:

- incurring additional debt;
- incurring additional liens;
- entering into mergers and consolidations;
- selling or otherwise disposing of assets;
- making dividends, redemptions or other distributions in respect of capital stock;
- making acquisitions, investments, loans and advances, and
- paying or modifying certain subordinated and other material debt.

In addition, the TCEH Senior Secured Facilities contain a maintenance covenant that prohibits TCEH and its restricted subsidiaries from exceeding a maximum consolidated secured leverage ratio and to observe certain customary reporting requirements and other affirmative covenants.

The TCEH Initial Term Loan Facility is required to be repaid in equal quarterly installments in an aggregate annual amount equal to 1% of the original principal amount of such facility ($41 million quarterly), with the balance payable on October 10, 2014. The TCEH Delayed Draw Term Loan Facility is required to be repaid in equal quarterly installments beginning on December 31, 2009 in an aggregate annual amount equal to 1% of the actual principal outstanding under the TCEH Delayed Draw Term Loan Facility as of such date, with the balance payable on October 10, 2014. Amounts borrowed under the TCEH Revolving Facility may be reborrowed from time to time from and after the closing date until October 10, 2013. The TCEH Letter of Credit Facility will mature on October 10, 2014. The TCEH Commodity Collateral Posting Facility will mature on December 31, 2012.

F-267

EFIHMW00246345

The TCEH Senior Secured Facilities contain certain customary events of default for senior leveraged acquisition financings, the occurrence of which would allow the lenders to accelerate all outstanding loans and terminate their commitments.

**TCEH Notes Issued Subsequent to the Merger**—Pursuant to an indenture entered into in October 2007 (the TCEH Indenture), TCEH and TCEH Finance (the Co-Issuers) issued and sold $3.0 billion aggregate principal amount of 10.25% Senior Notes due November 1, 2015. In December 2007 under a supplemental indenture, the Co-Issuers issued and sold $2.0 billion aggregate principal amount of 10.25% Series B Senior Notes due November 1, 2015. Interest on these notes (referred to as the TCEH Cash-Pay Notes) is payable in cash semiannually in arrears on May 1 and November 1 of each year at a fixed rate of 10.25% per annum, and the first interest payment was made on May 1, 2008.

Pursuant to the supplemental indenture, the Co-Issuers also issued and sold $1.75 billion aggregate principal amount of 10.50%/11.25% Senior Toggle Notes due November 1, 2016. The initial interest payment on these notes (referred to as the TCEH Toggle Notes) was paid in cash. For any interest period thereafter until November 1, 2012, the Issuer may elect to pay interest on the notes, at the Issuer's option (i) entirely in cash; (ii) by increasing the principal amount of the notes or by issuing new TCEH Toggle Notes (Payment-in-Kind or PIK Interest); or (iii) 50% in cash and 50% in PIK Interest. Interest on the notes is payable semi-annually in arrears on May 1 and November 1 of each year at a fixed rate of 10.50% per annum for cash interest and at a fixed rate of 11.25% per annum for PIK Interest, and the first interest payment was made on May 1, 2008. See "Debt Related Activity in 2008" above for discussion of TCEH's election to use the PIK option for the May 1, 2009 payment.

The $6.75 billion principal amount of notes issued under the TCEH Indenture and its supplement (the TCEH Cash-Pay Notes and the TCEH Toggle Notes) are collectively referred to as the TCEH Notes.

The TCEH Notes are fully and unconditionally guaranteed by TCEH's direct parent, EFC Holdings (which owns 100% of TCEH and its subsidiary guarantors), and by each subsidiary that guarantees the TCEH Senior Secured Facilities (the TCEH Guarantors). The TCEH Notes are the Co-Issuers' senior unsecured debt and rank senior in right of payment to any future subordinated indebtedness of the Co-Issuers, equally in right of payment with all of the Co-Issuers' existing and future senior unsecured indebtedness, and structurally subordinated in right of payment to all existing and future indebtedness and other liabilities of the Co-Issuers' non-guarantor subsidiaries, including trade payables (other than indebtedness and liabilities owed to the Co-Issuers or the TCEH Guarantors). The TCEH Notes rank effectively junior in right of payment to all existing and future senior secured indebtedness of the Co-Issuers, including the TCEH Senior Secured Facilities to the extent of the value of the collateral securing such indebtedness.

The guarantees are joint and several guarantees of the TCEH Notes, are the TCEH Guarantors' senior unsecured obligations and rank equal in right of payment with all existing and future senior unsecured indebtedness of the relevant TCEH Guarantor and senior in right of payment to any existing or future subordinated indebtedness of the relevant TCEH Guarantor. The guarantees rank effectively junior to all secured indebtedness of the TCEH Guarantors to the extent of the assets securing that indebtedness. EFC Holdings' guarantee of the TCEH Notes ranks equally with its guarantee of the EFH Corp. Cash-Pay Notes and the EFH Corp. Toggle Notes (discussed below). The guarantees of the TCEH Notes are structurally junior to all indebtedness and other liabilities of the Co-Issuers' subsidiaries that do not guarantee the notes.

The TCEH Indenture contains a number of covenants that, among other things, restrict, subject to certain exceptions, the Co-Issuers' and their restricted subsidiaries' ability to:

- make restricted payments;

- incur debt and issue preferred stock;

- create liens;

Confidential

- enter into mergers or consolidations;
- sell or otherwise dispose of certain assets;
- permit dividend and other payment restrictions on restricted subsidiaries, and
- engage in certain transactions with affiliates.

The TCEH Indenture also contains customary events of default, including failure to pay principal or interest on the TCEH Notes or the guarantees when due, among others. If an event of default occurs under the TCEH Indenture, the trustee or the holders of at least 30% in principal amount of the Required Debt (as such term is defined in the TCEH Indenture) may declare the principal amount on the TCEH Notes to be due and payable immediately.

The Co-Issuers may redeem the TCEH Cash-Pay Notes, in whole or in part, at any time on or after November 1, 2011, or the TCEH Toggle Notes, in whole or in part, at any time on or after November 1, 2012, at specified redemption prices, plus accrued and unpaid interest, if any. In addition, before November 1, 2010, the Co-Issuers may redeem with the cash proceeds of certain equity offerings up to 35% of the aggregate principal amount of TCEH Cash-Pay Notes from time to time at a redemption price of 110.250% of the aggregate principal amount of the TCEH Cash-Pay Notes, plus accrued and unpaid interest, if any, or 110.500% of the aggregate principal amount of the TCEH Toggle Notes, plus accrued and unpaid interest, if any. The Co-Issuers may also redeem the TCEH Cash-Pay Notes at any time prior to November 1, 2011 or the TCEH Toggle Notes at any time prior to November 1, 2012 at a price equal to 100% of their principal amount, plus accrued and unpaid interest and a "make-whole" premium. Upon the occurrence of a change in control of TCEH, the Co-Issuers must offer to repurchase the TCEH Notes at 101% of their principal amount, plus accrued and unpaid interest, if any.

The TCEH Notes were issued in a private placement with registration rights. Notes having substantially identical terms as the TCEH Notes were registered with the SEC by the Co-Issuers in December 2008 as part of an offer to exchange freely tradable exchange notes for the TCEH Notes. The exchange offer was completed in January 2009. Because the exchange offer was not completed within 360 days after the issue date of the TCEH Notes (a TCEH Registration Default), the annual interest rate on the TCEH Notes increased for the period during which the TCEH Registration Default continued (October 26, 2008 to January 30, 2009 for the Senior Notes and November 30, 2008 to January 30, 2009 for the Series B Senior Notes and Senior Toggle Notes), resulting in incremental interest of $3.7 million.

***EFH Corp. Notes Issued Subsequent to the Merger***—EFC Holdings is a guarantor of certain EFH Corp. notes. In accordance with SEC Staff Accounting Bulletin (SAB) Topic 5-J, EFC Holdings reflects $2.250 billion principal amount of the EFH Corp. Notes on its balance sheet and the related interest expense in its income statement. The amount reflected on EFC Holdings' balance sheet, which represents 50% of the EFH Corp. debt guaranteed by EFC Holdings, was calculated based upon the relative equity investment of EFC Holdings and Intermediate Holding in their respective operating subsidiaries at the time of the Merger. Because payment of principal and interest on the notes is the responsibility of EFH Corp., EFC Holdings records the settlement of such amounts as noncash capital contributions from EFH Corp. The notes and the guarantees are described below.

Pursuant to an indenture entered into in October 2007 (the EFH Corp. Indenture), EFH Corp. issued and sold $2.0 billion aggregate principal amount of 10.875% Senior Notes due November 1, 2017. Interest on the notes (referred to as the EFH Corp. Cash-Pay Notes) is payable in cash semi-annually in arrears on May 1 and November 1 of each year at a fixed rate of 10.875% per annum, and the first interest payment was made on May 1, 2008.

Pursuant to the EFH Corp. Indenture, EFH Corp. also issued and sold $2.5 billion aggregate principal amount of 11.250%/12.000% Senior Toggle Notes due November 1, 2017. The initial interest payment on the notes (referred to as the EFH Corp. Toggle Notes) was paid in cash. For any interest period thereafter until

F-269

November 1, 2012, EFH Corp. may elect to pay interest on the notes, at EFH Corp.'s option (i) entirely in cash; (ii) by increasing the principal amount of the notes or by issuing new EFH Corp. Toggle Notes (PIK Interest); or (iii) 50% in cash and 50% in PIK Interest. Interest on the notes is payable semi-annually in arrears on May 1 and November 1 of each year at a fixed rate of 11.250% per annum for cash interest and at a fixed rate of 12.000% per annum for PIK Interest, and the first interest payment was made on May 1, 2008. See "Debt Related Activity in 2008" above for discussion of EFH Corp.'s election to use the PIK option for the May 1, 2009 payment.

The $4.5 billion principal amount of notes issued under the EFH Corp. Indenture (the EFH Corp. Cash-Pay Notes and the EFH Corp. Toggle Notes) are collectively referred to herein as the EFH Corp. Notes.

The EFH Corp. Notes are fully and unconditionally guaranteed by EFC Holdings and Intermediate Holding, 100% owned subsidiaries of EFH Corp. (the EFH Corp. Guarantors). The EFH Corp. Notes are EFH Corp.'s senior unsecured debt and rank senior in right of payment to any existing and future subordinated indebtedness of EFH Corp., equally in right of payment with all of EFH Corp.'s existing and future senior unsecured indebtedness and structurally subordinated in right of payment to all existing and future indebtedness, preferred stock and other liabilities of EFH Corp.'s non-guarantor subsidiaries, including trade payables (other than indebtedness and liabilities owed to EFH Corp. or the EFH Corp. Guarantors). The EFH Corp. Notes will rank effectively junior in right of payment to all future secured indebtedness of EFH Corp. to the extent of the assets securing that indebtedness.

The guarantees are joint and several guarantees of the EFH Corp. Notes, are the EFH Corp. Guarantors' unsecured senior obligations and rank equal in right of payment with all existing and future senior unsecured indebtedness of the relevant EFH Corp. Guarantor and senior in right of payment to any existing or future subordinated indebtedness of the relevant EFH Corp. Guarantor. The guarantees of the EFH Corp. Notes will be structurally junior to all indebtedness and other liabilities of the relevant EFH Corp. Guarantor's subsidiaries that are not guarantors.

The EFH Corp. Indenture contains a number of covenants that, among other things, restrict, subject to certain exceptions, EFH Corp.'s and its restricted subsidiaries' ability to:

- make restricted payments;

- incur debt and issue preferred stock;

- create liens;

- engage in mergers or consolidations;

- permit dividend and other payment restrictions on restricted subsidiaries, and

- engage in certain transactions with affiliates.

The EFH Corp. Indenture also contains customary events of default, including failure to pay principal or interest on the EFH Corp. Notes or the guarantees when due, among others. If an event of default occurs under the EFH Corp. Indenture, the trustee or the holders of at least 30% in principal amount outstanding of the EFH Corp. Notes may declare the principal amount on the EFH Corp. Notes to be due and payable immediately.

EFH Corp. may redeem the EFH Corp. Notes, in whole or in part, at any time on or after November 1, 2012, at specified redemption prices, plus accrued and unpaid interest, if any. In addition, before November 1, 2010, EFH Corp. may redeem, with the net cash proceeds of certain equity offerings, up to 35% of the aggregate principal amount of the EFH Corp. Notes from time to time at a redemption price of 110.875% of the aggregate principal amount of the EFH Corp. Cash Pay Notes, plus accrued and unpaid interest, if any, or 111.250% of the aggregate principal amount of the EFH Corp. Toggle Notes, plus accrued and unpaid interest, if any. EFH Corp. may also redeem the EFH Corp. Notes at any time prior to November 1, 2012 at a price equal to 100% of their

Confidential

EFIHMW00246348

principal amount, plus accrued and unpaid interest and a "make-whole" premium. Upon the occurrence of a change in control, EFH Corp. must offer to repurchase the EFH Corp. Notes at 101% of their principal amount, plus accrued and unpaid interest, if any.

The EFH Corp. Notes were issued in a private placement with registration rights. Notes having substantially identical terms as the EFH Corp. Notes were registered with the SEC by EFH Corp. in December 2008 as part of an offer to exchange freely tradable exchange notes for the EFH Corp. Notes. The exchange offer was completed in January 2009. Because the exchange offer was not completed within 360 days after the issue date of the EFH Corp. Notes (an EFH Corp. Registration Default), the annual interest rate on the EFH Corp. Notes increased for the period during which the EFH Corp. Registration Default continued (October 26, 2008 to January 30, 2009), resulting in incremental interest of $3.2 million.

***Intercreditor Agreement***—In October 2007, in connection with the Merger, TCEH entered into an Intercreditor Agreement (the Intercreditor Agreement) with Citibank, N.A. and five secured commodity hedge counterparties (the Secured Commodity Hedge Counterparties). The Intercreditor Agreement provides that the lien granted to the Secured Commodity Hedge Counterparties will rank pari passu with the lien granted with respect to the collateral of the secured parties under the TCEH Senior Secured Facilities. The Intercreditor Agreement also provides that the Secured Commodity Hedge Counterparties will be entitled to share, on a pro rata basis, in the proceeds of any liquidation of such collateral in connection with a foreclosure on such collateral in an amount provided in the TCEH Senior Secured Facilities. The Intercreditor Agreement also provides that the Secured Commodity Hedge Counterparties will have voting rights with respect to any amendment or waiver of any provision of the Intercreditor Agreement that changes the priority of the Secured Commodity Hedge Counterparties' lien on such collateral relative to the priority of lien granted to the secured parties under the TCEH Senior Secured Facilities or the priority of payments to the Secured Commodity Hedge Counterparties upon a foreclosure and liquidation of such collateral relative to the priority of the lien granted to the secured parties under the TCEH Senior Secured Facilities.

***TCEH Interest Rate Swap Transactions***—In 2007, subsequent to the Merger, TCEH entered into interest rate swap transactions pursuant to which payment of the floating interest rates on an aggregate of $15.05 billion of senior secured term loans of TCEH were exchanged for interest payments at fixed rates of between 7.3% and 8.3% on debt maturing from 2009 to 2014. The interest rate swaps were being accounted for as cash flow hedges related to variable interest rate cash flows until August 29, 2008, at which time these swaps were dedesignated as cash flow hedges as a result of the intent to change the variable interest rate terms of the hedged debt (from three-month LIBOR to one-month LIBOR) in connection with the planned execution of interest rate basis swaps (discussed immediately below) to further reduce the fixed borrowing costs. Based on the fair value of the positions, the cumulative unrealized mark-to-market net losses related to these interest rate swaps totaled $431 million (pre-tax) at the dedesignation date and was recorded in accumulated other comprehensive income. This balance will be reclassified into net income as interest on the hedged debt is reflected in net income. No ineffectiveness gains or losses were recorded.

In September 2008, TCEH entered into interest rate swap transactions pursuant to which payment of the floating interest rates on an aggregate of an additional $1.5 billion of senior secured term loans of TCEH were exchanged for interest payments at fixed rates of between 7.3% and 7.6% on debt maturing from 2013 to 2014.

In October 2008, TCEH entered into interest rate swap transactions pursuant to which payment of the floating interest rates on an aggregate of an additional $1.0 billion of senior secured term loans of TCEH were exchanged for interest payments at fixed rates of between 7.5% and 7.6% on debt maturing in 2014.

In May 2008, TCEH entered into an interest rate swap transaction pursuant to which semiannual payment (settled quarterly) of the floating interest rates at LIBOR on an aggregate of $2.095 billion of senior secured term loans of TCEH were exchanged for floating interest rates at LIBOR plus 0.21% receivable monthly.

F-271

EFIHMW00246349

In September 2008, TCEH entered into interest rate basis swap transactions pursuant to which quarterly payment of the floating interest rates at LIBOR on an aggregate of $7.95 billion of senior secured term loans of TCEH were exchanged for floating interest rates of LIBOR plus spreads ranging from 0.076% to 0.145% receivable monthly.

In November 2008, TCEH entered into interest rate basis swap transactions pursuant to which quarterly payment of the floating interest rates at LIBOR on an aggregate of $3.0 billion of senior secured term loans of TCEH were exchanged for floating interest rates of LIBOR plus spreads ranging from 0.21% to 0.292%, receivable monthly.

The interest rate swap counterparties are secured proportionally with the lenders under the TCEH Senior Secured Facilities. Subsequent to the dedesignation in August 2008 discussed above, changes in the fair value of the swaps discussed in the above paragraphs are being reported in the income statement in interest expense and related charges, and such unrealized mark-to-market net losses totaled $1.477 billion in 2008.

***EFC Holdings Long-Term Debt Fair Value Hedges***—EFC Holdings has used fair value hedging strategies to manage its exposure to fixed interest rates on long-term debt. These swaps qualified for and were designated as fair value hedges in accordance with SFAS 133 (under the "short-cut method" entities are allowed under SFAS 133 to assume no hedge ineffectiveness in a hedging relationship of interest rate risk if certain conditions are met).

***Long-Term Debt Fair Value Adjustments Related to Interest Rate Swaps (fixed to variable rate)*—**

| | |
|---|---:|
| **Predecessor:** | |
| Long-term debt fair value adjustments at January 1, 2007—net reduction in debt carrying value | 10 |
| Fair value adjustments during the period | 5 |
| Recognition of net gains on settled fair value hedges (a) | (1) |
| **Successor:** | |
| Long-term debt fair value adjustments at October 10, 2007—net reduction in debt carrying value | 14 |
| Purchase accounting adjustment (b) | (14) |
| Long-term debt fair value adjustments related to interest rate swaps at December 31, 2007 | $— |

(a) Net value of settled in-the-money fixed-to-variable swaps recognized in net income when the hedged transactions are recognized. Amount is pretax.

(b) Reflects the fair-valuing of debt as part of purchase accounting.

Changes in market values of unsettled fair value hedge positions are accounted for as adjustments to the carrying value of related debt amounts, offset by changes in commodity and other derivative contractual asset or liability amounts.

## 13.  COMMITMENTS AND CONTINGENCIES

*Generation Development*

EPC agreements have been executed for the development of three lignite coal-fueled generation units in Texas, two units at Oak Grove and one at Sandow, and construction of the units is well underway.

Subsidiaries of EFC Holdings have received the air permits for the Sandow and Oak Grove units. However, the Oak Grove air permit remains the subject of litigation as discussed below under "Litigation Related to Generation Development."

F-272

Confidential

Construction work-in-process asset balances for the Oak Grove units totaled approximately $2.8 billion as of December 31, 2008, which includes the effects of the fair value adjustments related to purchase accounting and capitalized interest. In the unexpected event the development of the Oak Grove units was cancelled, the cancellation exposure as of December 31, 2008 totaled $3.1 billion, which includes the carrying value of the project and up to approximately $300 million of termination obligations. This estimated exposure amount excludes any potential recovery values for assets acquired to date and for assets already owned prior to executing such agreements that are intended to be utilized for these projects.

### Contractual Commitments

At December 31, 2008, EFC Holdings had noncancellable commitments under energy-related contracts, leases and other agreements as follows:

| | Coal purchase agreements and coal transportation agreements | Pipeline transportation and storage reservation fees | Capacity payments under power purchase agreements (a) | Nuclear Fuel Contracts | Water Rights Contracts |
|---|---|---|---|---|---|
| 2009 . . . . . . . . . . . . | $263 | $ 41 | $ 3 | $153 | $ 8 |
| 2010 . . . . . . . . . . . . | 54 | 38 | — | 91 | 8 |
| 2011 . . . . . . . . . . . . | 44 | 37 | — | 113 | 8 |
| 2012 . . . . . . . . . . . . | — | 37 | — | 182 | 8 |
| 2013 . . . . . . . . . . . . | — | 42 | — | 120 | 8 |
| Thereafter . . . . . . . . | — | 22 | — | 272 | 45 |
| Total . . . . . . . . | $361 | $217 | $ 3 | $931 | $85 |

(a) On the basis of EFC Holdings' current expectations of demand from its electricity customers as compared with its capacity and take-or-pay payments, management does not consider it likely that any material payments will become due for electricity not taken beyond capacity payments.

Future minimum lease payments under both capital leases and operating leases are as follows:

| | Capital Leases | Operating Leases (a) |
|---|---|---|
| 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 29 | 41 |
| 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 29 | 40 |
| 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 71 | 39 |
| 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14 | 40 |
| 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 9 | 40 |
| Thereafter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 50 | 331 |
| Total future minimum lease payments . . . . . . . . . . . . . . . . . . . . | 202 | $531 |
| Less amounts representing interest . . . . . . . . . . . . . . . . . . . . . . . . | 43 | |
| Present value of future minimum lease payments . . . . . . . . . . . . . . | 159 | |
| Less current portion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 19 | |
| Long-term capital lease obligation . . . . . . . . . . . . . . . . . . . . . . . . . | $140 | |

(a) Includes operating leases with initial or remaining noncancellable lease terms in excess of one year. Excludes future minimum lease payments for combustion turbines owned by a TCEH lease trust of $17 million in each of 2009 through 2013 and $17 million thereafter.

Rent charged to operating cost, fuel cost and SG&A totaled $73 million for the year ended December 31, 2008, $20 million for the period October 11, 2007 through December 31, 2007, $50 million for the period January 1, 2007 through October 10, 2007 and $65 million for the year ended December 31, 2006.

F-273

EFIHMW00246351

PX 014
Page 633 of 1116

*Litigation Related to Generation Development*

An administrative appeal challenging the order of the TCEQ issuing the air permit for construction and operation of the Oak Grove generation facility in Robertson County, Texas to EFC Holdings was filed in September 2007 in the State District Court of Travis County, Texas. Plaintiffs asked that the District Court reverse the TCEQ's approval of the Oak Grove air permit and the TCEQ's adoption and approval of the TCEQ Executive Director's Response to Comments, and remand the matter back to the TCEQ for further proceedings. The TCEQ has filed the administrative record with the District Court. In addition to this administrative appeal, two other petitions were filed in Travis County District Court by non-parties to the administrative hearing before the TCEQ and the State Office of Administrative Hearings (SOAH) seeking to challenge the TCEQ's issuance of the Oak Grove air permit and asking the District Court to remand the matter to the SOAH for further proceedings. The plaintiffs in these two additional lawsuits filed a third, joint petition claiming insufficiencies in the Oak Grove application, permit, and process and seeking party status and remand to the SOAH for further proceedings. One of the plaintiffs has asked the court to consolidate all these proceedings, and the Attorney General of Texas, on behalf of TCEQ, has filed pleas to the jurisdiction that would, if granted, dismiss all but the administrative appeal. EFC Holdings does not know when the court will rule on these requests. EFC Holdings believes the Oak Grove air permit granted by the TCEQ is protective of the environment and that the application for and the processing of the air permit by the TCEQ was in accordance with law. There can be no assurance that the outcome of these matters would not result in an adverse impact on the Oak Grove project.

In May 2008, the Sierra Club announced that it may sue Oak Grove Management Company LLC for violating federal Clean Air Act provisions regarding hazardous air pollutants. Similarly, in July 2008, the Sierra Club announced that it may sue Luminant, after the expiration of a 60-day waiting period, for violating federal Clean Air Act provisions in connection with its Martin Lake generation facility. In December 2008, Luminant reached a settlement with the Sierra Club regarding its allegations relating to Oak Grove. Pursuant to the settlement, Luminant has filed for a Maximum Achievable Control Technology determination for hazardous air pollutant emissions by the TCEQ and has agreed to offset any emissions above the levels set in that review; in exchange the Sierra Club will not pursue legal action to obstruct construction or commencement of operation of the Oak Grove units. EFC Holdings cannot predict whether the Sierra Club will actually file suit relating to Martin Lake or the outcome of any such proceeding.

*Other Litigation*

In July 2008, Alcoa Inc. filed a lawsuit in Milam County, Texas district court against Luminant Generation Company LLC, Luminant Mining Company LLC, Sandow Power Company LLC, Luminant Energy Company LLC (each of which is an indirect wholly-owned subsidiary of EFC Holdings) and EFH Corp. The lawsuit makes various claims concerning operation of the Sandow Unit 4 generation facility and the Three Oaks lignite mine and construction of the Sandow 5 unit, including claims for breach of contract, breach of fiduciary duty, fraud and conversion, and requests money damages in an unspecified amount, declaratory judgment, an accounting and rescission. A federal district court in Austin, Texas has ordered Alcoa Inc. to amend its Milam County complaint to remove any references to a federal consent decree relating to Sandow Units 4 and 5. Alcoa Inc. has not yet filed its amended complaint. While EFC Holdings is unable to estimate any possible loss or predict the outcome of this litigation, EFC Holdings believes the claims made in this litigation are without merit and, accordingly, intends to vigorously defend this litigation.

*Regulatory Investigations and Reviews*

In June 2008, the EPA issued a request for information to Luminant Energy under EPA's authority under Section 114 of the Clean Air Act. The stated purpose of the request is to obtain information necessary to determine compliance with the Clean Air Act, including New Source Review Standards and air permits issued by the TCEQ for the Big Brown, Monticello and Martin Lake generation facilities. EFC Holdings is cooperating with the EPA and is responding in good faith to the EPA's request. EFC Holdings is unable to predict the outcome of this matter.

F-274

Confidential