agreements. Luminant Energy is the largest purchaser of wind-generated electricity in Texas and the fifth largest in the US with more than 900 MW of existing wind power under contract.

In its hedging activities, Luminant Energy enters into contracts for the physical delivery of electricity and natural gas, exchange traded and "over-the-counter" financial contracts and bilateral contracts with producers, generators and end-use customers. A major part of these hedging activities is a long-term hedging program, described above under "—EFH Corp.'s Strategies" designed to reduce exposure to changes in future electricity prices due to changes in the price of natural gas, principally utilizing natural gas-related financial instruments.

Luminant Energy also dispatches Luminant Power's available natural gas-fueled generation capacity. Luminant Energy's dispatching activities are performed through a centrally managed real-time operational staff that synthesizes operational activities across the fleet and interfaces with various wholesale market channels. Luminant Energy coordinates the overall commercial strategy for these plants working closely with Luminant Power. In addition, Luminant Energy manages the natural gas and fuel-oil procurement requirements for Luminant Power's natural gas-fueled generation fleet.

Luminant Energy engages in commercial operations such as physical purchases, storage and sales of natural gas, electricity and natural gas trading and third-party energy management. Luminant Energy's natural gas operations include direct purchases from natural gas producers, transportation agreements, storage leases and commercial retail sales. Luminant Energy currently manages approximately 15 billion cubic feet of natural gas storage capacity.

Luminant Energy manages exposure to wholesale commodity and credit related risk within established transactional risk management policies, limits and controls. These policies, limits and controls have been structured so that they are practical in application and consistent with stated business objectives. Risk management processes include capturing transactions, performing and validating valuations and reporting exposures on a daily basis using risk management information systems designed to support a large transactional portfolio. A risk management forum meets regularly to ensure that business practices comply with approved transactional limits, commodities, instruments, exchanges and markets. Transactional risks are monitored and limits are enforced to comply with the established risk policy. Luminant Energy has a disciplinary program to address any violations of the risk management policies and periodically reviews these policies to ensure they are responsive to changing market and business conditions.

*Luminant Construction*—Luminant Construction is developing three new lignite-fueled units in Texas with total estimated capacity of approximately 2,200 MW. The three units consist of one new generation unit at a site leased from Alcoa Inc. that is adjacent to an existing owned lignite-fueled generation unit (Sandow) and two units at an owned site (Oak Grove) that was originally slated for the construction of a generation plant a number of years ago. Aggregate cash capital expenditures for these three units are expected to total approximately $3.25 billion including all construction, site preparation and mining development costs, of which approximately $3.1 billion was spent as of September 30, 2009. Including capitalized interest and the step-up in construction work-in-process balances to fair value as a result of purchase accounting for the Merger in 2007, carrying value of the units are estimated to total approximately $4.8 billion upon completion.

Agreements were executed with EPC contractors, Bechtel Power Corporation and Fluor Enterprises, Inc., to engineer and construct the units at Sandow and Oak Grove, respectively. Permits for the construction of all three units have been obtained. The Sandow unit achieved substantial completion (as defined in the EPC Agreement for the unit) effective September 30, 2009. Accordingly, the company has operational control of the unit. The first Oak Grove unit, which is in the commissioning and start-up phase, synchronized to the grid in August 2009 and is expected to achieve substantial completion (as defined in the EPC Agreement for the unit) in the fourth quarter of 2009. The second Oak Grove unit is nearing completion of construction and initiation of the commissioning and start-up phase and is expected to achieve substantial completion (as defined in the EPC Agreement for the unit) in mid-2010.

B-8

EFIHMW00246502

The development program includes up to $500 million for investments in state-of-the-art emissions controls for the three new units. The development program also includes an environmental retrofit program under which Luminant Construction plans to install additional environmental control systems at Luminant Power's existing lignite/coal-fueled generation facilities. Estimated capital expenditures associated with these additional environmental control systems total approximately $1.0 billion to $1.3 billion, of which $219 million was spent through 2008. Luminant Construction has not yet completed all detailed cost and engineering studies for the additional environmental systems, and the cost estimates could change materially as Luminant Construction determines the details of and further evaluates the engineering and construction costs related to these investments.

*TXU Energy*—TXU Energy serves more than 2.1 million residential and commercial retail electricity customers in Texas. Texas is one of the fastest growing states in the nation with a diverse economy and, as a result, has attracted a number of competitors into the retail electricity market; consequently, competition is expected to continue to be robust. TXU Energy, as an active participant in this competitive market, provides retail electric service to all areas of the ERCOT market now open to competition, including the Dallas/Fort Worth, Houston, Corpus Christi, and lower Rio Grande Valley areas of Texas. TXU Energy continues to market its services in Texas to add new customers and to retain its existing customers. As of December 31, 2008, there were more than 130 active REPs certified to compete within the state of Texas.

TXU Energy's strategy focuses on providing its customers with high quality customer service and creating new products and services to meet customer needs; accordingly, system and other customer care enhancements are being implemented to further improve customer satisfaction. TXU Energy offers a wide range of residential products to meet various customer needs. Starting in 2008, TXU Energy is investing $100 million over the next five years, including $6 million spent in 2008, in energy efficiency initiatives as part of a program to offer customers a broad set of innovative energy products and services.

*Regulation*—Luminant Power is an exempt wholesale generator under the Energy Policy Act of 2005 and is subject to the jurisdiction of the NRC with respect to its nuclear generation plant. NRC regulations govern the granting of licenses for the construction and operation of nuclear-fueled generation plants and subject such plants to continuing review and regulation. Luminant Energy also holds a power marketer license from the FERC and, with respect to any wholesale power sales outside the ERCOT market, is subject to market behavior and any other competition-related rules and regulations under the Federal Power Act that are administered by the FERC.

Luminant Power and Luminant Energy are also subject to the jurisdiction of the PUCT's oversight of the competitive ERCOT wholesale electricity market. PUCT rules do not set wholesale power prices in the market but do provide certain limits and framework for such pricing and market behavior.

TXU Energy is a licensed REP under the Texas Electric Choice Act and is subject to the jurisdiction of the PUCT with respect to provision of electricity service in ERCOT. PUCT rules govern the granting of licenses for REPs, including oversight but not setting of prices charged.

### Regulated Delivery Segment

The Regulated Delivery segment primarily consists of the operations of Oncor. Oncor is a regulated electricity transmission and distribution company that provides the essential service of delivering electricity safely, reliably and economically to end-use consumers through its distribution systems, as well as providing transmission grid connections to merchant generation plants and interconnections to other transmission grids in Texas. This territory has an estimated population in excess of seven million, about one-third of the population of Texas, and comprises 92 counties and over 370 incorporated municipalities, including Dallas/Fort Worth and surrounding suburbs, as well as Waco, Wichita Falls, Odessa, Midland, Tyler and Killeen. Oncor's transmission and distribution assets are located principally in the north-central, eastern and western parts of Texas. Most of Oncor's power lines have been constructed over lands of others pursuant to easements or along public highways, streets and rights-of-way as permitted by law. Oncor's transmission and distribution rates are regulated by the PUCT.

B-9

EFIHMW00246503

Oncor is not a seller of electricity, nor does it purchase electricity for resale. It provides transmission services to other electricity distribution companies, cooperatives and municipalities. It provides distribution services to REPs, which sell electricity to retail customers.

*Performance*—Oncor achieved market-leading electricity delivery performance in six out of seven key PUCT market metrics in 2008. These metrics measure the success of transmission and distribution companies in facilitating customer transactions in the competitive Texas electricity market. In July 2007, the PUCT established new performance standards, and Oncor has implemented a plan seeking to achieve compliance with these standards during 2009.

*Investing in Infrastructure and Technology*—In 2008, Oncor invested over $882 million in its network to construct, rebuild and upgrade transmission lines and associated facilities, to extend the distribution infrastructure, and to pursue certain initiatives in infrastructure maintenance and information technology. Reflecting its commitment to infrastructure, in September 2008, Oncor and several other ERCOT utilities filed with the PUCT a plan to participate in the construction of transmission improvements designed to interconnect existing and future renewable energy facilities to transmit electricity from Competitive Renewable Energy Zones (CREZ) identified by the PUCT. This plan included the joint parties' plans to construct and operate all of the CREZ transmission facilities (CREZ Transmission Plan). Several other parties, including ERCOT and non-ERCOT entities, also filed CREZ Transmission Plans. Hearings on the CREZ Transmission Plan proposals were held in December 2008. In January 2009, the PUCT assigned approximately $1.3 billion of CREZ construction projects to Oncor. A written order reflecting the PUCT's decision was entered in March 2009, and an order on rehearing was issued by the PUCT in May 2009. The cost estimates for the CREZ construction projects are based upon cost analyses prepared by ERCOT. For the nine months ended September 30, 2009, CREZ-related capital expenditures totaled $84 million. It is expected that the necessary permitting actions and other requirements and all construction activities for the assigned construction projects will be completed by the end of 2013.

Oncor continues to invest in technology initiatives that include development of a modernized grid through the replacement of existing meters with advanced digital metering equipment and development of advanced digital communication, data management, real-time monitoring and outage detection capabilities. This modernized grid is expected to produce electricity service reliability improvements and provide the potential for additional products and services from REPs that will enable businesses and consumers to better manage their electricity usage and costs. Oncor's plans provide for the full deployment of over three million advanced meters by the end of 2012 to all residential and most non-residential retail electricity customers in Oncor's service area. As of September 30, 2009, Oncor has installed approximately 310 thousand advanced digital meters, including approximately 270 thousand in the nine months ended September 30, 2009. Cumulative capital expenditures for the deployment of the advanced meter system totaled $137 million as of September 30, 2009. In July 2009, Oncor's advanced metering system completed its first 15-minute interval, billing-quality electricity consumption data reporting to the Texas market. The data, which makes it possible to support innovative new programs and pricing options, represented information technology integration of over 200,000 advanced meters.

In July 2009, Oncor applied to the US Department of Energy for approximately $317 million in stimulus funds to advance its modernized grid initiatives. In October 2009, the US Department of Energy notified Oncor that these applications were not selected for funding.

In 2008, Oncor acquired a vendor's existing broadband over powerline (BPL)-based "Smart Grid" network assets in Oncor's service territory for $90 million in cash. These network assets include BPL equipment and technology such as fiber optics, embedded sensors and software analytics that are intended to enable Oncor to better monitor its electricity distribution network over up to one-sixth of its service territory. The network assets also included certain finished goods inventory and additional components. As part of the transaction, Oncor agreed to purchase software licenses and maintenance and operation services for a three-year period for approximately $35 million, including $25 million paid at the closing of the transaction. In addition, Oncor may, at its option, purchase additional equipment and utilize additional services from the vendor that would allow Oncor to expand the BPL network to up to one-half of its service territory.

B-10

EFIHMW00246504

**PX 014**
**Page 786 of 1116**

In a stipulation with several parties that was approved by the PUCT (as discussed in Note 8 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus), Oncor committed to a variety of actions, including minimum capital spending of $3.6 billion over the five-year period ending December 31, 2012, subject to certain defined conditions. This spending does not include the CREZ facilities.

*Electricity Transmission*—Oncor's electricity transmission business is responsible for the safe and reliable operations of its transmission network and substations. These responsibilities consist of the construction and maintenance of transmission facilities and substations and the monitoring, controlling and dispatching of high-voltage electricity over Oncor's transmission facilities in coordination with ERCOT.

Oncor is a member of ERCOT, and its transmission business actively assists the operations of ERCOT and market participants. Through its transmission business, Oncor participates with ERCOT and other member utilities to plan, design, construct and operate new transmission lines, with regulatory approval, necessary to maintain reliability, interconnect to merchant generation plants, increase bulk power transfer capability and minimize limitations and constraints on the ERCOT transmission grid.

Transmission revenues are provided under tariffs approved by either the PUCT or, to a small degree related to an interconnection to other markets, the FERC. Network transmission revenues compensate Oncor for delivery of electricity over transmission facilities operating at 60 kV and above. Other services offered by Oncor through its transmission business include, but are not limited to: system impact studies, facilities studies, transformation service and maintenance of transformer equipment, substations and transmission lines owned by other parties.

Provisions of the 1999 Restructuring Legislation allow Oncor to annually update its transmission rates to reflect changes in invested capital. These provisions encourage investment in the transmission system to help ensure reliability and efficiency by allowing for timely recovery of and return on new transmission investments.

Oncor's transmission facilities include approximately 5,043 circuit miles of 345-kV transmission lines and approximately 9,862 circuit miles of 138-and 69-kV transmission lines. Approximately sixty-three generation plants totaling approximately 37,691 MW are directly connected to Oncor's transmission system, and approximately 277 transmission stations and approximately 697 distribution substations are served from Oncor's transmission system.

At December 31, 2008, Oncor's transmission facilities had the following connections to other transmission grids in Texas:

|  | Number of Interconnected Lines | | |
| Grid Connections | 345kV | 138kV | 69kV |
| --- | --- | --- | --- |
| Centerpoint Energy Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 8 | — | — |
| American Electric Power Company, Inc (a) . . . . . . . . . . . . . . . . . . . . . . . | 4 | 7 | 12 |
| Lower Colorado River Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6 | 20 | 3 |
| Texas Municipal Power Agency . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 8 | 9 | — |
| Texas New Mexico Power . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2 | 9 | 11 |
| Brazos Electric Power Cooperative . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4 | 99 | 21 |
| Rayburn Country Electric Cooperative . . . . . . . . . . . . . . . . . . . . . . . . . | — | 31 | 7 |
| City of Georgetown . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 2 | — |
| Tex-La Electric Cooperative . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 11 | 1 |
| Other small systems operating wholly within Texas . . . . . . . . . . . . . . . . | — | 3 | 2 |

(a)  One of the 345-kV lines is an asynchronous high-voltage direct current connection with the Southwest Power Pool.

Confidential

*Electricity Distribution*—Oncor's electricity distribution business is responsible for the overall safe and efficient operation of distribution facilities, including electricity delivery, power quality and system reliability. These responsibilities consist of the ownership, management, construction, maintenance and operation of the distribution system within Oncor's certificated service area. Oncor's distribution system receives electricity from the transmission system through substations and distributes electricity to end-users and wholesale customers through approximately 3,080 distribution feeders.

The Oncor distribution system includes over 3.1 million points of delivery. Over the past five years, the number of Oncor's distribution system points of delivery served, excluding lighting sites, grew an average of approximately 1.5% per year, adding approximately 33,500 points of delivery in 2008.

The Oncor distribution system includes approximately 56,266 miles of overhead primary conductors, approximately 21,639 miles of overhead secondary and street light conductors, approximately 15,277 miles of underground primary conductors and approximately 9,497 miles of underground secondary and street light conductors. The majority of the distribution system operates at 25-kV and 12.5-kV.

*Customers*—Oncor's transmission customers consist of municipalities, electric cooperatives and other distribution companies. Oncor's distribution customers consist of more than 65 REPs in Oncor's certificated service area, including TCEH. Distribution revenues from TCEH represented 39% of Oncor's total revenues for 2008, and revenues from two subsidiaries of Reliant Energy, Inc., each of which is a non-affiliated REP, represented 16% of Oncor's total revenues for 2008. No other customer represented more than 10% of Oncor's total operating revenues. The retail customers who purchase and consume electricity delivered by Oncor are free to choose their electricity supplier from REPs who compete for their business.

*Regulation and Rates*—As its operations are wholly within Texas, EFH Corp. believes that Oncor is not a public utility as defined in the Federal Power Act and has been advised by its legal counsel that it is not subject to general regulation under this Act.

The PUCT has original jurisdiction over transmission and distribution rates and services in unincorporated areas and in those municipalities that have ceded original jurisdiction to the PUCT and has exclusive appellate jurisdiction to review the rate and service orders and ordinances of municipalities. Generally, PURA prohibits the collection of any rates or charges by a public utility (as defined by PURA) that does not have the prior approval of the appropriate regulatory authority (PUCT or municipality with original jurisdiction).

In June 2008, Oncor filed for a rate review with the PUCT (Docket No. 35717) and 204 cities. On August 31, 2009, the PUCT issued a final order with respect to the rate review. The final order approves a total annual revenue requirement for Oncor of $2.64 billion, based on Oncor's 2007 test year cost of service and customer characteristics. New rates have been calculated for all customer classes using 2007 test year billing metrics and the approved class cost allocation and rate design. The PUCT staff has estimated that the final order results in an approximate $115 million increase over Oncor's 2007 test year revenues, before recovery of rate case expenses. Prior to implementing the new rates in September 2009, Oncor had already begun recovering $45 million of the $115 million increase as a result of approved transmission cost recovery factor and energy efficiency cost recovery factor filings. Excluding the one-time write-off of certain regulatory assets discussed below, the result of the rate case is not expected to have a material effect on Oncor's net income.

Key findings made by the PUCT in the rate review include:

- recognizing and affirming Oncor's corporate ring-fence from EFH Corp. and its unregulated affiliates by rejecting a proposed consolidated tax savings adjustment arising out of EFH Corp.'s ability to offset Oncor's taxable income against losses from other investments;

- approving the recovery of all of Oncor's capital investment in its transmission and distribution system, including investment in certain automated meters that will be replaced pursuant to Oncor's advanced meter deployment plan;

B-12

EFIHMW00246506

- denying recovery of $25 million of certain regulatory assets, which resulted in a $16 million after-tax loss recognized in the third quarter 2009; and

- setting Oncor's return on equity at 10.25%.

New rates were implemented effective September 17, 2009. The final order is subject to motions for rehearing and appeals.

At the state level, PURA, as amended, requires owners or operators of transmission facilities to provide open-access wholesale transmission services to third parties at rates and terms that are nondiscriminatory and comparable to the rates and terms of the utility's own use of its system. The PUCT has adopted rules implementing the state open-access requirements for utilities that are subject to the PUCT's jurisdiction over transmission services, such as Oncor.

*Securitization Bonds*—The Regulated Delivery segment includes Oncor's wholly-owned, bankruptcy-remote financing subsidiary, Oncor Electric Delivery Transition Bond Company LLC. This financing subsidiary was organized for the limited purpose of issuing specified transition bonds in 2003 and 2004. Oncor Electric Delivery Transition Bond Company LLC issued $1.3 billion principal amount of securitization (transition) bonds to recover generation-related regulatory asset stranded costs and other qualified costs under an order issued by the PUCT in 2002.

**Environmental Regulations and Related Considerations**

*Global Climate Change*

*Background*—In recent years, a growing concern has emerged nationally and internationally about global climate change and how greenhouse gas emissions (GHGs), such as $CO_2$, contribute to global climate change. EFH Corp. produces GHG emissions from the direct combustion of fossil fuels at its generation plants, primarily its nine lignite/coal-fueled generation plants. $CO_2$, methane and NOx are emitted in this combustion process, with $CO_2$ representing the largest portion of these GHG emissions. GHG emissions (primarily $CO_2$) from EFH Corp.'s combustion of fossil fuels represent the substantial majority of EFH Corp.'s total GHG emissions. EFH Corp. estimates that its generation plants produced an average of 57 million tons of $CO_2$ annually from 2005 to 2008. The three lignite-fueled units currently under construction that EFH Corp. estimates will come on-line in 2009 and 2010 will generate additional $CO_2$ emissions. EFH Corp.'s other GHG emission sources include, among other things, coal piles at its generation plants, sulfur hexafluoride in its electric operations, refrigerant from its chilling and cooling equipment, fossil fuel combustion in its motor vehicles and electricity usage at its facilities and headquarters. Because a substantial portion of the generation portfolio consists of lignite/coal-fueled generation plants and EFH Corp. is constructing three new lignite-fueled generation units, EFH Corp.'s financial condition and/or results of operations could be materially adversely affected by the enactment of laws or regulations that mandate a reduction in GHG emissions or that impose financial penalties, costs or taxes on those that produce GHG emissions. See "Risk Factors" included elsewhere in this Prospectus for additional discussion of risks posed to EFH Corp. regarding global climate change regulation.

*Global Climate Change Legislation*—Several bills have been introduced in the US Congress or discussed by the Obama Administration that are intended to address climate change using different approaches, including a cap on carbon emissions with emitters allowed to trade unused emission allowances (cap-and-trade), a tax on carbon emissions (carbon tax) and incentives for the development of low-carbon technology. In addition to potential federal legislation to regulate GHG emissions, the US Congress might also consider other legislation that could result in the reduction of GHG emissions, such as the establishment of renewable energy portfolio standards (RPS). There is a growing consensus that some form of legislation or regulation is likely to occur in the near future at the federal level concerning GHG emissions.

EFH Corp., through its own evaluation and working in tandem with other companies, has supported the development of an integrated package of recommendations for the federal government to address the global

B-13

climate change issue through federal legislation, including GHG emissions reduction targets for total US GHG emissions and rigorous cost containment measures to ensure that program costs are not prohibitive. In the event GHG legislation involving a cap-and-trade program is enacted, EFH Corp. believes that such a program should be mandatory, economy-wide, consistent with expected technology development timelines and designed in a way to limit potential harm to the economy and protect consumers. EFH Corp. contends that any mechanism for allocation of GHG emission allowances should include substantial allocation of allowances to offset the cost of GHG regulation, including the cost to electricity consumers. In addition, EFH Corp. participates in a voluntary electric utility industry sector climate change initiative in partnership with the DOE. EFH Corp.'s strategies are generally consistent with "EEI Global Climate Change Points of Agreement" published by the Edison Electric Institute in January 2009, and "The Carbon Principles" announced in February 2008 by three major financial institutions. Finally, EFH Corp. has created a Sustainable Energy Advisory Board that advises EFH Corp. on technology development opportunities that reduce the effects of EFH Corp.'s operations on the environment while balancing the need to address the energy requirements of Texas. EFH Corp.'s Sustainable Energy Advisory Board is comprised of individuals who represent the following interests, among others: the environment, customers, economic development in Texas and technology/reliability standards.

*Federal Level*—A number of pieces of legislation dealing with greenhouse gas (GHG) emissions have been proposed recently in the US Congress, including the Waxman-Markey bill, known as the American Clean Energy and Security Act of 2009 (Waxman-Markey) and the Kerry-Boxer bill, known as the Clean Energy Jobs and American Power Act (Kerry-Boxer). This proposed legislation is not law, but in June 2009, Waxman-Markey was passed by the US House of Representatives and sent to the US Senate for consideration. Kerry-Boxer is currently being debated in the US Senate Environment and Public Works Committee. President Obama has also expressed support for Waxman-Markey and Kerry-Boxer.

As currently proposed, Waxman-Markey takes several approaches to address GHG emissions, including establishing renewable energy and energy efficiency standards, establishing performance standards for coal-fueled electricity generation units, and creating an economy-wide cap-and-trade program. The renewable energy and energy efficiency standards would require retail electricity suppliers to meet 6% of their load with renewable energy sources by 2012, increasing to 20% of their load by 2020, some of which could be met by energy efficiency measures. The performance standards for coal-fueled electricity generation units would require a 65% reduction in $CO_2$ emissions for subject generation units initially permitted after January 1, 2020, and a 50% reduction in $CO_2$ emissions for subject electricity generation units initially permitted between January 1, 2009 and January 1, 2020 once certain technology deployment criteria are met but no later than January 1, 2025. The cap-and-trade program would require emissions from capped sources, including coal-fueled electricity generation units, to be reduced 3% below 2005 levels by 2012, 17% by 2020, 42% by 2030 and 83% by 2050. The version of Waxman-Markey passed by the US House of Representatives included provisions that allocated a large percentage of the emissions allowances at no charge to various groups that would be impacted by such a cap-and-trade program, including certain merchant coal-fueled generation units. The Kerry-Boxer proposal employs a cap and trade approach similar to Waxman-Markey. However, there are the following key differences between Waxman-Markey and Kerry-Boxer: (i) a 20% reduction in $CO_2$ emissions levels by 2020; (ii) a smaller grant of emission allowances to the electric power sector, including merchant coal-fueled generation units and (iii) the lack of renewable energy and energy efficiency standards that are addressed in a separate proposal in the US Senate.

Both Waxman-Markey and Kerry-Boxer remain subject to deliberation and modifications in the US Congress, thereby precluding an accurate estimate of the cost of compliance; however, if Waxman-Markey, Kerry-Boxer or similar legislation were to be adopted, our costs of compliance with the law could be material.

In April 2007, the US Supreme Court issued a decision in the case of *Massachusetts v. US Environmental Protection Agency* holding that $CO_2$ and other GHG emissions are pollutants subject to regulation under the new motor vehicle provisions of the federal Clean Air Act. The case was remanded to the EPA for further rulemaking to determine whether GHG emissions may reasonably be anticipated to endanger public health or welfare, or in

B-14

EFIHMW00246508

the alternative, provide a reasonable explanation why GHG emissions should not be regulated. In April 2009, the EPA issued a proposed determination finding that six GHGs in the atmosphere were pollutants under the Clean Air Act, the combination of the six GHGs formed air pollution, that this air pollution, through the mechanics of climate change, endangers public health and welfare, and that the emission of four of these GHGs by motor vehicles contributes to this air pollution and thereby the threat of climate change. Although this "endangerment finding" is in draft form and applies only to GHG emissions from motor vehicle engines, some of the GHGs that are the subject of the proposed endangerment finding are produced by the combustion of fossil fuels by other sources as well, including fossil-fueled electricity generation units. The public comment period for the proposed endangerment finding ended in June 2009. The EPA must now decide whether to issue a final endangerment finding, and whether it will proceed with the rulemaking process to promulgate regulations related to the finding. If such regulations are adopted, costs of compliance with such regulations could be material. The EPA continues to take steps to regulate GHG emissions, as represented by its recent proposal to establish permitting requirements for substantial new sources of GHGs.

In September 2009, the US Court of Appeals for the Second Circuit issued a decision in the case of *State of Connecticut v. American Electric Power Company Inc.* holding that various states, a municipality and certain private trusts have standing to sue and have sufficiently alleged a cause of action under the federal common law of nuisance for injuries allegedly caused by the defendant power generation companies' emissions of GHGs. While the decision does not address the merits of the nuisance claim, and is still subject to appeal, it might encourage or form the basis for other lawsuits asserting similar nuisance claims regarding emissions of GHGs.

In October 2009, the US Court of Appeals for the Fifth Circuit also issued a decision in the case of *Comer v. Murphy Oil USA* holding that certain Mississippi residents have standing to sue to pursue state law nuisance, negligence and trespass claims for injuries purportedly suffered because the defendants' emissions of GHGs allegedly increased the destructive force of Hurricane Katrina. This decision, like the *American Electric Power* decision discussed above, does not address the merits of such a nuisance claim and is still subject to appeal.

*State and Regional Level*—There is currently no Texas state regulations in effect concerning GHGs. EFH Corp. opposes state-by-state regulation of GHG. There are no regional initiatives concerning GHGs in which the State of Texas is a participant.

*International Level*—The US currently is not a party to the Kyoto Protocol, which is a protocol to the United Nations Framework Convention on Climate Change (UNFCCC). The United Nations' Kyoto Protocol process generally requires developed countries to cap GHG emissions at certain levels during the 2008 to 2012 time period. At the conclusion of the December 2007 United Nations Climate Change Conference, the Bali Action Plan was adopted, which identifies a work group, process and timeline for the consideration of possible post-2012 international actions to further address climate change.

EFH Corp. continues to assess the risks posed by possible future legislative or regulatory changes pertaining to GHG emissions. Because the proposals described above are in their formative stages, EFH Corp. is unable to predict the potential effects on its business, financial condition and/or results of operations; however, any such effects could be material. The effect will depend, in large part, on the specific requirements of the legislation or regulation and how much, if any, of the costs are included in wholesale prices.

***EFH Corp.'s Voluntary Energy Efficiency, Renewable Energy, and Global Climate Change Efforts***— EFH Corp. is considering, or expects to be actively engaged in, business activities that could result in reduced GHG emissions including:

- *Investing in Energy Efficiency or Related Initiatives by EFH Corp.'s Competitive Businesses*—EFH Corp.'s competitive businesses expect to invest $100 million in energy efficiency or related initiatives over a five-year period that began in 2008, including initiatives such as the TXU Energy Power Monitor™, an in-home display device that enables residential customers to monitor whole-house energy usage and cost in real-time, as well as projects month-end bill amounts; the TXU Energy iThermostat™, a web-enabled programmable thermostat with load control feature for cycling off air

B-15

EFIHMW00246509

conditioners during times of peak energy demand; the development of time-based electricity rates that are expected to work in conjunction with advanced metering infrastructure; rate plans that include electricity from renewable resources; a Compact Fluorescent Light (CFL) program that provide packages of CFLs to customers; a program to refer customers to energy efficiency contractors and provide rebates to residential customers who install energy-efficient heating and cooling systems, ceiling insulation or windows; the provision of loans to business customers for purchasing new energy efficient equipment for their facilities based on a detailed engineering design through the Energy Conservation Investment Program; the Energy Efficiency Assistance Program that delivers products and services, as well as grants through social service agencies, to improve the energy efficiency of participating low income customer homes and apartment complexes; and online energy audit tools and tips for using less electricity;

- *Investing in Energy Efficiency Initiatives by Oncor*—In addition to the potential energy efficiencies from advanced metering, EFH Corp. expects to invest $300 million in energy efficiency initiatives over a five-year period that began in 2008, including energy consumption and carbon emissions through such efforts as the Take a Load Off Texas Solar Photovoltaic Program, the Mobile Experience Center, and investment of over $16 million in the installation of solar photovoltaic systems in customer's homes and facilities that is expected to result in savings of up to 4.8 million kWh of electricity;

- *Participating in the CREZ Program*—Oncor has been selected by the PUCT to construct approximately $1.3 billion of CREZ transmission facilities that are designed to connect existing and future renewable energy facilities to the electricity distribution system in ERCOT;

- *Purchasing Electricity from Renewable Sources*—EFH Corp. expects to remain a leader in the ERCOT market in providing electricity from renewable sources by purchasing up to 1,500 MW of wind power. EFH Corp.'s total wind power portfolio is currently more than 900 MW;

- *Promoting the use of Solar Power*—EFH Corp. also hopes to promote solar power through solar/ photovoltaic cars, rebates, incentives, and/or credits. In addition, TXU Energy's Solar Academy works with Texas school districts to teach and demonstrate the benefits of solar power;

- *Investing in Technology*—EFH Corp. will evaluate over the next five to ten years the development and commercialization of cleaner power plant technologies, including integrated gasification combined cycle and pulverized coal emissions technology to reduce $CO_2$ emission intensity, as well as related technologies such as electric cars and plug-in hybrid electric vehicles that have the potential to reduce overall GHG emissions;

- *Evaluating the Development of a New Nuclear Generation Facility*—EFH Corp. has filed an application with the NRC for combined construction and operating licenses for up to 3,400 MW of new nuclear generation capacity (the lowest emission source of baseload generation available) at its Comanche Peak nuclear generation plant. In addition, EFH Corp. has formed a joint venture with Mitsubishi Heavy Industries Ltd. (MHI) to further develop the units using MHI's US-Advanced Pressurized Water Reactor technology; and

- *Offsetting GHG Emissions by Planting Trees*—EFH Corp. is engaged in a number of tree planting programs that offset GHG emissions, including its planting of over 1.4 million trees in 2008 (the majority of which were part of EFH Corp.'s mining reclamation effort) and TXU Energy's Urban Tree Farm program under which it has planted more than 100,000 trees since the program's inception in 2002.

### *Sulfur Dioxide, Nitrogen Oxide and Mercury Air Emissions*

The EPA has promulgated Acid Rain Program rules that require fossil-fueled plants to have sufficient $SO_2$ emission allowances and meet certain NOx emission standards. EFH Corp.'s generation plants meet these $SO_2$ allowance requirements and NOx emission rates.

B-16

EFIHMW00246510

In 2005, the EPA issued a final rule to further reduce $SO_2$ and NOx emissions from power plants. The $SO_2$ and NOx reductions required under the Clean Air Interstate Rule (CAIR), which were required to be phased in between 2009 and 2015, were based on a cap and trade approach (market-based) in which a cap was put on the total quantity of emissions allowed in 28 eastern states (including Texas). Emitters were required to have allowances for each ton emitted, and emitters were allowed to trade emissions under the cap. In July 2008, the US Court of Appeals for the D.C. Circuit (D.C. Circuit Court) vacated CAIR. In December 2008, in response to an EPA petition, the D.C. Circuit Court reversed, in part, its previous ruling. Such reversal confirmed CAIR is not valid, but allowed it to remain in place while the EPA revises CAIR to correct the previously identified shortcomings. Since the D.C. Circuit Court did not prescribe a deadline for this revision, at this time, EFH Corp. cannot predict how or when the EPA may revise CAIR. See Note 3 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus for a discussion of the impairment of emission allowances intangible assets.

In 2005, the EPA also published a final rule requiring reductions of mercury emissions from coal-fueled generation plants. The Clean Air Mercury Rule (CAMR) was based on a nationwide cap and trade approach. The mercury reductions were required to be phased in between 2010 and 2018. In March 2008, the D.C. Circuit Court vacated CAMR. In February 2009, the US Supreme Court refused to hear the appeal of the D.C. Circuit Court's ruling. Pursuant to the D.C. Circuit Court's ruling, the EPA must begin development of rules implementing a Maximum Achievable Control Technology standard, which will likely take several years. See "—Legal Proceedings—Litigation Related to Generation Facilities."

$SO_2$ reductions required under the proposed regional haze/visibility rule (or so-called BART rule) only apply to units built between 1962 and 1977. The reductions are required on a unit-by-unit basis. The EPA provides the option for states to use CAIR to satisfy BART reductions for electric generating units, and Texas has chosen this option. The D.C. Circuit Court decision to leave CAIR in place while the EPA revises it should allow Texas to move forward with its plans.

In connection with EFH Corp.'s construction of three new lignite-fueled generation units in Texas, EFH Corp. has committed to reduce emissions of NOx, $SO_2$ and mercury at its existing lignite/coal-fueled units such that the total of those emissions from both existing and new lignite/coal-fueled units are 20% below 2005 levels. EFH Corp. has also applied with the TCEQ to seek a "maximum achievable control technology" determination for its two Oak Grove units that are under construction and has agreed to offset any emissions above those levels. This reduction is expected to be accomplished through the installation of emissions control equipment in both the new and existing units and fuel blending at some existing units. These efforts, which will involve incremental equipment investments as well as additional costs for facility operations and maintenance in the future, will be coordinated with efforts related to applicable environmental rules to provide the most cost-effective compliance plan options.

The following are the major air quality improvements planned at EFH Corp.'s existing and new coal-fueled power plants to help meet the offset and reduction commitment:

- To reduce NOx emissions, EFH Corp. plans to install in-duct selective catalytic reduction (SCR) systems at its Martin Lake plant. In addition, EFH Corp. plans to install selective non-catalytic reductions systems at its Monticello and Big Brown plants and improve the low-NOx burner technology at one of its Monticello units to further reduce NOx emissions. This is in addition to external SCR systems at the existing Sandow unit and new Oak Grove units;

- To reduce mercury emissions, all of EFH Corp.'s new and existing plants plan to use activated carbon injection—a sorbent injection system technology; and

- To reduce $SO_2$ emissions, EFH Corp. plans to increase use of lower-sulfur coal at various plants. In addition, the Martin Lake, Monticello and Big Brown plants plan to employ coal-cleaning technology to reduce both $SO_2$ and mercury emissions.

B-17

EFIHMW00246511

The Clean Air Act requires each state to monitor air quality for compliance with federal health standards. The standards for ozone are not being achieved in several areas of Texas. The TCEQ adopted new State Implementation Plan (SIP) rules in May 2007 to deal with eight-hour ozone standards. These rules require further NOx emission reductions from certain EFH Corp. peaking natural gas-fueled units in the Dallas-Fort Worth area by spring 2009; EFH Corp. expects to be in compliance with these rules. In March 2008, the EPA made the eight-hour ozone standards more stringent. Since SIP rules to address attainment of these new more stringent standards will not be required for approximately four years, EFH Corp. cannot yet predict the impact of this action on its facilities.

EFH Corp. believes that it holds all required emissions permits for facilities in operation and has applied for or obtained the necessary construction permits for facilities under construction.

*Water*

The TCEQ and the EPA have jurisdiction over water discharges (including storm water) from facilities in Texas. EFH Corp. believes its facilities are presently in material compliance with applicable state and federal requirements relating to discharge of pollutants into water. EFH Corp. believes it holds all required waste water discharge permits from the TCEQ for facilities in operation and has applied for or obtained necessary permits for facilities under construction. EFH Corp. also believes it can satisfy the requirements necessary to obtain any required permits or renewals. Recent changes to federal rules pertaining to the Spill Prevention, Control and Countermeasure (SPCC) plans for oil-filled electrical equipment and bulk storage facilities for oil will require updating of certain of its plants and facilities. EFH Corp. has determined that SPCC plans will be required for certain substations, work centers and distribution systems by November 10, 2010, and it is currently compiling data for development of these plans.

Diversion, impoundment and withdrawal of water for cooling and other purposes are subject to the jurisdiction of the TCEQ and the EPA. EFH Corp. believes it possesses all necessary permits for these activities from the TCEQ for its present operations. EFH Corp. is in the process of obtaining the necessary water rights permit from the TCEQ for the lignite mine that will support the Oak Grove units. Clean Water Act Section 316(b) regulations pertaining to existing water intake structures at large generation plants were published by the EPA in 2004. As prescribed in the regulations, EFH Corp. began implementing a monitoring program to determine the future actions that might need to be taken to comply with these regulations. In January 2007, a federal court ruled against the EPA in a lawsuit brought by environmental groups challenging aspects of these regulations, and in July 2007, the EPA announced that it was suspending the regulations pending further rulemaking. EFH Corp. cannot predict the impact on its operations of the suspended existing regulations or of new regulations, if any, that replace them.

*Radioactive Waste*

EFH Corp. currently ships low-level waste material to a disposal facility outside of Texas. Under the federal Low-Level Radioactive Waste Policy Act of 1980, as amended, the State of Texas is required to provide, either on its own or jointly with other states in a compact, for the disposal of all low-level radioactive waste generated within the state. The State of Texas has agreed to a compact for a disposal facility that would be located in Texas. That compact was ratified by Congress and signed by the President in 1998. In 2003, the State of Texas enacted legislation allowing a private entity to be licensed to accept low-level radioactive waste for disposal, and in 2004 the State received a license application from such an entity for review. In January 2009, the TCEQ Commissioners voted to approve this permit. EFH Corp. intends to continue to ship low-level waste material off-site for as long as an alternative disposal site is available. Should existing off-site disposal become unavailable, the low-level waste material will be stored on-site. (See discussion under "—Operating Segments— Competitive Electric Segment—Luminant Power—Nuclear Generation Assets.")

B-18

Confidential

EFH Corp. believes that its on-site used nuclear fuel storage capability is sufficient for a minimum of five years. The nuclear industry is continuing to review ways to enhance security of used-fuel storage with the NRC to fully utilize physical storage capacity. Accordingly, EFH Corp. is actively reviewing alternatives for used-fuel storage, including evaluation of industry techniques such as dry cask storage.

### Solid Waste, Including Fly Ash Associated with Lignite/Coal-Fueled Generation

Treatment, storage and disposal of solid waste and hazardous waste are regulated at the state level under the Texas Solid Waste Disposal Act and at the federal level under the Resource Conservation and Recovery Act of 1976, as amended, and the Toxic Substances Control Act. The EPA has issued regulations under the Resource Conservation and Recovery Act of 1976 and the Toxic Substances Control Act, and the TCEQ has issued regulations under the Texas Solid Waste Disposal Act applicable to EFH Corp. facilities. EFH Corp. believes it is in material compliance with all applicable solid waste rules and regulations. In addition, EFH Corp. has registered solid waste disposal sites and has obtained or applied for permits required by such regulations. In December 2008, an ash impoundment facility at another company's site in another state ruptured releasing a significant quantity of coal ash slurry. No impoundment failures of this nature have ever occurred at any EFH Corp. impoundments, which are inspected on a regular basis. In addition, groundwater monitoring wells are sampled routinely to ensure compliance with all applicable regulations. EFH Corp. is unable to predict future impacts on its financial condition or operations due to any legislative or regulatory actions that may be taken in response to the impoundment failure mentioned above.

### Environmental Capital Expenditures

Capital expenditures for EFH Corp.'s environmental projects totaled $191 million in 2008 and are expected to total approximately $175 million in 2009 consisting primarily of environmental projects at existing lignite/coal-fueled generation plants. These amounts are exclusive of emissions control equipment investment planned as part of the three-unit generation development program, which is expected to total up to $500 million over the construction period. See discussion under "—Operating Segments—Competitive Electric Segment—Luminant Construction" regarding planned investments in emissions control systems.

### Legal Proceedings
#### Generation Development

Construction of three lignite-fueled generation units in Texas, two units at Oak Grove and one unit at Sandow, is nearing completion. The Sandow unit achieved substantial completion (as defined in the EPC Agreement for the unit) on September 30, 2009, and one Oak Grove unit is in the commissioning and start-up phase.

In connection with the acquisition of the development rights to the Sandow unit, a subsidiary of TCEH (Sandow Power Company LLC, or Sandow Power) became a party to a federal consent decree with, among others, the US Department of Justice in August 2007 (the Consent Decree). A 2007 federal court order that was merged into the Consent Decree requires that, among other things, the Sandow unit commence commercial operation (as defined in the Consent Decree) and achieve and maintain certain emission-related deadlines by August 31, 2009. The Sandow unit met the commercial operation deadline by synchronizing to the ERCOT grid in early July 2009. However, due to unforeseen weather events and equipment malfunctions experienced during commissioning and start-up activities, the Sandow unit was not able to meet the emission-related deadlines by August 31, 2009. Under the terms of the Consent Decree, Sandow Power may request an extension to these deadlines from the federal district court that presides over the Consent Decree for certain force majeure events (including such events as the weather events and equipment malfunctions described above). In September 2009, the federal district court granted Sandow Power's request for force majeure relief and gave Sandow Power an additional sixty-one days from August 31, 2009 to begin achieving compliance with the applicable Consent Decree deadlines. Sandow Power is performing tests to determine whether it has achieved compliance with these deadlines.

B-19

EFIHMW00246513

TCEH has received the air permits for the Sandow and Oak Grove units. However, the issuances of the air permits have been challenged as discussed below under "—Litigation Related to Generation Facilities."

Construction work-in-process asset balances for the Oak Grove units totaled approximately $3.3 billion as of September 30, 2009, which includes the effects of the fair value adjustments related to purchase accounting and capitalized interest. In the unexpected event the development of the Oak Grove units was cancelled due to air permit challenges, the cancellation exposure as of September 30, 2009 totaled $3.4 billion, which includes the carrying value of the project and up to approximately $100 million of termination obligations. This estimated exposure amount excludes any potential recovery values for assets acquired to date and for assets already owned prior to executing such agreements that are being utilized in these projects.

*Litigation Related to Generation Facilities*

In September 2007, an administrative appeal challenging the order of the TCEQ issuing the air permit for construction and operation of the Oak Grove generation facility in Robertson County, Texas was filed in the State District Court of Travis County, Texas. Plaintiffs asked that the District Court reverse the TCEQ's approval of the Oak Grove air permit and the TCEQ's adoption and approval of the TCEQ Executive Director's Response to Comments, and remand the matter back to TCEQ for further proceedings. In addition to this administrative appeal, two other petitions were filed in Travis County District Court by non-parties to the administrative hearing before the TCEQ and the State Office of Administrative Hearings (SOAH) seeking to challenge the TCEQ's issuance of the Oak Grove air permit and asking the District Court to remand the matter to the SOAH for further proceedings. Finally, the plaintiffs in these two additional lawsuits filed a third, joint petition claiming insufficiencies in the Oak Grove application, permit, and process and seeking party status and remand to the SOAH for further proceedings. One of the plaintiffs has asked the District Court to consolidate all these proceedings, and the Attorney General of Texas, on behalf of TCEQ, filed pleas to the jurisdiction seeking dismissal of all but the administrative appeal. In May 2009, the District Court dismissed the claims that contest the merits of the TCEQ's permitting decision, but declined to dismiss the claims that contest the process by which the TCEQ handled the permit application. Oak Grove Management Company LLC (a subsidiary of TCEH) has subsequently intervened in these proceedings and has filed its own pleas to the jurisdiction asking the court to dismiss the remaining collateral attack claims. In October 2009, one of the plaintiffs ended its legal challenge to the permit. We believe the Oak Grove air permit granted by the TCEQ was issued in accordance with applicable law. There can be no assurance that the outcome of these matters will not adversely impact the Oak Grove project.

In June and September 2008, administrative appeals were filed in the State District Court of Travis County, Texas to challenge the administrative action of the TCEQ Executive Director in issuing an air permit alteration for the previously-permitted construction and operation of the Sandow 5 generation facility in Milam County, Texas, and the failure of the TCEQ to overturn that administrative action. Plaintiffs asked that the District Court reverse the issuance of the permit alteration. The Attorney General of Texas, on behalf of TCEQ, is defending the issuance of the permit alteration. Sandow Power has intervened in support of the TCEQ. The plaintiff's brief was filed in late August 2009, and the Attorney General of Texas and Sandow Power have filed responsive briefs. We believe the Sandow 5 air permit alteration administratively issued by the Executive Director of the TCEQ was issued in accordance with applicable law. There can be no assurance that the outcome of these matters will not adversely impact the Sandow 5 project.

In July 2008, the Sierra Club announced that it may sue Luminant, after the expiration of a 60-day waiting period, for violating federal Clean Air Act provisions in connection with Luminant's Martin Lake generation facility. We cannot predict whether the Sierra Club will actually file suit relating to Martin Lake or the outcome of any such proceeding.

B-20

*Other Litigation*

In September 2005, a lawsuit was filed in the US District Court for the Northern District of Texas, Dallas Division against EFH Corp. (then known as TXU Corp.) and C. John Wilder, EFH Corp.'s former Chief Executive Officer. The plaintiffs asserted claims on behalf of themselves and a putative class of owners of certain EFH Corp. securities who tendered such securities in connection with a tender offer conducted by EFH Corp. in 2004. The plaintiffs alleged violations of the provisions of Sections 14(e), 10(b) and 20(a) of the Securities Exchange Act of 1934, as amended, and Rule 10b-5 thereunder. In August 2006, the District Court dismissed this litigation with prejudice. In 2007, the US Court of Appeals for the Fifth Circuit remanded the dismissal to the District Court in light of the US Supreme Court's then-recent decision in Tellabs, Inc. v. Makor Issues & Rights, Ltd. On remand, in April 2008, the District Court again dismissed this litigation with prejudice. In April 2009, the US Court of Appeals for the Fifth Circuit affirmed the dismissal of all claims. In June 2009, the plaintiffs requested that the US Supreme Court review the merits of the case. In October 2009, the US Supreme Court denied the plaintiff's petition for review. Accordingly, this litigation has concluded.

In July 2008, Alcoa Inc. filed a lawsuit in Milam County, Texas district court against Luminant Generation and Luminant Mining (wholly-owned subsidiaries of TCEH), later adding EFH Corp., a number of its subsidiaries, Texas Holdings and Texas Energy Future Capital Holdings LLC as parties to the suit. The lawsuit makes various claims concerning the operation of the Sandow Unit 4 generation facility and the Three Oaks lignite mine, including claims for breach of contract, breach of fiduciary duty, fraud, tortious interference, civil conspiracy and conversion. The plaintiff requests money damages of no less than $500 million, declaratory judgment, rescission and other forms of equitable relief. An agreed scheduling order is currently in place setting trial for May 2010. While we are unable to estimate any possible loss or predict the outcome of this litigation, we believe the plaintiff's claims made in this litigation are without merit and, accordingly, intend to vigorously defend this litigation.

*Regulatory Investigations and Reviews*

In June 2008, the EPA issued a request for information to TCEH under EPA's authority under Section 114 of the Clean Air Act. The stated purpose of the request is to obtain information necessary to determine compliance with the Clean Air Act, including New Source Review Standards and air permits issued by the TCEQ for the Big Brown, Monticello and Martin Lake generation facilities. The company is cooperating with the EPA and is responding in good faith to the EPA's request, but is unable to predict the outcome of this matter.

*Other Proceedings*

In addition to the above, we are involved in various other legal and administrative proceedings in the normal course of business, the ultimate resolution of which, in the opinion of management, should not have a material effect on our financial position, results of operations or cash flows.

Confidential

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS AS OF AND FOR THE NINE MONTHS ENDED SEPTEMBER 30, 2009**

The following discussion and analysis of EFH Corp.'s financial condition and results of operations as of and for the three and nine months ended September 30, 2009 and 2008 was included in EFH Corp.'s Quarterly Report on Form 10-Q for the quarter ended September 30, 2009 filed with the SEC on October 30, 2009 (the "3rd Quarter MD&A"). The 3rd Quarter MD&A should be read in conjunction with EFH Corp.'s historical consolidated financial statements for the nine months ended September 30, 2009 and the notes to those statements included elsewhere in this Prospectus. See "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Year Ended December 31, 2008" below for a discussion and analysis of EFH Corp.'s financial condition and results of operations as of and for the year ended December 31, 2008.

All dollar amounts in the tables in the following discussion and analysis are stated in millions of US dollars unless otherwise indicated.

**Business**

We are a Dallas-based holding company conducting operations principally through our TCEH and Oncor subsidiaries. TCEH is a holding company for subsidiaries engaged in competitive electricity market activities largely in Texas including electricity generation, development and construction of new generation facilities, wholesale energy sales and purchases, commodity risk management and trading activities, and retail electricity sales. Oncor is a majority-owned (approximately 80%) subsidiary engaged in regulated electricity transmission and distribution operations in Texas. Various "ring-fencing" measures have been taken to further separate Oncor from our other businesses. See Note 1 to EFH Corp.'s historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus for a description of the material features of these "ring-fencing" measures and Note 6 to EFH Corp.'s historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus for discussion of noncontrolling interests sold by Oncor.

*Operating Segments*

We have aligned and report our business activities as two operating segments: the Competitive Electric segment and the Regulated Delivery segment. The Competitive Electric segment is principally comprised of TCEH. The segment also includes equipment salvage and resale activities related to the cancellation of the development of eight new coal-fueled generation units in 2007; such activities were not material for the quarter ended September 30, 2009. The Regulated Delivery segment is comprised of Oncor and its wholly-owned bankruptcy-remote financing subsidiary.

See Note 12 to EFH Corp.'s historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus for further information regarding reportable business segments.

*Significant Activities and Events*

*Long-Term Hedging Program*—TCEH has a long-term hedging program designed to reduce exposure to changes in future electricity prices due to changes in the price of natural gas. Under the program, the company has entered into market transactions involving natural gas-related financial instruments, and as of September 30, 2009, has effectively sold forward approximately 1.7 billion MMBtu of natural gas (equivalent to the natural gas exposure of approximately 214,000 GWh at an assumed 8.0 market heat rate) for the period from October 1,

Confidential

EFIHMW00246516

2009 through December 31, 2014 at weighted average annual hedge prices ranging from $7.19 per MMBtu to $8.05 per MMBtu. These transactions, as well as forward power sales, have effectively hedged an estimated 71% of the natural gas price exposure related to TCEH's expected generation output for the period beginning October 1, 2009 and ending December 31, 2014 (on an average basis for such period and assuming an 8.0 market heat rate). The hedges were entered into with the continuing expectation that wholesale electricity prices in ERCOT will be highly correlated with natural gas prices, which are expected to be the marginal fuel for the purpose of setting electricity prices approximately 75% to 90% of the time. If the correlation changes in the future, the cash flows targeted under the long-term hedging program may not be achieved.

The long-term hedging program is comprised primarily of contracts with prices based on the NYMEX Henry Hub pricing point. However, because there are other local and regional natural gas pricing points such as Houston Ship Channel, future wholesale power prices in ERCOT may not correlate as closely to the Henry Hub pricing as other pricing points, which could decrease the effectiveness of the positions in the long-term hedging program in mitigating power price exposure. The company has hedged more than 95% of the Houston Ship Channel versus Henry Hub pricing point risk for the fourth quarter 2009 period and more than 95% for 2010.

The company has entered into related put and call transactions (referred to as collars), primarily for year 2014 of the program, that effectively hedge natural gas prices within a range. These transactions represented approximately 6% of the positions in the long-term hedging program at September 30, 2009, with the approximate weighted average strike prices under the collars being a floor of $7.80 per MMBtu and a ceiling of $11.75 per MMBtu. Financial instruments, including collars, are expected to be employed in future hedging activity under the long-term hedging program.

The following table summarizes the natural gas hedges in the long-term hedging program as of September 30, 2009:

| | Measure | Balance 2009 (a) | 2010 | 2011 | 2012 | 2013 | 2014 | Total |
|---|---|---|---|---|---|---|---|---|
| Natural gas hedge volumes (b) . . . . . . . . . . | mm MMBtu | ~58 | ~298 | ~466 | ~492 | ~300 | ~97 | ~1,711 |
| Weighted average hedge price (c) . . . . . . . . | $/MMBtu | ~8.05 | ~7.80 | ~7.56 | ~7.36 | ~7.19 | ~7.80 | — |
| Weighted average market price (d) . . . . . . . | $/MMBtu | ~4.75 | ~6.21 | ~6.87 | ~7.00 | ~7.06 | ~7.17 | — |

(a)   Balance of 2009 is from October 1, 2009 through December 31, 2009
(b)   Where collars are reflected, the volumes are estimated based on the natural gas price sensitivity (i.e. delta position) of the derivatives. The notional volumes for collars are approximately 150 million MMBtu, which corresponds to a delta position of approximately 97 million MMBtu in 2014.
(c)   Weighted average hedge prices are based on sales prices of forward natural gas sales positions in the long-term hedging program based on NYMEX Henry Hub prices (excluding the impact of offsetting purchases for rebalancing and pricing point basis transactions). Where collars are reflected, sales price represents the collar floor price.
(d)   Based on NYMEX Henry Hub prices.

Changes in the fair value of the instruments in the long-term hedging program are being recorded as unrealized gains and losses in net gain (loss) from commodity hedging and trading activities in the statement of income, which has and could continue to result in significant volatility in reported net income. Based on the size of the long-term hedging program as of September 30, 2009, a $1.00/MMBtu change in natural gas prices across the hedged period would result in the recognition of up to approximately $1.7 billion in pretax unrealized mark-to-market gains or losses.

The reported unrealized mark-to-market net loss related to the long-term hedging program for the three months ended September 30, 2009 totaled $106 million. This amount reflects a $145 million net gain due to the

B-23

Confidential

effect of lower forward prices of natural gas on the value of positions in the program, which was more than offset by net losses of $251 million representing reversals of previously recorded unrealized gains on positions that settled in the period. The reported unrealized net gain for the nine months ended September 30, 2009 totaled $559 million. This amount reflects a $1.086 billion net gain due to the effect of lower forward prices of natural gas on the value of positions in the program, partially offset by net losses of $527 million representing reversals of previously recorded net gains on positions that settled in the period. Given the volatility of natural gas prices, it is not possible to predict future reported unrealized mark-to-market gains or losses and the actual gains or losses that will ultimately be realized upon settlement of the hedge positions in future years. If natural gas prices at settlement are lower than the prices of the hedge positions, the hedges are expected to mitigate the otherwise negative effect on earnings of lower wholesale electricity prices. However, if natural gas prices at settlement are higher than the prices of the hedge positions, the hedges are expected to dampen the otherwise positive effect on earnings of higher wholesale electricity prices and will in this context be viewed as having resulted in an opportunity cost. The cumulative unrealized mark-to-market net gain related to positions in the long-term hedging program totaled $1.430 billion and $871 million at September 30, 2009 and December 31, 2008, respectively. These values can change materially as market conditions change.

As of September 30, 2009, more than 95% of the long-term hedging program transactions were directly or indirectly secured by a first-lien interest in TCEH's assets (including the transactions supported by the TCEH Commodity Collateral Posting Facility—see discussion below under "—Financial Condition—Liquidity and Capital Resources") thereby reducing the cash and letter of credit collateral requirements for the hedging program.

The following sensitivity table provides estimates of the potential impact (in $millions) of movements in natural gas and certain other commodity prices and market heat rates on realized pre-tax earnings for the periods presented. The estimates related to price sensitivity are based on TCEH's unhedged position and forward prices as of September 30, 2009, which for natural gas reflects estimates of electricity generation less amounts hedged through the long-term natural gas hedging program and amounts under existing wholesale and retail sales contracts. On a rolling twelve-month basis, the substantial majority of retail sales under month-to-month arrangements are deemed to be under contract.

|  | Balance 2009 (a) | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|
| $1.00/MMBtu change in gas price (b) ..................... | $ ~9 | $~12 | $~41 | $~91 | $~279 |
| 0.1/MMBtu/MWh change in market heat rate (c) ............ | $— | $~16 | $~49 | $~57 | $ ~59 |
| $1.00/gallon change in diesel fuel price ................... | $— | $— | $— | $— | $ ~50 |
| $10.00/pound change in uranium/nuclear fuel ............... | $— | $— | $— | $ ~4 | $ ~1 |

(a) Balance of 2009 is from November 1, 2009 through December 31, 2009.

(b) Assumes conversion of electricity positions based on an approximate 8.0 market heat rate with natural gas being on the margin 75% to 90% of the time (i.e. when coal is forecast to be on the margin, no natural gas position is assumed to be generated).

(c) Based on Houston Ship Channel natural gas prices as of September 30, 2009.

*Debt Exchange Offers and Consent Solicitations*—See Note 4 to EFH Corp.'s historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus for discussion of debt exchange offers and consent solicitations commenced in October 2009.

*TCEH Interest Rate Swap Transactions*—As of September 30, 2009, TCEH had entered into a series of interest rate swaps that effectively fix the interest rates at between 7.3% and 8.3% on $17.55 billion principal amount of its senior secured debt maturing from 2009 to 2014. All of these swaps were entered into prior to January 1, 2009. Taking into consideration these swap transactions, approximately 7% of our total long-term debt portfolio at September 30, 2009 was exposed to variable interest rate risk. TCEH also entered into interest rate basis swap transactions, which further reduce fixed borrowing costs, related to an aggregate of $18.0 billion

B-24

EFIHMW00246518

PX 014
Page 800 of 1116

principal amount of senior secured debt, including swaps entered into in 2009 related to $9.55 billion principal amount of debt and reflecting the expiration in 2009 of swaps related to an aggregate $4.595 billion principal amount of debt. We may enter into additional interest rate hedges from time to time. Unrealized mark-to-market net gains and losses related to all TCEH interest rate swaps, which are reported in interest expense and related charges, totaled $138 million in net losses and $527 million in net gains for the three and nine month periods ended September 30, 2009, respectively. The cumulative unrealized mark-to-market net liability related to all TCEH interest rate swaps totaled $1.4 billion at September 30, 2009, of which $238 million (pre-tax) was reported in accumulated other comprehensive income. These fair values can change materially as market conditions change, which could result in significant volatility in reported net income. See discussion in Note 4 to EFH Corp.'s historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus regarding various interest rate swap transactions.

*Texas Generation Facilities Development*—TCEH is developing three lignite-fueled generation units (2 units at Oak Grove and 1 unit at Sandow) in the state of Texas with a total estimated capacity of approximately 2,200 MW. The Sandow unit achieved substantial completion (as defined in the EPC Agreement for the unit) effective September 30, 2009. Accordingly, the company has operational control of the unit. The first Oak Grove unit, which is in the commissioning and start-up phase, synchronized to the grid in August 2009 and is expected to achieve substantial completion (as defined in the EPC Agreement) in the fourth quarter of 2009. The second Oak Grove unit is nearing completion of construction and initiation of the commissioning and start-up phase and is expected to achieve substantial completion (as defined in the EPC Agreement) in mid-2010. Aggregate cash capital expenditures for these three units are expected to total approximately $3.25 billion including all construction, site preparation and mining development costs, of which approximately $3.1 billion was spent as of September 30, 2009. Total recorded costs, including purchase accounting fair value adjustments and capitalized interest, are expected to total approximately $4.8 billion upon completion of the units, and the balance was $4.6 billion as of September 30, 2009. See discussion in Note 5 to EFH Corp.'s historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus regarding contingencies related to the units.

*Nuclear Generation Development*—In September 2008, TCEH filed a combined operating license application with the NRC for two new nuclear generation units, each with approximately 1,700 MW (gross) capacity, at its existing Comanche Peak nuclear generation site. In connection with the filing of the application, in January 2009, TCEH and Mitsubishi Heavy Industries Ltd. (MHI) formed a joint venture to further the development of the two new nuclear generation units using MHI's US–Advanced Pressurized Water Reactor technology. A subsidiary of TCEH owns an 88% interest in the joint venture, and a subsidiary of MHI owns a 12% interest.

In March 2009, the NRC announced an official review schedule for the license application. Based on the schedule, the NRC expects to complete its review by December 2011, and it is expected that a license would be issued approximately one year later.

While TCEH was not one of the initial four applicants selected to receive DOE loan guarantees, it continues to update its DOE loan guarantee application for financing the proposed units.

*Idling of Natural Gas-Fueled Units*—In February 2009, we notified ERCOT of plans to retire 11 of our natural gas-fueled units, totaling 2,229 MW of capacity (2,341 MW installed nameplate capacity), in May 2009, and mothball (idle) an additional four units, totaling 1,596 MW of capacity (1,675 MW of installed nameplate capacity), in September 2009. In May and September 2009, we entered into reliability-must-run (RMR) agreements for the remainder of 2009 with ERCOT for the operation of one unit originally planned to be retired with 115 MW of capacity (115 MW of installed nameplate capacity) and one unit planned to be mothballed with 515 MW of capacity (540 MW of installed nameplate capacity), respectively. The other units were retired in May 2009 or mothballed in September 2009 as originally planned. An impairment charge of $229 million related to the carrying value of these units was recorded in the fourth quarter of 2008.

B-25

EFIHMW00246519

*Global Climate Change*—A number of pieces of legislation dealing with greenhouse gas (GHG) emissions have been proposed recently in the US Congress, including the Waxman-Markey bill, known as the American Clean Energy and Security Act of 2009 (Waxman-Markey) and the Kerry-Boxer bill, known as the Clean Energy Jobs and American Power Act (Kerry-Boxer). This proposed legislation is not law, but in June 2009, Waxman-Markey was passed by the US House of Representatives and sent to the US Senate for consideration. Kerry-Boxer is currently being debated in the US Senate Environment and Public Works Committee. President Obama has also expressed support for Waxman-Markey and Kerry-Boxer.

As currently proposed, Waxman-Markey takes several approaches to address GHG emissions, including establishing renewable energy and energy efficiency standards, establishing performance standards for coal-fueled electricity generation units, and creating an economy-wide cap-and-trade program. The renewable energy and energy efficiency standards would require retail electricity suppliers to meet 6% of their load with renewable energy sources by 2012, increasing to 20% of their load by 2020, some of which could be met by energy efficiency measures. The performance standards for coal-fueled electricity generation units would require a 65% reduction in $CO_2$ emissions for subject generation units initially permitted after January 1, 2020, and a 50% reduction in $CO_2$ emissions for subject electricity generation units initially permitted between January 1, 2009 and January 1, 2020 once certain technology deployment criteria are met but no later than January 1, 2025. The cap-and-trade program would require emissions from capped sources, including coal-fueled electricity generation units, to be reduced 3% below 2005 levels by 2012, 17% by 2020, 42% by 2030 and 83% by 2050. The version of Waxman-Markey passed by the US House of Representatives included provisions that allocated a large percentage of the emissions allowances at no charge to various groups that would be impacted by such a cap-and-trade program, including certain merchant coal-fueled generation units. The Kerry-Boxer proposal employs a cap and trade approach similar to Waxman-Markey. However, there are the following key differences between Waxman-Markey and Kerry-Boxer: (i) a 20% reduction in $CO_2$ emissions levels by 2020; (ii) a smaller grant of emission allowances to the electric power sector, including merchant coal-fueled generation units and (iii) the lack of renewable energy and energy efficiency standards that are addressed in a separate proposal in the US Senate.

Both Waxman-Markey and Kerry-Boxer remain subject to deliberation and modifications in the US Congress, thereby precluding an accurate estimate of the cost of compliance; however, if Waxman-Markey, Kerry-Boxer or similar legislation were to be adopted, our costs of compliance with the law could be material.

In April 2007, the US Supreme Court issued a decision in the case of *Massachusetts v. US Environmental Protection Agency* holding that $CO_2$ and other GHG emissions are pollutants subject to regulation under the new motor vehicle provisions of the federal Clean Air Act. The case was remanded to the EPA for further rulemaking to determine whether GHG emissions may reasonably be anticipated to endanger public health or welfare, or in the alternative, provide a reasonable explanation why GHG emissions should not be regulated. In April 2009, the EPA issued a proposed determination finding that six GHGs in the atmosphere were pollutants under the Clean Air Act, the combination of the six GHGs formed air pollution, that this air pollution, through the mechanics of climate change, endangers public health and welfare, and that the emission of four of these GHGs by motor vehicles contributes to this air pollution and thereby the threat of climate change. Although this "endangerment finding" is in draft form and applies only to GHG emissions from motor vehicle engines, some of the GHGs that are the subject of the proposed endangerment finding are produced by the combustion of fossil fuels by other sources as well, including fossil-fueled electricity generation units. The public comment period for the proposed endangerment finding ended in June 2009. The EPA must now decide whether to issue a final endangerment finding, and whether it will proceed with the rulemaking process to promulgate regulations related to the finding. If such regulations are adopted, costs of compliance with such regulations could be material. The EPA continues to take steps to regulate GHG emissions, as represented by its recent proposal to establish permitting requirements for substantial new sources of GHGs.

In September 2009, the US Court of Appeals for the Second Circuit issued a decision in the case of *State of Connecticut v. American Electric Power Company Inc.* holding that various states, a municipality and certain

B-26

EFIHMW00246520

private trusts have standing to sue and have sufficiently alleged a cause of action under the federal common law of nuisance for injuries allegedly caused by the defendant power generation companies' emissions of GHGs. While the decision does not address the merits of the nuisance claim, and is still subject to appeal, it might encourage or form the basis for other lawsuits asserting similar nuisance claims regarding emissions of GHGs.

In October 2009, the US Court of Appeals for the Fifth Circuit also issued a decision in the case of *Comer v. Murphy Oil USA* holding that certain Mississippi residents have standing to sue to pursue state law nuisance, negligence and trespass claims for injuries purportedly suffered because the defendants' emissions of GHGs allegedly increased the destructive force of Hurricane Katrina. This decision, like the *American Electric Power* decision discussed above, does not address the merits of such a nuisance claim and is still subject to appeal.

While we are not a party to these suits, if any similar suit was successfully asserted against us in the future, it could have a material adverse effect on our business, results of operations and financial condition.

*Oncor Technology Initiatives*—Oncor continues to invest in technology initiatives that include development of a modernized grid through the replacement of existing meters with advanced digital metering equipment and development of advanced digital communication, data management, real-time monitoring and outage detection capabilities. This modernized grid is expected to produce electricity service reliability improvements and provide the potential for additional products and services from REPs that will enable businesses and consumers to better manage their electricity usage and costs. Oncor's plans provide for the full deployment of over three million advanced meters by the end of 2012 to all residential and most non-residential retail electricity customers in Oncor's service area. As of September 30, 2009, Oncor has installed approximately 310 thousand advanced digital meters, including approximately 270 thousand in the nine months ended September 30, 2009. Cumulative capital expenditures for the deployment of the advanced meter system totaled $137 million as of September 30, 2009. In July 2009, Oncor's advanced metering system completed its first 15-minute interval, billing-quality electricity consumption data reporting to the Texas market. The data, which makes it possible to support innovative new programs and pricing options, represented information technology integration of over 200,000 advanced meters.

In July 2009, Oncor applied to the US Department of Energy for approximately $317 million in stimulus funds to advance its modernized grid initiatives. In October 2009, the US Department of Energy notified Oncor that these applications were not selected for funding.

*Oncor Matters with the PUCT*—See discussion of these matters, including the awarded construction of $1.3 billion of transmission lines and a rate case with the PUCT, below under "—Regulation and Rates."

## Results of Operations

### *Consolidated Financial Results—Three Months Ended September 30, 2009 Compared to Three Months Ended September 30, 2008*

Reference is made to the comparisons of results by business segment that follow the discussion of consolidated results. The business segment comparisons provide additional detail and quantification of items affecting financial results.

Operating revenues decreased $810 million, or 22%, to $2.885 billion in 2009.

- Operating revenues in the Competitive Electric segment decreased $825 million, or 25%, to $2.433 billion.

- Operating revenues in the Regulated Delivery segment increased $42 million, or 6%, to $770 million.

- Net intercompany sales eliminations increased $27 million reflecting higher sales by Oncor to REP subsidiaries of TCEH.

B-27

Fuel, purchased power costs and delivery fees decreased $761 million, or 47%, to $870 million in 2009. See discussion below in the analysis of Competitive Electric segment results of operations.

Net gains from commodity hedging and trading activities totaled $123 million in 2009 compared to $6.045 billion in 2008. Results in 2009 included unrealized mark-to-market net gains totaling $20 million. See discussion below in the analysis of Competitive Electric segment results of operations.

Operating costs increased $18 million, or 5%, to $388 million in 2009.

- Operating costs in the Competitive Electric segment increased $3 million, or 2%, to $161 million.
- Operating costs in the Regulated Delivery segment increased $15 million, or 7%, to $228 million.

Depreciation and amortization increased $25 million, or 6%, to $456 million in 2009.

- Depreciation and amortization in the Competitive Electric segment increased $7 million, or 2%, to $303 million.
- Depreciation and amortization in the Regulated Delivery segment increased $19 million, or 15%, to $147 million.

SG&A expenses increased $28 million, or 11%, to $277 million in 2009.

- SG&A expenses in the Competitive Electric segment increased $20 million, or 12%, to $192 million.
- SG&A expenses in the Regulated Delivery segment increased $8 million, or 19%, to $50 million.
- Corporate and Other SG&A expenses totaled $35 million in both periods as higher transition costs associated with outsourced support services were offset by lower stock-based compensation expense and lower program fees related to the sale of accounts receivable.

Other income totaled $45 million in 2009 and $14 million in 2008. The 2009 amount included $23 million arising from the reversal of a use tax accrual recorded in purchase accounting related to periods prior to the Merger, which was triggered by a state ruling in the third quarter of 2009. The 2009 and 2008 amounts also included $10 million and $11 million, respectively, in accretion of the fair value adjustment to certain regulatory assets due to purchase accounting. Other deductions totaled $32 million in 2009 and $541 million in 2008. The 2009 amount includes a $25 million write off of regulatory assets as discussed in Note 13 to EFH Corp.'s historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus under "Oncor's Regulatory Assets and Liabilities." The 2008 amount included $499 million in impairment charges related to NOx and $SO_2$ environmental allowances intangible assets and $26 million in charges to reserve for net receivables (excluding termination related costs) from terminated hedging transactions with subsidiaries of Lehman Brothers Holdings Inc., which filed for bankruptcy under Chapter 11 of the US Bankruptcy Code. See Note 13 to EFH Corp.'s historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus for details of other income and deductions.

Interest expense and related charges increased $208 million to $1.039 billion in 2009 reflecting a $138 million unrealized mark-to-market net loss in 2009 related to interest rate swaps compared to a net gain of $36 million in 2008 and $39 million in increased noncash amortization of losses on interest rate swaps dedesignated as cash flow hedges in August 2008. See Note 13 to EFH Corp.'s historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus.

Income tax benefit totaled $31 million in 2009 compared to income tax expense of $2.001 billion in 2008. The effective rate on a loss in 2009 was 36.5%, and the effective rate on income in 2008 was 35.6%. The increase in the rate was driven by the impact of non-taxable earnings on certain employee benefit plan investments and higher lignite depletion deduction, partially offset by the impact of interest accrued for uncertain tax positions.

B-28

EFIHMW00246522

Earnings decreased $3.671 billion to a net loss of $54 million in 2009.

- Earnings in the Competitive Electric segment decreased $3.655 billion to a net loss of $44 million.

- Earnings in the Regulated Delivery segment decreased $7 million to $132 million.

Corporate and Other net expenses totaled $142 million in 2009 and $133 million in 2008. The amounts in 2009 and 2008 include recurring interest expense on outstanding debt and notes payable to subsidiaries, as well as corporate general and administrative expenses. The increase of $9 million reflects a lower effective tax rate on a loss reflecting an increase in interest accrued for uncertain tax positions.

*Consolidated Financial Results—Nine Months Ended September 30, 2009 Compared to Nine Months Ended September 30, 2008*

Reference is made to the comparisons of results by business segment that follow the discussion of consolidated results. The business segment comparisons provide additional detail and quantification of items affecting financial results.

Operating revenues decreased $1.635 billion, or 18%, to $7.366 billion in 2009.

- Operating revenues in the Competitive Electric segment decreased $1.665 billion, or 21%, to $6.144 billion.

- Operating revenues in the Regulated Delivery segment increased $68 million, or 3%, to $2.037 billion.

- Net intercompany sales eliminations increased $38 million, reflecting higher sales by Oncor to REP subsidiaries of TCEH.

Fuel, purchased power costs and delivery fees decreased $1.696 billion, or 44%, to $2.171 billion in 2009. See discussion below in the analysis of Competitive Electric segment results of operations.

Results from commodity hedging and trading activities totaled $1.003 billion in net gains in 2009 compared to $248 million in net losses in 2008. Results in 2009 included unrealized mark-to-market net gains totaling $769 million driven by the effect of lower forward market prices of natural gas on the value of positions in the long-term hedging program. See discussion below in the analysis of Competitive Electric segment results of operations.

Operating costs increased $51 million, or 5%, to $1.171 billion in 2009.

- Operating costs in the Competitive Electric segment increased $4 million, or 1%, to $504 million.

- Operating costs in the Regulated Delivery segment increased $48 million, or 8%, to $668 million.

Depreciation and amortization increased $69 million, or 6%, to $1.286 billion in 2009.

- Depreciation and amortization in the Competitive Electric segment increased $35 million, or 4%, to $862 million.

- Depreciation and amortization in the Regulated Delivery segment increased $35 million, or 9%, to $405 million.

SG&A expenses increased $80 million, or 11%, to $792 million in 2009.

- SG&A expenses in the Competitive Electric segment increased $56 million, or 11%, to $555 million.

- SG&A expenses in the Regulated Delivery segment increased $13 million, or 10%, to $139 million.

B-29

Confidential

- Corporate and Other SG&A expenses increased $11 million, or 13%, to $98 million as $29 million in higher transition costs associated with outsourced support services were partially offset by lower stock-based compensation expense and lower program fees related to the sale of accounts receivable.

See Note 2 to EFH Corp.'s historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus for discussion of the $90 million additional impairment of goodwill in 2009.

Other income totaled $71 million in 2009 and $43 million in 2008, including $30 million and $33 million, respectively, in accretion of the fair value adjustment to certain regulatory assets due to purchase accounting and a $23 million reversal of a use tax accrual in 2009, as described in the third quarter analysis above. Other deductions totaled $50 million in 2009 and $583 million in 2008. The 2009 amount includes a $25 million write off of regulatory assets as discussed in Note 13 to EFH Corp.'s historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus under "Oncor's Regulatory Assets and Liabilities." The 2008 amount includes $501 million in impairment charges related to NOx and SO$_2$ environmental allowances intangible assets and $26 million in charges to reserve for net receivables (excluding termination related costs) from terminated hedging transactions with subsidiaries of Lehman Brothers Holdings Inc., which filed for bankruptcy under Chapter 11 of the US Bankruptcy Code. See Note 13 to EFH Corp.'s historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus for details of other income and deductions.

Interest expense and related charges decreased $369 million to $2.136 billion in 2009 reflecting $491 million in higher unrealized mark-to-market net gains related to interest rate swaps, which was partially offset by $123 million in increased noncash amortization of losses on interest rate swaps dedesignated as cash flow hedges. Increased interest expense of $24 million due to higher average borrowings and $9 million due to higher average interest rates was largely offset by a $31 million increase in capitalized interest. See Note 13 to EFH Corp.'s historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus.

Income tax expense totaled $254 million in 2009 compared to an income tax benefit of $462 million in 2008. The effective rate on income in 2009 was 49.3%, and the effective rate on a loss in 2008 was 32.0%. The increase in the rate reflects the non-deductible goodwill impairment in 2009, which increased the effective rate by 7 percentage points. In addition, interest accrued on uncertain tax positions increased the rate on income in 2009 and decreased the rate on a loss in 2008.

Earnings increased $1.244 billion to $261 million in net income in 2009.

- Earnings in the Competitive Electric segment increased $1.298 billion to $436 million.

- Earnings in the Regulated Delivery segment decreased $37 million to $272 million.

- Corporate and Other net expenses totaled $447 million in 2009 and $430 million in 2008. The amounts in 2009 and 2008 include recurring interest expense on outstanding debt and notes payable to subsidiaries, as well as corporate general and administrative expenses. The increase of $17 million reflected a $20 million goodwill impairment and the $7 million increase in SG&A expense as discussed above, partially offset by $11 million in interest income related to a $400 million collateral funding arrangement (see Note 7 to EFH Corp.'s historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus).

B-30

Confidential

*Competitive Electric Segment*

*Financial Results*

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2009 | 2008 | 2009 | 2008 |
| Operating revenues | $ 2,433 | $ 3,258 | $ 6,144 | $ 7,809 |
| Fuel, purchased power costs and delivery fees | (1,187) | (1,923) | (2,987) | (4,646) |
| Net gain (loss) from commodity hedging and trading activities | 123 | 6,045 | 1,003 | (248) |
| Operating costs | (161) | (158) | (504) | (500) |
| Depreciation and amortization | (303) | (296) | (862) | (827) |
| Selling, general and administrative expenses | (192) | (172) | (555) | (499) |
| Franchise and revenue-based taxes | (27) | (26) | (74) | (74) |
| Impairment of goodwill | — | — | (70) | — |
| Other income | 33 | 2 | 38 | 8 |
| Other deductions | (7) | (533) | (22) | (559) |
| Interest income | 21 | 20 | 40 | 46 |
| Interest expense and related charges | (798) | (605) | (1,414) | (1,824) |
| Income (loss) before income taxes | (65) | 5,612 | 737 | (1,314) |
| Income tax (expense) benefit | 21 | (2,001) | (301) | 452 |
| Net income (loss) | $ (44) | $ 3,611 | $ 436 | $ (862) |

B-31

Confidential

*Competitive Electric Segment*

*Sales Volume and Customer Count Data*

| | Three Months Ended September 30, | | % Change | Nine Months Ended September 30, | | % Change |
|---|---|---|---|---|---|---|
| | 2009 | 2008 | | 2009 | 2008 | |
| **Sales volumes:** | | | | | | |
| Retail electricity sales volumes—(GWh): | | | | | | |
| Residential | 9,348 | 9,098 | 2.7 | 22,312 | 22,153 | 0.7 |
| Small business (a) | 2,598 | 2,241 | 15.9 | 6,228 | 5,802 | 7.3 |
| Large business and other customers | 4,049 | 4,038 | 0.3 | 10,905 | 10,951 | (0.4) |
| Total retail electricity | 15,995 | 15,377 | 4.0 | 39,445 | 38,906 | 1.4 |
| Wholesale electricity sales volumes | 10,126 | 12,472 | (18.8) | 30,180 | 35,529 | (15.1) |
| Net sales (purchases) of balancing electricity to/from ERCOT | (38) | 145 | — | (304) | (1,335) | (77.2) |
| Total sales volumes | 26,083 | 27,994 | (6.8) | 69,321 | 73,100 | (5.2) |
| **Average volume (kWh) per residential customer (b)** | 4,936 | 4,802 | 2.8 | 11,772 | 11,767 | — |
| **Weather (North Texas average)—percent of normal (c):** | | | | | | |
| Cooling degree days | 99.1% | 100.7% | (1.6) | 103.3% | 109.0% | (5.2) |
| Heating degree days | — % | — % | — | 89.3% | 93.7% | (4.7) |
| **Customer counts:** | | | | | | |
| Retail electricity customers (end of period and in thousands) (d): | | | | | | |
| Residential | | | | 1,876 | 1,909 | (1.7) |
| Small business (a) | | | | 273 | 276 | (1.1) |
| Large business and other customers | | | | 23 | 27 | (14.8) |
| Total retail electricity customers | | | | 2,172 | 2,212 | (1.8) |

(a)   Customers with demand of less than 1 MW annually.

(b)   Calculated using average number of customers for the period.

(c)   Weather data is obtained from Weatherbank, Inc., an independent company that collects and archives weather data from reporting stations of the National Oceanic and Atmospheric Administration (a federal agency under the US Department of Commerce). Normal is defined as the average over a 20-year period.

(d)   Based on number of meters. Typically, large business and other customers have more than one meter; therefore, number of meters does not reflect the number of individual customers. Nine months ended September 30, 2008 amounts reflect a reclassification of 18 thousand meters from residential to small business to conform to current presentation.

B-32

EFIHMW00246526

*Competitive Electric Segment*

*Revenue and Commodity Hedging and Trading Activities*

| | Three Months Ended September 30, | | % Change | Nine Months Ended September 30, | | % Change |
|---|---|---|---|---|---|---|
| | 2009 | 2008 | | 2009 | 2008 | |
| **Operating revenues:** | | | | | | |
| Retail electricity revenues: | | | | | | |
|     Residential | $1,272 | $1,258 | 1.1 | $3,048 | $2,966 | 2.8 |
|     Small business (a) | 366 | 335 | 9.3 | 924 | 852 | 8.5 |
|     Large business and other customers | 330 | 447 | (26.2) | 955 | 1,143 | (16.4) |
| Total retail electricity revenues | 1,968 | 2,040 | (3.5) | 4,927 | 4,961 | (0.7) |
| Wholesale electricity revenues (b) | 380 | 1,134 | (66.5) | 1,043 | 2,797 | (62.7) |
| Net sales (purchases) of balancing electricity to/from ERCOT | (5) | (44) | — | (50) | (227) | — |
| Amortization of intangibles (c) | 20 | 26 | (23.1) | 10 | (15) | — |
| Other operating revenues | 70 | 102 | (31.4) | 214 | 293 | (27.0) |
|     Total operating revenues | $2,433 | $3,258 | (25.3) | $6,144 | $7,809 | (21.3) |
| **Commodity hedging and trading activities:** | | | | | | |
| Unrealized net gains (losses) from changes in fair value | $ 136 | $6,068 | — | $1,026 | $ (237) | — |
| Unrealized net gains (losses) representing reversals of previously recognized fair values of positions settled in the current period | (116) | 20 | — | (257) | (68) | — |
| Realized net gains (losses) on settled positions | 103 | (43) | — | 234 | 57 | — |
|     Total gain (loss) | $ 123 | $6,045 | — | $1,003 | $ (248) | — |

(a)  Customers with demand of less than 1 MW annually.

(b)  Upon settlement of physical derivative power sales and purchase contracts that are marked-to-market in net income, wholesale electricity revenues and fuel and purchased power costs are reported at approximated market prices, as required by accounting rules, instead of the contract price. As a result, these line item amounts include a noncash component, which the company considers "unrealized." These amounts are as follows:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2009 | 2008 | 2009 | 2008 |
| Reported in revenues | $(11) | $ 76 | $(135) | $155 |
| Reported in fuel and purchased power costs | (6) | (22) | 79 | (71) |
|     Net gain (loss) | $(17) | $ 54 | $ (56) | $ 84 |

(c)  Represents amortization of the intangible net asset value of retail and wholesale power sales agreements resulting from purchase accounting.

B-33

EFIHMW00246527

**PX 014**

**Page 809 of 1116**

*Competitive Electric Segment*

*Production, Purchased Power and Delivery Cost Data*

| | Three Months Ended September 30, | | % Change | Nine Months Ended September 30, | | % Change |
|---|---|---|---|---|---|---|
| | 2009 | 2008 | | 2009 | 2008 | |
| **Fuel, purchased power costs and delivery fees ($ millions):** | | | | | | |
| Nuclear fuel | $ 28 | $ 25 | 12.0 | $ 86 | $ 69 | 24.6 |
| Lignite/coal | 175 | 172 | 1.7 | 474 | 485 | (2.3) |
| Total baseload fuel | 203 | 197 | 3.0 | 560 | 554 | 1.1 |
| Natural gas fuel and purchased power (a) | 431 | 1,161 | (62.9) | 953 | 2,532 | (62.4) |
| Amortization of intangibles (b) | 84 | 87 | (3.4) | 224 | 246 | (8.9) |
| Other costs | 39 | 94 | (58.5) | 145 | 304 | (52.3) |
| Fuel and purchased power costs | 757 | 1,539 | (50.8) | 1,882 | 3,636 | (48.2) |
| Delivery fees (c) | 430 | 384 | 12.0 | 1,105 | 1,010 | 9.4 |
| Total | $ 1,187 | $ 1,923 | (38.3) | $ 2,987 | $ 4,646 | (35.7) |
| **Fuel and purchased power costs (which excludes generation plant operating costs) per MWh:** | | | | | | |
| Nuclear fuel | $ 5.42 | $ 4.88 | 11.1 | $ 5.55 | $ 4.75 | 16.8 |
| Lignite/coal (d) | 16.53 | 15.39 | 7.4 | 16.49 | 15.83 | 4.2 |
| Natural gas fuel and purchased power | 47.99 | 104.02 | (53.9) | 44.06 | 91.55 | (51.9) |
| **Delivery fees per MWh** | $ 26.68 | $ 24.77 | 7.7 | $ 27.77 | $ 25.69 | 8.1 |
| **Production and purchased power volumes (GWh):** | | | | | | |
| Nuclear | 5,219 | 4,996 | 4.5 | 15,512 | 14,448 | 7.4 |
| Lignite/coal | 12,209 | 12,240 | (0.3) | 32,914 | 33,697 | (2.3) |
| Total baseload generation | 17,428 | 17,236 | 1.1 | 48,426 | 48,145 | 0.6 |
| Natural gas-fueled generation | 1,135 | 2,124 | (46.6) | 2,168 | 3,843 | (43.6) |
| Purchased power | 7,890 | 9,042 | (12.7) | 19,523 | 23,816 | (18.0) |
| Total energy supply | 26,453 | 28,402 | (6.9) | 70,117 | 75,804 | (7.5) |
| Line loss and power imbalances (e) | 370 | 408 | (9.3) | 796 | 2,704 | (70.6) |
| Net energy supply volumes | 26,083 | 27,994 | (6.8) | 69,321 | 73,100 | (5.2) |
| **Baseload capacity factors (%):** | | | | | | |
| Nuclear | 103.1% | 98.4% | 4.8 | 103.1% | 95.6% | 7.8 |
| Lignite/coal | 94.0% | 95.0% | (1.1) | 85.9% | 87.7% | (2.1) |
| Total baseload | 96.6% | 95.9% | 0.7 | 90.7% | 89.9% | 0.9 |

(a) See note (b) on previous page.

(b) Represents amortization of the intangible net asset values of emission credits, coal purchase contracts, nuclear fuel contracts and power purchase agreements and the stepped up value of nuclear fuel resulting from purchase accounting.

(c) Includes delivery fee charges from Oncor that are eliminated in consolidation.

(d) Includes depreciation and amortization of lignite mining assets, which is reported in the depreciation and amortization expense line item, but is part of overall fuel costs.

(e) Includes physical purchases and sales, the financial results of which are reported in commodity hedging and trading activities in the income statement.

B-34

*Competitive Electric Segment—Financial Results—Three Months Ended September 30, 2009 Compared to Three Months Ended September 30, 2008*

Operating revenues decreased $825 million, or 25%, to $2.4 billion in 2009.

Wholesale electricity revenues decreased $754 million, or 66%, as compared to 2008, when wholesale revenues increased 93%. Volatility in wholesale revenues and purchased power costs reflects movements in natural gas prices, as lower natural gas prices in 2009 drove a 55% decline in average wholesale electricity sales prices. Reported wholesale revenues and purchased power costs also reflect changes in volumes of bilateral contracting activity entered into to mitigate the effects of demand volatility and congestion. Results in 2009 reflect lower demand volatility and a decline in congestion, which drove a 19% decrease in sales volumes. Realized gains in 2009 on hedging activities mitigated the effect of lower wholesale electricity prices (see discussion of results from commodity hedging and trading activities below).

Bilateral electricity contracting activity includes hedging transactions that utilize contracts for physical delivery. Wholesale sales and purchases of electricity are reported gross in the income statement if the transactions are scheduled for physical delivery with ERCOT.

Wholesale balancing activity represents intraday purchases and sales transactions with ERCOT for real-time balancing purposes, as measured in 15-minute intervals, which are highly variable and in 2009 reflected reduced volatility and congestion.

Retail electricity revenues declined $72 million, or 4%, to $1.968 billion in 2009 and reflected the following:

- Lower average pricing contributed $154 million to the revenue decline, driven by the contract business market and also reflecting lower residential pricing. Lower average pricing reflected declines in wholesale electricity prices. In July 2009, the company announced retail residential price reductions of as much as 15% applicable to over 250,000 existing customers on month-to-month plans as well as reductions on offerings for new customers. The price reductions were effective in August 2009.

- A four percent increase in retail sales volumes increased revenues by $82 million, reflecting increases in both the residential and business markets. Higher residential volumes reflected the effect of Hurricane Ike in 2008 and warmer weather in south Texas, while the higher business markets volume reflected customer mix changes.

- Total retail electricity customer counts at September 30, 2009 decreased two percent from September 30, 2008 driven by a two percent decrease in the residential markets and reflecting competitive activity.

Other operating revenues decreased $32 million, or 31%, to $70 million in 2009 due to the effect of lower natural gas prices and lower volumes on sales of natural gas to industrial customers.

The change in operating revenues also reflected a $6 million decrease in amortization of intangible assets arising in purchase accounting.

Fuel, purchased power costs and delivery fees decreased $736 million, or 38%, to $1.2 billion in 2009. This decrease was driven by lower purchased power costs due to the effect of lower natural gas prices, decreased demand volatility and reduced congestion as discussed above regarding wholesale revenues. Lower costs of replacement power during unplanned generation unit repair outages contributed to improved margin. Other factors contributing to lower fuel and purchased power costs included lower natural gas-fueled generation and lower related fuel costs ($182 million) and the effect of lower natural gas prices and volumes on natural gas purchased for sale to industrial customers ($34 million).

B-35

Confidential

Overall baseload generation production increased one percent in 2009 reflecting a five percent increase in nuclear production, partially offset by a small decrease in lignite/coal-fueled production. The increase in nuclear production, which reflects a refueling outage in 2008, resulted in improved margin.

Net gain (loss) from commodity hedging and trading activities include realized and unrealized gains and losses associated with financial instruments used for commodity hedging and trading purposes, as well as gains and losses on physical sales and purchases of commodities for trading and hedging purposes. A substantial majority of the commodity hedging activities are intended to mitigate the risk of commodity price movements on future revenues and involve natural gas positions entered into as part of the long-term hedging program. The results of these activities have been volatile because of the effects of movements in forward natural gas prices on unrealized mark-to-market valuations. Following is an analysis of amounts reported as net gain (loss) from commodity hedging and trading activities for the three months ended September 30, 2009 and 2008:

*Three Months Ended September 30, 2009*—Unrealized mark-to-market net gains totaling $20 million included:

- $4 million in net losses related to hedge positions, which includes $121 million in net gains from changes in fair value driven by the impact of lower forward natural gas prices on the value of positions in the long-term hedging program, and $125 million in net losses that represent reversals of previously recorded net gains on positions settled in the period, and

- $24 million in net gains related to trading positions, which includes $15 million in net gains from changes in fair value and $9 million in net gains that represent reversals of previously recorded net losses on positions settled in the period.

Realized net gains totaling $103 million include:

- $110 million in net gains related to positions that primarily hedged electricity revenues recognized in the period, and

- $7 million in net losses related to trading positions.

*Three Months Ended September 30, 2008*—Unrealized mark-to-market net gains totaling $6.088 billion include:

- $6.091 billion in net gains related to hedge positions, which includes $6.074 billion in net gains from changes in fair value and $17 million in net gains that represent reversals of previously recorded net losses on positions settled in the period. The net gains from changes in fair value were driven by the effect of decreases in natural gas prices in forward periods on the value of positions in the long-term hedging program;

- $10 million in "day one" losses related to large hedge positions (see Note 7 to EFH Corp.'s historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus), and

- $7 million in net gains related to trading positions, which includes $4 million in net gains from changes in fair value and $3 million in net gains that represent reversals of previously recorded net losses on positions settled in the period.

Realized net losses totaling $43 million include:

- $105 million in net losses related to hedge positions that primarily offset hedged electricity revenues recognized in the period, and

- $62 million in net gains related to trading positions.

Operating costs increased $3 million, or 2%, to $161 million in 2009. The increase reflected $6 million in operational readiness costs in preparation for new lignite-fueled generation facilities start-up and $6 million in

B-36

EFIHMW00246530

increased normal baseload maintenance costs in 2009, partially offset by $6 million in 2008 maintenance costs incurred for a planned nuclear generation unit outage and $3 million in lower costs in 2009 due to natural gas-fueled generation unit retirements.

Depreciation and amortization increased $7 million, or 2%, to $303 million in 2009. The increase was driven by $11 million in higher amortization expense related to the intangible asset representing retail customer relationships recorded in purchase accounting. Lower natural gas generation unit depreciation resulting from an impairment in 2008 was substantially offset by increased lignite generation unit depreciation as a result of normal capital additions as well as adjustments to useful lives of components.

SG&A expenses increased $20 million, or 12%, to $192 million in 2009 driven by a $19 million increase in retail bad debt expense. The increase in bad debt expense primarily reflects higher delinquencies due to delays in final bills and disconnects resulting from a system conversion, customer losses and general economic conditions.

Other income totaled $33 million in 2009 and $2 million in 2008. The 2009 amount included a $23 million reversal of a use tax accrual (see Note 13 to EFH Corp.'s historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus) and a $6 million fee received related to an interest rate swap/commodity hedge derivative agreement. Other deductions totaled $7 million in 2009 and $533 million in 2008. The 2008 other deductions amount includes $499 million in impairment charges related to NOx and SO$_2$ environmental allowances intangible assets and $26 million in charges to reserve for net receivables (excluding termination related costs) from terminated hedging transactions with subsidiaries of Lehman Brothers Holdings Inc., which filed for bankruptcy under Chapter 11 of the US Bankruptcy Code. See Note 13 to EFH Corp.'s historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus.

Interest expense and related charges increased $193 million, or 32%, to $798 million in 2009 reflecting a $138 million unrealized mark-to-market net loss in 2009 compared to a $36 million net gain in 2008 related to interest rate swaps and a $39 million increase in noncash amortization of losses on interest rate swaps dedesignated as cash flow hedges in August 2008, partially offset by $14 million in lower amortization of discount and debt issuance costs and $6 million in increased capitalized interest.

Income tax benefit totaled $21 million in 2009 compared to income tax expense totaling $2.001 billion in 2008. The effective rates were 32.3% in 2009 and 35.7% in 2008. The decrease in the rate is primarily due to the effect of interest accrued for uncertain tax positions on a small loss in 2009.

Results for the segment declined by $3.7 billion to a loss of $44 million driven by the decrease in unrealized mark-to-market net gains related to commodity hedging activities and the unrealized mark-to-market net loss related to interest rate swaps in 2009 reported in interest expense and related charges, partially offset by the effect of impairment charges reported in other deductions in 2008.

### *Competitive Electric Segment—Financial Results—Nine Months Ended September 30, 2009 Compared to Nine Months Ended September 30, 2008*

Operating revenues decreased $1.7 billion, or 21%, to $6.1 billion in 2009.

Wholesale electricity revenues decreased $1.8 billion, or 63%, as compared to 2008 when revenues increased 78%. Volatility in wholesale revenues and purchased power costs reflects movements in natural gas prices, as lower natural gas prices in 2009 drove a 48% decline in average wholesale electricity sales prices. Reported wholesale revenues and purchased power costs also reflect changes in volumes of bilateral contracting activity entered into to mitigate the effects of demand volatility and congestion. Results in 2009 reflect lower demand volatility and a decline in congestion, which drove a 15% decline in wholesale sales volumes. Realized gains in 2009 on hedging activities mitigated the effect of lower wholesale electricity prices (see discussion of commodity hedging and trading activities below).

B-37

EFIHMW00246531

Bilateral electricity contracting activity includes hedging transactions that utilize contracts for physical delivery. Wholesale sales and purchases of electricity are reported gross in the income statement if the transactions are scheduled for physical delivery with ERCOT.

Wholesale balancing activity represents intraday purchases and sales transactions with ERCOT for real-time balancing purposes, as measured in 15-minute intervals, which are highly variable and in 2009 reflected reduced volatility and congestion, in part due to actions taken by ERCOT.

Retail electricity revenues declined $34 million, or 1%, to $4.927 billion and reflected the following:

- Lower average pricing contributed $103 million to the revenue decline. The change in average pricing reflected lower average contracted business rates driven by lower wholesale electricity prices, partially offset by higher average pricing in the residential and non-contract business markets resulting from advanced meter surcharges as well as customer mix.

- Retail sales volume growth of 1% increased revenues by $69 million. Volumes rose in both the residential and business markets.

Other operating revenues decreased $79 million, or 27%, to $214 million in 2009 due to the effect of lower natural gas prices and lower volumes on sales of natural gas to industrial customers.

The change in operating revenues also reflected a $25 million increase in amortization of intangible assets arising in purchase accounting.

Fuel, purchased power costs and delivery fees decreased $1.7 billion, or 36%, to $3.0 billion in 2009. This decrease was driven by lower purchased power costs due to the effect of lower natural gas prices, decreased demand volatility and reduced congestion as discussed above regarding wholesale revenues. Lower costs of replacement power during unplanned generation unit repair outages contributed to improved margin. Other factors contributing to lower fuel and purchased power costs included lower natural gas-fueled generation and lower related fuel costs ($372 million), the effect of lower natural gas prices on natural gas purchased for sale to industrial customers ($111 million) and lower amortization of intangible assets arising in purchase accounting ($22 million).

Overall baseload generation production increased 1% in 2009 reflecting a seven percent increase in nuclear production, partially offset by a two percent decrease in lignite/coal-fueled production. The increase in nuclear production, which reflects a refueling outage in 2008, resulted in improved margin. The decrease in lignite/coal-fueled production reflected reductions during certain periods when power could be purchased in the wholesale market at prices below production costs, which was largely due to lower natural gas prices and higher wind generation availability, partially offset by lower maintenance and repair outages.

Following is an analysis of amounts reported as net gain (loss) from commodity hedging and trading activities for the nine months ended September 30, 2009 and 2008:

*Nine Months Ended September 30, 2009*—Unrealized mark-to-market net gains totaling $769 million included:

- $750 million in net gains related to hedge positions, which includes $1.010 billion in net gains from changes in fair value, driven by the impact of lower forward natural gas prices on the value of positions in the long-term hedging program, and $260 million in net losses that represent reversals of previously recorded net gains on positions settled in the period, and

- $19 million in net gains related to trading positions, which includes $16 million in net gains from changes in fair value and $3 million in net gains that represent reversals of previously recorded net losses on positions settled in the period.

B-38

Confidential

Realized net gains totaling $234 million included:

- $247 million in net gains related to positions that primarily hedged electricity revenues recognized in the period, and
- $13 million in net losses related to trading positions.

*Nine Months Ended September 30, 2008*—Unrealized mark-to-market net losses totaling $305 million included:

- $250 million in net losses related to hedge positions, which includes $248 million in net losses from changes in fair value and $2 million in net losses that represent reversals of previously recorded net gains on positions settled in the period;
- $69 million in "day one" net losses related to large hedge positions (see Note 7 to EFH Corp.'s historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus), and
- $13 million in net gains related to trading positions, which includes $79 million in net gains from changes in fair value and $66 million in net losses that represent reversals of previously recorded net gains on positions settled in the period.

Realized net gains totaling $57 million include:

- $76 million in net losses related to hedge positions that offset hedged electricity revenues and fuel and purchased power costs recognized in the period, and
- $133 million in net gains related to trading positions.

Operating costs increased $4 million, or 1%, to $504 million in 2009. The increase reflected $21 million in higher maintenance costs incurred during planned and unplanned lignite-fueled generation unit outages in 2009 and $15 million in operational readiness costs incurred in preparation for new lignite-fueled generation facilities start-up, partially offset by the effect of $32 million in 2008 maintenance costs incurred for a planned nuclear generation unit outage.

Depreciation and amortization increased $35 million, or 4%, to $862 million in 2009. The increase was driven by $29 million in higher amortization expense related to the intangible asset representing retail customer relationships recorded in purchase accounting. Increased lignite generation unit depreciation as a result of normal capital additions as well as adjustments to useful lives of components was substantially offset by lower natural gas generation unit depreciation resulting from an impairment in 2008.

SG&A expenses increased $56 million, or 11%, to $555 million in 2009. The increase reflected $30 million in higher retail bad debt expense, reflecting higher delinquencies due to delays in final bills and disconnects resulting from a system conversion, customer losses and general economic conditions, $25 million in higher costs associated with the implementation of a new retail customer information management system and the transition of certain previously outsourced customer operations and $4 million in costs related to the nuclear generation development joint venture.

See Note 2 to EFH Corp.'s historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus for discussion of the additional impairment of goodwill of $70 million in 2009.

Other income totaled $38 million in 2009 and $8 million in 2008. The 2009 amount included a $23 million reversal of a use tax accrual (see Note 13 to EFH Corp.'s historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus) and a $6 million fee received related to an interest rate swap/commodity hedge derivative agreement. Other deductions totaled $22 million in 2009 and

B-39

$559 million in 2008. The 2009 amount includes charges for severance and other individually immaterial miscellaneous expenses. The 2008 amount includes $501 million in impairment charges related to NOx and $SO_2$ environmental allowances intangible assets and $26 million in charges to reserve for net receivables (excluding termination related costs) from terminated hedging transactions with subsidiaries of Lehman Brothers Holdings Inc., which filed for bankruptcy under Chapter 11 of the US Bankruptcy Code. See Note 13 to EFH Corp.'s historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus for more details.

Interest expense and related charges decreased $410 million, or 22%, to $1.4 billion in 2009. The decrease reflected $491 million in higher unrealized mark-to-market net gains related to interest rate swaps and $32 million in increased capitalized interest, partially offset by $123 million in increased noncash amortization of losses on interest rate swaps dedesignated as cash flow hedges in August 2008.

Income tax expense totaled $301 million in 2009 compared to an income tax benefit totaling $452 million in 2008. The effective rate was 40.8% on income in 2009 and 34.4% on a loss in 2008. The increase in the rate reflects the impacts of the non-deductible goodwill impairment in 2009, which added 3.5 percentage points to the effective rate, and the effect of interest accrued for uncertain tax positions, which increased the rate on income in 2009 and decreased the rate on a loss in 2008.

Results for the segment improved $1.3 billion to net income of $436 million in 2009 driven by the change in unrealized mark-to-market results related to commodity hedging activities, the 2008 impairment charges reported in other deductions related to environmental allowances intangible assets and the unrealized mark-to-market net gains related to interest rate swaps reported in interest expense.

### Regulated Delivery Segment

### Financial Results

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2009 | 2008 | 2009 | 2008 |
| Operating revenues | $ 770 | $ 728 | $2,037 | $1,969 |
| Operating costs | (228) | (213) | (668) | (620) |
| Depreciation and amortization | (147) | (128) | (405) | (370) |
| Selling, general and administrative expenses | (50) | (42) | (139) | (126) |
| Franchise and revenue-based taxes | (67) | (67) | (185) | (186) |
| Other income | 10 | 12 | 30 | 34 |
| Other deductions | (29) | (3) | (32) | (17) |
| Interest income | 13 | 12 | 32 | 34 |
| Interest expense and related charges | (85) | (80) | (258) | (229) |
| Income before income taxes | 187 | 219 | 412 | 489 |
| Income tax expense (a) | (55) | (80) | (140) | (180) |
| Net income | $ 132 | $ 139 | $ 272 | $ 309 |

(a) Effective with the sale of noncontrolling interests (see Note 6 to EFH Corp.'s historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus), Oncor is taxed as a partnership and thus not subject to income taxes; however, subsequent to the sale, Oncor reflects a "provision in lieu of income taxes," and the results of segments are evaluated as if they were stand-alone entities filing income tax returns.

B-40

EFIHMW00246534

PX 014
Page 816 of 1116

*Operating Data*

| | Three Months Ended September 30, | | % Change | Nine Months Ended September 30, | | % Change |
|---|---|---|---|---|---|---|
| | 2009 | 2008 | | 2009 | 2008 | |
| **Operating statistics:** | | | | | | |
| Electric energy billed volumes (GWh) . . . . . . . . . . . . . . . . . . . . | 32,017 | 32,611 | (1.8) | 80,189 | 83,859 | (4.4) |
| **Reliability statistics (a):** | | | | | | |
| System Average Interruption Duration Index (SAIDI) (nonstorm) . . . . . . . . . . . . . . . | | | | 91.0 | 82.6 | 10.2 |
| System Average Interruption Frequency Index (SAIFI) (nonstorm) . . . . . . . . . . . . . . | | | | 1.2 | 1.1 | 9.1 |
| Customer Average Interruption Duration Index (CAIDI) (nonstorm) . . . . . . . . . . . . . . | | | | 77.1 | 75.3 | 2.4 |
| **Electricity points of delivery (end of period and in thousands):** | | | | | | |
| Electricity distribution points of delivery (based on number of meters) . . . . . . . . . . . . . . . . . . . | | | | 3,142 | 3,116 | 0.8 |

| | Three Months Ended September 30, | | % Change | Nine Months Ended September 30, | | % Change |
|---|---|---|---|---|---|---|
| | 2009 | 2008 | | 2009 | 2008 | |
| **Operating revenues:** | | | | | | |
| Electricity distribution revenues (b): | | | | | | |
| Affiliated (TCEH) . . . . . . . . . | $308 | $290 | 6.2 | $ 783 | $ 773 | 1.3 |
| Nonaffiliated . . . . . . . . . . . . . . | 378 | 355 | 6.5 | 1,004 | 960 | 4.6 |
| Total distribution revenues . . . . . . . . . . . . | 686 | 645 | 6.4 | 1,787 | 1,733 | 3.1 |
| Third-party transmission revenues . . . . . . . . . . . . . . . . . . . . | 76 | 72 | 5.6 | 225 | 207 | 8.7 |
| Other miscellaneous revenues . . . . . | 8 | 11 | (27.3) | 25 | 29 | (13.8) |
| Total operating revenues . . . . . . . . | $770 | $728 | 5.8 | $2,037 | $1,969 | 3.5 |

(a)  SAIDI is the average number of minutes electric service is interrupted per consumer in a year. SAIFI is the average number of electric service interruptions per consumer in a year. CAIDI is the average duration in minutes per electric service interruption in a year. The statistics presented are based on twelve months ended September 30, 2009 and 2008 data.

(b)  Includes transition charge revenue associated with the issuance of securitization bonds totaling $44 million and $40 million for the three months ended September 30, 2009 and 2008, respectively, and $113 million and $108 million for the nine months ended September 30, 2009 and 2008, respectively. Also includes disconnect/reconnect fees and other discretionary revenues for services requested by REPs.

*Financial Results—Three Months Ended September 30, 2009 Compared to Three Months Ended September 30, 2008*

Operating revenues increased $42 million, or 6%, to $770 million in 2009. The increase reflected:

•   $12 million from increased rates implemented upon the PUCT's approval of new tariffs in September 2009 (see "—Regulation and Rates");

B-41

Confidential

- $8 million from increased distribution tariffs to recover higher transmission costs;

- $7 million from a surcharge to recover advanced metering deployment costs and $3 million from a surcharge to recover additional energy efficiency costs, both of which became effective with the January 2009 billing cycle;

- an estimated $5 million impact from growth in points of delivery;

- $4 million in higher transmission revenues primarily due to a rate increase to recover ongoing investment in the transmission system;

- $4 million in higher charges to REPs related to transition bonds (with a related increase in amortization of the related regulatory asset), and

- an increase in estimated average customer usage that was largely offset by the estimated effects of milder weather.

Operating costs increased $15 million, or 7%, to $228 million in 2009. The increase reflected $10 million in higher fees paid to other transmission entities and $2 million in costs related to programs designed to improve customer electricity demand efficiency, both of which have related revenue increases.

Depreciation and amortization increased $19 million, or 15%, to $147 million in 2009. The increase reflected $12 million in higher depreciation due to ongoing investments in property, plant and equipment, $4 million in higher amortization of regulatory assets associated with securitization bonds (with an offsetting increase in revenues) and $3 million due to increased depreciation and amortization rates implemented upon the PUCT approval of new tariffs in September 2009.

SG&A expenses increased $8 million, or 19%, to $50 million in 2009. The increase reflected $5 million in higher professional and contractor fees driven by outsourcing transition and CREZ development activities.

Other income totaled $10 million in 2009 and $12 million in 2008. The amounts reflected accretion of an adjustment (discount) to regulatory assets resulting from purchase accounting. See "Oncor's Regulatory Assets and Liabilities" in Note 13 to EFH Corp.'s historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus.

Other deductions totaled $29 million in 2009 and $3 million in 2008. The 2009 amount included a $25 million write off of regulatory assets (see Note 13 to EFH Corp.'s historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus) and costs totaling $1 million associated with the 2006 settlement with certain cities related to rates.

Interest income increased $1 million, or 8%, to $13 million in 2009. The increase reflected higher earnings on investments held for employee benefit plans, partially offset by a decrease in reimbursement of transition bond interest from TCEH reflecting lower remaining principal amounts of the bonds.

Interest expense and related charges increased $5 million, or 6%, to $85 million in 2009. The increase reflected $4 million in higher average borrowings, reflecting ongoing capital investments, and $1 million due to higher average interest rates.

Income tax expense totaled $55 million in 2009 compared to $80 million in 2008. The effective rate decreased to 29.4% in 2009 from 36.5% in 2008. The decrease in the rate was driven by the reversal of accrued interest due to the favorable resolution of uncertain tax positions. The decreased rate also reflects the effect of investment gains and losses on certain employee benefit plans, which are excluded in determining taxable income.

Net income decreased $7 million, or 5%, to $132 million in 2009 driven by the write off of certain regulatory assets, partially offset by the decrease in the effective income tax rate.

B-42

Confidential

*Financial Results—Nine Months Ended September 30, 2009 Compared to Nine Months Ended September 30, 2008*

Operating revenues increased $68 million, or 3%, to $2.037 billion in 2009. The increase reflected:

- $30 million from increased distribution tariffs to recover higher transmission costs;

- $19 million in higher transmission revenues primarily due to a rate increase to recover ongoing investment in the transmission system;

- $13 million from a surcharge to recover advanced metering deployment costs and $8 million from a surcharge to recover additional energy efficiency costs, both of which became effective with the January 2009 billing cycle;

- an estimated $13 million impact from growth in points of delivery, and

- $12 million from increased rates implemented upon the PUCT's approval of new tariffs in September 2009 (see "—Regulation and Rates"),

partially offset by an estimated $26 million in lower average consumption primarily due to the effects of milder weather and general economic conditions.

Operating costs increased $48 million, or 8%, to $668 million in 2009. The increase reflected $36 million in higher fees paid to other transmission entities and $7 million in costs related to programs designed to improve customer electricity demand efficiency, both of which have related revenue increases, $5 million in higher labor costs to meet enhanced service terms and conditions and $3 million in higher smart grid services costs.

Depreciation and amortization increased $35 million, or 9%, to $405 million in 2009. The increase reflected $28 million in higher depreciation due to ongoing investments in property, plant and equipment, $5 million in higher amortization of regulatory assets associated with securitization bonds (with an offsetting increase in revenues) and $3 million due to increased depreciation and amortization rates implemented upon the PUCT approval of new tariffs in September 2009.

SG&A expenses increased $13 million, or 10%, to $139 million in 2009. The increase reflected $10 million in higher professional and contractor fees driven by outsourcing transition and CREZ development activities and $4 million in higher costs related to certain benefit plans, partially offset by a $3 million one-time reversal of bad debt expense due to the PUCT's finalization of the Certification of Retail Electric Providers rule in April 2009. Write-offs of uncollectible amounts owed by nonaffiliated REPs are deferred as a regulatory asset (see "—Regulation and Rates").

Other income totaled $30 million in 2009 and $34 million in 2008. The amounts reflected accretion of an adjustment (discount) to regulatory assets resulting from purchase accounting. See "Oncor's Regulatory Assets and Liabilities" in Note 13 to EFH Corp.'s historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus for additional information.

Other deductions totaled $32 million in 2009 and $17 million in 2008. The 2009 amount included a $25 million write off of regulatory assets (see Note 13 to EFH Corp.'s historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus). The 2009 and 2008 amounts included costs totaling $2 million and $13 million, respectively, associated with the 2006 settlement with certain cities related to rates.

Interest income decreased $2 million, or 6%, to $32 million in 2009. The decrease reflected lower reimbursement of transition bond interest from TCEH due to lower remaining principal amounts of the bonds, partially offset by higher earnings on investments held for certain employee benefit plans.

Interest expense and related charges increased $29 million, or 13%, to $258 million in 2009. The increase reflected $15 million due to higher average interest rates, which was driven by refinancing of short-term borrowings with $1.5 billion of senior secured notes issued in September 2008. The majority of the proceeds of

B-43

the September 2008 notes issuance was used to pay outstanding short-term borrowings under Oncor's credit facility. The increase also reflected $14 million in higher average borrowings, reflecting ongoing capital investments.

Income tax expense totaled $140 million in 2009 compared to $180 million in 2008. The effective rate decreased to 34.0% in 2009 from 36.8% in 2008. The decrease in the rate was driven by the reversal of accrued interest due to the favorable resolution of uncertain tax positions.

Net income decreased $37 million, or 12%, to $272 million in 2009 driven by the effect of lower average consumption on revenues, the write off of certain regulatory assets and increased interest expense.

### Energy-Related Commodity Contracts and Mark-to-Market Activities

The table below summarizes the changes in commodity contract assets and liabilities for the nine months ended September 30, 2009. The net change in these assets and liabilities totaling $712 million, excluding "other activity" as described below, represents the pretax effect on earnings of positions in the commodity contract portfolio that are marked-to-market in net income (see Note 7 to EFH Corp.'s historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus). These positions represent both economic hedging and trading activities.

| | Nine Months Ended September 30, 2009 |
|---|---|
| Commodity contract net asset at beginning of period | $ 430 |
| Settlements of positions (a) | (314) |
| Unrealized mark-to-market valuations due to changes in fair value (b) | 1,026 |
| Other activity (c) | 63 |
| Commodity contract net asset at end of period (d) | $1,205 |

(a) Represents reversals of previously recognized unrealized gains and losses upon settlement (offsets realized gains and losses recognized in the settlement period).

(b) Primarily represents mark-to-market effects of positions in the long-term hedging program (see discussion above under "—Business—Significant Activities and Events—Long-Term Hedging Program").

(c) This amount does not represent unrealized gains or losses. Includes initial values of positions involving the receipt or payment of cash or other consideration.

(d) Amount excludes $12 million in net derivative liabilities related to instruments not marked-to-market in net income.

In addition to the effect on net income of recording unrealized mark-to-market gains and losses that are reflected in the table above, similar effects arise in the recording of unrealized ineffectiveness gains and losses associated with commodity-related positions accounted for as cash flow hedges. These effects on net income, which include reversals of previously recorded unrealized ineffectiveness gains and losses to offset realized gains and losses upon settlement, are reflected in the balance sheet as changes in cash flow hedge and other derivative assets and liabilities (see Note 7 to EFH Corp.'s historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus). The total pretax effect of recording unrealized gains and losses in net income related to commodity contracts is summarized as follows:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2009 | 2008 | 2009 | 2008 |
| Unrealized gains/(losses) related to contracts marked-to-market | $ 3 | $6,142 | $712 | $(217) |
| Ineffectiveness gains/losses related to cash flow hedges | — | — | 1 | (4) |
| Total unrealized gains (losses) related to commodity contracts | $ 3 | $6,142 | $713 | $(221) |

B-44

*Maturity Table*—Following are the components of the net commodity contract asset at September 30, 2009:

| | Amount |
|---|---:|
| Net commodity contract asset . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $1,205 |
| Net asset associated with receipts of natural gas under physical gas exchange transactions . . . . . . . . . . | 4 |
| Amount of net asset arising from mark-to-market accounting . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $1,209 |

The following table presents the net commodity contract asset arising from recognition of fair values under mark-to-market accounting as of September 30, 2009, scheduled by the source of fair value and contractual settlement dates of the underlying positions.

| Source of fair value | Maturity dates of unrealized net commodity contract asset at September 30, 2009 | | | | |
| | Less than 1 year | 1-3 years | 4-5 years | Excess of 5 years | Total |
|---|---:|---:|---:|---:|---:|
| Prices actively quoted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $(12) | $(80) | $ (2) | $ —— | $ (94) |
| Prices provided by other external sources . . . . . . . . . . . . . . . . . . . | 704 | 572 | 56 | —— | 1,332 |
| Prices based on models . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (10) | (29) | 140 | (130) | (29) |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $682 | $463 | $194 | $(130) | $1,209 |
| Percentage of total fair value . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 57% | 38% | 16% | (11)% | 100% |

The "prices actively quoted" category reflects only exchange traded contracts for which active quotes are readily available. The "prices provided by other external sources" category represents forward commodity positions valued using prices for which over-the-counter broker quotes are available in active markets. Over-the-counter quotes for power in ERCOT that are deemed active markets (excluding the West zone) generally extend through 2012 and over-the-counter quotes for natural gas generally extend through 2015, depending upon delivery point. The "prices based on models" category contains the value of all nonexchange traded options, valued using option pricing models. In addition, this category contains other contractual arrangements that may have both forward and option components, as well as other contracts that are valued using proprietary long-term pricing models that utilize certain market based inputs. See Note 8 to EFH Corp.'s historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus for fair value disclosures and discussion of fair value measurements.

## Financial Condition

### *Liquidity and Capital Resources*

#### *Consolidated Cash Flows—Nine Months Ended September 30, 2009 Compared to Nine Months Ended September 30, 2008*

*Cash Flows*—Cash provided by operating activities for the nine months ended September 30, 2009 totaled $1.743 billion compared to cash provided of $957 million in the nine months ended September 30, 2008. The increase in cash provided of $786 million was driven by:

- a $496 million favorable change in margin deposits primarily due to the effect of lower forward natural gas prices on positions in the long-term hedging program;

- a $220 million decrease in cash interest paid due to the payment of approximately $233 million of interest with new notes instead of cash as discussed under "—PIK Interest Election" below, and

- a $51 million favorable impact of timing of advanced metering surcharges.

B-45

EFIHMW00246539

Cash provided by financing activities decreased $2.632 billion as summarized below and reflected lower borrowing to support margin deposits:

| | Nine Months Ended September 30, | |
| | 2009 | 2008 |
| --- | --- | --- |
| Net issuances, repayments and repurchases of borrowings . . . . . . . . . . | $389 | $2,986 |
| Net issuances of common stock . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 33 |
| Net contributions from and distributions to noncontrolling interests . . | 10 | — |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 21 | 33 |
| Total provided by financing activities . . . . . . . . . . . . . . . . . . . . . | $420 | $3,052 |

Cash used in investing activities decreased $247 million as summarized below:

| | Nine Months Ended September 30, | |
| | 2009 | 2008 |
| --- | --- | --- |
| Capital expenditures, including nuclear fuel . . . . . . . . . . . . . . . . . . . | $(2,004) | $(2,179) |
| Money market fund redemptions (investments) . . . . . . . . . . . . . . . . . | 142 | (242) |
| Investment posted with derivative counterparty (Note 7) . . . . . . . . . . | (400) | — |
| Change in restricted cash . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 107 | 1 |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 28 | 46 |
| Total used in investing activities . . . . . . . . . . . . . . . . . . . . . . . . . | $(2,127) | $(2,374) |

The decline in capital spending for the nine months ended September 30, 2009 as compared to the nine months ended September 30, 2008 primarily reflected a decrease in spending related to the construction of new generation facilities, which is nearing completion, partially offset by capital expenditures for advanced metering deployment.

Depreciation and amortization expense reported in the statement of cash flows exceeds the amount reported in the statement of income by $452 million and $337 million for the nine months ended September 30, 2009 and 2008, respectively. The differences represent amortization of intangible net assets and debt fair value discounts arising from purchase accounting that is reported in various other income statement line items including operating revenues, fuel and purchased power costs and delivery fees, other income and interest expense and related charges. The differences also reflect the amortization of nuclear fuel, which is reported as fuel cost in the statement of income consistent with industry practice. In addition, the differences reflect the amortization of losses on dedesignated cash flow hedges, which is reported in interest expense and related charges in the statement of income, and the regulatory asset amortization resulting from the final PUCT order in the Oncor rate case that is reported in operating costs in the statement of income (see Note 13 to EFH Corp.'s historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus).

B-46

EFIHMW00246540

*Debt Financing Activity*—Activities related to short-term borrowings and long-term debt during the nine months ended September 30, 2009 are as follows (all amounts presented are principal, repayments and repurchases include amounts related to capital leases and exclude amounts related to debt discount, financing and reacquisition expenses):

|  | Borrowings (a) | Repayments and Repurchases |
|---|---|---|
| TCEH | $522 | $215 |
| EFCH | — | 2 |
| EFH Corp. | — | 10 |
| Oncor | — | 70 |
| Total long-term | 522 | 297 |
| TCEH | — | — |
| Oncor | 200 | — |
| Total short-term (b) | 200 | — |
| Total | $722 | $297 |

---

(a)   Excludes $150 million of EFH Corp. Toggle Notes and $98 million of TCEH Toggle Notes issued in May 2009 in payment of accrued interest as discussed below under "—PIK Interest Election."

(b)   Short-term amounts represent net borrowings/repayments.

See Note 4 to EFH Corp.'s historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus for further detail of long-term debt and other financing arrangements.

We or our affiliates may from time to time purchase our outstanding debt securities for cash in open market purchases or privately negotiated transactions, or we may refinance existing debt securities. We will evaluate any such transactions in light of market prices of the securities, taking into account liquidity requirements and prospects for future access to capital, contractual restrictions and other factors. The amounts involved in any such transactions, individually or in the aggregate, may be material. See Note 4 to EFH Corp.'s historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus for discussion of debt exchange offers and consent solicitations announced in October 2009.

*Available Liquidity*—The following table summarizes changes in available liquidity for the nine months ended September 30, 2009.

| | Available Liquidity | | |
|---|---|---|---|
| | September 30, 2009 | December 31, 2008 | Change |
| Cash and cash equivalents, excluding Oncor | $1,703 | $1,564 | $ 139 |
| Investments held in money market fund | — | 142 | (142) |
| TCEH Delayed Draw Term Loan Facility | — | 522 | (522) |
| TCEH Revolving Credit Facility (a) | 1,736 | 1,767 | (31) |
| TCEH Letter of Credit Facility | 459 | 490 | (31) |
| Subtotal | $3,898 | $4,485 | $(587) |
| Short-term investment (b) | 482 | — | 482 |
| Total liquidity, excluding Oncor (c) | $4,380 | $4,485 | $(105) |
| Cash and cash equivalents – Oncor | $   22 | $  125 | $(103) |
| Oncor Revolving Credit Facility | 1,341 | 1,508 | (167) |
| Total Oncor liquidity | $1,363 | $1,633 | $(270) |

B-47

Confidential

EFIHMW00246541

(a)  As of September 30, 2009 and December 31, 2008, the TCEH Revolving Credit Facility includes $141 million and $144 million, respectively, of commitments from Lehman that are only available from the fronting banks and the swingline lender.

(b)  Includes $417 million cash investment (including accrued interest) and $65 million in letters of credit posted related to certain interest rate and commodity hedge transactions. This collateral will be returned no later than March 2010. See Note 7 to EFH Corp.'s historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus.

(c)  Pursuant to PUCT rules, TCEH is required to maintain available liquidity to assure adequate credit worthiness of TCEH's REP subsidiaries, including the ability to return retail customer deposits, if necessary. As a result, at September 30, 2009, the total availability under the TCEH credit facilities should be further reduced by $237 million. See "—Regulation and Rates—Certification of REPs."

Note: Available liquidity above does not include the amounts available from exercising the payment-in-kind (PIK) option on the EFH Corp. Toggle Notes and TCEH Toggle Notes, which for the remaining payment dates from November 2009 through November 2012 could add approximately $1.6 billion of liquidity.

The $105 million decrease in available liquidity excluding Oncor, after taking into account the short-term investment, was driven by capital spending to construct the new generation facilities.

The decrease in available liquidity for Oncor of $270 million in the nine months ended September 30, 2009 reflected ongoing capital investment in transmission and distribution infrastructure.

See Note 4 to EFH Corp.'s historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus for additional discussion of these credit facilities.

*Pension and OPEB Plan Funding*—Pension and OPEB plan funding is expected to total $79 million and $22 million, respectively, in 2009. Oncor is expected to fund approximately 80% of these amounts. We made pension and OPEB contributions of $61 million and $16 million, respectively, in the nine months ended September 30, 2009.

*Long-Term Contractual Obligations and Commitments*—In the nine months ended September 30, 2009, we entered into contractual obligations for fuel for our generation facilities totaling approximately $320 million to purchase nuclear fuel in periods between 2010 and 2020 and totaling approximately $153 million to purchase coal in periods between 2010 and 2012.

*PIK Interest Election*—EFH Corp. and TCEH have the option every six months at their discretion, ending with the payment due November 2012, to use the payment-in-kind (PIK) feature of their respective toggle notes in lieu of making cash interest payments. Once EFH Corp. and/or TCEH make a PIK election, the election is valid for each succeeding interest payment period until EFH Corp. and/or TCEH revoke the applicable election. We elected to do so for the May 2009, November 2009 and May 2010 interest payments as an efficient and cost-effective method to further enhance liquidity, in light of the weaker economy and related lower electricity demand and the continuing uncertainty in the financial markets. Use of the PIK feature will be evaluated at each election period, taking into account market conditions and other relevant factors at such time.

EFH Corp. made its May 2009 interest payment and will make its November 2009 and May 2010 interest payments by using the PIK feature of the EFH Corp. Toggle Notes. During the applicable interest periods, the interest rate on the toggle notes is increased from 11.25% to 12.00%. EFH Corp. increased the aggregate principal amount of the EFH Corp. Toggle Notes by $150 million in May 2009 and will further increase the aggregate principal amount of the EFH Corp. Toggle Notes by $159 million in November 2009 and by $169 million in May 2010. The elections increased liquidity as of May 1, 2009 by an amount equal to approximately $141 million and will further increase liquidity as of November 1, 2009 and May 1, 2010 by an amount equal to approximately $149 million and $158 million, respectively, with such amounts constituting the amount of cash

B-48

EFIHMW00246542

interest that otherwise would have been payable on the respective dates, and will increase the expected annual cash interest expense by approximately $54 million, constituting the additional cash interest that will be payable with respect to the $478 million of additional toggle notes. See Note 4 to EFH Corp.'s historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus for discussion of debt exchange offers that may result in redemption of portions of the outstanding principal of these notes and a reduction of the effect of the PIK election for the May 2010 interest payment.

Similarly, TCEH made its May 2009 interest payment and will make its November 2009 and May 2010 interest payments by using the PIK feature of the TCEH Toggle Notes. During the applicable interest periods, the interest rate on the toggle notes is increased from 10.50% to 11.25%. TCEH increased the aggregate principal amount of the TCEH Toggle Notes by approximately $98.5 million in May 2009 and will further increase the aggregate principal amount of the TCEH Toggle Notes by approximately $104 million in November 2009 and $110 million in May 2010. The elections increased liquidity as of May 1, 2009 by an amount equal to approximately $92 million and will further increase liquidity as of November 1, 2009 and May 1, 2010 by an amount equal to approximately $97 million and $103 million, respectively, with such amounts constituting the amount of cash interest that otherwise would have been payable on the respective dates, and will increase the expected annual cash interest expense by approximately $33 million, constituting the additional cash interest that will be payable with respect to the $312 million of additional toggle notes.

***Liquidity Effects of Commodity Hedging and Trading Activities***—Commodity hedging and trading transactions typically require a counterparty to post collateral if the forward price of the underlying commodity moves such that the hedging or trading instrument held by such counterparty has declined in value. TCEH uses cash, letters of credit and other forms of credit support to satisfy such collateral obligations. In addition, TCEH's Commodity Collateral Posting Facility, an uncapped senior secured revolving credit facility, funds the cash collateral posting requirements for a significant portion of the positions in the long-term hedging program not otherwise secured by a first-lien in the assets of TCEH. The aggregate principal amount of this facility is determined by the exposure arising from higher forward market prices, regardless of the amount of such exposure, on a portfolio of certain natural gas hedging transaction volumes. Including those hedging transactions where margin deposits are covered by unlimited borrowings under the TCEH Commodity Collateral Posting Facility, at September 30, 2009, more than 95% of the long-term natural gas hedging program transactions were secured by a first-lien interest in the assets of TCEH that is pari passu with the TCEH Senior Secured Facilities, the effect of which is a significant reduction in the liquidity exposure associated with collateral requirements for those hedging transactions. See Note 4 to EFH Corp.'s historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus for more information about this facility.

As of September 30, 2009, TCEH received or posted cash and letters of credit for commodity hedging and trading activities as follows:

- $151 million in cash has been posted with counterparties for exchange cleared transactions (including initial margin), as compared to $317 million posted as of December 31, 2008;

- $497 million in cash has been received from counterparties, net of $7 million in cash posted, for over-the-counter and other non-exchange cleared transactions, as compared to $402 million received, net of $122 million in cash posted, as of December 31, 2008;

- $360 million in letters of credit have been posted with counterparties, as compared to $342 million posted as of December 31, 2008, and

- $10 million in letters of credit have been received from counterparties, as compared to $30 million received as of December 31, 2008.

In addition, EFH Corp. (parent) elected to post cash collateral of $400 million in 2009 related to certain TCEH interest rate and commodity hedge transactions (see Note 7 to EFH Corp.'s historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus).

B-49

EFIHMW00246543

With respect to exchange cleared transactions, these transactions typically require initial margin (i.e. the upfront cash and/or letter of credit posted to take into account the size and maturity of the positions and credit quality) in addition to variance margin (i.e. the daily cash margin posted to take into account changes in the value of the underlying commodity). The amount of initial margin required is generally defined by exchange rules. Clearing agents, however, typically have the right to request additional initial margin based on various factors including market depth, volatility and credit quality, which may be in the form of cash, letters of credit, a guaranty or other forms as negotiated with the clearing agent. With respect to cash collateral that is received, such cash collateral is either used for working capital and other corporate purposes, including reducing short-term borrowings under credit facilities, or it is required to be deposited in a separate account and restricted from being used for working capital and other corporate purposes. With respect to over-the-counter transactions, counterparties generally have the right to substitute letters of credit for such cash collateral. In such event, the cash collateral previously posted would be returned to such counterparties thereby reducing liquidity in the event that it was not restricted. As of September 30, 2009, restricted cash collateral was less than $1 million. See Note 13 to EFH Corp.'s historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus regarding restricted cash.

With the long-term hedging program, increases in natural gas prices generally result in increased cash collateral and letter of credit margin requirements. As of September 30, 2009, approximately 0.7 billion MMBtu of positions related to the long-term hedging program were not directly secured on an asset-lien basis and thus have cash collateral posting requirements. The uncapped TCEH Commodity Collateral Posting Facility supports the collateral posting requirements related to these transactions.

*Income Tax Refunds/Payments*—In February 2009, we received a refund totaling $98 million in income taxes and related interest related to IRS audits of 1993 and 1994 federal income tax returns. No material federal income tax payments or refunds are anticipated within the next twelve months. We made payments totaling approximately $51 million related to the Texas margin tax in May and August 2009. Tax payments for the Texas margin tax are expected to be approximately $57 million within the next twelve months.

*Sale of Accounts Receivable*—TXU Energy participates in an accounts receivable securitization program, the activity under which is accounted for as a sale of accounts receivable in accordance with transfers and servicing accounting standards. Under the program, TXU Energy (originator) sells retail trade accounts receivable to TXU Receivables Company, a consolidated wholly-owned bankruptcy-remote direct subsidiary of EFH Corp., which sells undivided interests in the purchased accounts receivable for cash to special purpose entities established by financial institutions. All new trade receivables under the program generated by the originator are continuously purchased by TXU Receivables Company with the proceeds from collections of receivables previously purchased. Funding under the program totaled $700 million and $416 million at September 30, 2009 and December 31, 2008, respectively. See Note 3 to EFH Corp.'s historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus for a more complete description of the program including the impact of the program on the financial statements for the periods presented and the contingencies that could result in a reduction of funding available under the program.

*Financial Covenants, Credit Rating Provisions and Cross Default Provisions*—The terms of certain of our financing arrangements contain maintenance covenants with respect to leverage ratios and/or minimum net worth. As of September 30, 2009, we were in compliance with all such maintenance covenants.

*Covenants and Restrictions under Financing Arrangements*—Each of the TCEH Senior Secured Facilities, indentures governing the TCEH Notes and the EFH Corp. Notes and agreements related to certain series of TCEH's pollution control revenue bonds contains covenants that could have a material impact on the liquidity and operations of EFH Corp. and its subsidiaries.

Adjusted EBITDA (as used in the restricted payments covenant contained in the indenture governing the EFH Corp. Notes) for the twelve months ended September 30, 2009 totaled $4.8 billion for EFH Corp. See

B-50

EFIHMW00246544

"—Adjusted EBITDA Reconciliation" for a reconciliation of net income to Adjusted EBITDA for EFH Corp. and TCEH, respectively, for the nine and twelve months ended September 30, 2009 and 2008.

The following table summarizes TCEH's secured debt to adjusted EBITDA ratio under the maintenance covenant in the TCEH Senior Secured Facilities and various other financial ratios of EFH Corp. and TCEH that are applicable under certain other covenants in the TCEH Senior Secured Facilities and the indentures governing the TCEH Notes and the EFH Corp. Notes as of September 30, 2009 and December 31, 2008 and the corresponding maintenance and other covenant threshold levels as of September 30, 2009:

|  | September 30, 2009 | December 31, 2008 | Threshold Level |
|---|---|---|---|
| **Maintenance Covenant:** |  |  |  |
| TCEH Senior Secured Facilities: |  |  |  |
| Secured debt to adjusted EBITDA ratio .......... | 4.68 to 1.00 | 4.77 to 1.00 | Must not exceed 7.25 to 1.00 |
| **Debt Incurrence Covenants:** |  |  |  |
| EFH Corp. Notes: |  |  |  |
| EFH Corp. fixed charge coverage ratio .......... | 1.6 to 1.0 | 1.5 to 1.0 | At least 2.0 to 1.0 |
| TCEH fixed charge coverage ratio .............. | 1.4 to 1.0 | 1.3 to 1.0 | At least 2.0 to 1.0 |
| TCEH Notes: |  |  |  |
| TCEH fixed charge coverage ratio .............. | 1.4 to 1.0 | 1.3 to 1.0 | At least 2.0 to 1.0 |
| TCEH Senior Secured Facilities: |  |  |  |
| TCEH fixed charge coverage ratio .............. | 1.4 to 1.0 | 1.3 to 1.0 | At least 2.0 to 1.0 |
| **Restricted Payments/Limitations on Investments Covenants:** |  |  |  |
| EFH Corp. Notes: |  |  |  |
| General restrictions (non-Sponsor Group payments): |  |  |  |
| EFH Corp. fixed charge coverage ratio (a) .... | 1.4 to 1.0 | 1.3 to 1.0 | At least 2.0 to 1.0 |
| General restrictions (Sponsor Group payments): |  |  |  |
| EFH Corp. fixed charge coverage ratio (a) .... | 1.6 to 1.0 | 1.5 to 1.0 | At least 2.0 to 1.0 |
| EFH Corp. leverage ratio ................... | 7.0 to 1.0 | 6.9 to 1.0 | Equal to or less than 7.0 to 1.0 |
| TCEH Notes: |  |  |  |
| TCEH fixed charge coverage ratio .............. | 1.4 to 1.0 | 1.3 to 1.0 | At least 2.0 to 1.0 |
| TCEH Senior Secured Facilities: |  |  |  |
| Payments to Sponsor Group: |  |  |  |
| TCEH total debt to adjusted EBITDA ratio ... | 8.4 to 1.0 | 8.7 to 1.0 | At least 6.5 to 1.0 |

(a) The EFH Corp. fixed charge coverage ratio for non-Sponsor Group payments includes the results of Oncor Holdings and its subsidiaries. The EFH Corp. fixed charge coverage ratio for Sponsor Group payments excludes the results of Oncor Holdings and its subsidiaries.

*Credit Ratings*—The issuer credit ratings as of October 5, 2009 for EFH Corp. and its subsidiaries, except for Oncor, are CC, Caa1 and B by S&P, Moody's and Fitch, respectively. The issuer credit ratings for Oncor are BBB+ and BBB- by S&P and Fitch, respectively.

B-51

EFIHMW00246545

PX 014
Page 827 of 1116

Additionally, the rating agencies assign credit ratings on certain of our debt securities. The credit ratings assigned for these debt securities as of October 5, 2009 are presented below:

| | S&P | Moody's | Fitch |
|---|---|---|---|
| EFH Corp. (Senior Unsecured) (a) . . . . . . . . . . . . . . | CC | Caa3 | B+ |
| EFH Corp. (Unsecured) (b) . . . . . . . . . . . . . . . . . . . | CC | Ca | CCC |
| EFCH (Senior Unsecured) . . . . . . . . . . . . . . . . . . . . | CCC | Caa3 | CCC |
| TCEH (Senior Secured) . . . . . . . . . . . . . . . . . . . . . . | B+ | B2 | BB |
| TCEH (Senior Unsecured) (c) . . . . . . . . . . . . . . . . | CC | Caa2 | B |
| TCEH (Unsecured) . . . . . . . . . . . . . . . . . . . . . . . . . | CCC | Caa3 | CCC |
| Oncor (Senior Secured) (d) . . . . . . . . . . . . . . . . . . | BBB+ | Baa1 | BBB |
| Oncor (Senior Unsecured) (d) . . . . . . . . . . . . . . . . | BBB+ | Baa1 | BBB- |

_____

(a)    EFH Corp. Cash-Pay Notes and EFH Corp. Toggle Notes

(b)    Moody's ratings of the EFH Corp. Series P, Series Q and Series R are Caa3, Ca and Ca, respectively.

(c)    TCEH Cash-Pay Notes and TCEH Toggle Notes. S&Ps ratings of the TCEH Cash-Pay Notes and the TCEH Toggle Notes are CC and CCC, respectively.

(d)    All of Oncor's long-term debt is secured by a first priority lien and is considered senior secured debt.

In October 2009, both S&P and Moody's announced rating actions related to their view that the debt exchange transaction announced by EFH Corp. in October 2009 represented a "distressed exchange." As a result, S&P downgraded the corporate issuer ratings of EFH Corp., EFCH and TCEH by four notches to CC from B- and affirmed their negative outlook. S&P also completed multi-notch downgrades of its ratings on issuances subject to the exchange to CC. S&P's ratings outlook for Oncor remains stable. Moody's affirmed its Caa1 corporate family ratings and negative outlook for EFH Corp. and TCEH but downgraded its probability of default rating for EFH Corp. and TCEH three notches to Ca from Caa1. Additionally, Moody's downgraded its ratings on certain issuances subject to the exchange and placed the ratings of TCEH Cash-Pay Notes on review for possible downgrade. S&P and Moody's have indicated that shortly after settlement of the debt exchange transaction they expect to replace these temporary "distressed exchange" ratings with new ratings based on their analysis of the outcome of the exchange. S&P and Moody's ratings and outlooks for Oncor were unaffected by the "distressed exchange" downgrades. Fitch affirmed their ratings and outlook for EFH Corp., EFCH and TCEH. All three agencies affirmed their ratings and outlook for Oncor.

In June 2009, Moody's upgraded the long-term debt rating for Oncor's senior secured debt by two notches from Baa3 to Baa1 citing, among other things, Oncor's position as a rate-regulated electric transmission and distribution utility in Texas, reasonably supportive regulatory jurisdiction, solid financial credit metrics, adequate sources of near-term liquidity and the continued evidence of strong corporate independence from EFH Corp. Moody's ratings outlook for Oncor remains stable.

In March 2009, Fitch downgraded certain ratings for EFH Corp., EFCH and TCEH and changed the outlook for EFH Corp., EFCH and TCEH from stable to negative, citing the effect of the economic slowdown in Texas and lower than anticipated market heat rates in ERCOT. Fitch's ratings outlook for Oncor remains stable.

A rating reflects only the view of a rating agency, and is not a recommendation to buy, sell or hold securities. Ratings can be revised upward or downward at any time by a rating agency if such rating agency decides that circumstances warrant such a change.

*Material Credit Rating Covenants and Credit Worthiness Effects on Liquidity*—As a result of TCEH's non-investment grade credit rating and considering collateral thresholds of certain retail and wholesale commodity contracts, as of September 30, 2009, counterparties to those contracts could have required TCEH to post up to an aggregate of $44 million in additional collateral. This amount largely represents the below market terms of these contracts as of September 30, 2009; thus, this amount will vary depending on the value of these contracts on any given day.

Confidential

EFIHMW00246546

Certain transmission and distribution utilities in Texas have tariffs in place to assure adequate credit worthiness of any REP to support the REP's obligation to collect securitization bond-related (transition) charges on behalf of the utility. Under these tariffs, as a result of TCEH's below investment grade credit rating, TCEH is required to post collateral support in an amount equal to estimated transition charges over specified time periods. The amount of collateral support required to be posted, as well as the time period of transition charges covered, varies by utility. As of September 30, 2009, TCEH has posted collateral support in the form of letters of credit to the applicable utilities in an aggregate amount equal to $28 million, with $16 million of this amount posted for the benefit of Oncor.

The PUCT has rules in place to assure adequate credit worthiness of each REP, including the ability to return customer deposits, if necessary. Under these rules, as of September 30, 2009, TCEH maintained availability under its credit facilities of approximately $237 million. See "—Regulation and Rates—Certification of REPs."

The RRC has rules in place to assure adequate credit worthiness of parties that have mining reclamation obligations. Under these rules, should the RRC determine that the credit worthiness of Luminant Generation Company LLC (a subsidiary of TCEH) is not sufficient to support its reclamation obligations, TCEH may be required to post cash or letter of credit collateral support in an amount currently estimated to be approximately $600 million to $800 million. The actual amount (if required) could vary depending upon numerous factors, including Luminant Generation Company LLC's credit worthiness and the level of mining reclamation obligations.

ERCOT also has rules in place to assure adequate credit worthiness of parties that schedule power on the ERCOT System. Under these rules, TCEH has posted collateral support, predominantly in the form of letters of credit, totaling $38 million as of September 30, 2009 (which is subject to weekly adjustments based on settlement activity with ERCOT).

Oncor and Texas Holdings agreed to the terms of a stipulation with major interested parties to resolve all outstanding issues in the PUCT review related to the Merger. As part of this stipulation, TCEH is required to post a letter of credit in an amount equal to $170 million to secure its payment obligations to Oncor if two or more of Oncor's credit ratings are below investment grade.

Other arrangements of EFH Corp. and its subsidiaries, including Oncor's credit facility, the accounts receivable securitization program (see Note 3 to EFH Corp.'s historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus) and certain leases, contain terms pursuant to which the interest rates charged under the agreements may be adjusted depending on the relevant credit ratings.

In the event that any or all of the additional collateral requirements discussed above are triggered, we believe we will have adequate liquidity to satisfy such requirements.

*Material Cross Default Provisions*—Certain financing arrangements contain provisions that may result in an event of default if there were a failure under other financing arrangements to meet payment terms or to observe other covenants that could or does result in an acceleration of payments due. Such provisions are referred to as "cross default" provisions.

A default by TCEH or any restricted subsidiary in respect of indebtedness, excluding indebtedness relating to the sale of receivables program, in an aggregate amount in excess of $200 million may result in a cross default under the TCEH Senior Secured Facilities. Under these facilities such a default may cause the maturity of outstanding balances ($22.356 billion at September 30, 2009) under such facilities to be accelerated.

The indenture governing the TCEH Notes contains a cross acceleration provision where a payment default at maturity or on acceleration of principal indebtedness under any instrument or instruments of TCEH and any of

B-53

EFIHMW00246547

its restricted subsidiaries in the aggregate amount equal to or greater than $250 million may cause the acceleration of the TCEH Notes.

Under the terms of a TCEH rail car lease, which had approximately $48 million in remaining lease payments as of September 30, 2009 and terminates in 2017, if TCEH failed to perform under agreements causing its indebtedness in aggregate principal amount of $100 million or more to become accelerated, the lessor could, among other remedies, terminate the lease and effectively accelerate the payment of any remaining lease payments due under the lease.

Under the terms of a TCEH rail car lease, which had approximately $54 million in remaining lease payments as of September 30, 2009 and terminates in 2028, if obligations of TCEH in excess of $200 million in the aggregate for payments of obligations to third party creditors under lease agreements, deferred purchase agreements or loan or credit agreements have been accelerated prior to their original stated maturity, the lessor could, among other remedies, terminate the lease and effectively accelerate the payment of any remaining lease payments due under the lease.

The indenture governing the EFH Corp. Notes contains a cross acceleration provision whereby a payment default at maturity or on acceleration of principal indebtedness under any instrument or instruments of EFH Corp. or any of its restricted subsidiaries in the aggregate amount equal to or greater than $250 million may cause the acceleration of the EFH Corp. Notes.

The accounts receivable securitization program contains a cross default provision with a threshold of $200 million that applies in the aggregate to the originator, any parent guarantor of an originator or any subsidiary acting as collection agent under the program. TXU Receivables Company and EFH Corporate Services Company (a direct subsidiary of EFH Corp.), as collection agent, in the aggregate have a cross default threshold of $50,000. If any of the aforementioned defaults on indebtedness of the applicable threshold were to occur, the program could terminate.

We enter into energy-related and financial contracts, the master forms of which contain provisions whereby an event of default or acceleration of settlement would occur if we were to default under an obligation in respect of borrowings in excess of thresholds, which vary, stated in the contracts. The subsidiaries whose default would trigger cross default vary depending on the contract.

Each of TCEH's natural gas hedging agreements that are secured with a lien on its assets on a pari passu basis with the TCEH Senior Secured Facilities contains a cross default provision. In the event of a default by TCEH or any of its subsidiaries relating to indebtedness (such amounts varying by contract but ranging from $200 million to $250 million) that results in the acceleration of such debt, then each counterparty under these hedging agreements would have the right to terminate its hedge agreement with TCEH and require all outstanding obligations under such agreement to be settled.

In the event of a default by TCEH relating to indebtedness in an amount equal to or greater than $200 million that results in the acceleration of such debt, then each counterparty under TCEH's interest rate swap agreements with an aggregate derivative liability of $1.39 billion at September 30, 2009 would have the right to terminate its interest rate swap agreement with TCEH and require all outstanding obligations under such agreement to be settled.

A default by Oncor or any subsidiary thereof in respect of indebtedness in a principal amount in excess of $50 million may result in a cross default under its credit facility. Under this facility such a default may cause the maturity of outstanding balances ($537 million at September 30, 2009) under such facility to be accelerated.

Other arrangements, including leases, have cross default provisions, the triggering of which would not be expected to result in a significant effect on liquidity.

B-54

EFIHMW00246548

*Guarantees*—See Note 5 to EFH Corp.'s historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus for details of guarantees.

**Off–Balance Sheet Arrangements**

See discussion above under "—Financial Condition—Liquidity and Capital Resources—Sale of Accounts Receivable" and in Note 3 to EFH Corp.'s historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus.

Also see Note 5 to EFH Corp.'s historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus regarding guarantees.

**Commitments and Contingencies**

See Note 5 to EFH Corp.'s historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus for discussion of commitments and contingencies.

**Changes in Accounting Standards**

See Note 1 to EFH Corp.'s historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus for a discussion of changes in accounting standards.

**Regulation and Rates**

*Regulatory Investigations and Reviews*

See Note 5 to EFH Corp.'s historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus.

*Certification of REPs*

In April 2009, the PUCT finalized a rule relating to the Certification of Retail Electric Providers. The rule strengthens the certification requirements for REPs in order to better protect customers, transmission and distribution utilities (TDUs), and other REPs from the potential insolvency of REPs. The rule is considered a competition rule and thus is subject to judicial review as specified in PURA. The rule, among other things, increases creditworthiness and financial reporting requirements for REPs and provides additional customer protection requirements and regulatory asset consideration for TDU bad debt expenses. Under the rule, Oncor uncollectible amounts owed by REPs are deferred as a regulatory asset. Recovery of the regulatory asset will be considered in a future rate case. Accordingly, Oncor recognized an approximately $3 million one-time reversal of bad debt expense in the three months ended June 30, 2009 (reported in other income). Due to the commitments made to the PUCT in connection with the Merger, Oncor may not recover bad debt expense, or certain other costs and expenses, from rate payers in the event of a TXU Energy default or bankruptcy. Under the rule, REPs are required to amend their certifications, including the manner in which they meet financial requirements, by May 21, 2010. TXU Energy plans to file its amended certification no later than the first quarter 2010. Under the new financial requirements, which will be effective upon approval of the amended certification, as of September 30, 2009, the amount of additional available liquidity required to be maintained by TCEH would have been reduced from $237 million to approximately $93 million as a result of no longer having to reserve liquidity for payments related to TDUs.

*Wholesale Market Design*

In August 2003, the PUCT adopted a rule that, when implemented, will alter the wholesale market design in the ERCOT market. The rule requires ERCOT to:

- use a stakeholder process to develop a new wholesale market model;

- operate a voluntary day-ahead energy market;

B-55

EFIHMW00246549

- directly assign all congestion rents to the resources that caused the congestion;

- use nodal energy prices for resources;

- provide information for energy trading hubs by aggregating nodes;

- use zonal prices for loads, and

- provide congestion revenue rights (but not physical rights).

ERCOT currently has a zonal wholesale market structure consisting of four geographic zones. The proposed location-based congestion-management market is referred to as a "nodal" market because wholesale pricing would differ across the various nodes on the transmission grid. The implementation of a nodal market is being done in conjunction with transmission improvements designed to reduce current congestion. Pursuant to a request from the PUCT, ERCOT announced in November 2008 a preliminary schedule for the implementation of the nodal market by December 2010.

ERCOT imposes a surcharge on all Qualified Scheduling Entities in the ERCOT market (including subsidiaries of TCEH) for the purpose of financing 38% of ERCOT's expected nodal implementation costs. In November 2008, ERCOT filed a request with the PUCT for approval of an interim increase in the nodal surcharge from $0.169 per MWh to $0.375 per MWh. In September 2009, the PUCT approved an increase in the nodal surcharge to $0.375 per MWh, effective January 1, 2010. At the approved $0.375 per MWh nodal surcharge, the annual surcharge will be an estimated $30 million to $35 million, which is reported in fuel, purchased power costs and delivery fees. The implementation of a nodal market is still scheduled for December 2010. We cannot predict the ultimate impact of the proposed nodal wholesale market design on our operations or financial results.

*Oncor Matters with the PUCT*

*Rate Case*—In June 2008, Oncor filed for a rate review with the PUCT and 204 cities. On August 31, 2009, the PUCT issued a final order with respect to the rate review. The final order approves a total annual revenue requirement for Oncor of $2.64 billion, based on Oncor's 2007 test year cost of service and customer characteristics. New rates were calculated for all customer classes using 2007 test year billing metrics and the approved class cost allocation and rate design. The PUCT staff has estimated that the final order results in an approximate $115 million increase in base rate revenues over Oncor's 2007 adjusted test year revenues, before recovery of rate case expenses. Prior to implementing the new rates in September 2009, Oncor had already begun recovering $45 million of the $115 million increase as a result of approved transmission cost recovery factor and energy efficiency cost recovery factor filings, such as those discussed immediately below. Excluding the one-time write-off of certain regulatory assets discussed below, the result of the rate case is not expected to have a material effect on Oncor's net income. Also see Note 13 to EFH Corp.'s historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus regarding the PUCT's review of regulatory assets and liabilities.

Key findings made by the PUCT in the rate review include:

- recognizing and affirming Oncor's corporate ring-fence from EFH Corp. and its unregulated affiliates by rejecting a proposed consolidated tax savings adjustment arising out of EFH Corp.'s ability to offset Oncor's taxable income against losses from other investments;

- approving the recovery of all of Oncor's capital investment in its transmission and distribution system, including investment in certain automated meters that will be replaced pursuant to Oncor's advanced meter deployment plan;

- denying recovery of $25 million of regulatory assets, which resulted in a $16 million after tax loss being recognized in the three months ended September 30, 2009, and

- setting Oncor's return on equity at 10.25%.

B-56

EFIHMW00246550

**PX 014**
**Page 832 of 1116**

New rates were implemented upon approval of new tariffs in September 2009. The final order is subject to any motions for rehearing and appeals.

*Transmission Rates*—In order to recover increases in its transmission costs, including fees paid to other transmission service providers, Oncor is allowed to request an update twice a year to the transmission cost recovery factor (TCRF) component of its retail delivery rate charged to REPs. In January 2009, an application was filed to increase the TCRF, which was administratively approved in February 2009 and became effective in March 2009. This increase is expected to increase annualized revenues by $16 million. In July 2009, an application was filed to increase the TCRF, which was administratively approved in August 2009 and became effective September 1, 2009. This increase is expected to increase annualized revenues by approximately $14 million.

In September 2009, Oncor filed an application for an interim update of its wholesale transmission rate. Accordingly, annualized revenues are expected to increase by approximately $34 million. Approximately $21 million of this increase is recoverable through transmission rates charged to wholesale customers, and the remaining $13 million is recoverable from REPs through the TCRF component of Oncor's delivery rates.

*Application for 2010 Energy Efficiency Cost Recovery Factor*—In May 2009, Oncor filed an application with the PUCT to request approval of an Energy Efficiency Cost Recovery Factor (EECRF) for 2010. PUCT rules require Oncor to make an annual EECRF filing by May 1 for implementation at the beginning of the next calendar year. The requested 2010 EECRF is $54 million, the same amount established for 2009, and would result in the same $0.92 per month charge for residential customers as proposed in Oncor's rate case. As allowed by the rule, the 2010 EECRF is designed to recover the costs of the 2010 programs, the under-recovery of 2008 program costs, and a performance bonus based on 2008 results. Approval of the application as filed would result in an immediate recognition of $9 million in revenues, representing the performance bonus. In October 2009, the Administrative Law Judge assigned to the case issued a proposal for decision recommending that Oncor's requests be granted as filed in its application. The PUCT is scheduled to rule on the proposal for decision at its November 5, 2009 open meeting and is not obligated to accept all or any part of the proposal for decision in its ruling.

*Competitive Renewable Energy Zones (CREZs)*—In January 2009, the PUCT assigned approximately $1.3 billion of CREZ construction projects to Oncor. A written order reflecting the PUCT's decision was entered in March 2009, and an order on rehearing was issued by the PUCT in May 2009. The cost estimates for the CREZ construction projects are based upon cost analyses prepared by ERCOT. For the nine months ended September 30, 2009, CREZ-related capital expenditures totaled $84 million. It is expected that the necessary permitting actions and other requirements and all construction activities for the assigned construction projects will be completed by the end of 2013.

In October 2009, the PUCT initiated a proceeding to determine whether there is sufficient financial commitment from generators of renewable energy to grant Certificates of Convenience and Necessity (CCNs) for transmission facilities located in two areas in the panhandle of Texas designated as CREZs. If the PUCT determines that there is not sufficient financial commitment from the generators for either CREZ, the PUCT may take action, including delaying the filing of CREZ CCN applications until such time as the PUCT finds sufficient financial commitment for that CREZ in accordance with the financial commitment provisions of the PUCT's rules. Three of the CREZ transmission projects awarded to Oncor are located in the two CREZs that are the subject of the proceeding. The estimated cost of these three transmission projects is approximately $380 million. Oncor expects the PUCT to issue an order concluding this proceeding in the second quarter of 2010.

*Summary*

We cannot predict future regulatory or legislative actions or any changes in economic and securities market conditions. Such actions or changes could significantly alter our basic financial position, results of operations or cash flows.

B-57

**Quantitative and Qualitative Disclosures about Market Risk**

Market risk is the risk that we may experience a loss in value as a result of changes in market conditions affecting factors such as commodity prices and interest rates, that may be experienced in the ordinary course of business. Our exposure to market risk is affected by a number of factors, including the size, duration and composition of our energy and financial portfolio, as well as the volatility and liquidity of markets. Instruments used to manage this exposure include interest rate swaps to manage interest rate risk related to indebtedness, as well as exchange traded, over-the-counter contracts and other contractual arrangements to manage commodity price risk as part of wholesale activities.

*Risk Oversight*

TCEH manages the commodity price, counterparty credit and commodity-related operational risk related to the unregulated energy business within limitations established by senior management and in accordance with overall risk management policies. Interest rate risk is managed centrally by the corporate treasury function. Market risks are monitored by risk management groups that operate independently of the wholesale commercial operations, utilizing defined practices and analytical methodologies. These techniques measure the risk of change in value of the portfolio of contracts and the hypothetical effect on this value from changes in market conditions and include, but are not limited to, Value at Risk (VaR) methodologies. Key risk control activities include, but are not limited to, transaction review and approval (including credit review), operational and market risk measurement, validation of transaction capture, portfolio valuation and reporting, including mark-to-market valuation, VaR and other risk measurement metrics.

We have a corporate risk management organization that is headed by the Chief Financial Officer, who also functions as the Chief Risk Officer. The Chief Risk Officer, through his designees, enforces applicable risk limits, including the respective policies and procedures to ensure compliance with such limits and evaluates the risks inherent in our businesses and their associated transactions.

*Commodity Price Risk*

TCEH is subject to the inherent risks of market fluctuations in the price of electricity, natural gas and other energy-related products it markets or purchases. The company actively manages its portfolio of owned generation assets, fuel supply and retail sales load to mitigate the near-term impacts of these risks on results of operations. The company, similar to other participants in the market, cannot fully manage the long-term value impact of structural declines or increases in natural gas and power prices and spark spreads (differences between the market price of electricity and its cost of production).

In managing energy price risk, TCEH enters into a variety of market transactions including, but not limited to, short- and long-term contracts for physical delivery, exchange traded and over-the-counter financial contracts and bilateral contracts with customers. Activities include hedging, the structuring of long-term contractual arrangements and proprietary trading. The company continuously monitors the valuation of identified risks and adjusts positions based on current market conditions. The company strives to use consistent assumptions regarding forward market price curves in evaluating and recording the effects of commodity price risk.

*Long-Term Hedging Program*—See "—Business—Significant Activities and Events" above for a description of the program, including potential effects on reported results.

*VaR Methodology*—A VaR methodology is used to measure the amount of market risk that exists within the portfolio under a variety of market conditions. The resultant VaR produces an estimate of a portfolio's potential for loss given a specified confidence level and considers among other things, market movements utilizing standard statistical techniques given historical and projected market prices and volatilities.

B-58

Confidential

A Monte Carlo simulation methodology is used to calculate VaR and is considered by management to be the most effective way to estimate changes in a portfolio's value based on assumed market conditions for liquid markets. The use of this method requires a number of key assumptions, such as use of (i) an assumed confidence level; (ii) an assumed holding period (i.e. the time necessary for management action, such as to liquidate positions); and (iii) historical estimates of volatility and correlation data.

*Trading VaR*—This measurement estimates the potential loss in fair value, due to changes in market conditions, of all contracts entered into for trading purposes based on a 95% confidence level and an assumed holding period of five to 60 days.

|  | Nine Months Ended September 30, 2009 | Year Ended December 31, 2008 |
|---|---|---|
| Month-end average Trading VaR: . . . . . . . . . . . . . . . . . . . . . . | $4 | $ 6 |
| Month-end high Trading VaR: . . . . . . . . . . . . . . . . . . . . . . . . | $7 | $15 |
| Month-end low Trading VaR: . . . . . . . . . . . . . . . . . . . . . . . . | $2 | $ 2 |

*VaR for Energy-Related Contracts Subject to Mark-to-Market (MtM) Accounting*—This measurement estimates the potential loss in fair value, due to changes in market conditions, of all contracts marked-to-market in net income (principally hedges not accounted for as cash flow hedges and trading positions), based on a 95% confidence level and an assumed holding period of five to 60 days.

|  | Nine Months Ended September 30, 2009 | Year Ended December 31, 2008 |
|---|---|---|
| Month-end average MtM VaR: . . . . . . . . . . . . . . . . . . . . . . . | $1,034 | $2,290 |
| Month-end high MtM VaR: . . . . . . . . . . . . . . . . . . . . . . . . . | $1,470 | $3,549 |
| Month-end low MtM VaR: . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 638 | $1,087 |

*Earnings at Risk (EaR)*—This measurement estimates the potential reduction of pretax earnings for the periods presented, due to changes in market conditions, of all energy-related contracts marked-to-market in net income and contracts not marked-to-market in net income that are expected to be settled within the fiscal year (physical purchases and sales of commodities). Transactions accounted for as cash flow hedges are also included for this measurement. A 95% confidence level and a five to 60 day holding period are assumed in determining EaR.

|  | Nine Months Ended September 30, 2009 | Year Ended December 31, 2008 |
|---|---|---|
| Month-end average EaR: . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $1,034 | $2,300 |
| Month-end high EaR: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $1,450 | $3,916 |
| Month-end low EaR: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 676 | $1,069 |

The decreases in the risk measures (MtM VaR and EaR) above were primarily driven by lower natural gas prices in 2009.

### Interest Rate Risk

As of September 30, 2009, the potential reduction of annual pretax earnings due to a one percentage point (100 basis points) increase in floating interest rates on long-term debt totaled approximately $31 million, taking into account the interest rate swaps discussed in Note 4 to EFH Corp.'s historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus.

### Credit Risk

*Credit Risk*—Credit risk relates to the risk of loss associated with nonperformance by counterparties. We maintain credit risk policies with regard to our counterparties to minimize overall credit risk. These policies prescribe practices for evaluating a potential counterparty's financial condition, credit rating and other

B-59

EFIHMW00246553

quantitative and qualitative credit criteria and specify authorized risk mitigation tools including, but not limited to, use of standardized master netting contracts and agreements that allow for netting of positive and negative exposures associated with a single counterparty. We have processes for monitoring and managing credit exposure of our businesses including methodologies to analyze counterparties' financial strength, measurement of current and potential future exposures and contract language that provides rights for netting and set-off. Credit enhancements such as parental guarantees, letters of credit, surety bonds and margin deposits are also utilized. Additionally, individual counterparties and credit portfolios are managed to assess overall credit exposure. This evaluation results in establishing exposure limits or collateral requirements for entering into an agreement with a counterparty that creates exposure. Additionally, we have established controls to determine and monitor the appropriateness of these limits on an ongoing basis. Prospective material adverse changes in the payment history or financial condition of a counterparty or downgrade of its credit quality result in the reassessment of the credit limit with that counterparty. This process can result in the subsequent reduction of the credit limit or a request for additional financial assurances.

*Credit Exposure*—Our gross exposure to credit risk associated with trade accounts receivable (retail and wholesale) and net asset positions arising from hedging and trading activities totaled $2.104 billion at September 30, 2009. The components of this exposure are discussed in more detail below.

Assets subject to credit risk as of September 30, 2009 include $1.074 billion in accounts receivable from the retail sale of electricity to residential and business customers. Cash deposits held as collateral for these receivables totaled $93 million at September 30, 2009. The risk of material loss (after consideration of bad debt allowances) from nonperformance by these customers is unlikely based upon historical experience. Allowances for uncollectible accounts receivable are established for the potential loss from nonpayment by these customers based on historical experience, market or operational conditions and changes in the financial condition of large business customers.

Assets subject to credit risk also include accounts receivable from electricity transmission and distribution services. This exposure, which totaled $255 million at September 30, 2009, consists almost entirely of noninvestment grade trade accounts receivable. Of this amount, $191 million represents trade accounts receivable from REPs. Oncor has a customer with subsidiaries that collectively represent 14% of the total exposure. No other nonaffiliated parties represent 10% or more of the total exposure.

The remaining credit exposure arises from wholesale energy sales and hedging and trading activities. Counterparties to these transactions include energy companies, financial institutions, electric utilities, independent power producers, oil and gas producers, local distribution companies and energy trading and marketing companies. As of September 30, 2009, the exposure to credit risk from these counterparties totaled $775 million taking into account the standardized master netting contracts and agreements described above but before taking into account $128 million in credit collateral (cash, letters of credit and other credit support). The net exposure (after credit collateral) of $647 million decreased approximately $148 million in the nine months ended September 30, 2009, reflecting the netting and right of setoff related to certain interest rate and commodity hedging transactions under a new derivative agreement with a counterparty (see Note 7 to EFH Corp.'s historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus).

Of this $647 million net exposure, 97% is with investment grade customers and counterparties, as determined using publicly available information including major rating agencies' published ratings and our internal credit evaluation process. Those customers and counterparties without a S&P rating of at least BBB- or similar rating from another major rating agency are rated using internal credit methodologies and credit scoring models to estimate a S&P equivalent rating. The company routinely monitors and manages credit exposure to these customers and counterparties on this basis.

The following table presents the distribution of credit exposure as of September 30, 2009 arising from wholesale energy sales and hedging and trading activities. This credit exposure represents wholesale trade

B-60

accounts receivable and net asset positions on the balance sheet arising from hedging and trading activities after taking into consideration netting and setoff provisions within each contract and any master netting contracts with counterparties. The amounts below do not include asset liens held as security for a portion of the net exposure.

| | Exposure Before Credit Collateral | Credit Collateral | Net Exposure | Net Exposure by Maturity | | | |
|---|---|---|---|---|---|---|---|
| | | | | 2 years or less | Between 2-5 years | Greater than 5 years | Total |
| Investment grade . . . . . . . . . . . . . . . . . | $754 | $127 | $627 | $724 | $ 29 | $(126) | $627 |
| Noninvestment grade . . . . . . . . . . . . . | 21 | 1 | 20 | 20 | ------ | ------ | 20 |
| Totals . . . . . . . . . . . . . . . . . . . . . . . | $775 | $128 | $647 | $744 | $ 29 | $(126) | $647 |
| Investment grade . . . . . . . . . . . . . . . . . | 97% | | 97% | | | | |
| Noninvestment grade . . . . . . . . . . . . . | 3% | | 3% | | | | |

In addition to the exposures in the table above, contracts classified as "normal" purchase or sale and non-derivative contractual commitments are not marked-to-market in the financial statements. Such contractual commitments may contain pricing that is favorable considering current market conditions and therefore represent economic risk if the counterparties do not perform. Nonperformance could have a material adverse impact on future results of operations, financial condition and cash flows.

We do not anticipate any material adverse effect on our financial position or results of operations due to nonperformance by any wholesale customer or counterparty.

Significant (10% or greater) concentration of credit exposure exists with two counterparties, which represented 55% and 10% of the net $647 million exposure. Exposure to these counterparties is viewed to be within an acceptable level of risk tolerance due to the applicable counterparty's credit rating and the importance of our business relationship with the counterparty. However, this concentration increases the risk that a default would have a material effect on results of operations.

With respect to credit risk related to the long-term hedging program, over 99% of the transaction volumes are with counterparties with an A credit rating or better. However, there is current and potential credit concentration risk related to the limited number of counterparties that comprise the substantial majority of the program with such counterparties being in the banking and financial sector. The transactions with these counterparties contain certain credit rating provisions that would require the counterparties to post collateral in the event of a material downgrade in the credit rating of the counterparties. An event of default by one or more hedge counterparties could subsequently result in termination-related settlement payments that reduce available liquidity if amounts are owed to the counterparties related to the commodity contracts or delays in receipts of expected settlements if the hedge counterparties owe amounts to us. While the potential concentration of risk with these counterparties is viewed to be within an acceptable risk tolerance, the exposure to hedge counterparties is managed through various ongoing risk management measures.

B-61

EFIHMW00246555

PX 014
Page 837 of 1116

**Adjusted EBITDA Reconciliation**

**EFH Corp.**
**Adjusted EBITDA Reconciliation**
**(millions of dollars)**

| | Nine Months Ended September 30, 2009 | Nine Months Ended September 30, 2008 | Twelve Months Ended September 30, 2009 | Twelve Months Ended September 30, 2008 |
|---|---|---|---|---|
| Net income (loss) attributable to EFH Corp. | $ 207 | $ (983) | $(8,648) | $(2,235) |
| Income tax expense (benefit) | 254 | (462) | 245 | (1,038) |
| Interest expense and related charges | 2,136 | 2,505 | 4,566 | 3,371 |
| Depreciation and amortization | 1,286 | 1,217 | 1,679 | 1,654 |
| **EBITDA** | $ 3,883 | $ 2,277 | $(2,158) | $ 1,752 |
| Oncor EBITDA | (1,043) | (1,053) | (488) | (1,338) |
| Oncor distributions/dividends (a) | 117 | 213 | 1,487 | 288 |
| Interest income | (30) | (22) | (35) | (49) |
| Amortization of nuclear fuel | 71 | 55 | 93 | 74 |
| Purchase accounting adjustments (b) | 259 | 325 | 394 | 463 |
| Impairment of goodwill | 90 | — | 8,090 | — |
| Impairment of assets and inventory write down (c) | 5 | 512 | 715 | 457 |
| Net income attributable to noncontrolling interests | 54 | — | (106) | — |
| EBITDA amount attributable to consolidated unrestricted subsidiaries | 3 | — | 3 | — |
| Unrealized net (gain) loss resulting from hedging transactions | (713) | 221 | (3,263) | 1,796 |
| Amortization of "day one" net loss on Sandow 5 power purchase agreement | (7) | — | (7) | — |
| Losses on sale of receivables | 9 | 22 | 17 | 33 |
| Income from discontinued operations, net of tax effect | — | — | — | (1) |
| Noncash compensation expenses (d) | 9 | 24 | 11 | 23 |
| Severance expense (e) | 9 | 1 | 10 | 1 |
| Transition and business optimization costs (f) | 22 | 38 | 29 | 47 |
| Transaction and merger expenses (g) | 65 | 44 | 84 | 107 |
| Insurance settlement proceeds (h) | — | — | (21) | — |
| Restructuring and other (i) | (10) | 32 | (6) | 33 |
| Expenses incurred to upgrade or expand a generation station (j) | 100 | 100 | 100 | 100 |
| **Adjusted EBITDA per Incurrence Covenant** | $ 2,893 | $ 2,789 | $ 4,949 | $ 3,786 |
| **Add back Oncor adjustments** | 926 | 807 | (148) | 1,014 |
| **Adjusted EBITDA per Restricted Payments Covenant** | $ 3,819 | $ 3,596 | $ 4,801 | $ 4,800 |

(a)  Twelve months ended September 30, 2009 amount includes $1.253 billion distribution of net proceeds from the sale of Oncor noncontrolling interests in November 2008.

(b)  Purchase accounting adjustments include amortization of the intangible net asset value of retail and wholesale power sales agreements, environmental credits, coal purchase contracts, nuclear fuel contracts

B-62

Confidential

and power purchase agreements and the stepped up value of nuclear fuel. Also include certain credits not recognized in net income due to purchase accounting.

(c)  Impairment of assets includes impairments of emission allowances and trade name intangible assets, impairment of the natural gas-fueled generation fleet and charges related to the cancelled development of coal-fueled generation facilities.

(d)  Non-cash compensation expenses are accounted for under accounting standards related to stock compensation and exclude capitalized amounts.

(e)  Severance expense includes amounts incurred related to outsourcing, restructuring and other amounts deemed to be in excess of normal recurring amounts.

(f)  Transition and business optimization costs include professional fees primarily for retail billing and customer care systems enhancements and incentive compensation.

(g)  Transaction and merger expenses include costs related to the Merger and abandoned strategic transactions. Also include outsourcing transition costs, administrative costs related to the cancelled program to develop coal-fueled generation facilities, the Sponsor Group management fee, costs related to certain growth initiatives and costs related to the Oncor sale of noncontrolling interests.

(h)  Insurance settlement proceeds include the amount received for property damage to certain mining equipment.

(i)  Restructuring and other for the twelve months ended September 30, 2008 includes a litigation accrual, a charge related to the bankruptcy of a subsidiary of Lehman Brothers Holdings Inc. and other restructuring initiatives and nonrecurring activities.

(j)  Expenses incurred to upgrade or expand a generation station reflect noncapital outage costs.

Confidential

EFIHMW00246557

**PX 014**
**Page 839 of 1116**

**TCEH Consolidated**
**Adjusted EBITDA Reconciliation**
**(millions of dollars)**

| | Nine Months Ended September 30, 2009 | Nine Months Ended September 30, 2008 | Twelve Months Ended September 30, 2009 | Twelve Months Ended September 30, 2008 |
|---|---|---|---|---|
| **Net income (loss)** . . . . . . . . . . . . . . . . . . . . . . . . | $ 493 | $ (811) | $(7,559) | $(1,956) |
| **Income tax expense (benefit)** . . . . . . . . . . . . . . . . | 330 | (425) | 343 | (1,010) |
| **Interest expense and related charges** . . . . . . . . . . | 1,331 | 1,756 | 3,492 | 2,356 |
| **Depreciation and amortization** . . . . . . . . . . . . . . | 862 | 827 | 1,127 | 1,150 |
| **EBITDA** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $3,016 | $1,347 | $(2,597) | $ 540 |
| Interest income . . . . . . . . . . . . . . . . . . . . . . . . . . . | (40) | (45) | (55) | (66) |
| Amortization of nuclear fuel . . . . . . . . . . . . . . . . . | 71 | 55 | 93 | 74 |
| Purchase accounting adjustments (a) . . . . . . . . . . . . | 224 | 290 | 347 | 424 |
| Impairment of goodwill . . . . . . . . . . . . . . . . . . . . . | 70 | — | 8,070 | — |
| Impairment of assets and inventory write down (b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2 | 502 | 710 | 502 |
| EBITDA amount attributable to consolidated unrestricted subsidiaries . . . . . . . . . . . . . . . . . . . . . | 3 | — | 3 | — |
| Unrealized net (gain) loss resulting from hedging transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (713) | 221 | (3,263) | 1,796 |
| Amortization of "day one" net loss on Sandow 5 power purchase agreement . . . . . . . . . . . . . . . . . . | (7) | — | (7) | — |
| Corporate depreciation, interest and income tax expenses included in SG&A expense . . . . . . . . . . | 5 | — | 5 | — |
| Losses on sale of receivables . . . . . . . . . . . . . . . . . . | 9 | 22 | 17 | 33 |
| Noncash compensation expense (c) . . . . . . . . . . . . . | 1 | 8 | 3 | 8 |
| Severance expense (d) . . . . . . . . . . . . . . . . . . . . . . . | 9 | 1 | 10 | 1 |
| Transition and business optimization costs (e) . . . . . | 22 | 30 | 26 | 39 |
| Transaction and merger expenses (f) . . . . . . . . . . . . . | 3 | 1 | 12 | 1 |
| Insurance settlement proceeds (g) . . . . . . . . . . . . . . | — | — | (21) | — |
| Restructuring and other (h) . . . . . . . . . . . . . . . . . . . | (15) | 32 | (15) | 34 |
| Expenses incurred to upgrade or expand a generation station (i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 100 | 100 | 100 | 100 |
| **Adjusted EBITDA per Incurrence Covenant** . . . . | $2,760 | $2,564 | $ 3,438 | $ 3,486 |
| Expenses related to unplanned generation station outages (i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 61 | 218 | 93 | 209 |
| Other adjustments allowed to determine Adjusted EBITDA per Maintenance Covenant (j) . . . . . . . . | 21 | 8 | 28 | 9 |
| **Adjusted EBITDA per Maintenance Covenant** . . | $2,842 | $2,790 | $ 3,559 | $ 3,704 |

---

(a) Purchase accounting adjustments include amortization of the intangible net asset value of retail and wholesale power sales agreements, environmental credits, coal purchase contracts, nuclear fuel contracts and power purchase agreements and the stepped up value of nuclear fuel. Also include certain credits not recognized in net income due to purchase accounting.

(b) Impairment of assets includes impairments of emission allowances and trade name intangible assets and impairment of the natural gas-fueled generation fleet.

(c) Non-cash compensation expenses are accounted for under accounting standards related to stock compensation and exclude capitalized amounts.

B-64

EFIHMW00246558

**PX 014**
**Page 840 of 1116**

(d)  Severance expense includes amounts incurred related to outsourcing, restructuring and other amounts deemed to be in excess of normal recurring amounts.

(e)  Transition and business optimization costs include professional fees primarily for retail billing and customer care systems enhancements and incentive compensation.

(f)  Transaction and merger expenses include costs related to the Merger, outsourcing transition costs and costs related to certain growth initiatives.

(g)  Insurance settlement proceeds include the amount received for property damage to certain mining equipment.

(h)  Restructuring and other for the twelve months ended September 30, 2008 includes a charge related to the bankruptcy of a subsidiary of Lehman Brothers Holdings Inc. and other restructuring initiatives and nonrecurring activities.

(i)  Expenses incurred to upgrade or expand a generation station reflect noncapital outage costs.

(j)  Primarily pre-operating expenses relating to Oak Grove and Sandow 5. 2008 amounts were not previously available.

B-65

Confidential

EFIHMW00246559

PX 014
Page 841 of 1116

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS AS OF AND FOR THE YEAR ENDED DECEMBER 31, 2008**

The following discussion and analysis of EFH Corp.'s financial condition and results of operations as of and for the fiscal years ended December 31, 2008, 2007 and 2006 was included in EFH Corp.'s Annual Report on Form 10-K for the year ended December 31, 2008 as recast in a Current Report on Form 8-K filed with the SEC on May 20, 2009 to reflect the adoption of SFAS 160 (the "Year End MD&A"). The Year End MD&A should be read in conjunction with "Selected Historical Consolidated Financial Data for EFH Corp. and its Subsidiaries" and EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2008 and the notes to those statements, each included elsewhere in this Prospectus. The Year End MD&A should also be read in conjunction with the disclosure set forth in "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Nine Months Ended September 30, 2009" above, which provides material updates to certain of the information contained in the Year End MD&A.

All dollar amounts in the tables in the following discussion and analysis are stated in millions of US dollars unless otherwise indicated.

### Business

EFH Corp., a Texas corporation, is a Dallas-based holding company conducting its operations principally through its TCEH and Oncor subsidiaries. TCEH is a holding company for subsidiaries engaged in competitive electricity market activities largely in Texas including electricity generation, development and construction of new generation facilities, wholesale energy sales and purchases, commodity risk management and trading activities, and retail electricity sales. Oncor is engaged in regulated electricity transmission and distribution operations in Texas. Various "ring-fencing" measures have been taken to further separate Oncor from the other EFH Corp. businesses. See Note 1 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus for a description of the material features of these "ring-fencing" measures and Note 18 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus for discussion of noncontrolling interests sold by Oncor.

#### Operating Segments

EFH Corp. has aligned and reports its business activities as two operating segments: the Competitive Electric segment and the Regulated Delivery segment.

The Competitive Electric segment includes the activities of TCEH, as described above, as well as equipment salvage and resale activities related to the 2007 suspension and subsequent cancellation of the development of eight new coal-fueled generation units.

The Regulated Delivery segment includes the activities of Oncor, as described above, its wholly-owned bankruptcy-remote financing subsidiary and certain 2007 revenues and costs associated with installation of equipment that will facilitate Oncor's technology initiatives designed to improve system reliability.

See Note 27 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus for further information regarding reportable business segments.

### Executive Summary

In October 2007, EFH Corp. completed the Merger. As a result of the Merger, EFH Corp. became a subsidiary of Texas Holdings, which is controlled by the Sponsor Group.

Confidential