Under the terms of a TCEH rail car master lease with approximately $56 million in remaining lease payments as of December 31, 2008, if obligations of TCEH in the aggregate in excess of $200 million for payments of obligations to third party creditors under lease agreements, deferred purchase agreements or loan or credit agreements have been accelerated prior to their original stated maturity, the lessor could, among other remedies, terminate the lease and effectively accelerate the payment of any remaining lease payments due under the lease.

The indenture governing the $4.5 billion of EFH Corp. Notes contains a cross acceleration provision where a payment default at maturity or on acceleration of principal indebtedness under any instrument or instruments of EFH Corp. and any of its restricted subsidiaries in the aggregate amount equal to or greater than $250 million may cause the acceleration of the EFH Corp. Notes.

The accounts receivable securitization program contains a cross default provision with a threshold of $200 million that applies in the aggregate to the originators, any parent guarantor of an originator or TCEH acting as collection agent under the program. TXU Receivables Company and EFH Corporate Services Company, as collection agent, in the aggregate have a cross default threshold of $50,000. If any of the aforementioned defaults on indebtedness of the applicable threshold were to occur, the program could terminate.

EFH Corp. and its subsidiaries enter into energy-related and financial contracts, the master forms of which contain provisions whereby an event of default or acceleration of settlement would occur if EFH Corp. or those subsidiaries were to default under an obligation in respect of borrowings in excess of thresholds, which vary, stated in the contracts. The entities whose default would trigger cross default vary depending on the contract.

Each of TCEH's natural gas hedging agreements that are secured with a lien on its assets on a pari passu basis with the TCEH Senior Secured Facilities contains a cross default provision. In the event of a default by TCEH or any of its subsidiaries relating to indebtedness (such amounts varying by contract but ranging from $200 million to $250 million), then each counterparty under these hedging agreements would have the right to terminate its hedge agreement with TCEH and require all outstanding obligations under such agreement to be settled.

In the event of a default by TCEH relating to indebtedness in an amount equal to or greater than $200 million that results in the acceleration of such debt, then each counterparty under TCEH's interest rate swap agreements with a notional value totaling $32 billion at January 30, 2009 would have the right to terminate its interest rate swap agreement with TCEH and require all outstanding obligations under such agreement to be settled.

A default by Oncor or any subsidiary thereof in respect of indebtedness in a principal amount in excess of $50 million may result in a cross default under its credit facility. Under this facility such a default may cause the maturity of outstanding balances ($337 million at January 30, 2009) under such facility to be accelerated.

Other arrangements, including leases, have cross default provisions, the triggering of which would not result in a significant effect on liquidity.

B-123

EFIHMW00246617

***Long-Term Contractual Obligations and Commitments***—The following table summarizes EFH Corp.'s contractual cash obligations as of December 31, 2008 (see Note 15 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus for additional disclosures regarding these long-term debt and noncancellable purchase obligations).

| Contractual Cash Obligations | Less Than One Year | One to Three Years | Three to Five Years | More Than Five Years | Total |
|---|---|---|---|---|---|
| Long-term debt—principal (a) ................... | $   371 | $1,094 | $2,117 | $38,325 | $41,907 |
| Long-term debt—interest (b) ................... | 3,141 | 6,626 | 6,284 | 9,786 | 25,837 |
| Operating and capital leases (c) ................. | 90 | 214 | 123 | 398 | 825 |
| Obligations under commodity purchase and services agreements (d) ............................. | 1,735 | 1,476 | 598 | 603 | 4,412 |
| Total contractual cash obligations (e) .......... | $5,337 | $9,410 | $9,122 | $49,112 | $72,981 |

(a)  Excludes capital lease obligations, unamortized discounts and fair value premiums and discounts related to purchase accounting. Also excludes $249 million of additional principal amount of notes to be issued in May 2009 and due in 2016 and 2017, reflecting the election of the PIK feature on toggle notes as discussed above under PIK Interest Election.

(b)  Includes net amounts payable under interest rate swaps. Variable interest payments and net amounts payable under interest rate swaps are calculated based on interest rates in effect at December 31, 2008.

(c)  Includes short-term noncancellable leases.

(d)  Includes capacity payments, nuclear fuel and natural gas take-or-pay contracts, coal contracts, business services and nuclear-related outsourcing and other purchase commitments. Amounts presented for variable priced contracts assumed the year-end 2008 price remained in effect for all periods except where contractual price adjustment or index-based prices were specified.

(e)  Table does not include estimated 2009 funding of the pension and other postretirement benefits plans totaling approximately $103 million. Funding for the pension plan is expected to total approximately $665 million for the 2009 to 2013 period as discussed above under "—Pension and OPEB Plan Funding." It also does not include cancellable contracts associated with the construction of new generation facilities with obligations totaling approximately $550 million through 2010. See Note 16 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus.

The following contractual obligations were excluded from the table above:

•   contracts between affiliated entities and intercompany debt;

•   individual contracts that have an annual cash requirement of less than $1 million (however, multiple contracts with one counterparty that are more than $1 million on an aggregated basis have been included);

•   contracts that are cancellable without payment of a substantial cancellation penalty;

•   employment contracts with management, and

•   liabilities related to uncertain tax positions totaling $1.6 billion discussed in Note 10 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus as the ultimate timing of payment is not known.

Hearings on CREZ Transmission Plan proposals were held in December 2008. At a January 2009 open meeting, the PUCT assigned approximately $1.3 billion of CREZ construction projects to Oncor. Oncor anticipates that a written order reflecting the PUCT's decisions will be entered in the first quarter of 2009. Oncor expects capital expenditures related to CREZ transmission facilities to be approximately $90 million in 2009 with additional expenditures through 2012. These amounts are not included in the table above.

B-124

EFIHMW00246618

*Guarantees*—See Note 16 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus for details of guarantees.

## Off–Balance Sheet Arrangements

See discussion above under "—Sale of Accounts Receivable" and in Note 14 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus.

Also see Note 16 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus regarding guarantees.

## Commitments and Contingencies

See Note 16 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus for discussion of commitments and contingencies.

## Changes in Accounting Standards

See Note 1 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus for a discussion of changes in accounting standards.

## Regulation and Rates

### 2009 Texas Legislative Session

The Texas Legislature convened in its regular biennial session beginning January 13, 2009. The session will conclude June 1, 2009. EFH Corp. is actively monitoring and providing input regarding legislation that could impact its operations. EFH Corp. is unable to predict the outcome of the 2009 legislative process or its impact, if any, on its financial position, results of operations or cash flows.

### Regulatory Investigations and Reviews

See Note 16 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus.

### Certification of REPs

In October 2008, the PUCT proposed a replacement of the rule relating to Certification of Retail Electric Providers. The proposed new rule is expected to strengthen the certification requirements for REPs in order to better protect customers, transmission and distribution utilities (TDUs), and other REPs from the insolvency and other harmful conditions and activities of REPs. The new rule would be considered a competition rule and thus be subject to judicial review as specified in PURA. The new rule proposes, among other things, increased creditworthiness requirements and financial reporting for REPs, additional customer protection requirements, deposit requirements to TDUs, and regulatory asset consideration for bad debt expenses. The PUCT is expected to finalize the new rule in the first quarter of 2009. EFH Corp. cannot predict the final outcome of this proposed rule.

### Wholesale Market Design

In August 2003, the PUCT adopted a rule that, when implemented, will alter the wholesale market design in the ERCOT market. The rule requires ERCOT to:

- use a stakeholder process to develop a new wholesale market model;

- operate a voluntary day-ahead energy market;

B-125

EFIHMW00246619

- directly assign all congestion rents to the resources that caused the congestion;
- use nodal energy prices for resources;
- provide information for energy trading hubs by aggregating nodes;
- use zonal prices for loads, and
- provide congestion revenue rights (but not physical rights).

ERCOT currently has a zonal wholesale market structure consisting of four geographic zones. The proposed location-based congestion-management market is referred to as a "nodal" market because wholesale pricing would differ across the various nodes on the transmission grid. The implementation of a nodal market is being done in conjunction with transmission improvements designed to reduce current congestion. In 2006, the PUCT approved a set of Nodal Protocols that was filed by ERCOT and describes the operation of a wholesale nodal market, and set an implementation date of no later than January 1, 2009. ERCOT has delayed the start of the nodal market beyond the January 1, 2009 implementation date. Pursuant to a request from the PUCT, ERCOT announced in November 2008 a new preliminary schedule for the implementation of the nodal market by December 2010. Additionally, pursuant to a request from the PUCT, ERCOT prepared a revised cost-benefit analysis for implementation of a nodal market design that showed a net present value of total system cost savings of $520 million compared to a net present value of $222 million of going forward costs for a nodal market design. In accordance with a PUCT order, ERCOT included a preliminary Nodal Program Integrated Project Schedule as part of the overall nodal budget filing with the PUCT in February 2009 as discussed immediately below.

In August 2006, the PUCT adopted an interim order approving ERCOT's application for a surcharge imposed on all Qualified Scheduling Entities in the ERCOT market (including subsidiaries of TCEH) for the purpose of financing 38% of ERCOT's expected nodal implementation costs. The surcharge took effect in October 2006. Additionally, in May 2008, the PUCT approved an increase in the surcharge. In November 2008, ERCOT filed a request with the PUCT for approval of an interim increase in the nodal surcharge from $0.169 per MWh to $0.38 per MWh. At the PUCT's Open Meeting on January 14, 2009, the PUCT voted to extend the existing $0.169 per MWh nodal surcharge through the end of February 2009. ERCOT submitted a revised not to exceed budget of $658.7 million with the PUCT in February 2009, up from the initial nodal budget of $363.5 million. At the PUCT open meeting on February 26, 2009, the PUCT commissioners voted to extend the ERCOT nodal program until March 31, 2009, while maintaining the existing nodal surcharge of $0.169 per MWh. The PUCT directed ERCOT to submit a filing for approval of the full nodal surcharge, budget and schedule by March 31, 2009. At the current level of the nodal surcharge, EFH Corp. expects that the annual impact of the surcharge would be approximately $10 to $11 million in additional expenses; however, EFH Corp. is unable to predict the ultimate impact of the proposed nodal wholesale market design on its operations or financial results.

### Environmental Regulations

See discussion in Note 3 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus regarding the invalidation of the EPA's Clean Air Interstate Rule and the related impairment of intangible assets representing NOx and SO$_2$ emission allowances.

### Oncor Matters with the PUCT

*Stipulation Approved by the PUCT*—In April 2008, the PUCT entered an order, which became final in June 2008, approving the terms of a stipulation relating to the filing in 2007 by Oncor and Texas Holdings of a Merger-related Joint Report and Application with the PUCT pursuant to Section 14.101 (b) of PURA and PUCT Substantive Rule 25.75. The stipulation required the filing of a rate case by Oncor no later than July 1, 2008 based on a test year ended December 31, 2007. Oncor filed the rate case with the PUCT in June 2008. In July 2008, Nucor Steel filed an appeal of the PUCT's order in the 200th District Court of Travis County, Texas. Oncor was named a defendant and intends to vigorously defend the appeal.

B-126

EFIHMW00246620

*Rate Case*—In June 2008, Oncor filed for a rate review with the PUCT (Docket No. 35717) and 204 cities, as required by the order approving the stipulation discussed above. If approved as requested, this review would result in an aggregate annual rate increase of approximately $253 million (adjusted from $275 million as reflected in Oncor's initial filing), the majority of which relates to increased depreciation expense due to capital investments and recovery of costs that have been recorded as regulatory assets. A hearing on the merits concluded in February 2009. Resolution of Oncor's proposed rate increase is expected to occur in the summer of 2009.

*Advanced Meter Rulemaking*—In 2005, the Texas Legislature passed legislation that authorized electric utilities to implement a surcharge to recover costs incurred in deploying advanced metering and meter information networks. Benefits of the advanced metering installation include improved safety, on-demand meter reading, enhanced outage identification and restoration and system monitoring of voltages. In 2007, the PUCT issued its advanced metering rule to implement this legislation. This rule outlined the minimum required functionality for an electric utility's advanced metering systems to qualify for cost recovery under a surcharge. Subsequent to the issuance of the rule, the PUCT opened an implementation proceeding for market participants to fine-tune the rule requirements, address the impacts of advanced metering deployment on retail and wholesale markets in ERCOT, and help ensure that retail customers receive benefits from advanced metering deployment. The implementation proceeding is expected to conclude by the end of the first quarter of 2009.

*Advanced Metering Deployment Surcharge Filing*—In May 2008, Oncor filed with the PUCT (Docket No. 35718) a description and request for approval of its proposed advanced metering system deployment plan and its proposed surcharge for the recovery of its estimated future investment for advanced metering deployment. Oncor's plan provides for the full deployment of over three million advanced meters by the end of 2012 to all residential and most non-residential retail electricity customers in Oncor's service area. Oncor installed approximately 5,000 advanced meters in a pilot program in the three months ended June 30, 2008, and deployed approximately 35,000 additional advanced meters in the fourth quarter of 2008.

In August 2008, a settlement was reached with the majority of the parties to this surcharge filing. The settlement includes the following major provisions (the comparisons are against amounts filed in the original request):

- a surcharge beginning on January 1, 2009 and continuing for 11 years;

- a total revenue requirement over the surcharge period of $1.035 billion (reduced from $1.069 billion);

- estimated capital expenditures for advanced metering facilities of $686 million (reduced from $690 million);

- related operation and maintenance expenses for the surcharge period of $153 million (increased from $148 million);

- $28 million of additional savings (in addition to the $176 million in the original filing), and

- an advanced metering cost recovery factor of $2.21 per month per residential retail customer (reduced from $2.29 per month) and varying from $2.42 to $5.21 per month for non-residential retail customers (reduced from $2.49 to $5.35 per month).

An order approving the settlement was issued by the PUCT in August 2008 and became final in September 2008. Oncor began billing the advanced metering surcharge in the January 2009 billing month cycle. Oncor may, through subsequent reconciliation proceedings, request recovery of additional costs that are reasonable and necessary. While there is a presumption that costs spent in accordance with a plan approved by the PUCT are reasonable and necessary, recovery of any costs that are found not to have been spent or properly allocated, or not to be reasonable or necessary, must be refunded.

B-127

EFIHMW00246621

Prior to the PUCT issuance of rules for minimum required functionality for advanced metering systems, Oncor installed approximately 600,000 automated meters in its service territory at a capital cost of approximately $125 million. These meters are not part of the surcharge request, and Oncor is seeking recovery of the incremental costs of these meters in its general rate case discussed above.

**Oncor Energy Efficiency Cost Recovery Filing**—In June 2008, Oncor filed with the PUCT a Request for Approval of Energy Efficiency Cost Recovery Factor (Docket No. 35634). Oncor requested a nonbypassable charge to be billed to REPs serving customer classes that receive services under Oncor's energy efficiency program. The proposed recovery factor is $0.22 per month for each residential customer and will vary for non-residential customers. The proposed charge will allow Oncor, in a timely manner, to recover reasonable and necessary costs incurred in administering its energy efficiency program. In October 2008, the PUCT approved the recovery factor. Oncor began billing the surcharge in the January 2009 billing month cycle.

**Transmission Rates**—In order to recover increases in its transmission costs, including fees paid to other transmission service providers, Oncor is allowed to request an update twice a year to the transmission cost recovery factor (TCRF) component of its retail delivery rate charged to REPs. In January 2009, an application was filed to increase the TCRF, which was administratively approved in February 2009 and became effective March 1, 2009. This increase is expected to increase annualized revenues by $16 million.

In February 2008, Oncor filed an application for an interim update of its wholesale transmission rate. The PUCT approved Oncor's application in April 2008, and the new rate went into effect immediately. Annualized revenues are expected to increase by approximately $39 million. Approximately $25 million of this increase is recoverable through transmission rates charged to wholesale customers, and the remaining $14 million is recoverable from REPs through the TCRF component of Oncor's delivery rates charged to REPs as discussed immediately above. With the pending rate case discussed above, Oncor has not filed for an interim update of it wholesale transmission rate in 2009.

**Competitive Renewable Energy Zones (CREZ)**—In the first quarter of 2007, the PUCT initiated a docket to identify the transmission facilities necessary to interconnect future renewable energy generating facilities. As part of the docket, the PUCT considered which zones would contain the best renewable energy sources. In July 2007, the PUCT voted to designate zones with generation potential of over 20,000 MW. In July 2008, the PUCT approved a plan for the construction of transmission facilities with an estimated cost of $4.9 billion to accommodate over 18,000 MW of wind capacity.

In September 2008, parties interested in the construction and operation of CREZ transmission facilities filed CREZ Transmission Plans. Oncor and several other ERCOT utilities filed a joint CREZ Transmission Plan, which includes the joint parties' plans to construct and operate all of the CREZ transmission facilities. Hearings on the CREZ Transmission Plan proposals were held in December 2008. At a January 2009 open meeting, the PUCT assigned approximately $1.3 billion of CREZ construction projects to Oncor. Oncor anticipates that a written order reflecting the PUCT's decisions will be entered in the first quarter of 2009. The cost estimates for the CREZ construction projects are based upon cost analyses prepared by ERCOT. Oncor anticipates completing the necessary permitting actions and other requirements and all construction activities so that its CREZ Transmission Plan may be implemented consistent with the PUCT's assignment. The PUCT's assignment calls for construction to be completed in 2012.

*Summary*

EFH Corp. cannot predict future regulatory or legislative actions or any changes in economic and securities market conditions. Such actions or changes could significantly alter its basic financial position, results of operations or cash flows.

B-128

EFIHMW00246622

**Quantitative and Qualitative Disclosures about Market Risk**

Market risk is the risk that EFH Corp. may experience a loss in value as a result of changes in market conditions affecting factors such as commodity prices and interest rates, to which EFH Corp. is exposed in the ordinary course of business. EFH Corp.'s exposure to market risk is affected by a number of factors, including the size, duration and composition of its energy and financial portfolio, as well as the volatility and liquidity of markets. EFH Corp. enters into instruments such as interest rate swaps to manage interest rate risk related to its indebtedness, as well as exchange traded, over-the-counter contracts and other contractual commitments to manage commodity price risk as part of its wholesale activities. EFH Corp.'s interest rate risk discussed below was significantly affected by debt issuances in connection with the Merger.

*Risk Oversight*

TCEH manages the commodity price, counterparty credit and commodity-related operational risk related to the unregulated energy business within limitations established by senior management and in accordance with EFH Corp.'s overall risk management policies. Interest rate risk is managed centrally by the corporate treasury function. Market risks are monitored by risk management groups that operate independently of the wholesale commercial operations, utilizing defined practices and analytical methodologies. These techniques measure the risk of change in value of the portfolio of contracts and the hypothetical effect on this value from changes in market conditions and include, but are not limited to, Value at Risk (VaR) methodologies. Key risk control activities include, but are not limited to, transaction review and approval (including credit review), operational and market risk measurement, validation of transaction capture, portfolio valuation and reporting, including mark-to-market valuation, VaR and other risk measurement metrics.

EFH Corp. has a corporate risk management organization that is headed by the Chief Financial Officer, who functions as the Chief Risk Officer. The Chief Risk Officer, through his designees, enforces applicable risk limits, including the respective policies and procedures to ensure compliance with such limits and evaluates the risks inherent in the various businesses of EFH Corp. and their associated transactions.

*Commodity Price Risk*

EFH Corp.'s businesses are subject to the inherent risks of market fluctuations in the price of electricity, natural gas and other energy-related products they market or purchase. EFH Corp.'s businesses actively manage their portfolio of owned generation assets, fuel supply and retail sales load to mitigate the near-term impacts of these risks on results of operations. These businesses, similar to other participants in the market, cannot fully manage the long-term value impact of structural declines or increases in natural gas and power prices and spark spreads (differences between the market price of electricity and its cost of production).

In managing energy price risk, subsidiaries of EFH Corp. enter into a variety of market transactions including, but not limited to, short- and long-term contracts for physical delivery, exchange traded and over-the-counter financial contracts and bilateral contracts with customers. Activities in the wholesale operations include hedging, the structuring of long-term contractual arrangements and proprietary trading. The wholesale operation continuously monitors the valuation of identified risks and adjusts positions based on current market conditions. EFH Corp. strives to use consistent assumptions regarding forward market price curves in evaluating and recording the effects of commodity price risk.

*Long-Term Hedging Program*—See "—Executive Summary—Significant Activities and Events" above for a description of the program, including potential effects on reported results.

*VaR Methodology*—A VaR methodology is used to measure the amount of market risk that exists within the portfolio under a variety of market conditions. The resultant VaR produces an estimate of a portfolio's potential for loss given a specified confidence level and considers among other things, market movements utilizing standard statistical techniques given historical and projected market prices and volatilities.

B-129

EFIHMW00246623

A Monte Carlo simulation methodology is used to calculate VaR and is considered by management to be the most effective way to estimate changes in a portfolio's value based on assumed market conditions for liquid markets. The use of this method requires a number of key assumptions, such as use of (i) an assumed confidence level; (ii) an assumed holding period (i.e. the time necessary for management action, such as to liquidate positions); and (iii) historical estimates of volatility and correlation data.

*Trading VaR*—This measurement estimates the potential loss in fair value, due to changes in market conditions, of all contracts entered into for trading purposes based on a 95% confidence level and an assumed holding period of five to 60 days.

| | Successor | |
| --- | --- | --- |
| | Year Ended December 31, 2008 | Year Ended December 31, 2007 |
| Month-end average Trading VaR: . . . . . . . . . . . . . . . . . . . . . . . | $ 6 | $ 9 |
| Month-end high Trading VaR: . . . . . . . . . . . . . . . . . . . . . . . . | $15 | $14 |
| Month-end low Trading VaR: . . . . . . . . . . . . . . . . . . . . . . . . . | $ 2 | $ 6 |

*VaR for Energy-Related Contracts Subject to Mark-to-Market (MtM) Accounting*—This measurement estimates the potential loss in fair value, due to changes in market conditions, of all contracts marked-to-market in net income (principally hedges not accounted for as cash flow hedges and trading positions), based on a 95% confidence level and an assumed holding period of five to 60 days.

| | Successor | |
| --- | --- | --- |
| | Year Ended December 31, 2008 | Year Ended December 31, 2007 |
| Month-end average MtM VaR: . . . . . . . . . . . . . . . . . . . . . . . . | $2,290 | $1,081 |
| Month-end high MtM VaR: . . . . . . . . . . . . . . . . . . . . . . . . . . | $3,549 | $1,576 |
| Month-end low MtM VaR: . . . . . . . . . . . . . . . . . . . . . . . . . . . | $1,087 | $ 322 |

*Earnings at Risk (EaR)*—This measurement estimates the potential reduction of pretax earnings for the periods presented, due to changes in market conditions, of all energy-related contracts marked-to-market in net income and contracts not marked-to-market in net income that are expected to be settled within the fiscal year (physical purchases and sales of commodities). Transactions accounted for as cash flow hedges are also included for this measurement. A 95% confidence level and a five to 60 day holding period are assumed in determining EaR.

| | Successor | |
| --- | --- | --- |
| | Year Ended December 31, 2008 | Year Ended December 31, 2007 |
| Month-end average EaR: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $2,300 | $1,070 |
| Month-end high EaR: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $3,916 | $1,559 |
| Month-end low EaR: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $1,069 | $ 318 |

The increases in the risk measures (MtM VaR and EaR) above were driven by higher natural gas prices and significant increases in market volatility.

### Interest Rate Risk

The table below provides information concerning EFH Corp.'s financial instruments as of December 31, 2008 and 2007 that are sensitive to changes in interest rates, which include debt obligations and interest rate swaps. EFH Corp. has entered into interest rate swaps under which it has agreed to exchange the difference between fixed-rate and variable-rate interest amounts calculated with reference to specified notional principal amounts at dates that generally coincide with interest payments. In addition, in connection with entering into

B-130

EFIHMW00246624

certain interest rate basis swaps to further reduce fixed borrowing costs, EFH Corp. has changed the variable interest rate terms of certain debt from three-month LIBOR to one-month LIBOR, as discussed in Note 15 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus. The weighted average interest rate presented is based on the rate in effect at the reporting date. Capital leases and the effects of unamortized premiums and discounts and fair value hedges are excluded from the table. See Note 15 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus for a discussion of changes in debt obligations.

| | | | Expected Maturity Date | | | | | Successor | | |
| | | | (millions of dollars, except percentages) | | | | | | | |
| | 2009 | 2010 | 2011 | 2012 | 2013 | There-After | 2008 Total Carrying Amount | 2008 Total Fair Value | 2007 Total Carrying Amount | 2007 Total Fair Value |
|---|---|---|---|---|---|---|---|---|---|---|
| Long-term debt (including current maturities) | | | | | | | | | | |
| Fixed rate debt amount (a) | $ 198 | $ 135 | $ 559 | $ 851 | $ 866 | $18,037 | $20,646 | $14,266 | $19,614 | $18,987 |
| Average interest rate | 5.59% | 5.46% | 5.66% | 6.24% | 6.00% | 9.10% | 8.70% | | 8.74% | |
| Variable rate debt amount | $ 173 | $ 200 | $ 200 | $ 200 | $ 200 | $20,288 | $21,261 | $14,886 | $20,256 | $19,909 |
| Average interest rate | 5.44% | 5.40% | 5.40% | 5.40% | 5.40% | 5.28% | 5.28% | | 8.29% | |
| Total debt | $ 371 | $ 335 | $ 759 | $1,051 | $1,066 | $38,325 | $41,907 | $29,152 | $39,870 | $38,896 |
| Debt swapped to variable: | | | | | | | | | | |
| Amount | $ — | $ — | $ — | $ — | $ — | $ — | — | | $ 200 | |
| Average pay rate | — | — | — | — | — | — | — | | 7.48% | |
| Average receive rate | — | — | — | — | — | — | — | | 6.38% | |
| Debt swapped to fixed: | | | | | | | | | | |
| Amount | $1,250 | $ 500 | $ 600 | $2,600 | $3,600 | $ 9,000 | $17,550 | | $15,050 | |
| Average pay rate | 7.33% | 7.43% | 7.57% | 7.99% | 7.60% | 8.31% | 8.00% | | 8.01% | |
| Average receive rate | 5.89% | 5.89% | 5.89% | 5.89% | 5.83% | 5.89% | 5.88% | | 8.40% | |
| Variable basis swaps: | | | | | | | | | | |
| Amount | $6,345 | $1,100 | $1,500 | $4,100 | $ — | $ — | $13,045 | | — | |
| Average pay rate | 2.51% | 2.39% | 2.67% | 2.39% | 1.82% | — | 2.48% | | — | |
| Average receive rate | 2.07% | 1.82% | 2.32% | 1.82% | — | — | 2.00% | | — | |

(a)  Reflects the remarketing date and not the maturity date for certain debt that is subject to mandatory tender for remarketing prior to maturity. See Note 15 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus for details concerning long-term debt subject to mandatory tender for remarketing.

As of December 31, 2008, the potential reduction of annual pretax earnings due to a one-point increase in interest rates totaled approximately $26 million, taking into account the interest rate swaps discussed in Note 15 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus.

*Credit Risk*

*Credit Risk*—Credit risk relates to the risk of loss associated with nonperformance by counterparties. EFH Corp. and its subsidiaries maintain credit risk policies with regard to their counterparties to minimize overall credit risk. These policies prescribe practices for evaluating a potential counterparty's financial condition, credit rating and other quantitative and qualitative credit criteria and specify authorized risk mitigation tools including, but not limited to, use of standardized master netting contracts and agreements that allow for netting of positive and negative exposures associated with a single counterparty. EFH Corp. has processes for monitoring and managing credit exposure of its businesses including methodologies to analyze counterparties' financial strength, measurement of current and potential future exposures and contract language that provides rights for netting and set-off. Credit enhancements such as parental guarantees, letters of credit, surety bonds and margin deposits are also utilized. Additionally, individual counterparties and credit portfolios are managed to assess overall credit exposure. This

B-131

**PX 014**
**Page 907 of 1116**

evaluation results in establishing exposure limits or collateral requirements for entering into an agreement with a counterparty that creates exposure. Additionally, EFH Corp. has established controls to determine and monitor the appropriateness of these limits on an ongoing basis. Prospective material adverse changes in the payment history or financial condition of a counterparty or downgrade of its credit quality result in the reassessment of the credit limit with that counterparty. This process can result in the subsequent reduction of the credit limit or a request for additional financial assurances.

*Credit Exposure*—EFH Corp.'s gross exposure to credit risk associated with trade accounts receivable (retail and wholesale) and net asset positions arising from hedging and trading activities totaled $2.270 billion at December 31, 2008. The components of this exposure are discussed in more detail below.

Assets subject to credit risk as of December 31, 2008 include $715 million in accounts receivable from the retail sale of electricity to residential and business customers. As of December 31, 2008, EFH Corp. held cash deposits of $108 million as collateral for these receivables. The risk of material loss (after consideration of bad debt allowances) from nonperformance by these customers is unlikely based upon historical experience. Allowances for uncollectible accounts receivable are established for the potential loss from nonpayment by these customers based on historical experience, market or operational conditions and changes in the financial condition of large business customers.

Most of the remaining credit exposure is with wholesale counterparties. These counterparties include energy companies, financial institutions, electric utilities, independent power producers, oil and gas producers, local distribution companies and energy trading and marketing companies. As of December 31, 2008, the exposure to credit risk from the wholesale customers and counterparties totaled $1.331 billion taking into account standardized master netting contracts and agreements described above but before taking into account $536 million in credit collateral (cash, letters of credit and other security interests) held by EFH Corp. subsidiaries.

Of this $795 million net exposure, 82% is with investment grade customers and counterparties, as determined using publicly available information including major rating agencies' published ratings and EFH Corp.'s internal credit evaluation process. Those customers and counterparties without a S&P rating of at least BBB- or similar rating from another major rating agency are rated using internal credit methodologies and credit scoring models to estimate a S&P equivalent rating. EFH Corp. routinely monitors and manages its credit exposure to these customers and counterparties on this basis. See discussion above under "—Financial Condition—Liquidity and Capital Resources—Bankruptcy Filing of Lehman Brothers Holdings Inc."

In addition, Oncor has exposure to credit risk from nonaffiliated parties totaling $224 million at December 31, 2008, of which $194 million represents trade accounts receivable principally from REPs. This exposure consists almost entirely of noninvestment grade trade accounts receivable. Oncor has one customer that represents 12% of the total exposure to nonaffiliated parties.

B-132

Confidential

The following table presents the distribution of credit exposure as of December 31, 2008, for wholesale counterparties. This credit exposure represents wholesale trade accounts receivable and net asset positions on the balance sheet arising from hedging and trading activities after taking into consideration netting within each contract and any master netting contracts with counterparties. The amounts below do not include asset liens held as security for a portion of the net exposure.

| | Exposure Before Credit Collateral | Credit Collateral | Net Exposure | Net Exposure by Maturity | | | |
|---|---|---|---|---|---|---|---|
| | | | | 2 years or less | Between 2-5 years | Greater than 5 years | Total |
| Investment grade ................. | $1,180 | $528 | $652 | $503 | $83 | $ 66 | $652 |
| Noninvestment grade ............. | 151 | 8 | 143 | 140 | 3 | — | 143 |
| Totals ...................... | $1,331 | $536 | $795 | $643 | $86 | $ 66 | $795 |
| Investment grade ................. | 89% | | 82% | | | | |
| Noninvestment grade ............. | 11% | | 18% | | | | |

In addition to the exposures in the table above, EFH Corp. has contracts classified as "normal" purchase or sale and non-derivative contractual commitments that are not marked-to-market in the financial statements. Such contractual commitments may contain pricing that is favorable considering current market conditions and therefore represent economic risk if the counterparties do not perform. Nonperformance could have a material adverse impact on EFH Corp.'s future results of operations, financial condition and cash flows.

EFH Corp. does not anticipate any material adverse effect on its financial position or results of operations due to nonperformance by any customer or counterparty.

EFH Corp.'s subsidiaries had credit exposure to two counterparties each having an exposure greater than 10% of the net $795 million credit exposure. These two counterparties represented 29% and 18%, respectively, of the net exposure. EFH Corp. views exposure to these counterparties to be within an acceptable level of risk tolerance due to the applicable counterparty's credit rating and business relationship with EFH Corp. However, this concentration increases the risk that a default would have a material effect on EFH Corp.'s net income and cash flows.

With respect to credit risk related to the long-term hedging program, over 98% of the transaction volumes are with counterparties with an A credit rating or better. However, EFH Corp. has current and potential credit concentration risk related to the limited number of counterparties that comprise the substantial majority of the program with such counterparties being in the banking and financial sector. The transactions with these counterparties contain certain credit rating provisions that would require the counterparties to post collateral in the event of a material downgrade in the credit rating of the counterparties. An event of default by one or more of EFH Corp.'s hedge counterparties could subsequently result in termination-related settlement payments that reduce available liquidity if EFH Corp. owes amounts related to its commodity contracts or delays in receipts of expected settlements if the hedge counterparties owe amounts to EFH Corp. While EFH Corp. views the potential concentration of risk with these counterparties to be within an acceptable risk tolerance, EFH Corp. strives to manage its exposure to its hedge counterparties through various ongoing risk management measures.

B-133

EFIHMW00246627

PX 014
Page 909 of 1116

**Adjusted EBITDA Reconciliation**

## EFH Corp. Consolidated
## Adjusted EBITDA Reconciliation

| | Year Ended December 31, 2008 | Year Ended December 31, 2007 |
|---|---|---|
| | (millions of dollars) | |
| Net loss | $(9,838) | $ (637) |
| Income tax benefit | (471) | (364) |
| Interest expense and related charges | 4,935 | 1,510 |
| Depreciation and amortization | 1,610 | 1,049 |
| **EBITDA** | $(3,764) | $ 1,558 |
| Oncor EBITDA | (496) | (1,291) |
| Oncor distributions/dividends (a) | 1,582 | 326 |
| Interest income | (27) | (80) |
| Amortization of nuclear fuel | 76 | 69 |
| Purchase accounting adjustments (b) | 460 | 138 |
| Impairment of goodwill | 8,000 | —— |
| Impairment of assets and inventory write down (c) | 1,221 | 757 |
| Net loss attributable to noncontrolling interests | (160) | — |
| Unrealized net (gain) or loss resulting from hedging transactions | (2,329) | 2,278 |
| Losses on sale of receivables | 29 | 39 |
| Income from discontinued operations, net of tax effect | — | (25) |
| Noncash compensation expense (SFAS 123R) (d) | 27 | 22 |
| Severance expense (e) | 3 | — |
| Equity losses of unconsolidated affiliate engaged in broadband over power lines | —— | 1 |
| Transition and business optimization costs (f) | 45 | 24 |
| Transaction and merger expenses (g) | 64 | 150 |
| Insurance settlement proceeds (h) | (21) | —— |
| Restructuring and other (i) | 35 | (33) |
| Expenses incurred to upgrade or expand a generation station (j) | 100 | 5 |
| **Adjusted EBITDA per Incurrence Covenant** | $ 4,845 | $ 3,938 |
| **Add back Oncor adjustments** | $ (267) | $ 978 |
| **Adjusted EBITDA per Restricted Payments Covenants** | $ 4,578 | $ 4,916 |

(a)  Includes $1.253 billion distribution of net proceeds from the sale of Oncor noncontrolling interests.
(b)  Purchase accounting adjustments include amortization of the intangible net asset value of retail and wholesale power sales agreements, environmental credits, coal purchase contracts, nuclear fuel contracts and power purchase agreements and the stepped up value of nuclear fuel. Also includes certain credits not recognized in net income due to purchase accounting.
(c)  Impairment of assets includes impairments of emission allowances and trade name intangible assets, impairment of the natural gas-fueled generation fleet and charges related to the cancelled development of coal-fueled generation plants.
(d)  Noncash compensation expenses exclude capitalized amounts.
(e)  Severance expense includes amounts incurred related to outsourcing, restructuring and other amounts deemed to be in excess of normal recurring amounts.
(f)  Transition and business optimization costs include professional fees primarily for retail billing and customer care systems enhancements and certain incentive compensation.

B-134

EFIHMW00246628

(g)  Transaction and merger expenses include costs related to the Merger, abandoned strategic transactions and a terminated joint-venture. Also includes administrative costs related to the cancelled program to develop coal-fueled generation facilities, the Sponsor management fee, costs related to certain growth initiatives and costs related to the Oncor sale of noncontrolling interests.

(h)  Insurance settlement proceeds include the amount received for property damage to certain mining equipment.

(i)  Restructuring and other for 2008 includes a litigation accrual and the charge related to the bankruptcy of a subsidiary of Lehman Brothers Holdings Inc., and for 2007 includes credits related to impaired combustion turbine leases and other restructuring initiatives and nonrecurring activities.

(j)  Expenses incurred to upgrade or expand a generation station reflect noncapital outage costs.

B-135

Confidential

**TCEH Consolidated**
**Adjusted EBITDA Reconciliation**

| | Year Ended December 31, 2008 | Year Ended December 31, 2007 |
|---|---|---|
| | (millions of dollars) | |
| Net income (loss) | $(8,862) | $ 35 |
| Income tax benefit | (411) | (56) |
| Interest expense and related charges | 3,918 | 910 |
| Depreciation and amortization | 1,092 | 568 |
| **EBITDA** | $(4,263) | $1,457 |
| Interest income | (60) | (281) |
| Amortization of nuclear fuel | 76 | 69 |
| Purchase accounting adjustments (a) | 413 | 128 |
| Impairment of goodwill | 8,000 | — |
| Impairment of assets and inventory write down (b) | 1,210 | — |
| Unrealized net (gain) or loss resulting from hedging transactions | (2,329) | 2,278 |
| Losses on sale of receivables | 29 | 39 |
| Noncash compensation expense (SFAS 123R) (c) | 10 | 8 |
| Severance expense (d) | 3 | — |
| Transition and business optimization costs (e) | 33 | 21 |
| Transaction and merger expenses (f) | 10 | — |
| Insurance settlement proceeds (g) | (21) | — |
| Restructuring and other (h) | 31 | (33) |
| Expenses incurred to upgrade or expand a generation station (i) | 100 | 5 |
| **Adjusted EBITDA per Incurrence Covenant** | $ 3,242 | $3,691 |
| Expenses related to unplanned generation station outages (i) | 250 | — |
| Other adjustments allowed to determine Adjusted EBITDA per Maintenance Covenant (j) | 15 | — |
| **Adjusted EBITDA per Maintenance Covenant** | $ 3,507 | $3,691 |

(a)  Purchase accounting adjustments include amortization of the intangible net asset value of retail and wholesale power sales agreements, environmental credits, coal purchase contracts, nuclear fuel contracts and power purchase agreements and the stepped up value of nuclear fuel. Also includes certain credits not recognized in net income due to purchase accounting.

(b)  Impairment of assets includes impairments of emission allowances and trade name intangible assets and impairment of the natural gas-fueled generation fleet.

(c)  Noncash compensation expenses exclude capitalized amounts.

(d)  Severance expense includes amounts incurred related to outsourcing, restructuring and other amounts deemed to be in excess of normal recurring amounts.

(e)  Transition and business optimization costs include professional fees primarily for retail billing and customer care systems enhancements and incentive compensation.

(f)  Transaction and merger expenses include costs related to the Merger and costs related to certain growth initiatives.

(g)  Insurance settlement proceeds include the amount received for property damage to certain mining equipment.

(h)  Restructuring and other for 2008 includes the charge related to the bankruptcy of a subsidiary of Lehman Brothers Holdings Inc., and for 2007 includes credits related to impaired combustion turbine leases and other restructuring initiatives and nonrecurring activities.

(i)  Expenses incurred to upgrade or expand a generation station reflect noncapital outage costs.

(j)  Primarily pre-operating expenses relating to Oak Grove and Sandow 5.

B-136

EFIHMW00246630

## CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

There were no changes in or disagreements with accountants on accounting and financial disclosure during EFH Corp.'s two most recent fiscal years and each subsequent interim period since the end of the most recent fiscal year.

## MANAGEMENT

### Directors

The names of EFH Corp.'s directors and information about them, as furnished by the directors themselves, are set forth below:

| Name | Age | Served As Director Since | Business Experience |
|------|-----|--------------------------|---------------------|
| Arcilia C. Acosta (1)(4) | 43 | 2008 | Arcilia C. Acosta has served as a Director of EFH Corp. since May 2008. During the last five years, Ms. Acosta's principal occupation and employment has been serving as the CEO of CARCON Industries & Construction, L.L.C. (CARCON) and its subsidiaries. She is also the CEO and controlling principal of Southwestern Testing Laboratories, L.L.C., (STL). CARCON's principal business is commercial, institutional and transportation construction. STL's principal business is geotechnical engineering, construction materials testing and environmental consulting. Ms. Acosta is a former Chair of the State of Texas Hispanic chambers organization known as the Texas Association of Mexican American Chambers of Commerce (TAMACC). Ms. Acosta serves on the Board of Advisors for Compass Bank and the Board of Governors for the Dallas Foundation. |
| David Bonderman | 66 | 2007 | David Bonderman has served as a Director of EFH Corp. since October 2007. He is a founding partner of TPG Capital, L.P. (TPG). Before forming TPG in 1992, Mr. Bonderman was Chief Operating Officer of the Robert M. Bass Group (now doing business as Keystone Group L.P.) in Fort Worth, Texas. He serves on the boards of the following public companies: CoStar Group, Inc., Gemalto N.V., and RyanAir Holdings PLC, of which he is Chairman. |
| Donald L. Evans (1)(2)(3)(4) | 63 | 2007 | Donald L. Evans has served as a Director of EFH Corp. since October 2007. He has been Non-Executive Chairman of EFH Corp. since October 2007 and was CEO of the Financial Services Forum from 2005 to 2007, after serving as the 34th secretary of the US Department of Commerce. Before serving as Secretary of Commerce, Secretary Evans was the former CEO of Tom Brown, Inc., a large independent energy company. He formerly served as a member and chairman of the Board of Regents of the University of Texas System. |

B-137

Confidential

| Name | Age | Served As Director Since | Business Experience |
|---|---|---|---|
| Thomas D. Ferguson (3) | 55 | 2008 | Thomas D. Ferguson has served as a Director of EFH Corp. since December 2008. He is a Managing Director of Goldman, Sachs & Co., having joined the firm in 2003. Mr. Ferguson heads the asset management efforts for the Merchant Bank's infrastructure investment activity worldwide. He currently serves on the boards of some of Goldman, Sachs & Co.'s largest infrastructure investments including Associated British Ports, the largest port company in the UK; Carrix, one of the largest private container terminal operators in the world; and Red de Carreteras, a major toll road concessionaire in Mexico. Additional responsibilities at the firm include an 18 month stint as the CEO of National Golf/American Golf, one of the leading owner/operators of golf courses in the US for which he now serves as the company's non-executive Chairman. |
| Frederick M. Goltz (2)(3) | 38 | 2007 | Frederick M. Goltz has served as a Director of EFH Corp. since October 2007. He has been with Kohlberg Kravis Roberts and Co., L.P. (KKR) for 13 years. Mr. Goltz has played a significant role in the development of many of the themes pursued by KKR in the energy space, including those related to integrated utilities, merchant generation, and oil and gas exploration and production. He now heads KKR's newly created Mezzanine Fund headquartered in San Francisco. He is a director of EFCH, TCEH, and Luminant. |
| James R. Huffines (1)(3) | 58 | 2007 | James R. Huffines has served as a Director of EFH Corp. since October 2007. He is Chairman of the University of Texas System Board of Regents, after previously serving as Vice Chairman from November 2007 to April 2009 and Chairman from June 2004 to November 2007. He also is Chairman, Central and South Texas Region, of PlainsCapital Bank, Senior Executive Vice President of PlainsCapital Corporation, and a director of Hester Capital Management, L.L.C., PlainsCapital Bank, and PlainsCapital Corp. He previously held senior management positions at Hester Capital Management, L.L.C.. and Morgan Keegan & Co. |
| Scott Lebovitz | 34 | 2007 | Scott Lebovitz has served as a Director of EFH Corp. since October 2007. He is a Managing Director of Goldman, Sachs & Co. in its Principal Investment Area. He joined Goldman, Sachs & Co. in 1997 and was promoted to Managing Director in 2007. Mr. Lebovitz serves on the boards of both public and private companies including CVR Energy, Inc., Village Voice Media, LLC, EFCH, TCEH, and Luminant. |

B-138

EFIHMW00246632

PX 014
Page 914 of 1116

| Name | Age | Served As Director Since | Business Experience |
|------|-----|--------------------------|---------------------|
| Jeffrey Liaw (1) | 32 | 2007 | Jeffrey Liaw has served as a Director of EFH Corp. since October 2007. He is active in TPG's energy and industrial investing practice areas. Before joining TPG in 2005, he worked for Bain Capital in its industrials practice since 2001. Mr. Liaw serves on the boards of both public and private companies including Graphic Packaging Corporation and Oncor. |
| Marc S. Lipschultz (2)(4) | 40 | 2007 | Marc S. Lipschultz has served as a Director of EFH Corp. since October 2007. He joined KKR in 1995. He is the leader of KKR's Energy and Infrastructure businesses. Currently, he is a director of Accel-KKR Company and Oncor. |
| Michael MacDougall (2)(3) | 38 | 2007 | Michael MacDougall has served as a Director of EFH Corp. since October 2007. He is a partner of TPG. Prior to joining TPG in 2002, Mr. MacDougall was a vice president in the Principal Investment Area of the Merchant Banking Division of Goldman, Sachs & Co., where he focused on private equity and mezzanine investments. Mr. MacDougall serves on the board of directors of both public and private companies including Aleris International, Graphic Packaging Corporation, Kraton Polymers LLC, EFCH, TCEH, and Luminant. Mr. MacDougall also serves as the Chairman of the Board of The Opportunity Network and is a member of the Board of the Dwight School Foundation and Islesboro Affordable Property. |
| Lyndon L. Olson, Jr. (3) | 62 | 2007 | Lyndon L. Olson, Jr. has served as a Director of EFH Corp. since October 2007. He was a Senior Advisor with Citigroup Inc. from 2002 to 2008, after serving as United States Ambassador to Sweden from 1998 to 2001. He previously was affiliated with Citigroup from 1990 to 1998, as President and CEO of Travelers Insurance Holdings and the Associated Madison Companies, predecessor companies. Before joining Citigroup, he had been President of the National Group Corporation and CEO of its National Group Insurance Company. Ambassador Olson also is a former Chairman and a Member of the Texas 173 State Board of Insurance, former President of the National Association of Insurance Commissioners, and a former member of the Texas House of Representatives. |
| Kenneth Pontarelli (2)(4) | 39 | 2007 | Kenneth Pontarelli has served as a Director of EFH Corp. since October 2007. He is a Managing Director of Goldman, Sachs & Co. in its Principal Investment Area. He transferred to the Principal Investment Area in 1999 and was promoted to Managing Director in 2004 and to Partner in 2006. Mr. Pontarelli serves as a director of both public and private companies including CCS, Inc., Cobalt International Energy, L.P., CVR Energy, Inc., Knight Inc., and TXU Energy. |

B-139

EFIHMW00246633

| Name | Age | Served As Director Since | Business Experience |
|---|---|---|---|
| William K. Reilly | 69 | 2007 | William K. Reilly has served as a Director of EFH Corp. since October 2007. He is a Senior Advisor to TPG and a founding partner of Aqua International Partners, an investment group that invests in companies that serve the water and renewable energy sectors. Mr. Reilly previously served as the seventh Administrator of the US Environmental Protection Agency. Mr. Reilly is a director of the following public companies: E.I DuPont de Nemours and Company, Eden Springs, Ltd. of Israel, ConocoPhillips and Royal Caribbean International. Before serving as EPA Administrator, he was President of World Wildlife Fund and President of The Conservation Foundation. He previously served as Executive Director of the Rockefeller Task Force on Land Use and Urban Growth, a senior staff member of the President's Council on Environmental Quality, and Associate Director of the Urban Policy Center and the National Urban Coalition. Mr. Reilly is Co-Chairman of the National Commission on Energy Policy. |
| Jonathan D. Smidt (1) | 36 | 2007 | Jonathan D. Smidt has served as a Director of EFH Corp. since October 2007. He has been with KKR since 2000, where he is a member of the firm's Energy and Natural Resources industry team. Currently, he is a director of Laureate Education Inc. and TXU Energy. |
| John F. Young (2)(3) | 53 | 2008 | John F. Young has served as a Director and President and Chief Executive of EFH Corp. since January 2008. Before joining EFH Corp., Mr. Young served in many leadership roles at Exelon from March 2003 to January 2008 including Executive Vice President of Finance and Markets and Chief Financial Officer of Exelon Corporation; President of Exelon Generation; and President and Chief Operating Officer of Exelon Power. Prior to joining Exelon, Mr. Young was Senior Vice President of Sierra Pacific Resources Corporation. Mr. Young is also a director of Luminant. |
| Kneeland Youngblood (1) | 53 | 2007 | Kneeland Youngblood has served as a Director of EFH Corp. since October 2007. He is founding partner of Pharos Capital Group, a private equity firm that focuses on providing growth and expansion capital to businesses in technology, business services, and health care services. Mr. Youngblood is a director of the following public companies: Starwood Hotels and Resorts Worldwide, Inc., Gap Inc. and Burger King Holdings, Inc. Mr. Youngblood is a member of the Council on Foreign Relations. |

(1)  Messrs. Evans, Huffines, Liaw, Smidt and Youngblood constitute all of the members of the Audit Committee prior to completion of the exchange offers. Effective upon completion of the exchange offers, the Audit Committee will consist of Messrs. Huffines and Youngblood and Ms. Acosta.
(2)  Member of Executive Committee.
(3)  Member of Governance and Public Affairs Committee
(4)  Member of Organization and Compensation Committee

B-140

Confidential

**Executive Officers**

The names and information regarding EFH Corp.'s executive officers are set forth below:

| Name of Officer | Age | Positions and Offices Presently Held | Date First Elected to Present Offices | Business Experience (Preceding Five Years) |
|---|---|---|---|---|
| John F. Young | 53 | President and Chief Executive Officer of EFH Corp. | January 2008 | John F. Young was elected President and Chief Executive Officer of EFH Corp. in January 2008. Before joining EFH Corp., Mr. Young served in many leadership roles at Exelon Corporation from March 2003 to January 2008, including Executive Vice President of Finance and Markets and Chief Financial Officer of Exelon Corporation; President of Exelon Generation; and President and Chief Operating Officer of Exelon Power. Prior to joining Exelon, Mr. Young was Senior Vice President of Sierra Pacific Resources Corporation. |
| James A. Burke | 41 | President and Chief Executive of TXU Energy | August 2005 | James A. Burke was elected President and Chief Executive of TXU Energy in August 2005. Previously, Mr. Burke was Senior Vice President Consumer Markets of TXU Energy. Prior to joining EFH Corp. in 2004, Mr. Burke was President and Chief Operating Officer of Gexa Energy. |
| David A. Campbell | 41 | President and Chief Executive of Luminant | June 2008 | David A. Campbell was elected President and Chief Executive of Luminant in June 2008. Previously, Mr. Campbell was Executive Vice President and Chief Financial Officer of EFH Corp. since April 2007 having served as Acting Chief Financial Officer since March 2006 and Executive Vice President since May 2004. Prior to joining EFH Corp. in 2004, Mr. Campbell was a Principal of McKinsey & Company, Inc. |
| Charles R. Enze | 56 | Executive Vice President and Chief Executive of Luminant Construction | September 2006 | Charles R. Enze was elected Executive Vice President and Chief Executive of Luminant Construction in September 2006. Prior to joining EFH Corp. in 2006, Mr. Enze was Vice President of Engineering and Projects for Shell International Exploration & Production. |

B-141

Confidential

EFIHMW00246635

| Name of Officer | Age | Positions and Offices Presently Held | Date First Elected to Present Offices | Business Experience (Preceding Five Years) |
|---|---|---|---|---|
| M. S. Greene | 64 | Vice Chairman of EFH Corp. | June 2008 | M. S. Greene was elected Vice Chairman of EFH Corp. in June 2008. Previously Mr. Greene held several other offices including President and Chief Executive of Luminant, Chairman of the Board, President and Chief Executive of TXU Power, Executive Vice President of TCEH, and Vice Chairman, Chief Executive and President of Oncor. |
| Joel D. Kaplan | 40 | Executive Vice President for Public and External Affairs | October 2009 | Joel Kaplan has served as the Executive Vice President for Public and External Affairs for EFH Corp. since 2009. From 2006 to 2009, he served as Deputy Chief of Staff in the George W. Bush White House, where he was responsible to the President and Chief of Staff for the development and implementation of the Administration's policy agenda. From 2003 to 2006, he served as Deputy Director of the Office of Management and Budget, and from 2001 to 2003, he was the Special Assistant to the President for Policy. Mr. Kaplan graduated from Harvard College and Harvard Law School and served as an artillery officer in the United States Marine Corps. |
| Paul M. Keglevic | 55 | Executive Vice President and Chief Financial Officer of EFH Corp. | July 2008 | Paul M. Keglevic was elected Executive Vice President and Chief Financial Officer of EFH Corp. in July 2008. Before joining EFH Corp., he was an audit partner at PricewaterhouseCoopers. Mr. Keglevic was Pricewaterhouse-Coopers Utility Sector Leader from 2002 to 2008 and Clients and Sector Assurance Leader from 2007 to 2008. |
| M. A. McFarland | 40 | Executive Vice President and Chief Commercial Officer of Luminant and Executive Vice President of EFH Corp. | July 2008 | M. A. McFarland was elected Executive Vice President and Chief Commercial Officer of Luminant and Executive Vice President of EFH Corp. in July 2008. Before joining Luminant, Mr. McFarland served as Senior Vice President of Mergers, Acquisitions and Divestitures and as a Vice President in the wholesale marketing and trading division power team at Exelon. |

B-142

Confidential

EFIHMW00246636

| Name of Officer | Age | Positions and Offices Presently Held | Date First Elected to Present Offices | Business Experience (Preceding Five Years) |
| --- | --- | --- | --- | --- |
| Robert C. Walters | 51 | Executive Vice President and General Counsel of EFH Corp. | March 2008 | Robert C. Walters was elected Executive Vice President and General Counsel of EFH Corp. in March 2008. Prior to joining EFH Corp., Mr. Walters was a Partner of Vinson & Elkins LLP and served on the firm's management committee. Mr. Walters was co-managing partner of the Dallas office of Vinson & Elkins LLP from 1998 through 2005. |

There is no family relationship between any of the above-named executive officers.

B-143

EFIHMW00246637

## EXECUTIVE COMPENSATION

**Compensation Committee, Compensation Committee Interlocks and Insider Participation**

The current Organization and Compensation Committee of the Board of Directors is comprised of four non-employee directors: Arcilia C. Acosta, Donald L. Evans, Marc S. Lipschultz and Kenneth Pontarelli. There were no relationships among our executive officers, members of the Organization and Compensation Committee or entities whose executives served on the Organization and Compensation Committee that required disclosure under applicable SEC rules and regulations. For a description of related person transactions involving members of the Organization and Compensation Committee, see "Certain Relationships and Related Party Transactions, Directors Independence—Related Person Transactions."

## Compensation Discussion and Analysis

### Overview

The EFH Corp. Board of Directors ("Board") has an Organization and Compensation Committee that establishes and assesses our executive compensation program (the "O&C Committee"). The O&C Committee is comprised of four non-employee directors: Arcilia C. Acosta, Donald L. Evans, Marc S. Lipschultz and Kenneth Pontarelli.

The responsibilities of the O&C Committee include:

- determining and overseeing EFH Corp.'s executive compensation program, including making recommendations to the Board with respect to the adoption, amendment or termination of incentive compensation, equity-based and other executive compensation and benefits plans, policies and practices, and

- evaluating the performance of our Chief Executive Officer and other executive officers and, ultimately, approving executive compensation based on those evaluations.

In determining the compensation of our executive officers (other than the CEO), including the executive officers named in the Summary Compensation Table (the "Named Executive Officers"), the O&C Committee seeks the input of our CEO. At the end of each year, our CEO assesses the performance of each of these executive officers against targeted business unit and individual goals and objectives for that year and provides recommendations to the O&C Committee. The O&C Committee and the CEO then review the CEO's assessments of those executives and, in that context, the O&C Committee approves the executive officers' compensation.

In assessing the EFH Corp.'s and the CEO's performance, the O&C Committee follows a thorough and detailed process, including a self-assessment prepared by the CEO reflecting the full year performance of the business, a follow up meeting with the CEO to further discuss his performance and address any questions or comments the O&C Committee may have about his performance, and a final meeting where the official full year financial, operating, and other results of EFH Corp. are evaluated and approved by the O&C Committee.

The O&C Committee may use, from time to time, independent compensation consultants to advise on executive compensation issues, including salary surveys and performance measurement criteria. We assess our compensation program against publicly-traded utility, energy and general industry companies, as well as known practices in private equity-owned companies, utilizing a variety of market reference points and benchmarks, median competitive data, and performance measurements.

B-144

EFIHMW00246638

**Compensation Philosophy**

*Overview*

We have a pay-for-performance compensation philosophy, which places an emphasis on pay-at-risk. In other words, a significant portion of an executive officer's compensation is made up of variable, at-risk incentive compensation. As a result of our pay-for-performance compensation philosophy, our compensation program is intended to compensate executive officers appropriately for their contribution to the attainment of financial, operational and strategic objectives. In addition, we believe it is important to strongly align the interests of our executive officers and stockholders through equity-based compensation, by giving our executive officers an opportunity to invest in our common stock and through the use of stock options. Equity ownership, coupled with other incentives, is an important component of our compensation program.

To achieve our pay-for-performance compensation philosophy, we believe that:

- compensation plans should balance both long-term and short-term objectives;

- the overall compensation program should emphasize variable compensation elements that have a direct link to overall corporate performance and stockholder value, and

- an executive officer's individual compensation level should be based upon an evaluation of the financial and operational performance of that executive officer's business unit (such as productivity, reliability, safety and customer satisfaction) as well as the executive officer's individual performance.

We believe our pay-for-performance compensation philosophy supports EFH Corp. by:

- aligning performance measures with our business objectives to drive the financial and operational performance of EFH Corp. and its business units;

- rewarding business unit and individual performance by providing compensation levels consistent with the level of contribution and degree of accountability;

- attracting and retaining the best performers, and

- strengthening the correlation between the long-term interests of our executive officers and the interests of stockholders through equity compensation and investment opportunities.

*Elements of Compensation*

As a result of these underlying compensation principles, the compensation program for our Named Executive Officers principally consists of:

- a base salary;

- the opportunity to earn an annual performance bonus based on the achievement of specific corporate, business unit and individual performance goals;

- long-term equity incentive awards—primarily in the form of options to purchase shares of our common stock (the "Stock Option Awards") under our 2007 Stock Incentive Plan for Key Employees of EFH Corp. and Affiliates (the "2007 Stock Incentive Plan");

- the opportunity to participate in our Salary Deferral Program and our Thrift (401(k)) Plan and receive company matching contributions, and

- the opportunity to participate in the EFH Retirement Plan (Retirement Plan) and Supplemental Retirement Plan (which has been limited for our competitive, non-regulated businesses to persons employed by us on or before October 1, 2007).

B-145

Confidential

*Assessment of Compensation Elements*

We try to ensure that the bulk of an executive officer's compensation is directly linked to our performance. For example, the annual performance bonus is based on the achievement of certain corporate and business unit financial targets and operational targets (such as productivity, growth and customer satisfaction). In addition, the vesting of half of an executive's Stock Option Awards is contingent upon the attainment of a corporate financial target. We also try to ensure that our executive compensation program is competitive in order to reduce the risk of losing key personnel within our organization.

The following is a discussion of the principal compensation components provided to our executive officers. More detail about each of the compensation elements that follow can be found in the compensation tables and the narrative and footnotes to the tables.

*Base Salary*

Base salary should reward executive officers for the scope and complexity of their position and the level of responsibility required. We believe that a competitive level of base salary is required to attract qualified talent.

The O&C Committee reviews base salaries annually to ensure they are market-competitive for attraction and retention purposes. The O&C Committee may also review an executive officer's base salary to the extent an executive officer is given a promotion or in the event an executive officer's responsibilities are significantly increased.

We want to ensure cash compensation is competitive and sufficient to entice key executive officers to remain with us, recognizing our high performance expectations (across a broad set of operational, financial, customer service and community-oriented goals and objectives) and the higher risk levels associated with being a significantly-leveraged company.

2008 Base Salary for EFH Corp.'s Named Executive Officers

| Name | Title (as of December 31, 2008) | Base Salary as of 12/31/08 |
|---|---|---|
| John F. Young (1) . . . . . . . | President and Chief Executive Officer of EFH Corp. | $1,000,000 |
| Paul M. Keglevic (2) . . . . . | Executive Vice President and Chief Financial Officer of EFH Corp. | $ 600,000 |
| David A. Campbell (3) . . . | Chief Executive Officer of Luminant | $ 600,000 |
| M. S. Greene (4) . . . . . . . . | Vice Chairman of EFH Corp. | $ 650,000 |
| James A. Burke . . . . . . . . . | Chief Executive Officer of TXU Energy | $ 600,000 |
| Robert C. Walters (5) . . . . | Executive Vice President and General Counsel of EFH Corp. | $ 575,000 |
| M.A. McFarland (6) . . . . . | Executive Vice President of EFH Corp. and Executive Vice President and Chief Commercial Officer of Luminant | $ 500,000 |
| David P. Poole (7) . . . . . . . | Former Executive Vice President & General Counsel of EFH Corp. | N/A |

(1) Mr. Young commenced his employment with EFH Corp. in January 2008.
(2) Mr. Keglevic commenced his employment with EFH Corp. in July 2008.
(3) Mr. Campbell served as a Co-Chief Executive Officer of EFH Corp. until Mr. Young was hired and the Chief Financial Officer of EFH Corp. through June 2008, after which he assumed responsibility as the Chief Executive Officer of Luminant.
(4) Mr. Greene served as a Co-Chief Executive Officer of EFH Corp. until Mr. Young was hired and the Chief Executive Officer of Luminant through June 2008, after which he assumed responsibility as the Vice Chairman of EFH Corp.
(5) Mr. Walters commenced his employment with EFH Corp. in March 2008.
(6) Mr. McFarland commenced his employment with EFH Corp. in July 2008.
(7) Mr. Poole terminated his employment with EFH Corp. in March 2008.

B-146

EFIHMW00246640

**Executive Annual Incentive Plan**

The Executive Annual Incentive Plan provides an annual performance-based cash bonus for the successful attainment of certain annual operational and financial goals that are established at each of the corporate and business unit levels by the O&C Committee at the beginning of each year. Under the terms of the plan, performance against the targets established by the O&C Committee drive bonus funding. These targets are generally set at challenging levels to ensure they are high performance goals. Based on the level of attainment of these performance targets, an aggregate plan funding percentage amount for all participants is determined. To calculate an executive officer's award amount, the executive officer's corporate/business unit funding percentages are multiplied by the executive officer's target incentive level, which is computed as a percentage of annualized base salary. Based on the executive officer's performance, an individual performance modifier is multiplied to the calculated award to determine the final award under the plan. An individual performance modifier is based on the CEO's and the O&C Committee's review and evaluation of the executive officer's performance. The individual performance modifier can range from an outstanding rating (200%) to an unacceptable rating (0%). The aggregate plan funding amount is limited to 200%, or two times, the aggregate target incentives of all participants.

The following table provides a summary of the 2008 annual incentive awards for each Named Executive Officer.

**2008 Annual Incentives for Our Named Executive Officers**

| Name | Target (% of salary) | Target Award ($ Value) | Actual Award (1) |
|---|---|---|---|
| John F. Young (1) ........................... | 100% | $1,000,000 | 1,418,000 |
| Paul M. Keglevic (2) ........................ | 75% | $ 450,000 | 613,800 |
| David A. Campbell (3) ....................... | 75% | $ 450,000 | 625,950 |
| M. S. Greene (4) ............................ | 75% | $ 487,500 | 521,625 |
| James A. Burke (5) .......................... | 75% | $ 450,000 | 473,918 |
| Robert C. Walters (6) ....................... | 75% | $ 431,250 | 695,175 |
| M.A. McFarland (7) .......................... | 75% | $ 375,000 | 529,032 |
| David P. Poole .............................. | N/A | N/A | N/A |

The O&C Committee establishes the targets and approves actual performance against those targets for the Executive Annual Incentive Plan. The 2008 targets included both financial and operational measures. Targets set for EFH Corp. and EFH Corporate Services were primarily financial; however the targets set for both Luminant and TXU Energy included both financial and operational measures such as safety, generation, construction performance, customer growth and customer satisfaction.

The performance measures for EFH Corp. were comprised of operational EBITDA and cash flow for EFH Corp. as well as total EFH Corp. total spend (Sales, General & Administrative (SG&A); Operating & Maintenance (O&M); and Capital Expenditures) as shown in the table of performance measures below. The operational EBITDA is a non-GAAP financial measure. Operational EBITDA is defined as EBITDA as adjusted by the O&C Committee as it deems appropriate in connection with its evaluation and compensation of our executive officers. Operational EBITDA is an internal measure used only for performance management purposes and EFH Corp. does not intend for operational EBITDA to be an alternative to net income as a measure of operating performance or an alternative to cash flows from operating activities as a measure of liquidity or an alternative to any other measure of financial performance presented in accordance with GAAP. Operational EBITDA is not the same as Adjusted EBITDA, which is disclosed elsewhere in this Prospectus and defined in Annex A to this Prospectus.

The performance measures for EFH Corporate Services were comprised of operational EBITDA for EFH Corp., EFH Corp. total spend (as defined above) and controllable costs for EFH Corporate Services. The performance measures for Luminant included Luminant specific EBITDA and cash flow, cost metrics (fuel costs;

Confidential

O&M; SG&A; and capital expenditures), and operational metrics that measured safety, generation and a construction performance. The performance metrics for TXU Energy included both financial and operational metrics, including TXU Energy EBITDA and controllable SG&A costs. TXU Energy's operational metrics included residential customer growth, customer satisfaction and achievement of key milestones in the upgrade to its major customer care system.

Performance against the applicable metrics for each executive officer is detailed below.

### EFH Corp. Performance Metrics—used to measure the performance of Mr. Young

| Metric | Weight | Performance (1) | Payout % |
|---|---|---|---|
| EFH Corp. EBITDA | 50% | 79% | 40% |
| EFH Corp. Cash Flow | 20% | 200% | 40% |
| EFH Corp. Total Spend | 30% | 123% | 37% |
| | | | 117% |
| Less safety modifier (10% of calculated payout) | | | (12)% |
| | | | 105% |

(1) Performance payouts equal 100% if the target amount is achieved for a particular metric, 50% if the threshold amount is achieved and 200% if the superior amount is achieved. The actual performance payouts are interpolated between threshold and target or target and superior, as applicable, with a maximum performance payout for any particular metric being equal to 200%.

### EFH Corp. Services Performance Metrics—used to measure the performance of Messrs. Keglevic, Greene, Campbell, Walters and McFarland

| Metric | Weight | Performance (1) | Payout % |
|---|---|---|---|
| EFH Corp. EBITDA | 40% | 79% | 32% |
| EFH Corp. Total Spend | 30% | 123% | 37% |
| EFH Corp. Services Company Costs | 30% | 185% | 55% |
| | | | 124% |

(1) Performance payouts equal 100% if the target amount is achieved for a particular metric, 50% if the threshold amount is achieved and 200% if the superior amount is achieved. The actual performance payouts are interpolated between threshold and target or target and superior, as applicable, with a maximum performance payout for any particular metric being equal to 200%.

### Luminant Performance Metrics—used to measure the performance of Messrs. Greene and Campbell

| Metric | Weight | Performance (1) | Payout % |
|---|---|---|---|
| Luminant EBITDA | 25% | 84% | 21% |
| Luminant Cash Flow | 25% | 132% | 33% |
| Fuel Costs | 3% | 0% | 0% |
| O&M/SG&A Costs | 4% | 100% | 4% |
| Capital Expenditure | 3% | 100% | 3% |
| Luminant Energy Incremental Value | 10% | 70% | 7% |
| Safety Incidents | 10% | 0% | 0% |
| Generation (GADS) | 10% | 60% | 6% |
| Construction Index | 10% | 160% | 16% |
| | | | 90% |

B-148

EFIHMW00246642

(1) Performance payouts equal 100% if the target amount is achieved for a particular metric, 50% if the threshold amount is achieved and 200% if the superior amount is achieved. The actual performance payouts are interpolated between threshold and target or target and superior, as applicable, with a maximum performance payout for any particular metric being equal to 200%.

*TXU Energy Performance Metrics—used to measure the performance of Mr. Burke*

| Metric | Weight | Performance (1) | Payout % |
|---|---|---|---|
| TXU Energy EBITDA ................................ | 42.4% | 52% | 22% |
| TXU Energy SG&A ................................. | 14.4% | 133% | 19% |
| Customer Growth ................................. | 14.4% | 163% | 24% |
| Customer Satisfaction ............................. | 14.4% | 100% | 14% |
| SAP Project ...................................... | 14.4% | 147% | 21% |
| | | | 100% |

(1) Performance payouts equal 100% if the target amount is achieved for a particular metric, 50% if the threshold amount is achieved and 200% if the superior amount is achieved. The actual performance payouts are interpolated between threshold and target or target and superior, as applicable, with a maximum performance payout for any particular metric being equal to 200%.

After approving the actual performance against the applicable target metrics under the Executive Annual Incentive Plan, the O&C Committee reviews the performance of each of our executive officers on an individual and comparative basis. Based on this review, which includes an analysis of both objective and subjective criteria, the O&C Committee approves an individual modifier for each executive to determine his final annual incentive award. For 2008, the personal modifier for each of our Named Executive Officers increased his actual award, reflecting the strong performance of a new leadership team during a challenging financial and economic market.

(1) Mr. Young's incentive award is based on EFH Corp.'s strong performance in 2008. In Mr. Young's first year, he successfully set the groundwork for long term success for the company. In 2008, he rebuilt the senior management team of the company and helped to clearly define our vision, values and operating principles and strategy. Mr. Young focused on risk management, to more effectively manage the current and future commodity volatility, as well as continuous improvement in operating performance across the company's businesses. Given these achievements, the O&C Committee increased Mr. Young's incentive award and did not prorate his incentive award for time spent at the company during 2008.

(2) Mr. Keglevic's incentive award is based on the EFH Corp. Services performance measures and his individual performance. Mr. Keglevic joined the company in July 2008 and quickly and successfully began the transformation of EFH Corp.'s financial processes, including processes and structures for understanding and managing the performance of the businesses, managing our risks and preserving effective liquidity levels. Given these achievements, the O&C Committee increased Mr. Keglevic's incentive award and did not prorate his incentive award for time spent at the company during 2008.

(3) Mr. Campbell was a Co-Chief Executive Officer of EFH Corp. through January 2008 and the Chief Financial Officer of EFH Corp. through June 2008, after which he served as President and Chief Executive Officer of Luminant. Accordingly, his incentive award was based 50% on EFH Corp. performance and 50% on Luminant performance. Mr. Campbell provided strong leadership at both EFH Corp., through a transition period coupled with a challenging commodity, financial and economic market, and Luminant, where he drove strong operational improvements and results in 2008. Given these achievements, the O&C Committee increased Mr. Campbell's incentive award.

(4) Mr. Greene was a Co-Chief Executive Officer of EFH Corp. through January 2008 and the Chief Executive Officer of Luminant through June 2008, after which he accepted the position of Vice Chairman of EFH Corp. His incentive award was based 50% on Luminant performance and 50% on EFH Corp. Services performance. Mr. Greene provided strong leadership to Luminant through the first six months of 2008 and to EFH Corp. during 2008.

B-149

EFIHMW00246643

(5) Mr. Burke's incentive award was based 100% on the performance of TXU Energy. Mr. Burke provided effective leadership of TXU Energy through a challenging year during which TXU Energy set itself apart from its competitors. Given these achievements, the O&C Committee increased Mr. Burke's incentive award.

(6) Mr. Walters' incentive award is based 100% on the EFH Corp. Services performance. The O&C Committee increased Mr. Walters' incentive award based on his individual performance, reflecting his leadership and results in managing significant legal issues and developing a strong public affairs strategy and team.

(7) Mr. McFarland joined EFH Corp. mid-year and has demonstrated strong performance as our wholesale commercial operations delivered significantly improved performance over 2007. Due to the nature of Mr. McFarland's role, where he provides services at both Luminant and EFH Corp. Services, his award is based 75% on the performance of Luminant business units and 25% on the performance of EFH Corp. Services. Luminant overall business units' performance was 98%. Because of his effective leadership and results, the O&C Committee increased Mr. McFarland's incentive award.

**Long-Term Equity Incentives**

In December 2007, our Board approved and adopted the 2007 Stock Incentive Plan. The purpose of the 2007 Stock Incentive Plan is to:

- promote our long-term financial interests and growth by attracting and retaining management and other personnel with the training, experience and ability to enable them to make a substantial contribution to the success of our business;

- motivate management and other personnel by means of growth-related incentives to achieve long-range goals; and

- align the interests of management with those of our stockholders through opportunities for stock (or stock-based) ownership in EFH Corp.

In February 2008, Mr. Young was granted 7,500,000 Stock Option Awards. In May 2008, Messrs. Campbell, Greene, Burke and Walters were granted 4,000,000, 2,000,000, 2,450,000 and 2,000,000, Stock Option Awards, respectively. In December 2008, Messrs. Keglevic and McFarland were granted 2,500,000 and 2,000,000 Stock Option Awards, respectively. All awards were granted with the terms described below. In the future, we may also make additional discretionary grants of options or stock to reward high performance or achievement.

Many of our executive officers have direct, illiquid, equity investments in EFH Corp., a privately-held company, as a result of the significant investments in EFH Corp. made by such executive officers. We believe that the management investment and ownership of EFH stock, along with the Stock Option Awards, provides significant retentive value to us for many reasons, most notably:

- Due to limitations on transferability until the occurrence of certain liquidity events, an investment in our common stock is illiquid while the executive remains employed by us. In addition, if an executive voluntarily terminated his or her employment with us, generally, the company could compel him or her to sell that stock back to us for a price equal to the price paid by the executive for the stock.

- Half of all of the Stock Option Awards granted are time-based and vest over a five year period (the "Time-Vesting Options"), except with regard to Mr. Greene whose Time Vesting Options vest over a two year period. The other half of the Stock Option Awards are performance-based and vesting is dependent upon EFH Corp. achieving certain performance targets (the "Performance-Vesting Options"). In addition, if in the event of a change in control certain investment returns are achieved for our equity-holders, the Performance-Vesting Options will vest.

B-150

EFIHMW00246644

Because half of the Stock Option Awards granted are performance-based, we believe the equity component of our compensation program motivates our executive officers to achieve top operational and financial performance and further aligns our executive officers' interests with the interests of our stockholders. In deciding whether to vest the Performance-Vesting Options, the O&C Committee considers EFH Corp.'s quantitative performance against certain EBITDA targets, which may be adjusted as described below. The O&C Committee also has the discretion to consider other qualitative and quantitative criteria.

The material terms of our Stock Option Awards are as follows:

- The exercise price is an amount equal to the fair market value of a share of our common stock on the date an option is granted, which was $5.00 for the options that were granted to Mr. Young in February 2008; Messrs. Campbell, Greene, Burke and Walters in May 2008 and Messrs. Keglevic and McFarland in December 2008.

- The fair market value of a share of our common stock is reviewed semi-annually by an independent valuation firm, which makes a recommendation that is reviewed and, if acceptable, approved by our Board.

- The options have a ten-year term.

- Half of the Stock Option Awards are Time-Vesting Options and vest as follows: for Messrs. Young, Campbell, Greene, Burke and Walters, the Time-Vesting Options vest in 20% increments on each of the first five anniversaries of October 10, 2007, the date that the Merger was completed, subject to the each executive's continued employment with EFH Corp. Mr. Greene's Time-Vesting Options vest in 50% increments on each of the first two anniversaries of October 10, 2007. Messrs. Keglevic and McFarland's Time-Vesting Options vest in 20% increments on each of the first five anniversaries of their employment, which is July 1, 2008 and July 7, 2008, respectively.

- The other half of the Stock Option Awards are Performance-Vesting Options and vest in 20% increments on each of the first five anniversaries of December 31, 2007, subject to the grantee's continued employment with us and our achievement of the annual EBITDA target for the given fiscal year (or certain cumulative performance targets) as detailed in the stock option agreements.

The performance options have a catch up provision for vesting. If we do not achieve the performance target for any particular fiscal year, but we do achieve the sum of two- or three-years of EBITDA performance targets at the end of either of the two immediately subsequent fiscal years, then any Performance-Vesting Options that did not vest because of a missed performance target in those prior years will vest.

When the O&C Committee reviews EBITDA for purposes of determining our performance against the applicable annual EBITDA target, it includes our earnings before interest, taxes, depreciation and amortization plus transaction, management and/or similar fees paid to the Sponsor Group, together with such adjustments as the O&C Committee shall determine appropriate in its discretion after good faith consultation with our Chief Executive Officer and the Chief Financial Officer, including adjustments consistent with those included in the comparable definitions in TCEH's Senior Secured Facilities to the extent considered appropriate for management compensation purposes.

Our EBITDA targets are also expected to be adjusted for acquisitions, divestitures or major capital investment initiatives to the extent that they were not contemplated in the financial plan that was presented by our executive officers to the Sponsor Group (the "Financial Plan").

The EBITDA targets are intended to measure achievement of the Financial Plan and the adjustments to EBITDA described above primarily represent elements of our performance that are either beyond the control of management or were not predictable at the time the Financial Plan was submitted.

Some or all of the Performance-Vesting Options granted to our executive officers could also vest when certain other events occur, including certain sales by the Sponsor Group of its investment in EFH Corp.

B-151

EFIHMW00246645

The actual EBITDA for 2008 of $4,488 million was approximately 97% of the EBITDA target established in the Financial Plan for 2008. Given the relative proximity of the actual EBITDA for 2008 to the established target, as well as EFH Corp.'s strong financial and operational performance during a challenging financial and economic market, the O&C Committee exercised its discretionary authority under the 2007 Stock Incentive Plan and approved the vesting of the 2008 Performance-Vesting Options.

Mr. Young was granted 600,000 restricted stock units in February 2008 under the terms of his employment agreement. All of the restricted stock units were vested upon the grant date; however if Mr. Young terminates his employment with EFH Corp. without good reason prior to February 2010 the restricted stock units will be forfeited.

Mr. Campbell entered into a Deferred Share Agreement with EFH Corp. in May 2008, pursuant to which he agreed to forego certain payments he was entitled to receive in return for a certain number of deferred shares of our common stock. Pursuant to the terms of his Deferred Share Agreement, Mr. Campbell agreed to reinvest a substantial portion of the amount that he was entitled to receive. As a result of the reinvestment, Mr. Campbell became entitled to receive 500,000 deferred shares of our common stock, with each share being valued at $5.00 based upon the fully diluted equity of EFH Corp. The shares will be distributed to Mr. Campbell on the earlier of termination of employment by EFH Corp. or a change in the effective control of EFH Corp.

Mr. Keglevic was granted 225,000 deferred shares in July 2008 under the terms of his employment agreement. One-half of the deferred shares will vest in July 2011 and the remaining one-half will vest in July 2013.

### Deferred Compensation and Retirement Plans

**Salary Deferral Program:** Our Salary Deferral Program allows participating employees, including our executive officers, to defer a portion of their salary and annual incentive award and to receive a matching award based on their salary deferrals. Executive officers can defer up to 50% of their base salary and up to 100% of any incentive-based award for seven years or until they retire. We match 100% of deferrals up to 8% of salary deferred under the program. We do not match deferred incentive-based awards. We believe that the program encourages employee retention because, generally, participants who terminate their employment with us prior to the seven year vesting period forfeit our matching contribution.

Please refer to the narrative that follows the Nonqualified Deferred Compensation table for a more detailed description of the Salary Deferral Program.

**Retirement Plan:** We maintain a retirement plan, which is qualified under applicable provisions of the Internal Revenue Code of 1986, as amended (Code) and is a benefit for certain employees that were employed by us prior to October 1, 2007. Our Retirement Plan contains both a traditional final average pay component and a cash balance component. Effective January 1, 2002, we changed our defined benefit plan from a traditional final average pay design to a cash balance design. This change was made to better align our retirement program with competitive practices. In late 2001, participants in the Retirement Plan were extended an opportunity to remain in the traditional final average pay component or transition to the cash balance component. Mr. Greene (the only named-executive officer then a participant in the Retirement Plan) elected to remain in the traditional final average pay component.

Eligible employees employed after January 1, 2001 may only participate in the cash balance component of the Retirement Plan. As a result, Messrs. Campbell and Burke are covered under the cash balance component of the Retirement Plan.

Participation in our Retirement Plan has been limited to employees of all of our businesses (other than Oncor) who were employed by us on or before October 1, 2007. As a result Messrs. Young, Keglevic, Walters and McFarland do not participate in the Retirement Plan. For a more detailed description of the Retirement Plan, please refer to the narrative that follows the Pension Benefits table.

B-152

EFIHMW00246646

**Supplemental Retirement Plan:** Our Supplemental Retirement Plan provides for the payment of retirement benefits that:

- would otherwise be capped by the Code's statutory limits for qualified retirement plans;

- include Executive Annual Incentive Plan awards in the definition of earnings (for participants covered by the traditional final average pay component of the Retirement Plan only); and/or

- we or our participating subsidiaries are obligated to pay under contractual arrangements.

Mr. Greene, the executive officer who elected to remain in the traditional final average pay component, is eligible for a supplemental retirement benefit in concert with that plan, which provides for a traditional defined benefit type retirement annuity stream. This feature of the plan is only available to executive officers who participate in the Supplemental Retirement Plan hired prior to January 1, 2001. As such, it is not available to Messrs. Campbell and Burke. Messrs. Campbell and Burke participate in the "make whole" portion of the Supplemental Retirement Plan as it relates to the cash balance component, which only provides for the payment of retirement benefits that would otherwise be capped by the Code, otherwise restricted or for the inclusion of additional accredited service under contractual arrangements.

Participation in our Supplemental Retirement Plan has been limited to employees of all of our businesses (other than Oncor) who were employed by us on or before October 1, 2007. As a result Messrs. Young, Keglevic, Walters and McFarland do not participate in the Supplemental Retirement Plan.

For a more detailed description of the Supplemental Retirement Plan, please refer to the narrative that follows the Pension Benefits table.

**Retiree Health Care:**

Employees hired prior to January 1, 2002 are generally entitled to receive an employer paid subsidy for retiree health care coverage upon their retirement from EFH Corp. As such, Mr. Greene will be entitled to receive a subsidy from EFH Corp. for retiree health care coverage upon his retirement from EFH Corp. Because Messrs. Young, Keglevic, Campbell, Burke, Walters and McFarland were hired after January 1, 2002, they are not eligible for retiree health coverage.

*Perquisites*

We do not believe that a significant amount of perquisites fit within our compensation philosophy. Those perquisites that exist are intended to serve as part of a competitive total compensation program and to enhance the executive officers' ability to conduct company business. These benefits include financial planning, a preventive physical health exam and reimbursement for certain country club and/or luncheon membership costs.

The following is a summary of perquisites offered to the Named Executive Officers (excluding Mr. Poole) that are not available to all employees:

**Executive Financial Planning:** We pay for certain executive officers to receive financial planning services. This service is intended to support them in managing their financial affairs, which we consider especially important given the high level of time commitment and performance expectation required of our executive officers. Furthermore, we believe that such service helps ensure greater accuracy and compliance with individual tax regulations by our executive officers.

**Annual Executive Physical Health Exam:** We pay for certain executive officers to receive annual physical health exams. The health of our executive officers is important given the vital leadership role they play in directing and operating the company. Our executive officers are important assets of EFH Corp. and this benefit is designed to help ensure their health and long-term ability to serve our stakeholders.

B-153

EFIHMW00246647

**Country Club/Luncheon Club Membership:** We reimburse our executive officers for certain country club or luncheon club dues and expenses. We provide this perquisite to allow our executive officers to interact with, and cultivate relationships with, other business professionals and key community leaders and officials.

Expenditures for the perquisites outlined above are disclosed by individual in footnotes to the Summary Compensation Table.

### *Individual Compensation*

#### *Compensation of the CEO and the CFO*

##### *John F. Young*

In January 2008, Mr. John F. Young became our Chief Executive Officer and President. He also serves as a member of our Board. In connection with his employment, we executed a five-year employment agreement with Mr. Young. After the initial five-year term, the employment agreement provides for automatic one year renewal periods unless terminated by EFH Corp. or Mr. Young.

**Base Salary:** As compensation for his services as CEO and President, Mr. Young is paid an annual base salary equal to $1 million.

**Annual Incentive:** Mr. Young has the ability to earn a target annual cash bonus equal to 100% of his base salary if he achieves certain annual performance targets established by the Board. Such annual cash bonus may be increased to an amount equal to 200% of his base salary if he achieves certain superior annual performance targets established by the Board. Mr. Young earned a bonus for 2008 of $1,418,000, reflecting the performance of EFH Corp. and his individual performance as previously discussed.

**Long Term Equity Incentive:** As part of his employment arrangement, Mr. Young purchased $3 million in shares of our common stock and was granted 7.5 million Stock Option Awards. Mr. Young also received 600,000 restricted stock units, to compensate him for unvested equity compensation he forfeited when he left his former employer to join EFH Corp. Each restricted stock unit entitles Mr. Young to receive one share of our common stock. The restricted stock units were fully vested on the grant date; however if Mr. Young terminates his employment with EFH Corp. without "good reason" prior to the second anniversary of the grant date the restricted stock units will be forfeited.

The employment agreement also entitles Mr. Young to receive other forms of customary compensation such as health and welfare benefits, perquisites, relocation expenses (including a tax gross-up for reimbursed relocation expenses that are required to be included in his income for tax purposes) and reimbursement of business expenses. Mr. Young does not receive any additional compensation for being a member of the Board.

##### *Paul M. Keglevic*

In July 2008, Mr. Paul M. Keglevic became our Executive Vice President and Chief Financial Officer. In connection with his employment, we executed a three-year employment agreement with Mr. Keglevic.

**Base Salary:** As compensation for his services as Executive Vice President and Chief Financial Officer, Mr. Keglevic is paid an annual base salary equal to $600,000.

**Annual Incentive:** Mr. Keglevic has the ability to earn an annual cash bonus equal to 75% of his base salary if he achieves certain annual performance targets established by the Board. Such annual cash bonus may be increased to an amount equal to 200% of his annual bonus target based on achievement of certain superior annual performance targets established by the Board. In 2008, Mr. Keglevic earned a bonus of $613,800, reflecting the performance of EFH Corp. and his individual performance as previously discussed.

B-154

Confidential

**Signing Bonus:** Mr. Keglevic was (or will be) paid a signing bonus equal to $550,000 as follows: (i) $250,000 in July 2008; (ii) $150,000 payable in July 2009 and (iii) $50,000 payable in each of July 2010, 2011 and 2012.

**Long Term Equity Incentive:** Mr. Keglevic was granted 2.5 million Stock Option Awards. Mr. Keglevic also received 225,000 deferred shares of our common stock to compensate him for compensation he forfeited when he left his former employer to join EFH Corp. If Mr. Keglevic is employed by us on the third and fifth anniversaries of his employment (July 2011 and 2013, respectively), 112,500 of such deferred shares shall vest on each such date. If Mr. Keglevic's employment with us terminates for any reason prior to July 1, 2013 (other than for "cause" or without "good reason"), he will have the right to (i) sell to us all (but not less than all) of the shares of our common stock that have vested pursuant to the deferred share arrangement (if any) for $3,200,000 or (ii) if no shares of our common stock shall have vested, a payment of $3,200,000.

The employment agreement also entitles Mr. Keglevic to receive other forms of customary compensation such as certain health and welfare benefits, certain perquisites and reimbursement of certain business expenses.

### Compensation of Other Named Executive Officers

#### David A. Campbell

We entered into a new three-year employment agreement with Mr. Campbell in May 2008, which three-year term is automatically extended for successive one-year periods unless terminated by EFH Corp. or Mr. Campbell. The agreement provides that, during the term, Mr. Campbell will be entitled to the terms outlined below:

**Base Salary:** As compensation for his services as a Co-Chief Executive Officer of EFH Corp. through January 2008, the Chief Financial Officer of EFH Corp. through June 2008, and the Chief Executive Officer of Luminant for the remainder of the year, Mr. Campbell was paid an annual base salary equal to $382,000 through March 25, 2008 and $600,000 for the remainder of the year.

**Annual Incentive:** Mr. Campbell's has the ability to earn a cash bonus equal to 75% of his base salary if he achieves certain annual performance targets established by the Board. Such annual cash bonus may be increased to an amount equal to 200% of his annual bonus target based on achievement of certain superior annual performance targets established by the Board. Mr. Campbell earned a bonus for 2008 of $625,950, reflecting the performance of EFH Corp. and Luminant, as well as his individual performance as previously discussed.

**Long Term Equity Incentive:** In May 2008, Mr. Campbell was granted 4,000,000 Stock Option Awards and received an award of 500,000 deferred shares. Under his Deferred Share Agreement, the deferred shares are to be distributed on the earlier of termination of his employment with EFH Corp., the occurrence of a change in the ownership or effective control of EFH Corp., or a change in the ownership of a substantial portion of the assets of EFH Corp.

**Other:** Under the terms of his prior employment agreement with TXU Corp., Mr. Campbell was entitled to certain payments if he terminated his employment following a change in control of EFH Corp. In order to retain Mr. Campbell after the Merger, the O&C Committee approved a sign-on bonus of $5,092,250 to offset a significant portion of those forfeited payments.

#### M. S. Greene

We entered into an employment agreement with Mr. Greene in May 2008. The agreement entitled Mr. Greene to the following individual compensation for 2008:

**Base Salary:** As compensation for his role as a Co-Chief Executive Officer of EFH Corp. through January 2008, the Chief Executive Officer of Luminant through June 2008 and the Vice Chairman of EFH Corp. for the remainder of the year, Mr. Greene was paid an annual base salary equal to $650,000.

B-155

EFIHMW00246649

**Annual Incentive:** Mr. Greene has the ability to earn a cash bonus equal to 75% of his base salary if he achieves certain annual performance targets established by the Board. Such annual cash bonus may be increased to an amount equal to 200% of his annual bonus target based on achievement of certain superior annual performance targets established by the Board. Mr. Greene earned a bonus for 2008 of $521,625, reflecting the performance of EFH Corp. and Luminant, as well as his individual performance as previously discussed.

**Long Term Equity Incentive:** In accordance with a Deferred Share Agreement, Mr. Greene agreed to forego the right to receive certain payments from EFH Corp. in respect of outstanding equity awards issued prior to the Merger and became entitled to 600,000 deferred shares of our common stock. The shares will be distributed on the earlier of termination of his employment with EFH Corp. or a change in control of EFH Corp. In May 2008, Mr. Greene was granted 2,000,000 Stock Option Awards.

*James A. Burke*

We entered into an employment agreement with Mr. Burke in December 2007, which was amended and restated in May 2008. The agreement provides for Mr. Burke's service as Chief Executive Officer of TXU Energy during a three-year term, commencing October 10, 2007, which term is automatically extended for successive one-year periods unless terminated by us or Mr. Burke. The agreement provides that, during the three year term, Mr. Burke will be entitled to the terms outlined below:

**Base Salary:** As compensation for his services as Chief Executive Officer of TXU Energy, Mr. Burke is paid an annual base salary equal to $600,000.

**Annual Incentive:** Mr. Burke has the ability to earn a cash bonus equal to 75% of his base salary if he achieves certain annual performance targets established by the Board. Such annual cash bonus may be increased to an amount equal to 200% of his annual bonus target based on achievement of certain superior annual performance targets established by the Board. Mr. Burke earned a bonus for 2008 of $473,918, reflecting the performance of TXU Energy and his individual performance as previously discussed.

**Long Term Equity Incentive:** In accordance with a Deferred Share Agreement, Mr. Burke agreed to forego the right to receive certain payments from EFH Corp. in respect of outstanding equity awards issued prior to the Merger and became entitled to 450,000 deferred shares of our common stock. The shares will be distributed on the earlier of termination of his employment with EFH Corp. or a change in control of EFH Corp. In May 2008, Mr. Burke was granted 2,450,000 Stock Option Awards.

*Robert C. Walters*

We entered into an employment agreement with Mr. Walters in May 2008 which three-year term is automatically extended for successive one-year periods unless terminated by EFH Corp. or Mr. Walters. The agreement entitled Mr. Walters to the following individual compensation for 2008:

**Base Salary:** As compensation for his services as Executive Vice President and General Counsel of EFH Corp., Mr. Walters is paid an annual base salary equal to $575,000.

**Signing Bonus:** Mr. Walters was paid a signing bonus equal to $100,000 in April 2008.

**Annual Incentive:** Mr. Walters has the ability to earn a cash bonus equal to 75% of his base salary if he achieves certain annual performance targets established by the Board. Such annual cash bonus may be increased to an amount equal to 200% of his annual bonus target based on achievement of certain superior annual performance targets established by the Board. Mr. Walters earned a bonus for 2008 of $695,175, reflecting the performance of EFH Corp. in 2008 and his individual performance as previously discussed.

**Long Term Equity Incentive:** In May 2008, Mr. Walters was granted 2,000,000 Stock Option Awards.

B-156

EFIHMW00246650

*M. A. McFarland*

We entered into an employment agreement with Mr. McFarland in July 2008. The agreement provides for Mr. McFarland's service as Executive Vice President of EFH Corp. and Executive Vice President and Chief Commercial Officer of Luminant during a three-year term, commencing July 7, 2008, which term is automatically extended for successive one-year periods unless terminated by EFH Corp. or Mr. McFarland. The agreement provides that, during the three year term, Mr. McFarland will be entitled to the terms outlined below:

**Base Salary:** As compensation for his services as Executive Vice President of EFH Corp. and Executive Vice President and Chief Commercial Officer of Luminant, Mr. McFarland is paid an annual base salary equal to $500,000.

**Signing Bonus:** Mr. McFarland was paid a signing bonus equal to $150,000 in July 2008.

**Annual Incentive:** Mr. McFarland has the ability to earn a cash bonus equal to 75% of his base salary if he achieves certain annual performance targets established by the Board. Such annual cash bonus may be increased to an amount equal to 200% of his annual bonus target based on achievement of certain superior annual performance targets established by the Board. Mr. McFarland earned a bonus for 2008 of $529,032, reflecting the performance of EFH Corp. and Luminant as well as his individual performance as previously discussed.

**Long Term Equity Incentive:** In December 2008, Mr. McFarland was granted 2,000,000 Stock Option Awards. In accordance with a Deferred Share Agreement, Mr. McFarland also received 100,000 deferred shares. These shares will vest provided Mr. McFarland is employed by EFH Corp. in July 2010. The shares will also vest upon a change in control of EFH Corp. or upon his termination for "good reason," without "cause," death or disability.

*David P. Poole*

Mr. Poole was EFH Corp.'s former General Counsel. He left the company in March 2008. We entered into an employment agreement with Mr. Poole in May 2004, which was amended in September 2007, October 2007 and January 2008. In 2008, Mr. Poole's base salary was $66,666 per month. Also, in January 2008, Mr. Poole received lump sum cash payments of (i) $982,400, representing the cash severance that would be due to him under his employment agreement upon his termination from EFH Corp. and (ii) $4,155,000, representing the amount agreed to be paid with regard to his ungranted 2008 and 2009 long term performance units under the company's pre-Merger equity incentive plan.

**Contingent Payments**

We have entered into employment agreements with Messrs. Young, Keglevic, Greene, Campbell, Burke, Walters and McFarland. Each of the employment agreements provides that certain payments and benefits will be paid upon the expiration or termination of the agreement under various circumstances, including termination without cause, resignation for good reason and termination of employment within a fixed period of time following a change in control. We believe these provisions are important in order to attract and retain the caliber of executive officers that our business requires and provide incentive for our executive officers to fully consider potential changes that are in our and our shareholders' best interest, even if such changes would result in the executive officers' termination. For a description of the applicable provisions in the employment agreements and our change in control policy and severance plan see "—Potential Payments upon Termination or Change in Control."

B-157

EFIHMW00246651

**PX 014**
**Page 933 of 1116**

**Accounting and Tax Considerations**

*Accounting Considerations*

Under current accounting rules, specifically SFAS 123R, the total amount of compensation expense to be recorded for stock-based awards (e.g., Stock Option Awards granted under the 2007 Stock Incentive Plan) is based on the fair value of the award on the grant date. This fair value is then recorded as expense over the vesting period, with an offsetting increase in paid-in capital. The amount of compensation expense is not subsequently adjusted for changes in our share price, for the actual number of shares distributed, or for any other factors except for true-ups related to estimated forfeitures compared to actual forfeitures.

*Income Tax Considerations*

Section 162(m) of the Code limits the tax deductibility by a publicly held company of compensation in excess of $1 million paid to the CEO or any other of its three most highly compensated executive officers other than the principal financial officer. Because EFH Corp. is a privately-held company, Section 162(m) will not limit the tax deductibility of any executive compensation for 2008.

The O&C Committee administers our compensation programs with the good faith intention of complying with Section 409A of the Code.

B-158

EFIHMW00246652

**PX 014**
**Page 934 of 1116**

The following table provides information for the fiscal years ended December 31, 2006, 2007 and 2008 regarding the aggregate compensation paid to our Named Executive Officers.

## Summary Compensation Table

| Name and Principal Position | Year | Salary ($) (1) | Bonus ($) (2) | Stock Awards ($) (3) | Non-Equity Incentive Plan Compensation ($) (4) | Change in Pension Value and Non-qualified Deferred Compensation Earnings ($) (5) | All Other Compensation ($) (6) | Total ($) |
|---|---|---|---|---|---|---|---|---|
| **John F. Young** . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2008 | 912,500 | N/A | 4,311,250 | 1,418,000 | 0 | 462,258 | 7,104,008 |
| President & CEO of EFH Corp. | 2007 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| | 2006 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| **Paul M. Keglevic** . . . . . . . . . . . . . . . . . . . . . . . . | 2008 | 293,182 | 250,000 | 1,499,550 | 613,800 | 0 | 88,508 | 2,745,040 |
| EVP & Chief Financial Officer of EFH Corp. | 2007 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| | 2006 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| **David A. Campbell** . . . . . . . . . . . . . . . . . . . . . . | 2008 | 545,500 | 5,092,250 | 1,566,000 | 625,950 | 22,779 | 75,915 | 7,928,394 |
| President & CEO Luminant | 2007 | 382,000 | 0 | 1,339,728 | 300,481 | 14,667 | 2,342,814 | 4,379,690 |
| | 2006 | 382,000 | 0 | 1,311,787 | 230,000 | 30,639 | 53,682 | 2,008,108 |
| **M. S. Greene** . . . . . . . . . . . . . . . . . . . . . . . . | 2008 | 650,000 | | 1,259,250 | 521,625 | 480,428 | 232,630 | 3,143,933 |
| Vice Chairman of EFH Corp. | 2007 | 536,792 | | 596,284 | 384,065 | 189,411 | 347,747 | 2,054,299 |
| | 2006 | 507,000 | | 1,145,979 | 220,000 | 1,222,893 | 229,765 | 3,325,637 |
| **James A. Burke** . . . . . . . . . . . . . . . . . . . . . . . | 2008 | 600,000 | | 959,175 | 473,918 | 25,501 | 639,136 | 2,697,730 |
| President & CEO of TXU Energy | 2007 | 342,712 | | 454,478 | 274,050 | 9,864 | 978,189 | 2,059,293 |
| | 2006 | 275,004 | | 512,932 | 100,000 | 15,962 | 52,233 | 956,131 |
| **Robert C. Walters** . . . . . . . . . . . . . . . . . . . . . . | 2008 | 435,609 | 100,000 | 783,000 | 695,175 | N/A | 44,249 | 2,058,033 |
| EVP & General Counsel of EFH Corp. | 2007 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| | 2006 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| **M.A. McFarland** . . . . . . . . . . . . . . . . . . . . . . | 2008 | 236,744 | 150,000 | 1,221,751 | 529,032 | 0 | 87,725 | 2,225,252 |
| EVP EFH Corp. & EVP & Chief Commercial Officer of Luminant | 2007 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| | 2006 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| **David P. Poole** . . . . . . . . . . . . . . . . . . . . . . | 2008 | 291,108 | | 0 | 0 | 16,769 | 7,629,785 | 7,937,662 |
| Former EVP & General Counsel of EFH Corp. | 2007 | 307,000 | | 1,099,176 | 220,487 | 13,388 | 2,627,981 | 4,268,032 |
| | 2006 | 307,000 | | 841,275 | 120,000 | 22,696 | 43,082 | 1,334,053 |

---

(1) The base salary for Messrs. Young, Keglevic, McFarland and Poole represent salaries for a partial year. Messrs. Young, Keglevic and McFarland commenced employment with EFH Corp. in January 2008, July 2008 and July 2008, respectively and Mr. Poole terminated his employment in March 2008.

(2) Mr. Keglevic's employment agreement provided that we pay him a signing bonus equal to $550,000 as follows: (i) $250,000 payable in July 2008; (ii) $150,000 payable in July 2009 and (iii) $50,000 payable in July 2010, 2011 and 2012. The bonus for Mr. Keglevic represents the first installment of his signing bonus. As an inducement for entering into his employment agreement, Mr. Campbell was entitled to a one-time payment of $5,092,250 in January 2009. Mr. Walters was paid a signing bonus of $100,000 in March 2008 and Mr. McFarland received a signing bonus of $150,000 in July 2008.

(3) The amounts reported as "Stock Awards" represent the compensation expense recognized over the vesting period in accordance with SFAS 123R for the restricted stock and/or stock options awarded under the 2007 Stock Incentive Plan. The 2007 Stock Incentive Plan is a stock-based incentive compensation plan providing for stock option awards to designated employees and non-employee directors. The reported amount includes the applicable 2008 compensation cost for restricted stock units, deferred shares or stock options awarded in 2008.

(4) Amounts reported as "Non-Equity Incentive Plan Compensation" were earned by the executive in 2008 and relate to 2008 awards pursuant to the Executive Annual Incentive Plan. Those awards will be paid to the executives in March 2009 and are described in the section entitled "Executive Annual Incentive Plan."

(5) Amounts reported under "Change in Pension Value and Nonqualified Deferred Compensation Earnings" include the aggregate increase in actuarial value of EFH Corp.'s Retirement Plan and Supplemental Retirement Plan. EFH Corp. and its participating subsidiaries maintain the Retirement Plan, which is qualified under applicable provisions of the Code and covered by ERISA. The Retirement Plan contains both a traditional final average pay component and a cash balance component. Mr. Greene is covered under the traditional final average pay component and Messrs. Campbell and Burke are covered under the cash balance component. While employed by EFH Corp., Mr. Poole was also covered under the cash balance program. For a more detailed description of EFH Corp.'s retirement plans, please refer to the narrative that follows the Pension Benefits table. There are no above market earnings for nonqualified deferred compensation.

(6) Amounts reported as "All Other Compensation" are attributable to the executive officer's participation in certain EFH Corp. plans and as otherwise described in this footnote.

B-159

EFIHMW00246653

**PX 014**
**Page 935 of 1116**

Under EFH Corp.'s Thrift Plan, all eligible employees of EFH Corp. and any of its participating subsidiaries may contribute a portion of their regular salary or wages to the plan. Under the Thrift Plan, EFH Corp. matches a portion of an employee's contributions. This matching contribution is 75% of the employee's contribution up to the first 6% of the employee's salary for employees covered under the traditional defined benefit component of the Retirement Plan, and 100% of the employee's contribution up to 6% of the employee's salary for employees covered under the cash balance component of the Retirement Plan (or those not eligible to participate in the Retirement Plan). All matching contributions are invested in Thrift Plan investments as directed by the participant. The amounts reported under "All Other Compensation" in the Summary Compensation Table include the following matching amounts for Messrs. Young, $8,664; Keglevic, $5,605;Campbell, $4,600; Greene, $10,351; Burke, $13,800; Walters, $12,101; McFarland, $1,875 and Poole, $11,040. All eligible Thrift Plan participants, including the executive officers, became entitled to receive an additional contribution from EFH Corp. as a result of the liquidation of the Leveraged Employee Stock Ownership Plan (LESOP)-the plan that was established to fund future employer matching contributions to the Thrift Plan. As a result, the amounts reported under "All Other Compensation" in the Summary Compensation Table for Messrs. Campbell, Greene, Burke and Poole include a cash allocation of $500, which was paid into each executive officer's Thrift Plan account in April 2008.

Under EFH Corp.'s Salary Deferral Program, all eligible employees may defer a percentage of their salary and/or annual incentive awards. EFH Corp. matches a portion of the salary deferral. Please refer to the narrative that follows the Nonqualified Deferred Compensation table for a more detailed description of the Salary Deferral Program and the matching formula. Salaries and incentive awards deferred under the Salary Deferral Program are included in amounts reported under Salary and Non-Equity Incentive Plan Compensation in the Summary Compensation Table. Matching awards made in 2008 under the Salary Deferral Program, which are included under "All Other Compensation" in the Summary Compensation Table, include these amounts for Messrs. Young, $66,667; Keglevic, $20,000; Campbell, $0; Greene, $65,000; Burke, $48,000 and Walters, $30,667. Mr. Poole had a matching award of $16,889 that was offset by a forfeiture of $22,090 for a total of ($5,201).

Under EFH Corp.'s Split-Dollar Life Insurance Program, a split-dollar life insurance policy was purchased for Mr. Greene. The eligibility provisions of this program were modified in 2003 so that no new participants may be added after December 31, 2003. Accordingly, Messrs. Young, Keglevic, Campbell, Burke, Walters, McFarland and Poole were not eligible to participate in the Split-Dollar Life Insurance Program. The death benefits of Mr. Greene's policy are equal to four times his annual Split-Dollar Life Insurance Program compensation. EFH Corp. pays the premiums for the policies and has received a collateral assignment of the policies equal in value to the sum of all of its insurance premium payments; provided that premium payments made after August 1, 2002, are made on a non-split-dollar life insurance basis and EFH Corp.'s rights under the collateral assignment are limited to premium payments made prior to August 1, 2002. Although the Split-Dollar Life Insurance Program is terminable at any time, it is designed so that if it is continued, EFH Corp. will fully recover all of the insurance premium payments covered by the collateral assignments either upon the death of the participant or, if the assumptions made as to policy yield are realized, upon the later of 15 years of participation or the participant's attainment of age 65. Because premium payments for Mr. Greene were made on a non-split-dollar life insurance basis during 2008, such premiums were fully taxable to Mr. Greene, and EFH Corp. provided tax gross-up payments to offset the effect of such taxes. During 2008, the amounts reported under "All Other Compensation" in the Summary Compensation Table attributable to the aggregate amount of premiums amounted to $82,320 for Mr. Greene. The amount reported under "All Other Compensation" also includes tax gross-up of $54,477 for Mr. Greene, which was provided to offset the effect of income taxes on premium payments made on a non-split dollar life insurance basis during 2008. In October 2007, the Split-Dollar Life Insurance program was amended to freeze the death benefits at the current level and the vested portions of the policies were fully funded.

Amounts reported under "All Other Compensation" for Messrs. Young, Keglevic and McFarland include payments for moving expenses in the amount of $340,991, $51,053, and $78,557, respectively.

B-160

Amounts reported under "All Other Compensation" for Mr. Poole include a severance payment which consists of lump sum cash payments of (i) $982,400, representing the cash severance that would be due to him under his employment agreement upon his termination from EFH Corp. and (ii) $4,155,000, representing the amount agreed to be paid with regard to his ungranted 2008 and 2009 long term performance units under the company's pre-Merger equity incentive plan and (iii) a one time cash payment of $22,090 equal to the forfeited portion of his account under the Salary Deferral Program. Additionally, Mr. Poole received a tax gross-up for $2,431,885 to offset the excise tax which resulted from the above payments related to the Merger.

Amounts reported under "All Other Compensation" for Messrs Young, Campbell and Burke include amounts for tax gross-up in the amount of $19,282, $59,187 and $558,651, respectively. The gross-up for Mr. Young was related to moving expenses. Messrs. Campbell and Burke received a tax gross-up for payments made in connection with the Merger.

Amounts reported under "All Other Compensation" also include the perquisites summarized in the following table for our Named Executive Officers.

**2008 Perquisites for Named Executive Officers**

| Name | Financial Planning | Executive Physical | Home Security Expense | Country Club | Board of Directors Strategy Meeting | Other– Spouse Travel (1) | Total |
|---|---|---|---|---|---|---|---|
| John F. Young | 17,620 | 0 | 2,325 | 0 | 1,598 | 3,479 | 25,022 |
| Paul M. Keglevic | 0 | 0 | 0 | 0 | 2,343 | 6,001 | 8,344 |
| David A. Campbell | 9,730 | 1,743 | 0 | 0 | 155 | 0 | 11,628 |
| M. S. Greene | 9,730 | 0 | 0 | 6,354 | 914 | 2,979 | 19,977 |
| James A. Burke | 8,530 | 0 | 0 | 4,108 | 3,325 | 0 | 15,963 |
| Robert C. Walters | 0 | 0 | 0 | 0 | 1,481 | 0 | 1,481 |
| M. A. McFarland | 0 | 2,775 | 0 | 0 | 3,088 | 1,430 | 7,293 |
| David P. Poole | 8,540 | 0 | 0 | 518 | 0 | 873 | 9,931 |

The values reported for perquisites are actual amounts spent by EFH Corp.

_____

(1)  Amounts in the "Other" column include spouse's expense while accompanying executive on business travel.

For a discussion of the terms of the employment agreements with the Named Executive Officers, please see the "Individual Compensation" section.

B-161

EFIHMW00246655

**PX 014**
**Page 937 of 1116**

The following table sets forth information regarding grants of compensatory awards to our Named Executive Officers during the fiscal year ended December 31, 2008.

### Grants of Plan-Based Awards—2008

| Name | Grant Date | Date of Board Action | Estimated Possible Payouts Under Non-Equity Incentive Plan Awards (1) | | | Estimated Future Payouts Under Equity Incentive Plan Awards (2) | | | All Other Stock Awards: # of Shares or Units (3) | All Other Option Awards: # of Securities Underlying Options (#) (4) | Exercise or Base Price of Option Awards ($/sh) | Grant Date Fair Value of Stock Award (5) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Threshold ($) | Target ($) | Max. ($) | Threshold (#) | Target (#) | (Max) (#) | | | | |
| John F. Young | 05/15/08 | 05/15/08 | 500,000 | 1,000,000 | 2,000,000 | | | | | | | |
| | 02/01/08 | 01/30/08 | | | | | 3,750,000 | | | 3,750,000 | $5.00 | 13,635,000 |
| | 02/01/08 | 01/30/08 | | | | | | | 600,000 | | | 3,000,000 |
| Paul M. Keglevic | 05/22/08 | 05/22/08 | 225,000 | 450,000 | 900,000 | | | | | | | |
| | 12/22/08 | 05/22/08 | | | | | 1,250,000 | | | 1,250,000 | $5.00 | 6,442,500 |
| | 07/01/08 | 05/22/08 | | | | | | | 225,000 | | | 1,125,000 |
| David A. Campbell | 05/15/08 | 05/15/08 | 225,000 | 450,000 | 900,000 | | | | | | | |
| | 05/20/08 | 05/02/08 | | | | | 2,000,000 | | | 2,000,000 | $5.00 | 7,272,000 |
| | 05/20/08 | 05/02/08 | | | | | | | 500,000 | | | 2,500,000 |
| M.S. Greene | 05/15/08 | 05/15/08 | 243,750 | 487,500 | 975,000 | | | | | | | |
| | 05/20/08 | 01/30/08 | | | | | 1,000,000 | | | 1,000,000 | $5.00 | 3,636,000 |
| James A. Burke | 05/15/08 | 05/15/08 | 225,000 | 450,000 | 900,000 | | | | | | | |
| | 05/20/08 | 01/30/08 | | | | | 1,225,000 | | | 1,225,000 | $5.00 | 4,454,100 |
| Robert C. Walters | 05/15/08 | 05/15/08 | 215,625 | 431,250 | 862,500 | | | | | | | |
| | 05/20/08 | 02/29/08 | | | | | 1,000,000 | | | 1,000,000 | $5.00 | 3,636,000 |
| M. A. McFarland | 05/22/08 | 05/22/08 | 187,500 | 375,000 | 750,000 | | | | | | | |
| | 12/22/08 | 05/22/08 | | | | | 1,000,000 | | | 1,000,000 | $5.00 | 5,114,000 |
| | 07/07/08 | 05/22/08 | | | | | | | 100,000 | | | 500,000 |
| David P. Poole | | | N/A | N/A | N/A | | N/A | | N/A | N/A | | |

(1) The amounts disclosed under the heading "Estimated Possible Payouts under Non-Equity Incentive Plan Awards" reflect the threshold, target and maximum amounts available under the Executive Annual Incentive Plan and each executive's employment agreement. The actual awards for the 2008 plan year were paid in March 2009 and are reported in the Summary Compensation Table under the heading "Non-Equity Incentive Plan Compensation" and are described under the section entitled "—Executive Annual Incentive Plan."

(2) Represents grants of performance vesting options under the 2007 Stock Incentive Plan. Because there is no market of our common stock, the per share exercise price is the fair market value of one share of our common stock on the grant date as determined in good faith by our Board of Directors. If we achieve specific EBITDA targets, these options are eligible to become vested in installments of 20% on each of December 31, 2008, 2009, 2010, 2011 and 2012. If an EBITDA target for a given fiscal year is not met, these options may still vest on a "catch up" basis if, at the end of fiscal years 2009, 2010, 2011, or 2012, the applicable cumulative EBITDA target is achieved. In addition, these options are subject to certain accelerated vesting provision as described in "—Potential Payments upon Termination or Change-in Control."

(3) Mr. Young received 600,000 restricted stock units in February 2008 which were fully vested upon grant; however if he voluntarily terminates his employment without good reason (other than due to disability) prior to the February 2010, he will forfeit all of the restricted stock units.

Mr. Keglevic received 225,000 deferred shares in July 2008. The deferred shares will vest and become non-forfeitable as to 112,500 of the shares in July 2011 and 112,500 of the shares in July 2013. In addition, these deferred shares are subject to certain accelerated vesting provision as described in "—Potential Payments upon Termination or Change-in Control."

In May 2008, Mr. Campbell received a grant of 500,000 deferred shares in connection with his continued employment with EFH Corp. and Luminant. The deferred shares will be issued to Mr. Campbell upon the earlier of (i) his separation of employment for any reason or (ii) the occurrence of a change in control of EFH Corp. or in the ownership of a substantial portion of the assets of EFH Corp.

In July 2008, Mr. McFarland received a grant of 100,000 deferred shares. These shares will vest in July 2010 if Mr. McFarland is employed by EFH Corp. or upon a change in control of EFH Corp. or upon Mr. McFarland's termination for good reason, without cause, death or disability.

(4) Represents grants of time-vested, non-qualified stock options under the 2007 Stock Incentive Plan. Because there is no market for our common stock, the per share exercise price is the fair market value of one share of our common stock on the grant date as determined in good faith by our Board of Directors. These options are scheduled to become exercisable ratably in installments of 20% annually. In addition, these options are subject to certain accelerated vesting provisions as described in "—Potential Payments upon Termination or Change-in Control."

(5) The amounts reported under "Grant Date Fair Value of Stock Award" represent the compensation expense under SFAS 123R for the entire five-year performance period related to the 2008 Awards.

B-162

EFIHMW00246656

PX 014
Page 938 of 1116

**Outstanding Equity Awards at Fiscal Year-End—2008**

| | Option Awards | | | | | Stock Awards | | | |
|---|---|---|---|---|---|---|---|---|---|
| | # of Securities Underlying Unexercised Options | | | | | | | | |
| Name | Exercisable (1) | Unexercisable (2) | Equity Incentive Plan Awards: # of Securities Underlying Unexercised Unearned Options (3) | Option Exercise Price | Option Expiration Date | # of Shares or Units of Stock That Have Not Vested (4) | Market Value of Shares of Units of Stock That Have Not Vested | Equity Incentive Plan Awards: # of Unearned Shares, Units or Other Rights That Have Not Vested | Equity Incentive Plan Awards Market Payout Value of Unearned Shares, Units or Rights That Have Not Vested |
| John F. Young ....... | 1,500,000 | 3,000,000 | 3,000,000 | 5.00 | 02/01/2018 | | | | |
| Paul M. Keglevic ..... | 250,000 | 1,250,000 | 1,000,000 | 5.00 | 12/22/2018 | 225,000 | 1,125,000 | | |
| David A. Campbell ... | 800,000 | 1,600,000 | 1,600,000 | 5.00 | 05/20/2018 | | | | |
| M. S. Greene ........ | 700,000 | 500,000 | 800,000 | 5.00 | 05/20/2018 | | | | |
| James A. Burke ...... | 490,000 | 980,000 | 980,000 | 5.00 | 05/20/2018 | | | | |
| Robert C. Walters ..... | 400,000 | 800,000 | 800,000 | 5.00 | 05/20/2018 | | | | |
| M. A. McFarland ..... | 200,000 | 1,000,000 | 800,000 | 5.00 | 12/22/2018 | 100,000 | 500,000 | | |
| David Poole ......... | NA | NA | NA | | | | | | |

(1) Amounts reported for Messrs Young, Keglevic, Campbell, Greene, Burke, Walters and McFarland include 750,000, 250,000, 400,000, 200,000, 245,000, 200,000 and 200,000 options, respectively, that vested in February 2009.

(2) These options are scheduled to become exercisable ratably in October 2009, 2010, 2011 and 2012 for Messrs Young, Campbell, Greene, Burke and Walters and ratably in July 2009, 2010, 2011, 2012 and 2013 for Messrs Keglevic and McFarland.

(3) If we achieve certain performance targets, these options are eligible to become exercisable ratably as of the end of fiscal years 2009, 2010, 2011 and 2012.

(4) The deferred shares for Mr. Keglevic will vest and become nonforfeitable as to (i) 112,500 of the shares on the third anniversary of employment and (ii) 112,500 of the shares on the fifth anniversary of employment.

The following table sets forth information regarding the vesting of equity awards held by the Named Executive Officers during 2008:

**Options Exercised and Stock Vested—2008**

| | Option Awards | | Stock Awards | |
|---|---|---|---|---|
| Name | Number of Shares Acquired on Exercise (#) | Value Realized on Exercise ($) | Number of Shares Acquired on Vesting (#) | Value Realized on Vesting ($) |
| John F. Young (1) ........................... | 0 | 0 | 600,000 | 3,000,000 |
| Paul M. Keglevic ........................... | 0 | 0 | | |
| David A. Campbell (2) ....................... | 0 | 0 | 500,000 | 2,500,000 |
| M.S. Greene ............................... | 0 | 0 | | |
| James A. Burke ............................. | 0 | 0 | | |
| Robert C. Walters .......................... | 0 | 0 | | |
| M. A. McFarland ........................... | 0 | 0 | | |
| David P. Poole ............................. | N/A | N/A | N/A | N/A |

B-163

EFIHMW00246657

**PX 014
Page 939 of 1116**

(1)  Mr. Young vested in the 600,000 restricted stock units that he received in February 2008 however, if he terminates employment voluntarily or is terminated for cause within two years from his date of employment these restricted stock units will be forfeited.

(2)  Mr. Campbell entered into a Deferred Share Agreement with EFH Corp. in May 2008. Pursuant to this agreement, EFH Corp. will issue 500,000 shares of common stock to Mr. Campbell on the earlier of (i) Mr. Campbell's separation of service for any reason and (ii) the later of January 2, 2009 or the occurrence of a change in the ownership or effective control of EFH Corp., or in the ownership of a substantial portion of the assets of EFH Corp.

The following table sets forth information regarding our retirement plans that provide for benefits, in connection with, or following, the retirement of the Named Executive Officers for the fiscal year ended December 31, 2008:

### Pension Benefits—2008

| Name | Plan Name | Number of Years Credited Service (#) | PV of Accumulated Benefit ($) | Payments During Last Fiscal Year ($) |
|---|---|---|---|---|
| John F. Young . . . . . . . . | Retirement Plan | N/A | N/A | 0 |
|  | Supplemental Retirement Plan | N/A | N/A |  |
| Paul M. Keglevic . . . . . . . | Retirement Plan | N/A | N/A | 0 |
|  | Supplemental Retirement Plan | N/A | N/A |  |
| David A. Campbell (1) . . . | Retirement Plan | 3.5833 | 26,379 | 0 |
|  | Supplemental Retirement Plan | 7.1667 | 49,510 |  |
| M.S. Greene . . . . . . . . . . | Retirement Plan | 38.1667 | 1,327,489 | 0 |
|  | Supplemental Retirement Plan | 38.1667 | 4,301,798 |  |
| James A. Burke  . . . . . . . | Retirement Plan | 3.1667 | 21,287 | 0 |
|  | Supplemental Retirement Plan | 3.1667 | 32,076 |  |
| Robert C. Walters . . . . . . . | Retirement Plan | N/A | N/A | 0 |
|  | Supplemental Retirement Plan | N/A | N/A |  |
| M. A. McFarland  . . . . . . . | Retirement Plan | N/A | N/A | 0 |
|  | Supplemental Retirement Plan | N/A | N/A |  |
| David P. Poole (2)  . . . . . . | Retirement Plan | 2.9167 | 28,353 | 0 |
|  | Supplemental Retirement Plan | 5.8334 | 32,135 |  |

(1)  Mr. Campbell's employment agreement entitles him to additional retirement compensation under the Supplemental Retirement Plan equal to the retirement benefits he would be entitled to if, during each of his first ten years of service with EFH Corp., he was credited with two years of service under the Supplemental Retirement Plan.

(2)  Mr. Poole's employment agreement entitled him to additional retirement compensation under the Supplemental Retirement Plan equal to the retirement benefits he would be entitled to if, during each of his first ten years of service with EFH Corp. he was credited with two years of service under the Supplemental Retirement Plan.

EFH Corp. and its participating subsidiaries maintain the Retirement Plan, which is intended to be qualified under applicable provisions of the Code and covered by ERISA. The Retirement Plan contains both a traditional defined benefit component and a cash balance component. Only employees hired before January 1, 2002 may participate in the traditional defined benefit component. All new employees hired after January 1, 2002 and before October 1, 2007 are eligible to participate in the cash balance component. In addition, the cash balance

B-164

EFIHMW00246658

component covers employees previously covered under the traditional defined benefit component who elected to convert the actuarial equivalent of their accrued traditional defined benefit to the cash balance component during a special one-time election opportunity in 2002. Participation in EFH Corp.'s Retirement Plan has been limited to employees of all of its businesses (other than Oncor) who were employed by EFH Corp. (or its participating subsidiaries) on or before October 1, 2007. Accordingly, Messrs. Young, Keglevic, Walters and McFarland are not eligible to participate in the Retirement Plan.

Annual retirement benefits under the traditional final average pay benefit component, which applied during 2008 to Mr. Greene is computed as follows: for each year of accredited service up to a total of 40 years, 1.3% of the first $7,800, plus 1.5% of the excess over $7,800, of the participant's average annual earnings (base salary) during his or her three years of highest earnings. Under the cash balance component, which applied during 2008 to Messrs. Campbell, Burke, and Poole (during his employment with EFH Corp.), hypothetical accounts are established for participants and credited with monthly contribution credits equal to a percentage of the participant's compensation (3.5%, 4.5%, 5.5% or 6.5% depending on the participant's combined age and years of accredited service) and interest credits based on the average yield of the 30-year Treasury bond for the 12 months ending November 30 of the prior year. Benefits paid under the traditional final average pay benefit component of the Retirement Plan are not subject to any reduction for Social Security payments but are limited by provisions of the Code.

The Supplemental Retirement Plan provides for the payment of retirement benefits, which would otherwise be limited by the Code or the definition of earnings under the Retirement Plan. The Supplemental Retirement Plan also provides for the payment of retirement compensation that is not otherwise payable under the Retirement Plan that EFH Corp. or its participating subsidiaries are obligated to pay under contractual arrangements. Under the Supplemental Retirement Plan, retirement benefits are calculated in accordance with the same formula used under the Retirement Plan, except that, with respect to calculating the portion of the Supplemental Retirement Plan benefit attributable to service under the traditional final average pay component of the Retirement Plan, earnings also include Executive Annual Incentive Plan awards which are reported under the Non-Equity Incentive Plan Compensation column of the Summary Compensation Table. Participation in EFH Corp.'s Supplemental Retirement Plan has been limited to employees of all of its businesses other than Oncor, who were employed by EFH Corp. (or its participating subsidiaries) on or before October 1, 2007. Accordingly, Messrs. Young, Keglevic, Walters and McFarland are not eligible to participate in the Supplemental Retirement Plan.

The table set forth above illustrates present value on December 31, 2008 of each Named Executive Officer's Retirement Plan benefit and benefits payable under the Supplemental Retirement Plan, based on their years of service and remuneration through December 31, 2008. Benefits accrued under the Supplemental Retirement Plan after December 31, 2004, are subject to Section 409A of the Code. Accordingly, certain provisions of the Supplemental Retirement Plan have been modified in order to comply with the requirements of Section 409A and related guidance.

The present value of accumulated benefit for the Retirement Plan, traditional final average pay component, was calculated based on the executive's straight life annuity payable at the earliest date that unreduced benefits are available under the plan (generally age 62). Post-retirement mortality was based on the RP2000 Combined Healthy mortality table projected 10 years using scale AA. A discount rate of 6.90% was applied and no pre-retirement mortality or turnover was reflected.

The present value of accumulated benefit for the Retirement Plan, cash balance component, was calculated as the value of their cash balance account projected to age 65 at an assumed growth rate of 4.75% and then discounted back to December 31, 2008 at 6.90%. No mortality or turnover assumptions were applied.

B-165

EFIHMW00246659

The following table sets forth information regarding plans that provide for the deferral of the Named Executive Officers' compensation on a basis that is not tax-qualified for the fiscal year ended December 31, 2008:

### Nonqualified Deferred Compensation—2008 (1)

| Name | Executive Contributions in Last FY ($) | Registrant Contributions in Last FY ($) (2) | Aggregate Earnings in Last FY ($) | Aggregate Withdrawals/ Distributions($) (3) | Aggregate Balance at Last FYE ($) |
|---|---|---|---|---|---|
| John F. Young . . . . . . . . . | 66,667 | 66,667 | (30,679) | 0 | 102,654 |
| Paul M. Keglevic . . . . . . . | 20,000 | 20,000 | 142 | 0 | 40,142 |
| David A. Campbell . . . . . | 0 | 0 | (61,532) | (15,198,604) | 147,333 |
| M.S. Greene . . . . . . . . . . | 65,000 | 65,000 | 57,529 | (8,061,810) | 1,343,190 |
| James A. Burke . . . . . . . . | 48,000 | 48,000 | (84,255) | (5,401,662) | 171,604 |
| Robert C. Walters  . . . . . . | 30,667 | 30,667 | (11,016) | 0 | 50,318 |
| M. A. McFarland . . . . . . . | 0 | 0 | 0 | 0 | 0 |
| David P. Poole . . . . . . . . . | 56,362 | (5,201) | (23,181) | (14,931,051) | 0 |

(1)  The amounts reported in the Nonqualified Deferred Compensation table also include deferrals and the company match under the Salary Deferral Program. The amounts reported as "Executive Contributions in Last FY" are also included as "Salary" in the Summary Compensation Table.

Under EFH Corp.'s Salary Deferral Program each employee of EFH Corp. and its participating subsidiaries who is in a designated job level and whose annual salary is equal to or greater than an amount established under the Salary Deferral Program ($110,840 for the program year beginning January 1, 2008) may elect to defer up to 50% of annual base salary, and/or up to 100% of any bonus or incentive award, for a period of seven years, for a period ending with the retirement of such employee, or for a combination thereof. EFH Corp. makes a matching award, subject to forfeiture under certain circumstances, equal to 100% of up to the first 8% of salary deferred under the Salary Deferral Program. Mr. Greene is participating in the Salary Deferral Program under a pre-1998 provision that allows an employee to defer up to 10% of annual base salary for a period ending with the retirement of such employee or a combination thereof. EFH Corp. makes a matching award, subject to forfeiture under certain circumstances, up to the maximum of 10% of salary deferred under the Salary Deferral Program for Mr. Greene.

Deferrals are credited with earnings or losses based on the performance of investment alternatives under the Salary Deferral Program selected by each participant. At the end of the applicable maturity period, the trustee for the Salary Deferral Program distributes the deferrals and the applicable earnings in cash as a lump sum or in annual installments at the participant's election made at the time of deferral. EFH Corp. is financing the retirement option portion of the Salary Deferral Program through the purchase of corporate-owned life insurance on the lives of participants. The proceeds from such insurance are expected to allow EFH Corp. to fully recover the cost of the retirement option.

(2)  The amount included in "Registrant Contributions in Last FY" attributable to EFH Corp.'s matching award under the Salary Deferral Program was for Messrs. Young, $66,667; Keglevic, $20,000; Campbell, $0; Greene, $65,000; Burke, $48,000; Walters, $30,667. Mr. Poole had a matching award of $16,889 that was offset by a forfeiture of $22,090 for a total of ($5,201).

(3)  Amounts reported under "Aggregate Withdrawals/Distributions" include the following amounts for performance units under EFH Corp.'s pre-Merger equity incentive compensation plan that vested in October 2007, but were deferred and paid in January 2008: Mr. Campbell, $15,198,604; Mr. Greene, $2,960,733; Mr. Burke, $3,151,662 and Mr. Poole, $14,349,364. It also includes the following amounts for the TXU Corp. Deferred and Incentive Compensation Plan paid in January 2008 to Mr. Greene, $2,054,237. These amounts are disclosed under this table because they meet the definition of "nonqualified deferred compensation" under the Code. Also, the amount reported in "Aggregate Withdrawals/Distributions" for Messrs. Greene and Burke include distributions of $3,000,000 and $2,250,000, respectively, that the executives were entitled to receive in respect of outstanding equity awards, but which they agreed to forego, pursuant to the terms of their respective Deferred Share Agreements, in exchange for deferred shares of the post-Merger equity of EFH Corp. These amounts were previously reported under "Registrant Contributions in Last FY."

Confidential

EFIHMW00246660

**Potential Payments upon Termination or Change in Control**

The tables and narrative below provide information for payments to the Named Executive Officers (or, as applicable, enhancements to payments or benefits) in the event of termination including retirement, voluntary, for cause, death, disability, without cause or change in control.

The information in the tables below is presented in accordance with SEC rules, assuming termination of employment and other information as of December 31, 2008.

**Employment Arrangements with Contingent Payments:** As of December 31, 2008, each of Messrs. Young, Keglevic, Campbell, Greene, Burke, Walters and McFarland had employment agreements with change in control and severance provisions as described in the following tables. Mr. Poole had an employment agreement and the change in control and severance terms included in the employment agreement governed until he left EFH Corp. in March 2008.

**Mr. Poole**

In March 2008, Mr. Poole resigned from EFH Corp. for "good reason" as defined in his employment agreement. Under the terms of his Severance Agreement, EFH Corp. provided Mr. Poole a severance payment which consisted of a lump sum cash payment of (i) $982,400, representing the cash severance that would be due to him under his employment agreement upon his termination from EFH Corp. plus (ii) $4,155,000, representing the amount agreed to be paid with regard to his ungranted 2008 and 2009 long term performance units under EFH Corp.'s pre-Merger equity incentive compensation plan, plus (iii) a one time cash payment equal to the forfeited portion of his account under the Salary Deferral Program. Additionally, as provided in his employment agreement, Mr. Poole received a tax gross-up in the amount of $2,431,885 to offset the excise taxes that resulted from the severance payment.

**1. Mr. Young**

**Potential Payments to Mr. Young upon Termination (per employment agreement as of December 31, 2008)**

| Benefit | Voluntary | For Cause | Death | Disability | Without Cause Or For Good Reason | Without Cause Or For Good Reason In Connection With Change in Control |
|---|---|---|---|---|---|---|
| Cash Severance . . . . . . . . . . . . . . . . . . | $0 | $0 | $    0 | $    0 | $5,000,000 | $6,000,000 |
| Executive Annual Incentive Plan . . . | $0 | $0 | $1,000,000 | $1,000,000 | $    0 | $    0 |
| Vesting of Restricted Stock Units . . . | $0 | $0 | $3,000,000 | $3,000,000 | $3,000,000 | $3,000,000 |
| Deferred Compensation | | | | | | |
| ——Salary Deferral Program . . . . | $0 | $0 | $   51,327 | $   51,327 | $    0 | $   51,327 |
| Health & Welfare | | | | | | |
| ——Medical/COBRA . . . . . . . . . . | $0 | $0 | $    0 | $    0 | $ 29,883 | $ 29,883 |
| ——Dental/COBRA . . . . . . . . . . | $0 | $0 | $    0 | $    0 | $ 2,971 | $ 2,971 |
| Totals . . . . . . . . . . . . . . . . . . . . . . . . | $0 | $0 | $4,051,327 | $4,051,327 | $8,032,854 | $9,084,181 |

Mr. Young has entered into an employment that provides for certain payments and benefits upon the expiration or termination of the agreement under the following circumstances:

1.   In the event of Mr. Young's death or disability:

   a.   a prorated annual incentive bonus for the year of termination; and

   b.   payment of employee benefits, including stock compensation, if any, to which Mr. Young may be entitled.

B-167

EFHMW00246661

2.   In the event of Mr. Young's termination without cause or resignation for good reason:

    a.   a lump sum payment equal to two and one-half times the sum of (i) his annualized base salary and (ii) a prorated annual incentive bonus;

    b.   payment of employee benefits, including stock compensation, if any, to which Mr. Young may be entitled; and

    c.   certain continuing health care and company benefits.

3.   In the event of Mr. Young's termination without cause or resignation for good reason within 24 months following a change in control of EFH Corp.:

    a.   a lump sum payment equal to two and one-half times the sum of: (i) his annualized base salary and (ii) his annual bonus target;

    b.   a prorated annual incentive bonus for the year of termination;

    c.   payment of employee benefits, including stock compensation, if any, to which Mr. Young may be entitled;

    d.   certain continuing health care and company benefits; and

    e.   a tax gross-up payment to offset any excise tax which may result from the change in control payments.

A change in control is generally defined as (i) a transaction that results in a sale of substantially all of our assets to another person and such person having more seats on our Board than the Sponsor Group, (ii) a transaction that results in a person not in the Sponsor Group owning more than 50% of our common stock and such person having more seats on our Board than the Sponsor Group or (iii) a transaction that results in the Sponsor Group owning less than 20% of our common stock and the Sponsor Group not being able to appoint a majority of the directors to our Board.

Mr. Young's employment agreement includes customary non-compete and non-solicitation provisions that generally restrict Mr. Young's ability to compete with us or solicit our customers or employees for his own personal benefit during the term of the employment agreement and 24 months after the employment agreement expires or is terminated.

### 2. Mr. Keglevic

**Potential Payments to Mr. Keglevic upon Termination (per employment agreement as of December 31, 2008)**

| Benefit | Voluntary | For Cause | Death | Disability | Without Cause Or For Good Reason | Without Cause Or For Good Reason In Connection With Change in Control |
|---|---|---|---|---|---|---|
| Cash Severance . . . . . . . . . . . . . . . . . | $0 | $0 | $      0 | $      0 | $2,100,000 | $2,100,000 |
| Executive Annual Incentive Plan . . . | $0 | $0 | $ 450,000 | $ 450,000 | $      0 | $      0 |
| Vesting of Deferred Shares . . . . . . . . | $0 | $0 | $3,200,000 | $3,200,000 | $3,200,000 | $3,200,000 |
| Deferred Compensation | | | | | | |
| ----Salary Deferral Program . . . . | $0 | $0 | $ 20,071 | $ 20,071 | $      0 | $ 20,071 |
| Health & Welfare | | | | | | |
| ----Dental/COBRA . . . . . . . . . . | $0 | $0 | $      0 | $      0 | $ 2,233 | $ 2,233 |
| **Totals** . . . . . . . . . . . . . . . . . . . . . . | **$0** | **$0** | **$3,670,071** | **$3,670,071** | **$5,302,233** | **$5,322,304** |

B-168

EFIHMW00246662

Mr. Keglevic entered into an employment agreement that provides for certain payments and benefits upon the expiration or termination of the agreement under the following circumstances:

1.  In the event of Mr. Keglevic's death or disability:

    a.  a prorated annual incentive bonus for the year of termination; and

    b.  payment of employee benefits, including stock compensation, if any, to which Mr. Keglevic may be entitled.

2.  In the event of Mr. Keglevic's termination without cause or resignation for good reason:

    a.  for a termination occurring on or prior to the second anniversary of agreement date a lump sum payment equal to two times the sum of his annualized base salary and annual target bonus and for a termination occurring after the second anniversary of agreement date a lump sum payment equal to (i) two times of his annualized base salary, (ii) a prorated annual incentive bonus and (iii) a lump sum equal to the matching contributions which would have been made on his behalf to EFH Corp.'s Salary Deferral Program had Executive continued his participation in such plan for an additional twelve months;

    b.  for a termination occurring prior to July 1, 2013, the right (but not the obligation) to sell to EFH Corp. all (but not less than all) of his deferred shares for a purchase price of $3,200,000;

    c.  payment of employee benefits, including stock compensation, if any, to which Mr. Keglevic may be entitled; and

    d.  certain continuing health care and company benefits.

3.  In the event of Mr. Keglevic's termination without cause or resignation for good reason within 24 months following a change in control of EFH Corp.:

    a.  a lump sum payment equal to two times the sum of: (i) his annualized base salary (ii) his annual bonus target;

    b.  a prorated annual incentive bonus for the year of termination;

    c.  payment of employee benefits, including stock compensation, if any, to which Mr. Keglevic may be entitled;

    d.  certain continuing health care and company benefits; and

    e.  a tax gross-up payment to offset any excise tax which may result from the change in control payments.

B-169

EFIHMW00246663

### 3. Mr. Campbell

**Potential Payments to Mr. Campbell upon Termination (per employment agreement as of December 31, 2008)**

| Benefit | Voluntary | For Cause | Death | Disability | Without Cause Or For Good Reason | Without Cause Or For Good Reason In Connection With Change in Control |
|---|---|---|---|---|---|---|
| Cash Severance ................ | $ 0 | $ 0 | $ 0 | $ 0 | $2,100,000 | $2,100,000 |
| Executive Annual Incentive Plan ..... | $ 0 | $ 0 | 450,000 | $ 450,000 | $ 0 | $ 0 |
| Deferred Shares ................ | $2,500,000 | $2,500,000 | $2,500,000 | $2,500,000 | $2,500,000 | $2,500,000 |
| Retirement Benefits | | | | | | |
| —Supplemental Retirement Plan (1) ................. | $ 103,497 | $ 103,497 | $ 103,497 | $ 247,029 | $ 103,497 | $ 103,497 |
| Deferred Compensation | | | | | | |
| —Salary Deferral Program (2) ... | $ 70,278 | $ 70,278 | $ 70,278 | $ 70,278 | $ 70,278 | $ 70,278 |
| Health & Welfare | | | | | | |
| —Medical/COBRA ........... | $ 0 | $ 0 | $ 0 | $ 0 | 23,997 | 23,997 |
| —Dental/COBRA ........... | $ 0 | $ 0 | $ 0 | $ 0 | 2,233 | 2,233 |
| Totals ......................... | **$2,673,775** | **$2,673,775** | **$3,123,775** | **$3,267,307** | **$4,800,005** | **$4,800,005** |

(1)  Mr. Campbell's employment agreement entitles him to additional retirement compensation under the Supplemental Retirement Plan equal to the retirement benefits he would be entitled to if, during each of his first ten years of service with EFH Corp., he was credited with two years of service under the Supplemental Retirement Plan.

(2)  Mr. Campbell is fully vested in the company matching portion of the Salary Deferral Plan

Mr. Campbell entered into an employment agreement that provides for certain payments and benefits upon the expiration or termination of the agreement under the following circumstances:

1.    In the event of Mr. Campbell's death or disability:

    a.    a prorated annual incentive bonus for the year of termination; and

    b.    payment of employee benefits, including stock compensation, if any, to which Mr. Campbell may be entitled.

2.    In the event of Mr. Campbell's termination without cause or resignation for good reason:

    a.    a lump sum payment equal to two times the sum of: (i) his annualized base salary and (ii) his annual incentive target;

    b.    payment of employee benefits, including stock compensations, if any, to which Mr. Campbell may be entitled; and

    c.    certain continuing health care and company benefits.

3.    In the event of Mr. Campbell's termination without cause or resignation for good reason within 24 months following a change in control of EFH Corp.:

    a.    a lump sum payment equal to two times the sum of: (i) his annualized base salary and (ii) his annual bonus target;

    b.    payment of employee benefits, including stock compensation, if any, to which Mr. Campbell may be entitled;

    c.    certain continuing health care and company benefits; and

    d.    a tax gross-up payment to offset any excise tax which may result from the change in control payments.

B-170

Confidential

**4. Mr. Greene**

**Potential Payments to Mr. Greene upon Termination (per employment agreement as of December 31, 2008)**

| Benefit | Retirement | Voluntary | For Cause | Death | Disability | Without Cause Or For Good Reason | Without Cause Or For Good Reason In Connection With Change in Control |
|---|---|---|---|---|---|---|---|
| Cash Severance . . . . . . . . . . . . . . . . . | $        0 | $        0 | $        0 | $        0 | $        0 | $2,275,000 | $2,275,000 |
| Executive Annual Incentive Plan . . . | $        0 | $        0 | $        0 | $ 487,500 | $ 487,500 | $        0 | $        0 |
| —Supplemental Retirement Plan (1) . . . . . . . . . . . . . . . . | $4,301,851 | $4,301,851 | $4,301,851 | $3,974,507 | $3,781,904 | $4,301,851 | $4,301,851 |
| —Retiree Medical (2) . . . . . . . . | $    3,828 | $        0 | $        0 | $        0 | $        0 | $        0 | $        0 |
| Deferred Compensation —Salary Deferral Program . . . . | $ 671,595 | $ 671,595 | $ 671,595 | $ 671,595 | $ 671,595 | $ 671,595 | $ 671,595 |
| Health & Welfare —Medical/COBRA . . . . . . . . . . | $        0 | $        0 | $        0 | $        0 | $        0 | $   15,949 | $   15,949 |
| Other —Split-Dollar Life Insurance (3) . . . . . . . . . . . | $ 136,796 | $        0 | $        0 | $3,140,000 | $ 136,796 | $ 136,796 | $ 136,796 |
| Totals . . . . . . . . . . . . . . . . . . . . . . | **$5,114,070** | **$4,973,446** | **$4,973,446** | **$8,273,602** | **$5,077,795** | **$7,401,191** | **$7,401,191** |

(1) Mr. Greene is fully vested in all retirement benefits as disclosed in the Pension Benefits table.
(2) Amount reported is the annual subsidy provided by EFH Corp.
(3) Amount reported, other than death benefit, is the yearly premium and tax gross-up. Amount reported in the case of death is the death benefit payable by the insurance provider.

Mr. Greene entered into an employment agreement that provides for certain payments and benefits upon the expiration or termination of the agreement under the following circumstances:

1. In the event of Mr. Greene's death or disability:

   a. a prorated annual incentive bonus for the year of termination; and

   b. payment of employee benefits, including stock compensation, restricted stock units or deferred shares, if any, to which Mr. Greene may be entitled.

2. In the event of Mr. Greene's termination without cause or resignation for good reason:

   a. a lump sum payment equal to two times the sum of: (i) his annualized base salary and (ii) his annual incentive target;

   b. payment of employee benefits, including compensation, if any, to which Mr. Greene may be entitled; and

   c. certain continuing health care and company benefits.

3. In the event of Mr. Greene's termination without cause or resignation for good reason within 24 months following a change in control of EFH Corp.:

   a. a lump sum payment equal to two times the sum of: (1) his annualized base salary (2) his annual bonus target;

   b. payment of employee benefits, including stock compensation, if any, to which Mr. Greene may be entitled;

   c. certain continuing health care and company benefits; and

   d. a tax gross-up payment to offset any excise tax which may result from the change in control payments.

B-171

EFIHMW00246665

**5. Mr. Burke**

**Potential Payments to Mr. Burke upon Termination (per employment agreement as of December 31, 2008)**

| Benefit | Voluntary | For Cause | Death | Disability | Without Cause Or For Good Reason | Without Cause Or For Good Reason In Connection With Change in Control |
|---|---|---|---|---|---|---|
| Cash Severance . . . . . . . . . . . . . . . . . . | $ 0 | $ 0 | $ 0 | $ 0 | $2,100,000 | $2,100,000 |
| Executive Annual Incentive Plan . . . . . | $ 0 | $ 0 | $450,000 | $450,000 | $ 0 | $ 0 |
| Retirement Benefits | | | | | | |
| —Supplemental Retirement Plan . . . . . . . . . . . . . . . . . . . . | $46,159 | $46,159 | $ 53,036 | $210,706 | $ 46,159 | $ 46,159 |
| Deferred Compensation | | | | | | |
| —Salary Deferral Program . . . . . | $44,198 | $44,198 | $ 85,802 | $ 85,802 | $ 44,198 | $ 85,802 |
| Health & Welfare | | | | | | |
| —Medical/COBRA . . . . . . . . . . . | $ 0 | $ 0 | $ 0 | $ 0 | $ 23,906 | $ 23,906 |
| —Dental/COBRA . . . . . . . . . . . . | $ 0 | $ 0 | $ 0 | $ 0 | $ 2,233 | $ 2,233 |
| Totals . . . . . . . . . . . . . . . . . . . . . . . . | **$90,357** | **$90,357** | **$588,838** | **$746,508** | **$2,216,496** | **$2,258,100** |

Mr. Burke entered into an employment agreement that provides for certain payments and benefits upon the expiration or termination of the agreement under the following circumstances:

1. In the event of Mr. Burke's death or disability:

   a. a prorated annual incentive bonus for the year of termination; and

   b. payment of employee benefits, including stock compensation, if any, to which Mr. Burke may be entitled.

2. In the event of Mr. Burke's termination without cause or resignation for good reason:

   a. a lump sum payment equal to two times the sum of: (i) his annualized base salary and (ii) his annual incentive target;

   b. payment of employee benefits, including stock compensation, if any, to which Mr. Burke may be entitled; and

   c. certain continuing health care and company benefits.

3. In the event of Mr. Burke's termination without cause or resignation for good reason within 24 months following a change in control of EFH Corp.:

   a. a lump sum payment equal to two times the sum of: (i) his annualized base salary and (ii) his annual bonus target;

   b. payment of employee benefits, including stock compensation, if any, to which Mr. Burke may be entitled;

   c. certain continuing health care and company benefits; and

   d. a tax gross-up payment to offset any excise tax which may result from the change in control payments.

B-172

EFIHMW00246666

**PX 014**
**Page 948 of 1116**

**6. Mr. Walters**

**Potential Payments to Mr. Walters upon Termination (per employment agreement as of December 31, 2008)**

| Benefit | Voluntary | For Cause | Death | Disability | Without Cause Or For Good Reason | Without Cause Or For Good Reason In Connection With Change in Control |
|---|---|---|---|---|---|---|
| Cash Severance . . . . . . . . . . . . . . . . . . . . . | $0 | $0 | $       0 | $       0 | $2,012,500 | $2,012,500 |
| Executive Annual Incentive Plan . . . . . . . | $0 | $0 | $431,250 | $431,250 | $       0 | $       0 |
| Deferred Compensation |  |  |  |  |  |  |
| —Salary Deferral Program . . . . . . . . | $0 | $0 | $ 25,159 | $ 25,159 | $       0 | $ 25,159 |
| Health & Welfare |  |  |  |  |  |  |
| —Medical/COBRA  . . . . . . . . . . . . . | $0 | $0 | $       0 | $       0 | $ 23,906 | $ 23,906 |
| —Dental/COBRA  . . . . . . . . . . . . . | $0 | $0 | $       0 | $       0 | $ 2,233 | $ 2,233 |
| **Totals** . . . . . . . . . . . . . . . . . . . . . . . . . | **$0** | **$0** | **$456,409** | **$456,409** | **$2,038,639** | **$2,063,798** |

Mr. Walters entered into an employment agreement that provides for certain payments and benefits upon the expiration or termination of the agreement under the following circumstances:

1.  In the event of Mr. Walters' death or disability:

    a.  a prorated annual incentive bonus for the year of termination; and

    b.  payment of employee benefits, including stock compensation, if any, to which Mr. Walters may be entitled.

2.  In the event of Mr. Walters' termination without cause or resignation for good reason:

    a.  a lump sum payment equal to two times the sum of: (i) his annualized base salary and (ii) his annual incentive target;

    b.  payment of employee benefits, including stock compensation, if any, to which Mr. Walters may be entitled; and

    c.  certain continuing health care and company benefits.

3.  In the event of Mr. Walters' termination without cause or resignation for good reason within 24 months following a change in control of EFH Corp.:

    a.  a lump sum payment equal to two times the sum of: (i) his annualized base salary and (ii) his annual bonus target;

    b.  payment of employee benefits, including stock compensation, if any, to which Mr. Walters may be entitled;

    c.  certain continuing health care and company benefits; and

    d.  a tax gross-up payment to offset any excise tax which may result from the change in control payments.

B-173

Confidential

### 7. Mr. McFarland

**Potential Payments to Mr. McFarland upon Termination (per employment agreement as of December 31, 2008)**

| Benefit | Voluntary | For Cause | Death | Disability | Without Cause Or For Good Reason | Without Cause Or For Good Reason In Connection With Change in Control |
|---|---|---|---|---|---|---|
| Cash Severance . . . . . . . . . . . . . . . . . . . . . | $0 | $0 | $     0 | $     0 | $1,750,000 | $1,750,000 |
| Executive Annual Incentive Plan . . . . . . . | $0 | $0 | $375,000 | $375,000 | $     0 | $     0 |
| Vesting of Deferred Shares . . . . . . . . . . . | $0 | $0 | $500,000 | $500,000 | $  500,000 | $  500,000 |
| Health & Welfare | | | | | | |
| ——Medical/COBRA . . . . . . . . . . . . . | $0 | $0 | $     0 | $     0 | $   23,906 | $   23,906 |
| ——Dental/COBRA . . . . . . . . . . . . . . | $0 | $0 | $     0 | $     0 | $    2,233 | $    2,233 |
| Totals . . . . . . . . . . . . . . . . . . . . . . . . . . | **$0** | **$0** | **$875,000** | **$875,000** | **$2,276,139** | **$2,276,139** |

Mr. McFarland entered into an employment agreement that provides for certain payments and benefits upon the expiration or termination of the agreement under the following circumstances:

1. In the event of Mr. McFarland's death or disability:

   a. a prorated annual incentive bonus for the year of termination; and

   b. payment of employee benefits, including stock compensation, if any, to which Mr. McFarland may be entitled.

2. In the event of Mr. McFarland's termination without cause or resignation for good reason:

   a. a lump sum payment equal to two times the sum of: (i) his annualized base salary and (ii) his annual incentive target;

   b. payment of employee benefits, including stock compensation, if any, to which Mr. McFarland may be entitled; and

   certain continuing health care and company benefits.

3. In the event of Mr. McFarland's termination without cause or resignation for good reason within 24 months following a change in control of EFH Corp.:

   a. a lump sum payment equal to two times the sum of: (i) his annualized base salary and (ii) his annual bonus target;

   b. payment of employee benefits, including stock compensation, if any, to which Mr. McFarland may be entitled;

   c. certain continuing health care and company benefits; and

   d. a tax gross-up payment to offset any excise tax which may result from the change in control payments.

*Excise Tax Gross-Ups*

**Executive Officers Covered by Employment Agreements:** Pursuant to their employment agreements, if any of our Named Executive Officers would be subject to the imposition of the excise tax imposed by Section 4999 of the Code, related to the executive's employment, but the imposition of such tax could be avoided by approval of our shareholders as described in Section 280G(b)(5)(B) of the Code, then such executive may cause EFH Corp. to seek such approval, in which case EFH Corp. will use its reasonable best efforts to cause

B-174

EFIHMW00246668

such approval to be obtained and such executive will cooperate and execute such waivers as may be necessary so that such approval avoids imposition of any excise tax under Section 4999. If such executive fails to cause EFH Corp. to seek such approval or fails to cooperate and execute the waivers necessary in the approval process, such executive shall not be entitled to any gross-up payment for any resulting tax under Section 4999.

### Recent Compensation Developments

On October 29, 2009, the O&C Committee of the Board of Directors approved several changes in EFH Corp.'s compensation program for its owner-operators (i.e. employees that either own common stock of EFH Corp. or have options to purchase shares of EFH Corp.'s common stock). The O&C Committee did so to provide incentives for retention and performance, reflect the effects of the recent economic dislocation and maintain alignment with the Sponsor Group that controls EFH Corp.

The compensation changes for EFH Corp.'s Named Executive Officers are described below.

### Base Salary

The O&C Committee approved an increase in the base salary for certain of its Named Executive Officers as follows: Mr. David Campbell's, Luminant's Chief Executive Officer, base salary will increase to $700,000; Mr. Paul Keglevic's, EFH Corp.'s Chief Financial Officer, base salary will increase to $650,000; Mr. Mac McFarland's, Luminant's Chief Commercial Officer, base salary will increase to $600,000; and Mr. Robert Walters', EFH Corp.'s General Counsel, base salary will increase to $600,000. These increases were made after considering relevant market compensation data and will be effective January 1, 2010.

### Executive Annual Incentive Plan

The O&C Committee approved an increase in the annual target award under the Energy Future Holdings Corp. Executive Annual Incentive Plan, which is computed as a percentage of base salary, from 75% to 85% for Messrs. Keglevic, Campbell, McFarland, Walters and James Burke, the Chief Executive Officer of TXU Energy. These increases will be effective for the 2010 Executive Annual Incentive Plan award period.

### Long Term Incentive

The O&C Committee approved the adoption of a new retention incentive award to be included by amendment in the Named Executive Officers' employment agreements ("Retention Award"). Under the terms of the Retention Award, each of Messrs. Keglevic, Campbell, McFarland, Burke and Walters (collectively, the "Executive Officers") will be entitled to receive on September 30, 2012, to the extent such Executive Officer remains employed by EFH Corp. on such date (with customary exceptions for death, disability and leaving for "good reason" or termination without "cause"), an additional one-time, lump-sum cash payment equal to 75% of the aggregate Executive Annual Incentive Plan award received by such executive officer for fiscal years 2009, 2010 and 2011.

B-175

EFIHMW00246669

*Stock Options*

The O&C Committee approved the grant of new stock options to each of the Executive Officers under the 2007 Stock Incentive Plan with a strike price of $3.50 per share (the fair market value of each share on the date of grant) as set forth in the table below. Certain of these stock options will vest 100% on September 30, 2014 ("Cliff-Vested Options") and certain of these stock options will vest 20% per year over a five-year period beginning September 30, 2009 ("Time-Vested Options"). In connection with the grant of these new stock options, each Executive Officer will surrender to EFH Corp. a portion of their currently outstanding unvested performance-related stock options as set forth in the table below.

| Executive Officer | Cliff-Vested Options | Time-Vested Options | Surrendered Options |
|---|---|---|---|
| David Campbell | 800,000 | 800,000 | 800,000 |
| Paul Keglevic | 500,000 | 500,000 | 500,000 |
| James Burke | 490,000 | 200,000 | 490,000 |
| Mac McFarland | 400,000 | 400,000 | 400,000 |
| Robert Walters | 400,000 | 400,000 | 400,000 |

The table below sets forth information regarding the aggregate compensation paid to the members of the board of directors during the fiscal year ended December 31, 2008. Directors who are officers, or former officers, of Energy Future Holdings Corp. do not receive any fees for service as a director. Energy Future Holdings Corp. reimburses some directors for certain reasonable expenses incurred in connection with their services as directors.

### Director Compensation

| Name | Fees Earned or Paid in Cash ($) | Stock Awards ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|
| Arcilia C. Acosta (1)(2) | 75,000 | 100,000 | n/a | 175,000 |
| David Bonderman (3) | n/a | n/a | n/a | n/a |
| Donald L. Evans (4) | 2,000,000 | 550,000 | 0 | 2,550,000 |
| Thomas D. Ferguson (3)(7) | n/a | n/a | n/a | n/a |
| Frederick M. Goltz (3) | n/a | n/a | n/a | n/a |
| James R. Huffines (2)(5)(6) | 150,000 | 700,000 | 225,000 | 1,075,000 |
| Scott Lebovitz (3) | n/a | n/a | n/a | n/a |
| Jeffrey Liaw (3) | n/a | n/a | n/a | n/a |
| Marc S. Lipschultz (3) | n/a | n/a | n/a | n/a |
| Michael MacDougall (3) | n/a | n/a | n/a | n/a |
| Lyndon L. Olson, Jr. (2)(5)(6) | 150,000 | 700,000 | 225,000 | 1,075,000 |
| Kenneth Pontarelli (3) | n/a | n/a | n/a | n/a |
| William K. Reilly (2)(6) | 150,000 | 700,000 | 0 | 850,000 |
| Jonathan D. Smidt (3) | n/a | n/a | n/a | n/a |
| John F. Young | n/a | n/a | n/a | n/a |
| William J. Young (3)(7) | n/a | n/a | n/a | n/a |
| Kneeland Youngblood (2) | 150,000 | 100,000 | 0 | 250,000 |

(1) Ms. Acosta joined the Board in May 2008.

(2) Ms. Acosta and Messrs. Huffines, Olson, Reilly and Youngblood receive $150,000 annually and an annual equity award valued at $100,000 for their service as a director.

(3) Directors who are employed by a member of the Sponsor Group (or their respective affiliates) do not receive compensation for service as directors.

(4) In May 2008, EFH Corp. entered into a consulting agreement with Mr. Evans, pursuant to which he receives the following compensation:

B-176

Confidential

1. An annual fee of $2,000,000;
2. 200,000 shares of restricted stock, of which 100,000 shares vested during 2008, 75,000 shares at $5.00 per share and 25,000 shares at $7.00 per share; and
3. Options to purchase 600,000 shares of EFH Corp.'s common stock, at an exercise price of $5.00 per share.

The consulting agreement has a term running through October 10, 2009, subject to extension upon mutual agreement of up to three additional years.

(5) In December 2007, EFH Corp. entered into consulting agreements with Messrs. Huffines and Olson with terms of up to five years. As compensation for their consulting services, they receive annual fees of $225,000, which fees are in addition to their standard director compensation arrangements described above. The amounts earned pursuant to these consulting agreements in 2008 are reflected above in the "All Other Compensation" column. In connection with the completion of the exchange offers, EFH Corp. expects that these consulting agreements will be terminated and that in connection with the termination of such consulting agreements, EFH Corp.'s board of directors will approve an annual payment of $225,000 to each of Messrs. Huffines and Olson for their services as Chairman of the Audit Committee and Chairman of the Governance and Public Affairs Committee, respectively.

(6) In 2008, Messrs. Huffines, Olson and Reilly were each granted 120,000 shares of EFH Corp.'s common stock at a price of $5.00 per share.

(7) Mr. Young left the Board in December 2008 and Mr. Ferguson joined the Board in December 2008.

In the second quarter of 2008, Messrs. Evans, Huffines, Olson, Reilly and Youngblood purchased shares of EFH Corp.'s common stock at a price of $5.00 per share. In August 2008, Ms. Acosta purchased shares of EFH Corp.'s common stock at a price of $7.00 per share. In connection with these purchases and with their grants of equity (see footnotes 2 and 6), these directors entered into stockholder agreements and sale participation agreements with EFH Corp. The stockholder agreements create certain rights and restrictions on such equity, including transfer restrictions and tag-along, drag-along, put, call and registration rights in certain circumstances. Pursuant to the terms of the sale participation agreements, shares of EFH Corp.'s common stock held by these individuals are subject to tag-along and drag-along rights in the event of a sale by the Sponsor Group of shares of EFH Corp.'s common stock held by the Sponsor Group.

Directors and their spouses are invited to attend EFH Corp.'s strategy meeting. As part of the events associated with this meeting, EFH Corp. pays for spousal travel, lodging and meals and for the directors and their spouses to participate in various recreational events and entertainment. For 2008, the aggregate incremental cost to EFH Corp. for such travel, lodging, events and entertainment was less than $10,000 for each director.

B-177

Confidential

## SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS

The following table presents information concerning stock-based compensation plans as of December 31, 2008. (See Note 23 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus.)

| | (a)<br>Number of securities to be issued upon exercise of outstanding options, warrants and rights | (b)<br>Weighted-average exercise price of outstanding options, warrants and rights | (c)<br>Number of securities remaining available for future issuance under equity compensation plans, excluding securities reflected in column (a) |
|---|---|---|---|
| Equity compensation plans approved by security holders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | $ — | — |
| Equity compensation plans not approved by security holders . . . . . . . . . . . . . . . . . . . . . . . | 56,535,286 | $4.65 | 15,464,714 |
| | 56,535,286 | $4.65 | 15,464,714 |

Note:  Includes 52.6 million stock options with an exercise price of $5.00 per option.

Includes 3.9 million vested and unvested restricted shares, deferred shares, as well as stock granted to directors as part of their compensation plan.

Excluding the 3.9 million awards, the weighted average exercise price of outstanding options, warrants, and rights would be $5.00.

### Beneficial Ownership of Common Stock of Energy Future Holdings Corp.

The following table lists the number of shares of common stock of EFH Corp. beneficially owned by each director and certain current and former executive officers of EFH Corp. and the holders of more than 5% of EFH Corp.'s common stock as of November 3, 2009.

| Name | Number of Shares Beneficially Owned | Percent of Class |
|---|---|---|
| Texas Energy Future Holdings Limited Partnership (1) . . . . . . . . . . . . . . . . . . . . . . . | 1,657,600,000 | 98.51% |
| Arcilia C. Acosta (2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 70,000 | * |
| David Bonderman (3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,657,600,000 | 98.51% |
| Donald L. Evans (4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,000,000 | * |
| Thomas D. Ferguson (5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,657,600,000 | 98.51% |
| Frederick M. Goltz (6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,657,600,000 | 98.51% |
| James R. Huffines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 360,000 | * |
| Scott Lebovitz (5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,657,600,000 | 98.51% |
| Jeffrey Liaw (3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,657,600,000 | 98.51% |
| Marc S. Lipschultz (6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,657,600,000 | 98.51% |
| Michael MacDougall (3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,657,600,000 | 98.51% |
| Lyndon L. Olson, Jr. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 220,000 | * |
| Kenneth Pontarelli (5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,657,600,000 | 98.51% |
| William K. Reilly . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 200,000 | * |
| Jonathan D. Smidt (6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,657,600,000 | 98.51% |
| John F. Young (7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,450,000 | * |
| Kneeland Youngblood . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 140,000 | * |

B-178

| Name | Number of Shares Beneficially Owned | Percent of Class |
|---|---|---|
| Paul M. Keglevic (8) | 725,000 | * |
| David A. Campbell (9) | 1,300,000 | * |
| M.S. Greene (10) | 1,800,000 | * |
| James A. Burke (11) | 1,185,000 | * |
| Robert C. Walters (12) | 400,000 | * |
| M.A. McFarland (13) | 500,000 | * |
| David P. Poole | ——— | ——— |
| All directors and current executive officers as a group (26 persons) | 1,670,879,000 | 99.30% |

* Less than 1%.

(1) Texas Energy Future Holdings Limited Partnership ("Texas Holdings") beneficially owns 1,657,600,000 shares of EFH. The sole general partner of Texas Holdings is Texas Energy Future Capital Holdings LLC ("Texas Capital"), which, pursuant to the Amended and Restated Limited Partnership Agreement of Texas Holdings, has the right to vote all of the EFH Corp. shares owned by Texas Holdings. The address of both Texas Holdings and Texas Capital is 301 Commerce Street, Suite 3300, Fort Worth, Texas 76102.

(2) Shares held in a family limited partnership, ACA Family LP.

(3) Includes the 1,657,600,000 shares owned by Texas Holdings, over which TPG Partners V, L.P., TPG Partners IV, L.P., TPG FOF V-A, L.P. and TPG FOF V-B, L.P. (the "TPG Entities") may be deemed, as a result of their ownership of 27.01% of Texas Capital's outstanding units and certain provisions of Texas Capital's Amended and Restated Limited Liability Company Agreement ("TC LLC Agreement"), to have shared voting or dispositive power. The ultimate general partners of the TPG Entities are TPG Advisors IV, Inc. and TPG Advisors V, Inc. David Bonderman and James Coulter are the sole shareholders and directors of TPG Advisors IV Inc. and TPG Advisors V Inc., and therefore, Messrs. Bonderman and Coulter, TPG Advisors IV Inc. and TPG Advisors V Inc. may each be deemed to beneficially own the shares held by the TPG Entities. Messrs. Bonderman, Liaw and MacDougall are managers of Texas Capital. By virtue of their position in relation to Texas Capital and the TPG Entities, Messrs. Bonderman, Liaw and MacDougall may be deemed to have beneficial ownership with respect to the shares of EFH Corp. common stock owned by Texas Holdings. Each of Messrs. Liaw and MacDougall disclaims beneficial ownership of such shares except to the extent of their pecuniary interest in those shares. The address of each entity and individual listed in this footnote is 301 Commerce Street, Suite 3300, Fort Worth, Texas 76102.

(4) Includes 600,000 shares issuable upon exercise of vested options.

(5) Includes the 1,657,600,000 shares owned by Texas Holdings, over which GS Capital Partners VI Fund, L.P., GSCP VI Offshore TXU Holdings, L.P., GSCP VI Germany TXU Holdings, L.P., GS Capital Partners VI Parallel, L.P., GS Global Infrastructure Partners I, L.P., GS Infrastructure Offshore TXU Holdings, L.P. (GSIP International Fund), GS Institutional Infrastructure Partners I, L.P., Goldman Sachs TXU Investors L.P. and Goldman Sachs TXU Investors Offshore Holdings, L.P. (the "Goldman Entities") may be deemed, as a result of their ownership of 27.02% of Texas Capital's outstanding units and certain provision of the TC LLC Agreement, to have shared voting or dispositive power. Affiliates of The Goldman Sachs Group, Inc. ("Goldman Sachs") are the general partner, managing general partner or investment manager of each of the Goldman Entities, and each of the Goldman Entities shares voting and investment power with certain of their respective affiliates. Each of Goldman Sachs and the Goldman Entities disclaims beneficial ownership of such shares of common stock except to the extent of its pecuniary interest therein. Messrs. Ferguson, Lebovitz and Pontarelli are managers of Texas Capital and executives with affiliates of Goldman Sachs. By virtue of their position in relation to Texas Capital and the Goldman Entities, Messrs. Ferguson, Lebovitz and Pontarelli may be deemed to have beneficial ownership with respect to the shares of EFH Corp. common stock owned by Texas Holdings. Each of Messrs. Ferguson, Lebovitz and Pontarelli disclaims beneficial ownership of such shares except to the extent of their pecuniary interest in those shares. The address of each entity and individual listed in this footnote is c/o Goldman, Sachs & Co., 85 Broad Street, New York, New York 10004.

B-179

EFIHMW00246673

(6)   Includes the 1,657,600,000 shares owned by Texas Holdings, over which KKR 2006 Fund L.P., KKR PEI
       Investments, L.P., KKR Partners III, L.P., KKR North American Co-Invest Fund I L.P. and TEF TFO
       Co-Invest, LP (the "KKR Entities") may be deemed, as a result of their ownership of 37.05% of Texas
       Capital's outstanding units and certain provision of the TC LLC Agreement, to have shared voting or
       dispositive power. The KKR Entities disclaim beneficial ownership of any shares of our common stock in
       which they do not have a pecuniary interest. Messrs. Goltz, Lipschultz and Smidt are managers of Texas
       Capital and executives of Kohlberg Kravis Roberts & Co. L.P. By virtue of their position in relation to
       Texas Capital and the KKR Entities, Messrs. Goltz, Lipschultz and Smidt may be deemed to have beneficial
       ownership with respect to the shares of EFH Corp. common stock owned by Texas Holdings. Each of
       Messrs. Goltz, Lipschultz and Smidt disclaims beneficial ownership of such shares except to the extent of
       their pecuniary interest in those shares. The address of each entity and individual listed in this footnote is c/o
       Kohlberg Kravis Roberts & Co. L.P., 9 West 57th Street, Suite 4200, New York, New York 10019.
(7)   Includes 2,250,000 shares issuable upon exercise of vested options. Also includes 600,000 restricted stock
       units that fully vested on the date of Mr. Young's employment and which are payable in shares of EFH
       Corp. common stock on the second anniversary of the grant date unless Mr. Young terminates his
       employment without good reason prior to that anniversary, in which case the restricted stock units would be
       forfeited.
(8)   Includes 225,000 deferred shares which, in accordance with the terms of the Deferred Share Agreement,
       will be settled in shares of EFH Corp. common stock upon the earlier of termination of employment or a
       change in control of EFH Corp. and 500,000 shares issuable upon exercise of vested options.
(9)   Includes 500,000 deferred shares which, in accordance with the terms of the Deferred Share Agreement,
       will be settled in shares of EFH Corp. common stock upon the earlier of termination of employment or a
       change in control of EFH Corp. and 800,000 shares issuable upon exercise of vested options.
(10)  Includes 600,000 deferred shares which, in accordance with the terms of the Deferred Share Agreement,
       will be settled in shares of EFH Corp. common stock upon the earlier of termination of employment or a
       change in control of EFH Corp. and 1,200,000 shares issuable upon exercise of vested options.
(11)  Includes 450,000 deferred shares which, in accordance with the terms of the Deferred Share Agreement,
       will be settled in shares of EFH Corp. common stock upon the earlier of termination of employment or a
       change in control of EFH Corp. and 735,000 shares issuable upon exercise of vested options.
(12)  Includes 400,000 shares issuable upon exercise of vested options.
(13)  Includes 100,000 deferred shares which, in accordance with the terms of the Deferred Share Agreement,
       will be settled in shares of EFH Corp. common stock upon the earlier of termination of employment or a
       change in control of EFH Corp. and 400,000 shares issuable upon exercise of vested options.

Confidential

## CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS, DIRECTOR INDEPENDENCE

**Policies and Procedures Relating to Related Party Transactions**

The Board has adopted a policy regarding related person transactions. Under this policy, a related person transaction shall be consummated or shall continue only if:

1. the Audit Committee of the Board approves or ratifies such transaction in accordance with the policy and if the transaction is on terms comparable to those that could be obtained in arm's length dealings with an unrelated third party;

2. the transaction is approved by the disinterested members of the Board or the Executive Committee; or

3. the transaction involves compensation approved by the Organization and Compensation Committee of the Board.

For purposes of this policy, the term "related person" includes EFH Corp.'s directors, executive officers, 5% shareholders and their immediate family members. "Immediate family members" means any child, stepchild, parent, stepparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law or sister-in-law or any person (other than a tenant or employee) sharing the household of a director, executive officer or 5% shareholder.

A "related person transaction" is a transaction between EFH Corp. or its subsidiaries and a related person, other than the types of transactions described below, which are deemed to be pre-approved by the Audit Committee of the Board:

1. any compensation paid to a director if the compensation is required to be reported under Item 402 of Regulation S-K of the Securities Act;

2. any transaction with another company at which a related person's only relationship is as an employee (other than an executive officer), director or beneficial owner of less than 10% of that company's ownership interests;

3. any charitable contribution, grant or endowment by EFH Corp. to a charitable organization, foundation or university at which a related person's only relationship is as an employee (other than an executive officer) or director;

4. transactions where the related person's interest arises solely from the ownership of EFH Corp.'s equity securities and all holders of that class of equity securities received the same benefit on a pro rata basis;

5. transactions involving a related party where the rates or charges involved are determined by competitive bids;

6. any transaction with a related party involving the rendering of services as a common or contract carrier, or public utility, as rates or charges fixed in conformity with law or governmental authority;

7. any transaction with a related party involving services as a bank depositary of funds, transfer agent, registrar, trustee under a trust indenture, or similar service;

8. transactions available to all employees or customers generally (unless required to be disclosed under Item 404 of Regulation S-K of the Securities Act, if applicable);

9. transactions involving less than $100,000 when aggregated with all similar transactions;

10. transactions between EFH Corp. and its subsidiaries or between subsidiaries of EFH Corp.;

11. transactions not required to be disclosed under Item 404; and

12. open market purchases of EFH Corp.'s or its subsidiaries' debt or equity securities and interest payments on such debt.

B-181

Confidential

The Board has determined that it is appropriate for the Audit Committee of the Board to review and approve or ratify related person transactions. Accordingly, at least annually, management reviews related person transactions to be entered into by EFH Corp. or its subsidiaries, if any. After review, the Audit Committee of the Board approves/ratifies or disapproves such transactions. Management updates the Audit Committee of the Board as to any material changes to such related person transactions. In unusual circumstances, EFH Corp. or its subsidiaries may enter into related person transactions in advance of receiving approval, provided that such related person transactions are reviewed and ratified as soon as reasonably practicable by the Audit Committee of the Board. If the Audit Committee of the Board determines not to ratify such transactions, EFH Corp. shall make all reasonable efforts to cancel or otherwise terminate such transactions.

The related person transactions described below under the heading "Business Affiliations," were ratified by the Audit Committee of the Board pursuant to the policy described above. All other related person transactions were approved prior to the Board's adoption of this policy, but were approved by either the Board or its Executive Committee. Transactions described below under "—Related Person Transactions—Transactions with Sponsor Affiliates" are not related person transactions under the EFH Corp. policy because they are not with a director, executive officer, 5% shareholder or any of their immediate family members, but are described in the interest of greater disclosure.

## Related Person Transactions

### *Limited Partnership Agreement of Texas Energy Future Holdings Limited Partnership; Limited Liability Company Agreement of Texas Energy Future Capital Holdings LLC*

The Sponsor Group and certain investors who agreed to co-invest with the Sponsor Group or through a vehicle jointly controlled by the Sponsor Group to provide equity financing for the merger ("Co-Investors"), entered into (i) a limited partnership agreement (the "LP Agreement") in respect of EFH Corp.'s parent company, Texas Holdings and (ii) the TC LLC Agreement in respect of Texas Holdings' sole general partner, Texas Capital. The LP Agreement provides that Texas Capital has the right to vote or execute consents with respect to any shares of EFH Corp.'s common stock owned by Texas Holdings. The TC LLC Agreement and LP Agreement contain agreements among the parties with respect to the election of EFH Corp.'s directors, restrictions on the issuance or transfer of interests in EFH Corp., including tag-along rights and drag-along rights, and other corporate governance provisions (including the right to approve various corporate actions).

The TC LLC Agreement provides that Texas Capital and its members will take all action required to ensure that the managers of Texas Capital are also members of EFH Corp.'s Board of Directors. Pursuant to the TC LLC Agreement each of (i) KKR 2006 Fund L.P. and affiliated investment funds, (ii) TPG Partners V, L.P. and affiliated investment funds and (iii) certain funds affiliated with Goldman Sachs, has the right to designate three managers of Texas Capital. These rights are subject to maintenance of certain investment levels in Texas Holdings.

### *Registration Rights Agreement*

The Sponsor Group and the Co-Investors entered into a registration rights agreement with EFH Corp. upon completion of the Merger. Pursuant to this agreement, in certain circumstances, the Sponsor Group can cause EFH Corp. to register shares of EFH Corp.'s common stock owned directly or indirectly by them under the Securities Act. In certain circumstances, the Sponsor Group and the Co-Investors are also entitled to participate on a pro rata basis in any registration of EFH Corp.'s common stock under the Securities Act that it may undertake. In January 2008, John Young became a party to this agreement. In 2008, Ms. Acosta and Messrs. Evans, Huffines, Olson, Reilly and Youngblood, each of whom are members of our Board, and Messrs. Greene, Campbell, Walters, McCall, Burke, Keglevic and McFarland, each of whom are executive officers of EFH Corp., became parties to this agreement.

B-182

Confidential

EFIHMW00246676

**PX 014**
**Page 958 of 1116**

*Management Services Agreement*

In October 2007, in connection with the Merger, the Sponsor Group and Lehman Brothers Inc. entered into a management agreement with EFH Corp. (the "Management Agreement"), pursuant to which affiliates of the Sponsor Group will provide management, consulting, financial and other advisory services to EFH Corp. Pursuant to the Management Agreement, affiliates of the Sponsor Group are entitled to receive an aggregate annual management fee of $35 million, which amount will increase 2% annually, and reimbursement of out-of-pocket expenses incurred in connection with the provision of services pursuant to the Management Agreement. The Management Agreement will continue in effect from year to year, unless terminated upon a change of control of EFH Corp. or in connection with an initial public offering of EFH Corp. or if the parties thereto mutually agree to terminate the Management Agreement. Pursuant to the Management Agreement, affiliates of the Sponsor Group and Lehman Brothers Inc. were paid transaction fees of $300 million for certain services provided in connection with the Merger and related transactions. In addition, the Management Agreement provides that the Sponsor Group will be entitled to receive a fee equal to a percentage of the gross transaction value in connection with certain subsequent financing, acquisition, disposition, merger combination and change of control transactions, as well as a termination fee based on the net present value of future payment obligations under the Management Agreement in the event of an initial public offering or under certain other circumstances. Under terms of the Management Agreement, EFH Corp. paid $35 million, inclusive of expenses, to the Sponsor Group during 2008.

*Indemnification Agreement*

Concurrently with entering into the Management Agreement, the Sponsor Group, Texas Holdings and EFH Corp. entered into an indemnification agreement (the "Indemnification Agreement"), pursuant to which EFH Corp. and Texas Holdings agree to indemnify the Sponsor Group and their affiliates against any claims relating to (i) certain securities and financing transactions relating to the Merger, (ii) the performance of transaction services pursuant to the Management Agreement, (iii) actions or failures to act by EFH Corp., Texas Holdings, Texas Capital or their subsidiaries or affiliates (collectively, the "Company Group"), (iv) service as an officer or director of, or at the request of, any member of the Company Group, and (v) any breach or alleged breach of fiduciary duty as a director or officer of any member of the Company Group.

*Sale Participation Agreement*

Ms. Acosta and Messrs. Evans, Huffines, Olson, Reilly and Youngblood, each of whom are members of our Board, and each of our executive officers have entered into sale participation agreements with EFH Corp. Pursuant to the terms of these agreements, among other things, shares of EFH Corp.'s common stock held by these individuals are subject to tag-along and drag-along rights in the event of a sale by the Sponsor Group of shares of EFH Corp.'s common stock held by the Sponsor Group.

*Certain Charter Provisions*

EFH Corp.'s restated certificate of formation contains provisions limiting directors' obligations in respect of corporate opportunities.

*Management Stockholders' Agreement*

Subject to a management stockholders' agreement, certain members of management, including EFH Corp.'s executive officers, along with other members of management, elected to invest in EFH Corp. by contributing cash or common stock, or a combination of both, to EFH Corp. prior to or following the Merger and receiving common stock in EFH Corp. in exchange therefore. The net aggregate amount of this investment as of August 31, 2009 is approximately $39.3 million. The management stockholders' agreement creates certain rights and restrictions on these shares of common stock, including transfer restrictions and tag-along, drag-along, put, call and registration rights in certain circumstances.

B-183

Confidential

*Director Stockholders' Agreement*

In the second and third quarters of 2008, certain members of our Board entered into a stockholders' agreement with EFH Corp. See "Execution Compensation—Director Compensation."

*Business Affiliations*

Mr. Olson, a member of our Board, has an ownership interest in two companies with which Oncor does business. These companies are Texas Meter and Device Company ("TMD") and Metrum Technologies LLC ("Metrum"). Mr. Olson and his brother collectively directly own approximately 24% of TMD and indirectly own approximately 19% of Metrum. Both entities are majority owned by their chief executive officer. In 2008, Oncor paid TMD approximately $0.9 million and paid Metrum approximately $2.0 million. Through August 31, 2009, Oncor paid TMD approximately $0.9 million and paid Metrum approximately $0.1 million during 2009. TMD tests Oncor's high voltage personal protective equipment. Metrum provides Oncor with cellular-based wireless communications equipment for its meters. Oncor is Metrum's largest customer. The business relationships with both TMD and Metrum commenced several years prior to Mr. Olson joining EFH Corp.'s Board.

*Transactions with Sponsor Affiliates*

At the closing of the Merger, TCEH entered into the TCEH Senior Secured Facilities and Oncor entered into a revolving credit facility, each with syndicates of financial institutions and other lenders. These syndicates included affiliates of GS Capital Partners. These transactions were approved by the Board of Directors.

Affiliates of GS Capital Partners have from time to time engaged in commercial banking and financial advisory transactions with EFH Corp. in the normal course of business. Affiliates of Goldman Sachs & Co. are party to certain commodity and interest rate hedging transactions with EFH Corp. in the normal course of business.

From time to time affiliates of the Sponsor Group may acquire debt or debt securities issued by EFH Corp. in open market transactions or through loan syndications.

*Director Independence*

Though not formally considered by the Board of Directors because EFH Corp.'s common stock is not currently registered with the SEC or traded on any national securities exchange, based upon the listing standards for issuers of equity securities of the New York Stock Exchange, the national securities exchange upon which EFH Corp.'s common stock was traded prior to the Merger, only Ms. Acosta and Mr. Youngblood would be considered independent. Because of their relationships with the Sponsor Group or with EFH Corp. directly, none of the other directors would be considered independent under the New York Stock Exchange's independence requirements for issuers of equity securities. See "Certain Relationships and Related Party Transactions, Director Independence" and "Executive Compensation—Director Compensation." Accordingly, EFH Corp. believes that Ms. Acosta is the only member of the Organization and Compensation Committee who would meet the New York Stock Exchange's independence requirements for issuers of equity securities. EFH Corp. believes that none of the members of EFH Corp.'s Governance and Public Affairs Committee would meet the New York Stock Exchange's independence requirements for issuers of equity securities. Under the New York Stock Exchange's audit committee independence requirements for issuers of debt securities, which will apply to EFH Corp. upon completion of the exchange offers, Messrs. Huffines and Youngblood and Ms. Acosta, who will constitute all members of the Audit Committee effective upon completion of the exchange offers, would be considered independent.

B-184

Confidential

## ANNEX C—INFORMATION RELATING TO EFIH AND EFIH FINANCE

**Capitalized terms used in this Annex C and not
otherwise defined herein have the meanings ascribed to them in Annex A to this Prospectus**

### BUSINESS

EFIH is a direct, wholly-owned subsidiary of EFH Corp. and a Dallas, Texas-based holding company. EFIH Finance is a direct, wholly-owned subsidiary of EFIH, and does not conduct any business operations independent of EFIH. The financial statements of EFIH reflect almost entirely the operations of its indirect, majority (approximately 80%) owned subsidiary, Oncor, a Delaware limited liability company. Therefore, the business and strategy of Oncor is discussed below as it is representative of essentially all of the operations of EFIH and EFIH Finance. If New EFIH Senior Secured Notes are issued in the exchange offers, EFIH will file annual, quarterly and current reports and other information with the Securities and Exchange Commission.

### Oncor Business and Strategy

Oncor is a regulated electricity transmission and distribution company that provides the essential service of delivering electricity safely, reliably and economically to end-use consumers through its distribution systems, as well as providing transmission grid connections to merchant generation plants and interconnections to other transmission grids in Texas. Oncor is a direct subsidiary of Oncor Holdings, which is a direct, wholly-owned subsidiary of EFIH, a direct, wholly-owned subsidiary of EFH Corp. Oncor Holdings owns 80.033% of Oncor's membership interests, Texas Transmission owns 19.75% of Oncor's membership interests and certain members of Oncor's management and board of directors indirectly beneficially own the remaining membership interests of Oncor. Oncor is a limited liability company organized under the laws of the State of Delaware, formed in 2007 as the successor entity to Oncor Electric Delivery Company, formerly known as TXU Electric Delivery Company, a corporation formed under the laws of the State of Texas in 2001.

Oncor's transmission and distribution assets are located principally in the north-central, eastern and western parts of Texas. This territory has an estimated population in excess of seven million, about one-third of the population of Texas, and comprises 92 counties and over 370 incorporated municipalities, including Dallas/Fort Worth and surrounding suburbs, as well as Waco, Wichita Falls, Odessa, Midland, Tyler and Killeen. Oncor is not a seller of electricity, nor does it purchase electricity for resale. It provides transmission services to other electricity distribution companies, cooperatives and municipalities. It provides distribution services to REPs, which sell electricity to retail customers. Most of Oncor's power lines have been constructed over lands of others pursuant to easements or along public highways, streets and rights-of-way as permitted by law. Oncor's transmission and distribution rates are regulated by the PUCT. Oncor is managed as an integrated business; consequently, there are no reportable segments.

Oncor operates the largest transmission and distribution system in Texas, delivering electricity to approximately three million homes and businesses and operating more than 117,000 miles of transmission and distribution lines in Texas. At September 30, 2009, Oncor had approximately 3,800 full-time employees, including approximately 700 in a collective bargaining unit.

EFH Corp. and Oncor have implemented certain structural and operational "ring-fencing" measures based on commitments made by Texas Holdings and Oncor to the PUCT that are intended to further separate Oncor from Texas Holdings and its other subsidiaries. These measures also serve to mitigate Oncor's credit exposure to those entities and to reduce the risk that the assets and liabilities of Oncor would be substantively consolidated with the assets and liabilities of Texas Holdings or any of its other subsidiaries in the event of a bankruptcy of one or more of those entities. See "The Transactions—Ring-Fencing" included elsewhere in this Prospectus for a description of the material features of these "ring-fencing" measures.

C-1

EFIHMW00246679

**PX 014
Page 961 of 1116**

With the closing of the Merger, on October 10, 2007, EFH Corp. became a wholly-owned subsidiary of Texas Holdings, a Delaware limited partnership controlled by the Sponsor Group. On November 5, 2008, Oncor sold equity interests resulting in an unaffiliated investor group acquiring a 19.75% noncontrolling stake in Oncor through Texas Transmission and an entity owned by certain members of Oncor's management acquiring a 0.21% noncontrolling stake in Oncor. See Note 1 to EFIH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus for additional details regarding the sale of the noncontrolling interests.

### *Oncor's Market (ERCOT statistics below were derived from information published by ERCOT)*

Oncor operates within the ERCOT market, which represents approximately 85% of electricity consumption in Texas. ERCOT is the regional reliability coordinating organization for member electricity systems in Texas and the system operator of the interconnected transmission grid for those systems. ERCOT is responsible for ensuring reliability, adequacy and security of the electric systems as well as nondiscriminatory access to transmission service by all wholesale market participants in the ERCOT region. ERCOT's membership consists of more than 300 corporate and associate members, including electric cooperatives, municipal power agencies, independent generators, independent power marketers, transmission service providers and distribution services providers, independent REPs and consumers.

In 2008, hourly demand peaked at 62,174 MW as compared to the record hourly peak demand of 62,339 MW in 2006. The ERCOT market has limited interconnections to other markets in the US, which currently limits potential imports into and exports out of the ERCOT market to 1,106 MW of generation capacity (or approximately 2% of peak demand). In addition, wholesale transactions within the ERCOT market are generally not subject to regulation by the FERC.

The ERCOT market operates under the reliability standards set by NERC. The PUCT has primary jurisdiction over the ERCOT market to ensure the adequacy and reliability of power supply across Texas's main interconnected transmission grid. Oncor, along with other owners of transmission and distribution facilities in Texas, assists the ERCOT independent system operator in its operations. Oncor has planning, design, construction, operation and maintenance responsibility for the portion of the transmission grid and for the load-serving substations it owns, primarily within its certificated area. Oncor participates with the ERCOT independent system operator and other ERCOT utilities to plan, design, obtain regulatory approval for and construct new transmission lines necessary to meet reliability needs, increase bulk power transfer capability to remove existing constraints and interconnect generation on the ERCOT transmission grid.

### *Oncor's Strategies*

Oncor focuses on delivering electricity in a safe and reliable manner, minimizing service interruptions and investing in its transmission and distribution infrastructure to serve its growing customer base.

Oncor believes building and leveraging upon opportunities to scale its operating advantage and technology programs enables Oncor to create value by eliminating duplicative costs, efficiently managing supply costs, and building and standardizing distinctive process expertise over a larger grid. Scale also allows Oncor to take part in large capital investments in its transmission and distribution system, with a smaller fraction of overall capital at risk and with an enhanced ability to streamline costs. Oncor's growth strategies are to invest in technology upgrades, including advanced metering systems, and to construct new transmission and distribution facilities to meet the needs of the growing ERCOT market. Oncor and other transmission and distribution businesses in ERCOT benefit from regulatory capital recovery mechanisms known as "capital trackers" that Oncor believes enable adequate and timely recovery of transmission investments and advanced metering investments through its regulated rates.

C-2

EFIHMW00246680

Oncor's technology upgrade initiatives include development of a modernized grid through the replacement of existing meters with advanced digital metering equipment and development of advanced digital communication, data management, real-time monitoring and outage detection capabilities. This modernized grid is expected to drive electricity service reliability improvements and provide the potential for additional products and services from REPs that will enable businesses and consumers to better manage their electricity usage and costs. Oncor installed approximately 5,000 advanced meters in a pilot program in the second quarter of 2008, and began full deployment of advanced meters in the fourth quarter of 2008 as part of a plan to have all of its approximately three million meters converted by 2012. The advanced meters can be read automatically, rather than by a meter reader physically visiting the location of each meter. Advanced meters are expected to also eventually provide automated demand side management, which allows consumers to monitor the amount of electricity they are consuming and adjust their electricity consumption habits.

### Oncor's Operations

*Performance*. Oncor achieved market-leading electricity delivery performance in six out of seven key PUCT market metrics in 2008. These metrics measure the success of transmission and distribution companies in facilitating customer transactions in the competitive Texas electricity market. In July 2007, the PUCT established new performance standards, and Oncor has implemented a plan seeking to achieve compliance with these standards during 2009.

*Investing in Infrastructure and Technology*. In 2008, Oncor invested over $882 million in its network to construct, rebuild and upgrade transmission lines and associated facilities, to extend the distribution infrastructure, and to pursue certain initiatives in infrastructure maintenance and information technology. Reflecting its commitment to infrastructure, in September 2008, Oncor and several other ERCOT utilities filed with the PUCT a plan to participate in the construction of transmission improvements designed to interconnect existing and future renewable energy facilities to transmit electricity from Competitive Renewable Energy Zones (CREZ) identified by the PUCT. This plan included the joint parties' plans to construct and operate all of the CREZ transmission facilities (CREZ Transmission Plan). Several other parties, including ERCOT and non-ERCOT entities, also filed CREZ Transmission Plans. Hearings on the CREZ Transmission Plan proposals were held in December 2008. In January 2009, the PUCT assigned approximately $1.3 billion of CREZ construction projects to Oncor. A written order reflecting the PUCT's decision was entered in March 2009, and an order on rehearing was issued by the PUCT in May 2009. The cost estimates for the CREZ construction projects are based upon cost analyses prepared by ERCOT. For the nine months ended September 30, 2009, CREZ-related capital expenditures totaled $84 million. It is expected that the necessary permitting actions and other requirements and all construction activities for the assigned construction projects will be completed by the end of 2013.

Oncor continues to invest in technology initiatives that include development of a modernized grid through the replacement of existing meters with advanced digital metering equipment and development of advanced digital communication, data management, real-time monitoring and outage detection capabilities. This modernized grid is expected to produce electricity service reliability improvements and provide the potential for additional products and services from REPs that will enable businesses and consumers to better manage their electricity usage and costs. Oncor's plans provide for the full deployment of over three million advanced meters by the end of 2012 to all residential and most non-residential retail electricity customers in Oncor's service area. As of September 30, 2009, Oncor has installed approximately 310 thousand advanced digital meters, including approximately 270 thousand in the nine months ended September 30, 2009. Cumulative capital expenditures for the deployment of the advanced meter system totaled $137 million as of September 30, 2009. In July 2009, Oncor's advanced metering system completed its first 15-minute interval, billing-quality electricity consumption data reporting to the Texas market. The data, which makes it possible to support innovative new programs and pricing options, represented information technology integration of over 200,000 advanced meters.

C-3

In July 2009, Oncor applied to the US Department of Energy for approximately $317 million in stimulus funds to advance its modernized grid initiatives. In October 2009, the US Department of Energy notified Oncor that these applications were not selected for funding.

In 2008, Oncor acquired a vendor's existing broadband over powerline (BPL)-based "Smart Grid" network assets in Oncor's service territory for $90 million in cash. These network assets include BPL equipment and technology such as fiber optics, embedded sensors and software analytics that are intended to enable Oncor to better monitor its electricity distribution network over up to one-sixth of its service territory. The network assets also included certain finished goods inventory and additional components. As part of the transaction, Oncor agreed to purchase software licenses and maintenance and operation services for a three-year period for approximately $35 million, including $25 million paid at the closing of the transaction. In addition, Oncor may, at its option, purchase additional equipment and utilize additional services from the vendor that would allow Oncor to expand the BPL network to up to one-half of its service territory.

In a stipulation with several parties that was approved by the PUCT (as discussed in Note 4 to EFIH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus), Oncor committed to a variety of actions, including minimum capital spending of $3.6 billion over the five-year period ending December 31, 2012, subject to certain defined conditions. This spending does not include the CREZ facilities.

*Electricity Transmission.* Oncor's electricity transmission business is responsible for the safe and reliable operations of its transmission network and substations. These responsibilities consist of the construction and maintenance of transmission facilities and substations and the monitoring, controlling and dispatching of high-voltage electricity over Oncor's transmission facilities in coordination with ERCOT.

Oncor is a member of ERCOT, and its transmission business actively assists the operations of ERCOT and market participants. Through its transmission business, Oncor participates with ERCOT and other member utilities to plan, design, construct and operate new transmission lines, with regulatory approval, necessary to maintain reliability, interconnect to merchant generation plants, increase bulk power transfer capability and minimize limitations and constraints on the ERCOT transmission grid.

Transmission revenues are provided under tariffs approved by either the PUCT or, to a small degree related to an interconnection to other markets, the FERC. Network transmission revenues compensate Oncor for delivery of electricity over transmission facilities operating at 60 kV and above. Other services offered by Oncor through its transmission business include, but are not limited to: system impact studies, facilities studies, transformation service and maintenance of transformer equipment, substations and transmission lines owned by other parties.

Provisions of the 1999 Restructuring Legislation allow Oncor to annually update its transmission rates to reflect changes in invested capital. These provisions encourage investment in the transmission system to help ensure reliability and efficiency by allowing for timely recovery of and return on new transmission investments.

Oncor's transmission facilities include approximately 5,043 circuit miles of 345-kV transmission lines and approximately 9,862 circuit miles of 138-and 69-kV transmission lines. Approximately sixty-three generation plants totaling approximately 37,691 MW are directly connected to Oncor's transmission system, and approximately 277 transmission stations and approximately 697 distribution substations are served from Oncor's transmission system.

C-4

Confidential