At December 31, 2008, Oncor's transmission facilities had the following connections to other transmission grids in Texas:

| Grid Connections | Number of Interconnected Lines | | |
|---|---|---|---|
| | 345kV | 138kV | 69kV |
| Centerpoint Energy Inc. | 8 | — | — |
| American Electric Power Company, Inc (a) | 4 | 7 | 12 |
| Lower Colorado River Authority | 6 | 20 | 3 |
| Texas Municipal Power Agency | 8 | 9 | — |
| Texas New Mexico Power | 2 | 9 | 11 |
| Brazos Electric Power Cooperative | 4 | 99 | 21 |
| Rayburn Country Electric Cooperative | — | 31 | 7 |
| City of Georgetown | — | 2 | — |
| Tex-La Electric Cooperative | — | 11 | 1 |
| Other small systems operating wholly within Texas | — | 3 | 2 |

(a) One of the 345-kV lines is an asynchronous high-voltage direct current connection with the Southwest Power Pool.

*Electricity Distribution.* Oncor's electricity distribution business is responsible for the overall safe and efficient operation of distribution facilities, including electricity delivery, power quality and system reliability. These responsibilities consist of the ownership, management, construction, maintenance and operation of the distribution system within Oncor's certificated service area. Oncor's distribution system receives electricity from the transmission system through substations and distributes electricity to end-users and wholesale customers through approximately 3,080 distribution feeders.

The Oncor distribution system includes over 3.1 million points of delivery. Over the past five years, the number of Oncor's distribution system points of delivery served, excluding lighting sites, grew an average of approximately 1.5% per year, adding approximately 33,500 points of delivery in 2008.

The Oncor distribution system consists of approximately 56,266 miles of overhead primary conductors, approximately 21,639 miles of overhead secondary and street light conductors, approximately 15,277 miles of underground primary conductors and approximately 9,497 miles of underground secondary and street light conductors. The majority of the distribution system operates at 25-kV and 12.5-kV.

*Customers.* Oncor's transmission customers consist of municipalities, electric cooperatives and other distribution companies. Oncor's distribution customers consist of more than 65 REPs in Oncor's certificated service area, including TCEH. Distribution revenues from TCEH represented 39% of Oncor's total revenues for 2008, and revenues from two subsidiaries of Reliant Energy, Inc., each of which is a non-affiliated REP, represented 16% of Oncor's total revenues for 2008. No other customer represented more than 10% of Oncor's total operating revenues. The retail customers who purchase and consume electricity delivered by Oncor are free to choose their electricity supplier from REPs who compete for their business.

*Seasonality.* A significant portion of Oncor's revenues is derived from rates that Oncor collects from REPs based on the amount of electricity it distributes on behalf of REPs. As a result, the revenues and results of operations of Oncor are subject to seasonality, weather conditions and other changes in electricity usage, with revenues being higher during the warmer months.

*Securitization Bonds.* Oncor's consolidated financial statements include its wholly-owned, bankruptcy-remote financing subsidiary, Oncor Electric Delivery Transition Bond Company LLC. This financing subsidiary was organized for the limited purpose of issuing specified transition bonds in 2003 and 2004. Oncor Electric Delivery Transition Bond Company LLC issued $1.3 billion principal amount of securitization (transition) bonds to recover generation-related regulatory asset stranded costs and other qualified costs under an order issued by the PUCT in 2002.

C-5

EFIHMW00246683

*Regulation and Rates*

As its operations are wholly within Texas, Oncor believes that it is not a public utility as defined in the Federal Power Act and has been advised by its legal counsel that it is not subject to general regulation under this act. The PUCT has original jurisdiction over transmission and distribution rates and services in unincorporated areas and in those municipalities that have ceded original jurisdiction to the PUCT and has exclusive appellate jurisdiction to review the rate and service orders and ordinances of municipalities. Generally, PURA prohibits the collection of any rates or charges by a public utility (as defined by PURA) that does not have the prior approval of the appropriate regulatory authority (PUCT or municipality with original jurisdiction). At the state level, PURA, as amended, requires owners or operators of transmission facilities to provide open-access wholesale transmission services to third parties at rates and terms that are nondiscriminatory and comparable to the rates and terms of the utility's own use of its system. The PUCT has adopted rules implementing the state open-access requirements for utilities that are subject to the PUCT's jurisdiction over transmission services, such as Oncor.

*Rate case.* In accordance with a stipulation approved by the PUCT, in June 2008, Oncor filed for a rate review with the PUCT (Docket No. 35717) and 204 cities. On August 31, 2009, the PUCT issued a final order with respect to the rate review. The final order approves a total annual revenue requirement for Oncor of $2.64 billion, based on Oncor's 2007 test year cost of service and customer characteristics. New rates have been calculated for all customer classes using 2007 test year billing metrics and the approved class cost allocation and rate design. The PUCT staff has estimated that the final order results in an approximate $115 million increase over Oncor's 2007 test year revenues, before recovery of rate case expenses. Prior to implementing the new rates in September 2009, Oncor had already begun recovering $45 million of the $115 million increase as a result of approved transmission cost recovery factor and energy efficiency cost recovery factor filings. Excluding the one-time write-off of certain regulatory assets discussed below, the result of the rate case is not expected to have a material effect on Oncor's net income.

Key findings made by the PUCT in the rate review include:

- recognizing and affirming Oncor's corporate ring-fence from EFH Corp. and its unregulated affiliates by rejecting a proposed consolidated tax savings adjustment arising out of EFH Corp.'s ability to offset Oncor's taxable income against losses from other investments;

- approving the recovery of all of Oncor's capital investment in its transmission and distribution system, including investment in certain automated meters that will be replaced pursuant to Oncor's advanced meter deployment plan;

- denying recovery of $25 million of certain regulatory assets, which resulted in a $16 million after-tax loss recognized in the third quarter 2009; and

- setting Oncor's return on equity at 10.25%.

New rates were implemented effective September 17, 2009. The final order is subject to motions for rehearing and appeals.

**Environmental Regulations and Related Considerations**

*Water*

The TCEQ has jurisdiction over water discharges (including storm water) from facilities in Texas. Facilities of Oncor are presently in material compliance with applicable state and federal requirements relating to discharge of pollutants into the water. Oncor holds all required waste water discharge permits from the TCEQ for facilities in operation and has applied for or obtained necessary permits for facilities under construction. Oncor believes it can satisfy the requirements necessary to obtain any required permits or renewals. Recent changes to federal rules pertaining to Spill Prevention, Control and Countermeasure (SPCC) plans for oil-filled electrical equipment and bulk storage facilities for oil will require updating of certain facilities. Oncor has determined that SPCC plans will be required for certain substations, work centers and distribution systems by November 10, 2010, and it is currently compiling data for development of these plans.

C-6

Confidential

*Solid Waste*

Treatment, storage and disposal of solid waste and hazardous waste are regulated at the state level under the Texas Solid Waste Disposal Act and at the federal level under the Resource Conservation and Recovery Act of 1976, as amended, and the Toxic Substances Control Act. The EPA has issued regulations under the Resource Conservation and Recovery Act of 1976 and the Toxic Substances Control Act, and the TCEQ has issued regulations under the Texas Solid Waste Disposal Act applicable to facilities of Oncor. Oncor is in compliance with applicable solid and hazardous waste regulations.

*Environmental Capital Expenditures*

Oncor's capital expenditures for environmental matters were $8 million in 2008 and are expected to be approximately $8 million in 2009. Oncor expects to invest $300 million, which includes $100 million in excess of regulatory requirements, over the five years ending in 2012 in programs designed to increase customer electricity demand efficiencies. Oncor invested $58 million in these programs in 2008.

## Legal Proceedings

The legal proceedings of EFIH consist mostly of the legal proceedings of Oncor. Oncor is involved in various legal and administrative proceedings in the normal course of business the ultimate resolution of which, in the opinion of management, should not have a material effect on the financial position, results of operations or cash flows of EFIH.

C-7

EFIHMW00246685

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF
OPERATIONS AS OF AND FOR THE NINE MONTHS ENDED SEPTEMBER 30, 2009**

The following discussion and analysis of EFIH's financial condition and results of operations as of and for the
three and nine months ended September 30, 2009 and 2008 should be read in conjunction with the EFIH's historical
consolidated financial statements for the nine months ended September 30, 2009 and the notes to those statements
included elsewhere in this Prospectus. See "Management's Discussion and Analysis of Financial Condition and
Results of Operations as of and for the Year Ended December 31, 2008" below for a discussion and analysis of
EFIH's financial condition and results of operations as of and for the year ended December 31, 2008.

**Business**

EFIH is a Dallas, Texas-based holding company whose financial statements reflect almost entirely the
operations of its indirect, majority (approximately 80%) owned subsidiary, Oncor. Oncor is a regulated
electricity transmission and distribution company principally engaged in providing delivery services to REPs,
including subsidiaries of TCEH, that sell power in the north-central, eastern and western parts of Texas.
Distribution revenues from TCEH represented 38% and 39% of total revenues for the nine months ended
September 30, 2009 and 2008, respectively. EFIH is a direct, wholly-owned subsidiary of EFH Corp. EFIH's
financial statements reflect almost entirely the operations of Oncor; consequently, there are no separate
reportable business segments.

Various "ring-fencing" measures have been taken to enhance the credit quality of Oncor Holdings and
Oncor. Such measures include, among other things: Oncor Holdings' sale of a 19.75% equity interest in Oncor to
Texas Transmission in November 2008; maintenance of separate books and records for the Oncor Ring-Fenced
Entities; Oncor's board of directors being comprised of a majority of independent directors, and prohibitions on
the Oncor Ring-Fenced Entities' providing credit support to, or receiving credit support from, any member of the
Texas Holdings Group. The assets and liabilities of the Oncor Ring-Fenced Entities are separate and distinct from
those of the Texas Holdings Group, and none of the assets of the Oncor Ring-Fenced Entities are available to
satisfy the debt or other obligations of any member of the Texas Holdings Group. Furthermore, Oncor does not
bear any liability for EFIH's obligations (including, but not limited to, debt obligations), and vice versa.
Accordingly, Oncor's operations are conducted, and its cash flows managed, independently from the Texas
Holdings Group.

**Significant Activities and Events**

*Debt Exchange Offers*—See Note 4 to EFIH's historical consolidated financial statements for the nine
months ended September 30, 2009 included elsewhere in this Prospectus for discussion of debt exchange offers
commenced by EFH Corp., EFIH and EFIH Finance in October 2009.

*Technology Initiatives*—Oncor continues to invest in technology initiatives that include development of a
modernized grid through the replacement of existing meters with advanced digital metering equipment and
development of advanced digital communication, data management, real-time monitoring and outage detection
capabilities. This modernized grid is expected to produce electricity service reliability improvements and provide
the potential for additional products and services from REPs that will enable businesses and consumers to better
manage their electricity usage and costs. Oncor's plans provide for the full deployment of over three million
advanced meters by the end of 2012 to all residential and most non-residential retail electricity customers in
Oncor's service area. As of September 30, 2009, Oncor has installed approximately 310 thousand advanced
digital meters, including approximately 270 thousand in the nine months ended September 30, 2009. Cumulative
capital expenditures for the deployment of the advanced meter system totaled $137 million as of September 30,
2009. In July 2009, Oncor's advanced metering system completed its first 15-minute interval, billing-quality
electricity consumption data reporting to the Texas market. The data, which makes it possible to support
innovative new programs and pricing options, represented information technology integration of over 200,000
advanced meters.

C-8

EFIHMW00246686

PX 014
Page 968 of 1116

In July 2009, Oncor applied to the US Department of Energy for approximately $317 million in stimulus funds to advance its modernized grid initiatives. In October 2009, the US Department of Energy notified Oncor that these applications were not selected for funding.

*Matters with the PUCT*—See discussion of these matters, including the awarded construction of $1.3 billion of transmission lines and a rate case with the PUCT, below under "—Regulation and Rates."

## Results of Operations

### Operating Data

| | Three Months Ended September 30, | | % Change | Nine Months Ended September 30, | | % Change |
|---|---|---|---|---|---|---|
| | 2009 | 2008 | | 2009 | 2008 | |
| **Operating statistics:** | | | | | | |
| Electric energy billed volumes (GWh) . . . . . . . . . . . . . | 32,017 | 32,611 | (1.8) | 80,189 | 83,859 | (4.4) |
| **Reliability statistics (a):** | | | | | | |
| System Average Interruption Duration Index (SAIDI) (nonstorm) . . . . . . . . . . . . . | | | | 91.0 | 82.6 | 10.2 |
| System Average Interruption Frequency Index (SAIFI) (nonstorm) . . . . . . . . . . . . | | | | 1.2 | 1.1 | 9.1 |
| Customer Average Interruption Duration Index (CAIDI) (nonstorm) . . . . . . . . . . . | | | | 77.1 | 75.3 | 2.4 |
| **Electricity points of delivery (end of period and in thousands):** | | | | | | |
| Electricity distribution points of delivery (based on number of meters) . . . . . . . . . | | | | 3,142 | 3,116 | 0.8 |

| | Three Months Ended September 30, | | % Change | Nine Months Ended September 30, | | % Change |
|---|---|---|---|---|---|---|
| | 2009 | 2008 | | 2009 | 2008 | |
| **Operating revenues:** | | | | | | |
| Electricity distribution revenues (b): | | | | | | |
| Affiliated (TCEH) . . . . . . . . . . . . . . . . . . . . . . . . | $308 | $290 | 6.2 | $ 783 | $ 773 | 1.3 |
| Nonaffiliated . . . . . . . . . . . . . . . . . . . . . . . . . | 378 | 355 | 6.5 | 1,004 | 960 | 4.6 |
| Total distribution revenues . . . . . . . . . . . . . | 686 | 645 | 6.4 | 1,787 | 1,733 | 3.1 |
| Third-party transmission revenues . . . . . . . . . . . . . . . | 76 | 72 | 5.6 | 225 | 207 | 8.7 |
| Other miscellaneous revenues . . . . . . . . . . . . . . . . . . | 8 | 11 | (27.3) | 25 | 29 | (13.8) |
| Total operating revenues . . . . . . . . . . . . . . | $770 | $728 | 5.8 | $2,037 | $1,969 | 3.5 |

(a)  SAIDI is the average number of minutes electric service is interrupted per consumer in a year. SAIFI is the average number of electric service interruptions per consumer in a year. CAIDI is the average duration in minutes per electric service interruption in a year. The statistics presented are based on twelve months ended September 30, 2009 and 2008 data.

(b)  Includes transition charge revenue associated with the issuance of securitization bonds totaling $44 million and $40 million for the three months ended September 30, 2009 and 2008, respectively, and $113 million and $108 million for the nine months ended September 30, 2009 and 2008, respectively. Also includes disconnect/reconnect fees and other discretionary revenues for services requested by REPs.

*Financial Results—Three Months Ended September 30, 2009 Compared to Three Months Ended September 30, 2008*

Operating revenues increased $42 million, or 6%, to $770 million in 2009. The increase reflected:

* $12 million from increased rates implemented upon the PUCT's approval of new tariffs in September 2009 (see "—Regulation and Rates");

* $8 million from increased distribution tariffs to recover higher transmission costs;

C-9

EFIHMW00246687

- $7 million from a surcharge to recover advanced metering deployment costs and $3 million from a surcharge to recover additional energy efficiency costs, both of which became effective with the January 2009 billing cycle;

- an estimated $5 million impact from growth in points of delivery;

- $4 million in higher transmission revenues primarily due to a rate increase to recover ongoing investment in the transmission system;

- $4 million in higher charges to REPs related to transition bonds (with a related increase in amortization of the related regulatory asset), and

- an increase in estimated average customer usage that was largely offset by the estimated effects of milder weather.

Operation and maintenance expense increased $24 million, or 11%, to $245 million in 2009. The increase reflected $10 million in higher fees paid to other transmission entities and $2 million in costs related to programs designed to improve customer electricity demand efficiency, both of which have related revenue increases, a $4 million increase in contractor and professional services, and other individually insignificant increases.

See Note 2 to EFIH's historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus for discussion of the write off of regulatory assets.

Depreciation and amortization increased $19 million, or 15%, to $147 million in 2009. The increase reflected $12 million in higher depreciation due to ongoing investments in property, plant and equipment, $4 million in higher amortization of regulatory assets associated with securitization bonds (with an offsetting increase in revenues) and $3 million due to increased depreciation and amortization rates implemented upon the PUCT approval of new tariffs in September 2009.

Other income totaled $10 million in 2009 and $12 million in 2008. The amounts reflected accretion of an adjustment (discount) to regulatory assets resulting from purchase accounting. See Note 2 to EFIH's historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus.

Other deductions totaled $5 million in 2009 and $4 million in 2008. The 2009 and 2008 amounts included professional fees totaling $2 million and $1 million, respectively. The 2009 amount included costs totaling $1 million associated with the 2006 settlement with certain cities related to rates.

Income taxes totaled $32 million in 2009 (including an expense of $49 million related to operating income and a benefit of $17 million related to nonoperating income) compared to $59 million (including an expense of $73 million related to operating income and a benefit of $14 million related to nonoperating income) in 2008. The effective rate on pretax income decreased to 27.4% in 2009 from 38.1% in 2008. The decrease in the rate was driven by the reversal of accrued interest due to the favorable resolution of uncertain tax positions. The decreased rate also reflects the effect of investment gains and losses on certain employee benefit plans, which are excluded in determining taxable income.

Interest income increased $1 million, or 8%, to $13 million in 2009. The increase reflected higher earnings on investments held for employee benefit plans, partially offset by a decrease in reimbursement of transition bond interest from TCEH reflecting lower remaining principal amounts of the bonds.

Interest expense and related charges increased $11 million, or 8%, to $155 million in 2009. The change included a $5 million increase related to Oncor's operations, reflecting $4 million due to higher average borrowings driven by ongoing capital investments and $1 million due to higher average rates. The remaining $6 million increase was driven by EFH Corp.'s PIK interest election on the Toggle Notes pushed down to EFIH as described in Note 4 to EFIH's historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus.

C-10

EFIHMW00246688

PX 014

Page 970 of 1116

Net income decreased $11 million, or 11%, to $85 million in 2009 driven by the write off of certain regulatory assets, partially offset by the decrease in the effective income tax rate.

***Financial Results—Nine Months Ended September 30, 2009 Compared to Nine Months Ended September 30, 2008***

Operating revenues increased $68 million, or 3%, to $2.037 billion in 2009. The increase reflected:

- $30 million from increased distribution tariffs to recover higher transmission costs;

- $19 million in higher transmission revenues primarily due to a rate increase to recover ongoing investment in the transmission system;

- $13 million from a surcharge to recover advanced metering deployment costs and $8 million from a surcharge to recover additional energy efficiency costs, both of which became effective with the January 2009 billing cycle;

- an estimated $13 million impact from growth in points of delivery, and

- $12 million from increased rates implemented upon the PUCT's approval of new tariffs in September 2009 (see "—Regulation and Rates"),

partially offset by an estimated $26 million in lower average consumption primarily due to the effects of milder weather and general economic conditions.

Operation and maintenance expense increased $58 million, or 9%, to $698 million in 2009. The increase reflected $36 million in higher fees paid to other transmission entities and $7 million in costs related to programs designed to improve customer electricity demand efficiencies, both of which have related revenue increases, $8 million in higher labor costs primarily to meet enhanced service terms and conditions, $5 million in higher contractor and professional services and $3 million in higher smart grid services costs, partially offset by a $3 million one-time reversal of bad debt expense due to the PUCT's finalization of the Certification of Retail Electric Providers rule in April 2009.

See Note 2 to EFIH's historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus for discussion of the write off of regulatory assets.

Depreciation and amortization increased $35 million, or 9%, to $405 million in 2009. The increase reflected $28 million in higher depreciation due to ongoing investments in property, plant and equipment, $5 million in higher amortization of regulatory assets associated with securitization bonds (with an offsetting increase in revenues) and $3 million due to increased depreciation and amortization rates implemented upon the PUCT approval of new tariffs in September 2009.

Other income totaled $30 million in 2009 and $34 million in 2008. The amounts reflected accretion of an adjustment (discount) to regulatory assets resulting from purchase accounting. See Note 2 to EFIH's historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus.

Other deductions totaled $14 million in 2009 and $21 million in 2008. The 2009 and 2008 amounts included professional fees totaling $7 million and $4 million, respectively, and costs associated with the 2006 settlement with certain cities related to rates totaling $2 million and $13 million, respectively.

Income taxes totaled $71 million in 2009 (including an expense of $122 million related to operating income and a benefit of $51 million related to nonoperating income) compared to $114 million (including an expense of $162 million related to operating income and a benefit of $48 million related to nonoperating income) in 2008. The effective rate on pretax income decreased to 34.6% in 2009 from 38.9% in 2008. The decrease in the rate was driven by the reversal of accrued interest due to the favorable resolution of uncertain tax positions.

C-11

Interest income decreased $2 million, or 6%, to $32 million in 2009. The decrease reflected lower reimbursement of transition bond interest from TCEH due to lower remaining principal amounts of the bonds, partially offset by higher earnings on investments held for certain employee benefit plans.

Interest expense and related charges increased $41 million, or 10%, to $465 million in 2009. The change included a $29 million increase related to Oncor's operations, reflecting $15 million due to higher average interest rates driven by refinancing of short-term borrowings with $1.5 billion of senior secured notes in September 2008 and $14 million due to higher average borrowings driven by ongoing capital investments. The majority of the proceeds of the September 2008 notes issuance was used to pay outstanding short-term borrowings under Oncor's credit facility. The remaining $12 million increase was driven by EFH Corp.'s PIK interest election on the Toggle Notes pushed down to EFIH as described in Note 4 to EFIH's historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus.

Net income decreased $45 million, or 25%, to $134 million in 2009 driven by increased interest expense, the effect of lower average consumption on revenues and the write off of certain regulatory assets.

## Financial Condition

### *Liquidity and Capital Resources*

*Cash Flows*—Cash provided by operating activities totaled $654 million and $590 million for the nine months ended September 30, 2009 and 2008, respectively. The major factors driving the $64 million increase were:

- a $51 million favorable impact due to timing of advanced metering surcharge billings (see Note 2 to EFIH's historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus);

- a $48 million decrease in cash payments for income taxes, and

- a $20 million decrease in pension and OPEB funding compared to an increased level in 2008,

partially offset by a $56 million increase in interest payments.

Cash provided by financing activities totaled $5 million in 2009 compared to $99 million in 2008. The activity reflected:

|  | Nine Months Ended September 30, | |
|---|---|---|
|  | 2009 | 2008 |
| Net issuances/(repayments) of borrowings | $ 127 | $ 288 |
| Distributions to members | (117) | (213) |
| Distributions to noncontrolling interests in subsidiary | (32) | — |
| Decrease in income tax-related note receivable from TCEH | 27 | 24 |
| Cash provided by financing activities | $ 5 | $ 99 |

Investing activities, which consisted primarily of capital expenditures, totaled $762 million in 2009 and $679 million in 2008. The activity reflected:

|  | Nine Months Ended September 30, | |
|---|---|---|
|  | 2009 | 2008 |
| Capital expenditures | $(728) | $(654) |
| Other | (34) | (25) |
| Cash used in investing activities | $(762) | $(679) |

C-12

EFIHMW00246690

**PX 014**
**Page 972 of 1116**

The $74 million, or 11%, increase in capital expenditures reflects $185 million in increased spending for advanced metering deployment and CREZ investments, partially offset by a $90 million purchase in 2008 of certain smart grid equipment.

Depreciation and amortization expense reported in the condensed statement of consolidated cash flows is less than the amount reported in the condensed statement of consolidated income by $19 million and $22 million for the nine months ended September 30, 2009 and 2008, respectively. The difference represents the accretion of the adjustment (discount) to regulatory assets of $30 million and $33 million, respectively, net of the amortization of debt fair value discount of $2 million and $3 million, respectively, both due to purchase accounting, and reported in other income and interest expense and related charges, respectively, in the condensed statement of consolidated income. The difference also represents the amortization of unamortized debt expense, reported in interest expense and related charges, on the EFH Corp. debt pushed down to EFIH as discussed in Note 4 to EFIH's historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus. In addition, the difference reflects regulatory asset amortization in 2009 resulting from the final order in the rate case that is reported in operation and maintenance expense in the condensed statement of consolidated income.

*Long-Term Debt Activity*—Repayments for the nine months ended September 30, 2009 totaled $70 million in scheduled transition bond principal payments. See Note 4 to EFIH's historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus for further information regarding long-term debt.

See "—PIK Interest Election Related to Pushed Down EFH Corp. Debt" below for discussion of a $75 million increase in Toggle Notes pushed down to EFIH that were issued in May 2009 in payment of accrued interest. See Note 4 to EFIH's historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus for discussion of debt exchange offers commenced in October 2009.

*Available Liquidity/Credit Facility*—At September 30, 2009, Oncor had a $2.0 billion secured revolving credit facility under which borrowings are available on a revolving basis through October 10, 2013. Borrowing capacity available under this credit facility totaled $1.341 billion and $1.508 billion at September 30, 2009 and December 31, 2008, respectively. This availability excludes $122 million and $155 million, respectively, of commitments from a subsidiary of Lehman Brothers Holding Inc. (such subsidiary, Lehman) that has filed for bankruptcy under Chapter 11 of the US Bankruptcy Code. Cash and cash equivalents totaled $23 million and $126 million at September 30, 2009 and December 31, 2008, respectively. Available liquidity (cash and available credit facility capacity) at September 30, 2009 of $1.364 billion reflected a decrease of $270 million from year-end 2008 due to ongoing capital investment in transmission and distribution infrastructure. See Note 3 to EFIH's historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus and Note 10 to EFIH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus for additional information regarding the credit facility.

*Distributions*—During 2009, EFIH's board of directors declared and EFIH paid $117 million in cash distributions to EFH Corp. as follows:

| Declaration Date | Payment Date | Amount Paid |
|---|---|---|
| August 18, 2009 . . . . . . . . . . . . . . | August 19, 2009 | $59 |
| May 19, 2009 . . . . . . . . . . . . . . . . | May 20, 2009 | $40 |
| February 18, 2009 . . . . . . . . . . . | March 3, 2009 | $18 |

See Note 6 to EFIH's historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus for discussion of distribution restriction provisions.

C-13

EFIHMW00246691

PX 014
Page 973 of 1116

*Pension and OPEB Plan Funding*—Pension and OPEB plan funding by subsidiaries of EFIH is expected to total $57 million and $17 million, respectively, in 2009. Subsidiaries of EFIH made contributions to the pension and OPEB plans totaling $41 million and $13 million, respectively, in the nine months ended September 30, 2009. In October 2009, subsidiaries of EFIH funded their remaining $16 million pension contribution for 2009.

*PIK Interest Election Related to Pushed Down EFH Corp. Debt*—EFH Corp. has the option every six months at its discretion, ending with the payment due November 2012, to use the payment-in-kind (PIK) feature of its senior toggle notes (Toggle Notes) in lieu of making cash interest payments. Once EFH Corp. makes a PIK election, the election is valid for each succeeding interest payment period until EFH Corp. revokes the election. EFH Corp. elected to do so for the May 2009, November 2009 and May 2010 interest payments as an efficient and cost-effective method to further enhance liquidity, in light of the weaker economy and related lower electricity demand and the continuing uncertainty in the financial markets. In the future, EFH Corp. will evaluate use of the PIK feature at each election period, taking into account market conditions and other relevant factors at such time.

EFH Corp. made its May 2009 interest payment and will make its November 2009 and May 2010 interest payments by using the PIK feature of the Toggle Notes. During the applicable interest periods, the interest rate on the Toggle Notes is increased from 11.25% to 12.00%. EFH Corp. increased the aggregate principal amount of the Toggle Notes by $150 million in May 2009 and will further increase the aggregate principal amount of the Toggle Notes by $159 million in November 2009 and by $169 million in May 2010. The elections will increase the expected annual cash interest expense by approximately $54 million (50% of which relates to EFIH due to push down), constituting the additional cash interest that will be payable with respect to the $478 million of additional Toggle Notes.

See Note 4 to EFIH's historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus for discussion of debt exchange offers that may result in redemption of portions of the outstanding principal amount of these notes (and accordingly, a reduction of the effect of the PIK election for the May 2010 interest payment) and the new notes offered by EFH Corp. in the exchange offers that would be subject to debt push down.

*Financial Covenants, Credit Rating Provisions and Cross Default Provisions*—Oncor's revolving credit facility contains a financial covenant that requires maintenance of a specified leverage ratio. As of September 30, 2009, Oncor was in compliance with such covenant.

*Covenants and Restrictions Related to Pushed Down Debt*—See Note 4 to EFIH's historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus for discussion of EFH Corp. debt pushed down to EFIH as a result of its guarantee of the debt. The indenture governing the EFH Corp. Notes contains covenants that could have a material impact on the liquidity and operations of EFH Corp. and its subsidiaries. See Note 11 to EFIH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus for additional discussion of the covenants contained in these financing arrangements.

Adjusted EBITDA (as used in the restricted payments covenant contained in the indenture governing the EFH Corp. Notes) for the twelve months ended September 30, 2009 totaled $4.8 billion for EFH Corp. "—Adjusted EBITDA Reconciliation" for a reconciliation of net income (loss) to Adjusted EBITDA for EFH Corp. for the nine and twelve months ended September 30, 2009 and 2008.

C-14

Confidential

The following table summarizes various financial ratios of EFH Corp. that are applicable under certain covenants in the indenture governing the EFH Corp. Notes as of September 30, 2009 and December 31, 2008 and the corresponding covenant threshold levels as of September 30, 2009:

|  | September 30, 2009 | December 31, 2008 | Threshold Level |
|---|---|---|---|
| Debt Incurrence Covenants: | | | |
| EFH Corp. fixed charge coverage ratio .......... | 1.6 to 1.0 | 1.5 to 1.0 | At least 2.0 to 1.0 |
| TCEH fixed charge coverage ratio .............. | 1.4 to 1.0 | 1.3 to 1.0 | At least 2.0 to 1.0 |
| Restricted Payments/Limitations on Investments Covenants: | | | |
| General restrictions (non-Sponsor Group payments): | | | |
| EFH Corp. fixed charge coverage ratio (a) .... | 1.4 to 1.0 | 1.3 to 1.0 | At least 2.0 to 1.0 |
| General restrictions (Sponsor Group payments): | | | |
| EFH Corp. fixed charge coverage ratio (a) .... | 1.6 to 1.0 | 1.5 to 1.0 | At least 2.0 to 1.0 |
| EFH Corp. leverage ratio ................. | 7.0 to 1.0 | 6.9 to 1.0 | Equal to or less than 7.0 to 1.0 |

(a)   The EFH Corp. fixed charge coverage ratio for non-Sponsor Group payments includes the results of Oncor Holdings and its subsidiaries. The EFH Corp. fixed charge coverage ratio for Sponsor Group payments excludes the results of Oncor Holdings and its subsidiaries.

*Credit Ratings*—Oncor's issuer credit ratings as of October 5, 2009 are BBB+ and BBB- as assigned by S&P and Fitch, respectively.

Additionally, the rating agencies assign credit ratings on certain debt securities issued by Oncor and EFH Corp. As of October 5, 2009, the credit ratings assigned for debt securities issued by Oncor and debt securities issued by EFH Corp. that are guaranteed by EFIH are presented below:

|  | Oncor Senior Secured | Oncor Senior Unsecured | EFH Corp. Senior Unsecured (a) |
|---|---|---|---|
| S&P ........................ | BBB+ | BBB+ | CC |
| Moody's .................... | Baa1 | Baa1 | Caa3 |
| Fitch ....................... | BBB | BBB- | B+ |

(a)   Cash-Pay Notes and Toggle Notes

As described in Notes 10 and 11 to EFIH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus, all of Oncor's long-term debt is currently secured by a first priority lien on certain of its transmission and distribution assets and is considered senior secured debt. All three rating agencies have placed Oncor's ratings on "stable outlook". In June 2009, Moody's upgraded the long-term debt rating for Oncor's senior secured debt by two notches from Baa3 to Baa1 citing, among other things, Oncor's position as a rate-regulated electric transmission and distribution utility in Texas, reasonably supportive regulatory jurisdiction, solid financial credit metrics, adequate sources of near-term liquidity and the continued evidence of strong corporate independence from EFH Corp.

In October 2009, both S&P and Moody's announced rating actions related to their view that the debt exchange transaction announced by EFH Corp. in October 2009 represented a "distressed exchange." As a result, S&P downgraded the corporate issuer rating of EFH Corp. by four notches to CC from B- and affirmed its negative outlook. S&P also completed multi-notch downgrades of its ratings on issuances subject to the exchange to CC. Moody's affirmed its Caa1 corporate family ratings and negative outlook for EFH Corp. but downgraded its probability of default rating for EFH Corp. three notches to Ca from Caa1. Additionally, Moody's downgraded its ratings on certain issuances subject to the exchange. S&P and Moody's have indicated that

C-15

EFIHMW00246693

shortly after settlement of the debt exchange transaction they expect to replace these temporary "distressed exchange" ratings with new ratings based on their analysis of the outcome of the exchange. Fitch affirmed their ratings and outlook for EFH Corp.

In March 2009, Fitch downgraded certain ratings for EFH Corp. and has changed the outlook for EFH Corp. from stable to negative, citing the effect of the economic slowdown in Texas and lower than anticipated market heat rates in ERCOT.

A rating reflects only the view of a rating agency, and is not a recommendation to buy, sell or hold securities. Ratings can be revised upward or downward at any time by a rating agency if such rating agency decides that circumstances warrant such a change.

*Material Credit Rating Covenants*—Certain arrangements of EFIH's subsidiaries, including Oncor's credit facility and certain leases, contain terms pursuant to which the interest rates charged under the agreements may be adjusted depending on credit ratings.

*Material Cross Default Provisions*—Certain financing arrangements contain provisions that may result in an event of default if there were a failure under other financing arrangements to meet payment terms or to observe other covenants that could or does result in an acceleration of payments due. Such provisions are referred to as "cross default" provisions.

A default by Oncor or any subsidiary thereof in respect of indebtedness in a principal amount in excess of $50 million may result in a cross default under its credit facility. Under this facility such a default may cause the maturity of outstanding balances ($537 million at September 30, 2009) under such facility to be accelerated.

The indenture governing the EFH Corp. Notes contains a cross acceleration provision whereby a payment default at maturity or on acceleration of principal indebtedness under any instrument or instruments of EFH Corp. or any of its restricted subsidiaries (as defined in the indenture) in the aggregate amount equal to or greater than $250 million may cause the acceleration of the EFH Corp. Notes.

**Off Balance Sheet Arrangements**

As of September 30, 2009, EFIH does not have any off-balance sheet arrangements involving special purpose entities or variable interest entities.

**Commitments and Contingencies**

See Note 5 to EFIH's historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus for details of contingencies, including guarantees.

**Changes in Accounting Standards**

See Note 1 to EFIH's historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus for a discussion of changes in accounting standards.

**Regulation and Rates**

*Certification of REPs*

In April 2009, the PUCT finalized a rule relating to the Certification of Retail Electric Providers. The rule strengthens the certification requirements for REPs in order to better protect customers, transmission and distribution utilities (TDUs), and other REPs from the potential insolvency of REPs. The rule is considered a competition rule and thus is subject to judicial review as specified in PURA. The rule, among other things,

C-16

EFIHMW00246694

increases creditworthiness and financial reporting requirements for REPs and provides additional customer protection requirements and regulatory asset consideration for TDU bad debt expenses. Under the rule, Oncor uncollectible amounts owed by nonaffiliated REPs are deferred as a regulatory asset. Recovery of the regulatory asset will be considered in a future rate case. Accordingly, Oncor recognized an approximately $3 million one-time reversal of bad debt expense in the three months ended June 30, 2009 (see Note 9 to EFIH's historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus). Due to the commitments made to the PUCT in connection with the Merger, Oncor may not recover bad debt expense, or certain other costs and expenses, from rate payers in the event of a default or bankruptcy by an affiliate REP.

### Matters with the PUCT

*Rate Case*—In June 2008, Oncor filed for a rate review with the PUCT and 204 cities. On August 31, 2009, the PUCT issued a final order with respect to the rate review. The final order approves a total annual revenue requirement for Oncor of $2.64 billion, based on Oncor's 2007 test year cost of service and customer characteristics. New rates were calculated for all customer classes using 2007 test year billing metrics and the approved class cost allocation and rate design. The PUCT staff has estimated that the final order results in an approximate $115 million increase in base rate revenues over Oncor's 2007 adjusted test year revenues, before recovery of rate case expenses. Prior to implementing the new rates in September 2009, Oncor had already begun recovering $45 million of the $115 million increase as a result of approved transmission cost recovery factor and energy efficiency cost recovery factor filings, such as those discussed immediately below. Excluding the one-time write-off of certain regulatory assets discussed below, the result of the rate case is not expected to have a material effect on Oncor's net income. Also see Note 2 to EFIH's historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus regarding the PUCT's review of regulatory assets and liabilities.

Key findings made by the PUCT in the rate review include:

- recognizing and affirming Oncor's corporate ring-fence from EFH Corp. and its unregulated affiliates by rejecting a proposed consolidated tax savings adjustment arising out of EFH Corp.'s ability to offset Oncor's taxable income against losses from other investments;

- approving the recovery of all of Oncor's capital investment in its transmission and distribution system, including investment in certain automated meters that will be replaced pursuant to Oncor's advanced meter deployment plan;

- denying recovery of $25 million of regulatory assets, which resulted in a $16 million after tax loss being recognized in the three months ended September 30, 2009, and

- setting Oncor's return on equity at 10.25%.

New rates were implemented upon approval of new tariffs in September 2009. The final order is subject to any motions for rehearing and appeals.

*Transmission Rates*—In order to recover increases in its transmission costs, including fees paid to other transmission service providers, Oncor is allowed to request an update twice a year to the transmission cost recovery factor (TCRF) component of its retail delivery rate charged to REPs. In January 2009, an application was filed to increase the TCRF, which was administratively approved in February 2009 and became effective in March 2009. This increase is expected to increase annualized revenues by $16 million. In July 2009, an application was filed to increase the TCRF, which was administratively approved in August 2009 and became effective September 1, 2009. This increase is expected to increase annualized revenues by approximately $14 million.

C-17

EFIHMW00246695

In September 2009, Oncor filed an application for an interim update of its wholesale transmission rate. Accordingly, annualized revenues are expected to increase by approximately $34 million. Approximately $21 million of this increase is recoverable through transmission rates charged to wholesale customers, and the remaining $13 million is recoverable from REPs through the TCRF component of Oncor's delivery rates.

*Application for 2010 Energy Efficiency Cost Recovery Factor*—In May 2009, Oncor filed an application with the PUCT to request approval of an Energy Efficiency Cost Recovery Factor (EECRF) for 2010. PUCT rules require Oncor to make an annual EECRF filing by May 1 for implementation at the beginning of the next calendar year. The requested 2010 EECRF is $54 million, the same amount established for 2009, and would result in the same $0.92 per month charge for residential customers as proposed in Oncor's rate case. As allowed by the rule, the 2010 EECRF is designed to recover the costs of the 2010 programs, the under-recovery of 2008 program costs, and a performance bonus based on 2008 results. Approval of the application as filed would result in an immediate recognition of $9 million in revenues, representing the performance bonus. In October 2009, the Administrative Law Judge assigned to the case issued a proposal for decision recommending that Oncor's requests be granted as filed in its application. The PUCT is scheduled to rule on the proposal for decision at its November 5, 2009 open meeting and is not obligated to accept all or any part of the proposal for decision in its ruling.

*Competitive Renewable Energy Zones (CREZs)*—In January 2009, the PUCT assigned approximately $1.3 billion of CREZ construction projects to Oncor. A written order reflecting the PUCT's decision was entered in March 2009, and an order on rehearing was issued by the PUCT in May 2009. The cost estimates for the CREZ construction projects are based upon cost analyses prepared by ERCOT. For the nine months ended September 30, 2009, CREZ-related capital expenditures totaled $84 million. It is expected that the necessary permitting actions and other requirements and all construction activities for the assigned construction projects will be completed by the end of 2013.

In October 2009, the PUCT initiated a proceeding to determine whether there is sufficient financial commitment from generators of renewable energy to grant Certificates of Convenience and Necessity (CCNs) for transmission facilities located in two areas in the panhandle of Texas designated as CREZs. If the PUCT determines that there is not sufficient financial commitment from the generators for either CREZ, the PUCT may take action, including delaying the filing of CREZ CCN applications until such time as the PUCT finds sufficient financial commitment for that CREZ in accordance with the financial commitment provisions of the PUCT's rules. Three of the CREZ transmission projects awarded to Oncor are located in the two CREZs that are the subject of the proceeding. The estimated cost of these three transmission projects is approximately $380 million. Oncor expects the PUCT to issue an order concluding this proceeding in the second quarter of 2010.

*Summary*

EFIH cannot predict future regulatory or legislative actions or any changes in economic and securities market conditions. Such actions or changes could significantly alter its basic financial position, results of operations or cash flows.

**Quantitative and Qualitative Disclosures about Market Risk**

Market risk is the risk that EFIH may experience a loss in value as a result of changes in market conditions such as interest rates that may be experienced in the ordinary course of business. EFIH may transact in financial instruments to hedge interest rate risk related to its indebtedness, but there are currently no such hedges in place. All of the long-term debt at September 30, 2009 and December 31, 2008 carried fixed interest rates.

Except as discussed below, the information required hereunder is not significantly different from the information set forth in "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Year Ended December 31, 2008—Quantitative and Qualitative Disclosures about Market Risk" and is therefore not presented herein.

C-18

EFIHMW00246696

*Credit Risk*

*Credit Risk*—Credit risk relates to the risk of loss associated with nonperformance by counterparties. Customers consist primarily of REPs. As a prerequisite for obtaining and maintaining certification, a REP must meet the financial resource standards established by the PUCT. Meeting these standards does not guarantee that a REP will be able to perform its obligations. REP certificates granted by the PUCT are subject to suspension and revocation for significant violation of PURA and PUCT rules. Significant violations include failure to timely remit payments for invoiced charges to a transmission and distribution utility pursuant to the terms of tariffs approved by the PUCT. See "—Regulation and Rates" above regarding a new REP certification rule.

*Credit Exposure*—Exposure to credit risk associated with accounts receivable totaled $174 million from affiliates, which consisted of $172 million of Oncor's trade accounts receivable from TCEH and $2 million of other receivables from affiliates, and $255 million from nonaffiliated customers as of September 30, 2009. The nonaffiliated customer receivable amount is before the allowance for uncollectible accounts, which totaled $2 million at September 30, 2009. The nonaffiliated exposure consists almost entirely of noninvestment grade trade accounts receivable, of which $191 million represented trade accounts receivable from REPs. As of September 30, 2009, subsidiaries of one customer collectively represent 14% of the nonaffiliated trade receivable amount. No other nonaffiliated parties represent 10% or more of the total exposure. Oncor views exposure to this customer to be within an acceptable level of risk tolerance considering PUCT rules and regulations; however, this concentration increases the risk that a default would have a material effect on cash flows.

Oncor is also exposed to credit risk associated with the note receivable from TCEH totaling $263 million ($36 million reported as current in trade accounts and other receivables from affiliates) at September 30, 2009 (see Note 8 to EFIH's historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus for additional information).

Confidential

EFIHMW00246697

**Adjusted EBITDA Reconciliation**

**Energy Future Holdings Corp.**

**Adjusted EBITDA Reconciliation**
**(millions of dollars)**

| | Nine Months Ended September 30, 2009 | Nine Months Ended September 30, 2008 | Twelve Months Ended September 30, 2009 | Twelve Months Ended September 30, 2008 |
|---|---|---|---|---|
| Net income (loss) attributable to EFH Corp. . . . . . . . . . | $    207 | $    (983) | $(8,648) | $(2,235) |
| Income tax expense (benefit) . . . . . . . . . . . . . . . . . . . . . | 254 | (462) | 245 | (1,038) |
| Interest expense and related charges . . . . . . . . . . . . . . . | 2,136 | 2,505 | 4,566 | 3,371 |
| Depreciation and amortization . . . . . . . . . . . . . . . . . . . . | 1,286 | 1,217 | 1,679 | 1,654 |
| **EBITDA** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 3,883 | $ 2,277 | $(2,158) | $ 1,752 |
| Oncor EBITDA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (1,043) | (1,053) | (488) | (1,338) |
| Oncor distributions/dividends (a) . . . . . . . . . . . . . . . . . | 117 | 213 | 1,487 | 288 |
| Interest income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (30) | (22) | (35) | (49) |
| Amortization of nuclear fuel . . . . . . . . . . . . . . . . . . . . . . | 71 | 55 | 93 | 74 |
| Purchase accounting adjustments (b) . . . . . . . . . . . . . . . . | 259 | 325 | 394 | 463 |
| Impairment of goodwill . . . . . . . . . . . . . . . . . . . . . . . . . | 90 | — | 8,090 | — |
| Impairment of assets and inventory write down (c) . . . . . | 5 | 512 | 715 | 457 |
| Net income attributable to noncontrolling interests . . . . . | 54 | — | (106) | — |
| EBITDA amount attributable to consolidated unrestricted subsidiaries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3 | — | 3 | — |
| Unrealized net (gain) loss resulting from hedging transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (713) | 221 | (3,263) | 1,796 |
| Amortization of "day one" net loss on Sandow 5 power purchase agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . | (7) | — | (7) | — |
| Losses on sale of receivables . . . . . . . . . . . . . . . . . . . . . | 9 | 22 | 17 | 33 |
| Income from discontinued operations, net of tax effect . . | — | — | — | (1) |
| Noncash compensation expenses (d) . . . . . . . . . . . . . . . . | 9 | 24 | 11 | 23 |
| Severance expense (e) . . . . . . . . . . . . . . . . . . . . . . . . . . . | 9 | 1 | 10 | 1 |
| Transition and business optimization costs (f) . . . . . . . . . | 22 | 38 | 29 | 47 |
| Transaction and merger expenses (g) . . . . . . . . . . . . . . . . | 65 | 44 | 84 | 107 |
| Insurance settlement proceeds (h) . . . . . . . . . . . . . . . . . . | — | — | (21) | — |
| Restructuring and other (i) . . . . . . . . . . . . . . . . . . . . . . . | (10) | 32 | (6) | 33 |
| Expenses incurred to upgrade or expand a generation station (j) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 100 | 100 | 100 | 100 |
| **Adjusted EBITDA per Incurrence Covenant** . . . . . . . . | $ 2,893 | $ 2,789 | $ 4,949 | $ 3,786 |
| **Add back Oncor adjustments** . . . . . . . . . . . . . . . . . . . . | 926 | 807 | (148) | 1,014 |
| **Adjusted EBITDA per Restricted Payments Covenant** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 3,819 | $ 3,596 | $ 4,801 | $ 4,800 |

(a)   Twelve months ended September 30, 2009 amount includes $1.253 billion distribution of net proceeds from the sale of Oncor noncontrolling interests in November 2008.

(b)   Purchase accounting adjustments include amortization of the intangible net asset value of retail and wholesale power sales agreements, environmental credits, coal purchase contracts, nuclear fuel contracts and power purchase agreements and the stepped up value of nuclear fuel. Also include certain credits not recognized in net income due to purchase accounting.

C-20

EFIHMW00246698

**PX 014**
**Page 980 of 1116**

(c)   Impairment of assets includes impairments of emission allowances and trade name intangible assets, impairment of the natural gas-fueled generation fleet and charges related to the cancelled development of coal-fueled generation facilities.

(d)   Non-cash compensation expenses are accounted for under accounting standards related to stock compensation and exclude capitalized amounts.

(e)   Severance expense includes amounts incurred related to outsourcing, restructuring and other amounts deemed to be in excess of normal recurring amounts.

(f)   Transition and business optimization costs include professional fees primarily for retail billing and customer care systems enhancements and incentive compensation.

(g)   Transaction and merger expenses include costs related to the Merger and abandoned strategic transactions. Also include outsourcing transition costs, administrative costs related to the cancelled program to develop coal-fueled generation facilities, the Sponsor Group management fee, costs related to certain growth initiatives and costs related to the Oncor sale of noncontrolling interests.

(h)   Insurance settlement proceeds include the amount received for property damage to certain mining equipment.

(i)   Restructuring and other for the twelve months ended September 30, 2008 includes a litigation accrual, a charge related to the bankruptcy of a subsidiary of Lehman Brothers Holdings Inc. and other restructuring initiatives and nonrecurring activities.

(j)   Expenses incurred to upgrade or expand a generation station reflect noncapital outage costs.

C-21

Confidential

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS AS OF AND FOR THE YEAR ENDED DECEMBER 31, 2008**

The following discussion and analysis of EFIH's financial condition and results of operations as of and for the fiscal years ended December 31, 2008, 2007 and 2006 should be read in conjunction with "Selected Historical Consolidated Financial Data for EFIH and its Subsidiaries" and EFIH's historical consolidated financial statements for the year ended December 31, 2008 and the notes to those statements included elsewhere in this Prospectus. The Year End MD&A should also be read in conjunction with the disclosure set forth in "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Nine Months Ended September 30, 2009" above, which provides material updates to certain of the information contained in the Year End MD&A.

All dollar amounts in the tables in the following discussion and analysis are stated in millions of US dollars unless otherwise indicated.

**Business**

EFIH is a Dallas, Texas-based holding company whose financial statements reflect almost entirely the operations of its indirect, majority (approximately 80%) owned subsidiary, Oncor. Oncor is a regulated electricity transmission and distribution company principally engaged in providing delivery services to REPs, including subsidiaries of TCEH, that sell power in the north-central, eastern and western parts of Texas. Distribution revenues from TCEH represented 39% of total revenues for the year ended December 31, 2008. EFIH is a direct, wholly-owned subsidiary of EFH Corp. With the closing of the Merger on October 10, 2007, EFH Corp. became a subsidiary of Texas Holdings, which is controlled by the Sponsor Group.

References in this report to EFIH are to EFIH and/or its direct or indirect subsidiaries as apparent in the context.

EFIH's consolidated financial statements include its indirect, bankruptcy-remote financing subsidiary, Oncor Electric Delivery Transition Bond Company LLC. This financing subsidiary was organized for the limited purpose of issuing specified transition bonds in 2003 and 2004. Oncor Electric Delivery Transition Bond Company LLC issued $1.3 billion principal amount of securitization (transition) bonds to recover generation-related regulatory asset stranded costs and other qualified costs under an order issued by the PUCT in 2002.

Various "ring-fencing" measures have been taken, in connection with the Merger, to enhance credit quality of Oncor Holdings and Oncor. Such measures include, among other things: Oncor Holdings' sale of a 19.75% equity interest in Oncor to Texas Transmission; TXU Electric Delivery Company's name change to Oncor Electric Delivery Company; the formation of a new special purpose holding company for Oncor, Oncor Holdings, as one of the Oncor Ring-Fenced Entities; the conversion of Oncor from a corporation to a limited liability company; maintenance of separate books and records for the Oncor Ring-Fenced Entities; changes to Oncor's corporate governance provisions; Oncor's board of directors being comprised of a majority of independent directors; physical separation of Oncor's headquarters from Luminant and TXU Energy; amendments to contracts between the Oncor Ring-Fenced Entities and the Texas Holdings Group, and prohibitions on the Oncor Ring-Fenced Entities' providing credit support to, or receiving credit support from, any member of the Texas Holdings Group. The assets and liabilities of the Oncor Ring-Fenced Entities are separate and distinct from those of the Texas Holdings Group, including TXU Energy and Luminant, and none of the assets of the Oncor Ring-Fenced Entities are available to satisfy the debt or other obligations of any member of the Texas Holdings Group. Furthermore, Oncor does not bear any liability for EFIH's obligations (including, but not limited to, debt obligations), and vice versa. Accordingly, Oncor's operations are conducted, and its cash flows managed, independently from the Texas Holdings Group.

EFIH's financial statements reflect almost entirely the operations of Oncor; consequently, there are no separate reportable business segments.

C-22

EFIHMW00246700

*Significant Activities and Events*

**Sale of Noncontrolling Interests**—In November 2008, Oncor sold additional equity interests that resulted in an unaffiliated investor group acquiring a 19.75% noncontrolling stake and certain members of Oncor's management indirectly acquiring a 0.21% stake in Oncor. The investor group was led by certain firms from Canada and Singapore and is not affiliated with any member of the Sponsor Group, Texas Holdings or EFH Corp. The investor group and management paid $1.267 billion in cash for the noncontrolling stakes. The proceeds (net of closing costs) of $1.253 billion received by Oncor from these issuances of equity were distributed to EFH Corp. See Note 14 to EFIH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus for additional information.

See discussion on Oncor credit rating upgrades as a result of the noncontrolling interests sale below under "—Financial Condition—Liquidity and Capital Resources—Financial Covenants, Credit Rating Provisions and Cross Default Provisions—Credit Ratings."

**Effects of Declines in Financial Markets**—The financial market conditions in late 2008 had a significant effect on EFIH's assessment of the carrying value of goodwill. EFIH recorded an impairment charge of $860 million in 2008, primarily arising from the dislocation in the capital markets that had increased interest rate spreads and the resulting discount rates reflected in EFIH's estimation of fair values and the effects of declines in market values of debt and equity securities of comparable companies. See Note 3 to EFIH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus and "—Application of Critical Accounting Policies" below for more information on the goodwill impairment charge and "—Financial Condition—Liquidity and Capital Resources" below for discussion of actions taken in response to the uncertain financial markets.

While EFIH believes Oncor's cash flows from operations combined with availability under Oncor's existing credit facility provides sufficient liquidity to fund Oncor's current and projected expenses and capital requirements for the next 12 months (see "—Financial Condition—Liquidity and Capital Resources" below), there can be no assurance, considering the current uncertainty in financial markets, that counterparties to the credit facility will perform as expected or that material unexpected changes in financial markets or the economy will not result in liquidity constraints or require increased funding of the EFH Corp. pension and OPEB plans. In addition, longer term capital spending, including Oncor's investment of approximately $1.3 billion to construct CREZ-related transmission lines and facilities discussed in "—Regulation and Rates," will require access to financial markets.

See "—Financial Condition—Liquidity and Capital Resources—Liquidity Needs, Including Capital Expenditures."

**Notice of Termination of Outsourcing Arrangements**—During the fourth quarter of 2008, Oncor executed a Separation Agreement with Capgemini Energy LP (Capgemini), Capgemini America, Inc. and Capgemini North America, Inc. (collectively, CgE). Simultaneous with the execution of that Separation Agreement, EFH Corp. and TCEH entered into a substantially similar Separation Agreement with CgE. The Separation Agreements principally provide for (i) notice of termination of each of the Master Framework Agreements, dated as of May 17, 2004, each as amended, between Capgemini and each of Oncor and TCEH and the related service agreements under each of the Master Framework Agreements and (ii) termination of the joint venture arrangements between EFH Corp. (and its applicable subsidiaries) and CgE. Under the Master Framework Agreements and related services agreements, Capgemini has provided to Oncor and EFH Corp. and its other subsidiaries outsourced support services, including information technology, customer care and billing, human resources, procurement and certain finance and accounting activities.

Consistent with the Master Framework Agreement, to provide for an orderly transition of the services, the Separation Agreement requires that Capgemini provide termination assistance services until the services are transitioned back to Oncor and/or to another service provider. The Separation Agreement provides that the

C-23

EFIHMW00246701

**PX 014**

**Page 983 of 1116**

services be transitioned by December 31, 2010 (June 30, 2011, in the case of the information technology services). The Master Framework Agreement will terminate when these termination assistance services are completed. Oncor previously provided a termination notice to Capgemini in respect of human resources services. See Note 16 to EFIH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus for further discussion.

The effects of the termination of the outsourcing arrangements, including the accrual of $16 million for incremental costs to exit and transition the services, were included in the final purchase price allocation (see Note 2 to EFIH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus).

*Refund to Customers*—Oncor provided a one-time $72 million refund to its REP customers in the September 2008 billing cycle. The refund was a commitment made by Oncor in connection with the PUCT's review of the Merger and was recorded as a regulatory liability in the fourth quarter 2007 as part of purchase accounting. The refund was in the form of a credit on distribution fee billings.

While the refund was provided to REPs, the intent was that it be passed through by REPs to end-use retail consumers, and only those REPs that agreed to do so received their portion of the credit. Funds allocated to those REPs that did not agree to pass on the refunds were redistributed to the other customers served by REPs agreeing to pass on the refunds to ensure that the entire $72 million was refunded. To qualify, a retail customer must have been an electricity customer in the Oncor territory during December 2007 and still be served at the same location by a REP that agreed to pass on the refund. Commercial and industrial customers also received a portion of the $72 million refund, although it was based on their individual usage during calendar year 2007.

*Rate Case, Advanced Metering Deployment Surcharge Case and Competitive Renewable Energy Zones*— See discussion of these major initiatives below under "—Regulation and Rates."

**Key Risks and Challenges**

Following is a discussion of key risks and challenges facing management and the initiatives currently underway to manage such challenges.

*Rates and Cost Recovery*

The rates assessed by Oncor are regulated by the PUCT and certain cities and are subject to regulatory rate-setting processes and annual earnings oversight. This regulatory treatment does not provide any assurance as to achievement of earnings levels. Oncor's rates are regulated based on an analysis of Oncor's costs and capital structure, as reviewed and approved in a regulatory proceeding. While rate regulation is premised on the full recovery of prudently incurred costs and a reasonable rate of return on invested capital, there is no assurance that the PUCT will judge all of Oncor's costs to have been prudently incurred, that the PUCT will not reduce the amount of invested capital included in the capital structure that Oncor's rates are based upon or that the regulatory process in which rates are determined will always result in rates that produce full recovery of Oncor's costs.

As part of a stipulation approved by the PUCT, Oncor filed a rate case with the PUCT (Docket No. 35717) and 204 cities in June 2008, based on a test year ended December 31, 2007. A hearing on the merits concluded in February 2009, and the PUCT voted on the rate review in August 2009. A final order was signed August 31, 2009, and new rates will be implemented once new tariffs are approved, which is expected to occur before the end of September 2009. The final order will remain subject to any motions for rehearing and appeals. (See "—Regulation and Rates—Matters with PUCT—Rate Case").

C-24

Confidential

In 2005, the Texas Legislature passed legislation that authorized electric utilities to impose a surcharge to recover costs incurred in deploying advanced metering and meter information networks. In 2007, the PUCT issued its advanced metering rule to implement this legislation. This rule outlined the minimum required functionality for an electric utility's advanced metering systems to qualify for cost recovery under a surcharge. In May 2008, Oncor filed with the PUCT (Docket No. 35718) a description and request for approval of its proposed advanced metering system deployment plan and its proposed surcharge for the recovery of its estimated future investment for advanced metering deployment. An order approving the settlement was issued by the PUCT in August 2008 and became final in September 2008. Oncor began billing the advanced metering surcharge in the January 2009 billing month cycle. Oncor may, through subsequent reconciliation proceedings, request recovery of additional costs that are reasonable and necessary. While there is a presumption that costs spent in accordance with a plan approved by the PUCT are reasonable and necessary, any costs that are found not to have been spent or properly allocated, or not to be reasonable or necessary, must be refunded.

Prior to the PUCT issuance of rules for minimum required functionality for advanced metering systems, Oncor installed approximately 600,000 automated meters in its service territory at a capital cost of approximately $125 million. These meters are not part of the surcharge request, and Oncor is seeking recovery of the costs of these meters in its general rate case discussed above. In its August 2009 ruling on the rate case, the PUCT voted to allow Oncor to recover the costs of these meters.

See "—Regulation and Rates" below for more detail regarding these regulatory proceedings.

*Technology Initiatives*

Oncor continues to invest in technology initiatives that include development of a modernized grid through the replacement of existing meters with advanced digital metering equipment and development of advanced digital communication, data management, real-time monitoring and outage detection capabilities. This modernized grid is expected to produce electricity service reliability improvements and provide the potential for additional products and services from REPs that will enable businesses and consumers to better manage their electricity usage and costs. Oncor's plans provide for the full deployment of over three million advanced meters by the end of 2012 to all residential and most non-residential retail electricity customers in Oncor's service area. As of June 30, 2009, Oncor has installed approximately 240 thousand advanced digital meters, including approximately 200 thousand in the six months ended June 30, 2009. Cumulative capital expenditures for the deployment of the advanced meter system totaled $108 million as of June 30, 2009. In July 2009, Oncor's advanced metering system completed its first 15-minute interval, billing-quality electricity consumption data reporting to the Texas market. The data, which makes it possible to support innovative new programs and pricing options, represented information technology integration of over 200,000 advanced meters.

In July 2009, Oncor applied to the US Department of Energy for approximately $317 million in stimulus funds to advance its modernized grid initiatives. The funds are available through the American Recovery and Reinvestment Act of 2009. Oncor expects to account for funds received, if any, as contributions in aid of construction, reducing the amount capitalized as property, plant and equipment. In its applications, Oncor requested:

- $200 million to lower the cost for its advanced metering system initiative,

- More than $58 million for telecommunications and network investments to support the modernized grid initiatives, and

- More than $58 million for distribution automation to improve service and reliability.

In May 2008, Oncor acquired a vendor's existing broadband over powerline (BPL)-based "Smart Grid" network assets in Oncor's service territory for $90 million in cash. These network assets include BPL equipment and technology such as fiber optics, embedded sensors and software analytics that are intended to enable Oncor

C-25

to better monitor its electricity distribution network over up to one-sixth of its service territory. The network assets also included certain finished goods inventory and additional components. As part of the transaction, Oncor agreed to purchase software licenses and maintenance and operation services for a three-year period for approximately $35 million, including $25 million paid at the closing of the transaction. In addition, Oncor may, at its option, purchase additional equipment and utilize additional services from the vendor that would allow Oncor to expand the BPL network to up to one-half of its service territory.

Risks to these programs include nonperformance by equipment and service providers, failure of the technology to meet performance expectations and inadequate cost recovery allowances by regulatory authorities. Oncor is implementing measures to mitigate these risks, but there can be no assurance that these technology initiatives will achieve the operational and financial objectives.

**Application of Critical Accounting Policies**

EFIH's significant accounting policies are discussed in Note 1 to EFIH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus. EFIH follows accounting principles generally accepted in the US. Application of these accounting policies in the preparation of EFIH's consolidated financial statements requires management to make estimates and assumptions about future events that affect the reporting of assets and liabilities at the balance sheet dates and revenues and expenses during the periods covered. The following is a summary of certain critical accounting policies of EFIH that are impacted by judgments and uncertainties and under which different amounts might be reported using different assumptions or estimation methodologies.

*Purchase Accounting*

The Merger was accounted for under purchase accounting, whereby the purchase price of the transaction was allocated to EFH Corp.'s identifiable assets acquired and liabilities assumed based upon their fair values. The estimates of the fair values recorded were determined based on the principles in SFAS 157 and reflect significant assumptions and judgments. For EFIH, the realization of its assets and settlement of its liabilities are largely subject to cost-based regulatory rate-setting processes. Accordingly, the historical carrying values of a majority of its assets and liabilities are deemed to represent fair values. See discussions in Note 2 to EFIH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus regarding adjustments to the carrying values of a regulatory asset and related long-term debt.

The excess of the purchase price over the estimated fair values of the net assets acquired was recorded as goodwill. The goodwill amount recorded at EFH Corp. totaled $23.2 billion as a result of purchase accounting, of which $4.9 billion was assigned to EFIH. The assignment of goodwill was based on the relative estimated enterprise value of EFIH's operations as of the date of the Merger using discounted cash flow methodologies. In accordance with SFAS 142, goodwill is not amortized to net income, but is required to be tested for impairment at least annually.

In the fourth quarter of 2008, EFIH recorded a goodwill impairment charge of $860 million based on estimated fair values as of December 31, 2008. See discussion immediately below under "—Impairment of Long-Lived Assets."

*Impairment of Long-Lived Assets*

EFIH evaluates long-lived assets (including intangible assets with finite lives) for impairment in accordance with SFAS 144 whenever events or changes in circumstances indicate that an impairment may exist. The determination of the existence of these and other indications of impairment involves judgments that are subjective in nature and may require the use of estimates in forecasting future results and cash flows.

C-26

Confidential

Goodwill is required to be tested for impairment at least annually or whenever events or changes in circumstances indicate an impairment may exist. EFIH tests goodwill for impairment on October 1st each year. Under this SFAS 142 goodwill impairment analysis, if at the assessment date EFIH's carrying value exceeds its estimated fair value (enterprise value), the estimated enterprise value is compared to the estimated fair values of EFIH's operating assets (including identifiable intangible assets) and liabilities at the assessment date, and the resultant implied goodwill amount is compared to the recorded goodwill amount. Any excess of the recorded goodwill amount over the implied goodwill amount is written off as an impairment charge.

The determination of enterprise value involves a number of assumptions and estimates. EFIH uses a combination of three fair value inputs to estimate enterprise values of its reporting units: internal discounted cash flow analyses (income approach), comparable company equity values and any recent pending and/or completed relevant transactions. The income approach involves estimates of future performance that reflect assumptions regarding, among other things, the discount rate, or weighted average cost of capital. The determination of the discount rate takes into consideration the capital structure, debt ratings and current debt yields of comparable companies as well as an estimate of return on equity that reflects historical market returns and current market volatility for the industry. Enterprise value estimates based on comparable company equity values involve using trading multiples of EBITDA of those selected companies to derive appropriate multiples to apply to EFIH's EBITDA. This approach requires an estimate, using historical acquisition data, of an appropriate control premium to apply to the values calculated from such multiples. Critical judgments include the selection of comparable companies and the weighting of the three value inputs in developing the best estimate of enterprise value.

See Note 3 to EFIH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus for a discussion of the $860 million goodwill impairment charge recorded in the fourth quarter of 2008. The charge is not deductible for income tax-related purposes. The impairment primarily arises from the dislocation in the capital markets that has increased interest rate spreads and the resulting discount rates used in the income approach and in the trading multiples of comparable companies and the effect of recent declines in market values of debt and equity securities of comparable companies.

### Revenue Recognition

Revenue includes an estimate for electricity delivery services provided from the meter reading date to the end of the period (unbilled revenue). Unbilled revenue is based on actual daily revenues for the most recent period, adjusted for weather and other measurable factors that affect consumption, applied to the number of unmetered days through the end of the period. Accrued unbilled revenues totaled $140 million, $137 million and $118 million at December 31, 2008, 2007 and 2006, respectively.

### Income Taxes

EFH Corp. files a consolidated federal income tax return; however, EFIH's income tax expense and related balance sheet amounts are recorded as if it was filing its own federal income tax returns. EFIH's income tax expense and related balance sheet amounts involve significant management estimates and judgments. Amounts of deferred income tax assets and liabilities, as well as current and noncurrent accruals, are determined in accordance with the provisions of SFAS 109 and FIN 48 and involve judgments and estimates of the timing and probability of recognition of income and deductions by taxing authorities. In assessing the likelihood of realization of deferred tax assets, management considers estimates of the amount and character of future taxable income. Actual income taxes could vary from estimated amounts due to the future impacts of various items, including changes in income tax laws, EFIH's forecasted financial condition and results of operations in future periods, as well as final review of filed tax returns by taxing authorities. EFH Corp.'s income tax returns are regularly subject to examination by applicable tax authorities. In management's opinion, an adequate reserve has been made for any future taxes that may be owed as a result of any examination.

C-27

EFIHMW00246705

Effective with the sale of noncontrolling interests in Oncor (see Note 14 to EFIH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus), Oncor became a partnership for US federal income tax purposes, and subsequently EFH Corp.'s share of partnership income is included in its consolidated federal income tax return. In connection with the Merger, Oncor, Oncor Holdings and EFH Corp. entered into a tax sharing agreement (amended in November 2008 to include Texas Transmission and Investment LLC), retroactive to January 1, 2007. The tax sharing agreement provides for the allocation of amounts related to income taxes to each of Oncor Holdings and Oncor substantially as if these entities filed their own income tax returns and requires payments to EFH Corp. and the noncontrolling interest holders determined on that basis (without duplication for any income taxes paid by a subsidiary of Oncor Holdings). Deferred income taxes are provided for temporary differences between the book and tax bases of individual parent company assets and liabilities of EFIH and Oncor Holdings, which primarily relate to the difference between the book and tax basis of the investment in Oncor.

FIN 48 provides interpretive guidance for accounting for uncertain tax positions, and as discussed in Note 6 to EFIH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus, EFIH adopted this new standard January 1, 2007, and the effects of the standard are reflected in amounts recorded under the tax sharing agreement. Also see Note 7 to EFIH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus.

*Depreciation*

As discussed above, the historical carrying values of the transmission and distribution utility assets subject to regulated rate recovery were deemed to represent fair values in purchase accounting. Depreciation expense for such assets totaled $330 million, $298 million and $301 million in 2008, 2007 and 2006, respectively, or 2.8% of carrying value in each of 2008, 2007 and 2006.

*Regulatory Assets*

The financial statements at December 31, 2008 and 2007 reflect total regulatory assets of $2.071 billion and $1.593 billion, respectively. These amounts include $865 million and $967 million, respectively, of generation-related regulatory assets recoverable by securitization (transition) bonds as discussed immediately below. Rate regulation is premised on the full recovery of prudently incurred costs and a reasonable rate of return on invested capital. The assumptions and judgments used by regulatory authorities continue to have an impact on the recovery of costs, the rate earned on invested capital and the timing and amount of assets to be recovered by rates. See Note 8 to EFIH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus for more information regarding regulatory assets and liabilities.

Generation-related regulatory asset stranded costs arising prior to the 1999 Restructuring Legislation became subject to recovery through issuance of $1.3 billion principal amount of transition bonds in accordance with a regulatory financing order. The carrying value of the regulatory asset upon final issuance of the bonds in 2004 represented the projected future cash flows to be recovered from REPs by Oncor through revenues as a transition charge to service the principal and fixed rate interest on the bonds. The regulatory asset is being amortized to expense in an amount equal to the transition charge revenues being recognized. As discussed in Note 2 to EFIH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus, the regulatory asset and related transition bonds were adjusted to fair value on the date of the Merger in accordance with purchase accounting rules.

Other regulatory assets that EFIH believes are probable of recovery, but are subject to review and possible disallowance, totaled $913 million at December 31, 2008. These amounts consist primarily of employee retirement costs and storm-related service recovery costs.

C-28

EFIHMW00246706

*Defined Benefit Pension Plans and OPEB Plans*

Subsidiaries of EFIH are participating employers in the EFH Retirement Plan, a defined benefit pension plan sponsored by EFH Corp. and also participate with EFH Corp. and certain other subsidiaries of EFH Corp. to offer certain health care and life insurance benefits to eligible employees and their eligible dependents upon the retirement of such employees. Reported costs of providing noncontributory pension and OPEBs are dependent upon numerous factors, assumptions and estimates.

Benefit costs are impacted by actual employee demographics (including but not limited to age, compensation levels and years of accredited service), the level of contributions made to retiree plans, expected and actual earnings on plan assets and the discount rates used in determining the projected benefit obligation. Changes made to the provisions of the plans may also impact current and future benefit costs. Fluctuations in actual equity market returns as well as changes in general interest rates may result in increased or decreased benefit costs in future periods.

Changes in benefit obligations associated with factors discussed above may not be immediately recognized in the financial statements, but recognized in future years over the remaining average service period of plan participants. As such, significant portions of benefit costs recorded in any period may not reflect the actual level of cash benefits provided to plan participants. Pension and OPEB costs as determined under applicable accounting rules are summarized in the following table:

| | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
| | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, 2006 |
| Pension costs under SFAS 87 . . . . . . . . . . . . . . . . . . . . . . | $ 15 | $ 3 | $ 21 | $ 41 |
| OPEB costs under SFAS 106 . . . . . . . . . . . . . . . . . . . . . . | 44 | 9 | 50 | 61 |
| Total benefit costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 59 | 12 | 71 | $ 102 |
| Less amounts deferred principally as a regulatory asset or property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (42) | (8) | (43) | (84) |
| Net amounts recognized as expense . . . . . . . . . . . . . | $ 17 | $ 4 | $ 28 | $ 18 |
| Discount rates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6.55% | 6.45% | 5.90% | 5.75% |
| Funding of pension and OPEB plans . . . . . . . . . . . . . . . | $ 77 | $ 6 | $ 30 | $ 28 |

*Regulatory Recovery of Pension and OPEB Costs*—In 2005, an amendment to PURA relating to EFH Corp.'s pension and OPEB costs was enacted by the Texas Legislature. This amendment, which was retroactively effective January 1, 2005, provides for the recovery by Oncor of pension and OPEB costs for all applicable former employees of the regulated predecessor integrated electric utility. In addition to Oncor's active and retired employees, these former employees largely include active and retired personnel engaged in TCEH's activities, related to service of those additional personnel prior to the deregulation and disaggregation of EFH Corp.'s business effective January 1, 2002. Accordingly, Oncor and TCEH entered into an agreement whereby Oncor assumed responsibility for applicable pension and OPEB costs related to those personnel.

The amendment additionally authorizes Oncor to establish a regulatory asset or liability for the difference between the amounts of pension and OPEB costs approved in current billing rates and the actual amounts that would otherwise have been recorded as charges or credits to earnings. Accordingly, in 2005 Oncor began deferring (principally as a regulatory asset or property) additional pension and OPEB costs consistent with the amendment. Amounts deferred are ultimately subject to regulatory approval.

C-29

EFIHMW00246707

**Presentation and Analysis of Results**

Management's discussion and analysis of results of operations and cash flows has been prepared by analyzing the results of operations and cash flows of the Successor for the year ended December 31, 2008 on a stand-alone basis, by comparing the results of operations and cash flows of the Successor for the period October 11, 2007 through December 31, 2007 to the results of operations and cash flows of the Predecessor for the three months ended December 31, 2006 and by comparing the results of operations and cash flows of the Predecessor for the period January 1, 2007 through October 10, 2007 to the results of operations and cash flows of the Predecessor for the nine months ended September 30, 2006. Certain volumetric and statistical data for 2007 have been presented as of and for the nine months ended September 30, 2007 and as of and for the three months ended December 31, 2007. Such volumetric and statistical data are measured and reported on a monthly, quarterly and annual basis. The Successor and Predecessor periods relate to periods after the Merger and before the Merger, respectively, and are presented separately due to the change in basis of presentation as a result of the application of purchase accounting for the Merger. EFIH (Successor) was formed at the time of the Merger. Oncor is the Predecessor.

See Note 1 to EFIH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus for discussion of presentation of income taxes.

## Results of Operations

### Financial Results

| | Successor | | Predecessor | | |
|---|---|---|---|---|---|
| | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Three Months Ended December 31, 2006 | Nine Months Ended September 30, 2006 |
| Operating revenues: | | | | | |
| Affiliated . . . . . . . . . . . . . . . . . . . . . . . . | $1,000 | $209 | $ 823 | $243 | $ 896 |
| Nonaffiliated . . . . . . . . . . . . . . . . . . . . . | 1,580 | 324 | 1,144 | 332 | 978 |
| Total operating revenues . . . . . . . . . | 2,580 | 533 | 1,967 | 575 | 1,874 |
| Operating expenses: | | | | | |
| Operation and maintenance . . . . . . . . . . | 852 | 200 | 649 | 197 | 607 |
| Depreciation and amortization . . . . . . . . | 492 | 96 | 366 | 117 | 359 |
| Income taxes . . . . . . . . . . . . . . . . . . . . | 191 | 25 | 150 | 21 | 135 |
| Taxes other than income taxes . . . . . . . . | 391 | 87 | 305 | 105 | 297 |
| Total operating expenses . . . . . . . . . | 1,926 | 408 | 1,470 | 440 | 1,398 |
| Operating income . . . . . . . . . . . . . . . . . . . | 654 | 125 | 497 | 135 | 476 |
| Other income and deductions: | | | | | |
| Impairment of goodwill (Note 3) . . . . . . . | 860 | — | — | — | — |
| Other income . . . . . . . . . . . . . . . . . . | 45 | 11 | 3 | — | 2 |
| Other deductions . . . . . . . . . . . . . . . . . . . | 25 | 8 | 30 | 12 | 15 |
| Nonoperating income taxes . . . . . . . . . . . | (62) | (17) | 9 | 3 | 11 |
| Interest income . . . . . . . . . . . . . . . . . . . . . | 47 | 12 | 44 | 15 | 43 |
| Interest expense and related charges (Note 19) . . . . . . . . . . . . . . . . . . . . . . . . . | 578 | 138 | 242 | 73 | 213 |
| Net income (loss) . . . . . . . . . . . . . . . . . . . | (655) | 19 | 263 | 62 | 282 |
| Net loss attributable to noncontrolling interests . . . . . . . . . . . . . . . . . . . . . . . . . . | 160 | — | — | — | — |
| Net income (loss) attributable to EFIH . . . . . . . | $ (495) | $ 19 | $ 263 | $ 62 | $ 282 |

C-30

*Operating Data*

| | Successor | | Predecessor | | |
|---|---|---|---|---|---|
| | Year Ended December 31, 2008 | Three Months Ended December 31, 2007 | Nine Months Ended September 30, 2007 | Three Months Ended December 31, 2006 | Nine Months Ended September 30, 2006 |
| **Operating statistics—volumes:** | | | | | |
| Electric energy delivered (GWh) . . . . . . . . . . . . . . . . . . . . | 107,672 | 24,622 | 81,523 | 23,618 | 83,480 |
| **Reliability statistics (a):** | | | | | |
| System Average Interruption Duration Index (SAIDI) (nonstorm) . . . . . . . . . . . . . . | 85.4 | 77.9 | 79.2 | 79.1 | 78.3 |
| System Average Interruption Frequency Index (SAIFI) (nonstorm) . . . . . . . . . . . . . . | 1.1 | 1.1 | 1.1 | 1.2 | 1.2 |
| Customer Average Interruption Duration Index (CAIDI) (nonstorm) . . . . . . . . . . . . . . | 74.7 | 70.6 | 69.5 | 67.5 | 67.3 |
| **Electric points of delivery (end of period and in thousands):** | | | | | |
| Electricity distribution points of delivery (based on number of meters) . . . . . . . . . . . . . . . . . . | 3,123 | 3,093 | 3,087 | 3,056 | 3,051 |

| | Successor | | Predecessor | | |
|---|---|---|---|---|---|
| | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Three Months Ended December 31, 2006 | Nine Months Ended September 30, 2006 |
| **Operating revenues:** | | | | | |
| Electricity distribution revenues (b): | | | | | |
| Affiliated (TCEH) . . . . . . . . . . . . . | $ 998 | $208 | $ 821 | $243 | $ 894 |
| Nonaffiliated . . . . . . . . . . . . . . . . . . | 1,264 | 257 | 921 | 264 | 782 |
| Total distribution revenues . . | 2,262 | 465 | 1,742 | 507 | 1,676 |
| Third-party transmission revenues . . . . . . . . . . . . . . . . . . . | 280 | 60 | 199 | 60 | 176 |
| Other miscellaneous revenues . . . . | 38 | 8 | 26 | 8 | 22 |
| Total operating revenues . . . . | $2,580 | $533 | $1,967 | $575 | $1,874 |

(a)  SAIDI is the average number of minutes electric service is interrupted per consumer in a year. SAIFI is the average number of electric service interruptions per consumer in a year. CAIDI is the average duration in minutes per electric service interruption in a year. The statistics presented are based on the preceding twelve months' data.

(b)  Includes transition charge revenue associated with the issuance of securitization bonds totaling $140 million for the year ended December 31, 2008, $29 million for the period October 11, 2007 through December 31, 2007, $116 million for the period January 1, 2007 through October 10, 2007, $34 million for the three months ended December 31, 2006 and $117 million for the nine months ended September 30, 2006. Also includes disconnect/reconnect fees and other discretionary revenues for services requested by REPs.

C-31

EFIHMW00246709

**PX 014
Page 991 of 1116**

*Financial Results—2008*

*Successor Period—Year Ended December 31, 2008*

Operating revenues for 2008 of $2.6 billion reflected rate increases approved in 2006 and 2007 to recover ongoing investment in the transmission system and growth in points of delivery.

Operation and maintenance expense for 2008 totaled $852 million, which included approximately $339 million in fees paid to other transmission providers. The balance of the costs consisted largely of employee and contractor costs to maintain and repair the transmission and distribution assets, including vegetation management, as well as administrative and general salaries and benefits and outsourced service provider costs.

Depreciation and amortization expense for 2008 of $492 million reflected ongoing investments in property, plant and equipment and included $145 million of ongoing regulatory asset amortization for which there are related revenues from transition charge billings.

Taxes other than income taxes for 2008 totaled $391 million, which included $255 million in local franchise fees and $125 million in property taxes.

See Note 3 to EFIH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus for a discussion of the $860 million goodwill impairment charge recorded in the fourth quarter of 2008.

Other income for 2008 totaled $45 million, which included $44 million of accretion for an adjustment (discount) to regulatory assets resulting from purchase accounting. Other deductions for 2008 totaled $25 million, which included $13 million in costs associated with the 2006 cities rate settlement. See Note 20 to EFIH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus for details of other income and deductions.

Income taxes for 2008 totaled $129 million on a loss (including an expense of $191 million related to operating income and a benefit of $62 million related to nonoperating income). Excluding the impacts of the non-deductible goodwill impairment, the effective rate on pretax income was 38.5%. The 38.5% effective rate as compared to the 35.0% statutory rate reflected state income taxes and the non-deductibility of losses on certain benefit plan investments and certain interest expense related to pushed down debt partially offset by the amortization of investment tax credits. See Note 7 to EFIH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus for reconciliation of the effective rate to the US federal statutory rate.

Interest income for 2008 totaled $47 million, which essentially consisted of interest income from TCEH with respect to Oncor's generation-related regulatory assets securitized through the issuance of transition bonds by Oncor's bankruptcy-remote financing subsidiary.

Interest expense and related charges for 2008 totaled $578 million, which reflected $7.6 billion in average borrowings at an average rate of 7.41%. See Notes 10 and 11 to EFIH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus for details of borrowings.

Net loss for 2008 totaled $655 million.

*Financial Results—2007 and 2006*

*Successor Period from October 11, 2007 through December 31, 2007 Compared to the Three Month Predecessor Period Ended December 31, 2006*

Operating revenues decreased $42 million, or 7%, to $533 million in 2007. The ten fewer days in the 2007 period resulted in $67 million in lower revenues. This decrease was partially offset by increased distribution

C-32

EFIHMW00246710

tariffs to recover higher transmission costs, higher transmission revenues primarily due to rate increases to recover ongoing investment in the transmission system, the effect of weather-driven higher average electricity consumption and the impact of growth in points of delivery.

Operation and maintenance expense increased $3 million, or 2%, to $200 million in 2007. The increase reflected higher incentive pay and benefits expense in 2007, higher fees paid to other transmission entities and higher vegetation management expenses, largely offset by $23 million in lower costs attributable to the ten fewer days in the 2007 period.

Depreciation and amortization decreased $21 million, or 18%, to $96 million in 2007. The ten fewer days in the 2007 period resulted in $12 million in lower costs.

Taxes other than income decreased $18 million, or 17%, to $87 million in 2007. The ten fewer days in the 2007 period resulted in $10 million in lower costs, and property taxes decreased reflecting lower tax rates as a result of enactment of the Texas margin tax. Included in this line item are local franchise fees resulting from the 2006 cities rate settlement totaling $2 million for the period October 11, 2007 through December 31, 2007 and $1 million for the three months ended December 31, 2006.

Other income in 2007 totaled $11 million, which included $10 million of accretion for an adjustment (discount) to regulatory assets resulting from purchase accounting. Other deductions totaled $8 million and $12 million in 2007 and 2006, respectively, which included costs associated with the 2006 cities rate settlement of $6 million and $7 million, respectively.

Income taxes in 2007 totaled $8 million (including an expense of $25 million related to operating income and a benefit of $17 million related to nonoperating income) and the effective rate was 29.6%. The provision for income taxes in 2006 totaled $24 million and the effective rate was 27.9%. The increased rate primarily reflected adjustments to state income tax expense recorded in the 2006 period related to prior period state franchise tax returns.

Interest income decreased $3 million, or 20%, to $12 million in 2007. The ten fewer days in the 2007 period resulted in $2 million in lower interest income and contractual reimbursements from TCEH for transition bond interest expense, which declined as a result of the declining balance of such bonds.

Interest expense and related charges increased by $65 million, or 89%, to $138 million in 2007. The ten fewer days in the 2007 period resulted in $9 million in lower expense. The increase reflected higher average balances and higher average rates driven by the Merger-related debt pushed down from EFH Corp. to EFIHs as discussed in Note 11 to EFIH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus.

Net income totaled $19 million in 2007 and $62 million in 2006.

*Predecessor Period from January 1, 2007 through October 10, 2007 Compared to the Nine Month Predecessor Period Ended September 30, 2006*

Operating revenues increased $93 million, or 5%, to $1.967 billion in 2007. Of this increase, $67 million was attributed to the ten additional days in the 2007 period. The balance of the revenue increase reflected:

- $18 million from increased distribution tariffs to recover higher transmission costs, and

- $16 million in higher transmission revenues primarily due to rate increases approved in 2006 and 2007 to recover ongoing investment in the transmission system,

partially offset by

- $9 million effect of lower average consumption due in part to cooler, below normal summer weather in 2007 and hotter than normal weather in 2006, net of the impact of increased points of delivery, and

C-33

EFIHMW00246711

- lower charges to REPs related to securitization bonds (offset by lower amortization of the related regulatory asset).

Operation and maintenance expense increased $42 million, or 7%, to $649 million in 2007. Of this increase, $23 million was attributed to the ten additional days in the 2007 period. The balance of the increase reflected $19 million in higher fees paid to other transmission entities, higher labor-related costs due to timing of equipment installation activities and expenses related to the rebranding of the Oncor Electric Delivery Company name, partially offset by lower vegetation management expenses.

Depreciation and amortization increased $7 million, or 2%, to $366 million in 2007 which was primarily due to the ten additional days in 2007 and ongoing investments in property, plant and equipment, partially offset by lower amortization of the regulatory assets associated with the securitization bonds (offset in revenue).

Taxes other than amounts related to income taxes increased $8 million, or 3%, to $305 million in 2007. The increase reflected $10 million attributed to the ten additional days in the 2007 period, partially offset by lower property taxes reflecting lower property tax rates as a result of the enactment of the Texas margin tax. Included in franchise and revenue-based taxes are local franchise fees resulting from the 2006 cities rate settlement totaling $6 million for the period January 1, 2007 through October 10, 2007 and $4 million for the nine months ended September 30, 2006.

Other income totaled $3 million in 2007 and $2 million in 2006. Other deductions totaled $30 million in 2007 and $15 million in 2006. The increase in other deductions was primarily due to higher costs associated with the 2006 cities rate settlement.

The provision for income taxes was $159 million in 2007 (including $150 million related to operating income and $9 million related to nonoperating income) compared to $146 million in 2006 (including $135 million related to operating income and $11 million related to nonoperating income). The effective rate increased to 37.7% in 2007 from 34.1% in 2006. The increased rate was driven by higher taxes under the Texas margin tax, higher interest accrued related to uncertain tax positions and the effect of full amortization prior to 2007 of a regulatory liability associated with statutory tax rate changes.

Interest expense increased $29 million, or 14%, to $242 million in 2007. Of this increase, $9 million was due to the ten additional days in the 2007 period. The balance of the increase reflected $14 million due to higher average borrowings, largely to support ongoing capital investment in the business, and $5 million due to higher average interest rates.

Net income decreased $19 million, or 7%, to $263 million. This decrease was driven by higher costs associated with the 2006 cities rate settlement and a decline in delivered volumes due to lower average electricity consumption.

**Other Comprehensive Income**

In September 2008, Oncor entered into interest rate swap transactions hedging the variability of treasury bond rates used to determine the interest rates on an anticipated issuance of an aggregate of $1.0 billion of senior secured notes maturing from 2013 to 2018. The hedges were terminated the same day, and $2 million in after-tax losses were recorded as other comprehensive income.

After tax losses of $1 million for the period January 1, 2007 through October 10, 2007 and $2 million for the year ended December 31, 2006 were recognized in net income related to settled cash flow hedges (variable to fixed interest rate swaps). All amounts included in accumulated other comprehensive income as of October 10, 2007, which totaled $18 million in net losses, were eliminated as part of purchase accounting. Oncor has used derivative financial instruments that were effective in offsetting future cash flow variability related to interest rates; these consisted of interest rate swaps entered into to hedge variable rate debt. Amounts in accumulated other comprehensive income included the value of dedesignated and terminated cash flow hedges at the time of such dedesignation/termination, less amounts reclassified to net income as the original hedged transactions were actually settled and affected net income.

C-34

**Financial Condition**

*Liquidity and Capital Resources*

*Cash Flows*—Cash flows from operating, financing and investing activities included:

| | Successor | | Predecessor | | |
|---|---|---|---|---|---|
| | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Three Months Ended December 31, 2006 | Nine Months Ended September 30, 2006 |
| Cash flows—operating activities | | | | | |
| Net income (loss) . . . . . . . . . . . . . . . . . | $(655) | $ 19 | $ 263 | $ 62 | $ 282 |
| Adjustments to reconcile net income to cash provided by operating activities: | | | | | |
| Depreciation and amortization . . . . | 462 | 97 | 366 | 116 | 357 |
| Deferred income tax expense (benefit)—net . . . . . . . . . . . . . . | 160 | 71 | 21 | (6) | 33 |
| Amortization of investment tax credits . . . . . . . . . . . . . . . . . . . | (5) | (1) | (4) | (1) | (4) |
| Impairment of goodwill . . . . . . . . . | 860 | — | — | — | — |
| Effect of parent's payment of interest on pushed down debt . . . | 251 | 24 | — | — | — |
| Other, net . . . . . . . . . . . . . . . . . . . . | 6 | 1 | 6 | — | 8 |
| Changes in operating assets and liabilities . . . . . . . . . . . . . . . . . . . . . | (250) | (146) | 30 | 59 | (278) |
| Cash provided by operating activities . . . . . . . . . . . . . . | 829 | 65 | 682 | 230 | 398 |
| Cash flows—financing activities | | | | | |
| Net issuances/(repayments) of borrowings (including advances from parent) . . . . . . . . . . . . . . . . . . . . . . . . | 440 | 62 | 214 | 16 | 511 |
| Distributions/dividends . . . . . . . . . . . . | (330) | — | (326) | (85) | (255) |
| Decrease in income tax-related note receivable from TCEH . . . . . . . . . . . | 34 | 9 | 24 | 9 | 30 |
| Excess tax benefit on stock-based incentive compensation . . . . . . . . . . | 10 | 15 | — | (3) | 17 |
| Cash provided by (used in) financing activities . . . . . . . | 154 | 86 | (88) | (63) | 303 |
| Cash flows—investing activities | | | | | |
| Capital expenditures . . . . . . . . . . . . . . . . | (882) | (153) | (555) | (165) | (675) |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3 | 7 | (23) | (2) | (40) |
| Cash used in investing activities . . . . . . . . . . . . . . | (879) | (146) | (578) | (167) | (715) |
| Net change in cash and cash equivalents . . . . | $ 104 | $ 5 | $ 16 | $ — | $ (14) |

C-35

EFIHMW00246713

**PX 014**
**Page 995 of 1116**

*Year Ended December 31, 2008*—Cash provided by operating activities totaled $829 million, reflecting normal, ongoing operating activities and the $72 million refund to customers discussed under "—Business— Significant Activities and Events."

Capital expenditures in 2008 reflected the acquisition of a vendor's existing BPL-based "Smart Grid" network assets in Oncor's service territory for $90 million. See "—Key Risks and Challenges" above for further discussion.

*Successor Period from October 11, 2007 through December 31, 2007 compared to the Three Month Predecessor Period Ended December 31, 2006*—Cash provided by operating activities totaled $65 million in the 2007 period compared to $230 million in the 2006 period. The $165 million decrease reflected $113 million in repurchases of accounts receivables previously sold (see Note 9 to EFIH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus) and $49 million unfavorable change in accrued taxes due to the impact of implementing the tax sharing agreement.

*Predecessor Period from January 1, 2007 through October 10, 2007 Compared to Nine Month Predecessor Period Ended September 30, 2006*—Cash provided by operating activities totaled $682 million in the 2007 period compared to $398 million in the 2006 period. The $284 million increase reflected:

- a $135 million favorable change in income taxes paid to EFH Corp. primarily due to timing of payments in 2006 related to the 2005 income tax liability, and

- a $102 million favorable change in working capital (accounts receivable, accounts payable and inventories) largely due to:

  - $42 million increase in sale of accounts receivable,

  - $29 million in lower materials and supplies inventory purchases due primarily to timing of capital expenditure projects, and

  - $21 million increase in accounts payable reflecting increased use of outsourced service providers and contractors for operation and maintenance activities.

The decrease in capital expenditures in the 2007 period compared to the 2006 period was driven by lower new customer distribution connections and the completion of several large transmission projects.

Depreciation and amortization expense reported in the statement of consolidated cash flows is less than the amount reported in the statement of consolidated income by $30 million for the year ended December 31, 2008. The difference represents the $44 million accretion of the adjustment (discount) to regulatory assets, net of the $3 million amortization of debt fair value discount, both due to purchase accounting and reported in other income and interest expense and related charges, respectively, in the statement of consolidated income. The difference also represents the amortization of unamortized debt expense, reported in interest expense and related charges, on the EFH Corp. debt pushed down to EFIH as discussed in Note 11 to EFIH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus.

***Long-Term Debt Activity***—In September 2008, Oncor issued and sold $1.5 billion aggregate principal amount of senior secured notes, consisting of $650 million aggregate principal amount of 5.95% notes due 2013, $550 million aggregate principal amount of 6.80% notes due 2018 and $300 million aggregate principal amount of 7.50% notes due 2038. Most of the $1.487 billion in proceeds (which is net of underwriters' fees and debt discounts) was used to repay borrowings under the Oncor revolving credit facility and the remainder was used for general corporate purposes. Repayments for the year ended December 31, 2008 totaled $99 million in scheduled transition bond principal payments. See Note 11 to EFIH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus for further information regarding long-term debt.

C-36

EFIHMW00246714

**PX 014**
**Page 996 of 1116**

*Available Liquidity/Credit Facilities*—At December 31, 2008, Oncor had a $2.0 billion revolving credit facility under which borrowings are available on a revolving basis through October 10, 2013. Oncor may increase the commitments under the facility in any amount up to $500 million, subject to the satisfaction of certain conditions. Borrowing capacity available under this credit facility totaled $1.336 billion at June 30, 2009, $1.508 billion at December 31, 2008 and $720 million at December 31, 2007. Availability increased $788 million for the twelve months ended December 31, 2008 due to the issuance of $1.5 billion principal amount of fixed-rate senior secured notes as described above, the net proceeds from which were used to repay credit facility borrowings, partially offset by funding of capital investments, including the purchase of an existing BPL based "Smart Grid" network as discussed above under "—Key Risks and Challenges." Cash and cash equivalents totaled $36 million at June 30, 2009 and $126 million at December 31, 2008. Available liquidity (cash and available credit facility capacity) at June 30, 2009 of $1.372 billion reflected a decrease of $262 million from year-end 2008 due to ongoing capital investment in transmission and distribution infrastructure. In April 2009, a portion of the Lehman commitment was purchased by another entity unrelated to Lehman, effectively increasing availability by $32 million.

Under the terms of Oncor's revolving credit facility, the commitments of the lenders to make loans to Oncor are several and not joint. Accordingly, if any lender fails to make loans to Oncor, Oncor's available liquidity could be reduced by an amount up to the aggregate amount of such lender's commitments under the facility.

In May 2008, Oncor secured the credit facility with a first priority lien on certain of its transmission and distribution assets. Oncor has also secured all of its existing long-term debt securities (excluding the transition bonds) with the same lien in accordance with the terms of those securities. The lien contains customary provisions allowing Oncor to use the assets in its business, as well as to replace and/or release collateral as long as the market value of the collateral is at least 115% of the aggregate secured debt. The lien may be terminated at Oncor's option upon the termination of Oncor's current credit facility. See Note 10 to EFIH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus for additional information regarding the credit facility.

*Additional Financial Market Uncertainty Consideration*—EFH Corp. has evaluated its investments held in trusts, including those that will be used by subsidiaries of EFIH to satisfy future obligations under pension and postretirement benefit plans. The recent substantial dislocation in the financial markets has caused a significant decline in the value of such investments, and a continuation or further disruption in the markets could be material to EFIH. While the pension and postretirement plan investments include some subprime-related securities, a decline in the fair value of such securities was not material to the overall decline in the plan investment values.

*Pension and OPEB Plan Funding*—Pension and OPEB plan calendar year funding for subsidiaries of EFIH is expected to total $61 million and $18 million, respectively, in 2009. Based on the funded status of the pension plan at December 31, 2008, EFH Corp.'s funding is expected to total approximately $665 million for the 2009-2013 period. Approximately 85% of this amount is expected to be funded by EFIH consistent with its share of the pension liability. Contributions to the pension and OPEB plans in 2008 totaled $46 million and $31 million, respectively.

*PIK Interest Election Related to Pushed Down EFH Corp. Debt*—See Note 11 to EFIH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus for discussion of EFH Corp. debt pushed down to EFIH as a result of its guarantee of the debt. EFH Corp. has the option every six months until November 1, 2012, at its election, to use the payment-in-kind (PIK) feature of its senior toggle notes (Toggle Notes) in lieu of making cash interest payments. While EFH Corp. has sufficient liquidity to meet its anticipated ongoing needs without use of this PIK feature, it elected to do so for the May 1, 2009 interest payment date as an efficient and cost-effective method to further enhance liquidity, in light of the substantial dislocation in the financial markets. In the future, EFH Corp. will evaluate use of the PIK feature at each election period, taking into account market conditions and other relevant factors at such time.

C-37

Confidential

EFH Corp. made its May 2009 interest payment and will make its November 2009 interest payment by using the PIK feature of the Toggle Notes. During the applicable interest periods, the interest rate on the Toggle Notes is increased from 11.25% to 12.00%. EFH Corp. increased the aggregate principal amount of the Toggle Notes by $150 million on May 1, 2009 and will further increase the aggregate principal amount of the Toggle Notes by $159 million on November 1, 2009. The election will increase the expected annual cash interest expense by approximately $35 million (50% of which relates to EFIH due to push down), constituting the additional cash interest that will be payable with respect to the $309 million of additional Toggle Notes.

***Liquidity Needs, Including Capital Expenditures***—Oncor's liquidity needs represent substantially all of the consolidated liquidity needs of EFIH. EFIH's direct liquidity, as the indirect parent of Oncor, consists principally of receipts of income tax related amounts and distributions, which are expected to be distributed to EFH Corp. (See Notes 1 and 13 to EFIH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus.)

Oncor's expects its capital expenditures to total approximately $875 million over the twelve months ending December 31, 2009 for investment in transmission and distribution infrastructure, which is consistent with its commitment to spend a minimum of $3.6 billion in capital expenditures over the five-year period ending December 31, 2012. This excludes investments in transmission assets to support CREZ as discussed below in "—Regulation and Rates." See Note 4 to EFIH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus for discussion of this and other commitments in the stipulation approved by the PUCT. In addition, Oncor expects its capital expenditures related to the CREZ Transmission Plan to total approximately $90 million over the twelve months ending December 31, 2009.

Oncor's primary source of liquidity aside from operating cash flows is its ability to borrow under its revolving credit facility. The facility contains a debt-to-capital ratio covenant that effectively limits Oncor's ability to incur indebtedness in the future. As of December 31, 2008 and June 30, 2009, Oncor was in compliance with such covenant. The credit facility and the senior notes issued by Oncor are secured by a deed of trust, which permits Oncor to secure other indebtedness with the lien of the deed of trust up to the amount of available bond credits. As of December 31, 2008, the available bond credits were approximately $2.1 billion. In connection with the Merger, Oncor also committed to the PUCT that it would maintain a regulatory capital structure at or below the assumed debt-to-equity ratio established periodically by the PUCT for ratemaking purposes, which is currently set at 60% debt to 40% equity.

Because Oncor's operations are capital intensive, access to financial markets is expected to be a significant source of liquidity over the long term for capital requirements not satisfied by cash-on-hand, operating cash flows or Oncor's revolving credit facility. The inability to raise capital on favorable terms or failure of counterparties to perform under credit or other financial agreements, particularly considering the current uncertainty in the financial markets, could impact the ability to sustain and grow the businesses and would likely increase capital costs that may not be recoverable through rates. Cash flows from operations, combined with availability under the revolving credit facility, are expected to provide sufficient liquidity to fund current obligations, projected working capital requirements, maturities of long-term debt and capital spending for at least the next twelve months.

***Distributions***—During 2008, EFIH's board of directors declared and EFIH paid the following cash distributions to EFH Corp.:

| Declaration Date | Payment Date | Amount Paid |
|---|---|---|
| November 13, 2008 | November 14, 2008 | $117 |
| August 20, 2008 | August 21, 2008 | $ 78 |
| May 14, 2008 | May 15, 2008 | $ 78 |
| February 20, 2008 | March 31, 2008 | $ 57 |

C-38

Confidential

The net proceeds of $1.253 billion from Oncor's sale of noncontrolling interests in November 2008 were distributed to EFH Corp. See Note 1 to EFIH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus for additional information.

During 2009, EFIH's board of directors declared and EFIH paid the following cash distributions to EFH Corp.:

| Declaration Date | Payment Date | Amount Paid |
|---|---|---|
| May 19, 2009 | May 20, 2009 | $40 |
| February 18, 2009 | March 3, 2009 | $18 |

See Note 13 to EFIH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus for discussion of distribution restriction provisions.

*Capitalization*—The capitalization ratios of EFIH were 61.7% long-term debt, less amounts due currently, 26.9% EFIH membership interests and 11.4% noncontrolling interests in subsidiary as of December 31, 2008 and 52.3% long-term debt, less amounts due currently, to 47.7% EFIH membership interests at December 31, 2007.

*Financial Covenants, Credit Rating Provisions and Cross Default Provisions*—Oncor's revolving credit facility contains a financial covenant that requires maintenance of a specified leverage ratio. As of December 31, 2008 and June 30, 2009, Oncor was in compliance with such covenant.

*Covenants and Restrictions Related to Pushed Down Debt*—See Note 11 to EFIH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus for discussion of EFH Corp. debt pushed down to EFIH as a result of its guarantee of the debt. The indenture governing the EFH Corp. Notes contains covenants that could have a material impact on the liquidity and operations of EFH Corp. and its subsidiaries. A brief description of certain of these covenants is provided below. See also Note 11 to EFIH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus for additional discussion of the covenants contained in these financing arrangements.

When the term "Adjusted EBITDA" (see Glossary contained in EFIH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus) is referenced in the covenant description below, it is a reference to, and generally synonymous with, the term "EBITDA" that is used in the indenture governing the EFH Corp. Notes. Further, the indenture provides that Oncor results be included in Adjusted EBITDA when used in connection with making restricted payments and investments other than payments to the Sponsor Group, but that the Oncor results be excluded and distributions received from Oncor be included when used in connection with incurrences of indebtedness. Adjusted EBITDA (as used in the restricted payments covenant contained in the indenture governing the EFH Corp. Notes) for the year ended December 31, 2008 totaled $4.6 billion for EFH Corp. See "—Adjusted EBITDA Reconciliation") for a reconciliation of net income (loss) to Adjusted EBITDA for EFH Corp. for the years ended December 31, 2008 and 2007.

*Debt Incurrence Covenants*—Under the indenture governing the EFH Corp. Notes, EFH Corp. and its restricted subsidiaries (other than TCEH and its restricted subsidiaries) are not permitted to incur indebtedness or issue certain classes of preferred stock unless, on a pro forma basis, after giving effect to such incurrence or issuance, the fixed charge coverage ratio (as defined in the EFH corp. indenture) on a consolidated basis for EFH Corp. and its restricted subsidiaries is at least 2.0 to 1.0 or such incurrence or issuance is otherwise permitted by specified exceptions in the indenture. The fixed charge coverage ratio is generally defined as the ratio of Adjusted EBITDA of EFH Corp. to fixed charges of EFH Corp., in each case on a consolidated basis but excluding Oncor. The fixed charge coverage ratio for EFH Corp. was 1.5 to 1.0 at December 31, 2008. In addition, under this indenture, TCEH and its restricted subsidiaries are not permitted to incur indebtedness or issue certain classes of preferred stock unless, on a pro forma basis, after giving effect to such incurrence or issuance, the fixed charge coverage ratio (as defined in the indenture) on a consolidated basis for TCEH and its restricted subsidiaries is at least 2.0 to 1.0 or such incurrence or issuance is otherwise permitted by specified

Confidential

exceptions in the indenture. The fixed charge coverage ratio for that purpose is generally defined as the ratio of Adjusted EBITDA of TCEH to fixed charges of TCEH, in each case, on a consolidated basis. The fixed charge coverage ratio for TCEH as of December 31, 2008 was 1.3 to 1.0.

   *Restricted Payments/Limitation on Investments*—Under the indenture governing the EFH Corp. Notes, EFH Corp. and its restricted subsidiaries have limitations, subject to certain exceptions, on making restricted payments (as defined in the indenture), including cash dividends, equity repurchases, subordinated debt repayments and investments, unless the amount of such restricted payments is less than a formula based on 50% of consolidated net income (as defined in such indenture) and unless a fixed charge coverage ratio (as defined in such indenture), on a pro forma basis, after giving effect to such restricted payment, is at least 2.0 to 1.0 (or 2.0 to 1.0 of TCEH in the case of certain restricted payments by TCEH and its restricted subsidiaries) or as such restricted payment is otherwise permitted by specified exceptions in the indenture. The fixed charge coverage ratio for this purpose is generally defined as the fixed charge coverage ratio of EFH Corp. and all of its restricted subsidiaries, including Oncor Holdings and its subsidiaries as restricted subsidiaries for purposes of such calculation, and was 1.3 to 1.0 as of December 31, 2008. However, in the case of payments to the Sponsor Group, the fixed charge coverage ratio for this purpose is defined as the fixed charge coverage ratio of EFH Corp. and its restricted subsidiaries (but not including Oncor Holdings and its subsidiaries as restricted subsidiaries for purposes of such calculation) and was 1.5 to 1.0 as of December 31, 2008. Notwithstanding any other provisions of the indenture, EFH Corp. and its restricted subsidiaries may not pay any dividends or other returns to Texas Holdings unless, on a pro forma basis, after giving effect to such payment, the consolidated leverage ratio of EFH Corp. is equal to or less than 7.0 to 1.0. The consolidated leverage ratio is generally defined as the ratio of consolidated total indebtedness (as defined in the indenture) of EFH Corp. to Adjusted EBITDA of EFH Corp., in each case, on a consolidated basis, excluding Oncor Holdings and its subsidiaries, and was 6.9 to 1.0 as of December 31, 2008.

   *Credit Ratings*—The rating agencies assign issuer credit ratings for Oncor. The issuer credit ratings as of August 3, 2009 for Oncor are BBB+ and BBB- by S&P and Fitch, respectively.

   Additionally, the rating agencies assign credit ratings on certain debt securities issued by EFH Corp. and Oncor. As of August 3, 2009, the credit ratings assigned for debt securities issued by EFH Corp. that are guaranteed by and pushed down to EFIH and debt securities issued by Oncor are presented below:

|  | S&P | Moody's | Fitch |
|---|---|---|---|
| EFH Corp. (Senior Unsecured) (a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | B- | Caa2 | B+ |
| Oncor (Senior Secured) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | BBB+ | Baa1 | BBB |
| Oncor (Senior Unsecured) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | BBB+ | Baa1 | BBB- |

(a)  Cash-Pay Notes and Toggle Notes

   As described in Notes 10 and 11 to EFIH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus, all of Oncor's long-term debt is currently secured by a first priority lien on certain of its transmission and distribution assets and is considered senior secured debt. All three rating agencies have placed Oncor's ratings on "stable outlook."

   In November 2008, Oncor sold additional equity interests resulting in an unaffiliated investor group acquiring a 19.75% noncontrolling stake in Oncor. In connection with Oncor's execution of the agreement, S&P upgraded Oncor's issuer credit rating and Oncor's long-term debt ratings by two notches from BBB- to BBB+, and Moody's upgraded Oncor's long-term debt ratings by one notch from Ba1 to Baa3. In conjunction with the Moody's upgrade, Moody's withdrew its issuer credit rating of Ba1 previously assigned to Oncor. As a matter of practice, Moody's does not assign issuer credit ratings for investment grade utility companies. In June 2009, Moody's upgraded the long-term debt rating for Oncor's senior secured debt by two notches from Baa3 to Baa1 citing, among other things, Oncor's position as a rate-regulated electric transmission and distribution utility in Texas, reasonably supportive regulatory jurisdiction, solid financial credit metrics, adequate sources of near-term liquidity and the continued evidence of strong corporate independence from EFH Corp. See Note 14 to EFIH's

C-40

EFIHMW00246718

historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus for additional information on the noncontrolling interests sale.

In August 2009, S&P placed the ratings for EFH Corp. on "negative outlook," citing its expectation that EFH Corp. and TCEH will exercise the PIK option on their toggle notes a third time, which will increase refinancing risk. In March 2009, Moody's downgraded ratings for EFH Corp. and confirmed the outlook for EFH Corp. as negative, citing the current material degradation in economic factors combined with declining fundamentals associated with weaker commodity prices. In August 2009, Moody's downgraded the issuer ratings for EFH Corp. one notch to Caa1 and downgraded the long-term debt ratings of EFH Corp. by one notch. Moody's downgrade and continued negative outlook for EFH Corp. cited weak business fundamentals including high debt levels, including maturities in 2014, prospective long-term liquidity, financial and credit market prospects due primarily to EFH Corp.'s long-term hedging program, acceleration of environmental legislative initiatives that could threaten margins from coal-fired plants and the risk of incremental market intervention in Texas. The negative outlook also reflects their view that the capital structure is untenable and will likely prompt EFH Corp. to pursue some form of restructuring activity. In March 2009, Fitch downgraded certain ratings for EFH Corp. and has changed the outlook for EFH Corp. from stable to negative, citing the effect of the economic slowdown in Texas and lower than anticipated market heat rates in ERCOT.

A rating reflects only the view of a rating agency, and is not a recommendation to buy, sell or hold securities. Ratings can be revised upward or downward at any time by a rating agency if such rating agency decides that circumstances warrant such a change.

*Material Credit Rating Covenants*—Certain arrangements of EFIH's subsidiaries, including Oncor's credit facility and certain leases, contain terms pursuant to which the interest rates charged under the agreements may be adjusted depending on credit ratings.

*Material Cross Default Provisions*—Certain financing arrangements contain provisions that may result in an event of default if there were a failure under other financing arrangements to meet payment terms or to observe other covenants that could or does result in an acceleration of payments due. Such provisions are referred to as "cross default" provisions.

A default by Oncor or any subsidiary thereof in respect of indebtedness in a principal amount in excess of $50 million may result in a cross default under its credit facility. Under this facility such a default may cause the maturity of outstanding balances ($542 million at June 30, 2009) under such facility to be accelerated.

The indenture governing the EFH Corp. Notes contains a cross acceleration provision where a payment default at maturity or on acceleration of principal indebtedness under any instrument or instruments of EFH Corp. and any of its restricted subsidiaries (as defined in the indenture) in the aggregate amount equal to or greater than $250 million may cause the acceleration of the EFH Corp. Notes.

***Long-Term Contractual Obligations and Commitments***—The following table summarizes EFIH's contractual cash obligations as of December 31, 2008 (see Notes 11 and 12 to EFIH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus for additional disclosures regarding these long-term debt and noncancelable purchase obligations).

| Contractual Cash Obligations | Less Than One Year | One to Three Years | Three to Five Years | More Than Five Years | Total |
|---|---|---|---|---|---|
| Long-term debt—principal (a) | $103 | $ 221 | $1,594 | $5,561 | $ 7,479 |
| Long-term debt—interest | 515 | 1,155 | 1,046 | 3,376 | 6,092 |
| Operating leases (a) | 8 | 14 | 9 | 11 | 42 |
| Obligations under outsourcing agreements (b) | 50 | 63 | — | — | 113 |
| Obligations under services agreements | 5 | 5 | — | — | 10 |
| Total contractual cash obligations (c) | $681 | $1,458 | $2,649 | $8,948 | $13,736 |

C-41

EFIHMW00246719

<hr>

(a)  Excludes $75 million of additional principal amount of EFH Corp. Notes issued in May 2009 and due in 2017, reflecting the election of the PIK feature on EFH Corp. Toggle Notes pushed down to EFIH as discussed in Note 11 to EFIH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus.

(b)  Includes short-term noncancelable leases.

(c)  See Note 16 to EFIH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus for discussion of an outsourcing agreement termination.

(d)  Table does not include estimated 2009 funding of the pension and other employee postretirement benefits plans totaling approximately $79 million. See "—Financial Condition—Liquidity and Capital Resources—Pension and OPEB Plan Funding" above for additional discussion of pension plan funding.

The following contractual obligations were excluded from the table above:

- contracts between affiliated entities and intercompany debt;

- individual contracts that have an annual cash requirement of less than $1 million (however, multiple contracts with one counterparty that are more than $1 million on an aggregated basis have been included);

- contracts that are cancelable without payment of a substantial cancellation penalty, including the construction and maintenance services contract described below;

- employment contracts with management, and

- liabilities related to uncertain tax positions totaling $122 million discussed in Note 6 to EFIH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus as the ultimate timing of payment is not known.

In June 2008, Oncor entered into a 10-year contract for transmission and distribution construction and maintenance services effective for calendar years 2009 through 2018. The contract terms include pricing that assumes minimum purchase amounts by Oncor of $300 million for each of the five two-year periods of the contract. Purchases of less than the assumed amounts may result in lost discount payments of up to $24 million per two-year period if such minimum levels are not met. The contract can be terminated by Oncor for convenience or by the vendor if certain threshold spending is not achieved, subject to a wind-down payment of up to $21 million in 2009, declining annually to $2 million at the beginning of 2018 or by either party for cause with no wind-down payment. Termination can be for the full contract or for certain services only. Management considers it unlikely that any material lost discount payments will be made.

In January 2009 the PUCT assigned approximately $1.3 billion of CREZ construction projects to Oncor. A written order reflecting the PUCT's decision was entered in March 2009. EFIH expects capital expenditures related to CREZ transmission facilities to be approximately $90 million in 2009 with additional expenditures through 2012. These amounts are not included in the table above.

If EFH Corp. defaulted in its contributions to the EFH Retirement Plan, as the plan sponsor, it is expected that EFIH would seek to continue the plan and would be liable for any liabilities in excess of the assets of the plan. As of December 31, 2008, the plan's liabilities in excess of its assets (excluding EFIH's portion) totaled $109 million.

*Guarantees*—See Note 12 to EFIH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus for details of guarantees.

### Off-Balance Sheet Arrangements

As of December 31, 2008, EFIH does not have any off-balance sheet arrangements with special purpose entities or variable interest entities.

C-42

EFIHMW00246720

**Commitments and Contingencies**

See Note 12 to EFIH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus for a discussion of commitments and contingencies, including guarantees.

**Changes in Accounting Standards**

See Note 1 to EFIH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus for a discussion of changes in accounting standards.

**Regulation and Rates**

*Certification of REPs*

In April 2009, the PUCT finalized a rule relating to the Certification of Retail Electric Providers. The rule strengthens the certification requirements for REPs in order to better protect customers, transmission and distribution utilities (TDUs), and other REPs from the potential insolvency of REPs. The rule is considered a competition rule and thus is subject to judicial review as specified in PURA. The rule, among other things, increases creditworthiness and financial reporting requirements for REPs and provides additional customer protection requirements and regulatory asset consideration for TDU bad debt expenses. Under the rule, Oncor uncollectible amounts owed by nonaffiliated REPs are deferred as a regulatory asset. Recovery of the regulatory asset will be considered in a future rate case. Accordingly, Oncor recognized an approximately $3 million one-time reversal of bad debt expense in the three months ended June 30, 2009 (see Note 9 to EFIH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus). Due to the commitments made to the PUCT in connection with the Merger, Oncor may not recover bad debt expense, or certain other costs and expenses, from rate payers in the event of a default or bankruptcy by an affiliate REP.

*Matters with the PUCT*

***Stipulation Approved by the PUCT***—In April 2008, the PUCT entered an order, which became final in June 2008, approving the terms of a stipulation relating to the filing in 2007 by Oncor and Texas Holdings of a Merger-related Joint Report and Application with the PUCT pursuant to Section 14.101 (b) of PURA and PUCT Substantive Rule 25.75. The stipulation required the filing of a rate case by Oncor no later than July 1, 2008 based on a test year ended December 31, 2007. Oncor filed the rate case with the PUCT in June 2008. In July 2008, Nucor Steel filed an appeal of the PUCT's order in the 200th District Court of Travis County, Texas. Oncor was named a defendant and intends to vigorously defend the appeal.

***Rate Case***—In June 2008, Oncor filed for a rate review with the PUCT (Docket No. 35717) and 204 cities, as required by the order approving the stipulation discussed in Note 4 to EFIH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus. An evidentiary hearing on the rate review filing before the State Office of Administrative Hearings (SOAH) concluded in February 2009. In June 2009, SOAH issued a Proposal for Decision (PFD). The PUCT considered Oncor's rate review filing and the PFD at two open meetings in July, and on August 13, 2009, the PUCT voted to adopt the PFD in part and reject the PFD in part. Key findings made by the PUCT include:

- recognizing and affirming Oncor's corporate ring-fence from EFH Corp. and its unregulated affiliates by rejecting a proposed consolidated tax savings adjustment arising out of EFH Corp.'s ability to offset Oncor's taxable income against losses from other investments;

- approving the recovery of all of Oncor's capital investment in its transmission and distribution system, including investment in certain automated meters that will be replaced pursuant to Oncor's advanced meter deployment plan;

C-43

Confidential

- denying recovery of $25 million of certain regulatory assets, which will result in a $16 million after tax loss being recognized in the third quarter 2009, and

- setting Oncor's return on equity at 10.25%.

The PUCT staff has estimated that the final order results in an approximate $115 million increase over Oncor's 2007 test year revenues, before recovery of rate case expenses. Excluding the one-time loss on regulatory assets discussed above, the result of the rate case is not expected to have a material effect on Oncor's net income.

A final order was signed August 31, 2009, and new rates will be implemented once new tariffs are approved, which is expected to occur before the end of September 2009. The final order will remain subject to any motions for rehearing and appeals.

*Advanced Meter Rulemaking*—In 2005, the Texas Legislature passed legislation that authorized electric utilities to implement a surcharge to recover costs incurred in deploying advanced metering and meter information networks. Benefits of the advanced metering installation include improved safety, on-demand meter reading, enhanced outage identification and restoration and system monitoring of voltages. In 2007, the PUCT issued its advanced metering rule to implement this legislation. This rule outlined the minimum required functionality for an electric utility's advanced metering systems to qualify for cost recovery under a surcharge. Subsequent to the issuance of the rule, the PUCT opened an implementation proceeding for market participants to fine-tune the rule requirements, address the impacts of advanced metering deployment on retail and wholesale markets in ERCOT, and help ensure that retail customers receive benefits from advanced metering deployment. The implementation proceeding concluded in 2009.

*Advanced Metering Deployment Surcharge Filing*—In May 2008, Oncor filed with the PUCT (Docket No. 35718) a description and request for approval of its proposed advanced metering system deployment plan and its proposed surcharge for the recovery of its estimated future investment for advanced metering deployment. Oncor's plan provides for the full deployment of over three million advanced meters by the end of 2012 to all residential and most non-residential retail electricity customers in Oncor's service area. As of June 30, 2009, Oncor has installed approximately 240 thousand advanced digital meters, including approximately 200 thousand in the six months ended June 30, 2009. Cumulative capital expenditures for the deployment of the advanced meter system totaled $108 million as of June 30, 2009. In July 2009, Oncor's advanced metering system completed its first 15-minute interval, billing-quality electricity consumption data reporting to the Texas market. The data, which makes it possible to support innovative new programs and pricing options, represented information technology integration of over 200,000 advanced meters.

In August 2008, a settlement was reached with the majority of the parties to this surcharge filing. The settlement includes the following major provisions (the comparisons are against amounts filed in the original request):

- a surcharge beginning on January 1, 2009 and continuing for 11 years;

- a total revenue requirement over the surcharge period of $1.035 billion (reduced from $1.069 billion);

- estimated capital expenditures for advanced metering facilities of $686 million (reduced from $690 million);

- related operation and maintenance expenses for the surcharge period of $153 million (increased from $148 million);

- $28 million of additional savings (in addition to the $176 million in the original filing), and

- an advanced metering cost recovery factor of $2.21 per month per residential retail customer (reduced from $2.29 per month) and varying from $2.42 to $5.21 per month for non-residential retail customers (reduced from $2.49 to $5.35 per month).

C-44

EFIHMW00246722

An order approving the settlement was issued by the PUCT in August 2008 and became final in September 2008. Oncor began billing the advanced metering surcharge in the January 2009 billing month cycle. Oncor may, through subsequent reconciliation proceedings, request recovery of additional costs that are reasonable and necessary. While there is a presumption that costs spent in accordance with a plan approved by the PUCT are reasonable and necessary, recovery of any costs that are found not to have been spent or properly allocated, or not to be reasonable or necessary, must be refunded.

Prior to the PUCT issuance of rules for minimum required functionality for advanced metering systems, Oncor installed approximately 600,000 automated meters in its service territory at a capital cost of approximately $125 million. These meters are not part of the surcharge request, and Oncor is seeking recovery of the incremental costs of these meters in its general rate case discussed above. In its August 2009 ruling on the rate case, the PUCT voted to allow Oncor to recover the costs of these meters.

***Energy Efficiency Cost Recovery Filing***—In June 2008, Oncor filed with the PUCT a Request for Approval of Energy Efficiency Cost Recovery Factor (Docket No. 35634). Oncor requested a nonbypassable charge to be billed to REPs serving customer classes that receive services under Oncor's energy efficiency program. The proposed recovery factor is $0.22 per month for each residential customer and will vary for non-residential customers. The proposed charge will allow Oncor, in a timely manner, to recover reasonable and necessary costs incurred in administering its energy efficiency program. In October 2008, the PUCT approved the recovery factor. Oncor began billing the surcharge in the January 2009 billing month cycle.

In May 2009, Oncor filed an application with the PUCT to request approval of an Energy Efficiency Cost Recovery Factor (EECRF) for 2010. PUCT rules require Oncor to make an annual EECRF filing by May 1 for implementation at the beginning of the next calendar year. The requested 2010 EECRF is $54 million, the same amount established for 2009, and would result in the same $0.92 per month charge for residential customers as proposed in Oncor's pending rate case. As allowed by the rule, the 2010 EECRF is designed to recover the costs of the 2010 programs, the under-recovery of 2008 program costs, and a performance bonus based on 2008 results. If the application is approved as filed, Oncor will record $9 million in revenues, representing the performance bonus.

***Transmission Rates***—In order to recover increases in its transmission costs, including fees paid to other transmission service providers, Oncor is allowed to request an update twice a year to the transmission cost recovery factor (TCRF) component of its retail delivery rate charged to REPs. In February 2008, Oncor filed an application for an interim update of its wholesale transmission rate. The PUCT approved Oncor's application in April 2008, and the new rate went into effect immediately. Annualized revenues are expected to increase by approximately $39 million. Approximately $25 million of this increase is recoverable through transmission rates charged to wholesale customers, and the remaining $14 million is recoverable from REPs through the TCRF component of Oncor's delivery rates charged to REPs as discussed immediately above. In January 2009, an application was filed to increase the TCRF, which was administratively approved in February 2009 and became effective in March 2009. This increase is expected to increase annualized revenues by $16 million. In July 2009, an application was filed to increase the TCRF, which was administratively approved in August 2009 and became effective September 1, 2009. This increase is expected to increase annualized revenues by approximately $14 million.

***Competitive Renewable Energy Zones (CREZ)***—In the first quarter of 2007, the PUCT initiated a docket to identify the transmission facilities necessary to interconnect future renewable energy generating facilities. As part of the docket, the PUCT considered which zones would contain the best renewable energy sources. In July 2007, the PUCT voted to designate zones with generation potential of over 20,000 MW. In July 2008, the PUCT approved a plan for the construction of transmission facilities with an estimated cost of $4.9 billion to accommodate over 18,000 MW of wind capacity.

C-45

Confidential

In January 2009, the PUCT assigned approximately $1.3 billion of CREZ construction projects to Oncor. A written order reflecting the PUCT's decision was entered in March 2009, and an order on rehearing was issued by the PUCT in May 2009. The cost estimates for the CREZ construction projects are based upon cost analyses prepared by ERCOT. For the six months ended June 30, 2009, CREZ-related capital expenditures totaled $39 million. It is expected that the necessary permitting actions and other requirements and all construction activities for the assigned construction projects will be completed by the end of 2013.

### Summary

EFIH cannot predict future regulatory or legislative actions or any changes in economic and securities market conditions. Such actions or changes could significantly alter its basic financial position, results of operations or cash flows.

## Quantitative and Qualitative Disclosures about Market Risk

### Interest Rate Risk

Market risk is the risk that EFIH may experience a loss in value as a result of changes in market conditions such as interest rates that may be experienced in the ordinary course of business. EFIH may transact in financial instruments to hedge interest rate risk related to its indebtedness, but there are currently no such hedges in place. All of EFIH's long-term debt at June 30, 2009 and December 31, 2008 and 2007 carried fixed interest rates.

| | Expected Maturity Date | | | | | | Successor | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | *(millions of dollars, except percentages)* | | | | | | 2008 Total Carrying Amount | 2008 Total Fair Value | 2007 Total Carrying Amount | 2007 Total Fair Value |
| | 2009 | 2010 | 2011 | 2012 | 2013 | There-after | | | | |
| Long-term debt (including current maturities) | | | | | | | | | | |
| Fixed rate debt amount (a) .... | $ 103 | $ 108 | $ 113 | $ 819 | $ 775 | $5,561 | $7,479 | $6,287 | $6,078 | $6,207 |
| Average interest rate ...... | 4.02% | 4.75% | 4.86% | 6.16% | 5.85% | 8.53% | 7.82% | ----- | 8.06% | ----- |

(a) Excludes unamortized premiums and discounts. See Note 11 to EFIH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus for a discussion of changes in debt obligations.

### Credit Risk

**Credit Risk**—Credit risk relates to the risk of loss associated with nonperformance by counterparties. Customers consist primarily of REPs. As a prerequisite for obtaining and maintaining certification, a REP must meet the financial resource standards established by the PUCT. Meeting these standards does not guarantee that a REP will be able to perform its obligations. REP certificates granted by the PUCT are subject to suspension and revocation for significant violation of PURA and PUCT rules. Significant violations include failure to timely remit payments for invoiced charges to a transmission and distribution utility pursuant to the terms of tariffs approved by the PUCT. See "—Regulation and Rates" above regarding a new REP certification rule.

**Credit Exposure**—Exposure to credit risk associated with accounts receivable totaled $147 million from affiliates, which consisted of $135 million of Oncor's trade account receivable from TCEH and $12 million of other receivables from affiliates, and $224 million from nonaffiliated customers as of December 31, 2008. The

C-46

EFIHMW00246724

nonaffiliated customer receivable amount is before the allowance for uncollectible accounts, which totaled $7 million at December 31, 2008. The nonaffiliated exposure consists almost entirely of noninvestment grade trade accounts receivable of which $168 million represents trade accounts receivables from REPs. As of December 31, 2008, subsidiaries of one customer represented 12% of the nonaffiliated trade receivable amount. No other nonaffiliated parties represent 10% or more of the total exposure. EFIH views exposure to this customer to be within an acceptable level of risk tolerance considering PUCT rules and regulations; however, this concentration increases the risk that a default would have a material effect on EFIH's net income and cash flows.

Oncor is also exposed to credit risk associated with the note receivable from TCEH totaling $289 million ($35 million reported as current in trade accounts and other receivables from affiliates) at December 31, 2008 (see Note 19 to EFIH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus for additional information).

### Adjusted EBITDA Reconciliation

**Energy Future Holdings Corp. Consolidated**
**Adjusted EBITDA Reconciliation**

| | Year Ended December 31, 2008 | Year Ended December 31, 2007 |
|---|---|---|
| | (millions of dollars) | |
| **Net loss** | $(9,838) | $ (637) |
| **Income tax benefit** | (471) | (364) |
| **Interest expense and related charges** | 4,935 | 1,510 |
| **Depreciation and amortization** | 1,610 | 1,049 |
| **EBITDA** | $(3,764) | $ 1,558 |
| Oncor EBITDA | (496) | (1,291) |
| Oncor distributions/dividends (a) | 1,582 | 326 |
| Interest income | (27) | (80) |
| Amortization of nuclear fuel | 76 | 69 |
| Purchase accounting adjustments (b) | 460 | 138 |
| Impairment of goodwill | 8,000 | — |
| Impairment of assets and inventory write down (c) | 1,221 | 757 |
| Net loss attributable to noncontrolling interests | (160) | — |
| Unrealized net (gain) or loss resulting from hedging transactions | (2,329) | 2,278 |
| Losses on sale of receivables | 29 | 39 |
| Income from discontinued operations, net of tax effect | — | (25) |
| Noncash compensation expense (SFAS 123R) (d) | 27 | 22 |
| Severance expense (e) | 3 | — |
| Equity losses of unconsolidated affiliate engaged in broadband over power lines | — | 1 |
| Transition and business optimization costs (f) | 45 | 24 |
| Transaction and merger expenses (g) | 64 | 150 |
| Insurance settlement proceeds (h) | (21) | — |
| Restructuring and other (i) | 35 | (33) |
| Expenses incurred to upgrade or expand a generation station (j) | 100 | 5 |
| **Adjusted EBITDA per Incurrence Covenant** | $ 4,845 | $ 3,938 |
| **Add back Oncor adjustments** | $ (267) | $ 978 |
| **Adjusted EBITDA per Restricted Payments Covenants** | $ 4,578 | $ 4,916 |

C-47

EFIHMW00246725

PX 014
Page 1007 of 1116

_____

(a) Includes $1.253 billion distribution of net proceeds from the sale of Oncor noncontrolling interests.

(b) Purchase accounting adjustments include amortization of the intangible net asset value of retail and wholesale power sales agreements, environmental credits, coal purchase contracts, nuclear fuel contracts and power purchase agreements and the stepped up value of nuclear fuel. Also includes certain credits not recognized in net income due to purchase accounting.

(c) Impairment of assets includes impairments of emission allowances and trade name intangible assets, impairment of the natural gas-fueled generation fleet and charges related to the cancelled development of coal-fueled generation plants.

(d) Noncash compensation expenses exclude capitalized amounts.

(e) Severance expense includes amounts incurred related to outsourcing, restructuring and other amounts deemed to be in excess of normal recurring amounts.

(f) Transition and business optimization costs include professional fees primarily for retail billing and customer care systems enhancements and certain incentive compensation.

(g) Transaction and merger expenses include costs related to the Merger, abandoned strategic transactions and a terminated joint-venture. Also includes administrative costs related to the cancelled program to develop coal-fueled generation facilities, the Sponsor Group management fee, costs related to certain growth initiatives and costs related to the Oncor sale of noncontrolling interests.

(h) Insurance settlement proceeds include the amount received for property damage to certain mining equipment.

(i) Restructuring and other for 2008 includes a litigation accrual and the charge related to the bankruptcy of a subsidiary of Lehman Brothers Holdings Inc., and for 2007 includes credits related to impaired combustion turbine leases and other restructuring initiatives and nonrecurring activities.

(j) Expenses incurred to upgrade or expand a generation station reflect noncapital outage costs.

C-48

EFIHMW00246726

## CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

There were no changes in or disagreements with accountants on accounting and financial disclosure during EFIH's two most recent fiscal years and each subsequent interim period since the end of the most recent fiscal year.

## MANAGEMENT

### Managers

The names of EFIH's managers and information about them, as furnished by the managers themselves, are set forth below:

| Name | Age | Served As Manager Since | Business Experience |
|------|-----|-------------------------|---------------------|
| Paul M. Keglevic | 55 | 2008 | Paul M. Keglevic has served as a manager of EFIH since July 2008. Mr. Keglevic was elected Executive Vice President and Chief Financial Officer of EFIH and EFH Corp. in July 2008. Before joining EFH Corp., he was an audit partner at PricewaterhouseCoopers. Mr. Keglevic was PricewaterhouseCoopers Utility Sector Leader from 2002 to 2008 and Clients and Sector Assurance Leader from 2007 to 2008. |
| Jeffrey Liaw | 32 | 2008 | Jeffrey Liaw has served as a manager of EFIH since July 2008. Mr. Liaw is active in TPG Capital, L.P.'s (TPG) energy and industrial investing practice areas. Before joining TPG in 2005, he worked for Bain Capital in its industrials practice since 2001. Mr. Liaw serves on the boards of both public and private companies, including Graphic Packaging Corporation, EFH Corp., Oncor Holdings and Oncor. |
| Marc S. Lipshultz | 40 | 2008 | Marc S. Lipshultz has served as a manager of EFIH since July 2008. Mr. Lipshultz joined Kohlberg Kravis Roberts & Co. L.P. (KKR) in 1995. Mr. Lipshultz is the leader of KKR's Energy and Infrastructure businesses. Currently, Mr. Lipshultz is a director of Accel-KKR Company, Oncor Holdings, Oncor and EFH Corp. |
| John F. Young | 53 | 2008 | John F. Young has served as a manager of EFIH since July 2008. Mr. Young was elected President and Chief Executive Officer of EFIH in July 2008 and of EFH Corp. in January 2008. Before joining EFH Corp., Mr. Young served in many leadership roles at Exelon Corporation from March 2003 to January 2008, including Executive Vice President of Finance and Markets and Chief Financial Officer of Exelon Corporation; President of Exelon Generation; and President and Chief Operating Officer of Exelon Power. Prior to joining Exelon, Mr. Young was Senior Vice President of Sierra Pacific Resources Corporation. |

C-49

EFIHMW00246727

**Directors**

The names of EFIH Finance's directors and information about them, as furnished by the directors themselves, are set forth below:

| Name | Age | Served As Director Since | Business Experience |
|------|-----|--------------------------|---------------------|
| Paul M. Keglevic | 55 | 2009 | Paul M. Keglevic has served as a manager of EFIH since July 2008. Mr. Keglevic was elected Executive Vice President and Chief Financial Officer of EFIH and EFH Corp. in July 2008. Before joining EFH Corp., he was an audit partner at PricewaterhouseCoopers. Mr. Keglevic was PricewaterhouseCoopers Utility Sector Leader from 2002 to 2008 and Clients and Sector Assurance Leader from 2007 to 2008. |
| John F. Young | 53 | 2009 | John F. Young has served as a manager of EFIH since July 2008. Mr. Young was elected President and Chief Executive Officer of EFIH in July 2008 and of EFH Corp. in January 2008. Before joining EFH Corp., Mr. Young served in many leadership roles at Exelon Corporation from March 2003 to January 2008, including Executive Vice President of Finance and Markets and Chief Financial Officer of Exelon Corporation; President of Exelon Generation; and President and Chief Operating Officer of Exelon Power. Prior to joining Exelon, Mr. Young was Senior Vice President of Sierra Pacific Resources Corporation. |

**Executive Officers**

The names of EFIH and EFIH Finance's executive officers and information about them, as furnished by the executive officers themselves, are set forth below (except that each executive officer of EFIH Finance was first elected to such executive officer's office in September 2009):

| Name of Officer | Age | Positions and Offices Presently Held | Date First Elected to Present Offices | Business Experience (Preceding Five Years) |
|-----------------|-----|--------------------------------------|--------------------------------------|--------------------------------------------|
| John F. Young | 53 | President and Chief Executive Officer | July 2008 | John F. Young was elected President and Chief Executive Officer of EFIH in July 2008. Mr. Young has also served as President and Chief Executive Officer of EFH Corp. since January 2008. Before joining EFH Corp., Mr. Young served in many leadership roles at Exelon Corporation from March 2003 to January 2008, including Executive Vice President of Finance and Markets and Chief Financial Officer of Exelon Corporation; President of Exelon Generation; and President and Chief Operating Officer of Exelon Power. Prior to joining Exelon, Mr. Young was Senior Vice President of Sierra Pacific Resources Corporation. |

C-50

EFIHMW00246728

**PX 014**
**Page 1010 of 1116**

| Name of Officer | Age | Positions and Offices Presently Held | Date First Elected to Present Offices | Business Experience (Preceding Five Years) |
|---|---|---|---|---|
| Paul M. Keglevic | 55 | Executive Vice President and Chief Financial Officer | July 2008 | Paul M. Keglevic was elected Executive Vice President and Chief Financial Officer of EFIH in July 2008. Mr. Keglevic has also served as Executive Vice President and Chief Financial Officer of EFH Corp. since July 2008. Before joining EFH Corp., he was an audit partner at PricewaterhouseCoopers LLP. Mr. Keglevic was PricewaterhouseCoopers Utility Sector Leader from 2002 to 2008 and Clients and Sector Assurance Leader from 2007 to 2008. |
| Robert C. Walters | 51 | Executive Vice President and General Counsel | July 2008 | Robert C. Walters was elected Executive Vice President and General Counsel of EFIH in July 2008. Mr. Walters has also served as Executive Vice President and General Counsel of EFH Corp. since March 2008. Prior to joining EFH Corp., Mr. Walters was a Partner of Vinson & Elkins L.L.P. (V&E) and served on the firm's management committee. Mr. Walters was co-managing partner of the Dallas office of V&E from 1998 through 2005. |

There is no family relationship between any of the above-named executive officers.

C-51

Confidential

## EXECUTIVE COMPENSATION

EFIH and EFIH Finance's executive officers are comprised of executive officers of EFIH's parent company, EFH Corp. Consequently, all of EFIH and EFIH Finance's named executive officers are also named executive officers of EFH Corp. All compensation matters, including compensation philosophy, are administered by EFH Corp. As a result, with respect of all executive officers of EFIH and EFIH Finance, please see the executive compensation disclosure set forth under "Executive Compensation" in Annex B included elsewhere in this Prospectus.

## DIRECTOR COMPENSATION

EFIH did not pay any compensation to the members of its current and former board of managers during the fiscal year ended December 31, 2008. EFIH Finance has not paid any compensation to the members of its current and former board of directors since inception. EFIH and EFIH Finance reimburse some managers and directors for certain reasonable expenses incurred in connection with their services as managers or directors, as the case may be.

## SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS

All of EFIH's equity interests are owned by EFH Corp. All of EFIH Finance's equity interests are owned by EFIH.

## COMPENSATION COMMITTEE INTERLOCKS AND INSIDER PARTICIPATION

Neither EFIH nor EFIH Finance has a compensation committee or other board committee performing equivalent function. As described above, all compensation matters for EFIH and EFIH Finance, including compensation philosophy, are administered by EFH Corp. For a description of the compensation committee interlocks and insider participation of EFH Corp.'s Organization and Compensation Committee, please see the disclosure set forth under "Compensation Committee Interlocks and Insider Participation" in Annex B included elsewhere in this Prospectus.

C-52

EFIHMW00246730

**PX 014**
**Page 1012 of 1116**

## ANNEX D—INFORMATION RELATING TO EFCH

**Capitalized terms used in this Annex D and not
otherwise defined herein have the meanings ascribed to them in Annex A to this Prospectus**

### BUSINESS

**EFCH Business and Strategy**

EFCH is a wholly-owned subsidiary of EFH Corp. and is a Dallas-based holding company that conducts its operations principally through its wholly-owned subsidiary, TCEH. TCEH is a Dallas-based holding company for subsidiaries engaged in competitive electricity market activities largely in Texas, including electricity generation, development and construction of new generation facilities, wholesale energy sales and purchases, commodity risk management and trading activities and retail electricity sales.

As of September 30, 2009, TCEH owned or leased 16,139 MW of generation capacity in Texas. TCEH's generation capacity consists of lignite/coal, nuclear and natural gas-fueled generation facilities. In addition, TCEH is the largest purchaser of wind-generated electricity in Texas and the fifth largest in the U.S. TCEH is currently constructing three lignite/coal-fueled generation units in Texas with expected generation capacity totaling approximately 2,200 MW. Permits have been obtained for construction of the three units. The Sandow unit achieved substantial completion (as defined in the EPC Agreement for the unit) effective September 30, 2009. Accordingly, the company has operational control of the unit. The first Oak Grove unit, which is in the commissioning and start-up phase, synchronized to the grid in August 2009 and is expected to achieve substantial completion (as defined in the EPC Agreement for the unit) in the fourth quarter of 2009. The second Oak Grove unit is nearing completion of construction and initiation of the commissioning and start-up phase and is expected to achieve substantial completion (as defined in the EPC Agreement for the unit) in mid-2010. TCEH provides competitive electricity and related services to more than 2.1 million retail electricity customers in Texas.

At September 30, 2009, TCEH had approximately 4,800 full-time employees, including approximately 2,000 employees under collective bargaining agreements.

**EFCH's Market**

EFCH operates primarily within the ERCOT market. This market represents approximately 85% of electricity consumption in Texas. ERCOT is the regional reliability coordinating organization for member electricity systems in Texas and the system operator of the interconnected transmission grid for those systems. ERCOT's membership consists of more than 300 corporate and associate members, including electric cooperatives, municipal power agencies, independent generators, independent power marketers, investor-owned utilities, independent REPs and consumers.

The ERCOT market is currently divided into four regions or congestion management zones, namely: North, Houston, South and West, which reflect transmission constraints that are commercially significant and which have limits as to the amount of electricity that can flow across zones. These constraints and zonal differences can result in differences between wholesale power prices among zones. Of TCEH's baseload generation units, 12 (including the two Oak Grove units under construction) are located in the North zone, and two are located in the South zone.

The ERCOT market operates under reliability standards set by the NERC. The PUCT has primary jurisdiction over the ERCOT market to ensure adequacy and reliability of power supply across Texas's main interconnected transmission grid. The ERCOT independent system operator is responsible for maintaining reliable operations of the bulk electricity supply system in the market. Its responsibilities include ensuring that electricity production and delivery are accurately accounted for among the generation resources and wholesale buyers and sellers. Unlike certain other regional power markets, the ERCOT market is not a centrally dispatched

D-1

EFIHMW00246731

power pool, and the ERCOT independent system operator does not procure energy on behalf of its members, except to the extent that it acquires ancillary services as agent for market participants. Members who sell and purchase power are responsible for contracting sales and purchases of power with other members through bilateral transactions. The ERCOT independent system operator also serves as agent for procuring ancillary services for those members who elect not to provide their own ancillary services.

The following data is derived from information published by ERCOT:

In 2008, hourly demand peaked at 62,174 MW as compared to the record hourly peak demand of 62,339 MW in 2006. The ERCOT market has limited interconnections to other markets in the US, which currently limits potential imports into and exports out of the ERCOT market to 1,106 MW of generation capacity (or approximately 2% of peak demand). In addition, wholesale transactions within the ERCOT market are generally not subject to regulation by the FERC.

From 1999 through 2008, over 36,000 MW of mostly natural gas-fueled and wind generation capacity has been developed in the ERCOT market. Net generation capacity in the ERCOT market for 2008 totaled 72,820 MW, excluding mothballed (idled) capacity; approximately 65% of this capacity was natural gas-fueled generation and approximately 27% of this capacity consisted of lignite/coal and nuclear-fueled baseload generation. ERCOT currently has a target reserve margin level of 12.5%; the reserve margin is projected by ERCOT to be 16.8% in 2009, 20.1% in 2010, and drop to 13.9% by 2014. Reserve margin is the difference between system generation capability and anticipated peak load.

Natural gas-fueled generation is the predominant electricity capacity resource in the ERCOT market and accounted for approximately 43% of the electricity produced in the ERCOT market in 2008. Because of the significant natural gas-fueled capacity and the ability of such plants to more readily increase or decrease production when compared to baseload generation, marginal demand for electricity is usually met by natural gas-fueled plants. As a result, wholesale electricity prices in ERCOT are highly correlated with natural gas prices.

### EFCH's Strategies

EFCH's businesses focus operations on key drivers such as optimizing its existing generation fleet to provide safe, reliable and cost-competitive electricity, developing and constructing additional environmentally considerate generation capacity to help meet the growing demand for electricity in Texas and providing high quality service and innovative energy products to retail customers.

Other elements of EFCH's strategy include:

- *Increase value from existing businesses*. EFCH's strategy focuses on striving for top quartile or better performance across its operations in terms of safety, availability, cost and customer service. In establishing tactical objectives, EFCH incorporates the following core operating principles:

  - *Safety*: Placing the safety of communities, customers and employees first;

  - *Environmental Stewardship*: Continuing to make strategic and operational improvements that lead to cleaner air, land and water;

  - *Customer Focus*: Delivering products and superior service to help customers more effectively manage their use of electricity;

  - *Community Focus*: Being an integral part of the communities in which EFCH lives, works and serves;

  - *Operational Excellence*: Incorporating continuous improvement and financial discipline in all aspects of the business to achieve top-tier results that maximize the value of the company for stakeholders, including operating world-class facilities that produce and deliver safe and dependable electricity at affordable prices;

D-2

Confidential

EFIHMW00246732

- *Performance-Driven Culture*: Fostering a strong values- and performance-based culture designed to attract, develop and retain best-in-class talent.

An example of how EFCH applies these principles is an ongoing program to drive productivity improvements in generation operations through application of lean operating techniques and deployment of a high-performance industrial culture.

- *Pursue growth opportunities across business lines.* EFCH's scale allows it to take part in large capital investments, such as new generation projects, with a smaller fraction of overall capital at risk and with an enhanced ability to streamline costs. EFCH expects to also explore smaller-scale growth initiatives that are not expected to be material to its performance over the near term but can enhance its growth profile over time. Specific growth initiatives include:

  - Finalize construction of three new lignite-fueled generation facilities with onsite lignite fuel supplies. Pursue new generation opportunities to help meet ERCOT's growing electricity needs over the longer term from a diverse range of alternatives such as nuclear, renewable energy, wind and advanced coal technologies.

  - Profitably increase the number of retail customers served throughout the competitive ERCOT market areas by delivering superior value through high quality customer service and innovative energy products, including pioneering energy efficiency initiatives and service offerings.

- *Reduce the volatility of cash flows through a commodity risk management strategy.* The strong historical correlation between natural gas prices and wholesale electricity prices in the ERCOT market provides EFH Corp. an opportunity to manage its exposure to variability of wholesale electricity prices. EFCH has established a long-term hedging program designed to reduce exposure to changes in future electricity prices due to changes in the price of natural gas. Under the program, subsidiaries of EFCH have entered into market transactions involving natural gas-related financial instruments, and as of September 30, 2009, have effectively sold forward approximately 1.7 billion MMBtu of natural gas (equivalent to the natural gas exposure of approximately 214,000 GWh at an assumed 8.0 market heat rate) over the next five years at weighted average annual hedge prices ranging from $7.19 per MMBtu to $8.05 per MMBtu. These transactions, as well as forward power sales, have effectively hedged an estimated 71% of the natural gas price exposure related to EFCH's expected generation output for the period beginning October 1, 2009 and ending December 31, 2014 (on an average basis for such period and assuming an 8.0 market heat rate). The hedges were entered into with the continuing expectation that wholesale electricity prices in ERCOT will be highly correlated with natural gas prices, which are expected to be the marginal fuel for the purpose of setting electricity prices approximately 75% to 90% of the time. If the correlation changes in the future, the cash flows targeted under the long-term hedging program may not be achieved. As of September 30, 2009, more than 95% of the long-term hedging program transactions were directly or indirectly secured by a first-lien interest in TCEH's assets, thereby reducing the cash and letter of credit collateral requirements for the hedging program.

- *Pursue new environmental initiatives.* EFCH is committed to continue to operate in compliance with all environmental laws, rules and regulations and to reduce its impact on the environment. EFH Corp.'s Sustainable Energy Advisory Board advises in the pursuit of technology development opportunities that reduce EFCH's impact on the environment while balancing the need to help address the energy requirements of Texas. The Sustainable Energy Advisory Board is comprised of individuals who represent the following interests, among others: the environment, labor unions, customers, economic development in Texas and technology/reliability standards. In addition, EFCH is focused on and is pursuing opportunities to reduce emissions from its existing and new lignite/coal-fueled generation units in the ERCOT market. EFCH has voluntarily committed to reduce emissions of mercury, NOx and $SO_2$ at its existing units, so that the total of those emissions from both existing and new lignite/coal-fueled units is 20% below 2005 levels. EFCH expects to make these reductions through a combination of investment in new emission control equipment, new coal cleaning technologies and optimizing fuel blends. In addition, EFCH expects to invest $100 million over a five year period that

D-3

EFIHMW00246733

began in 2008 in programs designed to encourage customer electricity demand efficiencies. EFCH invested $6 million in these programs in 2008.

### Seasonality

A significant portion of EFCH's revenues is derived from the amount of electricity it sells. As a result, the revenues and results of operations of EFCH are subject to seasonality, weather conditions and other changes in electricity usage, with revenues being higher during the warmer months.

### Business Organization

Commodity risk management and allocation of financial resources is performed at the consolidated level; consequently, there are no reportable segments. For purposes of operational accountability and performance management, TCEH has been divided into Luminant (i.e., Luminant Power, Luminant Energy and Luminant Construction) and TXU Energy. The operations of Luminant Power, Luminant Energy and TXU Energy are conducted through separate legal entities.

*Luminant Power*—Luminant Power's existing electricity generation fleet consists of 17 plants in Texas with total installed nameplate generating capacity as of September 30, 2009 as shown in the table below:

| Fuel Type | Installed Nameplate Capacity (MW) | Number of Plants | Number of Units (a) |
|---|---|---|---|
| Nuclear . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,300 | 1 | 2 |
| Lignite/coal (b) . . . . . . . . . . . . . . . . . . . . | 5,837 | 4 | 9 |
| Natural gas (c)(d) . . . . . . . . . . . . . . . . . . | 8,002 | 12 | 35 |
| Total . . . . . . . . . . . . . . . . . . . . | 16,139 | 17 | 46 |

(a)  Leased units consist of six natural gas-fueled units totaling 390 MW of capacity. All other units are owned.
(b)  Does not include approximately 2,200 MW of generation capacity being built as discussed below under "—Luminant Construction."
(c)  Includes 1,953 MW representing seven units mothballed and not currently available for dispatch and 655 MW representing two units operated under reliability must run (RMR) contracts with ERCOT. See "—Business Organization—Luminant Power—Natural Gas-Fueled Generation Assets" below.
(d)  Includes 1,528 MW representing 12 units currently operated for unaffiliated third-parties.

The generation plants are located primarily on land owned in fee. Nuclear and lignite/coal-fueled (baseload) plants are generally scheduled to run at capacity except for periods of scheduled maintenance activities or, in the case of lignite/coal units, backdown due to periods of low demand. The natural gas-fueled generation units supplement the baseload generation capacity in meeting consumption in peak demand periods as production from a certain number of these units can more readily be ramped up or down as demand warrants.

*Nuclear Generation Assets*—Luminant Power operates two nuclear generation units at the Comanche Peak plant, each of which is designed for a capacity of 1,150 MW. Comanche Peak's Unit 1 and Unit 2 went into commercial operation in 1990 and 1993, respectively, and are generally operated at full capacity to meet the load requirements in ERCOT. Refueling (nuclear fuel assembly replacement) outages for each unit are scheduled to occur every eighteen months during the spring or fall off-peak demand periods. Every three years, the refueling cycle results in the refueling of both units during the same year, which last occurred in 2008. While one unit is undergoing a refueling outage, the remaining unit is intended to operate at full capacity. During a refueling outage, other maintenance, modification and testing activities are completed that cannot be accomplished when the unit is in operation. Over the last three years, excluding the 55-day outage in 2007 to refuel and replace the steam generators and reactor vessel head in Unit 1, the refueling outage period per unit has ranged from a high of 21 days in 2008 to a low of 18 days in 2006. The Comanche Peak plant operated at a capacity factor of 98.8% in

D-4

EFIHMW00246734

2006, which represents top decile performance when compared to all US nuclear generation facilities, 93.5% in 2007, reflecting the planned extended refueling outage to replace the steam generator and reactor vessel head in Unit 1 and 95.2% in 2008, reflecting refueling of both units.

Luminant Power has contracts in place for all of its nuclear fuel conversion services through 2011 and 86% of its requirements through 2015. In addition, Luminant Power has contracts for the acquisition of 100% of its uranium requirements for 2009, and for 100% of its nuclear fuel enrichment services through 2009, as well as all of its nuclear fuel fabrication services through 2018.

Contracts for the acquisition of additional raw uranium and nuclear fuel enrichment services through 2024 and 2029, respectively, are being negotiated. Luminant Power does not anticipate any significant difficulties in acquiring raw uranium and contracting for associated conversion services and enrichment services in the foreseeable future.

Luminant Power believes its on-site used nuclear fuel storage capability is sufficient for a minimum of five years. The nuclear industry is continuing to review ways to enhance security of used-fuel storage with the NRC to fully utilize physical storage capacity. Accordingly, Luminant Power is actively reviewing alternatives for used-fuel storage, including evaluation of industry techniques such as dry cask storage.

The Comanche Peak nuclear generation units have an estimated useful life of 60 years from the date of commercial operation. Therefore, assuming that Luminant Power receives 20-year license extensions, similar to what has been granted by the NRC to several other commercial generation reactors over the past several years, plant decommissioning activities would be scheduled to begin in 2050 for Comanche Peak Unit 1 and 2053 for Unit 2 and common facilities. Decommissioning costs will be paid from a decommissioning trust that, pursuant to state law, is funded from Oncor's customers through an ongoing delivery surcharge. (See Note 16 to EFCH's historical consolidated financial statements for the year ended December 31, 2008 and Note 12 to EFCH's historical consolidated financial statements for the nine months ended September 30, 2009, each included elsewhere in this Prospectus, for discussion of the decommissioning trust fund.)

Nuclear insurance provisions are discussed in Note 13 to EFCH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus.

*Nuclear Generation Development*—In September 2008, TCEH filed a combined operating license application with the NRC for two new nuclear generation units, each with approximately 1,700 MW (gross) capacity, at its existing Comanche Peak nuclear generation site. In connection with the filing of the application, in January 2009, TCEH and Mitsubishi Heavy Industries Ltd. (MHI) formed a joint venture to further the development of the two new nuclear generation units using MHI's US–Advanced Pressurized Water Reactor technology. A subsidiary of TCEH owns an 88% interest in the joint venture, and a subsidiary of MHI owns a 12% interest.

In March 2009, the NRC announced an official review schedule for the license application. Based on the schedule, the NRC expects to complete its review by December 2011, and it is expected that a license would be issued approximately one year later.

While TCEH was not one of the initial four applicants selected to receive DOE loan guarantees, it continues to update its DOE loan guarantee application for financing the proposed units.

*Lignite/Coal-Fueled Generation Assets*—Luminant Power's existing lignite/coal-fueled generation fleet capacity totals 5,837 MW and consists of the Big Brown (2 units), Monticello (3 units), Martin Lake (3 units) and Sandow (1 unit) plants. These plants are generally operated at full capacity to help meet the load requirements in ERCOT. Maintenance outages are scheduled during off-peak demand periods. Over the last three years, the total annual scheduled and unscheduled outages per unit averaged 32 days. Luminant Power's lignite/

D-5

EFIHMW00246735

coal-fueled generation fleet operated at a capacity factor of 89.1% in 2006, 90.9% in 2007 and 87.6 % in 2008, which represents top quartile performance of US coal-fueled generation facilities. The 2008 performance reflects extended unplanned outages at several units.

Approximately 57% of the fuel used at Luminant Power's lignite/coal-fueled generation plants in 2008 was supplied from lignite reserves owned in fee or leased surface-minable deposits dedicated to the Big Brown, Monticello and Martin Lake plants, which were constructed adjacent to the reserves. Luminant Power owns in fee or has under lease an estimated 942 million tons of lignite reserves dedicated to its generation plants, including the Oak Grove generation facilities being constructed and 246 million tons associated with an undivided interest in the lignite mine that provides fuel for the Sandow plant. Luminant Power also owns in fee or has under lease in excess of 85 million tons of reserves not currently dedicated to specific generation plants. In 2008, approximately 23 million tons of lignite were recovered to fuel Luminant Power's plants. Luminant Power utilizes owned and/or leased equipment to remove the overburden and recover the lignite.

Lignite mining operations include extensive reclamation activities that return the land to productive uses such as wildlife habitats, commercial timberland and pasture land. In 2008, Luminant Power reclaimed 1,605 acres of land. In addition, EFCH planted more than 1.4 million trees in 2008, the majority of which were part of the reclamation effort.

Luminant Power supplements its lignite fuel at Big Brown, Monticello and Martin Lake with western coal from the Powder River Basin in Wyoming. The coal is purchased from multiple suppliers under contracts of various lengths and is transported from the Powder River Basin to Luminant Power's generation plants by railcar. Based on its current usage, Luminant Power believes that it has sufficient lignite reserves for the foreseeable future and has contracted 98% of its western coal resources and all of the related transportation through 2009, with discussions and negotiations underway related to contracts for 2010 and beyond.

*Natural Gas-Fueled Generation Assets*—Luminant Power's fleet of 35 natural gas-fueled generation units consists of 3,866 MW of currently available capacity, 2,183 MW of capacity being operated for unaffiliated third parties, pursuant to the direction of the unaffiliated third parties (including 655 MW under RMR agreements with ERCOT as discussed immediately below), and 1,953 MW of capacity currently mothballed (idled). The natural gas-fueled units predominantly serve as peaking units that can be ramped up or down as demand warrants.

In February 2009, we notified ERCOT of plans to retire 11 of our natural gas-fueled units, totaling 2,229 MW of capacity (2,341 MW installed nameplate capacity), in May 2009, and mothball (idle) an additional four units, totaling 1,596 MW of capacity (1,675 MW of installed nameplate capacity), in September 2009. In May and September 2009, we entered into reliability-must-run (RMR) agreements for the remainder of 2009 with ERCOT for the operation of one unit originally planned to be retired with 115 MW of capacity (115 MW of installed nameplate capacity) and one unit planned to be mothballed with 515 MW of capacity (540 MW of installed nameplate capacity), respectively. The other units were retired in May 2009 or mothballed in September 2009 as originally planned.

***Luminant Energy***—The Luminant Energy wholesale operations play a pivotal role in TCEH's business portfolio by optimally dispatching the generation fleet, sourcing TXU Energy's and other customers' electricity requirements and managing commodity price risk.

TCEH manages commodity price exposure across the complementary Luminant generation and TXU Energy retail businesses on a portfolio basis. Under this approach, Luminant Energy manages the risks of imbalances between generation supply and sales load, which primarily represent exposures to natural gas price movements and market heat rate changes (variations in the relationships between natural gas prices and wholesale electricity prices), through wholesale markets activities that include physical purchases and sales and transacting in financial instruments.

Confidential

Luminant Energy manages this commodity price and heat rate exposure through asset management and hedging activities. Luminant Energy provides TXU Energy and other wholesale customers with electricity and related services to meet their retail customers' demands and the operating requirements of ERCOT. Luminant Energy also sells forward generation and seeks to maximize the economic value of the generation fleet. In consideration of operational production and customer consumption levels that can be highly variable, as well as opportunities for long-term purchases and sales with large wholesale market participants, Luminant Energy buys and sells electricity in short-term transactions and executes longer-term forward electricity purchase and sales agreements. Luminant Energy is the largest purchaser of wind-generated electricity in Texas and the fifth largest in the US with more than 900 MW of existing wind power under contract.

In its hedging activities, Luminant Energy enters into contracts for the physical delivery of electricity and natural gas, exchange traded and "over-the-counter" financial contracts and bilateral contracts with producers, generators and end-use customers. A major part of these hedging activities is a long-term hedging program, described above under "—EFCH's Strategies," designed to reduce exposure to changes in future electricity prices due to changes in the price of natural gas, principally utilizing natural gas-related financial instruments.

Luminant Energy also dispatches Luminant Power's available natural gas-fueled generation capacity. Luminant Energy's dispatching activities are performed through a centrally managed real-time operational staff that synthesizes operational activities across the fleet and interfaces with various wholesale market channels. Luminant Energy coordinates the overall commercial strategy for these plants working closely with Luminant Power. In addition, Luminant Energy manages the natural gas and fuel-oil procurement requirements for Luminant Power's natural gas-fueled generation fleet.

Luminant Energy engages in commercial operations such as physical purchases, storage and sales of natural gas, electricity and natural gas trading and third-party energy management. Luminant Energy's natural gas operations include direct purchases from natural gas producers, transportation agreements, storage leases and commercial retail sales. Luminant Energy currently manages approximately 15 billion cubic feet of natural gas storage capacity.

Luminant Energy manages exposure to wholesale commodity and credit related risk within established transactional risk management policies, limits and controls. These policies, limits and controls have been structured so that they are practical in application and consistent with stated business objectives. Risk management processes include capturing transactions, performing and validating valuations and reporting exposures on a daily basis using risk management information systems designed to support a large transactional portfolio. A risk management forum meets regularly to ensure that business practices comply with approved transactional limits, commodities, instruments, exchanges and markets. Transactional risks are monitored and limits are enforced to comply with the established risk policy. Luminant Energy has a disciplinary program to address any violations of the risk management policies and periodically reviews these policies to ensure they are responsive to changing market and business conditions.

***Luminant Construction***—Luminant Construction is developing three new lignite-fueled units in Texas with total estimated capacity of approximately 2,200 MW. The three units consist of one new generation unit at a site leased from Alcoa Inc. that is adjacent to an existing owned lignite-fueled generation unit (Sandow) and two units at an owned site (Oak Grove) that was originally slated for the construction of a generation plant a number of years ago. Aggregate cash capital expenditures for these three units are expected to total approximately $3.25 billion including all construction, site preparation and mining development costs, of which approximately $3.1 billion was spent as of September 30, 2009. Including capitalized interest and the step-up in construction work-in-process balances to fair value as a result of purchase accounting for the Merger in 2007, carrying value of the units are estimated to total approximately $4.8 billion upon completion.

Agreements were executed with EPC contractors, Bechtel Power Corporation and Fluor Enterprises, Inc., to engineer and construct the units at Sandow and Oak Grove, respectively. Permits for the construction of all three

D-7

EFIHMW00246737

units have been obtained. The Sandow unit achieved substantial completion (as defined in the EPC Agreement for the unit) effective September 30, 2009. Accordingly, the company has operational control of the unit. The first Oak Grove unit, which is in the commissioning and start-up phase, synchronized to the grid in August 2009 and is expected to achieve substantial completion (as defined in the EPC Agreement for the unit) in the fourth quarter of 2009. The second Oak Grove unit is nearing completion of construction and initiation of the commissioning and start-up phase and is expected to achieve substantial completion (as defined in the EPC Agreement for the unit) in mid-2010.

The development program includes up to $500 million for investments in state-of-the-art emissions controls for the three new units. The development program also includes an environmental retrofit program under which Luminant Construction plans to install additional environmental control systems at Luminant Power's existing lignite/coal-fueled generation facilities. Estimated capital expenditures associated with these additional environmental control systems total approximately $1.0 billion to $1.3 billion, of which $219 million was spent through 2008. Luminant Construction has not yet completed all detailed cost and engineering studies for the additional environmental systems, and the cost estimates could change materially as Luminant Construction determines the details of and further evaluates the engineering and construction costs related to these investments.

*TXU Energy*—TXU Energy serves more than 2.1 million residential and commercial retail electricity customers in Texas. Texas is one of the fastest growing states in the nation with a diverse economy and, as a result, has attracted a number of competitors into the retail electricity market; consequently, competition is expected to continue to be robust. TXU Energy, as an active participant in this competitive market, provides retail electric service to all areas of the ERCOT market now open to competition, including the Dallas/Fort Worth, Houston, Corpus Christi, and lower Rio Grande Valley areas of Texas. TXU Energy continues to market its services in Texas to add new customers and to retain its existing customers. As of December 31, 2008, there were more than 130 active REPs certified to compete within the state of Texas.

TXU Energy's strategy focuses on providing its customers with high quality customer service and creating new products and services to meet customer needs; accordingly, system and other customer care enhancements are being implemented to further improve customer satisfaction. TXU Energy offers a wide range of residential products to meet various customer needs. Starting in 2008, TXU Energy is investing $100 million over the next five years, including $6 million spent in 2008, in energy efficiency initiatives as part of a program to offer customers a broad set of innovative energy products and services.

*Regulation*—Luminant Power is an exempt wholesale generator under the Energy Policy Act of 2005 and is subject to the jurisdiction of the NRC with respect to its nuclear generation plant. NRC regulations govern the granting of licenses for the construction and operation of nuclear-fueled generation plants and subject such plants to continuing review and regulation. Luminant Energy also holds a power marketer license from the FERC and, with respect to any wholesale power sales outside the ERCOT market, is subject to market behavior and any other competition-related rules and regulations under the Federal Power Act that are administered by the FERC.

Luminant Power and Luminant Energy are also subject to the jurisdiction of the PUCT's oversight of the competitive ERCOT wholesale electricity market. PUCT rules do not set wholesale power prices in the market but do provide certain limits and framework for such pricing and market behavior.

TXU Energy is a licensed REP under the Texas Electric Choice Act and is subject to the jurisdiction of the PUCT with respect to provision of electricity service in ERCOT. PUCT rules govern the granting of licenses for REPs, including oversight but not setting of prices charged.

Confidential

EFIHMW00246738

PX 014
Page 1020 of 1116

**Environmental Regulations and Related Considerations**

*Global Climate Change*

   *Background*—In recent years, a growing concern has emerged nationally and internationally about global climate change and how greenhouse gas emissions (GHGs), such as $CO_2$, contribute to global climate change. EFCH produces GHG emissions from the direct combustion of fossil fuels at its generation plants, primarily its nine lignite/coal-fueled generation plants. $CO_2$, methane and NOx are emitted in this combustion process, with $CO_2$ representing the largest portion of these GHG emissions. GHG emissions (primarily $CO_2$) from EFCH's combustion of fossil fuels represent the substantial majority of EFCH's total GHG emissions. EFCH estimates that its generation plants produced an average of 57 million tons of $CO_2$ annually from 2005 to 2008. The three lignite-fueled units currently under construction that EFCH estimates will come on-line in 2009 and 2010 will generate additional $CO_2$ emissions. EFCH's other GHG emission sources include, among other things, coal piles at its generation plants, refrigerant from its chilling and cooling equipment, fossil fuel combustion in its motor vehicles and electricity usage at its facilities and headquarters. Because a substantial portion of the generation portfolio consists of lignite/coal-fueled generation plants and EFCH is constructing three new lignite-fueled generation units, EFCH's financial condition and/or results of operations could be materially adversely affected by the enactment of laws or regulations that mandate a reduction in GHG emissions or that impose financial penalties, costs or taxes on those that produce GHG emissions.

   *Global Climate Change Legislation*—Several bills have been introduced in the US Congress or discussed by the Obama Administration that are intended to address climate change using different approaches, including a cap on carbon emissions with emitters allowed to trade unused emission allowances (cap-and-trade), a tax on carbon emissions (carbon tax) and incentives for the development of low-carbon technology. In addition to potential federal legislation to regulate GHG emissions, the US Congress might also consider other legislation that could result in the reduction of GHG emissions, such as the establishment of renewable energy portfolio standards (RPS). There is a growing consensus that some form of legislation or regulation is likely to occur in the near future at the federal level concerning GHG emissions.

   EFCH, through its own evaluation and working in tandem with other companies, has supported the development of an integrated package of recommendations for the federal government to address the global climate change issue through federal legislation, including GHG emissions reduction targets for total US GHG emissions and rigorous cost containment measures to ensure that program costs are not prohibitive. In the event GHG legislation involving a cap-and-trade program is enacted, EFCH believes that such a program should be mandatory, economy-wide, consistent with expected technology development timelines and designed in a way to limit potential harm to the economy and protect consumers. EFCH contends that any mechanism for allocation of GHG emission allowances should include substantial allocation of allowances to offset the cost of GHG regulation, including the cost to electricity consumers. In addition, EFCH participates in a voluntary electric utility industry sector climate change initiative in partnership with the DOE. EFCH's strategies are generally consistent with "EEI Global Climate Change Points of Agreement" published by the Edison Electric Institute in January 2009, and "The Carbon Principles" announced in February 2008 by three major financial institutions. Finally, EFH Corp. has created a Sustainable Energy Advisory Board that advises EFCH on technology development opportunities that reduce the effects of EFCH's operations on the environment while balancing the need to address the energy requirements of Texas. EFH Corp.'s Sustainable Energy Advisory Board is comprised of individuals who represent the following interests, among others: the environment, customers, economic development in Texas and technology/reliability standards.

   *Federal Level*—A number of pieces of legislation dealing with greenhouse gas (GHG) emissions have been proposed recently in the US Congress, including the Waxman-Markey bill, known as the American Clean Energy and Security Act of 2009 (Waxman-Markey) and the Kerry-Boxer bill, known as the Clean Energy Jobs and American Power Act (Kerry-Boxer). This proposed legislation is not law, but in June 2009, Waxman-Markey was passed by the US House of Representatives and sent to the US Senate for consideration. Kerry-Boxer is currently being debated in the US Senate Environment and Public Works Committee. President Obama has also expressed support for Waxman-Markey and Kerry-Boxer.

D-9

EFIHMW00246739

**PX 014**
**Page 1021 of 1116**

As currently proposed, Waxman-Markey takes several approaches to address GHG emissions, including establishing renewable energy and energy efficiency standards, establishing performance standards for coal-fueled electricity generation units, and creating an economy-wide cap-and-trade program. The renewable energy and energy efficiency standards would require retail electricity suppliers to meet 6% of their load with renewable energy sources by 2012, increasing to 20% of their load by 2020, some of which could be met by energy efficiency measures. The performance standards for coal-fueled electricity generation units would require a 65% reduction in $CO_2$ emissions for subject generation units initially permitted after January 1, 2020, and a 50% reduction in $CO_2$ emissions for subject electricity generation units initially permitted between January 1, 2009 and January 1, 2020 once certain technology deployment criteria are met but no later than January 1, 2025. The cap-and-trade program would require emissions from capped sources, including coal-fueled electricity generation units, to be reduced 3% below 2005 levels by 2012, 17% by 2020, 42% by 2030 and 83% by 2050. The version of Waxman-Markey passed by the US House of Representatives included provisions that allocated a large percentage of the emissions allowances at no charge to various groups that would be impacted by such a cap-and-trade program, including certain merchant coal-fueled generation units. The Kerry-Boxer proposal employs a cap and trade approach similar to Waxman-Markey. However, there are the following key differences between Waxman-Markey and Kerry-Boxer: (i) a 20% reduction in $CO_2$ emissions levels by 2020; (ii) a smaller grant of emission allowances to the electric power sector, including merchant coal-fueled generation units and (iii) the lack of renewable energy and energy efficiency standards that are addressed in a separate proposal in the US Senate.

Both Waxman-Markey and Kerry-Boxer remain subject to deliberation and modifications in the US Congress, thereby precluding an accurate estimate of the cost of compliance; however, if Waxman-Markey, Kerry-Boxer or similar legislation were to be adopted, our costs of compliance with the law could be material.

In April 2007, the US Supreme Court issued a decision in the case of *Massachusetts v. US Environmental Protection Agency* holding that $CO_2$ and other GHG emissions are pollutants subject to regulation under the new motor vehicle provisions of the federal Clean Air Act. The case was remanded to the EPA for further rulemaking to determine whether GHG emissions may reasonably be anticipated to endanger public health or welfare, or in the alternative, provide a reasonable explanation why GHG emissions should not be regulated. In April 2009, the EPA issued a proposed determination finding that six GHGs in the atmosphere were pollutants under the Clean Air Act, the combination of the six GHGs formed air pollution, that this air pollution, through the mechanics of climate change, endangers public health and welfare, and that the emission of four of these GHGs by motor vehicles contributes to this air pollution and thereby the threat of climate change. Although this "endangerment finding" is in draft form and applies only to GHG emissions from motor vehicle engines, some of the GHGs that are the subject of the proposed endangerment finding are produced by the combustion of fossil fuels by other sources as well, including fossil-fueled electricity generation units. The public comment period for the proposed endangerment finding ended in June 2009. The EPA must now decide whether to issue a final endangerment finding, and whether it will proceed with the rulemaking process to promulgate regulations related to the finding. If such regulations are adopted, costs of compliance with such regulations could be material. The EPA continues to take steps to regulate GHG emissions, as represented by its recent proposal to establish permitting requirements for substantial new sources of GHGs.

In September 2009, the US Court of Appeals for the Second Circuit issued a decision in the case of *State of Connecticut v. American Electric Power Company Inc.* holding that various states, a municipality and certain private trusts have standing to sue and have sufficiently alleged a cause of action under the federal common law of nuisance for injuries allegedly caused by the defendant power generation companies' emissions of GHGs. While the decision does not address the merits of the nuisance claim, and is still subject to appeal, it might encourage or form the basis for other lawsuits asserting similar nuisance claims regarding emissions of GHGs.

In October 2009, the US Court of Appeals for the Fifth Circuit also issued a decision in the case of *Comer v. Murphy Oil USA* holding that certain Mississippi residents have standing to sue to pursue state law nuisance, negligence and trespass claims for injuries purportedly suffered because the defendants' emissions of GHGs allegedly increased the destructive force of Hurricane Katrina. This decision, like the *American Electric Power* decision discussed above, does not address the merits of such a nuisance claim and is still subject to appeal.

D-10

EFIHMW00246740

*State and Regional Level*—There is no Texas state regulation in effect concerning GHGs. EFCH opposes state-by-state regulation of GHG. There are no regional initiatives concerning GHGs in which the State of Texas is a participant.

*International Level*—The US currently is not a party to the Kyoto Protocol, which is a protocol to the United Nations Framework Convention on Climate Change (UNFCCC). The United Nations' Kyoto Protocol process generally requires developed countries to cap GHG emissions at certain levels during the 2008 to 2012 time period. At the conclusion of the December 2007 United Nations Climate Change Conference, the Bali Action Plan was adopted, which identifies a work group, process and timeline for the consideration of possible post-2012 international actions to further address climate change.

EFCH continues to assess the risks posed by possible future legislative or regulatory changes pertaining to GHG emissions. Because the proposals described above are in their formative stages, EFCH is unable to predict the potential effects on its business, financial condition and/or results of operations; however, any such effects could be material. The effect will depend, in large part, on the specific requirements of the legislation or regulation and how much, if any, of the costs are included in wholesale prices.

*EFCH's Voluntary Energy Efficiency, Renewable Energy, and Global Climate Change Efforts*—EFCH is considering, or expects to be actively engaged in, business activities that could result in reduced GHG emissions including:

- *Investing in Energy Efficiency or Related Initiatives*—EFCH expects to invest $100 million in energy efficiency or related initiatives over a five-year period that began in 2008, including initiatives such as the TXU Energy Power Monitor™, an in-home display device that enables residential customers to monitor whole-house energy usage and cost in real-time, as well as projects month-end bill amounts; the TXU Energy iThermostat™, a web-enabled programmable thermostat with load control feature for cycling off air conditioners during times of peak energy demand; the development of time-based electricity rates that are expected to work in conjunction with advanced metering infrastructure; rate plans that include electricity from renewable resources; a Compact Fluorescent Light (CFL) program that provides packages of CFLs to customers; a program to refer customers to energy efficiency contractors and provide rebates to residential customers who install energy-efficient heating and cooling systems, ceiling insulation or windows; the provision of loans to business customers for purchasing new energy efficient equipment for their facilities based on a detailed engineering design through the Energy Conservation Investment Program; the Energy Efficiency Assistance Program that delivers products and services, as well as grants through social service agencies, to improve the energy efficiency of participating low income customer homes and apartment complexes; and online energy audit tools and tips for using less electricity;

- *Purchasing Electricity from Renewable Sources*—EFCH expects to remain a leader in the ERCOT market in providing electricity from renewable sources by purchasing up to 1,500 MW of wind power. EFCH's total wind power portfolio is currently more than 900 MW;

- *Promoting the use of Solar Power*—TXU Energy's Solar Academy works with Texas school districts to teach and demonstrate the benefits of solar power;

- *Investing in Technology*—EFCH will evaluate over the next five to ten years the development and commercialization of cleaner power plant technologies, including integrated gasification combined cycle and pulverized coal emissions technology to reduce $CO_2$ emission intensity, as well as related technologies such as electric cars and plug-in hybrid electric vehicles that have the potential to reduce overall GHG emissions;

- *Evaluating the Development of a New Nuclear Generation Facility*—EFCH has filed an application with the NRC for combined construction and operating licenses for up to 3,400 MW of new nuclear generation capacity (the lowest emission source of baseload generation available) at its Comanche Peak

Confidential

EFIHMW00246741

**PX 014**
**Page 1023 of 1116**