nuclear generation plant. In addition, EFCH has formed a joint venture with Mitsubishi Heavy Industries Ltd. (MHI) to further develop the units using MHI's US-Advanced Pressurized Water Reactor technology;

- *Offsetting GHG Emissions by Planting Trees*—EFCH is engaged in a number of tree planting programs that offset GHG emissions, including its planting of over 1.4 million trees in 2008 (the majority of which were part of EFCH's mining reclamation effort) and TXU Energy's Urban Tree Farm program under which it has planted more than 100,000 trees since the program's inception in 2002.

### Sulfur Dioxide, Nitrogen Oxide and Mercury Air Emissions

The EPA has promulgated Acid Rain Program rules that require fossil-fueled plants to have sufficient $SO_2$ emission allowances and meet certain NOx emission standards. EFCH's generation plants meet these $SO_2$ allowance requirements and NOx emission rates.

In 2005, the EPA issued a final rule to further reduce $SO_2$ and NOx emissions from power plants. The $SO_2$ and NOx reductions required under the Clean Air Interstate Rule (CAIR), which were required to be phased in between 2009 and 2015, were based on a cap and trade approach (market-based) in which a cap was put on the total quantity of emissions allowed in 28 eastern states (including Texas). Emitters were required to have allowances for each ton emitted, and emitters were allowed to trade emissions under the cap. In July 2008, the US Court of Appeals for the D.C. Circuit (D.C. Circuit Court) vacated CAIR. In December 2008, in response to an EPA petition, the D.C. Circuit Court reversed, in part, its previous ruling. Such reversal confirmed CAIR is not valid, but allowed it to remain in place while the EPA revises CAIR to correct the previously identified shortcomings. Since the D.C. Circuit Court did not prescribe a deadline for this revision, at this time, EFCH cannot predict how or when the EPA may revise CAIR. See Note 3 to EFCH's historical consolidated financial statements for the year ended December 31, 2008 and Note 2 to EFCH's historical consolidated financial statements for the nine months ended September 30, 2009, each included elsewhere in this Prospectus, for discussion of the impairment of emission allowances intangible assets.

In 2005, the EPA also published a final rule requiring reductions of mercury emissions from coal-fueled generation plants. The Clean Air Mercury Rule (CAMR) was based on a nationwide cap and trade approach. The mercury reductions were required to be phased in between 2010 and 2018. In March 2008, the D.C. Circuit Court vacated CAMR. In February 2009, the US Supreme Court refused to hear the appeal of the D.C. Circuit Court's ruling. Pursuant to the D.C. Circuit Court's ruling, the EPA must begin development of rules implementing a Maximum Achievable Control Technology standard, which will likely take several years. See "—Legal Proceedings—Litigation Related to Generation Development."

$SO_2$ reductions required under the proposed regional haze/visibility rule (or so-called BART rule) only apply to units built between 1962 and 1977. The reductions are required on a unit-by-unit basis. The EPA provides the option for states to use CAIR to satisfy BART reductions for electric generating units, and Texas has chosen this option. The D.C. Circuit Court decision to leave CAIR in place while the EPA revises it should allow Texas to move forward with its plans.

In connection with EFCH's construction of three new lignite-fueled generation units in Texas, EFCH has committed to reduce emissions of NOx, $SO_2$ and mercury at its existing lignite/coal-fueled units such that the total of those emissions from both existing and new lignite/coal-fueled units are 20% below 2005 levels. EFCH has also applied with the TCEQ to seek a "maximum achievable control technology" determination for its two Oak Grove units that are under construction and has agreed to offset any emissions above those levels. This reduction is expected to be accomplished through the installation of emissions control equipment in both the new and existing units and fuel blending at some existing units. These efforts, which will involve incremental equipment investments as well as additional costs for facility operations and maintenance in the future, will be coordinated with efforts related to applicable environmental rules to provide the most cost-effective compliance plan options.

Confidential

EFIHMW00246742

The following are the major air quality improvements planned at EFCH's existing and new coal-fueled power plants to help meet the offset and reduction commitment:

- To reduce NOx emissions, EFCH plans to install in-duct selective catalytic reduction (SCR) systems at its Martin Lake plant. In addition, EFCH plans to install selective non-catalytic reductions systems at its Monticello and Big Brown plants and improve the low-NOx burner technology at one of its Monticello units to further reduce NOx emissions. This is in addition to external SCR systems at the existing Sandow unit and new Oak Grove units;

- To reduce mercury emissions, all of EFCH's new and existing plants plan to use activated carbon injection—a sorbent injection system technology, and

- To reduce $SO_2$ emissions, EFCH plans to increase use of lower-sulfur coal at various plants. In addition, the Martin Lake, Monticello and Big Brown plants plan to employ coal-cleaning technology to reduce both $SO_2$ and mercury emissions.

The Clean Air Act requires each state to monitor air quality for compliance with federal health standards. The standards for ozone are not being achieved in several areas of Texas. The TCEQ adopted new State Implementation Plan (SIP) rules in May 2007 to deal with eight-hour ozone standards. These rules require further NOx emission reductions from certain EFCH peaking natural gas-fueled units in the Dallas-Fort Worth area by spring 2009; EFCH expects to be in compliance with these rules. In March 2008, the EPA made the eight-hour ozone standards more stringent. Since SIP rules to address attainment of these new more stringent standards will not be required for approximately four years, EFCH cannot yet predict the impact of this action on its facilities.

EFCH believes that it holds all required emissions permits for facilities in operation and has applied for or obtained the necessary construction permits for facilities under construction.

*Water*

The TCEQ and the EPA have jurisdiction over water discharges (including storm water) from facilities in Texas. EFCH believes its facilities are presently in material compliance with applicable state and federal requirements relating to discharge of pollutants into water. EFCH believes it holds all required waste water discharge permits from the TCEQ for facilities in operation and has applied for or obtained necessary permits for facilities under construction. EFCH also believes it can satisfy the requirements necessary to obtain any required permits or renewals. Recent changes to federal rules pertaining to the Spill Prevention, Control and Countermeasure (SPCC) plans for oil-filled electrical equipment and bulk storage facilities for oil will require updating of certain of its plants and facilities.

Diversion, impoundment and withdrawal of water for cooling and other purposes are subject to the jurisdiction of the TCEQ and the EPA. EFCH believes it possesses all necessary permits for these activities from the TCEQ for its present operations. EFCH is in the process of obtaining the necessary water rights permit from the TCEQ for the lignite mine that will support the Oak Grove units. Clean Water Act Section 316(b) regulations pertaining to existing water intake structures at large generation plants were published by the EPA in 2004. As prescribed in the regulations, EFCH began implementing a monitoring program to determine the future actions that might need to be taken to comply with these regulations. In January 2007, a federal court ruled against the EPA in a lawsuit brought by environmental groups challenging aspects of these regulations, and in July 2007, the EPA announced that it was suspending the regulations pending further rulemaking. EFCH cannot predict the impact on its operations of the suspended existing regulations or of new regulations, if any, that replace them.

*Radioactive Waste*

EFCH currently ships low-level waste material to a disposal facility outside of Texas. Under the federal Low-Level Radioactive Waste Policy Act of 1980, as amended, the State of Texas is required to provide, either on its own or jointly with other states in a compact, for the disposal of all low-level radioactive waste generated

D-13

EFIHMW00246743

within the state. The State of Texas has agreed to a compact for a disposal facility that would be located in Texas. That compact was ratified by Congress and signed by the President in 1998. In 2003, the State of Texas enacted legislation allowing a private entity to be licensed to accept low-level radioactive waste for disposal, and in 2004 the State received a license application from such an entity for review. In January 2009, the TCEQ Commissioners voted to approve this permit. EFCH intends to continue to ship low-level waste material off-site for as long as an alternative disposal site is available. Should existing off-site disposal become unavailable, the low-level waste material will be stored on-site. (See discussion under "—Business Organization—Luminant Power—Nuclear Generation Assets" above.)

EFCH believes that its on-site used nuclear fuel storage capability is sufficient for a minimum of five years. The nuclear industry is continuing to review ways to enhance security of used-fuel storage with the NRC to fully utilize physical storage capacity. Accordingly, EFCH is actively reviewing alternatives for used-fuel storage, including evaluation of industry techniques such as dry cask storage.

### Solid Waste, Including Fly Ash Associated with Lignite/Coal-Fueled Generation

Treatment, storage and disposal of solid waste and hazardous waste are regulated at the state level under the Texas Solid Waste Disposal Act and at the federal level under the Resource Conservation and Recovery Act of 1976, as amended, and the Toxic Substances Control Act. The EPA has issued regulations under the Resource Conservation and Recovery Act of 1976 and the Toxic Substances Control Act, and the TCEQ has issued regulations under the Texas Solid Waste Disposal Act applicable to EFCH facilities. EFCH believes it is in material compliance with all applicable solid waste rules and regulations. In addition, EFCH has registered solid waste disposal sites and has obtained or applied for permits required by such regulations. In December 2008, an ash impoundment facility at another company's site in another state ruptured releasing a significant quantity of coal ash slurry. No impoundment failures of this nature have ever occurred at any EFCH impoundments, which are inspected on a regular basis. In addition, groundwater monitoring wells are sampled routinely to ensure compliance with all applicable regulations. EFCH is unable to predict future impacts on its financial condition or operations due to any legislative or regulatory actions that may be taken in response to the impoundment failure mentioned above.

### Environmental Capital Expenditures

Capital expenditures for EFCH's environmental projects totaled $183 million in 2008 and are expected to total approximately $165 million in 2009, consisting primarily of environmental projects at existing lignite/coal-fueled generation plants. These amounts are exclusive of emissions control equipment investment planned as part of the three-unit generation development program, which is expected to total up to $500 million over the construction period. See discussion above under "—Business Organization—Luminant Construction" regarding planned investments in emissions control systems.

## Legal Proceedings

### Generation Development

Construction of three lignite-fueled generation units in Texas, two units at Oak Grove and one unit at Sandow, is nearing completion. The Sandow unit achieved substantial completion (as defined in the EPC Agreement for the unit) on September 30, 2009, and one Oak Grove unit is in the commissioning and start-up phase.

In connection with the acquisition of the development rights to the Sandow unit, a subsidiary of TCEH (Sandow Power Company LLC, or Sandow Power) became a party to a federal consent decree with, among others, the US Department of Justice in August 2007 (the Consent Decree). A 2007 federal court order that was merged into the Consent Decree requires that, among other things, the Sandow unit commence commercial operation (as defined in the Consent Decree) and achieve and maintain certain emission-related deadlines by

D-14

EFIHMW00246744

August 31, 2009. The Sandow unit met the commercial operation deadline by synchronizing to the ERCOT grid in early July 2009. However, due to unforeseen weather events and equipment malfunctions experienced during commissioning and start-up activities, the Sandow unit was not able to meet the emission-related deadlines by August 31, 2009. Under the terms of the Consent Decree, Sandow Power may request an extension to these deadlines from the federal district court that presides over the Consent Decree for certain force majeure events (including such events as the weather events and equipment malfunctions described above). In September 2009, the federal district court granted Sandow Power's request for force majeure relief and gave Sandow Power an additional sixty-one days from August 31, 2009 to begin achieving compliance with the applicable Consent Decree deadlines. Sandow Power is performing tests to determine whether it has achieved compliance with these deadlines.

TCEH has received the air permits for the Sandow and Oak Grove units. However, the issuances of the air permits have been challenged as discussed below under "—Litigation Related to Generation Facilities."

Construction work-in-process asset balances for the Oak Grove units totaled approximately $3.3 billion as of September 30, 2009, which includes the effects of the fair value adjustments related to purchase accounting and capitalized interest. In the unexpected event the development of the Oak Grove units was cancelled due to air permit challenges, the cancellation exposure as of September 30, 2009 totaled $3.4 billion, which includes the carrying value of the project and up to approximately $100 million of termination obligations. This estimated exposure amount excludes any potential recovery values for assets acquired to date and for assets already owned prior to executing such agreements that are being utilized in these projects.

*Litigation Related to Generation Facilities*

In September 2007, an administrative appeal challenging the order of the TCEQ issuing the air permit for construction and operation of the Oak Grove generation facility in Robertson County, Texas was filed in the State District Court of Travis County, Texas. Plaintiffs asked that the District Court reverse the TCEQ's approval of the Oak Grove air permit and the TCEQ's adoption and approval of the TCEQ Executive Director's Response to Comments, and remand the matter back to TCEQ for further proceedings. In addition to this administrative appeal, two other petitions were filed in Travis County District Court by non-parties to the administrative hearing before the TCEQ and the State Office of Administrative Hearings (SOAH) seeking to challenge the TCEQ's issuance of the Oak Grove air permit and asking the District Court to remand the matter to the SOAH for further proceedings. Finally, the plaintiffs in these two additional lawsuits filed a third, joint petition claiming insufficiencies in the Oak Grove application, permit, and process and seeking party status and remand to the SOAH for further proceedings. One of the plaintiffs has asked the District Court to consolidate all these proceedings, and the Attorney General of Texas, on behalf of TCEQ, filed pleas to the jurisdiction seeking dismissal of all but the administrative appeal. In May 2009, the District Court dismissed the claims that contest the merits of the TCEQ's permitting decision, but declined to dismiss the claims that contest the process by which the TCEQ handled the permit application. Oak Grove Management Company LLC (a subsidiary of TCEH) has subsequently intervened in these proceedings and has filed its own pleas to the jurisdiction asking the court to dismiss the remaining collateral attack claims. In October 2009, one of the plaintiffs ended its legal challenge to the permit. EFCH believes the Oak Grove air permit granted by the TCEQ was issued in accordance with applicable law. There can be no assurance that the outcome of these matters will not adversely impact the Oak Grove project.

In June and September 2008, administrative appeals were filed in the State District Court of Travis County, Texas to challenge the administrative action of the TCEQ Executive Director in issuing an air permit alteration for the previously-permitted construction and operation of the Sandow 5 generation facility in Milam County, Texas, and the failure of the TCEQ to overturn that administrative action. Plaintiffs asked that the District Court reverse the issuance of the permit alteration. The Attorney General of Texas, on behalf of TCEQ, is defending the issuance of the permit alteration. Sandow Power has intervened in support of the TCEQ. The plaintiff's brief was filed in late August 2009, and the Attorney General of Texas and Sandow Power have filed responsive briefs. EFCH believes the Sandow 5 air permit alteration administratively issued by the Executive Director of the TCEQ was issued in accordance with applicable law. There can be no assurance that the outcome of these matters will not adversely impact the Sandow 5 project.

Confidential

EFIHMW00246745

**PX 014**
**Page 1027 of 1116**

In July 2008, the Sierra Club announced that it may sue Luminant, after the expiration of a 60-day waiting period, for violating federal Clean Air Act provisions in connection with Luminant's Martin Lake generation facility. EFCH cannot predict whether the Sierra Club will actually file suit relating to Martin Lake or the outcome of any such proceeding.

### Other Litigation

In July 2008, Alcoa Inc. filed a lawsuit in Milam County, Texas district court against Luminant Generation and Luminant Mining (wholly-owned subsidiaries of TCEH), later adding EFH Corp., a number of EFCH's subsidiaries, Texas Holdings and Texas Energy Future Capital Holdings LLC as parties to the suit. The lawsuit makes various claims concerning the operation of the Sandow Unit 4 generation facility and the Three Oaks lignite mine, including claims for breach of contract, breach of fiduciary duty, fraud, tortious interference, civil conspiracy and conversion. The plaintiff requests money damages of no less than $500 million, declaratory judgment, rescission and other forms of equitable relief. An agreed scheduling order is currently in place setting trial for May 2010. While EFCH is unable to estimate any possible loss or predict the outcome of this litigation, it believes the plaintiff's claims made in this litigation are without merit and, accordingly, intends to vigorously defend this litigation.

### Regulatory Investigations and Reviews

In June 2008, the EPA issued a request for information to TCEH under EPA's authority under Section 114 of the Clean Air Act. The stated purpose of the request is to obtain information necessary to determine compliance with the Clean Air Act, including New Source Review Standards and air permits issued by the TCEQ for the Big Brown, Monticello and Martin Lake generation facilities. The company is cooperating with the EPA and is responding in good faith to the EPA's request, but is unable to predict the outcome of this matter.

### Other Proceedings

In addition to the above, EFCH is involved in various other legal and administrative proceedings in the normal course of business, the ultimate resolution of which, in the opinion of management, should not have a material effect on its financial position, results of operations or cash flows.

D-16

EFIHMW00246746

**PX 014**
**Page 1028 of 1116**

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS AS OF AND FOR THE NINE MONTHS ENDED SEPTEMBER 30, 2009**

The following discussion and analysis of EFCH's financial condition and results of operations as of and for the three and nine months ended September 30, 2009 and 2008 was included in EFCH's Quarterly Report on Form 10-Q for the quarter ended September 30, 2009 filed with the SEC on October 30, 2009 (the "3rd Quarter MD&A"). The 3rd Quarter MD&A should be read in conjunction with EFCH's historical consolidated financial statements for the nine months ended September 30, 2009 and the notes to those statements included elsewhere in this Prospectus. See "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Year Ended December 31, 2008" below for a discussion and analysis of EFCH's financial condition and results of operations as of and for the year ended December 31, 2008.

All dollar amounts in the tables in the following discussion and analysis are stated in millions of US dollars unless otherwise indicated.

## Business

EFCH is a subsidiary of EFH Corp. and is a Dallas-based holding company that conducts its operations principally through its wholly-owned subsidiary, TCEH. TCEH is a Dallas-based holding company for subsidiaries engaged in competitive electricity market activities largely in Texas, including electricity generation, development and construction of new generation facilities, wholesale energy sales and purchases, commodity risk management and trading activities, and retail electricity sales. Commodity risk management and allocation of financial resources are performed at the consolidated level; therefore, there are no reportable business segments.

### *Significant Activities and Events*

***Long-Term Hedging Program***—TCEH has a long-term hedging program designed to reduce exposure to changes in future electricity prices due to changes in the price of natural gas. Under the program, the company has entered into market transactions involving natural gas-related financial instruments, and as of September 30, 2009, has effectively sold forward approximately 1.7 billion MMBtu of natural gas (equivalent to the natural gas exposure of approximately 214,000 GWh at an assumed 8.0 market heat rate) for the period from October 1, 2009 through December 31, 2014 at weighted average annual hedge prices ranging from $7.19 per MMBtu to $8.05 per MMBtu. These transactions, as well as forward power sales, have effectively hedged an estimated 71% of the natural gas price exposure related to TCEH's expected generation output for the period beginning October 1, 2009 and ending December 31, 2014 (on an average basis for such period and assuming an 8.0 market heat rate). The hedges were entered into with the continuing expectation that wholesale electricity prices in ERCOT will be highly correlated with natural gas prices, which are expected to be the marginal fuel for the purpose of setting electricity prices approximately 75% to 90% of the time. If the correlation changes in the future, the cash flows targeted under the long-term hedging program may not be achieved.

The long-term hedging program is comprised primarily of contracts with prices based on the NYMEX Henry Hub pricing point. However, because there are other local and regional natural gas pricing points such as Houston Ship Channel, future wholesale power prices in ERCOT may not correlate as closely to the Henry Hub pricing as other pricing points, which could decrease the effectiveness of the positions in the long-term hedging program in mitigating power price exposure. The company has hedged more than 95% of the Houston Ship Channel versus Henry Hub pricing point risk for the fourth quarter 2009 period and more than 95% for 2010.

The company has entered into related put and call transactions (referred to as collars), primarily for year 2014 of the program, that effectively hedge natural gas prices within a range. These transactions represented approximately 6% of the positions in the long-term hedging program at September 30, 2009, with the approximate weighted average strike prices under the collars being a floor of $7.80 per MMBtu and a ceiling of

D-17

Confidential

$11.75 per MMBtu. Financial instruments, including collars, are expected to be employed in future hedging activity under the long-term hedging program.

The following table summarizes the natural gas hedges in the long-term hedging program as of September 30, 2009:

| | Measure | Balance 2009 (a) | 2010 | 2011 | 2012 | 2013 | 2014 | Total |
|---|---|---|---|---|---|---|---|---|
| Natural gas hedge volumes (b) . . . . . . . . . . | mm MMBtu | ~58 | ~298 | ~466 | ~492 | ~300 | ~97 | ~1,711 |
| Weighted average hedge price (c) . . . . . . . . | $/MMBtu | ~8.05 | ~7.80 | ~7.56 | ~7.36 | ~7.19 | ~7.80 | ——— |
| Weighted average market price (d) . . . . . . . | $/MMBtu | ~4.75 | ~6.21 | ~6.87 | ~7.00 | ~7.06 | ~7.17 | ——— |

(a)   Balance of 2009 is from October 1, 2009 through December 31, 2009

(b)   Where collars are reflected, the volumes are estimated based on the natural gas price sensitivity (i.e. delta position) of the derivatives. The notional volumes for collars are approximately 150 million MMBtu, which corresponds to a delta position of approximately 97 million MMBtu in 2014.

(c)   Weighted average hedge prices are based on sales prices of forward natural gas sales positions in the long-term hedging program based on NYMEX Henry Hub prices (excluding the impact of offsetting purchases for rebalancing and price point basis transactions). Where collars are reflected, sales price represents the collar floor price.

(d)   Based on NYMEX Henry Hub prices.

Changes in the fair value of the instruments in the long-term hedging program are being recorded as unrealized gains and losses in net gain (loss) from commodity hedging and trading activities in the statement of income, which has and could continue to result in significant volatility in reported net income. Based on the size of the long-term hedging program as of September 30, 2009, a $1.00/MMBtu change in natural gas prices across the hedged period would result in the recognition of up to approximately $1.7 billion in pretax unrealized mark-to-market gains or losses.

The reported unrealized mark-to-market net loss related to the long-term hedging program for the three months ended September 30, 2009 totaled $106 million. This amount reflects a $145 million net gain due to the effect of lower forward prices of natural gas on the value of positions in the program, which was more than offset by net losses of $251 million representing reversals of previously recorded unrealized gains on positions that settled in the period. The reported unrealized net gain for the nine months ended September 30, 2009 totaled $559 million. This amount reflects a $1.086 billion net gain due to the effect of lower forward prices of natural gas on the value of positions in the program, partially offset by net losses of $527 million representing reversals of previously recorded net gains on positions that settled in the period. Given the volatility of natural gas prices, it is not possible to predict future reported unrealized mark-to-market gains or losses and the actual gains or losses that will ultimately be realized upon settlement of the hedge positions in future years. If natural gas prices at settlement are lower than the prices of the hedge positions, the hedges are expected to mitigate the otherwise negative effect on earnings of lower wholesale electricity prices. However, if natural gas prices at settlement are higher than the prices of the hedge positions, the hedges are expected to dampen the otherwise positive effect on earnings of higher wholesale electricity prices and will in this context be viewed as having resulted in an opportunity cost. The cumulative unrealized mark-to-market net gain related to positions in the long-term hedging program totaled $1.430 billion and $871 million at September 30, 2009 and December 31, 2008, respectively. These values can change materially as market conditions change.

As of September 30, 2009, more than 95% of the long-term hedging program transactions were directly or indirectly secured by a first-lien interest in TCEH's assets (including the transactions supported by the TCEH Commodity Collateral Posting Facility—see discussion below under "—Financial Condition—Liquidity and Capital Resources") thereby reducing the cash and letter of credit collateral requirements for the hedging program.

D-18

The following sensitivity table provides estimates of the potential impact (in $millions) of movements in natural gas and certain other commodity prices and market heat rates on realized pre-tax earnings for the periods presented. The estimates related to price sensitivity are based on TCEH's unhedged position and forward prices as of September 30, 2009, which for natural gas reflects estimates of electricity generation less amounts hedged through the long-term natural gas hedging program and amounts under existing wholesale and retail sales contracts. On a rolling twelve-month basis, the substantial majority of retail sales under month-to-month arrangements are deemed to be under contract.

| | Balance 2009 (a) | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|
| $1.00/MMBtu change in gas price (b) | $ ~9 | $~12 | $~41 | $~91 | $~279 |
| 0.1/MMBtu/MWh change in market heat rate (c) | $— | $~16 | $~49 | $~57 | $ ~59 |
| $1.00/gallon change in diesel fuel price | $— | $— | $— | $— | $ ~50 |
| $10.00/pound change in uranium/nuclear fuel | $— | $— | $— | $ ~4 | $ ~1 |

(a)   Balance of 2009 is from November 1, 2009 through December 31, 2009.

(b)   Assumes conversion of electricity positions based on an approximate 8.0 market heat rate with natural gas being on the margin 75% to 90% of the time (i.e. when coal is forecast to be on the margin, no natural gas position is assumed to be generated).

(c)   Based on Houston Ship Channel natural gas prices as of September 30, 2009.

*Debt Exchange Offers*—See Note 4 to EFCH's historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus for discussion of debt exchange offers commenced by EFH Corp. and certain of its subsidiaries in October 2009.

*TCEH Interest Rate Swap Transactions*—As of September 30, 2009, TCEH had entered into a series of interest rate swaps that effectively fix the interest rates at between 7.3% and 8.3% on $17.55 billion principal amount of its senior secured debt maturing from 2009 to 2014. All of these swaps were entered into prior to January 1, 2009. Taking into consideration these swap transactions, approximately 10% of EFCH's total long-term debt portfolio at September 30, 2009 was exposed to variable interest rate risk. TCEH also entered into interest rate basis swap transactions, which further reduce fixed borrowing costs, related to an aggregate of $18.0 billion principal amount of senior secured debt, including swaps entered into in 2009 related to $9.55 billion principal amount of debt and reflecting the expiration in 2009 of swaps related to an aggregate $4.595 billion principal amount of debt. EFCH may enter into additional interest rate hedges from time to time. Unrealized mark-to-market net gains and losses related to all TCEH interest rate swaps, which are reported in interest expense and related charges, totaled $138 million in net losses and $527 million in net gains for the three and nine month periods ended September 30, 2009, respectively. The cumulative unrealized mark-to-market net liability related to all TCEH interest rate swaps totaled $1.4 billion at September 30, 2009, of which $238 million (pre-tax) was reported in accumulated other comprehensive income. These fair values can change materially as market conditions change, which could result in significant volatility in reported net income. See discussion in Note 4 to EFCH's historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus regarding various interest rate swap transactions.

*Texas Generation Facilities Development*—TCEH is developing three lignite-fueled generation units (2 units at Oak Grove and 1 unit at Sandow) in the state of Texas with a total estimated capacity of approximately 2,200 MW. The Sandow unit achieved substantial completion (as defined in the EPC Agreement for the unit) effective September 30, 2009. Accordingly, the company has operational control of the unit. The first Oak Grove unit, which is in the commissioning and start-up phase, synchronized to the grid in August 2009 and is expected to achieve substantial completion (as defined in the EPC Agreement) in the fourth quarter of 2009. The second Oak Grove unit is nearing completion of construction and initiation of the commissioning and start-up phase and is expected to achieve substantial completion (as defined in the EPC Agreement) in mid-2010. Aggregate cash capital expenditures for these three units are expected to total approximately $3.25 billion including all construction, site preparation and mining development costs, of which approximately $3.1 billion was spent as of

D-19

EFIHMW00246749

PX 014
Page 1031 of 1116

September 30, 2009. Total recorded costs, including purchase accounting fair value adjustments and capitalized interest, are expected to total approximately $4.8 billion upon completion of the units, and the balance was $4.6 billion as of September 30, 2009. See discussion in Note 5 to EFCH's historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus regarding contingencies related to the units.

*Nuclear Generation Development*—In September 2008, TCEH filed a combined operating license application with the NRC for two new nuclear generation units, each with approximately 1,700 MW (gross) capacity, at its existing Comanche Peak nuclear generation site. In connection with the filing of the application, in January 2009, TCEH and Mitsubishi Heavy Industries Ltd. (MHI) formed a joint venture to further the development of the two new nuclear generation units using MHI's US–Advanced Pressurized Water Reactor technology. A subsidiary of TCEH owns an 88% interest in the joint venture, and a subsidiary of MHI owns a 12% interest.

In March 2009, the NRC announced an official review schedule for the license application. Based on the schedule, the NRC expects to complete its review by December 2011, and it is expected that a license would be issued approximately one year later.

While TCEH was not one of the initial four applicants selected to receive DOE loan guarantees, it continues to update its DOE loan guarantee application for financing the proposed units.

*Idling of Natural Gas-Fueled Units*—In February 2009, EFCH notified ERCOT of plans to retire 11 of its natural gas-fueled units, totaling 2,229 MW of capacity (2,341 MW installed nameplate capacity), in May 2009, and mothball (idle) an additional four units, totaling 1,596 MW of capacity (1,675 MW of installed nameplate capacity), in September 2009. In May and September 2009, EFCH entered into reliability-must-run (RMR) agreements for the remainder of 2009 with ERCOT for the operation of one unit originally planned to be retired with 115 MW of capacity (115 MW of installed nameplate capacity) and one unit planned to be mothballed with 515 MW of capacity (540 MW of installed nameplate capacity), respectively. The other units were retired in May 2009 or mothballed in September 2009 as originally planned. An impairment charge of $229 million related to the carrying value of these units was recorded in the fourth quarter of 2008.

*Global Climate Change*—A number of pieces of legislation dealing with greenhouse gas (GHG) emissions have been proposed recently in the US Congress, including the Waxman-Markey bill, known as the American Clean Energy and Security Act of 2009 (Waxman-Markey) and the Kerry-Boxer bill, known as the Clean Energy Jobs and American Power Act (Kerry-Boxer). This proposed legislation is not law, but in June 2009, Waxman-Markey was passed by the US House of Representatives and sent to the US Senate for consideration. Kerry-Boxer is currently being debated in the US Senate Environment and Public Works Committee. President Obama has also expressed support for Waxman-Markey and Kerry-Boxer.

As currently proposed, Waxman-Markey takes several approaches to address GHG emissions, including establishing renewable energy and energy efficiency standards, establishing performance standards for coal-fueled electricity generation units, and creating an economy-wide cap-and-trade program. The renewable energy and energy efficiency standards would require retail electricity suppliers to meet 6% of their load with renewable energy sources by 2012, increasing to 20% of their load by 2020, some of which could be met by energy efficiency measures. The performance standards for coal-fueled electricity generation units would require a 65% reduction in $CO_2$ emissions for subject generation units initially permitted after January 1, 2020, and a 50% reduction in $CO_2$ emissions for subject electricity generation units initially permitted between January 1, 2009 and January 1, 2020 once certain technology deployment criteria are met but no later than January 1, 2025. The cap-and-trade program would require emissions from capped sources, including coal-fueled electricity generation units, to be reduced 3% below 2005 levels by 2012, 17% by 2020, 42% by 2030 and 83% by 2050. The version of Waxman-Markey passed by the US House of Representatives included provisions that allocated a large percentage of the emissions allowances at no charge to various groups that would be impacted by such a

D-20

EFIHMW00246750

cap-and-trade program, including certain merchant coal-fueled generation units. The Kerry-Boxer proposal employs a cap and trade approach similar to Waxman-Markey. However, there are the following key differences between Waxman-Markey and Kerry-Boxer: (i) a 20% reduction in $CO_2$ emissions levels by 2020; (ii) a smaller grant of emission allowances to the electric power sector, including merchant coal-fueled generation units and (iii) the lack of renewable energy and efficiency standards that are addressed in a separate proposal in the US Senate.

Both Waxman-Markey and Kerry-Boxer remain subject to deliberation and modifications in the US Congress, thereby precluding an accurate estimate of the cost of compliance; however, if Waxman-Markey, Kerry-Boxer or similar legislation were to be adopted, EFCH's costs of compliance with the law could be material.

In April 2007, the US Supreme Court issued a decision in the case of *Massachusetts v. US Environmental Protection Agency* holding that $CO_2$ and other GHG emissions are pollutants subject to regulation under the new motor vehicle provisions of the federal Clean Air Act. The case was remanded to the EPA for further rulemaking to determine whether GHG emissions may reasonably be anticipated to endanger public health or welfare, or in the alternative, provide a reasonable explanation why GHG emissions should not be regulated. In April 2009, the EPA issued a proposed determination finding that six GHGs in the atmosphere were pollutants under the Clean Air Act, the combination of the six GHGs formed air pollution, that this air pollution, through the mechanics of climate change, endangers public health and welfare, and that the emission of four of these GHGs by motor vehicles contributes to this air pollution and thereby the threat of climate change. Although this "endangerment finding" is in draft form and applies only to GHG emissions from motor vehicle engines, some of the GHGs that are the subject of the proposed endangerment finding are produced by the combustion of fossil fuels by other sources as well, including fossil-fueled electricity generation units. The public comment period for the proposed endangerment finding ended in June 2009. The EPA must now decide whether to issue a final endangerment finding, and whether it will proceed with the rulemaking process to promulgate regulations related to the finding. If such regulations are adopted, costs of compliance with such regulations could be material. The EPA continues to take steps to regulate GHG emissions, as represented by its recent proposal to establish permitting requirements for substantial new sources of GHGs.

In September 2009, the US Court of Appeals for the Second Circuit issued a decision in the case of *State of Connecticut v. American Electric Power Company Inc.* holding that various states, a municipality and certain private trusts have standing to sue and have sufficiently alleged a cause of action under the federal common law of nuisance for injuries allegedly caused by the defendant power generation companies' emissions of GHGs. While the decision does not address the merits of the nuisance claim, and is still subject to appeal, it might encourage or form the basis for other lawsuits asserting similar nuisance claims regarding emissions of GHGs.

In October 2009, the US Court of Appeals for the Fifth Circuit also issued a decision in the case of *Comer v. Murphy Oil USA* holding that certain Mississippi residents have standing to sue to pursue state law nuisance, negligence and trespass claims for injuries purportedly suffered because the defendants' emissions of GHGs allegedly increased the destructive force of Hurricane Katrina. This decision, like the *American Electric Power* decision discussed above, does not address the merits of such a nuisance claim and is still subject to appeal.

While EFCH is not a party to these suits, if any similar suit was successfully asserted against EFCH in the future, it could have a material adverse effect on EFCH's business, results of operations and financial condition.

D-21

Confidential

## Results of Operations

### *Sales Volume and Customer Count Data*

| | Three Months Ended September 30, | | % Change | Nine Months Ended September 30, | | % Change |
|---|---|---|---|---|---|---|
| | 2009 | 2008 | | 2009 | 2008 | |
| **Sales volumes:** | | | | | | |
| Retail electricity sales volumes—(GWh): | | | | | | |
| Residential . . . . . . . . . . . . . . . . . . . . . . . . . . . | 9,348 | 9,098 | 2.7 | 22,312 | 22,153 | 0.7 |
| Small business (a) . . . . . . . . . . . . . . . . . . . . . | 2,598 | 2,241 | 15.9 | 6,228 | 5,802 | 7.3 |
| Large business and other customers . . . . . . . . . | 4,049 | 4,038 | 0.3 | 10,905 | 10,951 | (0.4) |
| Total retail electricity . . . . . . . . . . . . . . . . . | 15,995 | 15,377 | 4.0 | 39,445 | 38,906 | 1.4 |
| Wholesale electricity sales volumes . . . . . . . . . . . . | 10,126 | 12,472 | (18.8) | 30,180 | 35,529 | (15.1) |
| Net sales (purchases) of balancing electricity to/from ERCOT . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (38) | 145 | — | (304) | (1,335) | (77.2) |
| Total sales volumes . . . . . . . . . . . . . . | 26,083 | 27,994 | (6.8) | 69,321 | 73,100 | (5.2) |
| **Average volume (kWh) per residential customer (b):** . . . . . . . . . . . . . . . . . . . . . . . . | 4,936 | 4,802 | 2.8 | 11,772 | 11,767 | — |
| **Weather (North Texas average)—percent of normal (c):** | | | | | | |
| Cooling degree days . . . . . . . . . . . . . . . . . . . . . . . . | 99.1% | 100.7% | (1.6) | 103.3% | 109.0% | (5.2) |
| Heating degree days . . . . . . . . . . . . . . . . . . . . . . . . | — % | — % | — | 89.3% | 93.7% | (4.7) |
| **Customer counts:** | | | | | | |
| Retail electricity customers (end of period and in thousands) (d): | | | | | | |
| Residential . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | 1,876 | 1,909 | (1.7) |
| Small business (a) . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | 273 | 276 | (1.1) |
| Large business and other customers . . . . . . . . . . . . . | | | | 23 | 27 | (14.8) |
| Total retail electricity customers . . . . . . . . . . . . . | | | | 2,172 | 2,212 | (1.8) |

(a) Customers with demand of less than 1 MW annually.

(b) Calculated using average number of customers for the period.

(c) Weather data is obtained from Weatherbank, Inc., an independent company that collects and archives weather data from reporting stations of the National Oceanic and Atmospheric Administration (a federal agency under the US Department of Commerce). Normal is defined as the average over a 20-year period.

(d) Based on number of meters. Typically, large business and other customers have more than one meter; therefore, number of meters does not reflect the number of individual customers. Nine months ended September 30, 2008 amounts reflect a reclassification of 18 thousand meters from residential to small business to conform to current presentation.

D-22

EFIHMW00246752

**Revenue and Commodity Hedging and Trading Activities**

| | Three Months Ended September 30, | | % Change | Nine Months Ended September 30, | | % Change |
|---|---|---|---|---|---|---|
| | 2009 | 2008 | | 2009 | 2008 | |
| **Operating revenues:** | | | | | | |
| Retail electricity revenues: | | | | | | |
| Residential | $1,272 | $1,258 | 1.1 | $3,048 | $2,966 | 2.8 |
| Small business (a) | 366 | 335 | 9.3 | 924 | 852 | 8.5 |
| Large business and other customers | 330 | 447 | (26.2) | 955 | 1,143 | (16.4) |
| Total retail electricity revenues | 1,968 | 2,040 | (3.5) | 4,927 | 4,961 | (0.7) |
| Wholesale electricity revenues (b) | 380 | 1,134 | (66.5) | 1,043 | 2,797 | (62.7) |
| Net sales (purchases) of balancing electricity to/from ERCOT | (5) | (44) | — | (50) | (227) | — |
| Amortization of intangibles (c) | 20 | 26 | (23.1) | 10 | (15) | — |
| Other operating revenues | 70 | 102 | (31.4) | 214 | 293 | (27.0) |
| Total operating revenues | $2,433 | $3,258 | (25.3) | $6,144 | $7,809 | (21.3) |
| **Commodity hedging and trading activities:** | | | | | | |
| Unrealized net gains (losses) from changes in fair value | $ 136 | $6,068 | — | $1,026 | $ (237) | — |
| Unrealized net gains (losses) representing reversals of previously recognized fair values of positions settled in the current period | (116) | 20 | — | (257) | (68) | — |
| Realized net gains (losses) on settled positions | 103 | (43) | — | 234 | 57 | — |
| Total gain (loss) | $ 123 | $6,045 | — | $1,003 | $ (248) | — |

(a)  Customers with demand of less than 1 MW annually.

(b)  Upon settlement of physical derivative power sales and purchase contracts that are marked-to-market in net income, wholesale electricity revenues and fuel and purchased power costs are reported at approximated market prices, as required by accounting rules, instead of the contract price. As a result, these line item amounts include a noncash component, which the company considers "unrealized." These amounts are as follows:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2009 | 2008 | 2009 | 2008 |
| Reported in revenues | $(11) | $ 76 | $(135) | $155 |
| Reported in fuel and purchased power costs | (6) | (22) | 79 | (71) |
| Net gain (loss) | $(17) | $ 54 | $ (56) | $ 84 |

(c)  Represents amortization of the intangible net asset value of retail and wholesale power sales agreements resulting from purchase accounting.

D-23

Confidential

EFIHMW00246753

**Production, Purchased Power and Delivery Cost Data**

| | Three Months Ended September 30, | | % Change | Nine Months Ended September 30, | | % Change |
|---|---|---|---|---|---|---|
| | 2009 | 2008 | | 2009 | 2008 | |
| **Fuel, purchased power costs and delivery fees ($ millions):** | | | | | | |
| Nuclear fuel | $ 28 | $ 25 | 12.0 | $ 86 | $ 69 | 24.6 |
| Lignite/coal | 175 | 172 | 1.7 | 474 | 485 | (2.3) |
| Total baseload fuel | 203 | 197 | 3.0 | 560 | 554 | 1.1 |
| Natural gas fuel and purchased power (a) | 431 | 1,161 | (62.9) | 953 | 2,532 | (62.4) |
| Amortization of intangibles (b) | 84 | 87 | (3.4) | 224 | 246 | (8.9) |
| Other costs | 39 | 94 | (58.5) | 145 | 304 | (52.3) |
| Fuel and purchased power costs | 757 | 1,539 | (50.8) | 1,882 | 3,636 | (48.2) |
| Delivery fees | 430 | 384 | 12.0 | 1,105 | 1,010 | 9.4 |
| Total | $ 1,187 | $ 1,923 | (38.3) | $ 2,987 | $ 4,646 | (35.7) |
| **Fuel and purchased power costs (which excludes generation plant operating costs) per MWh:** | | | | | | |
| Nuclear fuel | $ 5.42 | $ 4.88 | 11.1 | $ 5.55 | $ 4.75 | 16.8 |
| Lignite/coal (c) | 16.53 | 15.39 | 7.4 | 16.49 | 15.83 | 4.2 |
| Natural gas fuel and purchased power | 47.99 | 104.02 | (53.9) | 44.06 | 91.55 | (51.9) |
| Delivery fees per MWh | $ 26.68 | $ 24.77 | 7.7 | $ 27.77 | $ 25.69 | 8.1 |
| **Production and purchased power volumes (GWh):** | | | | | | |
| Nuclear | 5,219 | 4,996 | 4.5 | 15,512 | 14,448 | 7.4 |
| Lignite/coal | 12,209 | 12,240 | (0.3) | 32,914 | 33,697 | (2.3) |
| Total baseload generation | 17,428 | 17,236 | 1.1 | 48,426 | 48,145 | 0.6 |
| Natural gas-fueled generation | 1,135 | 2,124 | (46.6) | 2,168 | 3,843 | (43.6) |
| Purchased power | 7,890 | 9,042 | (12.7) | 19,523 | 23,816 | (18.0) |
| Total energy supply | 26,453 | 28,402 | (6.9) | 70,117 | 75,804 | (7.5) |
| Line loss and power imbalances (d) | 370 | 408 | (9.3) | 796 | 2,704 | (70.6) |
| Net energy supply volumes | 26,083 | 27,994 | (6.8) | 69,321 | 73,100 | (5.2) |
| **Baseload capacity factors (%):** | | | | | | |
| Nuclear | 103.1% | 98.4% | 4.8 | 103.1% | 95.6% | 7.8 |
| Lignite/coal | 94.0% | 95.0% | (1.1) | 85.9% | 87.7% | (2.1) |
| Total baseload | 96.6% | 95.9% | 0.7 | 90.7% | 89.9% | 0.9 |

(a) See note (b) on previous page.
(b) Represents amortization of the intangible net asset values of emission credits, coal purchase contracts, nuclear fuel contracts and power purchase agreements and the stepped up value of nuclear fuel resulting from purchase accounting.
(c) Includes depreciation and amortization of lignite mining assets, which is reported in the depreciation and amortization expense line item, but is part of overall fuel costs.
(d) Includes physical purchases and sales, the financial results of which are reported in commodity hedging and trading activities in the income statement.

Confidential

EFIHMW00246754

**Financial Results**

***Three Months Ended September 30, 2009 Compared to Three Months Ended September 30, 2008***

Operating revenues decreased $825 million, or 25%, to $2.4 billion in 2009.

Wholesale electricity revenues decreased $754 million, or 66%, as compared to 2008, when wholesale revenues increased 93%. Volatility in wholesale revenues and purchased power costs reflects movements in natural gas prices, as lower natural gas prices in 2009 drove a 55% decline in average wholesale electricity sales prices. Reported wholesale revenues and purchased power costs also reflect changes in volumes of bilateral contracting activity entered into to mitigate the effects of demand volatility and congestion. Results in 2009 reflect lower demand volatility and a decline in congestion, which drove a 19% decrease in sales volumes. Realized gains in 2009 on hedging activities mitigated the effect of lower wholesale electricity prices (see discussion of results from commodity hedging and trading activities below).

Bilateral electricity contracting activity includes hedging transactions that utilize contracts for physical delivery. Wholesale sales and purchases of electricity are reported gross in the income statement if the transactions are scheduled for physical delivery with ERCOT.

Wholesale balancing activity represents intraday purchases and sales transactions with ERCOT for real-time balancing purposes, as measured in 15-minute intervals, which are highly variable and in 2009 reflected reduced volatility and congestion.

Retail electricity revenues declined $72 million, or 4%, to $1.968 billion in 2009 and reflected the following:

- Lower average pricing contributed $154 million to the revenue decline, driven by the contract business market and also reflecting lower residential pricing. Lower average pricing reflected declines in wholesale electricity prices. In July 2009, the company announced retail residential price reductions of as much as 15% applicable to over 250,000 existing customers on month-to-month plans as well as reductions on offerings for new customers. The price reductions were effective in August 2009.

- A four percent increase in retail sales volumes increased revenues by $82 million, reflecting increases in both the residential and business markets. Higher residential volumes reflected the effect of Hurricane Ike in 2008 and warmer weather in south Texas, while the higher business markets volume reflected customer mix changes.

- Total retail electricity customer counts at September 30, 2009 decreased two percent from September 30, 2008 driven by a two percent decrease in the residential markets and reflecting competitive activity.

Other operating revenues decreased $32 million, or 31%, to $70 million in 2009 due to the effect of lower natural gas prices and lower volumes on sales of natural gas to industrial customers.

The change in operating revenues also reflected a $6 million decrease in amortization of intangible assets arising in purchase accounting.

Fuel, purchased power costs and delivery fees decreased $736 million, or 38%, to $1.2 billion in 2009. This decrease was driven by lower purchased power costs due to the effect of lower natural gas prices, decreased demand volatility and reduced congestion as discussed above regarding wholesale revenues. Lower costs of replacement power during unplanned generation unit repair outages contributed to improved margin. Other factors contributing to lower fuel and purchased power costs included lower natural gas-fueled generation and lower related fuel costs ($182 million) and the effect of lower natural gas prices and volumes on natural gas purchased for sale to industrial customers ($34 million).

D-25

Confidential

Overall baseload generation production increased one percent in 2009 reflecting a five percent increase in nuclear production, partially offset by a small decrease in lignite/coal-fueled production. The increase in nuclear production, which reflects a refueling outage in 2008, resulted in improved margin.

Net gain (loss) from commodity hedging and trading activities include realized and unrealized gains and losses associated with financial instruments used for commodity hedging and trading purposes, as well as gains and losses on physical sales and purchases of commodities for trading and hedging purposes. A substantial majority of the commodity hedging activities are intended to mitigate the risk of commodity price movements on future revenues and involve natural gas positions entered into as part of the long-term hedging program. The results of these activities have been volatile because of the effects of movements in forward natural gas prices on unrealized mark-to-market valuations. Following is an analysis of amounts reported as net gain (loss) from commodity hedging and trading activities for the three months ended September 30, 2009 and 2008:

*Three Months Ended September 30, 2009*—Unrealized mark-to-market net gains totaling $20 million included:

- $4 million in net losses related to hedge positions, which includes $121 million in net gains from changes in fair value driven by the impact of lower forward natural gas prices on the value of positions in the long-term hedging program, and $125 million in net losses that represent reversals of previously recorded net gains on positions settled in the period, and

- $24 million in net gains related to trading positions, which includes $15 million in net gains from changes in fair value and $9 million in net gains that represent reversals of previously recorded net losses on positions settled in the period.

Realized net gains totaling $103 million include:

- $110 million in net gains related to positions that primarily hedged electricity revenues recognized in the period, and

- $7 million in net losses related to trading positions.

*Three Months Ended September 30, 2008*—Unrealized mark-to-market net gains totaling $6.088 billion include:

- $6.091 billion in net gains related to hedge positions, which includes $6.074 billion in net gains from changes in fair value and $17 million in net gains that represent reversals of previously recorded net losses on positions settled in the period. The net gains from changes in fair value were driven by the effect of decreases in natural gas prices in forward periods on the value of positions in the long-term hedging program;

- $10 million in "day one" losses related to large hedge positions (see Note 7 to EFCH's historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus), and

- $7 million in net gains related to trading positions, which includes $4 million in net gains from changes in fair value and $3 million in net gains that represent reversals of previously recorded net losses on positions settled in the period.

Realized net losses totaling $43 million include:

- $105 million in net losses related to hedge positions that primarily offset hedged electricity revenues recognized in the period, and

- $62 million in net gains related to trading positions.

D-26

Confidential

Operating costs increased $3 million, or 2%, to $161 million in 2009. The increase reflected $6 million in operational readiness costs in preparation for new lignite-fueled generation facilities start-up and $6 million in increased normal baseload maintenance costs in 2009, partially offset by $6 million in 2008 maintenance costs incurred for a planned nuclear generation unit outage and $3 million in lower costs in 2009 due to natural gas-fueled generation unit retirements.

Depreciation and amortization increased $7 million, or 2%, to $303 million in 2009. The increase was driven by $11 million in higher amortization expense related to the intangible asset representing retail customer relationships recorded in purchase accounting. Lower natural gas generation unit depreciation resulting from an impairment in 2008 was substantially offset by increased lignite generation unit depreciation as a result of normal capital additions as well as adjustments to useful lives of components.

SG&A expenses increased $20 million, or 12%, to $192 million in 2009 driven by a $19 million increase in retail bad debt expense. The increase in bad debt expense primarily reflects higher delinquencies due to delays in final bills and disconnects resulting from a system conversion, customer losses and general economic conditions.

Other income totaled $33 million in 2009 and $2 million in 2008. The 2009 amount included a $23 million reversal of a use tax accrual (see Note 12 to EFCH's historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus) and a $6 million fee received related to an interest rate swap/commodity hedge derivative agreement. Other deductions totaled $6 million in 2009 and $531 million in 2008. The 2008 other deductions amount includes $499 million in impairment charges related to $NO_x$ and $SO_2$ environmental allowances intangible assets and $26 million in charges to reserve for net receivables (excluding termination related costs) from terminated hedging transactions with subsidiaries of Lehman Brothers Holdings Inc., which filed bankruptcy under Chapter 11 of the US Bankruptcy Code. See Note 12 to EFCH's historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus for more details.

Interest expense and related charges increased $195 million, or 30%, to $842 million in 2009 reflecting a $138 million unrealized mark-to-market net loss in 2009 compared to a $36 million net gain in 2008 related to interest rate swaps and a $39 million increase in noncash amortization of losses on interest rate swaps dedesignated as cash flow hedges in August 2008, partially offset by $14 million in lower amortization of discount and debt issuance costs and $6 million in increased capitalized interest.

Income tax benefit totaled $36 million in 2009 compared to income tax expense totaling $1.986 billion in 2008. The effective rates were 33.3% in 2009 and 35.6% in 2008. The decrease in the rate is primarily due to the effect of interest accrued for uncertain tax positions on a small loss in 2009.

Results declined by $3.7 billion to a loss of $72 million driven by the decrease in unrealized mark-to-market net gains related to commodity hedging activities and the unrealized mark-to-market net loss related to interest rate swaps in 2009 reported in interest expense and related charges, partially offset by the effect of impairment charges reported in other deductions in 2008.

***Nine Months Ended September 30, 2009 Compared to Nine Months Ended September 30, 2008***

Operating revenues decreased $1.7 billion, or 21%, to $6.1 billion in 2009.

Wholesale electricity revenues decreased $1.8 billion, or 63%, as compared to 2008 when revenues increased 78%. Volatility in wholesale revenues and purchased power costs reflects movements in natural gas prices, as lower natural gas prices in 2009 drove a 48% decline in average wholesale electricity sales prices. Reported wholesale revenues and purchased power costs also reflect changes in volumes of bilateral contracting activity entered into to mitigate the effects of demand volatility and congestion. Results in 2009 reflect lower demand volatility and a decline in congestion, which drove a 15% decline in wholesale sales volumes. Realized

Confidential

gains in 2009 on hedging activities mitigated the effect of lower wholesale electricity prices (see discussion of commodity hedging and trading activities below).

Bilateral electricity contracting activity includes hedging transactions that utilize contracts for physical delivery. Wholesale sales and purchases of electricity are reported gross in the income statement if the transactions are scheduled for physical delivery with ERCOT.

Wholesale balancing activity represents intraday purchases and sales transactions with ERCOT for real-time balancing purposes, as measured in 15-minute intervals, which are highly variable and in 2009 reflected reduced volatility and congestion, in part due to actions taken by ERCOT.

Retail electricity revenues declined $34 million, or 1%, to $4.927 billion and reflected the following:

- Lower average pricing contributed $103 million to the revenue decline. The change in average pricing reflected lower average contracted business rates driven by lower wholesale electricity prices, partially offset by higher average pricing in the residential and non-contract business markets resulting from advanced meter surcharges as well as customer mix.

- Retail sales volume growth of 1% increased revenues by $69 million. Volumes rose in both the residential and business markets.

Other operating revenues decreased $79 million, or 27%, to $214 million in 2009 due to the effect of lower natural gas prices and lower volumes on sales of natural gas to industrial customers.

The change in operating revenues also reflected a $25 million increase in amortization of intangible assets arising in purchase accounting.

Fuel, purchased power costs and delivery fees decreased $1.7 billion, or 36%, to $3.0 billion in 2009. This decrease was driven by lower purchased power costs due to the effect of lower natural gas prices, decreased demand volatility and reduced congestion as discussed above regarding wholesale revenues. Lower costs of replacement power during unplanned generation unit repair outages contributed to improved margin. Other factors contributing to lower fuel and purchased power costs included lower natural gas-fueled generation and lower related fuel costs ($372 million), the effect of lower natural gas prices on natural gas purchased for sale to industrial customers ($111 million) and lower amortization of intangible assets arising in purchase accounting ($22 million).

Overall baseload generation production increased 1% in 2009 reflecting a seven percent increase in nuclear production, partially offset by a two percent decrease in lignite/coal-fueled production. The increase in nuclear production, which reflects a refueling outage in 2008, resulted in improved margin. The decrease in lignite/coal-fueled production reflected reductions during certain periods when power could be purchased in the wholesale market at prices below production costs, which was largely due to lower natural gas prices and higher wind generation availability, partially offset by lower maintenance and repair outages.

Following is an analysis of amounts reported as net gain (loss) from commodity hedging and trading activities for the nine months ended September 30, 2009 and 2008:

*Nine Months Ended September 30, 2009*—Unrealized mark-to-market net gains totaling $769 million included:

- $750 million in net gains related to hedge positions, which includes $1.010 billion in net gains from changes in fair value, driven by the impact of lower forward natural gas prices on the value of positions in the long-term hedging program, and $260 million in net losses that represent reversals of previously recorded net gains on positions settled in the period, and

D-28

- $19 million in net gains related to trading positions, which includes $16 million in net gains from changes in fair value and $3 million in net gains that represent reversals of previously recorded net losses on positions settled in the period.

Realized net gains totaling $234 million included:

- $247 million in net gains related to positions that primarily hedged electricity revenues recognized in the period, and

- $13 million in net losses related to trading positions.

*Nine Months Ended September 30, 2008*—Unrealized mark-to-market net losses totaling $305 million included:

- $250 million in net losses related to hedge positions, which includes $248 million in net losses from changes in fair value and $2 million in net losses that represent reversals of previously recorded net gains on positions settled in the period;

- $69 million in "day one" net losses related to large hedge positions (see Note 7 to EFCH's historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus), and

- $13 million in net gains related to trading positions, which includes $79 million in net gains from changes in fair value and $66 million in net losses that represent reversals of previously recorded net gains on positions settled in the period.

Realized net gains totaling $57 million include:

- $76 million in net losses related to hedge positions that offset hedged electricity revenues and fuel and purchased power costs recognized in the period, and

- $133 million in net gains related to trading positions.

Operating costs increased $3 million, or 1%, to $504 million in 2009. The increase reflected $21 million in higher maintenance costs incurred during planned and unplanned lignite-fueled generation unit outages in 2009 and $15 million in operational readiness costs incurred in preparation for new lignite-fueled generation facilities start-up, partially offset by the effect of $32 million in 2008 maintenance costs incurred for a planned nuclear generation unit outage.

Depreciation and amortization increased $35 million, or 4%, to $862 million in 2009. The increase was driven by $29 million in higher amortization expense related to the intangible asset representing retail customer relationships recorded in purchase accounting. Increased lignite generation unit depreciation as a result of normal capital additions as well as adjustments to useful lives of components was substantially offset by lower natural gas generation unit depreciation resulting from an impairment in 2008.

SG&A expenses increased $60 million, or 12%, to $555 million in 2009. The increase reflected $30 million in higher retail bad debt expense, reflecting higher delinquencies due to delays in final bills and disconnects resulting from a system conversion, customer losses and general economic conditions, $25 million in higher costs associated with the implementation of a new retail customer information management system and the transition of certain previously outsourced customer operations and $4 million in costs related to the nuclear generation development joint venture.

See Note 2 to EFCH's historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus for discussion of the additional impairment of goodwill of $70 million in 2009.

D-29

Confidential

Other income totaled $38 million in 2009 and $8 million in 2008. The 2009 amount included a $23 million reversal of a use tax accrual (see Note 12 to EFCH's historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus) and a $6 million fee received related to an interest rate swap/commodity hedge derivative agreement. Other deductions totaled $19 million in 2009 and $550 million in 2008. The 2009 amount includes charges for severance and other individually immaterial miscellaneous expenses. The 2008 amount includes $501 million in impairment charges related to NOx and SO2 environmental allowances intangible assets and $26 million in charges to reserve for net receivables (excluding termination related costs) from terminated hedging transactions with subsidiaries of Lehman Brothers Holdings Inc., which filed for bankruptcy under Chapter 11 of the US Bankruptcy Code. See Note 12 to EFCH's historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus for more details.

Interest expense and related charges decreased $410 million, or 21%, to $1.5 billion in 2009. The decrease reflected $491 million in higher unrealized mark-to-market net gains related to interest rate swaps and $32 million in increased capitalized interest, partially offset by $123 million in increased noncash amortization of losses on interest rate swaps dedesignated as cash flow hedges in August 2008.

Income tax expense totaled $259 million in 2009 compared to an income tax benefit totaling $493 million in 2008. The effective rate was 42.7% on income in 2009 and 34.3% on a loss in 2008. The increase in the rate reflects the impacts of the non-deductible goodwill impairment in 2009, which added 4 percentage points to the effective rate, and the effect of interest accrued for uncertain tax positions, which increased the rate on income in 2009 and decreased the rate on a loss in 2008.

Results improved $1.3 billion to net income of $347 million in 2009 driven by the change in unrealized mark-to-market results related to commodity hedging activities, the 2008 impairment charges reported in other deductions related to environmental allowances intangible assets and the unrealized mark-to-market net gains related to interest rate swaps reported in interest expense.

### *Energy-Related Commodity Contracts and Mark-to-Market Activities*

The table below summarizes the changes in commodity contract assets and liabilities for the nine months ended September 30, 2009. The net change in these assets and liabilities totaling $712 million, excluding "other activity" as described below, represents the pretax effect on earnings of positions in the commodity contract portfolio that are marked-to-market in net income (see Note 7 to EFCH's historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus). These positions represent both economic hedging and trading activities.

|  | Nine Months Ended September 30, 2009 |
|---|---|
| Commodity contract net asset at beginning of period | $  430 |
| Settlements of positions (a) | (314) |
| Unrealized mark-to-market valuations due to changes in fair value (b) | 1,026 |
| Other activity (c) | 63 |
| Commodity contract net asset at end of period (d) | $1,205 |

(a) Represents reversals of previously recognized unrealized gains and losses upon settlement (offsets realized gains and losses recognized in the settlement period).

(b) Primarily represents mark-to-market effects of positions in the long-term hedging program (see discussion above under "—Business—Significant Activities and Events—Long-Term Hedging Program").

(c) This amount does not represent unrealized gains or losses. Includes initial values of positions involving the receipt or payment of cash or other consideration.

D-30

Confidential

(d)   Amount excludes $12 million in net derivative liabilities related to instruments not marked-to-market in net income.

In addition to the effect on net income of recording unrealized mark-to-market gains and losses that are reflected in the table above, similar effects arise in the recording of unrealized ineffectiveness gains and losses associated with commodity-related positions accounted for as cash flow hedges. These effects on net income, which include reversals of previously recorded unrealized ineffectiveness gains and losses to offset realized gains and losses upon settlement, are reflected in the balance sheet as changes in cash flow hedge and other derivative assets and liabilities (see Note 7 to EFCH's historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus). The total pretax effect of recording unrealized gains and losses in net income related to commodity contracts is summarized as follows:

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
|  | 2009 | 2008 | 2009 | 2008 |
| Unrealized gains/(losses) related to contracts marked-to-market ...... | $   3 | $6,142 | $712 | $(217) |
| Ineffectiveness gains/losses related to cash flow hedges ............. | — | — | 1 | (4) |
| Total unrealized gains (losses) related to commodity contracts ........ | $   3 | $6,142 | $713 | $(221) |

*Maturity Table*—Following are the components of the net commodity contract asset at September 30, 2009:

|  | Amount |
|---|---|
| Net commodity contract asset ................................................................. | $1,205 |
| Net asset associated with receipts of natural gas under physical gas exchange transactions ........... | 4 |
| Amount of net asset arising from mark-to-market accounting ............................... | $1,209 |

The following table presents the net commodity contract asset arising from recognition of fair values under mark-to-market accounting as of September 30, 2009, scheduled by the source of fair value and contractual settlement dates of the underlying positions.

|  | Maturity dates of unrealized net commodity contract asset at September 30, 2009 | | | | |
|---|---|---|---|---|---|
| Source of fair value | Less than 1 year | 1-3 years | 4-5 years | Excess of 5 years | Total |
| Prices actively quoted ...................................... | $(12) | $(80) | $  (2) | $ — | $  (94) |
| Prices provided by other external sources ................. | 704 | 572 | 56 | — | 1,332 |
| Prices based on models ............................... | (10) | (29) | 140 | (130) | (29) |
| Total ........................................... | $682 | $463 | $194 | $(130) | $1,209 |
| Percentage of total fair value .......................... | 57% | 38% | 16% | (11)% | 100% |

The "prices actively quoted" category reflects only exchange traded contracts for which active quotes are readily available. The "prices provided by other external sources" category represents forward commodity positions valued using prices for which over-the-counter broker quotes are available in active markets. Over-the-counter quotes for power in ERCOT that are deemed active markets (excluding the West zone) generally extend through 2012 and over-the-counter quotes for natural gas generally extend through 2015, depending upon delivery point. The "prices based on models" category contains the value of all nonexchange traded options, valued using option pricing models. In addition, this category contains other contractual arrangements that may have both forward and option components, as well as other contracts that are valued using proprietary long-term pricing models that utilize certain market based inputs. See Note 8 to EFCH's historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus for fair value disclosures and discussion of fair value measurements.

Confidential

EFIHMW00246761

**Financial Condition**

*Liquidity and Capital Resources*

*Consolidated Cash Flows—Nine Months Ended September 30, 2009 Compared to Nine Months Ended September 30, 2008*

*Cash Flows*—Cash provided by operating activities for the nine months ended September 30, 2009 totaled $1.471 billion compared to cash provided of $865 million in the nine months ended September 30, 2008. The increase in cash provided of $606 million reflected:

- a $496 million favorable change in margin deposits primarily due to the effect of lower forward natural gas prices on positions in the long-term hedging program, and

- a $131 million decrease in cash interest paid driven by the payment of $98 million of interest with new notes instead of cash as discussed under "—PIK Interest Election" below.

Cash provided by financing activities decreased $2.627 billion as summarized below and reflected lower borrowings to support margin deposits:

| | Nine Months Ended September 30, | |
| --- | --- | --- |
| | 2009 | 2008 |
| Net issuances, repayments and repurchases of borrowings . . . . . . . . . . . . . . . . . | $270 | $2,906 |
| Decrease in income tax related note payable to Oncor (Note 11) . . . . . . . . . . . . | (26) | (25) |
| Contributions from noncontrolling interests . . . . . . . . . . . . . . . . . . . . . . . . . . . | 42 | — |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 | 33 |
| Total provided by financing activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $287 | $2,914 |

Cash used in investing activities decreased $639 million as summarized below:

| | Nine Months Ended September 30, | |
| --- | --- | --- |
| | 2009 | 2008 |
| Net (loans to) repayments from affiliates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ (528) | $ (381) |
| Capital expenditures, including nuclear fuel . . . . . . . . . . . . . . . . . . . . . . . . . . | (1,263) | (1,514) |
| Money market fund redemptions (investments) . . . . . . . . . . . . . . . . . . . . . . . . . | 142 | (242) |
| Change in restricted cash . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 118 | 9 |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 48 | 6 |
| Total used in investing activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $(1,483) | $(2,122) |

The decline in capital spending for the nine months ended September 30, 2009 as compared to the nine months ended September 30, 2008 primarily reflected a decrease in spending related to the construction of new generation facilities, which is nearing completion.

Depreciation and amortization expense reported in the statement of cash flows exceeds the amount reported in the statement of income by $445 million and $335 million for the nine months ended September 30, 2009 and 2008, respectively. The differences represent amortization of intangible net assets and debt fair value discounts arising from purchase accounting that is reported in various other income statement line items including operating revenues, fuel and purchased power costs and delivery fees and interest expense and related charges. The differences also reflect the amortization of nuclear fuel, which is reported as fuel cost in the statement of income consistent with industry practice. In addition, the differences reflect the amortization of losses on dedesignated cash flow hedges, which is reported in interest expense and related charges in the statement of income.

D-32

EFIHMW00246762

**PX 014**
**Page 1044 of 1116**

*Debt Financing Activity*—Long-term borrowings for the nine months ended September 30, 2009 totaled $522 million consisting of borrowings under the TCEH Delayed Draw Term Loan Facility to fund capital expenditures principally related to the construction of the new generation facilities. Retirements for the nine months ended September 30, 2009 totaled $217 million and included $65 million of a matured TCEH promissory note, $123 million repaid under the TCEH Initial Term Loan Facility and other repayments totaling $29 million, principally related to capitalized leases. These issuances do not include the $98 million of TCEH Toggle Notes and $75 million of EFH Corp. Toggle Notes pushed down to EFCH that were issued in May 2009 in payment of accrued interest as discussed below under "—PIK Interest Election."

See Note 4 to EFCH's historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus for further detail of long-term debt and other financing arrangements.

EFCH or its affiliates may from time to time purchase their outstanding debt securities for cash in open market purchases or privately negotiated transactions, or may refinance existing debt securities. EFCH or its affiliates will evaluate any such transactions in light of market prices of the securities, taking into account liquidity requirements and prospects for future access to capital, contractual restrictions and other factors. The amounts involved in any such transactions, individually or in the aggregate, may be material. See Note 4 to EFCH's historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus for discussion of debt exchange offers announced by EFH Corp. and certain of its subsidiaries in October 2009.

*Available Liquidity*—The following table summarizes changes in available liquidity for the nine months ended September 30, 2009.

|  | Available Liquidity | | |
|  | September 30, 2009 | December 31, 2008 | Change |
|---|---|---|---|
| Cash and cash equivalents | $  754 | $  479 | $ 275 |
| Investments held in money market fund | — | 142 | (142) |
| TCEH Delayed Draw Term Loan Facility | — | 522 | (522) |
| TCEH Revolving Credit Facility (a) | 1,736 | 1,767 | (31) |
| TCEH Letter of Credit Facility | 459 | 490 | (31) |
| Subtotal | $2,949 | $3,400 | $(451) |
| Short-term investment (b) | 65 | — | 65 |
| Total liquidity (c) | $3,014 | $3,400 | $(386) |

(a)  As of September 30, 2009 and December 31, 2008, the TCEH Revolving Credit Facility includes $141 million and $144 million, respectively, of commitments from Lehman that are only available from the fronting banks and the swingline lender.

(b)  Represents $65 million in letters of credit posted related to certain interest rate swaps transactions. This collateral will be returned no later than March 2010. See Note 7 to EFCH's historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus.

(c)  Pursuant to PUCT rules, TCEH is required to maintain available liquidity to assure adequate credit worthiness of TCEH's REP subsidiaries, including the ability to return retail customer deposits, if necessary. As a result, at September 30, 2009, the total availability under the TCEH credit facilities should be further reduced by $237 million. See "—Regulation and Rates—Certification of REPs."

Note: Available liquidity above does not include the amounts available from exercising the payment-in-kind (PIK) option on the EFH Corp. Toggle Notes and TCEH Toggle Notes, which for the remaining payment dates from November 2009 through November 2012 could add approximately $948 million and $615 million of liquidity, respectively.

D-33

EFIHMW00246763

**PX 014**
**Page 1045 of 1116**

The $386 million decrease in available liquidity, after taking into account the short-term investment, was driven by capital spending to construct the new generation facilities, as well as an increase in notes receivable from EFH Corp.

See Note 4 to EFCH's historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus for additional discussion of these credit facilities.

**Long-Term Contractual Obligations and Commitments**—In the nine months ended September 30, 2009, EFCH entered into contractual obligations for fuel for its generation facilities totaling approximately $320 million to purchase nuclear fuel in periods between 2010 and 2020 and totaling approximately $153 million to purchase coal in periods between 2010 and 2012.

**PIK Interest Election**—EFH Corp. and TCEH have the option every six months at their discretion, ending with the payment due November 2012, to use the payment-in-kind (PIK) feature of their respective toggle notes in lieu of making cash interest payments. Once EFH Corp. and/or TCEH make a PIK election, the election is valid for each succeeding interest payment period until EFH Corp. and/or TCEH revoke the applicable election. EFH Corp. and TCEH elected to do so for the May 2009, November 2009 and May 2010 interest payments as an efficient and cost-effective method to further enhance liquidity, in light of the weaker economy and related lower electricity demand and the continuing uncertainty in the financial markets. Use of the PIK feature will be evaluated at each election period, taking into account market conditions and other relevant factors at such time.

EFH Corp. made its May 2009 interest payment and will make its November 2009 and May 2010 interest payments by using the PIK feature of the EFH Corp. Toggle Notes. During the applicable interest periods, the interest rate on the toggle notes is increased from 11.25% to 12.00%. EFH Corp. increased the aggregate principal amount of the EFH Corp. Toggle Notes by $150 million in May 2009 and will further increase the aggregate principal amount of the EFH Corp. Toggle Notes by $159 million in November 2009 and by $169 million in May 2010. The elections increased liquidity as of May 1, 2009 by an amount equal to approximately $141 million and will further increase liquidity as of November 1, 2009 and May 1, 2010 by an amount equal to approximately $149 million and $158 million, respectively, with such amounts constituting the amount of cash interest that otherwise would have been payable on the respective dates, and will increase the expected annual cash interest expense by approximately $54 million (50% of which relates to EFCH due to push down), constituting the additional cash interest that will be payable with respect to the $478 million of additional toggle notes.

See Note 4 to EFCH's historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus for discussion of debt exchange offers that may result in redemption of portions of the outstanding principal amount of these notes, a reduction of the effect of the PIK election for the May 2010 interest payment discussed immediately below and the new notes offered by EFH Corp. in the exchange offers that would be subject to debt push down.

Similarly, TCEH made its May 2009 interest payment and will make its November 2009 and May 2010 interest payments by using the PIK feature of the TCEH Toggle Notes. During the applicable interest periods, the interest rate on the toggle notes is increased from 10.50% to 11.25%. TCEH increased the aggregate principal amount of the TCEH Toggle Notes by approximately $98.5 million in May 2009 and will further increase the aggregate principal amount of the TCEH Toggle Notes by approximately $104 million in November 2009 and $110 million in May 2010. The elections increased liquidity as of May 1, 2009 by an amount equal to approximately $92 million and will further increase liquidity as of November 1, 2009 and May 1, 2010 by an amount equal to approximately $97 million and $103 million, respectively, with such amounts constituting the amount of cash interest that otherwise would have been payable on the respective dates, and will increase the expected annual cash interest expense by approximately $33 million, constituting the additional cash interest that will be payable with respect to the $312 million of additional toggle notes.

D-34

Confidential

*Liquidity Effects of Commodity Hedging and Trading Activities*—Commodity hedging and trading transactions typically require a counterparty to post collateral if the forward price of the underlying commodity moves such that the hedging or trading instrument held by such counterparty has declined in value. TCEH uses cash, letters of credit and other forms of credit support to satisfy such collateral obligations. In addition, TCEH's Commodity Collateral Posting Facility, an uncapped senior secured revolving credit facility, funds the cash collateral posting requirements for a significant portion of the positions in the long-term hedging program not otherwise secured by a first-lien in the assets of TCEH. The aggregate principal amount of this facility is determined by the exposure arising from higher forward market prices, regardless of the amount of such exposure, on a portfolio of certain natural gas hedging transaction volumes. Including those hedging transactions where margin deposits are covered by unlimited borrowings under the TCEH Commodity Collateral Posting Facility, at September 30, 2009, more than 95% of the long-term natural gas hedging program transactions were secured by a first-lien interest in the assets of TCEH that is pari passu with the TCEH Senior Secured Facilities, the effect of which is a significant reduction in the liquidity exposure associated with collateral requirements for those hedging transactions. See Note 4 to EFCH's historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus for more information about this facility.

As of September 30, 2009, TCEH received or posted cash and letters of credit for commodity hedging and trading activities as follows:

- $151 million in cash has been posted with counterparties for exchange cleared transactions (including initial margin), as compared to $317 million posted as of December 31, 2008;

- $497 million in cash has been received from counterparties, net of $7 million in cash posted, for over-the-counter and other non-exchange cleared transactions, as compared to $402 million received, net of $122 million in cash posted, as of December 31, 2008;

- $360 million in letters of credit have been posted with counterparties, as compared to $342 million posted as of December 31, 2008, and

- $10 million in letters of credit have been received from counterparties, as compared to $30 million received as of December 31, 2008.

In addition, EFH Corp. (parent) elected to post cash collateral of $400 million in 2009 related to certain TCEH interest rate and commodity hedge transactions (see Note 7 to EFCH's historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus).

With respect to exchange cleared transactions, these transactions typically require initial margin (i.e. the upfront cash and/or letter of credit posted to take into account the size and maturity of the positions and credit quality) in addition to variance margin (i.e. the daily cash margin posted to take into account changes in the value of the underlying commodity). The amount of initial margin required is generally defined by exchange rules. Clearing agents, however, typically have the right to request additional initial margin based on various factors including market depth, volatility and credit quality, which may be in the form of cash, letters of credit, a guaranty or other forms as negotiated with the clearing agent. With respect to cash collateral that is received, such cash collateral is either used for working capital and other corporate purposes, including reducing short-term borrowings under credit facilities, or it is required to be deposited in a separate account and restricted from being used for working capital and other corporate purposes. With respect to over-the-counter transactions, counterparties generally have the right to substitute letters of credit for such cash collateral. In such event, the cash collateral previously posted would be returned to such counterparties thereby reducing liquidity in the event that it was not restricted. As of September 30, 2009, restricted cash collateral was less than $1 million. See Note 12 to EFCH's historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus regarding restricted cash.

Confidential

EFIHMW00246765

With the long-term hedging program, increases in natural gas prices generally result in increased cash collateral and letter of credit margin requirements. As of September 30, 2009, approximately 0.7 billion MMBtu of positions related to the long-term hedging program were not directly secured on an asset-lien basis and thus have cash collateral posting requirements. The uncapped TCEH Commodity Collateral Posting Facility supports the collateral posting requirements related to these transactions.

*Sale of Accounts Receivable*—TXU Energy participates in an accounts receivable securitization program, the activity under which is accounted for as a sale of accounts receivable in accordance with transfers and servicing accounting standards. Under the program, TXU Energy (originator) sells retail trade accounts receivable to TXU Receivables Company, a consolidated wholly-owned bankruptcy-remote direct subsidiary of EFH Corp., which sells undivided interests in the purchased accounts receivable for cash to special purpose entities established by financial institutions. All new trade receivables under the program generated by the originator are continuously purchased by TXU Receivables Company with the proceeds from collections of receivables previously purchased. Funding under the program totaled $700 million and $416 million at September 30, 2009 and December 31, 2008, respectively. See Note 3 to EFCH's historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus for a more complete description of the program including the impact of the program on the financial statements for the periods presented and the contingencies that could result in a reduction of funding available under the program.

*Financial Covenants, Credit Rating Provisions and Cross Default Provisions*—The terms of certain financing arrangements of subsidiaries of EFCH contain maintenance covenants with respect to leverage ratios and/or minimum net worth. As of September 30, 2009, EFCH's subsidiaries were in compliance with all such maintenance covenants.

*Covenants and Restrictions under Financing Arrangements*—Each of the TCEH Senior Secured Facilities, indentures governing the TCEH Notes and the EFH Corp. Notes and agreements related to certain series of TCEH's pollution control revenue bonds contains covenants that could have a material impact on the liquidity and operations of EFCH and its subsidiaries.

Adjusted EBITDA (as used in the maintenance covenant contained in the indenture governing the TCEH Notes) for the twelve months ended September 30, 2009 totaled $3.6 billion for TCEH. See "—Adjusted EBITDA Reconciliation" for a reconciliation of net income to Adjusted EBITDA for TCEH and EFH Corp., respectively, for the nine and twelve months ended September 30, 2009 and 2008.

D-36

EFIHMW00246766

The following table summarizes TCEH's secured debt to adjusted EBITDA ratio under the maintenance covenant in the TCEH Senior Secured Facilities and various other financial ratios of EFH Corp. and TCEH that are applicable under certain other covenants in the TCEH Senior Secured Facilities and the indentures governing the TCEH Notes and the EFH Corp. Notes as of September 30, 2009 and December 31, 2008 and the corresponding maintenance and other covenant threshold levels as of September 30, 2009:

| | September 30, 2009 | December 31, 2008 | Threshold Level |
|---|---|---|---|
| **Maintenance Covenant:** | | | |
| TCEH Senior Secured Facilities: | | | |
| Secured debt to adjusted EBITDA ratio .......... | 4.68 to 1.00 | 4.77 to 1.00 | Must not exceed 7.25 to 1.00 |
| **Debt Incurrence Covenants:** | | | |
| EFH Corp. Notes: | | | |
| EFH Corp. fixed charge coverage ratio ........... | 1.6 to 1.0 | 1.5 to 1.0 | At least 2.0 to 1.0 |
| TCEH fixed charge coverage ratio .............. | 1.4 to 1.0 | 1.3 to 1.0 | At least 2.0 to 1.0 |
| TCEH Notes: | | | |
| TCEH fixed charge coverage ratio .............. | 1.4 to 1.0 | 1.3 to 1.0 | At least 2.0 to 1.0 |
| TCEH Senior Secured Facilities: | | | |
| TCEH fixed charge coverage ratio .............. | 1.4 to 1.0 | 1.3 to 1.0 | At least 2.0 to 1.0 |
| **Restricted Payments/Limitations on Investments Covenants:** | | | |
| EFH Corp. Notes: | | | |
| General restrictions (non-Sponsor Group payments): | | | |
| EFH Corp. fixed charge coverage ratio (a) .... | 1.4 to 1.0 | 1.3 to 1.0 | At least 2.0 to 1.0 |
| General restrictions (Sponsor Group payments): | | | |
| EFH Corp. fixed charge coverage ratio (a) .... | 1.6 to 1.0 | 1.5 to 1.0 | At least 2.0 to 1.0 |
| EFH Corp. leverage ratio .................. | 7.0 to 1.0 | 6.9 to 1.0 | Equal to or less than 7.0 to 1.0 |
| TCEH Notes: | | | |
| TCEH fixed charge coverage ratio .............. | 1.4 to 1.0 | 1.3 to 1.0 | At least 2.0 to 1.0 |
| TCEH Senior Secured Facilities: | | | |
| Payments to Sponsor Group: | | | |
| TCEH total debt to adjusted EBITDA ratio ... | 8.4 to 1.0 | 8.7 to 1.0 | At least 6.5 to 1.0 |

_____

(a)  The EFH Corp. fixed charge coverage ratio for non-Sponsor Group payments includes the results of Oncor Holdings and its subsidiaries. The EFH Corp. fixed charge coverage ratio for Sponsor Group payments excludes the results of Oncor Holdings and its subsidiaries.

*Credit Ratings*—The issuer credit ratings as of October 5, 2009 for EFCH and its subsidiaries are CC, Caa1 and B by S&P, Moody's and Fitch, respectively.

D-37

EFIHMW00246767

**PX 014**
**Page 1049 of 1116**

Additionally, the rating agencies assign credit ratings on certain of EFCH's debt securities. The credit ratings assigned for debt securities issued by EFCH and certain of its subsidiaries and by EFH Corp. that are guaranteed by EFCH as of October 5, 2009 are presented below:

|  | S&P | Moody's | Fitch |
|---|---|---|---|
| EFH Corp. (Senior Unsecured) (a) ........................ | CC | Caa3 | B+ |
| EFCH (Senior Unsecured) ............................... | CCC | Caa3 | CCC |
| TCEH (Senior Secured) ................................. | B+ | B2 | BB |
| TCEH (Senior Unsecured) (b) ........................... | CC | Caa2 | B |
| TCEH (Unsecured) .................................... | CCC | Caa3 | CCC |

_____

(a) EFH Corp. Cash-Pay Notes and EFH Corp. Toggle Notes

(b) TCEH Cash-Pay Notes and TCEH Toggle Notes. S&Ps ratings of the TCEH Cash-Pay Notes and the TCEH Toggle Notes are CC and CCC, respectively.

In October 2009, both S&P and Moody's announced rating actions related to their view that the debt exchange transaction announced by EFH Corp. in October 2009 represented a "distressed exchange." As a result, S&P downgraded the corporate issuer ratings of EFH Corp., EFCH and TCEH by four notches to CC from B- and affirmed their negative outlook. S&P also completed multi-notch downgrades of its ratings on issuances subject to the exchange to CC. Moody's affirmed its Caa1 corporate family ratings and negative outlook for EFH Corp. and TCEH but downgraded its probability of default rating for EFH Corp. and TCEH three notches to Ca from Caa1. Additionally, Moody's downgraded its ratings on certain issuances subject to the exchange and placed the ratings of TCEH Cash-Pay Notes on review for possible downgrade. S&P and Moody's have indicated that shortly after settlement of the debt exchange transaction they expect to replace these temporary "distressed exchange" ratings with new ratings based on their analysis of the outcome of the exchange. Fitch affirmed their ratings and outlook for EFH Corp., EFCH and TCEH.

In March 2009, Fitch downgraded certain ratings for EFH Corp., EFCH and TCEH and changed the outlook for EFH Corp., EFCH and TCEH from stable to negative, citing the effect of the economic slowdown in Texas and lower than anticipated market heat rates in ERCOT.

A rating reflects only the view of a rating agency, and is not a recommendation to buy, sell or hold securities. Ratings can be revised upward or downward at any time by a rating agency if such rating agency decides that circumstances warrant such a change.

*Material Credit Rating Covenants and Credit Worthiness Effects on Liquidity*—As a result of TCEH's non-investment grade credit rating and considering collateral thresholds of certain retail and wholesale commodity contracts, as of September 30, 2009, counterparties to those contracts could have required TCEH to post up to an aggregate of $44 million in additional collateral. This amount largely represents the below market terms of these contracts as of September 30, 2009; thus, this amount will vary depending on the value of these contracts on any given day.

Certain transmission and distribution utilities in Texas have tariffs in place to assure adequate credit worthiness of any REP to support the REP's obligation to collect securitization bond-related (transition) charges on behalf of the utility. Under these tariffs, as a result of TCEH's below investment grade credit rating, TCEH is required to post collateral support in an amount equal to estimated transition charges over specified time periods. The amount of collateral support required to be posted, as well as the time period of transition charges covered, varies by utility. As of September 30, 2009, TCEH has posted collateral support in the form of letters of credit to the applicable utilities in an aggregate amount equal to $28 million, with $16 million of this amount posted for the benefit of Oncor.

The PUCT has rules in place to assure adequate credit worthiness of each REP, including the ability to return customer deposits, if necessary. Under these rules, as of September 30, 2009, TCEH maintained

Confidential

EFIHMW00246768

availability under its credit facilities of approximately $237 million. See "—Regulation and Rates—Certification of REPs."

The RRC has rules in place to assure adequate credit worthiness of parties that have mining reclamation obligations. Under these rules, should the RRC determine that the credit worthiness of Luminant Generation Company LLC (a subsidiary of TCEH) is not sufficient to support its reclamation obligations, TCEH may be required to post cash or letter of credit collateral support in an amount currently estimated to be approximately $600 million to $800 million. The actual amount (if required) could vary depending upon numerous factors, including Luminant Generation Company LLC's credit worthiness and the level of mining reclamation obligations.

ERCOT also has rules in place to assure adequate credit worthiness of parties that schedule power on the ERCOT System. Under these rules, TCEH has posted collateral support, predominantly in the form of letters of credit, totaling $38 million as of September 30, 2009 (which is subject to weekly adjustments based on settlement activity with ERCOT).

Oncor and Texas Holdings agreed to the terms of a stipulation with major interested parties to resolve all outstanding issues in the PUCT review related to the Merger. As part of this stipulation, TCEH is required to post a letter of credit in an amount equal to $170 million to secure its payment obligations to Oncor if two or more of Oncor's credit ratings are below investment grade.

Other arrangements of EFCH and its subsidiaries, including the accounts receivable securitization program (see Note 3 to EFCH's historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus) and certain leases, contain terms pursuant to which the interest rates charged under the agreements may be adjusted depending on the relevant credit ratings.

In the event that any or all of the additional collateral requirements discussed above are triggered, EFCH believes it will have adequate liquidity to satisfy such requirements.

*Material Cross Default Provisions*—Certain financing arrangements contain provisions that may result in an event of default if there were a failure under other financing arrangements to meet payment terms or to observe other covenants that could or does result in an acceleration of payments due. Such provisions are referred to as "cross default" provisions.

A default by TCEH or any restricted subsidiary in respect of indebtedness, excluding indebtedness relating to the sale of receivables program, in an aggregate amount in excess of $200 million may result in a cross default under the TCEH Senior Secured Facilities. Under these facilities such a default may cause the maturity of outstanding balances ($22.356 billion at September 30, 2009) under such facilities to be accelerated.

The indenture governing the TCEH Notes contains a cross acceleration provision where a payment default at maturity or on acceleration of principal indebtedness under any instrument or instruments of TCEH and any of its restricted subsidiaries in the aggregate amount equal to or greater than $250 million may cause the acceleration of the TCEH Notes.

Under the terms of a TCEH rail car lease, which had approximately $48 million in remaining lease payments as of September 30, 2009 and terminates in 2017, if TCEH failed to perform under agreements causing its indebtedness in aggregate principal amount of $100 million or more to become accelerated, the lessor could, among other remedies, terminate the lease and effectively accelerate the payment of any remaining lease payments due under the lease.

Under the terms of a TCEH rail car lease, which had approximately $54 million in remaining lease payments as of September 30, 2009 and terminates in 2028, if obligations of TCEH in excess of $200 million in the aggregate for payments of obligations to third party creditors under lease agreements, deferred purchase

D-39

EFIHMW00246769

agreements or loan or credit agreements have been accelerated prior to their original stated maturity, the lessor could, among other remedies, terminate the lease and effectively accelerate the payment of any remaining lease payments due under the lease.

The indenture governing the EFH Corp. Notes contains a cross acceleration provision whereby a payment default at maturity or on acceleration of principal indebtedness under any instrument or instruments of EFH Corp. or any of its restricted subsidiaries in the aggregate amount equal to or greater than $250 million may cause the acceleration of the EFH Corp. Notes.

The accounts receivable securitization program contains a cross default provision with a threshold of $200 million that applies in the aggregate to the originator, any parent guarantor of an originator or any subsidiary acting as collection agent under the program. TXU Receivables Company and EFH Corporate Services Company (a direct subsidiary of EFH Corp.), as collection agent, in the aggregate have a cross default threshold of $50,000. If any of the aforementioned defaults on indebtedness of the applicable threshold were to occur, the program could terminate.

EFCH and its subsidiaries enter into energy-related and financial contracts, the master forms of which contain provisions whereby an event of default or acceleration of settlement would occur if EFCH or those subsidiaries were to default under an obligation in respect of borrowings in excess of thresholds, which vary, stated in the contracts. The subsidiaries whose default would trigger cross default vary depending on the contract.

Each of TCEH's natural gas hedging agreements that are secured with a lien on its assets on a pari passu basis with the TCEH Senior Secured Facilities contains a cross default provision. In the event of a default by TCEH or any of its subsidiaries relating to indebtedness (such amounts varying by contract but ranging from $200 million to $250 million) that results in the acceleration of such debt, then each counterparty under these hedging agreements would have the right to terminate its hedge agreement with TCEH and require all outstanding obligations under such agreement to be settled.

In the event of a default by TCEH relating to indebtedness in an amount equal to or greater than $200 million that results in the acceleration of such debt, then each counterparty under TCEH's interest rate swap agreements with an aggregate derivative liability of $1.39 billion at September 30, 2009 would have the right to terminate its interest rate swap agreement with TCEH and require all outstanding obligations under such agreement to be settled.

Other arrangements, including leases, have cross default provisions, the triggering of which would not be expected to result in a significant effect on liquidity.

*Guarantees*—See Note 5 to EFCH's historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus for details of guarantees.

## Off–Balance Sheet Arrangements

See discussion above under "Sale of Accounts Receivable" and in Note 3 to EFCH's historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus.

Also see Note 5 to EFCH's historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus regarding guarantees.

## Commitments and Contingencies

See Note 5 to EFCH's historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus for discussion of commitments and contingencies.

D-40

Confidential

**Changes in Accounting Standards**

See Note 1 to EFCH's historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus for a discussion of changes in accounting standards.

**Regulation and Rates**

*Regulatory Investigations and Reviews*

See Note 5 to EFCH's historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus.

*Certification of REPs*

In April 2009, the PUCT finalized a rule relating to the Certification of Retail Electric Providers. The rule strengthens the certification requirements for REPs in order to better protect customers, transmission and distribution utilities (TDUs), and other REPs from the potential insolvency of REPs. The rule is considered a competition rule and thus is subject to judicial review as specified in PURA. The rule, among other things, increases creditworthiness and financial reporting requirements for REPs and provides additional customer protection requirements and regulatory asset consideration for TDU bad debt expenses. Under the rule, REPs are required to amend their certifications, including the manner in which they meet financial requirements, by May 21, 2010. TXU Energy plans to file its amended certification no later than the first quarter 2010. Under the new financial requirements, which will be effective upon approval of the amended certification, as of September 30, 2009, the amount of additional available liquidity required to be maintained by TCEH would have been reduced from $237 million to approximately $93 million as a result of no longer having to reserve liquidity for payments related to TDUs.

*Wholesale Market Design*

In August 2003, the PUCT adopted a rule that, when implemented, will alter the wholesale market design in the ERCOT market. The rule requires ERCOT to:

- use a stakeholder process to develop a new wholesale market model;
- operate a voluntary day-ahead energy market;
- directly assign all congestion rents to the resources that caused the congestion;
- use nodal energy prices for resources;
- provide information for energy trading hubs by aggregating nodes;
- use zonal prices for loads, and
- provide congestion revenue rights (but not physical rights).

ERCOT currently has a zonal wholesale market structure consisting of four geographic zones. The proposed location-based congestion-management market is referred to as a "nodal" market because wholesale pricing would differ across the various nodes on the transmission grid. The implementation of a nodal market is being done in conjunction with transmission improvements designed to reduce current congestion. Pursuant to a request from the PUCT, ERCOT announced in November 2008 a preliminary schedule for the implementation of the nodal market by December 2010.

ERCOT imposes a surcharge on all Qualified Scheduling Entities in the ERCOT market (including subsidiaries of TCEH) for the purpose of financing 38% of ERCOT's expected nodal implementation costs. In November 2008, ERCOT filed a request with the PUCT for approval of an interim increase in the nodal

D-41

EFIHMW00246771

surcharge from $0.169 per MWh to $0.375 per MWh. In September 2009, the PUCT approved an increase in the nodal surcharge to $0.375 per MWh, effective January 1, 2010. At the approved $0.375 per MWh nodal surcharge, the annual surcharge will be an estimated $30 million to $35 million, which is reported in fuel, purchased power costs and delivery fees. The implementation of a nodal market is still scheduled for December 2010. EFCH cannot predict the ultimate impact of the proposed nodal wholesale market design on its operations or financial results.

*Summary*

EFCH cannot predict future regulatory or legislative actions or any changes in economic and securities market conditions. Such actions or changes could significantly alter EFCH's basic financial position, results of operations or cash flows.

**Quantitative and Qualitative Disclosures about Market Risk**

Market risk is the risk that EFCH may experience a loss in value as a result of changes in market conditions affecting factors such as commodity prices and interest rates, that may be experienced in the ordinary course of business. EFCH's exposure to market risk is affected by a number of factors, including the size, duration and composition of its energy and financial portfolio, as well as the volatility and liquidity of markets. Instruments used to manage this exposure include interest rate swaps to manage interest rate risk related to indebtedness, as well as exchange traded, over-the-counter contracts and other contractual arrangements to manage commodity price risk as part of wholesale activities.

*Risk Oversight*

TCEH manages the commodity price, counterparty credit and commodity-related operational risk related to the unregulated energy business within limitations established by senior management and in accordance with overall risk management policies. Interest rate risk is managed centrally by the corporate treasury function. Market risks are monitored by risk management groups that operate independently of the wholesale commercial operations, utilizing defined practices and analytical methodologies. These techniques measure the risk of change in value of the portfolio of contracts and the hypothetical effect on this value from changes in market conditions and include, but are not limited to, Value at Risk (VaR) methodologies. Key risk control activities include, but are not limited to, transaction review and approval (including credit review), operational and market risk measurement, validation of transaction capture, portfolio valuation and reporting, including mark-to-market valuation, VaR and other risk measurement metrics.

EFH Corp. has a corporate risk management organization that is headed by the Chief Financial Officer, who also functions as the Chief Risk Officer. The Chief Risk Officer, through his designees, enforces applicable risk limits, including the respective policies and procedures to ensure compliance with such limits and evaluates the risks inherent in EFCH's businesses and their associated transactions.

*Commodity Price Risk*

TCEH is subject to the inherent risks of market fluctuations in the price of electricity, natural gas and other energy-related products it markets or purchases. The company actively manages its portfolio of owned generation assets, fuel supply and retail sales load to mitigate the near-term impacts of these risks on results of operations. The company, similar to other participants in the market, cannot fully manage the long-term value impact of structural declines or increases in natural gas and power prices and spark spreads (differences between the market price of electricity and its cost of production).

In managing energy price risk, TCEH enters into a variety of market transactions including, but not limited to, short- and long-term contracts for physical delivery, exchange traded and over-the-counter financial contracts and bilateral contracts with customers. Activities include hedging, the structuring of long-term contractual

D-42

Confidential

arrangements and proprietary trading. The company continuously monitors the valuation of identified risks and adjusts positions based on current market conditions. The company strives to use consistent assumptions regarding forward market price curves in evaluating and recording the effects of commodity price risk.

*Long-Term Hedging Program*—See "—Business—Significant Activities and Events" above for a description of the program, including potential effects on reported results.

*VaR Methodology*—A VaR methodology is used to measure the amount of market risk that exists within the portfolio under a variety of market conditions. The resultant VaR produces an estimate of a portfolio's potential for loss given a specified confidence level and considers among other things, market movements utilizing standard statistical techniques given historical and projected market prices and volatilities.

A Monte Carlo simulation methodology is used to calculate VaR and is considered by management to be the most effective way to estimate changes in a portfolio's value based on assumed market conditions for liquid markets. The use of this method requires a number of key assumptions, such as use of (i) an assumed confidence level; (ii) an assumed holding period (i.e. the time necessary for management action, such as to liquidate positions); and (iii) historical estimates of volatility and correlation data.

*Trading VaR*—This measurement estimates the potential loss in fair value, due to changes in market conditions, of all contracts entered into for trading purposes based on a 95% confidence level and an assumed holding period of five to 60 days.

| | Nine Months Ended September 30, 2009 | Year Ended December 31, 2008 |
|---|---|---|
| Month-end average Trading VaR: . . . . . . . . . . . . . . . . . . . . . . . | $4 | $ 6 |
| Month-end high Trading VaR: . . . . . . . . . . . . . . . . . . . . . . . . . | $7 | $15 |
| Month-end low Trading VaR: . . . . . . . . . . . . . . . . . . . . . . . . . . | $2 | $ 2 |

*VaR for Energy-Related Contracts Subject to Mark-to-Market (MtM) Accounting*—This measurement estimates the potential loss in fair value, due to changes in market conditions, of all contracts marked-to-market in net income (principally hedges not accounted for as cash flow hedges and trading positions), based on a 95% confidence level and an assumed holding period of five to 60 days.

| | Nine Months Ended September 30, 2009 | Year Ended December 31, 2008 |
|---|---|---|
| Month-end average MtM VaR: . . . . . . . . . . . . . . . . . . . . . . . | $1,034 | $2,290 |
| Month-end high MtM VaR: . . . . . . . . . . . . . . . . . . . . . . . . . | $1,470 | $3,549 |
| Month-end low MtM VaR: . . . . . . . . . . . . . . . . . . . . . . . . . . | $  638 | $1,087 |

*Earnings at Risk (EaR)*—This measurement estimates the potential reduction of pretax earnings for the periods presented, due to changes in market conditions, of all energy-related contracts marked-to-market in net income and contracts not marked-to-market in net income that are expected to be settled within the fiscal year (physical purchases and sales of commodities). Transactions accounted for as cash flow hedges are also included for this measurement. A 95% confidence level and a five to 60 day holding period are assumed in determining EaR.

| | Nine Months Ended September 30, 2009 | Year Ended December 31, 2008 |
|---|---|---|
| Month-end average EaR: . . . . . . . . . . . . . . . . . . . . . . . . . . . | $1,034 | $2,300 |
| Month-end high EaR: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $1,450 | $3,916 |
| Month-end low EaR: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $  676 | $1,069 |

The decreases in the risk measures (MtM VaR and EaR) above were primarily driven by lower natural gas prices in 2009.

D-43

EFIHMW00246773

*Interest Rate Risk*

As of September 30, 2009, the potential reduction of annual pretax earnings due to a one percentage point (100 basis points) increase in floating interest rates on long-term debt totaled approximately $31 million, taking into account the interest rate swaps discussed in Note 4 to EFCH's historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus.

*Credit Risk*

*Credit Risk*—Credit risk relates to the risk of loss associated with nonperformance by counterparties. EFCH and its subsidiaries maintain credit risk policies with regard to their counterparties to minimize overall credit risk. These policies prescribe practices for evaluating a potential counterparty's financial condition, credit rating and other quantitative and qualitative credit criteria and specify authorized risk mitigation tools including, but not limited to, use of standardized master netting contracts and agreements that allow for netting of positive and negative exposures associated with a single counterparty. EFCH has processes for monitoring and managing credit exposure of its businesses including methodologies to analyze counterparties' financial strength, measurement of current and potential future exposures and contract language that provides rights for netting and set-off. Credit enhancements such as parental guarantees, letters of credit, surety bonds and margin deposits are also utilized. Additionally, individual counterparties and credit portfolios are managed to assess overall credit exposure. This evaluation results in establishing exposure limits or collateral requirements for entering into an agreement with a counterparty that creates exposure. Additionally, the company has established controls to determine and monitor the appropriateness of these limits on an ongoing basis. Prospective material adverse changes in the payment history or financial condition of a counterparty or downgrade of its credit quality result in the reassessment of the credit limit with that counterparty. This process can result in the subsequent reduction of the credit limit or a request for additional financial assurances.

*Credit Exposure*—EFCH's gross exposure to credit risk associated with trade accounts receivable (retail and wholesale) and net asset positions arising from hedging and trading activities totaled $1.783 billion at September 30, 2009. The components of this exposure are discussed in more detail below.

Assets subject to credit risk as of September 30, 2009 include $1.074 billion in accounts receivable from the retail sale of electricity to residential and business customers. Cash deposits held as collateral for these receivables totaled $93 million at September 30, 2009. The risk of material loss (after consideration of bad debt allowances) from nonperformance by these customers is unlikely based upon historical experience. Allowances for uncollectible accounts receivable are established for the potential loss from nonpayment by these customers based on historical experience, market or operational conditions and changes in the financial condition of large business customers.

The remaining credit exposure arises from wholesale energy sales and hedging and trading activities. Counterparties to these transactions include energy companies, financial institutions, electric utilities, independent power producers, oil and gas producers, local distribution companies and energy trading and marketing companies. As of September 30, 2009, the exposure to credit risk from these counterparties totaled $709 million taking into account the standardized master netting contracts and agreements described above but before taking into account $128 million in credit collateral (cash, letters of credit and other credit support). The net exposure (after credit collateral) of $581 million decreased approximately $214 million in the nine months ended September 30, 2009, reflecting the netting and right of setoff related to certain interest rate and commodity hedging transactions under a new derivative agreement with a counterparty (see Note 7 to EFCH's historical consolidated financial statements for the nine months ended September 30, 2009 included elsewhere in this Prospectus).

Of this $581 million net exposure, 97% is with investment grade customers and counterparties, as determined using publicly available information including major rating agencies' published ratings and TCEH's

D-44

Confidential

internal credit evaluation process. Those customers and counterparties without a S&P rating of at least BBB- or similar rating from another major rating agency are rated using internal credit methodologies and credit scoring models to estimate a S&P equivalent rating. TCEH routinely monitors and manages credit exposure to these customers and counterparties on this basis.

The following table presents the distribution of credit exposure as of September 30, 2009 arising from wholesale energy sales and hedging and trading activities. This credit exposure represents wholesale trade accounts receivable and net asset positions on the balance sheet arising from hedging and trading activities after taking into consideration netting and setoff provisions within each contract and any master netting contracts with counterparties. The amounts below do not include asset liens held as security for a portion of the net exposure.

| | Exposure Before Credit Collateral | Credit Collateral | Net Exposure | Net Exposure by Maturity | | | |
| | | | | 2 years or less | Between 2-5 years | Greater than 5 years | Total |
|---|---|---|---|---|---|---|---|
| Investment grade ................... | $688 | $127 | $561 | $659 | $ 29 | $(127) | $561 |
| Noninvestment grade .............. | 21 | 1 | 20 | 20 | — | — | 20 |
| Totals ....................... | $709 | $128 | $581 | $679 | $ 29 | $(127) | $581 |
| Investment grade ................... | 97% | | 97% | | | | |
| Noninvestment grade .............. | 3% | | 3% | | | | |

In addition to the exposures in the table above, contracts classified as "normal" purchase or sale and non-derivative contractual commitments are not marked-to-market in the financial statements. Such contractual commitments may contain pricing that is favorable considering current market conditions and therefore represent economic risk if the counterparties do not perform. Nonperformance could have a material adverse impact on future results of operations, financial condition and cash flows.

EFCH does not anticipate any material adverse effect on its financial position or results of operations due to nonperformance by any wholesale customer or counterparty.

Significant (10% or greater) concentration of credit exposure exists with two counterparties, which represented 61% and 11% of the net $581 million exposure. Exposure to these counterparties is viewed to be within an acceptable level of risk tolerance due to the applicable counterparty's credit rating and the importance of TCEH's business relationship with the counterparty. However, this concentration increases the risk that a default would have a material effect on results of operations.

With respect to credit risk related to the long-term hedging program, over 99% of the transaction volumes are with counterparties with an A credit rating or better. However, there is current and potential credit concentration risk related to the limited number of counterparties that comprise the substantial majority of the program with such counterparties being in the banking and financial sector. The transactions with these counterparties contain certain credit rating provisions that would require the counterparties to post collateral in the event of a material downgrade in the credit rating of the counterparties. An event of default by one or more hedge counterparties could subsequently result in termination-related settlement payments that reduce available liquidity if amounts are owed to the counterparties related to the commodity contracts or delays in receipts of expected settlements if the hedge counterparties owe amounts to EFCH. While the potential concentration of risk with these counterparties is viewed to be within an acceptable risk tolerance, the exposure to hedge counterparties is managed through various ongoing risk management measures.

D-45

**Adjusted EBITDA Reconciliation**

**TCEH Consolidated**
**Adjusted EBITDA Reconciliation**
**(millions of dollars)**

| | Nine Months Ended September 30, 2009 | Nine Months Ended September 30, 2008 | Twelve Months Ended September 30, 2009 | Twelve Months Ended September 30, 2008 |
|---|---|---|---|---|
| **Net income (loss)** | $ 493 | $ (811) | $(7,559) | $(1,956) |
| **Income tax expense (benefit)** | 330 | (425) | 343 | (1,010) |
| **Interest expense and related charges** | 1,331 | 1,756 | 3,492 | 2,356 |
| **Depreciation and amortization** | 862 | 827 | 1,127 | 1,150 |
| **EBITDA** | $3,016 | $1,347 | $(2,597) | $ 540 |
| Interest income | (40) | (45) | (55) | (66) |
| Amortization of nuclear fuel | 71 | 55 | 93 | 74 |
| Purchase accounting adjustments (a) | 224 | 290 | 347 | 424 |
| Impairment of goodwill | 70 | — | 8,070 | — |
| Impairment of assets and inventory write down (b) | 2 | 502 | 710 | 502 |
| EBITDA amount attributable to consolidated unrestricted subsidiaries | 3 | — | 3 | —— |
| Unrealized net (gain) loss resulting from hedging transactions | (713) | 221 | (3,263) | 1,796 |
| Amortization of "day one" net loss on Sandow 5 power purchase agreement | (7) | — | (7) | — |
| Corporate depreciation, interest and income tax expenses included in SG&A expense | 5 | — | 5 | —— |
| Losses on sale of receivables | 9 | 22 | 17 | 33 |
| Noncash compensation expense (c) | 1 | 8 | 3 | 8 |
| Severance expense (d) | 9 | 1 | 10 | 1 |
| Transition and business optimization costs (e) | 22 | 30 | 26 | 39 |
| Transaction and merger expenses (f) | 3 | 1 | 12 | 1 |
| Insurance settlement proceeds (g) | —— | — | (21) | —— |
| Restructuring and other (h) | (15) | 32 | (15) | 34 |
| Expenses incurred to upgrade or expand a generation station (i) | 100 | 100 | 100 | 100 |
| **Adjusted EBITDA per Incurrence Covenant** | $2,760 | $2,564 | $ 3,438 | $ 3,486 |
| Expenses related to unplanned generation station outages (i) | 61 | 218 | 93 | 209 |
| Other adjustments allowed to determine Adjusted EBITDA per Maintenance Covenant (j) | 21 | 8 | 28 | 9 |
| **Adjusted EBITDA per Maintenance Covenant** | $2,842 | $2,790 | $ 3,559 | $ 3,704 |

(a) Purchase accounting adjustments include amortization of the intangible net asset value of retail and wholesale power sales agreements, environmental credits, coal purchase contracts, nuclear fuel contracts and power purchase agreements and the stepped up value of nuclear fuel. Also include certain credits not recognized in net income due to purchase accounting.

(b) Impairment of assets includes impairments of emission allowances and trade name intangible assets and impairment of the natural gas-fueled generation fleet.

D-46

Confidential

EFIHMW00246776

(c)  Non-cash compensation expenses are accounted for under accounting standards related to stock compensation and exclude capitalized amounts.

(d)  Severance expense includes amounts incurred related to outsourcing, restructuring and other amounts deemed to be in excess of normal recurring amounts.

(e)  Transition and business optimization costs include professional fees primarily for retail billing and customer care systems enhancements and incentive compensation.

(f)  Transaction and merger expenses include costs related to the Merger, outsourcing transition costs and costs related to certain growth initiatives.

(g)  Insurance settlement proceeds include the amount received for property damage to certain mining equipment.

(h)  Restructuring and other for the twelve months ended September 30, 2008 includes a charge related to the bankruptcy of a subsidiary of Lehman Brothers Holdings Inc. and other restructuring initiatives and nonrecurring activities.

(i)  Expenses incurred to upgrade or expand a generation station reflect noncapital outage costs.

(j)  Primarily pre-operating expenses relating to Oak Grove and Sandow 5. 2008 amounts were not previously available.

D-47

Confidential

EFIHMW00246777

**PX 014**
**Page 1059 of 1116**

**EFH Corp.**
**Adjusted EBITDA Reconciliation**
**(millions of dollars)**

| | Nine Months Ended September 30, 2009 | Nine Months Ended September 30, 2008 | Twelve Months Ended September 30, 2009 | Twelve Months Ended September 30, 2008 |
|---|---|---|---|---|
| Net income (loss) attributable to EFH Corp. . . . . . . . . . . . . . . . . | $ 207 | $ (983) | $(8,648) | $(2,235) |
| Income tax expense (benefit) . . . . . | 254 | (462) | 245 | (1,038) |
| Interest expense and related charges . . . . . . . . . . . . . . . . . . . . | 2,136 | 2,505 | 4,566 | 3,371 |
| Depreciation and amortization . . . . | 1,286 | 1,217 | 1,679 | 1,654 |
| EBITDA . . . . . . . . . . . . . . . . . . . . | $ 3,883 | $ 2,277 | $(2,158) | $ 1,752 |
| Oncor EBITDA . . . . . . . . . . . . . . . | (1,043) | (1,053) | (488) | (1,338) |
| Oncor distributions/dividends (a) . . . | 117 | 213 | 1,487 | 288 |
| Interest income . . . . . . . . . . . . . . . | (30) | (22) | (35) | (49) |
| Amortization of nuclear fuel . . . . . . | 71 | 55 | 93 | 74 |
| Purchase accounting adjustments (b) . . . . . . . . . . . . . | 259 | 325 | 394 | 463 |
| Impairment of goodwill . . . . . . . . . . | 90 | — | 8,090 | — |
| Impairment of assets and inventory write down (c) . . . . . . . . . . . . . . | 5 | 512 | 715 | 457 |
| Net income attributable to noncontrolling interests . . . . . . . . . | 54 | — | (106) | — |
| EBITDA amount attributable to consolidated unrestricted subsidiaries . . . . . . . . . . . . . . . . | 3 | — | 3 | — |
| Unrealized net (gain) loss resulting from hedging transactions . . . . . . . | (713) | 221 | (3,263) | 1,796 |
| Amortization of "day one" net loss on Sandow 5 power purchase agreement . . . . . . . . . . . . . . . . | (7) | — | (7) | — |
| Losses on sale of receivables . . . . . . . | 9 | 22 | 17 | 33 |
| Income from discontinued operations, net of tax effect . . . . . . | — | — | — | (1) |
| Noncash compensation expenses (d) . . . . . . . . . . . . . . . | 9 | 24 | 11 | 23 |
| Severance expense (e) . . . . . . . . . . . . | 9 | 1 | 10 | 1 |
| Transition and business optimization costs (f) . . . . . . . . . . . . . . . . . . . . | 22 | 38 | 29 | 47 |
| Transaction and merger expenses (g) . . . . . . . . . . . . . . . . | 65 | 44 | 84 | 107 |
| Insurance settlement proceeds (h) . . . | — | — | (21) | — |
| Restructuring and other (i) . . . . . . . . . | (10) | 32 | (6) | 33 |
| Expenses incurred to upgrade or expand a generation station (j) . . . | 100 | 100 | 100 | 100 |
| Adjusted EBITDA per Incurrence Covenant . . . . . . . . . . . . . . . . . . . | $ 2,893 | $ 2,789 | $ 4,949 | $ 3,786 |
| Add back Oncor adjustments . . . . . | 926 | 807 | (148) | 1,014 |
| Adjusted EBITDA per Restricted Payments Covenant . . . . . . . . . . | $ 3,819 | $ 3,596 | $ 4,801 | $ 4,800 |

D-48

Confidential

EFIHMW00246778

_____

(a)  Twelve months ended September 30, 2009 amount includes $1.253 billion distribution of net proceeds from the sale of Oncor noncontrolling interests in November 2008.

(b)  Purchase accounting adjustments include amortization of the intangible net asset value of retail and wholesale power sales agreements, environmental credits, coal purchase contracts, nuclear fuel contracts and power purchase agreements and the stepped up value of nuclear fuel. Also include certain credits not recognized in net income due to purchase accounting.

(c)  Impairment of assets includes impairments of emission allowances and trade name intangible assets, impairment of the natural gas-fueled generation fleet and charges related to the cancelled development of coal-fueled generation facilities.

(d)  Non-cash compensation expenses are accounted for under accounting standards related to stock compensation and exclude capitalized amounts.

(e)  Severance expense includes amounts incurred related to outsourcing, restructuring and other amounts deemed to be in excess of normal recurring amounts.

(f)  Transition and business optimization costs include professional fees primarily for retail billing and customer care systems enhancements and incentive compensation.

(g)  Transaction and merger expenses include costs related to the Merger and abandoned strategic transactions. Also include outsourcing transition costs, administrative costs related to the cancelled program to develop coal-fueled generation facilities, the Sponsor Group management fee, costs related to certain growth initiatives and costs related to the Oncor sale of noncontrolling interests.

(h)  Insurance settlement proceeds include the amount received for property damage to certain mining equipment.

(i)  Restructuring and other for the twelve months ended September 30, 2008 includes a litigation accrual, a charge related to the bankruptcy of a subsidiary of Lehman Brothers Holdings Inc. and other restructuring initiatives and nonrecurring activities.

(j)  Expenses incurred to upgrade or expand a generation station reflect noncapital outage costs.

D-49

Confidential

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS AS OF AND FOR THE YEAR ENDED DECEMBER 31, 2008**

The following discussion and analysis of EFCH's financial condition and results of operations as of and for the fiscal years ended December 31, 2008, 2007 and 2006 was included in EFCH's Annual Report on Form 10-K for the year ended December 31, 2008 filed with the SEC on March 5, 2009 (the "Year End MD&A"). The Year End MD&A should be read in conjunction with "Selected Historical Consolidated Financial Data for EFCH and its Subsidiaries" and EFCH's historical consolidated financial statements for the year ended December 31, 2008 and the notes to those statements, each included elsewhere in this Prospectus. The Year End MD&A should also be read in conjunction with the disclosure set forth in "Management's Discussion and Analysis of Financial Condition and Results of Operations as of and for the Nine Months Ended September 30, 2009" above, which provides material updates to certain of the information contained in the Year End MD&A.

All dollar amounts in the tables in the following discussion and analysis are stated in millions of US dollars unless otherwise indicated.

**Business**

EFCH is a wholly-owned subsidiary of EFH Corp. and is a Dallas-based holding company that conducts its operations principally through its wholly-owned subsidiary, TCEH. TCEH is a Dallas-based holding company for subsidiaries engaged in competitive electricity market activities largely in Texas, including electricity generation, development and construction of new generation facilities, wholesale energy sales and purchases, commodity risk management and trading activities, and retail electricity sales. Commodity risk management and allocation of financial resources are performed at the consolidated level; therefore, there are no reportable business segments.

In October 2007, EFH Corp. completed the Merger. As a result of the Merger, EFH Corp. became a subsidiary of Texas Holdings, which is controlled by the Sponsor Group.

In connection with the Merger, which closed on October 10, 2007, certain wholly-owned subsidiaries of EFH Corp. established for the purpose of developing and constructing new generation facilities became subsidiaries of TCEH, and certain assets and liabilities of other such subsidiaries were transferred to TCEH and its subsidiaries. Those subsidiaries holding impaired construction work-in-process assets related to eight cancelled coal-fueled generation units did not become subsidiaries of TCEH. (In addition, a wholly-owned subsidiary of EFCH representing a lease trust holding certain combustion turbines became a subsidiary of TCEH.) Because these transactions were between entities under the common control of EFH Corp., EFCH accounted for the transactions in a manner similar to a pooling of interests. As a result, historical operations, financial position and cash flows of EFCH and the entities and other net assets contributed are presented on a combined basis for all periods presented. See Note 4 to EFCH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus for additional information.

**Executive Summary**

EFCH's consolidated net loss for 2008 totaled $9.0 billion. The loss primarily reflected non-cash impairments of goodwill, trade name and environmental allowances intangible assets and natural gas-fueled generation assets, interest expense on Merger-related debt, unrealized mark-to-market net losses on interest rate hedging transactions and the effects of purchase accounting, partially offset by unrealized mark-to-market net gains on commodity positions in the long-term hedging program. See "—Results of Operations" for further discussion.

Confidential

*Significant Activities and Events*

*Effects of Declines in Financial Markets*—The financial market conditions had a significant effect on EFCH's assessment of the carrying value of goodwill. EFCH recorded an impairment charge of $8.0 billion in 2008, primarily arising from the dislocation in the capital markets that has increased interest rate spreads and the resulting discount rates used in estimating fair values and the effects of recent declines in market values of debt and equity securities of comparable companies. This and other non-cash impairments referenced below will not cause EFCH or TCEH to be in default under any of their respective debt covenants or impact counterparty trading agreements or have a material impact on liquidity.

Further, in light of the significant dislocation and continued uncertainty in the financial markets, EFCH took actions to secure its available liquidity by drawing on its credit facilities and exercising the "payment-in-kind" (PIK) option on certain of its debt securities. In September 2008, EFCH also terminated its wholesale energy market transactions with subsidiaries of Lehman Brothers Holdings Inc., which filed for bankruptcy, resulting in a charge to reserve for the direct net financial position totaling $26 million (excluding termination related costs) with respect to the transactions.

See Note 3 to EFCH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus and "—Application of Critical Accounting Policies" below for more information on the goodwill and related impairment charges, Note 10 to EFCH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus regarding the charge related to Lehman Brothers Holdings Inc. and "—Financial Condition—Liquidity and Capital Resources" below for discussion of actions taken in response to the uncertain financial markets and the effect of financial market conditions on the energy commodity markets.

*Long-Term Hedging Program*—EFCH has a long-term hedging program designed to reduce exposure to changes in future electricity prices due to changes in the price of natural gas. Under the program, subsidiaries of EFCH have entered into market transactions involving natural gas-related financial instruments. As of January 30, 2009, these subsidiaries have effectively sold forward approximately 2.0 billion MMBtu of natural gas (equivalent to the natural gas exposure of approximately 250,000 GWh at an assumed 8.0 market heat rate) over the period from 2009 to 2014 at average annual sales prices ranging from $7.20 per MMBtu to $8.10 per MMBtu. EFCH currently expects to hedge approximately 80% of the equivalent natural gas price exposure of its expected baseload generation output on a rolling five-year basis. For the period from 2009 to 2013, and taking into consideration the estimated portfolio impacts of TXU Energy's retail electricity business, the hedging transactions described in the previous sentence result in EFCH having effectively hedged approximately 81% of its expected baseload generation natural gas price exposure for such period (on an average basis for such period) assuming an 8.0 market heat rate. The hedges were entered into with the continuing expectation that wholesale electricity prices in ERCOT will be highly correlated with natural gas prices. If market heat rates decline in the future, which would indicate a lessening of such correlation, EFCH expects that the cash flows targeted under the long-term hedging program may not be achieved.

The long-term hedging program is comprised primarily of contracts with prices based on the NYMEX Henry Hub pricing point. However, because there are other local and regional natural gas pricing points such as Houston Ship Channel, future wholesale power prices in ERCOT may not correlate as closely to the Henry Hub pricing as other pricing points, which could decrease the effectiveness of the positions in the long-term hedging program in mitigating power price exposure. EFCH has hedged approximately 95% of the Houston Ship Channel versus Henry Hub pricing point risk for the 2009 period.

Beginning in the second quarter of 2008, EFCH entered into related put and call transactions (referred to as collars), primarily for outer years of the program, that effectively hedge natural gas prices within a range. These transactions represented approximately 5% of the positions in the program at January 30, 2009, with the approximate weighted average strike prices under the collars being a floor of $7.80 per MMBtu and a ceiling of $11.75 per MMBtu. EFCH expects to employ both collars and, as has been the case, swap transactions for future

D-51

EFIHMW00246781

hedging activity under its long-term hedging program. Under the terms of the collars, if forward natural gas prices are lower than the floor price, unrealized mark-to-market gains related to the hedges would be recognized in net income, and if forward prices are higher than the ceiling price, unrealized mark-to-market losses related to the hedges would be recognized in net income.

Prior to March 2007, a significant portion of the instruments under the long-term hedging program were designated and accounted for as cash flow hedges. In March 2007, these instruments were dedesignated as allowed under SFAS 133. Subsequent changes in the fair value of these instruments are being recorded as unrealized gains and losses in net income, which has and could continue to result in significantly increased volatility in reported net income. Based on the size of the long-term hedging program as of January 30, 2009, a $1.00/MMBtu change in natural gas prices across the period from 2009 through 2014 would result in the recognition by EFCH of up to approximately $2.0 billion in pretax unrealized mark-to-market gains or losses.

Reported unrealized mark-to-market net gains for the year ended December 31, 2008 totaled $2.6 billion, reflecting declines in forward prices of natural gas in 2008. Given the volatility of natural gas prices, it is not possible to predict future reported unrealized mark-to-market gains or losses and the actual gains or losses that will ultimately be realized upon settlement of the hedge positions in future years. If natural gas prices at settlement are lower than the prices of the hedge positions, the hedges are expected to mitigate the otherwise negative effect on earnings of lower wholesale electricity prices. However, if natural gas prices at settlement are higher than the prices of the hedge positions, the hedges are expected to dampen the otherwise positive effect on earnings of higher wholesale electricity prices and will in this context be viewed as having resulted in an opportunity cost. The cumulative unrealized mark-to-market net losses or gains related to positions in the long-term hedging program totaled a net loss of $1.8 billion at December 31, 2007, a net gain of $871 million at December 31, 2008 and a net gain of $1.206 billion at January 30, 2009. These values can change materially as market conditions change.

As of December 31, 2008, more than 95% of the long-term hedging transactions were secured by a first-lien interest in TCEH's assets (including the transactions supported by the TCEH Commodity Collateral Posting Facility—see discussion below under "—Financial Condition—Liquidity And Capital Resources") thereby reducing the cash and letter of credit collateral requirements for the hedging program.

*TCEH Interest Rate Swap Transactions*—See discussion in Note 12 to EFCH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus regarding various interest rate swap transactions. As of December 31, 2008, TCEH had entered into a series of interest rate swaps that effectively fix the interest rates at between 7.3% and 8.3% on $17.55 billion principal amount of its senior secured debt maturing from 2009 to 2014. Taking into consideration these swap transactions, approximately 8% of EFCH's total long-term debt portfolio at December 31, 2008 was exposed to variable interest rate risk. In August 2008, swaps in effect at that time were dedesignated as cash flow hedges in accordance with SFAS 133, and subsequent changes in their fair value are being marked-to-market in net income (reported in interest expense and related charges). These swaps were dedesignated as a result of the intent to change the variable interest rate terms of the hedged debt (from three-month LIBOR to one-month LIBOR) in connection with the planned execution of interest rate basis swaps to further reduce the fixed borrowing costs. EFCH may enter into additional interest rate swap transactions from time to time. Reported unrealized mark-to-market net losses related to all TCEH interest rate swaps totaled $1.477 billion for the year ended December 31, 2008. The cumulative unrealized mark-to-market net losses related to all TCEH interest rate swaps totaled $1.909 billion at December 31, 2008 ($364 million of which was reported in accumulated other comprehensive income) and $280 million at December 31, 2007 (reported in accumulated other comprehensive income) due to changes in market interest rates. These fair values can change materially as market conditions change.

*Notice of Termination of Joint Venture Outsourcing Arrangements*—During the fourth quarter of 2008, EFH Corp. and TCEH executed a Separation Agreement with Capgemini Energy LP (Capgemini), Capgemini America, Inc. and Capgemini North America, Inc. (collectively, CgE). As a result of the "change of control" of EFH Corp.

D-52

EFIHMW00246782

that occurred as a result of the Merger, TCEH had the right to terminate, without penalty, its Master Framework Agreement with Capgemini. Under the Master Framework Agreement and related services agreements, Capgemini has provided to EFH Corp. and TCEH outsourced support services, including information technology, customer care and billing, human resources, procurement and certain finance and accounting activities.

Consistent with the Master Framework Agreement, to provide for an orderly transition of the services, the Separation Agreement requires that Capgemini provide termination assistance services until the services are transitioned back to EFH Corp. and/or to another service provider. The Separation Agreement provides that the services be transitioned by December 31, 2010 (June 30, 2011, in the case of the information technology services). The Master Framework Agreement will terminate when these termination assistance services are completed. EFH Corp. (or its applicable subsidiary) previously provided a termination notice to Capgemini in respect of human resources services and customer care and revenue management services for TXU Energy. See Note 17 to EFCH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus for further discussion.

The effects of the termination of the outsourcing arrangements, including an accrual of $28 million for incremental costs to exit and transition the services, were included in the final Merger purchase price allocation (see Note 2 to EFCH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus).

*Environmental Regulatory Matters*—See discussion in Note 3 to EFCH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus regarding the invalidation of the EPA's Clean Air Interstate Rule and the related impairment of intangible assets representing NOx and SO2 emission allowances in the third quarter of 2008.

*Texas Generation Facilities Development*—EFCH is developing three lignite-fueled generation units (2 units at Oak Grove and 1 unit at Sandow) in the state of Texas with a total estimated capacity of approximately 2,200 MW. Agreements were executed with EPC contractors to engineer and construct the units; design and procurement activities for the three units are essentially complete, and construction is well underway. Air permits for construction of all three units have been obtained. Aggregate cash capital expenditures for these three units are expected to total approximately $3.25 billion including all construction, site preparation and mining development costs, of which approximately $2.7 billion was spent as of December 31, 2008. Total recorded costs, including purchase accounting fair value adjustments and capitalized interest, are expected to total approximately $5.0 billion upon completion of the units. The expected commercial operation dates of the units are as follows: Sandow in mid 2009 and Oak Grove's two units in late 2009 and mid 2010, respectively. See discussion in Note 13 to EFCH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus under "Litigation Related to Generation Development" regarding pending litigation related to the new units.

The development program includes up to $500 million for investments in state-of-the-art emissions controls for the three new units. The development program also includes an environmental retrofit program under which EFCH will install additional environmental control systems at its existing lignite/coal-fueled generation facilities. Estimated capital expenditures associated with these additional environmental control systems total approximately $1.0 billion to $1.3 billion, of which $219 million was spent as of December 31, 2008. EFCH has not yet completed all detailed cost and engineering studies for the additional environmental systems, and the cost estimates could materially change as EFCH determines the details of and further evaluates the engineering and construction costs related to these investments.

*Nuclear Generation Development*—In September 2008, EFCH filed a combined operating license application with the NRC for two new nuclear generation facilities, each with approximately 1,700 MW (gross capacity), at its existing Comanche Peak nuclear generation site. The application was accepted by the NRC for review in December 2008. In connection with the filing of the application, in January 2009, a subsidiary of EFCH and Mitsubishi Heavy Industries Ltd. (MHI) formed a joint venture to further the development of the two

Confidential

new nuclear generation units using MHI's US–Advanced Pressurized Water Reactor technology. Under the terms of the joint venture, known as Comanche Peak Nuclear Power Company LLC, a subsidiary of EFCH holds an 88% ownership interest in the company, and MHI has a 12% stake.

In September 2008, EFCH filed Part I of its loan guarantee application with the DOE for financing related to the proposed units. In December 2008, EFCH filed Part II of the application with the DOE. The DOE continues to review the Part II application, and in accordance with DOE regulations, EFCH intends to file a "Follow-On Submission," updating its Part II application, in March 2009.

## Key Risks And Challenges

Following is a discussion of key risks and challenges facing management and the initiatives currently underway to manage such challenges.

### *Substantial Leverage, Uncertain Financial Markets and Liquidity Risk*

EFCH's substantial leverage, resulting in part from debt incurred to finance the Merger, requires a substantial amount of cash flow to be dedicated to principal and interest payments and could adversely affect EFCH's ability to raise additional capital to fund operations, limit its ability to react to changes in the economy or its industry, and expose it to interest rate risk. Short-term borrowings and long-term debt, including amounts due currently, totaled $32.725 billion at December 31, 2008. Taking into consideration interest-rate swap transactions, as of December 31, 2008 approximately 92% of EFCH's total long-term debt portfolio is subject to fixed interest rates, at a weighted average interest rate of 9.94%. Principal payments on EFCH's debt in 2009 are expected to total approximately $258 million, and interest payments on long-term debt are expected to total approximately $2.277 billion, including amounts related to EFH Corp. debt that is guaranteed by EFCH (as discussed in Note 12 to EFCH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus).

While EFCH believes its cash on hand and cash flow from operations combined with availability under existing credit facilities provide sufficient liquidity to fund current and projected expenses and capital requirements for 2009 (see "—Financial Condition—Liquidity and Capital Resources" section below), there can be no assurance, considering the current dislocation and uncertainty in financial markets, that counterparties to EFCH's credit facilities will perform as expected through the maturity dates or hedging and trading counterparties, particularly related to the long-term hedging program, will meet their obligations to EFCH. Failure of such counterparties to meet their obligations or substantial unexpected changes in financial markets, the economy, the requirements of regulators or EFCH's industry or operations could result in constraints on EFCH's liquidity. See discussion of credit risk in "—Quantitative and Qualitative Disclosures about Market Risk" and discussion of credit facilities in "—Financial Condition—Liquidity and Capital Resources" and in Note 12 to EFCH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus.

In addition, because its operations are capital intensive, EFCH expects to rely over the long-term upon access to financial markets as a significant source of liquidity for capital requirements not satisfied by cash-on-hand, operating cash flows or its available credit facilities. If the credit crisis and related dislocation in the global financial system continue, EFCH's ability to economically access the capital or credit markets may be restricted at a time when EFCH would like, or needs, to access those markets. Lack of such access could have an impact on EFCH's flexibility to react to changing economic and business conditions.

### *Natural Gas Price and Market Heat-Rate Exposure*

Wholesale electricity prices in the ERCOT market generally move with the price of natural gas because marginal demand for electricity supply is generally met with natural gas-fueled generation facilities. Historically the price of natural gas has fluctuated due to the effects of weather, changes in industrial demand, supply

D-54

EFIHMW00246784

availability, and other economic and market factors and such prices have been very volatile in recent years. Since 2005, natural gas prices ranged from below $5 per MMBtu to above $13 per MMBtu. The wholesale market price of power divided by the market price of natural gas represents the market heat rate. Market heat rate movements also affect wholesale electricity prices. Market heat rate reflects the efficiency of the marginal supplier (generally natural gas-fueled generation facilities) in generating electricity.

In contrast to EFCH's natural gas-fueled generation facilities, changes in natural gas prices have no significant effect on the cost of generating electricity from EFCH's nuclear and lignite/coal-fueled plants. All other factors being equal, these baseload generation assets, which provided 65% of supply volumes in 2008, increase or decrease in value as natural gas prices and market heat rates rise or fall, respectively, because of the effect of natural gas prices setting marginal wholesale power prices in ERCOT.

With the exposure to variability of natural gas prices, retail sales price management and hedging activities are critical to the profitability of the business and maintaining consistent cash flow levels. With the expiration of the formerly regulated rate mechanism on January 1, 2007, TXU Energy has price flexibility in all of its retail markets with the exception of the sales to customers on fixed rate plans and a committed price cap at 2006 levels through 2009 for qualifying residential customers who remain on certain plans that were equal to the previously regulated rates. During 2008, the cap was below prevailing market prices and reduced retail revenues by approximately $130 million compared to 2007. Effective January 1, 2009, the cap increases by more than 2 cents per kWh.

EFCH's approach to managing commodity price risk focuses on the following:

- employing disciplined hedging and risk management strategies through physical and financial energy-related (electricity and natural gas) contracts intended to partially hedge gross margins;

- continuing reduction of fixed costs to better withstand gross margin volatility;

- following a retail pricing strategy that appropriately reflects the magnitude and costs of commodity price and liquidity risk, and

- improving retail customer service to attract and retain high-value customers.

As discussed above under "—Executive Summary—Significant Activities and Events," EFCH has implemented a long-term hedging program to mitigate the risk of future declines in wholesale electricity prices due to declines in natural gas prices.

The following sensitivity table provides estimates of the potential impact of movements in natural gas prices and market heat rates on realized pre-tax earnings for the periods presented. The estimates related to natural gas price sensitivity are based on EFCH's unhedged position as of January 30, 2009, which reflects estimates of electricity generation less amounts hedged through the long-term natural gas hedging program and amounts under existing wholesale and retail sales contracts. (For the balance of the 2009 period, the substantial majority of retail sales under month-to-month arrangements are deemed to be under contract.)

| | Balance 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|
| $1.00 change in gas price (a) . . . . . . . . . . . . . . . . . . . . | $22 | $65 | $69 | $111 | $290 |
| 0.1 change in market heat rate (b) . . . . . . . . . . . . . . . | $ 8 | $43 | $57 | $ 63 | $ 65 |

(a)  Assumes conversion of electricity positions based on an approximate 8.0 market heat rate with natural gas being on the margin 75% to 90% of the time (i.e. when coal is forecast to be on the margin, no natural gas position is assumed to be generated).

(b)  Based on Houston Ship Channel natural gas price as of January 30, 2009.

EFCH's market heat rate exposure is derived from its generation portfolio and is potentially impacted by generation capacity increases, particularly increases in lignite/coal- and nuclear-fueled capacity, as well as wind capacity, which could result in lower market heat rates. EFCH expects that decreases in market heat rates would

D-55

Confidential

EFIHMW00246785

decrease the value of its generation assets because lower market heat rates generally result in lower wholesale electricity prices, and vice versa. EFCH mitigates market heat rate risk through retail and wholesale electricity sales contracts and shorter-term market heat rate hedging transactions. EFCH evaluates opportunities to mitigate market heat rate risk over extended periods through longer-term electricity sales contracts where practical considering pricing, credit, liquidity and related factors.

On an ongoing basis, EFCH will continue monitoring its overall commodity risks and seek to balance its portfolio based on its desired level of exposure to natural gas prices and market heat rates and potential changes to its operational forecasts of overall generation and consumption in its native and growth business. Portfolio balancing may include the execution of incremental transactions, including heat rate hedges, the unwinding of existing transactions and the substitution of natural gas hedges with commitments for the sale of electricity at fixed prices. As a result, commodity price exposures and their effect on earnings could change from time to time.

See "—Financial Condition—Liquidity and Capital Resources" below for a discussion of the liquidity effects of the long-term hedging program. Also see additional discussion of risk measures below under "—Quantitative and Qualitative Disclosures about Market Risk."

### Competitive Markets and Customer Retention

Competitive retail activity in Texas resulted in declines in sales volumes in 2006 and 2007. Total retail sales volumes declined 5% and 11% in 2007 and 2006, respectively, as retail sales volume declines in EFH Corp.'s historical service territory were partially offset by growth in other territories. While competition was a factor, the decline in 2007 also reflected unusually cool summer weather. While this trend reversed in 2008, with a slight increase in total retail sales volumes and 2% growth in retail customers, competition remains robust. The area representing EFH Corp.'s historical service territory prior to deregulation, largely in north Texas, consisted of more than 3.1 million electricity consumers (measured by meter counts) as of year-end 2008. EFCH currently has approximately 1.8 million retail customers in that territory and approximately 0.4 million retail customers in other competitive areas in Texas. In responding to the competitive landscape and full competition in the ERCOT marketplace, EFCH is focusing on the following key initiatives:

- Maintaining competitive pricing initiatives as evidenced by price reductions on most residential service plans in fall 2008 and early 2009 and the 15% cumulative price reduction in 2007 applicable to residential customers under qualifying service plans;

- Profitably growing the retail customer base by actively competing for new and existing customers in areas in Texas open to competition. The customer retention strategy remains focused on continuing to implement initiatives to deliver world-class customer service and improve the overall customer experience;

- Establishing TXU Energy as the most innovative retailer in the Texas market by continuing to develop tailored product offerings to meet customer needs. TXU Energy plans to invest $100 million over the five-year period beginning in 2008 in retail initiatives aimed at helping consumers conserve energy and other demand-side management initiatives that are intended to moderate consumption and reduce peak demand for electricity, and

- Focusing business market initiatives largely on programs targeted to retain the existing highest-value customers and to recapture customers who have switched REPs. Initiatives include maintaining and continuously refining a disciplined contracting and pricing approach and economic segmentation of the business market to enhance targeted sales and marketing efforts and to more effectively deploy the direct-sales force. Tactical programs put into place include improved customer service, new product price/service offerings and a multichannel approach for the small business market.

D-56

Confidential

*Texas Generation Development Program*

The undertaking of the development of three generation facilities in Texas as described above under "—Executive Summary—Significant Activities and Events" involves a number of risks. Aggregate cash capital expenditures to develop these three units are expected to total approximately $3.25 billion. While EFCH believes the investment economics of the program are strong, estimates of future natural gas prices, market heat rates and effects of any greenhouse gas emissions laws or regulation may prove to be inaccurate, and returns on the investment could be significantly less than anticipated. Although substantial construction work has been completed, the program remains exposed to start-up delays, failure of the units to meet performance specifications and other project execution risks. Further, the development program has been subject to litigation and other environmental challenges. In the unlikely event these development activities are cancelled, EFCH is exposed to impairment of construction work-in-process assets and project discontinuance costs, including equipment order cancellation penalties (see Note 13 to EFCH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus).

*Energy Prices and Regulatory Risk*

Natural gas prices rose to unprecedented levels in the latter part of 2005, reflecting a world-wide increase in energy prices compounded by hurricane-related infrastructure damage. The related rise in electricity prices elevated public awareness of energy costs and dampened customer demand. Natural gas prices remain subject to events that create price volatility, and while not reaching 2005 levels, forward natural gas prices rose substantially in 2007 and part of 2008 before falling in the second half of 2008 and were especially volatile in 2008. Sustained high energy prices and/or ongoing price volatility also creates a risk for regulatory and/or legislative intervention with the mechanisms that govern the competitive wholesale and retail markets in ERCOT. EFCH believes that competitive markets result in a broad range of innovative pricing and service alternatives to consumers and ultimately the most efficient use of resources and regulatory entities should continue to take actions that encourage competition in the industry. Regulatory and/or legislative intervention could disrupt the relationship between natural gas prices and electricity prices, which could impact the results of EFCH's long-term hedging strategy.

*New and Changing Environmental Regulations*

EFCH is subject to various environmental laws and regulations related to SO2, NOx and mercury emissions as well as other environmental contaminants that impact air and water quality. EFCH is in compliance with all current laws and regulations, but regulatory authorities continue to evaluate existing requirements and consider proposals for changes. In addition, in July 2008, the US Court of Appeals for the D.C. Circuit (D.C. Circuit Court) invalidated CAIR, which required reductions of SO2 and NOx emissions from power generation facilities in 28 states, including Texas, where EFCH's generation facilities are located and remanded CAIR to the EPA to promulgate a rule consistent with its opinion. In December 2008, in response to an EPA petition, the D.C. Circuit Court reversed, in part, its previous ruling. Such reversal confirmed that CAIR is not valid, but allowed it to remain in place while the EPA revises CAIR to correct the previously identified shortcomings. At this time, EFCH cannot predict the outcome of this decision, including how or when the EPA may revise CAIR. See further discussion under "Business—Environmental Regulations and Related Considerations—Sulfur Dioxide, Nitrogen Oxide and Mercury Emissions" and see Note 3 to EFCH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus for discussion of impairment charges recorded as a result of the D.C. Circuit Court's original ruling on CAIR.

EFCH continues to closely monitor any potential legislative and regulatory changes pertaining to global climate change. In view of the fact that a substantial portion of its generation portfolio consists of lignite/coal-fueled generation plants and EFCH is constructing three new lignite-fueled generation plants, EFCH's financial condition or results of operations could be materially adversely affected by the enactment of any legislation or regulation that mandates a reduction in GHG emissions or that imposes financial penalties, costs or taxes on entities that produce GHG emissions. For example, federal, state or regional legislation or regulation addressing

D-57

EFIHMW00246787

global climate change could result in EFCH either incurring increased material costs in order for it to reduce its GHG emissions or to procure emission allowances or credits in order for it to comply with a mandatory cap-and-trade emissions reduction program or incurring increased taxes, which could be material, due to the imposition of a carbon tax. See further discussion under "Business—Environmental Regulations and Related Considerations—Global Climate Change."

### Exposures Related to Nuclear Asset Outages

EFCH's nuclear assets are comprised of two generation units at Comanche Peak, each with a capacity of 1,150 MW. The Comanche Peak plant represents approximately 13% of EFCH's total generation capacity. The nuclear generation units represent EFCH's lowest marginal cost source of electricity. Assuming both nuclear generation units experienced an outage, the unfavorable impact to pretax earnings is estimated to be approximately $2 million per day before consideration of any insurance proceeds. Also see discussion of nuclear facilities insurance in Note 13 to EFCH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus.

The inherent complexities and related regulations associated with operating nuclear generation facilities result in environmental, regulatory and financial risks. The operation of nuclear generation facilities is complex and subject to continuing review and regulation by the NRC, covering, among other things, operations, maintenance, emergency planning, security, and environmental and safety protection. The NRC may implement changes in regulations that result in increased capital or operating costs, and it may require extended outages, modify, suspend or revoke operating licenses and impose fines for failure to comply with its existing regulations and the provisions of the Atomic Energy Act. In addition, an unplanned outage at another nuclear generation facility could result in the NRC taking action to shut down the Comanche Peak plant as a precautionary measure.

The Comanche Peak plant has not experienced an extended unplanned outage, and management continues to focus on the safe, reliable and efficient operations at the plant.

## Application of Critical Accounting Policies

EFCH's significant accounting policies are discussed in Note 1 to EFCH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus. EFCH follows accounting principles generally accepted in the US. Application of these accounting policies in the preparation of EFCH's consolidated financial statements requires management to make estimates and assumptions about future events that affect the reporting of assets and liabilities at the balance sheet dates and revenues and expenses during the periods covered. The following is a summary of certain critical accounting policies of EFCH that are impacted by judgments and uncertainties and under which different amounts might be reported using different assumptions or estimation methodologies.

### Purchase Accounting

The Merger was accounted for by EFH Corp. under purchase accounting, whereby the purchase price of the transaction was allocated to EFH Corp.'s identifiable assets acquired and liabilities assumed based upon their fair values. The estimates of the fair values recorded were determined based on the principles in SFAS 157 (see Note 20 to EFCH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus) and reflect significant assumptions and judgments. Material valuation inputs for long-lived assets and liabilities included forward electricity and natural gas price curves and market heat rates, discount rates, nonperformance risk adjustments related to liabilities, retail customer attrition rates, generation plant operating and construction costs and asset lives. The valuations reflected considerations unique to the competitive wholesale power market in ERCOT as well as EFCH's assets. For example, the valuation of the baseload generation facilities considered EFCH's lignite fuel reserves and mining capabilities.

D-58

The results of the purchase price allocation included an increase in the total carrying value of EFCH's baseload generation plants and the recording of intangible assets related to the retail customer base, the TXU Energy trade name and emission credits. Further, commodity and other contracts not already subject to fair value accounting were valued, and amounts representing favorable or unfavorable contracts (versus market conditions as of the date of the Merger) were recorded as intangible assets or liabilities, respectively. Management believes all material intangible assets were identified. See Notes 2 and 3 to EFCH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus for details of the purchase price allocation and intangible assets recorded, respectively.

The excess of the purchase price over the estimated fair values of the net assets acquired was recorded as goodwill. The goodwill amount recorded upon finalization of purchase accounting by EFCH totaled $18.3 billion. Purchase accounting impacts, including goodwill recognition, have been "pushed down," resulting in the assets and liabilities of EFCH being recorded at their fair values as of October 10, 2007. The assignment of purchase price was based on the relative estimated enterprise value of EFCH's operations as of the date of the Merger using discounted cash flow methodologies. In accordance with SFAS 142, goodwill is not amortized to net income, but is required to be tested for impairment at least annually. Management believes the drivers of the goodwill amount recorded by EFCH include the incremental value of the future cash flow potential of the baseload generation facilities, including facilities under construction, over the values assigned to those assets under purchase accounting rules, considering the market-pricing mechanisms and growth potential in the ERCOT market, as well as the value derived from the scale of the retail business. Also see discussion below under "—Application of Critical Accounting Policies—Impairment of Long-Lived Assets."

In the fourth quarter of 2008, EFCH recorded a goodwill impairment charge of $8.0 billion. The goodwill impairment is EFCH's best estimate and subject to change upon finalization of fair value calculations which is expected to be completed during the first quarter of 2009. See discussion immediately below under "—Application of Critical Accounting Policies—Impairment of Long-Lived Assets."

### Impairment of Long-Lived Assets

EFCH evaluates long-lived assets (including intangible assets with finite lives) for impairment whenever indications of impairment exist, in accordance with SFAS 144 whenever events or changes in circumstances indicate that its carrying amount may not be recoverable. One of those indications is a current expectation that "more likely than not" a long-lived asset will be sold or otherwise disposed of significantly before the end of its previously estimated useful life (as is the case for the natural gas-fueled generation assets discussed below). For EFCH's baseload generation assets, another possible indication would be an expected long-term decline in natural gas prices and/or market heat rates. The determination of the existence of these and other indications of impairment involves judgments that are subjective in nature and may require the use of estimates in forecasting future results and cash flows related to an asset or group of assets. Further, the unique nature of EFCH's property, plant and equipment, which includes a fleet of generation assets with a diverse fuel mix and individual plants that have varying production or output rates, requires the use of significant judgments in determining the existence of impairment indications and the grouping of assets for impairment testing.

Goodwill and intangible assets with indefinite useful lives are required to be tested for impairment at least annually or whenever events or changes in circumstances indicate an impairment may exist, such as the possible impairments to long-lived assets discussed above. EFCH tests goodwill and intangible assets with indefinite useful lives for impairment on October 1st each year. As required by SFAS 142, EFCH has allocated goodwill to its reporting unit, which essentially consists of TCEH and goodwill impairment testing is performed at the reporting unit level. Under the SFAS 142 goodwill impairment analysis, if at the assessment date a reporting unit's carrying value exceeds its estimated fair value (enterprise value), then the estimated enterprise value of the reporting unit is compared to the estimated fair values of the reporting unit's operating assets (including identifiable intangible assets) and liabilities at the assessment date, and the resultant implied goodwill amount is then compared to the recorded goodwill amount. Any excess of the recorded goodwill amount over the implied goodwill amount is written off as an impairment charge.

D-59

EFIHMW00246789

The determination of enterprise value involves a number of assumptions and estimates. EFCH uses a combination of three fair value inputs to estimate enterprise values of its reporting units: internal discounted cash flow analyses (income approach), comparable company equity values and any recent pending and/or completed relevant transactions. The income approach involves estimates of future performance that reflect assumptions regarding, among other things, forward natural gas and electricity prices, market heat rates, generation plant performance and retail sales volume trends. Another key variable in the income approach is the discount rate, or weighted average cost of capital. The determination of the discount rate takes into consideration the capital structure, debt ratings and current debt yields of comparable companies as well as an estimate of return on equity that reflects historical market returns and current market volatility for the industry. Enterprise value estimates based on comparable company equity values involve using trading multiples of EBITDA of those selected companies to derive appropriate multiples to apply to the EBITDA of the reporting units. This approach requires an estimate, using historical acquisition data, of an appropriate control premium to apply to the reporting unit values calculated from such multiples. Critical judgments include the selection of comparable companies and the weighting of the three value inputs in developing the best estimate of enterprise value.

See Note 3 to EFCH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus for a discussion of the goodwill impairment charge of $8.0 billion (not deductible for income tax purposes) recorded in the fourth quarter of 2008. The impairment primarily arises from the dislocation in the capital markets that has increased interest rate spreads and the resulting discount rates used in estimating fair values and the effect of recent declines in market values of debt and equity securities of comparable companies. Also see Note 3 to EFCH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus for discussion of the impairment charge of $481 million ($310 million after-tax) related to the trade name intangible asset also recorded in the fourth quarter of 2008. The estimated fair value of this intangible asset is based on an assumed royalty methodology.

In the fourth quarter of 2008, EFCH recorded an impairment charge of $229 million ($147 million after-tax) related to its natural gas-fueled generation fleet. The value of those natural gas-fueled generation assets was previously increased to fair value as of October 10, 2007 along with the adjustment of EFCH's baseload generation assets, as part of purchase accounting for the Merger. An impairment charge of $198 million ($129 million after-tax) related to the fleet was recorded in 2006. The natural gas-fueled generation units are generally operated to meet peak demands for electricity, and the fleet is tested for impairment as an asset group. See Note 5 to EFCH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus for a discussion of the impairments. The estimated impairments were based on numerous judgments including forecasted production, forward prices of natural gas and electricity, overall generation availability in ERCOT and ERCOT grid congestion. In February 2009, EFCH notified ERCOT of its plans to retire 11 of its natural gas-fueled units, totaling 2,229 MW of capacity (2,341 MW of installed nameplate capacity), in May 2009 and mothball (idle) an additional four units, totaling 1,596 MW of capacity (1,675 MW of installed nameplate capacity), in September 2009. ERCOT has 90 days from the date of the notification to request additional information or provide feedback on the proposed changes to the operation of these units.

*Derivative Instruments and Mark-to-Market Accounting*

EFCH enters into contracts for the purchase and sale of energy-related commodities, and also enters into other derivative instruments such as options, swaps, futures and forwards primarily to manage commodity price and interest rate risks. Under SFAS 133, these instruments are subject to mark-to-market accounting, and the determination of market values for these instruments is based on numerous assumptions and estimation techniques.

Mark-to-market accounting recognizes changes in the fair value of derivative instruments in the financial statements as market prices change. The default accounting treatment for a derivative is to record changes in fair value as unrealized mark-to-market gains and losses in net income with an offset to derivative assets and liabilities. The availability of quoted market prices in energy markets is dependent on the type of commodity (e.g., natural gas, electricity, etc.), time period specified and delivery point. In computing fair value for derivatives, each forward pricing curve is separated into liquid and illiquid periods. The liquid period varies by delivery point and commodity.

D-60

EFIHMW00246790

Generally, the liquid period is supported by exchange markets, broker quotes and frequent trading activity. For illiquid periods, fair value is estimated based on forward price curves developed using modeling techniques that take into account available market information and other inputs that might not be readily observable in the market. EFCH adopted SFAS 157 concurrent with the Merger and estimates fair value as described in Note 20 to EFCH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus and discussed under "—Application of Critical Accounting Policies—Fair Value Measurements" below.

SFAS 133 allows for "normal" purchase or sale elections and hedge accounting designations, which generally eliminate or defer the requirement for mark-to-market recognition in net income and thus reduce the volatility of net income that can result from fluctuations in fair values. These elections and designations are intended to match the accounting recognition of the contract's financial performance to that of the transaction the contract is intended to hedge. "Normal" purchases and sales are contracts that provide for physical delivery of quantities expected to be used or sold over a reasonable period in the normal course of business and are not subject to mark-to-market accounting.

In accounting for cash flow hedges, changes in fair value are recorded in other comprehensive income with an offset to derivative assets and liabilities to the extent the change in value is effective; that is, it mirrors the offsetting change in fair value of the forecasted hedged transaction. Changes in value that represent ineffectiveness of the hedge are recognized in net income immediately, and the effective portion of changes in fair value initially recorded in other comprehensive income are recognized in net income in the period that the hedged transactions are recognized. EFCH continually assesses its hedge elections and under SFAS 133 could dedesignate positions currently accounted for as cash flow hedges, the effect of which could be more volatility of reported earnings as all changes in the fair value of the positions would be included in net income. In March 2007, the instruments making up a significant portion of the long-term hedging program that were previously designated as cash flow hedges were dedesignated as allowed under SFAS 133, and subsequent changes in their fair value are being marked-to-market in net income. In addition, in August 2008, interest rate swap transactions in effect at that time were dedesignated as cash flow hedges in accordance with SFAS 133, and subsequent changes in their fair value are being marked-to-market in net income. See further discussion of the long-term hedging program and interest rate swap transactions above under "—Executive Summary—Significant Activities and Events."

The following tables provide the effects on both net income and other comprehensive income of accounting for those derivative instruments that EFCH has determined to be subject to fair value measurement under SFAS 133.

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, 2006 |
| Amounts recognized in net income (after-tax): | | | | |
| Unrealized net gains (losses) on positions marked-to-market in net income (a) | $ 517 | $ (955) | $(492) | $ (2) |
| Unrealized net (gains) losses representing reversals of previously recognized fair values of positions settled in the period (a) | 25 | (56) | (36) | 24 |
| Unrealized ineffectiveness net gains (losses) on positions accounted for as cash flow hedges | (3) | $ — | 74 | 150 |
| Reversals of previously recognized unrealized net (gains) losses related to cash flow hedge positions settled in the period | — | — | (15) | 5 |
| Total | $ 539 | $(1,011) | $(469) | $177 |
| Amounts recognized in other comprehensive income (after-tax): | | | | |
| Net gains (losses) in fair value of positions accounted for as cash flow hedges (b) | $(181) | $ (177) | $(288) | $598 |
| Net (gains) losses on cash flow hedge positions recognized in net income to offset hedged transactions (b) | 122 | — | (89) | (47) |
| Total | $ (59) | $ (177) | $(377) | $551 |

D-61

Confidential

(a)   Amounts for 2008 include $1.503 billion in net gains related to commodity positions and $960 million in net losses related to interest rate swaps. Prior period amounts are essentially all related to commodity positions. Prior period amounts have been reclassified to include effects of changes in fair values of positions entered into and settled within the period. This change was made in association with the reclassification of commodity hedging and trading activities discussed in Note 1 to EFCH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus.

(b)   As discussed in Note 1 to EFCH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus under "Basis of Presentation," these amounts have been reclassified to reflect current presentation.

The effect of mark-to-market and hedge accounting for derivatives on the balance sheet is as follows:

|  | Successor | |
|---|---|---|
|  | December 31, 2008 | December 31, 2007 |
| Net derivative asset related to commodity cash flow hedges . . . . . . . . . . | $     7 | $     7 |
| Net derivative liability related to interest rate hedges . . . . . . . . . . . . . . . . | (1,909) | (280) |
| Net commodity contract asset (liability) (a) . . . . . . . . . . . . . . . . . . . . . . . | $  459 | $(2,009) |
| Net accumulated other comprehensive gain (loss) included in shareholders' equity (after-tax) amounts (b) . . . . . . . . . . . . . . . . . . . . . | $  (236) | $  (177) |

(a)   Excludes amounts not arising from recognition of fair values such as payments and receipts of cash and other consideration associated with commodity hedging and trading activities.

(b)   All amounts included in other comprehensive income as of October 10, 2007, which totaled $53 million in net gains, were eliminated as part of purchase accounting.

*Fair Value Measurements*

In addition to purchase accounting, EFCH applies fair value accounting on a recurring basis to certain assets and financial instruments under the fair value hierarchy established in SFAS 157. EFCH utilizes several valuation techniques to measure the fair value of assets and liabilities, relying primarily on the market approach of using prices and other market information for identical or comparable assets and liabilities for those items that are measured on a recurring basis. These techniques include, but are not limited to, the use of broker quotes and statistical relationships between different price curves and are intended to maximize the use of observable inputs and minimize the use of unobservable inputs. In applying the market approach, EFCH uses a mid-market valuation convention (the mid-point between bid and ask prices) as a practical expedient.

Level 1 and Level 2 assets and liabilities consist primarily of commodity-related contracts for natural gas and electricity derivative instruments entered into for hedging purposes, securities associated with the nuclear decommissioning trust, and interest rate swaps that are economic hedges of interest payments on long-term debt. Level 1 valuations use quoted prices in active markets for identical assets or liabilities that are accessible at the measurement date. Level 2 valuations are based on evaluated prices that reflect observable market information, such as actual trade information of similar securities, adjusted for observable differences. Level 2 inputs include:

- quoted prices for similar assets or liabilities in active markets;

- quoted prices for identical or similar assets or liabilities in markets that are not active;

- inputs other than quoted prices that are observable for the asset or liability such as interest rates and yield curves observable at commonly quoted intervals, and

- inputs that are derived principally from or corroborated by observable market data by correlation or other means.

Examples of Level 2 valuation inputs utilized by EFCH include over-the-counter broker quotes and quoted prices for similar assets or liabilities that are corroborated by correlation or through statistical relationships between different price curves. For example, certain physical power derivatives are executed for a particular

D-62

EFIHMW00246792

location at specific time periods that might not have active markets; however, an active market might exist for such derivatives for a different time period at the same location. EFCH utilizes correlation techniques to compare prices for inputs at both time periods to provide a basis to value the non-active derivative. (See Note 20 to EFCH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus for additional discussion of how broker quotes are utilized.)

Level 3 assets and liabilities consist primarily of more complex long-term power purchases and sales agreements, including longer-term wind and other power purchase and sales contracts and certain natural gas positions in the long-term hedging program. Level 3 assets and liabilities are valued using significant unobservable inputs that are supported by little or no market activity and that are significant to the fair value of the assets and liabilities. EFCH uses the most meaningful information available from the market, combined with its own internally developed valuation methodologies, to develop its best estimate of fair value. The determination of fair value for Level 3 assets and liabilities requires significant management judgment and estimation.

Valuations of Level 3 assets and liabilities are sensitive to the assumptions used for the significant inputs. Where market data is available, the inputs used for valuation reflect that information as of EFCH's valuation date. In periods of extreme volatility, lessened liquidity or in illiquid markets, there may be more variability in market pricing or a lack of market data to use in the valuation process. An illiquid market is one in which little or no observable activity has occurred or one that lacks willing buyers. Fair value adjustments include adjustments for counterparties' credit risk, as well as EFCH's credit risk as appropriate, to determine a fair value measurement. Judgment is then applied in formulating those inputs. Valuation risk is mitigated through the performance of stress testing of the significant inputs to understand the impact that varying assumptions may have on the valuation and other review processes performed to ensure appropriate valuation.

As part of EFCH's valuation of assets subject to fair value accounting, credit risk is taken into consideration by measuring the extent of netting arrangements in place with the counterparty along with credit enhancements and the estimated credit rating of the counterparty. EFCH's valuation of liabilities subject to fair value accounting takes into consideration the market's view of its credit risk along with the existence of netting arrangements in place with the counterparty and credit enhancements posted by EFCH. EFCH considers the credit risk adjustment to be a Level 3 input since judgment is used to assign credit ratings, recovery rate factors and default rate factors.

Level 3 assets totaled $283 million at December 31, 2008 and represented approximately 7% of the assets measured at fair value, or less than 1% of total assets. Level 3 liabilities totaled $355 million at December 31, 2008 and represented approximately 7% of the liabilities measured at fair value, or less than 1% of total liabilities.

Valuations of several of EFCH's Level 3 assets and liabilities are based on long-dated price curves for electricity that are developed internally. Additionally, Level 3 assets and liabilities are sensitive to changes in discount rates, option-pricing model inputs such as volatility factors and credit risk adjustments. As of December 31, 2008, a $5.00 per MWh change in electricity price assumptions across unobservable inputs, primarily related to the outer years in EFCH's long-dated pricing model (years that are not market observable) would cause an approximate $95 million change in net Level 3 liabilities. In addition, EFCH has derivative contracts that are valued based on option-pricing models with unobservable inputs. A 10% increase in volatility and correlation related to these contracts would cause an approximate $8 million change in net Level 3 liabilities. See Note 20 to EFCH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus for additional information about fair value measurements, including a table presenting the changes in Level 3 assets and liabilities for the twelve months ended December 31, 2008.

D-63

*Revenue Recognition*

EFCH's revenue includes an estimate for unbilled revenue that represents estimated daily kWh consumption after the meter read date to the end of the period multiplied by the applicable billing rates. Estimated daily kWh usage is derived using historical kWh usage information adjusted for weather and other measurable factors affecting consumption. Calculations of unbilled revenues during certain interim periods are generally subject to more estimation variability because of seasonal changes in demand. Accrued unbilled revenues totaled $427 million, $404 million and $406 million at December 31, 2008, 2007 and 2006, respectively.

*Accounting for Contingencies*

The financial results of EFCH may be affected by judgments and estimates related to loss contingencies. A significant contingency that EFCH accounts for is the loss associated with uncollectible trade accounts receivable. The determination of such bad debt expense is based on factors such as historical write-off experience, aging of accounts receivable balances, changes in operating practices, regulatory rulings, general economic conditions, effects of hurricanes and other natural disasters and customers' behaviors. Changes in customer count and mix due to competitive activity and seasonal variations in amounts billed add to the complexity of the estimation process. Historical results alone are not always indicative of future results, causing management to consider potential changes in customer behavior and make judgments about the collectability of accounts receivable. Bad debt expense totaled $81 million, $13 million, $44 million and $67 million for the year ended December 31, 2008, the period from October 11, 2007 to December 31, 2007, the period from January 1, 2007 to October 10, 2007, and the year ended December 31, 2006, respectively. The increase in bad debt expense in 2008 was driven by retail operations in South Texas reflecting competitive customer acquisition and the effects of Hurricane Ike. See "—Financial Condition—Liquidity and Capital Resources—Bankruptcy Filing of Lehman Brothers Holdings Inc." regarding a reserve for amounts due from subsidiaries of Lehman.

Litigation contingencies also may require significant judgment in estimating amounts to accrue. EFCH accrues liabilities for litigation contingencies when such liabilities are considered probable of occurring and the amount is reasonably estimable. No significant amounts have been accrued for such contingencies during the three-year period ended December 31, 2008. See "Business—Legal Proceedings" for discussion of major litigation.

*Accounting for Income Taxes*

EFH Corp. files a consolidated federal income tax return; however, EFCH's income tax expense and related balance sheet amounts are recorded as if the entity was a stand-alone corporation. EFCH's income tax expense and related balance sheet amounts involve significant management estimates and judgments. Amounts of deferred income tax assets and liabilities, as well as current and noncurrent accruals, involve judgments and estimates of the timing and probability of recognition of income and deductions by taxing authorities. In assessing the likelihood of realization of deferred tax assets, management considers estimates of the amount and character of future taxable income. Actual income taxes could vary from estimated amounts due to the future impacts of various items, including changes in income tax laws, EFCH's forecasted financial condition and results of operations in future periods, as well as final review of filed tax returns by taxing authorities. EFH Corp.'s income tax returns are regularly subject to examination by applicable tax authorities. In management's opinion, an adequate reserve has been made for any future taxes that may be owed as a result of any examination.

FIN 48 provides interpretive guidance for accounting for uncertain tax positions, and as discussed in Note 7 to EFCH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus, EFCH adopted this new standard January 1, 2007. See Notes 1 and 9 to EFCH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus for discussion of income tax matters.

D-64

Confidential

EFIHMW00246794

**PX 014**
**Page 1076 of 1116**

*Depreciation and Amortization*

Depreciation expense related to generation facilities is based on the estimates of fair value and economic useful lives as determined in the application of purchase accounting described above. The accuracy of these estimates directly affects the amount of depreciation expense. If future events indicate that the estimated lives are no longer appropriate, depreciation expense will be recalculated prospectively from the date of such determination based on the new estimates of useful lives.

The estimated remaining lives range from 23 to 32 years for the lignite/coal-fueled generation units and an average 43 years for the nuclear-fueled generation units. The estimated life of these baseload units is 60 years, the same as estimates prior to purchase accounting. See Note 1 to EFCH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus under "Property, Plant and Equipment" for discussion of the change from composite to asset-by-asset depreciation effective with the Merger.

Finite-lived intangibles identified as a result of purchase accounting are amortized over their estimated useful lives based on the expected realization of economic effects. See Note 3 to EFCH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus for additional information.

*Defined Benefit Pension Plans and OPEB Plans*

Subsidiaries of EFCH are participating employers in the pension plan sponsored by EFH Corp. and offer pension benefits through either a traditional defined benefit formula or a cash balance formula to eligible employees. Subsidiaries of EFCH also participate in health care and life insurance benefit plans offered by EFH Corp. to eligible employees and their eligible dependents upon the retirement of such employees from EFCH. Reported costs of providing noncontributory defined pension benefits and OPEB are dependent upon numerous factors, assumptions and estimates.

Benefit costs are impacted by actual employee demographics (including but not limited to age, compensation levels and years of accredited service), the level of contributions made to retiree plans, expected and actual earnings on plan assets and the discount rates used in determining the projected benefit obligation. Changes made to the provisions of the plans may also impact current and future benefit costs. Fluctuations in actual equity market returns as well as changes in general interest rates may result in increased or decreased benefit costs in future periods.

In accordance with accounting rules, changes in benefit obligations associated with these factors may not be immediately recognized as costs in the income statement, but are recognized in future years over the remaining average service period of plan participants. As such, significant portions of benefit costs recorded in any period may not reflect the actual level of cash benefits provided to plan participants. Costs allocated from the plans are also impacted by movement of employees between participating companies. Pension and OPEB costs as determined under applicable accounting rules are summarized in the following table:

| | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
| | December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | December 31, 2006 |
| Pension costs under SFAS 87 .................... | $ 6 | $ 1 | $ 4 | $ 8 |
| OPEB costs under SFAS 106 ..................... | 8 | 2 | 9 | 10 |
| Total benefit costs and net amounts recognized as expense ................................. | $ 14 | $ 3 | $ 13 | $ 18 |
| Funding of pension and OPEB Plans ............... | $ 1 | $ — | $ 1 | $ 1 |
| Discount rate ................................ | 6.55% | 6.45% | 5.90% | 5.75% |

D-65

EFIHMW00246795

Regulatory Recovery of Pension and OPEB Costs—In 2005, an amendment to PURA relating to pension and OPEB costs was enacted by the Texas Legislature. This amendment provides for the recovery by Oncor of pension and OPEB costs for all applicable former employees of the regulated predecessor integrated electric utility. In addition to Oncor's active and retired employees, these former employees largely include active and retired personnel engaged in TCEH's activities, related to service of those additional personnel prior to the deregulation and disaggregation of EFH Corp.'s business effective January 1, 2002. Accordingly, Oncor and TCEH entered into an agreement whereby Oncor assumed responsibility for applicable pension and OPEB costs related to those personnel. The amendment additionally authorizes Oncor to establish a regulatory asset or liability for the difference between the amounts of pension and OPEB costs approved in Oncor's current billing rates and the actual amounts that would otherwise have been recorded as charges or credits to earnings. Accordingly, in 2005, Oncor began deferring (principally as a regulatory asset or property) additional pension and OPEB costs consistent with the amendment, which was effective January 1, 2005. Amounts deferred are ultimately subject to regulatory approval.

### Presentation and Analysis Of Results

Management's discussion and analysis of results of operations and cash flows has been prepared by analyzing the results of operations and cash flows of the Successor for the year ended December 31, 2008 on a stand-alone basis, by comparing the results of operations and cash flows of the Successor for the period October 11, 2007 through December 31, 2007 to the results of operations and cash flows of the Predecessor for the three months ended December 31, 2006 and by comparing the results of operations and cash flows of the Predecessor for the period January 1, 2007 through October 10, 2007 to the results of operations and cash flows of the Predecessor for the nine months ended September 30, 2006. To facilitate the discussion, certain volumetric and statistical data for 2007 have been presented as of and for the nine months ended September 30, 2007 compared to the nine months ended September 30, 2006 and as of and for the three months ended December 31, 2007 compared to the three months ended December 31, 2006. Such volumetric and statistical data are measured and reported on a monthly, quarterly and annual basis.

### Results of Operations

*Financial Results*

| | Successor | | Predecessor | | |
|---|---|---|---|---|---|
| | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period From January 1, 2007 through October 10, 2007 | Three Months Ended December 31, 2006 | Nine Months Ended September 30, 2006 |
| Operating revenues | $ 9,787 | $ 1,671 | $ 6,884 | $1,950 | $ 7,446 |
| Fuel, purchased power costs and delivery fees | (5,600) | (852) | (3,209) | (847) | (3,081) |
| Net gain (loss) from commodity hedging and trading activities | 2,184 | (1,492) | (554) | 92 | 61 |
| Operating costs | (677) | (124) | (471) | (164) | (441) |
| Depreciation and amortization | (1,092) | (315) | (253) | (81) | (252) |
| Selling, general and administrative expenses | (680) | (153) | (452) | (154) | (380) |
| Franchise and revenue-based taxes | (109) | (30) | (83) | (42) | (86) |
| Impairment of goodwill | (8,000) | — | — | — | — |
| Other income | 35 | 2 | 59 | 32 | 46 |
| Other deductions | (1,263) | (5) | 20 | (5) | (205) |
| Interest income | 59 | 9 | 312 | 79 | 173 |
| Interest expense and related charges | (4,187) | (652) | (329) | (77) | (257) |
| Income (loss) before income taxes | (9,543) | (1,941) | 1,924 | 783 | 3,024 |
| Income tax (expense) benefit | 504 | 675 | (618) | (259) | (1,047) |
| Net income (loss) | $(9,039) | $(1,266) | $ 1,306 | $   524 | $ 1,977 |

Confidential

EFIHMW00246796

*Sales Volume and Customer Count Data*

| | Successor | | Predecessor | | |
| --- | --- | --- | --- | --- | --- |
| | Year Ended December 31, 2008 | Three Months Ended December 31, 2007 | Nine Months Ended September 30, 2007 | Three Months Ended December 31, 2006 | Nine Months Ended September 30, 2006 |
| **Sales volumes:** | | | | | |
| Retail electricity sales volumes—(GWh): | | | | | |
| Residential .................... | 28,135 | 5,967 | 21,256 | 5,825 | 23,770 |
| Small business (a) .............. | 7,363 | 1,622 | 5,861 | 1,707 | 6,716 |
| Large business and other customers .. | 13,945 | 3,591 | 10,946 | 3,329 | 10,703 |
| Total retail electricity ..... | 49,443 | 11,180 | 38,063 | 10,861 | 41,189 |
| Wholesale electricity sales volumes ...... | 47,270 | 11,198 | 27,914 | 11,061 | 25,870 |
| Net sales (purchases) of balancing electricity to/from ERCOT (b) ........ | (527) | 47 | 622 | (394) | 1,268 |
| Total sales volumes ........... | 96,186 | 22,425 | 66,599 | 21,528 | 68,327 |
| **Average volume (kWh) per retail customer (c):** | | | | | |
| Residential ..................... | 14,780 | 3,197 | 11,399 | 3,086 | 12,235 |
| Small business .................. | 28,743 | 6,337 | 22,421 | 6,319 | 23,926 |
| Large business and other customers .. | 475,886 | 104,582 | 276,764 | 73,121 | 210,515 |
| **Weather (service territory average)— percent of normal (d):** | | | | | |
| Percent of normal: | | | | | |
| Cooling degree days ...... | 108.5% | 171.8% | 94.2% | 104.5% | 118.5% |
| Heating degree days ...... | 92.5% | 89.7% | 106.2% | 90.9% | 71.2% |
| **Average revenues per MWh:** | | | | | |
| Residential ..................... | $ 134.42 | $ 127.87 | $ 138.99 | $143.29 | $ 148.44 |
| **Customer counts:** | | | | | |
| Retail electricity customers (end of period and in thousands) (e): | | | | | |
| Residential ..................... | 1,932 | 1,875 | 1,858 | 1,871 | 1,904 |
| Small business (a) .............. | 257 | 256 | 256 | 267 | 273 |
| Large business and other customers .. | 25 | 33 | 35 | 44 | 47 |
| Total retail electricity customers ................ | 2,214 | 2,164 | 2,149 | 2,182 | 2,224 |

(a)  Customers with demand of less than 1 MW annually.

(b)  See Note 1 to EFCH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus for discussion of reporting of ERCOT balancing activity.

(c)  Calculated using average number of customers for the period.

(d)  Weather data is obtained from Weatherbank, Inc., an independent company that collects and archives weather data from reporting stations of the National Oceanic and Atmospheric Administration (a federal agency under the US Department of Commerce).

(e)  Based on number of meters.

D-67

Confidential

*Revenue and Commodity Hedging and Trading Activities*

| | Successor | | Predecessor | | |
|---|---|---|---|---|---|
| | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Three Months Ended December 31, 2006 | Nine Months Ended September 30, 2006 |
| **Operating revenues:** | | | | | |
| Retail electricity revenues: | | | | | |
| Residential | $3,782 | $ 654 | $3,064 | $ 835 | $3,528 |
| Small business (a) | 1,099 | 202 | 880 | 249 | 984 |
| Large business and other customers | 1,447 | 286 | 1,070 | 326 | 1,031 |
| Total retail electricity revenues | 6,328 | 1,142 | 5,014 | 1,410 | 5,543 |
| Wholesale electricity revenues | 3,329 | 505 | 1,637 | 643 | 1,635 |
| Net sales (purchases) of balancing electricity to/ from ERCOT (b) | (214) | (9) | (14) | (25) | (6) |
| Amortization of intangibles (c) | (36) | (50) | — | — | — |
| Other operating revenues (d) | 380 | 83 | 247 | (78) | 274 |
| Total operating revenues | $9,787 | $ 1,671 | $6,884 | $1,950 | $7,446 |
| **Commodity hedging and trading activities:** | | | | | |
| Unrealized net gains (losses), including cash flow hedge ineffectiveness from changes in fair value | $2,290 | $(1,469) | $ (646) | $ 25 | $ 203 |
| Unrealized net (gains) losses representing reversals of previously recognized fair values of positions settled in the current period | (9) | (87) | (76) | 33 | 11 |
| Realized net gains (losses) on settled positions (e) | (97) | 64 | 168 | 34 | (153) |
| Total gain (loss) | $2,184 | $(1,492) | $ (554) | $ 92 | $ 61 |
| **Estimated share of ERCOT retail markets (f):** | | | | | |
| Residential | 37% | 36% | 36% | 37% | 38% |
| Business markets | 26% | 27% | 27% | 29% | 30% |

(a)  Customers with demand of less than 1 MW annually.

(b)  See Note 1 to EFCH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus for discussion of reporting of ERCOT balancing activity.

(c)  Represents amortization of the intangible net asset value of retail and wholesale power sales agreements resulting from purchase accounting.

(d)  Includes a $162 million charge for a special customer appreciation bonus in the fourth quarter of 2006. This charge does not affect the computation of residential average revenues per MWh. See Note 6 to EFCH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus.

(e)  Includes physical commodity trading activity not subject to mark-to-market accounting of $44 million in net gains in 2008, $3 million in net losses in the period October 11, 2007 to December 31, 2007, $16 million in net losses in the period January 1, 2007 to October 10, 2007, $5 million in net losses for the three months ended December 31, 2006 and $29 million in net losses for the nine months ended September 30, 2006.

(f)  Based on number of meters at end of period. Based on the number of customers who have choice. Calculations based on TXU Energy customer segmentation and ERCOT total customer counts.

D-68

EFIHMW00246798

*Production, Purchased Power and Delivery Cost Data*

| | Successor | | Predecessor | | |
|---|---|---|---|---|---|
| | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Three Months Ended December 31, 2006 | Nine Months Ended September 30, 2006 |
| **Fuel, purchased power costs and delivery fees ($ millions):** | | | | | |
| Nuclear fuel . . . . . . . . . . . . . . . . . . . . . . . . . | $ 95 | $ 21 | $ 66 | $ 20 | $ 65 |
| Lignite/coal . . . . . . . . . . . . . . . . . . . . . . . . | 640 | 127 | 467 | 122 | 353 |
| Total baseload fuel . . . . . . . . . . . . . . . . | 735 | 148 | 533 | 142 | 418 |
| Natural gas fuel and purchased power . . . . . . | 2,881 | 302 | 1,435 | 358 | 1,429 |
| Amortization of intangibles (a) . . . . . . . . . . . | 318 | 67 | — | — | — |
| Other costs . . . . . . . . . . . . . . . . . . . . . . . . . | 351 | 68 | 213 | 60 | 169 |
| Fuel and purchased power costs (b) . . . . | 4,285 | 585 | 2,181 | 560 | 2,016 |
| Delivery fees . . . . . . . . . . . . . . . . . . . . . . . . | 1,315 | 267 | 1,028 | 287 | 1,065 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . | $5,600 | $ 852 | $3,209 | $ 847 | $ 3,081 |

| | Successor | | Predecessor | | |
|---|---|---|---|---|---|
| | Year Ended December 31, 2008 | Three Months Ended December 31, 2007 | Nine Months Ended September 30, 2007 | Three Months Ended December 31, 2006 | Nine Months Ended September 30, 2006 |
| **Fuel and purchased power costs (which excludes generation plant operating costs) per MWh:** | | | | | |
| Nuclear fuel . . . . . . . . . . . . . . . . . . . . . . . . . | $ 4.92 | $ 4.64 | $ 4.59 | $ 4.39 | $ 4.25 |
| Lignite/coal (c) . . . . . . . . . . . . . . . . . . . . . . | $15.80 | $13.48 | $14.31 | $12.46 | $11.60 |
| Natural gas fuel and purchased power . . . . . . | $81.99 | $60.04 | $62.29 | $54.08 | $65.71 |
| **Delivery fees per MWh** . . . . . . . . . . . . . . . . . . | $26.33 | $26.64 | $25.60 | $26.10 | $25.60 |
| **Production and purchased power volumes (GWh):** | | | | | |
| Nuclear . . . . . . . . . . . . . . . . . . . . . . . . . . . | 19,218 | 5,157 | 13,664 | 4,501 | 15,292 |
| Lignite/coal . . . . . . . . . . . . . . . . . . . . . . . . | 44,923 | 12,197 | 34,297 | 11,329 | 34,252 |
| Total baseload generation . . . . . . . . . . . . | 64,141 | 17,354 | 47,961 | 15,830 | 49,544 |
| Natural gas-fueled generation . . . . . . . . . . . . . | 4,122 | 500 | 3,491 | 502 | 3,487 |
| Purchased power (b) . . . . . . . . . . . . . . . . . . . | 31,018 | 5,483 | 18,619 | 6,122 | 18,258 |
| Total energy supply . . . . . . . . . . . . . . . . | 99,281 | 23,337 | 70,071 | 22,454 | 71,289 |
| Less line loss and power imbalances . . . . . . . . | 3,095 | 912 | 3,472 | 926 | 2,962 |
| Net energy supply volumes . . . . . . . . . . | 96,186 | 22,425 | 66,599 | 21,528 | 68,327 |
| **Baseload capacity factors (%):** | | | | | |
| Nuclear . . . . . . . . . . . . . . . . . . . . . . . . . . . | 95.2% | 101.6% | 90.8% | 89.2% | 102.0% |
| Lignite/coal . . . . . . . . . . . . . . . . . . . . . . . . | 87.6% | 94.5% | 89.7% | 87.9% | 89.5% |
| Total baseload . . . . . . . . . . . . . . . . . . . . | 89.8% | 96.5% | 90.0% | 88.2% | 93.1% |

(a) Represents amortization of the intangible net asset values of emission credits, coal purchase contracts, nuclear fuel contracts and power purchase agreements and the stepped up value of nuclear fuel resulting from purchase accounting.

(b) See Note 1 to EFCH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus for discussion of reporting of ERCOT balancing activity.

(c) Includes depreciation and amortization of lignite mining assets, which is reported in the depreciation and amortization expense line item, but is part of overall fuel costs.

D-69

EFIHMW00246799

*Financial Results—2008*

Operating revenues are shown in the following table:

| | Successor | | Predecessor | | |
|---|---|---|---|---|---|
| | **Year Ended December 31, 2008** | **Period from October 11, 2007 through December 31, 2007** | **Period From January 1, 2007 through October 10, 2007** | **Three Months Ended December 31, 2006** | **Nine Months Ended September 30, 2006** |
| Total retail electricity revenues . . . . . . | $6,328 | $1,142 | $5,014 | $1,410 | $5,543 |
| Accrued customer appreciation bonus (Note 6 to EFCH's historical consolidated financial statements for the year ended December 31, 2008 included elsewhere in this Prospectus) . . . . . . . . . . . . . . . . . . . | — | — | — | (162) | — |
| Wholesale electricity revenues . . . . . . . | 3,329 | 505 | 1,637 | 643 | 1,635 |
| Wholesale balancing activities . . . . . . . | (214) | (9) | (14) | (25) | (6) |
| Amortization of intangibles (a) . . . . . . . | (36) | (50) | — | — | — |
| Other operating revenues . . . . . . . . . . | 380 | 83 | 247 | 84 | 274 |
| Total operating revenues . . . . . . . . | $9,787 | $1,671 | $6,884 | $1,950 | $7,446 |

(a)   Represents amortization of the intangible value of retail and wholesale power sales agreements resulting from purchase accounting.

*Successor Period—Year Ended December 31, 2008*

Operating revenues for 2008 totaled $9.787 billion. Retail electricity revenues of $6.328 billion were positively impacted in 2008 by the effects of warmer than normal weather, a 3% increase in residential customers and higher prices in the business markets reflecting higher wholesale electricity costs. Retail electricity revenues were negatively impacted by reduced business electricity usage, especially in the fourth quarter, and a 15% price discount phased in during 2007 to those residential customers in EFH Corp.'s historical territory with month-to-month service plans and a rate equivalent to the former regulated rate. Wholesale electricity revenues of $3.329 billion reflected higher natural gas prices and a 21% increase in volumes. The rise in natural gas prices through July 2008 reflected the overall trend of higher energy prices and increased demand in natural gas-fueled generation due to warmer weather in 2008. Higher wholesale sales volumes reflected several factors, including increased demand (due to warmer weather), baseload plant outages and congestion, as well as increased near-term bilateral power contracting activity due in part to increased demand and market volatility in 2008. Wholesale balancing activity represents intraday purchases and sales transactions with ERCOT for real-time balancing purposes, as measured in 15-minute intervals, which are highly variable and in 2008 reflected weather-driven volatility, generation facility outages and congestion effects. Other operating revenues reflect retail natural gas sales and miscellaneous services revenues.

Fuel, purchased power costs and delivery fees for 2008 totaled $5.600 billion, which included $318 million of net expense representing amortization of the intangible net asset values of environmental credits, coal purchase contracts, nuclear fuel contracts and power purchase agreements and the stepped-up value of nuclear fuel resulting from purchase accounting. Fuel and purchased power costs for 2008 also reflected:

• higher purchased power costs due to higher natural gas prices and volatility in the markets as hot weather and congestion issues in the spring resulted in power purchases at high prices, while Hurricane Ike and economic factors resulted in lower demand later in the year and sales of excess power back into the markets at lower prices;

D-70

EFIHMW00246800

PX 014
Page 1082 of 1116