Confidential--For Professional Eyes Only
Mike Kunkel

OFFERING MEMORANDUM                                                CONFIDENTIAL

# ENERGY FUTURE HOLDINGS CORP.

### $500,000,000
### 10.000% Senior Secured Notes due 2020

Energy Future Holdings Corp. ("EFH Corp.") is offering $500,000,000 aggregate principal amount of its 10.000% Senior Secured Notes due 2020 (the "notes"). Interest on the notes is payable on January 15 and July 15 of each year, commencing on July 15, 2010. The notes accrue interest at the rate of 10.000% per annum. The notes will mature on January 15, 2020.

EFH Corp. may redeem any of the notes beginning on January 15, 2015 at the redemption prices set forth in this offering memorandum. EFH Corp. may also redeem any of the notes at any time prior to January 15, 2015 at a price equal to 100% of their principal amount, plus accrued and unpaid interest and a "make-whole" premium. In addition, before January 15, 2013, EFH Corp. may redeem up to 35% of the aggregate principal amount of the notes using the proceeds from certain equity offerings at the redemption price set forth in this offering memorandum.

The notes are senior obligations of EFH Corp. and rank equally in right of payment with all senior indebtedness of EFH Corp. The notes are effectively subordinated to any indebtedness of EFH Corp. secured by assets of EFH Corp. to the extent of the value of the assets securing such indebtedness and structurally subordinated to all indebtedness and other liabilities of EFH Corp.'s non-guarantor subsidiaries and any other unrestricted subsidiaries. The notes are senior in right of payment to any future subordinated indebtedness of EFH Corp.

Energy Future Competitive Holdings Company ("EFCH") and Energy Future Intermediate Holding Company LLC ("EFIH" and, together with EFCH, the "guarantors"), direct, wholly owned subsidiaries of EFH Corp., will jointly and severally guarantee the notes (the "guarantees"). The guarantee from EFIH is secured, equally and ratably with certain outstanding indebtedness of EFH Corp. and EFIH, by the pledge of all membership interests and other investments EFIH owns or holds in Oncor Electric Delivery Holdings Company LLC ("Oncor Holdings") or any of Oncor Holdings' subsidiaries (such membership interests and other investments, the "Collateral"). The guarantee from EFCH is unsecured. The guarantees are senior obligations of each guarantor and rank equally in right of payment with all existing and future senior indebtedness of each guarantor. The guarantee from EFIH is effectively senior to all unsecured indebtedness of EFIH to the extent of the value of the Collateral. The guarantees will be effectively subordinated to all secured indebtedness of each guarantor secured by assets other than the Collateral to the extent of the value of the assets securing such indebtedness, and will be structurally subordinated to any existing and future indebtedness and liabilities of EFH Corp.'s subsidiaries that are not guarantors.

Under certain circumstances, EFH Corp. and the guarantors have agreed to file a registration statement with the United States Securities and Exchange Commission (the "SEC") relating to an offer to exchange the notes and guarantees for publicly tradable notes and guarantees having substantially identical terms.

For a more detailed description of the notes, see "Description of the Notes" beginning on page 39.

--------

**See "Risk Factors" beginning on page 16 as well as those contained in EFH Corp.'s Annual Report on Form 10-K for the fiscal year ended December 31, 2008 (our "2008 Form 10-K") and EFH Corp.'s Quarterly Report on Form 10-Q for the fiscal quarter ended September 30, 2009 (our "September 30, 2009 Form 10-Q"), each of which is incorporated into this offering memorandum by reference, for a discussion of certain risks that you should consider before investing in the notes.**

The notes have not been registered under the Securities Act of 1933, as amended (the "Securities Act"), and may not be offered or sold within the United States or to, or for the account or benefit of, U.S. persons except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act. Accordingly, the notes are being offered and sold only (a) to "qualified institutional buyers" (as defined in Rule 144A under the Securities Act) and (b) outside the United States to non-U.S. persons in compliance with Regulation S under the Securities Act. For details about eligible offers, deemed representations and agreements by investors and transfer restrictions, see "Notice to Investors."

--------

**Price for notes: 100% plus accrued interest, if any, from January 12, 2010.**

--------

The initial purchasers expect to deliver book-entry interests in the notes to purchasers on or about January 12, 2010 through the facilities of The Depository Trust Company ("DTC").

*Joint Book-Running Managers*

| Citi | Goldman, Sachs & Co. | Credit Suisse | J.P. Morgan |

--------

*Co-Managers*

| BofA Merrill Lynch | | Morgan Stanley |

January 7, 2010

Confidential--For Professional Eyes Only
Mike Kunkel

Confidential—For Professional Eyes Only
Mike Kunkel

You should rely only on the information contained in and incorporated by reference into this offering memorandum. We have not, and the initial purchasers or their affiliates have not, authorized anyone to provide you with different information. No person has been authorized to give any information not contained in or incorporated by reference into this offering memorandum. If you receive any other information, you should not rely on it. No offer of these securities is being made in any jurisdiction where any such offer is prohibited. The information contained in or incorporated by reference into this offering memorandum is only accurate as of the date of this offering memorandum or such incorporated information.

––––––––––––––––

## TABLE OF CONTENTS

SECURITIES AND EXCHANGE COMMISSION REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    iv
INDUSTRY AND MARKET INFORMATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    iv
FORWARD-LOOKING STATEMENTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    v
SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1
RISK FACTORS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    16
THE TRANSACTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    33
USE OF PROCEEDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    36
CAPITALIZATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    37
DESCRIPTION OF THE NOTES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    39
NOTICE TO INVESTORS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    129
BOOK ENTRY; DELIVERY AND FORM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    132
CERTAIN UNITED STATES FEDERAL TAX CONSEQUENCES . . . . . . . . . . . . . . . . . . . . . . . . . . .    137
CERTAIN ERISA CONSIDERATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    142
PLAN OF DISTRIBUTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    144
LEGAL MATTERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    147
INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM . . . . . . . . . . . . . . . . . . . . . . . . . . . .    148
AVAILABLE INFORMATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    149
INCORPORATION BY REFERENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    149
INDEX TO CONSOLIDATED FINANCIAL STATEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    F-1

––––––––––––––

ii

Confidential—For Professional Eyes Only
Mike Kunkel

Confidential--For Professional Eyes Only
Mike Kunkel

EFH Corp. is making this offering and will sell the notes in reliance upon an exemption from registration under the Securities Act for offers and sales of securities that do not involve a public offering.

This offering memorandum has been prepared by EFH Corp. and the guarantors solely for use in connection with the proposed offering of the notes. This offering memorandum is personal to each offeree and does not constitute an offer to any other person or to the public generally to subscribe for or otherwise acquire securities. Distribution of this offering memorandum to any person other than the prospective investor and any person retained to advise such prospective investor with respect to its purchase is unauthorized, and any disclosure of any of its contents without the prior written consent of EFH Corp. is prohibited. Each prospective investor, by accepting delivery of this offering memorandum, agrees to the foregoing and to make no photocopies of this offering memorandum or any documents referred to herein.

The initial purchasers make no representation or warranty, express or implied, as to the accuracy or completeness of the information contained in or incorporated by reference into this offering memorandum. Nothing contained in or incorporated by reference into this offering memorandum is, or should be relied upon as, a promise or representation by the initial purchasers as to the past or future. The initial purchasers have not independently verified any of the information contained in or incorporated by reference into this offering memorandum (financial, legal or otherwise) and assume no responsibility for the accuracy or completeness of any such information.

Neither the SEC, any state securities commission nor any other regulatory authority has approved or disapproved the securities nor have any of the foregoing authorities passed upon or endorsed the merits of this offering or the accuracy or adequacy of this offering memorandum. Any representation to the contrary is a criminal offense.

The notes are subject to restrictions on transferability and resale and may not be transferred or resold except as permitted under the Securities Act and the applicable securities laws of any state or other jurisdiction pursuant to registration or exemption from registration. As a prospective purchaser, you should be aware that you may be required to bear the financial risks of this investment for an indefinite period of time. For additional information, see "Notice to Investors" and "Plan of Distribution."

In making any investment decision, prospective investors must rely on their own examination of EFH Corp. and the guarantors and the terms of this offering, including the merits and risks involved. See "Risk Factors." Prospective investors should not construe anything contained in or incorporated by reference into this offering memorandum as legal, business or tax advice. Each prospective investor should consult its own advisors as needed to make its investment decision and to determine whether it is legally permitted to purchase the notes under applicable legal investment or similar laws or regulations.

Each prospective investor must comply with all applicable laws and regulations in force in any jurisdiction in which it purchases, offers or sells notes or possesses or distributes this offering memorandum and must obtain any consent, approval or permission required by it for the purchase, offer or sale by it of the notes under the laws and regulations in force in any jurisdiction to which it is subject or in which it makes such purchases, offers or sales, and neither we nor the initial purchasers nor any of our or their respective representatives shall have any responsibility therefor.

Some of the initial purchasers participating in this offering may engage in transactions that stabilize, maintain or otherwise affect the price of the notes, including over-allotment, stabilizing and short-covering transactions in the notes, and the imposition of a penalty bid during and after this offering. Such stabilization, if commenced, may be discontinued at any time without notice. For a description of some of these activities, see "Plan of Distribution."

Confidential--For Professional Eyes Only
Mike Kunkel

Highly Confidential

Confidential—For Professional Eyes Only
Mike Kunkel

This offering memorandum contains summaries believed to be accurate with respect to certain documents, but reference is made to the actual documents for complete information. All such summaries are qualified in their entirety by such reference. Copies of documents referred to herein will be made available to prospective investors upon request to EFH Corp. See "Available Information."

Each person receiving this offering memorandum acknowledges that (1) it has reviewed all information incorporated into this offering memorandum by reference considered by it to be necessary to make an investment decision, (2) it has been afforded an opportunity to request and to review, and it has received, all additional information considered by it to be necessary to verify the accuracy of or to supplement the information contained in or incorporated by reference into this offering memorandum, (3) it has not relied upon the initial purchasers or any person affiliated with the initial purchasers in connection with its investigation of the accuracy of such information or its investment decision, (4) this offering memorandum relates to an offering that is exempt from registration under the Securities Act and may not comply in important respects with SEC rules that would apply to an offering document relating to a public offering of securities and (5) no person has been authorized to give information or to make any representation concerning us, this offering or the notes, other than as contained in this offering memorandum, in connection with an investor's examination of EFH Corp. and the terms of the offering contemplated by the offering memorandum.

Unless the context otherwise requires or as otherwise indicated, references in this offering memorandum to "we," "our" and "us" refer to Energy Future Holdings Corp. and its consolidated subsidiaries. References to "EFH Corp." refer to Energy Future Holdings Corp. and not to any of its subsidiaries. "2017 Notes" means, collectively, EFH Corp.'s 10.875% Senior Notes due 2017 and 11.250%/12.000% Senior Toggle Notes due 2017. "Legacy Notes" means, collectively, EFH Corp.'s 5.55% Series P Senior Notes due 2014, 6.50% Series Q Senior Notes due 2024 and 6.55% Series R Senior Notes due 2034. "TCEH 2015/2016 Notes" means, collectively, TCEH and TCEH Finance, Inc.'s 10.25% Senior Notes due 2015, 10.25% Senior Notes due 2015, Series B, and 10.50%/11.25% Senior Toggle Notes due 2016.

## SECURITIES AND EXCHANGE COMMISSION REVIEW

The information in this offering memorandum relates to an offering that is exempt from registration under the Securities Act. EFH Corp. and the guarantors will agree to file one or more registration statements with the SEC with respect to (1) a registered offer to exchange the notes for new exchange notes (the "exchange notes") having terms substantially identical in all material respects to the notes exchanged therefor (except that the exchange notes will not contain terms with respect to additional interest or transfer restrictions) or (2) resales of the notes. See "Description of the Notes — Exchange Offer; Registration Rights." In the course of the review by the SEC of any such registration statement and other filings EFH Corp. and the guarantors may make with the SEC, EFH Corp. may be required or may elect to make changes to the description of its business, financial statements and other information in those documents and filings. EFH Corp. believes that its financial statements and other financial data included in this offering memorandum have been prepared in a manner that complies, in all material respects, with the regulations published by the SEC and are consistent with current practice. This offering memorandum does not include or incorporate by reference financial statements or other financial data of EFIH or EFCH. However, consistent with SEC regulations, this offering memorandum includes financial statements of Oncor Holdings. See Oncor Holdings' audited historical consolidated financial statements for the year ended December 31, 2008 and unaudited condensed consolidated financial statements for the nine months ended September 30, 2009, each of which is included elsewhere in this offering memorandum.

## INDUSTRY AND MARKET INFORMATION

The industry and market data and other statistical information used throughout this offering memorandum are based on independent industry publications, government publications, reports by market research firms or

iv

Confidential—For Professional Eyes Only
Mike Kunkel

Confidential—For Professional Eyes Only
Mike Kunkel

other published independent sources, including certain data published by the Electric Reliability Council of Texas ("ERCOT"), the Public Utility Commission of Texas (the "PUCT"), or Potomac Economics, Inc., the market monitor for the ERCOT market. We did not commission any of these publications or reports. Some data is also based on our good faith estimates, which are derived from our review of internal surveys, as well as the independent sources listed above. Independent industry publications and surveys generally state that they have obtained information from sources believed to be reliable but do not guarantee the accuracy and completeness of such information. While we believe that each of these studies and publications is reliable, we have not independently verified such data and make no representation as to the accuracy of such information. Forecasts are particularly likely to be inaccurate, especially over long periods of time, and we do not know what assumptions regarding general economic growth are used in preparing the forecasts included in this offering memorandum. Similarly, while we believe that our internal and external research is reliable, such research has not been verified by any independent sources, and we make no assurances that the predictions contained therein are accurate.

## FORWARD-LOOKING STATEMENTS

This offering memorandum, including the information incorporated into this offering memorandum by reference, contains "forward-looking statements," which involve risks and uncertainties. All statements, other than statements of historical facts, that are included in or incorporated by reference into this offering memorandum, or made in presentations, in response to questions or otherwise, that address activities, events or developments that we expect or anticipate to occur in the future, including such matters as projections, capital allocation, future capital expenditures, business strategy, competitive strengths, goals, future acquisitions or dispositions, development or operation of power generation assets, market and industry developments and the growth of our business and operations (often, but not always, through the use of words or phrases such as "will likely result," "are expected to," "will continue," "is anticipated," "estimated," "projection," "target," "goal," "objective" and "outlook"), are forward-looking statements. Although we believe that in making any such forward-looking statement our expectations are based on reasonable assumptions, any such forward-looking statement involves uncertainties and is qualified in its entirety by reference to the discussion of risk factors under "Risk Factors" contained elsewhere in this offering memorandum and in the sections captioned "Risk Factors" of our 2008 Form 10-K and our September 30, 2009 Form 10-Q, which are incorporated into this offering memorandum by reference, and the following important factors, among others, that could cause our actual results to differ materially from those projected in such forward-looking statements:

- prevailing governmental policies and regulatory actions, including those of the Texas Legislature, the Governor of Texas, the Congress of the United States of America, the United States Federal Energy Regulatory Commission ("FERC"), the PUCT, the Railroad Commission of Texas, the United States Nuclear Regulatory Commission (the "NRC"), the United States Environmental Protection Agency (the "EPA") or the Texas Commission on Environmental Quality, with respect to, among other things:

- allowed prices;

- allowed rates of return;

- permitted capital structure;

- industry, market and rate structure;

- recovery of investments;

- purchased power;

- operations of nuclear generating facilities;

- operations of mines;

- acquisitions and disposal of assets and facilities;

v

Confidential—For Professional Eyes Only
Mike Kunkel

Confidential—For Professional Eyes Only
Mike Kunkel

- development, construction and operation of facilities;

- decommissioning costs;

- present or prospective wholesale and retail competition;

- changes in tax laws and policies; and

- changes in and compliance with environmental and safety laws and policies, including climate change initiatives;

- legal and administrative proceedings and settlements;

- general industry trends;

- economic conditions, including the current recessionary environment;

- our ability to attract and retain profitable customers;

- our ability to profitably serve our customers;

- restrictions on competitive retail pricing;

- changes in wholesale electricity prices or energy commodity prices;

- changes in prices of transportation of natural gas, coal, crude oil and other refined products;

- unanticipated changes in market heat rates in the ERCOT electricity market;

- our ability to effectively hedge against changes in commodity prices, market heat rates and interest rates;

- weather conditions and other natural phenomena, and acts of sabotage, wars or terrorist activities;

- unanticipated population growth or decline, or changes in market demand and demographic patterns;

- changes in business strategy, development plans or vendor relationships;

- access to adequate transmission facilities to meet changing demands;

- unanticipated changes in interest rates, commodity prices, rates of inflation or foreign exchange rates;

- unanticipated changes in operating expenses, liquidity needs and capital expenditures;

- commercial bank market and capital market conditions and the potential impact of continued disruptions in the U.S. credit markets;

- competition for new energy development and other business opportunities;

- the inability of various counterparties to meet their obligations with respect to our financial instruments;

- hazards customary to the industry and the possibility that we may not have adequate insurance to cover losses resulting from such hazards;

- changes in technology used by and services offered by us;

- significant changes in our relationship with our employees, including the availability of qualified personnel, and the potential adverse effects if labor disputes or grievances were to occur;

- changes in assumptions used to estimate costs of providing employee benefits, including pension benefits and other postretirement employee benefits, and future funding requirements related thereto;

- changes in assumptions used to estimate future executive compensation payments;

- significant changes in critical accounting policies;

- access to capital, the cost of such capital, and the results of financing and refinancing efforts, including availability of funds in the capital markets;

vi

Confidential—For Professional Eyes Only
Mike Kunkel

EFH00003256

Confidential—For Professional Eyes Only
Mike Kunkel

- financial restrictions placed on us by our credit facilities and indentures governing our debt instruments;

- our ability to generate sufficient cash flow to make interest payments on our debt instruments;

- actions by credit rating agencies;

- our ability to effectively execute our operational strategy;

- our ability to implement cost reduction initiatives;

- changes in electric transmission that allow additional generation to compete with our generation assets; and

- with respect to our lignite coal-fueled generation construction and development program, more specifically, our ability to fund such investments, changes in competitive market rules, adverse judicial rulings, changes in environmental laws or regulations, changes in electric generation and emissions control technologies, changes in projected demand for electricity, changes in wholesale electricity prices or energy commodity prices, transmission capacity and constraints, force majeure events, and our ability to manage the significant construction, commissioning and start-up program to a timely conclusion with limited cost overruns.

Any forward-looking statement speaks only as of the date on which it is made, and except as may be required by applicable law, we undertake no obligation to update any forward-looking statement to reflect events or circumstances after the date on which it is made or to reflect the occurrence of unanticipated events. New factors emerge from time to time, and it is not possible for us to predict all of them; nor can we assess the impact of each such factor or the extent to which any factor, or combination of factors, may cause results to differ materially from those contained in any forward-looking statement. You should not unduly rely on such forward-looking statements.

Confidential—For Professional Eyes Only
Mike Kunkel

Highly Confidential

EFH00003257

Confidential--For Professional Eyes Only
Mike Kunkel

## SUMMARY

*This summary highlights selected information appearing elsewhere in this offering memorandum. This summary is not complete and does not contain all of the information that you should consider before investing in the notes. You should carefully read this summary together with the entire offering memorandum, including the information set forth in the section entitled "Risk Factors" and the information that is incorporated by reference into this offering memorandum. See the sections entitled "Available Information" and "Incorporation by Reference" for a further discussion on incorporation by reference.*

*On October 10, 2007, Texas Energy Future Merger Sub Corp ("Merger Sub") merged with and into EFH Corp. (the "Merger"). As a result of the Merger, investment funds associated with or designated by Kohlberg Kravis Roberts & Co. ("KKR"), TPG Capital, L.P. ("TPG") and Goldman, Sachs & Co. ("Goldman Sachs," and, together with KKR and TPG, the "Sponsor Group"), and certain other co-investors (collectively with the Sponsor Group, the "Investors"), own EFH Corp. through Texas Energy Future Holdings Limited Partnership ("Texas Holdings"), with the Sponsor Group controlling Texas Holdings' general partner, Texas Energy Future Capital Holdings LLC. The acquisition of EFH Corp. by Texas Holdings was financed by the equity contributions and the debt financing described in the section entitled "The Transactions."*

### Our Businesses

We are a Dallas-based energy company that manages a portfolio of competitive and regulated energy businesses in Texas. EFH Corp. is a holding company conducting its operations principally through its subsidiaries, Texas Competitive Electric Holdings Company LLC ("TCEH") and Oncor Electric Delivery Company LLC ("Oncor"). TCEH is wholly-owned, and EFH Corp. has an approximate 80% indirect ownership interest in Oncor.

TCEH is a holding company for subsidiaries engaged in competitive electricity market activities largely in Texas including electricity generation, development and construction of new generation facilities, wholesale energy sales and purchases, commodity risk management and trading activities, and retail electricity sales. EFCH is the parent company of TCEH and a direct subsidiary of EFH Corp.

As of September 30, 2009, TCEH owned or leased 16,139 megawatts ("MW") of generation capacity in Texas. TCEH's generation capacity consists of lignite/coal, nuclear and natural gas-fueled generation facilities. In addition, TCEH is the largest purchaser of wind-generated electricity in Texas and the fifth largest in the U.S. TCEH is currently constructing three lignite/coal-fueled generation units in Texas with expected generation capacity totaling approximately 2,200 MW. Permits have been obtained for construction and operation of the three units. The Sandow unit achieved substantial completion (as defined in the engineering, procurement and construction agreement for the unit) effective September 30, 2009. Accordingly, we have operational control of the unit. The first Oak Grove unit, which is in the commissioning and start-up phase, synchronized to the grid in August 2009 and achieved substantial completion (as defined in the engineering, procurement and construction agreement for the unit) in December 2009. The second Oak Grove unit is nearing completion of construction and initiation of the commissioning and start-up phase and is expected to achieve substantial completion (as defined in the engineering, procurement and construction agreement for the unit) in mid-2010. TCEH provides competitive electricity and related services to more than 2.1 million retail electricity customers in Texas.

EFIH is a holding company for subsidiaries, including Oncor, principally engaged in providing delivery services to retail electric providers, including subsidiaries of TCEH, that sell power in the north-central, eastern and western parts of Texas.

1

Confidential--For Professional Eyes Only
Mike Kunkel

EFH00003258

Confidential--For Professional Eyes Only
Mike Kunkel

Oncor is engaged in regulated electricity transmission and distribution operations in Texas that are primarily regulated by the PUCT. Oncor provides both distribution services to retail electric providers that sell electricity to consumers and transmission services to other electricity distribution companies, cooperatives and municipalities. Oncor operates the largest transmission and distribution system in Texas, delivering electricity to approximately three million homes and businesses and operating more than 117,000 miles of transmission and distribution lines. A significant portion of Oncor's revenues represent fees for delivery services provided to TCEH. Distribution revenues from TCEH represented 39% and 38% of Oncor's total revenues for the year ended December 31, 2008 and the nine months ended September 30, 2009, respectively.

EFH Corp. and Oncor have implemented certain structural and operational "ring-fencing" measures based on commitments made by Texas Holdings and Oncor to the PUCT that further separate Oncor from Texas Holdings and its other subsidiaries (collectively, the "Texas Holdings Group"). These measures also serve to mitigate Oncor's credit exposure to those entities and to reduce the risk that the assets and liabilities of Oncor would be substantively consolidated with the assets and liabilities of the Texas Holdings Group in the event of a bankruptcy of one or more of those entities.

At September 30, 2009, we had approximately 8,900 full-time employees, including approximately 2,700 employees under collective bargaining agreements.

### Recent Developments

On October 5, 2009, EFH Corp., EFIH, and EFIH's direct, wholly owned subsidiary, EFIH Finance Inc. ("EFIH Finance" and, together with EFIH, the "EFIH Offerors"), commenced exchange offers (the "exchange offers") to exchange certain outstanding debt securities of EFH Corp. and TCEH for new senior secured notes to be issued by EFH Corp. and/or the EFIH Offerors. On November 16, 2009, in connection with the exchange offers, EFH Corp. issued $115,446,000 aggregate principal amount of its 9.75% Senior Secured Notes due 2019 (the "EFH Corp. Notes"), and the EFIH Offerors issued $141,083,000 aggregate principal amount of their 9.75% Senior Secured Notes due 2019 (the "EFIH Notes" and, together with the EFH Corp. Notes, the "Senior Secured Notes"). The indentures governing the Senior Secured Notes are filed as exhibits to our Current Report on Form 8-K filed with the SEC on November 20, 2009, which is incorporated into this offering memorandum by reference. The indentures and agreements governing our other material indebtedness are filed as exhibits to our 2008 Form 10-K, which is incorporated into this offering memorandum by reference.

In April 2007, the U.S. Supreme Court issued a decision in the case of *Massachusetts v. U.S. Environmental Protection Agency* holding that carbon dioxide and other greenhouse gas ("GHG") emissions are pollutants subject to regulation under the new motor vehicle provisions of the federal Clean Air Act. The case was remanded to the EPA for further rulemaking to determine whether GHG emissions may reasonably be anticipated to endanger public health or welfare, or in the alternative, provide a reasonable explanation why GHG emissions should not be regulated. In December 2009, the EPA issued a final finding that GHG emissions present an endangerment to human health and the environment and that emissions from motor vehicles cause or contribute to that endangerment. The EPA's findings and determination will require that the agency begin regulating GHG emissions from motor vehicles and ultimately stationary sources under existing provisions of the federal Clean Air Act, and the EPA has already begun work on such regulations. In September 2009, the EPA proposed two sets of regulations in anticipation of finalizing this endangerment finding: one to reduce GHG emissions from motor vehicles and the other to control GHG emissions from certain stationary sources, including power generation facilities. Although the motor vehicle rules are expected to be adopted in March 2010, it may take the EPA longer to impose regulations limiting GHG emissions from stationary sources. In addition, in September 2009, the EPA issued a final rule requiring the reporting by March 2011 of calendar year 2010 GHG emissions from facilities that emit 25,000 metric tons or more of carbon dioxide equivalent and other specified GHG emissions sources in the United States, including natural gas liquids fractionators and local natural gas

2

Confidential--For Professional Eyes Only
Mike Kunkel

EFH00003259

Confidential--For Professional Eyes Only
Mike Kunkel

distribution companies. Any federal GHG legislation is expected to prevent the EPA from regulating GHGs under existing Clean Air Act regulatory programs to some extent, but if Congress fails to pass GHG legislation that limits the EPA's authority to regulate GHGs under the Clean Air Act, the EPA is expected to continue its announced Clean Air Act regulatory actions. The costs of complying with future limitations on GHG emissions could be material.

On January 4, 2010, Richard Landy joined EFH Corp. as Executive Vice President of Human Resources. Mr. Landy previously served as the interim human resources leader for EFH Corp. Before joining EFH Corp., Mr. Landy worked as a private consultant and served as the Senior Vice President of Human Resources, Operations for Exelon Corporation.

### Additional Information

EFH Corp. was incorporated in Texas in 1996. EFIH was formed in Delaware in 2007. EFCH was incorporated in Texas in 1982. Our principal executive offices are located at Energy Plaza, 1601 Bryan Street, Dallas, TX 75201-3411. The telephone number of our principal executive offices is (214) 812-4600. Our website is *http://www.energyfutureholdings.com*. Information on or connected to our website does not constitute part of this offering memorandum.

Confidential--For Professional Eyes Only
Mike Kunkel

Highly Confidential

EFH00003260

**PX 020**
**Page 10 of 218**

Confidential—For Professional Eyes Only
Mike Kunkel

## Organizational Structure

The chart below is a summary of EFH Corp.'s organizational and ownership structure and illustrates our long-term debt as of September 30, 2009 after giving effect to the issuance of the Senior Secured Notes and the cancellation of certain of the 2017 Notes that were accepted for exchange in the exchange offers, each on November 16, 2009, and the issuance of the notes. Please see "Capitalization" for further information regarding our outstanding debt after giving effect to the issuance of the notes and the Senior Secured Notes and the cancellation of certain indebtedness accepted for exchange in the exchange offers. The chart below excludes subsidiaries of EFH Corp. that are not subsidiaries of EFIH or EFCH, including TXU Receivables Company. TXU Receivables Company conducts an accounts receivable securitization program.



1. This offering memorandum does not include or incorporate by reference financial statements or other financial data of EFIH or EFCH.
2. This offering memorandum includes financial statements of Oncor Holdings. See Oncor Holdings' audited historical consolidated financial statements for the year ended December 31, 2008 and unaudited condensed consolidated financial statements for the nine months ended September 30, 2009, each of which is included elsewhere in this offering memorandum.
3. Substantially all of the subsidiaries of TCEH are engaged in competitive market activities.

4

Confidential—For Professional Eyes Only
Mike Kunkel

EFH00003261

**PX 020
Page 11 of 218**

Confidential—For Professional Eyes Only
Mike Kunkel

### The Notes

The summary below describes the principal terms of the notes, the guarantees and the related indenture. Certain of the terms and conditions described below are subject to important limitations and exceptions. The "Description of the Notes" section of this offering memorandum contains more detailed descriptions of the terms and conditions of the notes, the guarantees and the related indenture.

| | |
|---|---|
| Issuer . . . . . . . . . . . . . . . . . . . . . . . . . | Energy Future Holdings Corp. |
| Securities Offered . . . . . . . . . . . . . . . . | $500,000,000 10.000% Senior Secured Notes due 2020. |
| Maturity Date . . . . . . . . . . . . . . . . . . . . | January 15, 2020. |
| Interest Rate . . . . . . . . . . . . . . . . . . . . . | The notes will accrue interest at the rate of 10.000% per annum. |
| Interest Payment Dates . . . . . . . . . . . . . | Interest on the notes will be payable on January 15 and July 15 of each year, commencing on July 15, 2010. |
| Ranking . . . . . . . . . . . . . . . . . . . . . . . . | The notes will be: |

- senior obligations of EFH Corp. and will rank equally in right of payment with all senior indebtedness of EFH Corp. (including the Legacy Notes, the 2017 Notes and the EFH Corp. Notes);

- effectively subordinated to any indebtedness of EFH Corp. secured by assets of EFH Corp. to the extent of the value of the assets securing such indebtedness;

- structurally subordinated to all indebtedness and other liabilities of EFH Corp.'s non-guarantor subsidiaries, including Oncor Holdings, TCEH and each of their respective subsidiaries, any of EFH Corp.'s foreign subsidiaries and any other unrestricted subsidiaries;

- senior in right of payment to any future subordinated indebtedness of EFH Corp; and

- guaranteed as described under "—Guarantees."

As of September 30, 2009, on a pro forma basis after giving effect to the issuance of the Senior Secured Notes and the notes, (1) EFH Corp. would not have had any senior secured indebtedness and (2) the notes would have been structurally subordinated to approximately $36.69 billion principal amount of indebtedness (including long-term debt, including amounts due currently, and short-term borrowings) of EFH Corp.'s subsidiaries, including all of TCEH's and its subsidiaries' indebtedness and all of Oncor Holdings' and its subsidiaries' indebtedness. As of September 30, 2009, TCEH had approximately $2.195 billion of additional available capacity under its senior secured credit facilities (excluding amounts available under its senior secured cash posting credit facility and $41 million of commitments from a subsidiary of Lehman Brothers Holding Inc. (such subsidiary, "Lehman") that has filed for bankruptcy under Chapter 11 of Title 11

5

Confidential—For Professional Eyes Only
Mike Kunkel

EFH00003262

Confidential—For Professional Eyes Only
Mike Kunkel

of the United States Code, as amended (the "Bankruptcy Code"), but including $141 million of undrawn commitments from Lehman that are only available from the fronting banks and the swingline lender and $459 million of available letter of credit capacity), and Oncor had approximately $1.341 billion of additional available capacity under its revolving credit facility (excluding $122 million of undrawn commitments from Lehman). In addition, TCEH's senior secured credit facilities permit TCEH to issue up to $5.0 billion of secured notes or loans ranking junior to TCEH's senior secured borrowings.

Guarantees . . . . . . . . . . . . . . . . . . . . . . . . The notes will be unconditionally guaranteed, jointly and severally, by EFCH (the parent of TCEH) on a senior unsecured basis and EFIH (the parent of Oncor Holdings) on a senior secured basis (to the extent of the Collateral securing the guarantee).

The guarantees will:

- be general senior obligations of each guarantor;

- in the case of the guarantee from EFIH, be secured, equally and ratably with EFIH's guarantee of the EFH Corp. Notes and the EFIH Notes, by the pledge of any investments EFIH owns or holds in Oncor Holdings or any of its subsidiaries, which on the date the notes will be issued will consist of all of the membership interests it owns in Oncor Holdings;

- in the case of the guarantee from EFCH, not be secured;

- rank equally in right of payment with all existing and future senior indebtedness of each guarantor;

- in the case of the guarantee from EFIH, be effectively senior to all unsecured indebtedness of EFIH to the extent of the value of the Collateral securing such guarantee;

- be effectively subordinated to all secured indebtedness of each guarantor secured by assets other than the Collateral to the extent of the value of the assets securing such indebtedness;

- be structurally subordinated to any existing and future indebtedness and liabilities of subsidiaries of a guarantor that do not guarantee the notes, including the Oncor Subsidiaries in the case of EFIH, and TCEH and its subsidiaries in the case of EFCH, and any other unrestricted subsidiaries;

- be senior in right of payment to any future subordinated indebtedness of each guarantor; and

- be effectively senior, in the case of EFIH, to all obligations under any future junior lien debt with respect to the Collateral.

As of September 30, 2009, on a pro forma basis after giving effect to the issuance of the Senior Secured Notes and the notes, the EFCH guarantee would have been effectively junior to approximately $106 million principal amount of senior secured indebtedness of EFCH

6

Confidential—For Professional Eyes Only
Mike Kunkel

Highly Confidential

Confidential—For Professional Eyes Only
Mike Kunkel

(excluding EFCH's secured guarantee of $22.356 billion of senior secured borrowings by TCEH under its senior secured credit facilities). As of September 30, 2009, TCEH had approximately $2.195 billion of additional available senior secured capacity under its senior secured credit facilities (excluding amounts available under its senior secured cash posting credit facility and $41 million of commitments from Lehman, but including $141 million of undrawn commitments from Lehman that are only available from the fronting banks and the swingline lender and $459 million of available letter of credit capacity). In addition, its senior secured credit facilities permit TCEH to issue up to $5.0 billion of notes or loans ranking junior to TCEH's senior secured borrowings.

None of EFH Corp.'s other subsidiaries guarantee the notes. For the year ended December 31, 2008 and the nine months ended September 30, 2009, the non-guarantor subsidiaries generated all of EFH Corp.'s consolidated total revenue. In addition, as of September 30, 2009, the non-guarantor subsidiaries held substantially all of EFH Corp.'s consolidated total assets.

See "Risk Factors — Risks Related to the Notes and Our Substantial Indebtedness — The liabilities of each of EFH Corp. and EFCH currently exceed its assets as shown on its most recent balance sheet. If a court were to find that EFH Corp., EFCH or EFIH were insolvent before or after giving effect to this offering and did not receive reasonably equivalent value or fair consideration for the issuance of the notes or the incurrence of a guarantee or the pledge of the Collateral, as applicable, the court may void all or a portion of the obligations represented by the notes or the guarantee of the notes by EFCH or EFIH or the pledge of the Collateral by EFIH as a fraudulent conveyance."

| | |
|---|---|
| Security . . . . . . . . . . . . . . . . . . . . . . . . | EFIH's guarantee of the notes will be secured, equally and ratably with EFIH's guarantee of the EFH Corp. Notes and the EFIH Notes, by its pledge of 100% of the membership interests and other investments it owns or holds in Oncor Holdings. As of the date of this offering memorandum, $115.4 million of EFH Corp. Notes and $141.1 million of EFIH Notes were outstanding. See "Description of the Notes — Security for the Notes." See also "Risk Factors — Risks Related to the Notes and Our Substantial Indebtedness — The indenture governing the notes may not protect holders from all actions that EFH Corp., EFIH or the Oncor Subsidiaries may take that would reduce your interest in the Collateral or that may reduce the value of the Collateral, including sales or exchanges of the Collateral or the assets of the Oncor Subsidiaries for other assets or investments." |
| Optional Redemption  . . . . . . . . . . . . . . . | EFH Corp. may redeem any of the notes on and after January 15, 2015 at the redemption prices set forth in this offering memorandum. EFH Corp. may also redeem any of the notes at any time prior to January 15, 2015 at a price equal to 100% of their principal |

7

Highly Confidential

EFH00003264

Confidential--For Professional Eyes Only
Mike Kunkel

amount, plus accrued and unpaid interest and a "make-whole" premium. In addition, before January 15, 2013, EFH Corp. may redeem up to 35% of the aggregate principal amount of the notes, using the proceeds from certain equity offerings at the redemption price set forth in this offering memorandum. See "Description of the Notes — Optional Redemption."

Change of Control Offer . . . . . . . . . . . .   Upon the occurrence of certain transactions meeting the definition of "change of control," holders of the notes will have the right to require EFH Corp. to repurchase some or all of the notes at 101% of their face amount, plus accrued and unpaid interest to the repurchase date. This right is subject to important limitations. For example, this right will not apply to a transaction that would otherwise be a "change of control" if EFH Corp. complies with the provisions relating to a transfer of either the Oncor business or the TCEH business described below under "— Important Covenants" or if the transaction meets certain other requirements. See "Description of the Notes — Repurchase at the Option of Holders — Change of Control" and the definition of "Change of Control" under "Description of the Notes."

EFH Corp. may not be able to pay holders the required price for notes they present to it at the time of a change of control, because EFH Corp. may not have enough funds at that time or the terms of EFH Corp.'s other indebtedness or any of its subsidiaries' indebtedness, including TCEH's senior secured credit facilities, may prevent EFH Corp. from making such payment or receiving funds from its subsidiaries in an amount sufficient to fund such payment.

See "Risk Factors — Risks Related to the Notes and Our Substantial Indebtedness — EFH Corp. may not be able to repurchase the notes upon a change of control," "Risk Factors — Risks Related to the Notes and Our Substantial Indebtedness — We may transfer or dispose of our interests in EFIH or Oncor Holdings to a third party in a manner that would result in EFIH or such third party becoming the obligor under the notes, without EFH Corp. or EFIH being required to offer to repurchase such notes. The risks of an investment in the notes may increase further following such a transaction" and "Risk Factors — Risks Related to the Notes and Our Substantial Indebtedness — We may transfer or dispose of our interests in or the assets of TCEH to a third party without such third party becoming the obligor under the notes and without being required to offer to repurchase the notes."

Important Covenants . . . . . . . . . . . . . . .   The indenture governing the notes will contain covenants limiting EFH Corp.'s ability and the ability of its restricted subsidiaries to:

- pay dividends on or make distributions in respect of EFH Corp.'s capital stock or make other restricted payments;

- make investments (including investments in Oncor);

- incur additional debt or issue some types of preferred shares;

- create liens on assets to secure debt;

8

Confidential--For Professional Eyes Only
Mike Kunkel

EFH00003265

Confidential—For Professional Eyes Only
Mike Kunkel

- sell assets;

- consolidate, merge, sell or otherwise dispose of all or substantially all of their assets in certain circumstances;

- enter into certain transactions with their affiliates; and

- designate EFH Corp.'s subsidiaries as unrestricted subsidiaries.

These covenants are subject to a number of important limitations and exceptions. For example, the first to occur of the sale of all of the Oncor business (as defined under "Permitted Asset Transfer" under "Description of the Notes") and all of the TCEH business (as defined under "TCEH Transfer" under "Description of the Notes") will not be considered the sale of all or substantially all of EFH Corp.'s assets under the indenture so long as certain conditions are satisfied, in the case of the sale of the Oncor business, including the condition that the transferee assumes the obligations under the notes. The transferee in the case of a TCEH Transfer would not be required to assume such obligations. Certain other transactions (including certain intercompany transactions) involving the Oncor business will also not be considered the sale of all or substantially all of EFH Corp.'s assets. Additionally, up to an aggregate of $4.0 billion of indebtedness secured by a first priority lien on the Collateral, including the Senior Secured Notes and the notes, may be incurred under the indenture.

Oncor Holdings, the immediate parent of Oncor, and its subsidiaries and Comanche Peak Nuclear Power Company LLC, Nuclear Energy Future Holdings LLC and Nuclear Energy Future Holdings II LLC will be unrestricted subsidiaries under the indenture and, accordingly, will not be subject to any of the restrictive covenants in the indenture. See "Description of the Notes."

Exchange Offer; Registration Rights  . . .    EFH Corp. and the guarantors will use commercially reasonable efforts to register with the SEC a new issue of EFH Corp.'s debt securities having substantially identical terms as the notes (except for the provisions relating to the transfer restrictions and payment of additional interest) as part of an offer to exchange freely tradable exchange notes for the notes.

EFH Corp. and the guarantors will file with the SEC a registration statement relating to such exchange offer and will use commercially reasonable efforts to cause the registration statement to be declared effective within 360 days after the issue date of the notes. If required under special circumstances, EFH Corp. and the guarantors will file a shelf registration statement with the SEC covering resales of the notes.

If EFH Corp. and the guarantors fail to satisfy their obligations with respect to the registration of the notes (a "registration default"), the annual interest rate on the notes will increase by 25 basis points for the first 90-day period during which a registration default continues, and thereafter the annual interest rate on the notes will increase by 50

9

Confidential—For Professional Eyes Only
Mike Kunkel

Highly Confidential

Confidential—For Professional Eyes Only
Mike Kunkel

basis points over the interest rate shown on the cover of this offering memorandum for the remaining period during which a registration default continues. If all registration defaults are cured, the interest rate on the notes will revert to the original level.

Any amounts of additional interest due will be payable on the same interest payment dates as interest on the notes is payable. See "Description of the Notes — Exchange Offer; Registration Rights."

Transfer Restrictions . . . . . . . . . . . . . . . EFH Corp. has not registered the notes under the Securities Act or any state or other securities laws. The notes are subject to restrictions on transfer and may only be offered or sold in transactions exempt from, or not subject to, the registration requirements of the Securities Act. See "Notice to Investors."

No Prior Market  . . . . . . . . . . . . . . . . . The notes will be new securities for which there is currently no market. We cannot assure you as to the liquidity of markets that may develop for the notes, your ability to sell the notes or the price at which you would be able to sell the notes. The initial purchasers have advised us that they intend to make a market in the notes and, if issued pursuant to a registration rights exchange offer, in the exchange notes, as permitted by applicable laws and regulations; however, they are not obligated to do so, and they may discontinue their market-making activities at any time without notice. Additionally, certain of the initial purchasers may be restricted in their market-making activities. See "Risk Factors — Risks Related to the Notes and Our Substantial Indebtedness — Your ability to transfer the notes may be limited by the absence of an active trading market, and there is no assurance that any active market will develop for the notes."

Listing . . . . . . . . . . . . . . . . . . . . . . . . EFH Corp. does not intend to list the notes for trading on any securities exchange or automated quotation system.

Use of Proceeds . . . . . . . . . . . . . . . . . . The proceeds we receive from the issuance of the notes will be used for general or other corporate purposes, which may include, without limitation, working capital needs, investment in business initiatives, capital expenditures and prepayment or repurchase of outstanding indebtedness of EFH Corp. and/or its subsidiaries. See "Use of Proceeds."

Denominations  . . . . . . . . . . . . . . . . . . The notes will be issued in minimum denominations of $2,000 and integral multiples of $1,000 in excess thereof.

**Risk Factors** . . . . . . . . . . . . . . . . . . . . . **In addition to the other information included in or incorporated by reference into this offering memorandum, you should carefully consider the information set forth in the section entitled "Risk Factors" beginning on page 16 and those contained in our 2008 Form 10-K and our September 30, 2009 Form 10-Q, each of which is incorporated into this offering memorandum by reference, before deciding whether or not to invest in the notes.**

10

Confidential—For Professional Eyes Only
Mike Kunkel

Confidential--For Professional Eyes Only
Mike Kunkel

### Summary Historical Consolidated Financial Data

The following table sets forth our summary historical consolidated financial data as of and for the periods indicated. The historical financial data as of December 31, 2008 and 2007 (Successor) and for the year ended December 31, 2008 (Successor), the period from October 11, 2007 through December 31, 2007 (Successor), the period from January 1, 2007 through October 10, 2007 (Predecessor) and for the year ended December 31, 2006 (Predecessor) have been derived from our audited historical consolidated financial statements and related notes included in our 2008 Form 10-K, as recast in a Current Report on Form 8-K filed on May 20, 2009 to reflect the adoption of new accounting guidance related to noncontrolling interests (our "May 20, 2009 Form 8-K"), which is incorporated into this offering memorandum by reference. The historical financial data as of December 31, 2006, 2005 and 2004 (Predecessor) and for the years ended December 31, 2005 and 2004 (Predecessor) have been derived from our audited historical consolidated financial statements that are not included in our 2008 Form 10-K or our May 20, 2009 Form 8-K and are not included in or incorporated by reference into this offering memorandum. The "Predecessor" period reflects the period prior to the Merger, which occurred on October 10, 2007. The historical financial data as of September 30, 2009 and for the nine months ended September 30, 2009 and 2008 have been derived from our unaudited historical interim condensed consolidated financial statements and related notes included in our September 30, 2009 Form 10-Q, which is incorporated into this offering memorandum by reference. In EFH Corp.'s opinion, such unaudited interim financial data reflects all adjustments, consisting of normal recurring accruals, necessary for the fair presentation of the results for those periods. The results of operations for the interim periods, for seasonal and other factors, are not necessarily indicative of the results to be expected for the full year or any future period. See "Available Information" and "Incorporation by Reference."

11

Highly Confidential

EFH00003268

Confidential--For Professional Eyes Only
Mike Kunkel

The summary historical consolidated financial data should be read in conjunction with our 2008 Form 10-K, as recast in our May 20, 2009 Form 8-K, including the audited consolidated financial statements and related notes contained therein and the sections captioned "Selected Financial Data" and "Management's Discussion and Analysis of Financial Condition and Results of Operations," and our September 30, 2009 Form 10-Q, including the unaudited interim condensed consolidated financial statements and related notes contained therein and the section captioned "Management's Discussion and Analysis of Financial Condition and Results of Operations."

| | Successor | | Predecessor | | | |
|---|---|---|---|---|---|---|
| | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, | | |
| | | | | 2006 | 2005 | 2004 |
| | (millions of dollars, except ratios and per share amounts) | | | | | |
| **Statement of Income Data:** | | | | | | |
| Operating revenues(a) . . . . . . . . . . . . | $11,364 | $ 1,994 | $8,044 | $10,703 | $10,826 | $9,319 |
| Income (loss) from continuing operations before extraordinary gain (loss) and cumulative effect of changes in accounting principles . . . | (9,998) | (1,361) | 699 | 2,465 | 1,775 | 81 |
| Income from discontinued operations, net of tax effect . . . . . . . . . . . . . . . . . | —— | 1 | 24 | 87 | 5 | 378 |
| Extraordinary gain (loss), net of tax effect . . . . . . . . . . . . . . . . . . . . . . . . | —— | —— | — | —— | (50) | 16 |
| Cumulative effect of changes in accounting principles, net of tax effect . . . . . . . . . . . . . . . . . . . . . . . . | —— | —— | — | —— | (8) | 10 |
| Exchangeable preferred membership interest buyback premium . . . . . . . . | —— | —— | — | —— | — | 849 |
| Preference stock dividends . . . . . . . . . | —— | —— | — | —— | 10 | 22 |
| Net income (loss) . . . . . . . . . . . . . . . . | (9,998) | (1,360) | 723 | 2,552 | 1,712 | (386) |
| Net loss attributable to noncontrolling interests . . . . . . . . . . . . . . . . . . . . . . | 160 | —— | — | —— | —— | —— |
| Net income (loss) attributable to EFH Corp. . . . . . . . . . . . . . . . . . . . . . . . . | (9,838) | (1,360) | 723 | 2,552 | 1,712 | (386) |
| Dividends declared per share . . . . . . . . | $ —— | $ —— | $ 1.30 | $ 1.67 | $ 1.26 | $ 0.47 |
| Ratio of earnings to fixed charges(b) . . . . . . . . . . . . . . . . . . . | —— | —— | 2.30 | 5.11 | 3.80 | 1.16 |
| Ratio of earnings to combined fixed charges and preference dividends(b) . . . . . . . . . . . . . . . . . . | —— | —— | 2.30 | 5.11 | 3.74 | 1.11 |

12

Confidential--For Professional Eyes Only
Mike Kunkel

Highly Confidential

EFH00003269

Confidential—For Professional Eyes Only
Mike Kunkel

|  | Successor | | Predecessor | | | |
|---|---|---|---|---|---|---|
|  | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, | | |
|  |  |  |  | 2006 | 2005 | 2004 |
|  |  |  | (millions of dollars) | | | |
| **Statement of Cash Flows Data:** | | | | | | |
| Cash flows provided by (used in) operating activities from continuing operations . . . . . . . . . | $ 1,505 | $ (450) | $ 2,265 | $ 4,954 | $ 2,793 | $ 1,758 |
| Cash flows provided by (used in) financing activities from continuing operations . . . . . . . . . | 2,837 | 33,865 | 1,394 | (2,332) | (1,563) | (6,519) |
| Cash flows provided by (used in) investing activities from continuing operations . . . . . . . . . | (2,934) | (34,563) | (2,283) | (2,664) | (1,038) | 4,280 |
| **Other Financial Data:** | | | | | | |
| Capital expenditures, including nuclear fuel . . . . . . . . . . . . . . . . . | $ 2,978 | $ 707 | $ 2,395 | $ 2,297 | $ 1,104 | $ 999 |

|  | Successor | | Predecessor | | |
|---|---|---|---|---|---|
|  | December 31, | | December 31, | | |
|  | 2008 | 2007 | 2006 | 2005 | 2004 |
|  |  |  | (millions of dollars) | | |
| **Balance Sheet Data:** | | | | | |
| Total assets(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $59,263 | $64,804 | 27,216 | $27,978 | $24,059 |
| Property, plant & equipment — net . . . . . . . . . . . . . . . . . . . . . . . | 29,522 | 28,650 | 18,569 | 17,006 | 16,495 |
| Goodwill and intangible assets . . . . . . . . . . . . . . . . . . . . . . . . . . | 17,379 | 27,319 | 729 | 728 | 723 |
| Total debt(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 42,460 | 40,834 | 12,607 | 13,380 | 12,851 |
| Preferred stock of subsidiaries(e) . . . . . . . . . . . . . . . . . . . . . . . | — | — | — | — | 38 |
| Total equity(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (2,177) | 6,685 | 2,140 | 475 | 639 |

(a)  The operating revenues shown above reflect the change in classification for commodity hedging and trading activities discussed in Note 1 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2008 included in our 2008 Form 10-K, as recast in our May 20, 2009 Form 8-K that resulted in an increase in operating revenues of $1.492 billion and $554 million for the Successor period from October 11 through December 31, 2007 and the Predecessor period from January 1 through October 10, 2007, respectively, a decrease of $153 million for the year ended December 31, 2006, and an increase of $164 million and $103 million for the years ended December 31, 2005 and 2004, respectively.

(b)  Fixed charges and combined fixed charges and preference dividends exceeded "earnings" (net loss) by $10.469 billion and $2.034 billion for the year ended December 31, 2008 and for the period from October 11, 2007 through December 31, 2007, respectively.

(c)  The total assets shown above reflect the change in presentation related to our adoption of accounting guidance related to the presentation of assets and liabilities with the legal right of offset (formerly FASB Staff Position FIN No. 39-1, *Amendment of FASB Interpretation No. 39* ("FSP FIN 39-1")), as discussed in Note 1 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2008 included in our 2008 Form 10-K, as recast in our May 20, 2009 Form 8-K. Such change in presentation resulted in an increase of $1.020 billion, $1.383 billion, $2.439 billion and $870 million in our total assets and total liabilities as of December 31, 2007, 2006, 2005 and 2004, respectively, as compared to amounts reported in EFH Corp.'s Annual Report on Form 10-K for the year ended December 31, 2007.

13

Confidential—For Professional Eyes Only
Mike Kunkel

Confidential—For Professional Eyes Only
Mike Kunkel

(d)  Includes long-term debt, including amounts due currently, and short-term borrowings. Also includes equity-linked debt securities in the amount of $179 million and $285 million for years ended December 31, 2005 and 2004, respectively.

(e)  Preferred stock outstanding at the end of 2008, 2007, 2006 and 2005 has a stated amount of $51 thousand.

(f)  Total equity as of December 31, 2008 includes noncontrolling interests in subsidiaries of $1.355 billion.

Although EFH Corp. continued as the same legal entity after the Merger, its "Summary Historical Consolidated Financial Data" for periods preceding the Merger and for the periods succeeding the Merger are presented as the consolidated financial statements of the "Predecessor" and the "Successor," respectively. The consolidated financial statements of the Predecessor have been prepared on the same basis as EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2007, which are not incorporated by reference into this offering memorandum, with the exception of a change in presentation related to EFH Corp.'s adoption of accounting guidance related to the presentation of assets and liabilities with the legal right of offset (formerly FSP FIN 39-1) and a change in classification to report the results of commodity hedging and trading activities on a separate line in the statement of consolidated income (loss) instead of within operating revenues. (See "Basis of Presentation" in Note 1 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2008 included in our 2008 Form 10-K, as recast in our May 20, 2009 Form 8-K). The consolidated financial statements of the Successor also reflect the application of "purchase accounting" and the adoption of amended guidance for accounting for noncontrolling interests in consolidated financial statements (formerly Statement of Financial Accounting Standards No. 160, "Noncontrolling Interests in Consolidated Financial Statements — an amendment of ARB No. 51" ("SFAS 160")).

Results for 2008 were significantly impacted by impairment charges related to goodwill, trade name and emission allowances intangible assets and natural gas-fueled generation plants. Results for 2004 were significantly impacted by charges related to EFH Corp.'s comprehensive restructuring plan.

|  | Successor | |
|---|---|---|
|  | Nine Months Ended September 30, 2009 | Nine Months Ended September 30, 2008 |
|  | (millions of dollars, except ratios) | |
| **Statement of Income Data:** | | |
| Operating revenues | $7,366 | $9,001 |
| Net income (loss) | 261 | (983) |
| Net income attributable to noncontrolling interests | (54) | — |
| Net income (loss) attributable to EFH Corp. | 207 | (983) |
| Ratio of earnings to fixed charges(a) | 1.21 | — |
| Ratio of earnings to combined fixed charges and preference dividends(a) | 1.21 | — |

|  | Successor | |
|---|---|---|
|  | Nine Months Ended September 30, 2009 | Nine Months Ended September 30, 2008 |
|  | (millions of dollars) | |
| **Statement of Cash Flows Data:** | | |
| Cash flows provided by operating activities | $ 1,743 | $   957 |
| Cash flows provided by financing activities | 420 | 3,052 |
| Cash flows used in investing activities | (2,127) | (2,374) |
| **Other Financial Data:** | | |
| Capital expenditures, including nuclear fuel | $ 2,004 | $ 2,179 |

14

Confidential—For Professional Eyes Only
Mike Kunkel

Confidential—For Professional Eyes Only
Mike Kunkel

|  | Successor |
|---|---|
|  | September 30, 2009 |
|  | (millions of dollars) |
| **Balance Sheet Data:** | |
| Total assets | $59,651 |
| Property, plant & equipment — net | 30,019 |
| Goodwill and intangible assets | 17,223 |
| Total debt(b) | 43,205 |
| Total equity(c) | (1,814) |

(a)  Fixed charges and combined fixed charges and preference dividends exceeded "earnings" by $1.445 billion for the nine months ended September 30, 2008.

(b)  Includes long-term debt, including amounts due currently, and short-term borrowings.

(c)  Total equity as of September 30, 2009 includes noncontrolling interests in subsidiaries of $1.420 billion.

Confidential—For Professional Eyes Only
Mike Kunkel

Highly Confidential

EFH00003272

Confidential—For Professional Eyes Only
Mike Kunkel

## RISK FACTORS

*You should carefully consider the risk factors set forth below and the risk factors incorporated into this offering memorandum by reference to our 2008 Form 10-K and our September 30, 2009 Form 10-Q, as well as the other information contained in and incorporated by reference into this offering memorandum before deciding to invest in the notes. The selected risks described below and the risks that are incorporated into this offering memorandum by reference to our 2008 Form 10-K and our September 30, 2009 Form 10-Q are not our only risks. Additional risks and uncertainties not currently known to us or those we currently view to be immaterial also may materially and adversely affect our business, financial condition or results of operations. Any of the following risks or any of the risks described in our 2008 Form 10-K and our September 30, 2009 Form 10-Q could materially and adversely affect our business, financial condition, operating results or cash flow. In such a case, the trading price of the notes could decline, or we may not be able to make payments of interest and principal on the notes, and you may lose all or part of your original investment.*

### Risks Related to the Notes and Our Substantial Indebtedness

***Our substantial leverage could adversely affect our ability to raise additional capital to fund our operations, limit our ability to react to changes in the economy or our industry, expose us to interest rate risk to the extent of our variable rate debt and prevent us from meeting obligations under the various debt agreements governing our indebtedness.***

We are highly leveraged. As of September 30, 2009, our consolidated principal amount of debt (short-term borrowings and long-term debt, including amounts due currently) totaled $43.996 billion (see Note 15 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2008 included in our 2008 Form 10-K, as recast in our May 20, 2009 Form 8-K and Note 4 to EFH Corp.'s historical condensed consolidated financial statements for the nine months ended September 30, 2009 included in our September 30, 2009 Form 10-Q). Our substantial leverage could have important consequences, including:

- making it more difficult for us to make payments on our indebtedness;

- requiring a substantial portion of cash flow from operations to be dedicated to the payment of principal and interest on indebtedness, therefore reducing our ability to use our cash flow to fund operations, capital expenditures and future business opportunities and execute our strategy;

- increasing our vulnerability to adverse economic, industry or competitive developments;

- exposing us to the risk of increased interest rates because, as of September 30, 2009, taking into consideration interest swap transactions, 7% of our long-term borrowings were at variable rates of interest;

- limiting our ability to make strategic acquisitions or causing us to make non-strategic divestitures;

- limiting our ability to obtain additional financing for working capital, capital expenditures, product development, debt service requirements, acquisitions and general corporate or other purposes, or to refinance existing debt; and

- limiting our ability to adjust to changing market conditions and placing us at a competitive disadvantage compared to competitors who are less highly leveraged and who, therefore, may be able to take advantage of opportunities that we cannot due to our substantial leverage.

A substantial amount of this indebtedness is comprised of our indebtedness under TCEH's senior secured credit facilities, substantially all of which matures in October 2014. We may not be able to refinance TCEH's senior secured credit facilities or our other existing indebtedness because of our high levels of debt and debt incurrence restrictions under our debt agreements or because of adverse conditions in credit markets generally.

16

Confidential—For Professional Eyes Only
Mike Kunkel

EFH00003273

Confidential—For Professional Eyes Only
Mike Kunkel

*Despite our current high indebtedness level, we may still be able to incur substantially more indebtedness. This could further exacerbate the risks associated with the notes and our other indebtedness.*

We may be able to incur additional indebtedness in the future. Although our debt agreements contain restrictions on the incurrence of additional indebtedness, these restrictions are subject to a number of significant qualifications and exceptions, and under certain circumstances, the amount of indebtedness that could be incurred in compliance with these restrictions could be substantial. The indenture governing the notes will allow EFH Corp. to incur up to an aggregate of $4.0 billion of debt, including the Senior Secured Notes and the notes, which would be secured on a parity lien basis by the Collateral, and a substantial amount of additional indebtedness, which additional indebtedness may be secured by a junior-priority security interest in the Collateral or by assets of EFH Corp. or EFIH other than the Collateral. If new debt is added to our existing debt levels, the related risks that we now face would intensify. See "Description of the Notes."

*EFH Corp.'s and its subsidiaries' debt agreements contain restrictions that limit flexibility in operating its businesses.*

EFH Corp.'s and its subsidiaries' debt agreements, including the indenture governing the notes, contain various covenants and other restrictions that limit the ability of EFH Corp. and/or its restricted subsidiaries to engage in specified types of transactions and may adversely affect the ability to operate its businesses. These covenants and other restrictions limit EFH Corp.'s and/or its restricted subsidiaries' ability to, among other things:

- incur additional indebtedness or issue preferred shares;

- pay dividends on, repurchase or make distributions in respect of capital stock or make other restricted payments;

- make investments;

- sell or transfer assets;

- create liens;

- consolidate, merge, sell or otherwise dispose of all or substantially all of its or their assets;

- enter into transactions with its or their affiliates; and

- repaying, repurchasing or modifying certain subordinated and other material debt.

There are a number of important limitations and exceptions to these covenants and other restrictions. See Note 15 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2008 included in our 2008 Form 10-K, as recast in our May 20, 2009 Form 8-K, and "Description of the Notes" for a description of these covenants and other restrictions.

Under the TCEH's senior secured credit facilities, TCEH is required to maintain a leverage ratio below specified levels. TCEH's ability to maintain its leverage ratio below such levels can be affected by events beyond its control, and there can be no assurance that it will meet any such ratio.

A breach of any of these covenants or restrictions could result in an event of default under one or more of EFH Corp.'s and its subsidiaries' debt agreements, including as a result of cross default provisions. Upon the occurrence of an event of default under one of the debt agreements, the lenders could elect to declare all amounts outstanding under that debt agreement to be immediately due and payable and/or terminate all commitments to extend further credit. Such actions by those lenders could cause cross defaults under EFH Corp.'s and its subsidiaries' other indebtedness. If EFH Corp. or one of its subsidiaries was unable to repay those amounts, the lenders could proceed against any collateral granted to them to secure such indebtedness. If lenders accelerate the repayment of borrowings, EFH Corp. or such subsidiary may not have sufficient assets and funds to repay those borrowings.

17

Confidential—For Professional Eyes Only
Mike Kunkel

Highly Confidential

Confidential—For Professional Eyes Only
Mike Kunkel

In addition, as described in "The Transactions —— Ring-Fencing," EFH Corp. and Oncor have implemented a number of "ring-fencing" measures to further separate Oncor, its immediate parent, Oncor Holdings, and Oncor Holdings' other subsidiaries, from Texas Holdings and its other subsidiaries. Those measures include, among other things:

- Oncor being treated as an unrestricted subsidiary with respect to certain EFH Corp. indebtedness;

- Oncor not being restricted from incurring its own indebtedness;

- Oncor not guaranteeing or pledging any of its assets to secure the indebtedness of Texas Holdings and its other subsidiaries; and

- restrictions on dividends and the right of the independent members of Oncor's board of directors and the minority member of Oncor to block the payment of dividends.

*We may not be able to generate sufficient cash to service all of our indebtedness, including the notes, and may be forced to take other actions to satisfy our obligations under our debt agreements, which may not be successful.*

Our ability to make scheduled payments on or to refinance our debt obligations depends on our financial condition and operating performance, which is subject to prevailing economic and competitive conditions and to certain financial, business and other factors beyond our control. We may not be able to maintain a level of cash flows from operating activities sufficient to permit us to pay the principal, premium, if any, and interest on our indebtedness, including the notes.

If cash flows and capital resources are insufficient to fund our and our subsidiaries' debt service obligations, we or our subsidiaries could face substantial liquidity problems and might be forced to reduce or delay investments and capital expenditures, or to dispose of assets or operations, seek additional capital or restructure or refinance indebtedness, including the notes. These alternative measures may not be successful or may not be adequate for us and our subsidiaries to meet our debt service obligations then due. Additionally, our and our subsidiaries' debt agreements, including the indentures governing the notes, the Senior Secured Notes, the 2017 Notes and TCEH's senior secured credit facilities, limit the use of the proceeds from any disposition of assets or operations. As a result, we may not be allowed, under these documents, to use proceeds from such dispositions to satisfy all current debt service obligations.

*Increases in interest rates may negatively impact our operating results and financial condition.*

Certain of our borrowings, to the extent the interest rate is not fixed by interest rate swaps, are at variable rates of interest. An increase in interest rates would have a negative impact on our results of operations by causing an increase in interest expense.

At September 30, 2009, we had $3.1 billion aggregate principal amount of variable rate long-term indebtedness (excluding $1.135 billion of long-term borrowings associated with the senior secured letter of credit facility of TCEH that are invested at a variable rate), taking into account interest rate swaps that fix the interest rate on $17.55 billion in notional amount of variable rate indebtedness. As a result, as of September 30, 2009, the impact of a 100 basis point increase in interest rates would increase our annual interest expense by approximately $31 million. See discussion of interest rate swap transactions in Note 4 to EFH Corp.'s historical condensed consolidated financial statements for the nine months ended September 30, 2009 included in our September 30, 2009 Form 10-Q.

Our interest expense for the nine months ended September 30, 2009 was $2.136 billion.

*If we or any of our subsidiaries default on obligations to pay indebtedness, we may not be able to make payments on the notes.*

Any default under our or our subsidiaries' debt agreements that is not waived by the required lenders or noteholders, and the remedies sought by the holders of such indebtedness, could prevent us from paying

18

Confidential—For Professional Eyes Only
Mike Kunkel

Highly Confidential

Confidential--For Professional Eyes Only
Mike Kunkel

principal, premium, if any, and interest on the notes, which could substantially decrease the market price of the notes. If our subsidiaries are unable to generate sufficient cash flows and we are otherwise unable to obtain funds necessary to meet required payments of principal, premium, if any, and interest on our indebtedness, or if we or our subsidiaries otherwise fail to comply with the various covenants, including any financial and operating covenants, in the instruments governing our or their indebtedness, we or they could be in default under the terms of the agreements governing such indebtedness. In the event of such default, the holders of such indebtedness could elect to declare all the funds borrowed thereunder to be due and payable, together with accrued and unpaid interest, and/or the lenders could elect to terminate their commitments thereunder, cease making further loans and, in the case of the lenders under TCEH's senior secured credit facilities or the holders of the Senior Secured Notes, institute foreclosure proceedings against the pledged assets, and we could be forced into bankruptcy, liquidation or insolvency. If the operating performance of our subsidiaries declines, we or certain of our subsidiaries, including TCEH, may in the future need to obtain waivers from the required lenders or noteholders to avoid being in default. If our subsidiaries breach the covenants under TCEH's senior secured credit facilities or the indenture governing the TCEH 2015/2016 Notes and seek a waiver, they may not be able to obtain a waiver from the required lenders. If this occurs, such subsidiaries would be in default under the instrument governing that indebtedness, the lenders could exercise their rights, as described above, and such subsidiaries could be forced into bankruptcy, liquidation or insolvency.

**_The majority of our subsidiaries will not guarantee the notes. As a result, the notes will be structurally subordinated to all liabilities of our subsidiaries that do not guarantee the notes._**

The notes will initially be guaranteed on a senior secured basis by EFIH and on a senior unsecured basis by EFCH, but the notes will not initially be guaranteed by any of EFH Corp.'s other subsidiaries. None of EFH Corp., EFIH or EFCH has any operations, and each relies on distributions from its subsidiaries. However, EFH Corp.'s historical consolidated financial statements incorporated into this offering memorandum by reference reflect the results of operations and assets, among other things, of all of EFH Corp.'s subsidiaries. EFH Corp.'s non-guarantor subsidiaries generated all of its consolidated revenues for the year ended December 31, 2008 and for the nine months ended September 30, 2009, and as of September 30, 2009, EFH Corp.'s non-guarantor subsidiaries held substantially all of its consolidated total assets.

EFH Corp.'s non-guarantor subsidiaries (including Oncor Holdings and Oncor and its subsidiaries) are separate and distinct legal entities and have no obligation, contingent or otherwise, to pay any amounts due pursuant to the notes, or to make any funds available therefore, whether by dividends, loans, distributions or other payments. The notes will be structurally subordinated to indebtedness and other liabilities of EFH Corp.'s subsidiaries that do not guarantee the notes. The claims of creditors of each of the non-guarantor subsidiaries, including trade creditors, will have priority as to the assets of these subsidiaries. In the event of a bankruptcy, liquidation or insolvency of any of these subsidiaries, these subsidiaries will pay the holders of their debts, holders of preferred equity interests and their trade creditors before they will be able to distribute any of their assets to EFH Corp. In addition, the guarantee of the notes by EFCH is structurally subordinated to the indebtedness of TCEH, the principal amount of which, as of September 30, 2009, was $30.957 billion (including long-term debt, including amounts due currently, and short-term borrowings), as well as any other indebtedness of the other subsidiaries of EFCH. See Note 29 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2008 included in our 2008 Form 10-K, as recast in our May 20, 2009 Form 8-K and Note 14 to EFH Corp.'s historical condensed consolidated financial statements for the nine months ended September 30, 2009 included in our September 30, 2009 Form 10-Q for financial information regarding EFH Corp.'s subsidiaries. See "Incorporation by Reference." Additionally, EFH Corp. may be able to designate each of EFCH and TCEH as an "Unrestricted Subsidiary" under the indenture that governs the notes. If they are so designated, EFCH and TCEH will not be subject to the restrictive covenants contained in the indenture governing the notes, and EFCH's guarantee of the notes will be released.

19

Confidential--For Professional Eyes Only
Mike Kunkel

Confidential—For Professional Eyes Only
Mike Kunkel

***Under the terms of the indenture governing the TCEH 2015/2016 Notes and TCEH's senior secured credit facilities, TCEH is restricted from making certain payments to EFH Corp.***

EFH Corp. is a holding company and substantially all of its consolidated assets are held by its subsidiaries. As of September 30, 2009, TCEH and its subsidiaries held approximately 71% of EFH Corp.'s consolidated assets. Accordingly, EFH Corp. depends upon TCEH for a significant amount of its cash flows and ability to pay its obligations, including its obligations under the notes. For the year ended December 31, 2008 and the nine months ended September 30, 2009, TCEH and its subsidiaries represented approximately 86% and 83%, respectively, of EFH Corp.'s consolidated revenues. However, under the terms of the indenture governing the TCEH 2015/2016 Notes and TCEH's senior secured credit facilities, TCEH is restricted from making certain payments to EFH Corp., except in the form of certain loans to cover certain of EFH Corp.'s obligations and dividends and distributions in certain other limited circumstances if permitted by applicable state law. Further, the indenture governing the TCEH 2015/2016 Notes and TCEH's senior secured credit facilities do not permit such intercompany loans to service EFH Corp. debt unless required for EFH Corp. to pay principal, premium and interest when due on indebtedness incurred by EFH Corp. to finance the Merger or that was in existence prior to the Merger, or any indebtedness incurred by EFH Corp. to replace, refund or refinance such debt. Such loans are also permitted to service other debt, subject to limitations on the amount of the loans. As a result, unless and until the net proceeds from this offering are used to replace, refund or refinance EFH Corp. debt, intercompany loans from TCEH to EFH Corp. to make payments on the notes will be restricted. In addition, TCEH is prohibited from making certain loans to EFH Corp. if certain events of default under the indenture governing the TCEH 2015/2016 Notes or TCEH's senior secured credit facilities have occurred and are continuing.

***Under the terms of the indenture governing the EFIH Notes, EFIH is restricted from making certain payments to EFH Corp.***

EFH Corp. is a holding company and substantially all of its consolidated assets are held by its subsidiaries. As of September 30, 2009, EFIH and its subsidiaries held approximately 26% of EFH Corp.'s consolidated assets and represented approximately 17% of EFH Corp.'s consolidated revenues. Accordingly, EFH Corp. depends upon EFIH for a significant amount of its cash flows to pay its obligations. However, under the terms of the indenture governing the EFIH Notes, EFIH is restricted from making certain payments, including dividends and loans, to EFH Corp., except in limited circumstances.

***The indenture governing the notes will not limit or restrict the activities of Oncor Holdings and its subsidiaries.***

Oncor Holdings and its subsidiaries will not be "Restricted Subsidiaries" under the indenture governing the notes (except under certain circumstances, such as in connection with the calculation of the "fixed charge coverage ratio" or "consolidated leverage ratio" for purposes of making certain restricted payments; see "Description of the Notes"). As of the date the notes are issued, EFIH's subsidiaries (other than EFIH Finance, the co-issuer of the EFIH Notes) will consist only of Oncor Holdings and its subsidiaries, all of which will be unrestricted subsidiaries of EFH Corp. Accordingly, none of EFIH's subsidiaries (other than EFIH Finance) will be subject to the restrictive covenants contained in the notes, described under "Description of the Notes," and none of EFIH's subsidiaries will guarantee the notes.

Because Oncor Holdings and its subsidiaries will be unrestricted subsidiaries of EFH Corp. under the indenture governing the notes and will therefore not be subject to any of the restrictive covenants therein, the indenture will not serve to limit or restrict the ability of Oncor Holdings or its subsidiaries to take any actions or enter into any transactions that would impair their ability to dividend funds to EFH Corp. to make payments on the notes and other debt of EFH Corp., or that would negatively affect the value of EFIH's equity interests in Oncor Holdings that are pledged as Collateral for the notes, such as incurring debt, selling or transferring all or a portion of the assets of Oncor Holdings or its subsidiaries, entering into joint ventures, dividending out assets or engaging in speculative investments. Certain actions that would negatively affect the value of the Collateral may increase the ability of EFH Corp. to make restricted payments.

20

Confidential—For Professional Eyes Only
Mike Kunkel

Confidential—For Professional Eyes Only
Mike Kunkel

***EFH Corp. has a very limited ability to control activities at Oncor due to structural and operational "ring-fencing" measures.***

EFH Corp. depends upon Oncor for a significant amount of its cash flows and ability to pay its obligations. However, EFH Corp. has a very limited ability to control the activities of Oncor. As part of the ring-fencing measures related to Oncor as implemented by EFH Corp. and Oncor, a majority of the members of Oncor's board of directors are required to meet the New York Stock Exchange requirements for independence in all material respects, and the unanimous consent of such directors is required for Oncor to take certain actions. In addition, any new independent directors are required to be appointed by the nominating committee of Oncor Holdings' board of directors, a majority of whose members are independent directors. No member of EFH Corp.'s management is a member of Oncor's board of directors. Under Oncor Holdings' and Oncor's organizational documents, EFH Corp. has the right, indirectly, to consent to new issuances of securities by Oncor, material transactions with third parties involving Oncor outside of the ordinary course of business, actions that cause Oncor's assets to increase the level of jurisdiction of the FERC, any changes to the state of formation of Oncor, material changes to accounting methods not required by U.S. generally accepted accounting principles ("GAAP"), and actions that fail to enforce certain tax sharing obligations between Oncor and EFH Corp. See "The Transactions — Ring-Fencing." In addition, there are restrictions on Oncor's ability to make distributions to its members, including indirectly to EFH Corp.

***EFCH's guarantee of the notes is effectively subordinated to those lenders who have a security interest in its assets.***

EFCH's obligations under its guarantee of the notes are unsecured, but its obligations under its guarantee of TCEH's senior secured credit facilities are secured by a security interest in substantially all of its tangible and intangible assets. If EFCH were unable to pay under its guarantee of TCEH's senior secured credit facilities, the lenders could foreclose on the pledged assets described above to the exclusion of holders of the notes, even if an event of default exists under the indenture governing the notes at such time. In any such event, because the guarantee of the notes will not be secured by any of EFCH's assets, it is possible that there would be no assets remaining from which your claims as a noteholder could be satisfied or, if any assets remained, they might be insufficient to fully satisfy your claims as a noteholder under such guarantee.

***The notes will be secured only to the extent of the value of the assets that have been granted as security for EFIH's guarantee of the notes.***

The Collateral securing EFIH's guarantee of the notes will include only EFIH's membership interests and other investments that EFIH owns or holds in Oncor Holdings and its subsidiaries (which will initially consist of 100% of the membership interests of Oncor Holdings, which are owned by EFIH), but does not include any assets of Oncor Holdings or its subsidiaries. Oncor Holdings owns approximately 80% of Oncor. No appraisals of any of the Collateral securing the guarantee by EFIH of the notes have been prepared by or on behalf of EFH Corp. The fair market value of the Collateral may not be sufficient to repay the holders of the notes upon any foreclosure. The fair market value of the membership interests of Oncor Holdings is subject to fluctuations based on factors that include, among other things, the financial results and prospects of Oncor Holdings and its subsidiaries and its ability to implement its business strategy, Oncor's capital structure and the amount of its other existing indebtedness (as to which EFH Corp. will have no control), applicable regulatory approvals that may be required to foreclose on the membership interests of Oncor Holdings and subsequently dispose of the membership interests of Oncor Holdings, the ability to sell the membership interests of Oncor Holdings in an orderly sale, general economic conditions, the availability of buyers and similar factors. Furthermore, upon a foreclosure on the Collateral, holders may be limited in their ability to obtain the best price for the Collateral if they are unable to exercise a "drag-along" right to force Texas Transmission Investment LLC ("Texas Transmission"), Oncor's primary noncontrolling owner, to sell its membership interests pursuant to the terms of the investor rights agreement, dated November 5, 2007, among EFH Corp., Oncor Holdings, Oncor and Texas Transmission (the "Investor Rights Agreement"). In addition, a court could limit recoverability if it were to apply non-New York law to a proceeding and deem a portion of the interest claim usurious in violation of public

Confidential—For Professional Eyes Only
Mike Kunkel

Highly Confidential

Confidential--For Professional Eyes Only
Mike Kunkel

policy. The amount to be received upon a sale of any Collateral would be dependent on numerous factors, including but not limited to the actual fair market value of the Collateral at such time, general, market and economic conditions and the timing and the manner of the sale.

EFIH's guarantee of the EFH Corp. Notes and the EFIH Notes are also secured by the Collateral, equally and ratably with the notes.

In the event that a bankruptcy or similar proceeding is commenced by or against EFH Corp., if at the time of the filing the value of the membership interests of Oncor Holdings and other Collateral is less than the amount of principal and accrued and unpaid interest on the notes and the Senior Secured Notes, interest may cease to accrue on the notes thereafter. If at the time of the filing the value of the membership interests of Oncor Holdings and other Collateral is greater than the amount of principal and accrued and unpaid interest on the notes and the Senior Secured Notes, interest may nevertheless cease to accrue at a subsequent time if at such time the value ceases to be in excess of the principal and accrued and unpaid interest. It is possible, given the broad discretionary powers of a bankruptcy court, even if at the time of the filing the value of the membership interests of Oncor Holdings and other Collateral is greater than the amount of principal and accrued and unpaid interest on the notes and the Senior Secured Notes on the date of filing, claims on the membership interests of Oncor Holdings and other Collateral for interest accruing from and after the date the bankruptcy petition is filed might not be allowed. In the event of a foreclosure, liquidation, bankruptcy or similar proceeding, the proceeds from any sale of the membership interests of Oncor Holdings and other Collateral may not be sufficient to pay the obligations due under the notes.

To the extent that the claims of the holders of the notes and the Senior Secured Notes exceed the value of the membership interests of Oncor Holdings and other Collateral, those claims will rank equally with the claims of the holders of EFH Corp.'s then outstanding senior notes and other senior debt. As a result, if the value of the membership interests of Oncor Holdings and other Collateral is less than the value of the claims of the holders of the notes and the Senior Secured Notes, those claims may not be satisfied in full.

The security interest granted in favor of the collateral trustee is subject to practical problems generally associated with the realization of security interests in collateral. For example, the collateral trustee may need to obtain the consent of a third party to obtain or enforce a security interest in a contract, and we cannot assure you that the collateral trustee will be able to obtain any such consent. The consents of any third parties may not be given when required to facilitate a foreclosure on any particular assets. Accordingly, the collateral trustee may not have the ability to foreclose upon such assets, and the value of the Collateral may significantly decrease.

***Regulatory approvals may be required in order to enforce the security interests in the Collateral and to dispose of an interest in, or operational control of, the Collateral that secures EFIH's guarantee of the notes.***

The Collateral securing EFIH's guarantee of the notes will include all of EFIH's membership interests and other investments that EFIH owns or holds in Oncor Holdings and its subsidiaries. Pursuant to the Public Utility Regulatory Act ("PURA"), Texas Utilities Code §§39.262(I) and 39.915, an electric utility must obtain prior PUCT approval of any change in majority ownership, controlling ownership or operational control of Oncor. As a result, prior to any foreclosure on the membership interests of Oncor Holdings, approval of the PUCT may be required for a change in ownership or control of Oncor Holdings. Pursuant to PURA §§39.262(m) and 39.915(b), the PUCT will approve such a transfer if it finds that the transaction is in the public interest. In making its determination, these sections of PURA provide that the PUCT will consider whether the transaction will adversely affect the reliability of service, availability of service or cost of service of Oncor. Therefore, in connection with any action taken to enforce the security against the Collateral, such approval may not be granted and, if it were to be granted, it is not known how long it would take to obtain such approval. Even if the approval were granted to foreclose on the Collateral, then additional prior PUCT approval may also be required for any subsequent change in majority ownership, controlling ownership or operational control in the membership interests of Oncor Holdings. Additionally, Texas Holdings has committed to hold a majority ownership interest in Oncor through October 10, 2012. This commitment is incorporated in the Order on Rehearing in PUCT Docket No. 34077.

22

Confidential--For Professional Eyes Only
Mike Kunkel

Highly Confidential

Confidential—For Professional Eyes Only
Mike Kunkel

In addition, pursuant to the terms of the Investor Rights Agreement, any transfer of the equity interests in Oncor Holdings to a third party, including as a result of any enforcement of the lien on the Collateral securing EFIH's guarantee of the notes, EFIH's guarantee of the EFH Corp. Notes and the EFH Notes, may be limited and give rise to a tag-along right of Texas Transmission, the primary noncontrolling investor in Oncor, to participate in that transfer on a pro rata basis, which may hinder the enforcement of the lien on the Collateral in a timely manner, if at all. See "The Transactions — Sale of Noncontrolling Interests in Oncor" for a description of the Investor Rights Agreement.

### In the event of EFH Corp.'s bankruptcy, the ability of the holders of the notes to realize upon the Collateral securing EFIH's guarantee of the notes will be subject to certain bankruptcy law limitations.

The right of the trustee for the notes to repossess and dispose of the Collateral, which will secure EFIH's guarantee of the notes, upon acceleration is likely to be significantly impaired by federal bankruptcy law if bankruptcy proceedings are commenced by or against EFH Corp. This could be true even if bankruptcy proceedings are commenced after the trustee for the notes has repossessed and disposed of the Collateral. Under bankruptcy law, a secured creditor, such as the trustee for the notes, is prohibited from repossessing collateral from a debtor in a bankruptcy case, or from disposing of collateral repossessed from a debtor, without bankruptcy court approval. Moreover, bankruptcy law permits the debtor to continue to retain and to use any such collateral, and the proceeds, products, rents or profits of such collateral, even though the debtor is in default under the applicable debt instruments, provided that the secured creditor is given "adequate protection." The meaning of the term "adequate protection" varies according to circumstances, but in general the doctrine of "adequate protection" requires a debtor to protect the value of a secured creditor's interest in the collateral, through cash payments, the granting of an additional security interest or otherwise. It is impossible to predict whether or when payments in respect of the notes might be made following commencement of a bankruptcy case, whether or when the trustee would repossess or dispose of the Collateral, or whether or to what extent holders of the notes would be compensated for any delay in payment or loss of value of the Collateral through the requirements of "adequate protection." Furthermore, in the event the bankruptcy court determines that the value of the Collateral is not sufficient to repay all amounts due on the notes, the holders of the notes would have unsecured "deficiency claims" as to the difference. Federal bankruptcy laws do not generally permit the payment of interest, costs, or attorneys' fees for unsecured claims during the debtor's bankruptcy case.

### Under the indenture governing the notes, holders of the notes will agree to not file a bankruptcy proceeding against Oncor Holdings or any of its subsidiaries.

Holders that receive the notes in this offering will acknowledge and agree that they will not (i) initiate any legal proceeding to procure the appointment of an administrative receiver or (ii) institute any bankruptcy, reorganization, insolvency, winding up, liquidation, or any like proceeding under applicable law, against Oncor Holdings, Oncor or any of their subsidiaries, or against any of the assets of Oncor Holdings, Oncor or any of their subsidiaries. Such holders will further acknowledge and agree that each of Oncor Holdings, Oncor and any of their subsidiaries is a third party beneficiary of the foregoing covenant and have the right to specifically enforce such covenant in any proceeding at law or in equity.

### The value of the Collateral may be diluted if we issue additional debt that is secured equally and ratably by the same Collateral securing the guarantee by EFIH of the notes or if the Collateral is sold.

The Senior Secured Notes are secured by the Collateral on a parity lien basis with the notes. In addition, the indentures governing the Senior Secured Notes provide, and the indenture governing the notes will provide, that EFH Corp. and EFIH may incur up to an aggregate of $4.0 billion of debt, including the Senior Secured Notes and the notes, which would be secured on a parity lien basis by the Collateral. Therefore, because the principal amount of the Senior Secured Notes and the notes will, in the aggregate, be less than $4.0 billion, EFH Corp. and EFIH may subsequently incur additional debt secured on a parity lien basis by the Collateral up to the $4.0 billion limit, subject to restrictions on their ability to incur debt and liens under the indenture governing the notes and under other documents governing their indebtedness. To the extent that any of this additional debt is incurred

23

Confidential—For Professional Eyes Only
Mike Kunkel

EFH00003280

Confidential—For Professional Eyes Only
Mike Kunkel

in the future, the interests of holders of the notes in the Collateral will be diluted. Additionally, EFH Corp. and EFIH are not restricted from issuing additional debt that is secured by a junior lien on the Collateral, subject to restrictions on their ability to incur debt and liens under the indenture governing the notes and under other documents governing their indebtedness.

The collateral trust agreement governing the pledge of Collateral generally provides that the holders of a majority of the debt secured by a first priority lien on the Collateral, including the Senior Secured Notes, the notes and other future debt incurred by EFH Corp. or EFIH secured by the Collateral equally and ratably, will have, subject to certain limited exceptions, the exclusive right to manage, perform and enforce the terms of the security documents securing the rights of secured debtholders in the Collateral, and to exercise and enforce all privileges, rights and remedies thereunder. To the extent that EFH Corp. and/or EFIH incurs additional secured debt that is secured equally and ratably with the notes and the amount of this secured debt, alone or together with any Senior Secured Notes, exceeds the amount of the notes, the holders of such secured debt may be able to exercise control under the collateral trust agreement and other security documents.

EFIH will in most cases have control over the Collateral securing its guarantee of the notes, and to the extent permitted, its sale by EFIH would eliminate the collateral securing such guarantee. The documents governing the pledge of the Collateral permit EFIH to remain in possession of, retain exclusive control over, freely operate and collect, invest and dispose of, any income from, the Collateral, such as cash dividends. In addition, in certain limited circumstances EFIH will have the right to sell the Collateral free and clear of the security interest underlying the notes.

*Rights of holders of the notes in the Collateral may be adversely affected by the failure to perfect security interests in certain Collateral acquired in the future.*

EFIH may acquire assets or investments in the future that would be required to be pledged as Collateral securing the notes. There can be no assurance that the trustee or the collateral trustee will monitor, or that we will inform the trustee or the collateral trustee of, the future acquisition of assets or investments that would be required to be pledged as Collateral, and that the necessary action will be taken to properly perfect the security interest in such after-acquired Collateral. Neither the trustee nor the collateral trustee has an obligation to monitor the acquisition of additional assets or investments that are required to be pledged as Collateral or the perfection of any security interest in such Collateral. Such failure may result in the loss of the security interest in the Collateral or the priority of the security interest in favor of the notes against third parties.

*We may transfer or dispose of our interests in EFIH or Oncor Holdings to a third party in a manner that would result in EFIH or such third party becoming the obligor under the notes, without EFH Corp. or EFIH being required to offer to repurchase the notes. The risks of an investment in the notes may increase further following such a transaction.*

The indenture governing the notes will provide that EFH Corp. may engage in a "Permitted Asset Transfer" with respect to EFH Corp.'s ownership of EFIH or EFIH's ownership of Oncor Holdings that would result in the obligations under the notes being assumed by EFIH or by a third party to which the investments in Oncor Holdings and its subsidiaries are transferred in any such Permitted Asset Transfer (referred to as a "third party transferee"). The indenture governing the EFH Corp. Notes contains similar provisions. This offering memorandum does not include or incorporate by reference financial statements or other financial data of EFIH. However, this offering memorandum includes financial statements of Oncor Holdings. See Oncor Holdings' audited historical consolidated financial statements for the year ended December 31, 2008 and unaudited condensed consolidated financial statements for the nine months ended September 30, 2009, each of which is included elsewhere in this offering memorandum. A Permitted Asset Transfer includes:

- the direct or indirect sale, assignment, transfer, conveyance or other disposition (including by way of merger, wind-up or consolidation) or spin-off of the equity of EFIH such that it is no longer a subsidiary of EFH Corp., and

24

Confidential—For Professional Eyes Only
Mike Kunkel

EFH00003281

Confidential--For Professional Eyes Only
Mike Kunkel

- the sale, assignment, transfer, conveyance or other disposition (other than by way of merger, wind-up or consolidation) of all of EFIH's equity interests and other investments in Oncor Holdings and its subsidiaries (collectively, the "Oncor Subsidiaries") or successor Oncor business and all other Collateral held by EFIH.

If a valid Permitted Asset Transfer occurs, the notes would become obligations of EFIH or the third party transferee of the investments in the Oncor Subsidiaries, which would result in the guarantee of EFCH being released and EFH Corp. no longer being liable on the notes and the EFH Corp. Notes unless EFH Corp. is the transferee. Currently, and for some period of time following the completion of this offering, it is expected that EFH Corp. will rely on the cash flows from TCEH and its subsidiaries to service its debt obligations, including the notes and the Senior Secured Notes. Following the completion of a Permitted Asset Transfer, other than a merger of EFIH into EFH Corp., the cash flows from EFH Corp. and its other subsidiaries, including TCEH and its subsidiaries, would no longer be available to pay interest and principal on the notes and the EFH Corp. Notes that would have become EFIH's obligation in connection with the Permitted Asset Transfer, and holders of the transferred notes would not be able to look to the assets of EFH Corp. and TCEH and its subsidiaries in the case of a bankruptcy, liquidation or insolvency with respect to EFIH. As of September 30, 2009, the assets of EFIH and its subsidiaries (including the Oncor Subsidiaries) represented 26% of the total consolidated assets of EFH Corp. and its subsidiaries. In connection with a Permitted Asset Transfer to a third party transferee, such third party transferee would not be a subsidiary of EFH Corp. and would not have the access to such cash flows to service its debt obligations, which would include the transferred notes and the transferred Senior Secured Notes, nor would such third party transferee be able to look to the assets of EFH Corp. and its subsidiaries in the case of a bankruptcy, liquidation or insolvency. In addition, such third party transferee, as the successor obligor, may not have sufficient sources of capital to service its debt and the obligations under the notes and the Senior Secured Notes, and distributions from the Oncor Subsidiaries may not be available or sufficient to service the obligations under such notes. No Oncor Subsidiary will become obligated on the notes and the Senior Secured Notes as a result of a Permitted Asset Transfer.

Additionally, if a Permitted Asset Transfer occurs in accordance with the terms of the indenture governing the notes, EFH Corp. will not be required to make a change of control offer to repurchase the notes under the indenture even if a change of control may otherwise have occurred.

The indenture governing the notes will provide that a Permitted Asset Transfer may only occur if certain conditions are met, including a requirement that the ratings of the notes are not lowered by two or more rating agencies (or the only rating agency then rating such notes) during a specified period before or after the proposed Permitted Asset Transfer has been publicly announced. However, these conditions may not protect holders against actions that EFIH or the permitted transferee could take that may negatively impact the credit risk of the notes following a Permitted Asset Transfer, such as removing assets and cash from EFIH or the Oncor Subsidiaries or increasing debt at EFIH before the Permitted Asset Transfer. In addition, because EFIH is a "Restricted Subsidiary" under the indenture governing the notes, assets of EFIH, other than the Collateral, could be transferred to EFH Corp. prior to a Permitted Asset Transfer and would in that case not be assets of EFIH or a third party transferee that has become the obligor of the notes.

The third party transferee that becomes the obligor on the notes may itself engage in a subsequent Permitted Asset Transfer, in which case the risks described above would continue to apply with respect to the subsequent Permitted Asset Transfer and the subsequent third party transferee.

There will be no event of default under the indenture governing the notes if the Oncor Subsidiaries take actions or enter into transactions that would impair their ability to dividend funds to EFIH, which could impair EFIH's ability to make payments on the notes following a Permitted Asset Transfer, or that would negatively affect the value of the assets that are pledged as Collateral, such as incurring debt, selling or transferring all or a portion of the assets of Oncor, entering into joint ventures, dividending out assets or engaging in speculative investments.

25

Confidential--For Professional Eyes Only
Mike Kunkel

Confidential—For Professional Eyes Only
Mike Kunkel

Any of the above actions on the part of EFIH, the third party transferee or subsequent third party transferee or the Oncor Subsidiaries following the completion of a Permitted Asset Transfer may further increase the credit risk of the notes, may result in the rating agencies taking negative action with respect to the notes and may reduce the market price of the notes.

See "Description of the Notes — Certain Covenants — Restrictions on Permitted Asset Transfers" and "Description of the Notes — Certain Covenants — Restrictions on TCEH Transfers" and the definitions of "Change of Control" and "Permitted Asset Transfer" contained under "Description of the Notes" for more information.

*We may transfer or dispose of our interests in or the assets of TCEH to a third party without such third party becoming the obligor under the notes and without being required to offer to repurchase the notes.*

The indenture governing the notes will provide that, subject to certain conditions, certain transactions with respect to TCEH, referred to in this offering memorandum as a "TCEH Transfer," which include a disposition or spin-off of all of the equity interests of an entity that owns all or substantially all of the assets of TCEH (including EFCH), or the sale of all or substantially all of the assets of TCEH, will not result in the acquirer of the TCEH equity interests or assets becoming the obligor under the notes. The indenture governing the EFH Corp. Notes contains similar provisions.

If a TCEH Transfer occurs, EFH Corp. will remain the obligor of the notes and the EFH Corp. Notes, even though substantially all of the assets of EFH Corp. and its subsidiaries may have been transferred to a third party, and therefore EFH Corp. could be a more highly-leveraged company. Additionally, if a TCEH Transfer occurs, EFH Corp. will not be required to make a change of control offer to repurchase the notes, even if the assets of TCEH transferred accounted for substantially all of the assets of EFH Corp. and its subsidiaries. As of September 30, 2009, EFCH and its subsidiaries, including TCEH and its subsidiaries, accounted for 71% of the consolidated assets of EFH Corp. The indenture governing the notes does not restrict EFH Corp.'s ability to transfer assets, other than Collateral, to any of its restricted subsidiaries, including EFCH and TCEH. EFH Corp. could take actions that may negatively impact the credit risk of the notes, including transferring assets to TCEH before a TCEH Transfer.

Currently, and for some period of time following the completion of this offering, it is expected that EFH Corp. will rely on the cash flows from TCEH and its subsidiaries to service its debt obligations, including the notes. Following the completion of a TCEH Transfer, the cash flows from TCEH and its subsidiaries would no longer be available to pay interest and principal on the notes and the Senior Secured Notes. Additionally, the holders of the notes would not be able to look to the assets of TCEH and its subsidiaries in the case of a bankruptcy, liquidation or insolvency with respect to EFH Corp. In addition, EFH Corp. may transfer its interest in TCEH and its subsidiaries without any consideration if the transaction would not violate the "Limitation on Restricted Payments" covenant in the indenture governing the notes.

Additionally, following a TCEH Transfer, the only operating subsidiaries of EFH Corp. could be the Oncor Subsidiaries, which are "Unrestricted Subsidiaries" under the indenture governing the notes. Unrestricted Subsidiaries will not be subject to the restrictive covenants contained in the indenture. The indenture governing the notes will not limit or restrict the ability of Unrestricted Subsidiaries, including the Oncor Subsidiaries, to take actions or enter into transactions that would impair their ability to dividend funds to EFH Corp. to make payments on the notes, or that would negatively affect the value of the Oncor Subsidiaries and therefore the equity value of the investments that are pledged as Collateral, such as incurring debt, selling or transferring all or a portion of the assets of the Oncor Subsidiaries, entering into joint ventures, dividending out assets or engaging in speculative investments.

The occurrence of a TCEH Transfer may further increase the credit risk of the notes, may result in the credit rating agencies taking negative action with respect to the notes and may reduce the market price of the notes.

26

Confidential—For Professional Eyes Only
Mike Kunkel

Confidential—For Professional Eyes Only
Mike Kunkel

See "Description of the Notes — Certain Covenants — Restrictions on TCEH Transfers" and the definitions of "Change of Control" and "TCEH Transfer" contained under "Description of the Notes" for more information.

***The indenture governing the notes may not protect holders from all actions that EFH Corp., EFIH or the Oncor Subsidiaries may take that would reduce your interest in the Collateral or that may reduce the value of the Collateral, including sales or exchanges of the Collateral or the assets of the Oncor Subsidiaries for other assets or investments.***

Under the indenture governing the notes, EFIH may dispose of all or a portion of the Collateral for fair market value consideration (including consideration other than cash) that may consist of assets or equity interests in joint ventures. Additionally, there will be no event of default under such indenture if the Oncor subsidiaries sell, transfer or otherwise dispose of their assets or equity interests for any form of consideration.

If EFIH or the Oncor Subsidiaries effect any of these transactions, holders' interest in the Collateral or the value of the Collateral may be materially reduced.

The indenture governing the notes will allow EFIH to transfer any of the Collateral in exchange for an equivalent fair market value of assets other than cash or for investments in businesses that are similar to the businesses of Oncor, including interests in joint ventures in businesses that are not controlled by EFH Corp. or EFIH. The assets received as consideration and pledged as substitute Collateral may prove to be less valuable than the value of the investments in Oncor that were disposed of in such transfer or exchange. Additionally, if interests in a new business were received in exchange for the Collateral, such new business may, in the future, engage in businesses activities that are different from the business that Oncor presently is in or such new business may not prove to be as creditworthy or valuable as Oncor, and EFH Corp. may not have any control over such business' activities if a minority interest in the joint venture interests was received in such transfer or exchange. Therefore, such new collateral may negatively alter the risk profile of EFIH or the value of such new collateral may decline relative to the value of the disposed investments in Oncor.

There will be no event of default under the indenture governing the notes if any of the Oncor Subsidiaries sells, transfers or disposes of the assets of Oncor Holdings or investments in or assets of Oncor. The consideration received in exchange for such assets or investments may decline in value as compared to the assets or investments that were so disposed, and, therefore, the value of the Collateral may be less than if such assets and investments had been retained. The Oncor Subsidiaries may transfer their assets and investments in exchange for interests in other businesses or assets, minority interests or interests in joint ventures, in which case the value of the Collateral may be at risk of declining due to the factors described above.

In any joint venture in which EFIH or an Oncor Subsidiary has an interest, EFIH or the Oncor Subsidiary may not have the right or power to direct the management and policies of such joint ventures and other participants may take action contrary to the instructions or requests of EFIH or such Oncor Subsidiary or against its policies and objectives, and any such actions taken by such joint ventures may not be in the best interests of holders of notes. In addition, the other participants to any such joint venture may become bankrupt or have economic or other business interests or goals that are inconsistent with the goals of EFIH or such Oncor Subsidiary and/or the holders of the notes.

Additionally, TCEH's senior secured credit facilities do not allow EFH Corp. to prepay the notes using proceeds received from a disposition of any investments of EFH Corp. and EFIH in the Oncor Subsidiaries (including the Collateral) or from a sale of all or substantially all of the assets of any of the Oncor Subsidiaries, so long as certain intercompany loans from TCEH to EFH Corp. are at the time outstanding. As of September 30, 2009, $1.112 billion of such intercompany loans from TCEH to EFH Corp. were outstanding.

The completion of any of the above events may result in the credit risk of the notes increasing, the credit rating agencies taking negative action with respect to the notes or the market price of the notes declining. Additionally, in the event of any foreclosure on the Collateral, holders of the notes may recover less than if the Collateral still consisted of investments in the Oncor Subsidiaries.

27

Confidential—For Professional Eyes Only
Mike Kunkel

Confidential–For Professional Eyes Only
Mike Kunkel

*You may be required to recognize taxable gain or loss in connection with a Permitted Asset Transfer.*

In connection with a Permitted Asset Transfer, EFH Corp.'s obligations under the notes would be transferred to, and assumed by, EFIH or a third party transferee or may be considered, for U.S. federal income tax purposes, to undergo a substitution of obligors even if not transferred to, or assumed by, a third party transferee. Upon any such transfer or deemed substitution of obligors, you may be deemed to have exchanged the notes for new notes for U.S. federal income tax purposes. Upon such deemed exchange, a holder, under U.S. federal income tax law, may be required to recognize gain or loss equal to the difference between the amount deemed to be realized in connection with the deemed exchange and such holder's adjusted tax basis in the notes on the date of the deemed exchange. For more information, please see "Certain United States Federal Tax Consequences — Certain Tax Consequences to U.S. Holders — Sale, Exchange, Retirement, or Other Disposition of Notes."

*The liabilities of each of EFH Corp. and EFCH currently exceed its assets as shown on its most recent quarterly balance sheet. If a court were to find that EFH Corp., EFCH or EFIH were insolvent before or after giving effect to this offering and did not receive reasonably equivalent value or fair consideration for the issuance of the notes or the incurrence of a guarantee or the pledge of the Collateral, as applicable, the court may void all or a portion of the obligations represented by the notes or the guarantee of the notes by EFCH or EFIH or the pledge of the Collateral by EFIH as a fraudulent conveyance.*

In a bankruptcy proceeding, a trustee, debtor in possession or another person acting on behalf of the bankruptcy estate may seek to recover all or a portion of transfers made or void obligations incurred prior to the bankruptcy proceeding on the basis that such transfers and obligations constituted fraudulent conveyances. Under certain circumstances, creditors may recover transfers or void obligations under state fraudulent conveyance laws even if the debtor is not in bankruptcy.

Fraudulent conveyances are generally defined to include transfers made or obligations incurred for inadequate consideration when a debtor was insolvent, inadequately capitalized or in similar financial distress, or transfers made or obligations incurred with the intent of hindering, delaying or defrauding current or future creditors. A trustee, debtor in possession or another person acting on behalf of a bankruptcy estate may be able to recover such transfers under the fraudulent conveyance provisions of the bankruptcy law and/or state fraudulent conveyance laws. The fraudulent conveyance provisions of the bankruptcy law allows the trustee, debtor in possession, or other person acting on behalf of a bankruptcy estate to void a fraudulent conveyance made within two years prior to the commencement of a bankruptcy proceeding. Under state fraudulent conveyance laws, transfers made more than two years prior to the commencement of a fraudulent conveyance lawsuit may be subject to avoidance.

If a court were to find that EFH Corp. issued the notes or EFCH or EFIH issued its respective guarantee, or EFIH granted its pledge of the Collateral, under circumstances constituting a fraudulent conveyance, then a court could void all or a portion of the obligations under the notes, such guarantee or the pledge of the Collateral. In addition, under such circumstances, the value of any consideration holders received with respect to the notes, such guarantee, and the Collateral, including upon foreclosure of the Collateral, could also be subject to recovery from such holders and, possibly, from subsequent transferees of the notes. If the pledge of Collateral was voided and the issuance of the notes and/or the related guarantees were not voided, then holders of notes would become unsecured creditors.

The notes or the related guarantees incurred by EFCH or EFIH or the pledge of the Collateral by EFIH could be voided as a fraudulent conveyance, or claims in respect of the notes, such guarantee or pledge could be subordinated to all other debts of EFH Corp., EFCH or EFIH, if EFH Corp., EFCH or EFIH, at the time they incurred the indebtedness evidenced by the notes or such guarantee or granted the pledge received less than reasonably equivalent value or fair consideration for the issuance of the notes or the incurrence of such guarantee and:

- were insolvent or rendered insolvent by reason of such issuance or incurrence;

28

EFH00003285

Confidential—For Professional Eyes Only
Mike Kunkel

- were engaged in a business or transaction for which our or EFCH's or EFIH's remaining assets constituted unreasonably small capital; or

- intended to incur, or believed that they would incur, debts beyond their ability to pay those debts as they mature.

The measures of insolvency for purposes of these fraudulent transfer laws will vary depending upon the law applied in any proceeding to determine whether a fraudulent transfer has occurred. Generally, however, a debtor would be considered insolvent if:

- the sum of its debts, including contingent liabilities, was greater than the fair saleable value of all of its assets;

- the present fair saleable value of its assets was less than the amount that would be required to pay its probable liability on its existing debts, including contingent liabilities, as they become absolute and mature; or

- it could not pay its debts as they become due.

The liabilities of each of EFH Corp. and EFCH currently exceed its assets as shown on its respective balance sheet prepared in accordance with U.S. GAAP as of September 30, 2009. The balance sheets showing the assets and liabilities of EFH Corp. and EFCH have been prepared in accordance with U.S. GAAP; however, the values assigned to assets and liabilities in these balance sheets are not necessarily indicative of the values that a court would assign to such assets and liabilities in making a solvency determination. We have not obtained or prepared an appraisal of the fair saleable value of the assets of EFH Corp., EFCH or EFIH. As a result, we cannot assure you that EFH Corp., EFCH or EFIH would satisfy the solvency tests set forth in the bullet points immediately prior to this paragraph or what standard a court would apply in determining whether EFH Corp., EFCH or EFIH would be considered to be insolvent.

In addition, we cannot assure you that a court would determine that reasonably equivalent value or fair consideration was received by each of EFH Corp., EFCH and EFIH in connection with the offering of the notes and the incurrence of the guarantee or pledge, as applicable. It is not expected that EFIH will receive any of the proceeds from this offering.

Each guarantee of the notes contains a provision intended to limit the guarantor's liability to the maximum amount that it could incur without causing the incurrence of obligations under its guarantee to be a fraudulent conveyance. This provision may not be effective to protect the guarantee from being voided under fraudulent conveyance law, or may reduce or eliminate the guarantor's obligation to an amount that effectively makes the guarantee worthless.

### EFH Corp. may not be able to repurchase the notes upon a change of control.

Upon the occurrence of specific kinds of change of control events, EFH Corp. will be required to offer to repurchase all of the notes at 101% of their respective principal amount plus accrued and unpaid interest. The source of funds for any purchase of the notes will be EFH Corp.'s available cash or cash generated from the EFH Corp.'s subsidiaries' operations or other sources, including borrowings, sales of assets or sales of equity. EFH Corp. may not be able to repurchase the notes upon a change of control because EFH Corp. may not have sufficient financial resources to purchase all of the notes that are tendered upon a change of control. Further, EFH Corp. may be restricted under the terms of debt agreements of TCEH, EFIH and Oncor from receiving funds from TCEH and Oncor sufficient to repurchase all of the notes tendered by holders upon a change of control. Accordingly, EFH Corp. may not be able to satisfy its obligations to purchase the notes unless EFH Corp. is able to refinance or obtain waivers under the instruments governing its indebtedness. EFH Corp.'s failure to repurchase the notes upon a change of control would cause a default under the indenture governing the notes and a cross-default under certain of EFH Corp.'s other debt agreements. The instruments governing TCEH's senior secured credit facilities also provide that a change of control will be a default that permits the lenders thereunder to accelerate the maturity of borrowings thereunder. Any of our future debt agreements may contain similar provisions.

29

Confidential—For Professional Eyes Only
Mike Kunkel

Confidential--For Professional Eyes Only
Mike Kunkel

*There are restrictions on your ability to transfer or resell the notes without registration under applicable securities laws.*

The notes are being offered and sold pursuant to exemptions from registration under U.S. and applicable state securities laws. Therefore, you may transfer or resell the notes in the United States only in a transaction registered under or exempt from the registration requirements of U.S. and applicable state securities laws, and you may be required to bear the risk of your investment for an indefinite period of time. EFH Corp. is obligated to use its commercially reasonable efforts to commence an offer to exchange the notes for notes with substantially identical terms that are registered under the Securities Act or, in certain circumstances, register the reoffer and resale of the notes under the Securities Act. See "Description of the Notes — Exchange Offer; Registration Rights" and "Notice to Investors."

*Your ability to transfer the notes may be limited by the absence of an active trading market, and there is no assurance that any active trading market will develop for the notes.*

The notes are a new issue of securities for which there is no established trading market. We do not intend to have the notes listed on a national securities exchange or included in any automated quotation system.

The initial purchasers have advised us that they intend to make a market in the notes, and the exchange notes, if issued, as permitted by applicable laws and regulations; however, the initial purchasers are not obligated to make a market in the notes or the exchanges notes, and they may discontinue their market-making activities at any time without notice. As Goldman, Sachs & Co. is a member of the Sponsor Group, it will be required to deliver a "market-making prospectus" when effecting offers and sales of notes and exchange notes. For so long as the market-making prospectus is required to be delivered, the ability of Goldman, Sachs & Co. to make a market in the notes and exchange notes may, in part, be dependent on our ability to maintain a current market-making prospectus. The liquidity of any market for the notes will depend upon the number of holders of the notes, our performance, the market for similar securities, the interest in securities dealers making a market in the notes and other factors. Therefore, we cannot assure you that an active market for the notes or exchange notes will develop or, if developed, that it will continue. If an active market does not develop or is not maintained, the price and liquidity of the notes will be adversely affected.

Historically, the market for non investment-grade debt has been subject to disruptions that have caused substantial volatility in the prices of securities similar to the notes. We cannot assure you that the market, if any, for the notes or exchange notes will be free from similar disruptions or that any such disruptions may not adversely affect the prices at which you may sell your notes. In addition, subsequent to their initial issuance, the notes or exchange notes may trade at a discount from their initial offering price, depending upon prevailing interest rates, the market for similar notes, our performance and other factors.

*The interests of the Sponsor Group may differ from the interests of the holders of the notes.*

The Sponsor Group indirectly owns approximately 60% of EFH Corp.'s capital stock on a fully diluted basis through their investment in Texas Holdings. As a result of this ownership and the Sponsor Group's ownership in interests of the general partner of Texas Holdings, the Sponsor Group has control over decisions regarding our operations, plans, strategies, finances and structure, including whether to enter into any corporate transaction, and will have the ability to prevent any transaction that requires the approval of EFH Corp.'s shareholders.

The interests of these persons may differ from your interests in material respects. For example, if we encounter financial difficulties or are unable to pay our debts as they mature, the interests of the Sponsor Group, as equity holders, might conflict with your interests as a noteholder. The Sponsor Group may also have an interest in pursuing acquisitions, divestitures, financings or other transactions that, in their judgment, could enhance their equity investments, even though such transactions might involve risks to you as a noteholder. Additionally, the indenture governing the notes permits us to pay advisory fees, dividends or make other restricted payments under certain circumstances, and the Sponsor Group may have an interest in our doing so.

30

Confidential--For Professional Eyes Only
Mike Kunkel

EFH00003287

Confidential—For Professional Eyes Only
Mike Kunkel

### Risks Related to Structure

*EFH Corp. is a holding company and its obligations are structurally subordinated to existing and future liabilities and preferred stock of its subsidiaries.*

EFH Corp.'s cash flows and ability to meet its obligations are largely dependent upon the earnings of its subsidiaries and the payment of such earnings to EFH Corp. in the form of dividends, distributions, loans or otherwise, and repayment of loans or advances from EFH Corp. These subsidiaries are separate and distinct legal entities and have no obligation to provide EFH Corp. with funds for its payment obligations. Any decision by a subsidiary to provide EFH Corp. with funds for its payment obligations, whether by dividends, distributions, loans or otherwise, will depend on, among other things, the subsidiary's results of operations, financial condition, cash requirements, contractual restrictions and other factors. In addition, a subsidiary's ability to pay dividends may be limited by covenants in its existing and future debt agreements or applicable law. Further, the distributions that may be paid by Oncor are limited through December 31, 2012, to an amount not to exceed Oncor's net income (determined in accordance with U.S. GAAP, subject to certain defined adjustments, including goodwill impairments), and are further limited by an agreement that Oncor's regulatory capital structure will be at or below the assumed debt-to-equity ratio established periodically by the PUCT for ratemaking purposes, which is currently set at 60% debt to 40% equity. Also, the independent members of Oncor's board of directors and the noncontrolling member of Oncor can block the payment of dividends.

Because EFH Corp. is a holding company, its obligations to its creditors are structurally subordinated to all existing and future liabilities and existing and future preferred stock of its subsidiaries that do not guarantee such obligations. Therefore, with respect to subsidiaries that do not guarantee EFH Corp.'s obligations, EFH Corp.'s rights and the rights of its creditors to participate in the assets of any subsidiary in the event that such a subsidiary is liquidated or reorganized are subject to the prior claims of such subsidiary's creditors and holders of such subsidiary's preferred stock. To the extent that EFH Corp. may be a creditor with recognized claims against any such subsidiary, EFH Corp.'s claims would still be subject to the prior claims of such subsidiary's creditors to the extent that they are secured or senior to those held by EFH Corp. Subject to restrictions contained in financing arrangements, EFH Corp.'s subsidiaries may incur additional indebtedness and other liabilities.

*Oncor may or may not make any distributions to EFH Corp.*

Upon the consummation of the Merger, EFH Corp. and Oncor implemented certain structural and operational "ring-fencing" measures based on principles articulated by rating agencies and commitments made by Texas Holdings and Oncor to the PUCT and the FERC to further separate Oncor from the Texas Holdings Group. See "The Transactions—Ring-Fencing." These measures were put into place to mitigate Oncor's credit exposure to those entities and to reduce the risk that the assets and liabilities of Oncor would be substantively consolidated with the assets and liabilities of the Texas Holdings Group in the event of a bankruptcy of one or more of those entities.

As part of the ring-fencing measures implemented by EFH Corp. and Oncor, a majority of the members of the board of directors of Oncor are required to be, and are, independent from EFH Corp. Any new independent directors are required to be appointed by the nominating committee of Oncor Holdings. The organizational documents of Oncor give these independent directors, acting by majority vote, and, during certain periods, any director designated by Texas Transmission, the express right to prevent distributions from Oncor if they determine that it is in the best interests of Oncor to retain such amounts to meet expected future requirements. Accordingly, there can be no assurance that Oncor will make any distributions to EFH Corp.

In addition, Oncor's organizational documents limit Oncor's distributions to EFH Corp. through 2012 to Oncor's net income and prohibit Oncor from making any distribution to EFH Corp. so long as and to the extent that such distribution would cause Oncor's debt-to-equity ratio for regulatory purposes to be above the debt-to-equity ratio established from time to time by the PUCT for ratemaking purposes, which is currently set at 60% debt to 40% equity.

31

Confidential—For Professional Eyes Only
Mike Kunkel

EFH00003288

Confidential—For Professional Eyes Only
Mike Kunkel

In March 2009, the PUCT awarded Oncor the right to construct approximately $1.3 billion of transmission lines and facilities associated with its Competitive Renewable Energy Zones (CREZ) Transmission Plan (see discussion in "Management's Discussion and Analysis of Financial Condition and Results of Operations — Regulation and Rates" included in our September 30, 2009 Form 10-Q). With the award, it is likely Oncor will incur additional debt. In addition, Oncor may incur additional debt in connection with other investments in infrastructure or technology. Accordingly, while Oncor is required to maintain a debt to equity ratio of 60% debt to 40% equity, there can be no assurance that Oncor's equity balance will be sufficient to maintain the required debt-to-equity ratio established from time to time by the PUCT for ratemaking purposes, thereby restricting Oncor from making any distributions to EFH Corp.

32

Confidential—For Professional Eyes Only
Mike Kunkel

EFH00003289

Confidential—For Professional Eyes Only
Mike Kunkel

# THE TRANSACTIONS

## The Merger

On October 10, 2007, the Merger occurred. Upon the effectiveness of the Merger, each share of EFH Corp. common stock outstanding immediately prior to the Merger (other than shares held by EFH Corp. or any of its subsidiaries or Texas Holdings or any of its subsidiaries, including Merger Sub, in each case not held on behalf of third parties, or shares held by holders who properly exercised their rights of dissent and appraisal under Texas law) was cancelled and converted into the right to receive $69.25 in cash, without interest and less any applicable withholding taxes.

## Equity Contributions

At the closing of the Merger, Texas Holdings received an aggregate equity investment of approximately $8.3 billion. Investment funds affiliated with the Sponsor Group, or their respective assignees, contributed approximately $5.1 billion to Texas Holdings. The Sponsor Group consists of investment funds associated with or designated by KKR, TPG and Goldman Sachs who, along with certain other co-investors, own EFH Corp. through Texas Holdings, with the Sponsor Group controlling Texas Holdings' general partner, Texas Energy Future Capital Holdings LLC. In addition, Citigroup Global Markets Inc., an initial purchaser in this offering, and Morgan Stanley & Co. Incorporated, or their respective affiliates, each made equity investments of approximately $250 million in Texas Holdings. The Sponsor Group obtained approximately $2.3 billion in equity investments from other existing investors in KKR's and TPG's private equity funds and other third party investors. Following the closing of the Merger and as of the date of this offering memorandum, the Sponsor Group owned approximately 62% of the limited partnership units issued by Texas Holdings in connection with the Merger.

The equity contributions by the Sponsor Group and the Investors are referred to in this offering memorandum as the "Equity Contributions."

## Debt Financing

In connection with the Merger, in addition to the Equity Contributions described above, we entered into the following debt financing arrangements, in each case, arranged by a consortium of arrangers and bookrunners:

- Senior secured credit facilities of TCEH, which are guaranteed by EFCH and subsidiaries of TCEH;

- a $6.75 billion senior unsecured interim loan facility of TCEH (the "TCEH Senior Interim Facility"), which was used to fund the Merger and related transactions; and

- a $4.5 billion senior unsecured interim loan facility of EFH Corp. (the "EFH Senior Interim Facility"), which was used to fund the Merger and related transactions.

In October and December 2007, TCEH and TCEH Finance, Inc. issued $6.75 billion aggregate principal amount of the TCEH 2015/2016 Notes in two private offerings. The proceeds from the offerings of the TCEH 2015/2016 Notes, along with cash on hand, were used by TCEH to repay in full the TCEH Senior Interim Facility.

In October 2007, EFH Corp. issued the 2017 Notes in a private offering. The proceeds from the offering of the 2017 Notes, along with cash on hand, were used by EFH Corp. to repay in full the EFH Senior Interim Facility.

Concurrently with the transactions described above, Oncor entered into a $2.0 billion senior revolving credit facility (the "Oncor Revolving Credit Facility"), which may be increased by up to $500 million, subject to certain conditions, which is being used by Oncor for working capital and for other general corporate purposes. No portion of the Oncor Revolving Credit Facility was used to finance the Merger or the debt repayment that occurred in connection with the Merger.

33

Confidential—For Professional Eyes Only
Mike Kunkel

Confidential—For Professional Eyes Only
Mike Kunkel

## Ring-Fencing

Upon the consummation of the Merger, EFH Corp. and Oncor implemented several measures that are referred to as "ring-fencing." Such measures included, among others, the following:

- the conversion of Oncor from a Texas corporation to a Delaware limited liability company;

- the inclusion of covenants in Oncor Holdings' and Oncor's limited liability company agreements intended to enhance the separation of Oncor Holdings and its subsidiaries, including Oncor, from Texas Holdings and its other subsidiaries, including EFIH;

- the establishment of boards of directors for Oncor Holdings and Oncor with a majority of members who meet the New York Stock Exchange requirements for independence in all material respects and whose unanimous consent is required to take certain actions, including (i) to consolidate or merge (A) with EFH Corp. or any of EFH Corp.'s other subsidiaries or (B) with any other entity, if Oncor Holdings or Oncor, as applicable, would not be the surviving entity; (ii) to sell, transfer or dispose of all or substantially all of the assets of Oncor Holdings or Oncor, as applicable, without adequate provision for the payment of all of such entity's creditors; (iii) to institute, or consent to the institution of, bankruptcy or similar proceedings in respect of Oncor Holdings or Oncor, as applicable; or (iv) to the fullest extent permitted by law, to dissolve or liquidate Oncor Holdings or Oncor, as applicable, without adequate provision for the payment of all of such entity's creditors;

- the specific delegation to each of the board of directors and the independent directors of Oncor, each acting by majority vote, of the right to prevent distributions, if it or they determine that it is in the best interests of Oncor to retain such amounts to meet expected future requirements;

- after the appointment of the initial independent directors, the delegation of the ability to nominate, appoint and fill vacancies in respect of the independent directors of Oncor Holdings and Oncor to a standing nominating committee of Oncor Holdings' board of directors, a majority of whose members are independent directors; and

- the incurrence of new indebtedness, evidenced by the Oncor Revolving Credit Facility, the lenders of which will be specifically relying on the separateness of Oncor Holdings and Oncor, and their assets, from Texas Holdings and its other subsidiaries.

The ring-fencing measures were based on certain principles articulated by rating agencies and certain commitments made by Texas Holdings and Oncor to the PUCT and the FERC intended to further separate Oncor from Texas Holdings and its subsidiaries and to mitigate Oncor's credit exposure to those entities and to reduce the risk that the assets and liabilities of Oncor Holdings or of any of its subsidiaries would be substantively consolidated with the assets and liabilities of Texas Holdings or of any of its other subsidiaries in the event of a bankruptcy of one or more of those entities. A number of ring-fencing measures put in place were incorporated into the Order on Rehearing in PUCT Docket No. 34077 that is legally binding on Oncor.

None of the ring-fenced entities guarantees or otherwise holds out its credit as being available to support the obligations of EFH Corp. or any of its subsidiaries (other than the ring-fenced entities), including the notes offered hereby. In addition, lenders under TCEH's senior credit secured facilities and the holders of the Senior Secured Notes, the 2017 Notes and the TCEH 2015/2016 Notes have acknowledged, and the future holders of such notes will acknowledge, by acceptance of such notes, the legal separation of Oncor and its subsidiaries from the borrowers and guarantors under such financing documents. Lenders under TCEH's senior secured credit facilities and the holders of the Senior Secured Notes, the 2017 Notes and the TCEH 2015/2016 Notes also agreed, and the future holders of such notes will agree, by acceptance of such notes, that they will not initiate any bankruptcy or similar proceeding against Oncor Holdings or its subsidiaries and that Oncor Holdings and its subsidiaries are entitled to enforce this non-petition covenant. In addition, holders of the notes, by acceptance of such notes, will acknowledge the legal separation of Oncor and its subsidiaries from EFH Corp., EFIH and EFCH under such financing documents. Holders of the notes, by acceptance of such notes, will also agree that they will not initiate any bankruptcy or similar proceeding against Oncor Holdings or its subsidiaries and that Oncor Holdings and its subsidiaries are entitled to enforce this non-petition covenant.

34

Confidential—For Professional Eyes Only
Mike Kunkel

Highly Confidential

EFH00003291

Confidential--For Professional Eyes Only
Mike Kunkel

### Sale of Noncontrolling Interests in Oncor

In November 2008, Oncor issued and sold additional equity interests to Texas Transmission for $1.254 billion in cash. At the closing of the sale, Oncor also offered and sold additional equity interests to Oncor Management Investment LLC, an entity owned by certain members of Oncor's management, for the same price per unit of equity interest paid by Texas Transmission. Accordingly, the equity issuances resulted in EFH Corp. indirectly owning 80.04% of Oncor, certain members of Oncor management indirectly owning 0.21% of Oncor and Texas Transmission owning 19.75% of Oncor.

The Investor Rights Agreement governs certain rights of certain members of Oncor and EFH Corp. arising out of their direct or indirect ownership of Oncor membership interests, including, without limitation, transfers of Oncor membership interests and restrictions thereon. Among other transfer restrictions, the Investor Rights Agreement provides that, prior to the earlier of the completion of a qualified initial public offering or seven years from the date of the Investor Rights Agreement, Texas Transmission may transfer its Oncor membership interests only to certain permitted transferees or with the prior approval of Oncor Holdings. Following such time period, Texas Transmission may transfer its Oncor membership interests under a registration statement or pursuant to applicable securities laws. The Investor Rights Agreement also grants Texas Transmission certain "tag-along" rights in relation to certain sales, transfers or pledges of Oncor membership interests by Oncor Holdings or indirectly by EFH Corp. or its subsidiaries. Subject to certain conditions, these "tag-along" rights allow Texas Transmission to transfer a pro-rata portion of its Oncor membership interests in the event of a transfer of Oncor membership interests by Oncor Holdings or indirectly by EFH Corp. or its subsidiaries on the same terms as Oncor Holdings, EFH Corp. or a subsidiary of EFH Corp. would receive for the Oncor membership interests. The agreement further provides that under certain offerings of equity securities occurring before an initial public offering of Oncor, Texas Transmission and Oncor Holdings will receive preemptive rights to purchase their pro-rata share of the equity securities to be sold pursuant to such offerings. The Investor Rights Agreement also provides EFH Corp. with a right of first refusal to purchase any Oncor membership interests to be sold in a permitted sale by Texas Transmission or its permitted transferees.

Additionally, Texas Holdings, EFH Corp., certain of EFH Corp.'s subsidiaries and Oncor Holdings have certain "drag-along" rights in relation to offers from third-parties to purchase their directly or indirectly owned membership interests in Oncor, where the resulting sale would constitute a change of control of Oncor. These "drag-along" rights compel Texas Transmission and all other members of Oncor to sell or otherwise transfer their membership interests in Oncor on substantially the same terms as Texas Holdings, EFH Corp., the EFH Corp. subsidiary or Oncor Holdings (as applicable). Pursuant to the Investor Rights Agreement, all members of Oncor that have entered into such agreement must cooperate with Oncor in connection with an initial public offering of Oncor.

35

Confidential--For Professional Eyes Only
Mike Kunkel

Confidential--For Professional Eyes Only
Mike Kunkel

## USE OF PROCEEDS

We estimate that we will receive net proceeds of approximately $488 million from this offering, after deducting the initial purchasers' discounts and our estimated offering expenses. The proceeds we receive from the issuance of the notes will be used for general or other corporate purposes, which may include, without limitation, working capital needs, investment in business initiatives, capital expenditures and prepayment or repurchase of outstanding indebtedness of EFH Corp. and/or its subsidiaries. The outstanding indebtedness that may be prepaid or repurchased includes, as of September 30, 2009: (i) $1.0 billion outstanding principal amount of EFH Corp.'s 5.55% Series P Senior Notes due November 15, 2014; (ii) $750 million outstanding principal amount of EFH Corp.'s 6.50% Series Q Senior Notes due November 15, 2024; (iii) $750 million outstanding principal amount of EFH Corp.'s 6.55% Series R Senior Notes due November 15, 2034; (iv) $2.0 billion outstanding principal amount of EFH Corp.'s 10.875% Senior Notes due November 1, 2017; (v) $2.65 billion outstanding principal amount of EFH Corp.'s 11.250%/12.000% Senior Toggle Notes due November 1, 2017; (vi) $3.0 billion outstanding principal amount of TCEH and TCEH Finance, Inc.'s 10.25% Senior Notes due November 1, 2015; (vii) $2.0 billion outstanding principal amount of TCEH and TCEH Finance, Inc.'s 10.25% Senior Notes due November 1, 2015, Series B; (viii) $1.848 billion outstanding principal amount of TCEH and TCEH Finance, Inc.'s 10.50%/11.25% Senior Toggle Notes due November 1, 2016; (ix) TCEH's senior secured credit facilities, which had approximately $22.4 billion of borrowings outstanding, bear interest at rates ranging from 3.75% to 3.79% plus certain customary facility fees (excluding TCEH's commodity collateral posting facility, for which there are no outstanding borrowings) and mature on December 31, 2012, October 10, 2013 and October 10, 2014; and (x) $1.5 billion outstanding principal amount of TCEH's pollution control revenue bonds due June 1, 2021, May 1, 2022, July 1, 2022, August 1, 2022, May 1, 2028, May 1, 2029, October 1, 2029, May 1, 2030, October 1, 2030, March 1, 2032, July 1, 2032, April 1, 2033, May 1, 2033, September 1, 2034, May 1, 2036, December 1, 2036, May 1, 2037, April 1, 2038, October 1, 2038 and March 1, 2041.

36

Confidential--For Professional Eyes Only
Mike Kunkel

Confidential—For Professional Eyes Only
Mike Kunkel

## CAPITALIZATION

The following table sets forth as of September 30, 2009, EFH Corp.'s cash and cash equivalents and capitalization of EFH Corp. and certain of its subsidiaries:

(1) on an actual basis;

(2) on an adjusted basis to give effect to the issuance of the Senior Secured Notes and the cancellation of certain indebtedness accepted for exchange in the exchange offers; and

(3) on an as further adjusted basis to give effect to the issuance of the notes.

| | As of September 30, 2009 | | |
| --- | --- | --- | --- |
| | Actual | As Adjusted(a) | As Further Adjusted(b) |
| | (millions of dollars) | | |
| Cash and cash equivalents .................................................. | $ 1,725 | $ 1,718 | $ 2,206 |
| **Debt:** | | | |
| EFH Corp.: | | | |
| 4.80% Series O Senior Notes due 2009 ................................... | 3 | 3 | 3 |
| 5.55% Series P Senior Notes due 2014 ................................... | 1,000 | 983 | 983 |
| 6.50% Series Q Senior Notes due 2024 ................................... | 750 | 740 | 740 |
| 6.55% Series R Senior Notes due 2034 ................................... | 750 | 744 | 744 |
| 10.875% Senior Notes due 2017 ........................................... | 2,000 | 1,831 | 1,831 |
| 11.250%/12.000% Senior Toggle Notes due 2017 ......................... | 2,650 | 2,797 | 2,797 |
| 9.75% Senior Secured Notes due 2019 ................................... | — | 116 | 116 |
| 10.000% Senior Secured Notes due 2020 offered hereby ................. | — | — | 500 |
| Unamortized fair value discount ......................................... | (619) | (612) | (612) |
| Unamortized discount on Senior Secured Notes and the notes ........... | — | — | — |
| Total EFH Corp. debt .......................................... | 6,534 | 6,602 | 7,102 |
| EFIH(c): | | | |
| 9.75% Senior Secured Notes due 2019 ................................... | — | 141 | 141 |
| Unamortized discount on Senior Secured Notes .......................... | — | — | — |
| Total EFIH debt .............................................. | — | 141 | 141 |
| EFCH(d): | | | |
| Secured debt ........................................................... | 94 | 94 | 94 |
| Unsecured debt ......................................................... | 9 | 9 | 9 |
| Total EFCH debt .............................................. | 103 | 103 | 103 |
| TCEH: | | | |
| Senior secured credit facilities ....................................... | 22,356 | 22,356 | 22,356 |
| 10.25% Senior Notes due 2015 and 10.25% Senior Notes due 2015, Series B ........... | 5,000 | 4,857 | 4,857 |
| 10.50%/11.25% Senior Toggle Notes due 2016 ............................ | 1,848 | 1,848 | 1,848 |
| Other secured debt ..................................................... | 208 | 208 | 208 |
| Other unsecured debt ................................................... | 1,390 | 1,390 | 1,390 |
| Total TCEH debt .............................................. | 30,802 | 30,659 | 30,659 |
| Oncor: | | | |
| Secured debt ........................................................... | 5,674 | 5,674 | 5,674 |
| Total Oncor debt ............................................. | 5,674 | 5,674 | 5,674 |
| Debt of Other Subsidiaries: | | | |
| Secured debt(e) ........................................................ | 92 | 92 | 92 |
| Total consolidated debt ...................................... | 43,205 | 43,271 | 43,771 |
| Total shareholders' equity ............................................. | (3,234) | (3,174) | (3,174) |
| Noncontrolling interests in subsidiaries .............................. | 1,420 | 1,420 | 1,420 |
| Total capitalization ......................................... | $41,391 | $41,517 | $42,017 |

(a) The adjustment to cash and cash equivalents reflects estimated issuance costs related to the exchange offers. Debt amounts exclude an aggregate principal amount of up to $176 million and unamortized fair value discount of up to $11 million related to exchanged notes that may remain outstanding and be held by EFH Corp. (parent), EFCH and/or EFIH; such notes would be eliminated in the EFH Corp.

Confidential—For Professional Eyes Only
Mike Kunkel

Highly Confidential

EFH00003294

Confidential—For Professional Eyes Only
Mike Kunkel

consolidated financial statements. The 11.250%/12.000% Senior Toggle Notes due 2017 as adjusted amount includes $159 million in additional principal reflecting the payment-in-kind interest payment on November 1, 2009. Total shareholders' equity reflects an approximate $60 million after tax gain on the transaction. Amounts do not include accrued and unpaid interest paid on the exchanged notes on which cash interest is paid, which was approximately $1 million.

(b)   The adjustment to cash and cash equivalents reflects estimated proceeds from the issuance of the notes, pending use for general or other corporate purposes or as otherwise described in "Use of Proceeds," net of estimated discount and issuance costs.

(c)   Excludes EFIH's guarantees of the EFH Corp. Notes, the 2017 Notes and the notes.

(d)   Excludes EFCH's guarantee of the EFH Corp. Notes, the 2017 Notes, TCEH's senior secured credit facilities, the TCEH 2015/2016 Notes and the notes.

(e)   Consists of a building finance lease.

38

Confidential—For Professional Eyes Only
Mike Kunkel

Highly Confidential

EFH00003295

Confidential—For Professional Eyes Only
Mike Kunkel

# DESCRIPTION OF THE NOTES

**General**

Certain terms used in this description are defined under the subheading "Certain Definitions." In this description, (i) the terms "*we*," "*our*" and "*us*" each refer to Energy Future Holdings Corp. and its consolidated Subsidiaries; and (ii) the term "*Issuer*" refers only to Energy Future Holdings Corp. and not any of its Subsidiaries.

The Issuer will issue $500 million aggregate principal amount of 10.000% senior secured notes due 2020 (the "*Notes*") under an Indenture to be dated as of the Issue Date (the "*Indenture*") among the Issuer, the Guarantors and The Bank of New York Mellon Trust Company, N.A., as trustee (the "*Trustee*"). The Notes will be issued in a private transaction that is not subject to the registration requirements of the Securities Act. See "Notice to Investors." The terms of the Notes will include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act.

As more particularly described under "The Transactions —— Ring-Fencing," upon the consummation of the Merger, Oncor Electric Delivery Company LLC ("*Oncor Electric Delivery*") undertook certain ring-fencing measures to separate itself, its subsidiaries and its immediate parent, Oncor Electric Delivery Holdings Company LLC ("*Oncor Holdings*"), from the Issuer and the Issuer's other Subsidiaries. Those measures include the Oncor Subsidiaries being treated as "Unrestricted Subsidiaries" with respect to the 10.875% Senior Notes due 2017, 11.250%/12.000% Senior Toggle Notes due 2017 and 9.75% Senior Secured Notes due 2019, in each case issued by the Issuer, and with respect to the 9.75% Senior Secured Notes due 2019, issued by Energy Future Intermediate Holding Company LLC ("EFIH") and EFIH Finance Inc. In order to comply with these ring-fencing obligations, the Oncor Subsidiaries will also be Unrestricted Subsidiaries with respect to the Notes. As Unrestricted Subsidiaries, the Oncor Subsidiaries will not be subject to any of the covenants described herein and will not guarantee the Notes.

The Holders of the Notes, by accepting the Notes, acknowledge (i) the legal separateness of the Issuer and the Guarantors from the Oncor Subsidiaries, (ii) that the lenders under the Oncor Electric Delivery Facility and the noteholders under Oncor's existing debt instruments have likely advanced funds thereunder in reliance upon the separateness of the Oncor Subsidiaries from the Issuer and the Guarantors, (iii) that the Oncor Subsidiaries have assets and liabilities that are separate from those of the Issuer and its other Subsidiaries, (iv) that the obligations owing under the Notes are obligations and liabilities of the Issuer and the Guarantors only, and are not the obligations or liabilities of any Oncor Subsidiary, (v) that the Holders of the Notes shall look solely to the Issuer and the Guarantors and their assets, and not to any assets, or to the pledge of any assets, owned by any Oncor Subsidiary, for the repayment of any amounts payable pursuant to the Notes and for satisfaction of any other obligations owing to the Holders under the Indenture, the Registration Rights Agreement and any related documents and (vi) that none of the Oncor Subsidiaries shall be personally liable to the Holders of the Notes for any amounts payable, or any other obligation, under the Indenture, the Registration Rights Agreement or any related documents.

The Holders of the Notes, by accepting the Notes, shall acknowledge and agree that the Holders of the Notes shall not (i) initiate any legal proceeding to procure the appointment of an administrative receiver or (ii) institute any bankruptcy, reorganization, insolvency, winding up, liquidation, or any like proceeding under applicable law, against any Oncor Subsidiary, or against any of the Oncor Subsidiaries' assets. The Holders further acknowledge and agree that each of the Oncor Subsidiaries is a third party beneficiary of the forgoing covenant and shall have the right to specifically enforce such covenant in any proceeding at law or in equity. The foregoing acknowledgements and agreements will be contained in the Indenture.

The following description is only a summary of the material provisions of the Indenture and the Security Documents, does not purport to be complete and is qualified in its entirety by reference to the provisions of the Indenture and the Security Documents, including the definitions therein of certain terms used below. We urge you to read the Indenture and the Security Documents because they, and not this description, will define your rights as Holders of the Notes. You may request copies of the Indenture and the Security Documents at our address set forth under the heading "Incorporation by Reference."

39

Confidential—For Professional Eyes Only
Mike Kunkel

Highly Confidential

Confidential—For Professional Eyes Only
Mike Kunkel

## Brief Description of Notes and the Guarantees

The Notes:

- will be senior obligations of the Issuer and will rank equally in right of payment with all Senior Indebtedness of the Issuer (including the 9.75% Notes and the applicable Existing Notes);

- will be effectively subordinated to any Indebtedness of the Issuer secured by assets of the Issuer, to the extent of the value of the assets securing such Indebtedness;

- will be structurally subordinated to all Indebtedness and other liabilities of non-guarantor Subsidiaries, including the Oncor Subsidiaries, TCEH and its Subsidiaries, any of the Issuer's Foreign Subsidiaries and any other Unrestricted Subsidiaries;

- will be senior in right of payment to any future Subordinated Indebtedness of the Issuer; and

- will be initially unconditionally guaranteed, jointly and severally, on a senior unsecured basis by Energy Future Competitive Holdings Company ("*EFCH*") and on a senior secured basis (to the extent of the Collateral) by EFIH, as described below under "— Guarantees."

The Guarantees:

- will be a general senior obligation of each Guarantor;

- in the case of the Guarantee from EFIH, will be secured, equally and ratably with EFIH's guarantee of the 9.75% Notes and the EFIH Notes, by the pledge of any investments EFIH owns in any Oncor Subsidiary (as described below under "— Security for the Notes"), which on the Issue Date will consist of all of the membership interests it owns in Oncor Holdings;

- in the case of the Guarantee from EFCH, will not be secured;

- will rank equally in right of payment with all existing and future Senior Indebtedness of each Guarantor;

- in the case of the Guarantee from EFIH, will be effectively senior to all unsecured Indebtedness of EFIH to the extent of the value of the Collateral securing such Guarantee;

- will be effectively subordinated to all secured Indebtedness of each Guarantor secured by assets other than the Collateral to the extent of the value of the assets securing such Indebtedness;

- will be structurally subordinated to any existing and future indebtedness and liabilities of Subsidiaries of a Guarantor that do not Guarantee the Notes, including the Oncor Subsidiaries in the case of EFIH, and TCEH and its Subsidiaries in the case of EFCH, and any other Unrestricted Subsidiaries;

- will be senior in right of payment to any future Subordinated Indebtedness of each Guarantor; and

- will be effectively senior to all obligations under any future Junior Lien Debt with respect to the Collateral.

See "Risk Factors — Risks Related to the Notes and Our Substantial Indebtedness — The liabilities of each of EFH Corp. and EFCH currently exceed its assets as shown on its most recent balance sheet. If a court were to find that EFH Corp., EFCH or EFIH were insolvent before or after giving effect to this offering and did not receive reasonably equivalent value or fair consideration for the issuance of the notes or the incurrence of a guarantee or the pledge of the Collateral, as applicable, the court may void all or a portion of the obligations represented by the notes or the guarantee of the notes by EFCH or EFIH or the pledge of the Collateral by EFIH as a fraudulent conveyance."

## Guarantees

The Guarantors, as primary obligors and not merely as sureties, will initially jointly and severally fully and unconditionally guarantee, on a senior basis, the performance and full and punctual payment when due, whether at maturity, by acceleration or otherwise, of all obligations of the Issuer under the Indenture and the Notes,

40

Confidential—For Professional Eyes Only
Mike Kunkel

EFH00003297

**PX 020**
**Page 47 of 218**

Confidential—For Professional Eyes Only
Mike Kunkel

whether for payment of principal of, premium, if any, or interest or Additional Interest in respect of the Notes, expenses, indemnification or otherwise, on the terms set forth in the Indenture by executing the Indenture.

The Issuer and the Guarantors are holding companies and none of the Issuer's or the Guarantors' other Subsidiaries will Guarantee the Notes. In the event of a bankruptcy, liquidation or reorganization of any of the non-guarantor Subsidiaries, the non-guarantor Subsidiaries will pay the holders of their debt and their trade creditors before they will be able to distribute any of their assets to the Issuer or the Guarantors. None of TCEH, the Subsidiaries of TCEH, or the Oncor Subsidiaries will guarantee the Notes. For the year ended December 31, 2008 and the nine months ended September 30, 2009, the non-guarantor Subsidiaries generated all of the Issuer's consolidated total revenue. In addition, as of September 30, 2009, the non-guarantor Subsidiaries held substantially all of the Issuer's consolidated total assets.

Any entity that makes a payment under its Guarantee will be entitled upon payment in full of all guaranteed obligations under the Indenture to a contribution from each other Guarantor in an amount equal to such other Guarantor's pro rata portion of such payment based on the respective net assets of all the Guarantors at the time of such payment determined in accordance with GAAP.

The obligations of each Guarantor under its Guarantee will be limited as necessary to prevent the Guarantee from constituting a fraudulent conveyance under applicable law. However, this limitation may not be effective to prevent a Guarantee from being voided under fraudulent conveyance law, or may reduce or eliminate a Guarantor's obligation to an amount that effectively makes its Guarantee worthless.

If a Guarantee were rendered voidable, it could be subordinated by a court to all other indebtedness (including guarantees and other contingent liabilities) of the Guarantor, and, depending on the amount of such indebtedness, a Guarantor's liability on its Guarantee could be reduced to zero. See "Risk Factors — Risks Related to the Notes and Our Substantial Indebtedness — The liabilities of each of EFH Corp. and EFCH currently exceed its assets as shown on its most recent balance sheet. If a court were to find that EFH Corp., EFCH or EFIH were insolvent before or after giving effect to this offering and did not receive reasonably equivalent value or fair consideration for the issuance of the notes or the incurrence of a guarantee or the pledge of the Collateral, as applicable, the court may void all or a portion of the obligations represented by the notes or the guarantee of the notes by EFCH or EFIH or the pledge of the Collateral by EFIH as a fraudulent conveyance."

Subject to "— Certain Covenants — Restrictions on Permitted Asset Transfers," each Guarantee by a Guarantor will provide by its terms that it will be automatically and unconditionally released and discharged upon:

(1)(a) any sale, exchange or transfer (by merger, wind-up, consolidation or otherwise) of the Capital Stock of such Guarantor (including any sale, exchange or transfer), after which the applicable Guarantor is no longer a Restricted Subsidiary or sale of all or substantially all the assets of such Guarantor, which sale, exchange or transfer is made in compliance with the applicable provisions of the Indenture, except that the Guarantee by EFIH shall only be released and discharged as provided under "— Certain Covenants — Restrictions on Permitted Asset Transfers";

(b) the release or discharge of the guarantee by such Guarantor that resulted in the creation of such Guarantee, except a discharge or release by or as a result of payment under such guarantee;

(c) the designation of any Restricted Subsidiary that is a Guarantor as an Unrestricted Subsidiary in compliance with the applicable provisions of the Indenture; or

(d) the exercise by the Issuer of its legal defeasance option or covenant defeasance option as described under "— Legal Defeasance and Covenant Defeasance" or the discharge of the Issuer's obligations under the Indenture in accordance with the terms of the Indenture; and

41

Confidential—For Professional Eyes Only
Mike Kunkel

EFH00003298

Confidential—For Professional Eyes Only
Mike Kunkel

(2) such Guarantor delivering to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that all conditions precedent provided for in the Indenture relating to such transaction have been complied with.

Further, the Guarantee by EFCH shall automatically be released in connection with a Permitted Asset Transfer made in accordance with "— Certain Covenants — Restrictions on Permitted Asset Transfers" other than a merger, wind-up or consolidation of EFIH into the Issuer where EFCH continues to be a Subsidiary of the Issuer.

**Holding Company Structure**

The Issuer is a holding company for its Subsidiaries, with no material operations of its own and only limited assets. Accordingly, the Issuer is dependent upon the distribution of the earnings of its Subsidiaries, whether in the form of dividends, advances or payments on account of intercompany obligations, to service its debt obligations. Each of the Guarantors are also holding companies for their Subsidiaries. See the risk factor in our 2008 Form 10-K entitled "EFH Corp. is a holding company and its obligations are structurally subordinated to existing and future liabilities and preferred stock of its subsidiaries."

**Paying Agent and Registrar for the Notes**

The Issuer will maintain one or more paying agents for the Notes. The initial paying agent for the Notes will be the Trustee at its offices in Houston, Texas.

The Issuer will also maintain a registrar. The initial registrar will be the Trustee at its offices in Houston, Texas. The registrar will maintain a register reflecting ownership of the Notes outstanding from time to time and will make payments on and facilitate transfer of Notes on behalf of the Issuer.

The Issuer may change the paying agents or the registrars without prior notice to the Holders. The Issuer or any of its Subsidiaries may act as a paying agent or registrar.

**Transfer and Exchange**

A Holder may transfer or exchange Notes in accordance with the Indenture. The registrar and the Trustee may require a Holder to furnish appropriate endorsements and transfer documents in connection with a transfer of Notes. Holders will be required to pay all taxes due on transfer. The Issuer will not be required to transfer or exchange any Note selected for redemption. Also, the Issuer will not be required to transfer or exchange any Note for a period of 15 days before a selection of Notes to be redeemed.

**Principal, Maturity and Interest**

The Issuer will issue $500 million in aggregate principal amount of Notes in this offering. The Notes will mature on January 15, 2020. Subject to compliance with the covenants described under "— Certain Covenants — Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" and "— Certain Covenants — Liens," the Issuer may issue additional Notes from time to time after the Issue Date under the Indenture (any such Notes, "*Additional Notes*"). The Notes and any Additional Notes subsequently issued under the Indenture will be treated as a single class for all purposes under the Indenture, including waivers, amendments, redemptions and offers to purchase. Unless the context requires otherwise, references to "Notes" for all purposes of the Indenture and this "Description of the Notes" section include any Additional Notes that are actually issued.

Interest on the Notes will accrue at the rate of 10.000% per annum and will be payable semi-annually in arrears on each January 15 and July 15, commencing on July 15, 2010, to the Holders of record on the immediately preceding January 1 and July 1. Interest on the Notes will accrue from the most recent date to which interest has been paid or, if no interest has been paid, from and including the Issue Date. Interest on the Notes will be computed on the basis of a 360-day year comprised of twelve 30-day months.

42

Confidential—For Professional Eyes Only
Mike Kunkel

EFH00003299

Confidential—For Professional Eyes Only
Mike Kunkel

Principal of, premium, if any, and interest on the Notes will be payable at the office or agency of the Issuer maintained for such purpose within the City of Houston and State of Texas or, at the option of the Issuer, payment of interest may be made by check mailed to the Holders of the Notes at their respective addresses set forth in the register of Holders; *provided* that all payments of principal, premium, if any, and interest with respect to the Notes represented by one or more global notes registered in the name of or held by DTC or its nominee will be made by wire transfer of immediately available funds to the accounts specified by the Holder or Holders thereof. Until otherwise designated by the Issuer, the Issuer's office or agency in Houston, Texas will be the office of the Trustee maintained for such purpose.

### Additional Interest

Additional Interest may accrue on the Notes in certain circumstances pursuant to the Registration Rights Agreement. All references in the Indenture, in any context, to any interest or other amount payable on or with respect to the Notes shall be deemed to include any Additional Interest pursuant to the Registration Rights Agreement.

### Mandatory Redemption; Offers to Purchase; Open Market Purchases

The Issuer will not be required to make any mandatory redemption or sinking fund payments with respect to the Notes. However, under certain circumstances, the Issuer may be required to offer to purchase Notes as described under "— Repurchase at the Option of Holders." The Issuer may at any time and from time to time purchase Notes in the open market or otherwise.

### Optional Redemption

Except as set forth below, the Issuer will not be entitled to redeem Notes at its option prior to January 15, 2015.

At any time prior to January 15, 2015, the Issuer may redeem all or a part of the Notes, upon not less than 30 nor more than 60 days' prior notice mailed by first-class mail to the registered address of each Holder of Notes or otherwise in accordance with the procedures of DTC, at a redemption price equal to 100% of the principal amount of the Notes redeemed plus the Applicable Premium as of, and accrued and unpaid interest and Additional Interest, if any, to, the date of redemption (the "*Redemption Date*"), subject to the rights of Holders of Notes on the relevant record date to receive interest due on the relevant interest payment date.

On and after January 15, 2015, the Issuer may redeem the Notes, in whole or in part, upon not less than 30 nor more than 60 days' prior notice mailed by first-class mail to the registered address of each Holder of Notes or otherwise in accordance with the procedures of DTC, at the redemption prices (expressed as percentages of principal amount of the Notes to be redeemed) set forth below, plus accrued and unpaid interest and Additional Interest, if any, to the applicable Redemption Date, subject to the right of Holders of Notes of record on the relevant record date to receive interest due on the relevant interest payment date, if redeemed during the twelve-month period beginning on January 15 of each of the years indicated below:

| Year | Percentage |
|---|---|
| 2015 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 105.000% |
| 2016 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 103.333% |
| 2017 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 101.667% |
| 2018 and thereafter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 100.000% |

In addition, until January 15, 2013, the Issuer may, at its option, on one or more occasions redeem up to 35% of the aggregate principal amount of Notes at a redemption price equal to 110.000% of the aggregate principal amount thereof, plus accrued and unpaid interest and Additional Interest, if any, to the applicable

43

Confidential—For Professional Eyes Only
Mike Kunkel

EFH00003300

Confidential—For Professional Eyes Only
Mike Kunkel

Redemption Date, subject to the right of Holders of Notes of record on the relevant record date to receive interest due on the relevant interest payment date, with the net cash proceeds of one or more Equity Offerings; *provided* that at least 50% of the sum of the original aggregate principal amount of Notes issued under the Indenture and the original principal amount of any Additional Notes issued under the Indenture after the Issue Date remains outstanding immediately after the occurrence of each such redemption; and *provided, further* that each such redemption occurs within 90 days of the date of closing of each such Equity Offering.

Any notice of any redemption may be given prior to the redemption thereof, and any such redemption or notice may, at the Issuer's discretion, be subject to one or more conditions precedent, including, but not limited to, completion of an Equity Offering or other corporate transaction.

If the Issuer redeems less than all of the outstanding Notes, the Trustee shall select the Notes to be redeemed in the manner described under "— Repurchase at the Option of Holders — Selection and Notice."

## Security for the Notes

### Collateral Trustee

EFIH has appointed The Bank of New York Mellon Trust Company, N.A. to serve as the collateral trustee (the "*Collateral Trustee*") for the benefit of the holders of the Secured Debt Obligations outstanding from time to time.

The Security Documents will provide that the Collateral Trustee will be subject to such directions as may be given it by the Trustee and by any other Parity Lien Debt Representatives from time to time as required or permitted by the Indenture and the other Parity Lien Debt Documents. The relative rights with respect to control of the Collateral Trustee are specified in the collateral trust agreement dated as of November 16, 2009 by and among EFIH, the trustees for the 9.75% Notes and the EFIH Notes, any other Parity Lien Debt Representatives, any Junior Lien Debt Representatives and the Collateral Trustee (the "*Collateral Trust Agreement*"). On the Issue Date, the Collateral Trustee and the Trustee for the benefit of the Holders of the Notes will enter into a Joinder to the Collateral Trust Agreement, and the Notes will be designated as "Parity Lien Debt" by EFIH. Except as provided in the Collateral Trust Agreement or as directed by an Act of Required Debtholders, the Collateral Trustee will not be obligated:

(1) to act upon directions purported to be delivered to it by any other Person;

(2) to foreclose upon or otherwise enforce any Lien; or

(3) to take any other action whatsoever with regard to any or all of the Security Documents, the Liens created thereby or the Collateral.

### Collateral

The Indenture and the Security Documents will provide that the Guarantee of the Notes by EFIH, together with any other Parity Lien Debt (which on the Issue Date will include EFIH's guarantee of the 9.75% Notes and the EFIH Notes), will be secured on an equal and ratable basis by first-priority security interests granted to the Collateral Trustee, in all of the following property of EFIH:

(1) any Equity Interests it owns as of the Issue Date or may thereafter acquire in any Oncor Subsidiary and any promissory notes or other Indebtedness owed by, or other Investments in, any Oncor Subsidiary that it owns as of the Issue Date or it may thereafter acquire;

(2) all proceeds of, income and other payments (including, without limitation, dividends and distributions received) now or hereafter due and payable with respect to, and supporting obligations relating to, any and all of the foregoing, which, in the case of cash dividends and distributions received by EFIH from Oncor Holdings may be used by EFIH for any purpose not prohibited by the Indenture so long as no

44

Confidential—For Professional Eyes Only
Mike Kunkel

EFH00003301

Confidential--For Professional Eyes Only
Mike Kunkel

Event of Default and no event of default under any other Parity Lien Debt, including the 9.75% Notes and the EFIH Notes, shall have occurred and be continuing; and

(3) any Asset Sale Cash Collateral Account established pursuant to the Indenture, the 9.75% Notes Indenture or the EFIH Indenture.

In addition, any Successor EFIH Company (including the Issuer, if EFIH is merged with and into the Issuer) will grant a first-priority security interest to the Collateral Trustee for the benefit of Holders of the Notes and holders of the other Parity Lien Debt and a second-priority security interest to the Collateral Trustee for the benefit of holders of Junior Lien Debt to the extent that such Successor EFIH Company holds any Equity Interests in, or Indebtedness of, or other Investments in, any Oncor Subsidiary following a Permitted Asset Transfer made in accordance with the covenants described under "— Certain Covenants — Restrictions on Permitted Asset Transfers" and "— Certain Covenants — Restrictions on Certain Investments in Oncor Subsidiaries."

On the Issue Date, the Collateral will consist of a pledge of all of the membership interests EFIH owns in Oncor Holdings. Oncor Holdings owns approximately 80% of Oncor Electric Delivery's outstanding membership interests. On November 16, 2009, EFIH and the Collateral Trustee entered into a pledge agreement (the "*Pledge Agreement*"), whereby the Collateral was pledged in favor of the Collateral Trustee for the benefit of the Collateral Trustee, the trustees for the 9.75% Notes and the EFIH Notes and the holders of the 9.75% Notes and the EFIH Notes and the holders of any other Secured Debt Obligations that may be issued in accordance with the Indenture and the 9.75% Notes Indenture and the EFIH Indenture. As a result of the Joinder to the Collateral Trust Agreement and the designation by EFIH referred to above, the Trustee and the holders of the Notes will benefit from the pledge of the Collateral under the Pledge Agreement. The Collateral does not consist of any assets of any Oncor Subsidiary. See "Risk Factors — Risks Related to the Notes and Our Substantial Indebtedness — The notes will be secured only to the extent of the value of the assets that have been granted as security for EFIH's guarantee of the notes"; "— Regulatory approvals may be required in order to enforce the security interests in the Collateral and to dispose of an interest in, or operational control of, the Collateral that secures EFIH's guarantee of the notes"; "— In the event of EFH Corp.'s bankruptcy, the ability of the holders of the notes to realize upon the Collateral securing EFIH's guarantee of the notes will be subject to certain bankruptcy law limitations"; and "— The value of the Collateral may be diluted if we issue additional debt that is secured equally and ratably by the same Collateral securing the guarantee by EFIH of the notes or if the Collateral is sold."

No appraisal of the value of the Collateral has been made in connection with the issuance of the Notes and the value of the Collateral in the event of liquidation will depend on many factors. Consequently, liquidating the Collateral may not produce proceeds in an amount sufficient to pay any amounts due on the Secured Debt Obligations, including the Notes.

The fair market value of the Collateral is subject to fluctuations based on factors that include, among others, the ability to sell the Collateral in an orderly sale, general economic conditions, the availability of buyers and similar factors. The amount to be received upon a sale of the Collateral would be dependent on numerous factors, including but not limited to the actual fair market value of the Collateral at such time and the timing and the manner of the sale. By its nature, the Collateral may be illiquid and may have no readily ascertainable market value. In the event of a foreclosure, liquidation, bankruptcy or similar proceeding, we cannot assure you that the proceeds from any sale or liquidation of the Collateral will be sufficient to pay the Parity Lien Obligations, including the Notes. Any claim for the difference between the amount, if any, realized by Holders of the Notes from the sale of Collateral securing the Secured Debt Obligations will rank equally in right of payment with all of our other unsecured unsubordinated Indebtedness and other obligations, including trade payables.

So long as no Event of Default and no event of default under any other Parity Lien Debt, including the 9.75% Notes and the EFIH Notes, shall have occurred and be continuing, and subject to certain terms and conditions, EFIH will be entitled to exercise any voting and other consensual rights pertaining to the Collateral (other than as set forth in the Pledge Agreement and the other Security Documents). The Pledge Agreement requires EFIH to deliver to the Collateral Trustee, for the Collateral Trustee to maintain in its possession,

45

Confidential--For Professional Eyes Only
Mike Kunkel

EFH00003302

Confidential—For Professional Eyes Only
Mike Kunkel

certificates, if any, evidencing the Collateral. Upon the occurrence and during the continuance of an Event of Default under the Notes, to the extent permitted by law and subject to the provisions of the Pledge Agreement, all of the rights of EFIH to exercise voting or other consensual rights with respect to the Collateral will cease, and all such rights will become vested in the Collateral Trustee, which, to the extent permitted by law, will have the sole right to exercise such voting and other consensual rights.

### Certain bankruptcy limitations

The right of the Collateral Trustee to repossess and dispose of the Collateral upon the occurrence of an Event of Default would be significantly impaired by applicable bankruptcy law in the event that a bankruptcy case were to be commenced by or against EFIH prior to the Collateral Trustee having repossessed and disposed of the Collateral. Upon the commencement of a case for relief under Title 11 of the United States Code, as amended (the "*Bankruptcy Code*"), a secured creditor such as the Collateral Trustee is prohibited from repossessing its security from a debtor in a bankruptcy case, or from disposing of security repossessed from the debtor, without bankruptcy court approval.

In view of the broad equitable powers of a U.S. bankruptcy court, it is impossible to predict how long payments under the Notes could be delayed following commencement of a bankruptcy case, whether or when the Collateral Trustee could repossess or dispose of the Collateral, the value of the Collateral at the time of the bankruptcy petition or whether or to what extent Holders of the Notes would be compensated for any delay in payment or loss of value of the Collateral. The Bankruptcy Code permits only the payment and/or accrual of post-petition interest, costs and attorneys' fees to a secured creditor during a debtor's bankruptcy case to the extent the value of the Collateral is determined by the bankruptcy court to exceed the aggregate outstanding principal amount at maturity of the obligations secured by the Collateral. There can be no assurance that the value of the Collateral will exceed the outstanding principal amount of the Notes and the other Parity Lien Debt Obligations, including the 9.75% Notes and the EFIH Notes.

Furthermore, in the event a bankruptcy court determines that the value of the Collateral is not sufficient to repay all amounts due on the Notes and the other Parity Lien Debt Obligations, including the 9.75% Notes and the EFIH Notes, the Holders of the Notes and the holders of the other Parity Lien Debt would hold secured claims to the extent of the value of the Collateral to which the Holders of the Notes and the holders of the other Parity Lien Debt are entitled, and unsecured claims with respect to any such shortfall.

### Additional Parity Lien Debt

On November 16, 2009, $115.4 million of 9.75% Notes were issued by the Issuer, and $141.1 million of EFIH Notes were issued by EFIH and EFIH Finance Inc., all of which constitutes Parity Lien Debt, and all of which is secured by the Collateral on an equal and ratable basis with the Notes. In addition, the Indenture and the Security Documents will provide that the Issuer and EFIH may incur additional Parity Lien Debt as permitted by the covenants described under "— Certain Covenants — Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" and "— Certain Covenants — Liens," by issuing Additional Notes under the Indenture or under one or more additional indentures or incurring other Indebtedness secured by Parity Liens on the Collateral. All additional Parity Lien Debt will be secured equally and ratably with EFIH's Guarantee of the Notes by Liens on the Collateral held by the Collateral Trustee for as long as EFIH's Guarantee of the Notes is secured by the Collateral. The Collateral Trustee under the Collateral Trust Agreement will hold all Parity Liens in trust for the benefit of the Holders of the Notes, the 9.75% Notes, the EFIH Notes and the holders of any future Parity Lien Debt and all other Parity Lien Obligations. Additional Parity Lien Debt will be permitted to be secured by the Collateral only if such Parity Lien Debt and the related Parity Liens are permitted to be incurred under the covenants described under "— Certain Covenants — Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" and "— Certain Covenants — Liens." The agent or representative of any Parity Lien Debt will become a party to the Security Documents by joinder agreement.

46

Confidential—For Professional Eyes Only
Mike Kunkel

EFH00003303

Confidential—For Professional Eyes Only
Mike Kunkel

### Future Junior Lien Debt

The Indenture and the Security Documents will provide that the Issuer and EFIH may incur Junior Lien Debt in the future by issuing debt securities under one or more indentures, incurring Indebtedness under Credit Facilities or otherwise issuing or increasing a new Series of Secured Lien Debt secured by Junior Liens on the Collateral. Junior Lien Debt will be permitted to be secured by the Collateral only if such Junior Lien Debt and the related Junior Liens are permitted to be incurred under the covenants described under "— Certain Covenants — Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" and "— Certain Covenants — Liens." The Collateral Trustee under the Collateral Trust Agreement will hold all Junior Liens in trust for the benefit of the holders of any Junior Lien Debt and all other Junior Lien Obligations. The agent or representative of any Junior Lien Obligations shall become a party to the Collateral Trust Agreement by joinder agreement.

### Enforcement of Liens

If the Collateral Trustee at any time receives written notice stating that any event has occurred that constitutes a default under any Secured Debt Document entitling the Collateral Trustee to foreclose upon, collect or otherwise enforce its Liens thereunder, it will promptly deliver written notice thereof to each Secured Debt Representative. Thereafter, the Collateral Trustee will await direction by an Act of Required Debtholders and will act, or decline to act, as directed by an Act of Required Debtholders, in the exercise and enforcement of the Collateral Trustee's interests, rights, powers and remedies in respect of the Collateral or under the Security Documents or applicable law and, following the initiation of such exercise of remedies, the Collateral Trustee will act, or decline to act, with respect to the manner of such exercise of remedies as directed by an Act of Required Debtholders. Unless it has been directed to the contrary by an Act of Required Debtholders, the Collateral Trustee in any event may (but will not be obligated to) take or refrain from taking such action with respect to any default under any Secured Debt Document as it may deem advisable to preserve and protect the value of the Collateral.

Until the Discharge of Parity Lien Obligations, the Holders of the Notes and the holders of other Parity Lien Obligations will have, subject to the exceptions set forth below in clauses (1) through (4), the exclusive right to authorize and direct the Collateral Trustee with respect to the Security Documents and the Collateral (including, without limitation, the exclusive right to authorize or direct the Collateral Trustee to enforce, collect or realize on any Collateral or exercise any other right or remedy with respect to the Collateral) and neither the provisions of the Security Documents relating thereto (other than in accordance with the Collateral Trust Agreement) nor any Junior Lien Representative or holder of Junior Lien Obligations, if any, may authorize or direct the Collateral Trustee with respect to such matters. Notwithstanding the foregoing, the holders of Junior Lien Obligations may direct the Collateral Trustee with respect to such matters:

(1) without any condition or restriction whatsoever, at any time after the Discharge of Parity Lien Obligations;

(2) to deliver any notice or demand necessary to enforce (subject to the prior Discharge of Parity Lien Obligations) any right to claim, take or receive proceeds of Collateral remaining after the Discharge of Parity Lien Obligations;

(3) as necessary to perfect or establish the priority (subject to Parity Liens) of the Junior Liens upon any Collateral; *provided* that, unless otherwise agreed to by the Collateral Trustee in the Security Documents, the holders of Junior Lien Obligations may not require the Collateral Trustee to take any action to perfect any Collateral through possession or control (other than the Collateral Trustee as agent for the benefit of the Parity Lien Representative and holders of the Parity Lien Obligations agreeing pursuant to the Collateral Trust Agreement to act as bailee for the Collateral Trustee as agent for the benefit of the Junior Lien Representatives and holders of the Junior Lien Obligations); or

(4) as necessary to create, prove, preserve or protect (but not enforce) the Junior Liens upon any Collateral.

47

Confidential—For Professional Eyes Only
Mike Kunkel

Confidential—For Professional Eyes Only
Mike Kunkel

Both before and during an insolvency or liquidation proceeding until the Discharge of Parity Lien Obligations, none of the holders of Junior Lien Obligations, the Collateral Trustee (unless acting pursuant to an Act of Required Debtholders) or any Junior Lien Representative will be permitted to:

(1) request judicial relief, in an insolvency or liquidation proceeding or in any other court, that would hinder, delay, limit or prohibit the lawful exercise or enforcement of any right or remedy otherwise available to the holders of Parity Lien Obligations in respect of the Parity Liens or that would limit, invalidate, avoid or set aside any Parity Lien or subordinate the Parity Liens to the Junior Liens or grant the Junior Liens equal ranking to the Parity Liens;

(2) oppose or otherwise contest any motion for (A) relief from the automatic stay or (B) any injunction against foreclosure or (C) any enforcement of Parity Liens, in each case made by any holder of Parity Lien Obligations or any Parity Lien Representative in any insolvency or liquidation proceeding;

(3) oppose or otherwise contest any lawful exercise by any holder of Parity Lien Obligations or any Parity Lien Representative of the right to credit bid Parity Lien Obligations at any sale of Collateral in the foreclosure of Parity Liens;

(4) oppose or otherwise contest any other request for judicial relief made in any court by any holder of Parity Lien Obligations or any Parity Lien Representative relating to the lawful enforcement of any Parity Lien; or

(5) challenge the validity, enforceability, perfection or priority of the Parity Liens with respect to the Collateral.

Notwithstanding the foregoing, both before and during an insolvency or liquidation proceeding, the holders of Junior Lien Obligations or Junior Lien Representatives may take any actions and exercise any and all rights that would be available to a holder of unsecured claims, including, without limitation, the commencement of an insolvency or liquidation proceeding against EFIH in accordance with applicable law; *provided* the Collateral Trust Agreement provides that no holder of Junior Lien Obligations or Junior Lien Representative will be permitted to take any of the actions prohibited by clauses (1) through (5) of the preceding paragraph or oppose or contest any order that it has agreed not to oppose or contest under the provisions described under "— Insolvency or Liquidation Proceedings."

At any time prior to the Discharge of Parity Lien Obligations and after (1) the commencement of any insolvency or liquidation proceeding in respect of EFIH or (2) the Collateral Trustee and each Junior Lien Representative have received written notice from any Parity Lien Representative stating that (A) any Series of Parity Lien Debt has become due and payable in full (whether at maturity, upon acceleration or otherwise) or (B) the holders of Parity Liens securing one or more Series of Parity Lien Debt have become entitled under any Parity Lien Document to and desire to enforce any or all of the Parity Liens by reason of a default under such Parity Lien Documents, no payment of money (or the equivalent of money) will be made from the proceeds of Collateral by EFIH to the Collateral Trustee (other than distributions to the Collateral Trustee in respect of its fees under the Collateral Trust Agreement and for the benefit of the holders of Parity Lien Obligations), any Junior Lien Representative or any holder of Junior Lien Obligations (including, without limitation, payments and prepayments made for application to Junior Lien Obligations).

All proceeds of Collateral received by any Junior Lien Representative or any holder of Junior Lien Obligations in violation of the immediately preceding paragraph will be held by such Person in trust for the account of the holders of Parity Lien Obligations and remitted to any Parity Lien Representative upon demand by such Parity Lien Representative. The Junior Liens will remain attached to and, subject to the provisions described under "— Provisions of the Indenture Relating to Security — Ranking of Parity Liens," enforceable against all proceeds so held or remitted. All proceeds of Collateral received by any Junior Lien Representative or any holder of Junior Lien Obligations not in violation of the immediately preceding paragraph will be received by such Person free from the Parity Liens.

48

Confidential—For Professional Eyes Only
Mike Kunkel

Confidential—For Professional Eyes Only
Mike Kunkel

Pursuant to the Public Utility Regulatory Act ("*PURA*"), Texas Utilities Code §§39.262(l) and 39.915 and, through October 10, 2012, to the Order on Rehearing in Public Utility Commission of Texas ("PUCT") Docket No. 34077, the PUCT must approve any change in majority ownership, controlling ownership or operational control of Oncor Electric Delivery. As a result, prior to any foreclosure on the Collateral consisting of membership interests in Oncor Holdings, approval of the PUCT will be required if such foreclosure consists of a change in majority ownership or control of Oncor Holdings. Pursuant to PURA §§39.262(m) and 39.915(b), the PUCT will approve such a transfer if it finds that the transaction is in the public interest. In making its determination, these sections of PURA provide that the PUCT will consider whether the transaction will adversely affect the reliability of service, availability of service or cost of service of Oncor Electric Delivery. We cannot assure you that such approval will be granted and, if it is not granted, the Collateral Trustee may not be able to liquidate the Collateral consisting of membership interests and, accordingly, the Collateral Trustee may not be able to distribute any proceeds to Holders of the Notes upon such foreclosure. If the approval is granted, then PUCT approval would also be required with respect to any subsequent disposition of a majority or controlling interest in the membership interests of Oncor Holdings.

In addition, pursuant to the terms of an investor rights agreement among the Issuer, Oncor Holdings, Oncor Electric Delivery and the minority investor in Oncor Electric Delivery, a transfer of the Equity Interests in Oncor Holdings to a third party, including as a result of any enforcement of the Lien on the Collateral consisting of Equity Interests of Oncor Holdings or Oncor Electric Delivery, may give rise to a tag-along right of the minority investor(s) in Oncor Electric Delivery to participate in that transfer on a pro rata basis.

### *Waiver of Right of Marshalling*

The Collateral Trust Agreement provides that, prior to the Discharge of Parity Lien Obligations, the holders of Junior Lien Obligations, each Junior Lien Representative and the Collateral Trustee may not assert or enforce any right of marshalling accorded to a junior lienholder, as against the holders of Parity Lien Obligations and the Parity Lien Representatives (in their capacity as senior or priority lienholders) with respect to the Collateral. Following the Discharge of Parity Lien Obligations, the holders of Junior Lien Obligations and any Junior Lien Representative may assert their right under the Uniform Commercial Code or otherwise to any proceeds remaining following a sale or other disposition of Collateral by, or on behalf of, the holders of Parity Lien Obligations.

### *Insolvency or Liquidation Proceedings*

If in any insolvency or liquidation proceeding and prior to the Discharge of Parity Lien Obligations, the holders of Parity Lien Obligations by an Act of Required Debtholders consent to any order:

(1) for use of cash collateral;

(2) approving a debtor-in-possession financing secured by a Lien that is senior to or on a parity with all Parity Liens upon any property of the estate in such insolvency or liquidation proceeding;

(3) granting any relief on account of Parity Lien Obligations as adequate protection (or its equivalent) for the benefit of the holders of Parity Lien Obligations in the Collateral; or

(4) relating to a sale of assets of EFIH that provides, to the extent the Collateral sold is to be free and clear of Liens, that all Parity Liens and Junior Liens will attach to the proceeds of the sale;

then, the holders of Junior Lien Obligations and the Junior Lien Representatives will not oppose or otherwise contest the entry of such order; *provided*, that the holders of Junior Lien Obligations or a Junior Lien Representative may request the grant to the Collateral Trustee, for the benefit of the holders of Junior Lien Obligations and the Junior Lien Representatives, of a Junior Lien upon any property on which a Lien is (or is to be) granted under such order to secure the Parity Lien Obligations, co-extensive in all respects with, but subordinated, as provided in the provisions described under "— Provisions of the Indenture Relating to Security — Ranking of Parity Liens," to, such Lien and all Parity Liens on such property. The holders of Parity Lien

Confidential—For Professional Eyes Only
Mike Kunkel

Highly Confidential

EFH00003306

Confidential—For Professional Eyes Only
Mike Kunkel

Obligations (including the Holders of the Notes) and the Parity Lien Representatives (including the Trustee) will agree not to oppose or otherwise contest in any respect any request made by the Junior Lien Representatives for a Junior Lien pursuant to the proviso to the preceding sentence.

Notwithstanding the foregoing, both before and during an insolvency or liquidation proceeding, the holders of Junior Lien Obligations and the Junior Lien Representatives may take any actions and exercise any and all rights that would be available to a holder of unsecured claims, including, without limitation, the commencement of insolvency or liquidation proceedings against EFIH in accordance with applicable law; *provided* that the Collateral Trust Agreement provides that no holder of Junior Lien Obligations or Junior Lien Representative will be permitted to take any of the actions prohibited under the third and fourth paragraphs of the provisions described under "— Enforcement of Liens," or oppose or contest any order that it has agreed not to oppose or contest under clauses (1) through (4) of the preceding paragraph.

Neither the holders of Junior Lien Obligations nor any Junior Lien Representative will file or prosecute in any insolvency or liquidation proceeding any motion for adequate protection (or any comparable request for relief) based upon their interest in the Collateral under the Junior Liens, except that:

(1) they may freely seek and obtain relief granting a Junior Lien co-extensive in all respects with, but subordinated, as provided in the provisions described under "— Provisions of the Indenture Relating to Security — Ranking of Parity Liens," to, all Liens granted in such insolvency or liquidation proceeding to, or for the benefit of, the holders of Parity Lien Obligations; and

(2) they may freely seek and obtain any relief upon a motion for adequate protection (or any comparable relief), without any condition or restriction whatsoever, at any time after the Discharge of Parity Lien Obligations.

### *Order of Application*

The Collateral Trust Agreement provides that if any Collateral is sold or otherwise realized upon by the Collateral Trustee in connection with any foreclosure, collection or other enforcement of Liens granted to the Collateral Trustee in the Security Documents, the proceeds received by the Collateral Trustee from such foreclosure, collection or other enforcement will be distributed by the Collateral Trustee in the following order of application:

FIRST, to the payment of all amounts payable under the Collateral Trust Agreement on account of the Collateral Trustee's fees and any reasonable legal fees, costs and expenses or other liabilities of any kind incurred by the Collateral Trustee or any co-trustee or agent of the Collateral Trustee in connection with any Security Document;

SECOND, ratably to the respective Parity Lien Representatives for application, after payment of any fees and expenses (including but not limited to, attorney's fees and expenses) of such Parity Lien Representative, to the payment of all outstanding Notes and other Parity Lien Debt and any other Parity Lien Obligations that are then due and payable in such order as may be provided in the relevant Parity Lien Documents in an amount sufficient to pay in full in cash all outstanding Notes and other Parity Lien Debt and all other Parity Lien Obligations that are then due and payable (including all interest accrued thereon after the commencement of any insolvency or liquidation proceeding at the rate, including any applicable post-default rate, specified in the relevant Parity Lien Documents, even if such interest is not enforceable, allowable or allowed as a claim in such proceeding, and including the discharge or cash collateralization (at the lower of (1) 105% of the aggregate undrawn amount and (2) the percentage of the aggregate undrawn amount required for release of Liens under the terms of the applicable Parity Lien Document) of all outstanding letters of credit constituting Parity Lien Debt);

THIRD, to the respective Junior Lien Representatives for application to the payment of all outstanding Junior Lien Debt and any other Junior Lien Obligations that are then due and payable in such order as may be provided in the Junior Lien Documents in an amount sufficient to pay in full in cash all outstanding Junior Lien Debt and all other Junior Lien Obligations that are then due and payable (including all interest accrued thereon

50

Confidential—For Professional Eyes Only
Mike Kunkel