OFFERING MEMORANDUM                                              CONFIDENTIAL

# ENERGY FUTURE HOLDINGS CORP.

### $500,000,000
### 10.000% Senior Secured Notes due 2020

Energy Future Holdings Corp. ("EFH Corp.") is offering $500,000,000 aggregate principal amount of its 10.000% Senior Secured Notes due 2020 (the "notes"). Interest on the notes is payable on January 15 and July 15 of each year, commencing on July 15, 2010. The notes accrue interest at the rate of 10.000% per annum. The notes will mature on January 15, 2020.

EFH Corp. may redeem any of the notes beginning on January 15, 2015 at the redemption prices set forth in this offering memorandum. EFH Corp. may also redeem any of the notes at any time prior to January 15, 2015 at a price equal to 100% of their principal amount, plus accrued and unpaid interest and a "make-whole" premium. In addition, before January 15, 2013, EFH Corp. may redeem up to 35% of the aggregate principal amount of the notes using the proceeds from certain equity offerings at the redemption price set forth in this offering memorandum.

The notes are senior obligations of EFH Corp. and rank equally in right of payment with all senior indebtedness of EFH Corp. The notes are effectively subordinated to any indebtedness of EFH Corp. secured by assets of EFH Corp. to the extent of the value of the assets securing such indebtedness and structurally subordinated to all indebtedness and other liabilities of EFH Corp.'s non-guarantor subsidiaries and any other unrestricted subsidiaries. The notes are senior in right of payment to any future subordinated indebtedness of EFH Corp.

Energy Future Competitive Holdings Company ("EFCH") and Energy Future Intermediate Holding Company LLC ("EFIH" and, together with EFCH, the "guarantors"), direct, wholly owned subsidiaries of EFH Corp., will jointly and severally guarantee the notes (the "guarantees"). The guarantee from EFIH is secured, equally and ratably with certain outstanding indebtedness of EFH Corp. and EFIH, by the pledge of all membership interests and other investments EFIH owns or holds in Oncor Electric Delivery Holdings Company LLC ("Oncor Holdings") or any of Oncor Holdings' subsidiaries (such membership interests and other investments, the "Collateral"). The guarantee from EFCH is unsecured. The guarantees are senior obligations of each guarantor and rank equally in right of payment with all existing and future senior indebtedness of each guarantor. The guarantee from EFIH is effectively senior to all unsecured indebtedness of EFIH to the extent of the value of the Collateral. The guarantees will be effectively subordinated to all secured indebtedness of each guarantor secured by assets other than the Collateral to the extent of the value of the assets securing such indebtedness, and will be structurally subordinated to any existing and future indebtedness and liabilities of EFH Corp.'s subsidiaries that are not guarantors.

Under certain circumstances, EFH Corp. and the guarantors have agreed to file a registration statement with the United States Securities and Exchange Commission (the "SEC") relating to an offer to exchange the notes and guarantees for publicly tradable notes and guarantees having substantially identical terms.

For a more detailed description of the notes, see "Description of the Notes" beginning on page 39.

**See "Risk Factors" beginning on page 16 as well as those contained in EFH Corp.'s Annual Report on Form 10-K for the fiscal year ended December 31, 2008 (our "2008 Form 10-K") and EFH Corp.'s Quarterly Report on Form 10-Q for the fiscal quarter ended September 30, 2009 (our "September 30, 2009 Form 10-Q"), each of which is incorporated into this offering memorandum by reference, for a discussion of certain risks that you should consider before investing in the notes.**

The notes have not been registered under the Securities Act of 1933, as amended (the "Securities Act"), and may not be offered or sold within the United States or to, or for the account or benefit of, U.S. persons except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act. Accordingly, the notes are being offered and sold only (a) to "qualified institutional buyers" (as defined in Rule 144A under the Securities Act) and (b) outside the United States to non-U.S. persons in compliance with Regulation S under the Securities Act. For details about eligible offers, deemed representations and agreements by investors and transfer restrictions, see "Notice to Investors."

**Price for notes: 100% plus accrued interest, if any, from January 12, 2010.**

The initial purchasers expect to deliver book-entry interests in the notes to purchasers on or about January 12, 2010 through the facilities of The Depository Trust Company ("DTC").

*Joint Book-Running Managers*

**Citi**          **Goldman, Sachs & Co.**          **Credit Suisse**          **J.P. Morgan**

*Co-Managers*

**BofA Merrill Lynch**                                                          **Morgan Stanley**

January 7, 2010

You should rely only on the information contained in and incorporated by reference into this offering memorandum. We have not, and the initial purchasers or their affiliates have not, authorized anyone to provide you with different information. No person has been authorized to give any information not contained in or incorporated by reference into this offering memorandum. If you receive any other information, you should not rely on it. No offer of these securities is being made in any jurisdiction where any such offer is prohibited. The information contained in or incorporated by reference into this offering memorandum is only accurate as of the date of this offering memorandum or such incorporated information.

_____

## TABLE OF CONTENTS

SECURITIES AND EXCHANGE COMMISSION REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    iv
INDUSTRY AND MARKET INFORMATION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    iv
FORWARD-LOOKING STATEMENTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    v
SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1
RISK FACTORS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    16
THE TRANSACTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    33
USE OF PROCEEDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    36
CAPITALIZATION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    37
DESCRIPTION OF THE NOTES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    39
NOTICE TO INVESTORS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    129
BOOK ENTRY; DELIVERY AND FORM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    132
CERTAIN UNITED STATES FEDERAL TAX CONSEQUENCES . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    137
CERTAIN ERISA CONSIDERATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    142
PLAN OF DISTRIBUTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    144
LEGAL MATTERS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    147
INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    148
AVAILABLE INFORMATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    149
INCORPORATION BY REFERENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    149
INDEX TO CONSOLIDATED FINANCIAL STATEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    F-1

_____

ii

EFIHMW00151821

**PX 022**
**Page 2 of 218**

EFH Corp. is making this offering and will sell the notes in reliance upon an exemption from registration under the Securities Act for offers and sales of securities that do not involve a public offering.

This offering memorandum has been prepared by EFH Corp. and the guarantors solely for use in connection with the proposed offering of the notes. This offering memorandum is personal to each offeree and does not constitute an offer to any other person or to the public generally to subscribe for or otherwise acquire securities. Distribution of this offering memorandum to any person other than the prospective investor and any person retained to advise such prospective investor with respect to its purchase is unauthorized, and any disclosure of any of its contents without the prior written consent of EFH Corp. is prohibited. Each prospective investor, by accepting delivery of this offering memorandum, agrees to the foregoing and to make no photocopies of this offering memorandum or any documents referred to herein.

The initial purchasers make no representation or warranty, express or implied, as to the accuracy or completeness of the information contained in or incorporated by reference into this offering memorandum. Nothing contained in or incorporated by reference into this offering memorandum is, or should be relied upon as, a promise or representation by the initial purchasers as to the past or future. The initial purchasers have not independently verified any of the information contained in or incorporated by reference into this offering memorandum (financial, legal or otherwise) and assume no responsibility for the accuracy or completeness of any such information.

Neither the SEC, any state securities commission nor any other regulatory authority has approved or disapproved the securities nor have any of the foregoing authorities passed upon or endorsed the merits of this offering or the accuracy or adequacy of this offering memorandum. Any representation to the contrary is a criminal offense.

The notes are subject to restrictions on transferability and resale and may not be transferred or resold except as permitted under the Securities Act and the applicable securities laws of any state or other jurisdiction pursuant to registration or exemption from registration. As a prospective purchaser, you should be aware that you may be required to bear the financial risks of this investment for an indefinite period of time. For additional information, see "Notice to Investors" and "Plan of Distribution."

In making any investment decision, prospective investors must rely on their own examination of EFH Corp. and the guarantors and the terms of this offering, including the merits and risks involved. See "Risk Factors." Prospective investors should not construe anything contained in or incorporated by reference into this offering memorandum as legal, business or tax advice. Each prospective investor should consult its own advisors as needed to make its investment decision and to determine whether it is legally permitted to purchase the notes under applicable legal investment or similar laws or regulations.

Each prospective investor must comply with all applicable laws and regulations in force in any jurisdiction in which it purchases, offers or sells notes or possesses or distributes this offering memorandum and must obtain any consent, approval or permission required by it for the purchase, offer or sale by it of the notes under the laws and regulations in force in any jurisdiction to which it is subject or in which it makes such purchases, offers or sales, and neither we nor the initial purchasers nor any of our or their respective representatives shall have any responsibility therefor.

Some of the initial purchasers participating in this offering may engage in transactions that stabilize, maintain or otherwise affect the price of the notes, including over-allotment, stabilizing and short-covering transactions in the notes, and the imposition of a penalty bid during and after this offering. Such stabilization, if commenced, may be discontinued at any time without notice. For a description of some of these activities, see "Plan of Distribution."

iii

Confidential

EFIHMW00151822

This offering memorandum contains summaries believed to be accurate with respect to certain documents, but reference is made to the actual documents for complete information. All such summaries are qualified in their entirety by such reference. Copies of documents referred to herein will be made available to prospective investors upon request to EFH Corp. See "Available Information."

Each person receiving this offering memorandum acknowledges that (1) it has reviewed all information incorporated into this offering memorandum by reference considered by it to be necessary to make an investment decision, (2) it has been afforded an opportunity to request and to review, and it has received, all additional information considered by it to be necessary to verify the accuracy of or to supplement the information contained in or incorporated by reference into this offering memorandum, (3) it has not relied upon the initial purchasers or any person affiliated with the initial purchasers in connection with its investigation of the accuracy of such information or its investment decision, (4) this offering memorandum relates to an offering that is exempt from registration under the Securities Act and may not comply in important respects with SEC rules that would apply to an offering document relating to a public offering of securities and (5) no person has been authorized to give information or to make any representation concerning us, this offering or the notes, other than as contained in this offering memorandum, in connection with an investor's examination of EFH Corp. and the terms of the offering contemplated by the offering memorandum.

Unless the context otherwise requires or as otherwise indicated, references in this offering memorandum to "we," "our" and "us" refer to Energy Future Holdings Corp. and its consolidated subsidiaries. References to "EFH Corp." refer to Energy Future Holdings Corp. and not to any of its subsidiaries. "2017 Notes" means, collectively, EFH Corp.'s 10.875% Senior Notes due 2017 and 11.250%/12.000% Senior Toggle Notes due 2017. "Legacy Notes" means, collectively, EFH Corp.'s 5.55% Series P Senior Notes due 2014, 6.50% Series Q Senior Notes due 2024 and 6.55% Series R Senior Notes due 2034. "TCEH 2015/2016 Notes" means, collectively, TCEH and TCEH Finance, Inc.'s 10.25% Senior Notes due 2015, 10.25% Senior Notes due 2015, Series B, and 10.50%/11.25% Senior Toggle Notes due 2016.

## SECURITIES AND EXCHANGE COMMISSION REVIEW

The information in this offering memorandum relates to an offering that is exempt from registration under the Securities Act. EFH Corp. and the guarantors will agree to file one or more registration statements with the SEC with respect to (1) a registered offer to exchange the notes for new exchange notes (the "exchange notes") having terms substantially identical in all material respects to the notes exchanged therefor (except that the exchange notes will not contain terms with respect to additional interest or transfer restrictions) or (2) resales of the notes. See "Description of the Notes — Exchange Offer; Registration Rights." In the course of the review by the SEC of any such registration statement and other filings EFH Corp. and the guarantors may make with the SEC, EFH Corp. may be required or may elect to make changes to the description of its business, financial statements and other information in those documents and filings. EFH Corp. believes that its financial statements and other financial data included in this offering memorandum have been prepared in a manner that complies, in all material respects, with the regulations published by the SEC and are consistent with current practice. This offering memorandum does not include or incorporate by reference financial statements or other financial data of EFIH or EFCH. However, consistent with SEC regulations, this offering memorandum includes financial statements of Oncor Holdings. See Oncor Holdings' audited historical consolidated financial statements for the year ended December 31, 2008 and unaudited condensed consolidated financial statements for the nine months ended September 30, 2009, each of which is included elsewhere in this offering memorandum.

## INDUSTRY AND MARKET INFORMATION

The industry and market data and other statistical information used throughout this offering memorandum are based on independent industry publications, government publications, reports by market research firms or

iv

other published independent sources, including certain data published by the Electric Reliability Council of Texas ("ERCOT"), the Public Utility Commission of Texas (the "PUCT"), or Potomac Economics, Inc., the market monitor for the ERCOT market. We did not commission any of these publications or reports. Some data is also based on our good faith estimates, which are derived from our review of internal surveys, as well as the independent sources listed above. Independent industry publications and surveys generally state that they have obtained information from sources believed to be reliable but do not guarantee the accuracy and completeness of such information. While we believe that each of these studies and publications is reliable, we have not independently verified such data and make no representation as to the accuracy of such information. Forecasts are particularly likely to be inaccurate, especially over long periods of time, and we do not know what assumptions regarding general economic growth are used in preparing the forecasts included in this offering memorandum. Similarly, while we believe that our internal and external research is reliable, such research has not been verified by any independent sources, and we make no assurances that the predictions contained therein are accurate.

## FORWARD-LOOKING STATEMENTS

This offering memorandum, including the information incorporated into this offering memorandum by reference, contains "forward-looking statements," which involve risks and uncertainties. All statements, other than statements of historical facts, that are included in or incorporated by reference into this offering memorandum, or made in presentations, in response to questions or otherwise, that address activities, events or developments that we expect or anticipate to occur in the future, including such matters as projections, capital allocation, future capital expenditures, business strategy, competitive strengths, goals, future acquisitions or dispositions, development or operation of power generation assets, market and industry developments and the growth of our business and operations (often, but not always, through the use of words or phrases such as "will likely result," "are expected to," "will continue," "is anticipated," "estimated," "projection," "target," "goal," "objective" and "outlook"), are forward-looking statements. Although we believe that in making any such forward-looking statement our expectations are based on reasonable assumptions, any such forward-looking statement involves uncertainties and is qualified in its entirety by reference to the discussion of risk factors under "Risk Factors" contained elsewhere in this offering memorandum and in the sections captioned "Risk Factors" of our 2008 Form 10-K and our September 30, 2009 Form 10-Q, which are incorporated into this offering memorandum by reference, and the following important factors, among others, that could cause our actual results to differ materially from those projected in such forward-looking statements:

- prevailing governmental policies and regulatory actions, including those of the Texas Legislature, the Governor of Texas, the Congress of the United States of America, the United States Federal Energy Regulatory Commission ("FERC"), the PUCT, the Railroad Commission of Texas, the United States Nuclear Regulatory Commission (the "NRC"), the United States Environmental Protection Agency (the "EPA") or the Texas Commission on Environmental Quality, with respect to, among other things:

  - allowed prices;

  - allowed rates of return;

  - permitted capital structure;

  - industry, market and rate structure;

  - recovery of investments;

  - purchased power;

  - operations of nuclear generating facilities;

  - operations of mines;

  - acquisitions and disposal of assets and facilities;

v

EFIHMW00151824

- development, construction and operation of facilities;

- decommissioning costs;

- present or prospective wholesale and retail competition;

- changes in tax laws and policies; and

- changes in and compliance with environmental and safety laws and policies, including climate change initiatives;

- legal and administrative proceedings and settlements;

- general industry trends;

- economic conditions, including the current recessionary environment;

- our ability to attract and retain profitable customers;

- our ability to profitably serve our customers;

- restrictions on competitive retail pricing;

- changes in wholesale electricity prices or energy commodity prices;

- changes in prices of transportation of natural gas, coal, crude oil and other refined products;

- unanticipated changes in market heat rates in the ERCOT electricity market;

- our ability to effectively hedge against changes in commodity prices, market heat rates and interest rates;

- weather conditions and other natural phenomena, and acts of sabotage, wars or terrorist activities;

- unanticipated population growth or decline, or changes in market demand and demographic patterns;

- changes in business strategy, development plans or vendor relationships;

- access to adequate transmission facilities to meet changing demands;

- unanticipated changes in interest rates, commodity prices, rates of inflation or foreign exchange rates;

- unanticipated changes in operating expenses, liquidity needs and capital expenditures;

- commercial bank market and capital market conditions and the potential impact of continued disruptions in the U.S. credit markets;

- competition for new energy development and other business opportunities;

- the inability of various counterparties to meet their obligations with respect to our financial instruments;

- hazards customary to the industry and the possibility that we may not have adequate insurance to cover losses resulting from such hazards;

- changes in technology used by and services offered by us;

- significant changes in our relationship with our employees, including the availability of qualified personnel, and the potential adverse effects if labor disputes or grievances were to occur;

- changes in assumptions used to estimate costs of providing employee benefits, including pension benefits and other postretirement employee benefits, and future funding requirements related thereto;

- changes in assumptions used to estimate future executive compensation payments;

- significant changes in critical accounting policies;

- access to capital, the cost of such capital, and the results of financing and refinancing efforts, including availability of funds in the capital markets;

vi

Confidential

EFIHMW00151825

- financial restrictions placed on us by our credit facilities and indentures governing our debt instruments;

- our ability to generate sufficient cash flow to make interest payments on our debt instruments;

- actions by credit rating agencies;

- our ability to effectively execute our operational strategy;

- our ability to implement cost reduction initiatives;

- changes in electric transmission that allow additional generation to compete with our generation assets; and

- with respect to our lignite coal-fueled generation construction and development program, more specifically, our ability to fund such investments, changes in competitive market rules, adverse judicial rulings, changes in environmental laws or regulations, changes in electric generation and emissions control technologies, changes in projected demand for electricity, changes in wholesale electricity prices or energy commodity prices, transmission capacity and constraints, force majeure events, and our ability to manage the significant construction, commissioning and start-up program to a timely conclusion with limited cost overruns.

Any forward-looking statement speaks only as of the date on which it is made, and except as may be required by applicable law, we undertake no obligation to update any forward-looking statement to reflect events or circumstances after the date on which it is made or to reflect the occurrence of unanticipated events. New factors emerge from time to time, and it is not possible for us to predict all of them; nor can we assess the impact of each such factor or the extent to which any factor, or combination of factors, may cause results to differ materially from those contained in any forward-looking statement. You should not unduly rely on such forward-looking statements.

vii

Confidential

EFIHMW00151826

**PX 022**
**Page 7 of 218**

## SUMMARY

*This summary highlights selected information appearing elsewhere in this offering memorandum. This summary is not complete and does not contain all of the information that you should consider before investing in the notes. You should carefully read this summary together with the entire offering memorandum, including the information set forth in the section entitled "Risk Factors" and the information that is incorporated by reference into this offering memorandum. See the sections entitled "Available Information" and "Incorporation by Reference" for a further discussion on incorporation by reference.*

*On October 10, 2007, Texas Energy Future Merger Sub Corp ("Merger Sub") merged with and into EFH Corp. (the "Merger"). As a result of the Merger, investment funds associated with or designated by Kohlberg Kravis Roberts & Co. ("KKR"), TPG Capital, L.P. ("TPG") and Goldman, Sachs & Co. ("Goldman Sachs," and, together with KKR and TPG, the "Sponsor Group"), and certain other co-investors (collectively with the Sponsor Group, the "Investors"), own EFH Corp. through Texas Energy Future Holdings Limited Partnership ("Texas Holdings"), with the Sponsor Group controlling Texas Energy Future Holdings' general partner, Texas Energy Future Capital Holdings LLC. The acquisition of EFH Corp. by Texas Holdings was financed by the equity contributions and the debt financing described in the section entitled "The Transactions."*

### Our Businesses

We are a Dallas-based energy company that manages a portfolio of competitive and regulated energy businesses in Texas. EFH Corp. is a holding company conducting its operations principally through its subsidiaries, Texas Competitive Electric Holdings Company LLC ("TCEH") and Oncor Electric Delivery Company LLC ("Oncor"). TCEH is wholly-owned, and EFH Corp. has an approximate 80% indirect ownership interest in Oncor.

TCEH is a holding company for subsidiaries engaged in competitive electricity market activities largely in Texas including electricity generation, development and construction of new generation facilities, wholesale energy sales and purchases, commodity risk management and trading activities, and retail electricity sales. EFCH is the parent company of TCEH and a direct subsidiary of EFH Corp.

As of September 30, 2009, TCEH owned or leased 16,139 megawatts ("MW") of generation capacity in Texas. TCEH's generation capacity consists of lignite/coal, nuclear and natural gas-fueled generation facilities. In addition, TCEH is the largest purchaser of wind-generated electricity in Texas and the fifth largest in the U.S. TCEH is currently constructing three lignite/coal-fueled generation units in Texas with expected generation capacity totaling approximately 2,200 MW. Permits have been obtained for construction and operation of the three units. The Sandow unit achieved substantial completion (as defined in the engineering, procurement and construction agreement for the unit) effective September 30, 2009. Accordingly, we have operational control of the unit. The first Oak Grove unit, which is in the commissioning and start-up phase, synchronized to the grid in August 2009 and achieved substantial completion (as defined in the engineering, procurement and construction agreement for the unit) in December 2009. The second Oak Grove unit is nearing completion of construction and initiation of the commissioning and start-up phase and is expected to achieve substantial completion (as defined in the engineering, procurement and construction agreement for the unit) in mid-2010. TCEH provides competitive electricity and related services to more than 2.1 million retail electricity customers in Texas.

EFIH is a holding company for subsidiaries, including Oncor, principally engaged in providing delivery services to retail electric providers, including subsidiaries of TCEH, that sell power in the north-central, eastern and western parts of Texas.

1

EFIHMW00151827

Oncor is engaged in regulated electricity transmission and distribution operations in Texas that are primarily regulated by the PUCT. Oncor provides both distribution services to retail electric providers that sell electricity to consumers and transmission services to other electricity distribution companies, cooperatives and municipalities. Oncor operates the largest transmission and distribution system in Texas, delivering electricity to approximately three million homes and businesses and operating more than 117,000 miles of transmission and distribution lines. A significant portion of Oncor's revenues represent fees for delivery services provided to TCEH. Distribution revenues from TCEH represented 39% and 38% of Oncor's total revenues for the year ended December 31, 2008 and the nine months ended September 30, 2009, respectively.

EFH Corp. and Oncor have implemented certain structural and operational "ring-fencing" measures based on commitments made by Texas Holdings and Oncor to the PUCT that further separate Oncor from Texas Holdings and its other subsidiaries (collectively, the "Texas Holdings Group"). These measures also serve to mitigate Oncor's credit exposure to those entities and to reduce the risk that the assets and liabilities of Oncor would be substantively consolidated with the assets and liabilities of the Texas Holdings Group in the event of a bankruptcy of one or more of those entities.

At September 30, 2009, we had approximately 8,900 full-time employees, including approximately 2,700 employees under collective bargaining agreements.

### Recent Developments

On October 5, 2009, EFH Corp., EFIH, and EFIH's direct, wholly owned subsidiary, EFIH Finance Inc. ("EFIH Finance" and, together with EFIH, the "EFIH Offerors"), commenced exchange offers (the "exchange offers") to exchange certain outstanding debt securities of EFH Corp. and TCEH for new senior secured notes to be issued by EFH Corp. and/or the EFIH Offerors. On November 16, 2009, in connection with the exchange offers, EFH Corp. issued $115,446,000 aggregate principal amount of its 9.75% Senior Secured Notes due 2019 (the "EFH Corp. Notes"), and the EFIH Offerors issued $141,083,000 aggregate principal amount of their 9.75% Senior Secured Notes due 2019 (the "EFIH Notes" and, together with the EFH Corp. Notes, the "Senior Secured Notes"). The indentures governing the Senior Secured Notes are filed as exhibits to our Current Report on Form 8-K filed with the SEC on November 20, 2009, which is incorporated into this offering memorandum by reference. The indentures and agreements governing our other material indebtedness are filed as exhibits to our 2008 Form 10-K, which is incorporated into this offering memorandum by reference.

In April 2007, the U.S. Supreme Court issued a decision in the case of *Massachusetts v. U.S. Environmental Protection Agency* holding that carbon dioxide and other greenhouse gas ("GHG") emissions are pollutants subject to regulation under the new motor vehicle provisions of the federal Clean Air Act. The case was remanded to the EPA for further rulemaking to determine whether GHG emissions may reasonably be anticipated to endanger public health or welfare, or in the alternative, provide a reasonable explanation why GHG emissions should not be regulated. In December 2009, the EPA issued a final finding that GHG emissions present an endangerment to human health and the environment and that emissions from motor vehicles cause or contribute to that endangerment. The EPA's findings and determination will require that the agency begin regulating GHG emissions from motor vehicles and ultimately stationary sources under existing provisions of the federal Clean Air Act, and the EPA has already begun work on such regulations. In September 2009, the EPA proposed two sets of regulations in anticipation of finalizing its endangerment finding: one to reduce GHG emissions from motor vehicles and the other to control GHG emissions from certain stationary sources, including power generation facilities. Although the motor vehicle rules are expected to be adopted in March 2010, it may take the EPA longer to impose regulations limiting GHG emissions from stationary sources. In addition, in September 2009, the EPA issued a final rule requiring the reporting by March 2011 of calendar year 2010 GHG emissions from facilities that emit 25,000 metric tons or more of carbon dioxide equivalent and other specified GHG emissions sources in the United States, including natural gas liquids fractionators and local natural gas

2

EFIHMW00151828

**PX 022
Page 9 of 218**

distribution companies. Any federal GHG legislation is expected to prevent the EPA from regulating GHGs under existing Clean Air Act regulatory programs to some extent, but if Congress fails to pass GHG legislation that limits the EPA's authority to regulate GHGs under the Clean Air Act, the EPA is expected to continue its announced Clean Air Act regulatory actions. The costs of complying with future limitations on GHG emissions could be material.

On January 4, 2010, Richard Landy joined EFH Corp. as Executive Vice President of Human Resources. Mr. Landy previously served as the interim human resources leader for EFH Corp. Before joining EFH Corp., Mr. Landy worked as a private consultant and served as the Senior Vice President of Human Resources, Operations for Exelon Corporation.

### Additional Information

EFH Corp. was incorporated in Texas in 1996. EFIH was formed in Delaware in 2007. EFCH was incorporated in Texas in 1982. Our principal executive offices are located at Energy Plaza, 1601 Bryan Street, Dallas, TX 75201-3411. The telephone number of our principal executive offices is (214) 812-4600. Our website is *http://www.energyfutureholdings.com*. Information on or connected to our website does not constitute part of this offering memorandum.

3

EFIHMW00151829

**PX 022**
**Page 10 of 218**

### Organizational Structure

The chart below is a summary of EFH Corp.'s organizational and ownership structure and illustrates our long-term debt as of September 30, 2009 after giving effect to the issuance of the Senior Secured Notes and the cancellation of certain of the 2017 Notes that were accepted for exchange in the exchange offers, each on November 16, 2009, and the issuance of the notes. Please see "Capitalization" for further information regarding our outstanding debt amounts after giving effect to the issuance of the notes and the Senior Secured Notes and the cancellation of certain indebtedness accepted for exchange in the exchange offers. The chart below excludes subsidiaries of EFH Corp. that are not subsidiaries of EFIH or EFCH, including TXU Receivables Company. TXU Receivables Company conducts an accounts receivable securitization program.



1.  This offering memorandum does not include or incorporate by reference financial statements or other financial data of EFIH or EFCH.
2.  This offering memorandum includes financial statements of Oncor Holdings. See Oncor Holdings' audited historical consolidated financial statements for the year ended December 31, 2008 and unaudited condensed consolidated financial statements for the nine months ended September 30, 2009, each of which is included elsewhere in this offering memorandum.
3.  Substantially all of the subsidiaries of TCEH are engaged in competitive market activities.

4

### The Notes

The summary below describes the principal terms of the notes, the guarantees and the related indenture. Certain of the terms and conditions described below are subject to important limitations and exceptions. The "Description of the Notes" section of this offering memorandum contains more detailed descriptions of the terms and conditions of the notes, the guarantees and the related indenture.

Issuer . . . . . . . . . . . . . . . . . . . . . . . . . . .  Energy Future Holdings Corp.

Securities Offered . . . . . . . . . . . . . . . . .  $500,000,000 10.000% Senior Secured Notes due 2020.

Maturity Date . . . . . . . . . . . . . . . . . . . . .  January 15, 2020.

Interest Rate . . . . . . . . . . . . . . . . . . . . . .  The notes will accrue interest at the rate of 10.000% per annum.

Interest Payment Dates . . . . . . . . . . . . .  Interest on the notes will be payable on January 15 and July 15 of each year, commencing on July 15, 2010.

Ranking . . . . . . . . . . . . . . . . . . . . . . . . . .  The notes will be:

- senior obligations of EFH Corp. and will rank equally in right of payment with all senior indebtedness of EFH Corp. (including the Legacy Notes, the 2017 Notes and the EFH Corp. Notes);

- effectively subordinated to any indebtedness of EFH Corp. secured by assets of EFH Corp. to the extent of the value of the assets securing such indebtedness;

- structurally subordinated to all indebtedness and other liabilities of EFH Corp.'s non-guarantor subsidiaries, including Oncor Holdings, TCEH and each of their respective subsidiaries, any of EFH Corp.'s foreign subsidiaries and any other unrestricted subsidiaries;

- senior in right of payment to any future subordinated indebtedness of EFH Corp; and

- guaranteed as described under "—Guarantees."

As of September 30, 2009, on a pro forma basis after giving effect to the issuance of the Senior Secured Notes and the notes, (1) EFH Corp. would not have had any senior secured indebtedness and (2) the notes would have been structurally subordinated to approximately $36.69 billion principal amount of indebtedness (including long-term debt, including amounts due currently, and short-term borrowings) of EFH Corp.'s subsidiaries, including all of TCEH's and its subsidiaries' indebtedness and all of Oncor Holdings' and its subsidiaries' indebtedness. As of September 30, 2009, TCEH had approximately $2.195 billion of additional available capacity under its senior secured credit facilities (excluding amounts available under its senior secured cash posting credit facility and $41 million of commitments from a subsidiary of Lehman Brothers Holding Inc. (such subsidiary, "Lehman") that has filed for bankruptcy under Chapter 11 of Title 11

5

of the United States Code, as amended (the "Bankruptcy Code"), but including $141 million of undrawn commitments from Lehman that are only available from the fronting banks and the swingline lender and $459 million of available letter of credit capacity), and Oncor had approximately $1.341 billion of additional available capacity under its revolving credit facility (excluding $122 million of undrawn commitments from Lehman). In addition, TCEH's senior secured credit facilities permit TCEH to issue up to $5.0 billion of secured notes or loans ranking junior to TCEH's senior secured borrowings.

Guarantees . . . . . . . . . . . . . . . . . . . . . . . The notes will be unconditionally guaranteed, jointly and severally, by EFCH (the parent of TCEH) on a senior unsecured basis and EFIH (the parent of Oncor Holdings) on a senior secured basis (to the extent of the Collateral securing the guarantee).

The guarantees will:

- be general senior obligations of each guarantor;

- in the case of the guarantee from EFIH, be secured, equally and ratably with EFIH's guarantee of the EFH Corp. Notes and the EFIH Notes, by the pledge of any investments EFIH owns or holds in Oncor Holdings or any of its subsidiaries, which on the date the notes will be issued will consist of all of the membership interests it owns in Oncor Holdings;

- in the case of the guarantee from EFCH, not be secured;

- rank equally in right of payment with all existing and future senior indebtedness of each guarantor;

- in the case of the guarantee from EFIH, be effectively senior to all unsecured indebtedness of EFIH to the extent of the value of the Collateral securing such guarantee;

- be effectively subordinated to all secured indebtedness of each guarantor secured by assets other than the Collateral to the extent of the value of the assets securing such indebtedness;

- be structurally subordinated to any existing and future indebtedness and liabilities of subsidiaries of a guarantor that do not guarantee the notes, including the Oncor Subsidiaries in the case of EFIH, and TCEH and its subsidiaries in the case of EFCH, and any other unrestricted subsidiaries;

- be senior in right of payment to any future subordinated indebtedness of each guarantor; and

- be effectively senior, in the case of EFIH, to all obligations under any future junior lien debt with respect to the Collateral.

As of September 30, 2009, on a pro forma basis after giving effect to the issuance of the Senior Secured Notes and the notes, the EFCH guarantee would have been effectively junior to approximately $106 million principal amount of senior secured indebtedness of EFCH

6

Confidential

(excluding EFCH's secured guarantee of $22.356 billion of senior secured borrowings by TCEH under its senior secured credit facilities). As of September 30, 2009, TCEH had approximately $2.195 billion of additional available senior secured capacity under its senior secured credit facilities (excluding amounts available under its senior secured cash posting credit facility and $41 million of commitments from Lehman, but including $141 million of undrawn commitments from Lehman that are only available from the fronting banks and the swingline lender and $459 million of available letter of credit capacity). In addition, its senior secured credit facilities permit TCEH to issue up to $5.0 billion of notes or loans ranking junior to TCEH's senior secured borrowings.

None of EFH Corp.'s other subsidiaries guarantee the notes. For the year ended December 31, 2008 and the nine months ended September 30, 2009, the non-guarantor subsidiaries generated all of EFH Corp.'s consolidated total revenue. In addition, as of September 30, 2009, the non-guarantor subsidiaries held substantially all of EFH Corp.'s consolidated total assets.

See "Risk Factors — Risks Related to the Notes and Our Substantial Indebtedness — The liabilities of each of EFH Corp. and EFCH currently exceed its assets as shown on its most recent balance sheet. If a court were to find that EFH Corp., EFCH or EFIH were insolvent before or after giving effect to this offering and did not receive reasonably equivalent value or fair consideration for the issuance of the notes or the incurrence of a guarantee or the pledge of the Collateral, as applicable, the court may void all or a portion of the obligations represented by the notes or the guarantee of the notes by EFCH or EFIH or the pledge of the Collateral by EFIH as a fraudulent conveyance."

| | |
|---|---|
| Security . . . . . . . . . . . . . . . . . . . . . . . . | EFIH's guarantee of the notes will be secured, equally and ratably with EFIH's guarantee of the EFH Corp. Notes and the EFIH Notes, by its pledge of 100% of the membership interests and other investments it owns or holds in Oncor Holdings. As of the date of this offering memorandum, $115.4 million of EFH Corp. Notes and $141.1 million of EFIH Notes were outstanding. See "Description of the Notes — Security for the Notes." See also "Risk Factors — Risks Related to the Notes and Our Substantial Indebtedness — The indenture governing the notes may not protect holders from all actions that EFH Corp., EFIH or the Oncor Subsidiaries may take that would reduce your interest in the Collateral or that may reduce the value of the Collateral, including sales or exchanges of the Collateral or the assets of the Oncor Subsidiaries for other assets or investments." |
| Optional Redemption . . . . . . . . . . . . . . | EFH Corp. may redeem any of the notes on and after January 15, 2015 at the redemption prices set forth in this offering memorandum. EFH Corp. may also redeem any of the notes at any time prior to January 15, 2015 at a price equal to 100% of their principal |

7

EFIHMW00151833

**PX 022**
**Page 14 of 218**

amount, plus accrued and unpaid interest and a "make-whole" premium. In addition, before January 15, 2013, EFH Corp. may redeem up to 35% of the aggregate principal amount of the notes, using the proceeds from certain equity offerings at the redemption price set forth in this offering memorandum. See "Description of the Notes — Optional Redemption."

Change of Control Offer . . . . . . . . . . . . .    Upon the occurrence of certain transactions meeting the definition of "change of control," holders of the notes will have the right to require EFH Corp. to repurchase some or all of the notes at 101% of their face amount, plus accrued and unpaid interest to the repurchase date. This right is subject to important limitations. For example, this right will not apply to a transaction that would otherwise be a "change of control" if EFH Corp. complies with the provisions relating to a transfer of either the Oncor business or the TCEH business described below under "— Important Covenants" or if the transaction meets certain other requirements. See "Description of the Notes — Repurchase at the Option of Holders — Change of Control" and the definition of "Change of Control" under "Description of the Notes."

EFH Corp. may not be able to pay holders the required price for notes they present to it at the time of a change of control, because EFH Corp. may not have enough funds at that time or the terms of EFH Corp.'s other indebtedness or any of its subsidiaries' indebtedness, including TCEH's senior secured credit facilities, may prevent EFH Corp. from making such payment or receiving funds from its subsidiaries in an amount sufficient to fund such payment.

See "Risk Factors — Risks Related to the Notes and Our Substantial Indebtedness — EFH Corp. may not be able to repurchase the notes upon a change of control," "Risk Factors — Risks Related to the Notes and Our Substantial Indebtedness — We may transfer or dispose of our interests in EFIH or Oncor Holdings to a third party in a manner that would result in EFIH or such third party becoming the obligor under the notes, without EFH Corp. or EFIH being required to offer to repurchase such notes. The risks of an investment in the notes may increase further following such a transaction" and "Risk Factors — Risks Related to the Notes and Our Substantial Indebtedness — We may transfer or dispose of our interests in or the assets of TCEH to a third party without such third party becoming the obligor under the notes and without being required to offer to repurchase the notes."

Important Covenants . . . . . . . . . . . . . . . .    The indenture governing the notes will contain covenants limiting EFH Corp.'s ability and the ability of its restricted subsidiaries to:

- pay dividends on or make distributions in respect of EFH Corp.'s capital stock or make other restricted payments;

- make investments (including investments in Oncor);

- incur additional debt or issue some types of preferred shares;

- create liens on assets to secure debt;

8

Confidential

EFIHMW00151834

**PX 022**
**Page 15 of 218**

- sell assets;
- consolidate, merge, sell or otherwise dispose of all or substantially all of their assets in certain circumstances;
- enter into certain transactions with their affiliates; and
- designate EFH Corp.'s subsidiaries as unrestricted subsidiaries.

These covenants are subject to a number of important limitations and exceptions. For example, the first to occur of the sale of all of the Oncor business (as defined under "Permitted Asset Transfer" under "Description of the Notes") and all of the TCEH business (as defined under "TCEH Transfer" under "Description of the Notes") will not be considered the sale of all or substantially all of EFH Corp.'s assets under the indenture so long as certain conditions are satisfied, in the case of the sale of the Oncor business, including the condition that the transferee assumes the obligations under the notes. The transferee in the case of a TCEH Transfer would not be required to assume such obligations. Certain other transactions (including certain intercompany transactions) involving the Oncor business will also not be considered the sale of all or substantially all of EFH Corp.'s assets. Additionally, up to an aggregate of $4.0 billion of indebtedness secured by a first priority lien on the Collateral, including the Senior Secured Notes and the notes, may be incurred under the indenture.

Oncor Holdings, the immediate parent of Oncor, and its subsidiaries and Comanche Peak Nuclear Power Company LLC, Nuclear Energy Future Holdings LLC and Nuclear Energy Future Holdings II LLC will be unrestricted subsidiaries under the indenture and, accordingly, will not be subject to any of the restrictive covenants in the indenture. See "Description of the Notes."

Exchange Offer; Registration Rights ... EFH Corp. and the guarantors will use commercially reasonable efforts to register with the SEC a new issue of EFH Corp.'s debt securities having substantially identical terms as the notes (except for the provisions relating to the transfer restrictions and payment of additional interest) as part of an offer to exchange freely tradable exchange notes for the notes.

EFH Corp. and the guarantors will file with the SEC a registration statement relating to such exchange offer and will use commercially reasonable efforts to cause the registration statement to be declared effective within 360 days after the issue date of the notes. If required under special circumstances, EFH Corp. and the guarantors will file a shelf registration statement with the SEC covering resales of the notes.

If EFH Corp. and the guarantors fail to satisfy their obligations with respect to the registration of the notes (a "registration default"), the annual interest rate on the notes will increase by 25 basis points for the first 90-day period during which a registration default continues, and thereafter the annual interest rate on the notes will increase by 50

9

EFIHMW00151835

**PX 022**
**Page 16 of 218**

basis points over the interest rate shown on the cover of this offering memorandum for the remaining period during which a registration default continues. If all registration defaults are cured, the interest rate on the notes will revert to the original level.

Any amounts of additional interest due will be payable on the same interest payment dates as interest on the notes is payable. See "Description of the Notes — Exchange Offer; Registration Rights."

Transfer Restrictions . . . . . . . . . . . . . . . . EFH Corp. has not registered the notes under the Securities Act or any state or other securities laws. The notes are subject to restrictions on transfer and may only be offered or sold in transactions exempt from, or not subject to, the registration requirements of the Securities Act. See "Notice to Investors."

No Prior Market . . . . . . . . . . . . . . . . . . The notes will be new securities for which there is currently no market. We cannot assure you as to the liquidity of markets that may develop for the notes, your ability to sell the notes or the price at which you would be able to sell the notes. The initial purchasers have advised us that they intend to make a market in the notes and, if issued pursuant to a registration rights exchange offer, in the exchange notes, as permitted by applicable laws and regulations; however, they are not obligated to do so, and they may discontinue their market-making activities at any time without notice. Additionally, certain of the initial purchasers may be restricted in their market-making activities. See "Risk Factors — Risks Related to the Notes and Our Substantial Indebtedness — Your ability to transfer the notes may be limited by the absence of an active trading market, and there is no assurance that any active market will develop for the notes."

Listing . . . . . . . . . . . . . . . . . . . . . . . . . . EFH Corp. does not intend to list the notes for trading on any securities exchange or automated quotation system.

Use of Proceeds . . . . . . . . . . . . . . . . . . . The proceeds we receive from the issuance of the notes will be used for general or other corporate purposes, which may include, without limitation, working capital needs, investment in business initiatives, capital expenditures and prepayment or repurchase of outstanding indebtedness of EFH Corp. and/or its subsidiaries. See "Use of Proceeds."

Denominations . . . . . . . . . . . . . . . . . . . The notes will be issued in minimum denominations of $2,000 and integral multiples of $1,000 in excess thereof.

**Risk Factors . . . . . . . . . . . . . . . . . . . . . . In addition to the other information included in or incorporated by reference into this offering memorandum, you should carefully consider the information set forth in the section entitled "Risk Factors" beginning on page 16 and those contained in our 2008 Form 10-K and our September 30, 2009 Form 10-Q, each of which is incorporated into this offering memorandum by reference, before deciding whether or not to invest in the notes.**

10

EFIHMW00151836

**PX 022
Page 17 of 218**

## Summary Historical Consolidated Financial Data

The following table sets forth our summary historical consolidated financial data as of and for the periods indicated. The historical financial data as of December 31, 2008 and 2007 (Successor) and for the year ended December 31, 2008 (Successor), the period from October 11, 2007 through December 31, 2007 (Successor), the period from January 1, 2007 through October 10, 2007 (Predecessor) and for the year ended December 31, 2006 (Predecessor) have been derived from our audited historical consolidated financial statements and related notes included in our 2008 Form 10-K, as recast in a Current Report on Form 8-K filed on May 20, 2009 to reflect the adoption of new accounting guidance related to noncontrolling interests (our "May 20, 2009 Form 8-K"), which is incorporated into this offering memorandum by reference. The historical financial data as of December 31, 2006, 2005 and 2004 (Predecessor) and for the years ended December 31, 2005 and 2004 (Predecessor) have been derived from our audited historical consolidated financial statements that are not included in our 2008 Form 10-K or our May 20, 2009 Form 8-K and are not included in or incorporated by reference into this offering memorandum. The "Predecessor" period reflects the period prior to the Merger, which occurred on October 10, 2007. The historical financial data as of September 30, 2009 and for the nine months ended September 30, 2009 and 2008 have been derived from our unaudited historical interim condensed consolidated financial statements and related notes included in our September 30, 2009 Form 10-Q, which is incorporated into this offering memorandum by reference. In EFH Corp.'s opinion, such unaudited interim financial data reflects all adjustments, consisting of normal recurring accruals, necessary for the fair presentation of the results for those periods. The results of operations for the interim periods, for seasonal and other factors, are not necessarily indicative of the results to be expected for the full year or any future period. See "Available Information" and "Incorporation by Reference."

Confidential

EFIHMW00151837

PX 022
Page 18 of 218

The summary historical consolidated financial data should be read in conjunction with our 2008 Form 10-K, as recast in our May 20, 2009 Form 8-K, including the audited consolidated financial statements and related notes contained therein and the sections captioned "Selected Financial Data" and "Management's Discussion and Analysis of Financial Condition and Results of Operations," and our September 30, 2009 Form 10-Q, including the unaudited interim condensed consolidated financial statements and related notes contained therein and the section captioned "Management's Discussion and Analysis of Financial Condition and Results of Operations."

| | Successor | | Predecessor | | | |
|---|---|---|---|---|---|---|
| | Year Ended December 31, 2008 | Period from October 11, 2007 through December 31, 2007 | Period from January 1, 2007 through October 10, 2007 | Year Ended December 31, | | |
| | | | | 2006 | 2005 | 2004 |
| | (millions of dollars, except ratios and per share amounts) | | | | | |
| **Statement of Income Data:** | | | | | | |
| Operating revenues(a) . . . . . . . . . . . . | $11,364 | $ 1,994 | $8,044 | $10,703 | $10,826 | $9,319 |
| Income (loss) from continuing operations before extraordinary gain (loss) and cumulative effect of changes in accounting principles . . . | (9,998) | (1,361) | 699 | 2,465 | 1,775 | 81 |
| Income from discontinued operations, net of tax effect . . . . . . . . . . . . . . . . | — | 1 | 24 | 87 | 5 | 378 |
| Extraordinary gain (loss), net of tax effect . . . . . . . . . . . . . . . . . . . . . . . . | — | — | — | — | (50) | 16 |
| Cumulative effect of changes in accounting principles, net of tax effect . . . . . . . . . . . . . . . . . . . . . . . . | — | — | — | — | (8) | 10 |
| Exchangeable preferred membership interest buyback premium . . . . . . . . | — | — | — | — | — | 849 |
| Preference stock dividends . . . . . . . . . | — | — | — | — | 10 | 22 |
| Net income (loss) . . . . . . . . . . . . . . . . | (9,998) | (1,360) | 723 | 2,552 | 1,712 | (386) |
| Net loss attributable to noncontrolling interests . . . . . . . . . . . . . . . . . . . . . . . | 160 | — | — | — | — | — |
| Net income (loss) attributable to EFH Corp. . . . . . . . . . . . . . . . . . . . . . . . . | (9,838) | (1,360) | 723 | 2,552 | 1,712 | (386) |
| Dividends declared per share . . . . . . . . | $ — | $ — | $ 1.30 | $ 1.67 | $ 1.26 | $ 0.47 |
| Ratio of earnings to fixed charges(b) . . . . . . . . . . . . . . . . . . . | — | — | 2.30 | 5.11 | 3.80 | 1.16 |
| Ratio of earnings to combined fixed charges and preference dividends(b) . . . . . . . . . . . . . . . . . . . | — | — | 2.30 | 5.11 | 3.74 | 1.11 |

12

EFIHMW00151838

| | Successor | | Predecessor | | | |
|---|---|---|---|---|---|---|
| | **Year Ended December 31, 2008** | **Period from October 11, 2007 through December 31, 2007** | **Period from January 1, 2007 through October 10, 2007** | **Year Ended December 31,** | | |
| | | | | **2006** | **2005** | **2004** |
| | | | (millions of dollars) | | | |
| **Statement of Cash Flows Data:** | | | | | | |
| Cash flows provided by (used in) operating activities from continuing operations . . . . . . . . . | $ 1,505 | $ (450) | $ 2,265 | $ 4,954 | $ 2,793 | $ 1,758 |
| Cash flows provided by (used in) financing activities from continuing operations . . . . . . . . . | 2,837 | 33,865 | 1,394 | (2,332) | (1,563) | (6,519) |
| Cash flows provided by (used in) investing activities from continuing operations . . . . . . . . . | (2,934) | (34,563) | (2,283) | (2,664) | (1,038) | 4,280 |
| **Other Financial Data:** | | | | | | |
| Capital expenditures, including nuclear fuel . . . . . . . . . . . . . . . . . | $ 2,978 | $ 707 | $ 2,395 | $ 2,297 | $ 1,104 | $ 999 |

| | Successor | | Predecessor | | |
|---|---|---|---|---|---|
| | **December 31,** | | **December 31,** | | |
| | **2008** | **2007** | **2006** | **2005** | **2004** |
| | | | (millions of dollars) | | |
| **Balance Sheet Data:** | | | | | |
| Total assets(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $59,263 | $64,804 | 27,216 | $27,978 | $24,059 |
| Property, plant & equipment — net . . . . . . . . . . . . . . . . . . . . . . . | 29,522 | 28,650 | 18,569 | 17,006 | 16,495 |
| Goodwill and intangible assets . . . . . . . . . . . . . . . . . . . . . . . . . . . | 17,379 | 27,319 | 729 | 728 | 723 |
| Total debt(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 42,460 | 40,834 | 12,607 | 13,380 | 12,851 |
| Preferred stock of subsidiaries(e) . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | — | — | 38 |
| Total equity(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (2,177) | 6,685 | 2,140 | 475 | 639 |

(a)  The operating revenues shown above reflect the change in classification for commodity hedging and trading activities discussed in Note 1 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2008 included in our 2008 Form 10-K, as recast in our May 20, 2009 Form 8-K that resulted in an increase in operating revenues of $1.492 billion and $554 million for the Successor period from October 11 through December 31, 2007 and the Predecessor period from January 1 through October 10, 2007, respectively, a decrease of $153 million for the year ended December 31, 2006, and an increase of $164 million and $103 million for the years ended December 31, 2005 and 2004, respectively.

(b)  Fixed charges and combined fixed charges and preference dividends exceeded "earnings" (net loss) by $10.469 billion and $2.034 billion for the year ended December 31, 2008 and for the period from October 11, 2007 through December 31, 2007, respectively.

(c)  The total assets shown above reflect the change in presentation related to our adoption of accounting guidance related to the presentation of assets and liabilities with the legal right of offset (formerly FASB Staff Position FIN No. 39-1, *Amendment of FASB Interpretation No. 39* ("FSP FIN 39-1")), as discussed in Note 1 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2008 included in our 2008 Form 10-K, as recast in our May 20, 2009 Form 8-K. Such change in presentation resulted in an increase of $1.020 billion, $1.383 billion, $2.439 billion and $870 million in our total assets and total liabilities as of December 31, 2007, 2006, 2005 and 2004, respectively, as compared to amounts reported in EFH Corp.'s Annual Report on Form 10-K for the year ended December 31, 2007.

13

EFIHMW00151839

(d)  Includes long-term debt, including amounts due currently, and short-term borrowings. Also includes equity-linked debt securities in the amount of $179 million and $285 million for years ended December 31, 2005 and 2004, respectively.

(e)  Preferred stock outstanding at the end of 2008, 2007, 2006 and 2005 has a stated amount of $51 thousand.

(f)  Total equity as of December 31, 2008 includes noncontrolling interests in subsidiaries of $1.355 billion.

Although EFH Corp. continued as the same legal entity after the Merger, its "Summary Historical Consolidated Financial Data" for periods preceding the Merger and for the periods succeeding the Merger are presented as the consolidated financial statements of the "Predecessor" and the "Successor," respectively. The consolidated financial statements of the Predecessor have been prepared on the same basis as EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2007, which are not incorporated by reference into this offering memorandum, with the exception of a change in presentation related to EFH Corp.'s adoption of accounting guidance related to the presentation of assets and liabilities with the legal right of offset (formerly FSP FIN 39-1) and a change in classification to report the results of commodity hedging and trading activities on a separate line in the statement of consolidated income (loss) instead of within operating revenues. (See "Basis of Presentation" in Note 1 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2008 included in our 2008 Form 10-K, as recast in our May 20, 2009 Form 8-K). The consolidated financial statements of the Successor also reflect the application of "purchase accounting" and the adoption of amended guidance for accounting for noncontrolling interests in consolidated financial statements (formerly Statement of Financial Accounting Standards No. 160, "Noncontrolling Interests in Consolidated Financial Statements — an amendment of ARB No. 51" ("SFAS 160")).

Results for 2008 were significantly impacted by impairment charges related to goodwill, trade name and emission allowances intangible assets and natural gas-fueled generation plants. Results for 2004 were significantly impacted by charges related to EFH Corp.'s comprehensive restructuring plan.

|  | Successor | |
|---|---|---|
|  | Nine Months Ended September 30, 2009 | Nine Months Ended September 30, 2008 |
|  | (millions of dollars, except ratios) | |
| **Statement of Income Data:** | | |
| Operating revenues | $7,366 | $9,001 |
| Net income (loss) | 261 | (983) |
| Net income attributable to noncontrolling interests | (54) | — |
| Net income (loss) attributable to EFH Corp. | 207 | (983) |
| Ratio of earnings to fixed charges(a) | 1.21 | — |
| Ratio of earnings to combined fixed charges and preference dividends(a) | 1.21 | — |

|  | Successor | |
|---|---|---|
|  | Nine Months Ended September 30, 2009 | Nine Months Ended September 30, 2008 |
|  | (millions of dollars) | |
| **Statement of Cash Flows Data:** | | |
| Cash flows provided by operating activities | $ 1,743 | $  957 |
| Cash flows provided by financing activities | 420 | 3,052 |
| Cash flows used in investing activities | (2,127) | (2,374) |
| **Other Financial Data:** | | |
| Capital expenditures, including nuclear fuel | $ 2,004 | $ 2,179 |

14

EFIHMW00151840

**PX 022**
**Page 21 of 218**

|  | Successor |
| --- | --- |
|  | **September 30, 2009** |
|  | (millions of dollars) |
| **Balance Sheet Data:** | |
| Total assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $59,651 |
| Property, plant & equipment — net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 30,019 |
| Goodwill and intangible assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 17,223 |
| Total debt(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 43,205 |
| Total equity(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (1,814) |

(a)  Fixed charges and combined fixed charges and preference dividends exceeded "earnings" by $1.445 billion for the nine months ended September 30, 2008.

(b)  Includes long-term debt, including amounts due currently, and short-term borrowings.

(c)  Total equity as of September 30, 2009 includes noncontrolling interests in subsidiaries of $1.420 billion.

15

EFIHMW00151841

**PX 022
Page 22 of 218**

## RISK FACTORS

*You should carefully consider the risk factors set forth below and the risk factors incorporated into this offering memorandum by reference to our 2008 Form 10-K and our September 30, 2009 Form 10-Q, as well as the other information contained in and incorporated by reference into this offering memorandum before deciding to invest in the notes. The selected risks described below and the risks that are incorporated into this offering memorandum by reference to our 2008 Form 10-K and our September 30, 2009 Form 10-Q are not our only risks. Additional risks and uncertainties not currently known to us or those we currently view to be immaterial also may materially and adversely affect our business, financial condition or results of operations. Any of the following risks or any of the risks described in our 2008 Form 10-K and our September 30, 2009 Form 10-Q could materially and adversely affect our business, financial condition, operating results or cash flow. In such a case, the trading price of the notes could decline, or we may not be able to make payments of interest and principal on the notes, and you may lose all or part of your original investment.*

### Risks Related to the Notes and Our Substantial Indebtedness

***Our substantial leverage could adversely affect our ability to raise additional capital to fund our operations, limit our ability to react to changes in the economy or our industry, expose us to interest rate risk to the extent of our variable rate debt and prevent us from meeting obligations under the various debt agreements governing our indebtedness.***

We are highly leveraged. As of September 30, 2009, our consolidated principal amount of debt (short-term borrowings and long-term debt, including amounts due currently) totaled $43.996 billion (see Note 15 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2008 included in our 2008 Form 10-K, as recast in our May 20, 2009 Form 8-K and Note 4 to EFH Corp.'s historical condensed consolidated financial statements for the nine months ended September 30, 2009 included in our September 30, 2009 Form 10-Q). Our substantial leverage could have important consequences, including:

- making it more difficult for us to make payments on our indebtedness;

- requiring a substantial portion of cash flow from operations to be dedicated to the payment of principal and interest on indebtedness, therefore reducing our ability to use our cash flow to fund operations, capital expenditures and future business opportunities and execute our strategy;

- increasing our vulnerability to adverse economic, industry or competitive developments;

- exposing us to the risk of increased interest rates because, as of September 30, 2009, taking into consideration interest swap transactions, 7% of our long-term borrowings were at variable rates of interest;

- limiting our ability to make strategic acquisitions or causing us to make non-strategic divestitures;

- limiting our ability to obtain additional financing for working capital, capital expenditures, product development, debt service requirements, acquisitions and general corporate or other purposes, or to refinance existing debt; and

- limiting our ability to adjust to changing market conditions and placing us at a competitive disadvantage compared to competitors who are less highly leveraged and who, therefore, may be able to take advantage of opportunities that we cannot due to our substantial leverage.

A substantial amount of this indebtedness is comprised of our indebtedness under TCEH's senior secured credit facilities, substantially all of which matures in October 2014. We may not be able to refinance TCEH's senior secured credit facilities or our other existing indebtedness because of our high levels of debt and debt incurrence restrictions under our debt agreements or because of adverse conditions in credit markets generally.

16

EFIHMW00151842

***Despite our current high indebtedness level, we may still be able to incur substantially more indebtedness. This could further exacerbate the risks associated with the notes and our other indebtedness.***

We may be able to incur additional indebtedness in the future. Although our debt agreements contain restrictions on the incurrence of additional indebtedness, these restrictions are subject to a number of significant qualifications and exceptions, and under certain circumstances, the amount of indebtedness that could be incurred in compliance with these restrictions could be substantial. The indenture governing the notes will allow EFH Corp. to incur up to an aggregate of $4.0 billion of debt, including the Senior Secured Notes and the notes, which would be secured on a parity lien basis by the Collateral, and a substantial amount of additional indebtedness, which additional indebtedness may be secured by a junior-priority security interest in the Collateral or by assets of EFH Corp. or EFIH other than the Collateral. If new debt is added to our existing debt levels, the related risks that we now face would intensify. See "Description of the Notes."

***EFH Corp.'s and its subsidiaries' debt agreements contain restrictions that limit flexibility in operating its businesses.***

EFH Corp.'s and its subsidiaries' debt agreements, including the indenture governing the notes, contain various covenants and other restrictions that limit the ability of EFH Corp. and/or its restricted subsidiaries to engage in specified types of transactions and may adversely affect the ability to operate its businesses. These covenants and other restrictions limit EFH Corp.'s and/or its restricted subsidiaries' ability to, among other things:

- incur additional indebtedness or issue preferred shares;
- pay dividends on, repurchase or make distributions in respect of capital stock or make other restricted payments;
- make investments;
- sell or transfer assets;
- create liens;
- consolidate, merge, sell or otherwise dispose of all or substantially all of its or their assets;
- enter into transactions with its or their affiliates; and
- repaying, repurchasing or modifying certain subordinated and other material debt.

There are a number of important limitations and exceptions to these covenants and other restrictions. See Note 15 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2008 included in our 2008 Form 10-K, as recast in our May 20, 2009 Form 8-K, and "Description of the Notes" for a description of these covenants and other restrictions.

Under the TCEH's senior secured credit facilities, TCEH is required to maintain a leverage ratio below specified levels. TCEH's ability to maintain its leverage ratio below such levels can be affected by events beyond its control, and there can be no assurance that it will meet any such ratio.

A breach of any of these covenants or restrictions could result in an event of default under one or more of EFH Corp.'s and its subsidiaries' debt agreements, including as a result of cross default provisions. Upon the occurrence of an event of default under one of the debt agreements, the lenders could elect to declare all amounts outstanding under that debt agreement to be immediately due and payable and/or terminate all commitments to extend further credit. Such actions by those lenders could cause cross defaults under EFH Corp.'s and its subsidiaries' other indebtedness. If EFH Corp. or one of its subsidiaries was unable to repay those amounts, the lenders could proceed against any collateral granted to them to secure such indebtedness. If lenders accelerate the repayment of borrowings, EFH Corp. or such subsidiary may not have sufficient assets and funds to repay those borrowings.

17

EFIHMW00151843

In addition, as described in "The Transactions — Ring-Fencing," EFH Corp. and Oncor have implemented a number of "ring-fencing" measures to further separate Oncor, its immediate parent, Oncor Holdings, and Oncor Holdings' other subsidiaries, from Texas Holdings and its other subsidiaries. Those measures include, among other things:

- Oncor being treated as an unrestricted subsidiary with respect to certain EFH Corp. indebtedness;

- Oncor not being restricted from incurring its own indebtedness;

- Oncor not guaranteeing or pledging any of its assets to secure the indebtedness of Texas Holdings and its other subsidiaries; and

- restrictions on dividends and the right of the independent members of Oncor's board of directors and the minority member of Oncor to block the payment of dividends.

***We may not be able to generate sufficient cash to service all of our indebtedness, including the notes, and may be forced to take other actions to satisfy our obligations under our debt agreements, which may not be successful.***

Our ability to make scheduled payments on or to refinance our debt obligations depends on our financial condition and operating performance, which is subject to prevailing economic and competitive conditions and to certain financial, business and other factors beyond our control. We may not be able to maintain a level of cash flows from operating activities sufficient to permit us to pay the principal, premium, if any, and interest on our indebtedness, including the notes.

If cash flows and capital resources are insufficient to fund our and our subsidiaries' debt service obligations, we or our subsidiaries could face substantial liquidity problems and might be forced to reduce or delay investments and capital expenditures, or to dispose of assets or operations, seek additional capital or restructure or refinance indebtedness, including the notes. These alternative measures may not be successful or may not be adequate for us and our subsidiaries to meet our debt service obligations then due. Additionally, our and our subsidiaries' debt agreements, including the indentures governing the notes, the Senior Secured Notes, the 2017 Notes and TCEH's senior secured credit facilities, limit the use of the proceeds from any disposition of assets or operations. As a result, we may not be allowed, under these documents, to use proceeds from such dispositions to satisfy all current debt service obligations.

***Increases in interest rates may negatively impact our operating results and financial condition.***

Certain of our borrowings, to the extent the interest rate is not fixed by interest rate swaps, are at variable rates of interest. An increase in interest rates would have a negative impact on our results of operations by causing an increase in interest expense.

At September 30, 2009, we had $3.1 billion aggregate principal amount of variable rate long-term indebtedness (excluding $1.135 billion of long-term borrowings associated with the senior secured letter of credit facility of TCEH that are invested at a variable rate), taking into account interest rate swaps that fix the interest rate on $17.55 billion in notional amount of variable rate indebtedness. As a result, as of September 30, 2009, the impact of a 100 basis point increase in interest rates would increase our annual interest expense by approximately $31 million. See discussion of interest rate swap transactions in Note 4 to EFH Corp.'s historical condensed consolidated financial statements for the nine months ended September 30, 2009 included in our September 30, 2009 Form 10-Q.

Our interest expense for the nine months ended September 30, 2009 was $2.136 billion.

***If we or any of our subsidiaries default on obligations to pay indebtedness, we may not be able to make payments on the notes.***

Any default under our or our subsidiaries' debt agreements that is not waived by the required lenders or noteholders, and the remedies sought by the holders of such indebtedness, could prevent us from paying

18

EFIHMW00151844

**PX 022
Page 25 of 218**

principal, premium, if any, and interest on the notes, which could substantially decrease the market price of the notes. If our subsidiaries are unable to generate sufficient cash flows and we are otherwise unable to obtain funds necessary to meet required payments of principal, premium, if any, and interest on our indebtedness, or if we or our subsidiaries otherwise fail to comply with the various covenants, including any financial and operating covenants, in the instruments governing our or their indebtedness, we or they could be in default under the terms of the agreements governing such indebtedness. In the event of such default, the holders of such indebtedness could elect to declare all the funds borrowed thereunder to be due and payable, together with accrued and unpaid interest, and/or the lenders could elect to terminate their commitments thereunder, cease making further loans and, in the case of the lenders under TCEH's senior secured credit facilities or the holders of the Senior Secured Notes, institute foreclosure proceedings against the pledged assets, and we could be forced into bankruptcy, liquidation or insolvency. If the operating performance of our subsidiaries declines, we or certain of our subsidiaries, including TCEH, may in the future need to obtain waivers from the required lenders or noteholders to avoid being in default. If our subsidiaries breach the covenants under TCEH's senior secured credit facilities or the indenture governing the TCEH 2015/2016 Notes and seek a waiver, they may not be able to obtain a waiver from the required lenders. If this occurs, such subsidiaries would be in default under the instrument governing that indebtedness, the lenders could exercise their rights, as described above, and such subsidiaries could be forced into bankruptcy, liquidation or insolvency.

### *The majority of our subsidiaries will not guarantee the notes. As a result, the notes will be structurally subordinated to all liabilities of our subsidiaries that do not guarantee the notes.*

The notes will initially be guaranteed on a senior secured basis by EFIH and on a senior unsecured basis by EFCH, but the notes will not initially be guaranteed by any of EFH Corp.'s other subsidiaries. None of EFH Corp., EFIH or EFCH has any operations, and each relies on distributions from its subsidiaries. However, EFH Corp.'s historical consolidated financial statements incorporated into this offering memorandum by reference reflect the results of operations and assets, among other things, of all of EFH Corp.'s subsidiaries. EFH Corp.'s non-guarantor subsidiaries generated all of its consolidated revenues for the year ended December 31, 2008 and for the nine months ended September 30, 2009, and as of September 30, 2009, EFH Corp.'s non-guarantor subsidiaries held substantially all of its consolidated total assets.

EFH Corp.'s non-guarantor subsidiaries (including Oncor Holdings and Oncor and its subsidiaries) are separate and distinct legal entities and have no obligation, contingent or otherwise, to pay any amounts due pursuant to the notes, or to make any funds available therefore, whether by dividends, loans, distributions or other payments. The notes will be structurally subordinated to indebtedness and other liabilities of EFH Corp.'s subsidiaries that do not guarantee the notes. The claims of creditors of each of the non-guarantor subsidiaries, including trade creditors, will have priority as to the assets of these subsidiaries. In the event of a bankruptcy, liquidation or insolvency of any of these subsidiaries, these subsidiaries will pay the holders of their debts, holders of preferred equity interests and their trade creditors before they will be able to distribute any of their assets to EFH Corp. In addition, the guarantee of the notes by EFCH is structurally subordinated to the indebtedness of TCEH, the principal amount of which, as of September 30, 2009, was $30.957 billion (including long-term debt, including amounts due currently, and short-term borrowings), as well as any other indebtedness of the other subsidiaries of EFCH. See Note 29 to EFH Corp.'s historical consolidated financial statements for the year ended December 31, 2008 included in our 2008 Form 10-K, as recast in our May 20, 2009 Form 8-K and Note 14 to EFH Corp.'s historical condensed consolidated financial statements for the nine months ended September 30, 2009 included in our September 30, 2009 Form 10-Q for financial information regarding EFH Corp.'s subsidiaries. See "Incorporation by Reference." Additionally, EFH Corp. may be able to designate each of EFCH and TCEH as an "Unrestricted Subsidiary" under the indenture that governs the notes. If they are so designated, EFCH and TCEH will not be subject to the restrictive covenants contained in the indenture governing the notes, and EFCH's guarantee of the notes will be released.

19

EFIHMW00151845

*Under the terms of the indenture governing the TCEH 2015/2016 Notes and TCEH's senior secured credit facilities, TCEH is restricted from making certain payments to EFH Corp.*

EFH Corp. is a holding company and substantially all of its consolidated assets are held by its subsidiaries. As of September 30, 2009, TCEH and its subsidiaries held approximately 71% of EFH Corp.'s consolidated assets. Accordingly, EFH Corp. depends upon TCEH for a significant amount of its cash flows and ability to pay its obligations, including its obligations under the notes. For the year ended December 31, 2008 and the nine months ended September 30, 2009, TCEH and its subsidiaries represented approximately 86% and 83%, respectively, of EFH Corp.'s consolidated revenues. However, under the terms of the indenture governing the TCEH 2015/2016 Notes and TCEH's senior secured credit facilities, TCEH is restricted from making certain payments to EFH Corp., except in the form of certain loans to cover certain of EFH Corp.'s obligations and dividends and distributions in certain other limited circumstances if permitted by applicable state law. Further, the indenture governing the TCEH 2015/2016 Notes and TCEH's senior secured credit facilities do not permit such intercompany loans to service EFH Corp. debt unless required for EFH Corp. to pay principal, premium and interest when due on indebtedness incurred by EFH Corp. to finance the Merger or that was in existence prior to the Merger, or any indebtedness incurred by EFH Corp. to replace, refund or refinance such debt. Such loans are also permitted to service other debt, subject to limitations on the amount of the loans. As a result, unless and until the net proceeds from this offering are used to replace, refund or refinance EFH Corp. debt, intercompany loans from TCEH to EFH Corp. to make payments on the notes will be restricted. In addition, TCEH is prohibited from making certain loans to EFH Corp. if certain events of default under the indenture governing the TCEH 2015/2016 Notes or TCEH's senior secured credit facilities have occurred and are continuing.

*Under the terms of the indenture governing the EFIH Notes, EFIH is restricted from making certain payments to EFH Corp.*

EFH Corp. is a holding company and substantially all of its consolidated assets are held by its subsidiaries. As of September 30, 2009, EFIH and its subsidiaries held approximately 26% of EFH Corp.'s consolidated assets and represented approximately 17% of EFH Corp.'s consolidated revenues. Accordingly, EFH Corp. depends upon EFIH for a significant amount of its cash flows to pay its obligations. However, under the terms of the indenture governing the EFIH Notes, EFIH is restricted from making certain payments, including dividends and loans, to EFH Corp., except in limited circumstances.

*The indenture governing the notes will not limit or restrict the activities of Oncor Holdings and its subsidiaries.*

Oncor Holdings and its subsidiaries will not be "Restricted Subsidiaries" under the indenture governing the notes (except under certain circumstances, such as in connection with the calculation of the "fixed charge coverage ratio" or "consolidated leverage ratio" for purposes of making certain restricted payments; see "Description of the Notes"). As of the date the notes are issued, EFIH's subsidiaries (other than EFIH Finance, the co-issuer of the EFIH Notes) will consist only of Oncor Holdings and its subsidiaries, all of which will be unrestricted subsidiaries of EFH Corp. Accordingly, none of EFIH's subsidiaries (other than EFIH Finance) will be subject to the restrictive covenants contained in the notes, described under "Description of the Notes," and none of EFIH's subsidiaries will guarantee the notes.

Because Oncor Holdings and its subsidiaries will be unrestricted subsidiaries of EFH Corp. under the indenture governing the notes and will therefore not be subject to any of the restrictive covenants therein, the indenture will not serve to limit or restrict the ability of Oncor Holdings or its subsidiaries to take any actions or enter into any transactions that would impair their ability to dividend funds to EFH Corp. to make payments on the notes and other debt of EFH Corp., or that would negatively affect the value of EFIH's equity interests in Oncor Holdings that are pledged as Collateral for the notes, such as incurring debt, selling or transferring all or a portion of the assets of Oncor Holdings or its subsidiaries, entering into joint ventures, dividending out assets or engaging in speculative investments. Certain actions that would negatively affect the value of the Collateral may increase the ability of EFH Corp. to make restricted payments.

20

EFIHMW00151846

***EFH Corp. has a very limited ability to control activities at Oncor due to structural and operational "ring-fencing" measures.***

EFH Corp. depends upon Oncor for a significant amount of its cash flows and ability to pay its obligations. However, EFH Corp. has a very limited ability to control the activities of Oncor. As part of the ring-fencing measures related to Oncor as implemented by EFH Corp. and Oncor, a majority of the members of Oncor's board of directors are required to meet the New York Stock Exchange requirements for independence in all material respects, and the unanimous consent of such directors is required for Oncor to take certain actions. In addition, any new independent directors are required to be appointed by the nominating committee of Oncor Holdings' board of directors, a majority of whose members are independent directors. No member of EFH Corp.'s management is a member of Oncor's board of directors. Under Oncor Holdings' and Oncor's organizational documents, EFH Corp. has the right, indirectly, to consent to new issuances of securities by Oncor, material transactions with third parties involving Oncor outside of the ordinary course of business, actions that cause Oncor's assets to increase the level of jurisdiction of the FERC, any changes to the state of formation of Oncor, material changes to accounting methods not required by U.S. generally accepted accounting principles ("GAAP"), and actions that fail to enforce certain tax sharing obligations between Oncor and EFH Corp. See "The Transactions — Ring-Fencing." In addition, there are restrictions on Oncor's ability to make distributions to its members, including indirectly to EFH Corp.

***EFCH's guarantee of the notes is effectively subordinated to those lenders who have a security interest in its assets.***

EFCH's obligations under its guarantee of the notes are unsecured, but its obligations under its guarantee of TCEH's senior secured credit facilities are secured by a security interest in substantially all of its tangible and intangible assets. If EFCH were unable to pay under its guarantee of TCEH's senior secured credit facilities, the lenders could foreclose on the pledged assets described above to the exclusion of holders of the notes, even if an event of default exists under the indenture governing the notes at such time. In any such event, because the guarantee of the notes will not be secured by any of EFCH's assets, it is possible that there would be no assets remaining from which your claims as a noteholder could be satisfied or, if any assets remained, they might be insufficient to fully satisfy your claims as a noteholder under such guarantee.

***The notes will be secured only to the extent of the value of the assets that have been granted as security for EFIH's guarantee of the notes.***

The Collateral securing EFIH's guarantee of the notes will include only EFIH's membership interests and other investments that EFIH owns or holds in Oncor Holdings and its subsidiaries (which will initially consist of 100% of the membership interests of Oncor Holdings, which are owned by EFIH), but does not include any assets of Oncor Holdings or its subsidiaries. Oncor Holdings owns approximately 80% of Oncor. No appraisals of any of the Collateral securing the guarantee by EFIH of the notes have been prepared by or on behalf of EFH Corp. The fair market value of the Collateral may not be sufficient to repay the holders of the notes upon any foreclosure. The fair market value of the membership interests of Oncor Holdings is subject to fluctuations based on factors that include, among other things, the financial results and prospects of Oncor Holdings and its subsidiaries and its ability to implement its business strategy, Oncor's capital structure and the amount of its other existing indebtedness (as to which EFH Corp. will have no control), applicable regulatory approvals that may be required to foreclose on the membership interests of Oncor Holdings and subsequently dispose of the membership interests of Oncor Holdings, the ability to sell the membership interests of Oncor Holdings in an orderly sale, general economic conditions, the availability of buyers and similar factors. Furthermore, upon a foreclosure in the Collateral, holders may be limited in their ability to obtain the best price for the Collateral if they are unable to exercise a "drag-along" right to force Texas Transmission Investment LLC ("Texas Transmission"), Oncor's primary noncontrolling owner, to sell its membership interests pursuant to the terms of the investor rights agreement, dated November 5, 2007, among EFH Corp., Oncor Holdings, Oncor and Texas Transmission (the "Investor Rights Agreement"). In addition, a court could limit recoverability if it were to apply non-New York law to a proceeding and deem a portion of the interest claim usurious in violation of public

21

EFIHMW00151847

policy. The amount to be received upon a sale of any Collateral would be dependent on numerous factors, including but not limited to the actual fair market value of the Collateral at such time, general, market and economic conditions and the timing and the manner of the sale.

EFIH's guarantee of the EFH Corp. Notes and the EFIH Notes are also secured by the Collateral, equally and ratably with the notes.

In the event that a bankruptcy or similar proceeding is commenced by or against EFH Corp., if at the time of the filing the value of the membership interests of Oncor Holdings and other Collateral is less than the amount of principal and accrued and unpaid interest on the notes and the Senior Secured Notes, interest may cease to accrue on the notes thereafter. If at the time of the filing the value of the membership interests of Oncor Holdings and other Collateral is greater than the amount of principal and accrued and unpaid interest on the notes and the Senior Secured Notes, interest may nevertheless cease to accrue at a subsequent time if at such time the value ceases to be in excess of the principal and accrued and unpaid interest. It is possible, given the broad discretionary powers of a bankruptcy court, even if at the time of the filing the value of the membership interests of Oncor Holdings and other Collateral is greater than the amount of principal and accrued and unpaid interest on the notes and the Senior Secured Notes on the date of filing, claims on the membership interests of Oncor Holdings and other Collateral for interest accruing from and after the date the bankruptcy petition is filed might not be allowed. In the event of a foreclosure, liquidation, bankruptcy or similar proceeding, the proceeds from any sale of the membership interests of Oncor Holdings and other Collateral may not be sufficient to pay the obligations due under the notes.

To the extent that the claims of the holders of the notes and the Senior Secured Notes exceed the value of the membership interests of Oncor Holdings and other Collateral, those claims will rank equally with the claims of the holders of EFH Corp.'s then outstanding senior notes and other senior debt. As a result, if the value of the membership interests of Oncor Holdings and other Collateral is less than the value of the claims of the holders of the notes and the Senior Secured Notes, those claims may not be satisfied in full.

The security interest granted in favor of the collateral trustee is subject to practical problems generally associated with the realization of security interests in collateral. For example, the collateral trustee may need to obtain the consent of a third party to obtain or enforce a security interest in a contract, and we cannot assure you that the collateral trustee will be able to obtain any such consent. The consents of any third parties may not be given when required to facilitate a foreclosure on any particular assets. Accordingly, the collateral trustee may not have the ability to foreclose upon such assets, and the value of the Collateral may significantly decrease.

***Regulatory approvals may be required in order to enforce the security interests in the Collateral and to dispose of an interest in, or operational control of, the Collateral that secures EFIH's guarantee of the notes.***

The Collateral securing EFIH's guarantee of the notes will include all of EFIH's membership interests and other investments that EFIH owns or holds in Oncor Holdings and its subsidiaries. Pursuant to the Public Utility Regulatory Act ("PURA"), Texas Utilities Code §§39.262(l) and 39.915, an electric utility must obtain prior PUCT approval of any change in majority ownership, controlling ownership or operational control of Oncor. As a result, prior to any foreclosure on the membership interests of Oncor Holdings, approval of the PUCT may be required for a change in ownership or control of Oncor Holdings. Pursuant to PURA §§39.262(m) and 39.915(b), the PUCT will approve such a transfer if it finds that the transaction is in the public interest. In making its determination, these sections of PURA provide that the PUCT will consider whether the transaction will adversely affect the reliability of service, availability of service or cost of service of Oncor. Therefore, in connection with any action taken to enforce the security against the Collateral, such approval may not be granted and, if it were to be granted, it is not known how long it would take to obtain such approval. Even if the approval were granted to foreclose on the Collateral, then additional prior PUCT approval may also be required for any subsequent change in majority ownership, controlling ownership or operational control in the membership interests of Oncor Holdings. Additionally, Texas Holdings has committed to hold a majority ownership interest in Oncor through October 10, 2012. This commitment is incorporated in the Order on Rehearing in PUCT Docket No. 34077.

22

In addition, pursuant to the terms of the Investor Rights Agreement, any transfer of the equity interests in Oncor Holdings to a third party, including as a result of any enforcement of the lien on the Collateral securing EFIH's guarantee of the notes, EFIH's guarantee of the EFH Corp. Notes and the EFIH Notes, may be limited and give rise to a tag-along right of Texas Transmission, the primary noncontrolling investor in Oncor, to participate in that transfer on a pro rata basis, which may hinder the enforcement of the lien on the Collateral in a timely manner, if at all. See "The Transactions — Sale of Noncontrolling Interests in Oncor" for a description of the Investor Rights Agreement.

***In the event of EFH Corp.'s bankruptcy, the ability of the holders of the notes to realize upon the Collateral securing EFIH's guarantee of the notes will be subject to certain bankruptcy law limitations.***

The right of the trustee for the notes to repossess and dispose of the Collateral, which will secure EFIH's guarantee of the notes, upon acceleration is likely to be significantly impaired by federal bankruptcy law if bankruptcy proceedings are commenced by or against EFH Corp. This could be true even if bankruptcy proceedings are commenced after the trustee for the notes has repossessed and disposed of the Collateral. Under bankruptcy law, a secured creditor, such as the trustee for the notes, is prohibited from repossessing collateral from a debtor in a bankruptcy case, or from disposing of collateral repossessed from a debtor, without bankruptcy court approval. Moreover, bankruptcy law permits the debtor to continue to retain and to use any such collateral, and the proceeds, products, rents or profits of such collateral, even though the debtor is in default under the applicable debt instruments, provided that the secured creditor is given "adequate protection." The meaning of the term "adequate protection" varies according to circumstances, but in general the doctrine of "adequate protection" requires a debtor to protect the value of a secured creditor's interest in the collateral, through cash payments, the granting of an additional security interest or otherwise. It is impossible to predict whether or when payments in respect of the notes might be made following commencement of a bankruptcy case, whether or when the trustee would repossess or dispose of the Collateral, or whether or to what extent holders of the notes would be compensated for any delay in payment or loss of value of the Collateral through the requirements of "adequate protection." Furthermore, in the event the bankruptcy court determines that the value of the Collateral is not sufficient to repay all amounts due on the notes, the holders of the notes would have unsecured "deficiency claims" as to the difference. Federal bankruptcy laws do not generally permit the payment of interest, costs, or attorneys' fees for unsecured claims during the debtor's bankruptcy case.

***Under the indenture governing the notes, holders of the notes will agree to not file a bankruptcy proceeding against Oncor Holdings or any of its subsidiaries.***

Holders that receive the notes in this offering will acknowledge and agree that they will not (i) initiate any legal proceeding to procure the appointment of an administrative receiver or (ii) institute any bankruptcy, reorganization, insolvency, winding up, liquidation, or any like proceeding under applicable law, against Oncor Holdings, Oncor or any of their subsidiaries, or against any of the assets of Oncor Holdings, Oncor or any of their subsidiaries. Such holders will further acknowledge and agree that each of Oncor Holdings, Oncor and any of their subsidiaries is a third party beneficiary of the foregoing covenant and have the right to specifically enforce such covenant in any proceeding at law or in equity.

***The value of the Collateral may be diluted if we issue additional debt that is secured equally and ratably by the same Collateral securing the guarantee by EFIH of the notes or if the Collateral is sold.***

The Senior Secured Notes are secured by the Collateral on a parity lien basis with the notes. In addition, the indentures governing the Senior Secured Notes provide, and the indenture governing the notes will provide, that EFH Corp. and EFIH may incur up to an aggregate of $4.0 billion of debt, including the Senior Secured Notes and the notes, which would be secured on a parity lien basis by the Collateral. Therefore, because the principal amount of the Senior Secured Notes and the notes will, in the aggregate, be less than $4.0 billion, EFH Corp. and EFIH may subsequently incur additional debt secured on a parity lien basis by the Collateral up to the $4.0 billion limit, subject to restrictions on their ability to incur debt and liens under the indenture governing the notes and under other documents governing their indebtedness. To the extent that any of this additional debt is incurred

23

EFIHMW00151849

in the future, the interests of holders of the notes in the Collateral will be diluted. Additionally, EFH Corp. and EFIH are not restricted from issuing additional debt that is secured by a junior lien on the Collateral, subject to restrictions on their ability to incur debt and liens under the indenture governing the notes and under other documents governing their indebtedness.

The collateral trust agreement governing the pledge of Collateral generally provides that the holders of a majority of the debt secured by a first priority lien on the Collateral, including the Senior Secured Notes, the notes and other future debt incurred by EFH Corp. or EFIH secured by the Collateral equally and ratably, will have, subject to certain limited exceptions, the exclusive right to manage, perform and enforce the terms of the security documents securing the rights of secured debtholders in the Collateral, and to exercise and enforce all privileges, rights and remedies thereunder. To the extent that EFH Corp. and/or EFIH incurs additional secured debt that is secured equally and ratably with the notes and the amount of this secured debt, alone or together with any Senior Secured Notes, exceeds the amount of the notes, the holders of such secured debt may be able to exercise control under the collateral trust agreement and other security documents.

EFIH will in most cases have control over the Collateral securing its guarantee of the notes, and to the extent permitted, its sale by EFIH would eliminate the collateral securing such guarantee. The documents governing the pledge of the Collateral permit EFIH to remain in possession of, retain exclusive control over, freely operate and collect, invest and dispose of, any income from, the Collateral, such as cash dividends. In addition, in certain limited circumstances EFIH will have the right to sell the Collateral free and clear of the security interest underlying the notes.

### Rights of holders of the notes in the Collateral may be adversely affected by the failure to perfect security interests in certain Collateral acquired in the future.

EFIH may acquire assets or investments in the future that would be required to be pledged as Collateral securing the notes. There can be no assurance that the trustee or the collateral trustee will monitor, or that we will inform the trustee or the collateral trustee of, the future acquisition of assets or investments that would be required to be pledged as Collateral, and that the necessary action will be taken to properly perfect the security interest in such after-acquired Collateral. Neither the trustee nor the collateral trustee has an obligation to monitor the acquisition of additional assets or investments that are required to be pledged as Collateral or the perfection of any security interest in such Collateral. Such failure may result in the loss of the security interest in the Collateral or the priority of the security interest in favor of the notes against third parties.

### We may transfer or dispose of our interests in EFIH or Oncor Holdings to a third party in a manner that would result in EFIH or such third party becoming the obligor under the notes, without EFH Corp. or EFIH being required to offer to repurchase the notes. The risks of an investment in the notes may increase further following such a transaction.

The indenture governing the notes will provide that EFH Corp. may engage in a "Permitted Asset Transfer" with respect to EFH Corp.'s ownership of EFIH or EFIH's ownership of Oncor Holdings that would result in the obligations under the notes being assumed by EFIH or by a third party to which the investments in Oncor Holdings and its subsidiaries are transferred in any such Permitted Asset Transfer (referred to as a "third party transferee"). The indenture governing the EFH Corp. Notes contains similar provisions. This offering memorandum does not include or incorporate by reference financial statements or other financial data of EFIH. However, this offering memorandum includes financial statements of Oncor Holdings. See Oncor Holdings' audited historical consolidated financial statements for the year ended December 31, 2008 and unaudited condensed consolidated financial statements for the nine months ended September 30, 2009, each of which is included elsewhere in this offering memorandum. A Permitted Asset Transfer includes:

- the direct or indirect sale, assignment, transfer, conveyance or other disposition (including by way of merger, wind-up or consolidation) or spin-off of the equity of EFIH such that it is no longer a subsidiary of EFH Corp., and

24

EFIHMW00151850

- the sale, assignment, transfer, conveyance or other disposition (other than by way of merger, wind-up or consolidation) of all of EFIH's equity interests and other investments in Oncor Holdings and its subsidiaries (collectively, the "Oncor Subsidiaries") or successor Oncor business and all other Collateral held by EFIH.

If a valid Permitted Asset Transfer occurs, the notes would become obligations of EFIH or the third party transferee of the investments in the Oncor Subsidiaries, which would result in the guarantee of EFCH being released and EFH Corp. no longer being liable on the notes and the EFH Corp. Notes unless EFH Corp. is the transferee. Currently, and for some period of time following the completion of this offering, it is expected that EFH Corp. will rely on the cash flows from TCEH and its subsidiaries to service its debt obligations, including the notes and the Senior Secured Notes. Following the completion of a Permitted Asset Transfer, other than a merger of EFIH into EFH Corp., the cash flows from EFH Corp. and its other subsidiaries, including TCEH and its subsidiaries, would no longer be available to pay interest and principal on the notes and the EFH Corp. Notes that would have become EFIH's obligation in connection with the Permitted Asset Transfer, and holders of the transferred notes would not be able to look to the assets of EFH Corp. and TCEH and its subsidiaries in the case of a bankruptcy, liquidation or insolvency with respect to EFIH. As of September 30, 2009, the assets of EFIH and its subsidiaries (including the Oncor Subsidiaries) represented 26% of the total consolidated assets of EFH Corp. and its subsidiaries. In connection with a Permitted Asset Transfer to a third party transferee, such third party transferee would not be a subsidiary of EFH Corp. and would not have the access to such cash flows to service its debt obligations, which would include the transferred notes and the transferred Senior Secured Notes, nor would such third party transferee be able to look to the assets of EFH Corp. and its subsidiaries in the case of a bankruptcy, liquidation or insolvency. In addition, such third party transferee, as the successor obligor, may not have sufficient sources of capital to service its debt and the obligations under the notes and the Senior Secured Notes, and distributions from the Oncor Subsidiaries may not be available or sufficient to service the obligations under such notes. No Oncor Subsidiary will become obligated on the notes and the Senior Secured Notes as a result of a Permitted Asset Transfer.

Additionally, if a Permitted Asset Transfer occurs in accordance with the terms of the indenture governing the notes, EFH Corp. will not be required to make a change of control offer to repurchase the notes under the indenture even if a change of control may otherwise have occurred.

The indenture governing the notes will provide that a Permitted Asset Transfer may only occur if certain conditions are met, including a requirement that the ratings of the notes are not lowered by two or more rating agencies (or the only rating agency then rating such notes) during a specified period before or after the proposed Permitted Asset Transfer has been publicly announced. However, these conditions may not protect holders against actions that EFIH or the permitted transferee could take that may negatively impact the credit risk of the notes following a Permitted Asset Transfer, such as removing assets and cash from EFIH or the Oncor Subsidiaries or increasing debt at EFIH before the Permitted Asset Transfer. In addition, because EFIH is a "Restricted Subsidiary" under the indenture governing the notes, assets of EFIH, other than the Collateral, could be transferred to EFH Corp. prior to a Permitted Asset Transfer and would in that case not be assets of EFIH or a third party transferee that has become the obligor of the notes.

The third party transferee that becomes the obligor on the notes may itself engage in a subsequent Permitted Asset Transfer, in which case the risks described above would continue to apply with respect to the subsequent Permitted Asset Transfer and the subsequent third party transferee.

There will be no event of default under the indenture governing the notes if the Oncor Subsidiaries take actions or enter into transactions that would impair their ability to dividend funds to EFIH, which could impair EFIH's ability to make payments on the notes following a Permitted Asset Transfer, or that would negatively affect the value of the assets that are pledged as Collateral, such as incurring debt, selling or transferring all or a portion of the assets of Oncor, entering into joint ventures, dividending out assets or engaging in speculative investments.

25

Confidential

Any of the above actions on the part of EFIH, the third party transferee or subsequent third party transferee or the Oncor Subsidiaries following the completion of a Permitted Asset Transfer may further increase the credit risk of the notes, may result in the rating agencies taking negative action with respect to the notes and may reduce the market price of the notes.

See "Description of the Notes — Certain Covenants — Restrictions on Permitted Asset Transfers" and "Description of the Notes — Certain Covenants — Restrictions on TCEH Transfers" and the definitions of "Change of Control" and "Permitted Asset Transfer" contained under "Description of the Notes" for more information.

### *We may transfer or dispose of our interests in or the assets of TCEH to a third party without such third party becoming the obligor under the notes and without being required to offer to repurchase the notes.*

The indenture governing the notes will provide that, subject to certain conditions, certain transactions with respect to TCEH, referred to in this offering memorandum as a "TCEH Transfer," which include a disposition or spin-off of all of the equity interests of an entity that owns all or substantially all of the assets of TCEH (including EFCH), or the sale of all or substantially all of the assets of TCEH, will not result in the acquirer of the TCEH equity interests or assets becoming the obligor under the notes. The indenture governing the EFH Corp. Notes contains similar provisions.

If a TCEH Transfer occurs, EFH Corp. will remain the obligor of the notes and the EFH Corp. Notes, even though substantially all of the assets of EFH Corp. and its subsidiaries may have been transferred to a third party, and therefore EFH Corp. could be a more highly-leveraged company. Additionally, if a TCEH Transfer occurs, EFH Corp. will not be required to make a change of control offer to repurchase the notes, even if the assets of TCEH transferred accounted for substantially all of the assets of EFH Corp. and its subsidiaries. As of September 30, 2009, EFCH and its subsidiaries, including TCEH and its subsidiaries, accounted for 71% of the consolidated assets of EFH Corp. The indenture governing the notes does not restrict EFH Corp.'s ability to transfer assets, other than Collateral, to any of its restricted subsidiaries, including EFCH and TCEH. EFH Corp. could take actions that may negatively impact the credit risk of the notes, including transferring assets to TCEH before a TCEH Transfer.

Currently, and for some period of time following the completion of this offering, it is expected that EFH Corp. will rely on the cash flows from TCEH and its subsidiaries to service its debt obligations, including the notes. Following the completion of a TCEH Transfer, the cash flows from TCEH and its subsidiaries would no longer be available to pay interest and principal on the notes and the Senior Secured Notes. Additionally, the holders of the notes would not be able to look to the assets of TCEH and its subsidiaries in the case of a bankruptcy, liquidation or insolvency with respect to EFH Corp. In addition, EFH Corp. may transfer its interest in TCEH and its subsidiaries without any consideration if the transaction would not violate the "Limitation on Restricted Payments" covenant in the indenture governing the notes.

Additionally, following a TCEH Transfer, the only operating subsidiaries of EFH Corp. could be the Oncor Subsidiaries, which are "Unrestricted Subsidiaries" under the indenture governing the notes. Unrestricted Subsidiaries will not be subject to the restrictive covenants contained in the indenture. The indenture governing the notes will not limit or restrict the ability of Unrestricted Subsidiaries, including the Oncor Subsidiaries, to take actions or enter into transactions that would impair their ability to dividend funds to EFH Corp. to make payments on the notes, or that would negatively affect the value of the Oncor Subsidiaries and therefore the equity value of the investments that are pledged as Collateral, such as incurring debt, selling or transferring all or a portion of the assets of the Oncor Subsidiaries, entering into joint ventures, dividending out assets or engaging in speculative investments.

The occurrence of a TCEH Transfer may further increase the credit risk of the notes, may result in the credit rating agencies taking negative action with respect to the notes and may reduce the market price of the notes.

Confidential

EFIHMW00151852

See "Description of the Notes — Certain Covenants — Restrictions on TCEH Transfers" and the definitions of "Change of Control" and "TCEH Transfer" contained under "Description of the Notes" for more information.

***The indenture governing the notes may not protect holders from all actions that EFH Corp., EFIH or the Oncor Subsidiaries may take that would reduce your interest in the Collateral or that may reduce the value of the Collateral, including sales or exchanges of the Collateral or the assets of the Oncor Subsidiaries for other assets or investments.***

Under the indenture governing the notes, EFIH may dispose of all or a portion of the Collateral for fair market value consideration (including consideration other than cash) that may consist of assets or equity interests in joint ventures. Additionally, there will be no event of default under such indenture if the Oncor subsidiaries sell, transfer or otherwise dispose of their assets or equity interests for any form of consideration.

If EFIH or the Oncor Subsidiaries effect any of these transactions, holders' interest in the Collateral or the value of the Collateral may be materially reduced.

The indenture governing the notes will allow EFIH to transfer any of the Collateral in exchange for an equivalent fair market value of assets other than cash or for investments in businesses that are similar to the businesses of Oncor, including interests in joint ventures in businesses that are not controlled by EFH Corp. or EFIH. The assets received as consideration and pledged as substitute Collateral may prove to be less valuable than the value of the investments in Oncor that were disposed of in such transfer or exchange. Additionally, if interests in a new business were received in exchange for the Collateral, such new business may, in the future, engage in businesses activities that are different from the business that Oncor presently is in or such new business may not prove to be as creditworthy or valuable as Oncor, and EFH Corp. may not have any control over such business' activities if a minority interest in the joint venture interests was received in such transfer or exchange. Therefore, such new collateral may negatively alter the risk profile of EFIH or the value of such new collateral may decline relative to the value of the disposed investments in Oncor.

There will be no event of default under the indenture governing the notes if any of the Oncor Subsidiaries sells, transfers or disposes of the assets of Oncor Holdings or investments in or assets of Oncor. The consideration received in exchange for such assets or investments may decline in value as compared to the assets or investments that were so disposed, and, therefore, the value of the Collateral may be less than if such assets and investments had been retained. The Oncor Subsidiaries may transfer their assets and investments in exchange for interests in other businesses or assets, minority interests or interests in joint ventures, in which case the value of the Collateral may be at risk of declining due to the factors described above.

In any joint venture in which EFIH or an Oncor Subsidiary has an interest, EFIH or the Oncor Subsidiary may not have the right or power to direct the management and policies of such joint ventures and other participants may take action contrary to the instructions or requests of EFIH or such Oncor Subsidiary or against its policies and objectives, and any such actions taken by such joint ventures may not be in the best interests of holders of notes. In addition, the other participants to any such joint venture may become bankrupt or have economic or other business interests or goals that are inconsistent with the goals of EFIH or such Oncor Subsidiary and/or the holders of the notes.

Additionally, TCEH's senior secured credit facilities do not allow EFH Corp. to prepay the notes using proceeds received from a disposition of any investments of EFH Corp. and EFIH in the Oncor Subsidiaries (including the Collateral) or from a sale of all or substantially all of the assets of any of the Oncor Subsidiaries, so long as certain intercompany loans from TCEH to EFH Corp. are at the time outstanding. As of September 30, 2009, $1.112 billion of such intercompany loans from TCEH to EFH Corp. were outstanding.

The completion of any of the above events may result in the credit risk of the notes increasing, the credit rating agencies taking negative action with respect to the notes or the market price of the notes declining. Additionally, in the event of any foreclosure on the Collateral, holders of the notes may recover less than if the Collateral still consisted of investments in the Oncor Subsidiaries.

27

EFIHMW00151853

***You may be required to recognize taxable gain or loss in connection with a Permitted Asset Transfer.***

In connection with a Permitted Asset Transfer, EFH Corp.'s obligations under the notes would be transferred to, and assumed by, EFIH or a third party transferee or may be considered, for U.S. federal income tax purposes, to undergo a substitution of obligors even if not transferred to, or assumed by, a third party transferee. Upon any such transfer or deemed substitution of obligors, you may be deemed to have exchanged the notes for new notes for U.S. federal income tax purposes. Upon such deemed exchange, a holder, under U.S. federal income tax law, may be required to recognize gain or loss equal to the difference between the amount deemed to be realized in connection with the deemed exchange and such holder's adjusted tax basis in the notes on the date of the deemed exchange. For more information, please see "Certain United States Federal Tax Consequences — Certain Tax Consequences to U.S. Holders — Sale, Exchange, Retirement, or Other Disposition of Notes."

***The liabilities of each of EFH Corp. and EFCH currently exceed its assets as shown on its most recent quarterly balance sheet. If a court were to find that EFH Corp., EFCH or EFIH were insolvent before or after giving effect to this offering and did not receive reasonably equivalent value or fair consideration for the issuance of the notes or the incurrence of a guarantee or the pledge of the Collateral, as applicable, the court may void all or a portion of the obligations represented by the notes or the guarantee of the notes by EFCH or EFIH or the pledge of the Collateral by EFIH as a fraudulent conveyance.***

In a bankruptcy proceeding, a trustee, debtor in possession or another person acting on behalf of the bankruptcy estate may seek to recover all or a portion of transfers made or void obligations incurred prior to the bankruptcy proceeding on the basis that such transfers and obligations constituted fraudulent conveyances. Under certain circumstances, creditors may recover transfers or void obligations under state fraudulent conveyance laws even if the debtor is not in bankruptcy.

Fraudulent conveyances are generally defined to include transfers made or obligations incurred for inadequate consideration when a debtor was insolvent, inadequately capitalized or in similar financial distress, or transfers made or obligations incurred with the intent of hindering, delaying or defrauding current or future creditors. A trustee, debtor in possession or another person acting on behalf of a bankruptcy estate may be able to recover such transfers under the fraudulent conveyance provisions of the bankruptcy law and/or state fraudulent conveyance laws. The fraudulent conveyance provisions of the bankruptcy law allows the trustee, debtor in possession, or other person acting on behalf of a bankruptcy estate to void a fraudulent conveyance made within two years prior to the commencement of a bankruptcy proceeding. Under state fraudulent conveyance laws, transfers made more than two years prior to the commencement of a fraudulent conveyance lawsuit may be subject to avoidance.

If a court were to find that EFH Corp. issued the notes or EFCH or EFIH issued its respective guarantee, or EFIH granted its pledge of the Collateral, under circumstances constituting a fraudulent conveyance, then a court could void all or a portion of the obligations under the notes, such guarantee or the pledge of the Collateral. In addition, under such circumstances, the value of any consideration holders received with respect to the notes, such guarantee, and the Collateral, including upon foreclosure of the Collateral, could also be subject to recovery from such holders and, possibly, from subsequent transferees of the notes. If the pledge of Collateral was voided and the issuance of the notes and/or the related guarantees were not voided, then holders of notes would become unsecured creditors.

The notes or the related guarantees incurred by EFCH or EFIH or the pledge of the Collateral by EFIH could be voided as a fraudulent conveyance, or claims in respect of the notes, such guarantee or pledge could be subordinated to all other debts of EFH Corp., EFCH or EFIH, if EFH Corp., EFCH or EFIH, at the time they incurred the indebtedness evidenced by the notes or such guarantee or granted the pledge received less than reasonably equivalent value or fair consideration for the issuance of the notes or the incurrence of such guarantee and:

- were insolvent or rendered insolvent by reason of such issuance or incurrence;

28

Confidential

EFIHMW00151854

- were engaged in a business or transaction for which our or EFCH's or EFIH's remaining assets constituted unreasonably small capital; or

- intended to incur, or believed that they would incur, debts beyond their ability to pay those debts as they mature.

The measures of insolvency for purposes of these fraudulent transfer laws will vary depending upon the law applied in any proceeding to determine whether a fraudulent transfer has occurred. Generally, however, a debtor would be considered insolvent if:

- the sum of its debts, including contingent liabilities, was greater than the fair saleable value of all of its assets;

- the present fair saleable value of its assets was less than the amount that would be required to pay its probable liability on its existing debts, including contingent liabilities, as they become absolute and mature; or

- it could not pay its debts as they become due.

The liabilities of each of EFH Corp. and EFCH currently exceed its assets as shown on its respective balance sheet prepared in accordance with U.S. GAAP as of September 30, 2009. The balance sheets showing the assets and liabilities of EFH Corp. and EFCH have been prepared in accordance with U.S. GAAP; however, the values assigned to assets and liabilities in these balance sheets are not necessarily indicative of the values that a court would assign to such assets and liabilities in making a solvency determination. We have not obtained or prepared an appraisal of the fair saleable value of the assets of EFH Corp., EFCH or EFIH. As a result, we cannot assure you that EFH Corp., EFCH or EFIH would satisfy the solvency tests set forth in the bullet points immediately prior to this paragraph or what standard a court would apply in determining whether EFH Corp., EFCH or EFIH would be considered to be insolvent.

In addition, we cannot assure you that a court would determine that reasonably equivalent value or fair consideration was received by each of EFH Corp., EFCH and EFIH in connection with the offering of the notes and the incurrence of the guarantee or pledge, as applicable. It is not expected that EFIH will receive any of the proceeds from this offering.

Each guarantee of the notes contains a provision intended to limit the guarantor's liability to the maximum amount that it could incur without causing the incurrence of obligations under its guarantee to be a fraudulent conveyance. This provision may not be effective to protect the guarantee from being voided under fraudulent conveyance law, or may reduce or eliminate the guarantor's obligation to an amount that effectively makes the guarantee worthless.

### EFH Corp. may not be able to repurchase the notes upon a change of control.

Upon the occurrence of specific kinds of change of control events, EFH Corp. will be required to offer to repurchase all of the notes at 101% of their respective principal amount plus accrued and unpaid interest. The source of funds for any purchase of the notes will be EFH Corp.'s available cash or cash generated from the EFH Corp.'s subsidiaries' operations or other sources, including borrowings, sales of assets or sales of equity. EFH Corp. may not be able to repurchase the notes upon a change of control because EFH Corp. may not have sufficient financial resources to purchase all of the notes that are tendered upon a change of control. Further, EFH Corp. may be restricted under the terms of debt agreements of TCEH, EFIH and Oncor from receiving funds from TCEH and Oncor sufficient to repurchase all of the notes tendered by holders upon a change of control. Accordingly, EFH Corp. may not be able to satisfy its obligations to purchase the notes unless EFH Corp. is able to refinance or obtain waivers under the instruments governing its indebtedness. EFH Corp.'s failure to repurchase the notes upon a change of control would cause a default under the indenture governing the notes and a cross-default under certain of EFH Corp.'s other debt agreements. The instruments governing TCEH's senior secured credit facilities also provide that a change of control will be a default that permits the lenders thereunder to accelerate the maturity of borrowings thereunder. Any of our future debt agreements may contain similar provisions.

29

EFIHMW00151855

**PX 022
Page 36 of 218**

***There are restrictions on your ability to transfer or resell the notes without registration under applicable securities laws.***

The notes are being offered and sold pursuant to exemptions from registration under U.S. and applicable state securities laws. Therefore, you may transfer or resell the notes in the United States only in a transaction registered under or exempt from the registration requirements of U.S. and applicable state securities laws, and you may be required to bear the risk of your investment for an indefinite period of time. EFH Corp. is obligated to use its commercially reasonable efforts to commence an offer to exchange the notes for notes with substantially identical terms that are registered under the Securities Act or, in certain circumstances, register the reoffer and resale of the notes under the Securities Act. See "Description of the Notes — Exchange Offer; Registration Rights" and "Notice to Investors."

***Your ability to transfer the notes may be limited by the absence of an active trading market, and there is no assurance that any active trading market will develop for the notes.***

The notes are a new issue of securities for which there is no established trading market. We do not intend to have the notes listed on a national securities exchange or included in any automated quotation system.

The initial purchasers have advised us that they intend to make a market in the notes, and the exchange notes, if issued, as permitted by applicable laws and regulations; however, the initial purchasers are not obligated to make a market in the notes or the exchanges notes, and they may discontinue their market-making activities at any time without notice. As Goldman, Sachs & Co. is a member of the Sponsor Group, it will be required to deliver a "market-making prospectus" when effecting offers and sales of notes and exchange notes. For so long as the market-making prospectus is required to be delivered, the ability of Goldman, Sachs & Co. to make a market in the notes and exchange notes may, in part, be dependent on our ability to maintain a current market-making prospectus. The liquidity of any market for the notes will depend upon the number of holders of the notes, our performance, the market for similar securities, the interest in securities dealers making a market in the notes and other factors. Therefore, we cannot assure you that an active market for the notes or exchange notes will develop or, if developed, that it will continue. If an active market does not develop or is not maintained, the price and liquidity of the notes will be adversely affected.

Historically, the market for non investment-grade debt has been subject to disruptions that have caused substantial volatility in the prices of securities similar to the notes. We cannot assure you that the market, if any, for the notes or exchange notes will be free from similar disruptions or that any such disruptions may not adversely affect the prices at which you may sell your notes. In addition, subsequent to their initial issuance, the notes or exchange notes may trade at a discount from their initial offering price, depending upon prevailing interest rates, the market for similar notes, our performance and other factors.

***The interests of the Sponsor Group may differ from the interests of the holders of the notes.***

The Sponsor Group indirectly owns approximately 60% of EFH Corp.'s capital stock on a fully diluted basis through their investment in Texas Holdings. As a result of this ownership and the Sponsor Group's ownership in interests of the general partner of Texas Holdings, the Sponsor Group has control over decisions regarding our operations, plans, strategies, finances and structure, including whether to enter into any corporate transaction, and will have the ability to prevent any transaction that requires the approval of EFH Corp.'s shareholders.

The interests of these persons may differ from your interests in material respects. For example, if we encounter financial difficulties or are unable to pay our debts as they mature, the interests of the Sponsor Group, as equity holders, might conflict with your interests as a noteholder. The Sponsor Group may also have an interest in pursuing acquisitions, divestitures, financings or other transactions that, in their judgment, could enhance their equity investments, even though such transactions might involve risks to you as a noteholder. Additionally, the indenture governing the notes permits us to pay advisory fees, dividends or make other restricted payments under certain circumstances, and the Sponsor Group may have an interest in our doing so.

30

EFIHMW00151856

**Risks Related to Structure**

***EFH Corp. is a holding company and its obligations are structurally subordinated to existing and future liabilities and preferred stock of its subsidiaries.***

EFH Corp.'s cash flows and ability to meet its obligations are largely dependent upon the earnings of its subsidiaries and the payment of such earnings to EFH Corp. in the form of dividends, distributions, loans or otherwise, and repayment of loans or advances from EFH Corp. These subsidiaries are separate and distinct legal entities and have no obligation to provide EFH Corp. with funds for its payment obligations. Any decision by a subsidiary to provide EFH Corp. with funds for its payment obligations, whether by dividends, distributions, loans or otherwise, will depend on, among other things, the subsidiary's results of operations, financial condition, cash requirements, contractual restrictions and other factors. In addition, a subsidiary's ability to pay dividends may be limited by covenants in its existing and future debt agreements or applicable law. Further, the distributions that may be paid by Oncor are limited through December 31, 2012, to an amount not to exceed Oncor's net income (determined in accordance with U.S. GAAP, subject to certain defined adjustments, including goodwill impairments), and are further limited by an agreement that Oncor's regulatory capital structure will be at or below the assumed debt-to-equity ratio established periodically by the PUCT for ratemaking purposes, which is currently set at 60% debt to 40% equity. Also, the independent members of Oncor's board of directors and the noncontrolling member of Oncor can block the payment of dividends.

Because EFH Corp. is a holding company, its obligations to its creditors is structurally subordinated to all existing and future liabilities and existing and future preferred stock of its subsidiaries that do not guarantee such obligations. Therefore, with respect to subsidiaries that do not guarantee EFH Corp.'s obligations, EFH Corp.'s rights and the rights of its creditors to participate in the assets of any subsidiary in the event that such a subsidiary is liquidated or reorganized are subject to the prior claims of such subsidiary's creditors and holders of such subsidiary's preferred stock. To the extent that EFH Corp. may be a creditor with recognized claims against any such subsidiary, EFH Corp.'s claims would still be subject to the prior claims of such subsidiary's creditors to the extent that they are secured or senior to those held by EFH Corp. Subject to restrictions contained in financing arrangements, EFH Corp.'s subsidiaries may incur additional indebtedness and other liabilities.

***Oncor may or may not make any distributions to EFH Corp.***

Upon the consummation of the Merger, EFH Corp. and Oncor implemented certain structural and operational "ring-fencing" measures based on principles articulated by rating agencies and commitments made by Texas Holdings and Oncor to the PUCT and the FERC to further separate Oncor from the Texas Holdings Group. See "The Transactions—Ring-Fencing." These measures were put into place to mitigate Oncor's credit exposure to those entities and to reduce the risk that the assets and liabilities of Oncor would be substantively consolidated with the assets and liabilities of the Texas Holdings Group in the event of a bankruptcy of one or more of those entities.

As part of the ring-fencing measures implemented by EFH Corp. and Oncor, a majority of the members of the board of directors of Oncor are required to be, and are, independent from EFH Corp. Any new independent directors are required to be appointed by the nominating committee of Oncor Holdings. The organizational documents of Oncor give these independent directors, acting by majority vote, and, during certain periods, any director designated by Texas Transmission, the express right to prevent distributions from Oncor if they determine that it is in the best interests of Oncor to retain such amounts to meet expected future requirements. Accordingly, there can be no assurance that Oncor will make any distributions to EFH Corp.

In addition, Oncor's organizational documents limit Oncor's distributions to EFH Corp. through 2012 to Oncor's net income and prohibit Oncor from making any distribution to EFH Corp. so long as and to the extent that such distribution would cause Oncor's debt-to-equity ratio for regulatory purposes to be above the debt-to-equity ratio established from time to time by the PUCT for ratemaking purposes, which is currently set at 60% debt to 40% equity.

31

EFIHMW00151857

In March 2009, the PUCT awarded Oncor the right to construct approximately $1.3 billion of transmission lines and facilities associated with its Competitive Renewable Energy Zones (CREZ) Transmission Plan (see discussion in "Management's Discussion and Analysis of Financial Condition and Results of Operations — Regulation and Rates" included in our September 30, 2009 Form 10-Q). With the award, it is likely Oncor will incur additional debt. In addition, Oncor may incur additional debt in connection with other investments in infrastructure or technology. Accordingly, while Oncor is required to maintain a debt to equity ratio of 60% debt to 40% equity, there can be no assurance that Oncor's equity balance will be sufficient to maintain the required debt-to-equity ratio established from time to time by the PUCT for ratemaking purposes, thereby restricting Oncor from making any distributions to EFH Corp.

Confidential

EFIHMW00151858

**PX 022**
**Page 39 of 218**

## THE TRANSACTIONS

### The Merger

On October 10, 2007, the Merger occurred. Upon the effectiveness of the Merger, each share of EFH Corp. common stock outstanding immediately prior to the Merger (other than shares held by EFH Corp. or any of its subsidiaries or Texas Holdings or any of its subsidiaries, including Merger Sub, in each case not held on behalf of third parties, or shares held by holders who properly exercised their rights of dissent and appraisal under Texas law) was cancelled and converted into the right to receive $69.25 in cash, without interest and less any applicable withholding taxes.

### Equity Contributions

At the closing of the Merger, Texas Holdings received an aggregate equity investment of approximately $8.3 billion. Investment funds affiliated with the Sponsor Group, or their respective assignees, contributed approximately $5.1 billion to Texas Holdings. The Sponsor Group consists of investment funds associated with or designated by KKR, TPG and Goldman Sachs who, along with certain other co-investors, own EFH Corp. through Texas Holdings, with the Sponsor Group controlling Texas Holdings' general partner, Texas Energy Future Capital Holdings LLC. In addition, Citigroup Global Markets Inc., an initial purchaser in this offering, and Morgan Stanley & Co. Incorporated, or their respective affiliates, each made equity investments of approximately $250 million in Texas Holdings. The Sponsor Group obtained approximately $2.3 billion in equity investments from other existing investors in KKR's and TPG's private equity funds and other third party investors. Following the closing of the Merger and as of the date of this offering memorandum, the Sponsor Group owned approximately 62% of the limited partnership units issued by Texas Holdings in connection with the Merger.

The equity contributions by the Sponsor Group and the Investors are referred to in this offering memorandum as the "Equity Contributions."

### Debt Financing

In connection with the Merger, in addition to the Equity Contributions described above, we entered into the following debt financing arrangements, in each case, arranged by a consortium of arrangers and bookrunners:

- Senior secured credit facilities of TCEH, which are guaranteed by EFCH and subsidiaries of TCEH;

- a $6.75 billion senior unsecured interim loan facility of TCEH (the "TCEH Senior Interim Facility"), which was used to fund the Merger and related transactions; and

- a $4.5 billion senior unsecured interim loan facility of EFH Corp. (the "EFH Senior Interim Facility"), which was used to fund the Merger and related transactions.

In October and December 2007, TCEH and TCEH Finance, Inc. issued $6.75 billion aggregate principal amount of the TCEH 2015/2016 Notes in two private offerings. The proceeds from the offerings of the TCEH 2015/2016 Notes, along with cash on hand, were used by TCEH to repay in full the TCEH Senior Interim Facility.

In October 2007, EFH Corp. issued the 2017 Notes in a private offering. The proceeds from the offering of the 2017 Notes, along with cash on hand, were used by EFH Corp. to repay in full the EFH Senior Interim Facility.

Concurrently with the transactions described above, Oncor entered into a $2.0 billion senior revolving credit facility (the "Oncor Revolving Credit Facility"), which may be increased by up to $500 million, subject to certain conditions, which is being used by Oncor for working capital and for other general corporate purposes. No portion of the Oncor Revolving Credit Facility was used to finance the Merger or the debt repayment that occurred in connection with the Merger.

33

EFIHMW00151859

**Ring-Fencing**

Upon the consummation of the Merger, EFH Corp. and Oncor implemented several measures that are referred to as "ring-fencing." Such measures included, among others, the following:

- the conversion of Oncor from a Texas corporation to a Delaware limited liability company;

- the inclusion of covenants in Oncor Holdings' and Oncor's limited liability company agreements intended to enhance the separation of Oncor Holdings and its subsidiaries, including Oncor, from Texas Holdings and its other subsidiaries, including EFIH;

- the establishment of boards of directors for Oncor Holdings and Oncor with a majority of members who meet the New York Stock Exchange requirements for independence in all material respects and whose unanimous consent is required to take certain actions, including (i) to consolidate or merge (A) with EFH Corp. or any of EFH Corp.'s other subsidiaries or (B) with any other entity, if Oncor Holdings or Oncor, as applicable, would not be the surviving entity; (ii) to sell, transfer or dispose of all or substantially all of the assets of Oncor Holdings or Oncor, as applicable, without adequate provision for the payment of all of such entity's creditors; (iii) to institute, or consent to the institution of, bankruptcy or similar proceedings in respect of Oncor Holdings or Oncor, as applicable; or (iv) to the fullest extent permitted by law, to dissolve or liquidate Oncor Holdings or Oncor, as applicable, without adequate provision for the payment of all of such entity's creditors;

- the specific delegation to each of the board of directors and the independent directors of Oncor, each acting by majority vote, of the right to prevent distributions, if it or they determine that it is in the best interests of Oncor to retain such amounts to meet expected future requirements;

- after the appointment of the initial independent directors, the delegation of the ability to nominate, appoint and fill vacancies in respect of the independent directors of Oncor Holdings and Oncor to a standing nominating committee of Oncor Holdings' board of directors, a majority of whose members are independent directors; and

- the incurrence of new indebtedness, evidenced by the Oncor Revolving Credit Facility, the lenders of which will be specifically relying on the separateness of Oncor Holdings and Oncor, and their assets, from Texas Holdings and its other subsidiaries.

The ring-fencing measures were based on certain principles articulated by rating agencies and certain commitments made by Texas Holdings and Oncor to the PUCT and the FERC intended to further separate Oncor from Texas Holdings and its subsidiaries and to mitigate Oncor's credit exposure to those entities and to reduce the risk that the assets and liabilities of Oncor Holdings or of any of its subsidiaries would be substantively consolidated with the assets and liabilities of Texas Holdings or of any of its other subsidiaries in the event of a bankruptcy of one or more of those entities. A number of ring-fencing measures put in place were incorporated into the Order on Rehearing in PUCT Docket No. 34077 that is legally binding on Oncor.

None of the ring-fenced entities guarantees or otherwise holds out its credit as being available to support the obligations of EFH Corp. or any of its subsidiaries (other than the ring-fenced entities), including the notes offered hereby. In addition, lenders under TCEH's senior credit secured facilities and the holders of the Senior Secured Notes, the 2017 Notes and the TCEH 2015/2016 Notes have acknowledged, and the future holders of such notes will acknowledge, by acceptance of such notes, the legal separation of Oncor and its subsidiaries from the borrowers and guarantors under such financing documents. Lenders under TCEH's senior secured credit facilities and the holders of the Senior Secured Notes, the 2017 Notes and the TCEH 2015/2016 Notes also agreed, and the future holders of such notes will agree, by acceptance of such notes, that they will not initiate any bankruptcy or similar proceeding against Oncor Holdings or its subsidiaries and that Oncor Holdings and its subsidiaries are entitled to enforce this non-petition covenant. In addition, holders of the notes, by acceptance of such notes, will acknowledge the legal separation of Oncor and its subsidiaries from EFH Corp., EFIH and EFCH under such financing documents. Holders of the notes, by acceptance of such notes, will also agree that they will not initiate any bankruptcy or similar proceeding against Oncor Holdings or its subsidiaries and that Oncor Holdings and its subsidiaries are entitled to enforce this non-petition covenant.

34

EFIHMW00151860

### Sale of Noncontrolling Interests in Oncor

In November 2008, Oncor issued and sold additional equity interests to Texas Transmission for $1.254 billion in cash. At the closing of the sale, Oncor also offered and sold additional equity interests to Oncor Management Investment LLC, an entity owned by certain members of Oncor's management, for the same price per unit of equity interest paid by Texas Transmission. Accordingly, the equity issuances resulted in EFH Corp. indirectly owning 80.04% of Oncor, certain members of Oncor management indirectly owning 0.21% of Oncor and Texas Transmission owning 19.75% of Oncor.

The Investor Rights Agreement governs certain rights of certain members of Oncor and EFH Corp. arising out of their direct or indirect ownership of Oncor membership interests, including, without limitation, transfers of Oncor membership interests and restrictions thereon. Among other transfer restrictions, the Investor Rights Agreement provides that, prior to the earlier of the completion of a qualified initial public offering or seven years from the date of the Investor Rights Agreement, Texas Transmission may transfer its Oncor membership interests only to certain permitted transferees or with the prior approval of Oncor Holdings. Following such time period, Texas Transmission may transfer its Oncor membership interests under a registration statement or pursuant to applicable securities laws. The Investor Rights Agreement also grants Texas Transmission certain "tag-along" rights in relation to certain sales, transfers or pledges of Oncor membership interests by Oncor Holdings or indirectly by EFH Corp. or its subsidiaries. Subject to certain conditions, these "tag-along" rights allow Texas Transmission to transfer a pro-rata portion of its Oncor membership interests in the event of a transfer of Oncor membership interests by Oncor Holdings or indirectly by EFH Corp. or its subsidiaries on the same terms as Oncor Holdings, EFH Corp. or a subsidiary of EFH Corp. would receive for the Oncor membership interests. The agreement further provides that under certain offerings of equity securities occurring before an initial public offering of Oncor, Texas Transmission and Oncor Holdings will receive preemptive rights to purchase their pro-rata share of the equity securities to be sold pursuant to such offerings. The Investor Rights Agreement also provides EFH Corp. with a right of first refusal to purchase any Oncor membership interests to be sold in a permitted sale by Texas Transmission or its permitted transferees.

Additionally, Texas Holdings, EFH Corp., certain of EFH Corp.'s subsidiaries and Oncor Holdings have certain "drag-along" rights in relation to offers from third-parties to purchase their directly or indirectly owned membership interests in Oncor, where the resulting sale would constitute a change of control of Oncor. These "drag-along" rights compel Texas Transmission and all other members of Oncor to sell or otherwise transfer their membership interests in Oncor on substantially the same terms as Texas Holdings, EFH Corp., the EFH Corp. subsidiary or Oncor Holdings (as applicable). Pursuant to the Investor Rights Agreement, all members of Oncor that have entered into such agreement must cooperate with Oncor in connection with an initial public offering of Oncor.

Confidential

EFIHMW00151861

## USE OF PROCEEDS

We estimate that we will receive net proceeds of approximately $488 million from this offering, after deducting the initial purchasers' discounts and our estimated offering expenses. The proceeds we receive from the issuance of the notes will be used for general or other corporate purposes, which may include, without limitation, working capital needs, investment in business initiatives, capital expenditures and prepayment or repurchase of outstanding indebtedness of EFH Corp. and/or its subsidiaries. The outstanding indebtedness that may be prepaid or repurchased includes, as of September 30, 2009: (i) $1.0 billion outstanding principal amount of EFH Corp.'s 5.55% Series P Senior Notes due November 15, 2014; (ii) $750 million outstanding principal amount of EFH Corp.'s 6.50% Series Q Senior Notes due November 15, 2024; (iii) $750 million outstanding principal amount of EFH Corp.'s 6.55% Series R Senior Notes due November 15, 2034; (iv) $2.0 billion outstanding principal amount of EFH Corp.'s 10.875% Senior Notes due November 1, 2017; (v) $2.65 billion outstanding principal amount of EFH Corp.'s 11.250%/12.000% Senior Toggle Notes due November 1, 2017; (vi) $3.0 billion outstanding principal amount of TCEH and TCEH Finance, Inc.'s 10.25% Senior Notes due November 1, 2015; (vii) $2.0 billion outstanding principal amount of TCEH and TCEH Finance, Inc.'s 10.25% Senior Notes due November 1, 2015, Series B; (viii) $1.848 billion outstanding principal amount of TCEH and TCEH Finance, Inc.'s 10.50%/11.25% Senior Toggle Notes due November 1, 2016; (ix) TCEH's senior secured credit facilities, which had approximately $22.4 billion of borrowings outstanding, bear interest at rates ranging from 3.75% to 3.79% plus certain customary facility fees (excluding TCEH's commodity collateral posting facility, for which there are no outstanding borrowings) and mature on December 31, 2012, October 10, 2013 and October 10, 2014; and (x) $1.5 billion outstanding principal amount of TCEH's pollution control revenue bonds due June 1, 2021, May 1, 2022, July 1, 2022, August 1, 2022, May 1, 2028, May 1, 2029, October 1, 2029, May 1, 2030, October 1, 2030, March 1, 2032, July 1, 2032, April 1, 2033, May 1, 2033, September 1, 2034, May 1, 2036, December 1, 2036, May 1, 2037, April 1, 2038, October 1, 2038 and March 1, 2041.

36

Confidential

## CAPITALIZATION

The following table sets forth as of September 30, 2009, EFH Corp.'s cash and cash equivalents and capitalization of EFH Corp. and certain of its subsidiaries:

(1) on an actual basis;

(2) on an adjusted basis to give effect to the issuance of the Senior Secured Notes and the cancellation of certain indebtedness accepted for exchange in the exchange offers; and

(3) on an as further adjusted basis to give effect to the issuance of the notes.

| | As of September 30, 2009 | | |
| --- | --- | --- | --- |
| | Actual | As Adjusted(a) | As Further Adjusted(b) |
| | | (millions of dollars) | |
| Cash and cash equivalents | $ 1,725 | $ 1,718 | $ 2,206 |
| **Debt:** | | | |
| EFH Corp.: | | | |
| 4.80% Series O Senior Notes due 2009 | 3 | 3 | 3 |
| 5.55% Series P Senior Notes due 2014 | 1,000 | 983 | 983 |
| 6.50% Series Q Senior Notes due 2024 | 750 | 740 | 740 |
| 6.55% Series R Senior Notes due 2034 | 750 | 744 | 744 |
| 10.875% Senior Notes due 2017 | 2,000 | 1,831 | 1,831 |
| 11.250%/12.000% Senior Toggle Notes due 2017 | 2,650 | 2,797 | 2,797 |
| 9.75% Senior Secured Notes due 2019 | — | 116 | 116 |
| 10.000% Senior Secured Notes due 2020 offered hereby | — | — | 500 |
| Unamortized fair value discount | (619) | (612) | (612) |
| Unamortized discount on Senior Secured Notes and the notes | — | — | — |
| Total EFH Corp. debt | 6,534 | 6,602 | 7,102 |
| EFIH(c): | | | |
| 9.75% Senior Secured Notes due 2019 | — | 141 | 141 |
| Unamortized discount on Senior Secured Notes | — | — | — |
| Total EFIH debt | — | 141 | 141 |
| EFCH(d): | | | |
| Secured debt | 94 | 94 | 94 |
| Unsecured debt | 9 | 9 | 9 |
| Total EFCH debt | 103 | 103 | 103 |
| TCEH: | | | |
| Senior secured credit facilities | 22,356 | 22,356 | 22,356 |
| 10.25% Senior Notes due 2015 and 10.25% Senior Notes due 2015, Series B | 5,000 | 4,857 | 4,857 |
| 10.50%/11.25% Senior Toggle Notes due 2016 | 1,848 | 1,848 | 1,848 |
| Other secured debt | 208 | 208 | 208 |
| Other unsecured debt | 1,390 | 1,390 | 1,390 |
| Total TCEH debt | 30,802 | 30,659 | 30,659 |
| Oncor: | | | |
| Secured debt | 5,674 | 5,674 | 5,674 |
| Total Oncor debt | 5,674 | 5,674 | 5,674 |
| Debt of Other Subsidiaries: | | | |
| Secured debt(e) | 92 | 92 | 92 |
| Total consolidated debt | 43,205 | 43,271 | 43,771 |
| Total shareholders' equity | (3,234) | (3,174) | (3,174) |
| Noncontrolling interests in subsidiaries | 1,420 | 1,420 | 1,420 |
| Total capitalization | $41,391 | $41,517 | $42,017 |

(a)   The adjustment to cash and cash equivalents reflects estimated issuance costs related to the exchange offers. Debt amounts exclude an aggregate principal amount of up to $176 million and unamortized fair value discount of up to $11 million related to exchanged notes that may remain outstanding and be held by EFH Corp. (parent), EFCH and/or EFIH; such notes would be eliminated in the EFH Corp.

37

EFIHMW00151863

consolidated financial statements. The 11.250%/12.000% Senior Toggle Notes due 2017 as adjusted amount includes $159 million in additional principal reflecting the payment-in-kind interest payment on November 1, 2009. Total shareholders' equity reflects an approximate $60 million after tax gain on the transaction. Amounts do not include accrued and unpaid interest paid on the exchanged notes on which cash interest is paid, which was approximately $1 million.

(b)   The adjustment to cash and cash equivalents reflects estimated proceeds from the issuance of the notes, pending use for general or other corporate purposes or as otherwise described in "Use of Proceeds," net of estimated discount and issuance costs.

(c)   Excludes EFIH's guarantees of the EFH Corp. Notes, the 2017 Notes and the notes.

(d)   Excludes EFCH's guarantee of the EFH Corp. Notes, the 2017 Notes, TCEH's senior secured credit facilities, the TCEH 2015/2016 Notes and the notes.

(e)   Consists of a building finance lease.

38

## DESCRIPTION OF THE NOTES

**General**

Certain terms used in this description are defined under the subheading "Certain Definitions." In this description, (i) the terms "*we*," "*our*" and "*us*" each refer to Energy Future Holdings Corp. and its consolidated Subsidiaries; and (ii) the term "*Issuer*" refers only to Energy Future Holdings Corp. and not any of its Subsidiaries.

The Issuer will issue $500 million aggregate principal amount of 10.000% senior secured notes due 2020 (the "*Notes*") under an Indenture to be dated as of the Issue Date (the "*Indenture*") among the Issuer, the Guarantors and The Bank of New York Mellon Trust Company, N.A., as trustee (the "*Trustee*"). The Notes will be issued in a private transaction that is not subject to the registration requirements of the Securities Act. See "Notice to Investors." The terms of the Notes will include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act.

As more particularly described under "The Transactions — Ring-Fencing," upon the consummation of the Merger, Oncor Electric Delivery Company LLC ("*Oncor Electric Delivery*") undertook certain ring-fencing measures to separate itself, its subsidiaries and its immediate parent, Oncor Electric Delivery Holdings Company LLC ("*Oncor Holdings*"), from the Issuer and the Issuer's other Subsidiaries. Those measures include the Oncor Subsidiaries being treated as "Unrestricted Subsidiaries" with respect to the 10.875% Senior Notes due 2017, 11.250%/12.000% Senior Toggle Notes due 2017 and 9.75% Senior Secured Notes due 2019, in each case issued by the Issuer, and with respect to the 9.75% Senior Secured Notes due 2019, issued by Energy Future Intermediate Holding Company LLC ("*EFIH*") and EFIH Finance Inc. In order to comply with these ring-fencing obligations, the Oncor Subsidiaries will also be Unrestricted Subsidiaries with respect to the Notes. As Unrestricted Subsidiaries, the Oncor Subsidiaries will not be subject to any of the covenants described herein and will not guarantee the Notes.

The Holders of the Notes, by accepting the Notes, acknowledge (i) the legal separateness of the Issuer and the Guarantors from the Oncor Subsidiaries, (ii) that the lenders under the Oncor Electric Delivery Facility and the noteholders under Oncor's existing debt instruments have likely advanced funds thereunder in reliance upon the separateness of the Oncor Subsidiaries from the Issuer and the Guarantors, (iii) that the Oncor Subsidiaries have assets and liabilities that are separate from those of the Issuer and its other Subsidiaries, (iv) that the obligations owing under the Notes are obligations and liabilities of the Issuer and the Guarantors only, and are not the obligations or liabilities of any Oncor Subsidiary, (v) that the Holders of the Notes shall look solely to the Issuer and the Guarantors and their assets, and not to any assets, or to the pledge of any assets, owned by any Oncor Subsidiary, for the repayment of any amounts payable pursuant to the Notes and for satisfaction of any other obligations owing to the Holders under the Indenture, the Registration Rights Agreement and any related documents and (vi) that none of the Oncor Subsidiaries shall be personally liable to the Holders of the Notes for any amounts payable, or any other obligation, under the Indenture, the Registration Rights Agreement or any related documents.

The Holders of the Notes, by accepting the Notes, shall acknowledge and agree that the Holders of the Notes shall not (i) initiate any legal proceeding to procure the appointment of an administrative receiver or (ii) institute any bankruptcy, reorganization, insolvency, winding up, liquidation, or any like proceeding under applicable law, against any Oncor Subsidiary, or against any of the Oncor Subsidiaries' assets. The Holders further acknowledge and agree that each of the Oncor Subsidiaries is a third party beneficiary of the forgoing covenant and shall have the right to specifically enforce such covenant in any proceeding at law or in equity. The foregoing acknowledgements and agreements will be contained in the Indenture.

The following description is only a summary of the material provisions of the Indenture and the Security Documents, does not purport to be complete and is qualified in its entirety by reference to the provisions of the Indenture and the Security Documents, including the definitions therein of certain terms used below. We urge you to read the Indenture and the Security Documents because they, and not this description, will define your rights as Holders of the Notes. You may request copies of the Indenture and the Security Documents at our address set forth under the heading "Incorporation by Reference."

39

EFIHMW00151865
**PX 022
Page 46 of 218**

**Brief Description of Notes and the Guarantees**

The Notes:

- will be senior obligations of the Issuer and will rank equally in right of payment with all Senior Indebtedness of the Issuer (including the 9.75% Notes and the applicable Existing Notes);

- will be effectively subordinated to any Indebtedness of the Issuer secured by assets of the Issuer, to the extent of the value of the assets securing such Indebtedness;

- will be structurally subordinated to all Indebtedness and other liabilities of non-guarantor Subsidiaries, including the Oncor Subsidiaries, TCEH and its Subsidiaries, any of the Issuer's Foreign Subsidiaries and any other Unrestricted Subsidiaries;

- will be senior in right of payment to any future Subordinated Indebtedness of the Issuer; and

- will be initially unconditionally guaranteed, jointly and severally, on a senior unsecured basis by Energy Future Competitive Holdings Company ("*EFCH*") and on a senior secured basis (to the extent of the Collateral) by EFIH, as described below under "— Guarantees."

The Guarantees:

- will be a general senior obligation of each Guarantor;

- in the case of the Guarantee from EFIH, will be secured, equally and ratably with EFIH's guarantee of the 9.75% Notes and the EFIH Notes, by the pledge of any investments EFIH owns in any Oncor Subsidiary (as described below under "— Security for the Notes"), which on the Issue Date will consist of all of the membership interests it owns in Oncor Holdings;

- in the case of the Guarantee from EFCH, will not be secured;

- will rank equally in right of payment with all existing and future Senior Indebtedness of each Guarantor;

- in the case of the Guarantee from EFIH, will be effectively senior to all unsecured Indebtedness of EFIH to the extent of the value of the Collateral securing such Guarantee;

- will be effectively subordinated to all secured Indebtedness of each Guarantor secured by assets other than the Collateral to the extent of the value of the assets securing such Indebtedness;

- will be structurally subordinated to any existing and future indebtedness and liabilities of Subsidiaries of a Guarantor that do not Guarantee the Notes, including the Oncor Subsidiaries in the case of EFIH, and TCEH and its Subsidiaries in the case of EFCH, and any other Unrestricted Subsidiaries;

- will be senior in right of payment to any future Subordinated Indebtedness of each Guarantor; and

- will be effectively senior to all obligations under any future Junior Lien Debt with respect to the Collateral.

See "Risk Factors — Risks Related to the Notes and Our Substantial Indebtedness — The liabilities of each of EFH Corp. and EFCH currently exceed its assets as shown on its most recent balance sheet. If a court were to find that EFH Corp., EFCH or EFIH were insolvent before or after giving effect to this offering and did not receive reasonably equivalent value or fair consideration for the issuance of the notes or the incurrence of a guarantee or the pledge of the Collateral, as applicable, the court may void all or a portion of the obligations represented by the notes or the guarantee of the notes by EFCH or EFIH or the pledge of the Collateral by EFIH as a fraudulent conveyance."

**Guarantees**

The Guarantors, as primary obligors and not merely as sureties, will initially jointly and severally fully and unconditionally guarantee, on a senior basis, the performance and full and punctual payment when due, whether at maturity, by acceleration or otherwise, of all obligations of the Issuer under the Indenture and the Notes,

40

Confidential

whether for payment of principal of, premium, if any, or interest or Additional Interest in respect of the Notes, expenses, indemnification or otherwise, on the terms set forth in the Indenture by executing the Indenture.

The Issuer and the Guarantors are holding companies and none of the Issuer's or the Guarantors' other Subsidiaries will Guarantee the Notes. In the event of a bankruptcy, liquidation or reorganization of any of the non-guarantor Subsidiaries, the non-guarantor Subsidiaries will pay the holders of their debt and their trade creditors before they will be able to distribute any of their assets to the Issuer or the Guarantors. None of TCEH, the Subsidiaries of TCEH, or the Oncor Subsidiaries will guarantee the Notes. For the year ended December 31, 2008 and the nine months ended September 30, 2009, the non-guarantor Subsidiaries generated all of the Issuer's consolidated total revenue. In addition, as of September 30, 2009, the non-guarantor Subsidiaries held substantially all of the Issuer's consolidated total assets.

Any entity that makes a payment under its Guarantee will be entitled upon payment in full of all guaranteed obligations under the Indenture to a contribution from each other Guarantor in an amount equal to such other Guarantor's pro rata portion of such payment based on the respective net assets of all the Guarantors at the time of such payment determined in accordance with GAAP.

The obligations of each Guarantor under its Guarantee will be limited as necessary to prevent the Guarantee from constituting a fraudulent conveyance under applicable law. However, this limitation may not be effective to prevent a Guarantee from being voided under fraudulent conveyance law, or may reduce or eliminate a Guarantor's obligation to an amount that effectively makes its Guarantee worthless.

If a Guarantee were rendered voidable, it could be subordinated by a court to all other indebtedness (including guarantees and other contingent liabilities) of the Guarantor, and, depending on the amount of such indebtedness, a Guarantor's liability on its Guarantee could be reduced to zero. See "Risk Factors — Risks Related to the Notes and Our Substantial Indebtedness — The liabilities of each of EFH Corp. and EFCH currently exceed its assets as shown on its most recent balance sheet. If a court were to find that EFH Corp., EFCH or EFIH were insolvent before or after giving effect to this offering and did not receive reasonably equivalent value or fair consideration for the issuance of the notes or the incurrence of a guarantee or the pledge of the Collateral, as applicable, the court may void all or a portion of the obligations represented by the notes or the guarantee of the notes by EFCH or EFIH or the pledge of the Collateral by EFIH as a fraudulent conveyance."

Subject to "— Certain Covenants — Restrictions on Permitted Asset Transfers," each Guarantee by a Guarantor will provide by its terms that it will be automatically and unconditionally released and discharged upon:

(1)(a) any sale, exchange or transfer (by merger, wind-up, consolidation or otherwise) of the Capital Stock of such Guarantor (including any sale, exchange or transfer), after which the applicable Guarantor is no longer a Restricted Subsidiary or sale of all or substantially all the assets of such Guarantor, which sale, exchange or transfer is made in compliance with the applicable provisions of the Indenture, except that the Guarantee by EFIH shall only be released and discharged as provided under "— Certain Covenants — Restrictions on Permitted Asset Transfers";

(b) the release or discharge of the guarantee by such Guarantor that resulted in the creation of such Guarantee, except a discharge or release by or as a result of payment under such guarantee;

(c) the designation of any Restricted Subsidiary that is a Guarantor as an Unrestricted Subsidiary in compliance with the applicable provisions of the Indenture; or

(d) the exercise by the Issuer of its legal defeasance option or covenant defeasance option as described under "— Legal Defeasance and Covenant Defeasance" or the discharge of the Issuer's obligations under the Indenture in accordance with the terms of the Indenture; and

41

EFIHMW00151867

(2) such Guarantor delivering to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that all conditions precedent provided for in the Indenture relating to such transaction have been complied with.

Further, the Guarantee by EFCH shall automatically be released in connection with a Permitted Asset Transfer made in accordance with "— Certain Covenants — Restrictions on Permitted Asset Transfers" other than a merger, wind-up or consolidation of EFIH into the Issuer where EFCH continues to be a Subsidiary of the Issuer.

## Holding Company Structure

The Issuer is a holding company for its Subsidiaries, with no material operations of its own and only limited assets. Accordingly, the Issuer is dependent upon the distribution of the earnings of its Subsidiaries, whether in the form of dividends, advances or payments on account of intercompany obligations, to service its debt obligations. Each of the Guarantors are also holding companies for their Subsidiaries. See the risk factor in our 2008 Form 10-K entitled "EFH Corp. is a holding company and its obligations are structurally subordinated to existing and future liabilities and preferred stock of its subsidiaries."

## Paying Agent and Registrar for the Notes

The Issuer will maintain one or more paying agents for the Notes. The initial paying agent for the Notes will be the Trustee at its offices in Houston, Texas.

The Issuer will also maintain a registrar. The initial registrar will be the Trustee at its offices in Houston, Texas. The registrar will maintain a register reflecting ownership of the Notes outstanding from time to time and will make payments on and facilitate transfer of Notes on behalf of the Issuer.

The Issuer may change the paying agents or the registrars without prior notice to the Holders. The Issuer or any of its Subsidiaries may act as a paying agent or registrar.

## Transfer and Exchange

A Holder may transfer or exchange Notes in accordance with the Indenture. The registrar and the Trustee may require a Holder to furnish appropriate endorsements and transfer documents in connection with a transfer of Notes. Holders will be required to pay all taxes due on transfer. The Issuer will not be required to transfer or exchange any Note selected for redemption. Also, the Issuer will not be required to transfer or exchange any Note for a period of 15 days before a selection of Notes to be redeemed.

## Principal, Maturity and Interest

The Issuer will issue $500 million in aggregate principal amount of Notes in this offering. The Notes will mature on January 15, 2020. Subject to compliance with the covenants described under "— Certain Covenants — Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" and "— Certain Covenants — Liens," the Issuer may issue additional Notes from time to time after the Issue Date under the Indenture (any such Notes, "*Additional Notes*"). The Notes and any Additional Notes subsequently issued under the Indenture will be treated as a single class for all purposes under the Indenture, including waivers, amendments, redemptions and offers to purchase. Unless the context requires otherwise, references to "Notes" for all purposes of the Indenture and this "Description of the Notes" section include any Additional Notes that are actually issued.

Interest on the Notes will accrue at the rate of 10.000% per annum and will be payable semi-annually in arrears on each January 15 and July 15, commencing on July 15, 2010, to the Holders of record on the immediately preceding January 1 and July 1. Interest on the Notes will accrue from the most recent date to which interest has been paid or, if no interest has been paid, from and including the Issue Date. Interest on the Notes will be computed on the basis of a 360-day year comprised of twelve 30-day months.

42

Principal of, premium, if any, and interest on the Notes will be payable at the office or agency of the Issuer maintained for such purpose within the City of Houston and State of Texas or, at the option of the Issuer, payment of interest may be made by check mailed to the Holders of the Notes at their respective addresses set forth in the register of Holders; *provided* that all payments of principal, premium, if any, and interest with respect to the Notes represented by one or more global notes registered in the name of or held by DTC or its nominee will be made by wire transfer of immediately available funds to the accounts specified by the Holder or Holders thereof. Until otherwise designated by the Issuer, the Issuer's office or agency in Houston, Texas will be the office of the Trustee maintained for such purpose.

### *Additional Interest*

Additional Interest may accrue on the Notes in certain circumstances pursuant to the Registration Rights Agreement. All references in the Indenture, in any context, to any interest or other amount payable on or with respect to the Notes shall be deemed to include any Additional Interest pursuant to the Registration Rights Agreement.

### Mandatory Redemption; Offers to Purchase; Open Market Purchases

The Issuer will not be required to make any mandatory redemption or sinking fund payments with respect to the Notes. However, under certain circumstances, the Issuer may be required to offer to purchase Notes as described under "— Repurchase at the Option of Holders." The Issuer may at any time and from time to time purchase Notes in the open market or otherwise.

### Optional Redemption

Except as set forth below, the Issuer will not be entitled to redeem Notes at its option prior to January 15, 2015.

At any time prior to January 15, 2015, the Issuer may redeem all or a part of the Notes, upon not less than 30 nor more than 60 days' prior notice mailed by first-class mail to the registered address of each Holder of Notes or otherwise in accordance with the procedures of DTC, at a redemption price equal to 100% of the principal amount of the Notes redeemed plus the Applicable Premium as of, and accrued and unpaid interest and Additional Interest, if any, to, the date of redemption (the "*Redemption Date*"), subject to the rights of Holders of Notes on the relevant record date to receive interest due on the relevant interest payment date.

On and after January 15, 2015, the Issuer may redeem the Notes, in whole or in part, upon not less than 30 nor more than 60 days' prior notice mailed by first-class mail to the registered address of each Holder of Notes or otherwise in accordance with the procedures of DTC, at the redemption prices (expressed as percentages of principal amount of the Notes to be redeemed) set forth below, plus accrued and unpaid interest and Additional Interest, if any, to the applicable Redemption Date, subject to the right of Holders of Notes of record on the relevant record date to receive interest due on the relevant interest payment date, if redeemed during the twelve-month period beginning on January 15 of each of the years indicated below:

| Year | Percentage |
| --- | --- |
| 2015 | 105.000% |
| 2016 | 103.333% |
| 2017 | 101.667% |
| 2018 and thereafter | 100.000% |

In addition, until January 15, 2013, the Issuer may, at its option, on one or more occasions redeem up to 35% of the aggregate principal amount of Notes at a redemption price equal to 110.000% of the aggregate principal amount thereof, plus accrued and unpaid interest and Additional Interest, if any, to the applicable

43

EFIHMW00151869

Redemption Date, subject to the right of Holders of Notes of record on the relevant record date to receive interest due on the relevant interest payment date, with the net cash proceeds of one or more Equity Offerings; *provided* that at least 50% of the sum of the original aggregate principal amount of Notes issued under the Indenture and the original principal amount of any Additional Notes issued under the Indenture after the Issue Date remains outstanding immediately after the occurrence of each such redemption; and *provided, further* that each such redemption occurs within 90 days of the date of closing of each such Equity Offering.

Any notice of any redemption may be given prior to the redemption thereof, and any such redemption or notice may, at the Issuer's discretion, be subject to one or more conditions precedent, including, but not limited to, completion of an Equity Offering or other corporate transaction.

If the Issuer redeems less than all of the outstanding Notes, the Trustee shall select the Notes to be redeemed in the manner described under "— Repurchase at the Option of Holders — Selection and Notice."

## Security for the Notes

### *Collateral Trustee*

EFIH has appointed The Bank of New York Mellon Trust Company, N.A. to serve as the collateral trustee (the "*Collateral Trustee*") for the benefit of the holders of the Secured Debt Obligations outstanding from time to time.

The Security Documents will provide that the Collateral Trustee will be subject to such directions as may be given it by the Trustee and by any other Parity Lien Debt Representatives from time to time as required or permitted by the Indenture and the other Parity Lien Debt Documents. The relative rights with respect to control of the Collateral Trustee are specified in the collateral trust agreement dated as of November 16, 2009 by and among EFIH, the trustees for the 9.75% Notes and the EFIH Notes, any other Parity Lien Debt Representatives, any Junior Lien Debt Representatives and the Collateral Trustee (the "*Collateral Trust Agreement*"). On the Issue Date, the Collateral Trustee and the Trustee for the benefit of the Holders of the Notes will enter into a Joinder to the Collateral Trust Agreement, and the Notes will be designated as "Parity Lien Debt" by EFIH. Except as provided in the Collateral Trust Agreement or as directed by an Act of Required Debtholders, the Collateral Trustee will not be obligated:

(1) to act upon directions purported to be delivered to it by any other Person;

(2) to foreclose upon or otherwise enforce any Lien; or

(3) to take any other action whatsoever with regard to any or all of the Security Documents, the Liens created thereby or the Collateral.

### *Collateral*

The Indenture and the Security Documents will provide that the Guarantee of the Notes by EFIH, together with any other Parity Lien Debt (which on the Issue Date will include EFIH's guarantee of the 9.75% Notes and the EFIH Notes), will be secured on an equal and ratable basis by first-priority security interests granted to the Collateral Trustee, in all of the following property of EFIH:

(1) any Equity Interests it owns as of the Issue Date or may thereafter acquire in any Oncor Subsidiary and any promissory notes or other Indebtedness owed by, or other Investments in, any Oncor Subsidiary that it owns as of the Issue Date or it may thereafter acquire;

(2) all proceeds of, income and other payments (including, without limitation, dividends and distributions received) now or hereafter due and payable with respect to, and supporting obligations relating to, any and all of the foregoing, which, in the case of cash dividends and distributions received by EFIH from Oncor Holdings may be used by EFIH for any purpose not prohibited by the Indenture so long as no

44

EFIHMW00151870

Event of Default and no event of default under any other Parity Lien Debt, including the 9.75% Notes and the EFIH Notes, shall have occurred and be continuing; and

(3) any Asset Sale Cash Collateral Account established pursuant to the Indenture, the 9.75% Notes Indenture or the EFIH Indenture.

In addition, any Successor EFIH Company (including the Issuer, if EFIH is merged with and into the Issuer) will grant a first-priority security interest to the Collateral Trustee for the benefit of Holders of the Notes and holders of the other Parity Lien Debt and a second-priority security interest to the Collateral Trustee for the benefit of holders of Junior Lien Debt to the extent that such Successor EFIH Company holds any Equity Interests in, or Indebtedness of, or other Investments in, any Oncor Subsidiary following a Permitted Asset Transfer made in accordance with the covenants described under "— Certain Covenants — Restrictions on Permitted Asset Transfers" and "— Certain Covenants — Restrictions on Certain Investments in Oncor Subsidiaries."

On the Issue Date, the Collateral will consist of a pledge of all of the membership interests EFIH owns in Oncor Holdings. Oncor Holdings owns approximately 80% of Oncor Electric Delivery's outstanding membership interests. On November 16, 2009, EFIH and the Collateral Trustee entered into a pledge agreement (the "*Pledge Agreement*"), whereby the Collateral was pledged in favor of the Collateral Trustee for the benefit of the Collateral Trustee, the trustees for the 9.75% Notes and the EFIH Notes and the holders of the 9.75% Notes and the EFIH Notes and the holders of any other Secured Debt Obligations that may be issued in accordance with the Indenture and the 9.75% Notes Indenture and the EFIH Indenture. As a result of the Joinder to the Collateral Trust Agreement and the designation by EFIH referred to above, the Trustee and the holders of the Notes will benefit from the pledge of the Collateral under the Pledge Agreement. The Collateral does not consist of any assets of any Oncor Subsidiary. See "Risk Factors — Risks Related to the Notes and Our Substantial Indebtedness — The notes will be secured only to the extent of the value of the assets that have been granted as security for EFIH's guarantee of the notes"; "— Regulatory approvals may be required in order to enforce the security interests in the Collateral and to dispose of an interest in, or operational control of, the Collateral that secures EFIH's guarantee of the notes"; "— In the event of EFH Corp.'s bankruptcy, the ability of the holders of the notes to realize upon the Collateral securing EFIH's guarantee of the notes will be subject to certain bankruptcy law limitations"; and "— The value of the Collateral may be diluted if we issue additional debt that is secured equally and ratably by the same Collateral securing the guarantee by EFIH of the notes or if the Collateral is sold."

No appraisal of the value of the Collateral has been made in connection with the issuance of the Notes and the value of the Collateral in the event of liquidation will depend on many factors. Consequently, liquidating the Collateral may not produce proceeds in an amount sufficient to pay any amounts due on the Secured Debt Obligations, including the Notes.

The fair market value of the Collateral is subject to fluctuations based on factors that include, among others, the ability to sell the Collateral in an orderly sale, general economic conditions, the availability of buyers and similar factors. The amount to be received upon a sale of the Collateral would be dependent on numerous factors, including but not limited to the actual fair market value of the Collateral at such time and the timing and the manner of the sale. By its nature, the Collateral may be illiquid and may have no readily ascertainable market value. In the event of a foreclosure, liquidation, bankruptcy or similar proceeding, we cannot assure you that the proceeds from any sale or liquidation of the Collateral will be sufficient to pay the Parity Lien Obligations, including the Notes. Any claim for the difference between the amount, if any, realized by Holders of the Notes from the sale of Collateral securing the Secured Debt Obligations will rank equally in right of payment with all of our other unsecured unsubordinated Indebtedness and other obligations, including trade payables.

So long as no Event of Default and no event of default under any other Parity Lien Debt, including the 9.75% Notes and the EFIH Notes, shall have occurred and be continuing, and subject to certain terms and conditions, EFIH will be entitled to exercise any voting and other consensual rights pertaining to the Collateral (other than as set forth in the Pledge Agreement and the other Security Documents). The Pledge Agreement requires EFIH to deliver to the Collateral Trustee, for the Collateral Trustee to maintain in its possession,

45

EFIHMW00151871

certificates, if any, evidencing the Collateral. Upon the occurrence and during the continuance of an Event of Default under the Notes, to the extent permitted by law and subject to the provisions of the Pledge Agreement, all of the rights of EFIH to exercise voting or other consensual rights with respect to the Collateral will cease, and all such rights will become vested in the Collateral Trustee, which, to the extent permitted by law, will have the sole right to exercise such voting and other consensual rights.

### Certain bankruptcy limitations

The right of the Collateral Trustee to repossess and dispose of the Collateral upon the occurrence of an Event of Default would be significantly impaired by applicable bankruptcy law in the event that a bankruptcy case were to be commenced by or against EFIH prior to the Collateral Trustee having repossessed and disposed of the Collateral. Upon the commencement of a case for relief under Title 11 of the United States Code, as amended (the "*Bankruptcy Code*"), a secured creditor such as the Collateral Trustee is prohibited from repossessing its security from a debtor in a bankruptcy case, or from disposing of security repossessed from the debtor, without bankruptcy court approval.

In view of the broad equitable powers of a U.S. bankruptcy court, it is impossible to predict how long payments under the Notes could be delayed following commencement of a bankruptcy case, whether or when the Collateral Trustee could repossess or dispose of the Collateral, the value of the Collateral at the time of the bankruptcy petition or whether or to what extent Holders of the Notes would be compensated for any delay in payment or loss of value of the Collateral. The Bankruptcy Code permits only the payment and/or accrual of post-petition interest, costs and attorneys' fees to a secured creditor during a debtor's bankruptcy case to the extent the value of the Collateral is determined by the bankruptcy court to exceed the aggregate outstanding principal amount at maturity of the obligations secured by the Collateral. There can be no assurance that the value of the Collateral will exceed the outstanding principal amount of the Notes and the other Parity Lien Debt Obligations, including the 9.75% Notes and the EFIH Notes.

Furthermore, in the event a bankruptcy court determines that the value of the Collateral is not sufficient to repay all amounts due on the Notes and the other Parity Lien Debt Obligations, including the 9.75% Notes and the EFIH Notes, the Holders of the Notes and the holders of the other Parity Lien Debt would hold secured claims to the extent of the value of the Collateral to which the Holders of the Notes and the holders of the other Parity Lien Debt are entitled, and unsecured claims with respect to any such shortfall.

### Additional Parity Lien Debt

On November 16, 2009, $115.4 million of 9.75% Notes were issued by the Issuer, and $141.1 million of EFIH Notes were issued by EFIH and EFIH Finance Inc., all of which constitutes Parity Lien Debt, and all of which is secured by the Collateral on an equal and ratable basis with the Notes. In addition, the Indenture and the Security Documents will provide that the Issuer and EFIH may incur additional Parity Lien Debt as permitted by the covenants described under "— Certain Covenants — Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" and "— Certain Covenants — Liens," by issuing Additional Notes under the Indenture or under one or more additional indentures or incurring other Indebtedness secured by Parity Liens on the Collateral. All additional Parity Lien Debt will be secured equally and ratably with EFIH's Guarantee of the Notes by Liens on the Collateral held by the Collateral Trustee for as long as EFIH's Guarantee of the Notes is secured by the Collateral. The Collateral Trustee under the Collateral Trust Agreement will hold all Parity Liens in trust for the benefit of the Holders of the Notes, the 9.75% Notes, the EFIH Notes and the holders of any future Parity Lien Debt and all other Parity Lien Obligations. Additional Parity Lien Debt will be permitted to be secured by the Collateral only if such Parity Lien Debt and the related Parity Liens are permitted to be incurred under the covenants described under "— Certain Covenants — Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" and "— Certain Covenants — Liens." The agent or representative of any Parity Lien Debt will become a party to the Security Documents by joinder agreement.

46

EFIHMW00151872

### Future Junior Lien Debt

The Indenture and the Security Documents will provide that the Issuer and EFIH may incur Junior Lien Debt in the future by issuing debt securities under one or more indentures, incurring Indebtedness under Credit Facilities or otherwise issuing or increasing a new Series of Secured Lien Debt secured by Junior Liens on the Collateral. Junior Lien Debt will be permitted to be secured by the Collateral only if such Junior Lien Debt and the related Junior Liens are permitted to be incurred under the covenants described under "— Certain Covenants — Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" and "— Certain Covenants — Liens." The Collateral Trustee under the Collateral Trust Agreement will hold all Junior Liens in trust for the benefit of the holders of any Junior Lien Debt and all other Junior Lien Obligations. The agent or representative of any Junior Lien Obligations shall become a party to the Collateral Trust Agreement by joinder agreement.

### Enforcement of Liens

If the Collateral Trustee at any time receives written notice stating that any event has occurred that constitutes a default under any Secured Debt Document entitling the Collateral Trustee to foreclose upon, collect or otherwise enforce its Liens thereunder, it will promptly deliver written notice thereof to each Secured Debt Representative. Thereafter, the Collateral Trustee will await direction by an Act of Required Debtholders and will act, or decline to act, as directed by an Act of Required Debtholders, in the exercise and enforcement of the Collateral Trustee's interests, rights, powers and remedies in respect of the Collateral or under the Security Documents or applicable law and, following the initiation of such exercise of remedies, the Collateral Trustee will act, or decline to act, with respect to the manner of such exercise of remedies as directed by an Act of Required Debtholders. Unless it has been directed to the contrary by an Act of Required Debtholders, the Collateral Trustee in any event may (but will not be obligated to) take or refrain from taking such action with respect to any default under any Secured Debt Document as it may deem advisable to preserve and protect the value of the Collateral.

Until the Discharge of Parity Lien Obligations, the Holders of the Notes and the holders of other Parity Lien Obligations will have, subject to the exceptions set forth below in clauses (1) through (4), the exclusive right to authorize and direct the Collateral Trustee with respect to the Security Documents and the Collateral (including, without limitation, the exclusive right to authorize or direct the Collateral Trustee to enforce, collect or realize on any Collateral or exercise any other right or remedy with respect to the Collateral) and neither the provisions of the Security Documents relating thereto (other than in accordance with the Collateral Trust Agreement) nor any Junior Lien Representative or holder of Junior Lien Obligations, if any, may authorize or direct the Collateral Trustee with respect to such matters. Notwithstanding the foregoing, the holders of Junior Lien Obligations may direct the Collateral Trustee with respect to such matters:

(1) without any condition or restriction whatsoever, at any time after the Discharge of Parity Lien Obligations;

(2) to deliver any notice or demand necessary to enforce (subject to the prior Discharge of Parity Lien Obligations) any right to claim, take or receive proceeds of Collateral remaining after the Discharge of Parity Lien Obligations;

(3) as necessary to perfect or establish the priority (subject to Parity Liens) of the Junior Liens upon any Collateral; *provided* that, unless otherwise agreed to by the Collateral Trustee in the Security Documents, the holders of Junior Lien Obligations may not require the Collateral Trustee to take any action to perfect any Collateral through possession or control (other than the Collateral Trustee as agent for the benefit of the Parity Lien Representative and holders of the Parity Lien Obligations agreeing pursuant to the Collateral Trust Agreement to act as bailee for the Collateral Trustee as agent for the benefit of the Junior Lien Representatives and holders of the Junior Lien Obligations); or

(4) as necessary to create, prove, preserve or protect (but not enforce) the Junior Liens upon any Collateral.

47

Confidential

Both before and during an insolvency or liquidation proceeding until the Discharge of Parity Lien Obligations, none of the holders of Junior Lien Obligations, the Collateral Trustee (unless acting pursuant to an Act of Required Debtholders) or any Junior Lien Representative will be permitted to:

(1) request judicial relief, in an insolvency or liquidation proceeding or in any other court, that would hinder, delay, limit or prohibit the lawful exercise or enforcement of any right or remedy otherwise available to the holders of Parity Lien Obligations in respect of the Parity Liens or that would limit, invalidate, avoid or set aside any Parity Lien or subordinate the Parity Liens to the Junior Liens or grant the Junior Liens equal ranking to the Parity Liens;

(2) oppose or otherwise contest any motion for (A) relief from the automatic stay or (B) any injunction against foreclosure or (C) any enforcement of Parity Liens, in each case made by any holder of Parity Lien Obligations or any Parity Lien Representative in any insolvency or liquidation proceeding;

(3) oppose or otherwise contest any lawful exercise by any holder of Parity Lien Obligations or any Parity Lien Representative of the right to credit bid Parity Lien Obligations at any sale of Collateral in the foreclosure of Parity Liens;

(4) oppose or otherwise contest any other request for judicial relief made in any court by any holder of Parity Lien Obligations or any Parity Lien Representative relating to the lawful enforcement of any Parity Lien; or

(5) challenge the validity, enforceability, perfection or priority of the Parity Liens with respect to the Collateral.

Notwithstanding the foregoing, both before and during an insolvency or liquidation proceeding, the holders of Junior Lien Obligations or Junior Lien Representatives may take any actions and exercise any and all rights that would be available to a holder of unsecured claims, including, without limitation, the commencement of an insolvency or liquidation proceeding against EFIH in accordance with applicable law; *provided* the Collateral Trust Agreement provides that no holder of Junior Lien Obligations or Junior Lien Representative will be permitted to take any of the actions prohibited by clauses (1) through (5) of the preceding paragraph or oppose or contest any order that it has agreed not to oppose or contest under the provisions described under "— Insolvency or Liquidation Proceedings."

At any time prior to the Discharge of Parity Lien Obligations and after (1) the commencement of any insolvency or liquidation proceeding in respect of EFIH or (2) the Collateral Trustee and each Junior Lien Representative have received written notice from any Parity Lien Representative stating that (A) any Series of Parity Lien Debt has become due and payable in full (whether at maturity, upon acceleration or otherwise) or (B) the holders of Parity Liens securing one or more Series of Parity Lien Debt have become entitled under any Parity Lien Document to and desire to enforce any or all of the Parity Liens by reason of a default under such Parity Lien Documents, no payment of money (or the equivalent of money) will be made from the proceeds of Collateral by EFIH to the Collateral Trustee (other than distributions to the Collateral Trustee in respect of its fees under the Collateral Trust Agreement and for the benefit of the holders of Parity Lien Obligations), any Junior Lien Representative or any holder of Junior Lien Obligations (including, without limitation, payments and prepayments made for application to Junior Lien Obligations).

All proceeds of Collateral received by any Junior Lien Representative or any holder of Junior Lien Obligations in violation of the immediately preceding paragraph will be held by such Person in trust for the account of the holders of Parity Lien Obligations and remitted to any Parity Lien Representative upon demand by such Parity Lien Representative. The Junior Liens will remain attached to and, subject to the provisions described under "— Provisions of the Indenture Relating to Security — Ranking of Parity Liens," enforceable against all proceeds so held or remitted. All proceeds of Collateral received by any Junior Lien Representative or any holder of Junior Lien Obligations not in violation of the immediately preceding paragraph will be received by such Person free from the Parity Liens.

48

Confidential

Pursuant to the Public Utility Regulatory Act ("*PURA*"), Texas Utilities Code §§39.262(l) and 39.915 and, through October 10, 2012, to the Order on Rehearing in Public Utility Commission of Texas ("PUCT") Docket No. 34077, the PUCT must approve any change in majority ownership, controlling ownership or operational control of Oncor Electric Delivery. As a result, prior to any foreclosure on the Collateral consisting of membership interests in Oncor Holdings, approval of the PUCT will be required if such foreclosure consists of a change in majority ownership or control of Oncor Holdings. Pursuant to PURA §§39.262(m) and 39.915(b), the PUCT will approve such a transfer if it finds that the transaction is in the public interest. In making its determination, these sections of PURA provide that the PUCT will consider whether the transaction will adversely affect the reliability of service, availability of service or cost of service of Oncor Electric Delivery. We cannot assure you that such approval will be granted and, if it is not granted, the Collateral Trustee may not be able to liquidate the Collateral consisting of membership interests and, accordingly, the Collateral Trustee may not be able to distribute any proceeds to Holders of the Notes upon such foreclosure. If the approval is granted, then PUCT approval would also be required with respect to any subsequent disposition of a majority or controlling interest in the membership interests of Oncor Holdings.

In addition, pursuant to the terms of an investor rights agreement among the Issuer, Oncor Holdings, Oncor Electric Delivery and the minority investor in Oncor Electric Delivery, a transfer of the Equity Interests in Oncor Holdings to a third party, including as a result of any enforcement of the Lien on the Collateral consisting of Equity Interests of Oncor Holdings or Oncor Electric Delivery, may give rise to a tag-along right of the minority investor(s) in Oncor Electric Delivery to participate in that transfer on a pro rata basis.

### *Waiver of Right of Marshalling*

The Collateral Trust Agreement provides that, prior to the Discharge of Parity Lien Obligations, the holders of Junior Lien Obligations, each Junior Lien Representative and the Collateral Trustee may not assert or enforce any right of marshalling accorded to a junior lienholder, as against the holders of Parity Lien Obligations and the Parity Lien Representatives (in their capacity as senior or priority lienholders) with respect to the Collateral. Following the Discharge of Parity Lien Obligations, the holders of Junior Lien Obligations and any Junior Lien Representative may assert their right under the Uniform Commercial Code or otherwise to any proceeds remaining following a sale or other disposition of Collateral by, or on behalf of, the holders of Parity Lien Obligations.

### *Insolvency or Liquidation Proceedings*

If in any insolvency or liquidation proceeding and prior to the Discharge of Parity Lien Obligations, the holders of Parity Lien Obligations by an Act of Required Debtholders consent to any order:

(1) for use of cash collateral;

(2) approving a debtor-in-possession financing secured by a Lien that is senior to or on a parity with all Parity Liens upon any property of the estate in such insolvency or liquidation proceeding;

(3) granting any relief on account of Parity Lien Obligations as adequate protection (or its equivalent) for the benefit of the holders of Parity Lien Obligations in the Collateral; or

(4) relating to a sale of assets of EFIH that provides, to the extent the Collateral sold is to be free and clear of Liens, that all Parity Liens and Junior Liens will attach to the proceeds of the sale;

then, the holders of Junior Lien Obligations and the Junior Lien Representatives will not oppose or otherwise contest the entry of such order; *provided*, that the holders of Junior Lien Obligations or a Junior Lien Representative may request the grant to the Collateral Trustee, for the benefit of the holders of Junior Lien Obligations and the Junior Lien Representatives, of a Junior Lien upon any property on which a Lien is (or is to be) granted under such order to secure the Parity Lien Obligations, co-extensive in all respects with, but subordinated, as provided in the provisions described under "— Provisions of the Indenture Relating to Security — Ranking of Parity Liens," to, such Lien and all Parity Liens on such property. The holders of Parity Lien

49

EFIHMW00151875

Obligations (including the Holders of the Notes) and the Parity Lien Representatives (including the Trustee) will agree not to oppose or otherwise contest in any respect any request made by the Junior Lien Representatives for a Junior Lien pursuant to the proviso to the preceding sentence.

Notwithstanding the foregoing, both before and during an insolvency or liquidation proceeding, the holders of Junior Lien Obligations and the Junior Lien Representatives may take any actions and exercise any and all rights that would be available to a holder of unsecured claims, including, without limitation, the commencement of insolvency or liquidation proceedings against EFIH in accordance with applicable law; *provided* that the Collateral Trust Agreement provides that no holder of Junior Lien Obligations or Junior Lien Representative will be permitted to take any of the actions prohibited under the third and fourth paragraphs of the provisions described under "— Enforcement of Liens," or oppose or contest any order that it has agreed not to oppose or contest under clauses (1) through (4) of the preceding paragraph.

Neither the holders of Junior Lien Obligations nor any Junior Lien Representative will file or prosecute in any insolvency or liquidation proceeding any motion for adequate protection (or any comparable request for relief) based upon their interest in the Collateral under the Junior Liens, except that:

(1) they may freely seek and obtain relief granting a Junior Lien co-extensive in all respects with, but subordinated, as provided in the provisions described under "— Provisions of the Indenture Relating to Security — Ranking of Parity Liens," to, all Liens granted in such insolvency or liquidation proceeding to, or for the benefit of, the holders of Parity Lien Obligations; and

(2) they may freely seek and obtain any relief upon a motion for adequate protection (or any comparable relief), without any condition or restriction whatsoever, at any time after the Discharge of Parity Lien Obligations.

### *Order of Application*

The Collateral Trust Agreement provides that if any Collateral is sold or otherwise realized upon by the Collateral Trustee in connection with any foreclosure, collection or other enforcement of Liens granted to the Collateral Trustee in the Security Documents, the proceeds received by the Collateral Trustee from such foreclosure, collection or other enforcement will be distributed by the Collateral Trustee in the following order of application:

FIRST, to the payment of all amounts payable under the Collateral Trust Agreement on account of the Collateral Trustee's fees and any reasonable legal fees, costs and expenses or other liabilities of any kind incurred by the Collateral Trustee or any co-trustee or agent of the Collateral Trustee in connection with any Security Document;

SECOND, ratably to the respective Parity Lien Representatives for application, after payment of any fees and expenses (including but not limited to, attorney's fees and expenses) of such Parity Lien Representative, to the payment of all outstanding Notes and other Parity Lien Debt and any other Parity Lien Obligations that are then due and payable in such order as may be provided in the relevant Parity Lien Documents in an amount sufficient to pay in full in cash all outstanding Notes and other Parity Lien Debt and all other Parity Lien Obligations that are then due and payable (including all interest accrued thereon after the commencement of any insolvency or liquidation proceeding at the rate, including any applicable post-default rate, specified in the relevant Parity Lien Documents, even if such interest is not enforceable, allowable or allowed as a claim in such proceeding, and including the discharge or cash collateralization (at the lower of (1) 105% of the aggregate undrawn amount and (2) the percentage of the aggregate undrawn amount required for release of Liens under the terms of the applicable Parity Lien Document) of all outstanding letters of credit constituting Parity Lien Debt);

THIRD, to the respective Junior Lien Representatives for application to the payment of all outstanding Junior Lien Debt and any other Junior Lien Obligations that are then due and payable in such order as may be provided in the Junior Lien Documents in an amount sufficient to pay in full in cash all outstanding Junior Lien Debt and all other Junior Lien Obligations that are then due and payable (including all interest accrued thereon

50

EFIHMW00151876

PX 022
Page 57 of 218

after the commencement of any insolvency or liquidation proceeding at the rate, including any applicable post-default rate, specified in the Junior Lien Documents, even if such interest is not enforceable, allowable or allowed as a claim in such proceeding, and including the discharge or cash collateralization (at the lower of (1) 105% of the aggregate undrawn amount and (2) the percentage of the aggregate undrawn amount required for release of Liens under the terms of the applicable Junior Lien Document) of all outstanding letters of credit, if any, constituting Junior Lien Debt); and

FOURTH, any surplus remaining after the payment in full in cash of the amounts described in the preceding clauses will be paid to EFIH, or its successors or assigns, or as a court of competent jurisdiction may direct.

If any Junior Lien Representative or any holder of a Junior Lien Obligation collects or receives any proceeds in respect of any foreclosure, collection or other enforcement to which it was not entitled pursuant to the terms of the immediately preceding paragraphs, whether after the commencement of an insolvency or liquidation proceeding or otherwise, such Junior Lien Representative or such holder of a Junior Lien Obligation, as the case may be, will forthwith deliver the same to the Collateral Trustee to be applied in accordance with the provisions set forth in the immediately preceding paragraphs. Until so delivered, such proceeds will be held by that Junior Lien Representative or that holder of a Junior Lien Obligation, as the case may be, in trust for the benefit of the holders of the Parity Lien Obligations. These provisions will not apply to payments received by any holder of Junior Lien Obligations if such payments are not proceeds of, or the result of a realization upon, Collateral.

The provisions set forth above under this "Order of Application" caption are intended for the benefit of, and will be enforceable as a third party beneficiary by, each present and future holder of Secured Debt Obligations, each present and future Secured Debt Representative and the Collateral Trustee as holder of Parity Liens and Junior Liens. The Issuer and EFIH will be required to cause the Secured Debt Representative of each future Series of Secured Lien Debt to deliver a joinder to the Collateral Trust Agreement, including a Lien Sharing and Priority Confirmation, to the Collateral Trustee and each other Secured Debt Representative at the time of incurrence of such Series of Secured Lien Debt.

In connection with the application of proceeds in accordance with the provisions set forth above under this "Order of Application" caption, except as otherwise directed by an Act of Required Debtholders, the Collateral Trustee may sell any non-cash proceeds for cash prior to the application of the proceeds thereof.

### *Release of Security Interests*

The Security Documents will provide that the Collateral will be released:

1. in whole, upon (a) payment in full of all outstanding Secured Debt Obligations at the time such debt is paid in full and (b) termination or expiration of all commitments to extend credit under all Secured Debt Documents and the cancellation or termination or cash collateralization in an account maintained by the Collateral Trustee (at the lower of (1) 105% of the aggregate undrawn amount and (2) the percentage of the aggregate undrawn amount required for release of Liens under the terms of the applicable Secured Debt Documents) of all outstanding letters of credit issued pursuant to any Secured Debt Documents; *provided* that the Issuer has delivered an Officer's Certificate to the Collateral Trustee certifying that the conditions described in this paragraph 1. have been met and that such release of the Collateral does not violate the terms of any applicable Secured Debt Document;

2. with respect to the Note Obligations only, upon satisfaction and discharge of the Indenture as set forth under "— Satisfaction and Discharge";

3. with respect to the Note Obligations only, upon a Legal Defeasance or Covenant Defeasance as set forth under "— Legal Defeasance and Covenant Defeasance";

4. with respect to the Note Obligations only, upon payment in full of the Notes and all other Note Obligations that are outstanding, due and payable at the time the Notes are paid in full;

51

Confidential

5. with respect to any Secured Debt Obligations (other than Note Obligations) only, upon payment in full of such Secured Lien Debt and all other Secured Debt Obligations in respect thereof that is outstanding, due and payable at the time such Secured Lien Debt is paid in full;

6. as to a release of all or substantially all of the Collateral, if (a) consent to the release of that Collateral has been given by holders of 66⅔% of the aggregate principal amount of Parity Lien Debt at the time outstanding voting together as one class, as provided for in the applicable Secured Debt Documents; *provided* that if an Event of Default under the Notes or an event of default with respect to any other Secured Lien Debt has occurred and is continuing at the time of the solicitation of any such consent, the consent of holders of 66⅔% of the aggregate principal amount of Secured Lien Debt at the time outstanding voting together as one class shall also be required, and (b) EFIH has delivered an Officer's Certificate to the Collateral Trustee certifying that any such necessary consents have been obtained and that such release of the Collateral does not violate the terms of any applicable Secured Debt Document;

7. as to a release of less than all or substantially all of the Collateral, if (A) consent to the release of all Parity Liens (or, at any time after the Discharge of Parity Lien Obligations, consent to the release of all Junior Liens) on such Collateral has been given by holders of a majority of the aggregate principal amount of Parity Lien Debt at the time outstanding voting as one class, as provided for in the Parity Lien Documents (or, at any time after the Discharge of Parity Lien Obligations, holders of a majority of the aggregate principal amount of the Junior Lien Debt at the time outstanding voting together as one class in the Junior Lien Documents) and (B) EFIH has delivered an Officer's Certificate to the Collateral Trustee certifying that any such necessary consents have been obtained and that such release of the Collateral does not violate the terms of any applicable Secured Debt Document;

8. as to any Collateral that is sold, transferred or otherwise disposed of by EFIH in a transaction or other circumstance that is not prohibited by the terms of any applicable Secured Debt Document, at the time of, or immediately prior to, such sale, transfer or other disposition; *provided* that EFIH has delivered an Officer's Certificate to the Collateral Trustee certifying that any such sale, transfer or other disposition does not violate the terms of any applicable Secured Debt Document; or

9. with respect to the Note Obligations only, in whole or in part, with the consent of the Holders of the requisite percentage of Notes in accordance with the provisions described under "— Amendment, Supplement and Waiver," and upon delivery of instructions and any other documentation, in each case as required by the Indenture and the Security Documents, in a form satisfactory to the Collateral Trustee.

Upon compliance by EFIH with the conditions precedent set forth above, the Collateral Trustee will promptly cause to be released and reconveyed to EFIH the released Collateral.

### Amendment

The Collateral Trust Agreement provides that no amendment or supplement to the provisions of the Collateral Trust Agreement or any other Security Document will be effective without the approval of the Collateral Trustee acting as directed by an Act of Required Debtholders, except that:

(1) any amendment or supplement that has the effect solely of (a) adding or maintaining Collateral, securing additional Secured Lien Debt that was otherwise permitted by the terms of the Secured Debt Documents to be secured by the Collateral or preserving, perfecting or establishing the priority of the Liens thereon or the rights of the Collateral Trustee therein; (b) curing any ambiguity, defect or inconsistency; (c) providing for the assumption of the obligations of EFIH under any Security Document in the case of a merger or consolidation or sale of all or substantially all of the assets of EFIH; or (d) making any change that would provide any additional rights or benefits to the holders of Secured Debt Obligations, the Secured Debt Representatives or the Collateral Trustee or that does not adversely affect the legal rights under any

52

Confidential

Secured Debt Document of any holder of Secured Debt Obligations, the Secured Debt Representatives or the Collateral Trustee, will, in each case, become effective when executed and delivered by EFIH and the Collateral Trustee;

(2) no amendment or supplement that reduces, impairs or adversely affects the right of any holder of Secured Debt Obligations:

(a) to vote its outstanding Secured Lien Debt as to any matter described as subject to an Act of Required Debtholders or direction by the Required Parity Lien Debtholders or Required Junior Lien Debtholders (or amends the provisions of this clause (2) or the definition of "Act of Required Debtholders," "Required Parity Lien Debtholders" or "Required Junior Lien Debtholders");

(b) to share in the order of application described under "— Order of Application" in the proceeds of enforcement of or realization on any Collateral that has not been released in accordance with the provisions described under "— Release of Security Interests"; or

(c) to require that Liens securing Secured Debt Obligations be released only as set forth in the provisions described under "— Release of Security Interests"

will become effective without the consent of the requisite percentage or number of holders of each Series of Secured Lien Debt so affected under the applicable Secured Debt Documents; and

(3) no amendment or supplement that imposes any obligation upon the Collateral Trustee or any Secured Debt Representative or adversely affects the rights of the Collateral Trustee, as determined by the Collateral Trustee in its sole discretion, or any Secured Debt Representative, respectively, in its individual capacity as such will become effective without the consent of the Collateral Trustee or such Secured Debt Representative, respectively.

Notwithstanding the foregoing clause (1), but subject to clauses (2) and (3) above:

(1) any Security Document that secures Junior Lien Obligations (but not Parity Lien Obligations) may be amended or supplemented with the approval of the Collateral Trustee acting as directed in writing by the Required Junior Lien Debtholders, unless such amendment or supplement would not be permitted under the terms of the Collateral Trust Agreement or the other Parity Lien Documents; and

(2) any amendment or waiver of, or any consent under, any provision of the Collateral Trust Agreement or any other Security Document that secures Parity Lien Obligations (except any such amendment, waiver or consent that releases Collateral with respect to which any consent of holders of Junior Lien Debt is required pursuant to the Collateral Trust Agreement, which will be governed by the provisions set forth above) will apply automatically to any comparable provision of any comparable Junior Lien Document without the consent of or notice to any holder of Junior Lien Obligations and without any action by the Issuer or EFIH or any Holder of Notes or holder of other Junior Lien Obligations.

*Voting*

In connection with any matter under the Collateral Trust Agreement requiring a vote of holders of Secured Lien Debt, each Series of Secured Lien Debt will cast its votes in accordance with the Secured Debt Documents governing such Series of Secured Lien Debt. The amount of Secured Lien Debt to be voted by a Series of Secured Lien Debt will equal (1) the aggregate outstanding principal amount of Secured Lien Debt held by such Series of Secured Lien Debt (including outstanding letters of credit whether or not then available or drawn), plus (2) the aggregate unfunded commitments to extend credit which, when funded, would constitute Indebtedness of such Series of Secured Lien Debt. Following and in accordance with the outcome of the applicable vote under its Secured Debt Documents, the Secured Debt Representative of each Series of Secured Lien Debt will vote the total amount of Secured Lien Debt under that Series of Secured Lien Debt as a block in respect of any vote under the Collateral Trust Agreement.

53

EFIHMW00151879

### Provisions of the Indenture Relating to Security

#### *Equal and Ratable Sharing of Collateral by Holders of Parity Lien Debt*

The Indenture will provide that, notwithstanding:

(1) anything contained in the Collateral Trust Agreement or in any other Security Documents;

(2) the time of incurrence of any Series of Parity Lien Debt;

(3) the order or method of attachment or perfection of any Liens securing any Series of Parity Lien Debt;

(4) the time or order of filing or recording of financing statements or other documents filed or recorded to perfect any Parity Lien upon any Collateral;

(5) the time of taking possession or control over any Collateral;

(6) that any Parity Lien may not have been perfected or may be or have become subordinated, by equitable subordination or otherwise, to any other Lien; or

(7) the rules for determining priority under any law governing relative priorities of Liens,

all Parity Liens granted at any time by EFIH will secure, equally and ratably, all present and future Parity Lien Obligations.

The foregoing section is intended for the benefit of, and will be enforceable as a third party beneficiary by, each present and future holder of Parity Lien Obligations, each present and future Parity Lien Representative and the Collateral Trustee as holder of Parity Liens.

#### *Ranking of Parity Liens*

The Indenture will require the Junior Lien Documents, if any, to provide that, notwithstanding:

(1) anything to the contrary contained in the Security Documents;

(2) the time of incurrence of any Series of Parity Lien Debt;

(3) the order or method of attachment or perfection of any Liens securing any Series of Parity Lien Debt;

(4) the time or order of filing or recording of financing statements or other documents filed or recorded to perfect any Lien upon any Collateral;

(5) the time of taking possession or control over any Collateral;

(6) that any Parity Lien may not have been perfected or may be or have become subordinated, by equitable subordination or otherwise, to any other Lien; or

(7) the rules for determining priority under any law governing relative priorities of Liens,

all Junior Liens at any time granted by EFIH will be subject and subordinate to all Parity Liens securing Parity Lien Obligations.

The Indenture will also require the Junior Lien Documents, if any, to provide that the provisions described in the foregoing clauses (1) through (7) are intended for the benefit of, and will be enforceable as a third party beneficiary by, each present and future holder of Parity Lien Obligations, each present and future Parity Lien Representative and the Collateral Trustee as holder of Parity Liens.

54

EFIHMW00151880

*Relative Rights*

The Indenture will require that nothing in the Junior Lien Documents will:

(1) impair, as between EFIH and the Holders of the Notes, the obligation of EFIH to pay principal, premium, if any, and interest and Additional Interest, if any, on the Notes in accordance with the terms of its Guarantee thereof or any other obligation of EFIH under the Indenture;

(2) affect the relative rights of Holders of Notes as against any other creditors of EFIH (other than holders of Junior Liens or other Parity Liens);

(3) restrict the right of any Holder of Notes to sue for payments that are then due and owing (but not enforce any judgment in respect thereof against any Collateral to the extent specifically prohibited by the provisions described under "— Security for the Notes — Enforcement of Liens" or "— Security for the Notes — Insolvency or Liquidation Proceedings");

(4) restrict or prevent any Holder of Notes or holder of other Parity Lien Obligations, the Collateral Trustee or any other Person from exercising any of its rights or remedies upon a Default or Event of Default not specifically restricted or prohibited by the provisions described under "— Security for the Notes — Enforcement of Liens" or "— Security for the Notes — Insolvency or Liquidation Proceedings"; or

(5) restrict or prevent any Holder of Notes or holder of other Parity Lien Obligations, the Trustee, the Collateral Trustee or any other Person from taking any lawful action in an insolvency or liquidation proceeding not specifically restricted or prohibited by the provisions described under "— Security for the Notes — Enforcement of Liens" or "— Security for the Notes — Insolvency or Liquidation Proceedings."

*Further Assurances*

The Indenture will provide and the Security Documents provide that EFIH, at its own expense, will do or cause to be done all acts and things that may be required, or that the Collateral Trustee from time to time may reasonably request, to assure and confirm that the Collateral Trustee holds, for the benefit of the Secured Debt Representatives and holders of Secured Debt Obligations, duly created and enforceable and perfected Liens upon the Collateral (including any property or assets that are acquired or otherwise become Collateral after the Notes are issued), in each case, as contemplated by, and with the Lien priority required under, the Secured Debt Documents.

Upon the reasonable request of the Collateral Trustee or any Secured Debt Representative at any time and from time to time, EFIH, at its own expense, will promptly execute, acknowledge and deliver such security documents, instruments, certificates, notices and other documents, and take such other actions as may be reasonably required, or that the Collateral Trustee may reasonably request, to create, perfect, protect, assure or enforce the Liens and benefits intended to be conferred, in each case as contemplated by the Secured Debt Documents for the benefit of the holders of Secured Debt Obligations.

*Impairment of Security Interest*

The Pledge Agreement provides that EFIH will not take or omit to take any action which would or could reasonably be expected to have the result of materially adversely affecting or impairing the Liens in favor of the Collateral Trustee, the Trustee and the holders of the Notes with respect to the Collateral. EFIH shall not grant to any Person, or permit any Person to retain (other than the Collateral Trustee), any interest whatsoever in the Collateral, other than pursuant to clause (3) of the definition of "Permitted Liens." The Issuer and its Restricted Subsidiaries (including EFIH) will not enter into any agreement that requires the proceeds received from any sale of Collateral to be applied to repay, redeem, defease or otherwise acquire or retire any Indebtedness of any Person, other than as permitted by the Indenture, the Notes and the Security Documents. EFIH shall, at its sole cost and expense, execute and deliver all such agreements and instruments as necessary, or as the Trustee shall reasonably request, to more fully or accurately describe the assets and property intended to be Collateral or the obligations intended to be secured by the Pledge Agreement or any other Security Document.

55

Confidential

*After-Acquired Property*

Promptly following the acquisition by EFIH of any Equity Interests in any Oncor Subsidiary or any Indebtedness of, or other Investments in, any Oncor Subsidiary or any property or assets required to be pledged as Collateral pursuant to the covenant described under "— Repurchase at the Option of Holders — Asset Sales" or any Equity Interests in or any Indebtedness of, or other Investments in, any Successor Oncor Business, EFIH will execute and deliver such security instruments, pledges, financing statements and certificates and opinions of counsel as shall be reasonably necessary to vest in the Collateral Trustee a perfected first-priority security interest in such Equity Interests, Indebtedness or other Investments or property or assets and to have such Equity Interests, Indebtedness or other Investments or property or assets added to the Collateral and thereupon all provisions of the Indenture relating to the Collateral shall be deemed to relate to such Equity Interests, Indebtedness or other Investments or property or assets to the same extent and with the same force and effect.

## Repurchase at the Option of Holders

### Change of Control

The Notes will provide that if a Change of Control occurs, unless the Issuer has previously or concurrently mailed a redemption notice with respect to all the outstanding Notes as described under "Optional Redemption" and will redeem all of the outstanding Notes pursuant thereto, the Issuer will make an offer to purchase all of the Notes pursuant to the offer described below (the "*Change of Control Offer*") at a price in cash (the "*Change of Control Payment*") equal to 101% of the aggregate principal amount thereof plus accrued and unpaid interest and Additional Interest, if any, to the date of purchase, subject to the right of Holders of the Notes of record on the relevant record date to receive interest due on the relevant interest payment date. Within 30 days following any Change of Control, the Issuer will send notice of such Change of Control Offer by first-class mail, with a copy to the Trustee, to each Holder of Notes to the address of such Holder appearing in the security register with a copy to the Trustee or otherwise in accordance with the procedures of DTC, with the following information:

(1) that a Change of Control Offer is being made pursuant to the covenant entitled "Change of Control" and that all Notes properly tendered pursuant to such Change of Control Offer will be accepted for payment by the Issuer;

(2) the purchase price and the purchase date, which will be no earlier than 30 days nor later than 60 days from the date such notice is mailed (the "*Change of Control Payment Date*");

(3) that any Note not properly tendered will remain outstanding and continue to accrue interest;

(4) that unless the Issuer defaults in the payment of the Change of Control Payment, all Notes accepted for payment pursuant to the Change of Control Offer will cease to accrue interest on the Change of Control Payment Date;

(5) that Holders electing to have any Notes purchased pursuant to a Change of Control Offer will be required to surrender such Notes, with the form entitled "Option of Holder to Elect Purchase" on the reverse of such Notes completed, to the paying agent specified in the notice at the address specified in the notice prior to the close of business on the third Business Day preceding the Change of Control Payment Date;

(6) that Holders will be entitled to withdraw their tendered Notes and their election to require the Issuer to purchase such Notes; *provided* that the paying agent receives, not later than the close of business on the expiration date of the Change of Control Offer, a telegram, facsimile transmission or letter setting forth the name of the Holder of the Notes, the principal amount of Notes tendered for purchase, and a statement that such Holder is withdrawing its tendered Notes and its election to have such Notes purchased;

(7) that the Holders whose Notes are being repurchased only in part will be issued new Notes and such new Notes will be equal in principal amount to the unpurchased portion of the Notes surrendered. The unpurchased portion of the Notes must be equal to $2,000 or an integral multiple of $1,000 in excess thereof; and

(8) the other instructions, as determined by the Issuer, consistent with the covenant described under this "— Repurchase at the Option of Holders — Change of Control" section, that a Holder must follow.

56

EFIHMW00151882

Any proceeds received by the Issuer or its Restricted Subsidiaries from a sale, conveyance or disposition of Collateral or other Oncor-related Assets that constitutes a Change of Control shall be subject to a perfected security interest for the benefit of the holders of the Secured Debt Obligations until consummation of the Change of Control Offer.

The Issuer will comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder to the extent such laws or regulations are applicable in connection with the repurchase of Notes pursuant to a Change of Control Offer. To the extent that the provisions of any securities laws or regulations conflict with the provisions of the Indenture, the Issuer will comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations described in the Indenture by virtue thereof.

On the Change of Control Payment Date, the Issuer will, to the extent permitted by law,

(1) accept for payment all Notes issued by it or portions thereof properly tendered pursuant to the Change of Control Offer;

(2) deposit with the paying agent an amount equal to the aggregate Change of Control Payment in respect of all Notes or portions thereof so tendered; and

(3) deliver, or cause to be delivered, to the Trustee for cancellation the Notes so accepted together with an Officer's Certificate to the Trustee stating that such Notes or portions thereof have been tendered to and purchased by the Issuer.

The TCEH Senior Secured Facilities, and future credit agreements or other agreements relating to Senior Indebtedness to which the Issuer becomes a party may, provide that certain change of control events with respect to the Issuer would constitute a default thereunder (including a Change of Control under the Indenture). If we experience a change of control that triggers a default under the TCEH Senior Secured Facilities, we could seek a waiver of such default or seek to refinance the TCEH Senior Secured Facilities. In the event we do not obtain such a waiver or refinance the TCEH Senior Secured Facilities, such default could result in amounts outstanding under the TCEH Senior Secured Facilities being declared due and payable and could cause a Receivables Facility to be wound down. Additionally, the terms of the 9.75% Notes and certain series of the Existing Notes provide that certain change of control events with respect to the Issuer (including a Change of Control under the Indenture) would result in the Issuer being required to offer to repurchase such Existing Notes of the relevant series.

Our ability to pay cash to the Holders of Notes following the occurrence of a Change of Control may be limited by our then-existing financial resources. Therefore, sufficient funds may not be available when necessary to make any required repurchases.

The Change of Control purchase feature of the Notes may in certain circumstances make more difficult or discourage a sale or takeover of us and, thus, the removal of incumbent management. As discussed above, a change in control of EFIH would require regulatory approval by the PUCT under the public interest standard and, through October 10, 2012, the PUCT order. As of the Issue Date, we have no present intention to engage in a transaction involving a Change of Control, although it is possible that we could decide to engage in such a transaction in the future. Subject to the limitations discussed below, we could, in the future, enter into certain transactions, including acquisitions, refinancings or other recapitalizations, that would not constitute a Change of Control under the Indenture, but that could increase the amount of indebtedness outstanding at such time or otherwise affect our capital structure or credit ratings. Restrictions on our ability to incur additional Indebtedness are contained in the covenants described under "— Certain Covenants — Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" and "— Certain Covenants — Liens." Such restrictions in the Indenture can be waived with the consent of the Holders of a majority in principal amount of the outstanding Notes. Except for the limitations contained in such covenants, however, the Indenture will not contain any covenants or provisions that may afford Holders of the Notes protection in the event of a highly leveraged transaction.

Confidential

EFIHMW00151883

The Issuer will not be required to make a Change of Control Offer following a Change of Control if a third party makes the Change of Control Offer in the manner, at the times and otherwise in compliance with the requirements set forth in the Indenture applicable to a Change of Control Offer made by us and purchases all Notes validly tendered and not withdrawn under such Change of Control Offer. Notwithstanding anything to the contrary herein, a Change of Control Offer may be made in advance of a Change of Control, conditional upon such Change of Control, if a definitive agreement is in place for the Change of Control at the time of making of the Change of Control Offer.

The definition of "Change of Control" includes, subject to certain exceptions, a disposition of all or substantially all of the assets of the Issuer to any Person. Although there is a limited body of case law interpreting the phrase "substantially all," there is no precise established definition of the phrase under applicable law. Accordingly, in certain circumstances there may be a degree of uncertainty as to whether a particular transaction would involve a disposition of "all or substantially all" of the assets of the Issuer. As a result, it may be unclear as to whether a Change of Control has occurred and whether a Holder of Notes may require the Issuer to make an offer to repurchase the Notes as described above.

The provisions under the Indenture relating to the Issuer's obligation to make an offer to repurchase the Notes as a result of a Change of Control may be waived or modified with the written consent of the Holders of a majority in principal amount of the outstanding Notes.

### *Asset Sales*

The Indenture will provide that the Issuer will not, and will not permit any of its Restricted Subsidiaries to consummate, directly or indirectly, an Asset Sale, unless:

(1) the Issuer or such Restricted Subsidiary, as the case may be, receives consideration at the time of such Asset Sale at least equal to the fair market value (as determined in good faith by the Issuer) of the assets sold or otherwise disposed of; and

(2)(A) except in the case of a Permitted Asset Swap, at least 75% of the consideration therefor received by the Issuer or such Restricted Subsidiary, as the case may be, is in the form of cash or Cash Equivalents; *provided* that the amount of:

(a) except in the case of an Asset Sale of Collateral, any liabilities (as shown on the Issuer's or such Restricted Subsidiary's most recent balance sheet or in the footnotes thereto) of the Issuer or such Restricted Subsidiary, other than liabilities that are by their terms subordinated to the Notes or that are owed to the Issuer or an Affiliate of the Issuer, that are assumed by the transferee of any such assets and for which the Issuer and all of its Restricted Subsidiaries have been validly released by all applicable creditors in writing,

(b) any securities received by the Issuer or such Restricted Subsidiary from such transferee that are converted by the Issuer or such Restricted Subsidiary into cash (to the extent of the cash received) within 180 days following the closing of such Asset Sale, and

(c) any Designated Non-cash Consideration received by the Issuer or such Restricted Subsidiary in such Asset Sale having an aggregate fair market value, taken together with all other Designated Non-cash Consideration received pursuant to this clause (c) that is at that time outstanding, not to exceed 5% of Total Assets at the time of the receipt of such Designated Non-cash Consideration, with the fair market value of each item of Designated Non-cash Consideration being measured at the time received and without giving effect to subsequent changes in value; *provided* that the aggregate fair market value of Designated Non-cash Consideration received by EFIH after the Secured Notes Issue Date in respect of Asset Sales of Collateral shall not exceed $400.0 million,

shall be deemed to be cash for purposes of this clause (A) and for no other purpose; and

(B) any consideration received by EFIH from an Asset Sale of Collateral shall be concurrently pledged as Collateral for the benefit of the Holders of the Notes and holders of the other Secured Debt Obligations;

58

EFIHMW00151884

**PX 022**
**Page 65 of 218**

*provided* that to the extent such consideration is received by EFIH in cash, it shall be held in an Asset Sale Cash Collateral Account pending the application of such cash consideration pursuant to this covenant.

In respect of Net Proceeds received by the Issuer or any Restricted Subsidiary from Asset Sales (other than an Asset Sale of Collateral or other Oncor-related Assets), within 450 days after the receipt of any Net Proceeds of any such Asset Sale, the Issuer or such Restricted Subsidiary, at its option, may apply the Net Proceeds from such Asset Sale,

> (1) to permanently reduce:

>> (a) Obligations under Senior Indebtedness which is Secured Indebtedness permitted by the Indenture, and to correspondingly reduce commitments with respect thereto;

>> (b) Obligations under other Senior Indebtedness (and to correspondingly reduce commitments with respect thereto); *provided* that the Issuer shall equally and ratably reduce Obligations under the Notes as provided under "— Optional Redemption," through open-market purchases (to the extent such purchases are at or above 100% of the principal amount thereof) or otherwise by making an offer (in accordance with the procedures set forth below for an Asset Sale Offer) to all Holders to purchase their Notes at 100% of the principal amount thereof, plus the amount of accrued but unpaid interest, if any;

>> (c) Obligations under any Existing Notes with a maturity prior to October 15, 2019; *provided* that, at the time of, and after giving effect to, such repurchase, redemption or defeasance, the aggregate amount of Net Proceeds used to repurchase, redeem or defease such Existing Notes pursuant to this subclause (c) following the Secured Notes Issue Date shall not exceed 3.5% of Total Assets at such time; or

>> (d) Indebtedness of a Restricted Subsidiary that is not a Guarantor, other than Indebtedness owed to the Issuer or another Restricted Subsidiary (or any Affiliate thereof);

> *provided* that, if an offer to purchase any Indebtedness of TCEH or any of its Restricted Subsidiaries is made in accordance with the terms of such Indebtedness, the obligation to permanently reduce Indebtedness of a Restricted Subsidiary will be deemed to be satisfied to the extent of the amount of the offer, whether or not accepted by the holders thereof, and no Net Proceeds in the amount of such offer will be deemed to exist following such offer;

>> (2) to make (a) an Investment in any one or more businesses; *provided* that such Investment is in the form of the acquisition of Capital Stock and results in the Issuer or another of its Restricted Subsidiaries, as the case may be, owning an amount of the Capital Stock of such business such that it constitutes a Restricted Subsidiary, (b) capital expenditures or (c) acquisitions of other assets, in each of (a), (b) and (c), used or useful in a Similar Business; or

>> (3) to make an Investment in (a) any one or more businesses; *provided* that such Investment is in the form of the acquisition of Capital Stock and results in the Issuer or another of its Restricted Subsidiaries, as the case may be, owning an amount of the Capital Stock of such business such that it constitutes a Restricted Subsidiary, (b) properties or (c) acquisitions of other assets that, in each of (a), (b) and (c), replace the businesses, properties and/or assets that are the subject of such Asset Sale;

*provided* that, in the case of clauses (2) and (3) above, a binding commitment shall be treated as a permitted application of the Net Proceeds from the date of such commitment so long as the Issuer, or such other Restricted Subsidiary enters into such commitment with the good faith expectation that such Net Proceeds will be applied to satisfy such commitment within 180 days of such commitment (an "*Acceptable Commitment*") (and reinvest within the later of 450 days from the date of receipt of Net Proceeds and 180 days of receipt of such commitment), and, in the event any Acceptable Commitment is later cancelled or terminated for any reason before the Net Proceeds are applied in connection therewith, the Issuer or such Restricted Subsidiary enters into another Acceptable Commitment (a "*Second Commitment*") within the later of (a) 180 days of such cancellation or termination or (b) the initial 450-day period; *provided further*, that if any Second Commitment is later cancelled or terminated for any reason before such Net Proceeds are applied, then such Net Proceeds shall constitute Excess Proceeds.

59

EFIHMW00151885

Notwithstanding the preceding paragraph, to the extent that regulatory approval is necessary for an asset purchase or investment, or replacement, repair or restoration on any asset or investment, then the Issuer or any Restricted Subsidiary shall have an additional 365 days to apply the Net Proceeds from such Asset Sale in accordance with the preceding paragraph.

Any Net Proceeds from Asset Sales (other than Asset Sales of Collateral or other Oncor-related Assets) that are not invested or applied as provided and within the time period set forth in the first sentence of the second preceding paragraph will be deemed to constitute "*Excess Proceeds*." When the aggregate amount of Excess Proceeds exceeds $200.0 million, the Issuer and/or any of its Restricted Subsidiaries shall make an offer to all Holders of the Notes and, if required or permitted by the terms of any Senior Indebtedness, to the holders of such Senior Indebtedness (an "*Asset Sale Offer*"), to purchase the maximum aggregate principal amount of the Notes and such Senior Indebtedness that is a minimum of $2,000 or an integral multiple of $1,000 in excess thereof that may be purchased out of the Excess Proceeds at an offer price in cash in an amount equal to 100% of the principal amount thereof, plus accrued and unpaid interest and Additional Interest, if any, to the date fixed for the closing of such offer, in accordance with the procedures set forth in the Indenture. The Issuer and/or any of its Restricted Subsidiaries will commence an Asset Sale Offer with respect to Excess Proceeds within 10 Business Days after the date that Excess Proceeds exceed $200.0 million by mailing the notice required pursuant to the terms of the Indenture, with a copy to the Trustee.

To the extent that the aggregate amount of Notes and such Senior Indebtedness tendered pursuant to an Asset Sale Offer is less than the Excess Proceeds, the Issuer and/or any of its Restricted Subsidiaries may use any remaining Excess Proceeds for general corporate purposes, subject to other covenants contained in the Indenture. If the aggregate principal amount of Notes or the Senior Indebtedness surrendered by such holders thereof exceeds the amount of Excess Proceeds, the Notes and such Senior Indebtedness will be purchased on a pro rata basis based on the accreted value or principal amount of the Notes or such Senior Indebtedness tendered. Additionally, the Issuer and/or any of its Restricted Subsidiaries may, at its/their option, make an Asset Sale Offer using proceeds from any Asset Sale (other than Asset Sales of Collateral or other Oncor-related Assets) at any time after consummation of such Asset Sale; *provided* that such Asset Sale Offer shall be in an aggregate amount of not less than $25.0 million. Upon consummation of such Asset Sale Offer, any Net Proceeds not required to be used to purchase Notes shall not be deemed Excess Proceeds.

In respect of Net Proceeds received by the Issuer or any Restricted Subsidiary (including EFIH) from Asset Sales of Collateral or other Oncor-related Assets, within 450 days after the receipt by the Issuer or any Restricted Subsidiary of any Net Proceeds of any such Asset Sale, the Issuer or such Restricted Subsidiary shall be required to deposit the Net Proceeds from such Asset Sale into an Asset Sale Cash Collateral Account that is subject to a perfected security interest for the benefit of the holders of Secured Lien Debt to be held solely for the purpose of repayment of principal, premium, if any, and interest and Additional Interest, if any, on, and/or to repay, prepay or repurchase, the Notes and other Parity Lien Obligations as described in the following clauses (1) and (2),

(1) to repay or prepay Parity Lien Debt (other than the Notes) (and, in the case of revolving loans and other similar obligations, permanently reduce the commitment thereunder) on a pro rata basis, but only up to an aggregate principal amount equal to such Net Proceeds to be used to repay Indebtedness pursuant to this clause (1) multiplied by a fraction, the numerator of which is the aggregate outstanding principal amount of such Parity Lien Debt and the denominator of which is the aggregate outstanding principal amount of all Parity Lien Debt (including the Notes), in each case based on amounts outstanding on the date of closing of such Asset Sale; *provided* that the Issuer shall equally and ratably reduce Obligations under the Notes as provided under "Optional Redemption," through open-market purchases (to the extent such purchases are at or above 100% of the principal amount thereof) or by making an offer (in accordance with the procedures set forth below for a Collateral Asset Sale Offer) to all Holders to purchase their Notes at 100% of the principal amount thereof plus the amount of accrued and unpaid interest, if any; or

(2) to repay or repurchase any EFIH Notes or other Parity Lien Debt of EFIH.

60

EFIHMW00151886

Notwithstanding the preceding paragraph, in the event that regulatory approval is necessary for an Investment in any Oncor Subsidiary, then the Issuer or any Restricted Subsidiary shall have an additional 365 days to apply the Net Proceeds from such Asset Sale in accordance with the preceding paragraph.

Any Net Proceeds from Asset Sales of Collateral or other Oncor-related Assets that are not invested or applied as provided and within the time period set forth in the first sentence of the preceding paragraph will be deemed to constitute "*Collateral Excess Proceeds.*" When the aggregate amount of Collateral Excess Proceeds exceeds $200.0 million, the Issuer and/or any of its Restricted Subsidiaries shall make an offer to all Holders of the Notes and, if required or permitted by the terms of any Parity Lien Debt, to the holders of such Parity Lien Debt (a "*Collateral Asset Sale Offer*"), to purchase the maximum aggregate principal amount of the Notes and such Parity Lien Debt that is a minimum of $2,000 or an integral multiple of $1,000 in excess thereof that may be purchased out of the Collateral Excess Proceeds at an offer price in cash in an amount equal to 100% of the principal amount thereof, plus accrued and unpaid interest and Additional Interest, if any, to the date fixed for the closing of such offer, in accordance with the procedures set forth in the Indenture. The Issuer and/or any of its Restricted Subsidiaries will commence a Collateral Asset Sale Offer with respect to Collateral Excess Proceeds within 10 Business Days after the date that Collateral Excess Proceeds exceed $200.0 million by mailing the notice required pursuant to the terms of the Indenture, with a copy to the Trustee.

To the extent that the aggregate amount of Notes and such Parity Lien Debt tendered pursuant to a Collateral Asset Sale Offer is less than the Collateral Excess Proceeds, the Issuer and/or any of its Restricted Subsidiaries may use any remaining Collateral Excess Proceeds for general corporate purposes, subject to other covenants contained in the Indenture and the terms of such Parity Lien Debt. If the aggregate principal amount of Notes or the Parity Lien Debt surrendered by such holders thereof exceeds the amount of Collateral Excess Proceeds, the Notes and such Parity Lien Debt will be purchased on a pro rata basis based on the accreted value or principal amount of the Notes or such Parity Lien Debt tendered. Additionally, the Issuer and/or any of its Restricted Subsidiaries may, at its/their option, make a Collateral Asset Sale Offer using proceeds from any Asset Sale of Collateral or other Oncor-related Assets at any time after consummation of such Asset Sale; *provided* that such Collateral Asset Sale Offer shall be in an aggregate amount of not less than $25.0 million. Upon consummation of such Collateral Asset Sale Offer, any Net Proceeds not required to be used to purchase Notes shall not be deemed Collateral Excess Proceeds and the Issuer and its Restricted Subsidiaries may use any remaining Net Proceeds for general corporate purposes, subject to the other covenants contained in the Indenture.

Pending the final application of any Net Proceeds pursuant to this covenant, the holder of such Net Proceeds may apply such Net Proceeds temporarily to reduce Indebtedness outstanding under a revolving credit facility or otherwise invest such Net Proceeds in any manner not prohibited by the Indenture; *provided, however,* that any Net Proceeds that represents proceeds of Collateral or other Oncor-related Assets shall be deposited and held in an Asset Sale Cash Collateral Account that is subject to a perfected security interest for the benefit of the Holders of the Notes and the holders of the other Secured Debt Obligations pending final application thereof in accordance with this covenant. For the avoidance of doubt, final application of Net Proceeds that represent proceeds of Collateral or other Oncor-related Assets includes, without limitation, the consummation of a Collateral Asset Sale Offer.

The Issuer will comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder to the extent such laws or regulations are applicable in connection with the repurchase of the Notes pursuant to an Asset Sale Offer or a Collateral Asset Sale Offer. To the extent that the provisions of any securities laws or regulations conflict with the provisions of the Indenture, the Issuer will comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations described in the Indenture by virtue thereof.

61

EFIHMW00151887

### Selection and Notice

If the Issuer is redeeming less than all of the Notes issued by it at any time, the Trustee will select the Notes to be redeemed (a) if the Notes are listed on any national securities exchange, in compliance with the requirements of the principal national securities exchange on which the Notes are listed, (b) on a pro rata basis to the extent practicable or (c) by lot or such other similar method in accordance with the procedures of DTC. No Notes of $2,000 or less can be redeemed in part.

Notices of purchase or redemption shall be mailed by first-class mail, postage prepaid, at least 30 but not more than 60 days before the purchase or Redemption Date to each Holder of Notes at such Holder's registered address or otherwise in accordance with the procedures of DTC, except that redemption notices may be mailed more than 60 days prior to a Redemption Date if the notice is issued in connection with a defeasance of the Notes or a satisfaction and discharge of the Indenture. If any Note is to be purchased or redeemed in part only, any notice of purchase or redemption that relates to such Note shall state the portion of the principal amount thereof that has been or is to be purchased or redeemed. The notice will also state any conditions applicable to a redemption.

The Issuer will issue a new Note in a principal amount equal to the unredeemed portion of the original Note in the name of the Holder upon cancellation of the original Note. Notes called for redemption become due on the date fixed for redemption but such redemption may be subject to one or more conditions precedent. On and after the Redemption Date, interest ceases to accrue on Notes or portions thereof called for redemption.

## Certain Covenants

### Limitation on Restricted Payments

The Issuer will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly:

(I) declare or pay any dividend or make any payment or distribution on account of the Issuer's, or any of its Restricted Subsidiaries' Equity Interests, including any dividend or distribution payable in connection with any merger or consolidation other than:

(a) dividends or distributions by the Issuer payable solely in Equity Interests (other than Disqualified Stock) of the Issuer; or

(b) dividends or distributions by a Restricted Subsidiary so long as, in the case of any dividend or distribution payable on or in respect of any class or series of securities issued by a Restricted Subsidiary other than a Wholly-Owned Subsidiary, the Issuer or a Restricted Subsidiary receives at least its pro rata share of such dividend or distribution in accordance with its Equity Interests in such class or series of securities;

(II) purchase, redeem, defease or otherwise acquire or retire for value any Equity Interests of the Issuer or any direct or indirect parent of the Issuer, including in connection with any merger or consolidation;

(III) make any principal payment on, or redeem, repurchase, defease or otherwise acquire or retire for value in each case, prior to any scheduled repayment, sinking fund payment or maturity, any Subordinated Indebtedness, other than:

(a) Indebtedness permitted under clauses (7) and (8) of the covenant described under "— Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock"; or

(b) the purchase, repurchase or other acquisition of Subordinated Indebtedness purchased in anticipation of satisfying a sinking fund obligation, principal installment or final maturity, in each case due within one year of the date of purchase, repurchase or acquisition; or

62

EFIHMW00151888
**PX 022**
**Page 69 of 218**

(IV) make any Restricted Investment

(all such payments and other actions set forth in clauses (I) through (IV) above (other than any exception thereto) being collectively referred to as "*Restricted Payments*"), unless, at the time of such Restricted Payment:

(1) no Default shall have occurred and be continuing or would occur as a consequence thereof;

(2)(A) with respect to any Restricted Payment by the Issuer or any Restricted Subsidiary of the Issuer (other than TCEH and its Restricted Subsidiaries) immediately after giving effect to such transaction on a *pro forma* basis, the Restricted Payment Coverage Ratio for the most recently ended four fiscal quarters for which internal financial statements are available immediately preceding the date of such Restricted Payment would have been at least 2.00 to 1.00 or (B) with respect to a Restricted Payment by TCEH or any Restricted Subsidiary of TCEH, immediately after giving effect to such transaction on a *pro forma* basis, TCEH could incur at least $1.00 of additional Indebtedness under the provisions of clause (ii) of the first paragraph of the covenant described under "— Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock"; and

(3) such Restricted Payment, together with the aggregate amount of all other Restricted Payments made by the Issuer and its Restricted Subsidiaries after the Closing Date (including Restricted Payments permitted by clauses (1), (2) (with respect to the payment of dividends on Refunding Capital Stock as defined above) pursuant to clause (b) thereof only), (6)(c), (9) and (14) of the next succeeding paragraph, but excluding all other Restricted Payments permitted by the next succeeding paragraph), is less than the sum of (without duplication):

(a)(A) with respect to a Restricted Payment by the Issuer or any Restricted Subsidiary of the Issuer (other than TCEH and its Restricted Subsidiaries) 50% of the Consolidated Net Income of the Issuer for the period (taken as one accounting period) beginning October 11, 2007, to the end of the Issuer's most recently ended fiscal quarter for which internal financial statements are available at the time of such Restricted Payment, or, in the case such Consolidated Net Income for such period is a deficit, minus 100% of such deficit or (B) with respect to a Restricted Payment by TCEH or any Restricted Subsidiary of TCEH, 50% of the Consolidated Net Income of TCEH for the period (taken as one accounting period) beginning October 11, 2007, to the end of TCEH's most recently ended fiscal quarter for which internal financial statements are available at the time of such Restricted Payment, or, in the case such Consolidated Net Income for such period is a deficit, minus 100% of such deficit; *plus*

(b) 100% of the aggregate net cash proceeds and the fair market value, as determined in good faith by the Issuer, of marketable securities or other property received by the Issuer since immediately after the Closing Date (other than net cash proceeds to the extent such net cash proceeds have been used to incur Indebtedness, Disqualified Stock or Preferred Stock pursuant to clause (12)(a) of the second paragraph of "— Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock") from the issue or sale of:

(i)(A) Equity Interests of the Issuer, including Treasury Capital Stock (as defined below), but excluding cash proceeds and the fair market value, as determined in good faith by the Issuer, of marketable securities or other property received from the sale of:

(x) Equity Interests to members of management, directors or consultants of the Issuer, any direct or indirect parent company of the Issuer and the Issuer's Subsidiaries after the Closing Date to the extent such amounts have been applied to Restricted Payments made in accordance with clause (4) of the next succeeding paragraph; and

(y) Designated Preferred Stock; and

(B) to the extent such net cash proceeds are actually contributed to the capital of the Issuer, Equity Interests of the Issuer's direct or indirect parent companies (excluding contributions of the proceeds from the sale of Designated Preferred Stock of such companies or contributions to the extent such amounts have been applied to Restricted Payments made in accordance with clause (4) of the next succeeding paragraph); or

63

     (ii) debt securities of the Issuer that have been converted into or exchanged for such Equity Interests of the Issuer;

*provided, however*, that this clause (b) shall not include the proceeds from (V) Refunding Capital Stock (as defined below), (W) Equity Interests or debt securities of the Issuer sold to a Restricted Subsidiary, as the case may be, (X) Disqualified Stock or debt securities that have been converted into or exchanged for Disqualified Stock or (Y) Excluded Contributions; *plus*

     (c) 100% of the aggregate amount of cash and the fair market value, as determined in good faith by the Issuer, of marketable securities or other property contributed to the capital of the Issuer following the Closing Date (other than such net cash proceeds to the extent such net cash proceeds (i) have been used to incur Indebtedness, Disqualified Stock or Preferred Stock pursuant to clause (12)(a) of the second paragraph of " — Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock," (ii) are contributed by a Restricted Subsidiary or (iii) constitute Excluded Contributions); *plus*

     (d) 100% of the aggregate amount received in cash and the fair market value, as determined in good faith by the Issuer, of marketable securities or other property received by means of:

          (i) the sale or other disposition (other than to the Issuer or a Restricted Subsidiary) of Restricted Investments (other than Restricted Investments in any Oncor Subsidiary or Successor Oncor Business) made by the Issuer or its Restricted Subsidiaries after the Closing Date and repurchases and redemptions of such Restricted Investments from the Issuer or its Restricted Subsidiaries and repayments of loans or advances, and releases of guarantees, which constitute Restricted Investments by the Issuer or its Restricted Subsidiaries after the Closing Date; or

          (ii) the sale (other than to the Issuer or a Restricted Subsidiary) of the stock of an Unrestricted Subsidiary (other than (x) to the extent the Investment in such Unrestricted Subsidiary was made by the Issuer or a Restricted Subsidiary pursuant to clause (7) of the next succeeding paragraph, (y) to the extent such Investment constituted a Permitted Investment or (z) an Investment in the Oncor Subsidiaries or any Successor Oncor Business) or a distribution or dividend from an Unrestricted Subsidiary after the Closing Date (other than distributions or dividends from the Oncor Subsidiaries or any Successor Oncor Business, except to the extent such distributions or dividends were received prior to the Secured Notes Issue Date and exceeded the aggregate amount of Investments in the Oncor Subsidiaries then outstanding under clauses (7) and (11) of the next succeeding paragraph and clauses (8) and (13) of the definition of "Permitted Investments"; and to the extent that the amount of such distributions or dividends did not exceed such aggregate amount of Investments then outstanding under such clauses, the amount of such Investments then outstanding under any of such clauses shall be reduced by the amount of such distributions or dividends received); *plus*

     (e) in the case of the redesignation of an Unrestricted Subsidiary (other than the Oncor Subsidiaries or any Successor Oncor Business) as a Restricted Subsidiary after the Closing Date, the fair market value of the Investment in such Unrestricted Subsidiary, as determined by the Issuer in good faith (or if such fair market value exceeds $200.0 million, in writing by an Independent Financial Advisor), at the time of the redesignation of such Unrestricted Subsidiary as a Restricted Subsidiary other than to the extent the Investment in such Unrestricted Subsidiary was made by the Issuer or a Restricted Subsidiary pursuant to clause (7) of the next succeeding paragraph or to the extent such Investment constituted a Permitted Investment.

As of September 30, 2009, the Issuer would have had approximately $1.7 billion available for Restricted Payments under clause (3) above.

The foregoing provisions will not prohibit:

     (1) the payment of any dividend within 60 days after the date of declaration thereof, if at the date of declaration such payment would have complied with the provisions of the Indenture;

64

(2)(a) the redemption, repurchase, retirement or other acquisition of any Equity Interests ("*Treasury Capital Stock*") or Subordinated Indebtedness of the Issuer or a Guarantor or any Equity Interests of any direct or indirect parent company of the Issuer, in exchange for, or out of the proceeds of the substantially concurrent sale (other than to a Restricted Subsidiary) of, Equity Interests of the Issuer or any direct or indirect parent company of the Issuer to the extent contributed to the capital of the Issuer (in each case, other than any Disqualified Stock) ("*Refunding Capital Stock*") and (b) if immediately prior to the retirement of Treasury Capital Stock, the declaration and payment of dividends thereon was permitted under clause (6) of this paragraph, the declaration and payment of dividends on the Refunding Capital Stock (other than Refunding Capital Stock the proceeds of which were used to redeem, repurchase, retire or otherwise acquire any Equity Interests of any direct or indirect parent company of the Issuer) in an aggregate amount per year no greater than the aggregate amount of dividends per annum that were declarable and payable on such Treasury Capital Stock immediately prior to such retirement;

(3) the redemption, repurchase or other acquisition or retirement of Subordinated Indebtedness of the Issuer or a Guarantor made in exchange for, or out of the proceeds of the substantially concurrent sale of, new Indebtedness of the Issuer or a Guarantor, as the case may be, which is incurred in compliance with the covenant described under " — Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" so long as:

(a) the principal amount (or accreted value) of such new Indebtedness does not exceed the principal amount of (or accreted value, if applicable), plus any accrued and unpaid interest on, the Subordinated Indebtedness being so redeemed, repurchased, acquired or retired for value, plus the amount of any reasonable premium (including reasonable tender premiums), defeasance costs and any reasonable fees and expenses incurred in connection with the issuance of such new Indebtedness;

(b) such new Indebtedness is subordinated to the Notes or the applicable Guarantee at least to the same extent as such Subordinated Indebtedness so purchased, exchanged, redeemed, repurchased, acquired or retired for value;

(c) such new Indebtedness has a final scheduled maturity date equal to or later than the final scheduled maturity date of the Subordinated Indebtedness being so redeemed, repurchased, acquired or retired; and

(d) such new Indebtedness has a Weighted Average Life to Maturity equal to or greater than the remaining Weighted Average Life to Maturity of the Subordinated Indebtedness being so redeemed, repurchased, acquired or retired;

(4) a Restricted Payment to pay for the repurchase, retirement or other acquisition or retirement for value of Equity Interests (other than Disqualified Stock) of the Issuer or any of its direct or indirect parent companies held by any future, present or former employee, director or consultant of the Issuer, any of its Subsidiaries or any of its direct or indirect parent companies pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement, including any Equity Interests rolled over by management of the Issuer or any of its direct or indirect parent companies in connection with the Transactions; *provided, however*, that the aggregate Restricted Payments made under this clause (4) do not exceed in any calendar year $25.0 million (which shall increase to $50.0 million subsequent to the consummation of an underwritten public Equity Offering by the Issuer or any direct or indirect parent entity of the Issuer) (with unused amounts in any calendar year being carried over to succeeding calendar years subject to a maximum (without giving effect to the following proviso) of $75.0 million in any calendar year (which shall increase to $150.0 million subsequent to the consummation of an underwritten public Equity Offering by the Issuer or any direct or indirect parent entity of the Issuer)); *provided, further* that such amount in any calendar year may be increased by an amount not to exceed:

(a) the cash proceeds from the sale of Equity Interests (other than Disqualified Stock) of the Issuer and, to the extent contributed to the Issuer, Equity Interests of any of the Issuer's direct or indirect parent companies, in each case to members of management, directors or consultants of the Issuer, any

65

EFIHMW00151891

of its Subsidiaries or any of its direct or indirect parent companies that occurs after the Closing Date, to the extent the cash proceeds from the sale of such Equity Interests have not otherwise been applied to the payment of Restricted Payments by virtue of clause (3) of the preceding paragraph; plus

(b) the cash proceeds of key man life insurance policies received by the Issuer or its Restricted Subsidiaries after the Closing Date; less

(c) the amount of any Restricted Payments previously made with the cash proceeds described in clauses (a) and (b) of this clause (4);

and *provided, further* that cancellation of Indebtedness owing to the Issuer or any Restricted Subsidiary from members of management of the Issuer, any of the Issuer's direct or indirect parent companies or any of the Issuer's Restricted Subsidiaries in connection with a repurchase of Equity Interests of the Issuer or any of its direct or indirect parent companies will not be deemed to constitute a Restricted Payment for purposes of this covenant or any other provision of the Indenture;

(5) the declaration and payment of dividends to holders of any class or series of Disqualified Stock of the Issuer or any of its Restricted Subsidiaries or any class or series of Preferred Stock of any Restricted Subsidiary issued in accordance with the covenant described under " — Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" to the extent such dividends are included in the definition of "Fixed Charges";

(6)(a) the declaration and payment of dividends to holders of any class or series of Designated Preferred Stock (other than Disqualified Stock) issued by the Issuer after the Closing Date;

(b) the declaration and payment of dividends to a direct or indirect parent company of the Issuer, the proceeds of which will be used to fund the payment of dividends to holders of any class or series of Designated Preferred Stock (other than Disqualified Stock) of such parent corporation issued after the Closing Date; *provided* that the amount of dividends paid pursuant to this clause (b) shall not exceed the aggregate amount of cash actually contributed to the Issuer from the sale of such Designated Preferred Stock; or

(c) the declaration and payment of dividends on Refunding Capital Stock that is Preferred Stock in excess of the dividends declarable and payable thereon pursuant to clause (2) of this paragraph;

*provided, however,* in the case of each of (a) and (c) of this clause (6), that for the most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date of issuance of such Designated Preferred Stock or the declaration of such dividends on Refunding Capital Stock that is Preferred Stock, after giving effect to such issuance or declaration on a pro forma basis, the Restricted Payment Coverage Ratio for the most recently ended four fiscal quarters for which internal financial statements are available immediately preceding the date of such Restricted Payment would have been at least 2.00 to 1.00;

(7) Investments in Unrestricted Subsidiaries having an aggregate fair market value (with the fair market value of each Investment being measured at the time made and without giving effect to subsequent changes in value), taken together with all other Investments made pursuant to this clause (7) that are at the time outstanding, without giving effect to the sale of an Unrestricted Subsidiary to the extent the proceeds of such sale do not consist of cash or marketable securities, not to exceed (A) 1.5% of Total Assets at the time of such Investment and (B) to the extent invested in any of the Oncor Subsidiaries or any Successor Oncor Business, $500.0 million;

(8) repurchases of Equity Interests deemed to occur upon exercise of stock options or warrants if such Equity Interests represent a portion of the exercise price of such options or warrants;

(9) the declaration and payment of dividends on the Issuer's common stock (or the payment of dividends to any direct or indirect parent entity to fund a payment of dividends on such entity's common stock), following consummation of the first public offering of the Issuer's common stock or membership

66

interests or the common stock of any of its direct or indirect parent companies after the Closing Date, of up to 6% per annum of the net cash proceeds received by or contributed to the Issuer in or from any such public offering, other than public offerings with respect to the Issuer's common stock registered on Form S-4 or Form S-8 and other than any public sale constituting an Excluded Contribution;

(10) Restricted Payments in an aggregate amount equal to the amount of Excluded Contributions;

(11) other Restricted Payments in an aggregate amount taken together with all other Restricted Payments made pursuant to this clause (11) not to exceed 2.0% of Total Assets at the time made;

(12) distributions or payments of Receivables Fees;

(13) any Restricted Payment made as part of or in connection with the Transactions (including payments made after the Closing Date in respect of the Issuer's and its Subsidiaries' long-term incentive plan or in respect of tax gross-ups or other deferred compensation) and the fees and expenses related thereto or used to fund amounts owed to Affiliates (including dividends to any direct or indirect parent of the Issuer to permit payment by such parent of such amount), in each case to the extent permitted by the covenant described under "— Transactions with Affiliates";

(14) the repurchase, redemption or other acquisition or retirement for value of any Subordinated Indebtedness in accordance with the provisions similar to those described under "— Repurchase at the Option of Holders — Change of Control" and "— Repurchase at the Option of Holders — Asset Sales"; *provided* that all Notes tendered by Holders in connection with a Change of Control Offer, Asset Sale Offer or Collateral Asset Sale Offer, as applicable, have been repurchased, redeemed or acquired for value;

(15) the declaration and payment of dividends by the Issuer to, or the making of loans to, any direct or indirect parent company in amounts required for any direct or indirect parent companies to pay, in each case without duplication,

(a) franchise and excise taxes and other fees, taxes and expenses required to maintain their corporate existence;

(b) foreign, federal, state and local income taxes, to the extent such income taxes are attributable to the income of the Issuer and its Restricted Subsidiaries and, to the extent of the amount actually received from its Unrestricted Subsidiaries, in amounts required to pay such taxes to the extent attributable to the income of such Unrestricted Subsidiaries; *provided* that in each case the amount of such payments in any fiscal year does not exceed the amount that the Issuer and its Subsidiaries would be required to pay in respect of foreign, federal, state and local taxes for such fiscal year were the Issuer, its Restricted Subsidiaries and its Unrestricted Subsidiaries (to the extent described above) to pay such taxes separately from any such parent entity;

(c) customary salary, bonus and other benefits payable to officers and employees of any direct or indirect parent company of the Issuer to the extent such salaries, bonuses and other benefits are attributable to the ownership or operation of the Issuer and its Restricted Subsidiaries;

(d) general corporate operating and overhead costs and expenses of any direct or indirect parent company of the Issuer to the extent such costs and expenses are attributable to the ownership or operation of the Issuer and its Restricted Subsidiaries; and

(e) fees and expenses other than to Affiliates of the Issuer related to any unsuccessful equity or debt offering of such parent entity; or

(16) the spin-off by the Issuer of the Equity Interests of EFIH in a Permitted Asset Transfer made in accordance with the covenant described under "— Restrictions on Permitted Asset Transfers";

*provided, however*, that at the time of, and after giving effect to, any Restricted Payment permitted under clauses (7) and (11), no Default shall have occurred and be continuing or would occur as a consequence thereof.

67

EFIHMW00151893

As of the Issue Date, all of the Issuer's Subsidiaries (other than the Oncor Subsidiaries, Comanche Peak Nuclear Power Company, Nuclear Energy Future Holdings LLC and Nuclear Energy Future Holdings II LLC) will be Restricted Subsidiaries. The Issuer will not permit any Unrestricted Subsidiary to become a Restricted Subsidiary except pursuant to the penultimate paragraph of the definition of "Unrestricted Subsidiary." For purposes of designating any Restricted Subsidiary as an Unrestricted Subsidiary, all outstanding Investments by the Issuer and its Restricted Subsidiaries (except to the extent repaid) in the Subsidiary so designated will be deemed to be Restricted Payments in an amount determined as set forth in the last sentence of the definition of "Investments." Such designation will be permitted only if a Restricted Payment in such amount would be permitted at such time, whether pursuant to the first paragraph of this covenant or under clause (7), (10) or (11) of the second paragraph of this covenant, or pursuant to the definition of "Permitted Investments," and if such Subsidiary otherwise meets the definition of an Unrestricted Subsidiary. Unrestricted Subsidiaries will not be subject to any of the restrictive covenants set forth in the Indenture.

Notwithstanding the foregoing provisions of this covenant, the Issuer will not, and will not permit any of its Restricted Subsidiaries to, pay any cash dividend or make any cash distribution on, or in respect of, the Issuer's Capital Stock or purchase for cash or otherwise acquire for cash any Capital Stock of the Issuer or any direct or indirect parent of the Issuer for the purpose of paying any cash dividend or making any cash distribution to, or acquiring Capital Stock of any direct or indirect parent of the Issuer for cash from, the Investors, or guarantee any Indebtedness of any Affiliate of the Issuer for the purpose of paying such dividend, making such distribution or so acquiring such Capital Stock to or from the Investors, in each case by means of utilization of the cumulative Restricted Payment credit provided by the first paragraph of this covenant, or the exceptions provided by clauses (1), (7) or (11) of the second paragraph of this covenant or clauses (8), (10) or (13) of the definition of "Permitted Investments," unless (x) at the time and after giving effect to such payment, the Consolidated Leverage Ratio of the Issuer would be equal to or less than 7.00 to 1.00 and (y) such payment is otherwise in compliance with this covenant.

### *Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock*

The Issuer will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable, contingently or otherwise (collectively, "*incur*" and collectively, an "*incurrence*") with respect to any Indebtedness (including Acquired Indebtedness), and the Issuer will not issue any shares of Disqualified Stock and will not permit any Restricted Subsidiary to issue any shares of Disqualified Stock or Preferred Stock; *provided, however*, that (i) the Issuer may incur Indebtedness (including Acquired Indebtedness) or issue shares of Disqualified Stock, and any of its Restricted Subsidiaries (other than TCEH and its Restricted Subsidiaries) may incur Indebtedness (including Acquired Indebtedness), issue shares of Disqualified Stock and issue shares of Preferred Stock, if the Fixed Charge Coverage Ratio on a consolidated basis for the Issuer and its Restricted Subsidiaries' most recently ended four fiscal quarters for which internal financial statements are available immediately preceding the date on which such additional Indebtedness is incurred or such Disqualified Stock or Preferred Stock is issued would have been at least 2.00 to 1.00 and (ii) TCEH or any of its Restricted Subsidiaries may incur Indebtedness (including Acquired Indebtedness), issue shares of Disqualified Stock and issue shares of Preferred Stock, if the Fixed Charge Coverage Ratio on a consolidated basis for TCEH and its Restricted Subsidiaries most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date on which such additional Indebtedness is incurred or such Disqualified Stock or Preferred Stock is issued would have been at least 2.00 to 1.00, in each case determined on a *pro forma* basis (including a *pro forma* application of the net proceeds therefrom), as if the additional Indebtedness had been incurred, or the Disqualified Stock or Preferred Stock had been issued, as the case may be, and the application of proceeds therefrom had occurred at the beginning of such four-quarter period.

The foregoing limitations will not apply to:

(1) the incurrence of Indebtedness under (x) Credit Facilities by the Issuer or any of its Restricted Subsidiaries and the issuance and creation of letters of credit and bankers' acceptances thereunder (with letters of

68

EFIHMW00151894

credit and bankers' acceptances being deemed to have a principal amount equal to the face amount thereof), up to an aggregate principal amount of $26,500.0 million outstanding at any one time and (y) any Collateral Posting Facility;

(2) the incurrence (w) by the Issuer or any Guarantor of Indebtedness represented by the Notes to be issued on the Issue Date (including any Guarantees thereof) and any Exchange Notes (including any guarantees thereof), (x) by the Issuer of Indebtedness represented by the 9.75% Notes and any additional 9.75% Notes (including any guarantees thereof) and by EFIH of Indebtedness represented by the EFIH Notes and any additional EFIH Notes, (y) by the Issuer of any Additional Notes to be issued after the Issue Date (including any guarantees thereof) and (z) by the Issuer or any Guarantor of any other Indebtedness; *provided* that the aggregate principal amount of Indebtedness incurred under this clause (2), together with refinancings thereof, shall not exceed $4.0 billion; and *provided, further* that the aggregate amount of Indebtedness that may be incurred under this clause (2) shall be reduced by an amount equal to the amount of Parity Lien Debt repaid using the Net Proceeds from Asset Sales of Collateral or other Oncor-related Assets in accordance with the covenant described under " — Repurchase at the Option of Holders — Asset Sales";

(3) Indebtedness of the Issuer and its Restricted Subsidiaries in existence on the Issue Date (other than Indebtedness described in clauses (1) and (2)), including the Existing Notes (including any PIK interest which may be paid with respect thereto and guarantees thereof);

(4) Indebtedness consisting of Capitalized Lease Obligations and Purchase Money Obligations, so long as such Indebtedness (except Environmental CapEx Debt) exists at the date of such purchase, lease or improvement, or is created within 270 days thereafter;

(5) Indebtedness incurred by the Issuer or any of its Restricted Subsidiaries constituting reimbursement obligations with respect to letters of credit issued in the ordinary course of business, including letters of credit in respect of workers' compensation or employee health claims, or other Indebtedness with respect to reimbursement-type obligations regarding workers' compensation or employee health claims; *provided, however,* that upon the drawing of such letters of credit or the incurrence of such Indebtedness, such obligations are reimbursed within 30 days following such drawing or incurrence;

(6) Indebtedness arising from agreements of the Issuer or its Restricted Subsidiaries providing for indemnification, adjustment of purchase price or similar obligations, in each case, incurred or assumed in connection with the disposition of any business, assets or a Subsidiary, other than Indebtedness incurred by any Person acquiring all or any portion of such business, assets or a Subsidiary for the purpose of financing such acquisition; *provided, however,* that such Indebtedness is not reflected on the balance sheet of the Issuer, or any of its Restricted Subsidiaries (contingent obligations referred to in a footnote to financial statements and not otherwise reflected on the balance sheet will not be deemed to be reflected on such balance sheet for purposes of this clause (6));

(7) Indebtedness of the Issuer to a Restricted Subsidiary; *provided* that any such Indebtedness (other than intercompany loans from TCEH and its Subsidiaries required to be unsubordinated by the terms of any Indebtedness of TCEH or such Subsidiaries) owing to a Restricted Subsidiary that is not a Guarantor is expressly subordinated in right of payment to the Notes; *provided, further* that any subsequent issuance or transfer of any Capital Stock or any other event which results in any Restricted Subsidiary ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such Indebtedness (except to the Issuer or another Restricted Subsidiary) shall be deemed, in each case, to be an incurrence of such Indebtedness not permitted by this clause (7);

(8) Indebtedness of a Restricted Subsidiary to the Issuer or another Restricted Subsidiary; *provided* that if a Guarantor incurs such Indebtedness to a Restricted Subsidiary that is not a Guarantor (other than intercompany loans from TCEH and its Subsidiaries required to be unsubordinated by the terms of any Indebtedness of TCEH or such Subsidiaries), such Indebtedness is expressly subordinated in right of payment to the Guarantee of the Notes of such Guarantor; *provided, further* that any subsequent issuance or transfer of any Capital Stock or any

69

EFIHMW00151895

other event which results in any Restricted Subsidiary ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such Indebtedness (except to the Issuer or another Restricted Subsidiary) shall be deemed, in each case, to be an incurrence of such Indebtedness not permitted by this clause (8);

(9) shares of Preferred Stock of a Restricted Subsidiary issued to the Issuer or another Restricted Subsidiary; *provided* that any subsequent issuance or transfer of any Capital Stock or any other event which results in any such Restricted Subsidiary ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such shares of Preferred Stock (except to the Issuer or another of its Restricted Subsidiaries) shall be deemed in each case to be an issuance of such shares of Preferred Stock not permitted by this clause (9);

(10) Hedging Obligations; *provided* that (i) other than in the case of commodity Hedging Obligations, such Hedging Obligations are not entered into for speculative purposes (as determined by the Issuer in its reasonable discretion acting in good faith) and (ii) in the case of speculative commodity Hedging Obligations, such Hedging Obligations are entered into in the ordinary course of business and are consistent with past practice;

(11) obligations in respect of performance, bid, appeal and surety bonds and completion guarantees provided by the Issuer or any of its Restricted Subsidiaries in the ordinary course of business;

(12)(a) Indebtedness or Disqualified Stock of the Issuer and Indebtedness, Disqualified Stock or Preferred Stock of any Restricted Subsidiary equal to 100.0% of the net cash proceeds received by the Issuer since immediately after the Closing Date from the issue or sale of Equity Interests of the Issuer or cash contributed to the capital of the Issuer (in each case, other than Excluded Contributions or proceeds of Disqualified Stock or sales of Equity Interests to the Issuer or any of its Subsidiaries) as determined in accordance with clauses (3)(b) and (3)(c) of the first paragraph of "— Limitation on Restricted Payments" to the extent such net cash proceeds or cash have not been applied pursuant to such clauses to make Restricted Payments or to make other Investments, payments or exchanges pursuant to the second paragraph of "— Limitation on Restricted Payments" or to make Permitted Investments (other than Permitted Investments specified in clauses (1) and (3) of the definition thereof) and (b) Indebtedness or Disqualified Stock of the Issuer and Indebtedness, Disqualified Stock or Preferred Stock of any Restricted Subsidiary not otherwise permitted hereunder in an aggregate principal amount or liquidation preference, which when aggregated with the principal amount and liquidation preference of all other Indebtedness, Disqualified Stock and Preferred Stock then outstanding and incurred pursuant to this clause (12)(b), does not at any one time outstanding exceed $1,750.0 million (it being understood that any Indebtedness, Disqualified Stock or Preferred Stock incurred pursuant to this clause (12)(b) shall cease to be deemed incurred or outstanding for purposes of this clause (12)(b) but shall be deemed incurred for the purposes of the first paragraph of this covenant from and after the first date on which the Issuer or such Restricted Subsidiary could have incurred such Indebtedness, Disqualified Stock or Preferred Stock under the first paragraph of this covenant without reliance on this clause (12)(b));

(13) the incurrence or issuance by the Issuer or any Restricted Subsidiary of Indebtedness, Disqualified Stock or Preferred Stock which serves to refund or refinance any Indebtedness, Disqualified Stock or Preferred Stock of the Issuer or any Restricted Subsidiary incurred as permitted under the first paragraph of this covenant and clauses (2), (3), (4) and (12)(a) above, this clause (13) and clause (14) below or any Indebtedness, Disqualified Stock or Preferred Stock of the Issuer or any Restricted Subsidiary issued to so refund or refinance such Indebtedness, Disqualified Stock or Preferred Stock of the Issuer or any Restricted Subsidiary including additional Indebtedness, Disqualified Stock or Preferred Stock incurred to pay premiums (including reasonable tender premiums), defeasance costs and fees in connection therewith (the "*Refinancing Indebtedness*") prior to its respective maturity; *provided, however*, that such Refinancing Indebtedness:

(a) has a Weighted Average Life to Maturity at the time such Refinancing Indebtedness is incurred which is not less than the remaining Weighted Average Life to Maturity of the Indebtedness, Disqualified Stock or Preferred Stock being refunded or refinanced,

70

EFIHMW00151896

(b) to the extent such Refinancing Indebtedness refinances (i) Indebtedness subordinated or *pari passu* to the Notes or any Guarantee thereof, such Refinancing Indebtedness is subordinated or *pari passu* to the Notes or the Guarantee at least to the same extent as the Indebtedness being refinanced or refunded or (ii) Disqualified Stock or Preferred Stock, such Refinancing Indebtedness must be Disqualified Stock or Preferred Stock, respectively, and

(c) shall not include Indebtedness, Disqualified Stock or Preferred Stock of a Subsidiary of the Issuer that is not a Guarantor that refinances Indebtedness, Disqualified Stock or Preferred Stock of the Issuer or a Guarantor;

and, *provided, further* that subclause (a) of this clause (13) will not apply to any refunding or refinancing of any Obligations under Credit Facilities secured by Permitted Liens; and, *provided, further* that with respect to any pollution control revenue bonds or similar instruments, the maturity of any series thereof shall be deemed to be the date set forth in any instrument governing such Indebtedness for the remarketing of such Indebtedness;

(14) Indebtedness, Disqualified Stock or Preferred Stock of (x) the Issuer or a Restricted Subsidiary incurred to finance an acquisition or (y) Persons that are acquired by the Issuer or any Restricted Subsidiary or merged into the Issuer or a Restricted Subsidiary in accordance with the terms of the Indenture; *provided* that after giving effect to such acquisition or merger, either

(a) in the case of an acquisition by or merger with the Issuer or any of its Restricted Subsidiaries other than TCEH and its Restricted Subsidiaries, either (A) the Issuer would be permitted to incur at least $1.00 of additional Indebtedness pursuant to clause (i) of the Fixed Charge Coverage Ratio test set forth in the first sentence of this covenant, or (B) such Fixed Charge Coverage Ratio of the Issuer and its Restricted Subsidiaries is greater than immediately prior to such acquisition or merger; or

(b) in the case of an acquisition by or merger with TCEH or any of its Restricted Subsidiaries, either (A) TCEH would be permitted to incur at least $1.00 of additional Indebtedness pursuant to clause (ii) of the Fixed Charge Coverage Ratio test set forth in the first sentence of this covenant, or (B) such Fixed Charge Coverage Ratio of TCEH and its Restricted Subsidiaries is greater than immediately prior to such acquisition or merger;

(15) Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business; *provided* that such Indebtedness is extinguished within two Business Days of its incurrence;

(16) Indebtedness of the Issuer or any of its Restricted Subsidiaries supported by a letter of credit issued pursuant to any Credit Facilities, in a principal amount not in excess of the stated amount of such letter of credit;

(17)(a) any guarantee by the Issuer or a Restricted Subsidiary of Indebtedness or other obligations of any Restricted Subsidiary, so long as the incurrence of such Indebtedness incurred by such Restricted Subsidiary is permitted under the terms of the Indenture, or (b) any guarantee by a Restricted Subsidiary of Indebtedness of the Issuer; *provided* that such guarantee is incurred in accordance with the covenant described under "— Limitation on Guarantees of Indebtedness by Restricted Subsidiaries";

(18) Indebtedness of the Issuer or any of its Restricted Subsidiaries consisting of (i) the financing of insurance premiums or (ii) take-or-pay obligations contained in supply arrangements, in each case, incurred in the ordinary course of business; and

(19) Indebtedness consisting of Indebtedness issued by the Issuer or any of its Restricted Subsidiaries to current or former officers, directors and employees thereof, their respective estates, spouses or former spouses, in each case to finance the purchase or redemption of Equity Interests of the Issuer or any direct or indirect parent company of the Issuer to the extent described in clause (4) of the second paragraph under "— Limitation on Restricted Payments."

71

EFIHMW00151897
**PX 022**
**Page 78 of 218**

For purposes of determining compliance with this covenant:

(1) in the event that an item of Indebtedness, Disqualified Stock or Preferred Stock (or any portion thereof) meets the criteria of more than one of the categories of permitted Indebtedness, Disqualified Stock or Preferred Stock described in clauses (1) through (19) above or is entitled to be incurred pursuant to the first paragraph of this covenant, the Issuer, in its sole discretion, will classify or reclassify such item of Indebtedness, Disqualified Stock or Preferred Stock (or any portion thereof) and will only be required to include the amount and type of such Indebtedness, Disqualified Stock or Preferred Stock in one of the above clauses; and

(2) at the time of incurrence, the Issuer will be entitled to divide and classify an item of Indebtedness in more than one of the types of Indebtedness described in the first and second paragraphs above;

*provided* that all Indebtedness outstanding under the TCEH Senior Secured Facilities on the Issue Date will be treated as incurred on the Issue Date under clause (1) of the preceding paragraph.

Accrual of interest, the accretion of accreted value and the payment of interest in the form of additional Indebtedness, Disqualified Stock or Preferred Stock will not be deemed to be an incurrence of Indebtedness, Disqualified Stock or Preferred Stock for purposes of this covenant.

For purposes of determining compliance with any U.S. dollar-denominated restriction on the incurrence of Indebtedness, the U.S. dollar-equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was incurred, in the case of term debt, or first committed, in the case of revolving credit debt; *provided* that if such Indebtedness is incurred to refinance other Indebtedness denominated in a foreign currency, and such refinancing would cause the applicable U.S. dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such U.S. dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being refinanced.

The principal amount of any Indebtedness incurred to refinance other Indebtedness, if incurred in a different currency from the Indebtedness being refinanced, shall be calculated based on the currency exchange rate applicable to the currencies in which such respective Indebtedness is denominated that is in effect on the date of such refinancing.

The Indenture will provide that the Issuer will not, and will not permit any Guarantor to, directly or indirectly, incur any Indebtedness (including Acquired Indebtedness) that is subordinated or junior in right of payment to any Indebtedness of the Issuer or such Guarantor, as the case may be, unless such Indebtedness is expressly subordinated in right of payment to the Notes or such Guarantor's Guarantee to the extent and in the same manner as such Indebtedness is subordinated to other Indebtedness of the Issuer or such Guarantor, as the case may be.

The Indenture will not treat (1) unsecured Indebtedness as subordinated or junior to Secured Indebtedness merely because it is unsecured or (2) Senior Indebtedness as subordinated or junior to any other Senior Indebtedness merely because it has a junior priority with respect to the same collateral.

### *Liens*

The Issuer will not, and will not permit any Guarantor that is a Restricted Subsidiary to, directly or indirectly, create, incur, assume or suffer to exist any Lien (except Permitted Liens) that secures obligations under any Indebtedness or any related guarantee, on any asset or property of the Issuer or any Guarantor that is a Restricted Subsidiary, or any income or profits therefrom, or assign or convey any right to receive income therefrom, unless:

(1) in the case of Liens securing Subordinated Indebtedness, the Notes and any related Guarantees are secured by a Lien on such property, assets or proceeds that is senior in priority to such Liens; or

72

(2) in all other cases, the Notes or any Guarantees are equally and ratably secured or are secured by a Lien on such property, assets or proceeds that is senior in priority to such Liens;

except that the foregoing shall not apply to (a) Liens securing Indebtedness permitted to be incurred pursuant to clause (2) of the second paragraph under "— Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock"; *provided* that the Notes or any related Guarantee are secured on at least an equal and ratable basis as such Indebtedness, (b) Liens securing Indebtedness permitted to be incurred under Credit Facilities, including any letter of credit relating thereto, that was permitted by the terms of the Indenture to be incurred pursuant to clause (1) of the second paragraph under "— Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" and (c) Liens incurred to secure Obligations in respect of any Indebtedness permitted to be incurred pursuant to the covenant described under "— Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock"; *provided* that, with respect to Liens securing Obligations permitted under this subclause (c), at the time of incurrence and after giving *pro forma* effect thereto, the Consolidated Secured Debt Ratio for the most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date on which such event for which such calculation is being made shall occur would be no greater than 5.0 to 1.0. Any Lien which is granted to secure the Notes under this covenant shall be discharged at the same time as the discharge of the Lien (other than through the exercise of remedies with respect thereto) that gave rise to the obligation to so secure the Notes.

Notwithstanding the foregoing, the Issuer will not, and will not permit EFIH to, directly or indirectly, create, incur, assume or suffer to exist any Lien on the Collateral (other than a Permitted Lien described under clause (3) of the definition of "Permitted Liens"), or any income or profits therefrom, or assign or convey any right to receive income therefrom except:

(1) Liens on the Collateral securing up to $4.0 billion in aggregate principal amount of Parity Lien Debt (including the Notes, Additional Notes, Exchange Notes and the 9.75% Notes, any additional 9.75% Notes, the EFIH Notes and any additional EFIH Notes and any guarantees of any of the foregoing and/or other Indebtedness incurred pursuant to the covenant described under "— Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock"); *provided* that such amount shall be reduced by an amount equal to the amount of Parity Lien Debt repaid using the Net Proceeds from Asset Sales of Collateral or other Oncor-related Assets in accordance with the covenant described under "— Repurchase at the Option of Holders — Asset Sales"; and

(2) Junior Liens on the Collateral securing Junior Lien Debt permitted to be incurred pursuant to the covenant described under "— Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock."

### *Merger, Consolidation or Sale of All or Substantially All Assets*

The Issuer may not consolidate or merge with or into or wind up into (whether or not the Issuer is the surviving corporation), or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets, in one or more related transactions, to any Person unless:

(1) the Issuer is the surviving corporation or the Person formed by or surviving any such consolidation, wind-up or merger (if other than the Issuer) or to which such sale, assignment, transfer, lease, conveyance or other disposition will have been made is a corporation organized or existing under the laws of the jurisdiction of organization of the Issuer or the laws of the United States, any state thereof, the District of Columbia, or any territory thereof (such Person, as the case may be, being herein called the "*Successor Company*");

(2) the Successor Company, if other than the Issuer, expressly assumes (i) all the obligations of the Issuer under the Notes, the Indenture and the Security Documents, to the extent the Issuer is a party thereto, pursuant to a supplemental indenture or other document or instrument in form reasonably satisfactory to the Trustee and (ii) the Registration Rights Agreement;

(3) immediately after such transaction, no Default exists;

73

EFIHMW00151899

(4) immediately after giving *pro forma* effect to such transaction and any related financing transactions (including, without limitation, any transaction the proceeds of which are applied to reduce the Indebtedness of the Successor Company or the Issuer, as the case may be), as if such transactions had occurred at the beginning of the applicable four-quarter period,

> (a) the Successor Company would be permitted to incur at least $1.00 of additional Indebtedness pursuant to clause (i) of the Fixed Charge Coverage Ratio test set forth in the first sentence of the covenant described under "— Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock," or

> (b) such Fixed Charge Coverage Ratio for the Successor Company and its Restricted Subsidiaries would be greater than such ratio for the Issuer and its Restricted Subsidiaries immediately prior to such transaction;

> (5) each Guarantor, unless it is the other party to the transactions described above, in which case clause (1)(b) of the second succeeding paragraph shall apply, shall have by a supplemental indenture confirmed that its Guarantee and any Security Documents to which it is a party shall apply to such Person's obligations under the Indenture, the Notes and the Registration Rights Agreement; and

> (6) the Issuer shall have delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that such consolidation, wind-up, merger or transfer and such supplemental indenture, if any, comply with the Indenture and, if a supplemental indenture is required in connection with such transaction, such supplemental indenture shall comply with the applicable provisions of the Indenture;

*provided*, that for the purposes of this covenant only, neither (A) the first to occur of a Permitted Asset Transfer or a TCEH Transfer (excluding a Permitted Asset Transfer consisting of a merger of EFIH with and into the Issuer for the purpose of determining the first to occur of a Permitted Asset Transfer or a TCEH Transfer) nor (B) a transaction meeting the requirements of the proviso to clause (3) under the definition of "Change of Control" will be deemed to be a sale, assignment, transfer, conveyance or other disposition of all or substantially all of the properties or assets of the Issuer and its Subsidiaries under the Indenture. For the avoidance of doubt, (1) the Issuer may therefore consummate the first to occur of a Permitted Asset Transfer made in accordance with the covenant described under "— Certain Covenants — Restrictions on Permitted Asset Transfers" and a TCEH Transfer made in accordance with the covenant described under "— Restrictions on TCEH Transfer," in either case, without complying with this "Merger, Consolidation or Sale of All or Substantially All Assets" covenant (excluding a Permitted Asset Transfer consisting of a merger of EFIH with and into the Issuer for the purpose of determining the first to occur of a Permitted Asset Transfer or a TCEH Transfer), (2) the Issuer or any of its Restricted Subsidiaries may consummate a transaction meeting the requirements of the proviso to clause (3) under the definition of "Change of Control" without complying with this "Merger, Consolidation or Sale of All or Substantially All Assets" covenant and (3) the determination in the preceding proviso shall not affect the determination of what constitutes all or substantially all the assets of the Issuer and its Subsidiaries under any other agreement to which the Issuer is a party.

The Successor Company will succeed to, and be substituted for, the Issuer under the Indenture and the Notes. Notwithstanding clauses (3) and (4) of the first paragraph of this "Merger, Consolidation or Sale of All or Substantially All Assets" covenant,

> (1) any Restricted Subsidiary (other than EFIH) may consolidate with or merge into or transfer all or part of its properties and assets to the Issuer, and

> (2) the Issuer may merge with an Affiliate of the Issuer solely for the purpose of reincorporating the Issuer in a State of the United States, the District of Columbia or any territory thereof so long as the amount of Indebtedness of the Issuer and its Restricted Subsidiaries is not increased thereby.

Notwithstanding the foregoing, EFIH may merge with and into the Issuer in a Permitted Asset Transfer in accordance with the covenant described under "— Restrictions on Permitted Asset Transfers."

74

EFIHMW00151900

Subject to certain limitations described in the Indenture governing release of a Guarantee upon the sale, disposition or transfer of a Guarantor, and except in the case of a Permitted Asset Transfer made in accordance with "— Restrictions on Permitted Asset Transfers," no Guarantor will, and the Issuer will not permit any Guarantor to, consolidate or merge with or into or wind up into (whether or not the Issuer or Guarantor is the surviving corporation) or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets, in one or more related transactions, to any Person unless:

(1)(a) such Guarantor is the surviving corporation or the Person formed by or surviving any such consolidation, wind-up or merger (if other than such Guarantor) or to which such sale, assignment, transfer, lease, conveyance or other disposition will have been made is a corporation, partnership, limited partnership, limited liability corporation or trust organized or existing under the laws of the jurisdiction of organization of such Guarantor, as the case may be, or the laws of the United States, any state thereof, the District of Columbia, or any territory thereof (such Guarantor or such Person, as the case may be, being herein called the "*Successor Person*");

(b) the Successor Person, if other than such Guarantor, expressly assumes all the obligations of such Guarantor under the Indenture and such Guarantor's related Guarantee and any Security Documents to which such Guarantor is a party pursuant to supplemental indentures or other documents or instruments in form reasonably satisfactory to the Trustee;

(c) immediately after such transaction, no Default exists; and

(d) the Issuer shall have delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that such consolidation, wind-up, merger or transfer and such supplemental indentures, if any, comply with the Indenture; or

(2) the transaction is made in compliance with the covenant described under "— Repurchase at the Option of Holders — Asset Sales."

Subject to certain limitations described in the Indenture, the Successor Person will succeed to, and be substituted for, such Guarantor under the Indenture and such Guarantor's Guarantee. Notwithstanding the foregoing, (i) any Guarantor may convert into a corporation, partnership, limited partnership, limited liability corporation or trust organized or existing under the laws of the jurisdiction of organization of such Guarantor, and any Guarantor (other than EFIH) may (A) merge into or transfer all or part of its properties and assets to another Guarantor or the Issuer or (B) merge with an Affiliate of the Issuer solely for the purpose of reincorporating the Guarantor in the United States, any state thereof, the District of Columbia or any territory thereof and (ii) EFIH may merge with and into the Issuer in a Permitted Asset Transfer in accordance with the covenant described under "— Restrictions on Permitted Asset Transfers."

*Restrictions on Permitted Asset Transfers*

The Issuer will not, and will not permit any of its Restricted Subsidiaries to, consummate a Permitted Asset Transfer unless:

(1) in the case of a Permitted Asset Transfer described in clause (2) of the definition of "Permitted Asset Transfer" or a Permitted Asset Transfer described in clause (1) of the definition of "Permitted Asset Transfer" by way of merger, wind-up or consolidation, the Person to which such sale, assignment, transfer, conveyance or other disposition of all of the Equity Interests of, and other Investments in, any Oncor Subsidiary and all other Collateral held by EFIH has been made is a corporation organized or existing under the laws of the United States, any state of the United States, the District of Columbia or any territory thereof (such Person being herein called the "*Successor EFIH Company*"); *provided* that the Successor EFIH Company may not be an Oncor Subsidiary;

(2) the Successor EFIH Company or, in the case of a Permitted Asset Transfer described in clause (1) of the definition of "Permitted Asset Transfer," EFIH and, to the extent the Successor EFIH Company is not a corporation, a Subsidiary of EFIH or the Successor EFIH Company, as the case may be, that is a

75

Confidential

co-obligor and a corporation organized or existing under the laws of the United States, any state of the United States, the District of Columbia or any territory thereof, has assumed all the obligations of the Issuer and EFIH under (i) the Notes and the Indenture (except in the case of a Permitted Asset Transfer consisting of a merger of EFIH with and into the Issuer, pursuant to a supplemental indenture, a form of which will be contained in an annex to the Indenture (the "*Permitted Transfer Supplemental Indenture*")), the Security Documents to which the Issuer or EFIH is a party pursuant to agreements, in each case, reasonably satisfactory to the Trustee and the Collateral Trustee and (ii) the Registration Rights Agreement;

(3) immediately after such transaction no Default exists;

(4) immediately after giving *pro forma* effect to such transaction and any related financing transactions (including, without limitation, any transaction the proceeds of which are applied to reduce the Indebtedness of the Successor EFIH Company or EFIH, as the case may be) as if the same had occurred at the beginning of the applicable four-quarter period, either:

(a) the Successor EFIH Company, or EFIH, as the case may be, would be permitted to incur at least $1.00 of additional Indebtedness pursuant to the fixed charge coverage ratio test set forth in the Permitted Transfer Supplemental Indenture; or

(b) the fixed charge coverage ratio (as defined in the Permitted Transfer Supplemental Indenture) for the Successor EFIH Company and its Restricted Subsidiaries or EFIH and its Restricted Subsidiaries, as the case may be, would be greater than such fixed charge coverage ratio for the Issuer and its Restricted Subsidiaries immediately prior to such transaction;

(5) except in the case of a Permitted Asset Transfer consisting of a merger of EFIH with and into the Issuer, the rating on the Notes shall not have been downgraded by two or more of the Rating Agencies (or, if the Notes are rated by only one Rating Agency at the time of the first notice of such Permitted Asset Transfer, such Rating Agency) during the period commencing 30 days prior to the first public notice of the occurrence of a Permitted Asset Transfer or the intention of the Issuer or any Subsidiary thereof to effect a Permitted Asset Transfer and ending on the date 60 days after such public notice relative to the rating at the start of such period; and

(6) the Issuer shall have delivered to the Trustee an Opinion of Counsel confirming that, subject to customary assumptions, exclusions and qualifications, the existing Security Documents, or to the extent that a Permitted Asset Transfer pursuant to clause (1) of the definition of "Permitted Asset Transfer" by way of merger, wind-up or consolidation or pursuant to clause (2) of the definition of "Permitted Asset Transfer" is being consummated, any new or amended Security Documents to be entered into by the Successor EFIH Company, are enforceable obligations of EFIH or the Successor EFIH Company, as the case may be, create a legally valid and enforceable security interest in the Collateral in favor of the Collateral Trustee for the benefit of the Holders of the Notes and the other Secured Debt Obligations, and that the security interests in the Collateral created by the Security Documents have been perfected.

The Permitted Transfer Supplemental Indenture will amend the definitions, covenants, events of default and other terms of the Indenture. The amended terms will be substantially similar to the terms of the EFIH Notes. For the avoidance of doubt, calculations under the Permitted Transfer Supplemental Indenture from and after the Permitted Asset Transfer will be made in accordance with the calculations relating to the EFIH Notes but, in respect of actions taken from and after the Permitted Asset Transfer, treating the Notes as if they had been issued by EFIH on the Secured Notes Issue Date.

In the case of a Permitted Asset Transfer described in clause (2) of the definition of "Permitted Asset Transfer" or a Permitted Asset Transfer described in clause (1) of the definition of "Permitted Asset Transfer" by way of merger, wind-up or consolidation, the Guarantee by EFIH will be released upon the consummation of such Permitted Asset Transfer in accordance with this "Restrictions on Permitted Asset Transfers" covenant. The successor entity formed by any merger of EFIH with and into the Issuer that is permitted by the Indenture shall not be permitted to effect a Permitted Asset Transfer described in clause (1) of the definition of Permitted Asset Transfer.

76

EFIHMW00151902

The provisions of this "Restrictions on Permitted Asset Transfers" covenant will not apply to a sale, assignment, transfer, conveyance or other disposition of assets between or among the Oncor Subsidiaries.

### Restrictions on TCEH Transfers

The Issuer will not, and will not permit any of its Restricted Subsidiaries to, consummate a TCEH Transfer unless:

> (1) the Issuer and the Trustee enter into a supplemental indenture, a form of which will be contained in an annex to the Indenture (the "*TCEH Transfer Supplemental Indenture*"), that will become operative at the time of consummation of such TCEH Transfer;

> (2) immediately after such transaction no Default exists;

> (3) immediately after giving *pro forma* effect to such transaction and any related financing transactions (including, without limitation, any transaction the proceeds of which are applied to reduce the Indebtedness of the Issuer) as if the same had occurred at the beginning of the applicable four-quarter period, either:

>> (a) the Issuer would be permitted to incur at least $1.00 of additional Indebtedness pursuant to the fixed charge coverage ratio test set forth in the TCEH Transfer Supplemental Indenture; or

>> (b) the fixed charge coverage ratio (as defined in the TCEH Transfer Supplemental Indenture) for the Issuer and its Restricted Subsidiaries would be greater than such fixed charge coverage ratio for the Issuer and its Restricted Subsidiaries immediately prior to such transaction; and

> (4) the rating on the Notes shall not have been downgraded by two or more of the Rating Agencies (or, if the Notes are rated by only one Rating Agencies at the time of the first notice of such TCEH Transfer, such Rating Agency) during the period commencing 30 days prior to the first public notice of the occurrence of a TCEH Transfer or the intention of the Issuer or any Subsidiary thereof to effect a TCEH Transfer and ending on the date 60 days after such public notice relative to the rating at the start of such period.

The TCEH Transfer Supplemental Indenture will amend the definitions, covenants, events of default and other terms of the Indenture. The amended terms will be substantially similar to the terms of the EFIH Notes, although Energy Future Holdings Corp. will continue to be the Issuer under the TCEH Transfer Supplemental Indenture.

### Restrictions on Certain Investments in Oncor Subsidiaries and the Collateral

The Issuer will not, and will not permit any Restricted Subsidiary (other than EFIH) to, hold any Equity Interests in, or Indebtedness of, or other Investments in, any of the Oncor Subsidiaries or any Successor Oncor Business or any other Collateral, except the Issuer may hold such Equity Interests, Indebtedness and other Investments following a merger of EFIH with and into the Issuer which is a Permitted Asset Transfer made in accordance with the provisions described under "— Restrictions on Permitted Asset Transfers."

The Issuer will not permit any Unrestricted Subsidiary to hold any Equity Interests in, or Indebtedness of, or other Investments in, EFIH, and will not permit any Unrestricted Subsidiary to hold any Equity Interests in, or Indebtedness of, or other Investments in, any of the Oncor Subsidiaries or any Successor Oncor Business; *provided* that an Oncor Subsidiary may hold Equity Interests in, or Indebtedness of, or other Investments in, another Oncor Subsidiary and a Successor Oncor Business may hold Equity Interests in, Indebtedness of, or other Investments in, another Successor Oncor Business.

The Issuer will not permit any of its Unrestricted Subsidiaries to accept any Investment from any Oncor Subsidiary or any Successor Oncor Business; *provided* that an Oncor Subsidiary may accept an Investment from another Oncor Subsidiary and a Successor Oncor Business may accept an Investment from another Successor Oncor Business.

77

EFIHMW00151903

EFIH will not sell, assign, transfer, convey or otherwise dispose of any Collateral, including any consideration (other than cash and Cash Equivalents) received by EFIH in an Asset Sale, including in respect of a Permitted Asset Swap of Collateral, except in connection with a Permitted Asset Transfer that satisfies the requirements of the covenant described under "— Restrictions on Permitted Asset Transfers" or pursuant to an Asset Sale that complies with the provisions of the covenant described under "— Repurchase at the Option of Holders — Asset Sales" pertaining to an Asset Sale of Collateral.

### Transactions with Affiliates

The Issuer will not, and will not permit any of its Restricted Subsidiaries to, make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction, contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate of the Issuer (each of the foregoing, an "*Affiliate Transaction*") involving aggregate payments or consideration in excess of $25.0 million, unless:

(1) such Affiliate Transaction is on terms that are not materially less favorable to the Issuer or its relevant Restricted Subsidiary than those that would have been obtained in a comparable transaction by the Issuer or such Restricted Subsidiary with an unrelated Person on an arm's-length basis; and

(2) the Issuer delivers to the Trustee with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate payments or consideration in excess of $50.0 million, a resolution adopted by the majority of the board of directors of the Issuer approving such Affiliate Transaction and set forth in an Officer's Certificate certifying that such Affiliate Transaction complies with clause (1) above.

The foregoing provisions will not apply to the following:

(1) transactions between or among the Issuer or any of its Restricted Subsidiaries or between or among the Issuer, any of its Restricted Subsidiaries and the Oncor Subsidiaries in the ordinary course of business;

(2) Restricted Payments permitted by the provisions of the Indenture described under the covenant "— Limitation on Restricted Payments" and the definition of "Permitted Investments" or to any Permitted Asset Transfer made in accordance with the covenant described under "— Restrictions on Permitted Asset Transfers" to the extent agreements with respect to which contain reasonable and customary provisions (as determined by the Issuer in good faith);

(3) the payment of management, consulting, monitoring and advisory fees and related expenses to the Investors pursuant to the Sponsor Management Agreement (plus any unpaid management, consulting, monitoring and advisory fees and related expenses accrued in any prior year) and the termination fees pursuant to the Sponsor Management Agreement, in each case as in effect on the Issue Date, or any amendment thereto (so long as any such amendment is not disadvantageous in the good faith judgment of the board of directors of the Issuer to the Holders when taken as a whole as compared to the Sponsor Management Agreement in effect on the Issue Date);

(4) the payment of reasonable and customary fees paid to, and indemnities provided for the benefit of, officers, directors, employees or consultants of the Issuer, any of its direct or indirect parent companies or any of its Restricted Subsidiaries;

(5) transactions in which the Issuer or any of its Restricted Subsidiaries, as the case may be, delivers to the Trustee a letter from an Independent Financial Advisor stating that such transaction is fair to the Issuer or such Restricted Subsidiary from a financial point of view or stating that the terms are not materially less favorable to the Issuer or its relevant Restricted Subsidiary than those that would have been obtained in a comparable transaction by the Issuer or such Restricted Subsidiary with an unrelated Person on an arm's-length basis;

(6) any agreement as in effect as of the Issue Date, or any amendment thereto (so long as any such amendment is not disadvantageous to the Holders when taken as a whole as compared to the applicable agreement as in effect on the Issue Date);

78

EFIHMW00151904

(7) the existence of, or the performance by the Issuer or any of its Restricted Subsidiaries of its obligations under the terms of, any stockholders agreement (including any registration rights agreement or purchase agreement related thereto) to which it is a party as of the Issue Date and any similar agreements which it may enter into thereafter; *provided, however*, that the existence of, or the performance by the Issuer or any of its Restricted Subsidiaries of obligations under any future amendment to any such existing agreement or under any similar agreement entered into after the Issue Date shall only be permitted by this clause (7) to the extent that the terms of any such amendment or new agreement are not otherwise disadvantageous to the Holders when taken as a whole;

(8) the Transactions (including payments made after the Closing Date in respect of the Issuer's and its Subsidiaries' long-term incentive plan or in respect of tax gross-ups and other deferred compensation) and the payment of all fees and expenses related to the Transactions;

(9) transactions with customers, clients, suppliers, or purchasers or sellers of goods or services, in each case in the ordinary course of business and otherwise in compliance with the terms of the Indenture which are fair to the Issuer and its Restricted Subsidiaries, in the reasonable determination of the board of directors of the Issuer or the senior management thereof, or are on terms at least as favorable as might reasonably have been obtained at such time from an unaffiliated party;

(10) the issuance of Equity Interests (other than Disqualified Stock) of the Issuer to any Permitted Holder or to any director, officer, employee or consultant;

(11) sales of accounts receivable, or participations therein, in connection with any Receivables Facility for the benefit of the Issuer or any of its Restricted Subsidiaries;

(12) payments by the Issuer or any of its Restricted Subsidiaries to any of the Investors made for any financial advisory, financing, underwriting or placement services or in respect of other investment banking activities, including, without limitation, in connection with acquisitions or divestitures, which payments are approved by a majority of the board of directors of the Issuer in good faith;

(13) payments or loans (or cancellation of loans) to employees or consultants of the Issuer, any of its direct or indirect parent companies or any of its Restricted Subsidiaries and employment agreements, stock option plans and other similar arrangements with such employees or consultants which, in each case, are approved by the Issuer in good faith;

(14) investments by the Investors in securities of the Issuer or any of its Restricted Subsidiaries so long as (i) the investment is being offered generally to other investors on the same or more favorable terms and (ii) the investment constitutes less than 5% of the proposed or outstanding issue amount of such class of securities; and

(15) payments by the Issuer (and any direct or indirect parent thereof) and its Subsidiaries pursuant to tax sharing agreements among the Issuer (and any such parent) and its Subsidiaries on customary terms to the extent attributable to the ownership or operation of the Issuer and its Subsidiaries; *provided* that in each case the amount of such payments in any fiscal year does not exceed the amount that the Issuer, its Restricted Subsidiaries and its Unrestricted Subsidiaries (to the extent of amounts received from Unrestricted Subsidiaries) would be required to pay in respect of foreign, federal, state and local taxes for such fiscal year were the Issuer and its Subsidiaries (to the extent described above) to pay such taxes separately from any such parent entity.

### *Dividend and Other Payment Restrictions Affecting Restricted Subsidiaries*

The Issuer will not, and will not permit any of its Restricted Subsidiaries that are not Guarantors to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or consensual restriction on the ability of any such Restricted Subsidiary to:

(1)(a) pay dividends or make any other distributions to the Issuer or any of its Restricted Subsidiaries on its Capital Stock or with respect to any other interest or participation in, or measured by, its profits, or

(b) pay any Indebtedness owed to the Issuer or any of its Restricted Subsidiaries;

79

(2) make loans or advances to the Issuer or any of its Restricted Subsidiaries; or

(3) sell, lease or transfer any of its properties or assets to the Issuer or any of its Restricted Subsidiaries,

except (in each case) for such encumbrances or restrictions existing under or by reason of:

(a) contractual encumbrances or restrictions in effect on the Issue Date, including pursuant to the TCEH Senior Secured Facilities and the related documentation and the Existing Notes Indentures and the related documentation;

(b)(i) the Indenture, the Notes and the Security Documents and (ii) the EFIH Notes and related documentation (including the related security documents) in effect on the Issue Date;

(c) purchase money obligations for property acquired in the ordinary course of business that impose restrictions of the nature discussed in clause (3) above on the property so acquired;

(d) applicable law or any applicable rule, regulation or order;

(e) any agreement or other instrument of a Person acquired by the Issuer or any Restricted Subsidiary in existence at the time of such acquisition (but not created in contemplation thereof), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person and its Subsidiaries, or the property or assets of the Person and its Subsidiaries, so acquired;

(f) contracts for the sale of assets, including customary restrictions with respect to a Subsidiary of the Issuer pursuant to an agreement that has been entered into for the sale or disposition of all or substantially all of the Capital Stock or assets of such Subsidiary;

(g) Secured Indebtedness that limits the right of the debtor to dispose of the assets securing such Indebtedness that is otherwise permitted to be incurred pursuant to the covenants described under "— Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" and "— Liens";

(h) restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business;

(i)(A) other Indebtedness, Disqualified Stock or Preferred Stock of Foreign Subsidiaries permitted to be incurred subsequent to the Issue Date pursuant to the provisions of the covenant described under "— Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" or (B) other Indebtedness, Disqualified Stock or Preferred Stock permitted to be incurred subsequent to the Issue Date pursuant to the provisions of the covenant described under "— Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" and either (i) the provisions relating to such encumbrance or restriction contained such Indebtedness are no less favorable to the Issuer, taken as a whole, as determined by the Issuer in good faith, than the provisions contained in the TCEH Indenture (in the case of Indebtedness of TCEH and its restricted Subsidiaries) or the EFIH Indenture (in the case of Indebtedness of EFIH and its restricted Subsidiaries), in the case of either of such Indentures only, as in effect on the Issue Date or (ii) any such encumbrance or restriction does not prohibit (except upon a default thereunder) the payment of dividends or loans in an amount sufficient, as determined by the Issuer in good faith, to make scheduled payments of cash interest of the Notes when due;

(j) customary provisions in joint venture agreements and other agreements or arrangements relating solely to such joint venture;

(k) customary provisions contained in leases or licenses of intellectual property and other agreements, in each case entered into in the ordinary course of business;

(l) any encumbrances or restrictions of the type referred to in clauses (1), (2) and (3) above imposed by any amendments, modifications, restatements, renewals, increases, supplements,

80

EFIHMW00151906

refundings, replacements or refinancing of the contracts, instruments or obligations referred to in clauses (a) through (k) above; *provided* that such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings are, in the good faith judgment of the Issuer, no more restrictive with respect to such encumbrance and other restrictions taken as a whole than those prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing;

(m) restrictions created in connection with any Receivables Facility for the benefit of the Issuer or any of its Restricted Subsidiaries that, in the good faith determination of the Issuer, are necessary or advisable to effect the transactions contemplated under such Receivables Facility; and

(n) restrictions or conditions contained in any trading, netting, operating, construction, service, supply, purchase, sale, hedging or similar agreement to which the Issuer or any Restricted Subsidiary is a party entered into in the ordinary course of business; *provided* that such agreement prohibits the encumbrance solely to the property or assets of the Issuer or such Restricted Subsidiary that are the subject of such agreement, the payment rights arising thereunder and/or the proceeds thereof and does not extend to any other asset or property of the Issuer or such Restricted Subsidiary or the assets or property of any other Restricted Subsidiary.

### *Limitation on Guarantees of Indebtedness by Restricted Subsidiaries*

The Issuer will not permit any of its Wholly-Owned Subsidiaries that are Restricted Subsidiaries (and non-Wholly-Owned Subsidiaries if such non-Wholly-Owned Subsidiaries guarantee other capital markets debt securities of the Issuer or any Guarantor), other than a Guarantor, a Foreign Subsidiary or a Receivables Subsidiary, to guarantee the payment of any Indebtedness of the Issuer unless:

(1) such Restricted Subsidiary within 30 days executes and delivers a supplemental indenture to the Indenture providing for a Guarantee by such Restricted Subsidiary, except that with respect to a guarantee of Indebtedness of the Issuer:

(a) if the Notes or such Guarantor's Guarantee is subordinated in right of payment to such Indebtedness, the Guarantee under the supplemental indenture shall be subordinated to such Restricted Subsidiary's guarantee with respect to such Indebtedness substantially to the same extent as the Notes are subordinated to such Indebtedness; and

(b) if such Indebtedness is by its express terms subordinated in right of payment to the Notes, any such guarantee by such Restricted Subsidiary with respect to such Indebtedness shall be subordinated in right of payment to such Guarantee substantially to the same extent as such Indebtedness is subordinated to the Notes; and

(2) such Restricted Subsidiary waives, and will not in any manner whatsoever claim or take the benefit or advantage of, any rights of reimbursement, indemnity or subrogation or any other rights against the Issuer or any other Restricted Subsidiary as a result of any payment by such Restricted Subsidiary under its Guarantee;

*provided* that this covenant shall not be applicable to any guarantee of any Restricted Subsidiary that existed at the time such Person became a Restricted Subsidiary and was not incurred in connection with, or in contemplation of, such Person becoming a Restricted Subsidiary.

81

Confidential

EFIHMW00151907

*Reports and Other Information*

Notwithstanding that the Issuer may not be subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act or otherwise report on an annual and quarterly basis on forms provided for such annual and quarterly reporting pursuant to rules and regulations promulgated by the SEC, the Indenture will require the Issuer to file with the SEC (and make available to the Trustee and Holders of the Notes (without exhibits), without cost to any Holder, within 15 days after it files them with the SEC) from and after the Issue Date,

(1) within 90 days (or any other time period then in effect under the rules and regulations of the Exchange Act with respect to the filing of a Form 10-K by a non-accelerated filer) after the end of each fiscal year, annual reports on Form 10-K, or any successor or comparable form, containing the information required to be contained therein, or required in such successor or comparable form;

(2) within 45 days after the end of each of the first three fiscal quarters of each fiscal year, reports on Form 10-Q containing all quarterly information that would be required to be contained in Form 10-Q, or any successor or comparable form;

(3) promptly from time to time after the occurrence of an event required to be therein reported, such other reports on Form 8-K, or any successor or comparable form; and

(4) any other information, documents and other reports which the Issuer would be required to file with the SEC if it were subject to Section 13 or 15(d) of the Exchange Act;

in each case in a manner that complies in all material respects with the requirements specified in such form; *provided* that the Issuer shall not be so obligated to file such reports with the SEC if the SEC does not permit such filing, in which event the Issuer will make available such information to prospective purchasers of Notes, in addition to providing such information to the Trustee and the Holders of the Notes, in each case within 15 days after the time the Issuer would be required to file such information with the SEC if it were subject to Section 13 or 15(d) of the Exchange Act. In addition, to the extent not satisfied by the foregoing, the Issuer will agree that, for so long as any Notes are outstanding, it will furnish to Holders and to securities analysts and prospective investors, upon their request, the information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act.

In the event that any direct or indirect parent company of the Issuer becomes a Guarantor of the Notes, the Indenture will permit the Issuer to satisfy its obligations in this covenant with respect to financial information relating to the Issuer by furnishing financial information relating to such parent; *provided* that the same is accompanied by consolidating information that explains in reasonable detail the differences between the information relating to such parent, on the one hand, and the information relating to the Issuer and its Restricted Subsidiaries on a standalone basis, on the other hand.

Notwithstanding anything herein to the contrary, the Issuer will not be deemed to have failed to comply with any of its obligations hereunder for purposes of clause (3) under "Events of Default and Remedies" until 60 days after the date any report hereunder is due.

## Events of Default and Remedies

The Indenture will provide that each of the following is an "*Event of Default*":

(1) default in payment when due and payable, upon redemption, acceleration or otherwise, of principal of, or premium, if any, on the Notes;

(2) default for 30 days or more in the payment when due of interest or Additional Interest, if any, on or with respect to the Notes;

(3) failure by the Issuer or any Restricted Subsidiary for 60 days after receipt of written notice given by the Trustee or the Holders of not less than 30% in principal amount of the outstanding Notes to comply with any of its obligations, covenants or agreements (other than a default referred to in clauses (1) and (2) above) contained in the Indenture, the Notes or the Security Documents relating to the Notes;

82

EFIHMW00151908

(4) default under any mortgage, indenture or instrument under which there is issued or by which there is secured or evidenced any Indebtedness for money borrowed by the Issuer or any of its Restricted Subsidiaries or the payment of which is guaranteed by the Issuer or any of its Restricted Subsidiaries, other than Indebtedness owed to the Issuer or a Restricted Subsidiary, whether such Indebtedness or guarantee now exists or is created after the issuance of the Notes, if both:

(a) such default either results from the failure to pay any principal of such Indebtedness at its stated final maturity (after giving effect to any applicable grace periods) or relates to an obligation other than the obligation to pay principal of any such Indebtedness at its stated final maturity and results in the holder or holders of such Indebtedness causing such Indebtedness to become due prior to its stated maturity; and

(b) the principal amount of such Indebtedness, together with the principal amount of any other such Indebtedness in default for failure to pay principal at stated final maturity (after giving effect to any applicable grace periods), or the maturity of which has been so accelerated, aggregate $250.0 million or more at any one time outstanding;

(5) failure by the Issuer or any Significant Subsidiary (or any group of Restricted Subsidiaries that together would constitute a Significant Subsidiary) to pay final judgments aggregating in excess of $250.0 million, which final judgments remain unpaid, undischarged and unstayed for a period of more than 60 days after such judgment becomes final, and in the event such judgment is covered by insurance, an enforcement proceeding has been commenced by any creditor upon such judgment or decree which is not promptly stayed;

(6) certain events of bankruptcy or insolvency with respect to the Issuer or any Significant Subsidiary (or any group of Restricted Subsidiaries that together would constitute a Significant Subsidiary);

(7) the Guarantee of any Significant Subsidiary (or any group of Restricted Subsidiaries that together would constitute a Significant Subsidiary) shall for any reason cease to be in full force and effect or be declared null and void or any responsible officer of any Guarantor that is a Significant Subsidiary (or any group of Restricted Subsidiaries that together would constitute a Significant Subsidiary), as the case may be, denies that it has any further liability under its Guarantee or gives notice to such effect, other than by reason of the termination of the Indenture or the release of any such Guarantee in accordance with the Indenture; or

(8) with respect to Collateral having a fair market value in excess of $250.0 million in the aggregate, any security interest and Lien purported to be created by any Security Document with respect to the Collateral (a) ceases to be in full force and effect, (b) ceases to give the Collateral Trustee, for the benefit of the holders of the Notes, the Liens, rights, powers and privileges purported to be created and granted thereby (including a perfected first-priority security interest in and Lien on, all of the Collateral thereunder) in favor of the Collateral Trustee, or (c) is asserted by EFIH not to be, a valid, perfected, first priority (except as otherwise expressly provided in the Indenture or the Collateral Trust Agreement) security interest in or Lien on the Collateral covered thereby.

If any Event of Default (other than of a type specified in clause (6) above) occurs and is continuing under the Indenture, the Trustee or the Holders of at least 30% in principal amount of the outstanding Notes may declare the principal, premium, if any, interest and any other monetary obligations on all the then outstanding Notes to be due and payable immediately.

Upon the effectiveness of such declaration, such principal and interest will be due and payable immediately. Notwithstanding the foregoing, in the case of an Event of Default arising under clause (6) of the first paragraph of this section, all outstanding Notes will become due and payable without further action or notice. The Indenture will provide that the Trustee may withhold from the Holders notice of any continuing Default, except a Default relating to the payment of principal, premium, if any, or interest, if it determines that withholding notice is in their interest. In addition, the Trustee shall have no obligation to accelerate the Notes if in the best judgment of the Trustee acceleration is not in the best interest of the Holders of the Notes.

83

EFIHMW00151909

Holders of the Notes may not enforce the Indenture, the Notes, the Security Documents or the Collateral Trust Agreement except as provided in such documents. The Indenture provides that the Holders of a majority in aggregate principal amount of the outstanding Notes by notice to the Trustee may on behalf of the Holders of all of the Notes waive any existing Default and its consequences under the Indenture except a continuing Default in the payment of interest on, premium, if any, or the principal of any Note held by a non-consenting Holder. In the event of any Event of Default specified in clause (4) above, such Event of Default and all consequences thereof (excluding any resulting payment default, other than as a result of acceleration of the Notes) shall be annulled, waived and rescinded, automatically and without any action by the Trustee or the Holders, if within 20 days after such Event of Default arose:

(1) the Indebtedness or guarantee that is the basis for such Event of Default has been discharged; or

(2) holders thereof have rescinded or waived the acceleration, notice or action (as the case may be) giving rise to such Event of Default; or

(3) the default that is the basis for such Event of Default has been cured.

Subject to the provisions of the Indenture relating to the duties of the Trustee thereunder, in case an Event of Default occurs and is continuing, the Trustee will be under no obligation to exercise any of the rights or powers under the Indenture at the request or direction of any of the Holders of the Notes unless the Holders have offered to the Trustee indemnity or security reasonably satisfactory to it against any loss, liability or expense. Except to enforce the right to receive payment of principal, premium, if any, or interest when due, no Holder of a Note may pursue any remedy with respect to the Indenture or the Notes unless:.

(1) such Holder has previously given the Trustee notice that an Event of Default is continuing;

(2) Holders of at least 30% in principal amount of the outstanding Notes have requested the Trustee to pursue the remedy;

(3) Holders of the Notes have offered the Trustee security or indemnity reasonably satisfactory to it against any loss, liability or expense;

(4) the Trustee has not complied with such request within 60 days after the receipt thereof and the offer of security or indemnity; and

(5) Holders of a majority in principal amount of the outstanding Notes have not given the Trustee a direction inconsistent with such request within such 60-day period.

Subject to certain restrictions, under the Indenture the Holders of a majority in principal amount of the outstanding Notes are given the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or of exercising any trust or power conferred on the Trustee. The Trustee, however, may refuse to follow any direction that conflicts with law or the Indenture or that the Trustee determines is unduly prejudicial to the rights of any other Holder of a Note or that would involve the Trustee in personal liability.

The Indenture will provide that the Issuer is required to deliver to the Trustee annually a statement regarding compliance with the Indenture, and the Issuer is required, within five Business Days, upon becoming aware of any Default, to deliver to the Trustee a statement specifying such Default.

**No Personal Liability of Directors, Officers, Employees and Stockholders**

No past, present or future director, officer, employee, incorporator or stockholder of the Issuer or any Guarantor or any of their parent companies (other than the Issuer and the Guarantors) shall have any liability for any obligations of the Issuer or the Guarantors under the Notes, the Guarantees, the Indenture, the Registration Rights Agreement or any Security Document or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Holder by accepting the Notes waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Notes. Such waiver may not be effective to waive liabilities under the federal securities laws, and it is the view of the SEC that such a waiver is against public policy.

84

EFIHMW00151910

**Legal Defeasance and Covenant Defeasance**

The obligations of the Issuer and the Guarantors under the Indenture will terminate (other than certain obligations) and will be released upon payment in full of all of the Notes. The Issuer may, at its option and at any time, elect to have all of its obligations discharged with respect to the Notes and have the Issuer's and each Guarantor's obligation discharged with respect to its Guarantee ("*Legal Defeasance*") and cure all then existing Events of Default except for:

(1) the rights of Holders of Notes to receive payments in respect of the principal of, premium, if any, and interest on the Notes when such payments are due solely out of the trust created pursuant to the Indenture;

(2) the Issuer's obligations with respect to Notes concerning issuing temporary notes, registration of such Notes, mutilated, destroyed, lost or stolen Notes and the maintenance of an office or agency for payment and money for security payments held in trust;

(3) the rights, powers, trusts, duties and immunities of the Trustee, and the Issuer's obligations in connection therewith; and

(4) the Legal Defeasance provisions of the Indenture.

In addition, the Issuer may, at its option and at any time, elect to have its obligations and those of each Guarantor released with respect to certain covenants that are described in the Indenture ("*Covenant Defeasance*") and thereafter any omission to comply with such obligations shall not constitute a Default with respect to the Notes. In the event Covenant Defeasance occurs, certain events (not including bankruptcy, receivership, rehabilitation and insolvency events pertaining to the Issuer) described under "Events of Default and Remedies" will no longer constitute an Event of Default with respect to the Notes.

In order to exercise either Legal Defeasance or Covenant Defeasance with respect to the Notes:

(1) the Issuer must irrevocably deposit with the Trustee, in trust, for the benefit of the Holders of the Notes, cash in U.S. dollars, Government Securities, or a combination thereof, in such amounts as will be sufficient, in the opinion of a nationally recognized firm of independent public accountants, to pay the principal of, premium, if any, and interest due on the Notes on the stated maturity date or on the redemption date, as the case may be, of such principal, premium, if any, or interest on such Notes, and the Issuer must specify whether such Notes are being defeased to maturity or to a particular redemption date;

(2) in the case of Legal Defeasance, the Issuer shall have delivered to the Trustee an Opinion of Counsel reasonably acceptable to the Trustee confirming that, subject to customary assumptions and exclusions,

(a) the Issuer has received from, or there has been published by, the United States Internal Revenue Service a ruling, or

(b) since the issuance of the Notes, there has been a change in the applicable U.S. federal income tax law,

in either case to the effect that, and based thereon such Opinion of Counsel shall confirm that, subject to customary assumptions and exclusions, the Holders of the Notes will not recognize income, gain or loss for U.S. federal income tax purposes, as applicable, as a result of such Legal Defeasance and will be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Legal Defeasance had not occurred;

(3) in the case of Covenant Defeasance, the Issuer shall have delivered to the Trustee an Opinion of Counsel reasonably acceptable to the Trustee confirming that, subject to customary assumptions and exclusions, the Holders of the Notes will not recognize income, gain or loss for U.S. federal income tax purposes as a result of such Covenant Defeasance and will be subject to such tax on the same amounts, in the same manner and at the same times as would have been the case if such Covenant Defeasance had not occurred;

85

EFIHMW00151911

(4) no Default (other than that resulting from borrowing funds to be applied to make such deposit and any similar and simultaneous deposit relating to other Indebtedness and, in each case, the granting of Liens in connection therewith) shall have occurred and be continuing on the date of such deposit;

(5) such Legal Defeasance or Covenant Defeasance shall not result in a breach or violation of, or constitute a default under any material agreement or instrument (other than the Indenture) to which the Issuer or any Guarantor is a party or by which the Issuer or any Guarantor is bound (other than that resulting from borrowing funds to be applied to make such deposit and any similar and simultaneous deposit relating to other Indebtedness and, in each case, the granting of Liens in connection therewith);

(6) the Issuer shall have delivered to the Trustee an Opinion of Counsel to the effect that, as of the date of such opinion and subject to customary assumptions and exclusions following the deposit, the trust funds will not be subject to the effect of Section 547 of the Bankruptcy Code;

(7) the Issuer shall have delivered to the Trustee an Officer's Certificate stating that the deposit was not made by the Issuer with the intent of defeating, hindering, delaying or defrauding any creditors of the Issuer or any Guarantor or others; and

(8) the Issuer shall have delivered to the Trustee an Officer's Certificate and an Opinion of Counsel (which Opinion of Counsel may be subject to customary assumptions and exclusions) each stating that all conditions precedent provided for or relating to the Legal Defeasance or the Covenant Defeasance, as the case may be, have been complied with.

The Collateral will be released from the Lien securing the Notes, as provided under "— Security for the Notes — Release of Security Interests," upon a Legal Defeasance or Covenant Defeasance in accordance with the provisions described in this "Legal Defeasance and Covenant Defeasance" section.

**Satisfaction and Discharge**

The Indenture will be discharged and will cease to be of further effect as to all Notes, when either:

(1) all Notes theretofore authenticated and delivered, except lost, stolen or destroyed Notes which have been replaced or paid and Notes for whose payment money has theretofore been deposited in trust, have been delivered to the Trustee for cancellation; or

(2)(a) all Notes not theretofore delivered to the Trustee for cancellation have become due and payable by reason of the making of a notice of redemption or otherwise, will become due and payable within one year or may be called for redemption within one year under arrangements satisfactory to the Trustee for the giving of notice of redemption by the Trustee in the name, and at the expense, of the Issuer, and the Issuer or any Guarantor has irrevocably deposited or caused to be deposited with the Trustee as trust funds in trust solely for the benefit of the Holders of the Notes, cash in U.S. dollars, Government Securities, or a combination thereof, in such amounts as will be sufficient without consideration of any reinvestment of interest to pay and discharge the entire indebtedness on the Notes not theretofore delivered to the Trustee for cancellation for principal, premium, if any, and accrued and unpaid interest to the date of maturity or redemption;

(b) no Default (other than that resulting from borrowing funds to be applied to make such deposit and any similar and simultaneous deposit relating to other Indebtedness and, in each case, the granting of Liens in connection therewith) with respect to the Indenture or the Notes shall have occurred and be continuing on the date of such deposit or shall occur as a result of such deposit, and such deposit will not result in a breach or violation of, or constitute a default under, any material agreement or instrument (other than the Indenture) to which the Issuer or any Guarantor is a party or by which the Issuer or any Guarantor is bound (other than that resulting from borrowing funds to be applied to make such deposit and any similar and simultaneous deposit relating to other Indebtedness and, in each case, the granting of Liens in connection therewith);

86

EFIHMW00151912

(c) the Issuer has paid or caused to be paid all sums payable by it under the Indenture; and

(d) the Issuer has delivered irrevocable instructions to the Trustee to apply the deposited money toward the payment of the Notes at maturity or the redemption date, as the case may be.

In addition, the Issuer must deliver an Officer's Certificate and an Opinion of Counsel to the Trustee stating that all conditions precedent to satisfaction and discharge have been satisfied.

The Collateral will be released from the Lien securing the Notes, as provided under "— Security for the Notes — Release of Security Interests," upon a discharge of the Indenture in accordance with the provisions described in this "Satisfaction and Discharge" section.

### Amendment, Supplement and Waiver

Except as provided in the next two succeeding paragraphs, the Indenture, the Guarantees, the Notes and the Security Documents relating to the Notes may be amended or supplemented with the consent of the Holders of at least a majority in principal amount of the outstanding Notes, including consents obtained in connection with a purchase of, or tender offer or exchange offer for, the outstanding Notes, and any existing Default or compliance with any provision of the Indenture, the Notes issued thereunder or any Guarantee or the Security Documents relating to the Notes may be waived with the consent of the Holders of a majority in principal amount of the outstanding Notes, other than Notes beneficially owned by the Issuer or its Affiliates (including consents obtained in connection with a purchase of or tender offer or exchange offer for the Notes).

The Indenture will provide that, without the consent of each affected Holder of Notes, an amendment or waiver may not, with respect to any Notes held by a non-consenting Holder:

(1) reduce the principal amount of such Notes whose Holders must consent to an amendment, supplement or waiver;

(2) reduce the principal of or change the fixed final maturity of any such Note or alter or waive the provisions with respect to the redemption of such Notes (for the avoidance of doubt, the provisions described under "— Repurchase at the Option of Holders" are not redemptions of Notes);

(3) reduce the rate of or change the time for payment of interest on any Note;

(4) waive a Default in the payment of principal of or premium, if any, or interest on the Notes, except a rescission of acceleration of the Notes by the Holders of at least a majority in aggregate principal amount of the Notes and a waiver of the payment default that resulted from such acceleration, or in respect of a covenant or provision contained in the Indenture or any Guarantee which cannot be amended or modified without the consent of all Holders;

(5) make any Note payable in money other than that stated therein;

(6) make any change in the provisions of the Indenture relating to waivers of past Defaults or the rights of Holders to receive payments of principal of or premium, if any, or interest on the Notes;

(7) make any change in these amendment and waiver provisions;

(8) impair the right of any Holder to receive payment of principal of, or interest on such Holder's Notes on or after the due dates therefor or to institute suit for the enforcement of any payment on or with respect to such Holder's Notes;

(9) make any change to or modify the ranking provisions of the Indenture or the Notes that would adversely affect the Holders; or

(10) except as expressly permitted by the Indenture, modify the Guarantees of any Significant Subsidiary in any manner adverse to the Holders of the Notes.

87

EFIHMW00151913

In addition, without the consent of at least a majority in aggregate principal amount of the Notes then outstanding, an amendment, supplement or waiver may not modify any Security Document relating to the Notes or the provisions of the Indenture dealing with the Security Documents or application of trust moneys in any manner materially adverse to the Holders other than in accordance with the Indenture and the Security Documents. Without the consent of at least 66⅔% in aggregate principal amount of the Notes then outstanding, no amendment, supplement or waiver may modify the Security Documents to release all or substantially all of the Collateral. Without the consent of at least a majority in aggregate principal amount of the Notes then outstanding, no amendment, supplement or waiver may modify the Security Documents to release less than all or substantially all of the Collateral.

Notwithstanding the foregoing, the Issuer, any Guarantor (with respect to a Guarantee or the Indenture to which it is a party) and the Trustee may amend or supplement the Indenture, any Guarantee, the Notes or any Security Document without the consent of any Holder to;

(1) cure any ambiguity, omission, mistake, defect or inconsistency;

(2) provide for uncertificated Notes of such series in addition to or in place of certificated Notes;

(3) comply with the covenant relating to mergers, consolidations and sales of assets;

(4) provide for the assumption of the Issuer's or any Guarantor's obligations to the Holders;

(5) make any change that would provide any additional rights or benefits to the Holders or that does not adversely affect the legal rights under the Indenture of any such Holder;

(6) add covenants for the benefit of the Holders or to surrender any right or power conferred upon the Issuer or any Guarantor;

(7) comply with requirements of the SEC in order to effect or maintain the qualification of the Indenture under the Trust Indenture Act;

(8) evidence and provide for the acceptance and appointment under the Indenture of a successor Trustee thereunder pursuant to the requirements thereof;

(9) provide for the issuance of Additional Notes;

(10) to provide for the issuance of Exchange Notes or private exchange notes, which are identical to Exchange Notes except that they are not freely transferable;

(11) add a Guarantor under the Indenture;

(12) conform the text of the Indenture, the Guarantees, the Notes or any Security Document to any provision of this "Description of the Notes" to the extent that such provision in this "Description of the Notes" was intended to be a verbatim recitation of a provision of the Indenture, the Guarantees, the Notes or any Security Document;

(13) make any amendment to the provisions of the Indenture relating to the transfer and legending of Notes as permitted by the Indenture, including, without limitation, to facilitate the issuance and administration of the Notes; *provided, however,* that (i) compliance with the Indenture as so amended would not result in Notes being transferred in violation of the Securities Act or any applicable securities law and (ii) such amendment does not materially and adversely affect the rights of Holders to transfer Notes;

(14) mortgage, pledge, hypothecate or grant any other Lien in favor of the Trustee for the benefit of the Holders of the Notes, as security for the payment and performance of all or any portion of the Obligations, in any property or assets;

(15) amend the Indenture in the manner set forth in the Permitted Transfer Supplemental Indenture to be entered into in connection with the consummation of a Permitted Asset Transfer in the manner set forth under "— Certain Covenants — Restrictions on Permitted Asset Transfers" or in the TCEH Transfer Supplemental Indenture to be entered into in connection with the consummation of a TCEH Transfer in the manner set forth under "— Certain Covenants — Restrictions on TCEH Transfers"; or

88

EFIHMW00151914

(16) provide for the accession or succession of any parties to the Security Documents (and other amendments that are administrative or ministerial in nature) in connection with an amendment, renewal, extension, substitution, refinancing, restructuring, replacement, supplementing or other modification from time to time of any agreement or action that is not prohibited by the Indenture, including to add any additional secured parties to the extent not prohibited by the Indenture.

The consent of the Holders is not necessary under the Indenture to approve the particular form of any proposed amendment. It is sufficient if such consent approves the substance of the proposed amendment.

### Notices

Notices given by publication will be deemed given on the first date on which publication is made and notices given by first-class mail, postage prepaid, will be deemed given five calendar days after mailing.

### Concerning the Trustee

The Indenture will contain certain limitations on the rights of the Trustee thereunder, should it become a creditor of the Issuer, to obtain payment of claims in certain cases, or to realize on certain property received in respect of any such claim as security or otherwise. The Trustee will be permitted to engage in other transactions; however, if it acquires any conflicting interest it must eliminate such conflict within 90 days, apply to the SEC for permission to continue or resign.

The Indenture will provide that the Holders of a majority in principal amount of the outstanding Notes will have the right to direct the time, method and place of conducting any proceeding for exercising any remedy available to the Trustee, subject to certain exceptions. The Indenture will provide that in case an Event of Default shall occur (which shall not be cured), the Trustee will be required, in the exercise of its power, to use the degree of care of a prudent person in the conduct of his own affairs. Subject to such provisions, the Trustee will be under no obligation to exercise any of its rights or powers under the Indenture at the request of any Holder of the Notes, unless such Holder shall have offered to the Trustee security and indemnity satisfactory to it against any loss, liability or expense.

### Governing Law

The Indenture, the Notes and the Guarantees will be governed by and construed in accordance with the laws of the State of New York.

### Certain Definitions

Set forth below are certain defined terms used in the Indenture. For purposes of the Indenture, unless otherwise specifically indicated, the term "*consolidated*" with respect to any Person refers to such Person on a consolidated basis in accordance with GAAP, but excluding from such consolidation any Unrestricted Subsidiary as if such Unrestricted Subsidiary were not an Affiliate of such Person.

"*9.75% Notes*" means the 9.75% Senior Secured Notes due 2019 issued by the Issuer under the 9.75% Notes Indenture, including the guarantees thereof.

"*9.75% Notes Indenture*" means the Indenture, dated as of November 16, 2009, under which the 9.75% Notes were issued.

89

Confidential

"*Acquired Indebtedness*" means, with respect to any specified Person,

(1) Indebtedness of any other Person existing at the time such other Person is merged with or into or became a Restricted Subsidiary of such specified Person, including Indebtedness incurred in connection with, or in contemplation of, such other Person merging with or into or becoming a Restricted Subsidiary of such specified Person, and

(2) Indebtedness secured by a Lien encumbering any asset acquired by such specified Person.

"*Act of Required Debtholders*" means, as to any matter at any time:

(1) prior to the Discharge of Parity Lien Obligations, a direction in writing delivered to the Collateral Trustee by or with the written consent of the holders of a majority of the sum of:

(a) the aggregate outstanding principal amount of Parity Lien Debt (including outstanding letters of credit whether or not then available or drawn); and

(b) the aggregate unfunded commitments to extend credit which, when funded, would constitute Parity Lien Debt; and

(2) at any time after the Discharge of Parity Lien Obligations, a direction in writing delivered to the Collateral Trustee by or with the written consent of the holders of Junior Lien Debt representing the Required Junior Lien Debtholders.

For purposes of this definition, (a) Secured Lien Debt registered in the name of, or beneficially owned by, the Issuer or any Affiliate of the Issuer will be deemed not to be outstanding, and (b) votes will be determined in accordance with the provisions described under "— Security for the Notes — Voting."

"*Additional Interest*" means all additional interest then owing pursuant to the Registration Rights Agreement.

"*Affiliate*" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise.

"*Applicable Premium*" means, with respect to any Note on any Redemption Date, the greater of:

(1) 1.0% of the principal amount of such Note; and

(2) the excess, if any, of (a) the present value at such Redemption Date of (i) the redemption price of such Note at January 15, 2015 (such redemption price being set forth in the table appearing under "— Optional Redemption"), plus (ii) all required interest payments due on such Note through January 15, 2015 (excluding accrued but unpaid interest to the Redemption Date), computed using a discount rate equal to the Treasury Rate as of such Redemption Date plus 50 basis points; over (b) the principal amount of such Note.

"*Asset Sale*" means:

(1) the sale, conveyance, transfer or other disposition (each referred to in this definition as a "*disposition*"), whether in a single transaction or a series of related transactions, of property or assets (including by way of a Sale and Lease-Back Transaction) of the Issuer or any of its Restricted Subsidiaries (including the disposition of outstanding Equity Interests of an Unrestricted Subsidiary owned directly by the Issuer or any of its Restricted Subsidiaries) and, solely to the extent cash or Cash Equivalents are received therefrom by any Oncor Subsidiary or any Successor Oncor Business and are thereafter

90

Confidential

dividended, distributed or otherwise paid to the Issuer or any of its Restricted Subsidiaries: (i) the primary issuance of new Equity Interests by any Oncor Subsidiary or any Successor Oncor Business, (ii) the disposition of outstanding Equity Interests of an Oncor Subsidiary or a Successor Oncor Business owned directly by another Oncor Subsidiary or by another Successor Oncor Business and (iii) the disposition of assets owned directly or indirectly by any Oncor Subsidiary or any Successor Oncor Business. For the avoidance of doubt, with respect to Unrestricted Subsidiaries other than Oncor Subsidiaries or Successor Oncor Businesses, the following shall not be deemed to be "Asset Sales": (i) the primary issuance of new Equity Interests by an Unrestricted Subsidiary and (ii) sales or transfers of assets owned directly by Unrestricted Subsidiaries; or

(2) the issuance or sale of Equity Interests of any Restricted Subsidiary, whether in a single transaction or a series of related transactions (other than Preferred Stock of Restricted Subsidiaries issued in compliance with the covenant described under "— Certain Covenants — Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock");

in each case, other than:

(a) any disposition of Cash Equivalents or Investment Grade Securities or obsolete or worn out equipment (including any such equipment that has been refurbished in contemplation of such disposition) in the ordinary course of business or any disposition of inventory or goods (or other assets) held for sale in the ordinary course of business;

(b)(1) the disposition of all or substantially all of the assets of the Issuer in a manner permitted by the covenant described under "— Certain Covenants — Merger, Consolidation or Sale of All or Substantially All Assets" (other than a disposition excluded from such covenant by the proviso at the end of the first paragraph of such covenant) or any disposition that constitutes a Change of Control pursuant to the Indenture or (2) any Permitted Asset Transfer made in accordance with the covenant described under "— Restrictions on Permitted Asset Transfers";

(c) the making of any Restricted Payment or Permitted Investment that is permitted to be made, and is made, under the covenant described under "— Certain Covenants — Limitation on Restricted Payments";

(d) any disposition of assets or issuance or sale of Equity Interests of any Restricted Subsidiary in any transaction or series of related transactions with an aggregate fair market value of less than $75.0 million;

(e) any disposition of property or assets or issuance or securities by a Restricted Subsidiary to the Issuer or by the Issuer or a Restricted Subsidiary to another Restricted Subsidiary; *provided however* to the extent such transfer involves Collateral or any part thereof, the transferee shall execute a joinder agreement to the Security Documents and the Collateral Trust Agreement or enter into a substantially similar collateral trust or intercreditor agreement immediately upon consummation of such transaction in accordance with the requirements of the Security Documents to pledge such transferred Collateral for the benefit of the Holders of the Notes;

(f) except in the case of a disposition of Collateral, to the extent allowable under Section 1031 of the Code or any comparable or successor provision, any exchange of like property (excluding any boot thereon) for use in a Similar Business;

(g) the lease, assignment or sub-lease of any real or personal property in the ordinary course of business;

(h)(i) any disposition of Equity Interests in an Unrestricted Subsidiary (other than an Oncor Subsidiary or a Successor Oncor Business) and (ii) any sale, conveyance, transfer or other disposition of Equity Interests in, or assets of, any of the Oncor Subsidiaries or a Successor Oncor Business (other than the Collateral) to the extent no cash or Cash Equivalents are received in connection with such sale, conveyance, transfer or other disposition or to the extent any cash or Cash Equivalents received in connection with such sale, conveyance, transfer or other disposition are not dividended, distributed or otherwise paid to the Issuer or any of its Restricted Subsidiaries;

91

EFIHMW00151917

(i) foreclosures on assets not constituting Collateral;

(j) sales of accounts receivable, or participations therein, in connection with any Receivables Facility for the benefit of the Issuer or any of its Restricted Subsidiaries;

(k) any financing transaction with respect to property built or acquired by the Issuer or any Restricted Subsidiary after the Issue Date, including Sale and Lease-Back Transactions and asset securitizations permitted by the Indenture;

(l) [Intentionally omitted];

(m) except in the case of a disposition of Collateral, sales, transfers and other dispositions (i) of Investments in joint ventures to the extent required by, or made pursuant to, customary buy/sell or put/call arrangements between the joint venture parties set forth in joint venture arrangements and similar binding arrangements or (ii) to joint ventures in connection with the dissolution or termination of a joint venture to the extent required pursuant to joint venture and similar arrangements;

(n) [Intentionally omitted];

(o) [Intentionally omitted];

(p) [Intentionally omitted];

(q) any Casualty Event; *provided* the net proceeds therefrom are deemed to be Net Proceeds and are applied in accordance with the covenant described under "— Repurchase at the Option of Holders — Asset Sales" or the Issuer or such Restricted Subsidiary delivers to the Trustee a Restoration Certificate with respect to plans to invest (and reinvests within 450 days from the date of receipt of the Net Proceeds);

(r) the execution of (or amendment to), settlement of or unwinding of any Hedging Obligation in the ordinary course of business;

(s) any disposition of mineral rights (other than coal and lignite mineral rights); *provided* the net proceeds therefrom are deemed to be Net Proceeds and are applied in accordance with the covenant described under "Repurchase at the Option of Holders — Asset Sales";

(t) any sale, transfer or other disposal of any real property that is (i) primarily used or intended to be used for mining which has either been reclaimed, or has not been used for mining in a manner which requires reclamation, and in either case has been determined by the Issuer not to be necessary for use for mining, (ii) used as buffer land, but no longer serves such purpose or its use is restricted such that it will continue to be buffer land, or (iii) was acquired in connection with power generation facilities, but has been determined by the Issuer to no longer be commercially suitable for such purpose;

(u) [Intentionally omitted];

(v) dispositions of power, capacity, heat rate, renewable energy credits, waste by-products, energy, electricity, coal and lignite, oil and other petroleum based liquids, emissions and other environmental credits, ancillary services, fuel (including all forms of nuclear fuel and natural gas) and other related assets or products of services, including assets related to trading activities or the sale of inventory or contracts related to any of the foregoing, in each case in the ordinary course of business;

(w) [Intentionally omitted];

(x) any disposition of assets in connection with salvage activities; *provided* the net proceeds therefrom are deemed to be Net Proceeds and are applied in accordance with the covenant described under "— Repurchase at the Option of Holders — Asset Sales"; and

(y) any sale, transfer or other disposition of any assets required by any Government Authority; *provided* the net proceeds therefrom are deemed to be Net Proceeds and are applied in accordance with the covenant described under "— Repurchase at the Option of Holders — Asset Sales."

"*Asset Sale Cash Collateral Account*" means a segregated account pledged under the Security Documents that is (i) subject to a perfected security interest for the benefit of the holders of Secured Lien Debt, (ii) under the

92

EFIHMW00151918

sole control of the Collateral Trustee and (iii) free from all other Liens (other than Liens permitted to be placed on the Collateral pursuant to the second paragraph of the covenant described under "— Certain Covenants — Liens").

"*Asset Sale Offer*" has the meaning set forth in the covenant described under "Repurchase at the Option of Holders — Asset Sales."

"*Bankruptcy Code*" means Title 11 of the United States Code, as amended.

"*Bankruptcy Law*" means the Bankruptcy Code and any similar federal, state or foreign law for the relief of debtors.

"*Business Day*" means each day which is not a Legal Holiday.

"*Capital Stock*" means:

>    (1) in the case of a corporation, corporate stock;

>    (2) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

>    (3) in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); and

>    (4) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person.

"*Capitalized Lease Obligation*" means, at the time any determination thereof is to be made, the amount of the liability in respect of a capital lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) in accordance with GAAP; *provided* that any obligations existing on the Issue Date (i) that were not included on the balance sheet of the Issuer as capital lease obligations and (ii) that are subsequently recharacterized as capital lease obligations due to a change in accounting treatment shall for all purposes not be treated as Capitalized Lease Obligations.

"*Capitalized Software Expenditures*" means, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities) by a Person and its Restricted Subsidiaries during such period in respect of purchased software or internally developed software and software enhancements that, in conformity with GAAP, are or are required to be reflected as capitalized costs on the consolidated balance sheet of a Person and its Restricted Subsidiaries.

"*Cash Equivalents*" means:

>    (1) United States dollars;

>    (2) euros or any national currency of any participating member state of the EMU or such local currencies held by the Issuer and its Restricted Subsidiaries from time to time in the ordinary course of business;

>    (3) securities issued or directly and fully and unconditionally guaranteed or insured by the U.S. government (or any agency or instrumentality thereof the securities of which are unconditionally guaranteed as a full faith and credit obligation of the U.S. government) with maturities, unless such securities are deposited to defease Indebtedness, of 24 months or less from the date of acquisition;

>    (4) certificates of deposit, time deposits and eurodollar time deposits with maturities of one year or less from the date of acquisition, bankers' acceptances with maturities not exceeding one year and overnight bank deposits, in each case with any commercial bank having capital. and surplus of not less than $500.0 million in the case of U.S. banks and $100.0 million (or the U.S. dollar equivalent as of the date of determination) in the case of non-U.S. banks;

93

EFIHMW00151919

(5) repurchase obligations for underlying securities of the types described in clauses (3) and (4) entered into with any financial institution meeting the qualifications specified in clause (4) above;

(6) commercial paper rated at least P-1 by Moody's or at least A-1 by S&P and in each case maturing within 24 months after the date of creation thereof;

(7) marketable short-term money market and similar securities having a rating of at least P-2 or A-2 from either Moody's or S&P, respectively (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another Rating Agency) and in each case maturing within 24 months after the date of creation thereof;

(8) investment funds investing 95% of their assets in securities of the types described in clauses (1) through (7) above;

(9) readily marketable direct obligations issued by any state, commonwealth or territory of the United States or any political subdivision or taxing authority thereof having an Investment Grade Rating from either Moody's or S&P with maturities of 24 months or less from the date of acquisition;

(10) Indebtedness or Preferred Stock issued by Persons with a rating of A or higher from S&P or A2 or higher from Moody's with maturities of 24 months or less from the date of acquisition; and

(11) Investments with average maturities of 24 months or less from the date of acquisition in money market funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's.

Notwithstanding the foregoing, Cash Equivalents shall include amounts denominated in currencies other than those set forth in clauses (1) and (2) above; *provided* that such amounts are converted into any currency listed in clauses (1) and (2) as promptly as practicable and in any event within ten Business Days following the receipt of such amounts.

"*Casualty Event*" means any taking under power of eminent domain or similar proceeding and any insured loss; *provided* that any such taking or similar proceeding or insured loss that results in Net Proceeds of less than $75.0 million shall not be deemed a Casualty Event.

"*Change of Control*" means the occurrence of any of the following:

(1) the sale, lease or transfer, in one or a series of related transactions, of all or substantially all of the assets of the Issuer and its Subsidiaries, taken as a whole, to any Person other than a Permitted Holder, other than (A) the first to occur of a Permitted Asset Transfer made in accordance with the covenant described under "— Certain Covenants — Restrictions on Permitted Asset Transfers" and a TCEH Transfer made in accordance with the covenant described under "— Certain Covenants — Restrictions on TCEH Transfer" (excluding a Permitted Asset Transfer consisting of a merger of EFIH with and into the Issuer for the purpose of determining the first to occur of a Permitted Asset Transfer or a TCEH Transfer), (B) a transaction meeting the requirements of the proviso to clause (3) of this definition of "Change of Control" and (C) any foreclosure on the Collateral;

(2) the Issuer becomes aware (by way of a report or any other filing pursuant to Section 13(d) of the Exchange Act, proxy, vote, written notice or otherwise) of the acquisition by any Person or group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act or any successor provision), including any group acting for the purpose of acquiring, holding or disposing of securities (within the meaning of Rule 13d-5(b)(1) under the Exchange Act or any successor provision), other than the Permitted Holders, in a single transaction or in a related series of transactions, by way of merger, consolidation or other business combination or purchase of beneficial ownership (within the meaning of Rule 13d-3 under the Exchange Act, or any successor provision) of 50% or more of the total voting power of the Voting Stock of the Issuer or any of its direct or indirect parent companies; or

94

EFIHMW00151920

(3) the sale, transfer, conveyance or other disposition, in one or a series of related transactions, of all or substantially all of the assets of EFIH and its Subsidiaries, taken as a whole, or all or substantially all of the Collateral or Oncor-related Assets, other than a Permitted Asset Transfer made in accordance with the covenant described under "— Certain Covenants — Restrictions on Permitted Asset Transfers"; *provided, however,* that a transaction that would otherwise constitute a Change of Control pursuant to this clause (3) shall not constitute a Change of Control if:

(a) the consideration received in respect of such transaction (i) is received by EFIH or an Oncor Subsidiary or Successor Oncor Business, as the case may be, (ii) consists of Capital Stock of a Person in a Similar Oncor Business that (A) would become a Subsidiary of EFIH or such Oncor Subsidiary or Successor Oncor Business or (B) is a joint venture in which EFIH or such Oncor Subsidiary or Successor Oncor Business would have a significant equity interest (as determined by the Issuer in good faith), (iii) is at least equal to the fair market value (as determined by the Issuer in good faith) of the assets sold, transferred, conveyed or otherwise disposed of and (iv) if received by EFIH, shall be concurrently pledged as Collateral for the benefit of the Holders of the Notes and the holders of the other Secured Debt Obligations;

(b) immediately after such transaction no Default exists;

(c) immediately after giving *pro forma* effect to such transaction and any related financing transactions (including, without limitation, any transaction the proceeds of which are applied to reduce the Indebtedness of the Issuer or EFIH) as if the same had occurred at the beginning of the applicable four-quarter period, either:

(i) the Issuer would be permitted to incur at least $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in clause (i) of the first paragraph of the covenant described under "— Certain Covenants — Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock"; or

(ii) such Fixed Charge Coverage Ratio for the Issuer and its Restricted Subsidiaries would be greater than such Fixed Charge Coverage Ratio for the Issuer and its Restricted Subsidiaries immediately prior to such transaction; and

(d) the rating on the Notes shall not have been downgraded by two or more of the Rating Agencies (or, if the Notes are rated by only one Rating Agency at the time of the first notice of such transaction, such Rating Agency) during the period commencing 30 days prior to the first public notice of the occurrence of such transaction or the intention of the Issuer or any Subsidiary thereof to effect such transaction and ending on the date 60 after such public notice relative to the rating at the start of such period.

"*Class*" means (1) in the case of Parity Lien Debt, every Series of Parity Lien Debt, taken together, and (2) in the case of Junior Lien Debt, every Series of Junior Lien Debt, taken together.

"*Closing Date*" means October 10, 2007.

"*Code*" means the Internal Revenue Code of 1986, as amended, or any successor thereto.

"*Collateral*" means all assets or property, now owned or hereafter acquired by EFIH, to the extent such assets or property are pledged or assigned or purported to be pledged or assigned, or are required to be pledged or assigned under the Security Documents to the Collateral Trustee, together with the proceeds thereof.

"*Collateral Asset Sale Offer*" has the meaning set forth under "— Repurchase at the Option of Holders — Asset Sales."

"*Collateral Excess Proceeds*" has the meaning set forth under "— Repurchase at the Option of Holders — Asset Sales."

95

EFIHMW00151921

**PX 022
Page 102 of 218**

"*Collateral Posting Facility*" means any senior cash posting credit facility, the size of which is capped by the mark-to-market loss, inclusive of any unpaid settlement amounts, of TCEH and its subsidiaries on a hypothetical portfolio of commodity swaps, forwards, and futures transactions that correspond to or replicate all or a portion of actual transactions by TCEH and its subsidiaries that are outstanding on, or entered into from time to time on or after, the Closing Date.

"*Collateral Trustee*" means The Bank of New York Mellon Trust Company, N.A., in its capacity as Collateral Trustee under the Collateral Trust Agreement, together with its successors in such capacity.

"*Collateral Trustee's Liens*" means a Lien granted to the Collateral Trustee as security for Secured Debt Obligations.

"*Consolidated Depreciation and Amortization Expense*" means with respect to any Person for any period, the total amount of depreciation and amortization expense, including the amortization of deferred financing fees, nuclear fuel costs, depletion of coal or lignite reserves, debt issuance costs, commissions, fees and expenses and Capitalized Software Expenditures, of such Person and its Restricted Subsidiaries for such period on a consolidated basis and otherwise determined in accordance with GAAP.

"*Consolidated Interest Expense*" means, with respect to any Person for any period, without duplication, the sum of:

(1) consolidated interest expense of such Person and its Restricted Subsidiaries for such period, to the extent such expense was deducted (and not added back) in computing Consolidated Net Income (including (a) amortization of original issue discount resulting from the issuance of Indebtedness at less than par, (b) all commissions, discounts and other fees and charges owed with respect to letters of credit, bankers' acceptances or any Collateral Posting Facility or similar facilities, (c) non-cash interest payments (but excluding any non-cash interest expense attributable to the movement in the mark to market valuation of Hedging Obligations or other derivative instruments pursuant to GAAP), (d) the interest component of Capitalized Lease Obligations, and (e) net payments, if any, pursuant to interest rate Hedging Obligations with respect to Indebtedness, and excluding (u) accretion of asset retirement obligations and accretion or accrual of discounted liabilities not constituting Indebtedness, (v) any expense resulting from the discounting of the Existing Notes or other Indebtedness in connection with the application of purchase accounting, (w) any Additional Interest and any comparable "additional interest" imposed in connection with failure to register any other securities, (x) amortization of reacquired Indebtedness, deferred financing fees, debt issuance costs, commissions, fees and expenses, (y) any expensing of bridge, commitment and other financing fees and (z) commissions, discounts, yield and other fees and charges (including any interest expense) related to any Receivables Facility); *plus*

(2) interest on Indebtedness of another Person that is guaranteed by EFIH solely to the extent such interest is actually paid by EFIH under such guarantee; *plus*

(3) consolidated capitalized interest of such Person and its Restricted Subsidiaries for such period, whether paid or accrued; *less*

(4) interest income of such Person and its Restricted Subsidiaries for such period.

For purposes of this definition, interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by such Person to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP.

"*Consolidated Leverage Ratio*" as of any date of determination, means the ratio of (x) Consolidated Total Indebtedness computed as of the end of the most recent fiscal quarter for which internal financial statements are available immediately preceding the date on which such event for which such calculation is being made shall occur to (y) the aggregate amount of EBITDA of the Issuer for the period of the most recently ended four full

96

EFIHMW00151922

consecutive fiscal quarters for which internal financial statements are available immediately preceding the date on which such event for which such calculation is being made shall occur, in each case with such pro forma adjustments to Consolidated Total Indebtedness and EBITDA as are appropriate and consistent with the pro forma adjustment provisions set forth in the definition of "Fixed Charge Coverage Ratio."

"*Consolidated Net Income*" means, with respect to any Person for any period, the aggregate of the Net Income of such Person for such period, on a consolidated basis, and otherwise determined in accordance with GAAP; *provided, however*, that, without duplication,

(1) any after-tax effect of extraordinary, non-recurring or unusual gains or losses (less all fees and expenses relating thereto) or expenses (including Transaction fees and expenses to the extent incurred on or prior to December 31, 2008), severance, relocation costs, consolidation and closing costs, integration and facilities opening costs, business optimization costs, transition costs, restructuring costs, signing, retention or completion bonuses, and curtailments or modifications to pension and post-retirement employee benefit plans shall be excluded;

(2) the cumulative effect of a change in accounting principles during such period shall be excluded;

(3) any after-tax effect of income (loss) from disposed, abandoned or discontinued operations and any net after-tax gains or losses on disposal of disposed, abandoned, transferred, closed or discontinued operations shall be excluded;

(4) any after-tax effect of gains or losses (less all fees and expenses relating thereto) attributable to asset dispositions or abandonments other than in the ordinary course of business, as determined in good faith by the Issuer, shall be excluded;

(5) the Net Income for such period of any Person that is (a) not a Subsidiary, (b) an Unrestricted Subsidiary or (c) accounted for by the equity method of accounting shall be excluded; *provided* that Consolidated Net Income of the Issuer shall be increased by the amount of dividends or distributions or other payments that are actually paid in cash (or to the extent converted into cash) to the referent Person or a Restricted Subsidiary thereof in respect of such period, other than dividends, distributions or other payments from the Oncor Subsidiaries or any Successor Oncor Business (i) from the proceeds of sales of Oncor-related Assets made after the Secured Notes Issue Date and (ii) consisting of Oncor-related Assets made after the Secured Notes Issue Date;

(6) solely for the purpose of determining the amount available for Restricted Payments under clause (3)(a) of the first paragraph under "— Certain Covenants — Limitation on Restricted Payments," the Net Income for such period of any Restricted Subsidiary (other than any Guarantor) shall be excluded to the extent that the declaration or payment of dividends or similar distributions by that Restricted Subsidiary of its Net Income is not at the date of determination wholly permitted without any prior governmental approval (which has not been obtained) or, directly or indirectly, by the operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule, or governmental regulation applicable to that Restricted Subsidiary or its stockholders, unless such restriction with respect to the payment of dividends or similar distributions has been legally waived or is otherwise permitted by the covenant described under "— Certain Covenants — Dividend and Other Payment Restrictions Affecting Restricted Subsidiaries"; *provided* that Consolidated Net Income of the Issuer will be increased by the amount of dividends or other distributions or other payments actually paid in cash (or to the extent converted into cash) or Cash Equivalents to the Issuer or a Restricted Subsidiary thereof in respect of such period, to the extent not already included therein;

(7) effects of all adjustments (including the effects of such adjustments pushed down to the Issuer and its Restricted Subsidiaries) in such Person's consolidated financial statements pursuant to GAAP resulting from the application of purchase accounting in relation to the Transactions or any consummated acquisition or the amortization or write-off of any amounts thereof, net of taxes, shall be excluded;

(8) any net after-tax effect of income (loss) attributable to the early extinguishment of Indebtedness (other than Hedging Obligations) shall be excluded;

97

Confidential

EFIHMW00151923

(9) any impairment charge or asset write-off, including, without limitation, impairment charges or asset write-offs related to intangible assets, long-lived assets or investments in debt and equity securities, in each case, pursuant to GAAP and the amortization of intangibles arising pursuant to GAAP shall be excluded;

(10) any non-cash compensation expense recorded from grants of stock appreciation or similar rights, stock options, restricted stock or other rights, and any cash charges associated with the rollover, acceleration or payout of Equity Interests by management of the Issuer or any of its direct or indirect parent companies in connection with the Transactions, shall be excluded;

(11) any fees and expenses incurred during such period, or any amortization thereof for such period, in connection with any acquisition, Investment, Asset Sale, issuance or repayment of Indebtedness, issuance of Equity Interests, refinancing transaction or amendment or modification of any debt instrument (in each case, including any such transaction consummated prior to the Closing Date and any such transaction undertaken but not completed) and any charges or non-recurring merger costs incurred during such period as a result of any such transaction shall be excluded;

(12) accruals and reserves that are established or adjusted within twelve months after the Closing Date that are so required to be established as a result of the Transactions in accordance with GAAP, or changes as a result of adoption or modification of accounting policies, shall be excluded;

(13) to the extent covered by insurance and actually reimbursed, or, so long as the Issuer has made a determination that there exists reasonable evidence that such amount will in fact be reimbursed by the insurer and only to the extent that such amount is (a) not denied by the applicable carrier in writing within 180 days and (b) in fact reimbursed within 365 days of the date of such evidence (with a deduction for any amount so added back to the extent not so reimbursed within 365 days), expenses with respect to liability or casualty events or business interruption shall be excluded;

(14) any net after-tax effect of unrealized income (loss) attributable to Hedging Obligations or other derivative instruments shall be excluded; and

(15) any benefit from any fair market value of any contract as recorded on the balance sheet at the time of the Transactions shall be excluded.

Notwithstanding the foregoing, for the purpose of the covenant described under "— Certain Covenants — Limitation on Restricted Payments" only (other than clause (3)(d) thereof), there shall be excluded from Consolidated Net Income any income arising from any sale or other disposition of Restricted Investments made by the Issuer and its Restricted Subsidiaries, any repurchases and redemptions of Restricted Investments from the Issuer and its Restricted Subsidiaries, any repayments of loans and advances which constitute Restricted Investments by the Issuer or any of its Restricted Subsidiaries, any sale of the stock of an Unrestricted Subsidiary or any distribution or dividend from an Unrestricted Subsidiary, in each case only to the extent such amounts increase the amount of Restricted Payments permitted under such covenant pursuant to clause (3)(d) thereof.

"*Consolidated Secured Debt Ratio*" means, as of any date of determination, the ratio of (x) Consolidated Secured Indebtedness computed as of the end of the most recent fiscal quarter for which internal financial statements are available immediately preceding the date on which such event for which such calculation is being made shall occur to (y) the aggregate amount of EBITDA of the Issuer for the period of the most recently ended four full consecutive fiscal quarters for which internal financial statements are available immediately preceding the date on which such event for which such calculation is being made shall occur, in each case with such *pro forma* adjustments to Consolidated Secured Indebtedness and EBITDA as are appropriate and consistent with the *pro forma* adjustment provisions set forth in the definition of "Fixed Charge Coverage Ratio."

"*Consolidated Secured Indebtedness*" means Consolidated Total Indebtedness secured by a Lien on any assets of the Issuer or any of its Restricted Subsidiaries.

"*Consolidated Total Indebtedness*" means, as at any date of determination, an amount equal to (1) the aggregate amount of all outstanding Indebtedness of the Issuer and its Restricted Subsidiaries on a consolidated

98

Confidential